1   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
    Carlos Holguín (Cal. Bar No. 90754)
2   Peter A. Schey (Cal. Bar No. 58232)
    Angela Perry (Cal. Bar No. 228228)
3   256 South Occidental Boulevard
    Los Angeles, CA 90057
4   Telephone: (213) 388-8693; Fax: (213) 386-9484

5
    LATHAM & WATKINS
6   Steven Schulman
    555 Eleventh St., NW, Suite 1000
7   Washington, DC 20004
    Telephone: (202) 637-2184
8
    NATIONAL CENTER FOR YOUTH LAW
9   Katina Ancar
    405 -14th Street, Suite 1500
10  Oakland, California 94612
    Telephone: (510) 835-8098; Fax: (510) 835-8099
11

12  Of counsel:

13  YOUTH LAW CENTER
    Alice Bussiere
14  417 Montgomery Street, Suite 900
    San Francisco, CA 94104
15  Telephone: (415) 543-3379 x 3903

16  *Attorneys for plaintiffs*

17

18                  UNITED STATES DISTRICT COURT

19                  CENTRAL DISTRICT OF CALIFORNIA

20  JENNY LISETTE FLORES, et al.,              )  Case No. CV 85-4544-RJK(Px)
                                               )
21          Plaintiffs,                        )  MEMORANDUM OF POINTS AND
                                               )  AUTHORITIES IN SUPPORT OF MOTION
22  -vs-                                       )  TO ENFORCE SETTLEMENT OF CLASS
                                               )  ACTION
23  TOM RIDGE, Secretary of Department of      )
    HomelandSecurity, et al.,                  )
24                                             )
                                               )  Hearing: March 1, 2004.
25          Defendants.                        )  Time: 10:00 a.m.
    _____)
26

27  / / /

28

OUTLINE OF CONTENTS

I   Introduction.................................................................................................1

II  Background to and synopsis of the Settlement...........................................5

    A   The Settlement requires defendants to favor the release of detained
        minors...............................................................................................8

    B   The Settlement requires defendants to place children who remain in
        their custody in the least restrictive setting...................................9

    C   The Settlement requires defendants to provide children in their custody
        with essential rights and services..................................................10

III Defendants are in material breach of the Settlement. ...............................10

    A   The Settlement can and should be enforced by this Court..............11

    B   Defendants' policies and practices violate the Settlement's policy
        favoring release.............................................................................13

        1   Defendants regularly refuse to release children to caregivers
            other than parents even where their parents refuse to appear for
            them.........................................................................................14

        2   Defendants fail to seek out ¶ 14E and F custodians and refuse to
            release children to such custodians who appear of their own
            accord. ..................................................................................18

    C   Defendants routinely fail to place detained children in the least
        restrictive environment. ..............................................................19

        1   Defendants place children in secure confinement solely because
            an order of removal has issued against them and without regard
            to whether there is a serious risk they would abscond.............22

        2   Defendants needlessly re-arrest children released to their families
            even where they know that physical removal will not take place
            for weeks, months, or even years............................................27

        3   Defendants automatically place minors who have been arrested
            for petty, non-violent crimes in secure facilities. ...................32

        4   Defendants have failed to provide medium secure placements for
            non-delinquent class members with special needs. ...............34

        5   Defendants' overuse of secure facilities cannot be excused as
            within the "influx" exception. ................................................37

    D   Defendants routinely fail to provide children in their custody with

|  |  |  | treatment and services required by the Settlement. ................................... 40 |
|  |  | 1 | Defendants deny children in their custody adequate education. ...... 42 |
|  |  | 2 | Children in defendants' care receive no or palpably inadequate mental health services. ............................................................. 46 |
|  |  | 3 | Defendants inform children in their custody little or nothing about the legal proceedings against them, the reasons for their confinement, or their prospects for release or removal. ...................... 49 |
|  |  | 4 | Defendants deny children adequate access to telephones. ................ 53 |
|  |  | 5 | Defendants routinely obstruct children's access to legal counsel. ...... 56 |
|  | E |  | Defendants regularly expose children in their custody to dangerous, unhealthful conditions prohibited under the Settlement and this Court's summary judgment. ....................................................................... 57 |
|  |  | 1 | Defendants arbitrarily handcuff and shackle non-delinquent minors during transit or as punishment. ............................... 58 |
|  |  | 2 | Children in defendants' custody are subjected to excessive and arbitrary solitary confinement. ............................................... 64 |
|  |  | 3 | Defendants unlawfully commingle non-delinquent class members with juvenile offenders. ........................................... 72 |
|  |  | 4 | Defendants continue to strip search children in violation of this Court's summary judgment. ................................................. 77 |
| V |  |  | Conclusion ........................................................................................... 79 |

/ / /

TABLE OF AUTHORITIES

<u>Cases</u>

*Beisler v. Commissioner*, 814 F.2d 1304 (9th Cir. 1987) ........................................ 31

*Carcamo-Flores v. Immigration and Naturalization Service*, 805 F.2d 60 (2nd Cir. 1986) ........................................................................................... 31

*Citizens to Save Spencer County v. United States Environmental Protection Agency*, 600 F.2d 844 (D.C. Cir. 1979) ........................................................ 31

*Clemente v. United States*, 766 F.2d 1358 (9th Cir. 1985) ................................... n31

*Flanegan v. Arizona*, 143 F.3d 540 (9th Cir. 1998) ........................................... n14

*Flores v. Meese*, 681 F. Supp. 665 (C.D. Cal. 1988) ........................... 7, 59, 72, 77

*Ford v. Citizens & S. Nat'l Bank, Cartersville*, 928 F.2d 1118 (11th Cir. 1991) .......................................................................................................... 11

*Genier v. Kennebec County*, 748 F. Supp. 908 (D. Me. (1990) ............................ 73

*Hagestad v. Tragesser*, 49 F.3d 1430 (9th Cir. 1995) ........................................ n14

*Hammon v. Kelly*, supra, 830 F. Supp. at 15 ..................................................... 26

*Horn v. Madison County Fiscal Court*, 22 F.3d 653 (6th Cir. 1994) .................. 73

*In re Suchy*, 786 F.2d 900 (9th Cir. 1986) ........................................................ 11

*Int'l Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401 (9th Cir. 1985) ............................................................. 13

*Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989) ................................... 12, 13

*Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) ................................................................................................. 12, 19, 27

*Klamath Water Users Protective Association v. Patterson*, 204 F.3d 1206 (9th Cir. 1999) ........................................................................................... 27

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) ............................... n14

*Lutheran Social Services of Minnesota v. United States*, 758 F.2d 1283 (8th Cir. 1985) ................................................................................................... 31

*Marshall v. Western Union Telegraph Co.*, 621 F.2d 1246 (3rd Cir. 1980) .................. 31

*Morton v. Ruiz*, 415 U.S. 199 (1974) .............................................................. n31

*Ocean Transp. Line, Inc., v. American Philippine Fiber Indus.*, 743 F.2d 85
   (2d Cir. 1984) .................................................................................................. n31

*Reno v. Flores*, 507 U.S. 292 ............................................................................ 5, 7

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992) ................... 12

*Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296 (1983) .................... 31

*Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983) ........................ 12, 13

*Spallone v. United States*, 493 U.S. 265, 276 (1990) ...................................... 11

*TNT Marketing, Inc. v. Simon*, 796 F.2d 276, 278 (9th Cir. 1986) .............. 11, 13

*Turner v. United States*, 875 F. Supp. 1430, 1433-34 (D. Nev. 1995) ......... 12, 26

*United States v. Canyon Country Enterprises*, 1991 U.S. App. LEXIS 29303
   (9th Cir. Dec. 5, 1991) ..................................................................................... 12

*W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29 (2d Cir. 1996) ...... n31

*Wilkinson v. Legal Serv. Corp.*, 27 F.Supp.2d 32 (D.D.C. 1990) ...................... n31

*Woodfork v. Marine Cooks and Stewards Union*, 642 F.2d 966 (5th Cir.
   1981) .............................................................................................................. 31

*Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ...... 30

<u>Statutes and regulations</u>

8 C.F.R. § 100.4 ................................................................................................ n28

8 U.S.C. § 1231(a) ............................................................................................. 30

8 U.S.C. § 1231(a)(1) ......................................................................................... 30

8 U.S.C. § 1231(a)(2) ......................................................................................... 30

8 U.S.C. § 1231(a)(3) ......................................................................................... 30

28 U.S.C. § 2412(d) ........................................................................................... 49

42 U.S.C. § 5633(a)(12) ..................................................................................... 73

42 U.S.C. § 5633(a)(13) ..................................................................................... 73

Arizona Rev. Statutes § 546-134-2 .................................................................. n10

Cal. Health & Safety Code § 1508 ................................................................... n44

Cal. Health & Safety Code §§ 1500 *et seq.* .............................................. 10, n10

Cal. Welf. & Inst. Code § 206 ................................................................................n10

Cal. Welf. & Inst. Code § 206 ....................................................................................73

Cal. Welf. & Inst. Code § 1505 (c) ...........................................................................n10

Homeland Security Act, Pub. L. 107-296 (H.R. 5005) ..............................................1

Other authorities

79 INTERPRETER RELEASES 1777 (Dec. 9, 2002) ........................................................n2

Amnesty International USA, *"Why Am I Here?" Children in Immigration Detention"* (June 18, 2003) ....................................................................................1

Fact Sheet :the President's Fiscal 2003 Immigration Budget, Border Enforcement, February 4, 2002 ...........................................................................39

The President's Fiscal 2003 Immigration Budget, Interior Enforcement, February 4, 2002 ..............................................................................................39

United States Department of Justice, Office of the Inspector General, *Unaccompanied Minors in INS Custody*, Report No. I-2001-009, (September 28, 2001) ............................................................................................1

/ / /

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

MOTION TO ENFORCE SETTLEMENT

I      INTRODUCTION

On January 28, 1997, this Court approved a Stipulated Settlement Agreement ("Settlement"), which promised to remedy the dire situation affecting some 5,000 children arrested each year for being unlawfully present in the United States. The Settlement is a comprehensive consent order that sets minimum standards for the release, detention, housing, and treatment of minors in the custody of the Immigration and Naturalization Service ("INS" or "Service"). Despite the Settlement, the INS continued to fall short of treating detained minors in accordance with generally accepted child welfare and juvenile justice standards, and indeed, failed to comply substantially with either the letter or spirit of the Settlement itself. *See, e.g.*, United States Department of Justice, Office of the Inspector General, Unaccompanied Minors in INS Custody, Report No. I-2001-009, (September 28, 2001), Exhibit 1, at Ch. 4 ("OIG Report"), and Amnesty International USA, "Why Am I Here?" Children in Immigration Detention" (June 18, 2003), Exhibit 2, at 16-17 ("Amnesty Report").

The INS's chronic mishandling of minors in its custody at last drew the attention of Congress. In 2002, Congress included in the Homeland Security Act, Pub. L. 107-296 (H.R. 5005) ("HSA"), provisions dissolving the INS and transferring most of the agency's functions to the new Department of Homeland Security ("DHS"). As regards *Flores* class members, however, Congress directed that primary responsibility for the release and care of *unaccompanied* minors[1] would, as of March 1, 2003,[2] reside not with the DHS, but with the

---

[1] The Settlement covers both accompanied and unaccompanied minors. Settlement ¶¶ 4, 10.

[2] This transfer deadline was set forth in the Administration's Department of Homeland Security Reorganization Plan. For a discussion of the plan and a chart identifying key transition dates and deadlines relevant to the HSA's immigration-related responsibilities. *See* 79 Interpreter Releases 1777 (Dec. 9, 2002).

1   Office of Refugee Resettlement ("ORR"), a division of the Department of Health and Human

2   Services ("HHS"). *Id.* at § 471. Yet despite ORR's new role, the HSA left the DHS with a

3   substantial residual role vis-a-vis detained minors.[3]

4          Over some 18 months before the INS dissolved, plaintiffs' counsel repeatedly advised

5   defendants that a growing body of evidence showed that the agency was in breach of the

6   Settlement and requested remediation.[4] Notwithstanding the INS's general indifference to

7   these complaints, the prospect that the HSA's transfer of primary authority to the ORR

8   would finally result in substantial compliance with the Settlement seemed to warrant

9   deferring formal legal action to enforce the Settlement.[5] But despite the nominal transfer to

10  ORR of responsibility for the majority of *Flores* class members, children continued to report

11  treatment and conditions violative of the Settlement. Plaintiffs accordingly continued their

12  efforts to bring defendants into compliance through a series of letters and teleconferences.[6]

13  _____

14  [3] Several INS functions regulated by the Settlement have been transferred to the DHS, and
15  not to the ORR. For example, determinations regarding an arrestee's age—and, *a fortiori*,
    whether they are entitled to the protections of the Settlement *vel non*—are made by DHS and
16  not by ORR.

17  Similarly, the HSA provides that decisions to release or detain a class member are to be
    make by ORR in consultation with the DHS, *see* HSA §§ 462(b)(1)(A) & 462(b)(2)(A), and it
18  has become increasingly clear that the DHS's authority with regard to release decisions
    trumps that of ORR.
19
    [4] *See* Letter from Katina Ancar to Susan Curda (DOJ) and Dew Steinberg (DOJ), October 29,
20  2002, Exhibit 81; Letter from Katina Ancar to Hugh G. Mullane (DOJ), March 14, 2003,
    Exhibit 73; and Letter from Katina Ancar to Daniel Stark (HHS) and Drew Stienberg (DHS),
21  June 27, 2003, Exhibit 72.

22  [5] The HSA includes explicit "Savings" provisions specifying that the settlement remains in
23  effect as to the new agencies, *as if the transfer had not occurred. See* §§ 462(f)(2), 1512(a)(1),
    1512. By its terms, the Settlement is similarly binding not only on the current parties, but on
24  their successors as well. Settlement ¶ 41.Defendants have not disputed that the agreement
    remains binding on both the ORR and DHS.
25
    [6] *See* Letter from Steven H. Schulman to Drew Steinberg (DOJ) John Pogash, (DOJ),
26  December 17, 2002, Exhibit 80; Letter from Steven H. Schulman to John Pogash, (DOJ),
    February 4, 2003, Exhibit 79; Letter from Steven H. Schulman to John Pogash (DOJ),
27  February 6, 2003, Exhibit 77; Letter from Steven H. Schulman to Hugh Mullane (DOJ),
    February 6, 2003, Exhibit 78; Letter from Steven H. Schulman to Hugh Mullane (DOJ),
28

After nearly ten months of fruitless efforts, it has become clear that neither the ORR nor the DHS is honoring the Settlement, nor is there any apparent reason to think they will comply absent court intervention.[7]

With regard to release, children's advocates report that securing the release of a child to his or her parent or relative is more onerous and time-consuming than ever now that responsibility for the decision to detain or release a child is diffused among multiple federal agencies.

As for conditions and treatment plaintiff children experience in DHS/ORR custody, defendants continue to violate the Settlement in multiple ways, including —

1) classifying detainees as adults on the basis of junk science dental examinations while unreasonably refusing to acknowledge birth certificates and other documentary evidence establishing that the individual is actually a minor;

2) automatically re-detaining children who have been released to their relatives once a removal order has been entered, even though defendants have no reasonable expectation that physical removal can be accomplished within any time certain;

3) automatically deeming children "escape risks" who must be consigned to secure facilities whenever a final order of removal is entered against them;

4) automatically confining children to secure facilities solely because at some time in the past they were arrested for or charged with an isolated, petty offense;

5) failing to develop and implement a coherent policy for the care and housing of children suffering from severe psychological trauma or who otherwise have special needs;

---

February 25, 2003, Exhibit 76; Letter from Carlos Holguín to  Daniel Stark (HHS) and Hugh Mullane (DOJ), March 20, 2003, Exhibit 75; Letter from Katina Ancar to Daniel Stark (HHS) and Hugh G. Mullane (DOJ), April 21, 2003, Exhibit 65; and Letter from Carlos Holguín to Daniel Stark (HHS) and Drew Steinberg (DOJ), April 29, 2003, Exhibit 74.

[7] Plaintiffs do, however, think the parties might resolve most of all of the violations described in this motion were settlement future negotiations supervised by a Magistrate Judge or other Court-appointed mediator.

6)   confining non-delinquent children in facilities where they have regular contact with juvenile delinquents;

7)   handcuffing and shackling non-delinquent children who pose no articulable danger to themselves or others;

8)   confining children to locked bedrooms without a written finding that they constitute a danger to themselves or others.

9)   denying those children confined to their rooms essential educational and social services without a written finding that providing such services would present a danger to themselves or others;

10)  confining children in facilities where they fail to receive educational services (including materials and daily instruction in a child's native language) commensurate with those stipulated in the Settlement;

11)  failing to provide mental health services to detained children;

12)  failing to inform children about the legal proceedings against them and the reasons for placement in secure facilities;

13)  failing to present detained children to immigration judges for bond redetermination hearings;

14)  refusing to recognize the authority of immigration judges to redetermine ORR and/or DHS decisions declining to release *Flores* class members; and

15)  routinely strip searching juveniles placed in secure facilities.[8]

On December 7, 2001, the parties stipulated to extend the Settlement beyond its original expiration date and "to confer regularly no less than once monthly" to resolve their differences. Despite class counsel's best efforts to correct the violations described above,

---

[8] In 1988, this Court entered summary judgment prohibiting defendants from "routinely strip searching juveniles upon admission to INS facilities, and after all visits with persons other than their attorneys." *Flores v. Meese*, 681 F. Supp. 665, 669 (C.D. Cal. 1988) (holding that such a policy and practice violated juveniles' Fourth Amendment rights).

1    defendants have failed to comply with the Settlement.[9] The utter lack of progress

2    demonstrates that defendants will honor their commitments to children if and only if this

3    Court requires them to do so. Plaintiffs ask that the Court do so now.

4    II        BACKGROUND TO AND SYNOPSIS OF THE SETTLEMENT

5             This certified class action began in 1985. Plaintiffs are juveniles—many, though not

6    all, of whom are unaccompanied by a parent or legal guardian in the United States—who

7    are arrested and detained pending the outcome of administrative removal proceedings. In

8    their complaint, plaintiff children alleged (i) that the Service unlawfully refused to release

9    detained juveniles on bond or recognizance unless their parents or legal guardians

10   surrendered for removal; and (ii) that the treatment and conditions minors experienced

11   during INS custody failed to meet constitutional minimums. *See* Order re: Class

12   Certification (August 11, 1986).

13            On November 30, 1987, this Court approved a settlement under which the Service

14   pledged to remedy the "deplorable conditions" affecting minors in its custody in its Western

15   Region. *See* Memorandum of Understanding Re: Compromise of Class Action: Conditions of

16   Confinement (November 30, 1987), Exhibit 3, (hereafter "MOU"); *see also* Brief for Petitioners

17   in *Reno v. Flores*, 507 U.S. 292 (1993), at 32 n.31 (characterizing MOU as a "consent decree"

18   prohibiting "deplorable conditions" previously existing in INS detention facilities).

19            In the MOU, the Service promised that plaintiff children would henceforth be placed

20   in "special child-care facilities": *i.e.*, "'community based shelter care programs' that will

21

22   _____

23   [9] On September 10, 2001, October 19, 2001, January 4, 2002, February 8, 2002, February 27,
     2002, and October 29, 2002, plaintiffs wrote defendants to detail their concerns regarding the
24   treatment of plaintiff children, but these letters received little or no response.

25   To date, plaintiffs have received an informal, partial and oral response to their letters of
     September 10, 2001 and October 19, 2001, no response whatsoever to their letter of February
26   8, 2002, no response to their letter of February 27, 2002 insofar as that letter set forth
     concerns respecting class members generally and not specific class members' cases, and no
27   substantive response to their letter of October 29, 2002. Plaintiffs' correspondence and
     defendants' replies, if any, are filed herewith as Exhibits 81-87.
28

'provide a safe and appropriate environment' ... 'through either residential, foster or group care programs' [meeting] 'state licensing requirements for the provisions of shelter care, foster care, group care and related services to dependent children.'" *Id*. at 2 and 11.

The MOU's fundamental requirement was that defendants would no longer routinely house children arrested solely for civil immigration proceedings in facilities designed for and primarily occupied by youthful offenders or delinquents. Rather, the agency would place children in settings appropriate for *dependent*, or non-delinquent minors.[10] The MOU also promised to standardize policy and practice toward an exceedingly vulnerable population that had until then been treated largely as local INS officials thought fit.[11]

Although the MOU nominally resolved the majority of plaintiffs' complaints over the treatment of minors in its custody, the Service refused to discontinue its practice of strip searching minors when they were admitted or re-admitted to detention facilities or after

---

[10] Unlike juvenile halls and other institutional settings in which youthful offenders or delinquents are confined, nearly all state laws provide that dependent children may be placed only in non-secure facilities meeting standards specifically tailored for them. *See e.g.*, Cal. Welf. & Inst. Code § 206; Cal. Health & Safety Code §§ 1500, *et seq*.; Arizona Rev. Statutes § 546-134-2.

California has also promulgated comprehensive regulations implementing this Act and providing detailed standards for the operation of residential facilities for dependent children. Cal. Admin. Code, title 22, § 80000 *et seq*. Juvenile halls, in contrast, are prohibited from holding a license under this Act. Cal. Welf. & Inst. Code § 1505 (c).

[11] The INS stated to the Supreme Court that class members experience "frequent traumatic circumstances" and cited research showing that "'at least 50% of the children' have 'clinically significant levels' of Post-Traumatic Stress Disorder." Brief of Petitioners, Exhibit 170, at 12, n.16. Based on the children's condition, the INS noted that "it is particularly important that the [detention] program provide comprehensive and professional care." *Id*.

The MOU *and defendants' compliance with that agreement* were critical elements underlying the Supreme Court's decision upholding defendants' restrictive release policy. In essence, the Supreme Court found that the Service's release regulation did not violate the Constitution, at least on its face, *provided* that the INS afforded children in appropriate conditions of confinement. "There is, in short, no constitutional need for a hearing to determine whether private placement would be better, so long as institutional custody is (as we readily find it to be, *assuming compliance with the requirements of the consent decree*) good enough." 113 S.Ct. at 1449 [emphasis added].

1    visiting with relatives or counsel. In 1988, this Court entered summary judgment in

2    plaintiffs' favor specifically prohibiting defendants from strip-searching minors absent a

3    reasonable suspicion that strip-searching a particular juvenile could yield weapons or

4    contraband. *Flores v. Meese*, 681 F. Supp. 665, 669 (C.D. Cal. 1988).

5            As for defendants' release policy, in 1993 the U.S. Supreme Court reversed the en

6    banc opinion of the Ninth Circuit Court of Appeals which had affirmed this Court's order

7    requiring the INS to determine whether individual minors should be released to reputable

8    caregivers in addition to their parents and guardians. The Supreme Court held that the INS

9    had discretion to adopt a blanket policy against releasing minors to unrelated caregivers *if*

10   the treatment and conditions children experienced in defendants' custody measured up to

11   the requirements of the MOU. *Reno v. Flores*, 507 U.S. 292, 305; 113 S.Ct. 1439; 123 L.Ed.2d 1

12   (1993) ("There is, in short, no constitutional need for a hearing to determine whether private

13   placement would be better, so long as institutional custody is (as we readily find it to be,

14   *assuming compliance with the requirements of the consent decree*) good enough" (emphasis

15   supplied)).

16           Upon remand from the Supreme Court, plaintiffs filed voluminous evidence showing

17   that the INS was not, in fact, in compliance with the consent decree. Rather than contest

18   plaintiffs' evidence, defendants agreed to the Settlement, which was entered as an order of

19   the Court in January 1997. The Settlement expanded the MOU's protections, rights and

20   benefits. It also extended those protections to children detained for immigration violations

21   anywhere in the country. Finally, the Settlement established nationwide policy favoring the

22   release of minors not only to their parents and guardians, but to other reputable custodians.

23           The Settlement and its exhibits establish a "nationwide policy for the detention,

24   release and treatment of minors" in defendants' custody. Settlement ¶ 9. Despite its length

25   and seeming complexity, the Settlement regulates defendants' release and treatment of

26   minors in three fundamental areas: First, it contemplates that children will generally be

27   released promptly to their parents and designated family members, or, if necessary, shelters

28

and unrelated custodians. Second, those class members who remain in defendants' custody must be placed in the least restrictive setting, generally a facility or home licensed for the care of dependent, non-delinquent minors. Third, regardless of where they are housed, detained minors are guaranteed a range of basic educational, health, social and other benefits and rights.[12] The Settlement's specific provisions and operation provide as follows:

**A    The Settlement requires defendants to favor the release of detained minors.**

The first fundamental promise of the Settlement is that defendants must actively seek to release minors from its custody. Section VI of the Settlement ("General Policy Favoring Release"), memorializes defendants' commitment to decrease the frequency and length of detention of minors. Stipulating that detention is generally detrimental to minors, defendants agreed to release a minor "without unnecessary delay" once it determines that "detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others." Settlement ¶ 14.

The Settlement makes clear that as a general matter defendants must actively and continuously attempt to locate appropriate custodians for detained minors and release minors who have qualified custodians available to care for them:

> Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody.

Settlement ¶ 18 (emphasis supplied).

The agreement also stipulates that detaining minors should be only a temporary solution:

------

[12] The Settlement also requires defendants to promulgate regulations implementing the agreement. As of the filing of this motion, they have not yet done so.

1       In any case in which the INS does not release a minor pursuant to Paragraph 14, the

2   minor shall remain in INS legal custody. Except as provided in Paragraphs 12 or 21,

3   such minor shall be placed *temporarily* in a licensed program *until such time as release*

4   *can be effected* in accordance with Paragraph 14 above or until the minor's

5   immigration proceedings are concluded, whichever occurs earlier.

6   Settlement ¶ 19 (emphasis supplied).

7       Although the Settlement provides that release to a parent is preferable, when a parent

8   is unavailable the agreement requires release to a youth shelter or a qualified adult

9   custodian, (including relatives and adults designated by the parent). Settlement ¶ 14.

10   **B**   **The Settlement requires defendants to place children who remain in their**

11   **custody in the least restrictive setting.**

12       The Settlement's second fundamental requirement is that the limited number of

13   minors who remain in defendants' custody must be placed in "the least restrictive setting

14   appropriate to the minor's age and special needs..." Settlement ¶ 11. Accordingly, except in

15   the extraordinary circumstance where a child poses a "serious" escape risk or a danger to

16   others, a minor in defendants' custody must be placed in a "licensed program." Settlement ¶

17   19. A licensed program is a "program, agency or organization that is licensed by an

18   appropriate State agency to provide residential, group, or foster care services for *dependent*

19   children." Settlement ¶ 6 (emphasis supplied).

20       The Settlement allows defendants to transfer a minor to a secure lock-down, such as a

21   juvenile hall, only when it can show that the child is charged or chargeable with a

22   delinquent act (except for isolated, non-violent or petty offenses), has committed or

23   threatened to commit a violent act, has proven to be unacceptably disruptive of a licensed

24   program, is a serious "escape risk," or needs secure confinement for protection from

25   smugglers. Settlement ¶ 21. Before resorting to secure confinement, however, defendants

26   must, if practicable, transfer the minor to another licensed program or to a "medium secure"

27   youth facility. Settlement ¶ 23.

28

- 9 -

**C    The Settlement requires defendants to provide children in their custody with essential rights and services.**

Defendants' third fundamental obligation is to treat children in their custody "with dignity, respect and special concern for their vulnerability as minors." Settlement ¶ 11. Exhibit 1 to the Settlement accordingly guarantees children the following benefits and services: (i) medical, dental and mental health services; (ii) an individual needs assessment, including an educational assessment and plan; (iii) appropriate educational services, including instruction and reading materials in such languages as needed; (iv) outdoor recreation; (v) at least one individual counseling session per week; (vi) group counseling twice per week; (vii) acculturation and adaptation services; (viii) orientation to the program; (ix) access to religious services; (x) visitation with family members, regardless of immigration status; (xi) right to privacy, including a right to wear own clothing; and (xii) family reunification services, including assistance in guardianship applications. Settlement Exhibit 1.

In addition, defendants must provide plaintiff class members certain basic rights. The Settlement requires defendants to keep detained children informed of their status of their deportation or removal cases. Settlement ¶ 12.A. It provides that detained children shall be free from unnecessary restraints and humiliating punishment. Settlement Exhibit 1, Part C. And the agreement guarantees children unrestricted access to legal counsel. *Id.* at Part A ¶ 14.

III    DEFENDANTS ARE IN MATERIAL BREACH OF THE SETTLEMENT.

There is little doubt that the Settlement has resulted in better conditions for many class members, primarily those fortunate enough to be housed in licensed facilities. Nevertheless, although the Settlement was signed over six years ago, defendants have simply not come into compliance with key provisions of the agreement. Defendants have adopted a number of written policies that are nominally consistent with the Settlement, but they have failed to ensure that their officers in the field are aware of and comply with these

- 10 -

1   policies. In other areas, they have interpreted the agreement contrary to its plain terms and

2   intent. In other areas still, defendants have yet to put any policies or guidance in writing

3   and have instead adopted daily practices violative of the agreement.

4       Substantively, the INS, and now the DHS and the ORR, have all breached the

5   Settlement by failing to promulgate or adhere to policies and practices in each of the

6   agreement's three basic areas: (i) facilitating minors' release; (ii) housing children in the least

7   restrictive environment; and (iii) providing essential educational, health and social services

8   to youth who remain in federal custody. Defendants have also violated the Court's

9   summary judgment prohibiting arbitrary strip searches.

10      Defendants are denying plaintiff children the benefit of their bargain. This Court

11  should find defendants in breach of the Settlement and its summary judgment. It should

12  order defendants to take remedial measures to ensure that plaintiff class members receive

13  the rights and benefits defendants agreed to provide.

14      **A      The Settlement can and should be enforced by this Court.**

15      The Settlement provides that plaintiffs may seek to enforce the Settlement in this

16  Court. Settlement ¶ 37 ("This paragraph provides for the enforcement, in this District Court,

17  of the provisions of this Agreement").[13] This provision, however, simply restates a court's

18  "inherent power to enforce the agreement in settlement of litigation before it." *TNT*

19  *Marketing, Inc. v. Simon*, 796 F.2d 276, 278 (9th Cir. 1986) (rejecting argument that district

20  court could not award damages for violation of settlement); *see also In re Suchy*, 786 F.2d 900,

21  902-03 (9th Cir. 1986); *Ford v. Citizens & S. Nat'l Bank, Cartersville*, 928 F.2d 1118, 1121-22

22  (11th Cir. 1991). In short, this Court has inherent power to enforce the Settlement. *Spallone v.*

23  *United States*, 493 U.S. 265, 276 (1990).[14]

24

25

26  [13] Plaintiffs have more than discharged their obligation to meet and confer with defendants prior to moving the Court to enforce the Settlement. *See* Exhibits 8, 65, 72-87.

27  [14] In *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994), the Supreme Court held that a proceeding to enforce a settlement requires its own basis of jurisdiction. *Id*. at 378; *see also*

28

1   A settlement is both a contract between parties and an order of the court. *See Rufo v.*

2   *Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). However, a motion to enforce a

3   settlement is basically decided in accordance with rules apposite to actions for breach of

4   contract. "Since consent decrees and orders have many of the attributes of ordinary

5   contracts, they should be construed basically as contracts." *Jeff D. v. Andrus*, 899 F.2d 753,

6   759 (9th Cir. 1989) ("An agreement to settle a legal dispute is a contract and its enforceability

7   is governed by familiar principles of contract law.").

8   Courts construe settlements to which the United States is a party and that implicate

9   federal rights according to federal law. *Turner v. United States*, 875 F. Supp. 1430, 1433-34 (D.

10   Nev. 1995) (applying federal law to settlement where U.S. Attorney General was party and

11   the dispute originated from application of a federal statute); *see also United States v. Canyon*

12   *Country Enterprises*, 1991 U.S. App. LEXIS 29303 (9th Cir. Dec. 5, 1991) (federal law applied

13   to interpret settlement where the "duties of the United States are at issue and the general

14   need for uniform interpretation of government contracts applies"). Because the INS, as well

15   as its successors, the ORR and DHS, are parties to the Settlement, and because the

16   Settlement concerns plaintiffs' rights under federal law, federal contract law applies and

17   provides the apposite rules of decision.

18   Federal law provides that a "written contract must be read as a whole and every part

19   interpreted with reference to the whole." *Kennewick Irrigation District v. United States*, 880

20   F.2d 1018, 1032 (9th Cir. 1989), *citing Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983)

21   "Preference must be given to reasonable interpretations as opposed to those that are

22   unreasonable, or that would make the contract illusory." *Id.* "The fact that the parties

23

24

25   *Hagestad v. Tragesser*, 49 F.3d 1430, 1433 (9th Cir. 1995). "Such a basis for jurisdiction may be
    furnished by separate provision (such as a provision retaining jurisdiction over the
    settlement agreement) or by incorporating the terms of the settlement agreement in the

26   order." *Flanegan v. Arizona*, 143 F.3d 540, 544 (9th Cir. 1998), quoting *Kokkonen, supra*, at 381.
    Because the Court has not yet dismissed this action, the *Kokkenen* concerns are not at issue.

27   Moreover, the Settlement explicity provides for jurisdiction of the Court to enforce it.
    Settlement ¶ 37.

28

dispute a contract's meaning does not establish that the contract is ambiguous." *Int'l Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir. 1985). "The overriding purpose ... is to give effect to the mutual intent of the parties *at the time the contract was made.*" *Jeff D., supra*, 899 F.2d at 760 (emphasis added); *Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983).

Under these principles, it will be seen, defendants are in breach of the Settlement, and the Court may therefore award damages or enter orders "commanding or enjoining particular conduct." *TNT Marketing, supra*, 796 F.2d at 278 ("settlement agreements may be specifically enforced . . . but an award of damages is also an available option"); see also Scharf v. Levittown Public Schools, 970 F.Supp. 122, 129 (E.D. N.Y. 1997) ("Where there is a material breach of the settlement agreement, a district judge may enforce the terms of the stipulation of settlement by altering the termos of the agreement."); Hammon v. Kelly, 830 F. Supp. 11, 13-15 (D.D.C. 1993) (enforcing parties' intentions, as agreed to in a settlement and consent decree, where the defendant acted inconsistent with its obligations). Plaintiffs urge this Court to issue an order in the form lodged enjoining defendants' further violating the Settlement.

**B      Defendants' policies and practices violate the Settlement's policy favoring release.**

Section VI of the Settlement establishes a "general policy favoring release." These provisions place defendants under an affirmative obligation to locate appropriate third party custodians for detained children and to release children to such custodians whenever practicable. In actual practice, however, defendants' policies and practices include (i) detaining children as "bait" to bring undocumented relatives into custody; (ii) refusing to release class members to other relatives when a child's parent refuses to assume custody of the minor; and (iii) failing to release minors without relatives in the United States to local youth shelters. These practices violate the Settlement's provisions relating to release, swell the population of detained minors, and undermine defendants' ability to house and care for

- 13 -

this population in accordance with the Settlement's requirements.[15]

**1**      **Defendants regularly refuse to release children to caregivers other than parents even where their parents refuse to appear for them.**

The Settlement sensibly prefers the release of children to parents. Nevertheless, in many instances a child's parents are either not in the United States or are unwilling to appear before defendants to take custody. Therefore, if a parent is unable or unwilling to take custody of a detainee, the Settlement generally requires defendants to locate an alternative custodian and to release the child promptly to that custodian. It provides as follows:

14. Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS *shall* release a minor from its custody *without unnecessary delay*, in the following order of preference, to:

A. a parent;

B. a legal guardian;

C. an adult relative (brother, sister, aunt, uncle, or grandparent);

D. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

E. *a licensed program willing to accept legal custody*; or

F. *an adult individual or entity seeking custody, in the discretion of the INS, when it*

---

[15] As has been noted, since the Settlement was signed the population of minors in defendants' custody has increased from a daily average of less than 130 in 1996 to nearly 500 in 2000. Although several variables have likely contributed to this increase, defendants' failure to implement the Settlement's provisions favoring release has certainly contributed to the burgeoning population of the detained minors.

- 14 -

1     *appears that there is no other likely alternative to long term detention and family*

2     *reunification does not appear to be a reasonable possibility.*

3     18. Upon taking a minor into custody, the INS, or the licensed program in which the

4     minor is placed, shall make and record the *prompt and continuous efforts on its part*

5     toward family reunification and *the release of the minor* pursuant to Paragraph 14

6     above. Such efforts at family reunification shall continue so long as the minor is in

7     INS custody.

8 Settlement ¶¶ 14, 17-18 (emphasis supplied).

9     These provisions require defendants to pursue a pro-active policy toward detained

10 minors: *i.e.*, defendants must use their best efforts to locate third-party custodians for a

11 detained child and release the child to an available custodian whenever detention "is not

12 *required*" to secure his or her appearance or safety. *Id.* at ¶ 14 (emphasis supplied).

13     As the OIG's report confirms, however, defendants regularly refuse to release

14 children to custodians other than parents whenever they believe that the child's parent is in

15 the United States *even if the parent is clearly unable or unwilling to appear for the child*:

16     Current INS policy requires the parent to be involved in the juvenile's release,

17     regardless of the parent's immigration status. *An undocumented parent must report to*

18     *an INS officer and enter immigration court proceedings before the INS will release the*

19     *juvenile.* If the parent is unwilling to come forward, the juvenile will remain in INS

20     custody, *even when another acceptable sponsor is available.*

21 OIG Report, Exhibit 1, at Executive Summary (emphasis added).

22     Defendants affirmed this policy as well in a 1999 letter to the United States Catholic

23 Conference:

24     The INS strongly believes that when there is a parent in the United States, he/she

25     should be the sponsor of the child regardless of the parent(s) immigration status. *If*

26     *the parent(s) is undocumented, he/she must present him/herself before an INS Officer in order*

27     *to be processed. If for any reason, the parent can not, or is not willing to, assume custody of*

28

- 15 -

1     *the minor, he/she must present him/herself before an INS Officer and state the reason why*

2     *he/she can not assume custody of the minor.* The parent must execute an affidavit if

3     he/she decides that the minor should be placed with a blood relative or responsible

4     adult. Please note that the execution of this document in no way guarantees the

5     release of the minor to the sponsor... All primary sponsors must be blood relatives

6     unless an affidavit naming a responsible adult is executed by the parent(s). If the

7     blood relative is not documented, he/she must present him/herself before an INS

8     Officer to be processed.

9

10   INS letter to the United States Catholic Conference, November 5, 1999.

11        In their visit to Tulare County Juvenile Detention Facility, attorneys from Latham and

12   Watkins were told "INS transfers minors to this Facility [Tulare] once a final order of

13   deportation has been issued, regardless of whether the minor has appealed the decision.

14   Once the INS transfers to this Facility, he or she will remain at the Facility until

15   deportation." *See*, Latham & Watkins Report on Flores Compliance Inspection of Tulare

16   County Juvenile Detention Facility (July 31, 2001), (hereinafter "Latham and Watkins Tulare

17   Report"), Exhibit 32 at 3. Latham and Watkins was also informed of this policy during their

18   visit to Los Padrinos. *Also see*, Memorandum from Latham and Watkins re: Los Padrinos

19   Facility Visit conducted July 25, 2001, September 2, 2001, Exhibit 49, at ¶ 2 (Ms. [Michele]

20   O'Brien [INS Juvenile District Coordinator] "informed us that Children with final orders of

21   removal are systematically placed at secure facilities because they are determined to be a

22   flight risk").

23        As recently as 2002, defendants confirmed this policy in several meetings with

24   Amnesty International. In September 2002, defendants' National Juvenile Coordinator

25   stated that children "must be released to a parent, held in INS custody, or returned home."

26   Amnesty Report, Exhibit 2, at 54. On November 5, 2002, the District Juvenile Coordinator for

27   Arizona likewise stated that "if the parent was undocumented in the U.S. and was unwilling

28

1 to come forward *the child would remain in detention even if an aunt or uncle was residing legally*

2 *in the country.." Id.* (emphasis added).

3      Defendants' policy and practice are having dire consequences for class members.

4 Even when undocumented parents do surrender, the time a child spends in defendants'

5 custody is often needlessly prolonged: "Juvenile coordinators cited cases in which days, and

6 on occasion weeks, were added to the time juveniles spent in detention before an

7 undocumented parent agreed to come to an INS office." OIG Report, Exhibit 1, Ch. 4 at 3.

8 Countless class members are never released at all because their parents and other relatives

9 persist in refusing to surrender for deportation.

10      Defendants' practice directly violates the Settlement. Defendants agreed to release a

11 child "without unnecessary delay" whenever "detention of the minor is not required either

12 to secure his or her timely appearance before the INS or the immigration court, or to ensure

13 the minor's safety or that of others." Settlement ¶ 14. Once that condition is met, the

14 Settlement requires defendants "to make ... *prompt and continuous efforts* on its part toward ...

15 the release of the minor." *Id.* ¶ 18.

16      Defendants improperly distend the Settlement's *preferring* parents over other

17 potential custodians into an absolute condition of release. Nothing in the Settlement allows

18 defendants to condition a child's release on the appearance of his or her parent, or for that

19 matter, on the appearance of any specific person. To the contrary, its plain language

20 obligates defendants to search out an appropriate custodian and to release a minor to that

21 custodian should one be found. Conditioning a child's liberty on the acts or omissions of

22 their parents or other third parties cannot be squared with the Settlement's most

23 fundamental principle: that class members must be treated with "dignity, respect and

24 special concern for their particular vulnerability as minors." Settlement ¶ 11.

25     **2**     **Defendants fail to seek out ¶ 14E and F custodians and refuse to**

26         **release children to such custodians who appear of their own accord.**

27      Defendants also regularly detain class members for months or years rather than

28

1   release them to licensed youth shelters or other reputable custodians, a violation of ¶ 14E

2   and F of the Settlement. The experience of class member Goldy Singh is illustrative.

3       Goldy arrived in the United States in January 2001, shortly after his 16th birthday.

4   Declaration of Steve Schulman, Exhibit 5, ¶ 3. Upon being apprehended, he immediately

5   advised defendants that he had a U.S. citizen relative (his brother's first cousin, whom

6   Goldy considered an uncle) living in Madison, Wisconsin. *Id.* at ¶ 4. Despite the Settlement's

7   demand that they "make and record the prompt and continuous efforts on its part toward

8   family reunification and the release of the minor," defendants made no effort to release

9   Goldy to his cousin, but instead incarcerated him at the Berks County Youth Shelter in rural

10  Pennsylvania. *Id.* at ¶ 6.

11      *Nearly a year later,* defendants finally began the positive suitability assessment

12  required under the Settlement, *see* Settlement ¶ 17, to determine whether Goldy's cousin

13  would be a suitable custodian for him. The home study dragged on for several more

14  months, during which Goldy remained at the Berks County facility. *Id*. at ¶ 7.

15      At the close of their assessment, defendants refused to release Goldy, not because his

16  cousin was unqualified to care for him, but rather because they determined—based on no

17  apparent standard—that the degree of kinship between Goldy and his cousin was too

18  distant. *Id*. Goldy *remained in INS custody for another year*, celebrating his 18th birthday in a

19  detention center rather than with his relatives. *Id.*

20      The INS did not advise Goldy that he had any right to have an immigration judge

21  review this decision, although the Settlement clearly gives him this right and requires

22  defendants to inform of that right. Settlement ¶¶ 24A ("A minor in deportation proceedings

23  shall be afforded a bond redetermination hearing before an immigration judge in every case,

24  unless the minor indicates on the Notice of Custody Determination form that he or she

25  refuses such a hearing"); 24D ("the INS shall promptly provide each minor not released

26  with (a) INS Form I-770; (b) an explanation of the right of judicial review as set out in

27  Exhibit 6, and (c) the list of free legal services providers compiled pursuant to INS

28

1    regulation (unless previously given to the minor)"); Settlement Exhibit 2 at ¶ (j) ("A minor

2    in deportation proceedings shall be afforded a bond redetermination hearing before an

3    immigration judge in every case in which he either affirmatively requests, or fails to request

4    or refuse, such a hearing on the Notice of Custody Determination").

5            Goldy's treatment hardly comports with the Settlement's "general policy favoring

6    release." Goldy's experience is fully consistent with defendants' "interpretation" of the

7    Settlement as preferring children's indefinite detention over releasing them to custodians

8    who are not specifically listed as approved relatives in ¶ 14C of the Settlement. Essentially,

9    defendants read out of the agreement ¶ 14E and F, provisions that require defendants to

10   find other suitable custodians—youth shelters and unrelated caretakers—when a parent,

11   guardian, or listed relative is unavailable. As Goldy's case demonstrates, even when a

12   qualified custodian does appear for a child, defendants reject available ¶ 14E or F

13   placements on the spurious grounds that they are not listed in ¶ 14C.

14           Under defendants' reading, sub-paragraphs E and F are mere surplusage, a reading

15   clearly at odds with the Settlement's "general policy favoring release" and with familiar

16   principles controlling the interpretation and enforcement of settlements. *Kennewick Irrigation*

17   *District v. United States, supra*, 880 F.2d 1018, 1032 (9th Cir. 1989)("[W]ritten contract must be

18   read as a whole and every part interpreted with reference to the whole."). The Court should

19   reject defendants' reading of ¶ 14 and require that they henceforth fulfill their obligation to

20   facilitate children's prompt release.

21       **C        Defendants routinely fail to place detained children in the least restrictive**

22                  **environment.**

23           The second fundamental guarantee of the Settlement is that defendants must house

24   the general population of unaccompanied minors in non-secure facilities licensed for the

25   care of dependent, as contrasted to delinquent, minors:

26           In any case in which the INS does not release a minor pursuant to Paragraph 14, the

27

28

minor shall remain in INS legal custody. Except as provided in Paragraphs 12 or 21,[16]

such minor *shall* be placed temporarily in a *licensed program* until such time as release

can be effected in accordance with Paragraph 14 above or until the minor's

immigration proceedings are concluded, whichever occurs earlier. ...

Settlement ¶ 19; *see also* Settlement Exhibit 6, ("The INS usually houses persons under the

age of 18 in an open setting, such as a group home, and not in detention facilities.").[17]

The Settlement thus limits secure confinement to exceptional cases, which are

specifically defined in the agreement, and only where no less restrictive alternatives are

available.[18] Yet overwhelming evidence demonstrates that defendants incarcerate class

members in juvenile halls and similar locked facilities as a matter of course and not only in

---

[16] Paragraph 12 permits defendants to place class members in unlicensed or secure facilities during the first 72 hours following arrest and in the event of an "emergency influx" of class members into defendants' custody.

Paragraph 21 permits defendants to place into in unlicensed or secure facilities class members who are themselves delinquents, serious escape risks, or who must be held in such a facility to protect them from smugglers and the like.

As discussed in the text, defendants' habitual resort to secure detention is within  neither exception.

[17] The Settlement defines "licensed program" as follows:

> The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for *dependent* children, including a program operating group homes, foster homes, or facilities for special needs minors.  A licensed program must also meet those standards for licensed programs set forth in Exhibit 1 attached hereto.  All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law ...

Settlement ¶ 6 (emphasis supplied).

[18] In this regard, the Settlement is fully consistent with federal law and standards for the treatment of juveniles. The Juvenile Justice and Delinquency Prevention Act, 42 U.S.C. § 5633(a)(12(B) (JJDPA), prohibits secure confinement of alien juveniles who have not been charged with  any offense. The U.S. Justice Department Office of Juvenile Justice and Delinquency Prevention has noted that the INS's housing non-delinquent class members in secure facilities does not comport with federal law. OJJDP, Juveniles in Federal Custody: Recommendations and Prospects for Change (1998), at 40.

- 20 -

1    the exceptional cases defined in the Settlement.

2            The Department of Justice's Office of Inspector General found that a disturbing

3    percentage of non-delinquent class members spend far too much time in secure facilities.

4    During FY 2000,[19] defendants detained 4,136 minors for more than 72 hours. OIG Report,

5    Exhibit 1, Ch. 1 at 1. Of these 4,136 minors, nearly 29 percent (1,933), were housed in secure

6    facilities. *Id.* at Ch. 2 at 1. Of the 1,933 minors placed in secure facilities, only 19 percent (364

7    minors), had been charged with a felony, adjudicated delinquents, or even placed in a

8    delinquency proceeding. *Id.* In short, *nearly 80 percent of the children placed in secure facilities*

9    *were non-delinquent youths who should have been placed in facilities licensed for the care of*

10   *dependent minors.*[20]

11           The evidence confirms defendants' habitual resort to secure confinement. The

12   evidence also shows a number of policies and practices that swell the population of children

13   in juvenile halls in violation of the Settlement's general and specific limits on the placement

14   of children in unlicensed locked facilities. These include the following:

15   1)     Defendants automatically transfer children from licensed facilities to locked facilities

16          solely because an order of removal is entered against them and without regard to

17          whether or not they are actually serious flight risks.

18   2)     Once an order of removal is entered against them, defendants automatically re-arrest

19          children previously released to their parents and other caregivers and thereafter

20          consign them to locked facilities, again without regard to whether or not they are

21          actual flight risks.

22

23   _____

     [19] The data from FY 2000 from the Office of Inspector General is the last set available to class
24   counsel.  While defendants supply data to class counsel on an annual basis, they do so in a
     hard-copy format that is largely unusable; they have refused to produce the same data in an
25   electronic format which would allow class counsel readily to compile statistics concerning
     defendants' treatment of class members.
26
     [20] The INS reported an even higher percentage, fixing the minors held in secure facilities in
27   2000 at 35 percent. INS OJA Fact Sheet, Exhibit 4. According to the INS, in 2001, about 2000
     minors—roughly 32 percent of all detained minors—were held in a secure facility. *Id.*
28

3)   Defendants automatically house minors in secure confinement if they have *ever* been arrested, no matter how remote in time the arrest, no matter if the arrest was for a non-violent, petty crime, and no matter how isolated the alleged crime or delinquent act.

4)   Defendants have failed to develop any alternative to secure confinement for "special needs" children: *i.e.*, youth whose behavioral problems stem from post-traumatic stress syndrome or physical, sexual or psychological abuse.

### 1   Defendants place children in secure confinement solely because an order of removal has issued against them and without regard to whether there is a serious risk they would abscond.

In several areas of the country defendants *automatically* transfer *all* minors to locked facilities once an order of removal or deportation is entered against them. Likewise, when a removal order is entered against a child previously released to relatives, defendants *automatically* re-arrest that child—without ever actually assessing whether the minor is in fact a flight risk—and lock him or her in a secure facility. Neither of these policies and practices can be squared with the Settlement, which specifically provides that a final order of removal is one, but *only* one, factor to be considered in an *individualized* decision to place a minor in secure confinement. Settlement ¶ 22.[21]

In interviews and correspondence, defendants have acknowledged transferring children to secure facilities for no reason other than that an order of removal has been entered against them. Defendants' juvenile coordinators for both the Los Angeles and San Francisco districts, for example, unequivocally and repeatedly stated that their policy and practice are to transfer minors to secure facilities once an order of removal issues:

---

[21] As explained below, entry of a removal order does not necessarily indicate that the minor's physical removal is imminent. Such orders are subject to review by the Board of Immigration Appeals and the federal Circuit Courts of Appeal. Even if the minor waives or loses an appeal, it often takes defendants months or years to secure permission to return the child to his or her home country.

> Both [Los Angeles Juvenile Coordinator Michelle] O'Brien and [San Francisco
> Juvenile Coordinator Cecyle J.] Andrews admitted that the minors were not in the
> secure Tulare Juvenile Detention Facility for any behavioral or disciplinary reasons.
> Although Ms. Andrews "has 300 beds available" in the San Francisco area, it is her
> practice to transfer minors with a "Final Order" to the Facility to await deportation.
> Ms. O'Brien does the same ...

> Both Ms. O'Brien and Ms. Andrews admitted that no evaluation of a minor's conduct
> is made before he or she is placed at the Facility. Both women seem to believe that a
> final order of deportation is enough of a flight risk to justify the transfer. Ms.

> Andrews said there are no "less restrictive alternatives" for minors with final orders.

Latham & Watkins Memorandum : July 31, 2001 Flores Compliance Inspection of Tulare

County Juvenile Detention Facility (August 13, 2001) (hereinafter Latham & Watkins Tulare

Report), Exhibit 32, at § II(A); *see also* Declaration of Shae Luti, September 2, 2001, Exhibit 6,

at 2 ("Ms. O'Brien informed us that Minors with final orders of removal are systematically

placed at secure facilities because they are determined to be a flight risk.").[22]

> As a result, children have spent months or years in locked facilities. Typical of these

stories is that of class member Chen Sai. Defendants initially placed Chen at a licensed

shelter facility in Florida known as Boys' Town, but transferred him to a juvenile hall once

he was ordered removed.

> All the minors at Boys' Town were there because of immigration violations only, as
> far as I know. At Boys' Town I was permitted to wear my own clothes, and we took
> trips to the park, to the movies, and to go skating, from time to time. At Boys' Town I
> never thought of escaping. Anyway, we could not escape because the main gate to

---

[22] At one point, defendants' headquarters office confirmed this policy. In response to
inquiries by plaintiffs' counsel pursuant to the Settlement's monitoring provisions,
defendants' Deputy Director of Juvenile Affairs confirmed that their *sole* reason for holding
four specific class members in secure confinement was that a final order of removal had
been entered against them. Letter of John Pogash, October 20, 2001, Exhibit 8.

1     the facility was kept locked, and there were staff people, but not guards, to prevent

2     us from leaving. At Boys' Town, I never had any trouble ...

3     About the beginning of February, 2001 I was transferred to Tulare Juvenile Hall. I

4     have now been here nearly eight months. When I left Boys' Town I was told I had to

5     be transferred because I had lost my immigration case, and I had failed in my appeal.

6     All minors who lose their appeals are sent here, as far as I know.

7   Declaration of Chen Sai, September 28, 2001, Exhibit 11, at ¶¶ 2-3; *see also* Declaration of Jim

8   Mei Huang, September 14, 2001, Exhibit 12, at ¶ 1 ("When I was transferred to Tulare

9   County, the INS told me I was transferred because I was an escape risk and because I had a

10  final deportation [order]. They said I was an escape risk because of my final deportation

11  [order]."); Declaration of Anibal Francisco Zuniga Valle, July 8, 2002, Exhibit 9, at ¶ 14;

12  Declaration of Oscar Morales Guerra, July 8, 2002, Exhibit 10, at ¶ 4 ("I was returned to

13  Globe [Juvenile Hall] after I received a final deportation order.").

14        More recently, in April 2003, class members Cesar Omar Martinez and Jose

15  Humberto Gonzalez were transferred to Central Juvenile Hall (CJH), a high security

16  juvenile detention facility in Los Angeles, California, from a licensed facility in Chicago. *See*

17  Declaration of Cesar Omar Martinez, April 29, 2003, Exhibit 13, at ¶ 3 and 4; Declaration of

18  Jose Humberto Gonzalez, April 29, 2003, Exhibit 14, at ¶ 3. The boys were not told why they

19  were transferred to CJH, but both state they have never been arrested, charged or convicted

20  of any crime or juvenile offense nor reported any behavioral problems in the Chicago

21  shelter. *See* Cesar Omar Declaration at ¶ 13 and Jose Humberto Declaration at ¶¶ 7 and 13.

22  An immigration judge had, however, entered a removal order against them. *See* Declaration

23  of Shiu Ming Cheer, May 12, 2003, Exhibit 16, at ¶ 4.

24        After staying at CJH for nine days, Jose and Cesar were transferred to the Florence

25  Service Processing Center, an adult detention facility in Florence, Arizona, ostensibly

26  because defendants intended to remove them promptly from the United States. Declaration

27  of Cesar Omar Martinez, May 6, 2003, Exhibit 15, at ¶¶ 2-4 ("I was told that I would be

28

leaving for Honduras on May 7th, and that I would wait for my flight in Arizona");
Declaration of Shiu Ming Cheer, May 12, 2003, Exhibit 16, at ¶ 4 (Jose and Cesar had been
transferred to Florence in handcuffs from Central Juvenile Hall on April 30, 2003 to await
removal to Honduras on May 7, 2003.[23]

These practices cannot be squared with the unambiguous text of the Settlement.
Paragraphs 21 and 22 permit secure confinement of minors who are *serious* escape-risks: that
is, minors with a demonstrated desire and the ability to escape from less secure facilities.[24]
Defendants' policy can be valid only if it logically follows that *all* minors with removal
orders are serious escape-risks. That is clearly not the case. For example, even though they
may be subject to final removal orders, very young class members are hardly escape
risks—much less *serious* escape risks—because they lack the ability to understand the legal
proceedings against them, have no idea what an order of removal is or means, and could
not care for themselves outside of the custody of a relative or defendants even if they were
disposed to escape. Defendants' blanket approach improperly conflates being subject to a
removal order with being a "serious" escape-risk. The two are simply not synonymous, and
the Settlement itself so provides.

Under the plain terms of the Settlement, whether any given minor is a serious escape-

---

[23] Defendants apparently house children in the adult processing center in Florence prior to
removing them to Central America as a matter of policy and practice. *See* Declaration of
Deborah Lee, May 15, 2003, Exhibit 17, at ¶ 11-13 ("On April 29, 2003, Deportation Officer
Ludin of Phoenix, Arizona… stated that if minors were being transferred from CJH, they
would be detained at a "staging area" at the Florence Service Processing Center."); *accord*
Declaration of Shiu Ming Cheer at ¶ 6 ("[I]t appears that this [placement of children in the
Florence adult jail] is becoming a normal practice as upon my visit to Cesar and Jose, I
learned that three other immigrant minors were being detained at the adult facility as
well."); Declaration of Diane Eason, May 15, 2003, Exhibit 18 ¶ 4-6 (reporting deportation
officer's party-admission that "detainees with a final order of removal or voluntary
departure who are being removed to Central American countries, are routinely transferred
to the [adult] staging facility in Florence, Arizona...").

[24] As discussed below, in many parts of the country defendants have no medium secure
placements. Thus, children whose propensity to escape could be addressed by the increased
supervision medium secure facilities provide end up in locked facilities.

1    risk must be determined on the basis of all the relevant facts : that is, defendants must make

2    an *individualized* determination that a particular minor is a serious escape-risk before he or

3    she may be locked down:

4         The term "escape-risk" means that there is a *serious* risk that the minor will attempt to

5         escape from custody. *Factors to consider* when determining whether a minor is an

6         escape-risk or not include, but are not limited to, whether:

7              A. *the minor is currently under a final order of deportation or exclusion;*

8              B. the minor's immigration history includes: a prior breach of a bond; a failure

9              to appear before the INS or the immigration court; evidence that the minor is

10             indebted to organized smugglers for his transport; or a voluntary departure or

11             a previous removal from the United States pursuant to a final order of

12             deportation or exclusion;

13             C. the minor has previously absconded or attempted to abscond from INS

14             custody.

15   Settlement ¶ 22 (emphasis added).

16        Were defendants' policies permitted under the Settlement, it would simply provide

17   that all minors under final removal orders are subject to secure confinement. It does not do

18   so. Rather, the Settlement provides that entry of a "final" order of deportation or exclusion

19   is only *one factor* defendants must consider in determining whether a particular child is a

20   *serious* escape-risk.

21        The Court's task is to give effect to the parties' intent as it appears on the face of the

22   Settlement. *Turner v. United States, supra*, 875 F. Supp. at 1434; *see also Hammon v. Kelly, supra*,

23   830 F. Supp. at 15 (looking to parties' intent in settlement and noting that plaintiffs had

24   waived any and all lcaims to further relief in agreeing to settlement). That defendants have

25   subsequently adopted an interpretation of the Settlement at odds with the unambiguous

26   purpose and intent of the agreement is no reason to depart from this well-established rule of

27   construction. *Kennewick Irrigation District v. United States, supra*, 880 F.2d 1018 at 1032

28

- 26 -

1    (parties' disagreeing as to a settlement's meaning does not impair validity).

2         Finally, it is axiomatic that settlements should be construed so as to avoid

3    neutralizing or ignoring any provisions or treating provisions as surplusage. *See, e.g.*,

4    *Klamath Water Users Protective Association v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999)

5    (interpreting contract pursuant to federal law); *Kennewick*, 880 F.2d at 1032 ("Preference

6    must be given to reasonable interpretations as opposed to those that are unreasonable or

7    would make the contract illusory.").

8         Were the Settlement to permit secure confinement whenever a removal order is

9    entered, it would not declare such an order one factor in an escape-risk determination. Nor

10   would there be any reason to provide, as the Settlement does, that "[a]*ll* determinations to

11   place a minor in a secure facility must be reviewed and approved by the regional juvenile

12   coordinator." Settlement ¶ 23 (emphasis supplied). Defendants' interpretation neutralizes

13   these provisions, a result not favored under law. *Klamath, supra*, 204 F.3d at 1210.

14        In sum, defendants' placing all children in secure facilities upon entry of a removal

15   order does not comport with structure, language, or intent of the Settlement. Defendants'

16   practice violates the Settlement and should be enjoined.

17        **2    Defendants needlessly re-arrest children released to their families**

18            **even where they know that physical removal will not take place for**

19            **weeks, months, or even years.**

20        In a variation on the foregoing automatic re-arrest policy, a variation that violates the

21   Settlement with respect to both release *and* placement, defendants also automatically re-

22   arrest children earlier released to family members upon the entry of an order of removal.

23   Re-arrested children are then subject to defendants' policy to house class members with

24   removal orders in secure confinement. These re-arrests are carried out without any

25   evaluation of the minor's actual propensity to flee or regard to whether physical repatriation

26   is even feasible. In effect, defendants senselessly take children from safe family homes and

27   place them in juvenile jails, even when they know that physical removal is months or even

28

- 27 -

1  years away.

2      The evidence contains multiple examples of this re-arrest policy. In October 2000, for

3  example, defendants released class member Chen Xiang to her aunt and uncle, a lawful

4  permanent resident and U.S. citizen, respectively, while it pursued removal proceedings

5  against Chen. Declaration of Chen Xiang, September 28, 2001, Exhibit 19, at ¶¶ 1 and 4. For

6  the next six months, Chen lived with her aunt and uncle, attending school in Long Island,

7  New York. *Id*. As a condition of her release, defendants required Chen to report monthly to

8  its New York district office. Chen did so diligently, only to find herself suddenly re-arrested

9  and transferred to juvenile hall 3,000 miles away when she reported after a removal order

10  was entered against her:

11      Every month, my aunt took me to the INS, Flushing, NY office. On July 25, 2001, I

12      went to the Flushing INS office to report to the INS but I was arrested. I called my

13      attorney and he only told me that I had lost my appeal and that I might be deported.

14      That same day, I was taken to Berks County, Pennsylvania [detention facility].

15      At Berks County, I was forced to take my clothes off and I was searched. The next

16      day, I was taken to Tulare County in California. I was not told why I was being taken

17      to Tulare County [Juvenile Hall].

18  *Id*. at ¶¶ 4-5.

19      Similarly, following the entry of a removal order, defendants re-arrested Xue Zhung

20  Zhou and Jin Rong Yiou, siblings who had been released to their uncle. Defendants

21  thereafter incarcerated them in juvenile halls in Spokane, Washington, and Tulare,

22  California. Jin, a shy, soft-spoken girl, described the resulting upheaval in her life:

23      In late July [2000] I was released to my uncle, and my brother and I went to live in his

24      house in Birmingham, Alabama. We stayed with my aunt, uncle, and their two

25      children. I began attending public school (8th grade). Once a month, my uncle would

26      take us to report to the INS in Atlanta, Georgia, a trip of 3-4 hours one way.

27      The second time we went to report to the Atlanta INS office, the officer told my uncle

28

1   The second time we went to report to the Atlanta INS office, the officer told my uncle

2   to step out of the office, that he could go home without us because we were going to

3   be deported. This was about October 4, 2000. My brother and I were re-arrested. The

4   INS fastened heavy sand bags to my brother's feet, but not to mine. I felt very sad

5   and surprised. I had no idea why this was happening to us. From the airport in

6   Spokane to Martin Hall [a juvenile hall], I was handcuffed and shackled.

7   Declaration of Jin Rong Yiou, September 14, 2001, Exhibit 20, at ¶¶ 7-8; Declaration of Xue

8   Zhung Zhou, September 14, 2001, Exhibit 21, at ¶ 12; *see also* Latham & Watkins Report Los

9   Padrinos Visit, Ex. 6, at 10 ("Both Ms Andrews and Ms. O'Brien confirm that the minors

10  detained at the Facility on the ground that they have received final orders of deportation

11  will be held at the Facility until they are deported, even if the process takes several months

12  (as it usually does for deported Chinese minors). They are making no effort to reunite these

13  minors with family members in the United States or to place them in less restrictive

14  settings.").

15      Defendants thereafter incarcerated Jin and Xue in the Tulare Juvenile Hall while it

16  attempted to obtain travel documents from the People's Republic of China ("PRC").[25] After

17  finding *pro bono* counsel to assist them, these minors were released again to their uncle after

18  fifteen months in detention, and defendants have apparently abandoned further efforts to

19  deport Jin and Xue. Declaration of Jennifer Wang, October 3, 2002, Exhibit 67, at ¶¶ 10-13.

20  All told, Jin and Xue spent *more than nine months* uselessly incarcerated at a combined cost to

21  U.S. taxpayers of some $87,000. *See* Latham & Watkins Tulare Report, Exhibit 32, at 1 (the

22  per diem for each minor at Tulare in 2001 was $180). These practices cannot be squared with

23  the Settlement or with the apposite statute.

24

25

[25] Travel documents evince a country's willingness to admit a deportee into its territory, and

26  without them defendants are unable to effect physical removal. In cases involving children

    from countries with which the United States has limited or no diplomatic ties, defendants

27  have no reasonable prospect of physically removing minors within any time certain

    following the entry of a final order of removal.

28

detention of persons against whom a final order of removal (deportation) is entered. 8 U.S.C. § 1231(a)(1) establishes a 90-day "removal period," which commences on the date an order of removal becomes "administratively final" or upon a circuit court of appeals' judgment if the court affirmatively stays removal.

The first sentence of 8 U.S.C. § 1231(a)(2) provides that during this removal period "the Attorney General shall detain the alien." 8 U.S.C. § 1231(a). The second sentence nevertheless provides: "Under no circumstances during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3) [relating to criminal aliens] or deportable under section 1227(a)(2) or 1227(a)(4)(B) [relating to terrorists] of this title." If, following the 90-day removal period, defendants have not effected removal, the agency must generally release individuals "under supervision." 8 U.S.C. § 1231(a)(3). *Zadvydas v. Davis*, 533 U.S. 678, 688-89 (2001).

Defendants' incarcerating children for up to 20 months cannot be squared with their statutory authority to detain aliens following entry of a final order of removal. Yet in the instant case, defendants detained class members Zhou and Yiou for an extra seventeen months, only to release them back to their aunt and uncle. Twenty months of incarceration of these unfortunate minors was completely unnecessary and clearly injurious to these children. Indeed, defendants violate the law when they automatically detain class members even for the 90 days nominally authorized under § 1231(a)(2).

First, the second sentence of § 1231(a)(2) qualifies the otherwise mandatory language of the subsection's first sentence: If the only individuals whom defendants are specifically prohibited from releasing during the 90-day removal period are those removable for crime or terrorism, then defendants must at least exercise discretion in detaining persons removable for other reasons, notwithstanding the use of "shall" in the first sentence of § 1231(a)(2). But defendants' policy and practice is to detain all children regardless of whether it has any hope of removing them within the 90 day period or thereafter. Defendants' broad detention policy cannot be squared with the statute itself.

- 30 -

To conclude otherwise would be to drain the second sentence of § 1231(a)(2) of all vigor, a result that should clearly be avoided. *See Woodfork v. Marine Cooks and Stewards Union*, 642 F.2d 966, 970-71 (5th Cir. 1981) ("A statute should not be construed in such a way as to render certain provisions superfluous or insignificant."); *Carcamo-Flores v. Immigration and Naturalization Service*, 805 F.2d 60, 66 (2nd Cir. 1986) (court "loath" to assume that statutory language "mere surplusage"); *Beisler v. Commissioner*, 814 F.2d 1304, 1307 (9th Cir. 1987) (en banc); *Citizens to Save Spencer County v. United States Environmental Protection Agency*, 600 F.2d 844, 870-71 (D.C. Cir. 1979) (court must view a statute as a whole, consider its underlying goals and purposes, and construe its various sections so as to give the legislature's purpose the greatest practical effect).

In expressly precluding defendants from releasing only certain aliens during the 90-day removal period, § 1231(a)(2) implicitly contemplates that they will at least exercise discretion to release other aliens even before 90 days have run. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296 (1983); *Lutheran Social Services of Minnesota v. United States*, 758 F.2d 1283, 1289 (8th Cir. 1985); *Marshall v. Western Union Telegraph Co.*, 621 F.2d 1246, 1251 (3rd Cir. 1980). Defendants' automatic re-arrest policy clearly exceeds their statutory authority.

Defendants' policy also violates the Settlement. The agreement makes no exception to its general policy favoring release merely because an order of removal has been entered against a child. Rather, ¶ 14 requires release except where "the INS determines that the detention of the minor is not required either [i] to secure his or her timely appearance before the INS or the immigration court, or [ii] to ensure the minor's safety or that of others ..." Obviously, nothing in the Settlement precludes defendants from detaining a child in the course of physically removing him or her. But neither does it permit months or years of open-ended incarceration.

Defendants entered into the Settlement *after* Congress had specified the general 90-day removal period in 8 U.S.C. § 1231(a), and their having done so supports plaintiffs'

1    analysis that nothing in § 1231(a) requires defendants to re-arrest children in *all* cases, and

2    certainly not where defendants (i) have made no prior effort to obtain travel documents

3    permitting the child's repatriation; or (ii) lack any basis to believe that they will get travel

4    documents at any time certain, if at all. Under these circumstances, the Settlement should be

5    read to require defendants to have a reasonable expectation that they will be able to effect

6    removal promptly before they may again seize a child. This Court should so require.

7           **3**      **Defendants automatically place minors who have been arrested for**

8                 **petty, non-violent crimes in secure facilities.**

9          Yet another policy and practice contributing to the routine overuse of secure facilities

10   is defendants' policy and practice to place *all* children with *any* prior arrest in secure

11   facilities. In Los Angeles, for example, minors with any suspected involvement in criminal

12   behavior are subject to secure confinement:

13        [Los Angeles District: INS Juvenile Coordinator Michelle] O'Brien explained to us

14        that Los Padrinos, the INS-contracted less-secure facility in this area, refuses to take

15        minors with any involvement, suspected or otherwise, in "criminal" activities. Thus,

16        any INS-detained minor who has been arrested for any activity is automatically

17        placed in CJH. Ms. O'Brien exhibited some concern over this practice and related one

18        story of her failing to report to Los Padrinos that a minor had been arrested where

19        the offense was so minor that she felt detention in CJH was completely unjustified.

20        Despite her one exercise of "discretion," it appears that in practice detention in CJH is

21        automatic.

22   Latham & Watkins Report on Flores Compliance Visit to Central Juvenile Hall (JAugust 22,

23   2001), (hereinafter "Latham & Watkins Central Report"), Exhibit 23, at 3; *see also* Declaration

24   of Shae Luti (2), Exhibit 6, at 11 (recounting interview with minor placed at Los Padrinos

25   Juvenile Hall "after being picked up for shoplifting").

26        Class member Ernesto Rivera Campos confirms defendants' policy to place minors in

27   secure facilities no matter how isolated or petty their offenses:

28

1    I made my way to Los Angeles because I was told in Texas that there were many

2    Salvadorans living in Los Angeles. I worked for about 1 week in Santee, CA. I lost

3    that job. That was the only job I have managed to find since I arrived here. I was

4    arrested in Fountain Valley. My shoes had worn out and I had no money, so I was

5    forced to steal a pair of shoes. The store employee held me until the police arrived.

6    They arrested me and took me to the police station. I spent one night there.

7    The next day, the INS came to speak with me. Then they brought me to San Diego

8    Juvenile Hall, where I have been ever since. That was the first and only time I've been

9    arrested for anything and the first time I've ever stolen anything. The INS never

10   asked me any questions about why I had tried to steal the shoes. The INS did ask me

11   whether I've been arrested before, and I told them this was the first and only time.

12   Declaration of Ernesto Rivera Campos, February 15, 2002, Exhibit 24, at ¶¶ 2-3. Defendants'

13   record of their reasons for placing Mr. Rivera in a locked facility confirms his account. *See*

14   Exhibit 25 (confirming Mr. Rivera's placement in San Diego Juvenile Hall because of "petty

15   theft arrest").[26]

16        The Settlement prohibits the *automatic* placement of *all* youth with any arrest—no

17   matter how isolated or petty the offense—in secure facilities. It specifically provides that

18   minors charged with non-violent or petty offenses may *not* be housed in secure facilities:

19

20   [26] The policy to place class members in juvenile halls extends even to minors who have

21   never been arrested. Ms. O'Brien, the juvenile coordinator for the Los Angeles District
     Office, advised plaintiffs' counsel that defendants automatically consign "gang members" to

22   juvenile hall as well, whether or not they've ever been arrested or convicted of any crime or
     juvenile offense:

23
          Eastlake is a secure detention facility located near downtown Los Angeles. According

24        to Ms. O'Brien, INS juvenile detainees (the "Detainee" or "Detainees") are held at
          Eastlake under two circumstances, either: (1) when the Detainee has been arrested or

25        involved in criminal activity, or (2) when the Detainee is believed to be involved in
          gang activity. It is unclear, however, as to what standard INS utilizes to determine

26        whether a Detainee is involved in gang activity.

27   Declaration of Shae Luti, Exhibit 6, at 2; *see also id.* at 3 ("Ms. O'Brien informed our team that
     all detainees with gang affiliations are automatically placed at Eastlake.")

28

- 33 -

A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

A. has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that *this provision shall not apply* to any minor whose offense(s) fall(s) within either of the following categories:

i. *Isolated offenses* that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc. This list is not exhaustive.);

ii. *Petty offenses*, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc. This list is not exhaustive.)...

Settlement ¶ 21 (emphasis added).

Defendants' across-the-board approach deletes essential terms of ¶ 21A from the Settlement. This Court should order defendants to comply with ¶ 21A.

### 4   Defendants have failed to provide medium secure placements for non-delinquent class members with special needs.

Defendants' failure to arrange medium secure placements further swells the population of children in secure confinement. The Settlement acknowledges that youth with behavioral problems or who are serious escape risks cannot generally be housed in a facility designed for the general population of class members. Such children frequently suffer from psychological problems requiring a heightened level of mental health services or supervision. Clearly, such children are not helped by being consigned to juvenile halls.

1   The Settlement designates such children as "special needs minors" and obliges
2   defendants to use their best efforts to avoid locking down children whose emotional
3   problems preclude their being housed with the general population of detained minors. The
4   agreement defines "special needs" minors as follows:

5   The term "special needs minor" shall refer to a minor whose mental and/or physical
6   condition requires special services and treatment by staff. A minor may have special
7   needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or
8   retardation, or a physical condition or chronic illness that requires special services or
9   treatment. A minor who has suffered serious neglect or abuse may be considered a
10   minor with special needs if the minor requires special services or treatment as a result
11   of the neglect or abuse. The INS shall assess minors to determine if they have special
12   needs and, if so, *shall place such minors, whenever possible, in licensed programs in which*
13   *the INS places minors without special needs, but which provide services and treatment for*
14   *such special needs.*

15   Settlement ¶ 7 (emphasis added).

16   In addition to providing special needs minors with additional supervision in licensed
17   facilities, the Settlement contemplates that medium secure facilities would be a viable and
18   reasonably available option for special needs minors:

19   Medium secure facilities should be available for "special needs minors," as well as for
20   other minors for whom the least restrictive setting (such as foster or shelter care) is
21   inappropriate, but that do not require placement in a correctional facility:

22   8. The term "medium security facility" shall refer to a facility that is operated by a
23   program, agency or organization licensed by an appropriate State agency and that
24   meets those standards set forth in Exhibit 1 attached hereto. A medium security
25   facility is designed for minors who require close supervision but do not need
26   placement in juvenile correctional facilities. It provides 24-hour awake supervision,
27   custody, care, and treatment. *It maintains stricter security measures, such as intensive*

28

- 35 -

custody, care, and treatment. *It maintains stricter security measures, such as intensive staff supervision, than a facility operated by a licensed program in order to control problem behavior and to prevent escape.* Such a facility may have a secure perimeter but shall not be equipped internally with major restraining construction or procedures typically associated with correctional facilities.

*Id.* (emphasis supplied).

Defendants accordingly pledged to use their best efforts to place these minors in licensed facilities or medium-secure facilities equipped to meet their special needs. This, of course, is consistent with the Settlement's fundamental guarantee that children should be placed in the least restrictive setting practicable. Settlement ¶ 21 ("The INS will not place a minor in a secure facility ... if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program."). Nevertheless, more than five years after entering the agreement, defendants have yet to offer special needs minors any viable alternative to secure confinement.

The available data show that as of November 2001 *defendants had only ten medium-secure beds in the entire country.* United States Department of Justice, Immigration and Naturalization Service, Office of Detention and Removal, Program Descriptions (November 2001), Exhibit 26.[27] All of these beds are concentrated in states in the former-INS's Central Region, far from the areas in which the vast majority of class members are apprehended: the Northeast and Southwest. Defendants have *no* medium-secure beds in either the Western or

---

[27] These beds are located in six facilities. Defendants had two beds available in five different facilities: Minnehaha County Regional Detention in Sioux Fall, SD; Carver County Juvenile Center in Chaska, MN, Western S. Dakota Juvenile Services in Rapid City, SD; Washington County Juvenile Detention Facility in Still Water, MN; and Hennipin County Juvenile Detention Center in Minneapolis, MN. The capacity of the only other medium secure facility—Charter Palms Psychiatric Hospital—is unknown.

1    Eastern Regions.[28] *Id.* For want of medium-secure placements, class members suffering from

2    psychological trauma end up in facilities designed for and primarily occupied by juvenile

3    delinquents.

4           The Settlement contemplates that defendants would either make medium-secure

5    placements reasonably available or provide licensed facilities with additional resources to

6    permit them to care for minors with special needs. They do neither. Defendants' failure to

7    arrange for medium-secure placements denies special needs minors the care and services

8    they should be receiving and contributes to the overuse of secure facilities in violation of the

9    Settlement.

10          **5        Defendants' overuse of secure facilities cannot be excused as within**

11               **the "influx" exception.**

12          Defendants cannot excuse their placing nearly one in three class members in locked

13   facilities as within the Settlement's "influx" exception. In a section entitled, "PROCEDURES

14   AND TEMPORARY PLACEMENT FOLLOWING ARREST," the Settlement permits defendants to

15   house children *temporarily* in secure facilities when the population of detained minors is

16   exceptionally large due to an "influx" of minors into defendants' custody. The Settlement

17   defines "influx" as follows:

18          The term "influx of minors into the United States" shall be defined as those

19          circumstances where the INS has, at any given time, more than 130 minors eligible

20          for placement in a licensed program under Paragraph 19, including those who have

21          been so placed or are awaiting such placement.

22   Settlement ¶ 19.

23          The Settlement's requiring defendants to have at least 130 licensed placements

24

25

26

27   [28] The Western Region comprises the states of Washington, Oregon, California, Hawaii,
     Arizona and Alaska. 8 C.F.R. § 100.4. The Eastern District comprises most of the country east
     of the Mississippi, including New York and Florida. *Id.*

28

- 37 -

1    guaranteed the entire population of detained minors in 1996 a bed in a licensed facility.[29]

2    The Settlement stipulated that the policy favoring release would reduce the population of

3    detained minors, but included the following prophylactic provision in the event the

4    population grew beyond 1997 levels:

5        In preparation for an "emergency" or "influx," ... the INS shall have a written plan

6        that describes the reasonable efforts that it will take to place all minors as

7        expeditiously as possible. This plan shall include the identification of 80 beds that are

8        potentially available for INS placements and that are licensed by an appropriate State

9        agency to provide residential, group, or foster care services for dependent children.

10       The plan, without identification of the additional beds available, is attached as

11       Exhibit 3. The INS shall not be obligated to fund these additional beds on an ongoing

12       basis. The INS shall update this listing of additional beds on a quarterly basis and

13       provide Plaintiffs' counsel with a copy of this listing.

14   Settlement ¶ 12C.

15       In the event of an emergency or influx that prevents the prompt placement of minors

16       in licensed programs with which the Community Relations Service has contracted,

17       INS policy is to make all reasonable efforts to place minors in licensed programs

18       licensed by an appropriate state agency as expeditiously as possible. ...

19       ...

20       4. In the event that the number of minors needing emergency placement exceeds the

21       available appropriate placements on the Emergency Placement List, the Juvenile

22       Coordinator will work with the Community Relations Service to locate additional

23       placements through licensed programs, county social services departments, and

24

25   ───────────────────

26   [29] In 1996, when the parties drafted the Settlement, the average daily population of youth in
     defendants' custody stood around 100. Four years later, the average daily population of had
27   increased to nearly 500. OIG Report, Exhibit 1 Ch. 1 at 1 (using population data from FY
     2000).
28

1   non-delinquent youth.[30]

2       Further still, defendants have *never* provided plaintiffs with a single reevaluation of

3   the need for licensed placements. Declaration of Carlos Holguin, January 14, 2004, Exhibit 7,

4   ¶ . Thus, defendants should not be heard to argue that they cannot afford sufficient licensed

5   placements for the current population of detained children.

6       Most vitally, it has been seen that defendants have embraced a number of policies

7   and practices violative of the Settlement that contribute to a persistent, if not permanent,

8   state of "influx":

9   •    defendants fail to release children to other reputable adults when their parents refuse

10       to appear for them;

11   •    defendants fail to seek out custodians for detained children;

12   •    defendants fail to release children to "unlisted" relatives, licensed youth shelters, or

13       other suitable custodians when a parent or "listed" family members fails to seek

14       custody of the child; and

15   •    defendants needlessly re-arrest children previously released to their parents or family

16       members even when they know there is little or no chance they will be able to

17       remove the child for weeks or months.

18       Defendants' persistently incarcerating 30 percent of class members in locked facilities

19   is inexcusable. This Court should issue appropriate orders requiring defendants to comply

20   with the Settlement forthwith.

21       **D**    **Defendants routinely fail to provide children in their custody with**

22       **treatment and services required by the Settlement.**

23       As has been seen, defendants' detaining large numbers of children, particularly in

24   juvenile jails, is wholly inconsistent with the Settlement; this motion accordingly seeks first

25

26   _____

27   [30] The fiscal 2003 budget included $50.5 million to improve detention facilities and expand
alternatives to detention. Fact Sheet: the President's Fiscal 2003 Immigration Budget,

28   Detention and Removals, February 4, 2002, Exhibit 70, at 1.

to secure defendants' compliance with the agreement's release and placement provisions. But for the thousands of children who remain in defendants' custody, properly or not, the Settlement's provisions fixing minimum standards for their care and treatment are no less important.

For however long they remain in defendants' custody, the Settlement guarantees children certain rights and benefits. Detailed primarily in Exhibit 1 to the Settlement and in defendants' Juvenile Protocol Manual, the agreement entitles detained children to basic educational and mental health services.[31] It vests them with the right to understand the proceedings against them, to have full and free access to counsel, and to be free from unreasonable restraints and other mistreatment.[32]

---

[31] The Juvenile Protocol Manual was completed in March 1999, after defendants entered into the Settlement. Clearly, defendants' interpretation of the Settlement in the JPM is compelling evidence of the meaning and purpose of the Settlement. *See* W. *Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29, 33 (2d Cir. 1996); *Ocean Transp. Line, Inc., v. American Philippine Fiber Indus.*, 743 F.2d 85, 91 (2d Cir. 1984) (stating that "parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent"); RESTATEMENT (SECOND) OF CONTRACTS § 202, cmt.g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").

Further, "even internal, unpublished rules can be binding, at least on the agency." *Wilkinson v. Legal Serv. Corp.*, 27 F.Supp.2d 32, 60 (D.D.C. 1990). This is so because "where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *cf. Clemente v. United States*, 766 F.2d 1358, 1365 & n.10 (9th Cir. 1985) ("[A]n executive agency must be rigorously held to the standards by which it professes its action to be judged.").

[32] Defendants will no doubt answer that only children placed in licensed programs are entitled to the treatment and services referenced in Settlement Exhibit 1, and that they may accordingly treat class members incarcerated in juvenile halls in any manner defendants see fit. Plaintiffs disagree. The Settlement's standards for services and treatment effectively protect children held in secure facilities as well.

First, as has been seen, defendants improperly consign up to 30 percent of class members to secure facilities. If defendants may deny basic rights and services to class members merely by placing them in secure facilities, they will be encouraged to violate the agreement's placement provisions. By ordering defendants to afford all class members basic rights and services even when they are in secure placements, the Court will remove an incentive for defendants to place children in such facilities improperly.

-41-

As discussed below, however, defendants have consistently failed to afford children in their custody the basic benefits and services guaranteed them by the Settlement.

### 1    Defendants deny children in their custody adequate education.

Defendants have not provided youth remaining in custody with the educational benefits guaranteed by the Settlement. The Settlement requires licensed programs to provide educational services for all class members. Specifically, according to Exhibit 1, the curriculum must include —

Second, the Settlement expressly precludes defendants from denying basic rights and services even to class members properly placed in secure facilities: —

> If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility. However, *minors shall be separated from delinquent offenders. Every effort must be taken to ensure that the safety and well-being of the minors detained in these facilities are satisfactorily provided for by the staff.*

Settlement ¶ 12 (emphasis added); *see also, id.* at ¶ 21 (secure facilities must be "suitable").

The Settlement further provides that at all times "[f]ollowing arrest" defendants may hold children only —

> in facilities that are *safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors.* Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours.

Settlement ¶ 12 (emphasis supplied).

Defendants' "concern for the particular vulnerability of minors," is no empty phrase: it finds specific expression in defendants' Juvenile Protocol Manual, which provides that secure facilities must meet minimum standards for educational services equivalent to those set out in Settlement Exhibit 1. Settlement ¶¶ 12 and 21 entitle all children held in secure facilities to the rights and privileges set out in the Juvenile Protocol Manual. *Wilkinson v. Legal Serv. Corp., supra; Morton v. Ruiz, supra; Clemente v. United States, supra.*

- 42 -

1    [e]ducational services appropriate to the minor's level of development, and

2    communication skills in a structured classroom setting, Monday through Friday,

3    which concentrates primarily on the development of basic academic competencies

4    and secondarily on English Language Training (ELT). *The education program shall*

5    *include instruction and educational and other reading materials in such languages as needed.*

6    *. . . .The program shall provide minors with appropriate reading materials in languages other*

7    *than English for use during the minor's leisure time.*

8    Settlement Exhibit 1, ¶ A4 (emphasis supplied); *see also,* Immigration & Naturalization

9    Service, Juvenile Protocol Manual, Exhibit 40, at §§ 3-JDF-5C-01 (educational services), and

10   3-JDF-5D-03 (library services).

11   Despite these provisions, children confined in facilities are routinely denied adequate

12   educational services. Twelve percent of secure facilities interviewed by Amnesty provide

13   class members *no* educational services whatsoever. Amnesty Report, Exhibit 2, at 39. Fifty-

14   seven percent fail to offer instruction in English as a second language; 48 percent offer no

15   instruction in children's native languages. *Id*. at 40.[33]

16   But children held in these facilities are lucky. *Children in other facilities receive no*

17   *educational instruction at all. See, e.g.,* Declaration of Wilbur Antonio Orillana, July 16, 2002,

18   Exhibit 38, at ¶ 12 ("I receive no schooling here [Hondo] and no one has tried to teach me

19   English"); Declaration of Olvin Geovani Arteaga Moncada, July 26, 2002, Exhibit 27, at ¶10

20   ("I don't get any schooling here [Hondo]."); Declaration of Anibal Francisco Zuniga Valle,

21

22   [33] Children report the futility of educational instruction they cannot understand. For
23   example, according to Xue Zhung Zhou, a child defendants detained in a San Diego juvenile
     hall, there were five classes per day. However, Zhou did not speak English, and "[a]ll the
24   classes were in English. [As a result] I learned very little." Declaration of Xue Zhung Zhou,
     September 14, 2001, Exhibit 21 at ¶ 6; Declaration of Jain Xing Zheng, September 14, 2001,
25   Exhibit 45 at ¶ 6 ("They do not provide education in Chinese and I have problems
     learning."); Declaration of Chen Sai, September 28, 2001, Exhibit 11 at ¶ 9 (instruction
26   mainly in English); Declaration of Jose Humberto Gonzalez, April 29, 2003, Exhibit 14 at ¶
     12 ("I have been going to school here[Central Juvenile Hall] but the teacher does not speak
27   Spanish. Sometimes the other kids in the classroom who can speak Spanish tell me what she
     is saying.").
28

July 8, 2002, Exhibit 9, at ¶¶ 17, 21 ("I don't get any classes here [Globe] at all," and the "book that I had in my room was taken away."); Declaration of Cesar Omar Martinez, May 6, 2003, Exhibit 15, at ¶ 9 ("I do not go to school [at Florence Adult Staging Facility]. I wish I could go to school so that I could have something to do and learn something."); Declaration of Jose Humberto Gonzales, May 6, 2003, Exhibit 41, at ¶ 8 ("We are all alone in our cells [at Florence Adult Staging Facility]. I have no books, paper or pencils. I do not go to school. Some youth are confined to their cells and not permitted to attend classes."); Declaration of Jose Wilber Hernandez-Segovia, October 18, 2001, Exhibit 33, at ¶ 1 ("Being in INS custody [at the Globe detention facility in Arizona] has been a tremendously horrible experience. For the last three days I have been in solitary lock-down... I am not permitted to leave my cell to eat or go to class."); Declaration of Walter Rodas-Hernández, July 8, 2002, Exhibit 39, at ¶ 6 ("So far, I have had no schooling [at Globe]."); Declaration of Carlos Hugo Pacheco, October 18, 2001, Exhibit 43, at ¶ 2 ("There has not been any classes since last Thursday [at Globe]. I do not know why."); Declaration of Felipe Galileo Lopez-Beltran, October 14, 1986, Exhibit 44, at ¶ 3-4 ("I was kept in the Chula Vista facility for 4 days. I received no educational instruction or access to educational reading materials while I was at Chula Vista...While at Hollywood, I have received no educational instruction of any type."); *see also* Gila County Juvenile Detention Center: Student and Parent Handbook, Exhibit 42 ("Gila Handbook") (confirming that Level "0" or "white shirt" detainees receive no education time).[34]

In other facilities, not only are class members denied educational instruction, they are even denied reading materials. *See* Declaration of Liliana Linares, September 17, 2003, Exhibit 61, at ¶ 14 ("I have no books, no reading materials."); Declaration of Manuel Sanchez, September 17, 2003, Exhibit 60, at ¶ 4 ("We have no books or magazines or

---

[34] Other facilities suspend all educational services during the summer months, which leaves children with lengthy periods of unstructured time, primarily resulting in excessive confinement to cells or time spent watching television. Declaration of Elizabeth Cox, July 7, 2003, Exhibit 52 at ¶ 12 and 15.

1   newspapers to read."); Declaration of Olvin Giovanni Arteaga Moncada, July 16, 2002,

2   Exhibit 27, at ¶ 13 ("I am not allowed to keep anything but a Bible in my room.");

3   Declaration of Felipe Galileo Lopez-Beltran, October 14, 1986, Exhibit 44, at ¶ 3 ("I received

4   no educational reading materials while I was at Chula Vista.").

5       Children also report receiving substandard instruction. At Berks County Youth

6   Center (BCYC), instruction is limited to a computer program, not live instruction. According

7   to Human Rights Watch,

8       non-English speaking children are often simply given books or worksheets to work

9       on individually. . . . Quian, fifteen [years old], reported in September (2001) that as

10      many as seven Chinese-speaking children were at BCYC at one time during her

11      period of detention. Because the facility only had one computer equipped with the

12      Chinese-English language program, the children were forced to sign up at intervals

13      to gain access. . . .Another Chinese girl was classified at the third grade level at the

14      time of her release from BCYC but within months of entering public school was

15      ranked in the top third of her ninth grade class.

16  Human Rights Watch, "Detained and Deprived Rights: Children in the Custody of the U.S.

17  Immigration and Naturalization Service," Exhibit 46, at 20 (December 1998) (hereinafter

18  "Children in Custody"); *See also* Declaration of Josué Enrique Andrade García, July 8, 2202,

19  Exhibit 35, at ¶ 31 ("The teachers ... don't explain much. Most of the time they just make us

20  copy words from [one] page to another. This is supposedly to teach us English. I don't feel

21  that I have learned anything here") and Declaration of Nery Amadour Rodriguez-Montejo,

22  July 8, 2002, Exhibit 37, at ¶ 7 ("Here [Globe] I've had no classes, except a teacher comes for

23  about 1/2 an hour during week days. I sit in front of a computer and listen to English

24  lessons.").

25      Despite the directives of both the Settlement and the Juvenile Protocol Manual,

26  defendants are denying children appropriate educational instruction and reading materials.

27  Far too often, children spend weeks or months locked in cells without classes or access to

28

1    books. This Court should find defendants in violation of the Settlement and exercise its

2    authority to enjoin further violations.

3         2    **Children in defendants' care receive no or palpably inadequate**

4              **mental health services.**

5        Defendants also deny minors in their care even rudimentary mental health services.

6    The Settlement guarantees class members —

7        [a]t least one (1) individual counseling session per week conducted by trained social

8        work staff with the specific objectives of reviewing the minor's progress, establishing

9        new short term objectives, and addressing both the developmental and crisis-related

10       needs of each minor [and]

11       [g]roup counseling sessions at least twice a week. This is usually an informal process

12       and takes place with all the minors present. It is a time when new minors are given

13       the opportunity to get acquainted with the staff, other children, and the rules of the

14       program. It is an open forum where everyone gets a chance to speak. Daily program

15       management is discussed and decisions are made about recreational activities, etc. It

16       is a time for staff and minors to discuss whatever is on their minds and to resolve

17       problems.

18   Settlement Exhibit 1, at ¶¶ 6-7.

19       The Juvenile Protocol Manual similarly declares that mental health services must be

20   provided to *all* minors in defendants' care, whether they are housed in licensed programs or

21   secure facilities. Juvenile Protocol Manual, Exhibit 40, at § 9.1.1 (establishing right to

22   appropriate mental health interventions in all facilities); *id*. at §§ 3-JDF-4C-16, 3-JDF-5B-04,

23   3-JDF-3E-01 (secure facilities required to provide mental health services and counseling, as

24   well as special management for minors with serious behavioral problems).

25       In practice, however, defendants honor these commitments only in the breach. The

26   Office of Inspector General reports that "secure facilities generally do not provide

27   counseling or have case workers on-site on a daily basis." OIG Report, Exhibit 1, Ch. 3.

28

- 46 -

1    Indeed, Amnesty International reports that only three of the 23 secure facilities

2    responding to its survey reported providing weekly counseling. Amnesty Report, Exhibit 2,

3    at 41. At Gila County, among several other facilities, counseling is provided only in

4    emergencies. *Id*. Only five secure facilities and only half of defendants' licensed facilities

5    purport to have access to mental health professionals trained in dealing with trauma. *Id*.

6    Amnesty International further found that "facility staff have in some cases, reportedly failed

7    to retain mental health professionals and hindered service providers in their efforts to

8    secure assistance." *Id*. at 41-42.

9        For children suffering from post-traumatic stress syndrome or other mental affliction,

10   defendants' failure to provide mental health services doubly damaging. According to

11   Amnesty International, rather than provide mental health services to children with

12   emotional or mental distress, defendants instead send them to secure facilities, where they

13   are placed in solitary confinement and subjected to handcuffing and like physical restraints.

14   Amnesty Report, Exhibit 2, at 22, 41-42. The testimonial evidence corroborates defendants'

15   preference for solitary confinement and mechanical restraints over mental health services.

16       The Bexar (Texas) County Detention Center, a secure facility, simply "doesn't offer

17   mental health services. The nurse uses locked 24-hour observations rooms to monitor

18   children who might hurt themselves." Declaration of Elizabeth Cox, July 7, 2003, Exhibit 53,

19   at ¶ 7. Staff at the Medina (Texas) County Juvenile Facility, another locked facility, admitted

20   that the "health department provides mental health services only if staff members notice a

21   grave need for therapeutic services and only with approval of immigration officers."

22   Declaration of Elizabeth Cox, July 7, 2003 , Exhibit 52, at ¶ 10.

23       Minors in other secure facilities corroborate the lack of counseling services, routinely

24   reporting having never seen a counselor or mental health practitioner. *See, e.g.*, Declaration

25   of Nery Amador Rodriquez-Montejo, July 8, 2002, Exhibit 37, at ¶ 8 (after three months in

26   detention at Southwest Key in Phoenix and later Globe Juvenile Hall, Nery stated he had

27   "never spoken to a counselor or psychologist since being arrested"); Declaration of Chen

28

Sai, September 28, 2001, Exhibit 11, at ¶ 8 (minor held at Tulare Juvenile Hall for eight months had "never spoken to a counselor about how I feel being here"); Declaration of Chen Xiang, September 28, 2001, Exhibit 19, at ¶ 2, 4, and 8 (youth held at Boystown [Florida] until released to aunt and uncle in Long Island, New York; upon losing appeal, minor re-arrested and held at Tulare Juvenile Hall; minor felt "depressed and sad being at Tulare County" and stated that although the staff sometimes talked to him they "do not offer me counseling services or tell me they are available"); Declaration of Jain Xing Zheng, September 14, 2001, Exhibit 45, at ¶ 6 (class member held at Tulare; reports that "although I often feel sad and depressed, the staff seldom, if ever, ask me if I am sad or depressed").

Numerous declarations also confirm that children who exhibit problem behavior are not assessed for mental health problems or provided with treatment, but are instead physically restrained or placed in solitary confinement. For example, one youth who had clearly experienced traumatic events, including the severe beating of his cousin, who was left for dead, was not provided with counseling. Instead, defendants confined him to a cell devoid of basic necessities such as bedding and reading material:

> When I was put in isolation, they took away the mattress and blankets on my bed. They also took away all the toilet paper. I have to ask for it when I need it. But for the first three days I had no toilet paper, so I had to use my underwear. I ripped it into pieces.

Declaration of Anibal Francisco Zúniga Valle, July 8, 2002, Exhibit 9, at ¶¶ 24 -29.

Rather than provide mental health services to a young girl whom they had identified as suicidal, defendants transferred her to Liberty County Juvenile Center, a secure facility repeatedly cited as substandard. Amnesty Report, Exhibit 2 at 22-23, citing OIG Report at Ch. 3. She appears never to have been evaluated at Liberty County, and there is no indication that she ever received any kind of mental health intervention. *Id.*

Sadly, these deprivations of counseling services are not isolated examples. *See, e.g.,* Declaration of Oscar Morales Guerra, July 8, 2002, Exhibit 10, at ¶ 19 (Oscar was returned to

1    Globe Detention Center after two months at Southwest Keys, he explained that at Globe, "if

2    you misbehave, you get handcuffed and restrained for a half hour to an hour." Youth who

3    misbehave "are not allowed any time outside their room except for meals and hour of

4    outside time. They are also not allowed any schooling."); Declaration of Josué Enrique

5    Andrade García, July 8, 2002, Exhibit 35, at ¶¶ 3, 12, 24, and 27 (youth's father killed by

6    thieves, mother's whereabouts unknown; detained at Globe Detention facility. "There are no

7    counselors here. There is no one to talk about what I'm going through.... If the staff here

8    believes a youth has misbehaved, that youth is put in isolation in their room. They are not

9    even allowed to come out for meals. They have to eat inside the room. They have to sit there

10   all day. They are not even allowed to attend class."); Declaration of Nery Amador

11   Rodriquez-Montejo, July 8, 2002, Exhibit 37, at ¶ 8 (youth's wallet containing his family's

12   contact information, taken by immigration official. During detention at Globe Juvenile

13   Facility, "I have never spoken to a counselor or psychologist since being arrested. I haven't

14   spoken with my family because I don't their phone numbers any more. Here we spend most

15   of the day locked in our rooms. I would say I spend all but 2-3 hours of the day locked in

16   my room").

17              ***3***        **Defendants inform children in their custody little or nothing about**

18                          **the legal proceedings against them, the reasons for their confinement,**

19                          **or their prospects for release or removal.**

20          One of the defendants' most frequently reported violations of the Settlement is their

21   failure to inform children of the status of their removal proceedings and their prospects for

22   release or removal. Class members are detained for weeks or months with only the faintest

23   understanding of their legal cases and with little or no idea about how long they will spend

24   in custody.

25          The Settlement contains several provisions obligating defendants to provide class

26   members with sufficient information to allow them to understand where they are in the

27   removal process and to have some idea about how long they will likely remain in custody:

28

1     •   Paragraph 24C: "In order to permit judicial review of Defendants' placement

2         decisions as provided in this Settlement Agreement, Defendants shall provide minors

3         not placed in licensed programs with a notice of the reasons for housing the minor in

4         a detention or medium security facility."

5     •   Paragraph 24D: "The INS shall promptly provide each minor not released with (a)

6         INS Form I-770; (b) an explanation of the right of judicial review as set out in Exhibit

7         6, and (c) the list of free legal services providers compiled pursuant to INS regulation

8         (unless previously given to the minor)."

9     •   Exhibit 1, ¶ 6: Detainees must receive "[a]t least one (1) individual counseling session

10       per week conducted by trained social work staff with the specific objectives of

11       reviewing the minor's progress, establishing new short term objectives, and

12       addressing both the developmental and crisis-related needs of each minor."

13     •   Exhibit 1, ¶ 9 : Class members should receive "[u]pon admission, a comprehensive

14       orientation regarding program intent, services, rules (written and verbal),

15       expectations and the availability of legal assistance."

16     •   Exhibit 1, ¶ 14: Detained class members are entitled to "[l]egal services information

17       regarding the availability of free legal assistance, the right to be represented by

18       counsel at no expense to the government, the right to a deportation or exclusion

19       hearing before an immigration judge, the right to apply for political asylum or to

20       request voluntary departure in lieu of deportation."

21         In its comprehensive evaluation of defendants' treatment of detained youth, the

22   Inspector General found that defendants' practices and policies are not reasonably

23   calculated to keep class members informed of their legal cases or the prospects for regaining

24   their freedom:

25       In four of the eight districts we visited, district juvenile coordinators did not always

26       see detained minors on a weekly basis, and in at least one district, the coordinator did

27       not regularly visit the facilities on a weekly basis. ....

28

1    The INS has no definition of what constitutes a visit to a juvenile or a facility, or how

2    these visits should be documented. The Juvenile Protocol Manual clearly states that

3    the district juvenile coordinator must visit each juvenile and each facility once per

4    week. ....

5    In order to remain adequately informed of juveniles' situations and conditions and to

6    maintain direct personal contact with the juveniles under its care, the INS needs to

7    take several corrective actions. *The INS needs to comply with the Flores requirement to*

8    *conduct weekly visits with all minors in custody and to all facilities.* If it is logistically

9    impossible for the district juvenile coordinator to conduct these visits, the

10   responsibility should be delegated to another properly trained individual. The INS

11   needs to develop standards for what constitutes a juvenile or facility visit. The INS

12   should properly document these visits.

13   OIG Report, Exhibit 1, Ch. 2 at 3-4 (emphasis added).[35]

14

---

15   [35] Defendants' failure to provide detained children basic information regarding the status of

16   their legal cases and prospects for release has been documented by international human
     rights monitoring organizations as well. In a report released in December 1998, Human

17   Rights Watch reported as follows:

18       Very few of the minors that we interviewed reported receiving any information
         about legal services from either INS or [Berk's County Youth Center] staff. Fernando,

19       a sixteen-year-old Salvadoran, told us in November that "when I came here, they
         gave us a paper and told us to read it. They told us about the rules here, and about

20       showers, classes, etc. But no, they didn't give me a list of lawyers, or anything about

21       court or a judge."

22   Human Rights Watch, Detained and Deprived of Rights: Minors in the Custody of the U.S.
     Immigration and Naturalization Service, Vol. 10, No. 4(G) (December 1998), Exhibit 46, at

23   16.

24   Nor are defendants regularly more informative regarding its reasons for holding minors in
     secure facilities. Again according to the Human Rights Watch report:

25
         Other minors who had been in secure detention for periods ranging from one week
26       to three months told Human Rights Watch that they were neither informed why they
         were placed in the secure wing nor told the reason for their eventual transfer to

27       shelter care. In fact, none of the minors with whom we spoke reported being given
         any reason, either written or verbal, for being placed in the secure wing.

28

- 51 -

1   The declarations of class members and independent observers confirm that

2   defendants do little or nothing to provide children in its custody any meaningful help in

3   understanding the proceedings against them. Non-English-speaking class members are left

4   to their own devices in deciphering English-only forms provided to them as a mere

5   formality. Children spend weeks or months under defendants' "care" without the slightest

6   idea of what is going on in their legal cases or how to go about defending themselves. The

7   Settlement clearly requires more.

8   This violation may lack the immediacy of a strip search or sudden transfer to a

9   juvenile hall, but it works a slow and insidious injury:

10   What was perhaps most striking to us was the overall lack of communication to INS

11   detainees. The two most recent arrivals appear to have a complete lack of

12   understanding as to why they were there. Both had agreed to voluntary deportation

13   and could not understand why they had not yet been deported. Because they had

14   only been at [Central Juvenile Hall] for a few days at most, the information void was

15   resulting in clearly distressed minors who could not speak English and were unclear

16   as to what was going to happen to them.

17   Latham & Watkins Central Report, Exhibit 23, at ¶ 6.

18   Children's accounts are replete with examples of their lack of knowledge about what

19   is happening in their cases or how long they will remain detained. *See e.g.*, Declaration of

20   Anibal Francisco Zuniga Valle, July 8, 2002, Exhibit 9, at ¶ 28 ("I have no idea how much

21   longer I am going to be here. The other kids who came here the same time I did have

22   already been deported."); Declaration of Josue Enrique Andrade Garcia, July 8, 2002, Exhibit

23   35, at ¶ 25 ("I have no idea what is gong to happen in my immigration case or how long I

24   will have to stay in this place. The staff here has not given me any information about this.");

25   Declaration of Nery Amador Rodriguez-Montejo, July 8, 2002, Exhibit 37, at ¶ 8 ("The

26

27

28   *Id.* at 26.

- 52 -

Immigration has not explained my case to me. I ask people here, When will I be deported or allowed to leave? And they tell me they know nothing."); Declaration of Juan Rojas, October 15, 2001, Exhibit 31, at ¶ 12 ("I have no idea how long I am going to be here. I feel like I am going to go crazy. I miss my own food and doing something else besides being locked in a room. ... No one talks to me about what is going to happen to me.").

The dearth of information available to detained youth has practical consequences as well: it precludes them from playing any meaningful role in their defense, even when their sole wish is to contest their placement in a secure detention facility or to end detention by accepting removal:

> None of the detainees we spoke with was aware of their rights nor the reasoning behind their placement at CJH. In addition, with the exception of one minor who was contesting deportation, none of them had received any information about legal services that might be available to them.

Latham & Watkins Central Report, August 22, 2001, Exhibit 23, at 5-6; *see also* Declaration of Oscar Morales Guerra, July 8, 2002, Exhibit 10, at ¶ 4 ("I was told I had the right to an attorney, but no one provided me with any names or phone numbers of an attorney."); Declaration of Josue Enrique Andrade Garcia, July 8, 2002, Exhibit 33, at ¶¶ 7-8 ("But when I crossed the border I was arrested almost immediately by the Border Patrol near Yuma [Arizona]. I was taken to a jail where I was held for two days. I was never told that I had a right to an attorney. I was not provided with any names of lawyers to call.").

This Court should order defendants to begin complying with their obligations under the Settlement to inform detained youth of the status of their legal cases and their prospects for release or removal.

**4      Defendants deny children adequate access to telephones.**

The Settlement guarantees minors in defendants' custody a "reasonable right to privacy, which shall include the right to . . . talk privately on the phone." Settlement Exhibit 1 at ¶ 12A. The evidence, however, shows that defendants have not fulfilled their obligation

1    to provide minors adequate access to telephones.

2        First, children in some facilities are denied access to telephones entirely for weeks on

3    end. *See, e.g.*, Declaration of Wilber Antonio Orillana, July 16, 2002, Exhibit 38, at ¶ 11

4    ("When I have asked to make phone calls, officers told me that I could not use the

5    telephone."); Declaration of Carlos Hugo Pacheco ¶ 4 ("I have been detained for over a

6    month and I have only been permitted to use the phone one time."); Declaration of Cesar

7    Omar Martinez, April 29, 2003, Exhibit 13, at ¶ 16 ("Since I have been at [Los Angeles

8    Central Juvenile Hall], I have not been able to make a telephone call... I ask the guards and

9    they always tell me I can make the telephone call later.").

10       According to Amnesty International, children are often not informed of their right to

11   telephone access at all. Amnesty Report, Exhibit 2 at 51. Human Rights Watch encountered a

12   youth in Pennsylvania who "described having to make repeated requests to place a phone

13   call, despite staff promises. . . . Both relayed instances where it took over a week until the

14   promised call was finally made. [One minor] indicated that it has been ten or eleven days

15   since he had been able to speak to his family." Human Rights Watch, "Children in

16   Custody," Exhibit 46, at 19.

17       Second, the right of children in other facilities to use the telephone depends on

18   whether they happen to have a pre-paid phone card or someone willing to accept collect

19   calls. *See e.g.*, Declaration of Jin Rong Yiou, September 14, 2001, Exhibit 20, at 6; *see also* OIG

20   Report, Exhibit 40, Ch. 2 at 4. ("In the secure facilities we visited, juveniles had to make long

21   distance calls collect, or purchase pre-paid phone cards with their own funds."). The cost of

22   collect calls from children detained in remote facilities interferes with such children's ability

23   to communicate with their attorneys, who often serve *pro bono publico*. *Id.* ("If the juveniles

24   lacked funds to pay for telephone calls,... they could not always make the calls to ...

25   attorneys guaranteed to them under *Flores*... In two locations, pro bono attorneys said they

26   could not afford to accept collect calls from juveniles in remote facilities, effectively

27   preventing the juveniles without funds from contacting attorneys.").

28

                                        - 54 -

1    Third, at other facilities arbitrary policies curtail any meaningful access to telephones.

2    Staff and children at Central Juvenile Hall in Los Angeles report there is no written policy

3    regarding telephone access. Rather "telephone access is determined by merit, *i.e.*, the staff in

4    the unit subjectively determines who can and cannot make telephone calls." Declaration of

5    Deborah Lee, August 15, 2003, Exhibit 57 at ¶ 11.

6    At Gila County Juvenile Detention Center in Arizona, for example, detained children

7    are permitted no phone calls during the week. Children with names beginning with N-Z

8    may use the phone only during a six-hour period on Saturdays; those with names beginning

9    with A-M may use the telephone only during a six-hour period on Sundays. Children may

10   only make collect calls, which are limited to 10 minutes. Declaration of Nery Amador

11   Rodriquez-Montejo, July 8, 2002, Exhibit 37, at ¶ 9 ("I am permitted to use the telephone

12   Saturdays and Sundays only"); Declaration of Juan Rojas, October 15, 2001, Exhibit 31, at ¶

13   11 (only able to speak with his former caregiver on the weekend "for about three minutes.").

14   Children with "white shirts" (Level "0") report receiving only seven minutes for telephone

15   calls. Declaration of Denis DeLeon Martinez, May 2, 2003, Exhibit 36, at ¶ 20.[36]

16   When defendants do provide class members access to telephones, they often insist on

17   listening in on children's phone calls, thus interfering with the right to privacy the

18   Settlement guarantees youth in their telephone communications. Twenty-five of the 33

19   facilities in the Amnesty International Survey reported that they log, monitor and/or record

20   calls. Amnesty Report, Exhibit 2, at 51. Fifty-two percent of those (13 of the 25), reported that

21   they "shared their records with the INS, or would do so if requested." *Id.* The Office of the

22   Inspector General noted that in one of the facilities, the phones were located only in open,

23   common areas. OIG Report, Exhibit 1, Ch. 2 at 4. Gila County's policy is that "*[a]ll . . . phone

24   calls . . . [are] monitored by staff at all times.*" Gila County Juvenile Detention Center

25   Handbook, Exhibit 42 (emphasis added).

26

27   [36] These restrictions are largely confirmed in the Gila County Juvenile Detention Center
     Student and Parent Handbook, Exhibit 42.

28

1    This lack of privacy prevents children from sharing their feelings about their

2    detention or conditions inside the facilities with the few people they trust. For children held

3    in remote areas or in facilities distant from the lawyers, defendants' monitoring telephone

4    calls effectively precludes confidential attorney-client communications. At Berks County

5    Youth Center in Pennsylvania, a minor informed Amnesty International that his caseworker

6    was always there when he talked to his lawyer, he stated "Sometimes I feel afraid... I don't

7    talk about stuff on the phone." Amnesty Report, Exhibit 2, at 51.

8    Lack of telephone access and privacy is yet another serious breach of the Settlement.

9    Plaintiff children are denied an important link to the outside world. As one class member

10   declared, "I desperately want to make more calls, "but I am told I cannot." Declaration of

11   Jose Wilber Hernandez Segovia, Exhibit 33, at ¶ 4. The Court should remedy this breach

12   now.

13            **5      Defendants routinely obstruct children's access to legal counsel.**

14   Detained children have an unquestionable right to retained counsel; defendants are

15   accordingly under a clear obligation to inform class members of that right and must

16   facilitate class members' access to retained counsel. In practice, however, defendants

17   typically do little or nothing to inform youth of their right to counsel, and as often as not,

18   actually impede children's access to lawyers and paralegals.[37]

19   The Settlement requires defendants to give all detained minors a list of free legal

20   services providers. Settlement ¶¶ 27 and 32A, and Exhibit 1 at ¶ A.14. Defendants often fail

21   to inform children of their right to counsel for weeks or even months after detaining them.

22   Amnesty Report, Exhibit 2, at 45. Staff at the Bexar County facility in Texas, for example,

23   admitted that the "facility does not maintain a list of potential pro bono representatives, and

24

25   _____

26   [37] The majority of class members do not have legal representation. OIG Report, Exhibit 1,
     Ch. 4 at 4.  At the Southwest Key  facility in Brownsville, Texas, for example, none of the 40

27   children housed there in was represented by an attorney. Amnesty Report, Exhibit 2, at 45.
     At the Southwest Key facility near San Diego, California, staff reported only 2 of 12 children

28   housed there in had an attorney. *Id.*

immigration officials do not provide one." Declaration of Elizabeth Cox, Exhibit 53, at ¶ 11.
This is no aberration: 15 of 23 secure facilities surveyed by Amnesty International stated that
they do not provide detained children with the required list of free legal services providers.
Amnesty Report, Exhibit 2, at 45.

When children to manage to retain counsel, defendants often interfere with effective
representation. Children's lawyers, who often serve pro bono publico, routinely endure long
delays and face arbitrary obstacles when meeting with clients. Declaration of Deborah Lee,
August 15, 2003, Exhibit 57, at ¶¶ 5 and 9 ("I consistently face needless difficulty and delays
in gaining access to my clients. Visitation procedures also seem to change from visit to visit,
increasing the difficulty, frustration and time it takes to get to see clients"); Declaration of
Lisa Frydman, June 26, 2003, Exhibit 55, at ¶¶ 5 and 7-11 (despite sending a letter to DHS
and ORR notifying them of an intended visit, upon arriving at the site, counsel was
informed that "none of the six children were available for interview").

Defendants' failure to facilitate class members' retaining counsel and their
obstructing children's access to lawyers when they nonetheless manage to retain lawyers
violate both the Settlement and the Juvenile Protocol Manual. The Court should order
defendants to comply with their obligations now.

> **E     Defendants regularly expose children in their custody to dangerous,**
> **unhealthful conditions prohibited under the Settlement and this Court's**
> **summary judgment.**

In addition to denying class members essential services, rights and benefits in
violation of the Settlement, defendants regularly expose class members to a range of
dangerous, unhealthful conditions and treatment that cannot be squared with the letter or
spirit of the agreement, including the following:

- Arbitrarily handcuffing and shackling non-delinquent class members;
- subjecting children to excessive and arbitrary solitary confinement;
- commingling non-delinquent class members with juvenile delinquents;

- failing to maintain sight and sound separation between children and adults in secure facilities; and

- strip searching children in violation of this Court's summary judgment.

As will be seen, these practices are both widespread and clearly violative of the Settlement. This Court should enjoin them now.

### 1   Defendants arbitrarily handcuff and shackle non-delinquent minors during transit or as punishment.

The Settlement guarantees that non-delinquent class members will not be treated like criminals. It provides that "[m]inors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living . . . ," Settlement, Exhibit 1 ¶ C, and defendants have interpreted this to mean that children should not be placed in mechanical restraints

The Juvenile Protocol Manual is more explicit. It provides that children should not be routinely placed in mechanical restraints:

> Escorting officers have the responsibility to determine the need and level of restraint used at any time while escorting a detainee. When an Officer determines that conditions warrant the use of restrains for members of a family unit, females, or juveniles, the Officer must be able to explain the conditions that require the restraints. *Only the minimum degree of restraint needed to ensure the safety of the officer, the detainee, and the public, or to prevent escape, will be used. ...*

Exhibit 40 at 6-1 (emphasis added).[38]

Defendants' actual practice of handcuffing and shackling children without any particular reason cannot be squared with their own standards, nor is it consistent with this Court's reasoning in its summary judgment barring defendants from arbitrarily strip searching children. Such practices are indistinguishable from routine strip searches, which

---

[38] As discussed above, the Juvenile Protocol Manual is binding under ¶¶ 12 and 21 of the Settlement.

1    this Court found to be "an invation of constitutional rights of some magnitue," particularly

2    given that children "are especially susceptible to possible traumas from strip searches."

3    *Flores v. Meese, supra,* 681 F.Supp. at 667.

4          There is abundant evidence that defendants routinely handcuff and shackle children.

5    Children report spending extended periods in handcuffs during trips to court or as

6    punishment for minor infractions of facility rules. Young people are especially likely to be

7    shacked or handcuffed during transport, regardless of whether they present any special risk

8    of flight or threaten the safety of themselves or others. Staff at Bexar County Juvenile Hall

9    admitted that "children are placed in restraints when they leave the facility for any reason.

10   The restraints consist of handcuffs and foot shackles chained to a metal waist belt."

11   Declaration of Elizabeth Cox, July 7, 2003, Exhibit 53, at ¶ 10. Nicolas Reyes Gonzales, a

12   minor detained at Central Juvenile Hall in Los Angeles, declared that he and five other

13   minors were handcuffed and chained while being transported between immigration court

14   back and juvenile hall. Declaration of Nicolas Gonzales Reyes, June 6, 2003, Exhibit 51, at ¶¶

15   6 and 9 ("All of us kids were handcuffed with our hands in front of our bodies" and "we

16   were also chained together by a longer chain that ran down the middle of the van");

17   Declaration of Anibal Francisco Zuniga Valle, July 8, 2002, Exhibit 9, at ¶¶ 25-26 ("A week

18   ago they put handcuffs on me [at Globe].  I was returning to my room to eat and the staff

19   person told me something in English, which I did not understand... She kept talking to me

20   but I didn't understand her instructions.  She kept talking to me but I didn't understand her

21   instructions... She left and came back with handcuffs.  I had to sit with the handcuffs on for

22   2 hours."); Declaration of Olvin Giovanni Arteaga Moncada, July 16, 2002, Exhibit 27, at ¶ 7

23   ("While I was in Brownsville I was handcuffed by a facility officer, because one of the other

24   kids was acting badly."); Declaration of Wilbur Antonio Orillana, July 16, 2002, Exhibit 38 ,

25   at ¶ 4 ("While I was in Brownsville, officers placed me in handcuffs and threatened to send

26   me to jail for 6 months in Houston, Texas when other kids in the facility misbehaved").

27         Children repeatedly relay incidents of their wrists being bound with handcuffs,

28

sometimes for hours at a time, during transport to and from various locations such as detention facilities or immigration court. *See, e.g.*, Declaration of Chen Sai, September 28, 2001, Exhibit 11, at ¶¶ 5-6 (handcuffed on trip from Los Angeles Airport to Tulare County Juvenile Detention Facility); Declaration of Anibal Francisco Zuniga Valle, July 8, 2002, Exhibit 9, at ¶ 5 (handcuffed on trip from Yuma to an unknown jail where she was held in isolation before being sent to Southwest Keys in Phoenix); Declaration of Oscar Morales Guerra, July 8, 2002, Exhibit 10, at ¶ 5 ("I was transported to Southwest keys where I stayed for 2 1/2 months. I was handcuffed while I was transported."); Declaration of Josué Enrique Andrade Garcia, July 8, 2002, Exhibit 35, at ¶ 9 (handcuffed in a van after being arrested at the border); Declaration of Xue Zhong Zhou, October 21, 2001, Exhibit 34, at ¶ 6 ("On the evening of October 4, 2001 I was brought in handcuffs to Los Padrinos."); Declaration of Jin Rong Yiou, October 21, 2001, Exhibit 50, at ¶¶ 4, 8 (transported by car and air in handcuffs); *see also* Declaration of Nery Amador Rodriquez-Montejo, Exhibit 37, at ¶ 6 ("When I was transferred to Globe, I was handcuffed with my hands *behind my back*" (emphasis added)); Declaration of Cesar Omar Martinez, May 6, 2003, Exhibit 15, at ¶ 5 ("I came to Arizona on an airplane. My hands and feet were handcuffed during the flight. The handcuffs on my hands were tied to the handcuffs on my feet. I had a chain around my waist."); Declaration of Jorge Mosquera-Perez, June 20, 2003, Exhibit 54, at ¶ 8 ("They made me wear handcuffs and shackles" to go to the doctor).

     Jin Rong Yiou, a class member who was re-arrested after voluntarily reporting to the INS's Atlanta District Office, recounts that INS officials "fastened heavy sand bags to [her] brother's feet" during the trip to Tulare County Juvenile Hall in California. Declaration of Jin Rong Yiou, Exhibit 20, at ¶ 8. Jin expressed dismay at this treatment:

> I had shackles on my feet, handcuffs, and a chain between the shackles and handcuffs. I do not understand why they did this to me because I have never caused any problems here, or anywhere I've been in INS custody. I guess this is just what they do to kids who live here.

1    *Id.* at ¶ 10.

2          The routine use of handcuffs and shackles on class members is confirmed by

3    independent observers and facility staff. Eighteen of the 31 children Amnesty International

4    interviewed confirmed being handcuffed. Amnesty Report, Exhibit 2, at 34. Eleven of the 18

5    reported being restrained more than once. *Id.* Nineteen secure facilities admitted using

6    mechanical restraints on children *whenever they are taken outside the facility.* Amnesty Report,

7    Exhibit 2, at 34.

8          In *Children in Custody,* Human Rights Watch similarly noted that "most of the

9    children we interviewed reported that they were handcuffed when they were taken to court

10   to appear before an immigration judge. . . . Several children told us that they were

11   handcuffed on such an occasion for more than eight hours, including transportation and

12   time spent consulting with their attorney." *Id.* at 21.[39]

13         The Inspector General likewise confirms the defendants' use of shackles and

14   handcuffs on children:

15         Contract guards and secure facilities under contract with the INS or that have signed

16         interagency agreements with the INS, as a regular course of action, restrain the INS's

17         unaccompanied non-delinquent juveniles during transport. All four of the secure

18         facilities we visited had written policy that allowed staff to handcuff, and in some

19         cases, shackle all juveniles, including the INS's unaccompanied juveniles, during

20

21   _____

22   [39] Children placed in restraints are often transported with adults. After a few days in a local
     jail, Genaro Perez-Martinez "was shackled to other men and put in a van" for transfer to
23   another facility.  Declaration of Genaro Perez-Martinez, October 15, 2001, Exhibit 30. at ¶ 12.

24   Nery Amador Rodriquez-Montejo told of being driven from Tuscon "in a van with 11
     others, 10 of whom were adults" while handcuffed to another juvenile. Declaration of Nery
25   Amador Rodriquez-Montejo, July 8, 2002, Exhibit 37, at ¶ 3; *see also* Declaration of Anibal
     Francisco Zúniga Valle, July 8, 2002, Exhibit 34, at ¶ 3 (youth transported with three adults
26   after he being arrested near Yuma, Arizona).

27   Such practices appear to place minors at particular risk because they are unable to use their
     hands to defend themselves against bigger adult detainees.
28

1    transport. . . . . [T]he Gila County Youth Detention Center . . . has a standing policy

2    that all juveniles . . .will be handcuffed and shackled during transport.

3    OIG Report, Exhibit 1, Ch. 2 at 4.

4    Although handcuffing and shackling non-delinquent class members is commonplace,

5    numerous children report that whether they are handcuffed or shackled is also wholly

6    arbitrary. For example, during one leg of a trip, a child will be unrestrained, only to be

7    placed in mechanical restraints during other parts of the same journey. Class member Jin

8    experience is fairly typical:

9    [When I was transported from] the airport in Spokane to Martin Hall, I was

10    handcuffed and shackled.

11    I stayed at Martin Hall until February 26, 2001, or so, when I was sent to Los Angeles

12    for one night. From Martin Hall to the Spokane Airport I was shackled and

13    handcuffed. At the airport the handcuffs and shackles were removed and I was not

14    again shackled or handcuffed. During all these trips, it was only my brother and me

15    with two immigration offices, one male and one female.

16    Declaration of Jin Rong Yiou, Exhibit 20, at ¶¶ 8 & 9.

17    Defendants' treatment of class member Manuel Sanchez was similarly arbitrary. He

18    declares:

19    When I was transferred to the hotel, I was taken in a van with two other minors. We

20    were all handcuffed during this trip, although a metal gate was installed between us

21    and the immigration official who was driving.

22    . . .

23    I've been let out of my room only once since being taken to the hotel: today, when I

24    was brought to the immigration office to talk with a lawyer. I was with two others,

25    but we were not handcuffed.

26    Declaration of Manuel Sanchez, September 17, 2003, at ¶¶ 2, 5; see also Declaration of

27    Liliana Linares, September 17, 2003, at ¶ 24 ("Every time I have been transported, except

28

1    today[,] I have been handcuffed. When I went to court I had handcuffs and chains on my

2    ankles also.").

3            Defendants' routine resort to mechanical restraints is not limited to times when they

4    are transporting children from one location to another. Youth report being forced to sit

5    handcuffed inside their rooms for prolonged periods after being accused of misbehaving.

6    *E.g.*, Declaration of Anibal Francisco Zúniga Valle, July 8, 2002, Exhibit 9, at ¶¶ 25, 26.

7    Others report being handcuffed as punishment for the misbehavior of others. Two youths in

8    Texas stated that when one or two children misbehave, officials handcuffed *all* of the

9    children and threatened to take them to a "real jail" where they would be locked away for

10   six months. Declaration of Olbin Geovani Arteaga Moncada, July 16, 2002, Exhibit 27, at ¶ 7;

11   Declaration of Wilbur Antonio Orillana, July 16, 2002, Exhibit 38, at ¶ 4.[40] Defendants' use of

12   restraints as a disciplinary tool constitutes "corporal punishment, humiliation and mental

13   abuse" prohibited under the Settlement. Settlement Exhibit 1 ¶ C.

14           As the Inspector General concludes, the application of mechanical restraints violates

15   defendants' nominal policy, which explicitly circumscribes the use of restraints on minors:

16   "Agencies under contract or interagency Agreement with the INS that are handling non-

17   criminal minors do not have authority to restrain such minors." The Inspector General

18   points out that defendants' National Juvenile Coordinator confirmed this policy, stating,

19   "Facilities should not be using restraints." *Id*. The Inspector General encouraged defendants

20

21   _____

     [40] Seven of the 23 secure facilities in Amnesty International's survey, reported that restraints
22   "may be used to punish children on the grounds of misbehavior." Amnesty Report, June 18,
     2003, Exhibit 2, at 36.
23
     Several facilities reported using "punishment chairs" and "restraint beds." *Id*. at 36-37.
24   Officials at the Gila County Juvenile Hall in Arizona recounted two incidents where they
     had placed class members in a restraining chair. *Id*. at 37.
25
     In one incident, a 15 year old boy grew despondent after waiting six months to be deported.
26   *Id*. When Gila County officials locked him in a restraint chair, he was described as "in utter
     despair," self-mutilating and hitting his head against the wall. *Id*. The boy's attorneys stated
27   he had shown no sign of mental illness prior to being confined at the Gila County facility.
     *Id*.
28

to develop procedures to ensure compliance with this policy. *Id.* at 7. To plaintiffs'
knowledge, defendants have never taken any action in response to the Inspector General's
recommendation.

Despite these admonishments, defendants have refused to curtail the routine use of
mechanical restraints against class members or to adopt a coherent policy that protects
minors from arbitrary restraint. A court order is the only apparent way to end this
mistreatment of children.

### 2    Children in defendants' custody are subjected to excessive and arbitrary solitary confinement.

Class members consigned to secure facilities—the vast majority of whom have never
before been detained—routinely endure policies and practices that violate the Settlement
and would be unacceptable even if applied against dangerous juvenile offenders. Far too
often, non-delinquent children in defendants' custody are denied outdoor recreation,
allowed no leisure activities, afforded inadequate education, and placed in solitary
confinement. *See, e.g.*, Latham & Watkins Tulare Report, Exhibit 32, at 4. (For unspecified
discipline problems, Tulare (California) facility "will deny telephone privileges (except for
attorney calls), limit recreation participation, or place a minor in "lock-down." A minor
placed in lock-down is locked in his or her room alone for the remainder of the day and let
out in the morning."). Such treatment cannot be squared with either the letter or spirit of
the Settlement, which requires defendants to treat "all minors in its custody with dignity,
respect and special concern for their particular vulnerability ..." Settlement ¶ 11.

As the declarations of numerous class members attest, defendants place children in
solitary confinement for seemingly trivial infractions of facility rules:

- talking to a minor in a neighboring cell, *e.g.*, Declaration of José Wilber Hernández
  Segovia, October 18, 2001, Exhibit 33, at ¶ 2 ("When I try and talk to Carlos in the
  next cell, I get into trouble."); Declaration of Anibal Francisco Zúniga Valle, July 8,
  2002, Exhibit 9, at ¶ 27 ("They have taken the mattress and blanket from me to punish

1  me for talking to the other kids through the holes in the wall in my room. They have

2  done this three times.");

3  •  chewing a piece of paper, Declaration of Denis DeLeon Martinez, May 2, 2003,

4      Exhibit 36, at ¶ 13, 14, and 18; for not sliding his comb back under the door fast

5      enough, *id.*;

6  •  refusing to participate in physical education activity, Latham & Watkins, Tulare

7      Report, Exhibit 32, at 7 ("On one occasion, the entire group was disciplined by

8      solitary confinement because they were all tired of participating in the physical

9      education program."); and

10 •  failing to follow instructions given only in English to non-English-speaking youth,

11     Declaration of Anibal Francisco Zúniga Valle, Exhibit 9 at ¶ 25; Declaration of Denis

12     DeLeon Martinez, May 2, 2003, Exhibit 36, at ¶ 7-8.[41]

13     According to Amnesty International, 56 percent of secure facilities report using

14 solitary confinement to discipline class members. Amnesty Report, Exhibit 2, at 31. The

15 testimonial evidence confirms that solitary confinement is common:

16 •  At [Globe] "I've been in isolation for the past month." Declaration of Anibal Francisco

17     Zúniga Valle, July 8, 2002, Exhibit 9, at ¶ 18.

18 •  "Here [Globe] we spend most of the day locked in our rooms…. What bothers me

19     most here is being locked in almost all day." Declaration of Nery Amador Rodríguez

20     Montejo, July 8, 2002, Exhibit 37, at ¶ 11.

21 •  At [Hondo] "I am often kept locked in my room." Declaration of Wilbur Antonio

22     Orillana, July 16, 2002, Exhibit 38, at ¶ 7.

23

24 _____

25 [41] Class members also frequently report that defendants inadequately inform them of the
   rules and regulations they are expected to follow. *See e.g.,* Declaration of Josué Enrique
26 Andrade García, July 8, 2002, Exhibit 35, at ¶ 29 ("But here [at Gila County Juvenile
   Detention Center] to 'behave badly' is defined differently. You can be just talking to another
27 youth and be told that you've misbehaved. They will switch your shirt color."); Declaration
   of Anibal Francisco Zúniga Valle, July 8 , 2002, Exhibit 34, at ¶¶ 17, 25, 26 ("The rules here
28 are very strict. I don't understand them.").

1     • "Here [Globe] we are awakened at 5:00 in the morning. We bathe, dress then I return

2        to my room, where I am locked in." Declaration of Walter Rodas-Hernández, July 8,

3        2002, Exhibit 39, at ¶ 5.

4     • At [Globe]"I am not permitted to leave my cell to eat or go to class. I use the

5        bathroom that is in my cell." Declaration of José Wilbur Hernández Segovia, October

6        18, 2001, Exhibit 33, at ¶ 1.[42]

7        Even assuming, *arguendo*, that all these youth engaged in misconduct meriting

8     discipline, the quality and quantity of their isolation remains inexcusable. When defendants

9     discipline youth, they often isolate them utterly, depriving them even of reading materials.

10    Declaration of Josué Enrique Andrade García, July 8, 2002, Exhibit 35, at ¶ 27 ("If the staff

11    here believes a youth has misbehaved, that youth is put in isolation in their room. They are

12    not even allowed to come out for meals."); Declaration of Anibal Francisco Zúñiga Valle,

13    July 8, 2002, Exhibit 9, at ¶¶ 20, 21 (minor allowed no books or other reading material in

14    cell); Declaration of Olbín Geovani Arteaga Moncada, July, 16, 2002, Exhibit 27, at ¶ 13

15    (youth allowed to keep only a Bible and no other reading materials in cell); Declaration of

16    Wilbur Antonio Orillana, Exhibit 38, at ¶ 9 (youth not allowed any books or personal items

17    whatsoever in cell); *see also* Declaration of Denis DeLeon Martinez, May 2, 2003, Exhibit 36,

18    at ¶ 13, 14, and 18. (youth given 15 days in solitary confinement for disobeying instruction

19

20    _____

21    [42] Defendants also occasionally engage in other irregular disciplinary practices. One child
      reports that after he was involved in a minor altercation with another youth, facility staff
22    began awakening him daily at 4:00 a.m. and then denied him a towel; after bathing he was
      forced to return to his cell wet and cold. Declaration of José Wilber Hernández Segovia,
23    October 18, 2001, Exhibit 33, at ¶ 3.

24    Another class member reports that defendants deprived him of a mattress and blanket after
      accusing him of violating facility rules. Declaration of Anibal Francisco Zúñiga Valle,
25    Exhibit 34, at ¶¶ 24, 27.

26    Such disciplinary practice are clearly inappropriate. *See* INS Juvenile Protocol Manual,
      Exhibit 40, at Part IV.B.86 ("Written policy, procedure, and practice [must] provide[] for the
27    issue of suitable clean bedding and linen, including two sheets, pillow and pillowcase, one
      mattress, and sufficient blankets to provide comfort under existing temperature controls).
28

not to chew piece of paper).[43]

       But defendants do not reserve solitary confinement for class members they accuse of misbehaving. At the Globe, Arizona, detention facility, for example, *all* class members are subjected to an initial period of near-total isolation. Fifteen-year-old Walter Rodas-Hernandez, a non-delinquent class member with no history of misbehavior, describes his experience in stark terms:

> Here we are awakened at 5:00 in the morning. We bath, dress then I return to my room, where I am locked in, then about 15-30 minutes later, I am taken our to breakfast. I have no roommate. *I am alone in the room, which has a toilet, sink, and a bed. I have no books or television in my room.* I eat alone in my room, but I think I will be permitted to eat with the others once I get my blue shirt or green shirt.
>
> *So far, I have had no schooling.* I have not spoken to a counselor or psychologist. I've not had a medical exam.
>
> I go out to recreation for 1/2 an hour per day. I play ball with the other minors detained here. I go out at about 7:00 a.m. for recreation. I play with about 14-15 other kids. I do not know why they are detained.
>
> After recreation, I go back to my room, where I'm obligated to stay until lunch. *I lie down very sad, because I have nothing to do.* About 12:00 I'm let out to get my lunch. I then go back to eat in my room. Then I'm locked in my room until dinner, which they give us at 4:30 or 5:00. I go out, get my food, and return to my cell to eat it. Then I'm given a toothbrush, which I use and then pass under the door. Then I try to sleep.

Declaration of Walter Rodas-Hernández, July 8, 2002, Exhibit 39, at ¶¶ 5-8 (emphasis

---

[43] Children sometimes report that isolation cells are not equipped with water or toilets. Consequently, they must yell out to ask for water or to use the rest room. *E.g.,* Declaration of Wilbur Antonio Orillana July 16, 2002, Exhibit 38, at ¶ 7 ("There is a lock on my door. If I want to get out, I have to knock or yell"); Declaration of Olbín Gevani Arteaga Moncada, July 16, 2002, Exhibit 27 at ¶¶ 10, 12 ("There is a lock on the outside of my room's door….Each time I want to go to the rest room or get a drink of water, I must ask permission").

added).

Defendants also place children awaiting physical removal in solitary confinement in adult "staging facilities." Declaration of Diane Eason, May 15, 2003, Exhibit 18, at ¶ 4 ([D]etainees with a final order of removal or voluntary departure, who are being removed to Central American countries, are routinely transferred to the staging facility in Florence, Arizona, an adult detention center, to await transportation to their home country."); Declaration of Deborah Lee, May 15, 2003, Exhibit 17, at ¶ 11-14 ("[S]everal of my clients have remained at the "staging area" at the Florence Service Processing Center for up to a week."); Declaration of Shiu Ming Cheer, May 12, 2003, Exhibit 17, at ¶ 6.

In these facilities, defendants must isolate children in cells virtually all day if only to prevent them from having contact with adult prisoners. *Id.* at ¶ 7 (class members "held in solitary cells for most of the day to prevent contact with adult detainees. They were not provided with any form of education, books, paper or pencil. They are allowed to watch television and permitted one hour of recreation time per day on a small patio outside"). Obviously, one of violation of the Settlement—isolating children in cells to prevent adult contact—does nothing to excuse another: housing children in adult jails.

Nor has the practice of locking children in cells for days on end ended with the transfer of responsibility over unaccompanied minors to defendant ORR. Plaintiffs' counsel recently inspected a hotel[44] near downtown Los Angeles where defendants are now incarcerating children, both unaccompanied and with family.

---

[44] Defendants' housing children in hotels cannot be squared with the Settlement's requirement that class members be placed in licensed facilities within 72 hours of arrest. Such "facilities" do not and cannot meet state licensing standards for facilities for dependent children.

In California, facilities for dependent children, other than those providing medical care, are regulated pursuant to the California Community Care Facilities Act, Health & Safety Code §§ 1500 *et seq.* and must be licensed by California Department of Social Services. Cal. Health & Safety Code § 1508. California law imposes civil and criminal sanctions on individuals who operate facilities for children in violation of these licensing requirements. Hotels clearly do not meet licensing standards.

We were permitted to enter all four [hotel] rooms [in which class members were then being housed]. Each was a standard hotel room with two double beds, a bathroom, television, and small refrigerator. We saw no reading materials of any kind. In two of the rooms we observed family units: each comprised a young mother and son. One of the children appeared to be approximately 15 years old; the other about seven. In a third room, we observed the 12-year-old unaccompanied male. In each of these rooms, ICE-DHS has posted two uniformed private security guards. The family units were watched over by males; two uniformed female guards watched over the unaccompanied male. As we entered the rooms, all of the guards appeared to be watching television. [Immigration and Customs Enforcement Juvenile Coordinator Robert] Naranjo stated that ICE-DHS policy and practice at this facility is to post two private security guards inside each of room, 24 hours per day, seven days per week.

...

*Mr. Naranjo stated that children receive no educational instruction while they are at the hotel, that they have no recreation, and that, except for occasional trips to court or for asylum interviews, they are locked in their rooms 24 hours per day.*

Declaration of Carlos Holguin, October 3, 2003, Exhibit 62, at ¶¶ 4-5.[45]

Class member Manuel Sanchez recounts how defendants isolated him in a room at this hotel, where for two weeks he did little but watch television:

I was arrested about the third of September, 2003, in Los Angeles. I have been detained by the Immigration authorities ever since. After I was arrested I was

---

[45] In response to inquiries from plaintiffs' counsel, defendants asserted that their isolating Manuel and several other class members in separate rooms at the hotel was proper because of an outbreak of chicken pox.

Manuel, however, declares, "Shortly after I was arrested, a doctor saw me and took my blood pressure and temperature, but I am healthy and have had no problems with my health since coming here. My roommate hasn't been sick either." Declaration of Manuel Sanchez, September 17, 2003, Exhibit 60, at ¶ 8.

1    brought to the downtown immigration office, where I spent one day, and then I was

2    taken to a hotel. I don't know the name or location of this hotel, but it is about 5

3    minutes drive from the downtown immigration office. I have now been there for

4    about 2 weeks.

5          . . .

6    At the hotel I share a room with one other boy. Since arriving at the hotel I have

7    received no education. We bathe in the bathroom attached to our hotel room, so we

8    are not permitted outside the room to bathe. We are also given our meals in our hotel

9    room, which we eat at a table in the room. We have no books or magazines or

10   newspapers to read. For the past two weeks, I have mostly sat on my bed watching

11   TV.

12   The doors to our room is constantly locked, and there are bars on the windows. *I've*

13   *been let out of my room only once since being taken to the hotel: today, when I was brought to*

14   *the immigration office to talk with a lawyer. . . .*

15   At the hotel I have had no outdoor recreation. We are given no exercise or indoor

16   recreation either.

17   Declaration of Manuel Sanchez, September 17, 2003, Exhibit 60, at ¶¶ 2-6 (emphasis

18   supplied).

19          Again, voluminous evidence demonstrates that these instances are representative of a

20   broad pattern and practice of Settlement violations. *See* Declaration of Liliana Linares,

21   September 17, 2003, Exhibit 61, at ¶¶ 25-26, ("In the (Los Angeles hotel) room I can walk

22   around, but it is very small. There is one window in the room. I am on the third floor. I have

23   asked the guards if I can go outside, but they say no."); Declaration of Oscar Morales

24   Guerra, Exhibit 10 at ¶¶ 10, 13 ("I am allowed only half an hour of time outside per day [at

25   Globe]. I have to spend much of my time in my room by myself....We only get a half hour

26   outside on the weekends also."); Declaration of Wilbur Antonio Orillana, July 16, 2002,

27   Exhibit 38, at ¶ 6 ("When I was in Brownsville, I was always locked in my room. I only went

28

                                            -70-

outside for recreation like the other kids five times."); Declaration of Anibal Francisco Zúniga Valle, July 8, 2002, Exhibit 9, at ¶¶ 7, 15, 19 ("Here [Globe] I only go outside for 30 minutes... I still have to eat meals inside my room."); Declaration of Josué Enrique Andrade García, July 8, 2002, Exhibit 35, at ¶ 27 (If the staff [at Globe] believes a youth has misbehaved, that youth is put in isolation in their room... They have to eat inside the room. They have to sit there all day. They are not even allowed to attend class."); Declaration of Nery Amador Rodríguez Montejo, July 8, 2002, Exhibit 37, at ¶ 8 ("Here [Globe] we spend most of the day locked in our rooms. I would say I spend all but 2-3 hours of the day locked in my room. What bothers me most here is being locked in almost all-day."); Declaration of José Wilber Hernández Segovia, October 18, 2001, Exhibit 33, at ¶ 1 ("Being in INS custody [at Globe, Arizona] has been a tremendously horrible experience. For the last three to four days I have been in solitary lock-down... I am not permitted to leave my cell to eat or go to class. I use the bathroom that is in my cell.").

Isolating youngsters in locked rooms for days on end, where they have do nothing but sleep or watch television is wholly unacceptable and violative of the Settlement. Within 72 hours of arrest, the Settlement requires defendants to provide children —

- "Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session." Settlement Exhibit 1, ¶ A.5.

- "[A]ccess to toilets and sinks, drinking water and food as appropriate." Settlement ¶ 12.A.

- "[A]ppropriate reading materials in languages other than English for use during the minor's leisure time." Settlement Exhibit 1 at ¶ A4.

The Settlement forbids defendants from subjecting children to "corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living such as

eating or sleeping." Settlement Exhibit 1 ¶ C. It requires that "[p]rogram rules and discipline standards shall be formulated with consideration for the range of ages and maturity in the program and shall be culturally sensitive to the needs of alien minors." Settlement Exhibit 1, ¶ C. In agreeing to these standards, defendants pledged to make "[e]very effort ... to ensure that the safety and well-being of the minors detained in [secure] facilities are satisfactorily provided for by the staff." Settlement ¶ 12.A.

Few experiences can be more devastating to a child's emotional and physical well being than being subjected to the sensory deprivation of solitary confinement. *Cf. Flores v. Meese, supra,* 681 F. Supp. at 667, *citing Eddings v. Oklahoma* 455 U.S. 104, 115 (1982) ("Youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage"). Defendants' routinely isolating children breaches the most basic principals of humanity, not to mention the many provisions of the Settlement that protect class members against abuse and neglect. Defendants' policy and practice to isolate class members patently violate the Settlement, and this Court should order defendants to stop.

### 3    Defendants unlawfully commingle non-delinquent class members with juvenile offenders.

When defendants place non-delinquent class members, rightly or wrongly, in secure facilities, they often commingle them with juvenile offenders. The Inspector General reported that in 2001 more than half of the 57 state-owned secure facilities it contacted did not have procedures or facilities to properly segregate non-delinquent from delinquent juveniles. OIG Report, Exhibit 1, Ch. 2 at 1. ("The facilities that do not separate juvenile delinquents from non-delinquents do not do so either as a matter of facility, policy, a lack of physical capacity to do so, or because of emergency overflow situations.") Amnesty International similarly found that only four of 23 participating secure facilities housed unaccompanied children separately from juvenile offenders. Amnesty Report, Exhibit 2, at 23-24.

Commingling class members with juveniles with a history of delinquency clearly places class members at risk. *See* OIG Report, Exhibit 1, Ch. 2 at 2 (reporting a disturbance at Liberty County Juvenile Center in Texas in which INS youth were pepper-sprayed). The practice also violates the Settlement.

The Settlement mandates that non-delinquent *"minors [in INS custody] shall be separated from delinquent offenders."* Settlement ¶ 12.A (emphasis added). The Settlement additionally requires that defendants make "every effort" to ensure the safety of the children in their custody. *Id.* Section V of the Settlement provides that defendants may house non-delinquent minors in secure facilities only in narrowly defined circumstances, and even then requires that *"minors shall be separated from delinquent offenders."* Settlement ¶ 12.A (emphasis added).

Separating non-delinquent and delinquent juveniles is also a requirement of federal law. The Juvenile Justice and Delinquency Prevention Act (JJDPA) provides:

> [J]uveniles who are charged with or who have committed offenses that would not be criminal if committed by an adult or offenses . . ., or alien juveniles in custody, or such nonoffenders as dependent or neglected children, shall not be placed in secure detention facilities or secure correctional facilities.

42 U.S.C. § 5633(a)(12)(A) (emphasis added).

State facilities receiving federal funding under the JJDPA may not place in a secure facility children who have not been charged with an offense. 42 U.S.C. § 5633(a)(12). The JJDPA further prohibits commingling minors and adults. 42 U.S.C. § 5633(a)(13). State law similarly requires separate facilities for delinquents and dependent youth. Cal. Welf. & Inst. Code § 206. Defendants must accordingly ensure separation of non-delinquent class members from and delinquent youth. *See generally Horn v. Madison County Fiscal Court*, 22 F.3d 653, 658 (6th Cir. 1994) (children may maintain a private right of action for JJPDA violations); *Genier v. Kennebec County*, 748 F. Supp. 908, 917-18 (D. Me. (1990) (same). Most, if not all, secure facilities defendants use to house minors are state- or county-owned. OIG

1    Report, Exhibit 1, Ch. 1 at 3.

2         Holding non-delinquent class members in secure facilities at all violates federal law;

3    if defendants are going to violate the law, at the very least they should ensure that non-

4    delinquent class members are segregated from juvenile offenders. But defendants flatly

5    disavow any obligation to segregate non-delinquent children from juvenile offenders. OIG

6    Report, Exhibit 1, Ch. 2 at 1 ("The INS does not interpret *Flores* as requiring that the

7    segregation be maintained once the non-delinquent juveniles are formally placed in a secure

8    facility, and INS policy does not require it").

9         Not surprisingly, detained children consistently report being commingled with

10   delinquents. As one class member recounts, while he was in defendants' custody he had

11   "contact every day with juveniles who are detained here for delinquency. One boy told me

12   he is detained here for shooting a gun, others have told me they are here for drugs and

13   robbery." Declaration of Nery Amador Rodriquez-Montejo, July 8, 2002, Exhibit 37, at ¶ 10.

14   Another was exposed to repeated "fights between rival gang members." Declaration of

15   Ernesto Rivera Campos, February 15, 2002, Exhibit 24, at ¶ 5.

16        Martin Hall Juvenile Detention facility near Spokane, Washington has no facilities for

17   separating juvenile offenders from non-delinquent class members, and regular daily contact

18   between the two populations is the rule, not the exception. *See* Declaration of Matthew

19   Adams, October 8, 2001, Exhibit 29, at ¶ 6. At Martin Hall, class member Jin Rong Yiou was

20   "mixed together during meals and recreation with girls and boys who had been there for

21   having committed crimes, such as stealing or using drugs." Declaration of Jin Rong Yiou,

22   September 14, 2001, Exhibit 20, at ¶ 3.

23        At the Medina County Juvenile Facility in Hondo, Texas, staff "make a conscience

24   effort to mix the delinquent and immigrant children in all activities." Declaration of

25   Elizabeth Cox, July 7, 2003, Exhibit 52, at ¶ 8; Declaration of Olbin Geovani Arteaga

26   Moncada, July 16, 2002, Exhibit 27, at ¶ 9 (non-delinquent minor's account of being

27   commingled with the juvenile offenders in Medina County facility).

28

Children held at numerous other secure facilities corroborate that commingling is widespread. *See e.g.,* Declaration of Elizabeth Cox, July 23, 2003, Exhibit 53, at ¶ 10 (at Bexar County Juvenile Detention Center "[i]mmigrant minors appear to be treated just as delinquent youth, participating in all activities with them"); Declaration of Deborah Lee, August 15, 2003, Exhibit 57, at ¶ 15 (after being placed on probation for stealing two pairs of pants to sell for food, Miguel Galvan was placed in the G/H unit at Central Juvenile Hall during the pendency of his immigration proceedings. The G/H unit is a "unit for those who have committed sex-offenses. Miguel has told me how the American delinquents have extensive criminal histories, instigate fights with others for no reason, and even abuse drugs smuggled in his unit. Miguel has expressed his concern that the staff, do not make any distinction between him and the American delinquents, who have been ordered by a Juvenile Court to actually serve a sentence at CJH").

Another commingled class member is Edwin Muñoz, who was 13 years old when defendants incarcerated him at San Diego Juvenile Hall in California. Testimony of Edwin Larios Munoz Before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, February 28, 2002, Exhibit 28. Edwin was commingled with juvenile offenders during classes and recreation. *Id.* Due to mistreatment by guards and other inmates, Edwin lost weight during his confinement and had frequent nightmares the guards and other boys were going to kill him. *Id.*

In addition to commingling class members with delinquents during meals and recreation, defendants often force immigrant youth to share cells with delinquent juveniles. According to Amnesty International's survey, 11 of 23 secure facilities admitted to holding non-delinquent immigrant youth in cells with juvenile offenders. Amnesty Report, Exhibit 2, at 24.

Another non-delinquent class member, Cesar Omar Martinez, reported that during his time at CJH, he attended classes, ate meals, spent recreation time, showered, and shared a cell with delinquents. Declaration of Cesar Omar Martinez, Declaration, April 29, 2003,

Exhibit 13, at ¶ 11-12; *see also*, Declaration of Jose Humberto Gonzalez, April 29, 2003,

Exhibit 14, at ¶¶ 9 and 13 (non-delinquent minors held at Los Angeles Central Juvenile Hall,

attend classes, spend recreation time, share meals and cells with delinquent youth);

Declaration of Matthew Adams, October 8, 2001, Exhibit 29, at ¶ 6 (non-delinquent youth

share cells with delinquents at Washington's Martin Hall).

Genaro Perez-Martinez, a young boy held in San Diego Juvenile Hall, declares that

he, too, shared a cell with juveniles held for drug smuggling, as well as youths "locked up

for robbery." Declaration of Genaro Perez-Martinez, October 15, 2001, Exhibit 30, at ¶ 5.

Similarly, Juan Rojas, also detained in San Diego Juvenile Hall, declares that he shared his

small cell with another juvenile who had "a record for being in trouble." Declaration of Juan

Rojas, October 15, 2001, Exhibit 31, at ¶ 9. According to the sworn testimony of class

member Ernesto Rivera Campos, in San Diego Juvenile Hall he slept in a cell "with another

juvenile who had been arrested for stealing a car while drunk." Declaration of Ernesto

Rivera Campos, Exhibit 24, at ¶ 4.

Daily interaction with juveniles who have committed serious offenses obviously

jeopardizes the safety and well-being of non-delinquent class members. It also violates

federal law and the Settlement. Defendants do not discharge their duty to protect non-

delinquent children in their care when they incarcerate them with gang members or violent

juvenile offenders. *See, e.g.*, OIG Report, Exhibit 1, Ch. 2 at 2 (reporting incident at Liberty

County Juvenile Center in Texas where non-delinquent class members pepper-sprayed).

Defendants' refusal to separate class members from juvenile offenders is yet another

breach of Settlement. For its part, the OIG concluded that "those juveniles [] placed in secure

detention while awaiting removal should be segregated from delinquents" *Id*.[46] Yet when it

comes to accepting this reasonable recommendation, defendants' preference for

---

[46] Defendants have ignored class counsel's demand that they refrain from allowing plaintiff children to have daily contact with juvenile offenders. *See* Letter from C. Holguin to M. Matese, February 8, 2002, Exhibit 86.

1   misinterpreting the Settlement trumps their purported "special concern" for children. This

2   Court should enjoin defendants against housing non-delinquent class members housed in

3   secure facilities where they are commingled with juvenile delinquents.[47]

4   **4      Defendants continue to strip search children in violation of this**

5   **Court's summary judgment**

6   In 1988, this Court held that defendants' policy of "strip search[ing] all juvenile aliens

7   upon admission to INS detention facilities, and following all visits with persons other than

8   their attorneys," violates the Fourth Amendment. *Flores v. Meese*, 681 F. Supp. 665, 666-69

9   (C.D. Cal. 1988) ("Summary Judgment"). Recognizing that "[c]hildren are especially

10  susceptible to possible traumas from strip searches," the Court rejected defendants'

11  remarkable contention that they should be permitted to strip search class members because

12  of many of them come from "countries where they have no rights analogous to those

13  afforded under our Constitution ..." *Id.* at 667-669. The Court entered summary judgment

14  prohibiting defendants' strip searching youth "[a]bsent a reasonable suspicion that a strip

15  search of a particular juvenile will yield weapons or contraband." *Id.* at 667-69.[48]

16  Defendants have failed to abide by the Court's order and continue to subject class

17  members to unconstitutional strip searches. Fifteen-year-old Oscar Morales Guerra declares

18  that defendants strip searched him every time he arrived at a new placement. Declaration of

19  Oscar Morales Guerra, July 8, 2002, Exhibit 10, at ¶ 8. Oscar's experience was far from

20  unique. *See, e.g.*, Declaration of Felipe Galileo Lopez-Beltran, October 14, 1986, Exhibit 44, at

21

22  ───────────────

23  [47] As discussed in the following section, defendants have sometimes responded to complaints about commingling non-delinquent class members with juvenile delinquents by isolating immigrant youth in locked cells for 24 hours a day, 7 days a week. As argued below, however, children should be under no obligation to choose between solitary confinement and commingling with juvenile delinquents. Such a choice is neither legal nor remotely consistent with defendants' "special concern" for youth.

24

25

26  [48] Under the Settlement, defendants must treat "all minors in its custody with dignity, respect, and special concern for their particular vulnerability as minors." Settlement ¶ 11. Strip searching children without probable cause to do so is palpably inconsistent with this standard.

27

28

1    ¶ 2 (When I arrived at Chula Vista I was taken to a room and INS officers ordered me to

2    remove my clothes; I was then strip searched."); Declaration of Josué Enrique Andrade

3    Garcia, July 8, 2002, Exhibit 35, at ¶¶ 10, 12 ("I was strip searched upon arriving at

4    Southwest Key... I was strip searched upon arriving [at Globe].  A man from the facility

5    watched me while I undressed."); Declaration of Wilbur Antonio Orillana, July 16, 2002,

6    Exhibit 38, at ¶ 10 ("When I arrived here at Hondo, I was strip-searched."); Declaration of

7    Olvin Giovanni Arteaga Moncada, July 16, 2002, Exhibit 27, at ¶ 8 ("I was strip-searched

8    when I was transferred here [Hondo] from Brownsville."); Declaration of Genaro Perez-

9    Martinez, October 15, 2001, Exhibit 30, at ¶ 4 ("I was handcuffed and brought to San Diego

10   with two other boys.  I got to [San Diego Central] Juvenile Hall in the afternoon.  I was taken

11   to a room and told by an official to remove my clothes."); Declaration of Chen Xiang,

12   September 28, 2001, Exhibit 19, at ¶ 5 ("At Berks County, I was forced to take my clothes off

13   and I was searched."); Declaration of Xue Zhung Zhou, September 28, 2001, Exhibit 21, at ¶

14   9 ("When I was admitted to Martin Hall, I was made to first take off all my clothes to be

15   searched.  A guard watched me while I took off my clothes.  Then he ordered me to turn

16   around, squat down and get up while he checked my body."); Declaration of Jin Mei Huang,

17   September 14, 2001, Exhibit 12, at ¶¶ 1, 3 ("I was then transferred to an [unknown] jail

18   where I was strip-searched.  At Berk's County I was strip-searched one more time.");

19   Declaration of Jain Xing Zheng, September 14, 2001, Exhibit 45, at ¶ 3 ("I was strip-searched

20   upon arrival [at Berks County].") .

21          Children at the Berks County Youth Center report that defendants strip search them

22   after every visit and after weekly room searches. Amnesty Report, Exhibit 2, at 33. One child

23   at the Berks County facility reported being strip searched 25 times in five weeks. *Id.* at 34. At

24   Gila County, staff admitted that children are strip searched any time they receive visitors or

25   see the warden. *Id.* According to Amnesty International, over 60 percent of defendants'

26   secure facilities routinely strip-search children. *Id.* at 33.

27          The strip searching of class members in violation of the Court's order is not

28                                          - 78 -

surprising: Defendants have failed to implement any policies and procedures that would ensure minors are protected from unlawful searches. To the contrary, the Juvenile Protocol Manual *requires* that facilities have a written policy, procedure, and practice allowing strip searches of detained minors. Juvenile Protocol Manual, Exhibit 40, at 3-JDF-#A-19 (Ref. 2-8196) (1999). The Manual imposes no restrictions on such searches, nor does it require a particularized suspicion that a search will yield weapons or contraband.

The overwhelming evidence is that defendants have failed to implement any effective policies or procedures to ensure compliance with the Court's judgment and are consequently violating that judgment with impunity. The Court should forthwith enjoin further violations of its judgment.

V    CONCLUSION

The foregoing has cited to only a portion of the voluminous evidence demonstrating defendants' broad disregard for their commitments under the Settlement. Defendants—from the INS and DHS to the ORR— have failed to honor their commitment to adopt a "general policy favoring release." They have disregarded children's needs to be reunified with family members and instead continue to detain children to force their undocumented relatives to surrender. As a result, class members are being kept in defendants' custody for extended periods, swelling the population of detained minors so as to create a permanent condition of "influx" that defendants can accommodate only by housing vast numbers of non-delinquent class members in juvenile halls, adult "staging facilities," and irregular detention facilities, such as hotels.

Far from living up to their self-professed "special concern" for class members, defendants habitually deny children in their custody the essential services, rights and benefits due them under the Settlement. Defendants regularly detain non-delinquent youth in secure facilities, deny them access to medium secure alternatives, commingle them with delinquents, isolate them in cells for days on end, deny them basic education, recreation, reading materials, access to telephones, lawyers, and basic information about the

1  proceedings against them and their prospects to regain their freedom.

2          This is clearly not the situation that should exist nearly six years after the Settlement

3  was entered as an order of this Court. Defendants have long been on notice that they are not

4  in compliance with the Settlement, and should have become acutely aware of their

5  shortcomings when the Inspector General issued its report in September 2001.

6          Despite the recommendations in the OIG Report, the transfer of authority to the ORR,

7  and the efforts by class counsel to persuade defendants to comply with the Settlement, they

8  remain in serious breach. An order of this Court is needed to remedy those breaches, as

9  defendants will not do so without compulsion.

10  / / /

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1        For the foregoing reasons, this Court should grant this motion and enter an order in

2  the form lodged concurrently herewith.[49]

3  Dated: January 14, 2004.            Respectfully submitted,

4                              CENTER FOR HUMAN RIGHTS &
                              CONSTITUTIONAL LAW

5                              Carlos Holguín
                              Peter A. Schey

6                              Angela Perry

7                              LATHAM & WATKINS

8                              Steven Schulman

9                              NATIONAL CENTER FOR YOUTH LAW
                              Katina Ancar

10                             YOUTH LAW CENTER

11                             Alice Bussiere

12

13                             Carlos Holguin

14

15                             Katina Ancar

16  / / /

17

18

19

20

21

22

23

24

25

26

---

27  [49] Plaintiffs will separately move the Court to award them attorney's fees and costs incurred
    in the prosecution of this motion pursuant to the Equal Access to Justice Act, 28 U.S.C. §
28  2412(d).

PROOF OF PERSONAL SERVICE

I, Carlos Holguin, declare and say as follows:

1. I am over the age of eighteen years and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, California, 90057, in said county and state.

2. On January 15, 2004, I served the attached NOTICE OF MOTION AND MOTION TO ENFORCE SETTLEMENT on defendants in this proceeding by delivering a copy personally to their attorney of record as follows:

> Frank Travieso
> Assistant United States Attorney
> 300 N. Los Angeles Street
> Los Angeles, California 900

and by then sealing said envelope and depositing the same, with postage thereon fully prepaid, in the mail at Los Angeles, California; that there is regular delivery of mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of January, 2004, at Los Angeles, California.

/ / /

- 82 -