1   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
    Carlos Holguín, State Bar No. 90754
2   Peter A. Schey, State Bar No. 58232
    256 South Occidental Boulevard
3   Los Angeles, CA 90057
    Telephone: (213) 388-8693
4    Fax: (213) 386-9484

5   LATHAM & WATKINS
    Steven Schulman
6   555 Eleventh St., NW, Suite 1000
    Washington, DC 20004
7   Telephone: (202) 637-2184
    Fax: (202) 637-2201
8

9   NATIONAL CENTER FOR YOUTH LAW
    Katina Ancar.
10  405 -14th Street, Suite 1500
    Oakland, California 94612
11  Telephone: (510) 835-8098
    Fax: (510) 835-8099
12

13  *Of counsel:*
    YOUTH LAW CENTER
14  Alice Bussiere
    417 Montgomery Street, Suite 900
15  San Francisco, CA 94104
    Telephone: (415) 543-3379
16  Fax: (415) 956-9022

17  *Attorneys for Plaintiffs*

18                  UNITED STATES DISTRICT COURT

19                 CENTRAL DISTRICT OF CALIFORNIA

20

21  JENNY LISETTE FLORES, *et al.,*          )   No. CV 85-4544-RJK(Px)
                                             )
22  Plaintiffs,                              )   NOTICE OF FILING OF INDEX
                                             )   TO EXHIBITS AND EXHIBITS
23  -vs-                                     )   IN SUPPORT OF PLAINTIFFS'
                                             )   NOTICE OF MOTION AND
24  TOM RIDGE, Secretary, Department of      )   MOTION TO ENFORCE
    Homeland Security, *et al.,*             )   SETTLEMENT OF CLASS
25                                           )   ACTION - VOLUME I
    Defendants                               )
26  _____      )   (ARGUMENT NOT REQUIRED)

27

28



FILED
CLERK, U.S. DISTRICT COURT
JAN 2 6 2004
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

scan only

LODGED
CLERK, U.S. DISTRICT COURT
JAN 15 2004
mm 9:45
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ORIGINAL

DOCKETED ON CM
JAN 2 7 2004
BY _____ 009

Plaintiffs hereby give notice of the filing of their Index to Exhibits and

Exhibits in Support of Plaintiffs' Notice of Motion and Motion to Enforce

Settlement of Class Action.  Volume I of V contains the following exhibits:

EXHIBIT 1:    United States Department of Justice, Office of the Inspector General, Unaccompanied Minors in INS Custody, Report No. I-2001-009 (September 28, 2001)

EXHIBIT 2:    Amnesty International USA, "Why Am I Here?" Children in Immigration Detention," (June 18, 2003)

EXHIBIT 3:    Memorandum of Understanding Re: Compromise of Class Action: Conditions of Confinement (November 30, 1987)

EXHIBIT 4:    U.S. Department of Justice, Immigration and Naturalization Service, INS Office of Juvenile Affairs Fact Sheet, (hereinafter "INS OJA Fact Sheet") (August 1, 2002)


Dated: January 15, 2004                    Respectfully Submitted,

                                           CENTER FOR HUMAN RIGHTS &
                                           CONSTITUTIONAL LAW


                                           Carlos Holguin, State Bar No. 90754
                                           *Attorney for Plaintiffs*

///

-2-

SCANNED

# EXHIBIT 1

**Return to the USDOJ/OIG Home Page**
**Return to the Table of Contents**

**Unaccompanied Juveniles in INS Custody**
Report Number I-2001-009
September 28, 2001

# EXECUTIVE SUMMARY

**Purpose**

The Office of the Inspector General (OIG), Evaluation and Inspections Division, reviewed the treatment of unaccompanied illegal juveniles held in the custody of the Immigration and Naturalization Service (INS). We examined the INS's policies and procedures developed in response to the *Flores v. Reno (Flores)* settlement agreement and other issues concerning juvenile detention. Our inspection focused on unaccompanied illegal juveniles who are detained in shelters or secure detention facilities. Accompanied juveniles, juveniles voluntarily returned to Mexico, and juveniles in custody less than 72 hours were not included in our review.

**Background**

*Flores* was a class-action lawsuit filed against the INS because of its policies related to the detention, processing, and release of unaccompanied illegal juveniles. The requirements of the agreement are intended to protect the rights of unaccompanied illegal juveniles in INS custody as well as to ensure their well-being. In March 1997, the INS's settlement of the suit resulted in new INS policies for the detention, processing, and release of unaccompanied illegal juveniles.

In fiscal year (FY) 2000, the INS detained 4,136 unaccompanied illegal juveniles for longer than 72 hours. The unaccompanied illegal juvenile population was 75 percent male and 25 percent female. Its average age was 15 years. The average length of time in custody was 33 days and the median was 19 days. The INS normally has between 400 and 500 juveniles in custody at any one time. The INS contracts with licensed facilities for shelter care programs, group homes, foster homes and juvenile detention facilities to house the juveniles in the least restrictive setting appropriate. The facilities are classified as secure, medium secure, and non-secure.

**Results in Brief**

During the last three years, the INS has made improvements in its Juvenile Program. The Juvenile Program staff developed a detailed *Juvenile Protocol Manual* that defines the policies, procedures, and responsibilities that INS officers are expected to follow with juveniles, from initial encounter through release or removal. The INS has provided training on the provisions of the *Flores* agreement to over 15,000 INS employees since 1997 and also made it part of the law enforcement academy training received by INS officers. The number of juvenile shelter bed spaces has increased from 131 in FY 1997 to over 400 in FY 2000. To meet the *Flores* requirement for data reporting, the INS developed the Juvenile Alien Management System (JAMS), enabling improved tracking and reporting on juveniles in its custody. All of the facilities we visited had programs in place to meet the *Flores* requirements for providing education, medical services, recreation, and social orientation programs in addition to providing the necessary food and shelter. The Juvenile Program has also submitted its required reporting to the court and the plaintiffs for three years and has not received notification from the court or the plaintiffs that INS is substantially out of compliance with the *Flores* agreement.

Although the INS has made significant progress since signing the *Flores* agreement, our review found that deficiencies in the handling of juveniles continue to exist in some INS districts, Border Patrol sectors, and headquarters that could have potentially serious consequences for the well-being of the juveniles.

**Principal Findings**

<u>INS Compliance with Policies and Procedures</u>

*Flores* and INS policy require the INS to segregate non-delinquent juveniles in temporary detention from juvenile offenders while they await appropriate placement. The INS does not interpret *Flores* as requiring that the segregation be maintained once the non-delinquent juveniles are formally placed in a secure facility, and INS policy does not require it. We believe the segregation of non-delinquent juveniles from juvenile delinquents should be continued as long as the juveniles are in INS custody in order to ensure their well-being. In FY 2000, 34 of 57 secure facilities did not have procedures or facilities to properly segregate non-delinquent from delinquent juveniles. As a result, there may have been as many as 484 potential instances when non-delinquent and delinquent juveniles were housed together.

The *Juvenile Protocol Manual* requires an INS official to visit with all juveniles in its custody on a weekly basis. At three of the eight districts reviewed, juvenile coordinators were not regularly conducting the required visits. In addition, the INS does not have procedures in place to document the visits when they do occur.

*Flores* requires the INS to segregate juveniles from adults during detention and transport after arrival at the first INS processing office. INS escort policy requires that juveniles be transported with same-sex escorts. The INS does not always document the detention and transport of juveniles and is thus unable to demonstrate compliance with this requirement. INS escort policy requires that all juveniles be escorted when on commercial aircraft. The INS allowed unescorted juveniles to

SCANNED

travel on commercial aircraft. INS restraint policy also prohibits the use of restraints on non-delinquent juveniles in custody or when transported by non-INS officers/agencies. Facilities in four districts used restraints when transporting non-delinquent juveniles.

*Flores* requires the INS to place juveniles in an appropriate secure juvenile detention facility or a non-secure shelter facility within three to five days of entering into INS custody. In FY 2000, the INS did not meet this requirement for 19 juveniles. For 339 juveniles, INS records were not sufficient to demonstrate that it had met this requirement.

## Juvenile Program Oversight

Three of the eight districts we reviewed had recurring problems with district or Border Patrol officers not carrying out the duties required by the *Juvenile Protocol Manual*. In several districts the effectiveness of the Juvenile Program was hampered by a lack of administrative support for the district juvenile coordinator. Three districts did not have a fully trained back-up district juvenile coordinator. Two district juvenile coordinators who handled a heavy volume of juveniles did not have clerical support.

The INS did not hold one shelter we reviewed to the terms of its cooperative agreement and did not control all actions affecting the custody of juveniles. At another secure facility, the district juvenile coordinator had difficulty meeting INS requirements for monitoring juveniles.

The INS did not have a clearly defined mechanism for analyzing its bed-space needs or a comprehensive plan for acquiring the beds. The INS needs to determine its requirements by types of beds and locations where new bed-space would best serve the Juvenile Program. In addition, the INS needs to better define district, regional, and national responsibilities for acquiring these beds.

Monitoring and oversight by the Juvenile Program managers was weak. Available data on the juveniles was not analyzed to identify systemic problems or trends in length of time in custody or facility placements. The managers failed to implement a procedure to analyze and track significant incident reports (SIRs) involving juveniles in custody. Required inspections of non-secure and secure facilities were not timely for most of the facilities. Changes in policy and guidance were not updated in the *Juvenile Protocol Manual*. Data entry errors were not always corrected and reconciled. Finally, the criteria for using influx as a justification for placing non-delinquent juveniles in secure facilities needs to be updated.[1]

The INS conducted the training agreed upon in the *Flores* settlement within 120 days of the final court approval. New officers also now receive the training at the law enforcement academy. However, beyond meeting the initial *Flores* training requirement, the INS has not developed comprehensive, INS-wide follow-up training for designated field employees.

## Related Processes

The *Flores* agreement established as INS policy that juveniles would be released without unnecessary delay, consistent with its interests to ensure the juvenile's timely appearance before the INS and the immigration courts and to protect the juvenile's well-being. Juveniles must be released to a sponsor who will accept responsibility for the juvenile. Preferred sponsors included parents, legal guardians, and close adult family members. If a juvenile has a parent in the United States, however, current INS policy requires the parent to be involved in the juvenile's release, regardless of the parent's immigration status. An undocumented parent must report to an INS officer and enter immigration court proceedings before the INS will release the juvenile. If the parent is unwilling to come forward, the juvenile will remain in INS custody, even when another acceptable sponsor is available. The current INS policy if too rigidly adhered to, may impede the INS's ability to ensure the least restrictive custody and most expeditious release of juveniles.

Unaccompanied juveniles in the Juvenile Program are required to go before the immigration courts to present their cases. The court proceedings are the responsibility of the Executive Office for Immigration Review (EOIR) but are initiated by INS at the outset of the juvenile's custody. For several reasons, few juvenile cases before the immigration courts are completed while the juveniles are still in custody. After juveniles were released from custody, 68 percent failed to appear for their hearings. Legal services available for juveniles in custody are limited, hearings on the merits of cases are frequently postponed until after release of the juveniles, and in two locations hearings for juveniles in shelter care were not scheduled expeditiously.

The law does not provide for legal representation at government expense for alien juveniles. However, EOIR is actively involved in developing sources of pro bono legal aid. The other reasons for delay are, for the most part, the responsibility of EOIR. To the extent that problems in the process affect juveniles in INS custody, the INS and EOIR should follow-up on discussions already begun to find effective mutually agreeable solutions.

The report contains 28 recommendations to address the issues we identified during our review.

---

**Footnotes**

1. An influx condition is one of the justifications the INS can use to place a juvenile in a secure facility. It is intended as a safety valve for emergencies. An influx condition is defined by Flores as a situation when the INS has more than 130 juveniles eligible for placement in a shelter facility. This number was set at a time when the INS had 131 shelter beds available. The Juvenile Program now has over 400 shelter beds available.

**2.**

**Return to the USDOJ/OIG Home Page**
**Return to the Table of Contents**

**Unaccompanied Juveniles in INS Custody**
Report Number I-2001-009
September 28, 2001

SCANNED

# CHAPTER 1 - INTRODUCTION

The Immigration and Naturalization Service (INS) encounters more than 100,000 accompanied and unaccompanied illegal juveniles under the age of 18 every year. The INS quickly returns the vast majority of the juveniles to their country of origin. Most of these are Mexican juveniles who are voluntarily returned to Mexico. Our inspection concentrated on the smaller number of unaccompanied illegal juveniles who are detained for longer than 72 hours and placed in shelters or secure detention facilities by the INS while they are in INS custody. These juveniles are from many countries. They come to find work, to be reunited with their families, or to flee human rights abuses and armed conflict in their home countries. The INS apprehends them when they try to enter the United States illegally along the border; at land, air, or sea ports of entry; or are picked up inside the country as a result of an INS enforcement action. Often alien smugglers are involved.

In FY 2000 the INS detained 4,136 unaccompanied illegal juveniles for longer than 72 hours.[2] This total includes 3,664 juveniles apprehended in FY 2000 and 472 juveniles in custody prior to the start of the fiscal year, but who were still in detention on October 1, 1999. Of these, 75 percent were male and 25 percent were female. Their average age was 15 years. These juveniles represented 64 different nationalities, with the largest percentages coming from Central America, China, and Mexico. Of the 3,664 juveniles apprehended in FY 2000, INS subsequently released 3,172 (87 percent) in the same fiscal year. The average length of time in custody was 33 days, and the median was 19 days.[3] The INS normally has between 400 and 500 juveniles in custody at any one time.

In 1984 the INS Western Region established a policy governing the release of alien juveniles detained pending the outcome of deportation procedures. Under this policy, the juvenile could only be released to a parent or lawful guardian. Only in extraordinary circumstances could the juvenile be released to another responsible individual. In 1985 two human rights legal advocacy organizations filed a class-action suit on behalf of Lisette Flores in the United States District Court for the Central District of California challenging the release policy and the conditions of detention.[4] While the Flores case was before the District Court, the INS established a single national rule for the release of juveniles in deportation or exclusion procedures, similar to the Western Region policy. However, according to this national policy, even if parents or guardians were available, detention could be continued to secure the juvenile's presence in immigration proceedings, or to ensure their safety.

In 1988 the District Court ruled in Flores' favor. The INS and the Attorney General appealed. In 1990 the United States Court of Appeals for the Ninth Circuit reversed the District Court findings in *Flores v. Meese*. The United States Supreme Court ruled in 1993 that the INS policy was reasonable and reversed the judgment of the Court of Appeals. In 1996 the plaintiffs and the INS entered into a settlement agreement that terminated the lawsuit. As part of the agreement, INS established new policies for the detention, processing, and release of juveniles under the age of 18 in INS custody and drafted new regulations. The INS was required to report annually to the court approving the agreement on its compliance with the terms of the agreement. The INS also was required to report semiannually to the plaintiffs on its compliance and provide data about the juveniles in INS custody longer than 72 hours.

After the *Flores* agreement, various groups published reports that continued to criticize the INS for alleged violations of juveniles' rights at detention facilities in Arizona, California, and Pennsylvania. Concerns raised by these groups have drawn Congressional attention, and new legislation to address them has been proposed recently. The *Unaccompanied Alien Child Protection Act* (S. 121) introduced in January 2001 by Senator Dianne Feinstein, would provide for appointed counsel and a *guardian ad litem* for unaccompanied alien juveniles and establish minimum standards for their custody.[5] A companion measure (H.R. 1904) has been introduced in the House of Representatives.

In general, our inspection reviewed the new policies and regulations the INS implemented after Flores, as described in the *Juvenile Protocol Manual,* published by the INS in March 1999. We assessed whether the INS was:

- Ensuring segregation of non-delinquent juveniles from delinquent juveniles in custody.
- Monitoring juveniles in custody and the juvenile detention facilities.
- Providing appropriate treatment and services to juveniles in custody.
- Facilitating timely, appropriate, and least-restrictive placement of juveniles.
- Providing appropriate levels of operational and administrative support for the Juvenile Program.
- Ensuring the shelter care facilities operated within their proper roles and responsibilities.
- Planning and acquiring the appropriate number and types of juvenile bed-spaces.
- Providing appropriate INS managerial oversight at all levels.
- Training INS employees in the requirements of the Juvenile Program.
- Limiting the time juveniles remained in custody to the extent possible.
- Initiating timely immigration hearings for juveniles and ensuring the appearance of the juveniles at the hearings.

**Scope and Methodology**

During our inspection, we visited 16 juvenile facilities, which housed 2,410 of the 4,136 juveniles (58 percent) in custody in FY 2000.[6] We reviewed the Juvenile Program at 8 of the INS's 33 districts and interviewed the INS regional juvenile coordinators for all 3 regions. We visited 3 of the 21 Border Patrol Sectors. We visited two INS Service Processing Centers (SPCs). We interviewed

senior INS and Executive Office for Immigration Review (EOIR) staff, immigration judges, INS attorneys, local legal service providers or immigrant rights organizations, and Public Health Service (PHS) officials. The data analysis presented in this report was largely based on FY 1999 and 2000 data from the INS's Juvenile Alien Management System (JAMS) database. JAMS was created in response to a *Flores* requirement that the INS track unaccompanied juveniles in its custody and record certain basic information.[7]

## Background

### Organization of the Juvenile Program

The INS Juvenile Program is directed by the INS National Juvenile Coordinator, who reports to the Deputy Associate Commissioner for the INS Office of Detention and Removal (D&R) at INS headquarters.[8] Three regional juvenile coordinators, reporting to the respective regional head of D&R, are responsible for overseeing and monitoring the district juvenile coordinators in their regions. The 33 INS district juvenile coordinators are selected from the district D&R staff. They report through the district chain of command and to the regional and National Juvenile Coordinator. Some district juvenile coordinators work with juveniles full-time and others work with both juvenile and adult cases, according to the juvenile workload.

The National Juvenile Coordinator and the regional juvenile coordinators coordinate the placement and movement of juveniles between districts and regions. The district juvenile coordinators are responsible for juveniles in custody in their jurisdictions, including the respective Border Patrol sectors. The district juvenile coordinators work with Border Patrol sector personnel designated to handle juvenile issues.

The district juvenile coordinators work with the juveniles, make family contacts, and communicate with INS officers and with detention and shelter care facility staffs. The district juvenile coordinators are on call 24 hours a day, 7 days a week, and must be notified whenever a juvenile is taken into custody to make arrangements for the juvenile's care and placement. The district juvenile coordinators are required to visit the shelters and the juveniles on a regular basis, coordinate juvenile immigration hearings and juvenile movement between districts (often escorting juveniles between districts), and coordinate their release or removal.

At present, the Juvenile Program contracts with more than 100 facilities, which provide over 500 bed spaces for juveniles. The bed spaces include 400 non-secure beds comprised of shelter, group, and foster beds as well as 100 secure beds. In a few instances, if beds are unavailable, juveniles are housed in hotel rooms secured by contract guards. All juvenile beds are considered national beds. That is, they are not for the exclusive use of individual districts or regions, regardless of their location. The national bed concept facilitates appropriate placement of juveniles wherever they are apprehended. The regional and district juvenile coordinators must maintain contact and cooperate with one another to ensure the timely placement of juveniles in appropriate facilities.

### Principal Provisions of *Flores v. Reno*

The *Flores* agreement resulted in new national policies applying to all juveniles in INS custody. The agreement stated the INS must treat juveniles with dignity, respect, and concern for their vulnerability, and must detain juveniles in the least restrictive setting appropriate to their ages and special needs. The agreement established a general policy favoring release without unnecessary delay. The INS agreed to continue its efforts towards family reunification and release of the juveniles. Release to a sponsor was to follow an order of preference ranging from a parent as the first choice, to an entity or unrelated adult willing to accept legal custody, if there were no other appropriate sponsors. Sponsors would be responsible for the juveniles' well-being and for ensuring their presence at all required immigration proceedings. The INS could terminate custody arrangements if the sponsor failed to carry out these responsibilities. The agreement stated clearly the INS was not required to release a juvenile to any person or agency if it had reason to believe the potential sponsor might harm, neglect, or fail to present the juvenile to the INS or the immigration courts when requested to do so.

The agreement requires that the INS not detain an unaccompanied juvenile with an unrelated adult for more than 24 hours and that the juveniles be held in safe and sanitary facilities. Juveniles taken into custody must be informed of their right to be represented by an attorney, to contact someone, to a hearing before an immigration judge, and to judicial review of their cases. The INS must also provide a list of free legal services available in the district. Unaccompanied juveniles should not be transported in vehicles with detained adults, except to go from the place of arrest to an INS office, or when separate transportation is impractical. Juveniles transported with adults must be separated and protected from harm. If a reasonable person would conclude an alien is an adult, in spite of claiming to be a juvenile, the INS may treat him or her as an adult. The INS may require a medical or dental examination to verify age.

If there are no sponsors to whom juveniles could be safely released, the INS agreed to house them in facilities meeting certain standards. The agreement distinguished between two general levels of facility security: non-secure shelter or foster programs; and secure or medium-secure juvenile detention facilities.

The INS may hold juveniles in secure facilities only when they meet certain criteria, which include:

- Juveniles charged or chargeable with criminal or delinquent actions.
- Juveniles who commit or threaten violence.
- Juveniles whose conduct in shelter care becomes unacceptably disruptive.
- Juveniles who present an escape risk.
- Juveniles in danger, for their own safety.

For juveniles who do not meet these criteria, but must be temporarily housed in secure detention, the INS agreed to separate non-delinquent juveniles from delinquent offenders. The INS further agreed to transfer juveniles not meeting the secure detention requirement to a licensed shelter, within three to five days. The INS should not use secure facilities if an appropriate shelter or medium-secure facility is available. In the event of an emergency, or an influx of minors in excess of the number of shelter beds, the INS can temporarily suspend these rules.

The settlement required the INS to designate a National Juvenile Coordinator to monitor compliance with the terms of the agreement. In response to an additional Flores requirement to track and provide certain basic information about unaccompanied juveniles in custody for more than 72 hours, the INS created the JAMS database. JAMS data is entered at the district level, forwarded weekly, and compiled at headquarters.[9] Flores also required the INS to provide training to INS employees regarding the agreement.

## Facilities

Except for initial, short-term housing, juveniles are held in four types of facilities: foster homes, shelter care facilities, medium-secure facilities, and secure detention facilities. Occasionally, if none of these types of bed space is available, hotel rooms secured by contract guards are used. Foster care, used infrequently, is generally reserved for girls, children aged 10 or under, and long-term detainees for whom a sponsor cannot be found.

Shelter facilities, or licensed programs, are any program, agency, or organization licensed by an appropriate state agency and contracted by the INS to provide residential, group, or foster care services for dependent juveniles. They may include programs operating group homes, foster homes, or facilities for juveniles with special needs, i.e., mental and/or physical conditions requiring special services and treatment by staff.

Medium-secure facilities are state-licensed facilities designed for juveniles who require close supervision but not secure detention. These facilities provide 24-hour supervision and maintain stricter security measures, such as constant staff supervision. They may have a secure perimeter but are not equipped internally with major restraining construction or procedures typically associated with correctional facilities.

Secure facilities are state or county licensed juvenile detention facilities or INS-contract facilities that have separate accommodations for juveniles.

## Immigration Process for Unaccompanied Juveniles

The largest proportion of juveniles the INS encounters are of Mexican origin. According to the Border Patrol and port of entry managers we spoke to in the field, the Mexican juveniles are typically detained in temporary holding areas and returned voluntarily within a matter of hours, and usually in no more than 24 hours to either a parent, a relative, or a representative of the Mexican government. The United States government has established repatriation agreements with Mexico and the ports of entry and Border Patrol sectors maintain close relationships with the Mexican consulates, ensuring the Mexican juveniles are properly returned and not simply dropped off across the border. About 90 percent of the juveniles who remain in the United States are processed and placed in an appropriate facility within three to five days.

INS officers apprehending unaccompanied juveniles who are not going to be voluntarily returned are required to give them a notice of their rights and a Notice to Appear (NTA) for hearings conducted by EOIR judges. The juveniles are then transported to the designated facility. Upon arrival at a shelter or a secure facility, the facility staff screens juveniles to determine their mental and physical health and conducts an initial interview to find potential family or other sponsors to whom to release the juveniles. Once appropriate sponsors are located, the INS will release the juveniles into their custody.

### Home Assessment Process

A special sub-group of juveniles, including all juveniles from China and India, is considered to be vulnerable to exploitation and abuse by smugglers. The sponsors of these juveniles are required to undergo an extensive home assessment before the juvenile can be released.

The INS has contracted with two volunteer agencies, the United States Catholic Conference (USCC) and the Lutheran Immigration and Refugee Services (LIRS), to perform home assessments for all Chinese and Indian juveniles. The assessments begin with juvenile coordinators or shelter staff attempting to identify potential sponsors by talking with the juveniles. The INS sends the information provided by the juveniles to the agencies to forward to caseworkers in the sponsors' area. Agency caseworkers interview the sponsors to verify their suitability, request the INS to perform preliminary records checks, and, if no negative information emerges, complete the home assessments. The National Juvenile Coordinator reviews the results of the assessment. If the National Juvenile Coordinator recommends approval, he notifies the district juvenile coordinator, who then checks the sponsor against the National Crime Information Center database. The sponsor must not have a criminal record. Authority for release of juveniles rests with district directors, but can be delegated to lower levels. If at any point information indicating that a sponsor would be unsuitable emerges, the search for a different sponsor starts over.

Often the Chinese and Indian juveniles, who require home assessments, are in custody much longer than other nationalities. In FY 2000, for a sample of 280 Chinese and Indian juveniles, the average time in custody was 146 days. Records show juveniles spent an average of 33 days in custody if they did not require home assessments.

Several factors affect the time required to complete home assessments: whether juveniles can or will identify acceptable sponsors, the reliability of the information juveniles provide, and the experience and workload of the voluntary agency caseworkers.

### Immigration Proceedings

All juveniles are entitled to a hearing before an immigration judge, who will determine if they will be allowed to remain in the United States. When INS officers take juveniles into custody, the juveniles are notified of their right to hearings conducted by an EOIR judge. INS officers also inform the juveniles of their right to be represented by an attorney, and give them a list of free legal service providers who may help them if the juveniles do not have funds to pay for a private attorney. A lawyer or paralegal representing a pro bono legal service provides most juveniles who come into INS custody (at the districts we visited) with at least a basic explanation of their rights and of immigration proceedings. While all juveniles are entitled to a hearing, many decline their right and elect to voluntarily return to their country of origin.

Case 2:85-cv-04544-DMG-AGR   Document 20   Filed 01/26/04   Page 9 of 169   Page ID #:109

During hearings, the judges consider any application for relief from removal the juvenile may put forward, most often an application for asylum. Judges may grant or deny the applications for relief. If the judges deny relief, the juveniles may be allowed to depart voluntarily, or they may be ordered removed from the country.

## Results of the Inspection

We concluded that the INS has made significant progress since signing the *Flores* agreement. The juvenile program staff developed a detailed *Juvenile Protocol Manual* that defines the procedures and responsibilities that INS officers are expected to follow with juveniles from initial encounter through release or removal. The INS has provided training on the provisions of the *Flores* agreement to over 15,000 employees since 1997 and made it part of the law enforcement academy training received by INS officers. The number of juvenile shelter bed spaces has increased from 131 in 1997 to over 400 in 2000. The INS implemented facility inspection standards for secure juvenile detention and shelter care facilities. Jail inspection training has been made part of training received by all juvenile coordinators. To meet the *Flores* requirement for data reporting, the INS developed the Juvenile Alien Management System (JAMS), enabling improved tracking and reporting on juveniles in its custody. JAMS is updated weekly at INS headquarters. All of the facilities we visited had programs in place to meet the Flores requirements for providing education, medical services, recreation, and social orientation programs in addition to providing the necessary food and shelter. The National Juvenile Coordinator and the regional juvenile coordinators hold formal meetings with nonprofit groups, advocacy groups, pro bono groups, and shelter care facility providers. The INS has also submitted its required reporting annually to the court and semi-annually to the plaintiffs for three years. According to the INS, the court and the plaintiffs have not notified them of any instances of substantial non-compliance with the *Flores* agreement.

Although the INS has made significant progress since signing the *Flores* agreement, our review found deficiencies with the implementation of the policies and procedures developed in response to *Flores* in INS districts, Border Patrol sectors, and at headquarters. Some of the problems existed across INS districts while some problems were specific to a few districts. This report alerts senior INS managers to the existence of problems that could lead to potentially serious consequences affecting the well-being of the juveniles.

Our findings are organized into three chapters. Each section within the chapters is followed by recommendations. Chapter 2 discusses deficiencies in the Juvenile Program's compliance with policies and procedures and identifies four areas that need improvement: segregating non-delinquent juveniles from delinquent juveniles, visits made to juveniles and facilities, management of custody issues, and timely placement of juveniles. Chapter 3 discusses shortcomings in Program oversight and identifies four areas that need improvement: managerial support and enforcement of *Flores*, roles and responsibilities of the INS and the facilities, acquisition of bed space, oversight of the Juvenile Program at INS headquarters, and training. Chapter 4 discusses two process issues related to the Juvenile Program we identified during our site visits: policies on release of juveniles to sponsors and problems related to the EOIR proceedings process. In these chapters we point out a number of best practices we observed. In Chapter 5 we list all the recommendations we made in the report.

## Footnotes

2. To determine the number of individuals in custody for FY 2000, we screened the JAMS data by unique A-number. We removed those juveniles that were in custody for less than 72 hours.
3. The mean and median length of stays are based on those juveniles in the JAMS database who were in custody for over 72 hours.
4. The organizations were the Center for Human Rights and Constitutional Law in Los Angeles and the National Center for Youth Law in San Francisco, California.
5. A guardian ad litem is a person appointed to represent a minor's interest in litigation. Under one legislative proposal, H.R. 1904, a guardian could be a child welfare professional or other individual who has received training in child welfare matters; who is recognized by the Attorney General as being qualified to serve as a guardian ad litem; and who is not an officer or employee of the INS, is not acting as the alien's immigration attorney, is not a relative of the alien, and is not a person with a conflict of interest.
6. For a more detailed discussion of INS juvenile facilities, refer to Chapter 3, Juvenile Program Oversight, Acquisition of Bed Space.
7. For a more detailed analysis of the juvenile population, refer to the individual sections and Appendix II and III.
8. Until November 2000, the Humanitarian Affairs Branch (HAB) administered the shelter care portion of the program. It oversaw and monitored the contracts and the programs of the largest shelter care providers. At that time a new Juvenile Affairs Division was created within D&R. The new Division took over the shelter care function from HAB. The financial/grants management staff and one administrative staff member from the former HAB staff were transferred to the new Division to continue their shelter care roles. Our report reflects the organizational structure that was in place at the time of our field work prior to the organizational change in November 2000.
9. For additional information on JAMS, refer to Appendix II.

6.

**Return to the USDOJ/OIG Home Page**
**Return to the Table of Contents**

**Unaccompanied Juveniles in INS Custody**
**Report Number I-2001-009**
**September 28, 2001**

# CHAPTER 2 - COMPLIANCE WITH POLICIES AND PROCEDURES

**Segregation of Juveniles**

**The INS does not always segregate its non-delinquent juveniles from delinquent juveniles housed in the same secure detention facility.**

The INS contracts with secure detention facilities to house non-delinquent and delinquent INS juveniles. Our telephone survey of the 57 secure detention facilities that housed INS juveniles in FY 2000 revealed that 34 of the facilities cannot guarantee segregation of non-delinquent INS juveniles from INS delinquent juveniles or from the county and state non-INS juvenile delinquent population. At three of the secure detention facilities we visited, the mingling of the two populations occurred.

*Flores* and the *Juvenile Protocol Manual* state that if there is no one to whom INS may release a juvenile and no appropriate licensed program (shelter) is immediately available for placement, the juvenile may be temporarily placed in an INS-contracted detention facility. These juveniles shall be separated from delinquent offenders.

An assessment is then done to determine whether the juvenile needs to be placed in a shelter or a secure facility. *Flores* and the *Juvenile Protocol Manual* both describe exceptions that allow non-delinquent juveniles to be placed in secure facilities. [10]

*Flores* makes no further mention of continued segregation of non-delinquent juveniles who are formally placed in secure facilities from juvenile offenders. The INS does not interpret *Flores* as requiring that the segregation be maintained once the non-delinquent juveniles are formally placed in a secure facility and INS policy does not require it. We believe the segregation of non-delinquent juveniles from delinquents should be continued as long as the juveniles are in INS custody in order to ensure their well-being. Local and national advocacy groups cite the failure to segregate non-delinquent and delinquent juveniles as evidence that non-delinquent juveniles are unnecessarily imperiled. Some members of Congress expressed this same concern and have proposed that the INS relinquish custodial responsibility for unaccompanied juveniles.

According to the JAMS data, there were 1,933 custody instances of secure detention in FY 2000. [11] Of the secure detentions, 364 instances (or 19 percent) were placed because the juveniles were:

- Chargeable with a felony (probable cause).
- Adjudicated as juvenile delinquents.
- Suspected adult - awaiting forensic tests.
- Placed in delinquency proceedings.
- Convicted of a felony as an adult.

These placements of delinquent INS juveniles with county and state delinquents are not a violation of the policy requiring separation.



Non-delinquent juveniles, however, accounted for 1,569 of the 1,933 instances of secure detention. Twenty-three secure detention facilities, housing 1,085 non-delinquent juveniles claimed in response to our survey that they properly segregated the delinquent from the non-delinquent juveniles. Thirty-four secure detention facilities, housing the remaining 484 non-delinquent juveniles, could not guarantee segregation from delinquent juveniles.

We emphasize the 484 instances were potential placements of non-delinquent juveniles with delinquent juveniles. We do not know how many non-delinquent juveniles were actually housed with delinquents, only that the facilities in which they were housed could not always separate them from the delinquent juvenile population. However, at two of the six facilities we visited, non-delinquent INS juveniles were commingled with delinquent juveniles. The facilities that do not separate juvenile delinquents from non-delinquents do not do so either as a matter of facility policy, a lack of physical capacity to do so, or because of emergency overflow situations.

We do know 248 of the 484 instances of possible mixing involved non-delinquent INS juveniles whose stay in non-segregating facilities overlapped with that of INS delinquent juveniles. We do not know when the stays of local non-INS delinquents overlapped with the stays of the INS juveniles in those facilities.

The majority of the 484 instances involving potential placement of non-delinquents with delinquents took place at three facilities: Liberty County Juvenile Detention Center in the Houston District in Texas had 114 instances (23.6 percent); Gila County Detention Center in the Phoenix District in Arizona had 95 instances (19.6 percent); and Martin Hall Juvenile Detention Center in the Seattle District in Washington had 86 (17.8 percent). Liberty County generally tries to keep the INS juveniles together in the same housing unit regardless of their delinquency status. The facility considers physical stature of the juveniles when making placement decisions. The INS and non-INS juveniles are not separated from one another in common areas and they share some classroom activities. Gila County does not separate on the basis of delinquency. Martin Hall started taking only delinquent juveniles in 2001.

The *Flores* agreement allows non-delinquent juveniles who have received an order of removal to be designated as escape risks and transferred to secure facilities. Although specifically permitted under *Flores*, those juveniles who are placed in secure detention while awaiting removal should be segregated from delinquents.

---

**Disturbance at Secure Facility[12]**

*A disturbance occurred at the Liberty County Juvenile Center on May 26, 2000. From 4:00 p.m. to sometime after 7:00 p.m., 14 juveniles in INS custody barricaded themselves in their shared housing unit, destroyed property, and brandished weapons fashioned out of plastic, sticks, and glass. When INS staff was unsuccessful in convincing the juveniles to end the barricade, facility staff, local police, and state troopers subdued and restrained the juveniles until order was restored. Pepper spray was used in the process. No juveniles were seriously hurt.*

*Based on information in JAMS, 10 of the 14 juveniles were non-delinquent juveniles, placed at Liberty Juvenile Center as escape risks because they were ordered deported. However, three others were chargeable with a juvenile offense, and one had been convicted as a criminal adult.*

---

The non-delinquent INS juveniles in this example were exposed to excessive risks because they were not housed separately from the delinquent INS juveniles. If non-delinquent juveniles must spend time in a secure setting, the INS should have clear written standards in the facility contract that provide for strict segregation in living quarters and minimal contact in other common areas.

**Recommendation**

1.  The INS should include and enforce standards in all contracts with secure detention facilities that require the segregation of non-delinquent INS juveniles from delinquent juveniles. These standards should provide for strict segregation in living quarters and no more than minimal contact in all other common areas. The facilities should be required to immediately notify the INS if they cannot meet this requirement so the INS can take immediate corrective action.

**Juvenile and Facility Visits**

**Some INS districts are not complying with the *Juvenile Protocol Manual* requirement that district juvenile coordinators meet weekly with each unaccompanied juvenile in custody and make weekly visits to each facility. The INS does not have clear guidance that defines the responsibilities of the juvenile coordinators when making the juvenile and facility visits. The INS is not adequately documenting visits to juveniles and facilities that do occur.**

Visits

In four of the eight districts we visited, district juvenile coordinators did not always see detained juveniles on a weekly basis, and in at least one district, the coordinator did not regularly visit the facilities on a weekly basis. INS staff offered a variety of reasons for why district juvenile coordinators could not comply with INS policy. They stated that the performance of the many duties essential to the care of juveniles often interferes with the district juvenile coordinators' ability to visit the facilities and juveniles on a weekly basis. [13] They also stated that districts that routinely process and house large numbers of unaccompanied juveniles and use facilities that are a long distance from the juvenile coordinator's office have difficulty meeting the requirements.

For example, the Phoenix District has several logistical difficulties. The district has two shelter facilities and three secure detention facilities that housed 620 of the 4,136 juveniles in custody in FY 2000, including most of the 376 unaccompanied juveniles apprehended by the Tucson Border Patrol Sector. All five facilities are in remote areas, with two being three to four hours away in opposite directions from the district office where the juvenile coordinator is stationed. It is virtually impossible for the one juvenile coordinator to visit each site on a weekly basis.

The number of unaccompanied juveniles housed in a given district directly increases the workload of the juvenile coordinator. It becomes especially difficult for the juvenile coordinator to visit each juvenile when facilities are operating at full capacity. Even in Los Angeles, where the INS has only one long-term detention facility and one 72-hour facility, scheduling and conducting meetings with every juvenile is very time consuming.

## Definition and Documentation of Visits

The INS has no written definition of what constitutes a visit to a juvenile or facility, or how these visits should be documented. The *Juvenile Protocol Manual* clearly states that the district juvenile coordinator must visit each juvenile and each facility once per week.

The INS keeps few records of visits with juveniles or to facilities. The district juvenile coordinators we met stated they rarely documented visits to facilities or meetings with juveniles, unless there was a medical or behavioral problem. They did record court hearing dates and family information provided by the juveniles. Any information recorded would be placed in the juvenile's INS Alien File (A-File), the JAMS database, or the Deportable Alien Control System (DACS), used by the INS to track the juveniles through the removal process. Without maintaining regular records of actions relating to visits, the INS cannot ensure proper oversight of the juveniles and facilities, and loses a useful tool for managing the program.

In order to remain adequately informed of juveniles' situations and conditions and to maintain direct personal contact with the juveniles under its care, the INS needs to take several corrective actions. The INS needs to comply with the *Flores* requirement to conduct weekly visits with all juveniles in custody and to all facilities. If it is logistically impossible for the district juvenile coordinator to conduct these visits, the responsibility should be delegated to another properly trained individual. The INS needs to develop standards for what constitutes a juvenile or facility visit. The INS should properly document these visits.

## Recommendation

2. The INS should implement procedures that ensure weekly visits with all juveniles in custody and to all juvenile housing facilities. The procedures should establish clear descriptions of the content of the visits and documentation requirements. The INS should delegate authority to appropriately trained staff to assist district juvenile coordinators in complying with the weekly visitation requirements.

## Custody Management Issues

**The INS does not have clear fully developed policies for same-sex transport, documentation of transport and detention, escort upon release, use of restraints, and telephone access for juveniles in custody. INS is not always ensuring that existing policy is followed.**

## Same-Sex Transport

From our interviews with INS staff, we learned that because of the small number of female INS officers, the INS does not always follow INS escort policies for juveniles. The National Juvenile Coordinator told us that the policy, although not written in the *Flores* agreement or included in the *Juvenile Protocol Manual*, is that juveniles must be escorted by officers of the same sex.

The most explicit written procedure making reference to opposite sex transport officers and unaccompanied juveniles states that "[w]hen a lone officer transports [in INS vehicles] an unaccompanied detainee of the opposite sex or an unaccompanied juvenile, he/she shall maintain regular electronic voice communication with a supervisor, radio operator, or other INS personnel at a separate location, insofar as technologically possible. At a minimum, communication shall include the officer's or unit's identity, route of travel, current location, and mileage, as a security precaution." [14] Furthermore, when unaccompanied juveniles are transported on commercial airlines, the requirements are much more strict - one escort of the same sex per juvenile. [15]

If same sex officers are not available, INS policy is to send two detention officers for transport purposes. However, we found that this does not always occur. For example, at the Miami District in Florida, the district juvenile coordinator routinely picked up unaccompanied juveniles of the opposite sex for transport without a second officer.

## Documentation of Transportation and Detention

Although not required by *Flores* or the *Juvenile Protocol Manual*, we recommend that the INS document the transport and detention of unaccompanied juveniles. The INS documents the transport of groups of aliens (e.g., seven adults, three juveniles), but there are rarely transportation logs that list the names of all the passengers in the vehicle. All districts and sectors we visited had separate holding cells or areas designated for juveniles during processing and temporary detention; however, only one of the INS districts and none of the sectors we visited maintained a log that would indicate who was in which cell and for how long. While field officers may be using appropriate procedures during transport and detention in most situations, without documentation the INS cannot confirm this or identify problems encountered. The INS should keep detailed log records on all transport and detention of juveniles in districts and sectors. These custodial records ensure accountability for the safety and well-being of the juveniles.

## Escort of Juveniles Upon Release

INS district officials told us that when released from INS custody, unaccompanied juveniles sometimes traveled unescorted. INS policy states: "Non-criminal juveniles may be escorted by certain designated non-INS personnel under contract or interagency agreement with the INS in place of INS officers." According to the National Juvenile Coordinator, current policy, though unwritten, allows only INS personnel or facility staff to escort unaccompanied juveniles upon release. In some districts, the INS places juveniles aboard commercial airlines under the supervision of airline personnel.

---

### Unaccompanied Juvenile Lost to Kidnappers

*In June 2000, the Southwest Key Corporation, under contract with the INS, released an unaccompanied 17-year-old juvenile to the custody of commercial airline personnel for safe passage between Phoenix, Arizona, and New York City, New York. Some time after arrival at La Guardia International Airport the unaccompanied juvenile was approached by a "group of Latino persons" who convinced him they were there to assist him in finding his family members. The group abducted the unaccompanied juvenile and contacted the family demanding $500.00 for the juvenile's safe release. Police were notified and the unaccompanied juvenile was safely released.*

---

As an alternative to INS or facility staff escorts to ensure the safe release of juveniles to sponsors, in some locations the INS required the sponsors to come to the district in person to accept custody. Under this procedure, the sponsors arranged transportation for the juveniles and became responsible for them immediately upon leaving the district where they were held in custody.

#### Use of Restraints

Contract guards and secure facilities under contract with the INS or that have signed interagency agreements with the INS, as a regular course of action, restrain the INS's unaccompanied non-delinquent juveniles during transport. All four of the secure facilities we visited had written policy that allowed staff to handcuff, and in some cases, shackle all juveniles, including the INS's unaccompanied juveniles, during transport. For example, the Gila County Youth Detention Center, a contract detention facility in Arizona, has a standing policy that all juveniles, including INS detainees, will be handcuffed and shackled during transport.

INS policy explicitly states that although "[n]on criminal aliens may be escorted by certain designated non-INS personnel under contract or interagency agreement with the INS in place of INS Officers...[a]gencies under contract or interagency agreement with the INS that are handling non-criminal juveniles do not have authority to restrain such juveniles. INS personnel will remove restraints prior to surrendering juveniles to such agencies." [16] The National Juvenile Coordinator confirmed this policy, stating facilities should not be using restraints.

The INS needs to examine the contracts with the secure facilities to determine if non-INS personnel are inappropriately restraining INS juveniles. If so, the INS needs to develop policies and procedures to protect juveniles from excessive restraint.

#### Telephone Access

From reviewing facility policy and interviewing facility staff, we learned that juveniles in secure facilities were required to pay for telephone calls with their own funds. If the juveniles lacked funds to pay for telephone calls or the family could not accept collect calls, they could not always make the calls to adult family members and attorneys guaranteed to them under *Flores*. In addition, pro bono attorneys in two locations expressed concerns over a lack of privacy for juveniles attempting to contact them by telephone.

The *Juvenile Protocol Manual* lists the minimum standards for telephone use. In shelter care facilities, the standards include facilitating telephone communications with legal counsel and providing access to a telephone, which may be a pay phone, for personal calls. The standards for secure facilities state that all long distance calls should be made collect. The individual facilities' telephone procedures govern times and frequency of use, but the INS plans to add a requirement for a minimum of two personal calls a week, totaling no less than 10 minutes, with unlimited calls to attorneys and other case-related calls.

Telephone use and privacy varies considerably between shelter and secure facilities. In the shelter facilities we visited, caseworkers commonly assisted juveniles in contacting their parents, with the calls funded by the shelter or by the caseworkers personally. In the secure facilities we visited, juveniles had to make long distance calls collect, or purchase pre-paid phone cards with their own funds. In two locations, pro bono attorneys said they could not afford to accept collect calls from juveniles in remote facilities, effectively preventing the juveniles without funds from contacting attorneys. In two secure detention facilities, attorneys were concerned their telephone conversations with the juveniles could be overheard. Officials at the two facilities agreed that this concern was valid. In one of the facilities, the only available telephones were located in an open common area.

#### Recommendations

3. The INS should implement procedures that require same-sex escort of juveniles. If same-sex escorts are not possible, procedures for appropriate alternative safeguards for juveniles should be followed.

4. 4. The INS should implement procedures that require juvenile transportation and detention custodial records that provide sufficient accountability for all juveniles detained in the custody of the Border Patrol sectors and the districts.

5. The INS should implement procedures that require INS officers, or designated INS personnel under contract with the INS, to escort and maintain physical custody of all juveniles until the juvenile is released to a sponsor.

6. The INS should implement specific rules that govern the use of restraints on juveniles in the custody of INS officers, in shelter facilities, and in secure facilities. The INS should implement procedures to monitor compliance.

7. The INS should revise its policy regarding telephone use by juveniles to ensure juveniles without funds are able to make appropriate telephone calls and juveniles are permitted access to telephones that at least meet the minimum requirements.

SCANNED

**Placement Requirement**

**For a small number of juveniles, the INS did not meet the *Flores* and *Juvenile Protocol Manual* requirements for timely placement after apprehension. The INS could not determine if it had met the requirement for an additional number of juveniles.**

In FY 2000, the INS apprehended and detained 3,664 juveniles in the custody of the Juvenile Program. The INS placed 3,306 juveniles (90.2 percent) in an appropriate facility within the required time frame. [17] The INS did not meet the placement requirement policy for 19 (1 percent) juveniles. Another 339 (9 percent) juveniles were possible overdue placements. *Flores* and the *Juvenile Protocol Manual* require the INS to transfer a juvenile to a licensed shelter program within three days if the juvenile is apprehended in an INS district in which a licensed program is located and has space available. The time allowed for placing juveniles has exceptions, which include:



- Placement within five calendar days if the apprehending district does not have a shelter facility or space available,
- Placement within five business days if transportation is required from remote areas for processing or if the juveniles speak unusual languages requiring an interpreter, and
- Placement as expeditiously as possible during an emergency influx of juveniles.

Possible Overdue Placements

While the INS was successful in timely placement for 90 percent of the juveniles in FY 2000, it took between 4 and 333 days to place the remaining 358 juveniles (19 actual overdue placements and 339 possible overdue placements) into an appropriate facility. Of the 339 possible overdue placements, the INS was unable to provide us with a reason for the overdue placement for 90 individuals (27 percent). The reasons for the remaining 249 overdue placements are discussed below. They are based on our analysis of data from JAMS and DACS on the juveniles whose placement was overdue, on additional information provided by the Western Regional Coordinator, and on our observations in the field.

Many juveniles claimed to be adults when apprehended and were sent to the local INS adult detention facility. After they admitted to being juveniles, they were placed in an appropriate juvenile facility. Juveniles claiming to be adults accounted for 186 (52 percent) of the possible overdue placements.

This points out the difficulty the sectors and to a lesser extent the districts have when trying to determine whether individuals taken into custody are under the age of 18. If there is no basis for making a reasonable judgment at the time of apprehension, determining age usually requires taking the juvenile to a location to have either a dental exam or an x-ray of the wrist and then trying to obtain a copy of a birth certificate. This adds time to the process and causes placements to be delayed.

Several juveniles were turned over to the INS from county, state, or the United States Marshals Service (USMS) custody. For delinquent juveniles held in state and county facilities, the date of apprehension in the JAMS database was the date the INS placed a detainer on the juveniles. A detainer is a formal request by the INS made to the detention facility to release the juveniles only into the custody of an INS officer. This date may be days, weeks, or even months before the date INS actually takes physical custody of the juveniles. For juveniles in the custody of the USMS, the apprehension date was accurate, but the INS did not take physical custody of the juvenile until they were returned to the INS. Of the 358 overdue placements, 37 (or 11 percent) were state or county juvenile delinquents or in the custody of the USMS.

The reasons for the remaining possible overdue placements (8 percent) were injured or sick juveniles kept in hospitals prior to placement in shelter facilities, juveniles apprehended more than once in FY 2000, [18] and data entry errors in JAMS.



## Border Patrol Placement Problems

The Border Patrol apprehended 2,073 of the 3,664 total unaccompanied juveniles apprehended in FY 2000. The Border Patrol is responsible for the majority of the actual or possible overdue placements, accounting for 185 (or 51.7 percent) in FY 2000. The top four locations for overdue placements were: the Laredo, Texas, Border Patrol Sector with 58; the McAllen, Texas, Border Patrol Sector with 39; the Del Rio, Texas, Border Patrol Sector with 27; and the Tucson, Arizona, Border Patrol Sector with 17.

In addition to reasons already discussed, there were several other reasons for the Border Patrol's overdue placements. During peak periods of apprehension along the border, these sectors encounter large numbers of juveniles for whom sufficient local bed space is frequently unavailable. Border Patrol stations are often long distances from the district office, and juvenile shelter facilities and apprehensions can occur in remote areas of the sector. The availability of transport to move juveniles from the custody of the Border Patrol to the custody of the juvenile coordinator is particularly difficult for the more remote Border Patrol locations.

The Border Patrol does not always notify the district juvenile coordinator of juvenile apprehensions, and in at least one sector placed them in a facility with which it had its own contract. Border Patrol sectors may be housing juveniles temporarily in secure facilities of which regional juvenile coordinators are unaware and which are not on the approved list of facilities. [19] Although a Deputy Chief for the Border Patrol at Central Region reported to us that no sectors in the Central Region were doing this, we witnessed this practice in the Eastern Region, and the Western Region Juvenile Coordinator told us he suspected it was happening in his region. Supervisors at all sectors we visited told us juveniles are held at the Border Patrol stations for as short a time as possible, and no longer than 24 hours.

## Other Obstacles to Timely Placement

Discussions with juvenile coordinators in the Los Angeles, Phoenix, Chicago, and Miami Districts revealed a number of other less obvious obstacles to timely placement:

- If transport resources are not assigned to the juvenile program, travel logistics often result in delays. Arranging for appropriate vehicles and staff generally depends upon the availability of detention enforcement officers working for the Border Patrol or for the district. While there are usually regularly scheduled runs, intervals between pick-ups can be lengthy and the distances traveled can be long.
- Juveniles apprehended late at night and on the weekend might encounter additional delays. Taking a large number of juveniles into custody at the same time, arranging transport, processing them, and making placement arrangements could result in placement exceeding the 3-to-5-day requirement.
- The juvenile coordinator was not always notified when a juvenile had been apprehended. In four districts we visited, we found instances of juveniles being placed in a facility and the juvenile coordinator learning of the placement only when reviewing the next day's daily facility roster.
- In three of the districts we visited, the apprehending INS officers did not complete all required paperwork, or sometimes did not forward the paperwork with the juvenile. These occurrences created unnecessary delays. Depending on the district, the problem might be with the Border Patrol, with investigations, or with inspections.
- In one of the districts, a supervisory INS officer with the appropriate level of signatory authority was not always available to sign the required documents, such as the Notice to Appear, required to place the juvenile into proceedings. This delays the decision by the juvenile coordinator on appropriate placement.
- The Los Angeles District, which accounts for the highest number of overdue placements among districts, has no shelter facility. Juveniles apprehended in the district requiring placement in a shelter must be transported to a non-secure shelter program in another district or region. [20]

The INS needs to ensure that juveniles are promptly placed into appropriate facilities. The INS needs to better monitor placements that do not occur within three to five days and decrease the length of time they are overdue. The INS also needs to modify the JAMS database so it will know when it is not meeting the 3-to-5-day placement requirement. Failure to do so "could endanger the welfare of the juveniles and risks adverse legal actions for violating the *Flores* agreement." [21]

## Recommendation

8. The INS should implement procedures that require the monitoring and regular reporting of instances of non-compliance with the 3-to-5-day placement requirement. These procedures should include the reporting of justifications for the overdue placements.

## Footnotes

10. For example, INS is allowed to place juveniles judged to be escape risks, behavior problems, or safety risks in secure facilities rather than in shelters.

11. Secure instances are those in which a juvenile is housed in a secure or medium-secure facility. "Instance" covers an individual custody event. The JAMS database tracks instances of juvenile detention. Whenever an unaccompanied juvenile is booked into a facility-for the first time, or for any successive transfers-an instance is recorded. It is therefore possible for a single juvenile to have several instances of detention if that juvenile is transferred several times from one facility to another.

12. This example, and subsequent example boxes are not meant to suggest that such incidents are widespread or frequently occurring. They do, however, reflect the potential for serious harm to juveniles, if the related issues are left unaddressed.

13. The duties of the district juvenile coordinator include: processing incoming juveniles; finding beds and arranging travel for those juveniles being transferred in and out of the district or region; ongoing work toward family reunification for all juveniles; and responding to inquiries from the court, the juvenile's attorneys, and INS attorneys regarding the immigration proceedings for the juveniles.

14. Enforcement Standards Escorts, February 5, 1998, sub-section VI.A.

15. Enforcement Standards Escorts, February 5, 1998, sub-section VI.D., Group Descriptors, Group1a.

16. *Juvenile Protocol Manual*, sub-section 6.2.4.

17. The INS placed 3,325 juveniles in a facility in three days, but were unable to transfer 19 juveniles to a shelter within the 5-day *Flores* requirement. The *Flores* agreement permits the INS to place juveniles in secure facilities because they require transportation from remote locations or are temporary stays awaiting appropriate placement. Both of these groups are expected to meet a 5-business-day requirement. The 3,306 also includes juveniles placed in secure facilities because they are delinquents or need to be in secure facilities for other approved specified reasons.

18. Due to a programming error in the JAMS database, juveniles apprehended more than once in FY 2000 retain their original date of apprehension when a new record was created.

19. Based on site visit to Miami district and with telephone interview with the Western Regional Juvenile coordinator.

20. Of the 315 juveniles apprehended by the Los Angeles District in FY 2000, 253 were transported to non-secure facilities in other locations.

21. INS draft report of INSpect review of the Phoenix District Office dated April 18, 2001, page 15.

**Return to the USDOJ/OIG Home Page**
**Return to the Table of Contents**

**Unaccompanied Juveniles in INS Custody**
Report Number I-2001-009
September 28, 2001

# CHAPTER 3 - PROGRAM OVERSIGHT

### Operational and Administrative Support

> **The Juvenile Program is not always getting the required operational support from INS supervisors and officers in the field. In some districts the Juvenile Program is hindered by a lack of administrative support.**

In some districts and Border Patrol sectors, the Juvenile Program is hampered by a lack of communication or disagreement over the operational responsibilities of supervisors and officers to the Juvenile Program, and by a lack of several types of administrative support for the juvenile coordinators.

Operational Support

Three of the eight district juvenile coordinators we spoke to had recurring problems with district or Border Patrol officers who did not carry out the duties required by the *Juvenile Protocol Manual.* INS officers did not always immediately notify the juvenile coordinator of juveniles detained in custody and, in some cases, simply dropped juveniles off at the district office or took them directly to one of the juvenile facilities in the district. INS officers in the field were not completing and forwarding required documentation to the juvenile coordinators. INS officers also moved or released juveniles without authorization from the district juvenile coordinator. Field managers did not deal promptly with problems raised by the juvenile coordinators. In some instances, managers were not aware of the compliance problems.

The *Juvenile Protocol Manual* requires field officers to perform several duties once a supervisory agent makes the decision to hold a juvenile in custody. First, the district juvenile coordinator must be notified immediately. Second, field officers must complete a number of required forms, including the I-770 Notice of Rights and the Notice of Secure Detention, specifically required by the *Flores* agreement. Third, the officers must file these documents in the juvenile's A-file and forward the file to the district juvenile coordinator so that a timely and appropriate placement decision can be made. The *Juvenile Protocol Manual* also requires that no movement or placement of juveniles occur without authorization from the district juvenile coordinator.

The district juvenile coordinators have responsibilities that cut across the normal chain of command. They have no supervisory authority and depend upon the cooperation of the Border Patrol agents, the inspectors, the investigators, and the D&R officers of their own division. When the INS officers in the field do not carry out their duties as described in the *Juvenile Protocol Manual*, the juvenile coordinators must work through the officers' chain of command, but they also have a responsibility to report to the regional juvenile coordinator and the National Juvenile Coordinator at INS headquarters.

The three district juvenile coordinators complained through the appropriate chains of command. Two of the coordinators documented the complaints that they forwarded to supervisors about these problems. Although this has improved the situation somewhat, officers still fail to prepare the required paperwork for the A-file. When the documentation is not complete, the placement process is slowed and the juvenile coordinators have difficulty moving the juveniles to other districts if necessary.

*Border Patrol*

Border Patrol agents did not always inform the juvenile coordinators when they took juveniles into custody or which facilities the agents used to temporarily house the juveniles. The district coordinator must inspect any facility the Border Patrol uses for juveniles. Border Patrol agents did not always inform the coordinators directly of any movement of juveniles. The district juvenile coordinators we visited posted their names and cell phone numbers at all Border Patrol stations and were on call 7 days a week, 24 hours a day. However, sometimes the agents notified only D&R staff at the district and the information did not always reach the coordinators promptly. The Border Patrol sectors are not part of the district office chain of command and they encounter many of the juveniles who come through the Juvenile Program, i.e., 2,233 of the 4,136 juveniles in custody in FY 2000. Better liaison between the Border Patrol and the district is needed to resolve disagreements or misunderstandings between the Border Patrol and the juvenile coordinators.

At the Miami Sector, Border Patrol agents used two facilities to house unaccompanied juveniles overnight. The Miami District juvenile coordinator was unaware of these facilities and had never inspected them. When we informed the district juvenile coordinator of this situation, he stated he did not see a problem with the Border Patrol housing unaccompanied juveniles overnight in these facilities without his knowledge. We disagree. It is the juvenile coordinator's responsibility to know about juveniles being held in custody in the jurisdiction of the district and to know where the juveniles are housed.

Although Miami Border Patrol Sector officials said they notified district D&R officers of the overnight stay, any juvenile placements must be cleared through the district juvenile coordinator. The district juvenile coordinator must inspect all facilities used regularly to house juveniles. We discussed the inappropriate placements with the Border Patrol, the District

Director, and the National Juvenile Coordinator. District and INS Headquarters officials would verify they were occurring and said corrective measures would be taken.

*Potential Harm to Juveniles*

In late January 2000 a young girl was apprehended by the Los Angeles District Investigation Division's anti-smuggling unit (ASU), along with an adult who claimed to be her uncle. The officer handling her case did not notify the district juvenile coordinator, and never gave the juvenile coordinator the case paperwork. The district juvenile coordinator reported the juvenile as being in custody after being notified by the D&R staff when a juvenile had been brought in. She then worked to verify the relationship with the uncle. When the district juvenile coordinator went to check on the girl and her uncle, the juvenile coordinator discovered the girl had been released by D&R staff at the request of the agent without the district juvenile coordinator's authorization.

After the first incident, the district juvenile coordinator went to her district supervisors and informed the regional juvenile coordinator. Branches and sub-offices were instructed to notify the district juvenile coordinator when a juvenile was taken into custody and to provide the necessary A-file paperwork. About a month later, the ASU arrested a group of aliens that included a juvenile. Again, the district juvenile coordinator did not receive any notification or paperwork from the ASU. Detention officers notified the district juvenile coordinator that a juvenile was in custody.

The same ASU officer then told the district juvenile coordinator that the juvenile was accompanied by a relative, although the officer did not identify the relative. The district juvenile coordinator questioned the boy, who said he was not related to any of the adults. When it appeared that the officer might release the juvenile to an unrelated adult, the district juvenile coordinator again spoke to her supervisors and prevented the inappropriate release. If the district juvenile coordinator had not pressed the issue and had not been backed up by her superiors, the unauthorized release of the juveniles might have gone undetected.

These cases demonstrate why the procedures are in place to protect juveniles. The failure of supervisors, whether in the districts or in Border Patrol sectors, to ensure its officers do what they are required could have serious repercussions for the juveniles, the officers, their supervisors, and for the INS. District and sector managers must require their field staff to immediately notify the juvenile district coordinators of all placement and movement of juveniles, and to complete and forward all required documentation to the district juvenile coordinators as soon as possible.

<u>Administrative Support</u>

In several districts the effectiveness of the Juvenile Program was hampered by a lack of administrative support for the district juvenile coordinator. Three districts did not have a fully trained back-up district juvenile coordinator. Two district juvenile coordinators who handled a heavy volume of juveniles did not have clerical support. In another busy district the juvenile coordinator position was a collateral duty and the coordinator was also responsible for an adult caseload.

Los Angeles and Phoenix, two districts that consistently process and hold juveniles in custody throughout the year, did not have an adequately trained or experienced back-up juvenile coordinator. This failure directly affected the district's ability to conduct weekly visits to facilities. Facility staff in these two districts told us that when the district juvenile coordinator had to be out of the office, the staff person backing up the district juvenile coordinator was unfamiliar with basic procedures. This delayed actions that needed to be taken on behalf of the juveniles, since the work often had to wait until the district juvenile coordinator returned.

The Los Angeles and Phoenix Districts did not provide clerical support to the district juvenile coordinators. These two districts are among the busiest in the country in terms of their juvenile program workload. The district juvenile coordinators made all the data entries in JAMS and DACS, handled all the A-file paperwork, made all the travel arrangements for juveniles being transferred or released, and sometimes transported juveniles locally. The district juvenile coordinators are also the points of contact when attorneys representing the juveniles have questions or concerns. Administrative support would save the district juvenile coordinators a great deal of time and facilitate all the activities that need to be taken on behalf of the juveniles.

At the Miami District, the district juvenile coordinator position was designated as a collateral duty, and the juvenile coordinator handled an adult caseload in addition to the juveniles. Given the size of the District's detained juvenile caseload, this arrangement does not appear to be adequate for handling the juveniles.

At other districts, the juvenile coordinators were supported by additional staff, allowing the coordinators to perform the required duties more readily. Three districts, Chicago, Harlingen, and Houston, had two juvenile coordinators. The Philadelphia District assigned a supervisory D&R officer and a juvenile coordinator to work on-site at the Berks County facility. The Harlingen District had a particularly strong juvenile unit. This unit included two juvenile coordinators, two docket clerks, and four Detention Enforcement Officers (two male and two female) to transport juveniles. The immediate supervisors at the Harlingen District and at the Central Region played a substantial role, providing supervisory support and oversight for the District's Juvenile Program.

In consultation with the regions and districts, the Juvenile Program should set criteria for determining when districts need to assign a minimum of one full-time district juvenile coordinator and a well-trained back-up district juvenile coordinator.

District and Border Patrol sector managers must be responsive when they are alerted to problems. District and sector managers must require their field staff to notify juvenile coordinators immediately of all placement and movement of juveniles, as well as complete and forward all required documentation to the coordinators as soon as possible. The regions and districts should also take steps to provide adequate administrative support to district juvenile coordinators.

**Recommendations**

9. The INS should require districts to designate and train back-up juvenile coordinators.
10. The INS should re-emphasize to all INS officers the requirement to immediately notify the district juvenile coordinators of all placements and movement of juveniles and to complete and forward all required documentation to the district juvenile coordinators.
11. The INS should provide a list of all approved juvenile housing facilities to the districts and Border Patrol sectors with the stipulation that no juveniles are to be placed in a facility without the prior notification of the juvenile coordinator.
12. The INS should identify all juvenile housing facilities now being used by the districts and Border Patrol sectors to house juveniles.
13. Each Border Patrol sector should designate a coordinator for juvenile issues to ensure timely liaison with the district juvenile coordinators.
14. Districts with a large volume of juvenile activity should provide administrative support to the district juvenile coordinator.

## Responsibilities of the INS and Facilities

**The INS was not holding one shelter to the terms of its cooperative agreement and did not control all actions affecting the custody of juveniles. At another secure facility, the district juvenile coordinator had difficulty meeting INS requirements for monitoring juveniles.**

The INS did not ensure that all facilities met their contractual agreements or met all of their responsibilities towards the juveniles in their care. At the Chicago Connections (CC) facility, the shelter staff took custody of juveniles without consulting the Chicago district juvenile coordinator, failed to provide timely notification of escapes, and did not provide required administrative information. At Central Juvenile Hall - Eastlake in Los Angeles, used by the INS only for delinquent juveniles, the district juvenile coordinator did not have timely access to the juveniles housed at the facility and was not informed of incidents involving INS juveniles.

The INS acquires non-secure shelter bed spaces for juveniles under cooperative agreements with private profit and nonprofit agencies. The agreements limit the services to the period of physical custody, and emphasize that during the juveniles' stay at the shelter they remain in the legal custody of the INS. The agreements expressly prohibit the shelter staff from hindering or interfering with custody arrangements or the execution of final immigration court orders. Secure bed spaces are primarily arranged through intergovernmental service agreements with local government entities. INS juveniles in secure facilities are subject to the facility rules and procedures, as well as INS requirements.

### Chicago Connections

According to INS managers, the care provided to the juveniles at the CC shelter was excellent. The shelter staff developed close relationships and a protective attitude toward the juveniles during long-term stays at the shelter.[22] However, we found that problems arose when the shelter staff took independent actions exceeding their authority.

- In one incident, after two juveniles escaped from the shelter, the staff failed to notify the district juvenile coordinator for eight hours. The agreement requires the shelter to report any unauthorized absence immediately upon discovery.
- In another incident, two Chinese girls who had been released from the shelter remained in contact with the shelter staff. The girls called the shelter directly and reported that their sponsor abused them. The shelter staff brought the girls back to the shelter without authority and without notifying the district juvenile coordinator. The district was unaware the girls had returned to the shelter until their names appeared on the shelter roster a week later. The cooperative agreement states that shelter services for the juveniles ends with their release from custody.
- In other incidents, the shelter did not provide written documentation of behavior problems when requested, failed to provide required telephone logs, and held juveniles for weeks beyond the approval date for their release, some well beyond their 18th birthdays. Holding the juveniles well beyond the approval date was possible because the shelter's agreement included making transportation arrangements for the juveniles on release.

In addition, an organizational connection between the shelter and the primary legal services provider has led to privacy concerns.[23] The exchange of information between the two groups, relating to juveniles in custody, went far beyond any we encountered elsewhere. District officials said they were disturbed about potential breaches of confidentiality because the pro bono attorneys had access to the shelter roster and specific personal information about the juveniles. District officials said the legal services attorneys received information about the juveniles directly from the shelter staff. According to immigration judges, the legal services attorneys often had more information about the juveniles than the INS attorneys.

The Chicago District Director made INS headquarters and regional D&R officials aware of all the problems discussed and the INS addressed them. On January 12, 2001, the INS and Heartland Alliance representatives met to define the shelter's responsibilities, including compliance with reporting requirements.[24] At the meeting the INS learned some pro bono attorneys working with MIRC had been given inappropriate access to the shelter for case preparation and interviews with juveniles, although they were not officially the attorneys of record.[25] To resolve the problems, the Chicago District:

- Instructed the shelter staff that they must maintain confidentiality and must not provide juvenile case information or documents to any organization other than the INS;
- Established a policy that only attorneys of record will have access to juveniles at the shelter; and
- Referred potential conflict of interest issues to the INS General Counsel.

In March 2001, Juvenile Program officials amended the cooperative agreements for all shelters to include the specific requirements discussed during the Chicago meeting.



Central Juvenile Hall - Eastlake, Los Angeles[26]

On several occasions, the juvenile coordinator for the Los Angeles District had difficulty getting timely access to the INS juveniles housed at Central Juvenile Hall in Los Angeles (Eastlake). Despite several requests, the district juvenile coordinator had never met the Eastlake superintendent. The assistant superintendent at Eastlake responsible for the INS juveniles told us he had never reported any significant incidents involving INS juveniles to the district juvenile coordinator, nor was he aware of a procedure or requirement for doing so.

During our visit, the superintendent and the district juvenile coordinator finally met. We explained to the superintendent that the INS needed to monitor the INS juveniles housed at the Eastlake facility to ensure they were treated in accordance with the *Flores* agreement, and the INS needed to be aware of any significant incidents involving INS juveniles. While this was a first step, there needs to be much closer cooperation and coordination between the INS and this facility. Eastlake must notify the INS immediately of any incidents involving INS juveniles. Finally, the district juvenile coordinator must have unrestricted and timely access to INS juveniles in custody at the facility.

Best Practices

In most of the districts we visited, the relationship among INS personnel, the shelter staff, the legal aid groups, and the immigrant rights organizations were professional, if not always cordial. In the Harlingen District, the Phoenix District, and the Philadelphia District at Berks County, practices were in place that fostered better working relationships between the INS and the local immigrant rights groups. In Harlingen and Phoenix, the INS held monthly meetings with the local immigrants rights groups to provide an opportunity to the pro bono organizations to voice, and the INS to respond to, concerns regarding local policies and cases. In September 1999, three advocacy groups in Berks County negotiated with the INS to provide coordinated legal services to all juveniles at the facility.[27] The staff of the three organizations visited or telephoned each juvenile weekly, and met with the INS and Berks County caseworkers every two weeks to follow up on each case. According to one of the pro bono attorneys, the cooperative effort diffused tensions and assisted the INS with disciplinary issues in some cases. The pro bono legal services provided at Berks County were the most comprehensive we encountered.

At the Berks County Youth Center, good communication between the INS and facility staff was also facilitated because the Philadelphia District Juvenile Coordinator and his immediate supervisor had an office on site and worked out of the facility.[28] This arrangement gave them unique access to and oversight of the facility and the juveniles. The Berks County facility is a county-run facility, while most of the other shelters we visited were run by nonprofit organizations. The Berks County facility is also an example of a more staff-intensive facility. The Berks facility has both a secure and a shelter component on the same site. Staff is able to pursue escapees and bring them back to the facility and the facility has a perimeter fence.

Shelter care providers we spoke to are reluctant to build fences because it conflicts with the shelter's mission. The directors explained that their programs are primarily schools set in home-like environments. They stated it is not their job to restrain or even pursue juveniles who run away from the shelters. The directors stated that perimeter fences are at odds with providing the least restrictive setting. On the other hand, the INS wants juveniles to be safe from persons who might prey on them, wants them to appear for their hearings, and does not want them to run away.

The Juvenile Program becomes less effective when there is a lack of coordination and communication among the three stakeholders - the INS, the facilities, and the legal services providers. The INS and the shelter staff need to develop a clear understanding of their roles and responsibilities concerning their actions on behalf of unaccompanied juveniles in INS custody. The INS needs to closely monitor its contracts and cooperative agreements with facilities to ensure all parties involved with juveniles have their rights respected and are meeting their responsibilities. The INS needs to improve its communication with all groups to ensure their concerns are addressed. The INS also needs to support the juvenile coordinators in developing liaison with the facilities' staff.

**Recommendations**

15. The INS should implement contract compliance procedures to ensure contracted facilities comply with their contractual responsibilities.
16. The INS should establish regular communications at the district level with volunteer agencies, shelter staff, and legal service providers to identify and resolve juvenile detention issues.


**Acquisition of Bed Space**

**The INS does not have a comprehensive plan to access and acquire additional bed space. The Juvenile Program lacks sufficient medium secure bed space for specific populations.**

The acquisition of more beds of all types needs to be part of a national plan. The Juvenile Program is responsible for acquiring bed space. The Juvenile Program needs to analyze juvenile populations and apprehension trends to assess where beds are most needed and what type of placement options are required. This analysis should also include assessment of INS district staffing to see how the juvenile programs would be affected. A greater effort should be made to find facilities that are not to far from access to attorneys and pro bono legal services, and where facility staff can be found with the special education and language skills needed to care for immigrant juveniles.

The INS's FY 1997-2002 5-year Interior Enforcement Strategy set as a strategic goal for FY 2000 the acquisition of additional quantity and quality juvenile detention beds. The INS has made substantial gains in meeting this priority. When

17.

the *Flores* agreement took effect in 199●●e INS had approximately 130 juvenile b●●available, including shelter and secure beds. At the time of our review, the INS had increased to over 500 the number of beds available.

Nationwide, the INS has 397 shelter beds and 92 detention beds available at all times. In the Western Region, the INS has 87 shelter beds and 62 secure beds. In the Eastern Region, the INS has 97 shelter beds and 5 secure beds. In Central Region, the INS has 213 shelter beds, 36 foster-care beds, and 25 secure beds.

In addition, INS has, on a space-available basis, contracted with 22 shelter facilities, 7 medium secure facilities, 44 secure facilities, 3 foster care facilities, and 1 group home. According to the National Juvenile Coordinator, with the increase in the number of shelter beds, juveniles who at one time would have been placed in secure facilities can now be placed in shelter facilities. In FY 2000, INS also placed 131 juveniles in hotel rooms secured by contract guards. The overwhelming majority of these placements were for juveniles apprehended in Puerto Rico and lasted seven days or less.

**Contracted Beds**

|                 | Western Region | Central Region | Eastern Region | Nationwide |
|-----------------|----------------|----------------|----------------|------------|
| Shelter Beds    | 87             | 213            | 97             | 397        |
| Secure Beds     | 62             | 25             | 5              | 92         |
| Foster Care     | 0              | 36             | 0              | 36         |
| Totals          | 149            | 274            | 102            | 525        |

Source: National Juvenile Program Headquarters

However, the INS does not have a clearly defined mechanism for analyzing its bed space needs or a comprehensive plan for acquiring the additional beds. The INS needs to determine its requirements by types of beds and locations where new bed space would best serve the Juvenile Program. In addition, the INS needs to better define district, regional, and national responsibilities for acquiring these beds.

In the past few years, the push for additional beds came from the Juvenile Program headquarters. INS districts initially resisted having a juvenile facility in their jurisdictions. The housing and care of the juveniles placed an additional strain on the district's already limited resources. Recently, however, INS districts have realized the benefit of having a juvenile facility nearby—apprehended juveniles can be appropriately placed very quickly, resources are not wasted transporting juveniles over long distances, and the time juveniles are in the physical custody of INS operational staff at Border Patrol stations, district offices, or other INS holding areas is reduced. As a result, the push for new facilities also comes from the field offices.

The systematic search for bed space has become a more time-consuming task. The Juvenile Program staff at headquarters, with help from the regions, now assesses requests from districts that want facilities in their jurisdiction, solicit interest from potential facilities, and evaluate unsolicited proposals from companies or facilities interested in housing juveniles for the INS.

> **District in Need of Shelter Beds**
>
> The Los Angeles District is an example of the challenge the Juvenile Program faces. The District has no juvenile shelter beds and must transfer all of its shelter cases out of the district. In FY 2000, the District apprehended 315 unaccompanied juveniles that were referred to the Juvenile Program, 253 of whom it had to transfer to non-secure facilities in other districts.

## Medium Secure Beds

*Flores* requires the INS to place juveniles in the least restrictive setting appropriate to their needs. It states that a medium secure facility is designed for juveniles who require close supervision but do not need placement in juvenile correctional facilities. The agreement says a medium security facility is appropriate for controlling problem behavior and preventing escape. The *Juvenile Protocol Manual* explicitly states that the INS should attempt to place in a medium secure or more staff-intensive facility, "a juvenile who has made threats to commit a violent or malicious act (toward self or others), engaged in unacceptable conduct in a shelter facility, is an escape risk, or is in danger from smugglers."

Of the 4,136 juveniles held over 72 hours in the Juvenile Program during FY 2000, 1,414 (34.2 percent)

were held in a secure facility at some point during their stay. These individuals represent 1,933 instances of secure detention.[29] Of these instances, 787 involved an influx of a large number of juveniles at one time, 331 were for juvenile delinquents, 281 were for temporary stays, 277 were for escape risks, 98 for safety reasons, 77 for remote apprehension location, 46 for behavior, and 33 were suspected adults awaiting the results of forensic testing.

The use of secure detention is unavoidable for juvenile delinquents, suspected adults, or those juveniles who are apprehended far from shelters or during an influx of minors and are awaiting transfer to a shelter facility. The remaining population-those juveniles held for safety reasons, less severe behavioral problems, or while awaiting removal after receiving a final order-may not require the same level of security. While technically allowed under *Flores*, the use of secure detention for this population is contrary to the tenet of least restrictive placement. *Flores* states that "INS will not place a minor in secure facility if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program." This is also reflected in the *Juvenile Protocol Manual*. The INS needs more medium secure beds to allow greater flexibility in the placement of these juveniles.

While the INS has done a good job in acquiring beds in shelter and secure facilities, there is a shortage of medium secure beds. At present, the INS has only 7 medium-secure facilities (approximately 20 beds contracted on an as-needed basis) and all are located in the Central Region. According to the JAMS database, in FY 2000, only 35 of 1,933 instances of secure detention were in medium-secure facilities.

The shortage of medium-secure beds results in juveniles being housed for extended periods of time in more restrictive settings than may be necessary. For example, a juvenile who receives an order of removal is considered a flight risk and is normally placed in a secure facility. The JAMS database indicates that during FY 2000, of 98 transfers from shelters to secure facilities, 65 were for juveniles who had received a final order and were awaiting removal. The average length of stay for these individuals was 47 days, the median 34 days. While juveniles have occasionally run away from shelters once they receive a final order, placing them in secure detention should not be the only option available.

The shortage of medium-secure beds has also led to the use of secure detention facilities for juveniles who present behavior problems. Shelter facilities often ask the INS to remove juveniles who demonstrate a pattern of disruptive behavior. In the past, the INS had little alternative to placing these juveniles in secure facilities. In some cases this led to inappropriate placement of troubled but non-delinquent juveniles with delinquent juveniles in secure facilities. According to the National Juvenile Coordinator, the INS now has more shelters able to care for problem juveniles and is no longer entirely dependent on secure facilities for handling them. Some of the shelter facilities have more skilled staff or experience in handling problem juveniles. The INS can transfer juveniles from one shelter to these other shelter facilities. Although the increase in shelter beds has helped, the INS needs to explore acquisition of additional medium-secure facilities for problem juveniles.

Various immigrants rights groups and pro bono legal service providers voiced concerns that the INS did not provide adequate or appropriate psychological services to the juveniles under its care. Juvenile coordinators and pro bono advocates in all districts cited examples of juveniles detained by the INS who exhibited symptoms of psychological disorders. The disorders described ranged from mild behavioral problems requiring counseling services, to more serious mental disorders requiring inpatient psychological care. While every juvenile taken into custody is given an initial screening, we found that secure facilities generally do not provide counseling or have case workers on-site on a daily basis. Some of the juveniles placed into secure detention because of behavioral problems require more counseling services than the facilities provide and would benefit from the closer supervision and counseling services that medium-secure facilities provide.

---

**Need for Alternative Bed space**

*On November 1, 2000, a 14-year-old Honduran girl was apprehended in the McAllen Border Patrol Sector. On the Form I-213, Report of Deportable Alien, completed by the Border Patrol, she stated she was suicidal. She was initially placed at the Los Fresnos shelter in the Harlingen District, where she was medically screened. The Form I-779, Juvenile Medical Screening, includes a statement that she was suicidal. Within a day, she was determined to be a behavior problem and the regional juvenile coordinator approved her transfer to the Liberty County Juvenile Center secure facility in the Houston District. There is no indication she was psychologically evaluated at Liberty County or received any kind of professional counseling.*

*Her pro bono attorney requested a transfer to one of the Catholic Charities group homes in Houston but was denied by the juvenile coordinator due to lack of space. Her removal is under appeal. She was still in custody at Liberty County as of April 20, 2001 pending the outcome of the appeal. The juvenile coordinator is attempting to locate a sponsor to whom she can be released.*

---

**Recommendation**

17. The INS should develop a national plan for assessing its needs for secure, medium secure, and non-secure bed space and acquiring the needed additional beds.

## Juvenile Program Management

**Juvenile Program managers did not use available information and data to monitor the Juvenile Program, did not ensure facility inspections were timely, did not update the *Juvenile Protocol Manual* to reflect important policy or procedural changes, did not always correct or reconcile data entries, and did not redefine influx to reflect the increase in available non-secure juvenile beds.**

The office of the National Juvenile Coordinator and the three regional juvenile coordinators are responsible for overseeing and monitoring the day-to-day operations of the Juvenile Program. They successfully initiated the Juvenile Program but their monitoring and oversight practices were weak. They did not analyze JAMS data to identify systemic problems or trends that might indicate a problem. They also failed to implement a procedure to analyze and track significant incident reports (SIRs) involving juveniles in custody. Required facility inspections were not timely. Changes in policy and guidance were not updated in the *Juvenile Protocol Manual* and influx as a justification for secure detention was not adjusted to match the increases in available non-secure bed spaces.

### Juvenile Alien Management System Data

*Flores* required and the Juvenile Program submitted semiannual compliance reports to the plaintiff's counsel and annual reports to the court. The reports included statistical information from the JAMS database. In addition to these standard reports, the managers occasionally ran non-standard queries on, for example, juveniles in custody over 120 days Program-wide and by facility. For each facility they can run reports on age, time in custody and nationality. However, the Juvenile Program managers did not conduct any regular substantive analysis of the JAMS data. For example, they did not use the JAMS database to more closely monitor timely placement issues. It was not used as a tool to reduce the time juveniles stay in custody by more closely tracking duration of stay. It was not used to regularly report on the time different categories of non-delinquent juveniles spent in secure detention facilities and thereby reduce it.

### *Significant Incident Reports*[30]

Significant incident reports (SIRs) involving juveniles are important as potential indicators of systemic or local problems that require managerial intervention. The INS was unable to determine by facility the number or type of reportable incidents involving juveniles in INS custody. Except for escapes, there were no clear instructions for what constitutes a reportable incident. The district juvenile coordinators used their judgment in reporting other incidents to INS managers at the district or to the region and the National Juvenile Coordinator. While copies of incident reports were placed into a juvenile's A-file, the INS did not consolidate SIRs for INS juveniles at the facilities, districts, regions, or at INS headquarters.

All the district juvenile coordinators we visited followed the procedure to report significant incidents through their district chain of command and through the regional juvenile coordinators to the National Juvenile Coordinator. However, with the exception of the district juvenile coordinator in Phoenix, none of the district juvenile coordinators maintained a central file on reportable incidents. The Juvenile Program did not require a consolidated SIR file.

The only incident data JAMS collects is escapes. The JAMS database showed a total of 45 escapes for FY 2000. All of the escapes occurred at 13 non-secure facilities. There was no indication of how many of the juveniles were later found.

Most of the other SIRs we saw involved medical or behavioral problems. The medical incidents included attempts at suicide. According to the National Juvenile Coordinator, none of the attempts were successful.

Facilities are required to report an SIR immediately to the district juvenile coordinator. A copy of the report goes in the juvenile's file at the facility. The Los Padrinos Juvenile Hall in Los Angeles had a centralized file. The chronological file they maintained included both INS and non-INS juveniles, but there was no way to easily identify whether the juvenile in question was an INS juvenile.

When the district juvenile coordinators received an SIR, they notified their supervisors in the district and their regional juvenile coordinator. The region logged the incident and assigned it an SIR number. The district coordinator notified INS headquarters by fax or e-mail and later forwarded a formal report to the region and headquarters. The report was placed in the juvenile's A-file at the district and nothing further was done with the report unless there was a request for additional information. With no central SIR file at the district, it was difficult to quickly identify trends or patterns that might indicate a systemic or local problem.

The reports received by the regions were also not kept in a central juvenile SIR file. Instead, they were chronologically filed with all SIRs received that include non-juvenile SIRs. Although Central Region began to keep an electronic database of the SIRs, the database included all SIRs, most of which had nothing to do with juveniles. The database did not allow for quick evaluation of juvenile reports for evidence of trends or problems.

At INS headquarters, the National Juvenile Coordinator did not maintain a central juvenile SIR file. He maintained files organized by region and district for the larger more active facilities. His reports included escapes and significant medical and behavioral incidents. He stated he probably did not get all the reports. He also said there was no standard reporting form and that each facility has its own incident report form.

The vulnerability of this incident reporting process was exemplified by a specific SIR concerning a suicide attempt in August 2000 at the Liberty County Juvenile Detention Center. When we visited the facility, we asked to see its report on this specific event. The facility did not have the report, the district juvenile coordinator could not locate it, and it was not in the region's database. Finally, when we contacted the National Juvenile Coordinator, he provided us with a copy, but the report had a different SIR number.

If the Juvenile Program does not track and analyze SIRs, issues requiring managerial intervention may not be identified.

### Facility Inspections

The Juvenile Program requires an annual jail inspection for all secure detention facilities. Juvenile jail inspection training is required as part of the training for all district juvenile coordinators. INS headquarters and the regional coordinators tracked the INS inspection requirement using a facilities database that is kept on all facilities with which the INS has a contract. As of May 31, 2001, 6 of the 24 secure facilities in the Eastern Region were overdue for their facility inspections, 9 of the 21 secure facilities in Central Region were overdue, and 16 of the 18 secure facilities in the Western Region were overdue. All of the facilities we visited were up-to-date on their county or state inspections.

The INS had not conducted timely inspections for most of its juvenile shelter care facilities. The INS is required to conduct a formal program inspection of shelter care facilities twice per year. The INS's Humanitarian Affairs Branch (HAB), Unaccompanied Minors Program, supervised nine shelter care facilities.[11] HAB staff was responsible for conducting two inspections per year of these facilities. Between October 1998 and September 2000 (FYs 1999 and 2000), each facility should have been inspected four times, for a total of 36 inspections. However, only 20 facility program inspections were conducted. The Southwest Key, Casa Grande shelter in Coolidge, Arizona was the only facility that met the requirement. The other eight facilities were inspected only two times over the 2-year period.

### Updating Policy and Guidance

The National Juvenile Coordinator stated there had been changes or modifications of policy and procedure that were not reflected in the *Juvenile Protocol Manual*. He considered the *Manual* an evolving document. Changes to the policies or procedures in the *Manual* were communicated to the field via e-mail instructions or faxes. However, there is no central updated version of the *Manual* to which juvenile coordinators or others could refer for clarification or guidance.

Examples of policy changes we encountered in the field and discussed in this report included: release to family members, escort of released juveniles to sponsors, and telephone use. Issues within the Juvenile Program that appear to require more guidance than is found in the *Juvenile Protocol Manual* included the visits to juveniles and facilities, the use of restraints on non-delinquent juveniles, and the recording of detention and transport log information on juveniles.

### Data Entry Errors

The data in JAMS was generally reliable.[12] We also checked the data in JAMS against the data in DACS. The DACS database is used primarily by INS D&R staff to track aliens through the deportation process. If someone outside the Juvenile Program wanted to know the status of a juvenile in INS custody, DACS would be the database checked. It is important that the basic identifying information on the unaccompanied juveniles in DACS and JAMS match.

In order to test for consistency of the reported data, we compared all 333 January 2001 instances in JAMS with the data recorded in DACS. The information generally matched. However, we found several significant discrepancies between information in JAMS and in DACS. In 20 cases information in JAMS was not in DACS: 14 A-numbers had incomplete information, i.e., there was an A-number entry and a name, but no additional information; 3 juveniles had an A-number in DACS, but it corresponded to another individual; and 3 other juveniles had no A-number in DACS.

#### 20 Significant Discrepancies



| 14 - Incomplete information |
|---|
| 3 - A-number corresponds to a different individual |
| 3 - A-number not found |

We also found several other minor discrepancies between JAMS and DACS. Out of 333 instances, 85 book-in dates in JAMS did not match DACS book-in dates (most of these 85 cases followed a pattern in which the book-in date in JAMS preceded the book-in date in DACS by one day); 11 instances had different book-out dates; 9 cases had an instance recorded in JAMS, but no corresponding instance in DACS; 8 cases had an instance recorded in DACS, but no corresponding instance in JAMS; and there were 8 other cases of multiple instances in JAMS combined into a single instance in DACS. Most of these problems should have been easily identified and corrected.

#### Other Discrepancies

| 85 Instances in which the Book-in dates did not match |
| --- |
| 11 Instances in which the Book-out dates did not match |
| 9 Instances recorded in JAMS and not in DACS |
| 8 Instances recorded in DACS and not in JAMS |
| 8 Multiple instances in JAMS correspond to one in DACS |

SCANNED

## The Meaning of Influx

An influx condition is one of the justifications the INS can use to place a non-delinquent juvenile in a secure facility. It is intended as a safety valve for emergencies. An influx condition is defined by *Flores* as a situation when the INS has, at any given time, more than 130 juveniles eligible for placement in a licensed (non-secure) program. Because there are approximately 400 juveniles in licensed programs at any given time, the INS is technically always above the influx threshold of 130 juveniles.

The Juvenile Program now has over 400 shelter beds available. Therefore, the INS could potentially assign juveniles to secure facilities and justify it as due to an influx condition, when an actual influx condition does not exist. If the term INFLUX is to be meaningful as a reason for detaining non-delinquent juveniles in secure facilities, the number of juveniles awaiting placement in a shelter facility must be raised to more accurately reflect the current availability of juvenile shelter beds. Alternatively, the INS might also standardize the use of INFLUX as a JAMS code to indicate a local influx of juveniles.

In addition to the problem of the criteria for an influx condition, we found a number of juvenile detention instances in JAMS coded as INFLUX that probably should have not been. The INS was, in most cases, using the INFLUX code to denote a local influx of juveniles into a particular district. However, in 71 cases, juveniles held in secure detention for INFLUX were subsequently deported. In 26 of these cases, juveniles had been transferred from a shelter to a secure facility, coded as INFLUX and subsequently removed. These 26 juveniles should probably have been coded as escape risks once they had received a final order, but were instead coded as INFLUX.

In order to better oversee and monitor the program, the National Juvenile Coordinator needs to improve the accuracy of the data and use it to monitor the Juvenile Program. The National Juvenile Coordinator should put into place a procedure for analyzing and tracking SIRs involving juveniles. Oversight of the timeliness of facility inspections needs to be more closely monitored. The *Juvenile Protocol Manual* should be updated to reflect changes or modifications to policies and procedures. The regional and national juvenile coordinators should regularly review JAMS and DACS for consistency and accuracy of data. The National Juvenile Coordinator needs to redefine what constitutes a state of influx.

## Recommendations

18. The INS should implement procedures that require at least quarterly reporting of instances of non-delinquent juveniles placed in secure detention. The procedures should include the duration of stay in secure detention for each instance.
19. The INS should implement procedures that require regional juvenile coordinators to monitor, document, and report juvenile housing facility inspections quarterly to headquarters.
20. The INS should implement procedures to track, analyze, and report on significant incident reports involving juveniles.
21. The INS should regularly review JAMS and DACS to ensure the data in both systems is consistent and accurate.
22. The INS should revise the *Juvenile Protocol Manual* to incorporate changes in juvenile policy or procedures and disseminate the revised manual to all field offices.

23. The INS should revise the definition of what constitutes an influx condition, provide guidance for when the use of the INFLUX code is justified for placing non-delinquent juveniles in secure detention, and monitor to ensure that INFLUX is not inappropriately used as a reason for placing non-delinquent juveniles in secure detention.
24. The INS should include the Juvenile Program in its INSPECT reviews to monitor compliance.

## Training

**The INS does not have a continuing INS-wide training program to ensure all employees whose duties bring them in contact with juveniles understand and comply with the terms of the *Flores* agreement.**

The INS conducted the training agreed upon in the *Flores* settlement within 120 days of the final court approval. Since then, the INS has not developed comprehensive, INS-wide follow-up training on the requirements imposed by *Flores* for designated employees.

In 1997 the INS prepared written and video materials, held train-the-trainer sessions in the three regions, and presented training to over 15,000 employees to satisfy the *Flores* agreement. Because a wide range of INS employees have duties that bring them into contact with juveniles, the INS included a 1-to-2 hour session on laws and procedures related to juveniles in the curricula for new officers at the law enforcement academies. These sessions focused on the interception of juveniles and post-apprehension procedures.

Case 2:85-cv-04544-DMG-AGR Document 20 Filed 01/26/04 Page 26 of 169 Page ID #:126

Almost all of the Border Patrol agents, investigators, and inspectors we interviewed received some *Flores* training, either the INS-wide training or subsequently as part of their classes at the officer training academies. However, many of those who received the *Flores* training in 1997 did not recall it clearly. Many officers whose contacts with unaccompanied juveniles were infrequent said they had to refer to written operations instructions if they encountered any juveniles. A few officers were not turning over required paperwork and relied upon the D&R staff to complete the processing. In most locations, district juvenile coordinators frequently had to correct or complete the paperwork filed by officers.

The juvenile coordinators worked constantly to tutor the processing officers. Some district juvenile coordinators offered or planned to offer training to other operations personnel, but their training efforts were hampered by a lack of emphasis by managers in other programs, or a lack of time. For instance, in two districts the juvenile coordinators provided training on a voluntary basis to a limited number of officers. In another district, the district juvenile coordinator said she would like to offer training but had insufficient time to do so.

The Juvenile Program relied on various measures to train officers including:

- Brief orientations for new officers at the academies.
- Four-day combined conferences and training sessions.
- On-the-job training for juvenile coordinators.
- Detailing experienced juvenile coordinators to train newer ones.
- Local outreach efforts made by the juvenile coordinators.

While these measures contribute to an awareness that unaccompanied juveniles require special handling, they do not guarantee that all INS personnel who encounter juveniles receive adequate or consistent training.

Periodic updated training in the procedures and sensitivity required for handling juveniles, coordinated from the headquarters level, would result in a more effective program. The INS needs to provide ongoing training because procedures for handling juveniles change and INS personnel take positions that give them new responsibilities for juveniles. Supervisors conceded the training previously provided was years old, and that refresher sessions would be valuable.

The National Juvenile Coordinator is planning additional training, including quarterly formal training sessions to provide more extensive and consistent training to field officers. He estimates the INS will initiate this program in the first quarter of FY 2002.

We believe that an INS-wide training program should be instituted to keep officers informed of current procedures and requirements for handling juveniles. The training should be required for all managers, Border Patrol agents, inspectors, investigators, deportation officers and detention enforcement officers who encounter juveniles. This training would contribute to the consistent and appropriate treatment of juveniles throughout the INS.

**Recommendation**

25. The INS should establish a continuing post-academy INS-wide training program to ensure all employees whose duties bring them into contact with juveniles understand and comply with the terms of the *Flores* agreement and document the training.

**Footnotes**

22. The majority of the juveniles housed in Chicago are Chinese or Indians. To protect the juveniles from the smugglers who brought them into the country, the INS requires extensive assessments of potential sponsors' homes before releasing the juveniles to the sponsors. As a result, the Chinese and Indian juveniles typically remain at the Chicago shelter significantly longer than other populations.

23. The shelter was closely linked to the principal legal services organization providing pro bono assistance to the juveniles. Chicago Connections and the Midwest Immigrant and Human Rights Center (MIRC), the legal services providers, are semi-autonomous organizations under the Heartland Alliance for Human Needs & Human Rights, an anti-poverty human rights umbrella organization.

24. The cooperative agreement with the CC shelter was signed by the Humanitarian Affairs Branch prior to the reorganization of the Juvenile Program. According to notes from the meeting, the CC staff believed that only requests for reports coming through HAB were official. The INS informed the shelter staff that D&R requests were official and outlined reporting procedures to D&R. Specifically, shelter staff were to forward telephone logs and written documentation of inappropriate juvenile behavior or medical needs to the juvenile coordinators as soon as possible after incidents occur.

25. MIRC attorneys are permitted to come to the shelter regularly to give rights presentations to new juveniles.

26. Eastlake is a secure detention facility used to house delinquent juveniles only. In FY 2000 the INS Juvenile Program placed 76 delinquent juveniles in the facility.

27. The three organizations were the Pennsylvania Immigration Resource Center (PIRC), the Nationalities Service Center (NSC), and the Detention Resource Project (DRP). PIRC and NSC provided legal assistance to juveniles in custody, while DRP staff provided non-legal social services, such as screening cases and interpretation.

28. When we asked shelter directors in other districts about the possibility of having the juvenile coordinator located on-site, we received mixed responses. Shelter staff were concerned that the presence of INS law enforcement officers at the shelter would undermine the role of the shelter as caregiver and prevent them from adequately caring for the children. The biggest concerns expressed by staff were that the juveniles at the facility would be intimidated by INS officers and the staff would not be able to get juveniles to talk freely to them. Furthermore, shelter staff feared that undocumented parents would be afraid of being served or taken into custody if they tried to contact their children.

29. In terms of the total number of juvenile-days in detention, secure detention accounted for 21 percent of the total number of days. Non-delinquent juveniles in secure facilities accounted for 14 percent of the total number of days. For more detail, see Appendix III.

30. The INS requires field offices to submit significant incident reports (SIRs) for certain categories of events that usually involve INS employees and could have an adverse impact on public safety, public relations, or INS operations.

31. All responsibilities for juveniles in INS custody have since been reassigned to the Juvenile Affairs Division in the Office of Detention and Removal.

32. We based this on our matching of facility rosters and JAMS data at the districts we visited in FY 2000 against the central JAMS database.

Case 2:85-cv-04544-DMG-AGR   Document 20   Filed 01/26/04   Page 28 of 169   Page ID #:128

**Return to the USDOJ/OIG Home Page**
**Return to the Table of Contents**

**Unaccompanied Juveniles in INS Custody**
Report Number I-2001-009
September 28, 2001

# CHAPTER 4 - RELATED PROCESSES

**Length of Time in Custody Before Release**

> **INS policies on release of juveniles may in some cases impede the INS's ability to ensure the least restrictive custody and most expeditious release. INS policies require known parents to come to INS offices, even if undocumented; undocumented sponsors to enter immigration proceedings; and homes for Chinese and Indian juveniles to be assessed before release.**

During FY 2000, the INS released to a sponsor 2,238 of the 4,136 juveniles detained in the custody of the Juvenile Program for over 72 hours.[34] The INS released 50 percent of these juveniles within three weeks of their apprehension, and 60 percent within four weeks. However, of the 40 percent still in custody after four weeks, 7 percent (164 juveniles) remained in custody for more than six months, and 1 percent (20 juveniles) remained in custody more than a year. One Chinese juvenile was in INS custody for 631 days.



Most juveniles who remained in INS custody for long periods did so because the INS had not yet found appropriate sponsors for them.[35] About 85 percent of those held for six months or longer were Chinese or Indians, for whom the INS required often time-consuming assessments of the sponsor before releasing the juveniles. In a few cases, the INS held juveniles for longer periods of time because an identified parent was unwilling to come to an INS office to take custody or to designate another sponsor in person.

Release Policies

The *Flores* agreement established a policy of releasing juveniles from INS custody "without unnecessary delay," consistent with its interests to ensure the juvenile's timely appearance before the INS and the immigration courts and to protect the juvenile's well-being. The agreement listed potential sponsors in order of preference, with a parent first, a legal guardian second, and an adult relative (specifically, a brother, sister, aunt, uncle, or grandparent) third. If none of these close relatives were available, the next preference fell to an adult individual or entity designated by a parent or legal guardian, in a declaration signed before an immigration or consular officer, or in other documentation containing convincing proof of the relationship.

The *Flores* agreement, while preferring a parent or guardian, did not seem to prohibit passing over them to one of the family members specified. The requirement for parental consent appeared only when the potential sponsors were no longer close family members.

The *Juvenile Protocol Manual* confirmed the policy of release without unnecessary delay, in the order of preference of the *Flores* agreement, but added a requirement that potential homes for Chinese and Indian juveniles be assessed before their release. The purpose of the assessments was to protect juveniles from the smugglers who may have brought them into the country, and to make sure any sponsors were legitimate. INS headquarters officials were to administer the home assessments. The *Juvenile Protocol Manual* emphasized that district directors continued to have full discretion over the release of juveniles from custody, except for the specially vulnerable Chinese and Indians.

The home assessment process involves multiple steps, performed sequentially by the INS and voluntary agencies (VOLAGs) under contract with INS to make home visits and do interviews. The steps include:

- INS and shelter care staff working with the juveniles to try to identify a potential sponsor.
- Preliminary home visits by voluntary agency caseworkers.
- Records checks performed by the INS.
- Interviews with sponsors and home visits by VOLAG caseworkers.
- Reviews of the results of the home assessment at INS Headquarters by the National Juvenile Coordinator.
- Records checks and final decisions on release at the district level.

These procedures often extend the length of custody for the juvenile. In some cases, several potential sponsors may be

assessed before an acceptable one is found. As a result of the assessments, Chinese and Indian juveniles spent longer time in INS custody than other nationalities. In FY 2000, 77 percent of the Chinese and Indians were detained for over one month, compared to 30 percent for other nationalities. The average length of stay in custody for Chinese and Indian juveniles was 146 days. Juveniles other than Chinese and Indians stayed in custody for 29 days.

The following flow chart shows the average amount of time taken at each step by the INS and VOLAG workers in FY 2000.



We did not examine the processing of specific cases to see if unnecessary delays are occurring. Headquarters officials told us, however, that the INS is looking at home assessments to streamline the process. The INS has proposed increased use of automation to transmit information between agencies and offices as one means of making the assessments more efficient.

<u>Clarification of Release Policy</u>

In November 1999, the INS clarified its juvenile release policy in a letter to the United States Catholic Conference (USCC) and the Lutheran Immigration and Refugee Services (LIRS), specifically requiring the involvement of any parent in the United States in the release of a juvenile.[36] The letter stated the INS's strong belief "that when there is a parent in the United States, he/she should be the sponsor of the child regardless of the parent(s) immigration status." The letter stated that any parent who was unable or unwilling to assume custody of the minor "must present him/herself before an INS Officer. . . and execute an affidavit if he/she decides that the minor should be placed with a blood relative or responsible adult."

The National Juvenile Coordinator confirmed it is INS policy not to release a juvenile to anyone other than a parent, if one was known to the INS. He said the policy has been communicated to the field and is clearly understood. However, it has not been formally incorporated into the *Juvenile Protocol Manual*. The requirement was based on the belief that parents are primarily responsible for the care and welfare of minors.

The November 1999 letter to the USCC included an additional requirement affecting release. The letter stated that according to INS policy, an undocumented parent, or any other undocumented sponsor, must appear before an INS officer and be served a Notice To Appear (NTA), before the juvenile could be released. The NTA initiated immigration proceedings for the sponsor. The requirement is based on the INS's belief that sponsors who are in proceedings themselves are more likely to ensure the juveniles attended proceedings when required. INS officials stated that having the person come forward and

Case 2:85-cv-04544-DMG-AGR   Document 20   Filed 01/26/04   Page 30 of 169   Page ID #:130

present themselves is the best way to make sure the person is not an imposter and positively identify the individual.

Under the policies of the November 1999 letter, if an undocumented parent refuses to come forward, a juvenile remains in custody. This occurs even if another close relative, in the United States legally, is willing to accept custody. Juvenile coordinators cited cases in which days, and on occasion weeks, were added to the time juveniles spent in detention before an undocumented parent agreed to come to an INS office.

An undocumented parent or, if there is no parent, another sponsor may be unwilling to come forward for a variety of reasons, including a fear of removal, which results in the juvenile remaining in INS custody. Pro bono legal and human rights organizations view this policy as "holding children hostage" or using them as "bait" to draw out the parents. These fears persist, even though the juvenile coordinators and apprehending officers said they do not arrest family members who come in to take custody of a juvenile, unless the family member had a criminal record. The officers said the rule of thumb is, "If you walk in, you walk out." Several juvenile coordinators said as a rule a parent eventually comes forward.

Other increases in the time juveniles spent in custody results from delays in issuing NTAs to sponsors, or in documenting relationships. Even after sponsors agree to enter proceedings, backlogs sometimes delay processing the paperwork. In one instance, a parent waited for more than two weeks for an NTA to be issued. During this time the juvenile remained in detention. Also, one immigration judge expressed concerns over a requirement for what she believed to be an unreasonable degree of proof of the relationship before some INS officers would release a juvenile to a family member.

The INS release policies are designed to protect the juveniles and to secure their appearance at immigration proceedings. However, for some juveniles, if the policies expressed in the letter to the USCC are too rigidly adhered to, they may impede INS's ability to ensure least restrictive custody and most expeditious release. In some situations juveniles may remain in custody longer than is necessary to ensure their safety, when an acceptable sponsor, other than an undocumented parent, is available. We could not determine how often this happens, or how much the time in custody is lengthened. Also, because most information about family members comes directly from the juveniles themselves, it is probable some juveniles are in fact released to other relatives if they do not identify a parent to the INS. We believe that it is reasonable for district directors to have the discretion to make exceptions to the overall policies on release and that the discretion be exercised on a case-by-case basis.

**Recommendation**

26. The INS should allow district directors discretion in releasing juveniles to a responsible sponsor if a parent is unwilling to come forward and the INS should provide appropriate guidance to control discretionary release.

### Problems Related to EOIR Hearings

**Limited legal services available to juveniles in custody, postponement of hearings on the merits of cases until after release, and scheduling some juveniles in shelter care for non-priority hearings caused most juveniles who sought relief from removal to be released before judges decided their cases. Most juveniles failed to appear for merits hearings after release from custody.**

From our sample of 173 juveniles in the EOIR database, 9 juveniles (5 percent) had their cases completed while they were in custody. The remaining 164 juveniles (95 percent) did not have their cases resolved prior to release and 112 of the 164 juveniles failed to appear for their immigration hearings

after release.

The unaccompanied juveniles in the Juvenile Program are required to go before the immigration courts to present their cases. The court proceedings are outside INS control but are initiated by INS at the outset of the juvenile's custody. Several factors contribute to the delay in deciding cases: the limited availability of legal representation; postponing hearing the merits of cases pending the juveniles' release from custody; and scheduling detained juveniles for non-expedited hearings. As a result, juveniles are frequently released from INS custody before the merits of their cases are heard.

The law does not provide for legal representation at government expense for alien juveniles. However, EOIR is actively involved in developing sources of pro bono legal aid. The other reasons for delay are, for the most part, the responsibility of EOIR. To the extent that problems in the process affect juveniles in INS custody, the INS and EOIR should follow-up on discussions already begun to find effective mutually agreeable solutions.

Unless a juvenile chooses voluntarily to leave the United States without a hearing, the INS is responsible for initiating hearings before an immigration judge.[37] The judges determine the juveniles' immigration status, but the attorneys for the juveniles, many of them serving pro bono, and the INS attorneys have significant roles in the hearings process. For several reasons, the hearings process for juveniles in custody is not working well.

Limitations on Available Legal Aid

Our sample of EOIR data for 302 juveniles, drawn from all juveniles in custody during the first half of FY 1999, showed that 131 juveniles (43 percent) were ultimately represented by an attorney of record.[38] Most of the Chinese juveniles were represented by attorneys. Most of the non-Chinese juveniles were not. Representation for the non-Chinese juveniles largely depended upon the availability of pro bono services.

Immigration judges we spoke to said they were reluctant to decide juvenile cases without an attorney in the courtroom to represent the juvenile. The efforts made by the EOIR, bar associations, and other legal assistance and voluntary organizations to recruit and maintain pro bono legal aid have improved access to basic legal information for juveniles in custody. Judges in most locations agreed that pro bono attorneys met with the juveniles and sometimes appeared in court informally with them. Often, however, the pro bono attorneys merely requested continuances on behalf of the juveniles or addressed custody issues.[39] Very few of the pro bono attorneys actually represented the juveniles in the hearings process.

In the locations we visited, pro bono legal services available for most juveniles in custody were limited to group presentations of their rights and an explanation of the hearings process itself. Sometimes the group sessions were followed by screening cases in individual interviews to determine whether the juvenile might have a basis for seeking relief from removal.[40]

Voluntary agency attorneys said that only in exceptional circumstances were they able to represent a juvenile or find a private attorney to take a case on a pro bono basis. The attorneys said they lacked the time and funds needed to fully develop and support claims for relief, usually applications for asylum.[41] Pro bono attorneys said some juveniles who were removed might have made a case for relief, if they had been given time and had been able to find adequate legal representation. Several attorneys suggested this might be true in 10 percent of the cases.

Some juveniles in custody were given little legal assistance, even when they had a private attorney of record. Frequently Chinese juveniles brought in by smugglers had been informed, prior to their arrival in the United States, that a private attorney at their final destination would represent them. Their destinations were usually far from the custody site. For example, Chinese juveniles in custody in the Phoenix District would have an attorney of record in New York City. These Chinese juveniles were often reluctant to speak with pro bono attorneys, even though the private attorneys provided few or no legal services while the juveniles were in custody. Immigration judges, INS attorneys, and pro bono attorneys expressed concern that the Chinese juveniles were not well served by their attorneys in many cases. The failure of the attorneys to appear in court to represent the juveniles contributed to immigration judges' reluctance to hear the cases.

Continuances of Immigration Hearings

An unwritten practice has developed concerning the granting of continuances for juveniles in immigration hearings. Immigration judges regularly postpone hearings on the merits of cases until after the juveniles' release to sponsors, usually involving a change of venue. For Chinese and Indian juveniles, the scheduling of hearings is tied to the progress of the home assessment required before their release. In several districts, pro bono attorneys who did attend the hearings asked for continuances to correspond with the projected release of the juvenile from custody.[42] Immigration judges said INS counsel offered little opposition to the continuances, and judges regularly granted them as requested.

INS attorneys agreed that release from custody and the merits of the cases were not inherently related. However, the INS attorneys did not consistently oppose continuances based on the status of a juvenile's home study. One attorney said the INS had recently started to oppose requests for continuances solely on this basis. If the continuances were based on release combined with other factors, such as obtaining legal representation or attorney preparation, the INS attorney said the INS would probably not oppose them.

One judge, in explaining the practice of granting continuances, said he was reluctant to schedule a juvenile for the 3-hour block of time required for merits hearings in asylum cases if the juvenile was likely to be leaving his jurisdiction. He said this wasted valuable court time when a juvenile scheduled for a merits hearing ended up released to another jurisdiction before the hearing date.

Juvenile Docket Management

In the Chicago and Houston Districts, the INS and EOIR did not ensure that juveniles in shelter care were expeditiously scheduled for hearings. In other locations, the immigration courts scheduled detained juveniles on an expedited basis for hearings. In Chicago and Houston, juveniles in shelter care were included with adults on the slower non-detained schedule, with a longer waiting period before their hearings. Hearings for non-detained aliens, juveniles or adults, typically occur at a much slower pace than is usual for detained aliens, with much longer intervals between the date of detention, the first master hearing, and any subsequent hearings.

Outcomes

After the juveniles are released, the INS can no longer ensure their attendance at hearings. The EOIR data showed 112 (68 percent) of the 164 juveniles released to a sponsor prior to completion of their hearings subsequently failed to appear.

Those juveniles who do complete the hearings process are rarely granted relief. The EOIR data showed that of

168 juveniles who completed their hearing, only 2 were granted relief. The two most common outcomes were removal (122) and voluntary departure (37).

We observed that the hearings process works best when the INS, the immigration courts, pro bono attorneys, voluntary agency groups, and the facilities' staff establish communication, develop respect for one another's roles, and participate cooperatively. At the Harlingen and the Phoenix Districts and at the Berks County facility in the Philadelphia District, particularly, all groups concerned with legal processes for juveniles, including the juvenile coordinators, cooperated well. To develop cooperation, the EOIR assigned specific judges and the INS assigned specific counsel to juvenile cases, to provide liaison and continuity in handling them. Also, all of the groups concerned met together on a regular basis.

## Recommendations

27. The INS should evaluate the home assessment process and implement changes to streamline the process.
28. The INS should confer with EOIR to implement procedures to facilitate timely immigration hearings for juveniles and to improve juvenile attendance at immigration hearings.

## Footnotes

34. At the end of the fiscal year, 509 of the 4,136 juveniles were still in custody. Sponsors may have been found for more in the following year. Of the juveniles who were neither released to sponsors nor retained in custody, 477 were given voluntary departure, 425 were deported, 282 reached their 18th birthday and were subsequently treated as adults, and the remaining 205 experienced miscellaneous outcomes, including a small number who ran away.
35. Juveniles also remained in extended custody for other reasons. Some examples include a record of serious delinquency, multiple attempts at illegal entry, and the jurisdiction for juvenile witnesses in alien smuggling cases were transferred to the U. S. Marshals Service.
36. USCC's Migration and Refugee Services and the LIRS are the two VOLAGs performing home assessments under cooperative agreements with the INS. The letter was written by the Director, Humanitarian Affairs Branch, INS, to the two agencies, outlining several changes to the program.
37. To initiate the hearings process, INS files an NTA with EOIR. EOIR then schedules the juvenile for one or more master hearings (initial appearances before a judge), and subsequently for one or more hearings to consider the merits of the case.
38. The sample was drawn from EOIR FY 1999 data to allow time for completion of a substantial number of the cases. For authority to represent a client (juvenile or adult) in INS matters, an attorney must provide a Notice of Entry of Appearance as Attorney or Representative (G-28), signed by the attorney and client. A similar form (E-28) addressed to EOIR is required to represent a client in EOIR proceedings. The 43 percent of juveniles with an attorney of record includes only those whose attorneys have filed an E-28. Attorneys who talk with juveniles, screen cases, and appear in court without filing an E-28 are not included in the 43 percent. Similarly, the filing of an E-28 may not mean an attorney continued to represent the juvenile to the conclusion of the INS proceeding.
39. Custody issues might involve requirements for a bond before release to family members, or review of the status of home assessments and projected release dates.
40. A voluntary or non-profit agency, sometimes with a legal staff of no more than one attorney, provided the services.
41. In two locations, the legal service providers had developed a cadre of additional pro bono attorneys willing to take cases. In others, there were very few.
42. In the Chicago district, the voluntary agency attorneys reached an agreement with EOIR judges to attend the hearings informally, as "friends of the court." In this role, they apprised the judges of the status of a home study as far as they knew it. The judges said they found this somewhat helpful, because there was otherwise very little information available about the juveniles, but that the real need was for someone to become involved and protect the "best interests of the child." This individual should be able to speak for the juveniles to the court, even with an attorney of record, if the attorney of record failed to serve the juvenile's best interests. The judges suggested that the guardian ad litem role envisioned should be based in law and federally funded.

**Return to the USDOJ/OIG Home Page**
**Return to the Table of Contents**

**Unaccompanied Juveniles in INS Custody**
Report Number I-2001-009
September 28, 2001

# CHAPTER 5 - RECOMMENDATIONS

## Chapter II: Compliance With Policies and Procedures

1. The INS should include and enforce standards in all contracts with secure detention facilities that require the segregation of non-delinquent INS juveniles from delinquent juveniles. These standards should provide for strict segregation in living quarters and no more than minimal contact in all other common areas. The facilities should be required to immediately notify the INS if they cannot meet this requirement so the INS can take immediate corrective action.
2. The INS should implement procedures that ensure weekly visits with all juveniles in custody and to all juvenile housing facilities. The procedures should establish clear descriptions of the content of the visits and documentation requirements. The INS should delegate authority to appropriately trained staff to assist district juvenile coordinators in complying with the weekly visitation requirements.
3. The INS should implement procedures that require same-sex escort of juveniles. If same-sex escorts are not possible, procedures for appropriate alternative safeguards for juveniles should be followed.
4. The INS should implement procedures that require juvenile transportation and detention custodial records that provide sufficient accountability for all juveniles detained in the custody of the Border Patrol sectors and the districts.
5. The INS should implement procedures that require INS officers, or designated non-INS personnel under contract with the INS, to escort and maintain physical custody of all juveniles until the juvenile is released to a sponsor.
6. The INS should implement specific rules that govern the use of restraints on juveniles in the custody of INS officers, in shelter facilities, and in secure facilities. The INS should implement procedures to monitor compliance.
7. The INS should revise its policy regarding telephone use by juveniles to ensure juveniles without funds are able to make appropriate telephone calls and juveniles are permitted access to telephones that at least meet the minimum requirements.
8. The INS should implement procedures that require the monitoring and regular reporting of instances of non-compliance with the 3-to-5-day placement requirement. These procedures should include the reporting of justifications for the overdue placements.

## Chapter III: Program Oversight

9. The INS should require districts to designate and train back-up juvenile coordinators.
10. The INS should re-emphasize to all INS officers the requirement to immediately notify the district juvenile coordinators of all placements and movement of juveniles and to complete and forward all required documentation to the district juvenile coordinators.
11. The INS should provide a list of all approved juvenile housing facilities to the districts and Border Patrol sectors with the stipulation that no juveniles are to be placed in a facility without the prior notification of the juvenile coordinator.
12. The INS should identify all juvenile housing facilities now being used by the districts and Border Patrol sectors to house juveniles.
13. Each Border Patrol sector should designate a coordinator for juvenile issues to ensure timely liaison with the district juvenile coordinators.
14. Districts with a large volume of juvenile activity should provide administrative support to the district juvenile coordinator.
15. The INS should implement contract compliance procedures to ensure contracted facilities comply with their contractual responsibilities.
16. The INS should establish regular communications at the district level with volunteer agencies, shelter staff, and legal service providers to identify and resolve juvenile detention issues.
17. The INS should develop a national plan for assessing its needs for secure, medium-secure, and non-secure bed space and acquiring the needed additional beds.
18. The INS should implement procedures that require at least quarterly reporting of instances of non-delinquent juveniles placed in secure detention. The procedures should include the duration of stay in secure detention for each instance.
19. The INS should implement procedures that require regional juvenile coordinators to at least quarterly monitor, document, and report juvenile housing facility inspections to headquarters.
20. The INS should implement procedures to collect, track, analyze, and report significant incident reports involving juveniles.
21. The INS should regularly review JAMS and DACS to ensure the basic identifying data in both systems match and is accurate.
22. The INS should revise the *Juvenile Protocol Manual* to incorporate changes in juvenile policy or procedures and disseminate the revised manual to all field offices.
23. The INS should revise the definition of what constitutes an influx condition, provide guidance for when the use of the INFLUX code is justified for placing non-delinquent juveniles in secure detention, and monitor to ensure that INFLUX is not inappropriately used as a reason for placing non-delinquent juveniles in secure detention.

24. The INS should include the Juvenile Program in its INSPECT reviews to monitor compliance.
25. The INS should establish a continuing post-academy INS-wide training program to ensure all employees whose duties bring them into contact with juveniles understand and comply with the terms of the *Flores* agreement and document the training.

## Chapter IV: Related Processes

26. The INS should allow district directors discretion in releasing juveniles to a responsible sponsor if a parent is unwilling to come forward and the INS should provide appropriate guidance to control discretionary release.
27. The INS should evaluate the home assessment process and implement changes to streamline the process.
28. The INS should confer with EOIR to implement procedures to facilitate timely immigration hearings for juveniles and to improve juvenile attendance at immigration hearings.

**Return to the USDOJ/OIG Home Page**
**Return to the Table of Contents**

**Unaccompanied Juveniles in INS Custody**
Report Number I-2001-009
September 28, 2001

# EXECUTIVE SUMMARY

### Purpose

The Office of the Inspector General (OIG), Evaluation and Inspections Division, reviewed the treatment of unaccompanied illegal juveniles held in the custody of the Immigration and Naturalization Service (INS). We examined the INS's policies and procedures developed in response to the *Flores v. Reno (Flores)* settlement agreement and other issues concerning juvenile detention. Our inspection focused on unaccompanied illegal juveniles who are detained in shelters or secure detention facilities. Accompanied juveniles, juveniles voluntarily returned to Mexico, and juveniles in custody less than 72 hours were not included in our review.

### Background

*Flores* was a class-action lawsuit filed against the INS because of its policies related to the detention, processing, and release of unaccompanied illegal juveniles. The requirements of the agreement are intended to protect the rights of unaccompanied illegal juveniles in INS custody as well as to ensure their well-being. In March 1997, the INS's settlement of the suit resulted in new INS policies for the detention, processing, and release of unaccompanied illegal juveniles.

In fiscal year (FY) 2000, the INS detained 4,136 unaccompanied illegal juveniles for longer than 72 hours. The unaccompanied illegal juvenile population was 75 percent male and 25 percent female. Its average age was 15 years. The average length of time in custody was 33 days and the median was 19 days. The INS normally has between 400 and 500 juveniles in custody at any one time. The INS contracts with licensed facilities for shelter care programs, group homes, foster homes and juvenile detention facilities to house the juveniles in the least restrictive setting appropriate. The facilities are classified as secure, medium secure, and non-secure.

### Results in Brief

During the last three years, the INS has made improvements in its Juvenile Program. The Juvenile Program staff developed a detailed *Juvenile Protocol Manual* that defines the policies, procedures, and responsibilities that INS officers are expected to follow with juveniles, from initial encounter through release or removal. The INS has provided training on the provisions of the *Flores* agreement to over 15,000 INS employees since 1997 and also made it part of the law enforcement academy training received by INS officers. The number of juvenile shelter bed spaces has increased from 131 in FY 1997 to over 400 in FY 2000. To meet the *Flores* requirement for data reporting, the INS developed the Juvenile Alien Management System (JAMS), enabling improved tracking and reporting on juveniles in its custody. All of the facilities we visited had programs in place to meet the *Flores* requirements for providing education, medical services, recreation, and social orientation programs in addition to providing the necessary food and shelter. The Juvenile Program has also submitted its required reporting to the court and the plaintiffs for three years and has not received notification from the court or the plaintiffs that INS is substantially out of compliance with the *Flores* agreement.

Although the INS has made significant progress since signing the *Flores* agreement, our review found that deficiencies in the handling of juveniles continue to exist in some INS districts, Border Patrol sectors, and headquarters that could have potentially serious consequences for the well-being of the juveniles.

### Principal Findings

INS Compliance with Policies and Procedures

*Flores* and INS policy require the INS to segregate non-delinquent juveniles in temporary detention from juvenile offenders while they await appropriate placement. The INS does not interpret *Flores* as requiring that the segregation be maintained once the non-delinquent juveniles are formally placed in a secure facility, and INS policy does not require it. We believe the segregation of non-delinquent juveniles from juvenile delinquents should be continued as long as the juveniles are in INS custody in order to ensure their well-being. In FY 2000, 34 of 57 secure facilities did not have procedures or facilities to properly segregate non-delinquent from delinquent juveniles. As a result, there may have been as many as 484 potential instances when non-delinquent and delinquent juveniles were housed together.

The *Juvenile Protocol Manual* requires an INS official to visit with all juveniles in its custody on a weekly basis. At three of the eight districts reviewed, juvenile coordinators were not regularly conducting the required visits. In addition, the INS does not have procedures in place to document the visits when they do occur. ·

*Flores* requires the INS to segregate juveniles from adults during detention and transport after arrival at the first INS processing office. INS escort policy requires that juveniles be transported with same-sex escorts. The INS does not always document the detention and transport of juveniles and is thus unable to demonstrate compliance with this requirement. INS escort policy requires that all juveniles be escorted when on commercial aircraft. The INS allowed unescorted juveniles to travel on commercial aircraft. INS restraint policy also prohibits the use of restraints on non-delinquent juveniles in custody or when transported by non-INS officers/agencies. Facilities in four districts used restraints when transporting non-delinquent juveniles.

*Flores* requires the INS to place juveniles in an appropriate secure juvenile detention facility or a non-secure shelter facility within three to five days of entering into INS custody. In FY 2000, the INS did not meet this requirement for 19 juveniles. For 339 juveniles, INS records were not sufficient to demonstrate that it had met this requirement.

### Juvenile Program Oversight

Three of the eight districts we reviewed had recurring problems with district or Border Patrol officers not carrying out the duties required by the *Juvenile Protocol Manual*. In several districts the effectiveness of the Juvenile Program was hampered by a lack of administrative support for the district juvenile coordinator. Three districts did not have a fully trained back-up district juvenile coordinator. Two district juvenile coordinators who handled a heavy volume of juveniles did not have clerical support.

The INS did not hold one shelter we reviewed to the terms of its cooperative agreement and did not control all actions affecting the custody of juveniles. At another secure facility, the district juvenile coordinator had difficulty meeting INS requirements for monitoring juveniles.

The INS did not have a clearly defined mechanism for analyzing its bed-space needs or a comprehensive plan for acquiring the beds. The INS needs to determine its requirements by types of beds and locations where new bed-space would best serve the Juvenile Program. In addition, the INS needs to better define district, regional, and national responsibilities for acquiring these beds.

Monitoring and oversight by the Juvenile Program managers was weak. Available data on the juveniles was not analyzed to identify systemic problems or trends in length of time in custody or facility placements. The managers failed to implement a procedure to analyze and track significant incident reports (SIRs) involving juveniles in custody. Required inspections of non-secure and secure facilities were not timely for most of the facilities. Changes in policy and guidance were not updated in the *Juvenile Protocol Manual*. Data entry errors were not always corrected and reconciled. Finally, the criteria for using influx as a justification for placing non-delinquent juveniles in secure facilities needs to be updated.[1]

The INS conducted the training agreed upon in the *Flores* settlement within 120 days of the final court approval. New officers also now receive the training at the law enforcement academy. However, beyond meeting the initial *Flores* training requirement, the INS has not developed comprehensive, INS-wide follow-up training for designated field employees.

### Related Processes

The *Flores* agreement established as INS policy that juveniles would be released without unnecessary delay, consistent with its interests to ensure the juvenile's timely appearance before the INS and the immigration courts and to protect the juvenile's well-being. Juveniles must be released to a sponsor who will accept responsibility for the juvenile. Preferred sponsors included parents, legal guardians, and close adult family members. If a juvenile has a parent in the United States, however, current INS policy requires the parent to be involved in the juvenile's release, regardless of the parent's immigration status. An undocumented parent must report to an INS officer and enter immigration court proceedings before the INS will release the juvenile. If the parent is unwilling to come forward, the juvenile will remain in INS custody, even when another acceptable sponsor is available. The current INS policy if too rigidly adhered to, may impede the INS's ability to ensure the least restrictive custody and most expeditious release of juveniles.

Unaccompanied juveniles in the Juvenile Program are required to go before the immigration courts to present their cases. The court proceedings are the responsibility of the Executive Office for Immigration Review (EOIR) but are initiated by INS at the outset of the juvenile's custody. For several reasons, few juvenile cases before the immigration courts are completed while the juveniles are still in custody. After juveniles were released from custody, 68 percent failed to appear for their hearings. Legal services available for juveniles in custody are limited, hearings on the merits of cases are frequently postponed until after release of the juveniles, and in two locations hearings for juveniles in shelter care were not scheduled expeditiously.

The law does not provide for legal representation at government expense for alien juveniles. However, EOIR is actively involved in developing sources of pro bono legal aid. The other reasons for delay are, for the most part, the responsibility of EOIR. To the extent that problems in the process affect juveniles in INS custody, the INS and EOIR should follow-up on discussions already begun to find effective mutually agreeable solutions.

The report contains 28 recommendations to address the issues we identified during our review.

---

**Footnotes**

1. An influx condition is one of the justifications the INS can use to place a juvenile in a secure facility. It is intended as a safety valve for emergencies. An influx condition is defined by Flores as a situation when the INS has more than 130 juveniles eligible for placement in a shelter facility. This number was set at a time when the INS had 131 shelter beds available. The Juvenile Program now has over 400 shelter beds available.

SCANNED

# EXHIBIT 2

# UNITED STATES OF AMERICA

# "WHY AM I HERE?"

## CHILDREN IN IMMIGRATION DETENTION





**Amnesty International USA**

34.

# UNITED STATES OF AMERICA
## UNACCOMPANIED CHILDREN IN IMMIGRATION DETENTION

SCANNED

## CONTENTS

1. INTRODUCTION: SUMMARY OF CONCERNS............................................................1
   1.1 Scope and Sources of Research.......................................................................2
   1.2 Recent Legislation: An Opportunity for Change?.........................................4
      1.2.1 Department of Homeland Security (DHS) and the Office of Refugee Resettlement
      (ORR).........................................................................................................4
   1.3 Amnesty International Report Summary...........................................................6

2. BACKGROUND: U.S. AND INTERNATIONAL LAW.......................................6
   2.1 Unaccompanied Children..................................................................................6
   2.2 International Law and Standards .....................................................................7
   2.3 Overview of U.S. Immigration System: Forms of Relief Available to Unaccompanied
   Children..................................................................................................................11
      2.3.1 Asylum................................................................................................12
      2.3.2 Guidelines for Children's Asylum Claims .......................................13
      2.3.3 Additional Forms of Relief for Children at Risk .............................14
   2.4 Overview of U.S. Framework for the Care of Unaccompanied Children (*Flores*)...........16

3. UNACCOMPANIED CHILDREN AND THE U.S. DETENTION SYSTEM......................17
   3.1 "Non-Secure" Detention..................................................................................18
      3.1.1 Shelter Care........................................................................................18
      3.1.2 Foster Care .........................................................................................19
      3.1.3 Hotels..................................................................................................19
   3.2 Secure Detention ..............................................................................................20
      3.2.1 Holding Cells......................................................................................20
      3.2.2 Juvenile Jails......................................................................................21
   3.3 Commingling with Juvenile Offenders............................................................23
   3.4 Children Housed with Adults: Age-Determination Techniques.....................26
   3.5 Challenging Placement in a Secure Facility...................................................28

4. CONDITIONS OF DETENTION..............................................................................28
   4.1 Excessive Discipline.........................................................................................29
   4.2 Physical and Verbal Abuse ..............................................................................30
   4.3 Solitary Confinement .......................................................................................31
   4.4 Pat-down and Strip Searches............................................................................33
   4.5 Use of Restraints...............................................................................................34
      4.5.1 Restraints During Transportation .....................................................34
      4.5.2 Restraints in the Courtroom...............................................................35
      4.5.3 Restraints in Detention Facilities ......................................................36
   4.6 Exercise, Access to Open Air, and Recreation ...............................................38
   4.7 Education ...........................................................................................................39
   4.8 Mental Health Services.....................................................................................40
   4.9 Religion .............................................................................................................43
   4.10 Girls .................................................................................................................43

i

SCANNED

5. CONCERNS ABOUT ACCESS TO ASSISTANCE AND SUPPORT IN DETENTION.......44
    5.1 Access to Legal Representation and Other Forms of Assistance in Detention ...............44
    5.2 Access to Non-Governmental Organizations (NGOs)....................................................46
    5.3 Juvenile Coordinator Visits.........................................................................................46
    5.4 Transfers ....................................................................................................................47
    5.5 Accessing Assistance: Handbooks..............................................................................48
    5.6 Interpreters/ Translation.............................................................................................49
    5.7 Telephone Access and Visits.......................................................................................50
        5.7.1 Telephones ....................................................................................................50
        5.7.2 Visits.............................................................................................................51
    5.8 Consulates...................................................................................................................51

6. RELEASE OF CHILDREN FROM DETENTION..................................................................52
    6.1 U.S. National Policy for the Release of Unaccompanied Minors: The Flores Settlement 52
        6.1.1. Release of Children to Available Family or Other Appropriate Caregivers ..........53
    6.2 Failure to Appear for Hearings ....................................................................................55
    6.3 Prolonged Detention: Indian and Chinese Children......................................................56
    6.4 Haitian Children...........................................................................................................57
    6.5 Effect of Long-term Detention: Children Abandoning Their Claims .............................59
    6.6 Failure to Release After Asylum Is Granted.................................................................59
    6.7 Effective Review of Decisions Not to Release Children ...............................................60

7. LACK OF LEGAL REPRESENTATION, FAILURE TO APPOINT GUARDIANS AND
ACCOMMODATE UNIQUE NEEDS OF CHILDREN IN COURTROOMS..........................60
    7.1 Lack of Legal Assistance for Children in U.S. Immigration Proceedings......................61
    7.2 A Child's Right to Legal Representation.......................................................................62
    7.3 Concerns Related to Court Hearings ............................................................................64
        7.3.1 Delays in Immigration Proceedings.................................................................65
        7.3.2 Adaptation of Courtroom Experience for Children............................................67
        7.3.3 Adaptation of Courtroom Experience for Children: Court Personnel (INS Trial
        Lawyers and Immigration Judges), and Courtroom Procedures....................................67
    7.4 Additional Concerns About Courtroom Experiences......................................................70
        7.4.1 Interpreters....................................................................................................70
        7.4.2 Video Conferencing Facilities .........................................................................70
        7.4.3 Courtroom Waiting Area (Krome, Florida): Proximity to Firing Range................70
    7.5 Guardians Ad Litem (Friend of the Child) ...................................................................71

8. THE FUTURE FOR UNACCOMPANIED CHILDREN IN THE U.S.................................73
    8.1 The Detention System..................................................................................................73
    8.2 Legal Representation and Guardians .............................................................................74
    8.3 Ongoing Concerns and Inherent Dangers of a Law Enforcement Culture: DHS.............75
    8.4 Additional Research and Monitoring Statistics .............................................................76

9. CONCLUSION AND RECOMMENDATIONS.................................................................77

SCANNED

# UNITED STATES OF AMERICA
## UNACCOMPANIED CHILDREN IN IMMIGRATION DETENTION

### 1. INTRODUCTION: SUMMARY OF CONCERNS

> Edwin was born in Honduras and his mother abandoned him shortly after his father died. He was only four years old at the time and ended up living with a cousin who abused him and forced him to work in the streets and give him money. *"When I didn't earn enough money, he punished me, beating me with a noose, car tools, and other objects, leaving scars on my body."* He was afraid to go to the authorities because his cousin threatened to throw him onto the street, and that the police would not protect a child like him. He was also afraid of living on the streets because he had heard that the authorities and gangs kill children living in the streets. When he was thirteen, he set off for the U.S.: *"I had heard wonderful things about the U.S. and how children were better treated here."* He says he walked, begged, and worked for food to get to the U.S. Upon crossing the border he was arrested and detained. He was housed at the San Diego Juvenile Hall for almost six months, and reports he was mistreated by both guards and juvenile offenders. *"The officers did not know why I or other children picked up by the INS were there. They treated us the same as the others, as criminals. They were mean and aggressive and used a lot of bad words. (...) Many of the other boys were violent, frequently looking for a fight."* He was transported in full shackles during transfers and trips to court. He reports that after winning his asylum case, he left the jail for the last time, to be taken to a foster family. Again, he was transported in shackles. When he asked the INS officer why he needed shackles, he was told that it was to prevent his escape. He challenged the fact that he might try to escape since he had won his asylum. The officer allegedly responded that asylum is *"just a piece of paper we can rip up, put you in jail and send you back to your country."* Edwin was held in detention for eight months before being released.
> - Edwin Larios Muñoz, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 28 February 2002

The number of unaccompanied children detained in the United States has more than doubled over the last five years, rising from 2,375 in 1997 to 5,385 in 2001.[1] Escaping political persecution, fleeing war, abusive families, or other dangerous or difficult conditions in their home countries, these children arrive in the U.S. unaccompanied by their parents or other legal guardians. Approximately 75 percent of these children are boys and 25 percent are girls.[2] They range in age from toddlers to teenagers and come from a wide range of countries.[3] U.S. immigration authorities take them into custody, and approximately one-third are detained in harsh conditions in a secure jail-like facility designed for the incarceration of juvenile offenders.[4] Children held in immigration detention are detained for administrative reasons, not as punishment for criminal behavior. Not charged with committing any crime, these unaccompanied minors may be held for months or even years, in punitive conditions alongside juvenile offenders pending

---

[1] U.S. Department of Justice, Immigration and Naturalization Service, INS Office of Juvenile Affairs Fact Sheet, 8/1/02.

[2] Ibid.

[3] Ibid. The U.S. Department of Justice reports that the top five countries are China, El Salvador, Guatemala, Honduras, and Mexico.

[4] Ibid. In 2001, 32 percent of unaccompanied children were held in a secure facility and 68 percent in a non-secure facility; in 2000, 35 percent were held in a secure facility and 65 percent in a non-secure facility; in 1999, 35 percent and 65 percent in non-secure facilities.

37.

SCANNED

resolution of their immigration status in administrative proceedings before an immigration court within the Executive Office of Immigration Review (EOIR).

The circumstances in which these children find themselves are complex and varied. Some may live in fear of persecution, civil unrest or human rights abuse in their home countries. Amnesty International has documented that around the world girls and boys are subjected to horrific violence and abuse. Children are tortured because they are caught up in wars and political conflict. Children are vulnerable to ill treatment by police and security forces, and are often detained in conditions that pose a threat to their health and safety. Many face being beaten or sexually abused by the very adults who are supposed to protect them.[5] Other children arriving in the U.S. may have been sent, willingly or otherwise, to secure what their parents or guardians perceive to be a better future in a more developed country. Irrespective of their immigration status, these children have special needs that must be met, needs and rights that are guaranteed under international laws and standards. According to the United Nations High Commissioner for Refugees (UNHCR), children seeking asylum, particularly if they are unaccompanied, are entitled to special care and protection.

Unaccompanied children in the U.S. immigration system are routinely deprived of their rights in contravention of international and U.S. standards. Children should be confined and imprisoned only in exceptional circumstances or as a last resort, and then only for the shortest possible time. Unaccompanied children arriving in the U.S. are not only detained but are often held in facilities that routinely fail to adhere to both international and U.S. standards governing the detention of children. AI has documented violations of rights essential to protection from arbitrary detention, including access to counsel, to translators, and to telephones. Violations of the right to humane treatment have also been documented: some children may be housed alongside juvenile offenders, denied access to appropriate education and exercise, and may be subjected to punitive and degrading treatment including the excessive use of shackles and restraints and routine strip searches.

Freedom from arbitrary detention is a fundamental human right. The system of determining whether a child should be held in a secure or non-secure facility and whether a child should remain in detention is fraught with difficulties and inconsistencies, and in some cases may amount to arbitrary detention. The decision to continue to detain a child may rest on factors such as whether a parent has appropriate immigration status in the United States, the availability of detention spaces, the attitude of the official involved, or an arbitrary and unreviewed decision that a child is a flight risk.

Unlike the criminal justice system, children deprived of their liberty in the immigration system are not guaranteed legal representation even though important rights are at stake; less than half of unaccompanied children have legal counsel to represent them in an immigration court. Unaccompanied children are a vulnerable population with complex needs; they are often confused and alone, yet U.S. immigration laws, practices, and procedures do not significantly distinguish children and adults. There is currently no system in place in the U.S. to ensure the appointment of a guardian ad litem ("friend of the child"), who in the absence of a traditional caregiver acts to ensure that all decisions are taken with a child's best interests in mind.

## 1.1 Scope and Sources of Research

---

[5] See also Amnesty International, Hidden Scandal, Secret Shame: Torture and Ill Treatment of Children, AI Index: ACT 40/38/00, 2000.

*38.*

Amnesty International (AI) has obtained information from a wide range of sources.  On December 10, 2002, a detailed questionnaire was sent nationwide to 115 facilities reportedly used by immigration authorities to house unaccompanied children, requesting comprehensive information on the policies, procedures, and conditions of detention.[6]  The questionnaire was designed to establish the level of compliance with international standards and U.S. detention standards relating to the unaccompanied children.  Fifty-five facilities responded to the questionnaire:[7]  33 returned a completed survey, 19 responded that they do not hold unaccompanied minors, and 3 indicated that they did not wish to participate in the survey.  Of those facilities responding to the survey, 23 were secure facilities and 10 were shelter facilities.

The organization also visited three detention facilities housing unaccompanied minors.  The facilities visited included secure and shelter detention centers used by U.S. immigration authorities to detain children and were located in the three designated immigration regions in the U.S. During these visits, delegates received extensive tours of the facilities and interviewed staff and thirty-one children.   An AI delegate also attended a master calendar hearing in the immigration court located at the Krome Detention Center in Miami, Florida.

September 5-6, 2002 – Berks County Youth Center (BCYC), Pennsylvania (Eastern Region) (shelter and secure facility), interviewed 14 children.
October 29-30, 2002 – Chicago INS Shelter Facility, Illinois (Central Region), interviewed 12 children.
November 5, 2002 – Gila County Juvenile Detention Center, Arizona (Western Region) (secure facility), interviewed 5 children.

AI appreciates that only a limited number of children were interviewed.  This was due in part not only to limited resources and time constraints but also to the fact that AI had to identify and provide the INS with the names of the children who were to be interviewed.  The practical implications of this restricted AI to facilities with an existing NGO or pro bono attorney presence that could assist the organization in identifying children.  This challenge also meant that AI only interviewed children with legal representation.  Nonetheless, AI has obtained information from a wide range of sources, suggesting that the problems reported are not simply anecdotal, but systemic in nature.

AI also met with the National Juvenile Coordinator, the Central and Western Regional Juvenile Coordinators and the District Juvenile Coordinators in Pennsylvania, Illinois, and Arizona.  A meeting with the Office of Refugee Resettlement took place in February 2003.

Additional sources included contacts with immigration attorneys and organizations working to assist unaccompanied minors, including the Women's Commission for Refugee Women and Children, the American Bar Association, Midwest Immigrant and Human Rights Center, Florence Immigrant and Refugee Rights Project, Florida Immigrant Advocacy Center, Lutheran Immigration and Refugee Services, Latham & Watkins, and Pennsylvania Immigration

---

[6] A follow-up letter was sent to all facilities again on 1/10/03, and telephone calls were also made to all facilities that failed to respond to AI's initial request to complete the survey.  AI sent the list of all facilities to the INS national Office of Juvenile Affairs (OJA) and requested confirmation that the list accurately reflected the facilities used by the INS to house unaccompanied children and that the OJA would provide any corrections and details of additional facilities that may not have been on the list. The OJA failed to respond to AI's written requests dated 1/21/03 and 1/30/03.

[7] AI did not send questionnaires to the facilities visited (Gila County Juvenile Detention Center, secure; Berks County Youth Center, secure and shelter unit; and a Chicago shelter). Since the issues in the questionnaire were covered during interviews at these four facilities, they are included in AI's survey.

3

39.



Resource Center. The organization has also reviewed a wide range of additional information and documentation, including the report by the Department of Justice (Office of Inspector General) on Unaccompanied Juveniles in INS Custody,[8] and has conducted a national survey of media reports.

AI has not included the names of many of the children or organizations that provided the organization with information to preserve privacy and confidentiality. AI has the names of these sources in its possession. On some occasions other identifying information has been excluded, for example, the date and location of interviews.

## 1.2 Recent Legislation: An Opportunity for Change?

R.D., age twelve, fled India to escape religious persecution. On arrival in the United States he applied for asylum. He has an uncle, a U.S. citizen, willing to sponsor his asylum, pending determination of his immigration status. However, he had been in detention over fifteen months when AI met with him. He told AI delegates that staff in the facility were strict and if children forgot to wear their name tags they would have to stand facing the wall. He said that children would get into trouble when, not understanding English, they failed to obey instructions. He told AI, *"It's been a long time.... I just want to get out of here."*

Recent legislation passed by the U.S. Congress means that there is now an opportunity to change the current system and the way that unaccompanied children in the United States are treated. The Immigration and Naturalization Service (INS) has ceased to exist, and the newly created Department of Homeland Security (DHS) has assumed many of its responsibilities. Furthermore, some critical functions relating to the care, custody, and treatment of unaccompanied children have now been assigned to the Office of Refugee Resettlement (ORR) within the Department of Health and Human Services. AI urges the U.S. government to build upon this opportunity and make a number of concrete reforms to protect this vulnerable population, as much still needs to be done to ensure compliance with international law and standards.

### 1.2.1 Department of Homeland Security (DHS) and the Office of Refugee Resettlement (ORR)



*Edwin Munoz, a 15-year-old unaccompanied child from Honduras testifying before the US Senate on 28 February 2002.*

For many years U.S. immigration authorities (the former INS) faced an inherent conflict of interest when it came to the treatment of unaccompanied minors. The INS was charged, until very recently, with providing custodial care to unaccompanied children while acting as the prosecutor seeking the child's removal from the United States. In effect, the former INS played the role of both caregiver and prosecutor: two clearly irreconcilable functions that resulted in many egregious actions that were

---

[8] Office of the Inspector General, Unaccompanied Juveniles in INS Custody, Report Number I-2001-009, September 28, 2001 (hereinafter cited as OIG, Unaccompanied Juveniles in INS Custody). Available at http://www.usdoj.gov/oig/i0109/exec.htm

40.

detrimental to the best interests of unaccompanied children.[9]

In November 2002, the U.S. Congress passed the Homeland Security Act (HSA 2002).[10] HSA 2002 represents the largest restructuring of the U.S. federal government in over fifty years. More than 170,000 employees and twenty-two existing federal agencies have been consolidated into a newly created Department of Homeland Security (DHS). The Act has a substantial impact on immigration and enforcement services since it dismantles the former functions of the INS into three separate bureaus and transfers them into the Department of Homeland Security. The three separate bureaus are the Bureau of Customs and Border Protection (BCBP), responsible for immigration and customs enforcement activities at the borders; the Bureau of Immigration and Customs Enforcement (BICE), responsible for immigration and customs investigation and enforcement within the United States;[11] and the Bureau of Citizenship and Immigration Services (BCIS), responsible for the administration of benefits and immigration services.[12]

The Homeland Security legislation also contained an important provision relating to unaccompanied minors. The responsibility for these children's care and custody was transferred from the (now abolished) INS to the Office of Refugee Resettlement (ORR) in the Department of Health and Human Services on March 1, 2003.[13] The Department of Homeland Security (through the newly created BCBP and BICE under the Directorate of Border and Transportation Security) has assumed the former INS immigration law enforcement functions related to unaccompanied minors in the United States, and the care, custody, and placement of unaccompanied children has been transferred to the Office of Refugee Resettlement, a separate agency within the Department of Health and Human Services that has a long history of dealing with the care and placement of refugee children. AI and many other organizations have long advocated that the responsibility for the care of unaccompanied children be transferred from INS to an agency that is not also seeking to remove the child from the country.[14]

Despite this important step in the right direction, it is the just the first step in a long journey that the U.S. government needs to undertake to ensure that unaccompanied children are treated in accordance with international law and U.S. standards. Although recent legislation radically restructures the system, it is too soon to say whether the overall effect for children will be positive. The change that took place on March 1, 2003, has not as yet directly affected this vulnerable population as they move through an immigration system that is arguably more complex. The ORR has inherited a network of facilities that the former INS used to house unaccompanied children. Many children still remain in those detention centers and jails

---

[9] See, e.g., Women's Commission for Refugee Women and Children, *Prison Guard or Parent: INS Treatment of Unaccompanied Refugee Children*, New York, May 2002

[10] Homeland Security Act of 2002, Pub. L. 107-296 (H.R. 5005), signed into law by President George W. Bush 11/25/02.

[11] BCBP and BICE fall under the Directorate of Border and Transportation Security (BTS) within the Department of Homeland Security and report to the Under Secretary for Border and Transportation Security, Asa Hutchinson. See Homeland Security Act of 2002, Pub. L. No. 107-296 (H.R. 5005), Title IV, Sec. 401 *et seq.* and Sec. 451 *et seq.*

[12] The Director of BCIS reports directly to the Deputy Secretary of the Department of Homeland Security, Gordon England. Both BICE and BCIS operate from the locations of the 33 INS District Offices and three Regional Offices. Interim Regional and District Directors for Interior Enforcement have been appointed as have Interim Regional and District Directors for BCIS.

[13] Homeland Security Act of 2002, Pub. L. No. 107–296 (H.R. 5005), Sec.462 (g)(2)(a–c).

[14] Including Human Rights Watch, Women's Commission for Refugee Women and Children, American Bar Association, Lutheran Immigration and Refugee Services, United States Conference of Catholic Bishops (USCCB), Senator Dianne Feinstein, Senator Edward M. Kennedy. The provisions relating to unaccompanied children that were included in the Homeland Security Act of 2002 were incorporated in part from a bill introduced by Senator Feinstein, Unaccompanied Alien Child Protection Act S.121. It should be noted that some important provisions contained in S.121 never made it into the HSA, see chapter 8 for more commentary.

41.

SCANNED

throughout the U.S.   Furthermore, unaccompanied children will continue to encounter immigration enforcement, now operated through the Department of Homeland Security. Children may still be shackled when they are taken to court, where they have to present their cases without a lawyer or an adult to guide them.

### 1.3 Amnesty International Report Summary

This report examines the problems with the previous system and highlights problems that remain ongoing despite legislative change.  An overview of international and U.S. standards is presented, as well as an overview of the existing detention system used to house unaccompanied children in the hope that lessons can be learned and immediate steps taken to remove children from facilities that are clearly inappropriate to their needs and fail to ensure they are treated humanely, with dignity and respect.  The report will also address a number of other concerns about the way the United States currently treats unaccompanied children, including release decisions and the critical need to receive assistance in the form of a lawyer and a guardian as the children navigate the U.S. immigration system.  It is hoped that this report will enable the U.S. government to learn from the shortfalls in the former INS system and work urgently to address the problems. Full recommendations are made at the end of this report.

## 2. BACKGROUND: U.S. AND INTERNATIONAL LAW

In this report, "child," "juvenile," and "youth" are used to describe people under the age of eighteen, in accordance with international legal standards and most countries in the world, which have set the legal age of majority or adulthood at eighteen.[15]  Most other non-governmental organizations (NGOs) and children's rights groups also use this definition. This chapter will present an overview of the circumstances in which children may flee their home countries, the international obligations to protect children, the legal framework currently in place in the U.S. that offers children at risk various forms of protection from being returned to their home countries, as well as an overview of the standards relevant to the detention of children.  As will be noted in subsequent chapters of this report, U.S. laws, policies, and practices frequently violate the fundamental rights of unaccompanied children, including those seeking asylum.

### 2.1 Unaccompanied Children

Malik is from Guinea in West Africa, and came to the United States at the age of sixteen seeking asylum because of persecution he and his family suffered in Guinea and the persecution and serious harm he will likely face should he be returned to Guinea. Malik's family was singled out for persecution in 1998 as part of a well-publicized incident in which the Guinean government destroyed several thousand homes and reportedly displaced 120,000 Guineans in particular areas of the country. Upon arrival at Dulles International Airport in Washington, D.C., the INS imprisoned him in an adult prison in Arlington, Virginia, and placed him in removal proceedings. He was then seemingly forgotten by the INS, remaining in detention for nine months before having his first hearing before an immigration judge after older inmates, feeling sorry for the boy, helped him write to an attorney to get help. Despite producing a birth certificate showing his age to be under eighteen, the INS refused to transfer him to a juvenile facility. The INS based its claim that he was not a juvenile on bone and X-ray evaluations, which have often been discredited by scientific studies. A psychological evaluation has further shown that Malik suffers

---

[15] For example, the Convention on the Rights of the Child applies to people under eighteen, "unless under the law applicable to the child, majority is attained earlier" (Article 1); the UN Rules for the Protection of Juveniles Deprived of Their Liberty apply to every person under eighteen.

6

42.

from moderate mental retardation. During his time in adult detention, he was reportedly abused by older inmates, and, on one occasion, beaten and pepper-sprayed by guards. According to his lawyers, these incidents have made Malik become even more fearful, confused, and depressed. Malik still remains in detention over two years since his initial detention.[16]

The unaccompanied children who arrive in the U.S. are not only alone but frequently are traumatized by what they have experienced. It is estimated that around half of the world's refugee population are children, yet their rights and special protection needs as children are often neglected.[17]  Refugees typically flee from their homes because they are in danger of being killed, raped, abducted, imprisoned, or tortured, often leaving behind everything they have. Unaccompanied children reportedly represent an estimated 2 to 5 percent of the refugee children population and will have often suffered from similar forms of abuse in the context of wars and gross human rights violations.[18] They may have lost their families to conflict, human rights abuses, or the chaos of displacement, and sometimes their families send them away to escape such violence. Certain human rights violations inflicted on children may be age-specific, such as recruitment as child soldiers, child prostitution, child labor, slavery, trafficking, or abuses as street children. Unaccompanied children are in a particularly vulnerable position by being at risk not only as refugees but also as children, separated from their parents or other caregivers. Their experience of flight frequently adds to their hardships and emotional trauma; flight leaves children susceptible to violence, to disruption of community and social structures, and to a shortage of basic resources, all of which affect their physical and psychological development. For some unaccompanied children, their families are the source of abuse; they have been forced to flee because they have been severely abused, abandoned, or neglected. Other children may be fleeing primarily for economic reasons.  Often children flee a combination of adverse circumstances reinforced by poverty.

Regardless of their reasons for flight, their mode of arrival or country of origin, children who arrive alone in the U.S. are a population in need of care that is sensitive to their age, previous experiences, culture, and displacement. All children have fundamental human rights, including the right to due process and to be treated humanely. Concerns raised in this report apply to all unaccompanied children in immigration detention; however, children seeking asylum require particular consideration.

## 2.2 International Law and Standards

The international community has adopted minimum standards to govern the conduct of states. These are based on the precept that human rights are an international responsibility, not simply internal matters. International human rights standards articulate the criteria against which the conduct of any state—including the U.S.—should be measured. The human rights of children are specified in a number of international treaties and other instruments.

Regardless of age, according to Article 14 of the Universal Declaration of Human Rights, everyone has the right to seek and enjoy asylum if they are forced to flee their country to escape persecution. The UN Convention relating to the Status of Refugees (Refugee Convention, 1951)

---

[16] Amnesty International. Refugee Action, 3/29/02. Materials made available to AI from the law firm of Latham & Watkins, 3/19/02. Latham & Watkins works on children's immigration detention issues as a comprehensive national pro bono project. The firm is also counsel to the Women's Commission for Refugee Women and Children and co-counsel to the Center for Human Rights and Constitutional Law on the *Flores v. Reno* class action settlement.
[17] UNIICR. *Statistical Yearbook 2001*. 2002.
[18] UNHCR. *Refugee Protection: A Guide to International Refugee Law*. 1991.

7

SCANNED

provides that no one should be returned to a country where he or she would be at risk of serious human rights abuses. The U.S. accepts this principle and was one of the main architects of the international system of refugee protection.[19] Yet U.S. authorities violate the fundamental human rights of asylum-seekers, including children seeking asylum, as will be shown in this report.[20]

Article 31 of the Refugee Convention provides that states should not penalize refugees who enter the country illegally, having come directly from a territory where their life or freedom was threatened, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence. Article 31 further provides a presumption against detention in that it requires that states do not restrict the movements of refugees "other than those which are necessary." The U.S. acceded to the 1967 Protocol to the 1951 UN Convention Relating to the Status of Refugees (the Refugee Convention), by which it undertook to apply Articles 2 to 34 of the Refugee Convention in 1968. The U.S. is a member of UNHCR's Executive Committee (EXCOM), an intergovernmental body of more than 50 states. EXCOM's conclusions are adopted by consensus and are regarded as authoritative in the field of refugee rights. EXCOM has stated that the detention of asylum-seekers should normally be avoided.[21] Detention is allowed by international standards on a strictly limited basis[22] and the onus is on the detaining authorities to demonstrate why other measures short of detention are not sufficient. Detention is allowed by international standards only if necessary, and if it is lawful and not arbitrary, and if it is for one of the following reasons:

(i)   to verify identify;[23]
(ii)  to determine the elements on which the claim to refugee status or asylum is based;[24]
(iii) to deal with cases where refugees or asylum-seekers have destroyed their travel or identity documents or how have used fraudulent documents in order to mislead the authorities of the State in which they intend to claim asylum;[25]
(iv)  to protect national security or public order.[26]

Moreover, even if an asylum-seeker is detained legitimately, detention should not continue for longer than is necessary. For example, detention "to verify identity" or "to determine the elements on which the claim to refugee status or asylum is based" should be permitted only until a preliminary interview can be carried out. In most cases, this should not

---

[19] In 1980 Congress amended the Immigration and Nationality Act, which governs immigration and refugee issues, to bring it into line with the 1967 Protocol. However, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) significantly revised the Immigration and Nationality Act.

[20] See also Amnesty International USA, *Lost in the Labyrinth: Detention of Asylum Seekers*, July 1999.

[21] EXCOM Conclusion 44.

[22] EXCOM Conclusion 44(b)

[23] This relates to cases where identity may be undetermined or in dispute

[24] This means that the asylum-seeker may be detained exclusively for the purposes of a preliminary interview to identify the basis of the asylum claim. This would involve obtaining essential facts from the asylum-seeker as to why asylum is being sought and would not extend to a determination of the merits or otherwise of the claim. This exception to the general principle cannot be used to justify detention for the entire status determination procedure, or for an unlimited period.

[25] What must be established is the absence of good faith on the part of the applicant to comply with the verification of identity process. In regard to asylum-seekers using fraudulent documents or traveling with no documents at all, detention is only permissible when there is an intention to mislead, or a refusal to cooperate with the authorities. Asylum-seekers who arrive without documentation because they are unable to obtain papers in their country of origin should not be detained solely for that reason.

[26] This relates to cases where there is evidence that the asylum-seeker has criminal antecedents and/or affiliations that are likely to pose a risk to public order or national security should he or she be allowed entry.

44.

require more than one or two days.[27] The 1999 UNHCR Guidelines on Applicable Criteria and standards relating to the Detention of Asylum Seekers (see below) are based on the general principle that asylum-seekers should not be detained. It is UNHCR's policy that refugee children should not be detained.[28] The Refugee Convention, EXCOM Conclusions, and the UNCHR Guidelines provide ample basis for arguing that asylum-seekers should not be detained and that detention is an exceptional measure, subject to severe limitations.

Freedom from arbitrary arrest or detention is a fundamental human right and is enshrined in Articles 3 and 9 of the 1948 Universal Declaration of Human Rights. Subsequent international standards, notably the International Covenant on Civil and Political Rights (ICCPR), recognize that the right to liberty is linked to freedom from arbitrary detention.[29] The ICCPR is the principal international treaty setting out fundamental civil and political rights. The U.S. ratified the ICCPR in 1992, but it reserved the right to refrain from implementing certain provisions or to restrict their application.[30] The U.S. did not, however, make a reservation to Article 9, which is of particular importance to children in immigration detention, and provides:

- Article 9.1 Everyone has the right to liberty and security of the person. No one shall be subject to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedures as are established by law.
- Article 9.4 Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.

The Human Rights Committee, the expert body that monitors the implementation of the ICCPR, made clear in its General Comment on Article 9 that it applies to immigration control. The Committee has defined arbitrariness as not merely being against the law but as including elements of inappropriateness, injustice, and lack of predictability.

The detention of asylum-seekers in the U.S. should be assessed on the basis of decision of the Human Rights Committee in *A v. Australia*.[31] The Human Rights Committee determined that the detention of a Cambodian asylum-seeker for over four years was arbitrary. The Committee noted that the detention policy of Australia was not per se arbitrary within the meaning of Article 9(1) of the ICCPR, but the Committee set limits on the power of a state. In particular, the Committee found that "remand in custody could be considered arbitrary if it is not necessary in all the circumstances of the case, for example, to prevent flight or interference with evidence: the element of proportionality becomes relevant in the context."[32] Furthermore, the Committee found that detention should be reviewed periodically so that the grounds justifying detention can be assessed.[33] The Committee determined that a state party may not justify indefinite and prolonged detention on the grounds that an asylum-seeker entered the country

---

[27] A letter from UNHCR (signed by Ghassan Aranout, Division of Refugee Law and Doctrine) to the European Consultation on Refugees and Exiles of 1/8/87 states that this criterion "means that a person may, if necessary, be detained to undergo a preliminary interview   It does not justify the detention of a person for the entire duration of a prolonged asylum procedure."
[28] UNHCR, Refugee Children: Guidelines on Protection and Care, 1994, Chapter 7, Section IV. "Detention."
[29] ICCPR, Article 9.
[30] The U.S. has declared that it will apply the ICCPR only to the extent that domestic law allows, effectively rendering this international treaty meaningless as a means of strengthening human rights protection in the U.S. In addition, the U S has not signed the First Optional Protocol to the ICCPR which allows individuals to bring complaints against a government for a violation of rights guaranteed by the ICCPR.
[31] CCPR/C/59/D/560/1993, 4/30/97.
[32] Ibid. at par. 9.2.
[33] Ibid. at par. 9.4

45.

SCANNED

unlawfully, and that there would be a perceived incentive for the asylum-seeker to abscond *if left in liberty.* The form of review must be "in its effects, real and not merely formal."[34]

Protection in international law against arbitrary detention is particularly strong in relation to children. The Working Group on Arbitrary Detention has stated that unaccompanied minors should never be detained.[35] The Convention on the Rights of the Child permits detention of a child only "in conformity with the law [...] as a measure of last resort and for the shortest appropriate period of time."[36] The obligations include that every child "deprived of liberty shall be treated with humanity and respect for the inherent dignity of the human person, and in a manner which takes into account the needs of persons of his or her age."[37] Children, like adults, also have the explicit right to prompt legal assistance and to challenge the legality of their detention before a court or other independent and impartial authority.[38] Various international standards stipulate that if detention is necessary, this should be demonstrated by means of a prompt and fair individual hearing before a judicial or similar authority.[39]

International law and standards provide that all persons who are arrested or detained should be informed immediately of the reasons for the detention and notified of their rights, including the right of prompt access to and assistance of a lawyer; the right to communicate and receive visits; the right to inform family members of the detention and place of confinement; and the right of foreign nationals to contact their embassy or an international organization. These rights are contained, *inter alia,* under Article 9 of the ICCPR, the UN Body of Principles for the Protection of All Persons Under Any Form of Detention or Imprisonment, adopted by consensus by the UN General Assembly in 1988. UNHCR Guidelines provide that unaccompanied children should receive legal representation and, in the absence of a traditional caregiver, should be appointed a guardian.

The ICCPR also includes the right not to be subjected to torture or cruel, inhuman, and degrading treatment or punishment (Article 7), and requires that anyone deprived of their liberty must be treated with humanity, and that unconvicted persons should be segregated from convicted persons (Article 10). Furthermore, the U.S. ratified the UN Convention Against Torture in 1994. This treaty requires states to prohibit and punish torture in law and in practice. States must investigate whenever reasonable grounds exist to believe that torture, or cruel, inhuman, or degrading treatment has been committed, and must bring those responsible to justice.

Children are entitled to even higher levels of protection: international standards guarantee children protection from all forms of violence, whatever the reason, whoever the perpetrator. The CRC is the most important treaty for the protection of the human rights of children and illustrates how international standards have been developed with specific reference to children. It is the only human rights treaty to come close to achieving universal ratification.[40] It has been ratified by every country in the world except the collapsed state of Somalia (which has had no government

---

[34] Ibid. at par. 9.5.
[35] See Working Group on Arbitrary Detention, *Report on the Visit of the Working Group to the United Kingdom on the Issue of Immigrants and Asylum-Seekers,* E/CN.4/1999/63/Add.3, 12/18/98.
[36] CRC, Article 37 (b).
[37] CRC, Article 37 (c).
[38] CRC, Article 37 (d).
[39] ICCPR, Article 14; Body of Principles for the Protection of all Persons Under Any Form of Detention or Imprisonment, Principle 11.
[40] Such widespread support confirms that there is a consensus possible in regard to the protection of children and their rights. Enunciating and confirming children's rights is no more than a first step; work must also be to ensure that these rights are implemented. The CRC may be the most widely ratified human rights treaty in the world, but it is still a long way from universal acceptance to universal observance.

46.

since 1991) and the U.S. Although the U.S. has failed to ratify the CRC, it signed the Convention in February 1995. As a signatory, the U.S. is obliged under international law to refrain from acts that would defeat the object and purpose of the treaty.[41]  Thus, although the CRC is not formally binding upon the U.S., its provisions still carry significant weight. The CRC represents an international consensus on child rights, and therefore cannot be completely disregarded by the U.S.[42] Accordingly, AI considers that the treaty provides a proper basis for the examination of laws, policies, and practices of U.S. authorities.

The notion of special childhood rights derives from the universal recognition that children, by reason of their physical and emotional immaturity, are dependent on their family and community and, more broadly, on adult structures of political and economic power to safeguard their well-being. Article 19 of the CRC obliges state parties to protect children from "all forms of physical or mental violence, injury, or abuse, including sexual abuse, while in the care of parent(s), legal guardian(s), or any other person who has the care of the child." AI holds that the state's responsibility to take effective steps to protect children from all forms of violence extends to domestic violence amounting to torture or ill treatment. Children are entitled to adult protection, but they are not adult property: children also have the right to make decisions on their own behalf in accordance with their maturity.  Children have the right to be heard and to have their own opinions on matters affecting them taken into account "in accordance with the age and maturity of the child."  One of the guiding principles in the CRC is that the "best interests of the child" should be a primary consideration in all decisions and procedures related to the child.

In addition to the provisions of international law, many human rights requirements are contained in non-treaty standards adopted by consensus by the international community. These have the authoritative value and persuasive force of their adoption by political bodies such as the UN General Assembly, even through they do not technically have the legal power of treaties, except insofar as they reflect customary international law. These include, but are not limited to, the UN Standard Minimum Rules for the Treatment of Prisoners; the UN Standard Minimum Rules for the Administration of Juvenile Justice (commonly called the "Beijing Rules"); the UN Body of Principles for the Protection of All Persons Under Any Form of Detention or Imprisonment (Body of Principles); and the UN Rules for the Protection of Juveniles Deprived of Their Liberty. The UNHCR has also issued a set of authoritative guidelines on issues pertaining to the detention and treatment of asylum-seekers, which are referred to throughout this report: the 1999 UNHCR Guidelines on Applicable Criteria and Standards Relating to the Detention of Asylum Seekers; the 1994 UNHCR Refugee Children: Guidelines on Protection and Care; and the 1997 UNHCR Guidelines on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum.

## 2.3 Overview of U.S. Immigration System: Forms of Relief Available to Unaccompanied Children

When immigration enforcement officials take an unaccompanied child into custody they must notify the child that he or she has a right to a hearing before an immigration judge who will determine if the child will be allowed to remain in the United States.[43]  These adversarial hearings

---

[41] Vienna Convention on the Law of Treaties, Article 18, 1980.

[42] The CRC has been ratified by all but two countries; it was adopted unanimously by the UN General Assembly after a long process, with a large number of countries actively involved; the importance of the Convention as a guide for work on behalf of children was underlined by 71 Heads of State/Government plus observers at the World Summit for Children  See also UNICEF. http://www.unicef.org/crc/process.htm.

[43] Although all juveniles are entitled to a hearing, many decline that right and elect to voluntarily return to their country of origin.

47.

are known as "removal proceedings" and are initiated by immigration enforcement authorities (formerly the INS, now BICE) seeking to remove the child from the U.S. Thousands of children are placed into removal proceedings every year, including all unaccompanied children who arrive at the U.S. border without appropriate documentation (a reality for many asylum-seekers).[44] The Executive Office of Immigration Review (EOIR) within the Department of Justice (DOJ) has exclusive jurisdiction over the cases of individuals placed in removal proceedings.

Children must then seek asylum or other forms of relief such as a "defense against removal" from the U.S. under the Convention Against Torture. Children may also be eligible to remain in the U.S. if they apply and qualify for other avenues of relief, including Special Immigrant Juvenile (SIJ) status, if they have been abused, abandoned, or neglected, or if they are victims of trafficking and certain serious crimes.[45] During removal hearings, an immigration judge considers any claim for relief from removal that the juvenile may put forward. If a judge denies relief from removal, the child may be allowed to leave the U.S. voluntarily, or he or she may be ordered removed from the country.[46] As will be noted, the basis of making such claims are complex and difficult to present without the assistance of a lawyer trained in immigration law. (See chapter 7 for a discussion about lack of legal representation and immigration removal proceedings.) The following represents some of the claims that children are entitled to seek under U.S. law to avoid removal (deportation) to their home countries.

### 2.3.1 Asylum

> *"Deportation is a harsh measure; it is all the more replete with danger when an alien makes a claim that he or she will be subject to persecution if forced to return to his or her home country."*
> - U.S. Supreme Court, *INS v. Cardoza-Fonseca*[47]

To qualify for political asylum, a child must, like any other applicant, establish that he or she meets the definition of refugee contained in article 1A(2) of the Refugee Convention, as codified by U.S. domestic law.[48] U.S. law defines a refugee as a person who is unable or unwilling to return to his or her country of origin or last habitual residence because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. A child must thus prove that he or she has been persecuted in the past or has a well-founded fear of being persecuted in the future and that the persecution is on account of one of the five enumerated grounds. The child must also show that

---

[44] Children placed in removal proceedings include those who arrive at U.S. borders without documents or proper documents, as well as those who are apprehended in the U.S. by immigration authorities for being "out of status," including those who entered the country without inspection by the INS or have have overstayed their visas.

[45] Certain forms of relief are not within the jurisdiction of immigration judges. Some forms of relief are within the EOIR's exclusive jurisdiction, others are coterminous with the DHS, and still more lie within the exclusive jurisdiction of the DHS. See Christopher Nugent and Steven Shulman, *Giving Voice to the Vulnerable: On Representing Detained Immigrant and Refugee Children*, Interpreter Releases, 10/8/01

[46] A right exists to appeal to the Board of Immigration Appeals.

[47] *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987). However, the Court has also made clear that immigration proceedings are purely civil actions to determine eligibility to remain in the U.S. These are not criminal actions, and as such, an alien facing removal is not accorded the same level of protection as that given to a defendant in a U.S. criminal trial.

[48] Refugee Convention, Article 1A(2), defines a refugee as a person who "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the persecution of that country; or who, not having a nationality and being outside the country of his former habitual residence [as a result of such events] is unable or owing to such fear, is unwilling to return to it." Codified in U.S. law at Immigration and Nationality Act, Sec. 101(a)(42).

48.

the persecution feared is either at the hands of the government or of an agent that the government is unable or unwilling to control.

For some children, the fact that they are children may be central to their claim. For example, human rights violations inflicted on children may be age-specific, such as recruitment as child soldiers or abuses as street children. In other cases, abuses and behaviors that may not qualify as persecution when targeted at adults may amount to a well-founded fear of persecution when applied to children. The child-centered and rights-based approach contained in the UN Convention on the Rights of the Child (1989) should inform the application of the concept of persecution to children. The current adult-centered approach to asylum claims, however, often fails adequately to address these situations, just as the male-centered approach to asylum neglected the specific gender-related claims of women asylum applicants. Specific regulations related to gender-related asylum claims were developed and these are still under consideration by the U.S. attorney general.[49] AI recommends that regulations be developed in order to deal with children's asylum claims or that the Guidelines for Children's Asylum Claims (see 2.3.2 below) be formalized into regulations and therefore made binding.

### 2.3.2 Guidelines for Children's Asylum Claims

In 1998, the INS adopted guidelines for asylum officers to use in adjudicating children's claims.[50] Known as the Guidelines for Children's Asylum Claims, these establish legal, evidentiary, and procedural standards with relevance to child applicants for asylum that include credibility determinations, presence of a trusted adult during all interviews, and "child-sensitive" questioning and listening. They draw heavily on international law and standards, including the Universal Declaration of Human Rights and the UN Convention on the Rights of the Child.

The Guidelines were a critical step toward compliance with international standards. However, they have a number of limitations. For example, they are nonbinding, they fail to ensure that the "best interests" of the child are paramount, and are only used when determining certain children's claims, namely, children who make what is known as an "affirmative" application for asylum. In order to make an affirmative application of asylum a child must be already be in the U.S. (either with or without legal immigration status) and then present him or herself to the immigration authorities and request asylum. (The Guidelines do not apply to children who have been arrested by the immigration enforcement authorities and placed in removal proceedings.)[51] In such cases INS Asylum Officers are then responsible for an initial nonadversarial adjudication of the child's asylum claim aided by the Guidelines. Asylum officers will now be based in the Bureau of Citizenship and Immigration Services.

Many children, however, have to present their cases in immigration court "removal" proceedings before immigration judges who are not required to follow the Guidelines in their

---

[49] Former Attorney General Janet Reno issued proposed regulations clarifying that victims of domestic violence and other gender-related persecution are eligible for asylum  AI strongly supported the proposed regulations, but final regulations were never issued. There are currently concerns that Attorney General John Ashcroft plans to issue new regulations that would reverse current policy and drastically reduce the scope of claims based on gender-related persecution. This would be in conflict with recent UNHCR guidelines on gender-related persecution.

[50] The U.S. is only the second country in the world to establish a framework for the consideration of children's asylum claims. Canada has also established guidelines.

[51] Children who may have entered the U.S. without inspection by the immigration authorities or who may have overstayed a visa can also apply under the affirmative procedure, provided they file such an application voluntarily and not after being apprehended by enforcement officials for being out of status.

49.

decision making.[52]  Children who arrive without appropriate documentation at a U.S. border are placed in removal proceedings.  AI calls upon the EOIR[53] to adopt the Guidelines for use in immigration courts adjudicating children's claims for relief from removal from the U.S. All immigration officers and personnel within the Department of Homeland Security who come into contact with children should receive special training on the special needs and circumstances of child asylum-seekers.[54]

### 2.3.3 Additional Forms of Relief for Children at Risk

U.S. law provides additional forms of relief for unaccompanied children who may be at risk if they were to be returned to their home countries.

### Special Immigrant Juvenile Status

Isau, age fifteen, fled Honduras and came to the United States reportedly to escape severe abuse at the hands of his stepfather and persecution by government death squads and youth gangs. His stepfather reportedly beat him with pieces of wood, rods, and a machete handle and burned him with various hot objects. His mother would allegedly disappear for months, leaving Isau at the mercy of his stepfather. Isau finally fled his stepfather's home and began living on the streets where he faced harassment from the authorities and gangs. The INS apprehended Isau upon his arrival in the U.S. and has denied him access to juvenile court, which could determine whether he was abused, abandoned, or neglected and eligible for long-term foster care; a finding that potentially would allow him to remain in the U.S. Isau has been in detention for over two years.[55]

Children who have been the victims of abuse, abandonment, or neglect may be eligible to obtain relief from removal from the U.S. under the provisions of what is known as a Special Immigrant Juvenile (SIJ) status.[56]  Children who have been victims of domestic violence or suffered abuses as street children may be eligible for SIJ status.[57]

In order to pursue this avenue of relief, children must apply to a U.S. juvenile court for a finding that they are eligible for long-term foster care because they have been abused, abandoned, or neglected and that it is not in the child's best interests to be returned to his or her home country.  If the court makes such a finding, the child can then present an SIJ status application to the immigration authorities (formerly the INS, now DHS). If granted, the child will receive lawful permanent residence.  Before taking these steps to secure SIJ status, however, the child must receive "consent." In 1997, Congress amended the SIJ provision and made it a requirement that before a child is allowed to go into juvenile court, the child must obtain the "express consent" of

---

[52] Michael F. Rahill, *What Child Is This?: How Immigration Courts Respond to Unaccompanied Minors*, Office of the Chief Immigration Judge, Institute for Court Management, Court Executive Development Program, Phase III Project, May 2000.

[53] The Homeland Security Act of 2002 recognizes the Executive Office of Immigration Review (EOIR) as an agency under the Department of Justice (DOJ) rather than transferring it to the Department of Homeland Security.

[54] Some immigration officers who encounter unaccompanied children at the border, airports, or within the U.S., have not been trained in the rights of children and their special circumstances as outlined in the Guidelines.

[55] Women's Commission for Women and Children Refugees, May 2002; AI interview with Isau, BCYC, September 2002, and attorney correspondence, April 2003.

[56] Immigration and Nationality Act (INA), Sec. 101(a) (27) (J).  Eligibility results in lawful permanent residence.

[57] Many children who apply for asylum may also be eligible for SIJ status, and attorneys representing children will frequently pursue simultaneously both forms of relief.

the INS.[58] Thereafter, INS district directors, with little or no child welfare expertise, were required to grant consent if entering into such proceedings would be in the "best interests" of the child.[59] Many advocates have reported that the INS hindered or prevented many children seeking access to this form of relief by denying or delaying decisions regarding consent. The determination on the veracity of a juvenile's claim of abuse rests with a juvenile state court. The INS, however, exercised considerable authority over a child's ability to seek this form of relief. Often decisions were arbitrary, depending on which district in the U.S. the application for consent was made. For example, it was reported that until October 2002 the INS in Florida had never given consent for a child to go to juvenile court. The written decisions denying consent reportedly often accused the children of fraud and demonstrated an inherent distrust of children in custody.[60] AI believes that any children who may be eligible for relief should be given an opportunity to present such a claim before an independent tribunal for consideration. Delays have resulted in children spending considerable periods of time in detention; for example, decisions regarding consent have taken as long as ten months while the child remains in detention.[61]

Furthermore, it appears that the requirement to obtain consent only applies to children in "actual or constructive" custody (children detained by the immigration authorities). The former INS did not appear to take the position that a child is in constructive custody if the child was once in INS custody but had since been released to a relative or guardian.[62] AI believes that this may have a discriminatory effect on children in detention because it presents a further hurdle to overcome in order to obtain relief. Further, the issue of whether consent is actually required before a child can pursue this avenue should be reexamined.

It is understood that the ORR will provide such consent in the future. AI recommends that any decisions regarding "consent" for children to pursue SIJ relief should be made only by individuals with child welfare expertise and experience. All decisions must be made expeditiously and AI recommends that the ORR be required to respond to any requests made within a defined and strictly limited time frame.

### Trafficked/Abused Children

> *"When a child's life or liberty or innocence is taken, it is a terrible, terrible loss. And those responsible have committed a terrible crime. Our society has a duty, has a solemn duty, to shield children from exploitation and danger.... Our first duty as adults is to create an environment in which children can grow and thrive without fearing for their security. That's what we've got to do. Because children are so vulnerable, they need the care of adults. Because they're so vulnerable, those who are cruel and predatory often target our children....*
> *Each year about a million girls and boys are trafficked for commercial sexual exploitation and forced labor. Such trafficking is nothing less than a modern form of slavery, an*

---

[58] The actual requirement is that the consent of the U S. attorney general must be obtained; however, the authority to provide consent was delegated to the INS and is now understood to be part of the ORR's functions since they now have custody of unaccompanied children. See also Immigration and Nationality Act, Sec. 101 (a)(27)(J), 1990, and the Homeland Security Act of 2002.

[59] See Thomas E. Cook, Acting Assistant Commissioner, Adjudications Division, Immigration and Naturalization Service, Memorandum of 7/9/99.

[60] FIAC, *"I running out of hopely "* *Profiles of Children in INS Detention in Florida*, Miami, October 2002. Pg 4.

[61] Ibid.

[62] See Pamela Kemp Parker, *The Road to Permanent Resident Status for Undocumented Foster Children—Special Immigrant Juvenile Status*, ABA Child Law Practice 21(6), August 2002; and Immigrant Legal Resource Center, *Special Immigrant Juvenile Status for Children Under Juvenile Court Jurisdiction*, Sec. 1.9, May 2001.

15

*51.*

SCANNED

> *unspeakable and unforgivable crime against the most vulnerable members of the global society. All these dangers put children at risk. All these dangers demand action to protect our children from harm. "*
> - President George W. Bush, Remarks at White House Conference on Missing, Exploited, and Runaway Children, Ronald Reagan Building, Washington, D.C., October 2002

A fifteen-year-old Chinese girl was smuggled into the U.S. by boat. Her parents sent her from China because she was denied education and medical care as the third-born child. The INS took the girl to the Donald E. Long Juvenile Detention Center in Portland where she had difficulties communicating; she was forced to wear the same gray uniform as the juvenile offenders and was handcuffed when she was taken to immigration court. Although a U.S. citizen uncle was willing to take care of her, she spent over seven months in detention before being released into foster care.[63]

U.S. immigration law also provides an additional form of relief for unaccompanied children who are the victims of trafficking and/or child abuse. The Victims of Trafficking and Violence Protection Act (2000) provides two forms of protection.[64]   Victims of severe forms of trafficking may be eligible for a "T" visa if they can demonstrate that they would suffer unusual or severe harm if they were removed from the United States. Victims of a range of criminal acts who have suffered substantial physical or mental abuse because of that criminal activity may be eligible for a "U" visa, if they help and cooperate in a criminal investigation.[65] Victims of domestic abuse and victims of trafficking, including children, may therefore be eligible for these additional forms of protection.

The INS does not track the types of relief from removal sought by children in its custody. Many children are not necessarily even aware that they may pursue asylum or special immigrant juvenile status or that relief is available for victims of trafficking and abuse.  It is therefore impossible to know how many children in detention in the U.S. are seeking asylum and/or other forms of relief.  All children should have an opportunity to be properly advised of all potential avenues of relief, and no child should be removed from the U.S. without an opportunity to participate fully in his or her claim as it is properly assessed before an immigration judge.

### 2.4 Overview of U.S. Framework for the Care of Unaccompanied Children (*Flores*)

*Flores et al. v. Janet Reno* is a class action lawsuit that was filed against the former INS in 1985. It challenged several aspects of former INS policy dealing with unaccompanied children in the custody of immigration authorities and resulted in a settlement agreement. The *Flores* agreement sets out nationwide policy for the detention and release and treatment of children in immigration custody.[66]

*Flores* is based on the premise that immigration authorities must treat children in their custody with "dignity, respect, and special concern for their vulnerability as minors."  The detailed agreement became effective in February 1997 and placed essentially three specific

---

[63] Julie Sullivan, *Chinese Girl Waits in Portland Jail for Months Despite Getting Asylum*, The Oregonian, 12/10/99. This child was granted asylum.
[64] Victims of Trafficking and Violence Protection Act of 2000, Pub. L. no 106-396, 114 Stat. 1464.
[65] Children under fifteen are exempted from this provision.  Victims of Trafficking and Violence Protection Act of 2000, Sec. 107(e)(1)(C)(III)(bb).
[66] Stipulated Settlement Agreement, *Flores v. Reno*, Case No. CV85-4544-RJK (C.D. Cal. 1996). (Hereinafter cited as *Flores.)*

52.

obligations on the former INS to: (1) ensure the prompt release of children from immigration detention; (2) place children for whom release is pending, or for whom no release option is available, in the "least restrictive" setting appropriate to the age and special needs of minors; and (3) implement standards relating to care and treatment of children in U.S. immigration detention. *Flores* stipulates various requirements relating to standards of treatment, including transportation arrangements, access to legal representation, telephones, health care, counseling, education, recreation, and religious services.[67]

*Flores* requires that the detailed provisions in the settlement be incorporated into a regulation in order to ensure a legal framework to guide the treatment of unaccompanied children. The former INS failed to promulgate regulations and the *Flores* settlement was set to expire in early 2002. The expiration of the *Flores* settlement had potential serious consequences, as it would have eliminated the existence of any legal framework to guide the treatment of unaccompanied children. In December 2001 the settlement agreement was extended by stipulation with the INS until 45 days after the adoption of final regulations incorporating its substantive provisions.[68] It is important that the *Flores* settlement now be incorporated into a regulation as soon as practicable. Care must be taken to ensure that the regulation includes all the guarantees provided for in the settlement agreement. In 2000, the DOJ developed fairly comprehensive detention standards for adults in immigration detention: the ORR should ensure that some of the more detailed adult standards—for example, those which provide for improved access to legal counsel—be incorporated into the regulations.[69] AI also calls for any such regulation to incorporate all guarantees afforded to unaccompanied children under international law and standards. The *Flores* settlement agreement governing the treatment of children will continue to apply to ORR as an "agreement" or "pending civil action." (See chapter 8.)

The former INS has been criticized for failing to comply with the provisions of *Flores*. The Office of the Inspector General (OIG), in the Department of Justice, concluded that while the former INS had made progress, "deficiencies in the handling of juveniles continue to exist in some INS districts, border patrol sectors and headquarters that could have potentially serious consequences for the well-being of the juveniles."

Together with the previously mentioned international standards, the *Flores* agreement provides a fundamental legal framework to measure U.S. compliance with regard to the treatment of unaccompanied children. The following chapters contain the findings from AI's survey of facilities used to house unaccompanied children and measures compliance with this framework, demonstrating that these problems continue.

## 3. UNACCOMPANIED CHILDREN AND THE U.S. DETENTION SYSTEM

The number of unaccompanied children taken into custody by U.S. immigration authorities has more than doubled in the last five years, from 2,375 in 1997 to 5,385 in 2001. On any given day it is estimated that 500 children are held in U.S. immigration detention. Children may spend months or even years in detention deprived of their liberty pending resolution of their immigration status in the U.S.

---

[67] *Flores*, Exhibit 1, Minimum Standards for Licensed Programs; and Exhibit 2, Instructions to Service Officers Re: Processing, Treatment, and Placement of Minors.

[68] *Flores v Ashcroft*, 85-4544-RJK (C.D.Cal), Stipulation and Order, Kelleher, J., 12/1/01.

[69] These standards provide for improved conditions of confinement including, for example, the requirement that free telephone calls can be made to secure legal representation. The detention standards for adults do not apply to children in immigration detention and have not been incorporated into a regulation.

The former INS developed a national network of contracted facilities to house unaccompanied children once they had been placed in removal proceedings. These facilities are categorized as either non-secure (juvenile shelter care facilities, group homes, and foster homes) or secure (secure or medium-secure juvenile detention facilities).[70] With only limited exceptions, children must be placed in non-secure settings. However, the INS overused secure detention and failed to place many children in the "least restrictive setting required by *Flores*."[71] Decisions on where to detain a child (placement decisions) were often arbitrary and inconsistent, with little consideration for what is in the best interests of the child

## 3.1 "Non-Secure" Detention

Immigration authorities contract with various nonprofit agencies to operate shelter care facilities specifically designed for children in immigration proceedings. There are currently eleven shelter care facilities, with a combined capacity of 369 beds, located in California, Texas, Georgia, Arizona, Florida, and Illinois. Additional shelter bed spaces are available through service agreements with county facilities, which primarily house non-delinquent youth in the custody of local authorities. Together with foster placements, immigration authorities have almost 500 non-secure placements available at any given time.[72]

### 3.1.1 Shelter Care

Shelter care facilities typically offer an environment of "soft" detention. The INS reportedly described "non-secure" facilities as those "without security fences or security hardware or other major construction typically associated with correctional facilities."[73] Children sleep in dormitory-like rooms with other children, or occasionally in private rooms, are not required to wear uniforms, and may sometimes be taken off the facility premises by staff to participate in sport events or go on educational trips. Staff closely monitors activities and the location of the children, and doors to the facilities are typically alarmed, camera security is used, and facilities are in some cases also fenced in.

Some advocates reported concerns that staff employed at INS-contracted shelter facilities often play conflicting roles with children in their care. Because the caseworkers at the shelters are typically the only adults to spend time with children in custody, the children often rely on them for support and may confide sensitive information to them relating to the disposition of their immigration cases. It has been reported that some of the confidential information relating to children's cases was shared with the former INS.

Furthermore, some shelters are characterized by procedures that correspond more in nature to the secure detention of juvenile offenders:

---

[70] The former INS used three types of contracts to secure juvenile bed space: (1) Cooperative Agreements with private for-profit and nonprofit agencies; (2) Intergovernmental Service Agreements with local government entities; and (3) Purchase Orders, used to handle "emergencies or special circumstances." The facilities that AI surveyed included all three types of contract.

[71] *Flores*, Exhibit 2(b).

[72] See Stuart Anderson, Executive Associate Commissioner, U.S. Immigration and Naturalization Service, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.

[73] U S Department of Justice Community Relations Service, *Alien Minors Shelter Care Program, Program Guidelines and Requirements*, p. 6. According to a 1/28/97 Human Rights Watch interview with INS Detention and Deportation Officer Elizabeth Herskovitz, this document was developed in 1995 to be given to all potential contracting agencies.

SCANNED

- **Berks County Youth Center (BCYC), Pennsylvania**: The proximity of the secure unit to the shelter unit and the sharing of staff between the units at this facility appeared to undermine the differences between these types of detention. John Pogash, the National Juvenile Coordinator, accompanied AI delegates on a tour of the facility and told AI that he believes that BCYC is one of the best in the country: "This is why we like Berks—if there is no way to control them, then they are placed in secure." Several of the children that AI spoke to in this shelter facility described it as being in "jail." Officials at BCYC told AI that only two or three children a year are transferred from the shelter facility to the secure unit, and one official commented that he could not remember when there was last a child who had been transferred from the shelter unit to "secure". Nevertheless, two of the children that AI interviewed at the facility had very recently been in secure detention for five weeks each; one had just returned to the shelter unit, the other had been back for about a month. [74]

### 3.1.2 Foster Care

Immigration authorities contract on a limited basis for foster care placements, offering approximately thirty-six spaces nationwide. [75] Two national voluntary agencies, the Lutheran Immigration and Refugee Service (LIRS) and the U.S. Conference of Catholic Bishops (USCCB) have provided services to unaccompanied minors who have been identified as being eligible for resettlement in the U.S., and, on a limited basis, to children who have been granted asylum, including those in foster care placements. The organizations assess that there is a far wider availability of foster care settings and point out that foster care ($55 per day) is much cheaper than detention ($200 per day). Nevertheless, they placed only 16 children in foster care in 2001. [76] The INS cited security concerns and the likelihood of the children absconding as reasons for not placing more children in foster care. However, LIRS and USCCB have reported that, in their experience, children do not abscond if appropriate services are in place to ensure that they are safe and cared for. The organizations have also criticized the INS for not following any set criteria or guidelines for determining whether a child should be placed in foster care and often do so on an ad hoc basis, usually following lengthy detention. [77] AI believes the former INS did not fully utilize foster care as an option for housing unaccompanied immigrant children. AI urges the ORR to develop the use of this appropriate form of housing for unaccompanied children and welcomes initial reports from the agency that this is under way.

### 3.1.3 Hotels

AI is also concerned by reports that some children may be detained in hotels. [78] Advocates in Florida say that the average stay in a hotel used by the immigration authorities is three weeks to a month; however, in some cases individuals have been held there much longer. [79] Hotels do not

---

[74] AI interviews, BCYC, September 2002.

[75] Office of Inspector General, *Unaccompanied Juveniles in INS Custody*, Report no. I-2001-009, 9/28/01. There are currently 15 refugee foster care programs in the following communities: Phoenix, AZ; Washington, D.C.; Boston, MA; Grand Rapids, MI; Lansing, MI; Jackson, MS; Fargo, ND; Philadelphia, PA; Richmond, VA; Seattle, WA; Tacoma, WA, Rochester, NY; and Syracuse, NY. Source: LIRS, http://www.lirs.org/InfoRes/faq/fostercare.htm.

[76] Julianne Duncan, Director of Children's Services for Migration and Refugee Services, U.S. Conference of Catholic Bishops, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 28 February 2002.

[77] Ibid.

[78] It appears that a number of the children held in hotels are not unaccompanied but may be placed there with family members. AI raises these concerns to highlight the treatment of children who are housed in such inappropriate conditions, regardless of whether they may be with their guardians.

[79] In one example, an Iranian mother and son were detained for more than six months.

*55.*

offer the kind of amenities and services appropriate for detaining children for long periods, such as the opportunity for exercise, recreation, and education, due to their provisional and temporary nature. The children may sometimes live in almost complete isolation in such locations, and many are not able to leave their rooms or go outside at all during their time in a hotel. Advocates have reported that children are often cold because they cannot control the air conditioning in their rooms, and a number of children have gone for days without a change of clothes or underwear. It has been reported that, until recently, advocates were unable to bring games or toys for the children, which were classified as "contraband" in at least one case.[80] Children housed in hotels may also find it difficult to access legal assistance.[81]

## 3.2 Secure Detention



Despite the requirements of *Flores* that emphasize release or placement in either shelter or foster care, the INS relied heavily on secure facilities to house children. Furthermore, many children often spend time in secure facilities prior to their placement in non-secure facilities or their release, which can take up to five days or in some cases even longer.[82]

### 3.2.1 Holding Cells

Several children AI interviewed were held for days in holding cells after they were arrested. Although holding cells are temporary by nature, AI is concerned at the inadequate and inappropriate conditions under which children may be held in such locations.[83] Many children reported stark facilities and inadequate services available—several reported that they were not given enough food to eat and were held in cold and dirty cells with thin and filthy mattresses and blankets. Others reported that there were adults in the same facility. One child reported sleeping on the concrete floor with three other children in a small cell.

*"Danny" arrived to the US from China at age 15. He is seen at the Colquitt County Jail in Moultrie, Georgia.*

- A.B. is a sixteen-year-old from Honduras. She was apprehended in Texas in August 2002 and was placed in a holding cell in Nuevo Laredo for two days, where she reported the blankets were very dirty. She slept on a thin mattress and a very hard cement bed. A.B. went two days without bathing; she was frightened and crying in the room.

---

[80] *The Gatekeeper: Watch on the INS, Kids in Captivity*, Village Voice, 3/5/02. Leonia, a fifteen-year-old girl housed in a hotel was reportedly not provided with a change of clothing for the nearly three months she was there.

[81] FIAC reported that the INS has not responded to its request to be informed of any children placed at the hotel so that FIAC can determine whether they need legal representation. To the organization's knowledge, no one detained at the hotel is given a list of free service providers. This is provided to them at their first court hearing instead. The organization also reported difficulties in arranging visits at the hotel to provide the children with legal assistance. AI interview with FIAC, 12/18/02.

[82] The Juvenile Protocol Manual (JPM) requires that children be placed in appropriate facilities within three days if apprehended in a district with a licensed program that has space, or otherwise five days afterward (Sec. 4.1.3). The INS was successful in timely placement for 90 percent of juveniles in 2000. It took between four and 333 days to place the remaining 358 juveniles   Delays regarding questioning a child's age are reported to account for 52 percent of overdue placements. Border patrol apprehended 2,073 of 3,664 total unaccompanied juveniles apprehended in 2000 and is responsible for the majority of actual or possible overdue placements. See also OIG, Unaccompanied Juveniles in INS Custody, 2001.

[83] The largest proportion of juveniles the immigration authorities encounter are of Mexican origin. Mexican juveniles are typically detained in temporary holding cells and are returned voluntarily within 24 hours. Only children detained for over 72 hours are included in the statistics kept by immigration authorities on unaccompanied children.

56.

During their time in holding cells, children report feelings of confusion and fear. Often they report that no one explained to them what was happening, why they were under arrest, or what their rights were. Some reported that they were not given the opportunity to make a phone call or speak to an attorney.[84] Whether the initial holding cells are to be run by the Bureau of Customs and Border Protection (BCBP), BICE, or ORR, U.S. authorities must ensure that children are guaranteed their rights under international law, including the right to be informed of the reason for their detention, prompt access to legal counsel, and humane treatment.

### 3.2.2 Juvenile Jails

After being transferred from holding cells, approximately one-third of children in the custody of immigration authorities spend time in secure facilities that are designed for the incarceration of youthful offenders for periods ranging from a few days to several months.[85] INS statistics indicate that a large majority of unaccompanied children (approximately 80 percent) housed in secure facilities are non-delinquent.[86]

Immigration authorities can only place children in an INS-contracted facility or a county or state juvenile detention center in limited circumstances—provided that the child is housed separately from the ordinary population of that facility. Although *Flores* requires that children be housed in the "least restrictive setting," it defines limited exceptions to this general rule that include:

- Cases of emergency or an influx of children;
- Children who are believed or who have been found to be criminal or delinquent;
- Children who present a risk to their own safety or that of others;
- Children whom the immigration authorities have deemed to be escape risks; and
- Those whom immigration authorities believe to be over the age of eighteen.

Many organizations and service providers nationwide have expressed concern that secure detention has consistently been overused.[87] This may be representative of the INS's primary goal of law enforcement combined with a fundamental lack of child-care expertise that results in an overly restrictive interpretation of *Flores* and the inappropriate placing of children in secure detention.

### *"Emergency Influx"*

---

[84] *Flores* requires that juveniles must be held in safe and sanitary facilities. They must be informed of their right to be represented by an attorney, be provided with a list of free legal service providers, given access to toilets and sinks, drinking water, food, and medical assistance. See *Flores*, Procedures and Temporary Placement Following Arrest, Paragraph 12A.

[85] In 1999, 35 percent (1,958) were held in secure facilities. In 2000, 35 percent were housed in secure. In 2001, 32 percent were held in secure  See U.S. Department of Justice, Immigration and Naturalization Service, INS Office of Juvenile Affairs Fact Sheet, 8/01/02. See also OIG, Unaccompanied Juveniles in INS Custody, 2001

[86] In 2000, non-delinquent children accounted for 1,569 out of 1,933 instances of secure detention (81 percent). In 2001, more than 80 percent of the nearly 2,000 children detained in secure facilities were non-delinquent juveniles. See OIG, Unaccompanied Juveniles in INS Custody, 2001, and testimony of Andrew Morton, attorney, Latham & Watkins, before the U S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02

[87] Wendy Young, director of Government Relations and U.S. Programs, Women's Commission on Refugee Women and Children, testimony before the U S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02; National Center for Youth Law, attorneys from Lawyers Committee for Human Rights, AI interviews, April 2002 and January 2003.

SCANNED

According to the INS, "emergency influx" was the basis for holding the majority of children in secure detention for more than seventy-two hours.[88]  *Flores* defines an emergency "influx" of children into the U.S. as more than 131 children in need of non-secure bed space. At the time the *Flores* agreement was reached, the INS had only 131 spaces available; however, the agency presently has almost 500 shelter (non-secure) bed spaces.[89]  As there are now approximately 500 children in immigration detention at any given time, the INS was technically always above the influx threshold of 131 children.   AI believes that the constant and high state of influx, which according to the INS has characterized every year, voids the use of the term as a description of an exception to the norm. Rather, immigration authorities must ensure that existing non-secure bed spaces are fully utilized and undertake an assessment of the actual numbers of unaccompanied children in need of non-secure bed space, and revise their capacity accordingly. The inappropriate and apparent unnecessary use of this exception as a justification for placing children in secure detention is of concern to AI.

### *"Safety of Child or Others"*

Some children are transferred to secure facilities because of alleged misbehavior in a shelter facility.  *Flores* provides that a child may be transferred if he or she has engaged in conduct that "has proven to be unacceptably disruptive to the functioning" of the facility and is necessary to "ensure the welfare of the minors or others."  The staff at the facility makes the determination and decision as to what level of behavior warrants being transferred into secure detention; such decisions may be arbitrary.  Furthermore, placing a child in secure for their own safety should be a decision made in accordance with the mental and physical condition of the child and is therefore a matter to be determined by a medical professional.

- **BCYC, Secure Unit, Pennsylvania**: INS officials informed AI delegates that a child would be placed in the secure unit only if he or she was violent and a danger to him or herself or to others.[90] However, AI received reports indicating that children may be transferred to secure detention for relatively minor incidents.
  - Isau Flores-Portillo was reportedly housed in the secure unit from June 20 to August 1, 2002, after which he was placed back in the shelter unit. The incident that prompted the transfer reportedly was that he translated an argument between two other children, culminating with one child putting his arm around the other to calm him down. Staff placed the boys in secure detention, although no physical harm was alleged.[91]
  - A boy reportedly reached over the table and tapped another boy on the head. This led to nineteen days in secure detention.[92]

AI is concerned that in some instances children with behavioral problems linked to mental health issues as well as children with suicidal tendencies are placed in secure facilities.[93] For example:
- A fourteen-year-old Honduran girl was taken into custody.  The form completed by Border patrol indicated that she was suicidal.  She was initially placed in a shelter facility

---

[88] In FY 2000, 41 percent of children held in secure detention were recorded by the INS to be there because of an "influx." See OIG, Unaccompanied Juveniles in INS Custody, 2001.
[89] Stuart Anderson, Executive Associate Commissioner, U.S. Immigration and Naturalization Service, testimony before the U S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.
[90] AI interview with BCYC, 9/2/02.
[91] Ibid., 9/5/02
[92] AI interview with advocacy group, August 2002.
[93] AI interview with INS officials, Chicago, 10/30/02.

*58.*

in Texas where she was medically screened; the documentation completed during the screening again included a statement that she was suicidal. Within a day she was determined to be a behavior problem and the regional juvenile coordinator approved her transfer to the Liberty County Juvenile Center secure facility.[94]

*"Escape Risk"*

Children may often be determined to be "escape risks" in order to justify secure detention, without an individual assessment of whether the child is indeed a flight risk. One child told AI, "A staff member here said she'd heard me say I was going to run away and that's why I was sent here [to secure detention], but I won't run away because I know that I have a strong claim for asylum so why would I run away?"[95] Children are also reportedly routinely transferred to secure detention if they have requested voluntary removal (deportation) or if their case has been decided and relief denied. Under Flores, "escape risk" is defined as meaning a serious risk that the minor will attempt to escape from custody.[96] Although the agreement's list of factors to be considered in this respect include whether a minor is under a final order of removal, a blanket policy may not be appropriate. AI urges the ORR to ensure that an individual assessment of each case is properly undertaken and that an automatic determination is not made that a child is an "escape risk" in these circumstances, particularly since many children may be appealing the decision denying them relief. An immigration judge should review any determination that a child is an "escape risk."

- **Gila County, Arizona**: All of the children AI spoke to at this facility had asked for voluntarily departure, including a fourteen-year-old child, who was clearly upset at being in the restrictive setting. Several of the children begged AI to help them get home sooner, asking if delegates knew anything more about the date when they might be sent back.

Administrative delays, insufficient staffing, including lack of personnel to transport children to shelter facilities, also reportedly contribute to children being inappropriately housed in secure facilities. According to child advocates, the psychological and emotional effects on a child of secure detention can be devastating.[97] AI has found that children in secure detention face significant hardship, some of which violate their right to access attorneys and family assistance. They are at a far greater risk of being shackled, strip-searched, or subject to physical or verbal abuse. AI believes that every effort must be made to end the practice of placing children in settings which are clearly inappropriate to meet the needs of unaccompanied children.

## 3.3 Commingling with Juvenile Offenders

AI is deeply concerned by reports that unaccompanied children in secure detention are frequently housed with juvenile offenders.[98] The organization's findings have confirmed that this is an ongoing and serious problem. Only four out of 23 (or 17 percent) secure facilities

---

[94] It was also reported that there was no indication that she was psychologically evaluated at Liberty County or received any kind of professional counseling. OIG, Unaccompanied Juveniles in INS Custody. 2001.

[95] AI interview, fall 2002.

[96] *Flores*, par. 22.

[97] Julianne Duncan, director of Children's Services for Migration and Refugee Services, U.S. Conference of Catholic Bishops, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.

[98] AI is concerned that unaccompanied children, including asylum-seekers, appear to be routinely housed alongside criminal detainees. This has been a general concern for several years, not only in the context of children, but also for adult INS detainees See, among others, Amnesty International, *Lost in the Labyrinth*, 1999; OIG, Unaccompanied Juveniles in INS Custody, 2001; Wendy Young, director of Government Relations and U.S. Programs, Women's Commission on Refugee Women and Children, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02

59.

responding to AI's survey reported that they housed unaccompanied children separately from the juvenile offender population. Eleven (48 percent of those responding) secure facilities reported that they house unaccompanied minors in the same cells as the juvenile offenders.

This practice is in direct contravention of both *Flores* and international standards. *Flores* stipulates that unaccompanied children must be housed separately from the delinquent population in secure facilities.[99] The ICCPR and the UN Standard Minimum Rules for the Treatment of Prisoners requires that untried prisoners should be kept separate from convicted prisoners and afforded treatment appropriate to their unconvicted status.[100]

Children are reportedly held with youth who have committed serious crimes. Staff appear to disregard the requirement that children not be housed alongside youthful offenders.

- **BCYC, Pennsylvania:** Staff told AI that the juvenile offenders in the secure unit were "rapists, drug smugglers, car-jackers—that kind of thing."[101]

According to advocates, immigration authorities appear to provide little information regarding individual children to the juvenile detention centers, making it extremely difficult for the facility to distinguish any special needs an unaccompanied child may have. Facility staff are often unaware of the reason for a child's detention. They have no idea whether the children are just undocumented or if they have been adjudicated as delinquent.[102] This suggests a lack of training of facility staff, as stipulated under the *Flores* requirements. Children in the custody of immigration authorities most often become indistinguishable from the general population by being forced to wear prison uniforms (all the secure facilities responding to AI's questionnaire require the children to wear uniforms), by sharing living space with the general population, and being subjected to the same rules and regulations. Facility administrators at the San Diego Juvenile Hall and the D. E. Long Juvenile Detention Center in California have stated that the INS provides only the most rudimentary information about the children who are transferred to the facility.[103]

- **San Diego Juvenile Hall, California:** Edwin Muñoz was just thirteen when he arrived in the U.S. and reportedly had no record of delinquency or any criminal offense. He was held in a commingled facility, where he was locked in his cell for approximately 18 hours a day, allowed out only a few hours a day for classes and twice a day for 20 minutes in a fenced-in area for exercise. The children had to walk silently with their hands crossed to avoid punishment. He reports that both guards and other inmates mistreated him. Edwin reported that the guards would break up fights using pepper spray, which would also sting the eyes of the children not involved in the fight. He was sprayed twice, making his eyes sting, and reports fearing he would go blind. Edwin reported losing weight and having frequent nightmares in which the guards and other boys were going to kill him. *"I cried a lot in the cell wondering why everything was turning out so bad for me in the United States and if I would ever be free."*[104]

AI is concerned by reports that children are at risk, including the risk of physical abuse, when housed with juvenile offenders. Failure to take reasonable steps to ensure the safety of

---

[99] *Flores*, par. 12 and Exhibit 2(c).
[100] ICCPR, Article 10, Rule 85 of the UN Standard Minimum Rules, and Principle 8 of the Body of Principles.
[101] AI interview with INS and county officials, BCYC, 9/6/02.
[102] Wendy Young, director of Government Relations and U.S. Programs, Women's Commission on Refugee Women and Children, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.
[103] Women's Commission for Women and Children Refugees, May 2002.
[104] Edwin Larios Munoz, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.

detainees is a violation of U.S. law and international standards.[105] *Flores* stipulates that the INS must make every effort to ensure that the staff satisfactorily provides for the safety and well-being of the minors detained.[106] Three facilities responding to AI's survey admitted there had been an incident in their facility between unaccompanied children and other detainees. Many of the children AI spoke to reported being physically assaulted by and constantly afraid of the juvenile offenders. For example:

- **Gila County, Arizona:** Two years ago, the facility reportedly ceased the practice of housing unaccompanied children in cells with juvenile offenders but continued to commingle during recreation, meals, and classes. E.F., a fourteen-year-old boy, told AI that he was often picked on by older juvenile offenders, and said he was scared of the U.S. juveniles. G.K., age fifteen, told AI that he'd been picked on by a youthful offender, who pushed him. An officer saw the incident, and although it was clear G.K. was not at fault, he was taken to the warden in handcuffs and shackles. Since September 2002, only unaccompanied girls are commingled with female juvenile offenders, following a serious physical altercation between juvenile offenders and INS detainees.[107]

Some facilities reportedly house unaccompanied minors in solitary confinement or in conditions amounting to solitary confinement in order to separate these children from the youthful offenders in the facility.[108]

- **Martin Hall Juvenile Detention Facility, Washington:** Children at this facility had previously been commingled with juvenile offenders.[109] In an interview with an attorney representing children at this facility, AI was told that children are now separated from the juvenile offenders by placement in solitary confinement, without access to education, recreation, or exercise. Spanish-speaking children do not have reading materials in their language. The children get so depressed that the attorney at times has requested that they be commingled despite the fact that her clients are constantly harassed and bullied by the delinquent population, and are often beaten up or get into fights. *"It was very hard on them—they were melancholy, not talking, looking miserable—had no spirit and were consistently down..... How can a kid spend five, six months in solitary?"*[110]

Although this problem has been reported on for many years, some high-level immigration officials fail to acknowledge the problem. More recently, the DOJ's Office of Inspector General (OIG) report, Unaccompanied Juveniles in INS Custody, found that 34 secure detention facilities could not guarantee segregation from juvenile offenders. AI spoke with the Central Regional Juvenile Coordinator, and she assured delegates that all INS children in her region are separated from juvenile offenders. She stated that even those housed in juvenile detention centers are "separated completely."[111] According to the responses received by AI to the questionnaire sent to facilities housing unaccompanied children, commingling takes place in all regions. Furthermore,

---

[105] *Flores*, Sec. V: Procedures and Temporary Placement Following Arrest, and *Flores*, Exhibit 2, UNHCR Guidelines on Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers, 1999, chap. 7, sec. 4. (Hereinafter referred to as the UNHCR Guidelines on Detention of Asylum Seekers, 1999).

[106] *Flores*, Exhibit 2(c).

[107] AI interviews at Gila County, 11/5/02. Since there are fewer unaccompanied girls, they have to continue to be housed in this manner. See section 4.10 of this report.

[108] This may be in contravention of the UN Rules for the Protection of Juveniles Deprived of their Liberty, Rule 67, which stipulates: *"All disciplinary measures constituting cruel, inhuman or degrading treatment shall be strictly prohibited, including corporal punishment, placement in a dark cell, closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned."*

[109] OIG, Unaccompanied Juveniles in INS Custody, 2001; Women's Commission for Women and Children Refugees, May 2002.

[110] AI telephone interview with Atieno Odhiambo, attorney with Columbia Legal Services, 1/24/03.

[111] AI interview with Maribell Loeches, Central Regional Juvenile Coordinator, Chicago, 10/30/02.

61.

14 out of 16 children (88 percent) who had been housed in secure facilities told AI that they had been commingled—four of these in Texas, falling under the jurisdiction of the Central Region.[112] Another official suggested that it may be better to house non-delinquent INS detainees as criminals, because you "don't know what they have done on the streets."[113]

The ORR must ensure that any child placed in a secure facility is separated at all times from juvenile offenders and that all facilities are aware of the requirement to do so pursuant to the *Flores* agreement.

### 3.4 Children Housed with Adults: Age-Determination Techniques

> *"Every child deprived of liberty shall be separated from adults unless it is considered in the child's best interest not to do so."*
> - The Convention on the Rights of the Child, Article 37(c)

AI has found that children may be housed alongside criminal adult suspects or inmates due to questionable age-determination techniques and in some instances may even find themselves housed with adults, even though the INS recognizes them as children. This violates one of the most basic requirements regarding detained juveniles under international law and standards, which demands that they be kept separate from adults.[114]

One reported incident was that of Alfredo Lopez Sanchez, a Guatemalan child, who was abruptly removed from a youth facility, Boystown, to the Monroe County adult jail in Key West, Florida, in November 2001. Allegedly, he was transferred because INS determined him to be a flight risk, even though a federal court judge later found that he presented no risk of flight.[115] His attorney in Miami was given no advance notice of the transfer. He was housed there for 15 days, before he was transferred again-this time to the children's shelter facility, BCYC, in Pennsylvania.[116]

When immigration authorities question the age of a child, children are subjected to an age-determination technique that involves dental or wrist bone X rays. Immigration authorities in the U.S. overemphasize the accuracy of these methods and demonstrate on occasion an unwillingness to consider other evidence of age. Scientific studies have suggested that a prudent margin of error be three years; however, such margins seem rarely if ever to be taken into consideration. Dental and bone examinations were never intended to be used for determining the exact age of a child and the precision of these tests has been drawn into question by several studies.[117]   The UNHCR Guidelines for Refugee Children suggest that authorities use caution

---

[112] AI interviews, BCYC, Chicago, and Gila County, Fall 2002.

[113] AI interview with Thomas Baranick, Director of Detention and Deportation, Phoenix, Gila County, 11/5/02.

[114] ICCPR, Art. 10(2)(b), stipulates: *"Juvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status."* This basic requirement is also contained in the UN Rules for the Protection of Juveniles Deprived of Their Liberty, Article 29; the Standard Minimum Rules for the Treatment of Prisoners, Article 8; and in the CRC, Article 37(c).

[115] District Judge Federico Moreno, Lopez-Sanchez v. Ashcroft (02-20421-CIV-MORENO), 3/7/02.

[116] AI interview with FIAC, 6/11/03.

[117] The INS relies on radiographic standards from the Greulich-Pyle Atlas, the authors of which expressly conclude that the Atlas cannot, and is not intended to, provide a means of assessing chronological age. William W. Greulich and S. I. Pyle, *Radiographic Atlas of Skeletal Development of the Hand and Wrist,* Stanford University Press, California, 1959, p. 41. According to one expert, *"There is absolute unanimity in the scientific literature that it is impossible to exactly determine a patient's chronological age from dental radiographs."* (Affidavit of Dr. Herbert F. Frommer, New York, 1/28/02. Furthermore, the Royal College of Radiologists advised its members in the U.K. in a 1998 letter *"it is*

62.

SCANNED

when relying on these methods, noting that the procedures can only estimate age. The guidelines recommend that authorities allow for margins of error.[118] Illustrating the difficulty of using dental and wrist bone exams as indications of age, the INS in some cases oscillated between classifying a youth as a juvenile or as an adult, reversing decisions on age several times. Such situations place much stress on the individuals in question.

- Mekabou Fofana, an ethnic Mandingo from Liberia, was reportedly just shy of sixteen when he arrived at JFK International Airport in July 1999. He was held at various adult facilities, despite his and his family's assertions that he was a minor, because of INS claims, made on the basis of a dental examination, that he was over eighteen. He was first taken to the Wackenhut detention center in Queens, New York, and then moved to a criminal detention facility, Lehigh County Prison. At Senate hearings in May 2001, he testified, *"I was the youngest one among them and was very scared that the criminal detainees would hurt me. My cell mate had killed someone and would tell me about the crimes he had done. I was so afraid that I couldn't sleep at night."* He was then transferred to York County Prison, another remote detention facility in Pennsylvania, where he was detained for about five months. He says about the experience: *"I felt like my life was finished. I was too young to be there."* Mekabou was detained as an adult for one and a half years before being granted asylum by the Board of Immigration Appeals.[119]

- AB is a slight sixteen-year-old girl from Honduras. She was taken to San Antonio in leg irons and handcuffs and was given a dental exam in the hospital. Reportedly, the immigration officer said to her: *"You'd better be a child—if you're an adult, not even your family will be able to save you."* [120]

International guidelines recommend that an individual should be afforded the benefit of the doubt in cases where the exact age is uncertain.[121] This is particularly important since a faulty age determination may put children in danger of having their rights violated. AI has previously voiced concerns that children imprisoned with adults are vulnerable to abuse, including sexual abuse and physical assault, and furthermore often do not have access to age-appropriate services and resources.[122] Faulty age-determination procedures may result in unaccompanied minors being placed in expedited removal proceedings—contrary to policy generally exempting minors from this process.[123] Individuals are returned to their home countries without appearing before an immigration judge under the expedited removal process. AI has previously expressed concern about this procedure because individuals seeking asylum may be returned to a country where they

---

*inappropriate to undertake a radiographic examination at the request of an immigration official, or the like, for the purposes of bone age estimation."* See also discussion in Wendy Young and Jacqueline Bhabha, *Not Adults in Miniature: Unaccompanied Child Asylum Seekers and the New U.S. Guidelines*, International Journal of Refugee Law 11, no. 1 (1999): 91–92 and Alan Elsner, *New York Dentists Can Settle the Fate of Migrants*, and *Harsh Fate Can Await Young Refugees in U.S.*, Reuters, 2001.

[118] UNHCR, Refugee Children: Guidelines on Protection and Care (hereinafter referred to as the UNHCR Guidelines for Refugee Children), 1994, chap. 8, "Legal Status, Unaccompanied Children."

[119] Mekabou Fofana, testimony before the U.S. Senate Committee on the Judiciary, Immigration Subcommittee, 5/3/01; Lawyers Committee for Human Rights, *Is This America? The Denial of Due Process to Asylum-Seekers in the United States*, October 2000; and Women's Commission on Refugee Women and Children, May 2002.

[120] AI interview, Fall 2002

[121] UNHCR, Guidelines for Refugee Children, 1994, chap. 8, "Legal Status, Unaccompanied Children, Determining Age": *"When the exact age is uncertain, the child should be given the benefit of the doubt."*

[122] Amnesty International, *Betraying the Young. Human Rights Violations against Children in the U S Justice System*, AI Index: AMR 51/60/98, November 1998.

[123] Wendy Young and Jacqueline Bhabha, *Not Adults in Miniature: Unaccompanied Child Asylum-seekers and the New U S. Guidelines*, International Journal of Refugee Law 11, no. 1 (1999).

63.

SCANNED

are at risk for serious human rights abuses.[124] AI recommends that when release is not an option that the ORR work with the DHS to designate a shelter facility or group home setting to house those individuals for whom age cannot be determined conclusively.

### 3.5 Challenging Placement in a Secure Facility

The *Flores* agreement provides the opportunity to challenge the placement of a child in a secure setting in federal court. Placement decisions are rarely reviewed, however, because children without attorneys are not usually capable of filing such applications. AI is also concerned that this is compounded by the failure of immigration authorities to inform the children of their right to seek judicial review in any U.S. District Court to challenge their placement.[125] *Flores* requires the INS to give children in secure facilities written notice of the reasons they have been placed there and an explanation of the right to judicial review.[126] Only 35 percent of all secure facilities responding to AI's questionnaire reported that they provide any kind of explanation to the children. Furthermore, only five out of 16 children interviewed by AI who had been housed in secure facilities reported that they had been given either such a written statement or a verbal explanation of this right.[127]

AI believes that because many children face barriers in pursuing their right to judicial review of their placement in secure facilities (and issues regarding conditions that violate *Flores*) the ORR should develop a system to address children's grievances and complaints. For example, the INS Detention Standards developed for adults in immigration detention provides for a detainee grievance procedure.[128]

## 4. CONDITIONS OF DETENTION

> *"The staff should learn how to respect and treat me like a human being."*
> - C.D., asylum-seeker, Guinea, age sixteen
>
> *"As a child welfare expert with knowledge of the foster care and juvenile justice systems, I find it shocking to see how children in INS custody are treated."*
> - Julianne Duncan, Director of Children's Services for Migration and Refugee Services, U.S. Conference of Catholic Bishops, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 28 February 2002
>
> *"Every child deprived of liberty shall be treated with humanity and respect for the inherent dignity of the human person, and in a manner that takes into account the needs of persons of his or her age."*
> - CRC, Art. 37(c)[129]
>
> *"In all actions concerning children ... the best interests of the child shall be a primary consideration."*
> - CRC, Art. 3(1)

---

[124] See also Amnesty International, *Lost in the Labyrinth*, 1999.
[125] *Flores*, Paragraph 24(c).
[126] *Flores*, Paragraph 24(d).
[127] AI interviews with BCYC, Chicago and Gila County, fall 2002.
[128] Christopher Nugent, *"The INS Detention Standards: Facilitating Legal Representation and Humane Conditions of Confinement for Immigration Detainees,"* Immigration Current Awareness Newsletter, published by National Immigration Project of National Lawyers Guild, 3 February 2003.
[129] See also ICCPR, Article 10(1), "All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of human persons."

64.

SCANNED

All children deprived of their liberty have the right to be protected from cruel, inhuman, and degrading treatment or punishment and have the right to be treated with dignity and respect. Some unaccompanied minors housed in facilities used by the former INS, particularly those minors in secure detention, are held in conditions that violate international standards.[130] Many violations also contravene the requirements of *Flores* regarding standards of detention conditions for unaccompanied children. It is a matter of concern that of those facilities responding to AI's survey, only four out of the 23 secure facilities and only four shelter facilities responded that their staff are trained in *Flores*. One facility requested more information, and another stated that the question was "not applicable" to their facility.

### 4.1 Excessive Discipline

> *"The rules mean they can throw people around."*
> - J.D., describing the physical abuse he suffered while in the secure facility at BCYC
>
> *"No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."*
> - International Covenant on Civil and Political Rights, Art. 7; UDHR, Art. 5; CRC, Art.37

While AI delegates during the two days of their visit at the shelter facility in Chicago found a friendly environment and seemingly appropriate disciplinary techniques,[131] some facilities housing unaccompanied children do not appear to treat the children in accordance with a basic respect for human dignity and humanity or take into account their age and special situations as required by international and national standards.[132] The level of rules and restrictions placed on many unaccompanied children in detention, even in shelter facilities, raises questions about their suitability for housing children. AI is aware of the multiple demands placed on staff and the administration of such centers; however, the organization believes it is essential that the children be treated according to their special needs.

- **BCYC, Secure Unit, Pennsylvania:** J.D. reported to AI that the rules were very strict and hard to follow. He alleges that he was required to do 200 push-ups because he did not pick up a napkin. He told AI that he was not able to continue after he had completed 150 push-ups and was made to sit at a table with his hands over his head all day. He reportedly was not allowed to speak during this time. The incident reportedly took place at breakfast, which meant he had to sit with his hands over his head for 10 hours.
- **BCYC, Shelter Unit, Pennsylvania:** Children told AI delegates of a punitive atmosphere where even small infractions of the rules may result in being made to stand or sit in the hallway, facing the wall for prolonged periods of time. Children are not allowed

---

[130] Among others, the prolonged use of solitary confinement, and excessive use of force in violation of Principle 6 and 7 of the UN Body of Principles; routine use of restraints, in violation of the UN Rules for the Protection of Juveniles Deprived of their Liberty, Art. 64; failure to provide mental health care in emergency situations, in contravention of the UN Rules for the Protection of Juveniles Deprived of their Liberty, Art. 51; and the UN Standard Minimum Rules for the Treatment of Prisoners, Art. 22; and lack of exercise and fresh air required by the UN Rules for the Protection of Juveniles Deprived of their Liberty, 1990, Art. 47.

[131] This was also confirmed by all AI interviews with the children at the Chicago facility.

[132] The ICCPR, Article 10 (1) states: *"All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of human persons."* The CRC echoes this: *"Every child deprived of liberty shall be treated with humanity and respect for the inherent dignity of the human person, and in a manner which takes into account the needs of persons of his or her age."* CRC, Art. 37(c). Article 3(3) of the CRC requires that states ensure that institutions and facilities responsible for the care of children shall conform to the standards established by competent authorities, particularly in the number and suitability of their staff. *Flores* also stipulates that children should be held in facilities that are consistent with concerns for the particular vulnerability of minors. *Flores*, Exhibit 2(c).

65.

to take a drink of water, talk out of turn, or go to the toilet without permission and are punished if they do. Children reported that they must watch the news for one hour a day, regardless of whether they understand what is going on. If they talk or do not wish to watch it, they are put in the hallway on a chair facing the wall.

It is a basic human right enshrined in international standards and treaties that no one shall be subjected to torture or to cruel, inhuman, or degrading treatment or punishment.[133] The *Flores* agreement also stipulates that minors may not be subjected to humiliation or mental abuse and stipulates that sanctions shall not affect a minor's health or physical or psychological well-being. AI has received reports, however, that children in immigration custody may be subjected to cruel disciplinary techniques.

- **San Antonio, Texas**: P.L. reported that punishments might include taking away a child's blankets and mattress, and alleged that the staff would turn up the air conditioning so it became unbearably cold. She told AI delegates that such punishment might be administered if somebody had spoken when they were not allowed to while they were watching TV or eating.

## 4.2 Physical and Verbal Abuse

AI has also received allegations that some children have been subjected to physical and/or verbal abuse while in custody. International standards, U.S. laws, and the standards imposed on facilities by state agencies accept that there are circumstances when custodial staff may use force and broadly agree about the legitimate purposes and scope of the use of force. Generally these circumstances

- Permit staff to use force and restraints for specific purposes such as self-defense and the protection of other people;
- Restrict the amount of force that can be used to the extent necessary; and
- Prohibit the use of force and restraints as punishment.[134]

Some children in the custody of immigration authorities may be subjected to treatment that goes beyond the acceptable limits described above. AI has heard a number of reports alleging violations of the international standards prohibiting the use of force or restraints as punishment. The majority of these reports have concerned secure facilities and facilities within the juvenile justice system. AI has previously reported concerns about the poor conditions in facilities in the juvenile justice system.[135] Reported allegations of mistreatment of children in secure detention include the following:

- **BCYC, Secure Unit, Pennsylvania:** Children and advocates told AI that physical force may be used as a punitive and disciplinary method. Staff reportedly kick, throw children to the floor and knock their heads into walls, for infractions such as looking the wrong way, saying "can I use the bathroom" instead of "may I," or not being able to count properly. A child told AI of one incident when staff reportedly asked a group of children to raise their hands if they wanted to play basketball. He reportedly eagerly stood up,

---

[133] ICCPR, Art. 7; UDHR, Art. 5; CRC, Art.37.

[134] For example, Rule 54(1) of the Standard Minimum Rules for the Treatment of Prisoners permit staff to use force for self-defense, to prevent escape, and in cases of active or passive physical resistance to an order based on law or regulations. Rule 64 of the UN Rules for the Protection of Juveniles Deprived of their Liberty permits the use of instruments of restraint and force to "exceptional cases, where all other control methods have been exhausted and failed ... in order to prevent the juvenile from inflicting self-injury, injuries to others or serious destruction of property."

[135] Among other concerns, the organization listed allegations of excessive use of force, in a manner constituting torture or cruel inhuman and degrading treatment or punishment, to a degree that would seem to reflect "major organizational deficiencies as well as personal misconduct." Amnesty International, *Betraying the Young*, 1998.

66.

waving his hand. He was reprimanded for not raising his hand and not allowed to play. He sat down, commenting that he had also raised his hand, reportedly prompting two staff members to knock his head against the wall and kick him. When he said to them that they didn't have the right to do that, they reportedly responded that his representative wouldn't be able to do anything.[136]

- **San Diego Juvenile Detention Center, California**: Edwin Muñoz reported that the guards at the facility were mean and aggressive and used a lot of bad words. *"They sometimes hit me with their sticks and shoved me and other boys, when they thought we were not following their orders."*[137]

- **L.A. Central Juvenile Hall, California:** A seventeen-year-old boy reported that when he complained about not being allowed to watch TV, four officers allegedly threw him face down on the floor so that he hurt the inside of his lip. The officers then reportedly pulled his arms and legs behind him and held them together. *"As a result of being held like a pig, I was badly injured,"* he said, *"I was walking with a big limp."* He also complained of back pain.[138]

- **Martin Hall, Washington**: A child housed at this facility was reportedly beaten after saying a word in Spanish that the guard interpreted as bad. His head was allegedly slammed to the floor. His attorney observed bruises on his neck. She requested copies of the medical photos taken but when they were finally delivered, he had been released.[139]

For particularly vulnerable children who may have been exposed to abusive and traumatic situations before their detention in the U.S. experiencing or witnessing these types of excessive and punitive disciplinary actions may have wider repercussions.

- **BCYC, Shelter Unit, Pennsylvania**: Alfredo Lopez Sanchez fled an abusive father in Guatemala. He reported to AI that the staff *"talks to you loud—more than my dad."*

AI has found that mentally ill children are often targeted for disciplinary action. AI has found a pattern of failure to diagnose the mental health of children properly and an inadequate access to counseling and other assistance (see below, 4.8). In such situations, appropriate mental health care and counseling may be far more efficient and humane than strict discipline in secure settings and the use of restraints or force to control a distraught child. The lack of appropriate mental health services in shelters combined with excessive rules and discipline often lead to children being placed in secure facilities. AI urges U.S. authorities to curtail the housing of children in inappropriate settings and to provide adequate resources to allow facilities to employ sufficient numbers of staff; to require staff to be specially trained to work with youth, particularly those with mental health problems; and to train staff in skills that reduce the necessity for the use of force.

## 4.3 Solitary Confinement

AI is concerned at findings indicating that children may spend extended periods in isolation across the country.[140] One secure facility reported to AI that it had held six unaccompanied minors in solitary confinement in the past 12 months.[141] Thirteen of 23 secure

---

[136] AI interviews with advocacy group, August 2002; and BCYC, fall 2002.
[137] Edwin Larios Munoz, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.
[138] AI interview with Southern Californian Legal Organization, January and May 2003
[139] AI telephone interview with Atieno Odhiambo, attorney with Columbia Legal Services, 1/24/03.
[140] AI interview with Child Advocate, January 2003.
[141] La Esperanza, Southwest Key Program, Brownsville, Texas.

67.

facilities responding to AI's survey report the use of solitary confinement as a disciplinary measure (57 percent).

AI has received several reports regarding children housed in juvenile facilities who have experienced solitary confinement as a punitive and disciplinary measure, at times for minor rule breaking. AI has previously reported concerns that solitary confinement is a common punishment in juvenile facilities in the U.S. and noted that its use as a punishment violates international standards.[142] Reports include:

- **L.A. Central Juvenile Hall, California:** Children are allegedly placed in lockdown for minor rule breaking, such as talking in class.[143]
- **Gila County, Arizona:** The children are housed in small single cells furnished only with a narrow cot, a toilet, and washbasin. The children are held in lockdown on the first day—then gradually move up in levels and are allowed more time outside the cells. Children and facility staff told AI that the children may be "dropped in levels" for misbehavior and locked in their cells. During this time, recreation, education, and other privileges are also withdrawn.[144]

In some facilities, unaccompanied immigrant children may be routinely segregated to separate them from youthful offenders. They are also deprived of exercise and education during their incarceration. AI has received such reports from advocates in Texas, Washington, and Virginia. Children are also held in facilities where the regular cells are small, stark, and empty. Forty-eight percent of the secure facilities responding to AI's survey reported that they hold children exclusively in single occupancy cells.

- **San Antonio, Texas:** R.T. was held for 15 days alone in a cell with no windows facing out of the facility. He only came out to eat and bathe. He reported spending most of the day in the cell, which had only a metal bed with a thin mattress. He said that he "didn't see the sun for twenty days."

Prolonged solitary confinement, particularly when imposed with other deprivations such as lack of exercise and contact with other children, may constitute torture or other cruel, inhuman, or degrading treatment, in violation of international standards.[145] The UN Rules for the Protection of Juveniles Deprived of Their Liberty, Rule 67, stipulates: "*All disciplinary measures constituting cruel, inhuman, or degrading treatment shall be strictly prohibited, including ... closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned.*" The use of solitary confinement under any circumstances has been found to have potentially grave repercussions for the physical and mental

---

[142] Amnesty International, *Betraying the Young*, 1998.

[143] AI interview with Southern California Legal Advocates, January 2003.

[144] AI interviews at Gila County, 11/5/03.

[145] Principle 6 of the UN Body of Principles contains the internationally recognized prohibition of torture and other cruel, inhuman, or degrading treatment or punishment. Principle 7 elaborates that the term "*cruel, inhuman, or degrading treatment or punishment should be interpreted as to extend the widest possible protection against abuses, whether physical or mental, including the holding of a detained or imprisoned person in conditions which deprive him, temporarily or permanently, of the use of any of his natural senses, such as sight or hearing, or of his awareness of place and the passing of time*" Furthermore, the UN Human Rights Committee, which monitors states' compliance with the ICCPR, has issued a set of authoritative general comments on key articles of the ICCPR. In its general comment on article 7, the Committee stated "*prolonged solitary confinement of the detained or imprisoned person may amount to acts prohibited by Article 7*" UN Human Rights Committee, General Comment 20 on Article 7 of the ICCPR, par. 6, 10 April 1992. According to the UN Rules for the Protection of Juveniles Deprived of their Liberty, Rule 67, "*All disciplinary measures constituting cruel, inhuman or degrading treatment shall be strictly prohibited, including corporal punishment, placement in a dark cell, closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned.*"

68.

health of children. Research indicates that isolation can cause anxiety and other negative reactions and is associated with higher rates of suicidal behavior.[146] The National Commission on Correctional Health Care advises:

*(A)nimal and human studies reveal biological, behavioral, and mental status changes under conditions of social isolation and/or sensory deprivation within 24 hours.... Although administrators and health personnel may wish to see segregation as an exclusively administrative measure, judges have consistently declared it a medical procedure on the basis of its medical dangers.* [147]

According to lawyers who have clients in secure facilities, or clients who have been housed in solitary confinement, it is not uncommon to see children show signs of depression and mental stress. Several children were described as crying continually, dejected, and withdrawn. This is also incompatible with the *Flores* agreement, which prohibits the use of any sanction that affects a minor's health or physical or psychological well-being. In light of these concerns, it is particularly distressing that several service providers have reported that the response of some facilities to mental health problems, including suicidal tendencies, is placing the child in solitary confinement (see further under "Mental Health Services," 4.8).

## 4.4 Pat-down and Strip Searches

*"Every time Manny* [his lawyer] *visited, they made me take off all my clothes to search my body. This embarrassed me."*
- Edwin Larios Munoz on his treatment at the San Diego Juvenile Detention Facility, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 28 February 2002

AI has found a routine practice of patting-down and strip-searching children who are detained in secure facilities. Seventy percent (16 of 23) of secure facilities and 30 percent (three out of 10) of the shelter facilities either pat-down or strip-search the children. Sixty-one percent (14 of 23) of all secure facilities responding to AI's survey reported that they strip-search the children in their care. Pat-down searches and strip searches represent intrusive physical contact, which in other contexts could constitute an assault. The searches compound the sense that the child is a wrongdoer and does not have the right to be physically respected. The procedures cause the children much distress, and do not allow for an individual assessment of the security concerns.

- **Gila County, Arizona:** Staff told AI delegates that the children are strip-searched any time they are "on white tile"–the area outside the living and school quarters that must be crossed to receive visits in private or speak to the warden. AI delegates were told that the hour-long interview they had with the children meant that they would be strip-searched upon return to their living quarters. Staff also reported that children are always patted-down and searched after classes, and when they move from one part of the facility to another.[148]
- **BCYC, Secure Unit, Pennsylvania:** Children in the secure unit are reportedly required to take off all clothing after any visit, with attorney or otherwise. This is also a weekly routine when their rooms are searched. Reportedly, several children have told advocates

---

[146] Office of Juvenile Justice and Delinquency Prevention, *Conditions of Confinement: juvenile detention and corrections facilities*, Washington D.C., 1994, p. 172.
[147] National Commission on Correctional Health Care, *Standards for Youth Services in Juvenile Confinement Facilities*, Chicago, 1984, p. 38.
[148] AI Interview at Gila County, 11/5/03

69.

that the staff verbally abuse the children during the searches, once allegedly calling them "you little whores."[149]

- **BCYC, Secure Unit, Pennsylvania:** J.D. told AI delegates that he has been strip-searched about 25 times in the five weeks he spent in the secure unit. He once lost a pen, and was allegedly strip-searched and threatened with being sent back to his home country because he couldn't find it.[150]
- **San Diego Juvenile Detention Facility, California**: Unaccompanied children are subject to strip searches, although U.S. children who are status offenders are exempt from this policy.[151]

While pat-down and strip searches cannot be ruled out when there are serious grounds to suspect that the child is hiding a dangerous substance or implement, they should not be routine. When these searches do occur, the procedure should be explained to the child and the search conducted by an appropriately trained person.

### 4.5 Use of Restraints

AI received reports that unaccompanied children are frequently placed in mechanical restraints in circumstances which contravene international standards, which state that such instruments can only be used in exceptional cases where all other control methods have been exhausted or have failed.[152] International standards prohibit the use of restraint and force except in specifically defined situations, namely to prevent the juvenile from inflicting self-injury or injuries to others, or serious destruction of property. They should not cause humiliation or degradation and should be used restrictively and only for the shortest possible period of time.[153] Nevertheless, children who had been housed in secure facilities reported the use of restraints as a routine measure. Eighteen of the 31 children AI spoke with reported being restrained while under the care of immigration authorities. Of those children, most (11, or 61 percent) reported they were restrained more than once, and the majority (13, or 72 percent) told AI that they were restrained using both leg shackles and handcuffs.

An INS official, Mr. Thomas Baranick, Director of Detention and Deportation, Phoenix Office, described to AI delegates the use of restraints on unaccompanied children as follows: *"The people who have not been in the criminal system do not know what to expect. They are unpredictable—the most problematic cases. Sometimes you don't know who they are, you don't know their identities. It is a precautionary thing—if in doubt, err on the side of caution."*[154] Such a statement suggests a disregard for international standards on the use of restraints.

### 4.5.1 Restraints During Transportation

AI found that children are routinely restrained during transportation. Nineteen of 23 (83 percent) of responding secure facilities reported to AI that they routinely restrain children who are taken outside the facility. Twenty-two percent (5 out of 23) of secure facilities responding to AI's surveys report that children in their custody are also placed in belly chains. Secure facilities that are contracting with the former INS particularly appear unable to distinguish between the children

---

[149] E-mail to AI from Child Advocate, 8/31/02; and interviews at BCYC, September 2002.
[150] AI interview, BCYC, September 2002
[151] Wendy Young, Director of Government Relations and U.S. Programs, Women's Commission on Refugee Women and Children, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.
[152] UN Rules for the Protection of Juveniles Deprived of their Liberty, Art. 64.
[153] Ibid., arts. 63 and 64.
[154] AI interview at Gila County, 11/5/02.

in immigration detention and their other charges, and regardless of actual flight or other possible risks, routinely shackle and handcuff the children. Most of the children AI interviewed were housed in shelter facilities, but over half of all children interviewed (16 out of 31, 51 percent) reported that they had been restrained during transfers between facilities. This included children who INS officials had informed AI were neither flight nor security risks. AI has heard reports of children as young as nine years old being fully restrained, using handcuffs and leg irons.

AI questioned INS officials in all three regions about restraint policies during transport. Answers were at times confused and contradicted information provided by facility staff, service providers, and/or children. The inconsistencies may reflect a policy that leaves the ultimate discretion to the individual officers in charge of transporting the children, and a lack of communication or accountability by officers in charge of transfers.

- P.L. was transferred to the shelter facility in Chicago from Texas. She was reportedly restrained on the way from the facility to the airport, in the airport, and throughout the two and a half hour flight. When the INS Juvenile Coordinator came to pick up the children at the airport, P.L. claims that the guards took off the handcuffs and hid them, telling the children to say "no" if they were asked whether they had been handcuffed.[155]

Several children described humiliating procedures where they were taken to the dentist in shackles and had to remain in shackles for long periods of time while waiting to be examined. It is often not properly explained to the children what is happening, adding to their confusion and anxiety.

- R.T. reported that he was handcuffed and restrained with leg irons and chained to two other children during transport to a dentist. He said that he remained handcuffed to other children in the waiting room. He told AI that there were other "regular people" in the waiting room and that they were staring at him.[156]

Staff at several facilities informed AI that children who are transported out of facilities for medical attention are routinely shackled. AI considers the use of restraints on sick prisoners who do not pose a specific security threat to constitute cruel, inhuman, or degrading treatment in violation of international standards.

### 4.5.2 Restraints in the Courtroom

Restraints on children in court settings are of particular concern to AI. Wearing shackles or restraints in a courtroom carries with it powerful connotations of guilt and dangerousness as well as subjecting the child to distress and humiliation. Although international standards provide that restraints should be used only as a precaution against escape during transfer, they stipulate that they "shall be removed when the prisoner appears before a judicial or administrative authority."[157] Some children are reportedly not only routinely shackled during transportation to court hearings but in some instances may be shackled in the courtroom. AI spoke to one child asylum-seeker from India who reported having to appear before judges in Arizona and Texas wearing both handcuffs and leg chains.[158] One advocate described to AI how she had seen a seven-year-old boy from Central America handcuffed before a judge in California.[159] An attorney in Washington reported that children routinely have their hands and legs shackled during

---

[155] AI interview, fall 2002.
[156] Ibid., fall 2002.
[157] UN Standard Minimum Rules for the Treatment of Prisoners, Art. 33.
[158] This child was being detained at a shelter facility when AI interviewed him, possessed no criminal convictions, and was not considered a flight risk.
[159] AI telephone interview with Amy Thompson, advocate, 1/23/02.

transportation from Martin Hall to court and, though their handcuffs are removed, the leg chains remain on during the entire time in the court building, where they may have to wait for up to four hours.[160]

### 4.5.3 Restraints in Detention Facilities

- **Gila County, Arizona:** AI delegates spoke to several unaccompanied children at the facility who reported that anyone wishing to see the warden is always restrained in handcuffs, shackles, and belly chains. Three out of the five children AI delegates interviewed reported that they were restrained in this manner. While AI notes the trust the children place in the warden to resolve their problems, and that they were able to speak with him in Spanish, such routine shackling of children is contrary to international standards. This does not correspond with information given to AI by facility staff, who claimed they would only use restraints inside the facility in a "grave situation"—for example, if someone is violent.[161]

Seven out of 23 (30 percent) of the secure facilities reported that restraints may be utilized to punish children on the grounds of misbehavior. Reasons listed were, among others: acting out, sexual acting out, possession of contraband, refusal to follow detention rules, refusing movement, and being out of control. This is in direct contravention with international standards, which prohibit the use of restraints as punishment.[162]

AI has also received reports of restraints being applied in a painful and callous manner, violating the provisions of UN standards, mentioned above.[163]

- **Gila County, Arizona:** A fifteen-year-old was reportedly left restrained in his room in handcuffs for over 12 hours. He reportedly later showed his attorney marks on his wrists, which seemed consistent with handcuffs.[164]
- **BCYC, Secure Unit, Pennsylvania:** Advocates told AI that they had seen scars around the wrists of one child that came from being restrained every day.[165] Another child reported to Amnesty International that he had been picked up, thrown to the ground, and handcuffed behind his back while a staff member put his knee on his back. (This restraint hold was later described and demonstrated to AI delegates by facility staff.) Staff reportedly then grabbed his hands and dragged them across the carpet. He showed AI delegates his hands, which were grazed across the knuckles. He told AI that the staff held him down for about half an hour, despite his complaints that his back hurt, and said a guard kicked his ankle when he complained about the pain.[166]

*Immobilizing Restraints*

---

[160] AI telephone interview with Atieno Odhiambo, attorney with Columbia Legal Services, 1/24/03.
[161] AI interviews at Gila County, 11/5/02.
[162] Article 33 of the Standard Minimum Rules for the Treatment of Prisoners states:  *"Instruments of restraint, such as handcuffs, chains, irons and strait-jacket, shall never be applied as a punishment."*
[163] UN Rules for the Protection of Juveniles Deprived of their Liberty, Art. 63. Likewise, the UN Standard Minimum Rules for the Treatment of Prisoners, Art. 33, provides that restraints in the case of people in custody should be used only for so long as is strictly necessary to prevent damage or injury.
[164] AI interview with Florence Immigrant and Refugee Rights Project, 11/4/02.
[165] AI interview with advocacy group, August 2002.
[166] AI interview, Advocacy group, August 2002.

72.

Seven of the secure facilities surveyed reported having immobilizing restraints, such as restraint beds, chairs, and "the wrap" (a type of straitjacket). Use of such restraints can cause emotional and physical injury and may be open to abuse.

AI has expressed concern at the growing use of restraint chairs in U.S. detention facilities, following reports of deaths, as well as numerous cases of abuse and ill treatment involving their use.[167] AI believes the chairs are prone to abuse because they are so easily deployed and their use is virtually unregulated in many jurisdictions.[168] In May 2000, the United Nations Committee Against Torture issued recommendations to the U.S. government to abolish the use of restraint chairs on the grounds that their use led to breaches of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment. Six of the 23 (26 percent) secure facilities responding to AI's survey reported utilizing such instruments. AI delegates observed a restraint chair in the intake area of the Gila County facility.

- **Gila County, Arizona:** Service providers reported two incidents of immigrant children being placed in the restraint chair. One was a fifteen-year-old Costa Rican boy who had waited six months to be deported. At the time of the incident, he was "in utter despair," self-mutilating and hitting his head against the wall, prompting his placement in the chair. To the knowledge of his attorneys he had no mental illness when he arrived at the facility.[169] Long-term detention is potentially harmful to the mental health of children, particularly for those in secure locations (see below). Facility staff also told AI that there were two incidents in the past year, and stated that staff are trained in the use of the chair, and tape all incidents.

### Chemical Restraints

> *"When I arrived here... the only thing that they told us was about fighting. They told us that if I was in a fight, they would pepper spray me and I was supposed to fall to the ground face first with my hands on the back of my head. They did not tell me any other rules."*[170]

Oleoresin capsicum (commonly called OC or pepper) spray inflames the mucous membranes, causing closing of the eyes, coughing, gagging, shortness of breath, and an acute burning sensation on the skin and inside the nose and mouth. There is concern about its health risks.[171] Four out of 23 secure facilities (17 percent) responding to AI's survey may use pepper spray as a restraint, placing non-criminal children at risk of being exposed to it. AI has heard accounts that pepper spray has hit children who were bystanders and has been used against children with mental health problems.[172]

AI urges U.S. authorities to ensure that a stricter policy be implemented in order to ensure that children are not subjected to indiscriminate and excessive use of restraints in contravention of both international and domestic standards. AI has called on all law enforcement agencies to either cease using pepper spray or to introduce strict limitations on its use, with clear

---

[167] A restraint chair is a device that consists of a metal-framed chair in which prisoners are immobilized in four-point restraints securing both arms and legs and a strap across the chest.

[168] Amnesty International, *United States of America. The Restraint Chair - How Many More Deaths?*, AI-Index: AMR 51/031/2002, 02/25/02.

[169] AI interview with Florence Immigrant and Refugee Rights Project, 11/4/02.

[170] Declaration of child provided to AI by Legal Organization, May 2003.

[171] Amnesty International, *Betraying the Young*, 1998, p. 20.

[172] OIG, Unaccompanied Juveniles in INS Custody, 2001; Women's Commission for Refugee Women and Children, May 2002; Angel Avila, The Oregonian, December 2000; Associated Press, September 1998.

monitoring procedures. In any event, chemical spray should not be used against children with mental health problems, who should be more appropriately dealt with by staff trained in mental health care (see 4.8).

## 4.6 Exercise, Access to Open Air, and Recreation

Several of the facilities utilized by immigration authorities do not live up to international and domestic standards governing access to exercise and outdoor activity. [173] Specifically, *Flores* stipulates that activities must include daily outdoor activity, weather permitting, and at least one hour per day of large muscle activity. Some advocates reported that in certain facilities there is no outdoor access at all. This was also reported by one of the secure facilities responding to AI's survey. [174] AI also heard reports from children that they had not been provided with any exercise—in particular, secure facilities in Texas (Brownsville and San Antonio).

- **San Antonio, Texas:** R.T. reported that for the 20 days he spent in this facility, he did not see the sun and spent most of the time in his cell. He reports that all the children were awoken at 4 A.M. and made to do exercises in the hallway and then sent back to their rooms. [175]

Three of the 23 (13 percent) secure facilities responding to AI's survey reported that they do not offer at least one hour of daily outdoor recreation. A number of the facilities appeared to be unaware of the *Flores* requirement. Only one of the facilities AI visited, BCYC, reported it meets the required standards, although AI received complaints from children housed there that this is not always the case. Facilities commonly lack access to appropriate recreational and physical training and adequate space, installations and equipment, as is required by international standards. [176] In some instances exercise or time outdoors allegedly is withheld as a disciplinary measure, despite the fact that *Flores* expressly prohibits this. [177]

International standards emphasize the importance of recreation and leisure time for children, in particular for those in detention, and state that apart from the daily exercise children should receive, additional time for leisure activities should be provided to juveniles deprived of their liberty. [178] The UNHCR Guidelines explain that play is vital to the healthy development of a child. It is a child's way of coping with what has happened, of relieving tensions and of assimilating what he or she has learned. The Guidelines hold that reception centers should have play areas and promote play. [179] AI has found that while some facilities emphasize recreational activities, others provide little stimulus for the children, and some provide no opportunities at all for play and leisure. AI was pleased to note the extent to which the facility in Chicago provides the children with opportunities to play and pursue recreational activities. However, such high standards were not met in any other facility visited, including both secure and shelter facilities. A number of detention centers overemphasize the use of TV as a recreational stimulus, despite the

---

[173] UN Rules for the Protection of Juveniles Deprived of their Liberty, 1990, Art. 47, provide that "every juvenile should have the right to a suitable amount of time for daily free exercise, in the open air whenever weather permits;" *Flores*, Exhibit 1(a).

[174] Skagit County Youth and Family Services Juvenile Probation Department, Washington.

[175] AI interview, fall 2002.

[176] UN Rules for the Protection of Juveniles Deprived of their Liberty, 1990, Art. 47. See also Wendy Young, Director of Government Relations and U S. Programs, Women's Commission on Refugee Women and Children, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02

[177] *Flores*, Exhibit 1(c).

[178] The UN Rules for the Protection of Juveniles Deprived of their Liberty, Article 47 (1990); the CRC also clearly stipulates the right of the child to leisure and to engage in play and recreational activities appropriate to the age of the child. (CRC, Article 31, 1).

[179] UNHCR, Guidelines for Refugee Children, 1994.

74.

SCANNED

*Flores* requirement of at least one hour per day of structured leisure time that should not include time spent watching television. Reports also indicate that children may in some cases be forced to watch TV in English and are punished if they close their eyes.[180] Furthermore, *Flores* stipulates that recreation and leisure time should be increased to a total of three hours a day on days when school is not in session. AI spoke to several children who had been housed in secure, commingled facilities in Texas, where there had been no school activities, and where the children had been held in lock-down for 23 hours a day. (See above, "Solitary Confinement," 4.3.)

### 4.7 Education

Receiving appropriate education is essential for children, and it is also a basic right under international law. The right to education is enshrined in UDHR. Article 26, and ICESCR, Article 13. Both provide that everyone has the right to education.[181] Other international instruments relating specifically to detained persons specify that states have the responsibility to provide education for detained juveniles, in particular asylum-seekers, to ease their acclimatization. "*Every juvenile of compulsory school age has the right to education suited to his or her needs and abilities and designed to prepare him or her for return to society.*"[182] Indeed, many of the children AI interviewed told delegates that attending school was the best—or only good thing about their situation.

Immigration authorities in many instances fail to provide for this essential right. According to advocates, access to education nationwide is "hit or miss."[183] AI found that 12 percent of the respondents to our survey (four out of 33) do not provide education at all. In particular, four of 10 interviewed children, who had been held in secure facilities in Texas for more than three days, reported to AI delegates that they had not received educational instruction.[184]

In particular, the children who were housed in secure facilities designed to hold juveniles offenders were denied the right to education, following a pattern previously reported by AI.[185] In some instances, the denial of education has allegedly been utilized as a disciplinary tool for children in custody.

International laws and standards provide that states must accord to refugees the same treatment as is accorded to nationals with respect to elementary education.[186] However, it has been a concern among some advocates that the educational standards are low in certain facilities-with poor language instruction and teaching capabilities and little educational material

---

[180] AI interviews at BCYC, September 2002; AI interview with advocates, August 2002.

[181] Further, the CRC, Art 29, recognizes the role of education in allowing the development of the child's personality, talents and mental and physical abilities to their fullest potential.

[182] UN Rules for the Protection of Juveniles Deprived of their Liberty, Rule 38. The UNHCR Guidelines for Refugee Children, provides additional rights for refugees. It requires that states must ensure that all refugee children, and those seeking asylum, have access to primary education. It stipulates in Article 22(I) that appropriate educational opportunities should be provided to children during the determination of refugee status or in reception centers.

[183] AI interview with advocate, January 2003.

[184] AI interview, Chicago, October 2002. In a few instances, the lack of education may have been linked to a summer schedule where there are no classes, although not all the children stayed at the facilities long enough to be able to verify this. While such a break may be appropriate for children outside a detention facility, it is clearly not for children detained for a prolonged period of time.

[185] In *Betraying the Young*, Amnesty International notes that some juvenile facilities in the U.S. have failed to provide adequate services for children in detention

[186] The Refugee Convention, Art. 22; the UNHCR Guidelines for Refugee Children, chap. 2, Sec. 1, also provide that the quality of education for refugee children should be as high as for nationals of the same age.

75.

available.[187] Such a situation may also violate provisions in *Flores* stipulating that educational services appropriate to the minor's level of development and communication skills be provided.[188] International standards suggest that education should be provided outside the detention facility whenever possible.[189] AI is not aware of any programs that provide education outside the detention facility.

AI is concerned that a great number of children are severely hampered in their ability to access education due to language difficulties, in particular those who do not speak any English or Spanish. Only 43 percent (10 out of 23) of responding secure facilities reported that they teach English as a second language, and 48 percent (16 out of 33) of all the responding facilities reported that they do not offer education in the children's native language. Thus in many instances, U.S. authorities may be in violation of international law as well as the *Flores* agreement, which stipulates that the educational program shall include materials in such languages as needed.[190] The UNHCR places great emphasis on the maintenance of the mother tongue as a critical factor in retaining identity and strongly recommends that the children's own language be used as the primary medium of instruction.[191]

Availability of reading materials in languages other than English for use during leisure time is highly recommended by international standards and reaffirmed in *Flores*. The UN Rules for the Protection of Juveniles Deprived of their Liberty, Article 41, stipulates that every detention facility should provide access to a library that is adequately stocked with both instructional and recreational books and periodicals, and that juveniles should be encouraged to make full use of it. *Flores* also states that minors should be provided with appropriate reading materials in languages other than English for use during the minor's leisure time.[192] Several children reported, however, that they had no access to reading materials in their mother tongue.

## 4.8 Mental Health Services

> *"Gets pressure. Can't breathe. Like a needle... It's when I'm thinking."*
> - Child interviewed by AI, fall 2002

AI has received several reports of children exhibiting disturbing symptoms of mental illness, which may be attributable, in part, to the severe conditions under which they are held or to their long-term detention.[193] Many children housed in secure detention reportedly exhibit symptoms of mental health problems, some crying continuously, others being depressed and listless. According to one of the lawyers AI spoke to, it is not uncommon for children to attempt suicide. She stated, *"I've just come to accept that it is one of their reactions."* She also noted that

---

[187] AI interviews with Southern Californian Legal Organization, January 2003, and Texas Legal Organization, January 2003.

[188] *Flores*, Exhibit 1(a).

[189] UN Rules for the Protection of Juveniles Deprived of their Liberty, Art. 38; UN Standard Minimum Rules for the Treatment of Prisoners, 1955, Art. 77(2).

[190] *Flores*, Exhibit 1(a)(4). See also UNHCR Guidelines for Refugee Children (1994), Chapter 9: Education, which stipulates that education "should be in the child's own language—at least initially. ."; and CRC, Art. 29(c), which holds that "the education of a child should be directed to the development of respect for the child's parents, his or her own cultural identity, language and values."

[191] UNHCR Guidelines for Refugee Children, 1994.

[192] Exhibit 1(a)(4).

[193] AI has previously reported that for adult asylum-seekers, the distress of flight from their own country can only be exacerbated by isolation from families and caregivers, resulting in some evidence of suicide attempts and depression among those indefinitely detained with little or no contact with outside assistance. Amnesty International, *Lost in the Labyrinth*, 1999, p. 63.

it is especially difficult for non-criminal children, who have of course never been to jail before. Other children have reportedly suffered anxiety attacks or breakdowns.

- **Gila County, Arizona:** AI delegates observed a child lying listlessly on the floor in his cell and were informed that there was doubt as to his identity. He was held in solitary confinement and isolated from the other children. Later, AI delegates observed the same child being taken to the medical office, reportedly because he complained that he could not breathe—apparently having an anxiety attack. He looked dazed and very red in the face, as if he had been crying, and was supported by a guard on each side. AI later found out he was a sixteen-year-old asylum-seeker whose case was under appeal by the INS. He had been housed in a shelter facility nearby, and reportedly was suddenly transferred to Gila in full shackles with no explanation. No one at the facility had spoken to him about what was happening, nor was he allowed to make any calls to his attorney, who had not been informed of his transfer. At the time of the attack, the boy had been there for five days, with no contact to the outside world, so afraid and confused that he had allegedly not been able to eat. His attorney was finally contacted by the warden to inform her of his "nervous breakdown." When she saw him, he kept begging her repeatedly, *"Help me!"* and started crying as she was leaving and explained he would be strip-searched, as is routine after attorney visits. The attorney noted that she normally spends time with the children who are likely to be transferred to Gila to explain what they can expect. She had not anticipated that might be necessary for this child.[194]

Despite the vulnerable and traumatized state of children detained by immigration authorities, and the harm that may further ensue due to long-term detention in punitive conditions, AI has found that there are serious deficiencies in the amount and quality of mental health care provided. Reportedly, it is not uncommon that counselors speak only English, impeding any attempts at communication with the majority of children. International law and standards stress the right of children to receive mental health care and treatment. The CRC stipulates appropriate measures to promote the physical and psychological recovery and social reintegration of a child victim of any form of neglect, exploitation, torture, or any other form of cruel, inhuman, or degrading treatment or punishment.[195] The *Flores* settlement confirms these obligations by stipulating that one hour of individual and two hours of group counseling sessions should be provided to the children weekly.[196] However, only three out of 23 secure facilities (13 percent) responding to AI's survey reported that they provide any kind of weekly counseling. At Gila County, and in several other secure facilities, counseling is only available in emergency situations.

Children reportedly do not receive mental health care in emergency situations, either, in contravention of international and domestic standards.[197] Only five secure facilities and half of the shelter facilities reported that they retain mental health professionals trained in dealing with trauma, which means that 30 percent (10 out of 33) of all surveyed facilities provide such essential services. In line with this finding, AI has received numerous reports of children with

---

[194] AI visit at Gila, 11/5/02; AI interview with attorney, November 2002.

[195] CRC, Art. 39. Refugee children and children eligible for other types of relief fall under this category and must be provided with all appropriate measures to ensure their recovery. See also UN Rules for the Protection of Juveniles Deprived of their Liberty, Art. 49.

[196] *Flores*, Exhibit (a)(6).

[197] Any juvenile demonstrating symptoms of mental difficulties should be examined promptly. Medical services should seek to detect and treat any mental illness. See UN Rules for the Protection of Juveniles Deprived of their Liberty, Art. 51. Similar provisions are also contained in the UN Standard Minimum Rules for the Treatment of Prisoners, Art. 22. The Flores agreement also requires that licensed programs shall provide appropriate mental health interventions when necessary, Exhibit(a)(2).

SCANNED

mental health problems, with which the facility staff were not equipped to deal. Facility staff have in some cases reportedly failed to retain mental health professionals and hindered service providers in their efforts to secure such assistance.

- **BCYC, Pennsylvania:** Advocates told AI that they had witnessed one child in the secure unit with serious mental health problems. He deteriorated rapidly, reportedly hearing voices and hallucinating. Although the case was brought to the attention of the superintendent, no further action was taken; the clinical social worker allegedly did not even make an assessment. Through concerned service providers, pro bono medical attention was retained, but the boy refused to take medication. Though the doctors offered to treat the child at a hospital instead, the INS refused permission.

- AI has also spoken with a number of service providers who have expressed concern that the response to children exhibiting emotional or mental distress is often simply to place the child in solitary confinement (see above). For example, AI has heard reports of a sixteen-year-old who attempted to take his life three times in the six months while he was being held in a secure facility. He was placed on "suicide watch," entailing holding him in solitary confinement and a staff person checking in on him periodically. He reportedly received no mental health counseling.[198]

Failure to diagnose children in detention properly and the inadequate access to counseling and other assistance may result in serious behavioral problems. Behavior ranging from depression to violence will be exacerbated if the child's trauma is not recognized and managed in light of his or her special circumstances. Unless detaining officials know the history of their charges, they risk misconstruing the behavior of those suffering the after-effects of torture, ill treatment, or other trauma. In some instances guards respond inappropriately to children with symptoms of mental health problems using restraints, force, or solitary confinement. INS officials have also described a policy of transferring children who exhibit symptoms of mental health problems, including suicidal tendencies, to secure facilities.[199]

AI is concerned by reports that, in at least one jurisdiction, information divulged by children to caseworkers and counselors may in some cases not be kept confidential and may be used against the children in court. This may be a contravention of international standards requiring the authorities entrusted with the care of the children to act in their best interests. The inherent conflict of interest, which existed when the (now-abolished) INS played the role of both prosecutor and caregiver, is evident in this situation.

- **Southwest Key Program, Arizona:** AI received reports suggesting that information about the children obtained during counseling sessions by social caseworkers may be divulged to immigration authorities and used against the children in court. Attorneys were able to give recent examples of how the children had been encouraged to talk about themselves and then found that the information had made its way to the courts. INS officials asserted that they do not have access to the mental health evaluations of the children. However, they did confirm that if an attorney asks for an independent professional—either mental health or medical—to provide input in an asylum case (for example, to evaluate physical or mental signs of torture or trauma), clinician records may be shared with the INS trial attorney.[200] This would seem to indicate that these records are available to the prosecution of the child. In a recent case in Arizona an immigration judge held the INS in contempt for (among other issues) seeking to use a social worker

---

[198] AI telephone interview with attorney, January 2003.
[199] AI interview in Chicago, 10/30/02.
[200] AI interview at Gila County, 11/5/03.

SCANNED

under contract with the INS at the shelter facility to testify against a child asylum-seeker from Guatemala.[201]

## 4.9 Religion

According to the UN Rules for the Protection of Juveniles Deprived of Their Liberty, Article 48, every juvenile should be allowed to practice his or her religious life by attending services or by conducting his or her own services, and by having the necessary books or items of religious observance. If sufficient numbers of juveniles of a given religion are detained in a facility, qualified representatives of that religion should be allowed to hold regular services. Furthermore, every juvenile should have the right to receive private visits from a qualified representative of any religion of his or her choice. AI believes that access to religious needs and services should be provided to all children, particularly since "a crucial element in regaining cultural normalcy is the renewed practice of religious and ritual activities," according to the UNHCR Guidelines for Refugee Children.

AI is concerned that unaccompanied children in detention have inconsistent access to religious services. The organization welcomes the attempt by several facilities to accommodate some of the religious needs of detained children and urges that all facilities be required to take steps to meet the children's needs.

## 4.10 Girls

According to the UN Guidelines women asylum-seekers and adolescent girls, especially those who arrive unaccompanied, are particularly at risk when compelled to remain in detention centers. Furthermore, they require that women asylum-seekers should receive the same access to services without discrimination as to their gender, and specific services in response to their special needs.[202] AI has not found any specific services catering to the special needs of girls, such as the provision of special recreational activities for girls, or medical attention and counseling tailored to meet their gender-specific needs or potential traumas. None of the facilities responding to the survey reported that they provide special arrangements for the needs of girls, beyond separate housing, shower, and eating arrangements.

The ICCPR requires that states must respect and ensure the rights of children, without discrimination of any kind, including based on a child's sex.[203] AI's findings indicate that unaccompanied girls detained by immigration authorities may in some cases be afforded fewer rights and suffer more hardship because of their sex. In particular, girls are more likely to be housed with adults or with juvenile offenders, because there are fewer of them, placing them at risk of abuse. At the Gila County Juvenile Detention Center in Arizona, staff and children told AI delegates during their visit that commingling had recently been curtailed at this facility. However, unaccompanied girls are still commingled with girls convicted of criminal offenses during recreation time.[204]

The UNHCR Guidelines also recommend the use of female guards in detention centers housing women, respect for cultural values, and improving the physical safety of women in

---

[201] Matter of Salık-Lopez, A95 283 410, IJ, 2/2/02. See also Dennis Wagner, *Judge Slaps INS Officials with Contempt Charges*, The Arizona Republic, 12/4/02.
[202] UNHCR Guidelines on Detention of Asylum-seekers, 1999. Chapter 8.
[203] ICCPR, article 2(1); also contained in the CRC, article 2(1).
[204] AI interview at Gila County, 11/5/02.

79.

detention centers.[205] Nevertheless, such steps have not always been followed by facilities under contract with the INS. Only 27 percent of the facilities (six secure and three shelter) responding to AI's survey retain female staff for girls.

- **San Diego, California**: Privacy needs are not always accommodated with respect to gender. During the visit of an NGO, a male guard was overseeing the girls' wing. From his control station, he reportedly had plain view of the girls' toilet and shower area, through a plate-glass window less than ten feet away. The doors to the toilets and showers were described as only about two to three feet in height, offering little privacy.[206]

## 5. CONCERNS ABOUT ACCESS TO ASSISTANCE AND SUPPORT IN DETENTION

### 5.1 Access to Legal Representation and Other Forms of Assistance in Detention

> *"Every child deprived of his or her liberty shall have the right to prompt access to legal and other appropriate assistance."*
> - CRC, Art. 37(d)

International standards require that all persons who are arrested or detained have the right to inform family members of the detention and place of confinement.[207] The UN Standard Minimum Rules on the Administration of Juvenile Justice provide that parents or guardians shall be notified immediately upon apprehension of a child.[208] The UNHCR Guidelines for Refugee Children also states that attempts to trace parents or other relatives is essential and must be undertaken as early as possible, including across borders in collaboration with the International Committee of the Red Cross (ICRC).[209]

Every arrested or detained person, whether or not held on a criminal charge, has the right to the assistance of legal counsel. U.S. law stipulates that individuals held for immigration violations have a right to counsel but not to court-appointed or state-funded attorneys. The OIG, as well as several NGOs, have found that the practical implication of this is that the majority of children detained by the INS do not have legal representation.[210]

The UN Human Rights Committee has stressed that "all persons arrested must have immediate access to counsel."[211] The UNHCR Guidelines for Refugee Children provide that a legal representative should be appointed immediately to ensure that the interests of an applicant for refugee status who is a minor are fully safeguarded.[212] According to U.S. standards, unaccompanied immigrant children should be provided with information regarding the right to be represented by counsel, the availability of free legal assistance and the right to apply for political

---

[205] UNHCR Guidelines on Detention of Asylum-seekers, 1999

[206] Women's Commission for Refugee Women and Children, May 2002.

[207] UN Body of Principles, 16; UN Standard Minimum Rules for the Treatment of Prisoners, 92.

[208] UN Standards Minimum Rules for the Administration of Juvenile Justice: Part Two Investigation and Prosecution, 10(1); The UN Body of Principles, Principle 16 (3)

[209] UNHCR Guidelines for Refugee Children, chap. 10, Sec. 3, Family Tracing.

[210] OIG, Unaccompanied Juveniles in INS Custody, 2001; Andrew Morton, attorney, Latham & Watkins, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 02/28/02; see chapter 7 for further discussion

[211] UN Doc. CCPR/C/79 Add, 4/09/97. Furthermore, Principle 7 of the UN Basic Principles on the Role of Lawyers states that access to a lawyer must be granted "promptly." The Inter-American Commission has also concluded that the right to counsel set out in Article 8(2) of the American Convention on Human Rights applies on the first interrogation. (OEASer.L/V/11.62, doc. 10, rev. 3, 1983.)

[212] UNHCR Guidelines for Refugee Children, 1994, chap.8.

80.

asylum.[213] AI has received reports that not only have children not been informed of their rights upon arrest, but they have often gone weeks, months, without such information. Many of these children arrive in the U.S. traumatized, frightened, and confused. They face a complex system, commonly in a language they do not understand, and with no one to guide them or give them answers to their most basic questions.

- **San Antonio, Texas**: R.T. reported that after he was apprehended, he was told that he had the right to an attorney, but was not given any further explanation of how to avail himself of that right. He reported that he had been made to sign some papers: *"The officers just told me to sign here."* During the interview with AI, his pro bono attorney checked R.T.'s file and found the papers he had signed. They indicated he had waived the right to a lawyer and to see a judge, and furthermore, had agreed to voluntary departure. R.T. became visibly upset, telling AI that he had not known he had signed any such statement.[214]

- **El Paso, Texas**: T.J. reported to AI delegates that nobody came to talk to him about his rights. He asked the officers what to do, since he was afraid to go back to India, but was told that they did not know. T.J. said to AI, *"All I knew was what the judge had told me and that I was going to be sent to a children's jail."*[215]

According to *Flores*, unaccompanied children must be provided with a list of pro bono lawyers to assist them in identifying counsel.[216] In response to the questionnaire sent by AI, 15 out of 23 (65 percent) responding secure facilities indicated that they did not hand out such lists, and another seven facilities did not indicate whether such lists were provided. In some instances, children reported to AI that they were given a list of lawyers, but no one explained what to do with the list. Children in such situations are frightened and alone and do not have the experience or knowledge to utilize a list of lawyers without further support. One secure facility housing mainly unaccompanied minors reported that all 40 of the children housed there had no attorney.[217] A shelter facility reported that 10 out of 12 children housed there had no attorney.[218]

Several practices in the INS detention system hindered children's access to information and assistance. In particular, children in secure facilities seem to be adversely affected in their ability to access legal counsel. Several secure facilities gave responses indicating that they did not grasp the differences between regular juvenile detainees and immigration children, and that they believe, erroneously, that when the child goes to court, a lawyer will be appointed automatically. One facility responded, *"If they are in our facility they would have legal counsel,"* another stated that the Public Defender's Office provides legal counsel for the children, and one reported that the INS provides legal services, neither of which is correct.

A number of children are placed in facilities that are remote and difficult to access for lawyers willing to take on their cases, as well as for translators, NGOs, and other service providers. The INS apparently failed to take due account of the extreme difficulties it causes children and those who seek to assist them by detaining them in some instances in facilities far removed from legal or other assistance. Furthermore, the INS makes it difficult for organizations willing to provide pro bono legal services to gain access to children in some regions, refusing to

---

[213] This also includes the right to a deportation or exclusion hearing before an immigration judge, or to request voluntary departure in lieu of deportation. *Flores*, Exhibit (1)(a)(14) and Juvenile Protocol Manual, 7.4.3.
[214] AI interview, fall 2002.
[215] AI interview, fall 2002.
[216] *Flores*, Exhibit (2)(J).
[217] La Esperanza, Southwest Key Program, Brownsville, Texas.
[218] Southwest Key Program, San Diego, California.

81.

provide details of the whereabouts of children. One attorney said it had become "almost impossible" to locate where unaccompanied children were being held, especially when immigration authorities use new facilities to house children. He was recently contacted by a jail warden who allegedly said that he did not know what to do with a child who had been crying for four days, placed in his facility by immigration authorities. There were four other immigrant children at the facility.[219] Eight out of 10 children AI spoke with, who had been in Texas for more than three days, had not seen an attorney during this time. One of the children was held in a Texas jail for 20 days, another for a full month, without speaking to an attorney.[220]

## 5.2 Access to Non-Governmental Organizations (NGOs)

Since asylum-seekers and other immigrants are not provided with legal representation from the state, the only hope for many of them lies in pro bono legal assistance from NGOs, law clinics, or a limited number of law firms that do pro bono immigration cases. Over the years, attorneys and NGOs have faced problems in trying to gain access to detention facilities to discover who is in need of assistance. In several of the visited facilities local NGOs and/or pro bono lawyers are guaranteed regular access. AI observed how much regular contact with NGOs means to the children in the facilities where such contact is allowed, in terms of their ability to understand and access their various rights, as well as in alleviating the tensions associated with their detention. One way NGOs attempt to communicate to children what their rights are is through group presentations known as "Know Your Rights." In facilities where children may not be represented by an attorney, such presentations carry even higher significance, particularly because children do not have guardians to ensure that their best interests are considered.

INS officials who met with AI delegates in both Arizona (Western Region) and Chicago (Central Region) informed AI that the excellent relationship they had with NGOs and service providers was representative of practices "region-wide."[221] Nevertheless, only 48 percent of facilities responding to AI's survey allow such visits (9 out of 23 secure facilities and 7 out of 10 shelter facilities). Several responses clearly indicated that the facilities were unaware of why NGOs would visit their facility.

In areas where no agreement has been negotiated with NGOs, children must fend for themselves in finding legal representatives and other services. Even when agreements have been negotiated allowing NGOs access to facilities, some express concern that such access could be withdrawn if they publicly voice their concerns about the facilities. AI believes that such a climate of fear would be addressed if the NGOs were given free and legally grounded access to children. AI further believes that in order for the U.S. to comply with its obligation to refugees, the government must go much further than simply allowing NGOs to explain asylum-seeker's rights to them. Since 1999, the Executive Office of Immigration Review (EOIR) has authorized a pilot program in which it cooperates with NGOs that conduct "Know Your Rights" presentations at three sites. AI urges the U.S. authorities to establish similar programs, on a permanent basis, for all detained asylum-seekers.[222]

## 5.3 Juvenile Coordinator Visits

[219] AI interview with attorney, 11/7/02.
[220] AI interviews, fall 2002.
[221] AI interview, Chicago, 10/30/02.
[222] Amnesty International, Lost in the Labyrinth, 1999, p. 38.

*Flores* requires that an immigration official (an INS District Juvenile Coordinator, or DJC) meet with the children in their district on a weekly basis.[223] Only five out of 33 facilities responding to AI's questionnaire indicated that these visits take place weekly. Generally, the shelter facilities reported at least some contact with the DJC, ranging from regular telephone calls to monthly visits, although one facility reported that the DJC only visits *"in cases where a minor may have serious behavioral issues."* [224] In particular, children housed in secure facilities with few other immigrant children only rarely, if ever, receive such visits. Four secure facilities responded that the DJC had never visited, three facilities responded that they did not know what a DJC is, and five said that the question was not applicable to them.

The OIG report noted that some District Juvenile Coordinators have hundreds of charges and no way of seeing them all on a weekly basis. An INS official in one district confirmed to AI that they do not speak to all the children on a routine basis, but only to the children who ask to speak with them.[225] Advocates characterized the workload of the DJC as "inhuman" and asserted that many of the problems that arise in the area are due to understaffing.[226] At present it is understood that the ORR will undertake this role as part of their new responsibilities, and, sufficient resources should be made available to ORR to fulfill this function.

## 5.4 Transfers

> *"I do not know if she knows where I am. Since I have been here... I have not been able to make a telephone call. My family thinks I am still in Chicago. I don't want them to worry about me. I asked to make a telephone call and the guards said they would let me, but I think they forget. I don't want to bother people. I ask the guards and they always say I can make the telephone call later."*
>
> - Sixteen-year-old boy describing not being allowed to speak to his attorney or family after transfer five days earlier[227]

The INS designated all bed spaces as "national," meaning that any INS district could request transfer and placement of a child to wherever a shelter, foster care, or secure placement was available.[228] Reports from advocates indicate that transfers may move a child far from family members or attorneys and frequently fail to take into account a child's special needs, such as the need for special language services or specialized counseling.[229] Some children have reported not being able to tell their families about their transfer to another facility for days. Access to family is an important principle in international standards governing the conditions of detention for persons deprived of their liberty.[230] Furthermore, transfers often undermine the child's legal case because they make effective communication with the child difficult, and, since essential case preparation time is interrupted, creates problems for the already underresourced pro bono network.[231]

---

[223] "The Juvenile Coordinator must make weekly visits to any facility where INS juveniles are housed, to see the facility and to visit the juveniles housed there." Juvenile Aliens: A Special Population, Immigration and Naturalization Service Juvenile Protocol Manual, Sec. 4.1.5. A juvenile coordinator was assigned to each of the 33 designated immigration districts.

[224] Southwest Key Program, Casa San Diego, El Cajon, California.

[225] AI interview at Gila County, 11/5/02.

[226] AI interview at Florence Immigrant and Refugee Rights Project, 11/4/02.

[227] Declaration of child provided to AI by Legal Organization, May 2003.

[228] Juvenile Protocol Manual, Sec. 4.1.4.

[229] AI interview at FIAC, 12/18/02.

[230] United Nations Rules for the Protection of Juveniles Deprived of their Liberty, I. 59 and 60; CRC, Article 10 (2), UN Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Principle 19.

[231] Ibid.

83.

Children are sometimes transferred between facilities without notification to attorneys, in contravention of *Flores*.[232] The pro bono Florida Immigration Advocacy Center (FIAC) told AI that the INS never provided advance notice of a transfer. Such cases include Alfredo Lopez Sanchez and Ernst Poulard, who were transferred from Florida to BCYC in Pennsylvania, 1,200 miles away.[233]

Transfers of children occur frequently and often seem to be conducted for arbitrary reasons, having more to do with the logistical or regulatory concerns of the INS than with the needs of the child.

- **Texas:** Twin brothers were reportedly held in a shelter facility. Due to a state regulation that children could not remain at the shelter for longer than three months, the brothers were transferred after three months to foster care for one day, and then returned to the shelter. This was repeated after six months. They were detained for a total of eight months.[234]

Several children reported to AI that they were confused about the transfer and that no one explained to them what was going on. Children and advocates also reported that the children are routinely shackled during transfers. (See above, "Restraints," for more detail.)

- Alfredo Lopez-Sanchez was transferred from Boystown. He told AI that he was moved at night, half-asleep, with no explanation as to why or where he was being taken. He reported being very scared, because he thought he was being returned to Guatemala. *"I freeze when INS comes. I get nervous and cold. [The INS] don't tell me anything."*

## 5.5 Accessing Assistance: Handbooks

*"I do not know what I am supposed to do or how to communicate with the guards. When I need to use the bathroom I raise my hand. They yell at me, but I stay quiet.... I think only some of them know that I do not speak English."*[235]

*Flores* requires that children be provided with a written copy of and comprehensive orientation in the rules as well as their rights upon admission into a facility.[236] These rights are also guaranteed by international standards, which provide that upon admission all juveniles shall be given a copy of the rules governing the detention facility and a written description of their rights and obligations in a language they can understand.[237] AI has found that children are often not provided with information at all, or are provided with materials ill suited to their needs. Twenty-seven percent (nine out of 33) of the facilities responding to AI's questionnaire reported that they do not provide a handbook to the children. This was equally prevalent among shelter and secure facilities. (Two provide a video orientation instead.) This failure to provide the children with the necessary information exacerbates their vulnerability and leaves them ill-

---

[232] *Flores*, par. 27, stipulates that no minor shall be transferred without advance notice to his or her counsel in a timely manner.
[233] AI interview at FIAC, 12/4/02 and 12/18/02. Also see FIAC report, 2002, p. 3.
[234] Julianne Duncan, Director of Children's Services for Migration and Refugee Services, U.S. Conference of Catholic Bishops, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.
[235] Declaration of child provided to AI by legal organization, May 2003.
[236] According to the *Flores* agreement, Exhibit (1)(a), a comprehensive orientation regarding program intent, services, rules, expectations and the availability of legal assistance must be provided to unaccompanied minors. The rules must be provided verbally and in writing.
[237] The UN Rules for the Protection of Juveniles Deprived of their Liberty. Adopted by General Assembly resolution 45/113 of 14 December 1990; Art. IV (B) (24).

84.

equipped to deal with both detention in and of itself, as well as access to their rights, including rights to asylum or immigration relief.

In many facilities, if there is a handbook, it is available only in English. Although the majority of unaccompanied children are Spanish-speaking, only 41 percent of the secure facilities that have handbooks provide them in Spanish (seven out of 17). Children who are not Spanish speakers are seldom provided with a handbook in their language, and only one secure facility reported that they have the handbook available in languages other than Spanish and English.[238] The numbers were higher for shelter facilities, though still only half of those with handbooks offered them in languages other than Spanish.



International standards specifically provide that all juveniles should be helped to understand the regulations of the facility as well as any other information necessary to enable them to fully understand their rights and responsibilities.[239]

- **Medina County, Texas:** A.B. was given the secure facility's rules in Spanish. She reports being forced to sign a paper saying that she had read and understood the rules. She wanted to read them first, but she told AI that a guard told her she must sign the paper right away—she "*would end up signing them anyway.*" She was not allowed to take a written copy of the rules with her to read later. She told AI delegates that this meant she did not know the rules when she first started, though eventually other girls explained them to her.

*Fega, an eight-year-old unaccompanied child from Nigeria testifying before the U.S. Senate on 28 February 2002.*

## 5.6 Interpreters/ Translation

The isolation and confusion many detained children experience is compounded in some cases by language difficulties. Failure to provide support to children in a language they understand violates international standards, including the ICCPR, the UN Rules for Juveniles Deprived of Their Liberty, and the CRC.[240] AI has found that interpreters or telephonic services may not always be used where needed. Only eight out of 23 (35 percent) of secure facilities responding to AI's survey reported using telephonic translation services, while six out of 10 shelters use this service (60 percent). Some reported that telephonic services would only be utilized in the event of an emergency.

- **Gila County, Arizona:** Staff told AI delegates that *"ninety-nine percent of immigration detainees are Spanish speakers."*[241] Several Spanish-speaking boys reported to AI that they sometimes did not understand what the guards were saying to them, and could not communicate with them. Three out of the five children AI spoke to had requested to speak to the warden, who speaks Spanish, if they had a problem, despite the fact that they would be subjected to shackling and a strip search in order to do so.
- **Martin Hall, Washington:** Children at this facility reportedly face "a serious language barrier" and a lack of adequate interpretation. An attorney reports that she had one client

---

[238] BCYC, Berks County, Pennsylvania.
[239] Ibid  All juveniles should also be helped to understand goals and methodology of the care provided, disciplinary requirements and procedures, other authorized methods of seeking information and of making complaints, and all such other matters as are necessary to enable them to understand fully their rights and obligations during detention.
[240] ICCPR, Art. 14.3, UN Rules for Juveniles Deprived of Their Liberty, Articles 6, 24; CRC, Article 40.
[241] AI interview at Gila County, 11/5/02

49

85.

who was not feeling well but was unable to tell staff. He was put in a solitary cell and was not able to communicate with staff.[242]

According to reports received by AI, children who speak rare languages or dialects have particular trouble communicating their needs and accessing their rights. Only 14 facilities (42 percent) reported having bilingual staff other than Spanish-speaking. Children are reportedly in some instances disciplined for not complying with orders that are communicated in a language they do not understand.

- **Boystown, Florida**: There is a general perception that a child will speak one of the more common languages, and staff will use that language, regardless of whether or not the child expresses comprehension. This leads to problems when a minor doesn't respond to instructions.
- **Boystown, Florida**: Fega curled up in a fetal position and wept when she heard Yoruba, her native language for the first time in over a year of detention in the United States. The primary languages at Boystown, where Fega spent 15 months of her life, are Spanish, Creole, and Mandarin. Fega asked the Yoruba interpreter if she was her mother, as she often asked any new woman she encountered.[243]

## 5.7 Telephone Access and Visits

Access to assistance and support for children in detention fluctuates significantly from facility to facility. This uneven access does not correspond with international standards, which stress that every means should be provided to ensure that juveniles have adequate communication with the outside world, as an integral part of the right to fair and humane treatment.[244] International standards also stress the importance and right of a child to maintain contact with his or her parents, even when they reside in a different country.[245]

## 5.7.1 Telephones

Facilities generally allow the children to call their lawyers, but some children have reportedly been denied adequate access, in particular while in solitary confinement. In secure facilities, children are often forced to rely on collect calls or phone cards. Seven out of 23 (or 30 percent) secure facilities responding to AI's survey allowed only collect calls or calls using a calling card; another six reported that the child generally has to pay for the call, though special arrangements may be made.

Immigration authorities have at times failed to communicate national standards on access to telephones at all facilities and to ensure these standards are adhered to. According to INS officials, the national policy allows for two calls a week for no less than 10 minutes.[246] Although in some facilities, children receive more than the allotted time; in others they receive significantly less. In some cases, they are allowed to speak for only five minutes.[247] In other instances, children

---

[242] AI telephone interview with Atieno Odhiambo, attorney with Columbia Legal Services, 1/24/03.
[243] FIAC Report, 2002.
[244] United Nations Rules for the Protection of Juveniles Deprived of their Liberty, adopted by General Assembly Resolution 45/113 of 14 December 1990, Rule I (59).
[245] "A child whose parents reside in different States shall have the right to maintain on a regular basis, save in exceptional circumstances personal relations and direct contacts with both parents...." CRC, Article 10.
[246] AI interview at BCYC, 9/6/02.
[247] Reported by children who had been housed in Southwest Key in Arizona and also the case in BCYC, Pennsylvania, until September 2001; AI interviews, fall 2002.

86.

have not been informed of this right at all. This failure to allow children to contact outside support does not correspond with international standards.[248]

Flores provides that children in INS detention must have a reasonable right to privacy, including the right to speak privately on the phone.[249] Nevertheless, the majority of facilities (25 out of 33) responding to the AI questionnaire reported that they log, monitor, and/or record calls. Of these, 52 percent (13 out of 25) reported that they share their records with the INS, or would do so if requested. This lack of privacy may be stressful for the children. At BCYC, R.D. told AI that his caseworker is always there when he talks to his lawyer. *"Sometimes I feel afraid—I don't talk about stuff on the phone."* Although the INS informed AI that these measures are taken to protect the children from smugglers, attorneys expressed concern that the phone logs and information gleaned from the calls are used in court.[250]

- S.C. was twelve years old when he came to the U.S. two years ago. He reportedly came from an extremely abusive background, living in the yard under his house. Advocates told AI that the INS claimed in court that he had made a number of calls to his father. His asylum case was thrown out on this basis, although S.C. claims the calls were to his younger brother, about whom he was very worried.[251]

ORR should allow the children privacy and confidentiality, as well as allow them to feel safe. The stress and hardship of detention is exacerbated if children fear that their actions or words will be turned against them by the only adults many of them are in contact with.

### 5.7.2 Visits

Most of the children AI spoke to had not received any visitors, several of them because their families were unable to travel to the places where they were held. AI encourages the ORR to attempt to house children nearby relatives in the U.S. willing to sponsor them.

In some cases, the restrictive nature of detention may inhibit the opportunity for some children to receive visits, including from their attorneys. In Florida, attorneys and relatives of children housed in a hotel must request permission 24 hours in advance of any meeting. Children are taken to Krome, an adult INS service. They are reportedly often not brought on time, sometimes miss meals in order to have legal visits, and spend hours waiting to be transported back to the hotel. On at least one occasion, the wrong child was brought to the meeting.

### 5.8 Consulates

Hardly any of the children AI interviewed had been in contact with their consulates. Of the facilities responding to AI's questionnaire, several seemed unaware of the children's right to contact their consulate, one facility asking AI for more information,[252] and only 12 out of 33 reporting that they notify the children of this right. Although they may choose not to exercise this right (particularly those children who fear return to their home country), all foreign nationals

---

[248] International standards hold that every juvenile should have the right to communicate in writing or by telephone at least twice a week with the person of his or her choice. United Nations Rules for the Protection of Juveniles Deprived of their Liberty, adopted by General Assembly Resolution 45/113 of 14 December 1990, Rule 1 (59).
[249] Exhibit 1(a)(12).
[250] AI interview at BCYC, 9/6/02.
[251] AI interview with advocacy group, August 2002.
[252] Montgomery County Youth Facility, Montgomery, Alabama

must be informed immediately upon arrest of their right to contact their consulate. It is the responsibility of the U.S. government to ensure this right is protected.[253]

## 6. RELEASE OF CHILDREN FROM DETENTION

> Alfredo Lopez Sanchez, age seventeen, arrived in the U.S. seeking asylum from his native Guatemala in June 2001. He reported suffering severe domestic violence and abuse at the hands of his father. He was repeatedly shackled and transferred eight times to various detention facilities. Alfredo had three separate offers of sponsorship but remained in detention. Alfredo speaks a rare Mayan dialect (Southern Low Mam), and an interpreter he met while he was detained in Miami was one of those willing to sponsor his release from detention. Alfredo was transferred to Berks County, Pennsylvania, before finally being released to the custody of his interpreter in December 2002, after 17 months of detention.
> - Amnesty International USA Refugee Action, 4 April 2002, and FIAC Report, October 2002

Many unaccompanied children spend months or even years in detention, even though a parent, brother, sister, or other appropriate adult or organization may be willing to take care of them in the U.S. International standards require that children should only be detained for the shortest possible time, and U.S. standards provide for a set of criteria for the release of unaccompanied children. However, in contravention of those standards, immigration authorities have often failed to ensure the timely release of children to someone willing to take care of them.[254]

According to the Department of Justice, during FY 2000, 2,238 of the 4,136 children detained by the INS were released to a sponsor.[255] However, children may spend considerable periods in detention prior to their release.[256] Sixty percent of children remained in detention for four weeks or less. Of the remaining 40 percent still in detention after four weeks, 7 percent (164 children) remained in custody for more than six months and one percent (20 children) remained in custody for over a year. Children from India and China are disproportionately affected and are subjected to lengthy periods in detention before release. One Chinese child had reportedly been held in custody for nearly two years (631 days).[257]

## 6.1 U.S. National Policy for the Release of Unaccompanied Minors: The Flores Settlement

---

[253] The Vienna Convention on Consular Relations, which the U.S. ratified without reservation in 1969, provides in Article 5(h) that consular functions consist of safeguarding the interests of minors particularly where any guardianship or trusteeship is required. See also Rule 38(1) of UN Standard Minimum Rules for the Treatment of Prisoners: "Prisoners who are foreign nationals shall be allowed reasonable facilities to communicate with the diplomatic and consular representatives of the State to which they belong." Principle 16(2) of the Body of Principles contains a similar provision.

[254] The United Nations Convention of the Rights of the Child; UN Rules for the Protection of Juveniles Deprived of Their Liberty (UN Rules for the Protection of Juveniles). The Standard Minimum Rules for the Treatment of Prisoners; the Body of Principles for the Protection of All Persons Under Any Form of Detention or Imprisonment (Body of Principles) provide further authoritative guidance for the interpretation of the above treaties. Finally, the UNHCR Guidelines on Refugee Children, the UNHCR Guidelines on Detention of Asylum-seekers, and the Recommendations of the Executive Committee of UNHCR provide additional assistance in complying with the international standards applicable to children in immigration custody.

[255] OIG, Unaccompanied Juveniles in INS Custody, 2001. These statistics relate to children detained by the INS for over 72 hours.

[256] For all juveniles, the average length of stay was 43.5 days. OIG, Unaccompanied Juveniles in INS Custody, 2001.

[257] See OIG, Unaccompanied Juveniles in INS Custody, 2001.

88.

> "[T]he INS shall release a minor from its custody without unnecessary delay" unless detention is required to secure the child's appearance in court or to ensure the minor's safety or that of others.
> - Stipulated Settlement Agreement, *Flores v Reno, case no. CV85-4544-RJK (C.D Cal. 1996)*

> "[I]t is generally in the best interests of a juvenile to be reunited with his or her parents, either in the United States or abroad, absent evidence that the juvenile will suffer harm....We should be working toward a system that quickly reunites children with their parents in the United States or abroad, or that quickly determines that reunification is not possible."
> - Stuart Anderson, INS, testimony before U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 28 February 2002

The *Flores* settlement requires the INS to release children without unnecessary delay and the agreement lays out in order of preference categories of relatives, unrelated adults, and licensed care settings to which children are to be released.[258] These include:

- A parent;
- A legal guardian;
- An adult relative (brother, sister, aunt, uncle, or grandparent);
- An adult individual or entity designated by the parent or legal guardian as capable and willing to care for the child;
- A licensed program willing to accept legal custody;
- An adult individual or entity seeking custody, at the discretion of the INS, when no likely alternative to long-term detention appears and family reunification does not appear to be a reasonable possibility.

Due to a restrictive interpretation of the above provisions of *Flores* by the INS, lawyers monitoring the implementation of *Flores* note that since the settlement was signed, the population of children in INS custody has increased from a daily average of fewer than 130 in custody in 1996 to a daily average of nearly 500 children in custody in 2000.[259] The DOJ found that INS policies on release of juveniles might in some cases impede expeditious release of children.[260] AI is concerned that release decisions appear to be arbitrary and inconsistent, with little consideration given as to what is in the best interests of each child. The following describes just some of the problems that result in delays in releasing children and consequent protracted and unnecessary periods of detention.

### 6.1.1. Release of Children to Available Family or Other Appropriate Caregivers

The parties to whom children may be released are listed in *Flores* in order of preference. Accordingly, children should be released into the custody of their parents. If that is not an option, then there is nothing to prevent authorities from working down the list and releasing children to other appropriate caregivers, such as a brother, aunt, cousin, or, if no family is available, another suitable sponsor.

The INS, however, interpreted the *Flores* list in a way that meant children remained in detention unless the custodian highest on list, who is also in the U.S., arranged to take custody of

---

[258] *Flores*, par. 14, VI. General Policy Favoring Release.
[259] Center for Human Rights and Constitutional Law, National Center for Youth Law, Latham & Watkins, Youth Law Center, *Unaccompanied Immigrant and Refugee Children. A Working Paper Prepared for the Office of Refugee Resettlement*, 14 January 2003.
[260] OIG, Unaccompanied Juveniles in INS Custody, 2001.

the child. If that "preferred" caregiver refused to appear, often the child remained in detention. One factor that has prevented potential caregivers from coming forward was an INS policy that many have criticized as effectively using children as "bait" to lure undocumented relatives in the U.S. into removal proceedings.[261]  The INS has stated that it was INS policy not to release a child to anyone other than a parent if he or she was known to be in the U.S. According to this policy, an undocumented parent, or indeed any other undocumented potential sponsor had to appear before an INS officer and be served a Notice to Appear (NTA) before a child will be released. (A Notice to Appear initiates immigration proceedings against the sponsor.)[262]  If a relative refused to appear before immigration authorities, then the child paid the price by remaining in detention for considerable periods of time, even if another documented relative was available to care for the child.

AI met with U.S. immigration officials in all three former INS regions and all described a restrictive release policy and interpretation of Flores. The National Juvenile Coordinator told AI that children must be released to a parent, held in INS custody, or be returned home. The reason given for the strict policy was that "the closer the relationship, the more control there is over the child"; if children are released to family members who are not particularly close, then they are less likely to appear in court.[263]  INS officials in Arizona (Western Region) told AI that if the parent was undocumented in the U.S. and was unwilling to come forward the child would remain in detention even if an aunt or uncle was residing legally in the country. This is because the INS cannot release the child to an aunt or uncle, since "it is clear that the child is intended to be with the parent."[264]

Many of the children with whom AI met indicated that they had relatives in the U.S. who were willing to take care of them. They expressed frustration and despair at having to remain in detention.

- A teenage girl told AI she was upset and could not understand why she could not live with a relative in the U.S. She had been in detention for nine months and told AI that her request to live with him had been turned down because their relationship was "not close enough." [265]
- Fega was only seven years old when she arrived in the U.S. Her mother was in the country illegally and refused to claim her for fear of removal. Her father in Nigeria asked that her maternal aunt, a U.S. citizen, be given custody so that Fega could be released from detention; another family member also offered to take care of her but the INS refused to release her to their care. Her attorney tried unsuccessfully to get her released into INS foster care. Fega was finally released after fifteen months in detention.[266]

AI also received reports of delays being encountered due to what was perceived by many advocates to be excessive demands for paperwork in order to process a request for release, particularly for children from countries where avenues for obtaining documentation, such as birth

---

[261] See, for example, Women's Commission for Refugee Women and Children, May 2002.

[262] See OIG, Unaccompanied Juveniles in INS Custody, 2001, which cites INS letter to U.S. Catholic Conference and Lutheran Immigration and Refugee Service dated November 1999.

[263] AI meeting with National Juvenile Coordinator at BCYC, Eastern Region, 9/6/02. AI also met on 10/30/02 with the Central Regional Coordinator in Chicago who confirmed national policy that if a parent is in the country, "the child was destined for that parent," and that the INS encourages the parents to come forward.

[264] AI interview at Gila County, 11/5/02. Those present at the meeting included the Western Regional Juvenile Coordinator and the Arizona District Juvenile Coordinator.

[265] AI interview, fall 2002.

[266] FIAC report, 2002.

*90.*

certificates and identification documentation, is cumbersome. If a child is released to a non-parent, non-legal guardian and the parents are in the home country, they are required to provide written consent notarized at the U.S. consulate to allow the child to be released; this thwarts expeditious family reunification to non-parents or legal guardians. An immigration judge expressed concerns about a requirement for what she believed to be an unreasonable degree of proof of the relationship before some INS officers would release a juvenile to a family member.[267]

Decisions regarding release must always be made in a child's best interests and be made expeditiously to ensure that whenever a child is detained, it is for the briefest possible time. The ORR should apply a more flexible approach and exercise discretion in releasing a juvenile to an appropriate sponsor and should ensure that such decisions are not based on factors such as whether an undocumented parent is willing to come forward.

## 6.2 Failure to Appear for Hearings

The main reason INS officials gave to AI for not releasing children was because of a concern that many children who were released failed to appear for subsequent immigration hearings. INS officials referred frequently to EOIR data in the DOJ's OIG report that showed 112 (68 percent) of 164 juveniles released to a sponsor prior to completion of their hearings subsequently failed to appear at immigration hearings.[268]

This is a factor that has been recognized by the NGO community. *"[C]hildren who are placed in private settings and who are assigned neither a social worker nor legal counsel frequently fail to complete the immigration/asylum determination process.'*[269] AI believes that if children were afforded a lawyer and a guardian, they would be provided with the relevant support and guidance to ensure that they appeared at all subsequent hearings. Indeed, the data in the OIG report, although limited, appears to support this suggestion. The number of children who failed to appear was significantly reduced if they had legal representation: only 39 children (30 percent) failed to appear when represented by counsel, whereas 95 children (56 percent) who had no attorney of record failed to appear at immigration hearings following release. Another factor that may contribute to a child's failure to appear may be a change of venue. Of 302 children, 128 received at least one change of venue (i.e., court location) at some point during the proceedings; of those children 89 (70 percent) dropped out or failed to appear.[270]

In a study conducted by the VERA Institute for Justice regarding the release of adults in removal proceedings, 91 percent of supervised adults in immigration proceedings appeared for all of their hearings.[271] This suggests that if children were provided with legal representation and a guardian, they would not only understand the importance of attending subsequent hearings, but they would be informed of such practicalities as date, time, and venue of a court hearing. AI encourages the ORR to undertake further research or undertake a pilot project in this area to

---

[267] OIG, Unaccompanied Juveniles in INS Custody, 2001.

[268] Ibid ;  AI meeting with National Juvenile Coordinator, 9/6/02; AI meeting with INS officials in Gila County, 11/5/02.

[269] See also Trans-Atlantic Workshop on Unaccompanied/ Separated Children· *Comparative Policies and Practices in North America and Europe, Georgetown University, June 18-19, 2001,* Draft Workshop Report 8/22/01.

[270] OIG, Unaccompanied Juveniles in INS Custody, 2001, appendix 2.

[271] See speech by Oren Root, National Director of the Appearance Assistance Program, *The Appearance Assistance Program· An Alternative to Detention for Non-Citizens in U.S. Immigration Removal Proceedings,* VERA Institute of Justice, New York, May 2000; and VERA Institute of Justice, *Testing Community Supervision for the INS: An Evaluation of the Appearance Assistance Program,* New York, August 2000.

91.

ensure that children do not unnecessarily remain in detention because of an assumption they will not appear for subsequent hearings. AI believes that an immigration court should only make such a determination after a full assessment of whether the child is indeed a flight risk.

## 6.3 Prolonged Detention: Indian and Chinese Children

*"All I think about is when I'm going to be free."*
- Seventeen-year-old Indian asylum-seeker to AI delegate after being in detention for 10 months

Under current INS policy and practice, many Chinese and Indian minors experience long periods of detention before being released to relatives or other agencies. The INS Juvenile Protocol Manual requires that potential homes for Chinese and Indian juveniles be assessed before their release. The purpose of this requirement is to protect juveniles from smugglers who may have brought them into the country and to make sure any sponsors are legitimate.[272]  As a result of a lengthy and time-consuming home assessment process known as "suitability assessments," Chinese and Indian children spent longer in custody than other nationalities. Eighty-five percent of children held for six months or longer are Chinese or Indian.[273] In 2000, 77 percent of the Chinese and Indian children were detained for over one month, compared to 30 percent for other nationalities, and the average length of detention for Chinese and Indian juveniles was 146 days compared to 29 days for other children.[274]

- R.D., a thirteen-year-old Indian boy seeking asylum on the grounds of religious persecution in his home country, had been in detention for over 14 months when AI met with him. *"It's been a long time,"* he said, and told delegates that there were seven other Indian boys at the detention facility that had all been there more than one year. This boy arrived in the U.S. with his cousin, but his cousin was paroled while he remained in detention. He told AI that he had an uncle who was willing to take care of him.
- K.Y., an Indian boy aged seventeen had been detained for 588 days when AI met with him in September 2002. He told AI that he had an uncle in the U.S. who was properly documented and who would take him in.

The ICCPR and the CRC stipulate that children must have access to their rights, without discrimination of any kind, including discrimination on the basis of race, color, language. or national origin.[275] AI is concerned that the current policy regarding home assessments for Chinese and Indian children, while not discriminatory in intent, may be discriminatory in its impact. Distinctions made on the basis of nationality alone would be regarded as discriminatory under international standards.

---

[272] The Juvenile Protocol Manual emphasizes that district directors continued to have full discretion over the release of juveniles from custody, except for the especially vulnerable Chinese and Indians. Home assessments involve a number of steps, performed sequentially by the INS and voluntary agencies under contract with the INS to make home visits and do interviews. For a detailed explanation of the procedure for home assessments see OIG, Unaccompanied Juveniles in INS Custody, 2001; and the Juvenile Protocol Manual. The INS is also authorized to conduct home assessments prior to releasing a child to any nongovernmental custodian. Reportedly, there are often excessive delays in initiating home studies and in releasing minors once such studies are completed.
[273] OIG, Unaccompanied Juveniles in INS Custody, 2001.
[274] Ibid.
[275] ICCPR, Art. 2(1); CRC, Art. 2(1)

56

92.

AI appreciates that certain children may be at high risk and recognizes that additional precautions may need to be taken; however, these risks are not appropriately addressed simply by extending a child's detention when a child belongs to a specific at-risk group.[276]   Special procedures need to be devised to expeditiously identify victims of trafficking, recognizing that each case will pose its own unique issues. The appointment of a guardian to all unaccompanied children could assist in this process. Children should not be placed in secure detention for their "protection" while a criminal case against smugglers is investigated and/or prosecuted, but rather in the least restrictive setting possible in confidential locations, in accordance with U.S. and international standards.[277]

AI does not take issue with U.S. authorities conducting suitability assessments; indeed, AI believes that whenever a child is being released to someone other than a parent that such assessments should be carried out. It is essential, however, that sufficient resources be made available to ensure that such a process does not result in any delay.

## 6.4 Haitian Children

Ernst Poulard, seventeen, arrived unaccompanied in the U.S. by boat on December 20, 2001. The INS immediately detained him in Florida, and then, in January 2002, transferred him to Berks County, Pennsylvania, a secure juvenile detention facility. There, he was reportedly commingled with U.S. juvenile offenders and subjected to strip searches and harsh conditions. His mother is a legal permanent resident (LPR) and lives in Miami, Florida. He also has other relatives with LPR status. Ernst was finally released to his mother in July 2002, six months after his arrival in the U.S.

—Amnesty International USA, Refugee Action, 17 May 2002

Ernst was among over 200 Haitians being held at several INS centers in the U.S. in response to two boat arrivals in December 2001.[278] Advocates argued that Ernst's detention, and that of the

---

[276] The INS believes that alien smugglers are aggressive in searching out and retaliating against minors following release.

[277] The INS has used a number of facilities previously for these situations. In addition, child trafficking victims are eligible for ORR-funded child welfare services through LIRS and USCCB. It is therefore important that there be a process in place to quickly identify victims of trafficking to ensure that children are released from detention expeditiously. See also LIRS letter to INS, 3/28/02. *"Law enforcement authorities may detain a victim during the course of investigating a traffic claim if the individual circumstances of the case require it."* However, the TVPA stipulates that such protection of victims of severe forms of trafficking should not be detained in facilities that are inappropriate to their status as crime victims. While victims should also be protected from recapture or other reprisals by their traffickers, the TVPA says such protection should not be the sole reason for detention by the INS. See also UN Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplement to the UN Convention Against Transnational Organized Crime, 2000, II. Protection of Victims of Trafficking in Persons, Art. 6; Assistance to and Protection of Trafficking in Persons, Art. 4. *"Each State Party shall take into account, in applying the provisions of this article, the age, gender and special needs of victims of trafficking in persons, in particular the special needs of children, including appropriate housing, education and care."*

[278] On 12/3/01 and 12/20/01, the U.S. Coast Guard interdicted two boats and apprehended 167 Haitians. Men were taken to Krome Service Processing Center (KSPC) and women to Turner Guildford Knight Correction Center (TGK), a maximum-security jail in Miami. Most of the unaccompanied children were sent to juvenile facilities, while some parents with children were housed at a hotel. A lawsuit filed on March 15, 2002, by immigration attorneys and Haitian rights advocates in Miami alleges that the U.S. government was discriminating against Haitian asylum-seekers, including those who have shown a credible fear of persecution in Haiti. See also: Class Action Petition for Writ of Habeas Corpus, *Ernest Moise et al v. INS,* 02-20822-CV-JAL; Amnesty International Action, AMR 51/067/2002, May 2000. It is reportedly not unusual for families seeking asylum to be separated and held in separate detention centers, which includes separating children from their parents and adult relatives. The INS has sought to address the problem of family separation by opening its first family detention center in Berks County, Pennsylvania. AI delegates observed

other Haitians, marked a reversal of previous INS handling of such cases, and that Haitians were being singled out based on a discriminatory policy. Until December 2001, Haitians arriving by boat to Miami were routinely paroled from detention if they had community ties in South Florida. Their detention had the appearance of singling out Haitians based on their nationality. Advocates and attorneys in Florida have claimed that it is not normal practice for Haitian children to be detained while their proceedings are under way. In March 2002, the INS acknowledged that it had changed its policy regarding Haitian asylum-seekers. Instead of regularly releasing Haitian asylum-seekers who had shown a credible fear, the INS continued to detain them, saying that it wanted to avoid further risk taking and to deter further Haitians attempting to enter the U.S. by boat.[279]

In April 2002, the UNHCR issued an advisory opinion on the detention of the Haitians, concluding that detention to deter future arrivals does not fall within any of the exceptional grounds allowed under international refugee law and is contrary to the principles underlying international refugee protection for detaining asylum-seekers. It further stated that detention for deterrence purposes is arbitrary and that deterrence is an "inappropriate goal and insufficient reason for detention," and that detention of asylum-seekers based on national origin is discriminatory and would also constitute arbitrary detention.

On November 13, 2002, after refusing to parole from detention Haitian passengers from another boat that ran aground on the coast of Florida on October 29, and in response to more criticism about the disparity in treatment of Haitian boat people, the INS announced that all boat people—with the exception of Cubans—would be subject to mandatory detention upon arrival or placed into expedited removal proceedings.

Some Haitians, especially children, nonetheless successfully petitioned for release from detention, until April 17, 2003, when Attorney General John Ashcroft personally decided one such case.[280] *In re D-J-*, Ashcroft wrote a sweeping decision, instructing immigration judges to refuse to release undocumented asylum-seekers if the government argues that "significant national security interests are implicated." Ashcroft ruled that all Haitians constitute such a group, since releasing Haitian asylum-seekers might encourage other Haitians to come to the U.S., which could injure national security by straining the resources of the Coast Guard. Therefore, he ordered, Haitians must be kept in detention irrespective of whether they personally pose any threat.[281] AI is deeply concerned by this trend toward blanket detention of Haitians and urges the U.S. government to reconsider its position to ensure that all asylum-seekers are afforded an individual assessment of their right to release and adheres to international standards that provide that, as a general principle, asylum-seekers should not be detained. It must be recognized that in an era of strict visa controls and other measures used to restrict access to borders, asylum-seekers are often forced to arrive at or enter a territory illegally in order to exercise their right to seek

---

the family center during a visit to Berks in September 2002. Space is limited, and AI met with one seventeen-year-old Russian boy whose parents were held in another facility. He was allowed to speak to his parents only by telephone. See also Women's Commission for Refugee Women and Children, May 2002.

[279] In order to avoid expedited removal (a process by which individuals arriving in the U.S. can be removed without appearing before an immigration judge), those who express fear of return to their home country have a "credible fear" interview. If a credible fear is demonstrated, the individual is placed in "removal proceedings" and is entitled to a hearing before an immigration judge. Children are not subjected to expedited removal proceedings and therefore do not have a credible fear interview, they are automatically placed in removal proceedings and therefore have the opportunity to bring any claim for relief before an immigration judge.

[280] *In re D-J-*, 23 I&N Dec.572 (A.G. 2003).

[281] Department of Justice, INS Order No. 2243-02, *Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act*, Part IV, 67 FR 68924, Federal Register, vol. 67, no. 219, 11/13/02; and *In re D-J-*, 23 I&N Dec.572 (A.G. 2003).

asylum under article 14 of the UDHR. When countries of asylum become fortresses, they should expect increased use of false documents and reliance on smugglers. AI believes that in balancing state interests against asylum-seekers' rights, the use of detention by the U.S. is a disproportionate and harsh measure in the pursuit of immigration control objectives.

## 6.5 Effect of Long-term Detention: Children Abandoning Their Claims

In 1998, AI wrote, *"Once asylum-seekers are caught in the labyrinth of the INS detention system, its complexity and almost complete disregard of the needs of refugees creates a 'trial by ordeal' from which only the most persistent, courageous, or lucky emerge unscathed.*[282] Prolonged periods of detention in harsh conditions (see chapters 3 and 4) may force many children to abandon their claims for relief in a desperate attempt to escape detention.

- N.D., a seventeen-year-old boy, told AI that he was going to return to Guatemala even though he was scared that he might be killed. He told AI he hated being in detention and that he had spoken to children who had been in detention for over a year, and he did not want that to happen to him. AI later learned he had returned to his home country.[283]
- An attorney who represents children detained in Martin Hall, Washington, told AI that it is very difficult to explain to children that they will be detained for a long period of time while their claim is being processed. She reported that many of her clients accept voluntary departure, because they would rather go back and try to fend for themselves than be locked up. *"Even after one month, they feel like they are going crazy and throw in the towel.'*[284]

The way children are detained in the U.S. may prevent or inhibit them from lodging or pursuing their claims. Detention may have the effect of inducing children to abandon their claims, especially when detention is prolonged and conditions are poor. Asylum or other forms of relief become dependent not solely on the children's eligibility under international and national law, but on their ability to endure long-term detention.

## 6.6 Failure to Release After Asylum Is Granted

Some children may not be released even after they have been granted asylum, particularly if the INS decides to appeal the decision.

- Kervens Bellot, a seventeen-year-old from Haiti was held in detention for three months. An immigration judge granted him asylum, but Kervens continued to remain in custody. His aunt, a U.S. citizen, was eager to sponsor him and had submitted all the relevant documentation to the INS. The documentation included a letter from his parents giving the aunt permission to adopt him. As this went beyond the requirements by the INS, they delayed his release until another letter was sent to reflect that the aunt could have "custody" and not "adoption."[285]
- A fifteen-year-old Chinese girl reportedly remained in detention for seven weeks after she had been granted asylum notwithstanding the availability of her U.S. citizen uncle to take

---

[282] Amnesty International previously described the toll that the U.S. detention system has taken on those seeking asylum in *Lost in the Labyrinth*, 1999.
[283] AI interview, fall 2002
[284] AI telephone interview with Atieno Odhiambo, attorney with Columbia Legal Services, 1/24/03.
[285] See AI Action, 2/12/03.

care of her. The INS reportedly did not commence a home assessment for the girl until she
had been detained for several months.[286]

This issue is of grave concern to AI, and arrangements should be made to immediately
release from detention any child who has been granted asylum or other forms of relief by a U.S.
immigration judge.

## 6.7 Effective Review of Decisions Not to Release Children

International standards provide that everyone has the right to be free from arbitrary
detention and that anyone deprived of his or her liberty shall be entitled to proceedings before a
court in order that the court can decide without delay on the lawfulness of detention and order
release if appropriate.[287] According to *Flores*, if a child is not released (or if the amount of bond
set by the INS payable to secure their release is too high), he or she is entitled to have an
immigration judge review the decision.[288]   Given the barriers to unaccompanied children
exercising these rights (not least the lack of legal representation or any form of adult assistance),
it appears that very few decisions denying release are ever reviewed by an immigration court or
federal judge. AI recommends that there should be an automatic hearing before an immigration
court to determine whether a child is a flight risk or a danger to society.  If a child is ordered
released, the ORR should ensure that such release is effected expeditiously, within a limited time
period, to a suitable sponsor in compliance with the terms of *Flores*. With such important rights at
stake, such as the right to liberty and freedom of movement, if release is not effected, detained
children must be afforded frequent opportunities to have their ongoing detention reviewed and the
authorities must be required to justify a child's continued detention.

## 7. LACK OF LEGAL REPRESENTATION, FAILURE TO APPOINT GUARDIANS AND ACCOMMODATE UNIQUE NEEDS OF CHILDREN IN COURTROOMS

---

[286] Julie Sullivan, *Chinese Girl Waits in Portland Jail for Months Despite Getting Asylum*, The Oregonian, 12/10/99;
*Refugee Flies Away to New Life, Freedom*, The Oregonian, 12/18/99.

[287] International Covenant on Civil and Political Rights (ICCPR), Art. 9.

[288] Children are entitled to a "bond redetermination" hearing in every case, unless the child indicates on the Notice of
Custody determination form that he or she refuses such a hearing. *Flores*, Right to Bond Redetermination, par. 12(a);
and Right to Challenge Placement in Federal Court, par. 24(b).  Of concern is the uncertainty that exists as to whether
the right to a bond redetermination hearing applies to arriving aliens, i.e., children apprehended at ports of entry as
opposed to children already in the U.S.  See 8 CFR, Sec. 3.1.9 (h)(2)(i)(B). AI believes that all children should be
afforded bond redetermination hearings.

*"There was no way I could win without Manny—I did not even know that asylum existed before Manny and I could not fill out all those papers in English and did not know what to do in court.... I saw many children like me who gave up fighting their immigration cases and accepting deportation because they hated the jail and did not have lawyers like Manny to help them."*
-Edwin Larios Muñoz, fifteen, testimony before U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 28 February 2002

*"The first time Baby Margaret [from Jamaica] entered a courtroom she was in the arms of her INS Deportation Officer. She did not have an attorney or a guardian ad litem, and at just eighteen months was unable to speak to the judge herself."* [289]

Statistics show that that asylum-seekers are four times more likely to be granted asylum when represented by a lawyer. [290]

Many adults, even native English speakers, find the U.S. immigration system complex and confusing. Unaccompanied children are not guaranteed a lawyer, or any form of adult assistance, to help them apply for asylum or other forms of relief from removal. Without appropriate legal assistance, children with valid asylum claims may be less likely to obtain asylum and more likely to be returned to a country where they may face death, torture, or ill treatment. [291]

### 7.1 Lack of Legal Assistance for Children in U.S. Immigration Proceedings

The majority of unaccompanied children in the U.S. do not have legal representation and face adversarial legal proceedings alone, often in a language they do not understand.[292] As already noted, unaccompanied children encounter considerable difficulties in securing legal representation, which may explain why the U.S. Department of Justice has reported that less than half (only 43 percent) of children are represented.[293] Advocates and attorneys have estimated that this may not reflect the real situation and that the number of children represented is likely far less. Andrew Morton, from the law firm Latham & Watkins, recently testified before the U.S. Senate: *"Of these nearly 5,000 unaccompanied juveniles apprehended annually by th e INS ... as many as 80 percent appear in an immigration court without the benefit of a lawyer, guardian ad litem, or assistance or adult assistance of any kind."*[294] As no comprehensive data is currently maintained on the number of children represented by counsel it is difficult to know exactly how many children are without counsel.

---

[289] FIAC report, 2002.

[290] Andrew I. Schoenholtz and Jonathan Jacobs, *The State of Asylum Representation: Ideas for Change*, Georgetown Immigration Law Journal, Summer 2002; and American Bar Association, *Fact Sheet Unaccompanied Immigrant Children*, September 2002.

[291] See Julianne Duncan, Director of Children's Services for Migration and Refugee Services, U.S Conference of Catholic Bishops, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02. See also Christopher Nugent and Steven Shulman, *"Giving Voice to the Vulnerable: On Representing Detained Immigrant and Refugee Children,"* Interpreter Releases, 10/8/01.

[292] OIG, Unaccompanied Juveniles in INS Custody, 2001.

[293] Ibid.

[294] Andrew Morton, attorney, Latham & Watkins, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.

Effective representation for these unaccompanied children includes ensuring all aspects of the child's legal interests that arise during protracted and complex immigration proceedings, including evaluating the child's ability to access any available forms of immigration relief; filing applications, pleadings, and motions before immigration judges; representing the child during hearings and asylum interviews. Legal representation also offers other critical safeguards for ensuring that laws and regulations protecting a detained child's rights are adhered to, including ensuring that a child is detained in the least restrictive setting possible and that his or her rights in detention are respected. Lawyers safeguard unaccompanied children from frequent and inappropriate transfers, and attempt to reunite the children with parents or suitable adult relatives either in the U.S. or abroad.

Even those children receiving legal assistance may not actually be receiving meaningful or effective representation. According to the DOJ study, of the 43 percent of children represented by an attorney, most were Chinese juveniles. Immigration judges, INS attorneys, and pro bono attorneys expressed concern that the Chinese juveniles in many cases were not well served by their attorneys.[295] Lawyers representing Chinese and Indian children often reportedly represent the interests of the smugglers rather than the child. Representation of the non-Chinese juveniles largely depended on the availability of pro bono services, and although pro bono and low-cost legal services are available in some areas, they are generally in short supply.[296]

Considerable efforts have been undertaken by the EOIR, the American Bar Association, and other legal assistance and voluntary organizations to improve access to basic legal information to children in detention. However, voluntary or nonprofit agencies sometimes have a legal staff of only one attorney and resources are limited. It is therefore understandable that the voluntary agency attorneys report that only in "exceptional circumstances" are they able to represent a juvenile or find a private attorney to take a case on a pro bono basis. Often the services to children in detention are limited to group presentations of an explanation of the hearings process and their rights. Pro bono attorneys told the DOJ that they "lacked the time and funds needed to fully develop and support claims for relief, usually applications for asylum." They said that "some juveniles who were removed might have made a case for relief, if they had been given time and had been able to find adequate legal representation." Several attorneys suggested this might be true in 10 percent of cases.[297]

## 7.2 A Child's Right to Legal Representation

> Unaccompanied children in INS custody *"encounter a stressful situation in which they are forced to make critical decisions. The interrogators are foreign and authoritarian. The environment is new and the culture completely different. The law is complex.... In short, it is obvious to the Court that the situation faced by unaccompanied minors is inherently coercive."*
> — *Perez-Funez v. INS,* 619 F. Supp. 656, 662 (C.D. Cal. 1985)

---

[295] Frequently Chinese juveniles brought in by smugglers had been informed, prior to their arrival in the United States, that a private attorney at their final destination would represent them. Their destinations were usually far from the custody site. For example, Chinese juveniles in custody in the Phoenix district would have an attorney of record in New York City. These Chinese juveniles were often reluctant to speak with pro bono attorneys, even though the private attorneys provided few or no legal services while the juveniles were in custody.

[296] Many legal services programs that cater to asylum-seekers lack the experience and resources to adequately serve children. See also Christopher Nugent and Steven Schulman, *"Giving Voice to the Vulnerable: On Representing Detained Immigrant and Refugee Children,"* Interpreter Releases, 10/08/01.

[297] OIG, Unaccompanied Juveniles in INS Custody, 2001.

98.

SCANNED

> *"It is ironic that the domestic juvenile offenders in juvenile jails have the right and access to legal counsel, but the children being detained by the INS do not. These children, young people who may have limited formal education and almost certainly not proficient in the English language are led into immigration proceedings where they are pitted against well-trained, well-educated, and experienced INS attorneys. This is not a fair fight.... After traveling alone and facing detention alone, they all too often confront a new and daunting challenge—defending themselves in immigration proceedings alone."*
> —Robert E. Hirshon, President, American Bar Association, remarks at immigration judges Conference, San Juan, Puerto Rico, June 2002

Under U.S. law, individuals in immigration proceedings have a right to counsel, but not at government expense.[298]   Children must be told that they have a right to a lawyer but that the government will not pay for one. International standards provide that a lawyer should be appointed whenever a child is detained or deprived of his or her liberty and that prompt and regular access to legal counsel is a fundamental human right.   For example, the United Nations Rules for the Protection of Juveniles Deprived of Their Liberty provides that children should have the right to legal counsel and be enabled to apply for free legal aid, where such aid is available.[299] The UNHCR Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-seekers state that detained asylum-seekers should be informed of the right to legal counsel and, where possible, should receive free legal assistance; children benefit from these same minimum procedural guarantees.[300]   In many European states and in Canada, governments have begun to build capacity to ensure that each unaccompanied child has a lawyer to represent him or her or to represent his or her best interests in immigration/asylum procedures.[301]

AI notes that in the U.S., outside of the immigration jurisdiction, counsel is appointed where children are deprived of their liberty and important rights are at stake. The U.S. government is required to provide free legal counsel to adults and children in criminal cases.[302]

---

[298] The Immigration and Naturalization Act (INA) of 1980, Sec. 292, provides aliens in removal proceedings with the right to representation at no expense to the government.

[299] See UN Rules for the Protection of Juveniles Deprived of their Liberty, 1990, Art. III. Juveniles Under Arrest or Awaiting Trial, Sec. 18(a). See also UN Standard Minimum Rules for the Administration of Juvenile Justice ("The Beijing Rules"), 1985. See also CRC, 1989, Article 37, which states that every child deprived of his or her liberty shall have the right to prompt access to legal and other appropriate assistance. UN Body of Principles for the Protection of All Persons Under Any Form of Detention or Imprisonment, 1988, Principle 17(1): *"A detained person shall be entitled to have the assistance of a legal counsel. He shall be informed of his right by the competent authority promptly after arrest and shall be provided with reasonable facilities for exercising it; (2) If a detained person does not have a legal counsel of his own choice, he shall be entitled to have a legal counsel assigned to him by a judicial or other authority in all cases where the interests of justice so require and without payment by him if he does not have sufficient means to pay."*

[300] UNHCR Guidelines on Detention of Asylum-seekers (February 1999). See also UNHCR Guidelines on Policies and Procedures in dealing with Unaccompanied Children Seeking Asylum (1997), Sec. 4.2, which stipulates that upon arrival, a child should be provided with a legal representative and that claims of unaccompanied children should be examined in a fair and age-appropriate manner.

[301] Models for funding and coordinating legal representation differ among countries, but they all aim to secure capable counsel for each child awaiting status determination. See also Georgetown University, *TransAtlantic Workshop on Unaccompanied/Separated Children: Comparative Policies and Practices in North America and Europe*, June 18-19, 2001 (Draft Workshop Report, August 22), 2001; and Secretariat of the Inter-Governmental Consultation on Asylum, Refugee and Migration Policies in Europe, North America and Australia, *Report on Unaccompanied Minors: Overview of policies and practices in IGC participating states*, July 1997. For example, in the U.K. and Canada, children, like adults, are eligible for state-funded representation to assist with their asylum claims.

[302] The Supreme Court held in *Gideon v. Wainwright* that the government must provide free counsel for indigent defendants in adult criminal cases.  In *In re Gault* the Court extended its holding in *Gideon*, finding that due process requires the government to provide lawyers for children in delinquency proceedings. *In re Gault*, 387 U.S. 1 (1967) and *Gideon v. Wainwright*, 372 U.S. 335 (1963)

63

99.

The U.S. Supreme Court stated, *"The juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and to submit it. The child requires the guiding hand of counsel at every step in the proceedings against him.*"[303] Indeed, in U.S. juvenile legal proceedings ranging from delinquency charges to civil suits, children are regularly appointed attorneys to assist them through the process.[304] Although the above comment was made in the U.S. Supreme Court case that established a child's right to counsel in domestic law, advocates have argued that this statement is as true for unaccompanied children facing removal proceedings as it is for juveniles in domestic criminal proceedings.[305]

The government's failure to provide counsel to unaccompanied children was recently challenged in a federal court. In March 2002, a U.S. District Court issued a preliminary injunction in the case of a fourteen-year-old Mexican boy detained in Martin Hall, in Washington state, who could not afford legal counsel. He did not understand his legal rights or options and was not represented during his removal proceedings. As a result, he unwittingly signed an agreement to voluntarily depart from the United States. The court ordered the INS to reach an agreement regarding the boy's release from detention, indicating that if such an agreement could not be reached, it would appoint counsel to the boy at the government's expense.[306] A class action lawsuit was subsequently filed on behalf of unaccompanied children.[307] Ultimately class certification on behalf of all unaccompanied minors without counsel was denied. However, the court appointed counsel to the fourteen-year-old boy for the purpose of release from detention, noting in its decision the significant hardships that detention had caused the boy.

AI believes that the U.S. government should ensure that all unaccompanied children receive legal representation, including providing paid counsel at the government's expense if effective pro bono representation cannot be guaranteed, in accordance with international law and standards.

## 7.3 Concerns Related to Court Hearings

Other factors pertaining to the handling of immigration removal hearings, in addition to lack of legal representations, include dehys in court proceedings; lack of training and guidelines for INS trial lawyers and immigration judges; lack of statistical data relating to children's cases; inadequate language services; failure to adapt courtroom procedures for children.

---

[303] Justice Abe Fortas in the majority opinion of *In re Gault,* 387 U.S. 1 (1967).

[304] For a wide variety of juvenile state court proceedings, ranging from delinquency charges to civil suits, to allegations of abuse and neglect, states such as California, Kansas, Massachusetts, Ohio, and Pennsylvania mandate the appointment of counsel to ensure a fair and objective adjudication to the benefit of minors, who invariably are ill-equipped to represent themselves. See Andrew Morton, attorney, Latham & Watkins, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.

[305] It has been argued that there is a strong basis for asserting that the government may at times be required by the U.S. Constitution to provide legal counsel for indigent adults in immigration removal proceedings and that the argument is still stronger as applied to unaccompanied minors. See Human Rights Watch, *Slipping Through the Cracks,* April 1997, for a full discussion of this argument.

[306] See Jonathan Martin, *Mexican Orphan Becomes Case Study,* The Spokesman Review, 4/14/02, noting that the suit seeks class action status for all children held in INS custody.

[307] Filed by the Southern Poverty Law Center, Columbia Legal Services and Northwest Immigrant Rights Project. See also *M.G M. v Ashcroft,* Case No. CS-02-0066-FVS, U.S. District Court for the Eastern District of Washington, 3/05/02. See *Gonzalez Machado v Ashcroft,* Case No. CS-02-066-FVS (E-WA 2001). See also *Elizabeth Amon, Youth, 14, Gets Lawyer for INS Case. Advocates Say Order Was First of Its Kind,* National Law Journal, 4/1/02; and Sharon Finkel, *Voice of Justice: Promoting Fairness Through Appointed Counsel for Immigrant Children,* N.Y. Law School Journal of Human Rights 17 (2001): 1105.

100.

### 7.3.1 Delays in Immigration Proceedings

According to the Department of Justice OIG report, the average duration of immigration proceedings is 160 days.[308] However, many children can spend months or even years in detention pending resolution of their immigration status, especially if the immigration service appeals their case. For example, AI met with a thirteen-year-old asylum-seeker who had been in detention for over fourteen months.

International standards provide that juvenile cases should be given the highest priority especially when children are detained. According to the UN Standard Minimum Rules for the Administration of Juvenile Justice, *"Each case shall from the outset be handled expeditiously, without any unnecessary delay."*[309]

One reason why immigration judges are willing to delay hearings is for efforts to be made for the child to secure legal representation. Indeed, the EOIR has been actively involved in trying to develop sources of pro bono legal aid. Notwithstanding these efforts, very few of the pro bono attorneys reportedly actually represent the children in the full hearings process.[310] According to Chief Immigration Judge Michael J. Creppy, *"Most immigration judges favor increased representation by legal counsel. Every day our judges conduct cases involving respondents who appear pro se [without a lawyer]. The judges know how to be fair, even when only one side to the proceeding is represented by counsel. However, when you combine the complexity of immigration laws with the varying degrees of maturity of juveniles, it provides a greater challenge to judges to ensure that the proceedings are fair, and that the juvenile understands the serious nature of the proceedings. If the judge knew that competent counsel were assured for every juvenile respondent, the efficiency of the hearing would be greatly improved."*[311]

---

[308] See OIG, Unaccompanied Juveniles in INS Custody, 2001. Duration of proceedings (first master calendar to completion date): Average: 160 days Median: 84 days.

[309] See UN Standard Minimum Rules for the Administration of Juvenile Justice ("The Beijing Rules"), Part III. Adjudication and Disposition, par 20, Avoidance of Unnecessary Delay; UN Rules for the Protection of Juveniles Deprived of their Liberty, 1990, Art. III, Sec. 14: Juveniles Under Arrest or Awaiting Trial. *"Juveniles who are detained under arrest or awaiting trial ("untried") are presumed innocent and shall be treated as such Detention before trial shall be avoided to the extent possible and limited to exceptional circumstances. Therefore, all efforts shall be made to apply alternative measures When preventive detention is nevertheless used, juvenile courts and investigative bodies shall give the highest priority to the most expeditious processing of such cases to ensure the shortest possible duration of detention. Untried detainees should be separated from convicted juveniles."* See also UNHCR, Geneva Guidelines on Policies and Procedures in dealing with Unaccompanied Children Seeking Asylum, See 8.1, February 1997: Refugee Status Determination for Unaccompanied Children. *"Considering their vulnerability and special needs, it is essential that children's refugee status applications be given priority and that every effort be made to reach a decision promptly and fairly. All appeals should be processed fairly and as expeditiously as possible."*

[310] See OIG, Unaccompanied Juveniles in INS Custody, 2001. Often pro bono attorneys merely request continuances on behalf of the juveniles or addressed custody issues. For example, custody issues might involve requirements for a bond before release to family members or review of the status of home assessments and projected release dates.

[311] Michael Creppy, Chief Immigration Judge, Executive Office of Immigration Review (EOIR), testimony before U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.

101.

Another reported practice of concern is the postponement of "merits" hearings (i.e., full consideration of a child's claim for immigration relief), for example, until after the child's release to sponsors. This often involves a change in venue if the child is transferred to another jurisdiction. Although such decisions may appropriately be made with a child's best interests in mind, they often contribute to considerable delays. In addition, the INS has been responsible for delays in children's proceedings.

- In a recent case in Arizona, three INS officials were cited for contempt for failing to answer a subpoena in a dispute over the treatment of a Guatemalan teenager, Alfredo Salik-Lopez, seeking asylum. The child's attorney stated he was repeatedly scheduled for final hearings in immigration court, but each had to be postponed because the INS failed to produce fingerprint clearances. As a result, Alfredo had been detained in Phoenix for nearly six months. The judge noted that the child "trembled with fright, and …cried during the entire proceedings." In a court order, the immigration judge reprimanded the INS for arrogance, deceit, and civil rights violations against a boy under its protection and chastised the INS for acting in "bad faith [by] violating its duties as the legal guardian of the child and preventing the speedy disposition of juvenile cases."[312]

A further factor that contributes to delays is that children may not be scheduled for expedited hearings.[313] The American Bar Association has recommended that the EOIR should establish formal juvenile dockets at sites with significant numbers of children. This would ensure that all children's cases would be consolidated for a designated day with a designated or rotating judge and would facilitate legal representation.[314] AI supports this recommendation and urges the EOIR to ensure that all detained children receive priority for expedited hearings to ensure the timely resolution of their cases.

There are 51 immigration courts throughout the U.S., 28 of which reportedly handle cases involving unaccompanied minors. The case tracking system does not, however, currently provide for a precise count of unaccompanied children.[315] A special "J" code has recently been implemented to identify and track any cases involving juveniles. It has been reported, however, that it is not consistently applied. AI believes that further initiatives to improve efficient handling of children's cases could be identified if effective tracking and monitoring of children's cases was

---

[312] *Judge Slaps INS Officials with Contempt Charges,* The Arizona Republic, 12/04/02.

[313] In some districts immigration courts schedule expedited hearings for detained children, however, in the Chicago and Houston districts, this did not take place and children in shelter care were included with adults on the slower non-detained schedule, with a longer waiting period before their hearings. Hearings for non-detained aliens, juveniles or adults, typically occur at a much slower pace than is usual for detained aliens, with much longer intervals between the date of detention, the first master hearing, and any subsequent hearings. See OIG, Unaccompanied Juveniles in INS Custody, 2001.

[314] A pilot project was launched in Phoenix, Arizona, in 2000 and Judge Creppy recently announced the expansion of the juvenile docket program in Harlingen, Texas; York, Pennsylvania, Los Angeles, San Diego, and San Francisco, California. See also Michael Creppy, Chief Immigration Judge, Executive Office of Immigration Review (EOIR), testimony before U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.

[315] Michael F. Rahill, *What Child Is This?· How Immigration Courts Respond to Unaccompanied Minors*, Office of the Chief Immigration Judge, Institute for Court Management, Court Executive Development Program, Phase III Project, May 2000.

102.

undertaken and recommends that implementation of the "J" code be monitored. Furthermore, the DHS, ORR, and EOIR should all work together to identify ways in which the efficiency of immigration proceedings could be improved.

### 7.3.2 Adaptation of Courtroom Experience for Children

*"Juveniles are a vulnerable population with different needs than adults. While this simple statement should be self-evident, many of our immigration laws, practices, and procedures do not significantly distinguish between juveniles and adults."*
—Stuart Anderson, Executive Associate Commissioner for Policy and Planning, U.S. Immigration and Naturalization Service, testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 28 February, 2002

*"The Office of the Chief Immigration Judge has not issued any detailed guidance on revised courtroom procedures for hearings involving children (unaccompanied or otherwise). Individual immigration judges may make accommodations based on the age and understanding of the child in proceedings, however, such accommodations are made on a case-by-case basis and in the absence of unusual circumstances, hearings will generally follow the traditional format."*

—Michael F. Rahill, *What Child Is This?: How Immigration Courts Respond to Unaccompanied Minors, 2000*

A courtroom setting can be intimidating for an adult and can be terrifying for a child. International standards provide that a court system should be adapted and that the professionals who administer juvenile justice should be appropriately trained to take into account the special needs of children. The UN Committee on the Rights of the Child has called for the adoption of a "child-oriented system," stressing that all actions concerning children should be guided by the "best interests" consideration. The establishment of a child-oriented system for juvenile justice, of any kind, also requires the provision of adequate resources and appropriate training for judges, prosecutors, and defense attorneys.[316]

Although highly trained in refugee issues, U.S. immigration trial attorneys, U.S. immigration courts, and immigration judges tend to handle adults and juveniles alike and few accommodations are made for the special needs of children.

### 7.3.3 Adaptation of Courtroom Experience for Children: Court Personnel (INS Trial Lawyers and Immigration Judges), and Courtroom Procedures

According to international standards, court proceedings must be conducive to the best interests of the child and be conducted in an atmosphere of understanding, which allows the child to participate and express him or herself freely.[317] One fundamental principle of the CRC is that State Parties must ensure that children can exercise the right to express their views freely in all matters affecting their lives and that the child's views shall be given "due weight in accordance with the age and maturity of the child." This is a participatory right (not primarily a right to freedom of expression, which is provided for in a separate article), which means that children have a right to be heard and participate in decisions that affect their lives. This is particularly

---

[316] See UNICEF Implementation Handbook for the Convention of the Rights of the Child, 2002, p. 543.
[317] See UN Standard Minimum Rules on the Administration of Juvenile Justice, Part III, Adjudication and Disposition, Article 14.2.

103.

relevant to the administration of justice.[318]  In order for states to fulfill this obligation effectively, it is increasingly recognized that courts and other decision-making bodies need to be adapted to facilitate children's participation, providing the child with a comfortable and safe environment in which to testify.   Consideration should be given to ensuring that the giving of testimony does not harm the child or subject him or her to further trauma.[319]

Immigration proceedings in the U.S. are adversarial.  INS staff attorneys who are trained and experienced in prosecuting violations of immigration law represent the U.S. government before immigration judges.  It appears that the manner in which cases are prosecuted against children fails to take into account their special needs and vulnerability.  One attorney told AI that aggressive cross-examination of children can be traumatic for the child and that "the INS treats them as aliens first and children second."[320]  Other advocates have commented that trial attorneys apparently have no sensitivity to the fact that they are dealing with children: "They might as well be serial murderers."[321]  Although testimony must be tested to ensure it is as accurate as possible, children should never be exposed to the aggressive forms of questioning that may otherwise be employed during cross-examination.  The president of the American Bar Association wrote to the INS General Counsel raising concerns regarding INS trial attorneys' hostility toward children during cross-examination in June 2002; however, no response was received.[322]

There is no specially trained corps of INS trial attorneys to deal with children's cases.  AI spoke with an INS trial attorney who had recently been appointed to prosecute children in a district where there was a high volume of cases and a pro bono organization that worked to provide legal representation for unaccompanied children.  The reason given for the appointment appears to reflect the heavy emphasis on the law enforcement culture of the immigration service and not the best interests of the child. It was because "we're at a disadvantage in comparison to the lawyers for the children." AI believes trial attorneys who work only with children and/or are specially trained to take a child's age and special vulnerability into consideration are much needed.  As the restructuring of BICE is under way, the Department of Homeland Security should ensure that this measure is implemented.  The American Bar Association offered to assist in the development of a training program for INS trial attorneys and raised concerns regarding the hostility of some INS trial attorneys; however, it received no response.[323]

AI attended a master calendar hearing in Miami, Florida, and observed an immigration judge speaking brusquely to the children who appeared before him, routinely using complex legal terminology and difficult terms such as "frivolous," "fraudulent statement," and "enter without inspection." Many of the children appeared to be intimidated and frightened.  Some appeared to have difficulty in understanding what was happening.  In one instance, the judge raised his voice to a child who clearly did not understand what he was being told. [324]

The Office of the Chief Immigration Judge in the Executive Office of Immigration Review (EOIR) has attempted to make some accommodations for the unique problems posed by

---

[318] CRC, Art. 12(2): *"For this purpose, the child shall in particular be provided the opportunity to be heard in any judicial and administrative proceedings affecting the child, either directly, or through a representative."*
[319] UNICEF Implementation Handbook for the Convention of the Rights of the Child.
[320] AI interview with Latham &Watkins law firm, 4/12/02.
[321] AI interview with advocacy group, August 2002
[322] Letter from Robert E. Hirshon, ABA president, to Owen B. Cooper, General Counsel, Immigration and Naturalization Service, 6/11/02
[323] Ibid.
[324] The court interpreter requested permission to interpret, rather than simply translate, in order to explain the technical terms used by the judge to the child who appeared to be clearly unnerved by the experience. AI visit, Krome, Florida, 12/19/02.

104.

SCANNED

unaccompanied children. For example, copies of the INS's "Guidelines for Children's Asylum Claims (see 2.3.2) have been distributed to all immigration courts, noting that the Guidelines raise and explore special factors that apply when children seek asylum, though further noting that INS policy documents are not binding on Immigration Court proceedings.[325] Copies of the Lutheran Immigrant Refugee Service's handbook, "Working with Refugee and Immigrant Children: Issues of Culture, Law, and Development," have been distributed to all Immigration Courts. In addition, at least two immigration judge training conferences have included trainings on children in immigration proceedings.

The U.S. immigration court does not have a designated set of special procedures for handling cases of unaccompanied minors in removal proceedings, and AI questions whether EOIR initiatives have gone far enough to ensure that court personnel are appropriately trained in dealing with legal and procedural issues of special relevance to children, including credibility determinations, child-sensitive questioning and listening, and the importance for children to have a trusted adult present in the courtroom. As previously noted, the fact that they are children may be central to their claim for immigration relief, including asylum. There is a need to be sensitive to cultural and developmental differences when dealing with children in an immigration setting; the experience of trauma, age, level of education, and even gender are all factors that can impact a child's ability to articulate and understand events that may be relevant to his or her claim for asylum or other forms of relief. It is essential that a child's age and cultural background be considered when evaluating a child's testimony.

Many children who appear before immigration judges have experienced some kind of trauma ranging from torture and armed conflict to severe abuse and neglect. The U.S. Department of Justice has made recommendations to improve the criminal and civil justice system's response to child victims and witnesses of crimes in the U.S., particularly the courtroom experience. A study by the DOJ states that adult professionals working with traumatized child victims and witnesses must be "able and willing to adjust their approach to the child's developmental level." The study makes a number of recommendations to judges that arguably apply equally, if not more so, to children seeking protection in the U.S. immigration system. These recommendations include adequate training of judges in the dynamics of child maltreatment; the impact of victimization and witnessing violence on child development; ensuring that development needs of children are recognized and accommodated in the arrangement of the courtroom; requiring that all attorneys use age-appropriate language; and being flexible in allowing a child to have a support person present in the courtroom.[326] Techniques and procedures need to be developed in order to avoid intimidation by non-child-friendly procedures. Such measures can include alteration of the courtroom environment; pre-hearing courtroom tours; seating judges at the same level and forgoing the wearing of robes; and child-appropriate vocabulary for direct and cross-examination.[327]

AI encourages the replacement of formal courtroom procedures with more informal, interview-style settings, appropriate questioning techniques, and credibility determinations that reflect an understanding of a child's developmental level. AI recommends that the U.S.

---

[325] Michael F. Rahill, *What Child Is This?: How Immigration Courts Respond to Unaccompanied Minors*, Office of the Chief Immigration Judge, Institute for Court Management, Court Executive Development Program, Phase III Project, May 2000.
[326] See U.S. Department of Justice, Office of Justice Programs, Office for Victims of Crime, *Advocating for the Fair Treatment of Crime Victims: Breaking the Cycle of Violence: Recommendations to Improve the Criminal Justice Response to Child Victims and Witnesses*, June 1999.
[327] See also ABA recommendations to EOIR and recommendations made by the National Association of Counsel for Children

105.

Guidelines be mandatory for immigration judges and immigration trial attorneys, and that the
EOIR undertake a study to implement changes in the courtroom process for children. In the
meantime, immigration judges should be required to respond flexibly to the need for modified
courtroom procedures.

## 7.4 Additional Concerns About Courtroom Experiences

### 7.4.1 Interpreters

A number of children reported to AI problems in understanding what is taking place in
the courtroom due to language difficulties and a lack of access to interpretation services. This
severely restricts a child's ability to participate in proceedings. For example, one child told AI,
*"There was no translator—I spoke only a little English then. The judge said, you can speak
English. I got confused so I lost. I lost because I had to speak English."*[328]

### 7.4.2 Video Conferencing Facilities

In two of the facilities that AI visited, BCYC in Pennsylvania and the Gila County
facility in Arizona, technology was in place for children to appear before an immigration judge
via video conferencing facilities. Some children reported how intimidating and confusing this
technology is, and AI is concerned that it affects a child's ability to participate fully in the
proceedings. One child told AI that there was a strange man on the TV and *"it was scary. I was
nervous, I was trembling."*[329] C.D., a sixteen-year-old asylum-seeker told AI that at one of his
hearings the video conferencing was not working properly, making it difficult to communicate
and that eventually they had to use telephones.[330]

AI has previously raised concerns about the use of video conferencing and the impact this
may have on a child's ability to participate and the immigration judge's ability to assess
credibility. AI believes that the INS should not use video-conference hearings as a substitute for a
proceeding where an asylum-seeker can confer privately with his or her attorney and the
immigration judge who will decide his or her fate. The procedure is depersonalized and raises
questions about the fairness of the procedure. These concerns included inadequate opportunity for
the asylum-seeker to communicate fully and participate fully in the procedure; inadequate
interpretation (although interpreters translate testimony and the immigration judge's instructions
and decisions, they do not interpret courtroom discussions for the detainee); and inadequate
opportunity for the detainee to confer privately with his or her legal representative.[331]

### 7.4.3 Courtroom Waiting Area (Krome, Florida): Proximity to Firing Range

AI spoke to advocates who had concerns about the proximity of a firing range to the
courtroom at the Krome Detention Center located in Florida. They reported that many of the
children are distressed by the loud and frightening noises from the firing range, in particular those
children who have suffered significant trauma in their lives. For example, an Albanian girl would
reportedly cry whenever she had to sit outside and listen to gunfire, and another child who had
fled the war in Kosovo was frightened and disturbed; the loud gunfire seemed to worsen his
fragile state, according to his attorney. An AI delegate observed the waiting area for children. It

---

[328] K.Y. about his court experience, AI Interview, fall 2002.
[329] AI interview, fall 2002
[330] AI interview, fall 2002.
[331] See Amnesty International, *Lost in the Labyrinth*, 1999, pp. 36, 39.

106.

was flanked on two sides by a "Firearm Storage Locker," in plain view, and the noise from the firing range was audible from both the waiting area and the courtroom.

Advocates report that this stressful environment is poorly suited to the vulnerability of children and it adversely affects their ability to articulate their asylum claims as well as exacerbates their already limited ability to be involved and participate in the hearings process. Following concerns raised by advocates, local immigration officials reportedly agreed that the firing range would not be operational during children's master calendar hearings. Advocates report, however, that this agreement has not been implemented to date. AI urges that this agreement be implemented as soon as possible and that it is extended to cover children's merits hearings when full consideration of their claims are heard.

## 7.5 Guardians Ad Litem (Friend of the Child)

> *"While an attorney can provide advice to the juvenile about his or her legal case—such as whether or not the juvenile is eligible for relief from removal—the advice is different from advice as to whether a juvenile should choose to try and stay in the U.S. or return to his or her family, a decision that a parent would be better suited to make. It is inappropriate for a counsel—even a talented and dedicated one—to make these decisions."*
>
> - Michael Creppy, Chief Immigration Judge, Executive Office of Immigration Review (EOIR), testimony before U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 28 February 2002

Unaccompanied children are alone—they do not have a parent or other trusted person to provide advice and help them make decisions. The role of a guardian is to act in loco parentis (in the position or place of a parent) in the absence of a traditional caregiver and is fundamentally different from that of a lawyer. A lawyer can provide advice about whether the child is eligible for asylum or other forms of relief under U.S. law. A guardian bridges the gap between legal considerations and a child's well-being. The guardian's main role is to ensure that all decisions are taken with the child's best interest in mind. The guardian establishes a relationship of trust with the child and plays an active role in ensuring that a child has suitable care, accommodation, education, language support, and health care provisions; ensures that a child has suitable legal representation to deal with his or her asylum or immigration claim; consults with and advises the child; contributes to identifying a durable solution that is in the child's best interests, including exploring the possibility of family tracing and reunification. A guardian would be crucial to assisting children to participate not only in legal proceedings, but also to navigate the detention system and release process detailed in chapters 3, 4, 5 and 6 Individuals carrying out these responsibilities should have child-care expertise and an understanding of the special and cultural needs of separated children in order to fulfill their role effectively.

International standards provide that children deprived of their families are entitled to special protection and assistance UNHCR Guidelines and the CRC, Article 20(1), call for the appointment of guardians in cases involving unaccompanied children. [332] Many countries appoint

---

[332] See UNHCR Guidelines on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum, February 1997, Sec. 5.7, Appointment of a Guardian or Adviser: *"It is suggested that an independent and formally accredited organization be identified/established in each country, which will appoint a guardian or adviser as soon as the unaccompanied child is identified. The guardian or adviser should have the necessary expertise in the field of childcare, so as to ensure that the interests of the child are safeguarded, and that the child's legal, social, medical and psychological needs are appropriately covered during the refugee status determination procedures and until a durable solution for the child has been identified and implemented. To this end, the guardian or adviser would act as a link between the child and existing specialist agencies/individuals who would provide the continuum of care required by the*

107.

a guardian or adult in a supervisory role for unaccompanied children. For example, in the Netherlands a special organization exists to act as a guardian for unaccompanied children without other adults to represent them.[333]

In the U.S., there is currently no system for the appointment of guardians or other personal representatives for unaccompanied children. The role of a guardian is, however, recognized in U.S. law. For example, all 50 states and the District of Columbia provide for the appointment of Guardians Ad Litem (GAL) in child abuse and neglect proceedings. In some states that guardian ad litem is a lawyer, while in other states the GAL is a lay volunteer (Court Appointed Special Advocate, or CASA). A study conducted by the U.S. Department of Health and Human Services on the effectiveness of representation through a GAL found that the best results appear to have been achieved when both attorneys and non-attorney representatives were involved in a case.[334] In the U.S., Guidelines for Children's Asylum Claims touch upon the possibility of an adult, other than an attorney, participating in the adjudication process.[335] There is also some support from immigration judges for guardians to be appointed for unaccompanied children. A survey of immigration judges noted that the concept of a guardian "appears to have general merit and is worth pursuing."[336] The EOIR is pursuing the concept through a pilot project that includes the appointment of a "Friend of the Child" (FOC), who is a child welfare professional, to facilitate a child's participation in the proceedings by establishing trust with the child and ensuring that the child's best interests are met. One immigration judge participating in a survey on the potential role of a guardian pointed to the case of a Chinese child held for seven

---

child." See also Sec. 8.3: "Not being legally independent, an asylum-seeking child should be represented by an adult that is familiar with the child's background and who would protect his/her interests. Access should also be given to a qualified legal representative  This principle should apply to all children, including those between sixteen and eighteen, even where application for refugee status is processed under the normal procedures for adults." See also UNHCR, Refugee Children: Guidelines on Protection and Care, 1994, Chapter 10, Unaccompanied Children: "Legal responsibility for unaccompanied refugee children rests with the government of the country of asylum. An unaccompanied child should have a legal guardian with respect to involvement in any legal proceedings and may need a legal guardian to advocate for the child's interests or to make decisions on behalf of the child in other situations." See also UNHCR Guidelines on the applicable Criteria and Standards Relating to the Detention of Asylum Seekers, February 1999, Sec. 6, Detention of Persons Under the Age of 18 Years: "A legal guardian or adviser should be appointed for unaccompanied minors."

[333] In the U.K. unaccompanied minors are referred to a panel, the Refugee Council Panel of Advisers for Unaccompanied Children, which appoints an adviser for each child. The panel offers "independent advice, support and where necessary advocacy" to ensure that children receive fair and equal access to the services they are entitled to for example legal representation, care, and accommodation; in Canada a "designated representative" is appointed for every child refugee claimant, whether accompanied or unaccompanied. See IGC, Secretariat of the Inter-governmental Consultations on Asylum, Refugee and Migration Policies in Europe, North America and Australia, Report on Unaccompanied Minors. Overview of Policies and Practices in IGC Participating States, July 1997. See also Draft Workshop Report, Transatlantic Workshop on Unaccompanied/Separated Children: Comparative Policies and Practices in North America and Europe, Georgetown University, 18-19 June, 2001, 8/22/01; and Bhabba and Young, Not Adults in Miniature. Unaccompanied Child Asylum Seekers and the New U.S. Guidelines, International Journal of Refugee Law Vol. 11, no. 1 (1999): 91–92.

[334] U.S. Department of Health and Human Services, Administration for Children and Families, Administration on Children, Youth and Families, National Center on Child Abuse and Neglect, Final Report on the Validation and Effectiveness Study of Legal Representation Through Guardian Ad Litem, 1995

[335] U.S. Department of Justice, INS, Guidelines for Children's Asylum Claims, 12/10/98: "It is generally in the best interest of the child to allow a trusted adult to attend an asylum interview with the child asylum applicant. A trusted adult is a person who may bridge the gap between the child's culture and the US asylum system."

[336] See Michael F. Rahill, What Child Is This?. How Immigration Courts Respond to Unaccompanied Minors, Office of the Chief Immigration Judge, Institute for Court Management, Court Executive Development Program, Phase III Project, May 2000. See also Michael Creppy, Chief Immigration Judge, Executive Office of Immigration Review (EOIR), testimony before the U.S Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02: Judge Creppy noted: "I believe the Immigration Court process would be aided by the presence of an independent adult who can make informed recommendations for the juvenile respondent"; however, he goes on to note that he supports the concept in "limited circumstances."

108.

weeks in a juvenile jail facility in Portland, Oregon, after being granted political asylum by the immigration court. The child's plight was only addressed after her case received extensive media coverage. Another judge noted that if such representation were not mandatory, those most in need of it might decline it because it would be inconsistent with a smuggling plan.[337]

## 8. THE FUTURE FOR UNACCOMPANIED CHILDREN IN THE U.S.

The changes implemented by the Homeland Security Act that place the responsibility of the care, custody, and placement of unaccompanied immigrant children with the Office of Refugee Resettlement (ORR) create important opportunities to address serious concerns about the children's treatment in the U.S. Although the recent legislative reforms are substantial, they do not address all concerns. The provisions related to unaccompanied children that were included in the Homeland Security Act were incorporated from an earlier bill, entitled the Unaccompanied Alien Child Protection Act (S121). While the Homeland Security legislation provides for ORR jurisdiction over unaccompanied children, it omits crucial revisions that were contained in the Unaccompanied Alien Child Protection Act, including statutory guarantees for guardians or pro bono counsel. Other issues of concern identified by AI in this report were also omitted, including reform of questionable age-determination procedures, Special Immigrant Juvenile consent processes, and practices such as shackling, handcuffing, solitary confinement, and pat-down or strip searches. AI urges that legislation to address the shortcomings in the present framework be introduced and that the U.S. Congress enact such legislation as soon as possible.[338]

As the previous chapters have demonstrated, the ORR has inherited a fundamentally flawed system, plagued with inconsistencies and routinely in violation of international and national standards. It must move quickly to implement radical changes in order to safeguard the rights of the children under its care. Furthermore, the U.S. Congress must demonstrate its commitment to this process by allocating adequate funds to carry out such initiatives.

### 8.1 The Detention System

The ORR has been assigned a number of responsibilities with regard to the care of unaccompanied children, including making decisions about where a child should be placed; identifying sufficient numbers of qualified individuals, entities, and facilities to house children; conducting inspections of facilities and other entities in which unaccompanied children reside;[339] and overseeing the infrastructure and personnel of these facilities.[340]

AI urges the ORR to ensure that children are not detained and that alternatives to detention are utilized, including release of unaccompanied children to relatives or other individuals and entities willing and suitable for housing unaccompanied minors, including the

---

[337] Michael F. Rahill, *What Child Is This?: How Immigration Courts Respond to Unaccompanied Minors*, Office of the Chief Immigration Judge, Institute for Court Management, Court Executive Development Program, Phase III Project, May 2000.

[338] Senator Feinstein (D-CA) has indicated that she intends to push for similar protections by seeking to introduce legislation making technical corrections to the HSA and/or in other bills before the 108th Cong. session See Frank Davies, *Migrant Kids' Care to Shift Away from the INS*, Miami Herald, 12/15/02.

[339] The former INS was required to inspect facilities housing children once a year. The results of such inspections were recently forwarded to the national Office for Juvenile Affairs, where decisions were made as to whether a contract with a particular facility should continue INS officials told AI that contracts are routinely renewed "unless there are severe violations."

[340] Homeland Security Act of 2002, Sec. 462 (b)(1)(F) and 462(b)(1)(L).

73

109.

foster care program. The Homeland Security Act also encourages the use of the refugee foster care system whenever possible.[341] AI is encouraged by reports that the ORR is already exploring and expanding the use of foster care and release to family members.

The ORR must ensure that in the event that a child is detained, it is only for the shortest time possible and in the least restrictive setting possible, in a facility that is appropriate to the child's needs and complies with both international and U.S. standards. This goal is severely hindered by the fact that the ORR has inherited a detention system that reflects the law enforcement culture of the INS, an agency long criticized for routinely placing immigration control above the best interests of the child. The entire contracted network of at least 115 facilities used by the former INS to house unaccompanied children (including secure juvenile jails housing approximately one-third of children) has been transferred to the ORR. This means that unaccompanied children still remain in detention in facilities that AI's findings demonstrate fail to meet international and U.S. standards. The ORR has expressed willingness to consider addressing some of the problems with the detention system, including a review of all existing contracts, during a meeting with AI in February 2003. AI welcomes ORR's commitment to review these contracts and requests that such a review be undertaken expeditiously.

It is clear that ORR faces a challenging and important task. AI is concerned that ORR will be hindered in its efforts due to lack of funding: ORR has a very limited budget and a skeleton staff to address the substantial challenges that it faces in bringing the existing system into compliance with both U.S. standards and international law. AI strongly urges the U.S. government to provide the ORR with sufficient resources to meet its new mandate.

## 8.2 Legal Representation and Guardians

As described in this report, unaccompanied children in the United States are not provided with a lawyer or a guardian ad litem (or FOC, "Friend of the Child") to help guide them through the complex U.S. immigration system. This is of grave concern to Amnesty International. The legal community within the U.S. has responded admirably to the need for pro bono representation for unaccompanied children, creating networks of pro bono legal representatives willing to represent these children. However, the networks are often overwhelmed and underfunded, and in the event that a pro bono lawyer is not available there is no guarantee that a child will be appointed an attorney.

Unfortunately, the Homeland Security Act did not remedy this situation, and does not address the issue beyond requiring certain administrative initiatives. The ORR has been given the responsibility of compiling, updating, and publishing a state-by-state list of professionals qualified to provide guardian and attorney representation services for unaccompanied alien children. It is also required to develop a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is appointed, "consistent with the law regarding appointment of counsel that is in effect on the date of enactment," i.e., at no expense to the government.[342] The ORR has indicated to AI that it is keen to work with the legal community. Nevertheless, ORR has not yet been given the financial resources to effectively complete this substantial task.

---

[341] Homeland Security Act of 2002, Sec. 462(b)(2)(3), referring to the system established in Sec. 412(d) of the Immigration and Nationality Act. The ORR administers the refugee foster care system through contracts with voluntary agencies, e.g., the U.S. Catholic Conference on Bishops and the Lutheran Immigration and Refugee Service. See chapter 3 for further details.
[342] Homeland Security Act of 2002, Sec. 462(b)(1)(9)(A) and 462(b)(1)(I).

110.

AI further notes that even with a network of pro bono representation, the majority of children still do not have legal representation. Legislation guaranteeing that all children are provided a lawyer and a guardian is required to ensure a safety net of court-appointed counsel at the government's expense for those instances where pro bono representation is not available.

## 8.3 Ongoing Concerns and Inherent Dangers of a Law Enforcement Culture: DHS

> *"The law creating the Department of Homeland Security spells out its security mission in great detail. But the role this agency will play in serving immigrants and visitors—a role that helps to boost our economy, enrich our culture and secure our moral standing in the world—is barely mentioned.... Refugees have always sought safe haven here, ever since the Pilgrims fled religious persecution in Europe in the 17th century. Jews sought refuge from Hitler, and Cubans, Vietnamese, and other refugees fled communist dictatorships in the last half of the 20th century; refugees continue coming here today from all parts of the world, and we must not forget their plight. For decades, the INS asylum officers have been on the front lines working to maintain this country's 200-year commitment to helping legitimate refugees flee persecution. Many of these dedicated public servants will continue this work as part of the Department of Homeland Security. But they are concerned that the beacon of hope that we have made to shine so brightly will be dimmed because of inadequate attention or resources. After the shock and trauma of September 11, there is a natural inclination by our political leaders to listen to those who seek to close our borders. The challenge for the new Homeland Security Department is to protect our borders while, at the same time, upholding our long-held values. This is a job too important to be left half done."*
>
> —James W. Ziglar, INS Commissioner, August 2001–December 2002, *The End of the INS: Let's Not Forget Our Immigration Duties*, Miami Herald, 4 March 2003

Amnesty International is concerned that, notwithstanding the involvement of the ORR in the care and custody of children, many will still encounter and potentially get lost in a system where the priority mission is law enforcement and protection of national security. There is a danger that obligations to protect those seeking safety in the U.S. will be forgotten. The former INS was frequently criticized for placing law enforcement concerns over the best interests of the child, and with the reorganization of the law enforcement and service elements of immigration control into the Department of Homeland Security (DHS), that danger is even more real than ever before.[343]

Particular attention to these issues must be undertaken by the Bureau of Customs and Border Protection (BCBP) and the Bureau of Immigration and Customs Enforcement (BICE) within the Directorate of Border and Transportation Security. Unaccompanied children will encounter officials from the BCBP at the airport or border crossing. Once it has been established that the child is undocumented, or if an unaccompanied child is found within the interior of the United States, the child will be referred to BICE, pending resolution of any claim for relief that they may have, such as for asylum.

The Homeland Security Act failed to specify a time limit for transferring the custody of children from the Department of Homeland Security (BICE). Given the problems that AI has

---

[343] See chapters 3, 4, 5, 6, and 7 of this report for examples of INS prioritization of law enforcement concerns over the best interests of the child. See also Wendy Young, Director of Government Relations and U.S. Programs, Women's Commission on Refugee Women and Children, testimony before U.S. Senate Committee on the Judiciary, Subcommittee on Immigration, 2/28/02.

documented with regard to children in the custody of the former INS (now BICE), the custody of children should be transferred to the custody of the ORR as soon as possible and within a strictly defined time frame. The DHS will be responsible for ensuring that an individual under the age of eighteen years is transferred to the custody of the ORR. This raises a number of concerns, as AI has documented abuses during transfer, such as inappropriate use of shackling of unaccompanied children by the former INS. Furthermore, the former INS used questionable age-determination techniques, which resulted in some children being housed with adults. BICE has assumed many of the enforcement functions of the former INS and is operating out of the existing INS district offices with staffing and most facilities remaining the same.

As the DHS undertakes restructuring, it must not lose sight of its obligation to protect this vulnerable population and ensure that policies and procedures are developed with the best interests of the child in mind. AI believes that fundamental changes in infrastructure, staffing, attitude, and philosophy must be addressed to ensure that a balance between law enforcement and protection of the children's rights is achieved, and that the mistakes of the INS are not repeated. It is understood that the ORR and DHS are currently working on a memorandum of understanding to resolve some of the issues that require clarification between the two agencies. While it is important to move quickly to resolve these issues, care must be taken to ensure the best interests of the children concerned. Therefore both agencies should consult extensively with advocates and NGOs with expertise in this field before any agreement is finalized.

## 8.4 Additional Research and Monitoring Statistics

Accurate record keeping is a vital element in ensuring that rights are respected and to facilitate the U.S. government's ability to design and implement an effective system for the care of unaccompanied children. The current failure of various agencies to keep accurate records on unaccompanied children is of concern to Amnesty International. The former INS has frequently been criticized on data gathering relating to children in its custody.[344] The INS failed to provide statistical data relating to detained asylum-seekers notwithstanding a statutory requirement to do so. The Omnibus Consolidated and Emergency Supplemental Appropriations Act (1999) required the U.S. attorney general to collect data on a nationwide basis with respect to asylum-seekers detained by the INS, including the age of detainees. However, despite this provision still no effective records are kept; for example, on the types of relief sought by children in immigration detention or whether or not children have legal representation. In addition, the immigration courts' Executive Office of Immigration Review (EOIR) does not effectively track children's cases.[345] A coordinated data collection system that includes information such as age, gender, nationality, case type and disposition, placement, and length of detention is required.

The ORR has now been tasked to coordinate with other agencies to collect data on unaccompanied children.[346] The Department of Justice (through the EOIR) and the Department of Homeland Security (through BCPS, BICE, BCIS) must all work with the ORR in the

---

[344] See OIG, Unaccompanied Juveniles in INS Custody, 2001. Those monitoring the implementation of *Flores* report not being provided with adequate or reasonably accessible data on unaccompanied children in detention. See Center for Human Rights and Constitutional Law, National Center for Youth Law, Latham & Watkins, Youth Law Center, *Unaccompanied Immigrant and Refugee Children. A Working Paper Prepared for the Office of Refugee Resettlement*, 1/14/03. AI did not receive a response to a written request for updated statistical data on unaccompanied children sent to the Office of Juvenile Affairs, 1/23/03.

[345] EOIR tracks the progress and outcome of cases in its Automated Nationwide System for Immigration Review (ANSIR), a case management database, but does not track via an individual's date of birth. Chief Immigration Judge Creppy has now mandated the use of the "J" system to track children, although the implementation may not be consistent and thus additional monitoring will be required to ensure an effective system of tracking.

[346] See Homeland Security Act of 2002, Sec. 472(b)(2)(J)(i)(v) and 472(b)(2)(K).

112.

Department of Health and Human Services to ensure that a coordinated data collection system is developed as soon as possible. Such information will enable all three departments (DHS, DOJ, DHHS) to design an effective system for the care of unaccompanied children in the U.S. Amnesty International welcomes this initiative and urges the agencies to develop such a system expeditiously. This effort must be only one of many coordinated efforts to ensure that the departments collaborate with greater transparency and efficiency than has been the case under the former INS.

## 9. CONCLUSION AND RECOMMENDATIONS

The rights of unaccompanied children in the U.S. immigration detention system are routinely violated. Children are detained in contravention of both U.S. and international standards, often for prolonged periods. The facilities used to detain children are often inappropriate and fail to meet the needs of this vulnerable population.

AI urges the U.S. government to end the practice of routinely detaining unaccompanied children in immigration proceedings immediately. If children are detained, they must only be detained as a last resort for the shortest possible time and in a facility appropriate to their needs. AI is also concerned about its findings on the conditions under which detained children are housed. As discussed in chapter 1, AI recognizes the limited number of children interviewed for the purposes of this report. Likewise, the information obtained in the facility survey may not fully represent the situation in every facility utilized to house unaccompanied children. Nevertheless, the wide range of sources utilized by AI suggests that the problems are not simply anecdotal, but systemic in nature, and has revealed some disturbing patterns and trends. The ORR should urgently undertake a comprehensive review of all facilities housing unaccompanied children to ensure that no child is housed in a facility that fails to meet international and U.S. standards. The ORR must demand that facilities rectify any violations of international law or of *Flores*, or contracts with such facilities should be terminated.

The responsibility for improving the treatment of unaccompanied children cannot rest solely with the ORR. Following the restructuring of the INS and the transfer of many functions into the Department of Homeland Security, now more than ever a coordinated approach is required by all agencies dealing with children. This report is not comprehensive and does not intend to cover the full range of issues pertaining to the three main departments with responsibilities to unaccompanied children. AI also makes the following recommendations, which represent the minimum procedural guarantees for the treatment of unaccompanied children in the U.S.

### U.S. Government

- The U.S. government should ratify, without reservations, the UN Convention on the Rights of the Child.

- Unaccompanied children awaiting determination of their immigration status should not be routinely detained. The U.S. government should revise its detention law and policy in light of the requirements of international law. International law requires that the detention of asylum-seekers is the exception and should normally be avoided and further stipulates that children should only be detained as a last resort and for the shortest possible period of time.

113.

- The U.S. government must ensure that all agencies dealing with unaccompanied children comply fully with all relevant national laws, regulations, and international standards concerning detention conditions for children.

- The U.S. government should pass legislation that will guarantee that all unaccompanied children are provided with legal representation and guardians. If a child cannot afford legal representation, and meaningful pro bono legal representation cannot be secured, it should be provided at the government's expense.

- The U.S. government should ensure that the Office of Refugee Resettlement is adequately funded and provided with the resources it needs to fulfill its responsibilities toward unaccompanied children.

- The U.S. government should ensure that no child is returned to a country where he or she would be at risk of serious human rights abuses.

- The U.S. government should give active consideration to extending an invitation to the UN Working Group on Arbitrary Detention to visit and report on incidence of arbitrary detention of unaccompanied children.

**Department of Homeland Security (DHS)**

- All employees whose duties bring them into contact with juveniles should receive training on the special needs and rights of unaccompanied children, including the requirements of *Flores* and international standards. All law enforcement officials within the Bureau of Customs and Border Protection (BCBP) and the Bureau of Immigration and Customs Enforcement (BICE) should receive such training, including continuing training.

- Consistent and in-depth training should be provided to all trial attorneys handling unaccompanied children's cases in removal proceedings. The DHS should consider developing a specially trained corps of trial attorneys who work only with children and/or are specially trained in how to take into consideration a child's age and vulnerability during proceedings.

- The Department of Homeland Security should coordinate closely with EOIR and ORR and meet regularly to discuss and resolve issues pertaining to the needs of unaccompanied children. All staff in the DHS should be made aware of the new roles and responsibilities of the ORR.

*Holding Cells*
- The DHS should ensure that all facilities used to house children prior to transfer of custody to ORR meet all international standards and the requirements of *Flores*. Children should be guaranteed immediate access to legal representation and the right to contact their consulates and the UNHCR.

*Age Determination*
- Where the Department of Homeland Security uses age assessments, it should ensure that such methods comply with the UNHCR Guidelines on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum. The individual should be given the benefit of the doubt in cases where an individual cannot be conclusively identified as a child. Allowances

114.

should be made for the margin of error inherent in many assessments that purport to
determine chronological age.

- All steps should be taken to ensure that children are not inappropriately placed in adult
facilities operated by the Bureau of Immigration and Customs Enforcement (BICE). The
DHS or the ORR should consider designating a shelter or group home setting for those
individuals where age cannot be conclusively determined.

- All steps should be taken by the Bureau of Customs and Border Protection (BCBP) to ensure
that children are not placed in expedited removal when an individual's age is in question. No
individual should be removed from the U.S. without an individualized hearing before an
immigration court.

### *Use of Restraints*
- The Department of Homeland Security should prohibit and end immediately the practice of
shackling children (handcuffs, leg irons, belly chains), including during transportation, a
practice AI considers is inconsistent with international standards on restraints and humane
treatment. Restraints should only be applied in exceptional circumstances and for the shortest
possible period of time in order to prevent injury or on medical grounds, and only when all
other control methods have been exhausted and failed. Children should not be shackled when
appearing before immigration judges. Guidelines on the use of restraints, in accordance with
international standards, should be developed, and fully and effectively implemented, and
compliance should be monitored.

## The Department of Health and Human Services: Office of Refugee Resettlement (ORR)

- The ORR should expand the capacity of its foster care system and ensure that children are
placed in the "least restrictive setting" appropriate to the child's age and needs.

- The ORR should finalize regulations that incorporate fully the requirements of *Flores* and
should include additional requirements to ensure compliance with international standards
relating to the care of unaccompanied children.

### *Release Decisions*
- The best interests of the child should be the primary consideration when making release
decisions. The ORR should ensure that the provisions of *Flores* regarding release of
unaccompanied children are adhered to.

- A child's release from detention should not be dependent on a relative's immigration status.

- The ORR should adopt a more flexible approach and exercise discretion in releasing a
juvenile to an appropriate sponsor. Family reunification should be completed expeditiously to
prevent the detention of children.

- Whenever home assessments are required to ensure that a relative/sponsor is in a position to
provide for the child's physical and emotional needs, the assessment should be undertaken
expeditiously within a defined time period. The ORR should conduct an audit of the current
procedures for home assessments and revise as appropriate to ensure that children do not
remain in detention for prolonged periods pending determination of a home assessment.

### *No Release Options Available*

- If a child is detained the reasons for doing so should be in accordance with international standards and by means of a prompt, fair individual hearing before a judicial or similar authority whose status and tenure afford the strongest possible guarantees of competence, impartiality, and independence.

- The ORR should ensure that unaccompanied children are not placed in state juvenile justice or criminal justice facilities or in other facilities with jail-like conditions. Children currently housed in juvenile jails should be immediately removed from those facilities and placed in a setting appropriate to their needs. Unaccompanied children should be held separately and not confined with U.S. juveniles serving criminal sentences.

- Children should not be placed in secure detention on the basis of influx of children or on the basis of an arbitrary decision that a child is a flight risk. AI recommends that in accordance with international standards, there should be a hearing before an immigration court to determine whether the government can present the necessary evidence to prove that an individual child should be detained. If release is not effected the child's detention should be reviewed periodically by an independent body, and the government must prove that grounds for continued detention exist.

- Children who are victims of trafficking should not be placed in secure detention. Safety considerations may require additional precautions, but such determinations should be made on a case-by-case basis, and such children detained only after a thorough and individualized assessment has revealed no possible safe alternatives. Detention cannot be justified on the grounds that it is being used to protect children from smugglers or other alleged dangers in the U.S. community.

### *Monitoring and Inspection*

- AI urges that the ORR undertake an immediate and comprehensive inspection of all facilities to ensure compliance with international standards and *Flores*. The ORR should require those that fail to meet standards to rectify those problems immediately or terminate their contracts.

### *Detention System/Conditions*

- Staff should treat children with dignity and respect and receive consistent and in-depth training on the requirements of *Flores* and international standards.

- The special circumstances of unaccompanied children should be communicated to all staff involved in the detention of unaccompanied children. In particular, they should be given training on who an asylum-seeker is and be made aware of the fact that many asylum-seekers may be seriously traumatized by their experience of persecution. Staff should be made aware of the requirements of cross-cultural communications and of post-traumatic stress disorder and the particular legal, cultural, and psychological needs of asylum-seekers.

- The INS Detention Standards for adults provide for a grievance procedure. The ORR should develop a system for children's grievances and complaints regarding placement decisions and conditions of confinement should be addressed.

### *Access to the Outside World and Information and Assistance*

116.



- Children should receive a verbal and written explanation of rights in a language he or she can understand. A sufficient number of trained interpreters should be available at facilities housing unaccompanied children and, in the absence of such interpreters, free access to alternative methods of translation should be made available.

- In accordance with international standards children should be afforded the right to inform family members of the detention and place of confinement. Parents or guardians should be notified immediately upon apprehension of a child.

- Access to counsel and NGOs assisting detained unaccompanied children should be given at all stages of a child's detention.

- Accurate lists of legal services should be provided in all facilities where unaccompanied children are detained. Assistance should be given to an unaccompanied child in securing legal representation. Children should be informed verbally and in writing, in a language they understand, of their court dates.

- The ORR should not contract with facilities that are unable to provide a comprehensive plan for ensuring that all children housed in the facility will receive access to meaningful legal representation. The ORR should develop and implement a pilot project for the housing of children in which pro bono legal representation and guardians are more readily available and should strive to house children in such locations.

- Unaccompanied children should be provided with opportunities to make free telephone calls to the offices of the United Nations High Commissioner for Refugees. Children should be informed verbally and in writing of this right.

- Access to family members or others with whom unaccompanied children wish to maintain contact should be given in a manner that minimizes inconvenience to both parties.

- Children should be given unrestricted and private access to telephones and assisted in making calls. All children should have the opportunity to call relatives and legal counsel free of charge.

- Unaccompanied children should not be transferred to another facility without full consideration of what is in the child's best interests and to determine the legitimate reasons for any such transfer. Unless such a transfer would be in the best interests of the child, no child should be transferred except in unusual or compelling circumstances, such as when the safety of the child or others is threatened. Proximity of relatives, the child's need to access legal counsel, and language services should be taken into consideration. In all cases, prior notification of any transfer should be given to family and legal representatives.

### General Conditions of Detention
- Children should not be subjected to physical restraint devices, use of force, or pepper spray except in exceptional circumstances, where all other control methods have been exhausted and failed. The use of restraint chairs should be banned. Procedures must be in place to ensure that children are not subject to cruel, inhuman, or degrading treatment, including the use of shackling.



- Staff should be specially trained to work with children, particularly those with mental health problems.

- U.S. authorities should ensure that ill treatment and excessive force will not be tolerated; that officials will be held accountable for their actions and those responsible for abuses will be brought to justice.

- Children should not be held in solitary confinement. The use of isolation as punishment for children should be prohibited in accordance with international standards.

- Children should not be subjected to routine pat-down or strip searches unless an individual assessment of security concerns has been undertaken.

- Children deprived of their liberty should be provided with appropriate educational opportunities and with adequate time, space, and facilities for both indoor and outdoor exercise and recreation. The implementation of these requirements should be monitored.

- Children should be provided with the opportunity to meet their religious needs, including attending services and having religious books.

- Medical and mental health care services should be available regularly at no cost to unaccompanied children. All juvenile facilities should provide comprehensive physical and mental health care services by qualified personnel; adequate federal funding should be made available to provide the required services; standards should be developed to allow for the effective monitoring of the adequacy and quality of the services and compliance should be routinely monitored.

- Children should be provided with education in accordance with the requirements of *Flores* and international standards.

- Children should be provided with reading materials in their own language for use during leisure time.

- The ORR should pay particular attention to the needs of female unaccompanied children. Girls' smaller numbers may mean that they are more likely to be confined with criminal detainees or face more difficult conditions than boys.

### Special Immigrant Juvenile (SIJ) Consent Decisions
- Consent to pursue SIJ status should be granted expeditiously to allow unaccompanied children to pursue this avenue of relief. Consent should only be withheld in exceptional circumstances and should always be made with the best interests of the child as the primary consideration. Only individuals with child welfare expertise and experience should make decisions, within a defined and strictly limited time frame. The issue of whether consent is actually required before a child can pursue this avenue of relief should be examined.

### Data Collection
- DHS/ORR/EOIR records should contain information that clearly identifies an unaccompanied child as an asylum-seeker. Such records should be kept from the time a child has filed an asylum claim until there has been a final disposition of the claim and, when applicable, the child's removal from the U.S.

- Detailed information on the number, location, country of origin, age, and gender of asylum-seekers should be made publicly available on a regular basis, as well as all relevant policies affecting their detention.

## Immigration Courts (Executive Office of Immigration Review)

- The Executive Office of Immigration Review should formally adopt Guidelines for Children's Asylum Claims. All immigration judges, including the Board of Immigration Appeals, and other personnel should receive consistent and in-depth training in the Guidelines and how to handle children's cases. The Guidelines should be fully and effectively implemented and compliance should be monitored.

- In accordance with international standards, unaccompanied children should be given the opportunity to fully participate in legal proceedings. Courtroom settings and procedures should be modified to ensure that this right is guaranteed.

- Immigration judges should not use telephone or video-conferencing facilities to conduct an unaccompanied child's merits hearing. Both the child and his/her legal representative should be required to appear in person before an immigration judge.

- All immigration courts handling claims by unaccompanied children's claims should adopt juvenile dockets to ensure timely processing of children's claims. In accordance with international standards juvenile cases should be given the highest priority and should be handled expeditiously, without any unnecessary delay, especially when children are detained.

- The EOIR should coordinate closely with ORR and DHS to ensure the timely and appropriate disposition of children's cases.

- The EOIR should work with the ORR and DHS to establish and implement a pilot project for the use of guardians in removal proceedings.

- Legal proceedings should be conducted in a language that the child understands or adequate interpretation must be made available.

- Decisions to detain a child should be made by a prompt and fair hearing before an immigration judge. Children should only be detained in exceptional circumstances based on a full and fair assessment of the child's individual case. All children should be afforded a bond redetermination hearing, and if release is not effected expeditiously, independent reviews of the ongoing detention must be conducted and the government required to bring forward reasons for their continued detention.

- A system for effective tracking of children's cases should be developed and implemented.

## International Community

- The United Nations High Commissioner for Refugees should monitor U.S. compliance with UNHCR Guidelines and other international standards and report regularly and publicly on their findings relating to U.S. detention practices and policies.

## GLOSSARY

AI              Amnesty International

ANSIR Automated Nationwide System for Immigration Review

BCBP       Bureau of Customs and Border Protection.  Created by the Homeland Security Act 2002.  Responsible for immigration and customs enforcement activities at the borders.

BCIS       Bureau of Citizenship and Immigration Services.  Created by the Homeland Security Act 2002.  Responsible for the administration of benefits and immigration services.

BCYC       Berks County Youth Center, Pennsylvania

BICE       Bureau of Immigration and Customs Enforcement.  Created by the Homeland Security Act 2002.  Responsible for immigration and customs investigation and enforcement within the United States.

BTS        Directorate of Border and Transportation Security. BICE and BCBP are housed under the BTS, and BTS is housed within the DHS.

CRC        UN Convention on the Rights of the Child

DHHS       Department of Health and Human Services

DHS        Department of Homeland Security

DJC        District Juvenile Coordinator

DOJ        Department of Justice

EOIR       Executive Office of Immigration Review

Flores     The Flores agreement (Flores, et al. v. Janet Reno, a class action lawsuit filed against the former INS in 1985) sets out nationwide policy for the detention and release of children in immigration custody.

GAL        Guardian ad litem

HSA        Homeland Security Act.  Passed by U.S. Congress in November 2002.

ICCPR      International Covenant on Civil and Political Rights

ICESCR     International Covenant on Economic, Social and Cultural Rights

IIRIRA Illegal Immigration Reform and Immigrant Responsibility Act

INA        Immigration and Nationality Act

84

120.



| | | |
|---|---|---|
| INS | Immigration and Naturalization Service | |
| JPM | Juvenile Protocol Manual | |
| OIG | Office of Inspector General | |
| OJA | Office of Juvenile Affairs | |

ORR        Office of Refugee Resettlement.  Agency within the Department of Health and Human Services.  Responsibility for the care, custody and placement of unaccompanied minors was transferred on March 1, 2003 from the (now abolished) INS to the ORR by the Homeland Security Act.

SIJ        Special immigrant juvenile (status)

UN        United Nations

UDHR        Universal Declaration of Human Rights

UNHCR        United Nations High Commission for Refugees

First published in 2003 by
Amnesty International USA
322 Eighth Avenue
New York, NY 10001

www.amnestyusa.org

Publication date: 18 June 2003
© Copyright
Amnesty International Publications 2003
ISBN: 1-887204-39-3
Original language: English

All rights reserved.
No part of this publication may be
reproduced, stored in a retrieval
system, or transmitted, in any form
or by any means, electronic, mechanical,
photocopying, recording, and/or
otherwise without the prior permission
of the publishers.

Cover photo: ® Alon Reininger (Contact Press Images)

UNICEF        United Nations International Children's Emergency Fund

**Amnesty International USA**
322 Eighth Avenue
New York, NY 10001

ISBN 1-8887204-39-3

122.   $12.95

SCANNED

# EXHIBIT 3

NATIONAL CENTER FOR IMMIGRANTS' RIGHTS, INC.
Carlos Holguin
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, California 90057
Telephone: (213) 388-8693

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
Teresa Demchak
Jim Morales
1663 Mission Street, 5th floor
San Francisco, California 94103
Telephone: (415) 543-3307

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
John Hagar
Paul Hoffman
633 Shatto Place
Los Angeles, California 90005
Telephone:  (213) 487-1720

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; et al., : | Case No. 85-4544-RJK (Px) |
| : | |
| : | MEMORANDUM OF UNDERSTANDING |
| : | RE COMPROMISE OF CLASS |
| Plaintiffs, : | ACTION: CONDITIONS OF |
| : | DETENTION. |
| -vs- : | |
| : | |
| : | |
| EDWIN MEESE, III; et al., : | |
| : | |
| : | |
| : | |
| Defendants. : | |

/ / /

123.

1.  The parties hereto shall stipulate to an order dismissing without prejudice plaintiffs' Third, Fourth, Fifth, and Sixth Causes of Action, said stipulation, and any order of dismissal entered pursuant thereto, to be conditioned upon implementation of and continuing compliance with the terms of this memorandum of understanding.  This memorandum of understanding shall thereupon be an enforceable settlement agreement between the federal defendants and the plaintiff class.

2.  Beginning on or before June 1, 1988, except in unusual and extraordinary circumstances as defined herein, the federal defendants shall house all juveniles detained more than 72 hours following arrest in a facility that meets or exceeds the standards set out in the April 29, 1987, Notice of Funding Programs, 52 Fed.Reg. 15569-15573, attached hereto and incorporated by this reference, and in the document, "Alien Minors Shelter Care Program - Description and Requirements (April 28, 1987)," attached hereto and incorporated by this reference. Such facilities shall additionally provide minors educational and other reading materials in Spanish.  The federal defendants shall make reasonable efforts to provide minors reading materials and educational instruction in other languages as needed.  The parties agree to negotiate concerning postponement of the June 1, 1988, implementation date in the event of unforseen circumstances.

3.  The INS Regional Associate Commissioner for Operations shall be informed of and monitor instances in which juveniles are not transferred within 72 hours of arrest to a facility meeting the standards described in paragraph 2 above.  Such monitoring

- 2 -

124.

shall ensure that juveniles are within 72 hours of arrest housed in facilities meeting said standards except in unusual and extraordinary circumstances.

4.  "Unusual and extraordinary circumstances" justifying exception to the 72-hour transfer requirement shall be limited to those cases in which the interests of the affected minor would be served by housing the minor in a non-complying facility or in which, because of unforeseen events, the affected minor cannot be housed in a complying facility.

5.  For a period of twelve (12) months following dismissal as herein provided, the federal defendants shall report to the court in camera all exceptions to the 72-hour transfer requirement, including the name of the affected class member, the date of his or her arrest, the facilities in which the minor has been housed and dates of occupancy, and the unusual and extraordinary circumstances warranting non-transfer.

/ / /

125.

6.  Plaintiffs shall not refile or otherwise renew the claims alleged in their Third, Fourth, Fifth, and/or Sixth Causes of Action so long as defendants are in compliance with the terms of this memorandum of understanding.  Plaintiffs agree to meet with the federal defendants to discuss any alleged non-compliance with the terms of the memorandum prior to refiling or otherwise renewing the claims alleged in their Third, Fourth, Fifth, and/or Sixth Causes of Action.

Approved as to form and content.

Dated:   November 24, 1987.

NATIONAL CENTER FOR IMMIGRANTS' RIGHTS, INC.
Carlos Holguin
Peter A. Schey

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
Teresa Demchak
James Morales

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
John Hagar
Paul Hoffman

_____
Attorneys for Plaintiffs

Dated:   November 15, 1987.

ROBERT C. BONNER
United States Attorney
FREDERICK M. BROSIO, JR.
Assistant United States Attorney
Chief, Civil Division
GEORGE WU
Assistant United States Attorney


_____
IAN FAN
Assistant United States Attorney
Attorneys for Federal Defendants

- 4 -

126.

notice, and to authorize the administrative law judge and the Commission, without further notice to the respondent, to find the facts to be as alleged in the complaint and this notice and to enter both an initial determination and a final determination containing such findings.

The complaint, except for any confidential information contained therein, is available for inspection during official business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary, U.S. International Trade Commission, 701 E Street NW., Room 156, Washington, DC 20436. telephone 202–523–0471. Hearing-impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on 202–724–0002.

Issued: April 22, 1987.

By order of the Commission.

Kenneth R. Mason,

Secretary.

[FR Doc. 87–9099 Filed 4–28–87; 8:45 am]

BILLING CODE 7020-02-M

## INTERSTATE COMMERCE COMMISSION

[Ex Parte No. 466 (Sub-No. 1)]

## Railroad Cost of Capital; Proposed Expedited Procedure

AGENCY: Interstate Commerce Commission.

ACTION: Notice seeking comment on a proposed procedure to expedite the Commission's annual determination of the railroad's cost of capital.

SUMMARY: Each year the Commission determines the railroad industry's cost of capital, or fair return rate. This cost of capital finding is used, among other things, to evaluate the adequacy of railroad revenues. The most recent cost of capital determination—for the year 1985—was made in Ex Parte No. 464, Railroad Cost of Capital—1985, served March 16, 1987.

We have developed a set of procedures with timetables for expediting the Commission's cost of capital finding. This will insure a final determination by June 30 of the year following that for which the determination is being made. The Commission seeks public comment on this proposal which is presented below.[1]

[1] In his vote in Ex Parte No. 464, supra, Commissioner Andre, joined by Commissioner Sterrett, commented separately that the Commission's staff should prepare for public comment an analysis describing how regulatory lag can be reduced.

Our proposal will produce a cost of capital finding within six months following the close of the calendar year. Under the proposal, the following timetable would be established for each year:

(1) By January 10—issue a notice instituting the cost of capital proceeding. This notice would set forth the due dates for the submission of comments, i.e., no later than February 10 for railroad initial comments, no later than March 10 for non-railroad comments, and no later than March 25 for railroad rebuttal comments.

(2) By February 10—receive initial comments from the railroads. In their comments submitted in the Ex Parte No. 464, supra, proceeding, the railroads indicated that if they knew in advance that the cost of capital proceeding would be instituted in January of each year, they would be able to meet this deadline, assuming no new and complex issues are introduced. The railroads indicated in their comments that this deadline could be met without a major revision to their data gathering activities; they would simply gather the necessary data throughout the year on a piecemeal basis. Requisite railroad data and information would be obtained directly by the Association of American Railroads from the railroads.

(3) By March 10—receive comments from the shippers and other non-railroad parties. Based on the comments received in Ex Parte No. 464, supra, the non-railroad parties should be able to meet this filing deadline without a major modification to their data gathering activities.

(4) By March 25—receive railroad rebuttal comments. Based on their comments in Ex Parte No. 464, supra, this deadline should also pose no particular problem for the railroads.

(5) March 25 through May 31—staff analyzes comments and makes recommendations to the Commission.

(6) Commission serves decision not later than June 30.

We believe that the dates in the above timetable can be met provided: (1) No lengthy filing extensions are granted to the parties, and (2) no highly contentious or novel issues are raised. Furthermore, we believe that these objectives can be met without any change in Commission internal procedures, funding levels, or statutory requirements nor changes in staffing levels in the Financial Analysis group. Nor, as indicated in their comments in Ex Parte No. 464, supra, will the expedited filing deadlines have a significant impact on the parties data gathering activities, including the costs associated with those activities.

Public comment on the above proposal is invited.

DATES: Comments due May 29, 1987.

ADDRESSES: Send an original and 15 copies of comments to: Office of the Secretary, Case Control Branch, Interstate Commerce Commission, Washington, DC 20423.

FOR FURTHER INFORMATION CONTACT: Ward L. Ginn, Jr., (202) 275–7489.

This action will not significantly affect either the quality of the human environment or energy conservation. Nor will it have a significant economic impact on a substantial number of small entities.

Authority: 49 U.S.C. 10704(a).

Decided: April 20, 1987.

By the Commission, Chairman Gradison, Vice Chairman Lamboley, Commissioners Sterrett, Andre, and Simmons.

Noreta R. McGee,

Secretary.

[FR Doc. 87–9624 Filed 4–28–87; 8:45 am]

BILLING CODE 7035-01-M

## DEPARTMENT OF JUSTICE

## Availability of Funding for Cooperative Agreements; Shelter Care and Other Related Services to Alien Minors

AGENCY: Community Relations Service (CRS), Justice.

ACTION: Notice of availability of funding for Cooperative Agreements to support programs which provide shelter care and other related child welfare services to alien minors detained in the custody of the United States Department of Justice, Immigration and Naturalization Service.

SUMMARY: This announcement governs the award of Cooperative Agreements to public or private non-profit organizations or agencies and under certain conditions, to for-profit organizations or agencies, to provide shelter care and other related child welfare services to alien minors detained in the custody of the United States Department of Justice, Immigration and Naturalization Service.

Awards will be to one (1) or more organizations. These awards are for the purpose of supporting licensed child welfare programs which provide shelter care and other related child welfare services to male and female alien minors under 18 years of age who are referred to the Community Relations Service by the Immigration and Naturalization Service.

These child welfare services will afford alien minors a structured, safe

and productive environment which meets or exceeds respective state guidelines and standards for similar services designed to serve children in their care and custody. Applications submitted pursuant to this announcement must plan for the delivery of services to a minimum population of 12–15 minors. The ability to provide services to a larger population of children is highly desirable.

The administration of Cooperative Agreements awarded under this announcement will require the substantial involvement of the Federal Government. The level and scope of Federal involvement is delineated in the Community Relations Service document entitled *Alien Minors Shelter Care Program—Description and Requirements.* This document is included in the Proposal Application Package available from the Community Relations Service.

**DATE:** Closing Date: 5:00 p.m., Eastern Daylight Time, Friday, June 12, 1987.

Proposals will be reviewed, evaluated and competitively rated by an independent panel of experts in the areas of child welfare and social services on the basis of weighted criteria listed in this Notice. All funding decisions are at the discretion of the Director, Community Relations Service. Awards will be subject to the availability of funds and the concurrence of the Assistant Commissioner, Detention and Deportation, Immigration and Naturalization Service.

**Authorization**

Authorities for the provision of certain child welfare services to alien minors detained in the custody of the Immigration and Naturalization Service (INS) are contained in a Memorandum of Agreement and an Inter-Agency Cost Reimbursable Agreement dated October 1, 1986, and signed by the Acting Director, Community Relations Service; the Assistant Commissioner, Detention and Deportation, Immigration and Naturalization Service and the Director, Refugee Health Affairs, United States Public Health Service.

Legislative authority for the Community Relations Service, Cuban/ Haitian Entrant Program is contained in Title V, section 501 (c) of Pub. L. 96–422 (The Refugee Education Assistance Act of 1980).

**Available Funds**

Approximately $1,500,000 will be available for this program activity on a fiscal year basis. This estimate does not bind the Community Relations Service

or the Immigration and Naturalization Service to any specific level of funding. This figure is only intended to serve as an estimate of the total amount of funding which could potentially be available during any specific fiscal year.

Future fiscal year funding for this program is contingent upon need and the availability of Federal appropriations. If adequate funds are available, the Acting Director, Community Relations Service, anticipates continuation of this program.

Awards normally will not exceed a 36 month program performance period. Funding will be for 12-month budget periods.

**Eligible Applicants**

Non-profit organizations incorporated under state law which have demonstrated child welfare, social service or related experience and are appropriately licensed or can expeditiously meet applicable state licensing requirements for the provision of shelter care, foster care, group care and other related services to dependent children are eligible to apply.

For-profit organizations, incorporated under state law, which have demonstrated child welfare, social service or related experience and are appropriately licensed or can expeditiously meet applicable state licensing requirements for the provision of shelter care, foster care, group care and other related services to dependent children; and, which can clearly demonstrate that only actual costs, and not profits, fees, or other elements above cost have been budgeted, are also eligible to apply.

The geographical location of the applicant is not restricted to the geographic area of need identified in this Notice; however, the applicant must be able to strongly substantiate that its network of local affiliates or its subcontractor(s) or subrecipient(s) will be able to effectively and appropriately deliver the required services; and, that local service provider organizations are licensed to provide 24 hour care under applicable state laws.

**Eligible Client Population**

Under the terms of this announcement, the eligible client population will consist of male and female alien minors.

**Definition of Alien Minor**

For the purposes of this Notice, an alien minor is defined as a male or female foreign national, under 18 years of age, who is detained in the custody of the Immigration and Naturalization Service and is the subject of exclusion or deportation proceedings under the

Immigration and Nationality Act; or, has an application for asylum pending with the Immigration and Naturalization Service.

**Designated Program Area**

The designated program areas consist of:

• SOUTHERN CALIFORNIA (San Diego and Los Angeles Counties)

• TEXAS (Cameron County)

**Technical Assistance Conference**

The CRS will hold public meetings regarding this solicitation. Further information regarding time, date and location will be included in the Proposal Application Package.

**SUPPLEMENTARY INFORMATION:**

**Purpose and Scope**

Community Relations Service Cooperative Agreement Recipients (hereafter referred to as Recipient) shall facilitate the provision of temporary shelter care and other child welfare related services to alien minors, who have been approved for transfer to a Community Relations Service supported Shelter Care Program.

These minors, although released to the physical custody of the Recipient, shall remain in the legal custody of the Immigration and Naturalization Service.

The population level of minors is expected to fluctuate as arrivals and case dispositions occur. Program content will, therefore, reflect differential planning of services to minors at various stages of adjustment and administrative processing. In addition, although the population of minors is projected to consist primarily of adolescents, Recipients are expected to be able to serve some children 12 years of age or younger.

Recipients are expected to facilitate the provision of assistance and services for each minor including, but not limited to: physical care and maintenance, access to routine and emergency medical care, comprehensive needs assessment, education, recreation, individual and group counseling, access to religious services and other social services.

Other services that are necessary and appropriate for these minors may be provided if the Community Relations Service determines in advance that the service is reasonable and necessary for a particular child.

The Recipient will develop an appropriate individualized service plan for the care and maintenance of each minor in accordance with his/her needs as determined in an intake assessment. In addition, agencies or organizations

128.

are required to implement and administer a case management system which tracks and monitors client progress on a regular basis to ensure that each child receives the full range of program services in an integrated and comprehensive manner. Shelter care services shall be provided in accordance with applicable state child welfare statutes and generally accepted child welfare standards, practices, principles and procedures.

Service delivery is expected to be accomplished in a manner which is sensitive to culture, native language and the complex needs of these minors.

*A. Program Design*

The applicant must set forth in detail information concerning the following:

1. Organization/Agency Capability

A comprehensive overview of the applicant agency, agency qualifications and agency history, including agency philosophy, goals and history of experience with respect to the provision of child welfare or related services to children under 18 years of age.

Identification of the organization(s)/ agency(ies) proposed for participation in the program, a description of their qualifications in relation to responsibilities; and the mechanism for coordination among these agencies (as applicable).

2. Target Population

A description of the proposed client population including a discussion of program acceptance criteria and estimates of the total number of minors to be served at any one time (capacity) and during any program year.

3. Management Plan

a. A plan which identifies the agency/ organization which will have overall fiscal and program responsibility, as applicable.

b. Identifies the organizational structure and lines of authority.

c. Describes the overall proposed staffing plan and staff qualifications for the program.

d. Includes a comprehensive plan for coordination of activities between the various program components and coordination with other community and governmental agencies.

e. Staff supervisory model.

f. Provisions for staff training.

g. Proposed staff schedule(s).

h. Role of consultants and rationale for their use.

4. Individual Client Service Plans

Applicants are expected to describe in detail:

a. The methodology regarding the development of individual client service plans, and;

b. The process to ensure that service plans will be periodically reviewed and updated. Identify staff who will have responsibility for the development and updating of the plans.

5. Case Management

Describe in detail the case management system for tracking and monitoring client progress on a regular basis to ensure that each minor receives the full range of program services in an integrated and comprehensive manner. Identify the staff positions responsible for coordinating the implementation and maintenance of the case management system.

6. Structure and Accountability

Applicants must fully describe:

a. The plan for developing and maintaining internal structure, control and accountability through programmatic means.

b. Utilization of daily logs, statistical reports, etc.

*B. Client Services*

Applicants are required to describe, in a detailed and comprehensive manner, the following services and the methodology for service delivery:

1. Physical Care and Maintenance;

2. Routine and Emergency Medical/ Dental Care;

3. Orientation;

4. Individual Counseling;

5. Group Counseling;

6. Acculturation/Adaptation;

7. Education;

8. Recreational, Social and Work Activities;

9. Visitation Procedures;

10. Legal Services, and;

11. Family Reunification Services.

*C. Client Records*

Applicants must provide descriptive information regarding the development, maintenance and content of individual client case records, including a description of all material/information which will be maintained in these records.

*D. Program Records*

Applicants are required to set forth comprehensive information regarding the types of program records to be maintained by the program (daily activity logs, records of staff meetings, cash disbursement systems, daily and weekly status of population reports, etc.).

*E. Facility*

As applicable, applicants are required to set forth in detail the following:

1. A description of the physical structure and the allocation of space for residential and office use.

2. A description of the location of the facility and discussion of the basis for selection.

3. Proof, in the form of a written certification, that the program and facility meet all applicable zoning and child welfare licensing requirements.

*F. Program Evaluation*

Applicants must set forth a plan for program evaluation including identification of evaluative criteria.

*G. Community Support*

Applicants must identify those measures the agency will take or has taken, to assure and maintain community receptivity and support and/ or reduce community opposition to the program.

*H. Budget*

Applicants are required to submit a comprehensive line item budget. A narrative explanation for each line item, included in each object class, must accompany the proposed budget.

*I. Supportive Addenda Material*

Applicants are required to submit the following supporting material as an addendum to the program proposal:

1. Administrative Requirements

A. Agency Administration and Organization

1. Agency organizational *chart* describing the agency as a whole and the organizational relationship of the proposed program to other agency programs.

2. Comprehensive organizational *chart* of the proposed program.

3. Copies of Articles or Incorporation.

4. Proof of IRS status as a non-profit organization, if applicable.

5. List of Officers and Board Members, if applicable.

6. List of professional affiliations and certifications.

7. Copy(ies) of applicable State child welfare licenses.

B. Organizational Standards/Policies and Policies Regarding Clients

1. Personnel Handbook and Standards of conduct.

2. Statement regarding professional and agency liability.

3. Copy of Disciplinary Procedures

4. Copy of Agency policy regarding the confidentiality of client information and records.

129.

5. Discussion of the method to be used to inform clients of program rules, regulations and policies, including the confidentiality of client information.

6. Copy of Grievance Policy and Procedures.

7. Fire and earthquake evacuation procedures, as applicable.

C. Staff

1. Job/Position Descriptions and resumes (if individuals have been identified for certain positions) for all personnel to be hired for the program including documented evidence of the availability of bi-lingual and/or bi-cultural personnel.

2. Resumes and qualifications of program consultants.

D. Community Support of the Program

1. Letters of program support from local political representatives, social service agencies, etc. Letters should reflect writers' awareness of program's intent, potential Federal funding source and location of the program.

Letters should also contain a recommendation or comment regarding the proposed program.

2. A listing of service providers to whom clients will be referred, including name, address and description of service(s) to be provided.

3. A listing of voluntary and/or donated resources, including letters of intent from the agencies or entities providing the resources, if applicable.

E. Implementation Plan

A plan for program implementation including time-lines regarding significant milestones.

2. Finance

a. A copy of the most recent agency/organization audit.

b. A description of the agency/organization Financial Management System.

c. A listing of other Federal, State, local or foundation grants, cooperative agreements or contracts, etc. being administered by the applicant. This material should include information regarding the funding source(s); grant, cooperative agreements or contract number; level of financial support; purpose of award; grant, cooperative agreement or contract performance period; and name, address and telephone number of grant, cooperative agreement and/or contract officer (Federal, State or local).

d. Subrecipients and/or Subcontractors

1. Identify all proposed services which are to be awarded to subrecipients/subcontractors.

2. Provide relevant background material regarding the proposed subrecipient(s)/subcontractor(s).

3. Provide letters from the proposed subrecipient(s)/subcontractor(s) indicating their commitment and the specific services to be provided.

*J. Screening Criteria*

CRS will screen all applications submitted pursuant to this Notice. Screening shall be done to determine whether an application is sufficiently complete to warrant consideration and review by the CRS Grant Review Panel. An application may be rejected if:

1. The application is from an ineligible applicant.

2. The application is received after the closing date.

3. The application omits:

a. Documented written evidence of community support for the program.

b. A comprehensive line-item budget with appropriate descriptive narrative.

c. A copy of the latest financial audit of the applicant.

*K. Criteria for Evaluating Applications*

Applications will be competitively reviewed, evaluated and ranked according to the following weighted criteria:

1. The degree to which the entire proposed plan for developing, implementing and administering a shelter care program is clear, succinct, integrated, efficient, cost effective and likely to achieve program objectives.

2. The quality of the applicant's program management and staffing plans as demonstrated by:

• The adequacy of the plan for program management and the plan for coordination between the components of the program.

• The adequacy of the plan for coordination with community and governmental agencies.

• The adequacy of the qualifications of the applicant organization and the extent to which this organization has a demonstrated record as a provider of child welfare or other social services.

• The extent to which the applicant has a demonstrated capacity for effective fiscal management and accountability.

• The extent to which subrecipient(s)/subcontractor(s) have a demonstrated capacity for effective fiscal and program management and accountability.

• The adequacy of the plans for staff supervision and intra-program communication.

• The adequacy of the staffing plans in terms of the relationship between the proposed functions and responsibilities of the staff in the program, and the education and relevant experience required for the position.

• Clear organizational charts delineating organizational relationships and levels of authority, including the identification of the staff position accountable for the overall management, direction and progress of the program.

3. Program Services—The applicant's response to the required program services, including a description of program resources which demonstrates:

• The capacity of the program to offer comprehensive, integrated and differential services which meet the needs of the clients.

• Utilization of resources in a manner which enhances program control, structure and accountability.

• Provision of services in a manner which promotes and fosters cultural identification and mutual support.

• Sensitivity to the issues of culture, race, ethnicity and native language.

4. The degree to which the applicant provides effective strategies of programmatic control, predictability and accountability as evidenced by the structure and continuity inherent in the program design.

5. The adequacy of the plans for:

(a) Developing and updating individual client service plans, and;

(b) The proposed system of case management.

6. The reasonableness of the proposed budget and budget narrative, in relation to proposed program activities.

7. The degree to which the application has provided written documented evidence of community support and acceptance of the program.

*L. Application Request and Submission*

Eligible applicants may request a Proposal Application Package from the United States Department of Justice, Community Relations Service, Suite 330, 5550 Friendship Boulevard, Chevy Chase, Maryland 20815; Attention: Cynthia Bowie, Senior Grants Management Specialist.

Proposal Application Packages may also be obtained by contacting the Community Relations Service at (301) 492–5818 or 1–800–421–9304.

Applicants must submit a signed original and two (2) copies of the proposal and supporting documentation to the United States Department of Justice, Community Relations Service, Suite 330, 5550 Friendship Boulevard, Chevy Chase, Maryland 20815; Attention: Cynthia Bowie, Senior Grants Management Specialist.

**Applications Delivered by Mail**

An applicant must show proof of mailing consisting of the following:

130.

- 8 -

1. A legible dated U.S. Postal Service postmark.

2. A legible mail receipt with the date of mailing stamped by the U.S. Postal Service.

3. A dated shipping label, invoice or receipt from a commercial carrier.

If an application is sent through the U.S. Postal Service, the Director does not accept either of the following as proof of mailing: (1) A private metered postmark, or (2) a mail receipt that is not dated by the U.S. Postal Service.

Applicants should note that the U.S. Postal Service does not uniformly provide a dated postmark. Before relying on this method, the applicant should check with their local Post Office.

Applicants are encouraged to use registered or at least First Class mail. Each late applicant will be notified that the application will not be considered.

Applications postmarked on or before June 12, 1987, shall be considered as timely applications.

**Applications Delivered by Hand**

An application that is hand-delivered must be taken to the United States Department of Justice, Community Relations Service, Suite 330, 5550 Friendship Boulevard, Chevy Chase, Maryland 20815.

The Grants Management Office will accept hand-delivered applications between 9:00 a.m. and 5:00 p.m., Eastern Daylight Time daily, except Saturdays, Sundays and Federal holidays.

An application that is hand-delivered will not be accepted after 5:00 p.m., Eastern Daylight Time, on the closing date.

Catalog of Federal Domestic Assistance Number: 16.201.

Dated: April 24, 1987.

**Wallace P. Warfield,**

*Acting Director, Community Relations Service.*

**Intergovernmental Review**

*Application Requirements*

Pursuant to Executive Order 12372, *Intergovernmental Review of Federal Programs,* all States have the option of designing procedures for review and comment on Federally assisted programs. Each applicant is required to notify each State in which it is proposing activities under this announcement and to comply with the State's established review procedures. This may be done by contacting the applicable State Single Point of Contact (SPOC).

**State Requirements**

Comments and recommendations relative to applications submitted under

this solicitation should be mailed no later than 45 days after the date of publication, addressed to: Richard Gutierrez, Coordinator, Immigration and Refugee Affairs, Community Relations Service, Suite 330, 5550 Friendship Boulevard, Chevy Chase, Maryland 20815.

[FR Doc. 87-9636 Filed 4-28-87; 8:45 am]

**BILLING CODE 4410-01-M**

**Bureau of Prisons**

**Intent to Prepare a Draft Environmental Impact Statement (DEIS) for the Construction of a Federal Correctional Facility, Schuylkill County, PA**

**AGENCY:** Federal Bureau of Prisons, Justice.

**ACTION:** Notice of intent to prepare a Draft Environmental Impact Statement (DEIS).

**SUMMARY:**

1. Proposed Action: The U.S. Department of Justice, Federal Bureau of Prisons has determined that a new medium security Federal Correctional Institution with an adjacent minimum security Federal Prison Camp is needed in the Northeastern United States. A site is currently being evaluated in Schuylkill County, Pennsylvania. The proposal calls for the construction of a 150 bed minimum security camp and an adjacent 500-600 bed facility to house medium security inmates. Approximately 250 total acres would be required for road access and parking, inmate housing, administration space, program areas and service/support facilities for the two facilities. In addition, exercise areas and an adequate natural buffer zone around the entire property would be included in the required acreage.

2. In the process of evaluating the specific site, the following subjects will receive a detailed examination: water and sewage, wetlands, threatened and endangered species, cultural resources, unique and prime farmlands, and varied socio-economic issues.

3. Alternatives: In developing the DEIS, the options of no action and alternative sites for the proposed facilities will be fully and thoroughly examined.

4. Scoping Process: A number of meetings have already been held with local officials and interested citizens. Additional meetings including at least one public meeting will be held once a specific site is identified. A formal public hearing will be held after the publication of the DEIS.

5. DEIS Preparation: The DEIS should be available for public review and comment not later than August 1, 1987.

6. Address: Questions concerning the proposed action and the DEIS should be addressed to: Jim Jones, Site Acquisition Coordinator, Facilities Development and Operations, Federal Bureau of Prisons, 320 First Street NW., Washington, DC 20534, Phone: (202) 272-6871.

Dated: April 23, 1987.

**Loy S. Hayes,**

*Deputy Assistant Director, Federal Bureau of Prisons, U.S. Department of Justice.*

[FR Doc. 87-9628 Filed 4-28-87; 8:45 am]

**BILLING CODE 4410-05-M**

**Drug Enforcement Administration**

**[Docket No. 87-5]**

**Bell Apothecary, Inc.; Easton, PA; Hearing**

Notice is hereby given that on August 15, 1986, the Drug Enforcement Administration, Department of Justice, issued to Bell Apothecary, an Order To Show Cause as to why the Drug Enforcement Administration should not revoke its DEA Certificate of Registration. BB0430734 and deny any pending applications for renewal of such registration.

Thirty days having elapsed since the said Order To Show Cause was received by Respondent, and written request for a hearing having been filed with the Drug Enforcement Administration, notice is hereby given that a hearing in this matter will be held commencing at 10:00 a.m. on Wednesday, April 29, 1987, in Courtroom 10, Room 309, United States Claims Court, 717 Madison Place, NW., Washington, DC.

Dated: April 20, 1987.

**John C. Lawn,**

*Administrator, Drug Enforcement Administration.*

[FR Doc. 87-9619 Filed 4-28-87; 8:45 am]

**BILLING CODE 4410-09-M**

**[Docket No. 86-70]**

**The Boro Pharmacy, Easton, PA; Hearing**

Notice is hereby given that on August 15, 1986, the Drug Enforcement Administration, Department of Justice, issued to The Boro Pharmacy, an Order To Show Cause as to why the Drug Enforcement Administration should not revoke its DEA Certificate of Registration. AL9145081 and deny any pending applications for renewal of such registration.

131.

SCANNED

ALIEN MINORS SHELTER CARE PROGRAM - DESCRIPTION AND REQUIREMENTS

United States Department of Justice

Community Relations Service

4/28/87

132.

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | BACKGROUND | 1 |
| III. | SCOPE OF WORK | 2 |
| IV. | AUTHORIZATION | 3 |
| V. | FUNDING INSTRUMENT AND AWARDS | 3 |
| VI. | APPLICABLE REGULATIONS AND REGULATORY REQUIREMENTS | 4 |
| VII. | ELIGIBLE APPLICANTS | 4 |
| VIII. | DEFINITION OF ALIEN MINOR | 5 |
| IX. | CLIENT POPULATION | 5 |
| X. | PROGRAM DESIGN | 5 |
| XI. | SUPPLEMENTAL PROGRAM INFORMATION | 14 |
| XII. | REPORTING REQUIREMENTS | 15 |
| XIII. | RECORD RETENTION AND DISPOSITION OF DATA | 17 |
| XIV. | PROGRAM APPLICATION ADDENDA MATERIAL | 17 |
| XV. | SUPPLEMENTAL INFORMATION - OFFICE AND RESIDENTIAL FACILITIES | 22 |
| XVI. | SUPPLEMENTAL INFORMATION - EQUIPMENT, FURNISHINGS AND SUPPLIES | 24 |

133.

SCANNED

## I. INTRODUCTION:

The United States Department of Justice (DOJ), Community Relations Service (CRS) and Immigration and Naturalization Service (INS) have entered into an agreement to establish a network of community based shelter care programs to provide physical care and maintenance and other related services to alien minors detained in the custody of the Immigration and Naturalization Service.

The intent of this initiative is to provide a safe and appropriate environment for alien minors for the interim period beginning when the minor is transferred into a CRS Shelter Care Program and ending when a final disposition of the minor's status is implemented. Final disposition may result in either the bond, release or removal of the minor from the United States.

This document will provide operational policy instructions and application guidance to agencies and organizations which are applying for Federal funds to develop plans, programs, and administrative procedures for the care and maintenance of alien minors held in the custody of the INS.

## II. BACKGROUND:

The Shelter Care Program described in this document was developed as an inter-agency approach and response to the complex issues associated with the apprehension and detention of alien minors by the Immigration and Naturalization Service.

The United States has traditionally accepted immigrants and refugees from around the world. Ordinarily, persons desiring such status apply for entry while residing in their own country or in a third country known as a "country of first asylum". However, since 1978, alien minors have been entering the United States seeking refugee or immigrant status without any prior administrative processing. These minors are coming primarily from the Caribbean nations and from Central and South America.

During the past two years, significant numbers of minors have been entering the United States at various border points between the United States and Mexico. The largest concentrations of entries are in the States of Texas and California. These minors come primarily from El Salvador, Nicaragua, Guatemala and Honduras. When apprehended by Federal authorities, these minors are taken to either an INS Contract Facility or Border Patrol Facility. For the most part, these are adult detention facilities which are not appropriate environments for the detention of dependent minors.

Many of these detained minors (primarily males 13 to 17 years of age) are seeking some form of relief from deportation. It is estimated that as many as 5,500 other than Mexican minors were apprehended by Federal

134.

-2-

authorities during Federal Fiscal Year 1986.  A majority of these children
are found to be "bound for" parents, other relatives, godparents or
friends already residing in the United States and it appears that the
majority of these youths were attempting to establish residence in this
country.

Since 1980, the CRS and INS have worked together to provide temporary
shelter care and other related services to Cuban/Haitian Entrant and
other alien minors apprehended and detained by the INS in South Florida.
These minors are provided physical care and maintenance and other services
while waiting disposition of various INS proceedings.  This CRS program has
provided services to over 2,500 children apprehended by the INS.

In October 1986, the CRS and INS entered into a comprehensive Inter-
Departmental Memorandum of Agreement which provides the framework for a
national initiative to address the challenges and complex issues created
by this influx of Central American youth.

The CRS and INS intend to work closely with CRS Cooperative Agreement
Recipients (hereafter referred to as Recipients) to asssist with the
development and administration of programs that address the intricate
and complex needs of the youth for care and protection in a manner which
meets the mandates of current United States law.

III.  SCOPE OF WORK:

Recipients shall facilitate the provision of temporary shelter care and
other related services to alien minors who have been approved for transfer
from detention at various INS Contract Facilities or Border Patrol Facilities.
Shelter care services will be provided for the interim period beginning when
the minor is transferred into the Shelter Care Program and ending when a final
disposition of the child's status is implemented.  Final disposition may result
in either the bond, release or removal of the minor from the United States.

These minors, although released to the physical custody of the CRS
Recipient, shall remain in the legal custody of the INS.

The population level of alien minors is expected to fluctuate as arrivals
and case dispositions occur.  Program content must, therefore, reflect
differential planning of services to children in various stages of personal
adjustment and administrative processing.  Although the population of
minors is projected to consist primarily of adolescents, Recipients are
expected to be able to serve some children 12 years of age and younger.

CRS Recipients are expected to facilitate the provision of assistance and
services for each alien minor including, but not limited to:  physical care
and maintenance, access to routine and emergency medical care, comprehensive
needs assessment, education, recreation, individual and group counseling,
access to religious services and other social services.

135.

-3-

Other services that are necessary and appropriate for these minors may be
provided if CRS determines in advance that the service is reasonable and
necessary for a particular child.

Recipients are expected to develop and implement an appropriate individua-
lized service plan for the care and maintenance of each minor in accordance
with his/her needs as determined in an intake assessment. In addition,
Recipients are required to implement and administer a case management system
which tracks and monitors client progress on a regular basis to ensure that
each child receives the full range of program services in an integrated and
comprehensive manner.

Shelter care services shall be provided in accordance with applicable
State child welfare statutes and generally accepted child welfare
standards, practices, principles, and procedures. The CRS intends that
services be delivered in an open type of setting without a need for
extraordinary security measures. However, Recipients are required to
design programs and strategies to discourage runaways and prevent the
unauthorized absence of minors in care.

Service delivery is expected to be accomplished in a manner which is
sensitive to culture, native language and the complex needs of these
children.

IV. AUTHORIZATION:

Authority for the provision of shelter care and related child welfare
services to alien minors detained in the custody of the Immigration and
Naturalization Service (INS) is contained in a Memorandum of Agreement
and an Inter-Agency Cost Reimbursable Agreement, dated October 1, 1986,
and signed by the Acting Director, Community Relations Service; by the
Assistant Commissioner for Detention and Deportation, Immigration and
Naturalization Service and by the Director, Refugee Health Affairs,
United States Public Health Service.

Legislative authority for CRS Cuban/Haitian Entrant child welfare activities
is contained in Title V, Section 501(c) of Public Law 96-422 (The Refugee
Education Assistance Act of 1980).

V. FUNDING INSTRUMENT AND AWARDS:

Awards of Federal monies to support the activities detailed in this
document will be in the form of Cooperative Agreements issued by the
Community Relations Service. All final funding decisions are at the
discretion of the Director, Community Relations Service.

In addition, Awards are subject to the availability of funds and the
concurrence of the Assistant Commissioner for Detention and Deportation,
Immigration and Naturalization Service.

136.

-4-

Awards for shelter care activities normally will not exceed a 36 month
program performance period. Funding will be for 12 month budget periods;
continuation of funding is dependent upon successful completion of prior
year objectives, the level of need as defined by the Federal Government
and the availability of future fiscal year funding.

VI.  APPLICABLE FEDERAL REGULATIONS AND REGULATORY REQUIREMENTS:

Cooperative Agreements awarded by the Community Relations Service are
subject to the following Federal Regulations:

Title 28, Code of Federal Regulations

| Part 42, Subpart C | Non-discrimination in Federally assisted programs, Title VI of the Civil Rights Act of 1964 |
| Part 42, Subpart D | Non-discrimination in Federally assisted programs-implementation of Section 815(c)(1) of the Justice System Improvement Act of 1979 |
| Part 42, Subpart G | Non-discrimination based on handicap in Federally assisted programs |
| Part 42, Subpart H | Procedures for complaints of employment discrimination filed against recipients of Federal financial assistance |

Title 41, Code of Federal Regulations

Title 45, Code of Federal Regulations

| Part 46 | Protection of Human Subjects |

Title 48, Code of Federal Regulations

| Part 31.2 | Contract Cost Principles and Procedures |

VII.  ELIGIBLE APPLICANTS:

Non-profit organizations incorporated under State law which have demon-
strated child welfare, social service or related experience and are
appropriately licensed or can expeditiously meet applicable state licensing
requirements for the provision of shelter care, foster care, group care
and related services to dependent children are eligible to apply.

137.

-5-

SCANNED

For-profit organizations incorporated under State law which have demonstrated child welfare, social service or related experience and are appropriately licensed or can expeditiously meet state licensing requirements for the provision of shelter care, foster care, group care and other related services to dependent children and which can clearly demonstrate that only actual costs and not profits, fees, or other elements above cost have been budgeted, are also eligible to apply.

The geographical location of the applicant is not restricted to its selected area of service; however, the applicant must be able to strongly substantiate that its network of local affiliates or its subcontractor(s) or subrecipient(s) will be able to effectively and appropriately deliver the required services and that local service provider organizations are licensed under applicable State law to provide emergency shelter care and related services to dependent children.

VIII. DEFINITION OF ALIEN MINOR:

An alien minor is defined as a male or female foreign national under 18 years of age who is detained in the custody of the Immigration and Naturalization Service and is the subject of exclusion or deportation proceedings under the Immigration and Nationality Act, or who has an application for asylum pending with the Immigration and Naturalization Service.

IX. CLIENT POPULATION:

It is anticipated that the client population will generally consist of males, 13-17 years of age. Females generally comprise approximately 15% of the total population of alien minors. These minors are primarily nationals of El Salvador, Nicaragua, Guatemala and Honduras; however, Recipients can expect to provide services to children from other countries. Recipients should also be prepared to provide emergency shelter care to limited numbers of children 12 years of age and younger.

Clients would generally be considered to be dependent children without significant behavioral or psychological problems. Many children have inconsistent or sporadic educational histories and some children may be illiterate in their own language.

X. PROGRAM DESIGN:

Shelter care and related services can be provided through either residential, foster or group care programs. Applicants are not restricted in their individual approaches to service delivery however, the ability to provide a mix of services and deliver these services in geographic proximity to the applicable District INS office is highly desirable due to the varying needs of the client population, the needs of the Federal Government and the varying length of time that the youth will be in care.

Recipients must be able to admit minors on a 24 hour per day, seven (7) day a week basis.

138.

-6-

Control, predictability and accountability are essential elements of a
successful program.  A highly structured, active and productive day of
activities mitigates against disruptive behavior.

Program design must insure that the youths follow an integrated and
structured daily routine which shall include, but not be limited to:
education, recreation, work or chores, study period, counseling, group
interaction, free time and access to religious services.

This daily routine will enhance programmatic supervision and accountability
as well as encourage the development of individual and social responsiblity
on the part of each child.  Program rules and disciplinary procedures,
written and translated into Spanish, must be provided to each client
and fully understood by each client and all program staff.

Minors served by this Program are individuals who have entered the
United States without inspection.  These youths are seeking some type
of relief from deportation through an administrative process.

Recipients and their staff are expressly prohibited from hindering or
interfering with the execution of final case dispositions as determined
by the Federal Government.

The length of care per child is anticipated to be approximately thirty (30)
days; however, due to the variables and uncertainties inherent in each case,
Recipients must design programs which are able to provide a combination of
short term and long term care.

a)  Program Management:

   1.  Organizational Structure and Coordination:

       CRS Recipients are required to have operative plans which identify
       organizational structures, lines of authority and lines of respon-
       sibility.  Recipients are also required to maintain and administer
       comprehensive plans which facilitiate and enhance intra-program
       and intra-organizational (if appropriate) communication.  At a
       minimum, programs must ensure weekly staff meetings to discuss
       client service plans, client progress and client work schedules.

       Recipients must maintain linkages with other social service agencies,
       and the local District Office of the INS.  The Program Director for
       each Recipient shall be responsible for maintaining working
       relationships and liaison with community organizations and the INS.

   2.  Staffing:

       Programs must ensure:

       o  One (1) person identifiably responsible for the entire program
          and its outcomes;

       o  One (1) staff person identifiably responsible for the overall
          coordination of services including the case management system;

139.

-7-

o Clear lines of authority and responsibility;

o Adequate professional staff available to provide program services;

o Adequate levels of staff available to provide structure and to coordinate and deliver all services required of the program;

o Availability of relief staff for illness and holidays;

o Availability of 24 hour per day, seven (7) days per week professional emergency backup staff;

o Employee educational and/or experience levels commensurate with the responsibilities and expertise required of the staff position;

o Staff training, and;

o Adequate levels of individual leave, sick and compensatory time.

All staff members who deal directly with clients must be culturally sensitive and bilingual in English and Spanish.

3. Direct Program Services:

All program planning should reflect innovative methods of service delivery. All services shall be delivered in accordance with applicable State licensing requirements and standards.

The following is a description of program services which all Recipients are required to provide:

a) Care and Maintenance:

Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, personal grooming items and personal allowance or remuneration for work (outside of normal chores or responsibilities) as defined by applicable State statutes.

b) Routine and Emergency Medical/Dental Care:

Access to appropriate routine medical and dental care, family planning services and emergency health care services are a required part of the program. Such services may be provided

140.

-8-

SCANNED

through enrollment in local medical assistance programs,
coverage by health insurance plans or special arrangements
with local providers.

Recipients are required to ensure that each child receives a
complete medical examination (including screening for infec-
tious disease) within 24 hours of admission, excluding weekends
and holidays.

A written immunization policy and procedure which is in
compliance with the U.S. Public Health Service, Center for
Disease Control, should be implemented.  Policy and procedure
will be provided by INS.

If hospitalization is required, the Recipient is required
to make the proper arrangements for admittance.

Recipients must develop and administer a comprehensive policy
regarding the dispensing of medication and special diets.

Shelter care programs are required to have operative interven-
tion plans in instances of mental health decompensation.

c)  Orientation:

Upon admission, all clients must receive a comprehensive
orientation regarding program intent, services, rules
(written and verbal), expectations and legal assistance (INS
Form I-770 shall be completed).

d)  Individual Counseling:

Programs should schedule at least one (1) individual counseling
session per week conducted by trained social work staff with
the specific objectives of reviewing client progress, establi-
shing new short term objectives and addressing both the
developmental and crisis related needs of each minor.  Recipients
should anticipate many "emergency" individual counseling sessions.

e)  Group Counseling:

Programs must conduct group counseling sessions at least
twice a week.  This is usually an informal process and takes
place with all the minors present.  It is a time when new
minors are given the opportunity to get acquainted with the
staff, other children and the rules of the program.  It is an
open forum where everyone gets a chance to speak.  Daily program
management is discussed and decisions are made about recreational
activities, etc.  It is a time for staff and minors to discuss
whatever is on their minds and to resolve problems.

141.

-9-

f) Acculturation/Adaptation:

Recipients are required to provide a program which includes,
but is not limited to, information regarding personal health
and hygiene, human sexuality and the development of social
and inter-personal skills which contribute to those abilities
necessary to live independently and responsibly.

g) Education:

Recipients shall provide an education program in a struc-
tured classroom setting, Monday through Friday, which
concentrates primarily on the development of basic
academic competencies and secondarily on English Language
Training (ELT). Basic academic areas should include
Science, Social Studies, Math, Reading, Writing and
Physical Education.

Services are to be provided by a teacher certified by the
State Department of Education. The teacher shall assess
each client in order to determine individual educational
competency levels. This assessment may determine the need
for bilingual classes. Students are usually separated into
groups according to their educational competency level
rather than by chronological age.

h) Recreational and Leisure-Time:

A recreation and leisure-time plan shall include at least one
hour per day of large muscle activity and one hour of
structured leisure-time activities (this should not include
time spent watching television). Activities should be
increased to a total of three hours on days school is not in
session. The recreation program shall be organized and
supervised by a trained staff member.

A variety of fixed and movable equipment will be provided for
each recreation area. Examples of the variety of equipment
that should be available include a basketball, volleyball,
softball, tetherball, punching bag and soccer ball.

i) Work/Employment:

Written procedures regarding work assignment schedules shall
be developed. Consideration will be given to the fact that
juvenile aliens are not required to participate in uncompensated
work assignments unless the work is housekeeping of personal
areas or personal hygiene needs.

142.

-10-

4. <u>Supplemental Services</u>:

   a) <u>Visitation</u>:

      Visitation and contact with family members shall be
      encouraged. Visitation at the facility or office
      shall occur on a day and time to be determined by the
      Recipient. Such visitation shall be supervised by
      staff and conducted in such a manner as to ensure
      reasonable procedures to prevent the unauthorized
      release of any minor in care.

      All visitation plans and procedures require the prior
      approval of the designated CRS Program Officer.

   b) <u>Legal Services</u>:

      The INS provides all detained minors with specific
      information regarding the availability of free legal
      assistance and advises each minor of their right to be
      represented by an attorney, right to a deportation or
      exclusion hearing, right to apply for political asylum
      or right to request voluntary departure.

      CRS Recipients are required to restate this information
      to each minor upon admission to the program. Recipients
      shall establish procedures to assist each minor in
      making confidential contact with attorneys or their
      authorized representatives.

      Federal regulations prohibits the expenditure of any CRS
      Cooperative Agreement funds for the direct provision of
      legal services or assistance to any child in care.

   c) <u>Family Reunification</u>:

      Upon entering a CRS supported program, each minor shall
      be interviewed by an identified staff person with an
      educational background in the behavioral sciences, in
      an attempt to identify relatives for potential family
      reunification. Once relative information is obtained,
      staff is required to make telephone contact with the
      relative, verify the relationship and develop the
      following information:

      1) <u>Identifying Data</u> - General information about all
         members of the household.

143.

-11-

2) <u>Personality Description</u> - Description of relative's personality characteristics and their willingness to share information.

3) <u>Quality of Marriage</u> - Description of marriage, if applicable.

4) <u>Housing and Financial Situation</u> - Description of home, neighborhood, expenses, employment, income, etc.

5) <u>Plans for Minor</u> - Plans the relatives have for the minor (i.e., school enrollment).

6) <u>Personal References</u> - Two personal references from friends, relatives or other person(s) not living with the relative which can provide additional information, verify the information given by the relative and attest to the relative's commitment and ability to care for the child.

7) <u>Summary and Impressions</u> - Summary of overall impressions and recommendations.

The information and accompanying recommendation shall be given to the INS Office with responsibility for the minor's case. A copy of these materials shall be forwarded to the designated CRS Program Officer.

ALL FINAL DECISIONS REGARDING THE RELEASE OF MINORS TO RELATIVES WILL BE MADE BY OFFICIALS OF THE INS.

In some cases, it may be necessary for the family to obtain legal guardianship prior to release by the INS. In these cases, Recipients should assist relatives in filing the proper documentation under applicable State statutory requirements.

5. <u>Assessment</u>:

CRS Recipients are required to complete a comprehensive assessment of each child within ten (10) working days from the date of admission. The assessment includes:
1. An intake study which must:

   (a) Set forth the essential data relating to the identification and history of the child and family;

   (b) Summarize the specific events surrounding the minor's entry into the United States, and;

144.

SCANNED

-12-

    (c)  State the specific problem(s) which appear to re-
quire immediate intervention.

2.  Educational assessment and plan.

3.  Assessment of family relationships and interaction
with adults, peers and authority figures.

4.  A definition of religious preference and practice.

5.  Assessment of personal goals, strengths and weaknesses.

6.  Assessment of the impact of migration on the youth's future
adjustment.

7.  Identifying information regarding immediate family members,
other relatives, godparents or friends who may be residing
in  the United States.

6.  Case Management:

Recipients must ensure that comprehensive and realistic
individual client service plans are developed, implemented
and closely coordinated for each child through an operative
case management system.  Individual plans for the care of
each minor must be developed in accordance with his/her
needs as determined by the various assessments.  Staff
members responsible for specific case management activities
must be identified and their responsibilities fully defined.

Due to the need for consistency and frequent updating of
service plans, programs must also ensure that formalized
lines of intra-program communication are established as an
adjunct to informal channels of staff interaction.

7.  Client Case Records:

Recipients are required to develop, maintain and safeguard
individual client case records.  Agencies and organizations
are required to develop a system of accountability which
preserves the confidentiality of client information and
protects the records from unauthorized use or disclosure.

145.

-13-

At a minimum, client case records must include the following information:

1) Name and alien control number;
2) Initial screening and intake forms;
3) Case information from the referral source;
4) Comprehensive assessment;
5) Medical/Dental files;
6) Medical consent form;
7) Individual service plans and case notes;
8) Progress reports;
9) Program rules/disciplinary policies;
10) Copies of disciplinary actions;
11) Referrals to other service agencies;
12) Cash transaction documentation;
13) Inventory of personal effects, and;
14) Any other relevant information.

8. <u>Program Evaluation</u>:

   CRS Recipients must have operative program evaluation plans which include evaluative criteria.

9. <u>Community Support</u>:

   Applicants are required to identify measures they will take or have taken to assure and maintain community receptivity and support and/or reduce community opposition to the program.

   The CRS works closely with the INS in the development, implementation and administration of Shelter Care Programs, and relies upon the INS for various types of operational support. Recipients are also required to maintain ongoing operational relationships with applicable offices of the INS. The CRS will facilitate the development of such operational relationships.

   In addition, it is essential that Program Directors develop and maintain liaison with other important community based public and private organizations and agencies.

XI. <u>SUPPLEMENTAL PROGRAM INFORMATION</u>

A) <u>Legal Guardianship</u>:

   All alien minors transferred to CRS supported Shelter Care Programs shall remain in the legal custody of the INS.

146.

-14-

B) Categories of Minors in Federal Detention:

Specific categories of Alien Minors detained in the custody of the
INS are generally as follows:

1. Minors with no locatable parents in either the United States
   or the country of origin.  Such children could be eligible
   for release or bonding to relatives, licensed child welfare
   agencies, or voluntary agencies willing to accept custody of
   these minors.

2. Minors whose parents are locatable in the country of origin
   and who are in a position to reassume custody of the child.
   Potentially, these children could be removed from the United
   States through either exclusion or deportation proceedings
   or could leave the United States through voluntary departure.

3. Minors with locatable parents residing in the United States.
   Two situations are in evidence:

   a) If the parent(s) is documented, the child would be releas-
      ed to the parent's custody;

   b) If the parent(s) is undocumented, the child would be
      released to the parent's custody after the parents were
      processed by INS and subsequently assigned to a deportation
      docket.

      INS policy is to release the child with the parents.
      However, it is possible that a parent could be detained
      if he/she were found to be the subject of an outstanding
      criminal warrant.

XII. REPORTING REQUIREMENTS:

A) Program Reporting:

   1. Quarterly Program Progress Report:

      Recipients shall, within thirty (30) days following the
      end of each calendar quarter, provide the Designated CRS
      Program Officer with a Quarterly Program Progress Report.

147.

-15-

This report must include, but is not limited to, narrative
information describing:

a) Program progress, movement toward attaining program goals,
   program achievements and program problems.

b) Programmatic or budgetary implementation time-lines for
   the next quarter.

c) Anticipated budgetary or programmatic modifications
   which will be requested during the next quarter.

d) A listing containing the names, positions and dates of
   action relating to all staff who were hired, laid off,
   fired, promoted, or who resigned during the reporting
   period.

e) Any child abuse or neglect incidents handled under State law.

f) Listing of all incidents which occurred during the quarter.

2. Final Program Progress Report:

A Final Program Progress Report is due ninety (90) days
after the completion of the program performance period.

3. Daily Reports:

Recipients are required to maintain:

a) A chronological listing of all clients which includes
   name, alien control number, date of admission and
   date of discharge.

b) A Daily Entry Log which accounts for the whereabouts
   of each minor and documents any significant incidents
   which occurred during the period.

Copies of the above referenced information shall be included
as an addenda to the Quarterly Program Progress Report.

148.

-16-

SCANNED

**4.** Status or Condition Report:

CRS Recipients are required to immediately notify the applicable local District Office of the INS and the Designated CRS Program Officer of any change in the status or conditon of any minor in care including the following:

a) Any unauthorized absence of the minor;
b) Pregnancy of the minor;
c) Child-birth by the minor;
d) Hospitalization of, or serious illness of, or injury to the minor;
e) Death of the minor;
f) Arrest and/or incarceration of the minor, and;
g) Any abuse or neglect incident handled under State law.

B) Financial Reporting:

In order to obtain financial information concerning the use of Federal funds, the CRS requires that Recipients of these funds submit timely reports for review. These reports are consistent with the manner of reporting established by OMB Circular A-110.

1. Schedule of Cooperative Agreement Payment Requests:

Recipients are required to provide the Grants Management Branch, CRS, with current time-lines reflecting the Recipient's anticipated drawdown of Federal funds.

This schedule of time-lines is due within thirty (30) days of the Recipient's acknowledging receipt of the award.

2. Financial Reporting - (SF 269):

Recipients shall, within thirty (30) days following the end of each calendar quarter, furnish to the Grants Management Branch, CRS, an original and two (2) copies of the Financial Status Report, SF-269. This report is required of all CRS Recipients. It is designed to reflect financial information relating to Federal and non-Federal obligations and outlays.

Within ninety (90) days of the end date of the project performance and budget periods, Recipients must submit to the Grants Management Branch, CRS an original and two (2) copies of the Final Financial Status Report, SF-269.

149.

-17-

3. <u>Financial Reporting - (SF-270):</u>

This report is applicable to all Recipients who are funded on a "Check-Issued" basis. It is required to document the status of Federal cash when a recipient requests an advance or reimbursement of funds. This report is reviewed on a quarterly basis for Recipients receiving reimbursement of funds and on a monthly basis for those organizations receiving advance funding.

4. <u>Federal Cash Transaction Report - (SF-272):</u>

Recipients shall,within fifteen (15) working days following the end of each quarter, furnish the Grants Management Branch, CRS with an original and two (2) copies of the Federal Cash Transaction Report, SF-272. It is designed to provided cash and disbursement information.

XIII. RECORD RETENTION AND DISPOSITION OF DATA:

CRS Recipients are required to maintain all records, program and financial information and/or data for three (3) years following the date of submission of a Final Program Progress Report.

At the conclusion of the three (3) year retention period, CRS will instruct Recipients regarding destruction or delivery of all records, program and financial information and/or other data.

Recipients are required to provide any and all records, program and financial information, and/or data requested by CRS. This information is to be delivered to:

UNITED STATES DEPARTMENT OF JUSTICE
COMMUNITY RELATIONS SERVICE
CUBAN-HAITIAN ENTRANT PROGRAM
SUITE 330
5550 FRIENDSHIP BOULEVARD
CHEVY CHASE, MD 20815

XIV. PROGRAM APPLICATION ADDENDA MATERIAL:

Shelter Care Program Applicants are required to attach the following addenda material to their technical program proposals. FAILURE TO COMPLY WITH THESE REQUIREMENTS COULD BE GROUNDS FOR NONACCEPTANCE OF PROPOSALS.

150.

SCANNED

-18-

A)   **Administrative Requirements:**

1.   **Agency Administration and Organization:**

   a)   Agency organizational chart describing the agency as a whole
        and the organizational relationship of the proposed program
        to other agency programs.

   b)   Comprehensive organizational chart of the proposed program.

   c)   Copies of Articles of Incorporation.

   d)   Proof of IRS status as a non-profit organization, if appli-
        cable.

   e)   List of Officers and Board Members, if applicable.

   f)   List of professional affiliations and certifications.

   g)   Copy(ies) of applicable State child welfare licenses.

2.   **Organizational Standards/Policies and Policies Regarding Clients:**

   a)   Personnel Handbook and Standards of Conduct.

   b)   Statement regarding professional and agency liability.

   c)   Copy of Disciplinary Procedures.

   d)   Copy of agency policy regarding the confidentiality of
        client information and records.

   e)   Discussion of the method to be used to inform clients of
        program rules, regulations and policies, including the
        confidentiality of client information.

   f)   Copy of Grievance Policy and Procedures.

   g)   Fire and earthquake evacuation procedures, as applicable.

3.   **Staff:**

   a)   Job/Position Descriptions and resumes (if individuals have
        been identified for certain positions) for all personnel to
        be hired for the program, including documented evidence of

151.

-19-

the availability of bi-lingual and/or bi-cultural personnel.

b) Resumes and qualifications of program consultants.

4. Community Support of the Program:

a) Letters of program support from local political representatives, social service agencies, etc. Letters should reflect writers' awareness of program's intent, potential Federal funding source and location of program.

Letters should also contain a recommendation or comment regarding the proposed program.

b) A listing of service providers to whom clients will be referred, including name, address and description of service(s) to be provided.

c) A listing of voluntary and/or donated resources, including letters of intent from the agencies or entities providing the resources, if applicable.

5. Implementation Plan:

A plan for program implementation including time-lines regarding significant milestones.

B) FINANCE:

1. A copy of the most recent agency/organization audit.

2. A description of the agency/organization Financial Management System.

3. An itemization of all other Federal, State, local or foundation grants, cooperative agreements or contracts, etc., being administered by the applicant. This listing should identify the funding source; grant, cooperative agreement or contract number; level of financial support; purpose of award; grant, cooperative agreement or contract performance period; and name, address and telephone number of grant, cooperative agreement and/or contracts officer (Federal, State or local).

4. Subrecipients and/or Subcontractors:

a) Identify all proposed services which are to be procured through subrecipients/subcontractors.

152.

-20-

b) Provide relevant background material regarding the proposed
subrecipient(s)/subcontractor(s).

c) Provide letters from the proposed subrecipient(s)/subcontractor(s)
indicating their commitment and the specific services to be
provided.

C) <u>BUDGET</u>:

The proposed budget will be examined by the CRS Senior Grants Manage-
ment Specialist to verify the costs data, evaluate specific elements
of cost and determine if costs are necessary, reasonable and allowable
under applicable Federal statutes and regulations. The following
budget structure should be used to provide appropriate costs breakdowns.

Detailed costs justification (Budget Narrative) for each budget
category <u>MUST BE</u> attached to the budget.

1. <u>Personnel</u>:

Show salaries and wages only. Fees and expenses for consultants
should be included in another category entitled "other". The
name and title, salary amounts and level of effort (allocation
of time) must be identified for each position.

2. <u>Fringe Benefits</u>:

Submit a current copy of the negotiated fringe benefit rate. If
fringe benefits are applicable to direct salaries and wages and
treated as a part of the negotiated Indirect Cost Rate (IDC),
provide detailed information in the budget narrative.

3. <u>Travel</u>:

Use only for travel (domestic) of employees on the Cooperative
Agreement. Include estimated cost breakout for airfare, per
diem ($100 per day plus an additional $25.00 per day for incidental
expenses during the travel period -- i.e., taxi, etc.), number of
days, number of persons traveling for the purpose of attending a CRS
sponsored conference.

Travel costs for consultants should not be identified in this
category, nor should costs associated with local transportation
(i.e., where no out-of-town trip is involved).

153.

-21-

4. <u>Equipment</u>:

Use only for non-expendable personal property, which is defined as follows:

Non-expendable personal property is tangible personal property having a useful life of more than two (2) years and an acquisition cost of $500 or more per unit. An applicant may use its own definition of non-expendable personal property provided that such definition would at least include all tangible personal property. Personal property is property of any kind except real property.

Each item of non-expendable personal property must be identified and explained (i.e., office equipment and furnishings which are usable for activities other than the technical, specialized aspects of the grant program). Indicate whether property will be purchased or leased.

5. <u>Supplies</u>:

Include all tangible expendable personal property except that which is included in the equipment line. Requests in excess of $500 per category of tangible expendable personal property (supplies) must be identified and explained.

6. <u>Contractual</u>:

Use for procurement contracts (except those which belong on other line items such as equipment, supplies, and construction). Payments to individuals such as stipends, consulting fees, and benefits must not be included in this category.

7. <u>Renovation</u>:

Costs for alterations and renovation must be explained in detail.

8. <u>Client Costs</u>:

All costs directly related to clients such as stipends and allowances, essentials, food, personal items, clothing, local transportation, out of pocket medical services, etc., must be identified and explained.

9. <u>Other</u>:

a) All direct costs not clearly covered in categories listed above (i.e., consulting costs, local transportation, office and facility rental, van usage, fringe benefits included as a part of the IDC rate, etc.) must be identified and explained.

154.

-22-

    b) Requests for any item which requires prior approval by the CRS
       Grants Officer must be identified and explained.

    c) Costs for space rental should be identified by square feet.
       Also identify utilities and break out costs per month.

10. Indirect Costs

Identify and explain indirect cost items.

XV. SUPPLEMENTAL INFORMATION - OFFICE AND RESIDENTIAL FACILITIES:

The following information is intended to provide general guidelines and
information regarding office spaces and residential facilities.

1. Office Space:

Depending on the program, appropriate office space may be:

   a. Rented at the residential site (as a separate cost item);
   b. Rented from the primary applicant of which the program is a part;
   c. Provided free of cost, or;
   d. Included in the rental of the residential facility.

In all cases except foster care services, it is essential that office
space be co-located with a residential facility in order to facilitate
oversight, control and staff coverage.

2. Residential Facilities:

Residential space requirements must be based upon the number of
clients served and the types of services delivered on site.

   a) CRS Recipients are required to set forth in detail the following:

      1. A description of the physical structure and the allocation of
        space for residential and office use.

      2. A description of the location of the facility and a discussion
        regarding the basis for selection.

      3. A description of security measures which will discourage run-
        aways and prevent the unauthorized release of a minor from
        the program.

155.

-23-

b) In addition, applicants must include information supporting the
following requirements:

1. All residential facilities and office space must conform to
applicable zoning and special use permit requirements.

2. All facilities must conform to applicable building, fire,
health and safety codes and/or ordinances.

3. All facilities must meet applicable state child welfare
licensing requirements.

4. All programs must have established fire and, as applicable,
earthquake, evacuation procedures. All clients and staff
must be familiar with these procedures.

5. All residential space (including foster homes) and office space
must be equipped with smoke detectors and fire extinguishers.

Renovation of Facility:

In cases when renovation is required to bring a facility into compliance
with existing codes and regulations, the extent and reasonableness of
renovation costs depend upon the extent of repairs required, property
value, etc. Repair work and renovation requires documented estimates of
cost and time and a description of the repair. Programs must conform to
the procurement standards set forth in Office of Management and Budget
(OMB) Circular A-122.

All repairs and renovations require the prior approval of the CRS.

Maintenance of Facility:

Programs should include a monthly budgeted amount for maintenance and
general repairs to the facility. This may include funds for commercial
refuse disposal contracts. The lease or rental agreement should clearly
define the extent of leasee and leasor responsibilities as they pertain
to maintenance and repairs.

Leases:

Programs must be flexible in lease arrangements in order to accommodate
an uncertain client flow from Federal detention. Leases should include
options for renewal beyond the anticipated end date of the lease agreement.

All leases are subject to the prior approval of CRS Program and Grants
Management staff.

156.

-24-

**Insurance:**

All program facilities must have adequate levels of fire, theft and
liability insurance.

**Utilities:**

Programs should budget for this expense on a monthly basis if not included
in the monthly rent.  If office space is shared with another program or
agency, utilities are to be pro-rated according to the percent of usage
as it relates to square feet.  Utilities include heat, water, electricity
and natural gas.

XVI.  SUPPLEMENTAL INFORMATION - EQUIPMENT, FURNISHINGS AND SUPPLIES:

The following information is intended to be illustrative of equipment,
furnishings and supplies which are considered to be reasonable and
necessary in the operation of a shelter care program.

CRS Recipients are required to obtain the following through the most cost-
effective means available.

1.  Equipment:

The following is seen as reasonable for the furnishing of office space.

Office Furnishings:

a.  Desks
b.  Chairs
c.  Tables
d.  File Cabinets
e.  Typewriters or Word Processing System
f.  Copy Machine
g.  Book Cases/Shelves
h.  Lamps
i.  Tapes and Cassette Player
j.  Telephones
k.  Paging System

The determination should be made whether it is more cost effective to
lease or buy a particular piece of equipment or obtain it through the
General Services Administration.  In addition, items that can be used
free of charge by a program should be identified.

2.  Residential Furnishings:

The program should provide the following furnishing for their
residential operation.

157.

SCANNED

-25-

   a. Tables
   b. Chairs
   c. Desks (study space)
   d. Books and Shelves
   e. Bulletin Board
   f. Television Set
   g. Stereo or Radio
   h. Couch
   i. File Cabinet
   j. Maintenance tools
   k. Appliances/Kitchen Implements
   l. Recreational Equipment

3. <u>Administrative and Facility Supplies</u>:

Included are:

   a. General Office Supplies such as pens, pencils, paper etc.
   b. Household and Maintenance Supplies
   c. Copier Supplies
   d. Educational Material and Supplies
   e. Vehicle Maintenance Supplies
   f. Postage Stamps
   g. Forms

158.

## CERTIFICATE OF SERVICE BY MAIL

I, ELEANOR MCKENZIE , declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is Office of the United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on NOVEMBER 27, 1987 , I deposited in the United States mails in the United States Courthouse at 312 North Spring Street, Los Angeles, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of

MEMORANDUM OF UNDERSTANDING RE COMPROMISE OF CLASS
ACTION: CONDITIONS OF DETENTION

addressed to WILLIAM E. HARRIS
A Professional Corporation
11150 W. Olympic Blvd.
Suite 800
Los Angeles, CA 90064-1892

at his last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on NOVEMBER 27, 1987 at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

Eleanor McKenzie

USA-12c-24D

159.

SCANNED

# EXHIBIT 4

**U.S. Department of Justice**
IMMIGRATION AND NATURALIZATION SERVICE

# FACT SHEET

8/1/02

## INS' Office of Juvenile Affairs

### Background

The Immigration and Naturalization Service (INS) recently established an Office of Juvenile Affairs dedicated to identifying and addressing the concerns of juveniles in INS custody. The office will adopt a cross-disciplinary approach, viewing the juvenile as a child first and foremost. The Director of the Office will report directly to the Commissioner of the INS and will have direct line authority over officers in the field making and implementing decisions regarding juveniles.

The backbone of the Office of Juvenile Affairs will be dedicated full-time juvenile Case Management Officers responsible for managing reasonable caseloads. Through the Case Management Officers, the Office of Juvenile Affairs will make placement decisions. This means determining whether a particular juvenile should be released to a family member or other guardian or should be placed in a shelter care facility, secure detention, or foster care. The Office of Juvenile Affairs will make decisions regarding removal proceedings and make recommendations regarding parole decisions for unaccompanied minors.

The custody and care of juveniles currently in the United States without parents or legal guardians presents unique challenges. The number of unaccompanied juveniles arriving in the United States has more than doubled in the last five years, rising from 2,375 in FY 1997 to 5,385 in FY 2001. The Office of Juvenile Affairs will provide an integrated response to this growing population seeking alternatives to detention whenever possible and ensuring that juveniles have access to all benefits and services to which they are entitled.

### INS Policy

INS embraces the well-established principle that it is generally in a child's best interest to be reunited with his or her family. Of course, unaccompanied minors who have been victims of abuse or neglect may need U.S. protection to ensure that they are not returned to an abusive environment. Absent evidence of such a threat, however, the Office of Juvenile Affairs will work toward developing a system that quickly reunites children with their families, in the United States or abroad.

### Case Management Officers

The Office of Juvenile Affairs will include Case Management Officers located in the field reporting directly to Headquarters. These officers will receive extensive training on children's issues as well as a comprehensive overview of immigration services. They will be empowered to make decisions regarding placement of juveniles, and make recommendations regarding removal proceedings and benefits such as special immigrant juvenile classification. Case Management Officers will serve as local liaison with service providers, attorneys, the Executive Office of Immigration Review, and other entities appropriate for all issues concerning juveniles under their management. They will arrange for home assessments and proactively seek out alternatives to detention as appropriate.

**INS' Office of Juvenile Affairs**
Page 2

**Facility Overview**

The Office of Juvenile Affairs will begin to assume responsibility for INS service contracts in a variety of facilities in the United States that are equipped to house juveniles. The vast majority of these facilities are non-secure shelter care facilities. In addition, INS recently opened a new Family Shelter Care Program, designed to help keep immediate family members together while in INS custody.

OJA will build upon this foundation by securing and administering additional grants to provide the best possible environment for the custody and care of juveniles. The Office will also seek to improve facilities for detaining juveniles during the initial hours of custody. OJA plans to develop and establish a special needs facility for detention of certain juveniles.

All facilities used by the INS are state-licensed and, as such, meet or exceed state requirements in the areas of safety, education, recreation and physical exercise, nutrition, and medical and counseling services. INS ensures that each facility is staffed with or has access to language interpreters to explain procedures and the juveniles' rights under U.S. law. Educational classes offering a curriculum that meets or exceeds state or local educational requirements are provided to all juveniles in INS custody. Juveniles in INS custody have access to libraries, either on the premises or through linkages with local county library systems. There are opportunities for recreation and social interaction. Facilities used by INS provide appropriate access to telephones. Specially trained child-care staff also provide for the psychological needs of the juveniles through structured programs as well as through informal interactions. Many of the considerations INS makes for the comfort and well being of the juveniles in its custody exceed state licensing standards and requirements.

- INS -

161.

**INS' Office of Juvenile Affairs**
Page 3

## Key Juvenile Statistics

|  | 1999 | 2000 | 2001 |
|---|---|---|---|
| **Total Juveniles in custody** | 4,607 | 4,675 | 4,896 |
| Male | 3,619 | 3,530 | 3,540 |
| Female | 988 | 1,145 | 1,356 |

Top 5 Countries: (Alphabetical Order)

| | 1999 | 2000 | 2001 |
|---|---|---|---|
| China | 648 | 632 | 291 |
| El Salvador | 813 | 741 | 881 |
| Guatemala | 721 | 677 | 654 |
| Honduras | 1,055 | 928 | 807 |
| Mexico | 809 | 830 | 795 |

* * * * *

|  | 1999 | 2000 | 2001 |
|---|---|---|---|
| **Total Custody Events** | 5,644 | 5,537 | 5,385 |
| **Percent in Secure Facilities \*** | 35% | 35% | 32% |
| Total in Secure Facilities | 1,958 | 1,923 | 1,716 |
| **Percent in Non-Secure Facilities \*** | 65% | 65% | 68% |
| Total in Non-Secure Facilities | 3,686 | 3,614 | 3,669 |

\* Percentages refer to custody events, not total juveniles in custody.

– INS –

162.

## CERTIFICATE OF SERVICE

I am not a party to this action. I am employed by the Center for Human Rights and Constitutional Law, 256 S. Occidental Blvd., Los Angeles, CA, 90057. I am over the age of eighteen.

Copies of the foregoing , **Notice of Filing of Index to Exhibits and Exhibits in Support of Plaintiff's Notice of Motion and Motion to Enforce Settlement of Class Action, Volumes I-IV,** were personally served on counsel for defendants on this date at the following addresses:

Mr. Frank Travieso

Assistant United States Attorney

Federal Building, Suite 7516

300 North Los Angeles Street

Los Angeles, CA  90012

Dated: January 15, 2004

Carlos Holguin, State Bar No. 90754
*Attorney for Plaintiffs*