

1  CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
   Carlos Holguín, State Bar No. 90754
2  Peter A. Schey, State Bar No. 58232
   256 South Occidental Boulevard
3  Los Angeles, CA  90057
   Telephone: (213) 388-8693
4   Fax: (213) 386-9484

5  LATHAM & WATKINS
   Steven Schulman
6  555 Eleventh St., NW, Suite 1000
   Washington, DC 20004
7  Telephone: (202) 637-2184
   Fax: (202) 637-2201
8
9  NATIONAL CENTER FOR YOUTH LAW
   Katina Ancar
10 405 -14th Street, Suite 1500
   Oakland, California 94612
11 Telephone: (510) 835-8098
   Fax: (510) 835-8099
12
   *Of counsel:*
13 YOUTH LAW CENTER
   Alice Bussiere
14 417 Montgomery Street, Suite 900
   San Francisco, CA 94104
15 Telephone: (415) 543-3379
   Fax: (415) 956-9022
16
17 *Attorneys for Plaintiffs*

18                 UNITED STATES DISTRICT COURT
19                 CENTRAL DISTRICT OF CALIFORNIA
20

21 JENNY LISETTE FLORES, *et al.*,          )   No. CV 85-4544-RJK(Px)
                                            )
22 Plaintiffs,                              )   NOTICE OF FILING OF INDEX
                                            )   TO EXHIBITS AND EXHIBITS
23 -vs-                                     )   IN SUPPORT OF PLAINTIFFS'
                                            )   NOTICE OF MOTION AND
24 TOM RIDGE, Secretary, Department of      )   MOTION TO ENFORCE
   Homeland Security, *et al.*,             )   SETTLEMENT OF CLASS
25                                          )   ACTION - VOLUME II
   Defendants                              )
26 _____     )   (ARGUMENT NOT REQUIRED)

27
28

Scan only

FILED
CLERK, U.S. DISTRICT COURT
JAN 26 2004
CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
JAN 15 2004
mm  9:45
CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

ORIGINAL

DOCKETED ON CM
JAN 27 2004
BY                    009

Plaintiffs hereby give notice of the filing of their Index to Exhibits and Exhibits in Support of Plaintiffs' Notice of Motion and Motion to Enforce Settlement of Class Action. Volume II of IV contains the following exhibits:

| | |
|---|---|
| EXHIBIT 5: | Declaration of Steve Schulman, dated January 12, 2004 |
| EXHIBIT 6: | Latham & Watkins Report on Los Padrinos Facility Visit, September 2, 2001 |
| EXHIBIT 7: | Declaration of Carlos Holguín, dated January 14, 2004 |
| EXHIBIT 8: | Letter from John Pogash to Carlos Holguin, October 28, 2001 |
| EXHIBIT 9: | Declaration of Anibal Francisco Zuniga Valle, July 8, 2002 |
| EXHIBIT 10: | Declaration of Oscar Morales Guerra, July 8, 2002 |
| EXHIBIT 11: | Declaration of Chen Sai, September 28, 2001 |
| EXHIBIT 12: | Declaration of Jim Mei Huang, September 14, 2001 |
| EXHIBIT 13: | Declaration of Cesar Omar Martinez, April 29, 2003 |
| EXHIBIT 14: | Declaration of Jose Humberto Gonzalez, April 29, 2003 |
| EXHIBIT 15: | Declaration of Cesar Omar Martinez, May 6, 2003 |
| EXHIBIT 16: | Declaration of Shiu Ming Cheer, May 12, 2003 |
| EXHIBIT 17: | Declaration of Deborah Lee, May 15, 2003 |
| EXHIBIT 18: | Declaration of Diane Eason, May 15, 2003 |
| EXHIBIT 19: | Declaration of Chen Xiang, September 28, 2001 |
| EXHIBIT 20: | Declaration of Jin Rong Yiou, September 14, 2001 |
| EXHIBIT 21: | Declaration of Xue Zhung Zhou, September 28, 2001 |
| EXHIBIT 22: | [Reserved] |
| EXHIBIT 23: | Latham & Watkins Report on Flores Compliance Visit to Central Juvenile Hall, August 22, 2001 |
| EXHIBIT 24: | Declaration of Ernesto Rivera Campos, February 15, 2002 |
| EXHIBIT 25: | [Reserved] |

1

EXHIBIT 26:     United States Department of Justice, Immigration and Naturalization
                Service, Office of Detention and Removal, Program Descriptions
2               (November 2001)

3

EXHIBIT 27:     Declaration of Olvin Arteaga Moncada, July 16, 2002

4

EXHIBIT 28:     [Reserved]

5

EXHIBIT 29:     Declaration of Matthew Adams, October 8, 2001

6

EXHIBIT 30:      Declaration of Genaro Perez-Martinez, October 15, 2001

7

Dated: January 15, 2004                    Respectfully Submitted,

8

9                                          CENTER FOR HUMAN RIGHTS &
                                           CONSTITUTIONAL LAW

10

11

12                                         Carlos Holguin, State Bar No. 90754
                                           *Attorney for Plaintiffs*

13

14      ///

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCANNED

# EXHIBIT 5

SCANNED

## DECLARATION OF STEVEN H. SCHULMAN

1.    I am an attorney with Latham & Watkins LLP, and make this declaration based on my
      personal knowledge.

2.    In November 2002, on a visit to the Berks County Youth Center ("BCYC") in Leesport,
      Pennsylvania, to meet with a *pro bono* client, I met Goldy Singh, a juvenile being
      detained at BCYC. This affidavit reports my conversations with Goldy, which I recorded
      in a draft affidavit for him shortly after our interview. Goldy was transferred out of
      BCYC before I had the opportunity to have him sign his affidavit.

3.    As of November 2002, Goldy was a 17 year-old boy from India who had lived at BCYC
      since his arrival in the United States from India on or around January 26, 2001.

4.    Goldy has a relative, Bulbir Singh, who is a United States citizen who lives in Madison,
      Wisconsin. Goldy reported that Bulbir has lived in the United States for many years.
      Goldy calls Bulbir his "uncle," but Bulbir is actually Goldy's paternal grandfather's
      brother's son, which makes him his father's first cousin. Bulbir has two children, both
      aged under ten years old.

5.    When Goldy arrived at Berks nearly two years ago, he told the immigration officer that
      his Uncle Bulbir lived in the United States and wanted Goldy to live with him. The
      immigration officer did not explain to Goldy any rights that he had to be released to his
      uncle, nor did the INS do anything to help get him out of Berks and live with his uncle.

6.    Goldy told me that he would very much like to live with his Uncle Bulbir instead of
      being kept at Berks, where he was housed with as many as 30 other kids from around the
      world. Goldy had no relatives nearby BCYC and, in the two years he was detained at
      BCYC, his Uncle Bulbir had been able to visit him only two times. Goldy did get to
      speak with his Uncle Bulbir on the phone every week.

7.    Sometime in the fall of 2001, when Goldy had been at Berks for nearly a year, the INS
      started a "home study" at the request of his Uncle Bulbir and Goldy's attorney. His
      Uncle Bulbir filled out papers for Goldy to live with him. The home study took several
      months. Sometime in early 2002, Corey Terrell, an immigration officer at BCYC, told
      Goldy that his Uncle Bulbir was not a close enough relative for him to be allowed to live
      with him. He was not giving any written explanation of this decision, nor did he
      understand why he had to live at an INS detention center rather than with his Uncle
      Bulbir, who could care for him.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 12,
2004.

_Steven H. Schulman_

163.

SCANNED

# EXHIBIT 6

# Latham & Watkins

ATTORNEYS AT LAW

WWW LW COM

633 WEST FIFTH STREET, SUITE 4000
LOS ANGELES, CALIFORNIA 90071-2007
TELEPHONE (213) 485-1234
FAX (213) 891-8763

DIRECT DIAL 213-891-7861
E-MAIL SHAE LUTI@LW COM

SCANNED

---

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

| | | | |
|---|---|---|---|
| TO | File | DATE | September 2, 2001 |
| | | FILE NO | 000011-1731 |
| FROM | Shae Luti | COPIES TO | Carlos Holguin |
| | | | Steve Schulman |
| | | | Deborah Lambe |
| | | | Stacey Gilman |

SUBJECT:   Los Padrinos Facility Visit

## I.  INTRODUCTION

On July 25, 2001, representatives of Latham & Watkins[1] conducted a facility visit at Los Padrinos Juvenile Detention Center ("Los Padrinos"), 7281 East Quill Drive, Downey, California 90242, pursuant to the *Flores v. Reno* Settlement Agreement (the "*Flores* Agreement"). The following memorandum is a summary of the thoughts and impressions of various team members regarding the level of compliance, to the *Flores* Agreement, demonstrated at Los Padrinos.

## II.  BACKGROUND FACILITY INFORMATION

The Assistant Superintendent, Dennis Carroll, and the INS Unit Supervisor, Jeff Probasco, conducted our tour of Los Padrinos. The INS Juvenile District Coordinator, Michele O'Brien, also accompanied us on the tour. Upon our arrival at Los Padrinos, we were greeted by the facility Superintendent, Ron Barrett. The tour was approximately three hours  Our visit also included interviews with randomly selected INS detainees (hereinafter, collectively, the "Children," and individually, the "Child"),[2] facility staff,[3] facility superintendents and the INS Juvenile District Coordinator.

---

[1] The Latham & Watkins team included: Shae Luti, Jean Chi, Joshua Ellis, Kye Pawlenko, Jonathan Su and Lindsay Weiss.

[2] The following INS detainees were interviewed  Brasanna Ariyathurairajah, Siu Kuen Chan, Amilcar Diaz Lopez, Dennis Reyes and Kasthuran (no surname available)

BOSTON * CHICAGO * FRANKFURT * HAMBURG * HONG KONG * LONDON * LOS ANGELES * MOSCOW * NEW JERSEY * NEW YORK * NORTHERN VIRGINIA
ORANGE COUNTY * SAN DIEGO * SAN FRANCISCO * SILICON VALLEY * SINGAPORE * TOKYO * WASHINGTON D C

164.

Los Padrinos is a secure facility that houses approximately 650 juveniles.[4] The general population of the facility consists of juveniles convicted of criminal offenses. Minors who have runaway from their homes are also housed at the facility. Although housed within the same facility, the criminal offenders and runaway minors are segregated into separate units and each unit has separate male and female quarters. The ages of the minors housed at Los Padrinos range from twelve to eighteen years of age. The facility is licensed by the State of California and receives a per diem amount of $156.00 for each INS minor. The INS detainee roster forwarded by Ms. O'Brien listed nine Children at the facility. At the time of our visit, however, only six of the Children were present.

Ms. O'Brien informed us that Children with final orders of removal are systematically placed at secure facilities because they are determined to be a flight risk. Additionally, Children who have expressed a desire to "escape" are also placed in secure facilities. When a Child arrives at Los Padrinos a medical exam is conducted[5] and the Child is then integrated into the housing unit for the runaway population, which is separate from the juvenile delinquent housing unit. Translation services are provided to the facility via AT&T operator and there are staff members who are fluent in Spanish and Chinese

## III. SUMMARY OF SECURE FACILITY CHECKLIST

### A.    Overview Questions: Facility Manager

Q1:    What is your role in running this facility?

Q2:    What challenges do you face with INS minors?

A1-2:  With respect to the Children, the primary challenge presented to the staff at Los Padrinos is one of scheduling. More specifically, the Los Padrinos staff must maintain a rigid schedule in order to facilitate the Children having access to the facility while continuing to keep the Children segregated from the 602 general population. The other major problem faced by the Los Padrinos staff is the language barrier between the staff and the Children. Translators are available via telephone; however, instantaneous communication with Children who speak languages other than Spanish is often difficult.

### B.    Information on Minors

Q3:    How long do INS minors stay at Los Padrinos?

Q4:    How much information are the superintendents and/or staff given on the INS minors that come here?

---

[4] The following staff members were interviewed: Rafael Delatorre, Darren Buckner, Natasha Bennett, Jose Sandoval and Ms Chen (first name unknown).

[4] The facility population consists of approximately 100 female and 550 male residents

[5] Medical exams for female detainees include a pelvic exam

A3-4:  A Los Padrinos staff member, Rafael Delatorre, commented that the longest a Child has remained in the male runaway/detainee unit is five months.  Additionally, the Los Padrinos staff is not given any information regarding the Children prior to their arrival

Q5:     Are INS minors treated differently from other minors in the facility?

A5:     The Children are subject to a more lax standard as compared with the general facility population.

## C.      Transfer of Minors

Q6:     How often are INS minors transferred between Los Padrinos and other facilities?

A6.     Mr. Carroll indicated that to his knowledge the Children are not transferred out of Los Padrinos once they arrive.  A Child only leaves if the Child is released to INS.  In Mr. Carroll's experience, an INS detainee at Los Padrinos has never been downgraded to a less secure facility.

## D.      Arrival Procedures

Q7:  What processes occur when a general population minor arrives at Los Padrinos?

Q8:  Do these processes differ for INS minors?

Q9:  Are minors strip-searched when they arrive?

A7-9:  The arrival procedures for the Children begin at the intake unit where an initial interview and assessment are conducted.  The Children are not strip-searched.  Instead, the Children receive a cursory visual search.  Next, the Children are sent to the infirmary to ensure that their health status will not preclude integration with the runaway population.

General population minors, however, are strip-searched upon arrival and are not integrated with the runaway population.

## E.      Family Reunification

Q10:    Has the facility made ongoing efforts at family reunification for each ·minor?

A10:    Mr. Carroll notes that the facility has not made an effort to facilitate family reunification.  He further explained that the facility would like to start a program. Mr. Carroll envisioned that under the program, visitations by relatives and media representatives with a court order would be allowed.  Los Padrinos has a visiting room, a day room and administrative offices where the Children are allowed contact visits

## F. General Visitation Rules

Q11: Can minors in the facility have visitors?

Q12: What are the facility visitation procedures?

A11-12: The facility allows all INS "approved" visitors to meet with the Children. To Mr. Probasco's knowledge, there are no written procedures with regard to visitations. Ms. O'Brien noted that the Children are allowed to have visitors; however, all visits must be approved through her. Volunteer groups and attorneys can go directly to the facility to visit with the Children. Family members and friends must go to Ms. O'Brien's office, in downtown Los Angeles, in order to meet with the Children. Ms. O'Brien commented that family members and friends are not allowed to "sneak behind" her back and visit with the Children directly at the facility. The Children are not affirmatively informed about visitation procedures.

Q13: Does the facility have a visiting room?

Q14: When are general visits permitted?

Q15: How long can these visits lasts?

Q16: Does the facility permit contact visits?

A13-16: Although, the facility has separate visitation rooms, a visit to one of the female Children must be conducted in the main lobby of housing unit for female runaways. Moreover, a visit to one of the male Children must be conducted in the common area of the male runaway housing units. Ms. O'Brien's schedule dictates when visits by friends and family members can be conducted with the Children as well as the length of the visits.

Q17: Do minors wear restraints during visits?

Q18: How often does the INS meet with INS minors in custody at Los Padrinos?

Q19: Are these INS visits regularly scheduled or do they occur sporadically?

A17-19: The Children do not wear restraints during visits but are observed at all times. An INS representative visits with the Children sporadically on an as-needed basis.

## G. Legal Representatives/Legal Visits

Q20: Are minors permitted to meet privately with their legal representatives?

Q21: Do facility staff monitor these meetings?

Q22: What are the legal visitation rules?

Q23. How does the facility inform minors of its visitation rules?

167.

Q24: What procedures do legal representatives have to follow in meeting with a minor?

A20-24: Visits by legal counsel or volunteers can be made directly at the facility at any time. The Children are allowed to meet with their legal representatives in the presence of a facility representative. There are no written rules with regard to visits by legal counsel. Additionally, the Children are not affirmatively informed about legal visitation rules or about their right to consult with legal counsel.

## H. Correspondence Procedures

Q25: Does the facility limit the amount of mail that a minor may receive or send?

Q26. Does the facility provide written policies on how correspondence is handled?

A25-26: The facility provides a certain amount of time every week for letter writing. There does not appear to be any restrictions on the amount of mail the Children may receive or send. The postage for letters sent by the Children is covered by the facility. Letters received by the Children must be opened in the presence of the recipient and pre-screened for objectionable content by facility representatives. Letters sent by the Children are also pre-screened for objectionable content in the same manner. There are no written policies with regard to correspondence.

## I. Disciplinary Measures

Q27: What is the facility's disciplinary policy?

Q28. Does the disciplinary policy include the use of corporal punishment, deprivation of correspondence privileges, deprivation of physical exercise, deviations from normal food services or deprivation of clothing, bedding, or items of personal hygiene?

A27-28: According to Ms. O'Brien, the INS does not have a disciplinary policy. Rather, the disciplinary policy of the facility governs the Children. Mr. Barrett advised that the facility does not have a specific disciplinary policy for the Children. Mr. Delatorre also advised that the staff never engage in corporal punishment.

Q29: What other disciplinary techniques does the facility use?

A29: Mr. Delatorre stated that the primary disciplinary measure is a "time out," where the detainee is sat down and separated from the group. In more severe situations, a Child may be sent to the infirmary and isolated.[6]

---

[6] The infirmary rooms resemble solitary confinement holds, containing only a cot and a toilet. The door has a window just large enough for the occupant's eyes to peer out.

LA_DOCS 716650 3 [W 97]

168.

### J.   Religious Practices

Q30:   Does the facility permit minors to participate in religious activities?

A30:   The facility contains one house of worship that primarily serves as a Catholic and Protestant church.  Both Catholic and Protestant services are offered at the chapel on Sundays.

Q31:   Are restrictions placed on religious practice?

Q32:   Is attendance at any religious activities required by the facility?

A31-32:        Two of the Children of Hindu faith expressed concern about being forced to pray in a Christian church  It was unclear as to whether attendance at the Sunday religious services was optional or mandatory, as the facility schedule of activities included Sunday morning religious services.  Moreover, the Children were required to take a moment of silence before each meal for prayer or meditation.  Additionally, the Children indicated to us that they regularly meet for bible study led by outside evangelical volunteers who visit the Center.  One Child asserted that one such volunteer had given her a Bible and preached to her that she should convert to Christianity.  In fact, all of the Children stated that they had been given Bibles and subjected to proselytization.

Q33:   Does the facility permit access to external clergy?

Q34:   Does the facility accommodate minors' religious dietary requirements?

A33-34:        A Child may request to be visited by a spiritual adviser of his or her faith.

### K.   Facility Classrooms

The facility contained one classroom for the Children that accommodates approximately twenty students.  The classroom was air conditioned and housed several computers.  The primary instructor, Natasha Bennett, stated that curriculum included studies of various cultures, geography, and other subjects.  The classroom appeared to be ill equipped to educate non-English speaking Children.  For example, none of the educational materials were written in a language other than English.[7]

---

[7] Upon our visit to the classroom Amilcar showed Mr. Weiss the book from which he was working  It was a basic first grade reading primer with six levels or chapters, and he had not done more than the first thirty pages in the past three months.  He complained that he was very bored and that he knew he could read at a much higher level.  Mr Weiss picked up an advanced-level workbook and opened to an essay about tiger sharks.  Amilcar demonstrated that he could read and comprehend the passage, which was at a much higher level than what was assigned to him  Also in the classroom, Dennis was assigned to play a Mario Bros. typing game using the letters A, S, D and F

6

169.

According to the facility staff, the Children spend 300 minutes per day in school, separately from the runaway and juvenile delinquent population. The classroom was large enough to hold approximately twenty students. One teacher and one teacher's assistant were present in the classroom on that day, but no formal instruction was facilitated – the students were left to proceed with their individual learning, with the teacher and assistant occasionally looking over their shoulders. The Children either read, listened to cassette tapes at listening stations, or practiced typing with a software program.

**L.   Living Room/Common Area**

Q35:   Are minors permitted to use the telephone?

Q36:   What are the telephone access rules?

Q37:   Does the facility provide at least one telephone for every 25 detainees?

Q38:   Does the facility maintain the telephones regularly?

A35-38:  According to the facility staff supervisor for the female INS detainee/runaway unit ("GH Annex"), Ms. Chen,[8] the girls are permitted to use the telephone on Monday, Wednesday, Friday, and Saturday evenings. She advised that the female Children are allowed to make private phone calls whereas the phone calls made by female runaways are monitored. The male Children are granted telephone access upon request.

Q39:   Does the facility restrict the duration of legal calls?

Q40:   Does the facility monitor the content of minors' calls?

A39-40:  The Children are allowed calls that last approximately seven to ten minutes. The facility does not monitor the content of the Children's calls.

**M.   Bedroom/Sleeping Area**

Q41:   Are minors permitted to have possessions of their own?

Q42:   What items are minors not permitted to keep with them?

Q43:   Does the facility have written procedures for property held for minors?

A41-43:       The male Children and runaways are housed in Building W. The unit contains approximately twenty-five sets of bunk beds and can accommodate 52 residents. Artwork made by the Children and runaways detainees was affixed to the walls adjacent to their beds; however, we later learned from the interviewed Children that they were only allowed to affix their artwork the day before our visit. The unit was air conditioned and contained a television, refrigerator, and microwave.

---

[8] Ms. Chen's first name is unavailable.

LA_DOCS\716650.3 [W97]

170.

The female Children and runaways were housed in the GH Annex. The GH Annex contained a common reception area and two partitioned sleeping areas—one to the left of the reception area and one to the right. The bunks were separated from the common area by a waist-high wall and thick glass that extended to the ceiling. Each side contained about 10 bunk beds and had their own separate bathrooms. Unlike the bathrooms in the male unit, the GH Annex had a door and afforded more privacy for the girls. Artwork created by the girls was affixed to the walls adjacent to their beds. The GH Annex did not contain a common area for eating nor was there a television, refrigerator, or microwave.

Q44:   Does the facility provide each minor with clothing?

Q45:   Does the facility provide each minor with sheets, towels, and blankets?

A44-45.       The Children are provided with clothing upon their arrival at Los Padrinos. The facility housing units are fully equipped with bedding and linen. Towels are also provided to the Children on an as-needed basis. The Children were provided with street clothes the day we came to visit. Prior to having the street clothes, the Children wore the same uniforms as the Juvenile delinquents.

## N.     Bathroom

Q46:   Does the facility provide each minor with toiletries?

A46:   The male housing unit contains showers, sinks, and toilets. Neither the showers nor the bathroom stalls have doors and/or curtains. As a result, any Child showering or using the toilet facilities can be seen by others. Only a waist high wall partitions the bathroom from the common living area. Moreover, there were no toiletries (i.e. soap, shampoo, and toothpaste) in the bathrooms. Mr. Delatorre stated that because the boys misplace toiletries so often, the facility staff retains control of toiletry items.

In the female quarters there are five lockers that are shared among the girls and, therefore, lack locks. Each bedroom has a bathroom with one sink, toilet and shower. Both the toilet and shower stalls lack doors, but are at least offered a modicum of privacy because they cannot be seen from the central room.

## O.     Kitchen/Dining Room

The director of kitchen services, Jose Sandoval, escorted the Latham team on a tour of the kitchen. The Los Padrinos kitchen prepares approximately 800 meals per day.[9] The kitchen area includes large meat and vegetable lockers. Due to the large quantity of food that needs to be prepared on a daily basis, fresh vegetable and meat deliveries are made daily. Mr. Sandoval indicated that the kitchen staff is certified in food preparation by the County of Los Angeles. Prepared food is distributed to Building W and the GH Annex via temperature-controlled carts.

---

[9] See Exhibit A for a copy of the meal menu

LA_DOCS\716650 3 [W97]

171.

Our visit was announced to the kitchen staff roughly five minutes before the Latham team entered the kitchen. Our initial impression was that the kitchen floor contained an unusually large quantity of trash, including various food products discarded in the course of food preparation. A significant amount of cleaning was taking place as we walked in, including mopping of the floor and cleaning of countertops. One could reasonably assume that this cleaning began upon our entry into the facility.

## P.    Facility Infirmary

Q46:   What medical services does the facility provide?

Q47:   Do minors receive initial medical and dental exams within 14 days of arrival?

A46-47: The infirmary inspection was led by Darren Buckner. Mr. Buckner stated that the infirmary is usually staffed by at least one staff member and one nurse. Doctors visit the facility regularly. The facility itself contains roughly ten "self-contained" rooms, each of which contains a bed and a toilet. There is a window in each room.

Upon arrival of an INS detainee, the Child is taken to the infirmary for a series of vaccinations and a "medical exam." When asked what constituted a "medical exam," Mr. Buckner was evasive and gave an incomplete answer (i.e. that a medical exam is a "general exam"). Mr. Buckner reported that doctors and nurses employed by Los Angeles County administer the medical exam and any vaccinations. Mr. Buckner further reported that female doctors and nurses may be secured for any detainee "upon request."

Q48:   What kind of individual counseling services does the licensed program provide?

A48:   The facility provides counseling services to the Children. However, the Children are not affirmatively informed about these counseling services. Instead, they are usually referred to counseling after an outburst or some other type of disruptive behavior. The facility does not provide group-counseling services. The facility also does not provide acculturation and adaptation services, although some facility representatives offer the Children advice and instruction on a personal level.

## Q.    Facility Recreation Area

Q49:   What activities does your recreation program include?

Q50:   How long do minors participate in recreation each day?

Q51:   How much of this time is spent watching television?

A49-51:   Ms. Chen advised that the female Children spend an hour outside each day for recreation (3:30-4:30) and are shown movies in the evenings. Other recreational

9

172.

Andrews explicitly stated that the children detained at the Facility were transferred to the Facility because they had received their final deportation orders, not because of threats to their safety.

        Paragraph 23 of the Settlement provides that "the INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program." Clearly, other less restrictive alternatives exist for these children. Since all determinations to place a minor in a secure facility are reviewed and approved by the regional juvenile coordinator, this decision is largely at the discretion of Ms. Andrews and Ms. O'Brien.

    B.    Failure to Release Children To Family Members or Less Restrictive Setting

        Under Paragraph 14 of the Settlement, "where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to: (a) a parent; (b) a legal guardian; (c) an adult relative (brother, sister, aunt, uncle, or grandparent); (d) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship; (e) a licensed program willing to accept legal custody; or (f) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."

        Under Paragraph 18, "upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody."

        Both Ms. Andrews and Ms. O'Brien confirm that the minors detained at the Facility on the ground that they have received final orders of deportation will be held at the Facility until they are deported, even if the process takes several months (as it usually does for deported Chinese minors). They are making no efforts to reunite these children with family members in the United States or to place them in less restrictive settings.

    C.    Problems at the Facility

        Given that these minors should not be detained at the Facility under the Settlement, there are other problems with the facility itself which should be noted.

    1    Lack of Privacy

        The doors to the rooms have a long, slanted window designed for the observation of juvenile detention center inmates. This window cannot be closed when the children use the toilet in their rooms. The communal showers are also in plain view of staff and other children, although the doors do seem to block an observer's view of the torso. As a matter of Facility

SF-196.839741 [W97]

DYSTFDI 00001 1-1788

173.

"few days." Siu Kuen believes she was only allowed to speak with her family because we came to visit.

**B.      Dennis Reyes & Amilcar Diaz Lopez**[14]

Dennis is a sixteen-year-old boy from La Ceyba, Honduras who has been housed at Los Padrinos for approximately four months. Amilcar is a fifteen year-old boy from Guatemala and has spent approximately three months at the facility. With regard to general questions about the facility, the boys asserted that the staff was nice to them and the food was fine; however, they did not like being locked up in such a "closed" place all the time ("siempre cerrado").

More specifically, they complained that they had filled out several request forms for a soccer ball, but never received one, they also requested for more paints, only to have them arrive the day before we came to inspect the facility. They further complained that they had been issued the same uniforms that were worn by the general juvenile delinquent population. Apparently, the Children were given street clothes to change into on the morning of our arrival.

Dennis is here in California without any other family. His father lives in Colombia, his mother is deceased and his older brother is still in Honduras, although they are on bad terms and do not really speak. He has a friend in the Los Angeles area with whom he wanted to live with, but the INS would not release him because the adult of the household had been arrested for selling drugs. He has no other family in Honduras besides his brother, and said that aside from staying with some friends, he would not know what to do or where to go upon return. He arrived at Los Padrinos after being detained in San Diego for illegally crossing the Mexican border. Dennis cannot read or write in his native language and has expressed a desire to learn and to read and write in both Spanish and English. He complained that he has been in the U.S. four months and has hardly picked up anything. He is frustrated by the fact that his teacher does not speak any Spanish, and the only teaching tools he is given are speak-along cassette tapes and computer games. Dennis is not really sure what he is waiting for and does not talk to anyone outside the facility.

Amilcar's parents live in San Rafael, California. He lived with them for approximately three years while attending public high school. He speaks with his parents approximately three times a week but he complains that his phone calls are ended by the staff in less than five minutes. He says his parents have not come to visit because it does not seem worthwhile to drive six hours for what they believe would only be a fifteen-minute visit. Amilcar was sent to Los Padrinos after being picked up for shoplifting. His parents have hired an attorney and are working on getting the proper papers for his release so he can return to them. His major complaint relates to his education at Los Padrinos. He can read and write well in English, but feels his learning growth is stunted here. He also pointed out that there were no books in the dormitory for them to read except for a bible.

---

[14] Dennis and Amilcar were interviewed by Ms Weiss and Ms. Luti.

LA_DOCS\716650 3 [W97]

174.

## C.   Kasthuran[15] and Bresanna Ariyathurairajah[16]

Kasthuran, 17-years old, and Bresanna, 15-years old, are from Sri Lanka. Kasthuran had just arrived at the facility the day before our visit. Kasthuran entered the United States, by air, through San Francisco. He does not have family in the United States but does have a sister in Canada. Kasthuran has contacted his sister and she has obtained counsel to represent him. He fled Sri Lanka because of the ongoing fighting there. Upon detention with the INS, he was strip-searched by a male officer, handcuffed, and placed on an U.S. Marshals airplane bound for San Diego. He was then bused to Los Angeles, where he spent the night in a "jail cell" along with a Pakistani Child.[17] When we inspected the infirmary there was a Pakistani Child still confined to one of their "intake" rooms and isolated from others. Michelle O'Brien confirmed that one detainee was picked-up in San Francisco and flown to San Diego on an U.S Marshals airplane and then bused to Los Angeles. She advised that normally detainees be transported on commercial airlines.

Bresanna had been at the facility for one month. He was detained in Los Angeles, where he arrived by airplane approximately one month ago. Like Kasthuran, he fled Sri Lanka because of the violence occurring there. He also does not have any family members in the United States but he does have an uncle in Canada. He, too, obtained counsel to represent him.[18] Bresanna was given legal papers from his attorney; however, the papers were confiscated either by the INS or the facility.[19] Bresanna was concerned about his case and wanted to speak with his lawyer.

Both Kasthuran and Bresanna wore "street" clothes and not uniforms. However, prior to our visit Bresanna wore a uniform similar to those worn by the juvenile delinquents. Because Kasthuran had just arrived the day before our visit, he was not able to confirm whether or not INS detainees are normally dressed in uniforms.

## V. VIOLATIONS OF FLORES AND OTHER STANDARDS

Below, is a list of notable violations of the detention standards, as articulated under the *Flores* Agreement.

- The facility does not have written rules regarding visits by legal counsel.

- The Children are not allowed private meetings with legal counsel.

- The Children are not affirmatively informed of INS policies, Los Padrinos policies, or their right to counsel.

---

[15] There is no surname available for Kasthuran.

[16] Kasthuran and Ariyathurairajah were both interviewed by Mr Pawlenko and Ms Luti.

[17] Presumably the "jail cell" he was referring to was one of the intake rooms within the facility infirmary

[18] It was unclear if both Bresanna and Kasthuran share the same lawyer.

[19] Bresanna was unsure who had his papers

F:\_DOCS\716650 3 [W-97]

175.



CAMP          HEAD COOK          MENU #1          DATE   10-29-00  to  11-4-00          APPROVED BY.

Espie Abueg, R.D

| DAY | BREAKFAST | | LUNCH | | DINNER | |
|---|---|---|---|---|---|---|
| Sunday 10-29-00 | GRAPEFRUIT<br>COLD CEREAL<br>HAM PATTIE<br>WG TOAST<br>MARG<br>MILK | 1/2<br>2 BOXES<br>1 OZ<br>2 SL<br>2 PATS<br>1 PT | CREAM OF TOMATO SOUP<br>CRACKERS<br>TOASTED CHEESE SAND<br>3 BEAN SALAD<br>OVEN FRIED POTATO<br>SWEET POTATO PIE W/ WHIP TOPP<br>MILK | 1 C<br>2 PKG<br>2<br>1/2C<br>1 C<br>1PC<br>1/2PT | CHICKEN TETRAZZINI<br>BROCCOLI<br>MIXED GREEN SALAD<br>LF FRENCH DRESSING<br>FRUIT CUP<br>WG BREAD<br>MARG<br>MILK | 2 C<br>1/2 C<br>1 C<br>2 OZ<br>1/2 C<br>2 SL<br>2 PATS<br>1/2 PT |
| Monday 10-30-00 | ORANGE<br>OATMEAL<br>SCRAM EGG<br>HASH BRN POTATOES<br>WG TOAST<br>MARG<br>MILK | 1 WH<br>1 C<br>1<br>3/4C<br>2 SL<br>2 PATS<br>1 PT | SLOPPY JOE SAND<br>ON WG BUNS<br>CORN<br>LETTUCE  & TOMATOES SALAD<br>LF RANCH DRESSING<br>ORANGE PINEAPPLE GELATIN<br>MILK | 2<br>2<br>1/2C<br>1 C<br>2OZ<br>1 SQ<br>1/2PT | ROAST TURKEY W/ STUFFING<br>MASHED POTATOES w GRAVY<br>PEAS<br>APPLE SALAD<br>SPICE CAKE<br>CORNBREAD<br>MILK | 3 OZ<br>1/2C<br>1 C<br>1/2 C<br>1 SQ<br>1 SQ<br>1/2 PT |
| Tuesday 10-31-00 | GRAPEFRUIT<br>CREAM OF WHEAT<br>BOILED EGG<br>PANCAKES<br>SYRUP<br>MILK | 1/2<br>1 C<br>1<br>3<br>2OZ<br>1 PT | TUNA AND NOODLES<br>CARROTS<br>MIXED GREEN SALAD<br>LF ITALIAN DRESSING<br>PEACH CRISP<br>WG BREAD<br>MARG<br>MILK | 2C<br>1/2C<br>1 C<br>1 OZ<br>1/2C<br>2SL<br>2PATS<br>1/2 PT | SWEET SOUR PORK<br>STEAMED RICE<br>GREEN BEANS<br>CABBAGE APPLE SALAD<br>ICE CREAM<br>WG BREAD<br>MARG<br>MILK | 11/2C<br>1 C<br>1/2C<br>1 C<br>1/2C<br>2 SL<br>2PATS<br>1/2PT |
| Wednesday 11-1-00 | CORN MEAL MUSH<br>SAUSAGE PATTY<br>BKD WG FRENCH TOAST STRIPS W/<br>SPICED APPLE TOPPING<br>MILK | 1 C<br>2<br>4<br>1/2 C<br>1 PT | HOT DOGS<br>WG HOT DOG BUNS<br>LF MAYO,MUSTD,CATSUP,SW RELISH<br>OVEN FRIED POTATOES<br>BAKED BEANS<br>CARROT PINEAPPLE SALAD<br>FRESH ORANGE<br>MILK | 2<br>2<br><br>1 C<br>1/2C<br>1/2C<br>1 WH<br>1/2PT | BEEF SHEPHERD PIE<br>BROCCOLI<br>CHEF'S SALAD<br>LF FRENCH DRESSING<br>PEANUTBUTTER BAR<br>WG BREAD<br>MARG<br>MILK | 2 SQ<br>1/2C<br>1 C<br>2 OZ<br>1 SQ<br>2 SL<br>2PATS<br>1/2PT |
| Thursday 11-2-00 | ORANGE<br>OATMEAL<br>SCRAM EGG<br>BACON<br>WG TOAST<br>MARG<br>MILK | 1 WH<br>1 C<br>1<br>1 SL<br>2 SL<br>2 PATS<br>1 PT | BEAN BURRITO W/ CHEESE<br>SPANISH RICE<br>GREEN BEANS<br>LETTUCE AND TOMATOES SALAD<br>FRESH APPLE<br>WG BREAD<br>MARG<br>MILK | 2<br>1 C<br>1/2C<br>1 C<br>1 WH<br>2 SL<br>2 PATS<br>1/2PT | BARBECUED CHICKEN<br>MASHED POTATOES<br>CORN<br>TOSSED GREEN SALAD<br>LF ITALIAN DRESSING<br>CARROT CAKE<br>WG BREAD<br>MARG<br>MILK | 5 OZ<br>1/2C<br>1/2C<br>1 C<br>2OZ<br>1 SQ<br>2 SL<br>2PATS<br>1/2PT |
| Friday 11-3-00 | GRAPEFRUIT<br>CREAM OF WHEAT<br>HAM SLICE<br>PANCAKES<br>SYRUP<br>MILK | 1/2<br>1 C<br>1 OZ<br>3<br>2 OZ<br>1 PT | SPAGHETTI W/ MEAT SAUCE<br>MIXED VEGETABLES<br>TOSSED GREEN SALAD<br>LF RANCH DRESSING<br>MELON<br>GARLIC BREAD<br>MILK | 11/2C<br>1/2C<br>1C<br>2 OZ<br>1 C<br>1 SL<br>1/2PT | BEEF STEW<br>WINTER SQUASH<br>KIDNEY BEAN SALAD<br>CHERRY COBBLER<br>CORNBREAD<br>MILK | 2 C<br>1/2C<br>1/2C<br>1 SQ<br>1 SQ<br>1/2PT |
| Saturday 11-4-00 | BANANA<br>COLD  CEREAL<br>SCRAM EGG<br>BISCUITS<br>JAM<br>MARG<br>MILK | 1 WH<br>2 BOXES<br>1<br>2<br>1 OZ<br>1 PAT<br>1 PT | CHICKEN STIR FRY<br>STEAMED RICE<br>SPINACH<br>COLESLAW<br>FRESH ORANGE<br>WG BREAD<br>MARG<br>MILK | 2 C<br>1 C<br>1/2C<br>1/2C<br>1 WH<br>2 SL<br>2 PATS<br>1/2PT | CHEESEBURGER<br>WG BUN<br>LETTUCE AND TOMATOES<br>LF MAYO,MUSTD,CATSUP,SW RELISH<br>OVEN FRIED POTATOES<br>MIXED VEGETABLES<br>BUTTERSCOTCH BROWNIES<br>MILK | 4 OZ<br>1<br>1/2C<br><br>1 C<br>1/2C<br>1 SQ<br>1/2PT |

176.

CAMP          HEAD COOK     MENU #2      DATE.  11-5-00 to 11-11-00

APPROVED BY:
E abney
Espie Abueg, R.D 

| DAY | BREAKFAST | | LUNCH | | DINNER | |
|-----|-----------|---|-------|---|--------|---|
| **Sunday**<br><br>11-5-00 | ORANGE<br>OATMEAL<br>SCRAM EGG<br>MUFFINS<br>MILK | 1 WH<br>1 C<br>1<br>2<br>1 PT | BEEF & CHEESE BURRITO<br>REFRIED BEANS<br>LETTUCE & TOMATOES<br>CARROT & RAISINS SALAD<br>FRESH APPLE<br>SALSA<br>WG BREAD<br>MARG.<br>MILK | 2 PC<br>1/2 C<br>1C<br>1/2 C<br>1 WH<br>1/4C<br>2 SL<br>2 PATS<br>1/2 PT. | OVEN FRIED CHICKEN<br>MASHED POTATO<br>CUT CORN<br>SPRING GREEN SALAD<br>LF RUSSIAN DRESSING<br>CORN BREAD<br>MARG.<br>PEANUT BUTTER BAR<br>MILK | 2 PC<br>1/2 C<br>1/2 C<br>1 C<br>2 OZ<br>1 SQ<br>1 PAT<br>1 SQ<br>1/2PT |
| **Monday**<br><br>11-6-00 | RAISINS<br>COLD CEREAL<br>SAUSAGE PATTIE<br>PANCAKES<br>SYRUP<br>MILK | 1/2 C<br>2 BOXES<br>1 OZ<br>3<br>2 OZ<br>1 PT | BAKED HAM<br>CANDIED YAMS<br>SPINACH<br>MIXED GREEN SALAD<br>LF ITALIAN DRESSING<br>GRAPES, SEEDLESS<br>WG BREAD<br>MARG.<br>MILK | 3 OZ<br>1/2C<br>1/2 C<br>1 C<br>2 OZ<br>1/2C<br>2 SL<br>2 PATS<br>1/2PT | MEAT LOAF W/2 OZ TOM SCE<br>STEAMED RICE<br>MIXED VEGETABLES<br>TOSSED GREEN SALAD<br>LF FRENCH DRESSING<br>FRESH ORANGE<br>WG BREAD<br>MARG.<br>MILK | 4 OZ<br>1 C<br>1/2 C<br>1 C<br>2 OZ<br>1 WH<br>2 SL<br>2PATS<br>1/2 PT |
| **Tuesday**<br><br>11-7-00 | GRAPEFRUIT<br>OATMEAL<br>BOILED EGG<br>HASH BRN POTATO<br>WG TOAST<br>MARG.<br>MILK | 1/2<br>1C<br>1<br>3/4 C<br>2 SL<br>2 PATS<br>1 PT | HOT DOGS ON<br>WG HOT DOG BUNS<br>LF MAYO, MUSTD, CATSUP, SW RELISH<br>BAKED BEANS<br>OVEN FRIED POTATOES<br>CREAMY COLESLAW<br>PEAR<br>MILK | 2<br>2<br><br>1/2C<br>1 C<br>1 C<br>1 WH<br>1/2PT | CHICKEN & NOODLE<br>GREEN BEANS<br>MACARONI SALAD<br>PEACHES<br>WG BREAD<br>MARG.<br>MILK | 2 C<br>1/2C<br>1/2C<br>1/2C<br>2 SL<br>2 PATS<br>1/2 PT |
| **Wednesday**<br><br>11-8-00 | ORANGE<br>CREAM OF WHEAT<br>VEG. OMELET<br>BACON<br>WG TOAST<br>MARG.<br>MILK | 1 WH<br>1 C<br>1<br>1 SL<br>2 SL<br>2 PATS<br>1 PT | CREOLE FISH<br>FRIED RICE<br>PEAS<br>POTATO SALAD<br>YELLOW CAKE<br>WG BREAD<br>MARG.<br>MILK | 3 OZ<br>2/3C<br>1/2C<br>1/2C<br>1 SQ<br>2 SL<br>2 PATS<br>1/2 PT | ROAST BEEF W/2 OZ GRAVY<br>SCALLOPED POTATOES<br>BROCCOLI<br>MIXED GREEN SALAD<br>LF RANCH DRESSING<br>APRICOTS<br>WG BREAD<br>MARG.<br>MILK | 3 OZ<br>1/2C<br>1/2 C<br>1 C<br>2 OZ<br>1/2C<br>2 SL<br>2 PATS<br>1/2 PT |
| **Thursday**<br><br>11-9-00 | GRAPEFRUIT<br>COLD CEREAL<br>SCRAM EGG<br>HASH BRN POTATO<br>WG TOAST<br>MARG<br>MILK | 1/2<br>2 BOXES<br>1<br>3/4 C<br>2 SL<br>2 PATS<br>1 PT | CHILI MACARONI<br>CARROTS<br>TOSSED GREEN SALAD<br>LF RANCH DRESSING<br>FRUIT CUP<br>WG BREAD<br>MARG.<br>MILK | 1-1/2 C<br>1/2 C<br>1 C<br>1 OZ<br>1/2C<br>2 SL<br>2 PATS<br>1/2 PT | BAKED HAM<br>SWEET POTATO<br>CAULIFLOWER<br>CABBAGE, RAISINS SALAD<br>GINGERBREAD W/ WHIP TOPP<br>WG BREAD<br>MARG<br>MILK | 3 OZ<br>1/2 C<br>1/2C<br>1/2C<br>1 SQ<br>2 SL<br>2 PATS<br>1/2 PT |
| **Friday**<br><br>11-10-00 | ORANGE<br>CREAM OF WHEAT<br>WG BAKED FRENCH TOAST STRIPS W/<br>SPICED APPLE TOPPING<br>HAM SLICE<br>MILK | 1 WH<br>1 C<br>4<br>1/2C<br>1 OZ<br>1 PT | PORK CHOPSUEY<br>RICE<br>BAKED WINTER SQUASH<br>WALDORF FRUIT SALAD<br>CANNED PINEAPPLE<br>WG BREAD<br>MARG.<br>MILK | 1 1/2C<br>1 C<br>1/2 C<br>1/2 C<br>1/2C<br>2 SL<br>2 PATS<br>1/2 PT | HAMBURGER PATTIE ON<br>WG HAMB BUN<br>LETTUCE & TOMATOES<br>LF MAYO, MUSTD, CATSUP, SW RELISH<br>GREEN BEANS<br>POTATO SALAD<br>JELLO W/FRUIT<br>MILK | 3 OZ<br>1<br>1/2 C<br><br>1/2 C<br>1/2 C<br>1/2 C<br>1/2 PT. |
| **Saturday**<br><br>11-11-00 | BANANA<br>COLD CEREAL<br>SAUSAGE LINKS<br>WAFFLES<br>SYRUP<br>MILK | 1 WH<br>2 BOXES<br>2 LINKS<br>3<br>2 OZ<br>1 PT | VEGETABLE SOUP<br>CRACKERS<br>COLD CUTS BOLOGNA<br>SL CHEESE<br>LETTUCE & TOMATO<br>LF MAYO, MUSTARD<br>MACARONI SALAD<br>FRESH ORANGE<br>WG BREAD<br>MILK | 1 C<br>2 PKGS<br>2 OZ<br>1 OZ<br>1 C<br>1 OZ EA<br>1/2 C<br>1 WH<br>2 SL<br>1/2 PT | BAKED FISH SCANDIA<br>RICE PILAF<br>STEWED TOMATO<br>TOSSED GREEN SALAD<br>LF FRENCH DRESSING<br>CHERRY COBBLER<br>WG BREAD<br>MARG.<br>MILK | 2 PORT.<br>1 C<br>1/2C<br>1 C<br>2 OZ<br>1/2C<br>2 SL<br>2 PATS<br>1/2PT |

177.

CAMP ____ HEAD COOK ____ MENU #3 ____ DATE 11-12-00 to 11-18-00

APPROVED BY:
_Espre Aburg_
Espre Aburg, R.D

| DAY | BREAKFAST | | LUNCH | | DINNER | |
|---|---|---|---|---|---|---|
| Sunday | GRAPEFRUIT | 1/2 | SPAGHETTI W/ MEAT SAUCE | 1 1/2 C | BAKED HAM/ 2 OZ FRUIT SAUCE | 3 OZ |
| | COLD CEREAL | 2 BOXES | ITALIAN SQUASH | 1/2 C | CREAMED POTATOES | 1/2 C |
| | WG BAGEL | 1 WH | MIXED GREEN SALAD | 1 C | GREEN BEANS | 1/2 C |
| | LF CREAM CHEESE | 1 TBSP | LF ITALIAN DRESSING | 2 OZ | CABB, APPLE, RAISINS SALAD | 1/2 C |
| | JAM | 1 OZ | MIXED FRUIT | 1/2 C | SWEET POTATO PIE w/ WHIP TOPP | 1 SL |
| | SAUSAGE PATTY | 1 OZ | GARLIC BREAD | 1 SL | WG BREAD | 2 SL |
| | MILK | 1 PT | MILK | 1/2 PT. | MARG. | 2 PATS |
| | | | | | MILK | 1/2 PT |
| Monday | ORANGE | 1 WH | BREADED CHICKEN ON 1 WG BUN | 3 OZ | VEGETABLE LASAGNA | 2 PC |
| | OATMEAL | 1 C | LETTUCE AND TOMATOES | 1 C | ITALIAN BREAD | 1 SL |
| | SCRAM EGG | 1 | LF MAYO, MUSTD, CATSUP, SW RELISH | | MARG | 1 PAT |
| | HASH BROWN POTATO | 3/4 C | BROCCOLI | 1/2 C | CAESAR SALAD | 1 C |
| | WG TOAST | 2 SL | RELISH PLATE | 2 OZ | BLOND BROWNIES | 1 SQ |
| | MARG. | 2 PATS | CHERRY CRISP | 2 PC | MILK | 1/2 PT. |
| | MILK | 1 PT | MILK | 1/2 PT | | |
| Tuesday | BANANA | 1 WH | SPLIT PEA SOUP | 1 C | CHICKEN FAJITAS | 2 PC |
| | RAISIN BRAN CEREAL | 2 BOXES | CRACKERS | 2 PKGS | LETTUCE AND TOMATOES | 1 C |
| | HAM PATTIE | 1 OZ | TURKEY CLUB BAGEL ON | 1 | LF SOUR CREAM | 2 OZ |
| | HASH BROWN POTATO | 3/4 C | BAGEL | 1 | SALSA | 2 OZ |
| | WG TOAST | 2 SL | OVEN FRENCH FRIED POTATOES | 1 C | SPANISH RICE | 1 C |
| | MARG. | 2 PATS | COLE SLAW | 1/2 C | THREE BEAN SALAD | 1/2 C |
| | MILK | 1 PT | FRESH ORANGE | 1 WH | COCONUT PUDDING | 1/2 C |
| | | | MILK | 1/2 PT | MILK | 1/2 PT |
| Wednesday | GRAPEFRUIT | 1/2 | CHILE CON CARNE W/ BEANS | 1 C | BREADED BKD PORK CHOP | 5 OZ |
| | CREAM OF WHEAT | 1 C | CRACKERS | 2 PKGS | OVEN BRWN POTATO | 1/2 C |
| | WG FRENCH TOAST | 3 SL | SUMMER SQUASH | 1/2 C | SPINACH | 1/2 C |
| | SYRUP | 2 OZ | TOSSED GREEN SALAD | 1 C | LETTUCE & TOMATOES SALAD | 1 C |
| | SAUSAGE LINKS | 2 LINKS | LF RANCH DRESSING | 2 OZ | LF ITALIAN DRESSING | 2 OZ |
| | MILK | 1 PT | PINEAPPLE | 1/2 C | OATMEAL RAISIN COOKIE | 2 |
| | | | WG BREAD | 2 SL | WG BREAD | 2 SL |
| | | | MARG. | 2 PATS | MARG. | 2 PATS |
| | | | MILK | 1/2 PT | MILK | 1/2 PT. |
| Thursday | ORANGE | 1 WH | ENCHILADAS | 2 PC | | |
| | CORN MEAL MUSH | 1 C | REFRIED BEANS | 1/2 C | NEW MACARONI & CHEESE | 2 C |
| | HARD BOILED EGG | 1 | PEAS | 1/2 C | BROCCOLI | 1/2 C |
| | BACON | 1 SL | POTATO SALAD | 1/2 C | COLE SLAW | 1/2 C |
| | WG TOAST | 2 SL | CANNED PEACHES | 1/2 C | CARROT CAKE | 1 SQ |
| | MARG. | 2 PATS | FLOUR TORTILLAS | 2 PC | WG BREAD | 2 SL |
| | MILK | 1 PT | LF SOUR CREAM | 2 OZ | MARG . | 2 PATS |
| | | | SALSA | 2 OZ | MILK | 1/2 PT. |
| | | | MILK | 1/2 PT | | |
| Friday | BANANA | 1 WH | PIZZA W/ CHEESE TOPP | 2 PC | CHEESE BURGER ON | 4 OZ |
| | COLD CEREAL | 1 C | BREAD STICKS | 2 STKS | WG BUN | 1 |
| | SAUSAGE PATTY | 1 OZ | GREEN BEANS | 1/2 C | LETTUCE & TOMATOES | 1/2 C |
| | HASH BROWN POTATO | 3/4 C | CARROT & PINEAPPLE SALAD | 1/2 C | LF MAYO, MUSTD, CATSUP, SW RELISH | |
| | WG TOAST | 2 SL | FRESH ORANGE | 1 WH | CORN | 1/2 C |
| | MARG. | 2 PATS | MILK | 1/2 PT | MIXED GREEN SALAD | 1 C |
| | MILK | 1 PT | | | LF ITALIAN DRESSING | 2 OZ |
| | | | | | CHERRY CAKE PUDDING | 1/2 C |
| | | | | | MILK | 1/2 PT |
| Saturday | GRAPEFRUIT | 1/2 | PORK BURRITO | 2 | HONEY LEMON CHICKEN | 2 PC |
| | OATMEAL | 1 C | REFRIED BEANS | 1/2 C | RICE PILAF | 1/2 C |
| | SL HAM | 1 OZ | MIXED GREEN SALAD | 1 C | CAULIFLOWER | 1/2 C |
| | PANCAKES | 3 | LF RANCH DRESSING | 2 OZ | GARDEN VEGETABLE SALAD | 1 C |
| | SYRUP | 2 OZ | FRESH APPLE | 1 WH | SPICE COOKIES | 2 |
| | MILK | 1 PT | WG FLOUR TORTILLAS | 2 PC | WG BREAD | 2 SL |
| | | | LF SOUR CREAM | 2 OZ | MARG. | 2 PATS |
| | | | MILK | 1/2 PT | MILK | 1/2 PT. |

178.

CAMP          HEAD COOK          MENU #4          DATE  11-19-00 to 11-25-00          APPROVED BY:
Espie Abueg, RD

| DAY | BREAKFAST | | LUNCH | | DINNER | |
|---|---|---|---|---|---|---|
| Sunday | ORANGE | 1 WH | BEAN SOUP | 1 C | ROAST BEEF/ 2 OZ GRAVY | 3 OZ |
| | CREAM OF WHEAT | 1 C | CRACKERS | 2 PKGS | MASHED POTAO | 1/2 C |
| | COFFEE CAKE | 1 SQ | BEEF TACO PIE | 2 PC | MIXED VEGETABLES | 1/2 C |
| | SCRAMBLED EGG | 1 | CORN | 1/2C | LETTUCE & TOMATOES SLD | 1 C |
| | MILK | 1 PT | LETTUCE AND TOMATOES | 1 C | LF RUSSIAN DRESSING | 2 OZ |
| | | | LF SOUR CREAM | 2 OZ | SPICE CAKE | 1 SQ |
| | | | FRESH APPLE | 1 WH | WG BREAD | 2 SL |
| | | | MILK | 1/2PT. | MARG. | 2 PATS |
| | | | | | MILK | 1/2PT |
| Monday | GRAPEFRUIT | 1/2 | PORCUPINE MEAT BALLS/TOM SCE | 3 OZ | BEEF STEW | 1 C |
| | COLD CEREAL | 2 BOX | OVEN BRN POTATO | 1 C | NOODLES | 1 C |
| | WG FRENCH TOAST | 3 SL | CAULIFLOWER | 1/2 C | SWEET & SOUR RED CABBAGE | 1/2 C |
| | HAM PATTIE | 1 OZ | CUCUMBER ONION SALAD | 1/2C | FRUIT SALAD | 1/2C |
| | SYRUP | 2 OZ | APRICOTS | 1/2 C | BREAD PUDDING | 1/2 C |
| | MILK | 1 PT | WG BREAD | 2 SL | WG BREAD | 1 SL |
| | | | MARG | 2 PATS | MARG | 1 PAT |
| | | | MILK | 1/2 PT | MILK | 1/2 PT |
| Tuesday | STEWED PRUNES | 8 | CORNED BEEF, BOILED | 3 OZ | CHEESEBURGER  ON | 4 OZ |
| | CORN MEAL MUSH | 1 C | BOILED POT & CABBAGE | 1 C | WG BUN | 1 |
| | SCRAMBLED EGG | 1 | CARROTS | 1/2C | OVEN FR FR POTATOES | 1C |
| | BACON | 1 SL | MIXED GREEN SALAD | 1 C | LF MAYO, MUSTD, CATSUP, SW RELISH | |
| | WG TOAST | 2 SL | LF RANCH DRESSING | 2 OZ | CUT CORN | 1/2 C |
| | MARG. | 2 PATS | FRESH  ORANGE | 1/2 C | LETTUCE & TOMATOES | 1 C |
| | MILK | 1 PT | WG BREAD | 2 SL | SHERBET | 1/2 C |
| | | | MARG | 2PATS | MILK | 1/2 PT. |
| | | | MILK | 1/2 PT | | |
| Wednesday | ORANGE | 1 WH | BARBECUE PORK  ON | 3 OZ | OVEN BAKED CHICKEN | 2PC |
| | OATMEAL | 1 C | WG BUN | 1 | PARSLIED POTATOES | 1/2 C |
| | WAFFLES | 3 | BAKED BEANS | 1/2 C | GLAZED CARROTS | 1/2 C |
| | SYRUP | 2OZ | MIXED VEGETABLES | 1/2 C | SPRING GREEN SALAD | 1 C |
| | SAUSAGE PATTY | 1 OZ | CABB, APPLE & CELERY SALAD | 1/2 C | LF FRENCH DRESSING | 2 OZ |
| | MILK | 1 PT | LEMON MERINGUE PIE | 1 PC | PINEAPPLE  SLICED | 4 SL |
| | | | MILK | 1/2 PT | WG BREAD | 2 SL |
| | | | | | MARG. | 2PATS |
| | | | | | MILK | 1/2 PT. |
| Thursday | GRAPEFRUIT | 1/2 | CHILI CON CARNE W/ BEANS | 1 C | SALISBURY STEAK /2OZ GRAVY | 3 OZ |
| | COLD CEREAL | 2 BOX | STEAMED RICE | 1 C | MASHED POTATOES | 1/2 C |
| | HARD BOILED EGG | 1 | PEAS | 1/2 C | BROCCOLI | 1/2 C |
| | HASH BRN POTATO | 3/4 C | TOSSED GREEN SALAD | 1 C | CARROT RAISINS SALAD | 1/2 C |
| | WG TOAST | 2 SL | LF ITALIAN DRESSING | 2 OZ | APPLESAUCE CAKE | 1 SQ |
| | MARG. | 2  PATS | FRESH PEAR | 1 WH | WG BREAD | 2 SL |
| | MILK | 1 PT | WG BREAD | 2 SL | MARG . | 2 PATS |
| | | | MARG. | 2 PATS | MILK | 1/2 PT |
| | | | MILK | 1/2 PT | | |
| Friday | ORANGE | 1 WH | TAMALE PIE | 2 SQ | BAKED  CAJUN FISH | 2PC |
| | CREAM OF WHEAT | 1 C | ZUCCHINI SQUASH | 1/2 C | OBRIEN POTATOE | 1/2 C |
| | PANCAKES | 3 | GARDEN VEGETABLES SALAD | 1 C | GREEN BEANS | 1/2 C |
| | SYRUP | 2 OZ | LF RANCH DRESSING | 2 OZ | MIXED GREEN SALU | 1 C |
| | SLICED HAM | 1 OZ | APPLE COBBLER | 1/2 C | LF FRENCH DRESSING | 2 OZ |
| | MILK | 1 PT | WG BREAD | 2 SL | SLICED PEACHES | 1/2 C |
| | | | MARG. | 2 PATS | WG BREAD | 2 SL |
| | | | MILK | 1/2 PT | MARG . | 2 PATS |
| | | | | | MILK | 1/2 PT. |
| Saturday | BANANA | 1 WH | SALAD PLATE- EGG SALAD | 1/3C | TURKEY A LA KING | 11/2C |
| | COLD CEREAL | 2 BOX | HAM SLICE, CHEESE SL | 1 OZ EA | STEAMED RICE | 1 C |
| | SCRAMBLE EGG | 1 | BAKED BEANS | 1/2 C | BROCCOLI | 1/2 C |
| | BISCUITS | 2 | LETTUCE & TOMATOES | 1 C | COLE SLAW | 1/2C |
| | MARG | 2 PATS | WATERMELON | 1 C | PEANUT BUTTER COOKIES | 3 |
| | HASH BROWNS | 3/4 C | WG BREAD | 2 SL | WG BREAD | 2 SL |
| | MILK | 1 PT | MARG | 2PATS | MARG. | 2 PATS |
| | | | MILK | 1/2 PT | MILK | 1/2 PT |

179.

CAMP          HEAD COOK          MENU          DATE   11-28-00 to 12-2-00          APPROVED BY

Espie Abueg, R.D.

| DAY | BREAKFAST | | LUNCH | | DINNER | |
|---|---|---|---|---|---|---|
| Sunday<br><br>11-26-00 | GRAPEFRUIT<br>OATMEAL<br>SAUSAGE LINKS<br>MUFFINS<br>MARG<br>MILK | 1/2<br>1 C<br>2 LINKS<br>2<br>2 PATS<br>1 PT | SUBMARINE SAND<br>WG SUB ROLL<br>BOLOGNA,CHEZ ,TURKEY,HAM<br>LETTUCE AND TOMATOES<br>POTATO SALAD<br>RANCH STYLE BEANS<br>MELON<br>MILK | 1<br>1<br>1 OZ EA<br>1 C<br>1C<br>1/2 C<br>1 C<br>1/2 PT | BARBECUED CHICKEN<br>PARSLIED POTATOES<br>GREEN BEANS<br>MACARONI SALAD<br>CANNED PINEAPPLE<br>WG BREAD<br>MARG.<br>MILK | 2PC<br>1/2C<br>1/2C<br>1/2C<br>1/2C<br>2 SL<br>2 PATS<br>1/2PT |
| Monday<br><br>11-27-00 | ORANGE<br>CREAM OF WHEAT<br>PANCAKES<br>HAM PATTIE<br>SYRUP<br>MARG.<br>MILK | 1 WH<br>1 C<br>3<br>1 OZ<br>2 OZ<br>1 PAT<br>1 PT | TURKEY AND NOODLES<br>CARROTS<br>CABB,APPLE,CELERY SALAD<br>PEARS<br>WG BREAD<br>MARG<br>MILK | 2 C<br>1/2 C<br>1/2C<br>1/2 C<br>2 SL<br>2PATS<br>1/2 PT | POLISH SAUSAGE<br>BAKED BEANS<br>LYONNAISE POTATO<br>COLESLAW<br>APPLE SAUCE<br>WG BREAD<br>MARG<br>MILK | 3 OZ<br>1/2 C<br>1/2C<br>1/2C<br>1/2 C<br>2 SL<br>2 PATS<br>1/2 PT |
| Tuesday<br><br>11-28-00 | GRAPEFRUIT<br>OATMEAL<br>SCRAMBLED EGG<br>HASH BROWN POTATO<br>WG TOAST<br>MARG.<br>MILK | 1/2<br>1 C<br>1<br>3/4 C<br>2 SL<br>2PATS<br>1 PT | BAKED LASAGNA<br>ZUCCHINI SQUASH<br>TOSSED GREEN SALAD<br>LF ITALIAN DRESSING<br>APPLE CRISP<br>GARLIC BREAD<br>MILK | 2 SQ<br>1/2 C<br>1 C<br>2 OZ<br>1/2 C<br>2 SL<br>1/2PT | CORNED BEEF<br>BOILED POTATOES & CABB<br>CARROTS<br>KIDNEY BEANS SALAD<br>MIXED FRUIT CUP<br>WG BREAD<br>MARG.<br>MILK | 3 OZ<br>1C<br>1/2 C<br>1/2 C<br>1/2 C<br>2SL<br>2PATS<br>1/2 PT. |
| Wednesday<br><br>11-29-00 | RAISINS<br>COLD CEREAL<br>FRIED EGG<br>BACON<br>WG TOAST<br>MARG<br>MILK | 1/2 C<br>2 BOXES<br>1<br>1 SL<br>2 SL<br>2 PATS<br>1 PT | CHICKEN CACCIATORE<br>STEAMED RICE<br>BROCCOLI<br>SPRING GREEN SALAD<br>LF RUSSIAN DRESSING<br>FRESH ORANGE<br>WG BREAD<br>MARG<br>MILK | 2 PC.<br>1 C<br>1/2 C<br>1 C<br>2 OZ<br>1 WH<br>2 SL<br>2PATS<br>1/2 PT | BAKED HAM W/ 2OZ FRT SCE<br>SWEET POTATOES<br>CAULIFLOWER<br>3 BEAN SALAD<br>PINEAPPLE UP-SIDE DWN CAKE<br>WG BREAD<br>MARG.<br>MILK | 3 OZ<br>1/2C<br>1/2C<br>1/2 C<br>1 SQ<br>2 SL<br>2 PATS<br>1/2 PT. |
| Thursday<br><br>11-30-00 | ORANGE<br>CORN MEAL MUSH<br>WG FRENCH TOAST<br>SYRUP<br>SLICED HAM<br>MILK | 1 WH<br>1 C<br>3 SL<br>2 OZ<br>1 OZ<br>1 PT | BKD BRD FISH SAND ON<br>WG BUN<br>LF MAYO, MUSTD,CATSUP,SW RELISH<br>OVEN FRIED POTATO<br>BAKED BEANS<br>CARROT SALAD<br>CHERRY COBBLER<br>MILK | 4 OZ<br>1<br><br>1C<br>1/2 C<br>1/2 C<br>1 SQ<br>1/2PT | ROAST TURKEY W/ 2OZ GRAVY<br>MASHED POTATO<br>MIXED VEGETABLES<br>COLE SLAW<br>APPLESAUCE CAKE<br>WG BREAD<br>MARG<br>MILK | 3 OZ<br>1/2 C<br>1/2 C<br>1/2 C<br>1 PC<br>2 SL<br>2PATS<br>1/2 PT. |
| Friday<br><br>12-1-00 | BANANA<br>COLD CEREAL<br>SCRAMBLED EGG<br>HASH BROWN POTATOES<br>WG TOAST<br>MARG.<br>MILK | 1 WH<br>2 BOXES<br>1<br>3/4 C<br>2 SL<br>2 PATS<br>1 PT | TURKEY CHOW MEIN<br>CHOW MEIN NOODLES<br>BAKED WINTER SQUASH<br>POTATO SALAD<br>FRESH ORANGE<br>WG BREAD<br>MARG.<br>MILK | 1 1/2 C<br>1 C<br>1/2 C<br>1/2 C<br>1 WH<br>2 SL<br>2 PATS<br>1/2 PT | MEAT LOAF W/ 2 OZ TOM SCE<br>OVEN FRIED POTATO<br>CARROTS<br>TOSSED GREEN SALAD<br>LF FRENCH DRESSING<br>BAKED CUSTARD<br>WG BREAD<br>MARG .<br>MILK | 3 OZ<br>1 C<br>1/2 C<br>1 C<br>2 OZ<br>1/2C<br>2 SL<br>2 PATS<br>1/2 PT |
| Saturday<br><br>12-2-00 | GRAPEFRUIT<br>CREAM OF WHEAT<br>BOILED EGG<br>DOUGHNUT<br>MILK | 1/2<br>1 C<br>1<br>1<br>1 PT | HOT DOGS ON<br>WG HOT DOG BUNS<br>OVEN BKD FRFR POTATO<br>CORN<br>RELISH PLATE<br>CANNED PEACHES<br>LF MAYO, MUSTD, CATSUP, SW RELISH<br>MILK | 2<br>2<br>1 C<br>1/2 C<br>2 OZ<br>1/2 C<br><br>1/2 PT. | ENCHILADAS<br>REFRIED BEANS<br>SPANISH RICE<br>MIXED GREEN SALAD<br>LF ITALIAN DRESSING<br>FLOUR TORTILLAS<br>LF SOUR CREAM<br>SALSA<br>ICE CREAM<br>MILK | 2<br>1/2C<br>1/2 C<br>1 C<br>2OZ<br>2 PC<br>2 OZ<br>2 OZ<br>1/2C<br>1/2PT |

180.

# JULY 2001 PROGRAMS UNITS GHX & W

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | **1** Computer Skills 3:00pm-4:30pm Catholic Bible Study 7:00pm-8:00pm | **2** Ping Pong 3:30pm-4:30pm Protestant Bible Study 7:00pm-8:00pm | **3** Photography 3:30pm-4:30pm | **4** GHX Volunteers 10:00-11:00 Chaplain's Eagles 2:30-3:30 Sewing Class GHX 2:30-4:30 |
| **5** Videography 2:30pm-4:30pm | **6** Music Appreciation 3:00pm-4:30pm & 6:30pm-7:30pm | **7** Arts & Craft 3:30pm-5:00pm | **8** Computer Skills 3:00pm-4:30pm Catholic Bible Study 7:00pm-8:00pm | **9** Ping Pong 3:30pm-4:30pm Protestant Bible Study 7:00pm-8:00pm | **10** Photography 3:30pm-4:30pm | **11** GHX Volunteers 10:00-11:00 Chaplain's Eagles 2:30-3:30 Sewing Class GHX 2:30-4:30 |
| **12** Videography 2:30pm-4:30pm | **13** Music Appreciation 3:00pm-4:30pm & 6:30pm-7:30pm | **14** Arts & Craft 3:30pm-5:00pm | **15** Computer Skills 3:00pm-4:30pm Catholic Bible Study 7:00pm-8:00pm | **16** Ping Pong 3:30pm-4:30pm Protestant Bible Study 7:00pm-8:00pm | **17** Photography 3:30pm-4:30pm | **18** GHX Volunteers 10:00-11:00 Chaplain's Eagles 2:30-3:30 Sewing Class GHX 2:30-4:30 |
| **19** Videography 2:30pm-4:30pm | **20** Music Appreciation 3:00pm-4:30pm & 6:30pm-7:30pm | **21** Arts & Craft 3:30pm-5:00pm | **22** Computer Skills 3:00pm-4:30pm Catholic Bible Study 7:00pm-8:00pm | **23** Ping Pong 3:30pm-4:30pm Protestant Bible Study 7:00pm-8:00pm | **24** Photography 3:30pm-4:30pm | **25** GHX Volunteers 10:00-11:00 Chaplain's Eagles 2:30-3:30 Sewing Class GHX 2:30-4:30 |
| **26** Videography 2:30pm-4:30pm | **27** Music Appreciation 3:00pm-4:30pm & 6:30pm-7:30pm | **28** Arts & Craft 3:30pm-5:00pm | **29** Computer Skills 3:00pm-4:30pm Catholic Bible Study 7:00pm-8:00pm | **30** Ping Pong 3:30pm-4:30pm Protestant Bible Study 7:00pm-8:00pm | **31** Photography 3:30pm-4:30pm | If scheduled for indoor program; please PT before going inside. |

181.

# MONDAY THRU FRIDAY SCHEDULE

| | |
|---|---|
| 6:15 | Wake Up/Wash-Up |
| 7:20 | Breakfast/Nurses Clinic |
| 8:15 | Court Movement |
| 8:30 | School Movement - Morning Drop Off |
| 11:20 | School Movement - Morning Pick-Up |
| 12:00 | Lunch/Nurses Clinic |
| 1:00 | School Movement - Afternoon Drop Off |
| 2:40 | School Movement - Afternoon Pick-Up |
| 3:30 | Recreation/3:30 Clinic |
| 4:45 | Dinner/Nurses Clinic |
| 6:00 | Showers |
| 7:00 | Recreation |
| 8:00 | Bedtime/Reading Period |
| 8:30 | Lights Out |

182.

# EXHIBIT 7

## DECLARATION OF CARLOS HOLGUÍN

I, Carlos Holguín, declare and say as follows:

1. I am over eighteen years of age.   I serve as general counsel for the Center for Human Rights and Constitutional Law, at 256 South Occidental Boulevard, Los Angeles, California 90057.

2. In my work at the Center, I have visited multiple facilities and interviewed numerous children pursuant to *Flores*.

3. The INS (USCIS) juvenile coordinators for both the Los Angeles and San Francisco districts and other immigration officials have admitted that it is the policy and practice of INS (USCIS) to transfer children with final orders of removal to secure facilities, as children with final orders are considered flight risks.

4. Immigration officials in San Diego, admitted placing all youth who have ever been arrested in secure confinement.

5. Defendants have never provided plaintiffs with a single reevaluation of the need for licensed placements

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of January 2004, at Los Angeles, California.

Carlos Holguín

/ / /

183.

SCANNED

# EXHIBIT 8



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPS 50/10

*801 I Street NW*
*Washington, DC 20536*

OCT 2 3 2001

CONFIDENTIAL
Carlos Holguin, Esq.
Center for Human Rights and
  Constitutional Law
256 S. Occidental Boulevard
Los Angeles, CA  90057

 Re:  <u>Flores v. Reno</u>

Dear Mr. Holguin:

 I am writing in response to your letter of September 24, 2001, requesting information on several juveniles held in secure facilities.  At that time, you requested that the Service explain its reasons for holding several juveniles in secure facilities.  The following information is being provided as per your request.

- Jin Rong Yiou (A77-052-527) and Xue Zhung Zhou (A77-052-528)

 Both are currently under a final order of removal and are being held in Los Angeles at the <u>Los Padrinos Juvenile Detention</u> Facility pending issuance of travel documents.  Since the Service has been unable to secure travel documents from the Chinese Consular Office, a home assessment was completed and approved.  At this time, the juvenile coordinator in Los Angeles is waiting for travel arrangements to be completed by the sponsor.  Upon completion, the juveniles will be released to the sponsor.

- Jin Mei Huang (A-77-618-736)

 This juvenile received a final order of removal and was placed in secure detention.  The case is currently under appeal with the 3rd Circuit Court.  On 9/24/01, the juvenile was released to a sponsor pending the outcome of the appeal.

- Jain Xing Zheng (A-77-618-736)

 This juvenile was taken back into custody in the New York District on 5/11/01 after it was found that he was not residing with his sponsor and not attending school.  On 5/31/01 his appeal was dismissed.  He is currently being held in Los Angeles in the <u>Los Padrinos Juvenile</u> Detention facility awaiting the issuance of a travel document.

- Julian Yeboah (A77-943-600)

184.

This juvenile was never in a secure facility.  On 9/14/01 he was transferred to an INS funded foster care home pending the outcome of his case.

I hope that this information is helpful.  Should you have any questions regarding the enclosed report, please call me at (202) 307-6007.

Sincerely,

John J. Pogash
Deputy Director
Juvenile Affairs Division

cc: Mary Giovagnoli
    Mark Matese
    David McLean
    Michele O'Brien
    Arthur Strathern

185.

SCANNED

# EXHIBIT 9

Declaration of Anibal Francisco Zúniga Valle

I, Anibal Francisco Zúniga Valle declare,

1. I was born in Logar Trinidad de Quebrada in the Fransico Morazán Department, in Honduras in 1984, I think. I'm not sure of the exact date.

2. I came to this country to find work. I arrived here three months ago. I don't have any family here.

3. I was arrested by immigration near Yuma. I was handcuffed and put into a van. There were three other people in the van. They were all adults. I sat next to them the whole way to the jail in Yuma.

4. I was locked up for three days in Yuma. I was in a cell by myself. I took meals with the adults. There were adults sitting at my table. I was not allowed to shower the entire time I was there. I did not get clean clothes. I was made to keep on the wet clothes I had been arrested in.

5. I was then taken to another jail in a van. I was handcuffed. I was the only one taken this time.

6. I was detained in the jail for 2 days. There, I was given clean clothes and allowed to shower.

7. I was held in isolation. I was not allowed outside my room. There was a toilet in my room. I even had to take meals inside the room.

8. I was then taken to Southwest Keys in Phoenix. Although I was there for a whole month, the documents in my file say I was there for only 17 days.

9. At Southwest Keys, the conditions were much better than they had been in jail.

10. There they woke us up at 6:00 a.m. We would have breakfast and then go to class at 8:00 a.m. I received English classes. But I didn't get any other subjects. Classes were over at noon. We went to lunch at noon. I was also taught to sew and draw.

11. The food there was good

12. After lunch we could go outside. We studied. We played. We watched television. We also played music on the stereo.

13. Dinner as at 5:00 p.m. By 8:00 p.m. we have to be showered and ready for bed.

186.

SCANNED

14.  I was sent to Globe after I got a final deportation order.

15.  It's much worse here for me than at Southwest Keys. Here I only go outside for 30 minutes.

16.  I don't get any classes here at all.

17.  The rules here are very strict. I don't understand them. Once I asked for a glass of water. I told the staff person, "Water please," and she told me that since I hadn't addressed her by name (Celine) that I couldn't have water and that she was going to change my shirt color.

18.  When they change your shirt it means you can't watch television. You have to be in your room. So I've been in isolation for the past month. Today they changed me from a white shirt to a gray one. I have to wait until I get a green shirt to watch TV again.

19.  But I still have to eat my meals inside the room.

20.  I am not allowed to go to class. I have not been in class for the past month. The book that I had in my room was taken away.

21.  Other kids here get to have books. But not me. I have to sleep because there is nothing to do.

22.  I have had a headache for the last 4 days. They would not give me an aspirin. They said that I was still under punishment. Today I finally got some aspirin.

23.  I was given two injections at Southwest Keys. I have no idea what it was for.

24.  When I was put in isolation, they took away the mattress and blankets on my bed. They also took away all the toilet paper. I have to ask for it when I need it. But for the first three days I had no toilet paper, so I had to use my underwear – I ripped it into pieces.

25  A week ago they put handcuffs on me. I was returning to my room to eat and the staff person told me something in English, which I did not understand. I later found out she was telling me to hurry up. I went into the room and started eating. She kept talking to me but I didn't understand her instructions. I couldn't eat fast enough for her liking, so I threw the food in the trash. She left and came back with handcuffs.

26.  I had to sit with the handcuffs on for 2 hours. This other staff person came and asked why I had insulted the other staff person. I explained that I had not insulted her, but not understood her.

187.

27. They have taken the mattress and blanket from me to punish me for talking to other kids though the holes in the wall in my room. They have done this three times.

28. I have no idea how much longer I am going to be here. The other kids who came here the same time I did have already been deported.

29. When I was on my way here, I was with my cousin. [Starts crying.] We were stopped by some Mexican immigration officials. They beat up my cousin pretty badly. They left him there. I don't know if he's dead or alive. He doesn't really have family. Just me. He was 11 years old. He really didn't have anyone to tell him, "don't go, it's dangerous." I have not told my parents. I have not called them at all. They will be upset.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of July 2002, at Globe Detention Center, Globe Arizona.


_____
Anibal Francisco Zúniga Valle


## CERTIFICATE OF TRANSLATION

I, Alexis Mazón, declare and say as follows:

1. I am fluent in Spanish and English.

2. On this day, I translated the foregoing to the declarant, who understood the contents thereof prior to affixing her signature therefore.

I declare under penalty of perjury that the foregoing is true and correct

Executed this 8th day of July, 2002 at Globe Detention Center, Globe, Arizona

_____
Alexis Mazón


_____
Alexis Mazon

188.

# EXHIBIT 10

Declaration of Oscar Morales Guerra

I, Oscar Morales Guerra, declare and say as follows:

1. I was born in the Dolores Department of Guatemala on May 8, 1986. I came to the United States about 4 months ago. I was 15 years old.

2. I came to the United States to study and to find work. I traveled here alone.

3. I was taken into custody by the INS 4 months ago in Douglas where I was detained for one day. I was then transported to the Globe Detention Center where I was detained for 12 days.

4. I was told that I had a right to an attorney, but no one provided me with any names or phone numbers of an attorney.

5. I was transported to Southwest Keys where I stayed for 2-1/2 months. I was handcuffed while I was transported.

6. Upon arriving at Southwest Keys, I was given three injections. I was not told what I was being injected with.

7. I preferred being in Southwest Keys to Globe Detention Center because I had more time outside there.

8. I have been strip searched every time I have arrived at a new place, be it Douglas, Southwest Keys or Globe Detention Center.

9. I was returned to Globe after I received a final deportation order. Holly Cooper was my attorney. I met her while at Southwest Key. I was given an injection of something when I arrived. Again, I'm not sure what it was.

10. I am allowed only half an hour of time outside per day. I have to spend much of my time in my room by myself.

11. We are awakened at 5:00 a.m. everyday. I have breakfast and then do some cleaning and go back to my room until noon. Lunch is served at noon.

12. At 1:00 p.m. I go to class. I have class Monday through Thursday from 1:00 p.m. to 4:30 p.m. or 5:00 p.m. The classes are partly in English and partly in Spanish.

13. Friday, Saturday and Sunday I spend mostly by myself in my room. We only get _ hour outside on the weekends also.

14. We are only allowed two books in our room at a time

189.

SCANNED.

15. I have a toilet in my room, a bed, some soap, a mirror, toilet paper and that is all.

16. I have not gotten sick since I've been here so I have not been in to see a nurse or doctor.

17. I have received one letter while I've been in Globe. I haven't tried to send one out.

18. I was given a t-shirt and jeans when I arrived. If you misbehave, they give you a different colored t-shirt. Your t-shirt also changes color the longer you've been here.

19. If you misbehave, you get handcuffed and restrained for a half hour to an hour. I have not misbehaved yet, but I know when other youth do they are not allowed any time outside their room except for meals and _ hour of outside time. They are also not allowed any schooling.

20. We get to watch 2-3 hours of television every evening after dinner. Then it's back to our rooms again. Only youth with green, purple and blue shirts can watch television.

21. I am only allowed calls on Sundays. But his past Sunday, they didn't let any of us make calls.

22. I am also allowed to go to mass for a half hour on Sundays.

23. They told me I will be sent back to Guatemala on Wednesday, but it's not certain if it will be then.


I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of July at Globe Detention Center.


_____

Oscar Morales Guerra


190.

## CERTIFICATE OF TRANSLATION

I, Alexis Mazón, declare and say as follows:

1. I am fluent in Spanish and English.

2. On this day, I translated the foregoing to the declarant, who understood the contents thereof prior to affixing her signature therefore.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2002 at Globe Detention Center, Globe, Arizona

_____

Alexis Mazón

191.

SCANNED

# EXHIBIT 11

## DECLARATION OF CHEN SAI, A 77-920-608

I, Chen Sai, declare and say as follows:

1. I am a native of China. I was born December 18, 1985. I am from Chang-Le City of Fu-Zhien province. I have never been accused, arrested, or convicted of any crime.

2. I arrived in the United States on March 11, 2000. I was arrested by the INS at Miami, Florida. I spent one or two days in custody in an INS office in Miami. Then I was sent to a hotel for about four or five days. I was kept in a room by myself, but there were guards outside. Then I was taken to a place called Boys' Town in Florida.

3. At Boys' Town I shared a room with another boy. All the children at Boys' Town were there because of immigration violations only, as far as I know. At Boys' Town I was permitted to wear my own clothes and we took trips to the park, to the movies, and to go skating, from time to time. At Boys' Town I never thought of escaping. Anyway, we could not escape because the main gate to the facility was kept locked, and there were staff people, but not guards, to prevent us from leaving. At Boys' Town, I never had any trouble at Boys' Town, except for once when one of the other boys pushed my friend off his bicycle, and I intervened to protect my friend. I was never punished for anything when I was at Boys' Town, and I always tried to behave well.

4. About the beginning of February, 2001 I was transferred to Tulare Juvenile Hall. I have now been here nearly eight months. When I left Boys' Town I was told I had to transferred because I had lost my immigration case, and I had failed in my appeal. All children who lose their appeals are sent here, as far as I know.

5. When I was transferred to Tulare, I was flown to Los Angeles, where I spent four or five days in a facility similar to Tulare Juvenile Hall. I was handcuffed during the trip from the Los Angeles airport to this facility.

-1-

192.

6. I was transported to the Tulare facility in a van that could hold about 8 people, but I was the only prisoner brought here in the van that day. Although there were two grown INS officers in the van with me, I was handcuffed for the entire trip. The two INS guards rode in the front, and I was locked in the back. There was a steel mesh divider between the area where I was and the front seats where the INS guards rode.

7. Since arriving here, I've not been asked to sign any papers so the Chinese government will take me back. No official from China has spoken to me. I believe I am being held here so I can be deported to China, but I am aware of no efforts having been made to send me back to China. I have no idea how much longer I will be here.

8. I have never spoken to a counselor about how I feel being here. When I arrived here, I felt like I was an idiot. I did not know what to do. I did not feel as smart as I had before. I had no hope. I could think of nothing to do. I left my fate to the mercy of others.

9. At Boys' Town, Chinese ladies taught us English, how to translate, math, American history, and some science. Here at Tulare, I study English mostly, and a little math, but all instruction is in English only.

10. At Tulare we are not permitted to leave the facility, like we were at Boys' Town. I play some basketball and at 5:00-5:15 every day someone comes and leads us in exercise. The food here is not too bad, but the trays and utensils are usually pretty dirty and smell bad.

11. My aunt (my father's sister) lives in the United States in New York. She has told me she would like me to live with her and her family.  I knew my aunt and her family in China and I knew I would be very happy living with them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of September, at Tulare Juvenile Hall, California.

_____

-2-

193.

DECLARATION OF TRANSLATOR

I, Anthony R. Wong, declare and say as follows:

1. I am fluent in Mandarin Chinese and English

2. On this day I translated the foregoing to the declarant, who thereby undestood the contents thereof prior to affixing his signature hereto

3. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of September, 2001, near Visalia, (Tulare Juvenile Hall), California.

_____

194.

A 77 920 608

## Declaration of Chen Sai

I, Chen Sai, declare and say as follows:

1. I am a native of China. I was born December 18, 1985. I am now 16 years old. I am from Chang-Le City Hsian of Foo - Fu - Zhien province. I have never been accused, arrested, or convicted of any crime.

2. I arrived in the United States on March 11, 2000. I was arrested by the INS at Miami, Florida. I spent one or two days in custody in an INS office in Miami. Then I was sent to el hotel for about four or five days. I was kept in a room by myself, but there were guards outside. Then I was taken to a place called Boys Town in Florida.

3. At Boys Town I shared a room with another boy. All the children at Boys Town were there because of immigration violations only, as far as I know. At Boys Town I was permitted to wear my own clothes and we took trips to the park, to the movies, and to go skating, from time-to-time. At Boys Town I never thought of escaping. Anyway, we could not escape because the main gate to the facility was kept locked, and there were staff people, but not guards, to prevent us from leaving. At Boys Town, I never had any trouble at Boys Town, except for once when one of the other boys pushed

195.

my friend of his bicycle and I
intervened to protect my friend I was
never punished for anything when I was
at Boys' Town and I always tried to
behave well.

4. About the beginning of February, 2001,
I was transferred to Tulare Juvenile Hall.
I have now been here nearly eight months.
When I left Boys' Town I was told
I had to transferred because I had lost
my immigration case and I had failed
in my appeal. All children who lose their
appeals are sent here, as far as know.

5. When I was transferred to Tulare,
I was flown to S. Los Angeles, where I
spent four or five days in a facility
similar to Tulare @ Juvenile Hall. I was
handcuffed during the trip from the
Los Angeles airport to this facility.

6. I was transported to the Tulare
facility in a van that could hold about
8 people, but I was the only prisoner
brought here in the van that day.
Although there were two green INS
officers in the van with me, I
was handcuffed for the entire trip.
The two INS guards rode in the
front, and I was locked in the back.
There was a steel mesh divider between
the area where I was and the front
seats where the INS guards rode. 196.

③

7. Since arriving here, I've not been asked to sign any papers so the Chinese government will take me back. No official from China has spoken to me. I believe I am being held here so I can be deported to China, but I am aware of no efforts being made to send me back to China. I have no idea how much longer I will be here.

8. I have never spoken to a counselor about how I feel being here. When I arrived here, I felt like I was an idiot. I did not know what to do. I did not feel as smart as I had before. I had no hope. I could think of nothing to do. I left my fate to the mercy of others.

9. At Boys Town, Chinese leaders taught us English, how to translate, math, American history, and some science. Here at Tulare, I study English mostly, and a little math, but all instruction is in English only.

10. At Tulare we are not permitted to leave the facility, like we were at Boys Town. I play some basketball and at 5:00 - 5:15 every day someone comes and teaches us in exercise. The food here is not too bad, but the trays and utensils [197.] are usually pretty dirty and smell bad.



11. My aunt (my father's sister) lives in the United States in New York. She has told me she would like to ime to live with her and her family. I knew my aunt and her family in China, and I knew I would be very happy living with her.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this <u>28th</u> day of September, at Tdare Juvenile Hall, California

<u>ᴋ Hai chen</u>

Declaration of Translator

I, Anthony R. Wong, declare and say as follows.

1. I am fluent in Mandarin Chinese and English.

2. On this day I translated the foregoing to the declarant, who thereby understood the contents thereof prior to affixing his signature hereto.

198.

3. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of September 2001, at near Visalia, (Tulare Juvenile Hall), California

x _Anthony Wong_

199.

SCANNED

# EXHIBIT 12

## DECLARATION OF JIN MEI HUANG

I, Jin Mei Huang, declare:

I am a seventeen-year old male from Fujien, China. I have one older sister, and mother and father in Fujien, China, and my two uncle's and father's cousin live in the U.S.

I was arrested on August 12, 1999, in Georgia. I was not informed why I was arrested or that I had any rights. I was not given an opportunity to make a phone call until August 14, 1999. I was then transferred from the harbor to a jail facility where I was strip-searched. I was never asked about the names, addresses, or phone numbers of my relatives while I was kept here. I was never informed of what was going to happen to me or why I was being transferred to Berks County on August 20, 1999.

I was held at Berks County from August 20, 1999, to January, 2001. Although my attorney (first) kept saying everything was ok and that he was working on my case, I don't think he did anything for me. He never met with me, showed me any documents or even told me what was happening in my case. My uncle and father's cousin both tried to get me released from Berks County. However, my uncle was told that he could not obtain my release because he did not have a job and my cousin could not obtain my release because he was too distant a relative. At Berk's County, I was strip-searched once more. However, I liked it here much better than Tulare County because I was fed well, could go outside, and was not locked up.

When I was transferred to Tulare County, the INS told me I was transferred because I was an escape risk and because I had a "final deportation". They said I was an escape risk because of my "final deportation". I have never been accused of our change with committing any crimianl or deliquent acts in China or the United States. I have never been punished or been subjected to disciplinary action by the INS. I am not afraid of smugglers and have no reason to fear them if released because they want me to be released so I can begin working to pay them their fees.

SCANNED

200.

For the past six months, my uncle in Atlanta, Georgia, who is married and has a son, has been trying to obtain my release but the INS has refused to release me saying that I have a " final deportation".  My uncle has lived here for 10 years and has a green card.

Since being transferred to Tulare County, I am often depressed and afraid of what is going to happen because I don't know where I'll be tomorrow.  I also get depressed because I feel like the officers here treat me just like the minors here who have committed crimes.  Although I am depressed often here, I am not asked whether I am sad and have not been offered counseling.

I do not get enough to eat here and I have lost around ten pounds since arriving at Tulare County.  We are only provided one tray of food at each meal and can only get more food by asking individual staff if they are going to eat their food.  If the staff are nice, they will give us their food, but some just throw the food away rather than give it to us.

I have difficulty learning here because we are not taught in Chinese and have no Chinese books.  In fact, we only received Chinese dictionaries this month.  I am also locked in at night and am not permitted to go outside even with an escort.

I declare under penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

_____

Jin Mei Huang

201.

Jin Mei Huang

I, Jin Mei Huang, declare:

I am a seventeen-year-old male from Fujien, China. I have one older sister, and mother and father in Fujien, China, and my two uncle's and father's cousin live in the U.S.

I was arrested on August 12, 1999, in ~~Atlanta~~, Georgia. I was not informed why I was arrested or that I had any rights. I was not given an opportunity to make a phone call until August 14, 1999. I was then transferred from the ~~airport~~ harbor to a jail-~~like~~ facility where I was strip-searched. I was never asked about the names, addresses, or phone numbers of my relatives while I was kept here. I was never informed of what was going to happen to me or why I was being tranferred to Berks County on August 20, 1999.

I was held at Berks County from August 20, 1999, to January, 2001. Although my attorney (first) kept saying everything was ok and that he was working on my case, I don't think he did ~~everything~~ anything for me. He never met with me, showed me any documents, or even told me 202.

what was happening in my case. My uncle and father's cousin both tried to get me released from Berks County. However, my uncle was told that he could not obtain my release because he did not have a job and my cousin could not obtain my release because he was too distant a relative. At Berk's County, I was strip-searched once more. However, I liked it here much better than Tulare County because I was fed well, could go outside, and was not locked up.

When I was transferred to Tulare County, the INS told me I was transferred because I was an escape risk and because I had a "final deportation." They said I was an escape risk because of my "final deportation." I have never been accused of or charged with committing any criminal or delinquent acts in China or the United States. I have never been punished or been subjected to disciplinary action by the INS. I am not afraid of smuggler's and have no reason to fear them if released because they want me to be released so I can begin working to pay them their fees.

203.

For the past six months, my uncle in Atlanta, Georgia, who is married and has a son, has been trying to obtain my release but the INS has refused to release me saying that I have a "final deportation." My uncle has lived here for 10 years and has a green card.

Since being transferred to Tulare County, I am often depressed and afraid of what is going to happen because I don't know where I'll be tomorrow. I also get depressed because I feel like the officers here treat me just like the minors here who have committed crimes. Although I am depressed often here, I am not asked whether I am sad and have not been offered counseling.

I do not get enough to eat here and I have lost around ten pounds since arriving at Tulare County. We are only provided one tray of food at each meal and can only get more food by asking individual staff if they are going to eat their food. If the staff are nice, they will give us their food, but some just throw the food away rather than give it to us.

204.

I have difficulty learning here because we are not taught in Chinese and have no Chinese books. In fact, we only received Chinese dictionaries this month. I am also locked in at night and am not permitted to go outside even with an escort.

I declare under penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

x Jin mei Huang          9.14 2001
Jin Mei Huang

205.

# Declaration of Translation

I, Jonathon Klamer, declare:

I am fluent in Chinese (Mandarin) and English. I have accurately translated the foregoing declaration for Jin Mei Huang from English to Chinese (Mandarin). Jin Mei Huang has informed me that he understands the declaration and agrees with it.

I declare under penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

Jonathon Klamer                9/14/01

206.

SCANNED

# EXHIBIT 13

Cesar Omar Martinez (A# 96-076-947)
Page 1 of 2

### Declaration of Cesar Omar Martinez (A# 96-076-947)

1. My name is Cesar Omar Martinez. I was born on December 14, 1986. I am from Tegucigalpa, Honduras.

2. I arrived in the United States sometime around March 13, 2003. The police arrested me somewhere around Laredo, Texas. The police asked me where I was from. When I told them that I was from Honduras they had me wait in the patrol car while the immigration officers came to get me. I waited in the patrol car about 30 minutes. I remember I was so tired when they caught me.

3. When the immigration officers arrived, they took me to get my fingerprints taken. They took me to a group home called La Esperanza. I was there about 5 days. Afterwards, they took me to another shelter in Chicago. I don't remember the name.

4. Right now, I am in Central Juvenile Hall in Los Angeles, California. The immigration officers brought us here on Monday, April 21, 2003. They woke us up very early, maybe 5a.m., and flew us here on an airplane. When I arrived in Los Angeles airport, the officers put handcuffs on me. They took them off when I got to the immigration office here but put them on again during the ride from the Immigration office to Central Juvenile Hall.

5. In Chicago, I had an attorney named Adriana. I have not spoken to here since I came to Central Juvenile Hall. I think I last spoke with Adriana a week or week and a half before coming here to Central Juvenile Hall. I do not know if she knows where I am.

6. I did not know they were going to bring us to Central Juvenile Hall. The immigration officers only told us that I was going to Los Angeles. They did not explain why. I do not remember anyone telling me if I had behaved badly at the shelter in Chicago. I did not have a chance to explain if they thought I was behaving badly there.

7. Here at Central Juvenile Hall, I am in the "T/V" unit. I know another kid from the Chicago shelter is also here in the T/V unit. I do not know if the other kids are here for their immigration cases. I believe they are delinquents.

8. The guards here yell at us all the time. When the guards wake us up, they yell at us. They told me "Pinche juevón" and told me to pick up my clothes.

9. I do not know the rules. When I arrived here at Central Juvenile Hall, the only thing that they told us was about fighting. They told us that if I was in a fight they would pepper spray me and I was supposed to fall to the ground face first with my hands on the back of my head. They did not tell me any other rules.

10. I do not know what I am supposed to do or how to communicate with the guards. When I need to use the bathroom, I raise my hand. They yell at me but I stay quiet. I do not say anything. I do not know if the guards know that I am here for my immigration case. I think only some of them know that I do not speak English.

11. While I have been here, I have been going to school everyday. I go to school with the delinquent kids here.

Cesar Omar M.
29 De abril
\1 2003

207.

Cesar Omar Martinez (A# 96-076-947)
Page 2 of 2

12. The other kids here are from the United Sates. They are not here for immigration reasons. I am worried about these kids hurting me. They stare at me a lot. I do not stare back. They want to fight with me. I do not know if they know I do not speak English. I feel very uncomfortable with these kids. I sleep in a cell with one of the American delinquent kids. I also go to school, eat, spend recreation time, and shower with the other American delinquent kids. I wish I were not here. I wish I could receive some help. I wish I could go to a shelter.

13. I do not know why they brought me here from the shelter in Chicago. I have never been arrested before, have never been to delinquency court, and have never been convicted of a crime. Maybe it was because I did not eat my meal at the shelter in Chicago. I did not want to eat two times or so. Maybe they wrote me a bad behavior report.

14. Maybe I was brought here because I was playing with a friend of mine at the shelter in Chicago. We were not fighting, just horseplaying. We like each other. I do not know if they people at the shelter did not like this. They would not tell us when they were making a report. Adriana never told me that they wrote bad reports about me or that they were going to move me.

15. I feel really bad. I do not know how to express myself but I feel really bad. I do not know when they will send me back to Honduras.

16. Since I have been here at Central Juvenile Hall, I have not been able to make a telephone call. I wanted to call my country. My family thinks I am still in Chicago. I don't want them to worry about me. I asked to make a telephone call and the guards said they would let me but I think they forget. I don't want to bother people. I ask the guards and they always tell me I can make the telephone call later.

17. This declaration has been read to me in the Spanish language. I understand all of its contents and all is true and correct.


_Cesar omar martinez_                    29 De abril Del 2003
Cesar Omar Martinez                      Date


Translated by:  _Din Hul_                    4/29/2003
                Translator: Dino Hainline        Date

I declare that I am fluent in Spanish and English and I have read this declaration in its entirety to Cesar Omar Martinez.


208.

# EXHIBIT 14

Jose Humberto Gonzales (A# 96-077-160)
Page 1 of 2

## Declaration of Jose Humberto Gonzales (A# 96-077-160)

1. My name is Jose Humberto Gonzales. I was born on May 10, 1985. I am from Honduras.

2. I am currently being held here in Central Juvenile Hall in Los Angeles, California. I am living in the T/V unit here at Central Juvenile Hall.

3. Before I came to Central Juvenile Hall on Monday, April 21, 2003, I was living at a shelter in Chicago.

4. Before I was in the Chicago shelter, I was in San Antonio. I had been in the Immigration office for about 3 days and then was in a San Antonio jail for about 10 days.

5. The San Antonio jail was a place like Central Juvenile Hall, but they did not treat me as bad. I did not have an attorney there in San Antonio. I stayed there with other kids from the United States who did not have immigration cases. I was put in the San Antonio jail because I do not have permission to be in the United States. I have never been arrested for anything other than not having papers to live in the United States.

6. I do not remember the name of the shelter in Chicago, but it was for immigration kids. Chicago was a good place. They fed us and gave us a place to sleep. I was not afraid when I was there. While I was there, I met once with an attorney named Adriana who helped me ask to be returned to Honduras. I think I was in Chicago for about a month and a half.

7. I did not know that they were going to bring me to Central Juvenile Hall. The immigration officers just brought us here on Monday morning. I still do not know why I was brought here. If I did not behave properly in the Chicago shelter, nobody ever told me as far as I remember. Nobody gave me a chance to explain if I did something wrong.

8. I am scared being here. I do not speak English and cannot understand what is happening around me. The officers here at Central Juvenile Hall just yell at us but I do not understand what they are saying. Sometimes some of the other kids who can speak Spanish let me know what the officer is ordering me to do.

9. I have a roommate here at Central Juvenile Hall but he is not here for his immigration case. We sleep in the same cell at night. I do not know his name but he is from the United States. He stole a car.

10. There is another kid who came with me from the shelter in Chicago. His name is Cesar. Cesar has a roommate also but that roommate is also from the United States. I do not know why they did not let Cesar and me be roommates.

11. Since I got here on Monday, April 21, 2003, I have been able to make one telephone call to my family. I have not been able to call my attorney Adriana. I do not know if she knows I am here in Los Angeles, California.

209.

Jose Humberto Gonzales (A# 96-077-160)
Page 2 of 2

12. I have been going to school here but the teacher does not speak Spanish. Sometimes the other kids in the classroom who can speak Spanish tell me what she is saying.

13. Here I am locked up with juvenile delinquents, even though I have never been arrested, charged, or convicted of any crime or juvenile offense. I have contact every day with delinquents- when I go to eat, to school, and to recreation. I am afraid of being at Central Juvenile Hall because I know that the other kids here have done bad things. They are gang members. Some are drug addicts. I am afraid that they want to get in a fight with me. Some of them make hand signals at me. I think that these are gang signs but I do not remember how to imitate it.

14. The staff here at Central Juvenile Hall is always screaming at us. They scream very loud. Sometimes I do not do what they tell me to because I do not understand what they are saying. I am afraid that they are going to hurt me.

15. I want to go back to Honduras but I am afraid of being here. I want to be sent to a shelter like the one in Chicago.

16. This declaration has been read to me in the Spanish language. I understand all of its contents and all is true and correct.

_Jose Humberto gonzales_    _Abril 29 2003_
Jose Humberto Gonzales       Date

Translated by: _____    _4/29/2003_
                    Dino Hainline                        Date

I declare that I am fluent in Spanish and English and I have read this declaration in its entirety to Jose Humberto Gonzales.

210.

# EXHIBIT 15

Cesar Omar Martinez (A96-076-947)
Page 1 of 2

SCANNED

## Declaration of Cesar Omar Martinez (A96-076-947)

1.    My name is Cesar Omar Martinez. I was born on December 14, 1986. I am from Tegucigalpa, Honduras.

2.    I arrived in the United States around March 13, 2003. Since getting caught by Immigration, I have been held in Texas, Chicago, and Los Angeles. On April 21, 2003, I was taken to Central Juvenile Hall in Los Angeles, California.

3.    I was never given an explanation why I was brought to Central. An attorney in Los Angeles mentioned that I might have been moved because I was an escape risk and because I was a member of a gang. I don't understand this because I never tried to escape; I never even talked about it. I am not a member of a gang and no one besides my attorney ever asked me if I was a member of a gang. Even if these are the reasons I was transferred, I was never given the opportunity to explain.

4.    On April 30, 2003, I was taken to an adult detention center in Florence, Arizona. I was told that I would be leaving for Honduras on May 7th, and that I would wait for my flight in Arizona.

5.    I came to Arizona on an airplane. My hands and feet were handcuffed during the flight. The handcuffs on my hands were tied to the handcuffs on my feet. I had a chain around my waist. There were adults on the flight also. Everyone was handcuffed like me.

6.    After arriving in Arizona, I was taken to the detention center by bus. I was also handcuffed on the bus. No one explained the rules to me when I arrived in Arizona. When I got to the detention center, I was asked to take off my clothes and shower. Then I was given a change of clothes.

7.    Here at the detention center, I am kept apart from the adults. I don't see them.

8.    There are four other minors here. Three other minors and I are waiting for deportation. There is one other minor who is fighting his case because he murdered someone. I don't see this minor much – he is kept in a different cell and does not have the same recreation time as the other minors.

9.    I am in a small cell by myself. There is nothing in my cell except for a television. I do not go to school. I wish I could go to school so that I could have something to do and learn something. I have one hour of recreation a day. It is on a very small patio outside.

211.



10.     There is a public telephone in my cell.  But I can't use it because I can't pay for calls.  I asked several times if I could call my family at home.  I was told I could call on Tuesday, May 6th.

11.     I have not had contact with my attorneys or family members since arriving here.

12.     So far I have been treated all right.  I am treated better than I was at Central and I feel more secure than I did at Central.  But I am still in a prison.  I didn't do anything to be here.  It's better to be in a house.

13.     This declaration has been read to me in the Spanish language.  I understand all of its contents and all is true and correct.


_Cesar omar martinez_                                    _5/6/03_
Cesar Omar Martinez                                       Date


Translated by: _____                       _5/6/03_
                 Shiu-Ming Cheer                          Date


            I declare that I am fluent in Spanish and English and I have read this declaration in its entirety to Cesar Omar Martinez.

212.

# EXHIBIT 16

SCANNED

## DECLARATION OF SHIU MING CHEER

I, Shiu Ming Cheer, declare and say as follows:

1.  I am the Children's Attorney at the Florence Immigrant and Refugee Rights Project, Inc., located at 300 South Main Street, P.O. Box 654, Florence, Arizona 85232. Our office number is (520) 868-0191.

2.  Through my work I meet many of the children detained in immigration custody in the various shelters, detention centers and holding facilities in Arizona. Two of the children that I have recently visited include Jose Humberto Gonzalez, (A# 96-077-160, DOB 5/10/85) and Cesar Omar Martinez, (A#96-076-947; DOB 12/14/86).

3.  On May 5, 2003 I visited Jose and Cesar at the Florence Service Processing Center ("Florence"), in Florence, Arizona to obtain declarations from them. *See*, Declarations of Jose Humberto Gonzalez and Cesar Omar Martinez, attachments 5 and 6.

4.  Jose and Cesar had been transferred to Florence in handcuffs from Central Juvenile Hall on April 30, 2003 to await removal to Honduras on May 7, 2003.

5.  Florence is an adult detention center not meant to detain immigrant minors. I am not clear why these two minors were placed at the adult detention center rather than Southwest Key or Globe, the shelter and juvenile jail where most immigrant minors go to await removal.

6.  However, it appears this is becoming a normal practice as upon my visit to Cesar and Jose, I learned that three other immigrant minors were being detained at the adult facility as well. According to Cesar and Jose two of the boys were also awaiting removal and the final boy had murdered someone and was fighting his removal case.

7.  Cesar and Jose were being held in solitary cells for most of the day to prevent contact with the adult detainees. They were not provided with any form of education, books, paper or pencil. They are allowed to watch television and permitted one hour of recreation time per day on a small patio outside.

8.  They had not been able to use the telephone and had not spoken with their attorney or family members since their transfer.

9.  Placement of children at the Florence Service Processing Center is a violation of the Flores settlement agreement and a practice that should not be continued or condoned by DHS or ORR.

213.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this $\underline{12}$ day of May, 2003, at Florence, Arizona.

Shiu Ming Cheer

SCANNED

214.

SCANNED

# EXHIBIT 17

SCANNED

## DECLARATION OF DEBORAH LEE

I, Deborah Lee, declare and say as follows:

1.  I am a law graduate employed by the Catholic Legal Immigration Network, Inc. (CLINIC) at 1530 James M. Wood Boulevard, Los Angeles, CA 90015. I sat for the February 2003 California Bar examination and am currently awaiting the results. Since September 2002, I have been recognized by the Hon. Immigration Judge Muñoz to represent detained minors, while under the supervision of Allison Wannamaker, Esq., managing attorney at CLINIC's Los Angeles office.

2.  Pursuant to my work with CLINIC, I provide legal rights presentations to detained minors in ORR/BICE custody at Central Juvenile Hall, a secure lock-down facility for delinquent youth run by the Los Angeles County Probation Department in Los Angeles, California.

3.  On April 26, 2003 I met with Jose Humberto Gonzales (DOB: 5/10/85; A# 96-077-160) (hereinafter "Jose Humberto") and Cesar Omar Martinez (DOB: 12/14/86; A# 96-076-947) (hereinafter "Cesar Omar") at Central Juvenile Hall.

4.  Jose Humberto and Cesar Omar were detained at Central Juvenile Hall from April 21-April 30, 2003 when they were transferred to Florence, Arizona to be removed from the United States on May 7, 2003.

5.  Jose Humberto and Cesar Omar stated to me that they had no criminal history. They stated that they had no prior police arrests and had never been adjudicated as juvenile delinquents. Jose Humberto and Cesar Omar told me that they had not received any explanation about why they had been transferred to Central Juvenile Hall. Both were confused and fearful to find themselves in a jail setting.

6.  Both boys told me that they were handcuffed during their transportation from the airport to the Immigration office and from there to Central Juvenile Hall.

7.  Both Jose Humberto and Cesar Omar informed me that they were being commingled with juvenile delinquents at school, during recreation time, and while showering. In addition, both stated that they were sharing cells with American delinquent kids. Jose Humberto noted that his cellmate had been arrested for Grand Theft Auto.

8.  Jose Humberto and Cesar Omar told me that they were very afraid during their interactions with the American delinquent kids as they know many of them are gang members, drug addicts and have been convicted of various crimes. Both told me that they were fearful that they were going to be beaten by the American delinquent kids.

9.  As of April 26, neither minor had spoken with their attorney in Chicago, Adriana Ysern, since their arrival at Central Juvenile Hall. Cesar Omar told me that he had not been able to make any telephone calls despite his repeated requests. Jose Humberto told me that he had made one call to family.

215.

SCANNED

10.   Jose Humberto and Cesar Omar told me that they were not told any rules of Central Juvenile Hall except that, if caught in a fight, they would be pepper sprayed and should fall to the ground face first with their hands on the back of their heads. Both Jose Humberto and Cesar Omar expressed fear of the staff at Central Juvenile Hall. They told me that the staff was always screaming at them in English. Because neither speaks any English to understand these screams, Jose Humberto and Cesar Omar were afraid that the staff was going to hit them.

11.   On or around April 29, 2003, Deportation Officer Ludin of Phoenix, AZ confirmed that, to the best of her knowledge, Cesar Omar and Jose Humberto would be transferred to the Florence Service Processing Center the following day. She stated that if minors were being transferred from Central Juvenile Hall, they would be detained at a "staging area" at the Florence Service Processing Center. While the Florence Service Processing Center is a secure adult detention facility, minors are also apparently detained there.

12.   Previous clients of mine who have been transferred from Central Juvenile Hall have also been detained at the Florence Service Processing Center while awaiting removal from the United States. I know that several of my clients have remained at the "staging area" at the Florence Service Processing Center for up to a week. I do not know the living conditions of where my clients are being held at the Florence Service Processing Center or whether my clients have any telephone access or privileges to call me.

13.   On or around April 8, 2003, a Deportation Officer in Phoenix, AZ informed me that minors from Central Juvenile Hall are not generally transferred into the care of the Phoenix Juvenile Coordinator, but remain the responsibility of the Los Angeles Juvenile Coordinator even while the minors are being detained at the Florence Service Processing Center

14.   When attempting to contact clients transferred to the Florence Service Processing Center, I have been able to leave messages for a client to telephone me, but was not able to speak directly with my client when I called.

15.   I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.

Executed this *15th* day of May, 2003, at CLINIC, 1530 James M Wood Blvd., Los Angeles, California.

_____
Deborah Lee

216.

# EXHIBIT 18

# DECLARATION OF DIANE EASON

I, Diane Eason, declare and say as follows:

1. I am an attorney, employed at the Center for Human Rights and Constitutional Law at 256 South Occidental Boulevard, Los Angeles, California 90019. My telephone number is (213) 388-8693, extension 103.

2. May 7, 2003, pursuant to the *Flores* settlement, I visited Central Juvenile Hall (CJH) to speak with Bureau of Immigration and Customs Enforcement (BICE) detainees held at CJH.

3. During my visit, I spoke with Sonia Munoz, a deportation officer at BICE regarding transfer of detainees under final order of removal or voluntary departure.

4. According to Ms. Munoz, detainees with a final order of removal or voluntary departure, who are being removed to Central American countries, are routinely transferred to the staging facility in Florence, Arizona, an adult detention center, to await transportation to their home country.

5. Ms. Munoz stated that Florence is provided sufficient notice, one to two weeks, to make room for the detainees in a separate area of the facility to prevent adult contact.

6. Ms. Munoz stated that this has always been the policy and practice in place for the transportation of detainees back to Central American countries.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of May, 2003, at Los Angeles, California.

*Diane Eason*
Diane Eason

217.

SCANNED

# EXHIBIT 19



## DECLARATION OF CHEN XIANG

I, Chen Xiang, declare:

1. I am a native and citizen of The People's Republic of China. My A number is 77 920 848. I was born on March 26, 1984. My father, mother, older brother and sister live in China. My uncle, who is a U.S. citizen, and my aunt, who is a permanent resident, live in Long Island, New York.

2. I was arrested by the INS on March 8, 2000, when I arrived in Maimi, Florida. No one informed me why I was being arrested or where I was being taken. I was taken to another building and kept in a room with guards posted outside for a few hours. During that time, I learned that I was being kept in an adult jail and, in fact, an adult was kept in the room with me for a few hours. I was then transferred to a facility called Boy's Town late that evening.

3. At Boy's Town, they did not make me wear a uniform and I could wear my own clothes. I was also allowed to go to the beach, library, park and ice skating once a week. Classes were taught in English but there was a Mandarin Interprer. There were psychological and counseling services available and the staff occasionally asked how I was feeling. I was not permitted to call my aunt until after a week.

4. On October 31, 2000, I was released to my aunt and uncle in Long Island, NY. In Long Island, NY, I attended school and I was very happy. My aunt and uncle love me very much and treated me very well. Every month, my aunt took me to the INS, Flushing, NY office. On July 25, 2001, I went to the Flusing INS office to report to the INS but I was arrested. I called my attorney and he only told me that I had lost my appeal and that I might be deported. That same day, I was taken to Berks County, PA.

5. At Berks County, I was forced to take my clothes off and I was searched. The next day, I was taken to Tulare County in CA. I was not told why I was being taken to Tulare County.

218

6. At Tulare County, I am forced to wear a uniform and cannot leave the facility. This place is like a jail. I had much more freedom at Boy's Town. Here they lock my room door at 9 p.m. in the evening and unlock it in the morning. In school, there is no instruction in Chinese. I have not left this facility since I arrived here. I am permitted recreation in the open yard for one or two hours per day. The open yard is completely enclosed by a roof and high walls.

7. I have never been charged or accused of any cirme or deliquent act in China or the U.S. I have never been in trouble with the authorities in China or the U.S. I have never tried to escape or flee from the INS. I have nothing to fear from smugglers if I am released.

8. I get depressed and sad being at Tulare County. Sometimes the staff comes to talk to me but they do not offer me couseling services or tell me that they are available. Being locked up here with juveniles who have committed crimes or deliquent acts makes me feel like a criminal.

9. I do not know what my attorney has done for me and do not know what he is doing for me now. I do not believe my attorney has done a good job and I am looking for a new attorney.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed at Tulare County, California, this 28th day of September, 2001.

---

Certificate of Translation

I, _____ , declare:

1. I am fluent in English and Mandarin.

-2-

219.

2.  On this day I translated the foregoing declaration in full to the declarant, who indicated that he understood the contents thereof and that the same is true and correct of her own knowledge prior to affixing her signature hereto.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of September, 2001, at Tulare County, CA.

_____

S.CANNED:

220.

# Declaration of Chen Xiang

I, Chen Xiang, declare:

1. I am a native and citizen of the Peoples Republic of China. My A number is 77 920 848. I was born on March 26, 1984. My father, mother, older brother & sister live in China. My uncle, who is a U.S. citizen, and my aunt, who is a permanent resident, live in Long Island, New York.

2. I was arrested by the INS on March 8, 2000, when I arrived in Miami, Florida. Noone informed me why I was being arrested or where I was being taken. I was taken to another building and kept in a room with guards posted outside for a few hours. During that time, I learned that I was being kept in an adult jail and, in fact, an adult was kept in the room with me for a few hours. I was then transferred to a facility called Boy's Town late that evening.

3. At Boy's Town, they did not make me wear a uniform and I could wear my own clothes. I was also allowed to go to the beach, library, park, and ice skating once a week. Classes were taught in English but there was a Mandarin Interpreter. There were psychological

221

and counseling services available and
the staff occasionally asked how I was
feeling. I was not permitted to call my aunt
until after a week.

4. On October 31, 2000, I was released
to my aunt and uncle in Long Island, NY.
In Long Island, NY, I attended school and
I was very happy. My aunt + uncle
love me very much and treated me very well.
Every month, my aunt took me to the INS
Flushing, NY office. On July 25, 2001, I
went to the Flushing INS office to report to
the INS but I was arrested. I called my
attorney and he only told me that I had lost
my appeal and that I might be deported. That
same day, I was taken to Berks County, PA.

5. At Berks County, I was forced to
take my clothes off and I was searched.
The next day, I was taken to Tulare County
in CA. I was not told why I was being
taken to Tulare County.

6. At Tulare County, I am forced to wear
a uniform and cannot leave the facility. This
place is like a jail. I had much more 222
freedom at Boys Town. Here they lock

my room door at 9 pm in the evening and unlock it in the morning. In school, there is no instruction in Chinese. I have not left this facility since I arrived here. I am permitted recreation in the open yard for one or two hours a day. The open yard is completely enclosed by a roof and high walls.

7. I have never been charged or accused of any crime or delinquent act in China or the U.S. I have never been in trouble with the authorities in China or the U.S. ~~and have never been punished by the INS~~ I have never tried to escape or flee from the INS. I have nothing to fear from smugglers if I am released.

8. I get depressed and sad being at Tulare County. Sometimes the staff comes to talk to me but they do not offer me counseling services or tell me that they are available. Being locked up here with juveniles who have committed crimes or delinquent acts makes me feel like a criminal.

223.

9.   I do not know what my attorney has done for me and do not know what he is doing for me now. I do not believe my attorney has done a good job and I am looking for a new attorney.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed at Tulare County, California, this 28th day of September, 2001.

Chen Xiang

Chen Xiang

Certificate of Translation

I, _____, declare:

1. I am fluent in English and Mandarin.

2. On this day I translated the foregoing declaration in full to the declarant, who indicated that he understood the contents thereof and that the same is true and correct of

224.

her own Knowledge prior to
affixing her signature hereto.

I declare under penalty of perjury
that the foregoing is true and correct.
Executed this 28th day of September,
2001, at Tulare County, CA



Yuning Fu

225.

# EXHIBIT 20

## DECLARATION OF JIN RONG YIOU

I, Jin Rong Yiou, declare and say as follows:

1. I am a native and citizen of the Peoples Republic of China. My INS file number is A 77 052 527. I was born October 5, 1985; I am now 16 years old. When I was born, my mother already had one child, my brother Xue Zhou, so my birth violated China's "one-child" policy. I was accordingly registered as my father's uncle's daughter, which is why my last name is different than my brother's.

2. I have never before been arrested, nor have I ever been charged with any crime or delinquency. The only time I have been detained was on October 26, 1999, in Honolulu, Hawaii. I spent a day and a half in a detention room at the airport before being sent to Martin Hall in Spakane, Washington, where I stayed until February 15, 2000.

3. At Martin Hall I was mixed together during meals and recreation with girls and boys who had been put there for having committed crimes, such as stealing or using drugs. I stayed in a cell most of the time by myself, but several times the facility ran short of space, so they put an American girl in my cell. During all the time I was at Martin Hall, I never spoke to a counselor or psychologist or social worker. There was no educational instruction in Chinese, and I participated in no sports. Recreation consisted of playing board games and short daily exercise sessions. When I was admitted to Martin Hall, I was made to remove my clothing in front of female guard. She took my clothes away and gave me a uniform to wear.

4. While I was at Martin Hall I went to immigration court twice in Seattle. From Martin Hall I was handcuffed and shackled by my feet. At the airport, the INS office removed the shackles and handcuffed me to my brother, and we stayed that way on the flight to Seattle. When we arrived in Seattle, I was again handcuffed individually for the ride to immigration court. The handcuffs were removed during my hearing, but I was again handcuffed and shackeled like I had been on the way to court. My lawyer never visited me at Martin Hall, but I did have a lawer at the immigration court. I spoke to him for a few minutes only before the hearing.

5. On February 15, 2000 as I recall, I was transferred to Bible Children's Home in Georgia. From Martin Hall to the airport I was handcuffed and shackled, but once I was on the plane the handcuffs and shackles were removed and I was not again handcuffed or shackled on my trip to Bible Children's Home.

6. I stayed at Bible Children's Home until late July 2000, when I was released to my uncle. At Bible Children's Home I was permittted to wear some of my own clothes, but they did gave a special T-shirt. At the Bible Children's Home, there were no delinquents-only INS detainees. I went to school but all instruction was in English only. With supervision, I was also able to go out to the movies and the park. I could also use the phone every day at any time, but I had to make calls

226.

collect or use a calling card that my uncle had given me.  I could go play outside in the yard and participate in crafts.

7.  In late July I was released to my uncle, and my brother and I went to live in his house in Birminghan, Alabama.  We stayed with my aunt, uncle, and their two children.  I began attending public school (8th grade).  Once a month, my uncle would take us to report to the INS in Atlanta, Georgia, a trip of 3-4 hours one way.

8.  The second time we went to report to the Atlanta INS office, the officer told my uncle to step out of the office, that he could go home without us because we were going to be deported.  This was about October 4, 2000.  My brother and I were rearrested.  The INS fastened heavy sand bags to my brother's feet, but not to mine.  I felt very sad and surprised.  I had no idea why this was happening to us.  From the airport in Spokane to Martin Hall, I was handcuffed and shackled.

9.  I stayed at Martin Hall until February 26, 2001, or so, when I was sent to Los Angeles for one night.  From Martin Hall to the Spokane Airport I was shackled and handcuffed.  At the airport the handcuffs and shackles were removed and I was not again shackledor handcuffed.  During all these trips, it was only my brother and me with two immigration offices, one male and one female.

10.  I arrived here at the Tulane County Juvenile Hall about the end of February, 2001.  Here I wear a uniform.  I have not been permitted outside this facility except twice, to see a doctor, each time, I had shackles on my feet, handcuffs, and a chain between the shackles and handuffs.  I do not undestand why they did this to me because I have never caused any problems here, or anywhere I've been in INS custody.  I guess this is just what they do to kids who live here.

11.  At Tulare, we INS detainees are kept in Pod 2, and we do not have contact with juvenile delinquents.  We go to school in the facility, but all instruction is in English.  A guard patrols every 15 minutes to cound heads.  We do not really have acces to the outdoors.  Rather, there is an area about the size of four large rooms with a metal roof or covering with a hole in it.  The area is surrounded by high walls.

12.  I do not understand where my immigration case stands.  Although I've been here for about 6 months, no social worker, psychologist or counselor has talked to me.  Only once a man come to ask me a few questions about how I feel.  If somebody did ask me I would tell them I would still like to stay here, because its better than the country I left behind.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of September, at Tulane County Juvenile Hall, California.

_____/s/_____
Jin Rong Yiou

227.

## CERTIFICATE OF TRANSLATION

I, Frank Wu, declare and say as follows:

1. I am fluent in Mandarin and English.

2. On this day, I translated the foregoing to the declarant, who understood the contents thereof prior to affixing her signature therefor.

I declare under penalty of prejury that the foregoing is true and correct.

Executed this 14th day of September, 2001, at Tulane County Juvenile Hall, California.

                                            _____

                                                Frank Wu

228.

## Declaration of Jin Rong Yiou

I, Jin Rong Yiou, declare and say as follows:

1) I am a native and citizen of the Peoples Republic of China. My INS file number is A77 052 527. I was born October 5, 1985; I am now 16 years old. When I was born, my mother already had one child, my brother Xue Zhou, so my birth violated China's "one-child" policy. I was accordingly registered as my father's uncle's daughter, which is why my last name is different than my brother's.

2) I have never before been arrested, nor have I ever been charged with any crime or delinquency. The only time I have been detained was on October 26, 1999 in Honolulu, Hawaii. I also spend a day and a half in a detention room at the airport before being sent to Martin Hall in Spokane, Washington, where I stayed until February 15, 2000.

3) At Martin Hall I was mixed together during meals and recreation with girls and boys who had been put there for having committed crimes, such as stealing or using drugs. I stayed in a cell most of the time by myself, but several times the facility [229.] ran short of space, so they put an American girl in my cell. During all the

③

time I was at Martin Hall, I never spoke to a counsellor or psychologist or social worker. There was no educational instruction in Chinese, and I paired participated in no sports. Recreation consisted of playing board games and short daily exercise sessions. When I was admitted to Martin Hall, I was made to remove my clothing in front of a female guard. She took my clothes away and gave me a uniform to wear.

4) On Febru While I was at Martin Hall I went to immigration court twice in Seattle. From the Martin Hall I was handcuffed and shackled by my feet. At the airport, the INS officer removed the shackles and handcuffed me to my brother, and we stayed that way on the flight to Seattle. When we arrived in Seattle, I was again handcuffed individually for the ride to immigration court. The handcuffs were removed during my hearing, but I was again handcuffed and shackled after I had been on the way to court. No lawyer ever visited me at Martin Hall, but I did have a lawyer at the immigration court. I spoke to him for a few minutes only before the hearing.

230.

5) On February 15, 2000, as I recall, I was transferred to Bible Children's Home in Georgia. From Martin Hall to the airport

③

I was handcuffed and shackled, but once I was on the plane the handcuffs and shackles were removed, and I was not again handcuffed or shackled on my trip to Bible Children's Home.

6) I stayed at Bible Children's Home until late July 2000, when I was released to my uncle. At Bible Children's Home I was permitted to wear some of my own clothes, but they did give me a special T-shirt. At Bible Children's Home, there were no delinquents – only IMS detainees. So I went to school, but all instruction was in English only. With supervision, I was also able to go out to the movies and the park. I could also use the phone every day, at any time, but I had to make calls collect or use a calling card that my uncle had given me. I could go play outside in the yard and participate in crafts.

7) In late July I was released to my uncle, and my brother and I went to live in his house in Birmingham, Alabama. We stayed with my aunt, uncle, and their two children. I began attending public school (8th grade). Once a month, my uncle would take us to report to the 231. IMS in Atlanta, Georgia, a trip of 3-4 hours one-way.

8) The second time we went to report to the Atlanta IMS office, the officer told us my uncle to step out of the office, that he could go home without us because we were going to be deported. This was about October 4, 2000. My brother and I were rearrested. The IMS put fastened heavy sand bags to my brother's feet, but not to mine. I felt very sad and surprised. I had no idea why this was happening to us. From the airport in Spokane to Martin Hall, I was handcuffed and 9) shackled.

9) I stayed at Martin Hall until February 26, 2001, or so, when I was sent to Los Angeles for one night. From Martin Hall to the Spokane Airport I was shackled and handcuffed. At the airport the handcuffs and shackles were removed, and I was not again shackled or handcuffed. During all these trips, it was only my brother and me with two immigration officers, one male and one female.

10) I arrived here at the Tulare County Juvenile Hall on about the end of February, 2001. Here I wear a uniform. I have not been permitted outside this facility except twice, to see a doctor. Each time, I had shackles on my feet, handcuffs, and a chain between the shackles and $\boxed{232.}$ handcuffs. I do not understand why they did this to me because I have never caused any problems here, or anywhere



I've been in INS custody. I guess this is just what they do to kids who live here.

11). At Tulare, we INS detainees are kept in a Pod 2, and we do not have contact with juvenile delinquents. We go to school in the facility, but all instruction is in English. A guard patrols every 15 minutes to perfo count heads. We do not really have access to the outdoors. Rather, there is an area that about the size of four large room with a metal roof with a or covering with a hole in it. The area is surrounded by high walls.

12) I do not understand where my immigration case stands. Although I've been here for about 6 months, no social worker, psychologist or counselor has talked to me. Only once a man came to ask me a few questions and about how I feel. If somebody did ask me, I would tell them I would still like to stay here, because its better then the country I left behind.

233.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __14th__ day of ~~August~~ September, at Tulare County Juvenile Hall, California.

Jim Rong, Xion

Certificate of Translation

I, Frank Wu, declare and say as follows:

1. I am fluent in Mandarin and English.

2. On this date, I translated the foregoing to the declarant, who understood the contents thereof prior to affixing her signature thereto.

Executed this _____ day of September, 2001, at Tulare County Juvenile H

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of September, 2001, at Tulare County Juvenile Hall, California.

Frank S. Wu
Frank Wu.

234.

# EXHIBIT 21

## Declaration of Xue Zhong Zhou

I, Xue Zhong Zhou, declare and say as follows:

1. I am a native and citizen of the Peoples Republic of China. My INS file Number is A77 052 528. I was born December 11, 1983. I am now 17 years old.

2. I was taken into custody by the INS on October 26, 1999. ~~I have now~~ been in Honolulu, Hawaii. I spent a day and a half in a detention room at the airport before being sent to a juvenile hall in Spokane, Washington. I believe this was called Martin Hall. I stayed there from October 28, 1999 to February 15, 2000. Then I was transferred to a childrens home in Georgia. I recall this place was called Bible Childrens Home, but I am not very sure of the exact name. I stayed there until July 25, 2000, when I was released to my uncle. I went to live in Birmingham, Alabama with my uncle. I stayed with my uncle until October 4, 2000. I was then rearrested and sent Spokane's Martin Hall. I stayed at Martin Hall until February 26, ~~27~~ 2001, when I was sent to Los Angeles. I spent one night in Los Angeles before being sent to Tulare County Juvenile Hall in California, where I remain to this day.

235

②

3   At Martin Hall ☒ I lived in a cell
with iron bars. My cell had a bunk
bed and a toilet and sink. The cell
had an iron door that was locked all
the time. To leave my cell I had to
push a button, to call the guard to
let me out. People were classified according
to our behavior. If we behaved, we
were given a different color uniform
and more time to watch television.
My cell was located on a long row of
cells, which were on both sides of
a hallway. Most of the cells were
occupied by American juveniles who were
there for being delinquents. When a
cell would open up, the INS would
be permitted to bring more detainees
there.

. |236.|

4. I was permitted outside my cell for
two hours per day, for activity period. allowance
Someone from the facility would lead us
in exercise for about 15-30 minutes. Then
we would have class until 2:00 or 2:45,
then we were sent back to our cells
until bathing time, at about which varied
according to availability of the bathroom
until dinner time at 5:00. After
dinner, we would be sent back to our
cells or given activity period depending
on availability.

⑤

4. At Martin Hall, a guard would wake us up at 6:00 every morning except Saturdays and tell us to clean our cell. The guard would watch us clean, take our tools, lock the door and Move to the next cell. At 7:00 we were taken out to a big dining area where I would eat with all the other prisoners, including those in jail for being delinquents. Some of them told me they were there for drugs and destroying property. On a few occasions, these boys tried to teach me here to take drugs by sniffing or injecting them. I told them I wasn't interested in drugs.

5. After breakfast we went back to our cells to brush our teeth. Then we were taken to an exercise room. The room had no exercise equipment, just a table and bench. A guard as instructed some of the prisoners to lead us in exercise for about 15-30 minutes. Then the guard gro divided us into groups and sent us to class.

237.

45-minute-classes:
6. We had 5 4th Computers, Math, English Geography and reviews. All the classes were in English, so I learned very little. The Math class was very basic — all things I had learned already in China.

7. After the school, about 2:45, we were locked in our cells until dinner at 5:00 - 5:30. Then we would have rec time depending on our behavior. The level We were assigned to recreation levels according to behavior. Everyone was initially assigned to level 0, which was given 15 minutes rec time. After the guards observe you for a week, and you displayed good behavior, you advanced to level 1, which meant you get 30 minutes. It went like that this to level 4, which I attained after about two and a half months. Then I got 2 hours rec time. After rec time, we were locked in our rec rooms again.

8. During the rec time, I played some card and board games, but we had no sports equipment or activities.

9. When I was first admitted to Martin Hall, I was made to take off all my clothes to be searched. A guard watched by me while he I took off my clothes. Then he ordered me to turn around, me squat down and get up while he checked my body.

238.

10. Until the INS arrested me, I had never before been in any trouble. I had never been arrested or accused of any crime. In China I was a student. Since being arrested, I have never attempted



to flee or escape. During the time I've been detained by the INS, I've never been in trouble with the guards. I've never had any punishment or had my privileges suspended.

11) Bible Children's Home was much better than Martin Hall. There we could go outside. We stayed in a room without bars. We were always under supervision, but it did not feel like being in a jail. We went to the movies sometimes, and also to the park.

12) When I was released to my uncle, I was required to report to the INS office in Atlanta once monthly. I went the first month and there was no problem. Then the second time I reported, the INS took me and my sister into custody and told us and our uncle that we had to be deported to China. I was completely surprised because I didn't know anything new about my case. That night I was back at Martin Hall.

239.

13) I believe it took a long time to release me to my uncle because we were first supposed to be released to another uncle, but he got into a car accident and couldn't take care of us. Then my mother's brother asked for us, but the INS took three months to check his home and release us.

④

14) I am now in Tulare County Juvenile Hall. Here I am not locked in a cell but must stay in one area of the facility. This is not like Biola Children's Home. I am not permitted to leave the facility and I have to wear a uniform. I attend the school inside the facility, but there is no instruction in Chinese. I have not spoken to a counselor or psychologist since I've been here. I am permitted to use the phone three times per week for six minutes per call.

15) I have not seen my father since 1992. My mother asked my sister and I to come to the United States. She said we would have a better life here. In China, my sister and I were raised by our grandmother. We saw our mother occasionally. One day she came and said we should go to the United States. After we came here, my mother also left China. She may be coming to the United States, but I do not know where she is now. If I am deported to China, my sister and I will be responsible for paying the debts my mother incurred to send us here. Since we are young and will have no way to pay this money back, I fear we will either be forced into labor, enslaved, or be beaten or killed.

[240.]

16) In Martin Hall I was diagnosed with tuberculosis and given some medicine. When I went to Georgia, I was given a thorough

SCANNED

# PAGINATION SKIPS
# FROM 240. TO 250.

Medical exam, and I was told the medicine had damaged my liver. Now I am not taking any medication at all.

I declare under penalty of perjury, that the foregoing is true and correct and that if called to testify with respect thereto I could do so competently.

Executed this __14th__ day of September, 2001, at Tulare County Juvenile Hall, California.

Xue zhong zhou.

+ ＊ × ← ×

Certificate of Translation

I, Frank Wu, declare and say as follows:

1) I am fluent in English and Mandarin.
2) On this day I translated the foregoing declaration in full to the declarant, who indicated the he understood the contents thereof and that the same is true and correct of his own knowledge prior to affixing his signature hereto. [250.]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __14th__ day of September, 2001, at Tulare County Juvenile Hall California

Frank S. Wu



SCANNED

## DECLARATION OF XUE ZHUNG ZHOU

I, Xue Zhung Zhou, declare and say as follows:

1. I am a native and citizen of the Peoples Republic of China. My INS file number is A 77 052 528. I was born December 11, 1983. I am now 17 years old.

2. I was taken into custody by the INS on October 26, 1999, in Honolulu, Hawaii. I spent a day and a half in a detention room at the airport before being sent to a juvenile hall in Spokane, Washington. I believe this was called Martin Hall. I stayed there from October 28, 1999 to February 15, 2000. Then I was transferred to a children's home in Georgia. I recall this place was called Bible Children's Home, but I am not very sure of the exact name. I stayed there until July 25, 2000, when I was released to my uncle. I went to live in Birmingham, Alabama with my uncle. I stayed with my uncle until October 4, 2000. I was then rearrested and sent Spokane's Martin Hall. I stayed at Martin Hall until February 26, 2001, when I was sent to Los Angeles before being sent to Tulare County Juvenile Hall in California, where I remain to this day.

3. At Martin Hall I lived in a cell with iron bans. My cell had a bunk bed and a toilet and sink. The cell had an iron door that was locked all the time. To leave my cell I had to push a button to call the guard to let me out. People were classified according to our behavior. If we behaved, we were given a different color uniform and more time to watch television. My cell was located on a long row of cells, which were on both sides of a hallway. Most of the cells were occupied by American juveniles who were there for being delinquents, when a cell would open up, the INS would be permitted to bring more detainees there.

4. At Martin Hall, a guard would wake us up at 6:00 every morning except Saturdays and tell us to clean our cell. The guard would watch us clean, take our tools, lock the door and move to the next cell. At 7:00 we were taken out to a big dining area where I would eat with all the other prisoners, including

251.

those in jail for being delinquents. Some of them told me they were there for drugs and destroying property. On a few occasions, these boys tried to teach me how to take drugs by sniffing or injecting them. I told them I wasn't interested in drugs.

5.  After breakfast we went back to our cells to brush our teeth. Then we were taken to an exercise room. The room had no exercise equipment, just a table and bench. A guard instructed some of the prisoners to lead us in exercise for about 15-30 minutes. Then the guard divided us into groups and sent us to class.

6.  We had five 45 minute classes: computers, math, English, geography and review. All the classes were in English, so I learned very little. The math class was very basic, all things I had learned already in China.

7.  After school, about 2:45, we were locked in our cells until dinner at 5:00 - 5:30. Then we would have rec time depending on our behavior. We were assigned to recreation levels according to behavior. Everyone was initially assigned to level 0, which was given 15 minutes rec time. After the guards observe you for a week, and you displayed good behavior, you advanced to level 1, which meant you get 30 minutes. It went like this to level 4, which I obtained after about two and a half months. Then I got 2 hours rec time. After rec time, we were locked in our rooms again.

8.  During rec time, I played some card and board games, but we had no sports equipment or activities.

9.  When I was admitted to Martin Hall, I was made to first take off all my clothes to be searched. A guard watched me while I took off my clothes. Then he ordered me to turn around, squat down and get up while he checked my body.

252.

10. Until the INS arrested me, I had never before been in any trouble. I had never been arrested or accused of any crime. In China I was a student. Since being arrested, I have never attempted to flee or escape. During the time I've been detained by the INS, I've never been in trouble with the guards. I've never had any punishment or had my privileges suspended.

11. Bible Children's Home was much better than Martin Hall. There we could go outside, we stayed in a room without bars. We were always under supervision, but it did not feel like being in a jail. We went to the movies sometimes, and also to the park.

12. When I was released to my uncle, I was required to report to the INS office in Atlanta once monthly. I went the first month and there was no problem. Then the second time I reported, the INS took me and my sister into custody and told us and our uncle that we had to be deported to China. I was completely surprised because I didn't know anything new about my case. That night I was back at Martin Hall.

13. I believe it took a long time to release me to my uncle because we were first supposed to be released to another uncle, but he got into a car accident and couldn't take care of us. Then my mother's brother asked for us, but the INS took three months to check his home and release us.

14. I am now in Tulare County Juvenile Hall, here I am not locked in a cell, but must stay in one area of the facility. This is not like Bible Children's Home. I am not permitted to leave the facility and I have to wear a uniform. I attend school inside the facility, but there is no instruction in Chinese. I have not spoken to a counselor or psychologist since I've been here. I am permitted to use the phone three times per week for six minutes per call.

15. I have not seen my father since 1992. My mother asked my sister and I to come to the United States. She said we would have a better life here. In

253.

China, my sister and I were raised by our grandmother. We saw our mother occasionally. One day she came and said we should go to the United States. After we came here my mother also left China. She may be coming to the United States, but I do not know where she is now. If I am deported to China, my sister and I will be responsible for paying the debts my mother incurred to send us here. Since we are young and will have no way to pay this money back, I fear we will either be forced into labor, or enslaved, or be beaten or killed.

16. In Martin Hall I was diagnosed with tuberculosis and given some medicine. When I went to Giorgia, I was given a thorough medical exam, and I was told the medicine had damaged my liver. Now I am not taking any medication at all.

I declare under penalty of prejury, that the foregoing is true and correct and that if called to testify with respect there to I could do so comptently.

Executed this 14th day of September, 2001, at Tulare County Juvenile Hall, California.

_____

Xue Zhung Zhou

Certificate of Translation

I, Frank Wu, declare and say as follows:

1. I am fluent in English and Mandarin.

2. On this day I translated the foregoing declaration in full to the declarant, who indicated that he understood the contents thereof and that the

254.

same is true and correct of his own knowledge prior to affixing his signature here to.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ _____ day of Septmeber, 2001, at Tulare County Juvenile Hall, California.

_____

Frank Wu

255.

SCANNED

# EXHIBIT 22

SCANNED

[RESERVED]

256.

# EXHIBIT 23

# Latham & Watkins

ATTORNEYS AT LAW

WWW.LW.COM

633 WEST FIFTH STREET, SUITE 4000
LOS ANGELES, CALIFORNIA 90071-2007
TELEPHONE (213) 485-1234
FAX: (213) 891-8763

DIRECT DIAL: (213) 891-7344
E-MAIL: BRIAN.FOX@LW.COM

| | | | |
|---|---|---|---|
| TO: | Steve Schulman | DATE: | August 22, 2001 |
| | | FILE NO.: | 000011-1788 |
| FROM: | Aaron Murphy | COPIES TO: | File |

SUBJECT:  Flores Compliance Visit to Central Juvenile Hall

## I.      Introduction

On Thursday, August 2, 2001, Latham & Watkins attorneys Aaron Murphy and Rodrigo Vazquez, accompanied by summer associates Ofer Lion, Alexis Leland, Peter Krogh, and Brian Fox, inspected the Central Juvenile Hall (CJH) in Los Angeles, California. The purpose of the inspection was to monitor the facility for its compliance with the settlement agreement in Flores v. Meese (the "Flores Agreement"). Michele O'Brien, the district juvenile coordinator for the Immigration and Naturalization Service (INS), accompanied the Latham team.

Central Juvenile Hall is a secure juvenile detention facility. It is a full-service, self-contained facility with an on-site school, infirmary, multiple residential "dormitories," and even two swimming pools. There are approximately five hundred juveniles, both male and female, present at CJH at any one time. Under California law, juvenile court jurisdiction ends at age 18; therefore, any resident of CJH must be released or transferred to an adult facility at that age.

The inspection lasted from approximately 11:00 AM to 2:30 PM. During that time, in addition to speaking with Ms. O'Brien, we met with the four INS-detained juveniles held at CJH at that time. In addition, we also spoke with a number of facility personnel. Two general observations arose from the inspection: 1) INS-detained juveniles and delinquent juveniles are treated in a substantially similar manner, and 2) the procedure for placing INS-detained juveniles in CJH is inadequate.

Although efforts were made to conduct the inspection in an organized manner that would permit the completion of checklists for the individuals we spoke with – it became apparent rather quickly that almost nothing is done at CJH to comply with the Flores Agreement. CJH is a facility operated either by Los Angeles County or the State of California (it was not

LA DOCS:719691.1 [W97]

257.

entirely clear, but does not matter for our analysis) for the purpose of housing youth that have been adjudicated and found delinquent or guilty of criminal acts. The adjudicated youth at the facility are guilty of offenses ranging from minor thefts or drug use to murder. From the perspective of the employees of CJH, the fact that some of the detainees are INS-detainees is of no consequence and this distinctive status is recognized, at best, as an afterthought.[1] It was apparent to me that, to the extent CJH is in compliance with the <u>Flores</u> Agreement that compliance is, at best, serendipitous.

It must be emphasized however that this "failure" on the part of CJH is simply a byproduct of the fundamentally different mission statement of the facility. CJH was not built and is not run for the purpose of handling INS-detained minors. That such minors are housed there at all is viewed as a matter of convenience to and cooperation with the INS. From the standpoint of monitoring <u>Flores</u> compliance, it is Ms. O'Brien's vague knowledge of the <u>Flores</u> requirements and apparent apathy toward the needs of INS-detained minors that gives us the most pause.

While helpful and cooperative, Ms. O'Brien seemed to exhibit only a cursory understanding of the requirements of <u>Flores</u>. Furthermore, she exhibits the unfortunately all-too-familiar quality of concerned indifference exhibited by employees of large bureaucracies who are at once aware of both problems in the system and the system's immense inertia against change. Thus, while it is our conclusion that Ms. O'Brien, as well as all of the employees of CJH, need a much better understanding of the <u>Flores</u> Agreement, there is clearly an institutional component to the abject failure of compliance we confronted at CJH. The INS simply has not put forth the effort and resources required to ensure that the minors it detains are treated in accordance with the obligations it agreed to in <u>Flores</u>.

## II.   General Observations

### A.   The Placement of INS-Detained Juveniles in CJH is an Automated Process that Fails to Comply with ¶ 21 of the Flores Agreement

The <u>Flores</u> Agreement sets forth a general policy favoring the release of detained minors whenever possible. (<u>Flores</u> Agreement ¶ 14.) Where release is not possible the minor shall remain in INS custody and be placed in a licensed program until release becomes possible or the immigration proceedings are concluded. (<u>Flores</u> Agreement ¶ 19.) Placement in a secure facility is only permitted where one of five criteria set out in ¶ 21 of the <u>Flores</u> Agreement is met. One of those criteria permits confinement in a secure facility where a minor:

---

[1] As an example, when speaking to the principal of the on-campus school, I was asked "How would I, or an instructor, know if one of the kids was an INS kid?" Although we cannot attribute this statement to all employees of CJH, it was apparent to us that a detainee's status as an INS-detainee is largely irrelevant to the workings of the institution.

258.

has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act

(<u>Flores</u> Agreement ¶ 21(A).)  The broad sweep of this provision is then limited by the mandatory exclusion of those cases where the offenses are either:

> i.  Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc.  This list is not exhaustive);

> ii.  Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc. This list is not exhaustive.)

(<u>Flores</u> Agreement ¶ 21(A).)

Ms. O'Brien explained to us that, Los Pedrinos, the INS-contracted less-secure facility in this area, refuses to take juveniles with any involvement, suspected or otherwise, in "criminal" activities.  Thus, any INS-detained minor who has been arrested for any activity is automatically placed in CJH.  Ms. O'Brien exhibited some concern over this practice and related one story of her failing to report to Los Pedrinos that a minor had been arrested where the offense was so minor that she felt detention in CJH was completely unjustified.  Despite her one exercise of "discretion," it appears that in practice detention in CJH is automatic.

Beyond the obvious problems with this automatic placement procedure, Ms. O'Brien exhibited no knowledge of the exclusions in ¶ 21(A).  She habitually recited her understanding of the <u>Flores</u> Agreement as permitting placement in a secure facility anytime a minor is "chargeable" with a crime.  While Ms. O'Brien exhibited empathy with some of the harsh consequences of this "rule," she obviously is not aware that it is a misreading of <u>Flores</u>.  Furthermore, Ms. O'Brien did not appear to be familiar with ¶ 23 which requires that an INS-detained minor not be placed in a secure facility where there are other, less restrictive alternatives available.

It appears that there is no mechanism in place whereby a determination is made as to the applicability of the mandatory exclusions from secure facility detention set out in ¶ 21(A).  As a result, while certain individuals may correctly be placed in CJH, the process by which such placement occurs in woefully inadequate.  At least two of the minors we spoke with stated that they were arrested for drug use or possession related offenses, either of these cases might have fit within the exclusions of ¶ 21(A); however, no determinations on that issue appear to have been made.

Furthermore, the INS does not begin deportation proceedings until after the completion of any delinquency or criminal proceedings, including the serving of any sentences.  Thus, the two INS juveniles from whom we obtained the most information had each served time for delinquent offenses (one actually in CJH), but had completed those sentences and now were being held securely only because they were INS detainees with past offenses.  In addition, they

3

I A DOCS719691 1 [W97]

259.

were classified and housed according to those previous offenses. While there are certain
instances where continued detention at CJH may be proper, the automated nature of these
detentions again appears to violate the <u>Flores</u> Agreement. It is certain that these two detainees
would be refused by Los Pedrinos; however, having served their time, each would be free but for
his INS status. Thus, again, there is a failure to make any determination regarding the
applicability of ¶ 21(A).

While it is unfortunate that Los Pedrinos will not accept minors who have been
arrested, this fact is of little significance. The INS, as an institution, has not sought another
facility as an alternative to automatic placement in CJH. It is plainly apparent that the INS needs
to either contract with additional facilities or acquire a facility of its own where minors who fall
within ¶ 21(A), but who cannot be released, can be placed.

    **B.**    **Assuming a Correct Placement in CJH, INS-Detained Minors
are Indistinguishable from the General Population**

Minors detained by the INS at CJH are indistinguishable from the general juvenile
population. They wear the same clothes, live in the same dorms, and share rooms with
adjudicated youth serving sentences for delinquent or criminal offenses. There are no special
provisions made for INS youth upon their entry into the facility, except in those instances where
an interpreter is required. INS minors brought to CJH go through an intake process identical to
adjudicated youth: they are questioned, screened for medical requirements, and classified
according to offense. In the case of INS youth, classification is based on any past offense or
arrest as opposed to being limited to the current offense.

Once placed at CJH, INS minors participate in the day-to-day activities of all
detained youth without differentiation. Most of the day is spent in school (the school meets
California requirements for time spent in class and course offerings). Educational
accommodations are made for non-English speaking students. Meals take place in the individual
residence halls. There is one hour of structured outdoor physical activity for each residence hall
each day.

The two INS juveniles we spoke to that had spent significant time at CJH stressed
that, in general, their treatment differed in no way from that of other juveniles. One of these
minors, Gerson Alvarado, reported that his uncle was not permitted to visit him at CJH as an INS
detainee. However, this same uncle was permitted to visit when Mr. Alvarado was previously
detained at CJH as a delinquent. Mr. Alvarado reported that facility staff explained that such
visits were not allowed for INS youth. Verification of this refusal was unavailable, although Ms.
O'Brien stated that the visitation rules for INS juveniles at CJH should not differ from those of
the regular population.

When it comes to secure facility detention, it is not entirely clear what the <u>Flores</u>
Agreement requires. Paragraph 21 permits a minor to be held in "a suitable State or county
juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having
separate accommodations for minors". Paragraph 4 of the <u>Flores</u> Agreement states that the term
"'minor' shall apply to any person under the age of eighteen (18) years who is in the legal
custody of the INS." Thus, it is possible that the phrase "having separate accommodations for

260.

minors" means that INS-detained minors must be detained in a facility apart from both adults as well as other people under the age of eighteen.

However, even if this is the intended meaning of the word "minor," there is an additional problem with the language in Paragraph 21. The doctrine of last antecedent may operate to restrict the requirement of separate accommodations only to INS-contracted facilities. This indeed might be the proper interpretation since a "State or county juvenile detention facility" is by definition only for the detention of minors – as that term is generally used. Thus, the proper reading of the language may be that the INS can place a "minor" in a secure INS facility, a State or county juvenile detention center, or in an INS-contracted facility so long as that facility can house INS detained minors separate from the general population.

The intended meaning may be elucidated by ¶ 12 which contains very similar language although arranged in a significantly different way. Paragraph 12 states that, where immediate placement in a licensed program pursuant to ¶ 19 is not possible, a minor may be temporarily placed "in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility. However, minors shall be separated from delinquent offenders." This language makes it much clearer that the phrase "having separate accommodations for minors" applies only to INS-contracted facilities and not to State or county detention facilities. This reading is reinforced by the additional sentence requiring separation from "delinquent offenders," which appears to apply to all such placements under ¶ 12.

Placed in the context of the agreement as a whole ¶ 21 may not require INS-detained minors to be separated from the general population of delinquent or criminal minors at State or county juvenile facilities. That the sentence requiring minors to be "separated from delinquent offenders" is absent from ¶ 21 is significant in and of itself. In addition, the overall purpose of ¶¶ 12 and 21 differ significantly. Paragraph 12 addresses the temporary placement of minors in secure facilities who rightfully belong in licensed programs under ¶ 19. In those cases a concession is made to the INS where it is not possible to immediately place a minor in a licensed program: such a minor can be placed in a secure facility for three or five days, so long as the minor is held separately from delinquent offenders. Paragraph 21 deals with the proper placement of minors who, according to the settlement, may be permanently placed in secure facilities until resolution of their INS proceedings. In such cases, once properly placed in a State or county juvenile facility there is no need to separate the INS-detained minor from the general population. Thus, while members of the inspection team all felt that it was inappropriate to mix INS-detainees with adjudicated youth, I am not convinced it is a violation of the settlement assuming the INS-detainee has been properly placed in CJH.

Despite the fact that separate housing may not be required, the <u>Flores</u> Agreement has other components that require a distinction to be made between INS-detained minors and delinquent or criminal minors. For example, ¶ 24(B) permits any INS detained minor to seek review of the INS's placement determination in federal District Court. To facilitate review an INS-detained minor placed in a secure facility is to receive notice of the reasons for the INS's placement determination as well as an explanation of the minor's rights and a list free legal service providers. (<u>Flores</u> Agreement ¶¶ 24(B)-(C).) None of the detainees we spoke with was aware of their rights nor the reasoning behind their placement at CJH. In addition, with the

5

261.

exception of one minor who was contesting deportation, none of them had received any
information about legal services that might be available to them.

Beyond this general failure to treat INS-detained minors in a manner different
from the treatment of regularly detained juveniles, there were several other problems that gave us
concern.

## C.    Other General Problems

What was perhaps most striking to us was the overall lack of communication to
INS detainees. The two most recent arrivals appear to have a complete lack of understanding as
to why they were there. Both had agreed to voluntary deportation and could not understand why
they had not yet been deported. Because they had only been at CJH for a few days at most, the
information void was resulting in clearly distressed children who could not speak English and
were unclear as to what was going to happen to then.

In addition, the record keeping at CJH is very suspect. We had prearranged our
visit a week ahead of time with both Ms. O'Brien and CJH. Yet, upon arrival at CJH it took
nearly an hour for Ms. O'Brien and the CJH staff to determine how many INS detainees were
even at the facility. Once that was determined, it took an additional hour for all four of the
detainees to be located. This sub-standard record keeping only increases the chances that a
minor could be detained at CJH for a substantial period without any contact with the outside
world or any information as to the reasons for the detention at CJH.

## III.   Minors Interviewed

### A.    Gerson Alvarado

Gerson Alvarado, originally from Guatemala, had been held in CJH as an INS
detainee for over two months. He did have a history of juvenile arrests, and had been detained as
a delinquent immediately prior to being turned over to INS custody for selling drugs. Mr.
Alvarado was not at all clear about his rights as an INS detainee, although he did report that he
had been appointed a lawyer by the court who was helping him contest deportation. For the past
three weeks, Mr. Alvarado had met weekly with his counsel at the INS office (on Wednesdays).
However, he spent several weeks incarcerated where he did not have representation or visit the
INS offices; he reported that his attorney felt his file was "lost." Hardly a surprising revelation
given the record-keeping we witnessed.

Mr. Alvarado has a mother and brothers (over eighteen) legally living in the
United States (and California). However, for whatever reason, he was not in their custody. Mr.
Alvarado claimed it was because they were incapable of paying the $3,000 bond that seemed to
be associated with his release. Ms. O'Brien, however, stated that any bond could be waived
where financial need exists and that instead Mr. Alvarado did not get along with his stepfather
and thus his mother would not accept custody. Information about the brothers was unavailable.

### B.    Ruben Perez (Correa)

LA_DOCS 719691 1 [W97]

262.

Ruben Perez, originally from Mexico, had been in CJH for several months. However, he had only been an INS hold for the two weeks prior to our visit. Prior to that, he had been held on charges of curfew violation and being under the influence of crystal methamphetamine.

The accuracy of Mr. Perez's statements is questionable. He made a number of contradictory statements, along with multiple obviously false statements. However, like Mr. Alvarado, he seemed to be unclear as to his legal rights, and we had difficulty discerning who provided his current legal representation and how long that representation had been provided. In addition, the $3,000 bond also came up during his interview. It is unlikely that Mr. Perez and Mr. Alvarado had any contact – each lived in separate dormitories, were different ages, and had different risk classifications -- and we therefore feel it is unlikely that there would have been any opportunity for them to "prepare" for our visit. Overall, Mr. Perez did not express any complaints about his treatment in the facility.

**C.    Gabriel Garcia Hernandez and one Minor Who's Name is Unknown**

The two remaining INS detained juveniles had been in the facility for a combined total of three days. Both minors seemed confused about what was happening to them. Each had agreed to voluntary deportation and each were under the impression that they should already have been deported. Neither appeared to have received any information regarding their rights. Because of the great confusion over the number and identities of the INS detainees at CJH we were never sure of the name of the fourth detainee who had only arrived the night before.

263.

SCANNED

# EXHIBIT 24

## DECLARATION OF ERNESTO RIVERA CAMPOS

I, Ernesto Rivera Campos, declare and say as follows:

1. I arrived in the United States in November, 2001. I crossed the border walking, in Texas. My parents remained in El Salvador. I was born June 28, 1988. I am now 16 years old.

2. I made my way to Los Angeles because I was told in Texas that there were many Salvadorans living in Los Angeles. I worked for about 1 week in Santee, CA. I lost that job. That was the only job I have managed to find since I arrived here. I was arrested in Fountain Valley. My shoes had worn out and I had no money, so I was forced to steal a pair of shoes. The store employee held me until the police arrived. They arrested me and took me to the police station. I spent one night there.

3. The next day, the INS came to speak with me. Then they brought me to San Diego Juvenile Hall, where I have been ever since. That was the first and only time I've been arrested for anything and the first time I've ever stolen anything. The INS never asked me any questions about why I had tried to steal the shoes. The INS did ask me whether I've been arrested before, and I told them this was the first and only time.

4. Here at San Diego Juvenile Hall I first spent 2 days alone in a cell. The cell had only a toilet and sink, and bed. I spent all day locked in my room. I was then taken out and placed in a cell with another person, who had been arrested for smuggling drugs, I spent about 15 days in this cell. I was then allowed out of my cell for school and recreation. I was then transferred to another cell; I shared that cell with another juvenile who had been arrested for stealing a car while drunk I was then transferred to a room for 5 persons. This was a room for those of us who behave well.

264.

SCANNED

5. Here I have regular daily contact with delinquents. Sometimes there are fights between rival gang members.

6. When I first arrived here, a counselor talked to me a coupe of times, but I didn't get to see her any more.  Nobody asks how I feel, or if I miss my family.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15 day of February, 2002, at San Diego, California.


_____
Ernesto Rivera Campos

/ / /

265.

Ernesto Rivera Campos:

I arrived in the United States in November, 2001. I crossed the border walking, in Texas. My parents remained in El Salvador. I was born June 28, 1988. I am now 14 years old.

I made my way to Los Angeles because I was told in Texas that there were many Salvadorans living in Los Angeles. I worked for about 1 week in Santa, but I lost that job. I was arrested in Fountain Valley. My shoes had worn out and I had no money, so I was forced to steal a pair of shoes. The store employees held me until the police arrived. They arrested me and took me to the police station. I spent one night there. The next day, the INS came to speak with me. They then brought me to San Diego Juvenile Hall, where I have been ever since. That was the first and only time I've been arrested for anything, and the first time I've ever stolen anything. The INS never asked me any questions about why I had tried to steal the shoes. The INS did ask me whether I'd ever been arrested before, and I told them this was the first and only time.

266.

Here at San Diego Juvenile Hall
I first spent 2 days alone in
a cell. The cell had only a toilet
and sink, and bed. I spent all
day locked in my room.

I was then taken out and placed in
a cell with one other person, who had
been arrested for smuggling drugs. I
spent about 15 days in that cell. I was then
allowed out of my cell for school
and recreation.

I was then transferred to another
cell; I shared that cell with another
juvenile who had been arrested for
stealing a car while drunk. Here This

I was transferred to a room
for 5 persons. This was a room for
those of us who behave well.

Here I have regular daily contact
with delinquents. Sometimes there are
fights between rival gang members.

When I first arrived here, a
counsellor talked to me a couple of times,
but I don't get to see her any more
Nobody asks how I feel, or if I
miss my family.

I declare under penalty of perjury
That the foregoing is true and correct.
Executed this 15th day of            267.
February 2002 at San Diego, California

X _____

SCANNED

# EXHIBIT 25

SCANNED

[RESERVED]

268.

SCANNED

# EXHIBIT 26

U. S. Department of Justice
Immigration and Naturalization Service



Anthony S. Tangeman, Deputy Executive Associate Commissioner
David Venturella, Associate Deputy Executive Associate Commissioner

**HDDP/JAD (NOV. 2001)**

# OFFICE OF DETENTION AND REMOVAL PROGRAM DESCRIPTIONS

## Non-Secure Shelters Care Facilities

### South West Key Program – El Cajon

| | |
|---|---|
| Location: | El Cajon, CA |
| Service Area: | Nationwide |
| Number of Juvenile Beds: | 16 Shelter Care |
| Start Date: | April, 1998 |
| Number of Juveniles Placed FY01: | 148 |
| Number of Juveniles Placed to Date: | 497 |
| Total FY02 Funding: | $1,190,200 |
| Average Length of Stay: | 26 Days |
| Point of Contact: | Betty Chao |

269.

The El Cajón UMSCP is licensed as a group home by the State of California Department of Social Services. The facility is located approximately 20 miles from the INS District Office in San Diego. All staff with the exception of the Program Director are bilingual, and all program rules and disciplinary procedures are translated into Spanish and Mandarin Chinese, which are the primary languages understood by the majority of residents.

The program has ensured that minors residing at the facility follow a structured daily routine which includes education, vocational training including chores, study periods, counseling and access to legal and religious services. The daily routine enhances supervision and accountability, as well as encouraging the development of individual and social responsibility in each of the residents.

The population served at the program is very diverse, with the majority of clients being either of Chinese decent or Spanish decent from Central and South America. Other populations served included Pakistan, India, Iran, Iraq, Armenia, Poland, Yugoslavia and Portugal. The program has developed both long term and short term resident care plans, as much of the Chinese population have a longer length of stay than other residents. Historically, the program has successfully reunified to a family member or sponsor, approximately 53% of clients served to date.

## Catholic Charities Galveston/Houston

| | |
|---|---|
| Location: | Houston, TX |
| Service Area: | Nationwide |
| Number of Juvenile Beds: | 18 Shelter Care plus 4 Foster Care |
| Start Date: | FY1988 |
| Number of Juveniles Placed FY01: | 106 |
| Number Placed to Date: | 1,716 |
| Total FY02 Funding: | $1,097,163 |
| Average Length of Stay: | 30 Days |
| Point of Contact: | Connie Hidalgo |
| Phone: | 713-874-6529 |

This program was started by Msgr. James Jamail. Its' purpose was to have undocumented juveniles who were apprehended by the INS cared for by parish volunteers in their homes in lieu of being placed into a juvenile detention facility. In 1987 two group homes which could care for a total of 18 youths were licensed by the state of Texas and licensed foster families were recruited to care for 4 female

270.

minors. The U.S. Department of Justice began funding the program that same year. The program has
served 1,610 minors from over 18 countries since its inception in October 1987.

The program provides a safe and nurturing environment to all unaccompanied minors sent to the
program by the Immigration and Naturalization Service (INS). The following services are provided:
shelter, clothing, meals, medical checkups, education, legal assistance, and communication with relatives
in the USA and in the countries of origin. The ultimate goal of the program is that the minor be reunited
with relatives either here in the USA or if that is not possible, with relatives in the country of origin.

## Georgia Baptist Children's Homes and Family Ministries, Inc.

| | |
|---|---|
| Location: | Meansville, GA |
| Service Area: | Nationwide |
| Number of Juvenile Beds: | 30 Shelter Care |
| Start Date: | April 1998 |
| Number of Juveniles Placed FY01: | 114 |
| Total Placed to Date: | 497 |
| Total FY02 Funding: | $1,832,880 |
| Average Length of Stay: | 21 Days |
| Point of Contact: | Allison Hutcherson |
| Phone: | 770-567-8987 |

In 1872, out of concern for orphans left by the Civil War, women from the Second Baptist Church of
Atlanta began a home for these destitute and helpless children. They established the Georgia Baptist
Asylum for Orphaned Children. Since that time, the ministry has grown to meet the needs of more than
11,00 children and families each year and is one of the oldest and largest child care providers in the
South.

Georgia Baptist Children's Homes and Family Ministries, Inc. (GBCH&FM) is a ministry of services
designed to promote the spiritual, physical and emotional well-being of children, youth and families. In
July, 1998 the Hope Shelter Care Program opened in Meansville, Georgia. The Hope Program has

271.

primarily served Spanish and Chinese ethnic groups, as well as Asian-Indian (Sri-Lankan, etc.) populations.

The program has developed very close working relationships with the Spanish Baptist Mission Church and Chinese Mission Church in the area. The residents have also been able to experience such cultural activities as Atlanta Braves Baseball Games, the Chinese Market, Six Flags, and participation in a softball tournament hosted by the Meansville Campus.

## Southwest Key Program, Inc. - La Esperanza Home for Boys

| | |
|---|---|
| Location: | Brownsville, TX |
| Service Area: | Nationwide |
| Number of Juvenile Beds: | 32 Shelter Care |
| Start Date: | July 1998 |
| Number of Juveniles Placed FY01: | 354 |
| Number Placed to Date: | 1,314 |
| Total FY02 Funding: | $1,650,100 |
| Average Length of Stay: | 22 Days |
| Point of Contact: | Celestino Abergo |
| Phone: | 956-546-0373 |

La Esperanza is licensed as a basic care facility by the Texas Department of Protective and Regulatory Services. Most of the residents at La Esperanza are of Spanish decent from Central America; though, at times the program has housed some Chinese and Brazilian undocumented minors.

The program ensures that minors residing at the facility follow a structured daily routine, which includes education, vocational, training including chores, study periods, counseling and access to legal and religious services. The daily routine enhances supervision and accountability, as well as encouraging the development of individual and social responsibility in each of the residents.

272.

SCANNED

# Catholic Charities Of the Archdiocese of Miami

| | |
|---|---|
| Location: | Miami, FL |
| Service Area: | Nationwide |
| Number of Juvenile Beds: | 32 Shelter Care |
| State Date: | 1983 |
| Number of Juveniles Placed FY01: | 161 |
| Total Placed to Date: | 2.761 (since 1983) |
| Total FY02 Funding: | $2,323,604 |
| Average Length of Stay: | 32 Days |
| Point of Contact: | Francisco Brizuela |
| Phone: | 305-380-0141 |

The Unaccompanied Minors Program, Boystown of Florida has been serving unaccompanied alien minors since the early 60's. A formal cooperative agreement was signed with the Department of Justice in 1983 to provide emergency shelter services to Cuban and Haitian minors.        At present, UMP-Boystown serves an average of 300 children per year, 30% Chinese, 35% Hispanic, 25% Haitian and 10% from other nationalities.

All children receive an initial orientation and intake. Simultaneously, both psychosocial and educational assessments are initiated. These assessment tools set up the base for a service plan, which is evaluated every 15 days. The program provides the following services: social services through Case Management (English, Chinese, Creole, and Spanish), Mental Health and Counseling, Educational Services (Formal School Setting), Food and Nutrition Services, and Day Treatment (After School Activities and Field Trips).

273.

Special activities are planned on a monthly basis and       include monthly birthday celebrations and monthly graduation celebrations. Field trips are organized once a week to museums, parks, libraries, or a swimming pool.

## South West Key — El Paso, TX

| | |
|---|---|
| Location: | El Paso, TX |
| Service Area: | Nationwide |
| Number of Juvenile Beds: | 48 Shelter Care |
| Start Day: | FY1996 |
| Number of Juveniles Placed FY01: | 222 |
| Placed to Date: | 1,380 |
| Total FY02 Funding: | $2,343,500 |
| Average Length of Stay: | 57 Days |
| Point of Contact: | Barbara Hall |
| Phone: | 915-577-0550 |

The UMSCP Casa El Paso is located in the heart of downtown El Paso, Texas. It is a 48 bed program serving both boys and girls ages 10 through 17 years. Nestled in the middle of the El Paso business district, and having no play area, we capitalize on the city's parks and other recreational areas for our residents. The program has turned what seemed a disadvantage into a distinct advantage by extending our educational program beyond our doors out to the entire city. Residents enjoy public libraries, museums, planetariums, as well as opportunities to participate in poetry readings with one of the local high schools. In addition to the basic educational program, El Paso has an extensive vocational program, which utilizes some of our community businesses as a means of enriching the vocational experience for our residents. The program is fortunate to have in our employ many staff who are certified and/or licensed in their area of expertise and training, providing instruction in the area of auto repair and welding using state of the art materials.

274.

Community members are active in the facility regularly making presentations of interest to residents. The police department, fire department, community planners, health clinic workers, etc. are on a seven-week rotating schedule for presentations.

Legal services are provided by Las Americas, an El Paso organization providing pro-bono legal services to immigrant people, and medical services are provided exclusively by Public Health Service.

## South West Key — Casa Grande, AZ

| | |
|---|---|
| Location: | Phoenix, AX |
| Service Area: | Nationwide |
| Number of Juvenile Beds: | 48 Shelter Care |
| Date Started: | FY1996 |
| Number of Juveniles Placed FY01: | 278 |
| Total Placed to Date: | 1,934 |
| Total FY02 Funding: | $3,338,100 |
| Average Length of Stay: | 54 Days |
| Point of Contact: | Ivonne Velasquez |
| Phone: | 520-723-7310 |

The program in Casa Grande is licensed by the Arizona Department of Health, Behavioral Health as a shelter facility. The program serves a high population of Chinese minors, as the facility is a highly secure one. The creation of the multi-cultural program in Casa Grande for both Chinese- and Spanish-speaking clients has been both challenging and very rewarding.

275.

All juveniles are given an intensive orientation packet upon arrival to the shelter care facility. This packet is available in English, Spanish and Chinese. The juveniles also participate in individual and group counseling focusing on issues relating to separation from family, cultural awareness, behavior management and community life. These sessions take into account clients' culture, language, and developmental needs.

Educational emphasis is placed on basic    English acquisition, life skills, and on effecting cultural sensitivity through the Cultural Enrichment component of the social sciences module. A multi-lingual Integrated Learning Program, comprised of seven learning modules: English as a Second Language, Social Sciences, Typing and Keyboard, Mathematics, Science, Life Skills, Humanities and Physical Education has been implemented. English classes are bilingual. Math and Science are taught in clients' native language.

All juveniles participate in exercise activities, these activities may include, but are not limited to, soccer, baseball, volleyball, basketball, dance, or other aerobic exercise. Other activities include: planting and maintaining vegetable gardens, playing Ping-Pong, "foosball", board games, and viewing videos which enhance understanding and knowledge of American culture and other cultures.

Special activities are planned on a monthly basis and        include monthly birthday celebrations and monthly graduation celebrations. Field trips are organized once a week to museums, parks, libraries, or a swimming pool. Special activities such as an on-site carnival were organized for clients, with the rental of snowball machines, cotton candy machines, dunking tanks and many other games.

Unique to Casa Grande is an on-site library has been established with reading materials available to clients in their native language. The library has been equipped with a variety of reading materials in English, Chinese, and Spanish. There has also a large purchase of over 200 video materials and an extensive collection of audio materials completes the library.

## Heartland Alliance/TIA/Chicago Connections - International Children's Center

Location:                          Chicago, IL
Service Area:                      Nationwide
Number of Juvenile Beds:           70 Shelter Care
Start Date:                        August 1995
Number of Juveniles Placed FY01:   369
Total Place to Date:               1,454
Total FY02 Funding:                $2,614,871
Average Length of Stay:            77 Days
Point of Contact:                  Hugo Ruiz
Phone:                             773-764-0526

276.

The TIA/Chicago Connections (TIA/CC) International Children's Center (ICC), is a residential shelter care program safe created to serve the needs of unaccompanied minors. The program is centrally located in Chicago, close to both the local INS District Office and O'Hare International Airport.

The children of ICC range in age from infancy to seventeen as contracted by the INS. The program is licensed by the Illinois Department of Children and Family Services (DCFS). The minors come from Asia, Africa, the Middle East, Europe and Central and South America. Regardless of their origin, all of these children crave the fundamental needs for love, a family environment, and a sense of belonging.

Fostering an atmosphere of family and security,      the program attends to the emotional, medical, educational and recreational needs of the children. At the Center, children receive healthy, culturally diverse food, as well as warm clothing and a comfortable place to live. In addition,      the children participate in educational classes including English, mathematics, social science and arts and crafts. Their recreational activities include frequent trips to the local YMCA, where the children swim and play basketball, as well as trips to Chicago's cultural museums and parks.

Due to the overwhelming numbers of children in need the program has grown 350% since the Center's August 1995 opening. As of September 30, 2001, ICC has served 1,454 clients since it's inception. The Center's staff speaks a multiplicity of languages, including the universal language of hand signals and smiles. Included among the 21 different languages spoken by the staff are Chinese, Hindi and Spanish, which are the languages spoken by the majority of ICC's children. Using their own personal experiences, the diverse staff helps the children ease through the difficult transition and insures safe passage to their families, either in the United States or their homeland.

## International Educational Services, Inc.

| | |
|---|---|
| Location: | Los Fresnos, TX |
| Service Area: | Nationwide |
| Number of Juvenile Beds: | 64 Shelter Care - 12 |
| Start Date: | FY1989 |
| Number of Juveniles Placed FY01: | 1,041 |
| Total Placed to Date: | 13,448 |
| Total FY02 Funding: | $2,879,449 |
| Average Length of Stay: | 9 Days |
| Point of Contact: | Ruben Gallegos |
| Phone: | 956-233-5705 |

In October 1988, IES opened as the first Alien Unaccompanied Minors Shelter Care Program in Los Fresnos, Texas, under a Cooperative Agreement with the U.S. Department of Justice. IES serves over

277.

1000 minors per year.    The prominent countries served are Honduras, El Salvador, Guatemala, Nicaragua, Costa Rica, Panama, and Beliz.  In addition, IES has also provided services to minors from Ecuador, Dominican Republic, Brazil, Colombia, Peru, Venezuela, Egypt, Alberia, China, India, Iran, Liberia, Macedonia, Romania, Yugoslavia, Mexico, Pakistan, Albania, Africa, and Yemen.

IES provides short and long term twenty-four (24) hour shelter care and all related child welfare services to alien female and male minors, under the age of eighteen (18). IES developed a successful program that nurtures a positive, rewarding and productive experience in a healthy, safe, caring, respectful, and home-like environment. IES offers a complete structured quality care service program for minors from all nationalities referred by INS.

## Lutheran Immigration and Refugee Service

| | |
|---|---|
| Service Area: | Nationwide |
| Number of Family Reunification Referrals: | 175 Shelter Care |
| Start Date: | FY1994 |
| Total FY02 Funding: | $565,530 |
| Point of Contact: | Susan Schmidt |
| Phone: | 410-230-2725 |

Lutheran Immigration and Refugee Service (LIRS) is the national organization which coordinates refugee resettlement and advocacy for uprooted peoples on behalf of various Lutheran church bodies in the U.S. Since 1975, LIRS has provided foster care to more than 5,000 unaccompanied refugee children through licensed foster care affiliates funded by the Department of State.  Since FY1994, LIRS has also provided foster care or family reunification services to more than 900 unaccompanied minors in INS custody.

278.

The program provides family reunion and follow-up services to Chinese minors in INS custody. In 1998, children from India were referred and more recently, children from other countries, including Sierra Leone, Armenia, Brazil, Kosovo, Somalia, and Sri Lanka, have been referred. LIRS provides the following: seeks appropriate family sponsors, conducts and reports on home suitability assessments of sponsors, provides three-months of community follow-up services for youth leaving Service custody to reunify with relatives in the U.S.

Through these services, LIRS helps to locate legitimate relatives willing and able to care for these youth, so that they are released into an appropriate family setting as soon as possible. Community-based follow-up services include regular visits and facilitation of a weekly support group, and focus on school enrollment, health care, adjustment to the home, and overall safety.

## United States Conference of Catholic Bishops/Migration and Refugee Services

Service Area:                                    Nationwide
Number of Family Reunification Referrals:        175
Start Date:                                      FY1994
Total FY02 Funding:                              $651,064
Point of Contact:                                Nathalie Lummert
Phone:                                           202-541-3114

Since the turn of the century, the Catholic Church in the United States has been engaged in the resettlement of refugees, advocating on behalf of immigrants and people on the move, and providing pastoral care to newcomers from all over the world. The United States Conference of Catholic Bishops (USCCB)/Migration and Refugee Services (MRS), resettles nearly one-fourth of all refugees admitted to the U.S. each year.

279.

Since October 1993, through participating diocesan programs, USCCB has provided family reunification services or foster care for unaccompanied minors, primarily Chinese, in the custody of          the INS. USCCB provides these services through an extensive diocesan refugee resettlement network, which includes over  100  programs  across  the  United  States  with  extensive  language  and  cross-cultural expertise. Through these services, USCCB assists minors in reuniting with their families as soon as possible. Professional case workers     provide  family  reunification  services  which  include:  seeking appropriate family sponsors, conducting suitability assessments for potential family sponsors, and providing three-month follow-up services after a minor is released from an INS facility.

Follow-up  services  include  home  visits,  assistance  with  school  enrollment,  orientation  to  the community and adjustment to the home, assistance with medical issues and legal issues, and support group services through certain programs.

280.

# JUVENILE FACILITIES
# NATIONWIDE
# BY REGION

| NAME | SEC. LEV | NO. BEDS | NO. SV'D FY 00 |
|---|---|---|---|
| WESTERN REGION | | | |
| 1. McLaughlin Youth Center | Secure | IGSA S/A (space Available) | 0 |
| 2. Los Padrinos Juv. Det Ctr | Secure | IGSA S/A (15-46 bed access) | 15 |
| 3. Central Juv. Hall | Secure | IGSA S/A (0-6 bed access) | 0 |
| 4. Clark County | Secure | IGSA | 0 |
| 5. Huachuca City Children Center | Shelter Non-Secure | Shelter overflow | 0 |
| 6. Santa Cruz Juv Det | Secure | IGSA S/A (5-6 bed access) | 0 |
| 7. SW Key Phoenix | Shelter Non-secure | 48 | |
| 8. Wittenberg Hall Juv. | Secure | IGSA S/A | 0 |
| 9. YUMA County Juv. Det | Secure | IGSA S/A | 0 |
| 10. Gila County Det Cent | Secure | IGSA S/A | 0 |
| 11. Multnomah Cty/D.E.Long. Juv. Det. Hall | Secure | IGSA S/A NEW | 0 |
| 12. Cowlitz Cty Youth Svc Center | Secure | IGSA S/A | 0 |
| 13. Klamath Cty Juv Det Hall | Secure | IGSA S/A | 0 |
| 14. Northern Oregon Correction Facility JDF | Secure | IGSA S/A | 52 |
| 15. Okanagan Cty JD | Secure | IGSA S/A | 0 |
| 16. Martin Hall JDC | Secure | IGSA S/A | 14 |
| 17. Chelan Cty JDC | Secure | IGSA S/A | 0 |
| 18. Marin Cty Juv Hall | Secure | IGSA S/A | 14 |
| 19. Hosanna Ranch—Boys/Girls | Non-Secure Shelter | 24 IGSA | 75 |
| 20. Caba San Juan | Secure | IGSA S/A | 110 |
| 21. Imperial County Juv Hall | Secure | IGSA S/A | Do Not Use |
| 22. San Diego Juv Hall | Secure | IGSA S/A (3-4 bed access) | 91 |
| 23. SW Key El CaJon | Non-Secure Shelter | 15 | |
| EASTERN REGION | | | |
| 1. Berks Cty Detention Facility | Shelter Secure (w/County) | 5 | |
| 2. Berks Cty Detention Facility | Shelter Non-Secure | 35 | |
| 3. Georgia Baptist | Shelter Non-Secure | 30 | |
| 4. Boystown, Miami, FL | Shelter Non-Secure | 32 | |
| • CENTRAL REGION | | | |
| 1. Travelers Aid, Chicago, IL | Shelter Non-Secure | 70 | |
| 2. YMCA Casa Shelter | Shelter | S/A (5 beds access) | |
| 3. Val Verde Emergeny Shelter | Shelter | S/A | |
| 4. Southwest Key, El Paso, TX | Non-Secure Shelter | 48 | |

281.

| | | | |
|---|---|---|---|
| 5.  Grandforks C. Juv. Det. Ctr. | **Secure** | S/A | |
| 6.  Cass Co. Juv. Det. Ctr | **Secure** | S/A | |
| 7.  Carver County Juv. Det. Ctr. | **Secure** | S/A | |
| 8.  Western S. Dakota Juv. Services | **Secure** | S/A | |
| 9.  SW Multi-County Corr. Dtr. | **Secure** | S/A | |
| 10.  Charter Palms Psychiatric Hos. | **Medium Secure** | S/A | |
| 11.  International Education Svc. | **Non-Secure Foster/Shelter** | 72 | |
| 12.  Catholic Charities, Houston, TX | **Non-Secure Foster/Shelter** | 22 | |
| 13.  SW Key, Brownsville, TX | **Non-Secure Shelter** | 32 | |
| 14.  Liberty Co. Juv. Det. Ctr. Liberty, TX  77575 | **Secure** | 25 | |
| 15.  Cascade County Juv. Det. Ctr. Great Falls, MT | **Secure** | S/A | |
| 16.  Yellowstone County Juv. Det. Ctr. Billings, MT | **Secure** | S/A | |
| 17.  St. Louis County Juv. Det. Center St. Louis, MO | **Secure** | S/A (1 bed access) | |
| 18.  Clay County Juv. Ctr. Liberty, MO | **Secure** | S/A (1 bed access) | |
| 19.  Jasper County Youth Det, Ctr. Joplin, MO | **Secure** | S/A (1 bed access) | |
| 20.  Johnson County Juv. Det. Ctr. Olathe, KS | **Secure** | S/A (1 bed access) | |
| 21.  Ector County Juv. Ctr. Odessa, TX | **Secure** | S/A | |
| 22.  Youth Center of the High Points Amarillo, TX | **Secure** | S/A | . |
| 23.  Reeves County Juv. Ctr. Pecos, TX | **Secure** | S/A | |
| 24.  Pooh Corner/Hastings Juv. Ctr. Hastings, Ne | **Foster** | S/A (3 bed access) | |
| 25.  Boystown/Father Flanagan's Boys Home, Grand Island, NE | **Group** | S/A (3 bed access) | |
| 26.  Douglas County, NE Social Svcs. Omaha, NE | **Foster** | S/A (3 bed access) | |
| 27.  Blackhawk Co. N. Iowa Juv. Det Svc., Waterloo, IA | **Secure** | S/A (3 bed access) | |
| 28.  Hall Co. NE Mid-Plains Foster Care, Grand Island, NE | **Foster** | S/A (3 bed access) | |
| 29.  Douglas County Juvenile Center Omaha, NE | **Secure** | S/A (3 bed access) | |
| 30.  Lancaster Attention Center Lincoln, NE | **Secure** | S/A | |
| 31.  Wayne County Juv. Ctr. Wayne, NE | **Secure** | S/A | |
| 32.  Dakota County Jail (NE) Sioux City, NE | **Secure** | S/A | |
| 33.  OMA Detention & Deportation Omah, NE | **Secure** | S/A | |
| 34.  Community Correction, Inc. Hondo, TX | **Secure** | <u>No Contract</u> | |
| 35.  The Bridge San Antonio, TX | **Foster** | No Contract | |
| 36.  Val Verde Emergency Shelter Del Rio, TX | **Shelter** | S/A | |
| 37.  Stop Child Abuse and Neglent | **Shelter** | S/A | |

282.

| 38.  Minnehaha County Reg. Det.<br>Sioux Fall, SD | Medium | S/A<br>(2 bed access) | |
|---|---|---|---|
| 39.  Carver County Juv. Ctr<br>Chaska, MN | Medium | S/A<br>(2 bed access) | |
| 40.  Western S. Dakota Juv. Services<br>Rapid City, SD | Medium | S/A<br>(2 bed access) | |
| 41.  Washington County Juv. Det. Facility,<br>Still Water, MN | Medium | S/A<br>(2 bed access) | |
| 42.  Hennipin County Juv. Det. Ctr<br>43.  Minneapolis, MN | Medium | S/A<br>(2 bed access) | |
| 44.  Bottineau County Jail<br>Bottineau, NE | Secure | S/A | |
| 45.  Ramsey County Juv. Services<br>St. Paul, MN | Secure | S/A<br>(2 bed access) | |

283.

SCANNED

# EXHIBIT 27

SCANNED

Declaration of Olvin Giovanni Arteaga Moncada

I declare as follows,

1. My name is Olvin Giovanni Arteaga Moncada. I was born in Honduras on January 6, 1985. I am 17 years old. My Alien Registration No. is A095212975.

2. I came to the United States 45 days ago.

3. I was picked up by INS in Laredo, Texas.

4. I was kept in Laredo for 3 days. I shared a room with another child from Guatemala. I was give only one sandwich per day.

5. I was transferred to La Esperanza in Brownsville where I stayed for one month. There in Brownsville I was attacked by a kid who tried to stab me with a brush. After that I was transferred to Hondo.

6. I was ordered deported while I was in Brownsville.

7. While I was in Brownsville I was handcuffed by a facility officer, because one of the other kids was acting badly. The officers threatened to take us to Houston and put us in a "real jail."

8. I was strip-searched when I was transferred here from Brownsville.

9. I often eat and have recreation with non-INS delinquent kids in this facility.

10. I don't get any schooling here. I spend most of my time confined to my room. Sometimes I go out for recreation; sometimes I don't. There is a lock on the outside of my room's door.

11. Once I was punished by being kept in my room from 10 a.m. to 6 p.m.

12. Each time I want to got to the restroom or get a drink of water. I must ask permission.

13. I am not allowed to keep anything but a Bible in my room.

284.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on July 16, 2002, at Hondo, Texas.

Olvin Giovanni Arteag Moncada

285.

I declares as follows,                                    Moncada

1. My name is Olvin-Giovanni-Artega. I was born in Honduras on January 6, 1955. I am 17 years old. My Alien Registration No is 4095262975.

2. I came to the United States 45 days ago.

3. I was picked up by INS in Laredo, Texas.

4. I was kept in Laredo for 3 days. I shared a room with another child from Guatemala. I was given only one sandwich per day.

5. I was transferred to La Esparanza in Brownsville where I stayed for a month. There in Brownsville I was attacked by a kid who tried to stab me with a brush. After that I was transferred to Hondo.

6. I was ordered deported while I was in Brownsville.

7. While I was in Brownsville I was handcuffed by a facility officer, because one of the other kids was acting badly. The officers threated to take us to Houston and put him in a "real jail."

8. I was strip-searched when I was transferred here from Brownsville.

9. I often eat and have recreation with non-INS, delinquent kids in this facility.

286.

10. I don't get any schooling here. I spend most of my time confined to my room. Sometimes I go out for recreation; sometimes I don't. There is a lock on the outside of my room's door.

11. Once I was punished by being kept in my room from 10am to 6pm.

12. Each time I want to go to the restroom or get a drink of water, I must ask permission.

13. I am not allowed to keep anything but a Bible in my room.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on July 16, 2002, at Hondo, Texas.

Olvin Geovani Arteaga Moncada
Olvin Giovanni Arteaga Moncada

Declaration of Translation

I, Tino Gallegos, declare & say as follows:

1. I am fluent in English and Spanish.

2. On this day, I translated the foregoing to the declarant, who indicated he understood the foregoing and affirmed its accuracy before signing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 16, 2002, at Hondo, Texas.

287.

SCANNED

# EXHIBIT 28

SCANNED

[RESERVED]

288.

SCANNED

# EXHIBIT 29

SWORN DECLARATION OF MATTHEW ADAMS

State of Washington   )
County of Yakima      )   ss.

Matthew Adams, being duly sworn, deposes and states as follows:

1. My name is Matthew Adams. I was born on August 2, 1971, in Hood River, Oregon. I currently reside at 919 S. 29th Avenue, Yakima, Washington.

2. I am the directing attorney for the Eastern Washington State office of Northwest Immigrant Rights Project. I have visited the Martin Hall Juvenile Detention facility (Martin Hall), outside of Spokane, Washington, on several occasions, both in my capacity of providing individual legal representation to unaccompanied alien juveniles in the custody of the INS and also for the purpose of instituting "know your rights" presentations, in conjunction with Columbia Legal Services;

3. Martin Hall is classified as a secure confinement under the terms of the Flores v. Reno settlement agreement (Flores);

4. In connection with my visits, I have come into contact with unaccompanied alien juveniles in INS custody who are non-offenders and who have been placed in secure confinement at Martin Hall under the "influx" or "flight risk" provisions of Flores;

5. Often these non-offender alien children remain in detention at Martin Hall beyond the 3-5 day temporary placement provisions of Flores. I have seen children in the custody of INS detained at Martin Hall for as long as six months;

6. Martin Hall structurally cannot accommodate any separate housing of non-offender children from juvenile offenders, and therefore non-offender alien juveniles are commingled with the general population of juvenile offenders. While most of the cells hold only one individual, at times non-offender alien juveniles are kept in the same cell as a juvenile offender from the general population.

Under penalty of perjury and pursuant to the laws of the State of Washington, I swear that the foregoing is true and correct to the best of my knowledge and belief.

By: _____   Date: __10-08-01__
Matthew Adams

Subscribed and sworn before me this 8th day of October, 2001

At Granger, WA Commission expires on 2|4|2003

_____
Signature of Notary Public

ADELA RUIZ
NOTARY PUBLIC
COMMISSION EXPIRES FEBRUARY 4, 2003
STATE OF WASHINGTON

289.

SCANNED

# EXHIBIT 30

## DECLARATION OF GENARO PEREZ-MARTINEZ

1. I was born on July 10, 1984 in Queretaro, Mexico. In July of 2001 I crossed the border because I wanted to live with father in Escondido. I lived with my father until I was arrested. My A number is A79778383.

2. On September 22, 2001, I went to a friend's house and had some liquor. When I got into the car to drive home I was arrested for driving drunk. They put me in jail in Vista. I had never been in trouble before but I was given seven days in jail. The officials told me that after jail, the immigration would take me and I would be deported. I was in the Vista Jail for a few days. I can't remember how many.

3. The officials then took me to Descanso. I was shackled to other men and put in a van. In Descano I was put in a dormitory with 25 adult men. I was told that I would be in Descanso for a few days and then be deported. When I was in Descanso, the immigration spoke to me. I told them my father lives in Escondido. They said they would send me back to Mexico after I was done with my seven-day sentence. I was in Descanso for four or five days. Most of the men in Descanso were there because of drugs and having beaten their wives.

4. After I served my sentence, the immigration picked me up. I was handcuffed and brought to San Diego with two other boys. I got to juvenile hall in the afternoon. I was taken to a room and told by an official to remove my clothes. He watched me take my clothes off. He then told me to take a shower. I was given a dark blue shirt and pants to wear. After I took a shower, I was put in a room with two others. The rooms are always kept locked. The doors have windows where the officials can see us. The first day I was there I was not given any food until the next day.

5. The next day, they woke me up at about 6:00 in the morning. I was asked whether I wanted to be in a room by myself or be with someone else. I didn't want to be alone so I chose to be with someone else. I was put in a room with a boy who smuggled drugs across the border.

6. In the morning, the doors to the room are opened and we are taken to the bathroom to wash our mouth. Two boys are taken at a time. After we wash, we are taken back to the room. About 10 or 15 minutes later, we go and eat breakfast. There are about 15 or 20 boys who eat together. We are fed a lot of sandwiches.

7. After breakfast we go back to our room for a little while. At about 8:30 we go to school until 9:30. They divide us by groups. I think it has to do with how much you know.

8. After 9:30 we go back to our room until lunch. At that time they give us lunch. We all eat lunch together. They give us half an hour to eat and then we have to go back to our rooms. We sit a long time.

290.



9. At about noon we go back to school until about 1:30. And again we go back to
   our room. After a few minutes in our room, we are allowed to go outside to play
   for half an hour. There are about 20 to 25 kids playing outside. We are then told
   to line up and we are taken back to our rooms.

10. A little while later, we are taken to the showers. Five of us at a time must take a
    shower. The shower stalls don't have doors. We get dressed and are taken back
    to our rooms.

11. At about 4 in the afternoon, we go and eat dinner. After dinner we are taken back
    to our rooms until the next morning and then it starts all over again. They don't let
    us do anything. The only thing we do is sleep or sit and stare at the wall. If we
    have to go to the bathroom, we push a button and we are let out of the room to go
    to the bathroom.

12. I have been in juvenile hall for about nine days. I have been put in different
    rooms with different kids. For three nights I was with a drug smuggler. For one
    night I was with five other kids who couldn't understand me. For the last five or
    six days I have been with four other kids. One is locked up for robbery and one
    for drug smuggling. There are two bunk beds on each side and a mattress on the
    floor. I am lucky since I have one of the beds.

13. When I first got to juvenile hall I was given a shot in the arm but no one told me
    what it was or why they did it. They haven't told me how long I will be here. I
    don't want to be here. I want to go home to my father. I have not seen him since
    September 22, 2001.

I declare under penalty of perjury, that the foregoing is true and correct.
Executed this 15th day of October, 2001 at San Diego County Juvenile Hall, California.

_____
Genaro Perez-Martinez

CERTIFICATE OF TRANSLATION

I, Tania L. Bowman, declare and say as follows:

1. I am fluent in Spanish and English
2. On this day, I translated the Genaro Perez-Martinez' declaration from Spanish to
   English.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of October 2001 in San Diego County, California.

_____
Tania L. Bowman

291.

# CERTIFICATE OF SERVICE

I am not a party to this action.  I am employed by the Center for Human Rights and Constitutional Law, 256 S. Occidental Blvd., Los Angeles, CA, 90057.  I am over the age of eighteen.

Copies of the foregoing , **Notice of Filing of Index to Exhibits and Exhibits in Support of Plaintiff's Notice of Motion and Motion to Enforce Settlement of Class Action, Volumes I-IV**, were personally served on counsel for defendants on this date at the following addresses:

Mr. Frank Travieso

Assistant United States Attorney

Federal Building, Suite 7516

300 North Los Angeles Street

Los Angeles, CA  90012

Dated: January 15, 2004

Carlos Holguin, State Bar No. 90754
*Attorney for Plaintiffs*