CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín, State Bar No. 90754
Peter A. Schey, State Bar No. 58232
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
 Fax: (213) 386-9484

LATHAM & WATKINS
Steven Schulman
555 Eleventh St., NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2184
Fax: (202) 637-2201

NATIONAL CENTER FOR YOUTH LAW
Katina Ancar
405 -14th Street, Suite 1500
Oakland, California 94612
Telephone: (510) 835-8098
Fax: (510) 835-8099

*Of counsel:*
YOUTH LAW CENTER
Alice Bussiere
417 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 543-3379
Fax: (415) 956-9022

*Attorneys for Plaintiffs*

Scan only

FILED
CLERK, U.S. DISTRICT COURT

JAN 26 2004

CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

JAN 15 2004
mm 9:15

CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

ORIGINAL

DOCKETED ON CM

JAN 27 2004

BY ___ 009

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | No. CV 85-4544-RJK(Px) |
| Plaintiffs, | NOTICE OF FILING OF INDEX TO EXHIBITS AND EXHIBITS |
| -vs- | IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND |
| TOM RIDGE, Secretary, Department of Homeland Security, *et al.*, | MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION - VOLUME III |
| Defendants | (ARGUMENT NOT REQUIRED) |

Plaintiffs hereby give notice of the filing of their Index to Exhibits and Exhibits in Support of Plaintiffs' Notice of Motion and Motion to Enforce Settlement of Class Action.  Volume III ov V contains the following exhibits:

EXHIBIT 31:    Declaration of Juan Rojas, October 15, 2001

EXHIBIT 32:    Latham & Watkins Report on Flores Compliance Inspection of Tulare County Juvenile Detention Facility (July 31, 2001)

EXHIBIT 33:    Declaration of José Wilber Hernández Segovia, October 18, 2001

EXHIBIT 34:    [Reserved}

EXHIBIT 35:    Declaration of Josué Enrique Andrade García, July 8, 2002

EXHIBIT 36:    Declaration of Denis DeLeon Martinez, May 2, 2003

EXHIBIT 37:    Declaration of Nery Amador Rodríguez Montejo, July 8, 2002

EXHIBIT 38:    Declaration of Wilbur Antonio Orillana, July 16, 2002

EXHIBIT 39:    Declaration of Walter Rodas-Hernández, July 8, 2002

EXHIBIT 40:    Immigration & Naturalization Service Juvenile Protocol Manual, Special Instruction for INS Secure Juvenile Detention Facilities, [Excerpts]

EXHIBIT 41:    Declaration of Jose Humberto Gonzales, May 6, 2003

EXHIBIT 42:    Gila County Juvenile Detention Center: Student and Parent Handbook

EXHIBIT 43:    Declaration of Carlos Hugo Pacheco, October 18, 2001

EXHIBIT 44:    Declaration of Felipe Galileo Lopez-Beltran, October 14, 1986

EXHIBIT 45:    Declaration of Jain Xing Zheng, September 14, 2001

EXHIBIT 46:    Human Rights Watch, United States Detained and Deprived Rights: Children in the Custody of the U.S. Immigration and Naturalization Service, Volume 10, Number 4(G), (December 1998)

EXHIBIT 47:    Declaration of Shiu Ming Cheer, (regarding Eugenia Sirin-Godinez), May 12, 2003

EXHIBIT 48:    Correspondence from Nguyen Van Hanh, Ph.D., July 18, 2003

EXHIBIT 49:    Reserved

EXHIBIT 50:  Declaration of Jin Rong Yiou, October 21, 2001

Dated: January 15, 2004                    Respectfully Submitted,

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW

Carlos Holguin, State Bar No. 90754
*Attorney for Plaintiffs*

///

- 3 -

SCANNED

SCANNED

# EXHIBIT 31

## DECLARATION OF JUAN ROJAS

SCANNED

1. I was born in Tepeaca, Puebla, Mexico on September 13, 1985. I have never been in trouble with the law before. Mi A number is _____.

2. On June 7th of 2001, I was stopped by police in Brawley, California for speeding. The Sheriffs arrested me. I was taken to a sheriff's station and then sent to juvenile hall in El Centro, California.

3. They kept me in El Centro until October 8, 2001. On that day, the immigration came to get me in a van. I was brought to San Diego with five women who had crossed the border. I was taken to San Diego. I was handcuffed and placed in a van and brought here to juvenile hall in San Diego, California.

4. I arrived here at about 7:30 at night. The officials searched me by touching my whole body. I was taken to the bathroom and the official asked me to undress. Then he told me to take a shower and let him know when I was finished. The showers don't have doors there are only dividers in each stall. After I took a shower, I got dressed in a uniform they gave me of dark pants and shirt. After my shower I was taken to a room with two other kids. There were two beds in the room and a mattress on the floor. I slept in one of the beds.

5. They woke me up early, about 6:30 in the morning. That day they gave food to eat in the room. They gave us a tuna sandwich to eat. The other two guys were taken someplace else and they brought in another guy into my room. They lock us in our room and we can't get out until they let us out.

6. The morning after I came in here I was taken to an office and given a shot in the arm. They didn't tell me anything but I think it was to see if I have tuberculosis. They didn't ask me if I was sick.

7. We get up at 6:30 in the morning. The officials let us out of our rooms and they line us up and take us to breakfast. We eat in a big room with about 20 to 25 kids. We are then told to line up again and taken back to our rooms. We sit in our rooms a lot with nothing to do.

8. I started to go to school yesterday at 8:30 in the morning. We go to school until 11:00 and then they line us up again and we go back to our room. We eat lunch around 11:30. We have to go back to our room as soon as we have eaten. After lunch we are allowed to go outside. About 30 kids usually play American football. We are allowed to be outside for 30 minutes.

9. At about 12:30 we go back to school again. We are in school until about 2:00 and after school we are taken to our rooms again. My room now is small. There are two beds in there and I share a room with another kid. The kid says he has a record for being in trouble but I don't know what he did.

10. We eat dinner really early. We eat about 4 in the afternoon. We get sandwiches and milk but yesterday they give us some spaghetti. They take us back to our room as soon as we eat and we are in our rooms the rest of the night. There is nothing to do there. We have no books, we don't watch TV and we have no games to play.

11. I have no family here. I lived in Los Angeles with a lady who brought me here from Mexico. They tell me I can only call her Saturday and Sunday. Saturday and Sunday they let me use the phone for about three minutes. On weekends,

292.

they let us out one hour but since there is no school, it is boring to sit all day without doing anything.

12. I have no idea how long I am going to be here. I feel like I am going to go crazy. I miss my own food and doing something else besides being locked in a room. I can't go to the bathroom unless I press a button and I am allowed to get out of the room. No one talks to me about what is going to happen to me.

13. I feel very bad being here because I don't know when I am getting out of here. I would rather be in El Centro, California. There we could see the television and go outside more often. They gave us good food.

14. I have never been in legal troubles before and I want them to let me out of here.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of October 2001 at San Diego County Juvenile Hall, California.

_____
Juan Rojas

CERTIFICATE OF TRANSLATION

I, Tania L. Bowman, declare and say as follows:

1. I am fluent in Spanish and English.
2. On this day, I translated the Juan Rojas' translation from Spanish to English.

I declare, under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of October 2001 at San Diego County, California.

_____
Tania L. Bowman

293.

SCANNED

# EXHIBIT 32

# Latham & Watkins

### ATTORNEYS AT LAW
WWW.LW.COM

505 MONTGOMERY STREET, SUITE 1900
SAN FRANCISCO, CALIFORNIA 94111-2562
TELEPHONE: (415) 391-0600
FAX: (415) 395-8095

| | | | |
|---|---|---|---|
| TO: | Gabriel Gregg<br>Peter Huston | DATE | August 13, 2001 |
| | | FILE NO. | 000011-1788 |
| FROM. | Ben Hughes, Kristen Cain,<br>Cheng-Ling Chen, Errol Hunter | COPIES TO | Steve Schulman |

SUBJECT: <u>July 31, 2001 Flores Compliance Inspection of Tulare County Juvenile Detention Facility</u>

This memo sets forth observations from our inspection of the Tulare County Juvenile Detention Facility on July 31, 2001. We toured the facility and interviewed INS district staff, Tulare County Probation Department staff, and detained INS minors to determine whether the INS was fulfilling its obligations under the Flores Agreement.

**Our most significant finding is that the facility is in gross violation of *Flores'* "least restrictive setting" requirement.**

## I. THE TULARE JUVENILE DETENTION FACILITY

The Tulare Juvenile Detention Center (the "Facility") is a secure facility for adjudicated delinquent minors. Mr. Pat Aldrich is the Superintendent of the Facility. The Facility contracts with the INS to house minors detained by the INS. The per diem for each minor is $180.00.

The Facility presently has the capacity to house 360 minors in six separate "Pods" of 60 beds each. INS minors are housed in one of these pods, and are separated from the adjudicated delinquent minors. The Facility does not commingle INS minors with adjudicated juvenile delinquents.

### A. The Physical Facility

The Facility is an extremely high security facility. We passed through several secured entrances to arrive at the "INS pod" where INS minors are housed. The perimeter of the facility is surrounded by razor wire, and the Facility operates like a high security jail. We passed though a metal detector and our bags were searched upon entry, and we were advised to remain calm in the event of a security emergency. The INS pod is physically the same as all other pods in the Facility, and although the children are allowed some freedom of movement within the pod itself, it is a highly secure prison environment with no windows.

BOSTON • CHICAGO • FRANKFURT • HAMBURG • HONG KONG • LONDON • LOS ANGELES • MOSCOW • NEW JERSEY • NEW YORK • NORTHERN VIRGINIA
ORANGE COUNTY • SAN DIEGO • SAN FRANCISCO • SILICON VALLEY • SINGAPORE • TOKYO • WASHINGTON, D.C.

SF DOCS\302141 1 [W97]                                    08/31/01 000011-1788

294.

1.    The Bedroom/ Bathroom

Each "bedroom" is an 8 ft. by 12 ft. cell equipped with a metal toilet, sink, mirror and bed. The door to each cell has a window for observation by Facility staff which cannot be closed, even while the minor uses the toilet. The showers are located in a common area and are also subject to observation. Both the toilet and the showers look clean.

According to Facility staff, fresh clothing and towels are provided daily and fresh bedding every third day. They also provide toothpaste, a toothbrush, soap, a brush, deodorant, lotion and other common bathroom amenities.

The Facility allows minors to keep in their rooms only those possessions that the Facility provides or items made during arts and crafts. All personal possessions are stored elsewhere, and allegedly returned to the minor upon deportation.

2.    The Living Area

Boys and girls live in separate quarters consisting of several bedrooms opening into a common living area. Each of these small living areas has a few tables and chairs, and the shower is located in the corner of this area. The areas have been decorated by the children with paper cutouts and origami, but are otherwise drab and windowless. These small living areas open into the main lobby of the pod, which has a guard stand and doors to the classroom, the recreation area, the visitation rooms and the pod exit.

3.    The Classroom

The classroom appeared clean and well-lit, although it had no windows. It was equipped with computers with internet access and the normal classroom appurtenances. The teacher spoke with us and appeared to be sensitive to the linguistic and cultural needs of her students. She said that the classroom curriculum focuses on language skills, but also provides significant instruction in high-school level subject areas. Minors may earn credit toward their high school equivalency, and the Facility maintains transcripts and records for the minor's later use.

Instruction is in English. If the teacher is having serious problems communicating with a student, she will use AT&T translation services via telephone.

4.    The Kitchen/ Dining Room

The Facility prepares its own meals in its kitchen, which looked clean. The Facility provides three meals per day and makes a special effort to provide white rice to Chinese INS minors instead of the default Spanish rice. There is no dining room, and INS minors eat their meals in the common living area.

SF DOCS\302141 1 [W97]                08/31/01  000011-1788

295.

5.      The Recreation Area

The recreation area was a small triangular concrete area in the pod. There was no grass or greenery in sight, nor any windows in the recreation area to the outside. Sunlight is admitted through the metal grating over the top of the recreation area.

Recreation includes games such as ping-pong, badminton and an exercise program similar to a high school physical education class. According to Mr. Aldrich, recreation lasts for approximately two to three hours each day. Minors do not watch television on a regular basis, if at all.

B.      Security

According to Mr. Aldrich, there is one security staff member for every ten minors. In addition to the security staff members, there are also staff members who provide educational, medical, dental, psychological, laundry and cooking services.

Although INS minors are subject to the same disciplinary rules and regulations as other minors housed in the facility, some restrictions are relaxed for them. For example, they are allowed to use scissors for arts and crafts.

C.      Transfer, Arrival and Processing of INS Minors

The INS transfers minors to this Facility once a final order of deportation has been issued, regardless of whether the minor has appealed the decision. Once the INS transfers a minor to this Facility, he or she will remain at the Facility until deportation.

When a minor arrives at the Facility, he or she is strip-searched by a staff member of the same gender. There is no exception for INS minors. Each minor then takes a shower and receives a routine medical examination.

Upon arrival, minors are also informed of the strict, regimented schedule of the Facility and notified of the policies and procedures.[1]

INS minors' stay at this Facility ranges from days to months. However, it is difficult to estimate an average time of detention at this point because the Facility only started contracting with the INS to house minors a few months prior to our visit.

D.      Visitation Policy

For INS minors, the Facility will allow attorneys and others who have been approved by the INS to visit. Attorneys may visits minors during business hours. Attorney visits can last as long as needed, but seldom exceed fifteen to twenty minutes. Normally the Facility

---

[1]      Attached hereto as attachment A are copies of the Daily Schedule as well as the Policy and Procedure Notification.

296.

staff monitors all meetings, but upon request by the attorney the meetings may be private and unmonitored.

The Facility has a visiting room for each living area where a glass window separates the minor from the visitor. But the Facility allows the attorneys of INS minors to visit within the living area itself, thereby having physical contact with the minor. Minors do not wear restraints during visits.

Contact visits do not trigger strip-searches. Strip-searches only occur upon the minor's entering the Facility. However, as a general procedure, staff members "pat-down" each minor at regular intervals throughout the day.

E.      Discipline

The Facility disciplines minors by depriving them of privileges that they did not "earn." Such discipline does not include corporal punishment, withholding of food, or deprivation of clothing, bedding or items of personal hygiene. But the Facility will deny telephone privileges (except for attorney calls), limit recreation participation, or place a minor in "lock-down." A minor placed in lock-down is locked in his or her room alone for the remainder of the day and let out the next morning.

Facility staff reported that the INS minors are much less challenging to house than the adjudicated juvenile delinquents normally housed at the Facility, and discipline was not a major problem.

F.      Telephone Privileges

According to Facility staff, minors are permitted to use the telephone at any time to call attorneys and at scheduled intervals for other calls. All phones in the living area had a dial tone when we picked up the receivers. There are four domestic telephone lines and one telephone for international calls in the living area. Indigent minors must call collect for domestic calls, and obtain a calling card for international calls. The Facility does not monitor international telephone calls, but we are uncertain whether domestic calls are monitored.

G.      Medical Care

The Facility provides minor and non-invasive medical services, and will transfer a minor to a local hospital for any service that the Facility cannot provide. According to Mr. Aldrich, the Facility maintains 24-hour medical care. A nurse is always on duty, and doctors are on call when not at the Facility. Counseling services are also provided, and the Facility has approximately four to six mental health service professionals.

The medical area is separate from the INS pod and serves all minors in detention at the Facility. All minors, including INS minors, are transported to and from the medical area in handcuffs. The medical area appeared to be clean.

4

## II. INTERVIEWS WITH INS STAFF

Two INS district representatives were present during our visit to the Facility. Michelle O'Brien, Deportation Officer and District Juvenile Coordinator, was present from Los Angeles, and Cecyle J. Andrews, Deportation Officer, was present from San Francisco. Kristen Cain spoke with both women for about 30 minutes. The following are highlights from their conversation:[2]

A.    Transfer to Secure Facility

Both Ms. O'Brien and Ms. Andrews admitted that the minors were not in the secure Tulare Juvenile Detention Facility for any behavioral or disciplinary reasons. Although Ms. Andrews "has 300 beds available" in the San Francisco area, it is her practice to transfer minors with a "Final Order" to the Facility to await deportation. Ms. O'Brien does the same, and may also transfer minors without a final order if a lack of bed space in the Los Angeles area requires it. There were a few minors housed in the Facility during our visit for this reason.

Ms. Andrews and Ms. O'Brien say they inform the minors of the reasons for their placement in the Facility, and the minors are also issued a "Notice of Secured Placement," which lists reasons for placement in a secure facility such as "influx" (if there is just not enough space in a less secure facility, as is currently the case in Los Angeles) or "Final Order of Deportation." They are also issued a Notice of Judicial Review so they can seek judicial review of their placement. Both Ms. O'Brien and Ms. Andrews admitted that no evaluation of a minor's conduct is made before he or she is placed at the Facility. Both women seem to believe that a final order of deportation is enough of a flight risk to justify the transfer. Ms. Andrews said there are no "less restrictive alternatives" for minors with final orders.

B.    Minors' Attorneys

Ms. Andrews and Ms. O'Brien both reported that all minors currently in custody at the Facility are represented, and that most Chinese minors in INS custody at any given time are already represented even before they are detained. Both women expressed distrust of these attorneys, and believe that the lawyers are connected to smuggling operations.

C.    "Special Population" & Home Assessment.

"Special population" includes Chinese and Indian aliens. Even if a true parent for a special population minor is verified by the INS, the minor will remain in custody until the "home assessment" is completed. This is performed by the INS at the home office.

---

[2]    Attached hereto as attachment B is a copy of the worksheet Kristen filled out as she interviewed Ms. O'Brien and Ms. Andrews.

08/31/01  000011-1788

298.

D.    Possessions

        Both women reported that luggage and most other possessions of a detained minor were stored at the district offices when the minor is transferred to Tulare. The minor is supposed to be reunited with their possessions at the airport on the way out of the United States. Things left in the United States are "timely sent" to the minors' home country.

E.    *Flores* Compliance

        No formal mechanism exists for reporting of *Flores* compliance. Both Ms. Andrews and Ms. O'Brien say they are aware of *Flores*, receive training about it, and comply on a daily basis.

F.    Visiting the Facility

        Both Ms. Andrews and Ms. O'Brien say they try to visit the Facility once a week, and are in constant communication with each other so that if one cannot make the trip, the other will "cover" for her.

## III. INTERVIEWS WITH MINORS DETAINED AT THE FACILITY

        There were eleven INS minors in custody at the Facility on the date of our inspection visit. All eleven were from the Fujian region of China. Their ages ranged from fifteen to eighteen. Cheng-Ling Chen and Ben Hughes interviewed six of the minors detained at the facility. Four children were interviewed by Ben and Cheng-Ling alone, and two were interviewed with the participation of Carlos Holguin of the Center for Human Rights and Constitutional Law ("CHRCL"). All six children were asked about conditions at the Facility and their treatment there, and two children were interviewed in depth about the circumstances which led to their detention at the Facility.

A.    Facility Conditions

        The minors reported that the Facility was generally clean, including their individual cells. They did complain that their food was sometimes served on dirty plates, however.  In addition they expressed displeasure that the window in the door of their cell cannot be covered up when they are using the toilet in their cell.

        There are no windows in the Facility, which some minors found depressing.  They also noted that the small enclosed recreation area is too small, but said they enjoyed playing badminton, ping pong, and basketball.  They said they spend about spend two hours a day in recreational activities.

B    Arrival Procedures

        When they first arrived at the Facility, the minors were strip-searched by a staff member of the same gender.  They were given clothing (jeans and a plain, beige-colored T-shirt), and their possessions were taken away for storage.  They are allowed to keep a few items (pencils, books) in their cells

6

C.    Educational Services

The minors attend classes together for at least 240 minutes a day. They said they generally enjoy the classes and like their teacher. They do not seem to like their substitute teacher, who uses "time-out" (where they are locked in their cells) as punishment too often. The classes are taught in English, but they help each other understand if one student is having difficulty.

D.    Telephone Access, Visitation and Correspondence

The children are allowed access to the telephone only three days per week, and for five or six minutes at a time. To make long distance calls, they must use their own calling cards, which are sent to them by relatives. They minors cannot receive outside calls except from their lawyers.

None of the minors we interviewed had ever been visited by family members or by their attorneys. This may be due to the remote location of the facility. Several minors who had been detained in other areas of the country such as New York or Miami had relatives who lived in those areas, but their relatives were unable to visit them after they were moved to the Facility. The only visits to the Facility reported by the minors were by local religious clergy.

The minors may receive mail, but the contents are searched. For some reason, the stamps are also removed.

E.    Discipline

As punishment for violation of the many rules and regulations of the Facility, the minors are locked in their individual cells for the remainder of the day. They are not released from this solitary confinement until the following morning. During this time, they must eat meals alone in their room, and all materials including bedding are removed from the room. They are not allowed to come out of their cells for classes or recreation.

On one occasion, the entire group was disciplined by solitary confinement because they were all tired of participating in the physical education program. Usually, however, the punishment is for failing to do assigned chores or homework. None of the minors reported receiving or witnessing corporal punishment while at the Facility.

F.    Medical Care and Counseling

Very few of the minors we interviewed had sought medical treatment at the Facility. One reported that she had visited the doctor for a stomach flu, and she complained that the doctor simply gave her aspirin and sent her back to her cell. She also reported that she was restrained at the hands and ankles during her visit to the doctor.

Although most of the minors were interviewed seemed sad and somewhat bewildered as to why they were being detained in such a high security facility, very few of the minors have received any counseling. The Facility does not provided regular counseling, and

7

300.

none of the minors we interviewed had ever been to see a counselor. One mentioned that counseling was provided over the phone.

G.   Food

The minors get three meals a day plus a snack in the afternoon. In general the minors were not enthusiastic about the food, and two of them complained that there was not enough to eat. Others said that the Facility provided sufficient food and that the diet was balanced.

H.   Minors Interviewed

All minors interviewed were from the Fujian province of China. They all spoke Mandarin Chinese and a limited amount of English.

**Yiou Jin Rong** is a fifteen year old girl who has been at the Facility for five months. She was first arrested by the INS in Honolulu, where she spent two days in INS custody before being transferred to the Facility. Her lawyer is in Los Angeles, and she has met with him once or twice. Her brother is also at the Facility.

**Jin Mei Huang** is a seventeen year old boy. He was first detained in Georgia, where he spent eight days in jail after he was first caught. His lawyer is in Pennsylvania.

**Wendy Zheng** is a seventeen year old girl who has been at the Facility for almost two months. She was detained in Miami for nine months and Chicago for three months before coming to the Facility. Her lawyer is in Miami. She spent two days at the INS when she was first detained.

**Lisa Yu** is a sixteen year old girl who has been at the Facility for three months. She was detained in Pennsylvania before coming to Tulare. When she was first detained, she spent one night at the INS. Her lawyer is in Utah. She has never met her lawyer.

The following two girls were interviewed in depth with the participation of CHRCL lawyer Carlos Holguin:

**Xiang Chen** is seventeen. Her birthday is March 26, 1984, and her Alien number is 77920848. She arrived at the Facility on July 27, 2001, only a few days before our visit. She was detained for eight months in Miami, and then lived for six months in New York with an aunt. While living in New York, she reported regularly to the INS, but was detained and sent to the Facility on her most recent visit, apparently because she received her final order of deportation. She was allowed to call her aunt prior to being sent across the country to the Facility, but has no idea why she is being detained. She does not know the status of her asylum appeal, whether she will be returned to China, or how long she will be detained at the Facility.

**Zhaoxia Lin** is sixteen. Her birthday is March 20, 1985, and her Alien number is 77297916. She has been at the Facility for five months. She was held for eleven days at the Los Padrinos detention facility in Los Angeles after her initial arrest. Prior to coming to Tulare, she spent one year at Hosanna Homes, a low security INS facility in the San Francisco area.

8

30 l.

Although she never attempted to escape and never had any disciplinary problems at Hosanna, she was transferred to the high security Facility when she received her final order of deportation five months ago and has been waiting to be deported since that time.

## IV. VIOLATIONS OF THE *FLORES* SETTLEMENT

### A.  Requirement That Minors Be Detained in the Least Restrictive Setting

Paragraph 11 of the *Flores* Settlement (the "Settlement") states that "the INS shall place each detained minor in the <u>least restrictive setting</u> appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others." Ms. Andrews justified the detention of these minors by stating that, as a matter of policy, all minors with final orders of deportation were considered flight risks and sent to the Facility until deportation.

Under Paragraph 21 of the Settlement, "a minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility... whenever the District Director or Chief Patrol Agent determines that the minor... is an escape-risk." Escape risk is defined in Paragraph 22 of the Settlement as "a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether: (a) the minor is currently under a final order of deportation or exclusion; (b) the minor's immigration history includes: (i) a prior breach of a bond; (ii) a failure to appear before the INS or the immigration court; (iii) evidence that the minor is indebted to organized smugglers for his transport; or (iv) a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion; or (c) the minor has previously absconded or attempted to abscond from INS custody."

Therefore, while a final order of deportation may be one factor to consider in determining whether a minor is a flight risk, it should not trigger an automatic transfer to a high security detention center such as the Facility in the absence of other factors. None of the children we interviewed had ever had any disciplinary problems while in the custody on the INS. Several had been detained in low or medium security facilities such as Hosanna Homes in the San Francisco area, and none had ever attempted to escape. One girl had lived with family members and reported regularly to the INS prior to being sent to the Facility. In short, there is no indication that any of the minors we interviewed needed to be detained in this high security, prison-like Facility in order to ensure their appearance before the INS or the immigration court.

The INS may also detain a minor in a high security facility under Paragraph 21 of the Settlement if the INS determines that 'he minor "must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees." However, Ms. Andrews has repeatedly noted that the low security Hosanna Homes facility is protected from smugglers because of its undisclosed location and the many precautions taken by the INS to ensure the safety of the minors detained there. To our knowledge, there have been no incidents involving threats to children detained at Hosanna Homes. Furthermore, both Ms. O'Brien and Ms.

9

08/31/01  000011-1788

302.

Andrews explicitly stated that the children detained at the Facility were transferred to the Facility because they had received their final deportation orders, not because of threats to their safety.

Paragraph 23 of the Settlement provides that "the INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program." Clearly, other less restrictive alternatives exist for these children. Since all determinations to place a minor in a secure facility are reviewed and approved by the regional juvenile coordinator, this decision is largely at the discretion of Ms. Andrews and Ms. O'Brien.

B.    Failure to Release Children To Family Members or Less Restrictive Setting

Under Paragraph 14 of the Settlement, "where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to: (a) a parent; (b) a legal guardian; (c) an adult relative (brother, sister, aunt, uncle, or grandparent); (d) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship; (e) a licensed program willing to accept legal custody; or (f) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."

Under Paragraph 18, "upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody."

Both Ms. Andrews and Ms. O'Brien confirm that the minors detained at the Facility on the ground that they have received final orders of deportation will be held at the Facility until they are deported, even if the process takes several months (as it usually does for deported Chinese minors). They are making no efforts to reunite these children with family members in the United States or to place them in less restrictive settings.

C.    Problems at the Facility

Given that these minors should not be detained at the Facility under the Settlement, there are other problems with the facility itself which should be noted.

1.    Lack of Privacy

The doors to the rooms have a long, slanted window designed for the observation of juvenile detention center inmates. This window cannot be closed when the children use the toilet in their rooms. The communal showers are also in plain view of staff and other children, although the doors do seem to block an observer's view of the torso. As a matter of Facility

10

303.

policy, staff are required to observe detainees every fifteen minutes. This intrusive policy may be appropriate for minors who have exhibited dangerous or self-destructive behavior, but it does not seem necessary for INS detainees with no demonstrated behavioral or psychological problems.

2.     Access to Telephone

According to the children we interviewed, the Facility allows minors access to the telephones only three days per week and for five minutes per child. They must call collect for domestic calls and use calling cards for international calls.

3.     Use of Shackles

Children are transported to their medical appointments in ankle shackles and handcuffs which attach to a waist belt. This is unnecessary for children who have not demonstrated any violent or disruptive behavior.

4.     Strict Disciplinary Regime

Children must line up between activities with their hands behind their backs and walk single file between the classroom, the living area and their rooms. They are subjected to the same strict rules of discipline as the adjudicated juvenile delinquents housed at the Facility.

SF_DOCS\302141.1 [W97]                                                                        08/31/01 000011-1788

304.

# Tulare County Probation Department
## Juvenile Detention Facility
## Policy and Procedure Notification

**Injury/Abuse:**
The process of booking a minor into the Juvenile Detention Facility has many purposes. Once a law enforcement agency decides to process an individual into the Juvenile Detention Facility we must ascertain that a minor can be detained safely, and that there is no need for emergency medical treatment. California Law also requires that child abuse situations be reported to Child Protective Services and/or the Juvenile Court Judge. Therefore, if you have any of the following injuries, please indicate these to the booking officer while you are being processed into the Juvenile Detention Facility

| Yes | No | Minor's Initials | |
|-----|----|----|----|
| ___ | ___ | ___ | 1. Do you have any injuries and/or conditions that need to be reported at once so that medical attention can be obtained immediately? |
| ___ | ___ | ___ | 2. Do you have any bruises, cuts and/or abrasions that you wish to report to the booking officer? |
| ___ | ___ | ___ | 3. Do you believe that the items listed in #two need medical attention at this time? |
| ___ | ___ | ___ | 4. If you have any abrasions, cuts and/or injuries at this time, how were they inflicted upon you? |
| ___ | | | 5. Were any of the above stated injuries inflicted by law enforcement agency personnel, your parents and/or any other individual? Please indicate the person's name: _____ |
| ___ | ___ | ___ | 6. Are there medical information and/or abuse information you wish to report to the booking officer at this time? |

☐ **Pepper Spray/Razor Wire:** (✓ when completed)

I have been advised the pepper spray (o.c.) is used at the Juvenile Detention Facility to control, restrain or subdue imminent or actual violent behavior. I have been advised that if I hear the commands *cover, Pepper Spray, or O.C.* I am to get into the *cover* position which has been explained to me.

I have also been advised the Juvenile detention Facility buildings and fences are surrounded by razor wire which is very sharp. Any attempt to climb over or around the razor wire is extremely dangerous and will result in serious bodily injury.

**Continuum of Restraint Procedure:** (✓ when completed)

| | |
|---|---|
| ☐ Staff Presence | Staff will constantly monitor individual and group activity and report any unusual or suspicious behavior. |
| ☐ Verbal Intervention | May involve an on the spot correction, a specific directive or a time out. Will never involve profanity, name calling, or degrading or humiliating statements. |
| ☐ O.C. Pepper Spray | May be used when staff believes that a lower level of force may result in the injury of staff and/or minors. |
| ☐ Physical Restraint | Will be used to prevent injury to staff, minors or others, to prevent substantial property damage, to prevent escape and when a minor's refusal to obey an order disrupts the functioning of the Juvenile Detention Facility. |
| ☐ Mechanical Restraint | Will only be used as a temporary measure and only with that force necessary to control the minor. Will be used when a minor is out of control and the minors' behavior could cause bodily injury to themselves. Or others. The methods of mechanical restraint may include handcuffs, leg restraints, the restraint chair or a safety helmet. |

☐ **No Hostage Policy:** (✓ when completed)
The Juvenile Detention Facility has a *No Hostage Policy.* Staff, visitors, wards, inmates, etc. Will not be recognized as hostages for bargaining purposes. The department will do all that is reasonable to resolve a hostage situation without injury to anyone. You will not be released to protect the property and/or lives of another person.

☐ **Notification ' ) Female Minors:** (✓ when completed)
W & I Codes 220 and 222 are posted in PODS 1 C & D on the bulletin board. This provides you with the required access to information on abortions.

**Procedures to be explained:** (✓ when completed)
☐ Facility Rules and Disciplinary Procedures   ☐ Grievance Procedure   ☐ Correspondence, Visiting and Telephone Use ☐ Availability of Personal Care Items and Opportunity for Personal Hygiene   ☐ Access to Legal Services   ☐ Availability of Reading Materials, Programs and Activities   ☐ Housing Assignment

_____   _____   _____   _____   _____   _____
Minor's Signature        Date        Interpreter's Signature        Date        Staff Signature        Date

305.

# DETAINEE RULES OF CONDUCT

1. PARTICIPATE IN THE JUVENILE DETENTION FACILITY PROGRAMS AND ACTIVITIES, IF PHYSICALLY CAPABLE.  (Minor's Initials _____)

2. CLOSELY FOLLOW ALL INSTRUCTIONS GIVEN BY STAFF AT ALL TIMES. FOLLOW ALL SAFETY RULES AND PROCEDURES ESPECIALLY WHEN EMERGENCY SITUATIONS OCCUR.   (Minor's Initials _____)

3. ALWAYS BE POLITE AND RESPECTFUL TOWARDS STAFF AND DO AS YOU ARE TOLD, EVEN IF THEY ASK YOU TO DO SOMETHING YOU DO NOT WANT TO DO.     (Minor's Initials _____)

4. SHOW RESPECT FOR JUVENILE DETENTION FACILITY PROPERTY; DESTROYING, DEFACING OR DAMAGING ANY COUNTY PROPERTY IS AGAINST  THE RULES.   (Minor's Initials _____)

5. RESPECT THE PROPERTY OF OTHERS.  TAKING THINGS THAT DO NOT BELONG  TO YOU IS THEFT AND IS AGAINST THE RULES. (Minor's Initials _____)

6. MAKING PLANS FOR, ASSISTING IN, OR ATTEMPTING TO ESCAPE FROM THE JUVENILE DETENTION FACILITY IS NOT PERMITTED.  (Minor's Initials _____)

7. MAKING OR POSSESSING WEAPONS, OR ITEMS THAT COULD BE USED FOR ESCAPING IS PROHIBITED.  POSSESSING DRUGS AND/OR TOBACCO IN ANY FORM IS PROHIBITED.   (Minor's Initials _____)

8. KEEP ONLY THINGS STAFF PERMITS YOU TO HAVE IN YOUR ROOM. POSSESSION OF ITEMS LIKE PENCILS, MARKERS, TATTOO KITS, AND EXTRA CLOTHING IS PROHIBITED. (Minor's Initials _____)

9. HARMING OR THREATENING TO HARM YOURSELF IS UNACCEPTABLE BEHAVIOR   (Minor's Initials _____)

10. FIGHTING OR ARGUING WITH OTHER DETAINEES OR STAFF IS AGAINST THE RULES. (Minor's Initials _____)

11. KEEP YOUR LANGUAGE CLEAN.  BE POLITE TOWARDS OTHER DETAINEES, AND REFRAIN FROM USING PROFANITY OR THREATENING WORDS.  (Minor's Initials _____)

12. WHEN GOING ANYWHERE IN THE JUVENILE DETENTION FACILITY, WALK WITH YOUR HANDS BEHIND YOUR BACK AND BE QUIET.   (Minor's Initials _____)

306.

# DETAINEE RULES OF CONDUCT CONT'D

13. STAY IN YOUR OWN ROOM. GOING INTO ANOTHER DETAINEE'S ROOM IS AGAINST THE RULES.   (Minor's Initials _____)

14. GAMBLING IN THE JUVENILE DETENTION FACILITY IS NOT ALLOWED. USING FOOD OR ANY OTHER ITEM TO PAY GAMBLING DEBTS IS PROHIBITED. NO TRADING OR GIVING OF FOOD IS PERMITTED. (Minor's Initials _____)

15. STAY AWAY FROM GANG ACTIVITY. USING GANG TALK, GESTURES, SLOGANS, SIGNS OR DRESS IS UNACCEPTABLE BEHAVIOR. (Minor's Initials _____)

16. PARTICIPATE IN DAILY HEALTH, HYGIENE AND MEDICAL PROGRAMS ( I.E., SHOWERING, BRUSHING YOUR TEETH, CHANGING YOUR CLOTHS, TAKING MEDICATION FROM THE NURSE, ETC.).  _____)

17. CLEAN YOUR ROOM EVERY DAY, AND HELP KEEP THE UNIT CLEAN. (Minor's Initials _____)

18. EAT YOUR MEALS PROPERLY. MAKING A MESS, THROWING FOOD, TALKING, OR MAKING NOISES IS NOT ALLOWED. CLEAN UP AFTER YOURSELF FOLLOWING A MEAL. (Minor's Initials _____)

19. GO TO SCHOOL, AND FOLLOW THE TEACHER'S INSTRUCTIONS. BEING DISRUPTIVE WILL LEAD TO DISCIPLINE.   (Minor's Initials _____)

20. WHEN YOU HEAR THE COMMAND "COVER", YOU MUST IMMEDIATELY GET IN THE COVER POSITION. YOU MUST HOLD THIS POSITION UNTIL FURTHER DIRECTION IS GIVEN BY STAFF. DRILLS ARE CONDUCTED BY STAFF EACH DAY TO MAKE SURE YOU KNOW HOW TO COVER. FAILURE TO COMPLY WITH THE "COVER" COMMAND, AND TO STAY IN THE "COVER" POSITION AUTHORIZES STAFF TO USE O.C. SPRAY WHEN APPROPRIATE. ALSO A DETAINEE'S FAILURE TO COMPLY WITH THIS COMMAND MAY RESULT IN ROOM CONFINEMENT. (Minor's Initials _____)

| _____ | _____ | _____ | _____ |
| Minor's Signature | Date | Staff Signature | Date |

cr:detainee rules of conduct06/00

307.

## Pod-2
# JDF DAILY SCHEDULE
**6-2 SHIFT**        **MONDAY - FRIDAY   FOR UNIT-A**

| | |
|---|---|
| 6:00 - 6:40 | SET-UP FOR THE SHIFT / BRIEF WITH 10-6 OFFICER./ PERIMETER CHECK / HEAD COUNT. |
| 6:45 - 7:00 | WAKE UP MINORS / WASH UP / INSTRUCT MINORS TO MAKE THERE BEDS. |
| 7:05 - 7:35 | BREAKFAST / CLEAN-UP DAY AREA. |
| 7:45 - 8:35 | HAVE ALL MINORS CLEAN / TOILETS / SINKS / SPRAY WALLS / SWEEP ROOMS AND HYGIENE. OFFICER BREAK. |
| 8:40 - 10:00 | SCHOOL / OFFICER ROTATE BREAK / AT LEAST ONE OFFICER IN SCHOOL AT ALL TIMES. CELL & UNIT INSPECTION |
| 10:00 - 10:10 | SCHOOL BREAK / HEAD CALLS |
| 10:15 - 12:00 | SCHOOL / CHECK FOR ANY MAINTENANCE PROBLEMS / STOCK UP ON SUPPLIES SUCH AS, PAPERWORK / TOILETRIES / CLOTHING / WRITING MATERIALS AND ETC.  ROTATE OFFICER BREAK. |
| 12:05 - 12:35 | LUNCH / CLEAN-UP / HEAD CALLS |
| 12:40 – 2:00 | SCHOOL / OBS / SET-UP SHOWER SUPPLIES / SET-UP PAPERWORK FOR 2-10 SHIFT/BRIEF 2-10 STAFF / CLOSE SHIFT REPORT /  COUNT MINORS AND PENCILS RIGHT BEFORE YOUR SHIFT  IS OVER. |

308.

# Pod-2
## JDF DAILY SCHEDULE
### MONDAY – FRIDAY FOR UNIT-A/ 2-19 TO 2-23

SCANNED

**2-10 SHIFT**

| | |
|---|---|
| 2:00 - 3:00 | SCHOOL / SET-UP FOR YOUR SHIFT / HEADCOUNT/BRIEF WITH THE 6-2 OFFICER / COUNT PENCILS / START YOUR PAPERWORK AND DO YOUR PERIMETER CHECK. |
| 3:05 - 4:00 | PT AND OUTSIDE-REC |
| 4:05 - 4:35 | DINNER / CLEAN-UP / HEAD CALLS / FIRST OFFICER BREAK |
| 4:45 - 6:00 | SECOND OFFICER BREAK / HOMEWORK FROM SCHOOL / COUNT PENCILS. |
| 6:00 - 7:00 | OUTSIDE-REC OR MATT REC |
| 7:OO - 8:00 | SHOWERS / REC / LETTERS / PHONES / CHURCH ON TUESDAY NIGHTS. OFFICER BREAK. COUNT PENCILS. |
| 8:00 - 9:00 | DIRECTED OR STRUCTURED ACTIVITY SECOND OFFICER BREAK. |
| 9:00 – 10:00 | BED-DOWN / HYGIENE / OBS / SET-UP PAPERWORK FOR 10-6 SHIFT / BRIEF 10-6 OFFICER. |

309.

# POD-2
## JDF SATURDAY SCHEDULE

6-2 SHIFT

| | |
|---|---|
| 6:00 - 6:40 | SET-UP FOR THE SHIFT / BRIEF WITH THE 10-6 OFFICER / PERIMETER CHECK / HEADCOUNT  AND  COUNT YOUR PENCILS. |
| 6:45 - 7:00 | WAKE-UP MINORS / WASH UP / INSTRUCT MINORS TO MAKE THERE BEDS. |
| 7:05 - 7:35 | BREAKFAST / CLEAN UP DAY AREA. |
| 7:45 - 9:30 | MAJOR CLEAN UP OF THE UNIT / LEAD DAY AREA / OUTSIDE-REC AREA / MOP ALL CELLS / UNIT / CLEAN WINDOWS / SHOWERS / TRASH CANS / TABLES / STAIRWAYS AND ETC. OFFICER BREAK /  OFFICER ROTATE BREAK |
| 9:35 - 11:00 | PT / OUTSIDE REC |
| 11:00 - 12:00 | DIRECTED OR STRUCTURED ACTIVITY. OFFICER BREAK. |
| 12:05 - 12:35 | LUNCH / CLEAN UP |
| 12:40 - 2:00 | LETTER WRITING / PERSONALS / PHONE CALLS / SECOND OFFICER BREAK / OBS / SET UP SHOWER SUPPLIES / SET UP PAPERWORK 2-10 / BRIEF STAFF 2-10 / COUNT MINORS / PENCILS AND CLOSE YOUR SHIFT REPORT. |

310.

# POD-2
## JDF SATURDAY SCHEDULE

2-10 SHIFT

| | |
|---|---|
| 2:00 –2:30 | HEADCOUNT / START PAPERWORK / HEAD CALLS / COUNT PENCILS / BRIEF WITH 6-2 OFFICER |
| 2:30 - 4:00 | OUTSIDE-REC OR MATT REC |
| 4:05 - 4:35 | DINNER / CLEAN UP / HEAD CALLS / OFFICER BREAK |
| 4:40- 5:45 | HOMEWORK / ACTIVITY / SECOND OFFICER BREAK |
| 5:50 - 7:15 | OUTSIDE-REC / PT / OFFICER BREAK |
| 7:20 - 8:20 | SHOWERS / REC / PHONES / LETTERS / SECOND OFFICER BREAK |
| 8:25 - 9:45 | VIDEO FOR SATURDAY NIGHT CLUB (CLEAR THROUGH THE I.S.) OBS / COMPLETE ALL PAPERWORK. |
| 9: 45- 10:00 | BED- DOWN / HYGIENE / HEADCOUNT / COUNT PENCILS / CLOSE SHIFT REPORT AND BRIEF WITH 10-6 STAFF. |

311.

# POD-2
## SUNDAY SCHEDULE

## 6-2 SHIFT

| | |
|---|---|
| 6:00 - 6:40 | BRIEF WITH 10-6 STAFF / HEADCOUNT / COUNT PENCILS / START PAPERWORK / PERIMETER CHECK. |
| 6:45 - 7:00 | WAKE UP MINORS / WASH UP / INSTRUCT MINORS TO MAKE THERE BEDS. |
| 7:05 - 7:35 | BREAKFAST / CLEAN UP DAY AREA |
| 7:40 - 9:00 | HAVE ALL MINORS CLEAN / TOILETS / SINKS / SPRAY ALL WALLS / SWEEP ROOMS / HYGIENE AND OFFICER BREAK MOP THE UNIT CELLS. |
| 9:00 - 10:30 | PT / OUTSIDE-REC OR MATT REC / SECOND OFFICER BREAK |
| 10:30 - 12:00 | DIRECTED OR STRUCTURED ACTIVITY / OFFICER BREAK / ROTATE SECOND BREAK. |
| 12:05 - 12:35 | LUNCH / CLEAN UP / HEAD CALLS |
| 12:40 - 2:00 | OUTSIDE-REC / DIRECTED / OBS / SET UP SHOWER SUPPLIES / BRIEF WITH 2-10 OFFICER / HEADCOUNT / COUNT PENCILS / CLOSE YOUR SHIFT. |

312.

SCANNED

# POD-2
## SUNDAY SCHEDULE

## 2-10 SHIFT

| | |
|---|---|
| 200 - 3:00 | CHURCH / BRIEF WITH 6-2 OFFICER / HEADCOUNT / START PAPERWORK / PERIMETER CHECK AND COUNT PENCILS. |
| 3:05 - 4:05 | DIRECTED OR STRUCTERED ACTIVITY / OFFICER BREAK |
| 4:10 - 4:40 | DINNER / CLEAN UP / HEADCALLS / SECOND OFFICER BREAK |
| 4:45 - 6:00 | PT / OUTSIDE REC OR MATT REC / OFFICER BREAK |
| 6:05 - 7:30 | SHOWERS / INSIDE-REC / PHONECALLS / PERSONALS / LETTER WRITING. SECOND OFFICER BREAK |
| 7:35 - 9:00 | DIRECTED OR STRUCTERED ACTIVITY |
| 9:00 - 9:30 | BED-DOWN / HYGIENE / HEADCOUNT / COUNT PENCILS / OBS CLOSE SHIFT REPORT. |
| 9:30 - 10:00 | BREIF WITH 10-6 SHIFT / COMPLETE ALL PAPERWORK / CLEAN UP DESK AND PODIUM. |

313.

Questions for District Staff

Name of INS Official Interviewed: Michelle O'Brien (LA) + Cecyle Andrews (SF)
Name and Location of Discussed Facility: Tulare Juvenile Detention Center, Tulare Co. California
Type of Facility: Secure
Date: July 31, 2001

| Question | Section | Y | N | Comments |
|---|---|---|---|---|
| **Questions to the INS Directly (Concerning a Particular Facility)** | | | | |
| **General Questions** | | | | |
| Is the facility the least restrictive setting appropriate to the minors in custody? | F-11 | | X | |
| How does the INS determine the least restrictive setting appropriate for a minor? | N/A | | | The minors don't come here 1st-they come here w/ a final order, or if no availability/space in LA. |
| How often does INS review placement of minors in secure facilities? | N/A | | | ongoing |
| Are minors automatically detained if an immigration judge enters a removal order? | N/A | | X | issued a "surrender notice", will be detained if w/fare in question is released |
| How does the facility protect the well-being of minors in custody? | F-11 | | | it's a secure, safe environment they question outside contact |
| How many violent acts occurred in the facility last year? N/A | F-11 | | | None |
| How many of these involved INS minors? None | | | | |
| Have minors in removal proceedings been given bond redetermination hearings? | F-24 | | | no Indian or Chinese minors released before bond assessment approved |

50

314.

Questions for ___ District Staff

| Question | Section | Y | N | Comments |
|---|---|---|---|---|
| Have minors been permitted to seek judicial review of their facility placements? | F-24 | X | | They are served w/ a notice of judicial review |
| Have minors been given reasons for placement in a secure/medium security facility? | F-24 | X | | told + given notice of secure detention then sends to notice of judicial review |
| Have detained minors been provided with: | F-24 | | | |
| INS Form DS-770? | F-24 | X | | |
| an explanation of the right of judicial review? | F-24 | X | | |
| a list of free legal service providers compiled pursuant to INS regulation? | F-24 | X | | |
| If no on any of these three items, please explain. | F-24 | | | |
| Has INS ensured that all detainees are notified of their right to consular access? | DS-1-3-K | | X | →it's written on the Board on the wall in the facility |
| Has INS permitted facility tours for media representatives? | DS-1-3-N | | X | last went too 1st - INS did not allow pictures (to protect minors) |
| Does INS permit group presentations on legal rights to multiple detainees? | DS-3-A | X | | first so being planned now |
| Does INS require G-28s to be filed by advocates making rights presentations? | DS-3-A | | X | |
| Does INS require G-28s to be filed by advocates conducting pre-representation interviews? | DS-3-A | | | usually yes, but maybe no if atty represents minor depends |

SCANNED/EDF = Flores
E1 = Flores Exhibit 1
DS = INS Detention Standards

315.

Questions for District Staff

| Question | Section | Y | N | Comments |
|---|---|---|---|---|
| **Questions Concerning Temporary Facilities** | | | | |
| Has INS updated its listing of 80 additional beds available for INS placements? | F-12 | | | thinks yes has 300 beds available |
| Have you sent any aliens claiming to be minors to adult facilities? | F-13 | | | if she is unsure of age, i would send "minor" to a secure facility until forensic dental exam per standard |
| If yes, please explain | | | | |
| Do any minors remain in custody who have one of the following in the U.S.: | | | | |
| a parent? no, identified; Chinese-Indian home commitment | F-14 | | | must be approved 1st. |
| a legal guardian? n/a | F-14 | | | |
| an adult brother, sister, aunt, uncle or grandparent? yes, unless separated | F-14 | | | deportation home assessment necessary first. |
| an adult individual designated by the parent as willing to care for the minor? foster care | F-14 | | | |
| a licensed program willing to accept legal custody? | F-14 | | | had to verify; need dec's |
| an adult individual or entity seeking custody, where reunification isn't possible? | F-14 | | | or a solid connection to parent |
| **Questions Concerning Secure Facilities** | | | | |
| Do INS minors housed in secure facilities have separate accommodations? | F-21 | X | | |
| If yes, please explain | | | | |
| What determinations were made of minors conduct before they were placed here? | F-21 | | | — none; final order or there b/c no space (LA) (SF) |
| Are less restrictive alternatives available to place minors housed in secure facilities? | F-23 | | | no by final orders some minors b/cm it could be in Los Padrinos if it had space or just shortterm. |

52

316.

Questions for District Staff

| Question | Section | Y | N | Comments |
|---|---|---|---|---|
| Has the regional coordinator reviewed all placements of minors in secure facilities? | F-23 | | | no given notice |
| **Transfer of Minors** | | | | |
| How often are INS minors transferred between facilities? | N/A | | | as status changes, ie after a final order, depending on availability of spacing around country |
| Where are they usually transferred and for what reasons? | | | | |
| How is the determination made to transfer an INS minor between temporary facilities? | N/A | | | not interest of minor to be near family space/availability / things in process |
| How is the determination made to transfer an INS minor between licensed programs? | N/A | | | '' |
| How is the determination made to transfer an INS minor between secure facilities? | N/A | | | '' |
| Are INS minors automatically transferred to secure facilities upon termination of immigration court proceedings in which removal is ordered? Does this transfer occur even if the INS minor has appealed the decision? — yes, if space makes it necessary) but usually try to give local kids to kids that still have court cases | N/A | | | No - supposed to, but recycle determines someone are not flight risks - need to transfer, esp. if short time before get travel papers. |
| Have any minors been transferred to another facility without all of their possessions? | F-27 | X | | minor's possessions left at district office when dont to see |
| If yes, were the possessions shipped to them in a timely manner? | F-27 | | | legacy is supposed to meet minor plane out of country, INS will mail to them if left behind |
| If no, please explain | | | | |

F = Flores
S = Flores Exhibit 1
DS = INS Detention Standards

317.

Questions for ... District Staff

| Question | Section | Y | N | Comments |
|---|---|---|---|---|
| Is advance notice given to an LdS minor's counsel before the minor's transfer? | F-27 | ✗ | | |
| What does INS do to ensure that counsel is notified? | F-27 | | | Will leave msg + fax if can't speak to attorney in person or if they're in another district |
| Does INS make any efforts to transfer unrepresented kids first? | F-27 | | X | |
| **Transportation of Minors** | | | | |
| Have minors been transported in INS vehicles with detained adults? | F-25 | | X | not often | If necessary, but separate! by 2 or 3 seats |
| If yes, when did these transports occur? | | | | |
| Has INS assisted in making transportation arrangements for released minors? | F-26 | | | |
| If no, please explain | | | | |
| **Family Reunification** | | | | |
| Has INS made efforts to achieve family reunification for the minors in custody? | F-18 | X | | out of their main objectives |
| If yes, has it kept records of these efforts? | F-18 | | X | |
| Do any minors remain in a facility after the conclusion of immigration proceedings? | F-19 | | X | If awaiting flight out of country) special population if home assessment still pending → if not special pop. Michelle & Cecille decide if to release |

54

318.

SCANNED
F = Flores
E1 = Flores Exhibit 1
DS = INS Detention Standards

Questions to. ● District Staff

| Question | Section | Y | N | Comments |
|---|---|---|---|---|
| **Flores Settlement Reporting.** | | | | |
| Has an INS Juvenile Coordinator monitored compliance with the Flores settlement? | F-28 | X | | no written compliance, day to day oversight, they get training on Flores + receive updated |
| If yes, what information does this include? | | | | |
| Ask for a copy of any written compliance information. | | | | |
| Has INS recorded reasons for placements in secure or medium security facilities? | F28 | | | given reasons why there on notice → "influx" or "final order." |
| Ask for a copy of any written placement information. | | | | |
| Has INS submitted annual reports regarding INS compliance with Flores? | F30 | | X | not specific annual reports "consistent report" |
| Ask for a copy of any written placement information. | | | | |
| If no, why not? | | | | |
| **Attorney-Client Visits** | | | | |
| Has INS permitted plaintiffs' counsel to have attorney-client visits with minors? | F-32 | X | | |
| Has INS, upon request, made available a list of minors housed in particular facilities? | F-32 | | | |
| Has INS provided each facility with the official list of pro bono legal organizations? | DS-I-3-I | X | | |
| Do you permit Expedited Removal consultations? | DS-I-3-J | | | only if minor wants to withdrawal + family concurs. |

SCANNED
F = Flores
E1 = Flores Exhibit 1
DS = INS Detention Standards

319.

Questions for   _ District Staff

| Question | Section | Y | N | Comments |
|---|---|---|---|---|
| **Facility Visits** | | | | |
| Has plaintiffs' counsel been denied access to INS facilities? | F-33 | | X | |
| If yes, please explain the circumstances | F-33 | | | |
| How often does the INS meet with INS minors in custody here? | N/A | | | goal: over 1 wk Michelle + Cecelia communicate constantly + may see each other's cases if one can't make it. |
| Are these INS visits regularly scheduled or do they occur sporadically? | N/A | | | sporadic |
| **Special Immigrant Juveniles** | | | | |
| Does anyone at INS screen for minor's eligibility for SIJ status? | N/A | Y | | trial counsel + district counsel |
| How many requests for consent to jurisdiction of juvenile court do you receive per year? | N/A | | | less than 1/yr |
| How does INS consider requests for consent to juvenile court jurisdiction?  *What are the standards?* | N/A | | | reviews eligibility requirements |
| Does INS act promptly upon request for consent? | N/A | | X | |
| Does INS act upon request for consent while minor is in removal proceedings? | N/A | | X | |

56

320.

SCANNED   F = Flores
E1 = Flores Exhibit 1
DS = INS Detention Standards

Questions for District Staff

| Question | Section | Y | N | Comments |
|---|---|---|---|---|
| How many SIJ petitions have been granted after juvenile court issued a removal order? | N/A | | | Ø. but they only knows of 3 cases |

SCANNED-Flores
E1 = Flores Exhibit 1
DS = INS Detention Standards

57

321.

Questions for ...s District Staff

| Question | Section | Y | N | Comments |
|---|---|---|---|---|
| How many SIJ petitions have been granted after juvenile court issued a removal order? | N/A | | | φ - but they only knows of 3 cases |
| | | | | |
| | | | | |

SCANNED   F = Flores
E1 = Flores Exhibit 1
DS = INS Detention Standards

57

322.

SCANNED

# EXHIBIT 33

To Whom It May Conern:

    Being in INS Custody has ben a tremendously hoorible experience. For the last three to four days I have been in solitary lock-down. I have no cell mates. I am not permited to leave my cell to eat or go to class. I use the bathroom that is in my cell.

When I try and talk to Carlos in the next cell, I get into trouble. I have been in lock-down because an American kid hit me in the chest with a ball. I hit him back and then we were broken up and sent to our cells where we have been ever since.

They wake me up at 4:00 a.m. to shower, but we are not given the opportunity to dry-off, so I return to my cell wet and cold.

I have been in Globe for a month and a half and I have only been able to use the phone one time. I desperately want to make more calls, but I am told I cannot.

I swear the following is true and correct under penalty of perjury.

October 18, 2001

                              Jose Wilber Hernandez Segovia
                              A79653810

SCANNED

323.

10/18/2001   16:43   5208680192      F1RRP      PAGE   02

SCANNED

To Whom It May Concern:

Being in INS custody has been a tremendously horrible experience For the last three to four days I have been in solitary lock-down. I have no cell mates. I am not permitted to leave my cell to eat or go to class. I use the bathroom that is in my cell.

When I try and talk to Carlos in the next cell, I get into trouble. I have been in lock-down because an American kid hit me in the chest with a ball I hit him back and then we were broken up and sent to our cells where we have been ever since.

They wake me up at 4:00 am to shower but we are not given the opportunity to dry-off so I return to my cell wet and cold.

~~I swear the fu~~ I have been in Hole for a month and a half and I have

324.

only been able to use the phone
one time. I desperately want to
make more calls, but I am told
I cannot.

I swear the following is true
and correct under penalty of
perjury.

Oct. 18, 2001.          x _____

Jose Wilber Hernandez-
                              Segovia.

A79 653 810.

325.

SCANNED

# EXHIBIT 34

SCANNED

[RESERVED]

326.

SCANNED

# EXHIBIT 35

Declaration of Josué Enrique Andrade García

I, Josué Enrique Andrade García declare:

1. I was born in Copán Department of Honduras on February 17, 1987.

2. When I was very young, my family moved to Mexico. My father is from Mexico. My mother is from Honduras.

3. My father was killed by thieves in Mexico when I was still very small. My mother returned to Honduras, or so I was told. I'm still not really sure what happened to her.

4. I was on my own from that point on. I went to live with a friend of my family's in Mexicali.

5. I wanted to study, to make something of myself, but there was no one in Mexico who could help me. There was no one to support me.

6. I thought if I came to the U.S. there would be more opportunities for me to go to school here.

7. But when I crossed the border I was arrested almost immediately by the Border Patrol near Yuma. I was taken to a jail where I was held for two days.

8. I was never told that I had a right to an attorney. I was not provided with any names of lawyers to call. I did not have a hearing.

9. They handcuffed me and put me in a van. I was in the van with some other kids who were taken to Tucson. Then the van took me to Southwest Key.

10. I was strip searched upon arriving at Southwest Key.

11. One day I really had to use the restroom and another person was occupying it so I tried another door. I didn't realize it was one of the emergency exits and an alarm began to sound. I waited there for one of the staff to come and explain what was going on. The staff told me they would report me to the INS authorities because they said I had tried to escape. I was never told that was an emergency door.

12. The following day, they moved me to the Globe Detention Center. I was strip searched upon arriving here. A man from the facility watched me while I undressed.

327.

13.    We are awakened here every morning at 5:00 a.m.  We go shower and then we have to go back to our rooms.  We stay there for about 1-1/2 hours.  Then they call us for breakfast.

14.    After breakfast we have to return to our rooms.  I just sit there.  We don't have paper to write letters or draw.

15.    There is a bed and two blankets in the room.  There is a toilet in the room and a sink.

16.    Lunch is at 12:00 noon.  Then I go back to my room again.  I have class at 1:00 p.m.  Usually class is Monday through Wednesday.  Thursday we rarely have class.  Friday never.

17.    Dinner is at about 4:00 p.m.  Then if you have a blue shirt you can watch television afterward.  We get 1-1/2 hours of TV during the week, those of us with blue shirts.  We get three hours on Saturday.

18.    We get to go outside for only _ hour every day.

19.    After watching TV, I go back to my room and wait for about 2-1/2 hours.  They we are called to brush our teeth.  Then it is back to my room and I go to sleep.

20.    It's hard to sleep because there is so much noise at night.  The adults incarcerated here are very loud.  They scream a lot.

21.    I have never seen a doctor or a nurse since I've been here.

22.    The food here is very bad.  Sometimes it upsets my stomach.  I have not gone to the bathroom for five days.  Today I was finally able to go to the bathroom.

23.    We are not allowed snacks between meals.  Sometimes I get hungry.  I never got hungry at Southwest Keys.  The food was much better there.  Here it is awful.

24.    There are no counselors here.  There is no one I can talk to about what I'm going through.

25.    I have no idea what is going to happen in my immigration case or how long I will have to stay in this place.  The staff here has not given me any information about this.

26.    There are many more rules here than at Southwest Keys

328.

27.   If the staff here believes a youth has misbehaved, that youth is put in isolation in their room. They are not even allowed to come out for meals. They have to eat inside the room. They have to sit there all day. They are not even allowed to attend class.

28.   I have a blue shirt so I get to watch television.

29.   But here to "behave badly" is defined differently. You can be just talking to another youth and be told that you've misbehaved. They will switch your shirt color.

30.   You aren't even allowed to sleep during the day because once the staff sees that you're taking a nap they'll invent any excuse to come bother you or buzz you.

31.   The teachers here are not very good at teaching. They don't explain much. Most of the time they just make us copy words from page to another. This is supposedly to teach us English. I don't feel that I have learned anything here. The classes were much better at Southwest Keys.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of July at Globe Detention Center.

_____
Josué Enrique Andrade García

## CERTIFICATE OF TRANSLATION

I, Alexis Mazón, declare and say as follows:

1. I am fluent in Spanish and English.

2. On this day, I translated the foregoing to the declarant, who understood the contents thereof prior to affixing her signature therefore.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2002 at Globe Detention Center, Globe, Arizona

_____
Alexis Mazón

329.

SCANNED

# EXHIBIT 36

Declaration of
Denis De Leon Martinez                        A 096 217 923
5/2/03

SCANNED

1.  My name is Denis DeLeon Martinez. I am from Guatemala. I entered the
    U.S. December 14, 2002. I was arrested in Phoenix by INS. I had a hearing
    before an immigration judge while I was at Southwest Key. I had several
    hearings while I was detained at Globe. I was brought to Phoenix for each
    hearing.

2.  I am 15 years old. My understanding is that I will be released to my mother
    who lives in California. My mother is named Herenilia [sic] Aguilono. I do
    not know when that will happen. I am waiting to be with my mother.

3.  I have been in detention at Globe for almost four months. I was at Southwest
    Key for 38 days. Things were not bad for me at Southwest Key compared
    with Globe. Except that for several days one of the other detainees at SW Key
    started calling me names and saying vulgar things to me. This happened
    while I was cleaning the bathrooms and other times. One of the workers at
    SW Key named Manyuri [sic] heard this guy calling me names and saying
    bad things to me in the lunch room. I made complaints about this guy whose
    name was Luis Rico to the officer named Millie. Others were having
    problems with me too. One day in the classroom Luis pushed a student
    named Carlitos down and hurt him. The teacher was taking some students to
    the bathroom and was not in the classroom at the time. The student was a
    little fat kid and could not protect himself. I told Luis that he should pick on
    someone his own size. Luis could have hurt him badly. Luis started calling
    me bad names so I got angry and we started fighting.

4.  In think the reason I was moved to Globe was because of the incident with
    Luis and one or two other problems like that.

5.  At Globe it is difficult to use the telephone. I was given only about 7 minutes
    to use a phone to call my mother. The officers in the morning are good, but
    two officers in the afternoon shift are not. The afternoon boss name Jennie
    talked at me while I was trying to talk on the phone. She was making fun of
    me and talking loudly so I could not hear my mother.

6.  When I cam to Globe I was given a white shirt and I had to stay in my cell all
    day with only one hour to watch TV. On my fifth day I was given a green
    shirt and allowed to come out of my cell for meals. When I am in my cell I am
    not supposed to talk to anyone or they will take away my shirt and give me a
    lower level. They will also turn on the lights so bright that it is hard to see.

7.  No one explained the rules to me when I came to Globe. I just find out about
    it myself. There were no Spanish speaking detainees here when I first got
    here. No one told me anything about the rules.

330.



8. Some people say there are rules written in English, but I do not speak or read English. No one has given me the rules in Spanish. It has been very difficult for me to learn the rules.

9. There is an emergency button in each cell. I did not know what it was for. It was not until a guy who I only see once in a while came and explained to me in Spanish that if someone is dying I push the button. His name is Mr. Thomas. I'm not sure what his job is.

10. There are 6 or 5 workers at Globe on each shift. On the shift working now as I give this declaration, there is no one on the shift of workers who speaks Spanish well. Only one of the workers on the current shift can speak Spanish, but he is not too good at it. It is very difficult because often there is no one who understands my language. There is one woman on the afternoon shift who does speak Spanish fairly well. There are only some workers on all the shifts who speak Spanish well, and there are times when none of them are here.

11. After I was here eight days one of the workers stopped me and scolded me for not walking with my hands behind my back. He said "Don't you know the rules? How long have you been here?: I told him eight days. he said that if I don't walk with my hands behind my back, they will take away my shirt and demote me to a level with fewer privileges. I did not know this because no one explained this to me in Spanish.

12. After I was here about twenty days, a friend of mine from SW Keys named Alex came here. No one told him the rules in Spanish. I was concerned for him so I would tell him the rules in Spanish so he would know them. The guards who speak English and not Spanish call us Spanish speaking detainees names and use bad words like "Son of a Bitch" and Fucker." The Spanish-speaking workers here at Globe do not like the fact the English-speakers use bad language to us. Some of the Spanish-speaking workers told me about this and that the words were bad. While I was trying to explain the rules to Alex is used the word "fucking" to describe a English bad word. One of the workers whose name I don't know, but who is a big fat guy, heard me say the word and thought I was trying to start a fight. I explained that Alex was my friend and I was just describing the word to him. the big worker does not know any Spanish. He took my shirt away and demoted me and I lost privileges even though I did not try to incite a fight.

13. About four days after Alex arrived, I was demoted by Candy another worker. it was because I did not slide my comb under the door after using it fast enough I was put in "white shirt" solitary confinement for two days for this. I was never given the rules in writing in Spanish.

14. About a 2 months (or more) ago a lawyer came to talk with me. She gave me a piece of paper with my mother's name on it. I was fiddling with the paper and tore a piece off and started chewing it. I don't know why it [sic[ did this, it is a habit. When I left the room one of the workers was checking

2                                   331.

me and noticed the piece of paper I was chewing. She asked me whether I knew that chewing on paper was against the rules. I told her that I did not because no one has given me the rules in Spanish. The workers who saw me with the piece of paper in my mouth are Irene and Joanna. Because of this, I was demoted to "white shirt" and was put in solitary confinement for 15 days.

15.     One day I was depressed and had some trouble eating due to chapped lips. The officer named "J.C." who does not speak Spanish told me to hurry. Because I was not drinking my water fast enough, J.C. took my remaining food - which was most of the meal - and kicked me in my leg.

16.     At times when there are about 4 other Spanish detainees, the afternoon shift will come by and throw Bibles into our cells. The Bible is a special book that should be respected. I believe in the Bible. I was taught by my father to respect others and to respect my elders. I also respect the Bible. Two of the shifts—the ones run by Jennie and Mr. Vaca throw the Bibles. Detainees, including myself, are upset because the Bible should not be treated with disrespect. The workers on those two shifts will throw books out of the cells. (We are only allowed one book.) They throw the Bibles. They should not do that. I have seen many detainees from Central America while I have been here. Most of them were upset about the throwing of the Bibles and complained. The workers still throw the Bibles.

17.     About two months ago I was playing basketball and one of the players slapped me across the face. The officer "J.C." was watching me. One of the other players whose name I don't know but who has a dragon tattoo on his upper arm is the one who hit me. A friend told me that he heard J.C. tell the other player (with the tattoo) to hit me. J.C. is the officer who kicked me. J.C. did nothing to reprimand the boy who hit me.

18.     About  month and a half ago I was doing exercises in my cell. I was chuckling to myself, thinking about something funny. One of the guards told [sic[ me to be quiet. I told him I was chuckling to myself and not hurting anyone. The worker named Juan called Bob and the two grabbed me around the neck and pinned my arms behind my back. They took me out of my cell to put me in solitary confinement. They wanted to take my shirt and demote me to a white shirt. I told them I had done nothing wrong. They [sic] tried to take the shirt from me and started wrestling with me. They scratched me on my chest and arm. They took off my pants and shirt and put me in the solitary confinement cell without a shirt or pants. I had only my underwear. A policeman came and wanted to talk to me about the incident, but changed my mind  I was too scared to tell the policeman what was happened. I did not want to be hurt again by those two guys.

19.     I have no criminal convictions. I have never been arrested or charged with any crime in my life, apart from the arrest by the INS in Phoenix. I have no arrest or conviction in Guatemala.

332.

20.     Here at Globe I can only use a telephone on Saturday or Sunday.  White shirt gets only seven minute phone call.  If I call my mother and ask her to call me back, I do not have to pay. With my green shirt, my call is limited to ten minutes.  we are not allowed to make calls Monday through Friday.

21.     With my green shirt I have 3 hours of indoor and outdoor recreation per day.  we have a small basketball and soccer area. Eight detainees go to recreation together.

22.     My cell is about 8' by 10.'  Sometimes there will be two detainees in one cell.

23.     I saw a doctor twice here at Globe.  Once was for a bleeding nose.  The second was after the incident when the guards took my shirt and pants.  One of them stepped n my finger and the scrape became infected.  The doctor does not come to us on a regular basis, only when we have a problem.

24.     I have not seen a dentist while I was in Globe.  Two other detainees asked to see a dentist and a dentist came for treatment.

25.     We can only have one book in our cell at a time  Most of the Spanish books are Bibles.  There are not many other books.  With my green shirt I get one and a half hours of TV.

26,     My Dad studied to be a pastor.  I go to church service here in the detention facility each Sunday.  It is 1/2 hour in English and 1/2 hour in Spanish.

27.     I cannot have a pen or pencil in my cell.  Green shirts and above can go to a special table to write.  Toilet paper, soap and a book are the only things allowed in our cells.

28.     I do not know of any grievance procedure here.  The rules are not explained in Spanish.  As far as I know there is no way to contest a demotion or other discipline.

This declaration has been read to me in the Spanish language and it is true and correct to the best of my ability.

_Denis-Guillermo-DeLeon_____
Denis DeLeon-Martinez
5/2/03

333.

P. 1 of 13

Declaration of
Denis Deleon Martinez          A 096 217 923
5/2/03

SCANNED

1. My name is Denis Deleon Martinez. I am from Guatemala. I entered the U.S. December 14, 2002. I was arrested in Phoenix by INS. I had a hearing before an immigration judge while I was at Southwest Key. I had several hearings while I was detained at Globe. I was brought to Phoenix for each hearing.

2. I am 15 years old. My understanding is that I will be released to my mother who lives in California. My mother is named Herecilia Aguilero. I do not know when that will happen. I am waiting to be with my mother.

3. I have been in detention at Globe for almost four months. I was at Southwest Key for 38 days. Things were not bad for me at Southwest Key, except compared with Globe. that for several days at Globe-SWKey one of the other detainees started calling me names and saying vulgar things to me. This happened while I was cleaning the bathrooms and other times. Finally, during One of the

D-G-A
334.

p. 2 of 13

workers at SW Key named Manguri
heard this guy calling me names and
saying bad things to me in the lunch
room. I made complaints about this
guy whose name is Luis Rico to
the officer named Millie. Others
were having problems with him too.
One day in the classroom Luis pushed
a student named Carlitos down and hurt
him. The teacher was taking some
students to the bathroom and was not
in the classroom at the time. The
student was a little fat kid and could not
protect himself. I told Luis that
he should pick on some one his own size.
Luis could have hurt him badly.
Luis started calling me bad names
so I got angry and we started
fighting.

4. I think the reason I was moved to Globe
was because of the incident with Luis and
one or two other problems like that.

5. At Globe it is difficult to
use the telephone. I was given only
about 7 minutes to use a phone to

335.

p.3 of 13

call my mother.    The officers in the
morning are good, but two officers in
the afternoon shift are not.    The
afternoon boss named Jennie talked
at me while I was trying to talk
on the phone.    She was making fun
of me and talking loudly so I could
not hear my mother.

6.  When I came to Globe I was given a
white shirt and ~~no~~ I had to stay in
my cell all day with only one hour
to watch TV.    ~~On~~ my ~~fifth day~~ ~~and~~ I
was given ~~a~~ a green shirt and allowed to come
out of my cell for meals.    When I am
in my cell I am not supposed to talk to
any one or they will take away my
shirt and give me a lower level.
They will also turn on the lights so
bright that it is hard to see.

7.  No one explained the rules to me when
I ~~came~~ to Globe.    I just find
out about it myself.    There were no
spanish-speaking detainees here when I
first got here.    No one told me
~~anything a~~ any thing about the rules.

336.

p. 4 of 13

SCANNED

8.  Some people say there are rules
    written in English, but I do not
    speak or read English.  No one has
    given me the rules in Spanish.  It
    has been very difficult for me to
    learn the rules.

9.  There is an emergency button in
    each cell.  I did not know
    what it was for.  It was not until
    A guy who I only see once in a while
    came and explained to me in Spanish
    that if someone is dying I push
    the button.  His name is Mr.
    Thomas.  I'm not sure what his
    job is.

10. There are (5 to) 6 or 5 workers at Globe on each
    shift.  On the shift working now as
    I give this declaration, there is
    no one on the shift of workers who
    speaks spanish well.  Only one of
    the workers on the current shift
    can speak spanish, but he is not too
    good at it.  It is very difficult
    because often there is no one who
    understands my language.  There

    337.

p. 5 of 13

is one woman on the afternoon shift who does speak spanish fairly well. There are only four workers on all the shifts who speak spanish well, and there are times when none of them are here.

11. After I was here eight days one of the workers stopped me and scolded me for not walking with my hands behind my back. He said "Don't you know the rules? How long have you been here?" I told him eight days. He said that if I don't walk with my hands behind my back, they will take away my shirt and demote me to a level with fewer privileges. I did not know this because no one explained this to me in Spanish.

12. After I was here about twenty days, a friend of mine from SW Key named Alex came here. He did not know the rules. No one told him the rules in Spanish. I was concerned for him so I would tell him the

338.

SCANNED

p. 6 of 13

rules in Spanish so he would know them.    The guards who speak English and not spanish call us Spanish-speaking detainees names and use bad words like "Son of a Bitch" and "Fucker." The spanish-speaking workers here at Globe do not like the fact that the English-speakers use bad language to us.    Whole it was Some of the spanish-speaking workers told me about this and that the words were bad.    While I was trying to explain the rules to Alex is used the word "fucking" to describe an English bad word. One of the workers whose name I don't know, but who is a big fat guy, heard me say the word and thought I was trying to start a fight.  I explained that Alex was my friend and I was just describing the word to him.  The big worker does not know any Spanish.    He took my shirt away and demoted me and I lost privileges even though to I did not try to incite a fight.

339.

P.7.9 13

13. About four days after Alex arrived, I was demoted by Candy, another worker. It was because I did not slide my comb under the door after using it not enough. I was put in "white shirt" solitary Confinement for two days for this. I was never given the rules in writing in spanish.

14. About a month 2 months [or more] ago a lawyer came to talk with me. She gave me a piece of paper with my mother's name on it. I was fiddling with the paper and I tore a piece off and started chewing it. I don't know why I did this — it is a habit. When I left the room one of the workers was checking me and noticed the piece of paper I was chewing. She asked me whether I knew that chewing on paper was against the rules. I told her I did not. because no one

340.

p. 8 of 13

has given me the rules in spanish. ~~So It~~ The waiters who saw me with the paper piece in my mouth are Irene and Joanna. Because of this I was demoted to "white shirt" and was put in solitary confinement for 15 days. ~~It the~~ ~~Irene~~

15.  One day I was depressed and ~~had~~ some trouble eating due to cramps. The officer named ~~fatted~~ "J.C." who does not speak ~~spanish~~ told me to hurry. Because I was not drinking my water fast enough, J.C took my remaining food -- which was most of the meal -- and kicked me in my leg.

16.  At times when there are about 4 or 5 other spanish speaking detainees, the afternoon shift will come by and throw Bibles into our ~~cold~~ cells. The Bible is a special book that should be respected. I believe in the Bible. I was taught by my father to respect others and to respect ~~others~~ my elders. I also respect the Bible. Two of the shifts -- the

341.

p.9 , 13

SCANNED

ones run by Jennie and Mr. B Vaca,
throw the Bibles.   ~~the~~ ~~also our~~
Detainees, including myself, are upset
because the Bible should not be
treated with disrespect.   The workers
~~on~~ those two shifts will throw
books out of the cells.  (We are
only allowed one book.)  They
throw the Bibles.  They should
not do that.   I have ~~been~~ many
detainees from Central America
while I have been here.  Most of
them were upset about ~~d~~ the throwing
of the Bibles and complained.   The
workers still throw the Bibles,

17.   About two months ago  I was playing
basketball and one of the players
slapped me across the face.   The
officer "J.C." was watching us.  One
of the other players  ~~told~~ whose name the boy who hit me
I don't know but who has a  told
dragon tatoo on his upper arm  told me
me ~~that~~ he heard JC, tell the other
player (with the tatoo) to hit me,   J.C. is the
officer who kicked me.   J.C. did nothing
to reprimand the boy who hit me.

342.

P.10 ]i3

SCANNED

18. About ~~two~~ ~~a~~ months and a half ~~and a half~~ ago I was doing exercises in my cell. I was chuckling to my self, thinking about something funny. One of the guards to me to be quiet. I told him ~~I~~ was chuckling to myself and not hurting anyone. The ~~staff~~ worker named Juan called Bob and the two grabed me around the neck and pinned my arms behind my ~~back~~. They took me out of my cell to put me in solitary confinement. They wanted to ~~talk~~ take my shirt and demote me to a white shirt. I told them I had done nothing wrong. The tried to take the shirt from me and started wrestling with me. They scratched me on my chest and arm. They took off my pants and shirt and put me in the solitary confinement cell without a shirt or pants. I had only my underware. A police-man came and i worked to talk to me about the incident but changed my mind. I was too scared to tell the policeman what was happened. I did not want to be hurt again by

343.

P. 11 of 13

those two guys.

19. I have no criminal convictions. I have never been arrested or charged with any crime in my life, apart from the arrest by the INS in Phoenix. I have no arrest or conviction record in Guatemala.

20. Here at Globe I can only use a telephone on Saturday or Sunday. White shirt gets only seven minute phone call. I ~~have to pay for~~ ~~phone calls.~~ If I call my Brother and ask her to call me back, I do not have to pay. With my green shirt, my call is limited to ten minutes. We are not allowed to make calls from Monday through Friday.

21. With my green shirt I have 3 hours of indoor and outdoor recreation per day. We have a small basketball and soccer area. Eight detainees go to recreation together,

344.

p. 12 of 13

22. My cell is about 8' by 10'. Sometimes there will be two detainees in one cell.

23. I saw a doctor twice here at Globe. Once was for a bleeding nose. The second was after the incident when the guards took my shirt and pants. One of them stepped on my finger and the scrape became infected. The doctor does not come ~~regular~~ to us on a regular basis, only when we have a problem.

24. I have not seen a dentist while I was in Globe. Two other detainees asked to see a dentist and a dentist came for treatment.

25. We can only have one book in our cell at a time. Most of the spanish books are Bibles. There are not many other books. With my green shirt I get one and a half hours of TV.

345.

SCANNED

P-13 913

26.  My Dad studied to be a pastor. I go to a church service here in the detention facility each Sunday. It's ~~one~~ ½ hour in English and one half hour in Spanish.

27.  I cannot have a pen or pencil in my cell. Green shirts and above can go to a special table to write. Toilet paper, soap and book are the only things allowed in ~~my~~ our cells.

28.  I do not know of any grievance procedure here. The rules are not explained in Spanish. As far as I know there is no way to contest a demotion or other discipline.

This declaration has been read to me in the Spanish language and it ~~is~~ is true and correct to the best of my ability.

DENIS-GUIERMa-DELeON
Denis DoLeon-Martinez

5/2/03

346.

SCANNED

# EXHIBIT 37

DECLARATION OF NERY AMADOR RODRIQUEZ-MONTEJO

I, Nery Amador Rodriquez-Montejo, declare and say as follows:

1. I am a citizen of Guatemala. I was born January 5, 1986. My parents live in Guatemala. I am now 16 years old. I came to the United States about 3 months ago. I was arrested by the INS near Nogales, when I was traveling from Tucson to Phoenix.

2. After the INS arrested me, I was taken to a jail, where I spent 2 days. I believe this jail was in Tucson. Then I was taken to another jail, where I spent 3 days. In the first jail I was alone; in the second I shared a room with another minor.

3. After that I was taken to the Southwest Key facility in Phoenix. I spent about a month and three days there, and then I was brought to Globe Juvenile Hall, where I am now. I was told that I should come to Globe so that even younger minors could have a place at Southwest Key. I never had any disciplinary problems at Southwest Key, nor did I even try to escape or run away.

4. At Southwest Key, I have classes during the week. I studied English, mathematics, art. We had only 10 minutes per day for indoor recreation; after school we were given a hour to play outside. I shared a room with 3 others. We had books to read, and there was a room to watch television. I was never allowed out of the facility, however, to go to the park or library.

5. One of the reasons I spent so long in detention is because the Immigration took my wallet at the first jail, and I watched as one of the officials threw it in a trash can. The wallet had the phone numbers of all my family, including a cousin who lives in the United States. For this reason, I've not been able to inform my family of my whereabouts or get any help from them.

6. I went to Immigration court once and I accepted to be deported. About two days later, I was brought to Globe Juvenile Facility. When I was transferred to Globe, I was handcuffed with my hands behind my back.

347.

7. When I arrived at Globe, I was given prison clothes. Here I've had no classes, except a teacher comes for about 1/2 an hour during week days. I sit in front of a computer and listen to English lessons. The teacher answers questions. We get 15-30 minutes to exercise outside. We are permitted one book at a time.

8. I have never spoken to a counselor or psychologist since being arrested. I haven't spoken with my family because I don't have their phone numbers any more. The Immigration has not explained my case to me. I ask people here, When I will be deported or allowed to leave? and they only tell me they know nothing.

9. For the most part, here they give classes only to those of us who have blue T-shirts. It takes about 2 weeks of good behavior to get a blue T-shirt.

10. Here I have contact every day with juveniles who are detained here for delinquency. One boy told me he is detained here for shooting a gun, others have told me they are here for drugs and robbery.

11. Here we spend most of the day locked in our rooms. I would say I spend all but 2-3 hours of the day locked in my room. What bothers me most here is being locked in almost all day.

12. I only wish that the INS would let me leave, either into the United States, or by deportation because I feel my situation here is without hope. It has been a long time since I've seen my family and I miss them. I hope they take me out of here soon.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2002 at Globe, Arizona.

_____

\* \* \* \* \*

DECLARATION OF TRANSLATION

I, Carlos Holguin, declare and say as follows:

348.

1) I am fluent in English and Spanish.

2) On this day, I translated the foregoing to the declarant, who indicated he understood the foregoing and affirmed its accuracy prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2002 at Globe, Arizona.

_____

349.

Montejo

Declaration of Nery Amador Rodriguez

I, Nery Amador Rodriguez Montejo, declare and say as follows:

1) I am a citizen of Guatemala. I was born January 5, 1986. My parents live in Guatemala. I am now 16 years old. I came to the United States about 3 months ago. I was arrested by the INS near Nogales, when I was traveling from Tucson to Phoenix.

2) After the INS arrested me, I was taken to a jail, where I spent 2 days. I believe this jail was in Tucson. Then I was taken to another jail, where I spent 3 days. In the first jail I was alone; in the second, I shared a room with another minor.

3) After that I was taken to the Southwest Key facility in Phoenix. I spent about a month and three days there and then I was brought to Globe Juvenile Hall, where I am now. I was told that I should come to Globe too so that even younger minors could have a place at Southwest Key. I never had any disciplinary problems at Southwest Key, nor did I have any ever try to escape or run away.

350.

②

4) At Southwest Key, I had classes during the week. I studied English, mathematics, art. We had only 10 minutes per day for recreation indoor recreation. Its after school, we were given a hour to play outside. I shared a room with 3 others. We had books to read, and there was a room to watch television. I was never allowed out of the facility, however, to go to the park or library.

One of the reasons

5) I spent so long in detention is because the Immigration took my wallet at the first jail, and I watched as one of the officials threw it in a trash can. The wallet had the phone numbers of all my family, including a cousin who lives in the United States. For this reason, I've not been able to inform my family of my whereabouts or get any help from them.

6) I went to immigration court once, and I actually accepted to be deported. About two days later, I was brought to Globe juvenile facility. When I was transferred to Globe, I was handcuffed with my hands behind my back. (The ride was about 2 hours.)

351.

7) When I arrived at Globe I was given prison clothes. Here I've had no classes, except a teacher comes for about 1/2 an hour during week days

③

I sit in front of a computer and listen to English lessons. The teacher answers questions. We get 15-30 minutes to exercise outside. We are permitted one (book) at a time.

8) I have never spoken to a counsellor or psychologist since being arrested. I haven't spoken with my family because I don't have their phone number any more. The immigration has not explained to my case to me. I ask people here when I will be deported or allowed to leave? and they only tell me they (Know) nothing.

For the most part
9) Have they give classes only to those of us who have blue T-shirts. I takes about 2 weeks of good behavior to get a blue T-shirt.

10) Here I have contact every day with juveniles who are detained here for delinquency. One boy told me he is detained here for shooting a gun. Others have told me they are here for drugs and robbery.

352.

11) Here we spend most of the day locked in our rooms. I would say I spend all but about 2-3 hours of the day locked in my room. What bothers me most here is being locked in almost all day.

(2) I only wish that the IHS would let me leave, either into the United States, or by deportation, because I can feel my situation here is without hope. It has been a long time since I've seen my family and I miss them. I hope they take me out of here soon.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2002, at Globe, Arizona.

x _____

Declaration of Translator

I, Carlos Holguin, declare and say as follows:

1) I am fluent in English and Spanish.

2) On this day, I translated the foregoing to the declarant, who under indication he understood the foregoing and affirmed to its accuracy prior to signing.

353.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of

July, 2002, at Globe, Arizona

354.

SCANNED

# EXHIBIT 38

Declaration of Wilbur Antonio Orillana

I declare as follows,

1. My name is Wilbur Antonio Orillana. I am 17 years old. I was born on October 22, 1984 in El Salvador.

2. My Alien Registration No. is A095211612.

3. I was placed in a jail in Eagle Pass, Texas, after the INS picked me up. I was transferred to the IES facility in Frenos, Texas, then to La Esperanza in Brownsville, Texas.

4. While in Brownsville, offers placed me in handcuffs and threatened to send me to jail for 6 months in Houston, Texas when other kids in the facility misbehaved.

5. I was ordered deported in Brownsville. I am supposed to be deported on July 26, 2002, but I am still being held. I don't know why I have not yet been deported.

6. When I was in Brownsville, I was always locked in my room. I only went outside for recreation like the other kids 5 times. I always had to eat in my room.

7. Here, I am able to eat, watch TV, and go outside with the non-INS kids at the facility. But I am often kept locked in my room. There is a lock on my door. If I want to get out, I have to knock or yell.

8. I have to get permission to go the restroom, or to get water. Sometimes, I am not allowed to go to the restroom when I need to: I am told I have to wait 10 or more minutes.

9. I am not allowed to keep personal items in my room. I am only allowed a few minutes to shower each day.

10. When I arrived here at Hondo, I was strip-searched.

11. When I have asked to make phone calls, officers told me that I could not use the telephone.

355.

12.    I receive no schooling here and no one has tried to teach me English.

13.    I am very frustrated that I have been held for so long.  I feel like I am being punished, but I have committed no crime.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration is executed on July 16, 2002, at Hondo, Texas.

_____

Wilbur Antonio Orillana

I declare as follows,

1. My name is Wilbur Antonio Orellana . I am 17 years old. I was born on October 22, 1984 in El Salvador.

2. My Alien Registration # is 095211612.

3. I was placed in a jail in Eagle Pass, Texas, after the INS picked me up. I was then transferred to the IESI facility in ~~Brownsville~~ Frenos, Texas, then to La Esperanza, in Brownsville, Texas.

4. While in Brownsville, officers placed me in handcuffs and threatened to send me to jail for 6 months in Houston Texas when other kids in the facility misbehaved.

5. I was ordered deported in Brownsville. I ~~am~~ was supposed to be deported on July 26, 2002, but I am still being held. I don't know why I have not yet been deported.

6. When I was in Brownsville I was always locked in my room. I only went outside for recreation like the other kids. I ~~often~~ 5 times always had to eat in my room.

357.

7. Here, I am able to eat, watch TV, and go outside with the non-INS kids at the facility. But I am often kept locked in my room. There is a lock on my door. If I want to get out, I have to knock or yell.

8. I have to get permission to go to the restroom or to get water. Sometimes, I am not allowed to go to the restroom when I need to; I am often told I have to wait 10 or more minutes.

9. I am not allowed to keep personal items in my room. I am only allowed a few minutes to shower each day.

10. When I arrived here at Hondo, I was strip-searched.

11. When I have asked to make phone calls, officers told me that I could not use the telephone.

12. I receive no schooling here & no one has tried to help me learn English.

358.

13. I am very frustrated that I have been held for so long. I feel like I am being punished, but I have committed no crime.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration is executed on July 16, 2002, at Hondo, Texas.



Wilbur Antonio Orillana

Declaration of Translation

I, Tino Gallegos, declare and say as follows:
1. I am fluent in English and Spanish.
2. On this day, I translated the foregoing to the declarant, who indicated he understood the foregoing and affirmed its accuracy before signing.

I declare under penalty of perjury that the foregoing is true and correct. Executed ~~this~~ on July 16, 2002, at Hondo, Texas.

359.

SCANNED

# EXHIBIT 39

DECLARATION OF WALTER RODAS-HERNANDEZ

I, Walter Rodas-Hernandex, declare and say as follows:

1. I am a native and citizen of El Salvador. I was born April 22, 1987. My mother died when I was four years old, and my father died when I was seven. I was therefore raised by my grandparents. We were very poor, and I decided to come to the United States so I could help my grandparents and other family members. I am now 15 years old.

2. I left El Salvador June 21, 2002. I was arrested walking through the desert, walking to Douglas, AZ, on July 5. I was coming to live with my aunt in Las Vegas. She and my sister have immigration status and live in Las Vegas.

3. After I was arrested I was taken to Douglas, then to Tucson, where I spent one day. The next day, I was brought to Globe, AZ, Juvenile Hall. When I left Tucson, I was taken in a van with 11 others, 10 of whom were adults. We rode in the back and one official drove. I was handcuffed during this trip to another minor.

4. When I was admitted to the Globe facility, I was given a white T-shirt. The next day, because I behaved well, I was given a gray-white shirt. If I behave well, I will be given a navy blue shirt.

5. Here we are awakened at 5:00 in the morning. We bath, dress then I return to my room, where I am locked in, then about 15-30 minutes later, I am taken our to breakfast. I have no roomate. I am alone in the room, which has a toilet, sink, and a bed. I have no books or television in my room. I eat alone in my room, but I think I will be permitted to eat with the others once I get my blue shirt or green shirt.

6. So far, I have had no schooling. I have not spoken to a counselor or psychologist. I've not had a medical exam.

7. I go out to recreation for 1/2 an hour per day. I play ball with the other minors detained here. I go out at about 7:00 a.m. for recreation. I play with about 14-15 other kids. I do not know why they are detained.

360.

8. After recreation, I go back to my room, where I'm obligated to stay until lunch. I lie down very sad, because I have nothing to do. About 12:00 I'm let out to get my lunch. I then go back to eat in my room. Then I'm locked in my room until dinner, which they give us at 4:30 or 5:00. I go out, get my food, and return to my cell to eat it. Then I'm given a toothbrush, which I use and then pass under the door. Then I try to sleep.

9. I am permitted to use the telephone Saturdays and Sundays only.

10. I have never had any problems with the police in my country. I have never attempted to escape or run away. The people here treat me well.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2002 at Globe, Arizona.

_____

* * * * *

DECLARATION OF TRANSLATOR

I, Carlos Holguin, declare and say as follows:

1) I am fluent in English and Spanish.

2) On this day, I translated the foregoing to the declarant, who understood the contents thereof, and affirmed the accuracy of the same prior signing.

Executed this 8th day of July 2002, at Globe, Arizona.

_____

361.

Declaration of Walter Redes-Hernandez

I, Walter Redes-Hernandez, declare and say as follows:

1) I am a native and citizen of El Salvador. I was born April 22, 1987. My mother died when I was four years old, and my father died when I was seven. I was thereafter raised by my grandparents. We were very poor, and I decided to come to the United States so that I could help my grandparents and my other family members. I am now 15 years old.

2) I left El Salvador June 21, 2002. I was arrested walking through the desert, walking to Douglas, AZ on July 5. I was coming to live with my aunt in Las Vegas. She and my sister have immigration status and live in Las Vegas.

3) After I was arrested I was taken to Douglas, then to Tucson, where I spent one day. The next day, I was brought to Pinal County Glode, AZ, juvenile hall. When I left Tucson, I was taken in a van with 11 others, 10 of whom were adults. We rode in the back, and one official drove. [362.] I was handcuffed during this trip to another (minor.)

4) When I was admitted to the

②

Celebe facility, I was given a white
T-shirt. The next day, because I
behaved well, I was given a grey
white shirt. If I behave well, I
will be given a navy blue shirt.

5) Here we are awakened at 5:00
in the morning. We bath, dress then
I return to my room, where I am locked
in, then about 15-30 minutes later,
I am taken out to breakfast. I have
no roommate. I am alone in the room,
which has a bath, toilet, sink, and a
bed. I have no books or television in my
room. I eat alone in my room, but
I think I will be permitted to eat
with the others once I get my
                    green
blue shirt, or red shirt

6) So far, I have had no schooling.
I have not spoken to a counsellor or
psychologist. I've not had a medical exam

7) I go out to recreation for 1/2 an
hour per day. We play ball with the
other minors detained here. I go out
at about 7:00 a.m. to for recreation.
I play with about 14-15 other kids.
I do not know why they are detained.

3.63.

8) After recreation, I go back to my room,
where I'm (obligated) to stay until lunch.
I lie down very sad, because I have
not nothing to do. About 12:00 I'm

let out to get my lunch. I then go
back to eat in my room. Then I'm
locked in my room until dinner which
they give us at 4:30 or 5:00
I go out, get my ol food, and return
to my cell to eat it. Then I'm
given a tooth brush, which I use and
then pass under the door. Then I
try to sleep.

9) I am permitted to use the telephone
Saturdays and Sundays, only.

10) I have never had any problems with
the police in my country. I have never attempted
to escape or run away. The people here treat
me (well.)

I declare under penalty of perjury
that the foregoing is true and correct.

Executed this 8th day of July,
at Glebe, Arizona.

X _____

_____

Declaration of Translator

I, Carlos Holguin, declare and say
as follows:

364.

1) I am fluent in English and
Spanish.

(H)

2) On this day, I translated the foregoing to the declarant who understood the contents (thereof), and affirmed the accuracy of the same prior to signing.

Executed this 8th day of July, 2002, at Globe, Arizona.

365.

SCANNED

# EXHIBIT 40

SCANNED

# JUVENILE ALIENS:

# A SPECIAL POPULATION

Immigration and Naturalization Service
**Juvenile Protocol Manual**

*Juvenile Detention and Shelter Care Program*



*Prepared By*
Office of Field Operations
Detention and Removals
Detention Operations Branch

**March 1999**

*366.*

**Bedding and Linen Issue**

**3-JDF-4B-12** (Ref. 2-8242)

86.  **Written policy, procedure, and practice provide for the issue of suitable clean bedding and linen, including two sheets, pillow and pillowcase, one mattress, and sufficient blankets to provide comfort under existing temperature controls.**  There is provision for linen exchange at least weekly.

*Comment:* Collection, storage, and exchange methods for bedding and linens should be done hygienically; that is, blankets, pillows, and mattresses should be cleaned before reissue, and linen and towels must be laundered before reissue.  Towels should be exchanged at least three times per week.


**Bathing and Personal Hygiene**

**3-JDF-4B-13** (Ref. 2-8246)

87.  **Written policy, procedure, and practice provide an approved shower schedule which allows daily showers and showers after strenuous exercise.**

*Comment:* None.


**3-JDF-4B-14** (Ref. 2-8240)

88.  **Written policy, procedure, and practice require that articles necessary for maintaining proper personal hygiene are provided to all juveniles.**

*Comment:* As part of the admissions process, each juvenile should be given soap, a toothbrush, toothpaste or powder, a comb, and toilet paper.  Shaving equipment should be made available upon request, and the special hygiene needs of females should be met.


**3-JDF-4B-15** (Ref. 2-8239)

89.  **There are hair care services available to juveniles.**

*Comment:* Barber and beautician's facilities should be provided so that juveniles can obtain hair care services when needed.

367.

**Current Mental Health Services**

**3-JDF-4C-16** (Ref. 2-8255)

100. **Written policy, procedure, and practice specify the provision of mental health services for juveniles.** These services include but are not limited to those provided by qualified mental health professionals who meet the educational and license/certification criteria specified by their respective professional disciplines (e.g., psychiatric nursing, psychiatry, psychology, and social work).

*Comment:* An adequate number of qualified staff members should be available to deal directly with juveniles who have severe mental health problems as well as to advise other correctional staff in their contacts with such individuals.

**Health-trained Staff Member**

**3-JDF-4C-17** (Ref. New)

101. **When facilities do not have full-time, qualified, health-trained personnel, a health-trained staff member coordinates the health delivery services in the facility under the joint supervision of the responsible health authority and facility administrator.**

*Comment:* The health-trained staff member (who is other than a nurse, physician's assistant, or emergency medical technician) may be full-time. Coordination duties may include reviewing receiving screening forms for needed follow-up, readying juveniles and their records for sick call, and assisting in carrying out orders regarding such matters as diets, housing, and work assignments.

368.

## Section B: Social Service

**Principle:** The facility makes available the professional services necessary to meet the identified needs of juveniles. Such services may include individual and family counseling, family planning and parent education, and programs for juveniles with drug and alcohol addiction problems.

**Counseling**

**3-JDF-5B-04** (Ref. 2-8375)

128. **Written policy, procedure, and practice provide that staff members are available to counsel juveniles at their request; provision is made for counseling juveniles on an emergency basis.**

*Comment:* In assisting juveniles with their personal problems and with adjustment to the facility, staff members should make time available on a regularly scheduled basis for appointments with juveniles who request it. Because juveniles may have problems that require immediate attention, at least one staff member should be available 24 hours a day.

**3-JDF-5B-05** (Ref. New)

129. **Written policy, procedure, and practice provide for juvenile access to mental health counseling and crisis intervention services in accordance with their needs.**

*Comment:* Juveniles placed in detention facilities are, in some cases, highly disturbed; therefore, it is imperative that mental health, psychiatric, and crisis intervention services are available on an as-needed basis. Treatment offerings should include group therapy and group and individual counseling.

369.

# Section C: Academic, Vocational, and Work

**Principle:** A written body of policy and procedures governs the facility's academic, vocational education, and work programs for juveniles, including program accreditation, staff certification, and coordination with other facility programs and services as well as with the community.

## Comprehensive Education Program

**3-JDF-5C-01** (Ref. 2-8356)
**130. There is a comprehensive education program for juveniles.**

*Comment:* The facility should provide juveniles with a broad educational program that is most suited to their needs and abilities and includes but is not limited to: developmental education; remedial education; special education; multicultural education; bilingual education, when the profile indicates; and tutorial services as needed. This program should operate under the auspices of the year-round school system.

**3-JDF-5C-03** (Ref. 2-8359)
**131. The educational program is supported by specialized equipment that meets minimum state education standards.**

*Comment:* Regardless of the extent of the educational program, specialized equipment is essential.

## Vocational/Work Programs

**3-JDF-5C-05** (Ref. 2-8302)
**132. Juveniles are not required to participate in uncompensated work assignments unless the work is related to housekeeping, maintenance of the facility or grounds, personal hygienic needs, or part of an approved training or community service program.**

*Comment:* Work that benefits the community or the facility may also serve the needs of the confined juveniles. It may be part of a training program, the opportunity to practice existing skills, or simply a relief from boredom. Juveniles in the custody of the INS may not participate in compensated work assignments.

**3-JDF-5C-06** (Ref. 2-8379)
**133. Juveniles are not permitted to perform any work prohibited by state and federal regulations and statutes pertaining to child labor.**

*Comment:* Juveniles in detention facilities should not be permitted to perform work that juveniles in the community would be prohibited from performing pursuant to state and federal child labor laws.

370.

## Section D: Library

**Principle:** A written body of policy and procedure governs the facility's library program, including acquisition of materials, hours of availability, and staffing.

**Comprehensive Library Services**

**3-JDF-5D-03** (Ref. 2-8366)
**134. Library services are provided and available to all juveniles.**

*Comment:* Every effort should be made to become part of a local library system. Young people should be encouraged to check out books and other library materials. Library services may be provided in the facility to include reading materials for nonlibrary hours. Reading material should reflect racial and ethnic interests and be appropriate for various levels of competency.

371.

# EXHIBIT 41

Jose Humberto Gonzales (A96-077-160)
Page 1 of 2

SCANNED

## Declaration of Jose Humberto Gonzales (A96-077-160)

1.  My name is Jose Humberto Gonzales. I was born on May 10, 1985. I am from Honduras.

2.  Since getting caught by Immigration, I have been held in San Antonio, Chicago, and Los Angeles. On April 21, 2003, I was taken to Central Juvenile Hall in Los Angeles, California.

3.  On April 30, 2003, I was taken to an adult detention center in Florence, Arizona. I was not told why I was brought here from Los Angeles.

4.  I came to Arizona on an airplane. The flight was about an hour and during this time my hands and feet were handcuffed. Everyone else on the flight was handcuffed like me.

5.  A bus took me from the airport to the detention center. I was also handcuffed on the bus.

6.  This is an adult detention center and the minors are kept separate from the adults. In my section there are about 6 cells and only minors are in them. There is one person in each cell.

7.  There are four other minors here. There are four minors waiting for deportation: me, Cesar (who's waiting to return to Honduras also), and two Guatemalans. There is one Mexican minor here who murdered someone. He is fighting his case. He is kept apart from the other minors and I.

8.  We are all alone in our cells. There is nothing to do except watch television. I have no books, paper, or pencils. I do not go to school. I get one hour of recreation per day.

9.  There is a public telephone in my cell. But it is only for making collect calls. I can't call anyone collect. I have a sister in Washington and have not spoken to her since I was in Chicago. I didn't speak to her in L.A. or from Arizona. I have not spoken to my attorneys since arriving here.

10. The staff here is ok. I haven't had any problems with them. It is better here than in L.A. But I still feel sad because I want to return to my country. I want to see my family because I haven't seen them for a long time. I was told that I would be leaving on May 7th and I hope that this is true.

372.

Jose Humberto Gonzales (A96-077-160)
Page 2 of 2

11.    This declaration has been read to me in the Spanish language.  I understand all of
       its contents and all is true and correct.


_Jose Humberto gonzales_           __5/6/03__
Jose Humberto Gonzales                 Date


Translated by: _____       __5/6/03__
         Shiu-Ming Cheer            Date


I declare that I am fluent in Spanish and English and I have read this
declaration in its entirety to Jose Humberto Gonzales.

373.

SCANNED

# EXHIBIT 42



# GILA COUNTY JUVENILE DETENTION CENTER

## Student and Parent Handbook

Gila County Juvenile Detention Center
1425 South Street
Globe, Arizona 85501
Phone: 928-425-3231
Ext. 8601 or 8602

SCANNED

## VISITATION HOURS & PHONE CALLS
### 9:00 am–300pm

**Saturday**
Names with the letters
A through M
15 minute contact visit
(Extra time for out of town visits)
Phone calls
N through Z
10 minute calls
(collect calls only)

**Sunday**
Names with the letters
N through Z
15 minute contact visit
(Extra time for out of town visits)
Phone Calls
A through M
10 minute calls
(collect calls only)
Sunday Church
1330-1430

ALL VISITS AND PHONE CALLS WILL BE
MONITORED BY STAFF AT ALL TIMES.
ALL VISITORS WILL BE SCANNED WITH A
METAL DETECTOR. ALL PURSES AND
WALLETS WILL NOT BE ALLOWED INTO THE
CENTER. ONLY PARENTS AND GUARDIANS
WILL BE ALLOWED TO VISIT OR CALL.
PLEASE BRING A PHOTO FORM OF I.D.
IF THERE IS ANY INFRACTIONS OF THE
RULES THE VISIT OR PHONE CALL WILL
BE TERMINATED.

2000-2200  Movie and snack ● level 4, if
behavior has been perfect for the week.
(Rated G or PG and at the shift       supervisor's
approval)
2100-2200 Level 3 can stay in day room and play
games or read. If behavior has been
perfect for the week.

# DAILY SCHEDULE

0500-0600.  Wake up detainees, head count, showers, and
clean up started.
0600-0620:  Breakfast served, levels 2,3,4 will eat in pod.
(level 0-1 will eat in cells.)
0620         All detainees placed in cells for shift change.
0700-0800:  Morning hygiene, sick call and school
preparation.
0700-0715:  Level 4 may request to clean breakfast trays.
(Pat down after activity)
0720-0735  Top floor escorted down to pod tables for
school
0735-0750  Bottom pod escorted to pod tables for school
0800         Detention Officers will conduct cell searches
0800-1200 All detainees not attending school will be
required to wash walls, clean windows, day
rooms, outside recreation and staging area.
1000-1100 Outside time for level 0 and level 1 if not
attending school.
0900-1200 WEEKENDS, all detainees will be required to
clean personal cells, scrub walls, toilets, beds
and mats.
1200-1215 Detainees returning from school will be patted
down. head count completed and will receive
lunch trays
(Level 0's and 1's will eat in cells.)
1200-1245 Level 4 may request to do clean up in pod area
or where needed.
1300-1400 Outside rec. for level 1's (if attended school)
and level 2's. (Head count reported to shift
supervisor)
1400-1445 Quiet time in cells.  All levels this is to be
used for reading.  (Shift change)
1445-1545 Outside rec. for levels 3&4
1545-1645 Outside rec. for females all levels.
1700-1720 Dinner served.  (Level0&1 eat in cells) Level
4 may request to pick up tray and clean up.
1700-1800 T.V and Game time.  Letter writing for level
1's if requested.
1800-1900  Level 1 placed back in cells.
2000         Level 2 placed back in cells.
2100         Level 3 placed back in cells.
2100-2200 Level 4 request laundry duty, organizing
room.
shower setups, clean up pods and laundry
2200        Level 4 patted down & placed back in cells,
head count completed and reported to shift supervisor.
2200        LIGHTS OUT!!!

374.

# YOUTH ORIENTATION

At the detention center we expect a better you. When you are admitted to the center, you will be placed in observation level for 24 hours. From then on you will be evaluated by staff during each respective shift. All privileges will be earned. YOU will be graded in the following areas.

**Personal Hygiene** includes personal appearance, showers, teeth brushed after each meal, hair combed and the use of deodorant.

**Room Appearance**, overall neatness of room, bed made military style, book on foot of bed when not used

**Meal Behavior**, being on time, proper manners, tone of voice, and vocabulary.

**Job Performance**, work details assigned by staff. Your are expected to have a good attitude, behavior and cooperation.

**Education**, attitude, behavior, participation, and completion of assignments.

**Activity Participation**, participation and involvement in all activities.

**Respect For Staff & Peers**, cordiality, mannerisms, and vocabulary.

All grades will be totaled for an overall average. Your level will be determined to you

Following the ABC's of the Detention Center Program.

(A) YOUR ATTITUDE

(B) YOUR BEHAVIOR

(C) YOUR COOPERATION

THE DECISION IS YOURS!
THE HIGHER GRADE YOU ATTAIN THE BETTER STATUS YOU ARE PLACED AND THE MORE EARNED PRIVILEGES YOU WILL RECEIVE.

375.

---

"WE EXPECT A BETTER YOU"

## GUIDELINES FOR YOUTH

1. Each youth is responsible for care of his or her room. At times of double capacity both youths will be responsible.
2. Juveniles must wear socks and shoes.
3. Youth must wash hair every day.
4. Television viewing only during activity time and earned free time. Movies are scheduled at the supervisor's decision.
5. Every youth shall attend classes.
6. Classroom and study time shall be conducted in classroom and areas designated by the shift supervisor.
7. Everyone is to sit at the table for meals ans snacks unless in isolation or on level 0.
8. During meal time youth shall display proper table etiquette.
YOU WILL NOT EAT OFF OTHERS TRAYS OR PASS FOOD.
9. All youth will participate in work details, unless authorized no to by the shift supervisor.
10. Juveniles are responsible for clean up of shower stalls and washroom after showers.
11. Pens or pencils are not allowed in cells or pods. Letter writing will be done in staging area with supervision.
12. Youth are no permitted tobacco products or matches, etc, etc.
13. In the event work is refused youth will be placed to room and a grade will not be given.
14. Youth may not have any physical contact with other detainees or staff.
15. Youth may not use profane or offensive vocabulary and/or name calling with staff or other youth, including racial slurs.
16. Youth may not damage the building in any way-writing on walls or furniture.
17. Horseplay may result in a loss of level.
18. Refusal to participate in program may constitute shift isolation.
19. Combs and toothbrushes are not allowed in cells.
20. Youth are not permitted to go from staff to staff requesting permission.
21. All youth complaints will be reported to the shift supervisor or lead officer.

---

## LEVEL SYSTEM

LEVEL

0   0-24 hours = 1 day evaluation period at the time of Intake.
    White shirt
    1 hour of outside time
    Meals in cell

1   24-28 hours = 2 days
    Gray shirt
    School 4 hours per day
    1 hour of outside time
    2 hours rec. time
    3 meals in pod

2   48-72 hours = 3 days
    Green shirt
    School 4 hours per day
    1 hour of outside time
    2 hours rec. time
    3 meals in pod

3   72-96 hours = 4 days
    Light blue shirt
    School 4 hours per day
    1 hour outside time
    3 hours of rec. time
    3 meals in pod
    Kitchen/laundry duties, etc.

4   96-110 hours = 5 days
    School 4 hours per day
    1 hour of outside time
    4 hours rec. time
    3 meals in pod
    Facility clean-up or special projects within the facility

ATTITUDE:
We live in a world of words...
No matter what happens, there is a word for it. Some words mean a great deal to us. Words such as love, happiness, success, achievement, joy and ability-but one word controls them all-ATTITUDE. If your attitude is good, you obtain GOOD RESULTS.

SCANNED

# EXHIBIT 43



18 of October 2001

     I arrived in Globe jail about September 8, 2001.  Since I have been here I feel like the other white kids look down on me.  The white kids try and hit us with balls when we go outside for break.

Yesterday, we only got to outside for about one and a half hours.  We were locked alone in our cells all day.  There has not been any classes since last Thursday.  I do not know why. We were permitted to leave our cell for one hour in the morning and then two hours in the afternoon for lunch.  Then from 4:30-8:30 p.m. we got to go outside for 40 minutes and then got to eat dinner and watch T.V.

We spend most of the day alone in our cells.  I only have a Bible in my cell.

I have been detained for over a month and I have only been permitted to use the phone one time.

I swear that the following is true and correct.

18-10-01                              _____

                             Carlos Hugo Pacheco
                             A79653585

SCANNED

376.

18 of October 2001

I arrived in Globe jail about September 8, 2001. Since I have been here I feel like the other white kids look down on me. The white kids try and hit us with balls when we go outside for break.

Yesterday, we only got to go outside for about one and a half hours. We were locked alone in our cells all day. There has not been any classes since last Thursday. I do not know why. We were permitted to leave our cell for one hour in the morning and then two hours in the afternoon for ~~lu~~ lunch. Then from 4:30 – 8:30pm we got to go outside for 40 minutes and then got to eat dinner and watch T.V.

We spend most of the day alone in our cells. I only have a Bible in my cell.

377.

I have been detained for over a month and I have only been permitted to use the phone one time.

I swear that the following is true and correct.

18-10-01          X Carlos Hugo P. G.

                  Carlos Hugo Pacheco

                  A79 653 585

378.

SCANNED

# EXHIBIT 44

## DECLARATION OF FELIPE GALILEO LOPEZ-BELTRAN

I, Felipe Galileo Lopez-Beltran, declare and say as follows:

1. I am a native and citizen of El Salvador. I am currently fourteen years of age.

2. I left El Salvador in September, 1986, with a friend. We traveled together by land to the United States. On September 12, 1986, I was arrested by agents of the Immigration and Naturalization Service near San Ysidro, California. I was transported in a van with about ten other adults and minors to a Border Patrol office, where I was questioned. I was then taken to the Chula Vista detention center. When I arrived at Chula Vista I was taken to a room and INS officers ordered me to remove my clothes; I was then strip searched.

3. I was kept in the Chula Vista facility for 4 days. I received no educational instruction or access to educational reading materials while I was at Chula Vista. Twice we were taken outside in a small patio, where we stayed for about two hours. However, I was allowed to participate in no recreational activities and was otherwise kept locked inside all day in a room with about twenty other people. We were given little to eat. Breakfast usually consisted of a small glass of milk and corn flakes. For both lunch and dinner we were usually one burrito, a soda, and an orange. My stomach finally became used to being hungry.

4. I was then transported in a bus with other detainees, both adults and juveniles, to the Hollywood detention center, where I am currently detained. While at Hollywood, I have received no educational instruction of any type. Although there

379.

are a few books available in Spanish, I know of no educational

textbooks available to me.

5.   THe only place for recreation at the Hollywood detention

center is a small cement patio in the middle of all the rooms.

This patio is not large enough for sports, although there is one

ping-pong table in the area.

6.   I have regular contact here throughout the day with both

male and female adult detainees.

7.   Throughout my detention at Hollywood and Chula Vista I

have never received a medical examination nor have I seen a nurse.

8.   I arrived at Chula Vista with only the clothes I was

wearing.  I have asked for more clothing, but they tell me there

aren't any.  I must therefore stay in my room all day whenever my

clothes are being washed.

9.   My parents are both in El Salvador, so they cannot come

to pick me up from INS detention.  When I came to the United

States I intended to live with my cousin, Doroteo Aparicio Lopez.

I have known my cousin Doroteo for all my life.  I trust him to

look out for my welfare; I believe he would take care of me and

protect me if I were allowed to live with him.

10.   I have also met Mr. Mike Niemeyer, a chaplin who

sometimes comes to the Hollywood detention facility.  If I am not

allowed to live with my cousin Doroteo, I would like to be

released to live with Mr. Niemeyer.  I also trust him to look out

for my welfare and believe he would take care of me and protect me

if I were allowed to live with him.

11.   I also understand that I must appear at any future

proceedings the Immigration Service schedules in my case and

*380.*

promise to do so.  I understand that if I do not appear at these proceedings, I will be arrested and deported anyway, and I will forfeit the amount of my bond.

12.  Prior to signing this declaration, it was translated to me in Spanish by Carlos Holguin, as I do not speak or understand English.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14 14_ day of October, 1986, at Los Angeles, California.

Galileo Felipe Lopez-Beltran
Felipe Galileo

/ / /

\* \* \* \* \* \*

## DECLARATION OF TRANSLATOR

I, _Carlos Holguin_ , declare and say as follows:

1.  I am fluent in English and Spanish.

2.  On this day, I fully translated the foregoing to the declarant.

I declare under penalty of perjury that the foregoing is true and correct and that if called to testify with respect thereto I could do so competently.

Executed this _14th_ day of October, 1986, at Los Angeles, California.

/ / /

381.

SCANNED

# EXHIBIT 45

## DECLARATION OF JAIN XING ZHENG

I, Jain Xing Zheng, declare:

I am a seventeen year old male from Fujian, China. I have an older brother, younger sister, mother and father in China.

I was arrested by the INS on August 12, 1999 for trying to enter the U.S. illegally. After being questioned by the INS, I was taken to Berks County detention facility in Pennsylvania about eight days later. My cousin lived in New York for the past 7 or 8 years and is a permanent legal residence. Although my cousin and attorney tried to get my release from INS detention, the INS would not release me. I was never informed why.

I was deteined at Berks County from August 20, 1999, to March 23, 2000. I was strip-searched upon arrival. I was permitted to go into the community with INS escorts. The rooms or areas we were kept were never locked. I was permitted to eat as much as I wanted.

On March 23, 2000, I was released to my female cousin. On January 4, 2001, I was arrested by the INS even though I had been reporting to the INS every month. In fact, I was arrested while reporting to the INS. The INS said it was because I was not living with the cousin the INS had authorized me to live with and had violated my release agreement.

I was returned to Berks County and stayed there until the end of June. I was then transferred to Tulare County detention facility. I was never informed why I was being transferred to Tulare County. I have never been charged with or arrested for any type of criminal activity in China or the U.S. I have never been a discipline problem or tried to escape. My family had paid off all the money owed to the smugglers and I have no reason to fear the smugglers.

-1-

382.

Since I have been at Tulare County, I have not been able to eat enough as we are only given one small portion of food per meal.  I have lost about 10 pounds and sometimes I am still hungry after meals.  when I ask for more food, sometimes they give it to me and sometimes they don't.  They do not provide education in Chinese and I have problems learning.  Although I often feel sad and depressed, the staff seldom, if ever, ask me if I am sad or depressed.  I am also not permitted to go into the community even with escorts.  I do not understand why I am locked up like this and that is what I wonder about most here.  I want to be with my family in New York.

I declare under penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

_____

Jian Xing Zheng

383.

Jain Xing Zheng

I, Jian Xing Zheng, declare:

I am a seventeen year old male from Fujian, China. I have an older brother, younger sister, mother and father in China.

I was arrested by the INS on August 12, 1999 for trying to enter the U.S. illegally. After being questioned by the INS, I was taken to Berks County detention facility in Pennsylvania about eight days later. My ~~cousin,~~ cousin relative ~~who has~~ lived in New York for the past 7 or 8 years and is a permanent legal resident. Although my cousin and attorney tried to get my release from INS detention, the INS would not release me. I was never informed why.

I was detained at Berks County from August 20, 1999, to March 23, 2000. I was strip-searched upon arrival. I was permitted to go into the community with INS escorts. The rooms or areas we were kept were never locked. I was permitted to eat as

384.

much as I wanted.

On March 23, 2000, I was released to
my cousin. On January 4, 2001, I was arrested
by the INS even though I had been reporting
to the INS every month. In fact, I was
arrested while reporting to the INS. The
INS said it was because I was not living with
the cousin the INS had authorized me to
live with and had violated my release agreement.

I was returned to Berks County and
stayed there until the end of June. I was
then transferred to Tulare County detention facility.
I was never informed why I was being transferred
to Tulare County. I have never been charged
with or arrested for any type of criminal activity
in China or the U.S. I have never been
a discipline problem or tried to escape.
My family has paid off all the money owed
to the smugglers and I have no reason to fear
the smugglers.

385.

Since I have been at Tulare County, I have not been able to eat enough as we are only given one small portion of food per meal. I have lost about 10 pounds and sometimes I am still hungry after meals. When I ask for more food, sometimes they give it to me and sometimes they don't. They do not provide education in Chinese and I have problems learning. Although I often feel sad & depressed, the staff seldom, if ever, ask me if I am sad or depressed. I am also not permitted to go into the community even with escorts. I do not understand why I am locked up like this and that is what I wonder about most here. I want to be with my family in New York.

I declare under penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

tJian Xing zheng

Jian Xing Zheng

386.

# Declaration of Translation

I, Jonathan Klaner, declare:

I have accurately translated the foregoing declaration from English to Chinese (Mandarin) for Jain King Zheng. He has informed me that he understands his declaration and agrees with it. I am fluent in Chinese and English.

I declare under penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

9/14/01

Jonathan Klamer

387.

SCANNED

# EXHIBIT 46

# HUMAN RIGHTS WATCH

A HUMAN RIGHTS WATCH REPORT; COPYRIGHT ©1998 HUMAN RIGHTS WATCH; ISSN: 1041-9197

December 1998

Vol. 10, No. 4 (G)

# UNITED STATES

## DETAINED AND DEPRIVED OF RIGHTS:

### CHILDREN IN THE CUSTODY OF THE
### U.S. IMMIGRATION AND NATURALIZATION SERVICE

I. SUMMARY AND RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        To the U.S. Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        To the U.S. Department of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        To the U.S. Immigration and Naturalization Service (INS) . . . . . . . . . . . . . . . . . . . . . . . . 5
          Detention Policies and Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          Age Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          Access to Legal Information and Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          Monitoring of Conditions and Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        To the Working Group on Arbitrary Detention of the U.N. Human Rights Commission . . . . . . . . . . . . . 8
        To the United Nations High Commissioner for Refugees (UNHCR) . . . . . . . . . . . . . . . . . . . . . . . 8
        To the Organization of American States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    United States Law and Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        Recent Changes to U.S. Immigration Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        Right to Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        Detention Conditions and Release Options for Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    International Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. THE IMMIGRATION AND NATURALIZATION SERVICE'S
     TROUBLING CONFLICT OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15



350 FIFTH AVENUE, 34TH FLOOR
NEW YORK, NY 10118-3299
TEL (212) 290-4700
FAX (212) 736-1300
E-MAIL hrwnyc@hrw.org

1522 K STREET, NW, #910
WASHINGTON, DC 20005-1202
TEL (202) 371-6592
FAX (202) 371-0124
E-MAIL hrwdc@hrw.org

33 ISLINGTON HIGH STREET
LONDON N1 9LH UK
TEL (44171) 713-1995
FAX (44171) 713-1800
E-MAIL hrwatchuk@gn.apc.org

15 RUE VAN CAMPENHOUT
1000 BRUSSELS, BELGIUM
TEL (322) 732-2009
FAX (322) 732-0471
E-MAIL hrwatcheu@gn.apc.org

WEB SITE http://www.hrw.org

LISTSERV ADDRESS To subscribe to the
list, send an e-mail message to
majordomo@igc.apc.org with
"subscribe hrw-news" in the body of
the message (leave subject line blank)

388.

IV. FINDINGS AT BERKS COUNTY YOUTH CENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Findings Common to All BCYC Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        Information on Legal Rights and Available Legal Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        Access to Translators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        Visitation and Telephone Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        Use of Restraints During Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        Treatment by Staff and Grievance Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        Activities and Recreation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        Transfers to Other Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        Release and Family Reunification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Conditions in BCYC's Secure Detention Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        The Standards for Placing Children in Secure Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        Privacy and Personal Possessions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ACKNOWLEDGMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

389.

# I. SUMMARY AND RECOMMENDATIONS

For six months, Xiao Ling lived in a small concrete cell, completely bare except for bedding and a Bible in a language she could not read. Locked up in prison-like conditions with juveniles accused of murder, rape, and drug trafficking, Xiao Ling told Human Rights Watch in June 1998 that she was kept under constant supervision, not allowed to speak her own language, told not to laugh, and even forced to ask permission to scratch her nose. Bewildered, miserable, and unable to communicate with anyone around her, she cried every day.[1]

Only fifteen years old at the time of her detention, Xiao Ling was never charged with any crime. Every year, thousands of unaccompanied children like Xiao Ling are apprehended by the U.S. Immigration and Naturalization Service (INS). Once in the hands of the INS, the children generally either accept immediate return to their countries of origin or face removal proceedings; most of the children arrested are released to family members or expelled from the United States within a few days. But for a variety of reasons, some of the children are detained by the INS while their cases are pending. Rarely understanding what is happening to them or why, they often end up, like Xiao Ling, in highly restrictive settings where they are denied basic rights.[2]

In 1997, Human Rights Watch released *Slipping Through the Cracks,* which documented the results of our investigation of children held by the INS in Arizona and California. The report detailed numerous violations of children's rights, in breach of the U.S. Constitution, U.S. statutory provisions, INS regulations, the terms of court orders binding on the INS, and international law. We found that with regard to unaccompanied children, the INS has an inherent and troubling conflict of interest: children are arrested, imprisoned, and frequently removed by the same agency that is charged with caring for them and protecting their legal rights. Additionally, we found that too many children were detained in jail-like conditions for long periods of time and that the INS failed to inform children of their legal rights, interfered with their efforts to obtain legal representation, and failed to facilitate contact with their family members. Based on our findings, Human Rights Watch recommended that the U.S. Congress separate the INS's caregiving function from its enforcement function by placing unaccompanied children in the custody of appropriate child welfare authorities. We also made a series of recommendations regarding detention policies and conditions, access to legal information and representation, and monitoring of conditions and practices.[3]

After the INS agreed to address concerns raised by human rights and other organizations, Human Rights Watch conducted several site visits in Pennsylvania to review the agency's progress. Our follow-up investigation focused on conditions of detention for children at the Berks County Youth Center (BCYC), in Leesport, Pennsylvania. BCYC

---

[1] Unless otherwise noted, accounts are taken from Human Rights Watch interviews of children detained or recently released from INS detention at the Berks County Youth Center, Leesport, Pennsylvania. Interviews were conducted on June 5, June 16, September 2, November 19, and November 23, 1998. Most interviews were conducted in Spanish or Chinese; quotations taken from those interviews were translated by Human Rights Watch. The names of children interviewed have been changed to protect their privacy.

[2] INS data record 4,295 "custody occurrences" of juveniles from October 1997 to July 1998. At the end of July, the INS had 479 juveniles in current custody. INS, Custody Status of Juveniles, Fiscal Year 1998 (Through 7/98) (September 1998) In 1990, the INS arrested 8,500 undocumented children, 70 percent of whom were unaccompanied by an adult guardian. *Reno v. Flores,* 507 U.S. 292, 295 (1993) (citing INS brief on appeal). In our investigation prior to the publication of our 1997 report on unaccompanied children detained by the INS, we found that over 200 children were in INS custody of more than seventy-two hours' duration at any given time. Human Rights Watch, *Slipping Through the Cracks: Unaccompanied Children Detained by the U.S. Immigration and Naturalization Service,* p. 2, n. 3 (New York: Human Rights Watch, 1997).

[3] Human Rights Watch has also reported on the conditions of confinement of adult INS detainees. *See, for example,* Human Rights Watch, "Locked Away: Immigration Detainees in Jails in the United States," *A Human Rights Watch Short Report,* vol 10, no. 1 (G), September 1998; Helsinki Watch, *Detained, Denied, Deported Asylum Seekers in the United States* (New York: Human Rights Watch, June 1989).

---

*390.*

consists of a secure detention facility and two shelter care facilities administered by the county.[4] Between June and
November 1998, we conducted a series of interviews with children and with their attorneys and immigration
advocates. Ten of the fifteen children we interviewed were placed at BCYC at the time of interview; five had recently
been released.

We visited BCYC three times, once in June 1998 and twice in November 1998. During our site visits, we met
with BCYC Superintendent Jack Borden, Assistant Director Eric Ruth, and other BCYC staff. In June 1998, we met
with local INS Supervisory Detention/Deportation Officer Marion Dillis (who has since transferred to a different
position within the INS); and in November, with the INS National Juvenile Coordinator John Pogash, Assistant
District Director Ted Nordmark, local INS Supervisory Detention/Deportation Officer James Slovik, and local INS
juvenile coordinator David Savina.

Since our original research, the INS has made efforts to improve its policies and practices regarding
unaccompanied minors. The INS has implemented an extensive training program, providing training for more than
1,500 INS officers nationwide. It has increased the number of shelter beds substantially, to approximately 350 from
the 130 which the *Flores v. Reno* settlement agreement provides for;[5] in Berks County, negotiations between BCYC
and the INS led to the opening of a second thirty-five bed shelter care facility primarily for unaccompanied minors
detained by the INS. The INS has improved its data collection efforts,[6] and it is has issued new regulations for the
implementation of *Flores*.

Despite these improvements, we found the INS's performance lacking in critical areas. Nationwide, as many
as one-third of children in INS detention are placed in secure detention centers for juvenile offenders.[7] Often held
with youth detained for committing violent crimes, they are denied personal possessions and held in a severely
restrictive, punitive environment. Children interviewed for this report were handcuffed during transport, strip
searched, and subjected to other degrading treatment. We found that too often, children in INS custody do not receive
adequate legal information or representation and are transferred without the knowledge of their attorneys or families.
Many children are denied information about their detention or education in a language that they understand and may

---

[4]BCYC's primary function is to house county children who are adjudicated delinquent or who are placed in the custody of
child welfare authorities. Those adjudicated delinquent are placed in secure detention; those in the custody of child welfare
authorities are placed in shelter care. The INS contracts with Berks County to place unaccompanied minors in BCYC; in
response to the INS's need for shelter care beds, BCYC opened a new thirty-five bed shelter care facility in mid-October 1998.
At the time of Human Rights Watch's visits to BCYC, the INS placed between five and ten children in the secure detention
facility and between fifteen and thirty children in shelter care. *See* Findings at Berks County Youth Center section.

[5]*Flores v. Reno* was a nationwide class-action lawsuit filed against the INS to challenge its policies relating to the detention,
processing, and release of children. It resulted in a negotiated settlement which sets out national policy for the detention, release,
and treatment of minors in the custody of the INS. *See* Stipulated Settlement Agreement, *Flores v. Reno*, Case No. CV 85-4544-
RJK(Px) (C.D. Cal. January 17, 1997) (hereinafter "*Flores* Settlement Agreement") . The INS published proposed regulations
implementing the settlement agreement in July 1998. *Federal Register*, vol. 63, p. 39,759 (July 24, 1998) (amending 8 C.F.R.
section 236.3).

[6]In October 1998, Congress enacted legislation that requires the Attorney General to collect data on detained asylum seekers
and other INS detainees. The statute specifies that the data must include a breakdown of the ages of detainees; the location of
each detainee by detention facility; whether each of the facilities is also used to detain criminals and whether any of the detainees
are held in the same cells as criminals; the number and frequency of transfers of detainees between detention facilities; the
average length of detention; and a description of the disposition of the detainees' cases. Beginning in October 1999, the Attorney
General must submit an annual report of these data to Congress. Omnibus Appropriations Act of 1998, Sections 903-904, in
*Congressional Record*, vol. 144, pp. H11190-91 (daily ed. October 19, 1998).

[7]Human Rights Watch interview with John Pogash, INS National Juvenile Coordinator, Leesport, Penn., November 23,
1998.

---

391.

be confined for months at a time without direct access to a single person with whom they can converse in their own language.

## Recommendations

Based on our site visit and interviews, Human Rights Watch found that many of the concerns raised in our 1997 report remain unaddressed and that the INS continues to violate its own regulations and the rights of children in its custody. The following recommendations reiterate many of those made in our 1997 report.

### To the U.S. Congress:

- To prevent conflicts of interest, the U.S. Congress should not charge the same agency with the care of unaccompanied, undocumented children and also the enforcement of the immigration laws against them. Once apprehended by the INS, unaccompanied children should be placed in the custody of appropriate child welfare authorities.

- Congress should request that the General Accounting Office initiate a study into the use of local juvenile detention centers by the INS to house children. The study should produce information on the number of children held in juvenile detention centers, including the number of those children who are asylum seekers; the number and location of all detention centers used; the average length of detention of children at each facility; transfer policies; language abilities of local detention center staff; compliance with INS detention stanadards and American Correctional Association guidelines; and compliance with international and domestic standards on the treatment of juvenile administrative detainees.

### To the U.S. Department of Justice:

- United States Attorney General Janet Reno should direct the INS to work towards full compliance with the United Nations High Commissioner for Refugees (UNHCR) Guidelines on Detention of Asylum Seekers, UNHCR Guidelines on the Protection and Care of Refugee Children, and the UNHCR Guideline on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum.

- United States Attorney General Janet Reno should order the INS to comply fully with all relevant national laws, regulations, and international standards concerning detention conditions for children.

- Unaccompanied children awaiting determination of their status should not be detained.

Until arrangements have been made to transfer custody of unaccompanied children from the INS to appropriate child welfare authorities:

- Attorney General Janet Reno should order that the INS immediately cease to place unaccompanied children in state juvenile justice or criminal justice facilities, or in other facilities with prison-like conditions.

- The Special Litigation Section of the Civil Rights Division should investigate conditions of confinement of children held by the INS in local juvenile detention centers.

### To the U.S. Immigration and Naturalization Service (INS):

#### *Detention Policies and Conditions*

Until custody of unaccompanied children is transferred to appropriate child welfare authorities:

- The INS should develop and implement alternatives to detention, consistent with its expressed policy of placing children "in the least restrictive setting appropriate to the juvenile's age and special needs." These alternatives should include local social service agencies and foster families in the area in which the child was originally

---

392.

detained. The INS should develop such alternatives to detention with the assistance of local public interest attorneys and community groups.

• In emergencies where there is no alternative to placing children in juvenile detention facilities, placement should be for the shortest possible period of time, and children should be separated from juvenile offenders.

• Safety considerations may require keeping some children in secure facilities to protect them against recapture by smugglers. Such determinations should be made only on a case-by-case basis, and such children should be detained in secure facilities only if a thorough and individualized investigation reveals no possible safe alternatives. If children must be detained in secure facilities, they should be held separately from children adjudicated delinquent.

• Shelter-care facilities should be in major ports of entry to the United States, where culturally appropriate community resources and legal services are available. When possible, children should be placed in shelter-care facilities in the area in which they were originally apprehended or in which they have friends or relatives.

• Children in detention (whether in juvenile detention facilities or in private shelter-care facilities) should be permitted to retain their own clothes and personal belongings, receive an adequate education, to visit public libraries, and to go on frequent educational and recreational field trips. Children in longer-term custody should be permitted to attend public school whenever possible.

• Children should be given unrestricted and private access to telephones and assisted in making calls. The INS should enable children to call relatives who cannot accept collect calls.

• Children in INS custody should not normally be subjected to the use of handcuffs or other restraints. In those rare instances in which the use of restraints must be used to protect a child's safety or the safety of others, instruments of restraint should not cause humiliation or degradation, and they should be used restrictively and only for the shortest period of time.

• Grievance procedures, including mechanisms for making confidential complaints against facility staff, should be made available and described in writing and clearly explained to children upon their arrival at a facility. INS officials and local facility supervisors should promptly investigate and respond to all complaints.

*Age Assessment*
• Where the INS employs age assessments, it should take care to ensure that the method of assessment conforms to the United Nations High Commissioner for Refugees's Guidelines on Policies and Procedures in dealing with Unaccompanied Children Seeking Asylum. Any assessment must take into account both the physical appearance and the psychological maturity of the child. Any examination must allow for a margin of error and must take into account the possibility of overestimating a child's age because of the inherent unreliability of many assessment tools which purport to measure chronological age. Further, examinations must employ methods which are safe and which respect human dignity. Finally, immigration authorities should err on the side of extending the protections accorded to minors in cases where an individual cannot be identified as an adult with certainty.

*Access to Legal Information and Representation*
• All unaccompanied children awaiting determination of their immigration status should have access to meaningful legal representation. If an unaccompanied child is indigent, the government should pay for legal representation. All legal representation should be by an attorney or accredited representative who is given adequate time to prepare the case and who commits to representing the child through completion of the proceedings.

---

393.

- Just as regulations currently in place provide that immigration judges cannot accept an admission of removability from an unrepresented child, the INS should adopt a regulation or operating instruction to prohibit INS officers from presenting a voluntary departure form or accepting a voluntary departure request from an unaccompanied, unrepresented child.

- No agency should receive a contract to provide shelter care for unaccompanied children unless it provides a full and complete plan for ensuring that all children in its facilities will have access to meaningful legal representation.

- The INS should promptly and regularly provide children with information about their legal rights in a language they can understand.

- The INS should promptly inform children of their court dates verbally and in writing in a language they can understand.

- The INS should inform children both verbally and in writing of their right to contact a local office of the United Nations High Commissioner for Refugees.

- The INS should ensure that all written rights advisory forms are translated into the language spoken by each child and provided to each child.

- The INS should provide a sufficient number of trained interpreters at facilities housing unaccompanied children, as required by the shifting language populations in the facilities.

- The INS should keep children, their attorneys, and the local public interest bar informed of all legal and policy developments affecting the children in their custody.

*Monitoring of Conditions and Practices*
- In compliance with the data collection provisions of the Omnibus Appropriations Act of 1998, the INS should keep statistics on all children apprehended and detained, including those detained for less than seventy-two hours and those who accept voluntary departure as an alternative to deportation proceedings. For those detained less than seventy-two hours, the INS should record the same information which it is required by law to collect on longer-term detainees, including the place of apprehension; whether the child was given the opportunity to call a parent, relative, friend, or free legal services organization; whether such a call was in fact made; whether the child accepted voluntary departure; and, if voluntary departure was accepted, when, where, and to whom the child's custody was transferred.

- In addition to the aggregate data which the Omnibus Appropriations Act of 1998 requires the INS to collect, the INS should maintain comprehensive individual statistics on each child's age and country of origin; place and length of detention; whether the place of detention is also used to detain juvenile offenders; if so, whether the child shares a cell with a juvenile offender; and the ultimate disposition of the child's case.

- As long as the INS retains custody of unaccompanied children, each INS district should keep comprehensive statistics on detained children, ensure that detention facilities provide appropriate standards of care, and maintain meaningful contact with children's attorneys and the immigration and public interest bars.

- Each INS regional office should form an oversight committee to monitor conditions for detained children. Membership of the committee should include representatives of local social service and legal service groups,

394.

and the committee should be empowered to make spot inspections of all juvenile detention facilities and to recommend changes in placement options.

- No agency should receive a contract to provide shelter care for unaccompanied children unless it provides a full and complete plan for ensuring that all applicable laws, regulations, and standards will be complied with, including those found in the U.S. Department of Justice's Alien Minors Shelter Care Program Guidelines and Requirements.

## To the Working Group on Arbitrary Detention of the U.N. Human Rights Commission:
- The Working Group on Arbitrary Detention should investigate the detention of unaccompanied children in the United States by the INS.

- The Working Group on Arbitrary Detention should issue written guidelines, in consultation with nongovernmental organizations, juvenile specialists, and detention experts, to delineate the minimum standards appropriate for administrative immigration detainees. These guidelines should contain a special section on unaccompanied children detained by immigration authorities.

## To the United Nations High Commissioner for Refugees (UNHCR):
- UNHCR should give priority to the needs of unaccompanied children, who are particularly vulnerable.

- UNHCR should actively, extensively, and regularly investigate conditions in facilities in which unaccompanied children are detained to ensure that their treatment complies with international laws and standards and with UNHCR guidelines and policies; UNHCR should make the findings of such investigations public.

- UNHCR should pay particular attention to children's access to lawyers and interpreters, and to children's ability to contact family members or adult friends by telephone or otherwise.

- UNHCR should talk with children privately and for whatever time is necessary to assess their situation and treatment.

- UNHCR should request the INS to provide UNHCR with full information on the total number of unaccompanied children taken into custody, including those released or those who accept voluntary departure within seventy-two hours. This information should include the number, ages, and nationalities of the children; place of apprehension; place and length of detention; the number of children applying for asylum; the disposition of each case; when, where, and to whom each child was ultimately released; whether the children had access to legal representation, and the number of children who contacted family members or other adult friends.

- Local offices of UNHCR should apply to the U.S. Department of Justice's Executive Office for Immigration Review to be placed on the legal services lists for each immigration court to enable unaccompanied minors to contact UNHCR.

- Local offices of UNHCR should develop the capacity to respond to requests for assistance from detained unaccompanied minors or to refer such requests for assistance to local pro bono counsel.

- UNHCR should meet regularly with nongovernmental organizations and lawyers' groups working actively on the issue of unaccompanied children and their treatment by the INS.

---

395.

**To the Organization of American States:**

- The Inter-American Commission on Human Rights of the Organization of American States should investigate the treatment and conditions of confinement of children in INS detention in the United States.

## II. LEGAL STANDARDS

### United States Law and Policy

In the United States, children have the same basic right to constitutional protection as adults.[8] Children detained by the INS and placed in removal proceedings benefit from the U.S. Constitution's most fundamental guarantees, including the Fifth Amendment's directive that no person shall "be deprived of life, liberty, or property, without due process of law."[9]

In addition, the U.S. Supreme Court has been careful to point out that children may require additional legal protection: "'[C]hildren have a very special place in life which law should reflect. . . . [C]onstitutional principles [must] be applied with sensitivity and flexibility to the special needs of parents and children. . . . [While] children generally are protected by the same guarantees against government deprivation as are adults, the State is entitled to adjust its legal system to account for children's vulnerability.'"[10]

### Recent Changes to U.S. Immigration Laws

On a wave of public anti-immigrant sentiment, Congress overhauled the immigration laws twice in 1996, enacting the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) in April and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) in September.[11] These changes eliminated many of the statutory rights that immigrants had enjoyed for decades. Of particular concern for children apprehended by the INS, these amendments provide for the "expedited removal," with no meaningful review, of those who were never properly admitted to the United States; place a one-year filing deadline and other limitations on most asylum applications; and purport to eliminate judicial review of discretionary decisions under the immigration laws.[12]

Even in the wake of these significant legal changes, unaccompanied minors apprehended by the INS may have a number of options. They may request "voluntary departure," which requires them to leave the United States at their

---

[8]In the landmark 1967 case *In re Gault,* the Supreme Court noted that "[n]either the Fourteenth Amendment nor the Bill of Rights is for adults only." 387 U.S. 1, 13 (1967). The Supreme Court reaffirmed this principle in 1979, declaring that "a child, merely on account of his minority, is not beyond the protection of the Constitution." *Bellotti v. Baird,* 443 U.S. 622, 633 (1979).

[9]The U.S. Supreme Court has long recognized that most constitutional provisions are applicable to noncitizens, including those who enter the United States without inspection or who otherwise violate the immigration laws. As the Supreme Court declared in a 1953 decision, "[a]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaugnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212 (1953). Similarly, in *Plyler v. Doe,* the Supreme Court reaffirmed its commitment to protecting the right of aliens: "Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." 457 U.S. 202, 210 (1981).

[10]*Bellotti,* 443 U.S. at 634-35 (quoting *May v. Anderson,* 345 U.S. 528, 536 (1953) (concurring opinion of Justice Frankfurter)).

[11]Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Public Law No. 104-132, title IV, sections 401-443 (April 24, 1996), 110 Stat. 1258 (1996); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law No. 104-208 (September 30, 1996), 110 Stat. 3009 (1996).

[12]We discuss these recent changes to the immigration laws in greater depth in "Locked Away," pp. 31-33. For an assessment of the expedited removal process, *see* Lawyers Committee for Human Rights, *Slamming the 'Golden Door': A Year of Expedited Removal* (New York: Lawyers Committee for Human Rights, April 1998).

---

396.

own expense, within a certain period of time, and permits them to avoid the legal consequences of removal.[13] Some unaccompanied minors may qualify to apply for asylum or receive the benefit of a provision known as "withholding of removal."[14] Others may benefit from special programs which give permanent residence to some battered children or to some children who have been placed in foster care by a juvenile court.[15] Less frequently, a child may be eligible for an extraordinary form of relief known as "cancellation of removal"[16] or may demonstrate that he or she is a United States citizen.[17] The evaluation of these possible options, the application process for each, and the level of documentation required to prevail are daunting for most adults. A child would find these options bewildering and virtually incomprehensible without the assistance of counsel.

### Right to Counsel

Individuals in immigration proceedings have a right to counsel, but not at government expense.[18] In general, constitutional due process guarantees protect against interference with the right to counsel in immigration proceedings and require that detainees be given a reasonable opportunity to secure legal representation.[19] Further, although the courts have generally found that the government is not required to pay for counsel for adults in deportation or removal

---

[13]8 C.F.R. sections 240.25 and 240.26.

[14]Asylum is a discretionary form of relief from removal for those who establish past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Grants of asylum are governed by INA sections 208 and 101(a)(42)(A), codified at 8 U.S.C. sections 1158 and 1101(a)(42)(A). In December 1998, the INS released guidelines for adjudicating the asylum claims of children. INS, Office of International Affairs, Guidelines for Children's Asylum Claims (December 10, 1998). See also Jaqueline Bhabha and Wendy A. Young, "Through a Child's Eyes: Protecting the Most Vulnerable Asylum Seekers," Interpreter Releases, vol. 75, pp. 757-73 (June 1, 1998). Withholding of removal, a related form of relief, is mandatory if an individual establishes that his or her life or freedom would be threatened upon return because of one of the five grounds of persecution (in contrast, eligibility for asylum requires only that such persecution be likely). INA, section 241(b)(3), codified at 8 U.S.C. section 1231(b)(3). Withholding may also be granted administratively to those who establish that they will be tortured if deported to the designated country of removal. See INS Office of Internal Affairs, Asylum Division, "Memorandum: Guidance on Compliance with Article 3 of the Convention against Torture," April 27, 1998.

[15]The Violence Against Women Act of 1994 provides for relief from deportation for some undocumented spouses and children who have been battered or subjected to extreme cruelty by a United States citizen or lawful permanent resident while in the United States. See Public Law No. 103-322, title IV, 108 Stat. 1902; 8 C.F.R. sections 103, 204, 205, and 216. See also Gail Pendleton, Immigration Law and Applications for Battered Immigrants Under the Violence Against Women Act (Boston: National Immigration Project of the National Lawyers Guild, October 1998).

Some children who have been declared dependent on a juvenile court or placed with a child welfare agency may qualify for special immigrant juvenile status, which permits them to apply for permanent residence. See generally Katherine Brady, Jan Austerlitz, and Kim Pederson, Special Immigrant Juvenile Status for Children in the Dependency System (San Francisco: Immigrant Legal Resource Center, 1997).

[16]This form of relief can only be granted to individuals who establish at least ten years' physical presence in the United States; good moral character; and "exceptional and extremely unusual hardship to a U.S. citizen or permanent resident spouse, parent, or child. Even if all of these conditions are met, relief from removal under this provision is discretionary. INA, section 240A(b), codified at 8 U.S.C. section 1229b(b). See Dan Kesselbrenner and Lory D. Rosenberg, Immigration Law and Defense, 3rd edition (Deerfield, Ill.: West Group, 1998).

[17]While citizenship by birth in the United States is generally straightforward, U.S. citizenship can be acquired by operation of law in other ways, usually through birth abroad to a U.S. citizen parent or upon the naturalization of one or both parents. See generally Robert A. Mautino, "Acquisition of Citizenship," Immigration Briefings, April 1990, pp. 1-28.

[18]Immigration and Nationality Act (INA), section 240(b)(4)(A), codified at 8 U.S.C. section 1229a(b)(4)(A), provides that an "alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in [removal] proceedings."

[19]For a thorough discussion of the development of immigration detainees' right to legal counsel and current obstacles to representation, see Margaret H. Taylor, "Promoting Legal Representation for Detained Aliens," Connecticut Law Review, vol. 29, p. 1647 (Summer 1997).

---

397.



proceedings,[20] there is a strong constitutional basis for asserting that the government has an obligation to provide counsel at government expense for indigent detained children in removal proceedings. This issue has not yet been addressed directly by the U.S. courts.

Based upon the due process guarantees of the Fifth and Fourteenth Amendments to the U.S. Constitution, the Supreme Court held in *Gideon v. Wainwright* that the government must provide free counsel for indigent defendants in adult criminal cases. In *In re Gault*, the court extended its holding in *Gideon*, finding that due process requires the government to provide lawyers for children in delinquency proceedings. Before the court's decision in *Gault*, children did not receive counsel at government expense in delinquency proceedings because such proceedings were technically civil rather than criminal in nature. The court based its holding in *Gault* on the fact that children in juvenile delinquency proceedings have a strong liberty interest at stake.[21] As the result of *Gault*, the right to government-appointed counsel does not turn upon technical distinctions between "civil" and "criminal" proceedings; instead, the right rests upon the seriousness of the proceeding's consequences. In particular, the right to an attorney provided by the government depends upon whether there are important constitutionally recognized interests at stake.[22]

As with juvenile delinquency proceedings, removal proceedings are technically civil in nature, not criminal. The courts have recognized, however, that the consequences of removal from the United States are as grave as the consequences of many criminal proceedings. In the words of the United States Court of Appeals for the Sixth Circuit, "although it is not penal in character, deportation is a drastic measure, at times the equivalent of banishment or exile. . . ."[23]

Two federal courts of appeals have suggested that where a noncitizen's rights would be substantially impaired in the absence of counsel, the government may be constitutionally required to pay for an attorney in immigration proceedings. The United States Court of Appeals for the Sixth Circuit has noted that "[w]here an unrepresented indigent alien would require counsel to present his position adequately to an immigration judge, he must be provided a lawyer at the Government's expense. Otherwise, 'fundamental fairness' would be violated."[24] In a similar context, the United States Court of Appeals for the Ninth Circuit has held that "Congress' treatment of indigent aliens . . . may

---

[20]*See, for example, Murgia-Melendez v. I.N.S.,* 407 F.2d 207, 209 (9th Cir. 1969); *Tupacyupanqui-Marin v. I.N.S.,* 447 F.2d 603, 606 (7th Cir. 1971). These decisions did not resolve the constitutional issues raised by the immigration law's explicit limitation that counsel in removal proceedings must be at no expense to the government. The Sixth Circuit has noted that fundamental fairness may be violated by failure to provide an unrepresented indigent alien with counsel at the government's expense. *Aguilera-Enriquez v. I.N.S.,* 516 F.2d 565 n.3 (6th Cir. 1975), *cert. denied,* 423 U.S. 1050 (1976). In a nuanced decision, the Second Circuit has held that lack of appointed counsel does not violate due process where the noncitizen admits the allegations of deportability and it does not appear that an attorney would affect the outcome of the case, implying that appointed counsel may be required under some circumstances. *See Henriques v. I.N.S.,* 465 F.2d 119, 121 (2d Cir.), *cert. denied,* 410 U.S. 968 (1972).

[21]*In re Gault,* 387 U.S. at 46.

[22]*See, for example, Aguilera-Enriquez v. I.N.S.,* 516 F.2d 565 n. 3 (6th Cir. 1975).

[23]*United States ex rel Brancato v. Lehmann,* 239 F.2d 663, 666 (6th Cir. 1956). Similarly, another court of appeals noted that "deportation is not a criminal action, but the consequences may more seriously affect the deportee than a jail sentence. The liberty of the individual is at stake and 'meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standard of fairness.'" *Johns v. Department of Justice of the United States,* 624 F.2d 522, 524 (5th Cir. 1980).

[24]*Aguilera-Enriquez,* 516 F.2d at 565 n. 3. The court distinguished prior decisions "which contain dictum appearing to set forth a *per se* rule against providing counsel to indigent aliens facing deportation" on the ground that they "rested largely on the outmoded distinction between criminal cases (where the Sixth Amendment guarantees indigents appointed counsel) and civil proceedings (where the Fifth Amendment applies)." Ibid. Despite this analysis, the *Aguilera-Enriquez* court did not direct the government to provide counsel in the case before it because it found that "[c]ounsel could have obtained no different result." Ibid., p. 516.

---

398.

not be constitutional as applied in individual cases. The fifth amendment guarantee of due process applies to immigration proceedings, and in specific proceedings, due process could be held to require that an indigent alien be provided with counsel . . . ."[25]

If there is a strong argument for asserting that the government may at times be required by the U.S. constitution to provide legal counsel for indigent adult aliens in removal proceedings, the argument is still stronger as applied to unaccompanied minors. As one federal district court observed, unaccompanied children in INS custody "encounter a stressful situation in which they are forced to make critical decisions. Their interrogators are foreign and authoritarian. The environment is new and the culture completely different. The law is complex. . . . In short, it is obvious to the Court that the situation faced by unaccompanied minors is inherently coercive."[26] For this reason, Human Rights Watch believes that the United States government should provide counsel for indigent unaccompanied children who have been detained by the INS pending the outcome of removal proceedings.[27]

*Detention Conditions and Release Options for Children*

As with all INS detainees, children held in INS detention are being detained for administrative reasons, not as punishment for criminal behavior. As a result of the 1996 amendments to the immigration laws, detention is mandatory for those classified as "aggravated felons," for certain other criminal aliens, and for asylum seekers awaiting final decisions on their cases.[28] In addition, the INS faces particular concerns in the case of unaccompanied minors. As the U.S. Supreme Court has noted, "the INS cannot simply send [juveniles] off into the night on bond or recognizance."[29]

Until the early 1980s, there was no codified INS policy governing the detention and release of unaccompanied minors. A class action suit initiated in 1985, ultimately known as *Flores v. Reno,* challenged the INS Western Region's blanket detention policy for minors and the prison-like conditions of detention. The INS settled *Flores* in 1997 and issued interim regulations based on the settlement agreement in 1998.[30] The settlement agreement and interim implementing regulations include the following provisions:

- As a matter of general policy, the INS will place detained children "in the least restrictive setting appropriate to the juvenile's age and special needs, provided that such setting is consistent with the need to ensure the juvenile's

---

[25] *Escobar-Ruiz v. I.N.S.,* 787 F.2d 1294, 1297 n.3 (9th Cir. 1986), *affirmed en banc,* 838 F.2d 1020 (1988)  In *Escobar-Ruiz,* an *en banc* court of eleven judges upheld the initial decision of a three-judge panel, noting that "deportation proceedings are difficult for aliens to fully comprehend, let alone conduct, and individuals subject to such proceedings frequently require the assistance of counsel." 838 F.2d at 1026.

[26] *Perez-Funez v. I.N.S.,* 619 F. Supp. 656, 662 (C.D. Cal. 1985).

[27] For an analysis of this argument in greater depth, *see Slipping Through the Cracks,* pp. 19-23.

[28] IIRIRA, section 303(b) (transition custody rules); INA, sections 236(c) (detention of criminal aliens) and 235(b)(1)(B)(iii)(IV) (detention of asylum seekers).  For discussions of these mandatory detention provisions, *see* "Locked Away," pp. 15, 30-33; Daniel Kerwin, "Detention of Newcomers: Constitutional Standards and New Legislation," *Immigration Briefings,* December 1996, p.1; Daniel Kerwin, "Throwing Away the Key: Lifers in INS Custody," *Interpreter Releases,* vol. 75, p. 649 (May 11, 1998).  In cases in which the mandatory detention rules do not apply, "an alien generally . . . should not be detained or required to post bond except on a finding that he is a threat to the national security or that he is a poor bail risk." *Reno v. Flores,* 507 U.S. 292, 295 (1993).

[29] *Reno v. Flores,* 507 U.S. at 295.

[30] The comprehensive agreement sets out nationwide police for the detention, release, and treatment of children in INS custody. *Flores* Settlement Agreement, p. 6. The interim regulations were published in July 1998. "Processing, Detention, and Release of Juveniles," Federal Register, vol. 63, p. 39,759 (July 24, 1998) (amending 8 C.F.R. section 236.3).  For a brief account of the *Flores* litigation, *see Slipping Through the Cracks,* pp. 23-26.  For a discussion of constitutional challenges to INS detention conditions generally, *see* Margaret H. Taylor, "Detained Aliens Challenging Conditions of Confinement and the Porous Border of the Plenary Power Doctrine," *Hastings Constitutional Law Quarterly,* vol. 22, p. 1807 (Summer 1995).

399.

timely appearance before the [INS] or the immigration court and to protect the juvenile's well-being and that of others."[31]

- Upon apprehending an unaccompanied child who is not an "arriving alien," the INS must provide the child with a written notice of rights. If the child is under fourteen, the INS must read and explain the form to the child in a language he or she understands.[32]

- An unaccompanied child who is apprehended in the immediate vicinity of the border and who resides permanently in Mexico or Canada must be "informed" of his or her right to call a parent, "close relative," friend, or "an organization found on the current list of pro bono counsel"; after so advising the unaccompanied child, the INS may present him or her with a voluntary departure form. All other unaccompanied children must "be provided access to a telephone and must, in fact, communicate with a parent, adult relative, friend, or an organization found on the current list of pro bono counsel prior to presentation of the voluntary departure form."[33]

- Following arrest, the INS will permit contact with family members who were arrested with the child.[34]

- The INS must separate unaccompanied children from unrelated adults, except that "[w]here such segregation is not immediately possible, an unaccompanied juvenile will not be detained with an unrelated adult for more than 24 hours."[35]

- Unaccompanied children should not be transported in the same vehicles as detained adults "except when being transported from the place of arrest or apprehension to a Service office or when separate transportation would be otherwise impractical, in which case juveniles shall be separated from adults."[36]

- Children represented by counsel must not be transferred from one facility to another without advance notice to counsel "except in unusual and compelling circumstances such as where the safety of the juvenile or others is threatened, or the juvenile has been determined to be an escape risk, or where counsel has waived notice." Under such circumstances the INS must give notice to counsel within twenty-four hours of transfer.[37]

## International Standards

The United States has ratified the two principal international treaties that protect the human rights of detainees: the International Covenant on Civil and Political Rights (ICCPR), ratified in 1992, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, ratified in 1994. These documents establish that under international law all individuals in INS custody, whether adults or children, have the right to be free from arbitrary detention and to be protected from cruel, inhuman, or degrading treatment.[38]

---

[31]*Flores* Settlement Agreement, pp. 8-9, 12-15; 8 C.F.R. section 236.3(d). For a discussion of the conditions under which the INS may place children in secure detention, *see* "The Standards for Placing Children in Secure Detention."

[32]8 C.F.R. section 236.3(c)(2). *See also Flores* Settlement Agreement, pp. 7-8.

[33]8 C.F.R. section 236.3(c)(3).

[34]*Flores* Settlement Agreement, p. 8; 8 C.F.R. section 236.3(d)(1).

[35]*Flores* Settlement Agreement, p. 8; 8 C.F.R. section 236.3(d)(1).

[36]*Flores* Settlement Agreement, pp. 15-16; 8 C.F.R. section 236.3(i)(1).

[37]*Flores* Settlement Agreement, p. 16; 8 C.F.R. section 236.3(i)(4).

[38]International Covenant on Civil and Political Rights (ICCPR), G.A. Res. 2200A (XXI), 999 U.N.T.S. 171 (opened for signature Dec. 19, 1966; entered into force Mar. 23, 1976); Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. Doc. A/RES/39/46, 1465 U.N.T.S. 85 (adopted December 10, 1984; entered into force June 26, 1987).

Article 10(1) of the ICCPR establishes that "all persons deprived of their liberty shall be treated with humanity and with

---

400.

The ICCPR mandates that juvenile detainees must be "accorded treatment appropriate to their age,"[39] a general rule which has been developed more fully in subsequent international documents on children. The most authoritative of these documents is the United Nations Convention on the Rights of the Child, which the United States signed in 1995.[40] The convention recognizes that children are entitled to special care and assistance and that the best interests of the child must be a primary consideration in all actions concerning children.[41] Article 37 of the convention extends specific protections to children deprived of their liberty. Under Article 37:

- no child shall be subjected to cruel, inhuman, or degrading treatment or punishment; the arrest and detention of a child must be "used only as a measure of last resort and for the shortest appropriate period of time";
- every child deprived of his or her liberty shall be separated from adults, with the exception of unusual cases in which it is not in the child's best interest to maintain such separation;
- in general, detained children have the right to maintain contact with their family through correspondence and visits;
- every child deprived of his or her liberty shall have the right to "prompt access to legal and other appropriate assistance," the right to "challenge the legality of the deprivation of his or her liberty before a court or other competent, independent and impartial authority," and the right "to a prompt decision on any such action."

Other international standards, notably the U.N. Rules for the Protection of Juveniles Deprived of Their Liberty (U.N. Rules for the Protection of Juveniles), the Standard Minimum Rules for the Treatment of Prisoners, and the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment (Body of Principles), provide authoritative guidance for the interpretation of these treaties.[42] Finally, the United Nations High Commissioner for Refugees' Guidelines on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum (UNHCR Guidelines on Policies), the UNHCR Policy on Refugee Children, the UNHCR Guidelines on Detention of Asylum Seekers, and the recommendations of the Executive Committee of UNHCR provide additional assistance in complying with the international standards applicable to children in INS custody.[43]

---

respect for the inherent dignity of the human person," and Article 7 of the ICCPR provides that "[n]o one shall be subjected to cruel, inhuman or degrading treatment or punishment." Articles 11 and 16(1) of the Convention against Torture obligate the United States to undertake to prevent torture or cruel, inhuman, or degrading treatment while in detention.

[39] ICCPR, Article 10(3).

[40] As a signatory to the Convention on the Rights of the Child, the United States is obligated to refrain from acts which would defeat the object and purpose of the treaty. Vienna Convention on the Law of Treaties, Article 18(a), 1155 U.N.T.S. 331 (concluded May 23, 1969; entered into force January 27, 1980). The United States is one of only two countries which has not ratified the Convention on the Rights of the Child; the other is Somalia, which has no effective government.

[41] Convention on the Rights of the Child, Article 3(1), G.A. Res. 44/25, U.N. Doc. A/RES/44/25 (adopted November 20, 1989; entered into force September 2, 1990).

[42] U.N. Rules for the Protection of Juveniles Deprived of Their Liberty (U.N. Rules for the Protection of Juveniles), G.A. Res. 45/113, U.N. Doc. A/45/49 (1990); Standard Minimum Rules for the Treatment of Prisoners, U.N. ECOSOC Res. 663C (XXIV), U.N. Doc. E/3048 (1957), amended by ECOSOC Res. 2076, U.N. Doc. E/5988 (1977); Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment (Body of Principles), G.A. Res. 43/173, U.N. Doc. A/43/49 (1988).

[43] UNHCR, Guidelines on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum (February 1997); UNHCR, Policy on Refugee Children, U.N. Doc. EC/SCP/82 (October 1993); UNHCR Guidelines on Detention of Asylum Seekers (January 29, 1996). *See also* UNHCR, *Refugee Children: Guidelines on Protection and Care* (Geneva: UNHCR, 1994). UNHCR is currently in the process of revising the guidelines to suggest alternatives to detention and recommend that unaccompanied minors should never be detained , among other revisions.

The Executive Committee of UNHCR has repeatedly emphasized that all actions taken on behalf of refugee children must be guided by the "best interests of the child" principle. Conclusion No. 47 (XXXVIII), Refugee Children, 1987; Conclusion No. 59 (XL), Refugee Children, 1989; Conclusion No. 84 (XLVIII), Conclusion on Refugee Children and Adolescents, 1997. More generally, the Executive Committee has stated that detention must be humane  Whenever possible, asylum seekers should "not be accommodated with persons detained as common criminals, and shall not be located in areas where their physical safety is

---

401.

## III. THE IMMIGRATION AND NATURALIZATION SERVICE'S TROUBLING CONFLICT OF INTEREST

Unaccompanied children are unique from other individuals in INS custody. Because they are too young to be released on their own recognizance, children who have no close relatives are forced to remain in detention under the legal guardianship of the INS. This presents a serious conflict of interest, since children are subject to the enforcement of the immigration laws by the same agency responsible for their care and protection. We have previously recommended that the United States solve this problem by separating the care-giving function from the enforcement function. In Britain, Canada, Denmark and the Netherlands, for instance, unaccompanied children are placed in the care of appropriate child welfare authorities while immigration officials evaluate the children's case.[44]

In a letter to Human Rights Watch, the INS argued that "[s]ince alien juveniles in INS custody are routinely placed in facilities that are owned and operated by non-INS agencies, INS believes that a 'split-off' of the care giving role already exists."[45] Human Rights Watch finds this argument unconvincing. Although non-INS facilities and staff may provide day-to-day services for detained children, the INS retains legal responsibility for the children and determines where the children are placed. As a result, a large number of children are placed in secure, jail-like facilities. The INS, as legal custodian, also maintains enormous influence over children's access to information on their legal rights and their access to meaningful legal representation. The complexity of immigration proceedings and their frequent lack of English skills makes it almost impossible for children to make their way through the legal process without the help of an attorney. The INS, which is usually seeking the children's removal from the United States, has little incentive to ensure that children receive this help.

Children are a uniquely vulnerable group and are entitled to be placed in the care of individuals or agencies which will act in the best interest of the child and are capable of protecting children's rights. Reassigning care-giving functions from the INS to appropriate child welfare authorities would eliminate the INS's troubling conflict of interest and would help ensure that the needs of unaccompanied children will be adequately met.

## IV. FINDINGS AT BERKS COUNTY YOUTH CENTER

The Berks County Youth Center (BCYC) consists of three separate facilities: a secure detention wing, housing juveniles who have been charged or adjudicated delinquent; a shelter care facility used primarily for children in the custody of local child welfare authorities (referred to in this report as the "old shelter"); and a second thirty-five-bed shelter care facility which opened in October 1998, used primarily for children in INS custody (referred to as the "new shelter").

The new shelter nearly triples the number of shelter beds available to the INS at BCYC. At capacity, the shelter will house thirty-five juvenile detainees. At the time of our visit on November 23, 1998, it held twenty-two children.

INS detainees may be placed in any one of the three facilities. Of the forty-seven children in INS custody who were detained at BCYC betweeen October 1 and November 9, 1998, approximately one-quarter were placed in secure

---

endangered." Conclusion No. 44 (XXXVII), Detention of Refugees and Asylum Seekers, 1986. Further, asylum seekers, including minors, should not be detained on an arbitrary basis or for unduly long periods, nor should they be detained without "adequate access to UNHCR and to fair procedures for timely review of their detention status." Conclusion No. 85 (XLIX), Conclusion on International Protection, paragraph (dd).

[44] *See Slipping Through the Cracks,* pp. 64-67.

[45] Letter from Richard B. Cravener, INS Acting Associate Commissioner for Field Operations, to Lois Whitman, Executive Director, Children's Rights Division, Human Rights Watch, August 13, 1998.

402.

detention and three-quarters in shelter care. On a national basis, roughly one-third of the children held by the INS are kept in secure detention.[46]

BCYC's old shelter care facility is carpeted, with comfortable furniture in both common areas and in individual rooms. Children in shelter care are allowed to maintain personal possessions, decorate their rooms, and are frequently allowed to go outdoors. Children interviewed report a wide range of available activities and a caring staff. With the exception of difficulties related to language and translation (discussed later in this report), children described general satisfaction with the facility and its programs.

The new shelter is a renovated wing of a retirement home. At the time of our November visit, it had been open only a few weeks and reflected the relatively sterile environment of a newly opened facility. However, its well-lit day rooms had newly installed carpet, comfortable furniture, television, and games. It also has two classrooms, each equipped with several computer terminals.

In stark contrast, BCYC's secure detention facility is surrounded by a fifteen-foot razor wire fence. Children are brought to secure detention in handcuffs and leg irons and are strip-searched upon entry. They are forced to relinquish their personal clothing and issued t-shirts, sweat pants, and sweat shirts. Children are assigned to cells with concrete walls, ceiling, and floor, completely bare except for bedding and a Bible.

## Findings Common to All BCYC Facilities

### *Information on Legal Rights and Available Legal Services*
Very few of the children that we interviewed reported receiving any information about legal services from either INS or BCYC staff. Fernando, a sixteen-year-old Salvadoran, told us in November that "when I came here, they gave us a paper and told us to read it. They told us about the rules here, and about showers, classes, etc. But no, they didn't give me a list of lawyers, or anything about court or a judge."

Neither could local INS and BCYC staff identify a clear mechanism by which children received this information. While local INS Supervisor Marion Dillis first told us that children received a list of legal services when they were first picked up, she later said that lists were provided by BCYC counselors.[47] BCYC director Jack Borden, on the other hand, said he didn't know anything about attorney representation and that the children had access to attorneys through Marion Dillis.[48] Some other BCYC staff told us that counselors had lists of attorneys. Asked for the list, a counselor spent several minutes rummaging in a file cabinet. He finally produced two dog-eared pages of listings, some nearly illegible and others without phone numbers. A local immigration judge told Human Rights Watch that while some children appearing in his court indicate that they have been given a list of legal services, "I always presume they have not."[49]

Several local immigration attorneys reported difficulty in learning about children needing legal representation. One commented that local INS and BCYC staff "don't care about representation"[50] and another said that she felt that it was an "unstated policy to make legal representation as difficult as possible."[51] Attorneys handling juvenile cases

---

[46]Interview with John Pogash, INS National Juvenile Coordinator, Leesport, Penn., November 23, 1998.

[47]Human Rights Watch interview with Marion Dillis, INS Supervisory Detention/Deportation Officer, Leesport, Penn , June 16, 1998.

[48]Human Rights Watch interview with Jack Borden, BCYC Superintendent, Leesport, Penn., June 16, 1998.

[49]Human Rights Watch telephone interview with Immigration Judge Walter A. Durling, August 10, 1998. Judge Durling is one of two immigration judges in York, Pennsylvania, where the cases of children detained at BCYC are heard.

[50]Human Rights Watch interview with immigration attorney Susan Weber, York, Penn., June 16, 1998.

[51]Human Rights Watch telephone interview with immigration attorney Susan Toler, May 6, 1998.

403.

reported that while they were sometimes called by BCYC counselors who believed a child needed representation, they were more often approached directly by judges.[52]

Several children reported that their only communication about legal representation was with an immigration judge at their first hearing. An immigration judge in nearby York, Pennsylvania, reported that the vast majority of children are unrepresented the first time they appear in his court. He said that access to legal representation for juveniles was a "great concern" and indicated that very few attorneys are willing to take on pro bono juvenile cases: "If an attorney happens to be in the court at the time, I'll talk to them and ask them to stand in, but I'm wearing out my welcome doing that."[53]

As required by regulation, local immigration judges refuse to take pleadings from children without an attorney or family members present.[54]  According to one attorney, "what this means is that kids are there for months and months without representation"[55] and often end up going back and forth to court.

Because few children have the means to pay for attorneys, most depend on pro bono representation. As a result, attorneys are often unwilling or unable to give the case much time and attention. Several children who told us that their attorneys had been secured by local judges reported that they had no contact with the attorney apart from a few minutes' conversation prior to a hearing. These children can hardly be said to have meaningful representation.

The expansion at Berks caused great concern among local attorneys and others concerned about legal representation for children in INS detention. One immigration attorney, referring to the limited number of local attorneys who are willing to take juvenile cases on a pro bono basis, said, "I don't know how we're ever going to represent that many kids."[56] Her concerns were echoed by a local immigration judge, who said, "I'm very concerned about it [the expansion] from the perspective of having virtually no pro bono counsel here in York. Frankly, I don't know how to approach this. We're up against a wall."[57]

In an effort to meet the legal needs of the increased number of juvenile detainees at BCYC, INS Assistant District Director Ted Nordmark has made efforts to improve access to legal representation. Shortly before the opening of the new shelter, he contacted the Nationalities Service Center (NSC), an agency in Philadelphia that provides immigration and other legal services. NSC is now working to set up a legal services program for juveniles at BCYC which would rely on law students, volunteer attorneys from the Pennsylvania chapter of the American Immigration Lawyers Association, and other local organizations. NSC is seeking funding for a full-time coordinator for the program and is identifying volunteer translators to help with representation. Under the planned program, NSC plans to send law students and attorneys to BCYC once or twice a week to complete initial interviews with the children and help identify appropriate attorneys willing to take cases.[58]

---

[52]Human Rights Watch interviews with immigration attorneys Susan Weber, York, Penn., June 16, 1998, and Ann Carr, Lancaster, Penn., June 16, 1998.

[53]Human Rights Watch telephone interview with Immigration Judge Walter A. Durling, August 10, 1998.

[54]8 C.F.R. section 240.10(c) requires:

The Immigration Judge shall not accept an admission of removability from an unrepresented respondent who is incompetent or under the age of 18 and is not accompanied by an attorney or legal representative, a near relative, legal guardian, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge does not accept an admission of removability, he or she shall direct a hearing on the issues.

[55]Human Rights Watch interview with Ann Carr, Lancaster, Penn., June 15, 1998.

[56]Human Rights Watch interview with immigration attorney Susan Weber, York, Penn., June 16, 1998.

[57]Human Rights Watch telephone interview with Immigration Judge Walter A. Durling, August 10, 1998.

[58]Human Rights Watch interview with Cherylle Corpuz, director of legal services, Nationalities Service Center, in Leesport, Penn., November 23, 1998.

404.

The INS is exploring the possibility of installing video-conferencing equipment to facilitate contact between children and their attorneys and allow the possibility of conducting hearings by video conference. Such capabilities could both reduce the need for lengthy trips to York and make it more possible for Philadelphia-area attorneys to represent clients at BCYC. INS officials also plan to propose that York-based immigration judges travel to Leesport to hold hearings at BCYC, also in an effort to reduce the amount of travel for both children and their attorneys.

If implemented as envisioned, these changes and the NSC's anticipated legal services program could significantly relieve existing problems related to legal access. However, the planned program depends on outside grant funding and the willingness of Philadelphia-area attorneys to take on pro bono clients housed over an hour away. One local attorney welcomed the new effort but expressed some skepticism that Philadelphia attorneys would be willing to travel to Berks, remarking, "Attorneys need to have direct contact with the children. It's very impersonal to do it by video conferencing. That's not terribly good for anything substantive."[59]

The concerns regarding legal representation and difficulties in hiring staff with appropriate language skills underline the importance of locating facilities housing juveniles in INS custody in major ports of entry to the United States and near urban centers where legal assistance and services from nongovernmental agencies (including those with multicultural staff and programs) are more likely to be available, as recommended by the United Nations High Commissioner on Refugees.[60]

### Access to Translators

A problem identified repeatedly in our interviews was the unavailability of translation, particularly the lack of staff with any Chinese language skills. While BCYC employs Spanish-speaking staff, until recently there were no staff who could communicate with Chinese-speaking children, despite the fact that the majority of the INS children detained at BCYC in the past year have been Chinese.

On a day-to-day basis, Chinese-speaking children often find themselves completely isolated, unable to communicate their needs or questions. The plight of these children underscores the need to locate facilities in areas where culturally appropriate community resources are available, as the United Nations High Commissioner for Refugees has recommended.[61]

BCYC staff acknowledged the need for Chinese-speaking staff and expressed frustration that they had been unable to hire staff with Chinese language skills. Several BCYC staff told Human Rights Watch that "we do the best we can," emphasizing that translation services can be requested through the INS when needed and are available twenty-four hours a day by telephone. However, not all staff appear to be aware of this option. For example, during our tour of the intake area for the secure facility, when one staff member mentioned the availability of telephone translation, the officer staffing the area responded, "I was never told to do that; we don't do that."[62] The intake process for the secure facility can be frightening for any child. However, one can only imagine that being brought in handcuffs and leg irons into a facility surrounded by a fifteen-foot razor-wire fence and then being strip searched without any explanation in a language a child can understand, could be terrifying.

---

[59]Human Rights Watch telephone interview with local immigration attorney, November 16, 1998.
[60]The United Nations High Commissioner for Refugees recommends that "[f]acilities should not be located in isolated areas where culturally appropriate community resources and legal access may be unavailable." UNHCR Guidelines on Policies, section 7.7.
[61]Ibid., section 7.7.
[62]Human Rights Watch site visit to BCYC, June 16, 1998.

405.

Human Rights Watch was shown copies of facility rules translated into Chinese and Spanish, and BCYC staff told us that a computer system offers some translation assistance for Chinese-speaking children. Nevertheless, most Chinese children we interviewed reported that they had not seen any Chinese-language materials.[63]

In addition, only one of the children we interviewed reported using telephone translation services. Most were unaware that it was available if needed. For many children, even basic requests were very difficult to communicate. For example, Bao, a fifteen-year-old from China, recalled during our September interview that he needed to make a phone call to relatives but lacked the ability to communicate his request to the staff.

While some Chinese-speaking children have been able to rely on other Chinese detainees with stronger English skills to help communicate with staff and other children, Human Rights Watch interviewed one child who had been detained for five months without a single person present in the facility with whom he could converse in his own language.

At the time of our June visit, there were no Chinese speaking staff at the facility. According to John Pogash, national INS juvenile coordinator, a condition of the expansion at Berks is that Chinese-speaking staff would be hired to provide twenty-four-hour coverage at the facility. Although BCYC is seeking additional staff with appropriate language capabilities and now has part-time Chinese-speaking staff, this goal has not been met.

Without exception, Chinese children identified Chinese-speaking staff and teachers as the single biggest need at BCYC. Qing, detained at age fifteen, told Human Rights Watch in September, "They should have staff who can speak Chinese, so things will be much easier for us." Miguel, a sixteen-year-old from El Salvador, shared the concern, telling us in November, "I think they should have more bilingual staff here, not just Spanish and English, because there are people here from lots of different countries, like India and China. They should have people who speak their language."

### Visitation and Telephone Access

Children at BCYC are allowed weekly visits and phone calls. Both attorneys and children expressed appreciation for policies that allow children to call family members as far away as China. Children from Central America also indicated that they were able to make extra phone calls after the November hurricane that affected several Central American countries to inquire about the health and safety of family members.

However, several children described difficulties in making telephone calls. Xiao Ling, fifteen at the time of her apprehension, and Carlos, sixteen, each described having to make repeated requests to place a phone call, despite staff promises to offer assistance. Both relayed instances where it took over a week until the promised call was finally made. At the time of our interview in June, Carlos indicated that it has been ten or eleven days since he had been able to speak to his family.

Miguel, sixteen, told us that on at least one occasion, staff had noted in their records that a phone call to his family had been made, when in fact, the call did not go through. He relayed another instance where he was trying to reach his brother in El Salvador. When his sister-in-law answered the phone and indicated that the brother was not at home, BCYC staff terminated the call rather than allowing Miguel to speak to his sister-in-law.

---

[63]International standards require that children in detention be given a copy of the detention center rules and a written description of their rights and obligations in a language they can understand. In addition, "for those juveniles who are illiterate or who cannot understand the language in the written form, the information should be conveyed in a manner enabling full comprehension." U.N. Rules for the Protection of Juveniles, Article 24.

---



Although phone calls are reportedly allowed twice a week, several children told us that they were only able to make them once a week, and Juan reported that while in secure detention, he was allowed phone calls only once every fifteen days.

### Education

The *Flores* settlement stipulates that children in "licensed programs,"[64] including those in shelter care facilities, must be provided educational services that are appropriate to the child's level of development and communication skills. These services must be provided in a structured classroom setting, and they must concentrate primarily on basic academic competencies and secondarily on English language training.[65]

Although the *Flores* agreement does not address the educational services that are required for children in secure detention, the Convention on the Rights of the Child calls upon states to make secondary education "available and accessible to every child."[66] The U.N. Rules for the Protection of Juveniles clarify that a child in detention has the "right to education suited to his or her needs and abilities and designed to prepare him or her for return to society."[67] Similarly, the United Nations High Commissioner for Refugees has stated that "[e]very child, regardless of status, should have full access to education in the asylum country."[68]

Children in shelter care at BCYC receive about four hours of classes per day, while children in secure detention receive about three hours. Non-English speaking children are often simply given books or worksheets to work on individually. Until recently, BCYC had no English-as-a-second language program, which severely hampered the ability of children to adapt to their environment or to benefit from other instruction. A local advocate had interviewed a Chinese youth who spoke no English even after two years at BCYC and a subsequent transfer to an adult facility.[69] Describing communication between the teacher and the Spanish-speaking students, Jesús told us, "We didn't know what she was saying, and she didn't know what we were saying."

Chinese children are generally forced to learn on their own, with books and access to a computer with a bilingual English-Chinese language program. Qian, fifteen, reported in September that as many as seven Chinese-speaking children were at BCYC at one time during her period of detention. Because the facility only had one computer equipped with the Chinese-English language program, the children were forced to sign up at intervals to gain access.

Teachers are available for questions, but children report that communication is difficult and often consisted of sign language. Bao told Human Rights Watch that during his four and a half months in detention, "it seems I made very little progress because there was no translator." Another Chinese girl was classified at the third grade level at the time of her release from BCYC but within months of entering public school was ranked in the top third of her ninth grade class.[70]

In conjunction with the opening of the new shelter facility, INS and BCYC officials have worked to implement new and improved services and programs for detainees. Education programs now include English as a Second Language (ESL) instruction, and the addition of new teachers has reduced the average class size. Both INS and

---

[64]A licensed program is "any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors." *Flores* Settlement Agreement, p. 4.

[65]Ibid., exhibit 1 (Minimum Standards for Licensed Programs), p. 2, paragraph 4.

[66]Convention on the Rights of the Child, Article 28(1)(b).

[67]U.N. Rules for the Protection of Juveniles, Article 38.

[68]UNHCR Guidelines on Policies, section 7.12.

[69]Human Rights Watch interview with immigration advocate, June 15, 1998.

[70]Human Rights Watch interview with Harriet Miller, Seven Valleys, Penn., June 5, 1998.

407.

BCYC have reached out to local non-profit agencies, such as the Nationalities Service Center for legal services and Latino Social Service for help building a foreign language library. BCYC staff have also made contact with local Chinese churches in order to provide Chinese-language pastoral visits for children at the Center.

## Use of Restraints During Transportation

Regardless of whether they were in secure detention or in shelter care, most of the children we interviewed reported that they were handcuffed when they were taken to court to appear before an immigration judge. To make the trip to immigration court, which is an hour away, in York, Pennsylvania, children often leave the facility at 6:30 or 7:00 a.m. and return to BCYC at 2:00 or 3:00 p.m. Several children told us that they were handcuffed on such an occasion for more than eight hours, including transportation and time spent consulting with their attorney. One attorney complained about the practice and described meeting with an eleven-year-old client who was "so small, the handcuffs were practically falling off his hands."[71]

Other children reported that the handcuffs were only used during transport, and were taken off once they reached court. Paul, a sixteen-year-old interviewed in November, estimated that he was handcuffed during five of his eight trips to immigration court.

Until recently, children in INS custody were also transported to court together with adult inmates, in direct violation of the *Flores* agreement.[72] Once this practice became known to district and national INS officers, they indicated that it would stop immediately. When asked about the use of handcuffs, however, they asserted that the INS was within its rights to use handcuffs as a security measure, stating that under INS enforcement standards, the use of restraints during transportation was at the officers' discretion.[73] International guidelines, however, only allow the practice in exceptional circumstances.[74]

Several children also told us that they were forced to skip meals on days when they appeared in court. Jose told us, "When you go to court, you are always hungry. Everyone always told us that." When the issue was raised with BCYC staff, they said that lunches were supposed to be provided at court but that they would explore providing bag lunches as an alternative.[75]

---

[71]Human Rights Watch telephone interview with Ann Carr, November 11, 1998.

[72]*Flores* Settlement Agreement, pp. 15-16.

[73]Human Rights Watch interview with John Pogash, Ted Nordmark, and others, Leesport, Penn., November 23, 1998. INS enforcement standards provide that "[r]emoval or application of restraints during transportation or escort shall be at the discretion of the officer." INS Enforcement Standard, Use of Restraints, Standard III.L (February 5, 1998). These standards also provide that in exercising discretion:

Each officer will make an assessment of the detainee's risks to the public, the escorting officer(s), and him or herself, as well as the likelihood of absconding. This assessment will include, at a minimum, a review of the detainee's criminal violations (if any), aggressive or asocial behavior, suspected influence of alcohol or drugs, physical condition, age, sex, and medical condition. Officers should also take into consideration the nature of the assignment, such as type of detainee, length of travel, destination or exposure to the public.

Ibid., Standard III.C. The standards require the INS officer to observe a special degree of care when using restraints on children: "When an officer determines that conditions warrant the use of restraints for members of a family unit, females or juveniles, the officer must be able to articulate the conditions which require the restraints, in accordance with Standard III.C." Ibid., Standard III.H.

[74]Article 64 of the U.N. Rules for the Protection of Juveniles states that only in exceptional circumstances should instruments of restraint be used. Restraints should not cause humiliation or degradation and should be used restrictively for the shortest possible period of time. Article 26 states that "[t]he transport of juveniles should be carried out at the expense of the administration in conveyances with adequate ventilation and light, in conditions that should in no way subject them to hardship or indignity."

[75]Human Rights Watch interview with Eric Ruth, Jack Borden, and others, Leesport, Penn., November 23, 1998.

---

408.

## Discipline

BCYC procedure identifies the use of restraints and isolation as a last resort for dealing with children exhibiting aggressive behavior. Both staff and children report that physical exercise is one of the primary disciplinary measures used in the facility. Children in shelter care as well as secure detention are required to do pushups in increments of twenty-five for noncompliance. Although physical condition is supposed to be noted when a child has his or her intake physical, we received several reports that indicate that physical exercise may be used excessively, putting children at risk. When describing the use of pushups as a disciplinary measure, one child indicated that even if children were sick or unable to complete the exercise, the staff "would keep on fucking with them until they do it." José, a seventeen-year-old Honduran housed in the new shelter, told us in November that during physical exercises another child developed cramps and started to cry, but staff forced him to continue the exercises. Paul, sixteen, reported that another detainee in the new shelter had been required to do 400 disciplinary pushups during the course of one day. A local advocate told us of another detainee who was forced to run laps despite severe asthma. On several occasions, staff forced her to continue until she collapsed and even then continued to harass her.[76]

The imposition of pushups and other physical exercise as disciplinary measures violate international standards when such punishment compromises the physical or mental health of a child.[77]

Several children held in the new shelter complained that discipline was sometimes administered inappropriately as a result of language barriers between detainees and staff. Fernando, sixteen, told us, "Sometimes they tell you to do something and we don't understand, so they make us do pushups." Miguel, a sixteen-year-old Salvadoran, said, "When you come here, they make you learn English and say everything to you in English. But if you are from El Salvador, and don't speak English, they don't give you time to understand. . . . A lot of times, staff don't give time for translation and make us do pushups."

## Treatment by Staff and Grievance Procedures

In general, children held in shelter care at BCYC expressed satisfaction with the treatment they received from staff. Most indicated that they were treated well, and some children credited staff with being helpful when they experienced problems.

The difficulties described by detainees were primarily related to language problems. Bao, a Chinese boy, told us that "because we [Chinese detainees] didn't speak English, we were blamed for conflicts with other kids. If we went to staff to complain, other kids would tell the opposite story, so we got frustrated." As described above, in such situations, children were often forced to do pushups. In other cases, detainees felt that discipline was applied arbitrarily. Miguel, age sixteen, told us that because he does not have glasses for reading, he often gets headaches. On one such occasion, he asked for permission to lie down but was refused. The staff person reportedly told him, "You don't get to do what you want to here" and made him do twenty-five pushups. Miguel reflected, "There are some people here who shouldn't be working here because they abuse their authority."

The U.N. Rules for the Protection of Juveniles establishes that children have the right to make requests or complaints to the director of the detention facility and other judicial authorities and to be informed of the response without delay. The rules also advocate an independent office to receive and investigate complaints made by juveniles deprived of their liberty.[78]

---

[76]Human Rights Watch interview with immigration advocate, June 15, 1998.
[77]U.N. Rules for the Protection of Juveniles, Article 67. In addition, the use of instruments of restraint and closed or solitary confinement as disciplinary measures violates international standards. Ibid., Articles 64 and 67.
[78]Ibid., Articles 75-77.

409.

When asked about grievance procedures at BCYC, staff told us that children had the right to speak to a shift supervisor or to submit a written complaint to the shelter director. When asked how that policy was communicated to detainees, we were told that it was part of the handbook that children get at the time of admission. However, the only instruction the document gives is "if a problem arises let staff know immediately." BCYC staff acknowledged that the instruction was not clear, and needed to be rewritten.[79]

### Activities and Recreation

Richard, sixteen, had spent several months in shelter care at BCYC and told Human Rights Watch in June that he was able to participate in a range of activities and was rarely bored. Children in shelter care attend presentations on reproductive health, AIDS, nutrition, and drug and alcohol awareness and participate in sewing, arts and crafts, and other activities. Richard also reported field trips to soccer games, wrestling matches, and a roller skating rink.

Children in the new shelter report that they are able to play outdoors almost daily, usually soccer and occasionally basketball. For their outside games, however, they are restricted to a small fenced area. Paul, a sixteen-year-old detained at the new shelter during its first two weeks of operation, told us that he felt the playing area was too small for the fourteen children who were housed at the facility at the time. He said he couldn't imagine how the field would accommodate thirty-five children when the facility reaches full capacity.

During the first month of operation, children in the new shelter were not able to go on any field trips. Staff are now arranging such trips, and are securing a new van to facilitate transportation.

None of the children we interviewed who had been in secure detention had ever been on a field trip. They also described a general lack of activities. In some cases, they spent hours each day in their bare rooms with no books or distractions.

### Transfers to Other Facilities

In the past year, detained children at Berks have been transferred to several different facilities, including those in San Diego, Miami, Chicago, and Phoenix. In one case, four boys were kept in secure detention at Berks, only to be transferred to San Diego on the day that authentication of their guardianship papers was received by the INS. Although they had been held in secure detention on the ground that the INS believed them to be escape risks, their attorney was informed the reason for the transfer was that the San Diego facility was the only one available to keep the children under less restrictive conditions.[80] After approving their release, the INS delays in transporting the children back to Berks forced their guardians (who were each New York City residents) to travel to San Diego and arrange return transportation for both themselves and the children at considerable personal expense and additional delay.

In this instance, the children's attorney was also not notified in advance of the transfer; she learned of the decision when INS attorneys filed a motion for a change of venue. Another attorney told us that his client had been transferred to Florida in the middle of the night without notice.[81]

The local INS officer seemed unconcerned about the difficulties created by transferring children to facilities that are distant from both their attorneys and family or guardians. She told us that children could be adequately represented by telephone, and that while attorneys are normally contacted prior to a child being transferred, there are

---

[79]Human Rights Watch interview with Jack Borden, Eric Ruth, and others, Leesport, Penn., November 23, 1998.
[80]Human Rights Watch interview with Ann Carr, Lancaster, Penn., June 15, 1998.
[81]Human Rights Watch telephone interview with attorney Blake Chisam, August 7, 1998.

410.

other occasions when "we don't necessarily want them knowing when someone is leaving"[82] because of security concerns. At the same time, she acknowledged that there have been no problems with smugglers at the BCYC facility.

The INS practice of transferring children without notice to their attorneys violates *Flores v. Reno* and other INS regulations. Particularly when the INS transfers children to distant facilities, this practice interferes with the ability of counsel to interview their clients, prepare applications for asylum and other forms of relief, and otherwise provide adequate representation. Accordingly, by moving children with no advance notice or notice within twenty-four hours in circumstances that are truly unusual, the INS routinely impedes minors' right to counsel, protected under domestic law and international standards.[83]

Local attorneys and advocates also complained that children are too often transferred between facilities without notification of the family. One attorney told Human Rights Watch that family members were often unaware of a child's whereabouts until she contacted them herself.[84]

### Release and Family Reunification

In interviews with children and attorneys, we learned of several instances where the release of children to the custody of family members or guardians was unnecessarily delayed. For example, four Pakistani children were held in secure detention at BCYC for three months despite the fact that each had a close relative in New York with guardianship papers. The INS submitted the papers to the Pakistani Consulate with the request that they be sent to Pakistan for authentification. During the weeks required for this process, the children were kept in secure detention and denied both phone contact and visitation with their relatives. Contact was reestablished only after their attorney protested.[85]

Xiao Ling, from China and now seventeen, was detained for one year, including six months in secure detention, despite the fact that she had an uncle in New York who had agreed to take custody of her. In another instance, an attorney representing two Tamil children reported that the children remained at BCYC for more than a month after receiving asylum because no contact had been made with their family.[86]

Release has also been delayed when families fail to receive clear information about the requirements for the release process. One attorney told us of one family that was forced to make two or three trips to BCYC and was each time turned away because the paperwork required for release was incomplete. The family kept returning because they couldn't read the written instructions that they had received and didn't understand what was required.[87]

The INS is currently sending many of the Chinese children in its custody to Arizona, claiming that more appropriate services are available at facilities there. However, according to John Pogash, 90 percent of these children

---

[82]Human Rights Watch interview with Marian Dillis, INS Supervisory Detention/Deportation Officer, Leesport, Penn., June 16, 1998.

[83]Under *Flores*, "[n]o minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer." *Flores* Settlement Agreement, p. 16.

[84]Human Rights Watch interview with Ann Carr, Lancaster, Penn., June 15, 1998. UNHCR recommends that "changes in residence for unaccompanied children should be limited to a minimum." UNHCR Guidelines on Policies, section 7.2.

[85]Human Rights Watch interview with Ann Carr, Lancaster, Penn., June 15, 1998.

[86]Ibid.

[87]Ibid.

411.

are eventually released to relatives or guardians in the New York City area.[88]  To send them to a facility so remote from their families creates unnecessary isolation and exacerbates problems related to both release and access to legal representation.

## Conditions in BCYC's Secure Detention Facility

The environment within BCYC's secure wing is more restrictive than in many other juvenile detention centers. BCYC's 1997 annual report noted an increase in the number of residents with violent behavioral backgrounds. It states that BCYC has a reputation of taking "out of control" juveniles from other county facilities which cannot control these youth.  The report claims that BCYC's effectiveness in holding such residents can be attributed to the "strict rules and regulations" enforced at the facility.[89]  Children interviewed by Human Rights Watch describe a rigid atmosphere and reported that in secure detention they were not allowed to laugh, often told not to talk, and were even required to ask staff for permission to scratch their nose.  Both Spanish-speaking and Chinese-speaking children reported that they were not allowed to speak in their native languages.  A local attorney who has represented numerous children reported that her clients have begged her to get them out.[90]  Xiao Ling, who spent several months in secure detention, told Human Rights Watch that while there she cried every day.[91]

Our investigation of secure confinement at BCYC revealed that the INS's placement decisions were often arbitrary.  In addition, international standards for children in confinement and INS regulations guarantee particular rights for children in confinement, including the right to personal possessions, to wear their own clothes, to have access to information in their own language, appropriate educational services, and meaningful activities and programs promoting the child's development and health.[92]  Children in secure detention at BCYC are denied each of these rights.

### The Standards for Placing Children in Secure Detention

The settlement agreement in *Flores v. Reno* allows the INS to keep children in secure detention in several circumstances.  First, the INS may hold children in secure detention for no more than five days while it finds a licensed placement, arranges transportation from remote areas, or locates interpreters for "unusual languages."[93]  Second, the INS may hold children in secure detention for an unspecified but temporary period of time in the event of an emergency or an "influx of minors into the United States"; under this provision, the INS must place children

---

[88]Human Rights Watch interview with John Pogash, INS National Juvenile Coordinator, Leesport, Penn., November 23, 1998.

[89]Berks County Juvenile Detention Center Annual Report, p. 15 (Leesport, Penn.: Berks County Sheriff's Department, 1997).

[90]Human Rights Watch interview with immigration attorney Ann Carr, Lancaster, Penn., June 15, 1998.

[91]Conditions for INS detainees in other secure juvenile facilities have been documented by other organizations.  For example, the Women's Commission on Refugee Women and Children visited the Liberty County Juvenile Correctional Center in Texas in June 1998.  At the time, the INS had over eighty children incarcerated in the maximum security facility, where they were commingled with juveniles with criminal records, forced to wear prison uniforms, pat searched, and restricted to cells for twenty-three hours a day. Testimony before the Senate Judiciary Subcommittee on Immigration, September 16, 1998, by Wendy Young, Washington Liaison, Women's Committee on Refugee Women and Children.

[92]*See generally* Convention on the Rights of the Child; U.N. Rules for the Protection of Juveniles; UNHCR Guidelines on Policies; and *Flores* Settlement Agreement.

[93]*Flores* Settlement Agreement, p. 8.

412

with less secure facilities "as expeditiously as possible."[94]  Finally, a child may be kept in secure detention if he or she:

- has been charged with, is chargeable with, or is convicted of a crime;
- is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act;[95]
- has committed or threatened to commit a violent or malicious act, including an act directed at him or herself;
- has engaged in unacceptable and disruptive behavior in a licensed program;
- is an escape risk; or
- must be held for his or her own safety, "such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees."[96]

The agreement also stipulates that under such circumstances:

- whenever possible, a child should be kept in a medium-security juvenile residential facility instead of a secure detention facility;
- when placed in a detention facility, the child should be placed in separate accommodations for INS minors;
- in all cases, the child must be provided with written notice of the reason for his or her placement in secure detention.

Several of the children we interviewed had been kept in secure detention while at BCYC, including one girl who had been kept in the secure wing for several months.  The decisions whether to place a child in the secure wing or shelter care at BCYC often appear arbitrary.  One sixteen-year-old girl, in secure detention for several months, told Human Rights Watch in June that she was transferred to shelter care only after her prospective foster parents were quoted in the local newspaper about her situation.  Other children who had been in secure detention for periods ranging from one week to three months told Human Rights Watch that they were neither informed why they were placed in the secure wing nor told the reason for their eventual transfer to shelter care.  In fact, none of the children with whom we spoke reported being given any reason, either written or verbal, for being placed in the secure wing.

In addition, none of the children in secure detention was segregated from children who were awaiting delinquency proceedings.  The BCYC superintendent, Jack Borden, informed us that the secure facility houses violent offenders, including children accused of murder, rape, and drug trafficking.  He also indicated that many of the children are repeat offenders.[97]  Although another BCYC staff person informed us that INS detainees in secure detention were either assigned rooms by themselves or shared a room with another INS detainee, we found this was not the case.  During our June tour of the facility, we observed a posted resident list indicating that one of the children in INS custody roomed with a juvenile offender.  Our interviews of children confirmed that INS detainees and

---

[94]Under *Flores,* an "influx of minors" occurs whenever the INS has more than 130 minors eligible for placement in licensed programs, including those already placed.  Ibid., p. 9.  Our 1996 investigation found that at any given time, over two hundred children were in INS custody for seventy-two hours or more.  According to data provided to us by the INS, some 241 children were in detention between October 7 and October 14, 1996, a figure that excludes those children detained less than seventy-two hours.  Of that total, 28 percent were age fifteen or under; 5 percent were under the age of ten.  *Slipping Through the Cracks,* p. 2.  INS figures for fiscal year 1998 showed 479 juveniles in the "current custody" of the INS.  Although these figures are not directly comparable (the 1998 figures represent "total custody occurrences" rather than the total number of juveniles), they show that the "influx" exception to the time limits on temporary secure detention is defined so broadly as to render the limit virtually meaningless.

[95]The criminal and delinquency provisions do not apply to children whose offenses are isolated ones that do not fall into a pattern or practice of criminal activity and do not involve violence against a person or the use or carrying of a weapon.  These provisions also do not apply to petty offenses, such as shoplifting, joyriding, or disturbing the peace.  *Flores* Settlement Agreement, pp. 12-13.

[96]Ibid., pp 13-14.

[97]Human Rights Watch interview with Jack Borden, BCYC superintendent, Leesport, Penn., June 16, 1998.

413.

juvenile offenders shared rooms. Even those children who may be assigned a room by themselves have extensive contact with juveniles charged as delinquents during meals, classes, physical training, and unstructured time in their pods' common room.

Although this commingling is prohibited by INS regulations and runs counter to international guidelines,[98] BCYC staff universally praised it. They indicated that they felt it had a positive effect on both populations by enabling the INS children to pick up English and giving culturally enriching interactions to the juveniles charged as delinquents.

Decisions regarding the transfer of a detainee from a shelter care facility to secure detention are made entirely at the discretion of the INS. For example, a child in INS custody who exhibits disruptive behavior could be transfered to secure detention based solely on the recommendation of a local INS officer and approval by the INS Regional Office. In contrast, a child who is in shelter care as a ward of local social welfare authorities can not be transferred into secure detention unless formal charges are brought against the child as the result of a police investigation and probable cause hearing.

While INS officers stressed to us that children in secure detention were often placed there because they are charged or adjudicated delinquent,[99] all of the detainees we interviewed who had been in secure detention were eventually placed in shelter care, indicating that it was unlikely that they had a history of delinquency. Most of the children we interviewed had been in secure detention for at least a week, and two had been held for more than three months.

### Privacy and Personal Possessions

International standards state that the right to personal possessions is a basic element of the right to privacy and essential to the psychological well-being of the child.[100] Detainees in secure detention at BCYC are forbidden to have any personal possessions in their cells, and are even denied deodorant. Children are not allowed to put anything on their walls, nor allowed books (other than an English language Bible), games or toys, even teddy bears. A prospective foster mother of a Chinese girl reported that when she took a child's storybook to the facility, the staff "acted like we'd brought a weapon."[101] The children are not allowed pencils in their rooms, unless given specific permission by staff.

Detainees are denied the right to wear their own clothes, and are given t-shirts, sweat pants, and sweat shirts. They are forced to use toilet stalls with no doors, and staff supervise their showers.

During our visit, Human Rights Watch observed concrete cells, completely bare except for bedding and a Bible. The negative impact of this sterile environment is compounded by the fact that in some cases, children spend several hours a day confined to their rooms, deprived of any sensory or intellectual stimulation except for a Bible in a language they most often cannot read.

---

[98]The *Flores* settlement requires that "minors shall be separated from delinquent offenders." *Flores* Settlement Agreement, p. 8. Guideline 6 of the UNHCR Guidelines on the Detention of Asylum Seekers directs that asylum seekers should be separated from convicted criminals, an extension of the general international standard requiring separation between different categories of detainees. *See* Standard Minimum Rules, Article 8; U.N. Rules for the Protection of Juveniles, Article 29.

[99]Interview with John Pogash, Ted Nordmark, and others, Leesport, Penn., November 23, 1998.

[100]Article 35 of the U.N. Rules for the Protection of Juveniles note that the possession of personal effects is a basic element of the right to privacy and is essential to the well-being of a child.

[101]Human Rights Watch interview with Harriet Miller, Seven Valleys, Penn., June 5, 1998.

---

414.

## ACKNOWLEDGMENTS

This report was written by Jo Becker, advocacy director for the Children's Rights Division of Human Rights Watch, and Michael Bochenek, counsel to the Children's Rights Division, based on research conducted between June and November 1998 by the authors. It was edited by Lois Whitman, executive director of the Children's Rights Division, and Michael McClintock, deputy program director of Human Rights Watch. Allyson Collins, senior researcher for Human Rights Watch; Joanne Mariner, associate counsel to Human Rights Watch; and Rachael Reilly, refugee program director of Human Rights Watch, reviewed and commented on the manuscript. Fitzroy Hepkins and Patrick Minges provided production assistance.

We are grateful to the children and immigration advocates who took the time to share information with Human Rights Watch and to the INS officials who met with us. We appreciate the cooperation of the BCYC staff, who shared generously of their time, provided full access to the facility, and facilitated confidential interviews with children.

*Human Rights Watch*
*Children's Rights Division*

Human Rights Watch is dedicated to protecting the human rights of people around the world.

We stand with victims and activists to bring offenders to justice, to prevent discrimination, to uphold political freedom and to protect people from inhumane conduct in wartime.

We investigate and expose human rights violations and hold abusers accountable.

We challenge governments and those holding power to end abusive practices and respect international human rights law.

We enlist the public and the international community to support the cause of human rights for all.

The staff includes Kenneth Roth, executive director; Michele Alexander, development director; Reed Brody, advocacy director; Carroll Bogert, communications director; Cynthia Brown, program director; Barbara Guglielmo, finance and administration director; Jeri Laber, special advisor; Lotte Leicht, Brussels office director; Patrick Minges, publications director; Susan Osnos, associate director; Jemera Rone, counsel; Wilder Tayler, general counsel; and Joanna Weschler, United Nations representative. Jonathan Fanton is the chair of the board. Robert L. Bernstein is the founding chair.

Its Children's Rights Division was established in 1994 to monitor and promote the human rights of children around the world. Lois Whitman is the director; Yodon Thonden and Michael Bochenek are counsel; Jo Becker is advocacy director. Vikram Parekh is research associate and Shalu Rozario is associate. Jane Green Schaller is chair of the advisory committee.

Web Site Address: http://www.hrw.org
Listserv address: To subscribe to the list, send an e-mail message to majordomo@igc.apc.org with "subscribe hrw-news" in the body of the message (leave the subject line blank).

415.

# 1998 HUMAN RIGHTS WATCH PUBLICATIONS

**(A) SUB-SAHARAN AFRICA**
**Short Reports**
(A1001) Africa -- Clinton Administration Policy & H. R. In Africa, 3/98, 19pp., $3.00.
(A1002) Zambia -- No Model for Democracy: Continuing H. R. Violations, 5/98, 57pp., $7.00
(A1003) Sierra Leone -- Sowing Terror: Atrocities against Civilians in Sierra Leone, 8/98, 42 pp., $5.00
(A1004 )Sudan -- Global Trade, Local Impact: Arms Transfers to All Sides in the Civil War, 8/98, 52 pp., $7.00

**Perfect-Bound Books**
(1797) Burundi --  Proxy Targets: Civilians in the War in Burundi, 3/98, 136pp., $10.00.
(1819) South Africa -- Abuse of Undocumented Migrants, Asylum Seekers, 3/98, 246pp.,$15.00.

**(B) AMERICAS**
**Perfect-Bound Books**
(1879) War Without Quarter: Colombia and International Humanitarian Law, 09/98, 245pp., $15.00.
(1924) Limits of Tolerance: Freedom of Expression and the Public Debate in Chile, 11/98, 205 pp , $15.00.
(1959) Behind Bars in Brazil, 12/98, 170pp., $10.00.

**(C ) ASIA**
**Short Reports**
(C1001) China -- State Control of Religion: Update #1, 3/98, 22pp., $3.00.
(C1002) Asia -- Impact on Labor Rights & Migrant Workers in Asia, 3/98, 22pp., $3.00.
(C1003) Cambodia -- Fair Elections Not Possible, 6/98, 26pp., $5.00
(C1004) Indonesia -- Release Prisoners of Conscience Now, 6/98, 49pp., $5.00
(C1005) Indonesia -- The Damaging Debate on Rapes of Ethnic Chinese Women, 9/98, 12pp., $3.00
(C1006) Burma/Thailand -- Unwanted and Unprotected: Burmese Refugees in Thailand,10/98, 52pp., $7.00
(C1007) Afhanistan--The Massacre in Mazar-I Sharif, 11/98, 17pp., $3.00

**Perfect Bound Reports**
(186X) Academic Freedom in Indonesia: Dismantling Soeharto Era Barriers, 08/98, 102 pp., $10.00.

**(D) EUROPE AND CENTRAL ASIA**
**Short Reports**
(D1001) Macedonia -- Police Violence: Official Thumbs Up, 4/98, 50pp., $5.00.
(D1002) Tajikistan -- Leninabad: Crackdown in the North, 4/98, 31pp., $5.00.
(D1003) Northern Ireland -- An Analysis of the Human Rights Provisions, 4/98, 10pp., $3.00
(D1004) Uzbekistan -- Crackdown in the Farghona Valley: Arbitrary Arrests and Discrimination, 5/98, 33pp., $5.00.
(D1005) Bosnia Hercegovina: Politics & the Policing Agenda of the UN, 6/98, 33pp., $5.00
(D1006) Bosnia Hercegovina:  Past & Present H. R. Abuses in Foca, 7/98, 69pp., $7.00
(D1007) Republic of Belarus: Turning Back the Clock, 8/98, 53 pp., $7.00
(D1008) Russian Federation: Ethnic Discrimination in Southern Russia, 8/98, 38 pp., $5.00
(D1009) Chemical Warfare in Bosnia: The Strange Experiences of the Srebrenica Survivors, 11/98, 55pp., 7.00
(D1010)Federal Republic of Yugoslavia: Detentions and Abuse in Kosovo, 12/98, 29pp., $5.00.

**Perfect-Bound Books**
(1789) Romania -- Public Scandals: Sexual Orientation & Criminal Law, 1/98, 120pp., $10.00.
(1940) Federal Republic of Yugoslavia: Humanitarian Law Violations in Kosovo, 10/98, 136 pp. $10.00.
(1916) Abandoned to the State: Cruelty & Neglect in Russian Orphanages, 12/98, 228pp., $15.00

**(E) THE MIDDLE EAST AND NORTH AFRICA**
**Short Reports**
(E1001) Algeria -- "Neither Among The Living Nor The Dead", 2/98, 45pp., $5.00.
(E1002) Israel – Israel's Record of Occupation: Violations of Civil and Political Rights, 08/98, 35pp., $5.00
(E1003) Algeria -- Algeria's Human Rights Crisis, 8/98, 43pp., $5.00

416.

**(G) GENERAL**
**Short Reports**
(G1003) Losing the Vote: The Impact of Felony Disenfranchisement Laws in the United States, 10/98, 27pp., $5.00
(G1002) United States -- Nowhere to Hide: Retaliation Against Women in Michigan StatePrisons, 09/98, 27 pp., $5.00
(G1001) United States -- Locked Away: Immigration Detainees in Jails in the United States, 09/98, 84 pp., $7.00

**Perfect-Bound Books**
(1843) Justice in the Balance--Recommendations for an Independent & Effective International Criminal Court, 6/98, 176pp., $15.00
(1835) Shielded from Justice: Police Brutality and Accountability in the United States, 07/98, 450 pp., $20.00

417.

SCANNED

# HUMAN RIGHTS WATCH PUBLICATIONS ON CHILDREN'S RIGHTS

*Please fill out completely, including subtotal, postage, total enclosed, and your shipping address. Please make checks payable to Human Rights Watch.*

| Qty | Country | Title | Price | Total |
|---|---|---|---|---|
| ____ | Brazil | (1231) Police & Death Squad Homicides of Adolescents, 2/94, 160pp | $ 15.00 | _____ |
| ____ | Bulgaria | (2009) Children of Bulgaria: Police Violence & Arbitrary, 9/96, 160pp. | 15.00 | _____ |
| ____ | Burma | (C901) Children's Rights & The Rule of Law, 1/97, 27pp. | 5.00 | _____ |
| ____ | China | (C801) Chinese Orphanages: A Follow-up, 3/96, 11pp. | 3.00 | _____ |
| ____ | | (1630) A Policy of Fatal Neglect in China's State Orphanages, 1/96, 406pp. | 20.00 | _____ |
| ____ | Colombia | (1444) Generation Under Fire: Children & Violence, 11/94, 104 pp. | 10.00 | _____ |
| ____ | General | (G801) Children in Combat, 1/96, 23 pp. | 3.00 | _____ |
| ____ | Guatemala | (2130) Guatemala's Forgotten Children, 7/97, 144pp. | 10.00 | _____ |
| ____ | | (0243) Getting Away with Murder, 8/91, 128pp. | 10.00 | _____ |
| ____ | India | (205X) Police Abuse & Killings of Street Children, 11/96, 200pp. | 15.00 | _____ |
| ____ | | (172X) The Small Hands Of Slavery Bonded Child Labor, 9/96, 192pp. | 15.00 | _____ |
| ____ | | (155X) Trafficking of Nepali Girls & Women to India's Brothels, 6/95, 96 pp. | 7.00 | _____ |
| ____ | Jamaica | (B611) Children Improperly Detained in Police Lockups, 10/94, 17pp. | 3.00 | _____ |
| ____ | Kenya | (2149) Police Abuse & Detention of Street Children, 6/97, 167pp. | 15.00 | _____ |
| ____ | Liberia | (1398) Easy Prey: Child Soldiers in Liberia, 9/94, 88pp. | 7.00 | _____ |
| ____ | Pakistan | (1541) Contemporary Forms of Slavery in Pakistan, 7/95, 96 pp. | 7.00 | _____ |
| ____ | Romania | (D215) Romania's Orphans: A Legacy of Repression, 12/90, 13pp. | 3.00 | _____ |
| ____ | Russia | (1916) Cruelty & Neglect in Russian Orphanages, 12/98, 228pp. | 15.00 | _____ |
| ____ | Sudan | (A610) The Lost Boys: Child Soldiers in Southern Sudan, 11/94, 25pp. | 5.00 | _____ |
| ____ | Thailand | (107X) Trafficking of Burmese Women & Girls into Brothels, 12/93, 168pp. | 15.00 | _____ |
| ____ | Turkey | (D607) A Matter of Power: State Control of Women's Virginity, 6/94, 38pp. | 5.00 | _____ |
| ____ | | (0529) 'Nothing Unusual': Torture of Children in Turkey, 1/92, 80pp. | 7.00 | _____ |
| ____ | Uganda | (2211) Children Abducted By The Lord's Resistance Army, 9/97, 152pp. | 10.00 | _____ |
| ____ | U.K. | (0804) Children in Northern Ireland, 7/92, 112pp. | 10.00 | _____ |
| ____ | U.S. | (219X) Children in Confinement in Colorado, 8/97, 120pp. | 10.00 | _____ |
| ____ | | (2092) Unaccompanied Children Detained By The U.S. INS, 4/97, 126pp. | 10.00 | _____ |
| ____ | | (1592) Children in Confinement in Louisiana, 10/95, 152pp. | 10.00 | _____ |
| ____ | | (B702) A World Leader in Executing Juveniles, 3/95, 22pp. | 3.00 | _____ |
| ____ | HRW | (1908) Human Rights Watch World Report 1999, 12/98, 518pp. | 25.00 | _____ |
| ____ | | (G901) International Failures to Protect Refugees, 4/97, 26pp. | 3.00 | _____ |
| ____ | | An annual subscription to all the publications from all the divisions of Human Rights Watch is available (includes postage & handling). | 450.00 | _____ |

|  |  |
|---|---|
| Subtotal | $ _____ |
| Postage & Handling | $ _____ |
| Total Enclosed | $ _____ |

Address orders to Human Rights Watch,
Publications Department, 350 Fifth Avenue, 34th Fl.
New York, NY 10118

Shipping charges: for U.S. orders add $3.50 plus $.50 for each additional item. For Canada add $4.50 plus $.75 for each additional item. For other countries: airmail orders add $8.00 plus $2.00 for each additional item.

Please Charge My Visa Or MasterCard Account.

Ship to (name and address): please print

_____

_____

_____

Account Number _____ Expiration Date

Card Holder _____ Print

Phone number _____

(12/98)

418.

# DECLARATION OF MICHAEL BOCHENEK

I, Michael Bochenek, declare as follows:

1. I am an attorney at law admitted to practice before the New York Appellate Division, First Department. I am employed as counsel to the Children's Rights Division of Human Rights Watch. My office address is 350 Fifth Avenue, 34th Floor, New York, New York 10118. My telephone number is (212) 216-1245.

2. I am a coauthor of *Detained and Deprived of Rights: Children in the Custody of the U.S. Immigration and Naturalization Service,* published by Human Rights Watch in December 1998. A copy of the report is attached to this declaration.

3. In the course of researching the Human Rights Watch report, I personally visited the Berks County Youth Center in Leesport, Pennsylvania, three times, once in June 1998 and twice in November 1998. The report describes the facts, observations, and representations I witnessed during this visit. The facts and circumstances related in the report are true and correct to the best of my personal knowledge and recollection and are incorporated by this reference as though fully set forth in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of September, 2002, at New York, New York.

_Michael Bochenek_
Michael Bochenek

Human Rights Watch
350 Fifth Avenue, 34th Floor
New York, New York 10118-1299

419.

SCANNED

## AFFIDAVIT OF JO BECKER

Jo Becker, being duly sworn, deposes and states as follows:

1. I am employed as advocacy director for the Children's Rights Division of Human Rights Watch. My office address is 350 Fifth Avenue, 34th Floor, New York, New York, 10118. My telephone number is (212) 216-1236.

2. I am the principal author of *Detained and Deprived of Rights: Children in the Custody of the U.S. Immigration and Naturalization Service,* published by Human Rights Watch in December 1998. A copy of the report is attached to this declaration.

3. In the course of researching the Human Rights Watch report, I personally visited the Berks County Youth Center in Leesport, Pennsylvania, three times, once in June 1998 and twice in November 1998. The report describes the facts, observations, and representations I witnessed during this visit. The facts and circumstances related in the report are true and correct to the best of my personal knowledge and recollection and are incorporated by this reference as though fully set forth in this declaration.

I swear under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated:  New York, New York
September 27, 2002

Jo Becker

Sworn and subscribed to before me
this 27th day of September, 2002.

Notary Public

MICHAEL BOCHENEK
Notary Public, State of New York
No. 02BO6019754
Qualified in Kings County
Commission Expires 16 February 20___

Human Rights Watch
350 Fifth Avenue, 34th Floor
New York, New York 10118-3299

420.

SCANNED

# EXHIBIT 47

**DECLARATION OF SHIU MING CHEER**

I, Shiu Ming Cheer, declare and say as follows:

1.   I am the Children's Attorney at the Florence Immigrant and Refugee Rights Project, Inc., located at 300 South Main Street, P.O. Box 654, Florence, Arizona 85232.  Our office number is (520) 868-0191.

2.   Through my work I meet many of the children detained in immigration custody in the various shelters, detention centers and holding facilities in Arizona.  One of the children that I represent is Eugenia Sirin-Godinez (A# 96-190-538; DOB 3/1/86).

3.   Eugenia, has been detained at the Southwest Key Program in Phoenix, Arizona, since October 23, 2002.  She was granted asylum on March 20, 2003 and her daughter Ana Marie Guadalupe Sirin (A#96-190-546; DOB 9/22/01) was granted derivative asylum through Eugenia.  *See,* Judge Richardson's Orders, dated April 21, 2003, attachments 1 and 2.

4.   The Department of Homeland Security (DHS) appealed this decision on April 14, 2003.

5.   Eugenia's United States citizen brother, Edwin Sirin submitted a reunification packet around April 3rd, but release to her brother was denied.  I was verbally told by a Southwest Key caseworker that the basis for the Office of Refugee Resettlement (ORR) denial was a need for more intensive supervision.  I was informed by DHS Juvenile Coordinator Elizabeth Lopez that she received an e-mail from Dr. Nguyen Van Hanh, ORR Director, denying Eugenia's release.

6.   I have requested a reason in writing for the denial of Eugenia's release to her brother.  I left messages with three staff members at ORR regarding Eugenia's situation.

7.   Teresa Noemi Pineda Levya, Eugenia's ex-husband's cousin has also offered to take in Eugenia, but release to Ms. Levya was also denied.  The reason given for this denial was because Ms. Levya is not a blood relative.

8.   Eugenia met with a volunteer psychiatrist, Paula T. McWhirter, Ph.D. on February 24, 2003, who determined Eugenia was suffering from Post Traumatic Stress Disorder and Major Depressive Disorder, brought on by a history of trauma, including child sexual abuse (perpetrated by a step-father and a traveling guide in the presence of her infant child), neglect (living alone on the streets), witnessing violence (witnessing the killing of several friends who had provided for her during her childhood), and receiving a personal death threat.  *See,* Declaration of Paula T. McWhirter, dated March 10, 2003, attachment 3.

9.   Dr. McWhirter recommended that Eugenia receive counseling from a female therapist with a background in Post Traumatic Stress Disorder who is fluent in Spanish, and a monitoring of her antidepressant psyhotropics and other medications.  *See,* McWhirter Declaration, attachment 3.

421.

10.     Eugenia has threatened suicide several times during her stay at Southwest Keys and was hospitalized in December 2002 after cutting her wrists.  *See*, McWhirter Declaration, attachment 3.

11.     On April 16, 2003, I submitted a letter to Shereen Faraj of ORR requesting that due to Eugenia's history of depression and the fact she has an infant daughter, she be placed in a therapeutic foster home or group home close to her brother in Los Angeles.  This letter also expressed Eugenia's desire to be transferred elsewhere as soon as possible.  *See*, Letter dated April 16, 2003, attachment 4.

12.     Despite this request and Eugenia's special needs, Eugenia has not been removed from Southwest Key.

13.     Eugenia has been receiving counseling services at Southwest Key and has been prescribed sleeping pills and anti-depressants.  However, the restrictive environment, coupled with her special vulnerability make full recovery impossible outside of placement in a more stable and nurturing environment.

14.     On May 6, 2003 I was informed that a referral had been made to Public Health Services because ORR felt the Unaccompanied Refugee Minors program was not equipped to service Eugenia's multiple needs.  This decision was made as a result of the combination of her behavioral problems, mental health needs, child abuse, her baby girl and fear that she is a flight risk.  Public Health Services will be looking for a community based placement that can provide more specialized services than foster care is able to.

15.     On May 7, 2003, I visited Eugenia.  She stated that she continues to be depressed over her continued detention and reiterated her desire to be transferred elsewhere as soon as possible.

16.     I have not been given an idea of how soon that can be arranged.  Eugenia's further detention at Southwest Key delays her improvement and places both Eugenia and subsequently her daughter's health and future at risk.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  12  day of May, 2003, at Florence, Arizona.

Shiu Ming Cheer

422.

# EXHIBIT 48



DEPARTMENT OF HEALTH & HUMAN SERVICES                JUL 9 1 2003

ADMINISTRATION FOR CHILDREN AND FAMIL
370 L'Enfant Promenade. S W.
Washington, D C   20447



JUL 1 8 2003

Carlos Holguin, Esquire
Center for Human rights and Constitutional Law
256 S. Occidental Boulevard
Los Angeles, CA 90057

Dear Mr. Holguin:

I write in response to your letter concerning ORR's policy on the release of minors to individuals who are not blood relations.  You inquired about ORR's overall policy and about the specific cases of Eugenia Sirin-Godinez (A96 190 538) and Alida Veronica Cahuec-Gonzalez (A96 190 537).  These minors were not released by the former Immigration and Naturalization Service (INS) to Teresa Noemi Pineda Leyva, a relative by law, not by blood.

ORR evaluates each case individually and makes decisions based on the best interests of the children.  In making recommendations for release, ORR follows the requirements in section VI "General Policy Favoring Release" in the *Flores* agreement.  It is not ORR policy to detain minors in lieu of releasing them to an adult who is not related by blood.  In the specific cases of Ms. Sirin-Godinez and Ms. Cahuec-Gonzalez, ORR has been unable to ascertain the reason the former INS did not find Teresa Noemi Pineda Leyva to be an acceptable sponsor.  However, I can give you the following information about the current status of the two cases.

## Eugenia Sirin-Godinez

Ms. Leyva has not come forward to ORR to request the release of Ms. Sirin-Godinez.  However, Ms. Sirin-Godinez's half-brother did request release.  ORR denied his request after being advised that Ms. Sirin-Godinez needs professional, therapeutic care, which her half brother cannot provide.  Ms. Sirin-Godinez is a teenage mother, who suffers from major depressive disorder and chronic post traumatic stress disorder.  Psychological evaluations of Ms. Sirin-Godinez note that she is an appropriate candidate for placement in a foster care, group home or residential treatment situation that can provide a supportive structure, therapeutic intervention, medication management and individual therapy.  Therefore, ORR is in the process of locating a suitable therapeutic placement that will be able to provide Ms. Sirin-Godinez and her child with the specialized care they require

423.



## Alida Veronica Cahuec-Gonzalez

As you are likely aware, Ms. Cahuec-Gonzalez turned 18 on May 7, while in ORR care. She was paroled into the community and is no longer at the Southwest Key Facility in Phoenix, Arizona.

I hope this information is helpful. The ORR staff look forward to continuing to work with you on behalf of the unaccompanied children in ORR's care.

Sincerely,

Nguyen Van Hanh, Ph.D.
Director
Office of Refugee Resettlement

424.

SCANNED

# EXHIBIT 49

SCANNED

[Reserved]

425.

SCANNED

# EXHIBIT 50

SCANNED

## DECLARATION OF JIN RONG YIOU

I, Jin Rong Yiou, declare and say as follows:

1. I am a native and citizen of the Peoples Republic of China. My Immigration and
Naturalization Service number is A77 052 527  I was born October 5, 1985. I am now 16 years
old.

2  I have been held in various detention facilities since October of 1999 when I was originally
detained.

3. Most recently I was housed at Tulare County Juvenile Hall. I was transferred to my location
as Los Padrinos Juvenile Detention Facility in Downcy on October 4, 2001. I was not informed
that I would be moved until the evening of October 3, 2001. They did not tell me where I was
being relocated. I did not have any chance to let anyone know that I was being moved.

4. On October 4, 2001 I was led to a car in handcuffs with only the clothes I was wearing. I
expressed concern about my luggage because it did not have my name on it. I did not know
where I was going. I was very uncertain about where I was going

5. I was taken to INS headquarters in Los Angeles, I believe. I saw my luggage there on October
4, 2001. I have not seen my luggage since then. I do not know its whereabouts. I have asked for
it many times. I had my attorney inquire about my luggage, but I have been here at Los Padrinos
for over two weeks and no one can tell me where my belongings are.   All of my paperwork I do
not have with me now

6  On the evening of October 4, 2001 I was brought to Los Padrinos. I was put in a unit with
other INS detainees and 601's. There are 6 girls living in the unit. Only three are INS kids. The
kid's designated as 601's have told me they are detained here because they refused to go to
school. At night the sleeping arrangements are very strange  If there are too many girls in the
other units, we are taken to sleep in the infirmary all together with the overflow. If there is no
overflow then we get to sleep in our units. Right before we are suppose to go to bed the officer
will tell us if we have to move to the infirmary for the night. If we sleep there, then in the
morning we go back to our unit.

7. I wake up at 6:30 a m , brush my teeth, make my bed, and wait for breakfast. After breakfast,
we clean, sweep the floors and mop according to whatever task we are assigned by the officers.

8. At 8:30 a.m. I begin school with about 15 other kids also held here by the INS  We have
school until 10:10  Then we have a recreation time outside for P.E.  After that we have lunch at
12:00 to 1:00, then clean again. At 1:00 p.m. we return to school till 2:45  Then we go back to
our units to do homework. The officers make a schedule for us, with work and activities.

426.

9. Around 4:00 or 4:30 we go outside again for exercise. Then we return to the unit and wait for dinner. I shower in the evening. I must shower with other people. After dinner we can do activities until 8:30 p.m. when the lights are turned out and we must go to sleep.

10. I do not get to ever go outside the facility. When I was in Georgia we went out into the public and got to go on field trips. Here at Los Padrinos I can never leave the facility.

11. When I was at the Los Angeles INS office the Immigration Officer told me that they were going to release me and my brother the next day and that we should not worry about our belongings because we would get them the next day. That was October 4, 2001. I once again got my hopes up that I would be in a better environment, even one like the Baptist Children's Home in Georgia would be better than being held in jail I am feeling sad that I am locked up for so long.

12 I was seen by the doctor here at Los Padrinos about one week ago. He drew blood, gave me a TB test and 5 shots I do not know what the shots were for. I asked a staff member to explain it to me, but all she could tell me is that the shots were to keep me from getting diseases. She did not tell me which diseases the shots were for.

13. When I arrived in the United States I was a Buddhist. Since studying the Christian religion I have converted to Christianity. I fear returning to China now that I am a Christian because Christians are persecuted for their beliefs and must practice Christianity in an underground way hidden from the officials assigned by the government to put Christians in jail.

SCANNED

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of October, at Los Padrinos Juvenile Detention Facility, Downey, California.

Jin Rong YIOU
A77 052 527

428.

# CERTIFICATE OF SERVICE

I am not a party to this action.  I am employed by the Center for Human Rights and Constitutional Law, 256 S. Occidental Blvd., Los Angeles, CA, 90057.  I am over the age of eighteen.

Copies of the foregoing , **Notice of Filing of Index to Exhibits and Exhibits in Support of Plaintiff's Notice of Motion and Motion to Enforce Settlement of Class Action, Volumes I-IV**, were personally served on counsel for defendants on this date at the following addresses:

Mr. Frank Travieso

Assistant United States Attorney

Federal Building, Suite 7516

300 North Los Angeles Street

Los Angeles, CA  90012

Dated: January 15, 2004

Carlos Holguín, State Bar No. 90754
*Attorney for Plaintiffs*