1  CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
   Carlos Holguín, State Bar No. 90754
2  Peter A. Schey, State Bar No. 58232
   256 South Occidental Boulevard
3  Los Angeles, CA 90057
   Telephone: (213) 388-8693
4   Fax: (213) 386-9484

5  LATHAM & WATKINS
   Steven Schulman
6  555 Eleventh St., NW, Suite 1000
   Washington, DC 20004
7  Telephone: (202) 637-2184
   Fax: (202) 637-2201
8

9  NATIONAL CENTER FOR YOUTH LAW
   Katina Ancar
10 405 -14th Street, Suite 1500
   Oakland, California 94612
11 Telephone: (510) 835-8098
   Fax: (510) 835-8099
12

13 *Of counsel:*
   YOUTH LAW CENTER
14 Alice Bussiere
   417 Montgomery Street, Suite 900
15 San Francisco, CA 94104
   Telephone: (415) 543-3379
16 Fax: (415) 956-9022

17 *Attorneys for Plaintiffs*

18                    UNITED STATES DISTRICT COURT

19                    CENTRAL DISTRICT OF CALIFORNIA

20
   JENNY LISETTE FLORES, *et al.,*       )    No. CV 85-4544-RJK(Px)
21                                        )
   Plaintiffs,                           )    NOTICE OF FILING OF INDEX
22                                        )    TO EXHIBITS AND EXHIBITS
   -vs-                                   )    IN SUPPORT OF PLAINTIFFS'
23                                        )    NOTICE OF MOTION AND
   TOM RIDGE, Secretary, Department of    )    MOTION TO ENFORCE
24 Homeland Security, *et al.,*           )    SETTLEMENT OF CLASS
                                          )    ACTION - VOLUME IV
25 Defendants                            )
                                          )    (ARGUMENT NOT REQUIRED)
26 ─────────────────────────────────────)

27

28

1    Plaintiffs hereby give notice of the filing of their Index to Exhibits and

2    Exhibits in Support of Plaintiffs' Notice of Motion and Motion to Enforce

3    Settlement of Class Action. Volume IV of IV contains the following exhibits:

4    EXHIBIT 51:    Declaration of Nicolas Gonzales Reyes, June 6, 2003

5    EXHIBIT 52:    Declaration of Elizabeth Cox, July 7, 2003

6    EXHIBIT 53:    Declaration of Elizabeth Cox, July 7, 2003

7    EXHIBIT 54:    Declaration of Jorge Mosquera-Perez, June 20, 2003

8    EXHIBIT 55:    Declaration of Lisa Frydman, June 26, 2003

9    EXHIBIT 56:    [Reserved]

10   EXHIBIT 57:    Declaration of Deborah Lee, August 15, 2003

11   EXHIBIT 58:    Declaration of Lisa Frydman, September 23, 2003

12   EXHIBIT 59:    Statement of Margoth Bermeo, September 10, 2003

13   EXHIBIT 60:    Declaration of Manuel Sanchez, September 17, 2003

14   EXHIBIT 61:    Declaration of Liliana Linares, September 17, 2003

15   EXHIBIT 62:    Declaration of Carlos Holguin, October 3, 2003

16   EXHIBIT 63:    Declaration of Celestino Gallegos, July 26, 2002

17   EXHIBIT 64:    Declaration of Martin Carreon-Gonzalez, June 20, 2003

18   EXHIBIT 65:    Letter from Katina Ancar to Daniel Stark (HHS) and Hugh G. Mullane
19                  (DOJ), April 21, 2003

20   EXHIBIT 66:    Letter from JoNel Newman to Allen W. Hausman, January 4, 2002

21   EXHIBIT 67:    Declaration of Jennifer Wang, October 3, 2002

22   EXHIBIT 68:    Fact Sheet: the President's Fiscal 2003 Immigration Budget, Border
23                  Enforcement, February 4, 2002

24   EXHIBIT 67:    Declaration of Jennifer Wang, October 3, 2002

25   EXHIBIT 68:    Fact Sheet: the President's Fiscal 2003 Immigration Budget, Border
                    Enforcement, February 4, 2002

26

27

28                              - 2 -

EXHIBIT 69:   Fact Sheet: the President's Fiscal 2003 Immigration Budget, Interior Enforcement, February 4, 2002

EXHIBIT 70:   Fact Sheet: the President's Fiscal 2003 Immigration Budget, Detention and Removals, February 4, 2002

EXHIBIT 71:   INS letter to the United States Catholic Conference, November 5, 1999

EXHIBIT 72:   Letter from Katina Ancar to Daniel Stark (HHS) and Drew Stienberg (DHS), June 27, 2003

EXHIBIT 73:   Letter from Katina Ancar to Hugh G. Mullane (DOJ), March 14, 2003

EXHIBIT 74:   Letter from Carlos Holguín to Daniel Stark (HHS) and Drew Steinberg (DOJ), April 29, 2003

EXHIBIT 75:   Letter from Carlos Holguín to  Daniel Stark (HHS) and Hugh Mullane (DOJ), March 20, 2003

EXHIBIT 76:   Letter from Steven H. Schulman to Hugh Mullane (DOJ), February 25, 2003

EXHIBIT 77:   Letter from Steven H. Schulman to John Pogash (DOJ), February 6, 2003

EXHIBIT 78:   Letter from Steven H. Schulman to Hugh Mullane (DOJ), February 6, 2003

EXHIBIT 79:   Letter from Steven H. Schulman to John Pogash, (DOJ), February 4, 2003

EXHIBIT 80:   Letter from Steven H. Schulman to Drew Steinberg (DOJ) John Pogash, (DOJ), December 17, 2002

EXHIBIT 81:   Letter from Katina Ancar to Susan Curda (DOJ) and Dew Steinberg (DOJ), October 29, 2002

EXHIBIT 82:   Letter from Carlos Holguín to Arthur Strathern (OGC, INS) and Mark Matese (Juvenile Coordinator, INS), September 10, 2001

EXHIBIT 83:   Letter from Carlos Holguín to Arthur Strathern (OGC, INS) and Mark Matese (Juvenile Coordinator, INS), October 19, 2001

EXHIBIT 84:   Letter from Mark Matese (INS) to Carlos Holguín, November 2, 2001

EXHIBIT 85:   [Reserved]

EXHIBIT 86:   Letter from Carlos Holguín to Mark Matese (Juvenile Coordinator, INS) and Arthur Strathern (OGC, INS), February 8, 2002

1

EXHIBIT 87:     Letter from Carlos Holguín to Arthur Strathern (OGC, INS) and
                Mark Matese (Juvenile Coordinator, INS), February 27, 2002

2

3

Dated: January 15, 2004                    Respectfully Submitted,

4

5                                          CENTER FOR HUMAN RIGHTS &
                                           CONSTITUTIONAL LAW

6

7

8                                          Carlos Holguín, State Bar No. 90754
                                           *Attorney for Plaintiffs*

9       ///

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                 - 4 -

SCANNED

# EXHIBIT 51

Gonzales Reyes, Nicolas (A 79-625-915)
Page 1 of 5

## DECLARATION OF NICOLAS GONZALES REYES (A# 79-625-915)

I solemnly affirm, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the
following is true and correct to the best of my knowledge and ability.

1. My name is Nicolas Gonzales Reyes. I am also known as Nicolas Reyes
   Gonzales. I was born on October 16, 1985.

2. I have been in the custody of the Office of Refugee Resettlement (ORR) at
   Central Juvenile Hall in Los Angeles, California since approximately March 21,
   2003.

3. I was living in San Francisco and was in the custody of the San Francisco County
   Probation Department before I was locked up here in Los Angeles. I had a
   hearing in San Francisco Immigration Court but am now seeing an Immigration
   Judge here in Los Angeles. I think I have to see the Immigration Judge in Los
   Angeles because I am locked up here. I do not really understand why I cannot go
   back to San Francisco to fight my immigration case.

4. After I had Immigration Court this past Monday, June 2, 2003, I was hit by an
   Immigration Officer who I think is named Mr. Dews. I am scared that he or
   another officer will hit me again when they bring me to Immigration Court again.

5. At about 3:30-4pm on June 2, 2003, Mr. Dews and another female Immigration
   Officer handcuffed about five other kids and me. We had finished seeing the
   Immigration Judge and the Immigration Officers were supposed to take us back to
   Central Juvenile Hall.

6. All of us kids were handcuffed with our hands in front of our bodies and were
   connected to each other with more chains. The two Immigration Officers took us
   to a large van and told us to get inside.

7. Mr. Dews is a black man, maybe between 30-40 years old. I think he is about 6
   inches taller than me. He was bald. He was wearing a green shirt and uniform
   like all the other Immigration Officers. I only heard him speaking English and do
   not think he ~~spoke~~ speaks Spanish.

N G - R
6 -6 -03

8. The female Immigration Officer was white. I do not know her name but she had
   long, light brown hair. I think she was between 30-40 years old. I only heard her
   speaking English and do not think she ~~spoke~~ speaks Spanish.   N - G - R - 6 - 6 - 03

9. All of us kids sat two to a bench seat in the van. Although I was handcuffed to
   the other kid in my bench seat, we all were also chained together by a longer
   chain that ran down the middle of the van.

Gonzales Reyes, Nicolas (A 79-625-915)
Page 2 of 5

10. As Mr. Dews drove the van, all the chains that were attached to us kept on moving around and making noise. This is because Mr. Dews was driving the van and making the chains move back and forth. I was not trying to make the chains move.

11. Mr. Dews yelled at us to be quiet. I remember that he screamed at us to "Shut the fuck up" and if we understood the words coming out of his mouth.

12. Although I speak English pretty well, I do not think any of the other kids in the van speak English. I do not know if Mr. Dews knew that most of the kids did not speak English. I do not think any of the other kids knew why he was screaming at us.

13. I remember that I told him that nobody was doing anything and that it was just the chains making noise. I told him that all of us kids were not going anywhere. Mr. Dews said that we were making too much noise.

14. I then overheard Mr. Dews say to the female Immigration Officer that us kids were trying to make him mad. He said that we needed to be taught a lesson. He said something like, "Why don't we bring them back and teach them how to respect us."

15. We then arrived in the parking lot of Central Juvenile Hall. Mr. Dews opened the door and told us kids to get out. When we got out he started cursing at me. He was standing less than one foot away and was screaming in my face. He said something like, "What the fuck, I told you not to make any noise." Then he said something like, "You think that I am playing. I am not a little kid. I come from the *pinta* and you know how they run it over there. They don't play. They are real men and you think you can play with me. I can fuck you up. You don't know what kind of person I am."

16. I remember that the female Immigration Officer then asked Mr. Dews what he wanted to do. Mr. Dews said that we were all "going back to the Department. We are going to show these motherfuckers that they cannot play with me." After that, Mr. Dews told us to get back into the van.

17. Although I was scared, I told the other kids not to worry because the Immigration Officers were not allowed to hit us. All of us kids got back into the van. Mr. Dews told the female Immigration Officer that we needed to be shown a little discipline and that we were motherfucking kids. I thought it was strange that Mr. Dews was going to take us back to the Immigration Office again since we had already arrived at Central Juvenile Hall, but that is what he said he was going to do.

430

Gonzales Reyes, Nicolas (A 79-625-915)
Page 3 of 5

18. Mr. Dews drove really crazy when we left Central Juvenile Hall. All of us kids kept on sliding around our bench seats because of the way he was driving. I told Mr. Dews to calm down but he told me to "shut the fuck up."

19. When we got back to the Immigration Office, Mr. Dews and the female Immigration Officer left us in the van. I thought they were going to just leave us there in the van to teach us a lesson.

20. But then the two came back and took us into the building. There were a bunch of chairs against a wall and Mr. Dews told us kids to sit down. The kids in front and behind me had already sat down and some of the chains connecting all of us were stretched tight in my seat. I could not sit down because the chain was in the way.

21. Mr. Dews grabbed my shirt and pushed my chest to make me sit down. Then he hit me on my neck with the side of his fist. Then he hit me on the back of my head with a half-closed fist.

22. I was so shocked. I could not believe that he was hitting me.

23. He then shoved his hand into my neck as if he was going to choke me. He then held my neck and pounded my head against the wall behind me. I do not remember how many times he did them-but it hurt a lot. I kept my eyes closed because I was getting dizzy.   *this*   N - G - R - 6-6-03

24. I remember that there were four or so other officers there in the room watching. They just let him do this to me. No one helped me.

25. I remember that one of the officers looked like he was Chinese. He came up to me and said that I was a punk. He said something like, "Do you know what this man can do to you. And you are going to lose. He can kill you and you don't have nothing to lose. You are the only one going to lose. He can kill you and no one is going to say anything. Trust me."

26. Mr. Dews said something like, "Motherfucker, don't play with me." Then I was uncuffed. I had trouble walking and felt that I was going to fall straight down.

27. I was put in a separate room by Mr. Dews. I asked him for his name but he would tell me. Then I saw his name on his badge. I didn't tell him that I knew his name. I think he did not want me to complain about him.

28. I was told that I was going to stay in this room for a long time. I felt dizzy and asked to see the nurse. An Immigration Officer told me to, "Shut the fuck up and sit down." I continued to knock on the door because I wanted to see a nurse.

29. When the nurse came the Immigration Officer told her that I had a headache. The nurse asked me what I needed. I told her that my neck hurt and so did my head.

431.

Gonzales Reyes, Nicolas (A 79-625-915)
Page 4 of 5

She just gave me two white pills. I think she thought I had a headache. I knew
that the Immigration Officer was right there and did not say that Mr. Dews had hit
me.   because of this   N-G-R   6-8-0

30. Later, I was brought back with the other kids and handcuffed to them again. I saw
Sonya Muñoz, an Immigration Officer that has taken me on the airplane to
Immigration Court in San Francisco. She asked out loud what was going on.

31. Mr. Dews spoke with Ms. Muñoz. Afterwards, he came up to me and said that he
was sorry and that he was apologizing. Ms. Muñoz then said that Mr. Dews was
apologizing to me. I did not feel comfortable then and said that I wanted to go
back to Central juvenile Hall. I did not care if he was apologizing because he
should not have hit me. My head hurt and I just wanted to go to the nurse at
Central Juvenile Hall.

32. Mr. Dews and the same female Immigration Officer from before took us again to
Central Juvenile Hall. When we came through the Movement Control Office, I
asked a Central Juvenile Hall staff member to get Mr. Dews' name. She asked
me why. I told her that Mr. Dews had hit me. She told me not to worry and that
she would get his name.

33. Mr. Dews then spoke with a supervising officer at Movement Control. This
supervisor was a big fat black man. I heard Mr. Dews say that I was trouble. He
spoke with the supervisor for a while alone and then signed a piece of paper.

34. The staff member that I had asked to get Mr. Dews' name then took my name and
told me not to worry.

35. The supervisor then asked me what had happened. I told him that Immigration
had hit me. I told him I felt bad and wanted to see the nurse. He said that he
would send me to the nurse. I told him that I didn't feel like explaining
everything then and just wanted to see the nurse.

36. I saw the nurse at Central Juvenile Hall. She asked if I got into a fight. I told her
that the Immigration Officer hit me. She gave me some ice and two white pills. I
remember that I still felt dizzy.

37. The next morning, I spoke with the supervisor of the "T/V" unit. He asked me if
someone from Immigration had hit me. I said yes. He told me that he had the
nurse's report and was going to give it to the police to investigate. He asked me if
I had called my lawyer. I told him that I called my lawyer in San Francisco but
there was no one there. He told me that I should call my lawyer.

38. I have a headache from being hit and feel a little ringing in my head. I do not
think that the Immigration Officers should be allowed to hit me.

432.

Gonzales Reyes, Nicolas (A 79-625-915)
Page 5 of 5

39. This entire declaration has been read to me. I understand all of its contents and
the statements herein are true and correct to the best of my knowledge and ability.

Executed on the _6_ day of __Juaio__, 2003.

By: _Nicolas Gonsale_

Nicolas Gonzales Reyes

433.

# EXHIBIT 52

1   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
    Carlos Holguín
2   Peter A. Schey
    Charles Song
3   256 South Occidental Boulevard
    Los Angeles, CA 90057
4   Telephone: (213) 388-8693
    Fax: (213) 386-9484
5

6   LATHAM & WATKINS
    Steven Schulman
7   555 Eleventh St., NW, Suite 1000
    Washington, DC 20004
8   Telephone: (202) 637-2184
    Fax: (202) 637-2201
9

10  NATIONAL CENTER FOR YOUTH LAW
    Katina Ancar
11  405 -14th Street, Suite 1500
    Oakland, California 94612
12  Telephone: (510) 835-8098
    Fax: (510) 835-8099
13

    Of counsel:
14  YOUTH LAW CENTER
    Alice Bussiere
15  417 Montgomery Street, Suite 900
    San Francisco, CA 94104
16  Telephone: (415) 543-3379
    Fax: (415) 956-9022
17

18  Attorneys for plaintiffs

19              UNITED STATES DISTRICT COURT

20              CENTRAL DISTRICT OF CALIFORNIA

21  JENNY LISETTE FLORES, et al.,          )    Case No. CV 85-4544-RJK(Px)
                                           )
22          Plaintiffs,                    )    DECLARATION OF ELIZABETH COX
                                           )    REGARDING MEDINA COUNTY
23  -vs-                                   )    JUVENILE FACILITY
                                           )
24  TOM RIDGE, Secretary, Department       )
    of the Homeland Security, et al.,      )
25                                         )
                                           )
    Defendants. _____    )

434.

I, Beth Cox, declare as follows:

1.   I am over 18 years of age.

2.   I am a summer intern with the Texas Lawyers for Civil Rights in San Antonio, TX.

3.   On July 1, 2003, I visited the Medina County Juvenile Facility, a secure facility housing unaccompanied immigrant children in Hondo, TX.  I spoke with Facility Director Ervin Still and other staff.  I also toured the facility's living and sleeping areas.  According to Mr. Still, the detention facility holds up to children 15 children and averages 3-4 immigrant children daily.  On this day, a total of five children were detained.

4.   The facility has a cold atmosphere and closely resembles a small jail or prison.  The facility staff present as prison guards dressed in fatigue pants, army boots, and black T-shirts.  During my visit, there were four guards on-duty.

5.   The main living area is small and dark, furnished with two round, hard cafeteria-like tables, a counter and benches along the walls, and a television.  None of the facility's furniture appears comfortable for use by children or adults.  There are no decorations of any sort, and very little natural lighting enters the room.

6.   The facility treats immigrant children the same as delinquent youth.  The children have their own dorm rooms to which the door is always locked.  Furniture is sparse, consisting of a hard, metal bench on which is placed a three-inch think mattress, pillows, and sheets.  The children may bring only one book into their rooms.  At no time can they possess any personal articles that they may have brought to the facility.

7.   Youth must request permission to use the restroom whether they in their locked rooms or out in the living area.  They must also ask permission to stand up and move around the living area.  According to Mr. Still, the facility provides the children with a pair of shorts and a T-shirt to wear during the summer and gray sweat suits for

435.

winter wear.  Footwear includes only a pair of shower sandals and canvas slip-on shoes.

8.   The facility also houses youth who have been adjudicated delinquent.  According to the staff, they make a conscience effort to mix the delinquent and immigrant children in all activities.  All children, including the immigrant youth, are handcuffed and shackled when they leave the building for any reason.

9.   When they first arrive at the facility, all youth, including immigrant children, are strip-searched and visually inspected, apparently for physical evidence of medical conditions.  However, this is not a medical exam.  They then shower and, if necessary, receive lice treatments.  Moreover, the immigrant children also receive tuberculosis immunizations, despite the lack of knowledge regarding any previous immunization or potential adverse reactions.

10.   The children receive medical attention from the local public health department on a need-only basis.  Local immigration officers must approve all treatment.  Similarly, the health department provides mental health services only if staff members notice a grave need for therapeutic services and only with approval of immigration officers.

11.   Staff does not know from where the immigrant children come, or where they go after they leave the facility.  The detention facility houses both immigrant children who have manifested behavioral problems at other facilities, as well as those who have not.

12.   During the school year, a Hondo School District teacher provides math, history, English, and life skills classes from 8:00 am to 2:45.  There is no educational instruction during the summer months.  Because this year's teacher was not bilingual, staff and other children attempted to act as interpreters.  When a child speaks a

436.

1    language other than Spanish or English, staff attempts to communicate with the child

2    through hand gestures and body language.

3    13.   The children receive one hour of outside recreation each day in a medium-sized

4          caged-in basketball court.  They cannot go outside on rainy days because the rain

5          makes the court slippery.  Even if the court is dry, the slippers provided to the

6          children do not appear adequate for the running and jumping involved in basketball or

7          soccer.  Staff discipline children who misbehave by locking them in their rooms for

8          the remainder of the day.

9    14.   Although staff reported that the children also have indoor recreation time, they were

10         not able to explain what activities recreation includes.  It appears to be unplanned,

11         haphazard, and left to the discretion of whoever is on duty.  During the summer the

12         children watch at least three hours of television.  The facility provides religious

13         activities, but they are limited to Christian services.

14   15.   Staff indicated that, other than for punishment, the children are locked in their rooms

15         only from 9:30 pm to 5:30 am, and during shift changes.  However, for the duration

16         of my 75-minute visit –during which I mostly sat in a side office – the children did

17         not leave their rooms.

18   16.   Although the staff stated that the children receive three meals a day, there are no

19         snacks provided.  The facility chef does not have a planned menu, and there is no

20         back-up cook.  When the chef cannot work, the staff pieces together meals from

21         canned foods and whatever else is left in the kitchen.

22   //

23   //

24   //

25   //

437.

1    I declare under penalty of perjury that the foregoing is true and correct.  This declaration is

2    executed on this 7 day of July, 2003, at *San Antonio*, Texas.

3

4    *Elizabeth A Cox*

5    Elizabeth Cox

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

438.

SCANNED

# EXHIBIT 53

1   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
2   Carlos Holguín
    Peter A. Schey
3   Charles Song
    256 South Occidental Boulevard
4   Los Angeles, CA 90057
    Telephone: (213) 388-8693
5    Fax: (213) 386-9484

6   LATHAM & WATKINS
    Steven Schulman
7   555 Eleventh St., NW, Suite 1000
    Washington, DC 20004
8   Telephone: (202) 637-2184
    Fax: (202) 637-2201
9

10  NATIONAL CENTER FOR YOUTH LAW
    Katina Ancar
11  405 -14th Street, Suite 1500
    Oakland, California 94612
12  Telephone: (510) 835-8098
    Fax: (510) 835-8099
13

    *Of counsel:*
14  YOUTH LAW CENTER
    Alice Bussiere
15  417 Montgomery Street, Suite 900
    San Francisco, CA 94104
16  Telephone: (415) 543-3379
    Fax: (415) 956-9022
17

18  *Attorneys for plaintiffs*

19              UNITED STATES DISTRICT COURT

20              CENTRAL DISTRICT OF CALIFORNIA

21  JENNY LISETTE FLORES, et al.,          )    Case No. CV 85-4544-RJK(Px)
                                           )
22          Plaintiffs,                    )    DECLARATION OF ELIZABETH COX
                                           )    REGARDING BEXAR COUNTY
23  -vs-                                   )    DETENTION FACILITY
                                           )
24  TOM RIDGE, Secretary, Department       )
    of the Homeland Security, et al.,      )
25                                         )
    Defendants.                            )

439.

I, Elizabeth Cox, declare as follows:

1.  I am over 18 years of age.

2.  I am a summer intern with the Texas Lawyers for Civil Rights in San Antonio, TX.

3.  On June 12, 2003, I toured the Bexar County Detention Center, a secure facility that houses unaccompanied immigrant children in San Antonio, TX. I spoke with David Reilly, the detention center's chief deputy officer, as well as other staff. According to Mr. Reilly, the detention facility can hold 200 delinquent youth, but houses only one or two immigrant children per month.

4.  Mr. Reilly believes that Bexar receives recently apprehended immigrant children. Many such children stay for 24 to 48 hours. Often children arrive late at night and are picked up early in the morning. Mr. Reilly and his staff have little independent information about where and how the children come into custody or where they go after leaving Bexar.

5.  After arriving at the detention center, all children receive blue uniforms and plastic sandals. They receive medical exams in accordance with American Correctional Association regulations. The children are isolated in a small windowless, locked holding cell with concrete floors and a thin sleeping mat. An intercom is provided for communication with a facility officer. Mr. Reilly indicated that when they believe a child will stay for only one night, the child spends the night in the holding cell.

6.  The detention center is made up of a holding and intake area, living space, cafeteria, small gym, classroom space, medical wing, and administration area. The children sleep one to each 70 square feet concrete cell, which contains a toilet, sink, and mirror. Children sleep on a concrete slab covered by a two-inch mattress with sheets and a blanket. The ceilings are high with small window near the ceiling allowing some natural lighting. A hefty lock secures the room.

440.

7. Bexar employs a full-time nurse and provides dental services. Physicians at the University of Texas Health Science Center provide more extensive medical care. However, the facility doesn't offer mental health services. The nurse uses locked 24-hour observations rooms to monitor children who might hurt themselves.

8. Staff members recounted the story of a Honduran boy who was teased by the delinquent youth at the facility. The youth bragged to the boy about their participation in gang activities. The boy simply laughed at them and told them he'd killed hundreds of people, because he fought in the military beginning at age 12. He came to the United States to escape the military and the war. Apparently, this boy received no counseling or mental health services.

9. San Antonio School District teacher offer Spanish-English bilingual classes in English, math, science, and life skills. However, immigrant youth do not participate in these classes because they usually stay for relatively short time periods. Indoor and outdoor recreation areas appeared adequate.

10. Immigrant minors appear to be treated just as delinquent youth, participating in all activities with them. The children must walk with their hands behind their backs, and the children are placed in restraints when they leave the facility for any reason. The restraints consist of handcuffs and foot shackles chained to a metal waist belt.

11. The children are allowed one phone call to a parent or guardian upon arrival, and one call per week thereafter. There are private areas for attorney-client meetings, but immigrant youth rarely have counsel. The facility does not maintain a list of potential pro bono representatives, and immigration officials do not provide one.

//

//

441.

1    I declare under penalty of perjury that the foregoing is true and correct.  This declaration is

2    executed on this _7_ day of July, 2003, at _San Antonio_ Texas.

3

4    _Elizabeth a. Cox_

5    Elizabeth Cox

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SCANNED

442.

# EXHIBIT 54

SCANNED

### DECLARATON OF JORGE MOSQUERA-PEREZ

I Jorge Mosquera-Perez declare,

1. I was born Quevedo, Ecuador on May 18th, 1987.

2. I came to the United States two months ago to find work. My brother lives in Queens, New York.

3. I was arrested at the border where I was taken to an INS office. They did not handcuff me.

4. From there they took me to a correctional facility where I stayed for two weeks.

5. I did not like staying there. I was treated like the other kids there. Many were Americans who who were there because the used drugs or robbed stores. They told me about what they had done.

6. My room was very small. I wore the prison uniform and was allowed one book. I didn't like being strip searched.

7. I had to knock on the door for someone to let me go to the bathroom.

8. I never went outside for the two weeks I was there except when I went to the doctor. They made me wear handcuffs and shackles.

9. I was hungry often because the fed us little food.

10. After two weeks they moved me to the Catholic Charities Shelter.

11. I liked it there. I liked going to the park.

12. Three and a half weeks later I was moved to Southwest Keys.

13. It is much better here than the first place I went, I'd rather be in Catholic Charities.

14. I feel closed-in here, and I really want to go home.

15. The food is not good here, and I know my parents are worried because I haven't talked to them yet. My uncle tells them how I am doing.

443.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration is executed on this 20th day of June 2003, at Houston, TX.

444.

# DECLARATION OF ELIZABETH COX

I Elizabeth Cox declare and say as follows:

1.  I am fluent in Spanish and English.

2.  On this day I translated the foregoing to the declarant who understood the contents there of to affixing his signature therefore.

I declare under penalty and perjury that the foregoing is true and correct.

Executed the 20th day of June, 2003 at the Southwest Keys Facility, Houston, TX.

_____

Elizabeth Cox

445.

I Jorge Mosquera-Perez declare,

1. I was born Quevedo, Ecuador on May 18th, 1987.

2. I came to the United States two months ago to find work. My brother lives in Queens, New York.

3. I was arrested at the border where I was taken to an INS office. They did not handcuff me.

4. From there they took me to a correctional facility where I stayed for two weeks.

5. I did not like staying there. I was treated like the other kids there. Many

446.

SCANNED

were Americans who who were there

because the used drugs or robbed stores.

They told me about what they had done.

6. My room was very small. I wore the

prison uniform and was allowed one

book. I didn't like being strip searched.

7. I had to knock on the door for someone

to let me go to the bathroom.

8. I never went outside for the two

weeks I was there except when

I went to the doctor. They made

me ~~wears~~ wear handcuffs and shackles.

9. ~~B~~ I was hungry often because they

fed us little food.                    447.

SCANNED

10. After two weeks they moved me to the Catholic Charities Shelter.

11. I liked it there, I liked going to the park.

12. Three and a half weeks later I was moved to Southwest Keys.

13. It is much better here than the first place I went, but I'd rather be in Catholic Charities.

14. I feel closed-in here, and I really want to go home.

15. The food is not good here, and I know my parents are worried because

448.

#6. I haven't talked to them yet. My

uncle tells them how I am doing.

I declare under penalty of perjury

that the foregoing is true and

correct, and that this declaration

is executed on this 20th day

of June 2003, at Houston, TX.

Jorge Mosquera

449.

I Elizabeth Cox declare and say
as follows:

1. I am fluent in Spanish and
English.

2. On this day I translated the
foregoing to the declarant who
understood the contents there
of to affixing his signature therefore.

I declare under penalty and
perjury that the foregoing is true
and correct.

Executed the 20th day of June,
2003 at the Southwest Keys
Facility, Houston, TX.

Elizabeth Cox

450.

SCANNED

# EXHIBIT 55

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Charles Song
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Fax: (213) 386-9484

LATHAM & WATKINS
Steven Schulman
555 Eleventh St., NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2184
Fax: (202) 637-2201

NATIONAL CENTER FOR YOUTH LAW
Katina Ancar
405 -14th Street, Suite 1500
Oakland, California 94612
Telephone: (510) 835-8098
Fax: (510) 835-8099
*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere
417 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 543-3379
Fax: (415) 956-9022
*Attorneys for plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, et al., | Case No. CV 85-4544-RJK(Px) |
| Plaintiffs, | DECLARATION OF LISA FRYDMAN |
| -vs- | |
| TOM RIDGE, Secretary, Department of the Homeland Security, et al., | |
| Defendants. | |

451.

I, Lisa Frydman, declare as follows:

1. I am over 18 years of age.

2. I am an attorney at Florida Immigrant Advocacy Center (FIAC) in Miami, Florida.

3. On April 29, 2003, Katina Ancar, co-counsel in the *Flores v. Ridge* et. al litigation provided me with a letter she intended to sent to the Department of Homeland Security and the Office of Refugee Resettlement. The letter notified DHS and ORR that Charu Newhouse Al-Sahli, Vail Gardner, and I would visit the Comfort Suites detention facility in Miami, Florida and interview detained children pursuant to ¶ 32 of the *Flores* Settlement Agreement. See Ancar letter, attached as Ex 1.

4. On May 22, 2003, as stated in the letter, I arrived at the Comfort Suites facility. I arrived early. I was met by the officer on duty at the hotel. I explained the purpose of my visit, which he claimed to know nothing about. As a result, I used a cellphone to contact George Hernandez, Chief of Detention at the Krome facility.

5. Mr. Hernandez stated that he was aware of our visit to the Comfort Suites hotel. He also informed me that an officer was on his way to monitor the visit. He then asked to speak to the officer on duty and explained that our visit was permitted.

6. The officer on duty informed me that six children were being detained at the hotel.

7. One of my colleagues arrived at the hotel at about 12:35 pm. Just after her arrival, the officer from Krome who was to conduct our visit arrived. He went to speak with the officer in charge while we waited in the lobby. A few minutes later, the officer returned and told us that none of the six children were available for interview.

8. According to the officer, one child had been released with his mother (they were detained together). I was pleased at the child's release. However, his attorney had advocated for his release continually for several months. The Department of Homeland Security (DHS)

452.

was fierce in its denial of his release. It concerns me that on the day of our visit, he was suddenly released.

9. A second child had been taken to see a doctor. I am glad to hear this child was taken to the doctor. However, it concerns me that just a few weeks earlier, DHS officers denied a very sick, two-year old boy at the hotel medical treatment. It was not until the two-year old was hardly breathing that DHS finally agreed to FIAC's request for medical care. Based on FIAC's experience with the two-year old boy, I find it questionable DHS' motivation for taking this second child to the doctor so expeditiously.

10. Finally, despite knowledge of our visit, the other four Dominican children being held at the facility had been transported to the consulate for the day.

11. The officer stated that the consulate visit was merely coincidental and may have been the result of the deportation officer's failure to notify the officer in charge of the consulate visit. I was not informed of the purpose of the consulate visit.

12. The officer told us he was sorry, but we would have to reschedule. I do not recall the name of the officer with whom we spoke.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on this 26th day of June, 2003, at Miami, Florida.

_Lisa Frydman_

Lisa Frydman

453.

SCANNED

# EXHIBIT 56

[RESERVED]

454.

# EXHIBIT 57

## DECLARATION OF DEBORAH LEE

I, Deborah Lee, declare and say as follows.

1. I am a law graduate employed by the Catholic Legal Immigration Network, Inc. (CLINIC) at 1530 James M. Wood Boulevard, Los Angeles, CA 90015. I have been employed by CLINIC since September 2002.

2. In the course of my work with CLINIC, I provide legal rights presentations to detained minors in Office of Refugee Resettlement (ORR)/ Department of Homeland Security (DHS) custody. I conduct these presentations for the minors at Central Juvenile Hall (CJH), a secure lock-down facility for delinquent youth run by the Los Angeles County Probation Department in Los Angeles, California. CJH is the Los Angeles facility contracted to house detained minors in immigration proceedings.

3. To my knowledge and belief, CLINIC is currently the only non-profit agency providing a substantial level of free legal representation to detained *Flores* class members in the Los Angeles area. CLINIC's resources are themselves limited, and we often find that we lack the staffing to assist all detained minors who require representation.

4. Since September 2002, I have been recognized by the Hon. Immigration Judge Muñoz to represent detained minors under the supervision of Allison Wannamaker, Esq., managing attorney at CLINIC's Los Angeles office. I have also been recognized by the Hon. Immigration Judge Stancill and Fong to represent detained minors under the supervision of Allison Wannamaker. Since September 2002, I have individually represented approximately 60 detained minors.

455.

5.  I have been visiting my clients at CJH approximately twice a week for the past nine months. Despite the regularity of these visits, I consistently face needless difficulty and delays in gaining access to my clients. It is not unusual at all for me to wait 1-1 ½ hours to see a client. The time lost waiting to see a client means that I have less time to represent other detained children who, as a practical matter, will have no one else available to represent them.

6.  For example, on March 10, 2003, I visited CJH to meet with a client in the morning. At 10am, I called to the Movement Control office at CJH to request that my client be brought to the interview rooms of the Boys' Receiving area of CJH. Although I am generally told that I cannot request for a minor to be brought to Boys' Receiving until I physically arrive at CJH, I was able to get confirmation from the staff at Movement Control that my client would be ready for me when I arrived.

7.  When I arrived at CJH and checked in, I was again told by a staff member that my client was being brought from school to the Boys' Receiving area. When I arrived at the Boys' Receiving area, I was told by another staff member that my client was arriving imminently. My client was not brought to Boys' Receiving for another 45 minutes.

8.  Unfortunately, the foregoing example is not an aberration. I have had repeated difficulty waiting to meet with my clients at CJH. On June 27, 2003, when an ORR representative came to visit two of my clients, we waited in Boys' Receiving for approximately 3 hours to meet with them.

9.  Visitation procedures also seem to change from visit to visit, increasing the difficulty, frustration and time it takes to get to see clients. I have asked for a copy of CJH's

2

456.

written attorney-client visitation policy, but have been informed that no written policy exists. I have been informed that I must rely solely on the information given to me orally by the staff at CJH when I visit.

10. Although I can tell my clients their rights to telephone access under the *Flores* settlement, I cannot assure them these rights will be honored at CJH. My clients consistently complain about not being able to telephone their families and me. My client's sporadic access to telephones means that our ability to communicate outside of in-person visits is marginal. This compounds the difficulties created by the obtsacles the facility places in the way of face-to-face attorney-client communication.

11. My clients also do not know the telephone number for the local DHS Juvenile Coordinator, ORR, or their local Consulate. Like the visitation policy, the phone policy and rules are not clearly defined. I have asked for but been told there is no written policy regarding telephone access; according to my clients and CJH staff, telephone access is determined by merit, i.e., the staff in the unit subjectively determines who can and who cannot make telephone calls. My clients often complain about how the American delinquent kids are favored, and that it is difficult for those *Flores* class members with limited English language skills to earn enough "merit" with the generally English monolingual staff to make a telephone call.

12. CLINIC staff is aware that the Homeland Security Act of 2002 transferred primary responsiblity for the detention and release of *Flores* class members to the Department of Health and Human Services' ORR. We are also aware that DHS retains substantial residual authority over this population. As we understand it, ORR assumed its responsibilities in March 2003. Like many advocates for detained immigrant and refugee minors, CLINIC had hopes that this change of responsiblity would

457.

significantly improve the conditions and treatment Flores class members experience during federal custody. Unfortunately, no such improvements have occurred. To the contrary, the difficulties we face in representing children have only increased in the wake of the division of responsiblity between ORR and DHS.

13. To begin, securing the release of detained minors to parents, relatives, and other caretakers is more difficult than ever. Despite ORR's nominal authority to authorize a minor's release, the DHS Juvenile Coordinator continues to receive and decide applications for a child's release. ORR refers release requests to the DHS Juvenile Coordinator for "investigation" purposes, consistently relies on the DHS Juvenile Coordinator's "recommendation" and any other unsubstantiated assessment of the child's suitability for release. I am not clear exactly what investigatory work that the DHS Juvenile Coordinator does, as CLINIC never receives any written documentation of her invesigation. Most troublingly, I do not believe that the DHS Juvenile Coordinator has any expertise in child welfare issues or investigations.

14. One of my clients, Wilber Escobedo-Garcia, from Guatemala, has been in custody for approximately 15 months. On April 25, 2003, I sent a release request to ORR. *See,* attached release request. Although ORR has continued to express their concern regarding Wilber, he still remains in CJH. He has been seen by a child psychiatrist for depression due to his prolonged detention, and has been prescribed anti-depressants and medication for insomnia. Wilber is an extremely resilient boy but has severely deteriorated because of his prolonged detention.

15. My clients at CJH are always commingled with American delinquents, regardless of the severity of their offense. One of my clients, Miguel Galvan, was arrested for shoplifting two pairs of pants from a JC Penney Department Store, hoping to sell

458.

them to buy some food. Although Miguel was only given probation by the Juvenile Court judge in Pomona, he has been housed in the G/H unit at CJH, a unit for those who have committed sex-offenses. Miguel has told me how the American delinquents in his unit have extensive criminal histories, instigate fights with others for no reason, and even abuse smuggled drugs in his unit. Miguel has expressed his concern that the staff do not make any distinction between him and the American delinquents, who have been ordered by a Juvenile Court to actually serve a sentence at CJH; everyone is treated as if they are serving a sentence at CJH.

16. It is also difficult for me to provide legal representation to non-delinquent youth in ORR/DHS custody. Although it was quite difficult to represent my non-delinquent clients when they were detained at Los Padrinos Juvenile Hall, it has been extremely difficult to obtain any contact with non-delinquents now housed in hotels I always have to rely on the DHS Juvenile Coordinator to let me know that these minors are even being detained. Further, the DHS Juvenile Coordinator will not let me meet with the minors at the hotel; I always have to extensively coordinate with the Juvenile Coordinator to bring the minors to her offices to interview them.

17. On June 11, 2003, I met with Artak Avagyan, an Armenian non-delinquent kid who had been detained at a hotel for 9 days. Artak told me that his uncle had visited him at the DHS Juvenile Coordinator's offices 6 days prior, but since then had not been able to make any telephone calls to his family. Artak said that he could only make telephone calls when he was brought to the DHS Juvenile Coordinator's offices and he never knew when that was going to be. Because Artak spoke no English at all, he could not even communicate basic needs, such as wanting to call his mother in North Hollywood, to the DHS staff that guarded him in his hotel room. Artak told me that he was detained in his hotel room all day, did not attend school, and was never given

5

459.

any recreation time. Artak did not even know if his family had found a private attorney to represent him because he had not been able to speak with them.

18. Complaints regarding the foregoing are routinely ignored. Indeed, the standard response of DHS staff to complaints is that we should take them up with ORR. To my knowledge, ORR has no personnel stationed in the Los Angeles area, and any response from its Washington, DC staff is typically vague or extremely slow. From all indications, the Government's policy and practices regarding *Flores* class members remains in the hands of former INS personnel who have transferred over to the DHS. It is accordingly "business as usual," except that now DHS officials are able to evade responsiblity for their actions by pointing a finger at a faceless and silent agency in Washington.

19. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __15th__ day of August, 2003, at Los Angeles, California.


_____
Deborah Lee



# CATHOLIC LEGAL IMMIGRATION NETWORK, INC.

1530 James M. Wood Blvd., Box 15095, Los Angeles, CA 90015   Tel. (213) 251-3505   Fax: (213) 487-0986
E-Mail: CLINICLOS@aol.com

S C A N N E D

*National Office*
*McCormick Pavilion*
*415 Michigan Ave., NE*
*Washington, DC 20017*
*Tel. (202) 635-2556*
*Fax: (202) 635-2649*

*Southwest Area Office*
*1205 North Oregon Street*
*El Paso, TX 79902*
*Tel. (915) 533-3971*
*Fax: (915) 533-3974*

*Northeast Area Office*
*FDR Station*
*P.O. Box 1390*
*New York, NY 10150*
*Tel. (212) 826-6251*
*Fax: (212) 826-6254*

*Northwest Area Office*
*564 Market Street*
*Suite 416*
*San Francisco, CA 94104*
*Tel: (415) 362-8677*
*Fax: (415) 394-8696*

## FACSIMILE TRANSMITTAL SHEET

**To:**            **Diane Eason, Center for Human Rights and
                   Constitutional Law**

**Fax Number:**    **(213) 386-9484**

**From:**          Deborah Lee

**Date:**          **8/13/03**

**Re:**            declaration....finally!

**Number of Pages (including cover sheet):** 25

The original of this transmittal:
_____   will be forwarded by HAND DELIVERY
__x_   will NOT be forwarded by mail.

__x__ THIS COMMUNICATION IS PROTECTED BY ATTORNEY-CLIENT PRIVILEGE.

MESSAGE:

**WARNING:** *This message is intended solely to be used by the addressee. You are hereby notified that any dissemination, distribution or copying of this communication to anyone other than the intended recipient is strictly prohibited. If you have received this communication in error, please telephone CLINIC immediately and return this communication to us at the above address via the United States Postal Service. Thank you*

461.

SCANNED

# EXHIBIT 58

# DECLARATION OF LISA FRYDMAN

SCANNED

I, Lisa Frydman, declare as follows:

1.  I am over 18 years of age. I am an attorney at Florida Immigrant Advocacy Center (FIAC) in Miami, Florida.

2.  In February, 2003 a paralegal from my office, Serge Fleurimond, met two Haitian minors, Kenier Tima and Richemond Joseph, while doing intakes at Krome Detention Center. Both had arrived in South Florida on a Haitian refugee boat in February 2003. Both minors informed Mr. Felurimond that they were 16 years old (one has since turned 17). The boys were detained at Krome (adult) Detention Center because the Bureau of Immigration and Customs Enforcement (BICE) believed them to be adults. Shortly after their apprehension, BICE took them for forensic dental examinations to determine their ages. The boys were taken to Dr. Eisner, a Miami based dentist who performs many such tests for BICE. Dr. Eisner ex-rayed the boys' teeth and determined both boys to be 18 years of age. He left no margin of error, but made an exact determination. Subsequently, in an interview with Tanya Weinberg from the Sun Sentinal newspaper, Dr. Eisner admitted that the dental examinations were "a guesstimate at best."

3.  The families of both boys sent us their birth certificates, which confirmed that each of them was sixteen years of age. Additionally, I spoke with family members who confirmed their ages. I spoke with Kenier's uncle, Ynerve Remy from Dana Beach, Florida who confirmed that Kenier was 16 years old. Ynerve wrote and signed an affidavit attesting to Kenier's age. I also spoke with Richemond's parents in Haiti who stated that he was sixteen years old.

4.  In March 2003, BICE officials transferred Kenier and Richemond to Orleans Parish jail in New Orleans. Despite Kenier and Richemond's claims and their birth certificates, BICE insisted that they were adults because of the dental examination results. During a telephone call to supervisory Officer Heinkle in New Orleans, Officer Heinkle assured me that forensic dental exams were "something like 99% accurate." I explained that many scientific articles show that

462.

the opposite is true, that dental examinations cannot determine chronological age, but Officer Heinkle was not interested. I insisted that because the boys had turned in birth certificates showing them as minors, they should be transferred to a juvenile facility. However, Officer Heinkle said he could not rely on the birth certificates because "how do I know they belong to these individuals?" He informed me that the teens' parents in Haiti would have to travel to the American embassy to provide further evidence that the boys were minors. I explained this would be impossible because Haitians are not allowed into the American embassy in Haiti.

5.   As minors, Kenier and Richemond should have been placed at a youth shelter, with other minors and provided education and recreation time. Instead, they are in an adult prison, where none of the staff and next to none of the detainees speak Creole. Neither of the boys speak English and both feel very isolated there as a result.

6.   As minors, Kenier and Richemond could have been released into the custody of their family members in the U.S. during the adjudication of their asylum claims. They also may be eligible for Special Immigrant Juvenile Status, which is clearly not a possibility while they are considered adults.

7.   Instead the two boys have been placed in an adult detention facility, surrounded by adult detainees in a prison environment. I am told by Richemond's new pro bono attorney, Mary Brandon, that Richemond is too confused, depressed and scared to talk when she visits. The boys are losing hope. They told Ms. Brandon they came to the U.S. for protection, but instead have been jailed.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on this 23rd day of September , 2003, at Miami, Florida.

Lisa Frydman

463.

# EXHIBIT 59

I, MARGOT BERMEO, swear the following statement is true and correct:

My name is Margot Bermeo. I am sixteen years old. I come from Ecuador.

I had a terrible experience when I came to the U.S. I am eight months pregnant with my first child. I came from Ecuador the end of August. I was not feeling well during the whole flight. After I landed in Kennedy Airport, the Immigration Officer at the long line checked my documents. He didn't believe they were real, so he sent me to another room for another officer to check my papers.

I told the officer I was not feeling well and he called the paramedic. The paramedics came and took my blood pressure and my temperature. I had a fever and high pressure, so they took me to Jamaica hospital. Three guards were waiting outside my door the whole time. I was very scared and alone. All I wanted was to call my husband, but the guards wouldn't let me. I was crying and begging them, but they said no.

I spent the whole day at the hospital, but they released me by evening. The guards took me back to Kennedy Airport. I was taken to inspections. The officer there began to ask me questions. I was crying and asked to call my husband, but he said no.

When nighttime came, they took me to a large room. They gave me a blanket and a pillow, but there was no bed and no mattress. I had to sleep on the floor like that for 2 nights. They brought a few other girls into the room in the middle of the night. It was all very scary, I had a hard time sleeping on the floor because I am sort of uncomfortable now that I'm eight months pregnant. I was freezing in the airport, but all I had was that one blanket.

The officers fed me while I was there, but they never gave me enough food. They fed me in the morning and then again at about three o'clock in the afternoon. I was hungry the whole time I was there.

I kept begging the different officers to let me call my husband. To let him know that me and the baby were okay and so I could feel less scared, but no one let me. After two nights, they told me they were sending me to Miami, to a place where they kept children. They sent me to Boystown. Here I have a bed and more food, and people are much nicer than in the airport, but I still haven't been allowed to call my husband.

Executed this 10th day of September, 2003 in Miami, Florida.

_Margoth Bermeo_
MARGOTH BERMEO

464.

SCANNED

# EXHIBIT 60

SCANNED

## Declaration of Manuel Sanchez

I, Manuel Sanchez, declare and say as follows:

1) I am 17 years; I was born in Mexico on May 14, 1987. I have never been arrested or accused of any crime.

2) I was arrested about the third of September, 2003, in Los Angeles. I have been detained by the Immigration authorities. After I was arrested I was brought to the downtown immigration office, where I spent one day, and then I was taken to a hotel. I don't know the name or location of this hotel, but it is about 5 minutes drive from the downtown immigration office. I have now been there for about 2 weeks.

3) I was transferred to the hotel, I was taken in a van with two other minors. We were all handcuffed during this trip, although a metal gate was installed between us and the immigration official who was driving.

4) At the hotel I share a room with one other boy. Since arriving at the hotel I have received no education. We bathe in the bathroom attached to our hotel room, so we are not permitted outside the room to bathe. We are also given our meals in our hotel room, which we eat at a table in the room. We have no books or magazines or newspapers to read. For the past two weeks, I have mostly sat on my bed watching TV.

5) The door to our room is constantly locked, and there are bars on the windows. The only time I've been let out of my room only once since being taken to the hotel: Today, when I was brought to the immigration office to talk with a lawyer. I was with two others, but we were not handcuffed.

6) At the hotel I have had no outdoor recreation. We are given no exercise or indoor recreation either.

7) I have seen no social worker, or counselor since being arrested.

8) Shortly after I was arrested, a doctor saw me and took my blood pressure and temperature, but I am healthy and have no problems

465.

with my health since coming here.  My roommate hasn't been sick either, I have not seen a dentist.

9)  I have not been taken to see an immigration judge so far.

10)  The hotel is a two story structure in a "u" shape.  It has a swimming pool in the middle, but it has no water.  I would guess there are maybe 30 rooms, (our is number 315) but I have no idea how many rooms are occupied by other minors because I am not allow out of my room.

11)  I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of September, 2003, at Los Angeles, California

Declaration of Translator

I, Carlos Holguin, declare and say as follows:

1) I am fluent in English and Spanish.

2) On this day I translated the foregoing to the declarant, who affirmed that he understood its contents prior to signing.

466.

Declaration of Manuel Sanchez

I, Manuel Sanchez, declare and say as follows:

1) I am 17 years; I was born in Mexico on May 14, 1987. I have never been arrested or accoused of any crime.

2) I was arrested about the third of September, 2003, in Los Angeles. I have been detained by the Immigration authorities. After I was arrested I was brought to the downtown Immigration office, where I spent one day, and then I was taken to a hotel. I don't know the name or location of this hotel, but it is about 5 minutes drive from the downtown Immigration office. I have now been held there for about 2 weeks.

3) ~~At the hotel~~ When I was transferred to the hotel, I was taken in a van with two other minors. We were all handcuffed during this trip, although a metal grate was installed between us and the Immigration official who was driving.

467.

4) At the hotel I share a room with one other boy. Since arriving at the hotel I have received no education. We are bathe in the bathroom attached to our hotel room, so we are not permitted outside

the room to bathe. We are also given our meals in the our hotel room, which we eat at a table in the room. We have no books to read or magazines or newspapers to read. For the past two weeks I have mostly sat on my bed watching T.V.

5) Because we The doors to our room is constantly locked, and there are bars on the windows. The only time I've been let out of my room only once since being taken to the hotel: Today, when I was brought to the Immigration office to talk with some lawyers I was with, two others, but we were not handcuffed.

6) At the hotel, I have had no outdoor recreation. We are given no exercise or indoor recreation either.

7) I have had no seen no social worker, or counsellor since being arrested.

8) Shortly after I was arrested a doctor saw me and took my blood pressure and temperature, but I am healthy and have any problems with my health since coming here. My roommate is not hasn't been sick either. I have not seen a dentist. 468.

9) I have not been taken to see an Immigration Judge so far.

(3)

10) The hotel is a two story
structure in a "U" shape. It has
a swimming pool in the middle, but
it has no water. I would guess there
are total maybe 30 rooms (our is number
35), but I have no idea how many
rooms are occupied by other minors.
because me I am not allowed out
of my room.

☒ I declare under penalty of
perjury that the foregoing is true
and correct.

Executed this 17th day of
September, 2003, at Los Angeles,
California.

x _____

x  x  x  x

Declaration of Translator.

I, Carlos Holguin, declare and
say as follows:

1) I am fluent in English and
Spanish.

469.

2) On this day, I translated the
foregoing to the declarant, who affirmed
that he understood its contents prior to
signing.

SCANNED

# EXHIBIT 61

# Declaration of Liliana Linares

I, Liliana Linares declare the following is true to the best of my knowledge:

1.  I was born in Morelia, Michoacan, Mexico August 13, 1987.

2.  I entered the United States late July or early August 2003, without inspection.

3.  I was detained by immigration on September 2, 2003. That night I was taken to a hotel. I have been there since then.

4.  In the beginning I stayed by myself for three days. The next two days I had three girls in the room. They were deported to Mexico. I then stayed with a lady and her child for one day. Since then I have been by myself.

5.  When I stayed with the 3 girls there were only 3 beds. Two girls shared a bed.

6.  Usually there are two guards in the room. Sometimes they are two men, two women, or mixed. I don't think the guards work for immigration, but maybe they are.

7.  There is a bathroom in the room.

8.  They bring us three to four meals a day.

9.  We do not have visitors. No one has come to see us.

10. I have never seen a doctor.

11. One day they told us a girl had chicken pox and we may have it too. Then they said we did not. Then maybe we did. A doctor never visited it [us].

12. We have a television in the room. Sometimes I watch TV, sometimes they guards take the remote and watch what they want.

13. There is a telephone in the room. I asked if I could use the phone but they said no.

14. I have no books, no reading materials.

15. Some guards speak Spanish, but must do not, so it is hard for me to get information.

16. There is no water in the room. Once I asked for water but they said no. Every once in a while someone will bring ice.

17. I asked to contact my family because it had been two weeks since I talked to them. I was told I could not contact them until I was taken downtown and then I

470.

18.   could ask the guards there and they might let me, but then I wasn't brought downtown to call them.

19.   Three days after I was detained I went to court. I was told I would be visited by an attorney who gave me a card, but he never came to the hotel. I told the guards I wanted to call the attorney, but they would not let me.

20.   I asked one of the guards if I could get my clothes to have an extra set. They said I could not. So I had to wash my clothes in the bathroom. While I washed them I wore a prison uniform. I used the hand soap to wash them.

21.   They have never asked me for any information about family to contact them and tell them what is happening to me.

22.   I asked them to transfer me somewhere else so I would not be by myself all the time. I feel bad while I am by myself, I think about my family a lot and that they do not know what is happening to me.

23.   The day I was detained I called my brother, I have not talked to them again.

24.   I have never been given a list of attorneys that could help me with my case.

25.   Every time I have been transported, except today I have been handcuffed. When I went to court I had handcuffs and chains on my ankles also.

26.   In the room I can walk around, but it is very small. There is one window in the room.

27.   I am on the third floor. I have asked the guards if I can go outside, but they say no.

28.   I have never spoken with a counselor, psychiatrist, or anyone.

29.   They never told me I could call the consulate.

30.   The guards bring their own food. They do not eat the food we eat.

31.   I have no idea about my immigration case. I was told by a woman that I could get out if someone would pay $5,000 bail. They wanted me to testify against the smugglers. They said if I lied they would deport me.

32.   I signed a sworn statement that they read to me. I do not know what the statement said. It said something about being a witness and I could be released if someone would pay $5,000 and I would come back to check in with the immigration.

471.

33.  I have not seen anyone regarding this document I signed or about testifying again or heard anymore about testifying.

34.  I have no idea how much longer I will be kept here. Although the judge said I would be moved to a different location they never came. I am still at the hotel.

35.  The judge said I should not be isolated. Sometimes I get desperate because I have been there two weeks and am all alone.

36.  I have no idea what will happen next. I do not want to testify against the smugglers, I would rather by returned to Mexico then to stay in the hotel by myself any longer and not know what is going on.

I solemnly swear the above is true to the best of my knowledge. Signed this 17th day of September 2003.

_____

Certificate of Translation

I, Aura Orozco have read this document in Spanish to the declarant. I am fluent in English and Spanish.
Signed this 17th day of September, 2003.

_____

3

472.

# Declaration of Liliana Linares

I, Liliana Linares, declare the following is true to the best of my knowledge:

1. I was born in Morelia, Michoacan, Mexico August 13, 1987.

2. I entered the United States late July or early August 2003, without inspection

3. I was detained by immigration on September 2, 2003. That night I was taken to a hotel. I have been there since then.

4. In the beginning I stayed by myself for three days. the next two days I had three girls in the room. They were deported to Mexico. I then stayed with a lady and her child for one day. Since then I have been by myself.

5. When I stayed with the 3 girls there were only 3 beds. Two girls shared a bed.

6. Usually there are two guards in the room. Sometimes they are two men, two women, or mixed. I don't think the guards work for immigration, but may be they are.

7. There is a bathroom in the room.  473.

8. They bring as three to four meals a day.

9. We do not have visitors. No one has come to see us.

2/5

10. I have never seen a doctor.

11. One day they told us a girl had chicken pox and we may have it too. Then they said we did not. Then maybe we did. A doctor never visited it.

12. We have a television in the room. Sometimes I watch TV, sometimes the guards take the remote and watch what they want.

13. There is a telephone in the room. I asked if I could use the phone but they said no.

14. I have no books, no reading materials.

15. Some guards speak Spanish, but most do not, so it is hard for me to get information

16. There is no water in the room. Once I asked for water but they say no. Everyonce in a while someone will bring ice

17. I asked to contact my family because it had been two weeks since I talked to them. I was told I could not contact them until I was taken downtown, and then I could ask the guards there and they but then I wasn't brought might let me. downtown to call them.

474.

18. Three days after I was detained I went to court. The first day I was told I would be visited by an attorney who gave me a card, but he never came to the hotel. I told the guards I wanted to call the attorney, but they would not let me.

19. I asked one of the guards if I ~~get~~ could get my clothes to have an extra set. They said I could not. So I had to ~~watch~~ wash my clothes in the bathroom. While I washed them I wore a prison uniform. I used the hand soap to wash them.

20. They have never asked me for any information about family to contact them and tell them what is happening to me.

21. I asked them to transfer me some ~~there~~ where else so I would not be by myself ~~any~~ all the time. I feel bad while I am by myself, I think about my family a lot and that they do not know what is happening to me.

22. The day I was detained I called my brother. I have not talked to them again.

23. I have never been given a list of attorneys that could help me with my case.

24. Every time I have been transported, except today I have been handcuffed. When I went to court I had handcuffs and chains on my ankles also.

25. In the room I can walk around, but it is very small. There is one window in the room.

475.

26. I am on the third floor. I have asked the guards if I can ~~st~~ go outside, but they say no.

27. I have never spoken with a counselor, psychiatrist or anyone.

28. They never told me I could call the consulate.

29. The guards bring their own food. They do not eat the food we eat.

30. I have no idea about my immigration cases. I was told by a woman that I could get out if someone would pay $5,000 bail. They wanted me to testify against the smugglers. They said if I lied they would deport me.

31. I signed a sworn statement that they read to me. I do not know what the statement said. It said something about being a witness and I could be released if someone would pay $5,000 and I would come back to check in with the immigration

32. I have not seen anyone again regarding the document I signed or about again or heard anymore about testifying.

33. I have no idea how much longer I will be kept here. Although the judge said I would be moved to a different location, they never came. I am still at the hotel.

34. The judge said I should not be isolated. Sometimes I get desperate because I have been there two weeks and am all alone.

476.

35. I have no idea what will happen next. I do not want to testify against the smugglers. I would rather be returned to Mexico then to stay in the hotel by myself any longer and not know what is going on.

5/5

I solemnly swear the above is true
to the best of my knowledge.
Signed this 17th day of September, 2003.


X Liliana linares Guillen


Certificate of Translation


I Aura Orozco have read this document
in Spanish to the declarant. I am fluent
in English and Spanish.
Signed this 17th day of September, 2003


477.

SCANNED

# EXHIBIT 62

DECLARATION OF CARLOS HOLGUIN

I, Carlos Holguin, declare and say as follows:

1. I am one of the attorneys for plaintiffs in the within entitled action.

2. Pursuant to ¶ 33 of the *Flores* settlement, on October 1, 2003, *Flores* co-counsel Peter A. Schey and I inspected the Best Western Hotel in Los Angeles, California. This hotel is currently being used by Immigration and Citizenship Enforcement of the Department of Homeland Security (ICE-DHS) and/or the Office of Refugee Resettlement of the Department of Health and Human Services (ORR-DHS) to house children arrested pending deportation or removal. Among the *Flores* class members who have recently been incarcerated in this hotel are Manuel Sanchez and Liliana Linares, both of whom executed declarations recounting the treatment and conditions they experienced while incarcerated for over two weeks at the Best Western Hotel.

3. Robert Naranjo, the ICE-DHS Juvenile Coordinator for Los Angeles, and Assistant United States Attorney Frank Travieso accompanied us on our inspection. Mr. Naranjo advised us that ICE-DHS was holding three family units, each with one accompanied child, and one 12-year-old unaccompanied minor in four rooms at the hotel. The rooms he showed us were clustered at one end of the hotel's third floor. One of the family units, we were told, was not present at the time of our visit.

4. We were permitted to enter all four rooms. Each was a standard hotel room with two double beds, a bathroom, television, and small refrigerator. We saw no reading materials of any kind. In two of the rooms we observed family units: each comprised a young mother and son. One of the children appeared to be approximately 15 years old; the other about seven. In a third room, we observed the 12-year-old unaccompanied male. In each of these rooms, ICE-DHS has posted two uniformed private security guards. The family units were watched over by males; two uniformed female guards watched over the unaccompanied male. As we entered the rooms, all of the guards appeared to be watching television. Mr. Naranjo stated that ICE-DHS policy

478.

and practice at this facility is to post two private security guards inside each of room, 24 hours per day, seven days per week. He speculated that ORR-DHS reimburses ICE-DHS for the cost of the hotel rooms and private guards, though initial billing is handled through ICE-DHS's detention and deportation branch. He thought that ORR-DHS likewise reimburses ICE-DHS for the cost of detaining minors at the Los Angeles County Central Juvenile Hall.

5. Mr. Naranjo stated that children receive no educational instruction while they are at the hotel, that they have no recreation, and that, except for occasional trips to court or for asylum interviews, they are locked in their rooms 24 hours per day.

6. Mr. Naranjo further stated that Customs and Border Protection of the DHS (CBP-DHS) had arrested all of the children then present at the hotel at the airport. According to Mr. Naranjo, CBP-DHS most often arrests children and issues them notices to appear at removal proceedings. Once this has been accomplished, CBP-DHS transfers the children to ICE-DHS. ICE-DHS then decides whether to release the child to a family member "sponsor," if one is available and the minor is not an unaccompanied Chinese or Indian. If a suitable relative is not immediately available, or if the minor is an unaccompanied Chinese or Indian, the minor will not be release, but must be transferred to ORR's custody. According to Naranjo, ORR may later decide to release a particular minor. Naranjo further explained that ICE-DHS will release minors only to family members or parents. The ultimate decision to detain or release is made by Robert Hudson, the Field Office Director for Detention and Removal Operations.

7. Mr. Naranjo stated that there is as yet no written agreement or "memorandum of understanding" between DHS and ORR-HHS as to how the two agencies will handle their respective responsibilities vis-a-vis unaccompanied *Flores* class members. In current practice, Naranjo stated, when ICE-DHS takes custody of a child, it prepares a "case action worksheet," which it forwards to ORR-HHS. ORR then directs ICE-DHS to transport the minor to an ORR-designated facility. Mr. Naranjo stated that ICE-DHS

479.

personnel are responsible for transporting the detained minor to the ORR-designated facility. According to Mr. Naranjo, ORR has no personnel in Los Angeles, nor does it have any licensed facility in the area. He said that class members are typically taken to ORR-designated facilities in San Francisco or San Diego; he did not know the names of the facilities in use in either city.

8. Mr. Naranjo further said that ICE-DHS relies on dental exams in questionable cases to decide whether a detainee is a minor eligible for referral to ORR-HHS. The dentist decides whether an individual is over or under 18 years, but does not otherwise determine an arrestee's age. If ICE-DHS thereby determines that an individual is 18 years or older, it does not refer that individual to ORR-HHS. Mr. Naranjo speculated that perhaps ORR-DHS might redetermine age once an individual is transferred to its authority, but that ORR-HHS can only decide that an individual subject to its jurisdiction is an adult, not that an individual in ICE-DHS custody is actually a minor.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3d day of October, 2003, at Los Angeles, California.

/ / /

# EXHIBIT 63

CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos Holguin
256 South Occidental Boulevard
Los Angeles, CA 90057
(213)388-8693

NATIONAL CENTER FOR YOUTH LAW
Katina Ancar
405 14th Street, 15th Floor
Oakland, CA 94612
(510)835-8098

LATHAM & WATKINS
Steven Schulman
555 Eleventh Street NW
Washington, D.C. 20004
(202)637-2184

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISSETTE FLORES; et al., | No. 85-4544-RJK |
| Plaintiffs, | DECLARATION OF CELESTINO GALLEGOS |
| vs. | |
| JOHN ASHCROFT; et al., | |
| Defendants. | |

I, Celestino Gallegos, declare as follows:

1. I am a law clerk at the Texas Lawyers Committee for Civil Rights in San Antonio, Texas. On July 16, 2002 I visited a juvenile detention facility in Hondo, Texas and acted as a Spanish-English translator for Katina Ancar, staff attorney at the National Center for Youth Law in Oakland, California.

2. The purpose of our visit was to interview unaccompanied minors being held at the facility under contract with the Immigration and Naturalization Service (INS). At the time of our visit, two INS children were being held. Both of these children are males and both speak Spanish.

-1-

481.

3. The INS children were held in a complex with several other buildings, including an adult probation office and a separate building referred to as "the Academy," which is a faith-based facility for delinquent minors in need of long-term placement.

4. The INS children are housed in a locked facility. A guard had to unlock both a chain-link door and a second interior door to allow us to enter.

5. The children are held in small individual rooms that are very sparsely furnished. The rooms contain only a metal slab and topped by a very thin mattress. The floors are concrete and there are no chairs or other furnishings. There are also no personal items, such as toothbrushes, clothes, etc. However, the children are allowed to keep a Bible in their rooms. The children must leave their shoes outside of their doors before entering their rooms. Each room is locked from the outside.

6. Before interviewing the INS children we met with Earl Stills, an employee of Ever Change, the faith-based organization that runs the facility and contracts with INS.

7. According to Stills, the facility has the capacity to house 15 children. The average population at any time, however is only 10-11 children. At the time of our visit, there were six children in custody—five boys and one girl. From my observations, it was clear that the facility did not separate the male and female children. The INS and delinquent youth were also allowed to intermingle.

8. Stills assumed that minors were transferred from other INS facilities to the facility because they had orders of deportation or had been adjudicated delinquent, or both.

9. Stills told us that children in the facility are allowed to place an initial phone call when they arrive at the facility, but that sometimes juvenile probation takes responsibility for the call. According to Stills, the minors are also allowed to make phone calls for 15 minutes on Tuesdays and Thursdays from 6-7 p.m. and for 30 minutes on Sundays from 1-3 p.m. The facility encourages the children to make these calls collect, but will pay for them if the party called will not accept collect charges. However, one of the INS children we interviewed said he asked to use the phone and was told no, but was not given a reason for this denial.

10. Stills reported that the facility does not provide a list of legal services providers to children upon their arrival

482.

11. From Stills we learned that the INS minors in custody are awakened at 7 a.m. each day and have breakfast at 8 a.m. The children shower in the evening and are in bed by 10 p.m.

12. Stills reported that the children are allowed out of their rooms for recreation daily. In the summer, Stills said their recreation time increases to two outings per day. The children, however, reported that they are not allowed to go out for recreation on most days.

13  I observed the recreational grounds the children use in the facility. The area is a very small basketball court, which is essentially a cage. It is fenced in on all sides with chain-link and it covered at the top.

14. Children may watch television, at times, in a very dimly lit room with a concrete floor. This is also the eating area and visitation room. Stills reported that the INS children "enjoy" watching television and "get to learn some English" from it. However, there were no educational activities.

15.  On Mondays and Fridays the children may attend worship sessions with local volunteer ministers. On Mondays, these sessions are conducted in English and Spanish.

I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge and that this declaration is executed on July 26, 2002 at San Antonio, TX.

Celestino Gallegos
Law Clerk,
Texas Lawyers Committee for Civil Rights

483.

-3-

SCANNED

# EXHIBIT 64

SCANNED

## DECLARATION OF MARTIN CARREON-GONZALEZ

I Martin Carreon-Gonzalez declare,

1. I was born in Puebla, Mexico in 1986 on January 30th.

2. I came to this country to work. I arrived three weeks ago hoping to find my uncle who lives in Houston.

3. I came with help from a coyote who brought me to Houston to a house with 23 other immigrants.

4. I was arrested by police 6 hours after arriving. They threw me to the ground and yelled at me. I lost hope that I would get to work here and make a living.

5. They took me to a jail where I waited for 12 hours in a cold and uncomfortable cell. I didn't like being alone. I was scared.

6. After 12 hours they took me to Catholic Charities where I stayed for two weeks. I liked living there very much.

7. Two weeks later they brought me to Southwest Keys because Catholic Charities needed room for other immigrants.

8. I don't like living in this place. I feel like I am trapped here. I don't get to go outside, and rarely when I do, there are many bugs.

9. Here they wake me up at 6:00 a.m. We eat breakfast, have a little time to play, and then go to classes.

10. I do not like the food here. It does not have any flavor.

11. Here I study math, history, English, and computation. I don't like math class because it is too simple.

12. We are allowed to watch television for one hour a day. I like that.

13. I have an attorney, but I have only met him once. I am allowed to talk to him whenever I need to.

484.

14.  I talk with my uncle on the phone and he will hopefully come to visit soon.

15.  If I had a choice, I would go back to Catholic Charities.  There I could play soccer outside and go to the park.

16.  I would rather go home then stay here any longer.  I don't get to see the sun much here, and I am not used to it.

17.  I also want to go to mass, but they haven't told me if I can go.  I haven't asked about mass, but I was here on Sunday, and nothing was mentioned.

I declare under penalty and perjury that the foregoing is true and correct.  Executed this the 20th day of June 2003, at Southwest Keys Facility, Houston, TX.

_____

485.

I Elizabeth Cox declare and say as follows:

    1.  I am fluent in Spanish and English.

    2.  On this day I translated the foregoing to the declarant who understands the contents there of to affixing his signature therefore.

    I declare under penalty and perjury that the foregoing is true and correct.

    Executed the 20th day of June 2003 at the Southwest Keys Facility, Houston, TX.

_____

486.

I Martin Carreon-Gonzalez declare,

1. I was born in Puebla, Mexico in 1986 on January 30th.

2. I came to this country to work. I arrived three weeks ago. hoping to find my uncle who lives in Houston.

3. I ~~born~~ came with help from a coyote who brought me to Houston to a house with 23 other immigrants.

4. I was arrested by police 6 hours after arriving. They threw me to the ground and yelled at me. I lost hope that I would get to work here and make a living.

RECEIVED

JUL - 3 2003

NATIONAL CENTER
FOR YOUTH LAW

487.

SCANNED.

5. They took me to a joil where I waited for ~~six~~ 12 hours in a cold and uncomfortable cell. I didn't like being alone. I was scared.

6. After ~~six~~ 12 hours they took me to Catholic Charities where I stayed for two weeks. I liked living there very much.

7. Two weeks later they brought me to Southwest Keys because Catholic Charities needed room for other immigrants.

8. I don't like living in this place. I feel like I am trapped here. I don't get to go outside, and rarely when I do, there are many bugs.

488.

SCANNED

9. Here they wake me up at 6:00 am.
& We eat breakfast, have a little time to play, and then go to classes.

10. I do not like the food here. It does not have any flavor.

11. Here I study math, history, English, and computation. I don't like math class because it is too simple.

12. We are allowed to watch television for one hour a day. I like that.

13. I have an attorney, but I have only met him once. I am allowed to talk to him whenever I need to.

489.



14. I talk with my uncle on the

phone and he will hopefully come

to visit soon.

15. If I had a choice, I would go

back to Catholic Charities. There I

could play soccer outside and go to

the park.

16. I would rather go home then

stay here any longer. I don't get

to see the sun much here, and I

am not used to it.

17. I also want to go to mass, but

they haven't told me if I can go.

490.

I haven't asked about mass, but I

was here on Sunday, and nothing was

mentioned.

I declare under penalty and

perjury that the foregoing is true

and correct. Executed this the 20th

day of June 2003, at Southwest Keys

Facility, Houston Texas.

491.

SCANNED

I Elizabeth Cox declare and say as follows:

1. I am fluent in Spanish and English

2. On this day I translated the foregoing to the declarant who understood the contents thereof to affixing his signature therefore.

I declare under penalty and perjury that the foregoing is true and correct.

Executed the 20th day of June 2003 at the Southwest Keys Facility, Houston, TX.

Elzabeth A Cox

492

# EXHIBIT 65



**NATIONAL
CENTER FOR
YOUTH LAW**

*Director*
John F. O'Toole

*Senior Attorneys*
Patrick Gardner
William Lee Grimm
   Admitted only in MD
Darryl L. Hamm
Sarah E. Kurtz

*Staff Attorneys*
Valerie Ackerman
Katina Ancar
Stephen M. Bingham
Rebecca Gudeman

*Equal Justice Works Fellows*
Phil Ladew
Meghan Lang

*Director of Finance
   & Administration*
Heather Ross

*Director of Development*
Dan De Vries

*Development Officer*
Gilberto Hayman-Martinez

*Director of Communications*
Stephen B. Texeira

*Office Manager*
Maria Salzano

*Administrative Staff*
Ethel L. Oden-Brown
Dainellee D. Stoll

April 21, 2003

***BY FAX & U.S. MAIL***

Daniel Stark
U.S. Department of Health and Human Services
Office of the General Counsel
330 Independence Avenue, Room 4280
Washington, DC 20201

Hugh G. Mullane
Office of Immigration Litigation
US Department of Justice
Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC  20044

Re: *Flores v. Ridge*

Dear Messrs Stark and Mullane,

I write to direct your attention to the deplorable conditions endured by
children detained at the Comfort Suites Hotel in Miami, Florida, as well as to
the problems in access to legal representation encountered by children
detained at Boys Town in Florida.

I.      Comfort Inn
As a general matter, the children held at the Comfort Suites Hotel at 3901
Southwest 117th Avenue, Miami, Florida, are not provided, recreation and
exercise, proper clothing and hygienic equipment or adequate medical and
mental health care.  Although some detained minors recently gained access to
educational instruction through transport to Boys Town, children under five
years of age remain confined at the hotel twenty-four hours a day with no
opportunity to leave hotel rooms that sometimes house six or more persons.

---

**405 14th Street, 15th Floor ■ Oakland, California 94612-2701 ■ (510) 835-8098  FAX (510) 835-8099
info@youthlaw.org ■ www.youthlaw.org**

493.

Daniel Stark, U.S. Department of Health and Human Services
Hugh G. Mullane, Office of Immigration Litigation
April 21, 2003
Page 2

SCANNED

Counsel has received reports of small children beating their heads against walls and
headboards and pulling down the curtains on the windows for want to go outside. Toddlers
are not permitted to play outside and have no opportunity to breathe fresh air. Additionally,
guards at the hotel are rarely proficient in the languages spoken by detainees. As a result,
detainees are unable to communicate about medical needs, telephone usage, and food
allergies, among other things. On April 10, 2003, a two-year-old boy had to be rushed to the
hospital after suffering from prolonged diarrhea with blood in his stool. The boy was visibly
ill and his breathing loud and labored. Officials failed to address this child's deteriorating
health -- despite a March 31, 2003 written request for medical attention by his attorney.

Furthermore, clothing and laundry service are insufficient for detainees. Toddlers in
particular are not provided with pants, socks and suitable undergarments, appropriately-sized
shirts, or even a sufficient number of diapers. Hotel guards have confiscated without
explanation additional clothing provided to children at the Krome facility or during visits
with relatives. Even basic grooming services, such as haircuts and nail clippings are not
provided. Some mothers bite their young children's nails.

Finally, legal advocates assert that, although they now have access to the hotel for client
visits, detainees and their representatives are not offered privacy during meetings. At the
insistence of officials, meetings must be conducted with doors open and guards standing at
the threshold, allowing guards to listen to privileged and confidential conversations. Direct
monitoring of interviews, as well as the lack of a private place at the hotel for advocates to
provide "Know Your Rights" presentations, is an unacceptable interference with minors'
right to counsel.

Each of these conditions constitutes a direct breach of *Flores* obligations and represent
violations of children's most fundamental needs. The conditions are even more shocking
given the availability of more suitable facility placements. For example, children could be
held at Boys Town, or, in accordance with *Flores*, released to relatives or other approved
adults willing to care for them. Just as appropriate, both children and their families could be
placed with the Broward County Transitional Center at 3500 North Powerline Road in
Pampano Beach, Florida. John Dobre, the facility administrator, indicates that the Center is
willing and able to provide shelter for the immigrant families detained at the Comfort Suites.

II.      Legal Representation at Boys Town

Although the Boys Town facility is more suitable for children than detention at the Comfort
Suites, Boys Town policies nonetheless interfere with effective representation of detained
children.  The facility provides attorneys with a list of the languages spoken by newly

494.

Daniel Stark, U.S. Department of Health and Human Services
Hugh G. Mullane, Office of Immigration Litigation
April 21, 2003
Page 3

detained children.  Although such information is appreciated, attorneys do not receive this
list until *the day of* the attorney-client meeting, making it nearly impossible for advocates to
secure interpreters for many children.  In addition, attorneys receive no information regarding
the names and A #s of children detained at Boystown, where a child entered the country, or
in which location(s) the child was held prior to transfer to Boys Town.  A weekly list of
newly-detained children and the languages they speak would assist in more effective
representation and decrease the number of facility visits advocates must make.

III.     Minors Transferred to Boys Town from Texas

Two girls now housed at Boys Town report that they were held in Texas for nearly two days
without food or water.  Vilma Lopez, A78 914 989, was detained in a room with two adults,
ages 24 years and 28 years.  The room had no bed and thus they were forced to sleep on the
cement floor.  There was a sink in the room, but the faucets had no water.   The second child,
Lilian Jordan (A # unavailable) was handcuffed at her ankles while transported to a dentist
for an age determination.  Please provide information on which facility had custody of these
children prior to their transfer to Boys Town, and describe your efforts to ensure that this
type of treatment does not recur.

In addition to the egregious *Flores* violations, this scenario points to another obstacle to
effective legal representation for these children: attorneys are not provided with information
on where children were held and must rely on their young clients to tell them where they
entered and where they were held.  Scared and traumatized children often do not receive or
cannot remember such information.  As evidenced above, Lilian Jordan's counsel has not
been provided even with her A#.  Such records and information should be available to
children's advocates.

In summary, as soon as possible, please provide the following information in writing:

(1) whether children are currently housed in the Comfort Suites hotel.  If children are in fact
held there, please provide a list of those children (including names, Alien Registration
Numbers, and length of detention) and advise as to your efforts to place them to with more
appropriate organizations, such as the Broward County Transitional Center;

(2) ORR's willingness to make available a weekly and more timely list of detained children,
their A #s, and languages spoken will be provided to legal advocates serving both Boys
Town and the Comfort Suites Hotel;

495.

Daniel Stark, U.S. Department of Health and Human Services
Hugh G. Mullane, Office of Immigration Litigation
April 21, 2003
Page 4

SCANNED

(3) regarding the location(s) where Vilma Lopez and Lilian Jordan were held prior to detention at Boys Town.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Katina Ancar

Katina Ancar
Staff Attorney
National Center for Youth Law

cc:   Carlos Holguín, Center for Human Rights and Constitutional Law
      Steven Schulman, Latham & Watkins
      Alice Bussiere, Youth Law Center
      Lisa Frydman
      Vail Gardner

496.

SCANNED

# EXHIBIT 66

SCANNED

## FLORIDA JUSTICE INSTITUTE, INC.

FIRST UNION FINANCIAL CENTER, SUITE 2870
200 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131-2310

TELEPHONE (305) 358-2081
FACSIMILE (305) 358-0910

January 4, 2002

Via Facsimile:    (202) 616-4948

Allen W. Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

Re:    Alfredo Lopez-Sanchez, A 79 038 393

Dear Mr. Hausman,

I write to inform you that, once again, our client has been transferred to Berks County Shelter in Pennsylvania with no advance notice to counsel and no justifiable reason. The most recent facts are as follows:

Alfredo Lopez-Sanchez was returned to Florida in mid-December. The INS's request for change of venue on his asylum case was denied and his case remains in Miami. Upon his return to Florida, Alfredo was originally housed in the Boystown facility in Miami, which offers an appropriate placement for him. Then, again without advance notice to counsel, he was abruptly transferred to the adult jail in Monroe County, Florida, over 150 miles from Miami. Because this placement violated the contract between INS and the Monroe County Sheriff as well as Florida law, the Sheriff of Monroe County refused to house Alfredo. Rather than return him to the appropriate placement at Boystown or a suitable community alternative, the INS insisted on keeping him in a hotel room where no services were provided.

This morning, Alfredo's counsel Christina Kleiser received a phone call from Juvenile Coordinator Dean Caputo informing her that Alfredo has been returned to the Berks County Shelter. We believe this treatment of our client violates the Settlement Agreement in Flores v. Ashcroft, CV 85-4544-RJK(Px) for the reasons stated in our original unfiled Motion to Enforce Stipulated Settlement Agreement of which you have a copy. Moreover, this series of sudden, unnecessary moves has adversely affected Alfredo's emotional well-being and his

497.

January 4, 2002
Page 2

SCANNED

attorneys' ability to coordinate necessary services for him. Please consider this letter a formal notice to invoke the dispute resolution provisions of paragraph 37 of the Agreement, and let one of the undersigned know when you will be available to this discuss this matter.

Very truly yours,

JoNel Newman          Charles F. Elsesser, Jr.          Christina Kleiser
(305) 358-2081        (305) 573-0092                    (305) 573-1106

cc:    Carlos Holguín

498.

SCANNED

# FLORIDA JUSTICE INSTITUTE, INC.

FIRST UNION FINANCIAL CENTER - SUITE 2870
200 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131

TELEPHONE (305) 358-2081                    FACSIMILE (305) 358-0910

## FACSIMILE TRANSMISSION SHEET

Date:        January 4, 2002

                                           Fax No.: (213) 386-9484

To:          Carlos Holguín
                                           Phone No.:

From:        JoNel Newman

        Our File Name:        Lopez-Sanchez

        Number of Pages (including this cover sheet):        3

Document Name: Letter

Message:        For your information.

Copy Mailed: Yes

WE ARE TRANSMITTING FROM AN HP FAX-200 FACSIMILE TRANSCEIVER. IF YOU
DO NOT RECEIVE ALL PAGES, PLEASE CALL BACK ON (305) 358-2081 AS SOON AS
POSSIBLE.

PLEASE NOTE· The information contained in this facsimile message is privileged and confidential and is
intended only for the use of the individual named above and others who have been specifically authorized to
receive it. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or
copying of this communication is strictly prohibited. If you have received this communication in error, or if any
problems occur with transmission, please notify us immediately by telephone.

499.

# EXHIBIT 67

# DECLARATION OF JENNIFER WANG

I, Jennifer Wang, declare as follows:

1.     I am an attorney duly authorized to practice law in the State of California and am a member of the Bar of this Court. I am an associate with the law firm of Latham & Watkins, counsel of record for Xue Zhong Zhou ("Xue")and Jin Rong Yiou ("Jin"), minor Immigration and Naturalization (the "INS") detainees with file numbers A77 052 528 and A77 052 527 (the "Minors"), respectively. I have personal knowledge of the facts set forth below, and if called upon to do so, could and would testify competently thereto.

2.     Latham & Watkins has represented the Minors since September 28, 2001, in connection with their detention by the INS.

3.     The first time I spoke with the Minors was at Tulares Juvenile Facility ("Tulares") in October 2001 in connection with the state of their legal representation.

4.     Since accepting representation, I had daily contact with the INS Los Angeles field office regarding the release of the Minors from detention pursuant to the Reno v. Flores Settlement Agreement.

5.     On October 10, 2001, INS agreed to release the Minors to the custody of Latham. INS withdrew the offer of release after Latham informed the field office of the impropriety of transferring custody of the Minors to their legal counsel.

6.     I met with the Minors for the first time on October 18, 2001 at Los Padrinos Juvenile Facility ("Los Padrinos") after they were transferred there. During the meeting, the Minors described the process of their transfer from Tulares to Los Padrinos. The Minors also described their new living conditions at Los Padrinos, where the INS detainees were co-mingled with juvenile delinquents.

7.     During the next week, I tried daily to exercise the legal right of counsel to speak with the Minors on the phone at Los Padrinos. I was repeatedly assured by INS that I would be granted access to the Minors, only to be denied access by officers at Los Padrinos. The process of trying to contact the Minors took an entire week before it was resolved properly.

12

*500.*

8.      I offered to INS two options concerning the release of the Minors.  INS could send the Minors back to their uncle in Birmingham by flying the Minors to Atlanta where they were re-arrested by INS last year.  Their uncle could drive to Atlanta to accept custody of the Minors.  Alternatively, INS could release the Minors to the custodial care of Mr. Fu, an upstanding local citizen who has offered to assume guardianship of the Minors.

9.      INS unreasonably denied both requests without offering any alternative solutions, requiring the Minors to remain in detention for the foreseeable future.

10.      Xue has hepatitis and asthma and requires supervisory medical care.  The Minors have been in detention for 15 months.  For every day the Minors are detained at Los Padrinos, it costs INS an additional sum of money.

11.      On October 22, 2001, INS agreed to release the Minors and fly them back to Atlanta, where the Minors could be released to the custody of their uncle.

12.      On October 31, the Minor were released from Los Padrinos and brought into the INS Facility in Los Angeles.  They were told to claim their luggage and tag it for transfer.  The Minors were accompanied by two INS agents who traveled with them on a flight from Los Angeles to Atlanta.  The Minors were met by their uncle at the Atlanta airport and released into his custody.

13.      The Minors have been living in Birmingham, Alabama under the care and supervision of their uncle since their release from Los Padrinos.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of October, 2002 at Los Angeles, California.

Jennifer Wang

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

501.

# EXHIBIT 68

# Fact Sheet

## The President's Fiscal 2003 Immigration Budget

2/04/02

## Border Enforcement

The FY 2003 budget includes **$711.7 million** and **1,790 new positions** to increase security at the borders of the United States while facilitating the legitimate flow of goods and people across those borders. This budget also includes $105.9 million to continue emergency counter-terrorism supplemental initiatives begun in FY 2002. Terrorists exploit legal and illegal means of coming to and remaining in the United States. INS enforcement activities continue to focus on protecting America from terrorism.

With this budget, INS will advance strategic control of the Northern border while continuing to expand control of the Southwestern border. INS will also expand border enforcement functions beyond the physical borders of the United States through technology, cooperative international initiatives, and intelligence.

The FY 2003 budget includes an additional 570 Border Patrol Agents ($76.3 million). With this increase, INS will achieve the goal of hiring the 5,000 agents authorized by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. The President has also identified $488 million in resources to continue securing the nation's ports-of-entry. These resources support the addition of 1,160 new Immigration Inspectors and the development of an entry-exit system.

### Border Control at the Ports-of-Entry

The FY 2003 budget will provide funds to hire an additional 1,160 Immigration Inspectors. Of these, 460 will be deployed to land border ports, 615 to airports, and 85 to seaports. Immigration Inspectors are critical to protecting the nation's security. They are charged with intercepting terrorists, smugglers, other criminals, and undocumented migrants seeking admission to the United States at the ports-of-entry while efficiently managing lawful travel and commerce across the borders. While ensuring the integrity of our borders remains our highest priority, INS expects to meet traffic management goals of processing 79 percent of all commercial airline passengers and 90 percent of land border crossers through primary inspection within 30 minutes. **($85.5 million)**

The FY 2003 budget also requests resources for the development and infrastructure requirements for an entry-exit system. Of the $380 million in the request, $362 million is from new resources. This system will implement departure control, track the arrival and departures of all aliens, and monitor alien overstays. INS, in conjunction with U.S. Customs Service, Department of State, and other Federal agencies, will design, develop and deploy this system. As part of this effort, INS will acquire technology, modify facilities and make other infrastructure changes. INS' goal is to complete implementation by the end of FY 2004. **($380 million)**

The FY 2003 budget also provides funding for the renovation of three Northern border ports. The ports at Porthill, ID; Fort Fairfield, ME; and Portal, ND, require new infrastructure for the additional personnel and expanding technology along the Northern border. These

---

*Prepared by the Office of Public Affairs • Immigration & Naturalization Service • (202) 514-2648*

502.

**FY 2003 INS Budget – Border Enforcement**
Page 2

. projects are in addition to the $60 million provided in FY 2002 for remote housing and facility changes to accommodate the entry-exit system.  Additional facility modifications are also requested in the
FY 2003 entry-exit request. **($22.5 million)**

## Border Control between the Ports-of-Entry

The FY 2003 request will add 570 Border Patrol agents.  Half of these agents will be deployed to the Northern Border.  The remaining 285 new agents will be deployed along the nine corridors on the Southwest border that account for more than 80 percent of all illegal traffic into the United States.  This will bring the authorized staffing for the Southwest and coastal borders to 9,829 agents.  The 285 agents deployed to the Northern border will result in a total of 898 agents on the Northern border, a 244-percent increase over current on-board staffing. **($101.3 million)**

The request will also ensure that the Northern, Southwestern and coastal borders all have dedicated air surveillance programs capable of responding on a 24-hour basis and that INS can sustain the positive deterrent that is the result of nine years of resource build-up along U.S. borders. **($10 million)**

The request includes resources for enforcement systems technology (ENFORCE).  The INS ENFORCE system is the principal database and processing system for enforcement operations.  Included in this request are resources to enhance the Border Patrol, Investigations, Intelligence, and Detention modules of the system.  Live scan 10-print fingerprint access to the FBI and other law enforcement databases will be made available to Border Patrol sites.  High-priority interfaces with other INS data sources and other Federal databases would be expanded, thereby increasing the integration of intelligence and case management data.  These initiatives will ensure that all INS law enforcement personnel have the biometric identification tools and biographic data needed.  **In addition, the budget includes $51.7 million to continue emergency counter-terrorism supplemental activities** to deploy force-multiplying equipment to monitor isolated areas where illegal entry may once have occurred. **($28 million)**

The FY 2003 budget completes a number of ongoing construction and engineering projects, and continues leasehold projects in support of the Border Patrol.  Of the $163.8 million being requested, $120.5 million is new resources.  These projects will improve operational infrastructure on the Northern and Southwestern borders to a level that is adequate and safe for staff and detainees, and includes construction, alteration and leasing of station buildings; construction of border roads, fence and vehicle barrier systems and border lighting systems; and emergency maintenance and repairs to existing infrastructure. **($120.5 million)**

503.

**FY 2003 INS Budget – Border Enforcement**
Page 3

| FY 2003 Program Improvements | Amount ($ in millions) |
|---|---|
| **Border Control at the Ports-of-Entry** | |
| New Immigration Inspectors<br>460 Land Border<br>615 Airport<br>85 Seaport | 85.5 |
| Renovation of Three Northern Border Port-of-Entry Facilities | 22.5 |
| Entry-Exit System (System Development and Infrastructure)<br>(includes $18 million in base resources) | 380.0 |
| **Border Control Between the Ports** | |
| New Border Patrol Agents<br>285 Northern Border<br>285 Southwestern Border | 101.3 |
| Rotary Wing Aircraft | 10.0 |
| Enforcement Systems Technology | 28.0 |
| **Construction, Renovation and/or Leasing of Border Patrol Facilities**<br>Station Buildings, Processing Rooms, Vehicle Maintenance Areas and<br>Supporting Infrastructure<br>Traffic Checkpoint Systems<br>Permanent Lights, Barriers, Fences, Roads | 120.5 |
| **Continuation of Emergency Supplemental Activities** | 105.9 |

504.

# EXHIBIT 69

# Fact Sheet
## The President's Fiscal 2003 Immigration Budget

02/04/02 (Rev.)

## Interior Enforcement

The FY 2003 budget request includes **$19.7 million** and **137 new positions** to advance national security and homeland defense against terrorist cells and supporters in the United States by enhancing cooperation with other Federal law enforcement agencies and the intelligence community. The budget will also continue initiatives begun in the FY 2002 emergency counter-terrorism supplemental ($21.9 million). Resources are included in this request for the development of a training program designed to promote awareness, recognition, and identification of women and children who are victimized by organizations violating the criminal provisions of the Victims of Trafficking and Violence Protection Act of 2000.

### Joint Terrorism Task Forces (JTTF)

To expand participation in FBI-led task force operations to locations requiring INS investigative resources, the budget will add 59 positions (48 Special Agents and 11 support positions). This initiative will also support efforts aimed at apprehending aliens linked to organized crime, violent gangs, and/or drug-trafficking organizations. (**$6 million**)

### International and Domestic Staffing

The budget requests 78 positions (22 Special Agents and 56 support positions) to increase INS' intelligence-gathering abilities. (**$10 million**)

### Victims of Trafficking and Violence Protection Act (VTVPA) Training

The budget includes $3.7 million to develop and implement a training program for INS personnel and agents abroad to assist with identifying, protecting, providing translation services for, and advancing the rights, benefits and services for victims of severe forms of trafficking and violence. (**3.7 million**)

| FY 2003 Program Improvements | Amount ($ in millions) |
|---|---|
| Joint Terrorism Task Forces<br>  48 Special Agents<br>  11 Support positions | 6.0 |
| International and Domestic Staffing<br>  22 Special Agents<br>  56 Support positions | 10.0 |
| Victims of Trafficking and Violence Protection Act Training | 3.7 |
| Continuation of Emergency Supplemental Activities | 21.9 |

505.

# EXHIBIT 70

# Fact Sheet
## The President's Fiscal 2003 Immigration Budget

02/04/02

## Detention and Removals

The FY 2003 budget request includes **$50.5 million** and **3 new positions** dedicated to improving detention facilities and expanding alternatives to detention. In addition, in FY 2003 the Detention Trustee (under the Department of Justice) will reimburse INS $615 million and more than 1,200 positions for detention services. The funding and positions were part of INS' base funding in FY 2002. In addition, the budget continues initiatives begun in the FY 2002 emergency counter-terrorism supplemental ($6.2 million).

### Alternatives to Detention

The budget includes $473,000 and 3 positions (a Detention Enforcement Officer, a Deportation Officer, and a support position). These funds will continue progress in this area begun in FY 2002, with alternative detention pilot projects in several locations. INS is committed to providing safe and humane treatment for non-criminal aliens, particularly asylum seekers, and ensuring their appearance at immigration court proceedings. **($473,000)**

### Construction

The budget includes $71.1 million to provide additional infrastructure to accommodate INS' rapid growth in personnel and enforcement capability over the past several years. Of this, $50.1 million is new resources above the FY 2002 funded level. Several construction projects will increase INS' detention capacity. **($50 .1 million)**

| FY 2003 Program Improvements | Amount ($ in millions) |
|---|---|
| Construction of Detention Facilities | 50.1 |
| Alternatives to Detention | 0.5 |

506.

| | | 5:00 am-11:30 pm |
| Note: Holiday hours may be subject to change. Please call the local agent at (503) 243-2310 for information. | Friday | 12:00 am-1:00 am 5:00 am-11:30 pm |
| | Saturday | 12:00 am-1:00 am 5:00 am-11:30 pm |
| | Sunday | 12:00 am-1:00 am 5:00 am-11:30 pm |
| | Holiday | 12:00 am-1:00 am 5:00 am-11:30 pm |

| The password you chose for the Gift Ticket Order is displayed here. It is your responsibility to communicate this password to the ticket recipient. | **Will Call Password** |
| | libre |

**This ticket purchase confirmation page is NOT a ticket. You must be issued a ticket to board the bus.**

Please arrive at the station one hour prior to scheduled departure, depending upon its hours of operation. If you will be checking baggage, please visit the counter in advance of the scheduled departure time.

Seating is first-come, first-served. In case of insufficient seating capacity, passengers will be placed on succeeding schedules that have available seats.

You have chosen to pick up tickets at the station or designated stop. It is solely the passenger's responsibility to pick up tickets in advance of travel.

Please retain this receipt for your records. For more information about bus travel, please consult the Frequently Asked Questions (FAQ) section of greyhound.com. For general schedule information, call (800) 229-9424.

Tickets are non-transferrable and, if presented for transportation by any person other than the one for whom it was originally purchased, will be void and may be confiscated by a Greyhound agent or authorized employee of any bus carrier over which the ticket is issued.

507.

# EXHIBIT 71

SCANNED

[RESERVED]

508.

# EXHIBIT 72



RECEIVED JUN 3 0 2003

SCANNED

**NATIONAL CENTER FOR YOUTH LAW**

*Director*
John F. O'Toole

*Senior Attorneys*
Patrick Gardner
William Lee Grimm
    Admitted only in MD
Darryl L. Hamm
Sarah E. Kurtz

*Staff Attorneys*
Valerie Ackerman
Katina Ancar
Rebecca Gudeman

*Equal Justice Works Fellows*
Phil Ladew
Meghan Lang

*Director of Finance
    & Administration*
Heather Ross

*Director of Development*
Dan De Vries

*Development Officer*
Gilberto Hayman-Martinez

*Director of Communications*
Stephen B Texeira

*Office Manager*
Maria Salzano

*Administrative Staff*
Ethel L Oden-Brown
Dainellee D. Stoll

June 27, 2003

**BY U.S. MAIL**

Daniel Stark
U.S. Department of Health and Human Services
Office of the General Counsel
330 Independence Avenue, Room 4280
Washington, DC 20201

Drew Steinberg
Department of Homeland Security
Office of the General Counsel
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

Re: *Flores v. Ridge*

Dear Messrs. Stark and Steinberg,

I write to confirm the substance of our June 23, 2003 Meet and Confer.

As has previously been the case in our meetings this year, defendants indicated that the pending Memorandum of Understanding between the Office of Refugee Resettlement and the Department of Homeland Security has not yet been completed and therefore no details regarding the MOU could be offered. Additionally, an estimated date for finalization of the MOU continues to be unavailable.

Defendants previously agreed to plaintiffs' request for a meeting with ORR operational staff to discuss both concerns about *Flores* violations and suggestions for improvement under ORR's direction. However, ORR cancelled the scheduled April 28, 2003 meeting, believing that including the director of the newly-created Division of Unaccompanied Children's Services (DUCS) would make such a meeting more productive. In light of the fact that there is no timeline for the hiring of the DUCS director, your willingness to revisit this issue is welcomed. We anticipate that this will also apply to plaintiffs' request for joint facility visits with ORR staff. Similarly, we again would like any information regarding which detention facilities ORR officials have or will visit.

In response to our ongoing request, we appreciate your new willingness to obtain from ORR a list of facilities currently housing, or under contract with ORR to house, minors. Plaintiffs would additionally appreciate a list of such facilities from DHS, as those minors are entitled *Flores* protections as well. Plaintiffs will in turn provide an updated list of persons who may visit facilities and interview class members. The list may need to be updated depending on the availability of attorneys and interpreters.

Finally, as many of plaintiffs' correspondences have gone several weeks, and in some cases months, without a reply, plaintiffs again requested written responses to outstanding inquiries, including our October 2002 letter to the INS. We look forward to your replies before our upcoming July 28 Meet and Confer.

Sincerely,

Katina Ancar
*For plaintiffs*

cc:     Hugh Mullane, Office of Immigration Litigation
        Frank Travieso, U.S. Attorney's Office
        Carlos Holguín, Center for Human Rights and Constitutional Law
        Steven Schulman, Latham & Watkins
        Alice Bussiere, Youth Law Center

510



# EXHIBIT 73

RECEIVED
MAR 17 2003
SCANNED

**NATIONAL
CENTER FOR
YOUTH LAW**

*Director*
John F. O'Toole

*Senior Attorneys*
Patrick Gardner
William Lee Grimm
    Admitted only in MD
Darryl L. Hamm
Sarah E. Kurtz

*Staff Attorneys*
Valerie Ackerman
Katina Ancar
Stephen M. Bingham
Rebecca Gudeman

*Equal Justice Works Fellows*
Phil Ladew
Meghan Lang

*Director of Finance
    & Administration*
Heather Ross

    *tor of Development*
    Je Vries

*Development Officer*
Gilberto Hayman-Martinez

*Director of Communications*
Stephen B Texeira

*Office Manager*
Maria Salzano

*Administrative Staff*
Ethel L. Oden-Brown
Dainellee D. Stoll

March 14, 2003

***BY U.S. MAIL AND FAX***

Hugh G. Mullane
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC  20044

    Re: *Flores v. Ashcroft*

Dear Hugh:

As we have discussed over the past weeks, we continue to have numerous concerns regarding noncompliance with the *Flores* Settlement Agreement. Although we hope for cooperation in remedying this state of affairs, as of yet, we have received no indication that these violations will be rectified within a reasonable period.  Accordingly, during our March 19, 2003 meeting, please include personnel who will be able to discuss specific details regarding ORR strategies for complying with *Flores* requirements in the following areas.

1. **Transfer to Licensed Programs**.  The Settlement Agreement requires that children be placed in licensed programs within 72 hours of detention. Settlement Agreement ¶ 12.A.  We would like information on the process for transferring children to ORR custody, as well as how ORR will manage the mandated 72-hour transfer provision.  Further, we request details on the process by which DHS and ORR will identify minors as defined by the Settlement Agreement ¶ 4.

2. **Policy Favoring Release and Custodial Preferences**.  Children must be released to available and suitable custodians in the order of preference provided in the Settlement Agreement.  ¶¶ 14, 17.  *See also* Exhibit 1, ¶ A.13.  We reiterate our concerns that release to potential caregivers is delayed or denied simply because a more preferred custodian refuses to appear, and that home assessments for prospective custodians are unnecessarily delayed.

**405 14th Street, 15th Floor ■ Oakland, California 94612-2701 ■ (510) 835-8098  FAX (510) 835-8099
info@youthlaw.org ■ www.youthlaw.org**

511.

3. **Challenge to Placement or Denial of Release.**  The Settlement Agreement provides that children who are denied release, or who believe their placement does not comport with *Flores* requirements, have the right to pursue redetermination of bond (¶ 12.A) or a challenge to the placement (¶ 24.B).  We therefore request information on ORR's plan for provision of adequate notice of such rights and development of procedures for children to pursue them.  Settlement Agreement ¶ 29.

4. **Use of Restraints and Disciplinary Tools.**  Treatment of detained children "with dignity, respect, and special concern for their particular vulnerability" is a hallmark of the Settlement Agreement.  ¶ 11.  As such, the use of restraints during transport must be limited.  Furthermore, employing handcuffs, shackles, or any type of "corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living such as eating or sleeping" as a disciplinary tool is also strictly prohibited.  Settlement Agreement, Exhibit 1, ¶ C.  Similarly, physical isolation -- and the resulting denial of education, recreation, and other services – is forbidden.  Settlement Agreement, Exhibit 1, ¶ A.  Please supply details regarding ORR's strategy for ensuring that such abuses cease.  Settlement Agreement ¶ 29.

5. **Inappropriate Facilities and Placement Practices.**  The Settlement Agreement requires placement of detained children in the "least restrictive setting."  ¶ 11.  A child may not be placed in juvenile detention or other secure facility unless the child (1) has been charged, or is chargeable, with a non-petty delinquent offense, or (2) has been individually determined to be an escape-risk.  ¶ 21.  Additionally, commingling of detained immigrant youth with juvenile offenders is unacceptable.  Settlement Agreement ¶ 12.A.  Finally, the Agreement provides for the use of medium-secure facilities to care for children who cannot receive adequate care in licensed facilities.  Settlement Agreement ¶¶ 23, 28.B.  Please provide information on plans to correct such conditions and to increase medium-secure beds in a prompt manner.

6. **Strip Searches.**  Such invasive and humiliating searches of children without individualized probable cause are a violation of the federal district court's summary judgment order.  *See Flores v. Meese*, 681 F. Supp. 665, 669 (C.D. Cal. 1988).  These searches are routine, particularly for those children placed in secure facilities.  Clear policies and strong directives are necessary to bring an immediate halt to this practice.

7. **Provision of Essential Services.**  Detained children are entitled to a multitude of services to address their particular needs.  These services include proper medical, dental, and mental health care; education services; living accommodations; clothing and personal hygiene products; and physical recreation.  Settlement Agreement ¶ 12.A and Exhibit 1.  Please advise as to ORR's strategy for honoring its obligations to provide such services.

8. **Information and Monitoring.**  The Settlement Agreement requires weekly collection of comprehensive statistical data on children detained for more than 72 hours, including name, birth date, country of birth, immigration status, immigration hearing dates, and date and location of every placement, transfer, removal and/or release.  Settlement

512.

Agreement ¶ 28.A.  We again request this statistical information in a useful and timely format.  Settlement Agreement ¶ 29.

We look forward to our meeting next week.


Sincerely,

Katina Ancar
Staff Attorney
National Center for Youth Law

cc:    Carlos Holguín, Center for Human Rights and Constitutional Law
       Steven Schulman, Latham & Watkins
       Alice Bussiere, Youth Law Center

513.

# EXHIBIT 74

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
**Foundation**
256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone· (213) 388-8693 Facsimile   (213) 386-9484

April 29, 2003

Dr. Van Hanh Nguyen, Director
Office of Refugee Resettlement
Administration for Children and Families
370 L'Enfant Promenade, SW
6th Floor / East
Washington, DC 20447

*Via    telecopier*

Re: *Flores v. Ashcroft.*

Dear Director:

This is to advise you that pursuant to ¶ 32 of the *Flores* settlement plaintiffs'
counsel will be visiting the Gila County Juvenile Detention Facility on Friday,
May 2, 2003, at 10:00 a.m., to interview minors detained there under the
authority of the DHS and/or ORR. Please be advised that these interviews will
involve attorney-client communications and will accordingly be confidential. This
visit will not involve a tour of the facility itself.

As required by ¶ 32A of the settlement, facility staff should be prepared to
furnish us with a list of names and alien registration numbers for the minors
housed at that facility under the DHS's and/or ORR's authority. Christopher
Brelje, of the Detained Children's Subcommittee of the Immigration Section of
the State Bar of Arizona will be conducting these interviews for plaintiffs. Mr.
Brelje will be accompanied by Mitchell Eickmann, pastor of Pan de Vida Lutheran
Church, Surprise, Arizona, who will serve as translator.

Thank you,

Carlos Holguin
General Counsel

ccs:    Daniel Stark, HHS-GC
        Hugh Mullane, DOJ-OIL
        Frank Travieso, AUSA
        Steven Schulman, Latham & Watkins
        Alice Bussiere, Youth Law Center
        Katina Ancar, Nat'l Center for Youth Law

514.

# Center for Human Rights & Constitutional Law

256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693
fax: 213/386-9484

## FAX COVER SHEET

Confidential Advisory: Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in the facsimile message may be attorney privileged and confidential information intended for the use of the individual or entity named above. Therefore, if the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by collect telephone, and return the original message to us at the above address via the U.S. Postal Service at our expense. Thank you.

| | |
|---|---|
| To: Van Han Nguyen | From: Emily M. Cowley |
| | Date: 4/30/2003 |
| Office of Refugee Resettlement | Time: 12:23:37 PM |
| | No. of pages (including this cover sheet): |
| Fax: 202.401.0981 | 2 |

Fax message:

Dear Dr. Nguyen:

Please see enclosed correspondence.

Please do not hesitate to contact me at 213.388.8693, ext 103, should there be any problems with the transmission of this facsimile.

Regards,

*Emily Cowley*

Emily M. Cowley
Legal Assistant

515.

TRANSMISSION VERIFICATION REPORT

```
                                          TIME : 04/30/2003 12:57
                                          NAME : CHRCL
                                          FAX  : 2133869484
                                          TEL  : 2133888693
```

```
          DATE.TIME                  04/30  12:56
          FAX NO./NAME               12024010981-6405
          DURATION                   00:00:39
          PAGE(S)                    02
          RESULT                     OK
          MODE                       STANDARD
                                     ECM
```

516.

# Center for Human Rights & Constitutional Law

*256 S. Occidental Blvd.*
*Los Angeles, CA 90057*
213/388-8693
fax: 213/386-9484

## FAX COVER SHEET

Confidential Advisory: Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in the facisimile message may be attorney privileged and confidential information intended for the use of the individual or entity named above. Therefore, if the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by collect telephone, and return the original message to us at the above address via the U.S. Postal Service at our expense. Thank you.

| | | |
|---|---|---|
| To: | Frank Traviesc | From: Emily M. Cowley |
| | | Date: 4/30/2003 |
| | AUSA | Time: 12:33:40 PM |
| | | No. of pages (including this cover sheet): |
| Fax: | 213.894.~~2448~~ 7519 | 4 |

Fax message:

Dear Mr. Travieso:

Please see enclosed correspondence.

Please do not hesitate to contact me at 213.388.8693, ext 107, should there be any problems with the transmission of this facsimile.

Regards,

*Emily Cowley*

Emily M. Cowley
Legal Assistant

517-

TRANSMISSION VERIFICATION REPORT

```
                                        TIME : 04/30/2003 13:11
                                        NAME : CHRCL
                                        FAX  : 2133869484
                                        TEL  : 2133888693
```

```
DATE.TIME               04/30  13:10
FAX NO./NAME            8947819
DURATION                00:01:12
PAGE(S)                 04
RESULT                  OK
MODE                    STANDARD
                        ECM
```

518.

# EXHIBIT 75

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone  (213) 388-8693 Facsimile·  (213) 386-9484

March 20, 2003

Daniel Stark
U.S. Department of Health and Human Services
Office of the General Counsel
200 Independence Ave., S.W., Room 713-F
Washington, DC 20201

Hugh Mullane
Office of Immigration Litigation
NPB 726N
P.O.Box 878
Washington , DC 20044

*Via e-mail and first class mail*

    Re: *Flores v. Reno*

Dear Messrs. Mullane and Stark:

Pursuant to ¶¶ 28B and 37 of the *Flores* settlement, I request that the Service detail its reasons for declining to release the following *Flores* class members:

1)     Cahuec-Gonzalez, Alida Veronica, A96 190 537; dob 5/7/85.

2)     Sirin-Godinez, Eugenia, A96 190 538; dob 3/1/86.

Both class members were being detained at the Southwest Key detention facility in Phoenix, Arizona, on February 11, 2003, when the undersigned visited that facility to interview detained class members pursuant to ¶ 32 of the *Flores* settlement.

According to our information, the INS refused to release either minor or their infant children to Teresa Noemi Pineda Leyva, an adult who is related to both girls by law, but not by blood. The girls' attorney of record, Shiu Ming Cheer, was provided no written decision explaining why release to Ms. Pineda had been denied, but was advised orally, as was Ms. Cahuec, that INS policy is to detain minors in lieu of releasing them to any individual who is not related by blood. To our knowledge, neither class member was afforded a bond redetermination hearing to review the denial of release, as is required under ¶ 24A of the *Flores* settlement.

Please advise in writing —

1)     whether current INS/ORR policy is to detain minors in lieu of releasing them to any adult who is not related by blood;

519.

Daniel Stark
Hugh Mullane
March 20, 2003
Page 2

SCANNED.

2)   whether the two above named class members were denied release to Ms. Pineda solely because she is not related by blood;

3)   whether these class members have been afforded a bond redetermination hearing; and

4)   of the specific reasons why the two class members were continued in detention in lieu of release to Ms. Pineda.

Thank you,

Carlos Holguin
One of the attorneys for plaintiffs

ccs:   Steven Schulman, Latham & Watkins
       Alice Bussiere, Youth Law Center
       Katina Ancar, Nat'l Center for Youth Law
       Shiu Ming Cheer

520.

# EXHIBIT 76

Steven H. Schulman
Direct Dial: 202-637-2184
steve.schulman@lw.com



555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200 Fax: (202) 637-2201
www.lw.com

MAR 0 3 2003

# LATHAM&WATKINS LLP

February 25, 2003

**BY U.S. MAIL AND E-MAIL**

Hugh G. Mullane
Office of Immigration Litigation
US Department of Justice
Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

| Boston | New Jersey |
|---|---|
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| | Washington, D.C. |

File No. 501846-0001

Re:     <u>Flores v. Ashcroft</u>

Dear Hugh:

This confirms our meeting on March 19, 2003 at 1 PM ET, pursuant to the December 2001 stipulation in *Flores v. Ashcroft* to discuss compliance with the Settlement Agreement on a monthly basis. While my co-counsel Carlos Holguin, Alice Bussiere and Katina Ancar will participate by telephone, I will be happy to meet in your offices.

In addition, we renew our request to meet with Office of Refugee Resettlement ("ORR") operational personnel who will be working on issues concerning the custody of unaccompanied minors, and ask that you convey this request to them. As you know, throughout the history of the Settlement Agreement, we have met with the INS juvenile coordinator and/or the Director of the INS Office of Juvenile Affairs, and have found those meetings to be more productive than meetings with lawyers only. A meeting with ORR personnel is particularly important at this stage so that we can establish a non-adversarial relationship that will help ensure full implementation of the terms of the Settlement Agreement, and so that personnel at these meetings can address specific issues of compliance. If you are concerned that there may be a risk in such a meeting of disclosure of litigation-sensitive information, we would certainly agree that any discussions be covered by Federal Rule of Evidence 408.

We look forward to our meeting.

Sincerely,

Steven H. Schulman
of LATHAM & WATKINS LLP

cc:   Carlos Holguin
      Katina Ancar
      Alice Bussiere

521.

# EXHIBIT 77

Steven H. Schulman
Direct Dial 202-637-2184
steve.schulman@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D C  20004-1304
Tel: (202) 637-2200  Fax: (202) 637-2201
www lw com



# ▃ATHAM&WATKINS LLP

| | |
|---|---|
| Boston | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| | Washington, D.C. |

February 6, 2003

**BY FIRST-CLASS MAIL AND E-MAIL**

John Pogash
Acting Director of Juvenile Affairs
801 Eye Street, NW
Washington, DC  20536

Re: Flores v. Ashcroft

Dear John:

This confirms that our monthly meeting pursuant to the stipulation in *Flores v. Ashcroft* will occur on Monday, February 10, 2003, at 1 PM ET, by telephone. Please call (877)807-5706, participant code 781015. I am advising Drew Steinberg and Hugh Mullane by copy of this letter; if there are personnel from the Office of Refugee Resettlement ("ORR") who would be interested in participating on this call, I ask that you advise them of this meeting.

This also confirms our agreement that you will provide us, at your earliest convenience, with (a) a list of all facilities the INS has used to house minors in its custody in FY 2003, and (b) data concerning each minor detained by the INS in FY 2003, which will include that minor's name, age, A#, apprehension date, reason for detention, and facility where located. We acknowledge that the data may contain entry errors, and will confer with you (or ORR, as is relevant) regarding any concerns raised by the data.

Thanks for your cooperation in these matters.

Sincerely,

Steven H. Schulman
of LATHAM & WATKINS LLP

cc:   Drew Steinberg (INS)
      Hugh Mullane (OIL)
      Carlos Holguin (CHRCL)
      Katina Ancar (NCYL)
      Alice Bussiere (YLC)
      Andrew Morton (L&W)

DC\571156 1

522.

# EXHIBIT 78

Steven H. Schulman
Direct Dial: 202-637-2184
steve.schulman@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200 Fax: (202) 637-2201
www.lw.com

# ʟATHAM & WATKINS ʟʟᴘ

RECEIVED
FEB 1 1 2003

Boston        New Jersey
Brussels      New York
Chicago       Northern Virginia
Frankfurt     Orange County
Hamburg       Paris
Hong Kong     San Diego
London        San Francisco
Los Angeles   Silicon Valley
Milan         Singapore
Moscow        Tokyo
              Washington, D.C.

File No. 501846-0001

February 6, 2003

**BY U.S. MAIL AND E-MAIL**

Hugh G. Mullane
Office of Immigration Litigation
US Department of Justice
Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Re:    Flores v. Ashcroft

Dear Hugh:

As class counsel in *Flores v. Ashcroft,* we write to repeat our request for a meeting with the Office of Refugee Resettlement ("ORR") to discuss matters concerning the detention of minors in federal custody. As you know, we had scheduled a meeting with ORR on January 15, 2003, for which my colleagues Katina Ancar and Carlos Holguin had flown from the West Coast to attend. That meeting was cancelled that morning, with the explanation that your office wanted to discuss the *Flores* Settlement Agreement with ORR prior to our meeting. While we disagree with your tactics (there was little reason to cancel at the last minute a meeting that you or someone from your office could have attended, if you thought it necessary) and dispute your legal analysis for forcing ORR to withdraw from the meeting (the Model Rules of Professional Conduct are clear that any bar on communication between opposing counsel and a party is inapplicable when a government agency is the party),[1] for the time being we will agree to limit our contact with ORR to communications through you with the understanding that you will immediately forward our communications to ORR.

Accordingly, we request that you advise us of when we can meet with ORR personnel who will be working on the custody of unaccompanied minors. We propose any day during the weeks of February 24 or March 3, 2003, with the exception of Friday, February 28 and Monday, March 3. We expect the meeting to last between one and two hours.

---

[1]        *See* Rule 4.2, Annotated Model Rules of Professional Conduct (4th Ed) at 411 (attached).

DC\570232.2

523.

Hugh G. Mullane
February 6, 2003
Page 2

**LATHAM&WATKINS**LLP

SCANNED

We look forward to hearing from you soon.

Sincerely,

Steven H. Schulman
of LATHAM & WATKINS LLP

Enclosure

cc:    Carlos Holguin
Katina Ancar
Alice Bussiere

524.

# TRANSACTIONS WITH PERSONS
# OTHER THAN CLIENTS

SCANNED

### Rule 4.2
*Communication with Person*
*Represented by Counsel*

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

## COMMENT

[1] This Rule does not prohibit communication with a represented person, or an employee or agent of such a person, concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party, or between two organizations, does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter. Also, parties to a matter may communicate directly with each other and a lawyer having independent justification or legal authorization for communicating with a represented person is permitted to do so. Communications authorized by law include, for example, the right of a party to a controversy with a government agency to speak with government officials about the matter.

[2] Communications authorized by law also include constitutionally permissible investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings, when there is applicable judicial precedent that either has found the activity permissible under this Rule or has found this Rule inapplicable. However, the Rule imposes ethical restrictions that go beyond those imposed by constitutional provisions.

[3] This Rule also applies to communications with any person, whether or not a party to a formal adjudicative proceeding, contract or negotiation, who is represented by counsel concerning the matter to which the communication relates.

[4] In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).

*525.*

[5] The prohibition on communications with a represented person only applies, however, in circumstances where the lawyer knows that the person is in fact represented in the matter to be discussed. This means that the lawyer has actual knowledge of the fact of the representation; but such actual knowledge may be inferred from the circumstances. See Terminology. Such an inference may arise in circumstances where there is substantial reason to believe that the person with whom communication is sought is represented in the matter to be discussed. Thus, a lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious.

[6] In the event the person with whom the lawyer communicates is not known to be represented by counsel in the matter, the lawyer's communications are subject to Rule 4.3.

## MODEL CODE COMPARISON

This Rule is substantially identical to DR 7-104(A)(1) except for the substitution of the term "person" for "party."

## LEGAL BACKGROUND

### PURPOSE OF THE RULE

Rule 4.2, sometimes called the "anticontact" rule, exists to prevent lawyers from taking advantage of uncounseled laypersons and to preserve the integrity of the lawyer-client relationship. *See Polycast Tech. Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621 (S.D.N.Y. 1990) (rule prevents lawyers from using superior skills and training to obtain "unwise statements" from opposing party, protects privileged information, and facilitates settlements by allowing lawyers skilled in negotiating to conduct discussions); *Michaels v. Woodland*, 988 F. Supp. 468 (D.N.J. 1997) (rule "seeks to protect the layperson who may be prone to manipulation by opposing counsel"); *Frey v. Department of Health and Human Servs.*, 106 F.R.D. 32 (E.D.N.Y. 1985) (provision meant to prevent situations in which adverse counsel would take advantage of represented party); *Wright v. Group Health Hosp.*, 691 P.2d 564 (Wash. 1984) ("presence of the party's attorney theoretically neutralizes the contact" by opposing party's lawyer); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 95-396 (1995) (anticontact rules "provide protection of the represented person against overreaching by adverse counsel, safeguard the client-lawyer relationship from interference by adverse counsel, and reduce the likelihood that clients will disclose privileged or other information that might harm their interests").

The Restatement approach (§ 158, as adopted in 1998) is basically consistent with that of the Model Rules. *Restatement (Third) of the Law Governing Lawyers* § 158 (Proposed Official Draft 1998).

### OPPOSING PARTIES MAY SPEAK TO EACH OTHER

As the Comment to Rule 4.2 states, the parties to a matter may voluntarily speak to each other without lawyer consent. A lawyer is not obligated to dissuade a client

526.

to extent suit
or Responsi-
ly hibits ex
rgan v. County
hospital vicari-
k ex parte with
iding hospital
g physicians]);
or Model Code
also potential
130 (N.J. 1995),
1996) (criminal
agreed to testi-
on, court repri-
postponed so
; court warned

See, e.g., Imper-
(plaintiff class
issed, 659 F.2d
ring that ethics
on expression
ting with Pata

v. Conti-
ndant in class
ployees while
Albertson's Inc.,
ed in F. Supp.)
eaning of Cal-
e contacted by

with the rep-
P.2d 1010 (Or.
urse of repre-
Responsibility,
d program not

the action in
cting lawyer's
held Rule 4.2
-from sending

copies of pleadings directly to his ex-wife and otherwise communicating with her over her lawyer's objection); *In re Segall*, 509 N.E.2d 988 (Ill. 1987) ("attorney who is himself party to the litigation represents himself when he contacts an opposing party"); *Sandstrom v. Sandstrom*, 880 P.2d 103 (Wyo. 1994) (lawyer-husband proceeding pro se may not contact wife directly); Ala. Bar Ass'n Ethics Comm., Op. 95-6 (1995) (revoking previous statement that lawyer who is party litigant has same rights as any other party and holding that lawyer representing himself may not communicate directly with represented opponent); D.C. Bar Legal Ethics Comm., Op. 258 (1995) (lawyer proceeding pro se may not communicate about matter with represented opponent; pro se lawyers bring their professional skills and legal knowledge to the table and retain presumptively unfair advantage over opposing parties). *But see Pinsky v. Statewide Grievance Comm.*, 578 A.2d 1075 (Conn. 1990) (lawyer acting on own behalf not "representing a client" and therefore did not violate ethical duties when he contacted represented opponent). *See generally* Langs, *Legal Ethics: The Question of Ex Parte Communications and Pro Se Lawyers under Model Rule 4.2—Hey, Can We Talk?*, 19 W. New Eng. L. Rev. 421 (1997).

## WHEN A GOVERNMENTAL AGENCY IS THE REPRESENTED PARTY

When a governmental agency is the represented party, the Comment to Rule 4.2 recognizes that a party may "speak with governmental officials about the matter." The First Amendment right of petition brings such communications within the "authorized by law" exception to Rule 4.2. *See American Canoe Ass'n, Inc. v. City of St. Albans*, 18 F. Supp. 2d 620 (S.D. W. Va. 1998) (when citizens litigating against government agencies, direct contact between agency officials and plaintiff's counsel regrading matter in controversy is authorized by law and permissible as long as formalities of particular citizen-access statute allowing direct communications met; however, plaintiff's counsel required to prepare inventory of any materials received from agencies under freedom of information statutes); *Camden v. State of Maryland*, 910 F. Supp. 1115 (D. Md. 1996) ("Insofar as a party's right to speak with government officials about a controversy is concerned, Rule 4.2 has been uniformly interpreted to be inapplicable."); N.C. State Bar Ass'n Ethics Comm., Op. 219 (1995) (lawyer for plaintiff suing various public officials may write directly to records custodian requesting relevant public records, even though records custodian is defendant and custodian's lawyer does not consent to communication; lawyer may, as matter of courtesy, send custodian's lawyer copy of request). *See generally* Baker, *Ethical Limits on Attorney Contact with Represented and Unrepresented Officials: The Example of Municipal Zoning Boards Making Site-Specific Land Use Decisions*, 31 Suffolk U. L. Rev. 349 (1997).

The Restatement applies the anticontact rule with less force when the person sought to be contacted is a governmental employee. Section 161 "applies only to litigation and its immediate prelude and does not bar direct contact otherwise, such as in lobbying, seeking a clarification of policy, seeking an exemption from a regulation, and similar approaches to the government." *Restatement (Third) of the Law Governing Lawyers*, Reporter's Memorandum (Proposed Official Draft 1998). The Restatement exception is still, however, narrower than that of California and some other jurisdictions, which broadly permit all such contact. *Id.*

411

527.

# EXHIBIT 79

Steven H. Schulman
Direct Dial: 202-637-2184
steve.schulman@lw.com

RECEIVED
FEB 1 0 2003

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200  Fax: (202) 637-2201
www.lw.com

**LATHAM & WATKINS** LLP

| Boston | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| | Washington, D.C. |

February 4, 2003

***BY FIRST-CLASS MAIL AND E-MAIL***

John Pogash
Acting Director of Juvenile Affairs
801 Eye Street, NW
Washington, DC 20536

       Re:    <u>Flores v. Ashcroft</u>

Dear John:

      Thank you for taking the time last week to discuss providing us, as class counsel in *Flores v. Ashcroft*, with data concerning minors in INS custody. We agreed that you will provide us a list of all facilities the INS has used to house minors in its custody in FY 2003. You further agreed to provide us data concerning each minor detained by the INS in FY 2003, which will include that minor's name, age, A#, apprehension date, reason for detention, and facility where located. You indicated that the facility list should be available immediately, while the minor-specific data may take a few more weeks. Please forward this information to me at your earliest convenience.

      In addition, at our meeting on January 15, 2003, we agreed that we would have our next monthly meeting to discuss the status of the Service's compliance with the *Flores* Settlement Agreement next Monday, February 10, 2003, at 1 PM ET, by telephone. Please confirm that you and your colleagues are still available for this call and whether personnel from the Office of Refugee Resettlement will be available to join us. I will set up a dial-in number once I hear from you.

      Thanks for your cooperation in these matters.

                  Sincerely,

                  Steven H. Schulman
                  of LATHAM & WATKINS LLP

cc:    Drew Steinberg (INS)
        Hugh Mullane (OIL)
        Carlos Holguin (CHRCL)
        Katina Ancar (NCYL)
        Alice Bussiere (YLC)
        Andrew Morton (L&W)

528.

DC\570170.1

# EXHIBIT 80

BOSTON
BRUSSELS
CHICAGO
FRANKFURT
HAMBURG
HONG KONG
LONDON
LOS ANGELES
MILAN
MOSCOW
NEW JERSEY

# Latham & Watkins

ATTORNEYS AT LAW
WWW.LW.COM

DIRECT DIAL: 202-637-2184
EMAIL: STEVE.SCHULMAN@LW.COM

NEW YORK
NORTHERN VIRGINIA
ORANGE COUNTY
PARIS
SAN DIEGO
SAN FRANCISCO
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

December 17, 2002

***BY FIRST-CLASS MAIL AND E-MAIL***

Drew Steinberg
Office of the General Counsel
Immigration and Naturalization Service
425 Eye Street, NW
Washington, DC 20536

John Pogash
Deputy Director of Juvenile Affairs
801 Eye Street, NW
Washington, DC 20536



RECEIVED
DEC 24 2002

      Re:   Flores v. Ashcroft

Dear Drew and John:

      Thank you for a productive meeting on December 3. We were encouraged by your response to the concerns we voiced about the Service's compliance with its obligations under the Settlement Agreement in *Flores v. Ashcroft.* Based on your representations, including your agreement to respond in writing to the letter sent to Drew and Sue Curda on October 29, 2002, we have decided at this time not to pursue a motion to enforce the Settlement Agreement.

      Specifically, you advised us during the meeting that since the Service's decisions on the transfer to secure confinement and release of juveniles in its custody are now made by the Office of Juvenile Affairs in Washington, D.C. you can commit that certain past practices we have documented will no longer continue. First, you stated that the Service will not automatically place minors in secure confinement on the basis of a final order of removal, but will make an individualized determination of whether the minor is indeed an escape risk, with the final order but one factor in that determination. You further agreed that, to the extent permitted by law, you would release to plaintiffs' counsel memoranda and policy directives articulating or implementing the INS's present policy that transfers to secure confinement do not occur pursuant to blanket policies, such as that reportedly followed upon entry of a final order of removal, but rather upon individualized determinations regarding the need for secure confinement.

      Second, you stated that the Service no longer has a policy of refusing to release minors to relatives when an undocumented parent is known to be in the United States. The

DC\559466.2

529.

LATHAM & WATKINS

John Pogash
Drew Steinberg
December 17, 2002
Page 2

Service at one time had a policy, outlined in a November 1999 letter to the United States Catholic Conference and the Lutheran Immigration and Refugee Services and discussed in the September 2001 report of the Office of Inspector General, was that no child would be released to anyone other than a parent when the parent was known to be in the United States. Instead, you advised us that the Service will make an individualized determination of whether a parent's status as an undocumented alien is likely to present a substantial risk that the child will fail to appear for immigration hearings. You agreed to set forth this policy in writing.

Third, in response to our concern that non-delinquent juveniles in INS custody are being commingled with delinquent juveniles, you said that the Service would visit secure facilities to determine whether commingling was still occurring, and whether there are approaches or alternative placements that could alleviate the commingling. Specifically, you stated that a facility compliance analyst would visit San Diego Juvenile Hall, a secure facility where we have documented substantial commingling of non-delinquent juveniles with violent offenders. We also have specific information that INS detainees have regular contact with delinquents at the Globe, Arizona, juvenile hall, and we ask that you determine whether such commingling is still occurring at that facility as well.

Fourth, you also committed that, as long as the Service retains custody of unaccompanied juvenile children prior to the transfer of this responsibility to the Office of Refugee Resettlement ("ORR"), you would meet with us on a monthly basis to discuss compliance with the Settlement Agreement. As you know, the Service committed to these monthly meetings in a stipulation filed with the Court in December 2001. We also reiterate our request that you involve appropriate ORR personnel in these meetings when the transition date comes closer. You agreed that, pending availability of the next Director of the Office of Juvenile Affairs, our next meeting would be on January 15, 2003 at 1.30 PM.

Fifth, you agreed to respond in writing to the remaining concerns set out in our letter of October 29, 2002.

Finally, you expressed some reservations of whether the Service's commitments under the Settlement Agreement would transfer to ORR. The Homeland Security Act is quite clear that "[c]ompleted administrative actions of an agency shall not be affected by the enactment of this Act or the transfer of such agency to the Department, but shall continue in effect according to their terms until amended, modified superceded, terminated, set aside or revoked in accordance with law." Public Law No. 107-296 §1512(a)(1). "Completed administrative action" is defined under the Act to include "orders, determinations, rules, regulations, personnel actions, permits, *agreements*, grants [and] *contracts*." *Id.* at §1512(a)(2) (emphasis added). Consistent with these provisions, any agreement or contract to which the INS is a party would continue in full affect against the ORR following the transfer of children's affairs from the INS to ORR. The Settlement Agreement is clearly a contract, *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989) ("An agreement to settle a legal dispute is a contract and its

DC\559466.2

530.

SCANNED

**LATHAM & WATKINS**

John Pogash
Drew Steinberg
December 17, 2002
Page 3

enforceability is governed by familiar principles of contract law"), and therefore the responsibility for compliance with its applicable provisions therefore transfers to ORR by operation of the Act.

We look forward to working with you over the course of the next months on issues relating to the Service's compliance with the Settlement Agreement, and the transfer of certain responsibilities thereunder to ORR.

Sincerely,

Steven H. Schulman
of LATHAM & WATKINS

cc:   Carlos Holguin
      Katina Ancar
      Alice Bussiere
      Andrew Morton

DC\559466.2

531.

# EXHIBIT 81



**NATIONAL
CENTER FOR
YOUTH LAW**

*Director*
John F. O'Toole

*Senior Attorneys*
Patrick Gardner
William Lee Grimm
   Admitted only in MD
Darryl L. Hamm
Sarah E. Kurtz

*Staff Attorneys*
Valerie Ackerman
Katina Ancar
   Skadden Fellow
Stephen M. Bingham
Rebecca Gudeman

*Equal Justice Works Fellows*
Phil Ladew
Meghan Lang

*Director of Finance
   & Administration*
Heather Ross

*Director of Development*
Dan De Vries

*Development Officer*
Gilberto Hayman-Martinez

*Director of Communications*
Stephen B. Teixeira

*Office Manager*
Maria Salzano

*Administrative Staff*
Ethel L. Oden-Brown
Daincilee D. Stoll

October 29, 2002

Susan Curda
Acting Director, Office of Juvenile Affairs
Immigration & Naturalization Service
425 I Street, NW
Washington, DC  20536

Drew Steinberg
Office of the General Counsel
Immigration & Naturalization Service
425 I Street, NW
Washington, DC  20536

Re: *Flores v. Ashcroft*

Dear Ms. Curda and Mr. Steinberg:

As counsel to the plaintiff class, we again write to urge defendants to join a formal dialogue regarding the Settlement Agreement entered in the above referenced action. As you know, on December 7, 2001, the Service and plaintiffs' counsel stipulated to extend the Settlement Agreement and "to confer regularly no less than once monthly" to discuss implementation of and compliance with the Settlement Agreement.

Despite our best efforts, these monthly conferences have not occurred. On September 10, 2001, October 19, 2001, February 8, 2002, and February 27, 2002, plaintiffs forwarded you letters detailing our concerns regarding the treatment of plaintiff children  These have received little response. To date, we have received an informal, partial and oral response to our letters of September 10, 2001 and October 19, 2001, no response whatsoever to our letter of February 8, 2002, and no response to our letter of February 27, 2002 insofar as that letter set forth concerns respecting class members generally and not specific class members' cases. Copies of this correspondence are attached to this letter for your reference

Susan Curda, Office of Juvenile Affairs
Drew Steinberg, Office of the General Counsel
Immigration & Naturalization Service
October 29, 2002
Page 2

We once more invite you to meet and confer in an effort to resolve the Service's uncorrected
violations of the Settlement Agreement. We propose to meet with you in your Washington D.C.
office, or in the offices of Latham & Watkins, on November15, 2002. We are prepared to discuss
the following matters of immediate concern to the plaintiff class.

**Automatic placement of minors into secure facilities after entry of removal order.** As we
noted in our past correspondence, the Settlement Agreement specifically states that a removal
order is only one of a list of factors that must be applied on an individual basis to determine
whether a child constitutes an escape risk. We continue to receive reports that several INS
districts automatically deem minors escape risks and house them in secure detention facilities
based solely upon entry of an order of removal.

**Automatic placement of minors with any prior arrest record into secure facilities.** The
Settlement Agreement provides that a minor may *not* be placed in a juvenile detention or secure
INS detention facility solely on the basis of an isolated incident in the child's history or a minor
offense for which a nonimmigrant juvenile would not be detained. Counsel is nonetheless
informed that the INS regularly places children in secure confinement based upon the existence of
any arrest record whatsoever, regardless of the severity of the alleged behavioral offense.

**Conmingling of immigrant youth with delinquent minors.** Paragraph 12.A of the Settlement
Agreement requires that INS "minors *shall be separated* from delinquent offenders" (emphasis
added). Even if children are placed initimately in secure facilities, the Settlement Agreement
permits daily contact with delinquent offenders only if the immigrant youth also has been
adjudicated delinquent. The Settlement Agreement is consistent with the Juvenile Justice and
Delinquency Prevention Act, which prohibits placement of non-offender children in secure
detention facilities. However, plaintiffs repeatedly report that they share recreation, dining,
sleeping, and other facilities with delinquent juveniles when housed in secure facilities.

**Lack of medium secure beds.** Plaintiffs' counsel previously expressed concern that nearly six
years after the Settlement Agreement was entered, the Service has only a small number of medium
security facilities to accommodate minors with special needs, behavior problems, or otherwise
cannot be kept in less restrictive environments. Minors eligible for housing in medium-secure
facilities are therefore by default incarcerated in secure facilities.

533.

OCT 30 '02  02:31PM NAT'L CTR YOUTH LAW

SCANNED

Susan Curda, Office of Juvenile Affairs
Drew Steinberg, Office of the General Counsel
Immigration & Naturalization Service
October 29, 2002
Page 3

**Strip searches of plaintiff children.** Invasive and humiliating strip searches of plaintiffs without individualized probable cause violates the district court's summary judgment order. *See Flores v. Meese*, 681 F. Supp. 665, 669 (C.D. Cal. 1988). Despite this unambiguous ruling and class counsel's repeated identification of the problem, plaintiff minors still report that they are routinely subjected to strip searches without probable cause

**Non-delinquent minors held in shackles or handcuffs during transport or as punishment.**
The INS has not indicated how it will alter its protocol to set out a structured standard for the use of restraints both by the INS and contracting facilities.
Facilities continue to have nearly unfettered discretion in restraining immigrant youth. Whatever the criteria, staff should under no conditions be permitted to restrain children solely as punishment.

**Refusal to release children unless undocumented parents or relatives surrender for removal.** In correspondence to the U.S. Catholic Conference and others, the INS has stated that its policy is to release minors only if the minor's parents or relatives surrender for removal. The Settlement Agreement does not permit the INS to extend a child's detention indefinitely solely because his or her parents or other relatives refuse to surrender for removal. Rather the Settlement Agreement provides for release in an order of preference to *available* custodians. The Service's practice of refusing to release children to available caregivers violates both the spirit and word of the Settlement Agreement.

**Access to medical health, counseling, and educational services.** Plaintiffs' counsel's evidence shows that the INS fails to provide minors (especially those in secure facilities) with adequate services  Both medical and mental health services are inadequate. Moreover, provision of educational services (both instruction and materials) is substandard and is often provided only in English. The deficiencies violate the Settlement Agreement, as well as the INS' Juvenile Protocol Manual, which require that facilities provide a comprehensive education program for all immigrant juveniles.

**Attorney-client communications and telephone service.** Although the Service has ensured that plaintiffs' counsel does not have any further difficulties in gaining access to facilities in order to interview class members, counsel has encountered problems with facility staff failing to respect plaintiffs' right to speak confidentially. In one instance, a facility staff member refused to move from his post outside of a door through which privileged conversations could be heard easily. Moreover, facilities have failed to take action to address the difficulty that immigrant minors have

Susan Curda, Office of Juvenile Affairs
Drew Steinberg, Office of the General Counsel
Immigration & Naturalization Service
October 29, 2002
Page 4

in gaining access to telephones.  Counsel are informed that policies are unclear and overly-
restrictive, and that juveniles are required to pay for calls or have the intended recipients accept
collect calls.  This policy prevents children who lack funds (or whose families or attorneys cannot
accept collect calls) from having communications mandated by the Flores settlement   In addition,
facilities with policies requiring monitoring of all phone calls or in which telephones are located
only in public areas impinge upon immigrant minors' right to confidential discussions with their
attorneys.

Plaintiffs' counsel hope to work with you to find a constructive and beneficial resolution in this
matter, but will resort to other solutions should good faith efforts to resolve these issues not begin
in earnest.  Please contact me at your earliest convenience at (510) 835-8098, extension 3023.

Sincerely,

Katina Ancar
For Plaintiffs

Enclosures

cc:    Carlos Holguín, Center for Human Rights and Constitutional Law
       Steven Schulman, Latham & Watkins
       Alice Bussiere, Youth Law Center

535.

SCANNED

# NATIONAL CENTER FOR YOUTH LAW
405 - 14th Street, 15th Floor
Oakland, CA 94612-2701
(510) 835-8098
FAX: (510) 835-8099

## FAX TRANSMITTAL COVER SHEET

TO:        Carlos Holguín                          **FAX NUMBER:**
           Steve Schulman                          213-386-9484
           Alice Bussiere/Alexis Mazón            202-637-2201
                                                   415-956-9022

FROM:      Katina Ancar, Ext. 3023

RE:        *Flores v. Ashcroft*

TRANSMITTED BY: Ethel L. Oden-Brown, Ext. 3011

NUMBER OF PAGES INCLUDING COVER SHEET:  5

DATE:      October 30, 2002

Message:   Please see the attached letter.

Special Instructions:

THIS MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY. THANK YOU.

536.

# EXHIBIT 82

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
256 S OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone. (213) 388-8693 Facsimile. (213) 386-9484

September 10, 2001

Arthur Strathern
Office of the General Counsel
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

Mark Matese
Juvenile Coordinator
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

*Via telecopier and first class mail*

     Re: *Flores v. Reno*

Dear Messrs. Strathern and Matese:

Pursuant to ¶¶ 29 and 37 of the settlement reached in the above referenced action, plaintiffs wish to convey the following concerns and questions regarding implementation of the settlement. Please consider this a formal request to meet and confer pursuant to ¶ 37 of the settlement regarding the following matters.

1. During visits to various facilities in which the Service currently houses minors, counsel for the plaintiff class were informed that current policy and practice is to place all minors with "final" orders of removal in secure facilities. The rationale for this policy, we were told, is that all such minors are considered escape-risks and therefore subject to secure confinement pursuant to ¶¶ 21(D) and 22 of the settlement.

Paragraph 22 states that whether a final order of deportation (removal) has been entered against a class member is one, but only one, factor to be considered in determining whether a given minor is an escape-risk. A blanket policy to place all minors with a final order of removal in secure facilities is therefore a clear violation of the settlement.

Please promptly advise as to whether the Service's current policy or practice is to transfer minors to secure confinement upon the entry of a final order of removal. If such is the Service's policy or practice, plaintiffs request an opportunity to meet and confer pursuant to ¶ 37 of the settlement. If the Service has no such policy, then plaintiffs request an opportunity to meet with you to discuss options for bringing field officers in better actual compliance with the settlement.

2. On July 24, 1998 the Service published proposed regulations setting forth standards for the processing, detention, and release of juveniles. 63 Fed.Reg. 39759-39763. By letter dated September 16, 1998, plaintiffs advised you of their objections to the proposed regulations. We have receive no response to that letter, nor has the Service yet promulgated regulations implementing the settlement.

537,  FILE COPY

Arthur Strathern
Mark Matese
September 10, 2001
Page 2

Pursuant to ¶ 9 of the settlement, the Service was to have taken action to publish the relevant and substantive terms of the agreement as a regulation within 120 days of the district court's approval of this settlement. It has now been over four years since the settlement was approved.

We accordingly ask you to specify a date certain, and in any event a date no later than October 10, 2001, by which you will publish implementing regulations. We ask that you advise us at your earliest convenience whether the proposed regulations will or will not be amended to meet our earlier objections. If you do not intend to meet our objections fully, we ask you to specify in which particulars you believe such objections invalid.

3. Paragraph 12C of the settlement requires the Service to update on a quarterly basis its listing of beds available for INS placements in the event of an emergency or influx and that it provide plaintiffs' counsel with a copy of this listing. We request a copy of the current list.

Thank you,

Carlos Holguin
One of the attorneys for plaintiffs

cc:     Steven Schulman, Latham & Watkins
        Alice Bussiere, Youth Law Center

538.

# EXHIBIT 83

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone. (213) 388-8693 Facsimile: (213) 386-9484

October 19, 2001

Arthur Strathern
Office of the General Counsel
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

Mark Matese
Director of Juvenile Affairs
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

*Via telecopier and first class mail*

Re: *Flores v. Reno*

Dear Messrs. Strathern and Matese:

This letter follows up on the meet-and-confer pursuant to ¶¶ 29 and 37 of the *Flores* Settlement conducted in the above referenced matter on October 12, 2001. With respect the points covered in that meeting, please be advised as follows:

1) **Extending the *Flores* settlement.** As we discussed, the *Flores* settlement arguably expires in February 2002. Plaintiffs accordingly proposed that the parties stipulate to extend the agreement by one year. If defendants would prefer, we propose in the alternative that the parties stipulate to extend the agreement pending publication of final regulations and revision of intergovernmental agreements to incorporate the terms of the *Flores* settlement. The grounds for extending the agreement are several:

First, defendants have not achieved substantial compliance with the settlement. Among other things, no final regulations implementing the agreement have been published, which according to the Service's own estimate will require at least another three to six months to complete.

Second, at this juncture plaintiffs are not satisfied that the final regulations will in fact comply with the settlement. On July 24, 1998 the Service published proposed regulations setting forth standards for the processing, detention, and release of juveniles. 63 Fed. Reg. 39759-63 (1998). On September 16, 1998, plaintiffs' counsel submitted detailed comments that note various provisions of the proposed regulations failing to comport with the *Flores* settlement. During the meet-and-confer, you advised us that the Service will again publish the proposed regulations for public comment, but that these regulations will be the same as those published over three years ago and will not incorporate any of the comments received in 1998. Although you assured us that

539.

Arthur Strathern
Mark Matese
October 19, 2001
Page 2

the final regulations will take our earlier comments into consideration, by the time final regulations are issued it may be too late for plaintiffs to seek recourse via the *Flores* litigation.

Third, and again according to the Service, compliance with the settlement in certain substantive areas—*e.g.*, strip searching and educational instruction in detainees' native languages—will require review and revision of numerous intergovernmental agreements. You stated that process will require between one year and sixteen months to complete.

Fourth, the Service stated that it has issued field memoranda directing adherence to the standards and procedures set out in the *Flores* settlement and have no intention of rescinding those directives upon expiration of the *Flores* agreement. Unlike the settlement, field memoranda do not amount to binding, enforceable standards. We would clearly be remiss in our obligations to our clients were we to accept what might well prove purely voluntary standards in lieu of extending the existing enforceable agreement. On the other hand, defendants will not be prejudiced by extending the agreement since the Service intends to continue following its terms in any event.

Fifth, if the Service does not agree to extend the *Flores* settlement, plaintiffs will be forced to seek judicial redress for the violations of the agreement. Resorting to litigation would, we realize, cut short the cooperative approach that permits the parties to work toward an orderly resolution of their disagreements. It is not to the Service's advantage to be ordered by the court to cease and desist placing minors in specified facilities, nor is it ultimately in the plaintiffs' best interest to litigate before efforts at a cooperative resolution have run their course. Although plaintiffs will insist that certain practices be discontinued immediately—*e.g.*, commingling non-delinquent INS detainees with delinquents—other matters, such as the pace of rulemaking and implementing educational instruction in native languages, could be handled with greater deliberation only if the *Flores* agreement is extended. Finally, plaintiffs may well obtain an order extending the agreement regardless. *See generally, Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367 (1992); *Vanguards of Cleveland v. Cleveland,* 23 F.3d 1013 (6th Cir. 1994).

2) **Automatically transferring detained minors to secure facilities upon entry of an order of removal**. The Service suggested that its district directors transfer minors to secure facilities on a case-by-case basis. The overwhelming evidence is to the contrary. As the annexed report regarding the Tulare County facility shows, the juvenile coordinators for both the San Francisco and Los Angeles districts admitted that the Service's policy and practice in these districts is to transfer minors *automatically* to secure facilities upon entry of an order of removal (with the possible exception of very young children). We have heard reports from other districts that this policy holds there, as well.

The Service suggested that entry of a final order of removal against a detained minor properly raises a *presumption* that he or she is an escape risk. This position conflicts with the *Flores* settlement, which lists a final order of removal as one factor in an individualized decision to place a minor in secure confinement. The fundamental

540.

Arthur Strathern
Mark Matese
October 19, 2001
Page 3

presumption of the *Flores* agreement is unaltered by this provision: non-delinquent INS detainees should be housed in facilities licensed for the care of dependent children. The agreement makes no broad exceptions to this presumption for those minors subject to an order of removal and requires *individualized* determinations for each detainee.

In order to address this policy, the Service agreed to consider issuing a memorandum to the field instructing against the automatic transfer of detainees to secure facilities following entry of a removal order. Plaintiffs would be pleased to work with defendants toward developing such a memorandum—time permitting—as a means of resolving this issue without need for judicial intervention.

3) **Commingling non-delinquent INS detainees with delinquents**. At least two secure facilities—Martin Hall, near Spokane, Washington, and San Diego Juvenile Hall—lack separate accommodations for INS detainees. At least in both of these facilities, non-delinquent INS detainees have regular daily contact with delinquents. This practice violates both the *Flores* agreement and the conditions of funding such facilities under the Juvenile Justice and Delinquency Prevention Act, 42 U.S.C. § 5633(a)(12)(A) (2001); therefore, the INS should immediately cease and desist housing non-delinquent detainees in these facilities. Further, regulations implementing the *Flores* agreement should prohibit explicitly the housing of non-delinquent INS detainees in secure facilities lacking separate accommodations for non-delinquent minors.

4) **Shackling and handcuffing minors during transport**. Minors routinely are shackled and handcuffed when being transported to or from Martin Hall. Minors routinely have been handcuffed when transported from the Los Angeles District Office to Tulare County Juvenile Hall.

The Service agreed to forward plaintiffs' counsel a copy of the Service's current juvenile escort and restraint policy. Time permitting, plaintiffs propose that the parties take up this issue again once plaintiffs have had an opportunity to review the extant policy.

5) **Strip searching**. Facility operators at the Tulare County Juvenile Hall admitted that INS detainees were strip searched upon initial admission to that facility. San Diego Juvenile Hall also routinely strip searches INS detainees. Strip searching without individualized probable cause is in direct violation of the district court's 1988 order of summary judgment. *Flores v. Meese*, 681 F. Supp. 665, 669 (C.D. Cal. 1988).

Defendants agreed to review existing inter-governmental agreements to determine what provisions they contain regarding strip searches of INS detainees. In all events, this practice should be discontinued immediately.

6) **Educational instruction in native languages**. Although several shelter care facilities do furnish detainees instruction in their native languages, Tulare County Juvenile Hall, among others, does not.

541.

Arthur Strathern
Mark Matese
October 19, 2001
Page 4

The Service agreed to review existing inter-governmental agreements to determine what provisions they contain regarding educational instruction for INS detainees in their native languages.

7) **Restrictions on attorney-client interviews**. The Service agreed that plaintiffs are entitled to interview class members in accordance with each particular facility's generally applicable attorney-client visitation procedure. The Service agreed to check existing inter-governmental agreements to see what provisions they contain regarding the access of plaintiffs' counsel to detained juveniles. The Service further agreed to consider issuing a field memorandum or undertaking additional training so that Service or facility personnel do not interfere with plaintiffs' counsel's visiting clients.

Enclosed please find a proposed stipulation plaintiffs have prepared, which would extend the duration of the *Flores* settlement in order to allow the parties to continue cooperating on these several issues. If the stipulation is acceptable, plaintiffs will defer legal action enforcing the provisions of the *Flores* settlement herein discussed. Although plaintiffs are open to reasonable counter-proposals, time is very much of the essence. Accordingly, we must insist that a stipulation be finalized within the next 14 days.

We look forwarding to hearing from you as soon as possible.

Thank you.

Carlos Holguin
One of the attorneys for plaintiffs

ccs:   Steven Schulman, Latham & Watkins
       Andrew Morton, Latham & Watkins
       Alice Bussiere, Youth Law Center

542.

# Latham & Watkins

ATTORNEYS AT LAW
WWW.LW.COM

505 MONTGOMERY STREET, SUITE 1900
SAN FRANCISCO, CALIFORNIA 94111-2562
TELEPHONE: (415) 391-0600
FAX: (415) 395-8095

| | | | |
|---|---|---|---|
| TO: | Gabriel Gregg<br>Peter Huston | DATE: | August 13, 2001 |
| | | FILE NO.: | 000011-1788 |
| FROM: | Ben Hughes, Kristen Cain,<br>Cheng-Ling Chen, Errol Hunter | COPIES TO: | Steve Schulman |

SUBJECT:   July 31, 2001 Flores Compliance Inspection of Tulare County Juvenile Detention Facility

This memo sets forth observations from our inspection of the Tulare County Juvenile Detention Facility on July 31, 2001. We toured the facility and interviewed INS district staff, Tulare County Probation Department staff, and detained INS minors to determine whether the INS was fulfilling its obligations under the Flores Agreement.

**Our most significant finding is that the facility is in gross violation of *Flores'* "least restrictive setting" requirement.**

## I. THE TULARE JUVENILE DETENTION FACILITY

The Tulare Juvenile Detention Center (the "Facility") is a secure facility for adjudicated delinquent minors. Mr. Pat Aldrich is the Superintendent of the Facility. The Facility contracts with the INS to house minors detained by the INS. The per diem for each minor is $180.00.

The Facility presently has the capacity to house 360 minors in six separate "Pods" of 60 beds each. INS minors are housed in one of these pods, and are separated from the adjudicated delinquent minors. The Facility does not commingle INS minors with adjudicated juvenile delinquents.

### A. The Physical Facility

The Facility is an extremely high security facility. We passed through several secured entrances to arrive at the "INS pod" where INS minors are housed. The perimeter of the facility is surrounded by razor wire, and the Facility operates like a high security jail. We passed though a metal detector and our bags were searched upon entry, and we were advised to remain calm in the event of a security emergency. The INS pod is physically the same as all other pods in the Facility, and although the children are allowed some freedom of movement within the pod itself, it is a highly secure prison environment with no windows.

BOSTON • CHICAGO • FRANKFURT • HAMBURG • HONG KONG • LONDON • LOS ANGELES • MOSCOW • NEW JERSEY • NEW YORK • NORTHERN VIRGINIA<br>ORANGE COUNTY • SAN DIEGO • SAN FRANCISCO • SILICON VALLEY • SINGAPORE • TOKYO • WASHINGTON, D C

1.      The Bedroom/ Bathroom

Each "bedroom" is an 8 ft. by 12 ft. cell equipped with a metal toilet, sink, mirror and bed. The door to each cell has a window for observation by Facility staff which cannot be closed, even while the minor uses the toilet. The showers are located in a common area and are also subject to observation. Both the toilet and the showers look clean.

According to Facility staff, fresh clothing and towels are provided daily and fresh bedding every third day. They also provide toothpaste, a toothbrush, soap, a brush, deodorant, lotion and other common bathroom amenities.

The Facility allows minors to keep in their rooms only those possessions that the Facility provides or items made during arts and crafts. All personal possessions are stored elsewhere, and allegedly returned to the minor upon deportation.

2.      The Living Area

Boys and girls live in separate quarters consisting of several bedrooms opening into a common living area. Each of these small living areas has a few tables and chairs, and the shower is located in the corner of this area. The areas have been decorated by the children with paper cutouts and origami, but are otherwise drab and windowless. These small living areas open into the main lobby of the pod, which has a guard stand and doors to the classroom, the recreation area, the visitation rooms and the pod exit.

3.      The Classroom

The classroom appeared clean and well-lit, although it had no windows. It was equipped with computers with internet access and the normal classroom appurtenances. The teacher spoke with us and appeared to be sensitive to the linguistic and cultural needs of her students. She said that the classroom curriculum focuses on language skills, but also provides significant instruction in high-school level subject areas. Minors may earn credit toward their high school equivalency, and the Facility maintains transcripts and records for the minor's later use.

Instruction is in English. If the teacher is having serious problems communicating with a student, she will use AT&T translation services via telephone.

4.      The Kitchen/ Dining Room

The Facility prepares its own meals in its kitchen, which looked clean. The Facility provides three meals per day and makes a special effort to provide white rice to Chinese INS minors instead of the default Spanish rice. There is no dining room, and INS minors eat their meals in the common living area.

08/31/01 000011-1788

544.

5.    The Recreation Area

The recreation area was a small triangular concrete area in the pod.  There was no grass or greenery in sight, nor any windows in the recreation area to the outside.  Sunlight is admitted through the metal grating over the top of the recreation area.

Recreation includes games such as ping-pong, badminton and an exercise program similar to a high school physical education class.  According to Mr. Aldrich, recreation lasts for approximately two to three hours each day.  Minors do not watch television on a regular basis, if at all.

B.    Security

According to Mr. Aldrich, there is one security staff member for every ten minors. In addition to the security staff members, there are also staff members who provide educational, medical, dental, psychological, laundry and cooking services.

Although INS minors are subject to the same disciplinary rules and regulations as other minors housed in the facility, some restrictions are relaxed for them.  For example, they are allowed to use scissors for arts and crafts.

C.    Transfer, Arrival and Processing of INS Minors

The INS transfers minors to this Facility once a final order of deportation has been issued, regardless of whether the minor has appealed the decision.  Once the INS transfers a minor to this Facility, he or she will remain at the Facility until deportation.

When a minor arrives at the Facility, he or she is strip-searched by a staff member of the same gender.  There is no exception for INS minors.  Each minor then takes a shower and receives a routine medical examination.

Upon arrival, minors are also informed of the strict, regimented schedule of the Facility and notified of the policies and procedures.[1]

INS minors' stay at this Facility ranges from days to months.  However, it is difficult to estimate an average time of detention at this point because the Facility only started contracting with the INS to house minors a few months prior to our visit.

D.    Visitation Policy

For INS minors, the Facility will allow attorneys and others who have been approved by the INS to visit.  Attorneys may visits minors during business hours.  Attorney visits can last as long as needed, but seldom exceed fifteen to twenty minutes.  Normally the Facility

---

[1]    Attached hereto as attachment A are copies of the Daily Schedule as well as the Policy and Procedure Notification.

08/31/01  000011-1788

545.

staff monitors all meetings, but upon request by the attorney the meetings may be private and unmonitored.

The Facility has a visiting room for each living area where a glass window separates the minor from the visitor. But the Facility allows the attorneys of INS minors to visit within the living area itself, thereby having physical contact with the minor. Minors do not wear restraints during visits.

Contact visits do not trigger strip-searches. Strip-searches only occur upon the minor's entering the Facility. However, as a general procedure, staff members "pat-down" each minor at regular intervals throughout the day.

### E.   Discipline

The Facility disciplines minors by depriving them of privileges that they did not "earn." Such discipline does not include corporal punishment, withholding of food, or deprivation of clothing, bedding or items of personal hygiene. But the Facility will deny telephone privileges (except for attorney calls); limit recreation participation, or place a minor in "lock-down." A minor placed in lock-down is locked in his or her room alone for the remainder of the day and let out the next morning.

Facility staff reported that the INS minors are much less challenging to house than the adjudicated juvenile delinquents normally housed at the Facility, and discipline was not a major problem.

### F.   Telephone Privileges

According to Facility staff, minors are permitted to use the telephone at any time to call attorneys and at scheduled intervals for other calls. All phones in the living area had a dial tone when we picked up the receivers. There are four domestic telephone lines and one telephone for international calls in the living area. Indigent minors must call collect for domestic calls, and obtain a calling card for international calls. The Facility does not monitor international telephone calls, but we are uncertain whether domestic calls are monitored.

### G.   Medical Care

The Facility provides minor and non-invasive medical services, and will transfer a minor to a local hospital for any service that the Facility cannot provide. According to Mr. Aldrich, the Facility maintains 24-hour medical care. A nurse is always on duty, and doctors are on call when not at the Facility. Counseling services are also provided, and the Facility has approximately four to six mental health service professionals.

The medical area is separate from the INS pod and serves all minors in detention at the Facility. All minors, including INS minors, are transported to and from the medical area in handcuffs. The medical area appeared to be clean.

08/31/01 000011-1788

546.

## II. INTERVIEWS WITH INS STAFF

Two INS district representatives were present during our visit to the Facility. Michelle O'Brien, Deportation Officer and District Juvenile Coordinator, was present from Los Angeles, and Cecyle J. Andrews, Deportation Officer, was present from San Francisco. Kristen Cain spoke with both women for about 30 minutes. The following are highlights from their conversation:[2]

A.      Transfer to Secure Facility

Both Ms. O'Brien and Ms. Andrews admitted that the minors were not in the secure Tulare Juvenile Detention Facility for any behavioral or disciplinary reasons. Although Ms. Andrews "has 300 beds available" in the San Francisco area, it is her practice to transfer minors with a "Final Order" to the Facility to await deportation. Ms. O'Brien does the same, and may also transfer minors without a final order if a lack of bed space in the Los Angeles area requires it. There were a few minors housed in the Facility during our visit for this reason.

Ms. Andrews and Ms. O'Brien say they inform the minors of the reasons for their placement in the Facility, and the minors are also issued a "Notice of Secured Placement," which lists reasons for placement in a secure facility such as "influx" (if there is just not enough space in a less secure facility, as is currently the case in Los Angeles) or "Final Order of Deportation." They are also issued a Notice of Judicial Review so they can seek judicial review of their placement. Both Ms. O'Brien and Ms. Andrews admitted that no evaluation of a minor's conduct is made before he or she is placed at the Facility. Both women seem to believe that a final order of deportation is enough of a flight risk to justify the transfer. Ms. Andrews said there are no "less restrictive alternatives" for minors with final orders.

B.      Minors' Attorneys

Ms. Andrews and Ms. O'Brien both reported that all minors currently in custody at the Facility are represented, and that most Chinese minors in INS custody at any given time are already represented even before they are detained. Both women expressed distrust of these attorneys, and believe that the lawyers are connected to smuggling operations.

C.      "Special Population" & Home Assessment.

"Special population" includes Chinese and Indian aliens. Even if a true parent for a special population minor is verified by the INS, the minor will remain in custody until the "home assessment" is completed. This is performed by the INS at the home office.

---

[2]      Attached hereto as attachment B is a copy of the worksheet Kristen filled out as she interviewed Ms. O'Brien and Ms. Andrews.

SF_DOCS\302141 1 [W97]                                          08/31/01 000011-1788

547.

D.    Possessions

Both women reported that luggage and most other possessions of a detained minor were stored at the district offices when the minor is transferred to Tulare. The minor is supposed to be reunited with their possessions at the airport on the way out of the United States. Things left in the United States are "timely sent" to the minors' home country.

E.    *Flores* Compliance

No formal mechanism exists for reporting of *Flores* compliance. Both Ms. Andrews and Ms. O'Brien say they are aware of *Flores*, receive training about it, and comply on a daily basis.

F.    Visiting the Facility

Both Ms. Andrews and Ms. O'Brien say they try to visit the Facility once a week, and are in constant communication with each other so that if one cannot make the trip, the other will "cover" for her.

## III. INTERVIEWS WITH MINORS DETAINED AT THE FACILITY

There were eleven INS minors in custody at the Facility on the date of our inspection visit. All eleven were from the Fujian region of China. Their ages ranged from fifteen to eighteen. Cheng-Ling Chen and Ben Hughes interviewed six of the minors detained at the facility. Four children were interviewed by Ben and Cheng-Ling alone, and two were interviewed with the participation of Carlos Holguin of the Center for Human Rights and Constitutional Law ("CHRCL"). All six children were asked about conditions at the Facility and their treatment there, and two children were interviewed in depth about the circumstances which led to their detention at the Facility.

A.    Facility Conditions

The minors reported that the Facility was generally clean, including their individual cells. They did complain that their food was sometimes served on dirty plates, however. In addition they expressed displeasure that the window in the door of their cell cannot be covered up when they are using the toilet in their cell.

There are no windows in the Facility, which some minors found depressing. They also noted that the small enclosed recreation area is too small, but said they enjoyed playing badminton, ping pong, and basketball. They said they spend about spend two hours a day in recreational activities.

B.    Arrival Procedures

When they first arrived at the Facility, the minors were strip-searched by a staff member of the same gender. They were given clothing (jeans and a plain, beige-colored T-shirt), and their possessions were taken away for storage. They are allowed to keep a few items (pencils, books) in their cells.

6

548.

SCANNED

C.   Educational Services

The minors attend classes together for at least 240 minutes a day.  They said they generally enjoy the classes and like their teacher.  They do not seem to like their substitute teacher, who uses "time-out" (where they are locked in their cells) as punishment too often.  The classes are taught in English, but they help each other understand if one student is having difficulty.

D.   Telephone Access, Visitation and Correspondence

The children are allowed access to the telephone only three days per week, and for five or six minutes at a time.  To make long distance calls, they must use their own calling cards, which are sent to them by relatives.  They minors cannot receive outside calls except from their lawyers.

None of the minors we interviewed had ever been visited by family members or by their attorneys.  This may be due to the remote location of the facility.  Several minors who had been detained in other areas of the country such as New York or Miami had relatives who lived in those areas, but their relatives were unable to visit them after they were moved to the Facility.  The only visits to the Facility reported by the minors were by local religious clergy.

The minors may receive mail, but the contents are searched.  For some reason, the stamps are also removed.

E.   Discipline

As punishment for violation of the many rules and regulations of the Facility, the minors are locked in their individual cells for the remainder of the day.  They are not released from this solitary confinement until the following morning.  During this time, they must eat meals alone in their room, and all materials including bedding are removed from the room.  They are not allowed to come out of their cells for classes or recreation.

On one occasion, the entire group was disciplined by solitary confinement because they were all tired of participating in the physical education program.  Usually, however, the punishment is for failing to do assigned chores or homework.  None of the minors reported receiving or witnessing corporal punishment while at the Facility.

F.   Medical Care and Counseling

Very few of the minors we interviewed had sought medical treatment at the Facility.  One reported that she had visited the doctor for a stomach flu, and she complained that the doctor simply gave her aspirin and sent her back to her cell.  She also reported that she was restrained at the hands and ankles during her visit to the doctor.

Although most of the minors were interviewed seemed sad and somewhat bewildered as to why they were being detained in such a high security facility, very few of the minors have received any counseling.  The Facility does not provided regular counseling, and

08/31/01 000011-1788

549.

none of the minors we interviewed had ever been to see a counselor. One mentioned that counseling was provided over the phone.

G.    Food

The minors get three meals a day plus a snack in the afternoon. In general the minors were not enthusiastic about the food, and two of them complained that there was not enough to eat. Others said that the Facility provided sufficient food and that the diet was balanced.

H.    Minors Interviewed

All minors interviewed were from the Fujian province of China. They all spoke Mandarin Chinese and a limited amount of English.

**Yiou Jin Rong** is a fifteen year old girl who has been at the Facility for five months. She was first arrested by the INS in Honolulu, where she spent two days in INS custody before being transferred to the Facility. Her lawyer is in Los Angeles, and she has met with him once or twice. Her brother is also at the Facility.

**Jin Mei Huang** is a seventeen year old boy. He was first detained in Georgia, where he spent eight days in jail after he was first caught. His lawyer is in Pennsylvania.

**Wendy Zheng** is a seventeen year old girl who has been at the Facility for almost two months. She was detained in Miami for nine months and Chicago for three months before coming to the Facility. Her lawyer is in Miami. She spent two days at the INS when she was first detained.

**Lisa Yu** is a sixteen year old girl who has been at the Facility for three months. She was detained in Pennsylvania before coming to Tulare. When she was first detained, she spent one night at the INS. Her lawyer is in Utah. She has never met her lawyer.

The following two girls were interviewed in depth with the participation of CHRCL lawyer Carlos Holguin:

**Xiang Chen** is seventeen. Her birthday is March 26, 1984, and her Alien number is 77920848. She arrived at the Facility on July 27, 2001, only a few days before our visit. She was detained for eight months in Miami, and then lived for six months in New York with an aunt. While living in New York, she reported regularly to the INS, but was detained and sent to the Facility on her most recent visit, apparently because she received her final order of deportation. She was allowed to call her aunt prior to being sent across the country to the Facility, but has no idea why she is being detained. She does not know the status of her asylum appeal, whether she will be returned to China, or how long she will be detained at the Facility.

**Zhaoxia Lin** is sixteen. Her birthday is March 20, 1985, and her Alien number is 77297916. She has been at the Facility for five months. She was held for eleven days at the Los Padrinos detention facility in Los Angeles after her initial arrest. Prior to coming to Tulare, she spent one year at Hosanna Homes, a low security INS facility in the San Francisco area.

8

08/31/01 000011-1788

550.

Although she never attempted to escape and never had any disciplinary problems at Hosanna, she was transferred to the high security Facility when she received her final order of deportation five months ago and has been waiting to be deported since that time.

## IV.  VIOLATIONS OF THE *FLORES* SETTLEMENT

A.  Requirement That Minors Be Detained in the Least Restrictive Setting

Paragraph 11 of the *Flores* Settlement (the "Settlement") states that "the INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others." Ms. Andrews justified the detention of these minors by stating that, as a matter of policy, all minors with final orders of deportation were considered flight risks and sent to the Facility until deportation.

Under Paragraph 21 of the Settlement, "a minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility... whenever the District Director or Chief Patrol Agent determines that the minor... is an escape-risk." Escape risk is defined in Paragraph 22 of the Settlement as "a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether: (a) the minor is currently under a final order of deportation or exclusion; (b) the minor's immigration history includes: (i) a prior breach of a bond; (ii) a failure to appear before the INS or the immigration court; (iii) evidence that the minor is indebted to organized smugglers for his transport; or (iv) a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion; or (c) the minor has previously absconded or attempted to abscond from INS custody."

Therefore, while a final order of deportation may be one factor to consider in determining whether a minor is a flight risk, it should not trigger an automatic transfer to a high security detention center such as the Facility in the absence of other factors. None of the children we interviewed had ever had any disciplinary problems while in the custody on the INS. Several had been detained in low or medium security facilities such as Hosanna Homes in the San Francisco area, and none had ever attempted to escape. One girl had lived with family members and reported regularly to the INS prior to being sent to the Facility. In short, there is no indication that any of the minors we interviewed needed to be detained in this high security, prison-like Facility in order to ensure their appearance before the INS or the immigration court.

The INS may also detain a minor in a high security facility under Paragraph 21 of the Settlement if the INS determines that the minor "must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees." However, Ms. Andrews has repeatedly noted that the low security Hosanna Homes facility is protected from smugglers because of its undisclosed location and the many precautions taken by the INS to ensure the safety of the minors detained there. To our knowledge, there have been no incidents involving threats to children detained at Hosanna Homes. Furthermore, both Ms. O'Brien and Ms.

9

551.

Andrews explicitly stated that the children detained at the Facility were transferred to the Facility because they had received their final deportation orders, not because of threats to their safety.

Paragraph 23 of the Settlement provides that "the INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program." Clearly, other less restrictive alternatives exist for these children. Since all determinations to place a minor in a secure facility are reviewed and approved by the regional juvenile coordinator, this decision is largely at the discretion of Ms. Andrews and Ms. O'Brien.

B.    Failure to Release Children To Family Members or Less Restrictive Setting

Under Paragraph 14 of the Settlement, "where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to: (a) a parent; (b) a legal guardian; (c) an adult relative (brother, sister, aunt, uncle, or grandparent); (d) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship; (e) a licensed program willing to accept legal custody; or (f) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."

Under Paragraph 18, "upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody."

Both Ms. Andrews and Ms. O'Brien confirm that the minors detained at the Facility on the ground that they have received final orders of deportation will be held at the Facility until they are deported, even if the process takes several months (as it usually does for deported Chinese minors). They are making no efforts to reunite these children with family members in the United States or to place them in less restrictive settings.

C.    Problems at the Facility

Given that these minors should not be detained at the Facility under the Settlement, there are other problems with the facility itself which should be noted.

1.    Lack of Privacy

The doors to the rooms have a long, slanted window designed for the observation of juvenile detention center inmates. This window cannot be closed when the children use the toilet in their rooms. The communal showers are also in plain view of staff and other children, although the doors do seem to block an observer's view of the torso. As a matter of Facility

10

08/31/01  000011-1788

552.

policy, staff are required to observe detainees every fifteen minutes. This intrusive policy may be appropriate for minors who have exhibited dangerous or self-destructive behavior, but it does not seem necessary for INS detainees with no demonstrated behavioral or psychological problems.

### 2. Access to Telephone

According to the children we interviewed, the Facility allows minors access to the telephones only three days per week and for five minutes per child. They must call collect for domestic calls and use calling cards for international calls.

### 3. Use of Shackles

Children are transported to their medical appointments in ankle shackles and handcuffs which attach to a waist belt. This is unnecessary for children who have not demonstrated any violent or disruptive behavior.

### 4. Strict Disciplinary Regime

Children must line up between activities with their hands behind their backs and walk single file between the classroom, the living area and their rooms. They are subjected to the same strict rules of discipline as the adjudicated juvenile delinquents housed at the Facility.

08/31/01  000011-1788

553.

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Charles Song
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693; Fax: (213) 386-9484

LATHAM & WATKINS
Steven Schulman
555 Eleventh St., NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2184

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere
417 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*Attorneys for plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, et al., | ) | Case No. CV 85-4544-RJK(Px) |
| Plaintiffs, | ) ) | STIPULATION EXTENDING SETTLEMENT AGREEMENT AND FOR |
| -vs- | ) ) | OTHER PURPOSES; PROPOSED ORDER THEREON. |
| JANET RENO, Attorney General of the United States, et al., | ) ) ) | |
| Defendants. | ) ) | |

/ / /

554.

SCANNED

IT IS HEREBY STIPULATED by and between the parties as follows:

*Option A:*

1. Paragraph 40 of the Stipulation filed herein on January 17, 1997, is modified to read as follows:

"All terms of this Agreement shall terminate the earlier of ~~five~~ *six* years from the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with the Agreement, except the following: the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors."

*Option B:*

1. Paragraph 40 of the Stipulation filed herein on January 17, 1997, is modified to read as follows:

"All terms of this Agreement shall terminate ~~the earlier of five six years from the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with the Agreement,~~ *upon defendants' completing the following three matters:*

   *a. Publication of final regulationsimplementing this Agreement; and*

   *b. Review, revision and execution of intergovernmental agreements incorporating the terms and conditions of this Agreement, or final regulations codifying this Agreement, for the housing,care, and detention of unaccompanied minors; and*

   *c. Providing plaintiffs' counsel 90 days' advance notice that the matters set out in subparagraphs a and b of this paragraph l:.ve been completed.*

~~except the following:~~ *Notwithstanding the foregoing,* the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors."

2. For a period of six months from the date this Stipulation is filed, plaintiffs shall not

555.

1    initiate legal proceedings to compel publication of final regulations implementing this

2    Agreement  or to extend this Stipulation involuntarily. Plaintiffs agree to work with

3    defendants cooperatively toward resolving disputes regarding compliance with the

4    Settlement. However, nothing herein shall require plaintiffs to forebear legal action to

5    compel compliance with this Agreement where plaintiff class members are suffering

6    irreparable injury.

7    Dated: October _____, 2001.           CENTER FOR HUMAN RIGHTS &
                                                CONSTITUTIONAL LAW
8                                               Carlos Holguín
                                                Peter A. Schey
9
                                                LATHAM & WATKINS
10                                              Steven Schulman

11                                              YOUTH LAW CENTER
                                                Alice Bussiere
12

13

14                                              _____

15                                              Carlos Holguín, *for plaintiffs*.

16

17                                              ARTHUR STRATHERN
                                                Office of the General Counsel
18                                              U.S. Immigration & Naturalization Service

19

20                                              _____

21   / / /                                      Arthur Strathern, *for defendants*.

22

23

24

25

26

27

28

-3-

556.

# EXHIBIT 84

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone: (213) 388-8693 Facsimile: (213) 386-9484

November 5, 2001

Mark Matese
Director of Juvenile Affairs
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

*Via telecopier and private mail courier*

Re: *Flores v. Reno*

Dear Mr. Matese:

We are in receipt of your letter of November 2, 2001, agreeing to extend the *Flores* settlement until implementing regulations are published. Enclosed for your review and signature is a stipulation memorializing that agreement.

We request that the stipulation provide that the settlement be extended for a period of 90 days following the publication of final regulations. This would allow plaintiffs a reasonable period to review the final regulations, bring deficiencies, if any, to defendants' attention, and seek judicial resolution of any unresolved disputes

You have stated that the Service intends to publish proposed regulations identical to those published over three years ago. Therefore, were the settlement to expire immediately upon publication of final regulations, it would be too late for plaintiffs to enforce settlement provisions going to the content, and not merely the publication, of implementing regulations in the absence of the proposed 90 day extension.

We commend the Service on its willingness to extend the *Flores* agreement and trust that the additional 90 days will prove acceptable. Again, time is very much of the essence, and we accordingly want to finalize this agreement within the next 7 days

If the enclosed stipulation is acceptable, please have it executed by counsel and return to this office. We will arrange for filing and forward you a conformed copy.

Thank you,

Carlos Holguin
One of the attorneys for plaintiffs

ccs:    Steven Schulman, Latham & Watkins
        Andrew Morton, Latham & Watkins
        Alice Bussiere, Youth Law Center

enclosure

557.

1    CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
     Carlos Holguín
2    Peter A. Schey
     Charles Song
3    256 South Occidental Boulevard
     Los Angeles, CA  90057
4    Telephone: (213) 388-8693; Fax: (213) 386-9484

5    LATHAM & WATKINS
     Steven Schulman
6    555 Eleventh St., NW, Suite 1000
     Washington, DC 20004
7    Telephone: (202) 637-2184

8
     *Of counsel:*
9
     YOUTH LAW CENTER
10   Alice Bussiere
     417 Montgomery Street, Suite 900
11   San Francisco, CA 94104
     Telephone: (415) 543-3379 x 3903
12
13   *Attorneys for plaintiffs*

14

15                    UNITED STATES DISTRICT COURT

16                   CENTRAL DISTRICT OF CALIFORNIA

17   JENNY LISETTE FLORES, et al.,          )    Case No. CV 85-4544-RJK(Px)
                                            )
18        Plaintiffs,                       )    STIPULATION EXTENDING
                                            )    SETTLEMENT AGREEMENT AND FOR
19   -vs-                                   )    OTHER PURPOSES; AND ORDER
                                            )    THEREON.
20   JANET RENO, Attorney General           )
     of the United States, et al.,          )
21                                          )
          Defendants.                       )
22                                          )
     _____)

23
     / / /
24

25

26

27

28

558.

IT IS HEREBY STIPULATED by and between the parties as follows:

1. Paragraph 40 of the Stipulation filed herein on January 17, 1997, is modified to read as follows:

"All terms of this Agreement shall terminate ~~the earlier of five years from the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with the Agreement,~~ *90 days following publication of final regulations implementing this Agreement.*

~~except the following:~~ *Notwithstanding the foregoing,* the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors."

2. For a period of six months from the date this Stipulation is filed, plaintiffs shall not initiate legal proceedings to compel publication of final regulations implementing this Agreement. Plaintiffs agree to work with defendants cooperatively toward resolving disputes regarding compliance with the Settlement. However, nothing herein shall require plaintiffs to forebear legal action to compel compliance with this Agreement where plaintiff class members are suffering irreparable injury.

Dated: November __5__, 2001.

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey

LATHAM & WATKINS
Steven Schulman

YOUTH LAW CENTER
Alice Bussiere

Carlos Holguín, *for plaintiffs*.

Dated: November __5__, 2001.

Arthur Strathern

- 2 -

559.

1

2

3

4

5   IT IS SO ORDERED.

6   Dated: November _____, 2001.

7

8

9   / / /

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Office of the General Counsel
U.S. Immigration & Naturalization Service

_____

Arthur Strathern, *for defendants.*


_____

UNITED STATES DISTRICT JUDGE

560.

# EXHIBIT 85

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone: (213) 388-8693 Facsimile: (213) 386-9484

January 4, 2002

Arthur Strathern
Office of the General Counsel
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

Mark Matese
Director of Juvenile Affairs
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

*Via telecopier and first class mail*

      Re: *Flores v. Reno*

Dear Arthur and Mark:

I hope you both had a pleasant holiday season.

During Mark's recent visit to Los Angeles, we tentatively agreed to meet in Washington, D.C., sometime during the week of January 21, 2002, to begin working out the problems concerning compliance with the *Flores* settlement. I would like to schedule the meeting for either Tuesday, January 22, or Wednesday, January 23.

Please advise whether either or both those dates would be workable so we can begin making travel arrangements.

Best wishes,

Carlos Holguin
General Counsel

ccs:    Steven Schulman, Latham & Watkins
       Alice Bussiere, Youth Law Center

561.

# Center for Human Rights & Constitutional Law

*256 S. Occidental Blvd.*
*Los Angeles, CA 90057*
213/388-8693
fax: 213/386-9484

## FAX COVER SHEET

Confidential Advisory: Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in the facisimile message may be attorney privileged and confidential information intended for the use of the individual or entity named above. Therefore, if the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by collect telephone, and return the original message to us at the above address via the U.S. Postal Service at our expense. Thank you.

| | | | |
|---|---|---|---|
| To: | Mark   Matese | From: | Carlos Holguin |
| | Director of Juvenile Affairs | Date: | 1/4/2002 |
| | INS Office of Field Operations, Juvenile Affairs Division | Time: | 5:16:38 PM |
| Fax: | 202-514-5585 | | |

No. of pages (including this cover sheet):

2

Fax message:

562.

TRANSMISSION VERIFICATION REPORT

```
                                    TIME : 01/04/2002 17:29
                                    NAME : CHRCL
                                    FAX  : 2133869484
                                    TEL  : 2133888693
```

| | |
|---|---|
| DATE,TIME | 01/04  17:28 |
| FAX NO./NAME | 12025145585-7005 |
| DURATION | 00:00:32 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

563.

# Center for Human Rights & Constitutional Law

256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693
fax: 213/386-9484

## FAX COVER SHEET

Confidential Advisory: Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in the facisimile message may be attorney privileged and confidential information intended for the use of the individual or entity named above. Therefore, if the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by collect telephone, and return the original message to us at the above address via the U.S. Postal Service at our expense. Thank you.

To:   Arthur  Strathern

Office of the General  Counsel,
U.S. I.N.S.

Fax:   (202) 514-0455

From:   Carlos Holguin

Date:   1/4/2002

Time:   5:16:59 PM

No. of pages (including this cover sheet):

| 2 |

Fax message:

564.

TRANSMISSION VERIFICATION REPORT

```
                                          TIME : 01/04/2002 17:25
                                          NAME : CHRCL
                                          FAX  : 2133869484
                                          TEL  : 2133888693
```

```
DATE,TIME              01/04  17:24
FAX NO./NAME           12025140455-7005
DURATION               00:00:33
PAGE(S)                02
RESULT                 OK
MODE                   STANDARD
                       ECM
```

565.

# EXHIBIT 86

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone: (213) 388-8693 Facsimile.  (213) 386-9484

February 8, 2002

Mark Matese
Director of Juvenile Affairs
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

Arthur Strathern
Office of the General Counsel
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

*Via telecopier and first class mail*

Re: *Flores v. Reno*

Dear Messrs. Matese and Stathern:

We are in receipt of your e-mail of February 4, 2001, advising us that scheduling conflicts will preclude your meeting with plaintiffs' representatives on March 1, 2001, as defendants had agreed to do during our telephone conversation of February 1, 2001.

As you are aware, on December 7, 2001, the parties stipulated "to confer regularly no less frequently than once monthly for the purpose of discussing the implementation of and compliance with the settlement agreement." By now, the parties should have conferred at least twice, yet we have spoken telephonically only once. We accordingly propose to re-schedule our meeting for March 11, 22, or 27, 2002. Plaintiffs' counsel are prepared to meet at your offices in Washington, DC, on any of these dates. If none of these dates is open, please provide two or three alternative dates during March when defendants will be available.

Your e-mail further states, "If you have additional critical findings to bring to our attention, please submit them in writing with specific details of any incidents & we will take the necessary actions as appropriate." In accordance with your suggestion, please be advised that on February 15, 2001, plaintiffs' counsel will visit San Diego Juvenile Hall to conduct interviews of class members. Plaintiffs' counsel will interview class members being held at the Northern Oregon Correction Facility JDF on March 8, 2001. We trust that in accordance with prior assurances you have given us, plaintiffs' counsel will be afforded access to INS detainees—our clients—being held in those facilities in full compliance with the *Flores* settlement.

566.

M. Matese, A. Strathern
February 8, 2002
Page 2

This will also serve to confirm the following representations defendants' made during our telephone conversation of February 1, 2001.

1) **Automatic placement of minors in secure facilities upon entry of a final order of removal.**

In response to plaintiffs' letter of September 10, 2001, defendants agreed that a final order of removal should not automatically result in secure confinement, rather whether a minor is subject to an administratively final order of removal should be treated as one of several relevant factors to be weighed in determining on a case-by-case basis whether an individual minor should be placed in a secure facility as a flight risk.

As we have previously pointed out, the INS juvenile coordinators at both the San Francisco and Los Angeles District Offices stated unequivocally before numerous individuals that policy in both districts is to place all minors with "final" orders of removal in secure facilities. The rationale for this policy, we were told, is that all such minors are *automatically* considered escape-risks and therefore subject to secure confinement pursuant to ¶¶ 21(D) and 22 of the settlement.

As we understand it, defendants have agreed to distribute a field guidance memorandum advising field personnel that they are not to pursue a blanket policy of secure confinement for minors subject to final orders of removal.

Pursuant to ¶ 29 of the settlement, plaintiffs are to be furnished a copy of "each INS policy or instruction issued to INS employees regarding the implementation of this Agreement." We accordingly request a copy of the field guidance memorandum as soon as it becomes available. In order to minimize future disputes over this question, we suggest that defendants furnish plaintiffs' with an advance draft of the field guidance memorandum and that, if necessary, the parties confer regarding its contents prior to distribution to INS field offices.

2) **Beds available for INS placements in the event of an emergency or influx.**

In our correspondence of September 10, 2001, plaintiffs also requested an updated listing of non-secure placements available for INS detainees in the event of an emergency or influx. Defendants stated that the INS now has enough beds in non-secure facilities sufficient for a population substantially larger than contemplated in the settlement and that juveniles should not be placed in secure facilities unless they meet the criteria under paragraph 21 of the settlement agreement.

The following issues remain outstanding, and we ask you to set forth the INS's position with respect thereto in writing:

567.

M. Matese, A. Strathern
February 8, 2002
Page 3

1)   **Commingling non-delinquent INS detainees with delinquents in secure facilities.**

As plaintiffs pointed out in our letter of October 19, 2001, our evidence shows that at least two secure facilities—Martin Hall, near Spokane, Washington, and San Diego Juvenile Hall—lack separate accommodations for INS detainees. In effect, *all* INS detainees, delinquent or not, have regular daily contact with delinquents when housed in these facilities.

During our telephone conference of February 1, 2001, defendants suggested (i) that all INS detainees placed in these facilities may themselves be delinquent; (ii) that, in any event, the *Flores* settlement would not preclude commingling non-delinquent INS detainees with delinquents so long as the INS is properly being held in a secure facility; and (iii) that the INS would in any event find it difficult or impossible to maintain sight and sound separation between non-delinquent INS detainees and the general population of delinquents in certain secure facilities.

With respect to defendants' first point, plaintiffs' evidence shows that non-delinquent INS detainees have been commingled with juvenile delinquents in both Martin Hall and San Diego Juvenile Hall. The following two individuals are examples of this practice:

| Name | File No. | D.O.B. | Facility | In facility |
|------|----------|--------|----------|-------------|
| Jin Rong Yiou | 77 052 527 | 10/5/85 | Martin Hall | 10/28/99 |
| Xue Zhung Zhou | 77 052 528 | 12/11/83 | Martin Hall | 10/28/99 |

It is clear that Martin Hall and San Diego Juvenile Hall are not the only facilities in which such commingling is bound to occur regardless of whether the individual INS detainee is delinquent or not. According to the recent report of the United States Department of Justice, Office of the Inspector General:

> Our telephone survey of the 57 secure detention facilities that housed INS juveniles in FY 2000 revealed that 34 of the facilities cannot guarantee segregation of non-delinquent INS juveniles from INS delinquent juveniles or from the county and state non-INS juvenile delinquent population. At three of the secure detention facilities we visited, the mingling of the two populations occurred.

USDOJ, OIG. "Unaccompanied Juveniles in INS Custody, I-2001-009." September 28, 2001 (hereafter OIG Report).

The OIG Report further identifies a number of specific facilities in which commingling is prevalent:

> The majority of the 484 instances involving potential placement of non-delinquents with delinquents took place at three facilities: Liberty County

568.

M. Matese, A. Strathern
February 8, 2002
Page 4

SCANNED

> Juvenile Detention Center in the Houston District in Texas had 114 instances (23.6 percent); Gila County Detention Center in the Phoenix District in Arizona had 95 instances (19.6 percent); and Martin Hall Juvenile Detention Center in the Seattle District in Washington had 86 (17.8 percent).

Plaintiffs must also disagree with defendants' assessment that the *Flores* settlement permits commingling of non-delinquent INS detainees with delinquents in secure facilities.

To begin, ¶ 12.A of the agreement specifically states that "minors shall be separated from delinquent offenders." Nowhere else in the agreement, including the provisions of ¶ 21, is there a provision that would abrogate this provision, except to the extent that the minor is a "delinquent offender." Moreover, this reading of the settlement is in accord with prevailing juvenile justice standards, including the Juvenile Justice and Delinquency Prevention Act, 42 U.S.C. § 5633(a)(12)(A) (2001), which clearly forbid the commingling of non-delinquent and delinquent youth.

In any event, the settlement clearly contemplates that the INS will endeavor to place all detained minors in the least restrictive setting appropriate under the circumstances. Obviously, this provision would require resort to medium-secure facilities before placement in a facility where an INS detainee would find him or herself sharing a cell with a serious juvenile offender. As we discuss below, the INS has clearly made inadequate progress in arranging for a reasonable number of medium-secure beds.

Even apart from the settlement, the INS should agree to discontinue using facilities in which non-delinquent INS detainees have regular daily contact with delinquent youth. Again, the OIG Report is fully consonant with plaintiffs' position:

> We believe the segregation of non-delinquent juveniles from juvenile delinquents should be continued as long as the juveniles are in INS custody in order to ensure their well-being. Local and national advocacy groups cite the failure to segregate non-delinquent and delinquent juveniles as evidence that non-delinquent juveniles are unnecessarily imperiled. Some members of Congress expressed this same concern and have proposed that the INS relinquish custodial responsibility for unaccompanied juveniles.

This sensible observation led the OIG to the following recommendation:

> The INS should include and enforce standards in all contracts with secure detention facilities that require the segregation of non-delinquent INS juveniles from delinquent juveniles. These standards should provide for strict segregation in living quarters and no more than minimal contact in all other common areas. The facilities should be required to immediately

569.

M. Matese, A. Strathern
February 8, 2002
Page 5

SCANNED

notify the INS if they cannot meet this requirement so the INS can take immediate corrective action.

The INS should immediately move to implement the foregoing recommendation; we ask that you advise us in writing as to defendants' position in this regard.

2)    **Shackling and handcuffing during transport.**

As stated in our letter of October 19, 2001, plaintiffs' evidence is that minors are routinely shackled and handcuffed when being transported to or from Martin Hall. Minors were routinely handcuffed when being transported from the Los Angeles District Office to Tulare County Juvenile Hall. We have reviewed the INS's juvenile protocol manual in this regard, and we find that it vests individual INS officers with so much discretion to shackle and handcuff minors as to provide no meaningful curb on the use of unnecessary restraints.

More importantly, it appears that even the standards set out in the protocol are inapplicable to local juvenile authorities who transport INS detainees. According to the OIG,

> Contract guards and secure facilities under contract with the INS or that have signed interagency agreements with the INS, *as a regular course of action*, restrain the INS's unaccompanied non-delinquent juveniles during transport. All four of the secure facilities we visited had written policy that allowed staff to handcuff, and in some cases, shackle *all* juveniles, including the INS's unaccompanied juveniles, during transport. For example, the Gila County Youth Detention Center, a contract detention facility in Arizona, has a standing policy that all juveniles, including INS detainees, will be handcuffed and shackled during transport.

> INS policy explicitly states that although "[n]on criminal aliens may be escorted by certain designated non-INS personnel under contract or interagency agreement with the INS in place of INS Officers...[a]gencies under contract or interagency agreement with the INS that are handling non-criminal juveniles do not have authority to restrain such juveniles. INS personnel will remove restraints prior to surrendering juveniles to such agencies." The National Juvenile Coordinator confirmed this policy, stating facilities should not be using restraints.

> The INS needs to examine the contracts with the secure facilities to determine if non-INS personnel are inappropriately restraining INS juveniles. If so, the INS needs to develop policies and procedures to protect juveniles from excessive restraint.

(Emphasis supplied.)

570.

M. Matese, A. Strathern
February 8, 2002
Page 6

Again, plaintiffs concur with the OIG's conclusions and recommendations. We ask that defendants advise us in writing as to what steps, if any, it intends to take to address the inappropriate restraining of juveniles during transport.

3)     **Medium-secure placements.**

According to the INS's current juvenile program description, *the agency has no medium-secure placements anywhere in the Western or Eastern Regions*. In the Central Region, the INS has six medium-secure facilities available to it, but the program description indicates that beds are available for only ten minors. These numbers are of particular concern to plaintiffs because it appears that the INS may now have *fewer* medium-secure placements than it did in FY 2000.

According to the Inspector General's report:

> While the INS has done a good job in acquiring beds in shelter and secure facilities, there is a shortage of medium secure beds. At present, the INS has only 7 medium-secure facilities (approximately 20 beds contracted on an as-needed basis) and all are located in the Central Region. According to the JAMS database, in FY 2000, only 35 of 1,933 instances of secure detention were in medium-secure facilities.

> *The shortage of medium-secure beds results in juveniles being housed for extended periods of time in more restrictive settings than may be necessary.* For example, a juvenile who receives an order of removal is considered a flight risk and is normally placed in a secure facility. The JAMS database indicates that during FY 2000, of 98 transfers from shelters to secure facilities, 65 were for juveniles who had received a final order and were awaiting removal. The average length of stay for these individuals was 47 days, the median 34 days. While juveniles have occasionally run away from shelters once they receive a final order, placing them in secure detention should not be the only option available.

> *The shortage of medium-secure beds has also led to the use of secure detention facilities for juveniles who present behavior problems.* Shelter facilities often ask the INS to remove juveniles who demonstrate a pattern of disruptive behavior. In the past, the INS had little alternative to placing these juveniles in secure facilities. In some cases this led to inappropriate placement of troubled but non-delinquent juveniles with delinquent juveniles in secure facilities.

(Emphasis added).

The Inspector General recommended that the INS "develop a national plan for assessing its needs for secure, medium secure, and non-secure bed space and acquiring the needed additional beds." Plaintiffs ask that defendants produce such a plan, if one exists, advise when such a plan will be adopted, or explain

571.

M. Matese, A. Strathern
February 8, 2002
Page 7

why the agency will decline to increase the number of medium-secure placements.

4)      **Telephone access in secure facilities.**

During plaintiffs' inspections of several secure detention facilities, it became apparent that minors' access to telephones was inadequate. According to the OIG,

> From reviewing facility policy and interviewing facility staff, we learned that juveniles in secure facilities were required to pay for telephone calls with their own funds. If the juveniles lacked funds to pay for telephone calls or the family could not accept collect calls, they could not always make the calls to adult family members and attorneys guaranteed to them under *Flores*.

The OIG accordingly recommended that the INS "revise its policy regarding telephone use by juveniles to ensure juveniles without funds are able to make appropriate telephone calls and juveniles are permitted access to telephones that at least meet the minimum requirements."

Again, plaintiffs contend that defendants are not in compliance with the *Flores* settlement, and that the INS should promptly revise IGSAs for secure facilities in which it houses minors to ensure compliance with standards regarding telephone access. We ask defendants to advise as whether it will undertake such revisions and if not, why not.

5)      **Refusing to release minors unless undocumented parents and relatives surrender for removal.**

Among the most alarming findings of the OIG report is that the INS has resumed its practice of conditioning minors' release on their parents' and relatives' willingness to surrender for removal.

According to the Inspector General's report,

> In November 1999, the INS clarified its juvenile release policy in a letter to the United States Catholic Conference (USCC) and the Lutheran Immigration and Refugee Services (LIRS), specifically requiring the involvement of any parent in the United States in the release of a juvenile. The letter stated the INS's strong belief "that when there is a parent in the United States, he/she should be the sponsor of the child regardless of the parent(s) immigration status." The letter stated that any parent who was unable or unwilling to assume custody of the minor "must present him/herself before an INS Officer. . . and execute an affidavit if he/she decides that the minor should be placed with a blood relative or responsible adult."

572.

M. Matese, A. Strathern
February 8, 2002
Page 7

why the agency will decline to increase the number of medium-secure placements.

**4)** **Telephone access in secure facilities.**

During plaintiffs' inspections of several secure detention facilities, it became apparent that minors' access to telephones was inadequate. According to the OIG,

> From reviewing facility policy and interviewing facility staff, we learned that juveniles in secure facilities were required to pay for telephone calls with their own funds. If the juveniles lacked funds to pay for telephone calls or the family could not accept collect calls, they could not always make the calls to adult family members and attorneys guaranteed to them under *Flores*.

The OIG accordingly recommended that the INS "revise its policy regarding telephone use by juveniles to ensure juveniles without funds are able to make appropriate telephone calls and juveniles are permitted access to telephones that at least meet the minimum requirements."

Again, plaintiffs contend that defendants are not in compliance with the *Flores* settlement, and that the INS should promptly revise IGSAs for secure facilities in which it houses minors to ensure compliance with standards regarding telephone access. We ask defendants to advise as whether it will undertake such revisions and if not, why not.

**5)** **Refusing to release minors unless undocumented parents and relatives surrender for removal.**

Among the most alarming findings of the OIG report is that the INS has resumed its practice of conditioning minors' release on their parents' and relatives' willingness to surrender for removal.

According to the Inspector General's report,

> In November 1999, the INS clarified its juvenile release policy in a letter to the United States Catholic Conference (USCC) and the Lutheran Immigration and Refugee Services (LIRS), specifically requiring the involvement of any parent in the United States in the release of a juvenile. The letter stated the INS's strong belief "that when there is a parent in the United States, he/she should be the sponsor of the child regardless of the parent(s) immigration status." The letter stated that any parent who was unable or unwilling to assume custody of the minor "must present him/herself before an INS Officer. . . and execute an affidavit if he/she decides that the minor should be placed with a blood relative or responsible adult."

573.

M. Matese, A. Strathern
February 8, 2002
Page 8

SCANNED

The National Juvenile Coordinator confirmed it is INS policy not to release a juvenile to anyone other than a parent, if one was known to the INS. *He said the policy has been communicated to the field and is clearly understood*. However, it has not been formally incorporated into the Juvenile Protocol Manual. The requirement was based on the belief that parents are primarily responsible for the care and welfare of minors.

The November 1999 letter to the USCC included an additional requirement affecting release. The letter stated that according to INS policy, *an undocumented parent, or any other undocumented sponsor, must appear before an INS officer and be served a Notice To Appear (NTA), before the juvenile could be released*. The NTA initiated immigration proceedings for the sponsor. The requirement is based on the INS's belief that sponsors who are in proceedings themselves are more likely to ensure the juveniles attended proceedings when required. INS officials stated that having the person come forward and present themselves is the best way to make sure the person is not an impostor and to positively identify the individual.

Under the policies of the November 1999 letter, *if an undocumented parent refuses to come forward, a juvenile remains in custody*. This occurs even if another close relative, in the United States legally, is willing to accept custody. Juvenile coordinators cited cases in which days, and on occasion weeks, were added to the time juveniles spent in detention before an undocumented parent agreed to come to an INS office.

(Emphasis supplied.)

The OIG recommended that the INS "allow district directors discretion in releasing juveniles to a responsible sponsor if a parent is unwilling to come forward and the INS should provide appropriate guidance to control discretionary release." Plaintiffs believe that recommendation a fairly accurate statement of the what the *Flores* settlement requires in any event.

The INS's failure to produce this letter and any related field guidance to plaintiffs is in violation of ¶ 29 of the settlement, and we ask that defendants immediately cure this by furnishing plaintiffs' counsel with a copy of this and all other documents bearing on the implementation of the *Flores* settlement.

We also ask defendants to state whether the OIG's above-quoted characterization of current INS policy and practice is accurate. If it is not, we ask you to specify in what particulars it is inaccurate.

574.

M. Matese, A. Strathern
February 8, 2002
Page 9

In the event defendants are adhering to a policy of conditioning minors' release on their parents' surrendering for deportation, we ask you to state whether defendants believe this policy accords with the *Flores* settlement.

Sincerely,

Carlos Holguin
General Counsel

ccs:    Steve Schulman, Latham & Watkins
Alice Bussiere, Youth Law Center
Andrew Morton, Latham & Watkins
Wendy Young, Women's Commission

575.

TRANSMISSION VERIFICATION REPORT

TIME : 02/08/2002 15:17
NAME : CHRCL
FAX  : 2133869484
TEL  : 2133888693

| | |
|---|---|
| DATE,TIME | 02/08  15:14 |
| FAX NO./NAME | 12025140455-6505 |
| DURATION | 00:03:28 |
| PAGE(S) | 10 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

576.

# Center for Human Rights & Constitutional Law

*256 S. Occidental Blvd.*
*Los Angeles, CA 90057*
213/388-8693
fax: 213/386-9484

## FAX COVER SHEET

Confidential Advisory: Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in the facisimile message may be attorney privileged and confidential information intended for the use of the individual or entity named above. Therefore, if the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by collect telephone, and return the original message to us at the above address via the U.S. Postal Service at our expense. Thank you.

To: Arthur  Strathern

Office of the General  Counsel,
U.S.  I.N.S.

Fax: (202) 514-0455

From: Peter Schey

Date: 2/8/2002

Time: 3:05:50 PM

No. of pages (including this cover sheet):

| 10 |

Fax message:

577.

# Center for Human Rights & Constitutional Law

*256 S. Occidental Blvd.*
*Los Angeles, CA 90057*
*213/388-8693*
*fax: 213/386-9484*

## FAX COVER SHEET

Confidential Advisory: Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in the facsimile message may be attorney privileged and confidential information intended for the use of the individual or entity named above.  Therefore, if the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by collect telephone, and return the original message to us at the above address via the U.S. Postal Service at our expense.  Thank you.

To:   Mark  Matese

      Director of Juvenile Affairs

      INS Office of Field
      Operations, Juvenile Affairs
      Division

Fax:  202  514-5585

From:  Peter Schey

Date:  2/8/2002

Time:  3:05:36 PM

No. of pages (including this cover sheet):

| 10 |
|----|

Fax message:

578.

# EXHIBIT 87

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone (213) 388-8693 Facsimile (213) 386-9484

February 27, 2002

Arthur Strathern
Office of the General Counsel
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

Mark Matese
Director of Juvenile Affairs
Immigration & Naturalization Service
425 I St., N.W.
Washington, DC 20536

*Via telecopier and first class mail*

    Re: *Flores v. Reno*

Dear Messrs. Strathern and Matese:

On February 15, 2002, plaintiffs' counsel, Peter A. Schey and the undersigned, interviewed three INS detainees at the San Diego Juvenile Hall, a detention facility the INS uses to house some unaccompanied minors. A representative of the Service met us at the facility, and she was both cooperative and informative. We appreciate the Service's cooperation in this regard.

According to the INS representative, two of the juveniles, Ernesto Rivera-Campo, A78 539 929 and Gerardo Carrillo-Olvera, A79 789 056, had been placed in the juvenile hall because they had been arrested for—though they were neither prosecuted for nor convicted of—petty theft and vehicle theft, respectively.

Mr. Carrillo-Olvera has lived in the United States since he was between one and one-and-one-half years old— nearly his entire life. All of his schooling has been in the United States, and he was attending the eighth grade at the time of his arrest by the INS. By all indications, he is likely eligible for cancellation of removal.

Mr. Carrillo-Olvera stated that he had never before been arrested or convicted of any crime or act of delinquency. To the best of his knowledge Mr. Carrillo-Olvera was not arrested for vehicle theft. Rather, some weeks before the INS arrested him his mother at their home, he had been detained for approximately ten minutes by local police, who had then released him unconditionally.

Mr. Rivera-Campo stated that he had been arrested for stealing a pair of shoes. He admitted having been arrested, but stated that he had not been prosecuted for the theft and had never before been arrested for or convicted of any crime or act of delinquency.

*579.*

Arthur Strathern
Mark Matese
February 27, 2002
Page 2

Service personnel advised us that there was room for these two youngsters at in local shelter care facilities, but that district policy is to place *all* minors with *any* prior arrest in secure confinement.

Based upon the information available to plaintiffs, the Service's confining these two juveniles in a secure facility violates ¶ 21 the *Flores* settlement. Paragraph 21 of the settlement provides:

> A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

> A. has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

> i. Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc. This list is not exhaustive.);

> ii. Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc. This list is not exhaustive.);

We accordingly ask you to state whether you believe the Service is in compliance with ¶ 21, and, if you believe the Service is not in compliance, when, where and how the Service will come into compliance. We also ask that you provide us with a copy of any INS written policy pertaining to the detention of minors with arrest records, including but not limited to the district policy cited to us (if in writing).

According to Service personnel, the third boy we interviewed, Jorge Cruz-Avalos, A79 781 153, had been transferred to the San Diego facility as a result of misbehaving at the Southwest Key shelter facility. We have no reason to doubt that this boy did exhibit behavioral problems at the Southwest Key shelter. Indeed, he appeared an obviously troubled youngster.

Mr. Cruz-Avalos stated that he had been abandoned by both his mother and father in El Salvador and had never attended school. He appeared anxious and preoccupied, yet he reported receiving neither counseling nor psychological assistance while at San Diego Juvenile Hall. It appears that the Service's principal response to his psychological problems was to transfer him to a lock-down, where he has since had regularly daily contact with juvenile delinquents.

580.

Arthur Strathern
Mark Matese
February 27, 2002
Page 3

Paragraph 23 of the settlement provides:

> The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program. All determinations to place a minor in a secure facility will be reviewed and approved by the regional juvenile coordinator.

According to the Minimum Standards for Licensed Programs, the Service must provide—

> 3. An individualized needs assessment which shall include: ... (b) essential data relating to the identification and history of the minor and family; (c) identification of the minors' special needs including any specific problem(s) which appear to require immediate intervention; (d) an educational assessment and plan; (e) an assessment of family relationships and interaction with adults, peers and authority figures; ... (g) an assessment of the minor's personal goals, strengths and weaknesses; ...

> 6. At least one (1) individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each minor.

> 7. Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the minors present. It is a time when new minors are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational activities, etc. It is a time for staff and minors to discuss whatever is on their minds and to resolve problems.

> 8. Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly. ...

The Minimum Standards further provide that the Service shall provide that a "comprehensive and realistic individual plan for the care of each minor must be developed in accordance with the minor's needs as determined by the individualized need assessment. Individual plans shall be implemented and closely coordinated through an operative case management system."

The available evidence suggests that the Service's treatment of Mr. Cruz fails to meet the foregoing paragraph and minimum standards. We accordingly ask you to state whether you believe the Service is in compliance with the quoted provisions, and, if you

581.

Arthur Strathern
Mark Matese
February 27, 2002
Page 4

believe the Service is not in compliance, when, where and how the Service will come into compliance.

In summary, plaintiffs' counsel believe that all three of the above described minors were improperly placed in a secure facility. In light of the concerns raised by this visit, we intend to interview minors a number of other lock-down facilities within the next two months. We will forward reports to you following each of these visits.

We reiterate our desire to meet to discuss the foregoing concerns, as well as the other outstanding issues relating to defendants' compliance with the *Flores* settlement.

Thank you,

Carlos Holguin
One of the attorneys for plaintiffs

ccs:   Steven Schulman, Latham & Watkins
       Alice Bussiere, Youth Law Center

582.

**CERTIFICATE OF SERVICE**

I am not a party to this action.  I am employed by the Center for Human Rights and Constitutional Law, 256 S. Occidental Blvd., Los Angeles, CA, 90057.  I am over the age of eighteen.

Copies of the foregoing , **Notice of Filing of Index to Exhibits and Exhibits in Support of Plaintiff's Notice of Motion and Motion to Enforce Settlement of Class Action, Volumes I-IV,** were personally served on counsel for defendants on this date at the following addresses:

Mr. Frank Travieso

Assistant United States Attorney

Federal Building, Suite 7516

300 North Los Angeles Street

Los Angeles, CA  90012

Dated: January 15, 2004

Carlos Holguín, State Bar No. 90754
*Attorney for Plaintiffs*