1  DEBRA W. YANG
   United States Attorney
2  LEON W. WEIDMAN
   Assistant United States Attorney
3  Chief, Civil Division
   FRANK M. TRAVIESO
4  Assistant United States Attorney
   California Bar Number: 180394
5      Room 7516, Federal Building
       300 North Los Angeles Street
6  Los Angeles, California 90012
       Telephone: (213) 894-2448
7      Facsimile: (213) 894-7819
   PETER D. KEISLER
8  Assistant Attorney General
   DAVID J. KLINE
9  Principal Deputy Director
   HUGH G. MULLANE
10 Senior Litigation Counsel
       Office of Immigration Litigation
11     Civil Division, U.S. Department of Justice
       P.O. Box 878, Ben Franklin Station
12     Washington, D.C. 20044
       Telephone: (202) 616-9095
13     Facsimile: (202) 616-4975

14 Attorneys for Defendants

15                  IN THE UNITED STATES DISTRICT COURT

16              FOR THE CENTRAL DISTRICT OF CALIFORNIA

17                           WESTERN DIVISION

18

19 JENNY LISETTE FLORES, et al.,        )
                                        )
20     Plaintiffs,                      )
                                        )
21         vs.                          ) Case No. CV 85-4544-RJK(Px)
                                        )
22 TOM RIDGE, Secretary of the          ) Opposition To Plaintiffs'
   Department of Homeland Security,     ) Motion To Enforce
23 et al.,                              ) Settlement
                                        )
24     Defendants.                      )
   ─────────────────────────────────────)
25
       Defendants, through undersigned counsel, hereby oppose
26
   plaintiffs' motion to enforce settlement and deny plaintiffs'
27

28

**TABLE OF CONTENTS**

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . .   2

BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . .   4

DISCUSSION  . . . . . . . . . . . . . . . . . . . . . . . . .   7

    A.    Plaintiffs' Failed To Meet And Confer As Required
          Under The Settlement Agreement Before Filing Their
          Motion, They Are In Breach Of The Settlement, And So
          The Motion Should Be Dismissed  . . . . . . . . . .   7

    B.    Burden Of Proof . . . . . . . . . . . . . . . . . .   10

    C.    ORR Releases The Vast Majority Of Juvenile Aliens Who
          Come Into Its Custody.  Plaintiffs' Contention That
          INS Did Not Do So Is Wrong And No Longer Relevant In
          Light Of The HSA's Transfer Of Responsibilities To
          ORR . . . . . . . . . . . . . . . . . . . . . . . .   11

    D.    ORR Presently Has Only 18 Juveniles In Secure
          Placements And So Plaintiffs Are Wrong When They
          Allege That Defendants Overuse Secure Confinement .   14

          1.    Defendants Do Not Automatically Place Children
                With Orders Of Removal Into Secure Custody ..   17

          2.    Defendants Do Not Arrest Children Released To
                Family Members When A Final Order Is Entered .   20

          3.    ORR Does Not Place Minors With Petty,
                Non-violent Crimes In Secure Care  . . . . . .   21

          4.    ORR Has Developed Significant Medium Secure
                Placements . . . . . . . . . . . . . . . . . .   22

          5.    ORR Has Not Relied On The "Influx" Exception To
                House Children In Secure Facilities  . . . . .   24

    E.    ORR Provides Minors With All Services Required Under
          The Agreement . . . . . . . . . . . . . . . . . . .   26

          1.    ORR Provides Adequate Education To Unaccompanied
                Children  . . . . . . . . . . . . . . . . . .   28

          2.    ORR Provides Appropriate Mental Health
                Services . . . . . . . . . . . . . . . . . .   29

          3.    ORR Has Sought To Involve Pro Bono Counsel And
                The Facilities Also Have Encouraged Pro Bono
                Counsel To Assist Children In Their Care ...   30

i

4. Children Are Not Denied Telephone Access ...        32

5. ORR Has Endeavored To Increase Access To
   Counsel, Not Interfere With It    .......        33

F. Defendants Take Appropriate Care Of Children And Do
   Not Violate The Settlement Agreement   .......        33

1. Defendants Have A Reasonable Policy Regarding The
   Use Of Restraints That Considers Danger To
   Children, The Public, And Law Enforcement   ..        33

2. Children Are Not Subject To Excessive And
   Arbitrary Solitary Confinement ........        36

3. ORR Does Not Commingle Non-Delinquent Class
   Members With Juvenile Offenders Nor Does It
   Condone Unlawful Strip Searches   .......        39

4. This Court Should Reject Plaintiffs' Other Claims
   Of Breach Where They Present No Evidence In
   Support Of Such Claims ...........        42

G. Defendants Are Unable To Respond To Plaintiffs' Remedy
   Request Because Plaintiffs Have Not Submitted A
   Proposed Order  .................        45

CONCLUSION   ........................        47

# TABLE OF AUTHORITIES

## CASES

Bell v. Wolfish,
       441 U.S. 520 (1979) ...................                41

Carr v. Runyan,
       89 F.3d 327 (7th Cir. 1996) ...............            11

Flores v. INS,
       507 U.S. 292 (1993)  ...............          3, passim

Flores v. Meese,
       681 F. Supp. 665 (C.D. Cal. 1988)  .......    27, 40, 42

Griffin v. Wisconsin,
       483 U.S. 868 (1987) ...................               41

Lewis v. Casey,
       518 U.S. 343 (1996) ...................               42

Lujan v. Defenders of Wildlife,
       504 U.S. 555 (1992) ...................               42

Mellon Bank, N.A. v. Aetna Business Credit, Inc.,
       619 F.2d 1001 (3rd Cir. 1980) ..............          11

O'Lone v. Estate of Shabazz,
       482 U.S. 342 (1987) ...................               41

## STATUTES

8 U.S.C. § 1252(a)(1) ...................               4, 5

6 U.S.C. § 279  ...................                 6, 7, 10

1   allegations that defendants are not in compliance with the

2   settlement agreement in this case.

3   **INTRODUCTION**

4       Plaintiffs and defendants signed a settlement agreement in

5   this case more than seven years ago.  The settlement agreement

6   obligates the parties to meet and confer <u>before</u> commencing any

7   litigation for breach of the agreement.  Plaintiffs' counsel

8   deliberately refused to meet and confer prior to filing this

9   litigation.  Accordingly, plaintiffs' themselves are in breach of

10  the settlement agreement, and so this motion should be denied for

11  that reason alone.

12      Plaintiffs' failure to meet and confer prior to their

13  initiating this action is unfortunate.  It is unfortunate

14  because, had they met and conferred, it is likely that this

15  litigation could have been avoided altogether.  Plaintiffs'

16  principal claim is that the Office of Refugee Resettlement

17  ("ORR") places too many juveniles in secure custody.[1]  They are

18  wrong about this, and their failure to meet and confer with

19  defendants is to blame for their being misinformed.

20      ORR currently has only eighteen juveniles in secure custody,

21  all of whom have committed serious criminal offenses.  Exhibit A

22  (Declaration of Maureen Dunn, Director of the Division of

23  Unaccompanied Children's Services (DUCS) (hereinafter Dunn Decl.)

24  at ¶ 6).  This critical fact negates nearly all of plaintiffs'

25

26  [1]  In enacting the Homeland Security Act, Congress transferred
    custody and care decisions regarding unaccompanied alien minors
27  from the Immigration and Naturalization Service ("INS") to Health
    and Human Service's ("HHS") ORR.

28
                                    2

1   claims.   As is shown below, ORR has reduced the number of

2   children placed in secure care, increased the amount of staff

3   secure placements, and increased shelter care and foster care

4   placements.

5        Aside from plaintiffs' breaching the agreement, it is shown

6   below that ORR is in full compliance with the settlement

7   agreement.   ORR has worked closely and well with the United

8   States Conference of Catholic Bishops ("U.S.C.C.B.") and Lutheran

9   Immigration and Refugee Service ("LIRS"), and with facilities'

10  managers and caregivers.   Julianne Duncan, the Associate Director

11  for Children's Services for the U.S.C.C.B. Migration and Refugee

12  Services, an expert in juvenile care and custody, says that "ORR

13  complies with the [Flores] stipulated settlement agreement . . .

14  [and] I am aware that ORR makes efforts to exceed the

15  requirements of the settlement agreement."   Exhibit B

16  (Declaration of Julianne Duncan (Duncan Decl.) at ¶ 8).

17  Moreover, ORR is committed to promulgating regulations regarding

18  the care of unaccompanied minors that will implement the

19  settlement agreement and end the opportunity for plaintiffs to

20  bring meritless actions like this one.

21       In any event, for all of the reasons set forth below,

22  plaintiffs have failed to establish a material breach of the

23  settlement agreement.   Accordingly, this Court should deny their

24  motion to enforce the settlement agreement.

25

26

27

28
                                    3

**BACKGROUND**

This case is a nearly twenty-year-old lawsuit regarding the care of juvenile aliens who are in the United States illegally. The United States Supreme Court rejected plaintiffs' facial challenge to the former Immigration and Naturalization Service's ("INS") regulation. <u>Flores v. INS</u>, 507 U.S. 292 (1993). The Supreme Court described plaintiffs' three principal attacks on the regulation as follows:

> First, they assert that alien juveniles suspected of being deportable have a "fundamental" right to "freedom from physical restraint," Brief for Respondents 16, and it is therefore a denial of "substantive due process" to detain them, since the Service cannot prove that it is pursuing an important governmental interest in a manner narrowly tailored to minimize the restraint on liberty. Second, respondents argue that the regulation violates "procedural due process," because it does not require the Service to determine, with regard to each individual detained juvenile who lacks an approved custodian, whether his best interests lie in remaining in INS custody or in release to some other "responsible adult." Finally, respondents contend that even if the INS regulation infringes no constitutional rights, it exceeds the Attorney General's authority under 8 U.S.C. § 1252(a)(1).

<u>Id</u>. at 299-300. The Supreme Court rejected all three arguments. Concerning the first argument, the Supreme Court said that "[i]t seems to us, however, that if institutional custody (despite the availability of responsible private custodians) is not unconstitutional in itself, it does not become so simply because it is shown to be less desirable than some other arrangement for the particular child." <u>Id</u>. at 303. The Supreme Court said that plaintiffs' "alleged interest in being released into the custody of strangers" only requires a "'reasonable fit' between governmental purpose (here, protecting the welfare of the

1   juveniles who have come into the Government's custody) and the

2   means chosen to advance that purpose." Id. at 305.  The Supreme

3   Court concluded that the government regulations were

4   constitutional.  Id.

5        The Supreme Court similarly rejected plaintiffs second

6   argument that the INS's regulation violated procedural due

7   process because there is no "hearing" to determine whether the

8   alien would be better off if released to some other responsible

9   adult.  Id. at 308.  The Court said, "[t]his is just the

10  'substantive due process' argument recast in 'procedural due

11  process' terms, and we reject it for the same reasons." Id. at

12  308.  Finally, the Supreme Court also rejected plaintiffs'

13  statutory argument that the "regulation goes beyond the scope of

14  the Attorney General's discretion to continue custody over

15  arrested aliens under 8 U.S.C. § 1252(a)(1)." Id. at 309.

16       On remand from the Supreme Court, the parties entered into a

17  settlement agreement to resolve the case.  The settlement

18  agreement itself is a twenty-two page document with five

19  exhibits.  The preamble in the settlement agreement acknowledges

20  several things.  It acknowledges that the Supreme Court has

21  upheld the constitutionality of the regulations on their face,

22  that the parties had conducted extensive discovery, that the

23  parties previously settled the standards of care in the Western

24  Region, that trial and subsequent appeals would be complex and

25  lengthy, and that settlement was in the parties' best interest.

26  The parties specifically agreed that the stipulated settlement

27

28

agreement "constitutes a full and complete resolution of the issues raised in this action" and agreed to its terms.

No action, before this one, was ever brought by plaintiffs' counsel to allege that the government was in breach of the settlement agreement. Moreover, the settlement agreement set forth the following termination date:

> All terms of this Agreement shall terminate the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors.

¶ 40, Settlement Agreement. On or about December 10, 2001, the parties agreed to extend the settlement agreement and modified ¶ 40 to effectuate the extension:

> All terms of this Agreement shall terminate 45 days following defendants' publication of final regulations implementing this Agreement. Notwithstanding the foregoing, the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors.

¶ 40, Stipulation Extending Settlement Agreement and For Other Purposes; And Order Thereon.

On November 25, 2003, Congress enacted the Homeland Security Act ("HSA"). Section 462 of the HSA, 6 U.S.C. § 279, transferred "to the Director of the Office of Refugee Resettlement of the Department of Health and Human Services functions under the immigration laws of the United States with respect to the care of unaccompanied alien children that were vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and

1    Naturalization Service)."  Accordingly, responsibilities that

2    former INS had regarding the care of unaccompanied alien children

3    are now handled by ORR.  Among its duties are "making placement

4    determinations for all unaccompanied alien children who are in

5    Federal custody by reason of their immigration status" and

6    "implementing the placement determinations."  6 U.S.C. §

7    279(b)(1)(C) and (D).

8                                 **DISCUSSION**

9   **A.**    **Plaintiffs' Failed To Meet And Confer As Required Under The**
        **Settlement Agreement _Before_ Filing Their Motion, They Are In**
10     **Breach Of The Settlement, And So The Motion Should Be**
        **Dismissed**

11

12       Paragraph 37 of the Stipulated Settlement Agreement

    provides:

13

14       This paragraph provides for the enforcement, in this
      District Court, of the provisions of this Agreement
15       except for claims brought under Paragraph 24.  The
      parties shall meet telephonically or in person to
16       discuss a complete or partial repudiation of this
      Agreement or any alleged non-compliance with the terms
17       of the Agreement, prior to bringing any individual or
      class action to enforce this Agreement.  Notice of a
18       claim that a party has violated the terms of this
      Agreement shall be served on plaintiffs addressed to:

19       CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
      Carlos Holguín
20       Peter A. Schey
      256 South Occidental Boulevard
21       Los Angeles, CA  90057

22       NATIONAL CENTER FOR YOUTH LAW
      Alice Bussiere
23       James Morales
      114 Sansome Street, Suite 905
24       San Francisco, CA  94104
      and on Defendants addressed to:

25

26       Michael Johnson
      Assistant United States Attorney
27       300 N. Los Angeles St., Rm. 7516
      Los Angeles, CA  90012

28

1   Allen Hausman
    Office of Immigration Litigation
2   Civil Division
    U.S. Department of Justice
3   P.O. Box 878, Ben Franklin Station
    Washington, DC  20044
4
    The purpose of Paragraph 37 is specifically to identify
5
    allegations of non-compliance with the settlement agreement
6
    before any legal action is commenced in this Court.  Plaintiffs'
7
    counsel first notified defendants of its intention to file this
8
    action on December 10, 2003.  Counsel for defendants sent
9
    plaintiffs' counsel several letters requesting a conference as
10
    required by paragraph 37 of the Flores Agreement.  Exhibit C
11
    (Letter from Hugh G. Mullane to Carlos Holguin, dated December
12
    12, 2003); Exhibit D (Letter from Hugh G. Mullane to Carlos
13
    Holguin, dated December 23, 2003); Exhibit E (Letter from Hugh G.
14
    Mullane to Carlos Holguin, dated January 8, 2004).  Counsel for
15
    plaintiffs ultimately refused to meet before any legal action was
16
    filed in this Court, as required by paragraph 37, and only met
17
    with plaintiffs' counsel after they filed their motion to enforce
18
    the settlement agreement.
19
        Plaintiffs' counsels' refusal to comply with paragraph 37
20
    should not be rewarded by allowing them to pursue their claims at
21
    this time.  The meet-and-confer provision is a critical and
22
    essential provision of the settlement agreement.  Its purpose is
23
    to encourage the parties to work out differences rather than
24
    litigating about them.  At other times, plaintiffs and defendants
25
    have been able to work out differences and avoid litigation.
26
    Exhibit F (Letter from Steve Schulman to Drew Steinberg and John
27
28
                                    8

Pogash) ("Thank you for a productive meeting on December 3. We were encouraged by your response to the concerns we voiced about the Service's compliance with its obligations under the Settlement Agreement in <u>Flores v. Ashcroft</u>. Based upon your representations, including your agreement to respond in writing to the letter sent to Drew and Sue Curda on October 29, 2002, we have decided at this time not to pursue a motion to enforce the Settlement Agreement."). Plaintiffs' counsel cannot comply with the settlement agreement's meet-and-confer provision only when it suits them. Defendants clearly stated that they were not waiving their rights under paragraph 37 of the settlement agreement when they asked to meet with plaintiffs' counsel, Exhibit C (Letter from Hugh G. Mullane to Carlos Holguin, dated December 12, 2003); Exhibit D (Letter from Hugh G. Mullane to Carlos Holguin, dated December 23, 2003); Exhibit E (Letter from Hugh G. Mullane to Carlos Holguin, dated January 8, 2004), but plaintiffs' counsel steadfastly refused to meet and confer <u>before</u> filing this motion.

In a footnote, plaintiffs contend that they have complied with paragraph 37 of the settlement agreement. They are wrong. The extension of the settlement agreement included a provision whereby counsel would meet monthly. Starting in September 2003, plaintiffs' counsel refused to comply with that provision. Counsel for defendants sent counsel for plaintiffs' two email requests to set up a meeting between counsel. Exhibit G (emails from Hugh G. Mullane to Steve Schulman). Regrettably, counsel for plaintiffs violated the provisions of the settlement agreement extension and refused to meet. In a letter dated

1   September 29, 2003, plaintiffs' counsel advised defendants that

2   they would not meet until defendants responded to their letter

3   dated August 1, 2003.  Exhibit H (Letter from Carlos Holguin to

4   Daniel Stark and Hugh Mullane).  Plaintiffs' counsel promised to

5   meet after defendants responded to their August 1, 2003 letter.

6   Id.  ORR responded to plaintiffs' counsel's letter on November

7   10, 2003.  Exhibit I (Letter from Nguyen Van Hanh to Carlos

8   Holguin).  Nevertheless, plaintiffs' counsel continued to refuse

9   to meet with defendants.  Accordingly, plaintiffs' counsel

10  breached the settlement agreement when they unilaterally refused

11  to meet.  They compounded that breach by not meeting as they

12  promised on September 29, 2003.

13      Plaintiffs cannot seriously contend that they have complied

14  with paragraph 37 of the settlement agreement.  On the contrary,

15  they have disregarded it at every turn.  Accordingly, this Court

16  should dismiss plaintiffs' motion to enforce the settlement and

17  instruct them to meaningfully meet and confer with counsel for

18  defendants before filing any litigation in this case.

19  **B.   Burden Of Proof**

20      Even if the Court were to find that plaintiffs complied with

21  the settlement agreement despite their refusal to meet and

22  confer, their claims lack substance, and their motion should be

23  denied.  Plaintiffs allege that defendants are in breach of the

24  settlement agreement.  "A settlement agreement is merely a

25  contract between the parties to the litigation, wherein generally

26  the defendants promise some partial remedy in exchange for the

27  plaintiff's promise to dismiss the case and release the

28

1 defendants from any future liability for their conduct that

2 formed the basis of the dispute." Carr v. Runyan, 89 F.3d 327,

3 331 (7th Cir. 1996).  The burden of proof in a contract action is

4 upon the party alleging breach or default.  See Mellon Bank, N.A.

5 v. Aetna Business Credit, Inc., 619 F.2d 1001 (3rd Cir. 1980).

6 **C.   ORR Releases The Vast Majority Of Juvenile Aliens Who Come**
**Into Its Custody.  Plaintiffs' Contention That INS Did Not**
7 **Do So Is Wrong And No Longer Relevant In Light Of The HSA's**
**Transfer Of Responsibilities To ORR.**

8

9       Plaintiffs assert that "if a parent is unable or unwilling

10 to take custody of a detainee, the Settlement generally requires

11 defendants to locate an alternative custodian and to release the

12 child promptly to that custodian."  Memorandum of Points And

13 Authorities In Support Of Motion To Enforce Settlement Of Class

14 Action ("Pl. Mem.") at 14.  To support their claim that

15 defendants are required to "locate an alternative custodian,"

16 plaintiffs cite paragraph 14 of the settlement agreement which is

17 taken nearly verbatim from the regulation that the Supreme Court

18 upheld.  Paragraph 14, however, does not compel or require

19 defendants to "locate an alternative custodian."  Indeed, the

20 word "locate" is not even mentioned in paragraph 14.  Instead,

21 the reasonable interpretation of paragraph 14 is merely to

22 establish a preferred order for releasing a juvenile:  parent,

23 legal guardian, adult relative, adult individual (designated by

24 the parent), a licensed program, and an adult individual (in the

25 government's discretion).

26       Indeed, paragraph 18 fatally undermines plaintiff's

27 interpretation of paragraph 14 because paragraph 18 also does not

28

1  require defendants "to locate an alternative custodian."
2  Instead, paragraph 18 simply asks "INS, or the licensed program
3  in which the minor is placed" to "make and record the prompt and
4  continuous efforts on its part toward family reunification and
5  the release of the minor pursuant to Paragraph 14 above."
6  Significantly, it does not require INS or the licensed program to
7  locate an alternative custodian.

8      The Supreme Court's decision drives the final nail into
9  plaintiffs' claim's coffin.  Before the Supreme Court plaintiffs
10  argued that they had a due process right to be released to a
11  responsible adult.  <u>Flores</u>, 507 U.S. at 299-300.  "Where a
12  juvenile has no available parent, close relative, or legal
13  guardian, where the government does not intend to punish the
14  child, and where the conditions of governmental custody are
15  decent and humane, such custody surely does not violate the
16  Constitution."  <u>Id</u>. at 1448.  Accordingly, given the fact that
17  the government won the legal issue of whether it had to find a
18  private placement for an alien juvenile, it is illogical to
19  assume that it then conceded that issue in the settlement
20  agreement as plaintiffs allege.

21      Even if ORR had an obligation to "locate an alternative
22  custodian," plaintiffs do not allege that it has failed to do so.
23  Indeed, ORR makes great efforts to release children to family
24  members.  Exhibit A (Dunn Decl. at ¶ 18).  In light of their
25  claims, it is surprising to note that plaintiffs do not cite even
26  one instance where ORR refused or declined to release a child to
27  a parent or adult relative.  Plaintiffs' utter failure to do so

28

1   means that they also have failed to show that defendants have

2   breached the settlement agreement.

3        Perhaps because plaintiffs have no evidence or innuendo that

4   ORR violates the settlement agreement, they focus on what they

5   claim is the past practice of the INS.  Of course, INS's past

6   practice cannot create a material breach of the settlement

7   agreement since ORR, not INS, makes placement decisions.

8        Plaintiffs next allege that "[d]efendants also regularly

9   detain class members for months or years rather than release them

10  to licensed youth shelters or other reputable custodians, a

11  violation of ¶ 14E and F of the Settlement."  Pl. Mem. 17-18.  In

12  support of this allegation plaintiffs produce a single example

13  from 2001 which, to preserve their own case, they describe as

14  "illustrative".  The fact that plaintiffs produce a single

15  example when the settlement agreement has been operative for more

16  than seven years speaks volumes in itself.  Accordingly, the

17  truly "illustrative" part of the example is its singularity.

18  Like the claim before, plaintiffs provide no evidence that ORR is

19  operating in accord with the single example they produce.

20       Turning to the single "example", there is no violation of

21  the Flores agreement in any event.  Plaintiffs state that "Goldy"

22  had a United States citizen relative, who is described as "his

23  brother's first cousin" and "his cousin".  Notably, paragraph 14

24  does not include "cousins" in the list of "adult relatives".  The

25  omission of "cousin" from that list means that they are not

26  considered "adult relatives".  Moreover, plaintiffs concede that

27  INS began a home study but ultimately the decision was made not

28

13

1   to place him with this individual.  The settlement agreement

2   requires, at most, that the INS (now ORR) make an effort to

3   release children and this clearly was done as shown by its doing

4   a home study.

5       Plaintiffs' argument that INS did not advise Goldy about

6   obtaining a "bond redetermination hearing before an immigration

7   judge" is a further impermissible stretch of the settlement

8   agreement.  The INS reasonably construed ¶ 24A to apply when it

9   sets a bond on a child who is released to a family member.

10  Moreover, Goldy was represented by class-counsel, Steve Schulman,

11  Latham & Watkins, and so to contend that Goldy was deprived an

12  immigration hearing he was entitled to is to impugn Mr. Schulman.

13  If class counsel disagreed with the INS' interpretation, they

14  should have advised INS or sought a hearing before the

15  immigration judge.

16  **D.  ORR Presently Has Only 18 Juveniles In Secure Placements And**
17  **    So Plaintiffs Are Wrong When They Allege That Defendants**
    **    Overuse Secure Confinement**

18      Plaintiffs contend that "overwhelming evidence demonstrates

19  that defendants incarcerate class members in juvenile halls and

20  similar locked facilities as a matter of course and not only in

21  the exceptional cases defined in the Settlement."  This is

22  plainly wrong.  At this time ORR has 18 juveniles in secure

23  placements.  See Exhibit A (Dunn Decl. ¶ 6).  ORR has worked hard

24  to develop a variety of housing situations for children in their

25  care.  At this time, ORR has six different living environments

26  for children:

27

28

(1) **Shelter Care**: generally located in a major apprehension area, shelter care provides initial reception, offers a full range of in-house services, is funded on a fixed cost basis, and provides 14 or more beds.  Also, shelter care offers longer stays until a minor is reunited with family or a sponsor or while a minor goes through the immigration hearing process.
(2) **Group Home**:  provides initial reception, offers a full range of in-house services, adheres to shelter guidelines in terms of services, is funded on a fixed cost basis and provides up to 6 beds.  A group home is intended for longer stays until a minor is reunited with family or goes through immigration proceedings.
(3)  **Long Term Transitional Foster Care**: provides initial reception, offers full range of in-house services (including education), adheres to shelter guidelines in terms of services and security, offers 2 to 4 beds, and provides care until minor is reunited with family or goes through immigration proceedings.
(4) **DUCS Foster Care**: provided to those minor with no sponsor alternative.  Generally the minor has been placed in a shelter and has been deemed appropriate for such placement.  Services extend beyond in-house to include public education.  The minor remains in the custody of ORR and follow-up is required.  (5) **Staff Secure Care**: provides a heightened level of staff supervision, communications and services in a structured licensed shelter care setting.  The minors have an offender history that includes adjudicated delinquents, arrests, chargeable offenses (probable cause), convictions for crimes, or pending delinquency proceedings.  Additionally, these minors may have behavior issues and other special needs.  Placement guidance includes, but is not limited to, minor offenses, isolated offenses not within a pattern or practice of criminal activity, isolated offenses that did not involve serious violence against a person, petty or minor offenses.  At this time, ORR has thirty (30) beds available and expects to add more this year.
(6)  **Secure care**: reserved for minors with a severe, violent or repeated criminal backgrounds (examples: sexual offender, assault crimes, assault with a deadly weapon, capital crimes, weapons offenses, and drug trafficking offenses).  These are generally juvenile detention centers operating under ORR guidelines and are funded on a per diem basis.

Id. at ¶ 5.  ORR has reduced the number of children housed in secure facilities by moving appropriate children to staff secure facilities.  Id. at ¶ 7.  A staff secure facility is "a shelter

1   care facility with heightened security and higher staffing

2   ratios."  _Id_.  ORR is also developing other innovative secure

3   care options:

4       Non-traditional secure facilities provide more services
    for children with behavior problems.  The program

5       relies on innovative behavior control techniques rather
    than "restraints" or other physical control mechanisms.

6       ORR plans to solicit new non-traditional secure
    facilities in Los Angeles, California, and Miami,

7       Florida, in the near future.

8   _Id_. at ¶ 10.  Plaintiffs are simply wrong regarding their

9   allegation that defendants are housing too many juveniles in

10   secure facilities.

11       The "overwhelming evidence" that plaintiffs cite is

12   outdated, four years outdated, in fact.  All the data that

13   plaintiffs rely on is from Fiscal Year 2000.  _See_ Pl. Mem. at 21.

14   This data, of course, cannot support a present breach of the

15   agreement, both because the data is too old and because another

16   federal agency, ORR, now makes placement decisions.  The current

17   information provided by ORR and the information provided by ORR

18   regarding secure detention as of August 25, 2003, _see_ Exhibit I

19   (Letter from Nguyen Van Hanh to Carlos Holguin), demonstrates

20   that plaintiffs have no valid claim regarding "overuse" of secure

21   detention.  The fact that plaintiffs do not even mention the data

22   ORR previously provided to them is telling.  Finally, INS

23   submitted the Fiscal Year 2000 data to plaintiffs' counsel and

24   this Court, _see_ Docket Entry 10, and plaintiffs did not claim

25   breach of the settlement agreement then.  Instead, plaintiffs

26   waited nearly four years to bring this claim and then rely

27

28

exclusively on four-year-old data to support their allegation of breach.

It is clear plaintiffs have not stated, and cannot state, a case for breach of the settlement agreement.

## 1. Defendants Do Not Automatically Place Children With Orders Of Removal Into Secure Custody

Unable to make a factual and current case for breach of the agreement, plaintiffs once again resort to alleging breach by anecdote. Plaintiffs allege that "[i]n several areas of the country defendants <u>automatically</u> transfer <u>all</u> minors to locked facilities once an order of removal or deportation is entered against them." Pl. Mem. at 22. Plaintiffs are wrong. ORR does not have a policy of transferring minors with a final order of removal or deportation to secure facilities. Exhibit A (Dunn Decl. at ¶ 8). Moreover, it is not DHS policy to request that ORR make such transfers. Exhibit J (Declaration of John Pogash at ¶ 5). DHS does not take unaccompanied juvenile aliens into its custody when final orders of deportation or removal are entered, ORR retains custody over such children. <u>Id</u>. In fact, as a matter of general practice, DHS only takes a minor alien into custody when it is actually ready to remove him. <u>Id</u>.

Plaintiffs' claim rests on a Latham & Watkins Memorandum. One sentence from that memorandum states that "[b]oth women <u>seem to believe</u> that a final order of deportation is enough of a flight risk to justify the transfer." Plaintiffs' Exhibit 32. The use of the phrase "seem to believe" in the Latham & Watkins report, written by class-counsel, totally fails as proof that a

1 federal agency has such a practice. Class-counsel's surmise

2 regarding INS practice is insufficient to show a breach of a

3 settlement agreement.

4 Plaintiffs have only one recent case to support their claim

5 that defendants transfer minors to secure detention as soon as a

6 final order of removal is entered. Pl. Mem. at 24. Plaintiffs

7 cite the cases of Cesar Omar Martinez and Jose Humberto Gonzalez

8 and their transfer from a licensed facility in Chicago to Central

9 Juvenile Hall in Los Angeles, California. Id. Plaintiffs claim

10 that these juveniles were transferred to Central Juvenile Hall

11 because "[a]n immigration judge had . . . entered a removal order

12 against them." Pl. Mem. at 24.[2] This is wrong. Defendants

13 advised plaintiffs' counsel, in writing, about this case on May

14 8, 2003. Exhibit K (Letter from Hugh G. Mullane and Frank

15 Travieso to Carlos Holguin). In that letter defendants' counsel

16 explained that the reason for the transfer was the juveniles' own

17 fighting and insubordinate behavior. Counsel for plaintiffs'

18 never responded to the government's letter or disputed those

19 facts until now. The declaration of Michele O'Brien, attached as

20 Exhibit L, sets forth the reason for the transfer: "ICE

21 information indicates that the juveniles were transferred from

22 the Chicago facility due to gang-related activity and aggressive

23 disruptive behavior. The shelter documented this behavior. Both

24 _____

25 [2] Plaintiffs' cite paragraph 4 of the declaration of Shiu Ming Cheer for this allegation. Paragraph 4 of the declaration does

26 not say what plaintiffs rely upon it for. It states "Jose and Cesar had been transferred to Florence in handcuffs from Central

27 Juvenile Hall on April 30, 2003, to await removal to Honduras on May 7, 2003."

28

18

juveniles were notified in writing of the reasons for placement in a secure facility." Id. at ¶ 8.  Furthermore, while not ordinarily the case, these juveniles were housed at the Florence Service Center for a short period where they were kept separately from adults and provided hot meals, showering facilities, television, and a recreation yard.  Exhibit M (Declaration of David Kollus (Kollus Decl.) at ¶ 3,5).  Accordingly, plaintiffs' only recent example of the alleged practice of automatically placing juveniles in secure detention upon entry of final removal orders was not that at all.  On the contrary, it was an appropriate exercise of discretion on the part of the government and a necessary action in order to preserve the health and safety of the children living at the Chicago shelter facility.

It is worth pointing out that plaintiffs, despite their rhetoric, do not actually prove their allegation.  Indeed, it is remarkable (and virtually unbelievable) that the defendants could move every child to secure care once a final order is entered and plaintiffs would be able to cite only a single claimed recent example.  Moreover, as shown above, plaintiffs' example does not even support their contention because the juvenile aliens were transferred on account of violence and gang-related behavior, not because there were orders of removal.

Plaintiffs' utter failure to come up with evidence to support their allegations means that their claim fails. Accordingly, this Court should reject this claim.

**2.    Defendants Do Not Arrest Children Released To Family Members When A Final Order Is Entered**

Plaintiffs also claim that "defendants also automatically re-arrest children earlier released to family members upon the entry of an order of removal."  Pl. Mem. at 27.  Once again, they are wrong.  ORR has no such policy of "automatically re-arrest[ing]" children after it releases them to family members.  Exhibit A (Dunn Decl. at ¶ 8).  Indeed, even though plaintiffs claim this policy is "automatic", they fail to cite even one instance when ORR has arrested an alien released to a family member because he has a final order of removal.  The failure to find even one instance of this "policy" is fatal to plaintiffs' claim.

Unable to cite a recent instance, plaintiffs rely on three examples that occurred in July 2001, nearly three years ago.  The fact that plaintiffs can only produce three examples in the last three and a half years means that the "policy" of re-arresting minors released to family members simply does not exist.  Most unaccompanied aliens are released to family members.  See Exhibit A (Dunn Decl. at ¶ 19).  Accordingly, if such a policy existed, plaintiffs' counsel would be able to produce substantial examples.  They have not.

Plaintiffs' arguments regarding the three examples they cite, however, is also undermined by the fact that apparently not one of the plaintiffs ever sought release pursuant to paragraph 24B of the settlement agreement which states that "[a]ny minor who disagrees with the INS's determination to place that minor in

1  a particular type of facility . . . may seek judicial review in

2  any United States District Court with jurisdiction and venue over

3  the matter to challenge that placement determination or to allege

4  noncompliance with the standards set forth in Exhibit 1."  No

5  district court review was ever sought in the three cases

6  plaintiffs' rely upon.  Indeed, class counsel themselves, who

7  conducted those interviews, did not commence any such action.

8  Accordingly, the only rational inference from this is that the

9  INS had good reason to hold Chen Xiang, Xue Zhung Zhou, and Jin

10 Rong Yiou in secure detention.[3]

    **3.  ORR Does Not Place Minors With Petty, Non-violent
       Crimes In Secure Care**

11     ORR has only eighteen children in secure detention at this

12 time.  See Exhibit A (Dunn Decl. at ¶ 6).  Nevertheless,

13 plaintiffs claim that it is "defendants' policy and practice to

14 place all children with any prior arrest in secure facilities."

15 Pl. Mem. at 32.  They are wrong yet again.  ORR reserves "secure

16 care" for juveniles who commit severe or violent crimes or

17 juveniles with long criminal histories.  See Exhibit A (Dunn

18 Decl. at ¶ 5).  Moreover, ORR has "staff secure" or "medium

19 secure" facilities to house juveniles with "minor offenses,

20 isolated offenses not within a pattern or practice of criminal

21 activity, isolated offenses that did not involve serious violence

22 against a person, petty or minor offenses."  Id.  Plaintiffs'

23 ability to produce only a single example of this "policy" once

24

25

26 _____

27 [3]  It is worth noting that another reason for holding a juvenile
in secure custody is to protect him or her from a smuggler.  See
¶ 21E of the Settlement Agreement.

28

1    again demonstrates that the "policy" does not exist.   Moreover,

2    the facts demonstrate otherwise.

3        **4.    ORR Has Developed Significant Medium Secure Placements**

4        Plaintiffs next claim that "[d]efendants' failure to arrange

5    medium secure placements further swells the population of

6    children in secure confinement."  Pl. Mem. at 34.  Plaintiffs

7    rely on data from November 2001 and contend that "defendants have

8    only ten medium-secure beds in the entire country" and no medium-

9    secure beds in the Western Region.  Pl. Mem. at 36.  The

10   inaccuracies of the plaintiffs' assertions are severe.

11   Regrettably, plaintiffs counsel failed to use the meet and confer

12   process and the monthly meeting process to educate themselves

13   about the current situation.  It is unfortunate that they have

14   breached the agreement in this way and sought to involve the

15   Court because they are truly misinformed.

16       ORR has done an outstanding job of developing the medium

17   secure space that plaintiffs claim they desire.  ORR at this time

18   has thirty (30) beds available in its "medium secure" or "staff

19   secure" housing and expects to add more this year.  Exhibit A

20   (Dunn Decl. at ¶ 5).  "A 'medium secure' or 'staff secure'

21   facility is a shelter care facility with heightened security and

22   higher staffing ratios.  Such placements now are available in

23   Houston, Texas; Seattle, Washington; and Brownsville, Texas."

24   Id.  It is the addition of this bed space that has allowed ORR to

25   reduce the amount of secure bed space that INS once used.

26   Clearly the presence of a medium secure facility in Seattle,

27

28

Washington, means that ORR has such space in the Western District.

Finally, ORR has not just added "staff secure" beds for unaccompanied juvenile aliens. It has embarked on a broad range of initiatives to better the care given to children. Among these initiatives are:

> (1) a non-traditional secure facility in Texas with Southwest Key as an alternative to "lock-down" detention facilities. Non-traditional secure facilities provide more services for children with behavior problems.

> (2) Plans to solicit for new non-traditional secure facilities in Los Angeles, California, and Miami, Florida, in the near future.

> (3) An active foster-care program.

> (4) A Pilot Project in Chicago, Illinois regarding the use of guardians ad litem and pro bono representation.

Exhibit A (Dunn Decl. at ¶ 10, 11, 21). Plainly, ORR is complying with the settlement agreement, and doing much more besides.

Plaintiffs are also wrong when they assert that ORR has not done enough for children with "special needs."[4] As shown above, ORR has increased the number of "staff secure" or "medium secure" placements. Moreover, one of the recognized experts on the issues of care for alien children specifically commends ORR for its work on behalf of children with "special needs." "In particular, ORR has made extensive efforts to improve the care options for children with special needs, such as alternative

---

[4] Paragraph 7 of the settlement agreement defines the term "special needs minor" as "a minor whose mental and/or physical condition requires special services and treatment by staff."

23

1  placements for children with mental health problems."  Exhibit B

2  (Duncan Decl. at ¶ 8).

3        Accordingly, plaintiffs' claim that ORR has not done enough

4  for children with "special needs" is wrong.  ORR has exceeded

5  what the Flores settlement agreement sought.

6     **5.   ORR Has Not Relied On The "Influx" Exception To House
            Children In Secure Facilities**

7        Plaintiffs contend that defendants rely on the "influx"

8  exception and house "30 percent of class members in locked

9  facilities."  Pl. Mem at 39-40.  Leaving aside, for the moment,

10  how plaintiffs have arrived at that figure, it is important to

11  examine what actually is happening.  In enacting the HSA and

12  reposing arrest and removal authority with DHS and custody and

13  care with ORR, Congress set up a system that was ideal for the

14  Flores agreement.  When all of the authority -- arrest, removal,

15  custody, and care -- was with the INS, the agency was forced to

16  divide its resources.  Now that the functions and duties are

17  split, the respective agencies focus exclusively on the mission

18  that Congress has devised for them.  As a practical matter this

19  means that DHS has an incentive as soon as possible to turn over

20  to ORR every minor who it arrests and who is unaccompanied.  This

21  is so because DHS' mission is not to care for unaccompanied

22  children and so it will not expend its scarce resources on

23  functions it does not have to do.  Moreover, another agency, ORR,

24  is obligated to care for any unaccompanied children that DHS puts

25  into proceedings.  That is ORR's congressionally assigned

26  mission.  Not surprisingly, DHS notifies ORR regarding an

27

28
                              24

1  unaccompanied minor as soon as the minor is arrested.  ORR, on

2  the other hand, has no enforcement role in the removal or

3  adjudication process.  Accordingly, ORR is free to decide how

4  best to place a child.  Of course, ORR has to make rational

5  decisions because the placement of one child will affect other

6  children.  Accordingly, a juvenile who has committed a serious

7  violent crime would not be placed in a shelter care facility

8  because that would endanger the non-violent children who live

9  there.  Moreover, ORR has an incentive to reunite children with

10  family members, because it understands that it is generally in

11  the child's interest to live with parents or other family members

12  instead of in children's shelters or group homes, no matter how

13  high the quality of care in those housing options.

14      Regrettably, plaintiffs do not seem to appreciate the system

15  that Congress has created and so continue to focus on outdated

16  statistics.  In this instance, plaintiffs do not disclose the

17  source for their claim that "thirty percent of class members are

18  in locked facilities."  The Court, however, must disregard

19  unsubstantiated claims and focus on what actually is happening.

20  Plaintiffs' contention that ORR places too many children in

21  secure detention based on the "influx" exception is wrong.  ORR

22  has not relied on the "influx" exception, and the low number of

23  children in secure care demonstrates this proposition to be true.

24  Accordingly, this Court must also reject this claim for breach as

25  well.

26

27

28

**E.     ORR Provides Minors With All Services Required Under The Agreement**

Plaintiffs are unable to show that ORR is in breach of the settlement agreement by alleging (wrongly) that ORR detains too many children in secure care.  Plaintiffs fare no better with their next allegation that the services provided to all children in ORR's care are inadequate.  Pl. Mem. at 40-42.  It is important to note at the outset of this discussion, that Dr. Julianne Duncan from USCCB, an expert in such matters, has concluded that ORR is complying with the Flores agreement. Exhibit B (Duncan Decl. at ¶ 8).  This is significant because USCCB has been at the forefront of this issue (and other immigration issues) for decades.  Furthermore, in the contracts that ORR enters into with institutions to care for children, ORR states affirmatively that the organization or entity must comply with the Flores agreement.  Exhibit A (Dunn Decl. ¶ 16). Finally, the declarations of Hugo Ruiz, Director for Youth and Residential Services for Heartland Human Services, and Juan Sanchez, President and Chief Operating Officer (CEO) for Southwest Key Program, Inc., clearly demonstrate that the contract facilities are in compliance with the settlement agreement.  Exhibit N (Declaration of Hugo Ruiz (Ruiz Decl.) at ¶ 7); Exhibit O (Declaration of Juan Sanchez (Sanchez Decl.) at ¶ 10).

It is also important to segregate plaintiffs' claim regarding services.  Despite plaintiffs' claim to the contrary, the settlement agreement does not afford children in shelter care

facilities with the same privileges and services that children in

secure facilities receive.  This proposition is plainly

demonstrated by a review of the settlement agreement provisions

themselves.  Paragraph 6 of the settlement agreement, in

pertinent part, states:

> The term "licensed program" shall refer to any program,
> agency or organization that is licensed by an
> appropriate State agency to provide residential, group,
> or foster care services for dependent children,
> including a program operating group homes, foster
> homes, or facilities for special needs minors.  A
> licensed program must also meet those standards for
> licensed programs set forth in Exhibit 1 attached
> hereto.

This paragraph, through reference to Exhibit 1, sets out the

standards which a shelter care or group home must meet.

Paragraph 8 of the settlement agreement, which governs medium

secure facilities, also imposes a similar requirement of abiding

by Exhibit 1:

> The term "medium security facility" shall refer to a
> facility that is operated by a program, agency or
> organization licensed by an appropriate State agency
> and that meets those standards set forth in Exhibit 1
> attached hereto.

Accordingly, the standards in Exhibit 1 apply to shelter care and

medium secure facilities.  No provision in the agreement,

however, requires a secure facility to comply with Exhibit 1.

While plaintiffs disagree with this interpretation.  See Pl. Mem.

at 41 n.32.  They have no textual argument to support a contrary

view.  Moreover, Columbia Legal Services has taken the opposite

view from plaintiffs.  See Exhibit P (Declaration of Patricia

Arthur ¶ 7 and 8 ("I have on several occasions spoken to class

counsel in Flores v. Meese, No. CV 85-4544-RJK(Px)(C.D. Cal.)."

1  "[T]he <u>Flores</u> agreement appears not to provide relief to mentally

2  ill youth who, like Plaintiff and the proposed class here, are

3  detained in secure detention facilities.")).  Accordingly,

4  plaintiffs' efforts to rewrite the settlement agreement must be

5  rejected.

6      While ORR is not obligated under the settlement agreement to

7  provide such care, that does not mean that it cannot do so.  ORR

8  wants to provide all children with good quality care, regardless

9  of the level of security that is necessary.  However, plaintiffs

10  cannot validly claim, as unfortunately, they do claim, that ORR

11  is in breach of the settlement agreement when the settlement

12  agreement does not oblige ORR to comply with the standards set

13  forth in Exhibit 1 that apply only to shelter care and medium

14  secure care.  Finally, ORR's modest use of secure care limits

15  this issue.

16      **1.   ORR Provides Adequate Education To Unaccompanied
            Children**

17

18      All of the group homes, shelter care facilities and medium-

    secure facilities provide the necessary educational programs.

19
    Indeed, every program that ORR uses is licensed by the state

20
    where it is situated and must meet educational standards in order

21
    to maintain those licenses.  Dr. Ruiz and Dr. Sanchez are fully

22
    familiar with the obligations of the Flores agreement and their

23
    facilities are in compliance.  Exhibit N (Ruiz Decl. at ¶ 5,6);

24
    Exhibit O (Sanchez Decl. at ¶ 9, 10).  Plaintiffs apparently do

25
    not dispute this as they fail to allege that any of the group

26

27

28                                    28

homes, shelter care facilities, or medium-secure facilities fail
to meet the minimum standards.

Plaintiffs focus their factual assertions exclusively on
secure facilities, which are not covered by the standards in
Exhibit 1 of the Flores agreement.  Moreover, plaintiffs fail to
cite even a single instance in the last year (or since ORR has
been charged with this program) where a juvenile alien in secure
care has been denied access to education entirely.  Indeed,
plaintiffs fail to cite any instances in the last year of even
"reduced" educational services.  Accordingly, it is clear that
plaintiffs have not shown a breach of the settlement agreement.

## 2. ORR Provides Appropriate Mental Health Services

It is important to reiterate that plaintiffs do not dispute
the sufficiency of mental health services afforded to children
housed in group homes, shelter care facilities, or medium secure
facilities.  Dr. Ruiz and Dr. Sanchez make perfectly clear that
such organizations provide the necessary mental health resources.
Exhibit N (Ruiz Decl. at ¶ 6); Exhibit O (Sanchez Decl. at ¶ 5,
10).  Accordingly, it is clear, that ORR is in compliance with
the settlement agreement.

The settlement agreement by its terms does not set forth a
binding mental health standard for secure facilities.  Notably,
however, ORR has reduced the number of juveniles who are subject
to secure custody, which further undermines plaintiffs' claim.
In addition, Dr. Duncan notes that "ORR has made extensive
efforts to improve the care options for children with special
needs, such as alternative placements for children with mental

1  health problems." Exhibit B (Duncan Decl. at ¶ 8). Finally, ORR

2  has devoted significant resources to ensuring that juveniles

3  placed in secure facilities are afforded access to mental health

4  services. Exhibit A (Dunn Decl. at ¶ 12). Furthermore, ORR has

5  eliminated the use of many secure facilities altogether and

6  limited the use of others only to short periods while other

7  placements are found. Id. at ¶ 7.

8           3.   ORR Has Sought To Involve Pro Bono Counsel And The
                 Facilities Also Have Encouraged Pro Bono Counsel To
9                Assist Children In Their Care

10      Plaintiffs contend that ORR is not adequately advising

11  children about "the status of their removal proceedings and their

12  prospects for release or removal." Pl. Mem. at 49. Notably, no

13  provision in the settlement agreement requires an advisal about

14  the status of the removal proceedings or about prospects for

15  release or removal. Plaintiffs' efforts to "create" this

16  obligation should be rejected as an effort to rewrite a

17  settlement agreement (and to rewrite it seven years after it was

18  signed). Plaintiffs are correct that Exhibit 1, ¶ 6, provides

19  for at least one individual counseling session per week; that

20  Exhibit 1, ¶ 9, provides for an orientation program for new

21  arrivals; and that Exhibit 1, ¶ 14, provides for legal services

22  information to be given to children. ORR and its contract

23  facilities do all of these things and more.

24      Dr. Ruiz and Dr. Sanchez both state that their facilities

25  provide the necessary counseling services and that they comply

26  with the Flores settlement agreement. Exhibit N (Ruiz Decl. at ¶

27  6); Exhibit O (Sanchez Decl. at ¶ 5, 10) ("Each of the shelter

28

                                   30

care facilities has a Medical Coordinator staffed on site to oversee and manage the healthcare needs of the youth."  "[A]ll youth have access to . . . health care (including mental health).").  In addition, all the facilities that ORR contracts with provide an orientation or introduction program for new children.  "Each facility or home used by ORR has an orientation program for new juveniles coming into their care."  Exhibit A (Dunn Decl. at ¶ 16); see also id. at ¶ 5 (noting that facilities all provide "initial reception").  Finally, all the facilities provide information regarding access to legal representation.  Exhibit N (Ruiz Decl. at ¶ 6); Exhibit O (Sanchez Decl. at ¶ 10).  ORR is also aided in this endeavor by the Department of Justice's Executive Office for Immigration Review, which includes the immigration court system.  See EOIR Pro Bono Program (www.usdoj.gov/eoir/probono).  "The Pro Bono Program is working to improve legal services for [unaccompanied] children by assisting in the design of special juvenile dockets at various Immigration Courts, promoting child-friendly court procedures, organizing legal training sessions for pro bono representatives, and providing reports and statistics on unaccompanied alien children populations in various parts of the country to nonprofit legal agencies, bar associations and other pro bono groups."  Id.

Furthermore, ORR is doing more than is required by the settlement agreement.

> ORR has initiated a Pilot Project in Chicago, Illinois regarding the use of guardian ad litem and pro bono representation.  Chicago Connections has taken the lead with a pro bono project and is studying various models of guardians ad litem programs in order to implement

one with unaccompanied alien minors at the International Children's Center in Chicago (Heartland Alliance).

Exhibit A (Dunn Decl. at ¶ 21).  In addition, Ms. Dunn makes Bar Association presentations and has worked closely with the ABA to provide pro bono representation to children.  <u>Id</u>. at ¶ 22.  These efforts demonstrate that ORR is complying with the settlement agreement and exceeding the agreement's standards.

**4.   Children Are Not Denied Telephone Access**

Plaintiffs misquote the <u>Flores</u> agreement insofar as the right to telephone access provided for in group homes, shelter care facilities, and medium secure facilities is concerned.  In those facilities -- which is where Exhibit 1 to the settlement applies -- paragraph 12 provides that a child will have a "reasonable right to privacy" and that shall include the "right to . . . talk privately on the phone, as permitted by the house rules and regulations."  Plaintiffs' omission of the phrase "as permitted by the house rules and regulations" is significant. Plaintiffs fail to cite even a single instance where a facility prohibited phone use in contravention of "house rules and regulations."

Plaintiffs seem to have lost sight of the basics.  No parent is obligated to afford a teenager unfettered access to a telephone.   The <u>Flores</u> agreement sensibly allows facilities, acting as parents, to set rules about phone use.  After having negotiated this provision, plaintiffs' cannot amend it through litigation ostensibly brought to enforce the agreement.

1    Plaintiffs focus most of their factual argument on juveniles
2    who are detained in secure facilities.  As shown above, however,
3    Exhibit 1 does not apply to such facilities.  Accordingly, the
4    possibility that juveniles in secure facilities may lack the easy
5    access to telephones that children in group homes, shelter care
6    facilities, or medium secure facilities do is no violation of the
7    settlement agreement.

8    **5.    ORR Has Endeavored To Increase Access To Counsel, Not
        Interfere With It**

9    Plaintiffs' contention that ORR interferes with access to
10   counsel is mistaken.  Pl. Mem. at 56.  As discussed above, ORR is
11   making efforts to increase juvenile access to counsel.  ORR is
12   about to implement a pilot program designed to deliver more
13   access to counsel.  In addition, ORR's outreach to bar
14   associations and the ABA demonstrates that it is providing more
15   access to counsel for children in its care, not less.

16   **F.   Defendants Take Appropriate Care Of Children And Do Not
        Violate The Settlement Agreement**

17

18   **1.    Defendants Have A Reasonable Policy Regarding The Use
        Of Restraints That Considers Danger To Children, The
        Public, And Law Enforcement**

19

20   The settlement agreement does not prohibit the use of
21   handcuffs or other restraints.  Plaintiffs cannot dispute this.
22   Furthermore, as set forth in the declaration of John Pogash, DHS
23   has a clear policy regarding the use of restraints:

24       Section 6.1.5 of the Juvenile Protocol Manual
         establishes the ICE policy on the use of restraints
25       when transporting juveniles.  This section clearly
         states that restraints are to be used on juveniles only
26       when required to ensure the safety of the officer, the
         detainee, and the public, or to prevent escape.
27       Section 6.1.5 also provides that officers may use only

28

1
2
3
4
5
6
7

> the minimum degree of restraint necessary to achieve these purposes. The use of restraints as punishment therefore is prohibited. Within these parameters, the use of restraints is subject to individual officer discretion. This discretion permits the officer sufficient flexibility to handle the myriad of different factual circumstances that may arise in this context. Among the factors that officers consider in determining the use and degree of restraints are the detainee's criminal violations (if any), aggressive or asocial behavior, suspected influence of alcohol or drugs, physical condition, sex, age, medical condition, length of travel, type of transportation, and the circumstances of the transportation.

8
9

Exhibit J (Pogash Decl. ¶ 7). Plaintiffs' allegation that

10

defendants' "actual practice" cannot "be squared with their own

11

standards" is not true. DHS follows the practice set forth

12

above. See Exhibit Q (Declaration of Annie Lopez (Lopez Decl.)

13

at ¶ 4) ("It has been my experience that this ICE policy

14

regarding the use of restraints when transporting juveniles is

15

properly followed in the Phoenix sector."); Exhibit L

16

(Declaration of Michelle O'Brien (O'Brien Decl. at ¶ 15). ("As a

17

juvenile coordinator, I followed this policy.").

18

Plaintiffs cite the case of Nicolas Reyes Gonzales as an

19

example of where DHS practice does not conform to its policy.

20

Pl. Mem. at 59. They are wrong. According to Michelle O'Brien,

21

"the juveniles kicked the seats and walls of the transport van,

22

and verbally challenged the transport officers." Exhibit L

23

(O'Brien Decl. at ¶ 16). This behavior made the trip unsafe and

24

the officers were forced to return to the ICE facility. Id. The

25

officers then placed the juveniles in restraints so that they

26

could be returned to Central Juvenile Hall safely. Id. This

27

incident demonstrates two things. First, ICE officers do not

28

34

1   <u>always</u> employ restraints when dealing with juveniles at secure

2   facilities. This is so because these juveniles did not commence

3   the trip wearing restraints. It was only when their behavior,

4   physical and verbal, constituted a threat that the ICE officers

5   applied restraints. Second, the ICE officers followed the

6   restraint policy described above and did not abuse their

7   discretion in applying restraints. The officers reasonably

8   determined that kicking seats and walls of a motor vehicle (while

9   it was in motion) coupled with the verbal challenges presented a

10  danger to public safety, officer safety, and even the safety of

11  the juveniles. Accordingly, plaintiffs' are plainly mistaken

12  about DHS actual practice and so their claim must fail.

13      It also is worth noting that DHS encounters approximately

14  5,000 children each year. Plaintiffs cite a handful of cases

15  where they allege that restraints were used over a three year

16  period. Given that DHS must have encountered over 15,000

17  juveniles in this time period, plaintiffs' reference to a handful

18  of cases does not demonstrate a breach of policy but rather a

19  confirmation of it.

20      Plaintiffs' claim is further undercut, if not eviscerated,

21  by the fact that ORR places few juveniles in secure care. Nearly

22  all of plaintiffs' examples stem from instances where the

23  juvenile was in secure custody. Indeed, plaintiffs are unable to

24  cite recent examples of the use of physical restraints that they

25  believe violate ICE policy. It follows that they have failed to

26  make out any violation of the <u>Flores</u> settlement as to this claim.

27      Furthermore, ORR has decided not to use some of the

28
                                    35

facilities that plaintiffs mention (except for short transitional
stays) including Globe in Gila County.  Exhibit A (Dunn Decl. at
¶ 9).  ORR also has "discouraged the use of handcuffs [and]
restraints" and made its views known to its facilities.  Id. at ¶
20.

For all these reasons, this Court should reject plaintiffs'
claim that defendants are in breach of the settlement agreement.
The Defendants have a lawful policy regarding the use of
restraints, and its practice is consistent with that lawful
policy.

### 2.   Children Are Not Subject To Excessive And Arbitrary Solitary Confinement

Plaintiffs next claim is that "[c]lass members consigned to
secure facilities -- the vast majority of whom have never before
been detained -- routinely endure policies and practices that
violate the Settlement and would be unacceptable if applied
against dangerous juvenile offenders."  Pl. Mem. at 64.
Plaintiffs' allegation is, once again, flawed by the mistaken
assumption that ORR places too many children in secure detention.
As explained above, this faulty assumption dooms the rest of
plaintiffs' allegation.  ORR houses very few juveniles in secure
detention.  Moreover, most of plaintiffs' complaints stem from
facilities that are no longer used (or used minimally) such as
Tulare, Hondo and Globe.  See Exhibit A (Dunn Decl. at ¶ 9);
Exhibit L (O'Brien Decl. at ¶ 5).  Plaintiffs cannot support a
present claim for breach on conduct that may have taken place
three years ago.  This is particularly true, as here, where

1  Congress has reshaped the federal responsibilities for this task.

2       As noted above, secure care is the exception.  When release

3  to a family member cannot be accomplished (usually because there

4  is no family member available) then shelter care, group home

5  care, staff secure care, or foster care will be used in the

6  overwhelming majority of cases.  Dr. Sanchez explains how

7  Southwest Key, one of ORR's main contractors, operates:

8       All of Southwest Key's ORR facilities utilize the
        Behavior Management program for disciplining youth . .
9       . . A fundamental component of the Behavior Management
        Program is the "Consequence List" technique through
10      which the clients acknowledge the consequence of their
        actions.  For more severe infractions youth may be
11      subjected to "supervised separation," for a period of
        less than one week (usually no more than 72 hours),
12      during which time some or all of the youth's privileges
        are revoked and/or the youth carries out his daily
13      tasks and recreational activities in a separate
        environment from the other youth.  During the
14      supervised separation period the clinician, the lead
        case worker, the shift supervisor and the director or
15      assistant director meet to evaluate the youth's
        progress.  At no time, are youth in solitary
16      confinement.

17  Exhibit O (Sanchez Decl. at ¶ 8 (emphasis added)).  Dr. Sanchez

18  makes clear that things are not as plaintiffs perceive them to

19  be.  ORR treats the children in its care well.

20       Plaintiffs also cite two instances where children were

21  housed in a hotel near downtown Los Angeles.  Pl. Mem. at 68-70.

22  A review of the facts of those two cases, however, demonstrates

23  that ICE's actions were authorized under the settlement

24  agreement.  Two provisions of the settlement agreement are

25  pertinent.  The first is paragraph 12B which defines an

26  "emergency" as "any act or event that prevents the placement of

27  minors pursuant to Paragraph 19 within the time frame provided."

28

Included among the definition of "emergencies" are "medical emergencies" which, in turn, is defined to include "a chicken pox epidemic among a group of minors." Id.  Accordingly, the settlement agreement's strict placement time does not operate when there is a medical emergency such as chicken pox.  That was the case for Manuel Sanchez.  He was part of a group of alien minors who the Public Health Service determined needed to be isolated because of exposure to chicken pox.  O'Brien Decl. at ¶ 10.  At times, ICE will use a hotel for a night prior to transferring the minor to ORR.  Id. at ¶ 9.  This practice does not violate the settlement agreement.

The second provision is pertinent to Liliana Linares' case and authorizes the use of secure detention if the juvenile "must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees."  Paragraph 21E of the settlement agreement.  Linares was housed at the hotel, by ICE (not ORR), because she was apprehended during an anti-smuggling operation.  Exhibit L (O'Brien Decl. at ¶ 11).  In the past, ICE used segregated units at Los Padrinos but ceased doing so when that facility closed.  Id. at ¶ 7, 11.  ICE also could not transfer them outside the district because of the pendency of the criminal smuggling case.  Id.  Accordingly, ICE also uses a hotel environment to house smuggling victims and other victims under the Trafficking Victims Protection Act.  A hotel provides a secure environment for the victim thus reducing the opportunity that the smugglers (or their

38

organization) will retaliate against the victim, and also avoids

placing a non-criminal in a secure facility.  Housing trafficking

victims in hotel space does not violate the settlement agreement.

Plaintiffs allege that families, including children, are

held in a hotel in Los Angeles.  Pl. Mem. at 68.  However, simply

holding a family, including children, at a hotel does not violate

the settlement agreement.  See Paragraph 12A of the settlement

agreement.  ICE may use a hotel, on a very short term basis, to

keep a family together pending imminent removal from the country

or release.  Exhibit L (O'Brien Decl. ¶ 9).  In their motion and

exhibits, plaintiffs have produced neither evidence nor made

allegations that ICE violates the settlement provision.[5]

### 3.  ORR Does Not Commingle Non-Delinquent Class Members With Juvenile Offenders Nor Does It Condone Unlawful Strip Searches

Plaintiffs' failure to cite even a single incident where ORR

has commingled a non-delinquent class member with a juvenile

offender is fatal to their claim that such is the practice.  As

set forth above, ORR houses only a small number of juveniles in

secure care.  Juveniles who have not committed serious criminal

offenses are not placed in secure care.  Those children are

placed in shelter care facilities like Southwest Key.  Moreover,

juveniles who have committed "less serious" offenses are housed

together in "staff secure" placements.  It is ORR's policy and

---

[5]  Although plaintiffs' allegations and proof plainly fail to show such violations, it is the case that ICE, when it has to choose between transferring a child and breaking up a family on the one hand or detaining the family together for a short time in a hotel on the other, will choose to keep them together.

1  practice not to "allow commingling with domestic delinquent

2  populations."  Exhibit A, Dunn Decl. at ¶ 20.

3      Plaintiffs also cite no instance where a juvenile in ORR's

4  care has been "strip searched" in violation of Flores v. Meese,

5  681 F. Supp. 665 (C.D. Cal. 1988).  ORR's minimal use of secure

6  facilities is the reason for the absence of any such claim.  In

7  addition, ORR has made great efforts to inform facilities during

8  its visits that unwarranted strip searches are not acceptable.

9  Exhibit A (Dunn Decl at ¶ 20).  Other facilities, such as

10 Southwest Key, do not even "physically restrain" juveniles let

11 alone conduct strip searches.  See Exhibit O (Sanchez Decl. ¶ 7,

12 8) ("None of the programs that Southwest Key operates perform

13 stip searches.").

14     Furthermore, Flores v. Meese, 681 F. Supp. 665 (C.D. Cal.

15 1988), does not stand for the proposition that a strip search of

16 a juvenile always violates the Fourth Amendment.  On the

17 contrary, the key fact influencing the Court was that "all

18 aliens, including juveniles" were stripped searched (at least at

19 certain INS locations).  Furthermore, the Court noted that

20 "numerous courts in other circuits have struck down policies

21 authorizing routine strip searches of minor offenders."  Id.  The

22 Court did not reach the issue of whether a secure juvenile

23 detention hall may conduct a "strip search" of its detainees.

24     Accordingly, plaintiffs cite no authority for the

25 proposition that a state juvenile hall may not constitutionally

26 conduct a strip-search of a juvenile detainee entering its

27 facility.  The Supreme Court has said:

28
                            40

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. . . . <u>A detention facility is a unique place fraught with serious security dangers.</u>  Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.  And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, App. 71-76, and in other cases.

<u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979) (citations omitted) (emphasis added).  More recently, the Supreme Court has concluded that "[a] State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."  <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987).  In addition, the Supreme Court noted, "[w]e have recently held that prison regulations allegedly infringing constitutional rights are themselves constitutional as long as they are 'reasonably related to legitimate penological interests.'"  <u>Id</u>. at 873 n.2 (<u>citing</u> <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 349(1987) (<u>quoting</u> <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)).

Plaintiffs have not presented specific instances where strip searches would violate <u>Bell</u> and <u>Griffin</u>.  Moreover, ORR places very few juveniles in secure care and those who are placed in secure care present serious criminal backgrounds.  Plaintiffs

1  have not shown that ORR is acting in violation of the settlement

2  agreement or contrary to Flores v. Meese.

3      **4.   This Court Should Reject Plaintiffs' Other Claims Of
          Breach Where They Present No Evidence In Support Of
4          Such Claims**

5      Plaintiffs claim that defendants violate the settlement

6  agreement even though they have no evidence that any violation

7  ever has occurred.  A hypothetical disagreement about an

8  interpretation of a provision of the settlement agreement is

9  insufficient to raise a claim of breach. Indeed, plaintiffs lack

10  standing to pursue such a claim.  To establish standing a

11  plaintiff "must have suffered an injury in fact -- an invasion of

12  a legally protected interest which is (a) concrete and

13  particularized, and (b) actual or imminent, not conjectural or

14  hypothetical."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560

15  (1992) (internal citations and quotations omitted).  In Lewis v.

16  Casey, 518 U.S. 343 (1996), the Supreme Court emphasized the

17  standing requirements for a class action.  "That a suit may be a

18  class action . . . adds nothing to the question of standing, for

19  even named plaintiffs who represent a class 'must allege and show

20  that they personally have been injured, not that injury has been

21  suffered by other, unidentified members of the class to which

22  they belong and which they purport to represent.'" 518 U.S. at

23  357 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S.

24  26, 40 n. 20 (1976)).

25      Plaintiffs claim that defendants classify "detainees as

26  adults on the basis of junk science dental examinations while

27  unreasonably refusing to acknowledge birth certificates and other

28

1  documentary evidence establishing that the individual is actually

2  a minor."  Pl. Mem. at 3.  Plaintiffs, however, cannot cite even

3  a single case where defendants relied exclusively on a dental

4  examination and refused to consider a birth certificate or other

5  documentary evidence.  Accordingly, they lack standing to pursue

6  this claim of "breach".

7      Even if plaintiffs could raise such hypothetical questions,

8  they must do so in the context of the government's actual

9  practice and the text of the settlement agreement.  Plaintiffs

10 conveniently ignore both.  Paragraph 13 of the settlement

11 agreement provides:

12     If a reasonable person would conclude that an alien
       detained by the INS is an adult despite his claims to
13     be a minor, the INS shall treat the person as an adult
       for all purposes, including confinement and release on
14     bond or recognizance.  The INS may require the alien to
       submit to a medical or dental examination conducted by
15     a medical professional or to submit to other
       appropriate procedures to verify his or her age.  If
16     the INS subsequently determines that such an individual
       is a minor, he or she will be treated as a minor in
17     accordance with this Agreement for all purposes.

18 Accordingly, the settlement agreement itself states that the

19 government may rely on dental examinations in the age

20 determination process.  Furthermore, the settlement agreement

21 only requires that the government's determination meet the

22 "reasonable person" standard.  The actual practice of ICE is

23 reasonable:

24     Before ICE transfers physical custody to ORR, ICE makes
       a determination as to whether the person apprehended is
25     under the age of 18.  It is ICE policy to consider all
       available evidence on age when making a decision, and
26     to use the "reasonable person" standard set forth in
       paragraph 13 of the Flores settlement agreement.  In
27     some cases, ICE arranges for professional forensics

28
                              43

> evaluations in accordance with paragraph 13.  However,
> ICE evaluates these professional opinions in light of
> all evidence available on age.

Exhibit J (Pogash Decl. at ¶ 7).  Accordingly, this Court should reject plaintiffs' unsupported claim of breach regarding ICE's age determination policy.

Plaintiffs also allege that defendants have "refus[ed] to recognize the authority of immigration judges to redetermine ORR and/or DHS decisions declining to release Flores class members." Pl. Mem. at 4.  Once again, plaintiffs fail to submit even a single order from an immigration judge that defendants refused to recognize or comply with.  Accordingly, for the reasons set forth above they lack standing to pursue this hypothetical claim.

It is also instructive to note that the history of the settlement agreement includes virtually no litigation[6] regarding the bond amount set when a minor is released to a family member, or the appropriateness of a secure facility placement.  Paragraph 24 A states:

> A minor in deportation proceedings shall be afforded a
> bond redetermination hearing before an immigration
> judge in every case, unless the minor indicates on the
> Notice of Custody Determination form that he or she
> refuses such a hearing.

---

[6]  Undersigned counsel is aware of one case brought in the United States District Court for the District of Arizona, where INS transferred an individual it believed to be a juvenile from a shelter care facility to a secure facility and where he claimed that the transfer violated the settlement agreement.  Mansur v. Smith, No. CV-02-2326 (D. Az.).  The alien was transferred for national security reasons and the government in defending the case learned that he was actually an adult.  After hearing the government's reason for transfer, counsel for petitioner withdrew, the alien was transferred to an adult facility, and the case was dismissed.

Paragraph 24B states:

> Any minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit 1 attached hereto, may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1.  In such an action, the United States District Court shall be limited to entering an order solely affecting the individual claims of the minor bringing the action.

The fact that there has been little litigation in either immigration court or federal court for the last seven years must mean that defendants are acting within the terms of the settlement agreement.  Indeed, class counsel's failure to ever commence any such litigation themselves significantly undermines many of their other claims of breach -- including that INS overused secure care.

**G.    Defendants Are Unable To Respond To Plaintiffs' Remedy Request Because Plaintiffs Have Not Submitted A Proposed Order**

Plaintiffs do not articulate what remedy they seek from this Court.  In their conclusion they state that "this Court should grant this motion and enter an order in the form lodged concurrently herewith."  Pl. Mem. at 81.  Defendants are not aware of a proposed order that plaintiffs say they have lodged with the Court.  Defendants were not served with such a proposed order.  Accordingly, pursuant to the local rules, plaintiffs' motion is deficient.  Moreover, defendants are entitled an opportunity to respond to any future proposed order plaintiffs may lodge.

1                    *              *              *

2          Plaintiffs' Motion to Enforce the Settlement should be

3    denied.   Plaintiffs steadfastly refused to meet and confer as the

4    settlement agreement required.   If they had, this process likely

5    could have been avoided altogether.   This is so because, in

6    meeting and conferring, plaintiffs would have learned that ORR

7    rarely uses secure custody.   They would have developed a sense of

8    the positive direction ORR has taken the program and its

9    consistent focus on the well-being of minors in its care.

10   Plaintiffs themselves might have offered ORR some insight.

11   Instead, plaintiffs have chosen to litigate while making

12   unfounded allegations.   In this connection, one of the great

13   experts in the field of juvenile custody and care, Dr. Julianne

14   Duncan, demonstrated the meritlessness of plaintiffs' motion when

15   she said, "I believe that ORR complies with the stipulated

16   settlement agreement . . . [and] I am aware that ORR makes

17   efforts to exceed the requirements of the settlement agreement."

18   Exhibit B, Duncan Decl. at ¶ 8.

19         Congress devised a logical and efficient system for the care

20   of juveniles and that system is working.   DHS has been tasked

21   with law enforcement functions, and ORR has been tasked with

22   responsibility for the care of unaccompanied minors.

23         ORR is dedicated to the task assigned to it.   It has forged

24   a strong and committed partnership with U.S.C.C.B. and LIRS.   It

25   has contracted with excellent facilities, such as Southwest Key

26   and Heartland Human Services, which have admirably provided

27   unaccompanied alien minors services that exceed the requirements

28

46

1  of the settlement agreement.  ORR is now turning to the process

2  of creating a regulatory framework for its program.

3      This is not the time for rancorous litigation that may delay

4  and distract ORR from its important mission.  Instead, this Court

5  should deny plaintiffs' motion for enforcement of the settlement

6  agreement because the motion is meritless.

7                           **CONCLUSION**

8      For all the foregoing reasons, this Court should deny

9  plaintiffs' motion to enforce the settlement agreement.

10     DATED: February /7, 2004.

11                                PETER D. KEISLER
                                  Assistant Attorney General
12                                DAVID J. KLINE
                                  Principal Deputy Director
13

14                                _____

15                                HUGH G. MULLANE
                                  Senior Litigation Counsel
16                                Office of Immigration Litigation

17                                Attorneys for Defendants

18

19

20

21

22

23

24

25

26

27

28
                                  47

## PROOF OF SERVICE BY FEDERAL EXPRESS

I am over the age of 18 and not a party to the within action. I am employed by the Office of United States Attorney, Central District of California. By business address is 300 North Los Angeles Street, Suite 7516, Los Angeles, California 90012.

On **February 17, 2004**, I served

**OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT** on each person or entity named below by enclosing a copy in an Federal Express envelope addressed as shown below and placing the envelope for collection on the date and at the place shown below following our ordinary office practices. I am readily familiar with the practice of this office for collection and processing correspondence for Federal Express. On the same day that correspondence is placed for collection, it is deposited in the ordinary course of business with Federal Express in a sealed envelope.

Date of pick-up: **February 17, 2004**. Place of pickup:  Los Angeles, California.

Person(s) and/or Entity(s) to Whom Federal Expressed was sent:

**Carlos Holguin, Esq.**
**Peter Schey, Esq.**
**Center for Human Rights & Constitutional Law**
**256 South Occidental Boulevard**
**Los Angeles, CA 90057**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on: **February 17, 2004** at Los Angeles, California.

OLIVIA HERNANDEZ