CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephonke: (213) 388-8693
Facsimile:    (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org
        marchela@centerforhumanrights.org

WILLIAM A. MOLINSKI (STATE BAR NO. 145186)
wmolinski@orrick.com
T. WAYNE HARMAN (STATE BAR NO. 254089)
wharman@orrick.com
ELENA GARCIA (STATE BAR NO. 299680)
egarcia@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, California  90017
Telephone:  +1-213-629-2020
Facsimile:  +1-213-612-2499

*Attorneys for Plaintiffs*
(listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, | Case No. CV 85-4544-RJK(Px) |
| Plaintiffs, | **MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION** |
| v. | |
| Jeh Johnson, Secretary, U.S. Department of Homeland Security, *et al.*, | Hearing:   March 9, 2015 |
| Defendants. | Time:      TBD<br>Dept:      TBD |

1   *Plaintiffs' counsel, continued:*

2   LA RAZA CENTRO LEGAL, INC.
    Michael S. Sorgen (Cal. Bar No. 43107)
3   474 Valencia Street, #295
    San Francisco, CA 94103
4   Telephone: (415) 575-3500

5   *Of counsel:*

6   YOUTH LAW CENTER
    Alice Bussiere (Cal. Bar No. 114680)
7   Virginia Corrigan (Cal. Bar No. 292035)
    200 Pine Street, Suite 300
8   San Francisco, CA 94104
    Telephone: (415) 543-3379 x 3903
9
    Ranjana Natarajan (Cal. Bar No. 230149)
10  UNIVERSITY OF TEXAS SCHOOL OF LAW
    Civil Rights Clinic
11  727 E. Dean Keeton St.
    Austin, TX 78705
12  Telephone: (512) 232-7222
    Email: rnatarajan@law.utexas.edu

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

THIS COURT HAS JURISDICTION TO ENFORCE THE SETTLEMENT
AS A CONTRACT AND CONSENT DECREE. ........................................... 3

ARGUMENT ............................................................................................................ 5

I    ICE'S NO-RELEASE POLICY IS A MATERIAL BREACH OF THE
SETTLEMENT. .......................................................................................... 5

    A    ICE's new no-release policy breaches the Settlement's
requirement that defendants minimize the detention of children. ........ 5

    B    ICE must consider releasing class members with their preferred
custodians: their mothers. ................................................................. 11

II    ICE'S ROUTINE CONFINEMENT OF CHILDREN IN SECURE,
UNLICENSED FACILITIES BREACHES THE SETTLEMENT .............. 14

III    DEFENDANTS VIOLATE THE SETTLEMENT BY REGULARLY
EXPOSING CHILDREN IN BORDER PATROL CUSTODY TO
HARSH, SUBSTANDARD CONDITIONS AND TREATMENT. ............ 17

IV    CONCLUSION ........................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Matter of Adeniji,*
    22 I. &N. Dec. 1102 (BIA 1999)..........................................................................11

*Airline Stewards v. Trans World Airlines, Inc.*,
    713 F.2d 319 (7th Cir. 1983) .......................................................................... 5

*Buckhannon Board & Care Home v. West Virginia Dep't of Health
    and Human Resources*,
    532 U.S. 598; 121 S. Ct. 1835; 149 L. Ed. 2d 855 (2001) ................................... 4

*City of Las Vegas v. Clark County,*
    755 F.2d 697 (9th Cir. 1985) .......................................................................... 5

*In re D-J-,*
    23 I. & N. Dec. 572 (A.G. 2003) ...................................................................... 8

*Demore v. Kim,*
    538 U.S. 510; 123 S. Ct. 1708; 155 L. Ed. 2d 724 (2003)............................. 7, 11

*Flanegan v. Arizona,*
    143 F.3d 540 (9th Cir. 1998) .......................................................................... 4

*Flores v. Meese,*
    681 F. Supp. 665 (C.D. Cal. 1988) ............................................................... 1, 11

*Flores v. Meese,*
    934 F.2d 991 (9th Cir. 1990) .......................................................................... 1

*Flores v. Meese,*
    942 F.2d 1352 (9th Cir. 1992) ........................................................................ 1

*Matter of Guerra,*
    24 I. & N. Dec. 37 (BIA 2006)........................................................................11

*Jeff D. v. Andrus,*
    899 F.2d 753 (9th Cir. 1989) .......................................................................... 4

*Kennewick Irrigation Dist. v. United States*,
   880 F.2d 1018 (9th Cir. 1989) ........................................................................ 5, 13

*Kokkonen v. Guardian Life Ins. Co.*,
   511 U.S. 375; 114 S. Ct. 1673; 128 L. Ed. 2d 391 (1994) ................................... 4

*Nodine v. Shiley Inc.*,
   240 F.3d 1149 (9th Cir. 2001) ............................................................................. 5

*Nordlinger v. Hahn*,
   505 U.S. 1; 112 S. Ct. 2326; 120 L.Ed.2d 1 (1992) ........................................... 14

*Matter of Patel*,
   15 I. & N. Dec. 666 (BIA 1976) ........................................................................ 11

*Plummer v. Chemical Bank*,
   668 F.2d 654 (2d Cir. 1982) ................................................................................. 5

*R.I.L.R., v. Johnson*,
   No. 15-00011 ..................................................................................................... 11

*Reno v. Flores*,
   507 U.S. 292; 113 S.Ct.1439; 123 L.Ed.2d 1 (1993) ..................................... 1, 11

*Rufo v. Inmates of Suffolk County Jail*,
   502 U.S. 367; 112 S. Ct. 748; 116 L. Ed. 2d 867 (1992) ..................................... 4

*Smith v. Organization of Foster Families*,
   431 U.S. 816; 97 S. Ct. 2094; 53 L. Ed. 2d 14 (1977) ...................................... 13

*Stockton Dry Goods v. Girsh*,
   36 Cal.2d 677; 227 P.2d 1 (1951) ...................................................................... 10

*TNT Marketing, Inc. v. Agresti*,
   796 F.2d 276 (9th Cir. 1986) ............................................................................... 5

*United States v. Armour & Co.*,
   402 U.S. 673; 91 S. Ct. 1752; 29 L. Ed. 2d 256 (1971) ...................................... 5

*United States v. Atlantic Refining Co.*,
   360 U.S. 19; 79 S. Ct. 944; 3 L. Ed. 2d 1054 (1959) ........................................ 10

*United States v. ITT Continental Baking Co.*,
   420 U.S. 223; 95 S. Ct. 926; 43 L. Ed. 2d 148 (1975) ...................................... 10

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT OF CLASS ACTION
CV 85-4544-RJK(Px)

*Walnut Creek Pipe Distrib., Inc. v. Gates Rubber Co. Sales Div.*,
  228 Cal.App.2d 810; 39 Cal.Rptr. 767 (1964) ................................................... 9

*Walsh v. Schlecht*,
  429 U.S. 401; 50 L. Ed. 2d 641; 97 S. Ct. 679 (1977) ...................................... 13

*Williams v. Vukovich*,
  720 F.2d 909 (6th Cir. 1983) ............................................................................. 5

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) .......................................................................................... 7

**Constitutional Authorities**

Fifth Amendment ................................................................................................... 14

**Statutes, Rules and Regulations**

6 U.S.C. § 279 ................................................................................................. 1, 17

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ........................................................................ 12

8 U.S.C. § 1226(a) ........................................................................................ 12, 13

42 U.S.C. § 5633(a)(12)(B) ............................................................................ 14, 15

Ariz. Rev. Stat. § 546-134-2 ................................................................................. 3

Cal. Admin. Code § 80000 ................................................................................... 3

Cal. Health & Safety Code § 1500 ....................................................................... 3

Cal. Welf. & Inst. Code § 206 .............................................................................. 3

Equal Access to Justice Act, 28 U.S.C. § 2412(d) .............................................. 21

Homeland Security Act, Pub. L. 107-296 .............................................................. 1

HSA 1512(a)(1) ..................................................................................................... 1

HSA §1512 ............................................................................................................ 1

HSA § 462(f)(2) .................................................................................................... 1

Immigration and Nationality Act .......................................................................... 11

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT OF CLASS ACTION
CV 85-4544-RJK(Px)

8 C.F.R. § 1236.1(c)(8) ......................................................................................... 12

8 C.F.R. § 1236.3(b) ........................................................................................ 9, 11

Fed.R.Civ. Proc. 23 .............................................................................................. 1

Fed. R. Civ. Proc. 23(e)(1)(A), ............................................................................ 4

H.R. 5005 ............................................................................................................. 1

INTRODUCTION

On January 28, 1997, this Court approved a class-wide settlement of this action pursuant to Rule 23, Fed.R.Civ.Proc. Plaintiffs' First Set of Exhibits in Support of Motion to Enforce Settlement, filed herewith, Exhibit 1 ("Settlement").[1] The agreement sets minimum national standards for the detention, release, treatment and housing of children detained by U.S. Customs and Border Protection ("CBP") or U.S. Immigration and Customs Enforcement ("ICE") on suspicion of being present in the U.S. without authorization.

For nearly 18 years[2] the Settlement has guaranteed class member children (1) safe and appropriate placement during federal custody; and (2) a fair opportunity for release on bond or recognizance pending proceedings to determine whether they are lawfully entitled to be in the United States. These provisions give effect to

_____

[1] Opinions in this action preceding the Settlement include *Flores v. Meese*, 681 F. Supp. 665 (C.D. Cal. 1988); *Flores v. Meese*, 934 F.2d 991 (9th Cir. 1990); *Flores v. Meese*, 942 F.2d 1352 (9th Cir. 1992) (en banc); and *Reno v. Flores*, 507 U.S. 292; 113 S.Ct. 1439; 123 L.Ed.2d 1 (1993).S

[2] Although the agreement contains a five-year sunset clause, on December 7, 2001, the parties stipulated that the Settlement remain binding until "45 days following defendants' publication of final regulations implementing this Agreement." Exhibit 3. Defendants have never published such regulations.

In 2002, the Homeland Security Act, Pub. L. 107-296 (H.R. 5005) ("HSA"), dissolved the former Immigration and Naturalization Service ("INS") and transferred most INS functions to the Department of Homeland Security ("DHS") and its subordinate agencies, including CBP and ICE. 6 U.S.C. § 279. The HSA included "savings" provisions providing, *inter alia*, that the Settlement should remain in effect as to the successor agencies. HSA §§ 462(f)(2), 1512(a)(1), 1512.

The Settlement binds the INS and Department of Justice, as well as "their agents, employees, contractors, and/or successors in office." Settlement ¶ 1. Defendants have repeatedly acknowledged that the Settlement binds DHS. *See, e.g.*, Report to Congress on the Department of Homeland Security Office for Civil Rights and Civil Liberties (2007), at 20, *available at* www.dhs.gov/xlibrary/assets/crcl-fy07annualreport.pdf (last checked December 9, 2014).

defendants' oft-professed resolve to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Settlement ¶ 11.

Beginning in the summer of 2014, ICE reacted to a temporary "surge" of Central Americans arriving at the U.S.-Mexico border by adopting a policy to detain all female-headed families, including children, in secure, unlicensed facilities for howsoever long as it takes to determine whether they are entitled to remain in the U.S. Class member children and their mothers now fill secure facilities in Leesport, Pennsylvania, Karnes City, Texas, and a new mega-facility in Dilley, Texas, which will eventually "house up to 2,400 individuals'…" Exhibit 9.[3]

Defendants' no-release policy and housing children in secure facilities breach the Settlement in three principal ways:

First, the Settlement requires ICE to take affirmative steps to release a child to a parent, close adult relative, or other qualified custodian, except where an individual child's detention is required "either to secure his or her timely appearance before the INS (now ICE) or the immigration court, or to ensure the minor's safety or that of others…" Settlement ¶ 14. ICE's no-release policy as applied against class members apprehended with their mothers breaches defendants' duty to minimize children's detention. In addition, the Settlement affords class members the right to be released first to their parents. Settlement ¶ 14. ICE's categorical refusal to consider releasing class members' mothers denies class members their right to release to the care and protection of their preferred custodian.

Second, except for delinquents or serious flight risks, the Settlement obliges defendants to house children, usually no more than 72 hours after arrest, in non-secure facilities that are licensed to care for dependent (as opposed to delinquent)

---

[3] The Government recently closed a similar detention facility in Artesia, New Mexico. *Id.*

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT OF CLASS ACTION
CV 85-4544-RJK(Px)

children. Settlement ¶¶ 12, 19. ICE's family detention facilities meet neither of these requirements.

Third, the Settlement requires U.S. Customs and Border Protection ("CBP") to hold recently apprehended children in facilities that are "safe and sanitary and that are consistent with the [Government's] concern for the particular vulnerability of minors." Settlement ¶ 12. In breach of this provision, defendants routinely expose class members to unacceptably harsh conditions during Border Patrol custody, including cold, overcrowding, inadequate food and drink, sleep deprivation, and poor sanitation.

THIS COURT HAS JURISDICTION TO ENFORCE THE SETTLEMENT AS A CONTRACT AND CONSENT DECREE.

This class action challenged the former-INS's policies (1) to release apprehended children only to parents or legal guardians; and (2) to house children in facilities in which they were provided no education, recreation, or visitation, and in which they were commingled with unrelated adults.[4]

_____

[4] On November 30, 1987, this Court approved a partial settlement in which the Government pledged to remedy the "deplorable conditions" affecting detained minors in western states. *See* Memorandum of Understanding, etc., Nov. 30, 1987, Exhibit 26 (MOU). The MOU required defendants to house minors in "special child-care facilities": *i.e.*, "'community based shelter care programs' that will 'provide a safe and appropriate environment' ... [meeting] 'state licensing requirements for the provision of shelter care … and related services to dependent children.'" *Id*. at 2 and 11.

In contrast to juvenile halls and like institutions for youthful offenders, nearly all states require that *dependent* children be placed only in non-secure facilities. *E.g.*, Cal. Welf. & Inst. Code § 206; Cal. Health & Safety Code §§ 1500, *et seq*.; Cal. Admin. Code §§ 80000 *et seq.;* Ariz. Rev. Stat. § 546-134-2.

The Settlement supersedes and expands upon the MOU, but likewise requires defendants to house the general population of detained minors in non-secure facilities licensed to care for dependent children.

- 3 -

After several years' litigation, the parties settled. The Settlement, which the Court approved in January 1997, protects children, whether accompanied or unaccompanied, detained anywhere in the country. Settlement ¶ 9 ("The certified class in this action shall be defined as follows: 'All minors who are detained in the legal custody of the INS.'").

In *Kokkonen v. Guardian Life Ins. Co*., 511 U.S. 375; 114 S. Ct. 1673; 128 L. Ed. 2d 391 (1994), the Court held that a proceeding to enforce a settlement requires its own basis of jurisdiction. *Id*. at 378. "Such a basis for jurisdiction may be furnished by separate provision (such as a provision retaining jurisdiction over the settlement agreement) or by incorporating the terms of the settlement agreement in the order." *Flanegan v. Arizona*, 143 F.3d 540, 544 (9th Cir. 1998).

Here, the Settlement and, *a fortiori*, this Court's order approving it,[5] reserve jurisdiction in this Court to redress class-wide violations. Settlement ¶ 37 ("This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24."); Order, January 28, 1997, Exhibit 2.[6]

The law guiding enforcement of the Settlement is well-established. The Settlement is a contract, *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378; 112 S. Ct. 748; 116 L. Ed. 2d 867 (1992), and is therefore generally construed and enforced as such. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989).

The Settlement is also an order of the Court and therefore a consent decree. *See Buckhannon Board & Care Home v. West Virginia Dep't of Health and Human Resources*, 532 U.S. 598, 604 n.7; 121 S. Ct. 1835; 149 L. Ed. 2d 855 (2001); *Rufo*,

---

[5] The Settlement resolves a certified class action, and the Court was accordingly required to find the accord consistent with law and the public interest. Rule 23(e)(1)(A), Fed. R. Civ. Proc.

[6] Paragraph 24 of the Settlement provides for judicial review of placement decisions affecting individual class members in any judicial district with venue. Paragraph 37 therefore requires that claims of class-wide violations be brought in this Court.

- 4 -

*supra*, 502 U.S. at 378 (settlement "a judicial decree that is subject to the rules generally applicable to other judgments and decrees."). The prospective provisions of the Settlement operate as an injunction. *See Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir. 1982); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).

Whether enforced as a contract or consent decree, the Court's task is largely the same. *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985) ("A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles.").[7]  Foremost, the Court enforces the agreement "*according to the plain meaning of its terms.*" *Nodine v. Shiley Inc.*, 240 F.3d 1149, 1154 (9th Cir. 2001) (emphasis supplied); *United States v. Armour & Co.*, 402 U.S. 673, 682; 91 S. Ct. 1752; 29 L. Ed. 2d 256 (1971) (settlement's requirements "must be discerned within its four corners, …").

If the agreement is breached, the Court may issue orders "commanding or enjoining particular conduct." *TNT Marketing, Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986).

ARGUMENT

I    ICE'S NO-RELEASE POLICY IS A MATERIAL BREACH OF THE SETTLEMENT.

**A    ICE's new no-release policy breaches the Settlement's requirement that defendants minimize the detention of children.**

In Part VI of the Settlement, "General Policy Favoring Release," defendants agreed that detention is detrimental to children and that they would therefore release a child to a qualified custodian "without unnecessary delay" whenever

---

[7] Generally, "the construction and enforcement of settlement agreements are governed by principles of local law…" *Airline Stewards v. Trans World Airlines, Inc.*, 713 F.2d 319, 321 (7th Cir. 1983) (citation omitted). However, "federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party." *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989). Here, federal and state law accord.

continued "detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others …" Settlement ¶ 14.

Further ensuring that detaining children would be a last resort, the Settlement requires defendants to take affirmative steps to find qualified custodians for detained children:

> Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, *shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor* pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody.

Settlement ¶ 18 (emphasis added).[8]

These provisions place defendants under an affirmative obligation to locate suitable custodians—preferably parents—and to release children to such custodians except as otherwise provided in the Settlement. Since the summer of 2014, however, ICE has detained children apprehended with their mothers *en masse* regardless of whether they are flight-risks, dangerous, or whether qualified custodians are available to care for them:

---

[8] The  Settlement also directs defendants to release a child "in order of preference to

 A. a parent;

 B. a legal guardian;

 C. an adult relative (brother, sister, aunt, uncle, or grandparent);

 D. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

 E. a licensed program willing to accept legal custody; or

 F. an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."

Settlement ¶ 14.

Prior to June 2014, ICE's general practice was to release children and parents upon a determination that those individuals were not a signficant flight risk or danger to the public. Generally, delays in releasing children and their parents were not significant. … Since June, ICE has begun detaining all Central American families without the possibility of release on bond, recognizance, supervision or parole if it believes that those families arrived in the United States as part of the "surge" or unauthorized entrants—mostly children—that purportedly began in the summer of 2014.

Declaration of Bridget Cambria, November 7, 2014, Exhibit 10 ¶¶ 3-5 (Cambria).[9]

The Settlement, however, posits only two exceptions to defendants' obligation to seek out qualified custodians and to release children to their care: (1) a minor is demonstrably dangerous; or (2) extraordinarily likely to abscond, such that detention is "*required*" to secure his or her appearance. Settlement ¶ 14 (emphasis supplied).[10] Yet —

ICE applies its current no-release policy indiscriminately to all Central American children and their mothers. ICE does not consider the individual

[9] *See also, e.g.,* Declaration of Barbara Hines, Jan. 31, 2014, Exhibit 17 (Hines) ¶ 12 ("Since DHS began detaining families at the Karnes City facility, DHS has insisted on categorical detention of all of the families of mothers and children who are brought to the facility."); Declaration of Virginia Raymond, Dec. 13, 2014, Exhibit 35 ¶ 7; Declaration of Carol Anne Donohoe, Nov. 15, 2014, Exhibit 11 (Donohoe) ¶ 5.

[10] To comport with due process, civil immigration detention must serve discrete statutory purposes and be accompanied by "constitutionally adequate" procedures to ensure confinement is not erroneous. *Zadvydas v. Davis*, 533 U.S. 678 (2001); *Demore v. Kim*, 538 U.S. 510, 532-33; 123 S.Ct. 1708; 155 L. Ed. 2d 724 (2003) (Kennedy, J., concurring).  Here, ICE's detaining children apprehended with their mothers *en masse* lacks a "reasonable relation" to the purposes for immigration detention: *i.e.,* to prevent flight or danger. ICE also detains children generally "to deter others" even in the absence of any reason to believe an individual child is an exceptional flight risk or danger.

MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION
CV 85-4544-RJK(Px)

child's age, reasons for coming to the United States, prior immigration violations, family ties in the United States, eligiblity for lawful status or favorable exercise of prosecutorial discretion, credible fear of persecution abroad, likelihood to abscond, or the child's safety or the safety of others. … Presently, a single man has a greater chance of being released from detention than a Central American mother with child.

Cambria ¶ 5; *see also, e.g.,* Donohoe ¶ 5; Hines ¶ 15.

In opposing requests that immigration judges order children's release over its objection, ICE has repeatedly admitted and defended its no-release policy. *E.g.*, Exhibits 7 and 8.

ICE's stock opposition features the declaration of Philip Miller, ICE's Assistant Director of Field Operations, who asserts that "the high probability of a prompt release, coupled with the likelihood of low or no bond, is among the reasons" motivating Central American detainees' coming to the United States. Exhibit 8 at 5. Miller opines that "implementation of a 'no bond' or 'high bond' policy would significantly reduce the unlawful mass migration of Guatemalans, Hondurans and Salvadoran (sic)." *Id*.[11]

---

[11] Traci Lembke, ICE's Assistant Director over Investigative Programs, similarly declares, "Illegal migrants to the United States who are release on a minimal bond become part of 'active migration networks,'… which in turn likely encourages further illegal migration into the United States." *Id*. at 10.

ICE also customarily relies on *In re D-J-*, 23 I. & N. Dec. 572 (A.G. 2003), which upheld detention of a Haitian adult crossing by sea as a national security risk and to deter similar "unlawful mass migrations." *Id*. at 579.

ICE has also sometimes defended its no-release policy as a humanitarian measure "to maintain family unity as families await the outcome of immigration hearings or return to their home countries." Exhibit 9. But this is feeble justification for stripping children of their rights under the Settlement.

First, ICE's no-release policy encourages mothers and children to enter separately. Children apprehended alone or with anyone other than a parent—whether smuggler,

ICE's novel no-release policy plainly breaches the Settlement. The agreement obliges defendants to search out an appropriate custodian and, with two exceptions, to release a child if one is available. Yet ICE makes no effort to locate custodians for children apprehended with their mothers and refuses to release class members even when a qualified custodian is available.[12]  ICE's no-release policy unilaterally revises ¶ 14 of the Settlement to provide as follows:

> Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, *or the minors has been apprended with a mother and the INS determines all such children should remain detained in order to deter future unauthorized entry by others,* the INS shall release a minor from its custody without unnecessary delay, ...

ICE's unilateral revision is wholly unlawful. Apart from extraordinary circumstances nowhere present here, a party may not unilaterally add to a settlement. *Walnut Creek Pipe Distrib., Inc. v. Gates Rubber Co. Sales Div.*, 228

---

human trafficker, or complete stranger—remain eligible for release. ICE's policy thus promotes family disintegration, not unity.

Second, ICE need not detain families to keep them together. ICE can and should release mothers and children together in accordance with actual equities, just as the agency's regulations. 8 C.F.R. § 1236.3(b) (2014) ("(2) If an individual specified in paragraphs (b)(1)(i) through (iii) of this section cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in Service detention, *simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis*." (Emphasis added.)

[12] *See, e.g.*, Declaration of R_ E_ A_, Jan. 8, 2015, Exhibit 20 ¶ 7 (R_E_A_Ex20); Declaration of J_ H_M, Sept. 20, 2014, Exhibit 12 ¶ 7 (J_H_M_Ex12); Declaration of M_ C_T, Sept. 19, 2014, Exhibit 13 ¶ 7 (M_C_T_Ex13); Declaration of M_ F_S, Sept. 19, 2014, Exhibit 14 ¶ 8 (M_F_S_Ex14).

Cal.App.2d 810, 816, 39 Cal.Rptr. 767 (1964) (courts should not imply additional terms, except in cases of "obvious necessity.").[13]

Defendants' no-release policy thus violates the Settlement's "general policy favoring release" and its specific provisions requiring ICE to seek out qualified custodians and release children to them absent exceptional circumstances.[14]

---

[13] Additional terms may be implied only if *all* of the following conditions are satisfied:

(1)  the implied term must arise from the language of the contract itself or it must be indispensable to effectuate the intention of the parties;

(2) it must appear from the language used that the term was so clearly within the contemplation of the parties that they deemed it unnecessary to express it;

(3) the additional term must be justified on the grounds of legal necessity;

(4) it must appear that the additional term would have been included had attention been called to it; and

(5) the additional term may not treat a subject completely covered by the contract.

*Stockton Dry Goods v. Girsh*, 36 Cal.2d 677, 680; 227 P.2d 1 (1951). The addition defendants unilaterally invent meets none of these criteria.

As for "obvious necessity," ICE initially justified its no-release policy as a response to the influx of *unaccompanied* minors that started in March 2014. The influx, however, proved short-lived: by October 2014, defendants apprehended 2,529 unaccompanied children, fewer than the 2,986 apprehended in February 2013. *See* http://www.dhs.gov/sites/default/files/publications/secretary/14_1009_s1_border_slide_508.pdf#page=31 (last checked January 16, 2015).

Of course, ICE's no-release policy targets not *unaccompanied* minors, but children apprehended with mothers, a far smaller population: by October 2014, fewer than 100 families were apprehended in the Border Patrol Rio Grande Sector, by far the sector most impacted by the surge. *Id.;* www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children-2014 (last checked Jan. 16, 2015).

[14] Even assuming, *arguendo*, defendants had some basis to evade their obligations under the Settlement, their remedy is to ask the Court to reform the agreement, not unilaterally breach it. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236-37; 95 S. Ct. 926; 43 L. Ed. 2d 148 (1975); *United States v. Atlantic Refining Co.*, 360 U.S. 19, 23; 79 S. Ct. 944; 3 L. Ed. 2d 1054 (1959) (that government's interpretation of consent decree might better accord with statute would "not warrant our substantially changing the terms of a decree … without any adjudication of the issues.").

**B      ICE must consider releasing class members with their preferred custodians: their mothers.**

The Settlement further grants class members a right to release "in order of preference to … a parent; …" Settlement ¶ 14.[15] ICE's denying their mothers any chance for release denies class members a right the Settlement explicitly confers: preferential release to a parent.[16]

Until June 2014, defendants exercised individualized discretion to release women who are statutorily eligible regardless of whether they were apprehended with their children. Hines ¶ 9; Cambria ¶ 2.[17] Women who are lawfully eligible for

---

[15] As noted, defendants' own regulations require much the same. *See* 8 C.F.R. § 1236.3(b) (2015).

The Supreme Court has also remarked that mothers should generally be considered for release along with their children:

The Board of Immigration Appeals has stated that "an alien generally … should not be detained or required to post bond except on a finding that he is a threat to the national security … or that he is a poor bail risk." ... In the case of arrested alien juveniles, however, the INS cannot simply send them off into the night on bond or recognizance. The parties to the present suit agree that the Service must assure itself that someone will care for those minors pending resolution of their deportation proceedings. *That is easily done when the juvenile's parents have also been detained and the family can be released together*; …

*Reno v. Flores, supra*, 507 U.S. at 295 (citations omitted; emphasis added).

[16] On January 6, 2015, a proposed class action challenging ICE's no-release policy as applied against *Flores* class members' mothers commenced in the United States District Court for the District of Columbia. *R.I.L.R., v. Johnson,* No. 15-00011. The suit contends that ICE's no-release policy violates mothers' rights apart from those the Settlement confers on class members herein. *See* Memorandum in Support of Preliminary Injunction, Exhibit 36.

[17] The Immigration and Nationality Act (INA) generally permits detention pending removal proceedings only where an arrestee is a danger to the community or to prevent flight where the risk of absconding cannot be mitigated through imposition of bond or other conditions. *Demore v. Kim*, *supra*, 538 U.S. at 527-28; *Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006); *Matter of Adeniji*, 22 I. &N. Dec. 1102 (BIA 1999); *Matter of Patel*, 15 I. & N. Dec. 666 (BIA 1976). The INA and

MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION CV 85-4544-RJK(Px)

release include bona fide asylum-seekers: *i.e.*, those who prove a credible fear of persecution. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). The mothers of *many* class members are bona fide asylum-seekers,[18] and until now were deemed a "low priority" for detention.[19]

Even now, women apprehended without children—and nearly all adult males—receive an individualized assessment of whether detention is warranted if they prove a credible fear of persecution. Hines ¶ 17. Defendants reserve their most rigid detention policy for mothers apprehended with children despite their being statutorily eligible for release:

> DHS has applied this policy and practice of categorical detention even to Central American families who have been found to have a credible fear of persecution in their home countries and are eligible for release. … I am not aware of any family detained at Karnes who despite being eligible for release under 8 U.S.C. § 1226(a), and despite having received a favorable credible fear finding, then received an DHS custody determination allowing for

---

implementing regulations direct ICE to exercise discretion to determine whether a non-citizen's release on bond will prove dangerous or inadequate to secure his or her appearance. 8 U.S.C. § 1226(a); 8 C.F.R. § 1236.1(c)(8).

[18] *E.g.*, Declaration of Anne Chandler, Dec. 1, 2014, Exhibit 28 ¶ 14 (Chandler); Declaration of Allison Boyle, Nov. 24, 2014, Exhibit 29 ¶ 15 (Boyle); Declaration of Brittany Perkins, Nov. 28, 2014, Exhibit 30 ¶ 12 (Perkins); Declaration of Clayton Matheson, Nov. 30, 2014, Exhibit 31 ¶ 11 (Matheson).

[19] *See, e.g.*, ICE, Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* § 6.2 (Dec. 8, 2009), *available at* www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf (last checked Jan. 18, 2015).

In fiscal year 2012, DHS released 80 percent of bona fide asylum-seekers. U.S. Comm'n on Int'l Religious Freedom, *Assessing the U.S. Government's Detention of Asylum Seekers: Further Attention Needed to Fully Implement Reforms* 9-10 (Apr. 2013), *available at* www.uscirf.gov/sites/default/files/resources/ERS-detention%20reforms%20report%20April%202013.pdf (last checked Jan. 18, 2015).

1  release.

2  B. Hines ¶ 14; *see also,* Declaration of Kate Lincoln, Dec. 2, 2014, Exhibit 32 ¶ 13;

3  Declaration of Melissa Cuadrado, Nov. 26, 2014, Exhibit 33 ¶ 12 (Cuadrado);

4  Declaration of Scott Williams, Dec. 1, 2014, Exhibit 34 ¶ 11.

5          ICE's no-release policy toward mothers cannot be squared with the

6  Settlement's granting class members a right to preferential release to a parent. A

7  "written contract must be read as a whole and every part interpreted with reference

8  to the whole." *Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1032

9  (9th Cir. 1989). "Preference must be given to reasonable interpretations as opposed

10  to those that are unreasonable, or that would make the contract illusory." *Id*. ICE's

11  exercising discretion to release mothers as 8 U.S.C. § 1226(a) directs is essential if

12  children's right to prefential release to a parent is to have any meaning at all.

13          Further, consent decrees should also be enforced whenever practicable so as

14  to avoid raising constitutional questions. *Cf. Walsh v. Schlecht*, 429 U.S. 401, 408,

15  50 L. Ed. 2d 641, 97 S. Ct. 679 (1977) ("Contracts should not be interpreted to

16  render them illegal and unenforceable where the wording lends itself to a logically

17  acceptable construction that renders them legal and enforceable."). Here, construing

18  the Settlement to allow ICE to detain class members' mothers merely because they

19  have been apprehended together would raise substantial constitutional concerns.

20          First, ICE's releasing class members—as the Settlement clearly requires—

21  while refusing even to exercise discretion to release their mothers would undermine

22  children's due process interest in parental care. *Smith v. Organization of Foster*

23  *Families*, 431 U.S. 816, 844, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) (due process

24  right of children in not being dislocated from the "emotional attachments that

25  derive from the intimacy of daily association" with the parent).

26          Second, defendants continue to release men, women, and adolescents

27  apprehended separately in accordance with 8 U.S.C. § 1226(a). Detaining *only*

28  mothers merely because they were apprehended with their children bears no

- 13 -

relationship to any legitimate governmental purpose and would accordingly raise substantial equal protection concerns. *Nordlinger v. Hahn*, 505 U.S. 1, 10; 112 S.Ct. 2326; 120 L.Ed.2d 1 (1992) (equal protection component of the Fifth Amendment "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

ICE's refusing to exercise discretion to release class members' mothers accordingly breaches the preference for parental custody ¶ 14 posits. Detaining children is universally recognized as inimical to their well-being, and release together with a parent is not only required by ¶ 14, it is clearly in the best interests of a particularly vulnerable population.[20]

II    ICE'S ROUTINE CONFINEMENT OF CHILDREN IN SECURE, UNLICENSED FACILITIES BREACHES THE SETTLEMENT.

The Settlement stipulates that defendants shall house the general population of children they do not release in facilities that are licensed to care for *dependent minors*: "In any case in which the INS does not release a minor pursuant to Paragraph 14, … [e]xcept as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program ..." Settlement ¶ 19.

The agreement defines a "licensed program" as a "program, agency or organization that is *licensed by an appropriate State agency* to provide residential, group, or foster care services for *dependent children* …" Settlement ¶ 6 (emphasis added).[21]

---

[20] *E.g.*, Lutheran Immigration and Refugee Services, *et al.*, *Flores Settlement Agreement and DHS Custody: Key Flores Provisions & DHS Noncompliance* (undated), Exhibit 37 (LIRS Report).

[21] In this regard, the Settlement is consistent with federal law regulating the detention of juveniles. 42 U.S.C. § 5633(a)(12)(B) prohibits secure confinement of juveniles not charged with delinquency or crime. The U.S. Department of Justice maintains that housing non-delinquent class members in secure facilities would therefore be inconsistent with federal policy. Office of Juvenile Justice and Juvenile

The Settlement's requiring that detention facilities be licensed ensures that disinterested state officials with appropriate expertise are regularly monitoring and certifying that ICE placements meet child-welfare standards.[22]

Exceptional cases aside,[23] the Settlement precludes ICE from housing children in unlicensed facilities, and even then only if no less restrictive alternative is available. *Id.* ¶ 23. Yet ICE freely admits it is routinely holding non-delinquent class members in facilities that are not licensed to care for dependent minors. *See*

---

Delinquency Prevention, *Juveniles in Federal Custody: Recommendations and Prospects for Change* (1998), at 40.

[22] Child welfare and protection expert Genevra Berger elaborates on the importance of licensing:

It bears emphasis that the state licensing agency plays a pivotal role not only in initially assessing the standards are met but also in conducting periodic inspections to determine continuing compliance. … [M]ost importantly, … the lack of licensing means that no qualified and independent agency is verifying that the minimal safety requirements … are being met. Nor is there any qualified and independent child welfare agency available to receive and investigate allegations of child abuse or neglect …

Declaration of Genevra Berger, Jan. 12, 2015, Exhibit 25 ¶¶ 25, 28 (Berger).

[23] The Settlement leaves defendants free to place delinquents and exceptional escape-risks in unlicensed, secure facilities, such as juvenile halls. Settlement ¶ 21.

The Settlement also allows defendants to place children who are neither escape-risks nor delinquent in unlicensed facilities in the event of an "influx." *Id.* ¶ 12. Defendants have not yet sought to excuse their housing class members apprehended with their mothers in unlicensed facilities under the influx provision. Their doing so could not possibly be excused as an influx response.

First, the influx of children apprehended with their mothers ended months ago. Note 13, *ante*. Second, defendants continue to place *unaccompanied* minors, who have always far outnumbered children apprehended with their mothers, *id.*, in licensed placements. Third, ¶ 12 of the Settlement stipulates that even "in the event of an … influx of minors into the United States, … the INS shall place all minors" in licensed settings "as expeditiously as possible…" Defendants feign no effort at all to place minors apprehended with their mothers in licensed settings.

1   *e.g.*, Defendants' response to questions re: implementation of class action

2   settlement, November 3, 2014, Exhibit 6 at 12.

3        In addition to licensing, the Settlement stipulates that "[a]ll homes and

4   facilities operated by licensed programs … shall be *non-secure* as required under

5   state law ..."; that defendants "usually house[] persons under the age of 18 in an

6   *open setting*, such as a group home, *and not in detention facilities*." *Id*. (emphasis

7   supplied).[24] Yet ICE's family detention facilities are unquestionably secure:

8        The Karnes City facility is a large block building, which appeared to have

9        only one entrance. To enter, my colleagues and I were … directed to a sally

10        port, which comprised two heavy metal doors with a small room between.

11        We passed through one door, it closed behind us; … the second door was

12        opened, we walked through, and we then reached the interior of the facility.

13        The Karnes facility is constructed of concrete block. A staff member stated

14        the facility had been designed to house adult male prisoners. … [A] central

15        open area … was effectively surrounded by the high block walls of the

16        facility itself, denying those inside any means of ingress or egress except via

17        the secure entrance I earlier described. Facility staff stated that children

18        detained at Karnes have never been permitted outside the facility to go to the

19        park, library, museum, or other public places.

20   Declaration of Carlos Holguín, January 15, 2013, Exhibit 23 ¶¶ 4-5; *see also* Hines

21   ¶ 63; Matheson ¶ 17; Cuadrado ¶ 6; Chandler ¶ 21; Perkins ¶ 21.

22    

---

23   [24] Dr. Luis Zayas, a leading child psychologist and Dean of the School of Social
Work at the University of Texas at Austin emphasizes the harm secure confinement

24   does to children: "The medical and psychiatric literature has shown that
incarceration of children, even in such circumstances as living with their mothers in

25   detention, has long-lasting psychological, developmental, and physical effects."

26   Declaration of Luis Zayas, Dec. 10, 2014, Exhibit 24 ¶¶ 1-6. After interviewing
children at ICE's Karnes detention center, Dr. Zayas found that "children [at

27   Karnes] are suffering emotional and other harms as a result of being detained." *Id*.

28   ¶10.

1   In sum, ICE's detaining children in secure, unlicensed facilities is

2   "detrimental to child welfare and places the detained children at grave risk of

3   serious harm." Berger ¶ 16. It also clearly breaches ICE's duty to house the general

4   poplation of children it does not release in non-secure settings that are properly

5   licensed to care for dependent minors.

6   III DEFENDANTS VIOLATE THE SETTLEMENT BY REGULARLY EXPOSING CHILDREN

7   IN BORDER PATROL CUSTODY TO HARSH, SUBSTANDARD CONDITIONS AND

8   TREATMENT.

9   The Settlement guarantees class members a minimum level of care even

10   while they await release or transfer to a licensed placement:

11   Following arrest, the INS shall hold minors in facilities that are safe and

12   sanitary and that are consistent with the INS's concern for the  particular

13   vulnerability of minors. Facilities will provide access  to toilets and sinks,

14   drinking water and food as appropriate, medical assistance if the minor is in

15   need of emergency services, adequate temperature control and ventilation, ...

16   Settlement ¶ 12.

17   Typically, upon apprehension class members are taken first to a Border

18   Patrol station. Children may spend from one to several nights in Border Patrol

19   holding cells before they are turned over to the Office of Refugee Resettlement, if

20   unaccompanied, or if accompanied, to ICE, for longer term housing. *See* 6 U.S.C. §

21   279. Though ¶ 12 guarantees that children will be treated in accordance with

22   minimum standards during Border Patrol detention, reports of agonizing cold,

23   overcrowding, and inadequate nutrition and hygiene are endemic:

24   [W]e were first taken to a Border Patrol station near McAllen, Texas, where

25   we spent three days and four nights. … The Border Patrol put us in a cell

26   with perhaps 100 other women and children. There were so many of us that

27   only perhaps half of us could lie down. … We were given neither mattress

28   nor pillow, so we did our best to sleep on the hard concrete floor, which was

- 17 -

covered with dust. We were given nothing to keep warm except a cover of aluminum foil. Neither my children nor I could sleep that first night. The cell had only two toilets for all of us to use. There were short walls surrounding the toilets, but it was so crowded that people were sitting or lying down in the stalls, so any privacy the stall might have provided was lost. There was no waste basket in the stalls, so people had to throw used Kotex and used toilet paper on the floors. There was no soap for us to use to wash our hands, and we were not permitted to bathe or brush our teeth the entire time we were there.

The cell had no window to allow daylight to enter; only a window out to the central part of the Border Patrol station. They kept the light on all the time, and there was no clock so we lost track of whether it was day or night, but I believe it was the next morning when we were finally given something to eat, which was a baloney sandwich. For the next days, we were given nothing else to eat except baloney sandwiches three times a day. We were constantly hungry.

Declaration of D_ V_A, Jan. 9, 2015, Exhibit 18 ¶¶ 3-5 (D_V_A_Ex18).[25]

---

[25] Journalists, human rights observers, and advocates have repeatedly expressed concern over Border Patrol conditions. *See, e.g.* Americans for Immigrant Justice, *The Hieleras: A Report on Human and Civil Rights Abuses Committed by U.S. Customs and Border Protection Agency*, Aug. 2013, *available at* http://d3n8a8pro7vhmx.cloudfront.net/aijustice/pages/391/attachments/original/1398795271/The_Hieleras_A_Report.pdf?1398795271; Center for Investigative Reporting, *Detained border crossers may find themselves sent to "the freezers,"* Nov. 18, 2013, *available at* http://cironline.org/reports/detained-border-crossers-may-find-themselves-sent-to-freezers-5574; National Public Radio, *Amid Wave of Child Immigrants, Reports of Abuse by Border Patrol*, July 24, 2014, *available at* www.npr.org/2014/07/24/334041633/amid-wave-of-child-immigrants-reports-of-abuse-by-border-patrol; Complaint regarding Systemic Abuse of Unaccompanied Children in CBP Custody, June 11, 2014, *available at* www.acluaz.org/sites/default/files/documents/DHS%20Complaint%20re%20CBP%20Abuse%20of%20UICs.pdf.

MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION CV 85-4544-RJK(Px)

Detainees' accounts of harsh Border Patrol conditions are disturbingly consistent. Children routinely endure extreme cold and have little or no access to clothing, blankets, or beds.[26] Detainees consistently refer to CBP facilities as "hieleras" or iceboxes.[27] Coverings, when provided, are of "aluminum foil" and are often inadequate to keep children warm in "ice box" temperatures.[28]

Children and their mothers regularly report being held for one to three days in extremely overcrowded rooms with 100 or more unrelated adults and children.[29] In overcrowded conditions, children must frequently sleep standing up or not at all; they often lack space even to walk around.[30] Whatever floor space may be available consists of concete floors caked with mud and dirt from migrants' shoes.[31]

---

[26] *E.g.* Declaration of H_R_M, Jan. 9, 2015, Exhibit 19 ¶ 5  (H_R_M_Ex19); Declaration of E_G_M, Jan. 9, 2015, Exhibit 41 ¶ 5  (E_G_M_Ex41); Declaration of M_G_S, Jan. 8, 2015, Exhibit 40 ¶ 4 (M_G_S_Ex40).

[27] *E.g.* Declaration of A_F_E, Jan. 9, 2015, Exhibit 44  ¶ 5 (A_F_E_Ex44); H_R_M_Ex19 at ¶ 5; Declaration of C_C_C, Jan. 8, 2015, Exhibit 47 ¶ 7 (C_C_C_Ex47); Declaration of S_ A_M_B, Jan. 8, 2015, Exhibit 50 ¶ 6 (S_A_M_B_Ex50). CBP facility temperatures are so cold that children have fallen ill. E.g. A_F_E_Ex44 ¶¶ 9-13; Declaration of S_C_M, Jan. 8, 2015, Exhibit 38 ¶ 4 (S_C_M_Ex38).

[28] *E.g.* Declaration of A_Z_M, Jan. 9, 2015, Exhibit 42 ¶ 5 (A_Z_M_Ex42); Declaration of A_C_G, Jan. 9, 2015, Exhibit 43 ¶ 6 (A_C_G_Ex43); A_F_E_Ex44 at ¶ 5; H_R_M_Ex19 ¶ 5; Declaration of H_M_P, Jan. 9, 2015, Exhibit 45 ¶ 8 (H_M_P_Ex45); E_G_M_Ex41 ¶ 5; Declaration of M_M_M, Jan. 9, 2015, Exhibit 46 ¶ 5 (M_M_M_Ex46); R_E_A_Ex20 ¶ 3; D_V_A_Ex18 ¶ 4; C_C_C_Ex47 ¶ 7; Declaration of S_M_A, Jan. 9, 2015, Exhibit 48 ¶ 5 (S_M_A_Ex48); Declaration of L_B_S, Jan. 8, 2015, Exhibit 49 ¶ 5 (L_B_S_Ex49); Declaration of S_B_T, Jan. 8, 2015, Exhibit 39 ¶¶ 5-6 (S_B_T_Ex39).

[29] *E.g.* A_F_E_Ex44 ¶ 5; M_M_M_Ex46 ¶ 5; R_E_A_Ex20 ¶ 3; D_V_A_Ex18 ¶ 4 (cell shared with 100 women and children); S_C_M_Ex38 ¶ 4.

[30] *E.g.* Declaration of O_ F_C_M, Jan. 9, 2015, Exhibit 51 ¶ 6 (O_F_C_M_Ex51); H_M_P_Ex45 ¶ 6; M_G_ S_Ex40 ¶ 4; S_C_M_Ex38 ¶ 4; S_A_M_B_Ex50 ¶ 6. Many children and their mothers report that lights are left on at night, further preventing them from sleeping. *E.g.* O_F_C_M_Ex51 ¶ 6; H_M_P_Ex45 ¶ 6; M_M_M_Ex46 ¶ 5 ("You could not tell if it was day or night because there were no

Children have virtually no privacy in Border Patrol holding cells and must often use toilets that are open and visible to other detainees.[32] Children's access to toilets is often wholly inadequate: at times only one toilet for 50 to 100 detainees; toilets quickly become overwhelmed, and used toilet paper and sanitary napkins piles into corners.[33]

Children are frequently provided inadequate food and water during Border Patrol custody.[34] Children and mothers report that drinking water tastes of chlorine bleach to the point that it is nearly undrinkable.[35] Nutrition typically consists of sandwiches served three times daily. Special or additional meals, milk, or nutrition for breast-feeding mothers, infants, or toddlers is out of the question.[36]

Whether considered individually or together, Border Patrol detention conditions are anything but "safe and sanitary" or "consistent with the [Government's] concern for the particular vulnerability of minors." Settlement ¶ 12. Other than "standards prescribed by the American Society of Heating, Refrigeration

---

windows"); R_E_A_Ex20 ¶ 4; D_V_A_Ex18 ¶ 6 (no sleep because of overcrowding, noise, lights); S_M_A_Ex48 ¶ 5; L_B_S_Ex49 ¶ 8.

31 *E.g.* A_F_E_Ex44 at ¶ 7; D_V_A_Ex18 at ¶ 4.

[32] *E.g.* A_C_G_Ex43 ¶ 6 ("Everyone could see when you used the bathroom."); Declaration of J_E_F, Jan. 9, 2015, Exhibit 52 ¶ 6 (J_E_F_Ex52) (same); S_C_M_Ex38 ¶ 4; S_A_M_B_Ex50 ¶ 6.

[33] *E.g.* A_Z_M_Ex42 ¶ 5; H_R_M_Ex19 ¶ 6 (one toilet for 125 people); E_G_M_Ex41 ¶ 5; D_V_A_Ex18 ¶ 4 (two toilets for 100; no waste baskets, soap, bathing or brushing of teeth); L_B_S_Ex49 ¶ 5 (mothers sleeping in bathroom with babies in arms).

[34] *E.g.* A_Z_M_Ex42 ¶ 5; E_G_M_Ex41 ¶ 5; M_M_M_Ex46 ¶ 5 (only two meals a day); D_V_A_Ex18 ¶ 5 (nothing to eat but sandwiches). Numerous children and mothers eating nothing more than a cold taco or ham sandwich. *E.g.* H_R_M_Ex19 ¶ 7; M_G_S_Ex40 ¶ 4; S_B_T_Ex39 ¶ 5.

[35] *E.g.* J_E_F_Ex52 ¶ 11 ("The water tasted terrible, like bleach, and it was very hard to drink."); H_R_M_Ex19 ¶ 7 (same).

[36] *E.g.* A_F_E_Ex44 ¶ 6.

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT OF CLASS ACTION
CV 85-4544-RJK(Px)

and Air Conditioning Engineers" for keeping holding cells at "room temperature," defendants report adhering to *no* specific standards regulating the treatment and conditions children experience during Border Patrol custody. Exhibit 6 at 16-19.[37]

IV   CONCLUSION

For the foregoing reasons, this Court should grant this motion and enter an order in the form lodged concurrently herewith.[38]

---

[37] Defendants fail to report any procedures for *monitoring* temperature, overcrowding, nutrition, etc., in Border Patrol facilities. *Id*. CBP's reluctance to treat allegations of Border Patrol abuse seriously has been independently remarked. *See* American Immigration Council, *No Action Taken: Lack of CBP Accountability in Responding to Complaints of CBP Abuse*, May 2014, *available at* www.americanimmigrationcouncil.org/sites/default/files/No%20Action%20Taken_Final.pdf.

[38] Plaintiffs will separately move the Court to award them attorney's fees and costs incurred in the prosecution of this motion pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT OF CLASS ACTION
CV 85-4544-RJK(Px)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:          January 30, 2015

Respectfully submitted,

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian

ORRICK, HERRINGTON & SUTCLIFFE LLP
William A. Molinski
T. Wayne Harman
Elena García

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

RANJANA NATARAJAN

 /s/ Carlos Holguín
Carlos Holguín


 /s/ T. Wayne Harman
T. Wayne Harman


 /s/ Ranjana Natarajan
Ranjana Natarajan

*Attorneys for plaintiffs*

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT OF CLASS ACTION
CV 85-4544-RJK(Px)