1    CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
     Carlos Holguín (Cal. Bar No. 90754)
2    Peter A. Schey (Cal. Bar No. 58232)
     Marchela Iahdjian (Cal. Bar No. 295595)
3    256 South Occidental Boulevard
     Los Angeles, CA 90057
4    Telephone: (213) 388-8693
     Facsimile: (213) 386-9484
5    Email:crholguin@centerforhumanrights.org
             pschey@centerforhumanrights.org
6            marchela@centerforhumanrights.org

7    ORRICK, HERRINGTON & SUTCLIFFE LLP
     William A. Molinski (Cal. Bar No. 145186)
8    wmolinski@orrick.com
     T. Wayne Harman (Cal. Bar No. 254089)
9    wharman@orrick.com
     Elena Garcia (Cal. Bar No. 299680)
10   egarcia@orrick.com
     777 South Figueroa Street, Suite 3200
11   Los Angeles, CA 90017
     Telephone: (213) 629-2020
12

13   *Attorneys for Plaintiffs*
     (listing continues on following page)

14

15                        UNITED STATES DISTRICT COURT

16                       CENTRAL DISTRICT OF CALIFORNIA

17                             WESTERN DIVISION

18

19

20   Jenny Lisette Flores, et al.,            Case No. CV 85-4544-RJK(Px)

21               Plaintiffs,                  **Plaintiffs' First Set Of Exhibits In
                                              Support Of Motion For Class-Wide
22        v.                                  Enforcement Of Settlement [Part 1:
                                              Exhibits 1-6]**
23   Jeh Johnson, Secretary, U.S. Department
     of Homeland Security, et al.,            Hearing:   March 9, 2015
24                                            Time:      TBD
                 Defendants.                  Dept:      TBD
25

26
                            **PUBLIC VERSION**
27

28                                           PLAINTIFFS' FIRST SET OF EXHIBITS IN
                                             SUPPORT OF MOTION FOR CLASS-WIDE
                                             ENFORCEMENT OF SETTLEMENT
                                             [PART 1: EXHIBITS 1-6]
                                             CV 85-4544-RJK(Px)

1

2   *Plaintiffs' counsel, continued:*

3   LA RAZA CENTRO LEGAL, INC.
    Michael S. Sorgen
4   Maria Victoria Castro
    Amanda Alvarado Ford
5   474 Valencia Street, #295
    San Francisco, CA 94103
6   Telephone:   (415) 575-3500
    Facsimile:    (415) 255-7593
7
    *Of counsel:*
8
    YOUTH LAW CENTER
9   Alice Bussiere
    Virginia Corrigan
10  200 Pine Street, Suite 300
    San Francisco, CA 94104
11  Telephone:  (415) 543-3379 x 3903

12  RANJANA NATARAJAN
    Clinical Professor
13  Director, Civil Rights Clinic
    University of Texas School of Law
14  727 E. Dean Keeton St.
    Austin TX 78705
15  Telephone:  (512) 232-7222

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 1: EXHIBITS 1-6]
CV 85-4544-RJK(PX)

INDEX TO EXHIBITS

1   Settlement of class action, January 17, 1997 ................................................... 1

2   Order approving settlement of class action, January 28, 1997 ...................... 47

3   Stipulation extending settlement of class action, December 7, 2001 ........................................................................................................ 53

4   Plaintiffs' letter requesting pre-enforcement meeting, October 15, 2014 ........................................................................................................ 58

5   Plaintiffs' letter posing questions re: implementation of class action settlement, October 2, 2014 ............................................... 64

6   Defendants' response to questions re: implementation of class action settlement, November 3, 2014 ........................................... 85

7   ICE opposition to bond redetermination, July 24, 2014 ............................ 107

8   ICE opposition to bond redetermination, October 8, 2014 ........................ 158

9   U.S. Immigration & Customs Enforcement, news release, November 18, 4014 ...................................................................... 210

10  Declaration of Bridget Cambria, November 7, 2014 .................................. 211

11  Declaration of Carol Anne Donohoe, November 15, 2014 ......................... 219

12  Declaration of J███ H████████ M█████, September 20, 2014................... 227

13  Declaration of M███ C████████ d█ T█████, September 19, 2014........................................................................................................ 232

14  Declaration of M███ F██████ S███, September 19, 2014 .......................... 238

15  Declaration of M████ L█████ M██████, September 19, 2014...................... 244

16  Affidavit of Adriana Piñon re: Texas Public Information Act Request, September 3, 2014 ..................................................... 248

17  Declaration of Barbara Hines, January 14, 2014 ......................... 253

18  Declaration of D███ V████ A███████, January 9, 2015.............................. 301

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 1: EXHIBITS 1-6]
CV 85-4544-RJK(Px)

19    Declaration of H████ R███████ M████, January 9, 2015 ............................ 305

20    Declaration of R████ E███████ A██████, January 8, 2015 ....................... 309

21    Karnes Attorney Visitation Form and Guidelines, January 9, 2015 ................................................................................................ 312

22    Declaration of Jonathan Hiskey, September 22, 2014 ................................. 314

23    Declaration of Carlos Holguin, January 13, 2015 ........................................ 319

24    Declaration of Luis H. Zayas, December 10, 2014 ...................................... 323

25    Declaration of Generva Gilden Berger, January 12, 2015 ........................... 366

26    Dilley Resident Handbook ......................................................................... 383

27    Memorandum of Understanding Re: Compromise of Class Action: Conditions of Detention, November 30, 1987 ................................ 433

28    Declaration of Anne Chandler, December 1, 2014 ...................................... 470

29    Declaration of Allison N. Boyle, November 24, 2014 ................................. 475

30    Declaration of Brittany Perkins, November 28, 2014 ................................. 490

31    Declaration of Clayton N. Matheson, November 24, 2014 ......................... 497

32    Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ....................... 504

33    Declaration of Melissa J. Cuadrado, November 26, 2014 ........................... 512

34    Declaration of Scott T. Williams, December 1, 2014 ................................. 522

35    Declaration of Virginia Marie Raymond, December 13, 2014 ................... 527

36    *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.), Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction, December 16, 2014 .......................................... 530

37    Flores Settlement Agreement and DHS Custody: Key Flores Provisions & DHS Noncompliance - Report of Lutheran Immigration and Refugee Services ........................................................... 570

ii

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 1: EXHIBITS 1-6]
CV 85-4544-RJK(Px)

38   Declaration of S█████ C█M█████, January 8, 2015 ................................. 577

39   Declaration of S████ B████ d█ T███, January 8, 2015 ........................... 580

40   Declaration of M███ G████ S████, January 8, 2015 ............................... 583

41   Declaration of E████████ G████ M█████, January 9, 2015 ...................... 586

42   Declaration of A██ Z████ M██████, January 9, 2015 ............................... 590

43   Declaration OF A████ E█████████ d█ l█ C███ G████, January 9, 2015 ................................................................................. 594

44   Declaration of A███ F████ d█ E███████, January 9, 2015 ........................ 597

45   Declaration of H███ L████ M████ P███, January 9, 2015 ....................... 602

46   Declaration of M███ M██████ M███, January 8, 2015 .......................... 606

47   Declaration of C████ M████ C████████ C███, January 8, 2015 ................................................................................. 609

48   Declaration of S████ L███ M█████ A████, January 9, 2015 ................................................................................. 611

49   Declaration of L███ B████ S██████, January 8, 2015 ............................. 613

50   Declaration of S███ A████ M██████ D██████, January 8, 2015 ................................................................................. 617

51   Declaration of O████ F█████ C█████ M████, January 9, 2015 ................... 621

52   Declaration of J████████ E█████ E███████ F████, January 9, 2015 ................................................................................. 624

53   Declaration of Lauren Beth Connell, November 26, 2014 ........................... 627

PLAINTIFFS' FIRST SET OF EXHIBITS IN SUPPORT OF MOTION FOR CLASS-WIDE ENFORCEMENT OF SETTLEMENT [PART 1: EXHIBITS 1-6] CV 85-4544-RJK(Px)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian


　　/s/ Carlos Holguín
Attorneys for Plaintiffs

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 1: EXHIBITS 1-6]
CV 85-4544-RJK(Px)

# Exhibit 1

## Publicly Filed

8/12/96

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA  90057
(213) 388-8693

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA  94104
(415) 453-3307

Attorneys for Plaintiffs

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

Attorneys for Defendants

Additional counsel listed next page



FILED
CLERK, U.S. DISTRICT COURT

JAN 1 7 1997

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, et al., | ) | Case No. CV 85-4544-RJK(Px) |
| | ) | |
| Plaintiffs, | ) | Stipulated Settlement |
| | ) | Agreement |
| -vs- | ) | |
| | ) | |
| JANET RENO, Attorney General | ) | |
| of the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Exhibit 1 - Page 1

Plaintiffs' Additional Counsel

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta
1616 Beverly Boulevard
Los Angeles, CA 90026
Telephone: (213) 977-9500

STREICH LANG
Susan G. Boswell
Jeffrey Willis
1500 Bank of America Plaza
33 North Stone Avenue
Tucson, AZ 85701
Telephone: (602) 770-8700

Defendants' Additional Counsel:

Arthur Strathern
Mary Jane Candaux
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC 20536
/ / /

2

Exhibit 1 - Page 2

## STIPULATED SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the constitutionality of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors taken into the custody of the Immigration and Naturalization Service (INS) in the Western Region; and

WHEREAS, the district court has certified this case as a class action on behalf of all minors apprehended by the INS in the Western Region of the United States; and

WHEREAS, this litigation has been pending for nine (9) years, all parties have conducted extensive discovery, and the United States Supreme Court has upheld the constitutionality of the challenged INS regulations on their face and has remanded for further proceedings consistent with its opinion; and

WHEREAS, on November 30, 1987, the parties reached a settlement agreement requiring that minors in INS custody in the Western Region be housed in facilities meeting certain standards, including state standards for the housing and care of dependent children, and Plaintiffs' motion to enforce compliance with that settlement is currently pending before the court; and

WHEREAS, a trial in this case would be complex, lengthy and costly to all parties concerned, and the decision of the district court would be subject to appeal by the losing parties with the final outcome uncertain; and

WHEREAS, the parties believe that settlement of this action is in their best interests and best serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals which could last several more years;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Stipulated Settlement Agreement

Exhibit 1 - Page 3

(the Agreement), stipulate that it constitutes a full and complete resolution of the issues raised in this action, and agree to the following:

I    DEFINITIONS

As used throughout this Agreement the following definitions shall apply:

1. The term "party" or "parties" shall apply to Defendants and Plaintiffs. As the term applies to Defendants, it shall include their agents, employees, contractors and/or successors in office. As the term applies to Plaintiffs, it shall include all class members.

2. The term "Plaintiff" or "Plaintiffs" shall apply to the named plaintiffs and all class members.

3. The term "class member" or "class members" shall apply to the persons defined in Paragraph 10 below.

4. The term "minor" shall apply to any person under the age of eighteen (18) years who is detained in the legal custody of the INS. This Agreement shall cease to apply to any person who has reached the age of eighteen years. The term "minor" shall not include an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult. The INS shall treat all persons who are under the age of eighteen but not included within the definition of "minor" as adults for all purposes, including release on bond or recognizance.

5. The term "emancipated minor" shall refer to any minor who has been determined to be emancipated in an appropriate state judicial proceeding.

6. The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. A licensed program must also meet those standards for licensed programs set forth in

4

Exhibit 1 - Page 4

Exhibit 1 attached hereto.  All homes and facilities operated by licensed programs, including facilities

for special needs minors, shall be non-secure as required under state law; provided, however, that a

facility for special needs minors may maintain that level of security permitted under state law which is

necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a

minor has drug or alcohol problems or is mentally ill.  The INS shall make reasonable efforts to provide

licensed placements in those geographical areas where the majority of minors are apprehended, such as

southern California, southeast Texas, southern Florida and the northeast corridor.

7.  The term "special needs minor" shall refer to a minor whose mental and/or physical

condition requires special services and treatment by staff.  A minor may have special needs due to drug

or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or

chronic illness that requires special services or treatment.  A minor who has suffered serious neglect or

abuse may be considered a minor with special needs if the minor requires special services or treatment

as a result of the neglect or abuse. The INS shall assess minors to determine if they have special needs

and, if so, shall place such minors, whenever possible, in licensed programs in which the INS places

children without special needs, but which provide services and treatment for such special needs.

8.  The term "medium security facility" shall refer to a facility that is operated by a program,

agency or organization licensed by an appropriate State agency and that meets those standards set forth

in Exhibit 1 attached hereto. A medium security facility is designed for minors who require close

supervision but do not need placement in juvenile correctional facilities.  It provides 24-hour awake

supervision, custody, care, and treatment.  It maintains stricter security measures, such as intensive staff

supervision, than a facility operated by a licensed program in order to control problem behavior and to

prevent escape.  Such a facility may have a secure perimeter but shall not be equipped internally with

5

Exhibit 1 - Page 5

major restraining construction or procedures typically associated with correctional facilities.

II       SCOPE OF SETTLEMENT, EFFECTIVE DATE, AND PUBLICATION

9. This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and shall supersede all previous INS policies that are inconsistent with the terms of this Agreement. This Agreement shall become effective upon final court approval, except that those terms of this Agreement regarding placement pursuant to Paragraph 19 shall not become effective until all contracts under the Program Announcement referenced in Paragraph 20 below are negotiated and implemented. The INS shall make its best efforts to execute these contracts within 120 days after the court's final approval of this Agreement. However, the INS will make reasonable efforts to comply with Paragraph 19 prior to full implementation of all such contracts. Once all contracts under the Program Announcement referenced in Paragraph 20 have been implemented, this Agreement shall supersede the agreement entitled Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention (hereinafter "MOU"), entered into by and between the Plaintiffs and Defendants and filed with the United States District Court for the Central District of California on November 30, 1987, and the MOU shall thereafter be null and void. However, Plaintiffs shall not institute any legal action for enforcement of the MOU for a six (6) month period commencing with the final district court approval of this Agreement, except that Plaintiffs may institute enforcement proceedings if the Defendants have engaged in serious violations of the MOU that have caused irreparable harm to a class member for which injunctive relief would be appropriate. Within 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation. The final regulations shall not be inconsistent with the terms of this Agreement. Within 30 days of final court approval of this

6

Exhibit 1 - Page 6

Agreement, the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles. Those instructions shall include, but may not be limited to, the provisions summarizing the terms of this Agreement, attached hereto as Exhibit 2.

III     CLASS DEFINITION

10. The certified class in this action shall be defined as follows: "All minors who are detained in the legal custody of the INS."

IV     STATEMENTS OF GENERAL APPLICABILITY

11. The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others. Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

V     PROCEDURES AND TEMPORARY PLACEMENT FOLLOWING ARREST

12.A. Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable. Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to

7

Exhibit 1 - Page 7

protect minors from others, and contact with family members who were arrested with the minor.  The

INS will segregate unaccompanied minors from unrelated adults.  Where such segregation is not

immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more

than 24 hours.  If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and

no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the

minor may be placed in an INS detention facility, or other INS-contracted facility, having separate

accommodations for minors, or a State or county juvenile detention facility.  However, minors shall be

separated from delinquent offenders.  Every effort must be taken to ensure that the safety and

well-being of the minors detained in these facilities are satisfactorily provided for by the staff.  The INS

will transfer a minor from a placement under this paragraph to a placement under Paragraph 19, (i)

within three (3) days, if the minor was apprehended in an INS district in which a licensed program is

located and has space available; or (ii) within five (5) days in all other cases; except:

1.   as otherwise provided under Paragraph 13 or Paragraph 21;

2.   as otherwise required by any court decree or court-approved settlement;

3.   in the event of an emergency or influx of minors into the United States, in which case
    the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible; or

4.   where individuals must be transported from remote areas for processing or speak
    unusual languages such that the INS must locate interpreters in order to complete
    processing, in which case the INS shall place all such minors pursuant to Paragraph 19
    within five (5) business days.

    B.  For purposes of this paragraph, the term "emergency" shall be defined as any act or event

that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided.  Such

8

Exhibit 1 - Page 8

emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term "influx of minors into the United States" shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement.

C. In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. The plan, without identification of the additional beds available, is attached as Exhibit 3. The INS shall not be obligated to fund these additional beds on an ongoing basis. The INS shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing.

13. If a reasonable person would conclude that an alien detained by the INS is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require the alien to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor in accordance with this Agreement for all purposes.

VI    GENERAL POLICY FAVORING RELEASE

14. Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that

9

Exhibit 1 - Page 9

of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

A.    a parent;

B.    a legal guardian;

C.    an adult relative (brother, sister, aunt, uncle, or grandparent);

D.    an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

E.    a licensed program willing to accept legal custody; or

F.    an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

15. Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

A.    provide for the minor's physical, mental, and financial well-being;

B.    ensure the minor's presence at all future proceedings before the INS and the immigration court;

C.    notify the INS of any change of address within five (5) days following a move;

D.    in the case of custodians other than parents or legal guardians, not transfer custody of the minor to another party without the prior written permission of the District Director;

10

Exhibit 1 - Page 10

E.      notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

F.      if dependency proceedings involving the minor are initiated, notify the INS of the initiation of such proceedings and the dependency court of any immigration proceedings pending against the minor.

In the event of an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 72 hours.  For purposes of this paragraph, examples of an "emergency" shall include the serious illness of the custodian, destruction of the home, etc.  In all cases where the custodian, in writing, seeks written permission for a transfer, the District Director shall promptly respond to the request.

16.  The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement required under Paragraph 15.  The INS, however, shall not terminate the custody arrangements for minor violations of that part of the custodial agreement outlined at Subparagraph 15.C above.

17.  A positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14.  A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit.  Any such assessment should also take into consideration the wishes and concerns of the minor.

11

Exhibit 1 - Page 11

18.  Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above.  Such efforts at family reunification shall continue so long as the minor is in INS custody.

VII    INS CUSTODY

19.  In any case in which the INS does not release a minor pursuant to Paragraph 14, the minor shall remain in INS legal custody.  Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier.  All minors placed in such a licensed program remain in the legal custody of the INS and may only be transferred or released under the authority of the INS; provided, however, that in the event of an emergency a licensed program may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

20.  Within 60 days of final court approval of this Agreement, the INS shall authorize the United States Department of Justice Community Relations Service to publish in the Commerce Business Daily and/or the Federal Register a Program Announcement to solicit proposals for the care of 100 minors in licensed programs.

21.  A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

A.       has been charged with, is chargeable, or has been convicted of a crime, or is the subject

12

Exhibit 1 - Page 12

of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

i. Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc.  This list is not exhaustive.);

ii. Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.  This list is not exhaustive.);

As used in this paragraph, "chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense;

B.     has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

C.     has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.  This list is not exhaustive.);

D.     is an escape-risk; or

E.     must be held in a secure facility for his or her own safety, such as when the INS has

13

Exhibit 1 - Page 13

reason to believe that a smuggler would abduct or coerce a particular minor to secure

payment of smuggling fees.

22.  The term "escape-risk" means that there is a serious risk that the minor will attempt to

escape from custody.  Factors to consider when determining whether a minor is an escape-risk or not

include, but are not limited to, whether:

    A.    the minor is currently under a final order of deportation or exclusion;

    B.    the minor's immigration history includes: a prior breach of a bond; a failure to appear

        before the INS or the immigration court; evidence that the minor is indebted to

        organized smugglers for his transport; or a voluntary departure or a previous removal

        from the United States pursuant to a final order of deportation or exclusion;

    C.    the minor has previously absconded or attempted to abscond from INS custody.

23.  The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less

restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a

medium security facility which would provide intensive staff supervision and counseling services or (b)

another licensed program.  All determinations to place a minor in a secure facility will be reviewed and

approved by the regional juvenile coordinator.

24.A.  A minor in deportation proceedings shall be afforded a bond redetermination hearing

before an immigration judge in every case, unless the minor indicates on the Notice of Custody

Determination form that he or she refuses such a hearing.

B.  Any minor who disagrees with the INS's determination to place that minor in a particular

type of facility, or who asserts that the licensed program in which he or she has been placed does not

comply with the standards set forth in Exhibit 1 attached hereto, may  seek judicial review in any

Exhibit 1 - Page 14

United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1. In such an action, the United States District Court shall be limited to entering an order solely affecting the individual claims of the minor bringing the action.

C. In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility. With respect to placement decisions reviewed under this paragraph, the standard of review for the INS's exercise of its discretion shall be the abuse of discretion standard of review. With respect to all other matters for which this paragraph provides judicial review, the standard of review shall be *de novo* review.

D. The INS shall promptly provide each minor not released with (a) INS Form I-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor).

E. Exhausting the procedures established in Paragraph 37 of this Agreement shall not be a precondition to the bringing of an action under this paragraph in any United District Court. Prior to initiating any such action, however, the minor and/or the minors' attorney shall confer telephonically or in person with the United States Attorney's office in the judicial district where the action is to be filed, in an effort to informally resolve the minor's complaints without the need of federal court intervention.

VIII   TRANSPORTATION OF MINORS

25. Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except:

A. when being transported from the place of arrest or apprehension to an INS office, or

15

Exhibit 1 - Page 15

B.  where separate transportation would be otherwise impractical.

When transported together pursuant to Clause B, minors shall be separated from adults.  The INS shall take necessary precautions for the protection of the well-being of such minors when transported with adults.

26.  The INS shall assist without undue delay in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released pursuant to Paragraph 14.  The INS may, in its discretion, provide transportation to minors.

IX     TRANSFER OF MINORS

27.  Whenever a minor is transferred from one placement to another, the minor shall be transferred with all of his or her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions will be shipped to the minor in a timely manner.  No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer.

X MONITORING AND REPORTS

28A.  An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours.  Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations.  Statistical information will include at least the following: (1)

16

Exhibit 1 - Page 16

biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility.

B. Should Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the reasons why the minor has not been released.

29. On a semi-annual basis, until two years after the court determines, pursuant to Paragraph 31, that the INS has achieved substantial compliance with the terms of this Agreement, the INS shall provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law, and each INS policy or instruction issued to INS employees regarding the implementation of this Agreement. In addition, Plaintiffs' counsel shall have the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement and the information provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28. Plaintiffs' counsel shall present such questions either orally or in writing, at the option of the Juvenile Coordinator. The Juvenile Coordinator shall furnish responses, either orally or in writing at the option of Plaintiffs' counsel, within 30 days of receipt.

30. On an annual basis, commencing one year after final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the

17

Exhibit 1 - Page 17

terms of this Agreement.  The Coordinator shall file these reports with the court and provide copies to

the parties, including the final report referenced in Paragraph 35, so that they can submit comments on

the report to the court.  In each report, the Coordinator shall state to the court whether or not the INS is

in substantial compliance with the terms of this Agreement, and, if the INS is not in substantial

compliance, explain the reasons for the lack of compliance.  The Coordinator shall continue to report on

an annual basis until three years after the court determines that the INS has achieved substantial

compliance with the terms of this Agreement.

31.  One year after the court's approval of this Agreement, the Defendants may ask the court to

determine whether the INS has achieved substantial compliance with the terms of this Agreement.

XI     ATTORNEY-CLIENT VISITS

32.A.  Plaintiffs' counsel are entitled to attorney-client visits with class members even though

they may not have the names of class members who are housed at a particular location.  All visits shall

occur in accordance with generally applicable policies and procedures relating to attorney-client visits at

the facility in question.  Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the

facility staff shall provide Plaintiffs' counsel with a list of names and alien registration numbers for the

minors housed at that facility.  In all instances, in order to memorialize any visit to a minor by

Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any

attorney-client meeting.  Plaintiffs' counsel may limit any such notice of appearance to representation

of the minor in connection with this Agreement.  Plaintiffs' counsel must submit a copy of the notice of

appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of

the facility.

B.  Every six months, Plaintiffs' counsel shall provide the INS with a list of those attorneys who

18

Exhibit 1 - Page 18

may make such attorney-client visits, as Plaintiffs' counsel, to minors during the following six month period. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law in Los Angeles, California or the National Center for Youth Law in San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

C. Agreements for the placement of minors in non-INS facilities shall permit attorney-client visits, including by class counsel in this case.

D. Nothing in Paragraph 32 shall affect a minor's right to refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

XII    FACILITY VISITS

33. In addition to the attorney-client visits permitted pursuant to Paragraph 32,  Plaintiffs' counsel may request access to any licensed program's facility in which a minor has been placed pursuant to Paragraph 19 or to any medium security facility or detention facility in which a minor has been placed pursuant to Paragraphs 21 or 23.  Plaintiffs' counsel shall submit a request to visit a facility under this paragraph to the INS district juvenile coordinator who will provide reasonable assistance to Plaintiffs' counsel by conveying the request to the facility's staff and coordinating the visit.   The rules and procedures to be followed in connection with any visit approved by a facility under this paragraph are set forth in Exhibit 4 attached, except as may be otherwise agreed by Plaintiffs' counsel and the facility's staff.  In all visits to any facility pursuant to this Agreement, Plaintiffs' counsel and their associated experts shall treat minors and staff with courtesy and dignity and shall not disrupt the normal functioning of the facility.

19

Exhibit 1 - Page 19

## XIII  TRAINING

34.  Within 120 days of final court approval of this Agreement, the INS shall provide appropriate guidance and training for designated INS employees regarding the terms of this Agreement. The INS shall develop written and/or audio or video materials for such training.  Copies of such written and/or audio or video training materials shall be made available to Plaintiffs' counsel when such training materials are sent to the field, or to the extent practicable, prior to that time.

## XIV   DISMISSAL

35.  After the court has determined that the INS is in substantial compliance with this Agreement and the Coordinator has filed a final report, the court, without further notice, shall dismiss this action.  Until such dismissal, the court shall retain jurisdiction over this action.

## XV   RESERVATION OF RIGHTS

36.  Nothing in this Agreement shall limit the rights, if any, of individual class members to preserve issues for judicial review in the appeal of an individual case or for class members to exercise any independent rights they may otherwise have.

## XVI   NOTICE AND DISPUTE RESOLUTION

37.  This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24.  The parties shall meet telephonically or in person to discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms of the Agreement, prior to bringing any individual or class action to enforce this Agreement.  Notice of a claim that a party has violated the terms of this Agreement shall be served on plaintiffs addressed to:

/ / /

20

Exhibit 1 - Page 20

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA 90057

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA 94104

and on Defendants addressed to:

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA 90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

XVII   PUBLICITY

38.   Plaintiffs and Defendants shall hold a joint press conference to announce this Agreement. The INS shall send copies of this Agreement to social service and voluntary agencies agreed upon by the parties, as set forth in Exhibit 5 attached. The parties shall pursue such other public dissemination of information regarding this Agreement as the parties shall agree.

XVIII ATTORNEYS' FEES AND COSTS

39.   Within 60 days of final court approval of this Agreement, Defendants shall pay to Plaintiffs the total sum of $374,110.09, in full settlement of all attorneys' fees and costs in this case.

/ / /

21

Exhibit 1 - Page 21

XIX    TERMINATION

40.  All terms of this Agreement shall terminate the earlier of  five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors.

XX     REPRESENTATIONS AND WARRANTY

41.  Counsel for the respective parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law.  Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service, and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation.  Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation.  The undersigned, by their signatures on behalf of the Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.

For Defendants:  Signed: _Doris Meissner_  Title: Commissioner, INS

Dated: _9/16/96_

For Plaintiffs:  Signed: per next page _____  Title: _____

Dated: _____

22

Exhibit 1 - Page 22

The foregoing stipulated settlement is approved as to form and content:

CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos Holguin
Peter Schey

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta

STEICH LANG
Susan G. Boswell
Jeffery Willis

Date: 1/13/97          By _____

Date: 11/13/96         By _____

23

Exhibit 1 - Page 23

**Exhibit 1**

Exhibit 1 - Page 24

EXHIBIT 1

MINIMUM STANDARDS FOR LICENSED PROGRAMS

A.  Licensed programs shall comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes and shall provide or arrange for the following services for each minor in its care:

1.  Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items.

2.  Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

3.  An individualized needs assessment which shall include: (a) various initial intake forms; (b) essential data relating to the identification and history of the minor and family; (c) identification of the minors' special needs including any specific problem(s) which appear to require immediate intervention; (d) an educational assessment and plan; (e) an assessment of family relationships and interaction with adults, peers and authority figures; (f) a statement of religious preference and practice; (g) an assessment of the minor's personal goals, strengths and weaknesses; and (h) identifying information regarding immediate family members, other relatives, godparents or friends who may be

1

Exhibit 1 - Page 25

residing in the United States and may be able to assist in family reunification.

4.  Educational services appropriate to the minor's level of development, and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT). The educational program shall include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program shall provide minors with appropriate reading materials in languages other than English for use during the minor's leisure time.

5.  Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session.

6.  At least one (1) individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each minor.

7.  Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the minors present. It is a time when new minors are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management

2

Exhibit 1 - Page 26

is discussed and decisions are made about recreational activities, etc.  It is a time for staff and minors to discuss whatever is on their minds and to resolve problems.

8.     Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

9.     Upon admission, a comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.

10.    Whenever possible, access to religious services of the minor's choice.

11.    Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation.  The staff shall respect the minor's privacy while reasonably preventing the unauthorized release of the minor.

12.    A reasonable right to privacy, which shall include the right to: (a) wear his or her own clothes, when available; (b) retain a private space in the residential facility, group or foster home for the storage of personal belongings; (c) talk privately on the phone, as permitted by the house rules and regulations; (d) visit privately with guests, as permitted by the house rules and regulations; and (e) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

13.    Family reunification services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the minor.

14.    Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a deportation or

3

Exhibit 1 - Page 27

exclusion hearing before an immigration judge, the right to apply for political asylum or
to request voluntary departure in lieu of deportation.

B.  Service delivery is to be accomplished in a manner which is sensitive to the age, culture,
native language and the complex needs of each minor.

C.  Program rules and discipline standards shall be formulated with consideration for the range
of ages and maturity in the program and shall be culturally sensitive to the needs of alien minors.
Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive
interference with the daily functions of living, such as eating or sleeping.  Any sanctions employed shall
not: (1) adversely affect either a minor's health, or physical or psychological well-being; or (2) deny
minors regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal
assistance.

D.  A comprehensive and realistic individual plan for the care of each minor must be developed
in accordance with the minor's needs as determined by the individualized need assessment.  Individual
plans shall be implemented and closely coordinated through an operative case management system.

E.  Programs shall develop, maintain and safeguard individual client case records.  Agencies and
organizations are required to develop a system of accountability which preserves the confidentiality of
client information and protects the records from unauthorized use or disclosure.

F.  Programs shall maintain adequate records and make regular reports as required by the INS
that permit the INS to monitor and enforce this order and other requirements and standards as the INS
may determine are in the best interests of the minors.

4

Exhibit 1 - Page 28

**Exhibit 2**

Exhibit 1 - Page 29

EXHIBIT 2

INSTRUCTIONS TO SERVICE OFFICERS RE:
PROCESSING, TREATMENT, AND PLACEMENT OF MINORS

These instructions are to advise Service officers of INS policy regarding the way in which minors in INS custody are processed, housed and released. These instructions are applicable nationwide and supersede all prior inconsistent instructions regarding minors.

**(a) Minors.** A minor is a person under the age of eighteen years. However, individuals who have been "emancipated" by a state court or convicted and incarcerated for a criminal offense as an adult are not considered minors. Such individuals must be treated as adults for all purposes, including confinement and release on bond.

Similarly, if a reasonable person would conclude that an individual is an adult despite his claims to be a minor, the INS shall treat such person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require such an individual to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor for all purposes.

**(b) General policy.** The INS treats, and will continue to treat minors with dignity, respect and special concern for their particular vulnerability. INS policy is to place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with the need to ensure the minor's timely appearance and to protect the minor's well-being and that of others. INS officers are not required to release a minor to any person or agency whom they have reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

**(c) Processing.** The INS will expeditiously process minors and will provide a Form I-770 notice of rights, including the right to a bond redetermination hearing, if applicable.

Following arrest, the INS will hold minors in a facility that is safe and sanitary and that is consistent with the INS's concern for the particular vulnerability of minors. Such facilities will have access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will separate unaccompanied minors from unrelated adults whenever possible. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours.

If the juvenile cannot be immediately released, and no licensed program (described below) is available to care for him, he should be placed in an INS or INS-contract facility that has separate accommodations for minors, or in a State or county juvenile detention facility that separates minors in

1

Exhibit 1 - Page 30

INS custody from delinquent offenders.  The INS will make every effort to ensure the safety and well-being of juveniles placed in these facilities.

**(d) Release.**  The INS will release minors from its custody without unnecessary delay, unless detention of a juvenile is required to secure her timely appearance or to ensure the minor's safety or that of others.  Minors shall be released, in the following order of preference, to:

    (i)  a parent;

    (ii) a legal guardian;

    (iii) an adult relative (brother, sister, aunt, uncle, or grandparent);

    (iv) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer, or (ii) such other documentation that establishes to the satisfaction of the INS, in its discretion, that the individual designating the individual or entity as the minor's custodian is in fact the minor's parent or guardian;

    (v) a state-licensed juvenile shelter, group home, or foster home willing to accept legal custody; or

    (vi) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

**(e) Certification of custodian.**  Before a minor is released, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

    (i) provide for the minor's physical, mental, and financial well-being;

    (ii) ensure the minor's presence at all future proceedings before the INS and the immigration court;

    (iii) notify the INS of any change of address within five (5) days following a move;

    (iv) if the custodian is not a parent or legal guardian, not transfer custody of the minor to another party without the prior written permission of the District Director, except in the event of an emergency;

    (v) notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

Exhibit 1 - Page 31

(vi) if dependency proceedings involving the minor are initiated, notify the INS of the initiation of a such proceedings and the dependency court of any deportation proceedings pending against the minor.

In an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS, but must notify the INS of the transfer as soon as is practicable, and in all cases within 72 hours.  Examples of an "emergency" include the serious illness of the custodian, destruction of the home, etc.  In all cases where the custodian seeks written permission for a transfer, the District Director shall promptly respond to the request.

The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement.  However, custody arrangements will not be terminated for minor violations of the custodian's obligation to notify the INS of any change of address within five days following a move.

**(f)  Suitability assessment.**  An INS officer may require a positive suitability assessment prior to releasing a minor to any individual or program.  A suitability assessment may include an investigation of the living conditions in which the minor is to be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit.  The assessment will also take into consideration the wishes and concerns of the minor.

**(g)  Family reunification.**  Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, will promptly attempt to reunite the minor with his or her family to permit the release of the minor under Paragraph (d) above.  Such efforts at family reunification will continue as long as the minor is in INS or licensed program custody and will be recorded by the INS or the licensed program in which the minor is placed.

**(h)  Placement in licensed programs.**  A "licensed program" is any program, agency or organization licensed by an appropriate state agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors.  Exhibit 1 of the *Flores v. Reno* Settlement Agreement describes the standards required of licensed programs.  Juveniles who remain in INS custody must be placed in a licensed program within three days if the minor was apprehended in an INS district in which a licensed program is located and has space available, or within five days in all other cases, except when:

(i) the minor is an escape risk or delinquent, as defined in Paragraph (i) below;

(ii) a court decree or court-approved settlement requires otherwise;

(iii) an emergency or influx of minors into the United States prevents compliance, in which case all minors should be placed in licensed programs as expeditiously as possible; or

(iv) the minor must be transported from remote areas for processing or speaks an unusual

3

Exhibit 1 - Page 32

language such that a special interpreter is required to process the minor, in which case the minor
must be placed in a licensed program within five business days.

**(i) Secure and supervised detention.** A minor may be held in or transferred to a State or county
juvenile detention facility or in a secure INS facility or INS-contracted facility having separate
accommodations for minors, whenever the District Director or Chief Patrol Agent determines that the
minor —

> (i) has been charged with, is chargeable, or has been convicted of a crime, or is the subject of
> delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent
> act, unless the minor's offense is

>> (a) an isolated offense not within a pattern of criminal activity which did not involve
>> violence against a person or the use or carrying of a weapon (Examples: breaking and
>> entering, vandalism, DUI, etc.); or

>> (b) a petty offense, which is not considered grounds for stricter means of detention in
>> any case (Examples: shoplifting, joy riding, disturbing the peace, etc.);

> (ii) has committed, or has made credible threats to commit, a violent or malicious act (whether
> directed at himself or others) while in INS legal custody or while in the presence of an INS
> officer;

> (iii) has engaged, while in a licensed program, in conduct that has proven to be unacceptably
> disruptive of the normal functioning of the licensed program in which he or she has been placed
> and removal is necessary to ensure the welfare of the minor or others, as determined by the staff
> of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of
> others, etc.);

> (iv) is an escape-risk; or

> (v) must be held in a secure facility for his or her own safety, such as when the INS has reason
> to believe that a smuggler would abduct or coerce a particular minor to secure payment of
> smuggling fees.

"Chargeable" means that the INS has probable cause to believe that the individual has committed a
specified offense.

The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from
custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are
not limited to, whether:

> (a) the minor is currently under a final order of deportation or exclusion;

4

Exhibit 1 - Page 33

(b) the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

(c) the minor has previously absconded or attempted to abscond from INS custody.

The INS will not place a minor in a State or county juvenile detention facility, secure INS detention facility, or secure INS-contracted facility if less restrictive alternatives are available and appropriate in the circumstances, such as transfer to a medium security facility that provides intensive staff supervision and counseling services or transfer to another licensed program. All determinations to place a minor in a secure facility will be reviewed and approved by the regional Juvenile Coordinator.

**(j) Notice of right to bond redetermination and judicial review of placement.** A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing. A juvenile who is not released or placed in a licensed placement shall be provided (1) a written explanation of the right of judicial review as set out in Exhibit 6 of the *Flores v. Reno* Settlement Agreement, and (2) the list of free legal services providers compiled pursuant to INS regulations (unless previously given to the minor.

**(k) Transportation and transfer.** Unaccompanied minors should not be transported in vehicles with detained adults except when being transported from the place of arrest or apprehension to an INS office or where separate transportation would be otherwise impractical, in which case minors shall be separated from adults. INS officers shall take all necessary precautions for the protection of minors during transportation with adults.

When a minor is to be released, the INS will assist him or her in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released. The INS may, in its discretion, provide transportation to such minors.

Whenever a minor is transferred from one placement to another, she shall be transferred with all of her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions must be shipped to the minor in a timely manner. No minor who is represented by counsel should be transferred without advance notice to counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived notice, in which cases notice must be provided to counsel within 24 hours following transfer.

**(l) Periodic reporting.** Statistical information on minors placed in proceedings who remain in INS custody for longer than 72 hours must be reported to the Juvenile Coordinator by all INS district offices and Border Patrol stations. Information will include: (a) biographical information, including the minor's name, date of birth, and country of birth, (b) date placed in INS custody, (c) each date placed, removed or released, (d) to whom and where placed, transferred, removed or released, (e) immigration

Exhibit 1 - Page 34

status, and (f) hearing dates.  INS officers should also inform the Juvenile Coordinator of the reasons for placing a minor in a medium-security facility or detention facility as described in paragraph (i).

**(m) Attorney-client visits by Plaintiffs' counsel.**  The INS will permit the lawyers for the *Flores v. Reno* plaintiff class to visit minors, even though they may not have the names of minors who are housed at a particular location.  A list of Plaintiffs' counsel entitled to make attorney-client visits with minors is available from the district Juvenile Coordinator.  Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law of Los Angeles, California, or the National Center for Youth Law of San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

Visits must occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question.  Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff must provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility.  In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting.  Plaintiffs' counsel may limit the notice of appearance to representation of the minor in connection with his placement or treatment during INS custody. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

A minor may refuse to meet with Plaintiffs' counsel.  Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

**(n) Visits to licensed facilities.**  In addition to the attorney-client visits, Plaintiffs' counsel may request access to a licensed program's facility (described in paragraph (h)) or to a medium-security facility or detention facility (described in paragraph (i)) in which a minor has been placed.  The district juvenile coordinator will convey the request to the facility's staff and coordinate the visit.  The rules and procedures to be followed in connection with such visits are set out in Exhibit 4 of the *Flores v. Reno* Settlement Agreement, unless Plaintiffs' counsel and the facility's staff agree otherwise.  In all visits to any facility, Plaintiffs' counsel and their associated experts must treat minors and staff with courtesy and dignity and must not disrupt the normal functioning of the facility.

Exhibit 1 - Page 35

**Exhibit 3**

Exhibit 1 - Page 36

EXHIBIT 3

CONTINGENCY PLAN

In the event of an emergency or influx that prevents the prompt placement of minors in licensed programs with which the Community Relations Service has contracted, INS policy is to make all reasonable efforts to place minors in programs licensed by an appropriate state agency as expeditiously as possible. An "emergency" is an act or event, such as a natural disaster (e.g. earthquake, fire, hurricane), facility fire, civil disturbance, or medical emergency (e.g. a chicken pox epidemic among a group of minors) that prevents the prompt placement of minors in licensed facilities. An "influx" is defined as any situation in which there are more than 130 minors in the custody of the INS who are eligible for placement in licensed programs.

1. The Juvenile Coordinator will establish and maintain an Emergency Placement List of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements. These 80 placements would supplement the 130 placements that the INS normally has available, and whenever possible, would meet all standards applicable to juvenile placements the INS normally uses. The Juvenile Coordinator may consult with child welfare specialists, group home operators, and others in developing the List. The Emergency Placement List will include the facility name; the number of beds potentially available at the facility; the name and telephone number of contact persons; the name and telephone number of contact persons for nights, holidays, and weekends if different; any restrictions on minors accepted (e.g. age); and any special services that are available.

2. The Juvenile Coordinator will maintain a list of minors affected by the emergency or influx, including (1) the minor's name, (2) date and country of birth, (3) date placed in INS custody, and (4)

1

Exhibit 1 - Page 37

place and date of current placement.

3.   Within one business day of the emergency or influx the Juvenile Coordinator or his or her designee will contact the programs on the Emergency Placement List to determine available placements.  As soon as available placements are identified, the Juvenile Coordinator will advise appropriate INS staff of their availability.  To the extent practicable, the INS will attempt to locate emergency placements in geographic areas where culturally and linguistically appropriate community services are available.

4.   In the event that the number of minors needing emergency placement exceeds the available appropriate placements on the Emergency Placement List, the Juvenile Coordinator will work with the Community Relations Service to locate additional placements through licensed programs, county social services departments, and foster family agencies.

5.   Each year the INS will reevaluate the number of regular placements needed for detained minors to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of minors eligible for placement in licensed programs.  However, any decision to increase the number of placements available shall be subject to the availability of INS resources.  The Juvenile Coordinator shall promptly provide Plaintiffs' counsel with any reevaluation made by INS pursuant to this paragraph.

6.   The Juvenile Coordinator shall provide to Plaintiffs' counsel copies of the Emergency Placement List within six months after the court's final approval of the Settlement Agreement.

2

Exhibit 1 - Page 38

**Exhibit 4**

Exhibit 1 - Page 39

EXHIBIT 4

AGREEMENT CONCERNING FACILITY VISITS UNDER PARAGRAPH 33

The purpose of facility visits under paragraph 33 is to interview class members and staff and to observe conditions at the facility. Visits under paragraph 33 shall be conducted in accordance with the generally applicable policies and procedures of the facility to the extent that those policies and procedures are consistent with this Exhibit.

Visits authorized under paragraph 33 shall be scheduled no less than seven (7) business days in advance. The names, positions, credentials, and professional association (e.g., Center for Human Rights and Constitutional Law) of the visitors will be provided at that time.

All visits with class members shall take place during normal business hours.

No video recording equipment or cameras of any type shall be permitted. Audio recording equipment shall be limited to hand-held tape recorders.

The number of visitors will not exceed six (6) or, in the case of a family foster home, four (4), including interpreters, in any instance. Up to two (2) of the visitors may be non-attorney experts in juvenile justice and/or child welfare.

No visit will extend beyond three (3) hours per day in length. Visits shall minimize disruption to the routine that minors and staff follow.

1

Exhibit 1 - Page 40

**Exhibit 5**

Exhibit 1 - Page 41

EXHIBIT 5

LIST OF ORGANIZATIONS TO RECEIVE INFORMATION RE: SETTLEMENT AGREEMENT

Eric Cohen, Immig. Legal Resource Center, 1663 Mission St. Suite 602, San Francisco, CA 94103

Cecilia Munoz, Nat'l Council Of La Raza, 810 1st St. NE  Suite 300, Washington, D.C. 20002

Susan Alva, Immig. & Citiz. Proj Director, Coalition For Humane Immig Rights of LA, 1521 Wilshire Blvd., Los Angeles, CA 90017

Angela Cornell, Albuquerque Border Cities Proj., Box 35895, Albuquerque, NM 87176-5895

Beth Persky, Executive Director, Centro De Asuntos Migratorios, 1446 Front Street, Suite 305, San Diego, CA 92101

Dan, Kesselbrenner, , National Lawyers Guild, National Immigration Project, 14 Beacon St.,#503, Boston, MA 02108

Lynn Marcus , SWRRP, 64 E. Broadway, Tucson, AZ 85701-1720

Maria Jimenez, , American Friends Service Cmte., ILEMP, 3522 Polk Street, Houston, TX 77003-4844

Wendy Young, , U.S. Cath. Conf., 3211 4th St. NE, , Washington, DC, 20017-1194

Miriam Hayward , International Institute Of The East Bay, 297 Lee Street , Oakland, CA 94610

Emily Goldfarb, , Coalition For Immigrant & Refugee Rights, 995 Market Street, Suite 1108 , San Francisco, CA 94103

Jose De La Paz, Director, California Immigrant Workers Association, 515 S. Shatto Place , Los Angeles, CA, 90020

Annie Wilson, LIRS, 390 Park Avenue South, First Asylum Concerns, New York, NY 10016

Stewart Kwoh, Asian Pacific American Legal Center, 1010 S. Flower St., Suite 302, Los Angeles, CA 90015

Warren Leiden, Executive Director, AILA, 1400 Eye St., N.W., Ste. 1200, Washington, DC, 20005

Frank Sharry, Nat'l Immig Ref & Citiz Forum, 220 I Street N.E., Ste. 220, Washington, D.C. 20002

Reynaldo Guerrero, Executive Director, Center For Immigrant's Rights, 48 St. Marks Place , New York, NY 10003

1

Exhibit 1 - Page 42

Charles Wheeler , National Immigration Law Center, 1102 S. Crenshaw Blvd., Suite 101  , Los Angeles, CA 90019

Deborah A. Sanders, Asylum & Ref. Rts Law Project, Washington Lawyers Comm., 1300 19th Street, N.W., Suite 500 , Washington, D.C. 20036

Stanley Mark, Asian American Legal Def.& Ed.Fund, 99 Hudson St, 12th Floor, New York, NY 10013

Sid Mohn, Executive Director, Travelers & Immigrants Aid, 327 S. LaSalle Street, Suite 1500, Chicago, IL, 60604

Bruce Goldstein, Attornet At Law, Farmworker Justice Fund, Inc., 2001 S Street, N.W., Suite 210, Washington, DC 20009

Ninfa Krueger, Director, BARCA, 1701 N. 8th Street, Suite B-28, McAllen, TX 78501

John Goldstein, , Proyecto San Pablo, PO Box 4596,, Yuma, AZ 85364

Valerie Hink, Attorney At Law, Tucson Ecumenical Legal Assistance, P.O. Box 3007 , Tucson, AZ 85702

Pamela Mohr, Executive Director, Alliance For Children's Rights, 3708 Wilshire Blvd. Suite 720, Los Angeles, CA 90010

Pamela Day, Child Welfare League Of America, 440 1st St. N.W., , Washington, DC 20001

Susan Lydon, Esq., Immigrant Legal Resource Center, 1663 Mission St. Ste 602, San Francisco, CA 94103

Patrick Maher, Juvenile Project, Centro De Asuntos Migratorios, 1446 Front Street, # 305, San Diego, CA 92101

Lorena Munoz, Staff Attorney, Legal Aid Foundation of LA-IRO, 1102 Crenshaw Blvd., Los Angeles, CA 90019

Christina Zawisza, Staff Attorney, Legal Services of Greater Miami, 225 N.E. 34th Street, Suite 300, Miami, FL 33137

Miriam Wright Edelman, Executive Director, Children's Defense Fund, 122 C Street N.W.  4th Floor, Washington, DC 20001

Rogelio Nunez, Executive Director, Proyecto Libertad, 113 N. First St., Harlingen, TX  78550

2

Exhibit 1 - Page 43

**Exhibit 6**

Exhibit 1 - Page 44

EXHIBIT 6
NOTICE OF RIGHT TO JUDICIAL REVIEW

"The INS usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities.  If you believe that you have not been properly placed or that you have been treated improperly, you may ask a federal judge to review your case.  You may call a lawyer to help you do this.  If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

Exhibit 1 - Page 45

PROOF OF SERVICE BY MAIL

I, Sonia Fuentes, declare and say as follows:

1. I am over the age of eighteen years and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 South Occidental Boulevard, Los Angeles, California 90057, in said county and state.

2. On January ___, 1997, I served the attached STIPULATED SETTLEMENT AGREEMENT on defendants in this proceeding by placing a true copy thereof in a sealed envelope addressed to their attorneys of record as follows:

> Mr. Michael Johnson
> Assistant U.S. Attorney
> 300 N. Los Angeles St. #7516
> Los Angeles, CA 90012

and by then sealing said envelope and depositing the same, with postage thereon fully prepaid, in the mail at Los Angeles, California; that there is regular delivery of mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___th day of January, 1997, at Los Angeles, California.

/ / /

- 3 -

Exhibit 1 - Page 46

# Exhibit 2

## Publicly Filed

1    CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
2    Carlos Holguín
     Peter A. Schey
3    256 South Occidental Boulevard
     Los Angeles, CA  90057
4    (213) 388-8693

5    NATIONAL CENTER FOR YOUTH LAW
     Alice Bussiere
6    James Morales
7    114 Sansome Street, Suite 905
     San Francisco, CA  94104
8    (415) 453-3307

9    *Attorneys for Plaintiffs*

10   MICHAEL JOHNSON
11   Assistant United States Attorney
     300 N. Los Angeles St., Rm. 7516
12   Los Angeles, CA  90012

13   ALLEN HAUSMAN
     Office of Immigration Litigation
14   Civil Division
15   U.S. Department of Justice
     P.O. Box 878, Ben Franklin Station
16   Washington, DC  20044

17   *Attorneys for Defendants*

18   *Additional counsel listed next page*

19                UNITED STATES DISTRICT COURT

20               CENTRAL DISTRICT OF CALIFORNIA

21   JENNY LISETTE FLORES, et al.,          )    Case No. CV 85-4544-RJK(Px)
                                            )
22          Plaintiffs,                     )    STIPULATION RE NOTICE AND APPROVAL
                                            )    OF COMPROMISE OF CLASS ACTION
23   -vs-                                   )
                                            )    [Rule 23(e), Fed.R.Civ.Proc.]
24   JANET RENO, Attorney General           )
25   of the United States, et al.,          )
                                            )
26          Defendants.                     )
                                            )
27   _____  )

28

FILED
CLERK, U.S. DISTRICT COURT
JAN 28 1997
CENTRAL DISTRICT OF CALIF.
BY

LODGED
CLERK, U.S. DISTRICT COURT
JAN 17 1997
CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

ENTERED ON ICMS

Exhibit 2 - Page 47

*Plaintiffs' Additional Counsel:*

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta
1616 Beverly Boulevard
Los Angeles, CA 90026
Telephone: (213) 977-9500

STREICH LANG
Susan G. Boswell
Jeffrey Willis
1500 Bank of America Plaza
33 North Stone Avenue
Tucson, AZ 85701
Telephone: (602) 770-8700

*Defendants' Additional Counsel:*

ARTHUR STRATHERN
MARY JANE CANDAUX
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC 20536

*/ / /*

- 2 -

Exhibit 2 - Page 48

This is a class action pursuant to Rule 23(b)(2), Fed.R.Civ.Proc. The parties have entered into an agreement, filed herewith, to settle this action. Rule 23(e) of the Federal Rules of Civil Procedure provides, "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." In accordance with Rule 23(e),

IT IS HEREBY STIPULATED by and between the parties through their undersigned counsel as follows:

1. Defendants will distribute the notice annexed hereto as Exhibit A to all facilities in which plaintiff class members are regularly detained. The notice will be posted for 30 days in a conspicuous location regularly accessible to class members. The notices will be posted on or before January 24, 1997.

3. Plaintiffs' counsel will make available to any class member who requests one a complete copy of the settlement agreement within seven days of receiving the class member's request.

4. If no class member files an objection to the settlement on or before February 24, 1997, the settlement shall be approved, subject to its terms, without further order of the Court. If a class member files an objection to the settlement on or before February 24, 1997, the parties shall serve and file a response on or before March 10, 1997. The Court may thereafter either schedule a hearing on the fairness of the proposed settlement or approve the settlement over the objection.

/ / /

- 3 -

Exhibit 2 - Page 49

| | |
|---|---|
| Dated: January 17 1997. | CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW<br>Carlos Holguín<br>Peter A. Schey |
| | NATIONAL CENTER FOR YOUTH LAW<br>Alice Bussiere<br>James Morales |
| | ACLU FOUNDATION OF SOUTHERN CALIFORNIA<br>Mark Rosenbaum<br>Sylvia Argueta |
| | STREICH LANG<br>Susan G. Boswell<br>Jeffrey Willis |

By: _____
        Carlos Holguín
        Attorneys for Plaintiffs

Dated: January 17, 1997.

MICHAEL JOHNSON
Assistant United States Attorney

ALLEN HAUSMAN
Office of Immigration Litigation
Civil Division
U.S. Department of Justice

ARTHUR STRATHERN
MARY JANE CANDAUX
Office of the General Counsel
U.S. Immigration & Naturalization Service

By: _____
        Michael Johnson
        Attorneys for Defendants

IT IS SO ORDERED.

Dated: January 28, 1997.

_____
Senior United States District Judge

- 4 -

Exhibit 2 - Page 50

EXHIBIT A

NOTICE OF COMPROMISE OF CLASS ACTION

To all minors in the custody of the Immigration and Naturalization Service:

A settlement has been reached in a federal class action lawsuit that may affect your rights. The United States District Court for the Central District of California is currently considering whether to approve settlement of the action entitled *Jenny Lisette Flores, et al., v. Janet Reno, Attorney General, et al.,* No. 85-4544-RJK. The settlement will affect the rights of the following persons:

"All minors who are detained in the legal custody of the INS."

The settlement sets out nationwide standards for the detention, release, housing, and treatment of minors in INS custody. Class members who object to the settlement should file a statement setting out their objections with the federal court. The court will consider class members' objections in deciding whether to approve the settlement. The principal terms of the settlement are as follows:

1) The settlement prescribes a general policy favoring the release of minors on bond or recognizance where their detention is not required to secure the minor's appearance before an immigration judge or the INS, or to ensure the minor's safety. The settlement provides that the INS will generally release minors to specified individuals or community programs.

2) The settlement provides that the INS will house detained minors in the least restrictive setting appropriate to the minor's age and special needs, consistent with the INS's interest in ensuring the minor's presence before it and the immigration court. The settlement generally requires that minors be housed in facilities holding a state license for the care of dependent or non-delinquent minors. The settlement provides that in limited circumstances the INS may house minors in secure facilities. These circumstances generally cover minors who have been adjudged delinquents or who are escape-risks.

Class members wishing a complete copy of the settlement may obtain one by contacting plaintiffs' counsel:

Carlos Holguín                         Alice Bussiere
Peter A. Schey                         James B. Morales
CENTER FOR HUMAN RIGHTS &              NATIONAL CENTER FOR YOUTH LAW
CONSTITUTIONAL LAW                     114 Sansome Street, Suite 900
256 S. Occidental Blvd.                San Francisco, CA 94104-3820
Los Angeles, CA 90057                  Telephone: (415) 543-3307
Telephone: (213) 388-8693

Class members who object to the settlement must file their objections with the United States District Court for the Central District of California, 312 N. Spring St., Los Angeles, CA 90012, on or before February 24, 1997. A copy of the objections must also be mailed to one of the lawyers for plaintiffs listed above and to counsel for the defendants, Michael Johnson, Assistant United States Attorney, 300 N. Los Angeles St., Rm. 7516, Los Angeles, CA 90012.

This notice shall remain posted from January 24, 1997, to February 24, 1997.

Exhibit 2 - Page 51

1    EXHIBICION A

2    NOTICIA DE COMPROMISO DE LA DEMANDA EN GRUPO

3    A todos los menores que se encuentren bajo la custodia del Servicio de Inmigración y Naturalización.

4    Un acuerdo se ha conseguido en la demanda federal en grupo que podría afectar sus derechos.  La Corte Federal del Distrito de los Estados Unidos por el Distrito Central de California esta actualmente
5    considerando ya sea que se apruebe el acuerdo de la acción titulada *Jenny Lisette Flores, et al., v. Janet Reno, Abogada General, et al., No. 85-4544-RJK*.  El acuerdo afectará los derechos de las
6    siguientes personas:

7        "Todos los menores quienes son detenidos y se encuentren bajo la custodia legal del INS"

8    El acuerdo emprende nacionalmente las normas sobre detención, libertad, vivienda y tratamiento de menores encontrados bajo custodia del INS.  Miembros de clase de esta demanda quienes objecionen
9    a este acuerdo deberan fichar en la Corte Federal una declaración especificando sus objeciones.  La corte considerará las objeciones de los miembros de esta demanda en decidir ya sea que se apruebe
10   este acuerdo.  Los términos principales del acuerdo son los siguientes:

11   1)      El acuerdo prescribe una poliza general favoreciendo la libertad de los memores bajo fianza o por reconocimiento cuando su detención no es requerido para asegurar la precencia del menor ante un
12   juez de inmigración o INS, o para garantizar la seguridad del menor.  El acuerdo provee que generalmente el INS ponga a los menores que han sido puestos en libertad con individuales
13   específicos o en programas comunitarios.

14   2)  El acuerdo requiere que el Servicio de Inmigración y Naturalización aloje a los menores detenidos al menos en un restrictivo ambiente apropiado a la edad del menor y las necesidades especiales,
15   consistente con el interés del Servicio de Inmigración y Naturalización de asegurar la precensia del menor ante a él y la corte de inmigración.  El acuerdo generalmente requiere que el menor sea alojado
16   en fácilidades que tengan una licencia estatal para el cuidado de menores dependientes o que no sean delincuentes.  El acuerdo requiere que en circunstancias limitadas el Servicio de Inmigración y
17   Naturalización pueda alojar a menores en facilidades seguras. Estas circunstancias generalmente cubren a menores adjudicados delincuentes o a los que presentan un riesgo a escapar.

18
19   Miembros de la clase que deseen una copia completa del acuerdo pueden obtener una al comunicarse con los abogados de la clase:

20   Carlos Holguín                                    Alice Bussiere
     Peter A. Schey                                    James B. Morales
21   CENTER FOR HUMAN RIGHTS &                         NATIONAL CENTER FOR YOUTH LAW
     CONSTITUTIONAL LAW                                114 Sansome Street, Suite 900
22   256 S. Occidental Blvd.                           San Francisco, CA 94104-3820
     Los Angeles, CA 90057                             Teléfono: (415) 543-3307
23   Teléfono: (213) 388-8693

24   Miembros de la clase que objecionan a este acuerdo deberan fichar sus objeciones con la corte federal del distrito para el Distrito Central de California, 312 N. Spring St. Los Angeles, CA 90012, en o
25   antes del 24 febrero, 1997.  Una copia de la objeción debe ser enviada a uno de los abogados de la clase  en la lista de arrriba y al abogado de la defensa, Michael Johnson, Abogado Asistente  de los
26   Estados Unidos, 300 N. Los Angeles St. Rm.7516, Los Angeles, CA 90012.

27   Este aviso debe permanecer fija del 24 de enero, 1997, a 24 de febrero, 1997.

28

Exhibit 2 - Page 52

# Exhibit 3

## Publicly Filed

LODGED

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguin
Peter A. Schey
Charles Song
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693; Fax: (213) 386-9484

LATHAM & WATKINS
Steven Schulman
555 Eleventh St., NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2184

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere
417 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*Attorneys for plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, et al., | ) | Case No. CV 85-4544-RJK(Px) |
| | ) | |
| Plaintiffs, | ) | STIPULATION EXTENDING SETTLEMENT AGREEMENT AND FOR OTHER PURPOSES; AND ORDER THEREON |
| -vs- | ) | |
| | ) | |
| JANET RENO, Attorney General of the United States, et al. | ) | |
| | ) | |
| Defendants | ) | |

Exhibit 3 - Page 53

1

2          IT IS HEREBY STIPULATED by and between the parties as follows:

3          1. Paragraph 40 of the Stipulation filed herein on January 17, 1997, is modified to read

4    as follows:

5          "All terms of this Agreement shall terminate ~~the earlier of five years after the date of~~

6          ~~final court approval of this Agreement or three years after the court determines that~~

7          ~~the INS is in substantial compliance with this Agreement,~~ *45 days following defendants'*

8          *publication of final regulations implementing this Agreement*

9          ~~except that~~ *Notwithstanding the foregoing,* the INS shall continue to house the general

10         population of minors in INS custody in facilities that are state-licensed for the care of

11         dependent minors."

12   / / /

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 3 - Page 54

2  For a period of six months from the date this Stipulation is filed, plaintiffs shall not initiate legal proceedings to compel publication of final regulations implementing this Agreement  Plaintiffs agree to work with defendants cooperatively toward resolving disputes regarding compliance with the Settlement. The parties agree to confer regularly no less frequently than once monthly for the purpose of discussing the implementation of and compliance with the settlement agreement  However, nothing herein shall require plaintiffs to forebear legal action to compel compliance with this Agreement where plaintiff class members are suffering irreparable injury

Dated: December 7, 2001.

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A Schey

LATHAM & WATKINS
Steven Schulman

YOUTH LAW CENTER
Alice Bussière

Carlos Holguín, *for plaintiffs*.

Dated: December 7, 2001

Arthur Strathern
Office of the General Counsel
U. S. Immigration & Naturalization Service

Arthur Strathern, *for defendants*
Per tax authorization

IT IS SO ORDERED

Dated: December _____ 2001

_____
UNITED STATES DISTRICT JUDGE

Exhibit 3 - Page 55

1    2. For a period of six months from the date this Stipulation is filed, plaintiffs shall not

2 initiate legal proceedings to compel publication of final regulations implementing this

3 Agreement. Plaintiffs agree to work with defendants cooperatively toward resolving

4 disputes regarding compliance with the Settlement. The parties agree to confer regularly no

5 less frequently than once monthly for the purpose of discussing the implementation of and

6 compliance with the settlement agreement. However, nothing herein shall require plaintiffs

7 to forebear legal action to compel compliance with this Agreement where plaintiff class

8 members are suffering irreparable injury.

9 Dated: December 7, 2001.    CENTER FOR HUMAN RIGHTS &
10             CONSTITUTIONAL LAW
              Carlos Holguín
11             Peter A. Schey

12             LATHAM & WATKINS
13             Steven Schulman

14             YOUTH LAW CENTER
              Alice Bussiere
15

16

17             _____
              Carlos Holguín, *for plaintiffs*

18 Dated: December 7, 2001.    Arthur Strathern
19             Office of the General Counsel
              U.S. Immigration & Naturalization Service
20

21

22             _____
              Arthur Strathern, *for defendants*
23             Per fax authorization

24

25 IT IS SO ORDERED

26 Dated: December 7, 2001.    _____
27             UNITED STATES DISTRICT JUDGE

28

- 3 -

Exhibit 3 - Page 56

PROOF OF SERVICE BY MAIL

I, Carlos Holguin, declare and say as follows:

1   I am over the age of eighteen years and am not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 256 South Occidental Boulevard, Los Angeles, California 90057, in said county and state

2   On December 7, 2001, I served the attached STIPULATION on defendants in this proceeding by placing a true copy thereof in a sealed envelope addressed to their attorneys of record as follows:

Arthur Strathern
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC  20536

and by then sealing said envelope and depositing the same, with postage thereon fully prepaid, in the mail at Los Angeles, California; that there is regular delivery of mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct

Executed this 7th day of December, 2001, at Los Angeles, California

Exhibit 3 - Page 57

# Exhibit 4

## Publicly Filed

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone:  (213) 388-8693 Facsimile:  (213) 386-9484
www.centerforhumanrights.org

October 15, 2014

Sarah B. Fabian
Trial Attorney
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Michael Johnson (or successor in office)
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman (or successor in office)
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

*Via first class mail (and email to Ms. Fabian).*

Re: *Flores*, et al., *v. Holder,* et al., No. CV 85-4544 (C.D. Cal.).

Dear Madam / Sirs:

Pursuant to ¶ 37 of the settlement[1] approved in the above referenced action on January 25, 1997 (Settlement), plaintiffs hereby give notice of claims that defendants are violating the Settlement in the particulars stated below.

In accordance with ¶ 37 and Rule 7-3 of the Rules of the United States District Court for the Central District of California, plaintiffs request that defendants Attorney General and Department of Homeland Security (DHS) ("defendants") meet with plaintiffs telephonically within the next seven days, or in person in the Central District of California within the next fourteen days, to discuss defendants' compliance with the Settlement. Plaintiffs reserve the right to address with defendants during the meet and

---

[1] Paragraph 37 provides in pertinent part as follows: "This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24.  The parties shall meet telephonically or in person to discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms of the Agreement, prior to bringing any individual or class action to enforce this Agreement."

Exhibit 4 - Page 58

Sarah Fabian
October 15, 2014
Page 2 of 6

confer additional issues relating to compliance with the Settlement not identified below that may come to light as the result of plaintiffs' ongoing investigation of the treatment and conditions class members are experiencing.

1. Violations of ¶¶ 14 and 18.

Paragraph 14 of the Settlement provides: "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to: A. a parent; …"

Paragraph 18 of the Settlement provides: "Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above.  Such efforts at family reunification shall continue so long as the minor is in INS custody."

We are informed and believe that defendants are now pursuing a blanket policy and practice to detain class members apprehended with their mothers in lieu of releasing them on bond, recognizance, or parole, pending a determination of their right to remain in the United States: that is, without regard to class members' age, reasons for coming to the United States, prior immigration violations, family ties in the United States, potential eligibility for lawful status or for relief under the memoranda issued June 17, 2011, by Immigration and Customs Enforcement Director John Morton, likelihood to abscond, or the minors' safety or safety of others.

We are informed and believe that defendants do not make or record prompt and continuous efforts toward the release of class members apprehended with their mothers.

We are informed and believe that defendants are now pursuing a blanket policy and practice to detain the mothers of class members, when mother and child are apprehended together, in lieu of releasing such mothers on bond, recognizance, or parole, pending a determination of their right to remain in the United States: that is, without regard to class members' mothers' reasons for coming to the United States, prior immigration violations, family ties in the United States, potential eligibility for lawful status or for relief under the memoranda issued June 17, 2011, by Immigration and Customs Enforcement Director John Morton, likelihood to abscond, potential to endanger themselves or others, or whether their release is in the best interests of class members.

Defendants are thereby in violation of ¶¶ 14 and 18 of the Settlement.

Exhibit 4 - Page 59

Sarah Fabian
October 15, 2014
Page 3 of 6

2. <u>Violations of ¶ 24A</u>.

Paragraph 24A of the Settlement provides: "A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing."

We are informed and believe that defendants are not regularly providing class members apprehended with adult mothers a bond redetermination hearing before an immigration judge in every case except where the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

Defendants are thereby in violation of ¶ 24A of the Settlement.

3. <u>Violations of ¶¶ 11, 19 and 24C</u>.

Paragraph 11 of the Settlement provides in pertinent part: "The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others."

Paragraph 19 provides, "Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program² until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier."

Paragraph 24C provides: "In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility."

We are informed and believe that defendants' policy and practice are to detain class members apprehended with their mothers in secure facilities that are not licensed by an appropriate state agency to provide residential, group or foster care services for dependent children, and that are not the least restrictive setting appropriate to class members' age and special needs.

---

² Definition 6 of the Settlement provides in pertinent part, "The term 'licensed program' shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors… All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law; …"

Exhibit 4 - Page 60

We are informed and believe that defendants are pursuing a policy and practice of failing to provide minors apprehended with their mothers notice of the reasons for housing them in a secure or medium security facility.

We are informed and believe that defendants have no written standards, or else no effective monitoring thereof, for monitoring and treating —

      (a) weight loss,

      (b) the mental health,

      (c) respiratory illnesses, or

      (d) fevers

in detained minors apprehended with their mothers.

Defendants are thereby in violation of ¶¶ 11, 19 and 24C of the Settlement.

4. <u>Violations of ¶ 12.</u>

Paragraph 12 of the Settlement provides in pertinent part: "Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

We are informed and believe that defendants have no written standards for Border Patrol facilities, or else no effective monitoring thereof, specifying —

      (a) minimum standards required to ensure that facilities in which class members are detained are safe and sanitary;

      (b) the minimum and maximum temperatures for rooms in which class members are held;

      (c) the provision of mattresses and blankets to class members;

      (d) the retention, removal, or destruction of minors' jackets, sweaters, identity documents and other personal property;

      (e) the maximum capacity of rooms in which class members are held following arrest;

      (f) class members' regular access to toilets and sinks; and

      (g) the quality and quantity of food and drink class members are to be provided.

Exhibit 4 - Page 61

Sarah Fabian
October 15, 2014
Page 5 of 6

As a result of the foregoing, class members are regularly detained at Border Patrol facilities under conditions that are not safe, sanitary, or consistent with a good faith concern for their particular vulnerability.

Defendants are thereby in violation of ¶ 12 of the Settlement.

5. Violation of ¶ 7.

Paragraph 7 of the Settlement provides in pertinent part that "[t]he INS shall assess minors to determine if they have special needs …" A minor may have special needs "due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment. A minor who has suffered serious neglect or abuse may be considered a minor with special needs if the minor requires special services or treatment as a result of the neglect or abuse."

We are informed and believe that defendants fail to assess whether class members have special needs and fail to place minors in facilities which provide services and treatment of such special needs, including unlicensed facilities when class members are apprehended with their mothers.

Defendants are thereby in violation of ¶ 7 of the Settlement.

6. Violation of 12A.

Paragraph 12A of the Settlement provides that "[w]henever the INS takes a minor into custody, it shall … provide the minor with a notice of [his or her] rights …"

We are informed and believe that when defendants take class members into custody, defendants do not routinely advise such class members about their right to apply for relief under the memoranda issued June 17, 2011, by Immigration and Customs Enforcement Director John Morton, or of their right to apply for Special Immigrant Juvenile status if they have been abused abandoned or neglected, or of their right to seek legalization of status if they have certain close relatives who are lawful permanent residents or U.S. citizens.

Defendants are thereby in violation of ¶ 12A of the Settlement.

7. Violation of Paragraph 28A.

Paragraph 28A provides in pertinent part as follows: "An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours.  Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations.

Exhibit 4 - Page 62

Sarah Fabian
October 15, 2014
Page 6 of 6

We have requested information from defendants regarding compliance with ¶ 28A and
will be in a position to assess defendants' compliance with ¶ 28A upon receipt of
defendants responses to our letter of October 2, 2014.

8. <u>Violations of ¶ 12C.</u>

Paragraph 12C provides: "In preparation for an 'emergency' or 'influx,' as described in
Subparagraph B, the INS shall have a written plan that describes the reasonable efforts
that it will take to place all minors as expeditiously as possible…The INS shall update
this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a
copy of this listing."

We are informed and believe that defendants have no written plan regarding
preparation for an "emergency" or "influx" as described in ¶ 12B, and have not
provided plaintiffs' counsel with quarterly updates of the listing of additional beds, that
describes the reasonable efforts defendants will take or have taken to place all minors as
expeditiously as possible in licensed facilities.

Should defendants wish any clarification regarding the foregoing, I may be reached at
the above address and telephone number. When communicating by email, please
forward communications to me at crholguin@centerforhumanrights.org, Peter Schey at
pschey@centerforhumanrights.org, and Alice Bussiere at abussiere@ylc.org.

Please inform us of proposed dates and times you will be available to meet
telephonically within the next week, or in person in the Central District of California
within the next 14 days.

Thank you,

Carlos Holguin
One of the attorneys for plaintiffs

ccs:    Peter A. Schey, Center for Human Rights & Constitutional Law
        Alice Bussiere, Youth Law Center

Exhibit 4 - Page 63

# Exhibit 5

## Publicly Filed

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone:  (213) 388-8693 Facsimile:  (213) 386-9484
www.centerforhumanrights.org

October 2, 2014

Sarah B. Fabian
Trial Attorney
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

*Via e-mail and first class mail*

Re: *Flores*, et al., *v. Holder,* et al., No. CV 85-4544 (C.D. Cal.).

Dear Ms. Fabian:

Plaintiffs ask defendants Attorney General, Department of Homeland Security (DHS), and their subordinate entities ("defendants") the following questions pursuant to ¶ 29 of the settlement¹ approved in the above referenced action on January 25, 1997 (Settlement):

1. Questions relating to implementation of ¶¶ 9, 10 and 41.

Paragraph 10 of the Settlement provides that the agreement shall apply to "[a]ll minors who are detained in the legal custody of the INS."

Paragraph 9 of the Settlement provides in pertinent part, "This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS ..."

Definition 4 defines a "minor" as any person under the age of eighteen (18) years who is detained in the legal custody of the INS.

Paragraph 41 provides that "Defendants … principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law."

a) Do defendants agree that the Settlement governs the detention, release, and treatment of minors in DHS's legal custody?

---

¹ Paragraph 29 provides in pertinent part as follows: "… Plaintiffs' counsel shall have the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement and the information provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28."

Exhibit 5 - Page 64

If not, please identify the facts, documents, and tangible things on which you base your response.

b) Do defendants agree that the Settlement is binding on the Executive Office of Immigration Review?

If not, please identify the facts, documents, and tangible things on which you base your response.

c) Do defendants consider themselves bound to comply with the Settlement with respect to minors taken into DHS custody pursuant to the Immigration and Nationality Act (INA) who are accompanied by an adult parent?

If not, please identify the facts, documents, and tangible things on which you base your response.

d) Do defendants treat minors they take into DHS custody pursuant to the INA differently if they are apprehended in the company of an adult mother as opposed to an adult father? If so —

How does such treatment differ?

What law and facts justify disparate treatment of minors depending on the gender of their accompanying parent?

e) Do defendants treat minors they take into DHS custody pursuant to the INA differently if they are arrested in the company of a parent as opposed to in the company of an adult family member other than a parent? If so —

How does such treatment differ?

What law and facts justify disparate treatment of minors depending on the type of accompanying adult relative?

2. Questions relating to implementation of ¶¶ 14 and 18.

Paragraph 14 of the Settlement provides: "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay …"

Paragraph 18 of the Settlement provides: "Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above.  Such efforts at family reunification shall continue so long as the minor is in INS custody."

Exhibit 5 - Page 65

Sarah Fabian
October 2, 2014
Page 3 of 21

a) Is it defendants' policy and practice to detain minors who unlawfully enter with their mothers in lieu of releasing them on bond, recognizance, or parole, pending a determination of their right to remain in the United States? If so —

> Do defendants follow such policy and practice uniformly: that is, without regard to individual minors' age, reasons for coming to the United States, prior immigration violations, family ties in the United States, or potential eligibility for lawful status?

> What evidence, if any, do defendants have that such policy and practice ensure the safety of others?

> What instructions or directions, if any, have defendants issued to their employees, agents or officers regarding the detention or release of minors detained with their mothers?

> What, if any, objections to defendants have to providing class counsel with copies of any such instructions or directions?

b) Do defendants contend that minors taken into DHS custody pursuant to the INA with an adult mother present a risk to national security? If so —

> What evidence supports such contention?

> How long do defendants believe such minors will continue to present a risk to national security?

> What evidence, if any, do defendants have that minors who enter without authorization with an adult mother present a risk to national security greater than that presented by minors who so enter unaccompanied?

> What evidence, if any, do defendants have that minors who enter without authorization with an adult mother present a risk to national security different from or greater than that presented by adults who so enter without children?

> What evidence, if any, do defendants have that minors who enter without authorization with an adult mother present a risk to national security different from or greater than that presented by minors who so enter with an adult father?

> Do defendants contend that accompanied minors entering without authorization present impair national security such that defendants are excused from complying with all or part of the Settlement?

> If so, as to which parts of the Settlement do defendants believe their compliance excused and what is the legal and factual basis for defendants' position?

c) Is it defendants' policy and practice to refuse minors taken into custody with their mothers the favorable exercise of prosecutorial discretion pursuant to the memoranda

Exhibit 5 - Page 66

issued June 17, 2011, by Immigration and Customs Enforcement Director John Morton? If so —

> Do defendants follow such policy and practice uniformly: that is, without regard to individual minors' age, reasons for coming to the United States, prior immigration violations, family ties in the United States, or potential eligibility for lawful status?

> What facts, documents, and tangible things justify such policy and practice?

d) Is it defendants' policy and practice to advise minors taken into custody with their mothers that they might qualify for the favorable exercise of prosecutorial discretion pursuant to the memoranda issued June 17, 2011, by Immigration and Customs Enforcement Director John Morton?

> If so, do defendants follow such policy and practice uniformly: that is, without regard to individual minors' age, reasons for coming to the United States, prior immigration violations, family ties in the United States, or potential eligibility for lawful status?

e) Do defendants make and record prompt and continuous efforts toward the release of minors detained at the facility in Artesia, New Mexico?  If so —

> Where are such records kept?

> What objections, if any, do defendants have to providing class counsel with copies of such records?

> If not, please identify the facts, documents, and tangible things that justify defendants' failure to make and record prompt and continuous efforts toward the release of minors detained at the facility in Artesia, New Mexico.

f) Do defendants make and record prompt and continuous efforts toward the release of minors detained at the facility in Karnes City, Texas?  If so —

> Where are such records kept?

> What objections, if any, do defendants have to providing class counsel with copies of such records?

> If not, please identify the facts, documents, and tangible things that justify defendants' failure to make and record prompt and continuous efforts toward the release of minors detained at the facility in Karnes City, Texas.

g) Do defendants make and record prompt and continuous efforts toward the release of minors detained at the facility in Leesport, Pennsylvania?  If so —

> Where are such records kept?

Exhibit 5 - Page 67

What objections, if any, do defendants have to providing class counsel with copies of such records?

If not, please identify the facts, documents, and tangible things that justify defendants' failure to make and record prompt and continuous efforts toward the release of minors detained at the facility in Leesport, Pennsylvania.

h) When setting bond for minors detained with a parent, do defendants consider parent and child separately, or do defendants determine bond for them as a family unit?

i) What factors do defendants consider when setting bond for —

A detained minor individually?

A detained family that includes a minor, if bond is determined for the family as a whole?

A parent of a detained minor, if bond is determined for the parent and child separately?

j) Do defendants consider potential eligibility for Special Immigrant Juvenile (SIJ) status in setting bond for minors apprehended with an adult parent? If so —

Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider a minor's eligibility for Special Immigrant Juvenile (SIJ) status when making a bond determination?

What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

k) Do defendants consider potential eligibility for Special Immigrant Juvenile (SIJ) status in setting bond for minors apprehended unaccompanied by an adult parent? If so —

Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider a minor's eligibility for Special Immigrant Juvenile (SIJ) status when making a bond determination?

What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

l) Do defendants consider national security in setting bond for minors apprehended with an adult mother? If so —

What factors do defendants consider in assessing the impact releasing minors apprehended with an adult mother will have on national security?

Exhibit 5 - Page 68

Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider national security in setting bond for minors apprehended with an adult mother?

What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

m) Do defendants consider national security in setting bond for minors apprehended with an adult father? If so —

What factors do defendants consider in assessing the impact releasing minors apprehended with an adult father will have on national security?

Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider national security in setting bond for minors apprehended with an adult father?

What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

n) Do defendants consider the national security in setting bond for unaccompanied minors detained pursuant to the INA? If so —

What factors do defendants consider in assessing the impact releasing unaccompanied minors will have on national security?

Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider the national security in setting bond for unaccompanied minors detained pursuant to the INA?

What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

o) Do defendants contend that minors apprehended with an adult mother should be detained in order to deter others from entering the United States without authorization? If so —

What evidence, if any, is there that detaining minors apprehended with an adult mother deters others from entering the United States without authorization?

Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers minors detain minors apprehended with an adult mother in order to deter others from entering the United States without authorization?

What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

Exhibit 5 - Page 69

p) Do defendants contend that minors apprehended with an adult father should be detained in order to deter others from entering the United States without authorization? If so —

What evidence, if any, is there that detaining minors apprehended with an adult father deters others from entering the United States without authorization?

Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers minors detain minors apprehended with an adult father in order to deter others from entering the United States without authorization?

What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

q) Do defendants contend that minors apprehended unaccompanied by an adult parent should be detained in order to deter others from entering the United States without authorization? If so —

What evidence, if any, is there that detaining unaccompanied minors deters others from entering the United States without authorization?

Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers detain minors apprehended without an adult parent in order to deter others from entering the United States without authorization?

What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

r) In deciding whether to detain a parents arrested with a minor child, or release such parent on bond, recognizance or parole, is it defendants policy and practice to consider the best interests of the detained child? If so —

What do such policy and practice provide?

Where are such policy and practice published?

What are defendants' procedures for monitoring compliance with such policy and practice, and where are reports of such monitoring, if any, kept and published?

Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider minors' best interests in determining whether to release their parents on bond, recognizance, or parole?

What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

Exhibit 5 - Page 70

s) For the period from June 1, 2014, to September 30, 2014 —

>What percentage and raw number of bond-eligible families comprising one or more minors did defendants determine should be detained without bond?

>What percentage and raw number of children apprehended with an adult parent did defendants order detained without bond?

>What percentage and raw number of bond-ineligible families comprising one or more minors which passed credible fear interviews did defendants release on parole?

>What percentage and raw number of children who were part of bond-ineligible families which passed credible fear interviews did defendants release on parole?

t) For the period from June 1, 2013, to September 30, 2013 —

>What percentage and raw number of detained, bond-eligible families comprising one or more minors did defendants order held without bond?

>What percentage and raw number of children who were part of bond-eligible families did defendants order detained without bond?

>What percentage and raw number of  bond-ineligible families comprising one or more minors which passed credible fear interviews did defendants release on parole?

>What percentage and raw number of children who were part of bond-ineligible families which passed credible fear interviews did defendants release on parole?

u) Of bonds set by DHS between June 1, 2014, and September 30, 2014, what was the average bond set for the release of  —

>An individual minor?

>An individual minor and parent, when bond was set for the family as a whole?

>A parent of a detained minor, if bond was set for parent and child individually?

v) Of bonds set by DHS between June 1, 2013, and September 30, 2013, what was the average bond set for the release of —

>An individual minor?

>An individual minor and parent, when bond was set for the family as a whole?

>A parent of a detained minor, if bond was set for parent and child individually?

Exhibit 5 - Page 71

w) Of bonds set by DHS between June 1, 2014, and September 30, 2014, what percentage and raw number of families with one or more minors posted bond and were released?

x) Of bonds set by DHS between June 1, 2013, and September 30, 2013, what percentage and raw number of families with one or more minors posted bond and were released?

y) With respect to bond redetermined by immigration judges between June 1, 2014, and September 30, 2014, what percentage and raw number of families with one or more minors —

Were unable to post bond and remained detained?

Were released on recognizance?

Had the immigration judge's bond decision stayed by DHS appeal to the BIA?

z) With respect to release on bond or recognizance ordered by immigration judges between June 1, 2013, and September 30, 2013,  what percentage and raw number of families with one or more minors —

Were unable to post bond and remained detained?

Were released on recognizance?

Had the immigration judge's bond decision stayed by DHS appeal to the BIA?

3. Questions relating to implementation of ¶ 24A.

Paragraph 24A of the Settlement provides: "A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing."

a)  Are minors detained at the facility in Artesia, New Mexico, given a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing? If so —

Where are signed Notice of Custody Determination forms kept?

What objection, if any, do defendants have to providing class counsel with copies of such forms?

If not, please identify the facts, documents, and tangible things that justify defendants' failure give minors detained at the facility in Artesia, New Mexico, a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

Exhibit 5 - Page 72

b) Are minors detained at the facility in Karnes City, Texas, given a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing? If so —

> Where are signed Notice of Custody Determination forms kept?

> What objection, if any, do defendants have to providing class counsel with copies of such forms?

> If not, please identify the facts, documents, and tangible things that justify defendants' failure give minors detained at the facility in Karnes City, Texas, a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

c) Are minors detained at the facility in Leesport, Pennsylvania, given a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing? If so —

> Where are signed Notice of Custody Determination forms kept?

> What objection, if any, do defendants have to providing class counsel with copies of such forms?

> If not, please identify the facts, documents, and tangible things that justify defendants' failure give minors detained at the facility in Leesport, Pennsylvania, a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

4. Questions relating to implementation of ¶ 11.

Paragraph 11 of the Settlement provides in pertinent part: "The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others."

a) Do defendants identify, for each detained minor, the least restrictive setting appropriate to the minor's age and special needs?

> If so, please describe what information is collected, what tools and assessments are used to collect that information, what factors are considered, and who is responsible for the determination and where this information is recorded.

Exhibit 5 - Page 73

If not, please identify the facts, documents, and tangible things that justify defendants' failure to identify, for each detained minor, the least restrictive setting appropriate to the minor's age and special needs.

5. <u>Questions relating to implementation of Definition 6 and ¶¶ 19 and 24C.</u>

Definition 6 of the Settlement provides in pertinent part, "The term 'licensed program' shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors… All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law; …"

Paragraph 19 provides, "Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier."

Paragraph 24C provides: "In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility."

a) Is the detention facility in Artesia, New Mexico, state-licensed to provide residential, group, or foster care services for dependent children? If so —

What state agency issued such license?

What is the license's numerical or other official designation?

On what date was the license issued?

What was the date of the most recent visit or inspection by the licensing agency?

What objections, if any, do defendants have to providing class counsel with a copy of such license?

If not, please identify the facts, documents, and tangible things that excuse the absence of such licensing for the facility.

b) If the detention facility in Artesia, New Mexico, is not state-licensed to provide residential, group, or foster care services for dependent children —

Has the facility been licensed, approved or certified by any other entity? If so, what entity licensed, approved, or certified the facility, what standards did the facility meet, and on what date was the facility licensed, approved, or certified?

Exhibit 5 - Page 74

What objections, if any, do defendants have to providing class counsel with a copy of any such standards and license, approval or certification?

c) Are minors detained in the facility in Artesia, New Mexico, provided a notice of the reasons for  housing them in a detention or medium security facility? If so —

Where are records, if any, of such notices kept?

What objections, if any, do defendants have to providing copies of such records to class counsel?

If not, please identify the facts, documents, and tangible things that excuse defendants' failure to provide such notice.

d) Is the detention facility in Karnes City, Texas, state-licensed to provide residential, group, or foster care services for dependent children? If so —

What State agency issued such license?

What is the license's numerical or other official designation?

On what date was the license issued?

What was the date of the most recent visit or inspection by the licensing agency?

What objections, if any, do defendants have to providing class counsel with a copy of such license?

If not, please identify the facts, documents, and tangible things that excuse the absence of such licensing for the facility.

e) If the detention facility in Karnes City, Texas, is not state-licensed to provide residential, group, or foster care services for dependent children —

Has the facility been licensed, approved or certified by any other entity? If so, what entity licensed, approved, or certified the facility, what standards did the facility meet, and on what date was the facility licensed, approved, or certified?

What objections, if any, do defendants have to providing class counsel with a copy of any such standards and license, approval or certification?

f) Are minors detained in the facility in Karnes City, Texas, provided a notice of the reasons for  housing them in a detention or medium security facility? If so —

Where are records, if any, of such notices kept?

What objections, if any, do defendants have to providing copies of such records to class counsel?

Exhibit 5 - Page 75

If not, please identify the facts, documents, and tangible things that excuse defendants' failure to provide such notice.

g) Is the detention facility in Leesport, Pennsylvania, state-licensed to licensed to provide residential, group, or foster care services for dependent children? If so —

What State agency issued such license?

What is the license's numerical or other official designation?

On what date was the license issued?

What was the date of the most recent visit or inspection by the licensing agency?

What objections, if any, do defendants have to providing class counsel with a copy of such license?

If not, please identify the facts, documents, and tangible things that justify the absence of such licensing for the facility.

h) If the detention facility in Leesport, Pennsylvania, is not state-licensed to provide residential, group, or foster care services for dependent children —

Has the facility been licensed, approved or certified by any other entity? If so, what entity licensed, approved, or certified the facility, what standards did the facility meet, and on what date was the facility licensed, approved, or certified?

What objections, if any, do defendants have to providing class counsel with a copy of any such standards and license, approval or certification?

Are minors placed in such facility provided a notice of the reasons for  housing them in a detention or medium security facility, and if so, where are records of such notice kept and do defendants object to providing copies of such records to class counsel?

i) Are minors detained in the facility in Leesport, Pennsylvania, provided a notice of the reasons for  housing them in a detention or medium security facility? If so —

Where are records, if any, of such notices kept?

What objections, if any, do defendants have to providing copies of such records to class counsel?

If not, please identify the facts, documents, and tangible things that excuse defendants' failure to provide such notice.

Exhibit 5 - Page 76

j) Is the detention facility in Artesia, New Mexico, non-secure as required under state law?

      If so, under what state law do defendants deem the facility non-secure?

      If not, please identify the facts, documents, and tangible things that justify housing class members at the facility in Artesia, New Mexico.

k) Is the detention facility in Karnes City, Texas, non-secure as required under state law?

      If so, under what state law do defendants deem the facility non-secure?

      If not, please identify the facts, documents, and tangible things that justify housing class members at the facility in Karnes City, Texas.

l) Is the detention facility in Leesport, Pennsylvania, non-secure as required under state law?

      If so, under what state law do defendants deem the facility non-secure?

      If not, please identify the facts, documents, and tangible things that justify housing class members at the facility in Leesport, Pennsylvania.

m) In what facilities do defendants currently hold minors?  For each such facility —

      What is the name and location of the facility?

      What type of facility is it: *e.g.*, shelter, transitional foster care, long term foster care, group home, residential treatment, staff secure, or secure?

      For each facility identified, is the facility licensed, and if so, what type of license does the facility have and what agency issued the license?

n) Do defendants have written standards regarding monitoring and treatment of weight loss and/or failure to thrive in minors held in family detention facilities? If so —

      What do such standards provide?

      Where are such standards published?

      What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

      What objections, if any, do defendants have to providing class counsel with copies of any such standards?

      If defendants have no such standards, why are there no such standards?

Exhibit 5 - Page 77

o) Do defendants have written standards regarding the monitoring and treatment of the mental health of mothers and minors in family detention facilities? If so —

>What do such standards provide?

>Where are such standards published?

>What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

>What objections, if any, do defendants have to providing class counsel with copies of any such standards?

>If defendants have no such standards, why are there no such standards?

p) Do defendants have written standards regarding monitoring and treatment of respiratory illnesses in minors held in family detention? If so —

>What do such standards provide?

>Where are such standards published?

>What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

>What objections, if any, do defendants have to providing class counsel with copies of any such standards?

>If defendants have no such standards, why are there no such standards?

q) Do defendants have written standards regarding monitoring and treatment of fever in children held in family detention? If so —

>What do such standards provide?

>Where are such standards published?

>What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

>What objections, if any, do defendants have to providing class counsel with copies of any such standards?

>If defendants have no such standards, why are there no such standards?

6. Questions relating to implementation of ¶ 12.

Exhibit 5 - Page 78

Paragraph 12 of the Settlement provides in pertinent part: "Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the  particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

a) Do defendants have written standards specifying the minimum protections required to ensure that facilities are "safe and sanitary"?  If so —

> What do such standards provide?

> Where are such standards published?

> What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

> What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

> If defendants have no such standards or procedures, why not?

b) Do defendants have written standards specifying the minimum and maximum temperatures for rooms at Border Patrol facilities in which minors are held following arrest? If so —

> What do such standards provide?

> Where are such standards published?

> What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

> What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

> If defendants have no such standards or procedures, why not?

c) Do defendants have written standards on providing minors mattresses and blankets at Border Patrol facilities in which such minors are held following arrest? If so —

> What do such standards provide?

> Where are such standards published?

Exhibit 5 - Page 79

What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

If defendants have no such standards or procedures, why not?

d) Do defendants have written standards regarding the retention, removal, or destruction of minors' jackets, sweaters, identity documents and other personal property at Border Patrol facilities in which such minors are held following arrest? If so —

What do such standards provide?

Where are such standards published?

What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

If defendants have no such standards or procedures, why not?

e) Do defendants have written standards prescribing the maximum capacity of rooms at Border Patrol facilities in which such minors are held following arrest? If so —

What do such standards provide?

Where are such standards published?

What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

If defendants have no such standards or procedures, why not?

f) Do defendants have written standards prescribing minors' access to toilets and sinks at Border Patrol facilities in which such minors are held following arrest?  If so —

What do such standards provide?

Where are such standards published?

Exhibit 5 - Page 80

What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

If defendants have no such standards or procedures, why not?

g) Do defendants have written standards regulating the quality and quantity of food and drink minors are to be provided in Border Patrol facilities following arrest? If so —

What do such standards provide?

Where are such standards published?

What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

If defendants have no such standards or procedures, why not?

h) Do defendants have written standards regulating what information minors are to be provided when transferred from Border Patrol facilities to another detention facility? If so —

What do such standards provide?

Where are such standards published?

What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

If defendants have no such standards or procedures, why not?

i) Do defendants have written standards prohibiting their agents, officers and employees from falsely informing minors that they will be deported or are being deported? If so —

What do such standards provide?

Where are such standards published?

Exhibit 5 - Page 81

Sarah Fabian
October 2, 2014
Page 19 of 21

What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

If defendants have no such standards or procedures, why not?

j) Do defendants have written standards prohibiting their agents, officers and employees from recording false information on documentation, including by obtaining signatures without having provided translation services or by falsely affixing a signature? If so —

What do such standards provide?

Where are such standards published?

What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

If defendants have no such standards or procedures, why not?

7. Questions relating to implementation of ¶ 12C.

Paragraph 12C provides: "In preparation for an 'emergency' or 'influx,' as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible…The INS shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing.."

a) Do defendants have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible in licensed facilities? If so —

Why have defendants not provided plaintiffs' counsel with quarterly updates of the listing of additional beds?

What objections, if any, do defendants have to providing class counsel with copies such written plans issued in 2013 and 2014?

If not, please identify the facts, documents, and tangible things that justify defendants' failure to have a written plan that describes the reasonable efforts they will take to place all minors as expeditiously as possible in licensed facilities.

Exhibit 5 - Page 82

b) Have defendants identified facilities that will or may become available in 2014 to provide additional beds for the expeditious placement of minors, whether accompanied or unaccompanied?  If so —

What is the name, location and projected number of beds for each such facility?

Will defendants require each facility to be state-licensed before it admits minors?

8. Questions relating to implementation of ¶¶ 28A and 29.

Paragraph 28A in pertinent part provides as follows: "An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours. Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations."

Paragraph 29 provides in pertinent part: "… the INS shall provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law, and each INS policy or instruction issued to INS employees regarding the implementation of this Agreement."

a) Do defendants collect the statistical information described in ¶ 28A on a weekly basis? If so —

Why does the statistical report defendants have provided class counsel most recently report information through June 2013 only?

What objections, if any, do defendants have to providing class counsel with copies of the weekly reports for the period from July 2013, to the present, in hard copy and native format?

If not, please identify the facts, documents, and tangible things that justify defendants' failure to maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours, to collect such information weekly, and/or failure to provide up-to-date information in reports.

b) Have defendants provided to class counsel each policy or instruction issued to their employees regarding the implementation of the Settlement?  If not —

What facts, documents, and tangible things that justify defendants' failure to provide class counsel each policy or instruction issued to their employees regarding the implementation of the Settlement?

What objections, if any, do defendants have to providing class counsel with copies of such policies and instructions now?

Exhibit 5 - Page 83

Sarah Fabian
October 2, 2014
Page 21 of 21

Should defendants wish any clarification regarding the foregoing, I may be reached at the above address and telephone number, or via email to crholguin@centerforhumanrights.org.

Thank you,

Carlos Holguín
One of the attorneys for plaintiffs

ccs:   Peter A. Schey, Center for Human Rights & Constitutional Law
       Alice Bussiere, Youth Law Center
       Tamara Lange, Hannah Benton, National Center for Youth Law
       Ellen Richmond, Munger, Tolles & Olsen LLP
       Judy Rabinovitz, American Civil Liberties Union

Exhibit 5 - Page 84

# Exhibit 6

## Publicly Filed

1.   **Questions relating to implementation of ¶¶ 9, 10 and 41.**

    a.   Do defendants agree that the Settlement governs the detention, release, and treatment of minors in DHS's legal custody?  If not, please identify the facts, documents, and tangible things on which you base your response.

**RESPONSE:**  This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

    b.   Do defendants agree that the Settlement is binding on the Executive Office of Immigration Review?  If not, please identify the facts, documents, and tangible things on which you base your response.

**RESPONSE:**  This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

    c.   Do defendants consider themselves bound to comply with the Settlement with respect to minors taken into DHS custody pursuant to the Immigration and Nationality Act (INA) who are accompanied by an adult parent?  If not, please identify the facts, documents, and tangible things on which you base your response.

**RESPONSE:**  This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

    d.   Do defendants treat minors they take into DHS custody pursuant to the INA differently if they are apprehended in the company of an adult mother as opposed to an adult father?  If so
        i.   How does such treatment differ?
        ii.   What law and facts justify disparate treatment of minors depending on the gender of their accompanying parent?
    e.   Do defendants treat minors they take into DHS custody pursuant to the INA differently if they are arrested in the company of a parent as opposed to in the company of an adult family member other than a parent? If so —
        i.   How does such treatment differ?
        ii.   What law and facts justify disparate treatment of minors depending on the type of accompanying adult relative?

**RESPONSE:**  In response to questions 1(d) and 1(e), consistent with Paragraph 14 of the Settlement Agreement, and the immigration laws, U.S. Immigration and Customs Enforcement ("ICE") makes custody determinations with regard to individual class members on a case-by-case basis.  Where there is discretion to release an individual alien during the pendency of proceedings before the immigration courts, ICE considers all evidence that is relevant, including whether the individual poses a flight risk, a risk to his or her own safety or the safety of others, or a danger to the national security.  As provided by regulations, ICE's custody determination is subject to review by an immigration judge.

1

Exhibit 6 - Page 85

2. **Questions relating to implementation of ¶¶ 14 and 18.**

   a. Is it defendants' policy and practice to detain minors who unlawfully enter with their mothers in lieu of releasing them on bond, recognizance, or parole, pending a determination of their right to remain in the United States? If so —

      i. Do defendants follow such policy and practice uniformly: that is, without regard to individual minors' age, reasons for coming to the United States, prior immigration violations, family ties in the United States, or potential eligibility for lawful status?

      ii. What evidence, if any, do defendants have that such policy and practice ensure the safety of others?

      iii. What instructions or directions, if any, have defendants issued to their employees, agents or officers regarding the detention or release of minors detained with their mothers?

      iv. What, if any, objections to defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:** In response to the humanitarian situation created by the recent influx of foreign nationals (including adults with children) seeking to unlawfully enter the United States across the Southwest Border, the U.S. Department of Homeland Security ("DHS") has taken action to reduce the flow of illegal immigration by, among other things, detaining families in a manner consistent with all applicable legal authority. In cases in which adults with children are detained in family facilities, DHS has submitted documentary evidence establishing that releasing foreign nationals from detention encourages additional unlawful migration, risks the diversion of U.S. Customs and Border Protection's ("CBP") and ICE's limited resources, and diminishes DHS's ability to conduct background investigations to ensure community safety. The documentary evidence DHS has submitted shows that detention is especially crucial in instances of influx as significant resources have had to be diverted to the Southwest Border, not only to handle the additional caseload, but also as part of a strengthened effort to investigate, prosecute, and dismantle criminal smuggling organizations. Such a diversion of resources disrupts DHS's ability to deal with other threats to public safety, including national security threats.

Media reports detail widespread misconceptions of what will happen to individuals who risk the perilous trip to the United States either alone or at the hands of human traffickers. For example, several articles report the common belief that the individuals who came to the United States would be given a "permiso" allowing them to live freely in the United States. Other articles have reported that children sometimes make the trip based on the mistaken belief that they will be able to work and send home up to $1,000 per month.[1]

---

[1] Damien Cave and Frances Robles, New York Times, *A Smuggled Girl's Odyssey of False Promises and Fear*, (Oct. 6, 2014). http://www.nytimes.com/2014/10/06/world/americas/a-smuggled-girls-odyssey-guatemala-migration-abduction.html?emc=eta1 (Describing how one family took out a loan for $7,000, using their home as a guarantee, in order to send their 16-year old daughter, Cecilia, to the United States and explaining, among other life-altering concerns that Cecilia's "dreams of sending home $1,000 a month were unrealistic").

Exhibit 6 - Page 86

Although these general considerations are relevant to custodial determinations regarding adults with children, ICE makes such determinations on a case-by-case basis after consideration of the individual facts of the case.

b. Do defendants contend that minors taken into DHS custody pursuant to the INA with an adult mother present a risk to national security? If so —

   i. What evidence supports such contention?

   ii. How long do defendants believe such minors will continue to present a risk to national security?

   iii. What evidence, if any, do defendants have that minors who enter without authorization with an adult mother present a risk to national security greater than that presented by minors who so enter unaccompanied?

   iv. What evidence, if any, do defendants have that minors who enter without authorization with an adult mother present a risk to national security different from or greater than that presented by adults who so enter without children?

   v. What evidence, if any, do defendants have that minors who enter without authorization with an adult mother present a risk to national security different from or greater than that presented by minors who so enter with an adult father?

   vi. Do defendants contend that accompanied minors entering without authorization present impair national security such that defendants are excused from complying with all or part of the Settlement?

   vii. If so, as to which parts of the Settlement do defendants believe their compliance excused and what is the legal and factual basis for defendants' position?

**RESPONSE:**  See response to question 2(a).

c. Is it defendants' policy and practice to refuse minors taken into custody with their mothers the favorable exercise of prosecutorial discretion pursuant to the memoranda issued June 17, 2011, by Immigration and Customs Enforcement Director John Morton? If so —

   i. Do defendants follow such policy and practice uniformly: that is, without regard to individual minors' age, reasons for coming to the United States, prior immigration violations, family ties in the United States, or potential eligibility for lawful status?

   ii. What facts, documents, and tangible things justify such policy and practice?

**RESPONSE:**  This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

d. Is it defendants' policy and practice to advise minors taken into custody with their mothers that they might qualify for the favorable exercise of prosecutorial discretion

3

Exhibit 6 - Page 87

pursuant to the memoranda issued June 17, 2011, by Immigration and Customs Enforcement Director John Morton?

    i.   If so, do defendants follow such policy and practice uniformly: that is, without regard to individual minors' age, reasons for coming to the United States, prior immigration violations, family ties in the United States, or potential eligibility for lawful status?

**RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

    e.   Do defendants make and record prompt and continuous efforts toward the release of minors detained at the facility in Artesia, New Mexico? If so —

        i.   Where are such records kept?

        ii.   What objections, if any, do defendants have to providing class counsel with copies of such records?

        iii.   If not, please identify the facts, documents, and tangible things that justify defendants' failure to make and record prompt and continuous efforts toward the release of minors detained at the facility in Artesia, New Mexico.

**RESPONSE:** To the extent that an individual minor is eligible for release under the immigration laws, ICE makes detention and release determinations on a case-by-case basis after consideration of the facts of the individual case and records these determinations in accordance with ICE procedures and practices.

    f.   Do defendants make and record prompt and continuous efforts toward the release of minors detained at the facility in Karnes City, Texas? If so —

        i.   Where are such records kept?

        ii.   What objections, if any, do defendants have to providing class counsel with copies of such records?

        iii.   If not, please identify the facts, documents, and tangible things that justify defendants' failure to make and record prompt and continuous efforts toward the release of minors detained at the facility in Karnes City, Texas.

**RESPONSE:** See response to question 2(e).

    g.   Do defendants make and record prompt and continuous efforts toward the release of minors detained at the facility in Leesport, Pennsylvania? If so —

        i.   Where are such records kept?

        ii.   What objections, if any, do defendants have to providing class counsel with copies of such records?

        iii.   If not, please identify the facts, documents, and tangible things that justify defendants' failure to make and record prompt and continuous efforts toward the release of minors detained at the facility in Leesport, Pennsylvania.

Exhibit 6 - Page 88

**RESPONSE:** See response to question 2(e).

   h.  When setting bond for minors detained with a parent, do defendants consider parent and child separately, or do defendants determine bond for them as a family unit?

**RESPONSE:** ICE assesses each case on its unique facts, and makes custodial determinations based upon whether the release of any individual parent or child would pose a danger to the community, flight risk, or danger to the national security.

   i.  What factors do defendants consider when setting bond for —
      i.  A detained minor individually?
      ii.  A detained family that includes a minor, if bond is determined for the family as a whole?
      iii.  A parent of a detained minor, if bond is determined for the parent and child separately?

**RESPONSE:** See responses to questions 2(a) and 2(h).

   j.  Do defendants consider potential eligibility for Special Immigrant Juvenile (SIJ) status in setting bond for minors apprehended with an adult parent? If so —
      i.  Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider a minor's eligibility for Special Immigrant Juvenile (SIJ) status when making a bond determination?
      ii.  What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:** See responses to questions 2(a) and 2(h).

   k.  Do defendants consider potential eligibility for Special Immigrant Juvenile (SIJ) status in setting bond for minors apprehended unaccompanied by an adult parent? If so —
      i.  Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider a minor's eligibility for Special Immigrant Juvenile (SIJ) status when making a bond determination?
      ii.  What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:** Except in the case of exceptional circumstances, unaccompanied minors apprehended by DHS who lack immigration status (and who are from non-contiguous countries), as well as unaccompanied minors from contiguous countries who meet certain criteria, are transferred to the custody of the U.S. Department of Health and Human Services ("HHS") not later than 72 hours after determining that such child is an unaccompanied child under the requirements of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"). Pub. L. No. 110-457, Title II, Subtitle D, Dec. 23, 2008 (codified at 8 U.S.C. §1232(b)(3)). Certain unaccompanied minors from

Exhibit 6 - Page 89

contiguous countries may be permitted to withdraw their applications for admission.  8 U.S.C. § 1232(a)(2)(B).

> l.  Do defendants consider national security in setting bond for minors apprehended with an adult mother? If so —
>> i.  What factors do defendants consider in assessing the impact releasing minors apprehended with an adult mother will have on national security?
>> ii.  Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider national security in setting bond for minors apprehended with an adult mother?
>> iii.  What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:**  See responses to question 2(a) and 2(h).

> m.  Do defendants consider national security in setting bond for minors apprehended with an adult father? If so —
>> i.  What factors do defendants consider in assessing the impact releasing minors apprehended with an adult father will have on national security?
>> ii.  Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider national security in setting bond for minors apprehended with an adult father?
>> iii.  What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:**  See responses to question 2(a) and 2(h).

> n.  Do defendants consider the national security in setting bond for unaccompanied minors detained pursuant to the INA? If so —
>> i.  What factors do defendants consider in assessing the impact releasing unaccompanied minors will have on national security?
>> ii.  Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider the national security in setting bond for unaccompanied minors detained pursuant to the INA?
>> iii.  What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:**  See response to question 2(k).

> o.  Do defendants contend that minors apprehended with an adult mother should be detained in order to deter others from entering the United States without authorization?  If so —
>> i.  What evidence, if any, is there that detaining minors apprehended with an adult mother deters others from entering the United States without authorization?

Exhibit 6 - Page 90

    ii.  Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers minors detain minors apprehended with an adult mother in order to deter others from entering the United States without authorization?

    iii.  What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:** See responses to questions 2(a) and 2(h).

  p.  Do defendants contend that minors apprehended with an adult father should be detained in order to deter others from entering the United States without authorization?  If so —

    i.  What evidence, if any, is there that detaining minors apprehended with an adult father deters others from entering the United States without authorization?

    ii.  Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers minors detain minors apprehended with an adult father in order to deter others from entering the United States without authorization?

    iii.  What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:** See responses to questions 2(a) and 2(h).

  q.  Do defendants contend that minors apprehended unaccompanied by an adult parent should be detained in order to deter others from entering the United States without authorization?  If so —

    i.  What evidence, if any, is there that detaining unaccompanied minors deters others from entering the United States without authorization?

    ii.  Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers detain minors apprehended without an adult parent in order to deter others from entering the United States without authorization?

    iii.  What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:** See response to question 2(k).

  r.  In deciding whether to detain parents arrested with a minor child, or release such parent on bond, recognizance or parole, is it defendants' policy and practice to consider the best interests of the detained child?  If so —

    i.  What do such policy and practice provide?

    ii.  Where are such policy and practice published?

Exhibit 6 - Page 91

    iii.   What are defendants' procedures for monitoring compliance with such policy and practice, and where are reports of such monitoring, if any, kept and published?

    iv.   Have defendants issued written instructions or directions requiring that defendants' employees, agents or officers consider minors' best interests in determining whether to release their parents on bond, recognizance, or parole?

    v.   What objections, if any, do defendants have to providing class counsel with copies of any such instructions or directions?

**RESPONSE:**  ICE's detention determinations related to adults are outside the scope of Paragraph 29 of the Flores Settlement Agreement because it is not information regarding the implementation of the Settlement Agreement.

s.   For the period from June 1, 2014, to September 30, 2014 —

    i.   What percentage and raw number of bond-eligible families comprising one or more minors did defendants determine should be detained without bond?

    ii.   What percentage and raw number of children apprehended with an adult parent did defendants order detained without bond?

    iii.   What percentage and raw number of bond-ineligible families comprising one or more minors which passed credible fear interviews did defendants release on parole?

    iv.   What percentage and raw number of children who were part of bond-ineligible families which passed credible fear interviews did defendants release on parole?

t.   For the period from June 1, 2013, to September 30, 2013 —

    i.   What percentage and raw number of detained, bond-eligible families comprising one or more minors did defendants order held without bond?

    ii.   What percentage and raw number of children who were part of bond-eligible families did defendants order detained without bond?

    iii.   What percentage and raw number of bond-ineligible families comprising one or more minors which passed credible fear interviews did defendants release on parole?

    iv.   What percentage and raw number of children who were part of bond-ineligible families which passed credible fear interviews did defendants release on parole?

u.   Of bonds set by DHS between June 1, 2014, and September 30, 2014, what was the average bond set for the release of —

    i.   An individual minor?

    ii.   An individual minor and parent, when bond was set for the family as a whole?

    iii.   A parent of a detained minor, if bond was set for parent and child individually?

v.   Of bonds set by DHS between June 1, 2013, and September 30, 2013, what was the average bond set for the release of —

Exhibit 6 - Page 92

      i.  An individual minor?

      ii.  An individual minor and parent, when bond was set for the family as a whole?

      iii.  A parent of a detained minor, if bond was set for parent and child individually?

w.  Of bonds set by DHS between June 1, 2014, and September 30, 2014, what percentage and raw number of families with one or more minors posted bond and were released?

x.  Of bonds set by DHS between June 1, 2013, and September 30, 2013, what percentage and raw number of families with one or more minors posted bond and were released?

y.  With respect to bond redetermined by immigration judges between June 1, 2014, and September 30, 2014, what percentage and raw number of families with one or more minors —

      i.  Were unable to post bond and remained detained?

      ii.  Were released on recognizance?

      iii.  Had the immigration judge's bond decision stayed by DHS appeal to the BIA?

z.  With respect to release on bond or recognizance ordered by immigration judges between June 1, 2013, and September 30, 2013, what percentage and raw number of families with one or more minors —

      i.  Were unable to post bond and remained detained?

      ii.  Were released on recognizance?

      iii.  Had the immigration judge's bond decision stayed by DHS appeal to the BIA?

**RESPONSE:**  Questions 2(s) through 2(z) are outside the scope of Paragraph 29 of the Flores Settlement Agreement because they do not seek information regarding the implementation of the Settlement Agreement.  Moreover, Paragraph 29 of the Agreement does not permit class counsel to obtain the data sought in questions 2(s) through 2(z) nor does it require the identification or production of documents or data maintained by Defendants, other than the data specifically identified in that Paragraph.

**3.  Questions relating to implementation of ¶ 24A.**

a.  Are minors detained at the facility in Artesia, New Mexico, given a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing? If so —

      i.  Where are signed Notice of Custody Determination forms kept?

      ii.  What objection, if any, do defendants have to providing class counsel with copies of such forms?

      iii.  If not, please identify the facts, documents, and tangible things that justify defendants' failure give minors detained at the facility in Artesia, New Mexico, a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

**RESPONSE:**  A Notice of Custody Determination (Form I-286) is completed only in cases in which the alien is detained pursuant to section 236 of the Immigration and Nationality Act (INA).  In cases in which

Exhibit 6 - Page 93

a Form I-286 is completed, it is maintained in the alien file.  Minors detained at family residential centers are given an opportunity for a bond redetermination hearing before an immigration judge.

    b.   Are minors detained at the facility in Karnes City, Texas, given a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing? If so —
        i.   Where are signed Notice of Custody Determination forms kept?
        ii.   What objection, if any, do defendants have to providing class counsel with copies of such forms?
        iii.   If not, please identify the facts, documents, and tangible things that justify defendants' failure give minors detained at the facility in Karnes City, Texas, a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

**RESPONSE:**  See response to question 3(a).

    c.   Are minors detained at the facility in Leesport, Pennsylvania, given a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing? If so —
        i.   Where are signed Notice of Custody Determination forms kept?
        ii.   What objection, if any, do defendants have to providing class counsel with copies of such forms?
        iii.   If not, please identify the facts, documents, and tangible things that justify defendants' failure give minors detained at the facility in Leesport, Pennsylvania, a bond redetermination hearing before an immigration judge in every case unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

**RESPONSE:**  See response to question 3(a).

    **4.**   **Questions relating to implementation of ¶ 11.**
        a.   Do defendants identify, for each detained minor, the least restrictive setting appropriate to the minor's age and special needs?
            i.   If so, please describe what information is collected, what tools and assessments are used to collect that information, what factors are considered, and who is responsible for the determination and where this information is recorded.
            ii.   If not, please identify the facts, documents, and tangible things that justify defendants' failure to identify, for each detained minor, the least restrictive setting appropriate to the minor's age and special needs.

**RESPONSE:**  ICE's Family Residential Centers permit free movement of residents from 6:30 a.m. until 8:00 p.m., during which times they have access to the outdoors and other areas within the facility.

Exhibit 6 - Page 94

These areas include, but are not limited to, outdoor and indoor recreation areas, gym, library, cafeteria, common areas in residential buildings, barber/beauty grooming areas, and medical and dental clinics. Minors 12 years old and older are free to move about with a pass signed by his or her parent, and younger children are also free to move throughout the facility but must be accompanied by a parent. Each resident is screened at intake and his/her individual needs are assessed and any special requirements are incorporated into the resident's care.

5. **Questions relating to implementation of Definition 6 and ¶¶ 19 and 24C.**
   a. Is the detention facility in Artesia, New Mexico, state-licensed to provide residential, group, or foster care services for dependent children? If so —
      i. What state agency issued such license?
      ii. What is the license's numerical or other official designation?
      iii. On what date was the license issued?
      iv. What was the date of the most recent visit or inspection by the licensing agency?
      v. What objections, if any, do defendants have to providing class counsel with a copy of such license?
      vi. If not, please identify the facts, documents, and tangible things that excuse the absence of such licensing for the facility.

**RESPONSE:** The temporary family residential facility at Artesia was set up in response to the recent influx of minors, which included many entering the United States with a parent or legal guardian. The Settlement Agreement provides that individuals entering the country during an "influx" are not required to be transferred to a "licensed facility" within 3 to 5 days, but instead are required to be placed in such facilities as expeditiously as possible. The Artesia Family Residential Center operates pursuant to the ICE Family Residential Standards and meets the applicable substantive requirements for conditions at such facilities from the Agreement. ICE is currently in the process of working towards obtaining licensure, to the extent possible, for the Artesia facility as expeditiously as possible.

   b. If the detention facility in Artesia, New Mexico, is not state-licensed to provide residential, group, or foster care services for dependent children —
      i. Has the facility been licensed, approved or certified by any other entity? If so, what entity licensed, approved, or certified the facility, what standards did the facility meet, and on what date was the facility licensed, approved, or certified?
      ii. What objections, if any, do defendants have to providing class counsel with a copy of any such standards and license, approval or certification?

**RESPONSE:** See response to question 5(a).

   c. Are minors detained in the facility in Artesia, New Mexico, provided a notice of the reasons for housing them in a detention or medium security facility? If so —
      i. Where are records, if any, of such notices kept?

Exhibit 6 - Page 95

ii.  What objections, if any, do defendants have to providing copies of such records to class counsel?

iii. If not, please identify the facts, documents, and tangible things that excuse defendants' failure to provide such notice.

**RESPONSE:**  See response to question 4(a).  In addition, ICE is not housing children apprehended with adult parents in detention facilities or medium security facilities, but is instead placing them with a parent in one of ICE's family residential centers.  For that reason, the notices provided under paragraph 24.C are not implicated.

d.  Is the detention facility in Karnes City, Texas, state-licensed to provide residential, group, or foster care services for dependent children? If so —

i.  What State agency issued such license?

ii.  What is the license's numerical or other official designation?

iii. On what date was the license issued?

iv. What was the date of the most recent visit or inspection by the licensing agency?

v.  What objections, if any, do defendants have to providing class counsel with a copy of such license?

vi. If not, please identify the facts, documents, and tangible things that excuse the absence of such licensing for the facility.

**RESPONSE:**  The family residential facility at Karnes City, Texas was set up in response to the recent influx of minors entering the United States with a parent or legal guardian.  The FSA provides that individuals entering the country during an "influx" are not required to be transferred to a "licensed facility" within 3 to 5 days, but instead are required to be placed in such facilities as expeditiously as possible.  The Karnes Family Residential Center operates pursuant to the ICE Family Residential Standards and meets the applicable substantive requirements for conditions at such facilities from the Agreement.  To help facilitate state licensure, among their other requirements, the Family Residential Standards link closely to state law requirements for purposes of ensuring that any child detained as part of a family unit is provided with an Initial Educational Assessment and either (1) comprehensive educational services in a structured classroom setting, covering core subjects on a year-round schedule and providing appropriate educational texts and learning materials, or (2) age appropriate child development toys and reading materials.  The Standards also, for instance, require educational field trips and daily indoor and outdoor recreational activities that are appropriate to the needs and interests of families and children.  ICE is currently in the process of working towards obtaining licensure, to the extent possible, for the Karnes facility as expeditiously as possible**.**

e.  If the detention facility in Karnes City, Texas, is not state-licensed to provide residential, group, or foster care services for dependent children —

i.  Has the facility been licensed, approved or certified by any other entity? If so, what entity licensed, approved, or certified the facility, what standards did the facility meet, and on what date was the facility licensed, approved, or certified?

Exhibit 6 - Page 96

    ii. What objections, if any, do defendants have to providing class counsel with a copy of any such standards and license, approval or certification?

**RESPONSE:** See response to question 5(d).

    f. Are minors detained in the facility in Karnes City, Texas, provided a notice of the reasons for housing them in a detention or medium security facility? If so —
      i. Where are records, if any, of such notices kept?
      ii. What objections, if any, do defendants have to providing copies of such records to class counsel?
      iii. If not, please identify the facts, documents, and tangible things that excuse defendants' failure to provide such notice.

**RESPONSE:** See response to question 5(c).

    g. Is the detention facility in Leesport, Pennsylvania, state-licensed to licensed to provide residential, group, or foster care services for dependent children? If so —
      i. What State agency issued such license?
      ii. What is the license's numerical or other official designation?
      iii. On what date was the license issued?
      iv. What was the date of the most recent visit or inspection by the licensing agency?
      v. What objections, if any, do defendants have to providing class counsel with a copy of such license?
      vi. If not, please identify the facts, documents, and tangible things that justify the absence of such licensing for the facility.

**RESPONSE:** The Berks Family Residential Center, located in Leesport, Pennsylvania, is licensed by the Pennsylvania Department of Public Welfare.  It was most recently inspected in February 2014.  The next inspection will take place on or before February 2015.

    h. If the detention facility in Leesport, Pennsylvania, is not state-licensed to provide residential, group, or foster care services for dependent children —
      i. Has the facility been licensed, approved or certified by any other entity? If so, what entity licensed, approved, or certified the facility, what standards did the facility meet, and on what date was the facility licensed, approved, or certified?
      ii. What objections, if any, do defendants have to providing class counsel with a copy of any such standards and license, approval or certification?
      iii. Are minors placed in such facility provided a notice of the reasons for housing them in a detention or medium security facility, and if so, where are records of such notice kept and do defendants object to providing copies of such records to class counsel?

**RESPONSE:** See responses to questions 5(g) and 5(c).

Exhibit 6 - Page 97

      i.    Are minors detained in the facility in Leesport, Pennsylvania, provided a notice of the reasons for housing them in a detention or medium security facility? If so —

          i.   Where are records, if any, of such notices kept?

         ii.   What objections, if any, do defendants have to providing copies of such records to class counsel?

       iii.   If not, please identify the facts, documents, and tangible things that excuse defendants' failure to provide such notice.

**RESPONSE:** See response to question 5(c).

      j.    Is the detention facility in Artesia, New Mexico, non-secure as required under state law?

          i.   If so, under what state law do defendants deem the facility non-secure?

         ii.   If not, please identify the facts, documents, and tangible things that justify housing class members at the facility in Artesia, New Mexico.

**RESPONSE:**  See response to question 4(a).  In addition, there is no razor wire on the facility's perimeter fencing, no fence in front of the entrance to the facilities, no bars on the entrance to the facility or in the residences, and no signs on the premises describing the facility as a "corrections facility."  The recreation areas are landscaped and the resident intake area has doors which remain unlocked.

      k.    Is the detention facility in Karnes City, Texas, non-secure as required under state law?

          i.   If so, under what state law do defendants deem the facility non-secure?

         ii.   If not, please identify the facts, documents, and tangible things that justify housing class members at the facility in Karnes City, Texas.

**RESPONSE:**  See response to question 5(j).

      l.    Is the detention facility in Leesport, Pennsylvania, non-secure as required under state law?

          i.   If so, under what state law do defendants deem the facility non-secure?

         ii.   If not, please identify the facts, documents, and tangible things that justify housing class members at the facility in Leesport, Pennsylvania.

**RESPONSE:**  See response to question 5(j).

      m.   In what facilities do defendants currently hold minors? For each such facility —

          i.   What is the name and location of the facility?

         ii.   What type of facility is it: e.g., shelter, transitional foster care, long term foster care, group home, residential treatment, staff secure, or secure?

       iii.   For each facility identified, is the facility licensed, and if so, what type of license does the facility have and what agency issued the license?

**RESPONSE:**  Currently, ICE is housing minors encountered with a parent or legal guardian in Family Residential Centers in Berks, Artesia, and Karnes.  Unaccompanied alien children apprehended by DHS

Exhibit 6 - Page 98

who remain in the custody of the U.S. Government are transferred to HHS in accordance with the TVPRA.

    n.   Do defendants have written standards regarding monitoring and treatment of weight loss and/or failure to thrive in minors held in family detention facilities? If so —
       i.   What do such standards provide?
      ii.   Where are such standards published?
     iii.   What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?
     iv.   What objections, if any, do defendants have to providing class counsel with copies of any such standards?
      v.   If defendants have no such standards, why are there no such standards?

**RESPONSE:**  ICE has detailed written standards for routine and emergency medical and mental health care, including complete medical examinations of incoming residents.  The standards are available at http://www.ice.gov/detention-standards/family-residential.

    o.   Do defendants have written standards regarding the monitoring and treatment of the mental health of mothers and minors in family detention facilities? If so —
       i.   What do such standards provide?
      ii.   Where are such standards published?
     iii.   What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?
     iv.   What objections, if any, do defendants have to providing class counsel with copies of any such standards?
      v.   If defendants have no such standards, why are there no such standards?

**RESPONSE:**  See response to question 5(n).

    p.   Do defendants have written standards regarding monitoring and treatment of respiratory illnesses in minors held in family detention? If so —
       i.   What do such standards provide?
      ii.   Where are such standards published?
     iii.   What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?
     iv.   What objections, if any, do defendants have to providing class counsel with copies of any such standards?
      v.   If defendants have no such standards, why are there no such standards?

**RESPONSE:**  See response to question 5(n).

Exhibit 6 - Page 99

q.  Do defendants have written standards regarding monitoring and treatment of fever in children held in family detention? If so —

    i.  What do such standards provide?

    ii.  Where are such standards published?

    iii.  What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

    iv.  What objections, if any, do defendants have to providing class counsel with copies of any such standards?

    v.  If defendants have no such standards, why are there no such standards?

**RESPONSE:**  See response to question 5(n).

**6.  Questions relating to implementation of ¶ 12.**

a.  Do defendants have written standards specifying the minimum protections required to ensure that facilities are "safe and sanitary"? If so —

    i.  What do such standards provide?

    ii.  Where are such standards published?

    iii.  What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

    iv.  What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

    v.  If defendants have no such standards or procedures, why not?

**RESPONSE:**  Defendants cannot point to a particular policy that specifically defines the term "safe and sanitary" with regard to standards for its temporary detention facilities.  However, DHS is committed to providing appropriate care for everyone in its custody consistent with its legal obligations. DHS agents and officers are required to treat all minors with dignity, respect and special concern for their particular vulnerability. DHS makes every effort to take the best possible care of unaccompanied alien children in its custody.  Some of the steps taken during the recent influx included designating certain facilities for children alone (in order to further segregate them from unrelated adults and provide a secure environment), ensuring children had access to showers and clean clothes, providing three meals daily with access to drinks and snacks, and deploying FEMA Corps to assist with the general care of children, as well as providing recreational activities until such time as they could be transferred to the custody of HHS.

b.  Do defendants have written standards specifying the minimum and maximum temperatures for rooms at Border Patrol facilities in which minors are held following arrest? If so —

    i.  What do such standards provide?

    ii.  Where are such standards published?

Exhibit 6 - Page 100

   iii. What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

   iv. What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

   v. If defendants have no such standards or procedures, why not?

**RESPONSE:**  Temperature requirements may vary by the type of station and the location of that station. CBP follows the standards prescribed by the American Society of Heating, Refrigeration and Air Conditioning Engineers in keeping facilities in the range of comfort that is commonly referred to as 'room temperature.'

  c. Do defendants have written standards on providing minors mattresses and blankets at Border Patrol facilities in which such minors are held following arrest? If so —

   i. What do such standards provide?

   ii. Where are such standards published?

   iii. What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

   iv. What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

   v. If defendants have no such standards or procedures, why not?

**RESPONSE:**  Defendants cannot point to a standard specifically related to the provision of mattresses or blankets in its temporary detention facilities for Border Patrol.  However, DHS is committed to providing appropriate care for everyone in its custody consistent with its legal obligations.  During the recent influx DHS not only undertook to purchase additional blankets, it also provided laundering facilities in order to ensure that the needs of those individuals in its custody, including unaccompanied alien children not yet transferred to HHS, were provided for.  CBP was able to accept gifts, such as blankets and children's books, during the period of the crisis as part of our strong and ongoing cooperation with non-governmental organizations. So, for instance, the American Red Cross provided certain blankets and other supplies and, through its Restoring Family Links program, coordinated calls between children in the care of DHS and families concerned about their well-being.

  d. Do defendants have written standards regarding the retention, removal, or destruction of minors' jackets, sweaters, identity documents and other personal property at Border Patrol facilities in which such minors are held following arrest? If so —

   i. What do such standards provide?

   ii. Where are such standards published?

   iii. What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

Exhibit 6 - Page 101

      iv.  What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

      v.  If defendants have no such standards or procedures, why not?

**RESPONSE:**  CBP Directive 5240-007 (Nov. 6, 2006) establishes procedures to assist CBP officers in determining how to handle personal effects of detainees.  It provides, in part, that at the time of arrest, "a 100 percent inventory shall be taken of all personal effects . . . ."  ¶ 4.3.

    e.  Do defendants have written standards prescribing the maximum capacity of rooms at Border Patrol facilities in which such minors are held following arrest? If so —

      i.  What do such standards provide?

      ii.  Where are such standards published?

      iii.  What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

      iv.  What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

      v.  If defendants have no such standards or procedures, why not?

**RESPONSE:**  The capacity of a particular CBP facility will vary depending on the nature of the particular space and the individuals that may be detained in that space.  During the recent influx, CBP was proactive in its efforts to address the needs of the unaccompanied alien children in its custody by using its processing center in Nogales, Arizona and adding a processing center in McAllen, Texas, which significantly expanded CBP's capacity to house minors who were awaiting transfer into HHS custody. The Nogales, Arizona facility is not currently being used to hold minors.

    f.  Do defendants have written standards prescribing minors' access to toilets and sinks at Border Patrol facilities in which such minors are held following arrest? If so —

      i.  What do such standards provide?

      ii.  Where are such standards published?

      iii.  What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

      iv.  What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

      v.  If defendants have no such standards or procedures, why not?

**RESPONSE:**  Access to restroom facilities is available to any detainees in a hold room, a temporary holding area, or in any secondary inspection area.  Unaccompanied alien children have access to medical care, food, water, and bathroom facilities pursuant to CBP's processes for the particular facility in which that child is being held.

    g.  Do defendants have written standards regulating the quality and quantity of food and drink minors are to be provided in Border Patrol facilities following arrest? If so —

Exhibit 6 - Page 102

   i. What do such standards provide?

   ii. Where are such standards published?

   iii. What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

   iv. What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

   v. If defendants have no such standards or procedures, why not?

**RESPONSE:** All individuals who are detained in CBP's custody are provided appropriate nutrition. CBP provides access to snacks, milk or juice to certain vulnerable populations such as minors and pregnant women. During the most recent influx of unaccompanied alien children, contractors provided meals and snacks for unaccompanied alien children in the Rio Grande Valley (RGV) that met their nutritional needs. Those meals included at least two hot meals (and one cold) each day.

  h. Do defendants have written standards regulating what information minors are to be provided when transferred from Border Patrol facilities to another detention facility? If so —

   i. What do such standards provide?

   ii. Where are such standards published?

   iii. What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

   iv. What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

   v. If defendants have no such standards or procedures, why not?

**RESPONSE:** All minors apprehended by CBP are provided with the Notice of Rights and Request for Disposition (Form I-770). *See* 8 C.F.R. § 236.3(h). Depending on where they are processed and whether they are part of other groups where additional advisals are required, those may also be provided. Moreover, even though the TVPRA only requires screening for certain unaccompanied alien children, every unaccompanied alien child apprehended by CBP is screened to determine whether he or she has a fear of return or has been a victim of a severe form of trafficking. This screening is done on a standard form, CBP Form 93. Unaccompanied alien children that are subject to removal proceedings are transferred to the custody of HHS for shelter placement. DHS defers to HHS regarding what information may be provided to minors after their transfer to HHS custody.

  i. Do defendants have written standards prohibiting their agents, officers and employees from falsely informing minors that they will be deported or are being deported? If so —

   i. What do such standards provide?

   ii. Where are such standards published?

Exhibit 6 - Page 103

    iii.   What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

    iv.   What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

    v.   If defendants have no such standards or procedures, why not?

**RESPONSE:**  Federal regulations require DHS officers to give specific notices of rights to minors including but not limited to the I-770 which specifically states that minors have rights which cannot be taken away including the right to:  an attorney, a hearing before an immigration judge, speak to your consular, and use the telephone.  Additionally, the TVPRA requires that "[a]ny unaccompanied alien child sought to be removed by the Department of Homeland Security, except for unaccompanied alien children from a contiguous country [] shall be placed in removal proceedings under section 240 of the [INA]."  Removal decisions under section 240 of the INA are made by immigration judges.

Moreover, CBP and ICE have standards of conduct applicable to all employees.  CBP's standards of conduct may be found here:  http://www.cbp.gov/sites/default/files/documents/std_of_conduct_3.pdf, and and ICE's standards may be found at http://www.ice.gov/doclib/foia/dro_policy_memos/employee-code-of-conduct.pdf.

Both ICE and CBP hold their workforce to a high standard of integrity and have robust processes to address any claim of misconduct.

    j.   Do defendants have written standards prohibiting their agents, officers and employees from recording false information on documentation, including by obtaining signatures without having provided translation services or by falsely affixing a signature? If so —

       i.   What do such standards provide?

      ii.   Where are such standards published?

     iii.   What are defendants' procedures for monitoring individual facilities' compliance with such standards, and where are reports of such monitoring, if any, kept and published?

     iv.   What objections, if any, do defendants have to providing class counsel with copies of any such standards, procedures and reports?

      v.   If defendants have no such standards or procedures, why not?

**RESPONSE:**  See response to question 6(i).

**7.**  **Questions relating to implementation of ¶ 12C.**

    a.   Do defendants have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible in licensed facilities? If so —

       i.   Why have defendants not provided plaintiffs' counsel with quarterly updates of the listing of additional beds?

      ii.   What objections, if any, do defendants have to providing class counsel with copies such written plans issued in 2013 and 2014?

Exhibit 6 - Page 104

iii.  If not, please identify the facts, documents, and tangible things that justify defendants' failure to have a written plan that describes the reasonable efforts they will take to place all minors as expeditiously as possible in licensed facilities.

**RESPONSE:**  As noted paragraph 12(C) of the Settlement Agreement "[t]he plan, without identification of the additional beds available, is attached as Exhibit 3."  With the enactment of the TVPRA, DHS's role in detaining minors changed significantly and all unaccompanied minors who remain in U.S. Government custody are transferred to HHS for housing and placement in accordance with the TVPRA.  ICE has maintained 96 beds at the Berks facility.  Further, in response to the recent influx of minors and families that occurred over the past year, DHS further increased its capacity to detain family units.  DHS has provided class counsel not only with the locations of those facilities, but with tours of the facilities which included information on the overall capacity of the residential centers.  See also responses to questions 5(a) and 5(d).

b.  Have defendants identified facilities that will or may become available in 2014 to provide additional beds for the expeditious placement of minors, whether accompanied or unaccompanied? If so —
  i.  What is the name, location and projected number of beds for each such facility?
  ii.  Will defendants require each facility to be state-licensed before it admits minors?

**RESPONSE:**  During the recent influx, DHS arranged additional processing centers to handle the increase in apprehensions within the Rio Grande Valley, including adding a processing center in McAllen, Texas.  All unaccompanied minors who remain in U.S. Government custody are transferred to HHS for custody and placement in accordance with the TVPRA, and DHS defers to HHS with regard to additional shelter facilities that may be identified for use by HHS.  With regard to accompanied minors, DHS has informed class counsel and the general public that it has entered into a contract for a family residential center in Dilley, Texas.  Expected to open in December, initial capacity at the South Texas Family Residential Center will be up to 480 residents, while the facility will ultimately accommodate up to 2,400 residents on the approximately 50-acre site.  ICE expects to open the facility to its first residents in early November and for the site to be ready for full capacity within 210 days.  The facility will operate under the ICE Family Residential Standards.

8.  **Questions relating to implementation of ¶¶ 28A and 29.**
  a.  Do defendants collect the statistical information described in ¶ 28A on a weekly basis? If so —
    i.  Why does the statistical report defendants have provided class counsel most recently report information through June 2013 only?
    ii.  What objections, if any, do defendants have to providing class counsel with copies of the weekly reports for the period from July 2013, to the present, in hard copy and native format?

Exhibit 6 - Page 105

       iii.   If not, please identify the facts, documents, and tangible things that justify defendants' failure to maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours, to collect such information weekly, and/or failure to provide up-to-date information in reports.

**RESPONSE:** Defendants collect the statistical information described in ¶ 28A, and have provided it to class counsel on a bi-annual basis. The most recent report was delayed slightly by the circumstances related to the influx of minors crossing the southern border in recent months, which caused DHS to focus its resources primarily on that situation. Nonetheless, that report is under review and DHS anticipates providing that report to class counsel as soon as possible.

    b.   Have defendants provided to class counsel each policy or instruction issued to their employees regarding the implementation of the Settlement? If not —

       i.   What facts, documents, and tangible things that justify defendants' failure to provide class counsel each policy or instruction issued to their employees regarding the implementation of the Settlement?

       ii.   What objections, if any, do defendants have to providing class counsel with copies of such policies and instructions now?

**RESPONSE:** Defendants are not aware of any policy or instruction issued to their employees within the last six months regarding the implementation of the Agreement.

Exhibit 6 - Page 106