1  CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
   Carlos Holguín (Cal. Bar No. 90754)
2  Peter A. Schey (Cal. Bar No. 58232)
   Marchela Iahdjian (Cal. Bar No. 295595)
3  256 South Occidental Boulevard
   Los Angeles, CA 90057
4  Telephone: (213) 388-8693
   Facsimile: (213) 386-9484
5  Email:crholguin@centerforhumanrights.org
           pschey@centerforhumanrights.org
6          marchela@centerforhumanrights.org

7  ORRICK, HERRINGTON & SUTCLIFFE LLP
   William A. Molinski (Cal. Bar No. 145186)
8  wmolinski@orrick.com
   T. Wayne Harman (Cal. Bar No. 254089)
9  wharman@orrick.com
   Elena Garcia (Cal. Bar No. 299680)
10 egarcia@orrick.com
   777 South Figueroa Street, Suite 3200
11 Los Angeles, CA 90017
   Telephone: (213) 629-2020
12
   *Attorneys for Plaintiffs*
13 (listing continues on following page)

14

15                    UNITED STATES DISTRICT COURT

16                   CENTRAL DISTRICT OF CALIFORNIA

17                         WESTERN DIVISION

18

19

20 | Jenny Lisette Flores, et al., | Case No. CV 85-4544-RJK(Px) |
   | Plaintiffs, | **Plaintiffs' First Set Of Exhibits In Support Of Motion For Class-Wide Enforcement Of Settlement [Part 3: Second Part of Exhibit 7]** |
21 | | |
22 | v. | |
23 | Jeh Johnson, Secretary, U.S. Department of Homeland Security, et al., | Hearing:  March 9, 2015 |
   | | Time:  TBD |
24 | Defendants. | Dept:  TBD |

25

26                        **PUBLIC VERSION**

27

1

2   *Plaintiffs' counsel, continued:*

3   LA RAZA CENTRO LEGAL, INC.
    Michael S. Sorgen
4   Maria Victoria Castro
    Amanda Alvarado Ford
5   474 Valencia Street, #295
    San Francisco, CA 94103
6   Telephone:   (415) 575-3500
    Facsimile:    (415) 255-7593
7
    *Of counsel:*
8
    YOUTH LAW CENTER
9   Alice Bussiere
    Virginia Corrigan
10  200 Pine Street, Suite 300
    San Francisco, CA 94104
11  Telephone:   (415) 543-3379 x 3903

12  RANJANA NATARAJAN
    Clinical Professor
13  Director, Civil Rights Clinic
    University of Texas School of Law
14  727 E. Dean Keeton St.
    Austin TX 78705
15  Telephone:   (512) 232-7222

16

17

18

19

20

21

22

23

24

25

26

27

28

1

INDEX TO EXHIBITS

2    1     Settlement of class action, January 17, 1997 ................................... 1

3    2     Order approving settlement of class action, January 28, 1997 ..................... 47

4
5    3     Stipulation extending settlement of class action, December 7, 2001 ................................................................................... 53

6
7    4     Plaintiffs' letter requesting pre-enforcement meeting, October 15, 2014 .......................................................................... 58

8
9    5     Plaintiffs' letter posing questions re: implementation of class action settlement, October 2, 2014 ............................................ 64

10
11   6     Defendants' response to questions re: implementation of class action settlement, November 3, 2014 ....................................... 85

12   7     ICE opposition to bond redetermination, July 24, 2014 ............................ 107

13   8     ICE opposition to bond redetermination, October 8, 2014 ......................... 158

14
15   9     U.S. Immigration & Customs Enforcement, news release, November 18, 4014 .............................................................. 210

16   10    Declaration of Bridget Cambria, November 7, 2014 ................................. 211

17   11    Declaration of Carol Anne Donohoe, November 15, 2014 ......................... 219

18   12    Declaration of J███ H███████ M█████, September 20, 2014 .................. 227

19
20   13    Declaration of M███ C██████ d█ T████, September 19, 2014 ................................................................................... 232

21   14    Declaration of M███ F██████ S███, September 19, 2014 ........................ 238

22
23   15    Declaration of M███ L█████ M██████, September 19, 2014 ...................... 244

24   16    Affidavit of Adriana Piñon re: Texas Public Information Act Request, September 3, 2014 ..................................................... 248

25
26   17    Declaration of Barbara Hines, January 14, 2014 ......................................... 253

27   18    Declaration of D███ V████ A███████, January 9, 2015 ............................ 301

28

i

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 3: EXHIBIT 7]
CV 85-4544-RJK(Px)

19    Declaration of H██ R████ M███, January 9, 2015 ............................ 305

20    Declaration of R███ E████ A███, January 8, 2015 ....................... 309

21    Karnes Attorney Visitation Form and Guidelines, January 9,
      2015 ................................................................................................ 312

22    Declaration of Jonathan Hiskey, September 22, 2014 ................................. 314

23    Declaration of Carlos Holguin, January 13, 2015 ........................................ 319

24    Declaration of Luis H. Zayas, December 10, 2014 ...................................... 323

25    Declaration of Generva Gilden Berger, January 12, 2015 ........................... 366

26    Dilley Resident Handbook ........................................................................ 383

27    Memorandum of Understanding Re: Compromise of Class
      Action: Conditions of Detention, November 30, 1987 ............................... 433

28    Declaration of Anne Chandler, December 1, 2014 ...................................... 470

29    Declaration of Allison N. Boyle, November 24, 2014 ................................. 475

30    Declaration of Brittany Perkins, November 28, 2014 .................................. 490

31    Declaration of Clayton N. Matheson, November 24, 2014 .......................... 497

32    Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ........................ 504

33    Declaration of Melissa J. Cuadrado, November 26, 2014 ............................ 512

34    Declaration of Scott T. Williams, December 1, 2014 .................................. 522

35    Declaration of Virginia Marie Raymond, December 13, 2014 ................... 527

36    *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.),
      Memorandum of Points & Authorities in Support of Motion
      for Preliminary Injunction, December 16, 2014 ........................................ 530

37    Flores Settlement Agreement and DHS Custody: Key Flores
      Provisions & DHS Noncompliance - Report of Lutheran
      Immigration and Refugee Services ............................................................ 570

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 3: EXHIBIT 7]
CV 85-4544-RJK(Px)

38   Declaration of S███ C█M███, January 8, 2015 ................................. 577

39   Declaration of S███ B██ d█ T██, January 8, 2015 ........................... 580

40   Declaration of M██ G███ S███, January 8, 2015 ........................... 583

41   Declaration of E██████ G███ M███, January 9, 2015 ..................... 586

42   Declaration of A█ Z███ M████, January 9, 2015 ................................. 590

43   Declaration OF A███ E██████ d█ l█ C██ G███,
January 9, 2015 ................................................................................. 594

44   Declaration of A██ F██ d█ E█████, January 9, 2015 ......................... 597

45   Declaration of H███ L███ M███ P███, January 9, 2015 ..................... 602

46   Declaration of M██ M████ M██, January 8, 2015 ........................... 606

47   Declaration of C███ M███ C█████ C██, January 8,
2015 ................................................................................................. 609

48   Declaration of S███ L███ M████ A███, January 9,
2015 ................................................................................................. 611

49   Declaration of L██ B███ S████, January 8, 2015 ............................. 613

50   Declaration of S███ A███ M████ D███, January 8,
2015 ................................................................................................. 617

51   Declaration of O███ F███ C████ M███, January 9, 2015 ................... 621

52   Declaration of J██████ E█████ E█████ F███, January 9,
2015 ................................................................................................. 624

53   Declaration of Lauren Beth Connell, November 26, 2014 .......................... 627

iii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian

    /s/ Carlos Holguín
Attorneys for Plaintiffs

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your bro
MORE »

**The New York Times**   http://nyti.ms/1eT2TNS

N.Y. / REGION   |   NYT NOW

# A 12-Year-Old's Trek of Despair Ends in a Noose at the Border

APRIL 19, 2014

About New York

By JIM DWYER

Noemi Álvarez Quillay took the first steps of the 6,500-mile journey to New York City from the southern highlands of Ecuador on Tuesday, Feb. 4, after darkness fell.

A bashful, studious girl, Noemi walked 10 minutes across dirt roads that cut through corn and potato fields, reaching the highway to Quito. She carried a small suitcase. Her grandfather Cipriano Quillay flagged down a bus and watched her board. She was 12.

From that moment, and through the remaining five weeks of her life, Noemi was in the company of strangers, including coyotes — human smugglers, hired by her parents in the Bronx to bring her to them. Her parents had come to the United States illegally and settled in New York when Noemi was a toddler.

Noemi was part of a human flood tide that has swelled since 2011: The United States resettlement agency expects to care for nine times as many unaccompanied migrant children in 2014 as it did three years ago.

For these children wandering thousands of miles, it is a grueling journey, filled with dangers. The vast majority come from Central America. Noemi's trip

(23)

was about twice as long. She had already tried once, leaving home last May, but was detained long before she even made it halfway.

"I went with a coyote and spent two months in Nicaragua and came back from there," she wrote in a school information sheet.

She got a little closer this year. In March, a month after she left home, the police picked up Noemi and a coyote in Ciudad Juárez, Mexico. The authorities took her to a children's shelter. She was described as crying inconsolably after being questioned by a prosecutor. A few days later, she was found hanged from a shower curtain rod in a bathroom at the shelter. Her death, ruled a suicide by Mexican authorities, remains under investigation by a human rights commission there.

The number of unaccompanied minors caught entering the United States and then referred for placement is expected to reach 60,000 in the 12 months ending Sept. 30, said Lisa Raffonelli, a spokeswoman for the Office of Refugee Resettlement, an increase from 6,560 in 2011. In Mexico, the number has more than doubled.

No single factor explains these surges, but in Noemi's hometown there are clues about the forces at work in her story.

In the district of El Tambo in Cañar province, her maternal grandparents, Mr. Quillay, 57, and María Jesús Guamán, 59, live in an adobe home with no running water. About 15 years ago, during an economic crisis in Ecuador, their adult children began migrating to the United States without visas.

"My four children went to find decent lives," Mr. Quillay said. "So I took over five grandchildren from when they were little."

They ate from the grandparents' farm. "We don't have the little sweets that they sometimes ask for," Mr. Quillay said.

"She was just born when her father left, and when she was 3, my daughter decided to go herself," Ms. Guamán said of Noemi. "I raised my granddaughter the same as the others."

As the children grew, their parents sent money to pay for the construction of a two-story concrete house nearby where the five grandchildren, cousins, lived on their own.

Leonela Yupa, a cousin and playmate of Noemi, remembered playing *"cocinita"* with her — fashioning from their imagination a little kitchen where they



fixed pretend meals. Noemi often joined in one of the world's universal games: hide and seek.

The children moved through a landscape that is a hybrid of peasant houses, like the home of their grandparents, and larger, modern ones that are "a symbol of the success of the Ecuadorean immigrant," said Rafael Ortiz, mayor of El Tambo.

The Quillays' unparented household was common. "We have 1,040 students, and at least 60 percent are children of migrant parents who have been under the care of grandparents, uncles or older siblings," said Magdalena Choglio Zambrano, a guidance counselor at the regional high school.

The parents abroad "at times send a little shirt, shoes, $100, but it is not the same as being papa or mama," Noemi's grandfather said.

A generation of children who grew up on their own in El Tambo have started to leave, getting a hand from their parents abroad, but still requiring shadowy journeys.

"Now we are seeing that the migrants are small children or teenagers whose parents are sending for them, running the risk of putting them in the hands of the coyotes to whom they pay 15, 20, 25 thousand dollars," said Ms. Choglio, the guidance counselor.

The cost of the trip depends on whether the smuggler uses airline flights to cut down on overland travel, Mayor Ortiz said.

"We don't know anything, not how they go or where they go," Ms. Guamán said. The parents "made the arrangements directly from there, and they called to tell us when we had to send the girl."

Both grandparents say they and Noemi were reluctant for her to leave. Ms. Guamán said she argued with her daughter, the girl's mother.

"I said to her, 'Why take her away? She's studying here, she's doing well,' " Ms. Guamán said. "But my daughter says education in Ecuador is no good and it's better for her to study there. And she took my Noemi away, only for this to happen."

Noemi had to be persuaded by her parents. "She was crying, she said she did not want to go," Sara Yupa, one of her cousins, recalled. "Then she was quiet."

Little is known about Noemi's travels until about 4,000 miles later, more than a month after she left home.

(25)

On Friday, March 7, in Ciudad Juárez, police saw Domingo Fermas Uves, 52, urinating outside a pickup truck, according to Alejandro Maldonado, a police spokesman. Inside was Noemi. In the official account, Mr. Fermas told officers that he was part of a network of smugglers hired by the girl's family to take her to the United States. The man gave false details about the girl, saying she was 8 years old and from an inland state in Mexico. The police recorded her name as Noemi Álvarez Astorga.

Noemi was taken to Casa de la Esperanza, a shelter for Mexican minors whose name means "House of Hope." Over that weekend, she was questioned by a prosecutor. After that, a doctor described Noemi as being "terrified," according to a report in El Diario of Juarez.

On March 11, when called to eat, Noemi instead went into the bathroom. Another girl could not get in. The doctor, Alicia Soria Espino, and others broke open the door and found Noemi hanging by the cloth shower curtain.

The next day, her parents in the Bronx received a phone call from a woman who told them that Noemi had safely crossed the border. Later that day, they received a second call saying that she had died, according to Ecuadorean consular officials.

The authorities determined that the girl initially thought to be an 8-year-old Mexican was probably the 12-year-old Ecuadorean. In part because her parents, who do not have legal immigration status, decided not to go to Mexico, DNA tests were required to confirm her identity, said Jorge W. Lopez, the Ecuadorean consul general in New York. Autopsies found no sign of a sexual assault, a common crime against migrants.

The man said to have been the smuggler, Mr. Fermas, was arrested but was later freed by a judge, who did not find enough evidence to hold him for prosecution, said Ángel Torres of the federal prosecutor's office in Ciudad Juárez. "Mr. Fermas is still under investigation for immigrant trafficking," Mr. Torres said. In published interviews, Mr. Fermas has said that the story about the pickup truck was untrue and that the police had entered his house and taken the girl under the guise of rescuing her. In the week after Noemi's death, 370 foreign child migrants were detained across Mexico, according to the national immigration agency. Nearly half were traveling alone.



The minors coming from Central America and Mexico are "propelled by violence, insecurity and abuse," the United Nations high commissioner for refugees said in a report issued the day after Noemi's death. The prospect of immigration reform in the United States is also enticing, Mr. Lopez said, because of the belief that anyone already in the country illegally will be allowed to stay.

Noemi's parents have said little publicly. Her mother, Martha V. Quillay, who works in a hair salon, spoke briefly with a reporter, then curtailed the conversation. Her father, José Segundo Álvarez Yupa, a construction worker, said it was too difficult to discuss. "These are private matters," he said. "This is a very painful thing. It's all over. We want to recover, we want to move on."

Last week, President Rafael Correa of Ecuador, who was visiting New York, called on the family at their home in the Bronx to offer condolences. Ms. Quillay posted pictures from the president's visit on her Facebook page.

Msgr. James Kelly, pastor of St. Brigid's Roman Catholic Church in Brooklyn, which has a large number of Ecuadorean parishioners, said recently that he heard every day about the young people traveling alone.

"I had parents in here yesterday whose child was coming north," Father Kelly said. "They wanted a Mass said, that the journey would be safe."

Email: dwyer@nytimes.com

Twitter: @jimdwyernyt

Maggy Ayala Samaniego in El Tambo Canton, Ecuador, Annie Correal in New York and Paulina Villegas in Mexico City contributed reporting.

A version of this article appears in print on April 20, 2014, on page A1 of the New York edition with the headline: A 12-Year-Old's Trek of Despair Ends in a Noose at the Border.

© 2014 The New York Times Company



Exhibit 7 - Page 136

Snakes and Thorny Brush. and Children at the Border Alone - NYTimes.c.. .\      Page 1 of 4

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your bro
MORE »



𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘    http://nyti.ms/1leowEN

U.S.  |  NYT NOW

# Snakes and Thorny Brush, and Children at the Border Alone

By JULIA PRESTON   JUNE 25, 2014

HIDALGO, Tex. — Border agents drove their patrol vehicles one recent day at dusk through this spit of land on the bank of the Rio Grande. Here, in a place known as the Devil's Corner, smugglers on the Mexican side have chosen to bring thousands of women and children to American soil.

After only a few minutes scouting the dirt roads, the agents came upon a cluster of illegal migrants, huddled in tall grass under palm trees, seeking respite from the baking heat. They made no effort to flee as the Border Patrol drove up.

Questioned by the agents, a boy from Honduras said his name was Alejandro and that he was 8 years old.

"Who are you with?" asked Raul L. Ortiz, deputy chief of the Border Patrol for the Rio Grande Valley, speaking in Spanish.

"By myself," Alejandro said, looking up at the man in the olive uniform and pulling a birth certificate, carefully folded, from his jeans — the only item he carried.

"Where are your parents, Alex?" Chief Ortiz asked, using a nickname to put the boy at ease.

"In San Antonio," he said.

But the child had no address for his family in the Texas city 250 miles to the north, or for an aunt in Maryland, which he thought was just as close. The agents gave him water and the boy smiled gratefully, not knowing that his journey, already three weeks long, would likely be a lot longer.



Exhibit 7 - Page 137

Families and children have become a high-profit, low-risk business for Mexican narcotics cartel bosses who, Chief Ortiz said, have taken control of human smuggling across the Rio Grande. They now offer family packages, migrants said, charging up to $7,500 to bring a minor alone or a mother with children from Central America to the American side of the river.

Smugglers like to use this snake-infested, thorn-ridden brushland for their crossings. A federal wildlife refuge, the site is downstream from the Anzalduas Dam, where the river slows and narrows, making it easy to paddle across. The bank is strewn with worn-out sneakers, broken baby bottles and rotting life preservers, the refuse of migrants who made it across and moved on. In less than two hours one evening last week, Border Patrol agents encountered 37 migrants walking the dusty roads here.

Alejandro said he had been brought by "Santiago the smuggler." Another migrant in the group was probably traveling with the boy, a neighbor or a cousin, Chief Ortiz said. Once they were back at the Border Patrol station, agents would have to figure out who that was.

More than 52,000 minors traveling without their parents have been caught crossing the southwest border illegally since October, including 9,000 in May alone, a record.

The migration surge also includes 39,000 adults with children detained since October, also an unprecedented figure. Authorities anticipate they will apprehend more than 240,000 illegal migrants, about three-quarters from Central America, in the Rio Grande Valley during this fiscal year.

Many migrants say they are fleeing poverty and vicious gang violence at home, and some were drawn by rumors the United States was giving entry permits for women and children. But many, especially the youngest, are coming to reconnect with families, hoping to join parents or close relatives who live in this country, often without papers.

"There's obviously a host of reasons that motivates the individuals to cross," Chief Ortiz said. "But trying to reunite with a family member who may already be here is probably one of the ones that comes at the top."

Chief Ortiz watched as agents coaxed information from the new detainees. The migrants answered, some apprehensively, others seemed relieved, none attempted to resist.

(29)

Exhibit 7 - Page 138

Snakes and Thorny Brush, and Children at the Border Alone - NYTimes.

A 14-year-old boy from Honduras said, "My parents are dead." There was an aunt in New Orleans he wanted to find.

A 19-year-old Guatemalan woman was tugging her 2-year-old child, whose father she said was in Indiana. Having lost her way at high noon, she was reeling from dehydration. She gulped water the agents offered.

Increasing numbers of women and children caught crossing illegally have been able to stay in the United States. Border authorities are required to turn over unaccompanied minors within 72 hours to the Department of Health and Human Services, which oversees detention shelters and works to find parents or guardians in this country. After President Obama declared a humanitarian crisis this month, new shelters for minors were opened at three military bases.

Officials had been releasing most women apprehended with children, but White House officials announced last week they would begin detaining or monitoring more of those families in an effort to discourage others from coming.

Most days, the crossings here come at dawn and at dusk. The smugglers pull up in vans on the Mexican bank, and send loads of migrants across the river on inflatable rafts, sometimes three or four trips in an hour. Guides know there is little chance the Border Patrol will stop them at the international boundary midstream.

"A lot of the times it's in our best interests and the best interests of the people on the raft to not attempt to necessarily grab them from the raft," said Enrique Romero, a Border Patrol agent, as he stood by the river eyeing the smuggler scouts who eyed him from the far bank. "You put their lives at risk."

While men are told to run, women and children are instructed by smugglers to look for the Border Patrol and turn themselves in. They are told, falsely, that is the way to get a permit.

The agents were initially cautious with the migrants, checking for gang members or drug couriers. But soon Chief Ortiz was fist-bumping with the children. A boy, 4, pulled on his ears to clown for the agents.

This week Secretary Jeh C. Johnson of Homeland Security sent an open letter warning Central American parents who are considering sending their children. "In the hands of smugglers, many children are traumatized and psychologically abused by their journey or worse, beaten, starved, sexually assaulted or sold into the sex trade," he wrote. "There are no 'permits' or free passes at the end."

30

Snakes and Thorny Brush, and Children at the Border Alone - NYTimes...

Page 4 of 4

At the border, agents trained to stop drug traffickers and adult crossers are adjusting to the new migrants.

"We're law enforcement officers, but a lot of us are parents or we have young siblings," Chief Ortiz said. "We try to make sure they recognize that, you know what, it's going to be O.K. You've got some safety and security here."

A version of this article appears in print on June 26, 2014, on page A14 of the New York edition with the headline: Snakes and Thorny Brush, and Children at the Border Alone.

© 2014 The New York Times Company

Guatemalan boy sought ca... for family in US and died crossing bord... esert | World ne...     Page 1 of 4

theguardian                                                                          [Search]

News  US  World  Sports  Comment  Culture  Business  Money  Environment  Science  Travel
Tech  Media  Life & style  Data

News
World news
US immigration

# Guatemalan boy sought care for family in US and died crossing border desert

Gilberto Ramos, a 15-year-old whose body was found in Texas, traveled hundreds of miles in vain for mother's epilepsy treatment

Share
Tweet this

Email

Associated Press in San Jose Las Flores, Guatemala
theguardian.com, Wednesday  2 July  2014 09.40 EDT
Jump to comments (...)

World news
US immigration ·
Guatemala ·
Americas · United
States  Texas ·
Mexico

More news

More features



Students walk under the rain after school, in the Guatemala mountain community that Gilberto Francisco Ramos Juarez left. Photograph: Luis Soto/AP

Gilberto Ramos wanted to leave his chilly mountain village for the United States to earn money to treat his mother's epilepsy.

His mother begged him not to go. "The better treatment would have been if he stayed," Cipriana Juarez Diaz said in a tearful interview with the Associated Press on Tuesday. When he wouldn't relent, she draped him with a white rosary for safe passage.

A month later, his decaying body was found in the Texas desert. Now, the boy has become a symbol for the perils faced by a record flood of unaccompanied children from Central America who are crossing illegally into the US.

## On the Guardian today



Football

Brazil a mix of mutiny and mourning after 'biggest shame in history'



Robin Thicke's Paula sells just 530 copies in first week of sales



Tips are not optional, they are how waiters get paid in America



Football

Brazil World Cup humiliation by Germany should serve as a call to arms

(32)

Guatemalan boy sought care for family in US and died crossing borde... desert | World ne...   Page 2 of 4

Authorities said Monday that Gilberto was 11, making him one of the youngest known such children to die crossing the desert. He was shirtless, having likely suffered heat stroke, but still wearing the rosary.

"He was a good son," Juarez said. "May God give me the strength to endure."

It turned out Gilberto was 15. His parents explained Tuesday that they had taken several years to register his birth because of the remoteness of their village in Guatemala's northern mountains. When they did, they had forgotten his actual birth date, so they listed the same date as his younger brother.

Teenage boys with working ability have long been part of the stream of young men heading north from Central America, seeking to escape poverty and gang violence. But the number of unaccompanied immigrant children picked up along the US border has been rising for three years.

Migrants tell of hearing that children traveling alone and parents traveling with young kids would be released by US authorities and allowed to continue to their destination. Gilberto, too, had heard in Guatemala that if he got in, he would be allowed to stay, his family said.



A view of the community of San Jose Las Flores, in the northern Cuchumatanes mountains, Guatemala, where Ramos lived. Photograph: Luis Soto/AP

He was born and grew up in San Jose Las Flores in a modest wood and sheet-metal home in the Cuchumatanes mountains of Huehuetenango province along the Mexico border. At 6,600 feet above sea level, the exuberant beauty of peaks and canyons are in stark contrast to the extreme poverty. There is no running or potable water and only a latrine. There is food, tortillas or wheat atole, an oatmeal-like drink, but never enough.

The cluster of homes where Gilberto lived is accessible only by foot along a rocky and often muddy mile-long path, which took 45 minutes in the canyons and mud to



World Cup 2014: day 28 – as it happened



George Clooney attacks Daily Mail over 'irresponsible' story on his fiancée

Today's best video



Penny Wong lambasts 'arrogant' Tony Abbott government on carbon tax
Penny Wong accuses the Australian government of trying to schedule the Senate carbon tax repeal vote around prime minister's media appearances



World Cup 2014: Brazil grieves after 7-1 humiliation by Germany
Fans across Brazil express shock after their team was beaten 7-1 by Germany in the World Cup semi-finals



Formula E racing 'makes electric cars more sexy'
Test days for the FIA Formula E championship saw the first single-seater, electrically powered racing cars on the track



Airbus 340 and Boeing 767 nearly collide at Barcelona airport
A video filmed at Barcelona airport shows two planes almost crashing on the runway

(33)

Exhibit 7 - Page 142

Guatemalan boy sought care for family in US and died crossing border desert | World ne...     Page 3 of 4

traverse on Tuesday. Gilberto walked that path each way to school, where he went as far as third grade before dropping out.

"He had to work to help the family," said his teacher, Francisco Hernandez, who remembered that Gilberto loved to draw.

Gilberto and his father, Francisco Ramos, hired themselves out to harvest and clean corn. Things improved when the oldest son, Esbin Ramos, reached Chicago and started working as a food preparer in a restaurant. He sends $100 to $120 a month when he can afford it, allowing the family to build a two-room home out of cement block to replace their wooden shack and paint it bright red and green. Gilberto slept on a piece of foam on the floor.

Short, quiet and humble, he stayed close to home. But he grew despairing and bored, Esbin Ramos said. Their mother grew sicker. The older brother suggested Gilberto come to Chicago, where he could return to school and work at night and on weekends.



Gilberto Haroldo Ramos Juarez, 11, brother of Gilberto Francisco. In the remote mountains, they had taken several years to register his birth and forgot the date. Photograph: Luis Soto/AP

Gilberto set out 17 May with a change of clothes and a backpack along the same path as his brother, walking the rugged road to the center of town and then hitching a ride to Chiantla to meet up with the smuggler, known as a coyote. He left his cowboy boots behind because he didn't want them to get ruined, his father said.

The trip cost $5,400, and the family had borrowed $2,600 of that, paying $2,000 the first week of the journey and another $600 the week before he died. They still owe the debt.

Esbin Ramos said Tuesday that he didn't know much about how Gilberto reached the Mexican border city of

On World news

Most viewed    Latest

Last 24 hours



1. White House: racial slurs in NSA intelligence material 'unacceptable'

2. Files on UK role in CIA rendition accidentally destroyed, says minister

3. Abbas: Israel commits 'genocide' as Gaza strikes continue – live update

4. Netanyahu instructs Israeli military to intensify assault on Gaza

5. What is it like to be a Muslim in Britain today?

More most viewed

Investing our content | Privacy policy | Terms of service | US advertising | A-Z index | About us

© 2014 Guardian News and Media Limited or its affiliated companies. All rights reserved.

Guatemalan boy sought care for family in US and died crossing border desert | World ne...    Page 4 of 4

Reynosa. Esbin went the whole way in the back of a
semitrailer. He said Gilberto told him he arrived by bus.

"I'm OK, just the deposit money," Gilberto told his father
as he was about to cross into Texas.

Then Gilberto and the coyote disappeared. His parents
tried to call the coyote. Four days passed, then five,
then six. By the eighth day, Esbin Ramos was worried.
He called the Guatemalan consulate in Houston and in
Guatemala seeking help, he said.



Cipriana Juarez Diaz, mother of Gilberto Francisco. She
begged him not set out on the dangerous journey from their
modest cinder block- and sheet-metal home high in the
northern Guatemalan mountains.Photograph: Luis Soto/AP

Then he got a call from a woman McAllen, Texas, from
what agency he doesn't know, telling him his brother
was dead. They had found the body 15 June,
authorities said, and Esbin's phone number on the
inside of Gilberto's belt buckle, a tactic many migrants
use to hide information from drug traffickers who are
looking to extort money from their families.

The Guatemalan consulate notified the family on
Tuesday that Gilberto's body would be returned soon,
whenever there is an available flight. His father is
already preparing his grave site in the local cemetery.

His bedridden mother stumbled to her feet Tuesday to
pray at the altar set up where he slept. There are no
photos. They sent them to the US to identify the body.

"The coyote told me that he was going to take him to a
safe place and I believed him," Francisco Ramos said.
"But that was the fate of my son."

Share   Tweet this

72 bodies found in Mexico were immigrants, officials say - CNN.con.                    Page 1 of 5

You've selected the U.S. Edition. Would you like to make this your default edition?    Yes  |  No

SET EDITION: U.S.   INTERNATIONAL   MÉXICO   ARABIC

TV: CNN   CNNi   CNN en Español   HLN



| Home | TV & Video | U.S. | World | Politics | Justice | Entertainment | Tech | Health | Living |

Sports

# 72 bodies found in Mexico were immigrants, officials say

By the CNN Wire
August 25, 2010 5 37 p.m. EDT



These guns were found at the Mexican ranch in Tamaulipas state, where 72 bodies were discovered

**STORY HIGHLIGHTS**

**NEW:** The victims were illegal immigrants heading toward the United States, officials say

Three suspects and a member of the Mexican military were killed in a shootout

The bodies of 58 men and 14 women were found in a building on the ranch

A man with a gunshot wound led navy personnel to the bodies

(CNN) -- Seventy-two bodies discovered at a ranch in northeast Mexico belonged to migrants who were making their way toward the United States, Mexican officials said Wednesday.

The preliminary investigation indicates the victims were illegal immigrants from Honduras, El Salvador, Brazil and Ecuador, said Alejandro Poiré, spokesman for national security strategy.

The motive for the killings was under investigation, though officials pointed out that Mexico's drug cartels have expanded their activities to include extortion and kidnapping of immigrants.

"Mexican institutions have hit the operational structures of these criminals and their income, and because of that, they turn to extortion and kidnapping of migrants, as well as recruiting them to force them to become part of their group of hit men," Poiré said.

The bodies of the 58 men and 14 women were found above ground in a structure on the ranch, which is about 14 miles (22 kilometers) from the town of San Fernando, near the border with Texas.

The Mexican navy, which was called in to investigate the case, said it is one of the largest discoveries of bodies in Mexico's 4-year-old war on organized crime.

(36)

Exhibit 7 - Page 145
7/9/2014



**Bodies found in Mexico**

**RELATED TOPICS**

Mexico

Tamaulipas

Members of the Mexican navy were tipped off to the site after a man with a gunshot wound approached a military roadblock. The man said he had been injured by a criminal gang, according to a statement released by the navy.

Mexico's attorney general's office identified the man as an Ecuadorean immigrant with a bullet wound to the neck.

"The navy went to the area where the man came from and encountered gunfights. A naval officer was killed and three of the delinquents were killed," said an officer who answered the telephone at the navy's communication department. The officer, who was not authorized to speak on the record, declined to give his name.

After the gunbattle, authorities said, they found a stash of weapons, including 21 rifles, camouflage uniforms, bulletproof vests and four trucks. One of the vehicles had been disguised to look like a truck from the Ministry of National Defense, officials said.

"This discovery once again demonstrates the extreme danger and violence that Central Americans face on their treacherous journey north, as well as Mexican authorities' abject failure to protect them," Amnesty International said. "Mexico must immediately investigate this massacre, bring the perpetrators to justice and establish the identities of those killed so that their families can be informed."

Wednesday's gruesome discovery came about a month after authorities in the neighboring state of Nuevo Leon discovered 51 bodies in nine mass graves.

In that instance, investigators found charred remains, incinerated bone fragments and stains of fire on the ground where bodies were presumably burned in steel drums, the state-run Notimex news agency said.

The bodies were mostly males between age 20 and 50, Notimex said. Many of them had tattoos.

Similar mass graves have been discovered in the Mexican states of Guerrero and Quintana Roo since late May. Authorities have linked them to Mexico's ongoing drug war.

Nuevo Leon and Tamaulipas, which border Texas, have seen a marked increase in drug violence this year due to an intensifying rivalry between the Gulf cartel and the Zetas gang, which was formerly the cartel's armed branch.



Last week, authorities found the bound and blindfolded body of Edelmiro Cavazos Leal, the mayor of a city in Nuevo Leon. He had been abducted two days earlier.

His body was found on the outskirts of the city of Santiago, where Cavazos was mayor. There were signs of torture.

News reports indicate that officials believe the Zetas ordered Cavazos killed. Five police officers and a transit worker were arrested last week in connection with the slaying.

More than 28,000 people have died in drug-related incidents since President Felipe Calderon intensified the government's fight against drug cartels and organized crime after taking office in December 2006.

About 90 percent of the fatalities have been among cartel members and other criminals, Calderon has said.

CNN's Nick Valencia contributed to this report.

FOLLOW THIS TOPIC ⊕



Westlaw.

Page 1

C
23 I. & N. Dec. 572, Interim Decision 3488, 2003 WL 1953603 (BIA)

U.S. Department of Justice
Office of the Attorney General
Board of Immigration Appeals

IN RE D-J-, RESPONDENT

Decided April 17, 2003

**\*572** (1) The Attorney General has broad discretion in bond proceedings under section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a) (2000), to determine whether to release an alien on bond.

(2) Neither section 236(a) of the Act nor the applicable regulations confer on an alien the right to release on bond.

(3) In determining whether to release on bond undocumented migrants who arrive in the United States by sea seeking to evade inspection, it is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations and the release of undocumented alien migrants into the United States without adequate screening.

(4) In bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, Immigration Judges and the Board of Immigration Appeals shall consider such interests.

(5) Considering national security grounds applicable to a category of aliens in denying an unadmitted alien's request for release on bond does not violate any due process right to an individualized determination in bond proceedings under section 236(a) of the Act.

(6) The denial of the respondent's release on bond does not violate international law.

(7) Release of the respondent on bond is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of the respondent and other similarly situated undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002; further, the respondent failed to demonstrate adequately that he does not present a risk of flight if released and should be denied bond on that basis as well.

IN BOND PROCEEDINGS

The respondent is an undocumented alien from Haiti who was taken into custody and detained by the Immigration and Naturalization Service ("INS") on October 29, 2002, while attempting to evade lawful immigration procedures and enter the United States illegally. He arrived aboard a vessel that sailed into Biscayne Bay, Florida, on that date, carrying 216 undocumented aliens from Haiti and the Dominican Republic. He and other passengers on the vessel were apprehended ashore after the vessel sought to **\*573** evade coastal interdiction by the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Exhibit 7 - Page 148

United States Coast Guard and after many of the aliens sought to evade law enforcement authorities ashore. *See* INS Brief in Support of Bond Appeal, Exh. A ("INS Brief"). Respondent was placed in removal proceedings and charged as being an inadmissible alien under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2002) ("INA"). He is now seeking asylum in the United States and has applied for bond, which would allow his release into the community pending disposition on removal or asylum.

On November 6, 2002, an Immigration Judge ("IJ") granted respondent's application for release on bond (set at $2,500) over the objections of the INS. The INS argued, inter alia, that the release of respondent, and of other members of the undocumented migrant group of October 29, would stimulate further surges of such illegal migration by sea and threaten important national security interests. The INS then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal, concluding, inter alia, that the broad national interests invoked by INS were not appropriate considerations for the IJ or the BIA in making the bond determination, "[a]bsent contrary direction from the Attorney General." Decision of the Board of Immigration Appeals, *In re D-J-*, at 2 (March 13, 2003) ("BIA Dec."). Exercising authority transferred to the Department of Homeland Security ("DHS") by the Homeland Security Act of 2002 ("HSA"), and pursuant to the provisions of 8 C.F.R. § 1003.1(h)(1)(iii), the Under Secretary for Border and Transportation Security has now referred the BIA's decision to me for review. [FN1] This referral automatically stayed the BIA's order pending my decision. *See* 8 C.F.R. § 1003.19(i)(2).

On February 12, 2003, the IJ denied respondent's application for asylum. His appeal of that decision is pending before the BIA.

Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect \*574 to questions of law arising under those statutes. [FN2] This statutory framework is consistent with the Attorney General's traditional role as the primary interpreter of the law within the Executive Branch. *See generally* 28 U.S.C. §§ 511-13 (2000).

Pursuant to the authority and discretion vested in me under the provisions of section 236(a) of the INA, 8 U.S.C. § 1226(a) (2000), [FN3] I have determined that the release of respondent on bond was and is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002. I further determine that respondent has failed to demonstrate adequately that he does not present a risk of flight if released on bond and that he should be denied bond on that basis as well. *See* 8 C.F.R. § 236.1(c)(8) (2002). Accordingly, I order that the BIA's decision and order be vacated, and that respondent be denied bond and detained pending appropriate disposition and proceedings respecting his status under the immigration laws.

*\*575 I.*

My review of the BIA's decision in this case is *de novo*; it is not confined to reviewing the decisions of the BIA or the IJ for legal or factual error. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). In making their decisions in this matter, both the IJ and the BIA were exercising limited authority that is dependent upon delegation from the Attorney General. *See id.* at 4. When I undertake review of such decisions pursuant to a referral

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



under 8 C.F.R. § 1003.1(h), the delegated authorities of the IJ and BIA are superseded and I am authorized to make the determination based on my own conclusions on the facts and the law. The recent promulgation of 8 C.F.R. § 1003.1(d)(3), which precludes the BIA from engaging in de novo review of an IJ's findings of fact, does not affect the de novo standard articulated in *Doherty* because that regulation does not govern the authority of the Attorney General to review BIA decisions.

I now turn to the question of whether respondent should have been detained or released on bond under the authority of section 236(a) of the INA.

II.

A.

The law governing the detention or release of aliens such as respondent (i.e., aliens arrested and detained pending a decision on removal) is set forth in section 236(a) of the INA. It provides that the Attorney General may (1) continue to detain the alien; or (2) release the alien on bond or conditional parole. *See* section 236(a) of the INA. [FN4] Conditional parole is not placed in issue here, so the only question is whether the respondent should be detained or released on bond.

As recognized by the Supreme Court, section 236(a) does not give detained aliens any *right* to release on bond. *See Carlson v. Landon*, 342 U.S. 524, 534 (1952). Rather, the statute merely gives the Attorney General the authority to grant bond *if* he concludes, in the exercise of broad discretion, that the alien's release on bond is warranted. The extensive discretion granted the Attorney General under the statute is confirmed by its further provision that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." Section 236(e) of the INA. Even apart from that provision, the courts have consistently recognized that the Attorney General has extremely broad discretion in *576 determining whether or not to release an alien on bond under this and like provisions. *E.g., Carlson*, 342 U.S. at 540;*United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577-78 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). Further, the INA does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal. *See, e.g., Carlson*, 342 U.S. at 534 (Attorney General's denial of bail to alien is within his lawful discretion as long as it has a "reasonable foundation"); *Barbour*, 491 F.2d at 578 (INS finding that alien was a threat to national security warranted denial of bond, applying "reasonable foundation" standard); *see also Sam Andrews' Sons v. Mitchell*, 457 F.2d 745, 748 (9th Cir. 1972) (Attorney General's exercise of discretionary authorities under the INA must be upheld if they are founded "on considerations rationally related to the statute he is administering").

Further discretionary authority for the release on bond of aliens such as respondent is found in subpart A, section 236.1 of the INS regulations governing "Detention of Aliens Prior to Order of Removal." *See*8 C.F.R. § 236.1(c)(8). This regulation provides:

> Any officer authorized to issue a warrant of arrest *may, in the officer's discretion*, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

*Id.* (emphasis added). This provision gives the DHS discretionary authority to release a covered alien on bond if, and only if, the alien makes a satisfactory demonstration with respect to the stated criteria. Like section 236(a), it does not establish any right to release on bond.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



**B.**

I will now briefly summarize the pertinent facts and contentions of the parties indicated in the record.

As noted above, respondent arrived off the shores of Florida in an overloaded vessel with 216 undocumented aliens from Haiti and the Dominican Republic on October 29, 2002. After the vessel sought to evade the orders and interdiction efforts of a U.S. Coast Guard ("USCG") vessel, some of the alien passengers jumped from the vessel and swam ashore. After the migrant vessel ran aground, the remaining passengers disembarked and, despite the order of USCG officers to stop, ran ashore and fled from law enforcement officers before they were apprehended. *See* INS Brief, Exh. A (Declaration of Captain Mark J. Kerski, USCG) ("Kerski Declaration"). I find nothing in the record showing that respondent was not among the alien *577 migrants who disobeyed the orders of, and sought to evade, USCG or law enforcement officers ashore in an effort to enter the United States unlawfully.

The respondent offered limited evidence and information in the proceedings below in support of his claims that he did not present a danger to the community, a risk of flight, or a threat to national security. Respondent testified that he has not been arrested or convicted of a crime; and that, if released, he would live with an uncle residing in New York, New York, who would provide him with food, shelter, and transportation while he applied for asylum. Memorandum Decision of the Immigration Judge, *In re D-J-*, at 2 (Dec. 12, 2002) ("IJ Dec.").

Respondent's brief before the BIA asserts that he was "willingly taken into INS custody." Respondent's Brief in Support of the Immigration Judge's Custody Determination at 3 ("Respondent's Brief"). That assertion, however, does not address whether the respondent was among the migrants who sought to evade USCG and other law enforcement officers after coming ashore, as indicated in the USCG's Kerski Declaration. Respondent's brief further asserts that, because he does not speak or understand English, he could not be expected to obey any orders from English-speaking law enforcement officers at the time he came ashore. That assertion, however, does not address the likelihood, indicated by the content of the Kerski Declaration, that the circumstances in which those orders were issued were such that their meaning would have been clear in context, without regard to the particular words uttered by the officers. *See* INS Brief, Exh. A, ¶¶ 4-6.

In opposing respondent's contentions, the INS submitted declarations from officers of the Coast Guard, the Department of State, and the Department of Defense ("DOD") as exhibits before the IJ and the BIA. [FN5] INS maintains that these declarations show that there are strong concerns of national security requiring the continued detention of the respondent and similarly situated undocumented migrants pending removal proceedings. Two general areas of concern are implicated. First, there is a concern that the release of aliens such as respondent and the other October 29 migrants would tend to encourage further surges of mass migration from Haiti by sea, with attendant strains on national and homeland security resources. Such mass migrations would also place the lives of the aliens at risk. Second, in light of the terrorist attacks of September 11, 2001, there is increased necessity in preventing undocumented aliens from entering the country without the screening of the immigration inspections process.

*578 The first area of national security concern advanced by INS is the threat of further mass migration. INS asserts that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage further mass migration attempts. [FN6] In support of this contention, INS has submitted a memorandum issued by the State Department supporting detention of the migrants who landed in Florida on October 29, 2002, in order to prevent further mass

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Exhibit 7 - Page 151

migrations. The memorandum states in relevant part:

The disposition of those detained in the October 29 arrival will spur further migration if they are released into the U.S. Such treatment would create a perception in Haiti of an easing in U.S. policy with respect to admission of migrants. For this reason, the Department of State strongly recommends that the 216 migrants (207 Haitians, 9 Dominicans) from the boat which reached Key Biscayne on October 29 be detained while they undergo processing. The migrants should be detained unless and until they demonstrate a well-founded fear of persecution. Those who cannot do so should continue to be held, absent a compelling humanitarian reason for release, until they can be expeditiously repatriated.

INS Brief, Exh. B (State Department Memorandum). The State Department memorandum sets forth extensive and detailed information documenting the relationship between perceptions in Haiti of successful U.S. entry by seagoing migrants and the likelihood of further mass migrations. *Id.*

The declarations submitted from the Coast Guard (*see supra* n.6) and the Defense Department express corroborating statements regarding this concern. The Coast Guard states that "[a]necdotal reporting and operational experience strongly suggests that detaining and swiftly repatriating those who illegally and unsafely attempt to enter the United States by sea is a significant deterrent to surges in illegal immigration and mass migration." INS Brief, Exh. C, ¶ 9. (Declaration of Captain Kenneth A. Ward, USCG). Similarly, the Department of Defense declaration states that "[a]ctual or even *perceived* changes in U.S. immigration policy can trigger mass migration events by encouraging other potential illegal migrants." *See* INS Brief, Exh. F, ¶ 5 (Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations).

The INS submissions also outline an additional national security implication of encouraging future mass migrations by sea from Haiti. The Coast Guard declaration states that continued mass migrations from Haiti have "heavily taxed Coast Guard capacity and capabilities," while "reducing *579 responsiveness in other mission areas." INS Brief, Exh. C, ¶ 7. The Department of Defense, which is also involved in efforts to contain such overseas migrations, also asserts that the demands of mass migrations from Haiti "would create a drain on scarce assets that are being used in or supporting operations elsewhere." INS Brief, Exh. F, ¶ 8.

The declarations submitted by INS also substantiate a national security concern raised by the prospect of undocumented aliens from Haiti being released within the United States without adequate verification of their background, associations, and objectives. Thus, the State Department declaration asserts that it has "noticed an increase in third country nations (Pakistanis, Palestinians, etc.) using Haiti as a staging point for attempted migration to the United States. This increases the national security interest in curbing use of this migration route." INS Brief, Exh. B, ¶ 11. Relatedly, the Coast Guard's supplemental declaration asserts that the boatloads of interdicted Haitians have included persons previously deported for drug trafficking and subject to outstanding felony warrants. INS Brief, Exh. E, ¶ 4 (Supplemental Declaration of Captain Kenneth A. Ward, USCG). The Coast Guard further asserts that "because maritime migrants are typically undocumented and carry little or no identification, it is often difficult to ascertain the identity and background of interdicted persons, particularly in large groups, which presents potential threats to officer safety, as well as national security." *Id.*

III.

Having considered the record and the briefs of the parties, and exercising my authority under section 236(a) of the INA, I have determined that the release of respondent on bond is unwarranted.

I conclude that releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



rise to adverse consequences for national security and sound Immigration policy. As demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of such aliens into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in such illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a).See Carlson, 342 U.S. at 534;Barbour, 491 F.2d at 578.

*580 I have noted the BIA's suggestion that the INS's recent adoption of a policy placing certain aliens (including many undocumented aliens who arrive by sea and are not admitted or paroled) in expedited removal proceedings in which affected aliens, with limited exceptions, would be automatically detained without review by an IJ or the BIA tends to negate the INS's concern regarding the encouragement of migration surges. BIA Dec. at 2 n.3; seeNotice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924-26 (Nov. 13, 2002). The offsetting effect suggested by the BIA would presumably be due to the prospect that the new expedited removal policy will be so restrictive that potential Haitian migrants would learn of that and be deterred from future migration attempts, regardless of respondent's fate and that of the other October 29 migrants. While the expedited removal policy may reduce the incidence of seagoing Haitian migrants being released on bond pending removal, it hardly provides airtight assurance against future successful entries by such migrants through legal and extra-legal maneuvers, or the encouragement of additional maritime migrations likely to arise from such entries. I note, for example, that the policy's strict detention provision is entirely inapplicable to aliens who are admitted or paroled. In any event, even if the new policy somewhat reduced the expectations of further successful U.S. entries, the release of respondent and hundreds of others from the October 29 migrant group would strongly undercut any resultant deterrent effect arising from the policy. The persistent history of mass migration from Haiti, in the face of concerted statutory and regulatory measures to curtail it, confirms that even sporadic successful entries fuel further attempts. I therefore am not persuaded that the new expedited removal policy negates the migration "surge" consideration.

I further conclude that the release on bond of undocumented seagoing migrant aliens from Haiti without adequate background screening or investigation presents a risk to national security that provides additional grounds for denying respondent's release on bond. This consideration is fortified by the State Department's assertion that it has observed an increase in aliens from countries such as Pakistan using Haiti as a staging point for migration to the United States. Under the current circumstances of a declared National Emergency, the Government's capacity to promptly undertake an exhaustive factual investigation concerning the individual status of hundreds of undocumented aliens is sharply limited and strained to the limit. Under these circumstances, it is reasonable to make a determination that aliens arriving under the circumstances presented by the October 29 influx should be detained rather than released on bond. There is substantial risk that granting release on bond to such large groups of undocumented aliens may include persons who present a threat to the national security, as well as a *581 substantial risk of disappearance into the alien community within the United States.

I note that the BIA has acknowledged the seriousness of INS's arguments that the detention or release of these aliens implicates important national security interests. See BIA Dec. at 2. The BIA determined, however, that such considerations fall "outside the scope of Immigration Judge bond proceedings as such proceedings are currently constituted," except where individual considerations show that the respondent is not likely to appear or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



presents a danger to the community. The BIA then stated: "Absent contrary direction from the Attorney General, we therefore agree with the Immigration Judge's focus on the respondent's individual likelihood to appear and individual danger to the community." *Id.* This opinion provides the BIA and Immigration Judges with the "contrary direction" to which the BIA referred. In future proceedings involving similarly situated aliens, this opinion constitutes binding precedent, requiring the BIA and IJs to apply the standards set forth herein, including consideration of national security interests. *See generally Iran Air v. Kugelman,* 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). Further, in all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, IJs and the BIA shall consider such interests.

Finally, I conclude that respondent has not individually demonstrated that he satisfies the prerequisites to discretionary release on bond under the provisions of 8 C.F.R. § 236.1(c)(8). INS may (but is not required to) grant release under that provision if the alien demonstrates to its satisfaction that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding. I do not find that respondent has adequately demonstrated that he is likely to appear at future proceedings for purposes of granting release on bond pursuant to section 236(a)(2) of the INA or 8 C.F.R. § 236.1(c)(8). There are strong indications in the record that respondent was among those aliens who sought to evade Coast Guard and law enforcement officers in a determined effort to effect illegal entry into the United States. Because such evasive behavior does not provide reassuring evidence of respondent's likely reliability in appearing for future proceedings, it was incumbent upon respondent to produce substantial countervailing evidence as to that criterion. I conclude that the minimal showing made by respondent on this point was insufficient to demonstrate the likelihood of his appearance for future proceedings. [FN7]

**\*582** In addition, I note that the respondent was denied asylum by the Immigration Judge on February 12, 2003. The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending. The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention. "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade,* 19 I&N Dec. 488, 490 (BIA 1987).

IV

Although neither the IJ nor the BIA chose to address the issue, respondent contends that he is constitutionally entitled on due process grounds to an "individualized determination" of his request for release on bond and that denying bond on broad national security grounds that are generally applicable to the October 29 migrants would somehow violate such a right. Respondent's Brief at 6-8. In that regard, I note that several federal appellate courts have recently held that a *lawful permanent resident alien* has a due process right to an individualized hearing and determination on whether he poses a risk of flight or a danger to the community when subjected to the mandatory detention provisions of section 236(c) of the INA. *See Kim v. Ziglar,* 276 F.3d 523 (9th Cir.), *cert. granted sub nom.Denmore v. Hyung Joon Kim,* 536 U.S. 956 (2002); *Patel v. Zemski,* 275 F.3d 299, 314-15 (3d Cir. 2001); *see also Hoang v. Comfort,* 282 F.3d 1247, 1256 (10th Cir. 2002). Another federal appeals court has reached a contrary conclusion on that issue, *see Parra v. Perryman,* 172 F.3d 954, 958 (7th Cir. 1999), and the Supreme Court has granted the Government's petition for a writ of certiorari and heard oral argument in *Kim.*

I first note that the decisions in *Kim* and *Patel* were specifically addressed to the *mandatory* detention provisions

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



of section 236(c) of the INA and are therefore fundamentally distinguishable from the procedures afforded under section 236(a). Section 236(c) requires nondiscretionary detention as a categorical statutory mandate for those aliens covered by it, whereas section 236(a) affords aliens to whom it applies the opportunity to seek discretionary relief (bond or conditional parole) in a hearing before an Immigration Judge. *See Kim,* 276 F.3d at 533.

More significantly, however, the holdings in *Kim* and *Patel* were premised upon the petitioner's status as a lawful permanent resident alien. *See Kim,* 276 F.3d at 528, 534; *Patel,* 275 F.3d at 307. In contrast, respondent has not **583** even been admitted to the United States, let alone acquired the status of a lawful permanent resident alien. Respondent's status is that of an undocumented alien, charged as being inadmissible as an alien present in the United States without having first been admitted or paroled. *See* section 212(a)(6)(A)(i) of the INA. As an alien who has "not yet gained initial admission to the United States," he does not qualify for the limited due process protection extended to "admitted" aliens under the sharply distinguishable circumstances presented in *Zadvydas v. Davis,* 533 U.S. 678, 682 (2001) ("We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question."). As explained by the court in *Gisbert v. United States Attorney General,* 988 F.2d 1437, 1440 (5th Cir.), *amended on other grounds,* 997 F.2d 1122 (5th Cir. 1993): "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Accord United States v. Lopez-Vasquez,* 227 F.3d 476, 484-85 (5th Cir. 2000); *Zheng v. INS,* 207 F.Supp.2d 550, 552 (E.D. La. 2002) ("The detention of aliens who have been denied initial admission into the United States does not implicate the Fifth Amendment, even if such aliens were subsequently paroled or released within the country.").

Even if the respondent *were* entitled to an individualized hearing, however, such a conclusion would not support a contention that this respondent's request for release on bond must be determined exclusively on the basis of his individual situation, rather than on the basis of general considerations applicable to a category of migrants, as a matter of constitutional due process. The mere fact that general considerations are introduced does not negate the individual nature of the hearing. The Attorney General is broadly authorized to detain respondent, and deny his request for bond, based on any reasonable consideration, individualized or general, that is consistent with the Attorney General's statutory responsibilities. *See Reno v. Flores,* 507 U.S. 292, 313-14 & n.9 (1993) (rejecting juvenile aliens' demands for an "individualized custody hearing" and upholding INS use of "reasonable presumptions and generic rules" in such cases).

In any event, I have given full consideration to the individual aspects of respondent's claim for bond based on the record in this proceeding. I find nothing in respondent's individual case that warrants granting him release on bond when balanced against the above-described compelling factors that militate against such release in the case of undocumented aliens attempting illegal entry into the United States under the circumstances presented by the October 29 influx.

**584** Finally, I note that respondent argued to the BIA that an INS policy of detaining Haitian migrants in order to deter other Haitians from migrating to the United States seeking international law. *See* Respondent's Brief at 8-9. In support of his argument, he invokes the right to asylum protected by Article 14 of the Universal Declaration of Human Rights ("UDHR") and an advisory opinion of the United Nations High Commission for Refugees stating that "asylum seekers should not be detained for purposes of deterrence." *Id.* at 8. The BIA did not address respondent's arguments on this point in its decision.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



This argument is without merit. First, the UDHR is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty. *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 816 n.17 (D.C. Cir. 1987) (UDHR "is merely a nonbinding resolution, not a treaty"). In any event, the application of U.S. law to protect the nation's borders against mass migrations by hundreds of undocumented aliens violates no right protected by the UDHR or any other applicable rule of international law. As the Supreme Court has recognized, "'[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments ....'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The authority to expel aliens is meaningless without the authority to detain those who pose a danger or a flight risk during the process of determining whether they should be expelled. The national security interests invoked in this opinion are directed at unlawful and dangerous mass migrations by sea, not the right to seek asylum. Aliens who do arrive in the United States, including the respondent himself, are afforded the right to apply for asylum and have those applications duly considered. [FN8]

## *585 CONCLUSION

I have determined that respondent's release on bond under the provisions of section 236(a) of the INA is unwarranted. The BIA's Order of March 13, 2003, is hereby vacated and respondent is to be detained pending decision on removal.

FN1. On March 1, 2003, the INS was transferred from the Department of Justice to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. The Executive Office for Immigration Review, however, remains in the Department of Justice. On February 28, 2003, the Attorney General published a technical rule that moved 8 C.F.R. § 3.1(h) (2002) to 8 C.F.R. § 1003.1(h). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9832 (Feb. 28, 2003) (to be codified at 8 C.F.R. § 1003.1(h)). The authority of the INS Commissioner to refer Board decisions to the Attorney General is now vested in the Secretary of Homeland Security, or in "specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General." 8 C.F.R. § 1003.1(h)(iii).

FN2. *See* section 103(a)(1) of the INA, 8 U.S.C. § 1103(a)(1), *as amended by* Homeland Security Act of 2002 Amendments, Division L of Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 531 (2003), which provides:
The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however*, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

FN3. Section 1102 of the HSA, 116 Stat. at 2274, added a new subsection (g) to section 103 of the INA, providing as follows:
The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.
The Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to this provision, although this authority is shared with the Secretary of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Exhibit 7 - Page 156

Homeland Security because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings. *See* sections 103(a), (g) of the INA, *as amended*; 8 C.F.R. §§ 236.1(c), (d), 287.3(d) (2002).

FN4. *See supra* n.3.

FN5. The exhibits submitted with the INS brief included: Declaration of Captain Mark J. Kerski, USCG (Exhibit A); Memorandum from the United States Department of State (Exhibit B); Declaration of Captain Kenneth A. Ward, USCG (Exhibit C); Declaration of Johnny Williams (Exhibit D); Supplemental Declaration of Captain Kenneth A. Ward, USCG (Exhibit E); and Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations (Exhibit F).

FN6. Following the successful landing of more than 200 Haitians on October 29, 2002, on November 7, 2002, and again on November 9, 2002, the USCG successfully interdicted three groups of undocumented Haitian migrants attempting to transit to the United States via the Bahamas. In all, 264 Haitian migrants were interdicted on these dates. Such incidents are "typical of a surge in Haitian migrant departures following similar successful landings and demonstrates the 'pull' factor that successful landing can have." INS Brief, Exh. E, ¶ 3 (Supplemental Declaration of Captain Kenneth A. Ward, USCG).

FN7. The INS also offered evidence disputing respondent's claim that, individually, he does not pose a danger to the community and is likely to appear in future proceedings. *See* INS Brief at 14-15.

FN8. I note that a regional official of the United Nations High Commissioner for Refugees ("UNHCR") has sent me a letter volunteering certain comments on this proceeding. Letter for The Honorable John Ashcroft, Attorney General of the United States, from Guenet Guebre-Christos, Regional Representative, United Nations High Commissioner for Refugees, *Re: Matter of D-J-, Advisory Opinion on Detention of Asylum Seekers* (March 28, 2003). In brief, the UNHCR letter makes certain arguments invoking purported obligations arising under the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (Jan. 31, 1967) ("Protocol"), and the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) ("Convention"). The United States is not a party to the Convention, but it is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the Convention. The Protocol is not self-executing, but Congress has incorporated into the INA, through the Refugee Act of 1980, the appropriate requirements of the Protocol. Consequently, the Protocol does not afford respondent any rights beyond what he is afforded under the federal immigration laws, as applied in this decision. *See Abdelwahed v. INS*, 22 Fed.Appx. 811, 815, 2001 WL 1480651 (9th Cir. 2001) (stating that "the Protocol does not give [the petitioner] any rights beyond what he already enjoys under the immigration statutes"); *Legal Obligations of the United States under Article 33 of the Refugee Convention*, 15 Op. O.L.C. 86, 87 (1991) ("[T]he Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.").

23 I. & N. Dec. 572, Interim Decision 3488, 2003 WL 1953603 (BIA)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Exhibit 7 - Page 157