1   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
    Carlos Holguín (Cal. Bar No. 90754)
2   Peter A. Schey (Cal. Bar No. 58232)
    Marchela Iahdjian (Cal. Bar No. 295595)
3   256 South Occidental Boulevard
    Los Angeles, CA 90057
4   Telephone: (213) 388-8693
    Facsimile: (213) 386-9484
5   Email:crholguin@centerforhumanrights.org
            pschey@centerforhumanrights.org
6            marchela@centerforhumanrights.org

7   ORRICK, HERRINGTON & SUTCLIFFE LLP
    William A. Molinski (Cal. Bar No. 145186)
8   wmolinski@orrick.com
    T. Wayne Harman (Cal. Bar No. 254089)
9   wharman@orrick.com
    Elena Garcia (Cal. Bar No. 299680)
10  egarcia@orrick.com
    777 South Figueroa Street, Suite 3200
11  Los Angeles, CA 90017
    Telephone: (213) 629-2020
12
    *Attorneys for Plaintiffs*
13  (listing continues on following page)

14

15                  UNITED STATES DISTRICT COURT

16                 CENTRAL DISTRICT OF CALIFORNIA

17                        WESTERN DIVISION

18

19

20  Jenny Lisette Flores, et al.,          Case No. CV 85-4544-RJK(Px)

21          Plaintiffs,                     **Plaintiffs' First Set Of Exhibits In
                                            Support Of Motion For Class-Wide
22      v.                                  Enforcement Of Settlement [Part 4:
                                            Exhibits 8-10]**
23  Jeh Johnson, Secretary, U.S. Department
    of Homeland Security, et al.,           Hearing:  March 9, 2015
24          Defendants.                     Time:     TBD
                                            Dept:     TBD
25

26                       **PUBLIC VERSION**

27

28                              PLAINTIFFS' FIRST SET OF EXHIBITS IN
                                SUPPORT OF MOTION FOR CLASS-WIDE
                                ENFORCEMENT OF SETTLEMENT
                                [PART 4: EXHIBITS 8-10]
                                CV 85-4544-RJK(Px)

1

2   *Plaintiffs' counsel, continued:*

3   LA RAZA CENTRO LEGAL, INC.
    Michael S. Sorgen
4   Maria Victoria Castro
    Amanda Alvarado Ford
5   474 Valencia Street, #295
    San Francisco, CA 94103
6   Telephone:   (415) 575-3500
    Facsimile:   (415) 255-7593
7
    *Of counsel:*
8
    YOUTH LAW CENTER
9   Alice Bussiere
    Virginia Corrigan
10  200 Pine Street, Suite 300
    San Francisco, CA 94104
11  Telephone:  (415) 543-3379 x 3903

12  RANJANA NATARAJAN
    Clinical Professor
13  Director, Civil Rights Clinic
    University of Texas School of Law
14  727 E. Dean Keeton St.
    Austin TX 78705
15  Telephone:  (512) 232-7222

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX TO EXHIBITS

1    Settlement of class action, January 17, 1997 ..................................................... 1

2    Order approving settlement of class action, January 28, 1997 ...................... 47

3    Stipulation extending settlement of class action, December 7, 2001 ........................................................................................................ 53

4    Plaintiffs' letter requesting pre-enforcement meeting, October 15, 2014 ........................................................................................................ 58

5    Plaintiffs' letter posing questions re: implementation of class action settlement, October 2, 2014 ............................................................. 64

6    Defendants' response to questions re: implementation of class action settlement, November 3, 2014 ........................................................... 85

7    ICE opposition to bond redetermination, July 24, 2014 ............................. 107

8    ICE opposition to bond redetermination, October 8, 2014 ......................... 158

9    U.S. Immigration & Customs Enforcement, news release, November 18, 4014 .......................................................................................... 210

10   Declaration of Bridget Cambria, November 7, 2014 ................................... 211

11   Declaration of Carol Anne Donohoe, November 15, 2014 ......................... 219

12   Declaration of J███ H██████ M████, September 20, 2014 ................... 227

13   Declaration of M███ C██████ d█ T████, September 19, 2014 ............................................................................................................ 232

14   Declaration of M███ F██████ S███, September 19, 2014 ......................... 238

15   Declaration of M███ L█████ M██████, September 19, 2014 ..................... 244

16   Affidavit of Adriana Piñon re: Texas Public Information Act Request, September 3, 2014 ...................................................................... 248

17   Declaration of Barbara Hines, January 14, 2014 ........................................ 253

18   Declaration of D███ V████ A██████, January 9, 2015 ............................... 301

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 4: EXHIBITS 8-10]
CV 85-4544-RJK(Px)

19   Declaration of H███ R████ M███, January 9, 2015 .............................. 305

20   Declaration of R███ E████ A███, January 8, 2015 ....................... 309

21   Karnes Attorney Visitation Form and Guidelines, January 9, 2015 ........................................................................................... 312

22   Declaration of Jonathan Hiskey, September 22, 2014 .................................. 314

23   Declaration of Carlos Holguin, January 13, 2015.......................................... 319

24   Declaration of Luis H. Zayas, December 10, 2014....................................... 323

25   Declaration of Generva Gilden Berger, January 12, 2015 ........................... 366

26   Dilley Resident Handbook ......................................................................... 383

27   Memorandum of Understanding Re: Compromise of Class Action: Conditions of Detention, November 30, 1987 ................................ 433

28   Declaration of Anne Chandler, December 1, 2014....................................... 470

29   Declaration of Allison N. Boyle, November 24, 2014................................... 475

30   Declaration of Brittany Perkins, November 28, 2014................................... 490

31   Declaration of Clayton N. Matheson, November 24, 2014........................... 497

32   Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ....................... 504

33   Declaration of Melissa J. Cuadrado, November 26, 2014............................ 512

34   Declaration of Scott T. Williams, December 1, 2014 .................................. 522

35   Declaration of Virginia Marie Raymond, December 13, 2014 ................... 527

36   *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.), Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction, December 16, 2014 ........................................... 530

37   Flores Settlement Agreement and DHS Custody: Key Flores Provisions & DHS Noncompliance - Report of Lutheran Immigration and Refugee Services ........................................................... 570

38    Declaration of S█████ C██ M█████, January 8, 2015 ................................. 577

39    Declaration of S█████ B████ d█ T███, January 8, 2015 ........................... 580

40    Declaration of M██ G███ S████, January 8, 2015 ................................... 583

41    Declaration of E████████ G████ M█████, January 9, 2015 ..................... 586

42    Declaration of A██ Z████ M██████, January 9, 2015 ............................... 590

43    Declaration OF A████ E████████ d█ l█ C███ G████, January 9, 2015 ................................................................................................ 594

44    Declaration of A███ F███ d█ E██████, January 9, 2015 ......................... 597

45    Declaration of H████ L████ M████ P███, January 9, 2015 ...................... 602

46    Declaration of M███ M██████ M███, January 8, 2015 ............................. 606

47    Declaration of C█████ M█████ C████████ C██, January 8, 2015 ........................................................................................................... 609

48    Declaration of S█████ L████ M█████ A████, January 9, 2015 ........................................................................................................... 611

49    Declaration of L███ B████ S█████, January 8, 2015 .............................. 613

50    Declaration of S████ A████ M██████ D██████, January 8, 2015 ........................................................................................................... 617

51    Declaration of O████ F████ C██████ M████, January 9, 2015 ................... 621

52    Declaration of J█████████ E█████ E██████ F████, January 9, 2015 ........................................................................................................... 624

53    Declaration of Lauren Beth Connell, November 26, 2014 ........................... 627

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 4: EXHIBITS 8-10]
CV 85-4544-RJK(Px)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian


  /s/ Carlos Holguín
Attorneys for Plaintiffs

iv

# Exhibit 8

## Publicly Filed

Corina E. Almeida                                    **DETAINED**
Chief Counsel
Kathleen L. Torres
Deputy Chief Counsel
Lynn M. Doble-Salicrup
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
12445 East Caley Avenue
Centennial, CO 80111

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## DENVER, COLORADO
## (ARTESIA DOCKET)

In the Matter of:                    )
                                     )
MEDRANO, Lorena                      )    File No.:
MENJIVAR-MEDRANO, Angel Josue        )
                                     )
                                     )
In BOND Proceedings                  )
                                     )

**Immigration Judge:  Hon. Eileen R. Trujillo**          **Next Hearing:  October 9, 2014**

## DEPARTMENT OF HOMELAND SECURITY'S
## SUBMISSION OF DOCUMENTARY EVIDENCE

Exhibit 8 - Page 158

## DEPARTMENT OF HOMELAND SECURITY'S
## SUBMISSION OF DOCUMENTARY EVIDENCE

The Department respectfully submits the following documents in support of the

Department's position in this matter:

| TAB | DESCRIPTION | PAGE |
|-----|-------------|------|
| A | Declaration of Philip T. Miller, Assistant Director of ERO and ICE Field Operations, on August 7, 2014 | 1-3 |
| B | Declaration of Traci A. Lembke, Assistant Director over Investigative Programs for HSI and ICE, on August 7, 2014 | 4-8 |
| C | Written Testimony of DHS Secretary Jeh Johnson, at http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security | 9-13 |
| D | U.S Moves to Stop Surge in Illegal Immigration, *New York Times*, dated June 20, 2014 | 14-17 |
| E | New U.S. Effort to Aid Unaccompanied Child Migrants, *New York Times*, dated June 2, 2014 | 18-20 |
| F | Obama Asks for $3.7 Billion to Aid Border, *New York Times*, dated July 8, 2014 | 21-24 |
| G | A 12-Year Old's Trek of Despair Ends in a Noose at the Border, *New York Times*, dated April 19, 2014 | 25-29 |
| H | Snakes and Thorny Brush, and Children at the Border Alone, *New York Times*, June 25, 2014 | 30-33 |
| I | Guatemalan Boy Sought Care for Family in the U.S. and Died Crossing Border Desert, *The Guardian*, dated July 2, 2014 | 34-38 |
| J | 72 Bodies Found in Mexico were Immigrants, Officials Say, CNN, dated August 25, 2010 | 39-40 |
| K | *Matter of D-J-*, 23 I&N Dec. 572 (A.G. 2003) | 41-49 |

Respectfully submitted by:

Lynn M. Doble-Salicrup
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Exhibit 8 - Page 159

## PROOF OF SERVICE

I hereby certify that, on October 8, 2014, I served a true copy (redacting A number) of this DEPARTMENT OF HOMELAND SECURITY'S SUBMISSION OF DOCUMENTARY EVIDENCE and any attached pages to the respondent c/o counsel of record at the following location:

Carlos Holguin, Esq.
Center for Human Rights
256 S. Occidental Blvd.,
Los Angeles, CA  90057

by:

☐　　　placing a true copy thereof in a sealed envelope, with postage thereon to be fully prepaid by normal government process and causing the same to be mailed by first class mail to the person at the address set forth above.

☐　　　causing to be personally delivered a true copy thereof to the person set forth above.

☒　　　electronic service, in accordance with applicable office procedure and DHS polices, to the addressee set forth above, at the following e-mail address:

　　　crholguin@centerforhumanrights.org

☐　　　Courier Service ( ☐FedEx  /  ☐ UPS) to the person at the address set forth above.

☐　　　telefaxing with acknowledgment of receipt to the person at the address set forth above.


Lynn M. Doble-Salicrup
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
12445 East Caley Avenue
Centennial, CO 80111

Exhibit 8 - Page 160

## DECLARATION OF PHILIP T. MILLER

I, Philip T. Miller, hereby declare that the following statements are true and correct to the best of my knowledge, information, and belief:

1. My name is Philip T. Miller. I am a member of the Senior Executive Service serving as the Assistant Director of Field Operations for Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE) in Washington, D.C. I have held this position since May 2013. My current work address is: 500 12th Street Southwest, Washington, DC. I hold a B.A. and an M.A. in Political Science.

2. I began federal service in 1996 with the former Immigration and Naturalization Service (INS) as an Immigration Inspector in New Orleans, Louisiana, where I worked at both air and sea ports of entry. In 1998, I was promoted to a Deportation Officer, and served as Juvenile Coordinator, National Crime Information Center Fugitive Officer, and managed a long-term detention and rehabilitation program. In 2001, I became an ICE Special Agent, conducting administrative and criminal investigations, including investigations of alien smuggling, critical infrastructure protection, and counterfeit document vending.

3. In July of 2007, I became an Assistant Field Office Director within the New Orleans Field Office of Detention and Removal Operations (DRO). In this capacity I was responsible for managing all mission support functions and fugitive operations, and I served as the Field Office's Public Affairs Officer and Congressional Liaison Officer. In April of 2008, I was promoted to Deputy Field Office Director for DRO. In September of 2009, I was promoted to Field Office Director of the New Orleans Field Office.

4. My experience as an immigration officer includes planning, directing, managing, and coordinating operational functions relating to the apprehension, transportation, and detention of aliens ordered removed; the execution of final orders of deportation; and liaison with Departmental, interagency, and community partners regarding ERO matters.

5. In my current position as Assistant Director of ERO Field Operations, I oversee, direct, and coordinate operational activities throughout the nation's ERO field offices and sub-offices, ensuring   such activities further agency goals and comply with agency policies. My duties include the oversight of operations concerning the detention of adults with children and unaccompanied children.

6. Last fiscal year, CBP apprehended 414,397 illegal migrants at the Southwest border, an increase of 16 percent compared to FY 2012 (356,873). Through July of this fiscal year, Southwest Border apprehensions reached r 421,957, compared to 348,798 during the same time period in FY 2013..

7. The number of credible fear cases that U.S. Citizenship and Immigration Services (USCIS) completed for nationals of all countries grew rapidly over a one-year period, going from 13,607 in FY12 to 36,454 in FY13, with the majority of this increase due to claims originating from nationals of El Salvador, Guatemala, and Honduras. USCIS

Exhibit 8 - Page 161

received a total of 8,475 credible fear cases for these three countries in FY12, with this number nearly tripling to 23,329 in FY13. http://www.uscis.gov/sites/default/files/USCIS/Outreach/Notes%20from%20Previous%20 Engagements/2013/Asylum-CredibleFear-ReasonableFear-FY13.pdf

8. On May 12, 2014, Secretary Johnson declared a Level IV condition of readiness within the Department of Homeland Security (DHS), which is a determination that the capacity of CBP and ICE to deal with the situation is full and we need to draw upon additional resources across all of DHS. He appointed Deputy Chief Vitiello to coordinate this effort within DHS. See Written Testimony of DHS Secretary Jeh Johnson, at http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security.

9. According to debriefings of Guatemalan, Honduran, and Salvadoran detainees, the high probability of a prompt release, coupled with the likelihood of low or no bond, is among the reasons they are coming to the United States. I have concluded that implementation of a "no bond" or "high bond" policy would significantly reduce the unlawful mass migration of Guatemalans, Hondurans, and Salvadoran.

10. The responsibilities of DHS include "[s]ecuring the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States...." 6 U.S.C. § 202(2) (codification of the Homeland Security Act of 2002). The DHS describes its cores missions as, inter alia, "[p]revent[ing] terrorism and enhancing security" and secur[ing] and manag[ing] our borders." http://www.dhs.gov/our-mission. Security of the borders includes a focus on the goal of "[d]isrupt[ing] and dismantl[ing] transnational criminal and terrorist organizations. http://www.dhs.gov/secure-and-manage-borders.

11. Detention is especially crucial in instances of mass migration. Annual surveys of people in Central American countries show that one key factor that influences the decision whether to migrate is the existence of an "active migration network," i.e. friends or family who previously migrated and are living in the United States. See Americas Barometer Insights: 2014, Violence and Migration in Central America, Latin American Public Opinion Project, Vanderbilt University, No. 101 (2014) [hereinafter Americas Barometer Insights].[1] Illegal migrants to the United States who are released on a minimal bond become part of such active migration networks.

12. Allowing detainees to bond out would have indirect yet significant adverse national security consequences as it undermines the integrity of our borders. As stated, the current detainees already are motivated, inter alia, by the belief that they would receive release from detention. Validating this belief further encourages mass migration, which only

---

[1] The work of the Latin American Public Opinion Project (LAPOP) is made possible through partnership with U.S. Agency for International Development. See http://www.vanderbilt.edu/lapop/sustaining-donors.php. LAPOP describes itself as "the premier academic institution carrying out surveys of public opinion in the Americas, with over thirty years of experience." See http://www.vanderbilt.edu/lapop/.

2

Exhibit 8 - Page 162

increases the already tremendous strain on our law enforcement and national security agencies.

13. Significant resources have had to be diverted to the Southwest Border, not only to handle the additional caseload, but also as part of a strengthened effort to investigate, prosecute, and dismantle criminal smuggling organizations. Such a diversion of resources disrupts our ability to deal with other threats to public safety, including national security threats. Specifically, DHS, together with the Department of Justice, has added personnel and resources to the investigation, prosecution, and dismantling of the smuggling organizations that are facilitating border crossings into the Rio Grande Valley Sector. ICE is surging 60 additional criminal investigators and support personnel to San Antonio and Houston offices for this purpose. *See Written Testimony of DHS Secretary Jeh Johnson*, available at http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security. Implementing a "no bond" or "high bond" policy would help ameliorate these disruptions.

14. Implementing a "no bond" or "high bond" policy would provide additional time to further screen the detainees and have a better chance of identifying any that present threats to our public safety and national security. In many instances illegal migrants arrive without any reliable identification documents, or present a fraudulent identity. In FY 2013 CBP encountered approximately 17,366 fraudulent documents at our Ports of Entry

15. Criminal enterprises and cartels are facilitating the networks of human smuggling and criminal activity along the Southwest Border. According to debriefings of Guatemalan, Honduran, and Salvadoran detainees, a majority of them paid funds to criminal elements, including the Zeta or Gulf cartels, to be smuggled across the Southwest Border. The average amount per alien paid was $3,800. The money paid to these cartels is used to fund additional illicit and dangerous activities in the United States and Mexico. By deterring smuggling activities, ICE can prevent further funding of these illegal organizations known for their intricate trafficking networks and murders.

16. By reducing the current influx of nationals, including adults with children, from Guatemala, El Salvador, and Honduras, DHS and other law enforcement agencies will be able to cease redirecting resources away from other priorities, such as removing criminal aliens and other individuals who pose a danger to the community.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

August 7, 2014.
Date

Philip T. Miller
Assistant Director, ERO Field Operations
Department of Homeland Security
U.S. Immigration and Customs Enforcement

3

## DECLARATION OF TRACI A. LEMBKE

I, Traci A. Lembke, hereby declare that the following statements are true and correct to the best of my knowledge, information, and belief:

1.  My name is Traci A. Lembke. I am a member of the Senior Executive Service serving as the Assistant Director over Investigative Programs for Homeland Security Investigations (HSI), U.S. Immigration and Customs Enforcement (ICE), in Washington DC. I have held this position since September of 2013. My current work address is: 500 12th Street, SW, Washington, DC. I hold a B.A. degree from the University of Northern Colorado.

2.  I began my federal law enforcement career in 1987 as a Special Agent with the former U.S. Customs Service (USCS) in Denver, Colorado. In 1991, I transferred to the USCS Office in Nogales, Arizona, where I investigated criminal organizations involved with illicit movement of narcotics, prohibited merchandise, firearms and currency into and out of the United States. In 1997, I was transferred to the Tucson, Arizona USCS Office of Internal Affairs (OIA), where I was promoted to the Resident Agent in Charge. In 2001, I was transferred by the USCS to Washington, DC, to join the Headquarters OIA staff, where I became the Director of the Internal Investigations Division.

3.  In 2003, I was named the Unit Chief over Internal Investigations for the newly created ICE Office of Professional Responsibility (OPR). In 2006, I joined the Senior Executive Service and was promoted to Director for ICE OPR. In this capacity, I oversaw all criminal and administrative investigations involving employees of ICE, U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS).

4.  In 2008, I was transferred to ICE's HSI, where I served as the Deputy Assistant Director (DAD) for the Investigative Services Division. I remained in this position until September 2013, when I was promoted to the Assistant Director for all of HSI's Investigative Programs.

5.  My experience as a USCS and HSI Special Agent included planning, directing, managing and coordinating all aspects of complex criminal investigations, to include conducting surveillance, collecting/seizing evidence, interviewing witnesses and suspects, writing reports of investigation, and presenting my cases for federal criminal prosecution.

6.  In my current position as the Assistant Director of HSI's Investigative Programs, I oversee, direct and coordinate over 100 investigative programs within four separate divisions, including the Transnational Crime and Public Safety Division. Within the Transnational Crime and Public Safety Division is the Human Smuggling and Trafficking Unit, which oversees programs designed to identify and disrupt criminal smuggling and trafficking organizations. This unit also assists with prioritizing these investigations according to the degree of risk posed to national security and public safety, and coordinating field office investigations to target human smuggling and trafficking organizations with the goal of eliminating their ability to function.

1

Exhibit 8 - Page 164

7. Congress has charged the Department of Homeland Security (DHS), ICE with securing the borders of the United States. Homeland Security Act of 2002, § 402(2), 116 Stat. 2135, 6 U.S.C. § 202(2) (2014). "Homeland security depends on security along our borders and at ports of entry. At our borders and ports of entry, we must deny entry to terrorists, drug traffickers, human traffickers, transnational criminal organizations, and other threats to national security and public safety while continuing to facilitate legal travel and trade." *Written Testimony of DHS Secretary Jeh Johnson for a Senate Committee on the Judiciary hearing titled "Oversight of the Department of Homeland Security"*, 113th Cong., 2d session (2014) available at http://www.dhs.gov/news/2014/06/11/written-testimony-dhs-secretary-jeh-johnson-senate-committee-judiciary-hearing.

8. ICE defines human smuggling as the "importation of people into the United States involving deliberate evasion of immigration laws." ICE Office of Investigations Memorandum, "Definitions of 'Human Smuggling' and 'Human Trafficking'" (Dec. 13, 2004). Human smuggling is traditionally motivated by a variety of reasons, including profit and family interest. The statutes governing this offense are contained within Title 8 U.S.C. Section 1324.

9. Although recent media reports emphasize the significant increases in unaccompanied children and family units encountered by immigration authorities along the Southwest border, the category of individual most frequently encountered illegally crossing the border is by far adults without children. *See* Customs and Border Protection, Southwest Border Unaccompanied Alien Children, *available at* http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children (reflecting that over 278,000 of the approximately 381,000 aliens CBP encountered in FY14 through June 2014 were neither unaccompanied children nor family units). In addition, the number of adults without children who illegally entered the United States increased from the last fiscal year. In FY13, CBP encountered approximately 278,000 adults without children at the Southwest border. In FY14 through June 2014, CBP already had encountered over 278,000 adults without children.

10. On May 12, 2014, Secretary Johnson declared a Level IV condition of readiness within DHS, a determination that CBP's and ICE's ability to deal with the situation was at full capacity and that drawing upon additional resources across all of DHS was needed. He appointed Ronald Vitiello, Deputy Chief of the U.S. Border Patrol, to coordinate this effort within DHS. *See Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border: Hearing Before the H. Comm. on Homeland Security*, 113th Cong., 2d session (2014) (testimony of Jeh Johnson, Secretary of DHS) available at http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security.

11. As the lead U.S. government agency for the investigation of human smuggling, ICE HSI initiates over 2,500 human smuggling and trafficking investigations annually. These criminal investigations have disclosed that human smuggling organizations (HSO) operating primarily in foreign countries and utilizing international confederates unlawfully

2

Exhibit 8 - Page 165

move individuals across international borders, regardless of whether these individuals pose potential national security or public safety threats. HSI's human smuggling initiative is focused on identifying, disrupting and dismantling human smuggling and the criminal infrastructure that supports it, as well as associated criminal organizations. HSI is uniquely positioned, through its investigative capabilities, to affect this issue by disrupting the criminal organizations.

12. Human smuggling poses a serious threat to our nation's security. HSOs usually attempt to turn a quick and significant profit and continue moving undocumented aliens across our borders. In severe cases, HSOs hold their human cargo hostage and demand more money from family members as a means to extort higher fees. HSOs arrange for their human cargo to be taken to drop-houses often under unsafe conditions with no way to communicate with relatives or to notify authorities if there is an emergency. Some smuggled aliens have been beaten or raped. For example, in a federal prosecution last month in Texas, "the conspirators seized the smuggled aliens' clothes, shoes, phones and other possessions. The conspirators used guns, paddles, tasers and other equipment to control and prevent the illegal aliens from escaping the stash house. They guarded the aliens with guns displayed in plain view and threatened to kill them by shooting them in the back of the head if they tried to escape." *See 3 Mexican Nationals Sentenced to More Than 9 Years in Federal for Their Roles Involving 115 Smuggled Aliens Discovered in Houston Stash House*, ICE News Release, Jul. 30, 2014, available at http://www.ice.gov/news/releases/1407/140730houston.htm.

13. HSOs often transport their human cargo — men, women and children — through desolate terrain, without food or water. They may also be placed into trucks or trailers without any ventilation. In Texas, 19 people, including a seven-year-old boy, died inside an airless trailer truck that was used to smuggle them from Mexico, El Salvador and Guatemala. *See Another Defendant Involved in May 2003 Smuggling Tragedy in Victoria, Texas, Sentenced to Prison*, USAO, SD TX Press Release, Nov. 9, 2009, available at http://www.justice.gov/usao/txs/1News/Archives/Archived%20Releases/2009%20November/110909Flores.htm.

14. Unauthorized mass migrations may be triggered by a multitude of factors, including violence in the country of origin. *Department of Homeland Security's 2014 Quadrennial Homeland Security Review*, p.26 (Jun. 18, 2014) (hereinafter DHS Quadrennial Review). Annual surveys of people in Central American countries show that one key factor that influences the decision whether to migrate is the existence of an "active migration network," i.e. friends or family who previously migrated and are living in the United States. *See Americas Barometer Insights: 2014, Violence and Migration in Central America*, Latin American Public Opinion Project, Vanderbilt University, No. 101 (2014) [hereinafter Americas Barometer Insights].[1]

---

[1] The work of the Latin American Public Opinion Project (LAPOP) is made possible through partnership with U.S. Agency for International Development. *See* http://www.vanderbilt.edu/lapop/sustaining-donors.php. LAPOP describes itself as "the premier academic institution carrying out surveys of public opinion in the Americas, with over thirty years of experience." *See* http://www.vanderbilt.edu/lapop/.

3

Exhibit 8 - Page 166

15. "Violent extremists and criminals can hide within this larger flow of migrants who intend no harm." DHS Quadrennial Review, p.26. For example, a man wanted in El Salvador for kidnapping was arrested by CBP in October 2013 while illegally entering the United States near Penitas, TX, in the Rio Grande Valley. *See* ICE Deports Salvadoran Man Suspected of Kidnapping in His Home Country, ICE News Release, Apr. 9, 2014, available at http://www.ice.gov/news/releases/1404/140409sanantonio.htm.

16. Transnational criminal organizations are expanding in strength and scope and may often engage in human smuggling in conjunction with other criminal activities. *See* DHS Quadrennial Review, p.26. For example, on July 17, 2014, HSI Del Rio special agents arrested a previously convicted cocaine smuggler and the leader of an illegal immigrant smuggling organization known for smuggling more than 400 undocumented immigrants into the United States since January 2013. *See* Secretary Johnson Announces 192 Criminal Arrests in Ongoing ICE Operation to Crack Down on Human Smuggling to the Rio Grande Valley, ICE News Release, Jul. 30, 2014, available at http://www.ice.gov/news/releases/1407/140722washingtondcb.htm.

17. Based on the DHS Immigration Statistics Yearbook for 2012, DHS apprehended individuals from over 160 different countries. On the Southwest border the majority have come from Mexico and Central America.

18. In many instances, illegal migrants arrive without any reliable identification documents or they present a fraudulent identity. In FY 2013 CBP encountered approximately 17,366 fraudulent documents at our Ports of Entry.

19. According to debriefings of detainees who have been part of the ongoing mass migration at the Southwest border, the high probability of a prompt release, coupled with the likelihood of low bond, is among the reasons they are coming to the United States. Illegal migrants to the United States who are released on a minimal bond become part of "active migration networks," *see* Americas Barometer Insights, which in turn likely encourages further illegal migration into the United States.

20. Combatting illegal migration and human smuggling requires significant HSI resources which necessarily must be diverted from other investigative priorities. Such a diversion of resources disrupts our ability to deal with other threats to public safety, including criminal activity related to illicit trade, travel and finance. Implementing a "no bond" or "high bond" policy would help alleviate these disruptions by deterring further mass migration.

4

Exhibit 8 - Page 167

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Aug 7th 2014
Date

Traci A. Lembke
Assistant Director Investigative Programs
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
Department of Homeland Security

5

Exhibit 8 - Page 168

Official website of the Department of Homeland Security

# Homeland Security

Home

Topics

How Do I?

Get Involved

News

About DHS

Home   News   Written testimony of DHS Secretary Jeh Johnson for a House Committee on Homeland Security hearing titled "Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border"

### News

Blog

Data

Fact Sheets

Multimedia

Press Releases

Comunicados de Prensa

Publications

Speeches

Testimony

Media Contacts

Social Media

# Written testimony of DHS Secretary Jeh Johnson for a House Committee on Homeland Security hearing titled "Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border"

Release Date: June 24, 2014

311 Cannon House Office Building

Chairman McCaul, Ranking Member Thompson, and Members of the Committee:

Thank you for the opportunity to testify today about our efforts to address the recent rise of unaccompanied children and others crossing our border in the Rio Grande Valley (RGV). With me today to answer questions are Craig Fugate, the Administrator of FEMA, and Ron Vitiello, Deputy Chief of the U.S. Border Patrol.

To be clear, we face an urgent situation in the RGV. Last fiscal year, CBP apprehended more than 24,000 unaccompanied children at the border. By mid-June of this fiscal year, that number has doubled to more than 52,000. Those from Guatemala, El Salvador, and Honduras make up about three quarters of that migration.

On Friday, I traveled to South Texas for the fourth time in six months in office, this time to lead an interagency team to oversee our efforts there. While there we met with officials at McAllen and Lackland to review the situation and hear directly from those on the ground what their needs are. While there I spent time talking with the children again. It was a vivid reminder that this is a humanitarian issue as much as it is a matter of border security. We are talking about large numbers of children, without their parents, who have arrived at our border—hungry, thirsty, exhausted, scared and vulnerable. How we treat the children, in particular, is a reflection of our laws and our values.

Therefore, to address this situation, our strategy is three-fold: (1) process the increased tide of unaccompanied children through the system as quickly as possible; (2) stem the increased tide of illegal migration into the RGV; and (3) do these things in a manner consistent with our laws and values as Americans.

-9-

Written testimony of DHS Secretary Jeh Johnson for a House Committee on Homeland Security hearing ...   Page 2 of 5
Case 2:85-cv-04544-DMG-AGR   Document 101-3   Filed 02/02/15   Page 20 of 70   Page ID
#:1076

So, here is what we are doing:

*First*, on May 12th, I declared a Level IV condition of readiness within DHS, which is a determination that the capacity of CBP and ICE to deal with the situation is full and we need to draw upon additional resources across all of DHS. I appointed Deputy Chief Vitiello to coordinate this effort within DHS.

*Second*, on June 1st, President Obama, consistent with the Homeland Security Act, directed me to establish a Unified Coordination Group to bring to bear the assets of the entire federal government on the situation. This Group includes DHS and all of its components, the Departments of Health and Human Services, Defense, Justice, State, and the General Services Administration. I, in turn, designated FEMA Administrator Fugate to serve as the Federal Coordinating Official for the U.S. Government-wide response. Under Administrator Fugate's supervision, there are now more than 140 interagency personnel and members stationed in FEMA's National Response Coordination Center dedicated to this effort.

*Third*, we have established added capacity to deal with the processing and housing of the children, we are creating additional capacity in places, and we are considering others. To process the increased numbers of unaccompanied children in Texas, DHS has had to bring the children to our processing center at Nogales, Arizona before they are sent to HHS. We are arranging additional processing centers to handle the rise in the RGV. Meanwhile, the Department of Defense has provided space at Lackland air base in Texas for HHS to house the children before HHS can place them. DoD is also providing facilities at Fort Sill, Oklahoma and Ventura, California for the same purpose. FEMA, DHS, and HHS are working to continue to identify additional facilities for DHS and HHS to house and process the influx of children.

*Fourth*, DHS and HHS are increasing Spanish-speaking case management staff, increasing staff handling incoming calls from parents or guardians, raising awareness of the Parent Hotline provided by FEMA and operated by HHS, surging staff to manage the intake of CBP referrals to track shelter bed capacity, and facilitate shelter designations. We are developing ways to expedite background checks for sponsors of children, integrate CBP and HHS information sharing systems, and increase capacity to transport and place children. (Here I must note, from personal observation, that our Border Patrol and other CBP personnel, as well as personnel from HHS, ICE, FEMA, and the Coast Guard, are doing a remarkable job in difficult circumstances. I have also witnessed how the not-for-profit Baptist Child Family Services stepped in quickly and is also doing a remarkable job housing the unaccompanied children at Lackland, identifying and then placing them consistent with HHS's legal obligations. All of these dedicated men and women deserve our recognition, support and gratitude.)

*Fifth*, DHS is building additional detention capacity for adults who cross the border illegally in the RGV with their children. For this purpose DHS is establishing a temporary facility for adults with children on the Federal Law Enforcement Training Center's campus at Artesia, New Mexico. The establishment of this temporary facility will help CBP process those encountered at the border and allow ICE to increase its capacity to house and expedite the removal of adults with children in a manner that complies with federal law. Artesia is one of several facilities that DHS is considering to increase our capacity to hold and expedite the removal of the increasing number of adults with children illegally crossing the southwest border. DHS will ensure that after apprehension, families are housed in facilities that adequately provide for their safety, security, and medical needs. Meanwhile, we will also expand use of the Alternatives to Detention program to utilize all mechanisms for enforcement and removal in the RGV Sector. DOJ is temporarily reassigning immigration judges to handle the additional caseload via video teleconferencing. These immigration judges will adjudicate these cases as quickly as possible, consistent with all existing legal and procedural standards, including those for asylum applicants. Overall, this increased capacity and resources will allow ICE to return unlawful migrants from Central America to their home countries more quickly.

*Sixth*, DHS has brought on more transportation assets to assist in the effort. The Coast Guard is loaning air assets to help transport the children. ICE is leasing additional charter aircraft.

*Seventh*, throughout the RGV Sector, we are conducting public health screening for all those who come into our facilities for any symptoms of contagious diseases or other possible public health concerns. Both DHS and HHS are ensuring that the children's nutritional and hygienic needs are met while in our custody; that children are provided regular meals and access to drinks and snacks throughout the day; that they receive constant supervision; and that children who exhibit signs of illness or disease are given proper medical care. We have also made clear that all individuals will be treated with dignity and respect, and any instances of mistreatment reported to us will be investigated.

*Eighth*, working through FEMA's National Response Coordination Center, we are coordinating with voluntary and faith-based organizations to help us manage the influx of unaccompanied children crossing the border. The American Red Cross is providing blankets and other supplies and, through their Restoring Family Links program, is coordinating calls between children in the care of DHS and families anxious about their well-being.

*Ninth*, to stem the tide of children seeking to enter the United States, we have also been in contact with senior government officials of Guatemala, El Salvador, Honduras, and Mexico to address our shared border security interests, the underlying conditions in Central America that are promoting the mass exodus, and how we can work together to assure faster, secure removal and repatriation. Last week President Obama spoke with Mexican President Peña Nieto about the situation, as has Secretary Kerry. This past Friday, Vice President Biden also visited Guatemala to meet with regional leaders to address the influx of unaccompanied children and families from Central America and the underlying security and economic issues that are causing this migration. The Vice President announced that the U.S. will be providing a range of new assistance to the region, including $9.6 million in additional funding for Central American governments to receive and reintegrate their repatriated citizens, and a new $40 million U.S. Agency for International Development program in Guatemala over 5 years to improve citizen security. An additional $161.5 million will be provided this year under the Central American Regional Security Initiative to further enable Central American countries to respond to the region's most pressing security and governance challenges. I will travel to

Exhibit 8    Page 170

Case 2:85-cv-04544-DMG-AGR    Document 191-3    Filed 02/02/15    Page 21 of 70   Page ID #:1077

Guatemala on July 8-9. The government of El Salvador has sent additional personnel from its consulate in the U.S. to South Texas to help expedite repatriation to its country.

*Tenth,* DHS, together with DOJ, has added personnel and resources to the investigation, prosecution and dismantling of the smuggling organizations that are facilitating border crossings into the RGV. Homeland Security Investigations, which is part of ICE, is surging 60 additional criminal investigators and support personnel to their San Antonio and Houston offices for this purpose. In May, ICE concluded a month-long, targeted enforcement operation that focused on the logistics networks of human smuggling organizations along the southwest border, with operations in El Paso, Houston, Phoenix, San Antonio, and San Diego that resulted in 163 arrests of smugglers. ICE will continue to vigorously pursue and dismantle these alien smuggling organizations by all investigative means to include the financial structure of these criminal organizations. These organizations not only facilitate illegal migration across our border, they traumatize and exploit the children who are objects of their smuggling operation. We will also continue to work with our partners in Central America and Mexico to help locate, disrupt, and dismantle transnational criminal smuggling networks.

*Eleventh,* we are initiating and intensifying our public affairs campaigns in Spanish, with radio, print, and TV spots, to communicate the dangers of sending unaccompanied children on the long journey from Central America to the United States, and the dangers of putting children into the hands of criminal smuggling organizations.

In collaboration with DHS, the Department of State has launched public awareness campaigns in El Salvador, Guatemala, and Honduras, to warn families about the dangers encountered by unaccompanied minors who attempt to travel from Central America to the U.S., and to counter misperceptions that smugglers may be disseminating about immigration benefits in the United States. Our embassies in Central America have collaborated with CBP to ensure both the language and images of the campaign materials would resonate with local audiences. I have personally issued an open letter (see attached) to the parents of those who are sending their children from Central America to the U.S., to be distributed broadly in Spanish and English, to highlight the dangers of the journey, and to emphasize there are no free passes or "permisos" at the other end. We are stressing that Deferred Action for Childhood Arrivals, or "DACA," does not apply to children who arrive now or in the future in the United States, and that, to be considered for DACA, individuals must have continually resided in the U.S. since June 2007. We are making clear that the "earned path to citizenship" contemplated by the Senate bill passed last year will not apply to individuals who cross the border now or in the future; only to those who have been in the country for the last year and a half.

*Twelfth,* given the influx of unaccompanied children in the RGV, we have increased CBP staffing and detailed 115 additional experienced agents from less active sectors to augment operations there. I am considering sending 150 more border patrol agents based on my review of operations there this past week. These additional agents allow RGV the flexibility needed to achieve more interdiction effectiveness and increase CBP's operational footprint in targeted zones within its area of operations.

*Thirteenth,* in early May I directed the development of a Southern Border and Approaches Campaign Planning effort that is putting together a strategic framework to further enhance security of our southern border. Plan development will be guided by specific outcomes and quantifiable targets for border security and will address improved information sharing, continued enhancement and integration of sensors, and unified command and control structures as appropriate. The overall planning effort will also include a subset of campaign plans focused on addressing challenges within specific geographic areas, all with the goal of enhancing our border security.

Finally, we will continue to work closely with Congress on this problem, and keep you informed. DHS is updating Members and staff on the situation in conference calls two times a week, and we are facilitating site visits to Border Patrol facilities in Texas and Arizona for a number of Members and their staff.

I have directed my staff to be forthright in bringing to me every conceivable, lawful option for consideration, to address this problem. In cooperation with the other agencies of our government that are dedicating resources to the effort, with the support of Congress, and in cooperation with the governments of Mexico and Central America, I believe we will stem this tide. Thank you.

## An open letter to the parents of children crossing our Southwest border

This year, a record number of children will cross our Southern border illegally into the United States. In the month of May alone, the number of children, unaccompanied by a mother or father, who crossed our southern border reached more than 9,000, bringing the total so far this year to 47,000. The majority of these children come from Honduras, El Salvador and Guatemala, where gang and drug violence terrorize communities. To the parents of these children I have one simple message: Sending your child to travel illegally into the United States is not the solution.

It is dangerous to send a child on the long journey from Central America to the United States. The criminal smuggling networks that you pay to deliver your child to the United [    ]  have no regard for his or her

Exhibit 8 - Page 171

safety and well-being – to them, your child is a commodity to be exchanged for a payment. In the hands of smugglers, many children are traumatized and psychologically abused by their journey, or worse, beaten, starved, sexually assaulted or sold into the sex trade; they are exposed to psychological abuse at the hands of criminals. Conditions for an attempt to cross our southern border illegally will become much worse as it gets hotter in July and August.

The long journey is not only dangerous; there are no "permisos," "permits," or free passes at the end.

The U.S. Government's Deferred Action for Childhood Arrivals program, also called "DACA," does not apply to a child who crosses the U.S. border illegally today, tomorrow or yesterday. To be eligible for DACA, a child must have been in the United States prior to June 15, 2007 – seven years ago.

Also, the immigration reform legislation now before Congress provides for an earned path to citizenship, but only for certain people who came into this country on or before December 31, 2011 – two and one half years ago. So, let me be clear: There is no path to deferred action or citizenship, or one being contemplated by Congress, for a child who crosses our border illegally today.

Rather, under current U.S. laws and policies, anyone who is apprehended crossing our border illegally is a priority for deportation, regardless of age. That means that if your child is caught crossing the border illegally, he or she will be charged with violating United States immigration laws, and placed in deportation proceedings – a situation no one wants. The document issued to your child is not a "permiso," but a Notice To Appear in a deportation proceeding before an immigration judge.

As the Secretary of Homeland Security, I have seen first-hand the children at our processing center in Texas. As a father, I have looked into the faces of these children and recognized fear and vulnerability.

The desire to see a child have a better life in the United States is understandable. But, the risks of illegal migration by an unaccompanied child to achieve that dream are far too great, and the "permisos" do not exist.

Jeh C. Johnson
Secretary of the U.S. Department of Homeland Security

*Review Date: June 24, 2014*

Topics

Border Security
Citizenship and Immigration Services
Civil Rights and Civil Liberties
Cybersecurity
Disasters
Economic Security
Homeland Security Enterprise
Homeland Security Jobs
Human Trafficking
Immigration and Enforcement
International Engagement
Law Enforcement Partnerships
Preventing Terrorism
Transportation Security
Get Involved
Blue Campaign
Citizen Corps
If You See Something Say Something
Ready.gov
How Do I?
For the Public
For Businesses
For Travelers
At DHS
By Alphabet
News

Blog
Comunicado de Prensa
Data
Events
Fact Sheets
Media Contacts
Multimedia
Press Releases
Publications
Social Media
Speeches
Testimony

About DHS
The Secretary
Budget & Performance
Careers
Contact Us
Doing Business with DHS
History
Laws & Regulations
Mission
Organization

Site Links
Contact Us
DHS Component Websites
En Español
FOIA
Inspector General
Metrics
Notices
Plain Writing at DHS
Plug-ins
Privacy Policy
No Fear Act
Site Map
The White House
USA.gov
GobiernoUSA.gov

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your browser. LEARN
MORE »

CALVARY
NOW PLAYING

**The New York Times**   http://nyti.ms/1m3zSQK

U.S.  |  NYT NOW

# U.S. Moves to Stop Surge in Illegal Immigration

By JULIA PRESTON and RANDAL C. ARCHIBOLD    JUNE 20, 2014

McALLEN, Tex. — White House officials, saying that misinformation about administration policies helped drive a surge of illegal migrants from Central America across the South Texas border, on Friday announced plans to detain more of them and to accelerate their court cases so as to deport them more quickly.

In tandem with those measures, Vice President Joseph R. Biden Jr. met in Guatemala on Friday with senior leaders of the three countries where most of the migrants come from — El Salvador, Guatemala and Honduras — to secure their help in conveying the message that there are no new legal channels to come to the United States and that those crossing illegally will be deported.

Department of Homeland Security officials are rushing to open more detention centers intended for families with children caught coming illegally to this country and will also expand the use of monitoring devices, such as electronic ankle bracelets, to keep track of migrants after they are released, the officials said.

Immigration officers and judges will be reassigned on an emergency basis to speed cases in the Rio Grande Valley of Texas, where most of the migrants are entering illegally.

The administration is trying to quell rampant rumors reaching Central America that American border authorities are offering entry permits to parents traveling with young children after they are caught. Officials hope that by increasing the numbers of migrants who are detained and then deported, others considering the trek will be dissuaded from doing so.

Mr. Biden announced $255 million for Central America to assist repatriation programs for deportees, improve prosecution of criminal street gang members, and expand youth programs to reduce gang recruitment.

Until now, White House officials have insisted that extreme poverty and an epidemic of gang violence in those Central American countries were the main causes of the unanticipated spike in illegal migration.

But many migrants told Border Patrol agents they decided to set out for the United States after hearing that it was offering some kind of entry permit. Many other migrants who asked for asylum after being apprehended have been allowed to stay temporarily, further fueling hopes that Central American women and children were receiving special treatment.

On a conference call with reporters, Cecilia Muñoz, director of the White House Domestic Policy Council, said the administration was moving to "push back" on "misinformation that is being deliberately planted by criminal organizations, by smuggling networks, about what people can expect if they come to the United States."

In Guatemala, Mr. Biden met with that country's president, Otto Pérez Molina; the president of El Salvador, Salvador Sánchez Cerén; and senior officials from Honduras and Mexico. But Mr. Biden got a taste of the disconnect the United States often has with regional leaders, who fault the failure of American immigration policy for driving children to join their parents in the United States no matter the cost. In his public remarks, Mr. Pérez Molina, while recognizing that the American Congress has to act, reiterated a request for a temporary worker program and a way for Guatemalans living in the United States illegally to be able to stay.

Mr. Biden ignored those points in his comments and emphasized the social causes of the migration.

"The United States recognizes that a key part of the solution to this problem is to address the root causes of this immigration in the first place," he said, turning to address Mr. Pérez Molina directly several times. "Especially poverty, insecurity and the lack of the rule of law, so the people can stay and thrive in their own communities, so a parent doesn't feel so desperate that they put their child in the hands of a criminal network and say take him, and take her to the United States."

-15-

U.S. Moves to Stop Surge in Illegal Immigration - NY Times.com    Page 3 of 4
Case 2:85-cv-04544-DMG-AGR   Document 101-3   Filed 02/02/15   Page 26 of 70   Page ID
#:1082

The Honduran president, Juan Orlando Hernández, sent a top aide to the meeting but skipped it himself in order to watch Honduras play in the World Cup in Brazil. Tension with Honduras has been growing over public complaints by Mr. Hernández regarding what he sees as a lack of American will to help stem the violence from a drug war he believes American consumption habits have caused.

Mr. Hernández's absence drew an unusually blunt rebuke from the American ambassador on a Honduran radio program. "I know he is in Brazil, and today there is a very important game, but the country has priorities for which the top leader should be present," said the ambassador, Lisa J. Kubiske.

The new American funding includes $40 million over five years for Guatemala to improve neighborhood security programs, $25 million over five years for El Salvador to open 77 youth centers offering alternatives to joining gangs for teenagers and $18.5 million for Honduras for police training.

Since 2008, the administration has designated $642 million for anticrime aid to the region, but congressional watchdogs have complained that a lack of transparency on the spending has made measuring results difficult.

In Washington, the House speaker, John A. Boehner, Republican of Ohio, sent a letter to President Obama on Friday urging him to send the National Guard to reinforce the Southwest border and help protect migrant children, saying their safety was "a matter of paramount importance."

Mr. Boehner blamed the administration for the surge. "The policies of your administration have directly resulted in the belief by these immigrants that once they reach U.S. soil, they will be able to stay here indefinitely," he wrote.

The sharp increase of illegal migrants includes more than 52,000 minors caught at the border since October without their parents. Mr. Obama, saying the surge is a humanitarian crisis, has ordered the Federal Emergency Management Agency to coordinate an effort to maintain detention shelters for them and help reunite them with relatives in this country.

Border authorities have also apprehended more than 39,000 adults with children since October, a record number.

Since there are no detention facilities for families in the Rio Grande Valley, the Border Patrol has been releasing them without bond, giving them only an order to appear in immigration court for deportation hearings and allowing them to travel to relatives living in the United States.

Migrants have been confusing the notice to appear in court — the immigration equivalent of an indictment — with a permit to stay and have sent word to Central America that they received permits to remain here, prompting more to embark on the journey across Mexico.

Officials said they would open more detention centers as soon as they could find buildings that met federal requirements for detaining children.

The administration is also sending more immigration officers who specialize in asylum cases to the Rio Grande Valley to make quicker initial determinations on whether migrants are fleeing persecution and might be eligible for protection here. Immigration judges will be reassigned on an emergency basis to hear asylum petitions and other cases of migrants in detention, Justice Department officials said.

### Correction: June 20, 2014

*An earlier version of this article misstated the location of the Department of Homeland Security's immigration detention facility for families with children. It is in Berks County, Pa., not Bucks, Pa.*

### Correction: June 25, 2014

*Because of an editing error, a picture caption on Saturday with an article about new efforts by the White House to curb illegal immigration rendered incompletely, in some editions, the name of a 7-year-old Honduran boy at a shelter in Texas. He is Yorfrin Daniel Cruz, not Daniel Cruz.*

Julia Preston reported from McAllen, and Randal C. Archibold from Mexico City. Benjamin Patrick Reeves contributed reporting from Guatemala City.

A version of this article appears in print on June 21, 2014, on page A12 of the New York edition with the headline: U.S. Moves to Stop Surge in Illegal Immigration.

© 2014 The New York Times Company

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your bro



**MORE »**

𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘    http://nyti.ms/1jNyRa6

POLITICS  |  NYT NOW

# New U.S. Effort to Aid Unaccompanied Child Migrants

**By JULIA PRESTON**    JUNE 2, 2014

Saying the surge in unaccompanied children crossing the South Texas border illegally had created a humanitarian crisis, President Obama on Monday ordered federal emergency authorities to take charge of the relief effort as immigration officials opened a second shelter for the youths in a military facility.

Mr. Obama ordered the administrator of the Federal Emergency Management Agency, Craig Fugate, to coordinate a response involving several federal agencies as well as state and local governments.

Officials said the youths would begin to be transferred on Friday from holding cells along the border to the new shelter at Naval Base Ventura County in Oxnard, Calif., which will house up to 600 children.

Last month the border authorities, overwhelmed by the numbers of unaccompanied young people crossing the border illegally, began sending them to a special shelter at Lackland Air Force Base in San Antonio. The shelter, set up by the Department of Health and Human Services, can handle up to 1,200 minors, federal officials said, and has already received 1,000.

Administration officials said 47,017 children traveling without parents had been caught crossing the southwest border since Oct. 1, a 92 percent increase over the same period in 2013. Most are coming from three Central American countries: El Salvador, Guatemala and Honduras. More than 33,000 minors were apprehended in the Rio Grande Valley of Texas.

The emergency effort, the officials said, would focus on providing the youths
with adequate housing, food, medical care and some education while they were in
federal custody.

"These are children who have gone through a harrowing experience," Cecilia
Muñoz, the White House director of domestic policy, said Monday. "We are talking
about making sure from the moment they encounter the government of the United
States that they are properly taken care of."

She said border agents had recently seen a spike in the numbers of girls and of
children under 13 years old — including some barely old enough to walk.

The surge was driven primarily by conditions in Central America, she said,
including deepening poverty and "an increase in sustained violence," and by many
youths' desires to reunite with parents in the United States.

"The push factors seem to be the greatest factors driving this migration," Ms.
Muñoz said.

By law, border agents can hold unaccompanied children for no more than 72
hours before they must be turned over to a refugee agency within the Department
of Health and Human Services, which administers the shelters. Refugee officials
are required to search the United States to find parents, relatives or other adults
who could receive the children.

The youths are placed in deportation proceedings when they are caught, and
their relatives in the United States are responsible for their care while their cases
move through the immigration courts, a process than can take years before any
resolution. If no relative can be found, the children remain in long-term federal
care until their deportation case is completed. Under current laws, only a minority
of the unaccompanied children are likely to be allowed to remain in the United
States permanently.

Alejandro Mayorkas, the deputy secretary of Homeland Security, said
immigration enforcement agents also would work to disrupt criminal smuggling
networks that have seized control of the traffic of children through Mexico to the
United States. He said his agency was working with governments in Mexico and
Central America to broadcast public service messages warning of the dangers of
the journey to the American border.

Republican leaders in Congress said that weak border enforcement by the
administration had caused the surge in young immigrants.

-19-

Representative Robert W. Goodlatte, Republican of Virginia and chairman of the House Judiciary Committee, called the increase "an administration-made disaster."

"And now President Obama is calling in FEMA to mitigate the damage," he said. "Word has gotten out around the world about President Obama's lax immigration enforcement policies, and it has encouraged more individuals to come to the United States illegally, many of whom are children from Central America."

Catholic bishops joined many immigrant advocates who welcomed the president's move.

"This is a humanitarian crisis born out of the growing violence in Central America," said Bishop Eusebio Elizondo of Seattle, chairman of the migration committee of the United States Conference of Catholic Bishops. "These children are refugees who deserve the protection of our nation. They should not be viewed as lawbreakers."

A version of this article appears in print on June 3, 2014, on page A14 of the New York edition with the headline: New U.S. Effort to Aid Unaccompanied Child Migrants.

© 2014 The New York Times Company

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your browser. **LEARN MORE »**

**The New York Times**   http://nyti.ms/1mvvyK2

U.S.  |  NYT NOW

# Obama Asks for $3.7 Billion to Aid Border

By MICHAEL D. SHEAR and JEREMY W. PETERS   JULY 8, 2014

WASHINGTON — President Obama urged Congress on Tuesday to quickly provide almost $4 billion to confront a surge of young migrants from Central America crossing the border into Texas, calling it "an urgent humanitarian situation."

But the request quickly became entangled in the fierce political debate over immigration: Republicans said they were wary of Mr. Obama's request and could not immediately support it, given what they called his administration's failure to secure the Mexican border after years of illegal crossings. Mr. Obama could face resistance from members of his own party as well.

The president said he needed the money to set up new detention facilities, conduct more aerial surveillance and hire immigration judges and Border Patrol agents to respond to the flood of 52,000 children. Their sudden mass migration has overwhelmed local resources and touched off protests from residents angry about the impact on the local economy. In a letter to congressional leaders, Mr. Obama urged them to "act expeditiously" on his request.

Republican lawmakers who have long demanded tougher enforcement of immigration laws along the border expressed cautious support on Tuesday for beefing up the federal presence in the Rio Grande Valley, where most of the children have been crossing into the United States.

But many Republicans, especially in the House, remain deeply suspicious of the president's commitment, a mistrust that led to a stalemate on a broader

immigration overhaul and now threatens to at least delay speedy passage of Mr. Obama's $3.7 billion spending request.

"Let's remember, this administration went around for years saying the border has never been more secure than it is now," said Senator Marco Rubio of Florida, a potential Republican presidential candidate in 2016. "I think that's been exposed as a fallacy over the last three weeks."

Speaker John A. Boehner said the president's plan failed to deploy the National Guard, an idea the White House said would not be effective. And Representative John Carter of Texas said he was wary of any measure that gave Mr. Obama too much autonomy.

"The president caused this self-inflicted crisis on the border by refusing to enforce the law," said Mr. Carter, a senior member of the House Appropriations Committee, which is likely to be asked to approve the request. "And now he is requesting a $3.7 billion bailout from the taxpayers to rectify his mistakes."

Some Democrats, like Senator Robert Menendez of New Jersey, have expressed strong misgivings about any plan that would allow for unaccompanied children to be sent back home to dangerous situations.

The charged politics will shadow a long-planned trip that Mr. Obama began on Tuesday and will include a two-day stop in Texas. The trip will emphasize the difficulties for the White House on immigration. The president is calling for immediate action on the border even as he remains under pressure by activists to relax deportations.

After insisting that Mr. Obama had no plans to visit the Texas-Mexico border, White House officials said he would meet with Gov. Rick Perry.

Mr. Perry, who is considering a second run for the Republican presidential nomination, had declined to participate in a photo opportunity with Mr. Obama in front of Air Force One, prompting a last-minute offer by the White House for the two to meet.

A Perry spokesman said they would meet privately and attend a round-table discussion with faith leaders and local officials.

The president's funding request is certain to revive legislative passions that prompted Mr. Obama to promise sweeping executive actions to get around Republican opposition to a bill that would provide a path to citizenship for 11 million immigrants in the country illegally. Republicans in both chambers hinted

Case 8:14-cv-04641-JDW Document Brooklyn - NYTimes.com Filed 02/02/15 Page 33 of 70 PageID Page 3 of 4
#:1089

Tuesday that they might insist on corresponding spending cuts or make other demands that Mr. Obama and his allies are likely to oppose.

Senator John Cornyn of Texas, the chamber's No. 2 Republican, said that Mr. Obama's request lacked the substantive policy changes needed to deal with issues like detaining those who cross the border illegally and ensuring that they show up for court dates once they are apprehended.

"Apparently the president has given up on any effort to effect the kind of reforms that he knows and his administration knows are necessary," Mr. Cornyn said.

White House officials said the president was not backing away from a request last week for more flexibility in how enforcement agents treat the Central American migrants who are surging across the border. A 2008 law aimed at combating human trafficking requires officials to provide extra legal protections for migrants from countries that do not share a border with the United States.

Those protections are not provided to Mexicans, who are often quickly returned home after being caught trying to enter the United States illegally. White House officials said they would like Congress to allow officials to process migrants from places like Honduras and Guatemala as quickly as Mexicans. One White House official said the administration was seeking to have "one approach to children coming from the region."

Officials pressed members of Congress on Tuesday to consider the funding request separately from the changes in legal authority. But some lawmakers suggested that they wanted to deal with both issues together. The resulting clash could end up as a replay of the gridlock that prevented the bipartisan immigration bill that passed the Senate in 2013 from being considered in the House.

Senator John McCain, Republican of Arizona, said that Congress needed to repeal the 2008 human trafficking law. "The message has to be, 'If you cross our border illegally, you will be returned immediately,'" he said.

Others have called for an even more aggressive deportation plan than the president's.

Senator Jeff Flake, Republican of Arizona, said the Department of Health and Human Services, which takes in many of the unaccompanied children, needed to be cut out of the process so that law enforcement officials could ship them home more quickly.

Exhibit 8 - Page 183

Mr. Cornyn said Congress should look at allowing the United States armed forces to stop drug and human trafficking.

An email to supporters from Heritage Action for America, a political arm of the conservative Heritage Foundation, signaled the kind of difficulty that Mr. Obama's request might face from Tea Party conservatives. The group called it "a nonstarter because it seeks to address the symptoms, not the cause."

### Correction: July 10, 2014

*An article on Wednesday about President Obama's asking Congress to provide $3.7 billion to confront a surge of young immigrants from Central America referred incorrectly to Heritage Action for America. It is a nonprofit group organized under Section 501(c)(4) of the tax code; it is not a political action committee.*

Carl Hulse contributed reporting.

A version of this article appears in print on July 9, 2014, on page A1 of the New York edition with the headline: Obama Asks for $3.7 Billion to Aid Border.

© 2014 The New York Times Company

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your bro

MICHAEL KEATON

**MORE »**

**The New York Times**    http://nyti.ms/1eT2TNS

N.Y. / REGION    |    NYT NOW

# A 12-Year-Old's Trek of Despair Ends in a Noose at the Border

APRIL 19, 2014

About New York

### By JIM DWYER

Noemi Álvarez Quillay took the first steps of the 6,500-mile journey to New York City from the southern highlands of Ecuador on Tuesday, Feb. 4, after darkness fell.

A bashful, studious girl, Noemi walked 10 minutes across dirt roads that cut through corn and potato fields, reaching the highway to Quito. She carried a small suitcase. Her grandfather Cipriano Quillay flagged down a bus and watched her board. She was 12.

From that moment, and through the remaining five weeks of her life, Noemi was in the company of strangers, including coyotes — human smugglers, hired by her parents in the Bronx to bring her to them. Her parents had come to the United States illegally and settled in New York when Noemi was a toddler.

Noemi was part of a human flood tide that has swelled since 2011: The United States resettlement agency expects to care for nine times as many unaccompanied migrant children in 2014 as it did three years ago.

For these children wandering thousands of miles, it is a grueling journey, filled with dangers. The vast majority come from Central America. Noemi's trip

was about twice as long. She had already tried once, leaving home last May, but was detained long before she even made it halfway.

"I went with a coyote and spent two months in Nicaragua and came back from there," she wrote in a school information sheet.

She got a little closer this year. In March, a month after she left home, the police picked up Noemi and a coyote in Ciudad Juárez, Mexico. The authorities took her to a children's shelter. She was described as crying inconsolably after being questioned by a prosecutor. A few days later, she was found hanged from a shower curtain rod in a bathroom at the shelter. Her death, ruled a suicide by Mexican authorities, remains under investigation by a human rights commission there.

The number of unaccompanied minors caught entering the United States and then referred for placement is expected to reach 60,000 in the 12 months ending Sept. 30, said Lisa Raffonelli, a spokeswoman for the Office of Refugee Resettlement, an increase from 6,560 in 2011. In Mexico, the number has more than doubled.

No single factor explains these surges, but in Noemi's hometown there are clues about the forces at work in her story.

In the district of El Tambo in Cañar province, her maternal grandparents, Mr. Quillay, 57, and María Jesús Guamán, 59, live in an adobe home with no running water. About 15 years ago, during an economic crisis in Ecuador, their adult children began migrating to the United States without visas.

"My four children went to find decent lives," Mr. Quillay said. "So I took over five grandchildren from when they were little."

They ate from the grandparents' farm. "We don't have the little sweets that they sometimes ask for," Mr. Quillay said.

"She was just born when her father left, and when she was 3, my daughter decided to go herself," Ms. Guamán said of Noemi. "I raised my granddaughter the same as the others."

As the children grew, their parents sent money to pay for the construction of a two-story concrete house nearby where the five grandchildren, cousins, lived on their own.

Leonela Yupa, a cousin and playmate of Noemi, remembered playing "cocinita" with her — fashioning from their imagination a little kitchen where they

Exhibit 8 - Page 186

fixed pretend meals. Noemi often joined in one of the world's universal games: hide and seek.

The children moved through a landscape that is a hybrid of peasant houses, like the home of their grandparents, and larger, modern ones that are "a symbol of the success of the Ecuadorean immigrant," said Rafael Ortiz, mayor of El Tambo.

The Quillays' unparented household was common. "We have 1,040 students, and at least 60 percent are children of migrant parents who have been under the care of grandparents, uncles or older siblings," said Magdalena Choglio Zambrano, a guidance counselor at the regional high school.

The parents abroad "at times send a little shirt, shoes, $100, but it is not the same as being papa or mama," Noemi's grandfather said.

A generation of children who grew up on their own in El Tambo have started to leave, getting a hand from their parents abroad, but still requiring shadowy journeys.

"Now we are seeing that the migrants are small children or teenagers whose parents are sending for them, running the risk of putting them in the hands of the coyotes to whom they pay 15, 20, 25 thousand dollars," said Ms. Choglio, the guidance counselor.

The cost of the trip depends on whether the smuggler uses airline flights to cut down on overland travel, Mayor Ortiz said.

"We don't know anything, not how they go or where they go," Ms. Guamán said. The parents "made the arrangements directly from there, and they called to tell us when we had to send the girl."

Both grandparents say they and Noemi were reluctant for her to leave. Ms. Guamán said she argued with her daughter, the girl's mother.

"I said to her, 'Why take her away? She's studying here, she's doing well,' " Ms. Guamán said. "But my daughter says education in Ecuador is no good and it's better for her to study there. And she took my Noemi away, only for this to happen."

Noemi had to be persuaded by her parents. "She was crying, she said she did not want to go," Sara Yupa, one of her cousins, recalled. "Then she was quiet."

Little is known about Noemi's travels until about 4,000 miles later, more than a month after she left home.

Exhibit 8 - Page 187

On Friday, March 7, in Ciudad Juárez, police saw Domingo Fermas Uves, 52, urinating outside a pickup truck, according to Alejandro Maldonado, a police spokesman. Inside was Noemi. In the official account, Mr. Fermas told officers that he was part of a network of smugglers hired by the girl's family to take her to the United States. The man gave false details about the girl, saying she was 8 years old and from an inland state in Mexico. The police recorded her name as Noemi Álvarez Astorga.

Noemi was taken to Casa de la Esperanza, a shelter for Mexican minors whose name means "House of Hope." Over that weekend, she was questioned by a prosecutor. After that, a doctor described Noemi as being "terrified," according to a report in El Diario of Juarez.

On March 11, when called to eat, Noemi instead went into the bathroom. Another girl could not get in. The doctor, Alicia Soria Espino, and others broke open the door and found Noemi hanging by the cloth shower curtain.

The next day, her parents in the Bronx received a phone call from a woman who told them that Noemi had safely crossed the border. Later that day, they received a second call saying that she had died, according to Ecuadorean consular officials.

The authorities determined that the girl initially thought to be an 8-year-old Mexican was probably the 12-year-old Ecuadorean. In part because her parents, who do not have legal immigration status, decided not to go to Mexico, DNA tests were required to confirm her identity, said Jorge W. Lopez, the Ecuadorean consul general in New York. Autopsies found no sign of a sexual assault, a common crime against migrants.

The man said to have been the smuggler, Mr. Fermas, was arrested but was later freed by a judge, who did not find enough evidence to hold him for prosecution, said Ángel Torres of the federal prosecutor's office in Ciudad Juárez. "Mr. Fermas is still under investigation for immigrant trafficking," Mr. Torres said. In published interviews, Mr. Fermas has said that the story about the pickup truck was untrue and that the police had entered his house and taken the girl under the guise of rescuing her. In the week after Noemi's death, 370 foreign child migrants were detained across Mexico, according to the national immigration agency. Nearly half were traveling alone.

Exhibit 8 - Page 188

The minors coming from Central America and Mexico are "propelled by violence, insecurity and abuse," the United Nations high commissioner for refugees said in a report issued the day after Noemi's death. The prospect of immigration reform in the United States is also enticing, Mr. Lopez said, because of the belief that anyone already in the country illegally will be allowed to stay.

Noemi's parents have said little publicly. Her mother, Martha V. Quillay, who works in a hair salon, spoke briefly with a reporter, then curtailed the conversation. Her father, José Segundo Álvarez Yupa, a construction worker, said it was too difficult to discuss. "These are private matters," he said. "This is a very painful thing. It's all over. We want to recover, we want to move on."

Last week, President Rafael Correa of Ecuador, who was visiting New York, called on the family at their home in the Bronx to offer condolences. Ms. Quillay posted pictures from the president's visit on her Facebook page.

Msgr. James Kelly, pastor of St. Brigid's Roman Catholic Church in Brooklyn, which has a large number of Ecuadorean parishioners, said recently that he heard every day about the young people traveling alone.

"I had parents in here yesterday whose child was coming north," Father Kelly said. "They wanted a Mass said, that the journey would be safe."

Email: dwyer@nytimes.com

Twitter: @jimdwyernyt

Maggy Ayala Samaniego in El Tambo Canton, Ecuador, Annie Correal in New York and Paulina Villegas in Mexico City contributed reporting.

A version of this article appears in print on April 20, 2014, on page A1 of the New York edition with the headline: A 12-Year-Old's Trek of Despair Ends in a Noose at the Border.

---

© 2014 The New York Times Company

http://www.nytimes.com/2014/04/20/nyregion/a-12-year-olds-trek-of-despair-ends-in-a-noose-at-t...   8/11/2014

Exhibit 8 - Page 189

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your browser.
MORE »



**The New York Times** | http://nyti.ms/1IeowEN

U.S. | NYT NOW

# Snakes and Thorny Brush, and Children at the Border Alone

By JULIA PRESTON    JUNE 25, 2014

HIDALGO, Tex. — Border agents drove their patrol vehicles one recent day at dusk through this spit of land on the bank of the Rio Grande. Here, in a place known as the Devil's Corner, smugglers on the Mexican side have chosen to bring thousands of women and children to American soil.

After only a few minutes scouting the dirt roads, the agents came upon a cluster of illegal migrants, huddled in tall grass under palm trees, seeking respite from the baking heat. They made no effort to flee as the Border Patrol drove up.

Questioned by the agents, a boy from Honduras said his name was Alejandro and that he was 8 years old.

"Who are you with?" asked Raul L. Ortiz, deputy chief of the Border Patrol for the Rio Grande Valley, speaking in Spanish.

"By myself," Alejandro said, looking up at the man in the olive uniform and pulling a birth certificate, carefully folded, from his jeans — the only item he carried.

"Where are your parents, Alex?" Chief Ortiz asked, using a nickname to put the boy at ease.

"In San Antonio," he said.

But the child had no address for his family in the Texas city 250 miles to the north, or for an aunt in Maryland, which he thought was just as close. The agents gave him water and the boy smiled gratefully, not knowing that his journey, already three weeks long, would likely be a lot longer.

Exhibit 8 - Page 190

Case 2:85-cv-04544-BMC-AGLR Document 101-9    Filed 02/27/18    Page 2 of 4
#:1097

Families and children have become a high-profit, low-risk business for
Mexican narcotics cartel bosses who, Chief Ortiz said, have taken control of human
smuggling across the Rio Grande. They now offer family packages, migrants said,
charging up to $7,500 to bring a minor alone or a mother with children from
Central America to the American side of the river.

Smugglers like to use this snake-infested, thorn-ridden brushland for their
crossings. A federal wildlife refuge, the site is downstream from the Anzalduas
Dam, where the river slows and narrows, making it easy to paddle across. The
bank is strewn with worn-out sneakers, broken baby bottles and rotting life
preservers, the refuse of migrants who made it across and moved on. In less than
two hours one evening last week, Border Patrol agents encountered 37 migrants
walking the dusty roads here.

Alejandro said he had been brought by "Santiago the smuggler." Another
migrant in the group was probably traveling with the boy, a neighbor or a cousin,
Chief Ortiz said. Once they were back at the Border Patrol station, agents would
have to figure out who that was.

More than 52,000 minors traveling without their parents have been caught
crossing the southwest border illegally since October, including 9,000 in May
alone, a record.

The migration surge also includes 39,000 adults with children detained since
October, also an unprecedented figure. Authorities anticipate they will apprehend
more than 240,000 illegal migrants, about three-quarters from Central America,
in the Rio Grande Valley during this fiscal year.

Many migrants say they are fleeing poverty and vicious gang violence at
home, and some were drawn by rumors the United States was giving entry permits
for women and children. But many, especially the youngest, are coming to
reconnect with families, hoping to join parents or close relatives who live in this
country, often without papers.

"There's obviously a host of reasons that motivates the individuals to cross,"
Chief Ortiz said. "But trying to reunite with a family member who may already be
here is probably one of the ones that comes at the top."

Chief Ortiz watched as agents coaxed information from the new detainees.
The migrants answered, some apprehensively, others seemed relieved, none
attempted to resist.

http://www.nytimes.com/2014/06/26/us/snakes-and-thorny-brush-and-children-at-the-border-alon...    8/11/2014

Exhibit 8 - Page 191

A 14-year-old boy from Honduras said, "My parents are dead." There was an aunt in New Orleans he wanted to find.

A 19-year-old Guatemalan woman was tugging her 2-year-old child, whose father she said was in Indiana. Having lost her way at high noon, she was reeling from dehydration. She gulped water the agents offered.

Increasing numbers of women and children caught crossing illegally have been able to stay in the United States. Border authorities are required to turn over unaccompanied minors within 72 hours to the Department of Health and Human Services, which oversees detention shelters and works to find parents or guardians in this country. After President Obama declared a humanitarian crisis this month, new shelters for minors were opened at three military bases.

Officials had been releasing most women apprehended with children, but White House officials announced last week they would begin detaining or monitoring more of those families in an effort to discourage others from coming.

Most days, the crossings here come at dawn and at dusk. The smugglers pull up in vans on the Mexican bank, and send loads of migrants across the river on inflatable rafts, sometimes three or four trips in an hour. Guides know there is little chance the Border Patrol will stop them at the international boundary midstream.

"A lot of the times it's in our best interests and the best interests of the people on the raft to not attempt to necessarily grab them from the raft," said Enrique Romero, a Border Patrol agent, as he stood by the river eyeing the smuggler scouts who eyed him from the far bank. "You put their lives at risk."

While men are told to run, women and children are instructed by smugglers to look for the Border Patrol and turn themselves in. They are told, falsely, that is the way to get a permit.

The agents were initially cautious with the migrants, checking for gang members or drug couriers. But soon Chief Ortiz was fist-bumping with the children. A boy, 4, pulled on his ears to clown for the agents.

This week Secretary Jeh C. Johnson of Homeland Security sent an open letter warning Central American parents who are considering sending their children. "In the hands of smugglers, many children are traumatized and psychologically abused by their journey or worse, beaten, starved, sexually assaulted or sold into the sex trade," he wrote. "There are no 'permits' or free passes at the end."

-32-

Exhibit 8 - Page 192

At the border, agents trained to stop drug traffickers and adult crossers are adjusting to the new migrants.

"We're law enforcement officers, but a lot of us are parents or we have young siblings," Chief Ortiz said. "We try to make sure they recognize that, you know what, it's going to be O.K. You've got some safety and security here."

A version of this article appears in print on June 26, 2014, on page A14 of the New York edition with the headline: Snakes and Thorny Brush, and Children at the Border Alone.

---

© 2014 The New York Times Company

Exhibit 8 - Page 193

Edition:  **UK**  US  AU  | Beta

## theguardian

Search

News | US | World | Sports | Comment | Culture | Business | Money | Environment | Science | Travel
Tech | Media | Life & style | Data

News
World news
US immigration

# Guatemalan boy sought care for family in US and died crossing border desert

Gilberto Ramos, a 15-year-old whose body was found in Texas, traveled hundreds of miles in vain for mother's epilepsy treatment

Share
Tweet this
✉
Email

Associated Press in San Jose Las Flores, Guatemala
theguardian.com, Wednesday 2 July 2014 09.40 EDT
Jump to comments (...)

World news
US immigration ·
Guatemala ·
Americas · United
States · Texas ·
Mexico

More news

More features



Students walk under the rain after school, in the Guatemala mountain community that Gilberto Francisco Ramos Juarez left. Photograph: Luis Soto/AP

Gilberto Ramos wanted to leave his chilly mountain village for the United States to earn money to treat his mother's epilepsy.

His mother begged him not to go. "The better treatment would have been if he stayed," Cipriana Juarez Diaz said in a tearful interview with the Associated Press on Tuesday. When he wouldn't relent, she draped him with a white rosary for safe passage.

A month later, his decaying body was found in the Texas desert. Now, the boy has become a symbol for

**On the Guardian today**



World news

Beyond the border: the US's deadly immigration crisis



Science

Perseids meteor shower and supermoon bring light to the night sky



Iraq: US plans rescue mission for besieged Yazidi refugees



World news

Exhibit 8 - Page 194

8/11/2014

Case 2:85-cv-04544-DMG-AGR Document 161-3 Filed 02/02/15 Page 45 of 70 Page ID #:1101

the perils faced by a record flood of unaccompanied children from Central America who are crossing illegally into the US.

Authorities said Monday that Gilberto was 11, making him one of the youngest known such children to die crossing the desert. He was shirtless, having likely suffered heat stroke, but still wearing the rosary.

"He was a good son," Juarez said. "May God give me the strength to endure."

It turned out Gilberto was 15. His parents explained Tuesday that they had taken several years to register his birth because of the remoteness of their village in Guatemala's northern mountains. When they did, they had forgotten his actual birth date, so they listed the same date as his younger brother.

Teenage boys with working ability have long been part of the stream of young men heading north from Central America, seeking to escape poverty and gang violence. But the number of unaccompanied immigrant children picked up along the US border has been rising for three years.

Migrants tell of hearing that children traveling alone and parents traveling with young kids would be released by US authorities and allowed to continue to their destination. Gilberto, too, had heard in Guatemala that if he got in, he would be allowed to stay, his family said.



A view of the community of San Jose Las Flores, in the northern Cuchumatanes mountains, Guatemala, where Ramos lived. Photograph: Luis Soto/AP

He was born and grew up in San Jose Las Flores in a modest wood and sheet-metal home in the Cuchumatanes mountains of Huehuetenango province along the Mexico border. At 6,600 feet above sea level, the exuberant beauty of peaks and canyons are in st...

Iraq crisis: US to arm Kurds - live updates



Anti-Jewish hatred is rising – we must see it for what it is



Sydney man in Syria 'posts picture of son holding severed head'

**Today's best video**



Diego Maradona slaps journalist in the face
Former Argentinean football player Diego Maradona slaps a journalist in the face in Buenos Aires



Human teeth found inside Christ statue
Human teeth are found inside an 18th-century statue of Christ as experts carry out restoration work in Mexico.



Israel patrols Gaza border as new ceasefire begins
Israeli soldiers relax by the Gaza border as a new 72-hour ceasefire gets underway

contrast to the extreme poverty. There is no running or potable water and only a latrine. There is food, tortillas or wheat atole, an oatmeal-like drink, but never enough.

The cluster of homes where Gilberto lived is accessible only by foot along a rocky and often muddy mile-long path, which took 45 minutes in the canyons and mud to traverse on Tuesday. Gilberto walked that path each way to school, where he went as far as third grade before dropping out.

"He had to work to help the family," said his teacher, Francisco Hernandez, who remembered that Gilberto loved to draw.

Gilberto and his father, Francisco Ramos, hired themselves out to harvest and clean corn. Things improved when the oldest son, Esbin Ramos, reached Chicago and started working as a food preparer in a restaurant. He sends $100 to $120 a month when he can afford it, allowing the family to build a two-room home out of cement block to replace their wooden shack and paint it bright red and green. Gilberto slept on a piece of foam on the floor.

Short, quiet and humble, he stayed close to home. But he grew despairing and bored, Esbin Ramos said. Their mother grew sicker. The older brother suggested Gilberto come to Chicago, where he could return to school and work at night and on weekends.



Gilberto Haroldo Ramos Juarez, 11, brother of Gilberto Francisco. In the remote mountains, they had taken several years to register his birth and forgot the date. Photograph: Luis Soto/AP

Gilberto set out 17 May with a change of clothes and a backpack along the same path as his brother, walking the rugged road to the center of town and then hitching a ride to Chiantla to meet up with the smuggler, known



**Vigil held in Missouri for unarmed teen shot by police**
Residents of Ferguson, Missouri, gather at the scene where 18-year-old Michael Brown was shot dead

**On World news**

Most viewed | Latest

Last 24 hours



1. Nouri al-Maliki set to be replaced as Iraq's prime minister

2. Iraq crisis: Maliki defiant as US embraces nominal successor - live

3. Sydney man in Syria 'posts picture of son holding severed head'

4. Vigil for St Louis teenager killed by police descends into violence

5. Human teeth found inside Christ statue - video

More most viewed

License/buy our content | Privacy policy | Terms of service | US advertising | A - Z index | About us

© 2014 Guardian News and Media Limited or its affiliated companies. All rights reserved.

as a coyote. He left his cowboy boots behind because he didn't want them to get ruined, his father said.

The trip cost $5,400, and the family had borrowed $2,600 of that, paying $2,000 the first week of the journey and another $600 the week before he died. They still owe the debt.

Esbin Ramos said Tuesday that he didn't know much about how Gilberto reached the Mexican border city of Reynosa. Esbin went the whole way in the back of a semitrailer. He said Gilberto told him he arrived by bus.

"I'm OK, just the deposit money," Gilberto told his father as he was about to cross into Texas.

Then Gilberto and the coyote disappeared. His parents tried to call the coyote. Four days passed, then five, then six. By the eighth day, Esbin Ramos was worried. He called the Guatemalan consulate in Houston and in Guatemala seeking help, he said.



Cipriana Juarez Diaz, mother of Gilberto Francisco. She begged him not set out on the dangerous journey from their modest cinder block- and sheet-metal home high in the northern Guatemalan mountains.Photograph: Luis Soto/AP

Then he got a call from a woman McAllen, Texas, from what agency he doesn't know, telling him his brother was dead. They had found the body 15 June, authorities said, and Esbin's phone number on the inside of Gilberto's belt buckle, a tactic many migrants use to hide information from drug traffickers who are looking to extort money from their families.

The Guatemalan consulate notified the family on Tuesday that Gilberto's body would be returned soon, whenever there is an available flight. His father is already preparing his grave site in the local cemetery.

Case 2:85-cv-04544-DMG-AGR  Document 101-3  Filed 02/02/15  Page 48 of 70  Page ID
#:1104

His bedridden mother stumbled to her feet Tuesday to
pray at the altar set up where he slept. There are no
photos. They sent them to the US to identify the body.

"The coyote told me that he was going to take him to a
safe place and I believed him," Francisco Ramos said.
"But that was the fate of my son."

Share    Tweet this        ✉

Exhibit 8 - Page 198

You've selected the U.S. Edition. Would you like to make this your default edition?   Yes   |   No

Close

SET EDITION: U.S. | INTERNATIONAL | MÉXICO | ARABIC

TV: CNN | CNNi | CNN en Español | HLN

Sign up   Log in

SEARCH


CNN Justice

Home | TV & Video | U.S. | World | Politics | Justice | Entertainment | Tech | Health | Living | Travel | Opinion | iReport | Money

Sports

# 72 bodies found in Mexico were immigrants, officials say

By the CNN Wire
August 25, 2010 5:37 p.m. EDT



These guns were found at the Mexican ranch in Tamaulipas state, where 72 bodies were discovered.

**STORY HIGHLIGHTS**

**NEW:** The victims were illegal immigrants heading toward the United States, officials say

Three suspects and a member of the Mexican military were killed in a shootout

The bodies of 58 men and 14 women were found in a building on the ranch

A man with a gunshot wound led navy personnel to the bodies

**(CNN)** -- Seventy-two bodies discovered at a ranch in northeast Mexico belonged to migrants who were making their way toward the United States, Mexican officials said Wednesday.

The preliminary investigation indicates the victims were illegal immigrants from Honduras, El Salvador, Brazil and Ecuador, said Alejandro Poire, spokesman for national security strategy.

The motive for the killings was under investigation, though officials pointed out that Mexico's drug cartels have expanded their activities to include extortion and kidnapping of immigrants.

"Mexican institutions have hit the operational structures of these criminals and their income, and because of that, they turn to extortion and kidnapping of migrants, as well as recruiting them to force them to become part of their group of hit men," Poire said.

The bodies of the 58 men and 14 women were found above ground in a structure on the ranch, which is about 14 miles (22 kilometers) from the town of San Fernando, near the border with Texas.

The Mexican navy, which was called in to investigate the case, said it is one of the largest discoveries of bodies in Mexico's 4-year-old war on organized crime.



Bodies found in Mexico

**RELATED TOPICS**

Mexico

Tamaulipas

Members of the Mexican navy were tipped off to the site after a man with a gunshot wound approached a military roadblock. The man said he had been injured by a criminal gang, according to a statement released by the navy.

Mexico's attorney general's office identified the man as an Ecuadorean immigrant with a bullet wound to the neck.

"The navy went to the area where the man came from and encountered gunfights. A naval officer was killed and three of the delinquents were killed," said an officer who answered the telephone at the navy's communication department. The officer, who was not authorized to speak on the record, declined to give his name.

After the gunbattle, authorities said, they found a stash of weapons, including 21 rifles, camouflage uniforms, bulletproof vests and four trucks. One of the vehicles had been disguised to look like a truck from the Ministry of National Defense, officials said.

"This discovery once again demonstrates the extreme danger and violence that Central Americans face on their ... erous journey

**NewsPulse**

Most popular stories right now

You can't change the color of Facebook - it's a virus

Live in a multimillion-dollar home for $2,500

Is it time for Wall St. to issue a correction?

Got medical debt? Your FICO credit score may go up

Glenn Beck's challenge: Getting onto your TV

Explore the news with NewsPulse »

Lawyers.com          LexisNexis

**Law firm search**

Search for attorneys by location and area of practice. Enter the city name below.

Select a state          Area of practice

or: advanced search

http://www.cnn.com/2010/CRIME/08/25/mexico.dead.bodies/index.html

Exhibit 8 - Page 199

8/11/2014

72 bodies found in Mexico were immigrants, officials say - CNN.com    Page 2 of
Case 2:10-cv-04644-DMG-AGR Document 101-2 Filed 02/02/15 Page 50 of 70 Page ID
#:1106

north, as well as Mexican authorities' abject failure to protect them,"
Amnesty International said. "Mexico must immediately investigate
this massacre, bring the perpetrators to justice and establish the
identities of those killed so that their families can be informed."

Wednesday's gruesome discovery came about a month after
authorities in the neighboring state of Nuevo Leon discovered 51
bodies in nine mass graves.

In that instance, investigators found charred remains, incinerated
bone fragments and stains of fire on the ground where bodies were
presumably burned in steel drums, the state-run Notimex news
agency said.

The bodies were mostly males between age 20 and 50, Notimex
said. Many of them had tattoos.

Similar mass graves have been discovered in the Mexican states of
Guerrero and Quintana Roo since late May. Authorities have linked
them to Mexico's ongoing drug war.

Nuevo Leon and Tamaulipas, which border Texas, have seen a
marked increase in drug violence this year due to an intensifying
rivalry between the Gulf cartel and the Zetas gang, which was
formerly the cartel's armed branch.

Last week, authorities found the bound and blindfolded body of
Edelmiro Cavazos Leal, the mayor of a city in Nuevo Leon. He had
been abducted two days earlier.

His body was found on the outskirts of the city of Santiago, where
Cavazos was mayor. There were signs of torture.

News reports indicate that officials believe the Zetas ordered
Cavazos killed. Five police officers and a transit worker were
arrested last week in connection with the slaying.

More than 28,000 people have died in drug-related incidents since
President Felipe Calderon intensified the government's fight against
drug cartels and organized crime after taking office in December
2006.

About 90 percent of the fatalities have been among cartel members
and other criminals, Calderon has said.

CNN's Nick Valencia contributed to this report.

FOLLOW THIS TOPIC 🌐

Exhibit 8 - Page 200

http://www.cnn.com/2010/CRIME/08/25/mexico.dead.bodies/index.html

8/11/2014

23 I. & N. Dec. 572 (BIA), Interim Decision 3488, 2003 WL 1953603

U.S. Department of Justice

Office of the Attorney General

Board of Immigration Appeals

IN RE D-J-, RESPONDENT

Decided April 17, 2003

**\*\*1  \*572** (1) The Attorney General has broad discretion in bond proceedings under section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a) (2000), to determine whether to release an alien on bond.

(2) Neither section 236(a) of the Act nor the applicable regulations confer on an alien the right to release on bond.

(3) In determining whether to release on bond undocumented migrants who arrive in the United States by sea seeking to evade inspection, it is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations and the release of undocumented alien migrants into the United States without adequate screening.

(4) In bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, Immigration Judges and the Board of Immigration Appeals shall consider such interests.

(5) Considering national security grounds applicable to a category of aliens in denying an unadmitted alien's request for release on bond does not violate any due process right to an individualized determination in bond proceedings under section 236(a) of the Act.

(6) The denial of the respondent's release on bond does not violate international law.

(7) Release of the respondent on bond is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of the respondent and other similarly situated undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002; further, the respondent failed to demonstrate adequately that he does not present a risk of flight if released and should be denied bond on that basis as well.

IN BOND PROCEEDINGS

The respondent is an undocumented alien from Haiti who was taken into custody and detained by the Immigration and Naturalization Service ("INS") on October 29, 2002, while attempting to evade lawful immigration procedures and enter the United States illegally. He arrived aboard a vessel that sailed into Biscayne Bay, Florida, on that date, carrying 216 undocumented aliens from Haiti and the Dominican Republic. He and other passengers on the vessel were apprehended ashore after the vessel sought to  \*573  evade coastal interdiction by the United States Coast Guard and after many of the aliens sought to evade law enforcement authorities ashore. *See* INS Brief in Support of Bond Appeal, Exh. A ("INS Brief"). Respondent was placed in removal proceedings and charged as being an inadmissible alien under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2002) ("INA"). He is now seeking asylum in the United States and has applied for bond, which would allow his release into the community pending disposition on removal or asylum.

Exhibit 8 - Page 201

**\*\*2** On November 6, 2002, an Immigration Judge ("IJ") granted respondent's application for release on bond (set at $2,500) over the objections of the INS. The INS argued, inter alia, that the release of respondent, and of other members of the undocumented migrant group of October 29, would stimulate further surges of such illegal migration by sea and threaten important national security interests. The INS then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal, concluding, inter alia, that the broad national interests invoked by INS were not appropriate considerations for the IJ or the BIA in making the bond determination, "[a]bsent contrary direction from the Attorney General." Decision of the Board of Immigration Appeals, *In re D-J-*, at 2 (March 13, 2003) ("BIA Dec."). Exercising authority transferred to the Department of Homeland Security ("DHS") by the Homeland Security Act of 2002 ("HSA"), and pursuant to the provisions of 8 C.F.R. § 1003.1(h)(1)(iii), the Under Secretary for Border and Transportation Security has now referred the BIA's decision to me for review. [1] This referral automatically stayed the BIA's order pending my decision. *See* 8 C.F.R. § 1003.19(i)(2).

On February 12, 2003, the IJ denied respondent's application for asylum. His appeal of that decision is pending before the BIA.

Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect **\*574** to questions of law arising under those statutes. [2] This statutory framework is consistent with the Attorney General's traditional role as the primary interpreter of the law within the Executive Branch. *See generally* 28 U.S.C. §§ 511-13 (2000).

Pursuant to the authority and discretion vested in me under the provisions of section 236(a) of the INA, 8 U.S.C. § 1226(a) (2000), [3] I have determined that the release of respondent on bond was and is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002. I further determine that respondent has failed to demonstrate adequately that he does not present a risk of flight if released on bond and that he should be denied bond on that basis as well. *See* 8 C.F.R. § 236.1(c)(8) (2002). Accordingly, I order that the BIA's decision and order be vacated, and that respondent be denied bond and detained pending appropriate disposition and proceedings respecting his status under the immigration laws.

**\*575** I.

**\*\*3** My review of the BIA's decision in this case is *de novo*; it is not confined to reviewing the decisions of the BIA or the IJ for legal or factual error. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). In making their decisions in this matter, both the IJ and the BIA were exercising limited authority that is dependent upon delegation from the Attorney General. *See id.* at 4. When I undertake review of such decisions pursuant to a referral under 8 C.F.R. § 1003.1(h), the delegated authorities of the IJ and BIA are superseded and I am authorized to make the determination based on my own conclusions on the facts and the law. The recent promulgation of 8 C.F.R. § 1003.1(d)(3), which precludes the BIA from engaging in de novo review of an IJ's findings of fact, does not affect the de novo standard articulated in *Doherty* because that regulation does not govern the authority of the Attorney General to review BIA decisions.

I now turn to the question of whether respondent should have been detained or released on bond under the authority of section 236(a) of the INA.

II.

A.

Exhibit 8 - Page 202

The law governing the detention or release of aliens such as respondent (i.e., aliens arrested and detained pending a decision on removal) is set forth in section 236(a) of the INA. It provides that the Attorney General may (1) continue to detain the alien; or (2) release the alien on bond or conditional parole. *See* section 236(a) of the INA. [4] Conditional parole is not placed in issue here, so the only question is whether the respondent should be detained or released on bond.

As recognized by the Supreme Court, section 236(a) does not give detained aliens any *right* to release on bond. *See Carlson v. Landon*, 342 U.S. 524, 534 (1952). Rather, the statute merely gives the Attorney General the authority to grant bond *if* he concludes, in the exercise of broad discretion, that the alien's release on bond is warranted. The extensive discretion granted the Attorney General under the statute is confirmed by its further provision that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." Section 236(c) of the INA. Even apart from that provision, the courts have consistently recognized that the Attorney General has extremely broad discretion in **576 determining whether or not to release an alien on bond under this and like provisions. *E.g., Carlson*, 342 U.S. at 540; *United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577-78 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). Further, the INA does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal. *See, e.g., Carlson*, 342 U.S. at 534 (Attorney General's denial of bail to alien is within his lawful discretion as long as it has a "reasonable foundation"); *Barbour*, 491 F.2d at 578 (INS finding that alien was a threat to national security warranted denial of bond, applying "reasonable foundation" standard); *see also Sam Andrews' Sons v. Mitchell*, 457 F.2d 745, 748 (9th Cir. 1972) (Attorney General's exercise of discretionary authorities under the INA must be upheld if they are founded "on considerations rationally related to the statute he is administering").

**4 Further discretionary authority for the release on bond of aliens such as respondent is found in subpart A, section 236.1 of the INS regulations governing "Detention of Aliens Prior to Order of Removal." *See* 8 C.F.R. § 236.1(c)(8). This regulation provides:

Any officer authorized to issue a warrant of arrest *may, in the officer's discretion,* release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

*Id.* (emphasis added). This provision gives the DHS discretionary authority to release a covered alien on bond if, and only if, the alien makes a satisfactory demonstration with respect to the stated criteria. Like section 236(a), it does not establish any right to release on bond.

B.

I will now briefly summarize the pertinent facts and contentions of the parties indicated in the record.

As noted above, respondent arrived off the shores of Florida in an overloaded vessel with 216 undocumented aliens from Haiti and the Dominican Republic on October 29, 2002. After the vessel sought to evade the orders and interdiction efforts of a U.S. Coast Guard ("USCG") vessel, some of the alien passengers jumped from the vessel and swam ashore. After the migrant vessel ran aground, the remaining passengers disembarked and, despite the order of USCG officers to stop, ran ashore and fled from law enforcement officers before they were apprehended. *See* INS Brief, Exh. A (Declaration of Captain Mark J. Kerski, USCG) ("Kerski Declaration"). I find nothing in the record showing that respondent was not among the alien *577 migrants who disobeyed the orders of, and sought to evade, USCG or law enforcement officers ashore in an effort to enter the United States unlawfully.

The respondent offered limited evidence and information in the proceedings below in support of his claims that he did not present a danger to the community, a risk of flight, or a threat to national security. Respondent testified that he has not been arrested or convicted of a crime; and that, if released, he would live with an uncle residing in New York, New York, who would

provide him with food, shelter, and transportation while he applied for asylum. Memorandum Decision of the Immigration Judge, *In re D-J-*, at 2 (Dec. 12, 2002) ("IJ Dec.").

Respondent's brief before the BIA asserts that he was "willingly taken into INS custody." Respondent's Brief in Support of the Immigration Judge's Custody Determination at 3 ("Respondent's Brief"). That assertion, however, does not address whether the respondent was among the migrants who sought to evade USCG and other law enforcement officers after coming ashore, as indicated in the USCG's Kerski Declaration. Respondent's brief further asserts that, because he does not speak or understand English, he could not be expected to obey any orders from English-speaking law enforcement officers at the time he came ashore. That assertion, however, does not address the likelihood, indicated by the content of the Kerski Declaration, that the circumstances in which those orders were issued were such that their meaning would have been clear in context, without regard to the particular words uttered by the officers. *See* INS Brief, Exh. A, ¶¶ 4-6.

**\*\*5** In opposing respondent's contentions, the INS submitted declarations from officers of the Coast Guard, the Department of State, and the Department of Defense ("DOD") as exhibits before the IJ and the BIA.[5] INS maintains that these declarations show that there are strong concerns of national security requiring the continued detention of the respondent and similarly situated undocumented migrants pending removal proceedings. Two general areas of concern are implicated. First, there is a concern that the release of aliens such as respondent and the other October 29 migrants would tend to encourage further surges of mass migration from Haiti by sea, with attendant strains on national and homeland security resources. Such mass migrations would also place the lives of the aliens at risk. Second, in light of the terrorist attacks of September 11, 2001, there is increased necessity in preventing undocumented aliens from entering the country without the screening of the immigration inspections process.

**\*578** The first area of national security concern advanced by INS is the threat of further mass migration. INS asserts that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage further mass migration attempts.[6] In support of this contention, INS has submitted a memorandum issued by the State Department supporting detention of the migrants who landed in Florida on October 29, 2002, in order to prevent further mass migrations. The memorandum states in relevant part:

The disposition of those detained in the October 29 arrival will spur further migration if they are released into the U.S. Such treatment would create a perception in Haiti of an easing in U.S. policy with respect to admission of migrants. For this reason, the Department of State strongly recommends that the 216 migrants (207 Haitians, 9 Dominicans) from the boat which reached Key Biscayne on October 29 be detained while they undergo processing. The migrants should be detained unless and until they demonstrate a well-founded fear of persecution. Those who cannot do so should continue to be held, absent a compelling humanitarian reason for release, until they can be expeditiously repatriated.

INS Brief, Exh. B (State Department Memorandum). The State Department memorandum sets forth extensive and detailed information documenting the relationship between perceptions in Haiti of successful U.S. entry by seagoing migrants and the likelihood of further mass migrations. *Id.*

The declarations submitted from the Coast Guard (*see supra* n.6) and the Defense Department express corroborating statements regarding this concern. The Coast Guard states that "[a]necdotal reporting and operational experience strongly suggests that detaining and swiftly repatriating those who illegally and unsafely attempt to enter the United States by sea is a significant deterrent to surges in illegal immigration and mass migration." INS Brief, Exh. C, ¶ 9 (Declaration of Captain Kenneth A. Ward, USCG). Similarly, the Department of Defense declaration states that "[a]ctual or even *perceived* changes in U.S. immigration policy can trigger mass migration events by encouraging other potential illegal migrants." *See* INS Brief, Exh. F, ¶ 5 (Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations).

**\*\*6** The INS submissions also outline an additional national security implication of encouraging future mass migrations by sea from Haiti. The Coast Guard declaration asserts that continued mass migrations from Haiti have "heavily taxed Coast Guard capacity and capabilities," while "reducing **\*579** responsiveness in other mission areas." INS Brief, Exh. C, ¶ 7. The

Exhibit 8 - Page 204

Department of Defense, which is also involved in efforts to contain such overseas migrations, also asserts that the demands of mass migrations from Haiti "would create a drain on scarce assets that are being used in or supporting operations elsewhere." INS Brief, Exh. F, ¶ 8.

The declarations submitted by INS also substantiate a national security concern raised by the prospect of undocumented aliens from Haiti being released within the United States without adequate verification of their background, associations, and objectives. Thus, the State Department declaration asserts that it has "noticed an increase in third country nations (Pakistanis, Palestinians, etc.) using Haiti as a staging point for attempted migration to the United States. This increases the national security interest in curbing use of this migration route." INS Brief, Exh. B, ¶ 11. Relatedly, the Coast Guard's supplemental declaration asserts that the boatloads of interdicted Haitians have included persons previously deported for drug trafficking and subject to outstanding felony warrants. INS Brief, Exh. E, ¶ 4 (Supplemental Declaration of Captain Kenneth A. Ward, USCG). The Coast Guard further asserts that "because maritime migrants are typically undocumented and carry little or no identification, it is often difficult to ascertain the identity and background of interdicted persons, particularly in large groups, which presents potential threats to officer safety, as well as national security." *Id.*

### III.

Having considered the record and the briefs of the parties, and exercising my authority under section 236(a) of the INA, I have determined that the release of respondent on bond is unwarranted.

I conclude that releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to adverse consequences for national security and sound immigration policy. As demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of such aliens into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in such illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a). *See Carlson*, 342 U.S. at 534; *Barbour*, 491 F.2d at 578.

**\*7 \*580** I have noted the BIA's suggestion that the INS's recent adoption of a policy placing certain aliens (including many undocumented aliens who arrive by sea and are not admitted or paroled) in expedited removal proceedings in which affected aliens, with limited exceptions, would be automatically detained without review by an IJ or the BIA tends to negate the INS's concern regarding the encouragement of migration surges. BIA Dec. at 2 n.3; *see* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924-26 (Nov. 13, 2002). The offsetting effect suggested by the BIA would presumably be due to the prospect that the new expedited removal policy will be so restrictive that potential Haitian migrants would learn of that and be deterred from future migration attempts, regardless of respondent's fate and that of the other October 29 migrants. While the expedited removal policy may reduce the incidence of seagoing Haitian migrants being released on bond pending removal, it hardly provides airtight assurance against future successful entries by such migrants through legal and extra-legal maneuvers, or the encouragement of additional maritime migrations likely to arise from such entries. I note, for example, that the policy's strict detention provision is entirely inapplicable to aliens who are admitted or paroled. In any event, even if the new policy somewhat reduced the expectations of further successful U.S. entries, the release of respondent and hundreds of others from the October 29 migrant group would strongly undercut any resultant deterrent effect arising from the policy. The persistent history of mass migration from Haiti, in the face of concerted statutory and regulatory measures to curtail it, confirms that even sporadic successful entries fuel further attempts. I therefore am not persuaded that the new expedited removal policy negates the migration "surge" consideration.

I further conclude that the release on bond of undocumented seagoing migrant aliens from Haiti without adequate background screening or investigation presents a risk to national security that provides additional grounds for denying respondent's release

on bond. This consideration is fortified by the State Department's assertion that it has observed an increase in aliens from countries such as Pakistan using Haiti as a staging point for migration to the United States. Under the current circumstances of a declared National Emergency, the Government's capacity to promptly undertake an exhaustive factual investigation concerning the individual status of hundreds of undocumented aliens is sharply limited and strained to the limit. Under these circumstances, it is reasonable to make a determination that aliens arriving under the circumstances presented by the October 29 influx should be detained rather than released on bond. There is substantial risk that granting release on bond to such large groups of undocumented aliens may include persons who present a threat to the national security, as well as a *581 substantial risk of disappearance into the alien community within the United States.

**8  I note that the BIA has acknowledged the seriousness of INS's arguments that the detention or release of these aliens implicates important national security interests. *See* BIA Dec. at 2. The BIA determined, however, that such considerations fall "outside the scope of Immigration Judge bond proceedings as such proceedings are currently constituted," except where individual considerations show that the respondent is not likely to appear or presents a danger to the community. The BIA then stated: "Absent contrary direction from the Attorney General, we therefore agree with the Immigration Judge's focus on the respondent's individual likelihood to appear and individual danger to the community." *Id.* This opinion provides the BIA and Immigration Judges with the "contrary direction" to which the BIA referred. In future proceedings involving similarly situated aliens, this opinion constitutes binding precedent, requiring the BIA and IJs to apply the standards set forth herein, including consideration of national security interests. *See generally Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). Further, in all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, IJs and the BIA shall consider such interests.

Finally, I conclude that respondent has not individually demonstrated that he satisfies the prerequisites to discretionary release on bond under the provisions of 8 C.F.R. § 236.1(c)(8). INS may (but is not required to) grant release under that provision if the alien demonstrates to its satisfaction that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding. I do not find that respondent has adequately demonstrated that he is likely to appear at future proceedings for purposes of granting release on bond pursuant to section 236(a)(2) of the INA or 8 C.F.R. § 236.1(c) (8). There are strong indications in the record that respondent was among those aliens who sought to evade Coast Guard and law enforcement officers in a determined effort to effect illegal entry into the United States. Because such evasive behavior does not provide reassuring evidence of respondent's likely reliability in appearing for future proceedings, it was incumbent upon respondent to produce substantial countervailing evidence as to that criterion. I conclude that the minimal showing made by respondent on this point was insufficient to demonstrate the likelihood of his appearance for future proceedings. [7]

*582  In addition, I note that the respondent was denied asylum by the Immigration Judge on February 12, 2003. The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending. The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention. "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

IV

**9  Although neither the IJ nor the BIA chose to address the issue, respondent contends that he is constitutionally entitled on due process grounds to an "individualized determination" of his request for release on bond and that denying bond on broad national security grounds that are generally applicable to the October 29 migrants would somehow violate such a right. Respondent's Brief at 6-8. In that regard, I note that several federal appellate courts have recently held that a *lawful permanent resident alien* has a due process right to an individualized hearing and determination on whether he poses a risk of flight or a danger to the community when subjected to the mandatory detention provisions of section 236(c) of the INA. *See Kim v. Ziglar*,

Exhibit 8 - Page 206

276 F.3d 523 (9th Cir.), *cert. granted sub nom. Denmore v. Hyung Joon Kim*, 536 U.S. 956 (2002); *Patel v. Zemski*, 275 F.3d 299, 314-15 (3d Cir. 2001); *see also Hoang v. Comfort*, 282 F.3d 1247, 1256 (10th Cir. 2002). Another federal appeals court has reached a contrary conclusion on that issue, *see Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999), and the Supreme Court has granted the Government's petition for a writ of certiorari and heard oral argument in *Kim*.

I first note that the decisions in *Kim* and *Patel* were specifically addressed to the *mandatory* detention provisions of section 236(c) of the INA and are therefore fundamentally distinguishable from the procedures afforded under section 236(a). Section 236(c) requires nondiscretionary detention as a categorical statutory mandate for those aliens covered by it, whereas section 236(a) affords aliens to whom it applies the opportunity to seek discretionary relief (bond or conditional parole) in a hearing before an Immigration Judge. *See Kim*, 276 F.3d at 533.

More significantly, however, the holdings in *Kim* and *Patel* were premised upon the petitioner's status as a lawful permanent resident alien. *See Kim*, 276 F.3d at 528, 534; *Patel*, 275 F.3d at 307. In contrast, respondent has not **\*583** even been admitted to the United States, let alone acquired the status of a lawful permanent resident alien. Respondent's status is that of an undocumented alien, charged as being inadmissible as an alien present in the United States without having first been admitted or paroled. *See* section 212(a)(6)(A)(i) of the INA. As an alien who has "not yet gained initial admission to the United States," he does not qualify for the limited due process protection extended to "admitted" aliens under the sharply distinguishable circumstances presented in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001) ("We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question."). As explained by the court in *Gisbert v. United States Attorney General*, 988 F.2d 1437, 1440 (5th Cir.), *amended on other grounds*, 997 F.2d 1122 (5th Cir. 1993): "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Accord United States v. Lopez-Vasquez*, 227 F.3d 476, 484-85 (5th Cir. 2000); *Zheng v. INS*, 207 F.Supp.2d 550, 552 (E.D. La. 2002) ("The detention of aliens who have been denied initial admission into the United States does not implicate the Fifth Amendment, even if such aliens were subsequently paroled or released within the country.").

**\*\*10** Even if the respondent *were* entitled to an individualized hearing, however, such a conclusion would not support a contention that this respondent's request for release on bond must be determined exclusively on the basis of his individual situation, rather than on the basis of general considerations applicable to a category of migrants, as a matter of constitutional due process. The mere fact that general considerations are introduced does not negate the individual nature of the hearing. The Attorney General is broadly authorized to detain respondent, and deny his request for bond, based on any reasonable consideration, individualized or general, that is consistent with the Attorney General's statutory responsibilities. *See Reno v. Flores*, 507 U.S. 292, 313-14 & n.9 (1993) (rejecting juvenile aliens' demands for an "individualized custody hearing" and upholding INS use of "reasonable presumptions and generic rules" in such cases).

In any event, I have given full consideration to the individual aspects of respondent's claim for bond based on the record in this proceeding. I find nothing in respondent's individual case that warrants granting him release on bond when balanced against the above-described compelling factors that militate against such release in the case of undocumented aliens attempting illegal entry into the United States under the circumstances presented by the October 29 influx.

**\*584** Finally, I note that respondent argued to the BIA that an INS policy of detaining Haitian migrants in order to deter other Haitians from migrating to the United States seeking asylum violates international law. *See* Respondent's Brief at 8-9. In support of his argument, he invokes the right to asylum protected by Article 14 of the Universal Declaration of Human Rights ("UDHR") and an advisory opinion of the United Nations High Commission for Refugees stating that "asylum seekers should not be detained for purposes of deterrence." *Id.* at 8. The BIA did not address respondent's arguments on this point in its decision.

This argument is without merit. First, the UDHR is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty. *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 816 n.17 (D.C. Cir. 1987) (UDHR "is

Exhibit 8 - Page 207

merely a nonbinding resolution, not a treaty"). In any event, the application of U.S. law to protect the nation's borders against mass migrations by hundreds of undocumented aliens violates no right protected by the UDHR or any other applicable rule of international law. As the Supreme Court has recognized, "'[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments ....'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The authority to expel aliens is meaningless without the authority to detain those who pose a danger or a flight risk during the process of determining whether they should be expelled. The national security interests invoked in this opinion are directed at unlawful and dangerous mass migrations by sea, not the right to seek asylum. Aliens who do arrive in the United States, including the respondent himself, are afforded the right to apply for asylum and have those applications duly considered.[8]

## *585 CONCLUSION

**11  I have determined that respondent's release on bond under the provisions of section 236(a) of the INA is unwarranted. The BIA's Order of March 13, 2003, is hereby vacated and respondent is to be detained pending decision on removal.

### Footnotes

1   On March 1, 2003, the INS was transferred from the Department of Justice to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. The Executive Office for Immigration Review, however, remains in the Department of Justice. On February 28, 2003, the Attorney General published a technical rule that moved 8 C.F.R. § 3.1(h) (2002) to 8 C.F.R. § 1003.1(h). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9832 (Feb. 28, 2003) (to be codified at 8 C.F.R. § 1003.1(h)). The authority of the INS Commissioner to refer Board decisions to the Attorney General is now vested in the Secretary of Homeland Security, or in "specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General." 8 C.F.R. § 1003.1(h)(iii).

2   *See* section 103(a)(1) of the INA, 8 U.S.C. § 1103(a)(1), *as amended by* Homeland Security Act of 2002 Amendments, Division L of Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 531 (2003), which provides:
    The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

3   Section 1102 of the HSA, 116 Stat. at 2274, added a new subsection (g) to section 103 of the INA, providing as follows:
    The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.
    The Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to this provision, although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings. *See* sections 103(a), (g) of the INA, *as amended;* 8 C.F.R. §§ 236.1(c), (d), 287.3(d) (2002).

4   *See supra* n.3.

5   The exhibits submitted with the INS brief included: Declaration of Captain Mark J. Kerski, USCG (Exhibit A); Memorandum from the United States Department of State (Exhibit B); Declaration of Captain Kenneth A. Ward, USCG (Exhibit C); Declaration of Johnny Williams (Exhibit D); Supplemental Declaration of Captain Kenneth A. Ward, USCG (Exhibit E); and Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations (Exhibit F).

6   Following the successful landing of more than 200 Haitians on October 29, 2002, on November 7, 2002, and again on November 9, 2002, the USCG successfully interdicted three groups of undocumented Haitian migrants attempting to transit to the United States via the Bahamas. In all, 264 Haitian migrants were interdicted on these dates. Such incidents are "typical of a surge in Haitian migrant departures following similar successful landings and demonstrates the 'pull' factor that successful landing can have." INS Brief, Exh. E, ¶ 3 (Supplemental Declaration of Captain Kenneth A. Ward, USCG).

7    The INS also offered evidence disputing respondent's claim that, individually, he does not pose a danger to the community and is likely to appear in future proceedings. *See* INS Brief at 14-15.

8    I note that a regional official of the United Nations High Commissioner for Refugees ("UNHCR") has sent me a letter volunteering certain comments on this proceeding. Letter for The Honorable John Ashcroft, Attorney General of the United States, from Guenet Guebre-Christos, Regional Representative, United Nations High Commissioner for Refugees, *Re: Matter of D-J-, Advisory Opinion on Detention of Asylum Seekers* (March 28, 2003). In brief, the UNHCR letter makes certain arguments invoking purported obligations arising under the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (Jan. 31, 1967) ("Protocol"), and the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) ("Convention"). The United States is not a party to the Convention, but it is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the Convention. The Protocol is not self-executing, but Congress has incorporated into the INA, through the Refugee Act of 1980, the appropriate requirements of the Protocol. Consequently, the Protocol does not afford respondent any rights beyond what he is afforded under the federal immigration laws, as applied in this decision. *See Abdelwahed v. INS,* 22 Fed.Appx. 811, 815, 2001 WL 1480651 (9th Cir. 2001) (stating that "the Protocol does not give [the petitioner] any rights beyond what he already enjoys under the immigration statutes"); *Legal Obligations of the United States under Article 33 of the Refugee Convention,* 15 Op. O.L.C. 86, 87 (1991) ("[T]he Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.").

23 I. & N. Dec. 572 (BIA), Interim Decision 3488, 2003 WL 1953603

---

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 9

## Publicly Filed

# ICE's new family detention center in Dilley, Texas to open in December

Official Website of the Department of Homeland Security

TOP STORY

Enforcement and Removal

11/18/2014

ICE will transition out of the temporary facility in Artesia, New Mexico

WASHINGTON — U.S. Immigration and Customs Enforcement (ICE) will be expanding its detention capacity for adults with children at the South Texas Family Residential Center in Dilley, Texas, in December. In light of this upcoming expansion, ICE is transitioning out of the temporary family residential facility at the Federal Law Enforcement Training Campus (FLETC) in Artesia, New Mexico, and returning this facility full time to FLETC operations during the month of December.

"With the opening of the Dilley facility, ICE will have the initial capacity to house up to 480 residents but the ultimate capacity to house up to 2,400 individuals," said Acting ICE Director Thomas S. Winkowski. "These facilities help ensure timely and effective removals that comply with our legal and international obligations, while deterring others from taking the dangerous journey and illegally crossing into the United States."

The South Texas Family Residential Center in Dilley is the fourth facility the Department of Homeland Security (DHS) has used to increase its capacity to detain and expedite the removal of adults with children who illegally crossed the Southwest border. ICE continues to use a newly modified residential center in Karnes City, Texas, and a long-standing facility in Leesport, Pennsylvania, to house adults with children.

"ICE opened the temporary facility in Artesia in June as a critical piece of the government's response to the unprecedented influx of adults with children at the Southwest border. Since then, the numbers of illegal migrants crossing into south Texas has gone down considerably," said Acting Director Winkowski. "However, we must be prepared for traditional, seasonal increases in illegal migration. The Dilley facility will provide invaluable surge capacity should apprehensions of adults with children once again surge this spring."

On Nov. 7, 2014, ICE ceased intake of individuals to its temporary family residential center in Artesia, New Mexico, and began the draw-down process to cease operations by the end of 2014.

ICE is screening the approximately 420 current residents of the Artesia facility on a case by case basis to identify those for whom transfer to another facility is appropriate. These individuals will be transferred before the end of the year to the family residential centers in Karnes City, Texas, and Dilley, Texas.

ICE's residential centers for adults with children are an effective and humane alternative to maintain family unity as families await the outcome of immigration hearings or return to their home countries. ICE ensures that these residential centers operate in an open environment, which includes medical care, play rooms, social workers, educational services, and access to legal counsel.

Exhibit 9 - Page 210

# Exhibit 10

## Publicly Filed

DECLARATION OF BRIDGET CAMBRIA

I, Bridget Cambria, declare and say as follows:

1.  I am an attorney licensed to practice in the state of Pennsylvania.  I am a partner in the law firm of Cambria & Kline, P.C.  My practice includes regular representation of immigrant and refugee children and their parents detained pursuant to the Immigration and Nationality Act and housed at the Berks Family Residential Center detention center located in Leesport, Pennsylvania (hereinafter "Berks").  In the course of my practice, I have regular occasion to observe, and therefore am familiar with, the policies and practices of United States Immigration and Customs Enforcement (ICE) toward the detention, release, and treatment of children and mothers detained at Berks.  I have also had the opportunity to observe how those policies and practices have changed over time.

2. Prior to June 2014, ICE's general practice was to release children and parents upon a determination that those individuals were not a significant flight risk or a danger to the public.  Generally, delays in releasing children and their parents were not significant.  This release policy applied uniformly to those accused of having entered the United States without inspection, to those apprehended as "arriving" aliens, and to those placed in "expedited" removal proceedings.

Exhibit 10 - Page 211

3. Starting around June 2014, ICE changed its policies and practices regarding release of detained children and mothers.  Since June, ICE has begun detaining all Central American families without the possibility of release on bond, recognizance, supervision, or parole if it believes that those families arrived in the United States as part of the "surge" of unauthorized entrants – mostly children – that purportedly began in the summer of 2014.  The justification given for this change in policy is threefold.  According to ICE, Central American parents and children pose a threat to national security and must be detained without the possibility of release to contain that risk; the detention without the possibility of release serves to deter unauthorized migration from Central America; and Central American parents and children pose an elevated flight risk simply by virtue of their country of origin and arrival during the "surge."  With respect to the final supposed justification for the change in policy, in my experience, most individuals who are released from detention at Berks do not pose a significant flight risk and do appear in court after their release.

4. To the best of my knowledge and belief, ICE never gave any public notice that it intended to reverse its prior release policy.  To my knowledge and belief, the public was not given the opportunity to comment on the merits of that policy change.

- 2 -

Exhibit 10 - Page 212

5. ICE applies its current no-release policy indiscriminately to all Central American children and their mothers. ICE does not consider the individual child's age, reasons for coming to the United States, prior immigration violations, family ties in the United States, eligibility for lawful status or favorable exercise of prosecutorial discretion, credible fear of persecution abroad, likelihood to abscond, or the child's safety or the safety of others. To the best of my knowledge, the only class of non-criminal migrants that ICE detains without the possibility of release is families who ICE believes entered the United States as part of the "surge." A significant majority of these families are Central American mothers and children. The Office of Refugee Resettlement (ORR) continues to release unaccompanied minors from Central America who arrived as part of the "surge" to qualified custodians. Presently, a single man has a greater chance of being released from detention than a Central American mother with a child.

5. Since ICE's policy and practice regarding detention changed in June 2014, the long-term detention of children and parents, particularly Central American children and their mothers, has skyrocketed. Before June 2014, I estimate that a parent and child would spend, on average, seven days detained at Berks prior to release. Now, because ICE has ceased releasing individuals detained at Berks, the average stay of those currently detained in the facility is several months. In the spring of this year, to the best of my knowledge, there were

- 3 -

Exhibit 10 - Page 213

about 10 to 20 persons detained at Berks at any given time.  Now, the population

of the facility sits at approximately 88 persons, more than half of whom are

children.  The last detainees I can recall being released from Berks were freed in

June 2014, and I am personally aware of multiple families that have been detained

there for over six months, with no end to detention in sight.

6.  Berks is clearly a secure facility.  The doors of the facility are locked and

guarded by staff members.  Entry and exit to the facility are controlled through jail-

like security procedures.  Visitors to the facility are rare, and visitation has been

increasingly regulated since the change in ICE release policies in June.  Prior to the

change in policy, I was able to bring individuals such as interpreters and

counselors to meetings with my clients in Berks.  Now, the process for approval of

such visitors can take a week or longer.  To my knowledge, children detained at

Berks are only allowed outside the facility to receive medical treatment the facility

is not equipped to provide internally and to get haircuts.  When inside the facility,

children and parents are under constant supervision by staff.  Schooling takes place

inside the locked doors of the facility.  To my knowledge and belief, most the staff

at the Berks facility were previously employed as guards when Berks was being

used as a juvenile detention facility.  I am not aware that the staff of Berks has

been given any training in caring for dependent children under applicable state

laws and standards.

- 4 -

Exhibit 10 - Page 214

7. Among my clients whose experience is illustrative of the foregoing are Wendy recently turned 18-year-old native and citizen of Honduras. She was 17 years old and a member of the class protected under the settlement in *Flores, et al. v. Holder, et al.,* No. 85-4544 (C.D. Cal), and her mother, Araceli a 38 year-old native and citizen of Honduras.

8. A- is the mother of five children, three of whom are U.S. citizens. She and her daughter W- have been detained since March of 2014, in excess of seven months. W- recently turned 18 years old, while in detention this October. They fled Honduras for two reasons. One, they are victims of domestic violence. Araceli has fled a 10 year abusive relationship. She has been physically, sexually and emotionally abused by the father of two of her children. W-, as a teenage girl has been a witness to the abuse of her mother and her siblings. Also, A- has become a target of threats and intimidation at the hands of the "maras" in Honduras following her being a witness to a gang murder in Honduras.

9. A- and W- are applications for protection from persecution and have filed applications for that protection before the immigration court. Furthermore, A- and W- have filed meritorious U-Visa applications with USCIS which are now pending. Their applications for a U Visa, based on being a victim of crime who participates with law enforcement in the prosecution of an offender, have been certified by law enforcement based on their cooperation. The certification is based

- 5 -

Exhibit 10 - Page 215

on A- participating in the prosecution of her abuser, an person whom she

prosecuted in the US and who we now threaten to return her to.

10. In the seven months that ICE has detained this family they have made no

effort to release A- or W- to family members or anyone else qualified to care for

them. They have legal relatives in the United States able and willing to provide

case. Furthermore, because A- is detained she has been unable to reunify with her

children who are United States citizens. Because she is detained she has been

separated from her citizen children and they have been forced to remain in

Honduras while she remains at Berks. They family in the US are unable to care for

three minor children without A-'s support. Since the US citizen children have been

in Honduras, they have been unable to continue school because of the violence.

They have been threatened and intimidated by their mother's abuser as well as the

gangs which plague San Pedro Sula. ICE's detention of their mother, has placed

the lives of the USC children at risk.

11. On July 3, 2014, ICE determined that both class member W- and her

mother would be detained in lieu of release on bond, recognizance, supervision or

parole. On or about October 14, 2014, ICE opposed parole redetermination for the

sole reason that my clients have a willful disregard for Immigration laws of the

United States, and without regard to the specific facts of the case, nor the equities

of the family.

- 6 -

Exhibit 10 - Page 216

11. I believe that the continued detention of W- and other class members is causing them irreparable harm. I believe that the health of class members is at serious risk. Multiple mothers have reported to me that their children are unable to eat the food served at Berks. As a result, I have observed a number of children, especially younger children, lose a significant amount of weight over the course of their detention at Berks. In addition, I have observed multiple children fall ill while detained at Berks. For example, one of my clients, Candi, a 1-year-old native and citizen of Guatemala, arrived at my office recently wheezing and barely able to speak. Her and her mother had just been granted Asylum by the Immigration Court. She and her daughter were confirmed refugees. Candi had lost a significant amount of weight since her arrival at Berks, and she was struggling to breathe. Her mother informed me that she had not been given medication while detained at Berks and had not seen a doctor for two weeks. I believe this is not an isolated case. To the best of my knowledge and belief, detainees who are ill are not permitted to see a doctor unless they have a fever higher than 100 degrees. Class members' education has also suffered. To my knowledge, there are two classrooms in Berks that serve children of a wide range of ages and educational backgrounds. Many of my clients report that they do not know what grade level they are in and that they are making minimal progress in their education. The long-term detention of parents and children has caused increased tensions in the

- 7 -

Exhibit 10 - Page 217

facility have increased.  Part of the increased strain is due to the fact that, to my knowledge, only one member of the Berks staff speaks Spanish.  Because the vast majority of people detained at Berks are either monolingual Spanish speakers or speakers of indigenous languages, communication between staff and detained individuals is difficult.  This tension is having significant adverse effects on children detained at Berks, causing increased stress and anxiety.  Parents have reported to me that their children cry daily and are emotionally distressed due to their continued detention.  Conditions in Berks are so difficult for children that many families are reluctant to take the additional time necessary to develop their potentially meritorious cases because of the toll of detention on the physical and emotional health of their children.    Finally, continuing to detain class members at Berks is having significant negative effects on family integrity.  Many of these children have family members, even siblings, living outside of Berks who they are unable to see.  The continued long-term detention of W- and other class members at Berks is denying them the chance to be children.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of November 2014, at Reading, PA.

Bridget Cambria, Esq.

- 8 -

Exhibit 10 - Page 218