CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org
        marchela@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
William A. Molinski (Cal. Bar No. 145186)
wmolinski@orrick.com
T. Wayne Harman (Cal. Bar No. 254089)
wharman@orrick.com
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020

*Attorneys for Plaintiffs*
(listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, et al., | Case No. CV 85-4544-RJK(Px) |
| Plaintiffs, | **Plaintiffs' First Set Of Exhibits In Support Of Motion For Class-Wide Enforcement Of Settlement [Part 5: Exhibits 11-16]** |
| v. | |
| Jeh Johnson, Secretary, U.S. Department of Homeland Security, et al., | Hearing:  March 9, 2015 |
| Defendants. | Time:     TBD<br>Dept:     TBD |

## PUBLIC VERSION

1

2  *Plaintiffs' counsel, continued:*

3  LA RAZA CENTRO LEGAL, INC.
   Michael S. Sorgen
4  Maria Victoria Castro
   Amanda Alvarado Ford
5  474 Valencia Street, #295
   San Francisco, CA 94103
6  Telephone:  (415) 575-3500
   Facsimile:   (415) 255-7593
7
   *Of counsel:*
8
   YOUTH LAW CENTER
9  Alice Bussiere
   Virginia Corrigan
10 200 Pine Street, Suite 300
   San Francisco, CA 94104
11 Telephone:  (415) 543-3379 x 3903

12 RANJANA NATARAJAN
   Clinical Professor
13 Director, Civil Rights Clinic
   University of Texas School of Law
14 727 E. Dean Keeton St.
   Austin TX 78705
15 Telephone:  (512) 232-7222

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX TO EXHIBITS

1    Settlement of class action, January 17, 1997 ................................................... 1

2    Order approving settlement of class action, January 28, 1997 ...................... 47

3    Stipulation extending settlement of class action, December 7,
     2001 ...................................................................................................... 53

4    Plaintiffs' letter requesting pre-enforcement meeting, October
     15, 2014 ................................................................................................ 58

5    Plaintiffs' letter posing questions re: implementation of class
     action settlement, October 2, 2014 ............................................... 64

6    Defendants' response to questions re: implementation of class
     action settlement, November 3, 2014 ........................................... 85

7    ICE opposition to bond redetermination, July 24, 2014 ............................ 107

8    ICE opposition to bond redetermination, October 8, 2014 ......................... 158

9    U.S. Immigration & Customs Enforcement, news release,
     November 18, 4014 .............................................................................. 210

10   Declaration of Bridget Cambria, November 7, 2014 ................................... 211

11   Declaration of Carol Anne Donohoe, November 15, 2014 .......................... 219

12   Declaration of J███ H████████ M█████, September 20, 2014 ................. 227

13   Declaration of M███ C███████ d█ T████, September 19,
     2014 ..................................................................................................... 232

14   Declaration of M███ F███████ S███, September 19, 2014 ..................... 238

15   Declaration of M███ L█████ M██████, September 19, 2014 .................. 244

16   Affidavit of Adriana Piñon re: Texas Public Information Act
     Request, September 3, 2014 ...................................................................... 248

17   Declaration of Barbara Hines, January 14, 2014 ........................................ 253

18   Declaration of D███ V████ A██████, January 9, 2015 .......................... 301

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 5: EXHIBITS 11-16]
CV 85-4544-RJK(Px)

19    Declaration of H█████ R█████████ M█████, January 9, 2015 ............................ 305

20    Declaration of R█████ E████████ A████████, January 8, 2015 ........................ 309

21    Karnes Attorney Visitation Form and Guidelines, January 9, 2015 ........................................................................................... 312

22    Declaration of Jonathan Hiskey, September 22, 2014 .................................. 314

23    Declaration of Carlos Holguin, January 13, 2015 ........................................ 319

24    Declaration of Luis H. Zayas, December 10, 2014 ...................................... 323

25    Declaration of Generva Gilden Berger, January 12, 2015 ........................... 366

26    Dilley Resident Handbook ........................................................................... 383

27    Memorandum of Understanding Re: Compromise of Class Action: Conditions of Detention, November 30, 1987 ................................ 433

28    Declaration of Anne Chandler, December 1, 2014 ...................................... 470

29    Declaration of Allison N. Boyle, November 24, 2014 ................................. 475

30    Declaration of Brittany Perkins, November 28, 2014 .................................. 490

31    Declaration of Clayton N. Matheson, November 24, 2014 .......................... 497

32    Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ....................... 504

33    Declaration of Melissa J. Cuadrado, November 26, 2014 ........................... 512

34    Declaration of Scott T. Williams, December 1, 2014 .................................. 522

35    Declaration of Virginia Marie Raymond, December 13, 2014 ................... 527

36    *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.), Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction, December 16, 2014 .......................................... 530

37    Flores Settlement Agreement and DHS Custody: Key Flores Provisions & DHS Noncompliance - Report of Lutheran Immigration and Refugee Services ............................................................ 570

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 5: EXHIBITS 11-16
CV 85-4544-RJK(Px)

38   Declaration of S█████ C█ M█████, January 8, 2015 ................................... 577

39   Declaration of S█████ B███ d█ T███, January 8, 2015 ........................... 580

40   Declaration of M█ G███ S████, January 8, 2015 ................................. 583

41   Declaration of E█████████ G████ M█████, January 9, 2015 ..................... 586

42   Declaration of A█ Z████ M█████, January 9, 2015 ................................. 590

43   Declaration OF A█████ E███████████ d█ l█ C███ G████, January 9, 2015 ................................................................ 594

44   Declaration of A████ F████ d█ E███████, January 9, 2015 ...................... 597

45   Declaration of H█████ L████ M█████ P████, January 9, 2015 ...................... 602

46   Declaration of M███ M█████ M████, January 8, 2015 ......................... 606

47   Declaration of C█████ M█████ C████████ C███, January 8, 2015 ................................................................ 609

48   Declaration of S█████ L████ M█████ A█████, January 9, 2015 ................................................................ 611

49   Declaration of L███ B████ S██████, January 8, 2015 .............................. 613

50   Declaration of S█████ A█████ M███████ D███████, January 8, 2015 ................................................................ 617

51   Declaration of O█████ F█████ C████████ M████, January 9, 2015 ................... 621

52   Declaration of J█████████ E██████ E███████ F████, January 9, 2015 ................................................................ 624

53   Declaration of Lauren Beth Connell, November 26, 2014 .......................... 627

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 5: EXHIBITS 11-16
CV 85-4544-RJK(Px)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian


   /s/ Carlos Holguín
Attorneys for Plaintiffs

# Exhibit 11

## Publicly Filed

DECLARATION OF CAROL ANNE DONOHOE

I, Carol Anne Donohoe, declare and say as follows:

1.  I am an attorney licensed to practice in the state of Pennsylvania.  In the course of my practice I regularly represent immigrant and refugee children and their mothers detained pursuant to the Immigration and Nationality Act and housed at the Berks Family Residential Center detention center located in Leesport, Pennsylvania (hereinafter "Berks").  I have had regular occasion to observe, and am accordingly familiar with, the policies and practices of United States Immigration and Customs Enforcement (ICE) toward the detention, release, and treatment of children and mothers detained at Berks, as well as how those policies and practices have changed over time.

2. Prior to June 2014, ICE regularly released mothers and children without substantial delay, provided the agency determined that those released would not abscond or endanger the public. This release policy applied uniformly to those accused of having entered the United States without inspection, to those apprehended as "arriving" aliens, and to those placed in "expedited" removal proceedings.

3. Beginning in about June, ICE reversed this policy and practice. The agency now detains uniformly all families from Guatemala, Honduras, and El Salvador, whom ICE believes came to the U.S. as part of the "surge" of

Exhibit 11 - Page 219

unauthorized entrants, mostly children, which reportedly began in the summer of 2014.  Those who had a prior removal order or who are considered to be "arriving aliens" are no longer allowed to be paroled or released on bond.  Those who came in "EWI" (entered without inspection) may be eligible for a bond but the bonds are often set ridiculously high. The ostensible justification for this no-release policy is that Central American parents and children threaten U.S. national security and should be detained without possibility of release to ameliorate that risk, to deter future unauthorized migration from Central America, and that Central American parents and children present a flight risk if they are released.  However, in my experience, and the statistics show, most individuals who are released from detention do not pose a significant flight risk and do appear in court after their release.

4. To the best of my knowledge and belief, ICE never gave the public any notice that it intended to reverse its prior release policy, nor was the public ever allowed to comment on the merits of that policy change.

5. ICE applies its current no-release policy uniformly to all Central American children and their mothers: that is, without regard to an individual child's age, reasons for coming to the United States, family ties in the United States, eligibility for lawful status or favorable exercise of prosecutorial discretion, credible fear of persecution abroad, likelihood to abscond, or the child's safety or

- 2 -

Exhibit 11 - Page 220

the safety of others.  To my knowledge, families who ICE believes came to the U.S. as part of the "surge" are the only class of non-criminal migrants detained without possibility of release.  A significant majority of these families are Central American mothers and children.  In contrast, the Office of Refugee Resettlement (ORR) continues to release unaccompanied Central American "surge" children to qualified custodians.  As things now stand, a criminal transferred to ICE custody has a better chance of being released than a Central American child or mother.

5.  In the wake of ICE's change of policy and practice, the long-term detention of Central American children and their parents has risen dramatically. Prior to June 2014 I estimate the average length of time a parent and child would spend detained at Berks was approximately twelve  days. Around April 2014, I visited the Berks facility, and I believe there were about 14 persons in total housed there at that time.  Since the change in ICE's detention policy, detainees are simply not being released, and most detainees have spent several months at the Berks facility.  The population of the facility has now ballooned to some 88 persons, more than half of whom are children.  The facility is planning to open another floor and double its capacity by the beginning of the year.

The last detainees I can recall being released from Berks were freed in June 2014, and I am personally aware of more than one family that has now been detained there for over six months, with no end to detention in sight.

- 3 -

Exhibit 11 - Page 221

6.   The facility at Berks is clearly secure.  The facility doors are locked and guarded, and ingress and egress are controlled via jail-like security procedures. To my knowledge, children detained at Berks are never allowed outside the grounds of the facility, except perhaps to receive medical treatment the facility is not equipped to provide internally, and to get haircuts.  Schooling takes place inside the locked doors of the facility.  There are two classrooms for all school-age children of various abilities.  Detainees are under the observation of staff members at all times. Visitation is tightly regulated.  Since the change in ICE policies, the process for obtaining clearance to enter the facilities has become more onerous.  Before the change, I was able to bring individuals such as interpreters and counselors to meetings with my clients with minimal difficulty.  Now, the approval process can take longer than a week, and the process includes inquiries into the purpose of the individual's presence in the building.  I am not aware that the staff of Berks has been given any training in caring for dependent children under applicable state laws and standards.

7. Among my clients whose experience is illustrative of the foregoing are L-E-T, a 6-year-old native and citizen of Honduras and a member of the class protected under the settlement in *Flores, et al. v. Holder, et al.,* No. 85-4544 (C.D. Cal), and his mother, P-T-R, a 22-year-old native and citizen of Honduras, as well as his 3 year old sister.

- 4 -

Exhibit 11 - Page 222

8.  L-E-T's mother had been previously brought to the U.S. against her will as a victim of trafficking. When picked up by Border Patrol she requested to be sent back to Honduras because she had not come willingly to the U.S.   Even though she had not come of her own accord, she was issued an order of removal.

Back in Honduras, L-E-T's mother worked to get her life back together . She opened a business.  Neighbors of hers, who were related to a gang boss, demanded that she pay rent. She was able to do so for a while but they kept raising the amount. They beat her to try to get the money. One time they dragged her to the middle of the town and beat her in front of everyone. L-E-T (who was then 5-years old) came rushing out to help her. The gang member grabbed L-E-T and pushed him into the concrete ditch, splitting his head open. They continued to beat his mother, who ended up hemorrhaging. L.E.T's mother was unable to hide from the gang so she fled with her young children to the U.S.

9. On May 14, 2014, L-E-T.and  P-T-R., along with L.E.T's then 2 year old sister, were taken into custody near Hidalgo, Texas. They were thereafter held in the "freezer" (*la Hielara*) at a Border Patrol facility for several days before being transferred to the detention facility in Leesport, PA.  ICE gave class member P-T-R (L-E-T's mother) a list of free legal services providers. However, when she attempted to call the numbers listed, there was no response.  ICE gave P-T-R a Notice of Custody Determination which stated she could request a review by an

- 5 -

Exhibit 11 - Page 223

Immigration Judge ("IJ").  ICE did not inform P-T-R that, according to their new policy, she was not actually entitled to a custody redetermination before an IJ because she had a prior order of removal. ICE has never given P-T-R a notice of the reasons she and her children are being housed in a secure facility. ICE has made no effort to release L-E-T, his mother, or his younger sister to family members or anyone else qualified to care for him.

11. I believe that continuing to detain class members such as L-E-T is inflicting irreparable harm on them.  Over the course of their detention, I have observed multiple children lose weight at an alarming rate, with younger children especially seriously affected.  Many mothers report that their children are unable to eat the food that is served at Berks.  I have observed multiple children fall ill while detained at Berks.  Contributing to the rampant sickness among children detained at Berks is the tight regulation of medical services.  To the best of my knowledge and belief, detainees who are ill are not permitted to see a doctor unless they have a fever higher than 100 degrees, and even obtaining an aspirin to treat a headache requires approval from a doctor.  If they are sick, they are instructed to gargle with salt water.

Children detained at Berks are also suffering loss of educational opportunity. The school-aged children detained at Berks are separated into two classrooms, and the children in each classroom span a wide range of education levels.  As a result,

- 6 -

Exhibit 11 - Page 224

many of my clients report that they do not know what grade level their children are in and that they are making minimal progress in their education.

In addition, as families spend longer and longer periods detained, tensions in the facility have increased, causing significant stress and anxiety to children detained in Berks.  Part of the increased strain is due to the fact that, to my knowledge, only one member of the Berks staff speaks Spanish, and the vast majority of people detained at Berks are either monolingual Spanish speakers or speakers of indigenous languages.

I have received multiple reports indicating that many children in the facility cry every day.  Conditions in Berks are so difficult for children that many mothers are reluctant to take any additional time necessary to develop their potentially meritorious cases.  Finally, continuing to detain class members at Berks is having significant negative effects on family integrity.  Many of these children have family members, even siblings, living outside of Berks who they are unable to see. Simply put, the children detained at Berks are losing their chance to be children.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of November, 2014, at Reading, Pennsylvania.


_____*Carol Anne Donohoe*_____       ///


- 7 -

Exhibit 11 - Page 225

- 8 -

Exhibit 11 - Page 226

# Exhibit 12

## Conditionally Filed Under Seal

Declaracion of J████ C█████
H██████-V█████ M█████

I, Jeimi C████████ H██████-M████, declare
and say as follows:

① I am a native and citizen of El Salvador.
I was arrested the 11th of June, 2014, ██
with my son, J████ A█████ V█████-
H██████, 11 years of age, in Texas, after ██ age
entering the U.S. ~~near~~ from Reynosa, Mexico.

② After the Border Patrol arrested us, we
were driven about 20 minutes to a station
~~in McAllen.~~
that we called the "icebox," because it is
very, very cold inside. We arrived in the
afternoon very hungry, ~~to~~ and were given a
cookie ~~to eat~~ eat. We were put in a very
crowded cell. There was room for each of us
only to stand or sit, and no one could lie
down. We were given ~~a~~ no mattress or blanket.
Neither of my children nor I were able to
sleep.

③ The Border Patrol agents were very abusive and
rude to us. They told us we were a ~~use~~ threat
to the country and that we had no business

Exhibit 12 - Page 227



leaving our countries. When we were later given something more to eat, the official practically threw the food at us.

④ About 3 hours later the Border Patrol gave us a burrito to eat and to drink water that tasted of Clorox. The next day, they gave us the same. That was all we ate at the hie icebox. We were not allowed to use the telephone or given any explanation of our legal rights.

⑤ We were then taken to McAllen to another icebox. We stayed the night. This icebox was even worse, because the officials would almost hit you when they called you out to interview. Also, they took my son and put him in a different cell from ours, with a group of other boys. We were given nothing to eat, it was cold, and we were given only an aluminium blanket for the cold.

⑥ In the early morning, we were flown from McAllen to El Paso, then put on a bus to Artesia, New Mexico. This was a surprise, because the officials had told us to wake

Exhibit 12 - Page 228

up and get ready fast because we were
being deported to our countries.

⑦ We arrived the 19th of June in
Artesia. We were given no notice of
our legal rights or a list of free legal
Services. About 10 days after arriving here
an asylum officer interviewed me. I
told her that I have an uncle
in Boston who is a U.S. citizen and is
willing to help us and give us a place
to live. No other official has asked if
I or my children have anyone to help
us or give us shelter in the United States.

⑧ Up until about two weeks ago,
We were sometimes allowed to make free
telephone calls, at least to a lawyer. But
now we are allowed no free calls to
family, and only to a lawyer only if we
tell what it is we want to talk about.
I've not been permitted a free call in
about 25 days, and I can only make paid
calls to my uncle, who deposited some
money so I could call him.

Exhibit 12 - Page 229



⑨ There are no classes for my children here. We are told they will start the 29th of this month. In the time we've been here my children have never been permitted to leave the facility to go to the park or anywhere else.

⑩ We are not permitted ~~with~~ visits with our family members. An official told us our family could not visit us ~~bee~~ because as prisoners ~~we~~ we have no right to anything.

⑪ I came to the United States to escape domestic violence, and also because there is much delinquency in my country. I explained this in detail ~~in~~ during a bond hearing, after which the Immigration Judge set to my bail at $~~12~~15,000. I cannot pay that much, so we have remained detained.

⑫ I cannot go back to El Salvador. My ex-husband has told me he will kill me.

I do not ~~speak~~ English, but the foregoing was translated to me before I signed. ~~Execute~~ I declare under penalty of perjury that the foregoing is true and correct.

Exhibit 12 - Page 230

Hernandez - Morales,
Cont.

⑤

Executed this 20th day of September,
2014 at Artesia, New Mexico.

x ████████████

Declaration of Translation.

I, Carlos Holguin, declare and say as follows:

1) I am fluent in English and Spanish.

2) On this day, I translated the foregoing
Declaration of Jeimi Hernandez-Morales to
the declarant, who indicated to me that
the contents thereof are true and correct
prior to her signing.

I declare under penalty of perjury that the
foregoing is true and correct.

Executed this 20th day of September, 2014
at Artesia, New Mexico.

Carlos Holguin.

Exhibit 12 - Page 231

# Exhibit 13

## Conditionally Filed Under Seal

Declaration of

M████ B█████ (██████ ████ T█████

① I am a native and citizen of El Salvador. I was arrested September 6, 2014, together with my daughter, A████, who is 12 ~~years~~ years old.

② We left El Salvador ~~in~~ together with my husband, O██ A██████ T█████. ~~up~~ and our son, A██████, who is four years old. The Border Patrol arrested my husband and son first on about August 28, 2014. The Border Patrol took them to a Border Patrol station, where they detained my son and husband for ~~that~~ 9 days. My son later told me it was very cold in the Border Patrol station and that he and my husband shared a room with other ~~adlty~~ adults and children. ~~Among~~ There were adults and children of both sexes in the same room. On the 6th of September, the Border Patrol separated my husband and son, and sent my son to a foster home, where he stayed for about 10 days.

③ When the Border Patrol arrested my daughter and me they ~~took~~ us to a Border Patrol station. We were held there ~~for~~ two and a half days. The officers were often very rude and abusive because we didn't want to sign

Exhibit 13 - Page 232



for immediate deportation. They kept telling us we would be deported whether we signed or not.

6) My daughter and I were held in room about 12 meters by 6 meters. There were about 70 other detainees in the room, mostly children. There was not room enough to lie down, nor were there any mattresses. The Border Patrol took our sweaters, and there was only on large silver blanket for all of us. It was very cold, and they left the lights on all the time. Nobody could sleep. We all stood, and the children mostly cried. All we were given was a sandwich twice a day with a powdered drink. We were not allowed to bathe or brush our teeth. We were forced to use a toilet in the cell, which was completely open and afforded no privacy. We were only allowed out of the room to be counted or to clean the station. There was no window or in the cell, not even a clock, so we lost track of whether it was day or night.

Exhibit 13 - Page 233

③

⑤ After ± 2½ days, we were transferred to a shelter in McAllen. We stayed there one day. They told us we were to be deported and put on a plane. One official started laughing and told me to call him from my country. We weren't deported, but were instead taken to Artesia, New Mexico, where we have been detained now for about two weeks. About four days ago, they brought my son Anderson to be detained with my daughter and me. ₮ The Salvadoran Consul told me my husband is detained at Del Rio detention center, but I've not been allowed to speak to him but once, about a week ago. He ~~en~~. couldn't tell me very much and mostly cried. I do not know whether he is aware that Anderson is ~~so~~ now with me.

⑥ We have not been given ~~anything in any~~ written notice of our rights, ~~the even~~ no list of free legal services, or that we could ask an immigration judge to ~~check~~ decide whether we could be released on bond.

⑦ My husband's ~~father~~ brother is a U.S. citizen, who is able and willing to give us shelter and

Exhibit 13 - Page 234

(4)

8 and other help to stay in the United States. None of the officials has asked whether we have any place to stay in the United States.

⑨ Here at Artesia we share a room with five others, all females, 2 adults and 3 minors. There are no classes for my daughter, but we are told they will start the 29th of this month. ~~I have never~~ We are not permitted to use the telephone except by asking to use it, and then it takes four days to ~~get~~ to make a call, and then we are permitted only 3 minutes on the phone.

⑩ We have been told nothing about release on bond by the officials, but other detainees say you won't be released ~~to~~ unless you have $5,000 - $30,000, which I could not begin to pay. The high bonds force many to accept deportation. But deportation can be very dangerous.

⑩ In our case, the gangs in El Salvador charged us "rent," ~~which they use to~~ We paid for some time, but then they killed one of our employees and demanded telephone numbers for our

Exhibit 13 - Page 235



friends and Emily, so they could change their "rent", too. After our employee was killed, we felt it was too dangerous to stay, and it would be very dangerous for us to go back to El Salvador now. A family member of a gangster told us we would be kidnapped if we didn't pay more rent, and if we couldn't pay before, we would have no chance of paying what they want now.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of September at Artesia, New Mexico.



Exhibit 13 - Page 236

**CERTIFICATE OF TRANSLATION**

I, Carlos Holguin , affirm that I am fluent in both English and Spanish. I declare under penalty of perjury that I have translated _Declaration of Maydi Beatriz Contreras de Torres_ to the best of my abilities, to the declarant who indicated that she understood the same and that it is accurate.

_____     09/16/2014     _Carlos Holguin_____
Signature of Translator          Date              Name of Translator


Translator's address: 256 S. Occidental Blvd., Los Angeles, CA 90057

Translator's phone number: 213-388-8693 x 309

Translator's email: crholguin@center for human Rights.org.

Exhibit 13 - Page 237

# Exhibit 14

Conditionally Filed Under Seal

Declaration of M███ D███ F█████ S██

I, M███ D███ F█████ S██, declare and say as follows:

① I am a native and citizen of Guatemala. I was arrested the 16th of July near Reynosa, Mexico. I was arrested with my sons, K██████ S███████, 8 years of age, and E███ I██ F██████ F█████, de 6 years of age. We have been detained ever since.

② We were taken to an "icebox" in Texas, about a half hour drive from where we were arrested. We call the place where we were taken an "icebox" because the Border Patrol keeps it very cold there, and will make it even colder if one complains about being cold. The Border Patrol took our sweaters and didn't give us a blanket or other clothing to help us against the cold.

③ We arrived at the icebox at about 6:00 p.m. We were given nothing to eat, although we were very hungry. The next morning we were given a cold taco and a ham sandwich and a little can of milk. We stayed to at this icebox for two nights, and this is what

Exhibit 14 - Page 238

7

We ate were given to eat twice a day.

6 We were held in a room with about 50 people, adults and children. All the adults were women. There were some mattresses, but not nearly enough for all of us. Some children had a mattress, but no adult had one, and my children stayed on my lap. My children kept asking me, "Why don't they give us a blanket? We are very cold." During the two nights the my children slept only a few moments, and I didn't to sleep because of the cold and, because the officials kept calling me out to answer more questions.

7 The next night, about midnight, we were taken to another bo icebox about 1/2 hour drive. The Border Patrol put me in one room, but took my children to another I felt very sad because it was very cold in this place as well, and they only gave us a cover made of aluminum. At least I could keep my children a little warm by holding them close to me in the first icebox; I couldn't even do that at the second. We spent one night and one day there. Than Then we were told we'd be transferred again.

Exhibit 14 - Page 239



6) My son Kristian was sleeping about 5:00 am when they came for us. From my cell, I heard the guards yelling at my son to get up. When he didn't wake up right away the guard banged on the cell door and yelled at him to get up and to wake his brother. I heard him crying from my cell.

7) We were then put in an airplane. Nobody told us where we were being taken, but a guard at the first icebox had told us we would be deported, so I was sure we were being sent back to Guatemala. Instead, we were brought to Artesia, where we have been ever since.

8) Since our arrest, no official have provided us with any notice of our legal rights or a list of free legal services. The officials have not told us about any possibility to be released on bond. No official has asked whether my sons have any family members they could live with in the United States, although they have a grandmother who is a legal resident of the United States, and she is ready and willing to give us shelter and help.

Exhibit 14 - Page 240

(9)

Q My ~~older~~ two sons have ~~had~~ both been ill since we arrived in Artesia. They ~~have~~ had fever, and coughs ~~They had fares~~ for about a week, and ~~also~~ were also vomiting and ~~with~~ diarrea. My younger son has gone from 55 pounds to 43, and won't ~~eat~~. His nose has been bleeding at least once a day every day. ~~At~~ The doctor told me ~~there~~ they didn't have medicine for them and that they should just drink water. More recently medicine arrived, and now both are getting better.

10 There are no classes for children yet, but we are told they will begin the 24th of the Month. We are told we cannot have visits from family members.

11 We are not permitted telephone calls unless we ~~have~~ are able to pay ~~for~~ them. Even then, the telephones frequently don't work.

12 I left ~~Gra~~ Guatemala because my husband beat me and my sons. I ~~have~~ filed a police complaint, but the police did nothing to protect us ~~or~~ on remove my husband. I left because I could not take any more abuse or see him abuse my sons.

Exhibit 14 - Page 241



③ I cannot go back to Guatemala. Their father threatened to kidnap my sons and kill me. I believe he is capable of carrying out his threats.

~~I declare under p.~~
④ I do not speak English, but this declaration was translated to me, and I ~~affirm its content~~ understood and affirmed its contents prior to signing.

I declare under penalty of perjury that the foregoing ~~it~~ is true and correct

Executed this __19th__ day of September at Artesia, New Mexico.

K_____ ,

## CERTIFICATE OF TRANSLATION

I, _Carlos Holguin_ , affirm that I am fluent in both English and Spanish. I declare under penalty of perjury that I have translated _Declaration of Maria Dolores Figueroa Solis_ to the best of my abilities.

_signature_     09/15/2014     _Carlos Holguin_

Signature of Translator     Date     Name of Translator

Translator's address: _256 S. Occidental Blvd, Los Angeles, CA 90057_

Translator's phone number: _213/388-8693 x.309_

Translator's email: _Crholguin@centerforhumanrights.org._

Exhibit 14 - Page 243

# Exhibit 15

Conditionally Filed Under Seal

Declaration of ██████ L█████ ██████████

I, ██████ L███ ██████, declare and say as follows:

1) I am a native and citizen of El Salvador. I arrived with my son, N████ J███ ██████ ██████ on the 8th of Septiembre, 2014. crossing from ██ Reynosa, Mexico, to the United States.

2) We were taken to the "icebox" in McAllen, Texas. We spent three days and two nights there. It is a Border Patrol station, but the people who are detained there call it an icebox because it is always very cold. We were given no blanket or mattress. There were about 40 persons in the room. and there was no room for us to lie down and sleep. Neither my son or I could sleep for the two nights.

3) For three days we were given to eat only a sandwich and fruit drink three times per day. We were both hungry nearly all the time. The room had no window to let in sunlight, and the Border Patrol left the lights on around the clock, so we didn't know for sure whether it was night or day.

Exhibit 15 - Page 244



4) We were not allowed to make any telephone calls. The official told me I would be deported. I was not advised I had any right to ask for political asylum. ~~He to she also told me I should sign for my deportation.~~

5) We were then taken to another facility, a type of warehouse, about 10 minutes away. We arrived in the afternoon, and ~~in~~ the morning we were taken to an airplane and flown ~~to~~ and then by bus to Artesia, New Mexico, ~~where~~ where my son and I have been detained ever since.

6) When we arrived here an official asked whether we had any family in the U.S. with whom we could live. I told them my sister is ~~in the pu~~ lives in Houston and is getting her papers, and my brother-in-law has some legal status I don't really understand. My sister reports that no one from Immigration has contacted her or my brother-in-law.

7) I am very afraid to return to El Salvador. In May of this year, my son was held at knife-point while I was robbed

Exhibit 15 - Page 245



In 2008, gangsters killed my cousin because he had tried to leave the gang. More recently, gang members began charging me "rent," ~~to a~~ which I had to pay or else they would harm my son first, and then they would kill me. They also demanded I give them information about my work in an import-export company; that, I should tell the gang when shipments would be made or they would hurt my son and then me.

I do not speak English, but the foregoing was translated to me, and I understood its contents and affirm their accuracy by my signature.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of September, at Artesia, New Mexico.


X_____

Exhibit 15 - Page 246

## CERTIFICATE OF TRANSLATION

I, _Carlos Holguin_ , affirm that I am fluent in both English and Spanish. I declare under penalty of perjury that I have translated _Declaration of Mirna Lorena Myedueno_ to the best of my abilities.

_[signature]_        08/18/2014        _Carlos Holguin_

Signature of Translator        Date        Name of Translator

Translator's address: 256 S. Occidental Blvd. Los Angeles, CA 90057

Translator's phone number: 213/388-8693 x.309

Translator's email: Cvholguin@ Center for humanrights.org

Exhibit 15 - Page 247

# Exhibit 16

## Publicly Filed

## AFFIDAVIT OF ADRIANA PIÑON

STATE OF TEXAS       )
                           : SS.:

COUNTY OF HARRIS    )

On this day, Adriana Piñon appeared before me and attested as follows:

1.      My name is Adriana Piñon. I am a senior staff attorney at the American Civil Liberties Union of Texas. The facts stated in this Affidavit are within my personal knowledge and are true and correct.

2.      On August 15, 2014, I drafted a Public Information Act Request (Request) to the Department of Family and Protective Services (DFPS) and caused it to be filed with the Open Records Coordinator for DFPS. The Request sought, *inter alia*, information concerning licensing by DFPS for Karnes County Residential Center. A true and correct copy of the Request is attached hereto as Exhibit A.

3.      On Friday, August 22, 2014, Mr. Craig Purifoy, Open Records Coordinator at DFPS, emailed our paralegal, Mr. Christopher Clay, a response to our Request. Mr. Clay then forwarded the email response to me. A true and correct copy of the email response is attached hereto as Exhibit B.

_____
Adriana Piñon

Subscribed and sworn to before me on this 3nd day of September, 2014.

_____
Notary Public

My commission expires:_____11/30/15_____

CHRISTOPHER CLAY
Notary Public, State of Texas
Commission Expires 11-30-2015

Exhibit 16 - Page 248



August 15, 2014

*Via email and first class mail*

Open Records Coordinator
Department of Family and Protective Services
P.O. Box 149030
Austin, TX 78714
OpenRecordsRequests@dfps.state.tx.us

Re:   *Public Information Request Concerning Karnes County Residential Center and T. Don Hutto Residential Center*

Dear Open Records Coordinator:

On behalf of the American Civil Liberties Union of Texas ("ACLU of Texas"), I write to request information[1] pursuant to the Texas Public Information Act, Texas Government Code Chapter 552, concerning Karnes County Residential Center, located at 409 FM 1144, Karnes City, Texas 78118, and T. Don Hutto Residential Center, located at 1001 Welch Street, Taylor, Texas 76574. Specifically, I request the following information:

1. Any license pertaining to the operation of Karnes County Residential Center;
2. All records relating to any licensure application pertaining to the operation of Karnes County Residential Center;
3. Any license pertaining to the operation of T. Don Hutto Residential Center; and,
4. All records relating to any licensure application pertaining to the operation of T. Don Hutto Residential Center.

If your agency does not possess any of the above-requested information, please let me know. To the extent possible, I request that responsive information be emailed to the attention of

---

[1] The term "information" includes all records or communications in written or electronic form, including but not limited to correspondence, documents, data, videotapes, audio tapes, emails, faxes, telephone messages, logs, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, training manuals, other manuals, or studies.

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS**

**DALLAS OFFICE**
P.O. BOX 600169
DALLAS, TX 75360
T/ 214.346.6575

**RIO GRANDE VALLEY OFFICE**
P.O. BOX 6087
BROWNSVILLE, TX 78523
T/ 956.465.1905

**STATE CAPITOL OFFICE**
P.O. BOX 12905
AUSTIN, TX 78711
T/ 512.478.7300

**STATE HEADQUARTERS**
P.O. BOX 8306
HOUSTON, TX 77288
T/ 713.942.8146

WWW.ACLUTX.ORG

Exhibit 16 - Page 249

Adriana Piñon at following address: apinon@aclutx.org. Records that are not available electronically can be mailed to: Adriana Piñon, ACLU of Texas, P.O. Box 8306, Houston, TX, 77288.

In addition, I request a waiver of any fees associated with this request. Section 552.267(a) of the Texas Public Information Act allows for a fee waiver where "providing the copy of the information primarily benefits the general public." This request merits a waiver because the ACLU of Texas has no commercial interest in obtaining the requested information. We seek this information to further public understanding of the workings of government. Moreover, as stated in our articles of incorporation filed with the Texas Secretary of State, the ACLU of Texas is a non-profit organization organized exclusively to promote the public interest.[2] However, if a fee waiver is denied, please notify me of the cost of completing the request.

Thank you in advance for your cooperation. If you have any questions, please do not hesitate to call me at 713-942-8146 x 111.

Sincerely,

Adriana Piñon
ACLU of Texas

---

[2] The Internal Revenue Service recognizes the ACLU Foundation of Texas as a non-profit, public interest research organization under Sec. 501(c)(3) of the IRS Code.

Exhibit 16 - Page 250

**Adriana Pinon**

| | |
|---|---|
| **From:** | Christopher Clay |
| **Sent:** | Friday, August 22, 2014 1:15 PM |
| **To:** | Adriana Pinon |
| **Subject:** | FW: PIA Request 08212014LDL |

**Christopher Clay**
American Civil Liberties Union of Texas
P.O. Box 8306, Houston, TX 77288-8306
*with offices in Austin, Brownsville, and Dallas*
■ o 713.942.8146 x106 ■ CClay@aclutx.org
www.aclutx.org



BECAUSE FREEDOM CAN'T PROTECT ITSELF

This message may contain information that
is confidential or legally privileged. If you are
not the intended recipient, please immediately
advise the sender by reply email that this
message has been inadvertently transmitted

**From:** DFPS Open Records Requests [mailto:DFPSOpnRec@dfps.state.tx.us]
**Sent:** Friday, August 22, 2014 1:05 PM
**To:** Christopher Clay
**Subject:** RE: PIA Request 08212014LDL

Good Afternoon Christopher,

I got word back from Child Care Licensing and they have confirmed that both operations are not licensed by DFPS.  They are both run by ICE.

Please let me know if you have any questions.

Sincerely,

Craig Purifoy | DFPS Records Management Group | Open Records Coordinator | 512.929.6689

**From:** Christopher Clay [mailto:CClay@aclutx.org]
**Sent:** Wednesday, August 20, 2014 3:57 PM

1

Exhibit 16 - Page 251

**To:** DFPS Open Records Requests
**Subject:** PIA Request 08212014LDL

Please see the attached open records request

**Christopher Clay**
American Civil Liberties Union of Texas
P.O. Box 8306, Houston, TX 77288-8306
*with offices in Austin, Brownsville, and Dallas*
■ o 713.942.8146 x106 ■ CClay@aclutx.org
www.aclutx.org 🇫 🐦



BECAUSE FREEDOM CAN'T PROTECT ITSELF

This message may contain information that
is confidential or legally privileged. If you are
not the intended recipient, please immediately
advise the sender by reply email that this
message has been inadvertently transmitted

Exhibit 16 - Page 252