1  CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
   Carlos Holguín (Cal. Bar No. 90754)
2  Peter A. Schey (Cal. Bar No. 58232)
   Marchela Iahdjian (Cal. Bar No. 295595)
3  256 South Occidental Boulevard
   Los Angeles, CA 90057
4  Telephone: (213) 388-8693
   Facsimile: (213) 386-9484
5  Email:crholguin@centerforhumanrights.org
           pschey@centerforhumanrights.org
6          marchela@centerforhumanrights.org

7  ORRICK, HERRINGTON & SUTCLIFFE LLP
   William A. Molinski (Cal. Bar No. 145186)
8  wmolinski@orrick.com
   T. Wayne Harman (Cal. Bar No. 254089)
9  wharman@orrick.com
   Elena Garcia (Cal. Bar No. 299680)
10 egarcia@orrick.com
   777 South Figueroa Street, Suite 3200
11 Los Angeles, CA 90017
   Telephone: (213) 629-2020
12
   *Attorneys for Plaintiffs*
13 (listing continues on following page)

14

15                   UNITED STATES DISTRICT COURT

16               CENTRAL DISTRICT OF CALIFORNIA

17                       WESTERN DIVISION

18

19

20 Jenny Lisette Flores, et al.,          Case No. CV 85-4544-RJK(Px)

21              Plaintiffs,               **Plaintiffs' First Set Of Exhibits In Support Of Motion For Class-Wide Enforcement Of Settlement [Part 6: Exhibit 17]**

22        v.

23 Jeh Johnson, Secretary, U.S. Department  Hearing:   March 9, 2015
   of Homeland Security, et al.,            Time:      TBD
24             Defendants.                  Dept:      TBD

25

26                        **PUBLIC VERSION**

27

28

1

2    *Plaintiffs' counsel, continued:*

3    LA RAZA CENTRO LEGAL, INC.
     Michael S. Sorgen
4    Maria Victoria Castro
     Amanda Alvarado Ford
5    474 Valencia Street, #295
     San Francisco, CA 94103
6    Telephone:   (415) 575-3500
     Facsimile:   (415) 255-7593
7
     *Of counsel:*
8
     YOUTH LAW CENTER
9    Alice Bussiere
     Virginia Corrigan
10   200 Pine Street, Suite 300
     San Francisco, CA 94104
11   Telephone:   (415) 543-3379 x 3903

12   RANJANA NATARAJAN
     Clinical Professor
13   Director, Civil Rights Clinic
     University of Texas School of Law
14   727 E. Dean Keeton St.
     Austin TX 78705
15   Telephone:   (512) 232-7222

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX TO EXHIBITS

1   Settlement of class action, January 17, 1997 ................................................... 1

2   Order approving settlement of class action, January 28, 1997 ...................... 47

3   Stipulation extending settlement of class action, December 7, 2001 ................................................................................................................. 53

4   Plaintiffs' letter requesting pre-enforcement meeting, October 15, 2014 ............................................................................................................... 58

5   Plaintiffs' letter posing questions re: implementation of class action settlement, October 2, 2014 ............................................................. 64

6   Defendants' response to questions re: implementation of class action settlement, November 3, 2014 ........................................................... 85

7   ICE opposition to bond redetermination, July 24, 2014 ............................ 107

8   ICE opposition to bond redetermination, October 8, 2014 ......................... 158

9   U.S. Immigration & Customs Enforcement, news release, November 18, 4014 .......................................................................................... 210

10  Declaration of Bridget Cambria, November 7, 2014 ................................... 211

11  Declaration of Carol Anne Donohoe, November 15, 2014 .......................... 219

12  Declaration of J███ H█████ M████, September 20, 2014 .................. 227

13  Declaration of M███ C██████ d█ T███, September 19, 2014 ................................................................................................................. 232

14  Declaration of M███ F█████ S███, September 19, 2014 ......................... 238

15  Declaration of M███ L███ M█████, September 19, 2014 ...................... 244

16  Affidavit of Adriana Piñon re: Texas Public Information Act Request, September 3, 2014 ...................................................................... 248

17  Declaration of Barbara Hines, January 14, 2014 ........................................ 253

18  Declaration of D███ V███ A██████, January 9, 2015 .............................. 301

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 6: EXHIBIT 17]
CV 85-4544-RJK(Px)

19  Declaration of H█ R██████ M███, January 9, 2015 ........................... 305

20  Declaration of R███ E██████ A█████, January 8, 2015 ...................... 309

21  Karnes Attorney Visitation Form and Guidelines, January 9, 2015 ................................................................................................ 312

22  Declaration of Jonathan Hiskey, September 22, 2014 .................................. 314

23  Declaration of Carlos Holguin, January 13, 2015 ......................................... 319

24  Declaration of Luis H. Zayas, December 10, 2014 ........................................ 323

25  Declaration of Generva Gilden Berger, January 12, 2015 ........................... 366

26  Dilley Resident Handbook ................................................................................ 383

27  Memorandum of Understanding Re: Compromise of Class Action: Conditions of Detention, November 30, 1987 ............................... 433

28  Declaration of Anne Chandler, December 1, 2014 ........................................ 470

29  Declaration of Allison N. Boyle, November 24, 2014 .................................. 475

30  Declaration of Brittany Perkins, November 28, 2014 ................................... 490

31  Declaration of Clayton N. Matheson, November 24, 2014 .......................... 497

32  Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ....................... 504

33  Declaration of Melissa J. Cuadrado, November 26, 2014 ............................ 512

34  Declaration of Scott T. Williams, December 1, 2014 ................................... 522

35  Declaration of Virginia Marie Raymond, December 13, 2014 ................... 527

36  *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.), Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction, December 16, 2014 ........................................... 530

37  Flores Settlement Agreement and DHS Custody: Key Flores Provisions & DHS Noncompliance - Report of Lutheran Immigration and Refugee Services ............................................................. 570

ii

PLAINTIFFS' FIRST SET OF EXHIBITS IN SUPPORT OF MOTION FOR CLASS-WIDE ENFORCEMENT OF SETTLEMENT [PART 6: EXHIBIT 17] CV 85-4544-RJK(Px)

38   Declaration of S█████ C██ M██████, January 8, 2015 .................................. 577

39   Declaration of S████ B██ d█ T███, January 8, 2015 ........................... 580

40   Declaration of M████ G███ S████, January 8, 2015 ................................. 583

41   Declaration of E█████████ G████ M██████, January 9, 2015 ...................... 586

42   Declaration of A██ Z████ M██████, January 9, 2015 ................................. 590

43   Declaration OF A████ E█████████ d█ l█ C███ G████,
     January 9, 2015 ....................................................................... 594

44   Declaration of A███ F███ d█ E███████, January 9, 2015 ....................... 597

45   Declaration of H█████ L████ M██████ P███, January 9, 2015 ...................... 602

46   Declaration of M████ M██████ M████, January 8, 2015 .......................... 606

47   Declaration of C█████ M█████ C████████ C███, January 8,
     2015 ......................................................................................... 609

48   Declaration of S█████ L████ M██████ A█████, January 9,
     2015 ......................................................................................... 611

49   Declaration of L██ B█████ S██████, January 8, 2015 ............................... 613

50   Declaration of S███ A█████ M██████ D██████, January 8,
     2015 ......................................................................................... 617

51   Declaration of O████ F███ C███████ M████, January 9, 2015 ................... 621

52   Declaration of J███████ E██████ E████████ F████, January 9,
     2015 ......................................................................................... 624

53   Declaration of Lauren Beth Connell, November 26, 2014 ........................... 627

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 6: EXHIBIT 17]
CV 85-4544-RJK(Px)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian


    /s/ Carlos Holguín
Attorneys for Plaintiffs

# Exhibit 17

## Publicly Filed

## DECLARATION OF BARBARA HINES

I, Barbara Hines, hereby declare:

1. I make this declaration based on my own personal knowledge and, if called to testify, I could and would do so competently as follows:

**Background and Experience**

2. I have been a licensed attorney in Texas since 1975. I am a clinical professor of law and co-director of the immigration clinic at the University of Texas School of Law. I have held this position since January 1999. I have practiced immigration law for 39 years. I have been Board Certified in Immigration and Nationality Law by the State Bar of Texas since 1981. I have won numerous awards for my work in the field of immigration law including the 1992 American Immigration Lawyers Association (AILA) Jack Wasserman Award for Excellence in Litigation; the 1993 AILA Texas Chapter Litigation Award; the 2002 Texas Law Fellowships Excellence in Public Interest Award; the 2007 AILA Elmer Fried Excellence in Teaching Award; the 2009 MALDEF Excellence in Legal Services Award; the 2010 National Lawyers Guild Carol King Award and the 2014 Massey Teaching Excellence Award.

3. I have represented countless non-citizens in removal, bond and asylum proceedings in my 39 years of practice. The immigration clinic represents immigrants in removal proceedings and thus I have supervised and taught many students handling bond and asylum cases over the last 16 years. In addition, I have taught a law school seminar on the Immigration Consequences of Crime, including classes on detention and bond. I have spoken at numerous continuing legal education seminars on issues relating to bond, detention and asylum. I mentor other attorneys in these areas of immigration practice.

1

Exhibit 17 - Page 253

4. I am one of the founders and coordinating committee members of the Karnes pro bono project. The Karnes pro bono project is a joint effort of the law firm of Akin Gump, the University of Texas School of Law immigration clinic, the Refugee and Immigrant Center for Education and Legal Services (RAICES), Tahirih Justice Center, and volunteer attorneys. The project works to provide legal representation to women and children detained at the immigration detention center in Karnes City, Texas. Our project holds weekly calls to discuss legal strategy, court procedures, intakes, case distribution and administration of the project. I mentor volunteer lawyers, discuss their individual cases, and provide samples and templates for use by our group. I also coordinate with and participate in discussions and meetings with the American Immigration Lawyers Association pro bono project at the Artesia, New Mexico detention facility, as well as with local and national immigration organizations focusing on family detention.

5. Since August 2014, under my direction, the immigration clinic at the University of Texas School of Law has represented eight women in custody redetermination proceedings, each of whom had one child in detention as well. Clinic students and faculty have also conducted dozens of intake screenings for potential representation through the Karnes pro bono project. Our students have served as interpreters for other pro bono lawyers working at the Karnes facility as well. Our clinic monitors detention conditions at Karnes, and we have interviewed many women regarding conditions at the facility. I receive information regarding the detention situation of families held at Karnes directly from women detained at the facility, as well as from my students in the immigration clinic and from volunteer lawyers who participate in the Karnes pro bono project.

Exhibit 17 - Page 254

6. All of the families that we have represented, interviewed, counseled or interpreted for are from El Salvador, Guatemala and Honduras. All are women detained with one or more children. All are asylum seekers.

7. Based on the above experiences, I am very familiar with the policies and practices of U.S. Department of Homeland Security ("DHS") with regard to the detention of mothers and children, particularly at the Karnes detention center.

**DHS's past policy and practice with respect to detention of families**

8. Through my experience practicing immigration law in Texas and my interactions with national immigration organizations and immigration attorneys practicing throughout the United States, I also have knowledge of the government's past policies and practices with respect to immigration detention of families. Prior to the summer of 2014, families apprehended near the border without immigration documents were generally briefly detained by U.S. Customs and Border Protection and then released. DHS did not generally take custody of families.

9. Although DHS did detain families at the T. Don Hutto immigration detention center in Taylor, Texas, from May 2006 to September 2009, family detention at Hutto was widely condemned and ultimately discontinued in response to intense media and other scrutiny, as well as litigation over conditions at the facility. In discontinuing family detention at Hutto, DHS reaffirmed its longstanding policy of releasing families on bond, parole or conditions of release, as well as making bond decisions based on individualized factors. Further, as far as I know, DHS never had a blanket policy of denying release to families detained at the Hutto facility who established a credible fear of persecution and who were eligible for release on bond, recognizance or other conditions.

**DHS's Recent Expansion of Family Detention and Adoption of "No-Release" Policy for**

Exhibit 17 - Page 255

**Detained Families**

10. In June 2014, DHS changed its policies and began detaining families of children with mothers who were apprehended together after crossing the border. Many of these families were placed in a streamlined removal process known as expedited removal and were sent to DHS family detention facilities to await the outcome of the proceedings.

11. DHS first sent families to a newly opened detention center in Artesia, New Mexico. Beginning in August 2014, DHS began sending families to the detention center in Karnes City, Texas.

12. Since DHS began detaining families at the Karnes City facility, DHS has insisted on categorical detention of all of the families of mothers and children who are brought to the facility.

13. To my knowledge, Central American children and their mothers make up most if not all of detained non-criminal migrants at the southern border against whom DHS has adopted a no-release policy. The Office of Refugee Resettlement (ORR) continues to release unaccompanied Central American children to qualified custodians. I do not believe that children fathers who are arrested together are generally detained without the possibility of release.

14. DHS has applied this policy and practice of categorical detention even to Central American families who have been found to have a credible fear of persecution in their home countries and are eligible for release. For families who are eligible for release on their own recognizance, bond or other conditions under 8 U.S.C. 1226(a), and 8 C.F.R. 236.1(c)(8), ICE issues a custody determination notice shortly after a favorable credible fear determination and issuance of a Notice to Appear. In each such case at Karnes, the custody determination notice orders continued detention without opportunity for release on recognizance,

4

Exhibit 17 - Page 256

bond or other conditions. Each of the eight client families represented by the immigration clinic received a custody determination notice denying release. Based on my conversations with other attorneys in the Karnes pro bono network and outside of the network, as well as my observation of hearings in multiple Karnes cases before the immigration court, I am not aware of any family detained at Karnes who despite being eligible for release under 8 U.S.C. § 1226(a), and despite having received a favorable credible fear finding, then received an DHS custody determination allowing for release. Out of all such families detained at Karnes, I know of only two cases in which DHS reached a decision to release the family, but those decisions were based on serious medical considerations. Moreover, in those two cases, DHS initially issued a custody determination denying release.

15. DHS requires the detention of the families at Karnes regardless of whether they pose an individualized risk of flight or danger to the community. During the asylum interview, the USCIS asylum officer requests and records information regarding where the family will reside. DHS ignores this information, although it is readily available to them and included in the families' immigration files. Based on the information provided to the clinic by families detained at Karnes that we have represented, DHS does not conduct subsequent interviews with the families to obtain information regarding flight risk or danger to the community before issuing the custody determination notices. DHS provides no explanation to families when denying them release, whether on the Form I-286 Notice of Custody Determination or otherwise.

16. When families have sought a custody redetermination before an immigration judge, DHS counsel has opposed release and has argued before the immigration court that families must be held in detention in order to deter other Central American migrants from coming to the United

Exhibit 17 - Page 257

States. In each of the eight bond redetermination proceedings handled by the immigration clinic,

DHS counsel has submitted the same evidentiary packet containing, among other things, a

declaration from Philip T. Miller, Immigration and Customs Enforcement ("ICE") Assistant

Director of Field Operations for Enforcement and Removal Operations, stating that

"implementing a 'no bond' or 'high bond' policy would significantly reduce the unlawful mass

migration of Guatemalans, Hondurans, and Salvadoran." Decl. of Philip T. Miller ¶ 10. In

support of DHS's position, the evidentiary packet also includes a copy of *Matter of D-J-,* I. & N.

Dec. 572 (A.G. 2003), an Attorney General decision holding that certain migrants can be

detained for purposes of generalized deterrence and national security. *See id.* at 581. The packet

also includes a declaration from Traci A. Lembke, ICE Assistant Director over Investigation

Programs. True and correct copies of the Miller declaration and the Lembke declaration are

attached as Exhibit A.

17. Furthermore, to my knowledge, mothers and their children detained together by DHS,

who are predominantly Central American, are the only class of detainees eligible for release on

bond, recognizance or other conditions, for whom DHS has adopted a blanket "no release"

policy. In contrast to its blanket "no-release" policy for mothers detained with their children,

DHS routinely authorizes release for adults detained without children who pass a credible fear

screening and who are eligible for release on bond, recognizance or other conditions. For

example, the "no-release" policy is not being applied to the women without children who are

being detained at the T. Don Hutto detention facility. I have regularly represented women

without children who have been held at the facility since 2009. At Hutto, DHS authorizes release

on bond, recognizance or other conditions for detained women who have passed their credible

fear interviews, including many from Central America with similar claims as the mothers

Exhibit 17 - Page 258

detained at Karnes. In addition, to my knowledge, DHS generally does not have a policy of detaining fathers and children apprehended together.

**Examples of Mothers and Children Detained at Karnes**

18. I have visited women at the Karnes detention center on numerous occasions. I have discussed cases and conditions at Karnes with clinic students as part of my teaching and supervision responsibilities.

19. The Karnes detention center is a secure facility with a surrounding perimeter fence, operated by The GEO Group, Inc. Ingress and egress are controlled via jail-like security procedures. Visitors must pass through a metal detector and there is a secure door to enter the legal visitation room. Women and children cannot leave the detention center's premises. All mothers and children must wear a tag with their name, photo and alien registration number. GEO staff control the movements of women and children, among other things, setting and controlling the meal times, setting the evening lights-out time, at which time women and children must stay in their rooms and go to sleep and determining the procedures for the counts. Initially children and their mothers were required to remain in their rooms to be counted. Now they must line up three times a day to be counted. Schooling takes place inside the locked gates of the facility. GEO staff has the authority to "write up" and discipline women and children for infraction of facility rules.

19. The following descriptions, using pseudonymic initials, are examples of the mothers and children whom the immigration clinic has represented and are based on client files, interviews with clients that immigration clinic student and I have conducted and my familiarity with their cases.

Exhibit 17 - Page 259

LAC and Her Daughter D

19. LAC, and her daughter D, age two, from El Salvador, were apprehended by immigration authorities on July 30, 2014, and were detained at the Karnes Detention Center from approximately August 1, 2014 until their release on September 16, 2014. Ms. LAC and her daughter were initially placed in expedited removal pursuant to Section 235(b) of the Immigration and Nationality Act.

20. Ms. LAC and D were first taken to a U.S. Customs and Border Protection ("CBP") short-term holding facility at or near Hidalgo, Texas, where they were detained for one night. Ms. LAC told me that at this site, which she described as a "hielera" ("ice box"), she and her child experienced very harsh detention conditions. Ms. LAC stated that there were so many people in the holding cell that she could barely sit or stand and that she had to hold D in her arms. She and D. slept on the floor with only one blanket to cover them.

21. When Ms. LAC informed the Customs and Border Patrol agent of her fear of persecution based on domestic violence, he told her that she had a losing case. The agent discounted the threats against her and against D and told her that while her husband might kill her, he wouldn't kill his own child. The CBP agent told her to just "sign the papers." Ms. LAC responded that she couldn't sign the papers because she didn't understand what they said. The agent told her that if she didn't sign, she would be kept at the holding facility at the border and would not be transferred out. Thus, Ms. LAC signed the paperwork and was transferred to the Karnes Detention Center the following day.

22. On August 6, 2014, while detained at Karnes, Ms. LAC passed her Credible Fear Interview ("CFI"), based on her claim of domestic violence, inflicted by her spouse. DHS did not provide a separate CFI for Ms. LAC's child, or otherwise seek to examine any asylum claims that

8

Exhibit 17 - Page 260

her child might have independent of her mother. On August 7, 2014, ICE issued a Notice to Appear for both Ms. LAC and her daughter. However, ICE ordered the family detained in lieu of release on bond, recognizance, parole or supervision.

23. Upon information and belief, in denying Ms. LAC and her daughter any possibility of release, DHS did not take make an individualized assessment of flight risk or danger, nor consider any other relevant factors, in making its decision to continue detaining them at Karnes. Ms. LAC's Record of Sworn Statement taken by the CBP agent on July 31, 2014, indicates that she told the agent that her father was a lawful permanent resident. ICE did not provide Ms. LAC or her daughter any explanation of its decision to deny release in their case. ICE did not ask Ms. LAC if she had any family member in the U.S., if D had a legal guardian or if there were other responsible persons in the United States to whom D should or could be released. In fact, Ms. LAC's father and D's grandfather is a lawful permanent resident and resides in the United States.

24. ICE did not provide Ms. LAC's daughter, D, with any Flores settlement-related written notices, informing her of ICE's decision to keep D in custody nor did U.S. Department of Health and Human Services make any contact with Ms. LAC or her child. ICE did not take any other steps to pursue D's release nor provide Ms. LAC any documents or information regarding possible release of her daughter.

25. Upon information and belief, the decision to detain Ms. LAC and her daughter, in lieu of releasing them on recognizance, bond or parole, was made pursuant to a blanket no-release policy, instituted in the summer of 2014, that ICE applies primarily to Central American female-headed families. I base my opinion not only the bond hearings that my students and I have handled, but also on other hearings handled by lawyers from the Karnes pro bono project. In all of these cases, ICE attorneys have argued that Central American women and children should be

9

Exhibit 17 - Page 261

held with no bond because of alleged national security and deterrence concerns. In addition, as stated previously, I work closely with national advocacy groups in Washington, D.C., and the AILA pro bono project at Artesia, New Mexico, where we frequently discuss ICE's no-bond policy and the government's supposed rationale for Central American women and children's continued and prolonged detention.

26. On August 27, 2014, Ms. LAC retained the University of Texas immigration clinic as her attorneys in her removal case and in her daughter's. On September 10, 2014, based on Ms. LAC's and her daughter D''s request for a redetermination of bond, I appeared before Immigration Judge Glenn P. McPhaul in San Antonio, Texas. At a previous master calendar hearing, ICE submitted that same set of documents that it is has submitted in opposition to the release of Central American women and children detained at both Karnes and Artesia, arguing that because Ms. LAC and her child entered the U.S. during the 2014 influx of migrants, she, like all of Central American mothers and children, pose a risk to national security and should be detained in order to deter "illegal migration" by other Central American families.

27. I submitted extensive evidence in support of Ms. LAC's request for release on bond, including her favorable CFI determination; identity documents; Ms. LAC's affidavit; an affidavit and supporting documents from her father, a lawful permanent resident residing in the U.S.; an affidavit from the church pastor where Ms. LAC's father is an active member, attesting that the church will provide religious and community support for the family; proof of pro-bono legal representation where Ms. LAC and D will reside; and documents relating to domestic violence in El Salvador. In addition, I submitted documentation, including affidavits from experts on the issue of the root causes of Central American migration to rebut ICE's claim that all Central

Exhibit 17 - Page 262

American mothers and their children are national security risks and that they must be detained to send a deterrence message to other Central American mothers and children fleeing persecution.

28. During the bond hearing, I argued that Ms. LAC and her child did not pose any flight risk or danger to the community. When questioned by the immigration judge, ICE counsel conceded that the agency had no individualized information that Ms. LAC or her daughter were national security risks or that they posed a danger to the community. Judge McPhaul set a bond of $1,500 for Ms. LAC and ordered that D be released on an order of recognizance. However, he set as a condition of bond that Ms. LAC and D must be released together.

29. Ms. LAC was able to pay her bond, and she and her child were released after posting bond on September 16,2014.

30. While detained at Kames for approximately a month and a half, Ms. LAC stated that her daughter barely ate. She believed that D lost weight at Kames because D did not like and was not accustomed to the food. Ms. LAC gave D fruit to eat, but there was not enough for D. Ms. LAC was dissatisfied with medical care at Karnes and told me that her daughter did not receive adequate medical care when she had a cold. She told me that children could not take toys into their sleeping areas. Ms. LAC also stated that she and other women and children had to remain in their rooms during counts for long periods of time. Ms. LAC said that there was not enough water for all the women and children. Ms. LAC told me that GEO staff threatened mothers that if their children did not behave, they would separate them from their children.

31. I picked up Ms. LAC on September 16, 2014, when she was released from Karnes. She cried with emotion as she walked out the detention center. Her release took place on the day of the tour of Karnes by non-governmental organizations. Ms. LAC told me that ICE had suddenly filled the refrigerators with food, as women had not seen before, but that women and

11

Exhibit 17 - Page 263

children were told they could not eat from the refrigerators. Ms. LAC stated that on the day of the tour, women and children were required to remain in their rooms for several hours and could not leave, while the tour was being conducted.

IGZ and Her Son J

32. Ms. IGZ and her son, J, age three, from Honduras, were apprehended by immigration authorities on July 29, 2014, and were detained at the Karnes Detention Center from approximately August 1, 2014, until their release on November 6, 2014. Ms. IGZ and her son were initially placed in expedited removal pursuant to Section 235(b) of the Immigration and Nationality Act.

33. Ms. IGZ and her son J were first taken to a U.S. Customs and Border Protection ("CBP") short-term holding facility at or near Hidalgo, Texas, where they were detained for approximately tln·ee days. The CBP agent, who questioned Ms. IGZ, claimed that he had the authority to deport her and discouraged Ms. IGZ from seeking asylum. The agent stated to Ms. IGZ that all the women were coming from Central America to take advantage of the U.S. Further, the CBP agent said he didn't care about what happened to the people in Honduras or if they were killed in Honduras. The agent told Ms. IGZ that she did not have rights, insulted her throughout the whole process and called her an "india." (Indian). Ms. IGZ cried while holding her child, telling the CBP agent that she was afraid of returning to Honduras. The agent also made derogatory statements to Ms. IGZ about President Obama. He called him "ese negro Obama" (that black guy Obama) and said the President was a Muslim.

34. While detained at this CBP detention facility, Ms. IGZ and her child experienced very harsh detention conditions. Ms. IGZ and her son were never allowed to go outside during their border detention. Ms. IGZ requested blankets for her son, but never received any. The

Exhibit 17 - Page 264

temperature was cold, resulting in J becoming sick. There were approximately 60 people in the cell. There was nowhere to sit or sleep because of crowding and Ms. IGZ and J slept on the floor. CBP agents would wake some women up by kicking them. Ms. IGZ said that water and milk had to be consumed immediately when they were eating because the border officials would not let them have any liquids outside of the dining hours.

35. Ms. IGZ was provided a Credible Fear Interview (CFI) on August 15, 2014. The CFI was conducted by telephone with an asylum officer from the Houston field office and an interpreter. Neither Ms. Ms. IGZ nor her son was represented by counsel. Ms. IGZ later told her student attorneys that the asylum officer only allowed her to give yes or no answers. Further, the asylum officer did not allow her to explain her answers. Ms. IGZ felt limited because she had no chance to explain her history. DHS did not provide a separate CFI for Ms. IGZ's child, or otherwise seek to examine any asylum claims that her child might have independent of his mother's. The asylum office issued a negative CFI on August 15, 2014.

36. Subsequently, Immigration Judge Margaret Burkhart overturned the negative CFI decision, based on Ms. IGZ's claim of domestic violence, inflicted by her ex-husband. On September 16, 2014, ICE issued a Notice to Appear for Ms. IGZ and her son J. However, ICE refused to set any bond amount for the family.

37. Upon information and belief, in denying bond to Ms. IGZ and her son, ICE did not make an individualized assessment of flight risk or danger, nor consider any other relevant factors, in making its decision to continue detaining them at Karnes. ICE did not provide Ms. IGZ or her son any explanation of its decision to set no bond in their case. ICE did not ask Ms. JGZ if she had any family member in the U.S., if J had a legal guardian or if there were other responsible persons in the United States to whom J should or could be released. ICE did not

Exhibit 17 - Page 265

provide Ms. IGZ's son, J, with any Flores settlement-related written notices informing her of ICE's decision to keep J in custody and the U.S. Department of Health and Human Services did not make any contact with Ms. IGZ or her child. ICE did not take any other steps to pursue J's release nor provide Ms. IGZ any documents or information regarding possible release of her son.

38. Upon information and belief, the decision to detain Ms. IGZ and her son, in lieu of releasing them on recognizance, bond or parole, was made pursuant to a blanket no-release policy, instituted in the summer of 2014, that ICE applies to Central American female-headed families. I base my opinion not only on the bond hearings that my students and I have handled, but also on other hearings handled by lawyers from the Karnes pro bono project. In addition, as stated previously, I work closely with national advocacy groups in Washington D.C. and the AILA pro bono project at Artesia, New Mexico where we frequently discuss ICE's no-bond policy and the government's supposed rationale for Central American women and children's continued and prolonged detention.

39. On September 20, 2014, Ms. IGZ retained the University of Texas immigration clinic as attorneys in her removal case and in her son's.

40. On October 27, 2014, based on Ms. IGZ and her son J's request for a redetermination of bond, clinic student attorneys and I appeared before Immigration Judge Gary Burkholder in San Antonio, Texas. At a previous master calendar hearing, ICE submitted the same set of documents that it is has submitted in opposition to the release of Central American women and children detained at both Karnes and Artesia, arguing that because Ms. LAC and her child entered the U.S. during the 2014 influx of migrants, she, like all of Central American mothers and children, pose a risk to national security and should be detained in order to deter "illegal migration" by other Central American families.

14

Exhibit 17 - Page 266

41. ICE's standard documentation, also submitted in Ms. IGZ's case, includes the affidavits of two DHS officials, Traci A. Hembke and Philip T. Miller. To justify ICE's no-bond policy, both affiants claim to rely on the findings of the *Americas Barometers Insights 2014: Violence and Migration in Central America*, an academic study conducted by Professor Jonathan Hiskey and other professors at Vanderbilt University. However, Ms. Hembke and Mr. Miller misrepresent the study's findings. On September 22, 2014, Professor Hiskey prepared and signed an affidavit attesting to ICE's misuse and mischaracterization of the study's conclusions. On information and belief, ICE attorneys are aware that Professor Hiskey has contradicted Hembke's and Miller's characterization of his research, but they continue to submit these misleading affidavits in opposition to the release of Central American women and children without disclosing to the immigration courts of Professor Hiskey's repudiation of ICE's position. On information and belief, ICE has also continued this practice in cases of unrepresented women detained at Karnes, who are unaware of the Hiskey affidavit.

42. Clinic student attorneys and I submitted extensive evidence in support of Ms. IGZ's request for bond redetermination, including identity documents; Ms. IGZ's affidavit; an affidavit and supporting documents from her sponsor, a member of her sister's church; an affidavit from the sponsor's and her sister's pastor welcoming Ms. IGZ into the church; proof of pro bono legal representation in the city where Ms. IGZ and J will reside; documents relating to domestic violence in Honduras; and proof that Ms. IGZ and her son are prima facie eligible for relief under the Violence Against Women's Act (VA WA) (because Ms. IGZ's abusive ex-husband is a naturalized U.S. citizen). In addition, we submitted documentation, including affidavits from expert academics, on the issue of the root causes of Central American migration and the affidavit of Professor Hiskey, described above, to rebut ICE's claim that all Central American mothers and

Exhibit 17 - Page 267

their children are national security risks and that they must be detained to send a deterrence

message to other Central American mothers and children fleeing persecution.

43. During the bond hearing, clinic students argued that Ms. IGZ and her child did not

pose any flight risk or danger. ICE argued that Ms. IGZ and J. should be detained because of

national security and deterrence concerns. The ICE counsel refused to negotiate any bond,

despite the fact that clinic students provided evidence that Ms. IGZ was eligible for lawful status

pursuant to the Violence Against Women Act. Judge Burkholder set a high bond of $8,000 for

Ms. IGZ and an order of recognizance for J. However, he set as a condition of bond that Ms. IGZ

and J must be released together.

44. Ms. IGZ was only able to raise $3,000 for her bond. Fortunately, the Refugee and

Immigrant Center for Education and Legal Services (RAICES) bond fund contributed the

remaining funds. Ms. IGZ and her son J were released from Karnes on November 6, 2014, after

posting bond.

45. While detained at Karnes from approximately August 1, 2014 through November 6,

2014, Ms. IGZ and her son suffered greatly. Ms. IGZ told us that there was little access to snacks

for children outside of the meal times. The refrigerators in the common areas were not restocked

regularly enough. Women could not take any food out of the cafeteria for their children.

Additionally, when Ms. IGZ first arrived at Karnes, women with infants were not provided baby

formula. Ms. IGZ had difficulty contacting her clinic student attorneys because she was unable to

make free phone calls. She stated that it was hard to keep small children in lines, as required by

GEO staff. Facility staff threatened women that if they continued to be "written up" that they

would separate them from their children. Women could be written up for having a messy room,

for their children speaking too loudly, or for their children stepping out of line in the cafeteria.

Exhibit 17 - Page 268

46. Ms. IGZ also told us that children who were not old enough to attend school were not provided with any educational programs or materials. Pens, crayons, markers, or paper were not regularly provided for all children. Children only had access to toys when they were in the visitation room, the "day care" rooms or at school.

47. When Ms. IGZ appeared by televideo in immigration court, the immigration judge did not allow her child to be present, although Ms. IGZ's son, J's, freedom was likewise at stake during the hearing. Ms. IGZ and all mothers at Karnes are required to leave their children with facility employees who, to the best of my knowledge and belief, are not licensed child care providers. Leaving her young child for an extended period of time with a facility employee was stressful for Ms. IGZ. On one instance when Ms. IGZ left her child at the "day care," she observed many children crying. She reported that there were only two GEO employees to care for all the children whose mothers were in court. At the "day care," there were insufficient snacks for the children.

JB and Her Son E

48. Ms. JB, and her son, E, age 4, from El Salvador, were apprehended by immigration authorities on August 20, 2014 and were detained at the Karnes Detention Center from approximately August 21, 2014 until their release on October 30,2014. Ms. JB and her son were initially placed in expedited removal pursuant to Section 235(b) of the Immigration and Nationality Act.

49. Ms. JB and her son E were first taken to a U.S. Customs and Border Protection ("CBP") short-term holding facility at or near Hidalgo, Texas, where they were detained for one day. Ms. JB told her clinic student attorney that at this CBP detention facility, she and her child experienced very harsh detention conditions. She and her son were provided limited amounts of

17

Exhibit 17 - Page 269

food which her son refused to eat because of the low quality. They were only provided a foil-like blanket, even though the cell was very cold. Ms. JB and her son E were barely able to sleep. There were no beds and the officers kept waking them up by knocking on the doors and turning on the lights. Ms. JB also told us that she was discouraged from filing for asylum. The CBP agent told that she was using her child to stay in this country and that it would not work. When Ms. JB refused to sign her deportation documents, the agent told her that she didn't need to sign in order for him to be able to send her back to El Salvador.

50. Ms. JB was provided a Credible Fear Interview (CFI) on August 28, 2014. Neither Ms. JB nor her son was represented by counsel. The CFI was conducted via telephone with an asylum officer from the Houston field office. The CFI occurred in Spanish with an interpreter. She later told her clinic student attorney that the asylum officer did not allow her to explain herself and would often cut off her answers. Ms. JB also said that the officer directed questions away from the crux of her claim. Additionally, Ms. JB's child, who was feeling sick, was present during the interview, making it very difficult for Ms. JB to fully explain the abuse and persecution she had experienced in El Salvador.

51. On September 10, 2014, Judge Margaret Burkhart overturned the negative CFI decision, based on Ms. JB's claim of persecution by the MS-13 gang in El Salvador, including death threats against Ms. JB and her partner and her kidnapping, rape, and sexual exploitation by the gang. On September 16, 2014, ICE issued a Notice to Appear for Ms. JB and her son E. Despite the family's prima facie eligibility for asylum, ICE refused to set any bond amount for the release of the Ms. JB or her son.

52. Upon information and belief, in denying bond to Ms. JB and her son, ICE did not make an individualized assessment of flight risk or danger, nor consider any other relevant

Exhibit 17 - Page 270

factors, in making its decision to continue detaining them at Karnes. ICE did not provide Ms. JB or her son any explanation of its decision to set no bond in their case. ICE did not ask Ms. JB if she had any family member in the U.S., if E had a legal guardian or if there were other responsible persons in the United States to whom E should or could be released. ICE did not provide Ms. JB's son, E, with any Flores settlement-related written notices informing her of ICE's decision to keep E in custody nor did U.S. Department of Health and Human Services make any contact with Ms. JB or her child. ICE did not take any other steps to pursue E's release nor provide Ms. JB any documents or information regarding possible release of her son.

53. Upon information and belief, the decision to detain Ms. JB and her son, in lieu of releasing them on recognizance, bond, or parole, was made pursuant to a blanket no-release policy, instituted in the summer of 2014, that ICE applies to Central American female-headed families. I base my opinion not only on the bond hearings that my students and I have handled, but also on other hearings handled by lawyers from the Karnes pro bono project. In addition, as stated previously, I work closely with national advocacy groups in Washington D.C. and the AILA pro bono project at Artesia, New Mexico where we frequently discuss ICE's no-bond policy and the government's supposed rationale for Central American women and children's continued and prolonged detention.

54. On September 20, 2014, Ms. JB retained the University of Texas immigration clinic as attorneys in her removal case and in her son's.

55. On October 23, 2014, based on Ms. JB and her son J's request for a redetermination of bond, a clinic student attorney and I appeared before Immigration Judge Glenn McPhaul in San Antonio, Texas. At a previous master calendar hearing, ICE submitted the same set of documents that it is has submitted in opposition to the release of Central American women and

Exhibit 17 - Page 271

children detained at both Karnes and Artesia, arguing that because Ms. JB and her child entered the U.S. during the 2014 influx of migrants, she, like all of Central American mothers and children, pose a risk to national security and should be detained in order to deter "illegal migration" by other Central American families. These documents included the Hembke and Miller affidavits, described in Paragraph 31 of this affidavit.

56. We submitted extensive evidence in support of Ms. JB's request for release on bond, including identity documents; Ms. JB's affidavit; an affidavit and supporting documents from her son's great aunt where she and her son plan to reside, proof of pro bono legal representation from a law school clinic in the area; a psychological evaluation establishing the trauma that Ms. JB suffered in El Salvador and in detention and her immediate need for medication to treat her post traumatic stress disorder; an expert academic affidavit supporting her asylum claim, and documents relating to gang violence and persecution in El Salvador, In addition, we submitted documentation, including affidavits from expert academics, on the issue of the root causes of Central American migration and the affidavit of Professor Hiskey, described above, to rebut ICE's claim that all Central American mothers and their children are national security risks and that they must be detained to send a deterrence message to other Central American mothers and children fleeing persecution.

57. During the bond hearing, the clinic student attorney argued that Ms. JB and her child did not pose any flight risk or danger to the community. ICE argued that Ms. JB and E should be detained because of national security and deterrence concerns. Judge McPhaul set a bond of $1,500 for Ms. JB and ordered that E be released on an order of recognizance. However, he set as a condition of bond that Ms. JB and E must be released together.

58. Ms. JB and her son E were released from Karnes after posting bond on Oct. 30 2014.

Exhibit 17 - Page 272

59. Ms. JB reported being harshly treated and subjected to numerous substandard conditions while she and her son were confined at the Karnes facility. She was "written up" by GEO officials when she failed to attend a count because her young child was sleeping. Ms. JB told us that children and their parents must line up to be counted. Ms. JB complained about the quality and amount of food at Karnes. Her son lost weight while detained as he refused to eat. Ms. JB bought food for E from the commissary but she could not always afford to do this. A GEO employee prohibited from her heating up milk in the evening for E. Mental health staff at Karnes diagnosed E as suffering from anxiety and nightmares and reported that E manifested fear of the police and of going to school. E was not provided adequate counseling or other treatment for these conditions.

**Summary of Karnes Pro Bono Project Case Files**

60.  Through the Karnes pro bono project, the University of Texas School of Law immigration clinic has tracked the proceedings of families who are eligible for release pending their immigration court proceedings, usually after passing a credible fear screening, and have been represented by volunteer attorneys in immigration court custody redetermination hearings. We have developed a tracking database on an Excel spreadsheet, which is housed at the immigration clinic. We ask volunteer attorneys from the Karnes pro bono project to report to us information regarding custody redetermination proceedings in which they have been involved. The data that we request from the volunteer attorneys includes information about: 1) a family's date of entry into the United States and apprehension; 2) date of immigration judge custody redetermination hearing; 3) name of the immigration judge conducting the custody redetermination hearing; 4) decision of the immigration judge regarding custody and any bond

21

Exhibit 17 - Page 273

amount set; and 5) decision by either party to appeal the immigration judge's custody
determination. In addition, we request additional information regarding the credible fear
interview and the basic facts of the asylum claim, as well as information about family members
or other sponsors who will house the family upon release from detention. All of this information
is entered into the database as a regular part of the work of the Karnes pro bono project, in order
to enable us to better advocate on behalf of the clients who are represented by volunteer
attorneys through the project. For example, we use the information to coordinate briefing efforts
on appeals of custody redetermination decisions filed with the Board of Immigration Appeals.

61. Our custody redetermination proceedings database currently includes 64 entries
relating to 64 families detained at the Karnes detention center who were denied release by DHS
despite being eligible for release under the statute, and who were represented by volunteer
lawyers during subsequent custody redetermination hearings before an immigration judge.
There is one entry per family, under the name of the mother, and each family includes one or
more children as well as the mother. We do not have complete information on every data point
for each entry, because the volunteer attorneys have not always provided the full information
requested.

62. For each entry in the database, the family has been placed into removal proceedings
and is statutorily eligible for release on bond, recognizance, or other conditions under INA
236(a). Almost all families have passed a credible fear screening interview. In a very small
number of cases, the families were placed directly into removal proceedings to pursue their
asylum claims without passing a credible fear interview, usually because of difficulties in
conducting the credible fear interviews for speakers of indigenous languages. In almost all cases,
it is the mother who has passed the credible fear interview, and the children are treated as

Exhibit 17 - Page 274

derivatives on the mother's asylum claim. In each case, DHS has served a Notice to Appear on
each family member to initiate removal proceedings, where the asylum claims will be heard.

63. Also, in each case, upon issuance of the Notice to Appear, DHS has issued a custody
determination for each member of the family, ordering continued detention. Every family in the
database had a custody redetermination hearing before an immigration judge. Because they were
part of the Karnes pro bono project, they had legal representation in these hearings.

64. The database tracks 64 custody redetermination hearings conducted by immigration
judges. Two immigration judges at the San Antonio Immigration Court have heard almost all of
the cases. In all 64 cases, the immigration judge has ordered release of the child(ren) on
recognizance and has ordered release of the mother on her own recognizance or on payment of a
bond. This strongly suggests that were it not for DHS's blanket No-Release policy, most of these
families would have been released and spared the additional weeks, sometimes months, of
detention that they are now forced to endure while they wait for bond hearings to take place.
Based on my review of the Karnes pro bono database, the data indicates that generally between
three to eight weeks lapsed between a mother's positive credible fear determination and her
custody redetermination hearing before an immigration judge.

65. In 18 cases for which volunteer attorneys have provided appeal information,
including two cases handled by the immigration clinic, DHS appealed custody redetermination
decisions to the Board of Immigration Appeals. In its appeals, DHS argued that the Immigration
Judge abused his discretion in granting release by failing to give sufficient deference to the
government's concerns about needing to deter mass migration, as articulated in *Matter of D-J-*,
23 I&N Dec. 572 (A.G. 2003). DHS recently filed its opening brief to the BIA in one appeal of a
case originating out of Artesia where it makes this same argument.

Exhibit 17 - Page 275

**Harms to Children and Mothers from Family Detention**

Harms from Unnecessarily Harsh Conditions

66. The University of Texas School of Law immigration clinic and others have

documented the appalling conditions to which immigration detainees are subject. On September

25, 2014, the University of Texas Immigration Clinic, the University of Texas Civil Rights

Clinic, MALDEF, and the Law Offices of Javier Maldonado sent a complaint letter to the

San Antonio ICE officials, notifying them of concerns at Karnes, including inadequate food,

problems with telephone access, lack of toys and developmental programs for children under

four, prohibition of crawling by infants, threats of separation of women from their children as a

disciplinary measure, separate living quarters for teenagers apart from their mothers, inadequate

medical and mental health services, lack of licensed child care providers and the high number of

male staff at the facility. A true and correct copy of that letter is attached here as Exhibit B. Two

months after the complaint was filed, ICE responded in a letter that the facility was "effective

and humane."

67. Mothers and children detained at Karnes were initially provided insufficient winter

clothing by the GEO Group. During a severe cold front in mid to late November, mothers and

children were provided only fleece jackets, even though they must routinely walk outdoors to go

from their rooms to other locations in the facility. Only after the University of Texas Civil Rights

Clinic complained on November 18, 2014, upon information and belief, did GEO begin to

distribute jackets, hats, gloves, and scarves to mothers and children.

68. In October 2014, after receiving credible allegations from detainees, MALDEF, along

with the University of Texas clinics and other advocates, filed a complaint letter with ICE

Exhibit 17 - Page 276

regarding allegations of sexual abuse by facility staff. A true and correct copy of that letter is attached here as Exhibit C. Although the DHS Office of Inspector General began an investigation, no results have been publicized to date.

69. For a few families, the GEO Group has separated children over the age of 13 from their mothers for their sleeping quarters. Instead of sleeping with their mothers and siblings, these children are made to sleep in a separate room with other children who are strangers. For many children already traumatized by experiences that gave rise to asylum claims, separation at night from their mothers and siblings has caused additional fear and anxiety.

Harms Relating to Finding and Talking with Attorneys and Presenting Asylum Cases

70. Being detained at Karnes makes it more difficult for women to obtain counsel and makes it challenging to offer adequate representation to those who are represented. For the immigration clinic, for example, each visit to Karnes involves a four and a half hour round trip drive from Austin, making it impossible to take on as many cases as would be possible without the time spent on travel.

71. As I know well through my decades of experience, it is very difficult for attorneys to prepare clients' asylum cases if they remain in detention throughout their proceedings. Preparing for a merits asylum hearing, including factual investigation of the basis of the asylum claim, requires a level of participation by the client that is difficult to achieve when a client is detained.

72. In addition, in my experience preparing cases for custody redetermination hearings before the immigration court, detention of mothers with their children poses additional challenges for the provision of adequate legal representation. Our clients must meet us with their children who are too young to attend school. If meetings occur during non-school hours, clients meet with us with their school-age children as well, since there is no day care at Karnes.

25

Exhibit 17 - Page 277

Furthermore, many of the children are very young and neither the children nor the mothers want
to be separated. Mothers do not want to leave their children with other detained women nor with
the untrained GEO staff who run the "day care" program. Thus, students and I have been forced
to prepare our clients for custody redetermination hearings, in which DHS routinely cross-
examines them regarding their asylum claims, in the presence of their children. The children can
hear their mothers describe horrific domestic violence, gang violence and other harm. It is also
difficult and much more time consuming for my students and me to develop the facts of a case
and prepare a client for court, when a mother must try to distract, entertain or comfort her crying
child during the attorney interviews. In several cases, I have found myself in the position of
caring for and occupying a child, for example with drawing materials, while simultaneously
trying to interview a tearful client.

73. We have also had difficulty obtaining access to Karnes for other members of our legal
teams, impeding effective representation of detained families. For example, volunteer attorneys
often must use an interpreter to communicate with their clients. The interpreters must be pre-
cleared before they can enter the facility. Even once cleared, interpreters have been asked to
obtain clearance again for a second visit. This process can be time consuming and inefficient,
making it difficult for attorneys to meet with their clients. It is also difficult for psychological
experts to travel long distances to visit families in detention. Such experts may be critical in
asylum and custody redetermination hearings, but securing psychological evaluations in many
cases is more difficult because of the detention setting.

74. The difficulty women face in obtaining counsel can contribute to the time spent
detained pursuant to the no-release policy. The Karnes pro bono project is not provided with the
identities of women who are scheduled for CFIs or who have passed their CFIs. In many cases,

Exhibit 17 - Page 278

therefore, project attorneys have learned about and interviewed women weeks after a credible fear finding and an ICE custody determination. Before a woman can receive a meaningful custody determination hearing in immigration court, it is first necessary for the project to match volunteer counsel to the client. When an attorney is found and enters an appearance at this late point in the proceedings, the attorney must request a continuance so as to prepare adequately for the bond proceedings. While appointment of counsel and adequate preparation are necessary due to ICE's policy of opposing all bond redetermination requests, these steps can cause delay and extend the time a family spends in detention.

75. Even though the immigration clinic and the Karnes pro bono project have represented women and children in custody redetermination proceedings, there are many other women and children at Karnes who do not have legal representation. More than 500 individuals are detained at Karnes at any time, involving approximately 200 families, and the Karnes pro bono project has only represented 64 families. Based on my past experience observing unrepresented detainees before the immigration court, I have witnessed the greater difficulties they face in presenting their cases. In the current context, unrepresented women face a particularly difficult challenge in arguing for release at a custody redetermination hearing since, as set forth above, DHS is submitting a standard evidentiary packet in all cases claiming that the women and children must be detained to deter future asylum-seekers. In my experience, unrepresented detainees generally do not know how to frame their asylum claims, and yet judges often ask them to explain the legal basis of their claims and DHS cross-examines them about their asylum cases. What is more, almost all of the detainees do not speak or read English, which severely hinders their ability to represent themselves. Their inability to read English prevents them from understanding documents, such as DHS's standard evidentiary packet, that are presented to them

Exhibit 17 - Page 279

in English. Any documents that they wish to submit in immigration court must be translated into
English for the court.

76. Although I do not have access to data on the outcomes of custody redetermination
hearings for unrepresented families at Karnes, I would expect that unrepresented families receive
higher bonds than families who are represented as part of the Karnes pro bono project. For
example, the Karnes pro bono project took over and represented one family who had appeared
pro se for their bond hearing. In that case, the immigration judge had set a significantly higher
bond amount for the family when they were unrepresented than the judge was typically setting
for represented families. This means that unrepresented families are more likely to remain
detained for a longer time, since it can be difficult to post the high bonds that are set. Moreover,
even though many of my clients have been able to secure release at a custody redetermination
hearing before an immigration judge, DHS's "no release" policy has unnecessarily prolonged
their detention in all cases.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of January 2015 in Austin, Texas.


_____

Barbara Hines

28

Exhibit 17 - Page 280

Exhibit A

Exhibit 17 - Page 281

## DECLARATION OF PHILIP T. MILLER

I, Philip T. Miller, hereby declare that the following statements are true and correct to the best of my knowledge, information, and belief:

1. My name is Philip T. Miller. I am a member of the Senior Executive Service serving as the Assistant Director of Field Operations for Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE) in Washington, D.C. I have held this position since May 2013. My current work address is: 500 12th Street Southwest, Washington, DC. I hold a B.A. and an M.A. in Political Science.

2. I began federal service in 1996 with the former Immigration and Naturalization Service (INS) as an Immigration Inspector in New Orleans, Louisiana, where I worked at both air and sea ports of entry. In 1998, I was promoted to a Deportation Officer, and served as Juvenile Coordinator, National Crime Information Center Fugitive Officer, and managed a long-term detention and rehabilitation program. In 2001, I became an ICE Special Agent, conducting administrative and criminal investigations, including investigations of alien smuggling, critical infrastructure protection, and counterfeit document vending.

3. In July of 2007, I became an Assistant Field Office Director within the New Orleans Field Office of Detention and Removal Operations (DRO). In this capacity I was responsible for managing all mission support functions and fugitive operations, and I served as the Field Office's Public Affairs Officer and Congressional Liaison Officer. In April of 2008, I was promoted to Deputy Field Office Director for DRO. In September of 2009, I was promoted to Field Office Director of the New Orleans Field Office.

4. My experience as an immigration officer includes planning, directing, managing, and coordinating operational functions relating to the apprehension, transportation, and detention of aliens ordered removed; the execution of final orders of deportation; and liaison with Departmental, interagency, and community partners regarding ERO matters.

5. In my current position as Assistant Director of ERO Field Operations, I oversee, direct, and coordinate operational activities throughout the nation's ERO field offices and sub-offices, ensuring such activities further agency goals and comply with agency policies. My duties include the oversight of operations concerning the detention of adults with children and unaccompanied children.

6. Last fiscal year, CBP apprehended 414,397 illegal migrants at the Southwest border, an increase of 16 percent compared to FY 2012 (356,873). Through July of this fiscal year, Southwest Border apprehensions reached r 421,957, compared to 348,798 during the same time period in FY 2013..

7. The number of credible fear cases that U.S. Citizenship and Immigration Services (USCIS) completed for nationals of all countries grew rapidly over a one-year period, going from 13,607 in FY12 to 36,454 in FY13, with the majority of this increase due to claims originating from nationals of El Salvador, Guatemala, and Honduras. USCIS

001

Exhibit 17 - Page 282

received a total of 8,475 credible fear cases for these three countries in FY12, with this number nearly tripling to 23,329 in FY13.
http://www.uscis.gov/sites/default/files/USCIS/Outreach/Notes%20from%20Previous%20Engagements/2013/Asylum-CredibleFear-ReasonableFear-FY13.pdf

8.  On May 12, 2014, Secretary Johnson declared a Level IV condition of readiness within the Department of Homeland Security (DHS), which is a determination that the capacity of CBP and ICE to deal with the situation is full and we need to draw upon additional resources across all of DHS. He appointed Deputy Chief Vitiello to coordinate this effort within DHS. See Written Testimony of DHS Secretary Jeh Johnson, at http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security.

9.  According to debriefings of Guatemalan, Honduran, and Salvadoran detainees, the high probability of a prompt release, coupled with the likelihood of low or no bond, is among the reasons they are coming to the United States. I have concluded that implementation of a "no bond" or "high bond" policy would significantly reduce the unlawful mass migration of Guatemalans, Hondurans, and Salvadoran.

10. The responsibilities of DHS include "[s]ecuring the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States...." 6 U.S.C. § 202(2) (codification of the Homeland Security Act of 2002). The DHS describes its cores missions as, inter alia, "[p]revent[ing] terrorism and enhancing security" and secur[ing] and manag[ing] our borders." http://www.dhs.gov/our-mission. Security of the borders includes a focus on the goal of "[d]isrupt[ing] and dismantl[ing] transnational criminal and terrorist organizations. http://www.dhs.gov/secure-and-manage-borders.

11. Detention is especially crucial in instances of mass migration. Annual surveys of people in Central American countries show that one key factor that influences the decision whether to migrate is the existence of an "active migration network," i.e. friends or family who previously migrated and are living in the United States. See Americas Barometer Insights: 2014, Violence and Migration in Central America, Latin American Public Opinion Project, Vanderbilt University, No. 101 (2014) [hereinafter Americas Barometer Insights].[1] Illegal migrants to the United States who are released on a minimal bond become part of such active migration networks.

12. Allowing detainees to bond out would have indirect yet significant adverse national security consequences as it undermines the integrity of our borders. As stated, the current detainees already are motivated, inter alia, by the belief that they would receive release from detention. Validating this belief further encourages mass migration, which only

---

[1] The work of the Latin American Public Opinion Project (LAPOP) is made possible through partnership with U.S. Agency for International Development. See http://www.vanderbilt.edu/lapop/sustaining-donors.php. LAPOP describes itself as "the premier academic institution carrying out surveys of public opinion in the Americas, with over thirty years of experience." See http://www.vanderbilt.edu/lapop/.

Exhibit 17 - Page 283

increases the already tremendous strain on our law enforcement and national security agencies.

13. Significant resources have had to be diverted to the Southwest Border, not only to handle the additional caseload, but also as part of a strengthened effort to investigate, prosecute, and dismantle criminal smuggling organizations. Such a diversion of resources disrupts our ability to deal with other threats to public safety, including national security threats. Specifically, DHS, together with the Department of Justice, has added personnel and resources to the investigation, prosecution, and dismantling of the smuggling organizations that are facilitating border crossings into the Rio Grande Valley Sector. ICE is surging 60 additional criminal investigators and support personnel to San Antonio and Houston offices for this purpose. *See Written Testimony of DHS Secretary Jeh Johnson*, available at http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security. Implementing a "no bond" or "high bond" policy would help ameliorate these disruptions.

14. Implementing a "no bond" or "high bond" policy would provide additional time to further screen the detainees and have a better chance of identifying any that present threats to our public safety and national security. In many instances illegal migrants arrive without any reliable identification documents, or present a fraudulent identity. In FY 2013 CBP encountered approximately 17,366 fraudulent documents at our Ports of Entry

15. Criminal enterprises and cartels are facilitating the networks of human smuggling and criminal activity along the Southwest Border. According to debriefings of Guatemalan, Honduran, and Salvadoran detainees, a majority of them paid funds to criminal elements, including the Zeta or Gulf cartels, to be smuggled across the Southwest Border. The average amount per alien paid was $3,800. The money paid to these cartels is used to fund additional illicit and dangerous activities in the United States and Mexico. By deterring smuggling activities, ICE can prevent further funding of these illegal organizations known for their intricate trafficking networks and murders.

16. By reducing the current influx of nationals, including adults with children, from Guatemala, El Salvador, and Honduras, DHS and other law enforcement agencies will be able to cease redirecting resources away from other priorities, such as removing criminal aliens and other individuals who pose a danger to the community.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

August 7, 2014.
Date

Philip T. Miller
Assistant Director, ERO Field Operations
Department of Homeland Security
U.S. Immigration and Customs Enforcement

003

3

Exhibit 17 - Page 284

## DECLARATION OF TRACI A. LEMBKE

I, Traci A. Lembke, hereby declare that the following statements are true and correct to the best of my knowledge, information, and belief:

1. My name is Traci A. Lembke. I am a member of the Senior Executive Service serving as the Assistant Director over Investigative Programs for Homeland Security Investigations (HSI), U.S. Immigration and Customs Enforcement (ICE), in Washington DC. I have held this position since September of 2013. My current work address is: 500 12th Street, SW, Washington, DC. I hold a B.A. degree from the University of Northern Colorado.

2. I began my federal law enforcement career in 1987 as a Special Agent with the former U.S. Customs Service (USCS) in Denver, Colorado. In 1991, I transferred to the USCS Office in Nogales, Arizona, where I investigated criminal organizations involved with illicit movement of narcotics, prohibited merchandise, firearms and currency into and out of the United States. In 1997, I was transferred to the Tucson, Arizona USCS Office of Internal Affairs (OIA), where I was promoted to the Resident Agent in Charge. In 2001, I was transferred by the USCS to Washington, DC, to join the Headquarters OIA staff, where I became the Director of the Internal Investigations Division.

3. In 2003, I was named the Unit Chief over Internal Investigations for the newly created ICE Office of Professional Responsibility (OPR). In 2006, I joined the Senior Executive Service and was promoted to Director for ICE OPR. In this capacity, I oversaw all criminal and administrative investigations involving employees of ICE, U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS).

4. In 2008, I was transferred to ICE's HSI, where I served as the Deputy Assistant Director (DAD) for the Investigative Services Division. I remained in this position until September 2013, when I was promoted to the Assistant Director for all of HSI's Investigative Programs.

5. My experience as a USCS and HSI Special Agent included planning, directing, managing and coordinating all aspects of complex criminal investigations, to include conducting surveillance, collecting/seizing evidence, interviewing witnesses and suspects, writing reports of investigation, and presenting my cases for federal criminal prosecution.

6. In my current position as the Assistant Director of HSI's Investigative Programs, I oversee, direct and coordinate over 100 investigative programs within four separate divisions, including the Transnational Crime and Public Safety Division. Within the Transnational Crime and Public Safety Division is the Human Smuggling and Trafficking Unit, which oversees programs designed to identify and disrupt criminal smuggling and trafficking organizations. This unit also assists with prioritizing these investigations according to the degree of risk posed to national security and public safety, and coordinating field office investigations to target human smuggling and trafficking organizations with the goal of eliminating their ability to function.

004

1

Exhibit 17 - Page 285

7. Congress has charged the Department of Homeland Security (DHS), ICE with securing the borders of the United States. Homeland Security Act of 2002, § 402(2), 116 Stat. 2135, 6 U.S.C. § 202(2) (2014). "Homeland security depends on security along our borders and at ports of entry. At our borders and ports of entry, we must deny entry to terrorists, drug traffickers, human traffickers, transnational criminal organizations, and other threats to national security and public safety while continuing to facilitate legal travel and trade." *Written Testimony of DHS Secretary Jeh Johnson for a Senate Committee on the Judiciary hearing titled "Oversight of the Department of Homeland Security"*, 113th Cong., 2d session (2014) available at http://www.dhs.gov/news/2014/06/11/written-testimony-dhs-secretary-jeh-johnson-senate-committee-judiciary-hearing.

8. ICE defines human smuggling as the "importation of people into the United States involving deliberate evasion of immigration laws." ICE Office of Investigations Memorandum, "Definitions of 'Human Smuggling' and 'Human Trafficking'" (Dec. 13, 2004). Human smuggling is traditionally motivated by a variety of reasons, including profit and family interest. The statutes governing this offense are contained within Title 8 U.S.C. Section 1324.

9. Although recent media reports emphasize the significant increases in unaccompanied children and family units encountered by immigration authorities along the Southwest border, the category of individual most frequently encountered illegally crossing the border is by far adults without children. *See* Customs and Border Protection, Southwest Border Unaccompanied Alien Children, available at http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children (reflecting that over 278,000 of the approximately 381,000 aliens CBP encountered in FY14 through June 2014 were neither unaccompanied children nor family units). In addition, the number of adults without children who illegally entered the United States increased from the last fiscal year. In FY13, CBP encountered approximately 278,000 adults without children at the Southwest border. In FY14 through June 2014, CBP already had encountered over 278,000 adults without children.

10. On May 12, 2014, Secretary Johnson declared a Level IV condition of readiness within DHS, a determination that CBP's and ICE's ability to deal with the situation was at full capacity and that drawing upon additional resources across all of DHS was needed. He appointed Ronald Vitiello, Deputy Chief of the U.S. Border Patrol, to coordinate this effort within DHS. *See Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border: Hearing Before the H. Comm. on Homeland Security,* 113th Cong., 2d session (2014) (testimony of Jeh Johnson, Secretary of DHS) available at http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security.

11. As the lead U.S. government agency for the investigation of human smuggling, ICE HSI initiates over 2,500 human smuggling and trafficking investigations annually. These criminal investigations have disclosed that human smuggling organizations (HSO) operating primarily in foreign countries and utilizing international confederates unlawfully

2

Exhibit 17 - Page 286

move individuals across international borders, regardless of whether these individuals pose potential national security or public safety threats. HSI's human smuggling initiative is focused on identifying, disrupting and dismantling human smuggling and the criminal infrastructure that supports it, as well as associated criminal organizations.   HSI is uniquely positioned, through its investigative capabilities, to affect this issue by disrupting the criminal organizations.

12. Human smuggling poses a serious threat to our nation's security. HSOs usually attempt to turn a quick and significant profit and continue moving undocumented aliens across our borders.  In severe cases, HSOs hold their human cargo hostage and demand more money from family members as a means to extort higher fees.  HSOs arrange for their human cargo to be taken to drop-houses often under unsafe conditions with no way to communicate with relatives or to notify authorities if there is an emergency. Some smuggled aliens have been beaten or raped.  For example, in a federal prosecution last month in Texas, "the conspirators seized the smuggled aliens' clothes, shoes, phones and other possessions. The conspirators used guns, paddles, tasers and other equipment to control and prevent the illegal aliens from escaping the stash house. They guarded the aliens with guns displayed in plain view and threatened to kill them by shooting them in the back of the head if they tried to escape." *See 3 Mexican Nationals Sentenced to More Than 9 Years in Federal for Their Roles Involving 115 Smuggled Aliens Discovered in Houston Stash House*, ICE News Release, Jul. 30, 2014, available at http://www.ice.gov/news/releases/1407/140730houston.htm.

13. HSOs often transport their human cargo — men, women and children — through desolate terrain, without food or water. They may also be placed into trucks or trailers without any ventilation.  In Texas, 19 people, including a seven-year-old boy, died inside an airless trailer truck that was used to smuggle them from Mexico, El Salvador and Guatemala. *See Another Defendant Involved in May 2003 Smuggling Tragedy in Victoria, Texas, Sentenced to Prison*, USAO, SD TX Press Release, Nov. 9, 2009, available at http://www.justice.gov/usao/txs/1News/Archives/Archived%20Releases/2009%20Novem ber/110909Flores.htm.

14. Unauthorized mass migrations may be triggered by a multitude of factors, including violence in the country of origin. *Department of Homeland Security's 2014 Quadrennial Homeland Security Review*, p.26 (Jun. 18, 2014) (hereinafter DHS Quadrennial Review). Annual surveys of people in Central American countries show that one key factor that influences the decision whether to migrate is the existence of an "active migration network," i.e. friends or family who previously migrated and are living in the United States.  *See Americas Barometer Insights: 2014, Violence and Migration in Central America*, Latin American Public Opinion Project, Vanderbilt University, No. 101 (2014) [hereinafter Americas Barometer Insights].[1]

---

[1] The work of the Latin American Public Opinion Project (LAPOP) is made possible through partnership with U.S. Agency for International Development. *See* http://www.vanderbilt.edu/lapop/sustaining-donors.php. LAPOP describes itself as "the premier academic institution carrying out surveys of public opinion in the Americas, with over thirty years of experience." *See* http://www.vanderbilt.edu/lapop/.

006

3

Exhibit 17 - Page 287

15. "Violent extremists and criminals can hide within this larger flow of migrants who intend no harm." DHS Quadrennial Review, p.26. For example, a man wanted in El Salvador for kidnapping was arrested by CBP in October 2013 while illegally entering the United States near Penitas, TX, in the Rio Grande Valley. *See* ICE Deports Salvadoran Man Suspected of Kidnapping in His Home Country, ICE News Release, Apr. 9, 2014, available at http://www.ice.gov/news/releases/1404/140409sanantonio.htm.

16. Transnational criminal organizations are expanding in strength and scope and may often engage in human smuggling in conjunction with other criminal activities. *See* DHS Quadrennial Review, p.26. For example, on July 17, 2014, HSI Del Rio special agents arrested a previously convicted cocaine smuggler and the leader of an illegal immigrant smuggling organization known for smuggling more than 400 undocumented immigrants into the United States since January 2013. *See* Secretary Johnson Announces 192 Criminal Arrests in Ongoing ICE Operation to Crack Down on Human Smuggling to the Rio Grande Valley, ICE News Release, Jul. 30, 2014, available at http://www.ice.gov/news/releases/1407/140722washingtondcb.htm.

17. Based on the DHS Immigration Statistics Yearbook for 2012, DHS apprehended individuals from over 160 different countries. On the Southwest border the majority have come from Mexico and Central America.

18. In many instances, illegal migrants arrive without any reliable identification documents or they present a fraudulent identity. In FY 2013 CBP encountered approximately 17,366 fraudulent documents at our Ports of Entry.

19. According to debriefings of detainees who have been part of the ongoing mass migration at the Southwest border, the high probability of a prompt release, coupled with the likelihood of low bond, is among the reasons they are coming to the United States. Illegal migrants to the United States who are released on a minimal bond become part of "active migration networks," *see* Americas Barometer Insights, which in turn likely encourages further illegal migration into the United States.

20. Combatting illegal migration and human smuggling requires significant HSI resources which necessarily must be diverted from other investigative priorities. Such a diversion of resources disrupts our ability to deal with other threats to public safety, including criminal activity related to illicit trade, travel and finance. Implementing a "no bond" or "high bond" policy would help alleviate these disruptions by deterring further mass migration.

007

4

Exhibit 17 - Page 288

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Aug 7th 2014
Date

Traci A. Lembke
Assistant Director Investigative Programs
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
Department of Homeland Security

008

5

Exhibit 17 - Page 289

# Exhibit B

Exhibit 17 - Page 290



**SCHOOL OF LAW**
THE UNIVERSITY OF TEXAS AT AUSTIN

*Civil Rights Clinic • 727 E. Dean Keeton Street • Austin, Texas 78705-3299 • 512-232-2698 • FAX 512-232-0800*

September 25, 2014

*Via Email and Regular Mail*

Enrique Lucero, Field Office Director
Sylvester Ortega, Assistant Field Office Director
San Antonio Field Office
U.S. Immigration and Customs Enforcement
1777 NE Loop 410, Suite 1500
San Antonio, TX 78217

Kevin Landy
Assistant Director
Office of Detention Policy and Planning
U.S. Immigration and Customs Enforcement
500 12th Street SW
Washington D.C. 20536

Re:    Complaints Regarding Conditions at Karnes County Residential Center

Dear Mr. Lucero and Mr. Landy:

We are writing on behalf of women and children who are currently detained at ICE's Karnes
County Residential Center in Karnes City, Texas whom we represent or with whom we have
consulted.  Through our legal work and consultations at Karnes, we have received many
complaints regarding the conditions at the Karnes facility, the most serious of which we have
listed below. We urge you to take immediate steps to correct these issues, since the health and
well-being of mothers and young children are at stake.

1.  Inadequate Access to Food. Detainees have complained that the two refrigerators with
    snacks are not regularly restocked, or that their children do not have access to a variety of
    nutritious snacks during non-meal hours. Several families reported that the refrigerators
    are only fully stocked during facility tours or visits, and that families are not allowed to
    take food from the refrigerators on those days to ensure that the refrigerators remain
    visibly full. Finally, mothers are not allowed to warm milk at night for their children.
    Adequate and nourishing food is imperative to ensure the growth, development, and well-
    being of the children at Karnes. Children commonly eat more food, and at irregular times,

1

Exhibit 17 - Page 291

during growth spurts, whether as toddlers or adolescents. In addition, nursing mothers are held at Karnes; they also require access to healthy foods at irregular times and calories beyond those required by other adults.

2. Problems with Telephone Calls and Messages. Several women have complained that the cost of outgoing phone calls, including domestic calls within the United States, is exorbitantly high. One client reported that her domestic call cost her approximately five dollars for two minutes. Women at Karnes cannot afford these prices. In addition, women have stated that they have difficulties making free calls to pro bono legal services providers. Outgoing phone calls are essential in order for detained women to communicate with their attorneys, their consulates, and their family members. In addition, messages from attorneys and family members are not given to women in a timely manner. Because attorneys and family members cannot call women directly, it is essential that a messaging system function properly to ensure effective communication between women and their attorneys and family members.

3. Toys and Playthings Not Allowed in Living Quarters. Women have complained that their children are not allowed to keep a set of toys or playthings, even paper and crayons, in their living quarters. Children of all ages require such items to promote their cognitive and psychosocial development, engage in imaginative play, and develop executive function. Moreover, many of these children have endured trauma in their home countries or on their journeys, and need additional care and attention.

4. Developmental and Educational Aids for Children under the Age of Four. Women have stated that children age three and under do not attend school or receive any educational or developmental programming. Because these are formative years for crucial cognitive and emotional development, children must have opportunities for social interaction, play, and education, including in a structured setting with licensed child-care providers.

5. Unduly Restrictive Treatment of Infants. Women have stated that guards have required mothers to carry their infants at all times, and that infants are not allowed to crawl and move about freely. Infants must be able to crawl and move freely to develop their balance and mobility, and aid in their cognitive development.

6. Gender of Guards. Karnes has a high number of male guards who interact with the women and children. Given that this is a facility that detains only women and children, in which many women have suffered gender-based violence in their home countries, and where DHS has an obligation to prevent sexual abuse of any kind, the presence of male guards is intimidating and potentially harmful.

2

Exhibit 17 - Page 292

7. Inappropriate Child Care Arrangements During the Mother's Absence. Women report that when they appear via televideo for their court hearings, facility guards are caring for their children in an open area. It is our understanding that the guards are not licensed child care providers, and they are not required to have coursework or certification in child development. Women have told us that guards are not able to properly attend to the large number of young children left in their care and do not make efforts to calm children who are crying or uncomfortable. This is particularly problematic because many of the children are suffering deteriorating mental health because of trauma in the home country and from the deleterious effects of detention. They may face emotional crises when separated from their mothers. Women also have complained that guards do not help young children to use the restroom, thereby increasing the risk of infection, and that guards do not timely feed children, so that children are ravenous when their mothers return.

8. Threats and Punishment against Detained Mothers and their Children. Women have reported that guards have told them that they will get "written up" if they have a messy room, if their child is being too loud, if the child wanders away out of line in the cafeteria, or if the child is separated from the mother too long. Guards have also told them that if they keep getting written up, the mothers will be separated from their children. Other guards have threatened to report disciplinary issues to the immigration judge hearing the families' asylum case.

9. Separation of Children from their Mothers. Some children over the age of thirteen have been separated from their mothers and are in separate living/ sleeping quarters, presumably in order to accommodate the maximum number of detainees. This family separation is harmful to children and their mothers, resulting in psychological harm that could be severe and long-lasting.

10. Inadequate Medical and Mental Health Services. Women have reported that although they are able to see the facility nurse, there is no doctor on staff to handle larger medical issues, such as persistent coughs, possible respiratory infections, and chronic ailments. Likewise, some women and children have reported feeling depressed or having nightmares, and they have not been able to see the therapist on staff, either because of scheduling issues or because they have not been informed of the mental health resources.

We urge you to take immediate measures to correct these conditions, and we trust that there will be no retaliation against any of the women and children at Karnes for sharing this information with us. We look forward to your prompt response. Please contact me at 512-232-7222 if you would like to discuss these issues further.

Exhibit 17 - Page 293

Sincerely yours,

*RNatarajan*

Ranjana Natarajan
Director, Civil Rights Clinic
The University of Texas School of Law

Along with:

Barbara Hines, Co-Director, Immigration Clinic, The University of Texas School of Law
Denise Gilman, Co-Director, Immigration Clinic, The University of Texas School of Law
Javier Maldonado, Law Office of Javier N. Maldonado, P.C.
Marisa Bono, Staff Attorney, MALDEF (Mexican American Legal Defense and Education
Fund)

Cc:     DHS Office of Civil Liberties and Civil Rights (via email:
        CRCLCompliance@hq.dhs.gov)

4

Exhibit 17 - Page 294

Exhibit C

Exhibit 17 - Page 295

# MALDEF

**Mexican American Legal Defense and Educational Fund**

**San Antonio
Regional Office**
110 Broadway
Suite 300
San Antonio, TX 78205
Tel: 210.224.5476
Fax: 210.224.5382

**National Headquarters
Los Angeles
Regional Office**
634 S. Spring Street
Los Angeles, CA 90014
Tel: 213.629.2512
Fax: 213.629.0266

**Chicago
Regional Office**
11 East Adams Street
Suite 700
Chicago, IL 60603
Tel: 312.427.0701
Fax: 312.427.0691

**Washington, D.C.
Regional Office**
1016 16th Street, NW
Suite 100
Washington, DC 20036
Tel: 202.293.2828
Fax: 202.293.2849

**Sacramento
Policy Office**
1512 14th Street
Sacramento, CA 95814
Tel: 916.444.3031
Fax: 916.444.7207

September 30, 2014

*Via Email and Regular Mail*

The Honorable Jeh Johnson
Secretary of Homeland Security
Washington, D.C.  20528

Department of Homeland Security
Office for Civil Rights and Civil Liberties
Review and Compliance
245 Murray Lane, SW
Building 410, Mail Stop #0190
Washington, D.C. 20528
Fax – (202) 401-4708
Email - CRCLCompliance@hq.dhs.gov

Kevin Landy
Assistant Director
Office of Detention Policy and Planning
U.S. Immigration and Customs Enforcement
500 12th Street SW
Washington, D.C.  20536

Enrique Lucero
Field Office Director
San Antonio Field Office
U.S. Immigration and Customs Enforcement
1777 NE Loop 410, Suite 1500
San Antonio, TX 78217

PREA Coordinator
Sexual Abuse and Assault Prevention
and Intervention Program Coordinator
Karnes County Residential Center
409 FM 1144
Karnes City, TX 78118

*Advancing Latino Civil Rights for over 40 Years*
www.maldef.org       Exhibit 17 - Page 296

Phebia Moreland, Director, Contract Compliance
GEO Corporate PREA Coordinator
The GEO Group, Inc.
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487
Email - pmoreland@geogroup.com


RE:     Complaints Regarding Sexual Abuse of Women in DHS Custody at
        Karnes County Residential Center

Dear Secretary Johnson, Ms. Shlanger, Mr. Lucero, and Mr. Landy:

We, the undersigned, are attorneys who have met with and represent women and children who are in DHS custody at the Karnes County Residential Center (the "Karnes Center"). We have become aware of serious allegations of substantial, ongoing sexual abuse in the Karnes Center, in violation of the Prison Rape Elimination Act (PREA) of 2003, 42 U.S.C. § 15601 *et seq.*; the Department of Homeland Security's (DHS) Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities, 6 C.F.R. Part 115; and U.S. Immigration and Customs Enforcement (ICE) Performance Based National Detention Standards (PBNDS), and Family Residential Standards. We ask that federal officials immediately investigate these allegations and implement protective measures for the women and children detained at the Karnes Center.

Numerous women detained at the Karnes Center have alleged that sexual abuse has been ongoing since August 2014, including:

1. Karnes Center guards and/or personnel removing female detainees from their cells late in the evening and during early morning hours for the purpose of engaging in sexual acts in various parts of the facility;

2. Karnes Center guards and/or personnel calling detainees their "novias," or "girlfriends," and using their respective position and power over the highly vulnerable detained women within the detention facility by requesting sexual favors from female detainees in exchange for money, promises of assistance with their pending immigration cases, and shelter when and if the women are released; and

3. Karnes Center guards kissing, fondling and/or groping female detainees in front of other detainees, including children.

On information and belief, at least three Karnes Center employees are suspected as having engaged in this conduct. Although detained women have reported the unlawful conduct to Karnes Center personnel, to date, no action has

2

Exhibit 17 - Page 297

been taken to stop or prevent this abuse, or to prevent its escalation. In fact, the Karnes Center provides an environment that facilitates the abuse. For example, Karnes Center guards, who are predominantly male, have free access to the cells and the detained women and children at any time, day or night. Moreover, some children over the age of thirteen have been separated from their mothers in separate living/sleeping quarters without explanation.

These incidents of sexual abuse and harassment and the hostile and unsafe environment for the women and children not only likely violate federal laws and regulations as noted below, they also likely subject the detained families to conditions that are punitive and unconstitutional under the Due Process Clause of the Fifth Amendment.[1]

PREA establishes a "zero-tolerance standard for rape in prisons in the United States." 42 U.S.C. § 15601–02. Under 28 C.F.R. § 115.6, "sexual abuse" of a detainee by a staff member at the facility includes any sexual contact with a detainee or resident, *regardless of whether such contact is consensual.* It also includes any "attempt, threat, or request" by a staff member to engage in sexual acts with detainees. 28 C.F.R. § 115.6.

Under 28 C.F.R. § 115.111, DHS and ICE must have a written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment and outlining the agency's approach to preventing, detecting, and responding to such conduct. DHS's Family Residential Standard for Prevention of Sexual Abuse mandates that all facilities must have protocols for responding to sexual abuse reported by detainees, and ensure proper follow up on such reports, including discipline and prosecution of assailants. It is clear from both the alleged continuing conduct and the failure to respond to reports of abuse that either there is no prevention plan in place for the Karnes Center, or the Karnes Center policy is not being properly implemented, overseen or enforced.

We call for an immediate investigation into these serious allegations of sexual abuse and the immediate protection of all women and children forced to reside in the facility, including but not limited to an investigation by the Office of Civil Rights and Civil Liberties (CRCL), pursuant to its authority under 6 U.S.C. § 345. Swift action must be taken to investigate the allegations and promptly implement protective and punitive measures, including disciplinary action, contract termination and staff dismissal as appropriate. Given the seriousness of the allegations and the poor management of the facility, DHS must provide direct oversight to ensure the complete safety and well-being of the detained families, including the immediate provision of appropriate medical and psychological services for victims.

We also demand that ICE bring the Karnes Center into compliance with PREA, its implementing regulations, and the Family Residential Standards by

---

[1] *Seling v. Young*, 531 U.S. 250 (2001).

Exhibit 17 - Page 298

developing, supervising, and enforcing a written policy to prevent, detect, and respond to unlawful sexual abuse by Karnes Center staff and ICE personnel. This includes an accessible and transparent complaint process for detained families, and proper training for all staff and management. All case records associated with claims of sexual abuse, including incident reports, investigative reports, offender information, case disposition, medical and counseling evaluation findings, and recommendations for post-release treatment and/or counseling should be maintained in appropriate files in accordance with the Family Residential Standards. Pursuant to 28 C.F.R. § 115.116, the Karnes Center must take appropriate steps to ensure that all detainees, including those who are not proficient in English, have an equal opportunity to benefit from all aspects of efforts to prevent, detect, and respond to sexual abuse and sexual harassment. Such steps shall include providing access to interpreters.

Finally, we request a written response detailing what ICE and the Karnes Center has done and will do in order to address the grave concerns we have described here. We trust that women who have or will come forward with complaints will not suffer retaliation, and that proper steps will be taken to prevent possible reprisal from staff or other detained women.

As you are well aware, the detainees at Karnes Center are predominantly women and children who have fled horrific violence and conditions in their home countries, including sexual violence and extortion. It is deeply disturbing that their experience in the custody of the U.S. government is subjecting them to further exploitation. DHS simply cannot continue to detain vulnerable individuals whom they are unable or unwilling to protect

Thank you for your prompt attention to these matters. If you have any questions, please contact Marisa Bono at (210) 224-5476 ext. 204.

Sincerely,

Marisa Bono
Staff Attorney
Mexican American Legal Defense
and Educational Fund (MALDEF)

Along with:

Barbara Hines, Co-Director, Immigration Clinic,
    The University of Texas School of Law
Ranjana Natarajan, Director,
    Civil Rights Clinic, The University of Texas School of Law

4

Exhibit 17 - Page 299

Andrea Guttin, Staff Attorney,
      Refugee Protection Program, Human Rights First
Javier Maldonado,
      Law Office of Javier N. Maldonado, P.C.
Allison Boyle,
      Law Office of Javier N. Maldonado, P.C.

cc:     Eskinder Negash, Director
       Office of Refugee Resettlement
       eskinder.negash@acf.hhs.gov

       Office of Inspector General
       DHSOIGHOTLINE@dhs.gov

       Jallyn Sualong, Administration for Children and Families
       901 D Street SW, ORR/8th Floor, Washington, DC 20447
       Email - jallyn.sualog@acf.hhs.gov

       Special Litigation Section, Civil Rights Division, U. S. Department of
       Justice, Fax:  (202) 514-0212; (202) 514-6273
       Email - Special.Litigation@usdoj.gov

       Warden, Karnes County Residential Center
       409 FM 1144
       Karnes City, TX 78118

       Texas Department of Family and Protective Services
       P.O. Box 149030, Austin, Texas 78714-9030

       Texas Ranger, Texas Department of Public Safety
       PO Box 4087, Austin, Texas 78773

       Sheriff Dwayne Villanueva, Karnes County Sheriff's Department
       101 N. Panna Maria Avenue
       Karnes City, Texas 78118

Exhibit 17 - Page 300