CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
       pschey@centerforhumanrights.org
       marchela@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
William A. Molinski (Cal. Bar No. 145186)
wmolinski@orrick.com
T. Wayne Harman (Cal. Bar No. 254089)
wharman@orrick.com
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020

*Attorneys for Plaintiffs*
(listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>Jeh Johnson, Secretary, U.S. Department of Homeland Security, et al.,<br><br>    Defendants. | Case No. CV 85-4544-RJK(Px)<br><br>**Plaintiffs' First Set Of Exhibits In Support Of Motion For Class-Wide Enforcement Of Settlement [Part 7: Exhibits 18-20]**<br><br>Hearing: March 9, 2015<br>Time: TBD<br>Dept: TBD |

**PUBLIC VERSION**

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen
Maria Victoria Castro
Amanda Alvarado Ford
474 Valencia Street, #295
San Francisco, CA 94103
Telephone:  (415) 575-3500
Facsimile:   (415) 255-7593

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone:  (415) 543-3379 x 3903

RANJANA NATARAJAN
Clinical Professor
Director, Civil Rights Clinic
University of Texas School of Law
727 E. Dean Keeton St.
Austin TX 78705
Telephone:  (512) 232-7222

PLAINTIFFS' FIRST SET OF EXHIBITS IN SUPPORT OF MOTION FOR CLASS-WIDE ENFORCEMENT OF SETTLEMENT
[PART 7: EXHIBITS 18-20]
CV 85-4544-RJK(Px)

| | INDEX TO EXHIBITS | |
|---|---|---|

| | | |
|---|---|---|
| 1 | Settlement of class action, January 17, 1997 | 1 |
| 2 | Order approving settlement of class action, January 28, 1997 | 47 |
| 3 | Stipulation extending settlement of class action, December 7, 2001 | 53 |
| 4 | Plaintiffs' letter requesting pre-enforcement meeting, October 15, 2014 | 58 |
| 5 | Plaintiffs' letter posing questions re: implementation of class action settlement, October 2, 2014 | 64 |
| 6 | Defendants' response to questions re: implementation of class action settlement, November 3, 2014 | 85 |
| 7 | ICE opposition to bond redetermination, July 24, 2014 | 107 |
| 8 | ICE opposition to bond redetermination, October 8, 2014 | 158 |
| 9 | U.S. Immigration & Customs Enforcement, news release, November 18, 4014 | 210 |
| 10 | Declaration of Bridget Cambria, November 7, 2014 | 211 |
| 11 | Declaration of Carol Anne Donohoe, November 15, 2014 | 219 |
| 12 | Declaration of J███ H██████ M███, September 20, 2014 | 227 |
| 13 | Declaration of M███ C██████ d█ T███, September 19, 2014 | 232 |
| 14 | Declaration of M███ F██████ S██, September 19, 2014 | 238 |
| 15 | Declaration of M███ L████ M████, September 19, 2014 | 244 |
| 16 | Affidavit of Adriana Piñon re: Texas Public Information Act Request, September 3, 2014 | 248 |
| 17 | Declaration of Barbara Hines, January 14, 2014 | 253 |
| 18 | Declaration of D███ V██ A████, January 9, 2015 | 301 |

i

Case 2:85-cv-04544-DMG-AGR   Document 101-6   Filed 02/02/15   Page 4 of 20   Page ID #:1231

| 19 | Declaration of H███ R██████ M████, January 9, 2015 ............................ 305 |
| 20 | Declaration of R███ E██████ A█████, January 8, 2015 ........................ 309 |
| 21 | Karnes Attorney Visitation Form and Guidelines, January 9, 2015 ............................................................................................................ 312 |
| 22 | Declaration of Jonathan Hiskey, September 22, 2014 ................................ 314 |
| 23 | Declaration of Carlos Holguin, January 13, 2015 ........................................ 319 |
| 24 | Declaration of Luis H. Zayas, December 10, 2014 ..................................... 323 |
| 25 | Declaration of Generva Gilden Berger, January 12, 2015 .......................... 366 |
| 26 | Dilley Resident Handbook ................................................................................ 383 |
| 27 | Memorandum of Understanding Re: Compromise of Class Action: Conditions of Detention, November 30, 1987 ................................ 433 |
| 28 | Declaration of Anne Chandler, December 1, 2014 ...................................... 470 |
| 29 | Declaration of Allison N. Boyle, November 24, 2014 ................................. 475 |
| 30 | Declaration of Brittany Perkins, November 28, 2014 .................................. 490 |
| 31 | Declaration of Clayton N. Matheson, November 24, 2014 .......................... 497 |
| 32 | Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ........................ 504 |
| 33 | Declaration of Melissa J. Cuadrado, November 26, 2014 ........................... 512 |
| 34 | Declaration of Scott T. Williams, December 1, 2014 .................................. 522 |
| 35 | Declaration of Virginia Marie Raymond, December 13, 2014 .................... 527 |
| 36 | *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.), Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction, December 16, 2014 ......................................... 530 |
| 37 | Flores Settlement Agreement and DHS Custody: Key Flores Provisions & DHS Noncompliance - Report of Lutheran Immigration and Refugee Services .......................................................... 570 |

ii

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 7: EXHIBITS 18-20]
CV 85-4544-RJK(Px)

| | | |
|---|---|---|
| 38 | Declaration of S█ C█ M███, January 8, 2015 | 577 |
| 39 | Declaration of S█ B██ d T██, January 8, 2015 | 580 |
| 40 | Declaration of M█ G███ S██, January 8, 2015 | 583 |
| 41 | Declaration of E████ G█ M███, January 9, 2015 | 586 |
| 42 | Declaration of A█ Z█ M███, January 9, 2015 | 590 |
| 43 | Declaration OF A███ E██████ d l C█ G███, January 9, 2015 | 594 |
| 44 | Declaration of A█ F██ d E████, January 9, 2015 | 597 |
| 45 | Declaration of H█ L██ M███ P█, January 9, 2015 | 602 |
| 46 | Declaration of M█ M███ M██, January 8, 2015 | 606 |
| 47 | Declaration of C███ M███ C█████ C█, January 8, 2015 | 609 |
| 48 | Declaration of S██ L█ M████ A███, January 9, 2015 | 611 |
| 49 | Declaration of L█ B███ S███, January 8, 2015 | 613 |
| 50 | Declaration of S█ A██ M███ D████, January 8, 2015 | 617 |
| 51 | Declaration of O█ F█ C███ M██, January 9, 2015 | 621 |
| 52 | Declaration of J████ E██ E█████ F███, January 9, 2015 | 624 |
| 53 | Declaration of Lauren Beth Connell, November 26, 2014 | 627 |

iii

PLAINTIFFS' FIRST SET OF EXHIBITS IN SUPPORT OF MOTION FOR CLASS-WIDE ENFORCEMENT OF SETTLEMENT
[PART 7: EXHIBITS 18-20]
CV 85-4544-RJK(Px)

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian


  /s/ Carlos Holguín
Attorneys for Plaintiffs

iv

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 7: EXHIBITS 18-20]
CV 85-4544-RJK(PX)

# Exhibit 18

Conditionally Filed Under Seal

DECLARATION OF D███ I███ V███-A███

I, D███ I███ V███ A███, declare and say as follows:

1. I am a native and citizen of El Salvador. I am 36 years old. I was arrested, along with my daughters J███ A███ V███, 15 years old, and I███ N███ V███ A███, 6 years old, near Hidalgo, Texas. We are currently detained at the immigration detention facility in Karnes City, Texas. We arrived here on November 15, 2014.

2. I decided to flee El Salvador because, among other things, gang members came and told me my daughter J███ was very pretty and that she had to go with them. They gave me two days to decide if I would give them my daughter, and that if I did not give them to her they would kill all of us. They said they knew where my mother lived and where I worked. Also, J███'s father had witnessed a gang murder and testified against the perpetrators. I feared that if the gang members learned that J███ was the daughter of a witness, they would kill her.

3. We entered the United States on about the 11th of November, 2014. We were arrested shortly after entering at about 8:30 at night, and we were first taken to a Border Patrol station near McAllen, Texas, where we spent three days and four nights.

4. We were very hungry when we arrived, but were given nothing to eat. The Border Patrol put us in a cell with perhaps 100 other women and children. There were so many of us that only perhaps half of us could lie down. The rest stood or crouched down as best we could. We were given neither mattress nor pillow, so we did our best to sleep on the hard concrete floor, which was covered with dust. We were given nothing to keep warm except a cover of aluminum foil. Neither my children nor I could sleep that first night.

5. The cell had only two toilets for all of us to use. There were short walls surrounding the toilets, but it was so crowded that people were sitting or lying down in the stalls, so any privacy the stall might have provided was lost. There was no waste basket in the stalls, so people had to throw used Kotex and used toilet paper on the floors. There was no soap for us to use to wash our hands, and we were not permitted to bathe or brush our teeth the entire time we were there.

5. The cell had no window to allow daylight to enter; only a window out to the central part of the Border Patrol station. They kept the light on all the time, and there was no clock so we lost track of whether it was day or night, but I believe it was the next morning when we were finally given something to eat, which was a baloney sandwich. For the next days, we were given nothing else to eat except baloney sandwiches three times a day. We were constantly hungry.

6. I did not manage to sleep during the four night I spent in the Border Patrol station. This was because there were too many people to lie down, officials were constantly calling people out of the cell and bringing other in, and I could not say whether it was day or night. My daughters managed to sleep a little bit, because I managed to get a little space for them to lie down.

7. When someone would ask for an extra aluminum blanket or something more to eat, the officials would tell us that we have been born under conditions worse than those at the station, so we shouldn't complain.

8. About two days after we had arrived at the Border Patrol station I was called out for an interview. I told the official I have a cousin living in the United States whom I believe is a U.S. citizen or a legal resident and lives in Washington state and works about half the year in Alaska, and would vouch for us and give us a home while our asylum claim is being decided. I gave the official my cousin's telephone number.

Sometime the next day, I think, I gave another interview to an official over a television screen. I told her the same thing about my cousin's willingness to help us, but she said we were going to be deported.

9. At the end of the three days in the Border Patrol station we were brought to the Karnes City detention. We share a room with, usually with five other persons. We are all women, usually about five children and three adults. We are not related; one of the other families we recently shared a room with is Salvadoran, and the other, Honduran.

10. Since we've been here neither I nor my children have never been allowed to leave the facility for any reason. When we entered we had to pass through two strong locked metal doors. We passed through one, and had to wait until it closed behind us before they opened the second door to allow us into the main part of the installation. Once inside, we found ourselves completely surrounded by block buildings with no opening to the outside world.

11. Three times a day officials come to count us: at 7:30, 4:00 and 8:00. Children over about 12 years are issued a pass allowing them to go to rec room and other parts of the facility, but those younger must be accompanied by their mother wherever they go.

12. We are not permitted to receive telephone calls. We are only able to make calls if we have money to pay for them, and they are very expensive. We were each given a card with three minutes credit for the telephone when we got here, but we used those minutes and now are not able to make telephone calls. We were also told that any calls we make would be recorded.

13. We are not permitted to wear rings, necklaces, or other jewelry. There is enough food, but we have to eat in accordance with the official schedule. Also, it is not

Exhibit 18 - Page 303

of good quality, and my youngest daughter sometimes refuses to eat. I estimate she has lost about two kilos in weight since we arrived here.

14. I asked an ICE officer if there was any possibility of our being released while my asylum claim is being decided. He told me that we could not be released except by order of an immigration judge. He did not tell me we could request to see a judge, but that they would set up a hearing for us.

15. About November 19, 2014, I was interviewed on my asylum claim, and the official concluded that I have a credible fear of being returned to El Salvador. As far as I can tell, this made no difference to ICE in my eligibility to be released on bond.

16. I do not understand English, but the foregoing was translated to me, and I understood its contents prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of January, 2015, at Karnes City, Texas.



D̶̶̶̶I̶̶̶̶V̶̶̶̶A̶̶̶̶

\* \* \* \* \* \*

### DECLARATION OF TRANSLATOR

I, Carlos Holguin, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I translated the foregoing to the declarant, who affirmed that she understood the contents thereof prior to signing.

Executed this 9th day of January, 2015, at Karnes City, Texas.

_____
Carlos Holguin

- 4 -

Exhibit 18 - Page 304

# Exhibit 19

Conditionally Filed Under Seal

DECLARATION OF H███ R████ M████

I, H██ R██ M███, declare and say as follows:

1. I was born in Guatemala. I am 27 years old. My immigration file number is ████████. I was arrested, along with my son, J████ 8 years old, near the U.S. border with Reynosa, Mexico. We are now being detained at the immigration facility in Karnes City, Texas. We arrived here on August 1, 2014.

2. Eight years ago I was raped and became pregnant as a result. The rapist did not know I was pregnant, and I was afraid to tell my father, so I left to live in Guatemala City with my sister. Several years later, the man who raped me appeared at my home and ordered me to give him my son, because he was a boy. I refused. Thereafter the rapist and his father began to harass and threaten me. Finally, he and some Zetas gang members broke in and destroyed my room. I then decided I could not stay in Guatemala any longer.

3. We entered the United States about the 15th of July, 2014. My son and I were arrested shortly after entering at about 5:00 in the afternoon. We were first taken to a Border Patrol station, I think near McAllen, Texas, where we spent three days or four days. I can't really say how long we were there because there was no window to the outdoors, the lights were always on, and after a while I did not know if it was day or night.

4. The Border Patrol put us in a cell with perhaps 125 other women and children. Boys older than perhaps 10 or 11 years were separated from their mothers and put in another cell. There were so many of us that we could not lie down. I spent most of the night standing up holding my son in my arms, shoulder-to-shoulder with many, many other detainees. We were given neither mattress nor pillow. It wouldn't have done any good anyway, because there was no place to spread out a mattress. I did not

understand why they packed so many of us in this cell, because I saw several other rooms that were empty or nearly so.

5. The Border Patrol officials took all of our clothing except an undershirt, pants, shoes and socks. The cell was very cold, and we were given no blankets or anything else to help us with the cold. We called this the "hielara" or icebox, because it was so cold it felt like we were in an icebox. I could see fog coming from the air conditioning vents. I knew it was warm outside, so it seemed that the cell was being kept very cold to punish us.

6. The cell had only one toilets for all of us. There were short walls about the toilet, but people were standing and even leaning against the toilet, so people would be watching when you went to the toilet. There was no place to throw dirty diapers, so we had to throw them in the corner by the toilet. There was no soap for us to use to wash our hands, and we could not bathe or brush our teeth during the days we were there. Some people didn't bathe or brush their teeth for eight days. The stench in the room was very strong.

7. Sometime later the officials gave us an apple and a cold taquito to eat, and water that tasted of Clorox to drink. This is what we were given to eat and drink twice a day for all the time we were in the hielera. We were constantly hungry.

8. I could not sleep during the time we were in the Border Patrol station. My son only slept a little between the frequent times they counted us. When someone would complain or ask for something, the officials would tell us that we have should have thought of that before coming here.

9. We were then taken to a place that detainees call "la perrera," or dog kennel, because it is like a warehouse with cages made of chain link fence. We spent one night there.

10. We were then brought to the Karnes City installation. We presently share a room with with six unrelated persons: four adult women and four children. For the first 15 days we were here we were permitted out of our rooms only to eat. All the rest of the time we were confined to our room. Little by little we were allowed out of our rooms more, but we are not allowed outside the installation. We are kept in by block buildings with no exit to the outside. Once an official came to count us, which they do three times per day, and I asked him why they bothered to count because how would one escape?

11. The officials here do no allow my son to be alone except when he is in class. Otherwise, I am required to be with him at all times.

12. We are not permitted to receive telephone calls. We are only able to make calls if we have money to pay for them, and $10 worth of credit is used up very fast. Sodas and other things we buy at the commissary are very expensive, but we have no choice but to pay for what they do not give us to eat or drink here. We have been told that any calls we make to our relatives are recorded.

/ / /

13. The food here is often too seasoned for my son and he refuses to eat it. I estimate he has lost about one kilo and a half since we arrived here.

14. I do not understand English, but the foregoing was translated to me, and I understood its contents prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of January, 2015, at Karnes City, Texas.



H▬▬ R▬▬ M▬▬

\* \* \* \* \* \*

### DECLARATION OF TRANSLATOR

I, Carlos Holguin, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I translated the foregoing to the declarant, who affirmed that she understood the contents thereof prior to signing.

Executed this 9th day of January, 2015, at Karnes City, Texas.

Carlos Holguin

# Exhibit 20

## Conditionally Filed Under Seal

DECLARATION OF R▮▮ E▮▮ A▮▮

I, R▮▮ E▮▮ A▮▮, declare and say as follows:

1. I am a native and citizen of El Salvador. I am 46 years old. I, along with my daughters E▮▮ A▮▮ H▮▮ A▮▮, 13 years old, and A▮▮ S▮▮ H▮▮ A▮▮, 11 years old, are currently detained at the immigration detention facility in Dilley, Texas. We arrived here on December 28, 2014.

2. We fled El Salvador because gang members had made our lives unbearable. They robbed my business and extorted money that I could no longer pay, sexually assaulted my daughter E▮▮ and threatened our lives on numerous occasions. We lived in terror for nearly two years before coming to the United States. In El Salvador, the police do not protect us from gang members. In fact, if you report them, the gang members are even more likely to kill you or your children.

3. We entered the United States near Reynosa, Mexico, on about the 25th of December. We were arrested shortly after entering, and we were first taken to a Border Patrol station near McAllen, where we spent the better part of two nights. The Border Patrol put us in a cell that measured about 8x8 meters. There were about another 30 women and children in the same cell with us. We were given neither mattress nor pillow, so we did our best to sleep on the hard concrete floor. We were given no blankets, and the first night we had only our sweaters to keep us warm. (The next night, a lady who was taken out of the cell gave us her cover, which was made of aluminum foil.)

4. When we arrived at the Border Patrol station we were very hungry. We were given sandwich and soda. We were given the same to eat and drink, I believe three times per day, but I cannot be sure because the cell we were in had no natural light, and no clock was visible, so we lost track of whether it was day or night. It was also very

- 1 -

Exhibit 20 - Page 309

uncomfortable because none of us was permitted to bathe or brush our teeth for the two days, and we were all wearing the same clothes we had worn when we were arrested.

5. About midnight of the second night after we were arrested, we were taken to another detention place, where we spent the rest of that night and one more night. Then we were brought to Dilley.

6. Here we are not free to leave. A wall surrounds the installation here. Facility officials count us three times per day: at 8:00 in the morning, noon, and 8:00 at night. We are not allowed to enter each others' rooms to watch television or for any other reason. Children are not allowed to move about the facility here without their mothers supervising them. We are not allowed to have cell phones, wear wristwatches or anything else that might be considered of value.

7. When we were arrested I told the Border Patrol officer that I have a brother and two sisters who live in Anaheim, California. My brother is a United States citizen, and my two sisters are lawful residents. I also told him my brother's name, address, and telephone number, and that he would provide us a place to live while our asylum claim is being decided. I also have another sister who lives in Dallas and is a lawful resident. The official told me that we could not be released until our asylum claim had been approved, although I told him that my sister would vouch for us.

///

8. I do not understand English, but the foregoing was translated to me, and I understood its contents prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of January, 2015, at Dilley, Texas.



R█████E████A█████

\* \* \* \* \* \*

### DECLARATION OF TRANSLATOR

I, Carlos Holguin, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I translated the foregoing to the declarant, who affirmed that she understood the contents thereof prior to signing.

Executed this 8th day of January, 2015, at Dilley, Texas.

Carlos Holguin