CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org
        marchela@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
William A. Molinski (Cal. Bar No. 145186)
wmolinski@orrick.com
T. Wayne Harman (Cal. Bar No. 254089)
wharman@orrick.com
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020

*Attorneys for Plaintiffs*
(listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Jeh Johnson, Secretary, U.S. Department of Homeland Security, et al., <br><br> Defendants. | Case No. CV 85-4544-RJK(Px) <br><br> **Plaintiffs' First Set Of Exhibits In Support Of Motion For Class-Wide Enforcement Of Settlement [Part 9: Exhibits 25-26]** <br><br> Hearing:   March 9, 2015 <br> Time:   TBD <br> Dept:   TBD |

**PUBLIC VERSION**

1

2     *Plaintiffs' counsel, continued:*

3     LA RAZA CENTRO LEGAL, INC.
      Michael S. Sorgen
4     Maria Victoria Castro
      Amanda Alvarado Ford
5     474 Valencia Street, #295
      San Francisco, CA 94103
6     Telephone:   (415) 575-3500
      Facsimile:    (415) 255-7593
7
      *Of counsel:*
8
      YOUTH LAW CENTER
9     Alice Bussiere
      Virginia Corrigan
10    200 Pine Street, Suite 300
      San Francisco, CA 94104
11    Telephone:   (415) 543-3379 x 3903

12    RANJANA NATARAJAN
      Clinical Professor
13    Director, Civil Rights Clinic
      University of Texas School of Law
14    727 E. Dean Keeton St.
      Austin TX 78705
15    Telephone:   (512) 232-7222

16

17

18

19

20

21

22

23

24

25

26

27

28
                                              PLAINTIFFS' FIRST SET OF EXHIBITS IN
                                              SUPPORT OF MOTION FOR CLASS-WIDE
                                                ENFORCEMENT OF SETTLEMENT
                                                 [PART 9: EXHIBITS 25-26]
                                                    CV 85-4544-RJK(Px)

INDEX TO EXHIBITS

1   Settlement of class action, January 17, 1997 ................................................... 1

2   Order approving settlement of class action, January 28, 1997 ...................... 47

3   Stipulation extending settlement of class action, December 7, 2001 ................................................................................................................. 53

4   Plaintiffs' letter requesting pre-enforcement meeting, October 15, 2014 ................................................................................................................. 58

5   Plaintiffs' letter posing questions re: implementation of class action settlement, October 2, 2014 ............................................................... 64

6   Defendants' response to questions re: implementation of class action settlement, November 3, 2014 ........................................................... 85

7   ICE opposition to bond redetermination, July 24, 2014 ............................. 107

8   ICE opposition to bond redetermination, October 8, 2014 ......................... 158

9   U.S. Immigration & Customs Enforcement, news release, November 18, 4014 ......................................................................................... 210

10  Declaration of Bridget Cambria, November 7, 2014 .................................. 211

11  Declaration of Carol Anne Donohoe, November 15, 2014 ......................... 219

12  Declaration of J███ H██████ M████, September 20, 2014 .................. 227

13  Declaration of M███ C██████ d█ T███, September 19, 2014 ......................................................................................................... 232

14  Declaration of M███ F██████ S███, September 19, 2014 ......................... 238

15  Declaration of M███ L███ M████, September 19, 2014 ..................... 244

16  Affidavit of Adriana Piñon re: Texas Public Information Act Request, September 3, 2014 ...................................................................... 248

17  Declaration of Barbara Hines, January 14, 2014 ......................................... 253

18  Declaration of D███ V███ A██████, January 9, 2015 .............................. 301

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 9: EXHIBITS 25-26]
CV 85-4544-RJK(Px)

19    Declaration of H█████ R█████████ M████, January 9, 2015 .............................. 305

20    Declaration of R█████ E████████ A██████, January 8, 2015 ........................ 309

21    Karnes Attorney Visitation Form and Guidelines, January 9, 2015 ..................................................................................................... 312

22    Declaration of Jonathan Hiskey, September 22, 2014 .................................. 314

23    Declaration of Carlos Holguin, January 13, 2015 ........................................ 319

24    Declaration of Luis H. Zayas, December 10, 2014 ...................................... 323

25    Declaration of Generva Gilden Berger, January 12, 2015 ............................ 366

26    Dilley Resident Handbook ........................................................................... 383

27    Memorandum of Understanding Re: Compromise of Class Action: Conditions of Detention, November 30, 1987 ................................ 433

28    Declaration of Anne Chandler, December 1, 2014 ....................................... 470

29    Declaration of Allison N. Boyle, November 24, 2014 .................................. 475

30    Declaration of Brittany Perkins, November 28, 2014 ................................... 490

31    Declaration of Clayton N. Matheson, November 24, 2014 ........................... 497

32    Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ........................ 504

33    Declaration of Melissa J. Cuadrado, November 26, 2014 ............................ 512

34    Declaration of Scott T. Williams, December 1, 2014 .................................. 522

35    Declaration of Virginia Marie Raymond, December 13, 2014 ................... 527

36    *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.), Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction, December 16, 2014 .......................................... 530

37    Flores Settlement Agreement and DHS Custody: Key Flores Provisions & DHS Noncompliance - Report of Lutheran Immigration and Refugee Services ............................................................ 570

38    Declaration of S████ C██M███, January 8, 2015 ................................. 577

39    Declaration of S███ B███ d█ T███, January 8, 2015 ........................... 580

40    Declaration of M██ G███ S███, January 8, 2015 ................................. 583

41    Declaration of E████████ G███ M███, January 9, 2015 ..................... 586

42    Declaration of A██ Z███ M███, January 9, 2015 ................................. 590

43    Declaration OF A███ E█████████ d█ l█ C██ G███,
       January 9, 2015 ................................................................................... 594

44    Declaration of A██ F███ d█ E██████, January 9, 2015 ....................... 597

45    Declaration of H███ L███ M███P███, January 9, 2015 ...................... 602

46    Declaration of M██ M██████M███, January 8, 2015 ......................... 606

47    Declaration of C███ M███ C██████ C███, January 8,
       2015 .................................................................................................... 609

48    Declaration of S███ L███ M███ A███, January 9,
       2015 .................................................................................................... 611

49    Declaration of L██ B███ S████, January 8, 2015 .............................. 613

50    Declaration of S███ A████ M███D████, January 8,
       2015 .................................................................................................... 617

51    Declaration of O███ F███ C█████ M███, January 9, 2015 ................... 621

52    Declaration of J████████ E████ E██████ F███, January 9,
       2015 .................................................................................................... 624

53    Declaration of Lauren Beth Connell, November 26, 2014 ........................... 627

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 9: EXHIBITS 25-26]
CV 85-4544-RJK(Px)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian


 /s/ Carlos Holguín
Attorneys for Plaintiffs

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 9: EXHIBITS 25-26]
CV 85-4544-RJK(Px)

# Exhibit 25

## Publicly Filed

## DECLARATION OF GENEVRA GILDEN BERGER

I, Generva Gilden Berger, hereby declare:

The statements in this declaration are based on my personal knowledge, and if called to testify I could and would do so competently as follows:

**Background and Qualifications**

1. I am a child welfare professional with over forty years of experience in child welfare programs, operations, and policies, both via direct service provision and in supervisorial and administrative capacities. My updated curriculum vitae is attached hereto as Exhibit A.

2. I began my career as a social worker with the Los Angeles County Department of Children and Family Services ("DCFS") (or as it was then called, the Department of Public Social Services). DCFS is the County agency responsible for providing child welfare services to children in Los Angeles County, the most populous county in the country with almost ten million residents. At DCFS, I held numerous supervisory and administrative positions, including Assistant Program Deputy, Child Welfare Administrator, and then Division Chief.

3. As the Chief of the Quality Assurance Division for Los Angeles County Department of Children and Family Services from 1992 to 2005, I was responsible for assuring legal consistency, financial compliance and quality delivery of services throughout the spectrum of public child welfare, from licensed care providers to the court dependency process, to adoption and aftercare services. County staff and private contractors to the county came within the purview of my functions.

4. Prior to that, as a Child Welfare Administrator, I designed the informational requirements and formats for the first computerized child welfare database in the county, implemented programs, analyzed fiscal and program legislation, and wrote agency policy.

1

Exhibit 25 - Page 366

5. In 1987, I developed a comprehensive quality assurance system in two implementation phases. I developed and implemented the first phase, which included the design of review protocols, practice assessments, and hiring and training of staff, to focus on the approximate 3,000 child welfare and adoption workers then employed. Annual reviews involved 1500 randomly-selected cases, immediate feedback to individual workers to explicate deficiencies in a less formal training setting and thereby positively affect ongoing practice, exit interviews with managers and supervisors to further explicate areas where regional training, discipline and management needed improvements, and statistical and management reporting. Prior to implementing this system, the county's child welfare system was threatened with take-over by the state for poor performance. Within four years of its implementation, Los Angeles was ranked as one of the top child welfare agencies in the state.

6. The second phase was concentrated on privately-owned congregate care providers and foster family agencies with whom Los Angeles County contracted. I revised the contract requirements and implemented audit measures to test compliance with state licensing regulations and the new contract deliverables. Over an approximate 10-year period, multiple agencies had their contracts terminated for cause while other agencies continued to improve their compliance and quality of service.

7. In addition to the quality assurance functions, I also managed the agency's Child Death and Serious Injury Review and the agency's litigation section which, together with the quality assurance findings, yielded a wealth of complementary data on problems and potential solutions both within and outside the agency.

8. Following my resignation from DCFS in 2004, I was appointed by the Los Angeles County Board of Supervisors to the Los Angeles County Commission for Children and Families,

Exhibit 25 - Page 367

on which I have served one year as vice-chair and the last two years as chair. The mission of the Commission is to advocate for children and families by overseeing DCFS and advising the Board of Supervisors on how best the County can meet the needs of at-risk children and families. The Commission's activities include reviewing all County programs and services for children at risk, receiving input from community organizations, making recommendations to the Board of Supervisors and department heads, and producing an annual report concerning the status of children's services.

9. Based on my experience as a child welfare professional, I have extensive knowledge of a wide array of programs and services for dependent children and families at risk, including foster care, family support services, mental health services, educational services, independent living support, quality child care, delinquency prevention, and programs for children who are homeless or at risk of homelessness.

10. I have previously served as an expert on child welfare administration in lawsuits in California, Florida, and Illinois.

**Relevant Facts and Materials Reviewed**

11. I am making this declaration in order to provide my considered opinion on the impact to child welfare from the practice by U.S. Immigration and Customs Enforcement ("ICE") of detaining children along with their mothers in family immigration detention facilities that are operated by contracting private companies and that are not licensed by the state in which they are located to provide care to dependent children. The opinions I offer are based on the following factual propositions, which I am informed and believe are true.

12. I understand that one such facility known as the Karnes County Residential Center, located in Karnes City, Texas, is operated by a for-profit company called the GEO Group. I

3

Exhibit 25 - Page 368

understand that another facility known as the South Texas Family Residential Center, located in Dilley, Texas, is operated by a for-profit company called the Corrections Corporation of America. I understand that these facilities are not currently licensed by the state (Texas) in which they are located.

13. I understand that U.S. Immigration and Customs Enforcement, which is within the Department of Homeland Security, currently detains children ranging in age from infancy to age seventeen, along with their mothers, in family immigration detention centers. ICE currently detains, or will detain, hundreds of children along with their mothers at the Karnes and South Texas detention centers. I understand that these children are recent entrants into the United States, and they are primarily although not solely from countries in Central America including Guatemala, Honduras, and El Salvador. The children do not for the most part speak English, and they are native Spanish speakers or speakers of various indigenous languages.

14. My findings and opinions are also based upon my review of the materials listed below, as well as my 40 plus years of experience as a child welfare professional who has overseen, administered, and supervised a wide array of child welfare services, including residential care, to children and adolescents. This includes experience conducting evaluations and oversight of child welfare programs and services, always with the goal of maximizing child welfare and minimizing risk of harm to children.

15. I have reviewed the following materials in relation to this declaration:

1) the Flores Settlement Agreement, available at

https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf;

4

Exhibit 25 - Page 369

2) the Texas Department of Family and Protective Services' *Minimum Standards for General Residential Operations*, as published in Chapter 748 of the Texas Register, available at http://www.dfps.state.tx.us/documents/Child_Care/Child_Care_Standards_and_Regulations/748_GRO.pdf;

3) the California Department of Social Services' *Manual of Policies and Procedures: Foster Family Homes*, as published in Title 22, Division 6, Chapter 9.5 of the California Code of Regulations, available at http://www.dss.cahwnet.gov/ord/entres/getinfo/pdf/ffhman1.pdf;

4) ICE Family Residential Standards, available at http://www.ice.gov/detention-standards/family-residential;

5) webpages and press releases about the Karnes and Dilley family detention centers, including:

a) ICE's new family detention center in Dilley, Texas to open in December, 11/18/14, available at https://www.ice.gov/news/releases/ices-new-family-detention-center-dilley-texas-open-december;

b) South Texas ICE detention facility center to house adults with children, 07/31/14, available at http://www.ice.gov/news/releases/south-texas-ice-detention-facility-house-adults-children;

c) CCA expands existing Intergovernmental Services Agreement to Manage the South Texas Family Residential Center in Dilley, Texas, 09/24/14, available at https://www.cca.com/press-releases/cca-expands-existing-intergovernmental-service-agreement-to-manage-the-south-texas-family-residential-center-in-dilley-texas;

Exhibit 25 - Page 370

d) The GEO Group Announces 626-Bed Expansion of the Karnes County Residential Center in Texas, December 19, 2014, available at http://phx.corporate-ir.net/phoenix.zhtml?c=91331&p=irol-newsArticle&ID=2001067;

6) articles from summer and fall of 2014 regarding immigration detention centers for families and children, including:

a) Taylor Wofford, Newsweek, The Operators of America's Largest Immigration Detention Center Have a History of Inmate Abuse, December 20, 2014, http://www.newsweek.com/operators-americas-largest-immigrant-detention-center-have-history-inmate-293632;

b) Julia Preston, New York Times, Detention Center Presented as Deterrent to Border Crossings, December 15, 2014, http://www.nytimes.com/2014/12/16/us/homeland-security-chief-opens-largest-immigration-detention-center-in-us.html?_r=0;

c) Julia Preston, New York Times, In Remote Detention Center, a Battle on Fast Deportations, September 5, 2014, http://www.nytimes.com/2014/09/06/us/in-remote-detention-center-a-battle-on-fast-deportations.html

d) Cindy Carcamo, Los Angeles Times, *Nearly 300 women, children deported from immigration detention centers*, August 21, 2014, http://www.latimes.com/nation/nationnow/la-na-nn-ff-new-mexico-immigration-deportation-20140821-story.html

e) Julia Preston, New York Times, As U.S. Speeds the Path to Deportation, Distress Fills New Family Detention Centers, August 5, 2014,

Exhibit 25 - Page 371

http://www.nytimes.com/2014/08/06/us/seeking-to-stop-migrants-from-risking-trip-us-speeds-the-path-to-deportation-for-families.html

f) Cindy Carcamo, Los Angeles Times, *Illness, unsanitary conditions plague immigration detention centers,* August 1, 2014, http://www.latimes.com/nation/la-na-immigrant-ig-report-20140731-story.html;

6) declarations provided by counsel for plaintiffs regarding representation of families in ICE detention, including: Declaration of Barbara Hines; Declaration of Brittany Perkins; Declaration of Allison Boyle; Declaration of Andrea Guttin; Declaration of Melissa Cuadrado; Declaration of Anne Chandler; Declaration of Scott Williams; and Declaration of Luis Zayas.

**Findings and Opinions**

**1. Lack of Detention Center Licensing Poses Unacceptable and Needless Risks of Harm to Detained Children**

16. As explained fully herein, U.S. Immigration and Customs Enforcement's practice of detaining children in secure facilities that are not licensed by the state in which they operate is detrimental to child welfare and places the detained children at grave risk of serious harm.

17. Federal law requires states receiving federal funding for foster care and child and family services to meet minimum requirements for, among other things, family foster homes and child care institutions that house non-delinquent children, even for short periods of time. Title IV-E of the Social Security Act authorizes this federal assistance program, and its implementing regulations, at 45 CFR Parts 1355-1357, set forth the requirements that states must meet. In setting forth the principles underlying the federally funded programs, the regulations at 45 CFR Part 1355.25(a) state: "The safety and well-being of children and of all family members is

7

Exhibit 25 - Page 372

paramount." Among other things, the regulations require states to license facilities where children are housed, in order to protect the safety and well-being of the children. *See e.g.* 45 CFR Part 1355.34(c)(7).

18. For example, 45 CFR Part 1356.30 requires states to complete criminal background checks of foster families and staff at child care institutions, to ensure child safety, and makes clear that states may not license facilities where background checks reveal certain criminal records. In addition, 45 CFR Part 1356.21(m)(2) requires states to periodically review the licensing standards for child care institutions and foster family homes. Under 45 Part 1356.71(d), federal agencies will review state programs for, among other things, proper licensing of family foster homes or child care institutions.

19. Likewise, nationally accepted standards of practice in child welfare require states to place dependent children, or children who have been temporarily removed by order of court from their parents' custody because of abuse or neglect, in facilities licensed and overseen by the state. The Child Welfare League of America, which is a coalition of hundreds of private and public agencies serving vulnerable children and families, has published best practices guidelines titled *CWLA Standards of Excellence for Child Welfare Services.* In Chapter 6 of the Standards, the CWLA states that "children have the right to the full protection of the state…"; that facilities must "meet or exceed all relevant licensing, accrediting and credentialing standards"; and, that state agencies should "conduct thorough and timely assessments and take any action necessary to protect children…".

20. The American Humane Association also publishes a book on best practices in child protective services titled *Helping in Child Protective Services: A Competency-Based Casework Handbook.* Chapter 7 of the Handbook makes clear that in addition to meeting licensing

Exhibit 25 - Page 373

standards, the agency must also have a "system of accountability" that embodies the safety and protection of children, the provision of resources in an effective and timely manner and the reduction of risk factors.

21. States maintain licensing systems for foster family homes and other residential facilities for children in order to ensure the health and welfare of children placed in those residences. States cannot and will not receive federal assistance if they violate federal regulations and place children in unlicensed facilities.

22. As a matter of federal law under Title IV-E and as a matter of nationally accepted standards of practice, meeting and maintaining state licensing standards is a basic child safety mandate for placement of dependent children in an individual home or congregate care facility.

23. Safety concerns animate the licensing requirements, which are similar from state to state. The safety concerns result in the following list of general, but not necessarily exhaustive, licensing criteria, with each criterion having numerous discrete points of examination:

- Certification that the property and all outbuildings meet electrical, plumbing and building codes and are free of fire hazards;

- Determination that the property is free of environmental and toxic waste hazards and is clean and well-kept;

- Determination that there is adequate food storage and that the food quality is fresh, nutritional and culturally appropriate to the resident population;

- Determination that there are suitable sleeping arrangements and that maximum occupancy of the facility as a whole and maximum occupancy of individual bedrooms is not exceeded;

Exhibit 25 - Page 374

- Certification that staff training curricula and individual staff training records document required training and proficiency in CPR, child care, conflict resolution, interpersonal dynamics, internal policies and procedures, cultural awareness and that all staff licenses are valid and up-to-date;

- Determination that educational, recreational and playground activities are available, age-appropriate and safe;

- Determination that medical and mental health facilities are available nearby and procedures and protocols are in place to quickly assess the presenting symptoms and transport to the medical facility in a timely manner;

- Determination that emergency procedures are well-defined and that all staff and residents are well-versed in them;

- Assurance that there is a feedback mechanism for staff and resident complaints that is linked to an independent state licensing agency.

- Determination that there are qualified professional staff on board to develop and update individual service plans, including educational and mental health needs.

24. The above minimum safety standards apply equally in Texas as in California, under the relevant regulations referenced above. Such regulations are crucial to the physical care of residents, for example by preventing accidents due to ingestion of poisons or toxic waste products not properly secured or disposed of, fire hazards left out in the open, and a variety of electrical, plumbing and structural deficiencies that can cause illness or severe injury. Equally crucial are mental health assessments and follow-up care for children who have already experienced trauma, or who cannot speak the language or cope within a comfortable environment.

10

Exhibit 25 - Page 375

25. It bears emphasis that the state licensing agency plays a pivotal role not only in initially assuring the standards are met but also in conducting periodic inspections to determine continuing compliance. Texas regulations require the state agency to monitor, oversee and periodically review and ensure compliance with licensing requirements even in the absence of specific reports that such requirements have been violated.

26. More important still is the critical role of the state licensing agency as the primary resource for complaints by residents or by staff who may see maltreatment or neglect by other staff or managers of the facility but are afraid to report it for fear of losing their jobs.  For a dependent child in care, there is also a state-provided social worker who routinely sees the child and who has established a bond of trust, which affords the fearful child greater accessibility to disclose problems of neglect or abuse.

27. In the case of family immigration detention, the fact that ICE places children in unlicensed facilities is appalling and worrisome. First, the federal agency is violating the principles that underlie federal law in Title IV-E of the Social Security Act. The federal government does not allow states receiving federal monies to place dependent children in unlicensed facilities. Therefore, for ICE to engage in the same practice that federal law forbids states from engaging in sets a troubling example and is highly disturbing in light of the grave risks of harm to children that may result.

28. Second, and most importantly, ICE is placing these children at risk of serious harm because the lack of licensing means that no qualified and independent agency is verifying that the minimal safety requirements – in terms of the physical plant, staff training, appropriate procedures for food safety and physical and mental health care, and so on – are being met. Nor is there any qualified and independent child welfare agency available to receive and investigate

Exhibit 25 - Page 376

allegations of child abuse or neglect that may occur in such unlicensed facilities. Such poor accountability and oversight only increases the odds that abuse or neglect will occur because abusers will discount the odds of their acts being discovered and corrected.

29. The fact that children in immigration detention facilities are detained along with their mothers is not a distinction that justifies their placement in unlicensed facilities or in any way mitigates the risk of harm from the lack of licensing. Although detained immigrant children are held along with their mothers in detention, their mothers cannot be expected to adequately protect their children from the harms that may arise in a detention setting because the mothers are in custody themselves and subject to the constraints of the detention center rules and staff. For example, the mothers cannot control the quantity or quality of food provided to their children, or even the times that food is provided, as they would in the free world. The mothers cannot obtain physical or mental health care for their children on demand after payment, as they would in the free world. The mothers cannot take their children away from a verbally abusive, bullying, or harassing guard or unrelated adult detainee, as they would in the free world. The mothers cannot choose their children's school as they would in the free world, since there is only one educational provider is a secure detention center. The mothers' ability to parent their children is severely compromised by virtue of their detention, and thus they would not be able to prevent harms that may result from placement in an unlicensed facility.

30. Finally, the ICE Family Residential Standards, which are not binding regulations, cannot substitute for a state licensing system that, as explained above, includes periodic monitoring and ongoing review and evaluation.

## 2. Detention Is Not the Least Restrictive Environment for Migrant Children

Exhibit 25 - Page 377

31. There are two axiomatic principles in child welfare: the first is that children should remain with their parents if at all possible, in the absence of abuse or neglect. The second is that dependent children, who are temporarily in governmental custody after a termination of parental rights, should be placed in the least restrictive environment, and family unity and ties should be supported and strengthened whenever possible.

32. For children who are in governmental custody, the "least restrictive environment" is typically placement in the home of a close family member, and not an institutional setting. In the child welfare context, a close family member's home is far preferable to any institutional setting because children are spared the trauma of a strange, often traumatizing setting with people they don't know. Relatives provide close emotional support in a family setting, which enables children to better cope with the trauma of the temporary loss of their parents while building trusting relationships. Studies have shown that family placement more effectively promotes cognitive and behavioral development in children of all ages, from infancy to adolescence, when compared with institutional placements.

33. From the child welfare perspective, the least restrictive environment is so important because the child in substitute care should know the person who is taking care of him or her, and have some familiarity with them, and living in a family-like setting reduces the child's fear from being with strangers and abates the child's anxiety as to what will happen to him or her.

34. Regardless of the conditions inside a facility such as the immigration detention centers at issue here, an institutional setting is never preferable to a home of a close family member who is competent and able to provide care because the more nurturing and personal the environment, the more realistic and achievable service plans become.

Exhibit 25 - Page 378

35. In the case of the children detained in the family immigration detention facilities, ICE clearly is not placing vulnerable children in the least restrictive environment. Presumably, ICE would justify this decision by stating that the children are detained with their mothers, and therefore ICE is keeping the families together. As explained above, however, parents who are detained cannot adequately protect their children or make parenting decisions because the rules and limitations of the detention center must always trump their parental prerogatives. In essence, ICE is placing children along with their mothers in the *most* restrictive placement.

36. To maximize the health and welfare of these children, ICE should place them in less restrictive settings. In order of preference, ICE should first seek to release them with their mothers when it is lawful to do so. Second, if simultaneous release of the parent and child is not possible, ICE should place these children with close family relatives or other qualified caregivers. Third, ICE should place them in facilities that are properly licensed and monitored and designed to care for dependent children. Ideally, ICE should release the children and the mothers together, so that the children can be cared for by their mothers in the free world. If ICE cannot release the mothers under the law, then ICE should evaluate, along with the mothers' input, whether the children could be placed temporarily with close relatives in their homes. That would be far less restrictive than requiring children to stay in detention with their mothers in a secure detention center.

### 3. Conditions at the Karnes Detention Center Are Harming the Children Detained There

37. I have read the above-noted declarations by attorneys representing women and children detained at Karnes. Based upon the information from those declarations and other reliable sources (including the news articles listed above), I believe that these children are in an

14

Exhibit 25 - Page 379

unsafe environment and are at substantial risk of irreversible trauma. These declarations detail numerous violations of nationally-accepted standards of care, licensing statutes and regulations including the Texas licensing regulations, and the *Flores* settlement agreement, all of which I have read and reviewed.

38. The violations are many:

- Threats and intimidation by Karnes staff in the form of withholding from residents food, water, phones, and freedom of movement within the facility;

- Lack of privacy;

- Lack of preventive medical care and necessary medications even when serious existing conditions are known;

- Lack of a safe and welcoming environment by enforcing rigid rules on residents, exacting punishment on adults in front of their children, and preventing personal expression by residents;

- Lack of sufficient fresh fruit, milk and food, which may have caused significant weight loss in mothers and young children;

- Limitation of necessities such as diapers, which one mother reported were rationed to one diaper per night even when her two-year-old was sick with fever and diarrhea;

- Failure to treat residents with respect by not telling residents whose children have received medical care the diagnosis, the reasons for and extent of the illness, and the follow-up care needed;

- Failure to provide translation services;

15

Exhibit 25 - Page 380

- Lack of mental health assessments at the intake stage which is axiomatic for all children who have been through the stresses that immigrant families coming to this country have endured;

- Unnecessary separation of mothers from older children which intensified an already fearful environment;

- Possible sexual abuse by Karnes staff against residents.

39. Regarding allegations of sexual abuse, in my long career, I have overseen numerous investigations of individual and group care facilities, both of which can be magnets for sexual predators who can get past background checks if there is no prior record on that person. In my personal experience, sexual assault was not uncommon in group facilities. Allegations of sexual assault, therefore, whether or not they appear credible, should be vigorously investigated by a state licensing agency as more than a remote possibility.

40. If the allegations in these attorneys' declarations are true, there is gross neglect and mistreatment of residents at Karnes. The attorneys themselves are at least 60 miles away and some hundreds of miles from Karnes, and cannot therefore expeditiously address the disclosures of their clients. In fact, most of their clients list among their complaints intimidation tactics by staff that includes barring access to phones and therefore to their attorneys.

41. The allegations of mistreatment in the declarations noted above become even more troubling when viewed in the light of research on early childhood trauma. One of the better references is The Harvard Studies on Early Childhood Trauma (National Scientific Council on the Developing Child, 2010) which in brief summary shows that the architecture of the young brain may be irreparably altered by persistent fear and anxiety resulting in lifelong negative outcomes for the affected children. In recounting the specific violations, therefore, we may really

16

Exhibit 25 - Page 381

be examining in post-mortem fashion how a young child's life ultimately resulted in suicide, crime, learning problems, emotional instability or other tragic outcomes.

42. The conditions that incite such trauma are the ones described so credibly by the residents to their attorneys in the already-referenced declarations and that violate all standards of good practice, the Texas licensing regulations, and the *Flores* Settlement standards.

**Conclusions**

43. It is my professional opinion that ICE's family immigration detention centers are not suitable placements for children for three independent reasons. First, the facilities are not licensed by the state of Texas and therefore lack proper safeguards—most importantly, monitoring by an independent agency with child welfare expertise—to ensure that they meet minimum safety requirements. Without such safeguards, ICE risks exposing children to grave harm. Second, ICE's family detention centers are clearly not the least restrictive environments for children, whether compared with living in the free world with their mothers or with close relatives, or in licensed, unsecure group homes. Third, attorneys representing children and mothers at these facilities have reported numerous conditions that would violate state licensing requirements and that pose potentially serious harms to the detained children. Based on those reports, at a minimum, ICE should complete an intensive investigation of such allegations and comprehensive review of these facilities and should cease detaining children at these facilities in the interim.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 13ᵗʰ day of January 2015 in _Pasadena_, California.

_Genevra Gilden Berger_
Genevra Gilden Berger

17

Exhibit 25 - Page 382

# Exhibit 26

## Publicly Filed

# South Texas Family Residential Center

## *Resident Handbook*

1925 W Highway 85
Dilley, TX 78017

Exhibit 26 - Page 383

# CONTENTS

INTRODUCTION ................................................................................................................ 7

STAFF ORGANIZATION AND CONTACT INFORMATION ................................................................ 7
   *Facility Staff* ................................................................................................................ 7

CONTACTING IMMIGRATION ................................................................................................ 8

THE RESIDENT INFORMATION CENTER .................................................................................. 9

RESIDENT HANDBOOK ...................................................................................................... 9

RESIDENT RIGHTS AND RESPONSIBILITIES ............................................................................ 9

RESIDENT PROGRAM RULES .............................................................................................. 11

RESIDENT REQUESTS ...................................................................................................... 12

LIVING ARRANGEMENTS .................................................................................................. 12
   *Bedrooms* ................................................................................................................ 13
   *Children Time* ............................................................................................................ 13
   *Overnight Checks* ........................................................................................................ 13

FREE MOVEMENT .......................................................................................................... 14
   *Outdoor Campus Access* ................................................................................................ 14

CLOTHING .................................................................................................................. 14
   *Center Clothing* .......................................................................................................... 15
   *Resident Dress Code* .................................................................................................... 15

LINENS ...................................................................................................................... 15

LAUNDRY ................................................................................................................... 16

PERSONAL HYGIENE ...................................................................................................... 16
   *Issued Personal Hygiene Items* ........................................................................................ 16

PERSONAL PROPERTY ..................................................................................................... 17
   *Allowable Property* ...................................................................................................... 17
   *Other Property* ........................................................................................................... 18
      Rules for Storing or Mailing Property ................................................................................ 18
      Staff Processing of Baggage and Personal Property Other Than Funds and Valuables ................... 19
      Release ................................................................................................................ 20
      Claims ................................................................................................................. 20
         *Stolen* ............................................................................................................ 20
         *Lost/damaged* .................................................................................................. 20
         *Processing* ...................................................................................................... 21
         *Investigation* ................................................................................................... 22
         *Replacement* ................................................................................................... 22
         *Reimbursement* ............................................................................................... 22
         *Property lost by another center / facility / agency* ...................................................... 23

CONTRABAND ........................................................................................ 23

WRITING INSTRUMENTS AND PAPER ........................................................ 23

GENERAL SAFETY/EVACUATION DRILLS ................................................... 24

RESIDENT CENSUS ................................................................................. 25

MEALS ................................................................................................. 25
  Snacks and Drinks ............................................................................. 26
  Special Diets .................................................................................... 26

RELIGIOUS SERVICES ............................................................................. 27
  Religious Services Coordinator (RSC) ................................................. 27

MEDICAL SERVICES ............................................................................... 27
  Emergency Medical Situations ........................................................... 28
  Sick Call ......................................................................................... 28
  Urgent Care ..................................................................................... 28
  Dental Services ................................................................................ 29
  Mental Health Services ..................................................................... 29
  Medications ..................................................................................... 29
  Medical Department Conduct ............................................................. 29
  Complaint or Grievance about Medical Care ......................................... 30

SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION .............. 30

MONITORED CARE SERVICES .................................................................. 31

RESIDENT CHORES ................................................................................ 31

TELEPHONE ACCESS ............................................................................. 31
  ICE Free Access Telephone Calls ........................................................ 32
  Indigent Resident Telephone Access ................................................... 32
  Legal Assistance Telephone Access .................................................... 32

FINANCES/RESIDENT FUNDS/MONEY ORDERS ........................................ 32

COMPLAINT AND GRIEVANCE PROCEDURES ............................................ 33
  Emergency Grievance Procedures ...................................................... 34
  Non-Grievable Matters ...................................................................... 35
  Staff Misconduct .............................................................................. 35

DISCIPLINE AND BEHAVIOR MANAGEMENT .............................................. 35
  Discipline Hearing Appeals ................................................................ 37
  Discipline Proceeding Postponements ................................................ 37
  Corrective Actions for Children .......................................................... 37
  Corrective Actions for Adults ............................................................. 38

DESCRIPTION OF OFFENSES .................................................................. 38
  Low Offenses ................................................................................... 38

*Moderate Offenses* ............................................................................................................ *39*

*Major Offenses* ................................................................................................................. *40*

EDUCATION ................................................................................................................ 42

*Special Needs Information* .............................................................................................. *42*

LIBRARY .................................................................................................................... 43

*General Library* ................................................................................................................ *43*

*Legal Information / Law Library / Access to Legal Materials* .......................................... *43*

*Materials Provided By Legal Representatives* ................................................................. *44*

*Free Legal Assistance* ..................................................................................................... *44*

RECREATIONAL PROGRAM ........................................................................................ 44

MARRIAGES ............................................................................................................... 44

VOLUNTARY WORK PROGRAM ................................................................................... 45

VISITATION ................................................................................................................ 45

*Social Visitation* .............................................................................................................. *46*

*Legal Aid Visitation* ......................................................................................................... *46*

*Consular Visitation* .......................................................................................................... *47*

*Visitor Dress Code* ........................................................................................................... *47*

ROUTINE SANITATION AND SAFETY INSPECTIONS ...................................................... 47

NON-ROUTINE SEARCHES ......................................................................................... 47

*Searches of Persons* ........................................................................................................ *48*

MAIL / CORRESPONDENCE ......................................................................................... 48

*Addressing Envelopes* ..................................................................................................... *49*

*Indigent Resident Mail* ................................................................................................... *49*

*Special Correspondence* .................................................................................................. *49*

*Postage and Envelopes* ................................................................................................... *50*

*Distribution of Incoming Mail* ........................................................................................ *50*

*Posting of Outgoing Mail* ................................................................................................ *50*

NOTARY PUBLIC ......................................................................................................... 51

PHOTOCOPIES ........................................................................................................... 51

HAIR CARE SERVICES .................................................................................................. 51

CONVENIENCE STORE ................................................................................................. 51

SMOKE-FREE ENVIRONMENT ...................................................................................... 51

SITE MAP ................................................................................................................... 52

# INTRODUCTION

The South Texas Family Residential Center (the Center) is operated by CCA. The Center's mission is to allow families to remain together while in ICE custody in the least restrictive setting available while enforcing rules necessary to ensure the safety and well-being of residents and staff alike. The Juvenile and Family Residential Unit (JFRMU) monitors activity at this Center. JFRMU is a unit within U.S. Immigration and Customs Enforcement and is responsible for all operations where ICE families are housed. JFRMU and the ICE Detention Services Monitor are responsible for monitoring the health, safety and security of residents placed here. These officers ensure the Center complies with federal standards relating to a variety of topics including food service, sanitation, medical care, visitation, and legal rights.

MAILING ADDRESS
**South Texas Family Residential Center**
**1925 W Highway 85**
**Dilley, TX 78017**

# STAFF ORGANIZATION AND CONTACT INFORMATION

## *Facility Staff*

Brief descriptions of the roles of certain staff members and their primary functions are listed below.

*Facility Administrator* -- Chief Administrative Officer of the Facility/Center. Directs, administers, oversees, and coordinates the activities of the Center;

*Assistant Facility Administrator(s)* -- coordinate(s) the professional Center management in the areas of security, unit operations, case management and programs operations;

*Chief of Security* -- responsible for the overall security plan, including staff and post assignments;

*Chief of Unit Management* -- supervises the overall operation of the housing unit management teams;

*Health Services Administrator* -- manages the Center's medical program activities and provides overall direction and leadership in compliance with all applicable policies, procedures, laws, regulations, and standards;

*Education Supervisor/Principal* -- responsible for the overall operation of the education department;

*Shift Supervisor* -- responsible for the supervision of the administrative and operational security activities on a specific shift;

*Unit Manager* – responsible for all matters relating to the housing units, including case management, security, programs, safety and sanitation;

*Chaplain/Religious Services Coordinator* – coordinates religious services, activities and volunteers. Performs pastoral work, including pastoral counseling;

*Case Manager and Resident Counselor* – the primary contacts for the residents in an apartment complex. Acts as a liaison between the resident and other staff;

*Resident Supervisor* – the first line supervisor for residents, a member of the unit team and supports the Center mission, and unit and Center programs. Resident Supervisors are assigned to specific posts/apartment complexes and will assist residents with questions regarding housing, supplies and other issues that may arise during the Resident's stay at the Center;

*Recreation Supervisor* – is responsible for planning and supervising the total recreational program for the Center;

*Grievance Coordinator* – acts as a liaison between the resident and other staff regarding the grievance process;

*Assistant Shift Supervisor* – assists in the supervision of the administrative and operational security activities for the Center. Directly supervises Resident Supervisors assigned to the shift and may serve as acting Shift Supervisor in the absence of the Shift Supervisor. Provides for the protection of each resident and the preservation of each resident's legal rights.

Residents may contact any staff by speaking to him/her in person or by completing a Resident Request Form, available in each apartment complex's Resident Information Center. Residents may contact the main office of CCA by calling directly to 1-877-834-1550 or in writing to:

**Managing Director, Division VI**
**Corrections Corporation of America**
**10 Burton Hills Boulevard**
**Nashville, TN 37215**

## CONTACTING IMMIGRATION

Specific ICE staff are assigned to immigration cases and they conduct a minimum of weekly scheduled visits to answer immigration concerns. Residents may visit with these officers during their scheduled visits and also submit written questions, requests or concerns to them by completing a Resident Request Form. These forms are available in each apartment complex's Resident Information Center. Completed forms are to be placed in the mailbox labeled "Requests." These forms are collected each

business day and routed to an ICE officer for resolution. Residents may obtain assistance from another resident or staff member in preparing request forms. The ICE visit schedule is posted in each apartment complex's Resident Information Center.

Residents may contact the Department of Homeland Security, Office of Inspector General by calling directly to 1-800-323-8603, by using the free call system programmed into the telephones or by writing to:

Department of Homeland Security

Office of the Inspector General

245 Murray Drive, S.E., Building 410

Washington, D.C. 20538

# THE RESIDENT INFORMATION CENTER

The Resident Information Center is located in each apartment complex. Forms and mailboxes are posted in that location relating to legal assistance, ICE communication requests, grievances, sick call, mail, program services information, recreational activities, a copy of the current resident handbook and required postings, among other things.

# RESIDENT HANDBOOK

The purpose of this handbook is to provide residents with specific rules, regulations, policies and procedures that must be followed while residing at the Center. The handbook will also provide a general overview of the programs and services offered. Upon admission to the Center, each family is provided with a copy of the resident handbook. It is the residents' responsibility to become familiar with the contents of this handbook and to ask staff questions if there is anything they do not understand. Questions may be directed to any of the staff. A copy of the current resident handbook is also posted in each apartment complex's Resident Information Center. Occasionally, changes need to be made to the resident handbook. When this occurs, residents will be given the updates and the updates will also be posted in each apartment complex's Resident Information Center.

# RESIDENT RIGHTS AND RESPONSIBILITIES

It is the Center's philosophy to treat residents with dignity and respect while maintaining a safe, secure, and sanitary residential facility. It is expected that staff will receive each resident's full cooperation while in residence here. Although staff may not know newly admitted residents by

name, they are always expected to address residents in an appropriate and respectful manner. Residents are expected to address other residents and staff in the same manner.

- Residents have the right to be informed of the rules, procedures and schedules concerning the operation of the Center; residents have the responsibility to know and abide by them;
- Residents have the right to freedom of religious affiliation and voluntary religious worship; residents have the responsibility to recognize and respect the rights of others in this regard;
- Residents have the right to contact their consulate or embassy and have those officials call and visit during a resident's stay at the Center; *see the sections on telephone usage and visitation for more information*;
- Residents have the right to receive regular health care, nutritious meals, proper bedding and clothing, regular shower opportunities, hygiene products, proper indoor climate control, and regular exercise opportunities, among other things; it is the resident's responsibility to seek medical care as needed, to not waste food, to follow the laundry schedule, to maintain proper hygiene and keep living quarters clean;
- Residents have the right to protection from personal abuse, corporal punishment, unnecessary and excessive use of force, personal injury, disease, property damage and harassment;
- Residents have the right to freedom from discrimination based on race, religion, national origin, sex, handicap, political beliefs, or sexual orientation;
- Residents have the right to pursue grievances in accordance with written procedures outlined in this handbook;
- Residents have the right to due process, including the prompt resolution of administrative disciplinary matters as outlined in this handbook;
- Residents have the right to unrestricted and confidential access to the courts;
- Residents have the right to pursue legal assistance at no cost to the United States Government;
- Residents have the right to use the law library; it is the resident's responsibility to use those resources responsibly and to respect the rights of other residents in the use of the space and materials;
- Residents have the right to freely correspond with persons or organizations;
- Residents have the right to have family members and friends visit; residents have the responsibility to conduct themselves properly during visits;
- Residents have the right to take advantage of activities and programing, which may aid in an enjoyable stay at the Center; residents have the responsibility to abide by the rules governing the use of such activities and programs;

- School-aged children have the right to attend school and receive instruction equal to that of their peers; residents have the responsibility to ensure their children attend school and study for assigned class work and homework;
- Children have the right to participate in all age-appropriate activities and programing when not in school; residents have the responsibility to encourage their children to participate in leisure activities, ensure they abide by all of the Center's rules, including respecting the personal space of others and refraining from bullying behavior.

## RESIDENT PROGRAM RULES

Residents must:

- follow the directives that are given by the Center staff;
- wear Center identification at all times and report any damage or loss to staff so a replacement may be made;
- treat all residents and staff with respect and courtesy, regardless of race, religion, ethnicity, gender or age;
- attend to the physical and emotional needs of their children while modeling appropriate behavior;
- monitor their child's behavior and use only approved behavior modification techniques when necessary. Corporal/physical punishment is prohibited;
- not file knowingly false complaints, grievances or other reports;
- not speak disrespectfully, or be verbally or physically aggressive towards other residents or staff; should a resident encounter others displaying this behavior, they should report it immediately to staff;
- not have physical or intimate contact with other residents or staff while at the Center; *see the section on sexual abuse and assault prevention for more information;*
- not possess contraband while at the Center;
- respect the rights of other residents and staff;
- not take or borrow other residents' property;
- comply with census procedures;
- perform assigned chores;
- maintain proper hygiene;
- clean bedroom every morning;
- behave in an orderly manner during meals, clear immediate area after each meal and ensure their children's area is also cleaned;
- (for students) follow classroom rules that are established by the teachers and the Center staff;

- promptly report broken items or damaged property to staff;
- alert staff immediately of any problems or concerns;
- ask a staff member if Center rules are not understood or remembered;
- abide by the room visitation policy; *see the section concerning bedrooms for more information*;
- not borrow or trade clothing, hygiene products, jewelry or make-up;
- not deface or otherwise damage Center property;
- comply with the dress code found in this handbook;
- not use or possess tobacco products in any form, drink alcohol or chew gum;
- not waste food; and
- not use profanity.

Failure to follow the above rules may result in the initiation of disciplinary proceedings. Serious and/or continuous infractions may lead to a review of continued suitability for placement in this residential setting. *See the section on disciplinary procedures for more information.* Residents who act in an aggressive manner and/or attempt to cause harm to themselves or others may be passively restrained under the Center's restrictive procedure policy to protect themselves and others.

## RESIDENT REQUESTS

Generally, residents can have questions answered and obtain services merely by speaking to staff. For those who would rather request information formally, the official method is by completing a Resident Request form. All the information requested on the forms must be completed. Residents may obtain assistance from another resident or staff member in preparing request forms. Completed forms are to be placed in the drop off box labeled "Requests" located in each apartment complex's Resident Information Center. These forms are collected each business day and routed to a unit team member for resolution. This procedure is not to be used for submitting formal grievances. *See the section on grievance procedures for more information.*

## LIVING ARRANGEMENTS

Residents are expected to share common equipment such as telephones, televisions, tables, laundry facilities and machines, recreational games and other equipment. Each living area and apartment has a television with both Spanish and English programs available. There will be a listing posted in the apartment complex of channels available. Generally, all activity will cease after children's bedtime; however, parents may use this time for reading or quiet time activities as long as they do not disturb

the sleep of others. During quiet hours, residents may only use provided headphones to view television or listen to music.

## Bedrooms

Each family unit is assigned to a specific apartment and bed. Residents are only allowed to enter the apartment to which they are assigned. Residents should make their beds and straighten up their immediate area each morning. When not in use, beds should remain made. Beds are not to be moved.

Residents are permitted to decorate their rooms with personal items so long as the decorations do not present a health or safety hazard, do not peel paint off the walls or otherwise deface Center property. No items are allowed to cover light fixtures, doors, or windows. Items are not to be hung from vents, sprinkler heads, or beds. Due to the communal nature of the Center, residents must only disrobe in the shower rooms, bathroom, or when utilizing the privacy screens provided in the apartments.

Approved property will be stored inside provided storage units. *See the section on allowed personal property for more information.* No food or drinks are allowed to be stored in bedrooms. All hygiene items must be stored in provided storage units. Toys are allowed in bedrooms during free movement hours. After free movement, all Center-owned toys must be taken back to the common areas so that they can be sanitized for the following day; however, personal toys may be kept overnight. *See the section on free movement for more information.*

## Children Time

Children's bedtimes are set to promote a routine for the Center's children and to allow for their restful attendance in class. The general bedtime for children 4 years old and younger is 8:30pm Sunday through Thursday. The general bedtime for children 5 years old up to 17 years of age is 9:00pm Sunday through Thursday. Bedroom lights shall be turned off no later than 15 minutes after the set times. Parents are encouraged to continue (or develop) their children's bedtime routines while at the Center.

## Overnight Checks

Staff will conduct room checks/well-being checks every 30 minutes during overnight hours to ensure resident safety. During these checks the staff is required to visually observe each resident to verify their well-being; however, the checks will be done with as little disruption as possible.

# FREE MOVEMENT

Barring temporary restrictions due to medical or security reasons, free movement hours are from 8:00am to 8:00pm each day. During this time, adult residents are allowed to move freely throughout their assigned neighborhood and all programming areas of the Center without first asking staff permission or notifying staff where they are going. Children age 12 and older may participate in free movement, when issued a pass by their parent. This pass may be given, suspended and reinstated by the parent at any time of their choosing. Residents not receiving free movement passes for their children at admission may request these passes by completing a Resident Request Form. These forms are collected each business day and routed to a member of staff for resolution. Residents may obtain assistance from another resident or staff member in preparing request forms.

Children age 12 and older who do not currently have a pass and all children under 12 years old are expected to be under the direct supervision of their parent at all times when not in school or participating in an organized activity.

Outside of free movement hours, residents are expected to remain in their apartment complex.

## Outdoor Campus Access

Barring temporary restrictions due to medical, environmental or security reasons, the outdoor campus is open from 8:00am to dusk or 8:00pm, whichever comes first. Outdoor recreation equipment may be checked out by speaking with assigned neighborhood recreation coordinators and may be used only on assigned neighborhood recreation yards. These items must be returned prior to going back inside the Center. Residents must report any loss or breakage to staff so the equipment stays in good working order and is replaced as needed. Drinking water is available at each recreation park and bathrooms have been located adjacent to the living areas and recreation parks. As a rule, residents must stay within the boundaries of their assigned neighborhood unless participating in programs or services available on Main Street.

# CLOTHING

Residents must be properly dressed when outside of their bedrooms. *See the section on resident dress code for more information.* Each resident is allowed to keep 10 sets of clothing in their rooms. Children, newborn to age 5 years may have 12 sets. These sets may be clothing brought in to the Center, clothing provided by the Center or clothing purchased during a resident's stay, or a combination of these. Underwear, bras and socks will be exchanged as needed. Residents in need of new underwear or clothes should speak with staff or submit a Resident Request form. Residents will

not be allowed to have more items than those listed above, except when authorized by the Facility Administrator.

## Center Clothing

Indigent residents and residents not arriving at the Center with a suitable amount of seasonally appropriate clothing will be issued a minimum of six sets of Center clothing to use during their stay. These items include six shirts, six pairs of pants, six bras, six pairs of socks, and six pairs of panties or boxer/briefs, and residents ages 12 and under may receive up to three sets of pajamas at their parent's request. Should additional or seasonally-appropriate clothing be needed, residents should speak with their Resident Supervisor or submit a Resident Request form.

## Resident Dress Code

Residents five years and older:
- Must wear clothing which covers shoulders, chest, stomach and all areas of the anatomy between the naval (belly button) and mid-thigh when seated;
- The top or neckline of clothing shall be no lower than the underarm in the front and in the back;
- Sheer (see-through) clothing is prohibited;
- Shoes shall be worn at all times while outside the apartment complex;
- Shirts shall be worn at all times;
- "Gang colors" or other signs are prohibited;
- No "sagging" (pants will be worn at waist).

## LINENS

The following linens are provided to each resident upon admission to the Center:
- 2 towels;
- 2 washcloths;
- 2 sheets;
- 1 pillowcase;
- 1 blanket; and
- 1 laundry bag.

These linens, other than blankets, will be exchanged for clean linens no less than once a week, or more frequently as needed. Should an occasion arise when clean linens are needed outside the

normal exchange day, residents should speak with staff. All linens must be returned when a resident departs from the Center.

## LAUNDRY

It is the resident family's responsibility to maintain clothing in a clean and sanitary condition. For that purpose, a laundry facility is provided in each apartment complex. Written procedures are posted in both English and Spanish in the laundry area. Residents' bedding (sheets and pillowcases) will be collected and laundered once a week using Center-wide services. Blankets will be collected and laundered monthly. Each neighborhood is scheduled to turn in their bedding on an assigned day. The schedules are posted in each apartment complex's Resident Information Center. In the event bedding/crib sheet becomes soiled between scheduled laundry times, residents should ask their Resident Supervisor for additional linens. When a resident leaves the Center, all Center-issued clothing must be returned for cleaning and recycling, with the exception of undergarments (bras, socks, and panties or boxer/briefs), which residents may keep.



## PERSONAL HYGIENE

At the Center, residents will be living in close proximity with other families, so personal hygiene is essential. Each resident is expected to bathe daily and keep their hair clean. Upon arrival to the Center, each resident is issued hygiene products. These items may be replaced as needed by submitting a Resident Request form. Feminine hygiene items are available in the female toilet room in each apartment complex and female residents are allowed to keep a supply in their bedroom.

### Issued Personal Hygiene Items

- 1 bar of bath soap, or equivalent;
- 1 comb;
- 1 tube of toothpaste;
- 1 toothbrush;
- 1 bottle of shampoo, or equivalent;
- 1 container of skin lotion;
- Other items designated as necessary by JFRMU; and
- Feminine hygiene items will be accessible, as needed.



Residents have free access to showers seven days a week. The shower rooms are labeled according to gender (male and female). Children 9 years and older will shower in their gender-specific shower areas during open shower times. (Phase 1 showers are available 24/7 in each cottage; Phase 2 showers are available 24/7 in the apartment complex -- 8 female and 8 male showers are available, with shower changing rooms). Should a resident's child need assistance and is older than 9, residents should see staff for accommodations. Children 8 years and younger will shower only under the direct supervision of their parent so as to not disturb other residents using the shower room.

Adults may wear their own make-up. All make-up must fit in the resident's assigned bedroom storage unit or placed into storage. Razors are available at any time by speaking with Resident Supervisors, but must be returned immediately following use for proper disposal.

# PERSONAL PROPERTY

## *Allowable Property*

Upon admission to the Center, residents will receive a copy of Form 14-100A, Allowable Personal Property List, which residents are permitted to retain in their apartment/bedroom. These items include:

- Sets of clothing (10) per resident (shirts, pants, underwear, bra, socks);
- Coat (seasonal);
- Shoes (2 pair), $60/athletic pair maximum value;
- Pajamas (3 sets, ages 12 and under);
- Newborn to five-year-old clothing (12 sets);
- Pillow (1 per person; must be flame retardant);
- Authorized personal hygiene items;
- Legal documents, legal papers, and legal Information;
- Photos (no nudity), loose, 5x7 or smaller;
- Photo album;
- Medical prostheses (i.e., eyeglasses, dentures, etc.), maximum value determined by ownership and medical direction;
- Personal reference materials (i.e., address/phone book and/or list of relatives and/or friends);
- Religious items (approval by the Center RSC required; *see the RSC section for more information*);

- · Newspapers, magazines, books ($25 maximum value) and other literature (limited to any combination of 10 at a time to ensure accumulations do not produce and/or effect fire safety standards);
- Convenience store purchases;
- Postage stamps (book or loose);
- Personal correspondence;
- Writing paper, pads (2), loose paper, and drawings (within reason to ensure accumulations do not produce and/or effect fire safety standards);
- Artwork, crafts, etc., created at the Center during stay (limited to 10 items);
- Wedding band (plain, no stones), $50 maximum value;
- Religious medallion/chain, $50 maximum value;
- Rosary (plastic).

Any items not included on the above list will be considered contraband.

## Other Property

Additional personal property must be approved by the Facility Administrator prior to purchase / possession. Identity documents such as passports and birth certificates, are to be held in each resident's A-file for safekeeping by ICE until the resident is removed or until the removal proceedings are resolved; however, upon written request, ICE staff shall provide the resident a copy of the requested document, certified to be a true and correct copy.

Electronic information recovered from phones or other electronic sources belonging to a resident and maintained by the Center with personal property may be accessed upon request to staff, to include contact information stored in cell phones.

### Rules for Storing or Mailing Property

To prevent overcrowding and related storage problems, staff shall encourage residents to send extra suitcases, televisions, electronic devices, and other "soft" (not illegal or dangerous) contraband to a third party of their choosing.

The resident will be provided the opportunity to designate the disposition on the 14-100C Disposition of Non-Allowable Personal Property in one of the following manners:

- The Center may make shipping arrangements for a resident requiring such help, and shall assume the cost if the resident cannot afford postage;

- If a resident does not provide an appropriate mailing address within 30 days, the Center may make reasonable accommodations to store the property; however, ordinarily, the amount stored may not exceed 40 lbs.;
- If a resident does not provide an appropriate mailing address, or is financially able but unwilling to pay the postage, the Facility Administrator may dispose of the property after providing the resident with 30 days written notice;
- When personal property is shipped, staff shall prepare an inventory record of the property that was shipped, the shipment addressee, and maintain a copy of the property inventory and shipping information in the resident's file.

## Staff Processing of Baggage and Personal Property Other Than Funds and Valuables

The procedures listed below do not apply to identity documents, such as passports and birth certificates, which are held in each resident's A-file.

If a resident has no baggage, a Center container shall be provided to store his or her personal property. After being properly inventoried and inspected for contraband, all baggage and Center containers shall be tagged as follows:

- A pre-numbered, three-part inventory form shall be issued for each separate container or item of baggage;
- Each form shall bear the resident's full name, A-number or Center resident number, and the date;
- The resident's signature must appear on the form;
- The top portion of the form shall be attached to the resident's property, and the center portion to the resident's booking card or residential file. A brief description of the property container shall be made on this portion of the inventory form; for example, "black suitcase" or "paper bag";
- The resident shall be given the bottom portion of the inventory form; the back portion of the form shall also contain a brief description of the property container.

All resident luggage and Center containers used for storing resident property shall be secured in a tamper-resistant manner (such as a tamper-proof, numbered tie strap) and shall only be opened in the presence of the resident. A logbook shall be maintained, listing the resident's name, A-number or Center resident number, inventory form number, security tie-strap number, property disposition, date issued, and date returned. Tagged baggage and other property tagged on an inventory form shall then be stored in the property storage area.

## Release

Prior to a resident's release, transfer or removal from custody, a complete inventory of the resident's personal property will be conducted by a designated employee. The inventory should be completed in the presence of the resident.

The resident will sign the 14-100B Allowable Personal Property Inventory/Receipt and be given a copy. The original will be maintained by the Center in the permanent property file. The resident will be given all property in storage at the time of release. The resident will be required to sign for all property received. Staff will ensure that all Center property has been collected and does not leave the Center.

## Claims

Only items outlined on the Allowable Property list will be eligible for claim investigation. Residents being transferred or released from the Center may also submit property claims.

### Stolen

- If a resident claims allowable personal property was stolen, the resident may request a claim investigation by completing the 14-100G Lost / Damaged / Stolen Personal Property Claim, which is available from the unit team and forwarding it to the Property Officer;
- Proof of ownership and value must be available upon investigation;
- The Center will attempt to recover property stolen by other residents; however, the Center will not be responsible for the reimbursement of those property items unless it is proven through investigation to be the result of Center negligence.

### Lost/damaged

- Property that has been lost or damaged due to CCA employee negligence will be eligible for claim investigation.
  - If a resident wishes to request an investigation on property that has been lost or damaged due to CCA employee negligence, the resident must complete the 14-100G Lost / Damaged / Stolen Property Claim and forward it to the Property Officer;
  - Proof of ownership and value must be available upon investigation.
- The designated ICE representative shall be immediately notified when properly-receipted resident property is reported missing or damaged. Supervisory staff shall investigate and, if necessary, take prompt action to prevent further loss. If the property is not recovered or is recovered in a damaged condition, staff shall prepare a report to the Facility Administrator and ICE/DRO, providing the following information:
  - Name and A-number or Center resident number of the resident claiming ownership;

- Description of the property and, if applicable, the noted damage;
- Date and time the loss or damage was discovered;
- Name(s) of person(s) discovering the loss or damage;
- The circumstances under which the person(s) discovered the loss or damage and the cause of the loss or damage to the property, if determined;
- Names and statements of the resident and all witnesses;
- Place, date, and time the property was last seen (before reported missing or damaged); and
- The circumstances under which the property was last seen (before reported missing or damaged).

- A resident being transferred, released, or removed who has a claim for lost or damaged property shall be allowed to initiate the claim before leaving the Center. A standard claim form (SF95) shall be provided to the resident for making his or her claim. The Facility Administrator shall send the result of the investigation of the resident's claim and his or her claim form to the Office of the Principal Legal Advisor, CALD, at 425 I Street, N.W. Room 6100, Washington, DC 20536 for further resolution of the claim.

- In addition, to the procedures listed above, ICE/DRO staff must complete a Report of Resident Missing Property for lost (but not damaged) property (Form I-137). The original copy of this form shall be placed in the resident's A-file, with a copy retained by the Center. The Facility Administrator shall send the result of the investigation of the resident's claim, a copy of the Form I-137, and the resident's SF95 to the Office of the Principal Legal Advisor, CALD, at 425 I Street, N.W. Room 6100, Washington, DC 20536 for further resolution of the claim.

- A copy of the completed forms shall be forwarded to the JFRMU for a determination of any additional required reporting.

*Processing*

The Property Officer will assign the claim a number and maintain a 14-100H Lost / Damaged / Stolen Personal Property Log that includes the following information:

- Claim number;
- Date the claim was received;
- Resident's name;
- Resident's A-number;
- Area where alleged loss / damage / theft occurred;
- Staff member assigned to investigate and date of assignment;
- Date investigation was completed;

- Disposition of the claim; and
- Date of replacement or reimbursement, if applicable.

The Property Officer shall forward the claim to the Center Investigator within three calendar days of receipt. When appropriate, the Facility Investigator may designate a staff member to complete the investigation.

*Investigation*
- The designated staff member shall complete the investigation within seven calendar days;
- The designated employee shall take the appropriate steps in reaching a determination of the validity of the claim;
- Once the investigation has been completed, the 14-100G and any corresponding paperwork will be returned to the Property Officer for logging;
- If the claim proves valid, the Investigator will forward the claim to the Facility Administrator, who will be the final authority in the award of any compensation;
- The Facility Administrator shall review and approve / disapprove the claim within five calendar days of receipt.

*Replacement*
- Attempts will be made to replace property with like items. If the replacement of the property is not possible, a reimbursement will be made;
- Prior to receipt of replacement property, the resident will sign the 14-100G;
- Replacement items shall be issued to the resident within 30 calendar days of the Facility Administrator's approval.

*Reimbursement*
- Reimbursement of property will be limited to the maximum amount determined by the Facility Administrator, which will be included in the Resident Handbook.
- If residents choose to acquire personal property valued above the maximum reimbursable amount designated by the Facility Administrator, they do so at their own risk. A claim, if found valid, will only result in the maximum reimbursable amount stated above.
- In addition to the maximum reimbursable amount, the following depreciation schedule will be used to calculate the normal wear and tear of residents' personal property:

| Age of Property (in months) | Percentage of Original/Maximum Reimbursable Value |
|---|---|
| Less than 12 months | 100% |
| 12-23 months | 75% |
| 24-35 months | 50% |
| 36 or more months | 25% |

- Prior to receipt of reimbursement funds, the resident will sign the 14-100G.
- Reimbursement shall be issued to the resident within thirty (30) calendar days of the Facility Administrator's approval.

**Property lost by another center / facility / agency**

If property is found to be missing when a resident is received at the Center, the Center will assist the resident in determining what procedures to follow. CCA is not responsible for property that another center / facility / agency may have lost or destroyed. The Center will notify ICE personnel in the event of property claims against another center / facility / agency.

# CONTRABAND

Contraband is any material prohibited by law or regulation or that can cause physical injury, is inherently dangerous as a weapon or tool of violence, affects the safety of Center residents or staff, or creates dangerous or unsanitary conditions in the Center. Examples would be knives, guns, flammable liquids, keys, intoxicants, prohibited currency, controlled substances, cigarettes, alcohol, scissors, pornography, any medications, food or drink brought to the Center, etc. Any item that is deemed contraband shall be seized by staff. If the contraband is not illegal under criminal statutes and would not otherwise pose a threat to security, the staff will inventory and receipt the property, and store with the resident's other stored personal property.

Religious property will not be treated as contraband or seized without consultation with the Center Religious Services Coordinator (RSC) and the Facility Administrator. However, if a religious item is deemed contraband, it will be seized and disposed of in accordance with contraband disposal procedures. Staff will discard all food (including uneaten fast food, drinks, and opened baby food or formula) at the time of admission. When the ownership of a contraband item is in question, an investigation will be conducted to determine ownership. Staff shall inventory and store the item(s) pending verification of ownership. The resident shall have seven days to verify ownership of the listed item(s). If a resident cannot establish ownership and/or ownership cannot be reasonably established, the property may be destroyed.

# WRITING INSTRUMENTS AND PAPER

Writing instruments, paper and envelopes are available at the Resident Supervisor station. Pens, pencils, arts supplies (colored pencils, crayons) are available in each apartment complex's activity

room and at the Resident Supervisor's stations or by completing a Resident Request Form. Parents must supervise young children using art supplies so as to not deface Center property.

## GENERAL SAFETY/EVACUATION DRILLS

The Center staff makes every effort to ensure the safety of all residents and staff. Residents also have a responsibility for aiding in their family's safety in the following ways:

- Cleaning up spills or request staff assistance to do so;
- Paying attention to posted warnings, such as wet floor signs and use reasonable care when in these areas;
- Notifying staff immediately if a fire, emergency or other possible hazard is observed.

During an emergency, loud alarms may sound and bright lights may flash. At these times residents must refrain from conversation unless it is directed to staff and concerns the immediate issue at hand. Resident's family safety depends on the ability to hear, understand, and follow staff direction during an emergency. During an emergency, staff is required to evacuate all residents and staff to a predetermined outdoor evacuation location. Staff will confirm everyone has left the building by counting the residents and staff when they arrive at that location. If family members become separated during a total evacuation the procedures listed below will be followed:

- Once in a secure location, a census will be conducted to verify all residents are present and accounted for;
- All separated residents will be staged in a central location, as identified by the supervisor in charge, until reunited with their family unit;
- All residents are to immediately inform the nearest resident supervisor if they become separated from their family unit, or if a member of their family is missing;
- Staff will immediately notify the supervisor in charge of any missing/separated residents;
- The supervisor in charge will then check with the 'separated resident' staging area for the resident. Once positive identification has been made, the family unit will be reunited as soon as it is safe to do so.

Residents should familiarize themselves with the evacuation route plan posted in each apartment complex's Resident Information Center, which shows the location of the outdoor evacuation location. There are exit diagrams posted around the Center that show the location of all emergency exits. Residents should study these diagrams carefully and become familiar with their locations. Should an emergency occur while a resident is near a fire exit, they should not wait for staff, but should exit to the outdoor evacuation location and wait for staff to arrive. Per local, state and federal laws, the Center

is required to perform evacuation drills. The Center performs several drills each month, at varied times of the day and night. These drills are not designed to inconvenience residents, but rather to comply with regulations and ensure resident and staff safety in the case of an actual emergency. Parents should advise and discuss these drills with their children.

## RESIDENT CENSUS

At this Center, resident accountability is done through resident reporting for censuses three times during each 24-hour period. Check-in times are:

7:00am to 8:00am

12:00pm (noon) to 1:00pm

8:00pm to 9:00pm

Residents will report to their Resident Supervisor as family units in their assigned apartment complex during the times listed above. If residents are at an appointment near the close of the census time, the staff supervising the appointment will report the resident's location. Residents who do not check in properly during census will be counseled regarding the requirement.

## MEALS

All menus are designed to be nutritionally balanced and are approved by a certified dietician. Residents are provided three meals each day in the dining room.

**Monday through Friday Schedule**

Breakfast 5:30am to 7:45am*

Lunch 11:00am to 1:00pm

Dinner 4:30pm to 6:30pm

*Children will not be awakened until 6:30am Monday through Friday; however, breakfast service will begin daily at 5:30am. Residents may voluntarily awaken early to eat should they choose to do so, but this is not required.

**Saturday and Sunday Schedule**

Continental Breakfast 6:00am to 8:00am

Brunch 10:00am to 2:00pm

Dinner 4:30pm to 6:30pm

Seating in the dining room is not assigned. Residents may sit wherever they desire for each meal. High chairs and booster seats are available in the dining room. Small children are expected to be seated during meals to encourage sound eating habits. Utensils and trays used in the dining room are not disposable. At the end of each meal, residents are required to clear their family's immediate area and return all utensils and trays to be cleaned. Residents are allowed unlimited trips to the self-service bars in the dining room, but must use a clean tray on every trip. It is the resident's responsibly to eat what is taken to reduce food waste. All food or drink must be consumed during the meal -- no food or drink may be taken from the dining room.



## *Snacks and Drinks*

Fruit, snacks and health drinks and baby formula are available 24 hours a day. Residents are not allowed to take more food or drinks than they will consume at one sitting. This food is replenished in each cottage two times a day. Food is to be consumed the day that it is taken from the refrigerator. These items are not allowed to be consumed or stored in the sleeping area.



## *Special Diets*

Therapeutic/medical diets shall be prepared and provided according to the orders of the Center medical department physician. Religious diets shall be prepared and provided for residents whose religious beliefs require the adherence to religious dietary laws. Residents are required to meet with the RSC for religious diet approval. *See the section on the Religious Services Coordinator (RSC) for more information.*

# RELIGIOUS SERVICES



All residents have access to religious resources, services, instructions and counseling while residing at the Center. These services include individual counseling, group prayer, Bible study and various church / worship services. These onsite religious services are provided through outside religious organizations and community volunteers. The Center RSC addresses all questions or concerns regarding religious opportunities or practices, will assist in obtaining materials on various faiths and may, upon request, be able to facilitate visits by ministers of particular religious faiths.

Outside religious persons may also freely visit with residents, either by appointment made by the RSC or during visitation hours. *See the section on visitation for more information.* A list of scheduled services is posted in each apartment complex's Resident Information Center. These services are open to all who wish to attend and are only limited by the occupancy of the chapel space. If this occurs, additional arrangements will be made. Should residents wish accommodation such as for special religious observances, they should speak to the RSC who will coordinate the request, if possible.

ADDITIONAL INFORMATION MAY BE PROVIDED BY VENDOR AFTER SELECTION.

## *Religious Services Coordinator (RSC)*

Residents may request appointments with the Chaplain by speaking with him/her, or by completing a Resident Request form.

# MEDICAL SERVICES

CCA wants resident families to be healthy during their stay, so appropriate and necessary health care is provided free of charge.

SPACE IS RESERVED FOR INFORMATION TO BE PROVIDED BY HEALTH CARE DEPARTMENT.

## Emergency Medical Situations

If residents or a family member is experiencing a medical emergency and/or need immediate medical attention while at the Center, they should notify any staff member and stay calm – medical will respond. If a resident cannot go to staff due to the medical situation, residents should request any other resident in the area to alert staff to help. Medical responds to all areas within the Center.

## Sick Call

If residents or their children are feeling sick or have a medical, dental or mental health problem, they can access the medical department through the sick call process. Sick call is conducted seven days a week. Sick call is held at specific times each day and the times are posted in each apartment complex's Resident Information Center. Staff is also available to provide information on how to access routine medical care.



## Urgent Care

Urgent care is defined as care that cannot wait for routine sick call but may not require hospitalization. If a resident is having an urgent medical, mental health or dental condition, they should notify staff so the medical department can be contacted. Examples of urgent care situations include, but are not limited to, an accident or injury, fever, difficulty breathing, or bleeding. If the condition reported is determined not to be non-urgent, residents may be requested to report to sick call for an appointment. Residents should not use the urgent care process for routine medical care because it slows down the medical process for everyone.

## Dental Services

The South Texas Family Residential Center's Medical Clinic is equipped to assess dental concerns. Upon admission to the Center, residents will receive a dental screening. Routine and emergency dental care is also available. Emergency dental care includes, but is not limited to, dental infections, painful teeth, facial swelling, or trauma to teeth. To receive dental treatment, residents should access the medical department through the sick call process. An appointment will



be made to address dental concerns in a timely manner. The appointment time will depend on the seriousness of the problem.

## Mental Health Services

Routine mental health services are available upon request. Residents should use the sick call process if the concern is routine in nature. Residents should notify a staff member if they are feeling suicidal or one of their children is expressing suicidal or thoughts of self-harm. This is considered a medical emergency and the medical staff is here to help.

Mental health services are available for all residents at the South Texas Family Residential Center. If you, a family member, or someone at the facility is feeling suicidal, expressing a desire to self-harm or experiencing a severe emotional crisis, it is considered a medical emergency and services are available 24 hours a day. For ALL mental health emergencies, IMMEDIATELY notify a staff member so the appropriate health care services can be provided.

Non-emergency mental health services, are available. Individuals seek mental health services for many reasons. Some individuals are being treated for illnesses such as depression, bipolar disorder or attention deficit disorder. Others seek mental health services to better cope with significant life stressors such as parenting a child with conduct problems, coping with the loss of a loved one or processing recent trauma. Residents are encouraged to request mental health services for themselves or their children if they notice a significant change in behavior or experience challenges in adapting to the routines of the facility.

The medical department is available to help you and your children.

## Medications

If a resident or family member is prescribed medication, they will be educated to the name, frequency, and purpose of the medication. These medications will be prepared and administered at scheduled intervals via a "pill-line." Residents should report to the "pill-line" as scheduled to assist in ensuring that they receive timely and appropriate medical care.



## Medical Department Conduct

The general rules of conduct at the Center will be followed while in the medical department. Parents are required to supervise their children at all times. The clinic is a busy place; parents are to keep

their children in sight at all times and ensure that they are not engaging in any activity that may lead to an injury, such as running around or jumping off chairs. There may be medical equipment in the area such as scales; parents are to ensure that their children are not playing on these items.

## *Complaint or Grievance about Medical Care*

Residents are encouraged to discuss the medical care that they or family members are receiving with the medical staff. If a resident needs to discuss the care that they or a family member receives, they should report to sick call and staff can answer their questions. If it is an urgent matter, residents should ask the Resident Supervisor in each apartment complex to contact the medical department. If residents are not satisfied with the outcome of the discussion with medical staff or continue to have concerns about medical services provided, they may choose to complete a medical grievance, which will be submitted to the Health Services Administrator for further review. *See the section on grievances for more information.*

# SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION

The Center has a Sexual Abuse and Assault Prevention and Intervention Program in place to protect residents and staff. If residents feel unsafe at any time during their stay at the Center because of threats of sexual abuse or assault, or if they are sexually abused or assaulted, residents should immediately advise any member of the staff for assistance. If a resident is sexually abused or assaulted, the medical department will provide appropriate treatment and counseling. There is also sexual abuse and assault information at the Resident Information Center. On site IHSC social workers provide counseling and/or assistance at resident request. Additionally, residents feeling in danger may do one or all of the following:

- Report concern to any member of the staff;
- File an emergency grievance stating the nature of the problems and emergent needs. *See the section on grievances for more information;*
- Contact ICE by completing a Resident Request Form;
- File a complaint directly to the Department of Homeland Security;
- Contact the Office of the Inspector General (OIG) through the free phone call system, or by:

Writing: DHS OIG HOTLINE

245 Murray Drive, S.E., Building 410

Washington, D.C. 20538

Emailing: DHSOIGHOTLINE@DHS.GOV

Telephoning: 1-800-323-8603

- Notify a relative, friend or attorney and request they contact ICE or OIG on the resident's behalf.

## MONITORED CARE SERVICES

Parents and/or legal guardians are expected to provide direct supervision of children while they are not in school or participating in other organized activities. Monitored care is a service available for short term child care services (M-F, 8:00a-8:00p) for those instances in which a parent is attending court, meeting with a legal representative, participating in an administrative interview, or for other short-term absences (i.e., medical appointments) when approved by an ICE representative.

Children cannot remain in the Monitored Care Center overnight or for multiple days. If a parent or guardian is going to be away from the Residential Center overnight or for a period of more than one day, and their children are not allowed to go, ICE staff will work with the family to make appropriate arrangements for the care of children during that time.



## RESIDENT CHORES

Residents are responsible for maintaining their bedrooms in a neat and sanitary condition. Residents are expected to make their beds each morning and pick up after themselves and their children.

## TELEPHONE ACCESS

Resident telephones are located in each apartment complex and apartment and are available 24 hours a day. The Center does not monitor or record conversations on any of the telephones. There are sanitizing wipes available to clean the phones before or after use. Accommodations shall be made for residents with communication impairments (ex: hearing / speech impaired), or residents who wish to communicate with such persons, by speaking with Resident Supervisors or completing a Resident Request form.

To ensure that all residents have the opportunity to use the telephones, residents are allowed to make up to two, 20-minute telephone calls within the United States each day at their expense. Additionally, calls outside of the United States to legal assistance organizations, immediate family or

others may be made in cases of emergency or compelling need by speaking to Resident Supervisors or by completing a Resident Request form.

Attorneys, friends and family may call the Center to leave messages for residents by calling 830-378-6500. The call-in number is posted in each apartment complex's Resident Information Center. Emergency messages will be delivered to the resident as soon as possible and non-urgent messages will be delivered within 24 hours.

### ICE Free Access Telephone Calls

Residents may contact a variety of organizations at no cost. This information is posted in each apartment complex's Resident Information Center or their Resident Supervisor for instructions on calling consulates, immigration courts, the American Bar Association, the ICE Public Advocate Hotline, the Office of Inspector General and a variety of other government and non-governmental offices.

### Indigent Resident Telephone Access

In addition to the ICE free telephone calls mentioned above, indigent residents may also make free calls to legal assistance organizations, family and others within the United States by speaking to their case manager or by completing a Resident Request Form. Additionally, calls outside of the United States to legal assistance organizations, immediate family or others may be made in cases of emergency or compelling need by speaking to Resident Supervisors or by completing a Resident Request form.

### Legal Assistance Telephone Access

Telephone calls to legal providers and courts are not monitored or recorded at any time. To access a more private area from which to make legal assistance calls, residents should speak to their case manager or complete a Resident Request form.

## FINANCES/RESIDENT FUNDS/MONEY ORDERS

Residents are not allowed to have money (paper or coin) or funds in their possession while at the Center. If any money is found in a resident's possession, disciplinary action may be taken. Upon admission, all U.S. currency will be deposited into an account for which residents have access during their stay. Any non-U.S. currency will be placed into resident's valuable stored property. Residents will receive a receipt for any funds processed during their stay at the Center. Residents may receive funds (cash or Western Union /Cash Box) from family and friends.

For residents who choose to participate in the Center's voluntary work program, those payments will also be deposited into their account. Residents may also receive funds during visits. These funds must be turned over to staff prior to the visit to be placed in the resident's account. Residents coming from another center will have their funds credited to their account within 24 hours of the arrival of those funds. Upon discharge, residents will receive the balance of any funds they have in their Center account, in cash.

In the event of an emergency or abandonment of funds or property, the Center shall report and turn over to ICE/DRO all resident's abandoned property for management and disposition.

Residents who need funds/monies sent (such as mail fees, legal fees, to persons, etc.) must complete a Personal Funds Withdrawal Slip. Residents should list only one item per withdrawal slip and be sure to specify the purpose of the funds. The slip must be filled out completely, signed by the resident, verified by the unit manager or case manager, and forwarded to the accounting clerk. If the check requires mailing, a stamped, self-addressed envelope must accompany the withdrawal slip.



# COMPLAINT AND GRIEVANCE PROCEDURES

Staff will not harass, discipline, punish or otherwise retaliate against a resident who files a grievance or complaint. Any allegations of this nature will be thoroughly investigated by the Facility Administrator. Residents have access to the formal grievance system at all times, but are encouraged to try to resolve small complaints informally whenever possible.

Informal Process – The informal route involves discussing the issue with staff in an attempt to resolve the matter. Residents may choose to speak with staff, caseworker, or supervisor. They may also submit a complaint on a Resident Request form, which a unit manager or designee will review and attempt to resolve. The informal route is less time consuming than the formal route and may offer resolution more quickly. Residents dissatisfied with the response they receive may file a formal grievance as outlined below.

Formal Process – If a resident does not receive a desired resolution through the informal process, or wishes to bypass the informal process, that resident may file a grievance on a grievance form. These forms are available at the Resident Information Center. If an attempt was made to resolve the matter first informally, residents should indicate on the grievance form who they spoke with informally.

Grievance forms should be completed and placed in the mailbox at the Resident Information Center marked "Grievance." Only the grievance coordinator has access to this mailbox, and will keep the grievance as confidential as possible. This mailbox will be checked and emptied each business day.



If a resident feels the grievance is of a sensitive nature or that their safety or well-being would be jeopardized if others read the grievance, it may be sealed in an envelope marked as "Sensitive" and delivered directly to the Facility Administrator. Residents should see their Resident Supervisor for an envelope if needed and information on how to deliver it directly to the Facility Administrator. Grievances should be filed as soon as possible after the alleged incident. Delays in filing may make it more difficult to investigate the issue. Residents may ask other residents, family members, legal representatives or staff for assistance in completing the grievance form. Residents are not allowed to submit a grievance on behalf of another resident unless they are the parent of the resident who has a problem.

Residents may write about one single complaint, or several closely-related complaints concerning a single subject on each grievance form. When completing the forms residents should try to clearly identify the issue, complaint or area of concern. If the form is not clear, it will be returned for further information. The responsible department head will meet with the resident, conduct an investigation, and return a written decision to the resident within five days of receipt of the grievance. If the resident disagrees with the first step formal decision, the resident may submit an appeal to the grievance coordinator. The grievance coordinator will respond to the appeal within five days and serve the resident with the written decision and basis of that decision.

If the resident disagrees with the grievance coordinator's second-step formal decision, the resident may appeal to the Facility Administrator. Prior to submission the resident must complete the section on the grievance form described as "State Reason(s) for Appeal" and return it to the grievance coordinator. The resident shall be provided with an opportunity to appear before the Facility Administrator to present his or her case, answer questions, and respond to conflicting evidence or testimony. The Facility Administrator will render a written decision on the appeal within five business days of receipt.

## Emergency Grievance Procedures

An emergency grievance is initiated when a resident verbally notifies staff that they have a complaint that immediately affects their safety or welfare. The staff receiving the resident's report will bring the

matter to the immediate attention of the Facility Administrator, Administrative Duty Officer or shift supervisor.

## Non-Grievable Matters

The following matters are not grievable through the Center grievance procedure:

- State and Federal Court decisions;
- State and Federal laws and regulations;
- Final decisions on grievances;
- ICE policies, procedures, or decisions (i.e., institutional transfers, releases, removals etc.);
- Disciplinary hearing decisions. Disciplinary appeals may be submitted on the disciplinary form after the hearing.

Residents who demonstrate a pattern of filing nuisance complaints or otherwise abuse the grievance system may have those complaints returned unprocessed.

## Staff Misconduct

If a resident suspects, sees, or is the recipient of staff misconduct, they may report the activity by speaking to any staff member or by writing a letter or statement, following the instructions in the Staff Organization and Contact section at the beginning of this manual. Or they may choose to follow the grievance reporting procedures listed in the Complaint and Grievance Procedure section above.

# DISCIPLINE AND BEHAVIOR MANAGEMENT

Prohibited acts are divided into three categories: "Major," "Moderate," and "Low." The corrective actions authorized for each category will be imposed only if the resident is found to have committed a prohibited act and no other method of behavioral modification has been found to be effective. Due to the family residential nature of the Center, corrective actions are used as a last resort and only as a means to correct behavior that threatens the safety and welfare of residents, staff, and visitors. Action or attempted action by any resident that violates established Center rules or poses a threat to the safety and orderly operation of the Center shall be dealt with through appropriate disciplinary action. Action or attempted action by any resident that violates the laws of the United States may also be actionable in a United States criminal court of law.

Staff will attempt to correct minor violations of Center rules informally through conversation and counseling whenever possible. This informal procedure may include consequences which are

mutually acceptable by the resident and staff, such as temporary floor restrictions, privilege loss, and for children, time outs. Children will only be interviewed concerning violations in the presence of their parent (unless the allegation involved an incident between a parent and child). Discipline will never be of a nature or administered in a way that is degrading or humiliating to residents.

Staff will never impose the following corrective actions: corporal punishment; deviations from normal food services; denial of legal assistance; deprivation of correspondence, telephone, or visitation privileges; deprivation of physical exercise or access to recreation, deprivation of school or education. No punishment shall require confinement in any locked room or space. Only in mental health situations may deprivation of clothing, bedding, or items of personal hygiene occur and if so, these decisions will be made by the medical department. In the event a staff member believes that a resident is committing an offense that cannot be handled through the informal procedure, the staff member will complete an incident report. The assigned supervisor will begin an investigation of incident reports within 24 hours of receipt. Residents under investigation have the right to:

- Remain silent during every stage of the disciplinary process. Silence will not be used to support a finding against the resident;
- Receive the Incident Report/Notice of Charges at least 24 hours before the start of administrative proceedings;
- Have an initial hearing before a Management Review Committee (MRC) within 24 hours of receiving the Notice of Charges for low to moderate violations.

During hearings before the MRC, residents have the right to:

- Present evidence and statements on their own behalf;
- Attend the hearing (except deliberation), unless behavior poses a safety concern;
- Have an interpreter present if the hearing is in a language not understood by the resident;
- Appeal the committee's determination through the appeal process.

Incidents involving major violations of Center rules, or unresolved cases will be referred to an Executive Review Panel (ERP). During hearings before the ERP, residents have the right to:

- Call witnesses and present evidence and statements on their own behalf;
- Attend the hearing (except deliberation), unless behavior poses a safety concern;
- Have an interpreter present if the hearing is in a language not understood by the resident;
- Request a staff representative to assist in the case;
- Waive the hearing and admit committing the offense in question;
- Appeal the committee's decision through the appeal process.

## *Discipline Hearing Appeals*

Residents may appeal disciplinary panel decisions following their hearing by giving their written appeal to one of the panel members. The panel will submit the appeal to the Facility Administrator who will provide a written response.

## *Discipline Proceeding Postponements*

Disciplinary proceedings may be postponed for reasons such as defense preparation, physical or mental illness, security concerns, escape, disciplinary transfer, pending criminal prosecution, etc.

## *Corrective Actions for Children*

Corrective Actions 1 through 4 below may be imposed by the MRC. Corrective Actions 1 through 5 may be imposed by the ERP.

1. Referral to counseling;
2. Restriction to their apartment complex, not to exceed 72 hours;
   a. When a child is restricted to housing, they must be afforded a minimum of one hour of outdoor activity time daily.
   b. The child may be restricted to the activity room but may not be forced to remain in his/her room except during a time out period.
   c. No corrective action may restrict a child from attending required school classes or religious practices.
3. Children 12 years old and older may have their free movement privilege suspended for up to 14 days. Such a suspension would require that the parent supervise all activities for that time period.
4. Loss of extracurricular activity time such as movie night.
5. Loss of field trip privileges for up to 45 days.

Corrective action may not interfere with such daily functions as eating and sleeping. Disciplinary actions may not adversely impact a child's health, physical or psychological well-being or deny a child regular meals, sufficient sleep, exercise, medical care, the right to correspondence, or legal assistance.

## Corrective Actions for Adults

Corrective Action 1 through 4 below may be imposed by the MRC. Corrective Action 1 through 5 may be imposed by the ERP.

1. Referral to counseling;

2. Require attendance in parenting classes;

3. Additional work details, such as general housekeeping;

4. Loss of convenience store privileges;

5. Restriction to their apartment complex, not to exceed 72 hours.
   Imposition of such a corrective action must take into account the ages of children and the negative impact this corrective action would have on minors who were not involved in the charged offense. In addition, access to outside recreation must be afforded for at least one hour a day for adults in these situations.

# DESCRIPTION OF OFFENSES

## Low Offenses

(101) *Being in an Unauthorized Area* -- Being an area that is designated through verbal, written, or posted orders as "off limits" to residents.

(102) *Disorderly Conduct* -- Behavior such as loud talking, yelling, or pushing, which disrupts the orderly running of the Center.

(103) *Failure of Parent/Legal Guardian to Appropriately Manage Children's Behavior* – For parents who allow their children to be unruly, disrespectful, or insubordinate while in their presence.

(104) *Failure to Follow Verbal or Posted Rules and/or Regulations* -- Not following specific rules and/or orders which have been designated for the clean, safe, orderly operation of the Center, and that residents have been told in advance through posting or have been given verbally by an employee of the Center or person who has charge of the resident at the time. This includes not following the procedures established by the Center for taking count.

(105) *Fighting* – Exchange of words or body contact in anger wherein no injury requiring medical attention occurs, such as horseplay.

(106) *Gambling* – Operate or act in any game of chance involving betting or waging of goods or other valuables.

(107) *Possession of Gambling Paraphernalia* – Having in one's control, items for use in operating or acting in any game of chance involving betting and wagering of goods or other valuables.

(108) *Self-Mutilation* – Inflicting injury on one's self; such as cutting on one's own body or tattooing.

(109) *Smoking* – Smoking or using tobacco of any form in any area of the Center.

(110) *Unauthorized Receipt or Possession of any Item of Value* – Receiving or having in one's possession any item of value which has been obtained through false pretenses, threats, or stealing.

(111) *Unexcused Absence from Place of Assignment* – Being away, without authorization from an appropriate supervisor, from the place of assignment, such as housing area, recreation area, health services, etc.

(112) *Use of Vulgar, Abusive, or Obscene Phrases/Language.*

(113) *Failure to Maintain Personal Hygiene or Personal Hygiene of Child* – Not having a clean body or clothes.

(114) *Unsanitary and Disorderly Housing Conditions* – Not keeping a clean, neat living area. The area should be kept in a manner so that all possessions are stored in an organized manner in areas designated for such. The area should be free from dirt and clutter.

(115) *Possession of Non-Dangerous Contraband (Soft Contraband)* – Possession of contraband items that are not allowed at the Center but are not capable of causing serious injury or harm to self or others, including tobacco products.

(116) *Unauthorized Use of Telephone* – Using the telephone during unauthorized times.

(201) *Refusal to Submit to a Reasonable Suspicion Drug Test* – Not providing a urine sample for use in reasonable suspicion drug testing.

## Moderate Offenses

(202) *Positive Reasonable Suspicion Drug Test* – Testing positive for an illegal drug or non-prescribed controlled substance.

(203) *Theft* – Unauthorized taking of something that belongs to someone else.

(204) *Destruction, Alteration, or Damage to Property (under $1,000)* – destroying, changing or hurting property of the Center or any other person.

(205) *Forgery or Unauthorized Reproductions of Documents or Articles (Excluding Money)* – Counterfeiting, forging, or reproducing without approval, any document, article, identification, or security document.

(206) *Hindering an Employee in the Performance of His or Her Duties* -- Acting in such a way to interrupt an employee during work time, such as causing delays or giving false information.

(207) *Refusal to Submit to a Reasonable Suspicion Search.*

(208) *Child Neglect* – Failure to give care and proper attention to a child (non-injury).

(209) *Verbal Sexual Harassment of a Resident* – Acting in such a manner as to create a hostile residential environment for other residents, regardless of age or gender.

## Major Offenses

(301) *Arson* -- Starting or causing to be started a fire which could or does cause damage to person(s) or property.

(302) *Assault/Battery* -- A non-sexually-related attack upon the body of another person with the intention of harming or causing serious injury.

(303) *Rape or Sexual Contact* of any person without his or her consent; or of a person who is unable to consent or refuse; and contact between the penis and the vagina or the penis and anus, including penetration, however slight; or contact between the mouth and the penis, vagina, or anus; or penetration of the anal genital opening of another person by a hand, finger, or other object (i.e., penetration or oral sodomy).

(303) *Sexual Assault* – Abusive contact of any person without his or her consent for the purpose of sexual gratification or arousal or of a person who is unable to consent or refuse; and intentional touching, either directly or indirectly or through the clothing of the genitalia, anus, groin, breast, inner thigh or buttocks of any person. Sexual assault excludes incidents involving penetration or oral sodomy.

(304) *Attempt/Conspiracy to Commit a Major Offense* -- An offense for residents who do not actually commit the offense but participate in one (1) or more of the following ways:

(304a) attempts to commit the major offense;

(304b) solicits another or others to commit the major offense;

(304c) conspires with another or others to commit the major offense; and/or

(304d) facilitates the action of another or others in committing the major offense.

(305) *Child Abuse* – Treating a child cruelly, roughly, wrongly, improperly, or in an insulting manner.

(306) *Child Neglect* -- Failure to give care and proper attention to a child, resulting in endangerment or injury to a child.

(307) *Confirmed STG Affiliation/Activity* -- Affiliated or participating in a gang-related activity.

(308) *Counterfeiting, Forgery, or Unauthorized Reproduction of Money.*

(309) *Death of Any Person* – Any act in which the end result is the death of any person, including employees, visitors/volunteers, and/or other residents.

(310) *Destruction, Alteration, or Damage to Property ($1,000 or more)* -- Destroying, changing or hurting the property of the Center or of any other person.

(311) *Hostage Taking* -- Holding a person(s) against their will as security for the fulfillment of certain terms.

(312) *Escape* -- Leaving the grounds of the Center or from the custody of an employee outside of the Center without permission.

(313) *Insurrection* -- Participation or encouraging another to participate in unauthorized activity such as protesting or rioting.

(314) *Possession of Dangerous Contraband (Hard Contraband)* – Possession of contraband items that are not allowed at the Center and are capable of causing serious injury or harm to self or others. This includes deadly weapons, items altered to be used as weapons, drugs and drug paraphernalia.

(315) *Sexual Misconduct* -- This includes, but is not limited to, the following acts:

(315a) Exposing the genitals or buttocks to an employee, visitor/volunteer, or resident for the purpose of sexual gratification or arousal.

(315b) *Masturbation* where an employee, visitor/volunteer, or other resident can see the act.

(316) *Intimidating or Threatening Another with Harm* — Telling someone, through actions or words, that harm will come to them.

(317) *Possession of Drugs or Intoxicants* — Possession of any drugs or intoxicants that have not been prescribed or approved by the health services department for use.

(318) *Violation of Any Federal, State, or Local Law* — Any act, though not specifically listed in this policy, that would be considered either a felony or misdemeanor under federal law or under the state law in which the resident is housed.

# EDUCATION

*Only applies during scheduled school semester*

The Center operates an on-site school during the school year. The Center school provides educational services to all children who are at least four years old on August 1 of the current school year. Attendance in the educational program is mandatory and is provided in a structured classroom setting Monday through Friday. Each school-aged child will be assigned to a morning or afternoon class schedule.



The basic academic areas include Science, Social Studies, Math, Language Arts, and Physical Education. All children four years old and over will be tested upon their admission to the Center and placed into the appropriate classroom. When school is in session parents are required to physically drop off their children in the proper Center classroom at the beginning of the school day. Parents must return to their children's classroom at the end of each school day to pick up their children, unless otherwise told by staff of schedule changes. School hours, holidays and breaks will be announced and posted in each apartment complex's Resident Information Center.

## Special Needs Information

Although each child is evaluated for special needs after admission, parents who believe their children may have educational deficiencies or learning disabilities may also initiate a special needs evaluation request. Parents may request this evaluation by speaking with their child's teacher, an assigned case manager, or by completing a Resident Request form. The educational unit will meet with the parent and test the child. If found to be eligible for special needs instruction, the child will receive an

Individual Educational Plan (IEP). The child's educational program, and any necessary modifications, will be driven by their IEP.

# LIBRARY

## *General Library*

Rules for general library use will be posted in the library. Library hours are posted in each apartment complex's Resident Information Center.

## *Legal Information / Law Library / Access to Legal Materials*

The law library is located on campus and is open as per the building schedule, which is posted in each apartment complex's Resident Information Center. If residents cannot access the law library due to the resident limit (based on available work stations), they should speak with a supervisor who will make arrangements to use the law library. Any residents not using the law library for its intended purpose will be asked to leave. Typewriters and computers are available in the law library for preparation of legal documents and for legal research.



The computers contain a "Lexus Nexus" application which has a variety of publications on immigration law and other related publications. There may be other legal, immigration or non-governmental organization related research on the bookshelves in the law library. Residents may request off site law related materials by completing a Resident Request form.

For instruction on accessing the Lexus Nexus application, to sign up for the orientation or for questions concerning use of the law library equipment, residents should speak with the library aide or complete a Resident Request form. Residents should speak to the library aide for paper, computer storage disks to store documents and/or to report malfunctioning of law library equipment.

## *Materials Provided By Legal Representatives*

Documents or other written material provided to a resident during a legal aid visit shall be inspected, but not read. Residents may keep legal materials in their bedrooms. Quantities of blank forms or self-help legal material in excess of that required for personal use may be held for the resident in their property. The resident will be permitted access to these documents by speaking with staff or by completing a Resident Request form.

## *Free Legal Assistance*

Pro bono (free) legal assistance may be requested by contacting the pro bono legal assistance organizations posted in each apartment complex's Resident Information Center. The Executive Office for Immigration Review supplies this list.

# RECREATIONAL PROGRAM



There are a variety of recreation activities offered to residents during their stay at the Center. Residents are authorized to use the recreation facilities within their neighborhood during open movement. Other activities as scheduled are available, and times and locations shall be posted weekly. Residents are expected to take care of supplies and equipment issued to them and to return the items after use.

Residents will be responsible for any recreational or leisure item until it has been returned. Staff will schedule specific activities for pleasure and fitness and ask that residents cooperate and participate in these activities; and encourage their children to participate. Some on-site activities are scheduled on particular days and times, while others are available for use independently. Recreation postings, information and schedules are posted in each apartment complex's Resident Information Center.

# MARRIAGES

Residents and their legal representative may request permission to have a marriage ceremony while at the Center from the Chief, JFRMU in writing. The request must specifically state:

- That the resident is legally eligible to be married;

- That he or she is mentally competent, as determined by a qualified medical practitioner;
- That the intended spouse wants to marry the resident, as attested by a written affirmation of intent to marry the resident by the intended spouse.

The affirmation must be included as part of the request. Failure to obtain approval from the Chief, JFRMU could result in a delay or cancellation of any ceremonies or approved visits for the purpose of marriage. *(See religious services staff for more information.)*

## VOLUNTARY WORK PROGRAM

Adult residents may participate in the Center's voluntary work program. Residents will receive any necessary training and are required to sign a voluntary work program statement prior to beginning to work. Residents participating in the voluntary work program will be paid $1.00 per day for their participation. Residents should see their counselor or unit manager to sign up for the voluntary work program or complete a Resident Request form.

Residents may also volunteer for temporary work details that occasionally arise. Temporary work generally lasts from several hours to several days. Residents assigned to special work areas shall be provided appropriate protective clothing and instruction in accordance to the requirements of the job. Work assignments are strictly voluntary. Unsatisfactory work performance and or disciplinary cases could result in removal from the voluntary work program.

## VISITATION

Residents are allowed social, legal and consular visits as outlined in those related sections in this handbook. All visitors must present identification as required by FRS Section 5.8. At the supervisor's discretion, a minor visitor without positive identification may be admitted if the accompanying adult visitor vouches for his/her identity. Minors will remain under the direct supervision of the adult visitor, so as to not disturb other visitors.



Disruptive conduct by visitors or residents may cause termination of the visit. Any property brought to a visit intended to be given to a resident must be turned over to staff for inventorying and receipting, prior to entering the visitation area. No items may be given directly to a resident during a

visit. Residents are not allowed to receive contraband or perishable food items. *See the sections on allowable personal property and contraband for more information.*

## Social Visitation

Residents may schedule social visits with friends, family and other associates. Social visitation is conducted seven days a week from 8:00am to 8:00pm, Sunday through Saturday. Residents may have an unlimited number of visits. Generally, visits will be a minimum of 60 minutes per visit. Visits are by appointment only. Appointments are made by signing up for visitation by completing a Resident Request form. The request must include the following information related to the visitor who wishes to come to the Center: Name, date of birth and country of birth.

All visitors may be checked against various law enforcement databases to determine their criminal history. Should the check determine the visitor has no criminal arrests or convictions, the resident will be notified of the appointment date and time which may be forwarded to the visitor. The number of visitors per visit may be restricted due to the volume of visits scheduled at that time. Residents may also request a special visitation accommodation if their visitors are traveling significant distances or have other special circumstances.

## Legal Aid Visitation

The Center permits legal visitation seven days a week, including holidays. Legal visitation hours are from 8:00am through 8:00pm, seven days a week, Sunday through Saturday. Legal visits are by appointment only. Legal aid visitors may contact the Center to schedule legal visitation appointments. Should a legal aid provider need to arrange an appointment at other than the times listed above, they may contact a supervisor for assistance. Legal visits may proceed through a scheduled meal period. In such cases, the resident shall receive a tray or sack meal after the visit, or may choose to eat during the visit. Attorneys must present a US state issued bar membership card. Persons allowed during a legal visit:

- Attorneys and other legal representatives;
- Legal assistants;
- Upon presentation of a letter of authorization from the legal representative under whose supervision he/she is working, an unaccompanied legal assistant may meet with a resident during legal visitation hours. The letter shall state that the named legal assistant is working on behalf of the supervising legal representative for purposes of meeting with the ICE resident(s);
- Approved Interpreters to aid the legal representatives or assistants.

## Consular Visitation

The Center permits visits by consular officers at any time. Consular officers should contact the Center to schedule appointments. Should a consular officer need to arrange an appointment at other than the times listed above, they may contact a supervisor for assistance.

## Visitor Dress Code

Visitors five years and older:

- Must wear clothing which covers shoulders, chest, stomach and all areas of the anatomy between the naval (belly button) and mid-thigh when seated;
- The top or neckline of clothing shall be no lower than the underarm in the front and in the back;
- Sheer (see-through) clothing is prohibited;
- Shoes shall be worn at all times;
- Shirts shall be worn at all times;
- "Gang colors" or other signs are prohibited;
- No "sagging" (pants will be worn at waist).

# ROUTINE SANITATION AND SAFETY INSPECTIONS

Sanitation and fire safety inspections are conducted weekly in all living and program areas of the Center. During these inspections, staff inspects for proper sanitary conditions and compliance with other regulations. When inspecting bedrooms during these inspections, the residents living in the room will be requested to be present. Parents are requested to be present when staff are checking their child's bedrooms.

# NON-ROUTINE SEARCHES

A non-routine search of housing or programing area is done when there is reasonable suspicion to believe contraband or a threat to resident or staff safety is present. A non-routine search of a resident's bedroom or personal items will only be done after the resident is notified and is present, unless urgent circumstances exist (such as in a self-harm situation). In these cases, the resident will be notified after the search is conducted.

## Searches of Persons

- *Visual Inspection* – A visual search for contraband without physical contact.
- *Pat Search* – A physical inspection of a resident while clothed. It will only be conducted by a staff member of the same gender. The inspector uses their sense of touch when patting or running the hands over the resident's body. A pat search does not require the resident to remove clothing, although the inspection may include a search of the resident's clothing and personal effects. Pat searches will only be conducted on any resident if there is reasonable and articulable suspicion   that they possess contraband. No children under 15 years of age will be the subject of a pat search without the explicit authorization of the Facility Administrator and JFRMU.

# MAIL / CORRESPONDENCE

Residents may send and receive correspondence and a variety of other items through the mail, including phone cards, money orders, books, clothing, prepaid envelopes, and other "allowable" items. Residents shall be permitted to receive and send at their own expense:



- An unlimited amount of general correspondence mail. The amount will only be limited when a public safety or Center security and order situation exists;
- An unlimited amount of special correspondence including correspondence with a legal representative, potential legal representative, courts and other governmental agencies and news organizations. *See the section on special correspondence for more information;*
- Packages containing personal property. Packages may neither be sent nor received without advance arrangements approved by the Facility Administrator. To get instructions and approval to send or receive packages, residents should complete a Resident Request form addressed to their counselor or unit manager. Residents will be instructed on the procedure for sending and receiving packages.

## *Addressing Envelopes*

When sending mail, the resident should write his/her name, "A" number, and the Center address legibly in the return address area of the envelope or package. They should also write the name and address of who the mail is being sent, legibly.

## *Indigent Resident Mail*

Residents who do not have adequate funds to purchase postage will be permitted to send at no cost:

- A reasonable amount of "special correspondence" mail. Should the Center consider the related amount "unreasonable," the ICE Office of Chief Counsel will be consulted prior to suspending mail postings;
- At least five general correspondence letters per week;
- Any packages that are deemed necessary by ICE Enforcement and Removal Operations (ERO), such as clothing, personal items, and items needed for return to country of origin;
- Packages containing personal property when it is determined that space is limited for the proper storage of the items.

Residents who are indigent and wish to use this service provided should contact their Resident Counselor for proper approval and processing.

## *Special Correspondence*

Special correspondence is written correspondence to or from attorneys and other legal representatives, judges, courts, embassies/consulates, the President and Vice President of the United States, members of Congress, the Department of Justice, the Department of Homeland Security, the U.S. Public Health Service, and representatives of the news media. Correspondence will only be treated as Special Correspondence if the title and office of the sender (for incoming mail) or addressee (for outgoing mail) are unambiguously identified on the envelope and the envelope is labeled "Special Correspondence." Incoming special correspondence must also be marked as "Special Correspondence" on the envelope or package. Residents must instruct anyone sending Special Correspondence to the Center of the related rules and address requirements.

- Special Correspondence may only be opened in the presence of the resident, and may only be checked for contraband, not read;
- Special Correspondence packages may only be sent or received with advance arrangements. To send or receive such a package, residents should speak with their Resident Supervisor or complete a Resident Request form.

## *Postage and Envelopes*

Envelopes will be provided to residents at no cost by speaking with their Resident Supervisor or by completing a Resident Request form. Postage is available for purchase at the Convenience Store or accepted through Mail Package.

## *Distribution of Incoming Mail*



Incoming flat mail will be distributed within 24 hours and packages within 48 hours of receipt when arriving during normal business hours. Incoming packages received on weekends and holidays will be distributed the next administrative business day. All incoming mail should list the resident's name and have an accurate return address. Incoming general mail will be opened and inspected for contraband only in the presence of the resident, unless waived by the resident or authorized by the Facility Administrator for security reasons.

Incoming general mail may also be read when a specific documented security concern arises with respect to an individual resident. Mail may be rejected if it contains contraband, other items of a security threat or perishable items. Both sender and intended receiver shall be provided written notice with an explanation as to why the mail is rejected and that the mail will be disposed of in accordance with the contraband section in this handbook. The resident and RSC will be consulted before religious articles are confiscated. Identity documents mailed to the resident will be turned over to ICE for placement in the Resident's A-file. Residents should contact ICE for a certified copy of the document. *See the section on contacting immigration for more information.*

## *Posting of Outgoing Mail*

Outgoing mail will not be opened, inspected, or censored unless it is addressed to another resident or alien in a detention center, or there is reason to believe the item may pose a threat to the Center security or orderly operation, endanger the recipient or the public or facilitate criminal activity. Outgoing mail will be posted within 24 hours of the time the mail was turned over to the Center by the resident, excluding weekends and holidays: then it will be posted the next administrative business day. Outgoing mail (containing appropriate postage) may be placed into the drop off box labeled "Mail" in each apartment complex's Resident Information Center.

If mail is placed into the drop off box without proper postage, it will be returned to the resident unless they are indigent. *See the section on indigent mail for more information.* Mail that does not fit into the slot may be handed to staff for processing.

## NOTARY PUBLIC

Notary public assistance may be obtained by filling out a Resident Request form.

## PHOTOCOPIES

Photocopies may be obtained by speaking to a staff member, case worker or filling out a Resident Request form. Photocopying services for legal material is available free of charge.

## HAIR CARE SERVICES

Residents have the opportunity to receive a haircut or other hair care services once a month. Hair care services information including a sign-up sheet, is located in each apartment complex's Resident Information Center.



## CONVENIENCE STORE

Convenience items are available for purchase at the Center's Convenience Store. Convenience Store hours are from Monday through Saturday, 12:00pm (noon) to 8:00pm. The price list and store hours are posted in each apartment complex's Resident Information Center.

## SMOKE-FREE ENVIRONMENT

South Texas Family Residential Center is tobacco-free in its entirety, to include the use and possession of smoking and smokeless tobacco and paraphernalia (lighters, matches, papers, pipes, etc.).

This handbook has been reviewed and approved by:

_____          _____
Facility Administrator                                          Date

_____          _____
JFRMU Representative                                        Date

## SITE MAP



PHASE

PHASE 2



SOUTH TEXAS FAMILY RESIDENTIAL CENTER
RESIDENT HANDBOOK

Exhibit 26 - Page 432