1

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)

2

Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)

3

256 South Occidental Boulevard
Los Angeles, CA 90057

4

Telephone: (213) 388-8693
Facsimile: (213) 386-9484

5

Email:crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

6

        marchela@centerforhumanrights.org

7

ORRICK, HERRINGTON & SUTCLIFFE LLP
William A. Molinski (Cal. Bar No. 145186)

8

wmolinski@orrick.com
T. Wayne Harman (Cal. Bar No. 254089)

9

wharman@orrick.com
Elena Garcia (Cal. Bar No. 299680)

10

egarcia@orrick.com
777 South Figueroa Street, Suite 3200

11

Los Angeles, CA 90017
Telephone: (213) 629-2020

12

13

*Attorneys for Plaintiffs*
(listing continues on following page)

14

15

16

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

17

WESTERN DIVISION

18

19

| | |
|---|---|
| Jenny Lisette Flores, et al., | Case No. CV 85-4544-RJK(Px) |
| Plaintiffs, | **Plaintiffs' First Set Of Exhibits In Support Of Motion For Class-Wide Enforcement Of Settlement [Part 10: Exhibits 27-32]** |
| v. | |
| Jeh Johnson, Secretary, U.S. Department of Homeland Security, et al., | Hearing:  March 9, 2015 |
| Defendants. | Time:    TBD |
| | Dept:    TBD |

20

21

22

23

24

25

26

**PUBLIC VERSION**

27

28

1

2  *Plaintiffs' counsel, continued:*

3  La Raza Centro Legal, Inc.
   Michael S. Sorgen
4  Maria Victoria Castro
   Amanda Alvarado Ford
5  474 Valencia Street, #295
   San Francisco, CA 94103
6  Telephone:   (415) 575-3500
   Facsimile:   (415) 255-7593
7
   *Of counsel:*
8
   Youth Law Center
9  Alice Bussiere
   Virginia Corrigan
10 200 Pine Street, Suite 300
   San Francisco, CA 94104
11 Telephone:   (415) 543-3379 x 3903

12 Ranjana Natarajan
   Clinical Professor
13 Director, Civil Rights Clinic
   University of Texas School of Law
14 727 E. Dean Keeton St.
   Austin TX 78705
15 Telephone:   (512) 232-7222

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    Plaintiffs' First Set Of Exhibits In
                                    Support Of Motion For Class-Wide
                                    Enforcement Of Settlement
                                    [Part 10: Exhibits 27-32]
                                    CV 85-4544-RJK(Px)

1

INDEX TO EXHIBITS

1    Settlement of class action, January 17, 1997 ...................................... 1

2    Order approving settlement of class action, January 28, 1997 ...................... 47

3    Stipulation extending settlement of class action, December 7, 2001 ................................................................................... 53

4    Plaintiffs' letter requesting pre-enforcement meeting, October 15, 2014 ................................................................................ 58

5    Plaintiffs' letter posing questions re: implementation of class action settlement, October 2, 2014 ................................................ 64

6    Defendants' response to questions re: implementation of class action settlement, November 3, 2014 .......................................... 85

7    ICE opposition to bond redetermination, July 24, 2014 ............................ 107

8    ICE opposition to bond redetermination, October 8, 2014 ........................ 158

9    U.S. Immigration & Customs Enforcement, news release, November 18, 4014 ...................................................................... 210

10   Declaration of Bridget Cambria, November 7, 2014 ................................ 211

11   Declaration of Carol Anne Donohoe, November 15, 2014 ........................ 219

12   Declaration of J▮▮▮H▮▮▮▮M▮▮▮, September 20, 2014 .................. 227

13   Declaration of M▮▮▮C▮▮▮▮d▮T▮▮▮, September 19, 2014 ................................................................................... 232

14   Declaration of M▮▮▮F▮▮▮▮S▮▮, September 19, 2014 ......................... 238

15   Declaration of M▮▮▮L▮▮▮M▮▮, September 19, 2014 ..................... 244

16   Affidavit of Adriana Piñon re: Texas Public Information Act Request, September 3, 2014 ...................................................... 248

17   Declaration of Barbara Hines, January 14, 2014 ....................................... 253

18   Declaration of D▮▮▮V▮▮A▮▮▮▮, January 9, 2015 ............................. 301

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 10: EXHIBITS 27-32]
CV 85-4544-RJK(Px)

19    Declaration of H███ R███M███, January 9, 2015 ............................ 305

20    Declaration of R███ E███ A███, January 8, 2015 ........................ 309

21    Karnes Attorney Visitation Form and Guidelines, January 9,
      2015 ................................................................................................ 312

22    Declaration of Jonathan Hiskey, September 22, 2014 ................................ 314

23    Declaration of Carlos Holguin, January 13, 2015 ................................... 319

24    Declaration of Luis H. Zayas, December 10, 2014 ...................................... 323

25    Declaration of Generva Gilden Berger, January 12, 2015 .......................... 366

26    Dilley Resident Handbook .......................................................................... 383

27    Memorandum of Understanding Re: Compromise of Class
      Action: Conditions of Detention, November 30, 1987 ................................ 433

28    Declaration of Anne Chandler, December 1, 2014 ...................................... 470

29    Declaration of Allison N. Boyle, November 24, 2014 ................................. 475

30    Declaration of Brittany Perkins, November 28, 2014 ................................. 490

31    Declaration of Clayton N. Matheson, November 24, 2014 .......................... 497

32    Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ...................... 504

33    Declaration of Melissa J. Cuadrado, November 26, 2014 ........................... 512

34    Declaration of Scott T. Williams, December 1, 2014 ................................. 522

35    Declaration of Virginia Marie Raymond, December 13, 2014 .................... 527

36    *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.),
      Memorandum of Points & Authorities in Support of Motion
      for Preliminary Injunction, December 16, 2014 .......................................... 530

37    Flores Settlement Agreement and DHS Custody: Key Flores
      Provisions & DHS Noncompliance - Report of Lutheran
      Immigration and Refugee Services ............................................................. 570

38   Declaration of S███ C███ M████, January 8, 2015 .................................. 577

39   Declaration of S███ B███ d█ T██, January 8, 2015 ........................... 580

40   Declaration of M██ G███ S████, January 8, 2015 ............................... 583

41   Declaration of E█████ G███ M███, January 9, 2015 ........................ 586

42   Declaration of A██ Z██ M█████, January 9, 2015 ................................ 590

43   Declaration OF A███ E████████ d█ l█ C███ G████,
     January 9, 2015 ................................................................. 594

44   Declaration of A██ F██ d█ E████, January 9, 2015 ........................... 597

45   Declaration of H███ L███ M███ P███, January 9, 2015 ....................... 602

46   Declaration of M███ M██████ M████, January 8, 2015 .......................... 606

47   Declaration of C███ M███ C██████ C███, January 8,
     2015 ............................................................................ 609

48   Declaration of S███ L███ M███ A████, January 9,
     2015 ............................................................................ 611

49   Declaration of L███ B███ S████, January 8, 2015 ............................. 613

50   Declaration of S███ A███ M██████ D████, January 8,
     2015 ............................................................................ 617

51   Declaration of O███ F███ C████ M███, January 9, 2015 ................... 621

52   Declaration of J██████ E████ E███████ F███, January 9,
     2015 ............................................................................ 624

53   Declaration of Lauren Beth Connell, November 26, 2014 .......................... 627

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 10: EXHIBITS 27-32]
CV 85-4544-RJK(Px)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian


      /s/ Carlos Holguín
Attorneys for Plaintiffs

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 10: EXHIBITS 27-32]
CV 85-4544-RJK(Px)

# Exhibit 27

## Publicly Filed

NATIONAL CENTER FOR IMMIGRANTS' RIGHTS, INC.
Carlos Holguin
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, California 90057
Telephone: (213) 388-8693

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
Teresa Demchak
Jim Morales
1663 Mission Street, 5th floor
San Francisco, California 94103
Telephone: (415) 543-3307

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
John Hagar
Paul Hoffman
633 Shatto Place
Los Angeles, California 90005
Telephone:  (213) 487-1720

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES; et al., | : | Case No. 85-4544-RJK (Px) |
| | : | |
| | : | MEMORANDUM OF UNDERSTANDING |
| | : | RE COMPROMISE OF CLASS |
| Plaintiffs, | : | ACTION: CONDITIONS OF |
| | : | DETENTION. |
| -vs- | : | |
| | : | |
| | : | |
| EDWIN MEESE, III; et al., | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| ——————————————— | : | |

/ / /

Exhibit 27 - Page 433

1.  The parties hereto shall stipulate to an order dismissing without prejudice plaintiffs' Third, Fourth, Fifth, and Sixth Causes of Action, said stipulation, and any order of dismissal entered pursuant thereto, to be conditioned upon implementation of and continuing compliance with the terms of this memorandum of understanding.  This memorandum of understanding shall thereupon be an enforceable settlement agreement between the federal defendants and the plaintiff class.

2.  Beginning on or before June 1, 1988, except in unusual and extraordinary circumstances as defined herein, the federal defendants shall house all juveniles detained more than 72 hours following arrest in a facility that meets or exceeds the standards set out in the April 29, 1987, Notice of Funding Programs, 52 Fed.Reg. 15569-15573, attached hereto and incorporated by this reference, and in the document, "Alien Minors Shelter Care Program - Description and Requirements (April 28, 1987)," attached hereto and incorporated by this reference. Such facilities shall additionally provide minors educational and other reading materials in Spanish.  The federal defendants shall make reasonable efforts to provide minors reading materials and educational instruction in other languages as needed.  The parties agree to negotiate concerning postponement of the June 1, 1988, implementation date in the event of unforseen circumstances.

3.  The INS Regional Associate Commissioner for Operations shall be informed of and monitor instances in which juveniles are not transferred within 72 hours of arrest to a facility meeting the standards described in paragraph 2 above.  Such monitoring

- 2 -

Exhibit 27 - Page 434

shall ensure that juveniles are within 72 hours of arrest housed in facilities meeting said standards except in unusual and extraordinary circumstances.

4.   "Unusual and extraordinary circumstances" justifying exception to the 72-hour transfer requirement shall be limited to those cases in which the interests of the affected minor would be served by housing the minor in a non-complying facility or in which, because of unforeseen events, the affected minor cannot be housed in a complying facility.

5.   For a period of twelve (12) months following dismissal as herein provided, the federal defendants shall report to the court in camera all exceptions to the 72-hour transfer requirement, including the name of the affected class member, the date of his or her arrest, the facilities in which the minor has been housed and dates of occupancy, and the unusual and extraordinary circumstances warranting non-transfer.

/ / /

Exhibit 27 - Page 435

6.   Plaintiffs shall not refile or otherwise renew the claims alleged in their Third, Fourth, Fifth, and/or Sixth Causes of Action so long as defendants are in compliance with the terms of this memorandum of understanding.   Plaintiffs agree to meet with the federal defendants to discuss any alleged non-compliance with the terms of the memorandum prior to refiling or otherwise renewing the claims alleged in their Third, Fourth, Fifth, and/or Sixth Causes of Action.

Approved as to form and content.

Dated:   November 24, 1987.     NATIONAL CENTER FOR
                                IMMIGRANTS' RIGHTS, INC.
                                Carlos Holguin
                                Peter A. Schey

                                NATIONAL CENTER FOR YOUTH LAW
                                Alice Bussiere
                                Teresa Demchak
                                James Morales

                                ACLU FOUNDATION OF
                                SOUTHERN CALIFORNIA
                                John Hagar
                                Paul Hoffman


                                _____
                                Attorneys for Plaintiffs

Dated:   November 19, 1987.     ROBERT C. BONNER
                                United States Attorney
                                FREDERICK M. BROSIO, JR.
                                Assistant United States Attorney
                                Chief, Civil Division
                                GEORGE WU
                                Assistant United States Attorney


                                _____
                                IAN FAN
                                Assistant United States Attorney
                                Attorneys for Federal Defendants

- 4 -                          Exhibit 27 - Page 436

notice, and to authorize the administrative law judge and the Commission, without further notice to the respondent, to find the facts to be as alleged in the complaint and this notice and to enter both an initial determination and a final determination containing such findings.

The complaint, except for any confidential information contained therein, is available for inspection during official business hours (9:45 a.m. to 5:15 p.m.) in the Office of the Secretary, U.S. International Trade Commission, 701 E Street NW., Room 156, Washington, DC 20436. telephone 202–523–0471. Hearing-impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on 202–724–0002.

Issued: April 22, 1987.

By order of the Commission.

**Kenneth R. Mason,**
*Secretary.*
[FR Doc. 87–9699 Filed 4–28–87; 8:45 am]
**BILLING CODE 7020-02-M**

---

## INTERSTATE COMMERCE COMMISSION

[Ex Parte No. 466 (Sub-No. 1)]

### Railroad Cost of Capital; Proposed Expedited Procedure

**AGENCY:** Interstate Commerce Commission.

**ACTION:** Notice seeking comment on a proposed procedure to expedite the Commission's annual determination of the railroad's cost of capital.

**SUMMARY:** Each year the Commission determines the railroad industry's cost of capital, or fair return rate. This cost of capital finding is used, among other things, to evaluate the adequacy of railroad revenues. The most recent cost of capital determination—for the year 1985—was made in Ex Parte No. 464, *Railroad Cost of Capital—1985,* served March 16, 1987.

We have developed a set of procedures with timetables for expediting the Commission's cost of capital finding. This will insure a final determination by June 30 of the year following that for which the determination is being made. The Commission seeks public comment on this proposal which is presented below.[1]

[1] In his vote in Ex Parte No. 464, *supra,* Commissioner Andre, joined by Commissioner Sterrett, commented separately that the Commission's staff should propose for public comment an analysis describing how regulatory lag can be reduced.

Our proposal will produce a cost of capital finding within six months following the close of the calendar year. Under the proposal, the following timetable would be established *each year:*

(1) By January 10—issue a notice instituting the cost of capital proceeding. This notice would set forth the due dates for the submission of comments. i.e., no later than February 10 for railroad initial comments, no later than March 10 for non-railroad comments, and no later than March 25 for railroad rebuttal comments.

(2) By February 10—receive initial comments from the railroads. In their comments submitted in the Ex Parte No. 464, *supra,* proceeding, the railroads indicated that if they knew in advance that the cost of capital proceeding would be instituted in January of each year, they would be able to meet this deadline, assuming no new and complex issues are introduced. The railroads indicated in their comments that this deadline could be met without a major revision to their data gathering activities; they would simply gather the necessary data throughout the year on a piecemeal basis. Requisite railroad data and information would be obtained directly by the Association of American Railroads from the railroads.

(3) By March 10—receive comments from the shippers and other non-railroad parties. Based on the comments received in Ex Parte No. 464, *supra,* the non-railroad parties should be able to meet this filing deadline without a major modification to their data gathering activities.

(4) By March 25—receive railroad rebuttal comments. Based on their comments in Ex Parte No. 464, *supra,* this deadline should also pose no particular problem for the railroads.

(5) March 25 through May 31—staff analyzes comments and makes recommendations to the Commission.

(6) Commission serves decision not later than June 30.

We believe that the dates in the above timetable can be met provided: (1) No lengthy filing extensions are granted to the parties, and (2) no highly contentious or novel issues are raised. Furthermore, we believe that these objectives can be met without any change in Commission internal procedures, funding levels, or statutory requirements nor changes in staffing levels in the Financial Analysis group. Nor, as indicated in their comments in Ex Parte No. 464, *supra,* will the expedited filing deadlines have a significant impact on the parties data gathering activities, including the costs associated with those activities.

Public comment on the above proposal is invited.

**DATES:** Comments due May 29, 1987.

**ADDRESSES:** Send an original and 15 copies of comments to: Office of the Secretary, Case Control Branch, Interstate Commerce Commission, Washington, DC 20423.

**FOR FURTHER INFORMATION CONTACT:**
Ward L. Ginn, Jr., (202) 275–7489.

This action will not significantly affect either the quality of the human environment or energy conservation. Nor will it have a significant economic impact on a substantial number of small entities.

Authority: 49 U.S.C. 10704(a).

Decided: April 20, 1987.

By the Commission, Chairman Gradison, Vice Chairman Lamboley, Commissioners Sterrett. Andre. and Simmons.

**Noreta R. McGee,**
*Secretary.*
[FR Doc. 87–9624 Filed 4–28–87; 8:45 am]
**BILLING CODE 7035-01-M**

---

## DEPARTMENT OF JUSTICE

### Availability of Funding for Cooperative Agreements; Shelter Care and Other Related Services to Alien Minors

**AGENCY:** Community Relations Service (CRS), Justice.

**ACTION:** Notice of availability of funding for Cooperative Agreements to support programs which provide shelter care and other related child welfare services to alien minors detained in the custody of the United States Department of Justice, Immigration and Naturalization Service.

**SUMMARY:** This announcement governs the award of Cooperative Agreements to public or private non-profit organizations or agencies and under certain conditions, to for-profit organizations or agencies, to provide shelter care and other related child welfare services to alien minors detained in the custody of the United States Department of Justice, Immigration and Naturalization Service.

Awards will be to one (1) or more organizations. These awards are for the purpose of supporting licensed child welfare programs which provide shelter care and other related child welfare services to male and female alien minors under 18 years of age who are referred to the Community Relations Service by the Immigration and Naturalization Service.

These child welfare services will afford alien minors a structured, safe

Exhibit 27 - Page 437

and productive environment which meets or exceeds respective state guidelines and standards for similar services designed to serve children in their care and custody. Applications submitted pursuant to this announcement must plan for the delivery of services to a minimum population of 12–15 minors. The ability to provide services to a larger population of children is highly desirable.

The administration of Cooperative Agreements awarded under this announcement will require the substantial involvement of the Federal Government. The level and scope of Federal involvement is delineated in the Community Relations Service document entitled *Alien Minors Shelter Care Program—Description and Requirements*. This document is included in the Proposal Application Package available from the Community Relations Service.

**DATE:** Closing Date: 5:00 p.m., Eastern Daylight Time, Friday, June 12, 1987.

Proposals will be reviewed, evaluated and competitively rated by an independent panel of experts in the areas of child welfare and social services on the basis of weighted criteria listed in this Notice. All funding decisions are at the discretion of the Director, Community Relations Service. Awards will be subject to the availability of funds and the concurrence of the Assistant Commissioner, Detention and Deportation, Immigration and Naturalization Service.

**Authorization**

Authorities for the provision of certain child welfare services to alien minors detained in the custody of the Immigration and Naturalization Service (INS) are contained in a Memorandum of Agreement and an Inter-Agency Cost Reimbursable Agreement dated October 1, 1986, and signed by the Acting Director, Community Relations Service; the Assistant Commissioner, Detention and Deportation, Immigration and Naturalization Service and the Director, Refugee Health Affairs, United States Public Health Service.

Legislative authority for the Community Relations Service, Cuban/ Haitian Entrant Program is contained in Title V, section 501 (c) of Pub. L. 96–422 (The Refugee Education Assistance Act of 1980).

**Available Funds**

Approximately $1,500,000 will be available for this program activity on a fiscal year basis. This estimate does not bind the Community Relations Service

or the Immigration and Naturalization Service to any specific level of funding. This figure is only intended to serve as an estimate of the total amount of funding which could potentially be available during any specific fiscal year.

Future fiscal year funding for this program is contingent upon need and the availability of Federal appropriations. If adequate funds are available, the Acting Director, Community Relations Service, anticipates continuation of this program.

Awards normally will not exceed a 36 month program performance period. Funding will be for 12-month budget periods.

**Eligible Applicants**

Non-profit organizations incorporated under state law which have demonstrated child welfare, social service or related experience and are appropriately licensed or can expeditiously meet applicable state licensing requirements for the provision of shelter care, foster care, group care and other related services to dependent children are eligible to apply.

For-profit organizations, incorporated under state law, which have demonstrated child welfare, social service or related experience and are appropriately licensed or can expeditiously meet applicable state licensing requirements for the provision of shelter care, foster care, group care and other related services to dependent children; and, which can clearly demonstrate that only actual costs, and not profits, fees, or other elements above cost have been budgeted, are also eligible to apply.

The geographical location of the applicant is not restricted to the geographic area of need identified in this Notice; however, the applicant must be able to strongly substantiate that its network of local affiliates or its subcontractor(s) or subrecipient(s) will be able to effectively and appropriately deliver the required services; and, that local service provider organizations are licensed to provide 24 hour care under applicable state laws.

**Eligible Client Population**

Under the terms of this announcement, the eligible client population will consist of male and female alien minors.

**Definition of Alien Minor**

For the purposes of this Notice, an alien minor is defined as a male or female foreign national, under 18 years of age, who is detained in the custody of the Immigration and Naturalization Service and is the subject of exclusion or deportation proceedings under the

Immigration and Nationality Act; or, has an application for asylum pending with the Immigration and Naturalization Service.

**Designated Program Area**

The designated program areas consist of:

• SOUTHERN CALIFORNIA (San Diego and Los Angeles Counties)
• TEXAS (Cameron County)

**Technical Assistance Conference**

The CRS will hold public meetings regarding this solicitation. Further information regarding time, date and location will be included in the Proposal Application Package.

**SUPPLEMENTARY INFORMATION:**

**Purpose and Scope**

Community Relations Service Cooperative Agreement Recipients (hereafter referred to as Recipient) shall facilitate the provision of temporary shelter care and other child welfare related services to alien minors, who have been approved for transfer to a Community Relations Service supported Shelter Care Program.

These minors, although released to the physical custody of the Recipient, shall remain in the legal custody of the Immigration and Naturalization Service.

The population level of minors is expected to fluctuate as arrivals and case dispositions occur. Program content will, therefore, reflect differential planning of services to minors at various stages of adjustment and administrative processing. In addition, although the population of minors is projected to consist primarily of adolescents, Recipients are expected to be able to serve some children 12 years of age or younger.

Recipients are expected to facilitate the provision of assistance and services for each minor including, but not limited to: physical care and maintenance, access to routine and emergency medical care, comprehensive needs assessment, education, recreation, individual and group counseling, access to religious services and other social services.

Other services that are necessary and appropriate for these minors may be provided if the Community Relations Service determines in advance that the service is reasonable and necessary for a particular child.

The Recipient will develop an appropriate individualized service plan for the care and maintenance of each minor in accordance with his/her needs as determined in an intake assessment. In addition, agencies or organizations

Exhibit 27 - Page 438

**15571**

are required to implement and administer a case management system which tracks and monitors client progress on a regular basis to ensure that each child receives the full range of program services in an integrated and comprehensive manner. Shelter care services shall be provided in accordance with applicable state child welfare statutes and generally accepted child welfare standards, practices, principles and procedures.

Service delivery is expected to be accomplished in a manner which is sensitive to culture, native language and the complex needs of these minors.

### A. Program Design

The applicant must set forth in detail information concerning the following:

**1. Organization/Agency Capability**

A comprehensive overview of the applicant agency, agency qualifications and agency history, including agency philosophy, goals and history of experience with respect to the provision of child welfare or related services to children under 18 years of age.

Identification of the organization(s)/ agency(ies) proposed for participation in the program, a description of their qualifications in relation to responsibilities; and the mechanism for coordination among these agencies (as applicable).

**2. Target Population**

A description of the proposed client population including a discussion of program acceptance criteria and estimates of the total number of minors to be served at any one time (capacity) and during any program year.

**3. Management Plan**

a. A plan which identifies the agency/ organization which will have overall fiscal and program responsibility, as applicable.

b. Identifies the organizational structure and lines of authority.

c. Describes the overall proposed staffing plan and staff qualifications for the program.

d. Includes a comprehensive plan for coordination of activities between the various program components and coordination with other community and governmental agencies.

e. Staff supervisory model.

f. Provisions for staff training.

g. Proposed staff schedule(s).

h. Role of consultants and rationale for their use.

**4. Individual Client Service Plans**

Applicants are expected to describe in detail:

a. The methodology regarding the development of individual client service plans, and;

b. The process to ensure that service plans will be periodically reviewed and updated. Identify staff who will have responsibility for the development and updating of the plans.

**5. Case Management**

Describe in detail the case management system for tracking and monitoring client progress on a regular basis to ensure that each minor receives the full range of program services in an integrated and comprehensive manner. Identify the staff positions responsible for coordinating the implementation and maintenance of the case management system.

**6. Structure and Accountability**

Applicants must fully describe:

a. The plan for developing and maintaining internal structure, control and accountability through programmatic means.

b. Utilization of daily logs, statistical reports, etc.

### B. Client Services

Applicants are required to describe, in a detailed and comprehensive manner, the following services and the methodology for service delivery:

1. Physical Care and Maintenance;
2. Routine and Emergency Medical/ Dental Care;
3. Orientation;
4. Individual Counseling;
5. Group Counseling;
6. Acculturation/Adaptation;
7. Education;
8. Recreational, Social and Work Activities;
9. Visitation Procedures;
10. Legal Services, and;
11. Family Reunification Services.

### C. Client Records

Applicants must provide descriptive information regarding the development, maintenance and content of individual client case records, including a description of all material/information which will be maintained in these records.

### D. Program Records

Applicants are required to set forth comprehensive information regarding the types of program records to be maintained by the program (daily activity logs, records of staff meetings, cash disbursement systems, daily and weekly status of population reports, etc.).

### E. Facility

As applicable, applicants are required to set forth in detail the following:

1. A description of the physical structure and the allocation of space for residential and office use.

2. A description of the location of the facility and discussion of the basis for selection.

3. Proof, in the form of a written certification, that the program and facility meet all applicable zoning and child welfare licensing requirements.

### F. Program Evaluation

Applicants must set forth a plan for program evaluation including identification of evaluative criteria.

### G. Community Support

Applicants must identify those measures the agency will take or has taken, to assure and maintain community receptivity and support and/ or reduce community opposition to the program.

### H. Budget

Applicants are required to submit a comprehensive line item budget. A narrative explanation for each line item, included in each object class, must accompany the proposed budget.

### I. Supportive Addenda Material

Applicants are required to submit the following supporting material as an addendum to the program proposal:

1. Administrative Requirements

A. Agency Administration and Organization

1. Agency organizational *chart* describing the agency as a whole and the organizational relationship of the proposed program to other agency programs.

2. Comprehensive organizational *chart* of the proposed program.

3. Copies of Articles or Incorporation.

4. Proof of IRS status as a non-profit organization, if applicable.

5. List of Officers and Board Members, if applicable.

6. List of professional affiliations and certifications.

7. Copy(ies) of applicable State child welfare licenses.

B. Organizational Standards/Policies and Policies Regarding Clients

1. Personnel Handbook and Standards of conduct.

2. Statement regarding professional and agency liability.

3. Copy of Disciplinary Procedures.

4. Copy of Agency policy regarding the confidentiality of client information and records.

Exhibit 27 - Page 439

5. Discussion of the method to be used to inform clients of program rules, regulations and policies, including the confidentiality of client information.

6. Copy of Grievance Policy and Procedures.

7. Fire and earthquake evacuation procedures, as applicable.

C. Staff

1. Job/Position Descriptions and resumes (if individuals have been identified for certain positions) for all personnel to be hired for the program including documented evidence of the availability of bi-lingual and/or bi-cultural personnel.

2. Resumes and qualifications of program consultants.

D. Community Support of the Program

1. Letters of program support from local political representatives, social service agencies, etc. Letters should reflect writers' awareness of program's intent, potential Federal funding source and location of the program.

Letters should also contain a recommendation or comment regarding the proposed program.

2. A listing of service providers to whom clients will be referred, including name, address and description of service(s) to be provided.

3. A listing of voluntary and/or donated resources, including letters of intent from the agencies or entities providing the resources, if applicable.

E. Implementation Plan

A plan for program implementation including time-lines regarding significant milestones.

2. Finance

a. A copy of the most recent agency/organization audit.

b. A description of the agency/organization Financial Management System.

c. A listing of other Federal, State, local or foundation grants, cooperative agreements or contracts, etc. being administered by the applicant. This material should include information regarding the funding source(s); grant, cooperative agreements or contract number; level of financial support; purpose of award; grant, cooperative agreement or contract performance period; and name, address and telephone number of grant, cooperative agreement and/or contract officer (Federal, State or local).

d. Subrecipients and/or Subcontractors

1. Identify all proposed services which are to be awarded to subrecipients/subcontractors.

2. Provide relevant background material regarding the proposed subrecipient(s)/subcontractor(s).

3. Provide letters from the proposed subrecipient(s)/subcontractor(s) indicating their commitment and the specific services to be provided.

J. Screening Criteria

CRS will screen all applications submitted pursuant to this Notice. Screening shall be done to determine whether an application is sufficiently complete to warrant consideration and review by the CRS Grant Review Panel. An application may be rejected if:

1. The application is from an ineligible applicant.

2. The application is received after the closing date.

3. The application omits:

a. Documented written evidence of community support for the program.

b. A comprehensive line-item budget with appropriate descriptive narrative.

c. A copy of the latest financial audit of the applicant.

K. Criteria for Evaluating Applications

Applications will be competitively reviewed, evaluated and ranked according to the following weighted criteria:

1. The degree to which the entire proposed plan for developing, implementing and administering a shelter care program is clear, succinct, integrated, efficient, cost effective and likely to achieve program objectives.

2. The quality of the applicant's program management and staffing plans as demonstrated by:

• The adequacy of the plan for program management and the plan for coordination between the components of the program.

• The adequacy of the plan for coordination with community and governmental agencies.

• The adequacy of the qualifications of the applicant organization and the extent to which this organization has a demonstrated record as a provider of child welfare or other social services.

• The extent to which the applicant has a demonstrated capacity for effective fiscal management and accountability.

• The extent to which subrecipient(s)/subcontractor(s) have a demonstrated capacity for effective fiscal and program management and accountability.

• The adequacy of the plans for staff supervision and intra-program communication.

• The adequacy of the staffing plans in terms of the relationship between the proposed functions and responsibilities of the staff in the program, and the education and relevant experience required for the position.

• Clear organizational charts delineating organizational relationships and levels of authority, including the identification of the staff position accountable for the overall management, direction and progress of the program.

3. Program Services—The applicant's response to the required program services, including a description of program resources which demonstrates:

• The capacity of the program to offer comprehensive, integrated and differential services which meet the needs of the clients.

• Utilization of resources in a manner which enhances program control, structure and accountability.

• Provision of services in a manner which promotes and fosters cultural identification and mutual support.

• Sensitivity to the issues of culture, race, ethnicity and native language.

4. The degree to which the applicant provides effective strategies of programmatic control, predictability and accountability as evidenced by the structure and continuity inherent in the program design.

5. The adequacy of the plans for:
(a) Developing and updating individual client service plans, and;
(b) The proposed system of case management.

6. The reasonableness of the proposed budget and budget narrative, in relation to proposed program activities.

7. The degree to which the application has provided written documented evidence of community support and acceptance of the program.

L. Application Request and Submission

Eligible applicants may request a Proposal Application Package from the United States Department of Justice, Community Relations Service, Suite 330, 5550 Friendship Boulevard, Chevy Chase, Maryland 20815; Attention: Cynthia Bowie, Senior Grants Management Specialist.

Proposal Application Packages may also be obtained by contacting the Community Relations Service at (301) 492–5818 or 1–800–424–9304.

Applicants must submit a signed original and two (2) copies of the proposal and supporting documentation to the United States Department of Justice, Community Relations Service, Suite 330, 5550 Friendship Boulevard, Chevy Chase, Maryland 20815; Attention: Cynthia Bowie, Senior Grants Management Specialist.

Applications Delivered by Mail

An applicant must show proof of mailing consisting of the following:

- 8 -

Exhibit 27 - Page 440

1. A legible dated U.S. Postal Service postmark.

2. A legible mail receipt with the date of mailing stamped by the U.S. Postal Service.

3. A dated shipping label, invoice or receipt from a commercial carrier.

If an application is sent through the U.S. Postal Service, the Director does not accept either of the following as proof of mailing: (1) A private metered postmark, or (2) a mail receipt that is not dated by the U.S. Postal Service.

Applicants should note that the U.S. Postal Service does not uniformly provide a dated postmark. Before relying on this method, the applicant should check with their local Post Office.

Applicants are encouraged to use registered or at least First Class mail. Each late applicant will be notified that the application will not be considered.

Applications postmarked on or before June 12, 1987, shall be considered as timely applications.

**Applications Delivered by Hand**

An application that is hand-delivered must be taken to the United States Department of Justice, Community Relations Service, Suite 330, 5550 Friendship Boulevard, Chevy Chase, Maryland 20815.

The Grants Management Office will accept hand-delivered applications between 9:00 a.m. and 5:00 p.m., Eastern Daylight Time daily, except Saturdays, Sundays and Federal holidays.

An application that is hand-delivered will not be accepted after 5:00 p.m., Eastern Daylight Time, on the closing date.

Catalog of Federal Domestic Assistance Number: 16.201.
Dated: April 24, 1987.

**Wallace P. Warfield,**
*Acting Director, Community Relations Service.*

**Intergovernmental Review**

*Application Requirements*

Pursuant to Executive Order 12372, *Intergovernmental Review of Federal Programs,* all States have the option of designing procedures for review and comment on Federally assisted programs. Each applicant is required to notify each State in which it is proposing activities under this announcement and to comply with the State's established review procedures. This may be done by contacting the applicable State Single Point of Contact (SPOC).

**State Requirements**

Comments and recommendations relative to applications submitted under this solicitation should be mailed no later than 45 days after the date of publication, addressed to: Richard Gutierrez, Coordinator, Immigration and Refugee Affairs, Community Relations Service, Suite 330, 5550 Friendship Boulevard, Chevy Chase, Maryland 20815.

[FR Doc. 87–9636 Filed 4–28–87; 8:45 am]
**BILLING CODE 4410–01–M**

**Bureau of Prisons**

**Intent to Prepare a Draft Environmental Impact Statement (DEIS) for the Construction of a Federal Correctional Facility, Schuylkill County, PA**

**AGENCY:** Federal Bureau of Prisons, Justice.

**ACTION:** Notice of intent to prepare a Draft Environmental Impact Statement (DEIS).

**SUMMARY:**

1. Proposed Action: The U.S. Department of Justice, Federal Bureau of Prisons has determined that a new medium security Federal Correctional Institution with an adjacent minimum security Federal Prison Camp is needed in the Northeastern United States. A site is currently being evaluated in Schuylkill County, Pennsylvania. The proposal calls for the construction of a 150 bed minimum security camp and an adjacent 500–600 bed facility to house medium security inmates. Approximately 250 total acres would be required for road access and parking, inmate housing, administration space, program areas and service/support facilities for the two facilities. In addition, exercise areas and an adequate natural buffer zone around the entire property would be included in the required acreage.

2. In the process of evaluating the specific site, the following subjects will receive a detailed examination: water and sewage, wetlands, threatened and endangered species, cultural resources, unique and prime farmlands, and varied socio-economic issues.

3. Alternatives: In developing the DEIS, the options of no action and alternative sites for the proposed facilities will be fully and thoroughly examined.

4. Scoping Process: A number of meetings have already been held with local officials and interested citizens. Additional meetings including at least one public meeting will be held once a specific site is identified. A formal public hearing will be held after the publication of the DEIS.

5. DEIS Preparation: The DEIS should be available for public review and comment not later than August 1, 1987.

6. Address: Questions concerning the proposed action and the DEIS should be addressed to: Jim Jones, Site Acquisition Coordinator, Facilities Development and Operations, Federal Bureau of Prisons, 320 First Street NW., Washington, DC 20534, Phone: (202) 272–6871.

Dated: April 23, 1987.

**Loy S. Hayes,**
*Deputy Assistant Director, Federal Bureau of Prisons, U.S. Department of Justice.*
[FR Doc. 87–9628 Filed 4–28–87; 8:45 am]
**BILLING CODE 4410–05–M**

**Drug Enforcement Administration**

**[Docket No. 87–5]**

**Bell Apothecary, Inc.; Easton, PA; Hearing**

Notice is hereby given that on August 15, 1986, the Drug Enforcement Administration, Department of Justice, issued to Bell Apothecary, an Order To Show Cause as to why the Drug Enforcement Administration should not revoke its DEA Certificate of Registration, BB0430734 and deny any pending applications for renewal of such registration.

Thirty days having elapsed since the said Order To Show Cause was received by Respondent, and written request for a hearing having been filed with the Drug Enforcement Administration, notice is hereby given that a hearing in this matter will be held commencing at 10:00 a.m. on Wednesday, April 29, 1987, in Courtroom 10, Room 309, United States Claims Court, 717 Madison Place, NW., Washington, DC.

Dated: April 20, 1987.

**John C. Lawn,**
*Administrator, Drug Enforcement Administration.*
[FR Doc. 87–9619 Filed 4–28–87; 8:45 am]
**BILLING CODE 4410–09–M**

**[Docket No. 86–70]**

**The Boro Pharmacy, Easton, PA; Hearing**

Notice is hereby given that on August 15, 1986, the Drug Enforcement Administration, Department of Justice, issued to The Boro Pharmacy, an Order To Show Cause as to why the Drug Enforcement Administration should not revoke its DEA Certificate of Registration, AL9145061 and deny any pending applications for renewal of such registration.

Exhibit 27 - Page 441

ALIEN MINORS SHELTER CARE PROGRAM - DESCRIPTION AND REQUIREMENTS

United States Department of Justice

Community Relations Service

4/28/87

Exhibit 27 - Page 442

- 10 -

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | BACKGROUND | 1 |
| III. | SCOPE OF WORK | 2 |
| IV. | AUTHORIZATION | 3 |
| V. | FUNDING INSTRUMENT AND AWARDS | 3 |
| VI. | APPLICABLE REGULATIONS AND REGULATORY REQUIREMENTS | 4 |
| VII. | ELIGIBLE APPLICANTS | 4 |
| VIII. | DEFINITION OF ALIEN MINOR | 5 |
| IX. | CLIENT POPULATION | 5 |
| X. | PROGRAM DESIGN | 5 |
| XI. | SUPPLEMENTAL PROGRAM INFORMATION | 14 |
| XII. | REPORTING REQUIREMENTS | 15 |
| XIII. | RECORD RETENTION AND DISPOSITION OF DATA | 17 |
| XIV. | PROGRAM APPLICATION ADDENDA MATERIAL | 17 |
| XV. | SUPPLEMENTAL INFORMATION - OFFICE AND RESIDENTIAL FACILITIES | 22 |
| XVI. | SUPPLEMENTAL INFORMATION - EQUIPMENT, FURNISHINGS AND SUPPLIES | 24 |

Exhibit 27 - Page 443

I.  INTRODUCTION:

The United States Department of Justice (DOJ), Community Relations Service
(CRS) and Immigration and Naturalization Service (INS) have entered into an
agreement to establish a network of community based shelter care programs
to provide physical care and maintenance and other related services to
alien minors detained in the custody of the Immigration and Naturalization
Service.

The intent of this initiative is to provide a safe and appropriate environment
for alien minors for the interim period beginning when the minor is transferred
into a CRS Shelter Care Program and ending when a final disposition of the
minor's status is implemented.  Final disposition may result in either the
bond, release or removal of the minor from the United States.

This document will provide operational policy instructions and application
guidance to agencies and organizations which are applying for Federal funds
to develop plans, programs, and administrative procedures for the care and
maintenance of alien minors held in the custody of the INS.

II.  BACKGROUND:

The Shelter Care Program described in this document was developed as an
inter-agency approach and response to the complex issues associated with
the apprehension and detention of alien minors by the Immigration and
Naturalization Service.

The United States has traditionally accepted immigrants and refugees from
around the world.  Ordinarily, persons desiring such status apply for entry
while residing in their own country or in a third country known as a "country
of first asylum".  However, since 1978, alien minors have been entering the
United States seeking refugee or immigrant status without any prior adminis-
trative processing.  These minors are coming primarily from the Caribbean
nations and from Central and South America.

During the past two years, significant numbers of minors have been entering
the United States at various border points between the United States and
Mexico.  The largest concentrations of entries are in the States of Texas
and California.  These minors come primarily from El Salvador, Nicaragua,
Guatemala and Honduras.  When apprehended by Federal authorities, these
minors are taken to either an INS Contract Facility or Border Patrol Facility.
For the most part, these are adult detention facilities which are not
appropriate environments for the detention of dependent minors.

Many of these detained minors (primarily males 13 to 17 years of age) are
seeking some form of relief from deportation.  It is estimated that as
many as 5,500 other than Mexican minors were apprehended by Federal

Exhibit 27 - Page 444

-2-

authorities during Federal Fiscal Year 1986.  A majority of these children are found to be "bound for" parents, other relatives, godparents or friends already residing in the United States and it appears that the majority of these youths were attempting to establish residence in this country.

Since 1980, the CRS and INS have worked together to provide temporary shelter care and other related services to Cuban/Haitian Entrant and other alien minors apprehended and detained by the INS in South Florida. These minors are provided physical care and maintenance and other services while waiting disposition of various INS proceedings.  This CRS program has provided services to over 2,500 children apprehended by the INS.

In October 1986, the CRS and INS entered into a comprehensive Inter-Departmental Memorandum of Agreement which provides the framework for a national initiative to address the challenges and complex issues created by this influx of Central American youth.

The CRS and INS intend to work closely with CRS Cooperative Agreement Recipients (hereafter referred to as Recipients) to asssist with the development and administration of programs that address the intricate and complex needs of the youth for care and protection in a manner which meets the mandates of current United States law.

III.  <u>SCOPE OF WORK</u>:

Recipients shall facilitate the provision of temporary shelter care and other related services to alien minors who have been approved for transfer from detention at various INS Contract Facilities or Border Patrol Facilities. Shelter care services will be provided for the interim period beginning when the minor is transferred into the Shelter Care Program and ending when a final disposition of the child's status is implemented.  Final disposition may result in either the bond, release or removal of the minor from the United States.

These minors, although released to the physical custody of the CRS Recipient, shall remain in the legal custody of the INS.

The population level of alien minors is expected to fluctuate as arrivals and case dispositions occur.  Program content must, therefore, reflect differential planning of services to children in various stages of personal adjustment and administrative processing.  Although the population of minors is projected to consist primarily of adolescents, Recipients are expected to be able to serve some children 12 years of age and younger.

CRS Recipients are expected to facilitate the provision of assistance and services for each alien minor including, but not limited to:  physical care and maintenance, access to routine and emergency medical care, comprehensive needs assessment, education, recreation, individual and group counseling, access to religious services and other social services.

Exhibit 27 - Page 445

-3-

Other services that are necessary and appropriate for these minors may be
provided if CRS determines in advance that the service is reasonable and
necessary for a particular child.

Recipients are expected to develop and implement an appropriate individua-
lized service plan for the care and maintenance of each minor in accordance
with his/her needs as determined in an intake assessment. In addition,
Recipients are required to implement and administer a case management system
which tracks and monitors client progress on a regular basis to ensure that
each child receives the full range of program services in an integrated and
comprehensive manner.

Shelter care services shall be provided in accordance with applicable
State child welfare statutes and generally accepted child welfare
standards, practices, principles, and procedures. The CRS intends that
services be delivered in an open type of setting without a need for
extraordinary security measures. However, Recipients are required to
design programs and strategies to discourage runaways and prevent the
unauthorized absence of minors in care.

Service delivery is expected to be accomplished in a manner which is
sensitive to culture, native language and the complex needs of these
children.

IV. AUTHORIZATION:

Authority for the provision of shelter care and related child welfare
services to alien minors detained in the custody of the Immigration and
Naturalization Service (INS) is contained in a Memorandum of Agreement
and an Inter-Agency Cost Reimbursable Agreement, dated October 1, 1986,
and signed by the Acting Director, Community Relations Service; by the
Assistant Commissioner for Detention and Deportation, Immigration and
Naturalization Service and by the Director, Refugee Health Affairs,
United States Public Health Service.

Legislative authority for CRS Cuban/Haitian Entrant child welfare activities
is contained in Title V, Section 501(c) of Public Law 96-422 (The Refugee
Education Assistance Act of 1980).

V. FUNDING INSTRUMENT AND AWARDS:

Awards of Federal monies to support the activities detailed in this
document will be in the form of Cooperative Agreements issued by the
Community Relations Service. All final funding decisions are at the
discretion of the Director, Community Relations Service.

In addition, Awards are subject to the availability of funds and the
concurrence of the Assistant Commissioner for Detention and Deportation,
Immigration and Naturalization Service.

Exhibit 27 - Page 446

-4-

Awards for shelter care activities normally will not exceed a 36 month
program performance period.  Funding will be for 12 month budget periods;
continuation of funding is dependent upon successful completion of prior
year objectives, the level of need as defined by the Federal Government
and the availability of future fiscal year funding.

VI. APPLICABLE FEDERAL REGULATIONS AND REGULATORY REQUIREMENTS:

Cooperative Agreements awarded by the Community Relations Service are
subject to the following Federal Regulations:

Title 28, Code of Federal Regulations

| | |
|---|---|
| Part 42, Subpart C | Non-discrimination in Federally assisted programs, Title VI of the Civil Rights Act of 1964 |
| Part 42, Subpart D | Non-discrimination in Federally assisted programs-implementation of Section 815(c)(1) of the Justice System Improvement Act of 1979 |
| Part 42, Subpart G | Non-discrimination based on handicap in Federally assisted programs |
| Part 42, Subpart H | Procedures for complaints of employment discrimination filed against recipients of Federal financial assistance |

Title 41, Code of Federal Regulations

Title 45, Code of Federal Regulations

| | |
|---|---|
| Part 46 | Protection of Human Subjects |

Title 48, Code of Federal Regulations

| | |
|---|---|
| Part 31.2 | Contract Cost Principles and Procedures |

VII. ELIGIBLE APPLICANTS:

Non-profit organizations incorporated under State law which have demon-
strated child welfare, social service or related experience and are
appropriately licensed or can expeditiously meet applicable state licensing
requirements for the provision of shelter care, foster care, group care
and related services to dependent children are eligible to apply.

Exhibit 27 - Page 447

- 15 -

-5-

For-profit organizations incorporated under State law which have demon-
strated child welfare, social service or related experience and are
appropriately licensed or can expeditiously meet state licensing
requirements for the provision of shelter care, foster care, group care
and other related services to dependent children and which can
clearly demonstrate that only actual costs and not profits, fees, or
other elements above cost have been budgeted, are also eligible to
apply.

The geographical location of the applicant is not restricted to its
selected area of service; however, the applicant must be able to strongly
substantiate that its network of local affiliates or its subcontractor(s)
or subrecipient(s) will be able to effectively and appropriately deliver
the required services and that local service provider organizations are
licensed under applicable State law to provide emergency shelter care
and related services to dependent children.

VIII.  DEFINITION OF ALIEN MINOR:

An alien minor is defined as a male or female foreign national under 18
years of age who is detained in the custody of the Immigration and
Naturalization Service and is the subject of exclusion or deportation
proceedings under the Immigration and Nationality Act, or who has an
application for asylum pending with the Immigration and Naturalization
Service.

IX.  CLIENT POPULATION:

It is anticipated that the client population will generally consist of
males, 13-17 years of age.  Females generally comprise approximately
15% of the total population of alien minors.  These minors are primarily
nationals of El Salvador, Nicaragua, Guatemala and Honduras; however,
Recipients can expect to provide services to children from other countries.
Recipients should also be prepared to provide emergency shelter care to
limited numbers of children 12 years of age and younger.

Clients would generally be considered to be dependent children without
significant behavioral or psychological problems.  Many children have
inconsistent or sporadic educational histories and some children may be
illiterate in their own language.

X.  PROGRAM DESIGN:

Shelter care and related services can be provided through either residen-
tial, foster or group care programs.  Applicants are not restricted in
their individual approaches to service delivery however, the ability to
provide a mix of services and deliver these services in geographic
proximity to the applicable INS office is highly desirable due
to the varying needs of the client population, the needs of the Federal
Government and the varying length of time that the youth will be in care.

Recipients must be able to admit minors on a 24 hour per day, seven (7)
day a week basis.

Exhibit 27 - Page 448

- 16 -

-6-

Control, predictability and accountability are essential elements of a
successful program. A highly structured, active and productive day of
activities mitigates against disruptive behavior.

Program design must insure that the youths follow an integrated and
structured daily routine which shall include, but not be limited to:
education, recreation, work or chores, study period, counseling, group
interaction, free time and access to religious services.

This daily routine will enhance programmatic supervision and accountability
as well as encourage the development of individual and social responsiblity
on the part of each child. Program rules and disciplinary procedures,
written and translated into Spanish, must be provided to each client
and fully understood by each client and all program staff.

Minors served by this Program are individuals who have entered the
United States without inspection. These youths are seeking some type
of relief from deportation through an administrative process.

Recipients and their staff are expressly prohibited from hindering or
interfering with the execution of final case dispositions as determined
by the Federal Government.

The length of care per child is anticipated to be approximately thirty (30)
days; however, due to the variables and uncertainties inherent in each case,
Recipients must design programs which are able to provide a combination of
short term and long term care.

a) Program Management:

   1. Organizational Structure and Coordination:

      CRS Recipients are required to have operative plans which identify
      organizational structures, lines of authority and lines of respon-
      sibility. Recipients are also required to maintain and administer
      comprehensive plans which facilitiate and enhance intra-program
      and intra-organizational (if appropriate) communication. At a
      minimum, programs must ensure weekly staff meetings to discuss
      client service plans, client progress and client work schedules.

      Recipients must maintain linkages with other social service agencies,
      and the local District Office of the INS. The Program Director for
      each Recipient shall be responsible for maintaining working
      relationships and liaison with community organizations and the INS.

   2. Staffing:

      Programs must ensure:

      o One (1) person identifiably responsible for the entire program
        and its outcomes;

      o One (1) staff person identifiably responsible for the overall
        coordination of services including the case management system;

Exhibit 27 - Page 449

-7-

o  Clear lines of authority and responsibility;

o  Adequate professional staff available to provide program
   services;

o  Adequate levels of staff available to provide structure
   and to coordinate and deliver all services required of the
   program;

o  Availability of relief staff for illness and holidays;

o  Availability of 24 hour per day, seven (7) days per week
   professional emergency backup staff;

o  Employee educational and/or experience levels commensurate
   with the responsibilities and expertise required of the staff
   position;

o  Staff training, and;

o  Adequate levels of individual leave, sick and compensatory
   time.

All staff members who deal directly with clients must be cultur-
ally sensitive and bilingual in English and Spanish.

3.  Direct Program Services:

All program planning should reflect innovative methods
of service delivery.  All services shall be delivered in accordance
with applicable State licensing requirements and standards.

The following is a description of program services which all
Recipients are required to provide:

a)  Care and Maintenance:

Proper physical care and maintenance, including suitable living
accommodations, food, appropriate clothing, personal grooming
items and personal allowance or remuneration for work (outside
of normal chores or responsibilities) as defined by applicable
State statutes.

b)  Routine and Emergency Medical/Dental Care:

Access to appropriate routine medical and dental care, family
planning services and emergency health care services are a
required part of the program.  Such services may be provided

-18-

Exhibit 27 - Page 450

-8-

through enrollment in local medical assistance programs, coverage by health insurance plans or special arrangements with local providers.

Recipients are required to ensure that each child receives a complete medical examination (including screening for infectious disease) within 24 hours of admission, excluding weekends and holidays.

A written immunization policy and procedure which is in compliance with the U.S. Public Health Service, Center for Disease Control, should be implemented.  Policy and procedure will be provided by INS.

If hospitalization is required, the Recipient is required to make the proper arrangements for admittance.

Recipients must develop and administer a comprehensive policy regarding the dispensing of medication and special diets.

Shelter care programs are required to have operative intervention plans in instances of mental health decompensation.

c) Orientation:

Upon admission, all clients must receive a comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and legal assistance (INS Form I-770 shall be completed).

d) Individual Counseling:

Programs should schedule at least one (1) individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing client progress, establishing new short term objectives and addressing both the developmental and crisis related needs of each minor.  Recipients should anticipate many "emergency" individual counseling sessions.

e) Group Counseling:

Programs must conduct group counseling sessions at least twice a week.  This is usually an informal process and takes place with all the minors present.  It is a time when new minors are given the opportunity to get acquainted with the staff, other children and the rules of the program.  It is an open forum where everyone gets a chance to speak.  Daily program management is discussed and decisions are made about recreational activities, etc.  It is a time for staff and minors to discuss whatever is on their minds and to resolve problems.

Exhibit 27 - Page 451

-9-

f) Acculturation/Adaptation:

Recipients are required to provide a program which includes, but is not limited to, information regarding personal health and hygiene, human sexuality and the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

g) Education:

Recipients shall provide an education program in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT). Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education.

Services are to be provided by a teacher certified by the State Department of Education. The teacher shall assess each client in order to determine individual educational competency levels. This assessment may determine the need for bilingual classes. Students are usually separated into groups according to their educational competency level rather than by chronological age.

h) Recreational and Leisure-Time:

A recreation and leisure-time plan shall include at least one hour per day of large muscle activity and one hour of structured leisure-time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days school is not in session. The recreation program shall be organized and supervised by a trained staff member.

A variety of fixed and movable equipment will be provided for each recreation area. Examples of the variety of equipment that should be available include a basketball, volleyball, softball, tetherball, punching bag and soccer ball.

i) Work/Employment:

Written procedures regarding work assignment schedules shall be developed. Consideration will be given to the fact that juvenile aliens are not required to participate in uncompensated work assignments unless the work is housekeeping of personal areas or personal hygiene needs.

Exhibit 27 - Page 452

-10-

4. Supplemental Services:

a) Visitation:

Visitation and contact with family members shall be encouraged. Visitation at the facility or office shall occur on a day and time to be determined by the Recipient. Such visitation shall be supervised by staff and conducted in such a manner as to ensure reasonable procedures to prevent the unauthorized release of any minor in care.

All visitation plans and procedures require the prior approval of the designated CRS Program Officer.

b) Legal Services:

The INS provides all detained minors with specific information regarding the availability of free legal assistance and advises each minor of their right to be represented by an attorney, right to a deportation or exclusion hearing, right to apply for political asylum or right to request voluntary departure.

CRS Recipients are required to restate this information to each minor upon admission to the program. Recipients shall establish procedures to assist each minor in making confidential contact with attorneys or their authorized representatives.

Federal regulations prohibits the expenditure of any CRS Cooperative Agreement funds for the direct provision of legal services or assistance to any child in care.

c) Family Reunification:

Upon entering a CRS supported program, each minor shall be interviewed by an identified staff person with an educational background in the behavioral sciences, in an attempt to identify relatives for potential family reunification. Once relative information is obtained, staff is required to make telephone contact with the relative, verify the relationship and develop the following information:

1) Identifying Data - General information about all members of the household.

Exhibit 27 - Page 453

-11-

2) <u>Personality Description</u> - Description of relative's personality characteristics and their willingness to share information.

3) <u>Quality of Marriage</u> - Description of marriage, if applicable.

4) <u>Housing and Financial Situation</u> - Description of home, neighborhood, expenses, employment, income, etc.

5) <u>Plans for Minor</u> - Plans the relatives have for the minor (i.e., school enrollment).

6) <u>Personal References</u> - Two personal references from friends, relatives or other person(s) not living with the relative which can provide additional information, verify the information given by the relative and attest to the relative's commitment and ability to care for the child.

7) <u>Summary and Impressions</u> - Summary of overall impressions and recommendations.

The information and accompanying recommendation shall be given to the INS Office with responsibility for the minor's case. A copy of these materials shall be forwarded to the designated CRS Program Officer.

ALL FINAL DECISIONS REGARDING THE RELEASE OF MINORS TO RELATIVES WILL BE MADE BY OFFICIALS OF THE INS.

In some cases, it may be necessary for the family to obtain legal guardianship prior to release by the INS. In these cases, Recipients should assist relatives in filing the proper documentation under applicable State statutory requirements.

5. <u>Assessment</u>:

CRS Recipients are required to complete a comprehensive assessment of each child within ten (10) working days from the date of admission. The assessment includes:
1. An intake study which must:

(a) Set forth the essential data relating to the identification and history of the child and family;

(b) Summarize the specific events surrounding the minor's entry into the United States, and;

Exhibit 27 - Page 454

-12-

    (c) State the specific problem(s) which appear to re-
        quire immediate intervention.

2. Educational assessment and plan.

3. Assessment of family relationships and interaction
   with adults, peers and authority figures.

4. A definition of religious preference and practice.

5. Assessment of personal goals, strengths and weaknesses.

6. Assessment of the impact of migration on the youth's future
   adjustment.

7. Identifying information regarding immediate family members,
   other relatives, godparents or friends who may be residing
   in the United States.

6. Case Management:

Recipients must ensure that comprehensive and realistic
individual client service plans are developed, implemented
and closely coordinated for each child through an operative
case management system. Individual plans for the care of
each minor must be developed in accordance with his/her
needs as determined by the various assessments. Staff
members responsible for specific case management activities
must be identified and their responsibilities fully defined.

Due to the need for consistency and frequent updating of
service plans, programs must also ensure that formalized
lines of intra-program communication are established as an
adjunct to informal channels of staff interaction.

7. Client Case Records:

Recipients are required to develop, maintain and safeguard
individual client case records. Agencies and organizations
are required to develop a system of accountability which
preserves the confidentiality of client information and
protects the records from unauthorized use or disclosure.

-23-

Exhibit 27 - Page 455

-13-

At a minimum, client case records must include the following
information:

1) Name and alien control number;
2) Initial screening and intake forms;
3) Case information from the referral source;
4) Comprehensive assessment;
5) Medical/Dental files;
6) Medical consent form;
7) Individual service plans and case notes;
8) Progress reports;
9) Program rules/disciplinary policies;
10) Copies of disciplinary actions;
11) Referrals to other service agencies;
12) Cash transaction documentation;
13) Inventory of personal effects, and;
14) Any other relevant information.

8. <u>Program Evaluation</u>:

CRS Recipients must have operative program evaluation plans
which include evaluative criteria.

9. <u>Community Support</u>:

Applicants are required to identify measures they will take
or have taken to assure and maintain community receptivity
and support and/or reduce community opposition to the
program.

The CRS works closely with the INS in the development,
implementation and administration of Shelter Care Programs,
and relies upon the INS for various types of operational
support.  Recipients are also required to maintain ongoing
operational relationships with applicable offices of the
INS.  The CRS will facilitate the development of such
operational relationships.

In addition, it is essential that Program Directors develop
and maintain liaison with other important community based
public and private organizations and agencies.

XI.  <u>SUPPLEMENTAL PROGRAM INFORMATION</u>

A)  <u>Legal Guardianship</u>:

All alien minors transferred to CRS supported Shelter Care Programs
shall remain in the legal custody of the INS.

Exhibit 27 - Page 456

-14-

B) **Categories of Minors in Federal Detention:**

Specific categories of Alien Minors detained in the custody of the
INS are generally as follows:

1. Minors with no locatable parents in either the United States
   or the country of origin.  Such children could be eligible
   for release or bonding to relatives, licensed child welfare
   agencies, or voluntary agencies willing to accept custody of
   these minors.

2. Minors whose parents are locatable in the country of origin
   and who are in a position to reassume custody of the child.
   Potentially, these children could be removed from the United
   States through either exclusion or deportation proceedings
   or could leave the United States through voluntary departure.

3. Minors with locatable parents residing in the United States.
   Two situations are in evidence:

   a) If the parent(s) is documented, the child would be releas-
      ed to the parent's custody;

   b) If the parent(s) is undocumented, the child would be
      released to the parent's custody after the parents were
      processed by INS and subsequently assigned to a deportation
      docket.

      INS policy is to release the child with the parents.
      However, it is possible that a parent could be detained
      if he/she were found to be the subject of an outstanding
      criminal warrant.

XII. **REPORTING REQUIREMENTS:**

A) **Program Reporting:**

1. **Quarterly Program Progress Report:**

   Recipients shall, within thirty (30) days following the
   end of each calendar quarter, provide the Designated CRS
   Program Officer with a Quarterly Program Progress Report.

Exhibit 27 - Page 457

-15-

This report must include, but is not limited to, narrative information describing:

a) Program progress, movement toward attaining program goals, program achievements and program problems.

b) Programmatic or budgetary implementation time-lines for the next quarter.

c) Anticipated budgetary or programmatic modifications which will be requested during the next quarter.

d) A listing containing the names, positions and dates of action relating to all staff who were hired, laid off, fired, promoted, or who resigned during the reporting period.

e) Any child abuse or neglect incidents handled under State law.

f) Listing of all incidents which occurred during the quarter.

2. Final Program Progress Report:

A Final Program Progress Report is due ninety (90) days after the completion of the program performance period.

3. Daily Reports:

Recipients are required to maintain:

a) A chronological listing of all clients which includes name, alien control number, date of admission and date of discharge.

b) A Daily Entry Log which accounts for the whereabouts of each minor and documents any significant incidents which occurred during the period.

Copies of the above referenced information shall be included as an addenda to the Quarterly Program Progress Report.

-26-

Exhibit 27 - Page 458

-16-

4. <u>Status or Condition Report</u>:

CRS Recipients are required to immediately notify the applicable local District Office of the INS and the Designated CRS Program Officer of any change in the status or conditon of any minor in care including the following:

a) Any unauthorized absence of the minor;
b) Pregnancy of the minor;
c) Child-birth by the minor;
d) Hospitalization of, or serious illness of, or injury to the minor;
e) Death of the minor;
f) Arrest and/or incarceration of the minor, and;
g) Any abuse or neglect incident handled under State law.

B) <u>Financial Reporting</u>:

In order to obtain financial information concerning the use of Federal funds, the CRS requires that Recipients of these funds submit timely reports for review. These reports are consistent with the manner of reporting established by OMB Circular A-110.

1. <u>Schedule of Cooperative Agreement Payment Requests</u>:

Recipients are required to provide the Grants Management Branch, CRS, with current time-lines reflecting the Recipient's anticipated drawdown of Federal funds.

This schedule of time-lines is due within thirty (30) days of the Recipient's acknowledging receipt of the award.

2. <u>Financial Reporting - (SF 269)</u>:

Recipients shall, within thirty (30) days following the end of each calendar quarter, furnish to the Grants Management Branch, CRS, an original and two (2) copies of the Financial Status Report, SF-269. This report is required of all CRS Recipients. It is designed to reflect financial information relating to Federal and non-Federal obligations and outlays.

Within ninety (90) days of the end date of the project performance and budget periods, Recipients must submit to the Grants Management Branch, CRS an original and two (2) copies of the Final Financial Status Report, SF-269.

Exhibit 27 - Page 459

-17-

3. <u>Financial Reporting - (SF-270)</u>:

This report is applicable to all Recipients who are funded on a "Check-Issued" basis. It is required to document the status of Federal cash when a recipient requests an advance or reimbursement of funds. This report is reviewed on a quarterly basis for Recipients receiving reimbursement of funds and on a monthly basis for those organizations receiving advance funding.

4. <u>Federal Cash Transaction Report - (SF-272)</u>:

Recipients shall,within fifteen (15) working days following the end of each quarter, furnish the Grants Management Branch, CRS with an original and two (2) copies of the Federal Cash Transaction Report, SF-272. It is designed to provided cash and disbursement information.

XIII. <u>RECORD RETENTION AND DISPOSITION OF DATA</u>:

CRS Recipients are required to maintain all records, program and finan- cial information and/or data for three (3) years following the date of submission of a Final Program Progress Report.

At the conclusion of the three (3) year retention period, CRS will instruct Recipients regarding destruction or delivery of all records, program and financial information and/or other data.

Recipients are required to provide any and all records, program and financial information, and/or data requested by CRS. This information is to be delivered to:

> UNITED STATES DEPARTMENT OF JUSTICE
> COMMUNITY RELATIONS SERVICE
> CUBAN-HAITIAN ENTRANT PROGRAM
> SUITE 330
> 5550 FRIENDSHIP BOULEVARD
> CHEVY CHASE, MD  20815

XIV. <u>PROGRAM APPLICATION ADDENDA MATERIAL</u>:

Shelter Care Program Applicants are required to attach the following addenda material to their technical program proposals. FAILURE TO COMPLY WITH THESE REQUIREMENTS COULD BE GROUNDS FOR NONACCEPTANCE OF PROPOSALS.

-18-

A)  Administrative Requirements:

1.  Agency Administration and Organization:

a)  Agency organizational chart describing the agency as a whole and the organizational relationship of the proposed program to other agency programs.

b)  Comprehensive organizational chart of the proposed program.

c)  Copies of Articles of Incorporation.

d)  Proof of IRS status as a non-profit organization, if applicable.

e)  List of Officers and Board Members, if applicable.

f)  List of professional affiliations and certifications.

g)  Copy(ies) of applicable State child welfare licenses.

2.  Organizational Standards/Policies and Policies Regarding Clients:

a)  Personnel Handbook and Standards of Conduct.

b)  Statement regarding professional and agency liability.

c)  Copy of Disciplinary Procedures.

d)  Copy of agency policy regarding the confidentiality of client information and records.

e)  Discussion of the method to be used to inform clients of program rules, regulations and policies, including the confidentiality of client information.

f)  Copy of Grievance Policy and Procedures.

g)  Fire and earthquake evacuation procedures, as applicable.

3.  Staff:

a)  Job/Position Descriptions and resumes (if individuals have been identified for certain positions) for all personnel to be hired for the program, including documented evidence of

Exhibit 27 - Page 461

-19-

the availability of bi-lingual and/or bi-cultural
personnel.

b)  Resumes and qualifications of program consultants.

4.  <u>Community Support of the Program</u>:

a)  Letters of program support from local political representa-
tives, social service agencies, etc.  Letters should reflect
writers' awareness of program's intent, potential Federal
funding source and location of program.

Letters should also contain a recommendation or comment
regarding the proposed program.

b)  A listing of service providers to whom clients will be
referred, including name, address and description of service(s)
to be provided.

c)  A listing of voluntary and/or donated resources, including
letters of intent from the agencies or entities providing
the resources, if applicable.

5.  <u>Implementation Plan</u>:

A plan for program implementation including time-lines regarding
significant milestones.

B)  <u>FINANCE</u>:

1.  A copy of the most recent agency/organization audit.

2.  A description of the agency/organization Financial Management
System.

3.  An itemization of all other Federal, State, local or foundation
grants, cooperative agreements or contracts, etc., being
administered by the applicant.  This listing should identify
the funding source; grant, cooperative agreement or contract
number; level of financial support; purpose of award; grant,
cooperative agreement or contract performance period; and name,
address and telephone number of grant, cooperative agreement
and/or contracts officer (Federal, State or local).

4.  <u>Subrecipients and/or Subcontractors</u>:

a)  Identify all proposed services which are to be procured through
subrecipients/subcontractors.

Exhibit 27 - Page 462

-30-

-20-

    b) Provide relevant background material regarding the proposed subrecipient(s)/subcontractor(s).

    c) Provide letters from the proposed subrecipient(s)/subcontractor(s) indicating their commitment and the specific services to be provided.

C) <u>BUDGET</u>:

The proposed budget will be examined by the CRS Senior Grants Management Specialist to verify the costs data, evaluate specific elements of cost and determine if costs are necessary, reasonable and allowable under applicable Federal statutes and regulations. The following budget structure should be used to provide appropriate costs breakdowns.

Detailed costs justification (Budget Narrative) for each budget category <u>MUST BE</u> attached to the budget.

1. <u>Personnel</u>:

    Show salaries and wages only. Fees and expenses for consultants should be included in another category entitled "other". The name and title, salary amounts and level of effort (allocation of time) must be identified for each position.

2. <u>Fringe Benefits</u>:

    Submit a current copy of the negotiated fringe benefit rate. If fringe benefits are applicable to direct salaries and wages and treated as a part of the negotiated Indirect Cost Rate (IDC), provide detailed information in the budget narrative.

3. <u>Travel</u>:

    Use only for travel (domestic) of employees on the Cooperative Agreement. Include estimated cost breakout for airfare, per diem ($100 per day plus an additional $25.00 per day for incidental expenses during the travel period -- i.e., taxi, etc.), number of days, number of persons traveling for the purpose of attending a CRS sponsored conference.

    Travel costs for consultants should not be identified in this category, nor should costs associated with local transportation (i.e., where no out-of-town trip is involved).

Exhibit 27 - Page 463

-21-

4.  Equipment:

Use only for non-expendable personal property, which is defined
as follows:

Non-expendable personal property is tangible personal property
having a useful life of more than two (2) years and an acquisition
cost of $500 or more per unit.  An applicant may use its own
definition of non-expendable personal property provided that such
definition would at least include all tangible personal property.
Personal property is property of any kind except real property.

Each item of non-expendable personal property must be identified
and explained (i.e., office equipment and furnishings which are
usable for activities other than the technical, specialized aspects
of the grant program).  Indicate whether property will be purchased
or leased.

5.  Supplies:

Include all tangible expendable personal property except that
which is included in the equipment line.  Requests in excess of
$500 per category of tangible expendable personal property
(supplies) must be identified and explained.

6.  Contractual:

Use for procurement contracts (except those which belong on other
line items such as equipment, supplies, and construction).  Payments
to individuals such as stipends, consulting fees, and benefits must
not be included in this category.

7.  Renovation:

Costs for alterations and renovation must be explained in detail.

8.  Client Costs:

All costs directly related to clients such as stipends and
allowances, essentials, food, personal items, clothing, local
transportation, out of pocket medical services, etc., must be
identified and explained.

9.  Other:

    a)  All direct costs not clearly covered in categories listed
        above (i.e., consulting costs, local transportation, office and
        facility rental, van usage, fringe benefits included as a
        part of the IDC rate, etc.) must be identified and explained.

Exhibit 27 - Page 464

-22-

    b) Requests for any item which requires prior approval by the CRS Grants Officer must be identified and explained.

    c) Costs for space rental should be identified by square feet. Also identify utilities and break out costs per month.

### 10. Indirect Costs

Identify and explain indirect cost items.

## XV. SUPPLEMENTAL INFORMATION - OFFICE AND RESIDENTIAL FACILITIES:

The following information is intended to provide general guidelines and information regarding office spaces and residential facilities.

### 1. Office Space:

Depending on the program, appropriate office space may be:

a. Rented at the residential site (as a separate cost item);
b. Rented from the primary applicant of which the program is a part;
c. Provided free of cost, or;
d. Included in the rental of the residential facility.

In all cases except foster care services, it is essential that office space be co-located with a residential facility in order to facilitate oversight, control and staff coverage.

### 2. Residential Facilities:

Residential space requirements must be based upon the number of clients served and the types of services delivered on site.

a) CRS Recipients are required to set forth in detail the following:

    1. A description of the physical structure and the allocation of space for residential and office use.

    2. A description of the location of the facility and a discussion regarding the basis for selection.

    3. A description of security measures which will discourage runaways and prevent the unauthorized release of a minor from the program.

Exhibit 27 - Page 465

-23-

b) In addition, applicants must include information supporting the
following requirements:

1. All residential facilities and office space must conform to
applicable zoning and special use permit requirements.

2. All facilities must conform to applicable building, fire,
health and safety codes and/or ordinances.

3. All facilities must meet applicable state child welfare
licensing requirements.

4. All programs must have established fire and, as applicable,
earthquake, evacuation procedures. All clients and staff
must be familiar with these procedures.

5. All residential space (including foster homes) and office space
must be equipped with smoke detectors and fire extinguishers.

## Renovation of Facility:

In cases when renovation is required to bring a facility into compliance
with existing codes and regulations, the extent and reasonableness of
renovation costs depend upon the extent of repairs required, property
value, etc. Repair work and renovation requires documented estimates of
cost and time and a description of the repair. Programs must conform to
the procurement standards set forth in Office of Management and Budget
(OMB) Circular A-122.

All repairs and renovations require the prior approval of the CRS.

## Maintenance of Facility:

Programs should include a monthly budgeted amount for maintenance and
general repairs to the facility. This may include funds for commercial
refuse disposal contracts. The lease or rental agreement should clearly
define the extent of leasee and leasor responsibilities as they pertain
to maintenance and repairs.

## Leases:

Programs must be flexible in lease arrangements in order to accommodate
an uncertain client flow from Federal detention. Leases should include
options for renewal beyond the anticipated end date of the lease agreement.

All leases are subject to the prior approval of CRS Program and Grants
Management staff.

Exhibit 27 - Page 466

-24-

Insurance:

All program facilities must have adequate levels of fire, theft and liability insurance.

Utilities:

Programs should budget for this expense on a monthly basis if not included in the monthly rent. If office space is shared with another program or agency, utilities are to be pro-rated according to the percent of usage as it relates to square feet. Utilities include heat, water, electricity and natural gas.

XVI. SUPPLEMENTAL INFORMATION - EQUIPMENT, FURNISHINGS AND SUPPLIES:

The following information is intended to be illustrative of equipment, furnishings and supplies which are considered to be reasonable and necessary in the operation of a shelter care program.

CRS Recipients are required to obtain the following through the most cost-effective means available.

1. Equipment:

The following is seen as reasonable for the furnishing of office space.

Office Furnishings:

a. Desks
b. Chairs
c. Tables
d. File Cabinets
e. Typewriters or Word Processing System
f. Copy Machine
g. Book Cases/Shelves
h. Lamps
i. Tapes and Cassette Player
j. Telephones
k. Paging System

The determination should be made whether it is more cost effective to lease or buy a particular piece of equipment or obtain it through the General Services Administration. In addition, items that can be used free of charge by a program should be identified.

2. Residential Furnishings:

The program should provide the following furnishing for their residential operation.

Exhibit 27 - Page 467

-25-

    a. Tables
    b. Chairs
    c. Desks (study space)
    d. Books and Shelves
    e. Bulletin Board
    f. Television Set
    g. Stereo or Radio
    h. Couch
    i. File Cabinet
    j. Maintenance tools
    k. Appliances/Kitchen Implements
    l. Recreational Equipment

3. <u>Administrative and Facility Supplies</u>:

Included are:

    a. General Office Supplies such as pens, pencils, paper etc.
    b. Household and Maintenance Supplies
    c. Copier Supplies
    d. Educational Material and Supplies
    e. Vehicle Maintenance Supplies
    f. Postage Stamps
    g. Forms

Exhibit 27 - Page 468

## CERTIFICATE OF SERVICE BY MAIL

1  I, ___ELEANOR MCKENZIE_____, declare:

2  That I am a citizen of the United States and resident or employed in Los

3  Angeles County, California; that my business address is Office of the United

4  States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles,

5  California 90012; that I am over the age of eighteen years, and am not a party

6  to the above-entitled action;

7  That I am employed by the United States Attorney for the Central District of

8  California who is a member of the Bar of the United States District Court for the

9  Central District of California, at whose direction the service by mail described

10 in this Certificate was made; that on _____NOVEMBER 27, 1987_____, I deposited in the

11 United States mails in the United States Courthouse at 312 North Spring Street,

12 Los Angeles, California, in the above-entitled action, in an envelope bearing the

13 requisite postage, a copy of

14          MEMORANDUM OF UNDERSTANDING RE COMPROMISE OF CLASS
              ACTION: CONDITIONS OF DETENTION

15 addressed to    WILLIAM E. HARRIS
16                 A Professional Corporation
                   11150 W. Olympic Blvd.
17                 Suite 800
                   Los Angeles, CA 90064-1892

18

19

20

21 at ___his___ last known address, at which place there is a delivery service by

22 United States mail.

23 This Certificate is executed on _____NOVEMBER 27, 1987_____ at

24 Los Angeles, California.

25 I certify under penalty of perjury that the foregoing is true and correct.

26                                    Eleanor McKenzie

27

28

USA-12c-24D
(Rev. 1/3/77)

Exhibit 27 - Page 469

# Exhibit 28

## Publicly Filed

DECLARATION OF ANNE CHANDLER

I, Anne Chandler, declare and say as follows:

1. I am an attorney licensed to practice law in the state of Texas. I am currently
employed as the Houston Director of the Tahirih Justice Center, a legal service organization
dedicated to protecting immigrant women and girls fleeing gender based violence. I have been
employed here for five years. Prior to joining Tahirih Justice Center, I taught for seven years at
the University of Houston Law Center as a Clinical Professor in the Immigration Clinic. From
2007 to 2009 I served as the Interim Director of the Immigration Clinic of the University of
Houston Law Center. Prior to joining the Law Center, I directed Houston's largest pro bono
asylum project when I served as the Director of the YMCA International Services' Legal
Department.

2. Since the second week of August, I have been traveling from Houston to Karnes City
to assist with the pro-bono effort. In addition to these weekly and/or bi-weekly visits, I have been
providing technical assistance to attorneys volunteering their time to provide pro bono
representation to the women and children at Karnes. I have met with over fifteen mothers who
are detained by U.S. Immigration and Customs Enforcement at the Karnes County Detention
Center in Karnes City, Texas. On several occasions, I have directly represented women and
children before the Immigration Customs Enforcement, the Asylum Office, and the Executive
Office of Immigration Review.

3. I have been practicing immigration law for sixteen years. I have represented many
dozens of non-citizens in immigration detention in removal proceedings. I have previously
represented asylum-seekers, including asylum-seekers who are detained. In addition in over

Exhibit 28 - Page 470

twenty occasions I have supervised law students, volunteer attorneys, and law school graduates
who have represented asylum seekers and individuals seeking bond and related relief.

4. Based on the above experience, I am familiar with the policies and practices of U.S.
Immigration and Customs Enforcement ("ICE") with regard to the detention of mothers and
children at the Karnes detention center.

5. The circumstances of one of my client's cases, O.A.L.B.T at the Karnes County
Residential Center are set forth below in greater detail. The information provided herein is based
upon my familiarity with my client's cases and circumstances, and her and her daughter's
immigration and detention case files.

6. As explained more fully below, in my client O.A.L.B.T.'s case, to my knowledge: 1)
the U.S. Department of Homeland Security ("DHS") placed my client's child in expedited
removal along with their mother; 2) DHS did not provide a separate Credible Fear Interview
("CFI") for my client's child, or otherwise seek to examine any asylum claims that the child
might have independent of her mother's; 3) DHS's determination to keep my client and her child
detained at Karnes after she passed her CFI was not based on any individualized assessment of
my client and her child's flight risk or danger, but rather was based on an attempt to deter illegal
migration by others; 4) in making its custody determination, DHS did not ask my client if she
had any family members or other legal guardians in the United States to whom the child should
or could be released; 5) DHS did not provide my client's child with any *Flores* settlement-related
written notices informing them of the decision to keep them in custody; and 6) the U.S.
Department of Health and Human Services did not make any contact with my client or her
daughter; and 7) even though my client is not fluent in Spanish, DHS proceeded to conduct her
CFI in Spanish even though she is fluent in Mam.

- 2 -

Exhibit 28 - Page 471

interview conducted in her native language. The CFI occurred by telephone with an asylum officer from the Houston field office. My client told me that she did not understand many of the questions that were asked of her because the interview was not conducted by a Mam interpreter and the Spanish words were "very confusing" and the person "spoke very fast" with "big words".

12. My client was served with documents informing her that she failed her CFI and the judge was going to review that decision. During the hearing, the judge obtained a Mam interpreter and my client was able to articulate some of the reasons for her fear of returning to Guatemala. The judge noted that her testimony contained inconsistencies from her CFI and, thus, confirmed the determination of the CFI without noting that the CFI was conducted in Spanish rather than Mam.

13. On or about September 16, 2014 I, on behalf of my client and her daughter, requested that the DHS conduct a new CFI in Mam, the language that my client speaks and understand.

14. On October 7, 2014, I represented my client in a new CFI. DHS found that Respondent had a credible fear and referred my client's case to removal proceedings under Section 240 of the Immigration and Nationality Act. Along with a Notice to Appear in removal proceedings, she was given a Notice of Custody Determination by DHS, which stated that DHS would continue to detain her and her child. DHS did not provide my client and her child any information about the basis of the decision to continue their detention.

15. Upon information and belief, DHS did not take into account the lack of flight risk or danger presented by my client or her child, nor any other relevant factors, in making its decision to continue detaining them at Karnes.

16. Upon information and belief, at the time of the custody determination and thereafter, DHS did not ask my client about any family members or other legal guardians in the United

- 4 -

Exhibit 28 - Page 472

Minnesota that provides pro bono representation to asylum seekers who had agreed to meet with
O and her daughter when they arrive in Minnesota. Counsel for DHS argued that my client posed
a flight risk. DHS also submitted affidavits arguing that my client and her child, along with other
female-headed Central American family units entering during the 2014 "surge," should be
detained in order to deter "illegal migration" by other Central Americans, and that they posed a
risk to national security. Over DHS's objection, the Immigration Judge granted bond in the
amount of $2,500. DHS reserved appeal.

21. My client was able to pay her bond, and she and her child were released after
payment of bond on November 10, 2014.

22. The detention of my client and her child at the Karnes County Detention Center was
harsh and severe. The Karnes detention center is a secure facility operated by The GEO Group,
Inc. My client and her child could not leave the detention center's premises. My client's child
was frequently sick and lost a lot of weight due to vomiting and inability to stomach the food
served in the facility. GEO staff controlled the movements of my client's daughter, among other
things, setting the meal times during which detainees may eat, setting the facility count times
during which the detainees must stay in their rooms, and setting the night time lights-out time, at
which time the detainees must stay in their rooms at night without lights on, and must go to
sleep. My client took her child to the medical clinic on multiple occasions but was usually turned
back without adequate explanation of what was the diagnosis.

23. During at least two of my visits with my client, my client's daughter was feverish and
had a runny nose. My client informed me that when she had tried to secure adequate medical
care, the medical staff informed her that her daughter was too young to get medicine. When my
client didn't understand, the medical staff never secured a Mam interpreter to speak to my client

- 6 -

Exhibit 28 - Page 473

28. Preparing my client's asylum application took a lot of factual investigation and participation by the client.

29. Based on my experience in representing my client and her daughter, and my conversations with my client, I believe that my client and her daughter are suffering emotional and other harms as a result of being detained at Karnes.

30. My client has suffered horrendous forms of sexual and physical violence, and despite requests for appropriate counseling, she was never provided access to a counselor. When I, as her attorney, attempted to speak to medical staff about her headaches and depression, I was forbidden from doing so. ICE, DHS informed that I needed to submit a written request for my client's medical records. On October 30th, I requested written requests for my client's medical records to ICE consistent with the procedures that were provided to me. To date, I have not received a copy of these medical records.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1 of December, 2014, in Houston, Texas at 4:07 pm CST.

_____

Anne Chandler

_____

Printed Name

- 8 -

Exhibit 28 - Page 474

# Exhibit 29

## Publicly Filed

DECLARATION OF ALLISON N. BOYLE

I, Allison N. Boyle, declare and say as follows:

1. I am an attorney licensed to practice law in the state of Texas. I am currently employed as Associate Attorney with the Law Office of Javier N. Maldonado, P.C. in San Antonio, Texas. I have been employed here for one year.

2. Over the past several months, I have represented three clients who were detained by U.S. Immigration and Customs Enforcement at the Karnes County Detention Center in Karnes City, Texas. All three women were from El Salvador. They had children ranging from ages 2-6. I represented all three families in their bond proceedings only.

3. I have been practicing immigration law for one year. At the Law Office of Javier N. Maldonado, I represent clients before the immigration court and USCIS, conduct client intakes, and prepare family-based petitions, waivers of inadmissibility, and applications for naturalization, adjustment of status, VAWA, DACA, and U-Visas. I also appeal immigration decisions to the Board of Immigration Appeals and the U.S. Court of Appeals for the Fifth Circuit. Previously, I represented asylum-seekers as a member of the University of Minnesota Immigration and Human Rights Clinic and as an intern for Diocesan Migrant and Refugee Services in El Paso, Texas.

4. I am a participant in the Karnes Pro Bono Project, a group of attorneys who provide pro bono legal services to the women and children detained at Karnes. I am also a signatory to the PREA (Prison Rape Elimination Act) complaint filed by the Mexican American Legal Defense and Education Fund ("MALDEF") about alleged sexual assaults at Karnes, dated September 30, 2014.

Exhibit 29 - Page 475

5.  Based on the above experience, I am familiar with the policies and practices of U.S.

Immigration and Customs Enforcement ("ICE") with regard to the detention of mothers and

children at the Karnes detention center.

6.  The circumstances of my clients' cases are set forth below in greater detail.  The

information provided herein is based upon a series of interviews conducted with each client

regarding the details of their case and a review of their immigration files.

7.  As explained more fully below, in my clients' cases, to my knowledge: 1) the U.S.

Department of Homeland Security ("DHS") placed my clients' children in expedited removal

along with their mother; 2) DHS did not provide a separate Credible Fear Interview ("CFI") for

my clients' children, or otherwise seek to examine any asylum claims that the children might

have independent of their mothers; 3) DHS's determination to keep my clients and their children

detained at Karnes after their mothers passed their CFI's was not based on any individualized

assessment of my clients' and their children's flight risk or danger, but rather was based on an

attempt to deter future illegal migration; 4) in making its custody determination, DHS did not ask

my clients if they had any family members or other legal guardians in the United States to whom

their children should or could be released; 5) DHS did not provide my clients' children with any

*Flores* settlement-related written notices informing them of the decision to keep them in custody;

and 6) the U.S. Department of Health and Human Services did not make any contact with my

clients or their children.

**I.E.C.M.**

8.  My client, I.E.C.M., came to the United States after fleeing from her native El

Salvador along with her children M.E., five years old, and A.S., two years old.  Her asylum

- 2 -

Exhibit 29 - Page 476

claim is based on threats, extortion, kidnapping, and physical and sexual assault at the hand of the gangs.

9.   My client and her children were apprehended by immigration authorities on or about July 29, 2014.  They were placed in expedited removal pursuant to Section 235(b) of the Immigration and Nationality Act.  They were taken to a U.S. Customs and Border Protection ("CBP") Station in McAllen, Texas where they were detained for at least three days.

10.   My client told me that at this CBP detention facility, she and her children experienced very harsh detention conditions.  For the first two days, Ms. I.E.C.M. and her children were denied food.  All Ms. I.E.C.M. had to give her children was the milk she came with.  Her children were starving.  On the third day, Ms. I.E.C.M. and her children were finally given sandwiches.  One Border Patrol officer, however, took a sandwich out of one of her son's hands, squeezed it, and threw it away.

11.   The Border Patrol agents verbally abused my client.  They said things like, "I didn't ask you to come," "You guys are dogs," and "My kids are suffering because you illegals have preference."

12.   One agent was extremely aggressive with Ms. I.E.C.M.  At one point, he pushed Ms. I.E.C.M. and she tripped.  When Ms. I.E.C.M. made a phone call, he took the phone away from her.  On the third day, when she and the other women were being interviewed, he made her sit from 9:00 A.M. to 4:00 P.M. waiting for all the other women to be interviewed before he allowed her to be interviewed.

13.   My client and her children were then transported to the Karnes County Detention Center, where they were detained until their release on October 3, 2014.

- 3 -

Exhibit 29 - Page 477

14. Ms. I.E.C.M. was provided a Credible Fear Interview (CFI) on or about August 13, 2014. The CFI occurred in person with an asylum officer from the Houston field office. The interview was conducted in English with translation in Spanish provided over the telephone.

15. On or about August 19, 2014, my client was served with documents informing her that she had passed her CFI and was being referred to removal proceedings under Section 240 of the Immigration and Nationality Act. Along with a Notice to Appear, she was given a Notice of Custody Determination by DHS, which stated that DHS would continue to detain her and her children. DHS did not provide my client and her children any information about the basis of the decision to continue their detention.

16. Upon information and belief, DHS did not take into account the lack of flight risk or danger presented by my client or her children, nor any other relevant factors in making its decision to continue detaining them at Karnes.

17. Upon information and belief, at the time of the custody determination and thereafter, DHS did not ask my client about any family members or other legal guardians in the United States to whom the children should or could be released, and DHS did not take any other steps to pursue the children's release. In addition, DHS did not provide my client any documents regarding the possible release of her children.

18. Upon information and belief, DHS's decision to detain my client and her children in lieu of releasing them on bond, recognizance, or parole was made pursuant to a blanket no-release policy DHS applies to family units of mothers and children apprehended during the so-called "surge" of Central American entrants to the United States that reportedly began in the summer of 2014.

- 4 -

Exhibit 29 - Page 478

19.  On or about August 27, 2014, my client agreed to our firm representing her on a pro bono basis in her bond proceedings.

20.  On September 17, 2014, based on my client's request for a redetermination of bond, Javier Maldonado and I appeared before Immigration Judge McPhaul in San Antonio.  Before the bond hearing, I submitted evidence in support of her request for bond, including documents proving my client was not a flight risk, a danger to society, or a national security threat.

21.  During the bond hearing, I argued that my client and her children do not pose any flight risk or danger.  Counsel for DHS produced an FBI rapsheet which demonstrated that criminal fingerprints had been taken from my client in the past.  They used the rapsheet to argue that my client posed a danger to society.  The rapsheet was a surprise because my client had no criminal history and all the criminal history checks on the I-213 were negative.  DHS did not argue that the children posed a flight risk or a danger.

22.  DHS had previously submitted affidavits arguing that my client and her children, along with other Central American women and children who entered during the 2014 "surge," should be detained in order to deter "illegal migration" by other Central Americans and that they posed a risk to national security.  During the bond hearing, DHS conducted direct examination of my client regarding the use of a smuggler, the places she had lived in El Salvador, her equities in the United States, why she had called her U.S. citizen fiancé (her sponsor) her "esposo" (translated husband) instead of her "comprometido" (translated fiancé) during her asylum interview, etc.  I conducted cross examination as well.  Judge McPhaul asked questions about the strength of my client's asylum and CAT claims.  Bond proceedings were continued to give us time to brief and obtain documents of the criminal fingerprints listed on the FBI rapsheet.

- 5 -

Exhibit 29 - Page 479

23. The continued bond hearing was held on October 1, 2014. During the hearing, I submitted documents including a declaration from a criminal attorney in El Salvador who attested that fingerprints are taken in El Salvador for many things, not just when someone is convicted of a crime. Also included in the documents submitted were articles about the difficulty of obtaining police clearance letters in El Salvador, information on the Central American Fingerprint Exploitation Program (a program initiated by the FBI in 2006 to collect and store existing criminal fingerprint records from Central American and make them available to all U.S. law enforcement agencies), and the rebuttal affidavit of Jonathan Hiskey. I conducted direct examination of my client about all the times she had been fingerprinted in her home country. I argued that the liberal practices of taking fingerprints in El Salvador combined with the fact that the FBI rapsheet was ambiguous about the reason for taking my client's fingerprints demonstrated that my client was not a danger to the community. DHS admitted that my client's testimony about the incidents in which she was fingerprinted matched up with their records and did not cross-examine my client. The Immigration Judge granted bond in the amount of $5,000.00. DHS appealed the decision to the Board of Immigration Appeals ("BIA"). That appeal is currently pending before the BIA.

24. My client was able to pay her bond, and she and her children were released after payment of bond on October 3, 2014. Ms. I.E.C.M. plans to file her asylum application before the Immigration Court.

25. The detention of my client I.E.C.M. and her children at the Karnes County Detention Center was harsh and severe. My client was a witness to the sexual assaults between detained women and guards at Karnes. Because she was a witness, at least one guard in such an illicit relationship threatened her. She reported the sexual abuse internally and nothing was done.

- 6 -

Exhibit 29 - Page 480

After my client was interviewed by a federal officer about the sexual abuse allegations, she was not provided any information about the U-Visa and was not given the option of parole as an alternative to detention considering the potential for retaliation against her.

26.   My client was subjected to punitive tactics by GEO staff members. Staff would write her up if her kids would run around.  She was also written up multiple times by a woman she confronted about the woman's illicit relationship with one of the guards.  Ms. I.E.C.M. was told by GEO staff that if she had five reports, they would deport her.

27.   My client did not have adequate access to food for her and her children while detained.  Food was unavailable after meal times.  She was not permitted to take food or drinks back to her room in case her children got hungry late at night.  The food she received at meal times sometimes was spoiled.  Her children did not like the food they were given and they refused to eat it, making eating after meal times that much more imperative.  My client lost approximately twenty pounds while in detention.  Her two and five year olds also lost a lot of weight due to the lack of access to food.

28.   My client told me the staff at Karnes would paint a pretty picture of the facility by stocking the refrigerators full of food during facility visits.  However, in reality, my client and her children did not have access to this food put on display.

29.   GEO staff members used punitive tactics involving food to punish my client.  These tactics included denying my client and her children food and kicking my client and her children out of the food line.  Once, my client attempted to heat milk for her youngest child late at night and a guard found her, told her she could not be heating up milk at that hour, and poured the milk down the drain.

- 7 -

Exhibit 29 - Page 481

30.  My client did not have access to mental health services at Karnes.  She attempted on multiple occasions to set up an appointment with the one psychologist on site.  They never called her in for an appointment.

31.  DHS requires Karnes detainees to attend their immigration court hearings, whether for bond or for removal proceedings, by videoconference.  When my client had to attend a court hearing by videoconference, she left her youngest child under the control of GEO staff, who, to the best of my knowledge and belief, are not licensed child care providers.

32.  Being detained at Karnes was a barrier between my client and me.  Detention made it more difficult for my client to obtain counsel, for me to interview her in preparing her bond case, and for me to communicate with her when necessary.  At the Karnes detention center, detainees cannot make free outgoing phone calls to their attorneys.  Attorneys cannot call in to their clients, but must leave messages with GEO staff and wait for a return phone call.  The lack of free telephone access is an obstacle to effective representation.

33.  My office is approximately sixty-three miles away from the Karnes detention center, so it takes me one hour and ten minutes to travel to the detention center to see my client.  Before each visit with my client, I sent a fax to Karnes notifying them I was on my way and listing her name and alien number.  More often than not, I would arrive and the staff would have no knowledge of my visit.  As a result, I had to wait up to an additional forty-five minutes to visit my client.

**Y.M.B.S.**

34.  My client, Y.M.B.S., came to the United States after fleeing from her native El Salvador along with her child K.S., six years old.  Her asylum claim is based on assault and multiple death threats.

- 8 -

Exhibit 29 - Page 482

35. My client Y.M.B.S. and her child were apprehended by immigration authorities on or about July 31, 2014. They were placed in expedited removal pursuant to Section 235(b) of the Immigration and Nationality Act.

36. My client Y.M.B.S. and her child were held in the Karnes County Detention Center, where they were detained until their release on September 25, 2014.

37. My client was provided a Credible Fear Interview (CFI) on or about August 8, 2014. The CFI occurred in person with an asylum officer from the Houston field office. The interview was conducted in English with translation in Spanish provided over the telephone.

38. On or about August 13, 2014, my client Y.M.B.S. was served with documents informing her that she had passed her CFI and was being referred to removal proceedings under Section 240 of the Immigration and Nationality Act. Along with a Notice to Appear, she was given a Notice of Custody Determination by DHS, which stated that DHS would continue to detain her and her daughter. DHS did not provide my client and her child any information about the basis of the decision to continue their detention.

39. Upon information and belief, DHS did not take into account the lack of flight risk or danger presented by my client or her child, nor any other relevant factors, in making its decision to continue detaining them at Karnes.

40. Upon information and belief, at the time of the custody determination and thereafter, DHS did not ask my client about any family members or other legal guardians in the United States to whom the child should or could be released and DHS did not take any other steps to pursue the child's release. In addition, DHS did not provide my client any documents regarding the possible release of her child.

- 9 -

Exhibit 29 - Page 483

41.  Upon information and belief, DHS's decision to detain my client and her child in lieu

of releasing them on bond, recognizance, or parole was made pursuant to a blanket no-release

policy DHS applies to family units of mothers and children apprehended during the so-called

"surge" of Central American entrants to the United States that reportedly began in the summer of

2014.

42.  On or about September 10, 2014, my client Y.M.B.S. agreed to our firm representing

her on a pro bono basis in her bond proceedings.

43.  On September 24, 2014, based on my client's request for a redetermination of bond,

Javier Maldonado and I appeared before Immigration Judge McPhaul in San Antonio.  Before

the bond hearing, I submitted evidence in support of her request for bond, including documents

proving my client was not a flight risk, a danger to society, or a national security threat.

44.  During the bond hearing, I argued that my client and her child do not pose any flight

risk or danger.  DHS had previously submitted affidavits arguing that my client and her children,

along with other Central American women and children who entered during the 2014 "surge,"

should be detained in order to deter "illegal migration" by other Central Americans and that they

posed a risk to national security.  During the bond hearing, DHS conducted direct examination of

my client regarding the use of a smuggler, the places she had lived in El Salvador, her equities in

the United States, etc., and I conducted cross examination.  Judge McPhaul asked questions

about the strength of my client's asylum and CAT claims.  He granted bond in the amount of

$3,500.00.  DHS appealed the decision to the BIA.  That appeal is currently pending.

45.  My client Y.M.B.S. was able to pay her bond, and she and her child were released

after payment of bond on September 25, 2014.  She plans to apply for asylum before the

Immigration Court.

- 10 -

Exhibit 29 - Page 484

46. The detention of my client and her child at the Karnes County Detention Center was harsh and severe. My client told me her daughter was depressed and would not eat. She was so sad and withdrawn that she would not play with her classmates at school and she would break down crying at various points throughout the day. My client was unable to keep food items for her daughter in her room. She said the food the detention center gave her was raw and spoiled. My client lost a lot of weight because she did not have adequate access to food.

47. Being detained at Karnes was a great barrier to finding representation for my client. When I met with her for the first time, she broke down in desperation for someone to take her case. She was very concerned for the well-being of her daughter and knew that being detained made her daughter go into a deeper depression with each passing day. My client's detention also made it difficult for me to interview her and communicate with her while preparing her bond case. At the Karnes detention center, detainees cannot make free outgoing phone calls to their attorneys. Attorneys cannot call in to their clients, but must leave messages with GEO staff and wait for a return phone call. The lack of free telephone access is an obstacle to effective representation.

48. My office is approximately sixty-three miles away from the Karnes detention center, so it takes me one hour and ten minutes to travel to the detention center to see my client. Before each visit with my client, I sent a fax to Karnes notifying them I was on my way and listing her name. More often than not, I would arrive and the staff would have no knowledge of my visit. As a result, I had to wait up to an additional forty-five minutes to visit my client.

- 11 -

Exhibit 29 - Page 485

**D.M.C.S.**

49. My client, D.M.C.S., came to the United States after fleeing from her native El Salvador along with her child J.U., two years old.  Her asylum claim is based on sexual assault and multiple death threats.

50. My client D.M.C.S. and her child were apprehended by immigration authorities on or about August 1, 2014.  They were placed in expedited removal pursuant to Section 235(b) of the Immigration and Nationality Act.

51. My client D.M.C.S. and her child were held in the Karnes County Detention Center, where they were detained until their release on November 4, 2014.

52. My client D.M.C.S. was provided a Credible Fear Interview (CFI) on or about August 15, 2014.  The CFI occurred in person with an asylum officer from the Houston field office.  The interview was conducted in English with translation in Spanish provided over the telephone.

53. At a later date, my client D.M.C.S. was served with documents informing her that she had passed her CFI and was being referred to removal proceedings under Section 240 of the Immigration and Nationality Act.  Along with a Notice to Appear, she was given a Notice of Custody Determination by DHS, which stated that DHS would continue to detain her and her children.  DHS did not provide my client and her child any information about the basis of the decision to continue their detention.

54. Upon information and belief, DHS did not take into account the lack of flight risk or danger presented by my client or her child, nor any other relevant factors in making its decision to continue detaining them at Karnes.

- 12 -

Exhibit 29 - Page 486

55.  Upon information and belief, at the time of the custody determination and thereafter,
DHS did not ask my client about any family members or other legal guardians in the United
States to whom the child should or could be released, and DHS did not take any other steps to
pursue the child's release.  In addition, DHS did not provide my client any documents regarding
the possible release of her child.

56.  Upon information and belief, DHS's decision to detain my client and her child in lieu
of releasing them on bond, recognizance, or parole was made pursuant to a blanket no-release
policy DHS applies to family units of mothers and children apprehended during the so-called
"surge" of Central American entrants to the United States that reportedly began in the summer of
2014.

57.  On or about October 22, 2014, my client D.M.C.S. agreed to our firm representing
her on a pro bono basis in her bond proceedings.

58.  On October 22, 2014, based on my client's request for a redetermination of bond,
Javier Maldonado and I appeared before Immigration Judge McPhaul in San Antonio.  Before
the bond hearing, the client's former counsel had submitted evidence in support of her request
for bond, including documents proving my client was not a flight risk, a danger to society, or a
national security threat.  We also submitted additional documents in support of my client's
request for bond at the hearing.

59.  During the bond hearing, I argued that my client and her child do not pose any flight
risk or danger.  DHS had previously submitted affidavits arguing that my client and her children,
along with other Central American women and children who entered during the 2014 "surge,"
should be detained in order to deter "illegal migration" by other Central Americans and that they
posed a risk to national security.  During the bond hearing, DHS conducted direct examination of

- 13 -

Exhibit 29 - Page 487

my client regarding the use of a smuggler, the places she had lived in El Salvador, her equities in the United States, etc. I cross-examined my client as well. Judge McPhaul asked questions about the strength of my client's asylum and CAT claims. He granted bond in the amount of $6,000.00. DHS reserved appeal.

60. My client D.M.C.S. was able to pay her bond, and she and her child were released after payment of bond on November 4, 2014. To date, no application for asylum has been filed for my client and her child.

61. The detention of my client D.M.C.S. and her child at the Karnes County Detention Center was harsh and severe. My client was a witness to the sexual assaults between detained women and guards at Karnes. She said since the allegations of sexual assault were made, all new female arrivals are given baggy clothing so that their figures are hidden.

62. The staff at Karnes would paint a pretty picture of the facility by stocking the refrigerators full of food during facility visits. However, in reality, my client and her child did not have access to this food put on display.

63. My client said there was not sufficient medical care at Karnes. When she took her son into the clinic for a cold, they told her to have him drink water and lay down and would not give him a check-up.

64. Being detained at Karnes made it more difficult for my client to obtain counsel and to assist me in preparing her bond case. At the Karnes detention center, detainees cannot make free outgoing phone calls to their attorneys. Attorneys cannot call in to their clients, but must leave messages with GEO staff and wait for a return phone call. The lack of free telephone access is an obstacle to effective representation.

- 14 -

Exhibit 29 - Page 488

65.  My office is approximately sixty-three miles away from the Karnes detention center, so it takes me one hour and ten minutes to travel to the detention center.  Before each visit with my client, I sent a fax to Karnes notifying them I was on my way and listing her name.  More often than not, I would arrive and the staff would have no knowledge of my visit.  As a result, I had to wait up to an additional forty-five minutes to visit my client.

66.  Based on my experience in representing my clients and their children, and my conversations with them, I believe that my clients and their children are suffering emotional and other harms as a result of being detained at Karnes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of Nov. , 2014, at San Antonio , TX .

TX Bar No. 24087197

Allison N. Boyle

- 15 -

Exhibit 29 - Page 489

# Exhibit 30

Publicly Filed

DECLARATION OF BRITTANY PERKINS

I, Brittany Perkins, declare and say as follows:

1. I am an attorney licensed to practice law in the state of Texas. I am currently employed as an Attorney at SafePlace, 1515 Grove Blvd., Austin, Texas 78760. I have been employed here for 10 months.

2. Over the past several weeks, I have represented a client and her minor daughter, who were detained by U.S. Immigration and Customs Enforcement at the Karnes County Detention Center in Karnes City, Texas. My clients J.A.L. and her daughter are Honduran nationals. My clients fled Honduras due to an imminent threat to their lives. My clients are seeking asylum in the United States and were found to have a credible fear of persecution by a United States government officer. I represented the clients for their bond re-determination hearing.

3. I have been practicing law for one year. I have previously represented non-citizens in removal and bond proceedings. I have previously represented two asylum-seekers, both who were initially detained by U.S. Immigration and Customs Enforcement, and both were granted asylum. I also have worked with detainees at the T. Don Hutto Residential Center in Taylor, Texas.

4. Based on the above experience, I am familiar with the policies and practices of U.S. Immigration and Customs Enforcement ("ICE") with regard to the detention of mothers and children at the Karnes detention center.

5. The circumstances of my client's case are set forth below in greater detail. The information provided herein is based upon my familiarity with my client's case and circumstances, and her and her child's immigration and detention case files.

Exhibit 30 - Page 490

6. As explained more fully below, in my client J.A.L.'s case, to my knowledge: 1) the

U.S. Department of Homeland Security ("DHS") placed my client's child in expedited removal

along with her mother; 2) DHS did not provide a separate Credible Fear Interview ("CFI") for

my client's child, or otherwise seek to examine any asylum claims that the child might have

independent of her mother's claim; 3) DHS's determination to keep my client and her child

detained at Karnes after she passed her CFI was not based on any individualized assessment of

my client and her child's flight risk or danger, but rather was based on an attempt to deter illegal

migration by others; 4) DHS did not provide my client's child with any *Flores* settlement-related

written notices informing them of the decision to keep the child in custody; and 5) the U.S.

Department of Health and Human Services did not make any contact with my client or her child.

**My Client J.A.L.'s Case**

7. My client J.A.L. came to the United States after fleeing from her native Honduras

along with her child M.S.C.A., age four, because they were afraid of their violent neighbor and

had faced acts of violence and threats to both their lives.

8. My client and her child were apprehended by immigration authorities on or about

September 3, 2014. They were placed in expedited removal pursuant to Section 235(b) of the

Immigration and Nationality Act. They were taken to a U.S. Customs and Border Protection

("CBP") short-term detention site at or near Rio Grande City, Texas, where they were detained

for approximately 4 days.

9. My client has told me that at this CBP detention facility, she and her child experienced

very harsh detention conditions. These conditions included the following: extremely cold

temperatures, referred to as an "ice box," inadequate food, a lack of access to medical attention

- 2 -

Exhibit 30 - Page 491

for her daughter who experienced a persistent cold and persistent chest pain, and crowding at the facility.

10. My client Ms. J.A.L. and her child were transported to the Karnes County Detention Center on or about September 8, 2014, where they were detained until October 24, 2014 when they were fortunate enough to post bond and be released.

11. My client Ms. J.A.L. was provided a Credible Fear Interview (CFI) on or about September 10, 2014. The CFI occurred at the Karnes County Detention Center with an asylum officer from the Houston field office present in person to conduct the interview. The CFI was conducted in Spanish with a translator provided via a telephonic interpretation service.

12. On or about September 24, 2014[1], my client was served with documents informing her that she had passed her CFI and was being referred to removal proceedings under Section 240 of the Immigration and Nationality Act. Along with a Notice to Appear in removal proceedings, she was given a Notice of Custody Determination by DHS, which stated that DHS would continue to detain her and her child. DHS did not provide my client and her child any information about the basis of the decision to continue their detention.

13. Upon information and belief, DHS did not take into account the lack of flight risk or danger presented by my client or her child, nor any other relevant factors, in making its decision to continue detaining them at Karnes.

14. Upon information and belief, at the time of the custody determination and thereafter, DHS did not ask my client about any family members or other legal guardians in the United States to whom the child should or could be released, and DHS did not take any other steps to

---

[1] There are various dates on these documents. Ms. JAL's NTA was signed by the Asylum Officer on 9/12/14, but the date of service is listed as 9/24/14. Ms. JAL's daughter's NTA was signed by the officer on 9/22/14 and the date of service is listed as 9/24/14. The date on both Notice of Custody Determination is 9/24/14.

- 3 -

Exhibit 30 - Page 492

pursue the child's release. In addition, DHS did not provide my client any documents regarding possible release of my client's child.

15. Upon information and belief, DHS's decision to detain my client and her child in lieu of releasing them on bond, recognizance, or parole was made pursuant to a blanket no-release policy DHS applies to female-headed family units apprehended during the so-called "surge" of Central American entrants to the United States that reportedly began in the summer of 2014.

16. On or about October 4, 2014, my client retained me as her attorney in her bond redetermination proceeding. I represented my client pro bono.

17. On October 20, 2014, based on my client's request for a redetermination of bond, she and I appeared before Immigration Judge Gary Burkholder in San Antonio, seeking release on bond for my client and her child. At the bond hearing, I submitted over 100 pages of evidence in support of her request for bond, including a bond memorandum detailing my client's lack of flight risk and danger, an affidavit from her bond sponsor promising to support my client and her daughter and ensure their presence at future court settings, letters of support from family members, letters of support from the bond sponsor's pastor and neighbor, and evidence of the bond sponsor's immigration status, his employment and income, and his community ties and property ownership. Also included in support of my client's request for bond were documents on the Flores Settlement Agreement, evidence that the Karnes County Residential Center is not licensed by the State of Texas for children, and documents on ICE's bond policy and parole policy.

18. During the bond hearing, I argued that my client and her child do not pose any flight risk or danger. I presented evidence that my client has ties to the community, specifically a family member with legal status in the United States who promised to act as her bond sponsor

- 4 -

Exhibit 30 - Page 493

and to financially support my clients upon their release from custody.  Counsel for DHS did not make any arguments in my case; DHS counsel made a blanket objection to any bond at the start of the detained docket.  DHS did submit affidavits arguing that my client and her child, along with other female-headed Central American family units entering during the 2014 "surge," should be detained in order to deter "illegal migration" by other Central Americans, and that they posed a risk to national security.  The Immigration Judge granted bond in the amount of $8,000.  DHS reserved the right to appeal, as did counsel.  As on November 19, 2014, no appeal has been filed.

19. My client was able to pay her bond, and she and her child were released after payment of bond on October 24, 2014.

20. My client seeks to file an asylum application on behalf of herself and her child.  The basis for their asylum claim is the assault, violence and threats of violence she and her daughter experienced in Honduras due to her religious faith and practice and due to property disputes with a well-connected neighbor.  My client's case was removed from the detained docket and as of November 19, 2014 there is no future case setting scheduled in her case.  She has yet to file her I-589, Application for Asylum and Withholding of Removal.

21. The detention of my client and her child at the Karnes County Detention Center was harsh and severe.  The Karnes detention center is a secure facility operated by The GEO Group, Inc.  My client and her child could not leave the detention center's premises.  GEO staff controlled the movements of my client and her child by, among other things, setting the meal times during which detainees may eat, setting the facility count times during which the detainees must stay in their rooms, and setting the night time lights-out time, at which time the detainees must stay in their rooms at night without lights on, and must go to sleep.

- 5 -

Exhibit 30 - Page 494

22. DHS requires Karnes detainees to attend their immigration court hearings, whether for bond or for removal proceedings, by videoconference. When my client had to attend a court hearing by videoconference, she had to leave her child under the control of GEO staff, who, to the best of my knowledge and belief, are not licensed child care providers.

23. My client and her child complained of numerous detention conditions at the Karnes detention center. These conditions include: extremely cold temperatures, inadequate food, inadequate or limited access to health care, particularly a lack of access to medical attention for my client's child who experienced a persistent cold and persistent chest pain over the course of weeks, inadequate health care for individuals who have health conditions or concerns established prior to arriving at the Karnes facility, lack of privacy, crowding at the facility, lack of access to a private phone line to communicate with legal counsel, lack of access to a free phone line to communicate with legal counsel. My client also heard rumors of physical and sexual assaults by the facility staff on the residents, although neither she nor her daughter was harmed.

24. Being detained at Karnes made it more difficult for my client to obtain counsel, and to assist me in preparing her bond case. At the Karnes detention center, detainees cannot make free outgoing phone calls to their attorneys. Attorneys cannot call in to their clients, but must leave messages with GEO staff and wait for a return phone call. The lack of free telephone access is an obstacle to effective representation.

25. My office is approximately 109 miles away from the Karnes detention center, so it took me approximately four hours to travel to and from the detention center to see my client and interview her for her asylum and bond cases.

26. Preparing my client's bond case and investigating her and her daughter's asylum claim took a lot of factual investigation and participation by the client. A client would be able to

- 6 -

Exhibit 30 - Page 495

help me locate witnesses for affidavits and possibly some documents from her home country much more effectively if she had not been in detention.

27. Based on my experience in representing my client and her child, and my conversations with my client and her child, I believe that my client and her child are suffering emotional and other harms as a result of having been detained at Karnes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28 day of November 2014, at AUSTIN , TX .

Brittany K. Perkins

Brittany K. Perkins
Printed Name

Exhibit 30 - Page 496

# Exhibit 31

Publicly Filed

DECLARATION OF CLAYTON N. MATHESON

I, Clayton N. Matheson, declare as follows:

1.     I am an attorney licensed to practice law in the state of Texas.  For the past four years, I have been employed by Akin Gump Strauss Hauer & Feld, LLP, 300 Convent Street, Suite 1600, San Antonio, Texas 78205.

2.     For the past several months, I have represented two clients who, until two weeks ago, were detained by U.S. Immigration and Customs Enforcement ("ICE") at the Karnes County Detention Center in Karnes City, Texas.  My clients—a 28-year-old woman named E.B.D. and her two-year-old daughter, S.R.D.—fled their native country of Honduras to escape years of emotional and physical abuse at the hands of E.B.D.'s former boyfriend.  They also fled because E., who is black, had been raped once and threatened with further sexual abuse by Honduran men who specifically targeted her because of her race.

3.     A few weeks ago, Immigration Judge Glenn P. McPhaul granted my clients' Application for Release on Bond.  Judge McPhaul set the bond at $5,000 for E.B.D. and $0 for S.R.D.  We were able to raise the $5,000 and secure their release.  They now are in Indianapolis with their sponsor family.

4.     I have been practicing immigration law, on a pro bono basis, for three years.  My primary practice is complex commercial litigation (with an emphasis on insurance-related disputes).  But I also have represented asylum-seekers, including asylum-seekers who are detained, as part of my firm's pro bono program.  As such, I am familiar with ICE's policies and practices with regard to the detention of mothers and children at the Karnes detention center.

Exhibit 31 - Page 497

5.     The circumstances of my clients' case are set forth below in greater detail.  The information provided herein is based on my familiarity with and firsthand knowledge of my clients' case and the circumstances of their detention at Karnes.

6.     Upon information and belief, it is my understanding that 1) the U.S. Department of Homeland Security ("DHS") placed two-year-old S.R.D. in expedited removal proceedings along with her mother; 2) DHS did not provide a separate Credible Fear Interview ("CFI") for S.R.D. or otherwise seek to examine any asylum claims she might have independent of her mother; 3) DHS's determination to keep my clients detained at Karnes was not based on any individualized assessment of  E.B.D. or S.R.D.'s flight risk or danger, but rather was based on an attempt to deter illegal migration by others; 4) in making its custody determination, DHS did not ask E.B.D. if she had any family members or other legal guardians in the U.S. to whom S.R.D. should or could be released; 5) DHS did not provide E.B.D. or S.B.D. with any *Flores* settlement-related written notices informing them of the decision to keep them in custody; and 6) the U.S. Department of Health and Human Services did not make any contact with E.B.D. or S.R.D.

**My Clients' Case**

7.     My clients came to the U.S. because E.B.D. was terrified that her former boyfriend would kill her.  He considered her his property and constantly abused her.  Even after she ended their relationship, she could not escape his reign of harassment and abuse.  E.B.D. also was raped in September 2013 by her workplace supervisor, who told her that he wanted to experience sex with a black woman.  Other Honduran men have threatened to further sexually abuse and rape her because of her race.

- 2 -

Exhibit 31 - Page 498

8.     E.B.D. and her daughter were apprehended by immigration authorities on or about August 2, 2014.  They were placed in expedited removal proceedings pursuant to Section 235(b) of the Immigration and Nationality Act.  They were taken to a U.S. Customs and Border Protection ("CBP") short-term detention site, and then to the Karnes County Detention Center. They were detained at Karnes until they were released on bond on November 7, 2014.

9.     While at the Karnes facility, they experienced very harsh conditions, including cold temperatures, overcrowding, lack of privacy, and a lack of any explanation as to why they were being detained.  The facility also was egregiously unfit for two-year-old S.R.D.  As just one example, there are no cribs at the detention center.  So E.B.D. had to share a bed with S.R.D. to make sure the child did not roll off the mattress during the night and fall several feet onto the concrete floor.

10.     E.B.D.'s CFI was conducted by telephone with an asylum officer from the Houston field office.  The CFI occurred in Spanish, with the assistance of a translator.  E.B.D. told me she could hardly hear—let alone understand—the asylum officer or translator.  She also said that the asylum officer constantly interrupted and cut off her answers and refused to let her tell her full story.  The record of the CFI further indicates that he did not ask her relevant questions or inquire about certain aspects of her case that clearly were germane to the issue of whether she exhibited a credible fear of persecution.

11.     E.B.D. failed her CFI, but we appealed the finding, and Immigration Judge Gary D. Burkholder reversed.  E.B.D. and S.R.D. then were referred to removal proceedings.  Along with a Notice to Appear, E.B.D. received a Notice of Custody Determination, which stated that DHS would continue to detain her and S.R.D.  Upon information and belief, DHS did not take

- 3 -

Exhibit 31 - Page 499

into account the lack of flight risk or danger presented by my clients, nor any other relevant factors, in making its decision to continue detaining them at Karnes.

12.     Upon information and belief, at the time of the custody determination and thereafter, DHS did not ask E.B.D. about any family members or other legal guardians in the U.S. to whom S.R.D. should or could be released, and DHS did not take any other steps to pursue S.R.D.'s release.  In addition, DHS did not provide E.B.D. any documents regarding S.R.D.'s possible release.

13.     Upon information and belief, DHS's decision to detain my clients rather than release them on bond, recognizance, or parole was made pursuant to a blanket no-release policy DHS applies to female-headed family units apprehended during the so-called "surge" of Central Americans into the U.S., which reportedly began in the summer of 2014.  However, long-term detention in the U.S. while awaiting her immigration court proceedings would not have deterred E.B.D. from fleeing Honduras, and she has no reason to believe that her detention will deter other Central American women in similar situations from attempting to enter the U.S. either.

14.     On October 22, 2014, E.B.D. and I appeared before Judge McPhaul to seek E.B.D. and S.R.D.'s release on bond.  In advance of the bond hearing, I submitted detailed evidence demonstrating that neither of my clients presents any flight risk or threat to the community.  I argued these points at the hearing.  In response, counsel for DHS submitted affidavits arguing that my clients, along with other female-headed Central American family units entering during the 2014 "surge," should be detained in order to deter "illegal migration" by other Central Americans, and that they posed a risk to national security.  Over DHS's objection, the Immigration Judge granted bond in the amount of $5,000.  DHS has not appealed that decision.

- 4 -

Exhibit 31 - Page 500

15.     We were able to secure the funds to pay the bond, and E.B.D. and S.R.D. were released from the Karnes facility on November 7, 2014.

16.     I have filed an asylum application on behalf of my clients.  We asserted three grounds to support the application: (i) persecution on account of E.B.D.'s membership in a particular social group (*i.e.*, "Honduran women in domestic relationships who are unable to leave, and who are viewed as property by virtue of their positions within those relationships"); (ii) persecution on account of their race; and (iii) relief under the Convention Against Torture. The asylum application currently is scheduled to be heard by Judge McPhaul on January 6, 2015. However, in light of her move to Indianapolis, we have filed a motion to change venue to Chicago, Illinois.

17.     My clients' detention at the Karnes facility was harsh.  The Karnes detention center is operated by The GEO Group, Inc.  E.B.D. and S.R.D. could not leave the detention center's premises.  GEO staff controlled their movements at all times by, among other things, setting the meal times during which they may eat, setting the facility count times (during which they were required to stay in their rooms), and setting the nightly lights-out time, at which time they were requiredto stay in their rooms, without lights, for the duration of the night.

18.     DHS requires Karnes detainees to attend their immigration court hearings, whether for bond or removal proceedings, by videoconference.  When E.B.D. had to attend a court hearing by videoconference, she was required to leave S.R.D. under the control of GEO staff, who, to the best of my knowledge and belief, are not licensed child care providers.

19.     Being detained at Karnes made it more difficult for E.B.D. to obtain counsel. When I became involved, it also was difficult to get E.B.D.'s assistance in preparing her and

- 5 -

Exhibit 31 - Page 501

S.R.D.'s asylum case and bond request.  At the Karnes detention center, attorneys cannot call in
to their clients, but must leave messages with GEO staff and wait for a return phone call.  The
lack of free telephone access is an obstacle to effective representation.

20.     My office is approximately 54 miles away from the Karnes detention center, so it
eprohibited from bringing my cell phone or computer into the facility, which meant I could not
see my clients without arranging for the presence of a translator (as I do not speak fluent
Spanish).

21.     Based on my experience in representing E.B.D. and S.R.D., I believe their lengthy
detention at Karnes not only was completely unjustified, but also was both physically and
emotionally dangerous.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24 day of November, 2014.

Clayton N. Matheson
Printed Name

- 6 -

Exhibit 31 - Page 502

Exhibit 31 - Page 503

# Exhibit 32

## Publicly Filed

DECLARATION OF Kate Lincoln-Goldfinch

I, Kate Lincoln-Goldfinch declare and say as follows:

1.  I am an attorney licensed to practice law in the state of Texas.  I am currently employed as an attorney at Hines & Leigh, PC, at 1005 E. 40th Street, Austin, TX  78751.  I have been employed here for four years.

2.  Over the past several months, I have represented clients who were detained by U.S. Immigration and Customs Enforcement at the Karnes County Detention Center in Karnes City, Texas. I have visited the detention center multiple times since August and have had contact with hundreds of women and children there.  I have accepted for full representation four clients: one mother and child from El Salvador who were ultimately released on their own recognizance due to complications with a malignant brain tumor in the child, and another mother and child from El Salvador who are currently seeking release on bond after passing a credible fear interview.

3. I have been practicing immigration law exclusively for six years. I have previously represented non-citizens in immigration detention in removal and bond proceedings. I have previously represented asylum-seekers, including asylum-seekers who are detained.

4. Based on the above experience, I am familiar with the policies and practices of U.S. Immigration and Customs Enforcement ("ICE") with regard to the detention of mothers and children at the Karnes detention center.

5. The circumstances of my clients' case are set forth below in greater detail. The information provided herein is based upon my familiarity with my client's cases and circumstances, and her and her children's immigration and detention case files.

6. As explained more fully below, in my clients S.B.R. and her daughter N.B.B.'s case, and my clients L.C.S.L. and her son M.R.S.'s case, to my knowledge: 1) the U.S. Department of

Exhibit 32 - Page 504

Homeland Security ("DHS") placed my clients' children in expedited removal along with their
mother; 2) DHS's determination to keep my clients and their children detained at Karnes after
passing a CFI was not based on any individualized assessment of my clients and their children's
flight risk or danger, but rather was based on an attempt to deter illegal migration by others; 4) in
making its custody determination, DHS did not ask my clients if they had any family members or
other legal guardians in the United States to whom the children should or could be released; 5)
DHS did not provide my client's children with any *Flores* settlement-related written notices
informing them of the decision to keep them in custody; and 6) the U.S. Department of Health
and Human Services did not make any contact with my client or her children.

**My Client S.B.R.'s Case**

7. My client S.B.R. came to the United States after fleeing from her native El Salvador
along with her daughter N.B.B. because they were fleeing family and gang violence.  S.B.R. had
been the victim of domestic violence at the hands of N.B.B.'s father, was subjected to repeated
abuse at the hands of her own father and brother, and had been targeted by a local gang member
as his property.  Despite the fact that N.B.B. was being treated for a malignant brain tumor in El
Salvador, S.B.R. made the difficult decision to flee her country.

8. My client and her children were apprehended by immigration authorities on or about
July 29, 2014. They were placed in expedited removal pursuant to Section 235(b) of the
Immigration and Nationality Act. They were taken to a U.S. Customs and Border Protection
("CBP") short-term detention site at or near Hidalgo, Texas where they were detained for several
days.

9. My client has told me that at this CBP detention facility, she and her children
experienced very harsh detention conditions. S.B.R. immediately asked for medical care for

- 2 -

Exhibit 32 - Page 505

N.B.B., but was told that she was not entitled to free medical care in this country.  S.B.R. was
told that she would lose her case and be deported.  They were given little food and held in a cell
with very cold temperatures and inadequate clothing.

10. My client and her daughter were transported to the Karnes County Detention Center
on or about August 4, 2014, where they were detained for over a month.

11. My client was provided a Credible Fear Interview (CFI) on or about August 7, 2014.
The CFI occurred by telephone with an asylum officer from the Houston field office. The CFI
occurred in Spanish, with a translator.

12. On or about August 18, 2014 my client was served with documents informing her that
she had passed her CFI and was being referred to removal proceedings under Section 240 of the
Immigration and Nationality Act. Along with a Notice to Appear in removal proceedings, she
was given a Notice of Custody Determination by DHS, which stated that DHS would continue to
detain her and her children. DHS did not provide my client and her children any information
about the basis of the decision to continue their detention.

13. Upon information and belief, DHS did not take into account the lack of flight risk or
danger presented by my client or her children, nor any other relevant factors, in making its
decision to continue detaining them at Karnes.

14. Upon information and belief, at the time of the custody determination and thereafter,
DHS did not ask my client about any family members or other legal guardians in the United
States to whom the children should or could be released, and DHS did not take any other steps to
pursue the children's release. In addition, DHS did not provide my client any documents
regarding possible release of my client's children.

- 3 -

Exhibit 32 - Page 506

15. Upon information and belief, DHS's decision to detain my client and her children in lieu of releasing them on bond, recognizance, or parole was made pursuant to a blanket no-release policy DHS applies to female-headed family units apprehended during the so-called "surge" of Central American entrants to the United States that reportedly began in the summer of 2014.

16. On or about August 26, 2014, my client retained me as her attorney.

17. On August 28, 2014, I wrote the Assistant Field Office Director in San Antonio requesting S.B.R. and N.B.B.'s release due to N.B.B.'s medical condition. N.B.B. was regularly wetting the bed and was losing feeling in her limbs, both signs of progression of her cancer. My inquiries contained statements by several local doctors who warned that she could suffer severe brain damage or death without specialty care.

18. I did not receive a response to my inquiry. A few days later, I launched a media campaign to help secure N.B.B.'s release. One day after local news outlets began reporting on N.B.B.'s condition, I received a call from a deportation officer that they would be released on their own recognizance.

19. The detention of my client and her children at the Karnes County Detention Center was harsh and severe. The Karnes detention center is a secure facility operated by The GEO Group, Inc. My client and her children could not leave the detention center's premises. GEO staff controlled the movements of my client and her child by, among other things, setting the meal times during which detainees may eat, setting the facility count times during which the detainees must stay in their rooms, and setting the night time lights-out time, at which time the detainees must stay in their rooms at night without lights on, and must go to sleep. For children

- 4 -

Exhibit 32 - Page 507

above the age of 4 who are provided education, GEO staff members have full control over the

children during the hours that the children receive educational services.

20. Being detained at Karnes made it more difficult for my client to obtain counsel, and

to assist me in preparing her asylum case and bond case. At the Karnes detention center,

detainees cannot make free outgoing phone calls to their attorneys. Attorneys cannot call in to

their clients, but must leave messages with GEO staff and wait for a return phone call. The lack

of free telephone access is an obstacle to effective representation.

21. My office is approximately 130 miles away from the Karnes detention center, so it

takes me more than two hours to travel to and fro to the detention center to see my client and

interview her for her asylum and bond cases.

**My Client L.C.S.L.'s Case**

22. My client L.C.S.L. came to the United States after fleeing from her native El Salvador

along with her son M.R.S. because they were fleeing gang violence.  M.R.S. had been recruited

by local gangs, and when he resisted, he was beat badly and his teeth were broken.

23. My client and her child were apprehended by immigration authorities on or about

October 7, 2014. They were placed in expedited removal pursuant to Section 235(b) of the

Immigration and Nationality Act. They were taken to a U.S. Customs and Border Protection

("CBP") short-term detention site at or near Hidalgo, Texas where they were detained for several

days.

24. My client has told me that at this CBP detention facility, she and her child

experienced very harsh detention conditions. She said the facility was very cold with only two

meals per day of "horrible" food, with many children sleeping on the floor in extremely cold

- 5 -

Exhibit 32 - Page 508

temperatures and no blankets.  She said that in some instances, CBP officials took sweaters and

coats that the children had been wearing when they were apprehended and left them without

protective clothing.

25. My client and her son were transported to the Karnes County Detention Center on or

about October 12, 2014, where they are still detained.

26. My client was provided a Credible Fear Interview (CFI) on or about October 28,

2014.  The CFI occurred by telephone with an asylum officer from the Houston field office. The

CFI occurred in Spanish, with a translator.

27. On or about October 28, 2014 my client was served with documents informing her

that she had passed her CFI and was being referred to removal proceedings under Section 240 of

the Immigration and Nationality Act. Along with a Notice to Appear in removal proceedings, she

was given a Notice of Custody Determination by DHS, which stated that DHS would continue to

detain her and her children. DHS did not provide my client and her children any information

about the basis of the decision to continue their detention.

28. Upon information and belief, DHS did not take into account the lack of flight risk or

danger presented by my client or her children, nor any other relevant factors, in making its

decision to continue detaining them at Karnes.

29. Upon information and belief, at the time of the custody determination and thereafter,

DHS did not ask my client about any family members or other legal guardians in the United

States to whom the children should or could be released, and DHS did not take any other steps to

pursue the children's release. In addition, DHS did not provide my client any documents

regarding possible release of my client's children.

- 6 -

Exhibit 32 - Page 509

30. Upon information and belief, DHS's decision to detain my client and her children in lieu of releasing them on bond, recognizance, or parole was made pursuant to a blanket no-release policy DHS applies to female-headed family units apprehended during the so-called "surge" of Central American entrants to the United States that reportedly began in the summer of 2014.

31. On or about November 7, 2014, my client retained me as her attorney in a bond matter.  Her next hearing is scheduled for November 24, 2014 with Judge Burkholder.

32. The detention of my client and her children at the Karnes County Detention Center is harsh and severe. The Karnes detention center is a secure facility operated by The GEO Group, Inc. My client and her children cannot leave the detention center's premises. GEO staff controls the movements of my client and her child by, among other things, setting the meal times during which detainees may eat, setting the facility count times during which the detainees must stay in their rooms, and setting the night time lights-out time, at which time the detainees must stay in their rooms at night without lights on, and must go to sleep. For children above the age of 4 who are provided education, GEO staff members have full control over the children during the hours that the children receive educational services.

33. Being detained at Karnes made it more difficult for my client to obtain counsel, and to assist me in preparing her asylum case and bond case. At the Karnes detention center, detainees cannot make free outgoing phone calls to their attorneys. Attorneys cannot call in to their clients, but must leave messages with GEO staff and wait for a return phone call. The lack of free telephone access is an obstacle to effective representation.

- 7 -

Exhibit 32 - Page 510

34. My office is approximately 130 miles away from the Karnes detention center, so it takes me more than two hours to travel to and fro to the detention center to see my client and interview her for her asylum and bond cases.

35. Preparing my client's asylum application takes a lot of factual investigation and participation by the client. She would be able to help me locate witnesses for affidavits and possibly some documents from her home country much more effectively if she were not in detention.

36. Based on my experience in representing my client and her children, and my conversations with my client and her children, I believe that my clients and their children are suffering emotional and other harms as a result of being detained at Karnes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of Dec, 2014, at 10:57 am.

Kate Lincoln - Goldfinch
Printed Name

- 8 -

Exhibit 32 - Page 511