1   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
    Carlos Holguín (Cal. Bar No. 90754)
2   Peter A. Schey (Cal. Bar No. 58232)
    Marchela Iahdjian (Cal. Bar No. 295595)
3   256 South Occidental Boulevard
    Los Angeles, CA 90057
4   Telephone: (213) 388-8693
    Facsimile: (213) 386-9484
5   Email:crholguin@centerforhumanrights.org
          pschey@centerforhumanrights.org
6         marchela@centerforhumanrights.org

7   ORRICK, HERRINGTON & SUTCLIFFE LLP
    William A. Molinski (Cal. Bar No. 145186)
8   wmolinski@orrick.com
    T. Wayne Harman (Cal. Bar No. 254089)
9   wharman@orrick.com
    Elena Garcia (Cal. Bar No. 299680)
10  egarcia@orrick.com
    777 South Figueroa Street, Suite 3200
11  Los Angeles, CA 90017
    Telephone: (213) 629-2020
12
    *Attorneys for Plaintiffs*
13  (listing continues on following page)

14

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17                   WESTERN DIVISION

18

19
    Jenny Lisette Flores, et al.,            Case No. CV 85-4544-RJK(Px)
20
              Plaintiffs,                    **Plaintiffs' First Set Of Exhibits In
21                                           Support Of Motion For Class-Wide
                                             Enforcement Of Settlement [Part
22       v.                                  11: Exhibits 33-37]**

23  Jeh Johnson, Secretary, U.S. Department
    of Homeland Security, et al.,            Hearing:  March 9, 2015
24                                           Time:     TBD
              Defendants.                    Dept:     TBD
25

26
                      **PUBLIC VERSION**
27

28                                           PLAINTIFFS' FIRST SET OF EXHIBITS IN
                                             SUPPORT OF MOTION FOR CLASS-WIDE
                                             ENFORCEMENT OF SETTLEMENT
                                             [PART 11: EXHIBITS 33-37]
                                             CV 85-4544-RJK(Px)

1

2   *Plaintiffs' counsel, continued:*

3   LA RAZA CENTRO LEGAL, INC.
    Michael S. Sorgen
4   Maria Victoria Castro
    Amanda Alvarado Ford
5   474 Valencia Street, #295
    San Francisco, CA 94103
6   Telephone:   (415) 575-3500
    Facsimile:   (415) 255-7593
7
    *Of counsel:*
8
    YOUTH LAW CENTER
9   Alice Bussiere
    Virginia Corrigan
10  200 Pine Street, Suite 300
    San Francisco, CA 94104
11  Telephone:  (415) 543-3379 x 3903

12  RANJANA NATARAJAN
    Clinical Professor
13  Director, Civil Rights Clinic
    University of Texas School of Law
14  727 E. Dean Keeton St.
    Austin TX 78705
15  Telephone:  (512) 232-7222

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX TO EXHIBITS

1   Settlement of class action, January 17, 1997 ..................................................... 1

2   Order approving settlement of class action, January 28, 1997 ...................... 47

3   Stipulation extending settlement of class action, December 7, 2001 ................................................................................................................ 53

4   Plaintiffs' letter requesting pre-enforcement meeting, October 15, 2014 ................................................................................................................ 58

5   Plaintiffs' letter posing questions re: implementation of class action settlement, October 2, 2014 ............................................................... 64

6   Defendants' response to questions re: implementation of class action settlement, November 3, 2014 ........................................................... 85

7   ICE opposition to bond redetermination, July 24, 2014 ............................. 107

8   ICE opposition to bond redetermination, October 8, 2014 ......................... 158

9   U.S. Immigration & Customs Enforcement, news release, November 18, 4014 ................................................................................... 210

10   Declaration of Bridget Cambria, November 7, 2014 ................................... 211

11   Declaration of Carol Anne Donohoe, November 15, 2014 .......................... 219

12   Declaration of J███ H███████ M█████, September 20, 2014 .................. 227

13   Declaration of M███ C██████ d█ T█████, September 19, 2014 ................................................................................... 232

14   Declaration of M███ F██████ S███, September 19, 2014 ......................... 238

15   Declaration of M███ L██████ M██████, September 19, 2014 ...................... 244

16   Affidavit of Adriana Piñon re: Texas Public Information Act Request, September 3, 2014 ...................................................................... 248

17   Declaration of Barbara Hines, January 14, 2014 ......................................... 253

18   Declaration of D███ V████ A██████, January 9, 2015 .............................. 301

19    Declaration of H█ R█████ M███, January 9, 2015 ............................ 305

20    Declaration of R███ E██████ A████, January 8, 2015 ...................... 309

21    Karnes Attorney Visitation Form and Guidelines, January 9, 2015 ......................................................................................... 312

22    Declaration of Jonathan Hiskey, September 22, 2014 ................................. 314

23    Declaration of Carlos Holguin, January 13, 2015 ........................................ 319

24    Declaration of Luis H. Zayas, December 10, 2014 ...................................... 323

25    Declaration of Generva Gilden Berger, January 12, 2015 ........................... 366

26    Dilley Resident Handbook ........................................................................ 383

27    Memorandum of Understanding Re: Compromise of Class Action: Conditions of Detention, November 30, 1987 ............................... 433

28    Declaration of Anne Chandler, December 1, 2014 ...................................... 470

29    Declaration of Allison N. Boyle, November 24, 2014 ................................. 475

30    Declaration of Brittany Perkins, November 28, 2014 ................................. 490

31    Declaration of Clayton N. Matheson, November 24, 2014 .......................... 497

32    Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ....................... 504

33    Declaration of Melissa J. Cuadrado, November 26, 2014 ........................... 512

34    Declaration of Scott T. Williams, December 1, 2014 ................................. 522

35    Declaration of Virginia Marie Raymond, December 13, 2014 ................... 527

36    *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.), Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction, December 16, 2014 .......................................... 530

37    Flores Settlement Agreement and DHS Custody: Key Flores Provisions & DHS Noncompliance - Report of Lutheran Immigration and Refugee Services ........................................................... 570

ii

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 11: EXHIBITS 33-37]
CV 85-4544-RJK(Px)

38   Declaration of S████ C██M████, January 8, 2015 .................................. 577

39   Declaration of S████ B███ d█ T███, January 8, 2015 ........................... 580

40   Declaration of M██ G████ S████, January 8, 2015 ................................. 583

41   Declaration of E██████ G████ M████, January 9, 2015 ...................... 586

42   Declaration of A██ Z████ M█████, January 9, 2015 ................................. 590

43   Declaration OF A████ E██████████ d█ l█ C███ G████,
     January 9, 2015 ................................................................................ 594

44   Declaration of A███ F███ d█ E██████, January 9, 2015 ....................... 597

45   Declaration of H████ L████ M████ P███, January 9, 2015 ...................... 602

46   Declaration of M███ M██████ M███, January 8, 2015 .......................... 606

47   Declaration of C████ M████ C██████ C███, January 8,
     2015 ................................................................................................. 609

48   Declaration of S████ L████ M█████ A████, January 9,
     2015 ................................................................................................. 611

49   Declaration of L███ B████ S█████, January 8, 2015 ............................. 613

50   Declaration of S████ A█████ M██████ D█████, January 8,
     2015 ................................................................................................. 617

51   Declaration of O████ F████ C██████ M████, January 9, 2015 .................. 621

52   Declaration of J████████ E█████ E███████ F████, January 9,
     2015 ................................................................................................. 624

53   Declaration of Lauren Beth Connell, November 26, 2014 ........................... 627

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 11: EXHIBITS 33-37]
CV 85-4544-RJK(PX)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian


  /s/ Carlos Holguín
Attorneys for Plaintiffs

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 11: EXHIBITS 33-37]
CV 85-4544-RJK(Px)

# Exhibit 33

## Publicly Filed

DECLARATION OF MELISSA J. CUADRADO

I, Melissa J. Cuadrado, declare and say as follows:

1.  I am an attorney licensed to practice law in the state of Texas.  I am currently employed as a Clinical Fellow and Supervising Attorney in the Immigration and Human Rights Clinic at St. Mary's University School of Law's Center for Legal and Social Justice, 2507 N.W. 36th Street, San Antonio, Texas, 78228. I have been employed here for one year and four months.

2.  Over the past several months, I have represented one client who is detained by U.S. Immigration and Customs Enforcement at the Karnes County Detention Center in Karnes City, Texas. This client and her two children arrived from El Salvador on August 3, 2014 and have been detained at Karnes since August 7th. On September 11th, an immigration judge issued a $15,000 bond. My client and her children are seeking asylum, withholding of removal, and protection under the Convention Against Torture. Their individual merits hearing is scheduled for December 4, 2014.

3.  I have been practicing immigration law as a licensed lawyer for just under a year and a half. However, I have been working in the field of immigration law since September 2011 when I was a law student in the Immigration Clinic. I have previously represented non-citizens in immigration detention in removal and bond proceedings. I have previously assisted in the representation of asylum-seekers, including asylum-seekers who were detained and later released.

4.  Based on the above experience, I am familiar with the policies and practices of U.S. Immigration and Customs Enforcement ("ICE") with regard to the detention of my client and her children at the Karnes detention center.

5. The circumstances of my client's case are set forth below in greater detail. The information provided herein is based upon my familiarity with my client's case and circumstances, and her and her children's immigration and detention case files.

6. As explained more fully below, in my client R.C.'s case, to my knowledge: 1) the U.S. Department of Homeland Security ("DHS") placed my client's children in expedited removal along with their mother; 2) DHS did not provide a separate Credible Fear Interview ("CFI") for my client's children, or otherwise seek to examine any asylum claims that the children might have independent of their mothers; 3) DHS's determination to keep my client and her children detained at Karnes after she passed her CFI was not based on any individualized assessment of my client and her children's flight risk or danger, but rather was based on an attempt to deter illegal migration by others; 4) in making its custody determination, DHS did not ask my client if she had any family members or other legal guardians in the United States to whom the children should or could be released; 5) DHS did not provide my client's children with any *Flores* settlement-related written notices informing them of the decision to keep them in custody; and 6) the U.S. Department of Health and Human Services did not make any contact with my client or her children.

## My Client R.C.'s Case

7. My client R.C. came to the United States after fleeing from her native El Salvador along with her children A.C., 12, and G.C., 6, because they were afraid of the Barrio 18 gang and had faced threats of serious injury, rape, and death. My client's husband was an officer in the National Civil Police force. On three separate occasions between February and May of this year, he and his fellow officers were involved in confrontations with members of the Barrio 18 gang,

- 2 -

resulting in the death of eight gang members. The officers' identities were discovered by the gang members and my client and her family began experiencing threats on a regular basis.

8. My client, her children, and her husband, G.M.R., were apprehended by immigration authorities on or about August 3, 2014. They were placed in expedited removal pursuant to Section 235(b) of the Immigration and Nationality Act. They were taken to a U.S. Customs and Border Protection ("CBP") short-term detention site at or near Hidalgo, Texas where they were detained for approximately four days.

9. My client has told me that at this CBP detention facility, she and her children experienced very harsh detention conditions. These conditions include the following: extremely cold temperatures, inadequate food, threats of deportation from officers, and extremely limited sleeping space due to overcrowding.

10. My client R.C. and her children were transported to the Karnes County Detention Center on or about August 7, 2014 where they have been detained ever since. Instead of transporting Ms. R.C.'s husband, Mr. G.M.R., to a detention facility nearby or within the state,[1] he was sent to the Broward Transitional Center in Pompano Beach, Florida, 1,352 miles away.

11. My client R.C.'s was provided a Credible Fear Interview (CFI) on or about August 18, 2014. The CFI occurred by telephone with an asylum officer from the Houston field office. The CFI occurred in Spanish, with a translator. My client told me that the asylum officer did not allow her to fully explain herself or elaborate. At the beginning of the interview she was

---

[1] There are twelve detention facilities in Texas listed on Immigration and Customs Enforcement's website, including the South Texas Detention Facility, located 85 miles from Karnes City in Pearsall, Texas; the Houston Contract Detention Facility, located 199 miles from Karnes City in Houston, Texas; and the Port Isabel Service Processing Center, located 223 miles from Karnes City in Los Fresnos, Texas. *See* ICE Detention Facility Locator, *available at* https://www.ice.gov/detention-facilities.

instructed to give complete answers, but then was cut off by the asylum officer during the interview.

12. On or about August 27, 2014, my client was served with documents informing her that she had passed her CFI and was being referred to removal proceedings under Section 240 of the Immigration and Nationality Act. Along with a Notice to Appear in removal proceedings, she was given a Notice of Custody Determination by DHS, which stated that DHS would continue to detain her and her children. DHS did not provide my client and her children any information about the basis of the decision to continue their detention.

13. Upon information and belief, DHS did not take into account the lack of flight risk or danger presented by my client or her children, nor any other relevant factors, in making its decision to continue detaining them at Karnes.

14. Upon information and belief, at the time of the custody determination and thereafter, DHS did not ask my client about any family members or other legal guardians in the United States to whom the children should or could be released, and DHS did not take any other steps to pursue the children's release. In addition, DHS did not provide my client any documents regarding possible release of my client's children.

15. Upon information and belief, DHS's decision to detain my client and her children in lieu of releasing them on bond, recognizance, or parole was made pursuant to a blanket no-release policy DHS applies to female-headed family units apprehended during the so-called "surge" of Central American entrants to the United States that reportedly began in the summer of 2014.

16. On or about September 25, 2014, my client retained me as her attorney in her removal proceeding.

- 4 -

17. On September 11, my client appeared *pro se* before Immigration Judge Burkholder for a master calendar hearing and, unbeknownst to my client, a bond hearing. To my knowledge, when the judge asked my client where she would go if released, she informed him that she has an uncle in California, but because he was not answering his phone, she might go to live with her in-laws in Tennessee. DHS also submitted affidavits arguing that my client and her children, along with other female-headed Central American family units entering during the 2014 "surge," should be detained in order to deter "illegal migration" by other Central Americans, and that they posed a risk to national security. Over DHS's objection, the Immigration Judge granted bond in the amount of $15,000 because, according to my client, she "might go to California or Tennessee - [she] doesn't know where she is going." DHS appealed the decision to the Board of Immigration Appeals [BIA] on October 6, 2014; I cross-appealed on October 10, 2014. That appeal is currently pending before the BIA.

17. On September 25, 2014, my client and I appeared before Immigration Judge Burkholder for a master calendar hearing. At the hearing, I informed the judge I would be seeking a subsequent redetermination of my client's bond. On October 10, 2014 I submitted a Motion for Bond Redetermination Due to Materially Changed Circumstances with copious evidence in support of the motion, including an affidavit from a family friend in Tennessee willing to take my client and her children in, information regarding migration trends, country conditions in El Salvador related to her asylum claim, the Flores Settlement regarding the detention of children, and regarding ICE's bond and parole policies. Immigration Judge Burkholder denied my client's Motion for Bond Redetermination on October 15, 2014. I appealed that decision to the BIA on October 24, 2014. On November 7, 2014 I filed a Motion

- 5 -

for Subsequent Bond Redetermination Due to Materially Changed Circumstances with the immigration court, as well as a Request for Humanitarian Release to ICE.

19. My client was not able to pay her bond, and she and her children remain detained at Karnes.

20. I have filed an asylum application on behalf of my client and her children. The basis for their asylum claim is persecution by the Barrio 18 gang after her husband, a police officer with the El Salvadoran National Civil Police, had three different on-duty confrontations with members of the Barrio 18 resulting in the death of eight gang members, and his identity was made available to Barrio 18 gang members. The persecution came in the form of threats of serious injury, rape, and death, both in person and by telephone calls and text messages. The Barrio 18 gang also murdered my client's uncle the day after my client and her husband filed a complaint detailing the threats to the Attorney General. The asylum application will be heard on December 4, 2014 by the Immigration Judge.

21. The detention of my client and her children at the Karnes County Detention Center has been harsh and severe. The Karnes detention center is a secure facility operated by The GEO Group, Inc. My client and her children cannot leave the detention center's premises. GEO staff control the movements of my client and her children by, among other things, setting the meal times during which detainees may eat, setting the facility count times during which the detainees must stay in their rooms, and setting the night time lights-out time, at which time the detainees must stay in their rooms at night without lights on, and must go to sleep. For children above the age of 4 who are provided education, GEO staff members have full control over the children during the hours that the children receive educational services.

- 6 -

22. DHS requires Karnes detainees to attend their immigration court hearings, whether for bond or for removal proceedings, by videoconference. When my client has to attend a court hearing by videoconference, she must leave her children under the control of GEO staff, who, to the best of my knowledge and belief, are not licensed child care providers.

23. My client and her children have complained of numerous detention conditions at the Karnes detention center. These conditions include: access to and quality of food and snacks, including the placement of fresh fruit on top of spoiled fruit and expired yogurt, harsh and indifferent treatment of the residents by GEO staff, including comments by GEO staff regarding the residents' comments about the quality of and access to food,  access to and quality of medical and mental health care, including disregard of serious preexisting conditions, and both inconvenient scheduling and long wait lines to receive medication. My client's son, G.C., was diagnosed with severe chronic rhinitis and severe allergies as an infant. After arriving at Karnes, R.C. informed medical staff of G.C.'s condition and that he needs regular treatment to keep him well. The treatment he has received since being at Karnes is insufficient to properly treat his allergies. He only receives treatment when R.C. takes him to the medical staff because he has gotten sick; then he is given Loratadine. Since arriving at Karnes, G.C. has been constantly sick; he is constantly coughing, sneezing, and congested, and his eyes are itchy and red. The medical staff at Karnes has not taken any steps for G.C. to be evaluated by an allergist or made arrangements for him to receive proper, continual treatment for his severe allergies. In addition, my client's daughter, A.C., was diagnosed with Conversion Disorder[2] in El Salvador in June

---

[2] Conversion disorder is described in the Diagnostic Statistical Manual of Mental Disorders, 4th Edition ("DSM-IV") as "involv[ing] unexplained symptoms or deficits affecting voluntary motor or sensory function that suggest a neurological or other general medical condition. Psychological factors are judged to be associated with the symptoms or deficits." AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MEDICAL DISORDERS 445 (4th ed. 1994).

- 7 -

2014 after fainting in the street. While hospitalized, she was seen by a psychologist who recommended further treatment. After arriving at Karnes, my client requested that A.C. be seen by a psychologist. While it is noted in her medical file that on August 26, 2014 she was presenting adjustment problems and required referral to mental health services, she was not evaluated by a psychologist at Karnes until September 19 when she was interviewed by phone. She was seen in person three days later for five minutes, during which time the psychologist appeared to be falling asleep: his eyes kept closing and his head was falling forward. At my request, an independent psychologist visited A.C. on October 24th. He diagnosed A.C. with Posttraumatic Stress Disorder[3] ("PTSD) and noted that she is at risk of further deterioration of mental, emotional and physical functioning if there is no change in her current circumstances. He recommended she be immediately treated with SSRI and anxiolytic medications. A review of her medical records reveals that the mental health staff at Karnes has not taken any steps to have A.C. evaluated by a psychiatrist regarding the possibility of prescribing medication to help alleviate her symptoms of PTSD, depression, and panic disorder.

24. Being detained at Karnes made it more difficult for my client to obtain counsel, and continues to be a difficulty in assisting me in preparing her asylum case and bond case. At the Karnes detention center, detainees cannot make free outgoing phone calls to their attorneys. Attorneys cannot call in to their clients, but must leave messages with GEO staff and wait for a return phone call. The lack of free telephone access is an obstacle to effective representation.

---

[3] Posttraumatic Stress Disorder is defined in the DSM-IV as the "reexperiencing of an extremely traumatic event accompanied by symptoms of increased arousal and by avoidance of stimuli associated with the trauma…the essential feature [of which] is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member…" DSM-IV at 393, 424.

- 8 -

Furthermore, neither my client nor her children have been able to speak to her husband / their father in over four months because he is also detained at the Broward Transitional Center in Pompano Beach, Florida. The Broward County facility is an ICE immigration detention facility. Neither Karnes nor the Broward County facility allow detainees to receive incoming phone calls, so neither of them can call the other. While G.M.R. has written to my client, she attests to the fact that staff at Karnes opens and reads all incoming mail for detainees. This is a clear lack of privacy. Their inability to contact G.M.R. has contributed to my client's and her children's deteriorating conditions.

25. My office is approximately sixty miles away from the Karnes detention center, so it takes me approximately one hour and fifteen minutes to travel to and from the detention center to see my client and interview her for her asylum and bond cases. While I have been allowed to take my laptop into the interview room, I have had issues with being allowed to take my cell phone. My phone serves as a hotspot for my laptop, so being unable to use my phone essentially makes taking my laptop useless. The student attorneys assigned to this case have also experienced long wait times to see our client, even when prior notice is sent with an expected arrival time. Most recently, one of the students waited for over an hour when notice of her visit was faxed to GEO staff earlier the same day.

26. Preparing my client's asylum application takes a lot of factual investigation and participation by the client. She would be able to help me locate witnesses for affidavits and possibly some documents from her home country much more effectively if she were not in detention. Many times in preparing my client's case, I have happened upon a question that only my client can answer. It is near impossible to ask every follow-up question during visitation with a client; questions are always going to come up after the fact. In my client's case, I cannot simply

- 9 -

pick up the phone and ask her these questions, or ask her to come by the office so we can talk. In
addition, there are three student attorneys working on our client's case. It is extremely difficult
for them to find time in their busy academic schedules to make a trip to Karnes. We will begin
preparing our client for her merits hearing this week which will require several visits between
now and December 4th. For the students, not only do they have to find the time to make the trip,
but they are approaching final exams and finding the time to go to Karnes gets more difficult.

27. Based on my experience in representing my client and her children, and my
conversations with my client and her children, I believe that my clients and their children are
suffering extreme emotional and other harms as a result of being detained at Karnes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of November, 2014, at San Antonio, Texas.

Melissa J. Cuadrado
Printed Name

- 10 -

# Exhibit 34

## Publicly Filed

## DECLARATION OF SCOTT T. WILLIAMS

I, Scott T. Williams, declare and say as follows:

1.      I am an attorney licensed to practice law in the state of Texas.  I am currently a partner at Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201. I have been at Akin Gump for over eighteen years.

2.      Over the past several months, I have represented a woman (M-C-M) and her daughter (A-C-D-C) who are detained by U.S. Immigration and Customs Enforcement at the Karnes County Detention Center in Karnes City, Texas.  My representation has been both for their bond application and for their removal proceedings.

3.      I have taken on this representation on a pro bono basis.  Over the course of my career, my practice has involved a wide variety of commercial litigation matters, but has also involved pro bono representation in a variety of fields.

4.      Based on my representation of M-C-M and A-C-D-C, I have become familiar with the policies and practices of U.S. Immigration and Customs Enforcement ("ICE") with regard to the detention of mothers and children at the Karnes detention center.

5.      The circumstances of my clients' cases are set forth below in greater detail. The information provided herein is based upon my familiarity with my clients' cases and circumstances, and their immigration and detention case files.

6.      As explained more fully below, in my clients M-C-M and A-C-D-C's cases, to my knowledge: 1) the U.S. Department of Homeland Security ("DHS") placed A-C-D-C (an infant) in expedited removal along with her mother; 2) DHS's determination to keep M-C-M and A-C-D-C detained at Karnes after M-C-M passed her Credible Fear Interview was not based on

1

Exhibit 34 - Page 522

any individualized assessment of my clients' flight risk or danger, but rather was based on an attempt to deter illegal migration by others; and 3) DHS did not provide my infant client A-C-D-C with any *Flores* settlement-related written notices informing her or her mother of the decision to keep them in custody.

**My Clients' Cases**

7.    My client M-C-M came to the United States along with her daughter A-C-D-C, who is 11 months old, after fleeing from their home in Guatemala because they were afraid of serious domestic abuse by M-C-M's domestic partner and had faced threats that he would kill M-C-M.  My client M-C-M also believed that she had no way to escape him in Guatemala, because he knew where all her family and friends lived, and because he had friends on the police force that he said would help him find her if she left.

8.    My client and her daughter were apprehended by immigration authorities on or about July 29, 2014.  They were placed in expedited removal pursuant to Section 235(b) of the Immigration and Nationality Act.

9.    Shortly after they were apprehended, my clients were transported to the Karnes County Detention Center, where they have been detained ever since.

10.    My client M-C-M was provided a Credible Fear Interview (CFI) on or about August 20, 2014.  The CFI occurred with an asylum officer from the Houston field office.  The CFI occurred in Spanish, with a translator.

11.    On or about August 27, 2014, my client M-C-M was served with documents informing her that she had passed her CFI and was being referred to removal proceedings under Section 240 of the Immigration and Nationality Act.  Along with a Notice to Appear in removal proceedings, she was given a Notice of Custody Determination by DHS, which stated that DHS

- 2 -

Exhibit 34 - Page 523

would continue to detain her and her children.  DHS did not provide my client and her children any information about the basis of the decision to continue their detention.

12.     Upon information and belief, DHS did not take into account the lack of flight risk or danger presented by my clients, nor any other relevant factors, in making its decision to continue detaining them at Karnes.

13.     Upon information and belief, DHS's decision to detain my client and her children in lieu of releasing them on bond, recognizance, or parole was made pursuant to a blanket no-release policy that DHS applies to female-headed family units apprehended during the so-called "surge" of Central American entrants to the United States that reportedly began in the summer of 2014.

14.     On or about September 9, 2014, M-C-M retained me as her pro bono attorney in her bond and removal proceedings.

15.     On September 29, 2014, based on my client M-C-M's request for a bond, she and my co-counsel appeared before Immigration Judge McPhaul in San Antonio, seeking release on bond for my clients.  In advance of the bond hearing, I submitted evidence in support of her request for bond.

16.     Over DHS's objection, the Immigration Judge granted bond in the amount of $5,000.00.  DHS has not appealed the decision to the Board of Immigration Appeals (BIA).

17.     My client M-C-M has not been able to pay her bond, and she and her daughter remain detained at Karnes.

18.     I have filed an asylum application on behalf of my clients.  The basis for their asylum claim is the severe and frequent physical abuse suffered by M-C-M at the hands of her

- 3 -

Exhibit 34 - Page 524

domestic partner, and his promise to kill her if she ever left him. The asylum application will be heard on January 9, 2015, by the Immigration Judge.

19.    DHS requires Karnes detainees to attend their immigration court hearings, whether for bond or for removal proceedings, by videoconference.

20.    My client has complained of a lack of adequate medical care for her daughter at the Karnes detention center. Specifically, in October, when M-C-M took her daughter for medical care because she had not been eating, she was initially sent away with little treatment being done. It was only after M-C-M made repeated pleas for help that her daughter was finally given any additional treatment.

21.    Being detained at Karnes made it more difficult for my client to obtain counsel, and to assist me in preparing her asylum case and bond case. At the Karnes detention center, detainees cannot make free outgoing phone calls to their attorneys. The lack of free telephone access is an obstacle to effective representation.

22.    My office is approximately 300 miles away from the Karnes detention center, so I fly to see my client, and it takes me 3-4 hours to travel to and from the detention center to see my client and interview her for her asylum and bond cases. In addition, when I visted my client, I was forced to wait for an additional 30-45 minutes while the admitting officer attempted to determine whether I would be able to take my laptop into my interview. In fact, because he could not find any documentation that I was allowed to take my laptop in, he initially refused to allow me to bring my laptop in, even though my firm has previously reached an agreement that all counsel are to be able to do so. Further, I was not allowed to use my cell phone while visiting the Karnes detention center, which again limits my ability to represent my clients.

- 4 -

Exhibit 34 - Page 525

23.    Preparing my clients' asylum applications takes a lot of factual investigation and participation by the clients.  M-C-M would be able to help me locate witnesses for affidavits and possibly some documents from her home country much more effectively if she were not in detention.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1ˢᵗ day of December, 2014, at Dallas, Texas.

_Scott T. Williams_

Scott T. Williams
Printed Name

- 5 -

Exhibit 34 - Page 526

# Exhibit 35

## Publicly Filed

## Declaration of Virginia Marie Raymond

I, Virginia Marie Raymond, hereby declare:

1. I make this declaration based on my own personal knowledge and, if called to testify, I could and would do so competently as follows:

2. I became licensed to practice law in Texas in 1985. I opened my own law practice in Austin, Texas, in January 2013. Eighty percent of my work is in the arena of immigration law, and I have appeared before immigration courts in San Antonio, Houston, and Harlingen, Texas. The most time-consuming part of my practice has involved representation of people detained and in removal proceedings.

3. Since August of this year, I have represented twenty-four people making up nine families (nine mothers and fifteen children) who have been detained at the detention center in Karnes City, Karnes County, Texas. The facility I refer to is the one at 409 FM 1144, currently described as the "Karnes City Residential Facility" but until this summer known as the "Karnes County Civil Detention Center." Of the families detained at the Karnes facility, whom I have met since August, most are Central American women and children.

4. Six of the nine Karnes families who I have represented since August were eligible for release on recognizance or bond.[1] In five of the six families who qualified for release on recognizance or bond, the families had entered the United States without authorization and then the mothers had expressed fear of returning to their home countries and had passed a credible fear interview. At this point, the Department of Homeland Security issued Notices to Appear against each of the family members in these five families, beginning the removal proceedings. The families were then eligible for release on their own recognizance or on bond or other conditions. The sixth family had also entered the United States without authorization, and the mother expressed a fear of returning to her home

---

[1] Of the other three families, one mother did not pass the threshold screening interview, the negative fear finding was upheld by a judge, and the family shortly thereafter removed. A second mother was deemed not to have a reasonable fear and she is still detained at Karnes with her children; I am seeking a credible fear interview for each of her three minor daughters. The mother in the third of these families did pass a credible fear interview, but the government has alleged that she and her sons are "arriving" aliens who qualify only for ICE parole.

1

Exhibit 35 - Page 527

country.  However, the Asylum Office determined that there would be too great a delay before it could obtain an interpreter in the woman's primary language, an indigenous one, in order to conduct a credible fear interview.  Instead, the Department of Homeland Security issued a Notice to Appear placing the family into removal proceedings without an interview.  Once placed in removal proceedings, this family was also eligible for release on recognizance or bond or other conditions.

5.  For each of these six families, Immigration and Customs Enforcement ("ICE") refused to authorize release of my clients on recognizance or bond in its custody determination.  In each case, I had to seek a custody redetermination hearing before an immigration judge to obtain an order allowing for release of the families on bond, even though none of these mothers or children had any criminal history and all had sponsors who could house them upon release and support them as they pursue their claims for asylum, withholding of removal, and protection under the Convention Against Torture.

6.  Moreover, I am not aware of any Karnes families for whom ICE has authorized release in the ICE custody determination decision reached when placing families into removal proceedings.  ICE has insisted on detention even where families have passed credible fear interviews and were eligible for release on recognizance or bond, and in most cases had close family or other sponsors who were ready to house them and provide support for appearances at hearings.

7.  On August 27, 2014, I spoke with Officer Bud Ratliff, an ICE deportation officer who works at Karnes.  I was at the Karnes facility for a reasonable fear interview for one of my clients and had the opportunity to speak with Officer Ratliff in the lobby of the facility.  I believed that he would have information about the detention policies at Karnes. I told Officer Ratliff that I had heard that ICE was not releasing any of the families detained at Karnes, and I asked him if what I heard was true.  He confirmed the report, telling me in these words or words very close to these:  *Our directive is no bonds on anyone.  We are keeping them here through the entire process, unless an immigration judge orders otherwise.*

8.  The blanket "no bond" policy is further apparent in the hearings to redetermine custody status that take place in front of the immigration judges.  In each of these hearings, the attorney for the Department of Homeland Security has opposed bond and has filed a set of

Exhibit 35 - Page 528

documents in support of its allegation that it is necessary to detain the women and children at Karnes in order to deter future migrants.  The documents filed in all cases are identical, and in the cases that I have handled, none of the documents proffered by DHS specifically referred to any of my clients.

Executed this ___13___ day of December, 2014, at Austin, Texas.

Virginia Marie Raymond, JD, PhD
State Bar of Texas 16617300
1006 East César Chávez Street
Austin, Texas  78702

3

Exhibit 35 - Page 529

# Exhibit 36

## Publicly Filed

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| R.I.L.R., *et al.*, on behalf of themselves and others similarly situated, | ) ) ) | |
| *Plaintiffs,* | ) ) | Civil Action No. _____ |
| *v.* | ) ) | |
| Jeh JOHNSON, Secretary of the Department of Homeland Security, in his official capacity, *et al.* | ) ) ) | |
| *Defendants.* | ) ) ) ) | |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Judy Rabinovitz
Michael K.T. Tan
Anand V. Balakrishnan
Lindsay Nash
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Dennis B. Auerbach (D.C. Bar No. 418982)
David M. Zionts (D.C. Bar No. 995170)
Philip Levitz (D.C. Bar No. 1018430)
Sonia Lahr-Pastor
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

*Additional counsel listed at end of memorandum*

Exhibit 36 - Page 530

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

BACKGROUND .................................................................................................2

    A.    Statutory and Regulatory Framework. ....................................................2

    B.    Pre-June 2014: DHS's Policies Regarding Family Detention and the
        Detention of Asylum Seekers With a Credible Fear of Persecution. .....................5

    C.    Post-June 2014: DHS's No-Release Policy for Central American Families
        with a Credible Fear of Persecution. ....................................................6

    D.    Application of the No-Release Policy to Plaintiffs. ................................9

STANDARD OF REVIEW.................................................................................11

ARGUMENT ....................................................................................................12

I.    Plaintiffs Are Substantially Likely to Succeed on the Merits. .........................12

    A.    The No-Release Policy Is Contrary to Law and Should Thus Be Set Aside
        and Enjoined Pursuant to the APA........................................................12

        1.    The No-Release Policy Violates the INA..................................12

        2.    The No-Release Policy Violates the Due Process Clause. ........................16

        3.    The No-Release Policy Violates DHS's Own Regulations......................17

        4.    The No-Release Policy Is an Arbitrary and Capricious Means of
            Deterring Mass Migration. ....................................................21

    B.    All of the Other Requirements for APA Relief Are Satisfied. ..............................23

II.    Plaintiffs and Those Similarly Situated Will Suffer Irreparable Harm Absent
    Injunctive Relief. ..............................................................................28

III.    The Balance of Harms and the Public Interest Both Favor Injunctive Relief. .................30

CONCLUSION ................................................................................................32

Exhibit 36 - Page 531

# TABLE OF AUTHORITIES

Page

## CASES

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ................................................................................. 25

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954) ................................................................................. 19

*Matter of Adeniji,*
    22 I. & N. Dec. 1102 (BIA 1999) ............................................................... 4

*Al–Siddiqi v. Achim,*
    531 F.3d 490 (7th Cir 2008) .................................................................... 28

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.,*
    898 F. Supp. 2d 73 (D.D.C. 2012) ........................................................... 31

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ............................................................... 24

*Auer v. Robbins,*
    519 U.S. 452 (1997) ................................................................................. 20

*Bell v. Wolfish,*
    441 U.S. 520 (1979) ........................................................................... 14, 16

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................... 23, 24

*Bois v. Marsh,*
    801 F.2d 462 (D.C. Cir. 1986) ................................................................. 26

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ........................................................................... 25, 26

*Bowen v. Michigan Academy of Family Physicians,*
    476 U.S. 667 (1986) ................................................................................. 27

*Brownell v. Tom We Shung,*
    352 U.S. 180 (1956) ................................................................................. 26

*Castaneda v. Souza,*
    769 F.3d 32 (1st Cir. 2014) ..................................................................... 28

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ........................................................... 28, 29

ii

Exhibit 36 - Page 532

*Christopher v. SmithKline Beecham Corp.*,
132 S. Ct. 2156 (2012) ...................................................................................20

*Clark v. Martinez*,
543 U.S. 371 (2005) ......................................................................................12

*Cohen v. United States*,
650 F.3d 717 (D.C. Cir. 2011)........................................................................26

*CropLife Am. v. EPA*,
329 F.3d 876 (D.C. Cir. 2003)........................................................................24

In *Matter of D-J-*,
23 I. & N. Dec. 572 (AG 2003) ............................................................4, 14, 20

*Darby v. Cisneros*,
509 U.S. 137 (1993) ......................................................................................25

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009)......................................................................30

*Davis v. U.S. Sentencing Comm'n*,
716 F.3d 660 (D.C. Cir. 2013)........................................................................27

*Demore v. Kim*,
538 U.S. 510 (2003) ..........................................................................15, 16, 27

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002)..........................................................................20

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*,
396 F.3d 1265 (D.C. Cir. 2005)......................................................................25

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ......................................................................................19

*Foucha v. Louisiana*,
504 U.S. 71 (1992) ............................................................................13, 14, 16

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) ......................................................................................15

*Holistic Candlers & Consumers Ass'n v. FDA*,
664 F.3d 940 (D.C. Cir. 2012)........................................................................23

*Hubbard v. EPA*,
809 F.2d 1 (D.C. Cir. 1986)............................................................................17

iii

Exhibit 36 - Page 533

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
    502 U.S. 183 (1991) ......................................................................................... 18, 19

*INS v. St. Cyr*,
    533 U.S. 289 (2001) ............................................................................................... 27

*Judulang v. Holder*,
    132 S. Ct. 476 (2011) ............................................................................................ 21

*\*Kansas v. Crane*,
    534 U.S. 407 (2002) ......................................................................................... 14, 16

*\*Kansas v. Hendricks*,
    521 U.S. 346 (1997) ................................................................................... 13, 14, 16

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1963) ............................................................................................. 14

*Klayman v. Obama*,
    957 F. Supp. 2d 1 (D.D.C. 2013) ......................................................................... 30

*Kolkevich v. Att'y Gen. of the United States*,
    501 F.3d 323 (3d Cir. 2007) ................................................................................. 26

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ............................................................................................. 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................................... 21

*Murray v. Schooner Charming Betsy*,
    6 U.S. (2 Cranch) 64 (1804) ................................................................................ 16

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ......................................................................... 31

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012) ........................................................................... 21

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ............................................................................. 17

*In re Navy Chaplaincy*,
    697 F.3d 1171 (D.C. Cir. 2012) ........................................................................... 29

*Matter of Patel*,
    15 I. & N. Dec. 666 (BIA 1976) ............................................................................ 4

Exhibit 36 - Page 534

*Reno v. Flores,
    507 U.S. 292 (1993) ...................................................................................18, 19

Rodriguez v. Robbins,
    715 F.3d 1127 (9th Cir. 2013) ..................................................................30

Shaughnessy v. Pedreiro,
    349 U.S. 48 (1955) ......................................................................................26

Singh v. Holder,
    638 F.3d 1196 (9th Cir. 2011) ..................................................................28

Sottera, Inc. v. FDA,
    627 F.3d 891 (D.C. Cir. 2010) ..................................................................12

Sylvain v. Att'y Gen. of United States,
    714 F.3d 150 (3rd Cir. 2013) ....................................................................28

Trudeau v. FTC,
    456 F.3d 178 (D.C. Cir. 2006) ..................................................................17

United States v. Ali,
    718 F.3d 929 (D.C. Cir. 2013) ..................................................................16

United States v. Salerno,
    481 U.S. 739 (1987) ...................................................................................15

Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n,
    758 F.2d 669 (D.C. Cir. 1985) .............................................................28, 29

*Zadvydas v. Davis,
    533 U.S. 687 (2001) ............................................................................passim

**STATUTES**

5 U.S.C. § 701 ....................................................................................................23

5 U.S.C. § 706(2)(A) ..........................................................................................12

8 U.S.C. § 1182(d)(5) ...........................................................................................5

8 U.S.C. § 1225(b)(1)(A) ......................................................................................2

8 U.S.C. § 1225(b)(1)(B) ......................................................................................2

*8 U.S.C. § 1226(a) .....................................................................................passim

8 U.S.C. § 1226(e) .......................................................................................27, 28

Exhibit 36 - Page 535

8 U.S.C. § 1229a ................................................................................................2

8 U.S.C. § 1252(a)-(b) .......................................................................................2

8 U.S.C. § 1325 ................................................................................................14

Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192 ....................3

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ...............................31

### OTHER AUTHORITIES

*U.S. Const., amend. V. ....................................................................................13

8 C.F.R. § 208.30 ...............................................................................................2

8 C.F.R. § 287.5(e)(2) ......................................................................................18

8 C.F.R. §§ 1003.19(a) .....................................................................................4

*8 C.F.R. § 1236.1 ......................................................................................*passim*

69 Fed. Reg. 48,877 (Aug. 11, 2004) ...............................................................2

DHS, *Fact Sheet: Artesia Temporary Facility for Adults With Children in Expedited Removal* (June 20, 2014) ...........................................................................6

DHS Press Release, Statement by Secretary of Homeland Security Jeh Johnson Before the Senate Committee on Appropriations (July 10, 2014) ..........................8

DHS Press Statement, South Texas ICE Detention Facility to House Adults With Children (July 31, 2014) ...........................................................................6

DHS Press Release, ICE to open additional facility in South Texas to house adults with children (Sept. 22, 2014) .........................................................................6

ICE, Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* § 6.2 (Dec. 8, 2009) ............................................5

Lutheran Immigration & Refugee Serv. & Women's Refugee Comm'n, *Locking Up Family Values, Again* (Oct. 2014) .......................................................................5

UNHCR, *Guideline on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention*, Guideline No. 4.1.4 (2012) ............16

U.S. Comm'n on Int'l Religious Freedom, *Assessing the U.S. Government's Detention of Asylum Seekers: Further Attention Needed to Fully Implement Reforms* (Apr. 2013) .............5

Exhibit 36 - Page 536

## INTRODUCTION

Plaintiffs and other members of the class they seek to represent are mothers and their minor children who have fled violence and persecution in their home countries—predominantly, Honduras, Guatemala, and El Salvador—to seek asylum in the United States.  Each has been found to have a "credible fear" of persecution, meaning there is a "significant possibility" she or he will be granted asylum.

In the past, individuals in this position were generally released while their asylum claims were processed.  Plaintiffs, however, are instead detained in prison-like conditions pursuant to an unprecedented "no-release" policy adopted by the Department of Homeland Security ("DHS") in June 2014 (the "No-Release Policy").  Under this policy, DHS locks up mothers and their minor children and refuses to release them on bond, recognizance, or other conditions.  It does so not because they individually pose a danger to the community or flight risk that requires their detention, but rather to deter other Central American migrants from coming to the United States.

The Government may not legally deprive *bona fide* asylum-seekers like Plaintiffs of their liberty simply to deter others.  As the Supreme Court has recognized, the purpose of immigration detention is to ensure that individuals appear for removal proceedings and to protect the public from danger.  "Deterrence" of others is not a legally permissible basis for civil confinement.

The No-Release Policy, however, provides for blanket detention of migrants for the purpose of deterrence, without an individualized custody determination and regardless of whether their detention is required by flight risk or danger to the community.  As such, the policy is contrary to law and arbitrary and capricious, and thus constitutes illegal agency action under the Administrative Procedure Act ("APA").  Specifically, the policy violates the Immigration and Nationality Act ("INA"), applicable DHS regulations, and the Due Process Clause of the Fifth Amendment to the United States Constitution, and even on its own terms is an arbitrary and

1

Exhibit 36 - Page 537

irrational means of achieving deterrence.  Every day the illegal No-Release Policy is maintained, it causes irreparable harm to the families subjected to it, including many children who are at risk of permanent psychological harm.  The balance of hardships tips overwhelmingly in Plaintiffs' favor, and the public has no interest in allowing Defendants to continue violating the law.  In these circumstances, the Court should preliminarily enjoin continued implementation of the No-Release Policy.

## BACKGROUND

### A.      Statutory and Regulatory Framework.

Plaintiffs crossed the border and entered the United States without documentation, after which they were apprehended by U.S. Customs and Border Protection.  Although initially subject to a streamlined removal process known as expedited removal,[1] they each went on to establish a credible fear of persecution before an asylum officer or immigration judge ("IJ")— meaning there is a "significant possibility" that they are eligible for asylum.  8 U.S.C. § 1225(b)(1)(B)(v).[2]  Upon establishing a credible fear, Plaintiffs were referred from the expedited removal system and placed into standard removal proceedings under 8 U.S.C. § 1229a. Under that system, an individual is entitled to a full asylum hearing before the immigration court and an administrative appeal to the Board of Immigration Appeals ("BIA"), both of which are administered by the Department of Justice's Executive Office of Immigration Review, as well as to petition for review of any removal order entered against her in the court of appeals.  *See* 8 C.F.R. § 208.30(f); 8 U.S.C. § 1225(b)(1)(B)(ii); 8 U.S.C. § 1252(a)-(b).

---

[1] *See* 8 U.S.C. § 1225(b)(1)(A)(i); 8 U.S.C. § 1225(b)(1)(A)(iii); 69 Fed. Reg. 48,877 (Aug. 11, 2004).

[2] *See* 8 U.S.C. § 1225(b)(1)(A) & (B); 8 C.F.R.§ 208.30(d)-(g).

2

Exhibit 36 - Page 538

Upon passing a credible fear determination and being referred for regular removal

proceedings, Plaintiffs were detained pursuant to the general immigration detention statute, INA

§ 236(a), 8 U.S.C. § 1226(a).  Under this statute, they are eligible for discretionary release from

detention.  Section 1226(a) provides that, "pending a decision on whether the alien is to be

removed from the United States[,]"

> the Attorney General--
>     (1) may continue to detain the arrested alien; and
>     (2) may release the alien on—
>         (A) bond of at least $1,500 with security approved by, and
>         containing conditions prescribed by, the Attorney General; or
>         (B) conditional parole . . . .

*Id.*[3]

Pursuant to section 1226(a) and its implementing regulations, DHS makes a custody

determination for each detained noncitizen, in which it considers her for release on bond,

recognizance, or other conditions.  The implementing regulations expressly delegate authority to

individual ICE officers to decide whether to detain or release noncitizens, based on

individualized considerations.  Specifically, the reviewing ICE officer "may, in the officer's

discretion, release an alien . . . under the conditions at section 236(a)(2) and (3) of the Act;

provided that the alien must demonstrate to the satisfaction of the officer that such release would

not pose a danger to property or persons, and that the alien is likely to appear for any future

proceeding."  8 C.F.R. § 1236.1(c)(8).

If ICE denies release or sets a bond that the noncitizen cannot pay, the individual remains

in custody.  While the regulations do not provide for further review within DHS, the noncitizen

---

[3] The Secretary of the DHS shares the Attorney General's authority under § 1226(a) to detain or
release noncitizens during removal proceedings.  *See* Homeland Security Act of 2002, Pub. L.
No. 107-296, § 441, 116 Stat. 2135, 2192.

Exhibit 36 - Page 539

has the option of requesting a custody redetermination from an IJ, and appealing the IJ's decision

to the BIA.  *See* 8 C.F.R. §§ 1003.19(a), 1236.1(d).  This hearing is not automatic, but instead

requires that the noncitizen affirmatively request redetermination.  There also is no requirement

that the hearing occur within any specific time period.  If the IJ does not grant release on bond,

recognizance, or other conditions, or if the noncitizen wishes to contest the bond set, she may

appeal to the BIA.  DHS may also appeal the IJ's custody decision and can automatically stay the

IJ's decision (and thus the individual's release) pending the appeal.  8 C.F.R. §§ 1003.19(f),

1003.19(i)(2).

Historically, section 1226(a) and its predecessor statute were understood to authorize the

detention of noncitizens based only on an individualized determination of flight risk or danger to

the community.  *See Matter of Patel*, 15 I. & N. Dec. 666, 666 (BIA 1976) ("An alien generally

is not and should not be detained or required to post bond except on a finding that he is a threat

to the national security . . . or that he is a poor bail risk." (internal citation omitted) (construing

former INA     § 242(a)));  *see also Matter of Adeniji*, 22 I. & N. Dec. 1102, 1112-13 (BIA

1999) (construing current INA § 236(a)).  Accordingly, DHS has never before authorized the

blanket detention of individuals like Plaintiffs under section 1226(a) based solely on generalized

deterrence concerns.[4]

---

[4] In *Matter of D-J-*, 23 I. & N. Dec. 572 (AG 2003), a case that involved Haitian and Dominican
migrants apprehended "after the[ir] vessel sought to evade coastal interdiction by the United
States Coast Guard," the Attorney General construed section 1226(a) to authorize immigration
officers to consider deterrence of these national security concerns as but one factor in
determining whether to exercise individualized discretion to release individual detainees.  *See id.*
at 572-73, 579-80.   As the opinion explained, "[t]he national security interests invoked in this
opinion are directed at unlawful and dangerous mass migrations . . . ."  *Id.* at 584.  For the
reasons set forth below, the underlying reasoning of *D-J-* is distinguishable from the facts here
and otherwise incorrect.  *See infra* nn. 13, 19.

Exhibit 36 - Page 540

**B.      Pre-June 2014: DHS's Policies Regarding Family Detention and the
Detention of Asylum Seekers With a Credible Fear of Persecution.**

Prior to June 2014, mothers who arrived in the United States with their minor children

and were placed in removal proceedings were generally released on parole or on their own

recognizance.  DHS generally did not detain such migrant families except for a small number of

families held at the 96-bed Berks County Residential Center ("Berks") in Leesport, Pennsylvania.

Declaration of Michelle Brané ("Brané Decl.") ¶¶ 11, 14 (Dec. 15, 2014) (attached as Exhibit

1).[5]

Prior to June 2014, DHS also routinely released from detention asylum-seekers who were

apprehended at a port of entry and were found to have a credible fear of persecution, pursuant to

its parole authority under 8 U.S.C. § 1182(d)(5).  *See* Brané Decl. ¶¶ 11-12.[6]  For example, in

fiscal year 2012, 80% of asylum seekers who were found to have a credible fear were granted

parole.[7]  Asylum seekers found to have a credible fear of persecution have long been deemed to

be a "low priority" for detention.[8]

---

[5] *See also* Lutheran Immigration & Refugee Serv. & Women's Refugee Comm'n, *Locking Up
Family Values, Again* 5 (Oct. 2014), *available at* http://lirs.org/familyvalues/.  DHS also
operated the T. Don Hutto Family Residential Facility in Taylor, Texas from 2006-2009, but
discontinued the facility in the face of intense public scrutiny, media coverage, and litigation.
Brané Decl. ¶ 11.

[6] DHS's historical treatment of "arriving aliens" at a port of entry is indicative of its traditional
approach more broadly, and further evidence of the fundamental departure created by the No-
Release Policy.  Plaintiffs, however, fall within the detention and release provisions of section
1226(a), not section 1182(d)(5), because they have effected an entry into the United States and
are not "arriving aliens."  *See supra* at 3.

[7] U.S. Comm'n on Int'l Religious Freedom, *Assessing the U.S. Government's Detention of
Asylum Seekers: Further Attention Needed to Fully Implement Reforms* 9-10 (Apr. 2013),
*available at* http://www.uscirf.gov/reports-briefs/special-reports/assessing-the-us-governments-
detention-asylum-seekers (citing ICE data).

[8] *See, e.g.*, ICE, Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of
Persecution or Torture* § 6.2 (Dec. 8, 2009), *available at*
(continued…)

Exhibit 36 - Page 541

Similarly, prior to June 2014, DHS generally did not detain families that (like Plaintiffs) were apprehended in the interior of the United States and found to have a credible fear of persecution.  Instead, DHS released the majority of such families on bond or their own recognizance based upon an individualized assessment of their flight risk and danger to the community under section 1226(a) and its implementing regulations.  *See* Brané Decl. ¶¶ 11-12; Declaration of Valerie Burch ("Burch Decl.") ¶¶ 7-9 (Dec. 14, 2014) (attached as Exhibit 3).

### C.   Post-June 2014: DHS's No-Release Policy for Central American Families with a Credible Fear of Persecution.

This all changed in June 2014.  In response to an increase in Central American migrants crossing the border, DHS adopted a new, blanket No-Release Policy in order to deter further migration to the United States.[9]  *See* Brané Decl. ¶ 12; Declaration of Barbara Hines ("Hines Decl.") ¶¶ 11-16 (Dec. 14, 2014) (attached as Exhibit 4); Declaration of Allegra McLeod

---

http://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.; Mem. for Reg'l Directors from Michael A. Pearson, Exec. Assoc. Comm'r, INS, Officer of Field Operations re: Detention Guidelines Effective October 9, 1998 (Oct. 7, 1998) (attached as Exhibit 2).

[9] More broadly, DHS has also dramatically expanded family detention in response to the increase in migration from Central America.  In June 2014, DHS opened a nearly 700-bed facility in Artesia, New Mexico ("Artesia").  In August 2014, DHS converted the Karnes County Residential Facility ("Karnes") in Karnes County, Texas into a family detention center with a 532-bed capacity.  Brané Decl. ¶ 14.  Although the Artesia facility is scheduled to close in December 2014, DHS is in the process of opening a new family detention facility in Dilley, Texas, which is ultimately slated to hold 2,400 mothers and children.  Families held at Artesia have been transferred to Karnes.  Meanwhile, DHS has begun expanding the Berks facility, and plans to expand capacity at Karnes as well.  Brané Decl. ¶ 14.  DHS has repeatedly stated that these changes are needed to deter future migration from Central America.  *See* DHS, *Fact Sheet: Artesia Temporary Facility for Adults With Children in Expedited Removal* (June 20, 2014), *available at* http://www.dhs.gov/news/2014/06/20/fact-sheet-artesia-temporary-facility-adults-children-expedited-removal (Artesia); DHS Press Statement, South Texas ICE Detention Facility to House Adults With Children (July 31, 2014), *available at* http://www.dhs.gov/news/2014/07/31/south-texas-ice-detention-facility-house-adults-children (Karnes); DHS Press Release, ICE to open additional facility in South Texas to house adults with children (Sept. 22, 2014), *available at* https://www.ice.gov/news/releases/ice-open-additional-facility-south-texas-house-adults-children (Dilley).

6

Exhibit 36 - Page 542

("McLeod Decl.") ¶¶ 6-7, 17 (Dec. 14, 2014) (attached as Exhibit 5).  Under this policy, ICE

officials are barred in virtually all cases from releasing these migrants.  Brané Decl. ¶¶ 22-23;

Hines Decl. ¶¶ 10-16; McLeod Decl. ¶¶ 6, 8-11.[10]

The No-Release Policy directs ICE officers categorically to deny release to mothers

detained with their minor children—whether on bond, recognizance, or other conditions.  Brané

Decl. ¶¶ 12, 22-23; Hines Decl. ¶¶ 13-15.  ICE officers have admitted that this policy exists,

confirming that "[o]ur directive is no bonds on anyone.  We are keeping them here through the

entire process . . . ."  Declaration of Virginia Marie Raymond ("Raymond Decl.") ¶ 7 (Dec. 13,

2014) (attached as Exhibit 6) (emphasis omitted).  The facts on the ground also attest to this sea-

change.  Prior to June 2014, migrants in exactly the same position as Plaintiffs and other

proposed class members were almost uniformly released; now, virtually no one is released.

Hines Decl. ¶¶ 8, 11, 14; Brané Decl. ¶¶ 11, 22.

This new policy is based on general deterrence concerns—*i.e.*, to send a "message" to

future migrants that they will be detained—rather than on an individualized assessment of each

migrant's circumstances and whether they pose a public danger or flight risk that requires

detention.  Brané Decl. ¶¶ 12, 18; Hines Decl. ¶ 10; McLeod Decl. ¶¶ 18-19.  Although DHS

does not explain the basis for its custody determinations when it makes them, it does go on to

uniformly defend them in immigration court on the ground that releasing Central American

migrants like Plaintiffs would encourage mass illegal migration from Central America.  As one

IJ noted, "DHS attorneys are taking a blanket 'no bond or high bond' position" based on

deterrence concerns.  *In re Z-R & C-Z*, at 4 (DOJ, EOIR Oct. 7, 2014) (attached as Exhibit 7).

_____

[10] Indeed, for *99 percent* of families at Artesia represented by the pro bono attorneys from the
American Immigration Lawyers' Association ("AILA"), ICE denied release.  McLeod Decl.
¶¶ 8-11.

7

Exhibit 36 - Page 543

In particular, in declarations filed in such cases, DHS states that a "'no bond' or 'high bond'

policy" is necessary to "significantly reduce the unlawful mass migration of Guatemalans,

Hondurans, and Salvadoran[s]." *See* Immigration Court Declaration of Philip T. Miller, ICE

Assistant Director of Field Operations for Enforcement and Removal Operations ("Miller Decl.")

at 55 (Aug. 7, 2014) (attached at Exhibit A to the Hines Declaration [Exhibit 4]), *available at*

http://www.aila.org/content/default.aspx?docid=49910.  The similar declaration of Assistant

Director Lembke contends that "[i]mplementing a 'no bond' or 'high bond' policy would help

alleviate [the diversion of HSI's resources from other investigative priorities] by deterring further

mass migration."  *See* Immigration Court Declaration of Traci A. Lembke, ICE Assistant

Director over Investigation Programs for HSI and ICE ("Lembke Decl.") at 60 (Aug. 7, 2014)

(attached at Exhibit A to the Hines Declaration [Exhibit 4]), *available at*

http://www.aila.org/content/default.aspx?docid=49910.[11]

      Notwithstanding the professed need to communicate this message, DHS applies its No-

Release Policy to a small minority of Central American migrants.  The much larger group of

adults held at ICE's adult detention centers who are found to have a credible fear of persecution

and who are eligible for release under section 1226(a) continue to receive an individualized

assessment of whether their detention is warranted.  Brané Decl. ¶¶ 24-25; Hines Decl. ¶ 16;

McLeod Decl. ¶ 18.

      The immigration courts are not bound by DHS's No-Release Policy, and some asylum-

seekers—particularly those fortunate enough to obtain legal representation—have been able to

---

[11] *See also* DHS Press Release, Statement by Secretary of Homeland Security Jeh Johnson
Before the Senate Committee on Appropriations (July 10, 2014), *available at*
http://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-
senate-committee-appropriations ("[T]here are adults who brought their children with them.
Again, our message to this group is simple: we will send you back.").

Exhibit 36 - Page 544

secure their release on bond, effectively confirming that there was no need to deprive them of liberty under traditional immigration detention standards.  *See* Hines Decl. ¶ 21; McLeod Decl. ¶¶ 14-16, 22-23.  Others, however, and in particular those who lack access to counsel, may not even know that this optional administrative appeal exists.  *See* Brané Decl. ¶ 15; Declaration of Matthew Archambeault ("Archambeault Decl.") ¶ 14 (Dec. 12, 2014) (attached as Exhibit 8).  Moreover, families subject to the No-Release Policy have no immediate recourse—they typically wait at least a month, and in many cases more than three months—before even having an opportunity to request their freedom from an immigration judge.  *See* Hines Decl. ¶ 21; McLeod Decl. ¶ 14.  As Plaintiffs' experiences illustrate, the No-Release Policy is inflicting significant and long-lasting wounds on those subjected to it, including young children, before DHS's blanket denials of release can be questioned by a separate agency.

### D.     Application of the No-Release Policy to Plaintiffs.

Plaintiffs are all Central American women and their minor children who came to the United States to seek asylum from violence in their home countries.  Each has received a positive credible fear assessment—meaning that an asylum officer has found that there is a "significant possibility" that they are eligible for asylum—and has been referred for a full hearing on the merits of their asylum claim.  None has any criminal history and all have family members with legal status in the United States who are ready and able to provide shelter and support through their immigration court proceedings.   Even though these families clearly satisfy the traditional criteria for release on bond or recognizance, all have been detained at Karnes pursuant to Defendants' blanket No-Release Policy.

Plaintiff R.I.L.R. has been detained in Karnes since entering the United States with her two children, Plaintiffs J.L.S.  and K.L.S., on October 30, 2014.  Declaration of R.I.L.R. ("R.I.L.R. Decl.") ¶ 4 (Dec. 12, 2014) (attached as Exhibit 9).  J.L.S. is seven years old and

Exhibit 36 - Page 545

K.L.S. is three years old.   R.I.L.R. Decl. ¶ 3.   The family fled its home in El Salvador to escape

pervasive abuse by the children's father, a gang member who repeatedly beat R.I.L.R., cut her

with a machete, and attempted to poison her.   R.I.L.R.   Decl. ¶¶ 5-9.   R.I.L.R. went to the police,

but they would not help her, even after her abuser kidnapped the children in retaliation for an

initial escape attempt.   R.I.L.R. Decl. ¶¶ 7-8.   An asylum officer interviewed the family on

November 5, 2014.   R.I.L.R. Decl. ¶ 11.   On November 10 or 11, 2014, ICE informed R.I.L.R.

that she had established a credible fear of persecution and that she could therefore pursue her

asylum claim before an immigration judge.   R.I.L.R. Decl. ¶ 14.   But ICE also informed her that

she and her children would be denied release, even though R.I.L.R. has no criminal record and

has a mother with lawful status in Houston, Texas who has agreed to provide housing and

support during the asylum proceedings.   R.I.L.R. Decl. ¶¶ 14-15, 17.   R.I.L.R.'s two children

have lost their appetites in detention and her daughter wakes up in the night, crying to go home.

R.I.L.R. Decl. ¶ 18.   R.I.L.R. worries that each day her children are kept in prison adds to the

trauma that they have already experienced.   R.I.L.R. Decl. ¶ 20.

Plaintiff Z.M.R. has been detained with her sixteen-year-old son, Plaintiff J.L.P.M., at

Karnes since entering the United States on October 26, 2014.   Declaration of Z.M.R. ("Z.M.R.

Decl.") ¶¶ 13-14 (Dec. 12, 2014) (attached as Exhibit 10).   The two came to the United States to

flee violence they experienced at the hands of Z.M.R.'s ex-partner in Honduras, who raped and

routinely beat Z.M.R. and abused her son.   Z.M.R. Decl. ¶¶ 4-13.   On November 6, 2014, she

was found to have a credible fear of persecution, and subsequently referred to immigration court

to pursue her asylum claim before an immigration judge.   Z.M.R. Decl. ¶ 15.   However, on

November 12, 2014, ICE issued notice that she would be denied release, even though Z.M.R. has

no criminal record and a sister in North Carolina with lawful status who is willing to provide her

Exhibit 36 - Page 546

with housing and support during her asylum proceedings.  Z.M.R. Decl. ¶¶ 16-17.  Since his detention, J.L.P.M. has suffered from depression, dizziness, and physical weakness, and Z.M.R. is distraught.  Z.M.R. Decl. ¶¶ 20-23; Declaration of J.L.P.M. ("J.L.P.M. Decl.") ¶¶ 8-14 (Dec. 11, 2014) (attached as Exhibit 11).

Plaintiff W.M.C. has been detained at Karnes with her two children, aged five years and eight months, since they entered the United States on October 2, 2014.  Declaration of W.M.C. ("W.M.C. Decl.") ¶¶ 3-4, 14 (Dec. 12, 2014) (attached as Exhibit 12).  The family fled El Salvador because W.M.C.'s former partner, a gang member, brutally abused W.M.C., including while she was pregnant.  W.M.C. Decl. ¶¶ 5-11, 13.  It was impossible for the family to find refuge in El Salvador.  W.M.C. Decl. ¶¶ 10-12.  An asylum officer interviewed W.M.C. on October 24, 2014; she received a positive credible fear assessment on October 27, 2014.  W.M.C. Decl.      ¶¶ 15-16.  That same day, ICE denied release, even though W.M.C. has no criminal history and an uncle in New York who is a U.S. citizen and who has offered to provide her and her children with housing and support during their asylum proceedings.  W.M.C. Decl. ¶¶ 16, 18.  Detention has been difficult for W.M.C. and her daughter: as W.M.C. explains, "[i]t is hard to see my daughters locked up in a jail and to know that I brought them here.  But I had no other choice: my partner was beating me, and I feared for our lives."  W.M.C. Decl. ¶ 20.[12]

### STANDARD OF REVIEW

---

[12] All of the Plaintiffs have requested and are scheduled to receive an IJ hearing seeking redetermination of custody.  R.I.L.R. Decl. ¶ 14; Z.M.R. Decl. ¶ 24; W.M.C. Decl. ¶ 17.  It is possible, though far from assured, that some or all could be released on bond following these hearings.  This possibility does not negate the irreparable harm suffered by asylum-seeking families (including children) for weeks or months before there is even a chance of recourse.  Nor, as further explained in Plaintiffs' brief in support of class certification, would it prevent certification of a class and entry of class-wide relief to protect this inherently transitory class from the illegal No-Release Policy.  *See* Pl. Mot. for Class Cert., at 12 n.1.

Exhibit 36 - Page 547

In deciding whether to issue a preliminary injunction, a court must consider "whether (1)
the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer
irreparable injury were an injunction not granted; (3) an injunction would substantially injure
other interested parties; and (4) the grant of an injunction would further the public interest."
*Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citations
omitted).  Plaintiffs meet these requirements here.

## ARGUMENT

**I.     Plaintiffs Are Substantially Likely to Succeed on the Merits.**

> **A.     The No-Release Policy Is Contrary to Law and Should Thus Be Set Aside
> and Enjoined Pursuant to the APA.**

> > **1.     The No-Release Policy Violates the INA.**

The No-Release Policy violates the INA and is thus contrary to law under the APA.  *See*
5 U.S.C. § 706(2)(A).  Plaintiffs, and others similarly situated, are detained pursuant to 8 U.S.C.
§ 1226(a).  The statute states only that DHS "may continue to detain the arrested alien," or "may
release the alien" on bond or parole.  The No-Release Policy, however, precludes release in favor
of a blanket policy of detaining arrested migrant families for general deterrence purposes,
without regard to their individual circumstances.  The statute contains no authorization for such a
sweeping expansion of civil detention, and must be read to avoid the serious constitutional
problems the No-Release Policy raises.

The Supreme Court has interpreted "may detain" language identical to that of section
1226(a) in another provision of the INA.  The Court described such language as "ambiguous,"
holding that it "does not necessarily suggest unlimited discretion."  *Zadvydas v. Davis*, 533 U.S.
687, 697 (2001).  In such situations, the Court recognized, it must "read significant limitations
into . . . immigration statutes in order to avoid their constitutional invalidation."  *Id.* at 689; *see*

Exhibit 36 - Page 548

*also Clark v. Martinez*, 543 U.S. 371, 381 (2005) (the avoidance canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts"). Thus, in *Zadvydas*, the Court interpreted "may detain" to contain a statutory "limitation" on indefinite detention of removable aliens who cannot be deported. 533 U.S. at 689. In reaching this result, the Court found that the traditional purposes of immigration detention did not justify the Government's policy: "the flight risk justification evaporates," and the policy "bears no relation to a detainee's dangerousness." *Id.* at 691-92.

   *Zadvydas* compels the same result here. As in *Zadvydas*, DHS claims a limitless power to detain for any reason. As in *Zadvydas*, that expansive approach does not comport with the traditional purposes of immigration detention. And as in *Zadvydas*, the sweeping detention power DHS seeks to read into the statute presents serious constitutional problems. Accordingly, as in *Zadvydas*, section 1226(a) must be construed to limit DHS's detention authority.

   Specifically, the Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of . . . liberty . . . without due process of law." U.S. Const., amend. V. As the Supreme Court has explained in the immigration context, "[f]reedom from imprisonment— from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. "[G]overnment detention violates th[e] [Due Process] Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (internal citations omitted) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992), and *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)). It is well established that these

13

Exhibit 36 - Page 549

Due Process principles "appl[y] to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693.[13]

As the Supreme Court has recognized, the legitimate "special justifications" for immigration detention are "preventing flight" and "protecting the community" from danger. *Id.* at 690-91. General deterrence, on the other hand, is decidedly not a valid basis for immigration detention. To the contrary, the Supreme Court has repeatedly warned that civil detention may not "become a 'mechanism for retribution or *general deterrence*'—functions properly those of criminal law, not civil commitment." *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (emphasis added) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 372-74 (1997) (Kennedy, J., concurring)).[14]

The Court has never allowed individuals to be deprived of their liberty through civil detention simply to send a deterrence message to others. The Government has ample tools to deter unlawful migration, including the criminal laws, which allow it to prosecute aliens for unlawful entry. 8 U.S.C. § 1325. If the Government wishes to pursue the criminal law goal of deterrence, it can and must pursue that goal through "ordinary criminal processes"—not an unprecedented assertion of civil commitment power. *Foucha*, 504 U.S. at 82.

---

[13] In *D-J-*, in which Attorney General Ashcroft determined that deterrence was a permissible factor to consider in making certain custody determinations under section 1226(a), *supra* n.4, the Attorney General disregarded this principle and stated that any alien not formally "admitted" lacks Due Process rights and so can be detained for any reason. *See D-J-*, 23 I. & N. Dec. at 583. As a result of this basic error, the Attorney General never applied the type of statutory analysis required by *Zadvydas*.

[14] *See also, e.g.*, *Hendricks*, 521 U.S. at 361-62 (upholding civil commitment statutes because it "does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence"); *Foucha*, 504 U.S. at 78, 80 (although Louisiana could "of course imprison convicted criminals for the purposes of deterrence and retribution," it had "no such punitive interest" in detention of individuals acquitted due to insanity; continued detention of such individuals required "determination in civil commitment proceedings of [their] current mental illness and dangerousness"); *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979) ("Retribution and deterrence are not legitimate nonpunitive governmental objectives" for pretrial detention (citing, *inter alia*, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963)).

14

Exhibit 36 - Page 550

In addition to requiring "special justifications" for the deprivation of liberty—deterrence not among them—civil confinement requires "strong procedural protections" to ensure that detention is serving a legitimate goal. *Zadvydas*, 533 U.S. at 690-91. As a result, immigration detention generally requires an *individualized* determination of flight risk and danger to the community. *Id.*; *United States v. Salerno*, 481 U.S. 739, 751-52 (1987) (affirming Bail Reform Act in light of procedures for "determining the appropriateness of detention" based on individualized factors); *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 518, 533 (2004) (detention of combatants during wartime is "neither revenge, nor punishment, but solely protective custody . . . to prevent the prisoners of war from further participation in the war;" due process requires opportunity for citizen-detainee to "challenge his classification as an enemy combatant" before a neutral decisionmaker (internal quotation marks and citation omitted)).[15]

The No-Release Policy is flatly inconsistent with the principles of civil immigration detention rooted in the Due Process Clause and reflected in *Zadvydas* and other cases. Immigration detention cannot be justified solely to deter others, and an individualized assessment of whether flight risk and danger to the community warrant detention in an individual case is required. Pursuant to the No-Release Policy, Plaintiffs and other putative class members receive no such individualized determinations. No government official has considered, let alone

---

[15] While the Supreme Court upheld the constitutionality of mandatory detention in *Demore v. Kim,* 538 U.S. 510 (2003), that case involved a Congressional statute that singled out individuals who were removable based on certain criminal convictions, and for whom Congress had before it an extensive record demonstrating that they posed a greater risk of flight and recidivism. In light of this record, the Court held that a brief period of mandatory detention—as applied to an individual who conceded deportability on one of the specified criminal grounds—was reasonably related to the government's interest in protecting against danger and flight risk, and thus satisfied due process. *See id.* at 531. Here, there is no evidence, much less an extensive record, showing that Plaintiffs and others similarly situated pose greater risks of flight risk or danger to the community.

15

Exhibit 36 - Page 551

determined, whether Plaintiffs present a flight risk or a danger to the community that requires their detention.  Rather, Plaintiffs and many others like them are being deprived of their liberty *en masse* as a general deterrent to others.

Section 1226(a) does not say that detention is authorized for this sweeping, unconstitutional general deterrent purpose.  Since it is "fairly possible" to read section 1226(a) not to authorize unconstitutional detention, the statute must be construed in that manner. *Zadvydas*, 533 U.S. at 678.  Accordingly, the No-Release Policy violates the INA and is "contrary to law" under the APA.[16]

### 2.    The No-Release Policy Violates the Due Process Clause.

For similar reasons, the No-Release Policy is contrary to law because it violates the Due Process Clause.  As set forth above, the Due Process Clause protects Plaintiffs and other putative class members from detention that is not reasonably related to the legitimate purposes of preventing flight or protecting the community. *Zadvydas*, 533 U.S. at 690; *see also Demore*, 538 U.S. at 527-28.  Deterrence is not a permissible basis for civil detention. *See Crane*, 534 U.S. at 412; *Hendricks*, 521 U.S. at 361-62; *Foucha*, 504 U.S. at 80; *Bell*, 441 U.S. at 539 n.20.  By

---

[16] This construction of the statute is also confirmed by another venerable canon of statutory construction: courts must avoid interpreting the statute to conflict with the United States' international law and treaty obligations "if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *see also United States v. Ali*, 718 F.3d 929, 936 (D.C. Cir. 2013).  Consistent with the U.S. Constitution, international law prohibits the detention of asylum seekers—such as Plaintiffs—based on general deterrence and without an individualized determination that detention is justified by danger or flight risk. *See* UNHCR, *Guideline on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention*, Guideline No. 4.1.4 (2012), *available at* http://www.refworld.org/docid/503489533b8.html ("Detention that is imposed in order to deter future asylum-seekers, or to dissuade those who have commenced their claims from pursuing them, is inconsistent with international norms.").  This international law requirement is reflected in specific treaty commitments binding on the United States.  United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U. S. T. 6259, arts. 26 & 31 (protecting "freedom of movement" for asylum-seekers); International Covenant on Civil and Political Rights, Dec. 19, 1996, 1916 U.S.T. 521, art. 9 (prohibiting arbitrary deprivations of liberty).

16

Exhibit 36 - Page 552

detaining Plaintiffs on the basis of general deterrence rather than an individualized determination that detention is warranted due to of flight risk or danger to the community, the No-Release Policy violates the Fifth Amendment.

Even assuming that general deterrence were a permissible purpose for detention in some circumstances, moreover, the No-Release Policy still violates Plaintiffs' due process rights. At a minimum, due process would require that such detention be reasonably related to Defendants' goals of deterring an influx of future migrants. *See Zadvydas*, 533 U.S. at 690. However, for the reasons set forth in section I.A.4, *infra*, the detention of a very small subset of *bona fide* asylum seekers, such as Plaintiffs, is not reasonably related to that objective. For this additional reason, the No-Release Policy is unconstitutional.[17]

### 3.    The No-Release Policy Violates DHS's Own Regulations.

Defendants' No-Release Policy also violates DHS's own regulations. "It is axiomatic . . . that an agency is bound by its own regulations. . . . Thus, an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks and citations omitted). Here, a DHS regulation expressly authorizes discretionary release determinations. DHS has violated this regulation by adopting a blanket No-Release Policy that *prohibits* such determinations. The policy should be set aside on this basis.

8 C.F.R. § 1236.1(c)(8) provides that "[a]ny officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act,

---

[17] Plaintiffs raise their due process claim both under the APA and as a freestanding claim under the Due Process Clause. *See Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) (independent cause of action exists to remedy constitution violations); *Hubbard v. EPA*, 809 F.2d 1, 11 n. 15 (D.C. Cir. 1986) ("[T]he court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself . . . .").

Exhibit 36 - Page 553

under the conditions at section 236(a)(2) and (3) of the Act." It goes on to say that, for an officer to exercise such discretion, "the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id*.

The plain text of the regulation thus dictates that the ICE officers who make custody-or-release determinations for individual migrants who have received a positive credible fear determination have "discretion" to release an alien on bond if the alien demonstrates that she or he does not present a danger to the community or a flight risk.[18] As the Supreme Court has repeatedly confirmed in the immigration context, this sort of "discretion" inherently requires some form of individualized determination.

For example, in *Reno v. Flores*, 507 U.S. 292 (1993), the Court was asked to interpret the Attorney General's "broad discretion" to release or detain aliens pending a final determination of deportability. *Id.* at 295-96 & n.1. Although the Court held that certain presumptions guiding the exercise of discretion may be appropriate, it also recognized that an "exercise of discretion . . . requires 'some level of individualized determination.'" *Id.* at 313 (quoting *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.* ("*NCIR*"), 502 U.S. 183, 194 (1991)) (emphasis added).

The Court applied similar reasoning in *NCIR*, in which it interpreted a statute that conferred discretion on the Attorney General to impose conditions on the release of excludable aliens. *NCIR*, 502 U.S. at 184-85. Again, the Court held that "the lawful exercise of the Attorney General's discretion . . . requires some level of individualized determination," because "in the absence of such judgments, *the legitimate exercise of discretion is impossible* in this

---

[18] The individual ICE officers who make these determinations are within the enumerated list of officers "authorized to issue a warrant of arrest." *See* 8 C.F.R. § 287.5(e)(2).

Exhibit 36 - Page 554

context." *Id.* at 194-95 (emphasis added).  More broadly, the Supreme Court has held that "if the word 'discretion' means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority *according to his own understanding and conscience*." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954) (emphasis added).

To be sure, general guidelines about how to *apply* discretion to particular, individualized facts are appropriate.  *See Flores*, 507 U.S. at 313 (approving "presumption" that certain types of individuals are unsuitable custodians for a released alien, because it requires immigration authorities to make "determinations that are specific to the individual").  But *guiding* discretion cannot mean *eliminating* it—the precise effect of the No-Release Policy.  The policy ties the hands of immigration officers and forecloses the exercise of "discretion" based on "some level of individualized determination."  *See* Raymond Decl. ¶ 7 (ICE officer admitted that "[o]ur directive is no bonds to anyone." (emphasis omitted)).

In short, the No-Release Policy nullifies the regulation: the regulation says an officer "may, in the officer's discretion, release an alien."  But the policy directs that an officer "may *not*, in the officer's discretion, release an alien."

This plain-text reading, supported by on-point Supreme Court precedent, is confirmed by the broader context of the regulation.  *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("words . . . must be read in their context" (internal quotation marks and citation omitted)).  The regulation contemplates a case-by-case custody determination in which an alien attempts to "demonstrate to the satisfaction *of the officer*" that she "would not pose a danger" or be a flight risk.  8 C.F.R. § 1236.1(c)(8) (emphasis added).  Although the regulation does not promise any particular result, it does speak in terms of an in-person determination, by an officer on the ground, and based on individualized factors (danger to the community and

19

Exhibit 36 - Page 555

flight risk).  All of this would be wholly irrelevant if a uniform No-Release Policy, based on a generalized interest in deterrence, could be mandated by DHS.

Defendants may offer some contrary interpretation of DHS's regulation, and then suggest that it be accorded deference under *Auer v. Robbins*, 519 U.S. 452 (1997).  Any such argument should be rejected.  As an initial matter, *Auer* deference is "unwarranted" where "the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (internal quotation marks and citations omitted).  In determining whether a theory offered in litigation warrants deference, the Court should assess whether it is "consistent with [the agency's] past statements *and actions*."  *Drake v. FAA*, 291 F.3d 59, 69 (D.C. Cir.  2002) (emphasis added).

No deference is warranted here under this test.  Far from ever interpreting the regulation to allow a blanket No-Release Policy that ignores individualized factors, DHS traditionally has applied the regulation exactly as one would expect from its text: it has looked to its officers on the ground to make individualized determinations.  *Auer* deference cannot rescue DHS's manifest reversal of position.[19]

Moreover, *Auer* deference is defeated where, as here, "the agency's interpretation is plainly erroneous or inconsistent with the regulation."  *Christopher*, 132 S. Ct. at 2166 (internal

---

[19] Plaintiffs are aware of the Attorney General's interpretation of the relevant regulation in *Matter of D-J-*, in which it concluded, among other things, that the regulation "does not establish any right to release on bond."  *D-J-*, 23 I. & N. Dec. at 576.  Plaintiffs, however, do not assert any such "right"; rather, they argue that when the regulation grants "discretion," actual, individualized "discretion" must be exercised, not prohibited.  Moreover, as explained in note 4 above, *D-J-* does not endorse the elimination of discretion and the effective elimination of individual custody determinations.  It held only (albeit incorrectly) that the government's generalized deterrence and national security concerns were factors to be considered in an officer's exercise of discretion.

20

Exhibit 36 - Page 556

quotation marks and citations omitted).  DHS may not rely on "deference" to subvert a regulation that says an officer *may* exercise discretion based on individualized factors with a policy providing that an officer *may not* exercise discretion based on such factors.

For these reasons, the No-Release Policy violates DHS's own regulations.  It is thus arbitrary and capricious and constitutes illegal agency action under the APA.

### 4.    The No-Release Policy Is an Arbitrary and Capricious Means of Deterring Mass Migration.

The No-Release Policy also is an arbitrary and capricious means of deterring mass migration.  Even if the statute and regulations permitted blanket detention on deterrence grounds, the selective detention of mothers and children seeking asylum is an arbitrary and irrational response to an increase in Central American migrants crossing the southwestern border.  DHS has provided no rational connection between its No-Release Policy, as it applies to Plaintiffs and those similarly situated, and its desire to deter a mass influx of migrants to the United States.  Instead, the policy arbitrarily selects only the most vulnerable for blanket detention.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1036 (D.C. Cir.  2012) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Where "high stakes" are involved, as is the case in deportation proceedings and detention decisions, courts will scrutinize an agency policy to ensure it bears a reasonable relationship with a legitimate policy goal.  *Judulang v. Holder*, 132 S. Ct. 476, 487 (2011) (finding BIA policy "arbitrary and capricious" where rules bore "no

Exhibit 36 - Page 557

connection to the goals of the deportation process or the rational operation of the immigration laws").

DHS has articulated no "rational connection" between the selective detention of mothers and children pursuing *bona fide* asylum claims and the general deterrence of migration from Central America.  In fact, no reasonable decisionmaker could find DHS's harsh policy remotely suited to its own stated goals. Although rising levels of violence in Central America appear to have contributed to an increase in emigration, the Government's own statistics attest that the vast majority of these migrants have been adults traveling without children.  *See* Lembke Decl. ¶ 9 ("over 278,000 of the approximately 381,000 aliens CBP encountered in FY14 through June 2014 were neither unaccompanied children nor family units").  Yet DHS is *not* applying its No-Release Policy to this population.  *See* Hines Decl. ¶ 16 (noting that adults who are detained without children and who pass a credible fear screening are routinely considered for release on bond, recognizance, or other conditions); Brané Decl. ¶ 25 (same).  DHS also is not applying the policy to children traveling alone—the most publicized group of migrants—whom the Government has agreed to release to responsible adult family members or guardians.  *See* Brané Decl. ¶ 26.  DHS has chosen to apply its No-Release Policy only to one small subset of individuals that are part of the purported migration "surge": mothers who are detained with their minor children and who have established a credible fear of persecution in their home countries.

There is no evidence that a detention policy of any kind would achieve any real deterrent effect.  The scholar whose work forms the basis of DHS's theory has explained that the Government's argument is "not empirically supported."  Declaration of Jonathan Hiskey ("Hiskey Decl.") ¶ 20 (Dec. 12, 2014) (attached as Exhibit 13); *see also* Declaration of Nestor Rodriguez ("Rodriguez Decl.") ¶ 11 (Dec. 12, 2014) (attached as Exhibit 14) ("[R]umors

Exhibit 36 - Page 558

regarding lenient immigration detention policies in the United States are not a significant factor motiving current Central American immigration[.]").  But at a minimum, the Government cannot plausibly claim that a policy limited to a very small subset of Central American migrants—mothers and children with a *bona fide* claim to be fleeing violence and persecution—could have any effect at all on migration patterns.  DHS's decision to subject only this most vulnerable population of migrants to blanket detention is thus arbitrary and capricious.

> **B.      All of the Other Requirements for APA Relief Are Satisfied.**

For all of the reasons set forth above, the No-Release Policy is contrary to law and arbitrary and capricious.  Pursuant to the APA, this Court may set aside and enjoin such unlawful agency action that is (1) "final agency action," and (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" or "agency action is committed to agency discretion by law."  5 U.S.C. §§ 701)(a), 704.  None of these criteria poses an obstacle to setting aside the illegal No-Release Policy.

1.  *Final Agency Action*.  An agency action is final where two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012).  The No-Release Policy meets this standard.

First, the policy "mark[s] the 'consummation' of the agency's decisionmaking process."  *Bennett*, 520 U.S. at 178.  It has immediate and binding effect within the agency by directing ICE officers to apply a specific approach to custody determinations (make the determination based on generalized deterrence concerns) and to reach a particular result (do not release).  ICE officers are applying the policy every day.  As a consequence, many asylum-seekers who would

23

Exhibit 36 - Page 559

otherwise receive an individualized determination of danger and flight risk, and potentially

secure their liberty, are instead imprisoned.  The D.C. Circuit has held that the APA finality

requirement is satisfied where, as here, an agency has announced broad, categorical rules about

how it will make particular kinds of determinations.  *See CropLife Am. v. EPA*, 329 F.3d 876,

881 (D.C. Cir. 2003) (EPA decision that it will "not consider or rely on any [third-party] human

studies in its regulatory decisionmaking" was final agency action); *Appalachian Power Co. v.

EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (agency's "settled position" which "officials in the

field are bound to apply" was final agency action).

Second, the No-Release Policy both determines "rights or obligations," and is an action

from which "legal consequences will flow."  *Bennett*, 520 U.S. at 178 (internal quotation marks

and citation omitted).  Only one of these standards need be met in order to demonstrate the

existence of a final agency action.  *Id.*  The obligations of ICE officers are determined by the No-

Release Policy, which gives ICE officers "marching orders" to generally deny release on the

basis of deterrence, instead of making individualized determinations based on danger to the

community and flight risk.  *Appalachian Power Co.*, 208 F.3d at 1023 (final agency action where

those responsible for enforcement are given "marching orders" that they are expected to follow,

even if those orders may not be followed with complete uniformity).  Additionally, the No-

Release Policy has profound and immediate consequences for asylum-seekers in family

detention, who, but for DHS's action, would have received individualized assessments based on

danger to the community and flight risk.  *See* Brané Decl. ¶¶ 20-21; Hines Decl. ¶¶ 21, 23-28;

McLeod Decl. ¶ 18.  In light of past agency practice, there is a significant likelihood that

Plaintiffs and those similarly situated would have been released based on individualized

Exhibit 36 - Page 560

determinations.  Instead, as an immediate consequence of the No-Release Policy, they are detained unless and until they can secure release from an immigration court.

2. *No Other Adequate Remedy.*  The Supreme Court has long interpreted the "other adequate remedy" limitation on APA review narrowly, stressing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) ("The Supreme Court has long instructed that the 'generous review provisions' of the APA must be given 'a hospitable interpretation' such that 'only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review.'" (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967))).  Instead, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions."  *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).

There is "no other adequate remedy" available to Plaintiffs and similarly situated individuals here.  First, Defendants cannot viably contend that Plaintiffs and those similarly situated have an adequate remedy through the immigration courts.  Immigration courts were created by regulation and so cannot be considered the sort of "special *statutory* procedure" to which the "other adequate remedy" restriction is addressed.  Additionally, no statute or regulation requires individuals detained *by DHS* to seek review through *a different agency's* procedures before they can challenge a final DHS agency action.  *See Darby*, 509 U.S. at 147 ("[I]t would be inconsistent with the plain language of [the APA] for courts to require litigants to exhaust optional [administrative] appeals.").

Exhibit 36 - Page 561

More fundamentally, any relief available through the immigration system is not
"adequate."  At a minimum, Plaintiffs and those similarly situated will suffer an unlawful period
of detention for weeks or months before an immigration judge reviews their custody.  Some
asylum-seekers, particularly those without counsel, may not even know this recourse exists.  *See*
Brané Decl. ¶ 15; Archambeault Decl. ¶ 14.  And every day a family is subject to continued
detention on account of the No-Release Policy compounds its injuries.  Such detention will
continue to cause irreparable harm to Plaintiffs and those similarly situated—especially children
for whom detention may cause particular trauma.  *See* Hines Decl. ¶¶ 23-28; Declaration of Luis
H. Zayas ("Zayas Decl.") ¶¶ 10-11 (Dec. 10, 2014) (attached as Exhibit 15); R.I.L.R. Decl. ¶¶ 18,
20; Z.M.R. Decl. ¶ 21; *see also Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986) ("exhaustion
might not be required if [the plaintiff] were challenging her incarceration . . . or the ongoing
deprivation of some other liberty interest").[20]

Second, there is no basis for DHS to contend that Plaintiffs' only remedy is through a
habeas petition.  Binding Supreme Court precedent is squarely on point: adverse immigration
actions that may be challenged in habeas can *also* be challenged under the APA.  *Shaughnessy v.
Pedreiro*, 349 U.S. 48, 52 (1955); *Brownell v. Tom We Shung*, 352 U.S. 180, 181 (1956).[21]
More recently, the Supreme Court has recognized that the function of the "other adequate

---

[20] Any relief that might be available to Plaintiffs through the immigration system also would not
be adequate because other members of the proposed class still would be subject to detention
based on the illegal No-Release Policy.  *See Cohen v. United States*, 650 F.3d 717, 732 (D.C.
Cir.  2011) (en banc) (administrative remedy not adequate where "the relief would be
individualized, not class wide as [Plaintiffs] seek," and where an APA challenge focuses on
illegal agency *procedures* rather than the agency's substantive decision).

[21] Congress has abrogated the specific result in *Pedreiro* (allowing APA review of deportation
orders), *see Kolkevich v. Att'y Gen. of the United States*, 501 F.3d 323, 327 (3d Cir. 2007), but its
broader holding remains good law.  In fact *Bowen*, the seminal modern case on adequacy of
remedies, recognizes that *Pedreiro* is good law by quoting it to stress the narrowness of the
restrictions on APA review.  *Bowen*, 487 U.S. at 904.

Exhibit 36 - Page 562

remedy" rule is to ensure that Plaintiffs do not bypass "special statutory procedures" in favor of a general APA remedy.

Habeas, far from being a "special statutory procedure" tailored to a particular agency, is a general statute on par with the APA. Congress has never manifested an intent to require those challenging an unlawful, nationwide immigration policy concerning how the agency will make custody determinations to choose a general habeas remedy instead of a general APA remedy. *Cf. Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660, 666 (D.C. Cir. 2013). Finally, requiring the nationwide No-Release Policy to be challenged through the habeas process would raise myriad undue complications; for example, the Government might abruptly move detainees across state lines (as it is doing now, *see* Brané Decl. ¶ 14) and potentially argue that class-wide habeas relief is not available across jurisdictions.

3. *No Statutory Bar To Review or Commitment To Agency Discretion.* Congress has done nothing to override "the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 671 (1986) ("clear and convincing" evidence required to "restrict access to judicial review" (internal quotation marks and citation omitted)); *see also INS v. St. Cyr*, 533 U.S. 289, 298 (2001). Although section 8 U.S.C. § 1226(e) restricts review of "[t]he Attorney General's *discretionary judgment* regarding the application of this section," and prevents a court from setting aside an action "regarding the detention or release of any alien," Plaintiffs do not challenge a "discretionary judgment" by DHS. *Id.* (emphasis added). Rather, they challenge DHS's adoption of a policy that is *beyond* the agency's discretion. *Demore*, 538 U.S. at 516-17. As four courts of appeals have held, section 1226(e) does not demonstrate "clear and convincing"

Exhibit 36 - Page 563

evidence that Congress intended to allow DHS to violate the Constitution, the INA, and its own regulations while evading review.[22]

Nor does this case present the "rare circumstances where the relevant statute" includes "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (internal quotation marks and citation omitted).  Again, the case is not about any particular discretionary decision; it is about agency action that exceeds the bounds of its discretion under the INA, applicable regulations, and the Fifth Amendment.

## II.     Plaintiffs and Those Similarly Situated Will Suffer Irreparable Harm Absent Injunctive Relief.

A party seeking a preliminary injunction must demonstrate irreparable harm by showing that the injury is "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (*quoting Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  The injury must also be "both certain and great; it must be actual and not theoretical." *Id.* (*quoting Wisconsin Gas*, 758 F.2d at 674).  Finally, the injury must be "beyond remediation." *Id*.

---

[22] *See, e.g.*, *Castaneda v. Souza*, 769 F.3d 32, 41 (1st Cir. 2014) ("[S]ubsection (e) does not bar our review of this case because [petitioners] . . .  challenge the statutory basis for their detention."); *Sylvain v. Att'y Gen. of United States*, 714 F.3d 150, 156 (3rd Cir. 2013) ("Nothing in 8 U.S.C.§ 1226(e) prevents us from deciding whether the immigration officials had statutory authority to impose mandatory detention"); *Singh v.  Holder*, 638 F.3d 1196, 1200–03 (9th Cir. 2011) ("Although § 1226(e) restricts jurisdiction in the federal courts in some respects, it does not limit habeas jurisdiction over constitutional claims or questions of law . . . including application of law to undisputed facts, sometimes referred to as mixed questions of law and fact" (internal quotation marks and citation omitted)); *Al–Siddiqi v. Achim*, 531 F.3d 490, 494 (7th Cir 2008) ("[T]his section [§ 1226(e)] strips us of our jurisdiction to review judgments designated as discretionary but does not deprive us of our authority to review statutory and constitutional challenges.").

Exhibit 36 - Page 564

Plaintiffs and those similarly situated will suffer irreparable harm without injunctive relief.  First, their injury is imminent and certain.  They are currently being detained in ICE facilities pursuant to DHS's No-Release Policy.  To be sure, Plaintiffs do not seek an order of release and will not *inevitably* secure it if the No-Release Policy is set aside.  But past DHS practice shows that most individuals in their situation would be released upon an individualized determination, but for the illegal policy.  *See* Brané Decl. ¶¶ 11, 22, 25; Hines Decl. ¶¶ 8, 21; McLeod Decl. ¶ 18.

Detention irreparably harms Plaintiffs and other putative class members in myriad ways, *see supra* Background Part D, and as mental health experts have testified, it is particularly harmful to minor children.  *See* Zayas Decl. ¶¶ 10-11.  Moreover, all Plaintiffs already experienced trauma before fleeing their home countries, and are thus particularly sensitive to the harm inflicted by continued detention.  These harms grow worse with each day of continued detention.

Plaintiffs and those similarly situated are already experiencing these harms as a result of the No-Release Policy, and will continue experiencing them until they are released.  R.I.L.R. Decl. ¶¶ 18, 20; Z.M.R. Decl. ¶¶ 19-23; W.M.C. Decl. ¶ 20.  There is no indication that DHS intends to discontinue the No Release Policy; to the contrary, DHS is expanding its family detention capacity.  *See* Brané Decl. ¶ 14.  Accordingly, members of the proposed class who are detained by ICE in the future will also be subjected to these harms.  *Wisconsin Gas*, 758 F.2d at 674.  The injuries caused by the No-Release Policy are thus "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Chaplaincy*, 454 F.3d at 297 (internal quotation marks and citation omitted); *In re Navy Chaplaincy*, 697 F.3d 1171, 1176-77 (D.C. Cir. 2012) ("The prospect of future injury becomes significantly less speculative

Exhibit 36 - Page 565

where, as here, plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury."), *aff'd*, 738 F.3d 425 (D.C. Cir. 2013), *cert. denied*, *Chaplaincy of Full Gospel Churches v. Dep't of Navy*, 135 S. Ct. 86 (2014).

Finally, Plaintiffs' injuries are "beyond remediation." Plaintiffs do not seek monetary compensation for their injuries. Rather, they seek injunctive and declaratory relief invalidating and setting aside the illegal No-Release Policy. Unlike economic harm, Plaintiffs' injuries cannot be remediated after the fact. *Cf. Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (economic losses are not irreparable in the absence of special circumstances because compensation can be awarded after a merits determination).

## III.   The Balance of Harms and the Public Interest Both Favor Injunctive Relief.

Plaintiffs ask this Court to enjoin an unlawful and unconstitutional policy to prevent irreparable harm to numerous mothers and their frightened children, who ask for nothing more than an opportunity to show that there is no individualized need to detain them. Neither the Government nor the public at large has any legitimate interest in violating the law to deny Plaintiffs this modest relief.

In a recent case involving immigration detention without an individualized bond determination, the Ninth Circuit concluded that "the major hardship posed by needless prolonged detention" outweighed any countervailing consideration. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The Government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Id.* "[T]he public interest also benefits from a preliminary injunction that ensures that federal statutes are construed and implemented in a manner that avoids serious constitutional questions." *Id.* at 1146.

Courts in this District have likewise been unwilling to license violations of the law as being in the public interest. *See, e.g.*, *Klayman v. Obama*, 957 F. Supp. 2d 1, 43 (D.D.C. 2013)

30

Exhibit 36 - Page 566

("Of course, the public has no interest in saving the Government from the burdens of complying

with the Constitution!"); *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F.

Supp. 2d 73, 84 (D.D.C. 2012) (recognizing "compelling concern for the safety of . . .

passengers and . . . system, from individual disputes with calamitous consequences to a terrorist

attack," but concluding that, when constitutional rights are at stake, "the thumb of the [c]ourt

[should] be on the [constitutional] side of the scales"); *N. Mariana Islands v. United States*, 686

F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies

comply with their obligations under the APA.").

      The Court thus does not need to look any further than the illegality of the No-Release

Policy and the traumatic harm to Plaintiffs and other class members to conclude that the balance

of harms and the public interest favor an injunction.  But even if the Court were to consider the

broader context of the No-Release Policy, the result would be the same.  The Government has an

array of tools at its disposal to confront the challenges of Central American migration, and it is

using them.  There is no credible evidence that the No-Release Policy could have any bearing on

migration patterns.  *See, e.g.*, Hiskey Decl. ¶ 17; Rodriguez Decl. ¶ 11.   Even if a deterrence

theory were viable in the abstract, it is simply irrational to think that the No-Release Policy as

implemented could have any such effect, given DHS's arbitrary decision to target a small subset

of Central American migrants.  *See supra* Part I.A.4.

      The bottom line is that the Government has access to many tools to combat any perceived

crisis on the border, but the Constitution, the INA, the APA, and DHS's own regulations prohibit

DHS from subjecting asylum-seekers to detention simply to send a deterrence message to others.

Far from undermining the public interest, treating asylum-seekers with basic fairness and dignity

is among our nation's best traditions.  *See, e.g.*, Refugee Act of 1980, Pub. L. No. 96-212,

Exhibit 36 - Page 567

§ 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States.").

The judicial power is most in need when the Government departs from the law and our nation's core values in the interest of expediency.  This Court should not hesitate to exercise such power here.  The balance of harms and the public interest decisively favor enjoining DHS to follow the law and to decide whether to release asylum-seekers on a case-by-case basis—and not to deprive mothers and children of liberty just to send a message.

**CONCLUSION**

For the foregoing reasons, this Court should preliminarily enjoin Defendants' continued implementation of the No-Release Policy and order Defendants to provide Plaintiffs and those similarly situated with an individualized assessment of whether their detention is warranted based on flight risk or danger to the community.

32

Exhibit 36 - Page 568

Dated: December 16, 2014                    Respectfully submitted,

                                            _____

Judy Rabinovitz                             Dennis B. Auerbach (D.C. Bar No. 418982)
Michael K.T. Tan                            David M. Zionts (D.C. Bar. No. 995170)
Anand V. Balakrishnan                       Philip Levitz (D.C. Bar No. 1018430)
Lindsay Nash                                Sonia Lahr-Pastor*
AMERICAN CIVIL LIBERTIES UNION              COVINGTON & BURLING LLP
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT      One CityCenter
125 Broad Street, 18th Floor                850 Tenth St., N.W.
New York, NY 10004                          Washington, D.C. 20001–4956
(212) 549-¶18                               (202) 662-6000

Stephen B. Kang                             Arthur B. Spitzer (D.C. Bar. No. 235960)
AMERICAN CIVIL LIBERTIES UNION              AMERICAN CIVIL LIBERTIES UNION OF THE
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT      NATION'S CAPITAL
39 Drumm Street                             4301 Connecticut Avenue, N.W., Suite 434
San Francisco, CA 94111                     Washington, D.C. 20008
(415) 343-0783                              (202) 457-0800

Witold J. Walczak                           Molly Tack-Hooper
ACLU OF PENNSYLVANIA                        ACLU OF PENNSYLVANIA
313 Atwood Street                           P.O. Box 40008
Pittsburgh, PA 15213                        Philadelphia, PA 19106
(412) 681-7864                              (215) 592-1513 x 113

Denise Gilman                               Adriana Piñon
IMMIGRATION CLINIC                          Rebecca L. Robertson
UNIVERSITY OF TEXAS SCHOOL OF LAW           ACLU OF TEXAS
727 E. Dean Keeton St.                      1500 McGowen Street, Suite 250
Austin, TX 78705                            Houston, Texas 77004
(512) 232-1292                              (713) 942-8146

                                            *Admitted to the Bar of the Commonwealth of
                                            Pennsylvania, admission to the Bar of the
                                            District of Columbia pending, and supervised
                                            by the principals of the firm.

33

Exhibit 36 - Page 569

# Exhibit 37

## Publicly Filed



**Lutheran Immigration
and Refugee Service**

## Flores Settlement Agreement & DHS Custody

### Flores History & Applicability to DHS Custody

The *Flores* Settlement Agreement (*Flores*), arrived at in 1997, was the result of over a decade of litigation responding to the Immigration and Naturalization Service's (INS) detention policy towards an influx of unaccompanied migrant children in the 1980s.[1] The agreement set national standards regarding the detention, release, and treatment of all children in INS custody. It requires that juveniles be held in the least restrictive setting appropriate to their age and special needs, generally, in a non-secure facility licensed to care for dependent, as opposed to delinquent, minors. It also requires that juveniles be released from custody without unnecessary delay to a parent, legal guardian, adult relative, individual specifically designated by the parent, licensed program, or, alternatively, an adult who seeks custody who the responsible government agency, then INS, now the Department of Homeland Security (DHS) and Health and Human Services' Office of Refugee Resettlement (ORR), deems appropriate.

The *Flores* agreement clearly applies to all children apprehended by DHS, including those held with their parents in family detention or transferred to ORR custody. While plaintiffs consisted of unaccompanied minors taken into custody, the class certified encompassed "*all minors* who are detained in the legal custody of the INS." [2] The settlement binds the INS and Department of Justice, as well as "their agents, employees, contractors, and/or successors in office." [3] When the Department of Homeland Security was created in 2002, INS authority and responsibilities for immigration custody were transferred to it.[4] The only immigration custody exception was for the "care of unaccompanied alien children." Those INS responsibilities were vested with the Director of the Office of Refugee Resettlement of the Department of Health and Human Services where they remain. *See* § 279(a).[5] The HSA includes explicit "savings" provisions specifying that the settlement remains in effect as to the new agencies, *as if the transfer had not occurred.*[6] The federal government has never disputed that the agreement remains binding on both the ORR and DHS.

---

[1] The Flores Settlement Agreement, Case No. CV 85-4544-RJK(Px); Available at:
http://web.centerforhumanrights.net:8080/centerforhumanrights/children/Document.2004-06-18.8124043749. Some of the agreement's terms have been codified at 8 CFR §§236.3, 1236.3. For cases culminating in the settlement agreement, *see Flores v. Meese*, No. 85-4544-RJK(Px)(CD Cal. Nov. 30, 1987); *Flores v. Meese*, No. 85-4544-RJK(Px)(CD Cal. May 25, 1988); *Flores v. Meese*, 934 F.2d 991 (1990); *Flores v. Meese*, 942 F.2d 1352 (1992); *Reno v. Flores*, 507 U.S. 292 (1993).
[2] ¶ 1, 4, 10, *emphasis* added.
[3] ¶ 1
[4] Homeland Security Act, Pub. L. 107-296 (H.R. 5005). The HSA "transferred" the former INS's authority and responsibilities to the Department of Homeland Security (DHS). *See* § 202.
[5] *See Bunikyte v. Chertoff*, 2007 WL 1074070, at 2 (W.D. Tex. 2007)
[6] *See* §§ 462(f)(2), 1512(a)(1), 1512.

Exhibit 37 - Page 570

The broad applicability of *Flores* to all children, including those held in both DHS and ORR custody, has been formally accepted and acknowledged. For example,

- *In re Hutto Family Detention Center*, the court acknowledged the application of *Flores* to family detention and *Flores*'s continued binding scope.[7]
- Department of Homeland Security Appropriations Bill House Reports in the 110th Congress acknowledge that *Flores* is binding upon DHS, ICE and CBP and that they must enact policies of compliance.[8]
- INS Juvenile Protocol Manual, *Juvenile Aliens: A Special Population*, provides guidance to ICE agents on *Flores* and its application to juveniles and indicates how to apply *Flores* to children not being transferred to ORR.[9]
- The DHS Office of the Inspector General has also documented DHS's obligations to comply with *Flores* in *A Review of DHS Responsibilities to Juvenile Aliens* (OIG 2005).[10]
- Both the 2007 and 2005/2006 annual reports to Congress on the Department of Homeland Security Office of Civil Rights and Civil Liberties documented DHS's obligations under *Flores* to children who are accompanied or unaccompanied and in DHS custody.[11]

**For more information on *Flores* and Family Detention, you can contact:**

**Jessica Jones, Child and Youth Policy Associate, LIRS, jjones@lirs.org, 202-626-3850**

---

[7] Case No. A-07-CA-164-ss (W.D. Texas 2007)
[8] H.R. REP. 110-181, 43-344, 2008 and H.R. REP 110-862, 38, 2009
[9] Issued March 1999 Detention and Removals, updated by John Pogash, ICE/National Juvenile Coordinator, November 2003
[10] Available at: http://www.dhs.gov/xlibrary/assets/crcl-fy0506annualreport.pdf
[11] Available at: https://www.dhs.gov/xlibrary/assets/crcl-fy07annualreport.pdf and http://www.dhs.gov/xlibrary/assets/crcl-fy0506annualreport.pdf

Exhibit 37 - Page 571

## Key Flores Provisions & DHS Noncompliance

**The following *Flores* analysis provides greater detail of the requirements DHS must meet in order to comply with the terms of the agreement. It also provides an assessment of DHS current compliance with Flores protections for accompanied children in their custody *(in blue and italics)*.**

**"General Policy Favoring Release"**

*Flores* requires DHS to pursue a policy favoring the release of a child from custody and reunification with family or other community-based sponsor except in two narrow circumstances:

1. Detention of a particular child is required to secure his or her timely appearance before DHS/HHS or immigration court.
   *Data shows the vast majority of children appear for their court proceedings, as such accompanied children in family detention should be afforded release opportunities.[12]*
   **OR**
2. Continued detention is required to ensure the child's safety or the safety of others.
   *An overwhelming amount of research demonstrates children and families from Central America are fleeing human rights abuses and violence and do not pose any safety risk to their families' communities in the U.S. Instead of national security threat, the increased flows are indicative of a refugee crisis. DHS has argued for this national security justification for family detention misapplying the case In re D-J-, in which the government argued that reports or rumors of successful entries could encourage further mass migration attempts and thereby endanger national security.[13] All of these children and families are not "successful entries" as they were apprehended or turned themselves in. Children who come with their mothers should also be eligible for release just like unaccompanied children from Central America.*

**If detention is not required for one or both of the above reasons, then DHS/HHS "shall release" a minor from its custody without unnecessary delay according to the following order of preference (¶ 14) (*see also* 8 CFR 236.3(b)):**

1. Parent
2. Legal guardian
3. Adult relative (brother, sister, aunt, uncle or grandparent)
4. An adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being through a declaration.
5. Licensed program willing to accept legal custody
6. An individual or entity willing to accept legal custody.

*Currently ICE's policy and practice is to detain all children apprehended with their mothers regardless of whether they are demonstrable flight risks or dangerous to themselves or others. The federal law does not pursue a similar no-release policy toward adults apprehended without children, to children apprehended without their mothers, or to children apprehended with fathers.*

---

[12] *New Data on Unaccompanied Children in Immigration Court,* (Transactional Records Access Clearinghouse at Syracuse University July 15 2014) available at: http://trac.syr.edu/immigration/reports/359/
[13] *In re D-J-*, I. & N. Dec. 572 (BIA 2003)

Exhibit 37 - Page 572

*Rather, the no-release policy is perversely reserved for female-headed family units: namely, mothers and their children. As there is a parent, and primary caregiver, available to take custody and care of the child, DHS should release the mother so that she can resume her primary caregiver role in accordance with the ICE's Parental Interest Directive.[14] The child should also be released in accordance with the aforementioned policy. Special consideration requirement for the child's unique vulnerability necessitates the release of the mother with the child.*

**Terms of Release**

1. **Affidavit of Support I-134 (¶ 15)**
2. **Statement of care: that affirms** proper provision for the child, assurance of child's appearance at future proceedings, notification to INS of a change of address, and 5 days advance notification of departure from the US or initiation of dependency proceedings. (¶ 15).
3. **Termination** of custody arrangement can be made by INS (¶ 16).
4. **Suitability assessment: *may be required*** prior to the release of a minor (¶ 17).
5. **Family reunification efforts** must continue for the duration of custody if a minor "is not immediately released to a relative" (¶ 18).

*There are effective procedures in place to ensure children are released safely and DHS and DOJ have adequate assurance of the child's location, notice, and compliance with appearance in court.*

**Rights of the Child in Short-Term Custody**
*Currently children in CBP custody are not adequately guaranteed these rights. Numerous research reports, human rights organizations and attorneys have documented systemic abuse by CBP.[15]*

1. Safe and sanitary facilities with: toilets, sinks, drinking water, food, medical assistance in case of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors, and contact with family members who were arrested with the minor. ¶ 12 *All of these issues are systemic and recurring problems with CBP, resulting in numerous complaints filed by unaccompanied and accompanied children and their families.[16]*
2. Segregation of minors from unrelated adults ¶ 12 *CBP has been better at segregating minors from unrelated adults, however, CBP does routinely separate related children from their parents or adult family members.*

---

[14] August 23, 2013, U.S. Immigration and Customs Enforcement (ICE) issued the *Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities* Directive (Parental Interests Directive), available at: **http://www.ice.gov/doclib/detention-reform/pdf/parental_interest_directive_signed.pdf**

[15] See e.g., Betsy Cavendish and Maru Cortazar, Children at the Border (Appleseed Network, 2011)(reporting on a 2 year investigation documenting failed TVPRA screening by CBP and the need for child appropriate interviewing by qualified professionals); UNHCR, Findings and Recommendations Relating to the 2012-2013 Missions to Monitor the Protection Screening of Mexican Unaccompanied Children Along the U.S.-Mexico Border (June 2014); Marc Rosenblum, Statement: Measuring Border Security: Hearing on the U.S. Border Patrol's New Strategic Plan and the Path Forward Before the House Subcommittee on Border and Maritime Security, 112th Congress (2012); U.S. Government Accountability Office, Border Patrol Strategy: Progress and Challenges in Implementation and Assessment Efforts, No. 12-888T (May 8, 2012).

[16] American Immigration Council, *No Action Taken: Lack of CBP Accountability in Responding to Complaints of Abuse* (2014); Joint complaint filed by NIJC, Esperanza, AIJ, FIRRP, and ACLU, "Systemic Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection," June 1ll, 2014.

Exhibit 37 - Page 573

3. Least restrictive setting appropriate to the child's age and special needs ¶ 11. *CBP hold rooms are not appropriate to children, instead children are routinely placed in the most restrictive setting—secure hold rooms without any child appropriate accommodations.*

4. Treatment with dignity, respect and special concern for their particular vulnerability as children ¶ 11 *Children in CBP custody are cared for by CBP law enforcement agents; their treatment can range from special consideration to abusive treatment.*

5. Right to notice of rights (Form I-770) (¶ 24D) **(see also 8 CFR 236.3(h))** *CBP routinely only has a copy of the English version of this form, instead they should provide an official translation in Spanish. This form is often inadequately explained to children.*

**Rights of the Child while in Long-Term ICE Custody**
*Currently children held with their moms in ICE custody (family detention) are not guaranteed the rights outlined in the Flores Settlement Agreement. Conversely in ICE facilities that hold children alone (typically in under 72-hour circumstances), ICE/Juvenile Family Residential Management Unit (JFMRU) have made substantial efforts over the years to comply with the minimum standards.[17]*

1. If no one to release minor to (*see* Policy Favoring Release ¶ 14), then INS may place a child temporarily in a licensed program (state agency the licenses custodial programs for dependent children) until release can be effectuated. *Exception* for licensure in cases of emergencies or influxes, but reunification and release efforts must continue. *ICE does not follow this policy favoring release. Children instead remain in ICE custody and ICE fails to conduct reunification efforts. ICE also fails to obtain state child welfare licensing for the facilities.*

2. Least restrictive setting appropriate to the minor's age and special needs ¶ 11. *ICE detains children apprehended with their mothers in secure facilities that are not licensed by an appropriate state agency and that are not the least restrictive setting appropriate to children's age and special needs.*

3. Treatment with dignity, respect and special concern for their particular vulnerability as children ¶ 11. *In their report, LIRS and WRC identified a systemic failure in the detention facilities to address the needs of children.[18]*

4. Right to notice of rights (Form I-770) (¶ 24D) **(see also 8 CFR 236.3(h))** and treatment in compliance with the Minimum Standards for Licensed Programs set forth in Exhibit 1:
   - Proper physical care and maintenance. *Children are held in restrictive, jail-like settings with little privacy and lack of culturally appropriate food, often leading to weight loss in children.[19]*

---

[17] *See Halfway Home: Unaccompanied Children in Immigration Custody,* Women's Refugee Commission (February 2009), at 5, 12-13, available at: http://www.womensrefugeecommission.org/resources/download/196 (detailing ICE compliance and non-compliance with *Flores*). Subsequently in July of 2010, the Women's Refugee Commission revisited the Berks Juvenile Facility and found it in substantial compliance with *Flores* (Visits conducted by Michelle Brane, Jessica Jones, Emily Butera). JFMRU has also complied with using a spectrum of facilities and not just the most restrictive facilities.

[18] *Locking Up Family Values, Again: A Report on the Inhumane Practice of Family Detention,* Lutheran Immigration and Refugee Service and the Women's Refugee Commission (October 2014) available at: lirs.org/familyvalues.

[19] *Id. at 7*

Exhibit 37 - Page 574

- Appropriate medical and dental care. *According to LIRS and the WRC's report, most children are either unable to access medical services or have a lack of adequate treatment.[20]*
- Individualized needs assessments (includes psycho-social and educational) (not sure, didn't find anything specific in report- if has to be done by child welfare prof. then they don't happen). Educational services (Monday through Friday). *Education is limited at all facilities, for example school only started at Artesia in October 2014 and no facilities have full-time, licensed education for children.[21]*
- Recreation and leisure time. *Children have inadequate opportunities for outdoor recreation time and are not allowed toys or playthings in their living quarters.[22]*
- One individual counseling session per week by trained social work staff and group counseling at least twice a week. *Children are not guaranteed counseling or mental health services. Most detention facilities have limited resources, for example only services through video tele-conferencing or only male service providers.[23]*
- Acculturation and adaptation services. *ICE does not provide such services.*
- Comprehensive orientation. *Children are not included in either the 'know your rights' presentations or Legal Orientation Programs, or are the programs adapted to children's particular needs.[24]*
- Access to religious services *Children do have access to religious services*
- Visitation and contact with family members *Children have inadequate visitation access and lack of contact with family members who may be looking for them.[25]*
- Right to privacy ( This includes the right to: a) wear own clothes, b) private space for storage of belongings, c) private conversations on phone, d) private visitation, e) receive and send uncensored mail). *While ICE is complying with the first two, the last three ICE routinely fails to provide privacy for private conversations for children, visitation and uncensored mail. Children do not even have privacy when meeting with their attorneys.[26]*
- Family reunification services *As ICE does not believe Flores applies, ICE seeks to keep children with their mothers in detention.[27]*
- Legal services. *Many children in family detention have an independent claim to asylum however lack resources to know their rights and lack access to legal representation.[28] Also, ICE has deported many families without proper hearings before an immigration judge, denying children due process.*

---

[20] *Id. at 8*
[21] *Id. at 9*
[22] *Id. at 6,7*
[23] *Id. at 13*
[24] *Id. at 15*
[25] *Id. at 6*
[26] Information from AILA, November 2014
[27] *Id. at 18.*
[28] *Id. at 15*

Exhibit 37 - Page 575

5.  Right to bond redetermination proceeding before an Immigration Judge (¶ 24A). *Currently, ICE is implementing a 'no bond' or 'high bond' policy for families, often enforcing a 'not bond eligible' policy without individual considerations.*[29]

6.  Right to judicial review in order to contest placement "in a particular facility" before a federal district court if a child believes they have been improperly placed or have been treated improperly. (¶ 24B) *As ICE does not believe Flores applies, ICE is not complying with this Flores requirement.*

7.  Right to notice of judicial review posted in facilities. (¶ 24B, Exhibit 6) *As ICE does not believe Flores applies, ICE is not complying with this Flores requirement.*

8.  Right to separation from unrelated adults. *The very nature of a family detention facility make this impracticable and impossible for ICE to keep children separated from unrelated adults.*

---

[29] *Id. at 18.*

Exhibit 37 - Page 576