CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org
        marchela@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
William A. Molinski (Cal. Bar No. 145186)
wmolinski@orrick.com
T. Wayne Harman (Cal. Bar No. 254089)
wharman@orrick.com
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020

*Attorneys for Plaintiffs*
(listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, et al., | Case No. CV 85-4544-RJK(Px) |
| Plaintiffs, | **Plaintiffs' First Set Of Exhibits In Support Of Motion For Class-Wide Enforcement Of Settlement [Part 12: Exhibits 38-53]** |
| v. | |
| Jeh Johnson, Secretary, U.S. Department of Homeland Security, et al., | Hearing: March 9, 2015 |
| Defendants. | Time: TBD |
| | Dept: TBD |

**PUBLIC VERSION**

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 12: EXHIBITS 38-53]
CV 85-4544-RJK(Px)

1

2      *Plaintiffs' counsel, continued:*

3      LA RAZA CENTRO LEGAL, INC.
       Michael S. Sorgen
4      Maria Victoria Castro
       Amanda Alvarado Ford
5      474 Valencia Street, #295
       San Francisco, CA 94103
6      Telephone:   (415) 575-3500
       Facsimile:    (415) 255-7593
7
       *Of counsel:*
8
       YOUTH LAW CENTER
9      Alice Bussiere
       Virginia Corrigan
10     200 Pine Street, Suite 300
       San Francisco, CA 94104
11     Telephone:   (415) 543-3379 x 3903

12     RANJANA NATARAJAN
       Clinical Professor
13     Director, Civil Rights Clinic
       University of Texas School of Law
14     727 E. Dean Keeton St.
       Austin TX 78705
15     Telephone:   (512) 232-7222

16

17

18

19

20

21

22

23

24

25

26

27

28                                          PLAINTIFFS' FIRST SET OF EXHIBITS IN
                                            SUPPORT OF MOTION FOR CLASS-WIDE
                                            ENFORCEMENT OF SETTLEMENT
                                            [PART 12: EXHIBITS 38-53]
                                            CV 85-4544-RJK(Px)

INDEX TO EXHIBITS

1   Settlement of class action, January 17, 1997 ..................................... 1

2   Order approving settlement of class action, January 28, 1997 ...................... 47

3   Stipulation extending settlement of class action, December 7, 2001 ................................................................................................. 53

4   Plaintiffs' letter requesting pre-enforcement meeting, October 15, 2014 ................................................................................................ 58

5   Plaintiffs' letter posing questions re: implementation of class action settlement, October 2, 2014 ............................................................ 64

6   Defendants' response to questions re: implementation of class action settlement, November 3, 2014 ........................................................ 85

7   ICE opposition to bond redetermination, July 24, 2014 ............................. 107

8   ICE opposition to bond redetermination, October 8, 2014 .......................... 158

9   U.S. Immigration & Customs Enforcement, news release, November 18, 4014 ............................................................................... 210

10  Declaration of Bridget Cambria, November 7, 2014 .................................. 211

11  Declaration of Carol Anne Donohoe, November 15, 2014 .......................... 219

12  Declaration of J███ H███████ M█████, September 20, 2014 .................. 227

13  Declaration of M███ C███████ d█ T████, September 19, 2014 ................................................................................................ 232

14  Declaration of M███ F██████ S███, September 19, 2014 ......................... 238

15  Declaration of M███ L████ M██████, September 19, 2014 ...................... 244

16  Affidavit of Adriana Piñon re: Texas Public Information Act Request, September 3, 2014 ....................................................................... 248

17  Declaration of Barbara Hines, January 14, 2014 ........................................ 253

18  Declaration of D███ V████ A██████, January 9, 2015 ............................ 301

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 12: EXHIBITS 38-53]
CV 85-4544-RJK(Px)

19   Declaration of H█████ R████████ M█████, January 9, 2015 ............................ 305

20   Declaration of R████ E████████ A██████, January 8, 2015 ....................... 309

21   Karnes Attorney Visitation Form and Guidelines, January 9, 2015 ................................................................................................. 312

22   Declaration of Jonathan Hiskey, September 22, 2014 ................................. 314

23   Declaration of Carlos Holguin, January 13, 2015 ...................................... 319

24   Declaration of Luis H. Zayas, December 10, 2014 ..................................... 323

25   Declaration of Generva Gilden Berger, January 12, 2015 ........................... 366

26   Dilley Resident Handbook ......................................................................... 383

27   Memorandum of Understanding Re: Compromise of Class Action: Conditions of Detention, November 30, 1987 ............................... 433

28   Declaration of Anne Chandler, December 1, 2014 ..................................... 470

29   Declaration of Allison N. Boyle, November 24, 2014 ................................ 475

30   Declaration of Brittany Perkins, November 28, 2014 ................................. 490

31   Declaration of Clayton N. Matheson, November 24, 2014 ......................... 497

32   Declaration of Kate Lincoln-Goldfinch, December 2, 2014 ....................... 504

33   Declaration of Melissa J. Cuadrado, November 26, 2014 ........................... 512

34   Declaration of Scott T. Williams, December 1, 2014 ................................. 522

35   Declaration of Virginia Marie Raymond, December 13, 2014 ................... 527

36   *R.I.L.R. v. Johnson*, No. 15-CV-00011-JEB (D.D.C.), Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction, December 16, 2014 .......................................... 530

37   Flores Settlement Agreement and DHS Custody: Key Flores Provisions & DHS Noncompliance - Report of Lutheran Immigration and Refugee Services ............................................................ 570

38    Declaration of S█████ C██ M█████, January 8, 2015 ................................... 577

39    Declaration of S█████ B████ d█ T███, January 8, 2015 ........................... 580

40    Declaration of M███ G████ S████, January 8, 2015 ................................. 583

41    Declaration of E████████ G████ M█████, January 9, 2015 ....................... 586

42    Declaration of A██ Z████ M██████, January 9, 2015 ................................. 590

43    Declaration OF A████ E██████████ d█ l█ C███ G████, January 9, 2015 ............................................................................. 594

44    Declaration of A████ F████ d█ E███████, January 9, 2015 ......................... 597

45    Declaration of H████ L█████ M█████ P████, January 9, 2015 ...................... 602

46    Declaration of M████ M██████ M████, January 8, 2015 ........................... 606

47    Declaration of C█████ M████ C█████████ C███, January 8, 2015 ............................................................................................................ 609

48    Declaration of S█████ L████ M█████ A█████, January 9, 2015 ............................................................................................................ 611

49    Declaration of L███ B████ S██████, January 8, 2015 .............................. 613

50    Declaration of S████ A█████ M██████ D██████, January 8, 2015 ............................................................................................................ 617

51    Declaration of O█████ F█████ C███████ M█████, January 9, 2015 .................. 621

52    Declaration of J███████ E█████ E███████ F████, January 9, 2015 ............................................................................................................ 624

53    Declaration of Lauren Beth Connell, November 26, 2014 ........................... 627

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 12: EXHIBITS 38-53]
CV 85-4544-RJK(Px)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian


  /s/ Carlos Holguín
Attorneys for Plaintiffs

PLAINTIFFS' FIRST SET OF EXHIBITS IN
SUPPORT OF MOTION FOR CLASS-WIDE
ENFORCEMENT OF SETTLEMENT
[PART 12: EXHIBITS 38-53]
CV 85-4544-RJK(Px)

# Exhibit 38

## Conditionally Filed Under Seal

## DECLARATION OF S███ C██ M████

I, S███C██M████, declare under penalty of perjury that the following is true and correct:

1. I am a native and citizen of Guatemala.

2. On or about December 19, 2014, my daughter Y███B███G███C██ and I crossed the border and entered the United States. We had spent many days walking and on bus. We had suffered from hunger on the journey, and we were very tired and scared.

3. I left Guatemala with my daughter because of fear for our lives and our well-being. My family, including my sister and my mother, had been targeted by gangs and had their lives threatened. My neighbor had also been threatened with death by the gangs. There is no way to get police protection in our part of Guatemala.

4. We were taken into custody by Border Patrol on the same day, and we were brought to a facility where we stayed one night. It was very crowded.  It was one room with about 28 people. There were no mattresses or blankets. There was so little room that we had to sleep sitting up on the hard floor. When we tried to sleep, they didn't let us. I got sick with a cold there because of temperature changes. I had a fever there. They gave us one sandwich for breakfast, lunch and dinner. The toilet was in the same room where everyone was. All of the other women and girls could see you when you used the bathroom.

5. They then transferred us to a different jail. At that second jail, we spent one night. At night, they separated me and my daughter, and we had to sleep very far away from each other, where I could not see her. I was very worried for her safety. It was also

Exhibit 38 - Page 577

very cold in the room at night. They gave us an aluminum blanket that was not enough to keep us warm.

6. We arrived here at the Detention Center in Dilley, Texas on or about December 20, 2014. We have been here since.

7. At this detention center, they showed us a video about legal rights but we did not really understand it. No one explained to us directly about how to apply for asylum, or how to apply for a bond to be released.

8. I feel very sad here at the Dilley facility because I cannot even call my brother-in-law or father who are here in the United States. The telephone in my cabin does not function properly. I have asked for help with using the telephone, but they told me that they could not help me. I am not able to contact any free lawyers, or my family members.

9. The people at this detention center asked me if we had family in the area. I told them that I did, and that I have my brother-in-law and father in the United States.

Executed this _8_ day of January 2015 in Dilley, Texas.

_____

Name: _____

Exhibit 38 - Page 578

## CERTIFICATE OF TRANSLATION

I, _Elena Garcia_____, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated for foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _8_ day of January, 2015, at _Dilley_, Texas.

Name: _Elena Garcia_

Exhibit 38 - Page 579

# Exhibit 39

Conditionally Filed Under Seal

**DECLARATION OF S███ B█████ D█ T█████**

I, S███ B███ D█ T███, declare under penalty of perjury that the following is true and correct:

1. I am a native and citizen of El Salvador.

2. I fled from El Salvador with my son, E█████ T███ B████, who is twelve years old, because I was afraid for our lives.

3. In the colony where I lived in El Salvador, there was a gang that had taken over and that was terrorizing the families who lived there. They asked people to pay money, and they threatened people with violence and death. They wanted to recruit my son E█████, and they threatened our lives if I did not let them recruit him.

4. My son and I entered the United States on or about December 27, 2014. We were so cold that I went up to a patrol car and knocked on the window for help. The Border Patrol took me into their custody and took me to a detention facility.

5. That first night, my son and I spent the night at a detention facility where there were many people. My son and I were separated and he was taken to a room with boys. In the room for women, I couldn't lie down or have space to even sit properly because there were so many people. There were no mattresses or blankets, just an aluminum blanket that did not keep me warm. My son was in another room, and I could not see him or sleep with him, and I was very worried about him. We were fed twice, and both times it was just bread with ham and a juice box. It was really cold there.

6. The next day, we were taken to a different detention facility. The second place was like a dog kennel, because there was fencing on all four sides and on top of us. Once again, I was separated from my son. I could not even talk to him once I was there, and he was

Exhibit 39 - Page 580

kept with all the boys. For meals, they gave us bread with ham, an apple, a cookie, and a drink.

7. After that, my son and I were brought to the detention center in Dilley, Texas, where we are now. This place is also like a jail because I am not able to communicate freely with my family, and the telephone card costs so much money.

8. My husband lives in Houston, and although he works, we do not have enough money to afford an attorney. I am looking for a free attorney to help me with my immigration case.

9. I asked one of the officials here how long do we have to stay here, and how do I get a free attorney. They only told me that I could get an attorney if I could find a free one or pay for one. No one at this detention facility told me that I might be able to pay a bond and be released. No one has explained about the process of applying for asylum. I was told yesterday that I will have an interview for my asylum case on Monday.

10. The officials at this facility asked me if I have family in the United States, and I told them that my husband lives in Houston.

Executed this ___ day of January 2015 in Dilley, Texas.



S███ B████ D█ T███

Exhibit 39 - Page 581

## CERTIFICATE OF TRANSLATION

I, _Elena Garcia_____, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated for foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _8_ day of January, 2015, at _Dilley_, Texas.

Name: _Elena Garcia_

Exhibit 39 - Page 582

# Exhibit 40

Conditionally Filed Under Seal

## DECLARATION OF M█████ G███████ S██████

I, M███ G██████ S████, declare under penalty of perjury that the following is true and correct:

1. I am a native and citizen of Guatemala, and I am fourteen years old. I am currently detained at South Texas Family Residential Center with my mother M████ X████ S████ and my sister M█████ G█████ S█████, who is nine years old.

2. My mother, sister and I entered into the United States on or about December 23, 2014. We were arrested by Border Patrol on the same night.

3. My mother, sister and I are native K'iche speakers. I can speak Spanish pretty well, and my mother speaks very little Spanish.

4. We spent one night in a government detention center. We had to sleep with our wet clothes on. They took away our sweaters. There were many people who were detained in the same room with us. There was not much room, so we had to sleep sitting up on the floor. We had no blankets. All we got for food was ham with bread, and the food did not have any flavor, so we could not eat it.

5. We spent a second night at another government detention center.

6. Then we were brought to the South Texas Family Residential Center in Dilley, Texas, where we have been since.

7. My father C████ G████ G████ lives in the United States, and he has been here for eight years. We also have four uncles who live in the United States, and they have been here for about ten years.

8. Since we came to this detention center, no government official has asked us if we have any family in the United States. And no government official has told us that we may be

Exhibit 40 - Page 583

able to be released from detention if we pay a bond.

Executed this ___ day of January, 2015 in Dilley, Texas.



Name: M█████ ██████ G██████ s█████

Exhibit 40 - Page 584

CERTIFICATE OF TRANSLATION

I, _elena gar[ia_____, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated for foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _8_ day of January, 2015, at _Dilley_, Texas.

_____

Name: _elena garcia_____

Exhibit 40 - Page 585

# Exhibit 41

Conditionally Filed Under Seal

DECLARATION OF E████████ G████ M██████

1. My name is E███████ G████ M██████. My date of birth is May 6, 1977. I am a native and citizen of Guatemala. My A# is ████████.

2. I certify that the information contained in this declaration is complete, true and correct.

3. I entered into the United States at McAllen Texas on or around 28 of July 2014 with my daughter L████ B████ G████ and my son J██ C██ B████ G███. L██ is 11 years old, and her A# is ████████. J██ C██ is 5 years old and I do not have his A# at the moment. I also have another son, G███ A████ B████ G███, age 17, who is in Guatemala.

4. I fled Guatemala because in in April and May 2014 gang members threatened me that if I did not pay them a large sum of money they would kidnap my children. Because I did not have the money to pay the gang, I had to flee my country to save my children's lives. I fear that if I am returned to Guatemala the gang members will kidnap my children. I also fear that if I am returned to my country my husband will continue his physical and mental abuse of me and I fear for my life.

5. When I arrived in McAllen Texas, the border patrol got my two children and me. They brought us to a large room with about 45 or 50 mothers and children in it. It was freezing, we called it the icebox. The border patrol took our jackets from us. There were no beds, we slept with a sheet on the floor. We didn't sleep at all; we were there 3 days. There was just one bathroom for all of us. My children were sad, they cried. They gave us food three times a day, but it was cold and the portions were too small. For drinks, we had to drink out of the water faucet; there was one right next to the one toilet.

6. After three nights at McAllen, the immigration officials transferred L████, J██ C████ and I to another place. It was fenced in, and the walls were made of metal fences, divided into a lot of smaller fenced in rooms. We stayed there five hours, and then we were driven here to Karnes City Detention Center.

7. We have lived in the Karnes Detention Center from August 1, 2014 until the now, January 9, 2015. We are not the only families who have been here this long, I know at least 25 other mothers and children who have been here at Karnes for as long as I have been here. Since I have been here so many months, I feel hopeless. I don't know when I will get out of here with my children. I frequently ask the officials here at Karnes when I will be able to leave this place, and they tell me that it will happen when the judge says I can leave.

Exhibit 41 - Page 586

8. My daughter L████ tells me that she feels like she is in jail because she cannot leave Karnes. The food is really bad she says. L████ says she feels strange here, because the guards watch her move from place to place everyday. The guards talk to her and they are strangers. They are adult men and women, completely unknown to her, and when they talk to her she feels scared by them.

9. I declare under penalty of perjury that the above statement is true and correct.

Executed at Karnes, Texas, on January 9, 2015.

████████████████

_____

Signature

Exhibit 41 - Page 587

Yo declaro bajo penaldad de perjurio que esta declaracion es verdad y correcto y fue escrito el dia ___de

___9___ de 2015 en _enero  2015_ , Karnes City, Texas.

Firma

_____9  enero  20.15_____

Fecha

Exhibit 41 - Page 588

## CERTIFICATE OF TRANSLATION

I, _____Amanda Alvarado Ford_____, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated for foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __9__ day of January, 2015, at __Karnes__, Texas.

_____

Name: _Amanda Alvarado Ford_
_01 - 09 - 2015_

Exhibit 41 - Page 589

# Exhibit 42

Conditionally Filed Under Seal

### DECLARATION OF A⬛ Z⬛ M⬛

I, A⬛Z⬛M⬛, hereby declare and say as follows:

1. I am a native and citizen of El Salvador.

2. I am currently detained with my son J⬛E⬛Z⬛ at the Karnes County detention center in Karnes City, Texas.

3. I left El Salvador with my son J⬛ because I was afraid for his life and for mine. There were gang members who were targeting my son for recruitment in the gangs, and they repeatedly tried to find him at school and threatened his life. The gangs were also targeting me because I had a very small store, and they wanted me to pay money to them or they would hurt me. The threats to my son increased to the point where we did not feel safe anywhere in the country, and so we had to leave.

4. On or about October 9, 2014 my son and I entered into the United States. We turned ourselves in to a police officer.

5. We were taken into Border Patrol custody, and we were taken to a place where we stayed the night. In that room, there was metallic fencing on all sides. We slept on mattresses, and we were given aluminum blankets. We were very cold in that room. There were mobile bathrooms that we had to use. The food was cold tacos with rice, beans and eggs and they had no flavor.

6. We were brought to the Karnes County detention center two days later. We have been here since October 11, almost three months.

7. At Karnes, we share a room with six other people – two other women and three children ranging from age ten to six. We have one bathroom (one toilet, and one shower and one sink) that we all have to share.

Exhibit 42 - Page 590

8.  We have four pairs of clothing (socks, pants, shirts, etc.) for each of us, which the
    detention facility gave us.

9.  On one occasion, I went to the clinic because of severe eye irritation and pain. I waited
    for more than an hour and was turned away without any examination. The person there
    just told me not to rub my eye. It continued to cause me pain for three days.

10. My son has lost about 12 lbs ~~18 lbs~~ at the Karnes facility because he does not like the food
    here. He used to weigh about 150 pounds, and now he weighs about 138 pounds.

11. On one occasion, I noticed that the milk in the refrigerators were expired. The staff
    members of GEO noticed that no one was taking the expired milk and they transferred it
    to the cafeteria.  I noticed that three days after the expiration, the milk was still being
    given in the cafeteria for breakfast.

12. My son has a Hotmail email account but he is not allowed to use it here at Karnes. It is
    blocked on the computer here.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of January, 2015, at Karnes City, Texas.

Exhibit 42 - Page 591

8. We have four pairs of clothing (socks, pants, shirts, etc.) for each of us, which the detention facility gave us.

9. On one occasion, I went to the clinic because of severe eye irritation and pain. I waited for more than an hour and was turned away without any examination. The person there just told me not to rub my eye. It continued to cause me pain for three days.

10. My son has lost about 18 lobs at the Karnes facility because he does not like the food here. He used to weigh about 150 pounds, and now he weighs about 138 pounds.

11. On one occasion, I noticed that the milk in the refrigerators were expired. The staff members of GEO noticed that no one was taking the expired milk and they transferred it to the cafeteria.  I noticed that three days after the expiration, the milk was still being given in the cafeteria for breakfast.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of January, 2015, at Karnes City, Texas.

Exhibit 42 - Page 592

CERTIFICATE OF TRANSLATION

I, _Elena Garca_____, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated the foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __9th__ day of January, 2015, at _Karnes_ Texas.

Name: _ELENA GARCIA_

Exhibit 42 - Page 593

# Exhibit 43

Conditionally Filed Under Seal

**DECLARATION OF A█████ E█████████ D█ L█ C██████ G███████**

I declare under penalty of perjury and say as follows:

1. I am a native and citizen of Guatemala. I am fourteen years old.

2. I am currently detained with my mother M█████ G█████ G███████, at the Karnes County detention center in Karnes City, Texas.

3. On or about December 18, 2014 my mother and I entered the United States. We fled from El Salvador because we were afraid for our lives.

4. My father lives in Florida, and he has lived there for many years.

5. My mother and I speak K'iche, which is an indigenous Guatemalan language. My mother understands a little Spanish, and she cannot read or write Spanish. I can understand Spanish well, and I can read and write a little Spanish.

6. When we were taken into custody, the Border Patrol officers took us to a very large room where the women and girls were held. We stayed there for two days and two nights. The room was very cold. We slept on the floor. Everyone could see you when you used the bathroom. There were many, many people in the room. They gave us a sandwich with ham, twice a day. We could not tell if it was day or night because there were no windows.

7. When the Border Patrol officer interviewed my mother, he asked her questions in Spanish. He did not speak K'iche. He did not allow me to sit with my mother and translate the questions into K'iche for her. She did the best that she could, but she had a hard time understanding everything.

8. The Border Patrol officer asked my mother to sign some documents. She told him that she did not understand them. He told her to sign anyway.

Exhibit 43 - Page 594

9. My mother had a terrible headache and pain and she asked the Border Patrol official for pain medication. He laughed at her and said that he would not give her any medication.

10. On or about December 31, 2014, my mother was scheduled for an asylum interview. We went for the interview, but the government official could not find a translator for the K'iche language and he said he would look for one.   He said that he would call us back in five days. He has not called us back for another appointment.

11. No one who works at the detention center has explained about the asylum process or about whether we can get released on bond to my mother in K'iche.


Executed this 9th day of January 2015 in Karnes City, Texas.



Exhibit 43 - Page 595

## CERTIFICATE OF TRANSLATION

I, _Elena Garcia_____, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated the foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed this _9Th_ day of January, 2015, at _Karnes_ Texas.

Name: _ELENA GARCIA_

Exhibit 43 - Page 596

# Exhibit 44

Conditionally Filed Under Seal

DECLARATION OF A███████F███████D█E████████████

    I declare under penalty of perjury and say as follows:

1. I am a native and citizen of El Salvador.

2. I am currently detained along with my son J████████E████████E████████F████, who is 15 years old, and my daughter A█████N█████E████████F███, who is 9 years old, at the detention center in Karnes City, Texas. We have been here for one month and five days.

3. I left El Salvador with my two children because I was very scared for our lives. The gangs in El Salvador were hunting for my son J████████, and they had already hurt him and were promising to torture or kill him. They kidnapped him for three days. During this time, the gang members even burned him on the arm with a hot metal and they beat him. We escaped from El Salvador to save his life.

4. My children and I entered the United States on or about December 3, 2014. We were taken into Border Patrol custody, and they took us to a facility with a very big room, where we stayed for three days and three nights.

5. The very big room was very cold. It was like a "hielera" (ice box). They took away our belongings, including my daughter's scarf that was keeping her warm. There were no blankets or mattresses, and they only gave us one aluminum blanket each to keep ourselves warm. It was not enough, and my daughter and I were both very cold. There were about one hundred and fifty people in the room. It was very crowded, and there was no space to even lie down on the floor. There were no chairs. My daughter and I either stood up or sat down together on the floor. It was very uncomfortable. My daughter and I had to sleep standing up.  They gave us bread and ham sandwiches to eat, two times a day.

Exhibit 44 - Page 597

6. There were babies crying because they wanted milk or wanted food. The treatment was extremely bad. One mom did not have clothes for her four or five month baby, and just a diaper. They did not provide anything for the babies, like milk or baby food or even clothes if needed.

7. The room was also very dirty. There was dirt all over the floor from the mud that people's shoes had gathered after crossing the river.

8. My son J███████ was separated from me and taken to another room with boys and men. I was extremely worried about his well-being in a room full of strange men. I did not get to talk to him for the three days and three nights that we were there. I asked someone if I could see him at least, and they let me see him for three to five minutes. I only saw him once in the three days there.  We could not talk to each other, though.

9. When we were in this facility, my daughter became sick from the food and began to vomit. She became feverish. They took me and my daughter to a small isolation room across from the big room. They isolated us because they said that she was infectious and they did not want other people to become sick.

10. When we were in that isolation room, my daughter vomited. They did not give me any towels or rags or cleaning liquid to clean up, so I had to use toilet paper to clean up the mess as best as I could. The woman who came to give us food would hold a gloved hand at the door and say, come and take the sandwich. She refused to come inside the door because my daughter was sick.

11. There was a bathroom in the isolation room, and everyone could see you inside because it had one side that was open and did not have any partition or door.

Exhibit 44 - Page 598

12. My daughter had a fever, so I asked if we could see a doctor. They took us to a doctor and the doctor gave her a small pill to reduce the fever.  He told me to keep her forehead moist, but they did not give me any towels to do so.

13. In the two days we were in the isolation room, they never cleaned it. The big room was cleaned once a day, but it still had a very dirty floor.

14. While we were at the hielera, an officer called me in and said that I had to sign an order agreeing to my deportation. I asked him why. He said that I had no right to be here, so I had to go back to your country. I told him that I could not go back because they will kill me and my son if I go back. I asked him if he had children. He said yes that he was a father. I told him that as a mother, I am committed -- even if I have to violate the law – to save my children's lives, and that I cannot go back to El Salvador because I know that if I go back they will kill my son. I asked him, if he would not do the same thing in my place to save his children's lives. He said yes.  He said I had to go where I was being sent, and to appeal my case there. He did not explain anything about asylum.

15. After three days and three nights, we were taken to another facility, and then we were brought to Karnes, where we are still detained.

16. On December 18, 2014, I had an interview with a government asylum officer. I answered her questions truthfully. She asked questions to J█████, who also answered her questions truthfully. However, she decided that we did not have a credible fear of persecution, and on Tuesday we went before an immigration to have that decision reviewed.

Exhibit 44 - Page 599

17. I have a brother and aunts and uncles who live in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of January 2015 in Karnes City, Texas.

Exhibit 44 - Page 600

## CERTIFICATE OF TRANSLATION

I, _Elena Garcia_____, declare and say as follows:

1.  I am fluent in English and Spanish.

2.  On this day, I fully and accurately translated the foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __9Th__ day of January, 2015, at _Karnes_ Texas.

Name: _ELENA GARCIA_

Exhibit 44 - Page 601

# Exhibit 45

## Conditionally Filed Under Seal

DECLARATION DE H██████ L█████ M████████ P█████

1.  My name is H████ L████ M████ P███. I am a native and citizen of Honduras.  My A # is ██████████████.

2.  I certify that this declaration is true and accurate, and is my recollection to the best of my abilities.

3.  I arrived in the U.S. on or around 21 of December 2014, with my 3 children.  They are O████ F████ C██████ M███, 15 years old; W██████ E█████ C██████ M████, 17 years old; and A████ M████ C██████ M███, 13 years old.

4.  I fear returning to Honduras because the gang Mara 18 verbally threatened my children and me that if I didn't pay them the money they were extorting from us, they would kill us.  I fear that the gang will kill us if we are forced to return to Honduras.

5.  The border patrol took us to the icebox in McAllen on or around December 21, 2014.  An official told me "You and your daughter go this way, and your two sons go over there."  I felt bad, being separated from my 2 sons.  I asked the official, "Can I see my son?"  I went over to the low wall to try to see my sons.  The official told me in a brusque manner, "Get away from the window!"  I told her, "I'm just trying to see my son."  She scolded me in a yelling voice, "Get away from there!"  All of us moms of boys 13 years and older were crowding around the window to try to catch a glimpse of our sons.

6.  In McAllen my daughter and I were there with 15 moms and little children.  It was super cold, and it was impossible to sleep.  We had to try to sleep sitting up.  We all stayed there 2 nights.  The lights were on all night.

7.  My children and I  were then transferred to "la Howla" or "Perrera".  This means "Dog Kennel" or the "Place where the Dogs Howl".  We stayed there just one night.  We called it the "Dog Kennel" because it was all wire fenced in with no real walls.  It was close to McAllen.  They separated me from my daughter and from my two sons.  I had never been separated from my daughter before, I put up with it, well, I had no choice.  Later my daughter A████ told me she was afraid to be apart from me.  When I went to visit the bathroom there, I could see through the metal fencing and I could catch a glimpse of my two sons, who were with the teen boys over in another part of the facility.  I could wave to them and say hi from a distance; they were far away.   But if the officials saw me waving they told me, "No no no you cannot!  Everyone go to your place!"  So I had to go back to where they were keeping me, just with the other moms.

8.  When I was in the "Perrera", I was with 8 moms, with their small babies.  We were given a small mattress and an aluminum blanket.  I was there 3 nights.  It was also super cold in that place, the lights were on all the time.  It was hard to sleep but I was so tired after 2 nights of no sleep that I did sleep.

Exhibit 45 - Page 602

9.      I didn't see any of my 3 children for the 2 nights I was at the "Perrera".

10.    Then, my 3 children and I were transferred to Karnes City Texas on or around the 23 of December 2014.  We were finally reunited as a family, we were happy to be together again.  My daughter told me she had cried without me, and when we were reunited there were tears again.

11.    Now at Karnes, I stay in a room with 4 bunk beds.  To begin with we shared a room with a mom with a little boy of 8 years and a little girl 4 years old.  They left soon after we arrived, about 2 days later.  Then another family arrived in our room.  A young lady of 21 years with a little girl of 6 years, were in our room for one night.  Then she and her girl were transferred to another room at Karnes.

12.    I feel as though I am constantly under watch here at Karnes.  If I am outside my room on the second floor and I start a conversation with another resident, the guards tell me that we cannot be there, we have to go elsewhere.

13.    The temperature in the rooms here at Karnes is cold, at night.  I cannot adjust the heat in my room.  I hope there is a way for me to fill out a form to get heat in my room.

14.    My daughter was ill when we arrived here from McAllen.  She had a throat infection on account of the cold temperatures in the "icebox" room we were kept in.  The medical staff at Karnes gave her pills that was supposed to be a five day course.  But they only gave her pills for two days.  Then the nurse told me that they had run out.  My daughter had to just get by sick and she is still sick even now, an infection in her throat.

15.    The water here at Karnes has a chlorine smell and taste.  It is really bad.

16.    I declare under penalty of perjury that the above declaration is true and correct and if called to testify I could do so competently.

Executed at Karnes, Texas on January 9, 2015

Signature                   H   L   M                          Name in Print

Exhibit 45 - Page 603

Yo declaro bajo penaldad de perjurio que esta declaracion es verdad y correcto y fue escrito el dia _7_ de _enero_ de 2015 en _____Karnes  Texas_.

H   L   M   P

**Firma**

01 - 09 - 2015

**Fecha**

Exhibit 45 - Page 604

## CERTIFICATE OF TRANSLATION

I, _____Amanda Alvarado Ford_____, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated for foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _09_ day of January, 2015, at _Karnes_, Texas.

Name: _Amanda Alvarado Ford_

Exhibit 45 - Page 605

# Exhibit 46

Conditionally Filed Under Seal

DECLARATION OF M█████ M██████████ M████L

I, M████ M█████ M████, hereby declare and say as follows:

1. I am a native and citizen of Honduras.

2. I entered the United States on December 23, 2014 with my daughter V████ N████ M█████, who is four years old. We are both currently detained at the family detention center in Dilley, Texas.

3. I left Honduras I am black and I was subject to discrimination on the bases of my race and color after my supervisor discriminated against me because of race. When I said I would complain, he threatened to kill me and to harm my family. Also, I left because there were problems my brother faced from the cartels, and I was afraid for my safety and that of my child.

4. I had my credible fear interview before an asylum officer earlier today, and I told him the details of why I left my country and was scared for my life. Last night I was very worried, and I was crying and feeling anxious and worried about my safety and that of my child.

5. When I was taken into custody by the Border Patrol, they took me to a detention facility that was a "hielera" (ice box). There were no mattresses or blankets, and my daughter and I were given only an aluminum blanket. The toilet there had no door and was visible to everyone. There were many women and girls there. You could not tell if it was day or night because there were no windows.  They only gave us meals two times a day.

6. On December 25, my daughter and I were taken to another detention facility that people called the "perrera" (or dog kennel). From there, my daughter and I were brought here to the Dilley detention center.

Exhibit 46 - Page 606

7. Yesterday I saw a volunteer attorney from RAICES who helped me by telling me about the asylum interview – what it is, why it is important, and why I should tell my story with details.

8. No one who works at this detention center has explained the asylum process to me. No one has told me that I might be able to get released after a payment of bond. They only show a video about the immigration process.

9. At this facility, they asked me if I have family in the United States, and I told them that I have a cousin in Brooklyn.

10. It is hard to communicate with family here. The telephone cards only gave three free minutes to me, and three free minutes to my daughter. I have to pay for any other telephone cards. Also, I cannot use Facebook on the computers here to talk with my family. The detention center says that Facebook is not allowed.

Executed this ___ day of January 2015.

Exhibit 46 - Page 607

CERTIFICATE OF TRANSLATION

I, ___Edwad De Avila___, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated for foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _8_ day of January, 2015, at _Pilley_, Texas.

Name: _Ed De Avila_

Exhibit 46 - Page 608

# Exhibit 47

## Conditionally Filed Under Seal

DECLARATION OF C█████ M█████ C███████████ C███████

1.      I, C█████ M█████ C███████████ C████, write this declaration and I swear under penalty of perjury that it is correct and true.

2.      I am a citizen of Honduras, my date of birth is the 5 of October 1989.  I am 25 years old.  I was born in the city of San Lorenzo.  I was raised in the city of Choluteca.  I have one daughter, H███ N███ B███████ C██████████, born the 18th day of July in the year 2007 in Honduras.  She is my only daughter, and I have always been a single mother.

3.      My daughter H████ and I entered in the United States close to Hidalgo Texas around the day 27th of December, 2014.  We had to flee from Honduras because the gang Salvatrucha de Choluteca came to look for me and came to hurt me and kill me.

4.      I am very afraid to return to Honduras because I fear for my life.  I had my business selling sweet soda churro cookies in the bus station in Choluteca.

5.      The Salvatrucha gang members told my neighbors in October 2014 "We are looking for the light one" which means me, everyone calls me that because I look like a white person, since I am pale in complexion.  Because I knew they were looking for me to find me and kill me and my daughter I left fleeing Honduras on 4 of October, 2014.

6.      The day 19 of November, I was reunited with my daughter Helen in San Pedro Sula.  We returned to the United States and we entered, as I mentioned above, the last days of December 2014.

7.      We entered into the United States in McAllen Texas.  I spent 2 nights in the room that we called "the freezer".  Even with our jackets it was very cold.  We didn't see any clock.

8.      In McAllen we slept in the floor without beds, with a mat.  They never turned off the light at night, and we could not sleep.

9.      In McAllen with the border patrol, I explained that I have family with whom I could go with to be reunited.  I have my uncle here in the United States, he is an American citizen.  But they said that "You are illegal  You can't go.  You have committed a crime  for illegal entry."

10.     In McAllen the officials told me "tell your daughter to shut up."  For no reason the officials were telling me this.  One female immigration official told me:  "Good luck with the immigration judge" mocking me.

11.     My daughter and I we stayed 2 nights in McAllen Texas, detained.

12.     I feel imprisoned here in the detention center in Dilley Texas.  There is a tall fence made of metal around where we are here in Dilley.

13.     Some times in the day the immigration officials in Dilley come, regularly they come some 4 or 5 times a day and at night to take stock of if we are here.  They even come several times when we are asleep to take stock of whether we are in our beds.  You cannot close the door with a lock, my door is open all day and all night so that the officials can come in whenever they want.  And the officials open the door at any moment

Exhibit 47 - Page 609

especially during the night when we are asleep, they come in several times when they want.

14.　　I share my little house here in Dilley with a woman 27 years old, she is Salvadoran, and her five year old daughter.  I didn't know her before coming here.  She is a stranger to me.

15.　　I do not want for my daughter to go the park much here in Dilley because there are women here who talk in an obscene way or use mature language, not appropriate for my daughter.  So I don't allow my daughter to be alone in the park or in any location in Dilley by herself, without me.

16.　　I am afraid to return to Honduras because if they return me and my daughter, we will be assassinated by the Salvatrucha gang.

Exhibit 47 - Page 610

# Exhibit 48

## Conditionally Filed Under Seal

## DECLARATION OF S█████ L█████ M███████ A██████

1.  My name is S███ L███ M█████ A███ I am a native and citizen of Honduras.  My A # is █████████.

2.  I swear that this declaration is true and accurate, and is my honest recollection to the best of my abilities.

3.  I entered the United States into Texas on or around December 28, 2014. I came here with my 12 year old daughter, Y█████ A████ M████ M██████.

4.  I am afraid to return to Honduras because my husband beat me and threatened to kill me.  I fear that if I return there, he will kill me.  I also fear that he will beat my two children, Y█████, and my 8 year old son, R█████.

5.  When we arrived in the U.S., Y█████ and I were brought to a very cold room by the U.S Border Patrol.  There were about 25 moms and children in the room.  We called it the "icebox", the temperature was very cold.  It wasn't possible to sleep in the cold room, because there were no beds.  My daughter and I tried to sleep on the floor, but we could not.

6.  The lights in the cold room were on at all hours.  That also made it difficult to sleep.

7.  After two nights, the immigration officials moved my daughter and I to another place.  We went in a van to the new place.  When we got there they registered us then they told us, "The moms go over here, and the kids go over there."  It was strange to be separated from my daughter.

8.  The room at this new place was covered on top, and there were metal fences dividing up the space, which you could see through.  We had small mattresses to sleep on.  I tried looking through the metal fence to see my daughter in another part of the room.  I could see her a little through the fence, she was far away but I could see her and she could see me, we made little hand signals at each other.  We stayed there one night.

9.  The next day, the officials let me see my daughter and she was able to stay with me and I was content.  My daughter told me "Mami I felt so weird to be apart from you, I thought they would keep us apart forever."

10. Then, the officials brought us here to Karnes Texas.  My daughter and I stay in a room with 6 other people.  There are 2 other families in our room.

11. I declare under penalty of perjury that this declaration is true and correct, and I could testify thereto competently.  It was written this 9th day of January 2015.

_____
Signature

_____
Name (printed)

Exhibit 48 - Page 611

# CERTIFICATE OF TRANSLATION

I, _Amanda Alvarado Ford_ _____, am competent to translate from
   (name of translator)

_a verbal Spanish statement_ _____ into English and certify that the translation of
   (language)

Declaration of
_Sandra Leticia Martinez Altunez_ is true and accurate to the best of my abilities.
   (name of documents)

_[signature]_____          _Amanda Alvarado Ford_____
(signature of translator)                (typed/printed name of translator)

_La Raza Centro Legal_____
(address of translator)

_474 Valencia St. #295   SF CA 94103_____
(address of translator)

_(415) 575-3500_____
(telephone number of translator)

Exhibit 48 - Page 612

# Exhibit 49

Conditionally Filed Under Seal

DECLARATION OF L███ B█████ S█████

1.   My name is L███ B█████ S█████.  I am a citizen and native of Guatemala.  My "A" number is ███████████.

2.   I make this declaration under penalty of perjury.  I swear that everything I mention here in this declaration is true and correct.

3.   I have one daughter, R███ C█████ B███, and she is 10 years old.  R███ and I entered in McAllen, Texas, around the day 24 of December 2014.

4.   I am afraid to return to my country because in December 2014, a group was asking me for money each week.  They said that if I did not pay this money, my family would be in danger.  So I am afraid to return to Guatemala because I fear for my life and for the life of my daughter.

5.   The United States migration officials caught us at night.  They put us in a jail, they say it is called the "freezer". It was super cold in that room.  The room was full, about 40 people in total.  There were mothers and children.  They didn't give us any mattress.  They didn't give us any jacket, and we arrived wet, were very cold, and it was December.  We had to sit on the floor, without a bed, and my daughter and I could not sleep.

6.   In the jail in McAllen the room where we were had 2 bathrooms, without doors, with a half wall.  The moms slept there in the bathroom, with their babies in their arms.

7.   R███ and I stayed there in the jail in McAllen 3 nights.  The immigration officials, when the people asked for something to drink or to eat they answered that it wasn't their country, it wasn't their house.  So they didn't bring them anything.

8.   The officials in McAllen never turned off the lights in the room in which we slept.  The lights were always turned on.  It was impossible to sleep there.

9.   Moreover, there were no windows in McAllen and we couldn't distinguish if it was day or night.

10.  After 3 days in McAllen, still in December 2014, they transferred my daughter and I to another detention center.  It had many buildings with wire mesh.  The officials said that R███ was going to bathe and I would go to another side.  I thought, they are going to take away my daughter.  I asked an official "Where is my daughter, she went with the other girls.  Why don't you bring her to me, because I don't want to be apart from her."  They told me that she was fine, with the other girls, and that she was fine.

11.  That night, I stayed in the room with many mothers, I slept in that room with the women.  I spent the night crying, because I didn't know what to think.  A woman told me, "Don't cry, just ask the Lord."  That's how I stayed, praying.

12.  When they got us up, each person was called by name.  They brought us the children.  I was reunited with my daughter.  I felt happy.  That same

Exhibit 49 - Page 613

day, they transferred R█████ and I to the detention center in Dilley, Texas. We have been here for about 2 weeks.

13.     Here in Dilley, we cannot visit other residents in other cabins.  The officials tell us we must not enter other cabins that belong to others, that we could have problems.

14.     The officials in Dilley are taking an accounting of us, more than 4 times a day.  It looks like they are guarding us.  There are cameras there, outside.

15.     If I were called as a witness, I could testify competently to everything that I have written in this declaration.

Exhibit 49 - Page 614

Yo declaro bajo penaldad de perjurio que esta declaracion es verdad y correcto y fue escrito el dia _8_ de _enero_ de 2015 en ___Dilley   Texas___.

Firma

01-08-2015

Fecha

Exhibit 49 - Page 615

# CERTIFICATE OF TRANSLATION

I, _Amanda Alvarado Ford_, am competent to translate from
  (name of translator)

_a verbal Spanish statement_ into English and certify that the translation of
  (language)

_Declaración de_
_Lucia Bernal Santiago_ is true and accurate to the best of my abilities.
  (name of documents)

(signature of translator)                    _Amanda Alvarado Ford_
                                             (typed/printed name of translator)

_474 Valencia St #295 SF CA_
(address of translator)

_La Raza Centro Legal_
_474 Valencia St. #25  SF CA_
(address of translator)

_(415) 575-3500_
(telephone number of translator)

Exhibit 49 - Page 616

# Exhibit 50

Conditionally Filed Under Seal

DECLARATION OF S███ A██████ M████████D█B█████

1. My name is S███ A██████ M████████D█B█████. I make this written declaration under penalty of perjury, and I swear that everything I have written here is true and correct.

2. My A number is #██████████. I am a native of Guatemala. My birthdate is 9 of March of 1979.

3. I arrived in the United States with my daughter who is 13 years of age, D███ A██████ M██████, around the 17th of December, 2014. D███'s "A" number is ██████████.

4. I am afraid to return to Guatemala because I received threats in and around the year 2014 from a group or persons or a gang in Guatemala. This group or gang has threatened me that they are going to kill me, and that they are going to violate my daughter. I am afraid that if we return, my daughter D███ and I to Guatemala, this group or gang will harm us or they will kill me.

5. My daughter and I entered in McAllen, Texas. We entered one afternoon in December 2014 with the immigration or border patrol.

6. In the immigration office in McAllen Texas, we, my daughter and I, came into a super cold room, the temperature was like a freezer. There were like some 20 people with us in the room. It was a room of moms and children. There were people who were strangers to me, they came from various countries and places. The room had 2 bathrooms, but just with a half wall. There was no privacy.

7. There were no beds in McAllen. We couldn't sleep because we had to sleep sitting up. I felt tired, and my daughter too.

8. The day after we arrived in McAllen, Texas, the immigration officials called us name by name. I went with my daughter into the car of the United States immigration. My daughter and I went into the car together, and we traveled to another detention center, it took us like 15 minutes to arrive.

9. When we arrived there, to the new detention center, the officials told me that I had to go with one official, and my daughter had to go with another official. I asked the official, "Why are you going to separate us?" He told me "That's how it has to be, the children on one side and the mothers on the other side." Well, since I was in another country, I feared saying anything to the contrary, better to wait. I noticed that they were separating the children from 12 years and up apart from their mothers.

10. I spent one night separated from my daughter. I felt sad and I felt hopeless, I did not want to move away from her because she is still a child. The love for the children is large. D███, my daughter, told me later that she felt alone too. I cried, they didn't tell us when or whether we would be reunited, the mothers with the children. D███ told me she slept in a room with 7 girls, and there was another room with 8 more girls. The girls were 11 and 12 years old. I was separated from D███ for like 12 hours.

11. The next day, the immigration officials told us that there we could get our mats. They called us by name. Then over there we were reunited with our daughters. I felt content, to be reunited with my daughter.

12. The officials didn't tell us where nor whom we were going to see at that moment. It was a surprise to me to be reunited with my daughter. D███ told me that she thought we were not going to be reunited, ever.

13. D███ told me that there was a guard, immigration official, outside the room where she and the other girls had slept. He stayed there outside their room all night.

Exhibit 50 - Page 617

14. At that detention center, the bedroom was always cold, and we received an aluminum paper and the mat, nothing more.  We were eight moms in the room, we threw the mat on the floor, and it wasn't very comfortable.  I didn't know anyone in my room as we were from different places.

15. Here in Dilley Texas, I don't have permission to bring visitors here.  They haven't given us that permission.

16. I don't permit that D███ walk alone in the Dilley center, as she is a minor.  I am always with her.

17. In Dilley I share my little house with a mom from El Salvador and her 13 year old daughter.  We didn't know them.

18. If I were called as a witness I could testify competently to these events mentioned here.

Exhibit 50 - Page 618

Yo declaro bajo penaldad de perjurio que esta declaracion es verdad y correcto y fue escrito el dia _8_ de _enero_ de 2015 en ____Dilley, Texas___.

(firma de ) ████ ▲ █████ M █████ D █ B █████ )

Firma

08 enero 2015

Fecha

Exhibit 50 - Page 619

# CERTIFICATE OF TRANSLATION

I, _Amanda Alvarado Ford_____, am competent to translate from
    (name of translator)

_____Spanish_____into English and certify that the translation of
    (language)

Declaracion
Silvia Araceli Miranda de Bravo____ is true and accurate to the best of my abilities.
    (name of documents)

_____          _____Amanda Alvarado Ford_____
(signature of translator)                      (typed/printed name of translator)

_La Raza  Centro Legal_____
(address of translator)

_474 Valencia St. # 295   SF CA_____
(address of translator)

_(415) 575-3500_____
(telephone number of translator)

Exhibit 50 - Page 620

# Exhibit 51

## Conditionally Filed Under Seal

DECLARACION DE O███ F███ C███ M███

1.  My name is Os██ Fa██ Cu██ M███. My A# is ▊▊▊▊▊▊▊.

2.  I certify that the information contained in this declaration is complete, true and correct.

3.  I am a citizen and native of Honduras. I arrived in Texas on or around December 21, 2014 with my mother H██ M██ P██ and my older brother and younger sister. My birthday is 16 february, 1999.

4.  I arrived here with my family because my mother and my siblings and I were threatened by a gang in Honduras. The gang threatened to kill us. I fear that if we return to Honduras we will be killed.

5.  When we arrived in McAllen Texas with the immigration officials I was separated from my mom. I was sent to a room where there were about 37 young men aged 17 to 14 years in a room. The room was small, with one toilet and one sink. Three of the teens in my room were tattooed. In Honduras and El Salvador those men who wear tattoos are gang members.

6.  The room in McAllen was cold, and there was not enough space, we had to try to sleep sitting up. The light was on all day, it was hard to sleep. There was no space to sleep, if you stretched out your legs you hit someone. I didn't speak with anyone else than my brother, I didn't know anyone else. I was there 2 nights. It was hard to be away from my mom.

7.  After McAllen we were taken to the "Perrera" or "Dog Kennel" place. It had metal fences for walls. I was separated from my mom again. I was with my brother and other teen boys, about 22 in the room. I stayed there 1 or 2 nights.

8.  I came next to Karnes, Texas detention facility. Here at Karnes the temperature is quite cold in the room at night. Also, the water tastes and smells of a lot of chlorine.

9.  I declare under penalty of perjury that the above statement is true and correct, and if called to testify on this declaration I could do so competently.

Executed at Karnes, Texas on January 9, 2015.

Signature

Exhibit 51 - Page 621

Yo declaro bajo penaldad de perjurio que esta declaracion es verdad y correcto y fue escrito el dia 9 de emero de 2015 en Karnes TX .



**Firma**

01 - 09 - 2015

**Fecha**

Exhibit 51 - Page 622

CERTIFICATE OF TRANSLATION

I, _Amanda Alvarado Ford_, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated for foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _09_ day of January, 2015, at _Karnes_, Texas.

Name: _Amanda Alvarado Ford_

Exhibit 51 - Page 623

# Exhibit 52

Conditionally Filed Under Seal

DECLARATION OF J███████ E███████ E███████ F███

I declare under penalty of perjury and say as follows:

1. I am a native and citizen of El Salvador.

2. I am currently detained along with my mother A██ F██ d█ E███████, and my sister A████ N████ E████-F███, who is 9 years old, at the detention center in Karnes City, Texas.

3. We have been at the detention center for approximately one month and five days.

4. My mother, sister and I entered the United States approximately one month and eight days ago. We were taken into the custody of the Border Patrol.

5. The Border Patrol took us to a facility with a very large room. I was separated from my mother and sister, and they were taken to a room with women and girls, and I was taken to a room with men and boys. I did not know anyone in the room, and I was very scared to be separated from my family. I stayed in this facility for three days and three nights.

6. In the room where I stayed, there were men about 70 men and boys, all of whom were strangers. The bathroom was open to everyone to see. There were guys from the cartels in the room, who threatened me that if I fell asleep, they would beat me up and try to take my stuff, like my jacket. I was afraid to sleep because I was afraid that they would try to hurt me. I did not sleep for the three nights that we were there.

7. The room where I stayed was very cold (like a "hielera," or ice box). It was also very dirty because there was dirt and mud on the floors from people's shoes. The government officials treated us very badly. For example, instead of giving us food, they would throw the food on the floor near us. They food they served was bread with ham, and it tasted very bad.

Exhibit 52 - Page 624

8.  I became sick while I was there because I was very nervous and afraid. I was so cold that I was shivering and I developed a fever. I didn't sleep and I couldn't eat.

9.  I asked a woman if I could go to the infirmary because I was feeling so sick. She said no because they did not have an obligation to send us to a doctor. She said if I want to see a doctor, I should go back to my own country.

10. I was separated from my mother and sister and could not talk to them, and that caused me a lot of worry. I only saw her once for a few minutes, and even then we could not talk to each other because we were not close together.

11. There was no trash can in the room. The water tasted terrible, like bleach, and it was very hard to drink.

12. The entire ordeal at the hielera was very difficult and painful.

13. After three days and nights, my mother, sister, and I were taken to another facility, and then we were brought to this detention center at Karnes.

14. Here at Karnes, I have had stomach problems. I suffer from gastritis, which makes me have stomach pain if I eat certain foods that are heavily seasoned. Back in El Salvador, I was seeing a doctor and taking medication for the pain. At Karnes, I went to the clinic and saw a doctor and told him that I get stomach pain, but he said the pain is normal, and he did not prescribe any medication. Whenever I eat food with seasoning, I have stomach pains that last for many hours and sometimes for 24 hours.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of January 2015 at Karnes City, Texas.



Exhibit 52 - Page 625

## CERTIFICATE OF TRANSLATION

I, _Elena Garcia_ , declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I fully and accurately translated the foregoing to the declarant, who affirmed that s/he understood the contents thereof and affirmed the same as being true and correct prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _9th_ day of January, 2015, at _Karnes_ Texas.

Name: _ELENA GARCIA_

Exhibit 52 - Page 626

# Exhibit 53

## Publicly Filed

## DECLARATION OF LAUREN BETH CONNELL

I, Lauren Beth Connell, declare and say as follows:

1.  I am a 2014 law graduate of the University of Pennsylvania.  I passed the bar exam for New York State administered in July 2014 and am currently awaiting the completion of a character and fitness evaluation before being sworn into the bar.  I am currently employed as a Law Clerk at Akin Gump Strauss Hauer & Feld, LLP, located at 300 Convent St., Suite 1600, San Antonio, TX 78205.  I have been employed here since September 22, 2014 with my full-time responsibilities being pro bono representation and volunteer coordination to benefit the women and children detained in Karnes City, Texas.

2. Over the past several months, I have represented, along with licensed co-counsel at Akin Gump, approximately 10 clients and their minor children, who are detained by U.S. Immigration and Customs Enforcement at the Karnes County Detention Center in Karnes City, Texas. My clients were from Honduras, El Salvador, or Guatemala.  Depending on the case, I represented the women and children in one or more of the following proceedings: bond proceedings, credible fear interviews, IJ review hearings, and preparation for asylum merits hearings.

3. I have several years of experience in the field of immigration law.  Prior to law school, I worked for nearly two years as a paralegal at a boutique immigration law firm in Philadelphia, Pennsylvania, helping foreign nationals adjust their immigration status to legal permanent resident through employment or family sponsorship.  In this position, I also helped legal permanent residents become citizens.  Throughout my three years of law school, I helped domestic violence survivors file VAWA petitions to gain legal permanent resident status, prepared U-Visa applications for immigrant victims of crime, and participated in advocacy

Exhibit 53 - Page 627

efforts in Philadelphia to stop the policy of police compliance with ICE holds.  I was able to do this work through summer internships at Her Justice and Akin Gump Strauss Hauer & Feld in New York, NY and participation in the Penn Law Immigrant Rights Project and the Penn Law Translational Legal Clinic in Philadelphia, Pennsylvania.

4. Based on the above experience, I am familiar with the policies and practices of U.S. Immigration and Customs Enforcement ("ICE") with regard to the detention of mothers and children at the Karnes detention center.

5. The circumstances of one of my client's cases are set forth below. The information provided herein is based upon my familiarity with my client's case and circumstances, and her and her child's immigration and detention case files.

6. As explained more fully below, in my client R.G.'s case, to my knowledge: 1) the U.S. Department of Homeland Security ("DHS") placed my client's child in expedited removal along with his mother; 2)  DHS's determination to keep my client and her child detained at Karnes after she passed her CFI was not based on any individualized assessment of  my client and her child's flight risk or danger, but rather was based on an attempt to deter illegal migration by others; 3) in making its custody determination, DHS did not ask my client if she had any family members or other legal guardians in the United States to whom the child should or could be released; 4) DHS did not provide my client's child with any *Flores* settlement-related written notices informing them of the decision to keep them in custody; and 5) the U.S. Department of Health and Human Services did not make any contact with my client or her child.

**My Client R.G.'s Case**

7. My client, R.G., came to the United States after fleeing from her native country of El Salvador along with her child, A.G., age 6, because they were afraid of persecution by the

- 2 -

Exhibit 53 - Page 628

FMLN party.  FMLN members had repeatedly threatened to kill R.G. and her son after she refused to join the FMLN party.

8. My client and her child were apprehended by immigration authorities on or about September 23, 2014.  They were placed in expedited removal pursuant to Section 235(b) of the Immigration and Nationality Act. They were taken to a U.S. Customs and Border Protection ("CBP") short-term detention site ("la hielera" or "ice box), where they were detained for one day before arriving in Karnes.

9. My client has told me that at this CBP detention facility, she and her child experienced very harsh detention conditions. These conditions include the following: extremely cold temperatures and having her prescribed medication taken from her.

10. My client R.G. and her son were transported to the Karnes County Detention Center on or about September 24, 2014 where they were detained until November 7, 2014.

11. On or about October 2, 2014, my client retained me to represent her in her CFI and bond proceedings.

12. My client was provided a Credible Fear Interview (CFI) on or about October 3, 2014. The CFI occurred on-site at Karnes with an asylum officer from the Houston field office.  I represented R.G. during this interview and was present at Karnes for the interview.  The CFI occurred in Spanish with an interpreter.

13. On or about October 10, 2014, my client was served with documents informing her that she had passed her CFI and was being referred to removal proceedings under Section 240 of the Immigration and Nationality Act. Along with a Notice to Appear in removal proceedings, she was given a Notice of Custody Determination by DHS, which stated that DHS would continue to

- 3 -

Exhibit 53 - Page 629

detain her and her son. DHS did not provide my client and her son any information about the basis of the decision to continue their detention.

14. Upon information and belief, DHS did not take into account the lack of flight risk or danger presented by my client or her child, nor any other relevant factors, in making its decision to continue detaining them at Karnes.

15. Upon information and belief, at the time of the custody determination and thereafter, DHS did not ask my client R.G. about any family members or other legal guardians in the United States to whom her child should or could be released, and DHS did not take any other steps to pursue the child's release. In addition, DHS did not provide my client any documents regarding possible release of my client's child.

16. Upon information and belief, DHS's decision to detain my client R.G. and her child in lieu of releasing them on bond, recognizance, or parole was made pursuant to a blanket no-release policy DHS applies to female-headed family units apprehended during the so-called "surge" of Central American entrants to the United States that reportedly began in the summer of 2014.

17. On November 6, 2014, based on my client's request for a redetermination of bond, she and I, along with co-counsel Dennis Windscheffel, appeared before Immigration Judge Glenn McPhaul in San Antonio, seeking release on bond for my client and her son. In advance of the bond hearing, I submitted evidence in support of her request for bond, including a detailed brief outlining her claim and the legal arguments in favor of release, evidence of her medical condition that was not being treated properly at Karnes, several country conditions documents showing the violent tendencies of the FMLN in El Salvador, and declarations from experts refuting DHS' "mass migration" theory.

- 4 -

Exhibit 53 - Page 630

18. During the bond hearing, I argued that my client and her son do not pose any flight risk or danger. I presented evidence that my client (1) has a U.S. citizen uncle living in California who would support her and offer her a place to live; (2) has a strong asylum case based on her political opinion and fear of the FMLN, especially considering favorable case law in the Ninth Circuit where she would bond out, giving her a strong incentive to appear in court; (3) has a medical condition that was not being properly treated at the Karnes facility; and (4) is not a threat to the national security based on the fact that she has no criminal record, did not try to flee from Border Patrol officers, and has followed all instructions and regulations at Karnes. Counsel for DHS argued, via affidavits submitted to the Immigration Court, that my client posed a flight risk because of the mass migration theory and did not provide any individualized assessment of my client's case. DHS did not argue that the son posed a flight risk. DHS also submitted affidavits arguing that my client and her child, along with other female-headed Central American family units entering during the 2014 "surge," should be detained in order to deter "illegal migration" by other Central Americans, and that they posed a risk to national security. Over DHS's objection, the Immigration Judge decided to release my client and her child on their own recognizance.  DHS did not appeal the decision to the Board of Immigration Appeals [BIA].

19. My client and her son were released on their own recognizance from the Karnes County Residential Center on November 7, 2014.

20. I plan to file an asylum application on behalf of my client and her son. The basis for their asylum claim is that my client was persecuted based on her political opinion of being anti-FMLN.  My client was threatened several times by FMLN members after she attended one party meeting but refused to subsequently join the party or participate in party activities.  Specifically, she objected to the violent advocacy methods used by the FMLN. The asylum application has not

- 5 -

Exhibit 53 - Page 631

yet been submitted to the Immigration Judge because she was released before we were able to submit the application.

21.   The detention of my client and her son at the Karnes County Detention Center was harsh and severe. The Karnes detention center is a secure facility operated by The GEO Group, Inc. My client and her son could not leave the detention center's premises except for when an exception was made for my client to go to an emergency gynecologist's appointment. GEO staff controlled the movements of my client and her son by, among other things, setting the meal times during which they could eat, setting the facility count times during which they were required to stay in their rooms, and setting the night time lights-out time, at which time they were required to stay in their rooms at night without lights on, and go to sleep. For her son, who was over 4 and provided education, GEO staff members had full control over him during the hours that he receives educational services.

22.   DHS requires Karnes detainees to attend their immigration court hearings, whether for bond or for removal proceedings, by videoconference. Every time my client had to attend a court hearing by videoconference, she had to leave her son under the control of GEO staff, who, to the best of my knowledge and belief, are not licensed child care providers.

23.   My client and her son have complained of numerous detention conditions at the Karnes detention center. These conditions include, most glaringly, my client's denial of necessary medical treatment while she was living at the Karnes facility.  In 2009, my client R.G. was diagnosed with cervical cancer.  As a result, she had a full hysterectomy, which fortunately removed all of the cancer.  Then, in 2014, she discovered lumps in her breasts and was experiencing severe pain as a result.  Therefore, in June 2014, she returned to her doctor and had a biopsy done on the largest lump.  The results showed that the lump was benign, but her doctor

- 6 -

Exhibit 53 - Page 632

prescribed her medication to take every day for a two year period in order to help her with the pain and prevent any recurrence of cancer.  My client R.G.  faithfully took her medicine, which eradicated her pain and put her at ease.

24. When my client R.G.  came to the United States, she was forced to surrender her medicine to officials.  As soon as she arrived at Karnes, she reported her medical history to the medical staff and asked if she could take that day's dose of the medication.  She was told by the doctor that she could not have her medication until the doctor consulted with another doctor on staff.  When R.G.  did not hear anything further, she returned to the medical staff and again asked if she could take her medication.  At this second appointment, a different doctor on staff told her to give her the phone number of her Salvadoran doctor and that they would follow-up with him about her being able to take her medicine.  Again, my client left without receiving the care that she needed and again no one followed up with her.  As the delays set in, my client R.G. began to experience pain in her breasts on a daily basis.  She returned to the infirmary a third time, complaining of the pain, and after the doctor inspected her scars from her surgeries, she informed my client that she could not have her medicine because the Karnes staff had not prescribed it.  Still suffering, my client returned a fourth time complaining of pain and was promised that she could see a specialist. This promise was never fulfilled.

25. With my assistance, R.G. contacted her Salvadoran doctor by phone, and he confirmed that no one from Karnes had tried to contact him.  He was very concerned that my client was not permitted to take her medication and promised to send along her medical records and a letter explaining the importance of taking the medication.  My client received these documents from her doctor on November 3, 2014.  I helped her get the documents translated, so that she could bring them to the infirmary that day and hopefully secure the treatment she

- 7 -

Exhibit 53 - Page 633

needed.  She was not able to see a doctor on November 3 due to long lines, so she returned on November 4 with all of the documentation.  She again explained her situation to medical staff, but they told her that, despite proof from her Salvadoran doctor, they still could not give her the medication and that she would need to wait until they arranged for her to see a gynecologist.

26. Later that day, on November 4, my client was thankfully was taken to a U.S. gynecologist in Floresville, Texas.  The gynecologist told her that he was writing a new prescription for the same medicine that she was prescribed by her Salvadoran doctor and told her that he was giving it to the medial staff at Karnes.  Upon return to Karnes, my client was not given her medicine from El Salvador nor was she given medicine from the filled prescription.  It turns out that the Karnes medical staff, despite having a prescription from a U.S. gynecologist, never filled the prescription.

27. When I picked R.G. up from Karnes after her release on November 7, 2014, she came out holding the prescription slip, which had never been filled, even though it had been written three days before.  Moreover, R.G. told me that she had to ask several people in order to get her Salvadoran medicine out of the infirmary.  As soon as we stepped out of the facility, she finally took a dose of her medicine for the first time in over a month.

28. I have been in touch with R.G. via email since she has left the facility and she says that she feels much better and her pain has diminished since being able to take the medicine.  I was very disturbed by how the Karnes medical staff ignored my client's needs and did nothing to help a woman who was in pain for over a month due to their negligence.  My client's suffering could have been prevented simply by giving her the medicine that she had brought from El Salvador.

- 8 -

Exhibit 53 - Page 634

29. Being detained at Karnes made it more difficult for my client to obtain counsel, and to assist me in preparing her asylum case and bond case. At the Karnes detention center, detainees cannot make free outgoing phone calls to their attorneys. Attorneys cannot call in to their clients, but must leave messages with GEO staff and wait for a return phone call. The lack of free telephone access is an obstacle to effective representation. Especially troubling for me was that my client could not leave me voicemails if I missed the call.  Therefore, all I saw on my caller ID was the general Karnes number, but I had no idea who was trying to call me.  Since I have several clients and also do intakes for countless women at Karnes, this made it very difficult to address my client R.G.'s unique needs.

30. My office is approximately 60 miles away from the Karnes detention center, so it takes me 1 hour to travel to the detention center to see my clients and interview them for their asylum and bond cases. I have also found that procedures for gaining access to the facility are highly inconsistent.  Sometimes, I need to wait as long as an hour to enter, which is very frustrating given the limited time I have to visit my clients.  I also always fax a list of the clients I plan to visit ahead of time and sometimes GEO staff members claim they never receive the list.

31. Based on my experience in representing my clients and their children, and my conversations with my clients and their children who have faced similar circumstances as R.G. and her son, I believe that my clients and their children are suffering emotional and other harms as a result of being detained at Karnes.


[signature page follows]


- 9 -


Exhibit 53 - Page 635

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of November, 2014, at San Antonio, TX.


_____

Lauren B. Connell
Printed Name

- 10 -

Exhibit 53 - Page 636