

JOYCE R. BRANDA
Acting Assistant Attorney General
Civil Division
LEON FRESCO
Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel, District Court Section
Office of Immigration Litigation
     P.O. Box 868, Ben Franklin Station
     Washington, D.C. 20044
     Tel:  (202) 532-4824
     Fax:  (202) 305-7000
     Email:  sarah.b.fabian@usdoj.gov
Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | )   Case No. CV 85-4544-DMG |
| | ) |
|     Plaintiffs, | )   **DEFENDANT'S PROTECTIVE** |
| | )   **NOTICE OF MOTION TO MODIFY** |
|     v. | )   **SETTLEMENT AGREEMENT** |
| | ) |
| ERIC H. HOLDER, JR., Attorney | )   Hearing Date:  March 27, 2015 |
| General of the United States; *et al.,* | )   Time: 9:30am |
| | )   Dept: Courtroom 7, Los Angeles - Spring |
|     Defendants. | )   Street Courthouse |
| | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |

## NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that the U.S. Department of Homeland Security ("DHS"), including components U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), by and through undersigned counsel, will bring this motion for hearing on March 27, 2015, or as soon thereafter as counsel may be heard, before United States District Judge Dolly M. Gee, in Courtroom 7, at the Los Angeles - Spring Street courthouse located within the Central District of California.

## COMPLIANCE WITH LOCAL RULE 7-3

This motion is made following telephonic meetings of counsel pursuant to L.R. 7-3, and paragraph 37 of the *Flores* Settlement Agreement, which took place on October 30, 2014 and January 21, 2015.

## PROTECTIVE MOTION TO MODIFY SETTLEMENT AGREEMENT

DHS, CBP, and ICE, hereby move to modify the *Flores* Settlement Agreement, Case No. 85-4544, January 28, 1997 ("Agreement") under Federal Rules of Civil Procedure 60(b)(5) and (6).  In the event the Court determines that DHS[1] is in material breach of the Agreement, modification of the Agreement

---

[1] The original Complaint in this case named as Defendants Edwin Meese, Attorney General of the United States; Immigration and Naturalization Service ("INS"); Harold W. Ezell, Western Regional Commissioner, INS; Behavioral Systems Southwest; and Corrections Corporations of America.  *See* Compl., Case No. 85-4544, July 11, 1985.  The Agreement names as Defendants then-current Attorney General Janet Reno, *et al.*, but gives no indication who any of the additional Defendants were at that time.  Under Federal Rule of Civil Procedure 25(d), Attorney

would be necessary because the prospective application of the Agreement, as it is currently written, to these entities is no longer possible, equitable, or in the public interest.  If DHS is deemed to be in material breach of the Agreement, the Court should modify the Agreement to facilitate the federal government's efforts to comply with the spirit of the Agreement while, at the same time, providing the flexibility necessary to protect the public safety and enforce the immigration laws given current challenges that did not exist at the time the Agreement was executed. In addition, the Agreement should be modified to: 1) reflect the significantly changed agency structure that presides over the issues addressed in the Agreement; 2) account for the new statutory framework that governs the treatment of unaccompanied alien children entering the United States; and 3) address the

---

General Eric H. Holder, Jr., is substituted for Attorney General Reno as the current named Defendant.  In Plaintiffs' motion to enforce the Agreement filed on February 2, 2015, Plaintiffs name as Defendants "Jeh Johnson, Secretary of Homeland Security, *et al.*"  Plaintiffs' counsel confirmed that the intended Defendants are "DHS and its subordinate entities, ICE and CBP." Thus, although Plaintiffs are seeking to enforce the Agreement against DHS, there is no indication that DHS is, in fact, a Defendant to this action.  As discussed more fully below, and also in the opposition to Plaintiffs' motion to enforce being filed by DHS concurrently with this motion, DHS does not dispute that the terms of the Agreement as it currently exists apply to some functions performed by DHS, and its components ICE and CBP, that were previously performed by INS, and that are clearly reflected in the Agreement (i.e., custody immediately following apprehension and the transportation of minors).  However, DHS disputes that this means that the Agreement can be stretched to cover additional functions of DHS and its components that were not performed by any entity at the time the Agreement was signed and entered, and were not contemplated by the terms of the Agreement, such as ICE family residential centers.  This confusion over who is even the proper Defendant to this action at this point in time only serves to highlight the substantial changes that have occurred since the Agreement was signed and entered, and the need for modification of the Agreement to reflect the realities that exist today.

significant changes in circumstances since 1997 affecting immigration enforcement priorities and national security.

This protective motion is based upon the above Notice, the accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at the time of the hearing.

DATED:        February 27, 2015              Respectfully submitted,


JOYCE R. BRANDA                          /s/ Sarah B. Fabian
Acting Assistant Attorney General        SARAH B. FABIAN
Civil Division                           Senior Litigation Counsel
                                         Office of Immigration Litigation
LEON FRESCO                              District Court Section
Deputy Assistant Attorney General       P.O. Box 868, Ben Franklin Station
Civil Division                           Washington, D.C. 20044
                                         Tel: (202) 532-4824
WILLIAM PEACHEY                          Fax: (202) 305-7000
Director, District Court Section         Email: sarah.b.fabian@usdoj.gov
Office of Immigration Litigation
                                         Attorneys for Defendants
WILLIAM SILVIS
Assistant Director, District Court
Section
Office of Immigration Litigation

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO MODIFY SETTLEMENT AGREEMENT ........................................1

I.      INTRODUCTION ..................................................................................1

II.     BACKGROUND ....................................................................................7

        a.      The *Flores* Settlement Agreement.. .......................................7

        b.      Significant Legal Changes Since 1997. ...................................8

        c.      The Influx of Alien Families and the Need for ICE Family Residential
                Centers ......................................................................................9

III.    ARGUMENT ........................................................................................13

        a.      Application of the Agreement to DHS Is Not Equitable or Just
                Because There Have Been Significant Legal and Factual Changes
                Since the Agreement was Signed and Entered....................................13

                i.      Federal Rule of Civil Procedure 60 (b)(5). ...............................13

                ii.     Federal Rule of Civil Procedure 60 (b)(6). ...............................14

                iii.    Given the Significant Changes in Law and Circumstances since
                        1997, Application of the Current Agreement is Not Equitable or
                        in the Public Interest. ...........................................................15

        b.      The Modifications DHS Seeks Are Tailored to Reflect These Changes
                in Law and Circumstances. .................................................................20

IV.     CONCLUSION.......................................................................................25

## <u>CASES</u>

*Bunikyte, ex rel. Bunikiene v. Chertoff*
 2007 WL 1074070 ................................................................................ 9, 19, 20

*Frew ex. rel. Frew v. Hawkins,*
 540 U.S. 431 (2004) ...........................................................................13

*Heath v. De Courcy,*
 888 F.2d 1105 (6th Cir. 1989) ......................................................... 14, 20

*Horne v. Flores,*
 557 U.S. 433 (2009) ........................................................................ 13, 14

*In re Pacific Far East Lines, Inc.,*
 889 F.2d 242 (9th Cir. 1989) ..............................................................15

*McGrath v. Potash,*
 199 F.2d 166 (D.C. Cir. 1952) .............................................................13

*Miller v. French,*
 530 U.S. 327 (2000) ...........................................................................14

*Philadelphia Welfare Rights Org. v. Shapp,*
 602 F.2d 1114 (3d Cir. 1979) ..............................................................16

*Reno v. Flores,*
 507 U.S. 292 (1993) ................................................................. 4, 7, 11, 12

*Rufo v. Inmates of the Suffolk County Jail,*
 502 U.S. 367 (1992) ..................................................................... passim

*Stratman v. Babbitt,*
 42 F.3d 1402, 1994 WL 681071 (9th Cir. Dec. 5, 1994).......................15

*United States v. Alpine Land & Reservoir Co.,*
 984 F.2d 1047 (9th Cir. 1993)..............................................................15

# **FEDERAL STATUTES**

6 U.S.C. § 279 .................................................................................4, 8

6 U.S.C. § 279(b)(l)(C) ...........................................................................8

6 U.S.C. § 279(b)(l)(D) ...........................................................................8

6 U.S.C. § 279(g)(2) .........................................................................16, 18

6 U.S.C. § 552 .....................................................................................4

8 U.S.C. § 1225 ..............................................................................18, 23

8 U.S.C. § 1226 ..................................................................................18

8 U.S.C. § 1226(a) ...............................................................................23

8 U.S.C. § 1231 ..............................................................................18, 23

8 U.S.C. § 1232 ...............................................................................4, 18

8 U.S.C. § 1232(a)(2)(A) .........................................................................16

8 U.S.C. § 1232(a)(2)(B) .....................................................................17, 18

8 U.S.C. § 1232(a)(4) ............................................................................17

8 U.S.C. § 1232(b)(1) .............................................................................9

8 U.S.C. § 1232(b)(2) ............................................................................17

8 U.S.C. § 1232(b)(3) .................................................................9, 17, 18, 19

8 U.S.C. § 1232(c)(2) ............................................................................18

8 U.S.C. § 1232(c)(2)(A) .........................................................................19

8 U.S.C. § (a)(5)(D), (b) ........................................................................17

8 U.S.C. §§ 1232(c)(2), (3) ...................................................................17

8 U.S.C. §§ 1232(c)(4), (5) ...................................................................18

### **FEDERAL RULES FOR CIVIL PROCEDURE**

Federal Rule of Civil Procedure 60(b)(5) ..............................................13

Federal Rule of Civil Procedure 60(b)(6) .........................................14, 15

Federal Rule of Civil Procedure 60(c)(1) ..............................................14

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PROTECTIVE MOTION TO MODIFY SETTLEMENT AGREEMENT

## I.   INTRODUCTION

When the U.S. Department of Homeland Security ("DHS") apprehends families with children illegally entering the United States, it must choose between three options: 1) provide the family with a Notice to Appear for immigration removal proceedings, release them from custody, and permit them to enter and temporarily remain in the United States in exchange for their promise to attend those proceedings; 2) separate the family unit by detaining the parents and either releasing the children to other relatives or transferring them to U.S. Health and Human Services ("HHS"); or 3) keep the family unit together by placing them at an appropriate family residential facility during their removal proceedings.

In the summer of 2014, an unprecedented number of families and unaccompanied children from Central America sought illegal entry into the United States.  Many of these families incorrectly believed that that they would be given a "permiso" (a permit) to enter the United States and reside here lawfully.[2]  Prior to

---

[2] *See* Julia Preston, *Witnessing the Border Crisis*, N.Y. Times, Aug. 1, 2014, available at http://www.nytimes.com/times-insider/2014/08/01/witnessing-the-border-crisis/?_r=0 ("After many hours of interviews, I realized that fast-traveling false rumors about the "permisos," fed by smugglers, had spurred thousands of people to head out for the United States, driven by fears their children would not be safe in Central America."); Julia Preston, *Migrants Flow in South Texas, as Do Rumors*, N.Y. Times, June 16, 2014, available at http://www.nytimes.com/2014/06/17/us/migrants-flow-in-south-texas-as-do-rumors.html ("Migrants have sent word back home they received a "permit" to remain at least temporarily in

1

2014, the only option available to the Government for the large majority of family units illegally crossing the border was the first option described above – i.e., to release the alien family to temporarily remain in the United States during their removal proceedings and provide them a Notice to Appear.  These families mistakenly viewed the Notice to Appear as a "permiso."  Thus, when an unprecedented number of families decided to undertake the dangerous journey to the United States in 2014, DHS officials faced an urgent humanitarian situation.  DHS encountered numerous alien families and children who were hungry, thirsty, exhausted, scared, vulnerable, and at times in need of medical attention, with some also having been beaten, starved, sexually assaulted or worse during their journey to the United States.

DHS mounted a multi-pronged response to this situation.  As one part of this response, DHS constructed appropriate facilities to hold family units together, in a safe and humane environment, during the pendency of their removal proceedings, in an attempt to end the perception that the Notice to Appear was a "permiso" for them to freely remain in the country.  These facilities are also designed to hold families who were flight risks or whose release might endanger the community.  As a result, families began to take the possibility of detention into account when deciding whether to seek to illegally enter the United States.  After construction of

the United States, feeding rumors along migrant routes and spurring others to embark on the long journey.").

these family residential centers, in conjunction with other efforts, the numbers of family units illegally crossing the border significantly decreased.

Although the Flores Settlement Agreement ("Agreement") was clearly intended to address issues related solely to the housing of unaccompanied alien children ("UACs"),[3] Plaintiffs seek a Court Order that would eliminate DHS's ability to have more than just one option – release – when processing family units illegally entering the United States.  Plaintiffs claim the Agreement should govern the housing of all children in immigration custody, including children who came to the United States and are housed together with their parents in U.S. Immigration and Customs Enforcement ("ICE") family residential centers.  Notably, Plaintiffs have not raised any claims that the conditions within the family residential centers fail to comply with the Agreement.  Instead, they claim that the Agreement should be applied to eliminate ICE's lawful prerogative to detain alien families (including the parents and guardians of accompanied minors) altogether.

Since the Agreement was executed in 1997, there have been several significant changes that have rendered some portions of the Agreement virtually irreconcilable with the new laws and governing framework for immigration

---

[3] Congress defined "unaccompanied alien child" in section 462(g)(2) of the HSA, 6 U.S.C. § 279(g)(2), as "a child who (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody."  This brief will refer to a singular "unaccompanied alien child" as a "UAC," and plural "unaccompanied alien children" as "UACs."

enforcement that exist today.  First, the nearly two-decade-old Agreement applied only to the U.S. Department of Justice ("DOJ") and the legacy U.S. Immigration and Nationality Service ("INS"), which then was vested with all applicable functions relevant to the Agreement.  But the Homeland Security Act of 2002 ("HSA") abolished the INS and transferred several former INS functions related to the detention, transportation, and removal of minors to the newly-formed DHS, and its components (including U.S. Customs and Border Protection ("CBP") and ICE).  And, with respect to UACs, the HSA also transferred functions from legacy INS to HHS, Office of Refugee Resettlement.  *See* 6 U.S.C. §§ 279, 552.  Six years later, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, § 235 (codified in principal part at 8 U.S.C. § 1232), which directed DHS, in conjunction with other federal agencies, to, among other things, develop policies and procedures to ensure that UACs are safely repatriated to their country of nationality or of last habitual residence.

Finally, unlike decades ago during the *Flores* litigation when the Supreme Court noted that an influx of approximately 8,500 UACs was a "serious" problem, *Reno v. Flores*, 507 U.S. 292, 295 (1993), today the numbers of UACs, and the numbers of accompanied children, have skyrocketed.  In fiscal year 2012, the Border Patrol apprehended 24,400 UACs alone, and that number jumped to 38,800

in fiscal year 2013.[4]  In fiscal year 2014 the number of UACs apprehended on the Southwest border reached 68,541, and the number of accompanied children (alien children encountered with a parent or legal guardian) apprehended surged to 38,845.[5]

Despite these significant changes, DHS has remained – and continues to remain – committed to upholding the material provisions at the heart of the Agreement related to safely housing and transporting minors in its custody.  But, in the face of the increases over the last few years of the numbers of UACs and alien families with minor children crossing the Southwest border, and the possibility that those numbers may continue to increase over time,[6] it has become clear that it is impossible to mandate full and strict compliance with all terms of the nearly two-decades-old Agreement while expecting DHS to fulfill its core function of protecting the public safety and enforcing U.S. immigration laws, including by deterring alien parents and guardians from risking their own and their children's lives to make the dangerous journey to illegally enter the United States.

---

[4] *See* U.S Border Patrol Statistics, available at: http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20UACs%20by%20Sector%2C%20FY10.-FY14.pdf.

[5] *See* U.S. Border Patrol Statistics, available at: http://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Family%20Units%20and%20UAC%20Apps%20FY13%20-%20FY14_0.pdf .

[6] *See* Hearing Before the Senate Committee on Appropriations (statement of Jeh Johnson, Sec'y of Homeland Security) *available at* http://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations (seeking supplemental funding to address apprehensions of UACs and children accompanied by a parent or guardian, including potential future increased apprehensions).

It is because of the significant changes in the law and factual circumstances since 1997 that DHS now seeks protective modification of the Agreement under Federal Rules of Civil Procedure 60(b)(5) and (6).  Given the significant changes in the landscape of immigration law and the security challenges faced by the United States over the last two decades, it is neither equitable nor in the public interest to demand strict and literal compliance with an Agreement negotiated and entered almost 20 years ago that no longer reflects current realities.

DHS therefore respectfully asks the Court to modify the Agreement. Specifically, DHS asks that the Agreement be modified to:  1) eliminate or amend portions of the Agreement that have been superseded by, or are inconsistent with, subsequent changes in the law, including the enactment of the HSA and the TVPRA; 2) clarify that DHS may detain alien minors who have arrived with their parent or legal guardian together in family residential facilities (rather than separating family members by requiring DHS to release any minors); 3) make clear that the state licensure requirement does not apply to family residential facilities (DHS does not object to the substantive language of the Agreement related to the conditions of detention with regard to these facilities, and DHS proposes regular inspections and reporting requirements to ensure the Government's compliance with such standards); and 4) amend or eliminate ongoing reporting requirements. *See* Proposed Order Modifying Settlement Agreement, filed herewith.

## II.   BACKGROUND

### a.  The *Flores* Settlement Agreement.

The original Complaint in this action was filed on July 11, 1985.  Compl., ECF No. 1, July 11, 1985.  Plaintiffs filed the *Flores* lawsuit to challenge "the constitutionality of [the INS's] policies, practices, and regulations regarding the detention and release of *unaccompanied* minors . . . ."  Agreement at 3 (emphasis added).  At the time the challenge reached the Supreme Court in 1993, the class consisted of juvenile aliens, "*not accompanied* by their parents or other related adults," who were apprehended by the INS.  *Reno*, 507 U.S. at 294 (emphasis added).  Ultimately, the Supreme Court rejected Plaintiffs' facial challenge to an INS regulation concerning care of juvenile aliens.  *Id.* at 305.

On remand from the Supreme Court, the parties entered into a settlement agreement to resolve the case.  The 1997 Agreement is a nearly two-decades-old agreement based on conditions and litigation that began yet another decade before that.  The Agreement became effective on January 28, 1997, upon its approval by this Court, and provides for continued oversight by the Court.  At the time the Agreement was signed between Plaintiffs and the now-abolished INS, the INS was responsible for arresting, processing, detaining or releasing, and removing aliens,

including UACs.  The Agreement was designed to express the positions of the parties with respect to INS's various roles in relation to UACs at that time.[7]

### b. **Significant Legal Changes Since 1997.**

There have been significant changes in the law since the signing of the Agreement in 1997.  First, in 2002 Congress enacted the HSA.  Pub. L. No. 107-296.  The HSA created DHS, and it transferred certain immigration functions formerly vested in and performed by the INS to the newly-formed DHS and its components, which, following agency reorganization, include CBP and ICE.  In addition, section 462 of the HSA, 6 U.S.C. § 279, transferred to HHS, Office of Refugee Resettlement , responsibilities for the care of UACs that were previously performed by INS.  The duties transferred included the making and implementing of placement determinations for all UACs in Federal custody.  6 U.S.C. § 279(b)(l)(C), (D).

Second, the TVPRA was signed into law on December 23, 2008.  Pub. L. No. 110-457.  Section 235 of the TVPRA prescribed additional protections relating to UACs.  Most notably, the TVPRA confirmed that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human

---

[7] The Agreement was originally set to expire within five years, but on December 7, 2001 the Parties agreed to a termination date of "45 days following defendants' publication of final regulations implementing this Agreement."  Stipulation, Dec. 7, 2001.  To date, no such regulations have been published.

Services." 8 U.S.C. § 1232(b)(1).  For example, under the TVPRA, except in the case of "exceptional circumstances," all UACs must be transferred from CBP (or other federal agency) to the custody of HHS within 72 hours of the agency's making a determination that the child is, in fact, a UAC.  8 U.S.C. § 1232(b)(3).

### c.  The Influx of Alien Families and the Need for ICE Family Residential Centers

At the time the parties signed and the Court entered the *Flores* Settlement Agreement in 1997 there were no family residential facilities in use by the INS. *See* Declaration of Tae D. Johnson at ¶ 12 ("Johnson Decl."), attached hereto as Exhibit A.  To ensure family unity while responding to the need to detain families subject to expedited removal proceedings (where detention is mandatory), ICE opened the Berks County Detention Center ("Berks") in Berks, Pennsylvania in 2001 which holds less than 100 individuals.  *Id.* ¶¶ 13, 15.[8]  Other than that, however, prior to June 2014 the only options available to the Government when it

---

[8] In 2006 ICE opened the T. Hutto Residential Center in Texas to house families with children while their immigration proceedings were being processed.  The facility was closed in 2009 after significant litigation which, in part, challenged that the facility did not comply with the *Flores* Agreement.  In the course of that litigation, the U.S. District Court for the Western District of Texas found that the *Flores* Agreement was "never intended to be permanent authority, much less the only binding authority setting standards for the detention of minor aliens[,]" and that the Agreement "did not anticipate the current emphasis on family detention," but the court nonetheless concluded that by its express terms, the Agreement did apply to the Hutto facility because the Agreement referenced all "minors," and not those who entered the United States unaccompanied. *Bunikyte, ex rel. Bunikiene v. Chertoff*, 2007 WL 1074070, at *2-3 (W.D. Tex., Apr. 9, 2007).  The Hutto case was resolved when the parties reached a settlement regarding conditions for minors at the facility. *See In re Hutto Family Detention Ctr.*, No. A-07-CV-164-SS, ECF No. 92-2, Aug. 26, 2007 (W.D. Tex.).

apprehends families with children illegally entering the United States were to allow the families to enter and remain in the United States in exchange for their promise to attend their removal proceedings, or to separate the family unit by detaining the parents and either releasing the children to other relatives or placing the children into the custody of HHS.  *See* Johnson Decl. ¶ 10.

The practice of releasing families led to the misperception by many individuals who sought to illegally enter the United States that they would be given a "permiso" upon arrival that would allow them to freely enter the United States. *See* Declaration of Kevin W. Oaks ("Oaks Decl.") ¶ 25, attached as Exhibit A to Opposition to Plaintiffs' Motion to Enforce Settlement Agreement, filed concurrently herewith.  This misunderstanding may have encouraged adults to subject children to a dangerous journey to and into the United States in order to avoid their own detention.  *See* Johnson Decl. ¶ 11.  Moreover, the general practice of releasing families creates significant enforcement vulnerabilities because alien smugglers have been known to exploit children by bringing them across the border along with groups of smuggled strangers in order to pass the groups off as family units.  *See* Johnson Decl. ¶ 11.

In 2014, an influx of UACs and children accompanied by a parent or guardian came across the Southwest border.  *See* Johnson Decl. ¶ 14.  As one part of its overall response to this significant humanitarian situation, ICE opened the

Artesia Family Residential Center in Artesia, New Mexico in June 2014, the

Karnes Family Residential Center in Karnes City, Texas in July 2014, and the

Dilley Family Residential Center in Dilley, Texas, in December 2014. *See*

Johnson Decl. ¶ 15.  The Artesia facility, which was a temporary facility, closed in

December 2014. *Id.*  Based on current plans, when the Dilley Residential Center

becomes fully operational, ICE will have available to it roughly 3,800 beds for

housing families while their removal proceedings are ongoing. *See id.*

ICE family residential centers keep the family unit together by placing them

at safe and humane ICE residential facilities during removal proceedings. *See*

Johnson Decl. ¶ 16.  ICE has family residential standards that govern all aspects of

custody at family residential centers. *See* Johnson Decl. ¶ 17.[9]  The family

residential standards were developed with input from medical, psychological, and

educational experts, as well as civil rights organizations, with the goal of mirroring

community standards and ensuring that all residents are treated with dignity and

respect. *Id.*  The ICE Enforcement and Removal Operations Juvenile and Family

Residential Management Unit oversees the ICE family residential centers and

ensures their compliance with the family residential standards. *See* Johnson Decl.

¶ 19.  The family residential centers are also subject to inspections by the ICE

Office of Professional Responsibility's Office of Detention Oversight, the DHS

---

[9] The ICE Family Residential Standards are available online at: http://www.ice.gov/detention-standards/family-residential.

Office of Civil Rights and Civil Liberties, and an independent compliance inspector.  *See id.*

Building these facilities helped diminish the mistaken perception that a "permiso" was waiting on the other end of an illegal crossing into the United States, and forced families to consider the possibility of detention when deciding whether to illegally enter the United States.  *See* Johnson Decl. ¶¶ 7-8; Oaks Decl. ¶¶ 26-27.  This caused some families to decide not to make the dangerous trip to the United States.  *See* Oaks Decl. ¶¶ 26-27.  Thus, ICE family residential facilities help DHS to reduce the migration of families who seek to come to the United States unlawfully, which in turn deters human smuggling and protects children from being subjected to the high risks associated with human smuggling and attempts to cross the southern border illegally.  *See* Johnson Decl. ¶¶ 8-9; Oaks Decl. ¶¶ 26-29.  After construction of these family residential centers, in conjunction with other efforts, the numbers of family units illegally crossing the border significantly decreased.  Oaks Decl. ¶ 29.  Thus, DHS strongly believes that the appropriate use of family detention is a key element of the U.S. Government's efforts to deter aliens from Central America from making the dangerous journey

across Mexico and into the United States.  *See* Johnson Decl. ¶ 7, Oaks Decl. ¶ 28.[10]

## III.   ARGUMENT

### a. <u>Application of the Agreement to DHS Is Not Equitable or Just Because There Have Been Significant Legal and Factual Changes Since the Agreement was Signed and Entered.</u>

#### i. *Federal Rule of Civil Procedure 60(b)(5).*

Under Federal Rule of Civil Procedure 60(b)(5), the Court may relieve a party from "a final judgment, order, or proceeding [if] applying [the prior action] prospectively is no longer equitable." Fed. R. Civ. Pro. 60(b)(5); *see Frew ex. rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004); *McGrath v. Potash*, 199 F.2d 166, 167-68 (D.C. Cir. 1952).  The party seeking relief "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 383 (1992).  That burden may be met by showing "a significant change either in factual conditions or in law." *Id.* at 384; *see also Horne v. Flores*, 557 U.S. 433, 447 (2009) ("[T]he passage of time frequently brings about changed circumstances – changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights – that warrant reexamination of the original judgment.").

---

[10] Detaining individuals who have recently crossed the border also gives ICE additional time to discover individuals who have serious criminal records or criminal affiliations in their country of origin, and to prevent their release into the local community.  *See* Johnson Decl. ¶ 8.

"Prospective relief must be 'modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law.'" *Miller v. French*, 530 U.S. 327, 347-48 (2000) (quoting *Rufo*, 502 U.S. at 388).  A motion under this section must be brought "within a reasonable time . . . ."  Fed. R. Civ. Pro. 60(c)(1).

The Agreement is an example of what the Supreme Court has termed "institutional reform litigation."  *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 380).  In *Rufo*, the Court noted that the district court's ability to modify a decree in response to changed circumstances is heightened in the context of institutional reform litigation.  502 U.S. at 380.  "Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." *Id.*  Moreover, "the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'"  *Id.* at 381 (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)).

### ii.   *Federal Rule of Civil Procedure 60(b)(6).*

Federal Rule of Civil Procedure 60(b)(6) allows a Court to relieve a party from "a final judgment, order, or proceeding for . . . any other reason that justifies

14

relief." Fed. R. Civ. Pro. 60(b)(6).  The rule generally is "used sparingly as an equitable remedy to prevent manifest injustice." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993).  The frustration of performance of a settlement agreement may provide reason to grant a motion under this Rule.  *Stratman v. Babbitt*, 42 F.3d 1402, 1994 WL 681071, at *4 (9th Cir. Dec. 5, 1994).  A motion under this section must be brought "within a reasonable time[,]" and the timeliness of a motion under this section "depends on the facts of each case[.]" *Alpine*, 984 F.2d at 1049 (quoting *In re Pacific Far East Lines, Inc.*, 889 F.2d 242, 249 (9th Cir. 1989) (holding relief appropriate where new legislation undermined the soundness of the judgment)).[11]

### iii.    Given The Significant Changes in Law and Circumstances Since 1997, Application of the Current Agreement is Not Equitable or in the Public Interest.

When seeking modification of a consent decree such as the *Flores* Agreement, a party must establish "that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383.  This standard is met where there have been "changes in circumstances that were beyond the defendants'

---

[11] This motion is brought within a reasonable time because DHS seeks these modifications in response to Plaintiffs' attempt to enforce the Agreement against ICE's family residential facilities.  *See* Motion, Feb. 2, 2015, ECF No. 100.  As discussed in DHS's opposition, filed concurrently, it is the Government's position that the provisions of the Agreement that Plaintiffs seek to enforce were not intended to apply to these facilities.  However, if the Court deems that DHS is in material breach of the Agreement, then DHS asks the Court to modify the Agreement to facilitate the federal government's efforts to comply with the spirit of the Agreement while, at the same time, providing the flexibility necessary to protect the public safety from challenges that did not exist at the time the Agreement was executed.

control and were not contemplated by the court or the parties when the decree was entered." *Id.* at 380-81 (discussing *Philadelphia Welfare Rights Org. v. Shapp*, 602 F.2d 1114, 1119-21 (3d Cir. 1979)

The HSA and the TVPRA are important changes in the law that reassigned the immigration functions formerly performed by the INS, and redefined the requirements for the Government's custody of UACs.  Before the HSA, all aspects of arrest, detention (or release), and removal for all minors were performed by legacy INS.  Following enactment of the HSA and the TVPRA, there is an entirely new procedure that governs the processing of all minors who enter the United States unlawfully across the Southwest border that involves multiple agency components and different considerations from those applicable in 1997.

A minor who enters the United States unlawfully by crossing the Southwest border will most likely first come into the custody of the U.S. Government when she is apprehended by CBP.  If the child is an "unaccompanied alien child" as defined at 6 U.S.C. § 279(g)(2), CBP determines whether the child is a national or habitual resident of a country contiguous to the United States (i.e., Mexico or Canada).  If the child is from such a contiguous country, she will be screened to see if she is a victim of trafficking, has a claim of fear of return, or is otherwise unable to consent to return.  8 U.S.C. § 1232(a)(2)(A).  If none of those factors is found, the UAC will normally be provided the opportunity to withdraw her

application for admission to the United States and return to the contiguous country. 8 U.S.C. § 1232(a)(2)(B).  Where CBP believes the child is an unaccompanied alien child, this screening process occurs within 48 hours of the of the child's apprehension by CBP.  8 U.S.C. § 1232(a)(4).

When the necessary screening determination cannot be made within 48 hours of the child's apprehension, when the child does not or cannot voluntarily withdraw her application for admission, or when the child is from a non-contiguous country, the child will be transferred to HHS and may be placed in removal proceedings before an immigration judge.  8 U.S.C. §§ 1232(a)(4), (a)(5)(D), (b).  Federal agencies, including CBP, must notify HHS within 48 hours of apprehension or discovery of any UAC in its custody or "any claim or suspicion that an alien in the custody of such department or agency is under 18 years of age." 8 U.S.C. § 1232(b)(2).  "Except in the case of exceptional circumstances," all UACs in CBP custody must be transferred into the custody of HHS within 72 hours of CBP determining that such child is a UAC.  8 U.S.C. § 1232(b)(3).  The TVPRA requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child" and it provides guidelines for the reunification of minors by HHS.  8 U.S.C. §§ 1232(c)(2), (3).  It also requires that HHS provide minors in its custody with a legal orientation program and access to legal services.  8 U.S.C. §§ 1232(c)(4), (5).

17

Alien children who arrive in the United States with a parent or legal guardian are not considered unaccompanied, and therefore do not fall under the provisions of the TVPRA.  *See* 6 U.S.C. § 279(g)(2); 8 U.S.C. § 1232.  Instead, the detention or release of alien family units is governed by the detention provisions of the Immigration and Nationality Act ("INA").  *See* 8 U.S.C. §§ 1225, 1226, 1231, and the responsibility of ICE.

Challenges arise because parts of the TVPRA, and the processing required under today's statutory regime, may render the Government unable to comply with both the TVPRA and the requirements of the Agreement, or may cause certain provisions of the Agreement to be extraneous.  For example:

- Paragraph 14 of the Agreement provides a policy for the order of preference for release of unaccompanied minors and requires release of UACs following that order of preference.  Yet, under the TVPRA, CBP may not release a UAC from its custody other than by returning her to her home country if she is from a contiguous nation, 8 U.S.C. § 1232(a)(2)(B), or by transferring her to HHS custody within 72 hours of determining that she is a UAC.  8 U.S.C. § 1232(b)(3).  HHS then must place the child "in the least restrictive setting that is in the best interest of the child."  8 U.S.C. § 1232(c)(2).

- Paragraph 12.A of the Agreement provides the Government up to 3 days to transfer a UAC to a licensed program in the same district, and up to 5 days to transfer a UAC to a licensed facility outside the area.  Under the TVPRA CBP may only release a child to HHS, and must do so within 72 hours of determining that the child is a UAC except in "exceptional circumstances."  8 U.S.C. § 1232(b)(3).

- Paragraph 21 of the Agreement provides that following apprehension a minor may be transferred to a suitable state or country juvenile detention

facility (or secure INS facility) under certain conditions.  That provision permits "the District Directors or Chief Patrol Agent" to make that determination.  However, under the TVPRA, CBP may only transfer UACs to the custody of HHS, 8 U.S.C. § 1232(b)(3), and any decisions regarding placement in a secure facility are delegated to HHS.  8 U.S.C. § 1232(c)(2)(A).

This new statutory scheme for the processing of UACs was a change in the law that the parties could not have anticipated in 1997.  Unless amendment of the Agreement is permitted to take these new legal realities into account, conflicts will always exist between Plaintiffs and the Government regarding the applicability of the Agreement in certain circumstances.

Moreover, family immigration detention simply did not exist at the time the Agreement was signed, and this is a strong indication that minors in Government custody with their parents were not the contemplated beneficiaries of the Agreement when it was signed by the parties and entered by the Court.  *See Bunikyte,* 2007 WL 1074070 at * 3 (recognizing that the Agreement "did not anticipate the current emphasis on family detention . . .").  Further, in 1997, the parties could not have anticipated the 2014 influx of UACs and families (including alien children accompanied by their parents) crossing the Southwest border of the United States – or even the substantial increases in those numbers that have occurred steadily over the last several years – that make family detention an essential tool for immigration enforcement today.  *See* Johnson Decl. ¶¶ 7-8; Oaks

Decl. ¶¶ 25-28.  In light of these changed circumstances, and the resulting need for family detention in order to combat the misconceptions that encourage migration, it is neither equitable nor in the interest of public safety to read this Agreement to render DHS powerless to take any action whatsoever to deter the arrival of families illegally crossing the border with minor children in the substantial numbers that are seen today.  *See Bunikyte,* 2007 WL 1074070 at * 20 ("[B]oth Congress and the *Flores* settlement recognize the release of detained families is secondary to the strong public interest in ensuring that illegal immigrants appear for all necessary legal proceedings.  Congress has delegated to DHS and ICE the authority to balance the public interest in family unification and supervised release against the public interest in enforcing immigration law.  Given the fact that as many as 39% of aliens issued a Notice to Appear by DHS never actually appear for immigration proceedings, the Court cannot say DHS has abused its mandate by exploring family detention.").  Enforcing the Agreement in this way would be inequitable, and would "impact on the public's right to the sound and efficient operation of its institutions.'"  *Rufo*, 502 U.S. at 381 (quoting *Heath*, 888 F.2d at 1109).

### b.  **The Modifications DHS Seeks Are Tailored to Reflect These Changes in Law and Circumstances.**

Once the moving party has established that modification is warranted, "the court should consider whether the proposed modification is suitably tailored to the

changed circumstance." *Rufo*, 502 U.S. at 383.  DHS seeks to modify the

Agreement in four ways.  First, DHS seeks to eliminate or amend portions of the

Agreement that have been superseded by, or are inconsistent with, the HSA and the

TVPRA.  Second, DHS seeks to clarify that the preference for release of alien

minors to a parent, legal guardian, or adult relative, does not apply to minors who

arrive in the United States accompanied by a parent or legal guardian.  Such

clarification would allow DHS to keep minors who have arrived with their families

together in family residential facilities, rather than requiring DHS to release such

minors and break up the family units.  Third, DHS seeks to make clear that the

state licensing requirement for housing minors does not apply to family residential

facilities.  DHS instead suggests that ICE be bound by the requirements in

Attachment 1 with respect to the conditions at these facilities, as well as

independent monitoring and reporting requirements to ensure compliance with

those standards.  And fourth, DHS seeks to amend ongoing reporting requirements.

The first requested modification that DHS seeks would amend the

Agreement so that it reflects the changed responsibilities of DHS and HHS, and the

abolishment of the INS, following the HSA and the TVPRA.  This would ensure

that the Agreement's requirements are not inconsistent with the roles these

agencies play today, or with the current statutory requirements relating to UACs.

This modification is tailored to mitigate the confusion that currently results from

trying to apply a decades old Agreement involving a now-abolished government agency to today's significantly changed legal and factual circumstances.

The second change DHS seeks would amend Section VI of the Agreement relating to the "General Policy Favoring Release."  That section provides that:

> [w]here the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:
> A. a parent;
> B. a legal guardian;
> C. an adult relative (brother, sister, aunt, uncle, or grandparent) . . . .

Agreement ¶ 14 (listing those and additional categories of individuals to whom minors may be released).  Notably, significant portions of this paragraph have been substantially superseded by the TVPRA, and as discussed above, to the extent the Agreement is inconsistent with the statute it should be modified.

Additionally, the Agreement should be modified to clarify that accompanied children (children who are apprehended with a parent or guardian) may be held in ICE custody with their parent or guardian, rather than requiring that they be released to another individual or placed into HHS custody.   If paragraph 14 of the Agreement is applied as written to accompanied children, ICE would be required to separate parents or guardians from their children in situations where ICE wishes

22

to detain the parent or guardian during removal proceedings.  Modification is also necessary because the inability to operate family residential facilities would essentially mean that CBP and ICE would be required to allow families to illegally cross the border and enter the interior of the United States without immediate consequence (and also without significant assurance they will appear at removal proceedings).

Requiring ICE to separate family units if it wishes to detain an individual alien accompanied by a child would impact ICE's ability to make detention decisions, even where the parent or guardian may be a flight risk or danger to others.  This, in turn, has a negative impact on ICE's ability to exercise its discretion to detain individuals as necessary and as it is authorized to do under the INA.  *See* 8 U.S.C. §§ 1225, 1226(a), 1231.  It also needlessly requires the separation of families, when family residential centers now provide a reasonable avenue for ICE to respond to changing immigration trends and detention needs while keeping families that enter the United States together as a family unit.[12]  This modification permits DHS to address periods of time in which the number of families crossing the Southwest border substantially increases by using

---

[12] Notably, while Plaintiffs have separately sought enforcement of certain terms of the Agreement, they have not challenged that the ICE family residential centers at Berks, PA, Dilley, TX, and Karnes, TX, in any way fail to comply with the requirements under the Agreement for the conditions at facilities that house minors.  As discussed more fully below, DHS raises no objections to complying with those requirements and to working with Plaintiffs to find an alternative to licensing that will ensure that compliance.

discretionary detention authority provided by Congress, while also allowing families to stay together in specially designed facilities rather than requiring the separation of children from their parents or guardians.

The next modification that DHS seeks is to Section VII, which requires that minors "be placed temporarily in a licensed program . . . ."  Agreement ¶ 19; Exhibit 1 (laying out the minimum standards for conditions in facilities holding minors).  A "licensed program" is one "that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children . . . ."  Agreement ¶ 6.

DHS seeks modification of this Section to clarify that family residential centers do not have to be "licensed programs."  This change is necessary because there is no state licensing readily available for facilities that house both adults and children.  Section VII should thus be modified to require that ICE family residential facilities meet the standards laid out in Exhibit 1 to the Agreement.  And because licensing is not possible, Section VII should be further modified to implement a system of independent monitoring of ICE's compliance through regular inspections, and to require DHS to provide the results of all such inspections to Plaintiffs' counsel.  These proposed modifications are tailored to adopt the Agreement's requirements on detention conditions to the family

residential facility context without requiring DHS to obtain a license that does not exist and would render family detention null.

The final change that DHS seeks would be to eliminate reporting requirements that applied to the implementation of the original Agreement in 1997, and add reporting requirements related to the inspection of family residential facilities. *See* Proposed Order. This modification is tailored to eliminate out-of-date requirements that may no longer be necessary, while at the same time adding reporting requirements consistent with the other modifications sought by DHS.

## IV. CONCLUSION

Because of the substantial changes that have occurred in the law and factual circumstances related to immigration since 1997, the Government respectfully asks the Court to modify the Agreement to facilitate the Government's compliance with the spirit of the Agreement while, at the same time, providing the flexibility necessary to protect the public safety from challenges that did not exist at the time the Agreement was executed.

DATED:      February 27, 2015          Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General
Civil Division

LEON FRESCO
Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4824
Fax: (202) 305-7000
Email: sarah.b.fabian@usdoj.gov

*Attorneys for Defendants*

26

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on February 27, 2015, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.


                                  <u>/s/ Sarah B. Fabian</u>
                                    SARAH B. FABIAN
                                    U.S. Department of Justice
                                    District Court Section
                                    Office of Immigration Litigation

                                    Attorney for Defendants