# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | ) Case No. CV 85-4544-DMG |
| Plaintiffs, | ) |
| v. | ) |
| ERIC H. HOLDER, JR., Attorney General of the United States; *et al.*, | ) |
| Defendants. | ) |

## DECLARATION OF TAE D. JOHNSON

I, Tae D. Johnson, hereby declare that the following statements are true and correct to the best of my knowledge, information and belief:

1. My name is Tae D. Johnson. I am a member of the Senior Executive Service serving as the Assistant Director, Custody Management Division, Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE), in Washington, D.C. I have held this position since January 2, 2011. My current work address is: 500 12th Street Southwest, Washington, D.C. 20536.

2. I hold a Bachelor of Science degree in accounting from Salisbury University in Salisbury, Maryland.

3. In 1992, I began my federal career in Salisbury, Maryland with the former Immigration and Naturalization Service (INS). For the past 20 years, I have served as a detention enforcement officer, a supervisory detention enforcement officer, a supervisory immigration enforcement agent and deportation officer with INS and ICE.

4. Since 2007, while at ICE headquarters, I have served as a Unit Chief of the detention standards compliance unit, as Chief of Staff for the Office of Detention Policy and Planning, as Special Assistant to the Assistant Secretary for ICE, and as Deputy Chief of Staff for the Executive Associate Director for ERO.

5. In my current position as Assistant Director, I oversee and direct the Custody Management Division, which provides policy and oversight for the administrative custody of more than 33,000 detainees daily and roughly 400,000 detainees annually. The Custody Management Division oversees and

1

manages ICE detention operations to provide for the safety, security and care of detainees in ICE custody. The ICE detention system consists of more than 250 local and state facilities operating under intergovernmental service agreements, contract detention facilities, ICE-owned facilities and facilities operated by the Bureau of Prisons.

6. One of the units which I direct and oversee within the Custody Management Division is the Juvenile and Family Residential Management Unit (JFRMU). JFRMU addresses issues confronting unaccompanied alien children (UAC) and alien family groups who come into ERO custody. JFRMU manages the ICE Family Residential Program for the non-violent, non-criminal families ERO takes into custody.

I. *Detention Deters Criminal Smuggling and Illegal Immigration*

7. In my experience, detaining recent border crossers has proven to be a successful deterrent strategy. According to briefings I have received, information received by ICE officers and agents from Salvadoran, Guatemalan, and Honduran recent border crossers, indicates a reason they decided to make the dangerous journey to illegally enter the United States is that they expect to be immediately released from custody. Information received from these detainees also demonstrates that this expectation is often due to promises of human trafficking organizations that they will not be detained but instead will be released and permitted to work in the United States. *See* Hearing Before the House Committee on Homeland Security titled "Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border," (written testimony of Jeh Johnson, Sec'y of Homeland Security), Jun. 24, 2014, available at:

2

http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security (last visited Feb. 25, 2014) (discussing efforts ICE is taking to reduce the misconceptions among Central American migrants that there are no free passes or "permisos" simply by travelling to the United States and that neither deferred action nor the path to citizenship contemplated in the legislation before Congress would apply to recent migrants); Damien Cave and Frances Robles, "A Smuggled Girl's Odyssey of False Promises and Fear," New York Times, Oct. 5, 2014, available at: http://www.nytimes.com/2014/10/06/world/americas/a-smuggled-girls-odyssey-guatemala-migration-abduction.html?emc=eta1 (last visited Feb. 25, 2015) ("Especially here in Guatemala, smugglers, or 'coyotes', have grown increasingly adept at marketing themselves to poor families, **drumming up hopes with false depictions of American immigration policy,** then squeezing their prey with death threats, demanding payment through bank loans or property titles" and specifically describing how one family took out a loan for $7,000, using their home as a guarantee, in order to send their 16-year old daughter, Cecilia, to the United States, and explaining, among other life-altering concerns that Cecilia's "dreams of sending home $1,000 a month were unrealistic") (emphasis added); Julia Preston, "Snakes and Thorny Brush, and Children at the Border Alone," New York Times, Jun. 25, 2014, available at: http://www.nytimes.com/2014/06/26/us/snakes-and-thorny-brush-and-children-at-the-border-alone.html (last visited Feb. 26, 2015) (noting smugglers falsely advise the women and children in their charge to "look for the Border Patrol and turn themselves in" in order to get a permit).

8. Detaining these individuals dispels such expectations, and deters others from unlawfully coming to the United States. Based on information relayed to me, ICE has discovered in its custody, including in its family residential centers, recent migrants who ICE determined had serious criminal records or gang associations in their countries of origin. Based on information uncovered while these individuals were detained, ICE was able to prevent their release into the local community.

9. I have reviewed reports that indicate a majority of the Guatemalans, Hondurans, and Salvadorans have paid significant fees to be illegally smuggled across the Southwest Border. *See Id.* (describing how one Guatemalan family paid $7,000, with an additional payment of $1,000, in order to send their 16-year old daughter to the United States and another family who paid $13,000 for two relatives to be smuggled to the United States). These payments are then used by cartels to fund additional illicit and dangerous activities in the United States and Mexico. Deterring smuggling reduces a funding source for these criminal enterprises. *Id.* ("The human export industry in the region is now worth billions of dollars, experts say, and it has become more ruthless and sophisticated than ever, employing a growing array of opportunists who trap, rape and rob from the point of departure to the end of the road"); Julia Preston, "New U.S. Effort to Aid Unaccompanied Child Migrants," New York Times, Jun. 2, 2014, available at: http://nytimes.com/2014/06/03/us/politics/new-us-effort-to-aid-unaccompanied-child-migrants.html (last visited Feb. 25, 2015) (noting that Alejandro Mayorkas, the Deputy Secretary of Homeland Security stated that ICE agents would work to disrupt the "criminal smuggling networks" that have seized control of the traffic of children through Mexico to the United

States in response to the 2014 surge of migrants from the Southwest border); Daniel Gonzalez, "Feds Targeting Smuggling Rings to Combat Border Crisis," USA Today, Jul. 23, 2014, available at: http://www.usatoday.com/story/news/nation/2014/07/23/feds-target-smuggling-rings-combat-border-crisis13033789 (last visited Feb. 26, 2015) (describing ICE's efforts to target the money-laundering operations of human smuggling operations as part of an effort to disrupt smuggling and counter an unprecedented surge in Central American migrants).

## II. Evolution and Current Status of ICE Family Residential Centers

10. Prior to the recent opening of additional ICE family residential centers, families were often released rather than detained. Without these facilities, the only option for detention would be to detain the parent or guardian in an adult detention facility and transfer the child to the care and custody of the Department of Health and Human Services or to the local government social services.

11. A practice of general release encourages parents to subject their children to this dangerous journey in order to avoid their own detention. It also puts unrelated children at increased risk of trafficking by smugglers who bring them across the border in an attempt to avoid detention by representing themselves as a family unit.

12. In 1997, when the parties executed the *Flores* Settlement Agreement, there were no family residential centers in use by the former Immigration and Naturalization Service.

13. ICE's first family residential center, located in Berks County, Pennsylvania, opened in March 2001.

14. Public information demonstrates that in fiscal year 2014, over 68,445 family units, comprised of a child and parent, were apprehended along the Southwest Border. This is a 361 percent increase from fiscal year 2013, in which just 14,855 family units were apprehended. Most of the apprehended family units were comprised of a mother and a child.

15. In response to the influx of family units across the Southwest Border, ICE increased its limited family residential capacity of less than 100 beds at Berks to more than 1,200 by opening facilities in Artesia, New Mexico in June 2014 and in Karnes City, Texas in July 2014. The family residential center in Artesia closed December 31, 2014. Also in December of 2014, ICE opened an additional family residential center in Dilley, Texas, which is scheduled to be completed in the first half of 2015. There are additional expansion efforts at Karnes Family Residential Center and Berks Family Residential Center, which are scheduled to be completed in 2015. Upon completion, ICE will have roughly 3,800 beds for family units.

16. ICE family residential centers enable families to remain together during immigration proceedings, maintaining family unity.

17. ICE family residential centers operate under the ICE Family Residential Standards (FRS), first issued on December 21, 2007. These standards promote a unique, open, and stimulating environment in which the residents are free to move about the center. The FRS were developed with input from medical, psychological, and educational experts, as well as civil rights organizations, with the goal of mirroring community standards and ensuring that all residents are treated with dignity and respect.

18. Residents at ICE family residential centers enjoy free movement during waking hours and have access to health and social services. Each center

permits visitors and provides indoor and outdoor recreational areas and activities, such as soccer, volleyball and basketball. All dining rooms serve three meals per day and residents have access to beverages and snacks 24 hours per day. Education is provided to all school-age children. Residents are permitted to wear their own personal attire or other non-institutional clothing, provided free of charge to those in need. Residents also have access to telephones, televisions, video games, the internet, and law libraries with printing and copying capabilities.

19. The JFRMU oversees the ICE family residential centers and their compliance with the FRS. The family residential centers are subject to inspections by the ICE Office of Professional Responsibility's Office of Detention Oversight (ODO) and an independent compliance inspector.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: February 27, 2015

TAE D. JOHNSON
Assistant Director
Custody Management Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement