JOYCE R. BRANDA
Acting Assistant Attorney General
Civil Division
LEON FRESCO
Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel, District Court Section
Office of Immigration Litigation
    P.O. Box 868, Ben Franklin Station
    Washington, D.C. 20044
    Tel:  (202) 532-4824
    Fax:  (202) 305-7000
    Email:  sarah.b.fabian@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | Case No. CV 85-4544 |
| Plaintiffs, | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION** |
| v. | |
| ERIC H. HOLDER, JR., Attorney General of the United States; *et al.*, | Hearing Date:  March 27, 2015 |
| Defendants. | Time: 9:30am |
| | Dept: Courtroom 7, Los Angeles - Spring Street Courthouse |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................1

II.     BACKGROUND ......................................................................4

      A.      The Flores Settlement Agreement ........................................4

      B.      ICE Family Residential Centers ..........................................5

III.    ARGUMENT ..........................................................................7

      A.      The Agreement Does Not Address ICE Family Residential Centers
               Because There Was No Meeting of the Minds of Parties With Regard
               to Such Facilities .................................................................7

            i.      The Agreement Should Be Interpreted as a Consent
                   Decree ..................................................................8

            ii.     The Agreement Was Never Intended to Apply to
                   Accompanied Minors in Family Residential Centers.......9

      B.      The "Preference for Release" Provision of the Agreement Should Not
               Be Applied to Accompanied Minors in Family Residential
               Centers………………………..………………………………13

      C.      The "Licensing" Provision of the Agreement Should Not Apply to
               Family Residential Centers…………..……………….………… 16

      D.      CBP Facilities Comply With the Requirements of the
               Agreement……………………………………………………...20

CONCLUSION…………………………..…………………………… 25

# TABLE OF AUTHORITIES

## CASES

*Bunitkye,*
   2007 WL 1074070 ...................................................................12, 13, 15, 16

*City of Las Vegas v. Clark County,*
   755 F.2d 697(9th Cir. 1985) ........................................................8

*Jeff D. v. Otter,*
   643 F.3d 278 (9th Cir. 2011) ......................................................18

*Mastrobuono v. Shearson Lehman Hutton, Inc.,*
   514 U.S. 52 (1995).......................................................................9

*Reno v. Flores,*
   507 U.S. 292, 294 558 F.3d 111(1st Cir. 2009)...................1, 4, 10, 13

*R.I.L.R., et al. v. Johnson, et al.,*
   Case No. 15-0011, Opinion ECF No. 33 (D.D.C. Feb. 20, 2015)..............14, 15

*Rufo v. Inmates of Suffolk County Jail,*
   502 U.S. 367, 378 (1992)...........................................................8

*Skilstaf, Inc. v. CVS Caremark Corp.,*
   669 F.3d 1005 (9th Cir. 2012) ...................................................10

*United Commerical Ins. Serv., Inc. v. Paymaster Corp.,*
   962 F.2d 853 (9th Cir. 1992) ......................................................9

*United States v. Armour & Co.,*
   402 U.S. 673 (1971).....................................................................9

*United States v. Asarco Inc.,*
   430 F.3d 972 (9th Cir. 2005) ......................................................8

*United States v. ITT Cont'l Baking Co.,*
   420 U.S. 223 (1975).............................................................18, 19

*Wong v. Bell,*
   642 F.2d 359 (9th Cir. 1981) ....................................................11

*Zadvydas v. Davis,*
   533 U.S. 678 (2001)..............................................................16, 17

## **STATUTES**

8 U.S.C. § 1101(b)(1).............................................................................11

8 U.S.C. § 1225(a) .................................................................................5

8 U.S.C. § 1225(b) .................................................................................5

8 U.S.C. § 1232(b)(3)............................................................................21

## I.      **INTRODUCTION**

More than 20 years ago, the Supreme Court wrote "this problem is a serious one" when describing the surge of "more than 8,500" unaccompanied alien children (UACs)[1] apprehended in 1990.   *Reno v. Flores*, 507 U.S. 292, 294 (1993).  In fiscal year 2014 the number of UACs apprehended on the southwest border reached 68,541, and the number of accompanied children (children encountered with a parent or legal guardian) apprehended increased to 38,845.[2] This unprecedented influx constituted a serious humanitarian situation, as large numbers of alien children—coming both with and without their parents—arrived at our border hungry, thirsty, exhausted, scared, and, at times, in need of urgent medical attention.

In response to this situation, the U.S. Department of Homeland Security ("DHS") created additional, family-appropriate immigration detention capacity to hold families apprehended at the border, without requiring separation of parents from their children.  These family residential facilities provide for the safety, security, and medical needs of both parents and children.  They also ensure both the maintenance of family unity and DHS's ability to efficiently and effectively process removal cases involving families.  As a result of these actions, the number

---

[1] This brief will refer to a singular "unaccompanied alien child" as a "UAC," and plural "unaccompanied alien children" as "UACs."

[2] *See* U.S. Border Patrol Statistics, available at: http://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Family%20Units%20and%20UAC%20Apps%20FY13%20-%20FY14_0.pdf .

1 of both UACs and accompanied children illegally entering the United States has

2 decreased significantly.

3

4 Now, Plaintiffs have filed a motion against DHS[3] seeking a court order that

5 would prevent the Government from holding family groups (generally defined as

6 children apprehended with adult parents or legal guardians) in U.S. Immigration

7 and Customs Enforcement ("ICE") family residential centers during their

8 immigration removal proceedings.  This request both threatens family unity and

9 ignores the significant growth in the number of children (both accompanied and

10 unaccompanied) apprehended while unlawfully crossing the southwest border.

11

12 Plaintiffs cite no constitutional or statutory basis that would prevent the

13 Government from operating these facilities.  Instead, Plaintiffs ask the Court to

14

15

16 _____

17 [3]  The original Complaint in this case named as Defendants Edwin Meese, Attorney General of the United States; Immigration and Naturalization Service ("INS"); Harold W. Ezell, Western Regional Commissioner, INS; Behavioral Systems Southwest; and Corrections Corporations of America.  *See* Compl., Case No. 85-4544, July 11, 1985.  The Agreement names as Defendants then-current Attorney General Janet Reno, *et al.*, but gives no indication who any of the additional Defendants were at that time.  Under Federal Rule of Civil Procedure 25(d), Attorney General Eric H. Holder, Jr., is substituted for Attorney General Reno as the current named Defendant.  In Plaintiffs' motion to enforce the Agreement filed on February 2, 2015, Plaintiffs name as Defendants "Jeh Johnson, Secretary of Homeland Security, *et al.*"  Plaintiffs' counsel confirmed that the intended Defendants are "DHS and its subordinate entities, ICE and CBP." Thus, although Plaintiffs are seeking to enforce the Agreement against DHS, there is no indication that DHS is, in fact, a Defendant to this action.  As discussed more fully below, DHS does not dispute that the terms of the Agreement as it currently exists apply to some functions performed by DHS, ICE, and CBP, that were previously performed by INS, and that are clearly reflected in the Agreement (i.e., custody immediately following apprehension and the transportation of minors).  However, as discussed more fully below, DHS disputes that this means that the Agreement can be stretched to cover additional functions of DHS and its components that were not performed by any entity at the time the Agreement was signed and entered, and were not contemplated by the terms of the Agreement, such as ICE family residential centers.

interpret the nearly two-decade-old *Flores* Settlement Agreement ("Agreement"), which the parties entered into in order to govern the treatment of UACs, in a manner that would require the Government to permit all accompanied children apprehended at the border, as well as their adult parents and legal guardians, to be released into the country.  Plaintiffs also challenge the conditions under which children are held in U.S. Customs and Border Protection ("CBP") holding facilities despite the fact that those facilities comply in all material respects with the Agreement, and the issues about which Plaintiffs complain are not contrary to the Agreement and are necessary to ensure the health and safety of all individuals at those facilities.

Plaintiffs' motion to enforce should be denied for three reasons.  First, the parties intended – as, indeed, the Agreement itself demonstrates – that the terms of the Agreement were meant to govern the treatment of UACs, and not accompanied children.  Second, to the extent the Agreement is ambiguous on this issue, the context in which the Agreement was signed weighs in favor of reading the Agreement in a manner that does not strictly apply it to situations involving accompanied children and ICE family residential facilities.  Finally, CBP holding facilities and ICE residential facilities are in substantial compliance with the Agreement and are not failing to comply with its material terms.

Although well-intentioned, Plaintiffs' requested relief will prevent DHS from effectively enforcing immigration laws against families apprehended at the

3

border, thus encouraging additional adults to take themselves and their children on the dangerous and potentially life-threatening journey to our Southwest border. For these reasons, the Court should deny Plaintiffs' motion.

## II.       BACKGROUND

### A.       The Flores Settlement Agreement.

The original Complaint in this action was filed on July 11, 1985. Compl., ECF No. 1, July 11, 1985. Plaintiffs filed the *Flores* lawsuit to challenge "the constitutionality of [the INS's][4] policies, practices, and regulations regarding the detention and release of *unaccompanied* minors . . . ." Agreement at 3 (emphasis added). At the time the challenge reached the Supreme Court in 1993, the class consisted of juvenile aliens, "not accompanied by their parents or other related adults," who were apprehended by the legacy INS. *Reno*, 507 U.S. at 294. Ultimately, the Supreme Court rejected Plaintiffs' facial challenge to an INS regulation concerning care of juvenile aliens. *Id.* at 305. On remand from the Supreme Court, the parties entered into a settlement agreement to resolve the case. The 1997 Agreement is a nearly 20-year-old agreement based on litigation that began yet another decade before that. The Agreement became effective on January

---

[4] In 2002 Congress abolished the INS, and its immigration functions relevant here were assigned to the newly-formed DHS and its components, as well as to the U.S. Department of Health and Human Services ("HHS"). Pub. L. No. 107-296.

28, 1997, upon its approval by this Court, and provides for continued oversight by the Court.[5]

## B.   ICE Family Residential Centers.

At the time the parties signed, and the court entered, the *Flores* Settlement Agreement in 1997, there were no family residential facilities in use for family immigration detention by the INS.  Declaration of Tae D. Johnson at ¶ 12 ("Johnson Decl."), attached as Exhibit A to Motion to Modify Settlement Agreement, filed concurrently herewith.  In the absence of family residential facilities, DHS had previously been faced with a difficult choice.  On the one hand, if DHS chose to detain adult parents apprehended at the border (which it is clearly authorized to do, *see* 8 U.S.C. §§ 1225(b), 1226(a)), the Department would essentially be forced to separate such parents from their children and transfer those children to the Department of Health and Human Services (HHS) or to local government social services, Johnson Decl. ¶ 10, an action the Department would not want to take.  On the other hand, if DHS chose to release every adult apprehended at the border with his or her child(ren), DHS would essentially be signaling that adults with children can illegally cross the border with impunity, Johnson Decl. ¶ 11, thereby encouraging parents to subject themselves and their

---

[5]  The Agreement was originally set to expire within five years, but on December 7, 2001 the Parties agreed to a termination date of "45 days following defendants' publication of final regulations implementing this Agreement."  Stipulation, Dec. 7, 2001.  To date, no such regulations have been published.

children to the life-threatening risks that come with efforts to illegally cross the border.  *Id.*, *see also* Declaration of Kevin W. Oaks ("Oaks Decl.") ¶ 25, attached hereto as Exhibit A.  At the same time, DHS would be increasing vulnerabilities that have long been exploited by human trafficking organizations, which have been known to bring children across the border along with groups of smuggled strangers in order to pass the groups off as families.  Johnson Decl. ¶ 9.  By ending the practice of automatically releasing alien families apprehended while entering the United States, DHS is able to deter human smuggling more effectively and to protect children from being subjected to the high-risk situations associated with human smuggling and attempts to cross the southern border illegally.  Oaks Decl. ¶¶ 25-28; Johnson Decl. ¶¶ 7-8.

Due to recent increases in the illegal migration of families, and to address very serious concerns related to human smuggling and trafficking, ICE opened the Artesia Family Residential Center in Artesia, New Mexico in June 2014, the Karnes Family Residential Center in Karnes City, Texas in July 2014, and the South Texas Family Residential Center in Dilley, Texas, in December 2014. Johnson Decl. ¶ 15.  The Artesia facility, which was a temporary facility, closed in December 2014.  *Id.*  Based on current plans, when the Dilley facility becomes fully operational upon completion of planned expansions to existing facilities, ICE will have available to it roughly 3,800 beds for housing families while their removal proceedings are ongoing.  *Id.*  These facilities are essential to ensuring that

DHS can fulfill its operational mission to secure the border and enforce the immigration laws of the United States.  Johnson Decl. ¶¶ 7-8; Oaks Decl. ¶¶ 25-28.[6]

## III.     ARGUMENT

### A.     The Agreement Does Not Address ICE Family Residential Centers Because There Was No Meeting of the Minds of the Parties With Regard to Such Facilities.

ICE's family residential centers should not be viewed as violating the Agreement.  The provisions of the Agreement that Plaintiffs seek to enforce should not apply to family residential centers because the parties simply did not contemplate at the time that the Agreement would apply to such facilities, or to the housing of families (including accompanied minors).  When the agreement was reached, neither party could foresee the significant growth in the number, and recent influx, of families at the border, nor the need for family residential centers to house such families without separating parents from their children.  It is clear from a collective reading of various provisions of the Agreement, as well as the factual circumstances surrounding the execution of the Agreement, that the parties

---

[6]  Plaintiffs complain that the fact that these facilities are used to house families with female heads of household, and not with male heads of household, raises equal protection concerns. Memo., ECF No. 100-1 at 13-14.  However, Plaintiffs' equal protection claim is without merit. First and foremost, this case is not about the constitutionality of family detention centers, but about whether the Agreement has been breached.  Moreover, the housing of families with male heads of household involves safety and security concerns that are not as prevalent with the housing of families with female heads of household.  Given these concerns, and the significantly higher number of families with female heads of household that cross the Southwest border, the current use of these facilities is the most efficient use of ICE's resources.  Declaration of Stephen M. Antkowiak ("Antkowiak Decl.") ¶ 26, attached hereto as Exhibit B.

7

did not intend the Agreement to cover situations involving accompanied minors held in family residential centers together with their parents or legal guardians. Enforcement of the Agreement to preclude use of these facilities would render the Agreement nonsensical, and would lead to adverse consequences never considered or anticipated by the parties at the time the Agreement was signed.

### i.    The Agreement Should Be Interpreted as a Consent Decree.

The Agreement became effective in 1997 only upon its approval by this Court and subject to this Court's continued oversight.  Agreement [Plaintiffs' Exhibit 2, at 50].   It is thus a consent decree.  *See Rufo* v. *Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992).  A consent decree is interpreted using general contract principles.  *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985) ("A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles."); *see also United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005) ("[C]ourts treat consent decrees as contracts for enforcement purposes.").  Like a contract, a consent decree "must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree."  *Asarco*, 430 F.3d at 980; *see also United States v. Armour & Co.*, 402 U.S. 673, 681  (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.").  The consent decree "should be read to give effect to all of its provisions and to render them consistent with

each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

### ii.   The Agreement Was Never Intended to Apply to Accompanied Minors in Family Residential Centers.

The Agreement should not be interpreted to apply to accompanied minors housed together with their parents in family residential centers, as this was not the intent of the parties.  "Under California law, the intent of the parties determines the meaning of the contract." *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) (citing Cal. Civ. Code §§ 1636, 1638).  In interpreting a contract, the Court looks to the objective intent of the parties as is made apparent by the actual agreement, "that is, the intent manifested in the agreement and by surrounding conduct—rather than the subjective beliefs of the parties." *Id.*  As is made clear by the language of the Agreement and the factual circumstances surrounding its creation, the Agreement simply did not contemplate the significant growth in the number, and recent influx, of families or the need to house them in family residential centers during their removal proceedings.

The Agreement was entered into to resolve a lawsuit challenging "the constitutionality of [the INS's] policies, practices, and regulations regarding the detention and release of *unaccompanied* minors . . . ."  Agreement at 3 (emphasis added); *see also Reno v. Flores,* 507 U.S. 292, 294 (1993) (noting that the litigation applied to "alien juveniles who are not accompanied by their parents or

other related adults.").  The entirety of Plaintiffs' argument rests upon the premise that because the Agreement defines the class as "[a]ll minors who are detained in the legal custody of the INS," Agreement ¶ 10, and contains a provision defining a "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS," Agreement ¶ 4, the Agreement must be read to include accompanied alien minors.  But, as the Ninth Circuit has recognized, the  "words of a written instrument often lack a clear meaning apart from the context in which the words are written . . . ."  *Skilstaf, Inc. v. CVS Caremark Corp*. 669 F.3d 1005, 1015 (9th Cir.  2012).

The purpose and context for the definition of "minor" shows no intent that the parties intended the term to apply to accompanied children.  Rather, the definition was meant to provide clarity as to who would be treated as a child and who would be treated as an adult under the Agreement.  *See* Agreement ¶ 4 (differentiating between minors and adults based on age).  In 1997 (and now), a "child" was defined in the Immigration and Nationality Act (INA) as "an unmarried person under twenty-one years of age . . . ."  *Wong v. Bell*, 642 F.2d 359, 360 (9th Cir. 1981) (citing 8 U.S.C. § 1101(b)(1)).  Had the agreement failed to define the term "minor," there would have been confusion as to whether the Agreement applied to individuals under the age of 21 or individuals under the age of 18.  In addition, to qualify as a "child" under the INA, an individual could not be married.  8 U.S.C. § 1101(b)(1).  Consequently, in the context of the

Agreement, the definition of "minor" was necessary to capture UACs under the age of 18 regardless of their marital status.

To the extent that the definition appears to signal the intent of the parties to encompass accompanied children (and not just UACs), or to the extent that the definition is ambiguous on this point, the court should consider the context and structure of the Agreement as a whole. The Agreement is clearly crafted in a manner that indicates that the parties did not intend its provisions to apply to accompanied children. In addition to the provisions discussed in succeeding sections, the following provisions indicate that the parties did not intend for it to apply to accompanied children:

- On page 3 of the Agreement, the parties note that the Agreement is designed to require that minors "in [Government] custody . . . be housed in facilities meeting certain standards, including state standards for housing and care of *dependent* children," making no mention regarding the housing of families or of children who enter the United States in the custody of their parents.

- Paragraph 24 of the Agreement, which references enforcement of the Agreement, mentions actions a child can take to be released from custody. None of the provisions in this paragraph mention the ability of a child to consult with his or her parent prior to seeking a bond hearing or filing a federal court action. To the contrary, the Agreement simply presumes that the child does not have a parent available to make these decisions on his or her behalf.
- Section VIII of the Agreement addresses the transportation of children arrested or taken into immigration custody. In no part of this section does it describe what to do with family members, including a parent apprehended or taken into custody together with his or her child during this process.

Further, at the time the Agreement was signed in 1997, there were no family residential facilities in operation.  Johnson Decl. ¶ 12.  There is also no indication that the parties anticipated that such facilities would be developed,[7] or even that they anticipated the significant increases in the numbers of alien children accompanied by their parents crossing the U.S. southwest border that would necessitate the development of such facilities.  *See* Johnson Decl. ¶¶ 7-8; Oaks Decl. ¶¶ 25-28.

In fact, the Agreement contains clear evidence of the parties' expectations with regard to the numbers of UACs crossing the border that would constitute an "influx," defining that as "circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program."  Agreement ¶ 12.B; *see also Reno*, 507 U.S. at 295 (noting that an influx of approximately 8,500 UAC was a serious problem).  But in fiscal year 2012, the Border Patrol apprehended more than 24,400 UACs alone, and that number jumped to more than 38,800 in fiscal year 2013.[8]  In fiscal year 2014 the number of UACs apprehended on the southwest border reached 68,541, and the number of accompanied children (children encountered with a parent or legal guardian) apprehended surged to 38,

---

[7] While the district court in Texas did find that the Agreement, by its terms, was applicable to the Hutto family facility because it refers to "minors" throughout, that court also clearly recognized that the Agreement "did not anticipate the current emphasis on family detention . . . ."  *Bunikyte*, 2007 WL 1074070 at *3.

[8] *See* U.S Border Patrol Statistics, available at: http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20UACs%20by%20Sector%2C%20FY10.-FY14.pdf.

845.[9]  Thus, in 2014, an average of approximately 188 UACs came into Government custody each day, suggesting that the "influx" provisions of the Agreement remained generally applicable throughout that year.  Given that the parties clearly did not anticipate the influx levels present today, it follows that the parties could not have anticipated the need for family detention to handle this influx.  Thus, the Agreement should not be stretched to cover situations the parties never anticipated.

## B.   The "Preference for Release" Provision of the Agreement Should Not Be Applied to Accompanied Minors in Family Residential Centers.

Paragraph 14, as written, provides for release of a "minor from its custody without unnecessary delay" to a parent, legal guardian, or adult relative "where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or immigration court, or to ensure the minor's safety or that of others . . . ."  Agreement ¶ 14.  The procedures and conditions of that release (which are discussed in Section VI) clearly contemplate the release of a UAC in Government custody to a parent or other individual who was previously present in the interior of the United States.[10]  There is absolutely no

---

[9] *See* U.S. Border Patrol Statistics, available at:
http://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Family%20Units%20and%20UAC%20Apps%20FY13%20-%20FY14_0.pdf .

[10]  Paragraph 15, for example, requires that the potential custodian sign an affidavit and agreement attesting that he or she will be able to "provide for the minor's physical, mental, and financial well-being" and "ensure the minor's presence at all future proceedings before the INS

basis to find that the parties intended these provisions to apply to an accompanied

child together with a parent or guardian who just entered the country and would

not be able to establish a pre-existing stable living environment.  *See Bunikyte*,

2007 WL 1074070 at 3 ("Of course, this preference for release makes no sense

when the minor's parents are detained with the child."); *id.* ("[T]he release policy

expressed in Paragraph 14 has limited utility in the context of family detention . . .

.").[11]

Moreover, as proof that Plaintiffs acknowledge that the language of the

Agreement is ambiguous, Plaintiffs contend – without citing any specific language

mandating this result – that Paragraph 14 of the Agreement requires ICE to release

not only accompanied children, but also their parents.  Memo, ECF No. 100-1, at

5-11.  Plaintiffs argue that releasing such parents would enable accompanied

and the immigration court".  Agreement ¶ 15.  Paragraph 16 enables the INS to terminate such
custodial arrangements if a custodian fails to comply with the affidavit and agreement.
Agreement ¶ 16.  Paragraph 17 even provides that the potential custodian may be subject to a
"suitability assessment" that includes components such as "an investigation of the living
conditions in which the minor would be placed and the standard of care he would receive" as
well as "verification of identity and employment of the individuals offering support, interviews
of members of the household, and a home visit." Agreement ¶ 17.

[11]   Plaintiffs argue that Defendants are violating this provision because they are applying a no-
release policy.  This claim is also at the heart of a district court case in the District of Columbia
in which the Court recently addressed a similar claim.  *See  R.I.L.R., et al. v. Johnson, et al.*,
Case No. 15-0011, Opinion, ECF No. 33 (D.D.C. Feb. 20, 2015).  Notably, in that case the Court
found that the Government does not have a blanket no-release policy for women and children,
but rather had a policy of considering deterrence of mass migration as a factor in making custody
determinations.  *Id.* at 8-9.  The Court then went on to find that consideration of this factor was
impermissible, and has enjoined the Government from its consideration.  *See generally id.*
However, this decision is not yet final, and the Court's conclusion was based on an incomplete
factual record.  Much of the evidence put forth before this Court has not yet been presented to
the Court in *R.I.L.R.*.

minors to have the opportunity for "preferential release to a parent."  *Id.*  But Plaintiffs' reading of the Agreement stretches it far beyond its terms.  Plaintiffs point to no provision where the Agreement provides for the release of parents and legal guardians who have no lawful immigration status, nor any provision of the Agreement that explicitly addresses adult rights and treatment within family residential centers.  Indeed, there is no basis to find that the Agreement provides for or requires the release of adults in immigration custody.  *See Bunikyte*, 2007 WL 1074070 at *16 ("The Flores settlement, however, does not provide any particular rights or remedies for adult detainees.").

Additionally, Paragraph 14 also provides that an alien child may continue to be detained "to ensure the minor's safety or that of others."  Agreement ¶ 14. Detaining an accompanied child together with his or her parent, rather than releasing him or her to another individual, complies with this provision of the Agreement because separating a child from his or her parent endangers the safety of the child, and keeping the family together is generally in the child's best interest.  *See Bunikyte*, 2007 WL 1074070 at *16 ("Both Plaintiffs and Defendants recognize that keeping the minor Plaintiffs with their parents is in their best interests . . . .").  Further, release of all accompanied children and their parents (or guardians) incentivizes such families to make the dangerous journey to this country.  Oaks Decl. ¶ 25.  Adults looking to smuggle children or otherwise cross the border illegally also would effectively be rewarded for having children

accompany them.  Johnson Decl. ¶ 11.  Smuggling endangers both the children

who are victims of the smugglers, and the public in general.  Johnson Decl. ¶ 9.

Moreover, releasing accompanied children and their parents after their

apprehension encourages increased migration and attendant national security

concerns, while the availability of detention is proven to reduce migration and

reduce these threats.  Johnson Decl. ¶¶ 7-9, 11; Oaks Decl. ¶¶ 25-28.[12]

## C. The "Licensing" Provision of the Agreement Should Not Apply to Family Residential Centers.

The purpose of requiring that alien children be placed in licensed facilities

was, as Plaintiffs acknowledge, to ensure that "ICE placements meet child-welfare

standards."  ECF No. 100-1, p.15.  This provision was not meant to apply to family

detention or to federal family residential facilities.  The parties never intended –

and could not have intended – such to apply to federally-operated family

residential centers that did not yet exist at the time of the parties entered the

---

[12]  Plaintiffs also argue that release is required because housing families in ICE family residential
centers does not comport with the requirements of due process.  Motion, ECF No. 100-1 at 7,
n.10.  However, Plaintiffs' ability to raise any challenge in this context is limited to the four
corners of the Agreement, and is not a generalized right to challenge their detention – such
challenges must be raised in a petition for habeas corpus in the district in which they are
detained.  Moreover, Plaintiffs' reliance on *Zadvydas v. Davis,* 533 U.S. 678 (2001) is
misplaced.  Plaintiffs point to no basis to find that ICE is subjecting families to indefinite, post-
order detention, as was the issue in *Zadvydas,* nor have they pointed to any other basis to find
that detention in ICE family residential centers is generally contrary to law, or outside ICE's
statutory authority.  And again, such a claim would need to be raised not in a contractual
enforcement motion, but in a petition for a writ of habeas corpus in the court with authority to
issue such a writ.

Agreement.  Johnson Decl. ¶ 12.  There is simply no basis to find that the state licensure provision was intended to apply to such facilities.

Moreover, nothing in the language of this section of the Agreement makes reference to the housing of families (including accompanied children).  Section VI, Paragraph 19 provides that, as an alternative to releasing a minor held in custody to a potential custodian, "[i]n any case in which the INS does not release a minor pursuant to Paragraph 14 . . ., such minor shall be placed temporarily in a licensed program . . . ."  Settlement ¶ 19.  Under the Agreement, a "licensed program" is defined as a "program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for *dependent children* . . . ."  Settlement ¶ 6 (emphasis added).  The reference to "dependent children" is clearly a reference to children who are not accompanied by a parent or guardian.  This reading of the Agreement is supported by the fact that there is no state licensing process available – nor was there in 1997 – for residential centers that house children along with their parents or guardians.  It is illogical to assume that the parties intended this provision to apply to facilities that did not even exist at the time, and for which no such licensing would have been available.  This provision should not be stretched to have the entirely unintended consequence of making it impossible for ICE to house families at ICE family residential centers, and to instead require ICE to separate accompanied children from their parents or legal guardians.

Finally, Defendants note that Plaintiffs have raised no challenges with regard to the standards of the conditions at any ICE family residential center.  In fact, if the substantive requirements of the Agreement concerning facility conditions were read to apply to family residential centers, ICE would be in substantial compliance with the requirements of the Agreement even in the absence of licensing.  *See Jeff D. v. Otter*, 643 F.3d 278, 283-84 (9th Cir. 2011) ("Because consent decrees have 'many of the attributes of ordinary contracts [and] . . . should be construed basically as contracts' . . . , the doctrine of substantial compliance, or substantial performance, may be employed.") (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975)).  ICE family residential centers are operated in strict compliance with ICE family residential standards.  *See* ICE Family Residential Standards, available at: http://www.ice.gov/detention-standards/family-residential; *see generally* Antkowiak Decl.  The family residential standards were developed with input from medical, psychological, and educational experts, as well as civil rights organizations, with the goal of mirroring community standards and ensuring that all residents are treated with dignity and respect.  Johnson Decl. ¶ 17.  Residents at ICE family residential centers enjoy free movement during waking hours and have access to health and social services.  Johnson Decl. ¶ 18; Antkowiak Decl. ¶¶ 5, 13, 16, 24.  Each center permits visitors and provides indoor and outdoor recreational areas and activities, such as soccer, volleyball and basketball.  Johnson Decl. ¶ 18; Antkowiak Decl. ¶¶ 10, 19.  All dining rooms

18

serve three meals per day and residents have access to beverages and snacks 24 hours per day.  Johnson Decl. ¶ 18; Antkowiak Decl. ¶¶ 14, 23.  Education is provided to all school-age children.  Johnson Decl. ¶ 18; Antkowiak Decl. ¶¶ 11, 20.  Residents are permitted to wear their own personal attire or other non-institutional clothing, which is provided free of charge to those in need.  Johnson Decl. ¶ 18; Antkowiak Decl. ¶ 7.  Residents also have access to telephones, televisions, video games, the internet, and law libraries with printing and copying capabilities.  Johnson Decl. ¶ 18; Antkowiak Decl. ¶¶ 9, 12, 18, 22.

The ICE Enforcement and Removal Operations Juvenile and Family Residential Management Unit oversees the ICE family residential centers and ensures their compliance with the family residential standards.  Johnson Decl. ¶ 19.  The family residential centers are also subject to inspections by the ICE Office of Professional Responsibility's Office of Detention Oversight and an independent compliance inspector.  *Id.*  Given that these conditions place DHS in substantial compliance with the terms of the Agreement, and noting that DHS is concurrently filing a motion to modify the Agreement to specifically allow for Plaintiffs to have oversight regarding ICE's compliance with these standards for ICE family residential centers, it would be even more inappropriate to stretch the Agreement to impose a licensing requirement in a way never intended by the parties almost two decades ago.

### D.    <u>CBP Facilities Comply With the Requirements of the Agreement.</u>

The Agreement requires that "[f]ollowing arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors."  Agreement ¶ 12.A.  With the enactment of the Homeland Security Act of 2002, the INS's responsibility to temporarily detain UACs based on their immigration status following apprehension at or between the ports of entry was transferred to CBP.  And CBP has complied with – and indeed, far exceeded – the minimal standards set forth in the Agreement with regard to the conditions of detention for UACs for the short time period that they are in CBP custody.

CBP sets and enforces clear standards for safe and sanitary conditions at the Border Patrol stations through facilities design guides and written policy guidance.  Standards addressed by CBP address the necessary aspects of care for children in CBP custody and include, but are not limited to, the requirements of the Agreement to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."  Agreement ¶ 12.A Hold Rooms and Short Term Custody Policy ("Hold Room Policy") 6.24.7, available at http://foiarr.cbp.gov/streamingWord.asp?i=378.

UACs remain in CBP custody for an extremely short period of time.  In accordance with the provisions of the TVPRA, UACs must be transferred to HHS custody within 72 hours of a determination that a child is, in fact, a UAC.  8 U.S.C. § 1232(b)(3).  Under Border Patrol policy, every effort is made to transfer UACs to HHS custody within 12 hours.   Oaks Decl. ¶ 14.[13]  Given the sheer volume of individuals passing through any given Border Patrol station each day, as well as the short duration of aliens' stay at a Border Patrol station, it would be impossible for CBP to provide the same level of care at a Border Patrol station that one would expect at a longer-term facility, a fact which is recognized by the lesser standards required by the Agreement for these facilities as compared to the standards for longer-term facilities.  CBP nonetheless embraces the need to meet children's basic needs, such as adequate food and safe shelter, for the short time children are there. *See*, *e.g.*, Hold Room Policy at 6.8-6.11; 6.16; 6.24; 6.26.6; 7.  CBP also has in place performance measures to ensure that its Agents understand and maintain the requirements of the Agreement.  *See* Hold Room Policy 6.24.11; *id.* at 7.

A Border Patrol station provides shelter in hold rooms, which are designed to have sufficient space and the appropriate number of toilets for the designated

---

[13]  On average, in 2014, UACs spent only 34 hours in CBP custody; accompanied alien children were in CBP custody only slightly longer, with an average of 46 hours.  During the unanticipated and unprecedented influx of aliens along the southwest border from March 2014 through July 2014, these averages rose, such that some children were in CBP custody for several days.  Once these surge conditions subsided, however, the average time spent in custody reverted back to a period of less than two days.  *See* USBP Unaccompanied and Accompanied Alien Children Apprehensions Average Hours in Custody, attached hereto as Exhibit C.

maximum number of occupants.  *See* Oaks Decl. ¶ 15; Hold Room Policy 6.24.7; 7.1.2.[14]  The typical hold room is constructed of hardened materials that are easy to clean and hygienic.  *See* Oaks Decl. ¶ 15.  There are no trash cans in the rooms for safety reasons; however, supervisors are required to ensure that every room is regularly cleaned and sanitized.  *See* Oaks Decl. ¶¶ 15, 16; Hold Room Policy 7.1.3; 7.2.  CBP employs custodial staff to regularly address sanitation needs and any required maintenance in holding areas.  Oaks Decl. ¶ 17.

In Border Patrol facilities, UACs are separated from unrelated adults and either placed in a segregated hold room or placed in an open area under the constant visual supervision of a Border Patrol agent.  *See* Hold Room Policy 7.1.1; DHS, Office of the Inspector General, CBP's Handling of Unaccompanied Alien Children at 20 (September 2010), available at http://www.oig.dhs.gov/assets/Mgmt/OIG_10-117_Sep10.pdf .  All aliens, including UACs, are separated by age and gender; however, CBP makes every effort to keep young children with their parents.  *See* Hold Room Policy 7.1.1.; Oaks Decl. ¶ 12.  Although families may need to be separated to ensure the safety and security of all aliens being held at a Border Patrol station, Border Patrol agents

---

[14]  When CBP experienced the unprecedented influx of alien children and families crossing the Southwest border in 2014, Border Patrol stations were pushed to their limits.  During that time CBP used Centralized Processing Centers ("CPC") to help ameliorate overcrowding.  The CPC is an integral part of the RGV Sector's strategy to develop a more efficient way to process all categories of aliens, with the ability to provide services associated with the care and temporary custody of children and families.  These services include hot meals, showers, child monitors, and laundry services, among others.  *See* Oaks Decl. ¶ 4.

provide reasonable opportunities for contact between children and their family members.  *See* Oaks Decl. ¶ 12.

Medical care is available at each Border Patrol station for all individuals, including children.  *See* Oaks Decl. ¶¶ 9-11; Hold Room Policy 6.7.2; 7.2.3.  Upon arrival, each individual is screened for serious contagious diseases, outward signs of illness, or complaints of any illness or discomfort.  *See* Oaks Decl. ¶ 10; Hold Room Policy 6.7.2.  Individuals who require medical treatment that cannot be provided by medical personnel on site, or where there is no medical staff on site, are transported to an appropriate medical facility.  *See* Oaks Decl. ¶ 11; Hold Room Policy 6.7.2.

Absolute privacy is not guaranteed in CBP hold rooms because of safety and security concerns.  *See* Oaks Decl. ¶ 18.  For example, locked or closed doors are not available or permitted.  *See id.*  The toilet areas are separated from the rest of the room by a screen wall which allows agents to monitor and protect detainees, especially children, while still providing privacy.  *See id.*; Hold Room Policy 6.23.  Border Patrol agents also monitor hold rooms via cameras mounted in the rooms.  *See* Oaks Decl. ¶ 16; Hold Room Policy 6.5.  Additionally, agents visually check each hold room at regular intervals.  *See* Oaks Decl. ¶ 16.  For security purposes, the hold rooms are designed as interior rooms with no exterior windows.  *See* Oaks Decl. ¶ 18.  The rooms also remain well-lit at all times, not only to provide

adequate lighting for detainees and for officers, but also to minimize the risks of safety and security problems. *See* Oaks Decl. ¶ 19.

CBP also maintains strict standards to ensure children receive adequate drinking water and food. Potable drinking water is available at all times. *See* Hold Room Policy 6.9. All detainees are provided snacks and juice every four hours, and children of all ages and pregnant women have regular access to snacks, milk, or juice at all times. *See* Hold Room Policy 6.8. All children are offered meals every six hours; two of every three meals are hot meals. *See id*. CBP Policy requires that agents record the provision of meals. *See* Hold Room Policy 6.24.8-9, 6.24.13; Use of the Updated e3 Detention Module, attached hereto as Exhibit D. As feasible, CBP provides meals that conform to the culinary, cultural, and religious dietary restrictions and/or differences of all detainees. *See* Hold Room Policy 6.8.

CBP makes every effort to maintain the Border Patrol stations at a universally comfortable temperature. Oaks Decl. ¶ 20. CBP also provides Mylar blankets which provide the most hygienic solution for temperature control. *See* Oaks Decl. ¶ 21; Hold Room Policy 6.11.

CBP makes every effort to care for the children in its custody, which includes complying with the requirements of the Agreement. In those areas in which Plaintiffs contend that conditions at CBP facilities do not comply, an underlying Governmental interest, such as safety, is often the cause of the

24

complained-of conditions.  For example, the need to ensure the safety of all aliens, to include children, causes the hold rooms to be well-lit at all times and the wastebaskets to be removed.  Likewise, the need to ensure sanitary conditions leads to water that may taste different than that to which individuals from another country are accustomed, and blankets that seem sterile.  Ensuring safe and sanitary conditions, as required by the Agreement, is the primary goal, and at times may override individual comfort concerns.

Regardless, CBP makes every effort to ensure the safety, health, and comfort of UACs as required by the Agreement during the brief period they are in CBP custody.  Based on the above, the Court should find that CBP is in substantial compliance with the Agreement.

## IV.    CONCLUSION

For the foregoing reasons, the Government requests that the Court deny the Plaintiffs' Motion to Enforce Class Action Settlement.

DATED:      February 27, 2015            Respectfully submitted,


                                         JOYCE R. BRANDA
                                         Acting Assistant Attorney General
                                         Civil Division

                                         LEON FRESCO
                                         Deputy Assistant Attorney General
                                         Civil Division

                                         WILLIAM PEACHEY
                                         Director, District Court Section
                                         Office of Immigration Litigation

                                         WILLIAM SILVIS
                                         Assistant Director, District Court Section
                                         Office of Immigration Litigation

                                         */s/ Sarah B. Fabian*
                                         SARAH B. FABIAN
                                         Senior Litigation Counsel
                                         Office of Immigration Litigation
                                         District Court Section
                                         P.O. Box 868, Ben Franklin Station
                                         Washington, D.C. 20044
                                         Tel: (202) 532-4824
                                         Fax: (202) 305-7000
                                         Email: sarah.b.fabian@usdoj.gov

                                         *Attorneys for Defendants*

1

CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2015, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.


/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants