Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, ) | |
|     *Plaintiffs*, ) | |
| ) | |
| ) | No. CV 85-4544-RJK(Px) |
| v. ) | |
| ) | |
| Jeh Johnson, Secretary, U.S. Department ) | |
| of Homeland Security, *et al.*, ) | |
|     *Defendants.* ) | |

## DECLARATION OF KEVIN W. OAKS

1. I am the Chief Patrol Agent for the Rio Grande Valley Sector of the U.S. Border Patrol (USBP), U.S. Customs and Border Protection (CBP). I have been employed in this capacity since April 6, 2014. I have been a Border Patrol agent for 30 years. In my capacity as Chief of the Rio Grande Valley Sector, I am responsible for executing the mission of the Department of Homeland Security (DHS), CBP as a whole, and also that of the Border Patrol within the Rio Grande Valley Sector. Our mission includes facilitating the flow of legal immigration and trade while preventing the illegal trafficking of people and contraband.

2. I make this declaration on the basis of my own knowledge, as well as the documents and the information made available to me in my position.

3. The Rio Grande Valley (RGV) Sector is comprised of nine Border Patrol stations: Brownsville, Fort Brown Station, Weslaco, Harlingen, McAllen, Rio Grande City, Falfurrias, Kingsville, and Corpus Christi, Texas. I oversee all nine stations within the RGV Sector and am responsible for

the oversight of more than 3,000 agents and support personnel combined, who work to secure 316 border/zone miles and 317 coastal miles. I have oversight of the day-to-day law enforcement operations of U.S. Border Patrol in the RGV Sector including the apprehension and processing of aliens.

4. As part of my responsibilities, I also oversee the RGV Centralized Processing Center (CPC). The RGV CPC consists of CPC-Ursula (short-term holding only), CPC-McAllen (McAllen Station processing area), and Weslaco Station (Weslaco Station processing area when operationally required). The CPC is an integral part of the RGV Sector's strategy to develop a more efficient way to process all categories of aliens. CPC-Ursula currently has the ability to hold 1,000 detainees, with the ability to provide services associated with the care and temporary custody of children and families. These services include hot meals, showers, child monitors, and laundry services, among others.

5. I am familiar with the policies and procedures that govern the apprehension, processing, and temporary detention of aliens. As Chief, I am responsible for ensuring that those policies and procedures are implemented and adhered to on a daily basis.

6. Although I am the Sector Chief for the RGV, the policies and procedures discussed are implemented nationwide, and are not generally limited to the RGV.

7. Statistically, the RGV Sector sees more unaccompanied alien children and family units than any other Border Patrol sector.

8. Once a Border Patrol Agent encounters an individual the agent believes to be an illegal alien, the agent will first establish alienage and determine if the alien is a minor. Once the initial questioning is completed in the field, the alien is brought to a Border Patrol station for further processing.

9. If a Border Patrol Agent encounters an individual, regardless of alienage, who presents signs of an emergent medical issue, the Border Patrol Agent will render first aid if necessary and coordinate transportation of that individual to the appropriate medical center.

10. Once at the station, an agent or a medical contractor (depending on availability of contract medical personnel) will conduct a preliminary health screening. The purpose of the preliminary health screening is to determine if the alien has any serious contagious diseases, outward signs of illness, or complains of any illness or discomfort. If the alien displays any symptoms of illness/serious contagious disease, or complains of illness that may require medical care, the alien is taken to the appropriate medical facility, normally the local emergency department. However, if the alien is at a CPC facility the alien may be seen by a contract medical provider for an initial screening to determine if additional/emergent medical care is required.

11. If the medical issue presented at a CPC facility is one that can be addressed by a contract medical provider, such as lice, scabies, insect bites, fever, upper respiratory infections, ear and eye infections, minor scrapes/cuts/bruises, body aches, or pregnancy testing, those issues will normally be addressed by the contract medical provider. Any medical issues that cannot be addressed by the contract medical provider at a CPC facility are still treated by the appropriate medical facility, normally the local emergency department.

12. After the initial health screening, aliens are normally separated by age and gender. However, every effort is made to keep young children with their parents. Moreover, Border Patrol Agents provide any reasonable opportunity for contact between family members who may be separated based on age or gender. Separation of family units is sometimes required in order to ensure the safety and security of all of those who are being held by Border Patrol.

13. Once in custody, aliens' biographic information and biometrics are collected and record checks are run through CBP and other law enforcement systems. In connection with processing, aliens are questioned individually by a Border Patrol Agent on issues related, for instance, to their biometric and biographic results, ability to lawfully enter or remain in the United States, as well any fear of returning to their country of origin. Ultimately, aliens are then classified and processed consistent with DHS's priorities and the governing legal framework.

14. Border Patrol stations are not designed for long-term care and detention. Every effort is made to promptly process, transfer, or remove those in custody as appropriate and as operationally feasible. As such, Border Patrol policy requires agents to seek to process and transfer all aliens within twelve (12) hours.

15. Border Patrol policy mandates that each facility be kept safe, secure, and clean. The size of hold rooms at Border Patrol stations varies. However, hold room capacity for any room requires sufficient space and the appropriate number of toilets for the occupants it is designed to accommodate. Typically a hold room is constructed of impervious materials that can be easily cleaned and are hygienic. Supervisors are required to ensure that each cell is regularly cleaned and sanitized.

16. In order to ensure the safety of detainees, there are cameras that monitor each hold room. These cameras provide agents the ability to visually inspect the hold rooms, although they do not provide sight lines to the toilet facilities. The agents will also visually check each hold room approximately every 15 minutes. There are no trashcans in the hold rooms for safety reasons. Trashcans are considered to be safety hazards, as they may be used as a weapon.

17. CBP's Facilities Management and Engineering (FM&E) and the General Services Administration (GSA) fund custodial staff to regularly address sanitation needs and any required maintenance of the holding areas.

18. As for privacy concerns, and like any other detention-like setting, Border Patrol cannot guarantee absolute privacy. Hold rooms are designed to have no exterior windows. But, allowing locked or closed doors would be a safety and security concern. The hold rooms instead employ screen walls by the bathroom to address privacy needs. These screen walls allow for an environment in which detainees, especially children, can be monitored and protected.

19. Similarly, the lights remain on at all the time while detainees are in Border Patrol custody for security reasons and due to operational necessity. Border Patrol stations are 24/7 facilities, and there may be agents arriving with newly apprehended aliens at all hours of the night. The agents

4

must be able to maintain visual control over the holding cells to ensure the safety and security of the detainees.

20. In general the temperature in a Border Patrol station is maintained at a comfortable temperature, although, in my experience, those who are not accustomed to air conditioning at times find it cooler than they are accustomed to.

21. In certain circumstances, aliens who are in Border Patrol's custody may require some form of bedding. During the summer of 2014, Border Patrol began using, in certain circumstances, mylar blankets. In the RGV sector, as well as in certain other localities, the use of these blankets was necessary in order to provide cost effective bedding which did not require routine laundering (which can be operationally challenging) and did not transmit communicable diseases such as lice or scabies.

22. Processed unaccompanied alien children who are not placed locally in the Rio Grande Valley by the Department of Health and Human Service's Office of Refugee Resettlement, as well as individuals who are part of family units that have completed their Border Patrol processing but are pending a determination on whether detention is appropriate, made by Immigration and Customs Enforcement, may be transferred to CPC-Ursula. This transfer is intended to segregate this population from the large population of Border Patrol detainees that may include criminal aliens. At CPC-Ursula Border Patrol provides additional services including showers, clothing, hot meals, medical, laundry, television, and age appropriate toys. CPC-Ursula also serves as a centralized collection point for the transfer of this population to ORR and ICE.

23. CPC-Ursula is a facility designed for the short-term detention of aliens and is not intended to provide long-term care. However, where individuals may need to be held for a period between 12 – 72 hours, it provides additional services as noted in paragraph 22.

24. At CPC-Ursula, all of the policies and procedures for Border Patrol, including for treatment of those detained by Border Patrol, continue to apply.

25. I have learned, based on information and documents available to me in my position, that prior to the increase in family residential facilities for detention by ICE, family units apprehended by Border Patrol, particularly those by Border Patrol in the RGV, claimed that a principal motive for entering the United States was to take advantage of the "permisos" that the United States was granting to family units. The term "permiso" in this context is used to refer to a Notice to Appear which permits aliens to depart the Border Patrol station without detention.

26. Based on information and documents available to me in my position as Sector Chief, I understand that aliens who have been apprehended by RGV Border Patrol Agents since the availability of family unit detention by ICE increased in July 2014 have indicated that they learned from family members, media, and other means that the United States was no longer providing "permisos." Family units apprehended by RGV Border Patrol have indicated that others of whom they are aware in their home countries have chosen not to come to the United States because "permisos" are no longer being issued.

27. I have also learned that family units who have been apprehended by Border Patrol Agents in the RGV Sector in July 2014 were under the impression that the United States government was only going to issue "permisos" to individuals prior to some end date of June or July 2014. While this impression was incorrect, it speaks to the understanding of the family units that detention, and the ability to simply depart a Border Patrol station, factor strongly into their determination on when and whether to attempt to cross into the United States.

28. Based on my experience as a Border Patrol Agent, the use of detention has historically been effective at deterring aliens (specifically aliens from countries other than Mexico) from entering the United States through the South Texas region. For example, in 1989 when there was a dramatic increase of Central American aliens illegally entering the United States, the former Immigration and Naturalization Service detailed staff to South Texas, opened temporary detention camps, and instituted a one-day expedited review of asylum applications, which dramatically reduced the average daily apprehensions of non-Mexicans along the Texas border.

Similarly, in 2005, when the RGV Sector was experiencing an influx of Brazilian nationals, the implementation of expedited removal with detention quickly and significantly reduced the number of Brazilian nationals illegally entering the United States.

29. Consistent with the information contained in paragraphs 26 and 27, Border Patrol apprehension statistics demonstrate that, year-over-year, there has been an approximate 16% reduction in family units apprehended in the RGV Border Patrol Sector. Moreover, from July 10, 2014 until the present, there has been an approximate 63% reduction in family units apprehended in the RGV Border Patrol Sector as compared to the period between December 1, 2013 to July 9, 2014.

30. I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED:

FEB 27 2015

Kevin W. Oaks
Chief Patrol Agent
U.S. Border Patrol
Rio Grande Valley Sector

7