CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone:  (213) 388-8693
Facsimile:   (213) 386-9484
Email: crholguin@centerforhumanrights.org
         pschey@centerforhumanrights.org
         marchela@centerforhumanrights.org

WILLIAM A. MOLINSKI (STATE BAR NO. 145186)
wmolinski@orrick.com
T. WAYNE HARMAN (STATE BAR NO. 254089)
wharman@orrick.com
ELENA GARCIA (STATE BAR NO. 299680)
egarcia@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, California  90017
Telephone:  +1-213-629-2020
Facsimile:   +1-213-612-2499

*Attorneys for Plaintiffs* (listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Jeh Johnson, Secretary, U.S. Department of Homeland Security, *et al.*,<br><br>Defendants. | Case No. CV 85-4544-DMG<br><br>OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF CLASS ACTION<br><br>Hearing:   March 27, 2015<br>Time:       9:30 a.m.<br>Courtroom 7, 312 N. Spring Street |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

Ranjana Natarajan (Cal. Bar No. 230149)
UNIVERSITY OF TEXAS SCHOOL OF LAW
Civil Rights Clinic
727 E. Dean Keeton St.
Austin, TX 78705
Telephone: (512) 232-7222
Email: rnatarajan@law.utexas.edu

1
2
3

OUTLINE OF CONTENTS

4

5    I      INTRODUCTION ..........................................................................1

6    II     NO CHANGE IN THE LAW WARRANTS MODIFYING THE
7           SETTLEMENT. ...........................................................................2

8           A   The Homeland Security Act is wholly consonant with the
9               Settlement. ...........................................................................2

10          B   The TVPRA nowise conflicts with the Settlement. ................6

11   III    NO CHANGE IN THE FACTS WARRANTS MODIFYING THE
12          SETTLEMENT. .........................................................................10

13          A   Defendants' evidence fails to establish any reason to modify the
14              Settlement. .........................................................................11

15          B   Defendants' proposed modifications would facilitate the unlawful
16              detention of children. ........................................................17

17          C   ICE's confining children in improper facilities furthers no
18              legitimate purpose. ............................................................18

19          D   Plaintiffs should be allowed discovery before the Settlement is
20              modified on the weight of defendants' evidence. ................24

21   IV     CONCLUSION ...........................................................................25

/ / /

22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Bunikyte v. Chertoff*, 2007 WL 1074070 (W.D. Tex. Apr. 9, 2007)......................23

*Frontiero v. Richardson*, 411 U.S. 677; 93 S. Ct. 1764; 36 L. Ed. 2d
    583 (1973) ................................................................................16

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530
    U.S. 1; 120 S. Ct. 1942; 147 L. Ed. 2d 1 (2000) ........................................5

*Local 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S.
    501; 92 L. Ed. 2d 405; 106 S. Ct. 3063 (1986) ....................................18

*Miller v. French*, 530 U.S. 327; 120 S. Ct. 2246; 147 L. Ed. 2d 326
    (2000) ........................................................................................3

*Nordlinger v. Hahn*, 505 U.S. 1; 112 S.Ct. 2326; 120 L.Ed.2d 1
    (1992) ......................................................................................16

*Orantes-Hernandez v. Gonzales*, 504 F. Supp. 825 (C.D. Cal. 2007),
    *aff'd*, 2009 U.S. App. LEXIS 7260 (9th Cir. 2008) ...........................10

*R.I.L.R. v. Johnson*, No. 15-0011, Opinion ECF No. 33 (D.D.C. Feb.
    20, 2015) ..........................................................................16, 18

*Reno v. Flores,* 507 U.S. 292; 113 S.Ct.1439; 123 L.Ed.2d 1 (1993) ...................23

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S. Ct. 748,
    116 L. Ed. 2d 867 (1992) ....................................................3, 10-11

*United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047 (9th Cir.
    1993) .........................................................................................3

*United States v. Asarco Inc.*, 430 F.3d 972 (9th Cir. 2005) ...................................10

*Walsh v. Schlecht*, 429 U.S. 401; 50 L. Ed. 2d 641; 97 S. Ct. 679
    (1977) ......................................................................................16

*Matter of Adeniji*, 22 I. &N. Dec. 1102 (BIA 1999) ................................................11

**Statutes, Rules and Regulations**

28 U.S.C. § 2412(d) ................................................................................25

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

42 U.S.C. § 5633(a)(12)(B) ................................................................. 12

6 U.S.C. § 279 ..................................................................................... 4

8 U.S.C. § 1226(a) .............................................................................. 12

8 U.S.C. § 1232(a)(2)(B) ..................................................................... 7

8 U.S.C. § 1232(b)(3) ....................................................................... 7, 8

8 U.S.C. § 1232(c)(2) .......................................................................... 7

Homeland Security Act of 2002, Pub. L. 107-296 (H.R. 5005) .............. 3

Wilberforce Trafficking Victims Protection Reauthorization Act of
     2008, Pub. L. 110-457, 122 Stat. 5044 (2008) ................................. 6

8 C.F.R. §§ 1236.1(c)(8) & 1236.3(b) (2015) ...................................... 12

I       INTRODUCTION

Defendants' "protective" motion to modify the class-wide settlement herein, Dkt. 101, Exhibit 1 ("Settlement"), all but concedes that their current policies toward the release and placement of class members apprehended with their mothers breaches that agreement.

Defendant Immigration & Customs Enforcement (ICE) admits it makes no effort to minimize children's detention, as Part VI of the Settlement requires. ICE similarly concedes it is now holding hundreds of children in secure facilities that are not licensed to house dependent minors in breach of ¶ 19 of the Settlement. ICE elsewhere urges the Court to condone both violations on the theory that the Settlement's expressly protecting "all minors" really means it protects only *some* minors: *i.e.,* those who are unaccompanied at the time of apprehension.

As defendants know, however, courts enforce settlements in accordance with their plain terms, and if the Court does so here, defendants lose. Defendants therefore implore the Court to revise the agreement so that ICE may *maximize* the time children spend in locked, unlicensed facilities.

As grounds for jettisoning fundamental protections for children, defendants offer both legal and factual justifications. First, they argue that changes in law dating from 2002 and 2008 have suddenly made it "impossible" for ICE to comply with both the Settlement and apposite statutes. Second, they argue ICE should be permitted to detain *some* class members—those apprehended with their mothers—

OPPOSITION TO MOTION TO MODIFY SETTLEMENT
OF CLASS ACTION
CV 85-4544-DMG

to discourage other would-be entrants from coming to the United States without authorization.

As will be seen, any merit defendants' arguments may have is superficial at best. First, there are *no* actual conflicts between the Settlement and subsequent legislation. To the contrary, Congress directed that ICE should remain bound by agreements pre-existing the enactment defendants cite. Defendants' delaying many years to suggest that some such conflicts even exist discovers their argument as wholly specious.

Second, there is simply *no* competent evidence that ICE's detaining a minority of class members in secure, unlicensed facilities has discouraged or will discourage others from fleeing crushing poverty and rampant lawlessness in Central America. Even were there such evidence, as a matter of law ICE simply may not detain children to deter others.

Defendants fall far short of carrying their burden of establishing lawful grounds to modify the Settlement. The Court should deny their motion.

II    NO CHANGE IN THE LAW WARRANTS MODIFYING THE SETTLEMENT.

     A    **The Homeland Security Act is wholly consonant with the Settlement.**

To warrant modifying the Settlement to conform with changed law defendants must point to "a *significant* change … in [apposite] law." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383-84, 112 S. Ct. 748, 116 L. Ed. 2d

867 (1992) (emphasis added), a change so important that complying with both

statute and a prior agreement would be "impermissible..." *Miller v. French*, 530

U.S. 327, 347-48; 120 S. Ct. 2246; 147 L. Ed. 2d 326 (2000) (internal quotation

marks omitted).

To carry that burden, defendants first offer that the Homeland Security Act of

2002, Pub. L. 107-296 (H.R. 5005) ("HSA") is inconsistent with the Settlement.

Motion at 15. It clearly is not.[1]

The HSA created the Department of Homeland Security (DHS) and

transferred to it certain functions formerly performed by the Immigration and

Naturalization Service (INS). As defendants note, before the HSA the INS was

responsible for the arrest, detention, release, and removal of unauthorized entrants,

including children. Motion at 16.

Section 441 of the HSA, *codified at* 6 U.S.C. § 251, "transferred from the

Commissioner of Immigration and Naturalization to the Under Secretary for Border

and Transportation Security all functions performed under the following programs,

and ... *all liabilities pertaining to such programs, immediately before such transfer*

*occurs*: (1) The Border Patrol program. (2) The detention and removal program. ..."

---

[1] Defendants' argument is also palpably untimely. *United States v. Alpine Land & Reservoir Co*., 984 F.2d 1047, 1049 (9th Cir. 1993) (motion to modify settlement based on change in law must be brought "within a reasonable time …" (internal quotation omitted)). Here, the change in law defendants assert has been in place for some 13 years, during which defendants managed to comply with the Settlement without any hint that doing so violated or was inconsistent with the HSA in any way.

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

*Id*. (emphasis supplied).[2]

HSA § 462, *codified at* 6 U.S.C. § 279, carved out from this transfer responsibility for "the care of *unaccompanied* alien children..." which Congress instead gave to the Office of Refugee Resettlement of the Department of Health and Human Services (ORR).[3]

Just how the HSA suddenly prevents ICE from complying with the Settlement is nowhere to be seen. First, the HSA transferred responsibility over unaccompanied children to ORR some 13 years ago, yet that agency feigns no difficulty in complying with both the Settlement and the HSA. Defendants wholly fail to explain how ORR manages house and release unaccompanied children as both the HSA and Settlement direct, while ICE suddenly cannot.[4]

---

[2] HSA § 471 provides that "[u]pon completion of all transfers from the Immigration and Naturalization Service as provided for by this Act, the Immigration and Naturalization Service of the Department of Justice is abolished." *Id*.

[3] Congress directed that ORR be responsible for "coordinating and implementing the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status," "ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child," "making [and implementing] placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status," and "identifying a sufficient number of qualified individuals, entities, and facilities to house unaccompanied alien children." *Id*.

[4] In promulgating regulations implementing the HSA, defendants acknowledged that all "functions of the Immigration and Naturalization Service (INS) of the Department of Justice, and all authorities with respect to those functions, transfer to DHS on March 1, 2003 ..." 68 Fed. Reg. 10922 (March 6, 2003). Nowhere in the

Indeed, the HSA itself expressly forecloses defendants' conflict argument. HSA § 1512, *codified at* 6 U.S.C. § 552, includes the following savings clause:

(a)(1) Completed administrative actions of an agency *shall not be affected by the enactment of this Act* or the transfer of such agency to the Department, but shall continue in effect according to their terms ...

(2) For purposes of paragraph (1), the term "completed administrative action" includes ... *agreements*, [and] *contracts* ...

(c) PENDING CIVIL ACTIONS.—Subject to the authority of the Secretary under this Act, pending civil actions shall continue notwithstanding the enactment of this Act or the transfer of an agency to the Department, and in such civil actions,... *judgments [shall be] enforced in the same manner and with the same effect as if such enactment or transfer had not occurred*.

*Id*. (emphasis supplied).

Congress "'says in a statute what it means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6; 120 S. Ct. 1942; 147 L. Ed. 2d 1 (2000). The Settlement does not conflict with the HSA, but defendants' seeking to roll back the agreement most assuredly does.

Defendants continue to implement the agreement with respect to

---

new regulations did defendants ever suggest that their duties under the Settlement were inconsistent with the requirements of the HSA.

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

unaccompanied children, children apprehended with their fathers, and indeed, children apprehended with *anyone* except their mothers. Nothing in the HSA requires that children receive disparate treatment merely because they were apprehended with their mothers. To the contrary, the HSA's savings clause compels the reverse.

**B      The TVPRA nowise conflicts with the Settlement.**

Defendants next offer that the Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, 122 Stat. 5044 (2008) (TVPRA) on December 23, 2008—six years after enactment—only now prevents them from complying with the Settlement. Motion at 8, 16-19. Their argument borders on the frivolous.

TVPRA § 235 in fact strives to afford *unaccompanied* children protections above and beyond prior law. Like the HSA, the TVPRA provides that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). In addition, it provides that except in "exceptional circumstances" DHS must transfer detained children to ORR within 72 hours of apprehension, which must then place such children "in the least restrictive setting that is in the best interests of the child," typically with "a suitable

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF CLASS ACTION
CV 85-4544-DMG

1    family member." 8 U.S.C. § 1232(b)(3).[5]

2
3            Defendants offer three ways in which their obligations under the Settlement

4    "may" render ICE "unable to comply with … the TVPRA …" Motion at 18. First,

5    defendants argue that Settlement ¶ 14 requires them to consider releasing children

6
7    in order of preference to their parents, and then to other reputable custodians,

8    whereas the TVPRA directs them to return children from Mexico and Canada to

9    their home countries, 8 U.S.C. § 1232(a)(2)(B), or else transfer them to ORR. 8

10
11    U.S.C. § 1232(b)(3).[6] Motion at 18.

12            Here, defendants attempt to set up the Settlement's requirements relating to

13    release *pending removal proceedings* as inconsistent with grounds for removal

14
15    itself, an error so egregious as to border on the misleading. As defendants well

16    know, nothing in the Settlement prevents ICE from removing children, whether

17    Mexican, Canadian, or Central American. The Settlement regulates how children

18
19    will be detained and housed for howsoever long it takes to determine whether they

20    should be removed, not whether they may be removed *vel non*.

21            Nor is the Settlement's generally requiring defendants to release children

22
23    "without unnecessary delay" to reputable custodians inconsistent with 8 U.S.C. §

24    ————————————
      [5] The TVPRA thus mirrors Settlement ¶ 15, which likewise generally requires
25    defendants to transfer children to non-secure licensed facilities within 72 hours of
26    arrest.

27    [6] Upon receiving a child, the TVPRA directs ORR to place her "in the least
      restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2).
28    Here, too, the TVPRA mirrors the Settlement. Settlement ¶ 11.

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

1232(b)(3).[7] As stated, TVPRA § 235(c)(2) guarantees children "[s]afe and secure placements," and directs ORR to place children "in the least restrictive setting that is in the best interests of the child," typically, "a suitable family member."  Like ¶ 14 of the Settlement, TVPRA provides, "A child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." *Id*.

Defendants know better. For years nothing in the Settlement prevented ICE from transferring unaccompanied minors to ORR's care, nor did the agreement hinder ORR from releasing unaccompanied minors to parents or other appropriate custodians. Indeed, both the TVPRA and Settlement have harmoniously regulated the release and placement of thousands of children for many years now. Even now, defendants raise no conflict as regards unaccompanied minors or minors apprehended with any adult other than their mothers. Defendants fail entirely to explain why they may not continue to do so as well with regards to minors apprehended with their mothers.[8]

---

[7] Defendants need not release children who are exceptional flight risks or dangerous. Settlement ¶ 14. Nor must defendants release a minor charged with or convicted of crime or delinquency. *Id*. ¶ 21A. Defendants need not "release a minor to any person or agency whom [the defendants] ha[ve] reason to believe may … fail to present him or her … when requested to do so." Settlement ¶ 11.

[8] Reports provided pursuant to Settlement ¶ 29 show that DHS has for many years transferred most children to ORR, which in turn places them in programs licensed for the care of dependent children until a parent or other reputable custodian is found to care for them.

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF CLASS ACTION
CV 85-4544-DMG

Defendants lastly offer that Settlement ¶ 21, which allows defendants to confine delinquent or violent juveniles in secure facilities, conflicts with DHS's obligation to transfer unaccompanied minors to ORR. Motion at 18-19. Here again, defendants conflate substantive grounds for keeping children in secure facilities with the agencies charged with determining whether such grounds apply (depending on whether a child is accompanied or unaccompanied).

Defendants reason that because the TVPRA directs ORR to decide whether *unaccompanied* children should be released or housed in secure facilities, ICE is unable to do the same respecting *accompanied* children. To put it charitably, that is curious reasoning. The TVPRA is inapplicable to accompanied children, and it cannot possibly conflict with ICE's discharging its duties under the Settlement toward accompanied children.[9]

In sum, the HSA distributed the former-INS's authority over the release and placement of detained children between HHS/ORR and DHS/ICE. The TVPRA later clarified how such authority should be exercised. The substantive protections

---

[9] Remarkably, defendants elsewhere concede that "[a]lien children who arrive in the United States with a parent or legal guardian are not considered unaccompanied, and therefore *do not fall under the provisions of the TVPRA*." Motion at 18 (emphasis added). Instead, "the detention or release of alien family units is governed by *the detention provisions of the Immigration and Nationality Act* ('INA'). *See* 8 U.S.C. §§ 1225, 1226, 1231 …" *Id*. (emphasis supplied).

The provisions defendants thus concede govern the treatment of accompanied children antedate the Settlement by many years and cannot possibly constitute a subsequent change in law warranting modification of a consent decree.

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

1    afforded children under the Settlement, the HSA, and the TVPRA are wholly

2    consonant. That the duty to afford those protections is now distributed between ICE

3

4    and ORR in no way creates or implies any substantive conflict that would warrant

5    denying children protections all three sources of law say they should have.

6
        Defendants have not come close to carrying their burden of showing that a

7

8    "significant change … in the law," *Rufo*, 502 U.S. at 383, requires modification of

9    the Settlement. Defendants' discharging their obligations under the Settlement is in

10
     no way "impermissible under federal law." *Miller*, *supra*, 530 U.S. at 347-48.

11

12   III    NO CHANGE IN THE FACTS WARRANTS MODIFYING THE SETTLEMENT.

13       Defendants next contend the Settlement should be modified because of

14

15   changed facts. Again, only a *significant* change in facts warrants revision of a

16   consent decree. *Rufo, supra*, 502 U.S. at 383-84; *United States v. Asarco Inc*., 430

17   F.3d 972, 979 (9th Cir. 2005). The test for a significant change is demanding:

18
     defendants must establish that the Settlement no longer "effectively addresses the

19

20   problem it was designed to remedy." *Orantes-Hernandez v. Gonzales*, 504 F. Supp.

21   825, 831 (C.D. Cal. 2007), *aff'd*, 2009 U.S. App. LEXIS 7260 (9th Cir. 2008). "The

22
     question in this case, therefore, is whether … evolving circumstances have resolved

23

24   the underlying problems, thereby rendering the [agreement] unnecessary." *Id*. at

25

26

27

28

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

831.[10]

Defendants' case for modifying the Settlement is inadequate on its face. ICE's *maximizing* children's detention in secure, unlicensed facilities makes plain that the Settlement's motivating purposes—*minimizing* children's detention and ensuring that they will be housed in non-secure, properly licensed facilities—are more important than ever. Yet even were defendants' interests determinative—and not children's need for continued protection—ICE's case for modifying the Settlement would clearly fail.

According to defendants, in the summer of 2014 their compliance with the Settlement suddenly began misleading Central American families to think that a "permiso" awaited them in the United States. Defendants contend that ICE's continuing to minimize children's detention (or continuing to place them in properly licensed, non-secure facilities) would hobble DHS from "fulfill[ing] its core function of protecting the public and enforcing U.S. immigration laws…" Motion at 5. Defendants' claim is meritless.

**A**   **Defendants' evidence fails to establish any reason to modify the Settlement.**

Defendants' case turns on one salient proposition: that the "surge" in undocumented migrants who arrived in the United States during the summer of

---

[10] If and only if defendants carry this burden should the Court "consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, *supra*, 502 U.S. at 383.

2014 makes ICE's continuing to comply with the Settlement impracticable. That claim does not withstand scrutiny.

To begin, defendants furnish *no* competent evidence that *their complying with the Settlement* has misled or will motivate any substantial number of persons to migrate to the U.S.[11] To the contrary, both reason and the evidence suggest that defendants' detaining children in secure, unlicensed facilities has had *no* appreciable impact on unauthorized migration at all.

First, defendants imagine that prior to June 2014 "the only option available to the Government for the large majority of family units illegally crossing the border was … to release the alien family …" Motion at 2. The Settlement neither posits nor implies any such restriction.

To the contrary, the agreement requires only that defendants (1) minimize children's detention by releasing them to reputable custodians on bond, recognizance, parole or supervision, *provided* an individual juvenile is neither an unusual flight risk nor dangerous, Settlement ¶ 14, and (2) place the general population of detained children in properly licensed, non-secure facilities for howsoever long as they remain in federal custody. *Id*. ¶ 19.[12]

---

[11] Plaintiffs are separately filing formal objections to the admission of unsubstantiated speculation contained in defendants' declarations filed in support of modifying the Settlement.

[12] As discussed *ante*, these requirements are wholly consonant with federal law and policy. *See* 8 U.S.C. § 1226(a); 8 C.F.R. §§ 1236.1(c)(8) & 1236.3(b) (2015); 42 U.S.C. § 5633(a)(12)(B) (prohibiting secure confinement of juveniles not charged

- 12 -

Second, as defendants are quick to note, the Settlement has been in effect since 1997, yet defendants offer no explanation as to why the agreement should only now encourage others to enter the United States without authorization.

Third, defendants' cited statistics fail to reveal that the 2014 "surge" turned out to be temporary: by October 2014, fewer than 100 families were apprehended in the Border Patrol Rio Grande Sector, far and away the sector most impacted by the surge. *Id*.; www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children-2014 (last checked Jan. 16, 2015).[13] Defendants' factual argument thus tilts at a windmill no longer extant.

Fourth, the great weight of scholarly authority holds that the principal causes of Central American migration have nothing to do with the Settlement. Rather —

the root causes pushing unaccompanied children to leave El Salvador, Guatemala, and Honduras [are] poor security and socioeconomic conditions, with high violent crime rates, significant transnational gang activity, low economic growth rates, and high levels of poverty and inequality.

with delinquency or crime); TVPRA § 235(c)(2) ("A child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense.").

[13] The surge also comprised many more *unaccompanied* minors than children apprehended with their mothers.

Even so, DHS data show that the influx of unaccompanied minors had effectively ended by October, 2014, when defendants apprehended only 2,529 unaccompanied children, fewer than the 2,986 apprehended in February 2013. *See* http://www.dhs.gov/sites/default/files/publications/secretary/14_1009_s1_border_slide_508.pdf#page=31 (last checked January 16, 2015).

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

Congressional Research Service, *Unaccompanied Children from Central America:*

*Foreign Policy Considerations*, February 10, 2015, at 16.[14] As a scholar whose

_____

[14] *See also* United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection*, March 2014, at 6 ("Our data reveals that no less than 58% of the 404 children interviewed were forcibly displaced because they suffered or faced harms that indicated a potential or actual need for international protection. … Two overarching patterns of harm related to potential international protection needs emerged: violence by organized armed criminal actors and violence in the home."); AFL-CIO, *Trade, Violence and Migration: The Broken Promises to Honduran Workers*, January 2014, at 3 ("[I]t is clear Central American children and their families will continue to flee their homes until they can live their lives without constant fear of violence, exercise their rights without retaliation and access decent work, …"); U.S. Hastings Center for Gender and Refugee Studies & KIND (Kids In Need of Defense), *A Treacherous Journey: Child Migrants Navigating the U.S. Immigration System*, February 2014, at ii ("Numerous reports and the children themselves say that increasing violence in their home communities and a lack of protection against this violence spurred them to flee. Children also travel alone to escape severe interfamilial abuse, abandonment, exploitation, deep deprivation, forced marriage, or female genital cutting. Others are trafficked to the United States for sexual or labor exploitation."); American Immigration Council, *No Childhood Here: Why Central American Children Are Fleeing Their Homes*, July 2014, at 1 ("[V]iolence, extreme poverty, and family reunification play important roles in pushing kids to leave their country of origin. In particular, crime, gang threats, or violence appear to be the strongest determinants for children's decision to emigrate. … Most referenced fear of crime and violence as the underlying motive for their decision to reunify with family now rather than two years in the past or two years in the future. Seemingly, the children and their families had decided they must leave and chose to go to where they had family, rather than chose to leave because they had family elsewhere."); D. Stinchcomb & E. Hershberg, *Unaccompanied Migrant Children from Central America: Context, Causes, and Responses*, Center for Latin American & Latino Studies, American University, Working Paper Series No. 7, November 2014 ("[S]ix [principal] factors … motivate migration: social exclusion, societal violence, household violence, drug trafficking, corruption, and institutional incapacity."); *see also* General Accounting Office, *Information on Migration of Unaccompanied Children from El Salvador, Guatemala, and Honduras*, February 2014, at 6 ("Five agency officials' responses … identified migrants' perceptions of U.S. immigration policies as a primary cause of UAC migration. For example, the

work defendants themselves are wont to cite declares, "*[T]here is absolutely no evidence in the Report that U.S. policy with respect to detention has any influence at all on the decisions of women and their children are making with respect to migration*." Declaration of Jonathan Hiskey, Sept. 22, 2014, Exhibit 8, Dkt. 101-7, ¶ 17 (emphasis added).[15]

Fourth, defendants seek no modification of the Settlement insofar as *unaccompanied* minors are concerned. *A fortiori,* ORR would continue releasing and housing the great bulk of class members just as the Settlement prescribes. Haphazardly detaining a minority of children in secure, unlicensed facilities could hardly send an intelligible message to would-be entrants that they had best seek refuge from violence and crushing poverty elsewhere. *See* Declaration of Nestor Rodriguez, Dec. 12, 2014, Plaintiffs' Exhibit 54 filed herewith, ¶ 14 ("[R]umors regarding lenient immigration detention policies in the United States are not a significant factor motivating current Central American immigration.").[16]

---

State official's response for Honduras reported that some Hondurans believed that *comprehensive immigration reform* in the United States would lead to a path to citizenship for anyone living in the United States at the time of reform. The USAID official's response for Honduras reported that some Hondurans believe that *unaccompanied* children would be reunited with their families and allowed to stay in the United States." (emphasis added)).

[15] Professor Hiskey's study features prominently in defendants' stock opposition to Central American families requests that immigration judges order them released over ICE objection. *E.g.*, Plaintiffs' Exhibit 8, Dkt. 101-3.

[16] More plausibly, defendants' incarcerating female-headed families *en masse* merely encourages mothers and children to enter *separately*. Since children

At bottom, defendants' visiting their harshest detention policy on children apprehended with their mothers bears *no* rational relationship to *any* legitimate governmental purpose. Modifying the agreement as defendants urge would accordingly raise profound equal protection concerns. *See, e.g., Frontiero v. Richardson*, 411 U.S. 677, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973) (plurality) (invalidating federal statute disfavoring children of female service members only); *Nordlinger v. Hahn*, 505 U.S. 1, 10; 112 S.Ct. 2326; 120 L.Ed.2d 1 (1992) (equal protection component of the Fifth Amendment "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

Avoiding such constitutional entanglements is reason enough to deny defendants' motion. *Cf. Walsh v. Schlecht*, 429 U.S. 401, 408, 50 L. Ed. 2d 641, 97 S. Ct. 679 (1977) ("Contracts should not be interpreted to render them illegal and unenforceable ..."); *R.I.L.R. v. Johnson*, No. 15-0011, Opinion ECF No. 33, at 31 (D.D.C. Feb. 20, 2015), Exhibit 53 filed herewith (declining to construe INA as allowing detention of Central American families to deter others because doing so would raise substantial constitutional questions).

---

apprehended alone or with anyone other than a mother—father, stranger, smuggler, or trafficker—remain eligible for release and proper placement, the deterrent defendants imagine is readily circumvented, albeit at the cost of family disintegration and child endangerment, hardly a result that is either "humanitarian" or "in the public interest."

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF CLASS ACTION
CV 85-4544-DMG

**B      Defendants' proposed modifications would facilitate the unlawful**

**detention of children.**

Even assuming, *arguendo*, that defendants' proposed modifications would pave the way for an appreciable deterrent, the Court should nevertheless deny their motion as a matter of law: deterring others is simply not a lawful basis to refuse *anyone* release, much less vulnerable children.

Though one would not know it from defendants' moving papers,[17] the United States District Court for the District of Columbia recently enjoined ICE from detaining families to deter others. The court held that deterrence is simply not a lawful criterion for denying release:

The justifications for detention previously contemplated by the [Supreme] Court relate wholly to characteristics inherent in the alien himself or in the category of aliens *being detained* – that is, the Court countenanced detention of an alien or category of aliens on the basis of *those aliens*' risk of flight or danger to the community. The Government here … claims that, in determining whether an individual claiming asylum should be released, ICE can consider the effect of release on others not present in the United States. … In discussing civil commitment more broadly, the Court has declared such "general deterrence" justifications impermissible. *See Kansas v. Crane*, 534

---

[17] Defendants do note *R.I.L.R.* in their opposition to plaintiffs' motion to enforce the Settlement. *See* Dkt. No. 121 at 14 n.11.

U.S. 407, 412 (2002) (warning that civil detention may not "become a 'mechanism for retribution or *general deterrence*' – functions properly those of criminal law, not civil commitment") (*quoting Kansas v. Hendricks*, 521 U.S. 346, 372-74 (1997) (Kennedy, J., concurring) ...

*R.I.L.R. v. Johnson*, *supra*, at 34-35 (emphasis in original).

Defendants will no doubt object that the injunction in *R.I.L.R.* is preliminary, etc., but that detracts nothing from the soundness of the court's legal analysis. Here, *defendants* must show they are entitled to modify the Settlement, yet they fail to argue, much less persuade, that deterring others is a lawful reason to detain children, *much less* one that warrants modifying a consent decree. *Local 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525; 92 L. Ed. 2d 405; 106 S. Ct. 3063 (1986) ("consent decree [may] provide[] broader relief than the court could have awarded after a trial.").

Clearly, the Court should not modify the Settlement to permit ICE to deny children release on impermissible grounds.

**C     ICE's confining children in improper facilities furthers no legitimate purpose.**

Defendants next propose to modify Settlement ¶ 19 to allow ICE to confine children apprehended with their mothers in secure, unlicensed facilities. Defendants seem to reason that since ICE should be permitted to detain female-headed families to deter others, its confining mothers and children together in non-compliant

facilities is better than detaining them separately.[18]

If that is their argument,[19] then the flaws in defendants' case justifying ICE's no-release policy extend, *a fortiorari*, to their case for modifying the Settlement's licensing and placement requirements. Since defendants offer no coherent reason the Court should modify the Settlement so ICE may detain children apprehended with their mothers, it follows they offer no reason to evade the Settlement's placement requirements either.[20]

Yet even were defendants' proposed modifications not flawed conceptual dominos, independent reasons support the Court's denying defendants' bid to undo the Settlement's placement requirements.

Defendants nowhere deny that their facilities in Leesport, Dilley and Karnes City are secure. Motion at 2 ("These facilities are also designed to hold families

---

[18] As plaintiffs understand it, defendants do not contend that children should be confined in inappropriate facilities to deter other would-be entrants. *But see* Motion at 12 (holding children in secure, unlicensed facilities helps "reduce the migration of families who seek to come to the United States unlawfully …").

[19] Settlement ¶ 19 provides: "In any case in which the INS does not release a minor pursuant to Paragraph 14, … [e]xcept as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program ..." Settlement ¶ 19.

The agreement defines a "licensed program" as a "program, agency or organization that is *licensed by an appropriate State agency* to provide residential, group, or foster care services for *dependent children* …" Settlement ¶ 6 (emphasis added).

The Settlement also stipulates that "[a]ll homes and facilities operated by licensed programs … shall be *non-secure* as required under state law ..." *Id*. at ¶ 23.

[20] If defendants' no-release policy truly forces ICE to confine children in improper facilities, that would be yet another reason to disapprove the no-release policy itself.

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

who were flight risks or whose release might endanger the community."); *see also*, Declaration of Carlos Holguín, January 15, 2013, Plaintiffs' Exhibits, Dkt. 101-7, Exhibit 23 ¶¶ 4-5 ("The Karnes facility … den[ies] those inside any means of ingress or egress except via the secure entrance ....").

Defendants also admit that ICE's family detention facilities are not licensed to care for dependent children, and what is more, that no state would so license those facilities. *Id*. at 24. Defendants instead suggest that since plaintiffs have no complaints regarding the actual conditions children experience in family detention facilities, the Court should condone ICE's confining class members in them.

However, it is clearly *not* the case that the specific conditions children experience in ICE's family detention facilities are acceptable. Foremost, these facilities are highly secure lock-ups, and therefore breach the Settlement's specific requirement that defendants house children in homes that are "*non-secure* as required under state law ..." Settlement ¶ 23 (emphasis added). If children must be detained, nothing obliges defendants to confine them in prison-like facilities.[21]

More importantly, scrapping the Settlement's licensing requirement would

---

[21] Dr. Luis Zayas, a leading child psychologist and Dean of the School of Social Work at the University of Texas at Austin notes the harm secure confinement does to children: "The medical and psychiatric literature has shown that incarceration of children, even in such circumstances as living with their mothers in detention, has long-lasting psychological, developmental, and physical effects." Declaration of Luis Zayas, Dec. 10, 2014, Exhibit 24, Dkt. 101-7, ¶¶ 1-6. After interviewing children at ICE's Karnes detention center, Dr. Zayas found that "children [at Karnes] are suffering emotional and other harms as a result of being detained." *Id*. ¶10.

strip vulnerable children of an essential protection: *i.e.*, regular and comprehensive oversight by *independent* child welfare agencies of innumerable conditions children experience during federal custody. Child welfare expert Genevra Berger explains:

> It bears emphasis that the state licensing agency plays a pivotal role not only in initially assessing the standards are met but also in conducting periodic inspections to determine continuing compliance. … [M]ost importantly, … the lack of licensing means that no qualified and independent agency is verifying that the minimal safety requirements … are being met. Nor is there any qualified and independent child welfare agency available to receive and investigate allegations of child abuse or neglect …

Declaration of Genevra Berger, Jan. 12, 2015, Dkt. 101-8, Exhibit 25 ¶¶ 25, 28.

Defendants understandably prefer that plaintiffs play whack-a-mole with respect to a never-ending stream of reports regarding abuse in family detention centers.[22] But the *raison d'être* for the Settlement's licensing requirement is that

---

[22] Though defendants would no doubt dispute them, reports of substandard conditions and treatment in family detention facilities are legion. *See e.g.*, Declaration of Allison Boyle, Nov. 24, 2014, Dkt. 101-9, Exhibit 29 ¶ 25 ("The detention of my client … and her children at the Karnes County Detention Center was harsh and severe. My client was witness to the sexual assaults between detained women and guards at Karnes. … She reported the sexual abuse internally and nothing was done."); Declaration of Brittany Perkins, Nov. 28, 2014, Dkt. 101-9, Exhibit 30 ¶ 12 ("My client and her child complained of numerous conditions at the Karnes detention center. These conditions include: extremely cold temperatures, inadequate food, inadequate or limited access to health care, particularly a lack of access to medical attention for my client's child who experience a persistent cold and persistent chest pain over the course of weeks, … lack of privacy, crowding at

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

facilities in which children are detained should undergo systematic, comprehensive,

and *independent* inspection by qualified child welfare experts. That is not a

protection the Court should now eliminate whether or not conditions in ICE's

the facility, lack of access to a private phone to communicate with legal counsel, …"); Declaration of Melissa Cuadrado, Nov. 26, 2014, Dkt. 101-10, Exhibit 33 ¶ 23 ("[M]y client's daughter, A.C., was diagnosed with Conversion Disorder in El Salvador … after fainting in the street. … After arriving at Karnes, my client requested that A.C. be seen by a psychologist. While it is noted in her medical file that on August 26, 2014, she was presenting adjustment problems and required referral to mental health services, she was not evaluated by a psychologist at Karnes until September 19 when she was interviewed by phone."); Declaration of C_C_C, Jan. 8, 2015, Dkt. 101-11, Exhibit 47 ¶ 13 (guards "come several times when we are asleep to take stock of whether we are in our beds. … And the officials open the door at any moment especially during the night when we are asleep, they come in several times when they want."); Declaration of J_E_F, Jan. 9, 2015, Dkt. 101-11, Exhibit 52 ¶ 14 ("Here at Karnes, I have had stomach problems. I suffer from gastritis, which makes me have stomach pain if I eat certain foods … I went to the clinic and saw a doctor and told him I have stomach pain, but he said the pain is normal and did not prescribe any medication."); Declaration of J_ H_M, Sept. 20, 2014, Dkt. 101-4, Exhibit 12 ¶¶ 9-10 ("There are no classes for my children here; we are told they will start the 29th of this month. … We are not permitted visits with our family members. An official told us our family could not visit us because as prisoners we have no right to anything."); Declaration of H_R_M, Jan. 9, 2015, Dkt. 101-6, Exhibit 19 ¶ 10 ("We presently share a room with six unrelated persons: four adult women and four children. For the first 15 days we were here we were permitted out of our rooms only to eat. All the rest of the time we were confined to our room… We are not permitted to receive telephone calls. We are only able to make calls if we have money to pay for them… We have been told that any calls we make to our relatives are recorded.").

Disturbingly, the U.S. Commission on Civil Rights has reportedly heard testimony regarding criminal charges filed against a guard at ICE's Leesport facility for "institutional sexual assault." The guard was charged January 16, 2015, over alleged involvement with a 19-year-old Honduran woman detained with her 3-year-old son. *See* http://articles.philly.com/2015-02-01/news/58654200_1_immigration-case-sharkey-u-s-commission#XEfyiROKmCOx2LQC.99 (last checked March 5, 2015).

detention camps are momentarily good enough.

Next, it is obviously *not* the case that ICE must detain families together to keep them together. As the Supreme Court observed some 22 years ago:

> In the case of arrested alien juveniles, however, the INS cannot simply send them off into the night on bond or recognizance. The … Service must assure itself that someone will care for those minors pending resolution of their deportation proceedings. *That is easily done when the juvenile's parents have also been detained and the family can be released together*; …

*Reno v. Flores,* 507 U.S. 292, 295; 113 S.Ct.1439; 123 L.Ed.2d 1 (1993) (citations omitted; emphasis added); *accord*, 8 C.F.R. § 1236.3(b) (2015) ("(2) If … the juvenile has identified a parent, legal guardian, or adult relative in Service detention, *simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis*." (Emphasis added.)).

Nothing stops defendants from returning to the *status quo ante* June 2014.[23]

---

[23] Nor should the Court modify the Settlement to condone improper placements because some families will likely remain detained despite defendants' complying fully with the Settlement.

For many years before June of 2014 defendants apprehended and detained families, usually without systematically violating the Settlement.

Defendants note one such failed attempt, however. In 2006 ICE began detaining families at the Hutto facility in Texas. Defendants abandoned that program in 2009 after they being sued for violating the Settlement. *See Bunikyte v. Chertoff*, 2007 WL 1074070 (W.D. Tex. Apr. 9, 2007); Motion at 9 n.8.

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG

**D     Plaintiffs should be allowed discovery before the Settlement is modified on the weight of defendants' evidence.**

No change in law or fact justifies modifying the Settlement as defendants propose. As appears in plaintiffs' evidentiary objections, *no* competent evidence supports defendants' claim that ICE's recent and flagrant violations of the Settlement have stopped anyone from seeking refuge here.

If the Court finds defendants' evidence competent and material, it should permit plaintiffs reasonable discovery before modifying the Settlement. The agreement has protected a vulnerable class  too long, and its protections are too important, to alter without affording plaintiffs a chance to test defendants' factual claims.

/ / /

---

In any event, that *some* mothers may prefer to be detained with their children in ICE's family detention centers is no reason to modify the Settlement. The remedial order plaintiffs propose in connection with their pending motion to enforce, Dkt. No. 118, accordingly provides that mothers may remain with their children in unlicensed facilities should they so choose. The preference of some, however, does not warrant stripping all of a fundamental protection the Settlement provides.

Opposition to Motion to Modify Settlement of Class Action
CV 85-4544-DMG

IV      CONCLUSION

For the foregoing reasons, this Court should deny defendants' motion to modify the Settlement.[24]

Dated: March 6, 2015.                     CENTER FOR HUMAN RIGHTS &
                                          CONSTITUTIONAL LAW
                                          Carlos Holguín
                                          Peter A. Schey
                                          Marchela Iahdjian

                                          ORRICK, HERRINGTON & SUTCLIFFE LLP
                                          William A. Molinski
                                          T. Wayne Harman
                                          Elena García

                                          LA RAZA CENTRO LEGAL, INC.
                                          Michael S. Sorgen

                                          YOUTH LAW CENTER
                                          Alice Bussiere
                                          Virginia Corrigan

                                          RANJANA NATARAJAN

                                          /s/Carlos Holguín _____

                                          /s/Peter A. Schey _____

                                          *Attorneys for plaintiffs*

---

[24] Plaintiffs will separately move the Court pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d) to award them attorney's fees and costs incurred in opposing defendants' instant motion.

OPPOSITION TO MOTION TO MODIFY SETTLEMENT OF
CLASS ACTION
CV 85-4544-DMG