CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone:   (213) 388-8693
Facsimile:    (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org
        marchela@centerforhumanrights.org

WILLIAM A. MOLINSKI (STATE BAR NO. 145186)
wmolinski@orrick.com
T. WAYNE HARMAN (STATE BAR NO. 254089)
wharman@orrick.com
ELENA GARCIA (STATE BAR NO. 299680)
egarcia@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, California  90017
Telephone:  +1-213-629-2020
Facsimile:    +1-213-612-2499

*Attorneys for Plaintiffs* (listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| Jenny Lisette Flores, *et al.*, | Case No. CV 85-4544-DMG |
|---|---|
| Plaintiffs, | PLAINTIFFS' SECOND SET OF EXHIBITS |
| v. | [Exhibits 53-55] |
| Jeh Johnson, Secretary, U.S. Department of Homeland Security, *et al.*, | Hearing:   March 27, 2015<br>Time:       9:30 a.m.<br>Courtroom 7, 312 N. Spring Street |
| Defendants. | |

1 | *Plaintiffs' counsel, continued:*

2

3 | LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)

4 | 474 Valencia Street, #295
San Francisco, CA 94103

5 | Telephone: (415) 575-3500

6

7 | *Of counsel:*

8 | YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)

9 | Virginia Corrigan (Cal. Bar No. 292035)

10 | 200 Pine Street, Suite 300
San Francisco, CA 94104

11 | Telephone: (415) 543-3379 x 3903

12

13 | Ranjana Natarajan (Cal. Bar No. 230149)
UNIVERSITY OF TEXAS SCHOOL OF LAW

14 | Civil Rights Clinic
727 E. Dean Keeton St.

15 | Austin, TX 78705

16 | Telephone: (512) 232-7222
Email: rnatarajan@law.utexas.edu

17

18

19

20

21

22

23

24

25

26

27

28

1

INDEX TO EXHIBITS

2

3

No.        Description                                                                  Page

4

53         *R.I.L.R. v. Johnson*, No. 15-0011, Opinion ECF No. 33
           (D.D.C. Feb. 20, 2015)...................................................... 2

5

6         54         Declaration of Nestor Rodriguez, December 12, 2014 ................ 42

7         55         Mendez, J., *Report of the Special Rapporteur on torture
                     and other cruel, inhuman or degrading treatment or
                     punishment*, U.N. General Assembly Report No.

8

9                    A/HRC/28/68 (March 5, 2015) ...................................... 77

10        Dated: March 9, 2015.                    CENTER FOR HUMAN RIGHTS &
                                                   CONSTITUTIONAL LAW

11                                                 Carlos Holguín

12                                                 Peter A. Schey
                                                   Marchela Iahdjian

13

14                                                 ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                   William A. Molinski

15                                                 T. Wayne Harman
                                                   Elena García

16

17                                                 LA RAZA CENTRO LEGAL, INC.
                                                   Michael S. Sorgen

18

19                                                 YOUTH LAW CENTER
                                                   Alice Bussiere

20                                                 Virginia Corrigan

21                                                 RANJANA NATARAJAN

22

23                                                 /s/Carlos Holguín _____

24

25                                                 *One of the attorneys for plaintiffs*

26

27

28

Exhibit 53

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

R. I. L-R, *et al.*,

        Plaintiffs,

           **v.**

JEH CHARLES JOHNSON, *et al.*,

        Defendants.

Civil Action No. 15-11 (JEB)

## MEMORANDUM OPINION

The United States saw a surge in immigration in the summer of 2014 as people fled increased lawlessness in Honduras, Guatemala, and El Salvador. Plaintiffs (and other members of the class they seek to represent) are mothers and their minor children who escaped violence and persecution in these countries to seek asylum in the United States. After entering this country unlawfully and being apprehended, each was found to have a "credible fear" of persecution, meaning there is a significant possibility that she will ultimately be granted asylum here. Although, in the past, individuals in this position were generally released while their asylum claims were processed, Plaintiffs were not so lucky. Instead, for each family, Immigration and Customs Enforcement determined that interim detention was the appropriate course.

Chasing liberty, Plaintiffs turned to the courts. They filed suit on January 6, 2015, naming the Secretary of the Department of Homeland Security and two ICE officials as Defendants. The Complaint alleges that Plaintiffs' detention resulted from an unlawful policy that DHS adopted in June 2014 in response to the immigration spike. Pursuant to that policy, Plaintiffs claim, DHS is detaining Central American mothers and children with the aim of

3

Case 2:85-cv-04544-DMG-AGR Document 124-3 Filed 03/09/15 Page 6 of 101 Page ID
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 2 of 40
#:1972

deterring potential <u>future</u> immigrants.  According to Plaintiffs, such detention violates the Fifth

Amendment to the United States Constitution, the Immigration and Nationality Act, the

Administrative Procedure Act, and applicable DHS regulations.

 They now seek a preliminary injunction to prevent DHS from applying this policy until a

final determination has been reached on the merits of this action.  Finding that the circumstances

here merit that extraordinary form of relief, the Court will grant Plaintiffs' Motion.

I.     **Background**

       A.  <u>Statutory and Regulatory Framework</u>

       Unlawful presence in the United States does not itself constitute a federal crime, although

it can trigger the civil remedy of removal.  <u>See</u> <u>Arizona v. United States</u>, 132 S. Ct. 2492, 2505

(2012); <u>Ortega Melendres v. Arpaio</u>, 695 F.3d 990, 1000 (9th Cir. 2012); 8 U.S.C. §§

1182(a)(6)(A)(I), 1227(a)(1)(B), (C).  The Immigration and Nationality Act, 8 U.S.C. § 1101 *et

seq.*, sets forth the conditions under which a foreign national may be admitted to and remain in

the United States and grants the Department of Homeland Security the discretion to initiate

removal proceedings.  <u>See, e.g.</u>, <u>id.</u> §§ 1181-1182, 1184, 1225, 1227-1229, 1306, 1324-25.

       Under the INA, a foreign national apprehended shortly after entering the United States

without valid documentation is initially subject to a streamlined removal process dubbed

"expedited removal."  <u>See id.</u> § 1225(b)(1)(A)(i)-(iii); 69 Fed. Reg. 48,877 (Aug. 11, 2004).  If,

however, she can demonstrate a "credible fear" of persecution in her home country during the

initial screening, <u>see</u> 8 U.S.C. § 1225(b)(1)(A) & (B); 8 C.F.R.§ 208.30(d)-(g), she is transferred

to "standard" removal proceedings pursuant to 8 U.S.C. § 1229a  Once reclassified, the foreign

national is entitled to a full asylum hearing before an immigration court, and, if unsuccessful, she

may file an administrative appeal with the Board of Immigration Appeals (BIA).  <u>See</u> 8 C.F.R. §

Case 2:85-cv-04544-DMG-AGR Document 124 Filed 03/09/15 Page 7 of 101 Page ID
#:1973
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 9 of 40

208.30(f); 8 U.S.C. § 1225(b)(1)(B)(ii).  She may also petition for review of any removal order

entered against her in the appropriate court of appeals.  See 8 U.S.C. § 1252(a)-(b).

     This case revolves around what happens to these aliens between their initial screening

and these subsequent proceedings.  Detention authority over such individuals is governed by 8

U.S.C. § 1226(a), which instructs:

> Pending a decision on whether the alien is to be removed from the
> United States[,] . . . the Attorney General—
>
> > (1)  may continue to detain the arrested alien; and
> > (2)  may release the alien on—
> >
> > > (A)  bond of at least $1,500 with security approved
> > > by, and containing conditions prescribed by,
> > > the Attorney General; or
> > > (B)  conditional parole . . . .

Per the Homeland Security Act of 2002, the Secretary of DHS shares the Attorney General's

authority under § 1226(a) to detain or release noncitizens during the pendency of removal

proceedings.  See Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192.  By regulation, the

Secretary's authority is delegated to individual officers within Immigration and Customs

Enforcement, a component of DHS.  See 8 C.F.R. § 1236.1.  For each noncitizen who passes the

threshold "credible-fear" screening, an ICE officer is tasked with making an initial custody

determination.  The officer "may, in [his] discretion, release an alien . . . under the conditions at

[8 U.S.C. § 1226(a)(2)(A) & (B)]; provided that the alien must demonstrate to the satisfaction of

the officer that such release would not pose a danger to property or persons, and that the alien is

likely to appear for any future proceeding."  8 C.F.R. § 1236.1(c)(8).

     If ICE denies release or sets bond that the noncitizen cannot pay, she remains in custody

pending a final asylum determination.  While the regulations do not provide for further review

within DHS, the alien has the options of requesting a custody redetermination from an

Case 2:85-cv-04544-DMG-AGR Document 33 Filed 03/09/15 Page 8 of 101 Page ID
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 4 of 40
#:1974

immigration judge within the Department of Justice and appealing an adverse redetermination

decision to the Board of Immigration Appeals.  See id. §§ 1003.19(a), 1236.1(d).  DHS may also

appeal the IJ's custody decision and may automatically stay the decision (and thus the

individual's release) pending the appeal.  See id. §§ 1003.19(f), 1003.19(i)(2).

    B.  Plaintiffs' Detention

    The ten named Plaintiffs and other members of the class they seek to represent are

mothers accompanied by minor children who fled severe violence and persecution in their

Central American home countries.  See Am. Compl., ¶ 1.  In the fall of 2014, after crossing the

border and entering the country without documentation, each family unit was apprehended by

U.S. Customs and Border Protection (CBP).  See id., ¶¶ 41, 58, 67, 75, 83.  All crossed the

border with the intent to seek asylum.  See id., ¶ 27.  None has a criminal history, and all have

family members residing in the United States who stand ready to provide shelter and support

through their immigration proceedings.  See id., ¶¶ 62-63, 70-71, 78-79, 87-88.  Although

initially referred to expedited removal proceedings, each subsequently went on to establish a

"credible fear" of persecution.  Id., ¶¶ 42, 59, 68, 76, 84.  That showing made, Plaintiffs were

transferred to standard removal proceedings.  Id.

    It is here that their quarrel with Defendants begins.  Each and every family was refused

bond after an ICE custody hearing and was detained at the Karnes County Residential Facility in

Texas.  See Am. Compl., ¶¶ 60, 69, 77, 85; Pl. Mot at 10-11.  Although all were subsequently

released several weeks or months later as a result of IJ custody-redetermination hearings, see

Def. Opp. & Mot., Exhs. A-C (IJ Custody Redetermination Hearings), ICE's initial denials form

the crux of Plaintiffs' case.

Case 2:85-cv-04544-DMG-AGR Document 124-33 Filed 03/09/15 Page 9 of 101 Page ID
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 9 of 40
#:1975

In years past, say Plaintiffs, ICE did not generally detain families apprehended in the interior of the United States who were found to have a credible fear of persecution. Instead – as explained by experienced immigration practitioners – after an individualized assessment of their potential flight risk and danger to the community, the majority of such families was released on bond or their own recognizance. See, e.g., Pl. Mot., Exh. 1 (Declaration of Michelle Brané), ¶¶ 11-12; id., Exh. 4 (Declaration of Barbara Hines), ¶¶ 8-15. Plaintiffs claim that an abrupt about-face occurred in June 2014, when DHS adopted an unprecedented "No-Release Policy" in response to increased immigration from Central America. According to Plaintiffs, the No-Release Policy directs ICE officers to deny release to Central American mothers detained with their minor children in order to deter future immigration – that is, to send a message that such immigrants, coming *en masse*, are unwelcome. See Brané Decl., ¶¶ 12, 22-23; Hines Decl., ¶¶ 13-15. They claim that this policy led to ICE's denial of release in each of their cases.

On January 6, 2015, Plaintiffs brought a class-action suit in this Court, alleging, *inter alia*, that the No-Release Policy violates the Immigration and Nationality Act and the Due Process Clause of the Constitution. They further claim that the policy is contrary to law and arbitrary and capricious, and thus constitutes illegal agency action under the Administrative Procedure Act. Presently before the Court are Plaintiffs' Motions for a preliminary injunction barring the continued implementation of the No-Release Policy during the pendency of this suit, as well as for provisional class certification for purposes of the requested injunction. Defendants oppose both Motions and separately seek dismissal of the suit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In keeping with the expedited nature of a preliminary-injunction proceeding, the parties filed briefs on an accelerated timetable, and the Court held a hearing on February 2, 2015. This Opinion now follows.

7

Case 2:85-cv-04544-DMG-AGR   Document 1243   Filed 03/29/15   Page 10 of 101   Page ID
#:1976
Case 1:15-cv-00011-JEB   Document 33   Filed 02/20/15   Page 6 of 40

## II.    Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. NRDC, Inc., 129 S. Ct. 365, 376 (2008).  The plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Id. at 374.  When moving for a preliminary injunction, the plaintiff "bear[s] the burdens of production and persuasion."  Qualls v. Rumsfeld, 357 F. Supp. 2d 274, 281 (D.D.C. 2005).  To meet these burdens, he may rely on "evidence that is less complete than in a trial on the merits," NRDC v. Pena, 147 F.3d 1012, 1022-23 (D.C. Cir. 1998), but the evidence he offers must be "credible."  Qualls, 357 F. Supp. 2d at 281.

Before the Supreme Court's decision in Winter, courts weighed the preliminary-injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another.  See Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  This Circuit, however, has suggested, without deciding, that Winter should be read to abandon the sliding-scale analysis in favor of a "more demanding burden" requiring a plaintiff to independently demonstrate both a likelihood of success on the merits and irreparable harm.  See Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011); see also Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009).  Because the Court finds that Plaintiffs in this case have met that higher standard, it need not tarry over whether Winter sounded a death knell for the sliding-scale analysis.

8

Case 2:85-cv-04544-DMG-AGR   Document 1243   Filed 03/09/15   Page 11 of 101   Page ID
Case 1:15-cv-00011-JEB   Document 33   Filed 02/20/15   Page 11 of 40
#:1977

## III.    Analysis

At the heart of Plaintiffs' suit is their assertion that DHS has adopted an unlawful

detention policy aimed at deterring mass migration.  In their Amended Complaint, this claim

finds voice in five distinct grounds for relief.  Four arise under the APA – specifically, Plaintiffs

allege that DHS policy: (1) violates the INA and is thus contrary to law under § 706(2)(A) of the

APA; (2) infringes on their rights to due process and is therefore contrary to law under §

706(2)(A); (3) deviates from DHS regulations, rendering it arbitrary and capricious under the

APA; and (4) constitutes an arbitrary and capricious means of deterring mass migration.

Plaintiffs also raise a freestanding due-process claim under the Fifth Amendment.  Because the

Court concludes that Plaintiffs' first theory, standing alone, warrants preliminary injunctive

relief, it will focus its attention accordingly.

Defendants mount a robust defense to that claim, erecting various jurisdictional and

substantive obstacles to relief.  Although the Court would ordinarily ensure its jurisdiction before

turning to the merits, it is confronted here with an underlying factual issue common to both

endeavors – namely, the very existence and nature of the DHS policy challenged by Plaintiffs.

Defendants adamantly deny that any reviewable policy exists and maintain, as a consequence,

that Plaintiffs' suit can proceed no farther.

Given this preliminary controversy, the Court will begin with a discussion of what, if

any, policy is actually in place.  Finding one extant, it will next move to an analysis of the

myriad jurisdictional hurdles that impede Plaintiffs, including how provisional class certification

figures into the mix.  Having cleared these considerable shoals, the Court will last navigate the

merits of injunctive relief.

9

A.  <u>Existence of a Policy</u>

Plaintiffs sketch two variants of the policy they seek to enjoin.  The first – that DHS adopted a categorical policy in June 2014 of denying release to all asylum-seeking Central American families in order to deter further immigration, <u>see</u> Pl. Mot. at 6-7 – is hotly disputed by Defendants as a factual matter.  According to the Government, the evidence reveals that ICE releases some such families after their initial custody determinations, debunking Plaintiffs' claim of a blanket policy.  <u>See</u> Def. Opp. & Mot. at 13-17.

This point has some force.  According to records maintained by the ICE Statistical Tracking Unit, ICE released 32 of the 2,602 individuals booked into a family residential center between June 1, 2014, and December 6, 2014, as a result of individualized custody determinations.  <u>See</u> Def. Reply, Exh. A (Amended Declaration of Marla M. Jones, ICE Officer, Statistical Tracking Unit), ¶ 6.  Plaintiffs, moreover, expressly admit that DHS's alleged policy has not resulted in universal detention.  <u>See</u> Am. Compl., ¶ 45 ("DHS has denied release to <u>nearly</u> every family that is detained at a family detention facility and has passed a credible fear interview.") (emphasis added); <u>see also</u> Pl. Mot., Exh. 5 (Declaration of Allegra McLeod, Associate Professor of Law at Georgetown University), ¶ 6 (referring to ICE's "<u>nearly</u> uniform" refusal to grant release) (emphasis added).  Although these materials certainly do not reflect a large body of favorable release determinations, the Court is reluctant to find an across-the-board No-Release Policy when it appears that – at least in some small number of cases – ICE does grant bond on the basis of individualized considerations.

Plaintiffs, however, have also articulated a slightly narrower formulation of the relevant policy.  In this alternate version, they maintain that DHS policy directs ICE officers to consider deterrence of mass migration as a factor in their custody determinations, and that this policy has

Case 2:85-cv-04544-DMG-AGR   Document 124-3   Filed 03/29/15   Page 13 of 101   Page ID
#:1979
Case 1:15-cv-00011-JEB   Document 33   Filed 02/20/15   Page 9 of 40

played a significant role in the recent increased detention of Central American mothers and

children.  See Pl. Opp. & Rep. at 9-10.  This second characterization finds ample support in the

record.

      Various immigration experts and attorneys have averred that, based on their firsthand

knowledge and collection of data, ICE has been largely denying release to Central American

mothers accompanied by minor children since June 2014.  For example, Michelle Brané – an

attorney with more than 25 years of experience working on immigration and human-rights issues

who currently serves as the Director of the Migrant Rights and Justice program at the Women's

Refugee Commission – attests that "despite clear authority to release families from detention

after a credible fear has been established, ICE has released only a handful of [Central American]

families" since the summer of 2014.  Brané Decl., ¶ 23; see also, e.g., Hines Decl., ¶ 12 ("Since

DHS began detaining families at the Karnes City facility [in August 2014], DHS has insisted on

categorical detention of all of the families who are brought to the facility."); id., ¶ 22 ("[B]y the

summer of 2014, it became clear . . . that ICE was implementing a blanket No-Release policy

precluding the release of families from detention.  Overwhelmingly families remained in

detention post-credible fear findings."); McLeod Decl., ¶¶ 8-11 (representing that ICE denied

release for 99 percent of families detained at the Artesia Detention Center who were represented

by *pro bono* attorneys from the American Immigration Lawyers Association).  Before June 2014,

such families were routinely released.  See, e.g., Hines Decl., ¶ 8 ("Prior to the summer of 2014,

families apprehended near the border without immigration documents were generally briefly

detained by U.S. Customs and Border Protection and then released.  DHS did not generally take

custody of families."); Brané Decl., ¶ 12 (referring to the post-June 2014 increase in detention as

"contrary to past practice").  It appears, moreover, that this increase in detention has not been

observed with regard to adults traveling without children. See Hines Decl., ¶ 16 (noting that adults who are detained without children and who pass a credible-fear screening are routinely released); Brané Decl., ¶ 25 (same).

Defendants have essentially conceded that the recent surge in detention during a period of mass migration is not mere happenstance, but instead reflects a design to deter such migration. Indeed, they state that ICE officials are required to follow the binding precedent contained in Matter of D-J-, 23 I. & N. Dec. 572 (2003), in which then-Attorney General John Ashcroft held that deterrence of mass migration should be considered in making custody determinations under 8 U.S.C. § 1226(a). See Def. Reply at 4; see also Matter of D-J-, 23 I & N. Dec. at 572 ("[I]t is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations [when making custody determinations]."); see also id. at 578-79 (agreeing with INS that "the threat of further mass migration" constitutes a "reasonable foundation" for denying release). Defendants admit, moreover, that this factor is considered "where applicable," and that an immigration "influx across the southwest border" of the United States last year "further support[s] the use of this factor in making custody determinations since June 2014." Def. Reply at 4.

The Government confirmed these representations during oral argument. When asked by the Court, "So it's fair, you will agree that ICE is considering national security and . . . [in] the way I'm talking about, namely, not the threat to national security posed by the individual but the threat that, the deterrence, an absence of deterrence would cause to national security," the Government responded, "I would say . . . consistent with Matter of D. J. that ICE is considering whether, if this individual – and they will make an individualized determination for that

12

Case 2:85-cv-04544-DMG-AGR Document 33 Filed 03/09/15 Page 15 of 101 Page ID
#:1981
Case 1:15-cv-00011-JEB Document 24-3 Filed 02/20/15 Page 11 of 40

individual, if this individual is part of a mass migration, if they fall under this decision in the
Matter of D.J., that that factor would be considered."  Oral Arg. Tr. at 34.

In addition, although ICE officials are not required to explain the contemporaneous basis
for their custody determinations, DHS has defended its recent denials of release in immigration
court by asserting that a "'no bond' or 'high bond' policy would significantly reduce the
unlawful mass migration of Guatemalans, Hondurans, and Salvadoran[s]."  Hines Decl., Exh. A.
(Immigration Court Declaration of Phillip T. Miller, ICE Assistant Director of Field Operations
for Enforcement and Removal Operations), ¶ 9.  Members of Congress, in turn, have recognized
DHS's adoption of a "'no-bond/high bond' policy for families in detention based upon the
argument that denying bond is necessary to deter additional migration."  Letter from Rep.
Lofgren, *et al.* to President Obama, at 1 (Oct. 27, 2014), underline available at
https://lofgren.house.gov/uploadedfiles/family_detention_letter_october_2014.pdf; see also id.
("In recent months, the Department of Homeland Security (DHS) has implemented an expansive
immigrant family detention policy in response to this summer's spike in Central American
migrants apprehended along our southwest border.").

The Court, accordingly, is satisfied that ICE has a policy of taking deterrence of mass
migration into account in making custody determinations, and that such consideration has played
a significant role in the large number of Central American families detained since June 2014,
including the named Plaintiffs.

B.  Justiciability

Informed by its conclusion that such a policy does, in fact, exist, the Court can turn to the
bevy of jurisdictional objections raised by Defendants.  Specifically, the Government alleges that
Plaintiffs' claims are barred by 8 U.S.C. § 1226(e), that they lack standing to bring this suit, and

Case 2:85-cv-04544-DMG-AGR Document 243 Filed 03/09/15 Page 16 of 101 Page ID
#:1982
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 12 of 40

that their claims are now moot. The Court will analyze these three issues *seriatim* and then
briefly address three ancillary issues raised by Defendants – namely, that 8 U.S.C. § 1252(f)(1)
bars Plaintiffs' suit; that the disputed policy does not constitute "final" agency action; and that
the APA does not provide a cause of action for Plaintiffs' claims. On the Court's scorecard, the
Government goes 0 for 6.

        1. *Section 1226(e)*

The Government's principal challenge to the justiciability of Plaintiffs' suit rests on 8
U.S.C. § 1226(e). It asserts that "the plain and unambiguous language" of that provision
precludes this Court from exercising subject-matter jurisdiction here. See Def. Opp. at 7.
Section 1226(e) provides:

> The Attorney General's discretionary judgment regarding the
> application of this section shall not be subject to review. No
> court may set aside any action or decision by the Attorney
> General under this section regarding the detention or release of
> any alien or the grant, revocation, or denial of bond or parole.

According to the Government, this broad provision "deprive[s] federal courts of jurisdiction to
review discretionary detention decisions made by the Executive Branch like the ones Plaintiffs
challenge here." Def. Opp. at 7.

        Defendants are half right and half wrong. They are correct insofar as this Court is clearly
barred from reviewing the Executive Branch's exercise of discretion in determinations made
under § 1226(a). But Defendants' belief that this principle precludes jurisdiction here is
mistaken. This is because Plaintiffs do not seek review of DHS's exercise of discretion. Rather,
they challenge an overarching agency policy as unlawful under the INA, its implementing
regulations, and the Constitution. That is, they challenge DHS policy as <u>outside</u> the bounds of its
delegated discretion. As they rightly point out, it "is not within DHS's 'discretion' to decide

14

whether it will be bound by the law." Pl. Opp. & Rep. at 4; see Zadvydas v. Davis, 533 U.S. 678, 688 (2001) (Plaintiffs "challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion."); Sylvain v. Attorney Gen. of U.S., 714 F.3d 150, 155 (3d Cir. 2013) ("Nothing in 8 U.S.C. § 1226(e) prevents us from deciding whether the immigration officials had statutory authority to impose mandatory detention. . . . [W]hether the officials had authority is not a 'discretionary judgment.'"); Red Lake Band of Chippewa Indians v. United States, 800 F.2d 1187, 1196 (D.C. Cir. 1986) ("A government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers."). The Court will not construe § 1226(e) to immunize an allegedly unlawful DHS policy from judicial review. See Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667, 671-72 (1986) ("[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review.").

      The out-of-circuit authority cited by Defendants does not alter this analysis. Three of the cases on which they rely – Prieto-Romero v. Clark, 534 F.3d 1053, 1058 (9th Cir. 2008); Pisciotta v. Ashcroft, 311 F. Supp. 2d 445, 453 (D.N.J. 2004); and Hatami v. Chertoff, 467 F. Supp. 2d 637, 639-40 (E.D. Va. 2006) – held only that discretionary determinations granting or denying bond or parole in an individual case are not subject to judicial review. This is hardly controversial. None of the three, however, suggested that § 1226(e) precludes review of the sort of challenge Plaintiffs bring here. The fourth – Loa-Herrera v. Trominski, 231 F.3d 984 (5th Cir. 2000) – does, in fact, take a more sweeping view of the jurisdictional bar imposed by that provision. See id. at 990-91 ("Congress, however, has denied the district court jurisdiction to adjudicate deprivations of the plaintiffs' statutory and constitutional rights [in determinations

Case 2:85-cv-04544-DMG-AGR Document 124-3 Filed 03/09/15 Page 19 of 101   Page ID
#:1984
Case 1:15-cv-00011-JEB   Document 33   Filed 02/20/15   Page 14 of 40

made under 1226(a)].").  The Fifth Circuit, however, provided little explanation of its reasoning, and, as outlined above, the Court is not persuaded by such an expansive interpretation of § 1226(e).  It thus declines to follow <u>Loa-Herrera</u> here.

      2.  *Standing*

Defendants next attack Plaintiffs' standing to bring suit.  To establish standing, a plaintiff "must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  <u>Bennett v. Spear</u>, 520 U.S. 154, 162 (1997) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-561 (1992); <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 471-472 (1982)).  Standing is assessed "upon the facts as they exist at the time the complaint is filed."  <u>Natural Law Party of U.S. v. Fed. Elec. Comm'n</u>, 111 F. Supp. 2d 33, 41 (D.D.C. 2000).

The Government first notes that Plaintiffs' alleged injury is the detention they experienced due to ICE's initial denial of release.  Yet, by the time their Amended Complaint was filed, eight of the ten named Plaintiffs had been released from detention as a result of IJ custody redeterminations.  <u>See</u> Am. Compl., ¶¶ 65, 73, 81, 90.  Defendants claim that such release means that Plaintiffs' injuries are unredressable through injunctive relief.  <u>See</u> Def. Opp. & Mot. at 11.  Such a position, however, ignores the obvious flaw apparent on its face: the remaining two Plaintiffs had <u>not</u> yet been released when the Amended Complaint was filed.  Because those two Plaintiffs – G.C.R. and J.A.R. – were still detained at the time suit was initiated, the status of the other Plaintiffs is immaterial.  <u>See</u> <u>Mendoza v. Perez</u>, 754 F.3d 1002, 1010 (D.C. Cir. 2014) ("To establish jurisdiction, the court need only find one plaintiff who has standing.").

Defendants further assert that the relief sought by Plaintiffs would not clearly redress the harm they allege.  See Def. Opp. & Mot. at 11.  According to the Government, "Although Plaintiffs contest Defendants' consideration of certain factors in ICE's custody determinations, Plaintiffs provide no basis to find that a different consideration of these factors would 'likely' result in the release of any individual Plaintiff."  Id. at 12 (quoting America's Community Bankers v. FDIC, 200 F.3d 822, 827 (D.C. Cir. 2000) (Plaintiffs must demonstrate redressability by "establish[ing] that it is likely, as opposed to merely speculative, that a favorable decision by this court will redress the injury suffered.")).  Again, the evidence is to the contrary.  This suit seeks to enjoin consideration of a factor that, at the very least, diminishes the likelihood of Plaintiffs' release.  The Government has admitted that ICE applies this factor in its custody determinations, and Plaintiffs have demonstrated that such consideration underlies ICE's near-universal denial of release to Central American families since June 2014.  See Part III.A, supra.  Because Plaintiffs fall within that class of individuals, it is in no sense "speculative" that enjoining ICE's consideration of this factor would render Plaintiffs' release far more likely.  As this Circuit has emphasized, "A significant increase in the likelihood that [a litigant] would obtain relief that directly redresses the injury suffered will suffice for standing."  Nat'l Parks Conservation Ass'n v. Manson, 414 F.3d 1, 7 (D.C. Cir. 2005) (internal quotation marks omitted); accord Lichoulas v. FERC, 606 F.3d 769, 775 (D.C. Cir. 2010).

    3.   *Mootness*

Defendants next advance the corollary argument that, regardless of initial standing, all of Plaintiffs' claims are now moot.  As explained by the Supreme Court, "[T]he doctrine of mootness can be described as the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue

Case 2:85-cv-04544-DMG-AGR Document 243 Filed 03/02/15 Page 20 of 101 Page ID
#:1986
Case 1:15-cv-00019-JEB Document 33 Filed 02/20/15 Page 16 of 40

throughout its existence (mootness)." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),

Inc., 528 U.S. 167, 189 (2000) (internal quotations omitted). A case is considered moot either

"when the issues presented are no longer live or the parties lack a legally cognizable interest in

the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969); see also Pharmachemie B.V. v.

Barr Labs., 276 F.3d 627, 631 (D.C. Cir. 2002) (case becomes moot when "events have so

transpired that the decision will neither presently affect the parties' rights nor have a more-than-

speculative chance of affecting them in the future."). Because its jurisdiction is limited, "a

federal court has no authority to give opinions upon moot questions or abstract propositions, or

to declare principles or rules of law which cannot affect the matter in issue in the case before it."

Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992). Noting that all the named

Plaintiffs have, at this juncture, been released from custody pursuant to custody redeterminations

before immigration judges, Defendants assert that there is "no further relief that this Court can

provide them" and that the case is, therefore, moot. See Def. Opp. & Mot. at 13.

     The named Plaintiffs acknowledge, as they must, that they have all been released. They

explain, however, that most of the asylum-seeking mothers and children being detained by ICE

are ultimately released during IJ custody redeterminations, and that the period of detention

between ICE's initial denial of release and such redeterminations, while significant, has proven

"too short for any particular plaintiff to seek meaningful injunctive relief on her or his own

behalf." Pl. Supp. Mem. at 2. By the time any particular plaintiff files suit, the issue is briefed,

and a hearing is held, she will, in all likelihood, be released from custody by an IJ (who is not

bound by DHS policy). See id. Plaintiffs argue that "[a] preliminary injunction would thus only

be effective to prevent the irreparable harm that DHS's No-Release Policy inflicts on other

asylum-seeking families." Id.

Case 2:85-cv-04544-DMG-AGR Document 243 Filed 03/09/15 Page 21 of 101   Page ID
Case 1:15-cv-00011-JEB   Document 33   Filed 02/20/15   Page 17 of 40
#:1987

To achieve meaningful relief with respect to DHS's allegedly unlawful policy, accordingly, they sensibly ask this Court to provisionally certify a class.  See Sosna v. Iowa, 419 U.S. 393, 401 (1975) (holding that a class action is not mooted by the "intervening resolution of the controversy as to the named plaintiffs"); Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991) (Although "the claims of the named plaintiffs have since been rendered moot, . . . by obtaining class certification, plaintiffs preserved the merits of the controversy for our review."); accord DL v. D.C., 302 F.R.D. 1, 19 (D.D.C. 2013).[1]  And, because certification ordinarily requires the existence of a live claim, Plaintiffs further argue that the proposed class is "inherently transitory."  Pl. Reply at 7.  Certification, therefore, should be deemed to "relate back" to the time the complaint was filed.  See id.  The Court turns first to whether class certification is appropriate under the circumstances presented here and then considers the question of relation back.  Only in resolving these issues can Defendants' mootness argument be addressed.

### a.   Class Certification

To certify a class under Rule 23, a plaintiff must show that the proposed class satisfies all four requirements of Rule 23(a) and one of the three Rule 23(b) requirements.  See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2548, 2551 (2011).  Rule 23(a) states that a class may be certified only if: (1) it is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative are typical of those of the class ("typicality"), and (4) the class representative will fairly and adequately protect the interests of the class ("adequacy of representation").  Plaintiffs must show, in addition, that: (1) the prosecution of separate actions

---

[1] Given the expedited nature of the instant proceedings, the parties have agreed to defer briefing on the merits of final class certification until after the resolution of Plaintiffs' request for preliminary injunctive relief.

by or against individual members of the class would create a risk of inconsistent adjudications, (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole, <u>or</u> (3) questions of law or fact common to the members of the class predominate over any questions affecting only individual members.  <u>See</u> Fed. R. Civ. P. 23(b)(1)-(3).

In deciding whether class certification is appropriate, a district court must ordinarily undertake a "rigorous analysis" to see that the requirements of the Rule have been satisfied.  <u>See</u> <u>Gen. Tel. Co. of SW v. Falcon</u>, 457 U.S. 147, 161 (1982).  "Rule 23 does not set forth a mere pleading standard."  <u>Wal-Mart</u>, 131 S. Ct. at 2551.  Rather, the party seeking class certification bears the burden of "affirmatively demonstrat[ing] his compliance with the Rule – that is, he must be prepared to prove that there are <u>in fact</u> sufficiently numerous parties, common questions of law or fact, etc."  <u>Id.</u> (emphasis in original).

Plaintiffs, however, seek only <u>provisional</u> class certification at this juncture.  In granting such provisional certification, the Court must still satisfy itself that the requirements of Rule 23 have been met.  <u>See</u> <u>Berge v. United States</u>, 949 F. Supp. 2d 36, 49 (D.D.C. 2013) (citing Fed. R. Civ. P. 23 Advisory Committee Notes 2003 Amendments).  Its analysis is tempered, however, by the understanding that "such certifications may be altered or amended before the decision on the merits."  <u>Bame v. Dillard</u>, No. 05-1833, 2008 WL 2168393, at *5 (D.D.C. May 22, 2008) (internal quotation marks omitted).

Plaintiffs' proposed class consists of Central American mothers and children who:

> (a) have been or will be detained in ICE family detention facilities [since June 2014]; (b) have been or will be determined to have a credible fear of persecution in their home country, see 8 U.S.C. § 1225(b)(1)B)(v), § 1158; 8 C.F.R. § 208.31; and (c) are eligible for

Case 2:85-cv-04544-DMG-AGR Document 243 Filed 03/09/15 Page 23 of 101 Page ID
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 19 of 40
#:1989

> release on bond, recognizance, or other conditions, pursuant to 8
> U.S.C. § 1226(a)(2) and 8 C.F.R. § 1236.1(c)(8), but (d) have been
> or will be denied such release pursuant to DHS's blanket policy of
> denying release to detained families without conducting an
> individualized determination of flight risk or danger to the
> community.

Pl. Supp. Mem. at 5. As framed, the class – particularly subsection (d) – is in some tension with

the Court's earlier discussion. To recap, Plaintiffs have not satisfactorily established that DHS

has a "blanket policy of denying release to detained families without conducting an

individualized determination of flight risk or danger to the community." The Court cannot,

therefore, certify a class defined in reference to that formulation.

It recognizes, however, Plaintiffs' clear intent to define the proposed class in relation to

the policy they challenge and, in addition, that Plaintiffs have clearly articulated and established

an alternative version of DHS's policy. See Part III.A, *supra*. In light of the expedited nature of

the briefing in this case and the provisional nature of certification sought, the Court believes it

appropriate to amend Plaintiffs' proposed class to incorporate their alternate formulation.

Subsection (d), accordingly, is edited to read: "(d) have been or will be denied such release after

being subject to an ICE custody determination that took deterrence of mass migration into

account."

So construed, the Court analyzes Plaintiffs' request for class certification under Rule 23.

It will begin by quickly addressing the first and fourth requirements of Rule 23(a), neither of

which Defendants contest. It then analyzes the second and third specifications together, both of

which are disputed. Finally, it considers whether Plaintiffs have satisfied their burden under

Rule 23(b).

i. Numerosity

The numerosity requirement is determined case by case and "'imposes no absolute

21

limitations.'" Bynum v. District of Columbia, 214 F.R.D. 27, 32 (D.D.C. 2003) (quoting Gen. Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980)). Plaintiffs need not prove exactly how many people fall within the class to merit certification. See, e.g., Kifafi v. Hilton Hotels Retirement Plan, 189 F.R.D. 174, 176 (D.D.C. 1999) ("So long as there is a reasonable basis for the estimate provided, the numerosity requirement can be satisfied without precise numbers."). As a general benchmark, "courts have found that a proposed class consisting of at least forty members" satisfies this requirement. Johnson v. District of Columbia, 248 F.R.D. 46, 52 (D.D.C. 2008); accord Taylor v. District of Columbia Water & Sewer Auth., 241 F.R.D. 33, 37 (D.D.C. 2007); Bynum, 214 F.R.D. at 3.

Defendants do not challenge the numerosity of the proposed class, and rightly so. Plaintiffs have provided ample evidence that a large number of Central American families – well over 40 – have been detained since June of 2014. See, e.g., McLeod Decl., ¶¶ 8-12 (data from advocates tracking 658 members of Central American families detained at Artesia after their initial ICE custody determination between August and December); Hines Decl., ¶¶ 12-13, 18-20 (data from pro-bono project identifying 64 families detained at Karnes Family Detention Facility between August and December 2014). They have further demonstrated that ICE is considering deterrence of mass immigration in making such detention determinations. Nothing more is needed.

ii. Adequacy of Representation

In order to satisfy this requirement, Plaintiffs must show both that (1) there is no conflict of interest between the named members and the rest of the class, and that (2) counsel is competent to represent the class. See Twelve John Does v. Dist. of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997); Johnson, 248 F.R.D. at 53-54; Taylor, 241 F.R.D. at 45; Bynum, 214 F.R.D. at

35.  No trace of a conflict exists here, and Plaintiffs are represented by very capable counsel from the American Civil Liberties Union and Covington & Burling LLP.  Defendants, appropriately, do not dispute that these requirements have been met either.

### iii.  Commonality and Typicality

Rule 23(a)(2) – commonality – requires that Plaintiffs establish that "there are questions of law or fact common to the class."  Class members' claims must depend on "a common contention [that] is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Wal-Mart Stores, 131 S. Ct. at 2551.  In other words, the representative plaintiffs must show that the class members have "suffered the same injury."  Id. (internal quotation marks omitted).  As the D.C. Circuit recently explained, commonality is satisfied where there is "a uniform policy or practice that affects all class members."  DL v. District of Columbia, 713 F.3d 120, 128 (D.C. Cir. 2013).

To demonstrate typicality, as required by Rule 23(a)(3), Plaintiffs must show that their claims are "typical of the claims . . . of the class."  Typicality means that the representative plaintiffs must "possess the same interest and suffer the same injury" as the other class members.  See Falcon, 457 U.S. at 156 (internal quotation marks and citations omitted)

The commonality and typicality requirements often overlap because both "serve as 'guideposts'" to determine whether a class action is practical and whether the representative plaintiffs' claims are sufficiently interrelated with the class claims to protect absent class members.  See Taylor, 241 F.R.D. at 44-45 (quoting Falcon, 457 U.S. at 157 n.13).  Here, as Defendants' principal challenge to class certification goes to both, the Court considers them together.

23

Emphasizing that Plaintiffs have been unable to establish a categorical No-Release Policy, Defendants argue that a class action is an improper vehicle to challenge Plaintiffs' alternative articulation of the relevant policy – to wit, that ICE treats deterrence of mass immigration as a factor in making custody determinations. They point out that ICE officers can consider a number of factors in making such determinations and assert that "there is absolutely nothing in the record to indicate whether these national security concerns were a factor in any individual Plaintiff's custody determination and, even if they were, whether they were the reason ICE exercised its discretion to maintain custody." Opp. to Class Cert. at 13. Thus, argues the Government, Plaintiffs have "fail[ed] to show that these [individual] custody determinations involved sufficiently similar factual or legal questions to satisfy the typicality and commonality requirements of Rule 23." Id. at 15.

This argument bears a striking resemblance to Defendants' objection to the named Plaintiffs' standing, and, for similar reasons, the Court rejects it here as well. While it is true that the reason for detention cannot be proven on an individualized basis – since ICE does not provide that information – the Government has nonetheless conceded that ICE is required to consider deterrence of mass migration "where applicable," and that it has been applying this factor in response to the surge in immigration on the southwestern border. See Def. Reply at 4. Plaintiffs, moreover, have provided ample evidence that nearly every Central American family apprehended since June 2014 has been detained, and they have further established a causal relationship between ICE's application of the disputed factor and the spike in detention. The Court can, therefore, conclude that "common questions of law and fact" unite the class members' claims – namely, ICE's consideration of mass immigration as a factor in its custody determinations.

24

That the exact role this allegedly impermissible factor played in any specific determination is unknowable does not destroy the fact that all (or nearly all) class members were subjected to a determination that included it. Otherwise, the Government could avoid the possibility of a class-action challenge simply by obfuscating the role any single impermissible factor plays in a given individual determination. Defendants' objection thus parried, the Court finds that commonality and typicality have been established.

iv. Rule 23(b)(2)

To receive certification, a proposed class must also satisfy just one of the three Rule 23(b) specifications. Plaintiffs here invoke Rule 23(b)(2), which sets forth two basic requirements: (1) the party opposing the class must have "acted, refused to act, or failed to perform a legal duty on grounds generally applicable to all class members," and (2) "final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, must be appropriate." Fed. R. Civ. P. 23(b)(2); 2 William B. Rubenstein, Newberg on Class Actions § 4:26 (5th ed. 2013).

In disputing that this requirement has been satisfied, Defendants regurgitate a variant of the same challenge they raised to standing, typicality, and commonality – to wit, that "there can be no certainty that the injunctive relief sought by Plaintiffs would benefit any particular putative class member, since different discretionary factors will be applicable to different individuals." Opp. to Class Cert. at 17. Once again, the Court cannot concur. Plaintiffs have shown that DHS policy requires ICE to consider deterrence of mass immigration in dealing with members of the class. They seek declaratory and injunctive relief invalidating consideration of that factor and enjoining ICE from applying the policy to deny release. In other words, the suit challenges a policy "generally applicable" to all class members. A determination of whether that policy is

Case 2:85-cv-04544-DMG-AGR Document 243 Filed 03/09/15 Page 28 of 101 Page ID
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 24 of 40
#:1994

unlawful would resolve all class members' claims "in one stroke," <u>Wal-Mart Stores</u>, 131 S. Ct. at

2251, while rendering the prospect of their release far more likely. Rule 23(b)(2) thus poses no

obstacle to class certification.

        b.   Relation Back

One last class-related dispute remains. Certification is ordinarily appropriate only if the

named plaintiff has a live controversy at the time of certification. <u>See</u> <u>Sosna</u>, 419 U.S. at 402.

Here, as the named Plaintiffs admit, all of their claims are, at this juncture, moot. They

nevertheless ask the Court to certify this class, relying on the "inherently transitory" nature of the

proposed class. The Court acquiesces to their request.

In appropriate cases, "a class action should not be deemed moot even if the named

plaintiff's claim becomes moot prior to certification of the class." <u>Basel v. Knebel</u>, 551 F.2d

395, 397 n.1 (D.C. Cir. 1977). As the Court in <u>Sosna</u> observed:

> There may be cases in which the controversy involving the named
> plaintiffs is such that it becomes moot as to them before the district
> court can reasonably be expected to rule on a certification motion.
> In such instances, whether the certification can be said to "relate
> back" to the filing of the complaint may depend upon the
> circumstances of the particular case and especially the reality of the
> claim that otherwise the issue would evade review.

419 U.S. at 402 n. 11. Where "claims are so inherently transitory that the trial court will not

have even enough time to rule on a motion for class certification before the proposed

representative's individual interest expires," the Court has found such relation back appropriate.

<u>Cnty. of Riverside</u>, 500 U.S. at 51 (internal quotation marks omitted); <u>DL</u>, 302 F.R.D. at 20

("The inherently transitory exception to mootness permits relation back [to the time the

complaint is filed] in any situation where composition of the claimant population is fluid, but the

population as a whole retains a continuing live claim.").

26

Case 2:85-cv-04544-DMG-AGR Document 243 Filed 03/09/15 Page 29 of 101   Page ID
Case 1:15-cv-00011-JEB   Document 33   Filed 02/20/15   Page 25 of 40
#:1995

This rule applies here. The period of allegedly unlawful detention at issue in this case is

weeks or months – *i.e.*, the period between ICE's initial denial of release and the point at which

detained families are able to obtain IJ redeterminations. See Hines Decl., ¶ 21 (calculating the

length of detention as between three to eight weeks); McLeod Decl., ¶ 14 (stating that the

"average" length of that period is "five weeks," but "[i]n several cases, the time between the ICE

custody determination and bond hearing before the IJ was more than three months"). This

period, while significant enough to create a cognizable injury, is too short for a court to be

expected to rule on a certification motion. So long as the policy remains in effect, moreover,

new asylum-seeking families are subjected to allegedly wrongful detention. The class

population as a whole thus retains a continuing live claim. Relation back is appropriate.

The Court, therefore, will grant Plaintiffs' Motion for provisional class certification, and,

as a result, it concludes that the suit, in its class-action form, is not moot. The Court may now

proceed to the remaining threshold issues raised by Defendants.

### 4. *8 U.S.C. § 1252(f)(1)*

The Government next claims that class-wide injunctive relief is proscribed by the INA.

See Def. Opp. & Mot. at 27. Specifically, it points to 8 U.S.C. § 1252(f)(1), which provides that

"no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain

the operation of the provisions of [8 U.S.C. §§ 1221-1231], other than with respect to . . . an

individual alien against whom proceedings under such part have been initiated." According to

Defendants, to grant relief in this case, the Court would need to enjoin the operations of ICE in

carrying out its delegated powers under 8 U.S.C. § 1226(a) on a class-wide basis – "precisely the

type of class-wide injunctive relief that is prohibited under 8 U.S.C. § 1252(f)(1)." Def. Opp. &

Mot. at 28. But this dog doesn't hunt either. Section 1252(f)(1) "prohibits only injunction of

'the operation of' the detention statutes, not injunction of a <u>violation</u> of the statutes." <u>Rodriguez</u> <u>v. Hayes</u>, 591 F.3d 1105, 1120 (9th Cir. 2010) (emphasis added); <u>see also</u> <u>Gordon v. Johnson</u>, 300 F.R.D. 31, 40 (D. Mass. 2014) ("[T]he court need not prohibit the operation of any part of the law to correct the government's <u>incorrect</u> application of it."). Put another way, "[w]here . . . a petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of [the statute], and § 1252(f)(1) therefore is not implicated." <u>Rodriguez</u>, 591 F.3d at 1120 (internal quotations and citations omitted). As class-wide injunction in this case would not obstruct the "operation of" Section 1226(a) but merely enjoin conduct that allegedly violates that provision, 8 U.S.C. § 1252(f)(1) poses no bar to relief.

     5.   *Finality*

Notwithstanding their acknowledgment that ICE considers deterrence of mass immigration in making custody determinations, and that such consideration contributed to the near universal detention of Central American families since June 2014, Defendants also argue that Plaintiffs have failed to demonstrate the existence of a reviewable policy. The Court once again disagrees.

The Government first claims that Plaintiffs' "amorphous" description of "ICE's ongoing practice of considering certain factors in individualized custody determinations" does not suffice to establish "final agency action" for purposes of the APA. <u>See</u> Def. Reply at 16. Instead, it contends, Plaintiffs have merely described "a generalized agency decision-making process" that is not subject to review. <u>Id.</u> While it is true that a "'generalized complaint about agency behavior' . . . gives rise to no cause of action," <u>Bark v. United States Forest Service</u>, No. 12-1505, 2014 WL 1289446, at *6 (D.D.C. Mar. 28, 2014), Plaintiffs here attack <u>particularized</u> agency action – namely, ICE's consideration of an allegedly impermissible factor in making

custody determinations.  They have shown, moreover, that the action is "one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted).  DHS's policy of considering deterrence has profound and immediate consequences for Central American asylum seekers detained as a result.

Relatedly, Defendants emphasize that Plaintiffs have failed to cite any statute, regulation, policy memoranda, or any other document memorializing the policy they challenge.  See Def. Opp. & Mot. at 22.  Agency action, however, need not be in writing to be final and judicially reviewable.  See Venetian Casino Resort LLC v. EEOC, 530 F.3d 925, 929 (D.C. Cir. 2008) (concluding that "the record" as a whole "leaves no doubt" that a policy exists, even though "the details . . . are still unclear"); Grand Canyon Trust v. Pub. Serv. Co. of N.M., 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) (holding that "[b]oth law and logic" dictate that an unwritten agency policy is reviewable).  A contrary rule "would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing."  Grand Canyon Trust, 283 F. Supp. 2d at 1252.  Denying review of agency action that is essentially conceded but ostensibly unwritten would fly in the face of the Supreme Court's instruction that finality be interpreted "pragmatic[ally]."  FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 239 (1980).

In a last attack on the purported finality of their policy, Defendants claim that "Plaintiffs' allegations are consistent with a finding that ICE is engaging in a longstanding practice" dating back to Matter of D-J-, "and not a newly-developed 'Policy'" adopted in June 2014.  See Def. Reply at 4 (emphasis added).  The Court is perplexed by the Government's focus on chronology. It is no mystery why Plaintiffs have linked the challenged policy to June 2014 – it is then that ICE began detaining large numbers of Central American families, corresponding to the surge in

29

Case 2:85-cv-04544-DMG-AGR Document 243 Filed 03/09/15 Page 32 of 101 Page ID
#:1998
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 28 of 40

immigration from that region. ICE's ability to detain such numbers, moreover, was substantially

aided by the recent increase in family-detention facilities. <u>See</u> Def. Reply at 5 ("Defendants do

not dispute that since June 2014 they have increased their capacity to house families during their

removal proceedings, and consequently have held more families in ICE custody since that

time."). That the justification for the policy may technically have been in place prior to last

summer, albeit largely dormant, does not mean that Plaintiffs have somehow misidentified the

relevant agency action.

### 6. *Adequacy of Review*

Finally, the Government asserts that Plaintiffs have failed to state a claim under the APA

because there are other "adequate remed[ies]" available to them. <u>See</u> Def. Opp. & Mot. at 25

(quoting 5 U.S.C. § 704) ("Agency action made reviewable by statute and final agency action for

which there is no adequate remedy in a court" is subject to judicial review). The Government

argues that Plaintiffs in this case may avail themselves of two such alternate remedies: review by

an immigration judge and the writ of habeas corpus. The Court finds that neither precludes APA

review here.

The Supreme Court has long construed the "adequate remedy" limitation on APA review

narrowly, emphasizing that it "should not be construed to defeat the central purpose of providing

a broad spectrum of judicial review of agency action." <u>Bowen v. Massachusetts</u>, 487 U.S. 879,

903 (1988); <u>see also</u> <u>El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health &</u>

<u>Human Servs</u>., 396 F.3d 1265, 1270 (D.C. Cir. 2005) ("The Supreme Court has long instructed

that the 'generous review provisions' of the APA must be given 'a hospitable interpretation' such

that 'only upon a showing of 'clear and convincing evidence' of a contrary legislative intent

should the courts restrict access to judicial review.'") (quoting <u>Abbott Labs. v. Gardner</u>, 387 U.S.

Case 2:85-cv-04544-DMG-AGR Document 124-3 Filed 03/09/15 Page 33 of 101 Page ID
#:1999
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 29 of 40

136, 141 (1967)).  Rather, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions."  <u>Darby v. Cisneros</u>, 509 U.S. 137, 146 (1993).

While it is true that an alien who is denied release by ICE may seek *de novo* review of that denial from an immigration judge, <u>see</u> 8 C.F.R. § 1003.19; 8 C.F.R. § 1236.1(d)(1), Defendants' reliance on this potential redetermination ignores the fact that it occurs weeks or months after ICE's initial denial of relief.  It thus offers no adequate remedy for the period of unlawful detention members of the class suffer <u>before</u> receiving this review – the central injury at issue in this case.

Insofar as the Government alternatively argues that Plaintiffs are required to proceed in habeas rather than under the APA, they have not provided a compelling reason why this is so.  APA and habeas review may coexist.  <u>See</u> <u>Davis v. U.S. Sentencing Comm'n</u>, 716 F.3d 660, 666 (D.C. Cir. 2013); <u>Goncalves v. Reno</u>, 144 F.3d 110, 120 (1st Cir. 1998); <u>Lee v. Reno</u>, 15 F. Supp. 2d 26, 33 (D.D.C. 1998).  And, although Congress has expressly limited APA review over individual deportation and exclusion orders, <u>see</u> 8 U.S.C. § 1252(a)(5), it has never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA.  Plaintiffs' case, therefore, may proceed under the latter statute.

C.  <u>The Merits</u>

At long last, having hacked through the jurisdictional thicket, the Court enters the sunlit uplands that constitute the merits of Plaintiffs' request for a preliminary injunction.  It will separately address each of the four prongs of that analysis.

31

1. *Likelihood of Success on the Merits*

To remind any reader whose attention may understandably have flagged: in Count One of their Amended Complaint, Plaintiffs allege that DHS's deterrence policy violates the INA and is thus "contrary to law" under the APA. See 5 U.S.C. § 706(2)(A). Likelihood of success, accordingly, turns on the strength of their argument that deterrence of mass immigration is an impermissible consideration in custody determinations made pursuant to 8 U.S.C. § 1226(a). This is where the rubber meets the road.

Although the statute is silent as to what factors may be considered in making such determinations, the Court must construe it with an eye toward avoiding "serious constitutional doubts." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 516 (2009). It will first discuss how that maxim of statutory interpretation applies here, then analyze the due-process rights at stake, and last examine the Government's justification for detention.

a. Chevron vs. Constitutional Avoidance

As previously explained, § 1226(a) governs the detention of aliens awaiting standard removal proceedings, which group includes Plaintiffs here. It provides that "pending a decision on whether the alien is to be removed from the United States," the Attorney General "may continue to detain the arrested alien" or release the alien on bond or conditional parole. The Government notes that the statute contains no limitation on the Executive's discretion to detain, nor does it enumerate the factors that may be considered. They further point out that the Attorney General – the officer charged by Congress with the responsibility to interpret and administer the INA – was already expressly interpreting § 1226(a) to allow consideration of mass migration in Matter of D-J-. Because that construction of the statute is facially permissible,

32

Defendants argue, it is entitled to <u>Chevron</u> deference.  <u>See generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842 (1984).  Not so fast.

The Government raised a virtually identical argument in <u>Zadvydas v. Davis</u>, 533 U.S 678 (2001), in relation to an analogous provision of the INA, 8 U.S.C. § 1231(a)(6).  That provision, which governs detention of certain categories of aliens who have been removed, says that such aliens "<u>may</u> be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision."  8 U.S.C. § 1231(a)(6) (emphasis added).  The Government contended that the provision "set[] no limit" on the length of detention and, therefore, that the Attorney General had total discretion over whether and how long to detain, even indefinitely.  <u>See Zadvydas</u>, 533 U.S at 689 (internal quotation marks omitted).

The Supreme Court disagreed, relying on the "cardinal principle of statutory interpretation" that "when an Act of Congress raises a serious doubt as to its constitutionality," the Court "will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."  <u>Id.</u> at 689 (internal quotation marks omitted); <u>see also id.</u> ("We have read significant limitations into other immigration statutes in order to avoid their constitutional invalidation.").  The Court held that the statute could not be construed to permit indefinite detention; rather, "read in light of the Constitution's demands," § 1231(a)(6) "limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States."  <u>Id.</u>

This Court follows <u>Zadvydas</u>'s lead in asking whether the Government's construction of the present statute raises a serious doubt as to its constitutionality.  <u>See also Nat'l Mining Ass'n v. Kempthorne</u>, 512 F.3d 702, 711 (D.C. Cir. 2008) (The "canon of constitutional avoidance

33

trumps <u>Chevron</u> deference" where the argument for applying the canon is "serious.") (internal quotation marks omitted).

        b.   Due Process Clause

The touchstone for the Court's analysis is, of course, the text of the Constitution itself. The Due Process Clause of the Fifth Amendment forbids the Government to "depriv[e]" any "person . . . of . . . liberty . . . without due process of law." The Supreme Court has repeatedly recognized that "[f]reedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that Clause protects." <u>Zadvydas</u>, 533 U.S. at 690; <u>see also, e.g.</u>, <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

In keeping with this fundamental precept, the <u>Zadvydas</u> Court explained that "government detention violates [the Due Process Clause] unless the detention is ordered in a <u>criminal</u> proceeding with adequate procedural protections, or, in certain special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." 533 U.S. at 690. The detention at issue in this case is undisputedly civil – <i>i.e.</i>, non-punitive in nature. The relevant question, accordingly, is whether the Government's justification for detention is sufficiently "special" to outweigh Plaintiffs' protected liberty interest.

In an attempt to evade this rigorous inquiry, Defendants note that the present class is comprised of noncitizens, whose entry into this country was unlawful. It follows, they say, that "Plaintiffs have extremely limited, if any, due process rights regarding [their] custody determinations." Opp. at 18. The Government is mistaken. While it is true that "certain

constitutional protections are unavailable to aliens outside of our geographic border," the Supreme Court has made clear that "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas, 533 U.S. at 693; see also id. ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law"); Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 175 (1993) ("It is important to note at the outset that our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'") (internal quotation marks omitted); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").

Plaintiffs in this case were apprehended in the territory of the United States. What is more, they may have legitimate claims to asylum, such that their presence here may become permanent. It is clear, then, that they are entitled to the protection of the Due Process Clause, especially when it comes to deprivations of liberty.

c. Justification for Detention

The Court must now evaluate the Government's interest in detention here. It is not without guidance in this endeavor. The Zadvydas Court clearly identified a pair of interests that can, under certain circumstances, suffice to justify the detention of noncitizens awaiting

Case 2:85-cv-04544-DMG-AGR Document 123 Filed 03/09/15 Page 33 of 101 Page ID
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 34 of 40
#:2004

immigration proceedings: "preventing flight" and "protecting the community" from aliens found

to be "specially dangerous." 533 U.S at 690-92. It explained that because those potentially

legitimate justifications were "weak" or "nonexistent" when applied to <u>indefinite</u> detention, such

detention raised serious constitutional concerns. <u>See id.</u> at 690. The Court emphasized those

same justifications in <u>Demore v. Kim</u>, 538 U.S. 510, 529-31 (2003), another seminal

immigration case. Although the <u>Demore</u> Court upheld mandatory detention of certain criminal

aliens under 8 U.S.C. § 1226(c), it justified such detention on the ground that such aliens, as a

class, pose a demonstrated risk of flight and danger to the community. <u>See</u> 538 U.S. at 519-20,

527-28; <u>see also id.</u> at 531-32 (Kennedy, J., concurring). The interest proposed by the

Government in this case, however – namely, deterrence of mass migration – is altogether novel.

<u>See</u> Oral Arg. Tr. at 38-39 (Government conceding that it has no "federal cases on point" to

support its view that this interest is permissible).

 Defendants, nonetheless, are not necessarily out of luck. This is because the Court does

not infer from <u>Zadvydas</u> and <u>Demore</u> that <u>no</u> other legitimate justification for noncitizen

detention – beyond the individual's flight risk or potential dangerousness – exists. Here,

however, not only is the justification urged by the Government unprecedented, but the Court is

struck by the essential distinction between the <u>nature</u> of that interest and those endorsed by the

Supreme Court. The justifications for detention previously contemplated by the Court relate

wholly to characteristics inherent in the alien himself or in the category of aliens <u>being detained</u>

– that is, the Court countenanced detention of an alien or category of aliens on the basis of <u>those</u>

<u>aliens</u>' risk of flight or danger to the community. The Government here advances an entirely

different sort of interest. It claims that, in determining whether an individual claiming asylum

should be released, ICE can consider the effect of release on others not present in the United

Case 2:85-cv-04544-DMG-AGR Document 243 Filed 03/09/15 Page 39 of 101 Page ID
#:2005
Case 1:15-cv-00015-JEB Document 33 Filed 02/20/15 Page 35 of 40

States. Put another way, it maintains that one particular individual may be civilly detained for the sake of sending a message of deterrence to other Central American individuals who may be considering immigration.

This appears out of line with analogous Supreme Court decisions. In discussing civil commitment more broadly, the Court has declared such "general deterrence" justifications impermissible. See Kansas v. Crane, 534 U.S. 407, 412 (2002) (warning that civil detention may not "become a 'mechanism for retribution or general deterrence' – functions properly those of criminal law, not civil commitment") (quoting Kansas v. Hendricks, 521 U.S. 346, 372-74 (1997) (Kennedy, J., concurring); see id. at 373 ("[W]hile incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone."). It is certainly possible that this bar on employing general deterrence does not apply in the civil immigration context – i.e., that some sort of immigration carve-out exists. The Court, however, is not persuaded why this should be so as a matter of logic. Its doubt is animated, in part, by Zadvydas, which grounds its analysis of immigration detention in principles derived from the wider civil-commitment context. See 533 U.S. at 690 (citing Hendricks, 521 U.S. 346 at 356 and Foucha, 504 U.S. 71 at 80).

Even assuming that general deterrence could, under certain circumstances, constitute a permissible justification for such detention, the Court finds the Government's interest here particularly insubstantial. It seeks to deter future mass immigration; but to what end? It claims that such Central American immigration implicates "national security interests," see Def. Reply at 4 (citing Matter of D-J-, 23 I. & N. Dec. at 572), but when pressed to elaborate, the principal thrust of its explanation is economic in nature. It argues, in essence, that such migrations force ICE to "divert resources from other important security concerns" and "relocate" their employees.

Case 2:85-cv-04544-DMG-AGR Document 243 Filed 03/29/15 Page 40 of 101 Page ID
Case 1:15-cv-00011-JEB Document 33 Filed 02/20/15 Page 36 of 40
#:2006

Oral Arg. Tr. at 30, 35.  The Government has not, however, proffered any evidence that this

reallocation of resources would leave the agency somehow short-staffed or weakened.

Defendants have not conjured up the specter of an influx's overwhelming the country's borders

or wreaking havoc in southwestern cities.  The simple fact that increased immigration takes up

government resources cannot necessarily make its deterrence a matter of national security, with

all the attendant deference such characterization entails.   In addition, a general-deterrence

rationale seems less applicable where – unlike pedophiles, see Hendricks, 521 U.S. at 354-55,

362, or other violent sexual offenders, see Crane, 534 U.S. at 869 – neither those being detained

nor those being deterred are certain wrongdoers, but rather individuals who may have legitimate

claims to asylum in this country.

Defendants have presented little empirical evidence, moreover, that their detention policy

even achieves its only desired effect – *i.e.*, that it actually deters potential immigrants from

Central America.  The best they can do is point to the Miller Declaration, which states:

> Detention is especially crucial in instances of mass migration.
> Annual surveys of people in Central American countries show that
> one key factor that influences the decision whether to migrate is
> the existence of an "active migration network," i.e. friends or
> family who previously migrated and are living in the United States.
> *See Americas Barometer Insights: 2014, Violence and Migration
> In Central America*, Latin American Public Opinion Project,
> Vanderbilt University, No. 101 (2014). . . . Illegal migrants to the
> United States who are released on a minimal bond become part of
> such active migration networks.

Miller Decl., ¶ 11.  But the author of the cited report, Jonathan Hiskey, has explained that

"DHS's reliance on the Report is erroneous and misplaced, demonstrating a failure to grasp the

empirical findings and theoretical underpinnings of that Report."  Pl. Mot, Exh. 13 (Declaration

of Jonathan Hiskey), ¶ 11.  He emphasizes that DHS "ignore[s] the report's central finding,

namely, the critical role that crime victimization in Central America plays in causing citizens of

38

these countries to consider emigration as a viable, albeit extremely dangerous, life choice," <u>id.</u>, ¶ 13, and states that DHS's assertions are "not empirically supported." <u>Id.</u>, ¶ 20; <u>see also</u> Pl. Mot., Exh. 14 (Declaration of Nestor Rodriguez, scholar whose focus is Central American immigration), ¶ 14 ("[R]umors regarding lenient immigration detention policies in the United States are not a significant factor motivating current Central American immigration."). Defendants have provided no additional evidence to rehabilitate their theory. <u>See also</u> ECF No. 31, Exh. A (BIA Decision in <u>Matter of D.A.M.</u> (January 30, 2015)) at 2 (concluding that, notwithstanding <u>Matter of D-J-</u>, "the extraordinary remedy of the continued detention" of an El Salvadoran family unit could not be justified on the basis of "deter[ring] future waves of mass migration").

The Court is fully cognizant, of course, of the deference owed the Executive in "cases implicating national security, a uniquely executive purview." <u>Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice</u>, 331 F.3d 918, 926-27 (D.C. Cir. 2003). "[D]eference," however, "is not equivalent to acquiescence." <u>Campbell v. Dep't of Justice</u>, 164 F.3d 20, 30 (D.C. Cir. 1998). Incantation of the magic words "national security" without further substantiation is simply not enough to justify significant deprivations of liberty. Similarly, although the Court acknowledges the "broad" latitude due the Executive in the realm of immigration, <u>Mathews v. Diaz</u>, 426 U.S. 67, 79-80 (1976), it cannot "abdicat[e]" its "legal responsibility to review the lawfulness" of detention. <u>Zadvydas</u>, 533 U.S. at 700. The government's power over immigration, while considerable, "is subject to important constitutional limitations." <u>Id.</u> at 695. It is those limitations with which the Court is concerned here.

This would, admittedly, be a closer case had the Government offered a defensible national-security interest that connects the aim of the challenged policy to its actual effect. The

Court, moreover, is rendering no judgment on the Executive's authority to use other means at its disposal to deter mass immigration. But when its chosen vehicle demands significant deprivation of liberty, it cannot be justified by mere lip service.

In sum, as in <u>Zadvydas</u>, the Government claims remarkably expansive authority to detain noncitizens found within our borders. Again channeling <u>Zadvydas</u>, its approach does not comport with the traditional purposes of such detention. The Government's justification, moreover, is poorly substantiated in its own right. The Court is thus convinced that Plaintiffs have a significant likelihood of succeeding on the merits of their claim – namely, that DHS's current policy of applying <u>Matter of D-J-</u> to detain Central American families violates 8 U.S.C. § 1226(a), read in light of constitutional constraints. Having decided this critical issue, the Court moves on to the remaining three preliminary-injunction factors.

### 2. *Irreparable Harm*

To establish the existence of the second factor, a party must demonstrate that the injury is "of such <u>imminence</u> that there is a 'clear and present' need for equitable relief to prevent irreparable harm." <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985)). The injury must also be "both certain and great; it must be actual and not theoretical." <u>Id.</u> (quoting <u>Wisconsin Gas</u>, 758 F.2d at 674). Finally, the injury must be "beyond remediation." <u>Id.</u>

Plaintiffs have satisfied this inquiry here. As discussed above, the evidence they present suggests that a large number of asylum-seeking families from Central America are currently being detained as a result of DHS's deterrence policy. Such detention harms putative class members in myriad ways, and as various mental health experts have testified, it is particularly harmful to minor children. <u>See</u> Hines Decl., ¶¶ 23-28; Pl. Mot., Exh. 15 (Declaration of Luis H.

40

Zayas), ¶¶ 10-11; ECF No. 1, Exh. 1 (Declaration of R.I.L.R.), ¶¶ 18-20; id., Exh. 2 (Declaration

of Z.M.R.), ¶¶ 20-21; see also Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013)

(recognizing the "major hardship posed by needless prolonged detention"); Wil S. Hylton, The

Shame of America's Family Detention Camps, N.Y. Times Magazine MM25 (February 8, 2015),

available at http://www.nytimes.com/2015/02/08/magazine/the-shame-of-americas-family-

detention-camps.html?_r=0 (describing conditions in family detention centers).

 The injuries at stake, furthermore, are "beyond remediation." Chaplaincy, 454 F.3d at

297. Members of the proposed class do not seek monetary compensation for their injuries.

Instead, they seek injunctive and declaratory relief invalidating and setting aside the improper

deterrence policy. Unlike economic harm, the harm from detention pursuant to an unlawful

policy cannot be remediated after the fact. Cf. Davis v. Pension Benefit Guar. Corp., 571 F.3d

1288, 1295 (D.C. Cir. 2009) (economic losses are typically not irreparable because compensation

can be awarded after a merits determination).

   3. *Balance of Harms and Public Interest*

 Under the circumstances of this case, factors three and four do not require in-depth

analysis. The Government "cannot suffer harm from an injunction that merely ends an unlawful

practice or reads a statute as required to avoid constitutional concerns." Rodriguez, 715 F.3d at

1145. And, as courts in this District have recognized, "The public interest is served when

administrative agencies comply with their obligations under the APA." N. Mariana Islands v.

United States, 686 F. Supp. 2d 7, 21 (D.D.C. 2009); see also Klayman v. Obama, 957 F. Supp.

2d 1, 43 (D.D.C. 2013). In light of the Court's conclusion that DHS's current policy of

considering deterrence is likely unlawful, and that the policy causes irreparable harm to mothers

and children seeking asylum, the Court finds that these last two factors favor Plaintiffs as well.

## IV.    Conclusion

For the aforementioned reasons, the Court will grant Plaintiffs' Motions for a Preliminary

Injunction and Provisional Class Certification and deny Defendants' Motion to Dismiss.  A

separate Order consistent with this Opinion shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  February 20, 2015

Exhibit 54

## DECLARATION OF NESTOR RODRIGUEZ

I, Nestor Rodriguez, hereby declare as follows:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

## I.     Qualifications

1.      I am currently a Professor in the Department of Sociology at The University of Texas at Austin in Austin, Texas.  I have held this position since September 2008.  My current office address is the following:  The University of Texas at Austin, Department of Sociology, 305 E. 23rd Street, A1700, Austin, Texas, 78712-1086.  I have a B.A. in Sociology and Political Science, and an M.A. and Ph.D. in Sociology.  See Nestor Rodriguez faculty profile:

http://www.utexas.edu/cola/depts/sociology/faculty/npr62.

2.      I have conducted research on Central American migration to the United States since the summer of 1985.  I published the first-ever journal article on Central American immigration in the United States.  The article, "Undocumented Central Americans in Houston: Diverse Populations," appeared in the peer-reviewed journal *International Migration Review*, volume 21, in 1987.  I have published 89 research papers since completing my doctoral studies, of which 52 concern migration research and 21 concern Central American migration.  I have a forthcoming coauthored book, *Guatemala-U.S. Migration:  Transforming Regions*, which will be published by the University of Texas Press in January 2015.  I have given congressional testimony before the Subcommittee on the Western Hemisphere of the Committee on Foreign Affairs of the House of Representatives. Hearings on Consequences of U.S. Deportations of Immigrants to Latin American Countries.  110th Congress, first session, July 24, 2007 -

http://archives.republicans.foreignaffairs.house.gov/110/36988.pdf.

1

44

3.      I am making this declaration to provide my considered opinions on the causes for the increased migration from Central America to the United States, including that of large numbers of women and children, and the effect or lack thereof of detaining migrants upon migration flows.

4.      As a basis for this opinion, I rely upon over three decades of research and fieldwork in Central American countries, including El Salvador, Guatemala and Honduras, as well as interviews and studies of Central American migrant populations in the United States.

5.      I have also reviewed two declarations submitted by Department of Homeland Security attorneys in bond proceedings for detained Central American women and children seeking asylum.  The first declaration is by Philip T. Miller; the second, by Traci A. Lembke.

**II.     Opinions**

6.      Over three decades of research, I have amassed a large amount of data, insights and observations about the causes of Central American migration to the United States.  Based on my years of research in Central America and studying Central American migration to the United States, it is my conclusion that increased violence in El Salvador, Guatemala and Honduras is the primary cause for the recent migration to the United States of large numbers of women and children from Central America.  A substantially related factor causing the migration is the failure of local and national governments in Central America to offer sufficient protection to citizens. The region's population has experienced a fundamental loss of social trust in their governments' ability to protect them from violence or offer remedies to address the violence.  As a result, many families have determined that flight from the region is necessary to seek safety.

7.      These conclusions are based on my research and my experiences interviewing Central American immigrants in the United States as well as individuals in Central America.  I began interviewing Central American immigrants in the United States regarding their migration

experiences in 1984 and made my first research trip to Guatemala in July 1988. I traveled to Guatemala for research almost annually between 1988 and 1998. In Guatemala, I interviewed residents regarding the conditions that caused town residents and nearby villagers to migrate to the United States, and regarding the ways migrants organized their migration.

8.      In 1997, I began new research on Central Americans who had migrated to Texas. In 1998, this research was expanded to El Salvador when we hired Salvadoran interviewers to interview 159 deported migrants or their families in different regions of El Salvador. In 2002, I traveled to San Salvador, El Salvador to organize a random social survey of 300 deported Salvadoran migrants.

9.      In the summers of 2010 and 2011, I returned to Guatemala to conduct research among 60 migrant families in the highland township of San Cristóbal Totonicapán. I studied changing social conditions in the highlands that affected Guatemalan migration to the United States. Also in 2010, I undertook new Central American migration research with another sociologist at The University of Texas, sending graduate students to El Salvador, Guatemala and Honduras, in addition to Mexico, to investigate the conditions faced by returning migrants, mostly deportees, to these countries.

10.     Of particular relevance are my observations and conclusions based on my research conducted between 2002 and the present. My research shows dramatically increasing levels of gang violence and insecurity in Central America over this period. This violence is motivating forced migration to the United States because of its severity.

11.     My research in El Salvador since 2002 has shown ever-increasing levels of youth gang violence in that country reported by community residents. Similarly, in my research trips to Guatemala in the summers of 2010 and 2011, I learned that criminal violence had emerged as a major danger.

12.     Because of the rise in violence, the conditions that I encountered in the Guatemalan highlands in 2010 and 2011 were different from the conditions I had seen in my late 1980s and 1990s travel to the region.  The forms of violence reported by residents in my research site of San Cristóbal Totonicapán included home invasions of domiciles owned by migrant families, threatening phone calls made by gang members to extort payments from migrant families that were thought to be receiving monthly remittances from the United States, kidnapping and killing of the daughter of a local hotel owner, a vicious attack and rape of a young women by transient youth in the nearby town of Momostenango, attacks of residents by assailants with knives demanding money, and the shooting of bus drivers, with at least one killed, for refusing to give a portion of their passenger fares to gangs.  Also, in the highlands I learned of the killing of a political candidate by political rivals and the killing of a human rights worker by unknown assailants.  It was clear to me that the changing social environment made residents extremely fearful for their safety.

13.     The study I initiated with a colleague and graduate students in 2010, surveying migrants returning to El Salvador, Guatemala and Honduras, has not yet been completed.  However, preliminary conversations with the field researcher in El Salvador indicate that violence is a principal driving factor in migration to the United States. When asked if high levels of violence against Central Americans on the Mexican passage would discourage the migration north, one Salvadoran respondent answered no, that violence was already an everyday lived reality in El Salvador.  This response suggests that the dangers of remaining in the home country are motivating migration and that, in these circumstances, the risks relating to travel and reception in the United States become less significant considerations in making the migration decision.

14.     My decades of research on Central American migration further allow me to conclude that rumors regarding lenient immigration detention policies in the United States are not a significant

4

factor motivating current Central American immigration to the United States.[1]  Even if some very small percentage of Central Americans may be prompted to undertake migration as a result of information suggesting that they will be released from detention promptly after arrival in the United States, this small minority of migrants would be made up of individuals who are predisposed to migrate without authorization under any circumstances.  These individuals would very likely undertake the journey at some point regardless of any policies on immigration detention in the United States.

15.     My research observations in Central America indicate that the large majority of populations in Central America are not predisposed to emigrate.  The 1,560,000 unauthorized migrants in the United States from El Salvador, Guatemala, and Honduras, estimated by the Department of Homeland Security, represent only 5.1 percent of the total populations of those countries.  See http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011; http://www.prb.org/pdf14/2014-world-population-data-sheet_eng.pdf.  Central Americans, like populations everywhere, except in closed totalitarian societies, have strong, inter-generational family and institutional attachments in their settings and are not predisposed to migrate *en masse* simply because they hear that someone bonded out, or was released, from detention.  Given the predisposition of most Central Americans to remain in their home countries, the central factor that compels and motivates those residents is the danger of imminent violence, not the prospect of release from detention once in the United States.

---

[1]     See Nestor Rodriguez, "Undocumented Central Americans in Houston:  Diverse Populations," *International Migration Review*, Vol. 20, No. 4 (1987); Nestor Rodriguez, "Mexicans and Central Americans in the Present Wave of U.S. Immigration." in Jose Luis Falconi and Jose Antonio Mazzoti (eds.), *The Other Latinos: Central and South Americans in the United States*m Cambridge, MA: Harvard University David Rockefeller Center for Latin American Studies, distributed by Harvard University Press (2007); Susanne Jonas and Nestor Rodriguez, *Guatemala—US Migration:  Transforming Regions*, Austin: University of Texas Press, 2014.

48

16.     Relatedly, based on what I have learned about the social organization of Central American migration in my research, it is very unlikely that the prompt release on bond, or without the requirement of bond, would stimulate a pattern of mass unauthorized migration of Salvadorans, Guatemalans, and Hondurans to the United States.  Since its inception in the 1970s, Central American migration to the United States has demonstrated regularities of social organization based on transnational circulation of information among migrant families of what to expect during and after the migration process.  As a result, potential migrants in Central America are very aware of the dangers involved in travelling to the United States as well as the economic and social costs.  They do not risk unauthorized migration, unless forced to do so by factors such as extreme violence, and certainly would not emigrate simply because they heard that someone was detained and then released.

17.     To conclude, based on my own research and my knowledge of the causes of migration from Central America, changes in the detention policy of asylum seeking women and children from Central America will have no effect on migration patterns.

**III.   Compensation**

18.     I am not being compensated for my services on behalf of the Plaintiffs in this case.

**IV.   Prior Testimony**

19.     I have not testified as an expert since December of 2010, four years prior to the date of this report.

20.     I reserve the right to amend or supplement this report as appropriate upon receipt of additional information or documents.

21.     I declare under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

_December 12, 2014_
Date

_Nestor Rodriguez_
Nestor Rodriguez
Professor
Department of Sociology
The University of Texas at Austin

Exhibit A (Attached):  C.V. of Professor Nestor Rodriguez

7

50

CURRICULUM VITAE

NESTOR P. RODRIGUEZ

The University of Texas at Austin
Department of Sociology
305 E 23rd St, A1700,
CLA 3.306
Austin, TX 78712

(512) 232-6300/471-5514
Email: nrodriguez@austin.utexas.edu

EDUCATION

Ph.D., Sociology, 1984, The University of Texas at Austin, Austin, Texas
M.A., Sociology and Government, 1974, Texas A&I University, Kingsville, Texas
B.A., Sociology and Government, 1973, Texas A&I University, Kingsville, Texas

HONORS AND AWARDS

Distinguished Career Award, Latino Section, American Sociological Association, 2013
Joseph S. Werlin Scholar of Latin American/Hispanic Studies in Sociology, University of Houston, 2004-2006
Human Rights Award, presented by Coordinador 96 and the Houston Immigration and Refugee Coalition, December 1996.
Distinguished Graduate Student Award, Texas A&I University, 1974
Summa Cum Laude Graduate, Texas A&I University, 1973
Governor's Public Service Internship Awardee, Austin, Texas, 1973

AREAS OF SPECIALIZATION

International Migration
Global Sociology
Historical/Comparative Sociology
Economic Sociology
Mexican American/Latin American Studies
Political Sociology
Race/Ethnic Relations
Urban Sociology

COURSES TAUGHT

> Immigration in U.S. Society
> International Migration
> Introductory Sociology
> Introductory Social Statistics
> Introductory Social Research
> Introduction to Sociological Theory
> Introduction to Population Studies
> Mexican American Subculture
> Political Sociology
> Racial and Ethnic Relations
> Social Change
> Globalization
> Social Stratification
> Sociology of Latin America
> Urban Sociology

ACADEMIC EXPERIENCE:

> Coordinator, The Mexican Center, Teresa Lozano Long Institute of Latin American Studies, The University of Texas at Austin, 2011-2013.

> Professor, Department of Sociology, University of Texas at Austin, 2008-present.

> Chair, Department of Sociology, University of Houston, 2003-2008.

> Professor, Department of Sociology, University of Houston, 2004-2008.

> Director, Center for Immigration Research, Colleges of Liberal Arts & Social Sciences, University of Houston, 1995-2007.

> Associate Professor, Department of Sociology, University of Houston, 1991-2004.

> Assistant Professor, Department of Sociology, University of Houston, 1984 to 1991.

> Assistant Instructor, Department of Sociology, The University of Texas at Austin, 1982-1984.

> Adjunct Instructor, Extension and Correspondence Studies, The University of Texas at Austin, 1980-1984.

> Teaching Assistant, Department of Sociology, The University of Texas at Austin, 1979.

Adjunct Instructor, Department of Psychology/Sociology, Texas A&I University at Kingsville, 1978.

Instructor, Department of Psychology/Sociology, Texas A&I University at Kingsville, 1975-1976.

OTHER PROFESSIONAL EXPERIENCE

American Sociological Association. Elected Council Member, International Migration Section, 2012 – present.

Advisory Board. *Latino Studies Journal.* 2011 – present.

Advisory Board. Latina/o Sociology Book Series, New York University Press, 2013.

Advisory Board. *Latinidad* Book Series. Rutgers University Press, 2012 – present.

Advisory Board. *Travaux et Recherches dans les Amériques du Centre* (Centre d'Études Mexicaines et Centrámericaines, France/Mexico). 2012—present.

Member. Binational Group on Mexican Migration to the United States. Georgetown University-CIESAS Guadalajara. Mexico City/Washington, D.C. 2011-2013.

Research Consultant, African American-Latino Relations Project, Southern Educational Foundation, Atlanta, GA, 2006-2008.

Member, Advisory Committee, Mayor's Advisory Committee on Immigrant and Refugee Affairs, Houston, TX, 2001-2005

Member, Advisory Committee, Inter-racial, Inter-cultural Community Building, Democratic Renewal Institute, Claremont University, 1998-2001

Member, Planning Committee, Gulfton Area Neighborhood Organization for Immigrant Legal and Community Services, 1997-2000

Member, Advisory Committee on Criteria for Diversity, Texas Higher Education Coordinating Board, Austin, TX, 1996-1997.

Founding member, Houston Inter-Ethnic Forum Collaborative and Research, 1994-1997

Member, Inter-University Program for Latino Research Committee,

53

Social Science Research Council, 1993-1996

Member, Board of Directors, Tejano Center for Immigrant Legal Assistance, Houston, TX, 1987-1989

RESEARCH FUNDERS AND GRANTS

Nestor Rodriguez. 2014. Research mentoring support, $1,400.  Inter-University Mentoring Program: University of Texas- Fatima Jinnah Women's University, Islamabad, Pakistan. Mentored graduate student on development of course curriculum on gender and migration for undergraduate instruction in Islamabad.

Nestor Rodriguez. 2011.  Awarded $10,000 by the Lozano Long Institute of Latin American Studies, The University of Texas at Austin. Seed money for a pilot study of impacts of U.S. deportations for migrant sending communities in Mexico and Honduras.

Nestor Rodriguez. 2011-2012.  Awarded $6,000. Foreign travel support funds awarded by the Lozano Long Institute of Latin American Studies, The University of Texas at Austin.

Nestor Rodriguez (with Rebecca Torres as Co-Principal Investigator).  2010-2013.  Awarded $208,650 by the National Science Foundation (NSF) for the three-year program Undergraduate Research Experience (REU) at the Population Research Center, The University of Texas at Austin.

Nestor Rodriguez.  Awarded $9,9088.  2010 US-Mexico Borderland/Indigenous Studies Research Award, given by UT-Austin College of Liberal Arts.  Award for 2010-2011 research on the death patterns of unauthorized migrants at the U.S.-Mexico border.

Diversity Mentoring Grant.  Applied for and was awarded a UT Austin Graduate School Diversity Mentoring Fellowship to support a minority graduate student in Sociology in the first year of enrollment.  $16,000+ of direct support for new graduate student for 2010-2011.

University of Houston.  Awarded $3,000 for exploratory research on unauthorized migration conditions at the Mexico-Guatemalan border, 2005.

Joseph S. Werlin Endowment, Latin American Scholar Award (University of Houston):  $6,000 for support on Latin American related research, 2004-2005.

54

Ford Foundation.  Awarded $3,500 for travel support to meet with migration researchers at Renmin University of China (People's University of China), Beijing, China, 2003.

Ford Foundation.  Awarded $170,000 for 2002-2004 for core support for Center for Immigration Research, University of Houston. Principal research focus: Effects of 1996 immigration law (IIRIRA) on communities in Texas, Mexico, and El Salvador; random survey in El Salvador of 300 Salvadoran deportees.  Co-principal investigator:  Jacqueline Hagan.

Ford Foundation.  Awarded $250,000 for 1998-2001 for core support for Center for Immigration Research, University of Houston. Principal research focus: effects of 1996 immigration law (IIRIRA) on local communities in Texas, and analysis of the death of unauthorized migrants at the U.S.-Mexico border.  Co-principal investigator:  Jacqueline Hagan.

Open Society.  Awarded $50,000 in 1998 to support center operations and projects of the Center for Immigration Research.  The projects include settlement patterns of new Asian immigrants in the Houston area. Co-principal investigator: Jacqueline Hagan.

Carnegie Endowment for International Peace/Migration Policy Institute grant: Awarded $20,000 for a field study of transborder community relations in the Laredo/Nuevo Laredo and El Paso/Juarez areas as part of a study along five international borders, 1997-2000.

Ford Foundation:  "Impacts of Recent Immigration and Welfare Legislation in Texas and Mexican Communities."  Awarded $75,000 for a 1997-1998 study of how 1996 immigration and welfare laws affects low-income and immigrant communities in six Texas localities, and in adjacent Mexican border communities. Co-principal investigator:  Jacqueline Hagan.

Hogg Foundation for Mental Health grant:  "Family Separation, Mental Health, and International Migration."  Awarded $42,000 for a study of mental health conditions (anxiety, depression, stress) among immigrants separated from families by U.S. immigration laws restricting travel between the United States and communities of origin.  The research sites are Houston, Austin, and San Antonio. Co-Principal Investigator: Antonio Ugalde.

University of Texas at Austin collaborative grant.  "Small Business Activity, Migration, and Urban Poverty:  The U.S.-Mexico Transborder Region."  Collaborative grant in 1996 for $10,000 from UT Austin (Bryan Roberts and Frank Bean) to investigate transnational economic linkages between immigrant households in Houston and communities of origin in Monterrey, Mexico. Jacqueline Hagan was a co-principal investigator in the Houston site.

55

Loyola University/HUD grant. "Creating and Sustaining Stable Diverse Urban Neighborhoods in the United States." Awarded $7,000 for a 1995 study of intergroup relations in a mixed Houston neighborhood as part of a HUD-funded national study of relations in mixed neighborhoods.

American Friends Service Committee (AFSC) grant. "Migrant Death at the Texas-Mexican Border." Awarded $14,000 by AFSC for a 1995 field study to estimate the number of deaths among undocumented migrants who attempt to cross into Texas from Mexico. Jacqueline Hagan was a co-principal investigator.

Ford Foundation grant. "Inter-Ethnic Forum of Houston (IEF)." Given $150,000 by the Ford Foundation in three grants during 1994-1996 for the formation of a research and community organization to study intergroup relational patterns in Houston and promote positive intergroup relations. Grant proposals were co-written with IEF staff.

Urban Institute contract: "Latino Settlement Patterns in Houston." Given $5,000 for a research paper on new Latino settlement zones in the Houston area. 1992.

Tomas Rivera Center grant: "Houston Evaluation of Hispanic Priorities." Given $500,000 by the Ford Foundation, The Houston Endowment, and the Andrew Mellon Foundation to conduct a two-year study (1991-1993) of Anglo, African American and Hispanic-community needs and priorities in the Houston area. Professor Ricardo Romo (UT-Austin) was a co-principal investigator.

Institute on Multiculturalism and International Labor, SUNY Binghamton, contract: awarded $8,000 for a study of labor market incorporation of undocumented Latin American migrant workers in Houston, 1991-1992.

University of Houston Institute for Higher Education, Law and Governance/UH Center for Public Policy funding: "Undocumented Students and Higher Education in Houston." Given $15,200 for a study (June-December, 1991) of problems that undocumented immigrant students face when seeking admission to institutions of higher education in the Houston area.

University of Texas grant: "Political Ethnography in Houston: Electoral Mobilization in the Barrio of Magnolia." Awarded $25,636 for a one-semester study (fall 1990) of electoral activities and political participation in a Latino district in Houston. The study was part of an ethnographic project at the University of Texas at Austin focusing on Latino electoral behavior in several U.S. cities.

Hogg Foundation grant: "Unaccompanied and Undocumented: A Mental-Health Study of Accompanied Central American Immigrant Children." Awarded $25,720 for an eight-month (January-August, 1990) study of Central American children apprehended by the INS at the Texas-Mexico border. The study (1)

56

sampled 500 child detainee files to develop a socio-demographic profile of the
apprehended children and (2) interviewed 133 youth to examine for the presence
of Post-Traumatic Stress Disorder.  Co-principal investigators were Ximena
Urrutia-Rojas and Robert Roberts.

Bureau of the Census grant:  "An Ethnographic Evaluation of Census Undercount
in Houston."  Awarded $15,173 to investigate the extent and causes of census
undercount among 132 immigrant households in Houston. Project started on June
1, 1990 and ended in spring 1991.  Co-principal investigator: Jacqueline Hagan.

Field study in San Cristobal Totonicapan, a Guatemalan sending community of
Mayan immigrant workers to the United States.  Conducted family interviews and
observations of highland Mayan residents and return migrants in the summers
from 1988 to 1998.

Ford Foundation  grant:  "Changing Relations Between New Immigrants and
Established Residents in the U.S.:  Houston."  Awarded $150,000 for a two-year
(1988-1989) field study of evolving relations between established residents
(Anglos, African Americans, and Mexican Americans) and new immigrants
(Mexican and Central Americans) in Houston.  Awarded LGIA grant ($800) by
University of Houston to transcribe project interviews.  Awarded an additional
$3,500 by the Changing Relations Project to organize a conference to disseminate
findings of the Changing Relations Project.

Research Fellow, Institute for Latin American Studies, The University of Texas at
Austin, 1987-1988.  Member of the Central American Research Group.

Field study of undocumented Central American migrants in Houston, 1985-1987.
The project has interviewed 260 migrants and is investigating several aspects of
the migrants' community conditions.  Awarded LGIA grant ($800) by the
University of Houston to pay for interview transcriptions.

Inter-University Program for Latino Research (IUP)/Social Science Research
Council grant:  "Hispanic Housing in the United States:  Research for Public
Policy."  Awarded $70,429 for a study of Hispanic rental housing conditions in
the United States.  The 1986-1987 research involved constructing a database of
national housing data, a telephone survey of Houston renters, and fieldwork
among Hispanic immigrant renters in Houston. The co-principal investigator was
John I. Gilderbloom.

Awarded Research Initiation Grant ($5,000) by the University of Houston for an
exploratory study of undocumented Central Americans in Houston, June-August,
1985.

Dissertation:  Labor Migration and the Development of the Capitalist World-
System:  A Theoretical and Socio-Historical Analysis of Selected Labor

57

Migration Patterns in the Dutch, British, and U. S. Periods of  Hegemony.
Supervised by Professor Joe R. Feagin.

Field study coordinator and interviewer.  "Work and Community Absorption of
Undocumented Mexican Workers in Austin and San Antonio."  Professor Harley
L. Browning, Principal Investigator.  Population Research Center, University of
Texas at Austin, 1980-1983.

Field study coordinator and interviewer. "San Antonio Undocumented Mexican
Labor Study."  Professor Harley L. Browning, Principal Investigator.  Population
Research Center, The University of Texas at Austin, June-December, 1978.

Research Assistant, Department of Sociology, University of Texas at Austin,
Summer, 1977.  Helped to catalog Latin America censuses.

## PROFESSIONAL MEMBERSHIP

American Sociological Association
Latin American Studies Association
Southern Demographic Association

## PUBLICATIONS

*Under Review:*

Leal, David, and Nestor Rodriguez (eds.).  *Migration in and Era of Restriction*.
Springer Press.

*Forthcoming:*

Jacqueline Hagan, David Leal, and Nestor Rodriguez. "Deporting Social Capital:
The Removal of Salvadoran Migrants from the United States." *Migration Studies*,
forthcoming.

Susanne Jonas and Nestor Rodriguez.  2014. *Guatemala—US Migration:
Transforming Regions.* Austin:  University of Texas Press. In Press.

Saenz, Rogelio, David Embrick, and Nestor Rodriguez (eds.). *International
Demography of Race and Ethnicity*.  Springer Press. In Press.

*In Print:*

Berger Cardoso, Jodi, Erin Hamilton, Nestor Rodriguez, Karl Eschbach, and
Jacqueline Hagan. "Deporting Fathers: Intent to Re-Migrate among Salvadoran
Deportees." *International Migration Review*.  Initial online publication: July 3,
2014.

Wheatley, Christine, and Nestor Rodriguez.  2014. 'With the Stroke of a Bureaucrat's Pen:  American State "Reforms" to Manage its Undocumented Population, 1920-2012.'  Pages 157-178 in Lois Lorentzen *(ed.), Hidden Lives and Human Rights in America: Understanding the Controversies and Tragedies of Undocumented Immigration*.  Westport, CT: Praeger.

Nestor Rodriguez and Cristian Paredes. 2014. "Coercive Immigration Enforcement and Bureaucratic Ideology." Pages 63-83 in Cecilia Menjívar and Dan Kanstroom (eds.), *Constructing Immigrant "Illegality: Critiques, Experiences, and Responses*.  Cambridge University Press.

Nestor Rodriguez.  2013.  "Immigration Reform."  *Contexts* 12 (2).  http://contexts.org/articles/issues/spring-2013/

Nestor Rodriguez.  2012.  "Urban Redevelopment and Mexican American Barrios in the Socio-Spatial Order."  Pp. 87-110 in *Barrio Urban Policy,* edited by David Diaz and Rodolfo Torres. New York: New York University Press.

Nestor Rodriguez.  2012.  "New Southern Neighbors:  Latino Immigration and Prospects for Intergroup Relations between African Americans and Latinos in the South." *Latino Studies* 10, No. 1-2 (Spring/Summer): 18-40.

Nestor Rodriguez.  2012.  "Questions de droits humains                  et d'éthique sur une stratégie états-unienne." *Hommes & Migration, No. 1296 (Mars-Avril): 54-63.*

Jacqueline Hagan, Nestor Rodriguez, and Brianna Castro. 2011.  "Social Effects of Mass Deportations by the United States Government:  2000-2010." *Ethnic and Racial Studies,* Vol. 34, No. 8 (August): 1374-1391.

Sarah Blanchard, Erin R. Hamilton, Nestor Rodríguez, and Hirotoshi Yoshioka. 2011.  "Shifting Trends in Central American Migration:  A Demographic Examination of Increasing Honduran-U.S. Immigration and Deportation." *The Latin Americanist* 55, No. 4 (December): 61-84.

Nestor Rodriguez and Tatcho Mindiola.  2011. "African Americans and Latinos in Houston: Intergroup Perceptions and Relations." In *Just Neighbors?:  Research on African American and Latino Relations in the U.S.*  Edited by Edward Telles, Gaspar Rivera-Salgado and Sylvia Zamora. New York: Russell Sage Foundation.

Arbona, Consuelo, Norma Olvera, Nestor Rodriguez, Jacqueline Hagan, Adriana Linares, and Margit Wiesner.  2010.  "Predictors of Acculturative Stress among Documented and Undocumented Latino Immigrants." *Hispanic Journal of Behavioral Sciences*, vol. 32, no. 2, 362-384.

Jacqueline Hagan, Brianna Castro, and Nestor Rodriguez. 2010. "The Effects of Deportation on Families and Communities:  Cross Border Perspectives." *North Carolina Law Review*. Vol. 88, No. 1 (June): 1799-1824.

Nestor Rodriguez and Cecilia Menjivar. 2009.  "Central American Immigration in the "Post"- Civil Rights Era. In Jose Cobas, Jorge Duany, and Joe Feagin (eds*.). U.S. Racialization of Latinas/os: At Home and Abroad*. Kent, WA: Paradigm Press.

Nestor Rodriguez. 2008. "Manifest Functions." Pp. 552-553 in Vincent N. Parrillo (ed.), *Encyclopedia of Social Problems*, Volume 2. Thousand Oaks, CA: Sage Publications.

Nestor Rodriguez. 2008. "Latent Functions." Page 538 in Vincent N. Parrillo (ed.), *Encyclopedia of Social Problems*, Volume 2. Thousand Oaks, CA: Sage Publications.

Hagan, Jacqueline, Karl Eschbach, and Nestor Rodriguez. 2008. "U.S. Deportation Policy, Family Separation, and Circular Migration." *International Migration Review*, vol. 42, no. 1 (Spring): 64-88.

Nestor Rodriguez.  2008.  "Theoretical and Methodological Issues of Latina/o Research." Pp. 3-15 in David Havidan, Rogelio Saenz and Cecilia Menjivar (eds.), *Latinas/os In the United States: A Research Source Book*. Berkeley: Springer Press.

Nestor Rodriguez.  2008.  "Los Mexico Americanos: Quiénes Somos Y Quiénes Seremos."  Pp. 63-70 in Victor Zúñiga (ed.), *Identidad y Diversidad*.  Monterrey, Nuevo León:  Fondo Editorial de Nuevo León.

Nestor Rodriguez. 2007.  "Mexican and Central Americans in the Present Wave of U.S. Immigration." Pp. 81-100 in Jose Luis Falconi and Jose Antonio Mazzoti (eds.), *The Other Latinos: Central and South Americans in the United States*. Cambridge, MA: Harvard University David Rockefeller Center for Latin American Studies, distributed by Harvard University Press.

Philips, Scott, Jacqueline Hagan and Nestor Rodriguez. 2006.  "Brutal Borders? Examining the Treatment of Deportees During Arrest and Detention." *Social Forces*, vol. 85, no. 1 (September):93-109.

Cecilia Menjivar and Nestor Rodriguez (eds.). 2005.  *When the State Kills: Latin America, the U.S. and Technologies of Terror*. Austin: University of Texas Press.

Cecilia Menjivar and Nestor Rodriguez. 2005.  "State Terror in the U.S.-Latin American Interstate Regime."  Pp. 3-27 in Cecilia Menjivar and Nestor Rodriguez

60

(eds.), *When the State Kills: Latin America, the U.S. and Technologies of Terror*. Austin: University of Texas Press.

Cecilia Menjivar and Nestor Rodriguez. 2005.  "New Responses to State Terror." Pp. 335-346 in Cecilia Menjivar and Nestor Rodriguez (eds.), *When the State Kills: Latin America, the U.S. and Technologies of Terror*. Austin: University of Texas Press.

Nestor Rodriguez and Jacqueline Hagan. 2004.  "Fractured Families and Communities: Effects of Immigration Reform in Texas, Mexico, and El Salvador." *Latino Studies*, vol. 2, no. 3 (December): 328-351.

Nestor Rodriguez. 2004. '"Workers Wanted": Employer Recruitment of Immigrant Workers." *Journal of Work & Occupation*, vol. 31, no. 4 (November): 453-473.

Randy Capps, Jacqueline Hagan and Nestor Rodriguez. 2004. "Border Residents Manage the Immigration and Welfare Reforms." Pp. 229-249 in Philip Kretsedemas and Ana Aparicio (eds.), *Immigrants, Welfare Reform, and the Poverty of Policy*. Westport, Connecticut: Praeger Publishers.

Karl Eschbach, Jacqueline Hagan, and Nestor Rodriguez. 2003. "Deaths during Undocumented Migration:  Policy Implications in the New Era of Homeland Security," in *In Defense of the Alien*, 26:37-52.

Scott Phillips, Nestor Rodriguez, Jacqueline Hagan. 2003.  "Brutality at the Border?: Use of Force in the Arrest of Immigrants in the United States" *International Journal of Sociology of Law*, vol. 30, (2003): 285-306.

Jacqueline Hagan, Nestor Rodriguez, Randy Capps, and Nika Kabiri.  2003. "Effects of Immigration Reform on Immigrants' Access to Health Care." *International Migration Review*, vol. 37, no. 2 (Summer):444-463.

Tatcho Mindiola, Yolanda Niemann, and Nestor Rodriguez. 2002. *Black/Brown Relations and Stereotypes*. Austin: University of Texas Press.

Jacqueline Hagan and Nestor Rodriguez.  2002.  "Resurrecting Exclusion: The Effects of 1996 Immigration Reform on Families and Communities in Texas, Mexico and El Salvador." Pp. 190-201 in Marcelo Suarez-Orozco and  Mariela Paez (eds.) *Latinos: Remaking America*. Los Angeles, CA:  University of California Press.

Jacqueline Hagan and Nestor Rodriguez. 2001. "Resurrecting Exclusion: The Impact of Legislative Reform in Texas and Mexico." *Research Perspectives on Migration*, vol. 3, no. 1: 15, 18-19.

61

Nestor Rodriguez and Jacqueline Hagan. 2001.  "Transborder Community Relations at the U.S.-Mexico Border." In Demetrios Papademetriou and Deborah Meyers (eds.),  *Caught in the Middle: Cross Border Communities in an Era of Globalization*. Washington, D.C.: Carnegie Endowment.

Nestor Rodriguez. 2001. "National Identity Outside the Nation-State: Notes from Japanese Immigrant Experiences." *Annual Review of Migration Studies*.  Vol. 7: 69-84.   (Japanese Association of Migration Studies)

Nestor Rodriguez and Jacqueline Hagan.  2000. "Maya Urban Villagers in Houston:  The Formation of a Migrant Community from San Cristobál Totonicapán."  In James Loucky and Marilyn Moors (eds.), *The Maya Diaspora: Guatemalan Roots, New American Lives*.  Philadelphia:  Temple University Press.

Rosa Davila and Nestor Rodriguez. 2000.  "Successes and Challenges of Relations between African Americans and Latinos in the United States at the End of the Twentieth Century." Pp. 36-48 in Lynn Huntly (ed.), *Beyond Racism: Embracing an Interdependent Future*.  Atlanta:  Southern Education Foundation.

Nestor Rodriguez.  2000. "Hispanic and Asian Immigration Waves in Houston." In Helen Rose Ebaugh and Janet Saltzman Chafetz (eds.),  *Religion and the New Immigrants: Continuities and Adaptations in Immigrant Congregations*. Walnut Creek, CA: Rowman and Littlefield.

Alejandra Rincon, Susanne Jonas, and Nestor Rodriguez. 1999.  "La migración guatemalteca en los EE.UU., 1980-1996. Pp. 7-32 in Juan Alberto Fuentes K. (coordinator), *Población y Migración en el Area Rural*. Guatemala:  Sistema de Naciones Unidas.

Nestor Rodriguez.1999.  "Black and Latino Relations at the End of the Twentieth Century." Pp. 423-432 in Charles Hisrchman, Philip Kasinitz and Josh Dewind (eds*.), The Handbook of International Migration: The American Experience*. New York: Russell Sage.

Nestor Rodriguez.  1999.  "Globalization, Autonomy, and Transnational Migration:  Impacts on U. S. Intergroup Relations." *Research in Politics and Society*, vol. 6: 65-84.

Karl Eschbach, Jacqueline Hagan, Nestor Rodriguez, Ruben Hernandez Leon, and Stanley Bailey. 1999.  "Death at the Border." *International Migration Review*, vol. 33 no. 3 (Summer): 430-454.

Nestor Rodriguez and Jacqueline Hagan.  1999.  "Central Americans in the United States."  Pp. 278-296 in A. Gary Dworkin and Rosalind Dworkin (eds.), *The Minority Report:  An Introduction to Racial, Ethnic, and Gender Relations*, 3rd ed.  Dallas, TX: Harcourt Brace Javanovich.

62

Karl Eschbach, Jacqueline Hagan, Nestor Rodriguez, and Anna Zakos.  1998.
"The Houston Heights: Co-existing Communities?" *Cityscapes: A Journal of
Policy Development and Research,* vol. 4, no. 2: 245-259.

Nestor Rodriguez.  1997.  "Inmigración Latina y Acceso a Servicios de Salud en
el Area Metropolitana de Houston."  Pp. 125-128 in Olga Solas and Antonio
Ugalde (eds.), *Inmigración, Salud y Politicas Sociales*.  Granada, España:
Andaluzá School of Public Health and The European Commission.

Ximena Urrutia-Rojas and Nestor Rodriguez.  1997. "Unaccompanied Migrant
Children from Central America:  Sociodemographic Characteristics and
Experiences with Potentially Traumatic Events."  Pp. 151-166 in Antonio Ugalde
and Gilberto Cardenas (eds.), *Health and Social Services among International
Labor Migrants:  A Comparative Perspective*.  Austin:  Center for Mexican
American Studies,  University of Texas Press.

Nestor Rodriguez. 1997.   "The Social Construction of the U.S.-Mexico Border."
Pp. 223-243 in Juan  F. Perea (ed.), *Immigrants Out!:  The New Nativism and the
Anti-Immigrant Impulse in the United States*.  New York:  New York University
Press.

    Updated and reprinted:

        Nestor Rodriguez, 2006, "Die soziale Konstruktion der US-mexikanischen
        Grenze," in Monika Eigmüller und Gorg Vobruba (Hrsg.), *Grenz-
        Soziologie: Die politische Strukturierung des Raumes*, Wiesbaden: VS
        Verlag.

Janis Hutchinson, Nestor Rodriguez, and Jacqueline Hagan.  1996.  "Community
Life:  African Americans and Multiethnic Residential Areas." *Journal of Black
Studies*, vol. 27, no. 2: 201-223 .

Nestor Rodriguez.  1996.  "The Battle for the Border:  Notes on Autonomous
Migration, Transnational Communities and the State." *Social Justice*, vol. 23, no.
3: 21-37.

Nestor Rodriguez.  1996.  "U.S. Immigration and Intergroup Relations in the Late
Twentieth Century:  African Americans and Latinos." *Social Justice*, vol. 23, no.
3:111-124.

Stanley Bailey, Karl Eschbach, Jacqueline Hagan, and Nestor Rodriguez. 1996.
"The Human Costs of Border Enforcement:  Migrant Deaths at the Texas-Mexico
Border." *Migration World*, vol. 24, no. 4: 16-20.

Nestor P. Rodriguez.  1995.  "Latino Settlement in the 'Free-Enterprise City.'"  Pp.
201-221 in  Robert D. Bullard, J. Eugene Grigsby III, and Charles Lee (eds.),
*Residential Apartheid*.  Los Angeles:  Center for Afro-American Studies, UCLA,
University of California Press.

Nestor P. Rodriguez.  1995.  "The Real 'New World Order.'"  Pp. 211-225 in
Michael Peter Smith and Joe R. Feagin (eds.).  *The Bubbling Cauldron:  Race,
Ethnicity and the Urban Crisis*.  Minneapolis:  University of Minnesota Press.

Nestor Rodriguez.  "Lessons on Survival from Central America."  *Forum for
Applied Research and Public Policy*, vol. 10, no. 3 (Fall 1995):90-93.

Nestor Rodriguez, Noelia Elizondo, David Mena, Frank Yeverino, Adolfo
Vasquez and Ricardo Rojas.  1994.  "Political Mobilization in Magnolia."
Rodolfo de la Garza, Louise DeSipio and Marta Manchaca (eds.), *Barrio Ballots:
Latino Politics in the 1990 Election*.  Boulder, CO:  Westview Press.

Nestor P. Rodriguez.  1993.  "Economic Restructuring and Latino Growth in
Houston."  Pp. 101-127 in Joan Moore and Raquel Pinderhughes (eds.), *In The
Barrios:  Latinos and the Underclass Debate*.  New York:  Russell Sage.

Nestor P. Rodriguez and Jacqueline Hagan.  1992.  "Apartment Restructuring and
Immigrant Tenant Struggles:  A Case Study of Human Agency."  *Comparative
Urban and Community Research*, vol. 4:164-180.

Jacqueline Hagan and Nestor Rodriguez.  1992.  "Recent Economic Restructuring
and Evolving Intergroup Relations in Houston."  Pp. 145-171 in Louise Lamphere
(ed.), *Structuring Diversity:  Ethnographic Perspectives on New Immigrants in
Six American Cities*.  Chicago:  University of Chicago Press.

Nestor P. Rodriguez and Ximena Urrutia-Rojas.  1990.  "Impact of Recent
Refugee Migration to Texas:  A Comparison of Southeast Asian and Central
American Newcomers."  Pp. 263-278 in Wayne H. Holtzman and Thomas H.
Bornemann (eds.), *Mental Health of Immigrants and Refugees*, Austin, TX:  Hogg
Foundation.

Rodolfo De La Garza, Nestor Rodriguez, and Harry Pachon.  1990.  "The
Domestic and Foreign Policy Consequences of Mexican and Central American
Immigration:  Mexican American Perspectives."  Pp. 135-147 in George Vernez
(ed.), *Immigration and Foreign Relations*.  Washington, D.C.:  The RAND
Corporation.

Beth Ann Sheldon, Nestor P. Rodriguez, Joe R. Feagin, Robert D. Bullard and
Robert D. Thomas.  1989.  *Houston:  A Study of Growth and Decline in a Sunbelt
Boomtown*.  Philadelphia:  Temple University Press.

64

Joe R. Feagin, John Gilderbloom and Nestor Rodriguez.  1989.  "The Houston Experience:  Private-Public Partnership."  Pp. 240-259 in Gregory Squires (ed.), *Unequal Partnerships:  The Political Economy of Urban Redevelopment in Postwar America*.  New Brunswick:  Rutgers University Press.

Nestor Rodriguez and Jacqueline Hagan.  1989.  "Undocumented Central American Migration to Houston in the 1980s." *Journal of La Raza Studies*, vol. 2, no. 1 (Summer/Fall)1-3.

Nestor P. Rodriguez.  1989.  "Houston's Hispanic Growth,"  Pp. 48-52 in Dorothy F. Caram, Anthony Gary Dworkin, and Nestor Rodriguez (eds.), *Hispanics in Houston and Harris County:  1519-1986*.  Houston:  Houston Hispanic Forum.

Dorothy F. Caram, Anthony Gary Dworkin, and Nestor Rodriguez (eds.).  1989. *Hispanics in Houston and Harris County:  1519-1986*.  Houston:  Houston Hispanic Forum.

Nestor P. Rodriguez.  1988.  "Participant Observation in the Undocumented Community."  Pp. 38-39 in Beth B. Hess, Elizabeth W. Markson, and Peter J. Stein, *Sociology*.  3rd edition.  New York:  MacMillan.

Nestor Rodriguez.  1987.  "Undocumented Central Americans in Houston:  Diverse Populations." *International Migration Review*, vol. 21(Spring):4-25.

Nestor Rodriguez and Joe R. Feagin.  1986.  "Urban Specialization in the World-System:  An analysis of Historical Cases." *Urban Affairs Quarterly*, 22(December): 187-220.

Nestor Rodriguez.  1986.  "Chicano-Indocumentado Relations in the Workplace." Pp. 72-84 in *Chicano-Mexicano Work Relations*.  Edited by Tatcho Mindiola, Jr. and Max Martinez.  Mexican American Studies Center, University of Houston.

Nestor Rodriguez and Rogelio T. Nunez.  1986.  "An Exploration of Factors that Contribute to Differentiation Between Chicanos and Indocumentados."  Pp. 138-156 in *Mexican Immigrants and Mexican Americans:  An Evolving Relation*. Edited by Harley L. Browning and Rodolfo de la Garza.  Center for Mexican American Studies/University of Texas Press.

Harley L. Browning and Nestor Rodriguez.  1985.  "The Migration of Mexican Indocumentados as a Settlement Process:  Implications for Work."  Pp. 277-292 in *Hispanics in the U.S. Economy*.  Edited by George Borgas and Marta Tienda. Academic Press.

Book Reviews:

*Beyond Methodological Nationalism:  Research Methodologies for Cross-Border Studies*, edited by Anna Amelina, Devrimsel D. Nergiz, Thomas Faist, and Nina Glick Schiller. Review in *Contemporary Sociology*, 43 (1): 63-65, 2014.

*The Xaripu Community Across Borders: Labor Migration, Community, and Family*, by Manuel Barajas. Review in *Social Forces* 89, No. 2, December, 2010.

*Generations of Exclusion:  Mexican Americans, Assimilation, and Race*, by Edward Telles and Vilma Ortiz. Review in *Journal of American Ethnic History*, fall 2009.

*Latin American Social Movements: Globalization, Democratization, and Transnational Networks*, edited by Hank Johnston and Paul Almeida.  In *Contemporary Sociology*, Vol. 37, No. 5, September, 2008.

*A Century of Chicano History:  Empire, Nations, and Migration,* by Gilbert G. Gonzalez and Raul Fernandez. In *International Migration Review*, vol. 39, no. 2, Summer, 2005.

*Remaking the American Mainstream: Assimilation and Contemporary Immigration,* by Richard Alba and Victor Nee. In *City and Community*, vol. 3, issue 4, December 2004.

*Ellis Island to JFK: New York's Two Great Waves of Immigration*, by Nancy Foner, in *American Journal of Sociology*, vol. 107, no. 1, July 2001.

*Batos, Bolillos, Pochos, and Pelados:  Class and Culture in the South Texas Border,* by Chad Richardson. In *Contemporary Sociology*, vol. 30, no 1. 2001.

*Arab and Jewish Immigrants in Latin America,* by Ignacio Klich and Jeffrey Lesser (eds.). In *Patterns of Prejudice*, vol. 34, no. 3.

*The Terror of the Machine:  Technology, Work, Gender, & Ecology on the U.S.-Mexico Border*,  by Devon G. Peña.  In *International Migration Review*.

*Immigration in America's Future:  Social Science Findings and the American Debate*, by David Heer.  In *Patterns of Prejudice*, 1998.

*Inside Babylon:  The Caribbean Diaspora in Britain*, by Winston James and Clive Harris.  In *Contemporary Sociology*, 24(1995):321-322.

*Hispanics in the Labor Force:  Issues and Policies*, by Edwin Melendez, Clara Rodriguez, and Janis Barry Figueroa.  In *Contemporary Sociology*, 22(July 1993), 540-542.

*Ethnicity at Work:  Divided Labor on a Central American Banana Plantation*, by
Philippe I. Bourgois.  In *American Journal of Sociology*, 97(July, 1991):235-237.

*Educación y Estructura Social:  Ensayos de sociología de la educación*, by
Gonzalo Cataño.  In *Contemporary Sociology*, 1991.

*Dancing on a Volcano:  The Latin American Drug Trade*, by Scott B.
MacDonald.  In *Contemporary Sociology*, 18(November, 1989):929.

*Puerto Rican Poverty and Migration*, by Julio Morales.  In *Contemporary
Sociology*, 17(November, 1988):789-790.

*Return to Aztlan:  The Social Process of International Migration from Western
Mexico*, by Douglas Massey, Rafael Alarcon, Jorge Durand, and Humberto
Gonzalez.  In *American Journal Of Sociology*, 94(September, 1988): 449-451.

*Birds of Passage:  migrant labor and industrial societies*, by Michael J. Piore.  In
*Contemporary Sociology*  10(March, 1981):298-299.

## WORKS IN PROGRESS

Bryan Roberts and Nestor Rodriguez.  Return Migration: Mexican and Central
American Perspectives.  Collecting chapters from field researchers for edited
volume.

The World that Migrant Labor Made: Migration and the Rise of the World
Economy. I am presently organizing my next book project.

## CONGRESSIONAL TESTIMONY

Nestor Rodriguez.  Testimony presented before the Subcommittee on the Western
Hemisphere of the Committee on Foreign Affairs. House of Representatives,
Hearings on Consequences of U.S.  Deportations of Immigrants to Latin
American Countries.  110th Congress, first session, July 24, 2007.

Nestor Rodriguez.  Testimony presented before the Subcommittee on Housing
and Community Development of the Committee on Banking, Finance and Urban
Affairs. House of Representatives, Hearings on Rehabilitation of Allen Parkway
Village, Houston, Texas. 103rd Congress, first session. December 14, 1993.

## PAPERS PRESENTED AND CONFERENCE ACTIVITIES

Nestor Rodriguez.  "Unaccompanied Migration of Central American Youth to the
United States: Recent Patterns." Presentation made at conference, "Central
American Young Migrants and the Border Crisis: Causes and Responses." The
University of Texas at San Antonio, August 26, 2014.

67

Nestor Rodriguez.  Session Organizer, "Section on International Migration Paper
Session:  International Migration and Development." Annual Meeting of the
American Sociological Association, August 16-19, San Francisco, California.

Nestor Rodriguez and Susanne Jonas.  2014. "A Phase-Specific Analysis of
Guatemalan Migration to the United States." Paper presented at the "Migration
and the State," Roundtable, Annual Meeting of the American Sociological
Association, August 16-19, San Francisco, California.

Nestor Rodriguez.  2014. Presider. "Migration & Identity across the Americas."
Paper panel, Institute of Latin American Studies Student Association (ILASSA)
Conference, February 27—March 1, 2014, The University of Texas at Austin.

Nestor Rodriguez, David Leal, and Jacqueline Hagan.  2013.  "Deportation
Impacts on Community Social Capital." Paper presented the Annual Meeting of
the American Sociological Association, New York City, NY.  August 10-13.

Paris Pombo, Maria Dolores, and Nestor Rodriguez.  2013.  "New Dangers and
Risks for Deported Migrants in Deportation Environments."  Paper presented at
the Annual Meeting of the Latin American Studies Association, Washington, DC,
May 29 – June 1.

Nestor Rodriguez.  2013.  "Trends in Latino Studies." Workshop panelist at the
Annual Meeting of the Latin American Studies Association, Washington, DC,
May 29 – June 1.

Nestor Rodriguez.  2013.  "Teaching about Race from the Perspective of
Immigration Policy." Teaching Race in the Classroom Symposium, Kinder
Institute for Urban Research, Rice University, April 5.

Nestor Rodriguez.  2013.  "Comments on Marcela Turati's *Fuego Cruzado*: Las
victimas atrapadas en la guerra del narco [*Cross Fire: The victims trapped in the
narco war*]." Forum on the new Latin American Journalism: Dialogue between
Academics and Journalists.  Lozano Long Institute of Latin American Studies,
The University of Texas at Austin, February 28.

Nestor Rodriguez. 2012.  Chair, Student Panel 1, annual conference of the
Southern Demographic Association, Williamsburg, Virginia, October 10-12.

Néstor Rodríguez.  2012. "Ambiente de miedo en contextos de control de
inmigracion." ("Environment of Fear in Contexts of Immigration Control")
Presentation at El Colegio de la Frontera (COLEF) Norte, Commerative Seminar
of the 30th Anniversary of COLEF, August 23-24. Tijuana, Mexico.

68

Nestor Rodriguez and Cristian Paredes.  2012.  "Coercive Bureaucracies, Ideology, and Immigration Control."  Paper presented at the meetings of the American Sociological Association, August 17-20, Denver.

Nestor Rodriguez.  2012.  "Migration in an Era of Restriction."  Paper presented at the meetings of the Latin American Studies Association, May 23-26, San Francisco.

Nestor Rodriguez.  2012.  "Issues and Trends in Latino/Latina Studies Today."  Roundtable panelist, meetings of the Latin American Studies Association, May 23-26, San Francisco.

Nestor Rodriguez.  2011. "The Future of Central America:   Challenges and Opportunities of Migration and Remittances." Brookings Institution. Panelist. September 29. Washington, D.C.

Nestor Rodriguez.  2011.  "Border Control:  Ethnical and Human Rights Issues of a U.S. Enforcement Policy."  Paper presented at conference Le Mexique dans les Migrations Internationales, Mises en Perpective Méditerranéennes.  Marseilles, France, October 17-19.

Nestor Rodriguez.  2010.  Poster Judge at 2010 International Conference Aging in the Americas, Austin, Texas, September 15-17.

Nestor Rodriguez .  2010.  "Honduran Migration to the United States:  An Overlooked Source of Central American Immigration," co-authored with Sarah Blanchard, Erin Hamilton, and Hirotoshi Yoshioka.  Paper presented at the annual meetings of the American Sociological Association, Atlanta, Georgia, August 14-17.

Nestor Rodriguez.  2010.  'Policy Contradictions of the "Liberal State.''' Participant in Thematic Session:  "International, Federal, and Local Government Policy Responses to Immigration."  Invited presentation made at annual meetings of the American Sociological Association, Atlanta, Georgia, August 14-17.

Nestor Rodriguez. 2010.  Participant in Author Meets Critics session (to discuss Timothy J. Dunn's book, *Blockading the Border and Human Rights*), meetings of the Southwestern Social Science Association,  April 1, Houston, Texas.

Nestor Rodriguez. 2010.  "New Southern Neighbors: Latino Immigration and Prospects for Inter-Group Relations between Latinos and African Americans in the South." Keynote address, Latinas and Latinos in the U.S. South Conference, University of Alabama, February 19.

Jacqueline Hagan, David Leal, Nestor Rodriguez. 2009.  "Deporting Social Capital: The Removal of Salvadoran Migrants from the United States." Invited paper presented at the conference "Deportation and the Development of

69

Citizenship," sponsored by the Department of International Development,
Refugee Studies Centre, and Centre on Migration, Policy, and Society, University
of Oxford. December 11-12.

Nestor Rodriguez.  2009.  'El "Endgame": Impactos de Deportaciones Masivas.'
Invited presentation made at the Seminario:  "Tendencias y políticas migratorias
ante la crisis económica y el momento politico." El Colegio de Mexico, Mexico
City, September 25.

Nestor Rodriguez and Susanne Jonas. 2009.  "Guatemalan Migration to the
United States:  A Spatial and Regional Perspective."  Paper presented at the
annual meetings of the American Sociological Association, San Francisco,
August 8-11.

Tatcho Mindiola and Nestor Rodriguez.  2009.  "Evolving Research on Black-
Brown Relations." Roundtable session at the annual meetings of the American
Sociological Association, San Francisco, August 8-11.

Nestor Rodriguez and Jacqueline Hagan.  2009.  " U.S. Policy of Massive
Migrant Removal: Impact on Salvadoran Migrants." Paper presented at annual
meetings of the Population Association of America, Detroit, Michigan, April 30.

Nestor Rodriguez.  2009.  Discussant on paper panel "Determinants of Migration
and Immigration." Annual meetings of the Population Association of America,
Detroit, Michigan, April 30-May 2.

Nestor Rodriguez.  2009.  '"Mistreated Guests": Three Eras of U.S. Deportations
to Mexico.' Invited presentation at the conference "China and Latin America in
the Global Age." Conference organized by Peking University, the Teresa Lozano
Long Institute of Latin American Studies at UT Austin, and the University of
Vera Cruz, Mexico. Beijing, March 17-18.

Nestor Rodriguez.  2008. "Border Control:  Ethical and Human Rights Issues."
Paper present at the American Sociological Association Meetings, Boston, July 3-
August 4.

Nestor Rodriguez.  2008.  Discussant in panel "Immigrants and Politics: Where
Do Latinos Fit in the Discourse?" American Sociological Association Meetings,
Boston, July 31-August 4.

Nestor Rodriguez.  2008.  "Political Challenges of Relations between African
Americans and Latinas/os in the South. Invited presentation at the conference
"The State of Black and Brown Arkansas," University of Arkansas, Fayetteville,
April 24-25.

Nestor Rodriguez. 2008.  "Immigration Enforcement Policy: Impacts on Mexican Migrants." Presentation at conference "Mexico-U.S. Migration: Rural Transformation and Development," Teresa Lozano Long Institute of Latin American Studies, UT Austin, April 8-10.

Nestor Rodriguez.  2008.  "*Deportaciones*:  Endgame Impacts on Mexican Migrants."  Paper presented at the conference "North America and the Dilemma of Integration:  Perspectives on the Future of the Region."  Conference organized by CIDE, UNAM, ITAM, COLMEX, ITESM, and LLILAS (UT Austin), Mexico City, February 25-29.

Nestor Rodriguez.  2007.  "México-Americanos:  Quienes Somos y Quienes Seremos."  Invited paper presented in the Diálogos Program of the UNICEF Foro Universal de las Culturas, Monterrey, Mexico, September-December.

Nestor Rodriguez.  2007. "Comparative Experiences and the Emerging Nexus of Asian and Latin American Immigration." Invited paper presented at "Asia in Latin America" Conference, University of Texas, Austin, TX, October 18-20.

Nestor Rodriguez.  2007.  "Dangerous Journey: Unauthorized Central American Youth Migration to the United States."  Paper presented at the meetings of the Latin American Studies Association, Montreal, Canada, September 5-9.

Phillips, Scott, Jacqueline Hagan, and Nestor Rodriguez.  2006. "Brutal borders?  Examining the treatment of deportees during arrest and detention."  American Sociological Association:  Montreal, Canada.

Nestor Rodriguez.  2005.  "Effects of 1996 Immigration Law on Central American Communities of Origin."  Paper presented at brown-bag session on October 4, at the Latin American Studies Program, Princeton University.

Nestor Rodriguez.  2004. Co-organizer, co-presider and discussant: State Terror in Latin America I and II (two panels), Latin American Studies Association, Las Vegas, NV, October 7-9.

Jacqueline Maria Hagan and Nestor Rodriguez.  2004.  "The Church vs. the State: Religious Work to Help Undocumented Person Migrating to the United States." Paper presented at the annual meetings of the American Sociological Society, San Francisco, California, August 12-18.

Nestor Rodriguez. 2004. "Migration and Social Change in U.S. Society." Invited lecture given to graduate students in the Department of Sociology, People's University in Beijing (Renmin Univerisity), March 17.

Nestor Rodriguez.  2003. "Effect of 9/11 on U.S. Border Security." Presentation at the meetings of the Latin American Studies Association, Dallas, Texas, March

27-29.

Nestor Rodriguez.  2003.  Mayan Immigrant Community Life:  What changes and what stays the same?" Presentation at the meetings of the Latin American Studies Association, Dallas, Texas, March 27-29.

Nestor Rodriguez.  2002.  "Can we Get Along?:  Hispanic New Immigrants in White Middle-Class Neighborhoods." Presented at the annual meetings of the American Sociological Association, Anaheim, CA, August.

Nestor Rodriguez.  2002. "Crossing the Mexican Gauntlet: Trials and Challenges of Central American Migration to the United States."  Presented at the Latin American Conference on "The Other Latinos" at Harvard University, April.

Scott Phillips, Jacqueline Hagan, and Nestor Rodriguez. 2002. "State Violence Against immigrants." Paper presented the Annual Meetings of the Southwest Sociological Association Meetings, New Orleans, March 28-30.

Jacqueline Hagan, Karl Eschbach and Nestor Rodriguez. 2002.  "Death at the Border." Paper presented at the 6th Annual Traverse Ethics Conference, "States and Migrants: New Challenges, Changing Responsibilities." University of California, Berkley, April 26.

Jacqueline Hagan and Nestor Rodriguez. 2002.  "Resurrecting Exclusion"." Paper presented at conference, Latinos Remaking America: Academic and Journalistic Perspectives, David Rockefeller Center for Latin American Studies, Harvard University, May 2.

Nestor Rodriguez. 2001.  "Work and Identity Transitions in the Global Labor Force: The Formation of a Mayan Workforce in Houston." Paper presented in the Special Session "Work and the Post-Industrial City." National meetings of the American Sociological Association, Anaheim, CA, August 18-21

Nestor Rodriguez. 2001.  Participant in "Critics Meet the Author" session (on Joe R. Fagin's *Racist America*) of the annual, national meetings of the American Sociological Association, Anaheim, CA, August 18-21.

Nestor Rodriguez and Jacqueline Hagan. 2001.  "Mayan Peasant Workers in a Post-Industrial Labor Force." Paper presented that the 2001 international Congress of the Latin American Studies Association, Washington, DC, September 5-8.

Karl Eschbach, Jacqueline Hagan, and Nestor Rodriguez. 2001. "Trends in Accidental Deaths of Foreign Transients at the Southwest Border of the United States, 1985-1998."  Presented at the Annual Meetings of the American Public Health Association, Atlanta, GA, October.

Nestor Rodriguez. 2001. "Revisiting the Free-Enterprise City: Observations at the Beginning of the Twenty-First Century." Paper presented at the regional meetings of the Social Science Southwest Association, Fort Worth, TX, March 14-18.

Nestor Rodriguez. 2000. Session Organizer:  "Poverty and the International Division of Labor." The annual meetings of the American Sociological Association, Washington, DC, August.

Nestor Rodriguez. 2000.  "Undocumented Migrants in U.S. Cities." Paper presented to the Migration Working Group, Waseda University, Tokyo, Japan, July.

Jacqueline Hagan, Nestor Rodriguez and Randy Capps. 1999. "The Effects of the 1996 Immigration and Welfare Reform Acts on Texas-Mexico Border communities." Paper presented at Immigration Session, the annual meetings of the American Sociological Association, Chicago, August.

Nestor Rodriguez. 1999. "Migration and Development of the World Economy." Lecture given in the Sociology Department, People's University of China, Beijing, July.

Nestor Rodriguez. 1999. "Contemporary Latino Immigration in U.S. Society." Presentation made to the Working Group on Japanese Immigration, Waseda University, Tokyo, Japan. July.

Nestor Rodriguez, 1998.  "Immigration into Texas." Presentation to faculty of College of Humanities, Universidad de Monterrey. Monterrey, Nuevo Leon. June.

Ruben Hernandez Leon, Nestor Rodriguez, and Jacqueline Hagan.  1997. "The Monterrey-Houston Connection:  The Social Organization of Migration in a Binational Urban Industrial Region.  Paper presented at the annual meetings of the American Sociological Association, Toronto, Canada, August.

Nestor Rodriguez.  1996. "The Social Construction of the U.S.-Mexico Border." Paper presented at the annual meetings of the American Sociological Association, New York City, August 16-20.

Nestor Rodriguez and Jacqueline Hagan.  1995. "From the Highlands of Guatemala to the Post Industrial Setting of Houston:  A Case Study of Mayan Migration. Paper presented at the annual meetings of the American Sociological Association, Washington, DC, August.

Nestor Rodriguez. 1995. "Immigrants and Health Care in Houston." Paper presented at the conference "International Migration: Health and Social Policies." Andalusian School of Public Health, Granada, Spain, June.

Nestor Rodriguez and Jacqueline Hagan.  "Beyond the Workplace:  Immigrant Workers and Housing Struggles in Houston."  Paper presented at the annual meetings of the American Sociological Association, Miami, August 11-16, 1993.

Jacqueline Hagan and Nestor Rodriguez.  "Investigating Census Coverage among Latino Immigrant Tenants."  Paper presented at the annual meetings of the American Sociological Association, Pittsburgh, August 19-24, 1992.

Nestor Rodriguez and Jacqueline Hagan, "Maya Migration to Houston:  The Totonicapan Experience."  Paper presented at the Latin American Studies Association meetings, April 4-6, 1991, Washington, DC.

Jacqueline Hagan and Nestor Rodriguez, "IRCA, Immigrant Households and Work."  Paper presented at the annual meetings of the Southwest Social Science Association, March 27-30, 1991, San Antonio, Texas.

Nestor Rodriguez and Jacqueline Hagan, "The New Immigration and IRCA:  Implications for Political Relations in Houston."  Paper presented at the annual meetings of the American Sociological Association meetings, August 10-15, 1990, Washington, DC.

Nestor P. Rodriguez.  "Intergroup Relations as a Strategy for the Social Well-Being of New Latino Immigrant Communities."  Paper presented at the 1990 annual conference of the Inter-University Program for Latino Research.  Cal Poly Pomona, May 25-27, 1990.

Nestor P. Rodriguez.  "Integration or Interdependence?:  Intergroup Relations Between New Latino Immigrants and Mexican Americans."  Paper presented at the annual meetings of the Southwestern Social Science Association, March 28-31, 1990, Forth Worth, Texas.

Nestor P. Rodriguez and Ximena Urrutia-Rojas.  "The Impact of Recent Refugee Migration to Texas:  A Comparison of Southeast Asian and Central American Newcomers."  Paper presented at the Conference On The Mental Health Of Immigrants And Refugees," March 22-25, 1990, Houston, Texas.

Nestor P. Rodriguez.  "Funding Qualitative Research."  Presentation at the First Annual Symposium on Qualitative Methods in Health Research, University of Texas School of Public Health, Houston, December 1, 1989.

Nestor Rodriguez.  "A Comparison of Intergroup Impacts of Mexican and Central American Immigrants on Mexican Americans:  Houston and the Lower Rio

74

Grande Valley."  Presented at the MEXAMERICA Conference, The Center for
Economic and Social Research, Universidad de Sonora, Hermosillo, Sonora,
November 17-18, 1989.

Nestor Rodriguez.  "Conducting Oral Histories among Central American
Immigrants:  A Research Experience."  Paper presented at the annual meeting of
the Oral History Association, Galveston, Texas, October 19-21, 1989.

Nestor Rodriguez.  "Mayan Ethnogenesis in Houston."  Paper presented at the
annual meetings of the American Sociological Association, San Francisco,
August, 1989.

Rodolfo O. de la Garza, Nestor Rodriguez, and Harry Pachon.  "The Domestic
and Foreign Policy Consequences of Mexican and Central American
Immigration:  Mexican American Perspectives."  Presented at the RAND/Urban
Institute conference "International Effects of IRCA." Guadalajara, Mexico, May
3-5, 1989.

Nestor Rodriguez.  "Evolving Relations Between Established Residents and New
Immigrants:  An Emerging Paradigm."  Presented at the Southwestern Social
Science Association meetings, Little Rock, Arkansas, March 29-April 1, 1989.

Nestor Rodriguez.  "Immigration in Houston's Mexican American
Neighborhoods."  Presented at the Southwestern Social Science Association
meetings, Houston, March 23-26, 1988.

Nestor Rodriguez.  Co-chair with Joe R. Feagin.  "Global Cities:  A Roundtable
Discussion."  American Sociological Association meetings, Chicago, August 28-
31, 1987.

Nestor Rodriguez. Panel Chair. "Central American Immigration."  Southwestern
Social Science Association meetings, Dallas, March 18-21, 1987

Nestor Rodriguez.  "Guatemalan Indigenas and Honduran Garifunas in Houston:
A Comparison of Undocumented Minority Migration."  Presented at the
Southwestern Social Science Association meetings, Dallas, March 18-21, 1987.

Nestor Rodriguez.  Moderator.  Student Session:  Unemployment in Texas.
Southwestern Social Science Association meetings, Dallas, March 18-21, 1987.

Nestor Rodriguez.  "Undocumented Central Americans in Houston:  Diverse
Populations."  American Sociological Association meetings, New York, NY,
August 29-September 6, 1986.

Nestor Rodriguez.  "Labor Commitment in the Undocumented Labor Market:  A
Preliminary Report on Field Research on Undocumented Workers."  Presented at

the Southwestern Social Science Association meetings, San Antonio, TX, March 19-22, 1986.

Joe R. Feagin and Nestor Rodriguez.  "Urban Specialization in the World-Economy."  Presented at the American Political Science Association meetings, August 29-September 1, 1985, New Orleans, Louisiana.

Nestor Rodriguez.  "The Growth of Houston's Hispanic Population."  Presented at the Southwestern Social Science Association meetings, March 20-23, 1985, Houston, TX.

Nestor Rodriguez.  "Political Class Relations Between Core and Peripheral Workers."  Presented at the Southwestern Social Science Association Meetings, March 20-23, 1985, Houston, Texas.

Nestor Rodriguez.  "Struggles in the Workplace:  Challenging the Myth of the Docile Illegal Alien."  Presented at the Meetings of the American Sociological Association, August 25-31, 1984, San Antonio, Texas.

Nestor Rodriguez.  "Dividing workers, controlling work:  Work and labor segmentation in the early history of capitalist production."  Presented at the Southwestern Social Science Association Meetings, March 21-24, 1984, Forth Worth, Texas.

Nestor Rodriguez.  "Chicano-Indocumentado  Relations in the Workplace."  Presented at the Regional Conference of the National Association of Chicano Studies, March, 1983, Houston, Texas.
Rogelio Nunez and Nestor Rodriguez.  "Exploring Chicano- Indocumentado Relations."  Presented at the Southwestern Social Science Association Meetings, March, 1983.  Houston, Texas.

Harley L. Browning and Nestor Rodriguez.  "Mexico-U.S.A. Indocumentado Migration as a Settlement Process and Its Implication for Work."  Presented at The Hispanic Labor Conference, February 1982, University of California at Santa Barbara.


PERSONAL BACKGROUND

Place of Birth:  Corpus Christi, Texas
Language Skills:  Bilingual (English and Spanish)

REFERENCES

Jose Limon, PhD
Hispanic Studies Center

University of Notre Dame
Notre Dame, IN 46556
gcardena@nd.edu

Joe R. Feagin, PhD
Department of Sociology
Texas A&M University
311 Academic Building
College Station, TX 77840-4351
feagin@tamu.edu

Dudley Poston, PhD
Department of Sociology
Texas A&M University
311 Academic Building
College Station, TX 77840-4351
d-poston@tamu.edu

77

# Exhibit 55

United Nations



# General Assembly

A/HRC/28/68

Distr.: General
5 March 2015

Original: English

---

**Human Rights Council**
**Twenty-eighth session**
Agenda item 3
**Promotion and protection of all human rights, civil,**
**political, economic, social and cultural rights,**
**including the right to development**

## Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Juan E. Méndez[*]

*Summary*

    In the present report, the Special Rapporteur focuses on children deprived of their liberty from the perspective of the prohibition of torture and other cruel, inhuman or degrading treatment or punishment.

    In the report, the Special Rapporteur explores the international legal framework and standards protecting children deprived of their liberty from being subjected to torture or other ill-treatment and from experiencing developmentally harmful and torturous conditions of confinement. He also examines specific statutes and standards applying to prevent torture and ill-treatment of children deprived of liberty, and shortcomings in the practical implementation of legal standards.

---

[*] Late submission.

GE.15-04337  (E)

∗1504337∗





# Contents

|  |  | *Paragraphs* | *Page* |
|---|---|---|---|
| I. | Introduction ................................................................................................................ | 1 – 2 | 3 |
| II. | Activities of the Special Rapporteur .......................................................................... | 3 – 15 | 3 |
|  | A. Upcoming country visits and pending requests ................................................ | 3 – 5 | 3 |
|  | B. Highlights of key presentations and consultations ........................................... | 6 – 15 | 3 |
| III. | Torture and ill-treatment of children deprived of their liberty.................................. | 16 – 68 | 4 |
|  | A. Legal framework and international standards ................................................... | 19 – 33 | 4 |
|  | B. Torture and other ill-treatment of children deprived of their liberty in law and in practice.................................................................................... | 34 – 62 | 7 |
|  | C. Training, complaint mechanisms and monitoring ............................................ | 63 – 68 | 14 |
| IV. | Conclusions and recommendations.............................................................................. | 69 – 86 | 15 |
|  | A. Conclusions .................................................................................................... | 69 – 83 | 15 |
|  | B. Recommendations ........................................................................................... | 84 – 86 | 19 |

2

## I.    Introduction

1.      The present report is submitted to the Human Rights Council in accordance with Council resolution 25/13.

2.      In an addendum to the present report (A/HRC/28/68/Add.1), the Special Rapporteur makes his observations on cases sent to Governments between 1 December 2013 and 30 November 2014, as reflected in the communications reports of special procedures mandate holders (A/HRC/26/21, A/HRC/27/72 and A/HRC/28/85). The Special Rapporteur made follow-up visits to Tajikistan and Tunisia (A/HRC/28/68/Add.2). During the period under review, the Special Rapporteur also visited Mexico (see A/HRC/28/68/Add.3) and the Gambia (see A/HRC/28/68/Add.4).

## II.    Activities of the Special Rapporteur

### A.    Upcoming country visits and pending requests

3.      The Special Rapporteur plans to visit Georgia from 12 to 20 March 2015. He is engaged with the Governments of Thailand and Brazil to find mutually agreeable dates for visits in 2015.

4.      The Special Rapporteur, with the support of the Anti-torture Initiative, plans to conduct follow-up visits to Morocco and Western Sahara, and to Ghana.

5.      The Special Rapporteur continues to request an invitation from the Government of the United States of America to visit the detention centre at Guantanamo Bay, Cuba, on conditions that he may accept. His request to visit State and federal prisons in the United States is still pending. Similarly, the Government of Bahrain has not suggested new dates for a visit after the second postponement.

### B.    Highlights of key presentations and consultations

6.      From 21 April to 2 May 2014, the Special Rapporteur conducted a country visit to Mexico at the invitation of the Government.

7.      From 4 to 6 June 2014, the Special Rapporteur conducted a follow-up visit to Tunisia at the invitation of the Government to assess the level of implementation of his recommendations and to identify remaining challenges regarding torture and other ill-treatment.

8.      On 3 September 2014, the Special Rapporteur published a volume entitled *Próximos pasos hacia una política penitenciaria de derechos humanos en Uruguay: Ensayos de seguimiento a las recomendaciones de 2009 y 2013 de la Relatoría de Naciones Unidas sobre la tortura* ("Next Steps Towards a Human Rights Penitentiary System in Uruguay: Reflections on the Implementation of the 2009 and 2013 Recommendations of the United Nations Special Rapporteur on Torture")

9.      On 8 September 2014, the Special Rapporteur participated in a webinar on police torture and human rights in Pakistan, co-organized by Justice Project Pakistan.

10.     On 9 September 2014, the Special Rapporteur held a lecture on the theme "the Argentine experience and the emergence of a universal right to truth" at the Duke Human Rights Center at the Franklin Humanities Institute.

11.     On 20 October 2014, the Special Rapporteur presented his interim report on the role of forensic and medical science in the prevention of torture to the General Assembly (A/69/387). He also participated in side events and met with representatives of permanent missions and civil society organizations.

12.     From 3 to 7 November 2014, the Special Rapporteur conducted a country visit to the Gambia at the invitation of the Government.

13.     On 10 and 11 November 2014, the Special Rapporteur held an expert consultation in Washington, D.C. on the theme "Children deprived of their liberty" with support of the Anti-Torture Initiative and the Ford Foundation.

14.     On 14 November 2014, the Special Rapporteur held a presentation at the Rothko Chapel in Houston, Texas, as part of an event entitled "Mainstreaming torture: ethical approaches in the post-9/11 United States".

15.     On 19 November 2014, the Special Rapporteur held a presentation at a reception organized by the World Organization against Torture for the launch of the new edition of its publication *Seeking Remedies for Torture Victims: A Handbook on the Individual Complaints Procedures of the UN Treaty Bodies*.

## III.     Torture and ill-treatment of children deprived of their liberty

16.     Children deprived of their liberty are at a heightened risk of violence, abuse and acts of torture or cruel, inhuman or degrading treatment or punishment. Even very short periods of detention can undermine a child's psychological and physical well-being and compromise cognitive development. Children deprived of liberty are at a heightened risk of suffering depression and anxiety, and frequently exhibit symptoms consistent with post-traumatic stress disorder. Reports on the effects of depriving children of liberty have found higher rates of suicide and self-harm, mental disorder and developmental problems.

17.     The unique vulnerability of children deprived of their liberty requires higher standards and broader safeguards for the prevention of torture and ill-treatment. Specific practices and issues, such as segregation, the organization and administration of detention facilities, disciplinary sanctions, opportunities for rehabilitation, the training of specially qualified personnel, family support and visits, the availability of alternative measures, and adequate monitoring and oversight, require specific attention and modified standards.

18.     For the above reasons, the Special Rapporteur has chosen to dedicate his thematic report to the unique forms of protection due to children deprived of their liberty and the particular obligations of States with regard to preventing and eliminating torture and ill-treatment of children in the context of deprivation of liberty.

## A.     Legal framework and international standards

19.     A number of international human rights treaties are relevant to torture and other ill-treatment in the context of children deprived of their liberty. These include the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishmentand the International Covenant on Civil and Political Rights, as well as regional treaties, such as African, Inter-American and European regional instruments. The Convention on the Rights of the Child is *lex specialis* on the human rights protections afforded to children.

20.     Other legal instruments applicable to children include the United Nations Standard Minimum Rules for the Administration of Juvenile Justice (Beijing Rules), the United Nations Guidelines for the Prevention of Juvenile Delinquency (Riyadh Guidelines), the United Nations Rules for the Protection of Juveniles Deprived of their Liberty (Havana Rules), the United Nations Rules for the Treatment of Women Prisoners and Non-custodial Measures for Women Offenders (Bangkok Rules) and the Standard Minimum Rules for the Treatment of Prisoners.

**1.     Deprivation of liberty of children**

21.     For the purpose of the present report, "deprivation of liberty" denotes any form of detention or imprisonment or the placement of a child in a public or private custodial setting where that child is not permitted to leave at will by order of any judicial, administrative or other authority (A/68/295, para. 27). Deprivation of liberty involves more severe restriction of motion within a narrower space than mere interference with liberty of movement: it includes police custody, remand detention, imprisonment after conviction, house arrest, administrative detention, involuntary hospitalization and institutional custody. It also includes children deprived of their liberty by private individuals or entities that are empowered or authorized by a State to exercise powers of arrest or detention.

22.     In accordance with the Convention on the Rights of the Child, and regardless of the age of majority, the terms "children" and "child" refer to all persons under the age of 18 years.

**2.     Prohibition of torture and other ill-treatment of children**

23.     The prohibition of torture is one of the few absolute and non-derogable human rights standards, a peremptory norm of customary international law or *jus cogens*. In addition, international law acknowledges the need for special protections for children and detained persons.

24.     In its general comment No. 2, the Committee against Torture interpreted States' obligations to prevent torture are indivisible, interrelated and interdependent with the obligation to prevent cruel, inhuman, or degrading treatment or punishment (ill-treatment) because conditions that give rise to ill-treatment frequently facilitate torture (CAT/C/GC/2, para. 3). The Convention on the Rights of the Child and the Havana Rules have extended this protection to children deprived of their liberty, specifying that no member of the detention facility or institutional personnel may inflict, instigate or tolerate any act of torture or any form of harsh, cruel, inhuman or degrading treatment, punishment, correction or discipline under any pretext or circumstance whatsoever.

25.     Under article 37 (b) of the Convention on the Rights of the Child and explained by the Committee on the Rights of the Child in its general comment No. 10 (CRC/C/GC/10), the deprivation of liberty of a child should be a last resort measure to be used only for the shortest possible period of time. Similarly, the Havana Rules require that deprivation of liberty be limited to exceptional cases. Both the Beijing Rules and the Riyadh Guidelines emphasize this principle. In addition, the best interests of the child must be a primary consideration in every decision on initiating or continuing the deprivation of liberty of a child.[1]

26.     Where the deprivation of liberty of a child can be justified as necessary, limited and consistent with the best interests of the child, the child must be treated with humanity and respect for his or her inherent dignity and in a manner that takes into account the needs of

---

[1]   Convention on the Rights of the Child, art. 3 (1).

persons of their age and maturity. [2] The Convention on the Rights of the Child specifies that the right to be confined in an age-appropriate manner includes, in particular, the right to be separated from adults unless it is considered in the child's best interest not to do so, and the right to maintain contact with his or her family through correspondence and visits, save in exceptional circumstances. Article 40 (1) of the Convention emphasizes this principle with regard to children in conflict with the law by adding the desirability of promoting the child's reintegration and assumption of a constructive role in society.

27.    The Havana Rules indicate how States should approach the deprivation of liberty of children, going beyond the Standard Minimum Rules for the Treatment of Prisoners by including guidelines on classification and placement, physical environment and accommodation, education, vocational training and work, recreation, religion and medical care, notification of illness, injury and death, contact with the wider community, limitations of physical restraint and the use of force, as well as disciplinary procedures and return to the community.

28.    The role of medical and forensic sciences in the prevention of torture and other ill-treatment for children deprived of their liberty is clear (see A/69/387, paras. 19-57). All children are to be properly interviewed and physically examined by a medical doctor or qualified nurse reporting to a doctor as soon as possible after their admission to an institution, preferably on the day of arrival. In the case of girls, access to gynaecologists and education on women's health care are to be provided.[3]

29.    To ensure that detention will not disrupt preparation for adulthood and the full realization of a child's potential, access to education is a fundamental right of children deprived of their liberty.[4] While Rule 77 (1) of the Standard Minimum Rules for the Treatment of Prisoners states that the education of illiterates and children should be compulsory, articles 38 to 46 of the Havana Rules also recommend participation in community schools, the availability of diplomas without reference to institutionalization, and the provision of vocational training.

30.    Article 40, paragraphs 3 (b) and (4), of the Convention on the Rights of the Child provides that alternatives to detention, such as care, guidance and supervision orders, counselling; probation, foster care, education and vocational training programmes should first be sought, or other alternatives that ensure that children are dealt with in a manner appropriate to their well-being and proportionate to both their circumstances and the offence committed.

31.    Lastly, regardless of the form of deprivation of liberty, whether criminal, institutional or administrative, article 37 (d) of the Convention on the Rights of the Child requires that any decision to deprive a child of liberty must be subject to periodic review of its continuing necessity and appropriateness. In its general comment No. 35, the Human Rights Committee specified that the child has a right to be heard, directly or through legal or other appropriate assistance, in relation to any decision regarding their deprivation of liberty, and that the procedures employed should be child-appropriate (CCPR/C/GC/35, para. 62).

---

[2]   International Covenant on Civil and Political Rights, art. 10; Convention on the Rights of the Child, art. 40; Bejing Rules, para. 5.1.

[3]   Bangkok Rules 6-18.

[4]   European Convention on Human Rights, art. 5; European Court on Human Rights, *Buomar v. Belgium*; Inter-American Court of Human Rights, *Juvenile Reeducation Institute v. Paraguay,* judgement of 2 September 2004, para. 161.

### 3.   Vulnerability of children and the threshold for torture and other ill-treatment

32.     Children are particularly vulnerable to certain human rights violations, including torture and other forms of ill-treatment. The Convention on the Rights of the Child, in its article 37 (c), establishes the obligation to take into account the age-specific needs of children. The Human Rights Committee, the European Court of Human Rights and the Inter-American Court of Human Rights, have also recognized the need for States to provide special measures or heightened "due diligence" to protect the personal liberty and security of every child.[5]

33.     Children experience pain and suffering differently to adults owing to their physical and emotional development and their specific needs. In children, ll-treatment may cause even greater or irreversible damage than for adults.[6] Moreover, healthy development can be derailed by excessive or prolonged activation of stress response systems in the body, with damaging long-term effects on learning, behaviour and health. A number of studies have shown that, regardless of the conditions in which children are held, detention has a profound and negative impact on child health and development. Even very short periods of detention can undermine the child's psychological and physical well-being and compromise cognitive development. Children held in detention are at risk of post-traumatic stress disorder, and may exhibit such symptoms as insomnia, nightmares and bed-wetting. Feelings of hopelessness and frustration can be manifested in acts of violence against themselves or others. Reports on the effect of detention on children have found higher rates of suicide, suicide attempts and self-harm, mental disorder and developmental problems, including severe attachment disorder.[7] The threshold at which treatment or punishment may be classified as torture or ill-treatment is therefore lower in the case of children, and in particular in the case of children deprived of their liberty.

## B.   Torture and other ill-treatment of children deprived of their liberty in law and in practice

### 1.   Children in conflict with the law

34.     International standards require the establishment of a minimum age of criminal responsibility that reflects when a child has the adequate mental capacity and moral

---

[5]   Human Rights Committee, general comments No. 17, para. 1 and No. 35, para. 62; European Court of Human Rights, *Z and Others v. United Kingdom*, paras. 74-75; Inter-American Court of Human Rights, *Gonzales v. USA*, final observations, 24 March 2008, pp. 64-67;.

[6]   See for example Anthony Lake and Margaret Chan, *Putting science into practice for early child development,* UNICEF, New York and WHO Geneva, 20 September 2014; and Michael D. De Bellis et al., "Developmental Traumatology Part II: Brain Development"*, Biological Psychiatry*, vol. 14, No. 10 (15 May 1999), pp. 1271-1284.

[7]   See The heart of the nation's existence: a review of reports on the treatment of children in Australian detention centres, ChilOut, 2002, appendix E, Michael Dudley and Bijou Blick; Sarah Mares and Jon Jureidini, "Psychiatric assessment of children and families in immigration detention – clinical, administrative and ethical issues", *Australian and New Zealand Journal of Public Health*, vol. 28, No. 6 (2004) pp. 520-526; Human Rights and Equal Opportunity Commission, "A last resort? National Enquiry into Children in Immigration Detention", April 2004; Zachary Steel et al., "The politics of exclusion and denial: the mental health costs of Australia's refugee policy", 12 May 2003, p. 10.

competence to be punished for crimes. In its general comment No. 10 (CRC/C/GC/10), the Committee on the Rights of the Child encouraged States parties to increase their lower minimum age of criminal responsibility to the age of 12 years as the absolute minimum age, and to continue to increase it to a higher age level. Nevertheless, many countries still maintain a minimum age of criminal responsibility well below 12 years.

35.     States have an international obligation to put in place a dedicated legal system and law enforcement processes for children. All too often, criminal justice systems are designed for adults and incorporate none of the specific procedural safeguards required for children. In particular, adult criminal justice systems expose children to a range of sentences and disciplinary punishments aimed specifically at adults, without any rehabilitative component.

36.     The imposition of the death penalty on children is forbidden under international law and has been accepted so universally as to reach the level of a *jus cogens* norm (A/67/279, para. 62).

37.     Similarly, life sentences without the possibility of release for children are expressly prohibited by international law and treaties, including article 37(a) of the Convention on the Rights of the Child. The Committee on the Rights of the Child, in its general comment No. 10 (CRC/C/GC/10), and the Human Rights Committee, in its general comment No. 21, confirmed that life imprisonment without the possibility of release is never an appropriate punishment for an offence committed by a juvenile offender.[8] The vast majority of States have taken note of the international human rights requirements regarding life imprisonment of children without the possibility of release. Significantly, the United States of America is the only State in the world that still sentences children to life imprisonment without the opportunity for parole for the crime of homicide.

38.     With regard to life imprisonment of children, the Human Rights Council, in its resolution 24/12, and the Committee on the Rights of the Child, in its general comment No. 10, urged States to ensure that no one is sentenced to life imprisonment for an offence committed by persons under 18 years of age.

39.     Although the Convention on the Rights of the Child requires States to ensure that detention or imprisonment of children should only be used as a measure of last resort, in exceptional circumstances, for the shortest possible period of time and only if it is in the best interests of the child, in reality, detention is often used as the first response to perceived problems. During his country visits, the Special Rapporteur observed that, although alternative or non-custodial measures are provided by law, in a high percentage of cases, detention is the preferred option and not the last resort (see A/HRC/22/53/Add.3, para. 53).

40.     In many instances, the worst situations for children arise at the time of arrest by the police, and during transportation or subsequent questioning in police custody (see A/HRC/16/52/Add.5, para. 43 and A/HRC/22/53/Add.1, para. 73). During the period immediately following apprehension, children are at particularly high risk of physical, verbal and psychological violence, such as verbal abuse, threats and beatings, and they are too often not provided with information on their human rights and the allegations brought against them in a manner that they can understand.[9] Following their arrest, children often do

---

[8]   See also CCPR/C/112/D/1968/2010, paras. 7.7 and 7.11, and Inter-American
      Commission on Human Rights, *Juvenile Justice and Human Rights in the Americas*:
      *Rapporteurship on the Rights of the Child* (UNICEF, 13 July 2011), para. 364.
[9]   See, for example, Association for the Prevention of Torture, Jean-Jacques Gautier NPM Symposium,
      "Addressing children's vulnerabilities in detention", outcome report, June 2014, p. 14

not have prompt and private access to legal assistance or notification of their parents or caregivers, which makes them even more vulnerable and subject to a higher risk of being subjected to torture or other ill-treatment.

41.    Despite the international legal framework in place, the majority of children deprived of their liberty are held in pretrial detention, often for prolonged periods, and for minor offences, often in unsuitable premises.[10] In many countries, the excessive use of pretrial detention leads to overcrowded facilities.

42.    Many States continue to hold children and adults in the same facilities, in particular those in pretrial detention and police custody, but also during transportation or in the context of immigration detention. Moreover, the continuous trying and sentencing of children as adults and the lack of specialized juvenile facilities have resulted in numerous children being placed in adult prisons. Disciplinary and other administrative rules and procedures are often applied, regardless of child status.

43.    Detaining children and adults together will inevitably result in negative consequences for the children, who are five times as likely to be subjected to a substantiated incident of sexual violence, and are also much more likely to witness or experience other forms of violence, including physical harm by facility staff members.[11] They are also more likely to commit suicide or engage in other forms of self-harm when housed in adult – rather than juvenile – facilities. Research also shows that imprisoning children with adults can result in increased recidivism and negative long-term consequences for children, their families and communities.[12]

44.    In many States, solitary confinement is still imposed on children as a disciplinary or "protective" measure. National legislation often contains provisions to permit children to be placed in solitary confinement. The permitted time frame and practices vary between days, weeks and even months. In accordance with views of the Committee against Torture, the Subcommittee on Prevention of Torture and the Committee on the Rights of the Child, the Special Rapporteur is of the view that the imposition of solitary confinement, of any duration, on children constitutes cruel, inhuman or degrading treatment or punishment or even torture (see A/66/268, paras. 77 and 86, and A/68/295, para. 61).[13]

45.    During country visits, the Special Rapporteur regularly observes the practice of corporal punishment as a disciplinary measure for children in detention, including severe caning, flogging, beating with sticks and electric cords, beatings on the buttocks with wooden boards, and being forced to kneel for long periods with hands in the air (A/HRC/25/60/Add.1, paras. 64-65 and A/HRC/22/53/Add.2, para. 56). Some States still allow the use of corporal punishment as a criminal sentence for children. With regard to the jurisprudence of United Nations treaty bodies and the European Court, the mandate holder has found that any form of corporal punishment is contrary to the prohibition of torture and other cruel, inhuman or degrading treatment or punishment (see A/60/316 and A/67/279). He also noted that States cannot invoke provisions of domestic law to justify violations of the prohibition of corporal punishment.

---

[10]  Ibid. and A/HRC/21/25, para. 8.

[11]  See Anna Volz, "Stop the Violence! The overuse of pre-trial detention, or the need to reform juvenile justice systems", Defence for Children International, Geneva, July 2010, p. 16.

[12]  Information received from the American Civil Liberties Union during the expert consultation held in Washington, D.C. on 10 and 11 November 2014.

[13]  See also A/HRC/22/53/Add.1, para. 73; United Nations Rules for the Protection of Juveniles Deprived of their Liberty, para. 67; Committee on the Rights of the Child, general comment No. 10 (CRC/C/GC/10), para. 89.

9

46.     Children are subjected to a range of adult punishments in detention, including physical and manual restraints, routine humiliation and degrading searches, and the indiscriminate use of mace, pepper spray and other harmful chemicals. During country visits, the Special Rapporteur has observed the use of psychotropic drugs for children in detention in order to maintain security in juvenile detention facilities (see A/HRC/22/53/Add.3, para. 52). In some instances, such forms of punishment (especially restraints) are adopted as a first resort rather than being used only in exceptional cases.

47.     A large number of children deprived of their liberty show signs of mental health problems, or mental illnesses or psychological disorders, which are often exacerbated during their detention. Children in detention are prone to self-harm, including suicide, because of depression. In many instances, children who suffer from mental health problems have no access to mental health screening within the first hours of admission to a detention centre and do not receive adequate treatment, including psychosocial counselling during detention. Moreover, children showing signs of mental health problems are often held together with children who do not show such signs.

48.     Girls deprived of their liberty are at a heightened risk of sexual violence, sexual exploitation and underage pregnancies while in detention. The risk of sexual abuse is greater when male guards supervise girls in detention. Girls deprived of their liberty have different needs not only to those of adults but also of boys. Girls in detention are often not only children but also carers, either as mothers or as siblings, and have specific health, hygiene and sanitary needs. Across the globe, girls are rarely kept separately from women in pretrial and post-conviction settings (see A/HRC/16/52/Add.3, para. 54). Similarly, the Special Rapporteur notes that lesbian, gay, bisexual, transgender and intersex children are at a heightened risk.

49.     Children deprived of their liberty are often not allowed to maintain regular contact with their families and friends, because either they are denied contact as a form of punishment or are placed in facilities located far away from their homes and families. A lack of vocational, educational and recreational activities for children deprived of their liberty creates situations of risk of abuse and ill-treatment. When children spend most of their time confined in their cells, they may experience a lack of motivation and even depression, which in turn can leads to incidents of abuse and violence between children or with staff members. The Special Rapporteur wishes to point out that, while lack of activities is detrimental for any prisoner, it is especially harmful for children, who have a particular need for physical activity and intellectual stimulation. This is also true for children detained with their mothers in prison. During country visits, the Special Rapporteur has observed that women's section of prisons often show inadequate space for women with children and a lack of well-equipped recreation areas for children (see A/HRC/22/53/Add.2, para. 58).

## 2.     Children in institutions

50.     The State's obligation to prevent torture applies not only to public officials, such as law enforcement agents, but also to medical doctors, health-care professionals and social workers, including those working in private hospitals, other institutions and detention centres (A/63/175, para. 51 and A/HRC/22/53, paras. 23-26).

51.     The Special Rapporteur has previously recognized that ill-treatment may occur in a diverse range of settings, even where the purpose or intention of the State's action or inaction was not to degrade, humiliate or punish the child. He notes that most instances of ill-treatment of children deprived of their liberty outside of the criminal justice system, such as children in administrative immigration detention or institutional settings, involve acts of omission rather than commission, such as emotional disengagement or unsanitary or unsafe conditions, and result from poor policies rather than from an intention to inflict suffering. Purely negligent conduct lacks the intent required under the prohibition of torture, but may

10

constitute ill-treatment if it leads to pain and suffering of some severity (A/63/175, para. 49). This is the case when the suffering is severe and meets the minimum threshold under the prohibition against torture and other ill-treatment, when the State is, or should be, aware of the suffering, including when no appropriate treatment was offered, and when the State has failed to take all reasonable steps to protect the child's physical and mental integrity.

52.     Private detention is often presented as a preferable alternative to forced criminal or health-related institutionalization of children with special needs, whether those needs be physical, mental or psychological. The Special Rapporteur notes that, because national law often does not regulate private detention centres, there is a gap in legal protections that may lead to rampant abuse.

53.     Special attention should be paid to children deprived of their liberty in health-care institutions (including hospitals, public and private clinics, hospices and institutions where healthcare is delivered). Children are detained in such settings primarily to treat psychiatric, psychosocial or intellectual disabilities, or drug dependence issues. Almost all States have legislation that permits the detention of children for psychiatric health purposes.[14] Persons with disabilities are particularly affected by forced medical interventions, and continue to be exposed to unwarranted non-consensual medical practices (A/63/175, para. 40). During his country visits, the Special Rapporteur has observed that, in particular with regard to children with disabilities, "incapacity" is often presumed, which limits their ability to decide where to live and what treatment to receive,[15] and may be taken as the basis of substitution of determination and decision-making by the child, or by parents, guardians, carers or public authorities.[16] Structural inequalities, such as the power imbalance between medical doctors and patients, exacerbated by stigma and discrimination, result in children with disabilities being disproportionately vulnerable to having informed consent compromised (A/HRC/22/53, para. 29). In this context, the Committee on the Rights of Persons with Disabilities, in its general comment No. 1 (CRPD/C/GC/1), explained that involuntary psychiatric treatment is prohibited on the grounds that it violates the right to consent to medical treatment under article 12 of the Convention on the Rights of Persons with Disabilities and the absolute prohibition of torture and cruel, inhuman and degrading treatment (para. 42). The Committee on the Rights of the Child, in its general comment No. 12 (CRC/C/GC/12), stated that children should be provided with information about proposed treatments and their effects and outcomes, including in formats appropriate and accessible to children with disabilities (paras. 48 and 100).

54.     The Special Rapporteur observes that children who use, or are suspected of using, drugs are commonly involuntarily confined in so-called rehabilitation centres. Children thus confined are compelled to undergo diverse interventions (A/HRC/22/53, para. 40), including painful withdrawal from drug dependence without adequate medical assistance, administration of unknown or experimental medications, State-sanctioned beatings, caning or whipping, forced labour, sexual abuse and intentional humiliation. Other reported abuses included "flogging therapy", "bread and water therapy", and electroshock resulting in seizures, all in the guise of rehabilitation. In some countries, a wide range of other marginalized groups, including street children and children with psychosocial disabilities, are reportedly detained in these centres.

55.     Similarly, the involuntary commitment of children with mental disabilities, including those who have long-term intellectual or sensory impairments, to psychiatric and

---

[14]   Carolyn Hamilton et al., "Administrative detention of children: a global report",
       UNICEF and the Children's Legal Centre, February 2011, p. 140.
[15]   See A/HRC/25/60/Add.1, para. 80 and CRC/C/GC/12, para. 21.
[16]   See Convention on the Rights of Persons with Disabilities, art. 7.

social care institutions, psychiatric wards, prayer camps, secular and religious-based therapeutic boarding schools, boot camps, private residential treatment centres or traditional healing centres has been well documented. Such children may live their whole lives in such psychiatric or social care institutions (A/HRC/22/53, paras. 57 and 68). Article 14, paragraph 1 (b) of the Convention on the Rights of Persons with Disabilities unambiguously states that "the existence of a disability shall in no case justify a deprivation of liberty". The Committee on the Rights of Persons with Disabilities has found that legislation that allows detention in a mental health institution on the basis of a standard of danger to self or others infringes this provision. Indeed, the Committee has repeatedly urged States to ensure that no one is detained against their will in any kind of mental health facility.[17] Furthermore, the Special Rapporteur has observed the continued use of solitary confinement and prolonged restraint of children with disabilities in psychiatric institutions. The environment of patient powerlessness and abusive treatment of children with disabilities in which restraint and seclusion are used can lead to other non-consensual treatment, such as forced medication and electroshock procedures (A/HRC/22/53, para. 63).

56.     One of the most egregious forms of abuse in health and social care settings is unique to children. Numerous studies have documented that a child's healthy development depends on the child's ability to form emotional attachments to a consistent care-giver.[18] Children need more than physical sustenance; they also require emotional companionship and attention to flourish. Unfortunately, this fundamental need for connection is consistently not met in many institutions, leading to self-abuse, including children banging their head against walls or poking their eyes. In reaction, care-givers use physical restraints as a long-term solution, or hold the children in cages or their beds, practices that have been linked to muscular atrophy and skeletal deformity.

57.     Another form of ill-treatment of children in health and social care detention settings is inappropriate medical care, including the use of psychoactive medications on children for punitive purposes, such as injected tranquilizers, which immobilize children for days, and forced labour in the guise of medical necessity. During one mission, the Special Rapporteur witnessed appalling conditions and ill-treatment of children with mental disabilities in so-called prayer camps, which are alternative residential facilities. He documented cases of shackling to the walls, floors or trees and forced fasting, in some cases on children with neurological problems (see A/HRC/25/60/Add.1, paras. 74-77).

58.     Unsanitary and unsafe conditions may also lead to a violation of the prohibition of ill-treatment. The Special Rapporteur observes that overcrowding is present in many institutions, leading to severe constraints on institutional resources, shortages of adequate food, clean drinking water, bedding and medical care. Overcrowding also increases the risk of disease transmission and infection. Furthermore, adults and children are often not segregated in institutional facilities, leading to issues of exploitation.

**3.    Children in administrative immigration detention institutions**

59.     States frequently detain children who are refugees, asylum seekers or irregular migrants for a number of reasons, such as health and security screening, to verify their

---

[17]   See for example CRPD/C/AUT/CO/1 paras. 29-30, CRPD/C/SLV/CO/1 para. 31-32 and CRPD/C/AZE/CO/1, paras. 28-29.

[18]   See Marinus H. van IJzendoorn et al., "Children in institutional care: delayed development and resilience", *Monographs of the Society for Research in Child Development*, vol. 76, No. 4 (2011), pp. 8-30; and Rebecca Johnson et al., "Young children in institutional care at risk of harm", *Trauma, Violence & Abuse*, vol. 7, No. 1 (2006), pp. 34-60.

identity or to facilitate their removal from the territory. Sometimes, children may be inadvertently detained because there is a failure to distinguish between child and adult migrants, such as when children are unable to prove their age.[19] The Special Rapporteur has previously noted with concern that unaccompanied child migrants are systematically held in detention at police stations, border guard stations or migration detention centres instead of being held in reception centres, which are in practice often not numerous enough or are overcrowded (see A/HRC/16/52/Add.4, paras. 68-69). Most of the unaccompanied minors are not adequately informed about asylum procedures or their rights, do not have access to legal counsel or guardians, and are generally ignorant of the system.[20] Furthermore, the procedure to identify minors and to assess their age and vulnerability appears to be completely inadequate, as many children reported being registered as adults (see A/HRC/16/52/Add.4, paras. 68-73 and CAT/C/USA/CO/3-5, para. 19).

60.     Many child migrants witness or suffer harsh physical abuse while detained. Reports indicate that children in immigration detention have been tied up or gagged, beaten with sticks, burned with cigarettes and given electric shocks, and that the use of solitary confinement of children in immigration detention is common around the globe. In other instances, migrant children have suffered from severe anxiety and mental harm after having witnessed sexual abuse and violence against other detainees. In some countries, encampment policies have led to the kidnapping, captivity and torture of child refugees. Child migrant detainees too often face lengthy detainment.[21]

61.     In addition, many child migrants suffer appalling and inhuman conditions while detained including overcrowding, inappropriate food, insufficient access to drinking water, unsanitary conditions, lack of adequate medical attention, and irregular access to washing and sanitary facilities and to hygiene products, lack of appropriate accommodation and other basic necessities. In some cases, detention centres refuse to keep migrant children with their families also being detained, and have denied migrant children's right to communicate with their families. Such practices effectively isolate child detainees from social support groups.

62.     According to the European Court of Human Rights, even short term detention of migrant children is a violation of the prohibition on torture and other ill-treatment, holding a child's vulnerability and best interests outweigh the Government's interest in halting illegal immigration.[22] The Inter-American Court of Human Rights further noted that, when assessing the possibility to return, expel, deport, repatriate, reject at the border, or not to admit or in any way transfer or remove a child to a State, the best interests of the child must be determined, which also incorporate the component of adequate development and survival of the child.[23]

---

[19] Information received from the International Detention Coalition on 2 February 2015.

[20] International Detention Coalition, *Captured Childhood*, Melbourne, Australia, 2012.

[21] See Human Rights Watch, *Barely Surviving: Detention, Abuse and Neglect of Migrant Children in Indonesia*, 2013, pp. 4, 34-36; MaryBeth Morand et al., *The Implementation of UNHCR's Policy on Refugee Protection and Solutions in Urban Areas, Global Survey – 2012*, UNHCR, April 2013, p. 5; and Amnesty International, "Egypt/Sudan: Refugees and asylum seekers face brutal treatment, kidnapping for ransom and human trafficking", 2013, paras. 6, 8.

[22] *Popov v. France*, judgement of 19 January 2012; *Rahimi v. Greece*, judgement of 5 April 2011; *Mubilanzila Mayeka and Kaniki Mitunga v Belgium*, judgement of 12 October 2006.

[23] *Rights and guarantees of children in the context of migration and/or in need of international protection*, Advisory Opinion of 19 August 2014, paras. 222 and 231-233.

## C.   Training, complaint mechanisms and monitoring

63.    An essential safeguard against torture and other forms of ill-treatment is the availability of multidisciplinary and qualified staff working in children's institutions. Inside the law enforcement, institution and migration systems, children are more vulnerable to human rights violations than adults because of the manner in which judicial and other officials deal with children.

64.    A significant number of States lack an independent mechanism to monitor human rights violations not only in detention facilities but also in medical and social care institutions. Moreover, even when legislation exists to provide for the monitoring of such institutions, inadequate human and financial resources and weak legal enforcement mechanisms are no excuse for failure to prevent abuse.

65.    Article 25 of the Convention on the Rights of the Child provides for the right of a child who has been placed by the competent authorities for the purposes of care, protection or treatment of his or her physical or mental health to a periodic review of the treatment provided to the child and all other circumstances relevant to his or her placement. In this context, the Special Rapporteur recalls that the possibility of release should be realistic and regularly considered (CRC/C/GC/10, para. 77). He also observes that, in practice, many States fail to apply these rights. Acts of torture and other cruel, inhuman or degrading treatment or punishment are more widespread than they appear owing to the greater vulnerability of children and their lack of capacity to articulate complaints and seek redress (see A/HRC/25/35, paras. 13-17).

66.    Effective complaint procedures are an important safeguard against torture and other ill-treatment in all places of detention for children. According to article 37 (d) of the Convention on the Rights of the Child, children, including migrant children, have the right to prompt access to legal aid and other appropriate assistance, as well as the right to challenge the legality of the deprivation of their liberty before a court or other competent, independent and impartial authority, and to a prompt decision on any such action.

67.    With regard to migrant children, authorities routinely impede their access to lawyers, non-governmental organizations, service providers, interpreters and other sources of information and protection. Furthermore, children often never meet with their appointed guardian because they are deported before their representative arrives. In some cases, the report of a child's ill-treatment is routinely ignored by the official guardians. States have similarly failed to implement a legal right to representation for children detained in health-care settings. Even when States provide a legal right to review, it generally does not cover children placed with parental consent.

68.    In January 2014, the Committee on the Rights of the Child, at its sixty-fifth session, adopted a recommendation that the General Assembly request the Secretary-General to conduct an in-depth international study on the issue of children deprived of liberty (A/69/41, annex II). The Special Rapporteur therefore welcomes General Assembly resolution 69/157, in which the Assembly invited the Secretary-General to commission an in-depth global study on children deprived of liberty.

## IV.   Conclusions and recommendations

### A.   Conclusions

69.    **Owing to their unique physiological and psychological needs, which render them particularly sensitive to deprivation and treatment that otherwise may not**

constitute torture, children are more vulnerable to ill-treatment and torture than adults. The detention of children, including pretrial and post-trial incarceration as well as institutionalisation and administrative immigration detention, is inextricably linked – in fact if not in law – with the ill-treatment of children, owing to the particularly vulnerable situation in which they have been placed that exposes them to numerous types of risk. Moreover, the response to address the key issues and causes is often insufficient.

70.    In determining the seriousness of acts that may constitute ill-treatment or torture, due consideration must be given to physical and mental effects and the age of the victim. In the case of children, higher standards must be applied to classify treatment and punishment as cruel, inhuman or degrading. In addition, the particular vulnerability of children imposes a heightened obligation of due diligence on States to take additional measures to ensure their human rights to life, health, dignity and physical and mental integrity.

71.    There is widespread agreement among experts that the institutionalization of children contributes to physical underdevelopment, abnormalities in brain development, reduced intellectual abilities and development, delays in speech and language development, and diminished social skills. Inappropriate conditions of detention exacerbate the harmful effects of institutionalization on children. The Special Rapporteur observes that one of the most important sources of ill-treatment of children in those institutions is the lack of basic resources and proper government oversight.

72.    The deprivation of liberty of children is intended to be an *ultima ratio* measure, to be used only for the shortest possible period of time, only if is in the best interests of the child, and limited to exceptional cases. Failure to recognize or apply these safeguards increases the risk of children being subjected to torture or other ill-treatment, and implicates State responsibility. Therefore, States should, to the greatest extent possible, and always using the least restrictive means necessary, adopt alternatives to detention that fulfil the best interests of the child and the obligation to prevent torture or other ill-treatment of children, together with their rights to liberty and family life, through legislation, policies and practices that allow children to remain with family members or guardians in a non-custodial, community-based context. Alternatives to detention must be given priority in order to prevent torture and the ill-treatment of children. This includes access to counselling, probation and community services, including mediation services and restorative justice. Furthermore, if circumstances change and the reclusion of children is no longer required, States are required to release them, even when they have not completed their sentences.

73.    With regard to children deprived of their liberty within the context of the criminal justice system, the Special Rapporteur recalls that children should be charged, tried and sentenced within a State's system of juvenile justice, affording them adequate forms of protection, and never within the adult criminal justice systems. In addition, laws, policies and practices that allow children to be subjected to adult sentences are inherently cruel, inhuman or degrading because they fail to consider any of the special measures of protection or safeguards that international law requires for children. Children should never be treated as if they were adults. Because children are less emotionally and psychologically developed, they are less culpable for their actions and their sentencing should reflect the principle of rehabilitation and reintegration.

74.    In this context, the Special Rapporteur recalls that the death penalty for children amounts to a violation of the prohibition of torture and other ill-treatment.

15

Other punishments considered grossly disproportionate also amount to cruel, inhuman or degrading treatment or punishment. Life imprisonment and lengthy sentences, such as consecutive sentencing, are grossly disproportionate and therefore cruel, inhuman or degrading when imposed on a child. Life sentences or sentences of an extreme length have a disproportionate impact on children and cause physical and psychological harm that amounts to cruel, inhuman or degrading punishment. Similarly, the Special Rapporteur finds that mandatory sentences for children are similarly incompatible with the State's obligation regarding children in conflict with the law and the prohibition of cruel, inhuman or degrading punishment. Mandatory minimum sentences may result in disproportionate punishments that are often overly retributive in relation to the crimes committed, particularly in relation to the child's individual circumstances and the opportunity for rehabilitation. In the light of the unique vulnerability of children, including the risk of torture or ill-treatment in detention and States' obligation of due diligence to afford children heightened measures of protection against torture and other forms of ill-treatment, children must be subject to sentences that promote rehabilitation and re-entry into society.

75.    The Special Rapporteur believe that there should be a formal obligation to notify a relative or another adult trusted by the child about his or her detention regardless of whether the child has so requested, except if this would not be in the best interests of the child. Parents or adults trusted by the child should furthermore be allowed to be present with the child during interrogation and any court appearances. An essential issue is the manner in which children are questioned. Interrogation should be age-sensitive and individualized, and undertaken by authorities that are skilled in interviewing children. Video recording should be given due consideration in certain circumstances, to avoid causing distress to children because of repeated questioning, and numerous visits to courts. Children should also have immediate access to a lawyer and a health professional. A specific information sheet setting out the above-mentioned safeguards should be given to all children taken into custody immediately upon their arrival at a law enforcement establishment, and this information should be verbally explained to children in terms that they understand.

76.    Children should be appropriately separated in detention, including but not limited to children in need of care and those in conflict with the law, children awaiting trial and convicted children, boys and girls, younger children and older children, and children with physical and mental disabilities and those without. Children detained under criminal legislation should never be detained together with adult detainees. The Special Rapporteur also notes that the permitted exception to the separation of children from adults provided for in article 37 (c) of the Convention on the Rights of the Child should be interpreted *sensu stricto*. The best interests of the child should not be defined in accordance with the convenience of the State. Children in conflict with the law should be held in detention centres specifically designed for persons under the age of 18 years, offering a non-prison-like environment and regimes tailored to their needs and run by specialized staff, trained in dealing with children. Such facilities should offer ready access to natural light and adequate ventilation, access to sanitary facilities that are hygienic and respect privacy and, in principle, accommodation in individual bedrooms. Large dormitories should be avoided.

77.    An important safeguard against torture and other forms of ill-treatment is the support given to children in detention to maintain contact with parents and family through telephone, electronic or other correspondence, and regular visits at all times. Children should be placed in a facility that is as close as possible to the place of residence of their family. Any exceptions to this requirement should be clearly described in the law and not be left to the discretion of the competent authorities. Moreover, children should be given permission to leave detention facilities for a visit

to their home and family, and for educational, vocational or other important reasons. The child's contact with the outside world is an integral part of the human right to humane treatment, and should never be denied as a disciplinary measure.

78.    Children in detention should be provided throughout the day with a full programme of education, sport, vocational training, recreation and other purposeful out-of-cell activities. This includes physical exercise for at least two hours every day in the open air, and preferably for a considerably longer time. Girls should under no circumstances receive less care, protection, assistance and training, including equal access to sport and recreation.

79.    The Special Rapporteur recalls that detention and forced labour programmes for children who use drugs are not a legitimate substitute for evidence-based measures, such as substitution therapy, psychological intervention and other forms of treatment given with full, informed consent (A/65/255, para. 31). Drug dependence as a "multi-factoral health disorder" requires a health response rather than recourse to detention.

80.    Within the context of administrative immigration enforcement, it is now clear that the deprivation of liberty of children based on their or their parents' migration status is never in the best interests of the child, exceeds the requirement of necessity, becomes grossly disproportionate and may constitute cruel, inhuman or degrading treatment of migrant children. Following the advisory opinion of the Inter-American Court of Human Rights on the rights and guarantees of children in the context of migration and/or in need of international protection in 2014, the Special Rapporteur recalls the different procedural purposes between immigration and criminal proceedings, and that, in the words of the Court, "the offenses concerning the entry or stay in one country may not, under any circumstances, have the same or similar consequences to those derived from the commission of a crime." The Special Rapporteur therefore concludes that the principle of *ultima ratio* that applies to juvenile criminal justice is not applicable to immigration proceedings. The deprivation of liberty of children based exclusively on immigration-related reasons exceeds the requirement of necessity because the measure is not absolutely essential to ensure the appearance of children at immigration proceedings or to implement a deportation order. Deprivation of liberty in this context can never be construed as a measure that complies with the child`s best interests. Immigration detention practices across the globe, whether de jure or de facto, put children at risk of cruel, inhuman or degrading treatment or punishment. Furthermore, the detention of children who migrate to escape exploitation and abuse contravenes the duty of the State to promote the physical and psychological recovery of child victims in an appropriate environment.[24] Therefore, States should, expeditiously and completely, cease the detention of children, with or without their parents, on the basis of their immigration status. States should make clear in their legislation, policies and practices that the principle of the best interests of the child takes priority over migration policy and other administrative considerations. Also, States should appoint a guardian or adviser as soon as the unaccompanied or separated child is identified, and maintain such guardianship arrangements until the child has either reached the age of majority or has permanently left the territory and/or jurisdiction of the State (A/HRC/20/24, para. 41). While the Special Rapporteur acknowledges that, in certain circumstances it is possible for States to place children in a shelter or other accommodation when it is based on the purpose of child care, protection and support, this should not become a

---

[24]   Convention on the Rights of the Child, arts. 34 and 39.

proxy for expanded unnecessary restrictions to the liberty of child migrants and families. States are required to favour measures that promote the care and well-being of the child rather than the deprivation of liberty. Facilities that grant accommodation for migrant children should have all the material conditions necessary and provide an adequate regime to ensure comprehensive protection from ill-treatment and torture, and allow for their holistic development. Migrant children should be separated from children who have been accused or convicted of criminal offences and from adults. The Special Rapporteur notes, however, that separating child migrants from unrelated adults can sometimes itself result in harm by depriving children of important interactions; ample opportunities for broader human interaction and physical activity must therefore be given to unaccompanied migrant children. When children are accompanied, the need to keep the family together is a not sufficient reason to legitimize or justify the deprivation of liberty of a child, given the prejudicial effects that such measures have on the emotional development and physical well-being of children. The Special Rapporteur shares the view of the Inter-American Court of Human Rights that, when the child's best interests require keeping the family together, the imperative requirement not to deprive the child of liberty extends to the child's parents, and requires the authorities to choose alternative measures to detention for the entire family.

81. The Special Rapporteur recommends that States adopt child-friendly administrative and criminal court procedures and train police officers, border guards, detention staff, judges and others who may encounter children deprived of their liberty in child protection principles and a better understanding of the vulnerabilities of children to human rights violations, such as torture and other forms of ill-treatment. Special mention should be made of girls, who are particularly vulnerable, and to special groups of children, such as minorities, disabled children and migrants.

82. Children deprived of their liberty and their parents or legal representatives should have avenues of complaint open to them in administrative systems, and should be entitled to address complaints confidentially to an independent authority. Upon admission, children should be given information on lodging a complaint, including the contact details of the authorities competent to receive complaints, as well as the address of any services that provide legal assistance. In this context, the Special Rapporteur welcomes the establishment of independent, local, socio-legal defence centres that provide children with the effective opportunity to have access to justice and subsequently to obtain remedies and advocate for systematic training in children's rights for professionals.

83. Regular and independent monitoring of places where children are deprived of their liberty is a key factor in preventing torture and other forms of ill-treatment. Monitoring should be conducted by an independent body, such as a visiting committee, a judge, the children's ombudsman or the national preventive mechanisms with authority to receive and act on complaints and to assess whether establishments are operating in accordance with the requirements of national and international standards. Independent monitoring mechanisms should draw on professional knowledge in a number of fields, including social work, children's rights, child psychology and psychiatry, in order to address the multiple vulnerabilities of children deprived of their liberty and to understand the specific normative framework and overall system of child protection.

## B. Recommendations

84. With regard to legislation, the Special Rapporteur calls upon all States:

(a)     To investigate all allegations of torture or other ill-treatment of children deprived of their liberty in accordance with the absolute prohibition of torture and other cruel, inhuman or degrading treatment or punishment, as codified in the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the International Covenant on Civil and Political Rights and the Convention on the Rights of the Child, to prosecute and punish those responsible, and to act in accordance with the heightened obligation of due diligence of States to prevent the torture and ill-treatment of children;

(b)     To expedite the ratification of the Convention of the Rights of the Child and the optional protocols thereto, and the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment;

(c)     To adhere to the United Nations Standard Minimum Rules for the Administration of Juvenile Justice, the United Nations Rules for the Protection of Juveniles Deprived of their Liberty and the United Nations Guidelines for the Prevention of Juvenile Delinquency.

85.     With regard to the vulnerability of children deprived of their liberty and policy reform, the Special Rapporteur calls upon all States:

(a)     To ensure that deprivation of liberty is used only as a measure of last resort only in exceptional circumstances and only if it is in the best interests of the child;

(b)     To ensure that child-appropriate age determination procedures are in place, and that the person is presumed to be under 18 years of age unless and until proven otherwise;

(c)     To promote preventive mechanisms, such as diversion and early identification and screening mechanisms, and to provide for a variety of non-custodial, community-based alternative measures to the deprivation of liberty;

(d)     To ensure that paediatricians and child psychologists with trauma-informed training are available on a regular basis to all children in detention, and to establish specialized medical screenings inside places of deprivation of liberty to detect cases of torture and ill-treatment, including access to forensic evaluation;

(e)     To provide mandatory training to all persons dealing with children, including training on the Manual on Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the detection, documentation and prevention of torture and ill-treatment;

(f)     To ensure that children in conflict with the law are charged, tried and sentenced within a State's juvenile justice system, never within the adult criminal justice system;

(g)     To set the minimum age of criminal responsibility to no lower than 12 years, and to consider progressively raising it;

(h)     To prohibit laws, policies and practices that allow children to be subjected to adult sentences and punishments, and to prohibit the death penalty and life imprisonment in all its forms;

(i)     To provide additional training to the judiciary so that bail, probation and alternative measures to detention are considered;

(j)     To establish clear guidelines for law enforcement agencies dealing with children; in particular, not to detain children in law enforcement establishments for more than 24 hours; to establish a formal obligation to notify a relative or caregiver

about his or her detention regardless of whether the child requests that this be done, except if not in the bests interest of the child; to ensure access to a lawyer and a medical doctor; and never to subject children to police questioning without the presence of a lawyer and, in principle, his or her caregiver;

(k)     Not to detain children in law enforcement establishments for more than 24 hours, and only in child-friendly environments;

(l)     To amend legislation to require a presumption of community living, with support, as the favoured policy, for children with disabilities;

(m)     To ensure that immigration detention is never used as a penalty or punishment of migrant children, including for irregular entry or presence, and to provide alternative measures to detention that promote the care and well-being of the child;

(n)     To prohibit the use of immigration detention as a method of control or deterrence for migrant children;

(o)     To ensure that unaccompanied migrant children are immediately provided with guardianship arrangements;

(p)     To take into consideration any trauma or exposure to torture or other forms of ill-treatment that child migrants have experienced prior to being detained;

(q)     To establish appropriate and confidential complaint mechanisms for all children deprived of their liberty, to provide all necessary support, including legal aid, information, representation and assistance, to guarantee access to justice for children who have been tortured or ill-treated while deprived of their liberty, and to ensure the safety and security of all children who file a complaint;

(r)     To establish independent monitoring mechanisms at all places of deprivation of liberty, including places run by private actors, through regular and unannounced visits, and to include civil society organizations in the monitoring of places of deprivation of liberty;

(s)     To transfer the oversight of all places of deprivation of liberty of children from justice, law enforcement or border management authorities to those responsible for child protection;

(t)     To collect quantitative and qualitative data on of children deprived of their liberty, and to elaborate and publish the State's plans for children deprived of liberty;

(u)     To support the global study on children deprived of their liberty, prepared pursuant to General Assembly resolution 69/157, and the appointment of an independent expert to lead the study.

86.     With regard to conditions during detention, the Special Rapporteur calls upon all States:

(a)     To separate children and adults in all places of detention and, when in the best interests of the child, to hold children and adults together during daytime, and only under strict supervision;

(b)     To consider case-by-case assessment to decide whether it is appropriate for a particular inmate to be transferred to an adult institution after reaching the age of majority;

(c)     To provide children deprived of their liberty with appropriate nutrition, health and other basic services, including ready access to natural light and adequate

ventilation, access to sanitary facilities that are hygienic and respect privacy and, in principle, accommodation in individual bedrooms;

(d)    To prohibit solitary confinement of any duration and for any purpose;

(e)    To prohibit corporal punishment;

(f)    To use restraints or force only when the child poses an imminent threat of injury to himself or herself or others, only for a limited period of time and only when all other means of control have been exhausted, and not to perform strip searches without reasonable suspicion;

(g)    To respond to the specific needs of groups of children that are even more vulnerable to ill-treatment or torture, such as girls, lesbian, gay, bisexual, transgender and intersex children, and children with disabilities;

(h)    To facilitate contact to the outside world, in particular with families and legal representatives;

(i)    To provide educational, vocational and recreational age-appropriate opportunities and green spaces for children;

(j)    To maintain an individualized case-management file for each child in detention (such as information on education and medical history), subject to careful data protection and privacy protection, including digital privacy, to ensure that the file is shared only with staff that requires such information.

(k)    To ensure appropriate resources and staffing for all places of deprivation of liberty.

———————————