BENJAMIN C. MIZER
Acting Assistant Attorney General
Civil Division
LEON FRESCO
Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel, District Court Section
Office of Immigration Litigation
    P.O. Box 868, Ben Franklin Station
    Washington, D.C. 20044
    Tel:  (202) 532-4824
    Fax:  (202) 305-7000
    Email:  sarah.b.fabian@usdoj.gov
Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | Case No. CV 85-4544-DMG |
| Plaintiffs, | **REPLY IN SUPPORT OF PROTECTIVE MOTION TO MODIFY SETTLEMENT AGREEMENT** |
| v. | |
| ERIC H. HOLDER, JR., Attorney General of the United States; *et al.,* | Hearing Date:  March 27, 2015 |
| Defendants. | Time: 9:30am<br>Dept: Courtroom 7, Los Angeles - Spring Street Courthouse |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................... 1

II.    ARGUMENT .................................................................................... 3

     a.   The Agreement Should Not Be Interpreted to Limit DHS's Statutory Authority to Address Issues Related to Accompanied Children or Family Detention ................................................................................. 3

     b.   Significant Changes in the Factual landscape of Immigration Enforcement Warrant Amendment of the Agreement. ..................... 5

     c.   The Homeland Security Act and the William Wilberforce Trafficking Victims Protection Reauthorization Act Are Significant Changes in the Law that Warrant Amendment of the Agreement. . 16

III.   CONCLUSION……………………………………………..…………22

# TABLE OF AUTHORITIES

Bell v. Wolfish,
  441 U.S. 520 (1979) ........................................................ 11

Bob Jones Univ. v. United States,
  461 U.S. 574 (1983) ........................................................ 20

Bunikyte, ex rel. Bunikiene v. Chertoff,
  2007 WL 1074070 (W.D. Tex. Apr. 9, 2007) .................................. 19

Demore v. Kim,
  538 U.S. 510 (2003) ........................................................ 12

Cf. Sys. Fed'n No. 91, Ry. Employees' Dep't, AFL-CIO v. Wright,
  364 U.S. 642 (1961)......................................................... 18

Frew ex rel. Frew v. Hawkins,
  540 U.S. 431 (2004) ......................................................... 9

Hook v. Ariz., Dep't of Corr.,
  972 F.2d 1012 (9th Cir. 1992) ............................................... 3

Horne v. Flores,
  557 U.S. 433 (2009) ......................................................... 9

Jeanty v. Bulger,
  204 F. Supp. 2d 1366 (S.D. Fla. 2002) ...................................... 11

Klinger v. Dep't of Corr.,
  31 F.3d 727 (8th Cir. 1994) ................................................ 16

Moise v. Bulger,
  321 F.3d 1336 (11th Cir. 2003) ............................................. 11

Reno v. Flores,
  507 U.S. 292 (1993) ................................................... 4, 6, 8, 11

R.I.L.R., et al v. Johnson, et al.,
  No. 15-0011, Opinion ECF No. 33 (D.D.C. Feb. 20, 2015) ..................... 10

Rufo v. Inmates of Suffolk Cnty. Jail,
  502 U.S. 367 (1992) ...................................................... 2, 9

United Commer. Ins. Serv. v. Paymaster Corp.,
   962 F.2d 853 (9th Cir. 1992) ............................................................ 3

United States v. FMC Corp.,
   531 F.3d 813 (9th Cir. 2008) ........................................................... 3

United States v. Rutherford,
   442 U.S. 544 (1979) ...................................................................... 20

United States v. Swift & Co.,
   286 U.S. 106 (1932) ...................................................................... 18

Zadvydas v. Davis,
   533 U.S. 678 (2001) ...................................................................... 11

### STATUTES

8 U.S.C. § 1232 ............................................................................17

8 U.S.C. § 1232(b)(3) ....................................................................21

iii

## I.   INTRODUCTION

Plaintiffs contend that, in bringing a protective motion to amend the *Flores* Settlement Agreement ("Agreement"), the U.S. Department of Homeland Security ("DHS") has "all but" conceded that its current policies are in violation of the Agreement.  Pl. Opp., ECF No. 122, at 1.  DHS has made no such concession, and categorically denies that it is violating the terms of the Agreement.  As explained in the Government's opposition to Plaintiffs' motion to enforce, the Agreement does not apply – and was never intended to apply – to: (1) children and a parent or guardian crossing the Southwest border as a family unit; (2) accompanied alien children; or (3) U.S. Immigration and Customs Enforcement's ("ICE") ability to operate family residential centers.

The Government's Protective Motion to modify the Agreement serves a different purpose however.  Should this Court disagree with the Government's reading of the plain language of the Agreement and the original understanding of the parties, the Protective Motion seeks to ensure that the Agreement does not interfere with DHS's ability to fulfil its public safety duties in an immigration environment that is vastly different than when the Agreement was entered in 1997.  The Government has therefore moved—in the alternative and out of an abundance of caution—to amend the Agreement to account for significant changes

in facts and law that "warrant[] revision of the decree." *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 383 (1992).

As DHS has explained, the influx of alien children and families across the Southwest border in 2014 and the overall trend of increases in those numbers over the past several years have created a pressing need to use ICE family residential centers as one important facet of DHS' overall enforcement response. ICE family residential centers help DHS to balance several vital goals including ensuring the presence of aliens at their immigration proceedings, protecting the public safety, deterring incidents of mass migration, reducing incidents of smuggling, keeping families together, and maintaining safety and security at ICE detention facilities. These family residential centers keep family units together by placing them at safe and humane ICE residential facilities during the brief and finite period of pending removal proceedings. In addition, significant changes in immigration law since the time the Agreement was entered make enforcement of the decades-old Agreement in today's immigration landscape unworkable. Thus, to the extent that the Agreement is interpreted to apply to minors who enter the Unites States illegally in the company of their parent or guardian, the Agreement should be modified to account for these greatly changed immigration enforcement circumstances.

## II.   ARGUMENT

### a.   The Agreement Should Not Be Interpreted to Limit DHS's Statutory Authority to Address Issues Related to Accompanied Children or Family Detention.

Contrary to Plaintiffs' contentions, nothing in the "plain terms" of the Agreement suggests that it was meant to cover housing accompanied children in ICE family residential centers.  "Contract principles are generally applicable in [a court's] analysis of consent decrees, provided contract analysis does not undermine the judicial character of the decree."  *United States v. FMC Corp.*, 531 F.3d 813, 819 (9th Cir. 2008) (quoting *Hook v. Ariz., Dep't of Corr.*, 972 F.2d 1012, 1014 (9th Cir. 1992)).  "Under California law, the intent of the parties determines the meaning of the contract." *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992).  Moreover, it is the objective intent of the parties that governs any interpretation of the Agreement, as "manifested in the agreement and by surrounding conduct . . . ." *Id.*

Nowhere in Plaintiffs' opposition do they contend that the Agreement was intended to apply to accompanied alien children – or for that matter ICE family residential centers – at the time it was entered into by the parties.  Further, as DHS has explained, the Agreement itself makes clear that it was entered into to resolve a lawsuit challenging "the constitutionality of [the Immigration and Naturalization Service's ("INS")] policies, practices, and regulations regarding the detention and

release of *unaccompanied* minors . . . ."  Agreement at 3 (emphasis added); *see also Reno v. Flores,* 507 U.S. 292, 294 (1993) (noting that the litigation applied to "alien juveniles who are not accompanied by their parents or other related adults."); DHS Opp., ECF No. 121, at 9-13.

Nonetheless, Plaintiffs appear to assume that the Agreement extends to cover accompanied alien children with no explanation as to why other than noting the Agreement's use of the word "minors."  Pl. Opp., ECF No. 122, at 1.  However, as DHS also explained (DHS Opp., ECF No. 121, at 10), the use of this term is not sufficient to signal any intent of the parties to apply the Agreement to accompanied alien children in ICE custody, because the definition of "minors" included in the Agreement can reasonably be read to provide clarity as to who would be treated as a child and who would be treated as an adult under the Agreement.  *See* Agreement ¶ 4 (differentiating between minors and adults based on age).  Read as a whole, the Agreement is clearly crafted in a manner that indicates that the parties did not intend its provisions to apply to accompanied alien children, but rather intended only to address unaccompanied alien children.  *See* DHS Opp., ECF No. 121, at 11-13.

Thus, Plaintiffs' opposition is premised on a faulty assumption that the existing Agreement was intended to extend to apply to children without lawful immigration status who entered the United States accompanied by a parent or

guardian and who are held together as a family unit in ICE custody. Starting from this faulty assumption, Plaintiffs then argue that the significant changes that have occurred over the last two decades have not affected the Agreement's applicability to today's immigration landscape. But the fact is, the parties to the Agreement simply never envisioned or considered housing families in Government immigration custody, and Plaintiffs do not contend otherwise. Thus, even if the Court concludes that the Agreement by its plain terms can be applied to the custody of accompanied alien minors, the Agreement should nonetheless be amended to more accurately reflect the immigration enforcement landscape today.

**b. Significant Changes in the Factual Landscape of Immigration Enforcement Warrant Amendment of the Agreement.**

Plaintiffs' contention that there have not been significant changes to the factual landscape of immigration enforcement that warrant amendment of the Agreement ignores reality. As DHS's motion explains, significant changes have occurred since 1997. Most notably, there has been a substantial change in the increased numbers of alien children accompanied by a parent or guardian crossing the Southwest border of the United States. Plaintiffs argue that this is not sufficient justification for amending the Agreement because the 2014 influx "turned out to be temporary . . . ." Pl. Opp., ECF No. 122, at 13. DHS does not deny that in 2014 the overall numbers of families apprehended on the Southwest

border decreased after ICE began using its family residential centers. *See* Declaration of Tae D. Johnson ("Johnson Decl."), ECF No. 120-1, ¶¶ 8-9; Declaration of Kevin W. Oaks ("Oaks Decl."), ECF No. 121-1, ¶¶ 26-29. However, to suggest that this means that circumstances have not substantially changed with regard to the increased number of families crossing the Southwest border since 1997 ignores significant evidence to the contrary.

In 1993, the Supreme Court noted that an influx of approximately 8,500 unaccompanied alien children was a "serious" problem, *Flores*, 507 U.S. at 295. In 1997, the parties to the Agreement defined an "influx," as "circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program." Agreement ¶ 12.B. Fast forwarding to today, between FY 2013 and FY 2014 the overall total numbers of all individuals crossing the Southwest border increased from 414,397 to 479,371 (by 16%).[1] In that same timeframe, the numbers of individuals apprehended as part of a family unit jumped from 14,855 in FY 2013 to 68,445 in FY 2014 (a 361% increase).[2] Plaintiffs note that fewer than 100 families were apprehended in the Border Patrol Rio Grande Sector in October 2014 as evidence that the influx was only temporary; but

---

[1] *See* United States Border Patrol, Total Illegal Alien Apprehensions by Month, available at: http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20Area%2C%20FY2000-FY2014_0.pdf.

[2] *See* U.S. Border Patrol Statistics, available at: http://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Family%20Units%20and%20UAC%20Apps%20FY13%20-%20FY14_0.pdf .

Plaintiffs' citation of a short-term localized data-point obscures the reality of the increase faced by DHS.  Looking year-to-year, comparisons between the beginning of FY 2015 through February 28, 2015, and the same time period in FY 2014, show that the total numbers of family unit apprehensions decreased only slightly between last year and this year for that time period, from 14,078 to 11,133 (a 21% decrease).[3]  Moreover, over the past five fiscal years, the highest numbers of apprehensions of aliens on the Southwest border have all occurred between March and May, and in FY 2014 those increased numbers continued into June.[4]

Thus, a single number from one Border Patrol sector in October 2014 not only provides no clear indication of what may happen in the coming months, but also does not even fairly represent what has been happening along the Southwest border over the past several years.  What is clear is that regardless of fluctuations that may occur, a significantly higher number of minors are crossing the Southwest border as part of family units today than were arriving in 1997.[5]  Coupled with the

---

[3] *See* United States Border Patrol, Southwest Border Sectors, available at: http://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Family%20Units%20and%20UAC%20Apps%20-%20Feb_0.pdf.

[4] *See* United States Border Patrol, Total Illegal Alien Apprehensions by Month, FY 2000-FY2014, available at: http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20Area%2C%20FY2000-FY2014_0.pdf.

[5] This is true in spite of the fact that the total numbers of all individuals apprehended on the Southwest border have decreased during that same time period.  *See* United States Border Patrol, Southwest Border Sectors , Total Illegal Alien Apprehensions by Fiscal Year, available at:

7

significant increases in unaccompanied alien children who are also arriving, this is a substantial and significant change that warrants revisiting and revising the Agreement.  The recent use of ICE family residential centers as one important aspect of DHS's overall strategy for dealing with significantly increased illegal immigration is a legitimate and necessary basis for amendment of the Agreement. Plaintiffs' arguments to the contrary misunderstand DHS's position.

Plaintiffs start by arguing that DHS has not established that complying with the Agreement "has misled or will motivate any substantial number of persons to migrate to the U.S."  Pl. Opp., ECF No. 122, at 12.  Plaintiffs go on to argue that, for multiple reasons, the Agreement has not impacted today's immigration numbers.  *Id.* at 12-15.  However, by limiting their arguments to their own reading of the Agreement, Plaintiffs have attacked a straw man and have failed to address the heart of DHS's argument.  The question for the Court in assessing DHS's motion is not whether the Agreement caused the increase in numbers of family units crossing illegally into the United States in recent years.  The question is whether the Agreement was intended to prevent, or should prevent, DHS from utilizing immigration custody and family residential centers as one of several means of meeting its legitimate government interests.

---

http://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Sector%20Apps%20FY1960%20-%20FY2014_0.pdf.

Those interests include ensuring the presence of aliens at their immigration proceedings, protecting the public safety, deterring incidents of mass migration by combatting the misperceptions held by a subset of past, present, and future illegal border crossers that the Government will provide them permission to unlawfully enter and reside inside the United States if they can make it across the border, reducing incidents of smuggling, keeping families together, and maintaining safety and security at ICE detention facilities.  Because there have been substantial changes in the circumstances surrounding the need for immigration enforcement involving family units illegally crossing the border, there is good reason to amend the Agreement to benefit the public interest by allowing DHS to more effectively fulfill its mission and further these legitimate governmental interests.  *See Horne v. Flores*, 557 U.S. 433, 447 (2009) ("[T]he passage of time frequently brings about changed circumstances – changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights – that warrant reexamination of the original judgment."); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441-42 (2004) ("*Rufo* rejected the idea that the institutional concerns of government officials were 'only marginally relevant' when officials moved to amend a consent decree, and noted that 'principles of federalism and simple common sense require the [district] court to give significant weight' to the views of government officials.") (quoting *Rufo*, 502 U.S. at 392).

Plaintiffs also contend that the Court should decline to amend the Agreement in order to avoid "constitutional entanglements." Pl. Opp., ECF No. 122, at 16. To start, although Plaintiffs seek to argue that family detention is unlawful, the lawfulness of family detention is not before this Court on DHS's motion.[6] Rather, the question for the Court if it finds that the Agreement even applies to ICE family residential centers, is whether substantial changes in circumstances since 1997 warrant amendment of the Agreement so that DHS can fulfill its border security mission given today's very different circumstances. More specifically, the Court must decide if it is in the public interest for a 1997 Agreement to preclude ICE from using family residential centers when the parties to that Agreement never anticipated or considered the use of such facilities.

---

[6] Plaintiffs suggest that the district court's decision in *R.I.L.R., et al. v. Johnson, et al.*, No. 15-0011, Opinion ECF No. 33 (D.D.C. Feb. 20, 2015), requires this Court to deny DHS's motion. However, as Plaintiffs point out, *R.I.L.R.* is a preliminary injunction motion that is subject to further review, and is not binding on this Court. Moreover, that decision addressed DHS's discretionary detention determinations for a very specific group of individuals, and not the legality of family detention as a whole. Finally, in that decision the district court noted that the Government had not submitted evidence connecting the aim of deterrence of future migration through the use of family detention with its actual effect, and commented that if such evidence were submitted it would be a closer case. Slip. Op. at 37. The court has since set a briefing schedule for the Government to file a motion for reconsideration in which the Government will have the opportunity to submit evidence to support its authority and the need to detain family units to address instances of mass migration. The record in that case did not, at the time of the court's opinion, include the record evidence that DHS has submitted in conjunction with this case, which provides additional support for the Government's position that the use of ICE family residential centers is reasonably related to its goal of deterring mass migration. Therefore, the Court should decline to place significant weight on the district court's decision in *R.I.L.R.*, and should make its own determination based on the multitude of Government interests addressed herein, and the evidence submitted in this case.

Even if the Court determines that it must look into the lawfulness of ICE's family residential centers, the Court only needs to find that ICE's use of family residential centers "meet[s] the (unexacting) standard of rationally advancing some legitimate governmental purpose." *Flores*, 507 U.S. at 306.[7]  Notably, Plaintiffs do not dispute DHS's position that it is preferable to keep families together rather than require their separation.  They only dispute DHS's chosen method of doing so.  Pl. Opp., ECF No. 122, at 25.  But the fact that Plaintiffs would prefer to maintain family unity by having the Government release all families does not automatically establish that ICE's family residential facilities are not also a reasonable and permissible way to achieve that goal.  The Constitution does not require ICE's methods to satisfy Plaintiffs, only that they be rationally related to DHS's legitimate goals.  ICE family residential centers keep family units together by placing them at safe and humane ICE residential facilities during the brief and finite period of their pending removal proceedings.  *See* Johnson Decl. ¶ 16; *see*

---

[7] *See also Zadvydas v. Davis*, 533 U.S. 678, 699-700 (2001) (Due Process "reasonableness [is judged] primarily in terms of the statute's basic purpose"); *Bell v. Wolfish*, 441 U.S. 520, 538 (1979) ("[I]n determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word[, a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."); *Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1381 (S.D. Fla. 2002), *aff'd sub. nom., Moise v. Bulger*, 321 F.3d 1336 (11th Cir. 2003) ("When analyzing an Executive official's exercise of discretion, a court must avoid overriding the policy determination of the Attorney General's designee . . . .  The Court need not agree with the policymaker's choice nor approve of the policy reasons underlying it; rather, the Court must only ascertain whether the Government has advanced a facially legitimate and bona fide reason supporting the decision . . . .  Here, the Court finds that preventing loss of life and avoiding a mass migration from Haiti are facially legitimate and bona fide reasons for detaining Haitian nationals who arrive by boat in South Florida.") (citations omitted).

*also Demore v. Kim*, 538 U.S. 510, 523 (2003) ("This Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process.").

Additionally, ICE's use of family residential facilities is reasonable to achieve other rational and legitimate governmental purposes not addressed by Plaintiffs' proffered preference for release, such as ensuring the presence of aliens at their immigration proceedings, protecting the public safety, and deterring incidents of mass migration. Building these facilities helped diminish the mistaken perception that a "permiso" was waiting on the other end of an illegal crossing into the United States, and forces families to consider the possibility of immigration detention followed by removal from the United States when deciding whether to illegally enter the United States. *See* Johnson Decl. ¶¶ 7-8; Oaks Decl. ¶¶ 26-27.[8] Thus, ICE family residential facilities help DHS to reduce migration of families who seek to come to the United States unlawfully, which in turn deters human smuggling and protects children from being subjected to the high risks associated with human smuggling and attempts to cross the southern border illegally. *See*

---

[8] While Plaintiffs dispute this evidence, their objections are unfounded. Moreover, the testimony of these Government officials is supported by a recent report of the Government Accountability Office, which found that "human smugglers have increasingly influenced the rate of migration through more aggressive and misleading marketing approaches." U.S. Government Accountability Office, Information on Migration of Unaccompanied Children from El Salvador, Guatemala, and Honduras, at 5, available at: http://www.gao.gov/assets/670/668749.pdf.

Johnson Decl. ¶¶ 8-9; Oaks Decl. ¶¶ 26-29.[9]  Detaining recent border crossers

pending their removal proceedings also gives ICE additional time to discover

individuals who have serious criminal records or criminal affiliations in their

country of origin, and to prevent their release into the local community.  *See*

Johnson Decl. ¶ 8.

Plaintiffs have failed to address these multiple legitimate Government

objectives which are reasonably furthered through the use of ICE family residential

centers.[10]  Thus, amendment of the Agreement is warranted in light of the

significantly changed landscape of immigration enforcement today.

_____

[9] *See also* Hearing Before the House Committee on Homeland Security titled "Dangerous
Passage: The Growing Problem of Unaccompanied Children Crossing the Border," (written
testimony of Jeh Johnson, Sec'y of Homeland Security), Jun. 24, 2014,available at:
http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-
committee-homeland-security (last visited Feb. 25, 2014) (discussing efforts ICE is taking to
reduce the misconceptions among Central American migrants that there are no free passes or
"permisos" simply by travelling to the United States and that neither deferred action nor the path
to citizenship contemplated in the legislation before Congress would apply to recent migrants);
Letter from  the President Barack Obama to Congress – Efforts to Address the Humanitarian
Situation in the Rio Grande Valley Areas of Our Nation's Southwest Border, Jun. 30, 2014,
available at http://www.whitehouse.gov/the-press-office/2014/06/30/letter-president-efforts-
address-humanitarian-situation-rio-grande-valley (last visited Mar. 9, 2015) (outlining the U.S.
Government's strategy to respond to the 2014 surge of migrants at the Southwest border,
including the detention of adults traveling with children to process [cases] "fairly and as quickly
as possible, ensuring the protection of asylum seekers and refugees while enabling the prompt
removal of individuals who do not qualify for asylum or other forms of relief from removal").

[10] Plaintiffs suggest that DHS's rationale for the use of family detention to combat the influx of
families into the United States by fighting the misapprehension that family units will be given
"permisos" is somehow undercut by the fact that DHS is not seeking to amend the Agreement
with regard to unaccompanied alien children. Pl. Opp., ECF No. 122, at 15.  However, as
Plaintiffs certainly recognize, DHS does not house unaccompanied alien children under the
Agreement, and thus could seek no such amendment.  Moreover, DHS acknowledges that the

Additionally, although Plaintiffs have raised no issues with the conditions at any of the ICE family residential centers in their motion to enforce the Agreement, and DHS has submitted significant evidence that these facilities comply with all material aspects of the Agreement regarding conditions (*see* DHS Opp., Exh. B, ECF No. 121-2), Plaintiffs nonetheless argue that the conditions at these facilities require the Court to decline DHS's request to amend the Agreement's licensing requirement.  Pl. Opp., ECF No. 122, at 25-28.  In its motion, DHS has provided alternatives to requiring a license (which is impossible to obtain for these facilities), and has expressed its commitment to complying with these requirements and with the even more stringent requirements of its own Family Residential Standards.  DHS Mot., ECF No. 120, at 24-25.  But Plaintiffs appear to be satisfied only with the conclusion that a licensing requirement in an Agreement that never contemplated or addressed family detention should be applied to make family

---

Agreement has always governed the Government's custody of unaccompanied alien children, and now the TVPRA significantly controls such custody as well.  Accordingly, no such amendment would be appropriate or lawful, as it would conflict with Congress's mandate under the TVPRA.  Finally, DHS notes that, at the height of the influx in 2014, President Obama did ask Congress for additional authority to permit detention and quick removal of unaccompanied children from Central America.  *See Letter from the President -- Efforts to Address the Humanitarian Situation in the Rio Grande Valley Areas of Our Nation's Southwest Border*, June 30, 2014, available at: http://m.whitehouse.gov/the-press-office/2014/06/30/letter-president-efforts-address-humanitarian-situation-rio-grande-valle.  Regardless, Plaintiffs have provided no basis to find that any of this has any bearing on whether the use of family detention is reasonably related to the Government's goal of reducing the illegal migration of families to the United States.

14

detention impossible.  Such a hard line approach is not equitable, nor is it in the public interest.

Finally, Plaintiffs are incorrect in arguing that modifying the Agreement would raise constitutional equal protection concerns.  All detention decisions by DHS, regardless of gender, are handled on a case-by-case basis taking into account the facts and circumstances involved in that particular case at that particular time. In rare cases involving families illegally entering the United States with a male parent or guardian, ICE makes custody decisions on a case-by-case basis, considering multiple options.  As in all cases, one option available to ICE is to parole the family into the United States.  Alternatively, if detention of a male head of household is appropriate, ICE has the option of detaining the male parent or guardian in an adult detention facility and either transferring the child (who is then unaccompanied) into the custody of HHS under the TVPRA, or, if the mother is also apprehended with the child, detaining the mother and child at a family residential facility.  ICE also has the option of housing the entire family at the Berks family residential center.  In all of these instances, ICE must make its decision on the basis of a multitude of factors, including safety and security concerns, available detention resources, and the applicable detention statutes.

Courts have long recognized that in the context of detention, differences between the available options for men and women may exist, "depending on

innumerable variables that officials must take into account." *Klinger v. Dept. of Corrections*, 31 F.3d 727, 732 (8th Cir. 1994). These variables will frequently mean that men and women are not similarly situated in the context of detention. Here, as DHS has already explained, housing families with male heads of household involves safety and security concerns that are not as prevalent with housing families with female heads of household. Declaration of Stephen M. Antkowiak, ECF No. 121-2, ¶ 26. Given these concerns, combined with the higher number of families that cross the Southwest border with female heads of household, the current use of these facilities is the safest and most efficient use of ICE's resources. *Id.* These variables show that in the context of ICE's immigration detention decisions, and the available options, male and female heads of household are not similarly situated. *See Klinger*, 31 F.3d at 733. Additionally, Plaintiffs have entirely failed to show that ICE's decisions are motivated by gender, rather than by reasonable concerns about safety, security, and available resources. This too is fatal to their equal protection claim. *See id.* at 733-734.

      **c.** **The Homeland Security Act and the William Wilberforce Trafficking Victims Protection Reauthorization Act Are Significant Changes in the Law that Warrant Amendment of the Agreement.**

Both the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, and the William Wilberforce Trafficking Victims Protection Reauthorization Act

of 2008 ("TVPRA"), Pub. L. No. 110-457, § 235 (codified in principal part at 8 U.S.C. § 1232), are significant changes in the law enacted after the parties' executed the Agreement.  These new laws conflict with provisions of the Agreement in a manner that necessitates judicial modification of the Agreement to clarify its meaning and intent.  Plaintiffs appear to misunderstand DHS's argument on this point, and suggest that these changes are not significant, or do not warrant amendment, simply because these statutes do not directly address the issue whether the Government has the legal authority to detain family units illegally crossing the border.  Plaintiffs' assertions greatly oversimplify the issue, and fail to respond to the Government's argument that, because the Agreement has become so outdated, *Rufo*, *Horne*, and other decisions, provide a basis on which the Court can address the ways in which this Agreement must be modified to be consistent with these statutes and to take into account the immigration enforcement landscape of today.

With regard to the HSA, for example, DHS does not dispute that the statute clearly transfers the functions performed by the INS at the time of the Agreement to DHS, DHS components, and HHS.  But as a general matter, this transfer alone means that functions previously performed by a single agency are now separated among multiple independent agencies, and multiple components within those separate agencies, creating the potential for confusion in reading and implementing

the Agreement.[11]  While there is less potential for confusion in areas where duties are specifically addressed in the Agreement and were clearly transferred to a specific agency/component, such as housing unaccompanied alien children by HHS, there is more uncertainty where, as here, Plaintiffs seek to apply the Agreement to functions that were not performed by INS at the time of the Agreement.  Thus, as a general matter, amending the Agreement to better specify the agency components designated to perform the functions covered by the Agreement is in the interest of both parties.  Moreover, it is necessary in light of the fact that Plaintiffs are now seeking to apply the Agreement to functions that were never performed by INS at the time the Agreement was entered into by the parties.  *Cf. Sys. Fed'n No. 91, Ry. Employees' Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 651 (1961) (quoting *United States v. Swift & Co.*, 286 U.S. 106, 114-15 (1932)) ("The consent [in a consent decree] is to be read as directed toward events as they then were.  It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be.").

Plaintiffs also argue that the TVPRA does not create any conflicts with the Agreement because it deals only with protections for unaccompanied alien children.  Pl. Opp., ECF No. 122, at 6.  Again, Plaintiffs misconstrue DHS's

---

[11] This confusion is highlighted by the fact that, as explained in DHS's motion, DHS and its components ICE and U.S. Customs and Border Protection ("CBP") are not even named defendants in the *Flores* litigation.

arguments on this point.  DHS's examples of conflicts between the plain language of the Agreement and the requirements of the TVPRA were intended to point out why the Agreement, entered into almost two decades ago, needs to be amended to address the structure of Government immigration custody of alien minors, both accompanied and unaccompanied, that exists today.

DHS also acknowledges that the TVPRA does not govern ICE's custody of accompanied alien minors in family residential facilities (and that in many substantive ways it mirrors the Agreement with regard to HHS's custody of unaccompanied alien children).  But that is because the TVPRA intended only to codify the material protections of the Agreement for unaccompanied alien children. In fact, Congress's omission of any mention of accompanied minors in the TVPRA can be read as recognition that the provisions of the Agreement were never intended to apply to accompanied alien children.  The TVPRA was enacted in 2008, after the Government had clearly indicated its belief that the Agreement did not apply to family residential centers and a federal district court in Texas had concluded that the Agreement never anticipated family detention (even though it did conclude that by its express terms the Agreement could be applied to accompanied alien minors).  *See Bunikyte, ex rel. Bunikiene v. Chertoff*, 2007 WL 1074070, at *3 (W.D. Tex., Apr. 9, 2007) (recognizing that the Agreement "did not anticipate the current emphasis on family detention . . .").

Thus Congress could have, in exacting the TVPRA, made clear that the provisions of the Agreement regarding a preference for release, and the requirement for housing in a licensed facility, applied to accompanied alien minors in Government custody as well as unaccompanied alien children.  However, Congress did not do so, and clearly limited to unaccompanied alien children its codification of certain provisions of the Agreement.  This is a good indication that Congress also did not believe that these provisions applied to accompanied alien children who might come into in Government custody.  *See, e.g., Bob Jones Univ. v. U.S.*, 461 U.S. 574, 600 (1983) (finding legislative acquiescence to an agency interpretation where there was evidence that Congress had considered the precise issue at hand and failed to make any legislative change); *U.S. v. Rutherford*, 442 U.S. 544, 554 n.10 (1979) (noting that a finding of legislative acquiescence is appropriate where the issue "has not escaped public or legislative notice[,]" and Congress "has not sought to alter that interpretation although it has amended the statute in other respects . . .").

Plaintiffs also ignore DHS's examples of ways in which the TVPRA renders it impossible for CBP to comply with certain provisions of the Agreement.  *See* DHS Mot., ECF No. 120, at 18-19.  Plaintiffs do not dispute that this is the case, they only suggest that this does not matter because, they contend, it does not impact ICE's custody of accompanied minors.  Pl. Opp., ECF No. 122, at 7.  But

20

this is not sufficient to support Plaintiffs' contention that the TVPRA is not a significant change in the law that affects DHS and that establishes Congress's intent that unaccompanied minors be treated differently than family units when illegally crossing the border.

The confusion – even here between the parties – as to which functions under the Agreement, and which agency or component, may or may not be impacted by the TVPRA (especially when considered in conjunction with the confusion discussed above with regard to the HSA), is yet another challenge in trying to read the 1997 Agreement to govern the functions performed by various DHS components under today's law.  So, for example, DHS pointed out that Paragraph 21 of the Agreement, on its face, would appear to require CBP, upon determination by "the District Director or Chief Patrol Agent" to transfer an unaccompanied alien child who met certain conditions to a suitable state or county juvenile detention facility (or secure Government facility).  *See* DHS Mot., ECF No. 120, at 18-19.  This is inconsistent with the TVPRA which requires CBP to transfer all UACs to the custody of HHS, who makes that determination.  8 U.S.C. § 1232(b)(3).  Plaintiffs' response suggests that they see no conflict between the Agreement on its face, and the TVPRA, but their reading of the Agreement in reaching this conclusion requires the assumption that duties performed by "the District Director or Chief Patrol Agent" were transferred to HHS and not CBP under the HSA.  Pl.

Opp., ECF No. 122, at 9.  This is not clear from the face of the Agreement, and is just one example of the confusion created by the HSA and compounded by the TVPRA.  Amendment of the Agreement is necessary to end this confusion.[12]

## III.    CONCLUSION

In the event that the Court interprets the 1997 Agreement to apply to the situation of accompanied alien minors who illegally cross the border together with their parents or guardians as family units, the Government respectfully asks the Court to modify the Agreement to facilitate the Government's compliance with the spirit of the Agreement while, at the same time, providing the flexibility necessary to protect the public safety from challenges that did not exist at the time the Agreement was executed.  Because of the substantial changes that have occurred in the law and factual circumstances related to immigration since 1997, such modification is necessary to protect the public and to ensure that the Agreement is clear and unambiguous as to all of its material provisions.

---

[12] DHS notes that Plaintiffs make no objection to DHS's request that the Court amend or eliminate ongoing reporting requirements related to the implementation of the Agreement.  DHS Mot., ECF No. 120, at 25.

DATED:      March 13, 2015          Respectfully submitted,

                                    BENJAMIN C. MIZER
                                    Acting Assistant Attorney General
                                    Civil Division

                                    LEON FRESCO
                                    Deputy Assistant Attorney General
                                    Civil Division

                                    WILLIAM C. PEACHEY
                                    Director, District Court Section
                                    Office of Immigration Litigation

                                    WILLIAM C. SILVIS
                                    Assistant Director, District Court Section
                                    Office of Immigration Litigation

                                    */s/ Sarah B. Fabian*
                                    SARAH B. FABIAN
                                    Senior Litigation Counsel
                                    Office of Immigration Litigation
                                    District Court Section
                                    P.O. Box 868, Ben Franklin Station
                                    Washington, D.C. 20044
                                    Tel: (202) 532-4824
                                    Fax: (202) 305-7000
                                    Email: sarah.b.fabian@usdoj.gov

                                    *Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2015, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.


/s/ Sarah B. Fabian
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants