CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone:   (213) 388-8693
Facsimile:    (213) 386-9484
Email: crholguin@centerforhumanrights.org
          pschey@centerforhumanrights.org
          marchela@centerforhumanrights.org

WILLIAM A. MOLINSKI (STATE BAR NO. 145186)
wmolinski@orrick.com
T. WAYNE HARMAN (STATE BAR NO. 254089)
wharman@orrick.com
ELENA GARCIA (STATE BAR NO. 299680)
egarcia@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, California  90017
Telephone:  +1-213-629-2020
Facsimile:    +1-213-612-2499

*Attorneys for Plaintiffs* (listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, | Case No. CV 85-4544-DMG |
| Plaintiffs, | PLAINTIFFS' THIRD SET OF EXHIBITS |
| v. | [Exhibits 56-60] |
| Jeh Johnson, Secretary, U.S. Department of Homeland Security, *et al.*, | Hearing:   March 27, 2015 |
| Defendants. | Time:       9:30 a.m. |
| | Courtroom 7, 312 N. Spring Street |

1

*Plaintiffs' counsel, continued:*

2

3

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)

4

474 Valencia Street, #295
San Francisco, CA 94103

5

Telephone: (415) 575-3500

6

7

*Of counsel:*

8

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)

9

Virginia Corrigan (Cal. Bar No. 292035)

10

200 Pine Street, Suite 300
San Francisco, CA 94104

11

Telephone: (415) 543-3379 x 3903

12

13

Ranjana Natarajan (Cal. Bar No. 230149)
UNIVERSITY OF TEXAS SCHOOL OF LAW

14

Civil Rights Clinic
727 E. Dean Keeton St.

15

Austin, TX 78705
Telephone: (512) 232-7222

16

Email: rnatarajan@law.utexas.edu

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' SECOND SET OF EXHIBITS

CV 85-4544-DMG

INDEX TO EXHIBITS

| No. | Description | Page |
|-----|-------------|------|
| 56 | *Matter of Granados-Gutierrez*, No. A206-848-455 (IJ, September 8, 2014) | 1 |
| 57 | *Matter of Granados-Gutierrez*, No. A206-848-455 (IJ, October 28, 2014) | 36 |
| 58 | Declaration of Carlos Holguín, March 13, 2015 | 57 |
| 59 | Declaration of Alice Bussiere, March 11, 2015 | 60 |
| 60 | Declaration of Genevra Gilden Berger, March 13, 2015 | 63 |

Dated: March 13, 2015.

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian

ORRICK, HERRINGTON & SUTCLIFFE LLP
William A. Molinski
T. Wayne Harman
Elena García

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

RANJANA NATARAJAN

/s/Carlos Holguín _____

*One of the attorneys for plaintiffs*

PLAINTIFFS' SECOND SET OF EXHIBITS
CV 85-4544-DMG

Exhibit 56

PAGE 2/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSG22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## ARTESIA, NEW MEXICO

| | |
|---|---|
| **IN THE MATTER OF** ) | |
| ) | **IN BOND PROCEEDINGS** |
| ) | |
| **GRANADOS-GUTIERREZ**, Maria Teresa (LEAD) ) | **File Nos.: A206-848-455** |
| **GUTIERREZ-GRANADOS**, Herson Yonatan (MINOR) ) | **A206-848-456** |
| ) | |
| ) | |
| **Respondents** ) | |
| ) | |

**MOTION:**     Motion for Bond and Release Pursuant to the Flores Settlement
Agreement

**On Behalf of Respondent:**                    **On Behalf of DHS:**
Rachel S. Bloomekatz, Esq.                      Karen Donoso Stevens
Jones Day                                       Senior Attorney - ICE
325 John H. McConnell Blvd.                     1901 S. Bell Street, Suite 900
Columbus, OH 43215                              Arlington, VA 22202

## ORDER OF THE IMMIGRATION JUDGE

### I.     BACKGROUND AND PROCEDURAL HISTORY

The hearing in this matter was conducted in Artesia, New Mexico, through videoconference
pursuant to INA § 240(b)(2)(A)(iii). Maria Teresa Granados-Gutierrez, Lead Respondent, and
her son Herson Yonatan Gutierrez-Granados, Minor Respondent, are natives and citizens of El
Salvador. On July 10, 2014, the Department of Homeland Security (DHS) issued Notices to
Appear (NTAs), charging Respondents with removability under INA § 212(a)(6)(A)(i) as aliens
present in the United States without having been admitted or paroled. Respondents accepted the
factual allegations and conceded removability as charged. Respondents further indicated that
they would be filing I-589 applications for asylum, withholding of removal, and relief pursuant
to the Convention Against Torture (CAT).

On July 16, 2014, Respondents were denied bonds by DHS and were to remain in detention
pending the outcome of removal proceedings. Respondents reserved an appeal of this
determination. On August 14, 2014, Respondents presented their case for bond and custody
redeterminations to this Court. DHS maintained its position that Respondents were flight risks
whose release would posit national security concerns. Respondents advocated for discretionary
release based on their pending asylum claims, ties to the community, and the Flores Settlement

- 2 -

PAGE 3/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MS22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 2 of 34

Agreement. The Court rendered its decision designating a family bond of $30,000.[1] Alternatively, the Court maintained its jurisdiction in order to contemplate whether one or both Respondents were eligible for release from custody pursuant to the Flores Settlement Agreement.

The case was re-set for a custody redetermination hearing on September 9, 2014. The issue now before the Court concerns Respondents' eligibility for release pursuant to the Flores Settlement Agreement. For the reasons contained herein, the Court will grant Minor Respondent Herson Yonatan Gutierrez-Granados' request for release from custody, but will deny Lead Respondent Maria Teresa Granados-Gutierrez's request. Minor Respondent will be released pursuant to conditional parole under section 236(a)(2)(B) of the Immigration and Nationality Act ("INA" or the "Act") into the custody of his aunt, Rosa Mundo, while Lead Respondent will remain in custody pursuant to a proportionately reduced bond of $15,000.

## II.   EVIDENCE

### A.   Documentary Evidence

The Bond Proceedings record contains the following evidence:

| | |
|---|---|
| **Group Exhibit 1:** | Respondent's Memorandum and Documentary Evidence in support of her Motion for Bond and for Child's Release pursuant to the Flores Settlement Agreement, including the following: |
| **Tab A** | Copy of Rosa Mundo's birth certificate, with corresponding translation; |
| **Tab B** | Copy of Rosa Mundo's Legal Permanent Resident Card; |
| **Tab C** | Copy of Rosa Mundo's Certification of Completion of Naturalization Test; |
| **Tab D** | Copies of Rosa Mundo's documents including her Texas driver's license, electric bill, and mortgage payment receipt; |
| **Tab E** | Copies of Rosa Mundo's social security card and a pay stub; |
| **Tab F** | Letter to the Immigration Judge from Rosa Mundo; |
| **Tab G** | Complete Affidavit of Support (Form I-134) for Respondents on behalf of Rosa Mundo; |
| **Tab H** | Respondents' identity documents (birth certificates and identification card) with translations; and |

---

[1] Respondents appealed that decision to the Board of Immigration Appeals on August 18, 2014. This Court may entertain a bond redetermination request even where there is an appeal pending before the Board of Immigration Appeals. *Matter of Valles*, 21 I&N Dec. 769 (BIA 1997).

P.003                                                                                  SEP-08-2014   17:18

Case 2:85-cv-04544-DMG-AGR   Document 128   Filed 03/13/15   Page 7 of 70   Page ID #:2135

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 3 of 34

| | |
|---|---|
| **Tab I** | Letter of Minor Respondent's school principal in El Salvador with certified translation. |
| **Group Exhibit 2:** | The Department of Homeland Security's Submission of Documentary Evidence, including therein: |
| **Tab A** | Declaration of Philip T. Miller, Assistant Director of Enforcement and Removal Operations ("ERO") and Immigration and Customs Enforcement ("ICE") Field Operations, dated August 7, 2014; |
| **Tab B** | Declaration of Traci A. Lembke, Assistant Director of Investigative Programs for Homeland Security Investigations ("HSI") and ICE, dated August 7, 2014; |
| **Tab C** | Written testimony of DHS Secretary, Jeh Johnson, before the House Committee on Homeland Security, hearing titled "Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border," release date June 24, 2014; |
| **Tab D** | Preston and Archibald, "U.S. Moves to Stop Surge in Illegal Immigration," *N.Y. Times*, June 20, 2014; |
| **Tab E** | Preston, "New U.S. Effort to Aid Unaccompanied Child Migrants," *N.Y. Times*, June 2, 2014; |
| **Tab F** | Shear and Peters, "Obama asks for $3.7 Billion to Aid Border," *N.Y. Times*, July 8, 2014; |
| **Tab G** | Dwyer, "A 12-Year-Old's Trek of Despair Ends in a Noose at the Border," *N.Y. Times*, April 19, 2014; |
| **Tab H** | Preston, "Snakes and Thorny Brush, and Children at the Border Alone," *N.Y. Times*, June 25, 2014; |
| **Tab I** | "Guatemalan Boy Sought Care for Family in the U.S. and Died Crossing Border Desert," *The Guardian*, July 2, 2014; |
| **Tab J** | "72 Bodies Found in Mexico were Immigrants, Officials Say," *CNN Wire*, August 25, 2010; and |
| **Tab K** | *Matter of D-J-*, 23 I&N Dec. 572 (AG 2003). |
| **Exhibit 3:** | Additional documents in support of Respondents' Motion, including an "Agreement Pursuant to Flores Settlement Agreement" signed by Rosa |

- 4 -

PAGE 3/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXX02MSI22 * DNIS:6057* CSID:* DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 4 of 34

> Mundo for Minor Respondent and a copy of Respondents' agreement with
> current counsel for continued representation in all future immigration
> proceedings.

## B.   Testimonial Evidence

In addition to the evidence listed above, Lead Respondent was questioned in these proceedings.
That testimony will be summarized here to the extent it is relevant to the Court's decision.

Respondents, through counsel, prefaced all questioning with a summary of Respondents'
background. Namely, counsel indicated that Respondents have "significant ties to the United
States" with two close relatives who are lawful permanent residents and two additional close
relatives who reside in the United States pursuant to Temporary Protected Status. Lead
Respondent's older sister and Minor Respondent's aunt, Rosa Mundo, is a lawful permanent
resident who resides in Spring, Texas outside the Houston Metropolitan Area. Counsel indicated
that her law firm has an office in Houston, Texas and that, should Respondents be released,
counsel would continue representation pursuant to a previously executed retainer agreement.
Counsel emphasized that Respondents have pending asylum applications that demonstrate a high
likelihood on the merits and a plausible future avenue to adjust status once Rosa Mundo is
naturalized.

After this summation of the facts was provided by Respondents' counsel, Government counsel
conducted questioning of Lead Respondent. Lead Respondent testified that she paid a smuggler
to gain passage to the United States. Specifically, Lead Respondent paid $7000 for her and
Minor Respondent to cross the United States border on a raft with a group of people. The
smuggler did not cross the river with Respondents. Lead Respondent was able to pay the $7000
fee with some money she borrowed and other money her partner (hereinafter "husband") sent
from the United States. Lead Respondent indicated that her husband and sister, Rosa Mundo,
were aware of her plans to enter the United States illegally. Both were aware that Lead
Respondent would be travelling with Minor Respondent. Lead Respondent's husband is the
father of Minor Respondent and he currently lives in Dallas, Texas. Were Respondents to be
released, they would live with Rosa Mundo in Houston. Lead Respondent's husband would then
relocate to reside in Rosa's home. Lead Respondent reiterated that neither she nor Minor
Respondent had ever entered the United States previously. Also, she explained that she had not
made any attempts to procure a visa or other means of entering the United States legally before
engaging with the smuggler and crossing the United States border.

## III.   RESPONDENTS' POSITION

Lead Respondent requests that this Court release her and Minor Respondent from custody
pursuant to 8 C.F.R. § 1003.19 or the Flores Settlement Agreement. Respondents argue that they
meet the requirements for release from custody under the standard traditionally prescribed by the
Board of Immigration Appeals. *See Matter of Patel*, 15 I&N Dec. 666 (BIA 1976). More
specifically, Lead Respondent argues that because she and Minor Respondent have strong claims
for asylum, significant community ties, a permanent address for residency, no criminal history,

900'd                                                                    61:ᴌ1   ᖆ1OZ-8O-dƎS

PAGE 6/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSG22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 5 of 34

and no attempts to evade immigration laws or officers, that neither party presents a flight risk or threat to society.

Lead Respondent also contends that the release of neither she nor Minor Respondent would give rise to national security concerns. Respondents aver that the Government's position in this case regarding *Matter of D-J-*, 23 I&N Dec. 572 (BIA 2003) is incorrect. Principally, Respondents argue that *Matter of D-J-* was not designed to create a policy that amounts "to an assertion that no one from Central America can receive release on bond" or a blanket national security threat that would disallow a single immigrant from three countries to be released from custody. *Respondents' Memorandum in Support*, at *7-8. Such an assertion would be overbroad and against the individualized custody determination that is required pursuant to section 235 of the Act. *Id.* at *7-8. In fact, Respondents argue that allowing DHS to apply a nationality or race-based policy on these grounds would be unconstitutional. *Id.* at *8. Alternatively, Respondents provide that even if *Matter of D-J-* were a valid source of contention, it is inapplicable to this case as the facts are distinguishable. *Id.* Specifically, *Matter of D-J-* repeatedly emphasized that the immigrants attempted to evade arrest which created a flight risk. Respondents state that this risk is not at issue in their applications for release. Moreover, the immigrants in *Matter of D-J-* did not have viable claims to asylum and were coming from a country which was a staging point for illegal immigration by sea. *Id.* Respondents argue that the holdings from *Matter of D-J-* do not apply to their custody determinations because they possess valid claims for asylum and there is no higher-level national security risk in their case.

Lastly, at a minimum, Lead Respondent argues that Minor Respondent must be released to his aunt in accordance with the Flores Settlement Agreement. Lead Respondent states that Minor Respondent must be released under the Flores Settlement Agreement unless it is determined his detention is necessary to secure his presence before the Court. Because this is not at issue in Minor Respondent's case, and because his aunt has provided the necessary affidavit in support as required by the Flores Settlement Agreement, Minor Respondent must be released from custody. Respondents request that, pursuant to the Flores Settlement Agreement, Minor Respondent be released on his own recognizance, or alternatively, on a low bond.

## IV.  GOVERNMENT'S POSITION

Department of Homeland Security (DHS) maintains a "no bond, high bond" position regarding the release of aliens at the border under the current circumstances. This policy is to apply to adults, juveniles, and unaccompanied minors alike due to the issues at play involving the current influx of undocumented immigrants at the United States border. DHS has submitted two affidavits, various news articles, and a copy of *Matter of D-J-*, 23 I&N Dec. 572 (AG 2003) in support of its position.

The first affidavit provided by Mr. Philip Miller (acting Assistant Director of Field Operations for Enforcement and Removal Operations) advocates for the "no bond, high bond" policy in light of national security concerns developing from current Central American mass migration. *DHS' Documents*, Tab A, at *2 ¶ 11. Mr. Miller explains that detention is crucial during instances of mass migration because annual surveys of Central Americans show that one key instigating

900'd                                                                            6I:ZI  ۮI0Z-80-dᴈS

Case 2:85-cv-04544-DMG-AGR  Document 128  Filed 03/13/15  Page 10 of 70  Page ID
#:2138

PAGE 7/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPX0ZMSG/22 * DNIS:6574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 6 of 34

factor is the existence of an "active migration network." *Id.* Immigrants released on bond are considered members of this "network." As a result, allowing detainees to bond out would have "an indirect yet significant adverse" effect on national security as it "undermines the integrity of our borders." *Id.* Mr. Miller attests that immigrants will continue to migrate under the impression that they will be released from detention if a policy favoring release is implemented. *Id.* Also, Mr. Miller explains that significant resources have been directed to the border in order to conduct hearings and investigations, as well as to dismantle criminal smuggling organizations. By reducing the current influx of foreign nationals, including adults with children, from Guatemala, El Salvador, and Honduras, DHS will again be able to reallocate resources to handle "other priorities" such as criminal and dangerous aliens. Further, at least the "no bond, high bond" policy would allow DHS officials more time to screen detainees to properly identify those individuals who present threats to the community and/or national security. *Id.*

The second affidavit provided by Ms. Traci Lembke (acting Assistant Director of Investigative Programs for Homeland Security Investigations) relays many of the same concerns. The only major distinction is that her affidavit places heavy emphasis on the "serious threat" that human trafficking poses to United States national security and immigrants. *DHS' Documents*, Tab B, at *6. The affidavit provides details on the operations of human smuggling organizations and how, by focusing on the border and current mass migration concerns, resources are being redirected from other priorities. *Id.* at *7. Ms. Lembke concludes that "[i]mplementing a 'no bond' or 'high bond' policy would help alleviate these disruptions by deterring future mass migration." *Id.* at *7, ¶ 20.

Both affidavits are critical to the Government's position as they maintain that "national security" concerns substantiate the need for a "no bond, high bond" policy pursuant to *Matter of D-J-*, 23 I&N Dec. 572 (AG 2003). In *Matter of D-J-*, the Attorney General held that Immigration Judges faced with concerns of mass migration must consider national security threats as well as evidence presented by the Government from sources in the Executive Branch with relevant expertise which establishes significant national security interests are implicated. 23 I&N Dec. at 581. Significantly, the Attorney General held that encouraging unlawful mass migration from a foreign country is inconsistent with sound immigration policy and important national security interests and thus, constitutes a "reasonable foundation" for the exercise of discretion to deny a release on bond pursuant to the Act. *Id.* at 579. DHS maintains that the current situation is analogous to that at issue in *Matter of D-J-* and thus, the "no bond, high bond" policy is the best option to be implemented.

Specific to Respondents' requests for release, DHS is unsatisfied with Respondents' evidence as presented. Namely, DHS maintains that no bond is proper in light of Respondents' blatant violations of U.S. immigration law and policy. DHS further argues that Respondents have not shown that they warrant relief under *Matter of Guerra*, 24 I&N Dec. 37, 38 (BIA 2006) or *Matter of Patel*, 15 I&N Dec. 666 (BIA 1976). Thus, DHS posits that given the significant national security concerns and the fact that Respondents have not demonstrated any favorable factors necessary for release, both Respondents have not carried their burden of proof and should remain detained with no bond or, at least a very high family bond.

- 7 -

Case 2:85-cv-04544-DMG-AGR  Document 128  Filed 03/13/15  Page 11 of 70  Page ID
#:2139
PAGE 8/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSG22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 7 of 34

## V.  SUMMARY OF LAW

### A.  The Flores Settlement Agreement

This section will first summarize the procedural posture and relevant holdings that gave rise to
the Flores Settlement Agreement (FSA). It will then outline the relevant parameters of the FSA.
Lastly, it will summarize any subsequent legislation relevant to minors[2] in custody and
persuasive case law arising from the terms of the FSA.

### 1.  History of the FSA

The cases giving rise to the FSA and, in fact what urged the need for the FSA originally, was the
increasing number of unaccompanied juveniles who entered the United States dating all the way
back to the 1980's. *See Reno v. Flores*, 507 U.S. 292, 294, 113 S.Ct. 1439, 123 L.Ed.2d 1
(1993). Based upon a policy adopted to handle the influx of unaccompanied juveniles, the former
Immigration and Naturalization Service (INS) limited the release of detained minors to "a parent
or lawful guardian." *Id.* at 295 (citations omitted). Only where a case presented "unusual and
extraordinary" circumstances could a juvenile be released to "a responsible individual who
agrees to provide care and be responsible for the welfare and wellbeing of the child." *Id.*

Later, in July of 1990, four unaccompanied juveniles initiated a class action lawsuit in the
District Court for the Central District of California challenging the INS policies on
constitutional, statutory, and international law grounds. *Id.* This lawsuit led to the uniform
deportation-exclusion rule (presently 8 C.F.R. §§ 236.3, 1236.3 former 8 C.F.R. §
242.24(1992)), which provided that alien juveniles shall be released to family members in a
descending preferred order so long as those relatives were not in detention, unless INS
determined that the detention of the juvenile was required to secure timely appearance before the
Court. *Id.* at 296-97. A parent or legal guardian in custody could provide an affidavit to
designate a caretaker for the juvenile so long as that custodian executed an agreement to care for
the juvenile and ensure presence at future hearings. *Id.* at 297. Lastly, in unusual and compelling
circumstances and within the discretion of INS, a juvenile could be released to other adults who
executed a care and attendance agreement. *Id.* Juveniles who were unable to be released
remained in "legal custody" at a suitable facility accommodating for juveniles. *Id.* at 298.
Additionally, pursuant to the Alien Minors Care Program implemented by the Department of
Justice, the INS had to place alien juveniles in a facility meeting or exceeding specific standards
within 72 hours of apprehension. *Id. citing See* Memorandum of Understanding Re Compromise
of Class Action: Conditions of Detention, *Flores v. Meese*, No. 85-4544-RJK (Px) (CD Cal.,
Nov. 30, 1987).

---

[2] Although not proper to do so in all contexts, throughout this opinion the Court will use the terms "minor" and
"juvenile" interchangeably. Both the regulations and FSA discussed in this opinion govern "individuals in custody
under the age of eighteen" but the regulations employ the term "juvenile" while the FSA designates them as
"minors." The Court notes that when it references either term in this decision – it is collectively referring to
"individuals in custody under the age of eighteen." *FSA*, ¶10; 8 C.F.R. § 1236.3(a).

- 8 -

PAGE 9/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSG22/22 * DNIS:6074 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 8 of 34

Although this regulation was adapted as an attempt to remedy the class members' concerns, the class decided to maintain litigation as a challenge to the new regulation upon their constitutional claims. *Flores*, 507 U.S. at 289-99. One week after the regulation went into effect, an unpublished decision of the District Court granted summary judgment to the class members and invalidated the former 8 C.F.R. § 242.24 for three reasons: (1) the court ordered INS to release minors otherwise eligible for release to not only the listed parties but also to any "other responsible adult party; (2) it dispensed with the requirement that unrelated caretakers must execute an affidavit; and (3) it rewrote the regulation to provide for an initial determination of prima facie removability and release conditions with review available by an immigration judge. *Id. citing Flores v. Meese*, No. CV 85-4544-RJK (Px) (CD Cal., May 25, 1988). The Ninth Circuit initially reversed the District Court with a divided panel, but subsequently affirmed all the District Court's holdings en banc. *See Flores v. Meese*, 934 F.2d 991 (9th Cir. 1990); *Flores v. Meese*, 942 F.2d 1352, 1365 (1991).

The Ninth Circuit's opinion was appealed to the Supreme Court. Before the Supreme Court, the class members attacked the regulation on constitutional grounds including substantive and procedural due process. The class members also argued that the Attorney General exceeded the authority delegated to her office by enacting the INS regulation. The Supreme Court denied all of the class's claims.

Principally, the Supreme Court held that the parameters of the Juvenile Care Agreement, adopted by the new regulation, did not create a physical restraint so severe as to invoke substantive due process concerns. *Reno* 52 U.S. at 302. Moreover, the Supreme Court reasoned that the class members raised no fundamental rights, and thus, INS only need to advance guidelines which were a "best fit" to protecting the interests of the children. *Id.* The Supreme Court found that this standard was met and therefore, the regulation was valid. The Supreme Court reasoned that juveniles necessarily required some form of "custody" as minors under the law and that no fundamental right, even if one existed, was violated by placing them in the custody of a government institution. *Id.* at 302-303. The Supreme Court went further and stated that if custody is not unconstitutional, neither is it unconstitutional just because it is merely not in the "best interests of the child" to receive private alternative placement. *Id.* Considering the Fifth Amendment, the Supreme Court opined that procedural due process was satisfied without requiring the *automatic* review of decisions by an Immigration Judge. *Id.* at 308-309. Lastly, the Supreme Court held that the Attorney General had not exceeded her discretion because the basis for the regulation was "reasonable" insofar as it struck a balance between the "concern for the welfare of the juvenile" and the fact that INS possessed "neither the expertise nor the resources to conduct home studies for placement of each juvenile released." *Id.* at 310 (citations omitted).

In conclusion, the Supreme Court stated: "We think the INS policy now in place is a reasonable response to the difficult problems presented when the Service arrests unaccompanied alien juveniles. It may well be that other policies would be even better, but 'we are [not] a legislature charged with formulating public policy… [o]n its face, INS regulation 242.24 accords with both the Constitution and the relevant statute.'" *Id.* at 315 (citations omitted). The case was remanded for further proceedings. Those further proceedings gave rise to the FSA.

- 9 -

600 'd                                                        IZ:LT    ⱯⱢOZ-80-dƎS

PAGE 10/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPFAX02MS1/22 * DNIS:6057 4 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 9 of 34

### 2. The FSA

After litigation had been pending for nine years, on January 17, 1997, the parties in the case *Flores v. Reno* reached a settlement agreement. The Flores Settlement Agreement (FSA) was created to set out a "nationwide policy for the detention, release, and treatment of minors in the custody of INS [which] shall supersede all previous INS policies." *FSA,* ¶ 9.

The FSA provided that plaintiffs included all minors (persons under eighteen years of age) who are detained in the legal custody of INS. *Id.* at ¶ 1, 3, 4, 10. Moreover, the class of plaintiffs and defendants referenced within the agreement included all "their agents, employees, contractors, and/or successors in office." *Id.* at ¶ 1.

While the FSA outlines at length the guidelines applicable to the facilities which are set to house juveniles, the most relevant provisions for the issues before the Court today pertain to the release of minors. *See FSA,* ¶ 12-18 (Release Provisions), ¶ 19-23, Exhibit 1 (Custody Provisions).

First, the FSA generally notes that all minors should be expeditiously processed and given proper notice of their rights, including the right to a bond redetermination where applicable. *FSA,* ¶ 12.A. In relation to "expeditious processing," the FSA states that minors should be released or placed in licensed facilities within a certain timeframe of three to five days. *Id.* INS will not be held to this timeline of proper placement without release if, among other circumstances, there is an "emergency or influx of minors into the United States." *Id.* An "influx of minors into the United States shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program…including those who have been so placed or are awaiting such placement." *Id.* at ¶ 12.B.

Setting a "General Policy Favoring Release" the FSA states:

> Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS **shall release a minor from its custody without unnecessary delay**, in the following order of preference, to:
>
> A. a parent;
>
> B. a legal guardian;
>
> C. an adult relative (brother, sister, aunt, uncle, or grandparent);
>
> D. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

- 10 -

Case 2:85-cv-04544-DMG-AGR Document 128 Filed 03/13/15 Page 14 of 70 Page ID #:2142

PAGE 11/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPXODMSG/22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 10 of 34

    E.    a licensed program willing to accept legal custody;

    F.    an adult individual or entity seeking custody, in the discretion of INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

*FSA,* ¶ 14. Before any minor is released pursuant to these rules, a custodian must execute an "Affidavit of Support (Form I-134)" as well as an agreement which states, among more specific details, that the custodian will properly provide for the child, ensure appearance at future proceedings, notify the INS of any change in address, and notify the INS at least five days prior to departing the United States and of any initiation of dependency proceedings. *Id.* at ¶ 15. The INS retains the ability to terminate custody arrangements if the custodian fails to comply with the executed agreement. *Id.* at ¶ 16. Moreover, a positive "suitability assessment" may be required prior to the release of any minor. *Id.* at ¶ 17. If a minor is not immediately released to a relative outlined within the agreement, the "efforts at family reunification shall continue so long as the minor is in INS custody." *Id.* at ¶ 18.

A minor may be held or transferred to a suitable facility, including a secure or medium-security facility, whenever it is determined that the minor "must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees." *FSA,* ¶ 21.

After a determination is made by INS, "[a] minor in deportation proceedings shall be afforded a bond redetermination hearing before an Immigration Judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such hearing." *Id.* at ¶ 24.A. Additionally, any minor who disagrees with his or her placement "in a particular facility" or who contends that the facility of placement "does not comply with the standards set forth in Exhibit 1 attached hereto" may seek judicial review in the United States District Court with jurisdiction and venue. *Id.* at ¶ 24.B. The challenge can cover the placement determination or allege noncompliance with the FSA's standards. *Id.* Any resulting action by a District Court related to an action brought under these provisions "shall be limited...to solely...the individual claims of the minor bringing the action." *Id.*

## 3.    Post-FSA: Legislation and Litigation

Since the date of the FSA's enactment, much in the landscape of immigration law and policy has changed.[3] Most notably, the INS is no longer a federal agency. Instead, the Homeland Security Act (HSA) of 2002 "transferred" the INS to the Department of Homeland Security (DHS), while the Executive Office for Immigration Review (EOIR) remained in the Department of Justice.

---

[3] *See* Rebeca M. Lopez, *Codifying the Flores Settlement Agreement: Seeking to Protect Immigrant Children in U.S. Custody*, 95 MARQ. L. REV. 1635 (2012)(providing a history and background of the Flores Settlement Agreement).

PAGE 12/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXOX02/25 * DNIS:6057 * CSID * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 11 of 34

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. As a result, it has been accepted that DHS and its component part, Immigration and Customs Enforcement (ICE), are the successors to INS and thus, the FSA is binding upon them. FSA ¶ 1 (FSA is stated to be binding upon INS successors); *See Bunikyte v. Chertoff*, 2007 WL 1074070, at \*2 (W.D. Tex. 2007); *see also* H.R. REP. 110-181, 43-44, 2008 (Congressional appropriations committee acknowledging that the FSA is binding upon DHS and ICE and that they must enact policies for compliance).

Additionally, since 1997, the HSA and the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008 have enacted pertinent statutory revisions regarding immigrant juveniles. The HSA set out preliminary procedures for the placement and handling of unaccompanied juveniles. The HSA transferred responsibility for unaccompanied minors to the Office of Refugee Resettlement (ORR) with the directive to create a national plan ensuring that the interests of the child were considered when making care and custody determinations. 6 U.S.C.A. § 279(b)(1)(A). Aside from the creation of ORR, however, little in the way of guidance was actually provided by the HSA.

Thereafter, TVPRA was enacted and subsequently reenacted, with the purpose of preventing illegal human trafficking. Pub. L. No. 110-457, 122 Stat. 5044 (2008). TVPRA contains provisions specific to unaccompanied juveniles including that the juvenile "shall be promptly placed in the least restrictive setting that is in the best interests of the child." TVPRA, § 235(c)(6). Further, TVPRA states that children must be placed in ORR custody within 72-hours of apprehension. TVPRA, § 235(b)(3). All of these provisions are similar to those guidelines contained in the FSA. However, they are limited to unaccompanied minors and do not necessarily enact the entirety of the FSA into law. Consequently, the FSA continues to govern DHS and its policies regarding the detention of minors.

Since the FSA remains controlling, immigrant juveniles have brought various lawsuits pursuant to its provisions in District Courts over the past decade. None of the decisions are published and many provide little insight into the FSA and how it should be applied. In large part, the decisions find that the juveniles who bring suit do not have a cognizable right, fundamental or otherwise, which render DHS' regulations and policies to be improper under the Constitution. *Walding v. United States*, 2009 WL 4930897 (W.D. Texas 2009)("undisputed that the Flores settlement agreement, which is in effect a remedial decree, does not in and of itself confer any constitutional rights upon the plaintiffs"); *see also Walding v. United States*, 2009 WL 902423 (W.D. Tex. 2009). Other decisions deny relief because the plaintiffs cannot sustain their burden against the government under specific causes of action such as *Bivens* claims, injunctive relief, or under the Federal Tort Claims Act. *Fabian v. Dunn*, 2009 WL 2567866 (W.D. Texas 2009)(finding a *Bivens* claim could not be found pursuant to the FSA because there was no respondeat superior liability, among other reasons of this same nature).

Nonetheless, the FSA was utilized to successfully create a settlement agreement that resulted in the closing of the much-publicized Don T. Hutto Family Residential Center ("Hutto"). *In re Hutto Family Detention Center*, Case No. A-07-CA-164-SS (W.D. Texas 2007). The predecessor decision of the District Court that gave rise to the Hutto settlement agreement is extremely

- 12 -

SEP-08-2014  17:22                                                                    P.012

Case 2:85-cv-04544-DMG-AGR  Document 128  Filed 03/13/15  Page 16 of 70  Page ID
#:2144
PAGE 13/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPFAX02/25 * DNIS:6057 * CSID:5INC * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 12 of 34

enlightening on the FSA and its role today. In *Bunikyte v. United States*, the minor plaintiffs
brought suit stating that the Hutto family facility was not properly licensed or compliant with the
terms of custody generated for minors under the FSA. 2007 WL 1074070, at *6-15. The
plaintiffs further alleged that the FSA created a favored policy of release for minors and that this
policy mandated the children and their detained parents be released. *Id.* at *16-20.

First, the District Court discussed that immigration policy, particularly regarding the release of
family groups, has critically changed since the tragedies of September 11, 2001 insofar as there
are more restrictive policies in place with tougher enforcement and broad expedited removal of
illegal aliens throughout the country. *Id.* at *1. As the plaintiffs brought their claim pursuant to
the FSA, in light of this change in policy, the District Court observed:

> Of course, the provisions of this settlement agreement, entered into over ten years
> ago, were never intended to be permanent authority, much less the only binding
> authority setting standards for the detention of minor aliens. The Flores
> Settlement was intended as a stopgap measure until the United States could
> promulgate reasonable, binding standards for the detention of minor[s] in
> immigration custody. Flores remains in force until "45 days following defendants'
> publication of final regulations implementing this Agreement." [ ] Yet the United
> States does not contest that the Flores settlement is still in effect. Despite the
> passage of just over a decade, neither DHS nor Congress has yet promulgated
> binding rules regarding the standards for the detention of minors. In fact, it
> appears that Flores is the only binding legal standard directly applicable to the
> detention of minor aliens by the United States government, despite the passage of
> time and the drastic changes in immigration policy since this judgment was first
> enacted.

*Id.* at *2. The District Court went on to state that it is no defense that the FSA may be outdated,
but it is "apparent the FSA did not anticipate the current emphasis on family detention, where the
parole of adult family members is limited by acts of Congress and the judicial branch." *Id.* at *3.

With ultimately finding that the FSA was still binding upon the parties[4], the District Court stated
that the FSA governs procedure for all minors in the custody of ICE and DHS. *Id.* Further, the
District Court reasoned that the FSA favored the release of minors when possible pursuant to the
standards set out by the FSA's provisions so long as detention is not necessary to secure the
minor's appearance in immigration court and there were no safety concerns for the minor or the
public. *Id.* After considering the applicable terms of the FSA, the opinion states that judicial
review of ICE's detention policy for a specific minor is guaranteed review before an immigration
judge, unless like the plaintiffs in this case, they are arriving aliens without right to that review.
*Id.* at *4. In those circumstances, it is valid that the plaintiffs bring suit in District Court pursuant
to the FSA's provisions governing that form of valid jurisdiction. *Id.*

---

[4] "The Settlement Agreement is, in essence, a Court-approved contract binding on ICE and DHS. *See e.g. United
States v. ITT Continental Baking Co.,* 420 U.S. 223, 237, 95 S.Ct. 926, 43 L.Ed.2d. 148 (1975). It is also a court
order directing the parties to comply with its terms. *Id.* at n.10." *Bunikyte,* at *8.

- 13 -

PAGE 14/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXOX2NS/22 * DNIS:6057 * CSID:22SWZOXAVN:RNS * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 13 of 34

Considering all the plaintiffs' allegations, the District Court determined that the Hutto facility was likely in violation of the FSA's operating standards. *Bunikyte*, at *16. However, the District Court held it could not grant injunctive relief because, although there was a likelihood of success on the merits, the relief sought by plaintiffs was unsupported by the FSA. Namely, plaintiffs sought "immediate release from Hutto *with their parents* as a remedy for Defendants' alleged *Flores* violations." *Id.* (emphasis in original). "The Flores settlement, however, does not provide any particular rights or remedies for adult detainees." *Id.*

## B.   Immigration Judges – Authority and Custody Determinations

Immigration judges are creatures of statute; they receive powers and duties directly from Congress or by delegation from the Attorney General. 8 U.S.C.A. 1252(b); 1103; *see also Lopez-Telles v. INS*, 564 F.2d 1302, 1303 (9th Cir. 1977). An immigration judge is generally limited to making determinations regarding the grounds of removability as well as whether there has been an abuse of discretion by DHS in the exercise of its particular discretionary powers. *Lopez-Telles*, 564 F.2d at 1304.

The regulations promulgated by the Attorney General have the force and effect of law. *Matter of Cubor-Cruz*, 25 I&N Dec. 470, 471 (BIA 2011) *citing* INA §103(a), 8 U.S.C. § 1103(a); *Matter of Anselmo*, 20 I&N Dec. 25, 30 (BIA 1989); 8 C.F.R. §§ 1003.1(d)(1)(i), 1003.10(b). Courts construe the language of the regulations following the same principles of interpretation applied to statutory provisions. *Id. citing Matter of Villarreal-Zuniga*, 23 I&N Dec. 886, 889 (BIA 2006). "Regulations, like statutes, must be interpreted to give effect to the entire regulatory scheme." *Id.* at 471-72, *citing Matter of C-W-L-*, 24 I&N Dec. 346, 348 (BIA 2007). However, the regulation that specifically addresses the issue at hand is controlling. *Id.* at 472 (citations omitted).

One of the specific areas designated to the Attorney General is that of custody determinations regarding aliens within the United States. Specifically, pursuant to section 1102 of the HSA, "the Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to [the HSA], although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether the alien will remain in custody during removal proceedings." *Matter of D-J-*, 23 I&N Dec. 572, 574, n.3 (A.G. 2003).

Subject to certain exceptions, the Attorney General may arrest and detain an alien pending a decision on whether the alien is to be removed from the United States. INA § 236(a)(1). Likewise, the Attorney General has the power to release the alien on either a bond of at least $1500 with security and conditions or on conditional parole. INA § 236(a)(2). Nevertheless, the Attorney General retains the power to revoke a bond or parole authorized pursuant to the Act at any time under the original warrant. INA § 236(b). Section 236 of the Act does not give a detained alien any right to be released on bond; rather, the Attorney General exercises broad discretion and has the ability to release a detained alien if he concludes such action is warranted. *Carlson v. Landon*, 342 U.S. 542, 534 (1952).

- 14 -

PAGE 15/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXX02MS/22 * DNIS:6057 4 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 14 of 34

As section 236 of the INA conveys this authority to the Attorney General, that authority has
explicitly been delegated to Immigration Judges by regulation at 8 C.F.R. §§ 1003.19, 1236.1(d).
Pursuant to this authority, the Immigration Judge may "exercise the authority in section 236 of
the Act...to detain the alien in custody, release the alien, and determine the amount of bond, if
any, under which the respondent may be released[.]" 8 C.F.R. § 1236.1(d).

With this authority, certain guidelines for custody determinations have been promulgated by the
Board of Immigration Appeals (BIA). Prominently, an alien must establish to the satisfaction of
the Immigration Judge that he or she does not present a danger to persons or property, is not a
threat to national security, and is not a flight risk or likely to abscond. *Matter of Guerra*, 24 I&N
Dec. 37, 38 (BIA 2006); *see also Matter of Patel*, 15 I&N Dec. 666 (BIA 1976). Despite these
traditional factors that should be considered, it is still consistently recognized that the Attorney
General has extremely broad discretion in deciding matters of custody. *Id.* at 39. As a result, the
Act does not limit an Immigration Judge to only these three factors in determining whether to
detain an alien pending the outcome of removal proceedings. *Id.*

Other factors offered by the BIA for consideration are: (1) whether the alien has a fixed U.S.
address; (2) the alien's length of residency in the U.S.; (3) the alien's family ties to the U.S. as
well as whether those ties may result in relief for the alien; (4) employment history; (5) the
alien's record of appearance in court; (6) the alien's criminal history, including that history's
recency, extensiveness, and seriousness; (7) the alien's history of immigration violations; (8) any
attempts by the alien to flee prosecution or authorities; and (9) the alien's manner of entry into
the U.S. *Guerra*, 24 I&N Dec. at 40 (citations omitted). Also, as a general rule, it is found that
those respondents with a greater likelihood of being granted relief have a greater motivation to
appear for his or her hearing. *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

## C.    Bond and Conditional Parole

Traditionally, an Immigration Judge conducts bond redeterminations for adult aliens in the
custody of DHS. The Immigration Judge has the authority to conduct bond and custody
proceedings under 8 C.F.R. §§ 1003.19, 1236.1; *see also* INA § 236. Bond redeterminations are
well developed under the law and typically involve a weighing of the factors discussed above in
the preceding section of this opinion.

Despite this area of the law being well founded with many guidelines for general practice, the
proper avenues for release regarding juveniles in family detention is much less obvious. The
regulations actually assume that release is conducted by bond, parole, or release on recognizance
by the time a custody determination is necessary. 8 C.F.R. § 1236.3(b). Both the FSA and
regulations apply obligatory language ("shall be released"), but provide no actual guidance on
how such a release is to be effectuated under the regulatory jurisdiction of an Immigration Judge.
And, of particular concern to this Court, where a custodian is available and the minor presents no
risk of flight or danger, it could be improper to issue a bond against the minor in light of such
compulsory language, especially considering that their "unaccompanied minor" counterparts in
family detention do not face these same issues. Instead, unaccompanied minors are either
released by DHS or placed in an ORR facility – few, if any, reach the level of necessity where he

P.016                                                                                        SEP-08-2014  17:24

PAGE 16/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXOZAPM/22 * DNIS:6057 4 * CSID: * DURATION (mm-ss):16-12

Case 2:85-cv-04544-DMG-AGR Document 128 Filed 03/13/15 Page 19 of 70 Page ID
#:2147

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 15 of 34

or she must challenge their custody in a family facility before an Immigration Judge, as is the case here. *See generally* TVPRA § 235(b)(3).

DHS' regulations provide express guidance that juveniles may be paroled into the United States pursuant to section 212(d)(5) of the Act. 8 C.F.R. § 212(b)(3). In particular, DHS' regulations state that juveniles eligible for release pursuant to 8 C.F.R. § 236.3 (the exact companion to EOIR's 8 C.F.R. §1236.3) may be paroled into the custody of a preferred adult for "urgent humanitarian reasons" or "significant public benefit" if he or she presents neither a security risk nor a risk of absconding. 8 C.F.R. §212(b)(3).

While this may be a viable option for DHS officials, the Immigration Judge's power to "parole" aliens has been a long-standing point of controversy. The BIA has consistently held that DHS is the sole entity possessing the power to parole an alien into the United States by way of 8 C.F.R. § 212(a). *Matter of Matelot*, 18 I&N Dec. 334, 336 (BIA 1982). According to this precedent, because of the Attorney General's express delegation of the parole power, neither Immigration Judges nor the BIA has jurisdiction to exercise the parole powers. *Id. citing Matter of Castellon*, 17 I&N Dec. 616 (BIA 1981); *Matter of Niayesh*, 17 I&N Dec. 231 (BIA 1980); *Matter of Lepofsky*, 14 I7N Dec. 718 (BIA 1974); *Matter of Conceiro*, 14 I&N Dec. 278 (BIA 1973). The Court does not dispute that it lacks jurisdiction to parole aliens into the United States under section 212 of the Act. However, since this is a regulatory avenue available to DHS that is not readily available to this Court, what then is the proper mechanism for this Court (where bond may be improper) to release a juvenile? *See* 8 C.F.R. § 1236.3.

Pursuant to 8 C.F.R. § 1003.19(d), this Court has been delegated all authority available to the Attorney General under section 236 of the Act, which expressly includes the ability to "conditionally parole" aliens pending the outcome of removal proceedings. INA § 236(a)(1)(B). Although this Court cannot parole in the same fashion as DHS, it may conditionally parole a juvenile to effectuate his or her proper release pursuant to 8 C.F.R. § 1236.3.

Circuit Courts and the BIA alike have recognized that the power and effects of "parole" and "conditional parole" are not one in the same. *Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010) *aff'd Castillo-Padilla v. Attorney General*, 417 Fed.Appx. 888 (11th Cir. 2011)(unpublished).[5] Namely, the BIA has held that a "release from custody on conditional parole does not amount to being paroled into the United States." *Id.* at 258. Comparing "parole" under section 212 of the Aet and "conditional parole" under section 236 of the Act, the BIA explained that "parole" requires urgent humanitarian concerns or a public benefit with strict conditions, whereas "conditional parole" inheres no such restrictions and instead "the alien is merely released from detention 'pending a decision on whether the alien is to be removed from the United States.'" *Id.* at 259 *citing* INA § 236. The BIA continued to reason that the authority to make custody determinations under section 236 of the INA is shared by both the Attorney General and Secretary of Homeland Security, but that section 212 of the Act is separate and

---

[5] *See also Ortega-Cervantes v. Gonzales*, 501 F.3d 1111 (9th Cir. 2007)(deferring to *Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010) in its entirety); *Cruz-Miguel v. Holder*, 650 F.3d 189 (2nd Cir. 2011)(the same); *Delgado-Sobalvarro v. Attorney General*, 625 F.3d 782 (3d Cir. 2010)(the same).

Case 2:85-cv-04544-DMG-AGR  Document 128  Filed 03/13/15  Page 20 of 70  Page ID
#:2148
PAGE 17/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXOZMS22 * DNIS:6057/4 * CSID * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 16 of 34

exclusively delegated to DHS. *Id.* at 261. Because the Attorney General no longer possesses the
power to parole under section 212(d)(5)(A), "it would be inconsistent with the regulations to
consider the two types of parole as equivalent." *Id.* Based on the foregoing, the BIA concluded
that an alien who is "conditionally paroled" under section 236 of the INA gains no benefits for
relief akin to those received under section 212 of the Act; rather, a conditionally paroled alien is
merely released from custody pending the outcome of his or her removal proceedings. *Id.* at 261-
63.

Despite this case law and the contradictory precedent stating that an Immigration Judge has "no
parole authority," the BIA has consistently declined in unpublished decisions to outline the
parameters of the Immigration Judge's authority to conditionally parole aliens under section 236
of the INA.[6] The only point provided by the BIA on the subject directly is an implication that the
features of conditional parole may actually "present more onerous conditions on a respondent
than the minimum bond" set by an Immigration Judge. *See In re Sanchez-Tello*, A 200 670 873,
2011 WL 1792611, at \*1, n. 1 (BIA 2011).

## VI.    FINDINGS AND ANALYSIS

### A.    The Applicability of the FSA

It is evident that the FSA remains valid and controlling upon ICE today. Various sources confirm
this contention including the express terms of the FSA, law interpreting settlement agreements,
FSA litigation, Congressional directives, and ICE internal operating policies.

The FSA was amended by stipulated order to indicate that it would remain in effect until "45
days after the federal government promulgates final regulations implementing the Agreement."[7]
It is clear from a multitude of sources that no such regulations have been enacted to establish
compliance with the FSA and its terms.[8] Accordingly, the Court finds that, as a general matter,
the FSA and its terms still govern custody determinations for minors.

---

[6] *See In re Navarro-Solajo*, A 087 966 841, 2011 WL 1792597, at \*1, n.1. (BIA 2011)("We acknowledge the
respondent's argument that he should have been released on conditional parole pursuant to section 236(a)(2)(B) of
the Act. It is not necessary here to address the extent of an Immigration Judge's authority as to conditional parole. A
release on conditional parole as provided under section 236(a)(2)(B) of the Act could present more onerous
conditions on a respondent than the minimum bond set by the Immigration Judge in this case. Moreover, the
respondent requested and was granted the minimum bond. The Immigration Judge's decision to impose a monetary
bond was the proper disposition for this case.").

[7] *Flores v. Reno*, Case No. CV 85-4544-RJK(Px), Stipulation Extending the Settlement Agreement and for Other
Purposes, and Order Thereon (C.D. Cal., Dec. 7, 2001) (copy on file with the authors). A settlement agreement is a
court-approved contract binding upon its parties as well as a court order directing parties to comply with its terms.
*U.S. v. ITT Continental Baking Co.*, 420 U.S. 223, 237 (1975). Neither party can "unilaterally avoid a material
contract term" to render the agreement void. *See Police Ass'n ex rel Cannatella v. City of New Orleans*, 100 F.3d
1159, 1173 (5th Cir. 1996).

[8] *See Bunikyte v. United States*, 2007 WL 1074070 at \*2; *see also* H.R. REP. 110-181, 43-44, 2008 U.S.C.C.A.N.
1336, 1376-77(recognition by the House Appropriations Committee that the Flores Settlement Agreement is binding
upon DHS, ICE, and ORR and mandating compliance with the terms therein); Juvenile Protocol Manual, *Juvenile
Aliens:       A       Special       Population*,       at       \*2,       (2006)       *available       at*
http://www.ice.gov/doclib/foia/dro_policy_memos/juvenileprotocolmanual2006.pdf (attaching the FSA as an exhibit

Case 2:85-cv-04544-DMG-AGR   Document 128   Filed 03/13/15   Page 21 of 70   Page ID
#:2149
PAGE 18/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPFAX02M2/25 * DNIS:6057 4 * CSID: * DURATION (mm-ss):16-12

What seems more difficult to discern is who is bound by the terms of the FSA. The Government
argued before this Court that the FSA is only binding upon the Office of Refugee Resettlement
("ORR"). Respondents contend that DHS and ICE are both bound by the FSA as successor
agencies to INS. *See FSA*, ¶1. The Court agrees with Respondents.

The language of the FSA is unambiguous. The defendants bound by the FSA as bargained for by
INS, includes "their agents, employees, contractors, and/or successors in office." *Id.* At least one
court has found, and ICE has seemingly conceded within its own policies, that DHS and ICE are
bound by the FSA under its plain language. *See Bunikyte v. United States*, 2007 WL 1074070 at
*3; *see also* Juvenile Protocol Manual, *Juvenile Aliens: A Special Population*, at *2, (2006)
*available at* http://www.ice.gov/doclib/foia/dro_policy_memos/juvenileprotocolmanual2006.pdf.
This conclusion is habitually reached by way of the express language of the Homeland Security
Act (HSA) that created DHS and ICE. Specifically, the HSA "transferred" the INS and its
responsibilities to DHS. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135,
2178. Consequently, DHS is the successor agency to INS and became a "defendant" within the
parameters of the FSA. *See also Bunikyte*, at *2 ("The *Flores* settlement is binding on ICE and
DHS as successor organizations to INS."). The Court finds, on account of these cumulative
sources, that the FSA is binding upon DHS and ICE.

Aside from arguing that the FSA is not binding upon ICE, the Government also contends that the
FSA only applies to "unaccompanied minors" as opposed to all minors.[9] It would follow then
that Minor Respondent is not covered by the Flores Agreement because, while he is fourteen
years of age, he is accompanied by his mother. Though the Court understands DHS' argument, it
disagrees and finds it to be a patently incorrect interpretation of the FSA.

The provisions of the FSA expressly indicate that, while unaccompanied minors were the actual
plaintiffs in the lawsuit, the entire class action was certified to encompass all minors in INS
custody. This is supported by the background, definitions, and class description sections of the
FSA. *FSA*, ¶1, 3, 4, 10. Specifically, the FSA states that "Plaintiffs" includes "all class
members." *FSA*, ¶1. "Class member(s)" applies to persons described in paragraph 10. *FSA*, ¶3.
Paragraph 10 of the FSA states: "The certified class in this action shall be defined as follows:
'All minors who are detained in the legal custody of the INS.'" *FSA*, ¶10. The term "minor(s)" is
defined as "any person under the age of eighteen (18) years who is detained in the legal custody
of INS." *FSA*, ¶14. It seems that, although the actual plaintiffs were unaccompanied minors, the
FSA was designed to create a nationwide policy for the detention of all minors, not only those

---

and acknowledging that it sets out many "common-sense principles" for the detention of juveniles which comprise a
binding policy on ICE operations); *see generally* Congressional Research Service, *Unaccompanied Alien Children –
Legal Issues: Answers to Frequently Asked Questions*, at *3-4, July 18, 2014, *available at*
http://fas.org/sgp/crs/homesec/R43623.pdf.

[9] In essence, this argument would bolster DHS' position that only ORR is bound by the FSA because only ORR
handles unaccompanied minors. Presently, within DHS, ICE handles the detention and enforcement of all aliens in
custody, including minors who enter the country with adults, and is in charge of detaining unaccompanied children
until they can be placed in an ORR facility. 6 U.S.C. §§251, 279(b)(1)(A), 291.

810'd                                                                                    SZ:LL   7l0Z-80-d3S

PAGE 19/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO2MS22/2 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 18 of 34

who are unaccompanied. *See FSA*, ¶9. This interpretation of the FSA and its reach is confirmed by persuasive case law confronting issues under the FSA as well as general policy guidance issued by ICE. *Bunikyte*, at *3 ("The *Flores* Agreement, by its terms, applies to all 'minors in custody' of ICE and DHS, not just unaccompanied minors."); *see also* ICE Juvenile Protocol Manual, *Juvenile Aliens: A Special Population*, at *2, (2006). As such, the Court finds that the FSA is designed to cover **all minors** as opposed to the more narrow interpretation of only unaccompanied minors.

Therefore, the Court concludes overall that the FSA is binding upon DHS and ICE to govern custody determinations for all minors, including Minor Respondent in this case.

## B. FSA and Immigration Courts

Pursuant to this Court's regulatory authority to conduct custody redeterminations, it finds that it must contemplate the FSA either because, it too is quasi-bound by its terms or because ICE is bound by its terms and both the FSA and regulations indicate that release of minors under the circumstances presented in this case is generally proper.

To some extent, it appears that EOIR could be bound by the FSA as a legacy component of INS. Although EOIR was in existence prior to the creation of the FSA, the FSA governs custody determinations and the successor agencies of INS which handle those determinations. It is clear from the terms of the HSA that the power of INS to render custody determinations is split and shared between EOIR and DHS. The HSA made evident that pursuant to section 103(g) of the Act, the Attorney General retained all authorities and functions delegated by law prior to the HSA's enactment. Effectively, this means that the Attorney General retained his power to render custody determinations pursuant to section 236 of the Act, but that the power will be shared with the Secretary of Homeland Security who must render initial custody determinations in removal proceedings. INA §103(a); Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2274. As the power to manage the custody of minors is shared, it would appear that the responsibility to comply with the FSA would also be shared.[10]

Regardless of whether responsibility under the FSA is shared with this Court, at a minimum, the Court must consider the FSA's parameters in custody redeterminations as those guidelines are binding upon ICE and a necessary component of ICE's initial custody determination. The importance of this reality becomes especially apparent considering that the Attorney General is the only authority able to review the custody determinations made by ICE – there is no other

---

[10] On its face, this seems logical. However, the Court does not rest its decision to contemplate the FSA on these grounds alone. In large part, this is because the FSA does not designate EOIR as a party to the agreement although it could have done so in its plain language. Cases interpreting the FSA as binding authority apply the tenants of contract law and thus, such an omission within the FSA could render the plausibility of EOIR's part in the FSA to be attenuated at best. *See Bunikyte*, at *8 ("The Settlement Agreement is, in essence, a Court-approved contract binding on ICE and DHS. *See e.g. United States v. ITT Continental Baking Co.*, 420 U.S. 223, 237, 95 S.Ct. 926, 43 L.Ed.2d. 148 (1975). It is also a court order directing the parties to comply with its terms. *Id.* at n.10."). The Court does not reach a conclusion as to whether the FSA is or is not binding upon this Court; rather, it finds that the FSA should be applied because the very authority that is at issue in the FSA is in fact shared by EOIR and DHS.

P.019                                                                              SEP-08-2014  17:26

Case 2:85-cv-04544-DMG-AGR Document 128 Filed 03/13/15 Page 23 of 70 Page ID #:2151

avenue for relief under the Act or FSA excepting limited circumstances regarding habeas petitions in federal court. *See* INA § 236(e)("The Attorney General's discretionary judgment regarding…this section shall not be subject to review…[n]o court may set aside any action or decision…regarding the detention or release of an alien[.]"); INA § 236A(b)(1)("Judicial review of any action or decision relating to this section…is available exclusively in habeas corpus proceedings…[e]xcept as provided in the preceding sentence, no court shall have jurisdiction to review, by habeas corpus petition or otherwise, any such action or decision.")[11]. To conclude otherwise would effectively allow ICE complete control over custody determinations regarding minors which is not the intent of the INA or HSA.

Furthermore, to consider the FSA in custody redeterminations regarding the release of minors goes hand in hand with applying 8 C.F.R. §§ 236.3, 1236.3, identical regulations which govern minor custody status for both DHS and EOIR. These regulations adopt language that is highly analogous to the language of the FSA. This is logical considering that the regulations were a product of the litigation that gave rise to the FSA. Significantly, both the FSA and regulations govern persons under the age of eighteen ("juveniles" or "minors") and explain that those persons "shall be released" to certain persons enumerated as a parent, guardian, or other adult relative (brother, sister, aunt, uncle, or grandparent). 8 C.F.R. §§ 236.3, 1236.3; *FSA*, ¶14. The regulations also indicate that these "juveniles" shall be released upon the posting of a bond, with conditional parole, or on their own recognizance. 8 C.F.R. §§ 236.3, 1236.3. As the binding regulations and FSA embrace the same policy favoring release of these juveniles under particular circumstances, it would appear that both are relevant to the Court's custody determination for Minor Respondent.

Lastly, while Immigration Judges may not be compelled to enforce the FSA's provisions, this Court finds it should, at the very least, consider the FSA and "best interests of the child" in rendering custody determinations as a matter of discretion. *Matter of Guerra*, 24 I&N Dec. 37, 38 (BIA 2006)(holding that the Court has wide discretion in the factors it may consider when acting pursuant to the Attorney General's authority under section 236 of the Act).

Therefore, whether it is as a party to the FSA, pursuant to governing regulations, or under the Attorney General's broad discretionary authority, this Court must consider and apply the terms of the FSA to the extent it does not conflict with controlling statutes and regulations. And,

---

[11] The FSA seemingly embraces this reality within its own terms as well. It indicates that a minor may bring suit in District Court due to a disagreement "with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards …attached hereto[.]" *FSA*, ¶24.B. Meanwhile, it leaves the jurisdiction of a "bond redetermination" to the immigration judge. *FSA*, ¶24.A. While the FSA expressly sets out terms for the release of minors, nowhere within its language does it provide a relevant jurisdictional provision to contest the initial determination whether a minor should or should not be released. Considering the authority delegated to the Attorney General, as well as the mandatory bond redetermination required by the FSA, it seems that the FSA inherently accepts that the review of the initial custody determination made by ICE is reviewable in a "bond redetermination." This conclusion is only supported further by the fact that bond and custody redeterminations are all governed by the exact same statutes and regulations.

Case 2:85-cv-04544-DMG-AGR Document 128 Filed 03/13/15 Page 24 of 70 Page ID
#:2152

PAGE 21/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPXOXDMS22/2 * DNIS:6052 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **20 of 34**

because the FSA is controlling upon DHS, as a matter of discretion this Court will consider the policy and provisions of the FSA in rendering its custody redetermination.

## C.    Custody Redetermination of Minor Respondent

Contemplating the statutes and regulations binding upon this Court, as well as the FSA and BIA precedent, the Court will consider various factors in rendering its custody determination for Minor Respondent.

Preliminarily, to "whom" Minor Respondent shall be released will be governed by regulations binding upon this Court. *See* 8 C.F.R. §1236.3. Next, as both the FSA and BIA precedent analyze certain factors, those factors will undeniably be considered by this Court in the decision at hand. Specifically, the Court will consider if Minor Respondent is a flight risk, if he is a national security threat, and if he posits a danger to the community. Other factors normally considered by the BIA in adult custody determinations, such as the likelihood of success on an underlying claim of relief, family ties, a permanent address, and criminal history are also relevant to this Court's determination and will be briefly considered.[12] Lastly, the Court will examine other pertinent factors that relate specifically to those custody determinations regarding minors. In particular, the Court will consider the best interests of the child as well as conduct a fact-specific inquiry as to whether there is sufficient documentation to support release of Minor Respondent to the designated custodian. Such an analysis will provide a reasonable evaluation of the unique discretionary factors apparent in this case while also dispelling any implications that advocating release of Minor Respondent effectively creates a "catch-and-release" policy. *See Bunikyte*, at *2(noting that family detention may be favored over automatic release of family units because release only encourages parents to subject their children to the dangers of illegal immigration.).

### 1.    Custodian for Release

As briefly touched upon previously, the FSA and regulations governing the release of minors are extremely similar. The FSA and 8 C.F.R. § 1236.3 adopt almost analogous lists of criteria to establish a proper custodian by order of preference, as (1) a parent; (2) a legal guardian; and (3) other adult relative (brother, sister, aunt, uncle, or grandparent). *FSA*, ¶14; 8 C.F.R. § 1236.3(b)(1). Further, both indicate that the parent or guardian, if otherwise unavailable to accept responsibility for the minor, may designate an adult individual by way of an affidavit to accept responsibility for the minor in his or her stead. 8 C.F.R. § 1236.3(b)(4). Critically, both

---

[12] The Court designates these factors as critical because it is probable that in most instances involving minors, some of the factors proposed by the BIA will be irrelevant. Principally, employment history, manner of entry, and evidence of other immigration violations are difficult to weigh against a minor respondent. Minors generally have no employment history and, if a minor enters with his or her parent, it would be difficult to render them ineligible for release where that minor enters illegally at the direction of an adult respondent. *See Plyler v. Doe*, 457 U.S. 202, 223 (1982)(acknowledging that children should not be stigmatized or receive a lifetime of hardship due to their illegal status in party because they are "not accountable for their disabling status."). As such, although these are factors that could possibly be important to a minor Respondent, they are the least so and the Court will not necessarily reach them in rendering this decision.

- 21 -

PAGE 22/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02NGS22 * DNIS:6057 4 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 21 of 34

provisions indicate that the minor **"shall be released"** from detention to a custodian. *Id.*
(emphasis added).

Although the bulk of the FSA and regulation are similar, they begin to differ after the foundation
criteria. The regulation dictates that the minor shall be released first to a parent, guardian, or
other adult relative who is not detained and, only where those individuals are unavailable, may a
minor be released to a parent, legal guardian, or adult relative in detention. 8 C.F.R. §
1236.3(b)(1)(iii). More specifically, "simultaneous release of the juvenile and the parent, legal
guardian, or adult relative shall be evaluated on a discretionary case-by-case basis." *Id.* The
regulation goes on to consider less preferential means for release of a minor and states that a
parent or legal guardian may submit an affidavit for the release of the minor to a specific third-
party, or that under unusual and compelling circumstances, a juvenile can be released to another
adult not within the list who executes an agreement to ensure the juvenile's well-being and
presence at all future proceedings. 8 C.F.R. §§ 1236.3(b)(3), 1236.3(b)(4).

In contrast, the FSA, also in descending order of preference after a parent, legal guardian, or
adult relative, states that a minor shall be released to an adult individual or entity designated by a
parent or custodian who is capable of caring for the child, a licensed program willing to accept
legal custody, or an adult individual or entity seeking custody, in the discretion of DHS, if there
is no likely alternative to long-term detention and family reunification does not appear to be a
reasonable possibility. *FSA,* ¶14.

At least one District Court has considered the apparent rift between the FSA and conflicting
regulations and determined that the inconsistency is a product of the rise in the number of minors
in family detention. The District Court for the Western District of Texas, in an unpublished
opinion, reasoned the following:

> The *Flores* Settlement was drafted in response to the complaint of
> *unaccompanied* minor aliens. Its provisions, though applicable to minors detained
> with their families, do not specifically contemplate family detention. Though
> family unification is a stated goal of both the Flores Settlement and U.S.
> immigration policy generally, nothing in the settlement agreement expresses a
> preference for releasing parents who have violated immigration laws.

> ...

> [I]t appears possible for ICE to comply fully with the settlement terms by
> releasing the children to adult relatives not in custody, adult friends designated by
> their parents, or even state-operated foster care. ... It therefore appears that
> nothing in this rule [8 C.F.R. §§ 236.3, 1236.3] or in the terms of the Flores
> settlement would prevent release of the children to an adult relative not in ICE
> custody.

*Bunikyte,* at *16-*17(emphasis in original). Therefore, although the District Court recognized
that there appeared to be a critical inconsistency between the FSA and regulation, it concluded

- 22 -

PAGE 23/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02KM2S22 * DNIS:6057 * CSID:SNG * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 22 of 34

that that there was no actual inconsistency through implementation. Instead, in instances
involving family detention, the District Court concluded that the outcome under the FSA and
regulations would be the same – a preference of release to a non-detained individual.

Accordingly, applying the same logic, this Court will apply the hierarchy prescribed by 8 C.F.R.
§1292.3 and, in doing so, will be applying the policy and provisions of the FSA.

In Minor Respondent's case, his mother is currently detained. Although minor Respondent's
father is not presently in DHS custody, neither Respondent advocates for the release of Minor
Respondent to his father. Rather, they advocate release of Minor Respondent to his adult aunt as
his "other relative." The Court finds that this designation is valid and, if Minor Respondent is to
be released, he will be released to his aunt Rosa Mundo.

## 2.  Flight Risk, Safety Concerns, and National Security

The statutes, regulations, FSA, and BIA precedent all indicate that this Court must consider
certain factors in rendering custody determinations for minors and, in fact, all aliens in custody.
In particular, the FSA and BIA mandate that this Court consider if Minor Respondent is a flight
risk and whether or not detention is required for his own safety or the safety of others. *FSA*, ¶14,
¶21; *Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006).

### a.  Flight Risk

Typically, a detained alien will be deemed a flight risk and will remain detained if it is
determined that his detention is necessary to secure timely appearance before DHS or the
Immigration Court. *Matter of Ellis*, 20 I&N Dec. 641, 643 (BIA 1993). In most cases, an
individual is deemed to present a lesser flight risk if he or she is statutorily eligible for any form
of relief. *Id.*; *see also Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987). Moreover, certain
factors evidence a lesser or greater risk such as stable employment history, a significant length of
residence in the community, the existence of family ties, a record of nonappearance at court
proceedings, and previous criminal or immigration law violations to determine if he or she is a
poor bail risk. *Andrade*, 19 I&N Dec. at 489.

The FSA adopts the proposition that a minor who presents a flight risk is ineligible for release.
*FSA*, ¶14 ("Where the INS determines that the detention of the minor is not required…to secure
his or her time appearance before…the immigration court…the INS shall release the minor from
its custody without unnecessary delay[.]"). Further, a minor who is an "escape-risk" may be
subjected to mandatory juvenile detention. *FSA*, ¶21("a minor may be held in or transferred to
a… juvenile detention facility or INS detention facility…whenever…[it is determined] that the
minor …is an escape-risk."). Under the FSA, in determining whether a minor constitutes an
"escape-risk" factors to be considered include, but are not limited to, whether the minor is
currently under a final order of removal, if the minor's immigration history indicates a breach of
bond, failure to appear before any agency, or evidence that the minor is indebted to organized

- 23 -

SEP-08-2014  17:27                                                                                          P.023

Case 2:85-cv-04544-DMG-AGR   Document 128   Filed 03/13/15   Page 27 of 70   Page ID
#:2155
PAGE 24/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX03MSG/22 * DNIS:6057A * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 23 of 34

smugglers, and if the minor has previously absconded or attempted to abscond immigration
custody. *FSA*, ¶22.

Considering both sets of factors, and giving all equal weight, the Court finds that Minor
Respondent does not present a substantial flight risk. In particular, Minor Respondent has
already filed a claim for asylum and that claim is entirely based upon his own fears of returning
to El Salvador. Group Exh.1, Tab I. In addition, Minor Respondent has no previous criminal or
immigration law violations and has significant family ties to the Houston, Texas area. Minor
Respondent is too young to possess a stable employment history and thus, this factor will not
count for or against his case.

The only negative factors of record are Minor Respondent's length of residency and manner of
entry. Minor Respondent has not resided in his community for any significant amount of time –
his only residency in the United States is limited to his time in detention. Moreover, the manner
of his entry is troublesome to the Court. Lead Respondent indicated that they paid a smuggler
and knowingly entered the United States illegally by raft. While the Court recognizes the
enormity of these actions, it finds that they carry lesser weight in this case as Minor Respondent
entered the United States illegally at the direction of his mother, his parent and the adult figure in
his life. *See Plyler v. Doe*, 457 U.S. 202, 223 (1982)(acknowledging that children should not be
stigmatized or receive a lifetime of hardship due to their illegal status in part because they are
"not accountable for their disabling status."). Also, the evidence does not suggest that Minor
Respondent owes the smuggler an outstanding sum or that he ever evaded authorities. Such
circumstances further diminish the severity of Minor Respondent's actions. This too is in light of
the fact that Minor Respondent does not present an extensive history of immigration law
violations or any other criminal history.

Considering Minor Respondent's vulnerable position as a juvenile, as well as the facts in Minor
Respondent's case, it is clear he does not present a flight risk. As such, Minor Respondent has
met this requirement to secure his release pursuant to both the FSA and regulations.

### b.   Safety of the Minor and Community

Combining the requirements of the FSA and the BIA, the Court must consider if Minor
Respondent needs to be detained for his own safety or the safety of the community.

The FSA dictates that both requirements are necessary for the release of a minor. Regarding the
safety of the minor, the FSA provides that a minor may "be held in a secure facility for his or her
own safety." *FSA*, ¶21, 14. The FSA further elaborates that this provision is applicable "when
[DHS] has reason to believe that a smuggler would abduct or coerce a particular minor to secure
payment of smuggling fees." *FSA*, ¶21.

In contrast to these guidelines, the FSA does not expressly define what constitutes a danger to
others. Rather, the FSA provides that a minor may be held where he or she presents any criminal
history that does not involve specific petty or isolated offenses, has committed or made credible

- 24 -

Case 2:85-cv-04544-DMG-AGR   Document 128   Filed 03/13/15   Page 28 of 70   Page ID
#:2156
PAGE 25/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPFAX02/25 * DNIS:6057 * CSID:22/SING * DURATION (mm-ss):16-12

threats to commit violent or malicious acts while in DHS custody or before a DHS officer, or
where the minor has been unacceptably disruptive to the normal functioning of another custody
placement and a new restricted placement is necessary for the welfare of the minor or others. *Id.*

While the BIA does not expressly adopt a requirement to consider the safety of the minor, it has
consistently held that Courts are to consider whether or not an individual presents a danger to the
community. Principally, aliens who present a danger to persons or property should not be
released during the pendency of removal proceedings. *Guerra*, 24 I&N Dec. at 38. Similar to the
loose guidance of the FSA, the BIA generally considers the criminal history of a respondent to
determine if he or she presents a danger to the community. *Id* However, Immigration Judges are
not limited to considering only criminal history and instead may consider any evidence in the
record that is probative specific to the relevant analysis. *Id.* at 40-41.

Considering the foregoing, the Court finds that Minor Respondent's case presents no instance of
danger to himself or the community.

Initially, although Minor Respondent utilized a smuggler to gain entry into the United States,
there is no evidence to indicate that he must subsequently be detained for his own safety. The
FSA provides that detention may be proper if there is evidence that a "particular minor" will be
abducted or coerced for the payment of outstanding smuggling fees. *FSA*, ¶21. While DHS
presents evidence of human trafficking schemes and the smugglers' pervasive persistence in
trafficking individuals across the border, there is no particularized evidence that Minor
Respondent continues to be in danger on account of his past connection to a human smuggler.
Group Exh. 2, Tabs D-J. In fact, Lead Respondent testified that the smuggler did not even cross
into the United States during their journey. No evidence suggests that the smuggler is looking for
Respondents, that they have any outstanding fees, or that the smuggler is present in the United
States. The totality of the circumstances reveals that there is little to no evidence that Minor
Respondent should remain detained for his own safety pursuant to the FSA.

Likewise, there is no evidence to suggest that Minor Respondent presents any danger to the
community or others. Minor Respondent alleges that he has no criminal history and DHS does
not contest this fact. Minor Respondent has not indicated to DHS officials nor outside parties that
he intends to commit violent acts against others should he be released. Despite Minor
Respondent's solitary civil immigration infraction, there is no evidence that suggests he may be a
danger to the community.

In weighing all considerations present in this case, the Court determines that Minor Respondent
does not need to be detained for his own safety or the safety of others.

### c.   National Security

The Attorney General held in *Matter of D-J-* that: "[I]n all future bond proceedings involving
aliens seeking to enter the United States illegally, where the Government offers evidence from
sources in the Executive Branch with relevant expertise establishing that significant national

- 25 -

PAGE 26/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02WX22/22 * DNIS:6057 4 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 25 of 34

security interests are implicated, IJs and the BIA shall consider such interests." *Matter of D-J-*,
23 I&N Dec. 572, 581 (A.G. 2003).[13]

The national security concerns at issue in *Matter of D-J-* were two-fold. First, the Government
stated that the "threat of future mass migration" presented national security concerns.
Specifically, the Government asserted "that reports and rumors of successful entry into the
United States by Haitian migrants have fueled recent migration surges and the perception of
further successful entries could encourage mass migration attempts." *Matter of D-J-*, 23 I&N
Dec. at 578. It was posited in affidavits from Executive Branch officials that not only is the mass
migration surge a problem in and of itself, but that the continued mass migration also drew
resources away from other areas of need and demand. *Id.* at 579. The second concern was that
released undocumented aliens from Haiti, a staging point for migration of Pakistanis and
Palestinians, without adequate verification of their background, associations, and objectives,
increased the national security interest in curbing the use of that migration route. *Id.*

Considering the evidence in its entirety, the Attorney General concluded that "releasing
respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to
adverse consequences for national security and sound immigration policy." *Id.* The Attorney
General reasoned that the Executive Branch's declarations demonstrated a substantial prospect
that the release of these types of aliens would encourage future surges of migration by sea. *Id.*
"Encouraging such unlawful mass migration is inconsistent with sound immigration policy and
important national security interests." *Matter of D-J-*, 23 I&N Dec. at 581. As a result, the
Attorney General concluded that the drain on resources coupled with the need to protect national
security and implement sound immigration policy, presented a "reasonable foundation" to
exercise discretion to deny release on bond under the Act. *Id.*

In addition to the national security interests, the Attorney General held that the respondent was
ineligible for bond because he presented a flight risk and did not have a high likelihood of being
granted any form of relief from removal. *Id.* Specifically, respondent had evaded law
enforcement apprehension during his illegal entry and had already been denied asylum by the
Immigration Court. *Id.* 581-82.

In the case presently before this Court, DHS is urging for no release, no bond, and, at a
minimum, a very high family bond. The cornerstone of the Government's argument rests on the
fact that there is a mass migration crisis, which would be encouraged by the release of any
immigrant who is detained at the border. DHS contends that to release these individuals,

---

[13] It is obvious that the Attorney General's opinion was rendered a number of years after the FSA. The FSA does not
expressly provide that issues of national security should be considered when rendering custody determinations for
minors. Despite its lack of inclusion on this point, the Court must consider national security interests pursuant to the
Attorney General's binding precedent. However, the Court points out that doing so is not actually in contention with
the FSA. The FSA provides that the Court is to consider whether or not releasing a minor presents a danger to the
community. Considering matters of national security is, in essence, nothing more than considering whether or not
release of the minor would present a dangerous situation at our nation's borders. As a result, although not expressly
indicated to be a factor under the FSA, it appears that the broad language of the FSA would accept national security
concerns to qualify as a valid consideration.

PAGE 27/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO3WZS/22 * DNIS:6057 4 * CSID: * DURATION (mm-ss):16-12

.A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **26 of 34**

including Minor Respondent, would embrace unsound immigration policy and go against
prominent national security concerns. In support of these contentions, DHS has submitted two
declarations from Executive Branch officials which indicate that many of the immigrants
similarly-situated to Respondents are migrating in mass due to the prospect of release to join
other members of their network. The focus on the mass migration at the border is taking efforts
and funds away from the agencies' abilities to destruct human smuggling rings and to properly
handle other areas involving illegal migration. Among these concerns, the declarations also attest
that large criminal organizations are profiting from smuggling these aliens across the border, that
proper background checks are not being conducted for these detainees, and that this continued
cycle renders the nation vulnerable to crime and other security risks.

Respondents maintain that *Matter of D-J-* is incorrectly interpreted by DHS to create a blanket
policy of detaining immigrants who come from three separate nations under the guise of national
security concerns. Respondents believe that such an interpretation is contrary both to the actual
policy dictated by the Attorney General in his opinion as well as the intention of Congress to
provide an individualized custody determination for Respondents pursuant to section 236 of the
Act. Aside from these overarching points, Respondents state that *Matter of D-J-* is factually
distinguishable from their case. First, Respondents have viable claims to relief not yet denied by
an immigration judge and present no grounds as flight risks. Second, Respondents' situations do
not embody the same heightened security risk as was the case with the respondent from Haiti in
*Matter of D-J-* because El Salvador is not a staging point for other nationals to enter the United
States illegally without proper background investigations. Lastly, Respondent posits that the
holdings of *Matter of D-J-* are narrow and only set to apply to one set of migrants who attempted
in mass to enter the United States by sea, on the same boat, on the same day.

The Court disagrees with Respondents' interpretation that *Matter of D-J-* is a narrow holding
which cannot create a blanket policy favoring detention for national security concerns. To the
contrary, the decision is clear that mass migration concerns, when supported by the proper
evidence, can give rise to the denial of bond pursuant to the discretionary authority of the
Attorney General. Further, the Court understands the Attorney General's opinion to indicate that
such evidence has to be considered by both Immigration Courts and the BIA should it be
presented. Thus, the Court must consider the evidence presented by DHS and it is not enough to
merely distinguish *Matter of D-J-* on its facts. Instead, the evidence must be seriously considered
in light of all the evidence presented in "all future proceedings."

Therefore, considering DHS' evidentiary support, the Court finds that Respondents' situations
present similar national security interests. The three major interests, as reflected by the
declarations of record and considered by *Matter of D-J-*, are encouraging mass migration, the
diversion of resources due to this mass migration, and the inability to conduct background
investigations to ensure the safety of the community. Yet, despite presenting a similar instance of
national security concern, the Court recognizes that it is but one factor for this Court to consider.
While it is a factor the Court shall consider, it is not the only factor controlling on this Court's
decision.

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 27 of 34

Accordingly, with careful consideration of all the evidence presented on this obviously important issue, the Court finds that meaningful national security concerns are apparent in Respondents' cases under the Attorney General's discretion. This critical concern will be weighed in conjunction with the other factors relevant to the Court's analysis in this opinion.

### 3. Best Interests of the Child

The foregoing interests are necessary to this Court's analysis. Nevertheless, under the circumstances, with a "border crisis" at hand, many of the above factors will be consistently presented in a similar manner throughout custody determinations. Many individuals may be entering for the first time, a multitude of minors may not present with a criminal history, and during a mass migration the same national security concerns are present in almost every case. This renders the Court's decision to be a difficult one. However, because this Court has wide discretion in rendering custody determinations, it will use the FSA and other authority to consider additional factors tailored to minors and their respective unique custody determinations.

There are no BIA decisions which render a case analysis for the custody of a minor pursuant to 8 C.F.R. §1236.3. Rather, the BIA decisions contemplating this regulation are limited to instances involving allegations of improper notice subsequent to the minor's release from custody. *See Matter of Cubor-Cruz*, 25 I&N Dec. 470 (BIA 2011); *Matter of Calderon-Arrazola*, 2006 WL 729764 (BIA 2006)(unpublished); *see also Lopez-Dubon v. Holder*, 609 F.3d 642 (5th Cir. 2010). Conversely, there are various cases which cite to DHS's companion regulations governing the release of juveniles at 8 C.F.R. §263.3. However, while there are a plethora of cases citing to the companion regulation, none are exactly on point regarding the issue of custody of a juvenile. Those cases also deal with notice and the various nuances of juvenile asylum claims. No opinions guide this Court on how to handle the root of these cases – whether or not the juvenile should be released pursuant to the regulation in the first instance.

Although the regulation is clear as to whom a juvenile can be released to, and in fact, that the juvenile should be released, it does not account for additional outside requirements that bind this Court such as the aforementioned requirements for the release of any alien and the countervailing interests of a minor in light of those additional requirements. By considering the arguments put forth by Respondents in this case, the Court will be better able to render its custody determinations as required by the regulations. Accordingly, the Court will consider any relevant evidence that has been presented as being in the best interests of Minor Respondent.

The Court understands that the "best interests of the child" is not a standard of law; it further acknowledges that the factor in and of itself is not dispositive in rendering a custody decision. *See Reno v. Flores*, 507 U.S. 292, 304 (1993)("'the best interests of the child' is not the legal standard"). However, the "best interests of the child" concept is applied in other contexts as a factor in custody determinations for immigrant children such as in Special Immigrant Juvenile Status and under TVPRA. *See* 8 U.S.C. § 1101(a)(27)(J)(mandating that relief be predicated on a finding that it is not in the best interests of the child to return to a home country); TVPRA § 235(c)(6). Further, and highly on point, the interests and welfare of the child is named a relevant factor for ICE and ORR to consider when placing a juvenile in a facility or the custody of

- 28 -

PAGE 29/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSG22 * DNIS:6057 * CSID:* DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 28 of 34

another relative.[14] Seeing as a minor's best interests are generally considered by every other agency rendering a similar decision, it would be inconsistent for this Court not to consider that factor in rendering its own decision pursuant to its discretion. Especially since all sources governing this Court's decision indicate that the safety or welfare of the juvenile is necessary to this Court's decision. 8 C.F.R. §§ 236.3, 1236.3.

Based upon the foregoing, Minor Respondent has presented three general points that purvey it would be in his best interest to be released into the custody of his aunt. First and crucially, Lead Respondent, as Minor Respondent's mother, indicated that this was not a decision that was taken lightly. In this particular case, both Respondents believe that releasing Minor Respondent into the custody of his aunt is the best course for their family. Respondents also argue that Minor Respondent is at a critical stage of development. Lead Respondent believes that stifling Minor Respondent's development by remaining detained will be indefinitely detrimental. Lastly, and quite compelling, Lead Respondent stated that she wishes for Minor Respondent to reside with his aunt and similarly-aged cousin to attend school.

DHS presented no countervailing arguments to show that release is not necessarily in the best interests of Minor Respondent specifically; rather DHS maintains that it is not in the community's best interests because of the national security concerns at stake.

As previously discussed, the policy favoring release under the FSA as well as under controlling regulations is in line with Lead Respondent's position that release from custody would be best for Minor Respondent. The legislative history of 8 C.F.R. § 236.3 indicates that for all juveniles, even juvenile offenders, "release of minors to parents or adult relatives is the preferred method." *Detention and Release of Juveniles*, 53 FR 17449-01, 17450 (1988). In particular that the welfare of a minor is of "paramount concern" to the Government and as a result, the word "shall" is explicitly utilized in the regulation to emphasize the notion that "reunification represents service policy, with detention being the exception." *Id.* There is a strict emphasis placed on the preferred release of minors for a multitude of reasons. The Court cannot ignore that minors, possibly unlike adults, have critically been targeted as needing release from custody wherein detention is the exception to that rule. This general policy reflects the best interests of Minor Respondent and thus, weighs heavily in favor of his release.

Further, it is critical that no educational resources are presently being offered in Artesia, New Mexico. It is long-standing Supreme Court precedent that forsaking illegal alien children access to public education violates the Constitution. *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382 (1982)(holding that the denial of a free public education to a discrete group of innocent children must be justified by some substantial interest to be valid). While there are no constitutional questions presented here, the emphasis on providing educational resources to detained children is consistent. The utter lack of educational resources available coupled with no timeline for such

---

[14] The legislative history of the former 8 C.F.R. §242.24 (now 8 C.F.R. §236.3) states: "The paramount concern of INS with respect to minors in custody is the welfare of the minor." *See Detention and Release of Juveniles*, 53 FR 17449-01; *See also* 6 U.S.C.A. §279(b)(1)(B)(ORR is responsible for "ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child.")

- 29 -

services being offered in the future is troublesome to the Court. Considering all sources, including Supreme Court guidance and the FSA, it appears to be a matter of consensus that receiving an education is within the best interests of the minor and something that is relevant to this Court's decision.[15]

On the other hand, Respondents' contentions regarding inhibition of development are less persuasive. The Court understands Lead Respondent's concerns, but there is nothing to support her position. Additionally, such concerns do not have a foundation in either the regulation applicable to the case or any other jurisprudential source. Significantly, without any substantiation in this case, conclusory concerns regarding mental development fall to the way side of the "best interests" analysis as constructed by the Supreme Court in *Reno v. Flores*. In *Reno v. Flores*, the Court was clear that the best interests of the child can and shall be subjugated by other concerns including the interests of other children, their parents, or their guardians so long as basic minimum requirements of child care are met. *Flores*, 292 U.S. at 303-304. The evidence does not suggest that the minimum requirements of child care are not being met generally in the Artesia facility as it pertains to Minor Respondent's mental development. Accordingly, while it may be true that it is better for Minor Respondent to be non-detained for his mental growth, the Court does not necessarily consider this factor to be persuasive that release is in Minor Respondent's best interests.

In the aggregate, the Court recognizes two points that are critical in its determination pertaining to Minor Respondent's release. Principally, there is a generally recognized policy favoring release which is inherently based on the best interests of a minor in custody. Then, as the Artesia facility currently operates, it is providing no educational resources for minors. Such resources are acknowledged as critical to illegal aliens by the Supreme Court and the Government has provided no reason as to why educational resources are unavailable. Without demonstrating some form of countervailing interest to the lack of educational resources, the Court cannot find any justification for forcing Minor Respondent to remain in custody and forego the educational opportunities that would otherwise be available to him upon his release. These two factors, although not determinative, demonstrate that release is within the best interests of Minor Respondent and weigh in favor of his release.

### 4. *Custodian's Documentation*

Both the regulations and FSA require the execution of specific documents or affidavits for the release of a minor to an adult relative. Purposely, 8 C.F.R. § 1236.3(b)(3) provides that where a parent or guardian is in detention with the minor, that the parent or legal guardian may execute an affidavit to attest that another designated adult relative is willing and capable to care for the minor's well-being. The regulation further states that the designated adult relative must execute an agreement to care for the juvenile and to ensure the juvenile's presence at all future immigration proceedings. 8 C.F.R. § 1236.3(b)(3). The FSA outlines similar requirements by requiring an adult relative designated by a parent or guardian to execute an agreement or

---

[15] The FSA, within its "conditions for custody" expressly includes that minors have access to educational resources throughout the length of their detention. *FSA*, Exhibit 1.

PAGE 31/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPFAX02MS/22 * DNIS:6052 * CSID * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 30 of 34

declaration under penalty of perjury that he or she is capable and willing to care for the minor's
well-being. *FSA*, ¶14. Further, any party taking custody of a minor must execute an Affidavit of
Support (Form I-134) and an agreement to provide for the minor's well-being, ensure presence at
all future proceedings, notify the Government of all address changes, as well as a promise not to
transfer custody or depart the United States without notice and/or permission. *FSA*, ¶15.

In this case, Minor Respondent's preferred custodian, Rosa Mundo, as designated by Lead
Respondent (his mother) before the Immigration Court, has submitted numerous documents to
that effect. The documents are in compliance with all the foregoing requirements as well as
substantiated by other support that show her ties to the community, commitment to bring Minor
Respondent to proceedings, and stability to care for the Minor Respondent. Specifically, Rosa
Mundo has submitted a copy of her legal permanent resident card, her certification for the U.S.
Naturalization test, copies of bills and the mortgage on her own home, pay stubs, the I-134
Affidavit of Support, and both a letter and agreement affirming Rosa Mundo's commitment to
care for Minor Respondent and attend all future hearings before the Government in any capacity.
Group Exh. 1.

Contrary to DHS's position, this evidence strongly shows that Rosa Mundo will take proper
custody of Minor Respondent. First, she plainly meets the documentary requirements outlined by
the regulations and FSA. Further, her active participation in Minor Respondent's life upon
release mitigates any apprehension advanced by DHS. DHS is concerned that Minor Respondent
presents a flight risk because Rosa Mundo knew of his illegal entry and permitted him to break
the immigration laws of the United States. While these actions are highly inappropriate, the
concerns surrounding that situation are critically outweighed by the overwhelming evidence
submitted by Rosa Mundo.

Considering all the factors related to a party being a flight risk or poor candidate for bond, Rosa
Mundo meets almost all of them excepting one which is mitigated by the very fact that she
herself has legally resided in the United States for nearly three decades. Rosa Mundo evidences
strong ties to the community by owning a home, she has resided in the United States for
approximately twenty-five years, her paystubs indicate that she has steady employment, she is in
the United States legally, and she presents no criminal history. The only negative factor is that
she allowed Respondents to enter the United States illegally. Yet, her very own legal residence
for an extended period of time diminishes any doubt that she does not respect the law or
immigration regulations. DHS's own emphasis on the factors from *Matter of Guerra* and *Matter
of Patel* draws a conclusion contrary to their position. Instead, giving custody to Rosa Mundo is
proper under these precedents and diminishes the already trivial flight risk of Minor Respondent.

Accordingly, the Court finds that Rosa Mundo has provided the requisite documentation to
establish she is a proper custodian under the regulations and FSA. Moreover, it finds that her
good status in the United States mitigates the already unsubstantial concerns DHS maintains

- 31 -

PAGE 32/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSC22 * DNIS:6052 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 31 of 34

regarding Minor Respondent to be a flight risk. Considering all points in the aggregate, the Court concludes that the release of Minor Respondent from custody is truly proper. [16]

### 5.    Minor Respondent's Avenue for Release

While the BIA has failed to provide the outlines of an Immigration Judge's conditional parole authority, its other precedent, as well as its silence in denying the existence of such authority all together, indicates that Immigration Judges have the ability to conditionally parole aliens pending removal proceedings pursuant to section 236 of the Act.

Considering the policy favoring release of minors embodied by both the FSA and juvenile regulations, conditional parole by an Immigration Judge may provide the equivalent opportunity for release without bond as would be afforded to unaccompanied juveniles or all minors were DHS to release them initially. Minor Respondent's custody status is controlled by the same regulations as unaccompanied juveniles or other minors not in family facilities, and, as such, must receive the same benefits or abilities for release as delegated under the regulations.

8 C.F.R. § 1236.3 expressly provides that "[j]uveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance, shall be released." It is clear that this Court could likely comply with its regulatory obligations by issuing a bond on this minor. However, Minor Respondent presents an extremely compelling case that no bond is required for his release. This Court finds that Minor Respondent presents no flight risk and no danger to the community. As a result, bond is seemingly entirely unreasonable. *See Matter of Patel*, ("Generally, an alien is **not and should not be detained or required to post bond** except on a finding that he is a threat to the national security, or that he is a poor bail risk.")(emphasis added). Conditional parole, however, provides for the obligatory release of Respondent without imposing an unnecessary and improper bond upon Minor Respondent. While the Court recognizes that releasing Minor Respondent on recognizance may lead to the same result, it does not have the express power to release an alien on recognizance pursuant to the INA. Additionally, as Minor Respondent must be released into the custody of a responsible adult, releasing Minor Respondent on own recognizance is counter-intuitive and contradictory to procedure. *See Flores-Chavez v. Ashcroft*, 362 F.3d 1150 (9th Cir. 2004)(holding that juveniles must be released to a responsible adult because it is presumed that juveniles are unable to appear at immigration proceedings without the assistance of an adult custodian.) As such, although release on own recognizance is mentioned in the juvenile regulations, the Court will not grant this exact request for release of Minor Respondent.

---

[16] The Court wants to emphasize that its decision on these specific facts will not present an avenue for all minors in family detention under all circumstances to be released from custody. The law and regulations are clear, to even be considered for release, a minor must provide a proper custodian with the proper documentation. That high burden has been met in this case and thus, Minor Respondent's release is warranted. A custodian of this kind will not be available in all cases. Moreover, the Respondents in this case made clear that they preferred release of Minor Respondent over staying in detention with his parent, Lead Respondent. Not all Respondents will elect to take this option. Under these facts, the Court concludes that release is in line with all binding precedent and regulations as well as sound immigration policy pertaining to minors.

- 32 -

PAGE 33/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPXZONSS22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 32 of 34

Rather, because Minor Respondent has presented the proper documentation as well as significant
evidence to indicate he is not a flight risk or a danger to the community or himself, the Court will
release him pursuant to conditional parole into the custody of Rosa Mundo pending the outcome
of his removal proceedings.

## D. Lead Respondent and Bond

While the FSA and regulations contemplated thus far indicate that Minor Respondent should be
released under the circumstances, they do not indicate that the Lead Respondent, as an adult,
should also be released. Rather, Courts have found quite the opposite. In *Bunikyte*, the District
Court precisely and logically reasoned that both the FSA and regulations favored release of a
minor to a party not in custody before it should be determined whether a minor may be
simultaneously released with his or her parent in custody. *Bunikyte*, at *16-17. Specifically, the
Court concluded:

> Neither *Flores* nor any federal rule or statute mandates the simultaneous release
> of parents and children from detention. ... It therefore appears that nothing in [8
> C.F.R. §236.3] or in the terms of the *Flores* settlement would prevent release of
> the children to an adult relative not in custody. This illustrates the fact that the
> *Flores* Settlement gives the minor Plaintiffs enforceable rights, but does not create
> rights in the parents separate from their children's rights.... As *Flores* creates no
> rights in the parents of detained minors, Plaintiffs have not established any basis
> for releasing of the parents of the minor Plaintiffs.

*Id.* The same logic applies to Lead Respondent's case for release. Respondents seemingly do not
contest this conclusion in any form. Accordingly, Lead Respondent will remain detained for the
same reasons outlined by the original determination of this Court. This conclusion remains valid
because the mitigating circumstances presented by Minor Respondent's case are not apparent in
her own custody determination. Rather, she presents less favorable factors to outweigh the
significant concerns of DHS.

Although Lead Respondent will remain detained for the same reasons previously expressed by
this Court, her bond must be proportionately reduced for the initial bond was a "family bond"
including Minor Respondent in its sum. To reflect the release of Minor Respondent, Lead
Respondent's bond will be respectively reduced to $15,000. Accordingly, she will remain
detained pursuant to a $15,000 bond.

## VII. CONCLUSION

In sum, the Court finds that the release of Minor Respondent in this case is proper pursuant to the
Flores Settlement Agreement and governing regulations binding upon this Court. Minor
Respondent offers a proper custodian for release and that custodian has presented the relevant
amount of evidence to indicate that she has the means and intentions to care for the minor,
present him at future hearings, and provide for his best interests. Further, Minor Respondent
himself presents a great interest in appearing for his future hearings on account of his viable

- 33 -

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 33 of 34

application for asylum. Moreover, despite entering the United States illegally, he presents no
other grounds to indicate he would be a flight risk or danger to the community. His record is void
of any other immigration violations or criminal history.

The Court acknowledges the great weight involving national security concerns in this case and
all others presented as a result of mass migration. However, this custody decision is not one for
every minor in detention. Rather, it is that the weight of the evidence presented by Respondent in
this specific case outweighs the national security concerns presented by DHS. The Attorney
General's opinion indicates that national security concerns surrounding mass migration shall be
considered by this Court. What the Attorney General did not hold is that those concerns should
be found necessarily to trump all evidence presented in a respondent's favor when rendering a
custody determination. Here, Minor Respondent presents no of the adverse factors. Instead, he
has submitted ample evidence to outweigh the significant national security concerns in his
particular case. Under the policy favoring release as well as the regulations that indicate release
of minors is proper under these circumstances, the Court cannot find that he should be detained
with no bond or even on a high bond.

As a result, because Minor Respondent demonstrates that he should be released pursuant to the
regulations, the FSA, the traditional requirements of the BIA, and other factors pertinent to a
minor custody determination, the Court will release Minor Respondent from custody pursuant to
conditional parole under section 236(a)(2)(B) of the Act. The Court acknowledges that
conditional parole is not the standard avenue for release; however, it will release Minor
Respondent on conditional parole because it best embodies the regulations and policy governing
minors. Conditional parole, without bond, is proper given the compulsory nature of the
regulations as well as the unique circumstances presented by minors in family detention
facilities. The overwhelming evidence indicates that this avenue for release is proper.

Conversely, Lead Respondent will remain in detention pursuant to a bond. No new
circumstances to mitigate a high bond have been evidenced in her case specifically. And,
unfortunately, she has no rights to release under the FSA or juvenile regulations in this case.
Thus, Lead Respondent is to remain in custody pursuant to a $15,000 bond.

Based upon the above and foregoing the Court enters the following orders:

It is Ordered:            The Motion for Release of Minor Respondent, Herson Yonatan
                          Gutierrez-Granados, IS GRANTED, and he is hereby
                          RELEASED PURSUANT TO CONDITIONAL PAROLE
                          UNDER SECTION 236(a)(2)(B) OF THE INA INTO THE
                          CUSTODY OF HIS AUNT, MS. ROSA MUNDO.

It is Further Ordered:    The Motion of Lead Respondent, Maria Teresa Granados-
                          Gutierrez, for Release IS DENIED.

PAGE 35/35 * RCVD AT 9/9/2014 3:14:18 PM [Eastern Daylight Time] * SVR:NAFXOXMRF02/3 * DNIS:6052 * CSID:* * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 34 of 34

It is Further Ordered:    The Motion of Lead Respondent, Maria Teresa Granados-
Gutierrez, for Bond Redetermination **IS GRANTED**, whereas
Lead Respondent shall remain **DETAINED PURSUANT TO A
$15,000 BOND.**

9-9-14
Date

Roxanne C. Hladylowycz
United States Immigration Judge

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:    MAIL (M)    PERSONAL SERVICE (P)
TO:  ( ) ALIEN  ( ) ALIEN c/o Custodial Officer  ( ) ALIEN's ATT/REP    ( ) DHS
DATE:_____ BY: COURT
STAFF_____

Attachment(s):  ( ) EOIR-33  ( ) EOIR-28 ( ) Legal Services List ( ) Other

- 35 -

Exhibit 57

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**ARTESIA, NEW MEXICO**

| | | |
|---|---|---|
| IN THE MATTER OF | ) | **IN BOND PROCEEDINGS** |
| | ) | |
| **GRANADOS-GUTIERREZ**, Maria Teresa (LEAD) | ) | **File Nos.:  A206-848-455** |
| **GUTIERREZ-GRANADOS**, Herson Yonatan (MINOR) | ) | **A206-848-456** |
| | ) | |
| **Respondents** | ) | |

**MOTION:**          MOTION TO RECONSIDER

**On Behalf of Respondent:**                    **On Behalf of DHS:**
Rachel S. Bloomekatz, Esq.                      Karen Donoso Stevens
Jones Day                                       Senior Attorney - ICE
325 John H. McConnell Blvd.                     500 12th Street, SW STOP 5902
Columbus, OH 43215                              Washington, DC 20536

**ORDER OF THE IMMIGRATION JUDGE**

### I.     BACKGROUND AND PROCEDURAL HISTORY

On September 9, 2014, this Court issued a written decision in bond proceedings for Maria Teresa Granados-Gutierrez, Lead Respondent, and her son Herson Yonatan Gutierrez-Granados, Minor Respondent. By means of that written decision, Lead Respondent's bond was proportionally reduced to $15,000 and Minor Respondent was released on conditional parole pursuant to the Flores Settlement Agreement ("FSA"), governing regulations, and section 236(a) of the INA.

Subsequently, on September 15, 2014, the Department of Homeland Security ("DHS") submitted a Motion to Reconsider the decision rendered on September 9, 2014. More specifically, DHS states: "While DHS does not necessarily ask the Court to change its ultimate decision ordering the Minor Respondent's release, the Court should reconsider certain portions of the analysis supporting the decision." *DHS' Motion*, at *1.

Thereafter, Respondents submitted a response to DHS' motion on October 10, 2014. Respondents generally argue that DHS' motion should be denied because it does not demonstrate that the Court committed any valid errors. Poignantly, Respondents maintain that the Executive Office for Immigration Review ("EOIR") is bound by the FSA as a party to the same and through the authority delegated by the Attorney General. *Respondents' Response*, at *4-6. In

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **2** of **20**

sum, Respondents conclude that any considerations made by the Court in its previous order were valid and that, even if DHS' motion were to be granted, there are no grounds presented for Minor Respondent to be remanded back into custody. *Id.* at *10-11.

The issues presently before the Court pertain to whether or not its initial decision contained errors of fact or law requiring reconsideration of the Court's prior orders. The Court finds that DHS has not shown that reconsideration is warranted in this case, whether it be for alleged errors of law or fact, and thus, DHS' motion is summarily denied.

## II.   DHS' POSITION

DHS contends that although this Court's final outcome may be correct, the legal reasoning and factual record contains readily identifiable errors that must be amended. *DHS' Motion*, at *1, 9. Generally, DHS vies that the Court "should reconsider its decision to reflect that: (1) DHS agrees it is bound by the FSA; (2) the minor respondent's release is solely based on the recognized factors of danger to the community, national security concerns, and flight risk; and (3) there is no presumption favoring release of minors in custody redetermination proceedings before [the Court]." *Id.* at *9. DHS supports each alleged error with the following points.

First, DHS moves the Court to correct "factual inaccuracies…with regard to the Government's position on the applicability of the FSA." *DHS' Motion*, at *2. The Government maintains that the record improperly reflects DHS' position to be that the FSA is only applicable to unaccompanied minors and is nonbinding upon DHS. DHS further implies that it was not actually given "an opportunity to state its position on the record." *Id.* at *3. DHS requests the record be corrected to reflect its concession that Immigration and Customs Enforcement ("ICE") is bound by the FSA and applies to all minors in custody. *Id.*

Next, DHS contends that the Court committed legal error when it did not limit the proceedings to a "consideration of danger to the community, flight risk, and national security concerns." *Id.* DHS avers that it was improper for the Court to consider other factors such as "best interests of the child and conditions of detention." *Id.* The Government reasons that the authority of Immigration Judges is limited by statute and regulation which delineate that a custody determination is confined to a consideration of the three aforementioned factors. *DHS' Motion*, at *3-4. DHS recognizes that Immigration Judges enjoy broad discretionary authority when rendering custody determinations but that all factors "must be viewed in the context of assessing national security concerns, danger to the community, and risk of flight, which are the primary considerations mandated by regulation and longstanding Board precedent." *Id.* at *5, 7-8. DHS further argues that the FSA in no way affects the analysis an Immigration Judge conducts for purposes of bond and custody determinations. *Id.* at *5-6. As a result, it is DHS' position that the Court incorrectly considered the FSA, best interests of the child, and conditions of detention. *Id.* at *5-8.

Lastly, DHS disputes this Court's legal conclusion that 8 C.F.R. §1236.3 demonstrates a policy favoring release. DHS reasons that this legal analysis is incorrect because it "ignores the limited applicability of the regulation." *DHS' Motion*, at * 9. DHS believes that the regulation simply

requires that children be released on bond or via other mechanisms to certain parties. DHS argues that the regulation does not "contravene or override the governing factors of flight risk and danger to the community, to be considered in making the custody determination." *Id.*

## III.   RESPONDENTS' POSITION

Respondents maintain that none of the allegations asserted by DHS are sufficient to warrant a finding of factual or legal error by the Court. Thus, Respondents ask that this Court deny DHS' motion to reconsider. Respondents aver that DHS' motion is improper for three key reasons. Alternatively, Respondents posit that even if DHS' motion were granted, Minor Respondent's release from custody remains proper and unaffected.

First, Respondents contend that DHS misrepresents its prior position in Respondents' bond proceedings. Citing to a transcript of those proceedings, Respondents contend that the Court's portrayal of the facts is correct and that a change in position does not warrant a finding of factual error. *Respondents' Response*, at *2-3, Exh. A.

Second, Respondents argue that the FSA applies to all minors in every custody status proceeding. Respondents provide three separate arguments in support of this contention. Initially, Respondents assert that DHS "improperly minimizes the importance and effect of the FSA." *Respondents' Response*, at *4. Respondents argue that the FSA is the "only binding legal standard applicable to the detention of minors" and that such standard was agreed to by the Attorney General. *Id.* at *5. Next, Respondents state that "Immigration Judges are not insulated from the FSA." *Id.* at *6. Pointing to ¶41 of the FSA, Respondents contend DHS' assertion that EOIR is not bound by the FSA is a false premise. *Id.* at *8. Respondents assert that the Attorney General, Department of Justice ("DOJ"), and Immigration and Nationality Service ("INS") were collective "Defendants" under the FSA. *Id.* Because the Homeland Security Act ("HSA") preserved the Attorney General's authority to render custody determinations and EOIR remains a component of DOJ, it is Respondents' position that the Court is legally bound to apply the FSA. *Respondents' Response*, at *6-7. Finally, Respondents argue that limiting the FSA to federal courts would inundate dockets and create instances of "sham proceeding[s] before an Immigration Judge." *Id.* at *8. Respondents declare that the context of the FSA's jurisdictional provisions, particularly ¶24.A and ¶9, clearly provide for Immigration Judges to apply the FSA. *Id.* Ultimately, Respondents argue that a "contrary reading would lead to an absurd result, namely that minors have a right to a hearing where they are incapable of asserting their rights." *Id.* at *9. In light of the foregoing points, Respondents contend that this Court's application of the FSA to Minor Respondent's bond proceedings was legally proper.

Third, Respondents argue that it was correct for the Court to consider the "best interests of the child" in its decision as it is consistent with the FSA. *Respondents' Response*, at *9-10. More specifically, taking into account the points raised during the initial bond proceedings, Respondents maintain that the Court's focus on a generally recognized policy favoring release as well as a lack of educational resources were related to the Minor Respondent's best interests and thus a valid factor in the Court's analysis. *Id.* at *10.

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **4** of 20

Finally, Respondent's declare that DHS has not provided a basis for re-detaining Minor Respondent. Resting on an alternative premise that DHS' motion could be granted, Respondents indicate that a reconsideration of the prior decision as proposed by DHS would have no bearing on this Court's original decision to release Minor Respondent from custody. *Id.* at *10-11.

## IV.   FINDINGS AND ANALYSIS

### A.   Motions to Reconsider as a Matter of Law

"Motions for reconsideration are disfavored in immigration cases." *Liu v. Mukasey*, 553 F.3d 37, 39 (1st Cir. 2009) citing *INS v. Doherty*, 502 U.S. 314, 323, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992). "The party seeking reconsideration has the burden of establishing that it is warranted." *Id. citing INS v. Abudu*, 485 U.S. 94, 110-11, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988). A motion to reconsider seeks reexamination of a decision in "light of additional legal arguments, a change of law, or perhaps an argument or aspect of the case which was overlooked." *Matter of Cerna*, 20 I&N Dec. 399, 402 n.2 (BIA 1991); *see generally* INA § 240(c)(6)(C); 8 C.F.R. § 1003.23(b)(2). A motion for reconsideration must include "an allegation of **material** factual or legal errors in the prior decision that is supported by pertinent authority." *Matter of O-S-G-*, 24 I&N Dec. 56 (BIA 2006)(emphasis added). Principally, "[t]he motion should identify the **material** errors in the underlying Immigration Judge's decision, if any, that were overlooked...**that ultimately affected the disposition**[.]" *Id.* at 59 (emphasis added). Motions which raise legal arguments that could have been raised during prior proceedings do not qualify for reconsideration of the Court. *Id.* at 58.

An abundance of persuasive Circuit Court and unpublished Board of Immigration Appeals ("BIA") decisions confirm that alleged errors of fact or law must be material to the disposition of a case to sustain an movant's burden of proof. *See Saka v. Holder*, 741 F.3d 244 (1st Cir. 2013)(affirming the BIA's denial of a motion to reconsider based on a finding that alleged errors lacked materiality); *Victor v. Holder*, 616 F.3d 705, 710 (7th Cir. 2010)(noting that the "harmless error doctrine" applies to review of immigration decisions and that harmless errors of law in motions to reconsider do not warrant a subsequent grant of that motion); *Zou v. Attorney General of the United States*, 523 Fed.Appx. 139 (3d Cir. 2013)(unpublished)(denying review where "alien's motion for reconsideration did not identify any material errors.").[1]

First and foremost, DHS' motion for reconsideration must be denied as it does not comply with the basic requirements pertinent to motions to reconsider. Significantly, by DHS' own concession, the motion submitted would not and does not affect the outcome of the previous bond proceedings. *See DHS' Motion*, at *1 ("While DHS does not necessarily ask the Court to

---

[1] The significance that alleged errors of law or fact be "material" to the disposition of the case has also consistently been contemplated and affirmed by the BIA in unpublished opinions. *See Matter of Sadi*, 2009 SL 3818038 (BIA 2009)("The respondent has failed to identify any material error of fact or law that would justify reversal of our prior decision."); *Matter of Huaman*, 2014 WL 1401599 (BIA 2014)("The motion to reconsider is denied because the respondent has not identified any material error of fact or law in our prior decision, or an aspect of the case which was overlooked."); *Matter of Martel*, 2014 WL 347654 (BIA 2014)("We conclude there are no material factual or legal errors in our... decision.").

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **5** of 20

change its ultimate decision ordering the minor respondent's release, the Court should reconsider certain portions of the analysis supporting the decision."). Nowhere within its motion does the Government advance an argument which would reflect how any amendment to this Court's legal reasoning would ultimately affect the outcome of the case. *See generally Matter of Guevara*, 20 I&N Dec. 238 (BIA 1991)(denying a motion to reconsider where INS did not seek to modify its case against the respondent, but merely requested an additional opportunity to make a second effort at proving the same allegations and charge which had already been advanced). Respondents properly allude to this gap within DHS' motion by contending that, even if this Court were to grant DHS' motion, there would be no grounds for the Court to remand Minor Respondent back into immigration custody. *Respondents' Response*, at *10-11. Rather, the issues raised by DHS provide no cogent basis upon which any alteration of the prior Court order would result in a change to the Court's outcome. *Id.* at*1-2. With such a critical aspect omitted from the Government's motion it cannot follow that any arguments advanced related to this Court's reasoning are by nature "material." To find otherwise would defeat the basic purpose of motions for reconsideration which are already generally disfavored.

Additionally, as Respondents briefly address, DHS' motion to reconsider raises "a variety of arguments for the first time" despite being given an opportunity to present those arguments previously. *Respondent's Response*, at *1. The BIA has long concluded that a "motion to reconsider based on a legal argument that could have been raised earlier in the proceedings will be denied." *O-S-G-*, 24 I&N at 58 *citing Matter of Medrano*, 20 I&N Dec. 216, 291 (BIA 1990, 1991)("Arguments for consideration on appeal should all be submitted at one time, rather than in a piecemeal fashion."). Here, although DHS had the opportunity to argue that this Court's jurisdiction is prohibited under the FSA, it did not do so. Nor did DHS indicate its position that this Court's authority is limited by regulation or other jurisprudence. Finally, DHS also did not contest when Respondents made arguments on the record regarding the best interests of Minor Respondent, detention conditions, or the existence of a policy favoring release of minors in custody. Although these arguments were all advanced by Respondents during proceedings, DHS submitted no response and no legal arguments related to those points. Instead, DHS wishes to do so now by way of a motion to reconsider. Legal arguments that could have been raised earlier in bond proceedings are to be denied. All of DHS' arguments could, and probably should, have been raised at the previous proceedings or thereafter in the form of a post-hearing written response. Because DHS did not take the opportunity to assert its arguments during the initial proceedings those arguments are lost and its motion to reconsider is procedurally deficient.

As such, this Court denies DHS' motion to reconsider as facially improper.

**B.     Factual Errors**

Alternatively, even if DHS' motion were deemed to be properly filed, its allegations of factual error fail on the merits. A close review of the record demonstrates that the Government's contentions about its position as stated on the record are considerably disingenuous.

Within its motion to reconsider, DHS maintains that there was a factual error on behalf of the Court. It concedes that the bond hearing was continued until September 9, 2014 "to determine

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 6 of 20

whether the respondents were eligible for release pursuant to the FSA." *DHS' Motion* at *3. The Government goes on to say that "without providing DHS an opportunity to state its position on the record" the Court issued a written decision. *Id.* Principally, the alleged factual error occurred after "DHS clarified to the Court that ICE was bound by the FSA, and the Court and respondents' counsel acknowledged the clarification, [and] the Court's decision erroneously states that DHS argued it was not bound by the FSA and that the FSA only applies to 'unaccompanied minors,' rather than to all alien minors." *Id.*; *see also IJ Opinion* at *17. Based upon its synopsis of the hearing, DHS requests that the record be amended to reflect two points: (1) that DHS is a successor of INS; and (2) that because DHS is the lone successor of INS, the FSA controls only DHS' initial custody determination. *Id.*

The Court declines to find that any such factual errors exist and the reasons are two-fold. First, a change in a party's position or even a misunderstanding as to a party's contentions does not constitute a "factual error" of record for purposes of a motion to reconsider. Second, DHS' motion utterly mischaracterizes the previous proceedings and incorrectly states what transpired on the record.

A motion to reconsider is the incorrect avenue for amending a party's position because this type of shift in one's outlook post-decision presents no grounds for reconsideration. In *Matter of Guevara*, the BIA held that a motion to reconsider was improper where the Government alleged there was a "misunderstanding" on the record and failed to state any desire to introduce additional evidence on its position despite having ample opportunity to do so. 20 I&N Dec. 238 (BIA 1991). This set of circumstances is analogous to the DHS' situation as described within its own motion.

DHS' motion indicates that at the original hearing on August 14, 2014 the parties presented arguments for custody redetermination pursuant to Respondents' original motion. Significantly, DHS then explains that "[t]he Court continued the bond hearing until September 9, 2014, **to determine whether respondents were eligible for release pursuant to the FSA.**" *DHS' Motion*, at *3 (emphasis added). It is clear from the audio record of proceedings on August 14, 2014 that DHS stated: "The Government would have to read the Flores Agreement and prepare an adequate response to that." Thereafter, prior to the continuance of the proceedings to determine FSA eligibility, the Court asked DHS: "Are you going to be responding or do you want it put on for a separate bond hearing?" Government counsel then responded that it opposed the release of the child and that it would be satisfied with another bond hearing. The subsequent bond hearing was set to September 9, 2014, which the Government was well aware would determine the issue of the child's eligibility for release pursuant to FSA. Nonetheless, DHS never replied in writing or submitted additional evidence.

This series of events must also be considered in light of Respondents' original motion which included a copy of the FSA and was entitled "Motion for Bond and for Child's Release Pursuant to the Flores Settlement Agreement" to which DHS responded. DHS' opposition to the original motion contained no arguments or other evidentiary materials regarding the FSA or its position on any legal issues raised by its implementation.

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **7** of **20**

Accordingly, to the extent a "misunderstanding" exists within the record of proceedings, DHS failed to express a desire to submit additional evidence to clarify its position. The Government did not submit or amend its original opposition to Respondents' motion despite having ample opportunity to do so. Thus, the Government's motion does not allege sufficient factual error on behalf of the Court as a matter of law and it must be denied.

Nevertheless, the Court has considered the facts of record and finds that there is actually no error of fact at issue. When asked to provide its position related to the FSA on the record, DHS made the following statements:

> The Flores Settlement Agreement... was a class action that was filed regarding minors that were in ORR custody. And they challenged the constitutionality of the policies, practices, and releases of unaccompanied minors... The FSA throughout, in all the documents that she has filed... refers to unaccompanied minors that are here. The big bulk of the Flores Settlement is for unaccompanied minors that are in [the Office of Refugee Resettlement] custody... **the FSA really comes into play with unaccompanied minors that are in the custody of Office of Refugee Resettlement. So, that argument is moot here because the juvenile is detained, is accompanied, and detained with his mother.**

*See Respondent's Response*, at *3, Exh. A. Thereafter, Respondents' counsel argued that DHS and ICE are bound by the FSA and that the agreement encompasses all minors in custody of those agencies, not solely those classified as "unaccompanied minors." Counsel also argued that release was proper because Lead Respondent believed "it was in her child's best interests."

DHS was provided an opportunity to respond. DHS did not address the confines of the FSA nor did it amend its position on the record. Instead, DHS adopted this position:

> If as counsel suggests the Flores Settlement applies to the detained juvenile who is detained and accompanied with his mother, then the same argument goes that nowhere in this statement does it say that he has to be released and that he has to be issued bond. So now we will have a bond hearing for the juvenile... nowhere in this Flores Settlement that I have read does it say that bond must be issued, that it is mandatory for any child who is detained with his mother or any other family... if counsel is saying they want a bond hearing just for the juvenile for the Flores Settlement then that is what we have to do.

Not once, throughout this entire discussion did DHS ever state that ICE was bound by the FSA. Similarly, as evidenced by this final response by the Government, DHS habitually contended that the FSA should not apply to an accompanied detained juvenile.

Furthermore, as persuasively noted by Respondents within their response, at the later bond hearing on September 9, 2014 when the Court's decision was set to be issued, DHS never objected to the Court's recitation of the facts or issuance of the order. *Respondents' Response*, at *3. Although DHS alluded that it had changed its position to seemingly be that ICE is bound by

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **8** of 20

the FSA, it did not ask or object to the Court issuing its order reflecting a contrary position. *Id.* Omitting this objection, which DHS now contends is critical, only further substantiates a finding that this Court committed no factual error when presenting DHS position leading to the written order issued on September 9, 2014.

Thus, to the extent that DHS advances that there was an "error of fact" reflected by its position in the record, it is patently incorrect. As such, for all the aforementioned reasons, DHS' motion to reconsider will be alternatively denied on the merits.

## C.     Legal Errors

DHS' alleged legal errors are also insufficient to warrant reconsideration of the Court's prior orders. DHS presents two overarching legal errors within its motion to reconsider: (1) "the Court's decision should be limited to consideration of danger to the community, flight risk, and national security concerns instead of separate factors regarding the applicability of the FSA, 'best interests of the child,' and conditions of detention;" and (2) "the Court's decision erroneously interprets 8 C.F.R. § 1236.3 addressing the process for release of minors, as demonstrating a policy favoring release." *DHS' Motion*, at *4, 8. The Court holds that both assertions of legal error lack merit. The Court will discuss each overarching legal error in turn as well as any subcomponents raised by DHS therein.

### 1.     *The Authority of an Immigration Judge in Custody Redeterminations*

DHS maintains that an Immigration Judge ("IJ") is constrained by the limited authority delegated to him or her by the Attorney General. Citing to section 236(a) of the Act, DHS avers that no legal authority exists authorizing an IJ to modify established custody review procedures in light of the FSA to consider "best interests of the child" or "conditions of detention." *DHS' Motion* at *3-4. Instead, citing to 8 CFR § 1236.1(c)(8), DHS maintains that an IJ's authority for purposes of custody proceedings is limited to determining whether an alien has demonstrated he or she is not a danger to property or persons and that he or she is not a flight risk. *Id.* at *4. DHS believes that BIA precedent affirms such constraints upon an IJ because any elements advanced by the BIA are in direct connection to the three factors outlined by the regulations. *DHS' Motion*, at *4-5. Thus, it must be that any discretionary matters considered by the IJ are "viewed in the context of assessing national security concerns, danger to the community, and risk of flight" as they are the "primary" considerations mandated by binding precedent and regulations. *Id.*

The Court disagrees with DHS' contentions. As an initial matter, the Court re-affirms its conclusion that it has broad regulatory authority to consider any evidence presented in custody matters. *See IJ Opinion*, at *19 ("Therefore, whether it is as a party to the FSA, pursuant to governing regulations, or under the Attorney General's broad discretionary authority, this Court must consider and apply the terms of the FSA to the extent it does not conflict with controlling statutes and regulations."). The Court finds that DHS' reasoning regarding the scope of controlling regulations is manifestly incorrect. The Court further finds that BIA precedent in no way contradicts this initial premise. Rather, BIA precedent facially supports the Court's conclusion. Lastly, the Court further upholds its positions regarding the FSA and the best

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 9 of 20

interests of the child. Additionally, based upon persuasive points raised by Respondent, the Court concludes it is bound to apply the FSA. The Court will dispose of each of DHS' points in turn and deny DHS' motion for reconsideration.

### a.    The Regulations

While the Court re-affirms its position that IJs are statutory and regulatory bound creatures, it declines to adopt DHS' specific position regarding the powers delegated to an IJ in rendering custody redeterminations. The Court declines to find a legal error in this instance because DHS' arguments erroneously construe the plain language of statutes and regulations at issue.

As DHS reasons and this Court already concluded: "Immigration judges are creatures of statute; they receive powers and duties directly from Congress or by delegation from the Attorney General." *IJ Opinion*, at *13, 14. Nevertheless, based upon this exact premise, DHS' position becomes fatally flawed.

DHS' assessment for "legal error" disregards the rest of the regulations binding upon this Court and incorrectly limits the parameters of this Court's authority to 8 C.F.R. § 1236.3(c)(8). DHS reads subsection 8 C.F.R. § 1236.1(c)(8) to mean that pursuant to section 236 of the INA, an IJ must only consider flight risk and danger to the community. 8 C.F.R. § 1236.3(c)(8) reads: "any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien under section 236(a)(2) of the Act... provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."

DHS neglects that this regulation has a companion regulation, 8 C.F.R. § 1003.19, which also delegates the Attorney General's authority to render custody determinations to IJs. *See Matter of Guerra*, 24 I&N Dec. 37, 38 (BIA 2006) *citing* 8 C.F.R. §§ 1003.19, 1236.1("The Attorney General has delegated [the authority for the Attorney General to release aliens on bond] to the Immigration Judges"). This companion regulation very clearly delineates that IJs may consider any evidence presented during a custody status hearing.

8 C.F.R. §1003.19(d)(emphasis added) reads in its entirety:

> Consideration by the Immigration Judge of an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding. **The determination of the Immigration Judge as to custody status or bond may be based upon any information that is available to the Immigration Judge or that is presented to him or her by the alien or the Service.**

DHS further neglects that subsection (d) of 8 C.F.R. § 1236.1, the very regulation it cites in support of its position, further affirms the wide jurisdiction and discretion of IJs pursuant to 8 C.F.R. § 1003.19(d). 8 C.F.R § 1236.1(d) (emphasis added) reads, in pertinent part:

**Application to immigration judge.** After an initial custody determination by the district director, including the setting of a bond, the respondent may…request amelioration of the conditions under which he or she may be released. Prior to such final order, and **except as otherwise provided in this chapter, the immigration judge is authorized to exercise the authority in section 236 of the Act**… to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released, **as provided in § 1003.19 of this chapter.**

DHS' erroneous reliance on a limited provision absolutely avoids the complete source of authority that applies to custody proceedings. In doing so, it ignores the jurisdictional parameters affirmed in 8 C.F.R. § 1236.1(d) which are those outlined by 8 C.F.R. § 1003.19. That expansive provision directly delegating the entirety of the Attorney General's authority states that IJs may determine bond or custody "upon any information that is available[.]"8 C.F.R. § 1003.19(d). From reading this provision in conjunction with 8 C.F.R. §1238.1(c)(8) and (d) – the Court finds that IJs may consider all evidence presented. Thus, to the extent DHS makes any arguments relying on the basis that this Court is limited to three factors only, those arguments are incorrect. *See DHS' Motion*, at *4-8 (including arguments related to an IJ's authority to consider best interests of the child, the FSA, and a general policy favoring release).

Such a reading of the regulatory scheme is only further supported by relevant jurisprudence. The BIA has adopted the position that there "is 'no more persuasive evidence of the purpose of a [regulation] than the words by which the [Attorney General] undertook to give expression to [his or her] wishes. If the language is clear, the inquiry ends – the BIA and IJ's 'must give effect to the unambiguously expressed intent' of the Attorney General." *Matter of Artigas,* 23 I&N Dec. 99, 100 (BIA 2001)(citations omitted). Additionally, where there is no language in applicable statutes or regulations that restrict the evidence an Immigration Judge may consider when adjudicating a claim under the Act, then an Immigration Judge may consider any relevant evidence. *Matter of Figueroa*, 25 I&N Dec. 596, 598 (BIA 2011). "In fact, Immigration Judges, who exercise the powers and duties delegated by the Attorney General of the United States, have broad authority over the manner in which they conduct proceedings." *Id.* at 598-99 *citing* 8 C.F.R. §1003.10(b). In deciding individual cases, an Immigration Judge must exercise his or her independent judgment and discretion and may take any action consistent with the Act and regulations that is appropriate and necessary for the disposition of such cases." *Id.*

Under these devices for regulatory interpretation, an IJ conducting bond or custody status hearings may contemplate any information presented by the parties because within the regulation's plain language, there are no evidentiary restrictions. There is in fact express language to the contrary. *See* 8 C.F.R. § 1003.19(d). The intent evidenced by the Attorney General's regulations is clear: IJs can consider all evidence presented when rendering a custody determination within the full and broad discretionary authority of the Attorney General under section 236 of the Act. Thus, pursuant to this Court's broad authority, it can properly consider the evidence presented in a given case, including best interests of the child, the FSA, and other

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 11 of 20

policy. Based upon DHS' own premise that IJs are bound to the language of the regulations, this is the only logical conclusion.

In sum, DHS has presented no legal error in this Court's prior decision. To the extent that the Government's motion rests upon a restricted reading of the regulations to a consideration of only flight risk, national security, and danger to the community, the Court finds there is no error of law and the Government's motion must be denied.

>        **b.      BIA Precedent**

The expansive authority of IJs is only further affirmed by case law interpreting the regulations. The landmark BIA decision which crafted the standard currently governing bond and custody determinations states that each determination requires a respondent to establish that he or she does not present a danger to persons or property, is not a threat to national security, and does not pose a risk of flight. *Guerra,* 24 I&N Dec. at 38. Similarly, the BIA reasoned that section 236(a) of the Act "merely gives the Attorney General the authority to grant bond if he concludes, in the exercise of discretion, that the alien's release on bond is warranted." *Id.* at 39. The BIA concluded that "the Act does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal." *Id.* Of course, "[a]ny evidence in the record that is probative and specific can be considered." *Id.* at 40-41.

DHS conflates the guidance of the BIA and the discretion granted to IJs under the regulations pursuant to section 236 of the Act. More specifically, the language of BIA opinions indicates that an IJ "must consider" whether an alien who seeks a change in custody is a threat to national security, danger to the greater community, likely to abscond, or otherwise a poor bail risk. *Id.* However, while the Court must consider these factors, by no means is the Immigration Court limited to those factors.

Indeed, BIA precedent reflects the exact opposite conclusion. Where the BIA listed potential factors to consider in custody determinations, the BIA implemented suggestive, not compulsory language. For example, the opinion reflects: "Immigration Judges **may** look to a number of factors in determining whether an alien merits release from bond, as well as the amount of bond that is appropriate." *Guerra,* 24 I&N Dec. at 40. And, affirming the same suggestive tone within the second sentence, the BIA states "The factors **may include any or all of the following**..." *Id.* (emphasis added); *see generally United States ex. rel. Siegel v. Thoman,* 156 U.S. 353, 359-60 (1895)("in the law to be construed here it is evident that the work 'may' is used in special contradistinction to the work 'shall'"). Immediately after contemplating possible factors to be considered by an IJ, the BIA reiterates, for the third or fourth time in the opinion, the following: "An Immigration Judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations. The Immigration Judge may choose to give greater weight to one factor over others, **as long as the decision is reasonable.**" *Id.* (emphasis added).

Nowhere in *Matter of Guerra* or any other BIA opinion is it held or stated that an IJ is limited in any fashion to only contemplating those factors which are related to flight risk or danger to the

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **12** of **20**

community. To the contrary, the BIA's own language, in direct compliance with the regulation governing an IJ's jurisdiction, indicates that an IJ has broad discretion and is able to consider a set of facts in light of that expansive discretion pursuant to section 236 of the Act.

The Court reemphasizes its agreement with DHS that it must consider elements such as flight risk, danger to the community, and national security.[2] As previously discussed, DHS cites to 8 C.F.R. § 1236.1(c)(8) as the point of regulatory authority limiting this Court's power. However, the BIA precedent adopting the considerations outlined by the same regulation actually compels a contrary conclusion to the position posited by DHS.

In *Matter of Adeniji*, the BIA noted that 8 C.F.R. §236.1(c)(8) and 8 C.F.R. §1236.1(c)(8) contain the exact same language, yet, by that same language, 8 C.F.R. §1236.1(c)(8) does not necessarily apply to IJs because he or she "is not authorized to issue a warrant of arrest." 22 I&N Dec. 1102, 1112 (BIA 1999). Conversely, the BIA recognized that the INS' regulation (8 C.F.R. §236.1(c)(8)) provides for its custody and bond determinations to be reviewed by an Immigration Judge. *Andeniji*, 22 I&N Dec. at 1112. The BIA reasoned that because INS reviewed flight risk and danger to the community in its initial determination, then an IJ's review of that same decision, as compelled by regulation, must necessarily consider such factors. *Id.* Pursuant to this line of reasoning the BIA specifically held: "We deem the regulatory provision at 8 C.F.R. §236(c)(8) to contain the appropriate test, as it is binding on us and pertains directly to removal proceedings under [the Illegal Immigration Reform and Immigrant Responsibility Act]. Consequently, to be eligible for bond, the respondent must demonstrate that his 'release would not pose a danger to property or persons, and that [he] is likely to appear for any future proceedings.'" *Id.* at 1113. Thus, the BIA held that the considerations of Immigration Courts stem directly from the fact that INS (now DHS) must contemplate flight risk and danger to the community within 8 C.F.R. §236.1 under the general power of INA § 236(a).

Although the BIA came to the aforementioned conclusion, nowhere in rendering that determination and placing such a requirement on bond proceedings did the BIA state that flight risk and danger to the community were the Court's sole considerations. Rather, because INS inevitably contemplated those factors, the Court was bound to consider those same factors.

This line of reasoning not only supports a finding that this Court is not limited in its discretionary authority, but it also strikes contrary to a bigger issue raised by DHS. Namely, DHS maintains that this Court should not consider "best interests of the child" or adopt a general policy favoring the release of minors. However, pursuant to the very line of reasoning presented by the BIA in *Adeniji*, this Court is bound to consider those factors. In similar fashion, the Court must consider the "best interests of the child" and implement a policy favoring release as DHS is commanded to consider the same when rendering its own decisions, reviewable by this Court, under section 236 of the Act. *See* 8 C.F.R. § 1236.1(d); *see also IJ Opinion*, at *27-28 ("Further, and highly on

---

[2] This position was adopted in the Court's prior decision. "With this authority, certain guidelines for custody determinations have been promulgated by the Board of Immigration Appeals (BIA). Prominently, an alien must establish to the satisfaction of the Immigration Judge that he or she does not present a danger to persons or property, is not a threat to national security, and is not a flight risk or likely to abscond." *IJ Opinion*, at *14. All three factors were extensively analyzed in the original written decision.

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 13 of 20

point, the interests and welfare of the child is named a relevant factor for ICE and ORR to consider when placing a juvenile in a facility or the custody of another relative."); *see also IJ Opinion,* at *28, n.14.

Hence, to the extent that the Government's motion rests upon a restricted reading of case law to a consideration of only flight risk, national security, or danger the community, the Court finds there is no error of law and the Government's motion must again be denied.

c.     **The FSA and Best Interests of the Child**

Apart from positing arguments about this Court's regulatory and jurisprudential authorities, DHS also advances more specific and minute arguments pertaining to why it was legal error to consider the FSA and "best interests of the child." The Court finds none of these arguments persuasive to establish an error of law.

i.     *The FSA*

The Government first argues that the FSA "contains no provision affecting how bond hearings involving alien minors are to be conducted." *DHS' Motion,* at *5. DHS further states that the EOIR was not a party to the FSA and that the FSA's provisions simply confirm that minors receive bond redetermination hearings. *Id.*

Respondents advance that this Court, as a component of EOIR, an agency of DOJ, and a derivative of the Attorney General, is bound by the FSA. Aside from asserting that EOIR is bound by the FSA because it is the only acting legal standard for minor detainees, Respondents further contend that the very language of the FSA indicates that EOIR is bound by its terms. *Respondent's Response*, at *5.

In the original opinion, this Court did not render an exact finding as to whether or not EOIR and IJs were bound by the language of the FSA. The Court recognized that the power to detain aliens is shared by DHS and the Attorney General under the INA pursuant to the HSA of 2002. *IJ Opinion,* at *13. The Court also found that the FSA was binding upon ICE within its own plain language. *Id.* at *17 ("The Court finds, on account of these cumulative sources, that the FSA is binding upon DHS and ICE."). Acknowledging that the power delegated by the Attorney General to ICE under the HSA after the dissolution of INS is shared with EOIR, the previous opinion explained that "[a]s the power to manage the custody of minors is shared, it would appear that the responsibility to comply with the FSA would also be shared." *Id.* However, the Court expressly relayed that, although this is a logical conclusion, the Court's opinion does not rest on the fact that it could be bound by the FSA, rather the Court must consider the parameters of the FSA because those factors are expressly binding upon ICE and the Court has the discretionary authority to consider any evidence relevant to its determination. *Id.* at *18, n.10.

Currently, because both DHS and Respondents raise this issue as germane to the Court's prior decision, although it re-affirms that it has the power under the regulations to consider the FSA regardless, it will further find that it is bound by the FSA as an acting component of DOJ and a

- 49 -

derivative of the Attorney General. In addition to the complete analysis of this Court in its previous opinion, designating that the FSA is binding upon EOIR as a matter of shared authority and statutory authority, it further finds that the language of the FSA itself binds this Court. Because the FSA is a binding settlement wherein DOJ and the Attorney General are both named defendants, its standard governs these proceedings as a matter of law.

Respondents' arguments and cites are highly persuasive in this regard. Rebutting DHS' position that EOIR "was not a party to the *Flores* litigation," Respondents point to ¶41 of the FSA which reads, in pertinent part: "**Defendants'** counsel represent and warrant that they are fully authorized and empowered to **enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service…**." *FSA*, ¶41 (emphasis added). The plain language of the FSA indicates that DOJ and the Attorney General are both bound by the FSA and its terms. To the extent that this Court's previous opinion contemplated the FSA in the realm of contract law, it becomes only clearer that the FSA is binding upon this Court. Critically, this Court declined to find that EOIR was necessarily bound by the FSA "because the FSA does not designate EOIR as a party to the agreement although it could have done so in its plain language. Cases interpreting the FSA as binding authority apply the tenants of contract law and thus, such an omission within the FSA could render the plausibility of EOIR's part in the FSA to be attenuated at best." *IJ Opinion*, at *18, n.10. In light of Respondents' persuasive arguments and citations, it is clear that the DOJ, including EOIR, and the Attorney General from whom this Court's powers derive, are both bound by the terms of the FSA as party defendants. Thus, the Court finds it is bound to apply the FSA's terms and further affirms its conclusion that contemplating the FSA was proper under the law.

Regardless, even if the Court did not reach this separate finding, DHS' motion for reconsideration still fails. The points raised by the Government heavily misconstrue this Court's previous opinion. Significantly, this Court held that its consideration of the FSA was valid, not because the FSA existed per se, but because the FSA was presented as a grounds for release by Respondents. As evidence supporting the release of Minor Respondent, which was developed into a regulation which is wholly binding upon this Court, the Court concluded that it was acting within its authority to consider the FSA. *IJ Opinion*, at *19 ("Furthermore, to consider the FSA in custody determinations regarding the release of minors goes hand in hand with applying 8 C.F.R. §§ 232.3, 1236.3). In addition, as was previously discussed in detail above, DHS neglects that this Court is mandated by regulation to review its initial custody decisions. Just as this Court must consider flight risk and danger to the community, the Court must consider the FSA to which, at a minimum, DHS is bound. *See IJ Opinion,* at 27-28, n.14 ("Seeing as a minor's best interests are generally considered by every other agency rendering a similar decision, it would be inconsistent for this Court not to consider that factor in rendering its own decision…[e]specially since all sources governing this Court's decision indicate that the safety or welfare of the juvenile is necessary to this Court's decision."). Since DHS' arguments here heavily rely on alleged limitations of this Court's authority, a ground which has already been discredited, and DHS' motion further fails to address these other precise rationales offered by the Court in its prior decision, the Court cannot conclude that DHS' motion raises any errors of law.

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **15** of **20**

DHS also separately alleges that the language of the FSA actually deprives this Court of the ability to review decisions rendered pursuant to its provisions. Pointing to ¶24B of the FSA, DHS maintains that alien minors wishing to challenge a custody determination must do so before federal courts. *DHS' Motion*, at \*5-6. More pointedly, DHS argues "it was wrong for the Court to infer from the FSA some role or obligations for Immigration Judges, who exercise only the authority specifically conferred upon them." *DHS' Motion*, at \*6.

Here, the Court must again confirm the jurisdictional limitations of the FSA. The Court finds DHS' arguments unpersuasive because the FSA explicitly provides for bond redeterminations with only limited review reserved for federal courts. *See Respondents' Response*, at \*8-9 ("Taken together, paragraph 9…and paragraph 24.A mean that an Immigration Judge must consider and follow the FSA when evaluating a minor's custody."). Crucially, the FSA provides that federal district courts are to review placement "in a particular type of facility" only. *FSA,* ¶ 24B. It does not, however, permit federal district courts to render custody redeterminations which culminate in a release of the minor. In fact, the FSA could not contain such a provision because federal district courts are stripped of the power to render custody determinations by statute. *See IJ Opinion,* at \*18-19; *see also* INA §236A(b)(1)("no court shall have jurisdiction to review"). As Respondents crucially argue, if the Court were to eliminate the FSA as a consideration, it would follow that "a minor must have a sham proceeding before an Immigration Judge." *Respondents' Response,* at \*8. It would strip an IJ of its custody authority as well as the minor's right to a hearing as District Courts likewise do not have custody authority. It would follow that no single tribunal would effectively be able to release a minor from custody. This is obviously an absurd result. Thus, since the FSA provides that Immigration Courts have the ability to conduct "bond redeterminations" it follows that the Immigration Courts likewise have the ability to conduct custody redeterminations under the FSA and corollary statutes. To conclude otherwise would deprive minors of the right to a custody redetermination. Such a terrible conclusion is improper under section 236 of the INA, the regulations, and the FSA.

Therefore, any arguments presented by DHS contending that this Court cannot consider the FSA or that the FSA does not permit review by Immigration Judges are incorrect. DHS' motion to reconsider for these legal errors is affirmatively denied.

ii.     *Best Interests of the Child*

Initially, specific to this Court's analysis of "best interests of the child," DHS argues that the Court is "cabined by the overarching framework under which Immigration Judges are authorized to re-determine an alien's custody, i.e., whether the alien has satisfied any national security, community danger, and flight risk concerns." *DHS' Motion*, at \*6. DHS contends that the FSA does not alter the Court's bond and custody analysis to include best interests of the child. *Id.* Presumably, because case law and the FSA do not "alter the generally applicable standards governing bond proceedings" there is "no other authority upon which the Court could reasonably rely to permissibly invoke a 'best interests of the child' analysis in bond proceedings." *Id.*

As already discussed at length, this Court has the ability to consider any evidence presented, including evidence pertaining to the "best interests of the child" under 8 C.F.R. §1003.19(d).

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **16** of **20**

Very specifically on the record, Respondents' counsel maintained that release of Minor
Respondent was the best course of action and stated the following: "[Lead Respondent] believes
that this would be in [Minor Respondent's] best interest. We do not make this argument in every
single case, as you understand, there are many times where mothers don't believe it is in their
child's best interest. **But in this case, your honor, my client has asked me to make this
argument because she does believe it is in her child's best interest.**" Respondents then went
on to argue various reasons as to why release was in Minor Respondent's best interests. With
such a deliberate submission of evidence of "best interests of the child" entered into the record
by Respondents, it is this very kind of evidence which is permitted to be considered by this Court
pursuant to 8 C.F.R. §1003.19(d). Thus, DHS' allegations that considering the best interests of
the child was an error of law are incorrect and the motion for reconsideration fails.

DHS also argues that, in order for this Court to consider "best interests of the child," such a
directive would have to be expressly delegated by statute. DHS states: "Indeed, where 'best
interests of the child' is a relevant consideration under our immigration laws, the statute has
made this clear." *DHS' Motion*, *6-7. DHS argues: "Thus, while Congress has made clear its
ability to allow such considerations elsewhere in the immigration context, no such statute confers
authority to consider an alien's – child or otherwise – 'best interests' when conducting bond
proceedings." *Id.* at *7. DHS requests then that this Court "reconsider those aspects of its
decision centered on minor respondent's 'best interests.'" *Id.*

DHS' arguments fail to address the foundation of how and why the Court was able to consider
"best interests of the child" in its analysis. Apart from the direct ability derived from the
regulations, it also is necessary to consider "best interests of the child" as it is a factor that must
be considered by DHS when it renders the initial custody determination. *See IJ Opinion*, at *27-
28. Pursuant to the same line of reasoning developed by *Matter of Andeniji*, IJs necessarily
review the custody determinations of DHS and by default, must review the very same factors it
used when rendering the initial determination. *Id.*  Whether it is through regulation, policy, or
even by statute, DHS is supposed to consider the welfare and best interests of the child when
rendering minor custody determinations. Thus, this Court was well within its authority to
consider the same. The Court finds DHS' points unpersuasive and that no error of law was
committed within the prior decision on these grounds.

As such, to the extent DHS alleges legal error on behalf of the Court in its prior decision as it
relates to consideration of "best interests of the child," DHS' motion to reconsider is denied.

      *iii.*      *"Conditions of Detention"*

The final point raised by DHS is that it was erroneous for this Court to consider "conditions of
detention" in the initial decision. DHS contends that such considerations were improper because
"respondents did not argue, and the Court did not find, that conditions of confinement are
relevant to the issue of national security, danger to the community, or flight risk." *DHS' Motion*,
at *7. DHS reiterates that "Immigration Judges have not been delegated authority to evaluate
such conditions." *Id.* at *7-8. Further, DHS alleges that it was erroneous for the Court to rely on

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **17** of **20**

*Plyler v. Doe*, 457 U.S. 202 (1982) because in doing so the Court rendered a finding on a constitutional issue which it does not have proper jurisdiction to issue. *Id.*

Contemplating each point in turn, it is clear that none of these arguments constitute an "error of law." As to the first and second points, DHS is correct; Respondents did not argue that conditions of confinement are relevant to national security, danger to the community, or flight risk. Instead, Respondents presented arguments regarding academic opportunities in direct relation to the "best interests of the child." In doing so, Respondents presented valid evidence that this Court could consider under 8 C.F.R. §1003.19(d). Thus, although DHS raises this issue, and more so the issue that this was an improper exercise of the Court's authority, it is unpersuasive. DHS' contentions of legal error on these bases are incorrect.

Regarding the third argument, it is clear that DHS wholeheartedly misconstrues the prior findings made by the Court. The Court did not render a constitutional determination nor was any reliance on *Plyler v. Doe* misplaced. Instead, the Minor Respondent's inability to obtain educational opportunities in the Artesia Detention Facility was raised to support the contention that it would be in Minor Respondent's best interests to be released from custody. *IJ Opinion*, at *28 ("While there are no constitutional questions presented here, the emphasis on providing educational resources to detained children is consistent.").[3] The Court contemplated the limited access to educational resources in Artesia insofar as it affected the interests of Minor Respondent. The Supreme Court precedent only emphasized how important the U.S. Constitution deems the educational opportunities of illegal migrants. Such emphasis supported a finding of the Court that it would logically be in Minor Respondent's best interests to have access to education as opposed to no educational opportunities. Thus, the misleading nature of DHS' argument is two-fold: first, because the Court was not considering "conditions of detention" so much as it was considering the "best interests of the child," which the Court has already substantiated as proper, and second, because the Court conducted absolutely no constitutional analysis, rather it relied on persuasive Supreme Court precedent finding a fundamental right to education for illegal alien children as a strong indication that access to school would be within Minor Respondent's best interests. *IJ Opinion*, at *29 ("it appears to be a matter of consensus that receiving an education is within the best interests of the minor and something that is relevant to the Court's decision.").

Therefore, the arguments submitted by DHS surrounding "conditions of detention" are entirely misguided and improper. Accordingly, the Court finds no legal error was made in its prior decision and DHS' motion to reconsider on these grounds is likewise denied.

---

[3] The Court acknowledges that, since the release of its original decision, educational resources have become available to the inhabitants of the Artesia Detention Facility. *See* ICE News Releases, dated October 10, 2014, *available at* http://www.ice.gov/news/releases/school-about-start-children-artesia-family-residential-center. However, the Court does not reach the issue of whether this change in facts would affect the outcome for Minor Respondent in this case. Because DHS' arguments rest on the premise that the Court should not have considered access to education in the first instance where the outcome would remain unaffected, this change in facts is moot.

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **18** of 20

2.    *Policy Favoring Release of Minors*

DHS argues that the Court's prior opinion incorrectly attributes a "policy favoring release" to regulations provided at 8 C.F.R. §§ 236.3, 1236.3. *DHS' Motion*, at *8. Principally, DHS maintains that the Court ignored "the limited applicability of the regulation." *Id.* at *9. DHS draws a distinction between these regulations and a custody redetermination by stating that no such policy may be considered since a Court is limited to contemplating the "governing factors of flight risk and danger to the community." *Id.*

In the Court's original written decision, a plethora of references were provided to show that the regulations, the FSA, and other policy materials all confirm that there is a generally recognized policy favoring release of minors in immigration proceedings. *See IJ Opinion*, at *9-10, 18-19, 28. As the Government's arguments related to limiting this Court's jurisdiction fail on the merits, so do the arguments related to this Court's ability to consider that there is a general policy favoring release.

To the extent DHS argues that the plain language of the regulations do not indicate a policy favoring release, DHS's arguments also lack merit. The regulations implement compulsory language; this compulsory language was specifically selected when the Attorney General created the governing regulation to effectuate the necessity for a policy favoring release. Not only is this position supported by the exact legislative history of the regulations, but it is further supported by traditional canons of statutory interpretation. *See IJ Opinion*, at *28 ("In particular that the welfare of a minor is of "paramount concern" to the Government and as a result, the word "shall" is explicitly utilized in the regulation to emphasize the notion that "reunification represents service policy, with detention being the exception.")(citations omitted). The use of the word "shall" within a statute or regulation has always been correlated with the necessity of mandatory action on behalf of an adjudicator. *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 532 U.S. 26, 35 (1998)("The mandatory 'shall'… normally creates an obligation impervious to judicial discretion."); *see also United States ex. Rel. Siegel v. Thoman*, 156 U.S. 353, 359-60 (1895)("in the law to be construed here it is evident that the work 'may' is used in special contradistinction to the work 'shall'"); *see generally Rastelli v. Warden, Metro, Correctional Center*, 782 F.2d 17, 23 (2d Cir.. 1986)("The use of a permissive verb – 'may review' instead of 'shall review' – suggests a discretionary rather than a mandatory review process."). Here, the language is clear, it is stated not only once, but twice in the regulations that juveniles "**shall be released**." 8 C.F.R. §1236.3(b)("Release. Juveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance, **shall be released** pursuant to the following guidelines…")(emphasis added); 8 C.F.R. § 1236.(b)(1)("Juveniles **shall be released**, in order of preference…")(emphasis added).

Because the FSA, binding regulations, legislative history, and policy governing custody determinations all demand that there be a general policy favoring release of minors from immigration custody, the Court does not find that it committed legal error in considering the same policy. Thus, DHS' motion to reconsider this alleged legal error fails and the motion is denied.

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **19** of **20**

V.    C<small>ONCLUSION</small>

After sincere consideration of DHS' motion in its entirety, the Court finds that DHS' motion for reconsideration must be denied.

As an initial matter, DHS' motion to reconsider is facially improper as a matter of law. DHS' motion is devoid of material issues and DHS concedes to this fact. Moreover, DHS' motion only asserts those arguments which should have and could have been raised before the Court issued its original orders. Because DHS' motion is fatally improper under the law governing the requirements for reconsideration, the Court must deny DHS's motion.

Alternatively, contemplating arguments raised by DHS and Respondents, the Court denies DHS' motion on the merits for it raises no errors of fact or law contained in this Court's prior opinion.

Principally, DHS' allegations of factual error are misguided. The record speaks for itself and it is clear that DHS mischaracterizes its own position throughout the proceedings previously held before this Court. Likewise, even taking DHS' version of the facts as true, a misconstrued assessment of a party's position under the circumstances does not constitute an "error of fact" for purposes of reconsideration. Therefore, for either reason, DHS' motion to reconsider errors of fact in the record is denied.

DHS' allegations of legal error do not fare any better when placed under scrutiny. Namely, DHS' motion ignores the entirety of the regulations that govern custody proceedings before Immigration Courts. Those regulations clearly designate that a Court may consider any evidence presented. In this case, that evidence constitutes the best interests of the child, conditions of detention, and the FSA. DHS' motion also ignores the procedural implications should this Court not consider the FSA and its provisions. Mainly, a minor in custody would be stripped of a meaningful review before the Court. A minor would have no avenue to seek his release from custody which is unsound, especially because a review of one's custody status is guaranteed by the FSA, the regulations, and section 236 of the Act. Finally, because DHS and Respondents both raise arguments related to this Court's status under the FSA, the Court concludes it is bound by the FSA as a party to the same. Thus, as a matter of law, whether by regulation or otherwise, it was correct for this Court to consider the FSA and any evidence presented by the parties. Such evidence explicitly includes a policy favoring release of minors and the best interests of Minor Respondents. Accordingly, DHS has presented no errors of law on behalf of this Court in its previous decision. DHS' motion for reconsideration on these grounds is denied.

Based on the above and foregoing, the Court enters the following Order:

**Order:**            **IT IS HEREBY ORDERED that DHS' Motion to Reconsider be DENIED.**

_10 - 28 - 14_
Date

_Roxanne C. Hladylowycz_
Roxanne C. Hladylowycz
United States Immigration Judge

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page **20** of **20**

Appeal Date: 11/28/2014

---

CERTIFICATE OF SERVICE

THIS DOCUMENT WAS SERVED BY:      MAIL (M)      PERSONAL SERVICE (P)

TO:   ( ) ALIEN   ( ) ALIEN c/o Custodial Officer   (✓) ALIEN's ATT/REP   (✓) DHS   √BIA

DATE:   10/28/2014         BY: COURT

STAFF_____MM_____

Attachment(s):  ( ) EOIR-33  ( ) EOIR-28 ( ) Legal Services List ( ) Other

---

# Exhibit 58

DECLARATION OF CARLOS HOLGUIN

I, Carlos Holguín, declare and say as follows:

1. I am General Counsel with the Center for Human Rights and Constitutional
Law Foundation. I have served in this capacity since 1984. The Center is a non-profit,
public interest legal foundation dedicated to defending the civil, constitutional and
human rights of immigrants, refugees, children and the poor.  My practice focuses on
legal, legislative and educational work on behalf of immigrants and refugees.  I have
served as lead and co-counsel in numerous impact cases involving deportation, political
asylum, and the rights of juveniles.

2. I am one of the attorneys for the certified plaintiff class in *Flores v. Johnson*, No.
CV 85-4544 (C.D. Cal.). I participated in investigating, filing, and litigating this action,
and in negotiating the class-wide settlement thereof approved by this Court on January
28, 1997 (Settlement). The facts recounted in this declaration are based upon my
personal knowledge of the negotiations that culminated in the Settlement.

3. The assertion contained in defendants' opposition to plaintiffs' motion to
enforce the Settlement to the effect that the Settlement's class definition is intended only
to avoid confusion with definition of a "child" in the Immigration and Nationality Act
(INA), 8 U.S.C. § 1101(b)(1), is factually incorrect. The parties settled upon the class
definition so that the agreement would cover all persons under the age of 18 in federal
custody on account of their immigration status. I recall no instance during the
negotiations that preceded the Settlement when any party expressed any concern that
the class definition be crafted so as to avoid confusion with the INA's definition of a
"child." Indeed, the parties would not have anticipated any such confusion because the
Settlement *consistently* refers to the beneficiaries of the agreement as "minors" or
"juveniles," and reserves the term "child" to describe the type of facilities in which non-

delinquent class members must be placed: *i.e.*, non-secure facilities licensed to care for dependent children.

4. The assertion contained in defendants' opposition to the effect that the Settlement's references to "dependent" minors manifests the parties' intent that the agreement not cover accompanied minors is also factually incorrect. Rather, the Settlement uses the term "dependent" exclusively with reference to the type of facilities in which the general population of class members would thenceforth be housed. The term was not intended to exclude accompanied minors from the protected class minors, but rather to incorporate by reference state standards for facilities in which dependent minors may be housed from locked facilities appropriate only for delinquent youth.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of March, 2015, at Santa Clarita, California.

_____
Carlos Holguín

/ / /

2

Exhibit 59

DECLARATION OF ALICE BUSSIERE

I, Alice Bussiere, declare and say as follows:

1. I am a staff attorney at the Youth Law Center. The Youth Law Center is a public interest law firm that works to protect children in the nation's foster care and justice systems from abuse and neglect, and to ensure that they receive the necessary support and services to become healthy and productive adults. From 1984 to 1997 I was a staff attorney at the National Center for Youth Law. I joined the Youth Law Center in 2000. My practice at both organizations has been focused on legal issues that affect children and youth, particularly those in out of home care.

2. I was an attorney for the plaintiff class in *Flores v. Johnson*, No. CV 85-4544 (C.D. Cal.) at the time the class-wide settlement (Settlement) of this matter was negotiated and approved by this court. I participated in investigating, filing, and litigating this action, and in negotiating the terms of the Settlement. The facts recounted in this declaration are based upon my personal knowledge of the negotiations that culminated in the Settlement.

3. The assertion at page 21 of Defendants' Response in Opposition to Plaintiff's Motion to Enforce Settlement of Class Action that "[t]he reference to 'dependent children' is clearly a reference to children who are not accompanied by a parent or guardian" is incorrect. The Settlement employs the term "dependent" to define licensed programs in order to distinguish these programs from detention centers and correctional facilities that house delinquent children.

4. The Settlement recognizes that children in federal custody solely because of allegations that they lack a legal immigration status should not be treated like criminals or delinquent youth.  The Settlement was based in part on concepts embodied in the Juvenile Justice and Delinquency Prevention Act that prohibit confinement of children, including alien children, who have not been charged with or committed a criminal or delinquent act in secure detention facilities or secure correctional facilities.  42 U.S.C. §5633(a)(11).  Paragraph 21 of the Settlement provides for secure confinement of minors who require incarceration for specified reasons including delinquency.

5.  State standards for children's residential facilities are different from the standards that apply to detention and correctional facilities for juveniles.  For example, in California the Community Care Facilities Act , Cal. Health and Safety Code §§1500-1567.87, governs licensing of children's residential facilities, but the Act specially exempts juvenile correctional facilities for delinquent youth.  Cal. Health & Safety Code §1505(c)&(d).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of March, 2015, at Princeville, HI.


Alice Bussiere

/ / /

Exhibit 60

**DECLARATION OF GENEVRA GILDEN BERGER**

I, Generva Gilden Berger, hereby declare:

The statements in this declaration are based on my personal knowledge, and if called to testify I could and would do so competently as follows:

**Background and Qualifications**

1. A full list of my background and qualifications is contained in my previous declaration, submitted in this case in support of Plaintiffs' motion to enforce the *Flores* settlement, dated January 12, 2015 (Dkt. __).

**Relevant Facts and Materials Reviewed**

2. I am making this second declaration in order to further provide my considered opinion on the impact to child welfare from the practice by U.S. Immigration and Customs Enforcement ("ICE") of detaining children along with their mothers in family immigration detention facilities that are operated by contracting private companies and that are not licensed by the state in which they are located to provide care to dependent children.

3. The opinions I offer are based on the factual propositions in my previous declaration, as well as my background, experience, and expertise in the area of child welfare. They are also based on my review of the government's opposition to the plaintiffs' motion to enforce the *Flores* settlement (Dkt. 121), dated February 27, 2015, and all declarations and exhibits attached thereto.

**Findings and Opinions**

**Placing Children in A Secure (Locked) Facility Imposes Untold Harms**

1

4.      I have reviewed ICE's response to the plaintiffs brief and have been asked by plaintiffs' attorneys to comment further upon the effects to children of being detained in secure (or locked down) facilities.

5.      Numerous studies have been conducted over the past two decades which document the damaging effects of incarceration in a locked facility on children.  Examples of these studies include: 1) "No Place for Kids" by the Annie E. Casey Foundation, addressing juvenile incarceration systems in the United States, available at http://www.aecf.org/resources/no-place-for-kids-full-report; 2) "Children Residing In Prison With Their Parents" by Poso, Enroos and Vierula; and 3) summaries of research studies addressing the effects of institutional care on vulnerable children, in "Research on Institutional Care of Vulnerable Children" by the North American Council on Adoptable Children, available at

http://www.crin.org/docs/US%20Instititional%20Care%20Research%20Studies%20NACAC.pdf

The data from multiple studies reflect more negative outcomes for children living in more restrictive settings with a locked down facility being at the top of the scale.  For this reason, national child welfare standards have defined "best practice" placements of dependent children as being first with relatives or guardianships and then with individual foster parents.

6.      One such study, named "Children Residing In Prison With Their Parents," was conducted in Finland and dealt specifically with children incarcerated with their mothers in two different prisons. The study investigated "institutional invisibility," a term which exemplifies the hidden trauma experienced by children and the lack of clear guidelines in recognizing and treating such issues.

7.      The research data from this and other investigative studies of the effects on confined children are clear:   marginalization of one's identity encompassing degradation of individual worth and self-responsibility; ambiguous loss trauma; longer-term negative outcomes which include clinical depression and other forms of mental illness, antisocial behavior, learning impairment, drug use, criminal acts and, most often, a multiplicity of such outcomes.

8.      For children who are alone, without a parent or relative in locked facilities, the aforementioned trauma-induced outcomes are the same or worse.

9.      The potential harm to children kept in locked facilities is so well-substantiated that the federal government (Department of Health and Human Services) does not permit states to use locked facilities as residential care for dependent foster children except in the specialized circumstance of documented severe mental illness which is reviewed and ordered by the court.

10.     In the case of accompanied or unaccompanied immigrant children, who have already undeniably experienced the significant trauma of being forced to flee the poor conditions and possible terrors of their native land, the rigors of a long, hard journey and the intrinsic fear of what lies ahead of them, their immediate confinement in a locked facility under the constant and brightly-lit scrutiny of guards, can only exacerbate the study results seen in children who are not seeking asylum in the country and who have not had to flee their native land.

11.     It is important to note that although residential care is not an ideal environment for children, the licensing laws which govern the states' oversight of  residential care facilities in the United States take into account the "whole child" welfare of dependent children who for various reasons, such as kidnapping danger or intensive mental health treatment needs or other individualized circumstances, are appropriate to reside in such facilities. Unlike the ICE facilities, they are not locked; they perform psycho-social assessments of each child upon entry

into the facility; they do not commingle children who may have dangerous propensities; they do not employ guards but, rather, employ staff who have received specified training in child care and development and receive enhanced training at periodic intervals; they provide group and individual therapy sessions; they are, in short, designed to improve and safeguard the child's physical, mental and psychological health as opposed to simply housing inmates to prevent escape.

11.     In closing, I think it is also important to point out that with reference to the *Flores* settlement's understanding that "ICE placements meet child welfare standards," the above are the child welfare standards that exist throughout this country and they do not change merely because a new facility is established or because of the passage of time.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 12ᵗʰ day of March 2015 in Pasadena, California.


Genevra Gilden Berger

4

- 67 -