BENJAMIN C. MIZER
Acting Assistant Attorney General
Civil Division
LEON FRESCO
Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel, District Court Section
Office of Immigration Litigation
        P.O. Box 868, Ben Franklin Station
        Washington, D.C. 20044
        Tel:  (202) 532-4824
        Fax:  (202) 305-7000
        Email:  sarah.b.fabian@usdoj.gov

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | Case No. CV 85-4544 |
| Plaintiffs, | **SUPPLEMENTAL EXHIBITS TO DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION** |
| v. | |
| ERIC H. HOLDER, JR., Attorney General of the United States; *et al.*, | |
| Defendants. | Hearing Date:  April 17, 2015 Time: 3:00 pm Dept: Courtroom 7, Los Angeles - Spring Street Courthouse |

Defendants hereby submit the following supplemental exhibits to their

Response in Opposition to Plaintiffs' Motion to Enforce Settlement of Class Action.

- **Exhibit E**:  *R.I.L.-R., et al. v. Johnson, et al.*, Case No. 15-0011-JEB, Defendants' Motion for Reconsideration of the Court's Preliminary Injunction Order, ECF No. 37 (D.D.C. Mar. 20, 2015) (attached hereto).

- **Exhibit F:**  Executive Office for Immigration Review, FY 2014 Statistics Yearbook, at P3 (showing that the rate of in absentia orders for aliens released on bond or on their own recognizance has increased over the last five years (from FY 2010 to FY 2014) from 22% to 39%), available at http://www.justice.gov/eoir/statspub/fy14syb.pdf.

- **Exhibit G**:  Department of Homeland Security, Office of the Inspector General, *CBP's Handling of Unaccompanied Alien Children*, September 2010 (attached hereto).

- **Exhibit H:**  Department of Homeland Security, Office of the Inspector General, Oversight of Unaccompanied Alien Children, July 30, 2014 (attached hereto).

- **Exhibit I:**  Department of Homeland Security, Office of the Inspector General, Oversight of Unaccompanied Alien Children, October 2, 2014 (attached hereto)

DATED:      March 26, 2015              Respectfully submitted,


                                        BENJAMIN C. MIZER
                                        Acting Assistant Attorney General
                                        Civil Division

                                        LEON FRESCO
                                        Deputy Assistant Attorney General
                                        Civil Division

                                        WILLIAM PEACHEY
                                        Director, District Court Section
                                        Office of Immigration Litigation

                                        WILLIAM SILVIS
                                        Assistant Director, District Court Section
                                        Office of Immigration Litigation

                                        */s/ Sarah B. Fabian*
                                        SARAH B. FABIAN
                                        Senior Litigation Counsel
                                        Office of Immigration Litigation
                                        District Court Section
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, D.C. 20044
                                        Tel: (202) 532-4824
                                        Fax: (202) 305-7000
                                        Email: sarah.b.fabian@usdoj.gov

                                        *Attorneys for Defendants*

1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 26, 2015, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.


/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EXHIBIT E

| | |
|---|---|
| R.I.L.R., *et al.*, on behalf of themselves and others similarly situated,   ) ) ) ) | |
| Plaintiffs,   ) ) | |
| v.   ) ) | Civil Action No. 15-0011-JEB |
| JEH JOHNSON, Secretary of Homeland Security, *et al.*,   ) ) ) ) | |
| Defendants.   ) ) ) ) | |

**DEFENDANTS' MOTION FOR RECONSIDERATION OF
THE COURT'S PRELIMINARY INJUNCTION ORDER[1]**

On February 20, 2015, the Court issued a preliminary injunction precluding Defendants from detaining class members for the purpose of deterring future immigration to the United States, as well as from considering deterrence of such immigration as a factor in custody determinations as required in the Attorney General's binding precedent in *Matter of D-J-*, 23 I. & N. Dec. 572 (A.G. 2003). *See* Order, ECF No. 32; Mem. Op., ECF No. 33, Feb. 20, 2015. But neither Plaintiffs' Amended Complaint, nor their motion for a preliminary injunction, challenged the legality of applying *Matter of D-J-*, as one factor to be considered in making discretionary detention decisions under 8 U.S.C. § 1226(a). Defendants therefore respectfully submit that the

---

[1] At the March 10, 2015 status conference, the Court gave Defendants until April 1, 2015 to file their reconsideration motion. Defendants, however, are filing their motion under Federal Rule of Civil Procedure 59(e), and Rule 6(b)(2) prohibits any extension of the twenty-eight day deadline for filing a motion under that Rule. Therefore, Defendants are filing their motion on March 20, 2015, and respectfully ask the Court to reset the response and reply deadlines to April 17, 2015, and May 1, 2015 respectively. Counsel for Defendants has conferred with counsel for Plaintiffs who stated that they do not oppose the entry of this amended schedule.

injunction entered by the Court did not speak to the specific issue raised by Plaintiffs in their Amended Complaint, and exceeded the scope of the injunction they requested. Because the Court ultimately ruled on claims that Plaintiffs never raised in their initial filings, Defendants were denied the opportunity to substantively and meaningfully address the issues on which the Court ultimately ruled, and to submit evidence related to those issues. For these reasons, Defendants now move under Federal Rule of Procedure 59(e) for the Court to reconsider its February 20, 2015 Memorandum Opinion and Order to correct clear error and prevent manifest injustice.[2]

Plaintiffs' Amended Complaint challenged an asserted "blanket No-Release Policy." Plaintiffs alleged that:

> DHS adopted a blanket No-Release Policy for detained Central American families in order to deter additional migrants from coming to the United States. Under this policy, even though Plaintiffs all demonstrated a credible fear of persecution—entitling them to pursue their asylum claims before the immigration court— and even though they are eligible under the immigration laws to be considered for release on bond, recognizance, or other conditions, Defendants *refused to consider them for release* and instead ordered their continued detention. Defendants did so without making any individualized determination as to whether Plaintiffs' detention was necessary to prevent flight or protect the community.

Am. Compl. ¶ 5 (emphasis added). Similarly, Plaintiffs' motion for preliminary injunction asked the Court to "preliminarily enjoin continued implementation of the 'No-Release Policy,'" which Plaintiffs defined as the "blanket detention of migrants for the purpose of deterrence, without an individualized custody determination and regardless of whether their detention is required by flight risk or danger to the community." Pl. Am. Mot., ECF No. 9-1, at 1-2. And Plaintiffs sought to certify a class of Central American family units who "have been or will be denied such

---

[2] Defendants seek reconsideration of the Court's rulings with regard to both Plaintiffs' preliminary injunction motion and Defendants' motion to dismiss.

release pursuant to DHS's blanket policy of denying release to detained families without conducting an individualized determination of flight risk or danger to the community." Am. Compl. ¶ 19. Defendants responded to these contentions, arguing at length that the Government was not applying a "blanket No-Release Policy," and explaining that they provided Plaintiffs and all putative class members with individualized custodial determinations considering a multitude of factors, including an individualized determination of flight risk and danger to the community, and the additional factor of whether detention was justified as a deterrent to prevent future mass migration under *Matter of D-J-. See, e.g.,* Def. Opp., ECF No. 22-1, at 13-17.

Notably, in their preliminary injunction motion, Plaintiffs not only did not argue that *Matter of D-J-* violated 8 U.S.C. § 1226(a), but also altogether distinguished the case from their claims before this Court. In arguing that individualized determinations are required under 8 U.S.C. § 1226(a), Plaintiffs contended that "DHS has never before authorized the blanket detention of individuals like Plaintiffs under section 1226(a) based solely on generalized deterrence concerns." Pl. Am. Mot. at 4. In a footnote discussing *Matter of D-J-*, Plaintiffs explained that case as holding that "the Attorney General construed section 1226(a) to authorize immigration officers to consider deterrence of these national security concerns *as but one factor in determining whether to exercise individualized discretion to release individual detainees.*" *Id.* at 4 n.4 (emphasis added). Plaintiffs went on to state, "For the reasons set forth below, the underlying reasoning of *D-J-* is distinguishable from the facts here and otherwise incorrect." *Id.* A later footnote clarified:

> Plaintiffs are aware of the Attorney General's interpretation of the relevant regulation in *Matter of D-J-*, in which it concluded, among other things, that the regulation "does not establish any right to release on bond." *D-J-*, 23 I. & N. Dec. at 576. Plaintiffs, however, do not assert any such "right"; rather, they argue that when the regulation grants "discretion," actual, individualized

"discretion" must be exercised, not prohibited. Moreover, as explained in note 4 above, *D-J-* does not endorse the elimination of discretion and the effective elimination of individual custody determinations. It held only (albeit incorrectly) that the government's generalized deterrence and national security concerns were factors to be considered in an officer's exercise of discretion.

*See id.* at 21-22 n. 19.

Thus, Plaintiffs made clear that, in their view, their challenge was to a purported "blanket" policy of denying release based on deterrence concerns. Plaintiffs did not actually make the argument that it was impermissible for ICE to follow *Matter of D-J-* as **part** of its individualized custody reviews at any point in their filings. Plaintiffs only submitted that "[e]ven if that were the extent of the policy, it is illegal and subject to review." Pl. Rep., ECF No. 24, at 10. But Plaintiffs' maintained, even in their reply, that what they were really challenging was the fact that, in they intended to challenge deterrence only insofar as they believed it to be the "*dispositive* factor in nearly every case." *Id.*

In its Memorandum Opinion, the Court found that Defendants adequately established that Plaintiffs' allegations were incorrect, concluding that it was "reluctant to find an across-the-board No-Release Policy when it appears that – at least in some small number of cases – ICE does grant bond on the basis of individualized considerations." Mem. Op. at 8.[3] Nonetheless, the Court went on to analyze what it called "a slightly narrower formulation of the relevant policy." *Id.* It was on this second formulation that the Court, citing only to Plaintiffs' reply, based its ruling granting the preliminary injunction. *Id.* at 8-9. In so ruling, the Court relied on

---

[3] In addition to the number of individuals released on bond by ICE, there were also a number of Central American family units seeking asylum who were released by ICE on parole, either *before* or after their credible fear hearings were concluded. *See* Amended Declaration of Marla M. Jones, ECF No. 29-1, ¶ 6. Although the Court did not address these individuals, their releases also make clear that Plaintiffs' allegations of a "blanket" no-release policy of Central American family units seeking asylum are unsupported by the evidence.

4

an argument that Plaintiffs only touched on in their reply, and that was raised only *after* Defendants had clearly established that Plaintiffs' initial allegations – that they were being denied individualized bond considerations pursuant to a "blanket" policy – were factually erroneous and could not stand.

Thus, rather than limiting its analysis to the "blanket no-release policy" challenged by the Plaintiffs, the Court's Memorandum Opinion more broadly addressed the already-settled question of whether considering deterrence as but one factor in a larger individualized bond consideration was permissible. And by focusing on this issue, the Court's injunction raised legal and jurisdictional issues well outside the contents of Plaintiffs' Amended Complaint and request for injunctive relief. As such, Defendants respectfully ask the Court to reconsider whether, in light of the history of the Immigration and Nationality Act ("INA"), the Supreme Court case law discussing immigration detention, and the plain language of 8 U.S.C. § 1226(e), it has jurisdiction to review a challenge to the use of one discretionary factor being considered in individualized bond decisions on a class-wide basis under the Administrative Procedure Act ("APA") rather than through a writ of habeas corpus brought by an individual in the district in which he or she is detained. Defendants also ask the Court to reconsider whether it may issue the class-wide injunctive relief contained in the preliminary injunction in light of 8 U.S.C. § 1252(f)(1). Finally, Defendants ask the Court to reconsider whether a preliminary injunction is warranted in light of the additional evidence submitted by the Government in conjunction with this Motion.

## I.  <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 59(e), a party may move to alter or amend within twenty-eight days of the Court's judgment. Fed. R. Civ. P. 59(e). "A Rule 59(e) motion is

Case 2:85-cv-04544-DMG-AGR Document 131-7 Filed 03/26/15 Page 10 of 31 Page ID
#:2222
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 6 of 32

discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Fox v. Am. Airlines Inc.*, 389 F.3d 1291, 1296 (D.C. Cir. 2004) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). A Rule 59(e) motion is not "simply an opportunity to reargue facts and theories upon which a court has already ruled." *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995).

## II.  ARGUMENT

### A.  The APA Does Not Provide a Waiver of Sovereign Immunity Because the Habeas Corpus Statute Provides an "Other Adequate Remedy" to Review Plaintiffs' Claims.

The Court's conclusion that individualized immigration detention decisions can be reviewed under *both* the APA and habeas is clear error.  The APA provides a waiver of sovereign immunity for "final agency action for which there is no other adequate remedy in a court . . . ." 5 U.S.C. § 704.  Notably, the Court did not find that a writ of habeas corpus is not an "other adequate remedy" under 5 U.S.C. § 704.  Rather, it found that Congress "never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA." (*See* Mem. Op. at 28-29.)  This conclusion must be reconsidered because it ignores the history of the INA, the plain language of 8 U.S.C. § 1226(e), and the substantial body of Supreme Court precedent relating to immigration detention.

The history of the INA, and the case law interpreting it, clearly establish Congress's intent to streamline judicial review of immigration removal orders in the circuit courts of appeals, and to provide only a limited exception for review of legal and constitutional issues related to immigration detention through a writ of habeas corpus.  The Supreme Court discussed the early history of the review of immigration detention in *Zadvydas v. Davis*:

6

Case 2:85-cv-04544-DMG-AGR Document 131 Filed 03/26/15 Page 11 of 31 Page ID
#:2223
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 7 of 32

> Before 1952, the federal courts considered challenges to the lawfulness of
> immigration-related detention, including challenges to the validity of a
> deportation order, in habeas proceedings. *See Heikkila v. Barber*, 345 U.S. 229,
> 230, 235-36 (1953). Beginning in 1952, an alternative method for review of
> deportation orders, namely, actions brought in federal district court under the
> Administrative Procedure Act (APA), became available. *See Shaughnessy v.
> Pedreiro*, 349 U.S. 48, 51-52 (1955). And in 1961 Congress replaced district
> court APA review with initial deportation order review in courts of appeals. *See*
> Act of Sept. 26, 1961, § 5, 75 Stat. 651 (formerly codified at 8 U.S.C. §
> 1105a(a)) (repealed 1996). The 1961 Act specified that federal habeas courts
> were also available to hear statutory and constitutional challenges to deportation
> (and exclusion) orders. *See* 8 U.S.C. § 1105a(a)(10), (b) (repealed 1996). These
> statutory changes left habeas untouched as the basic method for obtaining review
> of continued custody after a deportation order had become final. *See Cheng Fan
> Kwok v. INS*, 392 U.S. 206, 212, 215-16 (1968) (holding that § 1105a(a) applied
> only to challenges to determinations made during deportation proceedings and
> motions to reopen those proceedings) . . . .

533 U.S. 678, 687 (2001). Thus, in *Zadvydas*, the Court recognized that even though Congress

changed the forum for challenges to exclusion and deportation orders, it has always intended that

review of immigration custody, such as the instant case, remain under the habeas statute, 28

U.S.C. § 2241.

In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act ("AEDPA"),

Pub. L. No. 104-132, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant

Responsibility Act ("IIRIRA"), Division C of Pub. L. No. 104–208, 110 Stat. 3009-546. Among

other things, those two Acts "made significant changes in INA's provisions relating to judicial

review." *Sandoval v. Reno*, 166 F.3d 225, 229 (3d Cir. 1999). These changes created confusion

among the circuits, causing a division of authority on whether an alien could still challenge

certain legal issues related to his or her deportation order through a writ of habeas corpus.

*Compare Sandoval*, 166 F.3d at 238 (review available in habeas); *Goncalves v. Reno*, 144 F.3d

110 (1st Cir. 1998) (same); and *Henderson v. INS*, 157 F.3d 106 (2d Cir. 1998) (same); *with

Richardson v. Reno*, 162 F.3d 1338, 1358 (11th Cir. 1998) ("AEDPA and IIRIRA reflect

Case 2:85-cv-04544-DMG-AGR Document 131 Filed 03/26/15 Page 12 of 91 Page ID
#:2224
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 8 of 32

Congress' clear intent to avoid unduly protracted litigation over removal orders against resident aliens by consolidating all judicial challenges in the courts of appeals under INA § 242(b)(2) after a final removal order, and by removing all district-court jurisdiction, including § 2241 habeas jurisdiction, over immigration decisions."), *cert. granted and vacated by* 526 U.S. 1142 (1999).

In considering this issue, in *Sandoval*, the Third Circuit noted the fact that "in the immigration context, the Court has historically drawn a sharp distinction between 'judicial review' – meaning APA review – and the courts' power to entertain petitions for writs of habeas corpus." *Sandoval*, 166 F.3d at 235 (discussing *Heikkila*, 345 U.S. 235-36).[4] Thus, in concluding that AEDPA and IRRIRA did not preclude habeas corpus review, the Third Circuit "presume[d] that Congress, in enacting AEDPA and IIRIRA, was cognizant of the Court's differentiation between 'judicial review' on the one hand and writs of habeas corpus on the other." *Id.* at 235. This position was ultimately adopted by the Supreme Court, which held that provisions of AEDPA and IRRIRA precluding judicial review of an alien's purely legal challenge to his deportation order did not eliminate habeas corpus jurisdiction over such a challenge. *See INS v. St. Cyr*, 533 U.S. 289, 311 (2001) ("In the immigration context, 'judicial review' and 'habeas corpus' have historically distinct meanings.") (citing *Heikkila*, 345 U.S. at 229); *id.* at 305 ("Moreover, to conclude that the writ is no longer available in this context would

---

[4]     "[T]he Supreme Court in *Heikkila* held that although the 1917 Immigration Act was a 'statute precluding judicial review' within the contemplation of the APA, an alien could challenge his or her executive detention via habeas . . . .   In doing so, the Court was clear that the 'judicial review' precluded by the 1917 Acts did not include habeas corpus; the Court expressly rejected the conclusions of three courts of appeals that had 'taken the position that habeas corpus itself represented judicial review.'" *Sandoval*, 166 F.3d at 235 (quoting *Heikkila*, 345 U.S. 235-36) (internal citations omitted).

Case 2:85-cv-04544-DMG-AGR Document 131 Filed 03/26/15 Page 13 of 31 Page ID
Case 1:15-cv-00011-JEB Document 87 Filed 03/20/15 Page 9 of 32 Page ID
#:2225

represent a departure from historical practice in immigration law. The writ of habeas corpus has

always been available to review the legality of Executive detention.").

In 2005, Congress amended the INA again, this time channeling **all** judicial review of

immigration removal orders into the circuit courts of appeals. *See* REAL ID Act of 2005, Pub.

L. No. 109-13, Div. B., 119 Stat. 231 (May 11, 2005). This amendment "finished the job

[Congress] started a decade earlier – again routing all removal challenges into the courts of

appeals. This time it was emphatically clear; there would be no more district court involvement

in the review of removal orders, and specifically not by way of habeas corpus." *Musau v.*

*Carlson*, 499 Fed. Appx. 837, 842-43 (10th Cir. 2012). Thus, the REAL ID Act channeled **all**

judicial review of immigration removal orders into the circuit courts of appeals; but this did not

impact the availability of habeas jurisdiction in district court over legal and constitutional

challenges to detention (whether before or after entry of a removal order). *See, e.g., Ovchinnikov*

*v. Clark*, 543 F. Supp. 2d 1265, 1269 (W.D. Wash. 2008) ("The REAL ID Act, however, did not

eliminate habeas jurisdiction over challenges to detention that are independent of challenges to

removal.") (citing *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir.2006) ("By its terms,

the jurisdiction stripping provision does not apply to federal habeas corpus petitions that do not

involve final orders of removal.")).

While Congress has generally channeled all judicial review of removal orders into the

circuit courts of appeals, it also has expressed, in 8 U.S.C. § 1226(e), a clear intention to

preclude judicial review of bond and detention decisions. The applicable section, titled "Judicial

review," states:

> The Attorney General's discretionary judgment regarding the application of this
> section shall not be subject to review. No court may set aside any action or
> decision by the Attorney General under this section regarding the detention or
> release of any alien or the grant, revocation, or denial of bond or parole.

8 U.S.C. § 1226(e). Nonetheless, consistent with the prior history of the INA discussed above, Supreme Court case law interpreting 8 U.S.C. § 1226(e) has provided that for challenges to immigration detention, the sole exception to Congress's prohibition on judicial review is through a writ of habeas corpus, in which legal and constitutional challenges may be raised.

This Court concluded that individualized immigration detention decisions can be reviewed under *both* the APA and habeas, and that Congress "never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA." *See* Mem. Op. at 28-29). In reaching this conclusion, the Court cited to *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988), a case addressing whether federal district courts have APA jurisdiction to review final orders from the Department of Health and Human Services to deny states reimbursement under Medicaid, or whether review is barred by the Tucker Act, which mandates that those claims must go the Court of Federal Claims. While the Court found APA jurisdiction in that case, it also noted the limitations of the APA waiver and opined that Congress "did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies." *Id.* In contrast to the review at issue in *Bowen*, the processing of aliens for removal and their detention during and after removal proceedings is governed by the INA, and the narrow exception it allows for petitions for habeas corpus, which is exactly the type of "special statutory procedures" that the Court addressed in that case.

Indeed, the Supreme Court cases addressing immigration detention (upon which Plaintiffs' arguments rest) recognize this distinction and instruct that federal *habeas* jurisdiction is the only vehicle for Plaintiffs' claims. *See Zadvydas*, 533 U.S. at 687 (addressing post-order detention); *Demore v. Kim*, 538 U.S. 510, 518 (2003) (addressing detention during removal

Case 2:85-cv-04544-DMG-AGR Document 137 Filed 03/20/15 Page 15 of 91 Page ID
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 11 of 32
#:2227

proceedings).  Relying on the historical explanation of judicial review of immigration processes and procedures cited above, the *Zadvydas* Court concluded that "the primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear these cases." 533 U.S. at 687 (citing § 2241(c)(3) (authorizing any person to claim in federal court that he or she is being held "in custody in violation of the Constitution or laws . . . of the United States")).  The Court went on to find that even though Congress had "enacted several statutory provisions that limit the circumstances in which judicial review of deportation decisions is available[,]" none of them applied to the challenge at hand, and so "§ 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."  *Id.* at 687-88.

In *Demore*, the Court similarly explained that § 1226(e), the jurisdiction-stripping portion of the INA, did not explicitly bar review of *constitutional* claims under *habeas* in the immigration context.  The Court, in analyzing whether it had jurisdiction, said:

> But respondent does not challenge a "discretionary judgment" by the Attorney General or a "decision" that the Attorney General has made regarding his detention or release.  Rather, respondent challenges the statutory framework that permits his detention without bail.  *Parra v. Perryman*, [172 F.3d 954,] 957 [7th Cir. 1999)] ("Section 1226(e) likewise deals with challenges to operational decisions, rather than to the legislation establishing the framework for those decisions"). . . .
>
> Section 1226(e) contains no explicit provision barring habeas review, and we think that its clear text does not bar respondent's constitutional challenge to the legislation authorizing his detention without bail.

11

Case 2:85-cv-04544-DMG-AGR Document 137 Filed 03/26/15 Page 16 of 91 Page ID
Case 1:14-cv-00011-JEB Document 37 Filed 03/20/15 Page 12 of 32
#:2228

538 U.S. at 517.[5]  *See also Oyelude v. Chertoff*, 125 F. App'x. 543, 546 (5th Cir. 2005) ("Section

1226(e) may strip us of jurisdiction to review judgments designated as discretionary under the

pertinent language of the statute, but it does not deprive us of all authority to review statutory

and constitutional challenges. We retain jurisdiction to review Oyelude's detention insofar as

that detention presents constitutional issues, such as those raised in a habeas petition.") (citing

*Demore*, 538 U.S. at 516-17).

    In fact, no Court has ever found APA jurisdiction over legal or constitutional challenges

to the way officers make individualized custody determinations under the INA, and the Court's

finding that contemporaneous APA and *habeas* jurisdiction co-exist over claims such as

Plaintiffs' is clear error.  To support its finding, the Court cited three cases.  *See* Mem. Op. at 29

(citing *Davis v. U.S. Sentencing Com'n*, 716 F.3d 660, 666 (D.C. Cir. 2013); *Goncalves*, 144

F.3d at 120; and *Lee v. Reno*, 15 F. Supp. 2d 26, 33 (D.D.C. 1998)).  But none of these cases

supports a finding of co-existing jurisdiction.

    First, *Davis* dealt with a criminal's attack on the constitutionality of certain criminal

sentencing guidelines for crack cocaine convictions as applied to him individually under the

Equal Protection clause.  *See Davis*, 716 F.3d at 662.  The prisoner-plaintiff (initially *pro se*)

sought relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and asserted claims

---

[5]      Although the exception for habeas jurisdiction is acknowledged by the Court in *Zadvydas*
and *Demore*, it must be noted that it remains a limited exception; only review of legal and
constitutional challenges is permitted.  The limited nature of the exercise of habeas jurisdiction
allowed by the Court in *Demore* – a *constitutional* challenge in *habeas* to the framework of the
detention – is reinforced by Justice O'Connor's concurrence.  Although Justice O'Connor agreed
with the judgment (finding that the alien had failed to state a constitutional claim where he had
been detained during the pendency of removal proceedings for six months, *see id.* at 531), she
could not agree with the majority opinion that the Court had *habeas* jurisdiction to review the
alien's claims.  Indeed, the concurrence (joined by two other justices) sets forth the historical
reasons why even *habeas* jurisdiction over immigration detention claims should not lie.  *See id.*
at 533-40 (O'Connor, J., concurring).

Case 2:85-cv-04544-DMG-AGR Document 131 Filed 03/26/15 Page 17 of 91 Page ID
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 13 of 32 Page ID
#:2229

under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388

(1971). *See id.* Neither on appeal nor below, *see Davis v. U.S. Sentencing Comm'n*, 812 F.

Supp. 2d 1, 1-2 (D.D.C. 2011), was the issue of the availability or application of the APA to the

prisoner-plaintiff's claims discussed, nor was the prisoner an alien detained after an unlawful

entry into the United States subject to immigration detention.

*Goncalves* – a pre-REAL ID Act case as discussed above – stands for the proposition that

the **repeal** of district court APA jurisdiction over certain immigration decisions through the

AEDPA did not also repeal federal *habeas* jurisdiction under § 2241.[6] 144 F.3d at 120-21. Of

course, this analysis comports with the Supreme Court's analysis in *Zadvydas* and *Demore*,

namely, that *habeas* challenges to the constitutionality of immigration detention may lie in

federal district courts. But nowhere did the First Circuit, even in the pre-REAL ID Act context,

state in *Goncalves* that a plaintiff or plaintiffs could challenge immigration detention decisions

through the APA.

Third, the decision in *Lee* addresses almost identical facts to the ones before the First

Circuit in *Goncalves*. In *Lee*, the Court weighed the Government's argument that the various

judicial and statutory adjustments to judicial review of deportation proceedings – the restrictive

view under the INA, the expansive view of APA review under *Shaughnessy* and *Brownell*, and

the abrogation of those holdings by the 1961 Immigration Act, Pub. L. No. 87-301, § 5, 75 Stat.

650, 651, which only allowed review by the federal courts of appeal – had foreclosed aliens'

ability to bring *habeas* claims in the district court. 15 F. Supp. 2d at 33-34. This Court

---

[6]     As Defendants noted in their Reply in Support of Their Motion to Dismiss, the D.C.
Circuit also explained the expansion and contraction of judicial review through judicial and
legislative action in *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1161 (D.C. Cir. 1999). In that
case the Court noted the explicit statutory abrogation of Supreme Court decisions allowing APA
review of removal and exclusion orders.

Case 2:85-cv-04544-DMG-AGR Document 121 Filed 03/26/15 Page 18 of 91 Page ID
#:2230
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 14 of 32

disagreed and held that habeas remained an available route for review. *See id.* Again, this holding is consistent with the history of the INA, and with *Zadvydas* and *Demore*.

None of the cases cited by Plaintiffs or contained in the Court's Memorandum Opinion stands for the proposition that contemporaneous APA and *habeas* jurisdiction exist in the federal district courts in the immigration context. To the contrary, the Court relies heavily on *Zadvydas* and *Demore*, both of which were decided in the context of a habeas petition, in assessing the contours of permissible agency discretion in immigration bond determinations. Both cases support a conclusion that to the extent legal and constitutional challenges related to immigration detention under the INA are permissible, they are permissible only through a writ of habeas corpus. Because the history of the INA, and the entire body of Supreme Court case law related to immigration detention, require that Plaintiffs' challenges be brought in habeas, the APA simply does not provide a waiver of sovereign immunity because Plaintiffs have an "other alternative remedy." 5 U.S.C. § 704. Thus, the Court should reconsider its Memorandum Opinion and dismiss this case. Notably, this dismissal would not leave Plaintiffs without a remedy, but would allow the Plaintiffs to re-file their complaint as a *habeas* claim in the Western District of Texas. *See Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1374 (S.D. Fla. 2002), ("To the extent that Petitioners challenge the Attorney General's statutory and constitutional authority to refuse them parole allegedly without making case-by-case determinations, habeas jurisdiction exists to determine whether Petitioners are held in custody 'in violation of the Constitution or the laws or treaties of the United States.'") (quoting 22 U.S.C. § 2241(c)), *aff'd sub. nom., Moise v. Bulger*, 321 F.3d 1336 (11th Cir. 2003).

Case 2:85-cv-04544-DMG-AGR   Document 131   Filed 03/26/15   Page 19 of 91   Page ID
#:2231
Case 1:15-cv-00011-JEB   Document 37   Filed 03/20/15   Page 15 of 32

**B.  The Court's Order Violates 8 U.S.C. § 1252(f)(1).**

The Court found that it was not prohibited from issuing a class-wide preliminary injunction preventing ICE officers from considering deterrence of mass migration in their custody determinations because "Section 1252(f)(1) 'prohibits only injunction of 'the operation of' the detention statutes, not injunction of a violation of the statutes.'"  Mem. Op. at 25-26 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010)).[7]  However, "[t]he purpose of an injunction is to prevent future illegal and wrongful acts."  *EEOC v. Rogers Bros., Inc.*, 470 F.2d 965, 966 (5th Cir. 1972).  If there is no allegation that a law is being or will be violated, there is simply no legal basis for a Court to enter an injunction.  As such, the Court's interpretation of Section 1252(f)(1) constitutes clear error under Federal Rule of Civil Procedure 59(e).

Read to its logical conclusion, the Court's holding suggests that Congress enacted Section 1252(f)(1) simply to prohibit the federal courts from entering an injunction with regard to "Inspection, Apprehension, Examination, Exclusion, and Removal" of individual aliens (the subject matter covered by 8 U.S.C. §§ 1221-1232), *unless* there was a claim that a statute was being violated.  But if Congress intended Section 1252(f)(1) to allow injunctions against violations of the statute, then the only prohibition contained in Section 1252(f)(1) would be that the courts may not enjoin 8 U.S.C. §§ 1221-1232 when no one is alleged to be acting illegally.  It is illogical to assume that Congress would enact a statute to prevent a Court from entering an injunction that it is already legally barred from entering.

---

[7]      In *Rodriguez*, the Court did not squarely address the issue presented here, which is the Government's claim that "that Section 1252(f) properly interpreted does not apply to claims for habeas relief at all" as these cases must be brought on an individualized basis.  *Id*. at 1121, n.8.

15

The more reasonable reading of Section 1252(f)(1) is that Congress intended to prohibit the courts, other than the Supreme Court, from making class-wide injunctive rulings related to 8 U.S.C. §§ 1221-1232, and instead required that such relief be provided on an individualized basis.[8] This prohibition makes sense in the overall context of Section 1252 as a whole, which is designed to very narrowly limit and channel review of immigration decisions and actions.[9]

Nonetheless, despite the fact that Congress clearly intended to grant ICE broad discretion in custody determinations in 8 U.S.C. § 1226(a), and to limit class-wide injunctive relief related to the operation of that discretion, the Court has issued a nationwide injunction preventing ICE from considering one particular factor in making custody determinations with regard to a subset of individuals. The injunction severely (and indefinitely) limits ICE's discretion and provides ICE with no outlet for redress should mass migration and threats to national security change in the future. Such a broad injunction is precisely what Congress intended to prohibit in 8 U.S.C. § 1252(f)(1). *See also Indian Educators Fed. Local 4524 v. Kempthorne*, 590 F. Supp. 2d 15, 17 (D.D.C. 2008) ("Any injunctive relief is considered an extraordinary and drastic remedy, not to

---

[8]     In *Nken v. Holder* the Supreme Court described 8 U.S.C. § 1252(f)(1) as "a provision prohibiting classwide injunctions against the operation of removal provisions." 556 U.S. 418, 431 (2009); *see also Reno v. AAADC*, 525 U.S. 471, 481-82 (1999) ("By its plain terms, and even by its title, [8 U.S.C. § 1252(f)] is nothing more or less than a limit on injunctive relief. It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-1231, but specifies that this ban does not extend to individual cases.").

[9]     *See, e.g.,* 8 U.S.C. § 1252(a)(2) (designating a number of matters not subject to judicial review); § 1252(a)(5) (providing that a petition for review in the court of appeals is the exclusive means by which an alien may challenge his removal order); § 1252(b)(9) ("Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."); § 1252(e) (narrowly restricting the judicial review available for aliens who have not been admitted to the United States); § 1252(g) ("[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.").

Case 2:85-cv-04544-DMG-AGR   Document 137   Filed 03/20/15   Page 21 of 91   Page ID
Case 1:15-cv-00011-JEB   Document 37   Filed 03/20/15   Page 17 of 32
#:2233

be granted routinely, but only when the movant, by a clear showing, carries the burden of
persuasion.") (internal quotations omitted) (quoting *Harris County, Tex. v. CarMax Auto
Superstores*, 177 F.3d 306, 312 (5th Cir.1999)).  Therefore, because the Court's conclusion is
clear error the Court should reconsider its finding that a preliminary injunction is permissible
under 8 U.S.C. § 1252(f)(1).[10]

### C. The Government Has A Strong Security Interest in Using Family Detention As An Element of Its Efforts to Deter Illegal Mass Migration.

The jurisdictional arguments above are sufficient to establish that reconsideration is
warranted under Federal Rule of Procedure 59(e).  However, reconsideration is also warranted
with respect to the merits in order to prevent manifest injustice because the Court reached its
conclusions without the Government's having had the opportunity to submit a full record on the
issue being decided.

This Court owes deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense
Council, Inc.*, 467 U.S. 837, 842 (1984), to the decision of the Attorney General in *Matter of D-
J-*, which interprets the statute he is charged with interpreting and administering.  *See* 8 U.S.C. §
1103(a)(1).  The question is whether *Matter of D-J-*, and its provision allowing ICE officers to
consider mass migration and its attendant national security threats in individualized custody
determinations, provides a "permissible construction of the statute."  467 U.S. at 843.  Neither
party hereto disputes that threats to the national security are a permissible consideration for ICE
in making custody determinations.  *See Matter of Patel*, 15 I. & N. Dec. 666 (BIA 1976).
Nonetheless, the Court concluded that "[e]ven assuming that general deterrence could, under
certain circumstances, constitute a permissible justification for such detention, the Court finds

---

[10]     If the Court is not inclined to provide any other relief to Defendants, it should, at
minimum, amend its order to provide declaratory relief rather than injunctive relief.  *See
Rodriguez*, 591 F.3d at 1120.

Case 2:85-cv-04544-DMG-AGR Document 187 Filed 03/26/15 Page 22 of 91 Page ID
#:2234
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 18 of 32

the Government's interest here particularly insubstantial."  Mem. Op. at 25.  The Court relied
heavily on its finding that the Government had not provided sufficient evidence of a national
security interest in deterring mass migration through the use of detention to justify its
consideration of this factor in its detention decisions.  Mem. Op. at 33-38.  However, the
Government did not submit evidence on this point because, as described above, such evidence
was not relevant to the issues as they were framed in Plaintiffs' filings.

Because the Court's Memorandum Opinion makes clear that the Court believes such
evidence is necessary, Defendants now submit three declarations underscoring the fact the
Government has a significant interest in deterring mass migration through immigration detention
in order to protect the national security interests of the United States.  Those declarations –
described more fully below – demonstrate that ICE family residential centers help DHS to
balance several vital goals including protecting the integrity of the laws of the United States,
protecting the public safety, deterring incidents of mass migration, reducing incidents of
smuggling, keeping families together, and ensuring the presence of aliens at their immigration
proceedings.  Thus, there is good reason for the Court to reconsider its ruling and to find that the
deterrence of mass migration through the use of detention at ICE family residential centers is
rationally related to a legitimate government purpose and the public interest, and should not be
enjoined by this Court.

1.  <u>Unless the Government Acts Otherwise, Unchecked Periods of Mass Migration,
Particularly by Families and Unaccompanied Children, Reinforce Misperceptions
of the Status of Persons Entering the United States without Permission and
Therefore Encourage Additional Persons to Undertake Dangerous Journeys to the
United States</u>

More than 20 years ago, the Supreme Court wrote that a surge of 8,500 unaccompanied
alien children was a "serious one." *Flores*, 507 U.S. at 294.   In fiscal year 2013, 14,855

accompanied minors and their parents or guardians were apprehended crossing the Southwest border. Fiscal year 2014 saw a dramatic increase in family unit arrivals; 68,445 individuals (a 361% increase) were apprehended that year. This is in addition to 68,541 UACs who crossed the Southwest border in fiscal year 2014, as compared with 38,759 UACs in fiscal year 2013.[11] The unprecedented influx in 2014 constituted a serious humanitarian situation.

Prior to June 2014, as a result of extremely limited family detention space, the only options available to the Government when it apprehended families with children illegally entering the United States were either to allow families to enter and remain in the United States in exchange for their promise to attend their removal proceedings, or to separate children from their parents. *See* Declaration of Tae Johnson ("Johnson Decl.") ¶ 10, attached hereto as Exhibit A. This practice of releasing families led to the misperception by many individuals who sought to illegally enter the United States that adults would be given a "permiso" upon arrival that would allow them to freely enter the United States if they were accompanied by children. *See* Declaration of Ronald Vitiello ("Vitiello Decl.") ¶ 9, attached hereto as Exhibit B.[12] This

---

[11]       *See* U.S. Border Patrol Statistics, *available at*:
http://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Family%20Units%20and%20UAC%20Apps%20FY13%20-%20FY14_0.pdf.

[12]       *See also* Written Testimony of DHS Sec'y Jeh Johnson before the House Committee on Homeland Security, "Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border," *available at* http://www.dhs.gov/news/2014/06/24/written -testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security (discussing ICE's strategy to correct the misconceptions of recent Central American migrants they will receive a free pass or "permiso" upon entry); Letter from the President – Efforts to Address the Humanitarian Situation in the Rio Grande Valley Areas of Our Nation's Southwest Border, Jun. 30, 2014, at http://www.whitehouse.gov/the-press-office/2014/06/30/letter-president-efforts-address-humanitarian-situation-rio-grande-valley (same); Hearing Before the Senate Committee on Appropriations (statement of Jeh Johnson, Sec'y of Homeland Security), *available at* http://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations (same); The Crisis of Unaccompanied Children, S. Rep. No. 113-198, at 6 (2014) (noting "the reality is that many of these children are being sent for by parents who may be resident in the United States without legal status but who have an

Case 2:85-cv-04544-DMG-AGR Document 137 Filed 03/20/15 Page 24 of 91 Page ID
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 20 of 32
#:2236

misunderstanding may have encouraged adults to subject children to a dangerous journey to the

United States in order to avoid their own detention. *See* Johnson Decl. ¶ 11.[13]  Moreover, the

general practice of releasing families created significant enforcement vulnerabilities because

alien smugglers exploited children by bringing them across the border along with groups of

smuggled strangers in order to pass the groups off as family units. *See id.*

As one part of its overall response to the significant humanitarian situation caused by the

2014 influx of UACs and families on the Southwest border,[14] ICE opened the Artesia Family

Residential Center in Artesia, New Mexico in June 2014, the Karnes Family Residential Center

in Karnes City, Texas in July 2014, and the Dilley Family Residential Center in Dilley, Texas, in

December 2014. *See* Johnson Decl. ¶ 14.  The Artesia facility, which was a temporary facility,

closed in December 2014. *Id.*  Based on current plans, when the Dilley Residential Center

becomes fully operational, ICE will have available to it roughly 3,800 beds for housing families

while their removal proceedings are ongoing. *See id.*  These family residential facilities provide

for the safety, security, and medical needs of both parents and children. They also ensure both

_____

expectation—real or perceived—that some sort of immigration reform will be enacted and that
they would be better off if the entire family were together in the United States to obtain the
benefits of reform”).

[13]    *See also* Julia Preston, *Witnessing the Border Crisis*, N.Y. TIMES, Aug. 1, 2014,
available at http://www.nytimes.com/times-insider/2014/08/01/witnessing-the-border-
crisis/?_r=0 (“After many hours of interviews, I realized that fast-traveling false rumors about
the “permisos,” fed by smugglers, had spurred thousands of people to head out for the United
States, driven by fears their children would not be safe in Central America.”); Julia Preston,
*Migrants Flow in South Texas, as Do Rumors*, N.Y. TIMES, June 16, 2014, available at
http://www.nytimes.com/2014/06/17/us/migrants-flow-in-south-texas-as-do-rumors.html
(“Migrants have sent word back home they received a “permit” to remain at least temporarily in
the United States, feeding rumors along migrant routes and spurring others to embark on the long
journey.”).

[14]    Other parts of the Government’s multi-faceted strategy to respond to the influx included
the launching of a public awareness campaign in Central America to warn families of the
dangers of making the trip to the United States, the deployment of additional resources to the
Southwest border, and the increasing of efforts to dismantle smuggling networks. S*ee*
Declaration of Thomas Homan (“Homan Decl.”) ¶¶ 3, 8, attached hereto as Exhibit C.

the maintenance of family unity and DHS's ability to efficiently and effectively process removal cases involving families.[15]

After construction of these family residential centers, the numbers of family units illegally crossing the border significantly decreased. Vitiello Decl. ¶ 14.[16] This is at least in part because building these facilities helped diminish the mistaken perception that a "permiso" was waiting on the other end of an illegal crossing into the United States, and forced families to consider the possibility of detention, along with enforcement and subsequent removal, when deciding whether to illegally enter the United States. *See* Johnson Decl. ¶¶ 7; Vitiello Decl. ¶¶ 9-

---

[15] These family residential centers allow for family unity by placing families together at safe and humane ICE residential facilities during the brief and finite period of pending removal proceedings. Johnson Decl. ¶ 15. ICE family residential centers are operated according to ICE family residential standards. *See* ICE Family Residential Standards, available at: http://www.ice.gov/detention-standards/family-residential; Johnson Decl. ¶ 16. The family residential standards were developed with input from medical, psychological, and educational experts, as well as civil rights organizations, with the goal of mirroring community standards and ensuring that all residents are treated with dignity and respect. Johnson Decl. ¶ 16. Residents at ICE family residential centers enjoy free movement during waking hours and have access to health and social services. Johnson Decl. ¶ 17; Declaration of Stephen M. Antkowiak ("Antkowiak Decl."), ¶¶ 5, 16, 25, attached hereto as Exhibit D. Each center permits visitors and provides indoor and outdoor recreational areas and activities, such as soccer, volleyball and basketball. Johnson Decl. ¶ 17; Antkowiak Decl. ¶¶ 5, 10, 19. All dining rooms serve three meals per day and residents have access to beverages and snacks 24 hours per day. Johnson Decl. ¶ 17; Antkowiak Decl. ¶¶ 9, 14, 18, 23. Education is provided to all school-age children. Johnson Decl. ¶ 17; Antkowiak Decl. ¶¶ 11, 20. Residents are permitted to wear their own personal attire or other non-institutional clothing, which is provided free of charge to those in need. Johnson Decl. ¶ 17; Antkowiak Decl. ¶ 7. Residents also have access to telephones, televisions, video games, the internet, and law libraries with printing and copying capabilities. Johnson Decl. ¶ 17; Antkowiak Decl. ¶¶ 9, 12, 18, 22.

[16] *See also* ICE Enforcement and Removal Operations Report, Fiscal Year 2014, at 3 (Dec. 19, 2014), available at, http://www.ice.gov/removal-statistics (noting DHS efforts, including adding family residential centers, "helped contribute to dramatically reducing migration in the Rio Grande Valley") ; INS' Removal of Aliens Issued Final orders, Rep. I-2003-004, U.S. Dep't of Justice, OIG, at 11-13, Feb. 2003, at http://www.justice.gov/oig/reports/INS/e0304 (noting INS removes 92 percent of detained aliens and only 13 percent of non-detained aliens).

Case 2:85-cv-04544-DMG-AGR Document 137 Filed 03/26/15 Page 26 of 91 Page ID
#:2238
Case 1:154-cv-00011-JEB Document 37 Filed 03/20/15 Page 22 of 32

11.  This caused some families to decide not to make the dangerous trip to the United States.  *See*
Vitiello Decl. ¶¶ 9-11.  Thus, DHS strongly believes – and experience shows – that the
appropriate use of family detention is a key element of the U.S. Government's efforts to deter
aliens from Central America from making the dangerous journey across Mexico and into the
United States.  *See* Johnson Decl. ¶ 7, Vitiello Decl. ¶¶ 12-14; Homan Decl., ¶ 7.

The Government has a legitimate public interest in deterring mass migration because it
helps reduce a number of important security concerns.  First, ICE family residential facilities
help DHS to reduce the flow of families who seek to come to the United States unlawfully,
which in turn deters human smuggling and protects children from being subjected to the high
risks associated with human smuggling and attempts to cross the southern border illegally.  *See*
Johnson Decl. ¶ 7; Vitiello Decl. ¶¶ 9-11.  Second and relatedly, mass migration causes
significant funds to be paid to smuggling organizations, much of which is then passed on to
cartels to fund illicit and dangerous activities in the United States and Mexico.  *See* Johnson
Decl. ¶ 9.[17]  Deterring mass migration reduces the funding sources for these criminal enterprises.
*See id.*

Third, uncontrolled mass migration undermines government efforts to secure the borders
of the United States and diverts law enforcement resources away from national security
priorities.  *See* Homan Decl. ¶ 4.  In 2014, ICE diverted approximately ten percent of its staff to
process and care for the influx of migrants who crossed the Southwest border.  Homan Decl. ¶

---

[17]     *See also* Kenneth J. Franzblau, Immigration's Impact on U.S. National  Security and
Foreign Policy, U.S. Comm'n on Immigration Reform, at 6 (Oct. 1997) (describing alien
smuggling as a "political/security threat" to the United States because it is controlled by criminal
organizations and has resulted in gang warfare in the United States, and noting that President
Clinton declared alien smuggling a national security threat).

Case 2:85-cv-04544-DMG-AGR Document 181 Filed 03/26/15 Page 27 of 91 Page ID
#:2239
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 23 of 32

4.[18]  Approximately 800 of these personnel would otherwise have been dedicated to ICE's core enforcement, national security, and public safety missions, such as apprehending criminals and serious immigration violators within the United States and effecting removals of high-risk, dangerous criminals from the United States.  *Id.*  Fourth, detention of migrants during periods of mass migration allows for time to adequately verify the migrants' identity and criminal history and to assess any public safety risk of release; such individuals may not be fully vetted if they are released immediately into the community.  Johnson Decl. ¶ 8; Homan Decl. ¶ 7.  Thus, for all these reasons, interpreting the statute to allow ICE to exercise its discretion to, among other things, deter incidents of mass migration is both permissible, and necessary to ensure the safety and security both of aliens who seek to come to the United States, and residents of the United States.

The new evidence provided by the Government above, at the very least, makes clear that the Court did not properly weigh the balance of the equities in deciding to issue a preliminary injunction.  ICE family residential centers are designed with the unique needs of families in mind, and provide residents with schooling, mental and physical healthcare, social services, indoor and outdoor recreation, and access to legal services.  *See generally* Antkowiak Decl.  At the same time, in enjoining ICE from considering deterrence as a factor in determining the appropriateness of detention for any individual alien, the Court has taken away from ICE a key part of its overall response to incidents of mass migration, right at the beginning of the time of year that traditionally has the highest numbers of migration on the Southwest border.  *See* United States Border Patrol, Total Illegal Alien Apprehensions by Month, FY2000-FY2014, available at

---

[18]     *See also* ICE ERO Rep., FY 2014 , at 3 (Dec. 19, 2014) (noting that the unprecedented surge of illegal border crossings in 2014 required ICE to "devote[] significant resources" and "reprogram funds from other key homeland security priorities" to address the "urgent humanitarian situation").

Case 2:85-cv-04544-DMG-AGR Document 137 Filed 03/26/15 Page 28 of 91 Page ID
#:2240
Case 1:14-cv-00011-JEB Document 37 Filed 03/20/15 Page 24 of 32

http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20Apps%20by%2

0Sector%20and%20Area%2C%20FY2000-FY2014_0.pdf (reflecting that over the past five

years, the busiest months for migration on the Southwest border have been between March and

May).  As discussed above, the risks of mass migration are significant, and ICE must be able to

respond quickly should the need arise.  At the very least the Court should find that the balance of

harms weighs against granting this broad injunction on a preliminary basis.  *See Allina Health

Servs. v. Sebelius*, 756 F. Supp. 2d 61, 71 & n.5 (D.D.C. 2010) ("where a party seeks mandatory

preliminary relief that goes well beyond maintaining the status quo pendente lite, courts should

be extremely cautious about issuing a preliminary injunction") (quoting *Stanley v. Univ. of S.

Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994)).

> 2. Detention During Periods of Mass Migration Ensures that Migrants Will Attend
>    Judicial Proceedings

The Court has acknowledged that flight risk and potential dangerousness are the two

primary (but not only) factors to be considered when making detention determinations, *see* Mem.

Op. at 17 (construing *Zadvydas* and *Demore*); *see also Matter of D-J-*, 23 I. & N. Dec. at 580-81

(requiring the BIA and IJs to consider standards including the "substantial risk of disappearance

into the alien community within the United States").  In addition to the reasons for detention

during mass migration discussed above, detention of migrants during these periods also ensures

their appearance at further proceedings related to their removal from the United States, thus

lessening their flight risk.  As one federal court has recognized, migrants failing to appear in

immigration court has spiked during periods of mass migration.  *See Bunikyte, ex rel. Bunikiene

v. Chertoff*, Civ. Nos. A-07-CA-164-SS, A-07-CA-165-SS, A-07-CA-166-SS, 2007 WL

1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("Given the fact that as many as 39% of aliens issued a

Notice to Appear by DHS never actually appear for immigration proceedings, the Court cannot

Case 2:85-cv-04544-DMG-AGR Document 131 Filed 03/26/15 Page 29 of 91 Page ID
#:2241
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 25 of 32

say DHS has abused its mandate by exploring family detention"); *see also* Executive Office for Immigration Review, FY 2014 Statistics Yearbook, available at http://www.justice.gov/eoir/statspub/fy14syb.pdf, at P3 (showing that the rate of in absentia orders for aliens released on bond or on their own recognizance has increased over the last five years (from FY 2010 to FY 2014) from 22% to 39%).

This serious problem of individuals who enter during periods of mass migration and then abscond, in conjunction with Defendants' additional evidence discussed above, makes it even more clear that the Government has a significant interest in deterring mass migration through the use of immigration detention. Therefore, there is good reason for the Court to reconsider its ruling and to find that the deterrence of mass migration through the use of detention at ICE family residential centers is rationally related to a legitimate government purpose. *Cf. Jeanty*, 204 F. Supp. 2d at 1381-82 ("[T]he Court finds that preventing loss of life and avoiding a mass migration from Haiti are facially legitimate and bona fide reasons for detaining Haitian nationals who arrive by boat in South Florida."). Accordingly, ICE should not be enjoined by this Court from considering this factor in individualized bond determinations.

3. The Individualized Determinations Provided Properly Considered a Generalized Factor

As discussed above, Plaintiffs and the Court have recognized that Plaintiffs and the members of the provisionally certified class have each received or are receiving individualized detention determinations – the relief requested originally by Plaintiffs. The Court's Memorandum Opinion, however, expresses concern over the application of a generalized factor to such an individual determination. Precedent, though, instructs that such determinations are wholly proper. *See Reno v. Flores*, 507 U.S. 292, 313 & n.9 (1993).

Case 2:85-cv-04544-DMG-AGR   Document 131   Filed 03/26/15   Page 30 of 91   Page ID
Case 1:14-cv-00011-JEB   Document 37   Filed 03/20/15   Page 26 of 32
#:2242

In *Flores*, the Court examined whether a federal regulation allowing the arrest and detention of juveniles on suspicion of being deportable and potential release only to parents, close relatives, or legal guardians, ran afoul of the juveniles' due process rights. Upon a review of the Attorney General's exercise of discretion, the Court cited to its prior instruction that this process "requires 'some level of individualized determination.'" *Id.* at 313 (quoting *I.N.S. v. Nat'l Center for Immig. Rights, Inc.*, 502 U.S. 183, 194 (1991)). The Court continued, though, instructing that "as *NCIR* itself demonstrates, this does not mean that the Service must forswear use of reasonable presumptions and generic rules." *Id.* Indeed, the Court confronted and rejected the argument set forth in the dissent which Plaintiffs have advocated and the Court's Memorandum Opinion seems to adopt – that each custody determination must be "fully" individualized without the consideration of generally applicable factors.

Specifically, the Court engaged the dissent in *Flores* and instructed:

> The dissent would mandate fully individualized custody determinations for two reasons. First, because it reads *Carlson v. Landon*, *supra*, as holding that the Attorney General may not employ "mere presumptions" in exercising her discretion. *Post*, at 1465-66. But it was only the dissenters in Carlson who took such a restrictive view. *See* 342 U.S., at 558-59, 563-64, 568 (Frankfurter, J., dissenting). Second, because it believes that § 1252(a) must be interpreted to require individualized hearings in order to avoid "'constitutional doubts.'" *Post*, at 1464 (quoting *United States v. Witkovich*, 353 U.S. 194, 199 (1957)); *see post*, at 1466-67. The "constitutional doubts" argument has been the last refuge of many an interpretive lost cause. Statutes should be interpreted to avoid serious constitutional doubts, *Witkovich*, *supra*, at 202, 77 S.Ct., at 783, not to eliminate all possible contentions that the statute might be unconstitutional. We entertain no serious doubt that the Constitution does not require any more individuation than the regulation provides . . . .

*Id.* at 313 n.9. Therefore, because the Agency's application of the generalized factor of deterrence during a period of mass migration to the individual determinations was plainly correct under the Court's instructions in *Flores*, the Court should reconsider its grant of injunctive relief.

26

Case 2:85-cv-04544-DMG-AGR Document 131 Filed 03/26/15 Page 31 of 91 Page ID
#:2243
Case 1:15-cv-00011-JEB Document 37 Filed 03/30/15 Page 27 of 32

4. <u>The Detention at Issue in This Case Is Presumptively Reasonable Under Binding
Precedent</u>

Finally, both Plaintiffs and the Court's Memorandum Opinion seem to conflate the type
of detention at issue here (and detention in the immigration context) with other types of civil
detention or with a person seeking release pending trial in the criminal context. *See* Mem. Op. at
35. In the Memorandum Opinion, the Court concluded that general deterrence was an
impermissible factor for consideration by ICE in detention determinations based in part on its
reliance on Supreme Court cases dealing with criminal civil commitment. Mem. Op. at 35
(citing *Kansas v. Crane*, 534 U.S. 407, 412 (2002); *Kansas v. Hendricks*, 521 U.S. 346, 372-74
(1997)). But the purposes of civil commitment are substantively different from those in the
immigration context, and such reliance is therefore clear error.

The Court in *Hendricks* evaluated whether a statute allowing for the civil commitment of
sexually violent predators violated the Constitution's "double jeopardy prohibition or its ban on
*ex post facto* lawmaking." 521 U.S. at 360-61. Thus, the Court had to determine wither the
statue in question "establishes criminal proceedings; hence confinement under it necessarily
constitutes punishment." *Id.* at 361. To do so, the Court looked at whether the confinement at
issue "implicate[s] either of the two primary objectives of criminal punishment: retribution or
deterrence." *Id.* at 361-62. Thus, in that context, deterrence was an impermissible objective of
civil detention in *Hendricks* because the civil commitment, for the purpose of deterring future
criminal behavior, of an individual who had already served criminal time for an underlying
offense, would have violated the Constitution's double jeopardy prohibition.[19] No such

---

[19] Ultimately, the Court concluded that the statute at issue was not unconstitutional on that
basis because individuals who suffered from "a 'mental abnormality' or a 'personality disorder'
that prevents them from exercising adequate control over their behavior . . . are therefore
unlikely to be deterred by the threat of confinement." 521 U.S. at 362-63.

Case 2:85-cv-04544-DMG-AGR  Document 131  Filed 03/26/15  Page 32 of 91  Page ID
Case 1:15-cv-00011-JEB  Document 37  Filed 03/20/15  Page 28 of 32
#:2244

constitutional concerns are implicated here, and the Court's discussion of the impermissibility of
detention for the purpose of deterrence in that context is therefore inapplicable here.

The Supreme Court has never concluded that general deterrence is not a legitimate
purpose of immigration detention.  In concluding otherwise, this Court determined that the
Supreme Court, in *Zadvydas*, "grounds its analysis of immigration detention in principles derived
from the wider civil-commitment context."  Mem. Op. at 35.  But the *Zadvydas* Court compared
civil commitment to immigration detention because both raised potential constitutional concerns
regarding "indefinite detention."  533 U.S. at 690.  Thus, the *Zadvydas* Court relied on *Hendricks*
only for the purpose of explaining that ***indefinite*** civil detention may be authorized only by "a
special justification," that outweighs any liberty interest.  *Id.* at 690.[20]  In the case at hand, there
are no such concerns that exist with regard to Plaintiffs' detention because pre-removal detention
is not indefinite.  *Id.* at 697 ("[P]ost-removal-period detention, unlike detention pending a
determination of removability or during the subsequent 90–day removal period, has no obvious
termination point.").  Therefore, any discussion by the *Zadvudas* court regarding *Hendricks* is
simply inapplicable in this context.

In fact, the Court's Memorandum Opinion seems to tack not with the instructive holding
of the Court in *Demore*, but rather with the dissent in that case.  *See Demore*, 538 U.S. at 547-48
(Souter, J., dissenting in part and concurring in part).  Justice Souter's dissent attempted to
analogize criminal detention and civil commitment with *mandatory* immigration detention
without access to a hearing before an impartial officer.  *See id.*  Here, as discussed above, the
parties and the Court agree that each member of the provisional class receives an individualized
hearing and some have been released by ICE, indicating the detention cannot be mandatory.

---

[20] The Court thus noted that "harm-threatening mental illness" constituted a sufficient "special
justification."  *Id.* (citing *Hendricks*, 521 U.S. at 356).

Case 2:85-cv-04544-DMG-AGR   Document 137   Filed 03/26/15   Page 32 of 91   Page ID
#:2245
Case 1:15-cv-00011-JEB   Document 37   Filed 03/20/15   Page 29 of 32

Thus, even if Justice Souter's dissent were the binding majority opinion, the detention at issue here would pass muster.

Justice Souter also noted that the Government never argued that detention was necessary to guarantee the alien's appearance nor did the Government "claim [any] *justification in national emergency* or any *risk posed by [the alien] particularly*." *Id.* at 541 (emphases added). This statement indicates plainly that even the *Demore* dissent acknowledges – and indeed advocates for – individualized determinations that consider generalized national emergency factors as well as particular risks posed by the individual person. Thus, the determinations the Plaintiffs received were plainly proper.

Further, the Court's statement that Plaintiffs were "chasing liberty," and its finding that the Plaintiffs' detention by ICE for a period of weeks constitutes a cognizable injury (*see* Mem. Op. at 1, 29), overlooks the facts in this case and the Supreme Court's instructive holdings. As the Court has noted, Plaintiffs have produced evidence that the average length of time between an ICE custody determination and an IJ bond hearing is "five weeks," with the extreme being more than three months. Mem. Op. at 25. The Supreme Court has never found detention of this duration, during the pendency of removal proceedings, to raise any constitutional concerns. In light of this, the Court should reconsider its conclusion that Plaintiffs have suffered a Due Process violation.

The Court in *Zadvydas* – a case upon which the Plaintiffs and the Court repeatedly rely– explicitly held that a period of detention of six months of post-removal order detention is presumptively reasonable. 533 U.S. at 701. In reaching this conclusion, the Court noted the reluctance of the judiciary to inject itself into immigration matters where the Executive Branch has more expertise, explaining:

Case 2:85-cv-04544-DMG-AGR Document 137 Filed 03/20/15 Page 34 of 91 Page ID
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 30 of 32
#:2246

Ordinary principles of judicial review in this area recognize primary Executive Branch responsibility. They counsel judges to give expert agencies decisionmaking leeway in matters that invoke their expertise. *See Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633, 651-52 (1990). They recognize Executive Branch primacy in foreign policy matters. S*ee Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983). And they consequently require courts to listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise.

We realize that recognizing this necessary Executive leeway will often call for difficult judgments. In order to limit the occasions when courts will need to make them, we think it practically necessary to recognize some presumptively reasonable period of detention. We have adopted similar presumptions in other contexts to guide lower court determinations. *See Cheff v. Schnackenberg*, 384 U.S. 373, 379-80 (1966) (plurality opinion) (adopting rule, based on definition of "petty offense" in United States Code, that right to jury trial extends to all cases in which sentence of six months or greater is imposed); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56–58 (1991) (O'Connor, J.) (adopting presumption, based on lower court estimate of time needed to process arrestee, that 48-hour delay in probable-cause hearing after arrest is reasonable, hence constitutionally permissible).

While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months. *See Juris. Statement in United States v. Witkovich*, O.T.1956, No. 295, pp. 8-9. Consequently, for the sake of uniform administration in the federal courts, we recognize that period. After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing.

533 U.S. at 700-01.

The Government's interest in detaining an individual pre-removal order is even stronger than in the post-removal context considered in *Zadvydas*, where removal could not be effectuated. Pre-removal detention "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Demore*, 538 U.S. at

Case 2:85-cv-04544-DMG-AGR   Document 131   Filed 03/20/15   Page 35 of 91   Page ID
#:2247
Case 1:15-cv-00011-JEB   Document 37   Filed 03/20/15   Page 31 of 32

528.   To remove any doubt, the Court in *Demore* found that where the average period of

detention for an alien ***who had not yet received an order of removal*** was, on the average, a

month and a half, with a minority of cases lasting five months, no constitutional issues arose.

538 U.S. at 530-31.  Indeed, the individual plaintiff in *Demore* demonstrated that his detention

lasted longer than the average and spent six months in custody with no hearing, but the Court

still found this period constitutionally permissible on its face.  *See id.*

Thus, contrary to Plaintiffs' arguments and the Court's Memorandum Opinion, detention

of aliens while they await a determination of removability does not run afoul of the Fifth

Amendment's Due Process Clause.  *See Demore*, 538 U.S. at 523 ("This Court has recognized

detention during deportation proceedings as a constitutionally valid aspect of the deportation

process."); *see also Zadvydas*, 533 U.S. at 711 ("Congress' power to detain aliens in connection

with removal or exclusion, the Court has said, is part of the Legislature's considerable authority

over immigration matters.") (Kennedy, J., dissenting).

Additionally, the plaintiff-alien in *Zadvydas* had lived in the United States since he was

eight years old (approximately forty-five years at the time of the Court's decision).  *Zadvydas*,

533 U.S. at 684.   The plaintiff in *Demore* had been a lawful permanent resident for

approximately ten years.  Plaintiffs have not demonstrated anything close to the same ties here.

Thus, it is incongruous for this Court to hold that a period of five weeks' detention, as Plaintiffs

contend, runs afoul of the Fifth Amendment for aliens who were detained near the border and

subject to expedited removal proceedings, while the Supreme Court has explicitly held that a ***six

month*** period of detention for persons who had much greater ties to the United States is

presumptively reasonable and in conformance with the Due Process Clause.  For this reason the

Case 2:85-cv-04544-DMG-AGR Document 131 Filed 03/20/15 Page 36 of 91 Page ID
Case 1:15-cv-00011-JEB Document 37 Filed 03/20/15 Page 32 of 32
#:2248

Court should reconsider its conclusion that Plaintiffs' detention raised any constitutional

concerns.

## <u>CONCLUSION</u>

Defendants respectfully request that the Court reconsider its preliminary injunction order,

and issue a new opinion in light of the considerations addressed above.

Dated: March 20, 2015          Respectfully submitted,

RONALD C. MACHEN JR.          BENJAMIN C. MIZER
D.C. BAR # 447889          Acting Assistant Attorney General
United States Attorney for          Civil Division
 the District of Columbia

DANIEL F. VAN HORN          LEON FRESCO
Chief, Civil Division          Deputy Assistant Attorney General
D.C. Bar #924092          Civil Division

         WILLIAM C. PEACHEY
BY: /s/ *Wynne P. Kelly*          Director, District Court Section
WYNNE P. KELLY          Office of Immigration Litigation
Assistant United States Attorney
555 Fourth St., N.W.          WILLIAM C. SILVIS
Washington, D.C. 20530          Assistant Director, District Court Section
Wynne.Kelly@usdoj.gov          Office of Immigration Litigation
Phone: (202) 252-2545

         BY: /s/ *Sarah B. Fabian*
         SARAH B. FABIAN
         Senior Litigation Counsel
         District Court Section
         Office of Immigration Litigation
         Civil Division, U.S. Department of Justice
         P.O. Box 868, Ben Franklin Station
         Washington, D.C. 20044
         Phone: (202) 532-4824
         Fax: (202) 616-8962
         Sarah.B.Fabian@usdoj.gov

         Attorneys for Defendants

# Department of Homeland Security
## Office of Inspector General

EXHIBIT G

## CBP's Handling of
## Unaccompanied Alien Children



OIG-10-117                                                September 2010

*Office of Inspector General*

**U.S. Department of Homeland Security**
Washington, DC 20528

SEP - 9 2010



# Homeland Security

## Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978*. This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibilities to promote economy, efficiency, and effectiveness within the department.

This report addresses Customs and Border Protection's compliance with the *Flores Settlement Agreement* in the treatment of unaccompanied alien children in its custody. It is based on interviews with employees and officials of relevant agencies, direct observations, and a review of applicable documents.

The recommendations herein have been developed to the best knowledge available to our office, and have been discussed in draft with those responsible for implementation. We trust this report will result in more effective, efficient, and economical operations. We express our appreciation to all of those who contributed to the preparation of this report.

Carlton I. Mann
Assistant Inspector General for Inspections

# Table of Contents/Abbreviations

Executive Summary ........................................................................................................1

Background ...................................................................................................................2

Results of Review ........................................................................................................5

   CBP's Compliance With Terms of the *Flores Agreement* ..............................................5
   Recommendations ......................................................................................................11
   Management Comments and OIG Analysis ...............................................................11

   Emergency Medical Assistance .................................................................................12
   Recommendations ......................................................................................................15
   Management Comments and OIG Analysis ...............................................................15

   Toilets and Sinks........................................................................................................17
   Recommendations ......................................................................................................18
   Management Comments and OIG Analysis ...............................................................18

   Improvements Needed in Training in *Flores Agreement* Requirements .......................21
   Recommendations ......................................................................................................23
   Management Comments and OIG Analysis ...............................................................23

   Improvements Needed in Maintaining Unaccompanied Alien Children Information....24
   Recommendations ......................................................................................................26
   Management Comments and OIG Analysis ...............................................................26

## Appendices

   Appendix A:  Purpose, Scope, and Methodology........................................................28
   Appendix B:  Management Comments to the Draft Report .......................................29
   Appendix C:  Major Contributors to This Report ....................................................33
   Appendix D:  Report Distribution ...........................................................................34

## Abbreviation

| | |
|---|---|
| BP | Border Patrol |
| CBP | Customs and Border Protection |
| CRCL | Civil Rights and Civil Liberties |
| DHS | Department of Homeland Security |
| EMT | Emergency Medical Technician |
| HSA | *Homeland Security Act of 2002* |
| OBP | Office of Border Patrol |
| OFO | Office of Field Operations |
| OIG | Office of Inspector General |
| UAC | Unaccompanied Alien Children |
| VLC | Virtual Learning Center |

# OIG

***Department of Homeland Security***
***Office of Inspector General***

## Executive Summary

The *Flores v. Reno Settlement Agreement* governs the policy for the treatment of unaccompanied alien children in federal custody. Unaccompanied alien children are minors less than 18 years old who arrive in the United States without a parent or legal guardian and are in the temporary custody of federal authorities because of their immigration status.  The Department of Homeland Security is bound by the *Flores v. Reno Settlement Agreement*, which includes requirements that immigration officials detaining minors provide (1) food and drinking water, (2) medical assistance in the event of emergencies, (3) toilets and sinks, (4) adequate temperature control and ventilation, (5) adequate supervision to protect minors from others, and (6) separation from unrelated adults whenever possible.

Customs and Border Protection is one of the Department of Homeland Security's primary immigration enforcement agencies for handling unaccompanied children.  Customs and Border Protection personnel apprehend, process, and detain unaccompanied alien children intercepted along the borders and at ports of entry for attempting to enter the United States illegally.

Based on our site visits to 30 Border Patrol stations and ports of entry, select document reviews, and independent observations, we concluded that Customs and Border Protection was in compliance with the general provisions of the *Flores v. Reno Settlement Agreement*.  Although we did not identify any significant violations of the agreement, we are recommending that the agency (1) evaluate its food-purchasing and contracting methods to ensure efficient use of resources; (2) ensure that detainees are informed of the safety of drinking water provided in hold rooms; (3) determine whether unaccompanied alien children are injured or require medical attention; (4) document medical care provided; (5) ensure that detention facilities maintain sufficient inventories of medical supplies; (6) ensure that toilets and sinks are routinely inspected and work properly; (7) verify that all required personnel complete the mandatory annual refresher *Flores v. Reno Settlement Agreement* training; and (8) accurately and consistently document required information pertaining to unaccompanied alien children.

# Background

The Department of Homeland Security's (DHS) Customs and
Border Protection (CBP) protects United States borders and
enforces immigration laws by apprehending and detaining aliens
who attempt to enter the country illegally.  Juvenile detainees
include unaccompanied alien children (UAC), individuals who are
less than 18 years old with no lawful immigration status and no
parent or legal guardian in the United States available to provide
care and physical custody.[1]  These individuals must be treated
according to provisions of the *Flores v. Reno Settlement
Agreement* (*Flores Agreement*), which set forth policy for the
detention, treatment, and release of minors in CBP custody.

## Authorities

The *Flores Agreement* is the result of a settlement reached in a
federal class-action lawsuit filed against the Immigration and
Naturalization Service, a former subcomponent of the Department
of Justice responsible for apprehending and detaining minors who
were in the United States illegally.  The suit challenged the arrest,
processing, detention, and release of UAC who were in the country
illegally and later detained by the U.S. government.  The
Department of Justice and a coalition of immigrants' rights groups
negotiated a settlement in August 1996.  The Immigration and
Naturalization Service agreed to abide by stipulations of the
agreement for processing, detaining, and releasing minors held in
its custody.  The *Flores Agreement* established guidance on the
treatment of minors while in the custody of immigration officials,
and recognized the particular vulnerability of UAC while detained
without a parent or legal guardian present.  The *Flores Agreement*
includes a requirement that immigration officials hold minors in
facilities that provide (1) access to food and drinking water,
(2) medical assistance in the event of emergencies; (3) toilets and
sinks; (4) adequate temperature control and ventilation;
(5) adequate supervision to protect minors from others; and
(6) separation from unrelated adults whenever possible.

In March 2003, the *Homeland Security Act of 2002* (HSA) was
implemented, consolidating several agencies to create DHS.  The
HSA delegated the apprehension, detention, transfer, and
repatriation of UAC to DHS.

---

[1] *Homeland Security Act of 2002*, Public Law 107-296, 462(g), November 2002.

## DHS Responsibilities for Handling Unaccompanied Alien Children

Within DHS, CBP and Immigration and Customs Enforcement (ICE) share responsibility for UAC.  CBP apprehends, processes, and detains the majority of UAC arrested along the U.S. borders. ICE arrests UAC inside the United States, and removes inadmissible UAC after Immigration Judges or United States Courts issue removal orders.  ICE also coordinates the placement and long-term detention of UAC.

The Office of Border Patrol (OBP) and Office of Field Operations (OFO) are the two entities within CBP that process UAC.  OBP's mission includes preventing illegal aliens, smugglers, narcotics, and other contraband from entering the United States.  OFO is responsible for processing people, goods, and conveyances entering and leaving the United States at its ports of entry along land borders and at seaports.

DHS must abide by the terms of the *Flores Agreement*, which guides the treatment of alien children in federal custody.  The agreement mandates that juveniles be afforded appropriate care and protection given their age and vulnerability.

## Apprehension, Processing, and Short-Term Detention of UAC

In FY 2009, Border Patrol (BP) agents encountered and apprehended about 18,000 UAC while patrolling border areas, conducting routine checks at highway checkpoints, or performing border security enforcement operations.  From March to September 2009, OFO apprehended approximately 2,000 UAC at ports of entry.  Prior to March 23, 2009, OFO did not track UAC statistics separately from other juveniles.

CBP agents and officers process juveniles at CBP facilities to determine their names, ages, citizenship, and whether they are accompanied or unaccompanied.  Processing also includes querying federal government immigration and criminal databases to determine whether juveniles have the right to remain in the country and whether they have committed any criminal offenses. When CBP confirms that juveniles have entered the country illegally and unaccompanied, they are considered UAC and processed for immigration violations.

UAC brought to CBP facilities are detained in hold rooms.  OBP defines hold rooms as detention cells or search or interview rooms where individuals are temporarily detained pending processing or transfer.  OFO defines hold rooms as areas at ports of entry where detained individuals may be temporarily held pending secondary processing, which involves verifying documents and conducting interviews.  UAC are held in these secure areas on a short-term basis while their cases are being processed.  Short-term detention in CBP facilities is generally less than 24 hours; however, CBP's goal is to remove UAC from its custody within 12 hours after their apprehension.

Figure 1 depicts the usual flow of apprehending, processing, and detaining UAC while in DHS custody.

**Figure 1.  Flow of UAC Apprehension, Processing, and Detention[2]**



Source:  Customs and Border Protection

---

[2] DHS' Immigration and Customs Enforcement is also responsible for apprehending, processing, and detaining juveniles, to include UAC, who illegally enter the country.

# Results of Review

## CBP's Compliance With Terms of the *Flores Agreement*

CBP is complying with the provisions of the *Flores Agreement* as
described in the following sections of this report.

### Food and Drinking Water

The *Flores Agreement* requires that UAC in CBP custody have
access to food and drinking water.  To comply with the agreement,
CBP established internal policies requiring that food and drinking
water be provided to UAC.

OBP issued a *Hold Room and Short Term Custody* policy, dated
June 2, 2008.  According to the policy, meals must be offered to
UAC at least every six hours.  The policy also requires that two of
the meals served within the 24-hour period must be hot, and that
juveniles must have regular access to snacks, milk, and juice.

OFO's August 8, 2008, policy, *Secure Detention, Transport and
Escort Procedures at Ports of Entry*, includes requirements for
juveniles to have access to meals, snacks, and drinks at any time.
This policy also urges officers to be sensitive to cultural and
religious dietary restrictions whenever possible.

At the 17 BP stations and 13 ports of entry we visited, meals,
snacks, drinking water, and other beverages were available to
UAC.  Figures 2 and 3 list the types of food served at the facilities
we visited.

**Figure 2.  Meals, Snacks, and Beverages at Select Border Patrol Stations**

| OBP Sector | OBP Station | Meals | Snacks | Beverages |
|---|---|---|---|---|
| Tucson | Tucson Coordinating Center | Burger King contract for hamburgers, chicken sandwiches, side salads | Peanut butter and cheese crackers, fruit | Water, juice, milk |
| | Nogales | Chili packets, frozen burritos | Peanut butter and cheese crackers | Water, juice |
| | Sonoita | Chili packets | Peanut butter and cheese crackers | Water, juice |
| El Paso | El Paso | New Facility — Detainees processed at El Paso Station Processing Center | | |
| | El Paso Station Processing Center | Frozen burritos | Granola bars | Water, juice |
| | Ft. Hancock | Frozen burritos | Granola bars | Water, juice |
| | Fabens | Frozen burritos | Granola bars, crackers | Water, juice |
| | Santa Teresa | Frozen burritos | Granola bars | Water, juice |
| Detroit | Detroit | Meals Ready to Eat[3] | Peanut butter and cheese crackers | Water, juice |
| | Marysville | Meals Ready to Eat | None | Water |
| | Gibraltar | Meals Ready to Eat | None | Water |
| San Diego | Chula Vista | Meals Ready to Eat | Peanut butter and cheese crackers | Water, powdered juice |
| | Imperial Beach | Meals Ready to Eat | Peanut butter and cheese crackers | Water |
| | Brown Field | Meals Ready to Eat | Peanut butter and cheese crackers | Water |
| | El Cajon | Meals Ready to Eat | Peanut butter and cheese crackers | Water |
| Miami | Dania Beach | Pasta bowls | Fruit cups, applesauce, crackers | Water, juice, milk |
| | West Palm Beach | Pasta bowls | Peanut butter and cheese crackers | Water, juice, milk |

**Source: OIG observations during site visits**

[3] Meals Ready to Eat are prepackaged microwaveable food.  Packages include items such as pancakes or omelets for breakfast, and spaghetti, chicken pasta, beef ravioli, beef stroganoff, and chili with beans for lunch or dinner.

**Figure 3.  Meals, Snacks, and Beverages at Select Ports of Entry**

| OFO Field Office | OFO Facility | Meals | Snacks | Beverages |
|---|---|---|---|---|
| Tucson | Nogales | Chili packets | Peanut butter and cheese crackers | Water, juice |
| El Paso | Paso Del Norte Bridge | Frozen burritos | Snack bars | Water, juice |
| | Fabens | Frozen burritos | Fruit cups, crackers | Water, Gatorade |
| | Santa Teresa | Frozen burritos | Fruit cups, peanut butter and cheese crackers | Water, juice |
| Detroit | Detroit Ambassador Bridge | Noodle cups, pasta bowls | Granola bars | Water, juice |
| | Detroit Canada Tunnel | Noodle cups | Fruit cups, crackers | Water, juice |
| | Blue Water Bridge | Noodle cups, pasta bowls | Chips and breakfast bars | Water, juice |
| San Diego | San Ysidro | Brown bag meal: turkey sandwich, macaroni salad, carrots, and granola bar | Granola bars | Water, juice |
| | Otay Mesa | Brown bag meal: turkey sandwich, macaroni salad, carrots | Granola bars | Water, juice |
| | San Diego International Airport | None | | Water |
| Miami | Miami International Airport | Pasta bowls | Chips and Jell-O | Water, juice |
| | Ft. Lauderdale International Airport | Macaroni and cheese cups, noodle cups | Cereal | Water, juice, milk |
| | West Palm Beach International Airport | Noodle cups, pasta bowls | None | Water |

**Source: OIG observations during site visits**

## Food

OBP and OFO agents and officers followed similar practices when providing meals and snacks to UAC detained at BP stations or apprehended at ports of entry.  Typically, OBP and OFO provide:

- meals every 4 to 6 hours after the first meal in custody; and
- snacks, milk, or juice as often as requested, and in unlimited quantities.

Each CBP facility either maintained an inventory of food or had a process in place to purchase meals and snacks on an as-needed basis.  Three facilities, Marysville and Gibraltar BP stations and

West Palm Beach International Airport, stocked meals, but did not keep snacks readily available because of minimal UAC encounters. Each facility averaged contact with fewer than ten UAC per year. Each of these facilities had established procedures to purchase snacks as needed. San Diego International Airport handled fewer than five UAC a year and did not maintain a supply of food at its location. When CBP officials encounter UAC at this airport, the officials purchase food for them from a nearby food court. At the time of our visit to the El Paso station, OBP had recently occupied the building; therefore, detainees were being processed at the El Paso Processing Center. OBP officials told us that processing should begin at the El Paso station within a few weeks.

Even though food was provided to UAC in custody, OBP and OFO personnel described large quantities of food being discarded because UAC did not eat the meals offered. For example, UAC were provided food such as chili, macaroni salad, and turkey sandwiches; however, many refused to eat these items based on a lack of appeal, cultural preferences, or other reasons. CBP managers explained that agents and officers often compensate for such occurrences by purchasing food from the facilities' vending machines or in nearby fast food restaurants. Agents and officers said that when UAC refuse to eat the food offered, they have shared their own lunches and dinners with them.

Some stations and ports of entry provided meals that they considered appealing to children. For example, a Tucson BP station contracted with Burger King to provide hamburgers, sandwiches, and side salads. At Miami International Airport, officers assembled meal packages from items purchased in bulk. These items included microwavable pasta dishes, potato chips, Jell-O, and juice boxes. Agents and officers at BP stations and OFO ports of entry in El Paso said that UAC had no problems eating the variety of microwavable burritos they served as meals. In addition, OFO managers said that this arrangement works well in ports of entry where the volume of UAC is difficult to predict and purchasing nonperishable food is more practical.

**Examples of meals and snacks available to UAC**





**Source: DHS OIG**

## Drinking Water

During our site visits, we observed that drinking water was
accessible to all UAC detained in CBP facilities through a variety
of methods, including plastic coolers, water fountains, bottled
water, and combined toilet-sink units. The combined units were
located in hold rooms at BP stations, and designed with the sinks
located directly above the toilet. These sinks also served as
drinking fountains that dispensed regular tap water from a separate
water supply than that connected to the toilet. Of the 17 BP
stations that we visited that used these combined units, 14 stations
also offered bottled water or water from large plastic coolers to
UAC. The remaining three stations used the combined units as the
only source of drinking water.

BP managers informed us that having water available in bottles
and coolers stemmed from complaints filed by UAC that they were
drinking water from toilets. An official from DHS' Office for
Civil Rights and Civil Liberties (CRCL) informed us that
complaints had been filed by or on behalf of UAC who believed
that since the sink was located directly above the toilet, the

drinking water came from the toilet itself.  The CRCL
representative alerted OBP officials of this situation, which
resulted in some stations providing water from coolers or bottles.
Other BP stations indicated in English and Spanish above the
toilet-sink units that water from the combined unit was safe to
drink, as illustrated below.



**Source: DHS OIG.**

At the newer BP stations we visited, hold rooms had combined
toilet-sink units.  The combined units have the sink on one side and
the toilet on the other.  UAC detained in hold rooms were less
apprehensive about drinking water from this type of configuration.

**Toilet-sink unit at newer Border Patrol stations**



**Source: DHS OIG**

Although drinking water was accessible to UAC in OBP facilities,
one station did not have disposable cups readily available to hold
water from the cooler.  At another station, the water faucet in the
combined toilet-sink unit was inoperable.  In hold rooms at three
BP stations, the toilet-sink units had wet toilet paper or paper

towels in or around the units, making it appear that the area may not be sanitary and the water from the sink unsafe to drink.

At OFO ports of entry, water is provided to UAC from fountains located in secondary screening areas or from bottles.  When UAC are placed in hold rooms, they have access to water through toilet-sink units as described for OBP.  Every OFO facility we visited had drinking water available either in bottles or through drinking fountains in addition to toilet-sink combinations inside hold rooms.

According to OBP and OFO juvenile detention policies, milk could be available for UAC, as well as other categories of detainees including babies, toddlers, and pregnant women.  At the time of our fieldwork, four of the 30 facilities we visited served milk.  In addition, most facilities made other beverages available to UAC, such as orange or apple juice.  Figures 2 and 3 list the beverages available to UAC at the sites we visited.

## Recommendations

We recommend that the Chief, Office of Border Patrol, and Assistant Commissioner, Office of Field Operations:

**Recommendation #1:**  Evaluate the current methods for purchasing food to ensure that purchases are efficient and cost-effective.

**Recommendation #2:**  Display information near the toilet-sink units in all hold rooms to indicate that the water is safe to drink.

## Management Comments and OIG Analysis

We evaluated CBP's written comments and have made changes to the report where we deem appropriate.  A summary of CBP's written responses to our recommendations and our analysis of the responses follow each recommendation.  A copy of CBP's response, in its entirety, appears in Appendix B.

**CBP Response:**  CBP concurred with Recommendation 1.

Border Patrol sectors will identify current best practices and provide food items that will be well received by the unaccompanied alien children (UAC).  By identifying meals that have appeal, are culturally preferred, and cost-effective, we will

eliminate waste and redundancy.  The Border Patrol sectors will
implement best practices by January 31, 2011.

The Office of Field Operations (OFO) Logistics will survey the
field offices on the types of food that seem to be popular with the
"typical child" and share best practices with the field offices and
Office of Border Patrol (OBP).

**Due Date:**  January 31, 2011

**OIG Analysis:**  This recommendation is **resolved and open**
pending our receipt of the Office of Border Patrol (OBP) and
Office of Field Operation's (OFO) best practices on serving foods
to UAC in their custody that are appealing, culturally preferred,
and cost-effective.

**CBP Response:**  CBP concurred with Recommendation 2.

OBP will issue field guidance and conduct follow-up conference
calls with sector field staff by October 21, 2010, to ensure that
signage is properly displayed to inform everyone that the water is
drinkable.

By December 1, 2010, OFO will display information near the
toilet-sink units in all hold rooms to indicate that the water is safe
to drink.

**Due Date:**  December 1, 2010

**OIG Analysis:**  This recommendation is **resolved and open**
pending our receipt of Border Patrol (BP) guidance and OFO
confirmation that signs indicating water from toilet-sink units is
safe to drink have been properly displayed.

## Emergency Medical Assistance

The *Flores Agreement* requires that UAC have access to emergency
medical assistance.  OBP's *Policy for Encounters with Injured Subjects*
requires that all individuals who are injured or require medical assistance
when encountered by BP agents be provided access to medical treatment.
In addition, OBP's *Hold Room and Short-Term Custody* policy specifies
that a qualified medical professional, such as an emergency medical
technician (EMT), paramedic, or physician, evaluate detainees who
require medical attention or display symptoms of serious infectious

diseases or contagions such as tuberculosis, severe acute respiratory
syndrome, or pandemic influenza.

OFO officers must provide medical assistance at ports of entry when
encountering UAC who need medical care.  Specifically, OFO's policy,
*Secure Detention, Transport and Escort Procedures at Ports of Entry*,
requires that all persons placed in a secure area at its facilities be asked
whether they have a medical problem or condition that may require
medical attention.

Many BP agents and OFO officers we interviewed stated that juveniles
occasionally reported having medical conditions.  However, according to a
CRCL official, juveniles may be too intimidated to report an injury or
illness during processing.  OFO policy requires officers to ask all
detainees whether they need medical treatment, while OBP policy does
not have a similar requirement.  BP agents may observe that juveniles
require medical assistance or juveniles may request such assistance, but
OBP policy does not require the agent to ask.  Requesting information
from juveniles about their medical condition might be a useful tool in
assessing their physical well-being.

CBP managers, agents, and officers said that when they apprehend and
process UAC, CBP employees identify injured juveniles.  In cases of
medical emergencies, agents and officers said that they transport or escort
UAC to hospitals and monitor their condition.  When appropriate, UAC
are returned to BP stations or OFO ports of entry to complete
administrative processing.

OFO's *Secure Detention, Transport and Escort Procedures at Ports of
Entry* policy requires officers to complete an Individual Caution Sheet on
every UAC when they observe obvious medical conditions or UAC claim
to have an injury or illness.  A sector within OBP issued guidance,
*Juvenile Directive*, dated May 2003, requiring its BP agents to record
health-related complaints from juveniles in the narrative portion of Form
I-213, a document CBP completes when aliens are deportable.

BP agents reported documenting instances when UAC were transported to
hospitals for medical care or treated by EMTs.  In addition, employees who
process UAC said that they sometimes include a description of health
problems, medical emergencies, and any treatment provided on Form I-213.
However, a BP official said that OBP does not have a nationwide
requirement to document that type of information on Form I-213.  A CRCL
official commented that its office's review of Form I-213 indicated that
these forms do not always identify medical assistance provided to UAC
when CRCL investigates complaints filed by UAC or their representative.

More consistent documentation of medical assistance given to UAC could provide increased evidence of CBP's compliance with the *Flores Agreement*.

According to OBP personnel, all agents are certified to provide cardiopulmonary resuscitation and first aid.  Additionally, OBP has a cadre of 734 trained EMTs nationwide who are able to evaluate the severity of an injured or ill detainee's medical condition to determine the appropriate methods of treatment or contact emergency medical services (EMS) for conditions that require special medical attention.  When an OBP facility does not have EMTs available to evaluate a medical emergency, agents contact EMS for assistance.

OFO managers informed us that they had 104 certified EMTs, and 460 officers trained as first responders.  The managers said OFO also certifies officers in cardiopulmonary resuscitation and first aid during basic training.

Since certain minor injuries may not warrant treatment by EMS, CBP facilities should have first aid kits readily available and supplied with basic items, such as adhesive bandages, sterile pads, and cold packs, to treat detainees.  Of the 30 CBP facilities we visited, 23 had first aid kits with a sufficient inventory of medical supplies.  However, six BP stations and one OFO port of entry had first aid kits that either were empty or contained minimal basic first aid items.  In one OBP sector, all four stations we visited had first aid kits that were completely or almost empty.  Overall, CBP personnel said that they recognized the need to maintain sufficient supplies in order to provide UAC with immediate assistance for minor medical conditions.

**Examples of first aid kits we observed**

 

**Source: DHS OIG**

## Recommendations

We recommend that the Chief, Office of Border Patrol, and Assistant Commissioner, Office of Field Operations:

**Recommendation #3:** Establish a procedure that requires CBP employees who initially encounter UAC to inquire about any injury or illness that might require medical attention.

**Recommendation #4:** Develop a process to document any medical assistance provided to UAC.

**Recommendation #5:** Maintain a sufficient inventory of medical supplies in first aid kits at BP stations and ports of entry.

## Management Comments and OIG Analysis

**CBP Response:** CBP concurred with Recommendation 3.

By October 31, 2010, OBP will rerelease previously issued guidance to reemphasize adherence to the medical and reporting requirements contained in the memo, dated March 20, 2009, signed by Chief David V. Aguilar entitled, *Implementation of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008* (TVPRA, attached), the *Hold Rooms and Short Term Custody* policy issued June 2, 2008, and the *Policy for Encounters with Injured Subjects* signed on November 9, 2007.

OFO/Admissibility and Passenger Program will reissue Implementation of TVPRA field guidance to all ports of entry (POE). Reissue will also include a reminder to complete the Initial Placement Referral Form, which captures the UAC medical status (injury/treatment/illness).

**Due Date:** October 31, 2010

**OIG Analysis:** The management policies OBP cites in their response do not address its personnel specifically asking each UAC whether they are ill or injured when initially encountered. *Implementation of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008* requires that a child is only asked how they received injuries if they show signs of torture, malnourishment, fatigue, or emotional abuse. The *Hold Rooms and Short Term Custody* policy and the *Policy for Encounters with*

*Injured Subjects* address access to medical assistance, but do not mention inquiring about the need for medical attention due to illness or injury.

The intent of this recommendation is to inquire of every UAC whether they are ill or injured when initially encountered regardless of how they physically appear. This recommendation will remain **unresolved and open** until OBP establishes such a requirement.

OFO's policy to complete the Unaccompanied Alien Child Initial Placement Referral Form, which captures each UAC's medical status, addresses this recommendation.

**CBP Response:** CBP concurred with Recommendation 4.

By October 31, 2010, OBP will rerelease previously issued guidance to reemphasize adherence to the medical and reporting requirements. This is contained in the memo dated March 20, 2009, signed by Chief David V. Aguilar entitled, *Implementation of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008* (TVPRA, attached), the *Hold Rooms and Short Term Custody* policy issued June 2, 2008, and the *Policy for Encounters with Injured Subjects* signed on November 9, 2007.

OFO will reissue UAC field guidance including a reminder to complete the Initial Placement Referral Form, which captures the UAC medical status (injury/treatment/illness) and any medical assistance provided.

**Due Date:** October 31, 2010

**OIG Analysis:** The management policies cited in OBP's response do not include specific procedures for documenting medical assistance provided to UAC. *Implementation of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008* requires that a child is asked only how they received injuries if they show signs of torture, malnourishment, fatigue, or emotional abuse. The *Hold Rooms and Short Term Custody* policy and the *Policy for Encounters with Injured Subjects* address access to medical care, but do not require any documentation when medical assistance is provided. This recommendation will remain **unresolved and open** until OBP establishes a process for documenting medical assistance provided to UAC.

OFO's policy to complete the Initial Placement Referral Form, which captures any medical assistance provided to UAC, addresses this recommendation.

**CBP Response:**  CBP concurred with Recommendation 5.

By October 31, 2010, OBP will issue guidance reminding sector Health and Safety personnel to regularly inspect and stock medical supplies to ensure medical kits have the necessary supplies at all times.

OFO Logistics will immediately abate this issue by contacting the field offices to fill the first aid kits with the necessary components.

**Due Date:**  October 31, 2010

**OIG Analysis:**  This recommendation is **resolved and open** pending our receipt of OBP's guidance to Health and Safety personnel, and OFO's communication to its field offices to replenish first aid kits.  OFO's communication should also include guidance to ensure that first aid kits continue to be properly stocked following OFO Logistics' immediate replenishment of first aid kits that are currently under stocked.

## Toilets and Sinks

The *Flores Agreement* requires that minors be held in DHS facilities that are safe and sanitary and have access to toilets and sinks.  According to OBP and OFO detention policies, all detainees will have access to properly equipped restrooms.  In addition, OBP policy specifies that supervisors must ensure that officers are within visible or audible range of secure areas so they can respond to detainees' requests to use the restroom.

According to CBP personnel, toilets and sinks are always available to UAC.  CBP agents and officers said that where restrooms are not located within open areas or hold rooms where UAC are detained, a CBP employee of like gender escorts them to the nearest restroom.

We observed toilets and sinks inside hold rooms designated for UAC use.  At each facility, we tested toilets and sink faucets to ensure that both worked.  We noted only one toilet and one faucet that did not operate properly and brought that matter to the

attention of CBP personnel.  CBP should routinely check toilets
and sinks to ensure that they operate properly.

## Recommendation

We recommend that the Chief, Office of Border Patrol, and
Assistant Commissioner, Office of Field Operations:

**Recommendation #6:**  Routinely inspect toilets and sinks to
ensure they are working properly.

## Management Comments and OIG Analysis

**CBP Response:**  CBP concurred with Recommendation 6.

Because some of our stations are leased, OBP will work closely
with the CBP's Office of Administration to report toilets and sinks
that are not working properly.  Furthermore, by October 31, 2010,
OBP will rerelease previously issued guidance on the
implementation of the TVPRA and the *Hold Rooms and Short
Term Custody* policy.

OFO will issue guidance to the Field Office to routinely check
toilets and sinks to ensure that they are working properly.

**Due Date:**  October 31, 2010

**OIG Analysis:**  OFO's response addresses guidance that will be
issued to field offices to routinely inspect toilets and sinks for
proper operation, which represents a positive step in implementing
our recommendation.  OBP's response does not address how they
will ensure that toilets and sinks, in either owned or leased
facilities, are routinely inspected and working properly.  In
addition, OBP guidance previously issued on the TVPRA and *Hold
Rooms and Short Term Custody* policy does not address adequate
operation of toilets and sinks, as detailed in this report.

The recommendation is **unresolved and open** pending our receipt
of specific efforts by OBP to address this issue, and OFO's
guidance to the Field Office as detailed in their response.

## Proper Temperature Control and Ventilation

CBP's internal guidance incorporates the *Flores Agreement* requirement for detention facilities to provide adequate temperature control and ventilation.  The *Flores Agreement* does not specify the temperature range.  Agents and officers explained that they had few problems with the buildings' temperature and ventilation and contacted the appropriate maintenance personnel when problems occurred.

We noted variances in the temperatures in the CBP facilities we inspected.  CBP recognizes the challenges in regulating the temperature to suit everyone.  The most common complaint from detainees was that hold rooms were too cold.  However, we observed that blankets were available to detainees.

## Supervision for UAC in Custody

The *Flores Agreement* requires that detained minors be placed in the least restrictive setting appropriate to the minors' age and special needs if the setting is consistent with its interest to protect the minors' well-being and that of others.  The *Flores Agreement* further requires that DHS ensure the safety and well-being of minors in its custody.

OBP and OFO policies require that UAC be under direct supervision, with agents and officers stationed where they can constantly observe or hear detainees.  Under OBP policy, detainees are to be temporarily held in hold rooms.  According to OFO policy, when no hold rooms exist at a port of entry, a segregated area within the facility should be established, where feasible, away from the traveling public, where direct supervision and control of all detainees must be maintained.

CBP personnel use various methods to observe and supervise UAC.  Those methods include continuous direct observation or periodic checks—typically at 15-minute intervals—of hold rooms, one-on-one supervision, and closed circuit monitors.

Based on our observation of areas designated for UAC detainees, we concluded that either the proximity of the hold rooms to the processing desks or central control rooms, periodic scheduled checks, closed circuit monitors, or combinations thereof were sufficient to comply with the intent of the *Flores Agreement*.

**Processing area at OBP station with view of hold rooms**



**Source: DHS OIG.**

Although not required by the *Flores Agreement*, some CBP facilities provide televisions, toys, coloring books and crayons, and books for the UAC in their custody.  In addition, we noted that some agents and officers donate clothing for detainees.

## Separation From Unrelated Adults

The *Flores Agreement* stipulates that unaccompanied minors in DHS custody be separated from unrelated adult detainees unless it is not immediately possible.  When separation is impossible, UAC detention with an unrelated adult will not exceed 24 hours.

OBP guidelines require that UAC not be detained with unrelated adults.  The guidance also requires that, when a separate temporary hold room is unavailable, UAC be kept in an open area under constant visual supervision of desk officers or other BP agents, if feasible.

OFO policy requires that all detention options be considered when detaining UAC at ports of entry, including placing detainees in detention cells or hold rooms.  The policy requires that UAC not be held with unrelated adults, preferring that they be held in secondary or temporary holding areas, away from the public and under the direct supervision of officers.

We determined that CBP complies with the requirement of the *Flores Agreement* regarding separating UAC from unrelated adults.

**Other Issues**

*Telephones*

The *Flores Agreement* does not require immigration officials to provide access to telephones. However, CBP officials said that UAC processed for removal receive a list of free legal service providers in the jurisdiction where their apprehension occurred. OBP's policy requires that processing agents grant telephone access to UAC as soon as practicable. UAC may use telephones to communicate with attorneys, parents, and consular offices. OFO policy requires that supervisors determine whether detainees may use the telephone. OFO's policy does not distinguish between adult and juvenile detainees; however, OFO managers said UAC are always given access to telephones.

At each detention facility we visited, telephones were available and accessible for juvenile use. Telephones were located in areas such as hold rooms, interview rooms, and at processing desks.

## Improvements Needed In Training in *Flores Agreement* Requirements

According to the *Flores Agreement*, staff must make every effort to ensure the safety and well-being of minors detained in CBP facilities. As such, the agreement requires appropriate guidance and training for employees regarding the terms of the agreement. However, we were unable to determine whether all CBP employees responsible for handling UAC received sufficient training to comply with this requirement.

As part of the initial basic training curriculum, BP agents and OFO officers receive instruction on CBP's responsibilities for the care and treatment of juveniles in its custody. CBP's Unaccompanied Alien Children training course includes processing and notice of rights and disposition, and the treatment and placement of unaccompanied juveniles/minors.

CBP developed a one-hour electronic refresher course, titled "Unaccompanied Juveniles/Minors and the *Flores v. Reno Settlement Agreement,*" that is available through its Virtual Learning Center (VLC). In addition to this training, CBP personnel said that its staff receives policy updates during pre-shift briefings, through email, and by policy memorandums.

In March 2008, OBP issued an internal policy mandating that all supervisory and nonsupervisory BP agents complete the VLC training "Unaccompanied Juveniles/Minors and *Flores vs. Reno Settlement Agreement*" each year.  According to VLC records, 5, 492 agents, or approximately 35%, completed the training in FY 2008.  In FY 2009, 7,939 agents, nearly 40%, completed the training.

In October 2006, the Executive Director, OFO Mission Support, issued a memorandum mandating that any CBP officer or agent involved in apprehending, processing, reviewing, detaining, releasing, decision making or transporting juveniles to take this training annually.  However, CBP has not established a process to verify that employees responsible for handling UAC satisfy the training requirement.  According to VLC records, 17,661 OFO officers completed the course in FY 2008 and 17,897 OFO officers did so in FY 2009.  Since OFO does not distinguish officers with responsibility for handling UAC, it was unable to provide the number of officers who were required to complete the *Flores Agreement* training.

CBP employees responsible for these functions made the following comments regarding the *Flores Agreement* refresher course provided through VLC:

- A BP manager could not remember taking the refresher course since 2007.

- A BP manager completed the *Flores Agreement* training during the late 1990s but was unable to recall whether the same information was covered in VLC.

- An OFO officer completed the VLC course 2 years ago and was unaware that it was a yearly training requirement.

- An OFO officer said that it had been a long time since receiving the training, and it may have been given at the basic training academy.  The officer did not remember taking any refresher course through VLC.

- An OFO manager said that the delay in employees completing the *Flores Agreement* refresher course was due to rotations, temporary duty assignments, and agents going into active duty.

- Officers and agents who had infrequent or no contact with UAC said that they refer to internal detention policies when they encounter UAC.

A CBP manager said that the Office of Training and Development database contains the names of all CBP agents and officers who have completed VLC training.  A VLC specialist said that statistical data on CBP employees completing the course could be generated only by an employee's name, and not by OBP sectors or OFO field offices.

OBP and OFO have established policies and developed a course on *Flores Agreement* requirements for employees who maintain contact with UAC. However, CBP has not developed a tracking system to verify those personnel responsible for processing and detaining UAC complete annual refresher training.  Such a process would provide greater assurance that CBP complies with the *Flores Agreement*, as well as its own internal guidelines.

## Recommendation

We recommend that the Chief, Office of Border Patrol, and Assistant Commissioner, Office of Field Operations:

**Recommendation #7:**  Mandate that all CBP personnel required to take the *Flores Agreement* training complete the refresher course annually.

## Management Comments and OIG Analysis

**CBP Response:**  CBP concurred with Recommendation 7.

By October 31, 2010, OBP will re-release previously issued guidance to ensure that the field is aware and complies with the provisions of the policy signed by Chief Aguilar on March 11, 2008, entitled, *Unaccompanied Juveniles/Minors and Flores vs. Reno Settlement Agreement Virtual Learning Center Course* (attached).  The field will be reminded of the requirement to complete annual training once every fiscal year through the Virtual Learning Center course of the same title.

The Flores v. Reno online training course is currently available and a memorandum was issued in March 2009 requiring all U.S. Customs and Border Protection officers, who apprehend process, detain, and/or transport a juvenile/minor, complete this course by December 2009.  There are 7,793 completions to June 28, 2010.

A memorandum mandating completion of the course for 2010 has not been issued pending the revision of the course to include

updated material from the *Trafficking Victims Protection
Reauthorization Act of 2008*.  This development was requested
early in FY 2010, but was finally approved in May to start
development.  A design meeting is scheduled for July 2010 with an
expected completion in early November 2010 for full
implementation towards the end of the first quarter of FY 2011.

**Due Date:**  January 31, 2011

**OIG Analysis:**  OBP's release of guidance previously issued may
provide awareness, but does not provide assurance that required
training will be completed.  In addition, the CBP response does not
clearly identify any specific actions taken by OFO to satisfy this
recommendation.  This recommendation remains **unresolved and
open** as CBP continues its effort to establish and implement a
process to verify that CBP personnel complete the refresher course
annually.

## Improvements Needed in Maintaining Unaccompanied Alien Children Information

The *Flores Agreement* requires that up-to-date records be maintained on
minors placed in proceedings and remaining in custody for longer than 72
hours.  The records must include the following information:

- Biographical data such as name, date of birth, and country of
  origin
- Date placed in custody
- Date removed or released
- To whom and where placed, transferred, removed, or released
- Immigration status
- Hearing dates

CBP is responsible for collecting and reporting UAC information within
its jurisdiction, either electronically or manually.  A coordinated record-
keeping system can provide increased accountability for the safety and
well-being of UAC while in CBP custody.

OBP policy requires that each BP station maintain a detention log for
UAC in its custody.  According to OBP policy, at a minimum, these logs
should include the following information:

- Biographical information

- Alien registration number and nationality
- Reason for placement
- Date and time taken into CBP custody, transferred, and released
- Date and time juvenile coordinator notified
- Final disposition
- Times meals were provided
- Telephone use
- Showers
- Visual checks

OFO policy requires that officers record and initial the times of visual checks, physical observations, and meals offered, eaten, or declined in a Personal Detention Log.

During our site visits, we analyzed UAC detention log entries for September 28, 2008, and September 28, 2009.  In some locations, CBP did not have UAC in custody on those dates.  In those instances, we selected random dates.  Generally, CBP employees were consistent in documenting UAC biographical information.  However, at 28 of the 30 facilities, detention logs did not contain the documentation CBP requires.  For example, we observed detention logs that included category headings for required information; however, documentation was incomplete.  We also observed detention logs that did not include category headings for all required information to be recorded.

CBP officials provided several reasons for inconsistencies in documenting required information, including the following comments:

- Meals are documented when eaten by juveniles, but are not documented when a meal was offered and the juvenile refused to eat.
- Mealtimes are documented on a whiteboard located in the processing area.
- Information on alien apprehensions is maintained in the Enforcement Case Tracking System; however, there is no distinction between UAC and other juveniles.  OFO field offices keep track of UAC on a weekly basis and send the information to headquarters for compilation.
- Officers document meals served and phone usage in a manual log.
- Officers use an internal electronic UAC detention log.  However, officers are not consistent in documenting meals, especially when UAC refuse to eat food from the existing inventory and officers purchase a meal or snack for them.

OBP has developed an electronic system, referred to as e3, which collects comprehensive statistical information on alien apprehensions. e3 also contains a juvenile module that can function as an electronic juvenile detention log. This system has the capacity to differentiate between accompanied and unaccompanied juveniles, and captures specific information including the times meals are served, phone usage, detainee medical conditions, and detainee arrests and releases from CBP custody.

At the time of our fieldwork, the juvenile module in e3 was under development. OBP officials estimated that about 50 BP stations used the juvenile module in e3 to some extent in the pilot stage. According to OBP manager, all BP stations will use e3 after the system is completely developed.

The *Flores Agreement* specifies that complete and accurate records be maintained concerning detained UAC. A coordinated record-keeping system can provide increased accountability for UAC's safety and well-being during all phases of CBP's custody process.

## Recommendation

We recommend that the Chief, Office of Border Patrol, and Assistant Commissioner, Office of Field Operations:

**Recommendation #8:** Establish a CBP-wide procedure to document required UAC information.

## Management Comments and OIG Analysis

**CBP Response:** CBP concurred with Recommendation 8.

As OIG is aware, OBP has been working very closely with our Enforcement and Information Technology Division to proactively address this requirement. In June 2009, the Border Patrol developed a standardized Border Patrol juvenile detention processing module in e3, our enforcement system of record. The module serves as our electronic juvenile detention log. Currently, the Rio Grande Valley Sector has mandated the use of the juvenile detention module in all its stations. CBP's Office of Information and Technology (OIT) has additional Border Patrol requirements that will improve the uniform collection of juvenile data. Once OIT implements the improvements by March 31, 2011, OBP will mandate the use of the module nationwide. OBP welcomes the opportunity to open dialogue with our CBP counterparts and offer

any lessons learned to adapt or create, if fiscally-sound and
feasible, a CBP-wide electronic juvenile detention log.

OFO continues to work with all stakeholders to develop a Joint
Operations Manual for UAC.  Developments in information
technology and policy guidance are currently being worked on.  In
the interim, OFO will reissue UAC field guidance, no later than
October 31, 2010.

**Due Date:**  January 31, 2011

**OIG Analysis:**

CBP's response needs to address efforts to establish and
implement a CBP-wide procedure requiring both OBP and OFO to
capture similar UAC information.  The OBP response includes
their plan for full implementation of the detention processing
module in e3, which satisfies the intent of this recommendation.
OFO's response does not provide specific details regarding the
technology and policy guidance currently under development.

OBP is agreeable to open dialogue with OFO to adapt or create a
CBP-wide electronic juvenile detention log.  This could serve as a
means for achieving a uniform documentation requirement
throughout CBP.  This recommendation remains **unresolved and
open** pending additional efforts to develop uniform documentation
requirements for UAC information.

**Appendix A**
**Purpose, Scope, and Methodology**

The purpose of our review was to determine whether Customs and
Border Protection is complying with the *Flores Agreement* relating
to UAC in CBP custody.  The *Flores Agreement* requires that
following arrest, DHS detain minors, to include UAC, in facilities
that are safe, sanitary, and consistent with their vulnerabilities as
minors.  DHS must provide (1) food and drinking water;
(2) medical assistance in the event of emergencies; (3) toilets and
sinks; (4) adequate temperature control and ventilation;
(5) adequate supervision to protect minors from others; and
(6) separation from unrelated adults whenever possible.

We conducted our fieldwork from September to December 2009,
interviewing 110 CBP personnel and visiting 30 CBP facilities.
We interviewed senior CBP officials and staff in Washington, DC;
Arizona, Texas, Michigan, California, and Florida.  We also
consulted with DHS Office for Civil Rights and Civil Liberties on
civil rights and civil liberties issues.

In identifying locations for site visits, we analyzed relevant
documents and statistical data to determine the number of minors
CBP apprehended and initially detained in its holding facilities
during FYs 2008 and 2009.  We selected a sample of complaints
filed with the Office for Civil Rights and Civil Liberties to
determine which facilities allegedly violated the *Flores Agreement*.
During the fieldwork, we visited CBP holding facilities that
generated high as well as low volumes of complaints to assess
compliance with the *Flores Agreement*.  We notified CBP of our
site visits to 27 of the 30 locations we inspected.  We did not
disclose the location of the remaining three sites.  During these
visits, we observed detention conditions for UAC and assessed
whether the facilities met the provisions of the *Flores Agreement*.

We conducted this review under the authority of the *Inspector
General Act of 1978*, as amended, and according to the *Quality
Standards for Inspections* issued by the Council of the Inspectors
General on Integrity and Efficiency.

**Appendix B**
**Management Comments to the Draft Report**



U.S. Department of Homeland Security
Washington, DC 20229

**U.S. Customs and**
**Border Protection**

**July 15, 2010**

MEMORANDUM FOR RICHARD L. SKINNER
INSPECTOR GENERAL
DEPARTMENT OF HOMELAND SECURITY

FROM:                    Assistant Commissioner
                         Office of Internal Affairs

SUBJECT:                 U.S. Customs and Border Protection's Response to the Office of Inspector
                         General's Draft Report Entitled, "CBP's Handling of Unaccompanied Alien
                         Children"

Thank you for providing us with a copy of your draft report entitled "CBP's Handling of
Unaccompanied Alien Children" and the opportunity to discuss the issues in the report. We welcome
the Office of Inspector General's (OIG) acknowledgement of U.S. Customs and Border Protection's
(CBP) compliance with the provisions of the *Flores vs. Reno Settlement Agreement*.

Although the OIG did not identify any significant violations of the agreement, the OIG made eight
recommendations to CBP. CBP concurs with all eight recommendations and places great value in
addressing these recommendations. By implementing the corrective actions, we believe we can
enhance our program's overall effectiveness. The recommendations and CBP's actions to address the
recommendations are described below.

**Recommendation #1:** Evaluate the current methods for purchasing food to ensure that purchases are
efficient and cost effective.

**CBP Response:** CBP concurs with the recommendation.

Border Patrol sectors will identify current best practices and provide food items that will be well
received by the unaccompanied alien children (UAC). By identifying meals that have appeal, are
culturally preferred, and cost-effective, we will eliminate waste and redundancy. The Border Patrol
sectors will implement best practices by January 31, 2011.

The Office of Field Operations (OFO) Logistics will survey the field offices on the types of food that
seem to be popular with the "typical child" and share best practices with the field offices and Office of
Border Patrol (OBP).

**Due Date:** January 31, 2011

**Recommendation #2:** Display information near the toilet-sink units in all hold rooms to indicate that
the water is safe to drink.

2

**CBP Response:**  CBP concurs with the recommendation.

OBP will issue field guidance and conduct follow-up conference calls with sector field staff by October 21, 2010, to ensure that signage is properly displayed to inform everyone that the water is drinkable.

By December 1, 2010, OFO will display information near the toilet-sink units in all hold rooms to indicate that the water is safe to drink.

**Due Date:**  December 1, 2010

**Recommendation #3:** Establish a procedure that requires CBP employees who initially encounter UAC to inquire about any injury or illness that might require medical attention.

**CBP Response:**  CBP concurs with the recommendation.

By October 31, 2010, OBP will rerelease previously issued guidance to reemphasize adherence to the medical and reporting requirements contained in the memo dated March 20, 2009, signed by Chief David V. Aguilar entitled, *Implementation of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008* (TVPRA, attached), the *Hold Rooms and Short Term Custody* policy issued June 2, 2008 by Chief Aguilar (attached), and the *Policy for Encounters with Injured Subjects* signed by Chief Aguilar on November 9, 2007 (attached).

OFO/Admissibility and Passenger Program will reissue Implementation of TVPRA field guidance to all ports of entry (POE).  Reissue will also include a reminder to fully complete the Initial Placement Referral form, which captures the UAC medical status (injury/treatment/illness).

**Due Date:**  October 31, 2010

**Recommendation #4:** Develop a process to document any medical assistance provided to UAC.

**CBP Response:**  CBP concurs with the recommendation.

By October 31, 2010, OBP will rerelease previously issued guidance to reemphasize adherence to the medical and reporting requirements contained in the memo dated March 20, 2009, signed by Chief David V. Aguilar entitled, *Implementation of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008* (TVPRA, attached), the *Hold Rooms and Short Term Custody* policy issued June 2, 2008 by Chief Aguilar (attached), and the *Policy for Encounters with Injured Subjects* signed by Chief Aguilar on November 9, 2007 (attached).

OFO will reissue UAC field guidance including a reminder to fully complete the Initial Placement Referral form, which captures the UAC medical status (injury/treatment/illness) and any medical assistance provided.

**Due Date:**  October 31, 2010

**Recommendation #5:** Ensure that border patrol stations and ports of entry maintain a sufficient inventory of medical supplies in first aid kits.

**Appendix B**
**Management Comments to the Draft Report**

3

**CBP Response:** CBP concurs with the recommendation.

By October 31, 2010, OBP will issue guidance reminding sector Health and Safety personnel to regularly inspect and stock medical supplies to ensure that medical kits have the necessary supplies at all times.

OFO Logistics will immediately abate this issue by contacting the field offices to fill the first aid kits with the necessary components.

**Due Date:** October 31, 2010

**Recommendation #6:** Ensure that toilets and sinks are routinely inspected and working properly.

**CBP Response:** CBP concurs with the recommendation.

Because some of our stations are leased, OBP will work closely with the CBP's Office of Administration to report toilets and sinks that are not working properly. Furthermore, by October 31, 2010, OBP will rerelease previously issued guidance on the implementation of the TVPRA and the *Hold Rooms and Short Term Custody* policy.

OFO will issue guidance to the Field Office to routinely check toilets and sinks to ensure that they are working properly.

**Due Date:** October 31, 2010

**Recommendation #7:** Mandate that all CBP personnel required to take the *Flores Agreement* training complete the refresher course annually.

**CBP Response:** CBP concurs with the recommendation.

By October 31, 2010, OBP will rerelease previously issued guidance to ensure that the field is aware and complies with the provisions of the policy signed by Chief Aguilar on March 11, 2008, entitled, *Unaccompanied Juveniles/Minors and Flores vs. Reno Settlement Agreement Virtual Learning Center Course* (attached). The field will be reminded of the requirement to complete annual training once every fiscal year through the Virtual Learning Center course of the same title.

The Flores v. Reno online training course is currently available and a memorandum was issued in March 2009 requiring all U.S. Customs and Border Protection officers, who apprehend, process, detain, and/or transport a juvenile/minor, complete this course by December 2009. There are 7,793 completions to June 28, 2010.

A memorandum mandating completion of the course for 2010 has not been issued pending the revision of the course to include updated material from the Trafficking Victims Protection Reauthorization Act of 2008. This development was requested early in fiscal year (FY) 2010, but was finally approved in May to start development. A design meeting is scheduled for July 2010 with an expected completion in early November 2010 for full implementation towards the end of the first quarter of FY 2011.

**Due Date:** January 31, 2011

**CBP's Handling of Unaccompanied Alien Children**

**Appendix B**
**Management Comments to the Draft Report**

4

**Recommendation #8:** Establish a CBP-wide procedure to document required UAC information.

**CBP Response:** CBP concurs with the recommendation.

As OIG is aware, OBP has been working very closely with our Enforcement and Information Technology Division to proactively address this requirement. In June 2009, the Border Patrol developed a standardized Border Patrol juvenile detention processing module in e3, our enforcement system of record. The module serves as our electronic juvenile detention log. Currently, the Rio Grande Valley Sector has mandated the use of the juvenile detention module in all its stations. CBP's Office of Information and Technology (OIT) has additional Border Patrol requirements that will improve the uniform collection of juvenile data. Once OIT implements the improvements by March 31, 2011, OBP will mandate the use of the module nationwide. OBP welcomes the opportunity to open dialogue with our CBP counterparts and offer any lessons learned to adapt or create, if fiscally-sound and feasible, a CBP-wide electronic juvenile detention log.

OFO continues to work with all stakeholders to develop a Joint Operations Manual for UAC. Developments in information technology and policy guidance are currently being worked on. In the interim, OFO will reissue UAC field guidance, no later than October 31, 2010.

**Due Date:** January 31, 2011

**********

Attached are supporting documents referenced in this memo, as well as technical comments that relate to statements that need to be clarified prior to finalization of this report. With regard to the classification of the draft report, CBP has not identified any information within this report that warrants a "For Official Use Only" classification.

If you have any questions regarding this response, please contact me or have a member of your staff contact Ms. Lynn Richardson, Audit Liaison, CBP Audit Liaison, Office of Internal Affairs, at (202) 344-2953.

Attachments

**Appendix C**
**Major Contributors to This Report**

Deborah Outten-Mills, Chief Inspector, Department of Homeland
Security, Office of Inspector General, Office of Inspections

Jacqueline Simms, Senior Inspector, Department of Homeland
Security, Office of Inspector General, Office of Inspections

Tatyana Martell, Inspector, Department of Homeland Security,
Office of Inspector General, Office of Inspections

**Appendix D**
**Report Distribution**

<u>**Department of Homeland Security**</u>

Secretary
Deputy Secretary
Chief of Staff for Policy
General Counsel
Executive Secretariat
Director, GAO/OIG Liaison Office
Officer for Civil Rights and Civil Liberties
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Commissioner for Customs and Border Protection
CBP Liaison

**Office of Management and Budget**
Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**
Congressional Oversight and Appropriations Committees, as
appropriate



ADDITIONAL INFORMATION AND COPIES

To obtain additional copies of this report, please call the Office of Inspector General (OIG) at (202) 254-4100, fax your request to (202) 254-4305, or visit the OIG web site at www.dhs.gov/oig.

OIG HOTLINE

To report alleged fraud, waste, abuse or mismanagement, or any other kind of criminal or noncriminal misconduct relative to department programs or operations:

• Call our Hotline at 1-800-323-8603;

• Fax the complaint directly to us at (202) 254-4292;

• Email us at DHSOIGHOTLINE@dhs.gov; or

• Write to us at:
        DHS Office of Inspector General/MAIL STOP 2600,
        Attention: Office of Investigations - Hotline,
        245 Murray Drive, SW, Building 410,
        Washington, DC 20528.


The OIG seeks to protect the identity of each writer and caller.

# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

JUL 3 0 2014

MEMORANDUM FOR:   The Honorable Jeh C. Johnson
                  Secretary

FROM:             John Roth
                  Inspector General

SUBJECT:          Oversight of Unaccompanied Alien Children

We are performing ongoing unannounced site visits to determine the conditions of
detention for unaccompanied alien children (UAC) in DHS custody.  Site visits are taking
place along the southern border in facilities where Customs and Border Protection (CBP)
temporarily house UAC.  This report covers fieldwork performed from July 1 - 16, 2014.
Site visit locations are included as Attachment 1.

To accomplish this effort, we developed a checklist that incorporates requirements of
(1) The *Flores v. Reno* Settlement Agreement and (2) CBP's internal policies that address
the 2008 William Wilberforce Trafficking Victims Protection Reauthorization Act
(TVPRA).   The *Flores v. Reno* Settlement Agreement governs the policy for the
treatment of unaccompanied alien children in federal custody.  CBP internal policies
address additional requirements of the Homeland Security Act of 2002 and TVPRA.
Requirements include:

- operable and sanitary toilets and sinks;
- potable drinking water and adequate food;
- emergency medical care; adequate temperatures and ventilation;
- adequate supervision and access to telephones;
- notification to United States Citizenship and Immigration Services asylum officers
  when UAC raise protection concerns;
- notification to Department of Health and Human Services (HHS) for placement;
  and,
- UAC held in DHS custody for less than 72 hours before transfer to HHS except in
  exceptional circumstances.

We used the checklist, along with observations and interviews, to assess the treatment
of UAC in DHS custody.  When feasible, we ensured that immediate action was taken to
correct deficiencies noted during site visits.  The checklist is included as Attachment 2.

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

We also initiated investigations based on a June 11, 2014, American Civil Liberties Union
(ACLU) complaint to the DHS Officer for Civil Rights and Civil Liberties (CRCL) and the
DHS Office of Inspector General (OIG).  The ACLU filed this complaint on behalf of 116
UAC alleging criminal behavior; violations of civil rights and liberties; and violations of
laws, regulations and policies in the treatment and processing of UAC.  DHS is
investigating each of these allegations as follows:

- OIG - 16 allegations
- Immigrations and Customs Enforcement (ICE) Office of Professional
  Responsibility (OPR) - 1 allegation
- CBP Office of Internal Affairs (IA) - 99 allegations

The OIG is monitoring ICE and CBP investigations and will review the results.  DHS CRCL
identified 38 of the 116 allegations as potential CRCL violations, and will conduct
separate reviews as appropriate.

During this reporting period, we conducted 87 unannounced site visits to 63 locations,
including CBP ports of entry, U.S. Border Patrol (USBP) checkpoints, stations, and
holding facilities; ICE detention centers; and the Federal Law Enforcement Training
Center Artesia.  We visited selected sites on multiple occasions.

We developed the checklist after completing 18 of our initial site visits.  Therefore, this
initial report includes information from the 69 site visits where checklists were
completed.  Our subsequent reports will include information documented on checklists
for all site visits.  The following section represents our overall conclusions.  A detailed
summary of our site visit results is included as Attachment 3.

**Allegations of Inappropriate Conduct**

- OIG, ICE, CBP, and CRCL investigations of allegations of misconduct are ongoing.
- We did not observe misconduct or inappropriate conduct by DHS employees
  during our unannounced site visits.
- We did not receive new complaints during our random interviews of UAC.

**Compliance With UAC Laws, Regulations, Policies**

- A September 2010 OIG report emphasized the need for CBP to establish a
  procedure to document required UAC information such as the times meals are
  served, phone usage, detainee medical conditions, and detainee arrests and
  releases from CBP custody.   As such, E3 is the data system CBP uses to
  document compliance with UAC guidelines.  Border Patrol issued directives in

2

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

2012 and 2013 requiring that E3 be used to the fullest extent to capture required UAC information with appropriate updates. However, the system is unreliable due to frequent system outages which have resulted in inconsistent reporting. As a result, E3 is not a reliable tool for CBP to provide increased accountability for UAC's safety and well-being during all phases of CBP's custody process.

- DHS is holding UAC longer than 72 hours because no permanent shelter is available. Employee-to-UAC ratios are inconsistent. For example: (1) one station had more than 25 UAC for each employee while other facilities ranged from 0 to 3 UAC for each employee; (2) not all facilities post copies of UAC policies in English and Spanish; and (3) not all facilities are systematically maintaining an inventory of UAC property.
- Temperatures in DHS facilities were inconsistent. In some facilities, DHS employees cannot adjust thermostats.
- In one location, we observed that contractors did not provide an adequate amount of food. We brought this issue to the attention of CBP officials who corrected it during our site visit.

### Additional Observations

- Many UAC and family units require treatment for communicable diseases, including respiratory illnesses, tuberculosis, chicken pox, and scabies.
- UAC and family unit illnesses and unfamiliarity with bathroom facilities resulted in unsanitary conditions and exposure to human waste in some holding facilities. Contract cleaners and DHS employees are working to maintain sanitary conditions.
- DHS employees reported exposure to communicable diseases and becoming sick on duty. For example, during a recent site visit to the Del Rio USBP Station and Del Rio Port of Entry, CBP personnel reported contracting scabies, lice, and chicken pox. Two CBP Officers reported that their children were diagnosed with chicken pox within days of the CBP Officers' contact with a UAC who had chicken pox. In addition, USBP personnel at the Clint Station and Santa Teresa Station reported that they were potentially exposed to tuberculosis.
- DHS employees are donating clothing, toys and games to UAC and family units.
- DHS employees are purchasing food, in some instances with their own money, to supplement contract food supplies.

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Suggestions for Consideration

*To the Principal Deputy Assistant Secretary, U.S. Immigration and Customs
Enforcement*:

Identify resources necessary for ICE to ensure the E3 data system functions reliably.

*To the Commissioner, U.S. Customs and Border Protection:*

Develop, in consultation with DHS CRCL, a "Know Your Rights and Responsibilities" video
for UAC and family units.  The video should include, but need not be limited to: hygiene
while in custody; appropriate use of DHS facilities, including toilets and showers; DHS
processing procedures, such as medical screenings and vaccinations; the right to food
and potable water; procedures for access to emergency medical care, telephones, and
consular notification; and procedures for raising concerns. The video should be available
in Spanish and translated to other languages as needed.

Ensure that all DHS facilities that house unaccompanied alien children post the
Unaccompanied Alien Child Policy in English and Spanish.

Until E3 is functioning properly, DHS facilities should complete a property checklist for
each unaccompanied alien child or family unit in custody.

We appreciate the courtesies and cooperation extended to our staff by CBP personnel
during our onsite reviews.


cc:    The Honorable Thomas S. Winkowski, Principal Deputy Assistant Secretary
          U.S. Immigration and Customs Enforcement
       The Honorable R. Gil Kerlikowske, Commissioner
          U.S. Customs and Border Protection
       The Honorable Megan H. Mack, Officer for Civil Rights and Civil Liberties

Unaccompanied Alien Children Site Visits
July 1-16, 2014

| OIG INV Office | USBP SECTORS | LOCATION | Date of Visit | Date of Visit | Date of Visit | Date of Visit | Date of Visit |
|---|---|---|---|---|---|---|---|
| **TUCSON (1)** | Tucson Sector | Nogales | 7/2/2014 | 7/15/2014 | | | |
| **Site Vists (2)** | | | | | | | |
| | | | | | | | |
| **EL PASO (8)** | | FLETC Artesia - FLETC & ICE/ERO | 7/9/2014 | | | | |
| **Site Visits (8)** | El Paso Sector | Clint USBP Station | 7/10/2014 | | | | |
| | El Paso Sector | Deming USBP Station | 7/10/2014 | | | | |
| | El Paso Sector | El Paso USBP Station (Station 1) | 7/10/2014 | | | | |
| | El Paso Sector | Fort Hancock USBP Station | 7/10/2014 | | | | |
| | El Paso Sector | Santa Teresa USBP Station | 7/10/2014 | | | | |
| | El Paso Sector | Ysleta USBP Station | 7/10/2014 | | | | |
| | El Paso Sector | Paso Del Norte POE - CBP/OFO | 7/10/2014 | | | | |
| | | | | | | | |
| **SAN DIEGO (26)** | El Centro Sector | Calexico USBP Station | 7/1/2014 | | | | |
| **Site Visits (26)** | El Centro Sector | Calexico Port of Entry East | 7/1/2014 | | | | |
| | El Centro Sector | Calexico Port of Entry West | 7/1/2014 | | | | |
| | El Centro Sector | El Centro USBP Station | 7/1/2014 | | | | |
| | El Centro Sector | El Centro USBP Sub-Station-I-8 | 7/1/2014 | | | | |
| | El Centro Sector | El Centro ICE ERO | 7/1/2014 | | | | |
| | | El Centro ICE Service Procesings Center | 7/11/2014 | | | | |
| | El Centro Sector | Highway 86 USBP Checkpoint | 7/1/2014 | | | | |
| | El Centro Sector | Highway 111 USBP Checkpoint | 7/1/2014 | | | | |
| | El Centro Sector | Indio USBP Station | 7/1/2014 | | | | |
| | | | | | | | |
| | San Diego Sector | Andrade Port of Entry | 7/1/2014 | | | | |
| | San Diego Sector | Boulevard USBP Station | 7/1/2014 | | | | |
| | San Diego Sector | Brown Field USBP Station | 7/1/2014 | | | | |
| | San Diego Sector | Campo USBP Station | 7/1/2014 | | | | |
| | San Diego Sector | Chula Vista USBP Station | 7/1/2014 | | | | |
| | San Diego Sector | El Cajon USBP Sub-Station-Campo | 7/1/2014 | | | | |
| | San Diego Sector | El Cajon USBP Sub-Station-Magnolia | 7/1/2014 | | | | |
| | | | | | | | |
| | San Diego Sector | Highway 94 USBP Checkpoint | 7/1/2014 | | | | |
| | San Diego Sector | Imperial Beach USBP Station | 7/1/2014 | | | | |
| | San Diego Sector | Interstate 8 USBP Checkpoint | 7/1/2014 | | | | |
| | San Diego Sector | Murrieta USBP Station | 7/1/2014 | | | | |
| | San Diego Sector | Otay Mesa Port of Entry | 7/1/2014 | | | | |
| | San Diego Sector | S-2 USBP Checkpoint | 7/1/2014 | | | | |
| | San Diego Sector | San Clemente USBP Station | 7/1/2014 | | | | |
| | San Diego Sector | San Ysidro Point of Entry | 7/1/2014 | | | | |
| | San Diego Sector | Tecate Point of Entry | 7/1/2014 | | | | |
| | | | | | | | |
| **HOUSTON (28)** | Rio Grande Valley Sector | Brownsville USBP Station | 7/3/2014 | 7/14/2014 | | | |
| **Site Visits (51)** | Rio Grande Valley Sector | Corpus Christi BP Station | 7/7/2014 | 7/15/2014 | | | |
| | Rio Grande Valley Sector | Falfurias USBP Station | 7/7/2014 | 7/15/2014 | | | |
| | Rio Grande Valley Sector | Fort Brown USBP Station | 7/3/2014 | 7/14/2014 | | | |
| | Rio Grande Valley Sector | McAllen USBP Station | 7/2/2014 | 7/14/2014 | | | |
| | Rio Grande Valley Sector | Harlingen USBP Station | 7/3/2014 | 7/14/2014 | | | |
| | Rio Grande Valley Sector | Kingsville USBP Station | 7/7/2014 | 7/16/2014 | | | |
| | Rio Grande Valley Sector | Rio Grande Valley USBP Station | 7/2/2014 | 7/14/2014 | | | |
| | Rio Grande Valley Sector | Weslaco USBP Station | 7/2/2014 | 7/14/2014 | | | |
| | | | | | | | |
| | Del Rio Sector | Bracketville USBP Station | 7/15/2014 | | | | |
| | Del Rio Sector | Carrizo Spring USBP Station | 7/16/2014 | | | | |
| | Del Rio Sector | Comstock USBP Station | 7/16/2014 | | | | |
| | Del Rio Sector | Del Rio USBP Station | 7/3/2014 | 7/4/2014 | 7/6/2014 | 7/7/2014 | 7/9/2014 |
| | Del Rio Sector | Del Rio Port of Entry | 7/8/2014 | | | | |
| | Del Rio Sector | Eagle Pass North USBP Station | 7/14/2014 | | | | |
| | Del Rio Sector | Eagle Pass South USBP Station | 7/14/2014 | | | | |

| | Del Rio Sector | Uvalde USBP Station | 7/14/2014 | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | Laredo Sector | Cotulla USBP Station | 7/7/2014 | 7/14/2014 | | | |
| | Laredo Sector | Freer USBP Station | 7/8/2014 | 7/16/2014 | | | |
| | Laredo Sector | Freer I-59 Checkpoint | 7/8/2014 | 7/16/2014 | | | |
| | Laredo Sector | Hebbronville USBP Station | 7/9/2014 | 7/16/2014 | | | |
| | Laredo Sector | Hebbronville I-359 Checkpoint | 7/9/2014 | 7/16/2014 | | | |
| | Laredo Sector | Laredo North USBP Station | 7/2/2014 | 7/14/2014 | | | |
| | Laredo Sector | Laredo North USBP Checkpoint | 7/7/2014 | 7/14/2014 | | | |
| | Laredo Sector | Laredo South USBP Station | 7/2/2014 | 7/14/2014 | | | |
| | Laredo Sector | Laredo West USBP Station | 7/3/2014 | 7/15/2014 | | | |
| | Laredo Sector | Laredo Port of Entry | 7/15/2014 | | | | |
| | Laredo Sector | Zapata USBP Station | 7/3/2014 | 7/15/2014 | | | |

Attachment 2

## Facility Observations Checklist

Facility Name:

Observer's Name:

Date:

| Facility Observation Checklist | Conditions | Yes | No |
|---|---|---|---|
| Toilet | Operable | | |
| | Sanitary | | |
| | Screened? | | |
| Sink | Operable | | |
| | Sanitary | | |
| Drinking Water | Available | | |
| Food | On-Site | | |
| | Contract | | |
| | Other | | |
| | Provided four to six hours | | |
| | Hot food | | |
| | Snacks, milk and juice available | | |
| Emergency Medical Care | Trained medical technicians | | |
| | First aid kits | | |
| | Detainee access to prescribed medications | | |
| | Other | | |
| Temperature Control | Working thermostat | | |
| | Adjustable thermostat | | |
| | Current temperature | | |
| | Blankets available | | |
| Ventilation | Operation | | |
| Supervision | UAC monitored directly? | | |
| | Videos available (request videos be retained) | | |
| | Rooms easy to observe | | |
| | Staff-to-UAC ratio? | | |
| Separate Holding Areas from Unrelated Adults | Available | | |
| | Separation by gender | | |
| | Separation of opposite sex adults | | |
| Telephone | Available | | |
| | Phones operable | | |
| | Calls logged | | |
| Copy of Unaccompanied Minor Policy | Posted in English | | |
| | Posted in Spanish | | |
| Property Checklist | Checklist Available | | |
| | | | |

Attachment 2

| Name of INV Officer: |
| Date of observation: |
| Time of observation: |
| Name of OBP Unaccompanied Minor Coordinator: |

Attachment 3

# Unaccompanied Alien Children Site Visits
## July 1-16, 2014

| | COMPLIANCE | NON COMPLIANCE | INFORMATION NOT AVAILABLE |
|---|---|---|---|
| **TOILETS** | | | |
| Operable | 69 | - | - |
| Sanitary | 69 | - | - |
| Screened | 66 | 1 | 2 |
| **SINK** | | | |
| Operable | 68 | - | 1 |
| Sanitary | 68 | - | 1 |
| **DRINKING WATER** | | | |
| Available | 69 | - | - |
| **FOOD** | | | |
| On-Site | 62 | - | 7 |
| Contract | 66 | - | 3 |
| Provided 4-6 Hours | 66 | 1 | 2 |
| Hot Food | 66 | 1 | 2 |
| Snacks, Milk, and Juice available | 65 | 3 | 1 |
| **EMERGENCY MEDICAL CARE** | | | |
| Trained Medical Techs | 67 | 1 | 1 |
| First Aid Kits | 69 | - | - |
| Detainee Access to Prescription Medications | 32 | 4 | 33 |
| **TEMPERATURE CONTROL** | | | |
| Working Thermostat | 66 | 1 | 2 |
| Adjustable Thermostat | 64 | 4 | 1 |
| Current Temperature | Range from 56° - 80° | | |
| Blankets Available | 67 | - | 2 |
| **VENTILATION** | | | |
| Operation | 54 | - | 15 |
| **SUPERVISION** | | | |
| UAC Monitored Directly | 67 | - | 2 |
| Videos Available (Request Retained) | 25 | 10 | 34 |
| Rooms Easy to Observe | 68 | - | 1 |
| Staff-to-UAC Ratio | Range from 1 to 1 - 14 to 40 | | 27 |
| **SEPARATE HOLDING AREAS FROM UNRELATED ADULTS** | | | |
| Available | 65 | - | 4 |
| Separation by Gender | 66 | 1 | 2 |
| Separation of Opposite-Sex Adults | 51 | - | 18 |
| **TELEPHONE** | | | |
| Available | 68 | - | 1 |
| Phones Operable | 68 | - | 1 |
| Calls Logged | 64 | 3 | 2 |

Attachment 3

EXHIBIT I

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

OCT 0 2 2014

MEMORANDUM FOR:     The Honorable Jeh C. Johnson
                    Secretary

FROM:               John Roth
                    Inspector General

SUBJECT:            Oversight of Unaccompanied Alien Children

On August 28, 2014, we reported our observations from on-going unannounced site visits performed from July 17 through August 20, 2014, to determine the conditions of detention for unaccompanied alien children (UAC) in DHS custody. This report covers additional fieldwork performed from August 21 through September 26, 2014. Site visit locations are included as Attachment 1. Our methodology, including the checklist we developed, is provided as Attachment 2.

DHS initiated investigations based on a June 11, 2014, American Civil Liberties Union complaint on behalf of 116 UAC. As reported in our August 28, 2014, memorandum, of the 16 allegations that our office investigated, we were unable to substantiate any of the allegations. We continue to oversee the remaining 100 allegations being investigated by Immigration and Customs Enforcement (ICE) Office of Professional Responsibility, Customs and Border Protection (CBP) Office of Internal Affairs, and the DHS Office for Civil Rights and Civil Liberties (CRCL).

Border Patrol apprehensions of UAC declined from a high of 10,622 in June 2014 to 3,141 in August 2014, and remained low in September 2014. Only a limited number of CBP facilities are processing UAC. CBP personnel are transferring most UAC to appropriate Health and Human Services (HHS) housing within 6 hours. Based on this operating environment, we will curtail our routine spot inspections of CBP facilities. We may conduct additional spot inspections as conditions warrant. Conditions that may warrant additional inspections include increases in UAC apprehensions that result in many UAC being held in CBP facilities longer than 72 hours; and credible allegations of DHS employee misconduct.

Between August 21 and September 26, 2014, we conducted three unannounced site visits to two CBP facilities. We also conducted two unannounced site visits to the Federal Law Enforcement Training Center (FLETC) in Artesia, New Mexico. We

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

completed checklists for one of the visits to FLETC, and documented our results for both
in narrative form. A summary of our site visit results is included as Attachment 3.

Since we initiated our site visits in July 2014, CBP has improved its capacity to provide
care to UAC if apprehension levels again increase. Specifically, CBP improved its capacity
to provide medical screening, facility cleaning, food service, and case processing for
large groups of UAC. However, the DHS Office of Health Affairs and CRCL continue to
work with CBP to improve training, policies and procedures on screening aliens for
communicable diseases and processing UAC appropriately.

During this reporting period, we found that not all CBP personnel were trained to
manage routine UAC processing. For example:

- During one routine spot inspection, we observed that CBP personnel did not
  properly segregate a UAC with a communicable disease. They also did not ensure
  that food and water were readily available. CBP rotated personnel during a
  period when there had been no UAC in the facility for a month. As a result of this
  rotation, the personnel responsible for the UAC were not familiar with
  procedures.
- The results of this inspection prompted a second inspection of the facility a week
  later. During the subsequent inspection, CBP officials said they would assign
  personnel familiar with UAC processing any time there were UAC in the facility.
  They had compiled a list of personnel who were familiar with UAC procedures
  and were on call. At this inspection, food and water were readily available and
  the station had addressed all issues from the previous spot inspection.

**Allegations of Inappropriate Conduct**

- ICE, CBP, and CRCL investigations of allegations of misconduct are ongoing.
- We did not observe misconduct or inappropriate conduct by DHS employees
  during our unannounced site visits.
- We did not receive new complaints during our random interviews of adult
  females and children.

**Additional Observations**

- FLETC in Artesia does not house UAC, but houses family units which include
  children. Conditions in Artesia were improving. However:
  - Family units continued to require treatment for communicable diseases.
  - Many detainees do not follow up with recommended medical care for
    themselves or their children. If detainees do not attend sick call or stand

2

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

in line to receive daily medications, they remain sick and their illnesses
tend to get worse.

o  Family unit illnesses and unfamiliarity with bathroom facilities continued
   to result in unsanitary conditions. DHS employees told us the contracted
   cleaning service is inadequate.

o  A DHS dietician was scheduled to assess food choices to balance requests
   for a more familiar diet with nutritional guidelines. DHS is providing
   adequate nutritional meals. Snacks, milk, and fresh fruit are readily
   available.

We appreciate the courtesies and cooperation extended to our staff by CBP and ICE
personnel during our on-site reviews.

Attachments

cc:   The Honorable Thomas S. Winkowski, Principal Deputy Assistant Secretary
       U.S. Immigration and Customs Enforcement
      The Honorable R. Gil Kerlikowske, Commissioner
       U.S. Customs and Border Protection
      The Honorable Megan H. Mack, Officer for Civil Rights and Civil Liberties

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Attachment 1

| Unaccompanied Alien Children Site Visits August 21 - September 26, 2014 | | | | | |
|---|---|---|---|---|---|
| OIG INV Office | USBP SECTORS | LOCATION | Date of Visit | Date of Visit | Date of Visit |
| EL PASO (3) | | FLETC Artesia - FLETC & ICE/ERO | 9/3/2014 | 9/19/2014 | |
| Site Visits (5) | El Paso Sector | Clint USBP Station | 9/9/2014 | | |
| | El Paso Sector | Paso Del Norte POE - CBP/OFO | 9/10/2014 | 9/17/2014 | |

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Attachment 2

### Unaccompanied Alien Children Site Visit Methodology and Checklist

We developed a checklist that incorporates requirements of (1) The Flores v. Reno Settlement Agreement and (2) CBP's internal policies that address the 2008 William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA). The Flores v. Reno Settlement Agreement governs the policy for the treatment of unaccompanied alien children in federal custody. CBP internal policies address additional requirements of the Homeland Security Act of 2002 and TVPRA. Requirements include:

- operable and sanitary toilets and sinks;
- potable drinking water and adequate food;
- emergency medical care; adequate temperatures and ventilation;
- adequate supervision and access to telephones;
- notification to United States Citizenship and Immigration Services asylum officers when UAC raise protection concerns;
- notification to HHS for placement; and,
- UAC held in DHS custody for less than 72 hours before transfer to HHS except in exceptional circumstances.

We used the checklist, along with observations and interviews, to assess the treatment of UAC in DHS custody. When feasible, we ensured that immediate action was taken to correct deficiencies noted during site visits.

In our August 28, 2014, memorandum, Attachment 3 documented the checklists as they were during the site visit. Information in observations and interviews in some instances either further explained or amended information provided in the checklists. For example, at one CBP facility, the checklist showed that the thermostat was set at 50°; however, additional written narrative showed that the ambient temperature was 68° to 70°. The facility was experiencing air conditioning problems and set the thermostat at 50° to achieve a comfortable ambient temperature. All other facilities had temperatures between 67° and 76°.

Attachment 3 to this memorandum documents the checklists as they were submitted. Additional information was documented in narrative form to show deficiencies observed and the measures CBP and ICE personnel took to address them. Attachment 3 reflects that there were three checklists from three site visits to two CBP facilities and three checklists from a September 19, 2014, site visit to FLETC in Artesia.

5

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Facility Observations Checklist

Facility Name:
Observer's Name:
Date:

| Facility Observation Checklist | Conditions | Yes | No |
|---|---|---|---|
| Toilet | Operable | | |
| | Sanitary | | |
| | Screened? | | |
| Sink | Operable | | |
| | Sanitary | | |
| Drinking Water | Available | | |
| Food | On-Site | | |
| | Contract | | |
| | Other | | |
| | Provided four to six hours | | |
| | Hot food | | |
| | Snacks, milk and juice available | | |
| Emergency Medical Care | Trained medical technicians | | |
| | First aid kits | | |
| | Detainee access to prescribed medications | | |
| | Other | | |
| Temperature Control | Working thermostat | | |
| | Adjustable thermostat | | |
| | Current temperature | | |
| | Blankets available | | |
| Ventilation | Operation | | |
| Supervision | UAC monitored directly? | | |
| | Videos available (request videos be retained) | | |
| | Rooms easy to observe | | |
| | Staff-to-UAC ratio? | | |
| Separate Holding Areas from Unrelated Adults | Available | | |
| | Separation by gender | | |
| | Separation of opposite sex adults | | |
| Telephone | Available | | |
| | Phones operable | | |
| | Calls logged | | |

6

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

| | | | |
|---|---|---|---|
| Copy of Unaccompanied Minor Policy | Posted in English | | |
| | Posted in Spanish | | |
| Property Checklist | Checklist Available | | |
| | | | |

| |
|---|
| Name of INV Officer: |
| Date of observation: |
| Time of observation: |
| Name of OBP Unaccompanied Minor Coordinator: |

7

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Attachment 3**

| Unaccompanied Alien Children Site Visits August 21 - September 26, 2014 | | | |
|---|---|---|---|
| | **COMPLIANCE** | **NON COMPLIANCE** | **INFORMATION NOT AVAILABLE** |
| **TOILETS** | | | |
| Operable | 6 | 0 | 0 |
| Sanitary | 5 | 1 | 0 |
| Screened | 3 | 0 | 3 |
| **SINK** | | | |
| Operable | 6 | 0 | 0 |
| Sanitary | 5 | 1 | 0 |
| **DRINKING WATER** | | | |
| Available | 6 | 0 | 0 |
| **FOOD** | | | |
| On-Site | 6 | 0 | 0 |
| Contract | 5 | 0 | 1 |
| Provided 4-6 Hours | 5 | 0 | 1 |
| Hot Food | 5 | 0 | 1 |
| Snacks, Milk, and Juice Available | 5 | 0 | 1 |
| **EMERGENCY MEDICAL CARE** | | | |
| Trained Medical Techs | 4 | 2 | 0 |
| First Aid Kits | 6 | 0 | 0 |
| Detainee Access to Prescription Medications | 2 | 0 | 4 |
| **TEMPERATURE CONTROL** | | | |
| Working Thermostat | 5 | 0 | 1 |
| Adjustable Thermostat | 4 | 1 | 1 |
| Current Temperature | Range from 70° - 78.5° | | |
| Blankets Available | 5 | 0 | 1 |
| **VENTILATION** | | | |
| Operation | 5 | 1 | 0 |
| **SUPERVISION** | | | |
| UAC Monitored Directly | 4 | 1 | 1 |
| Videos Available (Request Retained) | 1 | 0 | 5 |
| Rooms Easy to Observe | 4 | 2 | 0 |
| Staff-to-UAC Ratio | Lowest ratio: 3 to 5 | | |
| **SEPARATE HOLDING AREAS FROM UNRELATED ADULTS** | | | |
| Available | 4 | 0 | 2 |
| Separation by Gender | 2 | 0 | 4 |
| Separation of Opposite-Sex Adults | 1 | 1 | 4 |
| **TELEPHONE** | | | |
| Available | 6 | 0 | 0 |
| Phones Operable | 6 | 0 | 0 |
| Calls Logged | 5 | 0 | 1 |
| **COPY OF UNACCOMPANIED MINOR POLICY** | | | |
| Posted in English | 1 | 0 | 5 |
| Posted in Spanish | 1 | 0 | 5 |
| **PROPERTY CHECKLIST** | | | |
| Checklist Available | 4 | 0 | 2 |