CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone:  (213) 388-8693
Facsimile:   (213) 386-9484
Email: crholguin@centerforhumanrights.org
          pschey@centerforhumanrights.org
          marchela@centerforhumanrights.org

WILLIAM A. MOLINSKI (STATE BAR NO. 145186)
wmolinski@orrick.com
T. WAYNE HARMAN (STATE BAR NO. 254089)
wharman@orrick.com
ELENA GARCIA (STATE BAR NO. 299680)
egarcia@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, California  90017
Telephone:  +1-213-629-2020
Facsimile:   +1-213-612-2499

*Attorneys for Plaintiffs* (listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, | Case No. CV 85-4544-DMG |
| Plaintiffs, | PLAINTIFFS' FOURTH SET OF EXHIBITS |
| v. | [Exhibits 61-66] |
| Jeh Johnson, Secretary, U.S. Department of Homeland Security, *et al.*, | Hearing:   April 24, 2015 |
| Defendants. | Time:        3:00 p.m. |
| | Courtroom 7, 312 N. Spring Street |

1

*Plaintiffs' counsel, continued:*

2

3

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

4

5

6

*Of counsel:*

7

8

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

9

10

11

12

13

Ranjana Natarajan (Cal. Bar No. 230149)
UNIVERSITY OF TEXAS SCHOOL OF LAW
Civil Rights Clinic
727 E. Dean Keeton St.
Austin, TX 78705
Telephone: (512) 232-7222
Email: rnatarajan@law.utexas.edu

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' FOURTH SET OF EXHIBITS

CV 85-4544-DMG

INDEX TO EXHIBITS

| No. | Description | Page |
|---|---|---|
| 61 | Statement by DHS Secretary Jeh C. Johnson Concerning the District Court's Ruling Concerning DAPA and DACA, February 17, 2015 | 1 |
| 62 | U.S. Customs & Border Protection, *Southwest Border Unaccompanied Alien Children* (FY 2015 apprehensions to date) | 3 |
| 63 | Declaration of Carlos Holguin, January 13, 3015 [Exhibit 23, executed] | 7 |
| 64 | Letter from William C. Hubbard, President, American Bar Association to DHS Secretary Jeh Johnson, March 26, 2015 | 12 |
| 65 | *Matter of Granados-Gutierrez*, No. A206-848-455, DHS Motion to Reconsider, September 26, 2014 | 17 |
| 66 | Letter from Mexican American Legal Defense & Education Fund, *et al.* to DHS Secretary Jeh Johnson, *et al.*, March 27, 2015 | 30 |

1   Dated: April 17, 2015.

2

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian

ORRICK, HERRINGTON & SUTCLIFFE LLP
William A. Molinski
T. Wayne Harman
Elena García

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

RANJANA NATARAJAN


/s/T. Wayne Harman _____
*One of the attorneys for plaintiffs*

/ / /

Exhibit 61

dhs.gov   http://www.dhs.gov/news/2015/02/17/statement-secretary-jeh-c-johnson-concerning-district-courts-ruling-concerning-dapa

# Statement by Secretary Jeh C. Johnson Concerning the District Court's Ruling Concerning DAPA and DACA

Release Date:

February 17, 2015

For Immediate Release
DHS Press Office
Contact: 202-282-8010

I strongly disagree with Judge Hanen's decision to temporarily enjoin implementation of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expanded Deferred Action for Childhood Arrivals (DACA). The Department of Justice will appeal that temporary injunction; in the meantime, we recognize we must comply with it.

Accordingly, the Department of Homeland Security will not begin accepting requests for the expansion of DACA tomorrow, February 18, as originally planned. Until further notice, we will also suspend the plan to accept requests for DAPA.

The Department of Justice, legal scholars, immigration experts and even other courts have said that our actions are well within our legal authority. Our actions will also benefit the economy and promote law enforcement. We fully expect to ultimately prevail in the courts, and we will be prepared to implement DAPA and expanded DACA once we do.

It is important to emphasize what the District Court's order does not affect.

The Court's order does not affect the existing DACA. Individuals may continue to come forward and request initial grant of DACA or renewal of DACA pursuant to the guidelines established in 2012.

Nor does the Court's order affect this Department's ability to set and implement enforcement priorities. The priorities established in my November 20, 2014 memorandum entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" remain in full force and effect. Pursuant to those enforcement priorities, we continue to prioritize public safety, national security, and border security. I am pleased that an increasing percentage of removals each year are of those convicted of crimes.  I am also pleased that, due in large part to our investments in and prioritization of border security, apprehensions at the southern border – a large indicator of total attempts to cross the border illegally -- are now at the lowest levels in years.

For more information, visit www.dhs.gov.

###

Review Date:

February 17, 2015

# Exhibit 62

cbp.gov      http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children

# Southwest Border Unaccompanied Alien Children

Beginning last year and specifically in the last few months, CBP has seen an overall increase in the apprehension of Unaccompanied Alien Children from Central America at the Southwest Border, specifically in the Rio Grande Valley. While overall border apprehensions have only slightly increased during this time period, and remain at historic lows, the apprehension and processing of these children present unique operational challenges for CBP and HHS. Addressing the rising flow of unaccompanied alien children crossing our southwest border is an important priority of this Administration and the Department of Homeland Security (DHS), and Secretary Johnson has already taken a number of steps to address this situation.

**Southwest Border Unaccompanied Alien Children (0-17 yr old) Apprehensions**

Comparisons below reflect Fiscal Year 2015 to date (October 1, 2014 - February 28, 2015) compared to the same time period for Fiscal Year 2014.

| Sector | Fiscal Year 2014 | Fiscal Year 2015 | % Change |
|---|---|---|---|
| Big Bend Sector | 89 | 142 | 60% |
| Del Rio Sector | 1,036 | 543 | -48% |
| El Centro Sector | 200 | 194 | -3% |
| El Paso Sector | 383 | 434 | 13% |
| Laredo Sector | 1,337 | 914 | -32% |
| Rio Grande Sector | 14,043 | 7,342 | -48% |
| San Diego Sector | 299 | 397 | 33% |
| Tucson Sector | 3,880 | 2,331 | -40% |
| Yuma Sector | 136 | 212 | 56% |
| **Southwest Border Total** | 21,403 | 12,509 | -42% |

**Southwest Border Family Unit Apprehensions** *

Comparisons below reflect Fiscal Year 2015 to date (October 1, 2014 - February 28, 2015) compared to the same time period for Fiscal Year 2014.

| Sector | Fiscal Year 2014 | Fiscal Year 2015 | % Change |
|---|---|---|---|
| Big Bend Sector | 36 | 115 | 219% |
| Del Rio Sector | 997 | 447 | -55% |
| El Centro Sector | 195 | 199 | 2% |

| Sector | Fiscal Year 2014 | Fiscal Year 2015 | % Change |
|---|---|---|---|
| El Paso Sector | 157 | 134 | -15% |
| Laredo Sector | 1,028 | 537 | -48% |
| Rio Grande Sector | 9,444 | 7,838 | -17% |
| San Diego Sector | 685 | 681 | -1% |
| Tucson Sector | 1,393 | 943 | -32% |
| Yuma Sector | 143 | 239 | 67% |
| **Southwest Border Total** | 14,078 | 11,133 | -21% |

**U.S. Border Patrol Southwest Border and Rio Grande Valley Sector Other Than Mexicans**

Comparisons below reflect Fiscal Year 2015 to date (October 1, 2014 - February 28, 2015)

| Sector | FY2015 |
|---|---|
| Rio Grande Valley | 34,138 |
| **Southwest Border** | **47,661** |

**Unaccompanied Alien Children Encountered by Fiscal Year**

Fiscal Years 2009-2014; Fiscal Year 2015 to date (October 1, 2014 - February 28, 2015)

| Country | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|---|---|
| El Salvador | 1,221 | 1,910 | 1,394 | 3,314 | 5,990 | 16,404 | 2,209 |
| Guatemala | 1,115 | 1,517 | 1,565 | 3,835 | 8,068 | 17,057 | 4,381 |
| Honduras | 968 | 1,017 | 974 | 2,997 | 6,747 | 18,244 | 1,181 |
| Mexico | 16,114 | 13,724 | 11,768 | 13,974 | 17,240 | 15,634 | 4,502 |

**Family Unit Apprehensions Encountered by Fiscal Year***

Fiscal Year 2015 to date (October 1, 2014 - February 28, 2015)

| Country | FY 2015 |
|---|---|
| El Salvador | 2,683 |
| Guatemala | 3,691 |

| Country | FY 2015 |
|---------|---------|
| Honduras | 2,585 |
| Mexico | 1,827 |

**Note:** (Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the U.S. Border Patrol.)

Tags:

Exhibit 63

DECLARATION OF CARLOS HOLGUIN

I, Carlos Holguín, declare and say as follows:

1. I am General Counsel with the Center for Human Rights and Constitutional Law Foundation. I have served in this capacity since 1984. The Center is a non-profit, public interest legal foundation dedicated to defending the civil, constitutional and human rights of immigrants, refugees, children and the poor.  My practice focuses on legal, legislative and educational work on behalf of immigrants and refugees.  I have served as lead and co-counsel in numerous impact cases involving deportation, political asylum, and the rights of juveniles.

2. I am one of the attorneys for the certified plaintiff class in *Flores v. Johnson*, No. CV 85-4544 (C.D. Cal.); I participated in investigating, filing, litigating that action, and in negotiating the class-wide settlement thereof approved by this Court on January 28, 1997. I execute this declaration in support of plaintiffs' motion to enforce the *Flores* settlement.

3. On January 8 and 9, 2015, I visited the detention facilities located in Dilley and Karnes City, Texas, in which U.S. Immigration and Customs Enforcement (ICE) confines women and children arrested for civil immigration violations. In the course of that visit I interviewed class members, observed the two facilities' physical plants and asked questions of facility staff. Staff at both facilities advised that they hold women and their children exclusively; both installations are unquestionably secure.

4. The Karnes City facility is a large block building, which appeared to have only one entrance. To enter, my colleagues and I were required to deposit our cell phones in a metal locker, exchange our driver's licenses for visitor's badges, pass our personal items through an X-ray machine, and walk through a metal detector. We were then directed to a sally port, which comprised two heavy metal doors with a small room

between. We passed through one door, it closed behind us; we were then directed to display our visitor's badges to a guard behind heavy glass; the second door was opened, we walked through, and we then reached the interior of the facility.

5. The Karnes facility is constructed of concrete block. A staff member stated the facility had been designed to house adult male prisoners. The building contained a series of passages and rooms that created a central open area, in which I saw some playground equipment and a soccer field. The interior passages appeared broken only by occasional windows and steel doors. In the central open area I saw neither a direct view nor access to the outside: it was effectively surrounded by the high block walls of the facility itself, denying those inside any means of ingress or egress except via the secure entrance I earlier described. Facility staff stated that children detained at Karnes have never been permitted outside the facility to go to the park, library, museum, or other public places. Children attend school exclusively within the walls of the facility itself. Detainees, including children, are required to participate in a "census" or head-count three times daily.

6. Karnes detainees, which staff stated numbered 487 at the time of our visit, were housed in rooms with access only to the central open area. We were shown one room, which facility staff said was representative of detainees' rooms at the facility. I observed perhaps four families, each comprising one woman and one or two children, sitting on bunk beds watching television. In addition to the four bunk beds, the room contained a shower, a single toilet, and sink. Each person has one approximately 50 gallon storage box for their clothes as well as their personal papers and legal documents, and the box is kept under the bunk beds. Facility personnel informed us that the families sharing the room were unrelated. Facility personnel also informed us that a few children above the age of 13 are not sleeping in the same rooms as their

mothers and siblings. Instead of keeping one family together in one room, GEO is housing those unrelated children together in one room, while their family members are in other rooms.

7. Karnes staff advised us that the education program is for children aged 4-17, and lasts for four hours a day plus an hour of physical education. There is no educational programming for children under the age of 4. We were shown a day room in which there were only two toys for small children, and a TV.

8. Karnes staff advised that detainees are not permitted incoming telephone calls, even from attorneys. They further advised that detainees' outgoing calls are subject to monitoring and recording, except those to counsel. Staff stated that each detainee is given three minutes of free telephone usage upon admission to the Karnes facility, and that detainees must thereafter pay for telephone calls, including those to counsel. Although staff stated that additional free calls might be arranged for indigent detainees upon special request, they also advised that detainees could earn credit for telephone calls and for commissary items by cleaning and kitchen work paid at the rate of $3.00 per day.

9. The Dilley facility, recently opened and holding fewer than 200 detainees, relies on a perimeter fence to confine mothers and children securely. Though lacking a sally port, my colleagues and I were required to pass through metal detectors, have our belongings scanned, stow our cell phones, and exchange our driver's licenses for visitor's passes upon entry.

10. The physical plant at Dilley looks like a work camp, with the children and their mothers housed in small cabins. Like Karnes, children and mothers at Dilley get one free phone call each for three minutes, and all other phone calls must be paid for. Like Karnes, children are housed with unrelated adults and children. Like Karnes, the

-10-

Dilley facility has rules that, if violated, lead to disciplinary measures of mothers and children. The education program at Dilley is slated to begin shortly. Dilley staff described policies regarding telephone use, head counts, off-site excursions (or lack thereof) virtually identical to those in effect at Karnes City.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of January, 2015, at Santa Clarita, California.

_____
Carlos Holguín

/ / /

4

Exhibit 64



**William C. Hubbard**
President

**AMERICAN BAR ASSOCIATION**

321 North Clark Street
Chicago, IL  60654-7598
(312) 988-5109
Fax: (312) 988-5100
abapresident@americanbar.org

March 26, 2015

The Honorable Secretary Jeh Johnson
U.S. Department of Homeland Security
Nebraska Avenue Complex
3801 Nebraska Avenue, N.W.
Washington, DC 20528

RE:   ABA Concerns about Expansion of Immigration Detention, Including Detention of
      Women and Children Seeking Protection as Refugees

Dear Secretary Johnson:

As President of the American Bar Association, I write to express the Association's concerns
about recent policies and practices that have significantly expanded immigration detention,
particularly impacting women and children arriving in family units at our borders seeking
refugee protection.  Widespread detention of migrants is inconsistent with fundamental
principles of liberty and due process and is particularly problematic when it impacts asylum
seekers and children.

The ABA has a long history of working to ensure fair treatment and due process rights for
noncitizens, including those placed in immigration detention in the United States.  For more than
two decades, the ABA has opposed the use of detention except in extraordinary circumstances,
such as when an individual poses a threat to national security or public safety, or a substantial
flight risk.[1]  The ABA has adopted a comprehensive set of Civil Immigration Detention
Standards,[2] intended to provide a blueprint for the Department of Homeland Security (DHS) as
the agency has worked to reform the detention system to a truly civil model. Guiding principles
for the standards include that: (1) any restrictions or conditions placed on noncitizens should be
the least restrictive, nonpunitive means necessary to ensure their appearance in immigration
court or for removal; (2) detention is only permissible based upon an objective determination that
an individual presents a threat to national security or public safety or a substantial flight risk that
cannot be mitigated through parole, bond, or a less restrictive form of custody or supervision;
and (3) noncitizens should not be presumed to be dangerous or prone to flight in the absence of
credible information establishing objective risk factors.

DHS's current detention policies fail to meet these standards and instead presume detention as
the default position for many migrants, particularly for Central American women and children
seeking asylum.  Specifically, since June of 2014, DHS has expanded the capacity for detention

---

[1] The ABA has reaffirmed this position several times, most recently in February of 2006. *See*:
http://www.americanbar.org/content/dam/aba/directories/policy/2006_my_107e.authcheckdam.pdf.
[2] Available at http://www.americanbar.org/groups/public_services/immigration/civilimmdetstandards.html.

March 26, 2015
Page 2 of 4

of families by approximately 1,000 detention spaces and has concrete plans to create an additional 2,500 beds in the coming months.  This rapid and significant expansion of detention for families runs counter to a presumption against detention and is also a marked departure from the government's 2009 decision to end the detention of families except in truly exceptional circumstances, which resulted in an appreciable reduction of detention space for families.  In 2009, the government reached the decision to eliminate the detention of families after recognizing that families present little to no risk to the nation's safety and that detention causes severe harm to asylum-seeking children and families because of their unique developmental vulnerabilities and the likelihood that they have already suffered serious trauma.  These same considerations continue to weigh against detention of mothers and children currently seeking asylum.  For these reasons, DHS general policy still favors release of asylum seekers, finding that detention is generally not "in the public interest."[3]

However, DHS has chosen to emphasize detention in addressing the humanitarian challenges presented last summer when larger numbers of women and children arrived at the U.S. border seeking protection.  DHS has placed these Central American women and children into expedited removal proceedings, which requires their detention at least until they pass a credible fear interview allowing them to pursue an asylum claim.  This practice is a departure from previous DHS practice and also from our nation's basic principles that favor liberty, due process, and access to justice.

The ABA also finds problematic DHS' process for determining custody after families pass a credible fear interview.  DHS initially insisted on the continued detention of families even after a favorable credible fear determination, based on a deterrence rationale.  Detention is neither effective nor justifiable as deterrence to migration of families and individuals fleeing violence.  Such detention violates basic principles requiring that any deprivation of liberty be justified based on individual circumstances and instead serves an impermissible punitive function that should be reserved for those convicted of crimes.  Indeed, on February 20, 2015 a federal district court issued a preliminary order enjoining DHS from "detaining class members for the purpose of deterring future immigration to the United States and from considering deterrence of such immigration as a factor in such custody determinations."[4]

Recently, DHS has begun to allow for release of some families upon payment of a bond after a favorable credible fear interview.  However, ICE has set prohibitively high bond amounts in many cases, such that release is impossible as a practical matter, and the bond amounts do not appear to reflect any individualized assessment.  These practices do not align with the principled approach, supported by ABA policy, of requiring individualized consideration of the necessity of detention based on objective criteria.

An additional concern regarding the widespread use of detention is that it significantly impedes access to legal representation.  Statistics show that about 50 percent of noncitizens in immigration proceedings lack legal counsel; the percentage rises to more than 80 percent for

---

[3] U.S. Immigration and Customs Enforcement, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture, December 8, 2009, available at: http://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf .
[4] RILR v. Johnson, No. 1:2015cv00011 (D.D.C. Feb. 20, 2015)

March 26, 2015
Page 3 of 4

those in detention. Multiple studies have confirmed that detention of an immigrant makes it more difficult to obtain counsel, which makes success in removal proceedings less likely.[5]  Family detention facilities are located in remote and concentrated areas, far from major urban centers where legal services organizations and *pro bono* attorneys can be found.  Detention thus makes it challenging for families to obtain representation and places a serious burden on the resources of *pro bono* legal service providers seeking to serve this uniquely vulnerable population.  Legal representation not only enhances due process protections but also increases rates of appearances and improves the efficiency of the immigration court process, a critical need given the historically high case backlog.  Thus, policies should be adopted that facilitate, rather than impede or obstruct, representation.

The expanded emphasis on detention is especially troubling when it is not necessary to accomplish the primary goal of ensuring appearances in court.  Asylum seekers are highly motivated to comply with court orders, as they have a strong interest in securing protection.  Most of the detained mothers and children present no flight risk because they can be released to family members, with valid U.S. immigration status, who can support them and help to ensure that they appear for their asylum hearings.  Children and families released in this manner are likely to appear in court, particularly when represented by counsel.[6]  For cases that present a flight risk that cannot be addressed adequately through requirement of payment of a nominal financial bond, there is a range of alternatives to detention that cost a fraction of the amount of detention.  Community-based support models have shown appearance rates of well over 90%, and ICE's existing full-service model reports an appearance rate of 99.6%.[7]  Lutheran Immigration and Refugee Service and the U.S. Conference of Catholic Bishops have piloted community support programs in cooperation with ICE, and these have been highly effective.  Utilizing alternatives to detention also enhances access to legal representation and ensures that individuals and families are able to access needed services and support to address the trauma that many have experienced.

For the reasons expressed above, we urge that DHS:
1. Revise its detention policies and practices to end the detention of families except in truly exceptional circumstances.
2. Cease the expansion of family detention spaces at the Karnes and Dilley detention centers.

---

[5] *See* The Honorable Robert A. Katzmann, Bench, Bar and Immigrant Representation, 15 Legislation and Public Policy 585, 593 (2012).

[6] *See* Wall Street Journal, Most Migrants Make their Court Date (Oct. 7, 2014), available at http://www.wsj.com/articles/most-migrants-make-their-court-date-1412715818; American Immigration Council's Immigration Policy Center, "Taking Attendance: New Data Finds Majority of Children Appear in Immigration Court," July 29, 2014, *available at* http://immigrationpolicy.org/just-facts/taking-attendance-new-data-finds-majority-children-appear-immigration-court; Migration Policy Institute, U.S. Detention of Asylum Seekers and Human Rights (March 1, 2005), available at http://www.migrationpolicy.org/article/us-detention-asylum-seekers-and-human-rights.

[7] DHS, U.S. Immigration and Customs Enforcement, Salaries and Expenses, Fy2014 Congressional Budget Justification, pg. 925, available at http://www.dhs.gov/xlibrary/assets/dhs-congressional-budget-justification-fy2012.pdf; *Intensive Supervision Appearance Program II: Contract Year 2013 Annual Report* (BI Incorp. 2013); *Lutheran Immigration & Refugee Serv.,* Alternatives to Detention: History and Recommendations 2 (2013) available at http://lirs.org/wpcontent/uploads/2013/04/LIRS-Backgrounder-on-Alternatives-to-Detention-3-12-13.pdf (between 93% – 97% appearance rate for individuals in supervision programs).

March 26, 2015
Page 4 of 4

3. Honor the preliminary injunction issued in *RILR v. Johnson*.
4. Abandon deterrence-based detention policies and adopt a presumption against detention, particularly in the case of vulnerable individuals such as asylum-seekers and children.
5. Provide an individualized custody assessment for families placed in expedited removal after they pass the credible fear interview, taking into account their individual circumstances and particular vulnerabilities as well as the specific likelihood that they pose a flight risk or danger to the community.
6. Prioritize release of eligible families on parole (without the requirement of a parole bond) or on recognizance in all possible cases.
7. Utilize alternatives to detention in cases in which some appearance support is determined to be necessary for those who would otherwise be detained.
8. In those limited cases where a specific flight risk or danger has been established and payment of a financial bond is the least restrictive means of addressing these risks, set the bond amount at an attainable level based on individual circumstances.
9. Facilitate access to legal representation and legal information for all individuals and families subjected to detention.

There is no question that the rapid increase in families and unaccompanied children entering our country over the past year has presented challenges. However, in the rush to address those challenges, the United States cannot abandon the principles of liberty, fairness, and due process that make this country a beacon of hope for those suffering persecution around the world. The current policies that have resulted in unprecedented levels of detention, most disturbingly a return to the failed practice of family detention, should be abandoned immediately in favor of policies that ensure a humane and effective system that reflects the core values of our legal and justice systems.

ABA representatives, along with representatives of other national stakeholders, have been meeting regularly with officials and staff from relevant government agencies, including DHS, to discuss the many serious issues that have arisen as a result of the children and family surge cases beginning last year and the ongoing expanded detention policies. We appreciate being included in that group and the efforts of those involved to ameliorate some of the problems, but we firmly believe that a fundamental changes in policy are necessary. We stand ready to work with you and your Department to accomplish the objectives that we propose in this letter.

Sincerely,

William C. Hubbard

cc:     Eric Holder, Attorney General, DOJ

-16-

Exhibit 65

Raphael Choi                                          **DETAINED**
**Chief Counsel**                                     **(Lead Respondent)**
**Department of Homeland Security**
**U.S. Immigration and Customs Enforcement**

**Karen Donoso Stevens**
**Senior Attorney**
**Department of Homeland Security**
**U.S. Immigration and Customs Enforcement**

**Mailing Address:**
500 12th Street, SW STOP 5902
Washington, DC 20536-5901

**Physical Address:**
1901 S. Bell Street, Suite 900
Arlington, VA  22202

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## ARTESIA, NEW MEXICO

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | |
| ) | |
| **GRANADOS-GUTIERREZ, Maria Teresa (Lead)** ) | **File No.   A206-848-455** |
| **GUTIERREZ-GRANADOS, Herson Yonatan (Minor)** ) | **A206-848-456** |
| ) | |
| ) | |
| **In Bond Proceedings** ) | |
| ) | |

**Immigration Judge Hladylowycz**                    **Next Hearing: N/A**

## THE DEPARTMENT OF HOMELAND SECURITY'S
## MOTION TO RECONSIDER

-18-

## INTRODUCTION

The Department of Homeland Security (DHS) respectfully moves this Court to reconsider its decision, dated September 9, 2014, ordering the minor respondent's conditional parole under section 236(a)(2)(B) of the Immigration and Nationality Act, in order to correct errors of fact and law contained therein.[1] *See* 8 C.F.R. § 1003.23(b) ("An immigration judge may upon ... motion of [DHS] ... reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals"). Reconsideration is warranted for three reasons: (1) to correct an error of fact in the decision, which erroneously indicates that DHS argued that the parties' January 17, 1997 stipulated settlement agreement in Flores v. Reno, No. CV 85-4544 (C.D. Cal.) (hereinafter *Flores* Settlement Agreement or FSA), is not binding upon ICE and that the FSA applies only to "unaccompanied minors"; (2) to correct an error of law in the decision, namely the Court's consideration of inappropriate factors in its bond redetermination which are not authorized by statute, regulation, or binding precedential decisions of the Attorney General or Board of Immigration Appeals (Board); and (3) to correct an error of law in the decision, namely the Court's misreading of 8 C.F.R. § 1236.3 to create a policy favoring release of minor aliens in bond proceedings before the Executive Office for Immigration Review (EOIR).

## SUMMARY OF THE ARGUMENT

While DHS does not necessarily ask the Court to change its ultimate decision ordering the minor respondent's release, the Court should reconsider certain portions of the analysis supporting the decision. In particular, the Court's reliance on factors beyond national security,

---

[1] DHS does not request reconsideration of the portion of the decision ordering the child's mother, Maria Teresa Granados-Gutierrez, to be released on bond in the amount of $15,000 (a reduction from the $30,000 bond previously imposed for release of both respondents as a "family unit").

A206-848-455

danger to the community, and flight risk is misplaced. Although the Court separately addressed the applicability of the FSA, and whether release was in the "best interests of the child," including analyzing detention conditions, such as access to education, such factors are not part of the framework governing the Court's authority in bond proceedings. While the Court maintains broad discretionary authority to grant an alien's release (subject to the alien meeting his or her burden), such discretion is limited by regulations and longstanding case law to consideration of national security, danger of the alien to the community, and likelihood that the alien will appear for future hearing. *See Matter of Guerra*, 24 I&N Dec. 37 (BIA 2007). Thus, the Court should reconsider its decision, insofar as it addresses the FSA and whether release is in the "best interests of the child" and should instead limit its analysis to whether the minor respondent's release would pose a national security risk, danger to the community, or flight risk.

### DISCUSSION

Reconsideration is warranted based on three interrelated issues, as discussed in detail below.

I. THE COURT SHOULD RECONSIDER ITS DECISION AND CORRECT FACTUAL INACCURACIES CONTAINED THEREIN WITH REGARD TO THE GOVERNMENT'S POSITION ON THE APPLICABILITY OF THE FSA.

On August 14, 2014, the respondents presented their case for bond redeterminations to the Court. DHS maintained its position that the respondents were flight risks whose release would implicate national security concerns in light of the recent surge of illegal entrants into the United States through the Southwest Border. Initially, the respondents argued for discretionary release based on their pending asylum claims and family and community ties. After the Court rendered its decision ordering release of both respondents upon payment of a bond of $30,000, the respondents advocated for the minor respondent's release pursuant to the FSA. The Court

continued the bond hearing until September 9, 2014, to determine whether the respondents were

eligible for release pursuant to the FSA.  On September 9, 2014, without providing DHS an

opportunity to state its position on the record, the Court issued its written decision.  Although

DHS clarified to the Court that ICE was bound by the FSA, and the Court and respondents'

counsel acknowledged the clarification, the Court's decision erroneously states that DHS argued

it is not bound by the FSA and that the FSA only applies to "unaccompanied minors," rather than

all alien minors.  I.J. at 17.

    As the Court correctly notes, DHS, as the successor to the Immigration and

Naturalization Service (INS), is bound by the terms of the FSA.[2]  I.J. at 10-11.  The terms of the

FSA relevant to release determinations, however, are limited to those determinations made by

DHS.  *See* FSA at ¶ 14 ("Where the INS determines . . . .").  To the extent that the Court's

decision inaccurately reflects DHS's position, DHS requests that the Court issue a new decision

accurately reflecting DHS's position on the applicability of the FSA to ICE.

II.     THE COURT'S DECISION SHOULD BE LIMITED TO CONSIDERATION
        OF DANGER TO THE COMMUNITY, FLIGHT RISK, AND NATIONAL
        SECURITY CONCERNS INSTEAD OF SEPARATE FACTORS REGARDING
        THE APPLICABILITY OF THE FSA, "BEST INTERESTS OF THE CHILD,"
        AND CONDITIONS OF DETENTION.

    "[I]mmigration judges (except as provided by statute) only have such authority as is

created and delegated by the Attorney General." *Matter of Fede*, 20 I&N Dec. 35, 35-36 (BIA

1989).  No legal authority exists authorizing an Immigration Judge to modify established custody

review procedures in light of the FSA, to consider the "best interests of the child," or to assess

the "conditions of detention" when making a custody redetermination under INA § 236(a).

Rather, the applicable regulations provide that the Court can only release an alien if he

---

[2] The Executive Office for Immigration Review (EOIR), of which this Court is a part, was not a party to the *Flores*
litigation, although at the time of the FSA, INS and EOIR were both Department of Justice components.

3                                                        A206-848-455

demonstrates that he is not a danger to property or persons, and that he is likely to appear for future proceedings.[3] *See* 8 C.F.R. § 1236.1(c)(8). When making a custody redetermination, "Immigration Judges may look to a number of factors in determining whether an alien merits release from bond, as well as the amount of bond that is appropriate." *Matter of Guerra*, 24 I&N Dec. at 40. As the Court recognized, its statutory authority to release an alien under INA § 236(a) has been delegated by the Attorney General, and is constrained by regulations and binding precedent. I.J. at 14. Moreover, only when the alien has established that he is not a danger to property or persons should the Court then consider the risk of flight. *Matter of Urena*, 25 I&N Dec. 140 (BIA 2009). Finally, in *Matter of D-J-*, the Attorney General authorized Immigration Judge's and the Board to consider the national security interests associated with mass migrations in making individual custody redeterminations. *Matter of D-J-*, 23 I&N Dec. 572, 581 (A.G. 2003).

The *Guerra* factors cited by the Court, including the presence of a fixed address, alien's length of residency in the United States, the alien's family ties in the United States, employment history, and the alien's record of appearance in court and criminal history, are all factors that the Board has determined the Court may consider in its custody determination. However, each of these factors is intimately connected with the two key considerations which must guide any release decision: danger to the community and flight risk. *See* 8 C.F.R. § 1236.1(c)(8). Although the Court has broad discretion to weigh a variety of factors in determining bond, these factors must be viewed in the context of assessing national security concerns, danger to the

---

[3] Both the current Immigration Judge's Practice Manual and the Immigration Judge's Bench Book make clear that the regulations provide primary guidance to Immigration Judges with respect to juvenile custody determinations – and not litigation to which EOIR is not a party. *See Immigration Judge Benchbook, Detained Juveniles*, § 5, http://www.justice.gov/eoir/vll/benchbook/tools/Bond_Guide.pdf; *OCIJ Practice Manual*, Detention and Bond, § 9.2, http://www.justice.gov/eoir/vll/OCIJPracManual/Practice_Manual_1-27-14.pdf#page=135.

community, and risk of flight, which are the primary considerations mandated by regulation and

longstanding Board precedent.  Accordingly, DHS requests that the Court reconsider its

reasoning which posits that the Court may consider factors beyond those set forth in regulation

and binding precedent from the Board and the Attorney General, when assessing a custody

redetermination.

> A.   The FSA Does Not Affect the Analysis Immigration Judges Are Authorized to
>      Apply in Bond Proceedings.

As explained above, this Court is one of limited jurisdiction and may only exercise those

authorities expressly conferred upon it by statute and Attorney General delegation.  EOIR was

not a party to the *Flores* litigation or the FSA, and the FSA contains no provision affecting how

bond hearings involving alien minors are to be conducted.  Instead, the FSA simply confirms that

alien minors "shall be afforded a bond redetermination hearing before an immigration judge in

every case...."  FSA, at ¶ 24A.  However, well-established legal authority frames the analysis

that must occur at such redetermination hearings (regardless of whether they involve adults or

minors), and such analysis must focus on danger to the community, flight risk, and national

security.  Indeed, when assessing the standard that the INS should use in determining whether to

release an alien minor, the FSA references the two considerations of whether "the detention of

the minor is [] required either to secure his ... timely appearance before the INS or the

immigration court, or to ensure the minor's safety or that of others...."  FSA, at ¶ 14.  Tellingly,

this provision speaks only to a determination by "INS" (rather than an Immigration Judge), but

regardless, the standard in assessing release under the FSA remains focused on flight risk and

danger to self or community.  Moreover, to the extent that an alien minor wishes to challenge

"the INS's determination to place [him or her] in a particular type of facility," such a challenge

would lie with the United States District Courts, rather than the Immigration Courts.  *See* FSA, at

5

A206-848-455

¶ 24B. Because the FSA expressly outlines the custody determination process *INS* was to follow and the availability of *federal court review* of certain INS decisions under the agreement, it was wrong for the Court to infer from the FSA some special role or obligations for Immigration Judges, who exercise only the authority specifically conferred upon them. *Cf. Matter of Artigas*, 23 I&N Dec. 99, 104 (BIA 2001) (applying the "well-settled" interpretive canon of *expressio unius est exclusio alterius* to read a provision as inapplicable to all other situations when it only mentioned one situation by name). DHS therefore respectfully requests that the Court reconsider its decision insofar as it relied in any way upon the FSA.[4]

      B.     The Immigration Court's Consideration of "Best Interests of the Child" to Determine Release Under INA § 236(a)(2)(B) is Erroneous.

Although the Court emphasized the Board's characterization in *Matter of Guerra* that Immigration Judges possess "extremely broad discretion" in bond proceedings, I.J. at 14, such discretion is not without its limits. DHS recognizes the Court's discretion in bond proceedings; however, such discretion is cabined by the overarching framework under which Immigration Judges are authorized to redetermine an alien's custody, i.e., whether the alien has satisfied any national security, community danger, and flight risk concerns. As explained above, beyond affirming that detained alien minors may seek custody redetermination before an Immigration Judge, the FSA does not alter the generally applicable standards governing bond proceedings. DHS is aware of no other authority upon which the Court could reasonably rely to permissibly invoke a "best interests of the child" analysis in bond proceedings. Indeed, where "best interests of the child" is a relevant consideration under our immigration laws, the statute has made this

---

[4] The Court itself appears to have recognized the limited applicability of the FSA to these proceedings by acknowledging that Immigration Judges "may not be compelled to enforce the FSA's provisions." I.J. at 19. Indeed, apart from reaffirming that alien minors should have access to bond proceedings, the FSA imposes no enforceable obligations on Immigration Judges. This Court should therefore have been guided by the governing legal framework applicable in all bond proceedings.

           A206-848-455

clear. *See, e.g.,* INA § 101(a)(27)(J) (addressing situations in which "it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence"); 8 U.S.C. § 1232(c)(2)(A) (authorizing consideration of the "best interests of the child" for custody determinations made for unaccompanied alien children in the custody of the Secretary of Health and Human Services). Thus, while Congress has made clear its ability to allow such considerations elsewhere in the immigration context, no such statute confers authority to consider an alien's – child or otherwise – "best interests" when conducting bond proceedings. Instead, Immigration Judges must focus on flight risk and the safety and security of the United States.[5] Accordingly, the Court should reconsider those aspects of its decision centered on the minor respondent's "best interests."

C.      The Court's Consideration of Detention Conditions Under the FSA to Determine Release Under INA § 236(a)(2)(B) Is Erroneous.

Finally, the Court's consideration of detention conditions, such as educational resources,[6] as a factor in making bond redeterminations is erroneous. Again, the purpose of bond and custody redetermination is to assess an alien's eligibility for release, not to assess the conditions of the residential facility. The respondents did not argue, and the Court did not find, that conditions of confinement are relevant to the issue of national security, danger to the community, or flight risk. And, while the conditions at DHS facilities are subject to a host of comprehensive review and oversight mechanisms,[7] Immigration Judges have not been delegated authority to

---

[5] The Court appears to have been at least somewhat aware of the difficulty with its approach when it acknowledged that "'the best interests of the child' is not a standard of law." I.J. at 27.
[6] While not legally relevant to the issue of a custody determination, the factual record should be corrected to note that DHS continues to develop educational and other resources for alien minors housed at the Artesia Residential Facility.
[7] In DHS's appropriations, Congress makes clear that the agency must regularly review the adequacy of detention service providers' performance. *See, e.g.,* Consolidated Appropriations Act of 2014, Pub. L. No. 113-76, 128 Stat.

A206-848-455

-25-

evaluate such conditions.    Moreover, the Court erred in relying on *Plyler v. Doe*, 457 U.S. 202

(1982) and the availability of education at the Artesia Family Residential Center, I.J. at 29-30, in

making its custody determination for the minor respondent.  *Plyler* is an Equal Protection Clause

constitutional law decision of the U.S. Supreme Court, and Immigration Judges may not

entertain constitutional challenges in proceedings under the Act.  *See Matter of Patel*, 19 I&N

Dec. 774, 788 (BIA 1988).  Should an individual in immigration custody seek to challenge

conditions of his or her detention, the Immigration Court is not the appropriate venue.  As such,

the Court's decision should be reconsidered to the extent it relied upon the conditions at the

Artesia Family Residential Center in determining whether to order the release of the minor

respondent.

      III.    THE COURT'S DECISION ERRONEOUSLY INTERPRETS 8 C.F.R. § 1236.3,
              ADDRESSING THE PROCESS FOR RELEASE OF MINORS, AS
              DEMONSTRATING A POLICY FAVORING RELEASE.

The Court's reliance upon 8 C.F.R. §§ 236.3, 1236.3 as evidence of a "policy favoring

release of these juveniles under particular circumstances," I.J. at 19, is erroneous and should be

reconsidered.  The Court's decision takes a portion of the regulation out of context to reach the

conclusion that such a policy exists.  Specifically, the Court states that the regulations "explain

that [minors] 'shall be released' to certain persons enumerated." I.J. at 19.  This statement,

---

5, 251 (providing U.S. Immigration and Customs Enforcement with funding for detention services and providing
further that "none of the funds provided under this heading may be used to continue any contract for the provision of
detention services if the two most recent overall performance evaluations received by the contracted facility are less
than 'adequate' or the equivalent median score in any subsequent performance evaluation system...").  To satisfy
this mandate, DHS contracts for independent inspectors to review conditions of confinement at U.S. Immigration
and Customs Enforcement (ICE) facilities on an annual and biennial basis.  All ICE facilities with an average daily
population of 50 or more detainees are inspected on an annual basis.  In addition, ICE employs 40 on-site Federal
Detention Managers at key detention facilities to monitor and inspect for compliance with ICE detention
standards.  The ICE Office of Detention Oversight (ODO) conducts compliance inspections at selected detention
facilities where detainees are housed for over 72 hours.  Also, the DHS Office for Civil Rights and Civil Liberties
reviews allegations related to civil rights and civil liberties at detention facilities and the DHS Inspector General
may also respond to certain complaints by conducting independent investigations.

A206-848-455

however, ignores the limited applicability of the regulation. The regulation only applies to "[j]uveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance." *See* 8 C.F.R. § 1236.3(b). These regulations address the process of releasing a juvenile from custody. The process for releasing a minor is different from the considerations that form the decision whether to order release. Nothing within these regulations contravene or override the governing factors of flight risk and danger to the community, to be considered in making the custody redetermination.

## CONCLUSION

Based on the foregoing, DHS respectfully requests that the Court reconsider the analysis supporting its determination that the minor respondent should be released on conditional parole. In the interest of fairness and to accurately reflect DHS's position, the Court should reconsider its decision to reflect that: (1) DHS agrees it is bound by the FSA; (2) the minor respondent's release is solely based on the recognized factors of danger to the community, national security concerns, and flight risk; and (3) there is no presumption favoring release of minors in custody redetermination proceedings before EOIR.

Respectfully submitted,

Karen Donoso Stevens
Senior Attorney

Dated: _____9/16/14_____

9                                    A206-848-455

-27-

**PROOF OF SERVICE**

On _____9/16/14_____, I, _Karen Donoso Stevens_, mailed a copy of this Department of Homeland Security's Motion to Reconsider to:

_Rachel S. Bloomekatz_
_Jones Day_
_325 John H. McConnell Blvd._
_Columbus, OH   43215_

by placing said copy in an envelope and placing said envelope in my office's receptacle designated for official "out-going" regular mail, said envelope having been addressed to the name and address indicated.

_____          _____9/16/14._____
(signature)                                      (date)

A206-848-455

-28-

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**ARLINGTON, VA**

In the Matter of: GRANADOS-GUTIERREZ, Maria Teresa     A Number: **A** 206-848-455
                GRANADOS-GUTIERREZ, Herson Yonatan          **A** 206-848-456

<u>**ORDER OF THE IMMIGRATION JUDGE**</u>

Upon consideration of the **Department of Homeland Security's Motion to Reconsider** it is
HEREBY ORDERED that the motion be

[ ] **GRANTED** [ ] **DENIED** because:

     [ ]   The respondent does not oppose the motion.

     [ ]   A response to the motion has not been filed with the court.

     [ ]   Good cause has been established for the motion.

     [ ]   The court agrees with the reasons stated in the opposition to the motion.

     [ ]   The motion is untimely per _____.

     [ ]   Other:

Deadlines:

     [ ]   The application(s) for relief must be filed by _____.

     [ ]   The respondent must comply with DHS biometrics instructions by _____.

_____        _____
Date                                 United States Immigration Judge

Certificate of Service

This document was served by:   [ ] Mail     [ ] Personal Service
To: [ ] Alien   [ ] Alien c/o Custodial Officer   [ ] Alien's Atty/Rep   [ ] DHS
Date: _____     By:   Court Staff

# Exhibit 66

# MALDEF
## Mexican American Legal Defense and Educational Fund

March 27, 2015

**San Antonio
Regional Office**
110 Broadway
Suite 300
San Antonio, TX 78205
Tel: 210.224.5476
Fax: 210.224.5382

*Via Email and Regular Mail*

The Honorable Jeh Johnson
Secretary of Homeland Security
Washington, D.C.  20528

**National Headquarters
Los Angeles
Regional Office**
634 S. Spring Street
Los Angeles, CA 90014
Tel: 213.629.2512
Fax: 213.629.0266

Megan H. Mack
Officer for Civil Rights and Civil Liberties
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
Building 410, Mail Stop #0190
Washington, D.C. 20528
Phone: 202-401-1474
Fax: 202-401-4708
crcl@dhs.gov

**Chicago
Regional Office**
11 East Adams Street
Suite 700
Chicago, IL 60603
Tel: 312.427.0701
Fax: 312.427.0691

Kevin Landy
Assistant Director
Office of Detention Policy and Planning
U.S. Immigration and Customs Enforcement
500 12th Street SW
Washington, D.C.  20536

**Washington, D.C.
Regional Office**
1016 16th Street, NW
Suite 100
Washington, DC 20036
Tel: 202.293.2828
Fax: 202.293.2849

Elaine Mueller-Cantu
Field Office Director
Texas - San Antonio Field Office
Central Region
U.S. Immigration and Customs Enforcement
8940 Fourwinds Drive
San Antonio, TX 78239

**Sacramento
Policy Office**
1512 14th Street
Sacramento, CA 95814
Tel: 916.444.3031
Fax: 916.444.7207

PREA Coordinator
Sexual Abuse and Assault Prevention
and Intervention Program Coordinator
Karnes County Residential Center
409 FM 1144
Karnes City, TX 78118

Phebia Moreland, Director, Contract Compliance
GEO Corporate PREA Coordinator
The GEO Group, Inc.

1

One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487
Email - pmoreland@geogroup.com

RE:   CORRECTED – PLEASE DISREGARD COMPLAINT DATED 3/24/15
      Complaints Regarding Sexual Abuse in DHS Custody at Karnes County
      Residential Center

Dear Secretary Johnson, Ms. Mack, Mr. Landy, Ms. Mueller-Cantu, and Ms. Moreland:

We, the undersigned, are attorneys who have met with and represent women and children who are or were in DHS custody at the Karnes County Residential Center (the "Karnes Center"). As you recall, the undersigned attorneys and others sent a letter dated September 24, 2014, detailing allegations of ongoing sexual abuse in the Karnes Center in violation of the Prison Rape Elimination Act (PREA) of 2003, 42 U.S.C. § 15601 *et seq.*; the Department of Homeland Security's (DHS) Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities, 6 C.F.R. Part 115; and U.S. Immigration and Customs Enforcement (ICE) Performance Based National Detention Standards (PBNDS), and Family Residential Standards.

We asked that federal officials immediately investigate the allegations and implement protective measures for the women and children detained at the Karnes Center to prevent any future abuse or harm. We voiced concerns about conditions in the facility that we believe facilitated the alleged abuse and created unsafe conditions for detainees, specifically:

- Predominantly male guards overseeing a predominantly female population, and having free access to the cells and the detained women and children at any time, day or night;

- Some children over the age of thirteen having been separated from their mothers in separate living/sleeping quarters without explanation;

- Despite reports of abuse from the detained women, the apparent lack of action taken at the Karnes Center to stop or prevent the alleged abuse, or preventing its escalation or reoccurrence;

- Apparent lack of implementation and enforcement of the PREA protocol at the facility, and apparent lack of training, monitoring, and oversight of Karnes facility guards.

Since that time, we received letters from ICE and the Office of Civil Rights and Civil Liberties (CRCL) of DHS on October 29, 2014, and December 4, 2014, respectively, stating that our complaint had been received and was being processed. The letters listed contact names and numbers for further information, but the messages we left

2

-32-

at those numbers went unanswered.  Since that time we have not heard anything further
from DHS or ICE about what actions, if any, DHS has taken to implement protective
measures for women and children detained at Karnes, and to our knowledge none have
been taken.

Earlier this year, we learned through media reports of a memorandum dated
January 7, 2015 to the Secretary of DHS from the DHS Office of the Inspector General.
The memorandum describes an investigation into sexual misconduct initiated in response
to a report made by a detainee through her attorney, and makes no mention of the
complaint we submitted.  The memorandum states that the investigation is confidential,
but we are aware that detainees were questioned outside of the presence of their
attorneys, which alone was likely not only unproductive but potentially coercive.  To
date, we have no information to ascertain whether proper precautionary measures were
taken to ensure that detainees felt they could participate fully and safely in an
investigation without the threat of retaliation.  For example, it was not clear whether any
investigators were female and/or whether they had any specialized training qualifying
them to work with female and child victims of violence.  Finally, and most troubling, the
investigation concluded that the OIG found improper sexual conduct between two
employees, but failed to detail any affirmative steps to address the conditions that
facilitated such conduct, such as insufficient oversight and monitoring.

Meanwhile, to date, we have received additional allegations of abuse at the
Karnes facility.   First, it is our understanding that a male minor detainee was sexually
assaulted by a group of other minor detainees in a bathroom in February of 2015.
Despite our previous warnings that separating children from their mothers in the evening
created unsafe conditions for detainees, the boys had been separated from their mothers
in separate sleeping quarters and were not properly supervised.  As either punishment or
part of an investigation, the alleged perpetrators, with their mothers, were placed in
physical isolation for days in windowless rooms without outside contact.

**Despite ICE's claims that PREA is being properly implemented at Karnes, it
is clear from both the alleged continuing conduct and the failure to respond
adequately to reports of abuse that either there is no prevention plan in place for the
Karnes Center, or  the Karnes Center policy is not being properly implemented,
overseen or enforced.**

We are alarmed by the dismissive response we have received up to this point, and
the apparent disregard for federal law and regulations.

We call for:

- Distribution of the written policy adopted at the Center under 28 C.F.R. §
  115.111 to prevent, detect, and respond to unlawful sexual abuse by
  Karnes Center staff and ICE personnel as required by PREA;
- Distribution of DHS's protocol under the Family Residential Standard for
  Prevention of Sexual Abuse, requiring that all facilities must have

protocols for responding to sexual abuse reported by detainees, and ensure proper follow up on such reports, including discipline and prosecution of assailants;

- an immediate investigation into these allegations outlined in this letter;

- prompt protective and punitive measures, including disciplinary action, contract termination and staff dismissal as appropriate; and

- direct oversight to ensure the complete safety and well-being of the detained families, including but not limited to: increased supervision and monitoring of male guards and enclosed areas during evening hours, increased training for staff on proper implementation of the PREA protocol, preventing separation of mothers and their children while in detention, and direct supervision of enclosed areas in the facility.

Finally, we demand a written response detailing what ICE and the personnel at the Karnes Center have done and will do in order to address the grave concerns we have described here and in our previous correspondence. This response should include:

- assurances that ICE has brought the Karnes Center into compliance with PREA, its implementing regulations, and the Family Residential Standards by developing, supervising, and enforcing a written policy to prevent, detect, and respond to unlawful sexual abuse;

- assurances that investigators into these incidents are trained on working with women and children and trauma survivors;

- an accessible and transparent complaint process for detained families, and proper training for all staff and management;

- detailed information regarding what investigation was made, if any, into the February 2015 incident between minor detainees, and the outcome of the investigation;

- maintenance of all case records associated with claims of sexual abuse, including incident reports, investigative reports, offender information, case disposition, medical and counseling evaluation findings, and recommendations for post-release treatment and/or counseling in appropriate files in accordance with the Family Residential Standards.

- Appropriate measures, such as providing access to interpreters, to ensure that all detainees, including those who are not proficient in English, have an equal opportunity to benefit from all aspects of efforts to prevent, detect, and respond to sexual abuse and sexual harassment.

4

Thank you for your prompt attention to these matters.  If you have any questions, please contact Marisa Bono at (210) 224-5476 ext. 204.

Sincerely,

Marisa Bono
Staff Attorney
Mexican American Legal Defense and
Educational Fund (MALDEF)

Along with:

Barbara Hines, Attorney-at-Law
Denise Gilman, Director, Immigration Clinic, The University of Texas School of Law
Ranjana Natarajan, Director, Civil Rights Clinic, The University of Texas School of Law
Manoj Govindaiah, Managing Attorney, RAICES, INC.
Javier Maldonado, Law Office of Javier N. Maldonado, P.C.
Allison Boyle, Law Office of Javier N. Maldonado, P.C.

Cc:     Eskinder Negash, Director
        Office of Refugee Resettlement
        eskinder.negash@acf.hhs.gov

        Office of Inspector General
        DHSOIGHOTLINE@dhs.gov

        Jallyn Sualong
        Administration for Children and Families
        901 D Street SW, ORR/8th Floor
        Washington, DC 20447
        jallyn.sualog@acf.hhs.gov

        Special Litigation Section, Civil Rights Division
        U. S. Department of Justice
        Fax:  (202) 514-0212; (202) 514-6273
        Special.Litigation@usdoj.gov

        Warden, Karnes County Residential Center
        409 FM 1144
        Karnes City, TX 78118

        Texas Department of Family and Protective Services
        P.O. Box 149030
        Austin, Texas 78714-9030

Texas Ranger
Texas Department of Public Safety
PO Box 4087
Austin, Texas 78773

Sheriff Dwayne Villanueva
Karnes County Sheriff's Department
101 N. Panna Maria Avenue
Karnes City, Texas 78118

-36-

1   CENTER FOR HUMAN RIGHTS &
     CONSTITUTIONAL LAW
2   Carlos Holguín (Cal. Bar No. 90754)
     Peter A. Schey (Cal. Bar No. 58232)
3   Marchela Iahdjian (Cal. Bar No. 295595)
     256 South Occidental Boulevard
4   Los Angeles, CA  90057
     Telephone:  (213) 388-8693
5   Facsimile:   (213) 386-9484
     Email: crholguin@centerforhumanrights.org
6            pschey@centerforhumanrights.org
             marchela@centerforhumanrights.org
7
     WILLIAM A. MOLINSKI (STATE BAR NO. 145186)
8   wmolinski@orrick.com
     T. WAYNE HARMAN (STATE BAR NO. 254089)
9   wharman@orrick.com
     ELENA GARCIA (STATE BAR NO. 299680)
10  egarcia@orrick.com
     ORRICK, HERRINGTON & SUTCLIFFE LLP
11  777 South Figueroa Street
     Suite 3200
12  Los Angeles, California  90017
     Telephone:  +1-213-629-2020
13  Facsimile:   +1-213-612-2499

14  Attorneys for Real Parties in Interest
     (listing continues on following page)
15

16                 UNITED STATES DISTRICT COURT

17                 CENTRAL DISTRICT OF CALIFORNIA

18                        WESTERN DIVISION

19

20  Jenny Lisette Flores, *et al.*,          Case No. CV 85-4544-RJK(Px)

21              Plaintiffs,                   **Proof of Service**

22        v.                                  Hearing:   April 24, 2015
                                              Time:       3:00 p.m.
23  Jeh Johnson, Secretary, U.S. Department   Courtroom 7, Spring Street
     of Homeland Security, *et al.*,
24
              Defendants.
25

26

27

28

                                              PROOF OF SERVICE
                                              CV 85-4544-RJK(Px)

1  *Plaintiffs' counsel, continued:*

2  LA RAZA CENTRO LEGAL, INC.
   Michael S. Sorgen (Cal. Bar No. 43107)
3  474 Valencia Street, #295
   San Francisco, CA 94103
4  Telephone: (415) 575-3500

5  *Of counsel:*

6  YOUTH LAW CENTER
   Alice Bussiere (Cal. Bar No. 114680)
7  Virginia Corrigan (Cal. Bar No. 292035)
   200 Pine Street, Suite 300
8  San Francisco, CA 94104
   Telephone: (415) 543-3379 x 3903
9
   Ranjana Natarajan (Cal. Bar No. 230149)
10 UNIVERSITY OF TEXAS SCHOOL OF LAW
   Civil Rights Clinic
11 727 E. Dean Keeton St.
   Austin, TX 78705
12 Telephone: (512) 232-7222
   Email: rnatarajan@law.utexas.edu

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

1

**PROOF OF SERVICE**

I, the undersigned, declare and certify as follows:

I am more than eighteen years old and not a party to this action.   My

business address is Orrick, Herrington & Sutcliffe LLP, 777 Figueroa Street, Suite

3200, Los Angeles, California 90017.

On April 17, 2015, I electronically filed the following document(s):

- **Plaintiffs' Fourth Set of Exhibits [Exhibits 61-66]**

with the United States District Court, Central District of California by using the

CM/ECF system.  Participants in the case who are registered CM/ECF users will be

served by the CM/ECF system.


        */s/ Nicole Payne*
        Nicole Payne

PROOF OF SERVICE
CV 85-4544-RJK(Px)