CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone:  (213) 388-8693
Facsimile:   (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org
        marchela@centerforhumanrights.org

WILLIAM A. MOLINSKI (STATE BAR NO. 145186)
wmolinski@orrick.com
T. WAYNE HARMAN (STATE BAR NO. 254089)
wharman@orrick.com
ELENA GARCIA (STATE BAR NO. 299680)
egarcia@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, California  90017
Telephone:  +1-213-629-2020
Facsimile:   +1-213-612-2499

*Attorneys for Plaintiffs* (listing continues on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, | Case No. CV 85-4544-DMG |
| Plaintiffs, | PLAINTIFFS' FIFTH SET OF EXHIBITS |
| v. | [Exhibits 67-68] |
| Jeh Johnson, Secretary, U.S. Department of Homeland Security, *et al.*, | Hearing:    April 24, 2015 |
| Defendants. | Time:        3:00 p.m. Courtroom 7, 312 N. Spring Street |

1

*Plaintiffs' counsel, continued:*

2

3

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)

4

474 Valencia Street, #295
San Francisco, CA 94103

5

Telephone: (415) 575-3500

6

*Of counsel:*

7

8

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)

9

Virginia Corrigan (Cal. Bar No. 292035)

10

200 Pine Street, Suite 300
San Francisco, CA 94104

11

Telephone: (415) 543-3379 x 3903

12

13

Ranjana Natarajan (Cal. Bar No. 230149)
UNIVERSITY OF TEXAS SCHOOL OF LAW

14

Civil Rights Clinic

15

727 E. Dean Keeton St.
Austin, TX 78705

16

Telephone: (512) 232-7222
Email: rnatarajan@law.utexas.edu

17

18

19

20

21

22

23

24

25

26

27

28

1

INDEX TO EXHIBITS

2

3

No.          Description                                                    Page

4    67    Declaration of Johana G. De Leon-Amendarez, April 21,
           2015...............................................................................1
5

6    68    Declaration of Victoria Rossi, April 22, 2015 ..............................21

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:  April 22, 2015

2

3

4

5

6

7

8

9

10

11

12

13

14

15    / / /

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
Marchela Iahdjian

ORRICK, HERRINGTON & SUTCLIFFE LLP
William A. Molinski
T. Wayne Harman
Elena García

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

RANJANA NATARAJAN


 _/s/Carlos Holguín_____
_One of the attorneys for plaintiffs_

# EXHIBIT 67

**DECLARATION OF JOHANA G. DE LEON-AMENDAREZ**

I, Johana G. De Leon-Armendarez, hereby declare and say as follows:

1.      I work as a full-time legal assistant at RAICES (Refugee and Immigrant Center for Education and Legal Services) in San Antonio, Texas. RAICES is a 501(c)(3) nonprofit agency that promotes justice by providing free and low-cost legal services to underserved immigrant children, families and refugees in Central and South Texas.

2.      Since the summer of 2014, RAICES has been coordinating a project to provide legal services to women who are detained along with their children at the Karnes County Residential Center ("Karnes") in Karnes City, Texas. Karnes is an immigration detention facility operated by a for-profit corporation called The GEO Group, Inc. The women and children detained at Karnes are in the custody of U.S. Immigration and Customs Enforcement ("ICE"), an agency within the Department of Homeland Security ("DHS").

3.      I have been working as a legal assistant at RAICES since July 2014. My immediate supervisor is Steven Walden, who is an attorney and the Karnes Pro Bono Project Coordinator. He reports to Jonathan Ryan, who is the Executive Director of RAICES. Before I worked at RAICES, I attended San Antonio College for two years. I am fluent in both English and Spanish.

4.      In a letter to Mr. Ryan dated October 26, 2014, Juanita Hester, an Assistant Field Office Director with ICE who is assigned to Karnes, confirmed that I would have access to Karnes for one year or the duration of my employment with RAICES in the capacity of Legal Assistant. A copy of that letter is attached hereto as Exhibit A.

5.      As the RAICES Legal Assistant assigned to Karnes, I take telephone calls from newly arrived detainees at Karnes who need help preparing for their Credible Fear Interviews ("CFIs"), which is an important part of the process for applying for asylum, and I enter their

1

-2-

information into our database. Mr. Walden then assists them in preparing for their CFIs. He also trains other attorneys to help the women prepare for their CFIs. I help coordinate attorneys and law students who want to voluntarily provide legal services to Karnes detainees as well.

6.     As part of my job responsibilities, I travel to Karnes to conduct in-person intake interviews for women who receive positive findings of credible fear. I also help them to find pro bono attorneys.

7.     I assist the pro bono attorneys, who are located across the state, by traveling to Karnes to obtain signatures from their clients for G-28 (Notice of Entrance of Appearance as Attorney or Accredited Representative) forms, declarations, and other legal documents. I assist clients and attorneys with administrative tasks as needed to help prepare for their cases.

8.     I also help women at Karnes who are representing themselves *pro se* to complete bond packets, which contain materials to support their applications for release on bond. I assist them in preparing and submitting those applications to the Immigration Judges.

9.     From approximately November 2014 until the end of March 2015, I was traveling to Karnes twice a week and speaking on the phone with women detained in Karnes on a daily basis, in order to do my work.

10.     On the afternoon of Tuesday, March 31, 2015, I had a conversation with Jonathan Ryan, the Executive Director of RAICES, regarding my duties relating to Karnes. He informed me that Deborah Achim, who works in the ICE San Antonio Field Office, had called him to speak about me. He informed me that Ms. Achim asked if he knew who Johana De Leon was, and he responded that I worked as a Legal Assistant for RAICES.  Mr. Ryan informed me that, according to Ms. Achim, I was suspended from entering Karnes pending an investigation. He informed me that Ms. Achim said that some of the detainees at Karnes had allegedly said that

2

I helped coordinate a hunger strike engaged in by the detainees, and that an investigation into the hunger strike was ongoing.

11.    Approximately a day or so later, Mr. Ryan informed me that Ms. Achim had called him again to relay that I was banned indefinitely from Karnes. Mr. Ryan informed me that Ms. Achim did not indicate that an investigation had been completed.

12.    To my knowledge, neither I, nor Mr. Ryan, nor anyone affiliated with RAICES, has received a written explanation from ICE giving reasons for their decision to forbid me from entering the Karnes facility.

13.    I did not coordinate the women to engage in a hunger strike. A group of women detained at Karnes made a collective decision to start a hunger strike on their own.

14.    I did not violate any ICE rules relating to Karnes, with regard to either attorney visitation or visitation by paralegals, or anything else. I feel that the fact that they banned me was very unfair and baseless.

15.    As a result of ICE's decision to ban me from visiting clients at Karnes, our work at RAICES has suffered. It has become very difficult for me to do my job. Attorneys such as Mr. Walden have had to travel to Karnes in my place. It has been difficult to coordinate schedules in order to obtain simple things like signatures for documents, which I used to do easily. Mr. Walden, my supervisor, cannot focus on CFI preparation anymore and now has to do the in-person intake interviews I used to do at Karnes. It is best to do these interviews in person so it is not possible for me to complete them over the telephone.

16.    My knowledge of the hunger strike is based on my communications with women detained at Karnes. Approximately 80 of the women detained at the Karnes detention facility engaged in a hunger strike for several days in protest of their incarceration and asking for the

release of their children and themselves. That hunger strike lasted from Monday, March 30, 2015, until Saturday, April 4, 2015. The women told me they observed the hunger strike during that week because it was a holy week.

17.     The women wrote a letter expressing their desperation and detailing their reasons for the hunger strike, which included the fact that some women and their children had been locked in Karnes for as long as ten months and that some women were not granted bond because they had a previous deportation order, and they could not be released with their children, who were granted bond. They also cited the poor conditions at Karnes and the deteriorating health of their children. I was given a copy of this letter by one of the women in Karnes on Monday, March 30, 2015.  A redacted version of this letter by the hunger strikers is attached hereto as Exhibit B.

18.     The women told me about the hunger strike because they were inspired to protest in part because of a Day of Action that RAICES helped organize, along with other immigrant rights activists, on Tuesday, March 24, 2015. The Day of Action included a demonstration to protest and call for an end to family detention and advocate for fair treatment of the women and children detained at Karnes. The women detained at Karnes learned of the Day of Action when they saw a news report about it on television, and they later decided to engage in a hunger strike as protest for their treatment and the detention conditions inside Karnes. This is why they talked with me about the hunger strike.

19.     I learned of the hunger strike for the first time on Thursday, March 26, 2015, from one of the strike's participants. In the course of the following week, many of the participants of the hunger strike spoke to me about the reasons for the hunger strike, which I have described above. These reasons included ICE's policy of setting very high bonds that the women could not

pay, and that resulted in their unnecessary detention, and the suffering of children who had been detained for six to eight months. The mothers felt they could not take it anymore.

20.     Several women detained at Karnes told me that the hunger strike was very peaceful, and at no time did the hunger strike participants pose any danger to the facility or to others in the facility.  The children of participants in the hunger strike were eating full meals at all times. The children did not participate in the hunger strike. The hunger strike was a desperate measure taken by the mothers to expose the injustices of their and their children's situations.

21.     Since I was banned, I have continued to speak on the phone and communicate through e-mail with the detained women on a daily basis. They have told me about instances of retaliation against women participating in the hunger strike.

22.     Several detainees at Karnes informed me that on Monday, March 30, 2015, three participants in the hunger strike were taken along with their children to a solitary confinement cells, also used as medical isolation rooms, because GEO and ICE suspected that they were leaders of the hunger strike. One woman and her children were released back to their dorms after about three hours, but the other two women and their children spent the night in the solitary cells and were not released back to their dorms until the next day, Tuesday, March 31, 2015.

23.     Several detainees at Karnes informed me that on Monday, March 30, 2015, ICE held a meeting with the women participating in the hunger strike and told them that if they participated in the hunger strike, their brains would not be functioning well and they would not be able to take care of their children, so their children would be taken away from them.

24.     On Wednesday, April 1, 2015, I learned from several women that ICE was taking away the work assignments of women who participated in the hunger strike. The women detained at Karnes depend on their work assignments even though they are only paid three

dollars per day because it helps them to buy additional food from the commissary store for their children. At least seven women lost their jobs. One woman told me that she did not have any money left to buy food for her children after she lost her work assignment. Many women use food from the commissary store to feed their children since their children don't eat from the dining hall because the food is inedible and their children throw it away. Taking their mothers' jobs away surely affected the children's well-being.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of April 2015, in San Antonio, Texas.

Johana G. De Leon-Armendarez

# EXHIBIT A

10/24/2014  12:57    9183025425?5        KCCDC DEPORTATION                      PAGE  01/01

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
409 FM 1144
Karnes City, Texas 78118



**U.S. Immigration
and Customs
Enforcement**

October 24, 2014

Jonathan D. Ryan; Executive Director, RAICES
1305 North Flores Rd.
San Antonio, Texas 78212

Re:  Access to Karnes County Residential Center

Dear Mr. Jonathan Ryan:

This letter serves as confirmation for access to the Karnes County Residential Center for your staff identified in your letter dated October 22, 2014. Access to the facility is granted to Johana G. De Leon-Armendariz for one year or the duration of her employment with your office. Johana G. De Leon-Armendariz is authorized to enter the Karnes County Residential Center in the capacity as your Legal Assistant. It is your responsibility to immediately notify this office upon Johana G. De Leon-Armendarizes' reassignment to another capacity and/or termination of her employment with your office.

This letter will need to be presented to the agent at the entrance to the facility for further guidance and/or instructions.

Please contact Assistant Field Officer Director Juanita Hester if you have any questions and/or concerns regarding this matter at (830) 254-2500.

Sincerely,

Juanita Hester
Assistant Field Office Director

# EXHIBIT B

En nombre de todas las madres residentes en el centro de de detencion de Kancs city, estamos escribiendo esta petición donde pedimos ser puestas en libertad con nuestros hijos. Ya que habemos madres enserradas en este lugar hace casi ya 10 meses, habemos tambien madres que por tener una deportación no nos dan el derecho a una fianza les han dado fianza a nuestros hijos pero no dan la salida a nosotras las madres..

Por ese motivo hemos tomado la iniciativa de unirnos y iniciar una huelga de hambre para hacer ver y sentir nuestra desesperación, nosotras hemos venido a este país con nuestros hijos en busca de ayuda de un refugio y se nos esta tratando como delincuentes y no somos esa mucho menos somos un peligro para este país, durante esta huelga de hambre ninguna madre trabajara en el centro

-11-

de detención, tampoco enviaremos a
nuestros hijos a la escuela
no utilizaremos ningun servicio
de este lugar, hasta que se han
escuchadas y aprovadas quere
mos nuestra LIBERTAD todas
las madres exigimos que nos
den una solución, habemos incluso
madres que es la primera vez
que venimos a este país.
oficiales de asilo nos dieron "positivo"
como resultado de nuestra entrevista
de miedo creible y avn seguimos
aquí detenidas porque se nos
impusieron Franzas muy elevadas
que no pudimos pagar y algunas
no tuvimos ni la oportunidad
de pagar una fianza.
Deben Saber que este es solo
el comienzo no pararemos hasta
Lograr nuestro objetivo, esta huelga
seguira hasta que cada una de
nosotras sea puesta en libertad
Las condiciones en las que están
nuestros hijos no son buenas
nuestros niños no se alimentan

-12-

bien cada dia nos pierden peso su salud se deteriora, sabemos que cualquier madre haria lo mismo que nosotras hacemos ahora por nuestros hijos, merecemos ser tratados con dignidad y que se nos respete nuestro derecho de emigrar es un derecho que tenemos, llevar un proceso migratorio libres con nuestros hijos,

Hay algunas madres que perdieron su asilo y por su desesperación se vieron forzadas a firmar deportación cosa que no concideramos justa porque ellas han venida a este pais pidiendo asilo porque corren peligro en su pais y estan siendo deportadas de regreso a un lugar donde pueden perder hasta su vida.

Esta peticion esta firmada por todas las madres de este centro de detencion.

\*   Ana

A!   7849

Gregoria

A   8158

Sandra

A ~~~~~ 9324

Alba

A   0381

Rosa

A   0324

Yessica

A:   095

Vilda

A   8020

Ena

A   0231

Martina

A   565

-14-

* Emeclicia
A.     1931

Fermina T
A     4667

& Margarita
A     13831

Glenda
A     5987

* Hilda
A.     2764

* Juana
A     8562

* Dunia
A     7718

* Maria
A     1638

Marta —,
A     2441

Lorena                                          Lorena
A      0767

Ruth                      RMB.B.
A     3918

Cindy
A     718

Celia
A     0442

Leidy C                   L. M. O. 2.
A     5603

Ninoska S
A     5308

* Sandra                       Sandra
A     0433

* Delmy                        Delmy
A     7488

-16-



* Marta ███████████████
   A2███ 256                              — ████

  Sonia ███████████
  A09█ ███05                              ████████

  Raymunda ████████████                 Raymunda P ███ (
  A2█ ███576

* Blanca ██████████████ les          Blanca ███████
  A2C ███582

* Esmeralda ██████████ █████          Esmeralda ███████
  A2C ███355

  Edmila Ca ████████ ██                Edmi████████████
  A09████4630                                          o

  Maria ████████                       ████████
  A2C ███02

  Neidi ████████████                   Neidy ████████████
  A2C ███774

* Besy ███████████ ia                  BesYS ████████████
  A20 ███634

  Lilian ██████████████ s              Lilon ████████████
  A2C ███267

* Blanca ███████████                  Bramley
  A206 ███012

  Maria ████████ M ██ █ ██             ████████
  A20 ███2231

  Besta ██████████ xs                  Bertha ████████████
  A09 ███107

-17-

Esmeralda ███████████
A09████292

Maribel █████████
A206████349

Claudia █████████
A20████570

Milvia █████████
A20████016

\* Ligia █████████
A20████211

Claudia █████████████
A09████343

Sonia █████████
A20████37

Danuvia █████████
A20████738

Sandra █████████████
A20████732

Edy █████████
A20████328

\* Maria █████████████
A08████777

\* Noemy █████████
A20████732

Deisy █████████
A20████4335

e.g █████

Nota

█████████

Milvia █████████

Ligia █████

Sonia █████

Danuvia █████

Edi G █████

* _ Saida _____   *saida*
  A 20_____ 240

_ Zoila _____
A 20____ 9484

_ Edilma _____ 30
A 088____ 9729

_ Polyane _____   Polyane _____
A 20____ 852

_ Karen _____
A 20____51

_ Nidia T. _____
A 2021____ 820

* _ Yanira _____
  A 206____ 727

* _ Elsa _____   Elsa _____
  A 205____ 4908

_ Raquel _____
A 206____ 8401

_ Carmen _____   Carmen RV.
A 20____ 1909

_ Kenia _____   Kenia _____
A 205____ 2814

_ Marlene _____
A 2065____ 714

_ Edith _____
A 200____ 736

\* _ Sasahi █████████████
     A 20█ ██0030

_ Alma █████████████
     A 20█ ██0213

_ Lilian █████████████
     A 20█ ██527

\* _ Paty █████████████ D████
     A 20█ ██348

\* _ Elvira █████████████
     A098 ██2971

\* _ Rosy █████████████
     A 205 ██608

\* _ Iris █████████████
     A 206 ██123

\* _ Andrea █████████████
     A 20█ ██954

_ Senia █████████████
     A 208 ██905

_ Cinthia █████████████
     A208 ██328

_ Griselda █████████████
     A208 ██699

_ Maria █████████████
     A 2021█ ██35

_ Ara █████████████
     A 20█ ██442

-20-

# EXHIBIT 68

## DECLARATION OF VICTORIA ROSSI

I, Victoria Rossi, hereby declare and say as follows:

1.     I am currently employed as a paralegal/legal assistant at the Law Office of Virginia Marie Raymond, located at 1006 East César Chávez Street, Austin Texas 78702. Virginia Marie Raymond (Ms. Raymond) is an attorney licensed by the State of Texas and practicing in the area of immigration law.

2.     I assist Ms. Raymond in the area of immigration law as she represents clients in removal proceedings, affirmative visa applications, adjustment of status claims, and various other proceedings before the Immigration Courts.

3.     On August 23, 2014, Ms. Raymond wrote to U.S. Immigration and Customs Enforcement (ICE), an agency of the U.S. Department of Homeland Security (DHS), requesting permission for me to enter the Karnes County Residential Center (Karnes), and attesting that I am a paralegal working under her supervision. Karnes is an ICE detention facility operated by the private prison company GEO Group Inc. where mothers and their children are detained together pending the completion of their removal (or deportation) proceedings. Ms. Raymond represents, on a pro bono basis, a number of women and children detained at Karnes.

4.     On October 31, 2014, Ms. Raymond wrote to ICE again, requesting permission for me to enter Karnes as a paralegal under her supervision.

5.     On October 31, 2014 ICE sent me a letter authorizing me to visit clients at Karnes. *See* Letter of Authorization for Visitation for Victoria Rossi, dated October 31, 2014, attached hereto as Exhibit A. Although Ms. Raymond had requested permission for me to enter Karnes as a paralegal, ICE had authorized me to enter Karnes as an interpreter. At the time, I did not notice that the ICE authorization had mistakenly identified me as an interpreter instead of a paralegal.

1

-22-

6.      On November 12, 2014, I went to Karnes with Ms. Raymond to interview clients. After spending the day at Karnes, I decided to reflect on my experiences by writing them down. I had found the experience to be very moving because it was my first visit to a family detention facility, and I was struck by the prison-like atmosphere and the emotional responses of the women and children who were detained. I wrote down my thoughts on ICE's practice of detaining asylum seeking women and children.

7.      On December 16, 2014, I emailed an editor at the *Texas Observer*, a magazine that reports on news, politics and culture in Texas. I asked if the magazine would like to publish an article account of my experiences of visiting Karnes, and I attached a draft based on what I had written in November.

8.      On January 5, 2015, an editor from the *Texas Observer* called to say that the magazine wanted to publish my piece in their February 2015 issue. At that time the editor and I agreed that I would freelance for the *Texas Observer* on a contract basis for this one article. Prior to this article, I had written only one article for the *Texas Observer*, back in 2009. I have previously worked as a journalist and I continue to occasionally freelance.

9.      On January 7, 2015 I sent in a request to ICE seeking permission to visit clients at Karnes the following day, on January 8, 2015. I identified the clients whom I intended to visit, and I attached the ICE letter of authorization for visitation I had received on October 31, 2014.

10.     On January 8, 2015 I went to Karnes by myself and gave the GEO employee at the front desk the ICE letter of authorization dated October 31, 2014, which stated that I was authorized to visit as an interpreter. At the time, I was still unaware that my authorization was as an interpreter and not a paralegal. The GEO employee allowed me to go meet with clients without incident.

- 2 -

-23-

11.     The editor of the *Texas Observer* wanted photographs to accompany my article. On January 12, 2015, Jen Reel, the art director at the *Texas Observer*, wrote me an email stating that she had spoken to an ICE official on the phone and had requested access to Karnes in order to take photographs. In the email, she also stated that the ICE official was hostile at first and that the ICE official said "There's no story here, I find it odd that someone would be writing about their work here." *See* Emails from Jen Reel, dated January 12, 2015, attached hereto as Exhibit B.

12.     The next day, on January 13, 2015, Jen Reel, the art director at the *Texas Observer*, followed with an email to ICE requesting access to Karnes to take photographs of the facility. *See* Emails between Jen Reel and Adelina Pruneda, dated January 12, 2015, attached hereto as Exhibit C. In her request, the art director stated that she was working with a paralegal who had written an article about her experiences working at Karnes. In the email exchange, ICE officials asked her to provide the name of the paralegal working on the article. *Id.*

13.     Following the ICE officer's request for my name, on January 13, 2015, the art director asked me and Ms. Raymond if she could provide our names to ICE, in conjunction with her request to take photographs. Ms. Raymond and I both said yes.

14.     On January 13, 2015 the art director of the *Texas Observer* provided my name and Ms. Raymond's name to ICE. *See* Exh. C. ICE quickly denied the request for photographs.

15.     On January 14, 2015, I faxed a request to visit clients at Karnes on the next day, January 15, 2015 to the appropriate GEO employees at Karnes. In the letter, I notified them of the names of the clients I intended to visit and attached the ICE letter of authorization, as I had done previously.

16.     On January 15, 2015, I went to Karnes to interview a client. Once I arrived, I showed the GEO employee at the front desk the same paperwork I had used to enter on January 8, 2015, including the letter of authorization dated October 31, 2014.

17.     This time, after I showed the GEO staff member my paperwork, two ICE officers came to the waiting area of the detention center. One of them approached me and asked me to identify myself, asked what my business was, and the purpose of my visit. I identified myself, and I showed the officers the asylum application I intended to work on with our client.

18.     One ICE officer asked me if I was really a paralegal. I told him that I was a paralegal and that I had worked with clients at Karnes before.

19.     At this time one of the ICE officers requested to see my letter of authorization for visitation, which I showed him. One of the officers pointed out that the letter had authorized me to enter Karnes as an interpreter. He said that interpreters could not enter Karnes unless an attorney accompanied them. I told them that I had entered unaccompanied before with the same letter of authorization. I asked the officer what had changed. In response, one of the ICE officers said "I'm here now." In the course of this conversation, I offered to call Ms. Raymond so that the officers could speak with her directly, clarify that I am a paralegal, and rectify the situation, but the officers refused to speak with her. The ICE officers told me that I would need to reapply to get permission as a paralegal if I wanted to enter without Ms. Raymond present. Ultimately, the ICE officers turned me away and informed me that I could not visit our clients that day.

20.     I believe that ICE turned me away, even though they had allowed me to visit clients before, because they had learned just days earlier that I had written an article about Karnes, which was going to be published in the *Texas Observer*. I think ICE's true reason for restricting my access was retaliation for writing an article about detention at Karnes.

21.     On February 2, 2015 the *Texas Observer* published my article describing my experiences at Karnes, first online, and then in its print edition. A copy of that article is attached hereto as Exhibit D.

22.     In mid-February, Ms. Raymond tried to reapply with ICE seeking permission for me to visit clients at Karnes as a paralegal, using the same information she had previously used, including my social security number and a copy of my driver license. This time ICE required us to supply a copy of my United States social security card or my United States passport. On March 16, 2015, Ms. Raymond sent in a copy of my U.S. passport along with the other materials and applied for permission for me to enter Karnes as a paralegal.

23.     On March 20, 2015, I visited clients at Karnes with Ms. Raymond, without incident.

24.     On March 23, 2015, ICE sent Ms. Raymond a letter by fax, dated March 19, 2015, stating that "Victoria Elsa Rossi may not enter the Karnes County Residential Center as a representative of your firm, in the capacity of Paralegal." The letter provided no basis for this decision. Juanita Hester, ICE San Antonio Assistant Field Office Director, had signed the letter. The letter also instructed Ms. Raymond to contact ICE Supervisory Detention and Deportation Officer Hilario Leal if she wished to discuss the matter further. *See* Letter from ICE to Virginia Raymond, dated March 16, 2015, attached hereto as Exhibit E.

25.     On March 24, 2015, I was with Ms. Raymond when she called ICE Officer Leal to discuss the matter further.  She told him that I was with her and that she had put the phone on speaker phone mode so that we could both listen to what he had to say. Ms. Raymond asked Officer Leal why my paralegal access had been denied. Officer Leal said that he had no idea what Ms. Raymond was talking about, and that he would need to do some research.

- 5 -

26.     Later the same morning, I was with Ms. Raymond when Officer Leal called her back.  Again, Ms. Raymond told Officer Leal that she had put the phone on speakerphone mode so that she and I could both hear what he had to say. Officer Leal informed Ms. Raymond that I had been denied access because I had entered Karnes as a paralegal even though I only had permission to enter the facility as an interpreter.  Officer Leal told Ms. Raymond to contact Norma Lacy, ICE San Antonio Field Office Special Assistant, if she wished to appeal the decision.

27.     Ms. Raymond emailed me on March 27, 2015 to report that she had again spoken with Officer Leal, and that he had told her that "the decision stands," that is, that ICE had determined that I would not be permitted to enter Karnes as a paralegal.  She told me that he had mentioned both that I had entered Karnes on January 8, 2015 as a paralegal, and that I had made an improper media request. I took this to refer to the media request by the *Texas Observer* to take photographs. I did not make that request, and even if I had, I do not understand how asking for permission would warrant a denial of paralegal access.

28.     On March 28, 2015, Ms. Raymond submitted another letter asking for reasons for the decision to ban me from Karnes. She sent the letter by email to Ms. Hester, Mr. Leal, Ms. Lacy, and Ms. Achim (another ICE supervisory official). ICE has not responded to Ms. Raymond's request as of this date.

29.     ICE's decision to ban me from Karnes has placed a hardship on Ms. Raymond's law practice and the clients she serves. In one instance when Ms. Raymond was out of town on business I was not able to enter Karnes to assist a client in completing an asylum application. As a result, Ms. Raymond was forced to assist the client in filling out an asylum application on the same day it was due.

- 6 -

30.    I never deliberately misrepresented myself in any way to ICE or GEO, or violated any visitation or other relevant ICE rules at Karnes.

31.    I believe that ICE's failure to provide any good reason for permanently denying me access to Karnes shows that the decision is based on retaliation for my article about detention at Karnes. That decision continues to harm Ms. Raymond's ability to represent clients at Karnes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of April 2015, in Austin_____, Texas.


_____

Victoria Rossi
_____
Printed Name

- 7 -

-28-

# EXHIBIT A



*Enforcement and Removal Operations*

U.S. Department of Homeland Security
409 FM 1144
Karnes City, Texas 78118

**U.S. Immigration and Customs Enforcement**

October 31, 2014

Virginia Marie Raymond, Attorney
1006 East Cesar Chavez
Austin, TX 78702

Re:  Access to Karnes County Residential Center

Dear Ms. Virginia Marie Raymond:

This letter serves as confirmation for access to the Karnes County Residential Center for your staff identified in your letter dated October 31, 2014. Access to the facility is granted to Victoria Elsa Rossi for one year or the duration of her employment with your office. Victoria Elsa Rossi is authorized to enter the Karnes County Residential Center in the capacity as your interpreter. It is your responsibility to immediately notify this office upon Victoria Elsa Rossi's reassignment to another capacity and/or termination of her employment with your office.

This letter will need to be presented to the agent at the entrance to the facility for further guidance and/or instructions.

Please contact Assistant Field Officer Director Sylvester Ortega if you have any questions and/or concerns regarding this matter at (830) 254-2500.

Sincerely,

Sylvester Ortega
Assistant Field Office Director

www.ice.gov

-30-

# EXHIBIT B



**Victoria Rossi <vicrossi@gmail.com>**

## problems with Karnes

**Jen Reel** <reel@texasobserver.org>                                         Mon, Jan 12, 2015 at 12:16 PM
To: Victoria Rossi <vicrossi@gmail.com>

Hi Victoria,

I just had a crazy conversation with Adelina Pruneda, who is the person in charge of granting me access at the facility. I didn't use your name, but she immediately said she finds it very odd that someone who is working with a client at the facility would be writing a personal essay. She was a bit hostile to me at first, saying things like " I know about your magazine" and "There's no story here, I find it odd that someone would be writing about their work here."

Anyway, I told her that I was assigned to photograph, and I wanted to be able to get a picture from inside, and that the decision of what we publish is made by my editors, not me. Anyway, she softened a bit after that and said, "Well send me your request, include the client's name, and I will respond with a bunch of questions about this story."

So, before I get you in any kind of hot water and possibly jeopardize your access to the facility, I wanted to check in with you and see how you'd like me to proceed.

Ugh.

--
Jen Reel
Multimedia Editor
Texas Observer
307 W 7th Street
Austin, TX 78701
(512) 477-0746
cell: (773) 384-7226
www.texasobserver.org

# EXHIBIT C



Victoria Rossi <vicrossi@gmail.com>

## Fwd: request for photographs- ICE response

4 messages

Jen Reel <reel@texasobserver.org>                                    Wed, Apr 8, 2015 at 7:54 PM
To: Victoria Rossi <vicrossi@gmail.com>

Hi Victoria,

Here is the email exchange between me and Adelina. I know we had a few phone conversations too, but we don't record those. Hope this helps!

---------- Forwarded message ----------
From: **Pruneda, Adelina A** <Adelina.A.Pruneda@ice.dhs.gov>
Date: Tue, Jan 13, 2015 at 3:01 PM
Subject: RE: request for photographs- ICE response
To: Jen Reel <reel@texasobserver.org>

We don't have resources to staff this request.

**Warm Regards**

**Nina Pruneda**

**ICE Public Affairs**

210-321-2811 (office)

210-889-5204 (cell)

Adelina.a.pruneda@ice.dhs.gov

**San Antonio, Austin, Waco, Del Rio, Eagle Pass, Brownsville, Harlingen, McAllen, Falcon Dam and Laredo**

*In seeking truth you have to get both sides of a story.*

*By Walter Cronkite*

**From:** Jen Reel [mailto:reel@texasobserver.org]
**Sent:** Tuesday, January 13, 2015 3:01 PM
**To:** Pruneda, Adelina A
**Subject:** Re: request for photographs- ICE response

Thanks for getting back to me. What does that mean specifically?

Best,
Jen


On Tue, Jan 13, 2015 at 2:56 PM, Pruneda, Adelina A <Adelina.A.Pruneda@ice.dhs.gov> wrote:

Jen,


We have limited resources to support your request at this time.



**Warm Regards**


**Nina Pruneda**

**ICE Public Affairs**

210-321-2811 (office)

210-889-5204 (cell)

Adelina.a.pruneda@ice.dhs.gov

**San Antonio, Austin, Waco, Del Rio, Eagle Pass, Brownsville, Harlingen, McAllen, Falcon Dam and Laredo**


*In seeking truth you have to get both sides of a story.*

*By Walter Cronkite*



**From:** Jen Reel [mailto:reel@texasobserver.org]
**Sent:** Tuesday, January 13, 2015 1:40 PM
**To:** Pruneda, Adelina A
**Subject:** Re: request for photographs


Thanks much. I appreciate it!


On Tue, Jan 13, 2015 at 1:36 PM, Pruneda, Adelina A <Adelina.A.Pruneda@ice.dhs.gov> wrote:

Okay, I will have to reach out to Victoria.



**Warm Regards**

-35-

**Nina Pruneda**

**ICE Public Affairs**

210-321-2811 (office)

210-889-5204 (cell)

Adelina.a.pruneda@ice.dhs.gov

**San Antonio, Austin, Waco, Del Rio, Eagle Pass, Brownsville, Harlingen, McAllen, Falcon Dam and Laredo**

*In seeking truth you have to get both sides of a story.*

*By Walter Cronkite*

**From:** Jen Reel [mailto:reel@texasobserver.org]
**Sent:** Tuesday, January 13, 2015 1:28 PM
**To:** Pruneda, Adelina A
**Subject:** Re: request for photographs

Sure, her name is Victoria Rossi and she works for the Law Offices of Virginia Raymond.

Thanks!

On Tue, Jan 13, 2015 at 12:03 PM, Pruneda, Adelina A <Adelina.A.Pruneda@ice.dhs.gov> wrote:

Jen,

We are needing to know who is the Paralegal writing the story and how she became interested in putting this story together. Where that person works etc. Does this person freelance for the Texas Observer?

Also, in order for ICE to make a decision we also need to check with the residents to see if they agree to be photographed. They will need to sign our privacy waiver.

Once you provide me with the information I'm asking for, I will then send to our management team for review.

This just seems like the story has been in the works for quite some time.

**Warm Regards**

**Nina Pruneda**

**ICE Public Affairs**

210-321-2811 (office)

210-889-5204 (cell)

Adelina.a.pruneda@ice.dhs.gov

**San Antonio, Austin, Waco, Del Rio, Eagle Pass, Brownsville, Harlingen, McAllen, Falcon Dam and Laredo**

*In seeking truth you have to get both sides of a story.*

*By Walter Cronkite*

**From:** Jen Reel [mailto:reel@texasobserver.org]
**Sent:** Tuesday, January 13, 2015 10:57 AM
**To:** Pruneda, Adelina A
**Subject:** Re: request for photographs

Yes, I understand. Maria and her daughters have been interviewed. The story is about how these women and their children are coming to the states and seeking asylum. It's about their story, what they were facing in their country that made them risk coming over here. It's a short piece, not very long.

On Tue, Jan 13, 2015 at 10:45 AM, Pruneda, Adelina A <Adelina.A.Pruneda@ice.dhs.gov> wrote:

Jen,

I can't assure you this request will be approved by this week. I still need to know what kind of story this and who has been interviewed.

Np

---

**From**: Jen Reel [mailto:reel@texasobserver.org]
**Sent**: Tuesday, January 13, 2015 10:35 AM
**To**: Pruneda, Adelina A
**Subject**: Re: request for photographs

Oh, I'm sorry. They are at the Karnes City facility. And also I was incorrect: She will be asked tomorrow if she would like her family photographed and will then provide written authorization.

Thank you.


On Tue, Jan 13, 2015 at 10:18 AM, Jen Reel <reel@texasobserver.org> wrote:

Dear Ms Pruneda,

I'm writing to request a meeting on Thursday, January 15th, with the following clients:


Maria Estela MARQUEZ Marquez, A 087 591 777

Jackeline Gabriela SALAMANCA Marquez, A 202 072 756

Carmen Elizabeth SALAMANCA Marquez, A 202 072 753

Melissa Guadalupe SALAMANCA Marquez, A 202 072 754

My request is to photograph Maria and her daughters in whatever area is permissible. It is my understanding that Maria Estela will be providing me a written authorization for this on Wednesday, January 14th.

Please let me know how to proceed from here.

Sincerely,


--

Jen Reel
Multimedia Editor
Texas Observer
307 W 7th Street
Austin, TX 78701
(512) 477-0746
cell: (773) 384-7226
www.texasobserver.org


--

Jen Reel
Multimedia Editor
Texas Observer
307 W 7th Street
Austin, TX 78701
(512) 477-0746
cell: (773) 384-7226
www.texasobserver.org


--

Jen Reel
Multimedia Editor
Texas Observer

-38-

307 W 7th Street
Austin, TX 78701
(512) 477-0746
cell: (773) 384-7226
www.texasobserver.org


--

Jen Reel
Multimedia Editor
Texas Observer
307 W 7th Street
Austin, TX 78701
(512) 477-0746
cell: (773) 384-7226
www.texasobserver.org


--

Jen Reel
Multimedia Editor
Texas Observer
307 W 7th Street
Austin, TX 78701
(512) 477-0746
cell: (773) 384-7226
www.texasobserver.org


--

Jen Reel
Multimedia Editor
Texas Observer
307 W 7th Street
Austin, TX 78701
(512) 477-0746
cell: (773) 384-7226
www.texasobserver.org


--

Jen Reel
Multimedia Editor
Texas Observer
307 W 7th Street
Austin, TX 78701
(512) 477-0746
cell: (773) 384-7226
www.texasobserver.org

-39-

**Victoria Rossi** <vicrossi@gmail.com>        Thu, Apr 9, 2015 at 10:23 AM
To: Jen Reel <reel@texasobserver.org>

> Thanks so much, Jen. I really really appreciate it. Love that you asked her what "limited resources" meant specifically!
>
> Best,
> Victoria
> [Quoted text hidden]
>
> --
> Victoria Rossi
> 713-542-4722

---

**Victoria Rossi** <vicrossi@gmail.com>        Thu, Apr 9, 2015 at 4:57 PM
To: malcolm greenstein <malcolm@greensteinandkolker.com>, Virginia Raymond <virginiaraymond@austin.rr.com>

> [Quoted text hidden]
>
> --
> Victoria Rossi
> 713-542-4722

---

**Victoria Rossi** <vicrossi@gmail.com>        Tue, Apr 14, 2015 at 9:23 AM
To: Seth Manetta-Dillon <seth.manettadillon@gmail.com>

> ---------- Forwarded message ----------
> From: **Jen Reel** <reel@texasobserver.org>
> Date: Wed, Apr 8, 2015 at 7:54 PM
> [Quoted text hidden]
>
>
> --
> Victoria Rossi
> 713-542-4722

# EXHIBIT D

# THE HOLDOUTS

Three Texas families who took a pass on the fracking boom — and what it cost them.
BY PRISCILA MOSQUEDA

## OBSERVER

LA LLORONA'S RETURN | INSIDE AND OUT IN KARNES CITY | RECONSIDERING THE LBJ LEGACY

FEBRUARY | 2015



$3.95

02>

0  74470 89397  4

# Inside and Out

## Seeking Asylum in Karnes City

### By Victoria Rossi



**T**O GET TO KARNES CITY, WE DROVE THROUGH A TOWN that smells of smoking beef and a town that smells of oil. We passed muddy cotton fields, four Dairy Queens and rusted pumpjacks that bobbed against the horizon like hungry birds. In Luling, they've decorated those pumps—one as a family of ducklings, another as a high school quarterback hurling a football. Approaching Karnes City, we passed eternal-seeming flames spouting from far-off drilling rigs and trailer parks that house the people who work on those fracking sites.

We were headed to an outpost of another big Texas industry—the Karnes County Residential Center, a civil detention center run by the private prison corporation GEO Group Inc. This is where U.S. Immigration and Customs Enforcement (ICE) keeps women and children who have come to the United States without permission. Most of the women at Karnes are asylum seekers from Central America. That means they fled their homes because of something horrible that happened to them or their children. They've been raped, beaten, harassed, or had their lives threatened by husbands or boyfriends or gang members, and they are asking the U.S. government for help.

Virginia Raymond, the immigration lawyer I work with as a paralegal, makes the two-hour drive from Austin to visit clients here once or twice a week. I'd come along this time, in November, to help with interviews and to share the driving. Most of the time I see clients in our office. I interview them, help with their immigration applications, and sometimes drive long distances to file court papers. This was my first visit to Karnes.

I'd seen the women of Karnes on TV. In September, I'd accompanied Virginia to an immigration court in San Antonio. She was requesting bond for a client and wanted me to see how it worked. We sat in the courtroom gallery and the judge sat on his bench. A clerk sat to his right and a Spanish interpreter sat to his left. We all looked at a TV screen showing rows of weary women sitting in Karnes. The judge called their alien-registration numbers and read their rights (much fewer than a U.S. citizen would have) and the charges against them (illegal entry, mostly). If a woman's lawyer was in the courtroom that day, the judge pressed a button or pulled a lever to turn the screen toward the counsel's table, so that the client in Karnes and the lawyer in San Antonio could wave at each other. Many of the women at Karnes did not have lawyers. One right that detainees lack is a court-appointed attorney, and so the screen these women looked at showed only the judge.

We'd driven to Karnes because a family we represent—Reza and her daughters, Julie and Dalia (not their real names)—was scheduled to be released that night. Though a judge had set their bond impossibly



high—impossible, that is, for an impoverished Honduran woman—we'd cobbled together the funds from individual donations and the San Antonio-based Refugee and Immigrant Center for Education and Legal Services. An $8,000 money order had been deposited at an ICE office in San Antonio that morning. Now it was 3 p.m.; if everything went smoothly, Reza, Julie and Dalia would be free by nightfall.

The imminent release felt like a small miracle. The asylum officer who first questioned Reza in her "credible fear" interview determined that she did not have a legitimate fear of persecution in Honduras, but after hearing her story a judge reversed the officer's findings.

This surprised everyone. Virginia was sitting with Reza in Karnes when the judge issued his decision from the screen. She says even some of the prison staff cried.

"I am troubled by your case," the judge had told Reza. "I don't know how to rule, and so I think you deserve to go through the full asylum application process." Virginia said it was one of the more humble decisions she'd seen from an immigration judge, many of whom rarely reverse negative credible-fear findings, and some of whom deny every asylum claim they hear. The ruling allowed Reza to request her release on bond. Once released, she'd still pursue her asylum claim—she just wouldn't be locked up during

Mothers from Central America carry children off a bus and into the Karnes County Residential Center on Aug. 1, 2014.
PHOTO BY TOM REEL/
©SAN ANTONIO
EXPRESS-NEWS/ZUMA

-44-



The Karnes County Civil
Detention Center, photo-
graphed on March 13, 2012.
PHOTO BY BOB OWEN/©SAN
ANTONIO EXPRESS-NEWS/ZUMA

the process. People leave Karnes for a number of reasons. ICE might release them on bond or grant them parole. Some receive asylum. Others are transferred to other facilities. But for every five people released from Karnes, one gets deported by bus or by plane.

This is a thought that sticks with me: What must those flights be like for these once-hopeful immigrants, the grittiest and bravest, and also the most desperate, poor and terrified, their hopes now dashed? Many, I imagine, would be taking a plane for the first time. The engines would bellow around them, and they'd feel the wheels lift into the air while their stomachs stayed on the ground. To get here they'd have walked, ridden on the roofs of trains, crammed into trucks or buses for thousands of miles, for weeks or months. People die on the trip up here. These women and kids made it. But their return journey is fast, a matter of just hours by air back to Honduras, Guatemala, El Salvador. What do the people in those planes imagine lies ahead of them?

I didn't work on Reza's case, so I don't know what happened that made her want to leave Honduras for the United States. I do know that cases like hers are on the rise. In 2014, border apprehensions of Central Americans outpaced those of Mexicans for the first time in more than 20 years. Nearly 69,000 families were apprehended attempting to migrate—more than triple the number in 2013, according to a U.S. Customs and Border Protection report.

Though overall immigration numbers are down, according to a Congressional Research Service report, the number of credible-fear claims in the United States nearly tripled between 2012 and 2013. Most of the claimants are from Central America.

Growing up, I always heard that immigrants came to this country "in search of better lives," for "more opportunities." They wanted to make money and to educate their kids, I was told. But the people in Karnes are scared. They're running from something. And they're not running just to the United States. According to the U.N., asylum applications to countries surrounding violence-torn El Salvador, Honduras and Guatemala increased by 712 percent between 2008 and 2013. What happened on the U.S. border last summer was not, as some have said, an immigration crisis. It was a refugee crisis.

WE PULLED UP TO KARNES COUNTY RESIDENTIAL CENTER, the 532-bed lockup that until July 2014 housed undocumented immigrant men. Since the women and kids began arriving in August, it's been outfitted with some homey trappings. In front of the otherwise flat facade, GEO Group has built a new stucco portico and painted it institutional blue to match the new blue plastic benches beneath it and the "GEO Group, Inc." flag that hangs next to those of the United States, Texas and the Department of Homeland Security. I did not know that private prison companies have their own flags. The GEO Group houses some 80,000 people worldwide.

Inside, we faced a long white hallway blocked by a metal detector and a receptionist whose white smock and teased hair in this context couldn't help but evoke Nurse Ratched. Lockers to our right would store our phones and laptops. To our left, the wall was hung with prints of southwestern landscapes and informational flyers. One showed two hands reaching for each other, à la "The Creation of Adam," and the words "Don't let go of hope."

"Is it quiet in here today?" Virginia asked, handing over our IDs.

The receptionist shook her head. "It's been pretty steady all afternoon. People keep coming in one by one." She sighed. "Wish it would stop. It'd be nice just to pause for a minute."

"Oh," Virginia said in a high, tight voice. "I'm sorry."

The receptionist asked me to fill out a form confirming that I hadn't been exposed to Ebola and gave me a red visitor badge in return. As Virginia listed the names and alien-registration numbers of the five women she planned to visit, ICE guards and GEO staffers passed through the metal detector. "Heading home?" the receptionist asked. "Lucky."

"Could I call Reza first?" Virginia asked.

"Reza?"

"Yes, she's supposed to be let out today. I'd like to see her first."

"I don't think we can do that. They'll need to put her in holding."

"Holding?"

"Yeah, the room where they wait to get let out."

"Could I talk to her before then?"

"I don't know if there'll be enough time."

"I just want to talk for 15 minutes." It was 3:30. Reza was supposed to be let out around 5, or maybe 6.

"She might already be in holding."

"Could you check?"

"Once she's in holding, that's it; she can't come back out."

"Yes, but could you check to see if she's there yet?"

This conversation continued in a restrained, polite back-and-forth. Eventually the receptionist addressed the question into a walkie-talkie and received a crackled, unintelligible response. "We'll see what we can do," she said. We passed through the metal detector.

I could understand Virginia's urge to see Reza. Karnes seemed like the sort of place where things could go wrong. Phones weren't allowed past the metal detectors. There is no Internet access inside, and all the walkways and buzzers and antechambers separating the receptionist's desk from the visiting area meant that communication with the outside world was difficult. Virginia had already missed a meeting with a translator of Ki'che', a Mayan language spoken by indigenous Guatemalans. He'd sat outside the prison, waiting for her, while she'd sat inside the visitors room waiting for him.

At the end of the hallway, a woman sat behind glass in a dark room that looked like an airport control tower. Virginia waved for her to buzz us in to the visitors area and she waved back. We fiddled with a thick metal door until it opened into an antechamber barred by another metal door. I felt dizzy trying to remember the procedure for each new chamber—did I buzz, turn the door handle, smile politely and wait?

A guard let us into a big white room containing empty plastic tables and chairs. A blank flat-screen TV hung on the wall, framed by more southwestern prints. At the far end, windows opened onto three private rooms, in one of which a lawyer consulted with his clients. A guard's desk faced another windowed room, and Virginia peered in. A few women and kids sat in chairs lined against the wall. Two of our clients were already waiting.

"I see Olivia and Mateo," Virginia reported to the guard. "Do you know when Reza's coming out?"

He glanced down at his binder. "She's not on my list."

"Oh. I wrote her name down outside."

He shrugged. "I didn't get it."

Virginia wrote out Reza's name and alien-registration number again.

The guard unlocked the waiting-room door for Olivia and Mateo [not their real names], who smiled shyly in greeting. The four of us walked through the visitors area and crowded into one of the tiny private rooms.

Olivia and Mateo would be released soon on bond, and would stay with Olivia's friend near Amarillo while they attended to their court dates. Mateo translated our halting Spanish for his mother, a bright-eyed Guatemalan woman who spoke only Ki'che'.

This was our last meeting together. Virginia explained that their case would be transferred to Dallas, not Amarillo, because there are no immigration courts in the Panhandle. To comply with the terms of their bond, Mateo and Olivia would have to take a bus more than 350 miles to a Dallas court. Mateo didn't understand the distance, so Virginia sketched a map of Texas on a yellow legal pad. She fussed with the drawing, trying to get the shape just right. Slowly, the distance seemed to sink in. As Mateo translated for his mother, their faces grew grim.

"Do you have any more questions?" Virginia asked.

"Can you see Diana today?" When we'd first walked in, as Virginia scanned the waiting room for Reza,



**I didn't work on Reza's case, so I don't know what happened that made her want to leave Honduras for the United States. I do know that cases like hers are on the rise.**

we'd seen another woman sitting next to Mateo and Olivia. Diana [not her real name] had smiled hopefully behind the thick plastic window and Virginia had sighed. Like Olivia, the woman spoke only Ki'che', and we didn't have an interpreter with us. Many indigenous detainees speak only Mayan languages, and with the logistical obstacles and high costs involved in finding Ki'che' interpreters, they're often the last to receive legal assistance.

"I'm so sorry, but I don't know how I'd speak to her," Virginia said. Mateo and Olivia said nothing.

As parting gifts, Virginia gave Mateo and Olivia each a journal. She flipped through the pages to reveal photos of protesters shouting and waving

-46-

signs. "These people were just outside," she said. "They don't think it's right that you're kept here.

"Good luck," she added. "I hope that from now on, this country treats you better."

I WORK MOSTLY WITH ASYLUM SEEKERS, AND FROM THE months of waiting they endure, the bureaucratic inconsistencies they navigate and the callous responses of government officials to the traumatic stories they're forced to tell again and again, it seems our immigration system is designed to discourage them, not welcome them. Once, during an asylum interview, one of our young clients told an immigration officer about the day her family was ambushed on the road by armed men. Her sister, shot in the head, had died in her lap. "But you weren't hurt?" the officer asked brightly. "Well, weren't you lucky!"

In the hour or so that had passed since we'd entered the visitors area, we'd seen no sign of Reza or her daughters. I walked back to the receptionist to check on them. No, I was told, we wouldn't be able to see them before they were released. They were already in holding. "They'll be out at 5," the receptionist said. "Maybe 6."

When I came back, Virginia was talking to someone new.

"I never thought we'd be in here this long," the woman said, putting her face in her hands.

Her son was epileptic and the setting was starting to rattle him. He'd had a seizure as they crossed into the United States, and she couldn't sleep for fear that he would have another one here.

No, she said, he hadn't seen a doctor yet.

I was exhausted. The fluorescent lights had begun to spot the corners of my vision, and each time we left



**Maria Estela could pay them, he said, or she could give them her daughters as MS-13 girlfriends, who are often raped as part of the gang's initiation. "That would be the best payment," he said.**

the private visitors room to call another client, more time seemed to have passed than I'd expected.

Still, I was excited to meet Maria Estela and her three daughters. I'd spent the last month talking with their cousin and aunt, who own a mom-and-pop diner in Virginia and were eager to give "the girls" a home. Vanessa, their cousin, seemed especially excited. "I'm going to be the big sister!" she told me on the phone. She wanted to teach the girls English, to help them adjust to school. But first, Vanessa noted, she'd teach them to cook the very first American-style food she'd learned to make: Mickey Mouse pancakes. Vanessa and her mom had already

started buying school supplies and winter clothes. She sent me page after page of documents to show a judge that she and her mom were fit to house them. Most people send me tax returns and utility bills. Vanessa added her babysitting certificate and a good-behavior report from middle school. She even put together a statement from the diner customers welcoming the girls to town.

The girls came out of the waiting room in matching pink Converse shoes. Melissa, the oldest, held pages torn from a legal pad in her hands. I wanted to compliment their shoes—they hinted at a kind of sassy, sisterly solidarity, I thought—but something in their faces stopped me. I'm not sure what I was expecting from them—some familial trace of Vanessa's bounciness, I suppose. It wasn't there, at least not today.

Virginia noticed too. Maria Estela hugged Jackeline, the littlest, in her lap. Melissa and Carmen, 15 and 13, sat with their arms crossed, staring at their laps. "Why does everyone look so sad?" Virginia asked.

Maria Estela smiled apologetically. "Our story. Melissa wrote it just before you got here. It's upset her."

"Oh Melissa," Virginia said, getting up to wrap her arms around the teenage girl. That was the tipping point; Melissa's tears came down fast.

"Do you want me to read it now?" Virginia asked. Melissa nodded. The room was quiet as Virginia scanned the pages. She'd asked Melissa to write down why they'd left El Salvador for the United States. Virginia wanted to make their story public.

Maria Estela's situation was tricky. She'd been deported once before for trying to enter the United States. This time, she and her daughters had fled their town after two MS-13 gang members broke into their home and put a gun to Maria Estela's head, attempting to collect an extortion she couldn't pay. I read about this later, the scene recorded by Melissa in her careful, looping script.

Holding a gun to Maria Estela's head, the two men had laughed at the three crying girls. Then one stopped and looked Melissa up and down.

Maria Estela could pay them, he said, or she could give them her daughters as MS-13 girlfriends, who are often raped as part of the gang's initiation. "That would be the best payment," he said.

If they didn't like those options, the other added, the extortionists could rape and kill them all right then.

"Yes," Maria Estela said, agreeing to give them her daughters. "Yes, that's fine."

The men said they'd come back. Maria Estela and the girls left before they could make good on the threat. Despite this story, the ICE official who interviewed them determined that Maria Estela did not possess a "reasonable fear" of returning to El Salvador, which, according to the United Nations, has the highest rate of femicide in the world.

Virginia stopped reading. "This is very difficult," she said to Melissa. "May I read the rest later?"

-47-



Melissa nodded and again the room fell silent. "How is everything else?" Virginia asked.

Jackeline wriggled in her mother's arms. "She's cold," Maria Estela said. "We're all cold." They each wore a sweatshirt, but I could see why that wouldn't be enough in a semi-heated building surrounded by 40-degree November weather; I was wearing my winter coat and I didn't feel warm, either. Maria Estela had heard that if they were released, their sweatshirts would be taken from them. "They say they're loans, that they're not ours to keep."

"Some people have to leave this place almost naked," Melissa said, wide-eyed.

"Well," Virginia said, "I was going to give you this." She pulled off her sweater, a blue and black knit from Ann Taylor, and handed it to Jackeline. "Here you go." The sweater hung huge on the little girl, who tucked her knees up into it. I offered my thin cardigan and Virginia added her red puffy vest. Melissa and Carmen swapped sweaters to better match the clothes they were wearing. They wanted to look as if they hadn't just received new clothes, so the guards wouldn't confiscate them.

Stories of such small cruelties are common to Karnes. There are more serious allegations, too. In the six months since Karnes has been open to families, MALDEF, Human Rights First and other legal groups have filed complaints alleging sexual abuse, extortion and harassment of the women and children detained there. Similar complaints surfaced at the T. Don Hutto Family Residential Center in Taylor, which forced that facility to stop holding migrant families in 2010. For four years, Texas had been free of family detention centers, but family detention is back. In December 2014, a new private detention facility opened in Dilley,

southwest of San Antonio. Built to house 2,400 people, it is by far the largest family detention center in the country.

I can't remember why I left the visiting area again. Virginia asked me to call someone, or put something in our locker, or maybe I just needed to use the bathroom.

Nurse Ratched must have heard my footsteps down the hallway, because she turned to me and shouted, "Hey! Tell your friend they're letting them out."

"Now?" I froze.

"Yeah, right now. Y'all need to get out here quick."

I buzzed and tapped until the guard let me back in. Virginia was talking with two new people. I opened the door.

"Virginia, they're letting them out."

"When?"

"Right now, actually. Sorry. The receptionist says we should get out there."

I had no idea what time it was. Without my cell-phone to use as a watch, time seemed to have sped up in the white, clockless room.

"I'm so sorry," Virginia said to her two clients, "but they're telling me I have to go. Do you know Reza? Dalia? Julie? They're being released right now."

We hurried to the exit. The guard didn't look up from his binder. I buzzed; no response. I buzzed again. The door wouldn't open. "Excuse me?" I said to the guard. "Do I buzz?" He sighed, closed his binder, and got up to open the door.

We walked into the hallway just as another door opened to reveal a small group of women and girls flanked by guards. I smiled at them, searching their faces. I'd never met Reza; was it her? Virginia walked ahead of everyone, hell-bent for the receptionist's desk.

**"Resident advisors"**
stand outside a security gate at the Karnes County Residential Center.
PHOTO BY BOB OWEN/©SAN ANTONIO EXPRESS-NEWS/ZUMA

-48-



"Virginia?"

She turned around. "Oh!"

"*Abogada!*" A high, young voice bounced off the white walls. A tiny girl sprinted from a tangle of taller legs, her long brown hair flapping behind her like a banner. Her mouth was wide open and bright red, as if she'd just swallowed a huge piece of candy. "*Abogada!*"

This was Dalia, a friend to prison guards and pro bono attorneys alike, a 6-year-old who would lie in wait for Virginia under the tables and chairs of Karnes' visitors room and leap out to shriek "Boo!" She'd grown skinny at Karnes, her mother later told



**Reza and her daughters were scheduled to be released that night. She, Julie and Dalia would be free by nightfall. The imminent release felt like a small miracle.**

us, echoing other parents' claims. Dalia wouldn't eat in there. The food was spiced too heavily for a 6-year-old. The meat tasted rancid.

We stepped easily through the metal detector. We hugged and laughed. We returned our visitors badges, gathered our IDs, and pulled our laptops from the lockers. The detached half-smile I'd worn through all the buzzing and the chambers and the walkways no longer felt necessary. It melted away, replaced by a confusing surge of elation and then dismay. Because this is how our country treats refugees.

The reception area was full. Pastor Rosemarie Doucette of San Antonio's Good News Lutheran Church was there to pick up the other women who'd been let out along with Reza's family. This was her first time at Karnes, too, but she'd done this before, in

the 1980s, when civil wars and genocide sent nearly 1 million Central Americans to the U.S. border seeking asylum. At the time, Rosemarie had been part of the Sanctuary Movement of religious and political groups that offered safe haven to refugees, sometimes in defiance of government deportation orders. She'd lived in Chicago then, and she remembers how the kids staying at her church would go nuts at their first sight of snow. "Go on," she'd say, nudging them outside. "You can eat it." She'd recently become involved again, in what some are calling the New Sanctuary Movement. On her drive to Karnes, she said, she'd repeated a Bible verse to herself: "The prisoner is soon to be set free."

I watched Julie, 15, a quieter counterpart to her little sister. She wore skinny jeans and a brown hoodie. Her wrists were wrapped in friendship bracelets she'd learned to weave from the Salvadoran kids she'd met in Karnes. Julie smiled shyly at everyone, but mostly stared at the floor. When she looked up, it was toward the prison's glass doors. It was now past 6 p.m., and there was nothing to see beyond them but blackness tinged by fluorescent light. She put her hand to her mouth and her face crumpled. She reached for her mom, and for a few moments the two of them stood there watching those doors.

"Our friends," Reza said, looking back down the hall. "What will happen to them?"

"*Listas?*" Virginia said. "Ready?" She opened the door.

The wind whipped across the flat black parking lot. In the distance, fracking flames glowed under a half moon. It was dark and cold and there wasn't much to see. But for me, a night has never felt more wild. Virginia let out a loud whoop, and then we all did. We raised our fists and howled into that cold night, walking toward Virginia's car, feeling like the wildest, freest creatures on earth. ◼

*Victoria Rossi is a writer and legal aide living in Austin.*

**Security personnel stand outside the dining hall at the Karnes County Residential Center during a press conference on March 13, 2012.**
PHOTO BY BOB OWEN/©SAN ANTONIO EXPRESS-NEWS/ZUMA

-49-

# EXHIBIT E

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
409 FM 1144
Karnes City, Texas 78118



**U.S. Immigration
and Customs
Enforcement**

March 19, 2015

Virginia Marie Raymond Lawyer / Abogada
1006 East Cesar Chavez Street
Austin, Texas 78702

Re: Access to Karnes County Residential Center

Dear Ms. Raymond:

In response to your letter dated March 16, 2015, Victoria Elsa Rossi may not enter the Karnes County Residential Center as a representative of your firm, in the capacity of a Paralegal.

Please contact Supervisor Detention and Deportation Officer Hilario Leal if you have any questions and/or concerns regarding this matter at (830) 254-2500.

Sincerely,

Juanita P. Hester
Assistant Field Office Director



**U.S. Immigration
and Customs
Enforcement**

**U.S. Department of Homeland Security**
*Karnes County Civil Detention Center*
409 FM 1144
Karnes City, Texas 78118

Phone: 830-254-2500 | Fax: 830-254-2975 |

# Fax Cover Sheet

TO: Virginia Raymond    FROM: Juanita Hester

FAX: 512.472.8263    PAGES: 2

PHONE: 512.748.0940    DATE: 3/23/15

RE: Victoria Elsa Rossi    CC:

□ URGENT   □ FOR REVIEW   □ PLEASE COMMENT   □ PLEASE REPLY

COMMENTS:

**PROOF OF SERVICE**

I, the undersigned, declare and certify as follows:

I am more than eighteen years old and not a party to this action.  My business address is Orrick, Herrington & Sutcliffe LLP, 777 Figueroa Street, Suite 3200, Los Angeles, California 90017.

On April 22, 2015, I electronically filed the following document(s):

- **Plaintiff's Fifth Set of Exhibits**

with the United States District Court, Central District of California by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

_/s/ Nicole Payne_
Nicole Payne