UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 1 of 25 |
|---|---|---|---|

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER RE PLAINTIFFS' MOTION TO ENFORCE
SETTLEMENT OF CLASS ACTION AND DEFENDANTS' MOTION TO
AMEND SETTLEMENT AGREEMENT [100, 120]**

**I.
INTRODUCTION**

The original complaint in this action was filed on July 11, 1985. [Doc. # 1.] On January 28, 1997, the Court approved a class-wide settlement of this action pursuant to Fed. R. Civ. P. 23. (*See* Plaintiffs' First Set of Exhibits in Support of Motion to Enforce Settlement ("Ps' First Set"), Exh. 1 ("Agreement").)

Plaintiffs Jenny L. Flores and other class members filed a motion to enforce the Agreement on February 2, 2015.[1] [Doc. # 100.] On February 27, 2015, Defendants Jeh Johnson and the U.S. Department of Homeland Security ("DHS") and its subordinate entities, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), filed an opposition to Plaintiffs' motion.[2] [Doc. # 121.] On March 13, 2015, Plaintiffs filed a reply. [Doc. # 127.]

_____

[1] According to the parties' 2001 Stipulation extending the Agreement, "[a]ll terms of this Agreement shall terminate 45 days following defendants' publication of final regulations implementing this Agreement." (*See* Ps' First Set, Exh. 3 ("Stipulation Extending Settlement of Class Action, December 7, 2001").) Because such regulations were never published, the Agreement is still in force.

[2] Defendants explain that the original Complaint named as Defendants Edwin Meese, Attorney General of the United States; Immigration and Naturalization Service ("INS"); Harold W. Ezell, Western Regional Commissioner, INS; Behavior Systems Southwest; and Corrections Corporation of America. The Agreement names as Defendants Attorney General Janet Reno, *et al.*, but does not indicate who the other Defendants were at the time. Under Fed. R. Civ. P. 25(d), Attorney General Loretta Lynch replaces Attorney General Reno as the named Defendant. In Plaintiffs' motion, Plaintiffs named Jeh Johnson, Secretary of Homeland Security, *et al.* Plaintiffs' counsel, however, confirmed that the intended Defendants are DHS and its subordinate entities, ICE and CBP. (Defendants' Motion to Amend at 1, n.1 [Doc. # 120].)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | | Date | July 24, 2015 |
|---|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 2 of 25 |
|---|---|---|---|---|

On February 27, 2015, Defendants filed a motion to amend the Agreement. [Doc. # 120.] On March 6, 2015, Plaintiffs filed an opposition. [Doc. # 122.] On March 13, 2015, Defendants filed a reply. [Doc. # 126.]

A hearing on the motions was held on April 24, 2015.

Having duly considered the respective positions of the parties as presented in their briefs and at oral argument, the Court now renders its decision.

**II.**
**MOTION TO ENFORCE**

Beginning in the summer of 2014, in response to a "surge" of Central Americans arriving at the U.S.-Mexico border, ICE adopted a blanket policy to detain all female-headed families, including children, in secure,[3] unlicensed facilities for the duration of the proceedings that determine whether they are entitled to remain in the United States. (Mot. to Enforce at 2; *see* Ps' First Set, Exh. 9 ("U.S. Immigrations & Customs Enforcement, News Release, November 18, 2014"); Ps' First Set, Exh. 10 (Declaration of Bridget Cambria ("Cambria Decl.")) ¶¶ 3-5 ("Since June, ICE has begun detaining all Central American families without the possibility of release on bond, recognizance, supervision or parole if it believes that those families arrived in the United States as part of the 'surge' of unauthorized entrants—mostly children—that purportedly began in the summer of 2014.").)

Plaintiffs argue that this "no-release" policy violates the Agreement. More specifically, Plaintiffs challenge the following policies and practices: (1) ICE's no-release policy, which Plaintiffs argue breaches the Agreement's requirements that Defendants must minimize the detention of children and must consider releasing class members to available custodians in the order of preference specified in the Agreement; (2) ICE's practice of confining children in secure, unlicensed facilities; and (3) ICE's practice of exposing children in Border Patrol custody to "harsh, substandard" conditions and treatment. (Mot. to Enforce at 5-21.)

///
///
///
///

---

[3] "Secure" in this context refers to a detention facility where individuals are held in custody and are not free to leave. Conversely, "non-secure" facilities are those where individuals are not held in custody.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | | Date | July 24, 2015 |
|---|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 3 of 25 |

**A.      Legal Standard**

This Court has the inherent power to enforce the terms of the Agreement because, with certain exceptions not relevant here, the Agreement "provides for the enforcement, in this District Court, of the provisions of this Agreement. . . ." (*See* Agreement ¶ 37; Ps' First Set, Exh. 2 ("Order Approving Settlement of Class Action, January 28, 1997").) *See also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994); *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978). "[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)).

Moreover, the parties agree that the Agreement is a consent decree. "Consent decrees have the attributes of both contracts and judicial acts," and in interpreting consent decrees, courts use contract principles, specifically the contract law of the situs state. *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990). Under California law, a court must interpret a contract with the goal of giving effect to the mutual intention of the parties as it existed at the time of contracting. Cal. Civ. Code § 1636. "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." *Winet v. Price*, 4 Cal. App. 4th 1159, 1166, 6 Cal. Rptr. 2d 554 (1992). Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 798, 79 Cal. Rptr. 2d 273 (1998). Where the contract is clear, the plain language of the contract governs. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264, 10 Cal. Rptr. 2d 538 (1998).

The Court must construe the contract as a whole, being sure "to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011) (quoting Cal. Civ. Code § 1641) (internal quotation marks omitted). "Courts must interpret contractual language in a manner that gives force and effect to every provision, and not in a way that renders some clauses nugatory, inoperative or meaningless." *Id.* When necessary, a court can look to the subsequent conduct of the parties as evidence of their intent. *See Crestview Cemetery Assn. v. Dieden*, 54 Cal. 2d 744, 754, 8 Cal. Rptr. 427 (1960). Finally, "[i]n cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code § 1654.

///
///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | | Date | July 24, 2015 |
|---|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 4 of 25 |

**B.**     **Discussion**

**1.**     **"Preference for Release" Provision**

Plaintiffs argue that Defendants' no-release policy—*i.e.*, the policy of detaining all female-headed families, including children, for as long as it takes to determine whether they are entitled to remain in the United States—violates material provisions of the Agreement.

These provisions require ICE (1) to "release a minor from its custody without unnecessary delay" to a parent, a legal guardian, or other qualified adult custodian, except where the detention of the minor is required "either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others"; and (2) "[u]pon taking a minor into custody, . . . [to] make and record prompt and continuous efforts on its part toward family reunification and the release of the minor . . . ." (Agreement ¶¶ 14, 18.)

Plaintiffs contend that Defendants, by making no effort to locate custodians for minors who are apprehended with their mothers and by refusing to release these minors even when a qualified custodian is available, have not only breached the Agreement but also have unilaterally revised it to create an additional exception to release—for minors who have been apprehended as part of a female-headed family.  *See Walnut Creek Pipe Distrib., Inc. v. Gates Rubber Co. Sales Div.*, 228 Cal. App. 2d 810, 816, 39 Cal. Rptr. 767 (1964) (courts should not imply additional terms, except in cases of "obvious necessity").

**a.**     **The Agreement Encompasses Accompanied Minors**

As a threshold matter, the parties dispute whether minors who are apprehended as part of a female-headed family are class members covered by the Agreement.  The plain language of the Agreement clearly encompasses accompanied minors.  First and most importantly, the Agreement defines the class as the following:  "*All minors* who are detained in the legal custody of the INS." (*See* Agreement ¶ 10 (emphasis added).)  The Agreement defines a "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS." (*See id.* ¶ 4.)  Defendants argue in their brief that this definition should not be dispositive of who was intended to be in the class because the parties' purpose in defining "minor" in that manner was merely to distinguish the Agreement's definition of a minor from the INA's definition of a "child" as "an unmarried person under 21 years of age," 8 U.S.C. § 1101(b)(1).  The language defining "minor" in the Agreement, however, is wholly unambiguous and Defendants have offered no reasonable alternative reading that would make it ambiguous.  As such, extrinsic evidence of intent is inadmissible, even if Defendants had proffered any, which they did not.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | | Date | July 24, 2015 |
|---|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 5 of 25 |
|---|---|---|---|---|

The text of the Agreement provides further support for the finding that the Agreement encompasses all minors who are in custody, without qualification as to whether they are accompanied or unaccompanied. In Paragraph 9, for example, the parties describe the scope of the Agreement in the following way: "This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." In Paragraph 12A, the Agreement specifically acknowledges the possibility of accompanied minors when it notes that "[f]acilities will provide . . . contact with family members who were arrested with the minor." Moreover, the Agreement provides special guidelines with respect to unaccompanied minors in some situations—*e.g.*, Paragraph 12A ("The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours."), and Paragraph 25 ("Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults . . . ."). It would make little sense to write rules making special reference to unaccompanied minors if the parties intended the Agreement as a whole to be applicable only to unaccompanied minors. Finally, the Agreement expressly identifies those minors to whom the class definition would not apply—"an emancipated minor or an individual who has been incarcerated due to a conviction re a criminal offense as an adult" (*see* Agreement ¶ 4)—an exclusion that does not mention accompanied minors. Had the parties to the Agreement intended to exclude accompanied minors from the Agreement, they could have done so explicitly when they set forth the definition of minors who are excluded from the Agreement.

Defendants contend that the definition of a class member should be read narrowly to exclude accompanied minors because Plaintiffs' lawsuit originally challenged "the constitutionality of INS's policies, practices, and regulations regarding the detention and release of *unaccompanied* minors." (*See* Agreement at 3 (emphasis added); *see also* Order re Class Certification [Doc. # 142-1].) This argument is unavailing in light of the fact that a consent decree may benefit individuals who were not victims of a defendant's illegal practices and provide "broader relief than the court could have awarded after a trial." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525, 106 S. Ct. 3063, 92 L. Ed. 2d 405 (1986). To the extent that Defendants are arguing that Plaintiffs' original intent in filing the lawsuit should inform the Court's understanding of what the parties meant when they defined the class in their Agreement, Defendants' argument is not sufficiently compelling to outweigh the plain language of the Agreement indicating the parties' intent to make "all minors," without qualification, part of the class.

Because the plain language of the Agreement is clear that accompanied minors are part of the class, the inquiry can end here. Nonetheless, the Court notes that other evidence supports its

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 6 of 25 |
|---|---|---|---|

interpretation of the Agreement. For example, the regulatory framework in place at the time the parties formed the Agreement further reinforces the Court's conclusion that the Agreement applies to all minors. Defendants' primary argument is that the "preference for release" provision should not be construed to apply to accompanied minors in family residential centers because the procedures and conditions of release, as discussed in Section VI of the Agreement, "clearly contemplate" that the parent or other individual to whom the child would be released would already be present in the interior of the United States. As discussed in greater detail *infra*, however, the Court finds strong evidence to the contrary. Furthermore, just because the Agreement does not explicitly provide for the release of parents and legal guardians or address the rights of adult detainees does not mean that the Agreement does not apply to accompanied minors. To the extent Defendants are asserting that releasing accompanying relatives would have been considered an unusual step at the time the Agreement was formed, the following regulation governing the release of detained minors in a narrower context, which was in place when the parties formed the Agreement and which is still in force, belies Defendants' assertion:

> (i)     Juveniles may be released to a relative (brother, sister, aunt, uncle, or grandparent) not in Service detention who is willing to sponsor a minor and the minor may be released to that relative *notwithstanding that the juvenile has a relative who is in detention.*
> (ii)    If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released *with an accompanying relative* who is in detention.

8 C.F.R. § 212.5(a)(3) (1997) (emphasis added). Given the regulatory context in which the parties formed the Agreement, it is reasonable to infer that the parties contemplated the release of an accompanied minor together with a relative in detention.

Finally, at least one other district court has held, at the preliminary injunction stage, that the Agreement applies to all minors, including accompanied minors, even though it saw the preference for release provision as having limited utility in the context of family detention. *See Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("[T]he *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors."). The Court finds the reasoning in *Bunikyte* persuasive on this issue, and Defendants have not offered a reason why this case is distinguishable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 7 of 25 |
|---|---|---|---|

In light of the Agreement's clear and unambiguous language, which is bolstered by the regulatory framework in which the Agreement was formed and Defendants' past practice,[4] the Court finds that the Agreement applies to accompanied minors.

### b.   <u>Defendants' No-Release Policy is a Material Breach of the Agreement</u>

Even if the Agreement applies to accompanied minors, Defendants assert that ICE's no-release policy nonetheless complies with the Agreement.  Defendants argue that, because separating a child from his or her parent endangers the minor's safety, its policy of detaining an

---

[4] Plaintiffs point out that Defendants' no-release policy unfairly penalizes women who are apprehended with children.  According to Plaintiffs, until June 2014, Defendants exercised individualized discretion to release women who were statutorily eligible, such as bona fide asylum seekers, regardless of whether they were apprehended with their children.  (*See* Ps' First Set, Exh. 17 (Declaration of Barbara Hines ("Hines Decl.")) ¶ 9; Cambria Decl. ¶ 2.)  Furthermore, Defendants, even now, individually assess women apprehended *without* children and nearly all adult males to see whether detention is warranted.  (*See* Hines Decl. ¶ 17.)  Starting in June 2014, however, Defendants ceased exercising such individualized discretion for women who are apprehended *with* children.  (*See* Hines Decl. ¶ 14.)

On May 13, 2015, Defendants lodged a press release announcing a series of changes with respect to the family residential centers.  (Defendants' May 13, 2015 Press Release ("May 13, 2015 Press Release") [Doc. # 153-1].)  These changes included a policy of reviewing the cases of any families detained beyond 90 days, and every 60 days thereafter, to evaluate whether detention or the designated bond amount continues to be appropriate during the pendency of their immigration case.  On July 8, 2015, Defendants announced additional reforms, including "a plan to offer release with an appropriate monetary bond or other condition of release to families at residential centers who are successful in stating a case of credible or reasonable fear of persecution in their home countries."  (Defendants' July 8, 2015 Press Release ("July 8, 2015 Press Release") [Doc. # 164-1].)

Defendants contend that these reforms should "affect the content and/or ultimate disposition of the Court's order such that the Court should rule in Defendants' favor on the pending motions."  (Defendants' Notice of Objection to Premature Lodging of Amended Proposed Order ("Ds' Objection") [Doc. # 175].)  This rather cryptic comment does not clarify Defendants' reasons for filing these press releases with the Court.  If Defendants are trying to argue that the intervening reforms render the case moot, then Defendants are incorrect.  *See Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014), *cert. denied sub nom. Rosebrock v. Hoffman*, 135 S. Ct. 1893 (2015) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.").  "A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015).

Merely issuing a press release announcing a change in policy from detaining all female-headed families to releasing those who have successfully stated a case of credible or reasonable fear of persecution does not satisfy Defendants' substantial burden of showing that it is "absolutely clear" that the violations of the Agreement could not reasonably be expected to recur.  Even assuming Defendant's new policy complies with the Agreement, Defendants could easily revert to the former challenged policy as abruptly as they adopted the new one.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk <u>KT</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | | Date | July 24, 2015 |
|---|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 8 of 25 |

accompanied minor together with his or her parent, rather than releasing the minor to another individual, falls within the exception set forth in Paragraph 14 of the Agreement, which allows for continued detention "to ensure the minor's safety or that of others."

In their reply, Plaintiffs do not squarely address this argument. Plaintiffs do contend, however, that the Agreement's "preference for release" provision requires ICE to exercise its discretion to release the accompanying mothers, so long as they do not present a danger or flight risk. (*See* Agreement ¶ 14 ("[T]he INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to: a parent . . . .").) If true, Plaintiffs' contention could resolve the issue Defendants identified—of potentially endangering the minor's safety by separating a minor from his or her parent—by releasing rather than detaining the parent and child together if no danger or flight risk is identified.

To determine whether the Agreement requires Defendants to release an accompanying parent, the Court examines the Agreement's text, Defendants' conduct subsequent to the formation of the Agreement, and the regulatory framework at the time the Agreement was formed and as it exists today. It is true that the Agreement does not contain any provision that explicitly addresses adult rights and treatment in detention. But ICE's blanket no-release policy with respect to mothers cannot be reconciled with the Agreement's grant to class members of a right to preferential release to a parent. (*See* Agreement ¶ 14.) Although Defendants argue that the provision could be read to mean a child should be released to a parent only if that parent is already lawfully in the United States, Paragraph 15 clearly contemplates the possible release of a child to an adult who is not lawfully in the United States:

> Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of support (Form I-134) and an agreement to . . . notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to *a grant of voluntary departure or order of deportation* . . . .

(Agreement ¶ 15 (emphasis added).) In light of the contract interpretation principle that a "written contract must be read as a whole and every part interpreted with reference to the whole," *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989), this provision makes clear that the Agreement does not require that the parent to whom the child is released in Paragraph 14 must already be lawfully in the United States.

Defendants' conduct over the last two decades since the Agreement was signed also clarifies what the parties understood to be the meaning of the preference for release provision.

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | | Date | July 24, 2015 |
|---|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 9 of 25 |

*See Crestview Cemetery*, 54 Cal. 2d at 754 (when necessary, a court can look to the subsequent conduct of the parties as evidence of their intent). It is uncontroverted that, prior to June 2014, ICE generally released children and parents upon determining that they were neither a significant flight risk nor a danger to safety. (*See* Cambria Decl. ¶ 2; Ps' First Set, Exh. 11 (Declaration of Carol Ann Donohoe) ¶ 2.) Thus, ICE's conduct subsequent to the formation of the Agreement bolsters Plaintiffs' argument that the preference for release provision requires the release of the accompanying mother along with the child, so long as she does not present a significant flight risk or danger to safety.

Finally, the existing regulatory framework, discussed *supra*, suggests that the parties would have contemplated releasing an accompanying relative. Whereas the regulation provides for the release of an accompanying relative only if no other suitable relative can be found, the Agreement, under the preference for release provision, would presumably release the accompanying parent first. Despite this difference between the regulation and the preference for release provision in the Agreement, the regulation provides contextual support for Plaintiffs' contention that the parties intended to allow for the release of the accompanying parent, so long as the release does not create a flight risk or safety risk.

In light of all the evidence, the Court agrees with Plaintiffs' interpretation of the preference for release provision, described in Paragraph 14 of the Agreement. As such, Defendants must release an accompanying parent as long as doing so would not create a flight risk or a safety risk. Since releasing the parent along with the child in this case would, in most instances, obviate Defendants' concern that releasing the child alone would endanger the child's safety, Defendants' argument that this policy falls within the safety risk exception as a blanket matter is unavailing.[5] Therefore, the Court finds that Defendants' blanket no-release policy with respect to minors accompanied by their mothers is a material breach of the Agreement.

### c.   Defendants' Policy Argument In Favor of Detaining Children

Defendants make a separate policy argument to justify detaining children who are accompanied by their mothers even though the Agreement requires otherwise. Defendants

---

[5] Neither side directly addresses the possibility that releasing the mother and child together might create a risk to safety of both mother and child, if neither has a place to stay within the United States. The parties also do not address the situation where the mother chooses to stay in the detention facility or has been deemed a flight or safety risk. As a practical matter, Defendants would be justified in detaining both mother and child in that case, but the examples presented in this case typically concern a mother and child who have relatives already residing in the United States who are willing to ensure their safety.

**CIVIL MINUTES—GENERAL** Initials of Deputy Clerk KT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | | Date | July 24, 2015 |
|---|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 10 of 25 |
|---|---|---|---|---|

contend that release of accompanied children and their parents gives families a strong incentive to undertake the dangerous journey to this country. Defendants support this argument with the following observations of Border Patrol officer Kevin W. Oaks:

> [F]amily units apprehended by Border Patrol . . . claimed that a principal motive for entering the United States was to take advantage of the "permisos" that the United States was granting to family units. The term "permiso" in this context is used to refer to a Notice to Appear which permits aliens to depart the Border Patrol station without detention. . . .

> While this impression [that the U.S. government was planning to stop issuing 'permisos' in June or July 2014] was incorrect, it speaks to the understanding of the family units that detention, and the ability to simply depart a Border Patrol station, factor strongly into their determination on when and whether to cross into the United States. . . .

> Based on my experience as a Border Patrol Agent, the use of detention has historically been effective at deterring aliens (specifically aliens from countries other than Mexico) from entering the United States through the South Texas region. For example, in 1989 when there was a dramatic increase of Central American aliens illegally entering the United States, the former Immigration and Naturalization Service detailed staff to South Texas, opened temporary detention camps, and instituted a one-day expedited review of asylum applications, which dramatically reduced the average daily apprehensions of non-Mexicans along the Texas border. Similarly, in 2005 when the RGV Sector was experiencing an influx of Brazilian nationals, the implementation of expedited removal with detention quickly and significantly reduced the number of Brazilian nationals illegally entering the United States.

> Consistent with the information contained in paragraphs 26 and 27, Border Patrol apprehension statistics demonstrate that, year-over-year, there has been an approximate 16% reduction in family units apprehended in the RGV Border Patrol Sector. Moreover, from July 10, 2014 until the present, there has been an approximate 63% reduction in family units apprehended in the RGV Border Patrol Sector as compared to the period between December 1, 2013 to July 9, 2014.

(Declaration of Kevin W. Oaks ("Oaks Decl.") ¶¶ 25-29.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | | Date | July 24, 2015 |
|---|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | | Page | 11 of 25 |
|---|---|---|---|---|

Setting to one side the question of whether this policy argument is relevant to interpreting the Agreement, the Court is unconvinced of the persuasive value of the statistical evidence Defendants proffer in support of this argument. Without discounting the value of Oaks' personal observations, the Court finds that the statistical evidence he cites, as presented in his declaration, is insufficient to establish causation between Defendants' current policy of detaining female-headed families in family detention centers and the decline in family units apprehended at the border. Oaks bases his conclusion on evidence that past actions taken by Defendant in 1989 and 2005 resulted in reductions in apprehensions. But even assuming the prior reductions in apprehensions were in fact caused by the actions Defendant took in 1989 and 2005 (which itself is not clearly established), those actions, which consisted of expedited review and removal, are notably different from the policy that is now being contested, of detaining minors accompanied by their mothers in family detention centers for the duration of their asylum proceedings. Thus, the helpfulness of the outcomes of measures taken by Defendants in 1989 and 2005 in assessing the effectiveness of Defendants' current family detention policy is minimal at best.

Moreover, although apprehensions of family units in his sector have declined 63% from an approximately six-month period immediately before the challenged policy took effect, Oaks also mentions that apprehensions of family units had been declining 16% year-over-year for an unspecified period of time. This statistic further calls into question whether and to what extent the decline in apprehensions of family units is attributable to Defendants' recent family detention policy, given that such apprehensions were already on the decline prior to the implementation of the policy in 2014.[6]

In sum, even assuming the dubious proposition that the Court can consider a policy argument to alter the terms of the Parties' Agreement, the Court is not persuaded by the evidence presented in support of Defendants' policy argument.[7]

---

[6] Further, at the hearing, Defendants mentioned that summer is the "high season" in border crossings. Defendants failed to account for how much of the 63% decline in family unit apprehensions from the prior six-month period could have been attributable to normal seasonal fluctuation. At the very least, Defendants could have provided family unit apprehension statistics by season from prior years so that the statistical significance of the 63% decline could be more readily determined.

[7] In the May 13, 2015 Press Release, ICE announced that, following a Washington, D.C. federal district court's injunction against invoking general deterrence in custody determinations, it "has presently determined that it will discontinue invoking general deterrence as a factor in custody determinations in all cases involving families." [Doc. # 153-1.] This announcement does not clarify, however, whether ICE has decided that it will no longer invoke general deterrence as an argument for amending the Agreement. In the absence of such clarification, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | | Date | July 24, 2015 |
|---|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 12 of 25 |

### 2.    "Non-Secure, Licensed Facilities" Provision

Plaintiffs assert that Defendants have materially breached the Agreement because they are obligated, but have failed, to house the children they do *not* release in non-secure facilities that are licensed to care for dependent children.  (Mot. to Enforce at 2-3; *see* Ps' First Set, Exh. 23 (Declaration of Carlos Holguín ("Holguín Decl.")) ¶¶ 4-5; Ps' First Set, Exh. 16 ("Affidavit of Adriana Piñon") (confirming that the Karnes Family Residential Center, in Karnes City, Texas, and the T. Don Hutto Residential Center, in Taylor, Texas, are not licensed by the state's Department of Family and Protective Services).)

The Agreement provides the following:  "In any case in which the INS does not release a minor pursuant to Paragraph 14, . . . [e]xcept as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program . . . ."  (Agreement ¶ 19.)  A "licensed program" is defined as a "program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children . . . ." (*Id.* ¶ 6.)  The Agreement further requires that '[a]ll homes and facilities operated by licensed programs . . . shall be non-secure as required under state law . . . ."  (*Id.* ¶ 23.)  Thus, according to the language of the Agreement, Defendants must house children who are not released in a non-secure facility that is licensed by an appropriate state agency to care for dependent children.

Defendants argue that the licensing provision cannot be interpreted to apply to family residential centers because (1) these centers did not exist at the time the agreement was formed, and (2) there is no state licensing process available now—nor was there in 1997—for facilities that hold children in custody along with their parents or guardians.  Defendants reason backwards.  Rather than considering whether the policy Defendants decided to enact in 2014 was contemplated by the parties to the Agreement in 1997, the Court's task is to examine whether Defendants' actions in 2014 satisfy the obligations set forth in the 1997 Agreement.  Under the Agreement, Defendants are required to provide children who are not released temporary placement in a licensed program.  The fact that the family residential centers cannot be licensed

---

Court proceeds on the assumption that general deterrence continues to be Defendants' primary policy justification for their detention of accompanied minors.

Alternatively, if Defendants mean they are no longer invoking general deterrence as a reason to amend the Agreement as well, this change would only strengthen the Court's finding, discussed *infra*, that no change in factual circumstances warrants modification of the Agreement.  The primary, if not *only*, justification that Defendants presented for detaining female-headed families was the supposed deterrent effect that such a measure would have on prospective entrants.  If Defendants have indeed abandoned this rationale for family detention, then Defendants have no other basis—at least, none that they have presented to this Court—for detaining female-headed families.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 13 of 25 |
|---|---|---|---|

by an appropriate state agency simply means that, under the Agreement, class members cannot be housed in these facilities except as permitted by the Agreement.[8]

Furthermore, Defendants contend that even if they are not following the letter of the law, they are following the spirit. Defendants argue that ICE family residential facilities substantially comply with the requirements of the Agreement despite the absence of licensing. *See Jeff D. v. Otter*, 643 F.3d 278, 283-84 (9th Cir. 2011) ("Because consent decrees have many of the attributes of ordinary contracts [and] . . . should be construed basically as contracts, the doctrine of substantial compliance, or substantial performance, may be employed.") (internal citation and quotation marks omitted).

According to Defendants, ICE family residential centers comply with ICE Family Residential Standards (available at http://www.ice.gov/detention-standards/family-residential), which were developed with input from medical, psychological, and educational experts, as well as civil rights organizations. These centers, according to Defendants, afford detainees many amenities, including meals, medical and dental services, recreational opportunities, and education for school-age children.[9]

---

[8] Defendants concede that the logical outcome of applying the licensing provision to family residential centers would be to make it impossible for ICE to house families at the family residential centers. Defendants also contend that it would have to mean separating accompanied children from their parents or legal guardians. Although the Agreement does not mandate that Defendants must release parents or legal guardians in all circumstances, Defendants certainly can and must make individualized determinations about whether releasing the parent is appropriate in a given situation. Defendants can also use the family residential centers as temporary facilities consistent with Paragraph 12A of the Agreement.

[9] Chief of Juvenile and Family Residential Management Unit ("JFRMU") Stephen M. Antokowiak attests to the conditions described below at the Karnes Family Residential Center ("KFRC"), in Karnes, Texas, which opened on July 31, 2014 and has 532 beds, and the South Texas Family Residential Center ("STFRC"), in Dilley, Texas, which opened on December 18, 2014 and has 480 beds. (*See* Declaration of Stephen M. Antkowiak ("Antkowiak Decl.") ¶¶ 5, 18.)

Upon arrival at the KFRC, families are brought into the intake room, where there is seating and a refrigerator stocked with beverages and snacks. (*See* Antkowiak Decl. ¶ 6, Exh. 2 ("Photograph of KFRC Intake Room").) Families may then select their own non-institutional clothing from a clothing storage room or wear the clothing they brought with them. (*See* Antkowiak Decl. ¶ 7, Exh. 2 ("Photograph of KFRC Clothing Storage Room").) For every two KFRC housing suites, each of which contains six beds to accommodate one or more families, there is an indoor day room, which features a flat-screen television, access to telephones, a refrigerator with snacks and beverages, and playpens and toys. (*See* Antkowiak Decl. ¶ 8, Exh. 4 ("Photograph of a KFRC Sleeping Area of Housing Suite"); Antkowiak Decl. ¶ 9, Exh. 5 ("Photograph of a KFRC Day Room").) Meanwhile, a typical STFRC housing unit consists of two bedrooms of four beds each, which can accommodate one or more families. (*See* Antkowiak Decl. ¶ 17, Exh. 16, 17 ("Photographs of STFRC Bedroom Areas of a Housing Unit").) Each housing unit has a family room featuring a sitting area, a flat-screen television, a telephone, and a kitchenette

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | Page | 14 of 25 |

   With evidence in the form of declarations, Plaintiffs contradict aspects of Defendants'
rosy account of the conditions in the centers and contend that they are not acceptable.  (*See, e.g.*,
Ps' First Set, Exh. 12 ("J_H_M Decl.") ¶¶ 10, 11 ("There are no classes for my children here; we
are told they will start the 29th of this month. . . .  We are not permitted visits with our family
members."); Ps' First Set, Exh. 14 ("M_F_S Decl.") ¶ 9 ("My two sons have both been ill since
we arrived in Artesia.  They had fever and coughs for about a week, and were also vomiting and
diarrhea [sic]. . . .  The doctor told me they didn't have medicine for them and that they should
just drink water.  More recently medicine arrived, and now both are getting better.").

   Assuming the conditions are acceptable or even outstanding, however, Defendants cannot
be in substantial compliance with the Agreement because the facilities are secure and non-
licensed.  The purpose of the licensing provision is to provide class members the essential
protection of regular and comprehensive oversight by an independent child welfare agency.
Defendants agree with Plaintiffs that oversight was the animating concern behind the licensing
provision.  Defendants respond that the facilities are subject to inspections by the ICE Office of
Professional Responsibility's Office of Detention Oversight and an independent compliance
inspector.  (*See* Declaration of Tae D. Johnson ("Johnson Decl.") ¶ 19.)  Furthermore,
Defendants have filed a motion to modify the Agreement to allow for Plaintiffs to have oversight
regarding compliance.  Nonetheless, Defendants' responses do not satisfy the Agreement's
unambiguous mandate to place children it does not release in "a program, agency or organization
that is licensed by an appropriate State agency to provide residential, group, or foster care
services for dependent children."  (Agreement ¶ 6.)

---

with a refrigerator that is re-stocked with beverages and snacks twice a day.  (*See* Antkowiak Decl. ¶ 18, Exh. 18, 19
("Photographs of an STFRC Family Room of a Housing Unit").)

   The centers also contain open recreational areas for sports and play areas for younger children.  (*See*
Antkowiak Decl. ¶ 10, Exh. 6, 7 ("Photographs of the KFRC Soccer Field and Play Area"); Antkowiak Decl. ¶ 19,
Exh. 20 ("Photograph of STFRC Recreational Areas").)  In addition, the centers provide state-licensed teachers to
all school-age children, where the classroom ratio is one teacher to 20 students, and both recreational and law library
services to residents.  (*See* Antkowiak Decl. ¶ 11, Exh. 8 ("Photograph of a KFRC Classroom"); Antkowiak Decl. ¶
12, Exh. 9 ("Photograph of KFRC's Recreational Library with Play Areas"); Antkowiak Decl. ¶ 20, Exh. 21, 22, 23,
24 ("Photographs of STFRC Classrooms"); Antkowiak Decl. ¶ 22, Exh. 27, 28 ("Photographs of STFRC's
Recreational and Law Libraries").)  Residents have access to medical, dental, and social services.  (*See* Antkowiak
Decl. ¶ 13, Exh. 10, 11 ("Photographs of KFRC Dental Examining Rooms"); Antkowiak Decl. ¶ 24, Exh. 32, 33
("Photographs of STFRC Medical Examining/Treatment Rooms").)  Finally, the centers also serve three dietician-
approved meals a day.  (*See* Antkowiak Decl. ¶ 14, Exh. 12, 13 ("Photographs of KFRC's Salad Bar and Snack
Refrigerator"); Antkowiak Decl. ¶ 23, Exh. 29, 30, 31 ("Photographs of STFRC's Dining Room and Food
Service").)

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 15 of 25 |
|---|---|---|---|

Moreover, even if the Court disregards the conditions in, and the unlicensed status of, the facilities, the facilities are secure, which violates the Agreement's requirement that "[a]ll homes and facilities operated by licensed programs . . . shall be non-secure as required under state law . . . ." (Agreement ¶ 23.) Plaintiffs proffer evidence showing that ICE's detention facilities are secure.

The Karnes City facility is a large block building, which appeared to have only one entrance. To enter, my colleagues and I were required to deposit our cell phones in a metal locker, exchange our driver's licenses for visitor's badges, pass our personal items through an X-ray machine, and walk through a metal detector. We were then directed to a sally port, which comprised two heavy metal doors with a small room between. We passed through one door, it closed behind us; we were then directed to display our visitor's badges to a guard behind heavy glass; the second door was opened, we walked through, and we then reached the interior of the facility.

The Karnes facility is constructed of concrete block. A staff member stated the facility had been designed to house adult male prisoners. . . . In the central open area I saw neither a direct view nor access to the outside: it was effectively surrounded by the high block walls of the facility itself, denying those inside any means of ingress or egress except via the secure entrance I earlier described. Facility staff stated that children detained at Karnes have never been permitted outside the facility to go to the park, library, museum, or other public places. Children attend school exclusively within the walls of the facility itself. Detainees, including children, are required to participate in a "census" or head-count three times daily.

(Holguín Decl. ¶¶ 4-5.)

Defendants do not dispute that the facilities are secure. Nor have Defendants argued that this provision is not a material term in the Agreement. Plaintiffs present evidence that secure confinement can inflict long-lasting psychological, developmental, and physical harm on children regardless of other conditions. (*See* Ps' First Set, Exh. 24 (Declaration of Luis H. Zayas ("Zayas Decl.")) ¶¶ 1-6.) Plaintiffs also proffer evidence that the children at KFRC specifically "are suffering emotional and other harms as a result of being detained." (*Id.* ¶ 10.)

Because the centers are secure, unlicensed facilities, and the provision is a material term in the Agreement, Defendants cannot be deemed in substantial compliance with the Agreement.

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 16 of 25 |
|---|---|---|---|

Thus, Defendants have materially breached the Agreement's requirement that children who are
not released be housed in non-secure, licensed facilities.

> **3.**      **"Custody" Provision**

Upon apprehension, class members are taken to a Border Patrol station, where they spend
one to several nights in holding cells before they are turned over to the Office of Refugee
Resettlement, if unaccompanied, or to ICE for longer-term housing, if accompanied.  *See* 6
U.S.C. § 279.  Plaintiffs argue that Defendants have materially breached the Agreement by
holding recently apprehended children in facilities that do not comply with the following
provision:

> Following arrest, the INS shall hold minors in facilities that are safe and sanitary
> and that are consistent with the INS's concern for the particular vulnerability of
> minors.  Facilities will provide access to toilets and sinks, drinking water and food
> as appropriate, medical assistance if the minor is in need of emergency services,
> adequate temperature control and ventilation; . . . .

(Agreement ¶ 12.)

Plaintiffs proffer evidence, in the form of numerous declarations from recent detainees,
testifying to conditions that do not meet the "safe and sanitary" standard described in Paragraph
12 of the Agreement.  These conditions include extreme cold.  Numerous declarants referred to
CBP facilities as *hieleras* or "iceboxes" and described being given coverings of aluminum foil
that were inadequate to keep them warm.  (*See, e.g.*, Ps' First Set, Exh. 18 ("D_V_A Decl.") ¶ 4
("We were given nothing to keep warm except a cover of aluminum foil"); Ps' First Set, Exh. 44
("A_F_D Decl.") ¶ 5 ("The very big room was very cold.  It was like a 'hielera' (ice box). . . .
There were no blankets or mattresses, and they only gave us one aluminum blanket each to keep
ourselves warm.  It was not enough, and my daughter and I were both very cold."); Ps' First Set,
Exh. 45 ("H_M_P Decl.") ¶ 8 ("When I was in the 'Perrera,' I was with 8 moms, with their small
babies.  We were given a small mattress and an aluminum blanket. . . .  It was also super cold in
that place . . . .").)

Recent detainees also testified to overcrowding.  Children and their mothers were held for
one to three days in rooms with 100 or more unrelated adults and children, which forced children
to sleep standing up or not at all.  (*See, e.g.*, D_V_A Decl. ¶ 4 ("The Border Patrol put us in a
cell with 100 other women and children.  There were so many of us that only perhaps half of us
could lie down."); A_F_D Decl. ¶ 5 ("There were about one hundred and fifty people in the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 17 of 25 |
|---|---|---|---|

room. It was very crowded, and there was no space to even lie down on the floor. . . .  My daughter and I had to sleep standing up.").)

Inadequate nutrition and hygiene were also reported.  (*See, e.g.*, D_V_A Decl. ¶ 5 ("The cell had only two toilets for all of us to use. . . .  There was no waste basket in the stalls, so people had to throw used Kotex and used toilet paper on the floors."); Ps' First Set, Exh. 49 ("L_B_S Decl.") ¶ 6 ("In the jail in McAllen . . . [t]he moms slept there in the bathroom, with their babies in their arms. . . .  The immigration officials, when the people asked for something to drink or to eat they answered that it wasn't their country, it wasn't their house.  So they didn't bring them anything."); Ps' First Set, Exh. 39 ("S_B_D Decl.") ¶ 5 ("We were fed twice, and both times it was just bread with ham and a juice box.").)

In response, Defendants contend that given the volume of individuals passing through a Border Patrol station each day as well as the short duration of their stay at a Border Patrol station, it would be impossible to provide the same level of care at a Border Patrol station as one would expect at a longer-term facility.  Nevertheless, Defendants argue that they have met the minimal standards set forth in the Agreement.  Defendants rely solely on their Hold Rooms and Short Term Custody Policy and Oaks' declaration to support the proposition that they have met the appropriate standards.

According to Oaks, after an individual has been brought to a Border Patrol station, the individual undergoes a preliminary health screening.  (*See* Oaks Decl. ¶ 10.)  If the individual displays any symptoms of illness or complains of illness, the individual is either treated by a contract medical provider at the facility or taken to the appropriate medical facility, such as the local emergency department.  (*Id.* ¶¶ 10, 11.)  After the health screening, the detainees are separated by age and gender, although "every effort is made to keep young children with their parents." (*Id.* ¶ 12.)  Border Patrol policy mandates that each facility be kept "safe, secure, and clean with sufficient space and the appropriate number of toilets for the occupants it is designed to accommodate." (*Id.* ¶ 13.)  A hold room is typically constructed of "impervious materials that can be easily cleaned and are hygienic," and "supervisors are required to ensure that each cell is regularly cleaned and sanitized." (*Id.* ¶ 15.)  There are no trash cans in the hold rooms for safety reasons, as they may be used as a weapon.  (*Id.* ¶ 16.)  Similarly, the lights are kept on at all times for security reasons and operational necessity.  (*Id.* ¶ 19.)  According to Defendants, the temperature is maintained at a "comfortable temperature," although "those who are not accustomed to air conditioning at times find it cooler than they are accustomed to." (*Id.* ¶ 20.)  Defendants also explain that the use of mylar blankets is necessary in order to provide cost-effective, sanitary bedding that does not require routine laundering or transmit communicable diseases such as lice or scabies.  (*Id.* ¶ 21.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 18 of 25 |
|---|---|---|---|

The testimony of one Border Patrol official regarding CBP's policies is insufficient to outweigh the evidence presented by Plaintiffs of the widespread and deplorable conditions in the holding cells of the Border Patrol stations. It is true that the Agreement holds Defendants to a lower standard—"safe and sanitary"—with respect to the temporary holding cells. But Defendants have wholly failed to meet even that minimal standard. With respect to the overcrowded and unhygienic conditions of the holding cells, all that Defendants have done is point to their own policies requiring sufficient space, an appropriate number of toilets, and regular cleaning and sanitizing. The mere existence of those policies tells the Court nothing about whether those policies are actually implemented, and the current record shows quite clearly that they were not. Furthermore, with respect to the temperature of the cells, the provision of mylar coverings, the absence of trash cans, and the policy of keeping the lights on at all times, Defendants have only confirmed the veracity of Plaintiffs' testimony in the course of attempting to justify these conditions. Finally, Defendants have said nothing to contradict Plaintiffs' accounts of inadequate nutrition, nor to offer impossibility or similar doctrines as a defense to the apparent contractual violation.

In light of the voluminous evidence that Plaintiffs have presented of the egregious conditions of the holding cells, the Court finds that Defendants have materially breached the Agreement's term that Defendants provide "safe and sanitary" holding cells for class members while they are in temporary custody.

## III.
## MOTION TO AMEND

Because the Court has found Defendants in material breach of the Agreement in the respects described *supra*, Defendants move to modify the Agreement pursuant to Fed. R. Civ. P. 60(b)(5) and (6).

Defendants seek to modify the Agreement in four ways. First, Defendants seek to eliminate or amend portions of the Agreement that have been superseded by, or are inconsistent with, the HSA and the TVPRA. Defendants ask that the Agreement reflect the changed responsibilities of DHS and HHS, and the abolishment of the INS, following the HSA and the TVPRA. In particular, Defendants seek to amend Section VI of the Agreement relating to the "General Policy Favoring Release," which provides:

Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or immigration court, or to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 19 of 25 |
|---|---|---|---|

ensure the minor's safety or that of others, the INS shall release a minor from its
custody without unnecessary delay, in the following order of preference, to:  A. a
parent; B. a legal guardian; C. an adult relative (brother, sister, aunt, uncle, or
grandparent) . . . .

(Agreement ¶ 14.)  Defendants argue that "significant portions of this paragraph have been
substantially superseded by the TVPRA," and to the extent the Agreement is inconsistent with
the statute it should be modified.

Second, Defendants would like clarification that the preference for release of alien
minors to a parent, legal guardian, or adult relative, does not apply to minors who arrive in the
United States accompanied by a parent or legal guardian.  Defendants argue that, if the provision
is enforced as written, ICE would be required to separate families if it wishes to detain an adult
alien accompanied by a child.  This outcome would negatively impact ICE's ability to exercise
its discretion to detain individuals as necessary and as it is authorized to do under the INA.  The
enforcement of the provision would also hamper Defendants' ability to operate the family
residential facilities, which in turn would deprive Defendants of a tool in sending a message to
families that they cannot illegally cross the border.

Third, Defendants would like to make clear that the state licensing requirement for
housing minors does not apply to family residential facilities.  Defendants reason that, because
state licensing requirements cannot be applied to the facilities, the licensing requirement should
be eliminated.  Defendants have instead proposed that ICE be bound by the requirements in
Attachment 1 with respect to the conditions at these facilities, as well as independent monitoring
and reporting requirements to ensure compliance.

Fourth, Defendants seek to amend ongoing reporting requirements to eliminate the
reporting requirements that applied to the implementation of the original Agreement in 1997 and
to add reporting requirements related to the inspection of family residential facilities.

**A.      Legal Standard**

A court may, on "motion and just terms," "relieve a party or its legal representative from
a final judgment, order, or proceeding" if "applying it prospectively is no longer equitable."  Fed.
R. Civ. P. 60(b)(5); *see Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383, 112 S. Ct. 748,
116 L. Ed. 2d 867 (1992) ("Rule 60(b)(5) provides that a party may obtain relief from a court
order when it is no longer equitable that the judgment should have prospective application, not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | Page | 20 of 25 |
|---|---|---|---|

when it is no longer convenient to live with the terms of a consent decree.") (internal quotation marks omitted).

"[The] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* "A party seeking modification of a consent decree may meet its initial burden by showing either a significant change either in factual conditions or in law." *Id.* The change in the law must be so significant that complying with both statute and a prior agreement would be "impermissible." *Miller v. French*, 530 U.S. 327, 347-48, 120 S. Ct. 2246, 147 L. Ed. 2d 326 (2000) (internal quotation marks omitted). Modification of a consent decree may also be appropriate when changed factual conditions make compliance with the decree "substantially more onerous," "unworkable because of unforeseen obstacles," or "when enforcement . . . without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 383.

A court may also "relieve a party or its legal representative from a final judgment, order, or proceeding" for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). "Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). "The rule is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *Id.* (citing, as an example, an instance where the rule was used to set aside a default judgment in a denaturalization proceeding because the petitioner had been ill, incarcerated, and without counsel for the four years following the judgment).

**B.**   **Discussion**

Defendants assert that two changes—one in the law and the other in factual conditions— justify modification of the Agreement.

**1.**   **There Has Been No Change in Law Warranting Modification**

First, with respect to changes in the law, Defendants contend that the Agreement applied only to the U.S. Department of Justice ("DOJ") and the legacy U.S. Immigration and Nationality Service ("INS"). The Homeland Security Act of 2002 ("HSA") abolished the latter agency and transferred several of its functions related to the detention, transportation, and removal of minors to the newly formed DHS and its components, including CBP and ICE.[10] Plaintiffs argue that

---

[10] Defendants mention that HSA transferred INS's functions with respect to unaccompanied minors to Health and Human Services ("HHS"), Office of Refugee Resettlement. *See* 6 U.S.C. §§ 279, 552. The William

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 21 of 25 |
|---|---|---|---|

there are no actual conflicts between the Agreement and subsequent legislation. In fact, under HSA § 1512, *codified at* 6 U.S.C. § 552, Congress, in the following provisions, directed that ICE should remain bound by agreements existing before the enactment of the HSA:

> (a)(1) Completed administrative actions of an agency *shall not be affected by the enactment of this Act* or the transfer of such agency to the Department, but shall continue in effect according to their terms . . . .
> (2) For purposes of paragraph (1), the term "completed administrative action" includes . . . *agreements*, [and] *contracts* . . . .
> (c) PENDING CIVIL ACTIONS.—Subject to the authority of the Secretary under this Act, pending civil actions shall continue notwithstanding the enactment of this Act or the transfer of an agency to the Department, and in such civil actions, . . . *judgments [shall be] enforced in the same manner and with the same effect as if such enactment or transfer had not occurred.*

*Id.* (emphasis added).

Furthermore, Defendants have proffered no evidence that they have experienced any difficulty implementing the Agreement with respect to unaccompanied children and children apprehended with their fathers in the 13 years since the HSA was passed. In light of the HSA's savings clause and Defendants' practice with respect to minors for the last 13 years since the enactment of the HSA, Defendants' argument that the change in the law created by the HSA compels modification of the Agreement falls flat.

Defendants also allege that a second change in the law, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, § 235 (codified in principal part at 8 U.S.C. § 1232), conflicts with the Agreement and is reason to modify the Agreement. The TVPRA requires CBP to determine whether the child is a national or habitual resident of a country contiguous to the United States, and if so, to screen the child to see if she is a victim of trafficking, fears return because of a credible fear of persecution, or is otherwise unable to consent to return. 8 U.S.C. § 1232(a)(2)(A). If none of those factors are present, the child is offered an opportunity to withdraw his application for admission to the United States and return to his country. 8 U.S.C. § 1232(a)(2)(B). When the necessary

---

Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, § 235 (codified in principal part at 8 U.S.C. § 1232), also directed DHS to develop policies and procedures to ensure that unaccompanied minors are safely repatriated to their country of nationality or of last habitual residence. Because this action concerns Defendants' policy regarding minors who are accompanied by their mothers, these changes with respect to unaccompanied minors do not appear relevant to the Court's analysis.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 22 of 25 |
|---|---|---|---|

screening determination cannot be made within 48 hours of the child's apprehension, or the child does not or cannot voluntarily withdraw her application for admission, or the child is from a non-contiguous country, the child is transferred to HHS within 72 hours of determining that the child is an unaccompanied minor and may be placed in removal proceedings before an immigration judge. 8 U.S.C. §§ 1232(a)(4), (a)(5)(D), (b)(3). HHS must then place the child "in the least restrictive setting that is in the best interest of the child," taking into consideration "danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2). Accompanied minors do not fall under the provisions of the TVPRA. *See* 6 U.S.C. § 279(g)(2); 8 U.S.C. § 1232.

Defendants argue that because CBP, under the TVPRA, may not release an unaccompanied minor from its custody other than by returning her to her home country if she is from a contiguous country, 8 U.S.C. § 1232(a)(2)(B), or by transferring her to HHS custody within 72 hours of determining that she is an unaccompanied minor, 8 U.S.C. § 1232(b)(3), Defendants cannot comply with (1) Paragraph 14 of the Agreement, which requires release of minors following a certain order of preference; (2) Paragraph 12A of the Agreement, which provides the government up to 3 days to transfer an unaccompanied minor to a licensed program in the same district, and up to 5 days to transfer an unaccompanied minor to a licensed facility outside the area; and (3) Paragraph 21 of the Agreement, which provides that a minor may be transferred to a suitable state or county juvenile detention facility (or secure INS facility) under certain conditions.

Defendants' argument regarding the TVPRA misses the mark since the Agreement's provision controls release *pending removal proceedings* and does not interfere with the grounds for removal itself. Further, the Agreement does not interfere with the TVPRA's requirement that CBP transfer a minor to HHS custody within 72 hours of determining that she is an unaccompanied minor. Once CBP makes the determination that a minor is unaccompanied and transfers her to HHS custody, it is then HHS's responsibility to comply with the provisions cited *supra*. Defendants have not demonstrated that HHS has had any difficulty complying with the Agreement's provisions.

Moreover, Plaintiffs have pointed to provisions in the TVPRA that are consistent with the Agreement's preference for release provision, such as the TVPRA's requirement that CBP find "[s]afe and secure placements" for children "in the least restrictive setting that is in the best interests of the child"—typically, "a suitable family member." 8 U.S.C. § 1235(c)(2). The same argument can be made that, similar to the Agreement's non-secure facilities provision, the TVPRA also mandates that "[a] child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | | Date | July 24, 2015 |
|---|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 23 of 25 |

Finally, the TVPRA is simply inapplicable to accompanied children.  The fact that the
TVPRA requires HHS to decide whether unaccompanied children should be released or housed
in secure facilities has little relevance to whether ICE is unable to do the same with accompanied
children.

Accordingly, Defendants have not met their burden of showing that a significant change
in the law, such that complying with the Agreement would be impermissible, has occurred, thus
requiring modification of the Agreement.  *See Miller*, 530 U.S. at 347-48.

### 2.      There is No Change in Factual Circumstances Warranting Modification

With respect to changed factual conditions, Defendants note that, unlike in 1993, when an
influx of approximately 8,500 children was considered a "serious" problem, *Reno v. Flores*, 507
U.S. 292, 295 (1993), the number of unaccompanied and accompanied children has increased.
In fiscal year 2014, the number of accompanied children apprehended was 38,845 and the
number of unaccompanied minors apprehended reached 68,541.   (Mot. to Amend at 5.)
Defendants contend that the surge is due to the mistaken belief that the release of detained
individuals with a Notice to Appear is equivalent to a *permiso*, allowing them to stay in the
United States.  Defendants also appear to assert not only that the Agreement caused the surge but
also that their female-headed family detention policy has deterred others who would have come.
Defendants are effectively proposing that the Court unilaterally modify the Agreement because
enforcement of the Agreement without modification would be detrimental to the public interest.
*See Rufo*, 502 U.S. at 383.

The Court agrees that what Defendants describe is a serious problem, even though it
appears the problem has abated somewhat.  With respect to whether the Agreement's provisions
caused the surge, Defendants do not satisfactorily explain why the Agreement, after being in
effect since 1997, should only now encourage others to enter the United States without
authorization.  Nor do Defendants proffer *any* competent evidence that ICE's detention of a
subset of class members in secure, unlicensed facilities has deterred or will deter others from
attempting to enter the United States.  As discussed *supra*, the Court has considered in detail the
evidence Defendants presented of the deterrent effect of the detention policy and finds the
evidence distinctly lacking in scientific rigor.  It is astonishing that Defendants have enacted a
policy requiring such expensive infrastructure without more evidence to show that it would be
compliant with an Agreement that has been in effect for nearly 20 years or effective at achieving

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | Page | 24 of 25 |
|---|---|---|---|

what Defendants hoped it would accomplish.[11]  It is even more shocking that after nearly *two decades* Defendants have not implemented appropriate regulations to deal with this complicated area of immigration law.  In light of the evidence, or lack thereof, the Court finds that Defendants have failed to meet their burden of showing that a change in factual circumstances requires modification of the Agreement.

**IV.**
**CONCLUSION**

Based on the foregoing, the Court finds that Defendants are in breach of the Agreement and **GRANTS** Plaintiffs' motion to enforce the Agreement.  Defendants' motion to amend the Agreement is **DENIED**.  Defendants are hereby ordered to show cause why the following remedies should not be implemented within 90 days.

1.  As required by Paragraph 18 of the Agreement, Defendants, upon taking an accompanied class member into custody, shall make and record prompt and continuous efforts toward family reunification and the release of the minor pursuant to Paragraph 14 of the Agreement.

2.  Unless otherwise required by the Agreement, Defendants shall comply with Paragraph 14A of the Agreement by releasing class members without unnecessary delay in first order of preference to a parent, including a parent who either was apprehended with a class member or presented herself or himself with a class member.  Class members not released pursuant to Paragraph 14 of the Agreement will be processed in accordance with the Agreement, including, as applicable, Paragraphs 6, 9, 21, 22, and 23.

3.  Accompanied class members shall not be detained by Defendants in unlicensed or secure facilities that do not meet the requirements of Paragraph 6 of the Settlement, or

---

[11] Even were there such evidence that Defendants' modifications would act as a successful deterrent, Plaintiffs contend that deterrence is not a lawful criterion for denying release.  *See R.I.L.R. v. Johson*, No. 15-0011, Opinion ECF No. 33, at 34-35 (D.D.C. Feb. 20, 2015) ("The justifications for detention previously contemplated by the Court relate wholly to characteristics inherent in the alien himself or in the category of aliens *being* detained— that is, the Court countenanced detention . . . on the basis of *those aliens'* risk of flight or danger to the community . . . .  In discussing civil commitment more broadly, the Court has declared . . . 'general deterrence' justifications impermissible.") (internal citation omitted) (emphasis in original).  Because Defendants have failed to present any evidence that the policy they have implemented either causes or addresses the recent change in factual circumstances, the Court need not rule on the issue of whether deterrence is a lawful criterion for denying release.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 25 of 25 |
|---|---|---|---|

in appropriate cases, as set forth in the Agreement, in facilities that do not meet the requirements of Paragraphs 12A, 21, and 23. Defendants shall not selectively apply the "influx" provision of Paragraph 12C of the Agreement to house class members apprehended with a parent in facilities that do not comply with the Agreement.

4.  To comply with Paragraph 14A of the Agreement and as contemplated in Paragraph 15, a class member's accompanying parent shall be released with the class member in a non-discriminatory manner in accordance with applicable laws and regulations unless after an individualized custody determination the parent is determined to pose a significant flight risk, or a threat to others or the national security, and the flight risk or threat cannot be mitigated by an appropriate bond or conditions of release.

5.  In consultation with Plaintiffs, Defendants shall propose standards, and procedures for monitoring compliance with such standards, for detaining class members in facilities that are safe and sanitary, consistent with concern for the particular vulnerability of minors, and consistent with Paragraph 12 of the Agreement, including access to adequate drinking water and food, toilets and sinks, medical assistance if the minor is in need of emergency services, temperature control, ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. Defendants shall file such proposed standards within 90 days of the date of this Order. Plaintiffs shall file objections thereto, if any, 14 days thereafter.

6.  Defendants shall monitor compliance with the Agreement and this Order and shall provide Class Counsel on a monthly basis statistical information collected pursuant to Paragraph 28A of the Agreement.

Defendants shall file a response to the OSC by August 3, 2015. Plaintiffs shall file a response thereafter by August 10, 2015, after which the matter will stand submitted.

**IT IS SO ORDERED.**