David J. Kaloyanides SBN 160368
E: djpkaplc@me.com
**DAVID J.P. KALOYANIDES**
A PROFESSIONAL LAW CORPORATION
15338 Central Avenue
Chino, CA 91710
T: (213) 623-8120/F: (213) 402-6292

Attorney for Third Party
Bryan Johnson

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY L. FLORES, *et al.*, | Case No.: 2:85-CV-04544 DMG (AGRx) |
| Plaintiffs, | THIRD PARTY BRYAN JOHNSON'S RESPONSE TO ORDER TO SHOW CAUSE |
| vs. | |
| JEH JOHNSON, *et al.*, | Date: August 24, 2015<br>Time: 10:00 a.m. |
| Defendants. | Courtroom: Spring Street 7<br>Hon. Dolly M. Gee |

Third party Bryan Johnson, having been advised of his rights by counsel of record in this case, David J. Kaloyanides, hereby admits his violation of the Court's May 12, 2015 order.

Mr. Johnson submits the accompanying memorandum in response to the Court's Order to Show Cause to address the appropriate action for the Court in light of Mr. Johnson's admission.

---
1
BRYAN JOHNSON'S RESPONSE TO OSC RE CONTEMPT

I, Bryan Johnson, hereby admit violating the Court's May 12, 2015 order.

Dated: August 5, 2015

_____
Bryan S. Johnson

Joined by counsel:

Dated: August 5, 2015

_____
David J. Kaloyanides
Attorney for Third Party
Bryan Johnson

BRYAN JOHNSON'S RESPONSE TO OSC RE CONTEMPT

# MEMORANDUM OF POINTS AND AUTHORITIES

I. INTRODUCTION

In the legal profession where advocates take up the cause of the oppressed and devote themselves to representing those who have no voice, the calm, deliberative reasoning of lawyers can be overwhelmed by the emotionally charged circumstances of the clients they represent. The legal profession is best served not only by the careful, reasoned analysis of nuances in the law, but also by the advocate whose humanity helps drive society to do better. However, it is that very humanity that makes those advocates vulnerable to error. Bryan Johnson is such an advocate. And it is because of his fear for his clients' safety and compassion for their plight that he is now before this Court.

Simply put, Mr. Johnson breached the trust of the Court by violating the confidentiality provision of the protective order prohibiting disclosure of the on-going negotiations in this case. Mr. Johnson admits his error and takes full responsibility for his conduct. But his violation was not out of disrespect for the Court. His wrongful conduct arose from the frustration toward the government and fear of continuing harm to those without a voice. It was an error in judgment and a reaction by one advocate who has devoted himself to be the voice of the most vulnerable—immigrant children.

Mr. Johnson comes before the Court fully realizing the breach of trust his conduct has caused. Mr. Johnson fully acknowledges the wrongfulness of his conduct. The damage he has brought to his own reputation before the Court, the harm he has brought to his own career, and the significant possibility of harm to the cause he holds most dear—the plight of immigrant children in the United States—will not change

regardless of any decision of this Court. While the Court may find that Mr. Johnson violated the Court's express order, there is no need for a finding of contempt or referral of this matter to the New York State Bar. Mr. Johnson's actions were not intended as any disrespect toward the Court. A sanction of a State Bar referral would for this individual now before the Court likely result in a punishment with lasting effect to Mr. Johnson and the clients he serves.

Based on circumstances surrounding Mr. Johnson's violation as well as his character and devotion to his clients' cause, a referral to the New York State Bar is not warranted here. Accordingly, Mr. Johnson respectfully requests that the Court discharge the Order to Show Cause without futher action.

II. STATEMENT OF FACTS

Mr. Johnson has an immigration practice in which he represents numerous minor children—both accompanied and unaccompanied. He also represents numerous families who are or have been subject to detention pending removal proceedings. In the short time in which Mr. Johnson and his partner have been in practice, they have developed an expertise in helping immigrant families, and particularly children, seek relief from removal.[1]

Mr. Johnson has become well-known in the legal community for his work with immigrant families. He often works pro bono and is extensively involved in charitable work for the immigrant population.[2] His practice focuses primarily on immigrant

---

[1] *See* Johnson Declaration, attached hereto, at ¶¶ 2-5.
[2] See Letter of Professor Lauris Wren, attached as Exhibit 1 to Letters in Support of Bryan Johnson (herein after "Letters"); see also Letter of Matthew Kolken, attached as Exhibit 7 to Letters.

families from Central America, and he is known as an important advocate for these immigrant families.[3]

Mr. Johnson has represented numerous children and their families who have been subjected to detention pending removal. In most of these cases, the detention was not in compliance with the *Flores v. Meese* settlement agreement. Mr. Johnson has worked first-hand with clients who have been subjected to significant mistreatment and neglect during their detention, often to the point of putting the lives of children at risk of great harm.

Because of his experience and expertise in this area, Mr. Johnson was requested to participate as a consultant in the current litigation to enforce the *Flores* settelement agreement and force the government to comply with its terms. Mr. Johnson joined the plaintiffs' team in May 2015. Mr. Johnson agreed to act as a consultant without compensation because he wanted to help ensure that the government complied with the terms of the *Flores* settlement agreement and stop the unlawful detention of immigrant children and their families.

As part of the terms of his consulting agreement, Mr. Johnson agreed to be bound by the Court's May 12, 2015, protective order that precluded the disclosure of certain information relating to the on-going negotiations between plaintiffs' counsel and the government. This protective order was entered on the stipulation of the parties and at the particular insistance of the government.

---

[3] See id.; Letter of Margaret Stock, attached as Exhibit 2 to Letters; Letter of Matthew Archambeault, attached as Exhibit 3 to Letters; Letter of Matthew Guadagno, attached as Exhibit 4 to Letters; Letter of David Bennion, attached as Exhibit 5 to Letters; and Letter of Christina Gaudio, attached as Exhibit 6 to Letters; Letter of Maurice Goldman, attached as Exhibit 8 to Letters.

Mr. Johnson did not consider that his position as a consultant in this litigation might provide him with access to information that would be relevant and material to his continuing representation of clients who could be affected by the outcome of this litigation. While it was certainly clear that Mr. Johnson's clients would benefit from enforcement of the *Flores* settlement agreement, it did not occur to Mr. Johnson that he would receive information that was directly related to his representation of his own clients. More importantly, Mr. Johnson did not consider that this information would be in the nature of confidential information that could not be disclosed. Simply put, Mr. Johnson never considered that by participating in this litigation, even as a consultant, he would find himself in a conflict between his obligations under a protective order and his obligations to his own clients.

As set forth fully in his own declaration, the delays in the negotiation process, as well as his own concerns for the plight of his clients, led to the rash decision of disclosing the Court's tentative ruling and a proposed settlement. After working with clients first hand who had suffered in pre-removal detention, Mr. Johnson found any further delay intolerable for the children and the families he represents.

It was under these circumstances that Mr. Johnson disclosed the confidential information and violated the Court's order.

III.  DISCUSSION

A. A STATE BAR REFERRAL WOULD HAVE THE SAME RESULT IN THIS CASE AS A PUNITIVE SANCTION FOR CONTEMPT.

The Court's Order to Show Cause is to determine whether Mr. Johnson should be referred to the State Bar of New York for his conduct in violating the Court's May

12, 2015 order. Although such referrals are often alternatives to contempt proceedings, in this case, such a referral would be punitive in nature as it is a sanction relating to prior conduct.

It is well-recognized that the district courts have the authority to issue such orders necessary for the effective and efficient administration of justice in the matters before them. This includes the power to bring contempt proceedings for disobedience to any of their lawful orders. Criminal contempt, for which the goal is to punish past conduct, requires the protections of due process along with proof beyond a reasonable doubt of willful misconduct in the court's presence that amounts to obstruction in the administration of justice. See 18 U.S.C. §401; *In re Gustafson,* 650 F.2d 1017, 1020 (9th Cir.1981). In comparison, civil contempt seeks to enforce compliance and must include an opportunity to purge the contempt.

A distinction is made where contempt proceedings are intended to punish conduct that threatens to disrupt the Court's on-going proceedings.

> The face-to-face refusal to comply with the court's order itself constituted an affront to the court, and when that kind of refusal disrupts and frustrates an ongoing proceeding, as it did here, summary contempt must be available to vindicate the authority of the court as well as to provide the recalcitrant witness with some incentive to testify. *In re Chiles*, 22 Wall. 157, 168, 22 L.Ed. 819 (1875). Whether such incentive is necessary in a particular case is a matter the Rule wisely leaves to the discretion of the trial court.

*United States v. Wilson*, 421 U.S. 309, 316-17, 95 S. Ct. 1802, 44 L. Ed. 2d 186 (1975).

The Court must consider whether the misconduct at issue disrupted and frustrated an ongoing proceeding in order for the court to find contempt. *Id*. And the court action in response to the contempt behavior must be "the least possible power adequate to the end proposed." *Id*. at 890. Where the conduct occurs outside the Court's presence but affects the the proceedings before it (for example disobeying discovery orders), such actions "touch upon the core justification for the contempt power." *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994). However, in such circumstances the Court has broad authority to impose sanctions other than contempt.

> Courts traditionally have broad authority through means other than contempt—such as by striking pleadings, assessing costs, excluding evidence, and entering default judgment—to penalize a party's failure to comply with the rules of conduct governing the litigation process. *See*, *e.g.,* Fed.Rules Civ.Proc. 11, 37. Such judicial sanctions never have been considered criminal, and the imposition of civil, coercive fines to police the litigation process appears consistent with this authority. Similarly, indirect contempts involving discrete, readily ascertainable acts, such as turning over a key or payment of a judgment, properly may be adjudicated through civil proceedings since the need for extensive, impartial factfinding is less pressing.

*Id*.

While the nature of a referral to the state bar is not directly punitive in that the referral itself does not impose an ultimate punishment, the referral itself places counsel in a position of being prosecuted in a disciplinary proceeding relating to prior conduct.

It is a sanction more akin to punishment than other sanctions available to the Court to enforce its orders.

In this case, as demonstrated by the circumstances surrounding Mr. Johnson's violation, a state bar referral is not the minimal action within the Court's power that is sufficient, but not greater than necessary, to address the goal of ensuring compliance with the Court's orders and which would promote respect for the Court's authority.

### B. A REFERRAL TO THE STATE BAR OF NEW YORK IS UNNECESSARY TO REDRESS THE VIOLATION HERE.

Mr. Johnson fully admits that he violated the Court's May 12th order and that he acted wrongfully by disclosing to the media the Court's tentative ruling and the plaintiffs' settlement proposal. The violation was not directly involved in a proceeding. It was more directly related to the parties' settlement negotiations. However, it involved a specific order of the Court entered upon the stipulation of the parties. While Mr. Johnson had no intention of showing any disrepect toward the Court nor in disrupting any of the proceedings in this litigation, his conduct amounted to a breach of the Court's trust.

And Mr. Johnson fully admits this and accepts responsibilty for his actions.

The question before the Court is what is the minimal necessary action by the Court to achieve the desired result. Here, the clear end for the Court is to ensure that no further disruptions to the litigation occur, to ensure that the Court is given proper respect, and that it's orders are followed.

The practical opportunities to correct this error are limited. There is no way for Mr. Johnson to undo the disclosure to the media. However, the Court is assured that no further breach of the Court's trust nor any disobedience to the Court's orders will

occur in the future. Mr. Johnson is no longer affiliated with the case. He is no longer a consultant to plaintiffs' counsel, nor does he have access to any confidential information regarding the matter.

In evaluating the appropriate action for Mr. Johnson's conduct, the Court should weigh heavily the circumstances surrounding Mr. Johnson's conduct but also his character and dedication to the legal cause of immigrant children and their families. As more fully set forth in Mr. Johnson's declaration, as well as the evidence from the letters of support for Mr. Johnson, he is dedicated to the plight of immigrant families from Central America, and his commitment to their cause as well as his expertise are highly valued in the immigration law community.

While Mr. Johnson has gained much notariety and respect among immigration law practitioners, he is still a young lawyer. The Court should also consider that in this particular case, Mr. Johnson's actions here were not in his capacity as a lawyer representing specific clients. Of course, as a licensed attorney, he should still have behaved in a manner becoming of an officer of the Court—he should have known better. He should have foreseen the conflict between his position as a consultant in this litigation and his obligation to his own clients. And it was this commitment to his clients and his motivation to end the suffering they have and continue to endure that led to his rash decision and wrongful conduct—not any disrespect for the Court or intent to impede the fair adminsitration of justice.

There is no need for any additional sanction nor a referral to the New York State Bar here. The publicity of Mr. Johnson's actions has already had a detrimental effect on his reputation in the immigration law community—particularly among the organizations in which Mr. Johnson has been involved. It will take some time before

he can regain the trust of other professionals who work in the immigration field. Additional discipline by the licensing authority would only add restrictions on his ability to practice entirely. As Mr. Matthew Guadagno, Adjunct Professor at Brooklyn Law School, writes in his letter to the Court: "[Mr. Johnson] needs guidance, not punishment."

IV. CONCLUSION

Mr. Johnson takes full responsibility and admits his violation of this Court's order. The evidence submitted here demonstrates not only his remorse but also the extensive mitigating factors that exist in this case.

For these reasons, and all those set forth above, the Court should discharge the Order to Show Cause without referring the matter to the New York State Bar.

Respectfully submitted,

Date: August 5, 2015

David J. Kaloyanides
Attorney for Third Party
Bryan Johnson

---

11
BRYAN JOHNSON'S RESPONSE TO OSC RE CONTEMPT

# DECLARATION OF BRYAN JOHNSON

I, Bryan Johnson, hereby state and declare as follows:

1. I am an attorney, duly licensed to practice law in the State of New York. I was admitted to the Appellate Division of the Second Judicial Department of the State of New York in 2011. I am a partner in the law firm of Amoachi and Johnson, Attorneys At Law, PLCC, in Bay Shore, New York. I have personal knowledge of the matters stated herein and would so testify if called as a witness.

2. My practice is dedicated exclusively to immigration law. The special focus of my practice is representing minors, both unaccompanied and accompanied, in immigration and family court. My law practice is devoted to protecting children as much as possible from the risk of harm that results when these children are returned to violent and dangerous circumstances in their country of origin.

3. My partner and I have represented hundreds of children since opening our practice in 2011. Most of our clients are pursuing Special Immigrant Juvenile Status ("SIJS") via guardianship or custody proceedings in Suffolk and Nassau County family courts, asylum petitions, withholding of removal, and protection under the United Nation's Convention Against Torture, to which the United States is a signatory.

4. I also represent minors who have been abused and neglected while in the custody of the United States Border Patrol. This representation includes seeking termination of removal proceedings.

5. My partner and I represent a signficant number of clients *pro bono*. In addition, when our retained clients can no longer afford legal fees for appeals or other relief, we continue to represent our clients pro bono. We currently represent five

female-headed families *pro bono* who were previously detained at Artesia, Karnes County Residential Center (hereinafter "KCRC"), and South Texas Family Residential Center ("STFRC"). We also represent three additional families formerly detained at KCRC and STFRC at substantially reduced fees—a "low bono" basis. We also represent numerous other female-headed families in removal proceedings who are at risk of detention at these facilities in the future depending on the outcome of their cases.

6. In this case before the Court, I was acting as a consultant for plaintiffs' counsel (also *pro bono*). It was my sincere desire to assist plaintiffs' counsel to address and correct the government's continuing violations of the stipulated judgment and settlement agreement and to stop the removals of children and families in violation of that agreement.

7. I am dedicated to the cause of my minor clients. I strive to do all I can to protect their rights and guarantee their safety through the legal processes available in this country. Unfortunately, in this case, my fear for their safety and zeal for their cause affected my judgment. Because of a series of events concerning my own clients as well as what seemed to me to be a calculated delay tactic by the government, I made a rash decision and acted wrongly.

8. I sincerely regret violating the Court's protective order by disclosing the Court's tentative ruling and settlement proposals to the press. I realize that my actions were rash and improper. My behavior was not becoming of an officer of the Court and may cause more harm to my clients than good.

9. I realize now that I should never have agreed to be a consultant on this case. I did not have the foresight and objectivity that would have helped me see that

the issues in this case were nearly identical to those affecting my own clients and that my position as a consultant could (and in fact did) result in me acquiring information that was relevant and material to my obligations to my clients in other matters. After much reflection and counsel, I now realize that I should have withdrawn as a consultant in this case as soon as I realized this conflict and sought direct relief from the Court regarding the confidentiality provision of the protective order. Regrettably, I did not follow this reasoned approach.

10. Over this past year, my representation of minors and their families subject to detention has increased substantially. Many times, I am contacted at the last minute when families are in the most desperate need of counsel in order to secure their release or stop their removal. The following examples are typical of the types of cases in which I have been involved in regarding family detention and demonstrate the emotionally charged nature of this work.

11. In July 2014, I worked for the release of a one-year old detained in the Artesia Detention Center. The child had become seriously ill on two separate ocassions. The child had previously been rushed to children's hospital in Roswell, New Mexico with suspected tuberculosis. He was finally diagnosed with viral pneumonia and discharged with medical instructions to be kept away from others with any symptoms of illness of any kind. The baby was not kept isolated as required and soon developed a high fever and serious cough. I immediately shought release for the baby and his mother because of his medical condition. DHS denied my request. It took me another six weeks of work before DHS agreed to release the baby and his mother on a $10,000 bond.

12. In September 2014, I began representing another family in detention. The mother and her daughter had been the victim of serious abuse by the girl's father. The abuse which including burning, rape, and beatings, was nothing short of torture. Even with the clear evidence of this abuse, DHS resisted any bond for the girl and her mother. After nearly a month, the immigration court granted the family release on bond. The hearing on the family's claim for asylum is set for August 26, 2015. I represent this family *pro bono*.

13. Later in October 2014, I began representing another family which had been detained in the Artesia center. The child, a 7-year old boy, had been raped by an older boy at the facility. Despite reporting the abuse, no investigation was conducted for nearly three months while the family remained in the same detention facility with the perpetrator of the abuse. And during this time, DHS continued to resist any provision for release of the victim and his family. Former counsel was finally able to secure their release by a court ordered bond in the amount of $10,000.

14. I began representing another client after her family was released from detention. The 4-year old had suffered shocking medical neglect while detained. The girl had become very ill. She had high fever and extensive tooth decay. She and her mother were placed in solitary confinement for nine days. Finally, the girl had to be rushed to an emergency room at San Antonio Methodist Children's hospital where she was diagnosed with pneumonia. She required extensive emergency oral surgery as well.

15. Upon her return to the detention center, she was placed in isolation with her mother again for several days. The family was finally released from the detention center on bond secured by former counsel.

16. As the above examples show, in the last year, my practice has involved families, usually young mothers and their very young children who are enduring detention in conditions that violate basic notions of human decency as well as numerous laws and regulations that mandate a minimum level of care for children. I saw the opportunity afforded by the *Flores* plaintiffs' counsel as a chance to not only help in correcting the prior violations of the *Flores* Settlement but to ensure immigrant children would not suffer from such detention in the future. With the Court's tentative ruling, I was convinced that there was a real chance at change.

17. Perhaps it was my own naivete or unrealistic optomism that led me to believe that a resolution would be quick in coming. But as the time wore on, as negotiations deadlines were continued, it seemed to me that the government was intentionally delaying any resolution in order to avoid compliance with the stipulated judgment. My frustration grew as the delays continued because each day's delay meant harm to the children who were kept in detention.

18. Finally, with the removal of my client (who I will identify only by her initials L.B. to protect her safety) on June 10, 2015, I lost all hope in the negotiations. As with many of my clients, I was contacted regarding Lilian when her situation had become desperate. I learned of her situation on June 4. I filed my notice of appearance with DHS to represent L.B. on June 5, 2015.

19. My client had been detained at KCRC with her 4-year old son since October, 2014. I learned that many preganant women were also being detained at KCRC. L.B. had attempted to kill herself by slitting her wrist. In response, she was stripped of her clothing; separated from her young son; restrained in a straitjacket; and placed in isolation for two days. She received no meaningful medical attention and

other than a brief video interview, she received no psychological assessment or treatment. Her son remained detained in the KCRC under the supervision of prison guards and was detained in the evenings in medical isolation rooms. He was only given one-hour visitation with his mother on three days following her isolation. On June 7 at 4:00 p.m., all phone and internet communication at the KCRC were cut off. Phone and internet communications did no return until 10:00 a.m. on June 8. It was early in the morning that day, June 8, that L.B Thereafter, my client and her sone were taken to a motel in a remote, undisclosed location. They were detained there until early the following day, June 9. Early that morning, they were taken on a bus with approximately ten other Honduran mothers and children to a government airport. Later that morning, my client and her son, along with the other Honduran families were removed to Honduras by plane.

20. It was clear to me that L.B. qualified for Special Immigrant Juvenile Status as well as being entitled to asylum, withholding of removal, and protection udner CAT. It was also clear that in failing to transfer L.B.'s son to the custody of Health and Human Services within 72 hours, DHS had not followed statutory requirements for L.B.'s son as an unaccompanied minor—the status he gained when he was removed from L.B. However, despite the efforts of several attorneys over the course of six days, which included a request for precautionary measures to the Inter-American Commission on Human Rights, L.B. and her son were removed from the country.

21. My decision to disclose the tentative ruling and the later settlement proposal was a rash act fueled by the desperation I felt from Lilian's removal and the events that led up to it along with my experiences with what my clients and others

17
BRYAN JOHNSON'S RESPONSE TO OSC RE CONTEMPT

have endured during their detentions. These detentions were clearly a violation of the *Flores* Settlement, and it my view, the government was doing nothing but delaying a resolution in order to remove as many people as possible. At the time, I believed that publicizing the events and the actions of the government was the only way to help my clients and others similarly situated.

22.  But I was wrong. I allowed the emotionally charged circumstances of my clients to impede my judgment. I failed to be their advocate and possibly have compromised my ability to serve these clients in the future. I fully expect that many organizations that I have helped in the past likely will be unwilling to work with me in the future as a result of my behavior here. A referral to the State Bar of New York could severely restrict my ability to advocate for our clients in the future.

23.  I did not intend my actions to be a sign of disrespect to the Court. My focus was entirely on my perception of the government's conduct and the desperate situation of my clients and others like them. However, in violating the Court's order, I betrayed the trust of the Court. And losing that trust and respect is something I deeply regret.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of August, 2015, at Huntington, New York.

Dated: August 5, 2015

Bryan S. Johnson

BRYAN JOHNSON'S RESPONSE TO OSC RE CONTEMPT