BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division
LEON FRESCO
Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel, District Court Section
Office of Immigration Litigation
  P.O. Box 868, Ben Franklin Station
  Washington, D.C. 20044
  Tel:  (202) 532-4824
  Fax:  (202) 305-7000
  Email:  sarah.b.fabian@usdoj.gov
Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | ) Case No. CV 85-4544-DMG |
| | ) |
|   Plaintiffs, | ) **DEFENDANTS' RESPONSE TO THE** |
| | ) **COURT'S ORDER TO SHOW CAUSE** |
|   v. | ) **WHY THE REMEDIES SET FORTH** |
| | ) **IN THE COURT'S JULY 24, 2015** |
| LORETTA E. LYNCH, Attorney | ) **ORDER SHOULD NOT BE** |
| General of the United States; *et al.*, | ) **IMPLEMENTED** |
| | ) |
|   Defendants. | ) [ORAL ARGUMENT REQUESTED][1] |
| | ) |

---

[1] Because of the importance of the issues discussed herein, and the potentially far-reaching scope of the remedies proposed by the Court, Defendants respectfully ask the Court for the opportunity to present oral argument before any final decision is rendered.  The parties will already be before the Court on August 24, 2015, and can present argument on this subject if the Court permits.

# TABLE OF CONTENTS

I.   INTRODUCTION.............................................................................. 1

    A. Length of Detention and Family Facilities ................................. 7

    B.  Border Patrol Stations ............................................................. 9

II.   FACTUAL AND LEGAL BACKGROUND ............................................. 11

    A. Today's Factual Landscape With Regard to Family Detention ............ 11

    B.  The Legal Landscape Governing the Apprehension and Detention of Minors and Families .......................................................... 18

        i.        Expedited Removal ......................................... 20

        ii.       Reinstatement of Removal ............................... 22

III.   ARGUMENT .............................................................................. 23

    A. The Court Ordered Remedy Should Be Consistent with the INA, Including Statutory Removal Authorities and Detention Requirements ........................................................... 23

    B.  The Court Should Reconsider Its Order Finding Defendants in Breach of the Agreement. ....................................... 33

        i.  DHS Does Not Have A "No Release" Policy............................ 33

        ii.  The Court Did Not Credit Important Evidence Regarding the Meaning of "All Minors" in the Agreement. .......................... 36

        iii.  The Court Did Not Credit Important Evidence Regarding the Course of Dealing of the Parties With Regard to Family Detention ................................................. 40

        iv.  The Court Should Reconsider Its Interpretation of the Term "Non-Secure" as Used in the Agreement............................. 42

i

C.  The Court Should Neither Find CBP in Breach Nor Order a Remedy Without Allowing Additional Fact-Finding ........................................... 44

IV.     CONCLUSION ............................................................................. 50

# TABLE OF AUTHORITIES

## CASES

*Alfaro Garcia, et al. v. Johnson, et al.,*
   No. 14-01775 (N.D. Cal.)………...................................................... 16

*Brady v. Grendene USA, Inc.,*
   No. 12-604, 2015 WL 3539702 (S.D. Cal, June 3, 2015)........................................ 38

*Bunikyte, ex rel. Bunikiene v. Chertoff,*
   Nos. 07-164, 07-165, 07-166, 2007 WL 1074070 (W.D. Tex., Apr. 9, 2007) ........ 32

*Crestview Cemetery Ass'n v. Dieden,*
   54 Cal.2d 744, 8 Cal. Rptr. 427, 356 P.2d 171 (1960)...................................... 40, 41

*In re Hutto Family Detention Ctr.,*
   No. 07-164, (W.D. Tex. Aug 26, 2007). ................................................. 32

*Reno v. Flores,*
   507 U.S. 292, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993) .................................... 29, 37

*R.I.L.R., et al. v. Johnson, et al.,*
   No. 15-0011, (D.D.C., Feb. 20, 2015)............................................6, *passim*

*Trist v. Child,*
   88 U.S. 441, 22 L. Ed. 623  (1874) ........................................................ 28

## ADMINISTRATIVE DECISIONS

*Matter of Aguilar-Aquino,*
   24 I. & N. Dec. 747 (BIA 2009)........................................................... 43

*Matter of D-J-*
   23 I. & N. Dec. 572 (BIA 2003)..................................................... 13, 35

*Matter of X-K-,*
   23 I. & N. Dec. 731 (BIA 2005)........................................................... 22

1

# STATUTES

2 6 U.S.C. § 279(g)(2) ............................................................................. 18, 19

3

4 6 U.S.C. § 279(g)(2)(C)(ii) ......................................................................... 19

5 8 U.S.C. § 1158(d)(2) .................................................................................. 36

6 8 U.S.C. § 1182(a)(7) .................................................................................. 26

7

8 8 U.S.C. § 1182(d)(5) .................................................................................. 21

9 8 U.S.C. § 1182(d)(5)(A) ........................................................................ 24, 29

10 8 U.S.C. §1225 ........................................................................................... 23

11

12 8 U.S.C. § 1225(b) ........................................................................... 20, 25, 41

13 8 U.S.C. § 1225(b)(1)(B) ............................................................................ 20

14

15 8 U.S.C. § 1225(b)(1)(B)(iii) ...................................................................... 21

16 8 U.S.C. § 1225(b)(1)(B)(iii)(III) ........................................................... 20, 21

17 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ........................................................ 12, 20, 24

18

19 8 U.S.C. § 1225(b)(1)(A)(i) ........................................................................ 26

20 8 U.S.C. § 1225(b)(1)(C) ............................................................................ 21

21 8 U.S.C § 1226 ........................................................................................... 23

22

23 8 U.S.C § 1226(a) ............................................................................. 12, *passim*

24 8 U.S.C. § 1229a ........................................................................................ 21

25 8 U.S.C. § 1231 ...................................................................... 12, 14, 23, 30

26

27 8 U.S.C. § 1231(a) ...................................................................................... 23

28 8 U.S.C. § 1231(a)(2) ............................................................................ 12, 26

8 U.S.C. § 1231(a)(5) ..................................................................................22

8 U.S.C. § 1232 ....................................................................................18, 19

8 U.S.C. § 1232(a)(2)(B) ...........................................................................20

8 U.S.C. § 1232(a)(3) ..................................................................................20

8 U.S.C. § 1232(a)(4) ............................................................................18, 19

8 U.S.C. § 1232(a)(5)(D) ......................................................................19, 20

8 U.S.C. § 1232(b) ......................................................................................19

8 U.S.C. § 1232(b)(3) ..................................................................................19

8 U.S.C. § 1232(c)(2) ..................................................................................19

8 U.S.C. § 1252(a)(1) ..................................................................................28

8 U.S.C. § 1252(a)(2)(A)(iii) .....................................................................21

8 U.S.C. 1325 ..............................................................................................26

## REGULATIONS

8 C.F.R. § 1.2 .............................................................................................21

8 C.F.R. § 208.30 ........................................................................................20

8 C.F.R. § 208.30(f) ....................................................................................21

8 C.F.R. § 208.31(b) ...................................................................................22

8 C.F.R. § 208.31(e) ...................................................................................22

8 C.F.R. § 208.31(f) ....................................................................................22

8 C.F.R. § 208.31(g)(1) ...............................................................................22

8 C.F.R. § 212.5(b) ........................................................................................ 21

8 C.F.R. § 235.3(b)(2)(iii) ............................................................................ 25

8 C.F.R. § 235.3(b)(4)(ii) ........................................................................ 25, 29

8 C.F.R. § 235.3(c) ........................................................................................ 21

8 C.F.R. § 235.3(b)(4) .................................................................................. 21

8 C.F.R. § 236.1(c)(8) ................................................................................... 29

8 C.F.R. § 274a.12(c)(8) ............................................................................... 36

8 C.F.R. § 1003.19(h)(2)(i) .......................................................................... 22

8 C.F.R. § 1003.19(h)(2)(i)(B) ..................................................................... 21

8 C.F.R. § 1003.42(c) ................................................................................... 21

8 C.F.R. § 1003.42(d) .............................................................................. 20, 21

8 C.F.R. § 1003.42(f) .................................................................................... 21

69 Fed. Reg. 48 ............................................................................................. 20

## I.   INTRODUCTION

This memorandum responds to the Court's order of July 24, 2015 (ECF No. 177), finding the U.S. Department of Homeland Security ("DHS") in breach of the *Flores* Settlement Agreement ("Agreement"), and providing Defendants an opportunity to respond to the Court's proposed remedial order.  Defendants welcome the opportunity to clarify the policies and practices related to the operation of U.S. Immigration and Customs Enforcement ("ICE") family facilities, which have evolved significantly since the briefing was completed, to address the legal issues raised by the breadth of the Court's proposed remedies, and to highlight the need for further factual development on conditions in U.S. Customs and Border Protection ("CBP") facilities.

In short, since the parties briefed this matter, the policies that the Court construed as imposing "blanket" detention of female-headed families have been eliminated,[2] and the length of detention at family facilities has been shortened dramatically.   Pursuant to recently-announced policies and procedures, Defendants are effectively transitioning the facilities into processing centers at which DHS can: efficiently process families; conduct health screenings and provide immunizations; preliminarily assess whether family members are eligible to apply for relief or protection to remain in the United States; facilitate access to counsel and legal orientation programs; and release those found eligible to apply for relief or protection

---

[2] Defendants have never maintained a "blanket no-release policy." *See infra* pp. 33-36.

within an average of approximately 20 days under reasonable conditions designed to achieve their appearance in immigration proceedings.

Based on the recently-implemented changes, DHS expects that the only individuals remaining in family facilities will be those whose short-term detention is required under the Immigration and Nationality Act ("INA"), or those who have been determined to be an unreasonable flight risk or who cannot satisfy reasonable conditions of release. Because the Court did not have an opportunity to consider the effect of these significant changes in policy and practice, which occurred after the April 24, 2015 hearing, or the full legal framework governing the processing and detention of the parents of accompanied minors, Defendants respectfully request that the Court reconsider its order. Even if the Court is correct that DHS's previous policies and practices violated the Agreement, it does not follow that the Court could or should enter an order enjoining the *current* policies and practices, which were not challenged by Plaintiffs in their enforcement motion, are authorized by the INA, and do not violate the Agreement.

The brief also explains how the Court's proposed remedy is inconsistent with today's removal and detention framework established by Congress in the INA, and provides an alternative remedial approach to address the Court's concerns while

preserving the undisputed legal authorities and requirements set forth by Congress involving the apprehension and processing of unlawful border crossers.[3]

\*       \*       \*

The Court found Defendants in breach of the Agreement with regard both to their operation of family facilities, and the conditions encountered by minors at facilities operated by CBP.  The Court also concluded that there has been no significant change in circumstances since the signing of the Agreement that warrants its amendment.  To remedy the breach, the Court has proposed ordering Defendants to comply with the following:

- Upon taking any accompanied minor into custody, DHS should "make and record prompt and continuous efforts towards family reunification and the release of the minor" without unnecessary delay, "in first order of preference to a parent, including a parent who was apprehended with [the minor] or presented herself or himself with [the minor]."

- DHS should not house minors in unlicensed or secure facilities, and should not "selectively apply the 'influx' provision of Paragraph 12C of the Agreement to house class members apprehended with a parent in facilities that do not comply with the Agreement."

- DHS must release a minor's accompanying parent "in accordance with applicable laws and regulations unless after an individualized custody determination the parent is determined to pose a significant flight risk, or a threat to others or the national security, and the flight risk or threat cannot be mitigated by an appropriate bond or conditions of release."

---

[3] Without waiving their position that the Agreement has not been breached, Defendants have provided an alternative proposed remedy that the Court should enter in the event the Court maintains its previous ruling that Defendants' former policies and practices violated the Agreement and should be enjoined. *See infra* pp.23-33.

- DHS must propose standards to govern CBP's compliance with the Agreement, and file those standards with the Court.

- DHS must provide monthly statistical information under Paragraph 28A of the Agreement.

*See* Order, ECF No. 177, at 24-25.  The Court also states that "Defendants can also use the family residential centers as temporary facilities consistent with Paragraph 12A of the Agreement."  *Id.* at 13 n.8.[4]

This proposed order, if adopted, could be understood to require DHS to release into the interior all families seeking to illegally enter the United States—even if they possess no legitimate claims for relief or protection from removal—if their removal takes longer than three to five days to execute.[5] *See* Order, ECF No. 177, at 24-25 ¶¶

---

[4] Paragraph 12A requires unaccompanied minors to be released in three days where a licensed program is available, in five days where a licensed program is not available, and "as expeditiously as possible" in the event of an emergency or influx.

[5] The Court found that "[i]t is uncontroverted that, prior to June 2014, ICE generally released parents and children upon determining that they were neither a flight risk nor a danger to safety." Order at 9.  While the Government does not dispute that it released most families before June 2014 (and continues to release most families today), it strongly disputes that it should be required by Court Order to do so contrary to the clear intent of Congress.  Prior to June 2014, families were a relatively small percentage of those who were apprehended at or near the border.  *See* Declaration of Thomas Homan ("Homan Decl."), ¶ 8 (Attached hereto as "Exhibit 1").  While families were not a significant percentage of those apprehended at the border, their removal was not the highest priority, and DHS dedicated very little bed space for detaining families.  *Id.* ¶¶ 9; 16.  The practical limitation restricted DHS's ability to use expedited removal, which requires some length of detention, for families.  *Id.* ¶¶ 8-9.  As the numbers of families apprehended at the border increased, so too did the need for DHS to exercise its statutory authority for expedited removal to respond to these increased numbers.  *Id.* ¶¶ 10-15; *see also* Johnson Declaration, ECF No. 120-1, ¶¶7-9; Oaks Declaration, ECF No. 121-1, ¶¶ 26-29.  Thus, while the Court is correct that the majority of alien families were previously released into the interior after apprehension, the Court should not conclude that this means DHS should *never* be permitted to improve its ability to respond to migration by placing families in expedited removal and detaining them in

2, 4.   Such a reading of the proposed order would result in a number of adverse potential consequences that include: overriding statutory authority and contravening congressional intent as expressed in the detention and expedited removal provisions of the INA; minimizing DHS's ability to properly process individuals who enter as members of family groups and to assess their eligibility to apply for relief or protection from removal; and leaving the separation of mothers and children as DHS's only option for utilizing its streamlined removal and detention authority in response to any future surge in unlawful border crossings by families.  Defendants submit that eliminating DHS's ability to use the authorities Congress has provided in the INA to respond to illegal entries could undo the progress that has been achieved in reducing the number of families illegally crossing the Southwest border since the summer of 2014.  Specifically, the proposed remedies could heighten the risk of another surge in illegal migration across our Southwest border by Central American families, including by incentivizing adults to bring children with them on their dangerous journey as a means to avoid detention and gain access to the interior of the United States.

It is in consideration of these concerns that the Government respectfully responds to the Court's July 24, 2015 Order to show cause why the proposed remedies

certain circumstances.  DHS must have access to the statutory tools that Congress has provided to respond to immigration trends, as well as ebbs and flows, including through expedited removal and reinstatement of removal orders of those who have previously been removed and illegally re-entered the United States.  Moreover, the "influx" provision of the Agreement has been in effect for many years; this provision should govern any enforcement of the Agreement by permitting Defendants to take action to respond to what the parties stipulated was a level of immigration constituting an emergency.

should not be implemented.  It does so in light of multiple changes to the landscape of family detention, including the following:

- ICE no longer considers general deterrence as a factor in individual bond determinations for Central American women and children.  *R.I.L.R., et al. v. Johnson, et al.*, Case No. 15-0011, ECF No. 32 at 1, ECF No. 33 at 38. (D.D.C., Feb. 20, 2015).[6]

- In May and June 2015, a series of new policies were announced by the Secretary of Homeland Security and the Director of ICE, and DHS is now implementing those new policies.

- The purported "blanket policy to detain all female-headed families . . . for the duration of . . . proceedings" referenced by the Court is simply not the current policy or practice (and Defendants aver that it was never their policy).

Thus, even assuming *arguendo* that DHS's *previous* policies and practices violated the Agreement and could be enjoined, the Court should not prohibit the *current* policies and practices that implement removal authorities and detention mandates in the INA, were never challenged by Plaintiffs in this enforcement action (or at any time in the last 15 years), and do not violate the Agreement.[7]

---

[6] This Court was incorrect in finding that "Defendants could easily revert to the former challenged policy as abruptly as they adopted the new one."  Order at 7 n.4.  Although as more fully discussed, *infra*, the preliminary injunction in *R.I.L.R.* was dissolved, if Defendants were to change their detention policies now, they would be required to notify the *R.I.L.R.* court, and the *R.I.L.R.* plaintiffs could proceed to reinstate the preliminary injunction. *See R.I.L.R., et al. v. Johnson, et al.*, Case No. 15-0011, ECF No. 43. (D.D.C, June 29, 2015).

[7] Defendants' principal concern is that the plain language of the Court's Proposed Remedial Order can be read in a manner that ends *all* detention of family units if their removal takes longer than three to five days to execute.  Such an order would significantly impact policies and practices that: 1) were not challenged in these enforcement proceedings by Plaintiffs; 2) have never been challenged by Plaintiffs in the nearly 15 years since the family facility in Berks,

## A. Length of Detention and Family Facilities

DHS's new policies, as detailed in the declarations of senior DHS officials attached to Defendants' response here, are designed to ensure that the majority of individuals in family facilities will be there only during the relatively short time needed for essential processing (to reach an anticipated average of approximately 20 days).  *See* Declaration of Thomas Homan ("Homan Decl."), ¶ 28, Ex. 1.  The new policies are demonstrably moving DHS toward achieving this goal.  For example, of those families booked into a family facility during the two-week period of June 28 to July 11, 2015, more than 60% had been released or removed by July 29 – or within two to four weeks, *Id.* ¶ 27, compared to the last six months of 2014, in which only 21% of families booked into family facilities were released or removed within 30 days.[8]  *Id.* ¶ 22.

Under these new policies and practices, heads of households along with their children are processed and – so long as their release would not pose a threat to public safety and they can provide a verifiable, fixed address where they will reside during

Pennsylvania has been in operation; and 3) have served as important border security tools whose use is mandated by Congress.  *See* Homan Decl. ¶ 33.  Therefore, Defendants respectfully submit that it is critical that the Court's remedial order –if such an Order is entered—clarify that its intent is only to end detention under the purported "blanket no release policy" that was specifically challenged in this case and not to end all detention of families for longer than three to five days regardless of the statutory reason for detention.

[8] Defendants are not asserting that this enforcement action is moot due to the changes that have occurred in the use of family facilities since the case was briefed.  See Order at 7 n. 4. The main purpose of this filing is to explain why any remedial order should take into account Defendants' current policies and practices, which Defendants respectfully submit cannot and should not be held as violating the Agreement.

immigration proceedings – released as expeditiously as possible after a threshold determination that they are eligible to apply for relief or protection from removal (because they are found to have a credible or reasonable fear of persecution or torture). *See id.* ¶ 7. The new policies balance the many mandates faced by the Secretary of Homeland Security in accomplishing the agency's mission, including: preventing and controlling unauthorized entry; using streamlined removal authority provided by the INA; complying with statutory provisions governing detention and eligibility for humanitarian relief; and allowing for processing and evaluation of eligibility to apply for relief or protection in a safe and humane environment that takes into account the particular vulnerability of children.

The Court's Order almost exclusively analyzed and addressed detention policies and practices that no longer exist. Moreover, the proposed remedies set forth in the Court's Order are far-reaching in scope and may be read to apply to individuals subject to various grounds of detention mandated by the INA. If the Court declines to revisit its underlying analysis regarding the applicability of the Agreement, Defendants respectfully submit that, in light of the important factual and legal issues raised herein, the parties be ordered to confer in a more detailed fashion under the direction of a Court-appointed Special Master,[9] on an expedited basis if necessary, in

---

[9] *See e.g. Franco-Gonzalez v. Napolitano et al*, Case No. 2:10-cv-02211-DMG-DTB (C.D. Cal. Aug. 2, 2013), ECF No. 648 (finding that "it would be appropriate to appoint a Special Master to assist the parties and the Court in finalizing an implementation plan for the permanent injunction.")

order to arrive at a remedy that will ensure compliance with both the Agreement as

interpreted by the Court, and the intent of Congress as expressed in the INA.

Alternatively, Defendants propose remedies that reflect the new policies and

procedures governing Defendants' use of family facilities on the ground. *See*

Defendants' Proposed Order. These new policies comply with the Agreement, and the

Agreement must be read consistently with the INA.[10]  Defendants are using these

facilities in a manner consistent with DHS's statutory authority and the INA's

mandate to detain certain categories of aliens, which must take precedence over the

Agreement both as a matter of law and by the express terms of the Agreement itself.

For these and other reasons discussed in this response, no remedy beyond that

proposed by Defendants would be warranted or proper.

**B. Border Patrol Stations**

With regard to the Court's proposed remedies relating to the conditions

encountered by minors at Border Patrol holding facilities, Defendants respectfully

contend that the Order and the proposed remedies should be vacated in light of the

incomplete factual development before the Court.  The question whether Defendants'

---

[10] Defendants respectfully preserve their positions, articulated throughout this litigation, that the Agreement should not be read to apply to accompanied minors, to adults, or to families, and that if the Agreement is read that way, it should be amended to better reflect the circumstances and statutory provisions that exist today.  To that end, Defendants herein also ask the Court to reconsider certain factual findings and legal conclusions in its Order regarding these points. However, while preserving these objections, Defendants present their proposed remedy in response to the Court's Order to Show Cause, and request that the Court enter this alternative remedy should the Court decide not to reconsider its Order.

Border Patrol facilities comply with the Agreement is disputed by the parties and requires an evidentiary hearing for the Court to enter findings of fact and conclusions of law.  Defendants have provided evidence: (1) that their facilities follow policies that balance the needs of all individuals in Border Patrol custody with important safety and security concerns, and (2) that audit reports from the DHS Office of the Inspector General concluded that CBP's holding facilities do not violate the Agreement.[11]

Plaintiffs' declarations – limited both in time and geography and disputed by Defendants' evidentiary submissions – are not sufficient to conclude that Defendants are in breach nationwide.[12]  This issue requires greater evidentiary development, and if necessary, an opportunity for both parties to present evidence regarding the actual, current conditions at these facilities at an evidentiary hearing.  Moreover, if the Court were to find that conditions in those locations are in breach of the Agreement, the

---

[11] In addition, after the Court issued its tentative decision in this enforcement action, the non-partisan and independent Government Accountability Office (GAO) issued findings based on a comprehensive audit it conducted of CBP facilities during the height of the surge in 2014.   GAO specifically found that, as to the *Flores* Agreement, although there were improvements that could be implemented, CBP was "generally providing care consistent with policy requirements [including *Flores*]."  *Unaccompanied Alien Children: Actions Needed to Ensure Children Receive Required Care in DHS Custody*, U.S. Government Accountability Office, GAO-15-521, p. 39, available at: http://www.gao.gov/assets/680/671393.pdf (July 2015); *see also* Declaration of Ronald Vitiello, ("Vitiello Decl."), ¶ 45 (Attached hereto as "Exhibit 2").

[12] Defendants also have not had an opportunity to depose or cross-examine the declarants, and the evidence provided in those declarations is limited to a relatively small number of individuals who experienced only a limited number of Border Patrol stations, all of which were in the Rio Grande Valley, during a limited number of days where there were substantially increased levels of border apprehensions.

remedy should not exceed the scope of the Agreement, such as by requiring CBP to implement broad standards that are not provided for anywhere in the Agreement.

## II.   FACTUAL AND LEGAL BACKGROUND

### A. Today's Factual Landscape With Regard to Family Detention.

Since the time that briefing was completed, and following a court order in the case of *R.I.L.R. v. Johnson*, the Secretary of Homeland Security and the Director of ICE have conducted a continuous assessment of best practices and conditions for ICE family residential centers.  On May 13, 2015 and June 24, 2015, the Secretary and Director publicly announced policies fundamentally changing the character of family detention and the use of ICE's family residential centers.  *See* Homan Decl. ¶ 24-26, Ex. 1.  As a result, these facilities now hold residents for only a relatively short period (of those processed into a family facility during the two-week period of June 28 to July 11, 2015, more than 60% had been released or removed by July 29 – or within two to four weeks, Homan Decl. ¶ 27), during which – in most cases – detention is required under the INA.  Less frequently, individuals may be in the facilities for longer periods when they have been determined to pose an unreasonable risk of flight, are unable to satisfy reasonable conditions of release, or are pending execution of a final order of removal.  As explained below, the vast majority of recently detained individuals for whom detention is discretionary, *e.g.*, individuals who have been found to have a credible or reasonable fear or are otherwise in standard removal proceedings, *are being released*.

Processing times are expected to further improve, not least because these statistics do not reflect the full impact of the May and June policy changes. *Id.* ¶ 22. As Defendants move forward in continuing to implement these new procedures, they anticipate that, under current circumstances, the average time that families found to establish a credible or reasonable fear of return by DHS will be held in family facilities will not exceed 20 days after a claim of fear is made. *Id.* ¶ 28. During that shortened period of detention, DHS can conduct background checks, provide health screenings and immunizations, screen individuals for a credible or reasonable fear of persecution or torture, and release individuals who establish eligibility to apply for relief or protection from removal under reasonable conditions to ensure their appearance at immigration proceedings. *Id.* ¶ 29.

At the time the parties briefed this case, individuals in ICE family residential centers generally fell into five different categories with regard to the statutory basis for their detention (as more fully set forth in Section B below):

1) Individuals subject to "expedited removal" who were mandatorily detained under 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) because they had not yet established a credible fear of persecution or torture.

2) Individuals who were previously removed from the United States who had a prior order of removal that had been "reinstated," who were detained under 8 U.S.C. § 1231(a)(2), and who had not yet established a reasonable fear of persecution or torture.[13]

---

[13] In some cases where a parent has a reinstated removal order, the children in that family group, if they are not subject to a reinstated removal order, may have a separate expedited removal order and may also have their own, separate credible fear screening.

3) Individuals detained under DHS's discretionary detention authority who had established a credible or reasonable fear, but whom DHS determined to be flight risks, and therefore required the posting of bond or other conditions for release.  Where a family was unable to comply with conditions of release, including bond, the family remained detained until their immigration court proceedings were completed, or the conditions of release were satisfied or modified.  *See* 8 U.S.C § 1226(a).

4) Individuals detained under DHS's discretionary detention authority who had established a credible or reasonable fear but whom DHS determined to be a significant flight risk, and thus detained pending completion of their immigration court proceedings.  *See* 8 U.S.C §§ 1226(a), 1231.

5) Individuals detained under DHS's discretionary detention authority who established a credible or reasonable fear but whom DHS held without bond until their immigration proceedings were completed pursuant to the now-discontinued practice of considering deterrence as a factor when making an individual bond determination.  *See Matter of D-J-,* 23 I. & N. Dec. 572 (2003).

Plaintiffs' enforcement motion, and ultimately the Court's decision, focused in large part on this fifth category of individuals (who were in discretionary, deterrence-based detention), and on what the Court perceived as "a blanket policy to detain all female-headed families, including children, in secure, unlicensed facilities for the duration of the proceedings that determine whether they are entitled to remain in the United States."  Order at 2; *see also* Motion, ECF No. 100-1, at 5-14.

Now, however, this fifth category of individuals *is simply no longer subject to detention* because of the recently announced overhaul of ICE policies and practices and the decision in the *R.I.L.R.* case.  Moreover, the number of individuals who remain detained under the third and fourth categories is – and will continue to be –

substantially limited by ICE's announced policy to: (1) "offer release with an appropriate monetary bond or other condition of release to families at family facilities who are successful in stating a case of credible or reasonable fear of persecution in their home countries, and (2) establish a family's bond amount at a level that is reasonable and realistic, taking into account ability to pay, while also encompassing risk of flight and public safety."  Statement of Secretary Johnson, DHS Press Announcement, ECF No. 164-1.[14]  Thus, it is the individuals in the first category (those in mandatory detention under the INA and in the process of being screened for credible fear) or the second category (those subject to reinstatement of removal who are in the process of being screened for a reasonable fear) who will make up the majority of the families in family facilities under the current policies.  *See* Homan Decl. ¶ 32, Ex.1.  Notably, these two categories of individuals are not specifically addressed in the Court's Order.  Yet, the Court's proposed remedies – if broadly applied – would effectively make it impossible to detain these individuals while they are screened for credible or reasonable fear, and remove them quickly as the INA requires, if no relief is available to them. *Id.* ¶ 33.

---

[14] This policy encompasses not only those who are detained under 8 U.S.C. § 1226(a) because they have established credible fear, but also those who are detained under 8 U.S.C. § 1231, but who have established a reasonable fear and been placed in withholding-only proceedings.  Where release is not possible even under this more lenient policy, DHS has announced that for those individuals who remain detained, ICE will "implement a review process for any families detained beyond 90 days, and every 60 days thereafter, to ensure detention or the designated bond amount continues to be appropriate while families await conclusion of their immigration proceedings . . . ."  DHS Press Release, ECF No. 153-1, at 2.

In practical terms, the changes adopted by DHS mean that almost all individuals are experiencing a significantly shorter period of detention in family facilities than was previously occurring at the time this case was briefed.  During the last half of 2014, only 21% of families detained in ICE family residential centers were released or removed within 30 days.  *Id.* ¶ 22.  In contrast, during the first half of 2015, more than 43% were released or removed within 30 days.  *Id.*  Of those more recently processed into a family facility during the two-week period of June 28 to July 11, 2015, over 60% had been released or removed by July 29, 2015.  *Id.* ¶ 27.  Based on current apprehension statistics and other factors, ICE anticipates that, in the future, families who assert a claim of fear at the time of their encounter by DHS will be processed, screened for reasonable or credible fear, and released under appropriate conditions within an average of 20 days of making that assertion.  *Id.* ¶ 28.[15]  That is significant because 86.9% of those who assert a claim to credible fear are currently

_____

[15] The length of time individuals will remain in detention is directly related to the amount of time it takes to screen them for credible or reasonable fear.  The Secretary's policy announcement directed USCIS to "conduct credible fear and reasonable fear interviews within a reasonable timeframe."  DHS Press Release, ECF No. 164-1 at 1.  For those able to establish credible or reasonable fear, the goal is that "the detention of families will be short-term in most cases."  *Id.* For credible fear cases screened from October 2014 through June 2015, the U.S. Citizenship and Immigration Services Asylum Division has completed more than 90% of the cases in 14 calendar days or less.  Declaration of John Lafferty ("Lafferty Decl."), ¶ 22 (Attached hereto as "Exhibit 3").  Under a class action settlement agreement, pending approval by the U.S. District Court for the Northern District of California, USCIS has agreed to achieve a national average of 10 business days for completing reasonable fear determinations for detained individuals, with no single reasonable fear determination taking more than 20 business days (not including tolling or delays due to exceptional circumstances).  *Id.* (discussing *Alfaro Garcia, et al. v. Johnson, et al.,* No. 14-01775 (N.D. Cal.).

receiving positive fear findings.  Declaration of John Lafferty ("Lafferty Decl."), ¶ 8 (Attached hereto as "Exhibit 3").   Thus, a significant majority of individuals who move through family facilities will be released in a short time period.

Taking an average of approximately 20 days to process families allows ICE the opportunity to accomplish the critical screening that occurs in facilities and that maximizes the likelihood of appearance at future immigration proceedings.  A period of approximately 20 days allows ICE to adequately process a family for security concerns, provide appropriate medical screening, and facilitate an Asylum Officer's evaluation of a family's claim of fear of persecution or torture.  Homan Decl. ¶ 29, Ex. 1.  Within this period, the family receives a medical and mental health evaluation, a physical examination, a dental screening, and medically necessary health or mental health referrals.  *Id.*  Children receive needed immunizations and a developmental assessment in the Well-Child clinics.  *Id.*  Families diagnosed with communicable diseases can be treated or begin treatment while in the facility, which promotes the health of the affected families and protects the U.S. public.  *Id.*  Families are also offered the opportunity to participate in a legal orientation program from pro bono organizations, which, for many individuals, will be their first opportunity to learn of their rights and responsibilities under the immigration laws.  *Id.*  This time period also ensures that families can contact their consulates and family members in the United States, and can provide ICE with proof of identity, a verifiable address, and sponsor

information so that ICE can effectively assess flight risk and consider the family for release under appropriate conditions. *Id.*

In short, rather than serving as long-term detention facilities for the pendency of removal proceedings as they were for some families at the time the parties briefed this case, these facilities are now serving a much shorter-term processing function. The current use of the facilities also serves the security and enforcement needs of the Government. Homan Decl. ¶¶ 29, 30, Ex. 1. It provides DHS with a critical tool for enforcing the immigration laws, which in turn dis-incentivizes future surges of families crossing the Southwest border. *Id.* ¶¶ 7, 12, 15. Screening and releasing families within a shorter period of time creates additional capacity at family facilities to process and screen more families for eligibility to apply for relief or protection from removal through a credible or reasonable fear determination. *Id.* ¶ 29. It also allows ICE to more fully examine families to determine their identity and consider their flight risk before they are released, and ensure release under appropriate safeguards that, among other things, will assist DHS in increasing appearance rates at subsequent immigration proceedings and reducing the number of removal orders issued *in absentia*. *Id.* ¶ 30.[16] Those who are not eligible for relief or protection from

---

[16] Releasing individuals without proper screening and education concerning their rights and responsibilities greatly increases the risk that they will not appear for their removal proceedings. *See* Homan Decl. ¶ 30. Even with the increased bed space made available from the building of the family residential centers at Dilley and Karnes, from July 2014 through June 2015, approximately 80% of families apprehended at or near the border were released rather than

removal may also be processed quickly for removal.  *Id.* ¶ 12.  The risk of effectively ending DHS's ability to make these complex and critical policy judgments constitutes a compelling basis for the Court to implement the alternative remedies proposed by Defendants.

### B.  The Legal Landscape Governing the Apprehension and Detention of Minors and Families.

The legal framework governing the detention of families and minors unlawfully crossing the border includes a complex set of removal and detention provisions and procedures that inform the boundaries of the Agreement and the appropriateness of the Court's remedial order.  An individual, including a minor, who unlawfully crosses the Southwest border into the United States will most likely first come into the custody of the U.S. Government when he or she is apprehended by CBP.  *See* Declaration of Ronald Vitiello, ("Vitiello Decl.") ¶¶ 7-8 (Attached hereto as "Exhibit 2").  If the minor is an "unaccompanied alien child" ("UAC") as defined at 6 U.S.C. § 279(g)(2), he or she is processed consistent with the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, § 235 (codified in principal part at 8 U.S.C. § 1232).  *See* Vitiello Decl. ¶ 11-12, 14.  Although only required by the TVPRA for certain UACs from contiguous countries, CBP screens all UACs to determine whether they are victims of human trafficking

---

detained as apprehensions continued to outpace available family detention capacity.  *Id.* ¶ 19.  A significant number of family members who were released and not detained during the surge have been issued *in absentia* removal orders because they failed to appear for their immigration hearings.  *Id.* ¶ 30.

18

and whether they have a fear of persecution or torture, consistent with 8 U.S.C. § 1232(a)(4).  *See id.* ¶ 13.

When a screening determination required by the TVPRA cannot be made within 48 hours of the child's apprehension, when the child does not or is not able to voluntarily withdraw her application for admission, or when the child is from any country other than Canada or Mexico, the UAC will be transferred to the Department of Health and Human Services ("HHS") and placed in removal proceedings before an immigration judge.  8 U.S.C. §§ 1232(a)(4), (a)(5)(D), (b); *see also* Vitiello Decl. ¶ 14.  "Except in the case of exceptional circumstances," all UACs who cannot be quickly repatriated and remain in custody of the federal government must be transferred into the custody of HHS within 72 hours of determining that such child is a UAC.  8 U.S.C. § 1232(b)(3).  The TVPRA requires that, subject to certain considerations such as risk of flight, and danger to self or others, UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child" and it provides guidelines for the reunification of minors with family members or other sponsors.  8 U.S.C. §§ 1232(c)(2), (3).

An "alien child" who comes to the United States with a parent or legal guardian is normally not considered unaccompanied,[17] and therefore does not fall under the

_____

[17] An alien child who comes with a parent or legal guardian may be considered unaccompanied, for example, if it is determined that such parent or legal guardian is neglecting or abusing the

provisions of the TVPRA.  *See* 6 U.S.C. § 279(g)(2); 8 U.S.C. § 1232.  Instead, the detention or release of a family is governed by the detention provisions of the INA, and is primarily the responsibility of ICE.  *See* Vitiello Decl. ¶ 15-16.  Every effort is made to process, transfer, or remove accompanied children in custody as promptly as is appropriate and operationally feasible.  *Id.* ¶ 17.

Families housed in family facilities may be subject to "expedited removal" or "reinstatement of removal."  Both of these accelerated removal processes, and the detention of individuals subject to these processes, are governed by the INA.

### i.    Expedited Removal

The provision codified at 8 U.S.C. § 1225(b), which provides an accelerated removal process for certain aliens, such as those apprehended at or near the border, is commonly referred to as "expedited removal."  69 Fed. Reg. 48,877 (Aug. 11, 2004).  Congress has explicitly mandated the detention of individuals who are in the expedited removal process and have not been found to have a credible fear of persecution.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); *see also* Homan Decl. ¶ 8, Ex. 1.  Congress expressly prohibited the use of expedited

---

child.  *See* 6 U.S.C. § 279(g)(2)(C)(ii) (requiring parents be "able to provide care and physical custody").

removal for UACs, but not for other populations such as families.  *See* 8 U.S.C. §§

1232(a)(2)(B), (a)(3), (a)(5)(D).

If a USCIS asylum officer interviews an individual in expedited removal

proceedings and determines that he or she has a credible fear of persecution or torture

the individual may seek asylum or other protection from removal before an

immigration judge.  8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. §§ 208.30, 235.3(b)(4).  If the

asylum officer determines the individual does not have a credible fear of persecution

or torture, the individual may request review of that determination by an immigration

judge.[18]  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42(d).  If the

individual ultimately does not have a credible fear of persecution or torture, he or she

may be removed from the United States.  8 U.S.C. § 1225(b)(1)(B)(iii); *see also*

8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii); 8 C.F.R. § 1003.42(f) ("No appeal

shall lie from a review of an adverse credible fear determination made by an

immigration judge."); *see also* Lafferty Decl. ¶ 7, Ex. 3.

If either the asylum officer or the immigration judge determines that the alien

has a credible fear of persecution or torture, expedited removal proceedings are

vacated and the alien is referred for standard removal proceedings before an

immigration judge under 8 U.S.C. § 1229a.  *See* 8 C.F.R. § 208.30(f).  Once an

---

[18] The review by an immigration judge is conducted *de novo* and includes an opportunity for the
alien to be heard and questioned by the immigration judge, who also may receive into evidence
any relevant oral or written statement.  8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. §§ 1003.42(c)
and (d).

individual has been found to have a credible fear of persecution or torture and placed

into standard removal proceedings, the authority for his or her detention normally

shifts to the discretionary detention provisions of 8 U.S.C. § 1226(a).[19]  *See Matter of*

*X-K-*, 23 I. & N. Dec. 731, 735-36 (BIA 2005) (holding that current Department of

Justice regulations do not bar an immigration judge from making custody re-

determinations of a person subject to expedited removal if he or she is determined to

have a credible fear and placed in removal proceedings under 8 U.S.C. § 1229a, and if

a bond is not otherwise precluded by 8 C.F.R. § 1003.19(h)(2)(i)).

>        ii.     *Reinstatement of Removal*

With respect to individuals who have previously been ordered removed, DHS

may "reinstate" a prior order of removal for an individual it finds "has reentered the

United States illegally after having been removed or having departed voluntarily,

under an order of removal."  8 U.S.C. § 1231(a)(5).  If the alien expresses fear of

returning to the country of removal, however, the alien is referred to USCIS for an

interview by an asylum officer to determine whether the alien possesses a "reasonable

fear" of persecution and torture.  8 C.F.R. § 208.31(b); *see generally* Lafferty Decl. ¶¶

---

[19] This shift occurs only for those aliens in expedited removal who are not "arriving aliens" as
defined in 8 C.F.R. § 1.2,  An arriving alien subject to expedited removal is ineligible for release
on bond or a bond redetermination hearing before an immigration judge.  8 C.F.R. §§ 235.3(c),
1003.19(h)(2)(i)(B).  Nevertheless, ICE policy favors parole under 8 U.S.C. § 1182(d)(5), 8
C.F.R. § 212.5(b) for such aliens who receive a positive credible fear determination, who can
establish their identity, and who present neither a danger nor a flight risk. *See* ICE Policy No.
11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture
(Dec. 8, 2009).

9-10, Ex. 3 (describing USCIS reasonable fear procedures).  If the asylum officer determines that the alien has not established a reasonable fear of persecution or torture, the alien may request review of that determination by an immigration judge.  8 C.F.R. § 208.31(f).  If the immigration judge concurs with the determination that no reasonable fear of persecution or torture exists, the case is returned to DHS for execution of the reinstated order of removal, and no administrative appeal is available.  8 C.F.R. § 208.31(g)(1).

If the asylum officer determines that the alien has established a reasonable fear of persecution or torture, the alien is referred to the immigration judge for consideration of withholding or deferral of removal only (aliens with reinstated orders of removal are not eligible for asylum).  8 C.F.R. § 208.31(e).  Because an alien's removal order remains administratively final throughout such "withholding-only" proceedings, 8 U.S.C. § 1231(a) continues to provide the statutory authority for her detention.

## III.   ARGUMENT

### A. The Court Ordered Remedy Should Be Consistent with the INA, Including Statutory Removal Authorities and Detention Requirements.

The policies and practices that DHS is currently implementing relating to detention at family facilities are consistent with the requirements of the INA, and should not be prohibited by the release, licensing, or non-secure-facility provisions of the Agreement.  The policies and practices resulting in lengthy detention that were the

23

focus of this enforcement action and of the Court's Order no longer exist.  The broader remedies proposed by the Court would create a conflict between the Court's reading of what is required under the Agreement, and the statutory authority for streamlined removal processes and detention that is currently effectuated through the use of family facilities.  8 U.S.C. §§ 1225, 1226, 1231.  Put another way, even if the Court is correct that DHS's previous policies and practices violated the Agreement, it does not follow that the Court could or should enter an order enjoining the *current* policies and practices, which were not challenged by Plaintiffs in their enforcement motion, are authorized by the INA, and do not violate the Agreement.

As the Court noted in its Order, where a parent is considered a flight risk, ICE is justified in detaining the parent and child.  *See* ECF No. 177 at p.9 n.5.  But as discussed above, a consideration of flight risk is not the only constraint governing whether detention is appropriate, or even mandatory, for the family groups housed at ICE family facilities.  In fact, the majority of individuals for whom an individualized finding of flight risk would be appropriate are released (subject to reasonable conditions to ameliorate the flight risk) under ICE's current policies.  The additional scenarios described above – under which detention is required by the INA – present an equally compelling justification for detention, yet they are not addressed in the Court's order or proposed remedies.

To start, individuals subject to mandatory detention under expedited removal are eligible only for parole under the limited criteria of 8 U.S.C. § 1182(d)(5)(A), and

not discretionary release under 8 U.S.C. § 1226(a). They cannot be released simply on finding no flight risk or danger (as the Court's proposed remedy in paragraph 4 would require) without contravening the INA. This is because expedited removal requires detention until eligibility for relief is established, and an order effectively requiring DHS to parole all individuals in expedited removal before such eligibility is established would conflict with the provisions governing expedited removal and parole. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); 8 U.S.C. § 1182(d)(5)(A) (DHS may, in its "discretion parole into the United States temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . . ."); 8 C.F.R. §§ 235.3(b)(2)(iii) and 235.3(b)(4)(ii) (parole of aliens in the expedited removal-credible fear process "may be permitted only when the [Secretary of Homeland Security] determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.").[20]

Additionally, the Court also recognized in its Order that the Agreement "controls release *pending removal proceedings* and does not interfere with the

---

[20] It is this standard, and not the discretionary release standard, that governs the release of accompanied children discussed in the Court's Order. *See* ECF No. 177 at 6.

grounds for removal itself." Order at 22 (emphasis in original). However, as written, the Court's proposed remedies would do more than govern release pending removal proceedings; they would, in fact, interfere with the Government's ability to place individuals into expedited removal at all. As noted above, expedited removal requires detention until eligibility for relief is established. *See* 8 U.S.C. § 1225(b); Homan Decl. ¶ 8, Ex. 1. Without the ability to detain even for the short period of time necessary to complete the expedited removal processing (which almost always will be longer than three to five days), DHS would effectively be prevented from using the expedited removal process as Congress intended. *See id.* ¶ 33 ("If this Order is maintained in its current form and interpreted in this manner, it would functionally terminate the ability of DHS to place families into expedited removal or reinstatement proceedings, which cannot be completed in three to five days.").

Thus, as currently proposed, the remedies in the Court's Order would effectively exempt families from the expedited removal process and thwart Congress's clear intent to provide expedited removal, including detention, as a tool for DHS to deal with the ever-changing trends in immigrant populations crossing the border and to ensure compliance with immigration proceedings.[21] *See* 8 U.S.C. § 1225(b)(1)(A)(i) (If an arriving alien is inadmissible under 8 U.S.C. § 1182(a)(7), an immigration officer "*shall order the alien removed from the United States without*

---

[21] A significant number of families who were released at the border have failed to appear in immigration proceedings. *See* Homan Decl. ¶ 30.

*further hearing or review* unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.") (emphasis added); *see also* Homan Decl. ¶¶ 8-9.  Without the practical authority to place individuals into expedited removal, the Government's only options are to criminally prosecute the adults under 8 U.S.C. §§ 1325 or 1326; to place the families in removal proceedings without any screening for eligibility for relief and release them into the interior; or to separate parents and their children by detaining the parents and releasing the children. *See* Johnson Declaration, ECF No. 120-1, ¶ 10; *see also, supra,* note 1.  The Court should not read the Agreement to eliminate expedited removal as an option for DHS with regard to families by making it impossible for DHS to detain them long enough to complete expedited removal processing.[22]

       Further supporting the conclusion that the Court should not order a remedy that nullifies various congressionally-provided removal options, the Agreement does not specifically authorize release from detention mandated by expedited removal or

---

[22] The case is equally compelling for individuals who have previously been removed, illegally reentered, and have had their prior orders of removal reinstated.  Those individuals are within the 90-day "removal period," during which ICE is entitled to detain individuals to effectuate their removal.  8 U.S.C. § 1231(a)(2).  As discussed above, and shown in Defendant's proposed order, DHS seeks to detain individuals with reinstated orders of removal for only a brief period of time – on average approximately 20 days – while their initial claims of reasonable fear are adjudicated.  Those who establish reasonable fear will be released under appropriate conditions in almost all cases.  Those who do not generally will be removed.  Requiring DHS to conduct an individualized determination of flight risk or dangerousness for these individuals in lieu of the reasonable fear screening is contrary to both the letter and the spirit of the statute, which is designed to ensure that individuals who have already shown a propensity to disobey the immigration laws are able to be removed promptly without opportunity to abscond again.

reinstated removal orders, nor does it purport to limit the government's ability to conduct expedited removal or reinstatement.  Such a major consequence should not be inferred from the Agreement by implication.  The expedited removal and reinstatement processes were established in 1996 pursuant to the Illegal Immigration Reform and Responsibility Act of 1996 ("IIRIRA"), which substantially amended the procedures under the INA regarding the admission and removal of aliens arriving in the United States without proper documentation.  In signing the Agreement, the parties specifically stated that they knew "of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law."  Agreement ¶ 41.[23] Thus, the Court should not order a remedy that would cause the Agreement to restrict DHS's legal authority with regard to the availability of certain removal processes under the INA.  Doing so would contravene the intent of the parties in making the Agreement and would render those removal options nugatory.[24]

_____

[23] The Government could not have entered into a settlement that nullified Congress's expedited removal or reinstatement statutes with regard to families.  Because a settlement agreement is a contract, it "may be illegal and void" where "it is contrary to a . . . statute."  *Trist v. Child*, 88 U.S. 441, 448, 22 L. Ed. 623 (1874). This is especially the case when there was no allegation in the underlying case that these statutes were unlawful as applied to minors.

[24] Even if the Court were to decide that the Agreement does require DHS to end the use of expedited removal proceedings and reinstatement proceedings involving families, this would still leave the question unanswered of what DHS is then supposed to do in cases where these families abscond from removal proceedings or do not show up for ICE appointments required by their conditional release.  If ICE cannot detain these families together to effectuate their removal – which will in many cases take longer than 3 to 5 days to obtain travel documents after the absconding family is apprehended – it is unclear how ICE would be able effectuate their

There is other evidence that the parties did not intend the Agreement to require release of individuals subject to mandatory detention under the INA, nor to apply the licensing requirement to the detention of minors under these INA provisions. To start, the original *Flores* litigation was solely challenging detention under what was, at the time, the discretionary detention statute. *See Reno v. Flores*, 507 U.S. 292, 309, 113 S. Ct. 1439, 1451, 123 L. Ed. 2d 1 (1993) ("Respondents contend that the regulation goes beyond the scope of the Attorney General's discretion to continue custody over arrested aliens under 8 U. S. C. § 1252(a)(1)"). There is no basis to find that the Agreement implicitly intended to cover mandatory detention situations when the underlying case was entirely about situations where a minor could be released, but Defendants exercised their discretion to refuse release of minors to non-parents. *Id.*

Moreover, the Agreement, by its terms, clearly reflects an intention to apply only to discretionary detention under the INA. This is made clear by the fact that the general policy favoring release applies where the Government otherwise determines that the minors are not flight risks or dangers to themselves or others. *Compare* Agreement ¶ 14, *with*, 8 U.S.C. § 1226(a); 8 C.F.R. § 236.1(c)(8). There is nothing in the Agreement that reflects an intent to require release of individuals in mandatory detention through use of the parole standard in 8 U.S.C. § 1182(d)(5)(A), which was

---

removal. *See* Homan Decl. ¶ 33. This example further illustrates why reading a 3-to-5 day detention maximum for families into the Agreement, regardless of the statutory authority for detention, would not only lead to absurd results, but would significantly impede DHS's ability to fulfill its enforcement mission.

not intended to be the norm and is in the sole and unreviewable discretion of DHS. *See* 8 C.F.R. § 235.3(b)(4)(ii) (providing that an alien subject to expedited removal may only be paroled prior to a positive credible fear determination when "required to meet a medical emergency or . . . necessary for a legitimate law enforcement objective.").  In fact, in paragraph 9 of the Agreement, the parties' stated their clear intent to supersede previous INS *policies* governing the detention, release, and treatment of minors in the custody of INS.  At the same time, they did not state an intent to supersede or otherwise nullify the operation or application of existing immigration *statutes* in cases involving minors.  This specific use of language illustrates that the clear intent of the agreement was to address INS policies regarding the detention of minors in the discretionary detention context and not to nullify statutory language on mandatory detention or the use of expedited removal or the reinstatement process.

It is also important to consider that Plaintiffs' entire enforcement action here is a challenge to ICE's failure to release those subject to discretionary detention, whose release or detention is determined by an evaluation of flight risk.  *See* Motion, ECF No. 100-1, at 5-14.  Plaintiffs thus did not raise a challenge to the continued detention of families whose detention is not discretionary, but rather is authorized or required under a separate section of the INA.  Because the Agreement has always been applied to the discretionary detention of minors – and not to mandatory detention or detention authorized under other, non-discretionary, sections of the INA – both the release and

the licensing provisions should not be read to eliminate DHS's ability to conduct short-term detention in those contexts.

Further evidence of the parties' intent in this regard is found in the parties' course of conduct since the Agreement was signed. The Berks Family Residential Center ("Berks facility") has been in operation, and has housed families, since 2001. *See* Declaration of Tae D. Johnson, ECF No. 120-1, ¶¶ 13, 15. By and large, during that time, the facility has been used to house families who are in expedited removal proceedings, or who are subject to a final order of removal and awaiting removal. *See id.* ¶¶ 13, 15. In fact, nearly 5,000 individuals have been housed at the Berks facility since 2001. Homan Decl. ¶ 16, Ex. 1. Nonetheless, Plaintiffs have never challenged the detention of minors with their parents at the Berks facility as violating the Agreement.

In fact, in 2004, Plaintiffs filed an action seeking enforcement of the Agreement, and raised several challenges to the Government's practices with regard to the detention of minors, but raised no challenge to the housing of accompanied minors at the Berks facility. ECF Nos. 18, 19. Moreover, it should be noted that in the course of that litigation, Plaintiffs acknowledged that the authority to detain individuals for purposes of removal under 8 U.S.C. § 1231 applied to minors, and was not precluded by the Agreement so long as it did not otherwise violate the statute. *See* ECF No. 19 at 31 ("[N]othing in the settlement precludes defendants from detaining a child in the course of physically removing him or her, but neither does it permit

months or years of open-ended incarceration."); *id.* at 32 (acknowledging that detention in secure facilities to effectuate removal is proper if there is a "reasonable expectation that they will be able to effect removal promptly").

Similarly, in 2007 challenges to family detention at the Hutto Family Residential Center, the parties reached a settlement agreement in which ICE was permitted to place families who were in expedited removal in family detention -- a clear sign that the parties did not understand the Agreement to apply to those in expedited removal who were subject to mandatory detention. *See In re Hutto Family Detention Ctr.*, No. 07-164, ECF No. 92-2 at ¶ 6.A, Aug. 26, 2007 (W.D. Tex.).  In that case, the district court recognized, "it is apparent that this agreement did not anticipate the current emphasis on family detention, where the parole of adult family members is limited by acts of Congress or the judicial branch." *Bunikyte, ex rel. Bunikiene v. Chertoff*, Nos. 07-164, 07-165, 07-166, 2007 WL 1074070, at *3 (W.D. Tex., Apr. 9, 2007).  Notably, Plaintiffs never challenged this provision of the *Hutto* settlement agreement in this Court or any other court as violating the Agreement.[25]

Overall, the language of the Agreement and the course of conduct of the parties since the Agreement was executed provide good reason to find that Defendants'

_____

[25] If the Court were to enter a proposed order that conflicted with the *Hutto* settlement, it would create the anomalous result where one district court held that Defendants could operate a family residential facility at Hutto (the conditions of which were inferior to the conditions at ICE's current family facilities) consistent with the Agreement, while this Court held that Defendants could not operate family facilities in a different part of Texas without violating the Agreement.

current practice of detaining families, including children, in family facilities (*i.e.*, detaining when required under the INA and presuming release for those who establish credible or reasonable fear and have a verifiable fixed address) is consistent with the INA and the Agreement.  For all of the above reasons, the Court should enter the Defendants' proposed order because it will ensure that the Court's reading of the Agreement remains consistent with the INA, and does not deprive DHS of the tools Congress has provided it to deal with ever-changing immigration trends and challenges.

## B.  The Court Should Reconsider Its Order Finding Defendants in Breach of the Agreement.

### i.   *DHS Does Not Have A "No Release" Policy.*

As discussed above, the Court's Order should be reconsidered because it is based on the Court's interpretation of DHS detention policies with regard to ICE family residential centers that do not exist.  Notably, the entirety of the Court's Order, factual findings, and legal conclusions, are premised upon a factual finding that DHS maintains families in detention pursuant to "a blanket policy to detain all female-headed families, including children, in secure, unlicensed facilities for the duration of the proceedings that determine whether they are entitled to remain in the United States."  Order at 2 (footnote omitted); *see also* Order at 4, 7 n.4, 7, 8, 9, 11, 12, 23, 24.  Defendants submit that such a policy has never existed, and, in any event, any ambiguity about the existence of a blanket "no-release" policy has been clarified

through subsequent DHS and ICE policy announcements and the resolution of *R.I.L.R.* Moreover, under the May and June directives of the Secretary of DHS and the Director of ICE, over 60% of persons processed into a family facility in a recent two-week period ending July 11 were released or removed within two to four weeks. Homan Decl. ¶ 27, Ex. 1. The bottom line is that the Court's Order is addressing a factual context that no longer exists (even assuming it did) and that does not apply to anyone currently housed at a family facility. Therefore, Defendants request that the Court reconsider its order and proposed remedy.

To clarify what has actually transpired since the summer of 2014, the Court is correct in finding that there was a surge of Central American families unlawfully entering the United States beginning in the summer of 2014. Order at 2; *see also* Homan Decl. ¶ 6. However, Defendants did not – in response to this "surge" – adopt a policy of detaining all female-headed families for the duration of their removal proceedings or their removal. Order at 4. This issue was extensively litigated in the case of *R.I.L.R., et al. v. Johnson, et al.*, Case No. 15-0011, ECF No. 33 (D.D.C, Feb. 20, 2015). In *R.I.L.R.*, the court concluded that no such blanket "No-Release Policy" existed. *Id.* at 8. Instead, the *R.I.L.R.* court acknowledged that Defendants were conducting individualized custody determinations for individuals who were members of family groups detained under 8 U.S.C. § 1226(a). *Id.*

The operative issue decided by the court in *R.I.L.R.* was whether Defendants could detain families pursuant to the Attorney General's binding precedent in *Matter*

*of D-J-*, 23 I. & N. Dec. 572 (2003), which held that deterrence of mass migration could be considered in making custody determinations under 8 U.S.C. § 1226(a).  The court ultimately ruled that Plaintiffs had a significant likelihood of succeeding on their claim that ICE's consideration of deterrence as a factor in custody decisions was unlawful.  *Id.* at 38.  The net effect of the *R.I.L.R.* court's order – in conjunction with the policy announcement made by DHS on May 13, 2015 and discussed more fully above – is that since February 20, 2015, Defendants have not detained a single person at a family facility where general deterrence of unlawful migration was used as a factor in his or her custody determination.[26]  *See also* Homan Decl. ¶ 7 ("ICE no longer uses deterrence as a factor in individual custody determinations . . . .").

Thus, ICE does not have a "No-Release Policy" for families, and further is not considering deterrence as a factor in its discretionary detention determinations under 8 U.S.C. § 1226(a) with regard to families.  There is thus no basis to find that any individuals – either adults or children – are detained in a family facility other than as

---

[26] In *R.I.L.R.*, the Government moved for reconsideration of the Court's finding.  *See R.I.L.R., et al. v. Johnson, et al.*, Case No. 15-0011, ECF No. 37 (D.D.C., March 20, 2015).  On May 13, 2015, despite the pendency of this motion for reconsideration, ICE announced that it would "discontinue invoking general deterrence as a factor in custody determinations in all cases involving families."  *See* DHS Press Release, ECF No. 153-1, at 2.  ICE reiterated that position on June 24, 2015, when it announced further changes to its detention practices regarding families.  *See* DHS Press Release, ECF No. 164-1, at 2.  At the direction of the *R.I.L.R.* court, the parties met and conferred and agreed to dissolve the *R.I.L.R.* preliminary injunction and administratively close the case, subject to an agreed-upon procedure that allows for reopening of the case followed by expedited consideration of the pending issues on reconsideration in the event the Government were to decide again to consider deterrence as a factor in custody determinations in the future.  *See R.I.L.R.* Order, ECF No. 43.

required by statute, or because the individual or family has been determined a flight risk and has not been able to satisfy reasonable conditions of release, such as posting a bond.

### ii.   The Court Did Not Credit Important Evidence Regarding the Meaning of "All Minors" in the Agreement.

In addition, the Court should reconsider its conclusion that the Agreement applies to alien children accompanied by their parents ("accompanied children").  As noted in prior briefing to the Court, the Agreement should not be interpreted to apply to such children as there was no meeting of the minds between the parties with respect to such a population.  *See* ECF No. 121, at 7-19.  The parties did not consider family detention when entering into the Agreement, as evidenced by the following:

- During the time that the lawsuit was filed and the Agreement was signed, the former Immigration and Naturalization Service (INS) had detention facilities for unaccompanied minors but not for families.  *Id.* at 12.

- The Agreement expressly stated that it was intended to resolve a lawsuit challenging INS's "policies, practices, and regulations regarding the detention and release of *unaccompanied* minors."  Agreement at 3 (emphasis added); *see also Reno v. Flores*, 507 U.S. 292, 294, 113 S. Ct. 1439, 1443, 123 L. Ed. 2d 1 (1993) (noting that the litigation applied to "alien juveniles who are not accompanied by their parents or other related adults").

- The Agreement contains many provisions clearly designed for UACs, including provisions:  governing the placement of class members in facilities licensed to care for "*dependent* children," Agreement at 3; requiring that any custodian to which a minor is released provide for the minor's "financial well-being" (yet accompanying parents pursuing asylum in standard removal proceedings or those pursuing protection in withholding/deferral only proceedings face significant limitations on their ability to lawfully work in the United States, 8 U.S.C. § 1158(d)(2), 8 C.F.R. § 274a.12(c)(8)), Agreement at 10; requiring notice to the INS upon the initiation of dependency proceedings, *id.* at 11; authorizing the INS to "assume legal custody of any minor whose custodian fails to comply with the agreement," *id.*; authorizing suitability assessments for possible custodians, *id.*; and requiring the INS to make "continuous efforts . . . toward family reunification," *id.* at 12.  Yet the Agreement contains no provisions expressly dealing with accompanying parents or the specific concerns faced by accompanying children.  Tellingly, there are no provisions specifically governing the detention of children with accompanying parents or the release of such parents when releasing their children.

The Agreement's provisions plainly indicate that the parties did not anticipate its application to accompanied children or family detention.

37

Further supporting this conclusion is the class certification originally entered by the Court in this case. *See* Order Re Class Certification, Aug. 11, 1986 (available at ECF No. 142-1). The second "Whereas" paragraph of the Agreement states that "the District Court has certified this case as a class action on behalf of *all minors* apprehended by the INS in the Western Region of the United States." Agreement at 3 (emphasis added). This provision, and the class certification it references, should be considered when attempting to discern what the term "all minors" means in the remainder of the Agreement. *See Brady v. Grendene USA, Inc.*, No. 12-604, 2015 WL 3539702, *4 (S.D. Cal, June 3, 2015) (noting that whereas clauses may be useful in interpreting ambiguous operative clauses). Here, the "Whereas" clause indicates that the definition of "all minors" in the Agreement should be interpreted commensurate with the definition contained in the class that was certified by the Court in this case.

The Court's original order on class certification makes clear that with regard to the Plaintiffs' claims that class members were unlawfully denied release, the relief for the certified class was meant to encompass only minors "who have been, are, or will be denied release from INS custody because a parent or legal guardian failed to personally appear to take custody of them." ECF No. 142-1. It reasonably follows, then, that the class definition contained in the Agreement, when it referenced "[a]ll minors[,]" was meant to cover this same group of individuals: those who are under 18, and not accompanied by a parent or guardian.

Interpreting the Agreement in a contrary manner fails to account for this key limitation in the scope of the litigation, and makes the Agreement as a whole inconsistent with the parties' intent of covering the same category of minors as those covered by the original class certification order in this litigation.  A broader reading is contrary to the Court's correct legal conclusion that the Agreement should be read as a contract, and thus should not be interpreted "in a way that renders" one of "its clauses nugatory".  ECF No. 177 at 3 (citations omitted).  The broader interpretation of the Agreement's scope also deviates markedly from the principle that there must be a meeting of the minds between the parties on key points in order to bind them to such significant ongoing obligations.  Because the Court failed to take account of the history of the litigation and the intent of the parties, the Court's conclusion merits reconsideration.

### iii.   The Court Did Not Credit Important Evidence Regarding the Course of Dealing of the Parties With Regard to Family Detention

The Court concluded that Defendants were in breach of the Agreement in part by reviewing "Defendants' conduct over the last two decades since the Agreement was signed . . . ."  Order at 8-9 (citing *Crestview Cemetery Ass'n v. Dieden*, 54 Cal.2d 744, 754, 8 Cal. Rptr. 427, 356 P.2d 171 (1960)).  Even though the Court correctly held that it can look to the subsequent conduct of the parties as evidence of their intent, *see* ECF No. 177 at 3, the Court concluded based on declarations submitted by Plaintiffs that, "[i]t is uncontroverted that, prior to June 2014, ICE generally released

children and parents upon determining that they were neither a significant flight risk nor a danger to safety." *Id.* at 9.  Thus, the Court found, "ICE's conduct subsequent to the formation of the Agreement bolsters Plaintiffs' argument that the preference for release provision requires the release of the accompanying mother along with the child, so long as she does not present a significant flight risk or danger to safety." *Id.*

However, this conclusion contains a clear and fundamental factual error because it fails to take into account the existence of the Berks facility that has been in operation, and has housed families in the manner challenged here, since 2001.  *See* Declaration of Tae D. Johnson, ECF No. 120-1, ¶¶ 13, 15.  Plaintiffs do not dispute that the Berks facility was used to house families even before June 2014, or that the average length of stay for families at the facility prior to June 2014 was greater than 72 hours.  *See* Declaration of Bridget Cambria ("Cambria Decl."), ¶ 5 (estimating that the average length of stay prior to June 2014 was seven days); Donohoe Decl. ¶ 5 (estimating that the average length of stay prior to June 2014 was twelve days).[27] Nonetheless, as noted above, Plaintiffs have never sought to challenge Defendants'

---

[27]  In fact, the average length of stay at the Berks facility, even prior to June 2014, was greater than estimated by Plaintiffs' declarants.  *See* Homan Decl. ¶ 22, n.10.  Since its first use as a family residential center in 2001, the average length of stay at Berks has been 66 days, with the lowest average length of stay for any one year at 36 days (in 2001).  *Id.*  Moreover, citing average lengths of stay can be misleading because family groups that cannot establish reasonable or credible fear may be detained for a very short period before being removed, while in the past family groups were more likely to be detained during their asylum or withholding proceedings (a situation which is extremely unlikely to occur under ICE's current policies), and that detention might extend for a longer period of time.  *See* Lutheran Immigration and Refugee Services, *Locking Up Family Values*, at 32, available at: http://www.lirs.org/wp-content/uploads/2012/05/RPTLOCKINGUPFAMILYVALUES2007.pdf

housing of families, including children, at the Berks facility, on the grounds that the use of Berks to house families violated the Agreement.  As noted earlier, in 2004 Plaintiffs raised several challenges to the Government's practices with regard to the detention of minors, but raised no challenge to the housing of accompanied minors at the Berks facility.  ECF Nos. 18, 19.  That a family facility has operated in Pennsylvania housing families, with no allegation that it violated the Agreement by Plaintiffs or anyone else, is a critical fact clarifying what the parties intended to be the meaning of the agreement.  *See* Order at 8 (citing *Crestview Cemetery*, 54 Cal.2d at 754).

Moreover, this fact is also essential to understanding why the Court erred in ruling that Defendants commenced operation of the facilities in Texas without evidence to believe that those facilities were compliant with the Agreement.  ECF 177 at 20.  ICE has operated the Berks facility as a family residential center since 2001, and it has housed accompanied children there with their parents for an average period of 66 days.  Yet Plaintiffs never once raised any claim that this course of conduct violated the Agreement.  This is an important issue of fact that must be taken into account when considering what the course of conduct between the parties says about the intent of the parties in signing the Agreement.

41

iv.   *The Court Should Reconsider Its Interpretation of the Term "Non-Secure" as Used in the Agreement.*

Finally, the Court should reconsider its interpretation of the language of the Agreement with regard to licensure.  Specifically, the Agreement requires that "[a]ll homes and facilities operated by licensed programs . . . shall be non-secure *as required by state law*."  Agreement ¶ 6 (emphasis added).  The Court's interpretation of the term "non-secure," however, fails to give effect to the operative language, "as required by state law," and conflicts with the additional requirement that the individual remain in the custody of DHS.  *See* Agreement ¶ 19 ("All minors placed in such a licensed program remain in the legal custody of the INS . . . .").

Despite the language of the Agreement requiring that a determination regarding whether a facility is "non-secure," be made by reference to state law, the Court's order provides, in footnote, that "'non-secure' facilities are those where individuals are not held in custody."  Order at 3 n.3.  This interpretation is in direct conflict with the remaining language of ¶ 19 of the Agreement, which expressly provides that "[a]ll minors placed in such a licensed program remain in the legal custody of the INS . . . ."  DHS does not have the authority or the appropriations to maintain individuals in its "legal custody" in the manner suggested by the Court's Order.  In addition, the Court's interpretation would be in direct tension with the remaining custody

framework of the INA.  Of note, the authority to detain families,[28] like other

removable aliens, is provided in, among other provisions, 8 U.S.C. §§ 1225(b), 1226,

and 1231.  And, DHS's authority to provide medical screening, education, and other

programs in family facilities is tied directly to its detention authorities.[29]  The Court

should clarify its interpretation of the term "non-secure" to recognize that individuals

housed in facilities deemed non-secure under state law are nonetheless in DHS

custody.  In accordance with the terms of the Agreement the Court should instead

apply state law in determining whether a particular facility is unsecure.

### C. The Court Should Neither Find CBP in Breach Nor Order a Remedy Without Allowing Additional Fact-Finding

The Agreement contains only minimal guidelines with regard to the conditions

CBP must maintain for minors in Border Patrol custody immediately following their

arrest or apprehension.  Such facilities are essential for maintaining border security,

protecting public safety, and preliminarily processing and caring for individuals

apprehended at or near the border.  *See* Vitiello Decl. ¶ 18, Ex. 2.  Generally, the

---

[28] "Congress used the terms 'custody' and 'detain' interchangeably and did not intend for them to be afforded different meanings."  *Matter of Aguilar-Aquino*, 24 I. & N. Dec. 747, 752 (BIA 2009).

[29] ICE receives appropriated funds to pay "necessary expenses for enforcement of immigration and customs laws, detention and removals, and investigations."  Department of Homeland Security Appropriations Act, 2015, Pub. L. No. 114-4, 129 Stat. 39, 42 (2015).  The provision for "detention" gives ICE the means to provide subsistence and medical care to aliens whom the agency has detained.  However, the appropriation makes no reference to providing for aliens who are not in ICE's custody.  Therefore, ICE cannot use funds appropriated for detention and removal to pay for the health care and other expenses of aliens who are not in ICE's custody

Agreement requires that CBP facilities be "safe and sanitary[,]" and "consistent with [CBP's] concern for the particular vulnerability of minors."  Agreement ¶ 12A. Specifically, the Agreement focuses on six basic requirements: (1) "drinking water and food as appropriate," (2) medical assistance if there is a need for "emergency services," (3) "access to toilets and sinks," (4) "adequate temperature control and ventilation," (5) "adequate supervision to protect minors from others," and (6) separation from unrelated adults whenever possible.  Agreement ¶ 12A.

Relying on its review of documentary evidence presented by Plaintiffs regarding conditions experienced by a limited number of Plaintiffs at (in some instances unspecified) CBP facilities (although all appear to be operated by Border Patrol) in the Rio Grande Valley area of Texas over a very short period of time during or immediately following the 2014 immigration surge, the Court concluded that "Defendants have wholly failed to meet even [the] minimal standard [set forth in the Agreement]."  Order at 18.  This conclusion is overbroad, and Defendants respectfully ask that the Court reconsider it.

Plaintiffs' enforcement motion, and accompanying proposed order, make clear that Plaintiffs' claims were based in large part on a contention that Defendants had no standards in place at Border Patrol facilities.  *See* Motion, ECF No. 100-1 at 21 ("[D]efendants report adhering to no specific standards regulating the treatment and conditions children experience during Border Patrol custody."); Proposed Order, ECF No. 118, at ¶ 3 (seeking an order requiring Defendants to propose standards for

Border Patrol facilities that comply with the requirements of the Agreement). Although the Agreement contains no requirement that Defendants maintain standards, Defendants nonetheless responded to these allegations by submitting documentary and testimonial evidence that they do, in fact, have standards in place, and that these standards necessarily also consider the safety and security needs at Border Patrol facilities given the nature and purpose of those facilities as short term processing centers. *See* Opp., ECF No. 121, at 20-25 (and attached exhibits); ECF No. 131, Exhibits G, H, I (reports from the independent DHS Inspector General's office indicating that CBP's holding facilities are generally in compliance with the Agreement).

Nonetheless, Plaintiffs contend, and the Court concluded, despite the limitations on Plaintiffs' evidence both in time and geography, that such anecdotal evidence was sufficient to establish that Defendants are in breach of the Agreement. Order at 18 ("The testimony of one Border Patrol official regarding CBP's policies is insufficient to outweigh the evidence presented by Plaintiffs of the widespread and deplorable conditions in the holding cells of the Border Patrol stations."). The Court therefore proposes that, to remedy this breach, CBP should implement *nationwide* standards and procedures governing conditions at Border Patrol facilities under the Agreement.

Defendants not only have disputed the Plaintiffs' evidence through their previous and current evidentiary submissions, but also dispute that the factual record

is sufficiently developed to support the Court's finding of nationwide breach against CBP.  Defendants reasonably understood that Plaintiffs were alleging that CBP lacks policies governing the minimal standards set forth in the Agreement in Border Patrol facilities, supported by testimonial evidence in the form of anecdotal declarations. Defendants therefore submitted evidence to the Court showing that although written policies are not a requirement of the Agreement, in fact Border Patrol does have standards in place on a nationwide basis, and other more localized practices and policies in place in the area of Texas about which Plaintiffs' complain.  Defendants specifically submitted testimonial evidence from the Border Patrol official familiar with the nationwide policies and responsible for the management of the Rio Grande Valley area of Texas that is the locus of Plaintiffs' allegations.  The Court recognized this evidence, but concluded that "the mere existence of those policies tells the Court nothing about whether those policies are actually implemented, and the current record shows quite clearly that they were not."  Order at 18.

Defendants respectfully submit that they had no opportunity to cross examine any of the declarants whose statements were submitted by Plaintiffs regarding their anecdotal claims, or to otherwise test the evidence submitted by Plaintiffs.  Given the nature of the proceedings thus far, and the limited opportunity for factual development, the totality of the evidence suggests that there are factual disputes as to whether Defendants have policies in place that comply with the Agreement, and as to whether Defendants are following those policies.  Moreover, CBP has in fact made

significant efforts at addressing concerns about the conditions in Border Patrol facilities in the Rio Grande Valley area of Texas that arose during the surge in the summer and fall of 2014.  *See* Vitiello Decl. ¶¶ 18-45 (discussing efforts that have decreased processing time and improved conditions at CBP facilities in the Rio Grande Valley since the 2014 surge); *see id.* ¶ 41 (noting that 86% of families apprehended during FY 2015 to date leave Border Patrol custody within 72 hours). Among those improvements was a new and permanent 55,000 square foot Border Patrol facility in the Rio Grande Valley specifically designed to allow for the separation of families and children from the general detainee population, and the provision of services specifically geared towards families and children.  *Id.* ¶ 33. Even accepting the statements of Plaintiffs' declarants as true statements of the conditions in Rio Grande Valley Border Patrol stations during and immediately following the surge period, the actions taken during and after that time period by CBP have resulted in all Border Patrol facilities now being in compliance with the Agreement.  *Id.* ¶ 45 (discussing a recent report by the U.S. Government Accountability Office concluding that CBP was "generally providing care consistent with policy requirements [including Flores].") (quoting *Unaccompanied Alien Children: Actions Needed to Ensure Children Receive Required Care in DHS Custody*, U.S. Government Accountability Office, GAO-15-521 http://www.gao.gov/assets/680/671393.pdf (July 2015).  At a minimum, Defendants have established that there are genuine issues of material fact requiring an evidentiary

hearing regarding whether, on a nationwide basis, CBP is in compliance with the Agreement. *See generally* Oaks Declaration, ECF No. 121-1; Vitiello Decl. ¶¶ 18-45; OIG Reports, ECF No. 131, Exhibits G-I (reports from the independent DHS Inspector General's office indicating that CBP's holding facilities are generally in compliance with the Agreement).

Additionally, the Court's Order rests on a significantly broader finding of breach than is supported by the Plaintiffs' evidentiary submissions. Plaintiffs provide no testimony from any declarant that he or she spent time in any Border Patrol station in any location other than the Rio Grande Valley in Texas. *See* Plaintiffs' Exhibits, ECF No. 101, Exhibits 12-15, 18-20, 38-52. Moreover, the declarants by and large came to the United States during, or immediately following, the significant increase in children and families crossing the Southwest border in the summer of 2014. *Id.* Plaintiffs provide no basis to find that the experiences of these individuals are representative of the experiences of individuals crossing the border at other times, or at other locations along the nearly 7,000 miles of Mexican and Canadian international land borders and coastal waters patrolled by the U.S. Border Patrol. *See generally* Border Security, Along U.S. Borders, available at: http://www.cbp.gov/border-security/along-us-borders (last accessed July 7, 2015); Vitiello Decl. ¶ 6. Accordingly, to the extent the Court's Order finds that a breach of the Agreement occurred in any Border Patrol location other than the Rio Grande Valley area of Texas, and at any times other than during and immediately following the significant

increase in border crossings that occurred in the summer of 2014, it is overbroad because it ignores the lack of evidence as to the conditions of Border Patrol facilities at any other times or locations.

In light of the above, Defendants respectfully ask that the Court reconsider its conclusion that conditions at Border Patrol facilities are, as a whole, in violation of the Agreement.  Given the minimal requirements of the Agreement, the large number and variety of Border Patrol facilities throughout the United States, and the changing numbers of individuals crossing the U.S. border at various locations over different time periods, additional evidentiary development is necessary for the Court and the parties to determine whether, and to what extent, Border Patrol facilities may be in breach of the Agreement.  Moreover, the current remedy proposed by the Court is significantly broader than is supported by the evidence or the language of the Agreement.  In light of the need for additional fact-finding, the Court should decline to order such a remedy at this stage.

Defendants suggest instead that the Court order that the parties meet and confer regarding a schedule for discovery and briefing – and an evidentiary hearing if necessary – that will allow both sides to present a more full and current picture of the conditions at Border Patrol facilities.  Allowing this additional evidentiary development will better allow the Court to assess whether, and to what extent Border Patrol facilities may be in breach of the Agreement, and to craft an appropriate remedy at that time.

IV.    **CONCLUSION**

In fiscal year 2014, the number of family members (children encountered with a parent or legal guardian) apprehended increased by 361% to 68,445.[30]  In fiscal year 2015, the Border Patrol has thus far apprehended 24,901 family members, representing a 55% decrease from the previous year.  *See* Vitiello Decl. ¶ 42, Ex. 2.  Despite this decrease, however, the number of apprehensions this summer is still substantially higher than has been the case for many years.  *Id.*  Moreover the numbers have increased steadily each and every month from January to July, which is a deviation from historical trends.  *Id.*  Immigration patterns may be affected by misinformation and rumors perpetuated by alien smugglers and human traffickers who are known to exploit changes in immigration policy.  *See* Oaks Decl., ECF No. 121-1, ¶¶ 25-28; Johnson Decl., ECF No. 120-1, ¶ 7.  Therefore, the Court's proposed remedy – to the extent that it eliminates the Government's ability to use expedited removal or reinstated orders of removal for families under any circumstances, could cause another notable increase in the numbers of parents choosing to cross the border with their children.   Smuggling endangers both the individuals who are victims of the smugglers, and the public in general.  Johnson Decl., ECF No. 120-1, ¶ 9.

---

[30]  *See* U.S. Border Patrol Statistics, available at:
http://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Family%20Units%20and%20UAC%20Apps%20FY13%20-%20FY14_0.pdf.

The Court's proposed order, as currently drafted, can be read to enjoin DHS from placing families at its family residential centers for longer than three to five days.  If this Order is maintained in its current form and interpreted in this manner, it would functionally terminate the ability of DHS to place families into expedited removal or reinstatement proceedings, which cannot be completed in three to five days.  Homan Decl. ¶ 33, Ex. 1; *see also* Lafferty Decl. ¶ 25, Ex. 3 (expecting that USCIS would be unable to conduct credible fear and reasonable fear screenings under a shortened time frame).  Similarly, if bed space is even further reduced as a result of the court's order, CBP believes this may result in longer detention at Border Patrol facilities and greater numbers of individuals attempting to cross the border unlawfully. Vitiello Decl. ¶ 47.  Taken together, the proposed Order would greatly impact DHS's operational capacity and its ability to secure the borders while facilitating lawful trade and travel.  *Id.*

   For these reasons, as well as the reasons discussed above, the Government therefore respectfully asks the Court to: 1) reconsider its Order; and 2) if it will not reconsider its Order, consider and adopt the proposed order attached hereto. *See* Defendants' Proposed Order.

DATED:       August 6, 2015               Respectfully submitted,

                                          BENJAMIN C. MIZER
                                          Principal Deputy Assistant Attorney General
                                          Civil Division

                                          LEON FRESCO
                                          Deputy Assistant Attorney General
                                          Civil Division

                                          WILLIAM C. PEACHEY
                                          Director, District Court Section
                                          Office of Immigration Litigation

                                          WILLIAM C. SILVIS
                                          Assistant Director, District Court Section
                                          Office of Immigration Litigation

                                          */s/ Sarah B. Fabian*
                                          SARAH B. FABIAN
                                          Senior Litigation Counsel
                                          Office of Immigration Litigation
                                          District Court Section
                                          P.O. Box 868, Ben Franklin Station
                                          Washington, D.C. 20044
                                          Tel: (202) 532-4824
                                          Fax: (202) 305-7000
                                          Email: sarah.b.fabian@usdoj.gov

                                          *Attorneys for Defendants*

CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2015, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.


/s/ Sarah B. Fabian
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants