IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES; *et al.*, ) Case No. CV 85-4544-DMG
)
    Plaintiffs, )
)
    v. )
)
LORETTA E. LYNCH, Attorney )
General of the United States; *et al.*, )
)
    Defendants. )
_____ )

## DECLARATION OF THOMAS HOMAN

I, Thomas Homan, hereby declare that the following statements are true and correct to the best of my knowledge, information and belief:

1. I am the Executive Associate Director for Enforcement and Removal Operations (ERO), employed by U.S. Immigration and Customs Enforcement (ICE) in Washington, D.C. As Executive Associate Director since May 2013, I am responsible for promoting public safety and national security by ensuring the departure from the United States of removable aliens through the fair enforcement of the Nation's immigration laws. I direct and oversee the nationwide day-to-day immigration enforcement and removal operations of six major program divisions, 24 field offices and 12 international offices. I am accountable for the execution of a $3.4 billion budget and the management of approximately 8,000 staff, including more than 6,000 law enforcement officers, 1,200 support personnel, and 900 U.S. Public Health Service commissioned officers and contract medical personnel.

2. I am a 32-year veteran of law enforcement. I began my career as a police officer in New York in 1983. In 1984, I became a United States Border Patrol Agent in Campo, California. In 1988, I became a Special Agent with the U.S. Immigration and Naturalization Service (one of ICE's predecessor agencies) in Phoenix, Arizona, and climbed through the ranks of Supervisory Special Agent and Deputy Assistant Director for Investigations. In 1999, I became the Assistant District Director for Investigations (ADDI) in San Antonio, Texas, and three years later transferred to the ADDI position in Dallas, Texas. Upon the creation of ICE, I was named the Assistant Special Agent in Charge in Dallas, Texas, and later the Deputy Special Agent in Charge there. In March of 2009, I accepted the position of ERO Assistant Director for Enforcement at ICE Headquarters in Washington, D.C. and was subsequently promoted to ERO Deputy Executive Associate Director. In May of 2013, I was promoted to Executive Associate Director for ERO.

3. I have a Bachelor of Science degree in Criminal Justice from the State University of New York.

4. The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my official capacity.

**Introduction**

5. ICE has a complex mission that requires a careful balancing of various interests and goals, including ensuring border security and the integrity of the immigration system; effectively and efficiently processing, detaining, and removing individuals from the United States under the immigration laws; identifying individuals with claims of fear who need to be screened for humanitarian protections under our immigration laws; providing care and medical treatment to individuals in immigration detention; ensuring public health and safety by conducting

2

examinations for communicable diseases, observing incubation periods, and administering vaccinations; evaluating risk of flight and making custody decisions that promote compliance with immigration proceedings; and providing access to legal orientation programs and ensuring access to counsel. ICE is committed to meeting its mission and performing these obligations in a lawful and humane way.

6. The unprecedented surge of illegal border crossings in the Rio Grande Valley in South Texas in the summer of fiscal year (FY) 2014—particularly by parents with children (collectively referred to herein as "families," and individually referred to as "family members") and unaccompanied alien children (UACs)—posed serious and unique challenges for the U.S. Government. As part of a comprehensive strategy to address this humanitarian crisis, the Department of Homeland Security (DHS) quickly implemented several actions. Among other things, DHS significantly expanded its family processing and detention capacity in an effort to secure the border and protect homeland security, enforce the rule of law, protect U.S. public health, examine and care for the thousands of children and families who came into DHS custody, process them and evaluate their eligibility for relief, and disrupt the organizations that put many of these individuals in harm's way.

7. Since the surge in FY 2014, DHS has taken a series of steps to further ensure its family residential centers serve as safe and humane facilities for families while they are processed by ICE—normally either upon apprehension by ICE or upon transfer from U.S. Customs and Border Protection (CBP). Rather than serving as long-term detention facilities, those facilities are now intended to serve as interim processing centers where ICE can conduct background checks, provide health screenings and immunizations, allow U.S. Citizenship and Immigration Services (USCIS) asylum officers to assess individuals for eligibility to apply for humanitarian

immigration protection (i.e., asylum, withholding of removal, and deferral of removal under the regulations implementing the Convention Against Torture), and release individuals under reasonable conditions if they establish eligibility to apply for relief or protection from removal. ICE no longer uses deterrence as a factor in individual custody determinations, and, under current policies and procedures, the only families who may be detained for longer than the minimum period necessary for initial processing and screening are those who: present a danger to themselves or others; pose an unreasonable risk of flight; or are otherwise subject to detention under the immigration laws, including those who are subject to streamlined removal processes and have not established eligibility to apply for relief from removal.

**Family Processing and Conditions Before the Expansion of Family Detention**

8. Prior to June 2014, families were a relatively small percentage of those who were apprehended at or near the border. Generally, under our immigration laws, individuals apprehended crossing the border illegally are subject to a streamlined removal process known as "expedited removal." For individuals in the expedited removal process, detention is mandatory unless the individual is determined to possess a credible fear of persecution or torture if returned to his or her country. Once an individual is determined to possess a credible fear, he or she is referred to an immigration judge for standard removal proceedings and is generally eligible to be considered for discretionary release under the immigration laws. Individuals determined not to possess a credible fear of removal remain in the expedited removal process and are generally detained until removal.

9. Prior to the expansion of family residential centers, however, DHS was largely unable to use expedited removal for the processing of families apprehended at the border. Expedited

removal requires detention,[1] and in recent years through the summer of 2014, ICE maintained fewer than 100 family beds nationwide.[2] Therefore, under a practice informally known as "catch and release," families were instead normally issued a Notice to Appear, which initiated removal proceedings before the immigration court, and then released on their own recognizance or on bond or other conditions of release, with no substantive screening for eligibility for relief or evaluation of their case at all. Following their release, families often failed to appear for their immigration court hearings, were ordered removed in absentia, and became immigration fugitives. As described below, increasing ICE's ability to use expedited removal and expanding family bed capacity was part of a comprehensive strategy to end "catch and release" and allow DHS to better evaluate the identity of families apprehended at the border; assess them for risk of flight and public safety, and eligibility to apply for relief; and reduce the number of in absentia removal orders issued to this unique population.

### FY 2014 Surge at the Southwest Border and DHS's Response

10. In the summer of 2014, the United States experienced an unprecedented surge of illegal border crossings focused in the Rio Grande Valley, particularly by families and UACs from Central America. U.S. Customs and Border Protection (CBP) apprehended over 68,500 UACs and 68,000 family members in FY 2014. These numbers represented a 77% increase in the apprehension of UACs and a 361% increase in the apprehension of family members, respectively, as compared to fiscal year 2013. Moreover, the influx was particularly concentrated in the summer months. The Border Patrol apprehended 14,725 UACs and 6,210 family members from May to August 2013. In that same timeframe during 2014, the Border

---

[1] *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) and 8 C.F.R. § 235.3(b)(4)(ii).

[2] ICE has operated the Berks Family Residential Center, including for families placed into expedited removal, since 2001.

Patrol apprehended 29,877 UACs and 39,899 family members. This extraordinary summer increase placed significant strain on a number of DHS resources and operations, including ICE.

11. During and after this surge of families and UACs, reports indicated that individuals illegally entering the United States from Central America had become increasingly aware that, after apprehension, families were being processed and released. The screening and evaluation of those released without being detained by ICE is less substantive, because of additional time constraints, than those who are detained. At the same time, DHS intelligence indicated smugglers were disseminating misconceptions about immigration benefits in the United States by telling families that if they made it to the U.S. border, they would be given "permisos," or free passes, and allowed to stay.[3]

12. In response to the unprecedented surge in FY 2014, DHS and other federal agencies developed a multi-faceted strategy to address the humanitarian crisis caused by this influx and to stem further mass migration. The strategy included, among other things: (1) deploying additional enforcement resources to the Southwest Border to process the influx of migrants; (2) increasing efforts to dismantle criminal smuggling networks and to identify possible victims of trafficking; (3) creating in-country refugee/parole processing programs in Honduras, El Salvador and Guatemala (which allow qualified minors at risk of harm abroad to be brought safely and legally to the United States); (4) alleviating overcrowding at Border Patrol stations by standing up additional processing centers and temporary facilities for children with U.S. Department of Health and Human Services (HHS) and the Department of Defense; (5) improving coordination in processing UACs by CBP, ICE and HHS, and increasing transportation resources; and (6)

---

[3] *See* Statement by Jeh C. Johnson, Secretary of Homeland Security, Before the House Committee on Homeland Security, June 24, 2014, *available at* http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security (last visited Aug. 6, 2015).

adding capacity to house families in facilities that met the safety, security, and medical needs of the migrants as quickly as possible.[4] This increased family housing capacity ensures the protection of asylum seekers and refugees and enables the prompt removal of individuals who do not qualify for asylum or other forms of protection or relief from removal.[5]

13. The FY 2014 surge in the Rio Grande Valley presented serious resource challenges to ICE's immigration enforcement efforts. In FY 2014, ICE ERO diverted approximately ten percent of its staff to process and care for the surge of migrants who crossed the Southwest border. Of ERO's total workforce, only 5,800 are officers delegated the legal authority to fulfill its enforcement mission within the territory of the United States and at the border. Approximately 800 of these personnel were diverted to address the 2014 Southwest border surge.

14. The unique makeup of this surge population – which consisted largely of UACs and families – also presented challenges for the U.S. Government, given the special care needed and the legal obligations with regard to housing UACs and families. ICE significantly expanded its family-appropriate housing, which must be designed and operated in a manner appropriate for the unique and sensitive needs of this population and compliant with applicable legal requirements and residential standards.[6]

---

[4] DHS also launched a media campaign in Central America highlighting the dangers of migrating illegally to the United States and correcting misinformation disseminated by smugglers.

[5] *See* Letter from the President – Efforts to Address the Humanitarian Situation in the Rio Grande Valley Areas of Our Nation's Southwest Border, Jun. 30, 2014, *available at*: http://www.whitehouse.gov/the-press-office/2014/06/30/letter-president-efforts-address-humanitarian-situation-rio-grande-valle (last visited Aug. 6, 2015); In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors – CAM), *available at*: http://www.uscis.gov/humanitarian/refugees-asylum/refugees/country-refugeeparole-processing-minors-honduras-el-salvador-and-guatemala-central-american-minors-cam (last visited Aug. 6, 2015).

[6] In 2007, in recognition of the unique and sensitive nature of detaining children with their parents, ICE issued Family Residential Standards, which apply to all ICE family residential centers. The Family Residential Standards were developed with input from medical, psychological, and educational experts, as well as civil rights organizations, with the goal of mirroring community standards and ensuring that all residents are treated with dignity and respect. The standards address a comprehensive range of conditions to ensure that arriving families are

15. In response to the U.S. Government's comprehensive efforts, the migration surge dropped precipitously over the months of July and August of 2014. Only 2,426 UACs and 2,301 family members, for example, were apprehended in September 2014. While these apprehension numbers were still high, they represented a dramatic decrease from the numbers seen during the height of the surge. ICE and DHS components continue to closely monitor the situation and will continue to work with Congress and our interagency and foreign counterparts to sustain our progress and to attempt to avoid another surge.

### Family Processing and Conditions During the Surge: The Creation of the Karnes and South Texas Facilities

16. At the time of the influx, ICE had access to only one facility capable of housing adults with children: the Berks Family Residential Center (Berks facility), located in Berks County, Pennsylvania. The Berks facility has been in continuous operation since March of 2001 for the housing of families, including families placed into expedited removal. The facility has had more than 4,900 book-ins since its opening,[7] and the average length of stay at the facility has been 66 days.

17. In response to the influx, ICE opened family residential centers in Artesia, New Mexico in June of 2014; Karnes County, Texas in July of 2014; and Dilley, Texas in December of 2014. The Artesia facility, which was intended as a temporary facility while more permanent facilities were contracted for and established, was closed on December 31, 2014.

---

treated humanely and are receiving proper care and opportunities for development while in immigration proceedings. Among other things, the standards address education, medical and mental health care, dental care, legal rights and access, recreation, telephone and mail access, escorted trips for non-medical emergencies, and visitation. These standards also promote a unique and open environment in which the residents are free to move about the center.

[7] Based on the way ICE captures historical detention data, it is not possible to identify individuals within this total who may have been booked in more than once (such as following a release and or subsequent to a reentry into the United States following removal). However, I believe that this would be a very small fraction of the total.

18. The South Texas Family Residential Center in Dilley, Texas (South Texas facility) has 2,400 beds, and the Karnes County Residential Center in Karnes County, Texas (Karnes facility) has 532 beds. The capacity of these facilities, when combined with the Berks facility's 96 beds, provide for a total of 3,028 beds. As a practical matter, given varying family sizes and compositions, and housing standards, not every available bed will be filled at any given time.[8] As of August 3, 2015, ICE had 643 families in custody at its three family residential centers, accounting for 1,419 individuals.

19. Although these facilities greatly increased DHS's capacity to detain families, their capacity was sufficient to house only a relatively small percentage of the families apprehended at the border. From July 2014 through June 2015, approximately 80% of families apprehended by DHS were released soon after apprehension rather than transferred to an ICE family residential center. Despite the creation of additional family residential beds, border apprehensions continued to outpace DHS's available family detention, processing, and transportation capacity.

20. Throughout the summer and fall of 2014, ICE dedicated significant resources to expeditiously contract for the South Texas facility and convert the Karnes facility from an adult facility to a family residential center compliant with ICE's Family Residential Standards. Under the open plans of the facilities, families can move about unescorted and avail themselves of

---

[8] As of August 3, 2015, despite a capacity of 532 beds, the Karnes facility was housing only 101 residents due to the need to respond to a suspected varicella exposure in that facility through a medical cohort. A medical cohort occurs where, in order to reduce the spread of infectious diseases, ICE houses residents exposed to an individual with an infectious disease of public health significance separately from the general population; it also places all such residents, as a group, on restricted movement for the duration of the incubation period. The South Texas facility, with a 2,400 bed capacity, was housing only 1,235 residents, with 439 beds unavailable due to family composition, housing coordination for residents with unique needs (e.g., speakers of indigenous languages), and a medical cohort.

The most common trigger for a medical cohort in an ICE family residential center is varicella. In light of the open plan of ICE family residential centers, a cohort often results in ceasing the intake of new residents during the incubation period, with the goal of limiting exposure to the infectious disease. Releases and removals are also limited during a cohort. Residents may, however, be released if legally required, or pursuant to ICE's discretion where the individual is determined not to pose a risk of spreading the disease.

educational and recreational opportunities, including contact visitation from friends, relatives, attorneys, and others. All school age children receive education in accordance with state regulations, and access to recreation resources including exercise classes, athletic fields, board games, books, age-appropriate toys, television, and movie nights. Religious services are available daily, and the facilities feature large libraries with hundreds of books, legal resources, and internet access. Temporary monitored care is provided for parents who prefer not to have their children present for attorney visits, immigration hearings, or administrative interviews.[9]

### Improving Family Processing and Conditions at Family Residential Centers

21. Since the FY 2014 surge, ICE has made significant efforts to process families at family residential centers more quickly and efficiently, and to respond promptly to concerns raised about conditions or processes at those facilities. In addition, under new policies described below, families who are detained at such facilities and are positively screened for humanitarian protection (i.e., those who are determined to have a "credible fear" or "reasonable fear" of persecution or torture if removed) are being processed more quickly and generally released.

22. Releases of individuals in ICE family facilities are now occurring more quickly than previously. During the last half of 2014, only 21% of families booked in to family residential centers were released or removed during their first 30 days in custody. During the first six months of 2015, more than 43% of such families were released or removed within 30 days.[10]

---

[9] DHS has been extensively engaged in efforts to obtain licensure from the State of Texas for the Karnes facility and South Texas facility throughout the course of these facilities' development and deployment. While Texas officials have indicated that Texas state law does not have provisions applicable to the oversight of such facilities generally, those discussions continue. Moreover, in May and August of 2015, respectively, the Texas Department of Family and Protective Services issued the Karnes facility and South Texas facility certificates to operate their monitored day care units, which ICE established to afford parents at the facility a temporary care option for their children while meeting with counsel or attending hearings.

[10] Contrary to plaintiffs' assertion, the average length of stay at the Berks facility has never been 7 days. Since its first use as a family residential facility in 2001, the average length of stay at Berks has been 66 days, with the lowest average length of stay for any one year at 36 days (in 2001).

And based upon my experience, these statistics do not reflect the full impact of the May and June policy changes, as custody reviews are ongoing, which will likely result in even shorter stays in the facilities. For example, of the 600 families booked into a Family Residential Center from June 28, 2015 through July 11, 2015, only 236 (less than 40%) remained detained as of July 29, 2015.

23. DHS is using all tools and authorities at its disposal to promote the prompt release of families from custody. Families are now regularly being released from family residential centers on a variety of conditions, including on bond, release on own recognizance, orders of supervision, or parole. From July 2014 through June 30, 2015, approximately 2,116 adults (in addition to 2,608 children) have been released from family residential centers. Such persons were released under appropriate conditions, including possible enrollment in the Alternatives to Detention (ATD) program.[11]

**Additional DHS Initiatives to Benefit Families in Family Residential Centers**

24. On May 13, 2015 and June 24, 2015, DHS and ICE announced a series of actions to further enhance oversight and accountability, increase access and transparency, and ensure the operation of family residential centers in as safe and humane a manner as possible. These initiatives aim to balance ICE's obligation to secure the borders and enforce the law and its equal commitment to the humane treatment of families in its custody.

25. On May 13, 2015, as part of its ongoing review of facility conditions and procedures, and its policies with respect to family detention, ICE announced it would implement a review process for any families detained beyond 90 days, and every 60 days thereafter, to reevaluate whether their detention or a designated bond amount continues to be appropriate while families

---

[11] ATD is not a stand-alone form of release; it is a condition of release that can be applied in any other circumstances of release (*e.g.*, bond, release on own recognizance, orders of supervision, or parole).

11

await conclusion of their immigration proceedings before the immigration courts.[12] On June 4, 2015, ICE ERO began reviewing all cases in which the individual would have been detained at a family residential center for 90 days or more on June 3, 2015. In conducting these custody reviews, which were taking place in addition to any legally required custody reviews, ERO was directed to consider the full context of the individual's case, including all current and updated information available and the current procedural posture of the individual's immigration proceedings. Officers were reminded to consider relevant factors specific to families. As a result of this review, 85 percent of cases reviewed were subsequently released from ICE custody. Of the 80 families considered for release after having been detained for 90 days or more, 68 (68 adults and 83 dependents) were released from ICE custody and enrolled in the ATD program. Nine of the remaining families have had their proceedings before the immigration court completed, and are pending removal from the United States or are in various stages of appeal and/or collateral challenge to the decision of the immigration judge.

26. On June 24, 2015, DHS announced even more profound changes to its family detention policies.[13] DHS committed to evaluating claims for humanitarian relief (i.e., making credible and reasonable fear determinations)[14] within a reasonable timeframe and favorably considering for release those who are able to establish such a fear of removal and who have a fixed,

---

[12] *See* News Release: ICE announces enhanced oversight for family residential centers, May 13, 2015, *available at* http://www.ice.gov/news/releases/ice-announces-enhanced-oversight-family-residential-centers (last visited Aug. 6, 2015).

[13] *See* Statement by Jeh C. Johnson on Family Residential Centers, June 24, 2014, *available at* http://www.dhs.gov/news/2015/06/24/statement-secretary-jeh-c-johnson-family-residential-centers (last visited Aug. 6, 2014).

[14] Most families detained at family residential centers have been held under mandatory detention provisions associated with either the: (a) expedited removal process described at 8 U.S.C. § 1225(b); or (b) the reinstatement of removal process described at 8 U.S.C. § 1231(a)(5). Under current law, if an individual subject to expedited removal or the reinstatement of removal process is determined to have established a credible or reasonable fear of persecution, the individual is referred for removal proceedings or withholding-only proceedings, respectively, before an immigration judge. *See* 8 C.F.R. §§ 208.30 - .31.

verifiable residence in the United States where they intend to reside while seeking humanitarian or other relief from removal. Such release may occur upon the posting of an appropriate monetary bond or meeting other conditions of release reasonably calculated to ensure appearance. If a bond is to be imposed, ICE will determine a reasonable and realistic bond amount, taking into account ability to pay, risk of flight, and public safety. Once the ICE custody determination is made, the individual can seek redetermination of that decision before an immigration judge.

27. The policy changes announced in May and June 2015 have significantly reduced the length of time that families are remaining in family residential centers for processing. As I explained above, during 2014, only 21% of families booked into family residential centers were released or removed during their first 30 days in custody. However, of those booked into a family residential center during the two-week period of June 28 - July 11, 2015, over 60% had been released or removed by July 29, 2015.

28. Indeed, based on current apprehension statistics, current USCIS credible fear and reasonable fear processing times, and other factors, ICE anticipates that, in the future, most families who assert a claim of fear at the time of their encounter by DHS will be processed, screened for reasonable or credible fear, and released under appropriate conditions within 20 days of that encounter. Generally, those who remain in custody for more than 20 days will be individuals who are appealing a finding of ineligibility for relief, who delayed raising a fear claim or asked for additional time to pursue that claim, or who are awaiting removal because they did not raise or were determined not to have a credible or reasonable fear.

29. Importantly, ICE believes that this brief period is critical to adequately process a family in a way that balances security concerns, allows for adequate medical screening, and provides an

opportunity for the family to raise a claim of fear and for that claim to be evaluated by USCIS. Within this period, the families receive a medical and mental health evaluation, a physical exam, a dental screening, and any medically necessary health or mental health referrals. Children receive needed immunizations and a developmental assessment in the Well-Child clinics. ICE further identifies and treats families diagnosed with communicable diseases while they are in the family residential centers, which promotes the health and well-being of the affected families and protects U.S. public health. Families are offered the opportunity to participate in a legal orientation program from certified pro bono organizations, which, for many, will be their first opportunity to learn of their rights and responsibilities under the immigration laws. This brief processing period is also required to ensure that families can contact their consulates and family members in the United States, and provide ICE with proof of identity, a verifiable address, and sponsor information so that ICE can effectively assess flight risk and danger and consider the family for release under appropriate conditions.

30. Relatedly, the brief processing period described above is also essential for ensuring that families attend their immigration proceedings and otherwise remain in compliance with legal requirements. The current use of family detention (including assessment of eligibility to apply for relief, education concerning rights and responsibilities, including the responsibility to appear from appointments with ICE and for immigration court hearings, and assessment of flight risk) helps to mitigate a family's risk of flight, and ICE needs a brief period to take the steps needed for that purpose. Without that period, we are likely to see higher non-compliance rates with this population, as we have seen in the past. For example, from July 2014 through July 2015, 41,297 cases involving families apprehended at the Southwest border and released were referred to immigration court. Of the cases that have been scheduled on the docket since then, 13,386 have

concluded in a removal order. Of these removal orders, 11,976 were issued *in absentia*. I believe that this significant incidence of families' failure to appear at immigration proceedings is substantially mitigated through the use of family detention, where families are screened for eligibility for relief and educated about their rights and responsibilities.

## Conclusion

31. DHS has an obligation to secure the borders and enforce the immigration laws. However, DHS is equally committed to performing its obligations in a humane way. ICE's current policies for processing of families strike a careful balance between the need to ensure border security and the integrity of the immigration system with the unique and sensitive realities of detaining families.

32. As described more fully above, ICE intends to use its family residential centers as processing centers where families can obtain a number of services, where they can be screened for humanitarian protection and relief from removal, and where reasonable custody determinations can be made that take into account the need for future compliance with our immigration laws. In general, families that establish a credible or reasonable fear of removal, or who are otherwise placed in standard removal proceedings, will be favorably considered for release if they have a verifiable, fixed address where they will be staying in the United States. Extended stays at these facilities will generally be reserved only for families subject to expedited removal or other streamlined removal processes who fail to establish a credible or reasonable fear of removal or do not appear eligible to apply for other forms of relief from removal.

33. The Court's proposed order, as currently drafted, can be read to enjoin DHS from placing families at its family residential centers for longer than three to five days. If this Order is maintained in its current form and interpreted in this manner, it would functionally terminate the

ability of DHS to place families into expedited removal or reinstatement proceedings, which cannot be completed in three to five days.  If DHS cannot place families into expedited removal or reinstatement proceedings, it will impair DHS' ability to protect public health, secure the border, evaluate the identity of families apprehended at the border, inform them of their rights and responsibilities, identify victims of trafficking, assess them for risk of flight and public safety, and assess their eligibility to apply for relief.  To the best of my knowledge, information and belief, DHS has never read the *Flores* Settlement Agreement to preclude the use of either expedited removal or reinstatement of a prior removal order and has been detaining families on these statutory bases since 2001 without facing litigation directly claiming that this violated the *Flores* Settlement Agreement.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 6th day of August, 2015.

_____
Thomas Homan
Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security