IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | ) Case No. CV 85-4544-DMG |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| LORETTA E. LYNCH, Attorney General of the United States; *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### DECLARATION OF RONALD VITIELLO

I, Ronald Vitiello, hereby make the following declaration with respect to the above-captioned matter:

1. I am the Deputy Chief of the U.S. Border Patrol, a component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). I have been employed in this capacity since 2010, and I have been a Border Patrol agent for 30 years.

2. I make this declaration on the basis of my own knowledge, as well as information made available to me in the course of my official duties.

3. In my capacity as Deputy Chief, I am responsible for the daily operations of the Border Patrol, and I assist the Chief of the Border Patrol in planning and directing nationwide enforcement and administrative operations. These responsibilities extend to oversight of nearly 21,000 Border Patrol Agents employed by CBP.

4. I am familiar with the policies and procedures that govern the apprehension, processing, and temporary detention of aliens. As Deputy Chief, I am responsible for ensuring that those policies and procedures are implemented and adhered to throughout the entire Border Patrol.

### The United States Border Patrol

5. CBP's central mission is to facilitate the flow of legal immigration and trade while preventing the illegal smuggling and trafficking of people and contraband. This mission is extremely complex, requiring CBP to balance many seemingly competing priorities. Among other things, CBP is responsible for securing the border while promoting lawful trade and travel, including: facilitating the entry of individuals authorized to enter the country; apprehending those who use unlawful means to enter or are otherwise inadmissible; aiding other law enforcement agencies to disrupt and dismantle transnational criminal organizations; referring instances where individuals may have been victims of trafficking to U.S. Immigration and Customs Enforcement (ICE); providing emergency assistance to persons in distress; intercepting illicit drugs and weapons, as well as agricultural and floral pests; identifying individuals with suspected national security concerns; and conducting operations at CBP's 328 ports of entry, 136 Border Patrol stations, and 21 Air and Marine branches.

6. With respect to border management and control, CBP takes a comprehensive approach, combining customs, immigration, border security, and agricultural protection into one coordinated and supportive activity. The Border Patrol, in particular, is responsible for securing U.S. borders between ports of entry. This includes the 6,000 miles of Mexican and Canadian international land borders and 2,000 miles of coastal waters surrounding the Florida Peninsula and the island of Puerto Rico. On a typical day, the Border Patrol apprehends more than 1,100 individuals and seizes nearly 6 tons of illicit drugs. Agents work around the clock on

assignments, in all types of terrain and weather conditions and in many isolated communities throughout the United States.

### Border Patrol Processing of Children and Families

7. Once a Border Patrol agent encounters an individual the agent believes to be unlawfully present, the agent will first establish alienage and determine if the individual is a minor.

8. If the individual presents signs of an emergent medical issue, the Border Patrol agent will render first aid if necessary and coordinate transportation of that individual to the appropriate medical center (likely, the closest available hospital).

9. Once initial questioning is completed in the field, the individual will be brought to a Border Patrol station for further processing. Individuals are normally separated by age and gender. Where operationally feasible, children are separated by both age and gender and adults are separated by gender. Separation of families is sometimes required in order to ensure the safety and security of all of those who are being held in custody by Border Patrol. Normally, for example, groups of teenage boys and girls are segregated and placed in separate rooms. However, every effort is made to keep young children with their parents. Moreover, Border Patrol agents provide any reasonable opportunity for contact between family members who may be separated based on age or gender.

10. Once individuals are in custody at a Border Patrol facility, Border Patrol agents collect biographic and biometric information from certain individuals, including minors who are over the age of 14, and conduct records checks through CBP and other law enforcement systems. Agents will also question aliens individually on issues related, for instance, to their biometric and biographic results, ability to lawfully enter or remain in the United States, and any fear of returning to their country of origin.

11. When a child is apprehended, the Border Patrol agent will process the child and complete certain steps that document the apprehension. For instance, the Border Patrol agent may use a form related to screening required under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), a Notice of Rights, or a sworn statement for certain children being placed in standard removal proceedings. For certain children who are old enough to understand their rights, the Border Patrol agent may utilize a Form M-444, which provides information to the child about the credible fear process.

12. If the child presents as an unaccompanied alien child ("unaccompanied child"), the agent will ask further interview questions of the child to determine if the child meets the statutory definition of an unaccompanied alien child, pursuant to 6 U.S.C. § 279(g). The term "unaccompanied alien child" is defined under the immigration laws as a child under the age of 18 who has no lawful immigration status in the United States, and has no parent or legal guardian in the United States, or has no parent or legal guardian in the United States who is available to provide care and physical custody. Unaccompanied children are processed pursuant to special procedures established by Congress in 2008 through the TVPRA.

13. The TVPRA places specific restrictions on the manner in which unaccompanied children may be processed. With respect to an unaccompanied child, Border Patrol agents screen the child to determine, among other things, whether he or she has a fear of return to his or her country or has been a victim of a severe form of trafficking in persons. If the child is from Mexico or Canada, does not have protection concerns, and is capable of making the decision to withdraw his or her application for admission to the United States, the child may be allowed to withdraw the application. Where DHS seeks to remove an unaccompanied child, it must initiate

standard removal proceedings, as unaccompanied children are not subject to expedited removal or other streamlined removal processes.

14. Unaccompanied children who do not or cannot withdraw their application for admission are required to be placed in standard removal proceedings and transferred to the custody of the Department of Health and Human Services (HHS). The TVPRA requires that, except in "exceptional circumstances," such children should be transferred to HHS within 72 hours after they are identified as being unaccompanied. In some cases, however, a child cannot be transferred to HHS immediately—such as when HHS does not have any immediately available bed space. In such cases, Border Patrol will continue to provide care to the child until HHS can accept custody.

15. Children who are determined to be accompanied by their parents or legal guardians ("accompanied children") are not covered by the TVPRA and are thus not subject to certain requirements in the Act. For instance, when determining the appropriate immigration disposition for an accompanied child, a Border Patrol agent may consider voluntary return, expedited removal (including, where appropriate, referral for a credible fear determination), placement of the child into standard removal proceedings by issuing a Notice to Appear (NTA), or, in limited instances, parole or reinstatement of a prior removal order.

16. Border Patrol normally seeks to transfer all individuals in its custody who cannot be immediately repatriated to ICE, another component of DHS, rather than releasing individuals directly from its custody. ICE makes decisions on whether to continue to hold individuals in its custody or release them. Border Patrol, however, has released families directly (rather than transfer them to ICE) when border apprehensions have outpaced DHS's available family detention, processing and transportation capacity.

5

17. Border Patrol facilities are designed to be short-term holding facilities for processing individuals before they are transferred to ICE or HHS, voluntarily returned if from a contiguous country, or released as appropriate. They are not designed for long-term care and detention. Every effort is made to process, transfer, or remove those in custody as promptly as is appropriate and operationally feasible.

18. Border Patrol stations are designed to provide a safe, secure, and clean facility to process apprehended individuals. Border Patrol policy mandates that each facility be kept safe, secure, and clean. Supervisors are required to ensure that the facilities are regularly cleaned and sanitized.

19. In order to ensure the safety of individuals in Border Patrol custody, there are cameras that monitor each room of the facility where individuals are in custody. The agents also visually check each room approximately every 15 minutes.

20. Like any other detention-like setting, Border Patrol cannot guarantee absolute privacy. Allowing locked or closed doors would present significant safety and security concerns. Facility rooms instead employ screen walls by the bathroom to address privacy needs. These screen walls allow for an environment in which individuals, and especially children, can be monitored and protected.

21. Similarly, the lights remain on while individuals are in custody for security reasons and due to operational necessity. Border Patrol stations operate 24 hours a day, and there may be agents arriving with newly apprehended individuals at all hours of the night. The agents must be able to maintain visual control over the rooms of the facility to ensure the safety and security of the individuals staying there.

22. Temperatures at Border Patrol stations, depending on the location, are normally set by the General Services Administration (GSA). Many Border Patrol stations stock Mylar blankets, and some stations are able to provide cloth blankets, where the number of individuals at those stations and the location of the station permits contracting for those blankets.

**Operations Prior to the Surge**

23. In fiscal year (FY) 2013, Border Patrol made a total of 414,397 apprehensions along the Southwest border. Of those apprehensions, 14,855 were of parents and their accompanying children (collectively referred to as "families," and individually referred to as "family members"), accounting for approximately 3.5% of the total number of apprehensions in FY 2013. This percentage is consistent with the rate of family members Border Patrol would typically apprehend on an annual basis prior to FY 2014.

24. Family members are processed upon apprehension similarly to other individuals. Families would in some cases be transferred to ICE for detention, but only when ICE indicated that they had available bed space and the ability to transport the individuals. Prior to FY 2014, ICE had less than 100 detention beds available for families, so most families could not be detained upon apprehension. Where ICE indicated that it would not seek further detention, Border Patrol took steps to release the individuals from its custody. In most cases, individuals were either permitted to voluntarily return to their home countries or were issued a Notice to Appear, placed into standard removal proceedings, and released into the interior of the United States.

25. Of the 6,210 family members apprehended by Border Patrol in the summer of 2013, only 485 were transferred to ICE for any purpose (even simply for further processing by ICE), representing approximately 7.8% of family member apprehensions during that period.

26. On average, in FY 2013, families were detained by Border Patrol nationwide for approximately 40 hours.

### Operations During the Surge

27. In the summer of 2014, the Border Patrol and the U.S. Government as a whole were faced with an urgent situation along the Southwest border. Over the period of just a few months, tens of thousands of families and unaccompanied children were apprehended attempting to enter the United States. Such apprehensions were overwhelmingly concentrated in a small section of the Rio Grande Valley in South Texas, a 320 mile section of the 2000-mile Southwest border. In total, CBP apprehended over 68,500 unaccompanied children and 68,000 family members across the Southwest border in FY 2014. These numbers represented a 77% increase in unaccompanied children and a 361% increase in family members, respectively, as compared to FY 2013.

28. The influx was particularly concentrated in the summer months of 2014. Between May and August of the preceding year (2013), the Border Patrol apprehended 14,725 unaccompanied children and 6,210 family members. During that same timeframe in 2014, the Border Patrol apprehended 29,877 unaccompanied children and 39,899 family members, representing an approximate 100% increase for unaccompanied children and more than a 500% increase for family members over the previous year. The nine Border Patrol stations in the Rio Grande Valley were quickly filled well beyond capacity.

29. In the immediate face of the influx, DHS and CBP took extraordinary steps to manage, care for, and provide humanitarian assistance to the dramatically increased numbers of children and families encountered along the Southwest border.

30. On May 12, 2014, the Secretary of Homeland Security determined that the capacity of CBP and ICE had been filled and that it was necessary to draw upon additional resources across the Department. I was appointed to coordinate these efforts within DHS.

31. On June 1, 2014, President Obama directed the Secretary of Homeland Security to establish a Unified Coordination Group to bring to bear the assets of the entire federal government on the situation. This Group included DHS and all of its components, HHS, Defense, Justice, State, and the GSA. The Secretary designated Administrator Fugate of the Federal Emergency Management Agency (FEMA) to serve as the Federal Coordinating Official for the U.S. Government-wide response. I worked closely with Administrator Fugate to address the influx during this time period.

32. Border Patrol took steps to address the most urgent humanitarian needs of those it apprehended in the area affected by the influx, purchasing additional supplies for children and families such as diapers, formula and wipes. The Border Patrol immediately spent significant funds purchasing emergency blankets and mattresses for the additional families that came into its custody in the Rio Grande Valley Border Patrol Sector. Border Patrol took steps to work with outside groups such as the Red Cross to install telephones in areas where there were large numbers of families or unaccompanied children. Border Patrol contracted for additional and expanded food services. CBP also established centralized processing centers (CPCs) in McAllen, Texas (CPC-Ursula) and Nogales, Arizona (NPC-Nogales). The CPCs/NPC have become an integral part of CBP's strategy to develop a more efficient way to process all categories of individuals when needed. For instance, although NPC-Nogales was needed to process individuals during the FY 2014 surge in illegal migration, the facility was subsequently discontinued when the number of apprehensions no longer required the consistent use of that

facility in order to maintain low numbers of individuals in Border Patrol's facilities in the Rio Grande Valley. The facility remains, however, available for use on a short time-frame whenever additional processing space is required.

33. In July 2014, CBP stood up CPC-Ursula, a new and permanent 55,000 square foot Border Patrol facility in the Rio Grande Valley specifically for families and unaccompanied children. The facility allows for a separation of families and unaccompanied children from the general detainee population. CPC-Ursula has permanent showers, laundry facilities, medical staff, personal toilets with adequate privacy, beds/cots, and a large supply of food and hygiene products. Additional contractors are present to assist Border Patrol agents by aiding in the monitoring of unaccompanied children. CPC-Ursula also has space for consulates to visit and conduct interviews or meetings.

34. While faced with this humanitarian situation, the Border Patrol was still required to interview, process, and document encounters with individuals as described above. Thus, CBP urgently sought ways to more efficiently process individuals. In an effort to decrease time in custody, DHS implemented a process that permitted individuals apprehended in the Rio Grande Valley to be transported expeditiously to sectors and facilities that were not experiencing the same heightened volumes. For example, Border Patrol instituted family flights to San Diego, California and El Paso, Texas in an effort to decrease time in custody. CBP also detailed over one hundred additional experienced agents from less active sectors to the Southwest border.

35. The Border Patrol further implemented a new system of remote processing to allow agents that were in other sectors to process individuals in the Rio Grande Valley and other busy sectors. Virtual Processing was established in the Rio Grande Valley to maximize processing while reducing the number of personnel required to maintain a productive processing workflow.

Virtual processing expedites the removal process by outsourcing processing activities, such as data entry, to other sectors, and by reducing the number of personnel required to maintain or exceed the current processing workflow at stations in the Rio Grande Valley, thus reducing the time families spend in the short-term Border Patrol holding rooms. This arrangement allows agents from supporting sectors to be used as force multipliers when processing individuals, either double or tripling the processing workflow of an agent in the Rio Grande Valley, and allowing Border Patrol to best utilize resources in the areas that need them most. CBP also worked with ICE to embed Enforcement and Removal Officers in Border Patrol stations and CPC-Ursula in McAllen, Texas to more efficiently process cases.

36. At the same time, CBP initiated and negotiated expanded food contracts in the Rio Grande Valley to better provide for the increased number of individuals in CBP custody. The contracts require that the food provided by the vendors meets the required caloric intake recommendations of the USDA.

37. With respect to the shorter-term holding facilities at Border Patrol stations, CBP rented port-a-potties and decontamination systems, and the agency contracted with emergency cleaning services to address the higher volume of individuals in CBP custody. Moreover, large trash cans were added to hold rooms in the McAllen Border Patrol station. These trash cans were able to be installed in a manner that did not create the safety concern normally associated with loose trash cans. However, because of cost and other considerations, CBP has not been able to install these trash cans elsewhere.

38. CBP made significant efforts to improve the conditions for families and unaccompanied children who remained in CBP custody until release was appropriate, either from CBP custody or through transfer to HHS or ICE. CBP expended significant resources – over $67 million

between February and September 2014 – in order to respond to the prolonged custody of accompanied and unaccompanied children. Border Patrol in particular spent at least $46 million responding to the influx; 70% of those funds were spent on contracted services, including food, medical, sanitation, and decontamination, as well as FEMA flight assistance for the transportation of unaccompanied children.

39. As noted above, the large increase in individuals apprehended along the Southwest border, particularly children and families, quickly overwhelmed affected stations. It takes time to process each individual properly, and the Border Patrol continued to process each person in accordance with the law and procedures laid out above. Unfortunately, the need to properly process individuals and make appropriate decisions about custody and detention—combined with limited capacity at HHS and DHS facilities and the strain on resources created by the influx—resulted in longer periods in CBP custody. Unaccompanied children spent an average of 112 hours in Border Patrol custody during the summer of 2014 (March to July), partly due to the lack of available bed space in HHS facilities, delays obtaining medical clearances for other HHS facilities, consular interviews, and other processing delays. Accompanied children spent an average of 64 hours in custody during that same time period.

### Current State of Operations

40. CBP's changes to its own processes and procedures, taken together with the overall strategy of DHS to address the influx, has resulted in a significant reduction in the average time in Border Patrol custody for families and unaccompanied children as compared to the influx period. While unaccompanied children spent an average of 112 hours in Border Patrol custody along the Southwest border during the summer of 2014 (March to July), they have spent an average of 24.85 hours in CBP custody along the Southwest border in FY 2015 (up to April).

Similarly, while accompanied children spent an average of 64 hours in custody along the Southwest border during that same time period in 2014, they have spent an average of 45.9 hours in CBP custody along the Southwest border in FY 2015.

41. A majority of families are now either released or transferred out of Border Patrol custody within 72 hours of apprehension. Specifically, 86% of families apprehended during FY 2015 to date leave Border Patrol custody within 72 hours. Fifty-five percent leave Border Patrol custody within 48 hours. Border Patrol continues to use all options available to it to address spikes in apprehensions where appropriate. For instance, Border Patrol will utilize remote processing or temporary changes in duty stations for agents where the situation requires a shift in its resources. Border Patrol also continues to use CPC-Ursula to help facilitate processing and hold families and unaccompanied children in the most appropriate facilities Border Patrol is operationally able to provide for families during this process. However, given the multitude of factors that go into each processing and detention decision, including current staffing levels and facility capabilities, Border Patrol has limited ability to speed up the time an individual spends in its custody.

42. In FY 2015, the Border Patrol has thus far apprehended 26,685 unaccompanied children and 24,901 family members. This represents a 54% and 55% decrease, respectively, from FY 2014. Despite this overall decrease in FY 2015, however, recent trends seem to be running counter to traditional seasonal patterns.[1] Based on historical trends, Border Patrol would expect

---

[1] In FY 2014, the number of apprehended family members in June in the Rio Grande Valley was 13,121. This number dropped significantly in July, as Border Patrol apprehended 5,448 family members in the Rio Grande Valley. Similarly, for unaccompanied children, the Border Patrol apprehended 8,135 in June 2014 in the Rio Grande Valley. One month later, Border Patrol had only apprehended 3,472 unaccompanied children in the Rio Grande Valley.

to be seeing a decrease in apprehensions of unaccompanied children and families by this time of year. That is not the case this year, especially in the Rio Grande Valley. The Border Patrol will likely apprehend more family members and unaccompanied children in July than in June, which is a deviation from historical trends. CBP continues to monitor this situation.

43. Border Patrol continues to ensure availability of supplies (whether it be sanitation, medical, food, or other supplies) for all individuals in Border Patrol custody. As of July 28, 2015, approximately $53,800,000 was spent on these contracts.

44. Border Patrol has continued to improve its systems to ensure constant monitoring of individuals in custody. Border Patrol agents track the times an individual is provided meals, and they electronically log the time they have been in custody.

45. Border Patrol continues to expend resources on the maintenance and upkeep of Border Patrol facilities to ensure that the stations are safe, secure, and sanitary. A recent GAO Report found, through direct observations and interviews, that CBP was "generally providing care consistent with policy requirements [including *Flores*]." *Unaccompanied Alien Children: Actions Needed to Ensure Children Receive Required Care in DHS Custody*, U.S. Government Accountability Office, GAO-15-521 http://www.gao.gov/assets/680/671393.pdf (July 2015). The GAO Report also noted that many of CBP's policy requirements place more rigorous standards on the Border Patrol than *Flores* requires. For example, "Border Patrol has a more stringent food policy than is required under the Flores Agreement [as Border Patrol] requires the provision of hot meals for two out of every three meals." *Id.* at 39 n.65. CBP is in the process of drafting new policies to further improve the care and custody of individuals in CBP custody. This new, updated policy is currently being negotiated with various stakeholder unions.

**Conclusion**


46. I have spent 30 years as a Border Patrol agent. In my time as an agent, I have seen the agency respond to many different situations, including the influx of last year. I reiterate that the situation for families and unaccompanied children in Border Patrol custody now is significantly different than it was in the summer of 2014. The whole of government approach has resulted in a dramatically lower number of individuals, including family members, attempting to unlawfully enter the United States between the ports of entry. Since the influx, the Border Patrol has experienced greatly reduced times that individuals remain in Border Patrol custody, including because individuals are now processed by the more efficient mechanisms outlined above. At the same time, the Border Patrol has taken steps to improve the conditions under which those who enter the United States in the areas most affected by the surge are held.

47. In my opinion, Border Patrol is currently doing everything in its power to efficiently and expeditiously process individuals in Border Patrol custody. As stated above, Border Patrol facilities are meant to be short-term holding areas only. They are not (and cannot be) long-term care facilities. However, as outlined above, CBP and Border Patrol more specifically have demonstrated their ability to quickly and efficiently mobilize those resources at its disposal to address unforeseen circumstances like the influx of 2014. When individuals stayed in our custody longer than anticipated, it was because of forces outside of our control—whether an unexpected influx of families or unaccompanied children, or the lack of bed space at ICE or HHS—which greatly affect our ability to move individuals out of our custody. If bed space is even further reduced as a result of the court's order, it may result in longer detention at Border Patrol facilities and greater numbers of individuals attempting to cross the border unlawfully. This would greatly impact our operational capacity and our ability to secure the borders while facilitating lawful trade and travel.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 6th day of August, 2015.

_____

Ronald Vitiello