CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
Marchela Iahdjian (Cal. Bar No. 295595)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org
        marchela@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
T. Wayne Harman (Cal. Bar No. 254089)
wharman@orrick.com
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>          Plaintiffs,<br>- vs -<br><br>JEH JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>          Defendants. | Case No. CV 85-4544 DMG (AGRx)<br><br>PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE<br><br>Hearing: N/A |

1

*Plaintiffs' counsel, continued*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
James Zahradka (Cal. Bar No. 196822)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:   (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org
        jamesz@lawfoundation.org
        annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

/ / /

Plaintiffs' Response to OSC

1

# TABLE OF CONTENTS

2

A.  DEFENDANTS' ALLEGED MODIFICATION OF POLICIES AND
PRACTICES DO NOT MOOT PLAINTIFFS' CLAIMS ..............................................7

B.  THE LENGTH OF DETENTION OF ACCOMPANIED CLASS MEMBERS
AND THE FACILITIES IN WHICH THEY ARE INCARCERATED CONTINUE TO
BREACH THE SETTLEMENT .................................................................................9
  1.  DEFENDANTS "NEW" POLICY HAS HAD NO SIGNIFICANT IMPACT ON THE RELEASE OF
  ACCOMPANIED CLASS MEMBERS ....................................................................9
  2.  NEITHER PLAINTIFFS' MOTION TO ENFORCE CLASS ACTION SETTLEMENT NOR THIS
  COURT'S RULINGS ARE LIMITED TO ONE CATEGORY OF DETAINED CLASS MEMBERS
  SUBJECT TO "DISCRETIONARY, DETERRENCE-BASED DETENTION" ...............................12
  3.  COMPLIANCE WITH THE SETTLEMENT WOULD NOT PREVENT DEFENDANTS FROM
  "SCREENING" ACCOMPANIED CLASS MEMBERS ...........................................15
  4.  DEFENDANTS ARE NOT REQUIRED BY THE INA TO PLACE CLASS MEMBERS IN
  "EXPEDITED REMOVAL" PROCEEDINGS AND NOT DOING SO WOULD IN NO WAY VIOLATE
  THE INA .................................................................................................17
  5.  PROLONGED DETENTION IS NOT NECESSARY TO ENSURE THAT FAMILIES RECEIVE
  MEDICAL CARE; IN FACT, THEIR HEALTH IS PLACED AT RISK IN DHS'S DETENTION
  CENTERS .................................................................................................19
  6.  PROLONGED DETENTION IS NOT NECESSARY TO ENSURE THAT FAMILIES CAN
  CONTACT THEIR CONSULATES AND FAMILY MEMBERS IN THE UNITED STATES ...........20
  8.  DEFENDANTS' POSITION ON THE USE OF DETERRENCE AS A FACTOR WEIGHING IN
  FAVOR OF DETENTION REMAINS UNCLEAR ...................................................22
  9.  THE STATUTES DEFENDANTS CLAIM THEY WOULD BE FORCED TO VIOLATE IF THE
  COURT ORDERS COMPLIANCE WITH THE SETTLEMENT WERE ENACTED *PRIOR* TO THE
  FLORES AGREEMENT ..................................................................................23
  10.  DEFENDANTS NOW SEEK REVISION OF THE SETTLEMENT IN WAYS NEVER
  ADDRESSED IN THEIR MOTION TO MODIFY THE SETTLEMENT ............................24
  11.  INSTEAD OF MOVING TOWARDS COMPLIANCE WITH THE SETTLEMENT,
  DEFENDANTS HAVE PLANS TO EXPAND THEIR DETENTION OF ACCOMPANIED CLASS
  MEMBERS .................................................................................................24

C.  DEFENDANTS OFFER NO COHERENT REASON WHY WITHIN 90 DAYS
THEY WOULD BE UNABLE TO PROPOSE CHANGES IN CONDITIONS AT
CPB FACILITIES CONSISTENT WITH THE FLORES SETTLEMENT ................25

D.  CONCLUSION ......................................................................................26

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Alfaro-Ortiz v. Holder,* 694 F.3d 955 (9th Cir. 2012) ....................................................12

*Luna-Garcia v. Holder*, 777 F.3d 1182 (10th Cir. 2015) ..............................................12

*Matter of E-R-M- & L-R-M-*, 25 I.&N. Dec. 520 (BIA 2011).......................................14

*McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015).........................................................4

*Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014), *cert. denied sub nom.*
   *Rosebrock v. Hoffman* 135 S. Ct. 1893 (2015) ...........................................................4

*U.S. v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199 (1968) ...........................4

*Villa-Anguiano v. Holder*, 727 F.3d 873 (9th Cir. 2013) ..............................................14

**Statutes**

8 U.S.C. § 1182(d)(5)(A) ...............................................................................................15

8 U.S.C. § 1226(a) ........................................................................................................12

8 U.S.C. § 1231(a)(5) ....................................................................................................12

8 U.S.C. § 1231(a)(6) ....................................................................................................12

**Other authorities**

8 C.F.R. § 241.4(e) ........................................................................................................12

8 C.F.R. § 287.3(d) ........................................................................................................17

/ / /

The significant harm caused to innocent children by Defendants' new policy of detaining hundreds of Flores class members with their mothers for weeks and months on end in remote lock-down detention facilities has been explained to Defendants by child-welfare experts,[1] leaders of Congress,[2] faith-based leaders,[3] the American Bar Association,[4] and children's advocacy groups.[5]  The Court's

———————————

[1] *See, e.g.,* Declaration of Dr. Luis Zayas, Dec. 10, 2014, Exhibit 24 ¶¶ 1-6 [Doc. # 101-7]; Declaration of Geneva Berger, Jan. 12, 2015, Exhibit 25 ¶¶ 25, 28 [Doc. # 101-8]; American Academy of Pediatrics (AAP) Letter to Sec. Johnson re: family detention, July 24, 2015 (Ex. 97.1); Declaration of Laurie Cook Heffron, LMSW, Ex. 109.2; Declaration of Professor Nestor Rodriguez, Ex. 109.4; Declaration of Professor Cecilia Menjivar, Ex. 109.1.

[2] *See, e.g.,* 136 U.S. Representatives Respond to Sec. Johnson, May 27, 2015 (Ex. 70); 33 U.S. Senators Respond to Sec. Johnson, June 1, 2015 (Ex. 71); Comment Of Senator Patrick Leahy (D-Vt.), Ranking Member, Senate Judiciary Committee, on Changes to the Administration's Family Detention Practices, June 24, 2015 (Ex. 72); Senator Reid Statement On Administration's Decision To Reform Family Detention Policies, June 24, 2015 (Ex. 74); U.S. Senate Democratic Leader Harry Reid (D-Nev.), May 18, 2015 (Ex. 73); "The time to end family detention is now" by Representative Judy Chu (D-CA), May 29, 2015 (Ex. 75); Congressman Adam Smith (D-WA), May 15, 2015 (Ex. 76); U.S. Senator Bob Menendez (D-NJ), May 14, 2015 (Ex. 77); "Democratic Members Say Reforming Family Immigrant Detention Isn't Enough", June 24, 2015 (Ex. 78).

[3] *See, e.g.,* Faith leaders representing churches, synagogues, and faith-based organizations in the United States letter to President Obama, March 26, 2015 (Ex.81); 96 NGOs and Faith-Based Organizations respond to Sec. Johnson, June 1, 2015 (Ex. 79); LIRS Statement regarding proposed DHS reforms to family immigration detention policies, June 24, 2015 (Ex. 80); Lutheran Immigration and Refugee Services (LIRS) "LIRS Urges Administration to Abandon Symbolic Reforms and End Family Detention," May 14, 2015 (Ex. 69).

[4] Letter from William C. Hubbard, President, American Bar Association to DHS Secretary Jeh Johnson, March 26, 2015, Exhibit 64 [Doc. # 136.]

Order re Motion to Enforce Settlement of Class Action etc. [Dkt. # 177] ("Order"), again explains how Defendants' policy harms children and is in breach of the Settlement.

Instead of responding to this Court's Order to Show Cause, Defendants dedicate over 50 pages of briefing in an effort to convince the Court to reconsider its Order. Without offering a single new argument, Defendants rehash legal positions already rejected by the Court. Factually, Defendants focus on their recent "new" policies professedly intended to reduce the time periods in which they illegally incarcerate class members for weeks and months in violation of the Settlement, in detention facilities that also violate the Settlement.[6]

As discussed below, Secretary Jeh Johnson's two press releases have

---

5 *See Statements:* American Immigration Lawyers' Association (AILA), "Little Meaningful Change in ICE Announcement on Family Detention," May 14, 2015 (Ex. 82); American Immigration Council "Government Shows No Signs of Backing Down on Family Detention," May 14, 2015 (Ex. 83); "Texas advocates throw cold water on ICE's promises to 'fix family detention'," May 14, 2015 (Ex. 84); Human Rights First "Reforms to Family Detention System Are Insufficient," May 14, 2015 (Ex. 85); Refugee and Immigrant Center for Education and Legal Services (RAICES), "Obama Administration Policy on Family Detention Continues to Violate the Law & Flores Settlement," May 14, 2015 (Ex. 86); Ex. 79 *supra*; National Immigrants Justice Center "Obama Administration Concedes that Detaining Mothers and Children Who Seek Asylum is Harmful and Unnecessary, Still Plans to Detain Them," June 24, 2015 (Ex. 87).

6 Indeed, Defendants' proposed Order [Doc. # 184.4] would *only* make sense if the Court had denied plaintiffs' motion to enforce and granted defendants' motion to modify the terms of the Settlement. If adopted, Defendants lengthy proposed Order would entirely rewrite the terms of the Settlement.

changed very little for mothers and children illegally incarcerated by DHS. Lengthy unsafe detention of class member children continues unabatted. Children are placed at risk every day. The DHS clings to a unique year-old policy that is not only illegal in the sense that it violates the Settlement, but is almost certainly unconstitutional in that it violently discriminates against "mothers" but not identically situated fathers, grandparents, uncles, aunts, or siblings, and mindlessly harms entirely innocent children.

A.   DEFENDANTS' ALLEGED MODIFICATION OF POLICIES AND PRACTICES DO NOT MOOT PLAINTIFFS' CLAIMS

On May 13, 2015, Defendants lodged a press release announcing a series of changes with respect to the family residential centers. Order at n. 4, *citing* Doc. # 153-1 ("May 13, 2015 Press Release").[7] On June 24, 2015, Defendants announced additional changes by way of a second "press release," including "a plan to offer release with an appropriate monetary bond or other condition of release to families at residential centers who are successful in stating a case of credible or reasonable fear of persecution in their home countries." *Id. quoting* Defendants' June 24, 2015 Press Release ("June 24, 2015 Press Release") [Doc. # 164-1].)

Defendants have argued that these announced policies should "affect the content and/or ultimate disposition of the Court's order such that the Court should

_____

7 These purported changes included a policy of reviewing the cases of any families detained beyond 90 days, and every 60 days thereafter, to evaluate whether detention or the designated bond amount continues to be appropriate during the pendency of their immigration case. *Id.*

rule in Defendants' favor on the pending motions." Defendants' Notice of Objection to Premature Lodging of Amended Proposed Order [Doc. # 175].) Defendants elaborate on this position in their Response to the Court's Order to Show Cause. [Doc. # 184].

Defendants' unsafe treatment of children continues unabated to this day in virtually every respect. As we discuss *infra*, the challenged conduct has in no significant way been "voluntarily ceased."

Even if Defendants actually took significant steps to end their breach of the Settlement, which they have not, any argument that such steps "render[ed] the case moot, [would be] incorrect." Order at n. 4 *citing Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014), *cert. denied sub nom. Rosebrock v. Hoffman* , 135 S. Ct. 1893 (2015) ("voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). A defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id. quoting McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015) (internal quotation marks omitted).[8] Here, nothing prevents DHS from reverting to its former policies, as set forth below.

---

8 *See also U.S. v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203 (1968) (a claim is moot only "if subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.")

In this case, the only thing "absolutely clear," even from Defendants' declarations [Doc ## 184.1-3], is that the allegedly wrongful behavior is fully ongoing. *For this reason alone, Defendants have failed to show cause by the Court's contemplated Order should not now be issued*. Nevertheless, out of abundance of caution, Plaintiffs will address Defendants' claims regarding the fine-tuning of their breach of the Settlement. As we'll show, their "challenged policy" stands firmly in place.[9]

B.   THE LENGTH OF DETENTION OF ACCOMPANIED CLASS MEMBERS AND THE FACILITIES IN WHICH THEY ARE INCARCERATED CONTINUE TO BREACH THE SETTLEMENT

1.   **Defendants "new" policy has had no significant impact on the release of accompanied class members**

Defendants inform the Court that they now have a policy issued via press releases that is vaguely **"**designed to ensure that the *majority* of [class members]" incarcerated in unlicensed lock-down detention centers will only suffer illegal detention during the "time needed for essential processing (to reach an anticipated

---

[9] Defendants request that "[i]f the Court declines to revisit its underlying analysis regarding the applicability of the Agreement," it Order the parties "to confer in a more detailed fashion under the direction of a Court-appointed Special Master …" DHS Response at 8. Plaintiffs oppose any such further waste of time and effort. Two months of discussion about every possible detail involved in a remedy--including numerous meetings and telecommunications--entirely failed to arrive at any agreement regarding a proposed Order. Further efforts would be a complete waste of all parties' limited time and resources and leave hundreds of class member children illegally detained in unsafe lock-down facilities for an indeterminate length of time. Nothing stops Defendants from making proposals to class counsel now or at anytime after this Court issues its Order in response to the OSC briefing.

Plaintiffs' Response to OSC

average of approximately 20 days [at some unknown time in the future])." DHS

Response at 7 (emphasis supplied).[10] Defendnants' declarations make it clear that

DHS persists in its breach, ignoring this Court's rulings and Settlement.[11]

As this Court has now ruled, the Settlement "require[s] ICE (1) to 'release a

minor from its custody without unnecessary delay' to a parent, a legal guardian, or

other qualified adult custodian, except where the detention of the minor is required

'either to secure his or her timely appearance before the INS or the immigration

court, or to ensure the minor's safety or that of others'; and (2) '[u]pon taking a

minor into custody, . . . [to] make and record prompt and continuous efforts on its

part toward … release of the minor . . . .'" Order at 4 (*quoting* Agreement ¶¶ 14,

18.) Nothing in the Settlement states or implies that only a "majority" (*i.e.* 51% or

more) of class members are protected by the Settlement's terms; nor does the

Settlement state or imply that Defendants may detain children in unsafe unlicensed

secure facilities for as long as they deem necessary to accomplish "processing"

---

[10] Defendants have not provided class counsel or the Court with the "policy." They
only provide two press releases and when carefully examined, three very vaguely
worded declarations. They have provided no instructions or directives issued to
implement their "press releases," or evidence documenting training materials issued to
Defendants' employees, or instruction to trainers, or records of training, or how alleged
implementation of the policy is being monitored (if at all), or reports of actual
monitoring.

[11] *See, e.g.*, Thomas Homan Declaration, p. 12 [Doc. # 184.1] (As a result of a recent
ICE review of the cases, it was found that "836" accompanied class "considered for
release" had been "detained for 90 days or more …").

Defendants have now decided only class members apprehended with "mothers" must suffer through; [12] nor does the Settlement permit Defendants to adopt a "goal" on some unknown date to reach an "anticipated average of [detention time of] approximately 20 days …" DHS Response at 7. Defendants claim they are "demonstrably moving … toward achieving [the] goal" of approximately 20 days of detention for a "majority" of class members, *but Defendants' "goal" itself clearly violates the terms of the Settlement*. Defendants are therefore right back to asking the Court to completely gut and then rewrite the Settlement Agreement.[13]

_____

[12] Defendants completed "essential processing" consistent with Flores for some 17 years. Defendants fail to explain to class counsel or the Court how many agents they have assigned to "process" class members, or, given the cost of detention, why they haven't simply assigned additional agents to "process" class members. The actual time to process a class member (check a federal database for identity and any criminal history) and determine whether the class member appears eligible for relief under the Immigration Act, is accomplished in a handful of hours, not 20 or more days. *Defendants claim that 60% of class members entering an ICE detention facility (after an unstated number of days in CBP stations) during the two-week period of June 28 to July 11, 2015 were released or removed within four weeks, leaving about 40% detained in excess of one month*. Homan Decl. ¶ 27. More than anything else, Defendants' percentages show that they remain in material breach of the Settlement.

[13] Even though the temporary 2-month "surge" around April-May 2014 was initially the sole justification for Defendants' breach of the Settlement, with that event now over a year old, Defendants' groping to have the Court modify the Settlement lacks any foundation other than the inertia of a large bureaucracy to stop a project it launched without much forethought and at great expense to innocent children and taxpayers, and in which it now finds itself entangled in multi-million dollar contracts with large corporations publicly assuring investors of expanding profits from operating the very facilities this case challenges. *See* Grassroots Leadership: "GEO Group tells shareholders that everything is fine in Karnes family detention center," August 5, 2015 (Ex. 88).

**2.      Neither Plaintiffs' motion to enforce class action Settlement nor this Court's rulings are limited to one category of detained class members subject to "discretionary, deterrence-based detention"**

Defendants' identify five categories of class members in detention and then

wrongly assert that Plaintiffs' enforcement motion, and the Court's decision,

"focused in large part" on only one category of class members "who were in

discretionary, deterrence-based detention …" DHS Response at 13. Plaintiffs'

motion addressed any accompanied class member detained in violation of the

Settlement, not just those held in non-compliant facilities in "discretionary,

deterrence-based detention." To this day class members in all "five categories"

defined by Defendants remain in custody in non-compliant facilities in violation of

the Settlement.[14]

_____

14 Defendants claim that class members in the "fifth category" – those who have been determined to have a credible fear of return to their home countries – are "no longer subject to detention …" DHS Response at 13 (emphasis added). This assertion is entirely misleading. Under Defendants' press releases, these class members are subject to detention for weeks and many for months until Defendants determine that they have a credible fear of returning to their home countries. In the majority of cases even after a positive credible fear determination, mothers and class members continue to be detained for up to several more weeks because of non-individualized unrealistically high bonds set by ICE. *See*, *e.g.*, Declaration of Stephen Manning, ¶¶10-12, Ex. 112 (for 107 detained families at Dilley represented by the CARA Project between May 13, 2015 and August 11, 2015, the average bond amount was $8,000, and observing, based on detailed data maintained by the CARA Project, *no change in ICE field practice after the June 24, 2015, announcement with respect to the setting of bond amounts*); Declaration of Aseem Mehta, ¶4, Ex. 91 (explaining that ICE does not determine bond amounts on any individualized basis); Declaration of Dr. Alan Shapiro, ¶14, Ex. 97 (observing that bond amounts for detained families at Berks are set too high for families to pay); Declaration of Andrew Free, ¶¶2,4, Ex. 90 (observing that bond amounts set for detained families at Dilley are too high for families to pay and ability

In a nutshell – ICE continues to routinely detain all categories of class

member children in non-compliant lock-down adult facilities for at least a

month;[15]  ICE sets bonds that most mothers simply cannot afford to post;[16]  ICE

---

to pay is not considered); Declaration of Scott Coomes, ¶14, Ex. 111 (bond amounts set by ICE are arbitrarily high at $7,500 to $8,000); Declaration of Brian Hoffman, ¶12, Ex. 92 (two sisters with the same claim for relief who received bonds set by ICE of $4,000 and $8,000, solely because different officers were assigned to their cases); Declaration of Chris Christensen, ¶ 11, Ex. 94 ("There was no individualized assessment in bond hearings; the ICE trial attorneys argued that the mothers were a significant flight risk in every single case."); Declaration of David Thompson, ¶13, Ex. 95 (in 332 cases studied the average bond amount after the June 24, 2015 DHS announcement only decreased by about $600); Declaration of Carol Anne Donohoe, ¶18, Ex. 93 (ICE routinely sets bonds without any consideration for the families' ability to pay); Declaration of Katherine Park, ¶¶2,6, Ex. 102 (ICE failed to consider families' ability to pay in setting bond amounts in early August at Dilley; Immigration Judge's lowered ICE bonds by at least fifty percent in the ten cases the attorney represented in one day); Declaration of Miranda Guerrero, ¶9, Ex. 108 (ICE set the same $8,500 bond in virtually every case she has represented of families detained at the Karnes facility, without any individualized assessment of the mother's ability to pay); Declaration of Robyn Barnard, ¶¶5-6, Ex. 110 (during week of July 26, 2015, represented 40 families detained at Dilley, ICE routinely set bonds of $7,000 to $9,500 for individuals who had passed the credible fear stage, without considering the ability of the families to pay).

[15] *See, e.g.*, Ex. 90, ¶¶ 3-4, 24-25 (each mother he represented the week of July 20, 2015, at Dilley, had been detained for well over one month); Ex. 93, ¶¶ 12, 19 (in June 2015 the majority of her clients at Berks had been detained for over a year and her six current clients have all been detained for over a month); Ex. 95, ¶ 11 (average period of detention for women released after the June 24, 2015 DHS announcement was actually nine days *longer* than women released prior to the alleged policy shift); Declaration of Elora Mukherjee, ¶18, Ex. 99 (mothers who have passed reasonable fear interviews remain detained for weeks at Dilley with their children); Declaration of Laura Lichter, ¶¶53-59, Ex. 104 (some families have been detained for near or over six months; example of a two-and-a-half year old and his mother, who passed a credible fear interview on June 26, still detained in August; example of a young autistic boy detained with his mother for ten weeks even though his mother had a positive reasonable fear determination in early July).

does not make individualized assessments in setting bonds or imposing the use of

ankle shackles;[17] Immigration Judges ("IJ") consistently reject ICE's high bond

determinations, but IJ review requires several more weeks in detention;[18]  ICE

demands that mothers agree to wear ankle shackles even when IJs have ordered

release without including such conditions;[19] and ICE has repeatedly violated class

---

[16] *See* footnote 14, *supra*.

[17] *See* footnote 14, *supra*. *See also* Ex. 92, ¶13 (no consistent differences between mothers granted release on bond versus those only granted release if agree to wear an ankle shackle); Ex. 93, ¶16 (at the Berks facility, parents with a positive reasonable or credible fear decision, if released, are only released with ankle shackles); Ex. 94, ¶ 4 ("Despite the fact that a Judge had set a bond for this client, ICE coerced her into signing an agreement to wear an electronic ankle monitor in order to be released."); Ex. 95, ¶15 (reviewing case data indicating that ICE made a decision to put virtually all mothers released after June 26, 2015, on ankle shackles).

[18] *See, e.g.*, Ex. 112, ¶13 (based on analysis of CARA Project data for mothers and children at Dilley, IJs routinely significantly lower bond amounts set by ICE, *between June 24, 2015 and August 11, 2015, this took an average of an additional 34.6 days in detention*); Ex. 110, ¶¶5-6 (although the IJs routinely lowered bonds set by ICE during the week of July 26, 2015, this resulted in several additional weeks in detention for families at Dilley); Ex. 108, ¶9 (at the Karnes facility, IJs routinely lower high bonds set by ICE, but this prolongs class members' detention by several weeks); Ex. 102, ¶2,6 (early August at Dilley, IJs lowered the ICE bonds by at least fifty percent in the ten cases the attorney represented in one day).

[19] *See, e.g.*, Ex. 90, ¶¶5-9 (ICE's practice at Dilley insisting that mothers of class members sign an agreement to wear an electronic ankle monitor upon release); Declaration of Kim Hunter, ¶¶24-26, Ex. 103 (detailing case of a detained mother at Dilley whose relative attempted to pay bond in New York, but was turned away; and case in which ICE ordered client to be released with an ankle monitor after an IJ had set bond without such a condition); Ex. 104, ¶¶44-45 (ICE practice at Dilley of calling detained mothers into the courtroom to coerce them into accepting ankle monitors upon release instead of a bond set by an Immigration Judge); Ex. 110, ¶7c (ICE

members and their mothers' right to counsel.[20]

It is hardly comforting that DHS announced that "for those individuals who remain detained, ICE will 'implement a review process for any [class members] detained beyond 90 days, and every 60 days thereafter, to ensure detention or the designated bond amount continues to be appropriate while families await conclusion of their immigration proceedings . . .'" DHS Response at 14, *quoting* DHS Press Release, ECF No. 153-1, at 2. Nowhere does the Settlement adopt some vague review process "90 days" after a class member has been detained in a non-compliant unlicensed lock-down facility with unrelated adults.

### 3. Compliance with the Settlement would not prevent Defendants from "screening" accompanied class members

Defendants argue that the Court's proposed remedies would "make it impossible to detain these individuals [who Defendants in their discretion have placed in expedited removal proceedings] while they are screened for credible or reasonable fear, and remove them quickly as the INA requires, if no relief is

---

officers advising detained mother that despite an IJ order granting conditional parole, she would not be released until she signed an agreement accepting an electronic ankle monitor).

[20] *See, e.g.*, Ex. 90, ¶¶6-13(ICE summons groups of detained mothers to the Courtrooms at the Dilley facility without counsel present to discuss bond orders and terms of release); Ex. 110, ¶8 (mothers requests to have counsel present when meeting with ICE regarding the terms of their release were denied); Ex.104, ¶ 12 (ICE officials routinely misinformed and misdirected detainees as to access to free legal services available through CARA volunteers); Ex. 93, ¶ 6 (discussing increasing restrictions on legal representation at Berks).

Plaintiffs' Response to OSC

available to them." DHS Response at 14, *citing* Order ¶ 33.[21]   Defendants add

that "the length of time individuals [must] remain in detention is directly related to

the amount of time it takes to screen them for credible or reasonable fear." DHS

Response at 15. And they assure the Court they will conduct credible fear and

reasonable fear interviews "within a reasonable timeframe." *Id. quoting* DHS Press

Release, ECF No. 164-1 at 1.

　　　Obviously if Defendants have suddenly after seventeen years decided they

want to screen every class member accompanied by a mother for credible or

reasonable fear, *the amount of time it takes to conduct this screening depends*

*almost entirely on the extent to which Defendants believe completing the screening*

---

[21] Regarding class members or mothers with reinstated removal orders, it is clear that Defendants are not required to detain these mothers and children. *See* DHS Response at 12. As the Ninth Circuit has explained, a removal order is not considered final, and thus the § 1231(a)(2) removal period does not begin, until a reasonable fear adjudication has been completed. *See Alfaro-Ortiz v. Holder, 694 F.3d 955, 958 (9th Cir. 2012); Luna-Garcia v. Holder*, 777 F.3d 1182, 1186 (10th Cir. 2015). Thus, the detention of most individuals with reinstated removal orders who have not yet established a reasonable fear would fall under 8 U.S.C. § 1226(a), which authorizes release from detention. Even then, § 1231(a)(2) only requires mandatory detention during the 90-day removal period after the entry of a final order of removal. For the vast majority of individuals placed in reinstatement of removal proceedings the 90 days will have elapsed. When DHS reinstates a removal order, the "prior order of removal is reinstated from its original date." 8 U.S.C. § 1231(a)(5). Thus, the detention of most individuals with reinstated removal orders who have not yet established a reasonable fear may fall under 8 U.S.C. § 1231(a)(6), which authorizes detention "beyond the removal period," rather than § 1231(a)(2), which authorizes detention "during the removal period." Detention under § 1231(a)(6) is discretionary*, not mandatory, and the regulations allow for release where the immigrant does not poses a danger or flight risk. 8 U.S.C. 1231(a)(6) (an "alien ordered removed who is inadmissible . . . *may* be detained beyond the removal period") (emphasis added); 8 C.F.R. § 241.4(e).

*of class members is a priority.* If it was a priority for Defendants, the "screening" they have decided to undertake could be completed in a handful of days.[22] Given the high cost of actually detaining class members, and Defendants' obligations under the Settlement, Defendants have nowhere explained why they have not simply opted to assign a small number of additional agents to promptly "screen" class members and their accompanying parents.

### 4.   Defendants are not required by the INA to place class members in "expedited removal" proceedings and not doing so would in no way violate the INA

Despite pretending otherwise, nothing requires DHS to place accompanied class members or their mothers in "expedited removal" proceedings.[23] *The*

---

[22] Almost all the existing delay in "screening" class members and their mothers is caused by Defendants. *See, e.g.*, Ex. 102, ¶3 (ICE had failed to issue a Notice to Appear for a detained mother where an Immigration Judge had failed to vacate the negative credible fear determination more than ten days earlier); Ex. 104, ¶46 (after the June 24 DHS announcement, ICE delayed for two to four weeks in issuing Notices to Appear to detained mothers at Dilley after those mothers had passed a credible fear or reasonable fear interview); Ex. 110, ¶7d (represented three families in late July still detained at Dilley, despite having positive reasonable fear determinations made three weeks earlier). While Defendants no longer process class members accompanied by their mothers consistent with the Settlement, it appears they have not stopped complying with the Settlement or the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") with regards unaccompanied minors, screening and releasing them within 72 hours. DHS Response at 19, *citing* Vitiello Decl. ¶ 11-12, 14.

[23] Defendants argue that "an order effectively requiring DHS to parole all individuals in expedited removal before … [a credible fear of return] is established would conflict with the provisions governing expedited removal and parole." DHS Response at 25,

*government has discretion to refer families to regular removal proceedings under*

*INA § 240 before an IJ, even if they are subject to expedited removal. See Matter*

*of E-R-M- & L-R-M-,* 25 I.&N. Dec. 520, 522–23 (BIA 2011) (holding that "DHS

has discretion to put aliens in section 240 removal proceedings even though they

may also be subject to expedited removal").[24] According to its own directives,

DHS routinely exercises prosecutorial discretion in "deciding to issue . . . a Notice

to Appear" or to "seek[] expedited removal or other forms of removal by means

other than a formal removal proceeding in immigration court." John Morton

Memorandum, Director, ICE, on Exercising Prosecutorial Discretion Consistent

with the Civil Immigration Enforcement Priorities of the Agency for the

---

*citing* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Neither the Settlement nor the Court's contemplated Order "requir[e]" this result.

[24] *Villa-Anguiano v. Holder,* 727 F.3d 873, 878 (9th Cir. 2013) (reinstatement of a prior removal order is neither "automatic" nor "obligatory …"; nothing "deprives the agency of discretion to afford an alien a new plenary removal hearing" (internal quotation marks omitted)). *See also,* Ex. 93, ¶17 (ICE issued Notices to Appear, rather than going through the expedited removal process for certain families detained at Berks); Ex. 107, ¶14 (ICE has bypassed the expedited removal process and instead issued Notices to Appear and paroled families into the United States); Ex. 108, ¶¶6-8, (ICE has during various periods placed families into removal proceedings through the issuance of a Notice to Appear); Ex. 112, ¶14, (ICE has often and can easily parole mothers placed in expedited removal or with reinstated removal orders or can issue Notices to Appear and release the families on reasonable bonds); Ex. 91, ¶6 (same). In addition, Defendants' own data makes clear that nearly 87% of families who assert a credible fear of persecution receive positive fear findings and are *already* being referred for removal proceedings before the IJ. Lafferty Decl. ¶ 8 [Doc. # 184.3].

1  Apprehension, Detention and Removal of Aliens, at 2 (June 17, 2011).[25]

2  **5.    Prolonged detention is not necessary to ensure that families
3          receive medical care; in fact, their health is placed at risk in
4          DHS's detention centers**

5  Defendants argue that they need several weeks if not months to provide class

6  members and their accompanying mothers with "medical and mental health

7  evaluation[s], … physical examination[s], … dental screening, and medically

8  necessary health or mental health referrals." DHS Response at 16 *citing* Homan

9  Decl. ¶ 29. In fact, there is overwhelming evidence that medical care provided

10  detained class member children is hopelessly inadequate and they are far more

11  likely to become ill, loose weight, or be infected with a communicable disease

12

13

14

15

16  _____

17  25 *Accord* Memorandum from Jeh Johnson, Secretary of Homeland Security, on
18  Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants
19  at 2 (Nov. 20, 2014).Pursuant to 8 U.S.C. § 1182(d)(5)(A), DHS may also, in its
20  discretion, "parole [class members] into the United States temporarily under such
21  conditions as [the Secretary] may prescribe … for urgent humanitarian reasons or
22  significant public benefit ..." The Secretary could easily determine that preventing the
23  detention of minors and their parents in secure unlicensed facilities constitutes an
24  "urgent humanitarian reason" and there is a "significant public benefit" achieved by
25  not breaching the Settlement. Its entirely duplicitous for Defendants to argue that under
26  the contemplated Order Defendants' "only options are to criminally prosecute the
27  adults …; to place the families in removal proceedings without any screening for
28  eligibility for relief …; or to separate parents and their children ..." DHS Response at
27. Class counsel and the Court are left to wonder, if a Court Order requiring
Defendants to comply with the Settlement with regards class members accompanied by
their mothers would somehow force DHS to "violate the INA," or cause the agency to
"separate parents and their children," or worse to "prosecute" the mothers, *why is this
not a problem for Defendants when it comes to their treatment of class members
accompanied by their fathers, or their grandmothers or aunties?*

*while detained* than if they were promptly released.[26]

**6.    Prolonged detention is not necessary to ensure that families can contact their consulates and family members in the United States**

_____

[26] *See, e.g.* Ex. 97 ¶¶ 9,12,16 (at the Berks facility there are no bilingual medical staff, a lack of training and screening for mental health symptoms, detention puts children's short-term and long-term well-being at risk); Ex. 105, ¶¶ 4-10 (describing complaint by the CARA Project on behalf of ten detained mothers who experienced inadequate medical care; describing wait times of three to fourteen hours for medical care, a lack of appropriate follow-up treatment, the administration of an adult dosage of the Hepatitis A vaccine to more than 250 children at Dilley, and the frequent prescription to drink water for all manner of illnesses); Ex. 91, ¶¶ 7-9 (instances at Dilley where a child's health was in jeopardy were it not for legal representatives taking action to call child protective services and/or an ambulance); Ex. 92, ¶¶ 12-14 (instance at Dilley where the attorney had to call the Texas Department of Family and Protective Services for a seriously ill three-year-old boy who was then transported by ambulance to hospital and treated for pneumonia); Ex. 111, ¶ 4 (at Karnes medical conditions were treated only with pain killers and telling detainees to drink more water); Ex. 93, ¶¶ 7,25 (countless instances of medical neglect at the Berks facility and one specific case where follow-up tests for a brain malformation were not conducted); Ex. 95, ¶ 17 (complaints relayed by interviews with 332 formerly detained women regarding inadequate medical care at Dilley); Ex. 99, ¶¶ 13-16 (lack of accommodations made for special needs children detained at Dilley and delays in treating a child with strep throat and dehydration until she was transported by ambulance to a local hospital); Ex. 100, ¶¶ 8-10 (conditions at the Karnes where children have lost weight, receive inadequate medical care including difficulties accessing medical records and receiving promised follow-up tests); Ex. 101, ¶¶ 5-7 (complaint with the DHS Office of Civil Rights and Civil Liberties on behalf of ten mothers demonstrating the negative psychological impact of detention for mothers and children); Ex. 104, ¶ 61 (access to medical care at Dilley is insufficient and what medical care is available is inadequate, including the specific example of a sick two-year-old who only finally received medical attention because legal volunteers threatened to call 911); Ex. 106, ¶3 ("trauma of family detention compounds the traumas already experienced by asylum-seeking children, and that DHS' family detention environments pose great risk of harm to the detained children's cognitive, behavioral and emotional development."); Ex. 113, ¶¶4-13 (detailing the experience of one detained mother detained at Karnes for five months with her two children, where the ten-year-old daughter was hospitalized but ICE and GEO officials refused to give the mother information about her daughter's diagnosis, treatment, or reasons for hospitalization).

Defendants add that "[t]his time period [in prolonged detention] also ensures that families can contact their consulates and family members in the United States, and can provide ICE with proof of identity, a verifiable address, and sponsor information so that ICE can effectively assess flight risk and consider the family for release under appropriate conditions." DHS Response at 16-17, *citing* Homan Decl. ¶ 29. Obviously class members (and their mothers) who are released will be far better able to secure whatever assistance they may need from their consulates and family members in the U.S. than those who remain in custody in extremely remote locations. Further, class members and their mothers can provide ICE with "proof of identity, a verifiable address, and sponsor information" in a matter of minutes. This hardly requires detention for 20-30 days or longer. In all other cases, other than detained class members and their mothers, ICE determines bond conditions within a matter of days, not weeks or months.[27]

### 7.   Prolonged detention is not necessary to facilitate access to counsel and legal orientation programs.

Prolonged detention is hardly necessary to facilitate access to counsel and legal orientation programs. In fact, ICE routinely interferes with the families' ability to access counsel in a number of ways. Pro bono attorneys face obstacles in

---

[27] ICE normally must issue a charge and set a bond within 48 hours of apprehension. 8 C.F.R. § 287.3(d). On or before the conclusion of this period, ICE must determine whether the individual will continue to be detained or released on bond or on his or her own recognizance. Id. Defendants therefore hardly need 20, 30 or more days to determine an appropriate bond or conditions of release.

scheduling and holding legal visits and in providing effective representation to

detained families.[28] The very location of the detention facilities obviously

undermines access to counsel and make long-term pro bono services to these

detained families unsustainable.

### 8. Defendants' position on the use of deterrence as a factor weighing in favor of detention remains unclear

On the one hand Defendants claim they no longer detain mothers and their

children to deter others from entering the country without inspcetion,[29] yet on the

other hand they continue to argue that their detention policy "dis-incentivizes

future surges of families crossing the Southwest border." DHS Response at 17

*citing* Homan Decl. ¶¶ *Id.* ¶¶ 7, 12, 15. All that can be said is that Defendants'

---

[28] *See* footnote 20 *supra*. *See also* Ex. 92, ¶¶ 7-10 (experienced several occasions between May 2015 and the present where legal volunteers were arbitrarily denied access to the Dilley facility); Ex. 104, ¶¶ 12-30 (detailing the myriad ways in which ICE and CCA have impeded access to and the provision of legal services); Ex. 103, ¶¶ 3-8 (faced serious impediments to accessing the Dilley facility, providing legal services and meeting with clients during four trips as a volunteer attorney); Ex. 99, ¶¶ 5-11 (detailing difficulties experienced at Dilley in conducting legal calls with detained mothers by phone, wait times of three to four hours to see clients); Ex. 90, ¶¶ 15-19 (ICE made it impossible for attorneys to consult with clients prior to bond hearings at Dilley); Ex. 111, ¶8 (access to the Karnes facility was denied for an individual without a Texas driver's license); Ex. 93, ¶ 5 (lawyer cannot speak to existing clients or new detainees without having them on a list submitted to the facility ahead of time); Ex. 102, ¶ 4 (had to wait between four and five hours to meet with a detained mother client at Dilley to prepare for a hearing next day leaving inadequate time to prepare).

[29] *See* Homan Decl. ¶ 7 ("ICE no longer uses deterrence as a factor in individual custody determinations . . .").

position on deterrence as a factor justifying detention remains unclear. [30]

**9.      The statutes Defendants claim they would be forced to violate if the Court Orders compliance with the Settlement were enacted *prior* to the Flores Agreement**

The Settlement Agreement was reached long after the INA was enacted and for some 17 years Defendants had little problem "read[ing] [the Settlement] consistently with the INA." DHS Response at 9 Nothing in the INA has changed during the past 12 months when Defendants decided to defiantly move into material breach of the Settlement.

Nothing in the Court's contemplated Order "would cause the Agreement to restrict DHS's legal authority with regard to the availability of certain removal processes under the INA." DHS Response at 28. Defendants argue that if the Court issues an Order requiring DHS to comply with the Flores Settlement, Defendants will somehow be forced to violate the INA's provisions dealing with reinstatement

_____

[30]  Defendants' two press releases from 2014 make clear that the family detention centers were opened solely to detain mothers and their children to deter others from coming. Defendants' press releases identified no other enforcement needs these detention facilities would serve. *See* Press Release, U.S. Dep't of Homeland Sec., South Texas ICE Detention Facility to House Adults with Children (July 31, 2014), (Ex. 114) http://www.dhs.gov/news/2014/07/31/south-texas-ice-detention-facility-house-adults-children (stating that repurposing of Karnes to house families was part of "'DHS' sustained and aggressive campaign to stem the tide of illegal migration from Central America'"); Press Release, U.S. Immigration and Customs Enforcement, ICE's New Family Detention Center in Dilley, Texas to Open in December (Nov. 17, 2014), (Ex. 115) https://www.ice.gov/news/releases/ices-new-family-detention-center-dilley-texas-open-december (stating that the Dilley facility was part of a policy aimed at "deterring others from taking the dangerous journey and illegally crossing into the United States").

Plaintiffs' Response to OSC

of removal orders and expedited removal. However, these statutes were enacted *before* Defendants entered into the Flores Settlement. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, Division C, Section 302.[31]

### 10. Defendants now seek revision of the Settlement in ways never addressed in their motion to modify the Settlement

Defendants' motion argued only that "application of the agreement to DHS is not equitable or just because there have been significant legal and factual changes *since the agreement was signed and entered ..."* Defendants' Protective Motion to Modify Settlement Agreeement [Dkt #120] at 13 (emphasis added).

As already pointed out, the statutes involving expedited removal and reinstatement of previous removal orders were enacted well *before* the Settlement was reached and approved by the Court, not "since the agreement was signed and entered …"

### 11. Instead of moving towards compliance with the Settlement, Defendants have plans to expand their detention of accompanied class members

Rather than signaling a willingness to end their breach of the Settlement, Defendants have indicated to their private prison-for-profit groups a readiness to

---

[31] In signing the Agreement, the parties stated that they knew "of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law." Agreement ¶ 41. The Court's contemplated Order simply enforces the Settlement and does nothing to amend the Settlement making it inconsistent with the INA.

*increase* the detention of mothers and their children.

It is widely known that Defendants plan to soon double the capacity of the detention facility located in Berks County, PA.

Just about one week ago, the GEO Group that Defendants pay to operate the Karnes detention facility announced on a second quarter 2015 Earnings Conference Call that by "December 1, [2015,] we expect to complete a $36 million *626 bed expansion* to the Karnes, Texas, Residential Center ... The new facility capacity will be 1,158 beds and will result in a new fixed monthly payment estimated to take place on December 1 of this year." *See* Exhibit 88 (emph. supplied).[32]

C.   DEFENDANTS OFFER NO COHERENT REASON WHY WITHIN 90 DAYS THEY WOULD BE UNABLE TO PROPOSE CHANGES IN CONDITIONS AT CPB FACILITIES CONSISTENT WITH THE FLORES SETTLEMENT

With regard the Court's proposed remedies relating to the conditions encountered by minors at Border Patrol holding facilities, Defendants "contend that the Order and the proposed remedies should be vacated in light of the

_____

[32] GEO executives informed shareholders of this litigation: "As you may be aware there's an ongoing case in Federal Court related to the government's family detention policies in particularly … the length of stay at family residential centers. While we cannot speculate on pending legal proceedings, we believe that the Department of Homeland Securities and ICE have an interest in the continued use of the family residential centers which comply with ICE's family residential standards …" *Id*. Thankfully for GEO shareholders, but not for class member children and their mothers, GEO's leadership "remains committed to returning value to our shareholders by targeting a 75% to 80% dividend payout," and "total revenue for the year is expected to be approximately $1.86 billion …" *Id*.

Plaintiffs' Response to OSC

incomplete factual development before the Court." DHS Response at 9. Without clearly stating what the material disputes are, Defendants now argue that whether Border Patrol facilities comply with the Agreement "is disputed by the parties and requires an evidentiary hearing ..." *Id*. Defendants make no proffer of the evidence they would seek to elicit at an evidentiary hearing, and failed to present any witnesses at the April 2015, hearing or to subpoena witnesses to appear.[33]

Defendants argue that "if the Court ... find[s] that conditions [of detention] are in breach of the Agreement, the remedy should not exceed the scope of the Agreement, such as by requiring CBP to implement broad standards that are not provided for anywhere in the Agreement." DHS Response at 10-11. The Court's Order simply directs the Defendants to file proposed standards within 90 days. The Court is not ordering a remedy that "exceed[s] the scope of the Agreement," and there is no reason to believe it will do so in the future.

D.   CONCLUSION

When this Court issued its Order it was fully apprised of the parties' arguments and submissions. Defendants continue in breach to this day. They offer no rational reason why they cannot comply with the detention and release provisions of the Order starting immediately and within 90 days provide the Court with proposed standards--and procedures for monitoring compliance with such

---

[33] Nothing would prevent Defendants from seeking an evidentiary hearing after they submit their proposed detention standards as required by the Order at 25.

1   standards--for detaining class members in facilities that are safe and sanitary,

2   consistent with concern for the particular vulnerability of minors, and consistent

3   with Paragraph 12 of the Agreement.[34]

4

5   Dated: August 13, 2015.                      Respectfully submitted,
                                                 CENTER FOR HUMAN RIGHTS &
6                                                CONSTITUTIONAL LAW
7                                                Carlos Holguín
                                                 Peter A. Schey
8                                                Marchela Iahdjian

9                                                ORRICK, HERRINGTON & SUTCLIFFE LLP
10                                               T. Wayne Harman
                                                 Elena García
11

12                                               LA RAZA CENTRO LEGAL, INC.
                                                 Michael Sorgen
13                                               Maria Victoria Castro
14                                               Amanda Alvarado Ford

15                                               LAW FOUNDATION OF SILICON
16                                               VALLEY -
                                                 LEGAL ADVOCATES FOR CHILDREN
17                                               & YOUTH
18                                               Jennifer Kelleher Cloyd
                                                 Katherine H. Manning
19                                               Kyra Kazantzis
20                                               James Zahradka
                                                 Annette Kirkham
21

22                                               Of counsel:

23                                               YOUTH LAW CENTER
                                                 Alice Bussiere
24                                               Virginia Corrigan

25

26   ─────────────────

27   [34] The sole change Plaintiffs suggest in the Court's contemplated Order is to increase
     Defendants' monitoring and reporting requirements as set forth in Plaintiffs' proposed
     Order. This much is justified solely in light of Defendants' egregious breach and
28   refusal to date to end its breach. *See* plaintiffs' proposed Order ¶ 7 [Doc. # 174.]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/*Peter Schey*
*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On August 13, 2015, I electronically filed the following document(s):

- **Plaintiffs' Response to Order to Show Cause**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*

1