# EXHIBIT 90

## Declaration of R. Andrew Free, Esq.

I, R. Andrew Free, depose and say:

1.      I am an attorney licensed and admitted to the state bar of Tennessee. I am a 2010 graduate of Vanderbilt University Law School. I have been practicing immigration law for the last four years, and have been a member of the American Immigration Lawyers Association since 2008. I previously served as a Chair of the American Bar Association's Committee on the Rights of Immigrants. During the week of July 20, 2015, I served as a volunteer attorney with the CARA Pro Bono project at the privately run, for-profit family detention facility in Dilley, Texas. I submit this declaration based on my on-the-ground experience at Dilley, as well as habeas petitions and Federal Tort Claims Act complaints I have filed or am preparing to file on behalf of clients in Dilley.

2.      In my capacity as a volunteer *pro bono* attorney, I represented approximately 20 women and children in bond and removal proceedings and appeared as a friend of the Court before Immigration Judge J. Daniel Dowell on Monday, Tuesday, and Wednesday. Every client I represented on these days had been assigned a bond of between $5,000 and $10,000 by ICE. ICE set these bonds at levels my clients could not afford. It did not appear that in any of these cases ICE had considered the ability of the client to actually post the bonds that were set in my clients' cases. Immigration Judge Dowell lowered the bond of each client to between the minimum of $1,500 and a maximum $2,500. The Department of Homeland Security ("DHS") waived appeal in each case.

3.      I also represented women in preparing for and providing testimony during Immigration Judge Dowell's review of the asylum officer's negative

**Exhibit 90 - page 287**

reasonable fear finding. Each mother I prepared had been detained with her minor child for well over one month.

4.      Finally, I prepared a woman in withholding-only proceedings to offer testimony in support of her claim at her final merits hearing, and appeared before the Immigration Judge along with my fellow CARA attorneys Kim Hunter and Isabel Saavedra at a hearing on July 23, 2015. The Judge granted relief. Our client and her daughter walked free that night, but not before they spent 109 days in custody (from April 6, 2015 – July 23, 2015)*, including 51 days (June 2, 2015 – July 23, 2015) after the Immigration Judge reversed the asylum officer's negative decision in her case, and nearly a month after the Secretary of Homeland Security announced publicly on June 24, 2015 that mothers and children in our client's position would be freed on reasonable conditions of release.*

5.      In my experience, detained mothers are being coerced into accepting ankle shackles as a condition of release. For example, during a bond hearing of a mother I represented on Tuesday, July 21, DHS Assistant Chief Counsel James Jones insisted that my client agree to wear an ankle shackle if she is released on bond. ICE set the bond amount at $5,000, which my client could not afford to post. Based on my discussions with my client, I explained to the Immigration Judge that she was concerned about the burden and stigmatizing effect of the shackle, and would prefer to pay a bond, provided she could afford the amount. ACC Jones argued that my client's declining to be released wearing an ankle bracelet should result in the IJ *increasing* rather than decreasing the bond amount. IJ Dowell nevertheless reduced the bond to $1,500.

6.      On Tuesday afternoon, I learned through interviews with multiple CARA clients that ICE was summoning large groups of detainees to the Courtrooms

Exhibit 90 - page 288

at the facility and speaking to them without counsel present about the immigration court bond orders. This raised significant concerns for the CARA legal team, as it interfered with our ability to prepare women and their children for bond hearings, and confused mothers about the nature of immigration court proceedings and their rights—including the privilege of representation by counsel—in immigration court.

7.      On Wednesday, July 22, 2015, prior to the beginning of the docket, I raised my concerns about this practice before Immigration Judge Dowell. I expressed serious concern about the potential for unintended confusion or misinformation about the differing roles played by the Immigration Court, which hears mothers' claims, and ICE, which detains, prosecutes, and attempts to deport them. IJ Dowell requested that I immediately ask the other two CARA pro bono attorneys to inform the judges managing their respective dockets—Judge Rodriguez de Jongh and Judge Alexander—of this issue. Judge Dowell stated that he had previously witnessed on the televideo screen to Dilley a person with his back to the camera and a semi-circle of woman surrounding them who appeared to be receiving a presentation. He requested that I inform CARA Lead Attorney Brian Hoffman that he and the Assistant Chief Immigration Judge, Elisa Sukkar, should schedule a televideo conference for the following week to discuss the issue.

8.      After finishing my court docket on Wednesday, July 22 around 11:30 a.m., I learned that the client I represented that in a bond hearing came to the legal visitation trailer distraught. She reported that she signed an ICE document under duress earlier in the morning. Specifically, my client stated that she received a yellow Post-It note summoning her to the Court building at the Dilley facility. Once there, she and dozens of other detainees, without counsel present, were told by an ICE officer that they could only be released with GPS ankle bracelets. My client

**Exhibit 90 - page 289**

informed me that when she asked to speak with counsel, the ICE officer refused to allow her to do so. Under pressure, she signed the document placed in front of her, which she didn't fully understand. She did not receive a copy of the document.

9.      On the same morning, several CARA clients, including some who had final bond orders issued by Immigration Judges, came to the legal trailer with copies of the ICE document attached hereto as Exhibit A. This document, which purports to inform mothers about their eligibility for ICE's Alternatives to Detention, begins, (in Spanish): "It has been determined that you are eligible for the ATD program. **Your bond (if you have one) is cancelled**." For women with Immigration Judge bond orders, this communication seemed to contradict our legal advice about their right to release on bonds set by the Immigration Judges. The practical consequence of this communication was to prevent mothers and children from paying their bond and obtaining release.

10.     Overall, the manner in which ICE processes mothers seeking Immigration Judge reviews of bond amounts set by ICE that mothers are routinely unable to afford to post is designed to make legal representation even by pro bono counsel extremely difficult. On July 22, at about 12:30 p.m., I and several other CARA volunteers went to the Dilley detention facility's Court trailer. There were approximately 70 women in each the facility's four courtrooms. The mothers had been provided with post-it notes telling them to be in court. See Exhibit B attached. The mothers informed us that they did not know why they were required to be in court. I spoke to an ICE deportation officer (whose name I believe was Mr. Garcia) and requested that ICE cease conducting its courtroom presentations until CARA's attorneys and ICE's attorneys and supervisors had a chance to discuss our concerns with interference with counsel for represented mothers. That day ICE Supervisory

**Exhibit 90 - page 290**

Detention and Deportation Officer K. Lawrence and ICE Deputy Chief Counsel
Nathan Herbert came to the court trailer to discuss our concerns. They then left to
speak with their supervisors about the issues we raised. I and other CARA
personnel waited for roughly 30 minutes before deciding we needed to return to the
legal trailer to ensure continuity of legal services for other CARA clients while ICE
deliberated. Shortly thereafter ICE Acting Assistant Field Office Director Silvestre
Ortega, DCC Herbert, and ACC William Muale met with CARA attorney Brian
Hoffman and me. They informed us ICE would identify and allow CARA clients to
come to the legal trailer for advice if CARA attorneys submitted G-28 Notice of
Appearance forms. They indicated they would "consider" our request that CARA
attorneys be provided a list of clients ICE required to appear in court so we could
identify represented parties. They agreed that we could provide group presentation
for roughly "two minutes" to notify mothers about CARA and how to obtain legal
advice and representation. ICE personnel rejected the idea of conducting the
presentations anywhere else in the facility, such as a gymnasium, cafeteria, chapel,
or meeting room used for Legal Orientation Program presentations. However, I
learned after I left Dilley that ICE has since changed this position, and is now
conducting the presentations elsewhere. For many women the presentations were
taking place the afternoon before their bond hearing, or immediately after it.

     11.    Immediately after the meeting in which Brian Hoffman and I raised
the issue of ICE misusing the Court trailer and denying access to counsel, ICE
locked CARA's attorneys out of the Court building. CCA personnel informed me that
*Deputy Chief Counsel Herbert instructed CCA personnel that no attorney would be
allowed into the Court trailer without his prior consent.*

**Exhibit 90 - page 291**

12.     About two hours after the meeting with ICE officials, CARA
volunteers met with two more clients—including a client of mine—who had been
coerced into signing an ICE ankle shackle agreement. When I contacted DCC
Herbert and asked what steps ICE attorneys had taken to retrain ICE officers in
response to our concerns about access to counsel, misleading information about
immigration court orders, and coercion, he stated that ICE had taken no action. He
confirmed that ICE had locked me and all other CARA attorneys out of the
courtroom at his direction. I again requested that the ICE presentations be
suspended until the interests of represented parties could be accounted for. DCC
Herbert refused. I informed him that my client would be seeking an order holding
ICE in contempt of the Immigration Judge's final bond order the following morning.
However, as I realized later that evening, though the Immigration and Nationality
Act vests contempt power in Immigration Judges, the extent of that authority must
be defined by regulation. Much to the chagrin of some immigration judges, the
regulations promulgated place DHS and its attorneys beyond the contempt powers
of the Immigration Court.

13.     The following morning, on Thursday, July 23, 2015 I presented an
emergency Motion for Bond Redetermination to Immigration Judge Rodriguez de
Jongh for the client who I had seen the previous afternoon in the legal trailer. That
motion is attached hereto (along with several relevant exhibits) as Exhibit C. ICE
claimed there was no coercion and that my client had not even visited the legal
trailer. It demanded an "evidentiary hearing," which the Court set for 1 p.m. on
Friday, July 24, 2015.  To prepare for the hearing, Brian Hoffman and I requested a
series of ICE documents that would corroborate our client's experience, and identify
witnesses for the hearing. We requested that the documents be produced by 6 PM,

**Exhibit 90 - page 292**

lest it become necessary to seek a subpoena from the Immigration Judge if the documents were not produced. At 5:58 p.m. ICE suddenly discovered that my client was no longer a "flight risk," and agreed to free her without requiring payment of the $1,500 bond or an agreement to wear an ankle shackle. This mooted our Motion. She and her two children, both of whom had been very ill for several days without receiving medical care, were released later that evening. It is highly unlikely this result would have been achieved were it not for the fact that this client had access to counsel, something mothers and children are not fortunate enough to have.

14.     Later that night and on the following day, ICE and CCA took several additional steps to further restrict access to counsel, and retaliate against CARA, and our clients, for bringing the agency's questionable practices to the attention of the Immigration Court. I am informed by mothers and believe that two male ICE agents went room-to-room in the dormitory where one of our clients slept whose declaration we had attached to the Motion filed with Judge Rodriguez de Jongh. These officers loudly demanded to know the names of mothers who were talking to the lawyers about the problems with the ankle shackles, and specifically asked for our client by name. The officials misinformed the women in the dormitory that lawyers have nothing to do with this matter. Our client, a former policewoman from El Salvador who fled threats on her life, informed me that she was intimidated by this episode and it made her question our authority as legal counsel to do anything for her.

15.     The retaliation against CARA clients and attorneys appeared to continue on Friday, July 24. CCA announced that cellular phones of legal volunteers could no longer be left in the lockers within the Dilley facility's lobby. They had to be left inside the cars in the parking lot beneath sweltering heat of about 115 degrees.

**Exhibit 90 - page 293**

Having one's cell phone in the lobby locker is significant because attorneys often need fairly prompt access to a cell phone to make and take calls relating to legal representation of CARA clients, including calls to the Immigration Court in Miami, and to CARA's organizational partners in Washington, D.C. I was told that now the lockers were for non-legal "visitors." I was told we were free to use lockers to stow other items such as power cords—just not cell phones. Obviously, leaving one's cell phone in a locked car in about 115 degrees can quickly destroy the phone. After I voiced my objections to a CCA supervisor, I was given a locker key and allowed to leave my phone in the locker, as I had done on each of the four previous days.

16.     Second, ICE and CCA denied CARA's staff access to the legal trailer at about 6:45 a.m., on July 24. This was in violation of the previous guarantee from ICE and CCA that CARA would have access to its clients and the *pro bono* room in the visitation trailer. According to the new policy, attorneys would be limited to visiting the legal trailer from 7 a.m. to 7 p.m. We were informed that CARA could request after-hours access. However, the person to whom such a request should be made, the reasons such a request may be granted or denied, and the period of how far in advance the request must be made were not communicated by CCA or ICE personnel.

17.     Third, I am informed and believe that ICE directed CCA personnel not to allow attorneys into the Court area prior to 8:00 a.m. If we wanted to speak with our clients, they would have to come to the legal trailer. Of course, communicating that message to our clients would be impossible, since they were locked inside the Court trailer and we were locked out. While we were locked out, clients later informed me that an ICE employee spoke to our clients inside the Court trailer on the morning of July 24 "to provide information about Court."

**Exhibit 90 - page 294**

18.     Around 7:30 a.m. on Friday, I knocked on the door to the Court trailer several times to request to speak with the person responsible for this new policy. CCA court officer Quintanilla allowed me and a CARA staff member into the sally port area of court, which opens into a secure hallway leading into the Court trailer. I met with an ICE official who confirmed that ICE was denying attorneys access to the courtroom until 8 a.m., when "court is in session." Because one of the CARA attorneys was not in the Court building 30 minutes early, as instructed by IJ Alexander, her hearings were postponed.

19.     I spoke with ICE SDDO Lawrence again once inside the courtroom building. She confirmed that ICE had begun applying the new *no-lawyers-in-court-until-the-moment-Court-is-in-session* policy the morning of Friday July 24. The justification she gave is that "this is a secure facility." I explained that we had been coming to the courtroom early to conduct business with the immigration court all week. The only explanation Officer Lawrence could provide was that this was the new policy.

20.     Shortly after 4:00 p.m. on Friday, July 24, 2015, CCA officials interrupted a confidential client interview with my Salvadoran policewoman client who ICE officials sought out the night before. A tall man who introduced himself as "Captain Bain" asked that I come with him to the lobby. When I asked why, he refused to tell me. When CARA staffer Aseem Mehta informed him that I was in the middle of a confidential client interview, he insisted that I accompany him. When I asked him if I was being ordered outside, he told me that I was. I was not allowed to collect my computer, work-product notes, or explain to my client what was happening or why I was being ordered out of an interview room with her.

**Exhibit 90 - page 295**

21.     Once in the facility's lobby, the CCA Captain, who was joined by two ICE officers, informed me that my access to the facility had been revoked by ICE effective immediately. When I asked for a reason, they said they could not provide one. The official said I could appeal this decision to the San Antonio Field Office Director. When I asked how I could appeal a decision without being given notice and an opportunity to contest its basis, they repeated that I could appeal to the Field Office Director. When I asked if I could get my computer and notes, they refused. I surrendered my facility badge and left the facility.

22.     I later received a letter, dated August 3, 2015, attached as Exhibit D hereto, from ICE Field Office Director Enrique M. Lucero, advising me that my visitation privileges at Dilley were suspended pursuant to Family Residential Standard 5.8(V)(6), and alleging that I had acted in a "manner contrary to the safety, security, and good order of the facility by interfering with the execution of Enforcement and Removal Operations (ERO) officer functions." FRS 5.8(V)(6) states: "A visitor's failure to abide by visiting rules may result in immediate cancellation or termination of a visit and/or suspension of future visitation privileges." Director Lucero failed to identify any facility rule that I violated.

23.     On August 6, 2015, prior to receiving the August 3 letter, I emailed Director Lucero, appealing the decision to revoke my access to the facility. A copy of my e-mail is attached as Exhibit E hereto.  In response, I received a second letter from Director Lucero, dated August 10, 2015 and attached as Exhibit F hereto, denying my appeal and stating that my access to my pro bono clients at Dilley would not be restored. In his second letter, Director Lucero falsely claims that I physically interfered with the service of documents upon detainees by ICE, and that I 'placed

**Exhibit 90 - page 296**

[my] hands' on an ICE official to keep her from walking away from me. Both assertions are absolutely false.

24.     After my physical access to the facility was revoked, I have continued to provide *pro bono* representation remotely to children and mothers detained at Dilley, as well as some who have been released, but now without being able to visit my clients. On July 30, 2015, I filed a petition for a writ of habeas corpus for six-year-old Maria and her mother Lolian Celina Gutierrez-Cruz, *who has been detained at Dilley since approximately January 23, 2015*. A copy of that petition is attached as Exhibit G hereto. *Maria and her mother have now been detained for more than seven months*. During that time, as documented in the habeas petition, both have suffered psychological and physical harm. An independent psychologist examined Maria and found that she is suffering from "symptoms of PTSD [Post-Traumatic Stress Disorder], depression, and high levels of anger." At six years old, Maria cannot understand why she and her mother remain incarcerated while some other families are released. The psychologist also found that Maria's mother is "at risk for a psychotic break." Maria and her mother have not received adequate medical care in detention.  Maria was vomiting blood for days before she was finally transferred offsite for medical treatment. *Although Maria's mother passed her reasonable fear interview, she remains in detention.*

25.     I am in the process of preparing and filing habeas claims for at least three other children and their mothers who have been detained for prolonged periods of time at Dilley, including one family that has been detained in government custody since December 27, 2014, and another that has been detained for over thirteen months.

**Exhibit 90 - page 297**

26.     On August 10, 2015, I filed five administrative complaints under the

Federal Tort Act Claims Act based on government agents' misconduct on behalf of

families who had been or currently are detained at Dilley.  These complaints,

redacted versions of which are attached hereto as Exhibits H-K, challenge

misconduct by officers of the U.S. Customs and Border Protection (CBP) and U.S.

Immigration and Customs Enforcement relating to conditions in CBP's short-term

holding facilities, inadequate medical care at Dilley, and processing delays that have

resulted in unnecessary and prolonged detention of mothers and their children.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of August, 2015, in the City of Nashville, State of Tennessee.

_____

R. Andrew Free

**Exhibit 90 - page 298**

# EXHIBIT 91

## Declaration of Aseem Mehta

I, Aseem Mehta, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am a Board of Immigration Appeals (BIA) Accredited Representative and Fellow with the Immigrant Justice Corps. I have been providing legal representation and coordinating the provision of legal services to detained women and Flores class member children with the CARA Pro Bono Project at the South Texas Residential Family Center in Dilley, Texas ("Dilley") since June 2015. I submit this declaration to share my knowledge of two issues relevant to the ongoing litigation in *Flores v. Reno*. First, I describe my experiences with class member children and mothers detained for periods of time in excess of one month. Second, I describe my experiences with medical emergencies occurring at the facility.

### Prolonged Detention of Class Member Children and Mothers at Dilley

2. Based on my experiences on the ground at Dilley, I can confirm that mothers and children who have passed credible and reasonable fear interviews have remained in detention for more than a month, even following Secretary Jeh Johnson's June 24 announcement. For several weeks following the Secretary's announcement, CARA staff and volunteers received push back from Immigration and Customs Enforcement (ICE) officers when inquiring into the release plans for clients who had positive fear determinations interviews. Between July 22 and August 3, I personally spoke with and requested updates from ICE Deportation Officers about the release plans for at least 15 mothers who had been detained for more than three weeks, three

**Exhibit 91 - page 299**

mothers who had been detained for more than six weeks, and two mothers who had been detained for more than five months. I requested information about why these mothers and Flores class member children continued to have their detention prolonged in spite of the Department's press releases announcing modifications in policy in favor of more speedy release.  As late as July 28, 2015, an ICE officer personally told me that all individuals with a positive reasonable fear result were "subject to mandatory detention as priority 1 criminal aliens due to their criminal re-entry," and therefore would not be released. This statement and the prolonged detention of these mothers and children are in direct contradiction to the Secretary's media statements.

3. Since July 2015, the CARA Pro Bono Project has documented more than forty examples of cases in which the detention of a client and her family was extended by a minimum of two weeks while awaiting the resolution of legal process delays including being scheduled for credible fear or reasonable fear interviews, receiving results from those interviews, or being docketed for a hearing before an Immigration Judge. Far more cases exist than we are able to document.

4. In seeking resolution to these process delays, I reached out to U.S. Citizenship and Immigration Services (USCIS) Asylum Office to inquire into the status of many of these cases. On July 17, 2015, a representative from the USCIS Asylum Office informed me that the delays in process were due to ICE's failure to serve the appropriate documents upon USCIS or the client. This included ICE's failure to serve USCIS triggering documents for clients who had not yet been scheduled for an interview, thus rendering USCIS unable to administer a credible or reasonable fear interview and leaving the client to wait as their detention is extended by this delay. It also included

**Exhibit 91 - page 300**

ICE's failure to serve the client with their interview results and Notice to Appear to move forward with their cases and release. Under the Secretary's June 24, 2015 statement, individuals with positive credible or reasonable fear determinations would be eligible for release; however, if an individual is never served with her fear determination, then she cannot be released and instead remains detained while the process delay continues. The USCIS representative explained that for the weeks of July 20 and July 27, USCIS had scheduled fewer than five interviews per day with detained women because ICE had not served them with additional triggering documents, despite the fact that dozens of women had arrived at the facility in the preceding weeks. Release is also not possible in many cases even if a detained mother passes an RFI or CFI because ICE sets bonds in amounts many mothers or their families simply cannot afford. In these cases ICE may as well set no bond or set a bond of $50 million. I have yet to see evidence that ICE consistently investigates, records and actually considers what a reasonable bond in an individual case may be based upon the ability of the mother to post the bond.

5. Furthermore, ICE has refused to accept bond payments from family members at ERO field offices and instead informs the detained mother's family that the detainee will only be released with an electronic ankle monitor (which the mothers themselves refer to as "grillettes" or shackles). After one client of my clients was issued a bond by the Immigration Judge, ICE called her family and instructed them not to pay the bond and to wait for the client to be released with an ankle monitor. In another instance, a client's family member was arrested by ICE officials while trying to pay the client's bond at the ERO

**Exhibit 91 - page 301**

field office because he was unable to produce sufficient proof of identification.

6. These coercive actions reflect a statement made by an ICE officer to the CARA team on the week of July 20. The officer explained that ICE was under a pressure to release the mothers of Flores class members with ankle shackles, and that other methods of release (release on own recognizance or low achievable bonds), and numerous alternatives to detention such as home monitoring, telephonic monitoring or field office check-ins, in most cases would not be considered. Nevertheless, as stated above, long delays continue despite the DHS Secretary's press releases, with ICE seemingly randomly deciding for a short period to issue mothers in expedited removal or reinstated removal orders Notices to Appear (waiving ICE's position on mandatory detention), and then changing course and refusing to issue NTAs, with delays of several weeks between the expression of a fear of return and ICE actually scheduling USCIS fear interviews, with clients receiving decisions on their CFI and RFI interviews, with clients having ICE determine whether they are eligible for other forms of relief from removal (something ICE officers rarely even inquire about), with ICE officers setting bonds or conditions of release even after clients pass their CFI or RFI interviews, and with Immigration Judge reviews of denials of CFIs and RFIs and bonds set by ICE. Overall, to an advocate working on behalf of detained mothers and Flores class member children, the practices relating to detention and release appear to continue to be driven by factors such as ICE access to bed space rather than the individual facts presented by the mothers' and children's cases.

Exhibit 91 - page 302

4

**Medical Emergencies at Dilley**

7. In my time working with children and mothers at Dilley, I have observed poor medical care and access to treatment. I worked to document the experiences of children and mothers related to medical care for a complaint filed with the Department of Homeland Security's Office of Civil Rights and Civil Liberties and the Office of the Inspector General on July 30, 2015. A copy of that Complaint is attached as Exhibit A. In addition to the information highlighted in that complaint, I have observed at least three troubling instances of a child's health in jeopardy were it not for legal representatives taking action. One mother brought her three-year-old child to the legal trailer, after she unsuccessfully sought medical attention at the facility for four consecutive days after he was mistakenly injected with the wrong vaccine. The child was listless and despondent. Brian Hoffman, attorney for the CARA Project, called and filed a complaint with Texas Department of Family & Protective Services and was instructed to call 911. We therefore took it upon ourselves to call the ambulance to care for the child. We later learned that the child was diagnosed with pneumonia and required immediate medical attention.

8. In another case, a four-year old child who had been vomiting and recorded high temperatures for nearly a week and had been repeatedly told by on-site medical personnel to "drink water," was brought to us by a very worried mother. After contacting the proper medical authorities, the child was rushed to a hospital in San Antonio where he was treated for five days for a viral infection.

**Exhibit 91 - page 303**

9.  In a third case, a five-year-old child who developed a severe case of asthma
    while detained that forced him to walk hunched over and stop eating, was
    told by a doctor in the facility that his condition required comprehensive
    medical treatment that could not be provided in the facility. Rather than
    arranging for the child to be referred to a medical provider or urging for the
    release of the family, the doctor told the client to go see her lawyers and let
    them know about the diagnosis. Ultimately, we successfully advocated for
    the client's release on humanitarian grounds so that her young son could
    access appropriate urgently needed medical care.

Executed on the 12th day of August, 2015.


_____ _____

Aseem Mehta

Exhibit 91 - page 304

# EXHIBIT 92

## DECLARATION OF BRIAN J. HOFFMAN

I, Brian J. Hoffman, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney admitted to the practice of law before all courts and agencies of the State of Ohio, before the United States District Court for the Southern District of Ohio, the United States Court of Appeals for the Sixth Circuit, and the U.S. Department of Justice Executive Office for Immigration Review, and I was admitted to the practice of law in November 2011.

2. Since April 2015, I have been the Lead Attorney with the CARA Family Detention Pro Bono Project ("CARA"), which provides pro bono representation to mothers and children detained at the South Texas Family Residential Center in Dilley, Texas ("Dilley facility").

3. The CARA Family Detention Pro Bono Project consists of four partner organizations: Catholic Legal Immigration Network, Inc. ("CLINIC"), the American Immigration Council ("Council"), the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), and the American Immigration Lawyers Association ("AILA"). CLINIC contracts with me and one other attorney, Isabel Saavedra. We work alongside a Pro Bono Coordinator from the Council, and a Board of Immigration Appeals accredited representative volunteer from another partner organization, Immigrant Justice Corps.

4. Because the Dilley facility is located about 80 minutes outside of San Antonio, little to no legal representation exists for the up to 2400 detained children and mothers other than the services provided by the CARA project. To provide pro bono representation to this enormous detained population, AILA and others recruit seven to twenty-five volunteer attorneys, paralegals, interpreters, and law students, from all over the country, who travel, largely at their own expense, to assist our on-the-ground staff each week from Sunday to Friday. Together, the CARA staff and volunteers see as many as 140 mothers on a daily basis. We assist them in preparing for credible and reasonable fear interviews, bond

**Exhibit 92 - page 305**

hearings, negative credible and reasonable fear reviews, and individual merits hearings. We also represent many clients at their asylum interviews, place many individual merits hearings with other pro bono attorneys, and represent every single respondent who does not otherwise have counsel at all Dilley bond hearings, literally dozens of which are scheduled every day.

5. I submit this declaration to provide information regarding conditions I have observed, along with our staff and volunteers at the Dilley facility, and to speak specifically to some of the problems with access to counsel that we face, along with the uncertainty and confusion regarding the terms of release and criteria for release of children and their mothers from the facility.

**Restrictions on Access to Counsel at the Dilley Facility**

6. The Dilley facility is managed by a private, for-profit company, Corrections Corporation of America ("CCA"). As such, we are often working with both Immigration and Customs Enforcement ("ICE") and CCA, as their contractor, in negotiating access to our clients in the facility.

7. Over the past four months since I have been lead attorney, we have experienced a variety of troubling instances where legal volunteers were denied access to the facility without explanation, or with an explanation that objectively did not justify the denial of access. Section 9 of the ICE/DRO National Residential Standards ("the Standards") is titled "Visits by Family and Friends" and contains the following provision: "The ICE facility administrator may establish a procedure for limited random criminal background and warrant checks, for the purpose of ensuring facility safety and security." Section 10 of the Standards is titled "Visits by Legal Representatives and Legal Assistants" and contains no provision for "pre-clearing" or conducting background checks on attorneys and legal assistants. Although ICE is therefore not authorized or required under the Standards to conduct background checks on legal representatives, including attorneys and law students, various legal and associated personnel providing pro bono services have been

**Exhibit 92 - page 306**

denied access to the facility, had their access revoked, or been forcibly ejected from the premises.

8. In July 2015, psychologists who were previously pre-cleared for entry into the facility and whose examinations of our clients are essential to establishing their claims for protection were forced to cease their activities, and were thereafter told their clearances had been revoked. I explained that they were legal volunteers under the Standards and displayed to the officer who interfered with their work letters indicating that they were under my supervision, to no avail. The doctors were denied entrance to the facility the following day. That same week a pro bono volunteer attorney who has been zealous in his representation of his clients was ejected from the facility while in the middle of a client interview.

9. Prior to that, in May of 2015, legal volunteers who had previously been cleared to enter other facilities, including the Karnes facility and, in one case, the west wing of the White House, were denied admission to Dilley for a period of six days, again without immediate explanation. When an explanation finally was provided after significant effort by us to uncover the reasons for the denials, the denials turned out to be based on an old traffic violation in one case, and a brief investigatory detention that did not result in an arrest in the other. ICE did not finally clear the volunteers (both bilingual and both with previous relevant experience that made them extremely necessary for the project) for entry until a national media outlet ran a piece on the situation.

10. Aside from the fundamental issue of attorney access to our clients – the detained children and mothers in the facility – the rules of the game are constantly changing. While government employees and even, according to our observations, private contractors like exterminators, are allowed to enter the facility with cell phones, volunteer attorneys have never been permitted to do so. Instead, volunteers donate money to purchase calling cards that can be used to make phone calls from the landlines in the facility. In July, CCA abruptly changed its policy further, and prohibited attorneys and other legal volunteers from even so much as using lockers in the security area of the facility to store their cell

**Exhibit 92 - page 307**

phones. Shortly thereafter, CCA reversed course and permitted the practice again, but in the interim, legal staff had to return to their cars in the parking lot to make calls when phone cards were unavailable, and then undergo an additional security check upon re-entering the facility. No reasonable basis exists for these restrictions, which waste time and resources and undermine our efforts to provide pro bono representation. This more serious issue of lacking access to cell phones exists in the context of near daily harassment by CCA over whether attorneys can, inter alia, wear open-toed shoes or underwire bras, bring in various completely innocuous items like headphones and coloring books, and even whether we can bring in basic office supplies like colored folders, extra computer monitors, and tablet computers. Several times a week policies either change or are inconsistently implemented for legal volunteers, despite the fact that agents of ICE and U.S. Citizenship and Immigration Services are specifically allowed to bypass searches of their belongings as they enter. Literally as I reviewed this document, a staff attorney was being told that her heels were too high to be worn inside the facility – a policy which we are hearing for the first time today. Shortly thereafter she was told that it wasn't her heels, which in fact were acceptable, but the fact that her blouse was too sheer. When asked whether we could have a copy of the dress code standards CCA was referring to in making this determination, we were told that we could not have a copy because the information was "proprietary."

**Confusion Regarding Release Criteria and Terms of Release**

11. Secretary Johnson's directive, issued on July 13, 2015, indicates that mothers and children who have received a positive credible or reasonable fear determination and have a willing sponsor in the United States will be eligible for release. Although the announcement specified only that the mothers must have a verifiable residential address, ICE at the Dilley facility has, until recently consistently and more recently sporadically, required each family to have an individual with legal permanent residence or U.S. citizenship promise to receive and provide for the detainees. For ICE to set a bond, officers would not accept letters of support from individuals without status. In contrast, for the Immigration Judges to re-determine those bonds, the legal status of the person with whom the clients were planning to live was relatively unimportant. Consequently,

**Exhibit 92 - page 308**

on a weekly basis, attorney volunteers explained to clients dozens of times that because the Judges do not place significant weight on the legal status of the persons with whom the clients would be living, the clients needed to submit new letters of support from these people rather than the letters they had submitted to ICE based on ICE's purported legal status requirements. These "requirements" in fact have no basis in law or regulation, and actually create no end of confusion as clients realize they can live with closer friends or more immediate family members who lack legal status, and then rush to obtain new documents from those individuals for submission to the Court.

12. For the literally hundreds of detained clients whom we have represented here at Dilley and for whom I have been primary counsel of record, we have also experienced a lack of transparency regarding how ICE sets bond amounts. For example, two sisters with the same claim for relief who crossed into the U.S. simultaneously had bonds set by ICE at $4,000 and $8,000 respectively, for no reason other than different officers assigned to their cases.

13. Likewise, there is a lack of transparency as to why restrictive forms of supervision like electronic ankle monitors are necessary in cases where there is no allegation by ICE of any particular risk of flight. I have seen dozens of clients personally in past weeks, and there are no consistent differences between those granted release on bond versus those granted release upon condition of an electronic ankle monitor. Moreover, we have found that in a great many cases women to whom ankle monitors are attached are unaware of how to operate the devices, what additional requirements are involved in their Orders of Recognizance, or the length of time for which they will have to keep the devices attached. Without this knowledge, they may even fail to comply with the terms of the electronic monitoring, which requires the women to charge the batteries on the monitors fairly frequently – a virtually impossible feat for those traveling on bus trips that can last days to reach their families in the rest of the United States

**Serious medical issues impeding access to counsel**

**Exhibit 92 - page 309**

14.     Many of the wide variety of very serious medical issues our clients have suffered while detained have already been reported in the press and were the subject of a July 30, 2015, complaint to the DHS Offices of Civil Rights and Civil Liberties and the Inspector General. One particular incident in which I was involved continues to trouble me more than others. On July 6, 2015, I met with our client, Cecilia[1] and her three-year-old son Raúl. Cecilia reported that Raúl was extremely ill and that she had been to the clinic several times without receiving treatment other than acetaminophen. I advised her to return to the clinic immediately and explain the gravity of her son's condition to clinic personnel. Cecilia returned the next day and advised me that the child had again been given acetaminophen but that she did not believe the treatment was adequate and his condition had not improved.

15.     Raúl showed obvious signs of a severe fever. His head was hot to the touch and he alternated between visibly crying and periods of near unresponsiveness. His medical records, which I had requested after our first meeting, indicated that he was among the over 250 children who had been mistakenly vaccinated with an adult dose of hepatitis A vaccine, as well as administered three or four other immunizations in early July. The client was not aware of this mistake until I advised her.

16.     Medical records indicate that Raúl presented at the Dilley facility clinic on July 4 with a fever of 101.3 which his mother (according to the records) stated began at 3 PM. He presented again on July 5 with vomiting, diarrhea, poor appetite, and a fever of 100.9. Records from July 5 indicate that his mother reported the fever had been present for three or four days. Also noteworthy is that various medical records bear the annotation "provider fluent in detainee's native language Spanish." In fact, Raúl and his mother's native language is Mam, and his mother does not claim to be fully fluent in Spanish or any other language.

17.     At that point, Raúl's mother informed me that he had not eaten in nearly a week and was refusing to drink sufficient quantities of water, a behavior which I observed. After

---

[1] Names changed to protect client confidentiality.

**Exhibit 92 - page 310**

discussing the situation with the client, we proceeded to call the Texas Department of
Family and Protective Services ("DFPS") and filed a complaint for neglect. The DFPS
case worker placed me on hold to speak with her supervisor. When she came back on the
line, she advised me to end the call and dial 911. She asked me to verbally confirm for
her that I would comply. I did as instructed. I advised CCA that an ambulance was on the
way, whereupon a sizable number of ICE agents and Dilley medical personnel descended
upon the visitation trailer where we meet with clients. The clients were taken by Dilley
medical personnel to the clinic.

18.     When I next spoke to the client a day or so later, she reported that they had been
        transported by ambulance to a nearby hospital where Raúl was diagnosed with
        pneumonia and treated with antibiotics. She also showed me that she had been issued a
        Notice to Appear and a bond, all without having to proceed with the Credible Fear
        Interview she had previously been awaiting. I believe that Raúl's illness was a severe
        impediment to his mother's ability to participate in her removal case, and I directly
        observed that the illness distracted her from being able to discuss her situation with me.
        Our volunteer groups frequently discuss similar situations where clients are extremely
        distraught about the medical conditions of their children to the extent that it hinders their
        ability to receive legal advice, and materially affects their judgment when it comes to
        making decisions about their cases.

Executed this 13th day of August, 2015 in Dilley, Texas.

Brian Hoffman, Esq.
P.O. Box 18070
Dilley, TX 78017

**Exhibit 92 - page 311**

# EXHIBIT 93

<u>**DECLARATION OF CAROL ANNE DONOHOE**</u>

I, Carol Anne Donohoe, Esq., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1.     I am an attorney admitted and licensed to practice in the state of Pennsylvania, since April 2011. My immigration and family law practice is in Berks County, Pennsylvania and I have actively represented families detained by Immigration and Customs Enforcement since the spring/summer of 2014 at the Berks County Residential Center (Berks) in Leesport, Pennsylvania. My office is located less than fifteen minutes from the family detention facility.

2.     I am the President of the Greater Reading Immigration Project, which is an organization that provides legal, educational, and social resources to the local immigrant community. I have given several presentations on Immigration Policy and, more specifically, ICE's policies of detaining families and children.  I took part in a symposium at Villanova University School of Law in Philadelphia, PA as a panelist outlining my experiences representing detained mothers and children at Berks and the egregious conditions they face. I presented at Alvernia University in a lecture titled "Protecting the Rights of Detained Victims of Foreign Torture," further discussing children in custody of ICE at Berks. I have supervised and mentored students from the Temple School of Law and the University of Pennsylvania School of Law as they assisted in our advocacy efforts for families and children detained at Berks.

3.     Despite my proximity to Berks, prior to the summer of 2014, there had been no need or occasion for me to represent families detained at Berks because any detention was short-term and detained families were promptly released without bond.

4.     Since the summer of 2014, I have regularly represented Flores class member children and their parents detained by ICE at Berks.  In the course of my practice, I have had regular occasion to observe and, therefore, am familiar with, the policies and practices of ICE toward the detention, release, and treatment of these children and their parents detained at Berks.

5. In the past year alone, I have represented close to forty parents and Flores class member children detained at Berks.  Due to ICE's 2014 blanket no-release policy, I am aware of many more mothers and children who were detained for over a year, some as long as fifteen months.  I have witnessed detained children who ranged in age from a fourteen-day-old newborn to seventeen-year-old teenagers.  The average age of the children I have represented is between five and six years old.

6.     Throughout my time at Berks, I have been subjected to increased restrictions on legal access to clients, including the requirement that I submit G-28 Entry of Appearance forms if I meet with any detainee more than once. This requirement means that both I, and the client, are locked in to representation even if we were seeking pro

**Exhibit 93 - page 312**

bono help for the client. I am currently required to notify the Berks staff ahead of time of any visit and list the names of the detainees with whom I will be meeting. If I fail to list the name of certain detainees, or if new detainees wish to speak with me, I am prohibited from meeting with them.

6. When attorneys enter Berks to meet with our clients, facility staff use wands to check our person and ask if we have any contraband, including cell phones. The entrances to both the facility itself and the attorney/client meeting area are locked. We cannot access them without a staff member.

7. Throughout my time at Berks I have been privy to countless stories of medical neglect, psychological harm, and repeated intimidation of both the parents and Flores class member children. This included a two-year-old child who was vomiting blood for three days before being taken to the hospital,[1] an institutional sexual assault on an adult detainee by a guard at the facility, mothers and children with suicidal thoughts and behaviors who were not attended to, and an untold number of mothers who were told by the staff that any infraction for which they would be written up would adversely impact their asylum cases.

8. I have had occasion to observe and represent families detained both during and after ICE's purported policy changes as outlined in "Defendants' Response to the Court's Order to Show Cause Why the Remedies Set Forth in the Court's July 24, 2015 Order Should Not Be Implemented" dated August 16, 2015, as well as outlined in the prior press releases by Secretary Jeh Johnson and ICE Director Sarah Saldaña. Through my interactions with ICE and from witnessing the arbitrary nature of the supposed implementation of these alleged policy changes, I believe that no substantial change in policy has been implemented. The so-called policy changes have not been uniformly applied or even discussed with detained families or their legal representatives.

9. In April of 2014, I took part in a group tour of the Berks facility arranged through the Berks County Bar Association. At that time there were a total of ten residents detained at Berks (including both parents and children). To place that in context, as of April of 2014 there were only about ten residents detained in "family detention" centers in the United States. At that time there had rarely been a need for attorney representation at Berks other than to assist in the preparation of I-589 Asylum Applications. In a matter of months, Defendants implemented a policy of "deterrence" resulting in a blanket policy of the indefinite detention of asylum seeking mothers and children. Not only did newly detained families fill Berks, which swelled from those ten residents to maximum capacity approaching ninety-six residents within a few months' time, but ICE also started using three additional detention facilities with the ability to detain up to 3,000 mothers and Flores class members.

---

[1] This mother testified about this incident at the Congressional Family Detention Forum in Washington DC, held on July 28, 2015.

2

**Exhibit 93 - page 313**

10.    Prior to the spring of 2014, only three Merits Hearings had been adjudicated at Berks. The hearings took place between 2012 and 2014. Upon information and belief, those hearings were adjudicated at Berks mostly because the asylum seekers did not have sponsors and, therefore, had to have their cases adjudicated while detained. In contrast, at least 95% of the long term detainees who spent their last year at Berks had sponsors ready and willing to take them in. Before June 2014, Merits Hearings were so rare at Berks that, initially, the Immigration Judges out of York stated to us that they were unsure as to where, or how, Merits Hearings for Berks detainees would take place.

11.    Defendants now contend that their blanket policy of indefinite detention has been eliminated and that they no longer use deterrence as a factor in detaining families. If that were so, we should have reverted to pre-Spring 2014 detention levels. Instead, Berks is still operating at near capacity. They have also added a fourth floor with the plan to soon double the facility's capacity. If, as Defendants assert, they have changed their policies and practices and no longer use detention as a means of deterrence, it would follow that Berks should no longer be at or near capacity.

12     In practice, ICE's enforcement policies continue to be erratic and arbitrary. As an example, on June 12, 2015, about one month after the *Flores* tentative ruling, my long term clients (the majority detained over one year) were called down and told by the ICE officers that they would have the individualized custody determinations they should have been receiving all along. They were told they had until June 19, 2015 to provide documents in support of these custody reviews and that they would be given a determination by June 30, 2015. They were also told that it was likely that the longest held detainees (several were detained a year or longer) may be released. Everyone was hopeful. We attorneys scrambled to get the necessary documents together and submit them to ICE. We advised mothers who were giving up and ready to accept deportation to hold on, that a change was coming. Prior to June 30, 2015, the teachers at the Berks facility helped the children make t-shirts that they all signed in anticipation of their departure.

13.    Sadly, we were reminded once again that DHS/ICE does not act in good faith when one of the mothers, A-R-S, who had submitted her custody review documents, was awakened a couple of nights later and deported with her twelve year-old daughter. A-R-S and her daughter had been detained for over a year. They were both suffering trauma due to the psychological effects of detention. Ana had expressed suicidal ideation to staff at the facility and had been placed in isolation for a period of time. Her daughter also expressed a desire to commit suicide.

14.    A-R-S and her daughter's deportation in the middle of the night led the other mothers to believe that, rather than signing acknowledgement of their custody review documents, they had actually been tricked into signing their removal papers.

15.    On June 30, 2015, at 5:00 in the afternoon, the mothers were given their custody determinations. *These reviews were boiler-plate forms with only the name and Alien Registration Number changed.* The majority of the detainees (and all of the longest term)

3

**Exhibit 93 - page 314**

were denied bond. This denial occurred after Jeh Johnson's statement that those who passed
their CFI/RFI interviews would be released. *All of those mothers had met that criteria.* In
fact, in the entire period during which I have represented detainees at Berks, up until this
day, ICE has not once issued an individualized initial custody determination which laid out
the reasoning for detention.

16.     These arbitrary practices take other forms as well. Since the Jeh Johnson
announcement, every mother (of whom I have knowledge) who has been released from
Berks following a positive CFI/RFI has been released with an electronic ankle monitor.  The
ankle monitor is attached regardless of the equities in the case, family ties, flight risk
assessment, or any other parameter.  If, as Defendants assert, they are evaluating each
individual for flight risk, it would seem that not *everyone at Berks who passed their CFI/RFI*
would be released with an ankle monitor.

17.     I have represented at least nine newly detained parents since Defendants
initiated their "changed" policies. Of those nine clients, only two have been given a
credible fear or reasonable fear interview. The rest were issued Notices to Appear (NTA)
for removal proceedings. There has been no explanation as to why some women receive
credible fear interviews and stay detained until days or weeks after they receive a credible
fear determination, while others are given Notices to Appear for regular removal
proceedings. ICE simply exercises its discretion with no explanation why it was
exercised one way or the other.

18.     *The detainees who are issued NTAs are not offered release on bond or
parole through ICE but are instead scheduled for a Master Calendar Hearing before the
IJ and remain detained.*  In my cases, at the behest of ICE, the Immigration Judges later
set bonds at these hearings anywhere between $4,000 and $10,000. *Contrary to DHS'
assertions, ICE does not appear to have given any consideration to a detainee's ability to
post a bond.* One client I represent, J-L-O, was scheduled for a Master Calendar Hearing
after being detained for a month. Based on arguments offered by ICE, the IJ set a bond of
$8,500.  The IJ set another master calendar hearing for a month out.  In the interim, ICE
notified the client that it had lowered the bond amount to $4,000 with no explanation as
to why. The client is indigent and unable to post a bond of $4,000.  I sent a request to the
Field Office Director (FOD) for the client to be issued an ankle monitor in lieu of bond.
That request was denied. After a second bond hearing, the IJ lowered the bond to $2,000.
Neither the client nor the family could promptly raise the funds for release. I asked the
deportation officer if ICE would accept $1,500 as that was the amount the family had
gathered. The deportation officer answered with one word: "No".  It took the family at
least two weeks longer to finally raise and post the $2,000 bond.

20.     Of the six clients I currently represent at Berks, all have been detained
longer than one month. In each case, ICE issued NTA's for them but denied release on
bond or any other conditions. These clients are still awaiting bond hearings before
Immigration Judges.

4

**Exhibit 93 - page 315**

21.     A mother called me today seeking representation.  She has been detained a
month and has not yet been given a Reasonable Fear Interview.

22.     In the course of my recent representation, I have represented clients who
are victims of family separation. One mother, E-H, and her five-year-old daughter were
separated at the river crossing from her husband and their one-year-old son, whom she
was still breastfeeding. Upon apprehension, ICE detained mother and Flores class
member daughter at Berks. In contrast, when her husband and son were apprehended,
they were released without bond and allowed to live with family members in South
Carolina. E-H was frantic, not knowing how her young son was being fed and cared for.
Prior to her release, E-H learned that her husband had been detained by ICE and that her
one-year-old son had been passed off to a family member. E-H passed her RFI, yet her
release was conditioned upon her paying a bond of $5,000 that her family found difficult
to pay. In July, ICE dropped E-H's bond and released her on an ankle monitor. In total
she had been detained approximately three and a half months, separated from her one-
year-old son and unable to get full details regarding her husband.

24.     I also represent a father, J-R-M, who was detained at Berks with his young
son and daughter, ages eleven and twelve. He had been separated from his wife and three
year old twins at the river. When his wife and twins were apprehended, they were
detained at the center in Dilley, Texas.  ICE was aware that J-R-M had a wife and
children detained in Dilley but made no effort at reuniting them at Berks or releasing
them as a family unit. J-R-M was released with his older children. His wife and twins
remain detained at Dilley even though she has passed her RFI. J-R-M reports that his
three year old daughter in Dilley is sick. She is severely constipated and she will not eat.
His wife was told by the medical staff that there is nothing they can do for her daughter.
As of this date, the family has been separated for over two months.

25.     Adequate medical care at the facility continues to be of deep concern.
During the year that I have represented detained parents at Berks, I have had knowledge
of several egregious cases of medical neglect. One of my clients, T-D-M, suffered
extreme headaches for months. She was taken to an eye doctor who referred her for an
MRI. T-D-M's MRI appointment kept getting rescheduled. She was never told what tests
were being performed on her or why. Despite my repeated request for medical records, I
was not able to obtain a copy of her diagnosis until several weeks after it had been made
(and then only through the hospital, not from the Berks medical staff). T-D-M was
diagnosed by an outside neurologist with having a brain malformation. Despite this
serious medical condition, along with a diagnosis of PTSD, glaucoma, and legal
blindness, ICE would not release her. It was not until I contacted Congressional staffers
and put in a second parole request (and two days after T-D-M had been taken to a dentist
to have 5 teeth removed) that T-D-M was released. The liability was such that ICE
actually paid for T-D-M's transportation to Minnesota.  That had never happened before,
to my knowledge.  T-D-M's medical complaint was one of ten complaints filed on July
30, 2015, to the DHS Offices of Civil Rights and Civil Liberties and Inspector General by

5

**Exhibit 93 - page 316**

a coalition of organizations including the CARA Family Detention Pro Bono Project, Immigrant Justice Corps, and the Women's Refugee Commission.

26.     A current client, O-R-I, who has been detained over a month was given her RFI at the beginning of this week. When questioned at the end of the interview as to whether she had anything further to report, O-R-I told the officer that she and her seven-year-old son have suffered psychological and physical harm since they arrived at Berks. She told the asylum officer that the staff at Berks had ridiculed her when they saw her taking books out of the library, that an older child had beaten up her seven-year-old son and the staff had merely admonished the mother, and that her son was fearful because the staff yells at him and he does not know what they are saying but he knows they are angry. O-R-I also informed me personally that when detainees go to seek help from the medical staff they are told that the staff does not speak Spanish and that it would be some time before they could get a translator. She expressed concern over the quality of care she and her son could receive under those conditions.

27.     Based on my experiences at Berks, both past and present, I have come to the conclusion that the purported policy changes Defendants reference in their August 6, 2015 Response have not at all been consistently implemented.  The number of detainees at Berks is as high as it was last summer, negating Defendants' argument that they are no longer considering deterrence as a factor or implementing a close to blanket detention policy for families. Further, my experiences at Berks during the past year have led me to conclude that the facility is not equipped or staffed to adequately care for the health and well-being of Flores class member children even for short periods of time. The facility is clearly unsafe and harmful for children.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of August 2015, at Reading, PA.

*Carol Anne Donohoe*

Carol Anne Donohoe, Esq.

6

**Exhibit 93 - page 317**

# EXHIBIT 94

## DECLARATION OF CHRISTIAN CHRISTENSEN

I, Christian Christensen, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am an attorney licensed and admitted in the state of Idaho since September, 2007. I am currently a staff attorney with Andrade Legal in Boise, Idaho. My practice focuses on all types of immigration law. I have represented clients in immigration proceedings for approximately four years.

2. Boise, Idaho is over 1,800 miles from Dilley, Texas. I traveled to Dilley for the week of July 26, 2015 to volunteer with the CARA Project, which represents detained children and their mothers. My firm covered my expenses; my flight was $532 round trip and my lodging was nearly $200.

3. In Dilley, I spoke with several women who told me that they had "court." When I called the Executive Office for Immigration Review's automated system and entered their alien registration numbers, I found that there was no court date. I found out later that these women were being summoned to the "court" building to meet with U.S. Immigration and Customs Enforcement (ICE) deportation officers regarding bond or other conditions of release. According to several clients, they were told by ICE that they would only be released if they agreed to wear an electronic ankle monitor. ICE did not allow these clients to discuss this important decision with any attorney before demanding an answer and a signature.

4. While in Dilley, there was one woman who obtained a bond from Immigration Judge Dowell. Despite the fact that a Judge had set a bond for this client, ICE coerced her into signing an agreement to wear an electronic ankle monitor in order to be released.

5. I represented detained mothers in bond hearings during the five weekdays I was in Dilley volunteering with the CARA Project. I was not allowed to meet with clients in the court building prior to their hearings on the day of their hearings.

6. The process of calling in a client to speak with an attorney was long and convoluted. We placed the woman's name on a list indicating we wanted to see her. Correctional Corporations of America (CCA – the private, for-profit company that contracts with ICE to run the Dilley facility) staff had to review the list and then physically go find the woman or women. It took a long time for the client we were seeking to be brought to the visitation area. There were at least two occasions where I waited an hour and a half after submitting my request before my client arrived. On every occasion it took at least thirty minutes. This negatively impacted my ability to prepare their cases because there is a limited amount of time and I was in court in the mornings. When I arrived in the visitation area and placed a woman's name on the list, there was a significant amount of time spent waiting.

**Exhibit 94 - page 318**

7. We were not allowed to bring cell phones into the facility. Furthermore, we could not bring two devices (for example, we could not bring in both a tablet and a laptop).

8. I had several clients who spoke Mam, a Guatemalan indigenous language. Because the Immigration Court was unable to reach a Mam interpreter for the hearings, this led to continuances in two cases, which meant more time in detention for these families. In one case, the Immigration Judge asked whether my client's six-year-old daughter spoke Spanish and Mam and could interpret for her. Fortunately, she did not. I would have vigorously objected to the use of a child as an interpreter.

9. We typically called in mothers for attorney meetings the afternoon prior to their bond and/or master calendar hearings. The first question I asked those mothers was if they knew why they were being called in to speak with us. Approximately half of the mothers with whom I spoke had no idea they were scheduled for a court hearing the next day. Similarly, although the mothers kept very good folders of important documents, well over half of the folders I reviewed had no hearing notices in them. The hearing notices provide the date, time, and place of the hearing. Mothers were not being informed of their hearings in a timely manner or at all.

10. Several detained mothers I spoke with had families who had purchased bus or plane tickets when asked to do so by ICE. In a couple of cases, those tickets had expired before the mother and her child or children were released.

11. During my time at Dilley, the ICE trial attorneys adamantly opposed any release on conditional parole and, in most cases, were opposed to reducing bond to something my clients' families could afford, like $1,500 to $2,500. There was no individualized assessment in bond hearings; the ICE trial attorneys argued that the mothers were a significant flight risk in every single case. If the mother was going to live with a family member, the ICE trial attorney argued she was a significant flight risk because the family member was undocumented. If the mother was going to live with a friend, the ICE trial attorney argued she was a significant flight risk because she was not going to live with family. Ultimately, the ICE trial attorney's argument was exactly the same regardless of the facts presented – significant flight risk.

Executed this 13th day of August, 2015, in Boise, Idaho,

Christian Christensen

2

**Exhibit 94 - page 319**

# EXHIBIT 95

DECLARATION OF DAVID THOMPSON

I, David Thompson, hereby declare:

1.  I make this declaration based on my own personal knowledge and, if called to testify, I could
    and would do so competently as follows:

Background

2.  I hold a Bachelor's Degree in Philosophy from The University of Oklahoma.  I am currently
    a candidate for a Master's Degree in Public Affairs at the Lyndon B. Johnson School of
    Public Affairs at The University of Texas at Austin with an expected graduation date of May
    2016.

3.  Prior to entering this program, I was employed by several non-profit organizations.  Between
    January and May of 2014 I worked as a Test Administrator and Project Manager for the
    Meadows Center for Preventing Educational Risk at the University of Texas, which involved
    questionnaire and test administration, research management and data fidelity assurance. In
    the context of my studies at the university I have taken 6 credit hours of coursework in Policy
    Research, including in survey design. I have taken an additional 6 hours of quantitative
    methods and statistics coursework, which facilitate interpretation of survey results and other
    data.

Survey Design and Implementation

4.  Between May 26, 2015 and July 24, 2015, I coordinated a survey project focused on
    gathering information from families released from the Department of Homeland Security-
    contracted family detention centers in Karnes City and Dilley, Texas.  I coordinated this
    project at the request of several faculty members at the University of Texas.  Specifically, I
    coordinated the project as Research Assistant to Professor Denise Gilman who directs the
    Immigration Clinic at the University of Texas School of Law.  Professor Laurie Cook-
    Heffron with the University of Texas School of Social Work also assisted in the design of the
    project and in the preparation of training materials for volunteers.   I also coordinated the
    project with the staff at RAICES, a non-profit organization based in San Antonio Texas,
    which serves detained families during detention and after release.

5.  Through this project, volunteers used a survey instrument to gather information from families
    released from detention who transited through the Greyhound bus station in San Antonio,
    Texas.  The volunteers conducting the surveys included University of Texas graduate student
    volunteers, community volunteers from the Austin and San Antonio, Texas area and staff and
    volunteers with RAICES.  All interviewers were fluent in Spanish and asked the survey
    questions in Spanish.  The bulk of survey interviews took place at the Greyhound bus station,
    while 10% or less occurred at a nearby church facility where some families were offered
    lodging if they were not able to leave on a bus from the Greyhound station on the same day
    that they were released.  Surveys were conducted at the bus station three to five days a week,
    when a volunteer was present.  Where possible, the survey responses were verified against

**Exhibit 95 - page 320**

the documentation issued to survey participants by the Department of Homeland Security
("DHS"). The survey respondents were adult women who had been detained with their
children and then released from detention facilities in Karnes City and Dilley, Texas, who
transited through the San Antonio, Texas Greyhound bus station and who agreed to
participate in the survey.  Families that did not transit through the San Antonio Greyhound
bus station (e.g. because they were picked up at the facilities by family or attorneys) or who
did not wish to participate in the survey are not included.

6.   The survey instrument collected a range of information, including country of origin, number
and age of children, length of DHS detention, method of release (bond, parole, electronic
ankle monitors), bond amounts paid where applicable,  and general conditions of detention.
The survey allowed for reporting of any other concerns participants wished to voice
regarding their experience in detention.  The interviewers advised families that their
identifying information would remain confidential.

7.   I worked with the volunteers from Austin and RAICES to collect and store the surveys on an
electronic site managed by the University of Texas.  RAICES also has access to the site.  I
entered the information recorded on the surveys into a spreadsheet and summarized the
relevant data in several short reports.

8.   The project had several purposes.  A first goal was to allow RAICES and the University of
Texas Immigration Clinic to provide more effective legal services and representation to
families subjected to detention.  Through the project, RAICES and the Immigration Clinic
were able to track which families had been released and to assess needs for legal
representation during detention and after release.   For example, by learning which families
had been released, RAICES knew that it would not be necessary to provide detention-related
legal services to those families.  By learning how long individuals were detained, RAICES
and the Immigration Clinic obtained important information about the time periods when legal
assistance could best be offered to families in detention.  The information also helped the
organizations to know when resources might be best focused on finding representation for
families in the new locations where they would reside after release.  A second goal of the
project was to provide information about trends in custody determination proceedings or
conditions so that advocacy could be directed at those issues as needed.

Survey Findings

9.   The findings of the survey, as summarized below, are taken from the spreadsheet that I
completed using the answers recorded on the survey instruments themselves.

10.  From May 26, 2015 to July 24, 2015, the project surveyed 332 women who had previously
been detained at the Karnes and Dilley facilities.The vast majority of the women encountered
were from Central America; a few Mexicans and South Americans were also encountered.
The largest portion of the women we met were Honduran, at 40%. Guatemalans and
Salvadorans represented, respectively, 28 and 29% of our sample population. Excluding
children 18 years of age and older who came with their mothers and who were detained
separately, the average age of the children accompanying their mothers was 6.64 years.

**Exhibit 95 - page 321**

11. Average detention times were over a month throughout the project period.  The project
encountered one family that had been detained for 330 total days.  Families released and
surveyed after the Secretary of DHS announced policy changes in detention practice on June
24, 2015 experienced a period of detention that was longer than those released prior to the
announcement, by an average of almost nine days. Excluding the case of the family detained
for 330 days, average detention times for each facility, both before and after the June 24,
2015 policy announcement, are listed below.

| Time Detained, Excepting Outliers | | | |
|---|---|---|---|
| | Prior to 6/24 | After 6/24 | Total |
| Karnes | 37.6071429 | 46.95946 | 44.39216 |
| Dilley | 33.7222222 | 41.07447 | 37.88554 |
| Combined | 34.81 | 43.66667 | 40.36194 |

12. Out of 298 families for which we obtained the relevant release information, 50% (149) were
released on bond set by DHS or the Immigration Court; 6% (17) were released on parole by
DHS (in a few cases with payment of a monetary bond in conjunction with parole); 44%
were released by DHS on electronic ankle monitors.

13. With regard to those families released on bond, the average bond amount paid by families, at
both facilities for the entire project period, was $3,705.  Below is a table reflecting the
average bond before and after June 24, 2015, demonstrating a slight decrease in average bond
amount after the policy announcement on June 24, 2015, from $3,901 to $3,320. The families
paid the assigned bond amounts in full before release, as there is no process for paying a
percentage amount to obtain release and bondsmen are generally not present in the
immigration context.  Several families conveyed that it was difficult for their relatives to
raise the assigned bond amounts and that those relatives encountered logistical difficulties in
paying the bonds, resulting in some period of additional detention for families after a
decision that they could be released on bond.

| Average Bond Rates | | | |
|---|---|---|---|
| | Prior to 6/24 | After 6/24 | Total |
| Karnes | $5,224 | $3,231 | $4,607 |
| Dilley | $3,328 | $3,353 | $3,293 |
| Combined | $3,901 | $3,320 | $3,705 |

14. The survey did not consistently collect whether the bond amount was set by DHS or by the
Immigration Court after a custody redetermination hearing.  At least some of the bonds paid
were bonds set by the Immigration Judges rather than DHS.  In those cases, the DHS custody
decision did not result in release and the family instead remained detained until receiving a
custody redetermination hearing before the Immigration Court.

**Exhibit 95 - page 322**

15. As noted above, of all families responding with relevant information regarding release, 44% of the heads of household were released with electronic ankle monitors over the full period of the project.  However, no surveys conducted before June 26 showed that electronic monitoring devices were required for release.  Of the 194 women who provided the necessary information and were surveyed from June 26 to July 27, 70% were released with the requirement of an electronic ankle monitor. The information gathered does not indicate any change in the population that would explain the requirement of electronic monitoring imposed after June 26, 2015. The information also does not suggest that an individualized evaluation led to imposition of the electronic monitoring requirement in certain kinds of cases rather than others.  On a single day, July 2, 2015, approximately fifty women with children were released with electronic ankle monitors. On the same day we also met six women released on bond and one on parole. The surveys did not reveal any differences in relevant characteristics between the groups.  The chart below reflects these findings.

### Families Encountered Exiting Detention, By Release Method



16. Surveyed families regularly reported deficiencies in medical treatment in both facilities.  For a period of time in July, the project surveyed very few families released from the Karnes City facility, because a chicken pox outbreak at the facility meant that fewer families were detained there.

**Exhibit 95 - page 323**

17. Specific complaints regarding medical care at Dilley included:
   a. A number of women stated that children regularly contracted colds, flus and fevers while at Dilley. All women who made this complaint stated that children were not offered medicine and were instead told by medical personnel to drink lots of water.
   b. Several women reported waiting up to ten hours to see medical personnel, often to be prescribed rest or water only. Several women reported 4-6 hour waits as being the norm.
   c. A woman who had been detained at Dilley reported that her child had an allergic reaction to vaccines and was not treated. Several women reported that their children became feverish following vaccination.
   d. One woman reported that a young boy who broke his arm was not treated until 20 days later.
   e. One woman reported that her child broke a collar bone and was in extreme pain but received no pain medication.
   f. One woman's son broke his finger playing soccer and was only given water.
   g. One woman reported that she asked the guards to take her and her son to medical due to a fever, but that the guards refused and advised the child to go to sleep.

18. A number of women complained of hostile treatment by personnel at the detention facilities. The women described being called "leeches," being threatened with deportation if any complaints about the facility were made, being "undressed with their eyes" by guards, and indigenous women being mocked by guards.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th of August, 2015 at Austin, Texas.

David Thompson

**Exhibit 95 - page 324**