# EXHIBIT 96

DECLARATION OF DENISE GILMAN

I, Denise Gilman, hereby declare:

1.      I make this declaration based on my own personal knowledge and, if called to testify, I
could and would do so competently as follows:

Background

2.      I have been a Texas-bar-licensed attorney since 1994. I am a clinical professor of law and
director of the immigration clinic at the University of Texas School of Law. I have been
employed by the University of Texas School of Law since fall 2007. The immigration clinic
represents immigrants in removal proceedings and thus I have supervised and taught many
students handling bond and asylum cases. I have also directly represented many asylum seekers
and other migrants in removal proceedings. I teach a class on Refugee Law and Policy as well. I
have spoken at numerous continuing legal education seminars on issues relating to bond,
detention and asylum. I mentor other attorneys in these areas of immigration practice and have
published academic articles on these topics.

Experience with Asylum Seekers Placed in Expedited Removal but not Detained

3.      Since the fall of 2011, in my capacity as supervising faculty with the clinic, I have
represented several asylum seekers who were placed in expedited removal but who were not
detained pending a credible fear interview. Instead, these asylum seekers were paroled into the
United States and allowed to reside in the community while they awaited their credible fear
interviews. Once they passed their credible fear interviews and a Notice to Appear was issued,
these asylum seekers left the border area and established their residence in Austin, Texas. The
clinic represented them in their ongoing removal proceedings.

4.      The following are examples of cases of asylum seekers placed in expedited removal but
not held in detention pending a credible fear interview. In each case, the clinic provided
representation for at least some period. The information is thus obtained from clinic case files
maintained in the ordinary course of business.

   a.   Adult female asylum seeker presented herself at the Paso del Norte, El Paso, Texas port
        of entry in February 2011 with her two sons, one of whom was a minor. The principal
        asylum seeker and her minor child received humanitarian parole and resided in El Paso,
        Texas pending a credible fear interview. The credible fear interview was conducted by
        the Houston Asylum Office 19 days after the family was paroled into the United States.
        The adult female asylum seeker, who was the principal asylum applicant, presented
        herself to the Immigration and Customs Enforcement non-detained unit offices for the
        interview. She passed the credible interview, and a Notice to Appear was served for her
        and her minor son at the end of March 2011. The adult son was detained pending a
        credible fear interview, which he passed, leading to the issuance of a Notice to Appear in
        his case as well. Subsequently, the family moved to Austin, Texas. All members of the
        family were granted asylum in November 2012.

**Exhibit 96 - page 325**

b.  Adult female asylum seeker presented herself at the Paso del Norte, El Paso, Texas port of entry in September 2011 with her young son, her 18-year old daughter and several other family members.  The principal asylum seeker and her two children received humanitarian parole and resided in El Paso, Texas pending a credible fear interview.  The credible fear interview was conducted by the Houston Asylum Office 18 days after the family was paroled into the United States.  The adult female asylum seeker, who was the principal asylum applicant, presented herself to the Immigration and Customs Enforcement non-detained unit offices for the interview.  She passed the credible interview, and a Notice to Appear was served for her and her son and daughter at the end of September 2011.  Subsequently, the family moved to Austin, Texas.  All members of the family were granted asylum in December 2012.

c.  Adult female asylum seeker presented herself at the Paso del Norte, El Paso, Texas port of entry in September 2011 with her three young children and several other family members.  The principal asylum seeker and her three children received humanitarian parole and resided in El Paso, Texas pending a credible fear interview.  The credible fear interview was conducted by the Houston Asylum Office 13 days after the family was paroled into the United States.  The adult female asylum seeker, who was the principal asylum applicant, presented herself to the Immigration and Customs Enforcement non-detained unit offices for the interview.  She passed the credible interview, and a Notice to Appear was served on her and her three children at the end of September 2011.  Subsequently, the family moved to Austin, Texas.  All members of the family were granted asylum in December 2012.

d.  Adult female asylum seeker presented herself at the Paso del Norte, El Paso, Texas port of entry in January 2012 with her husband and daughter.  All three family members received humanitarian parole and resided in El Paso, Texas pending a credible fear interview.  The credible fear interview was conducted by the Houston Asylum Office 18 days after the family was paroled into the United States.  The adult female asylum seeker, who was the principal asylum applicant, presented herself to the Immigration and Customs Enforcement non-detained unit offices for the interview.  She passed the credible interview, and a Notice to Appear was served on her and the other two family members in February 2012.  Subsequently, the family moved to Austin, Texas.  All members of the family were granted asylum in July 2013.

e.  Adult female asylum seeker entered the United States near Columbus, New Mexico in late September 2012 with her two minor children and several other family members.  The mother and her two minor children received humanitarian parole and resided in El Paso, Texas pending a credible fear interview.  The credible fear interview was conducted by the Houston Asylum Office approximately one month after the family was paroled into the United States.  The adult female asylum seeker, who was the principal asylum applicant, passed the credible interview, and a Notice to Appear was served on her and her two children.  Subsequently, the family moved to Austin, Texas.  The clinic has withdrawn its appearance in this matter and does not have information about the outcome of the case.

**Exhibit 96 - page 326**

f.   Adult female asylum seeker presented herself at the Paso del Norte, El Paso, Texas port of entry in February 2013 with her husband and three minor children.  All four family members received humanitarian parole and resided in El Paso, Texas pending a credible fear interview.  The credible fear interview was conducted by the Houston Asylum Office 23 days after the family was paroled into the United States.  The adult female asylum seeker, who was the principal asylum applicant, presented herself to the Immigration and Customs Enforcement non-detained unit offices for the interview.  She passed the credible interview, and a Notice to Appear was served on all five family members in March 2013.  Subsequently, the family moved to Austin, Texas.  The case remains pending.

g.   Adult female asylum seeker presented herself at the Paso del Norte, El Paso, Texas port of entry in May 2013 with two minor children and with an adult daughter who had her own U.S. citizen child.  All four family members received humanitarian parole and resided in El Paso, Texas pending credible fear interviews.  The adult female asylum seeker and her adult daughter appeared for separate credible fear interviews, which were conducted by the Houston Asylum Office approximately three weeks after the family was paroled.  Both adult female asylum seekers passed the credible fear interviews, and Notices to Appear were served on all four non-U.S. citizen family members.  Subsequently, the family moved to Austin, Texas.  The case remains pending.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21 of August, 2015 at Austin, Texas.

Denise Gilman

**Exhibit 96 - page 327**

# EXHIBIT 97

Exhibit 96 - page 328

## DECLARATION OF ALAN SHAPIRO, MD

I, Alan Shapiro, MD, make the following declaration based on my personal knowledge and

declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and

correct.

1.  I am a licensed Pediatrician in the state of New York since 1990, an Assistant Clinical

    Professor of Pediatrics at Montefiore Medical Center and the Albert Einstein College of

    Medicine and the Senior Medical Director for Community Pediatric Programs at the

    Children's Hospital at Montefiore for over ten years. Community Pediatric Programs,

    founded in 1987, provides comprehensive primary care to children and families at its

    federally qualified community health center, The South Bronx Health Center and Center

    for Child Resiliency, and through its federally qualified homeless health care program

    serving the New York City shelter system.  I have personally provided pediatric care to

    under-served children since beginning my career with Community Pediatric Programs in

    1990.

2.  Additionally, I co-founded Terra Firma, a medical-legal partnership program designed to

    provide integrated medical, mental health and legal services for undocumented immigrant

    children, both accompanied and unaccompanied by a legal guardian. This program was

    designed to facilitate access to the above-mentioned services and improve medical,

    mental health and legal outcomes for undocumented immigrant children. Integral to our

    program is a psycho-educational support group designed to assist youth in acculturation

    and help develop healthy behaviors and social networks. Terra Firma was founded in

1

**Exhibit 97 - page 329**

2013 to respond to the rise in unaccompanied immigrant children arriving at the US border, particularly from the Northern Triangle of Central America. The majority of our patients come from Honduras, El Salvador and Guatemala. Our program is perfectly situated in a federally qualified community health center in the South Bronx where there is a large population of Central Americans. As such, many of the unaccompanied immigrant children and newly arrived immigrant families are moving into this area to re-unite with family members.

3.  The vast majority of patients we see in our program have lacked comprehensive medical care for the entirety of their lives. None have had mental health care in their country of origin despite significant histories of trauma they have sustained either directly or indirectly (e.g. witnessing the murder of a family member or friend). Since our program began, we have also seen a rise in the number of families (predominantly women and children) who have fled to the United States seeking safe haven. Many are escaping community violence, domestic violence and most critically lack of state protection. Most unaccompanied minors and newly arrived immigrant families state that they are fleeing for their lives. Of note, depression, anxiety, adjustment disorders and post-traumatic stress disorder are common mental health diagnoses among this population. In a recent review of over 100 newly arrived patients, sixty five percent have one or more mental health diagnoses.

4.  Moreover, once the decision has been made to flee, the family must make the often times perilous journey to the US (over 3,000 miles to the US border). Families face hunger,

**Exhibit 97 - page 330**

exposure to the elements, extortion, violence and sequestration – histories we frequently elicit in our medical and mental health visits. This history of trauma from home country to the US border is important to understand in respect to the deleterious effects detention has on families.

5. The harmful effects of immigration detention on families and unaccompanied immigrant youth has been documented in numerous peer reviewed academic articles. I am making my declaration as a pediatrician with over 25 years of experience working with immigrant families, and based on a site visit I made on August 11, 2015 to the Berks County Residential Center in Leesport, Berks County, Pennsylvania.

6. On August 11, 2015, I accompanied a group of immigration lawyers and the President-elect of the American Academy of Pediatrics, to the Berks County Residential Center. First, we participated in an approximately one and a half hour orientation and tour of the facility during which we had the opportunity to ask questions to U.S. Immigration and Customs Enforcement (ICE) and Berks County staff and supervisors. We learned during our meeting with ICE and Berks County officials that the longest length of stay at the time of our visit was 120 days.

7. After the orientation and tour, we met with a group of sixteen parents and some of their children who were detained at the facility. The adults in the group consisted of three men and thirteen women.  What quickly emerged as we talked was the overwhelming stress that all participants felt.

**Exhibit 97 - page 331**

8. **The effect on children:** First and foremost was the parents' concern for their children. They related symptoms of behavioral regression (e.g. increased clinging), oppositional-defiant disorder, depression, anxiety and increased aggression both towards parents and other children. One symptom common in children under stress is changes in eating patterns. The parents we met with stated that this was a frequent problem, including increasing refusal to eat, increased pickiness and subsequent weight loss. Parents were also concerned about sleeping patterns. One inexplicable practice that the parents reported at the Berks facility—and which the ICE supervisors confirmed—was that facility staff enter the bedrooms of detained families and shine flashlights on each person every fifteen minutes throughout the entire night. Parents complained that this practice is very disruptive to their own and their child's sleeping patterns, both frightening them and waking them up.

9. **Education:** The parents and children we interviewed stated that while there was summer school (most of the families arrived after the typical school year ended), none of the teachers were bilingual and so they do not understand any of the assignments given.

10. **Medical/Mental Health Care:** While parents stated they were pleased with the medical services they received, they stated that there were no bilingual mental health staff and that this strongly impacted their decision to seek care. Fear of deportation, based on revealing mental health symptoms to clinical staff, was another concern we heard during the meeting with parents and children. In one instance, a mother broke down crying,

4

**Exhibit 97 - page 332**

explaining that her son was having suicidal ideation and making suicidal threats but she was too fearful of the consequences to bring him to the medical office.

11. When I directly questioned the head of the facility's mental health services about how they screen for mental health symptoms, we were told that this occurred mostly via observation and questioning parents, but not through direct interactions with the children. He was unable to mention any formal, evidence based, validated tools for screening or monitoring this population. This raises serious concerns about the care that detained families with compounded histories of trauma receive. As previously mentioned, sixty-five percent of newly arrived immigrant children we see in our health center have symptoms of mental health conditions. When we asked the head of mental health services about the availability of support groups for detainees, he stated that these were run using a telephonic translation service.  The families we met with subsequently raised serious concerns about attending these groups due to the lack of Spanish speaking mental health staff. This was also the case for individual care.

12. What was truly remarkable in the meeting with parents and children that I co-led in Spanish was how it immediately turned into a session where both adults and children one by one opened up, disclosing their stories often accompanied by crying – in effect a mental health support group. It was surprising to me, as a pediatric provider, that this detention facility lacked Spanish speaking bilingual staff to provide care to a predominantly Spanish speaking detained population. It was clear from our visit that the critical need for mental health services was not being met. In fact the claim by the head of

5

**Exhibit 97 - page 333**

the mental health staff that detainees were not interested in participating in a support

group was completely contradictory to what we found on the visit.

13. **Parents:** It was evident from our discussion with parents and children that the detained

adults in the Berks facility were under enormous stress. The group consisted of almost

half of the adults in the center at that time so we felt we had a substantial sample to

validate our concerns. There were two categories of problems we observed. First, parents

themselves openly disclosed worries about their own mental health, particularly feeling

both hopeless and helpless. These are key symptoms of depression. The vast majority of

the group stated they were not represented by legal counsel and that they had not been

provided any information about their cases or told when they would have a credible or

reasonable fear interview or see a judge. This led to overwhelming feelings of

desperation, leading many of the adults to breakdown crying in our meeting. Another

concern was the high cost of the bonds they needed to pay in order to leave detention.

Bonds of $5,000 were considered prohibitively high to gain release. One man in the

group stated that a $1,500 bond would be too high. Many participants in the discussion

were frustrated by this reality, which led to feelings of hopelessness.

14. Secondly, the parents expressed helplessness when it came to explaining to their children

why they were being detained and why they could not tell them how long this would

continue. In one instance, following our group discussion with families, a parent

informally brought her thirteen-year-old daughter to me for advice. They had been

detained for fifteen days and her daughter began acting out, refusing to talk to her and

6

**Exhibit 97 - page 334**

withdrawing from most activities. When I met with this girl alone, she stated she did not understand why her mother could not help them get out of the detention center. The daughter expressed frustration at her mother's helplessness and her anxiety about being detained and about her future. This was not isolated as other parents in the group related similar changes in their children's behavior patterns. One disturbing behavior was the increased aggressiveness that was directed against the parents and each other. One example was on the soccer field where there had been increased fighting between the children. Importantly, parents made it clear that these were new behaviors not observed in their own countries or prior to detention.

15. Based on my observations at the Berks County Residential Center, my experience working with immigrant families, and my 25 years of clinical experience in community pediatric care, it is my professional opinion that any detention is extremely detrimental and places both the child and parents' short-term and long-term well-being at risk. In the meeting we conducted with parents and children, the average length of stay was one month with a range of about two weeks to one month and a half. Notwithstanding this range, we observed significant stress and symptoms of mental health conditions in the group with whom we met.

16. Based on my clinical work with newly arrived immigrant children and their parents, observations I made at the Berks County Residential Center, and my knowledge of child development and the literature on this subject, I do not believe family detention can be implemented in a manner that does not jeopardize the mental well-being of children and

7

**Exhibit 97 - page 335**

their parents. Detention, in my view, only compounds the trauma families have already

endured in their home countries and during their perilous journeys to the US. Instead of

providing safe haven, detention instead leads to isolation, helplessness, hopelessness and

serious long-term medical and mental health consequences -- even if it lasts for only a

few weeks.

17. The conclusions I have reached are consistent with those expressed in the July 24, 2015

letter from the American Pediatrics Association to DHS Secretary Jeh Johnson

articulating concerns with family detention, attached for reference as Exhibit A hereto.

Executed on this 12th day of August, 2015 at Bronx, New York .

Alan Shapiro, MD

8

**Exhibit 97 - page 336**

# EXHIBIT 97.1

# American Academy of Pediatrics

### DEDICATED TO THE HEALTH OF ALL CHILDREN®

**AAP Headquarters**
141 Northwest Point Blvd
Elk Grove Village, IL 60007-1019
Phone: 847/434-4000
Fax: 847/434-8000
E-mail: kidsdocs@aap.org
www.aap.org

**Reply to**
**Department of Federal Affairs**
Homer Building, Suite 400 N
601 13th St NW
Washington, DC 20005
Phone: 202/347-8600
Fax: 202/393-6137
E-mail: kids1st@aap.org

**Executive Committee**

**President**
Sandra G. Hassink, MD, FAAP

**President-Elect**
Benard P. Dreyer, MD, FAAP

**Immediate Past President**
James M. Perrin, MD, FAAP

**Executive Director/CEO**
Karen Remley, MD, FAAP

**Board of Directors**

**District I**
Carole E. Allen, MD, FAAP
Arlington, MA

**District II**
Danielle Laraque, MD, FAAP
Brooklyn, NY

**District III**
David I. Bromberg, MD, FAAP
Frederick, MD

**District IV**
Jane M. Foy, MD, FAAP
Winston Salem, NC

**District V**
Richard H. Tuck, MD, FAAP
Zanesville, OH

**District VI**
Pamela K. Shaw, MD, FAAP
Kansas City, KS

**District VII**
Anthony D. Johnson, MD, FAAP
Little Rock, AR

**District VIII**
Kyle Yasuda, MD, FAAP
Seattle, WA

**District IX**
Stuart A. Cohen, MD, FAAP
San Diego, CA

**District X**
Sara H. Goza, MD, FAAP
Fayetteville, GA

July 24, 2015

The Honorable Jeh Johnson
Secretary
U.S. Department of Homeland Security
Washington, D.C. 20528

Dear Secretary Johnson:

On behalf of the American Academy of Pediatrics (AAP), an organization of 64,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists, dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults, I write to express our concerns for the health and well-being of children and mothers who are being detained in family detention centers in Texas and Pennsylvania. We applaud the recent announcement by the Department of Homeland Security (DHS) that Immigration and Customs Enforcement (ICE) will generally not detain mothers and children absent a threat to public safety or national security. Yet we remain concerned that continued detainment of any children and mothers in the existing facilities puts them at greater risk for physical and mental health problems and unnecessarily exposes children and mothers to additional psychological trauma.

Children and mothers from Central America who have crossed the border to enter the United States have high rates of exposure to trauma in the form of threat of death, physical and sexual abuse, and exploitation that leave serious physical and psychological scars. The act of detention or incarceration itself is associated with poorer health outcomes, higher rates of psychological distress, and suicidality making the situation for already vulnerable women and children even worse.[i] For children, exposure to early adverse experiences, often referred to as toxic stress, has long-term consequences. Alterations in a child's ecology as a result of toxic stress can have measureable effects in his or her developmental trajectory, with lifelong consequences for educational achievement, economic productivity, health status, and longevity.[ii]

As pediatricians, we believe that children are our most enduring and vulnerable legacy. All children deserve optimal health and the highest quality health care. This includes access to preventive care consistent with *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents* (see brightfutures.aap.org). We question whether the existing family detention facilities are capable of providing generally recognized standards of medical and mental health care for children.

**Exhibit 97.1 - page 337**

Many mothers and children fleeing their homes in Central America have been exposed to unspeakable violence and trauma. As such, the rates at which these families meet the standard to apply for asylum or other protections from removal based on persecution or torture are quite high. As DHS and ICE work to implement the new policies set forth in mid-July, the AAP stands ready to work with the Department to ensure that the medical and mental health needs of children are being met. Over the course of the past year, the AAP has worked closely with the Department of Health and Human Services' Administration for Children & Families and its Office of Refugee Resettlement (ORR) to ensure unaccompanied minor children receive an appropriate set of preventive screenings, immunizations, and other services. In particular, the AAP has worked with ORR on the documentation of this care so that there can be a more seamless transition once unaccompanied children are placed with sponsors and receiving follow-up care by pediatricians throughout the country. Regardless of the setting, DHS personnel are routinely interacting with children and their mothers, oftentimes when they may be at their most vulnerable. As such, the AAP would like to work with the Administration to put more protective policies in place for children. We would welcome the opportunity to meet with you and your staff and stand ready to participate on your Family Residential Centers Advisory Committee.

Above all else, we urge you to remember that these are children. They are scared, vulnerable children, many of whom have been victims of violence, and they need our compassion and assistance. We urge you do what's best for their health and well-being.

Sincerely,

*Sandra G. Hassink, MD, FAAP*

Sandra G. Hassink, MD, FAAP
President

SGH/tmh

---

[i] Physicians for Human Rights and Bellevue/NYU Program for Survivors of Torture. *From persecution to prison: The health consequences of detention for asylum seekers*, 2003
[ii] Shonkoff, J.P., Garner A.S., AAP Committee on Psychosocial Aspects of Child and Family Health, et al. The Lifelong Effects of Early Childhood Adversity and Toxic Stress. *Pediatrics*, 2012; 129;e232

**Exhibit 97.1 - page 338**

# EXHIBIT 98

## DECLARATION OF ELIZABETH G. SWEET

I, Elizabeth G. Sweet, depose and say:

1. I am the Director for Access to Justice at Lutheran Immigration and Refugee Service (LIRS).

2. I make this declaration based on my personal knowledge and through review of business communications and records within LIRS.

3. In my capacity as the Director for Access to Justice, I manage multiple programs within LIRS that demonstrate an alternative to immigration detention.  LIRS is a national leader in developing successful alternatives to immigration detention. Over the past 30 years, we have worked with legal and social service providers around the country to develop and investigate alternatives to immigration detention. We are committed to successfully demonstrating the effectiveness of community-based alternatives in meeting compliance goals in partnership with ICE.

4. Lutheran Immigration and Refugee Service is a 75 year old agency that has served refugees and migrants, primarily by securing and operating large, multi-million dollar cooperative agreements with the federal government. We hold a strong reputation as a trusted steward of federal resources and a provider of high-quality, cost-effective services. LIRS currently manages a

**Exhibit 98 - page 339**

total of $53,005,243 in federal awards from cooperative agreements with the

Department of State, and the Department of Health and Human Services.

LIRS manages more than 50 unique subcontractors throughout the United

States to administer these federal funds. We maintain long-term partnerships

with our subcontractors to develop local expertise and build strong

programs.

5. Within the Access to Justice program, LIRS operates Community Support, a

privately funded program that has provided services to adult men and

women released from immigration detention since 2012.  Community

Support provides case management services, legal services and housing to

migrants, particularly asylum seekers, released from detention while their

case is being adjudicated. The holistic service model focuses on setting

migrants up to comply, rather than focusing on imposing restrictions.  Case

management services promote the importance of ongoing compliance with

immigration appointments. Through our migrant child welfare program,

Children's Services, LIRS also provides case management services to

unaccompanied Flores class members who have been reunified with family

members after release from Office of Refugee Resettlement (ORR) custody.

In fiscal year 2014, LIRS provided 1,079 unaccompanied Flores class

members with post-release case management services, connecting 75% to

**Exhibit 98 - page 340**

medical and mental health services and 50% to legal services (where national average was 32%).

6. Building upon the work of the overall Community Support program, LIRS entered into an *unfunded* Memorandum of Understanding with Immigration and Customs Enforcement (ICE) in 2013.  The Memorandum of Understanding provided for referrals of individuals from detention into LIRS' Community Support program.  LIRS and ICE tracked ongoing compliance for enrolled participants.  Ultimately, 46 families individuals were released into the program and 44 continued to comply with their immigration obligations, which reflects a 95.6% continuing compliance rate. This is on par with other programs to test less restrictive approaches that provide ongoing support and services to released immigrants which have been shown to ensure compliance with immigration court proceedings at rates at or above 93%.[1]

7. In late 2014, LIRS approached the federal Administration to recommend the widespread use of this case management model of services for mothers and Flores class member children in detention.  We argued that case management services could be provided by non-profit organizations such as

---

[1] Two small pilots in the 1990s (Ullin Illinois and New Orleans, Louisiana) had appearance rates of 96% and 97% respectively.  A study conducted by the Vera Institute for Justice from February 1997 to March 2000 found that alternatives saved the federal government almost $4,000 per person while showing a 93% appearance rate for asylum seekers at all court hearings.

**Exhibit 98 - page 341**

LIRS.  Case management services would connect families to services and promote their continuing compliance with immigration obligations if released from detention. Such a service model for families would provide a safer and more humane environment for children than some alternatives, such as GPS ankle monitors that - through limiting the primary caregiver's freedom of movement - restrict a child's access to schools, medical services, churches and outdoor recreation.  *See Flores,* Defendants' Response to Court's Order to Show Cause, ("Def. Response") at 8.

8. While the Administration considered this recommendation, LIRS moved forward with securing private funding to pilot case management services *for families* on a small scale.  In April 2015, we initiated the Family Placement Alternatives program which served to provide case management services to a small number of families.  That program is funded by a private grant and does not receive government funding.

9. At this time, the Family Placement Alternatives pilot provides services to 9 families from El Salvador, Honduras, Swaziland, and Mexico. Families were eligible for participation if they had at least one dependent child, were in an active defense against immigration removal proceedings, and had recently been detained or released from immigration detention. Participant families are referred by legal and social providers in Arizona, Texas, Illinois, and by

**Exhibit 98 - page 342**

ICE. Families receive support for their immediate needs, by connecting them with legal representation, referring to medical and mental health care, maintaining stable housing, and responding to other emergency needs as they begin their immigration proceedings and begin to integrate into their new community.

10. Through the Family Placement Alternatives pilot, LIRS and our partners have consistently observed a serious gap in the ICE system that results in compliance failures.  ICE does not provide consistent, appropriate information for many families released from detention. In developing our referral mechanisms, we have learned that many mothers and class member children are released with entirely insufficient or unclear information and that they lack a clear means of communicating with ICE or another entity about ongoing compliance. The strength of the community-support model focuses on establishing, sustaining and reinforcing the understanding of compliance with immigration proceedings and ICE appointments before release and while migrants are in their community. *See* Def. Response, Declaration of Thomas Homan, ("Homan Decl.") ¶ 30.

11. In February 2015, ICE released Request for Proposals for a contract to provide case management services to families released from immigration detention.  Thus, the mechanism is already in place at ICE to extend case

**Exhibit 98 - page 343**

management services to a substantial number of the families released from immigration detention.

12. A case management based alternative to detention program would have the mutually reinforcing purposes of 1) promoting compliance with immigration obligations, 2) stabilizing and promoting the well-being of families, and 3) providing a less restrictive setting than detention or other alternatives to detention. Stabilization and connection to the new community promote compliance with immigration obligations.  A case management based alternative to detention could include the following components to ensure that families achieve stability and are able to successfully comply with immigration obligations.  These include:

- Supervision: A structured supervision system for every family to reinforce compliance

- Information: Orientation to the U.S. immigration legal process to overcome confusion and obtain the necessary knowledge to comply with legal obligations and understand legal options

- Legal Assistance: Assistance with the legal process (including referrals to legal representation), increasing investment in the process and participants' trust that they have been given a fair hearing

**Exhibit 98 - page 344**

- Services: Practical help and referrals to help stabilize lives and create incentives for compliance, providing clear and tangible benefits of program participation to enrolled families as well as something to lose if participation is terminated

- Psycho-social support: Psycho-social support and the establishment of social ties to help stabilize lives, provide structure, and build social incentives for compliance

13. LIRS has projected that a comprehensive case management approach to released families would cost less than $50 per day, per family unit. The price hinges on several variables including the scale of the program. A larger program would cost substantially less than $50/day since a program serving greater numbers of families would be more cost efficient per family unit. The cost of any version of a case management program is significantly lower than the daily cost of detaining a family in a facility. To date, the DHS has not funded community-based alternatives to detention.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of August, 2015, in Baltimore, Maryland.


*Elizabeth Sweet*

Elizabeth G. Sweet

**Exhibit 98 - page 345**

# EXHIBIT 99

## DECLARATION OF ELORA MUKHERJEE, ESQ.

I, Elora Mukherjee, Esq., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

**Background**

1. I am an Associate Clinical Professor of Law at Columbia Law School, and the Director of the law school's Immigrants' Rights Clinic.  I am based in New York, New York.  My teaching and practice focus on representing indigent asylum seekers and unaccompanied minors seeking Special Immigrant Juvenile Status.  I have represented clients who are immigrants, including those in immigration proceedings, for more than ten years.  I am admitted to practice law in New York and New Jersey.  I was admitted to the New Jersey bar in 2005 and the New York bar in 2006.

2. I have made four trips to the detention center in Dilley, Texas in 2015.  My first trip was in January 2015; my second trip was in May 2015; my third trip was in June 2015; my fourth trip was early August 2015.  For each of these trips, I have been in Dilley for four to seven days.  I have a fifth trip to Dilley planned in mid-September 2015, this time for a full week.

3. I have made these trips to Dilley notwithstanding the enormous time and expense they require.  My office is located more than 1,900 miles from the detention center in Dilley, Texas.  My roundtrip flights to Texas have cost from $341.20 to as much as $590.20.  I also must pay for a rental car.  When I have rented a mini-van to share with my students (who have also provided pro bono legal services at the detention center in Dilley), the rental car cost has been as much as $716 per week.  In addition, I pay the daily rate at the Days Inn in Dilley, which is now $69.99 per night plus taxes.

**Systemic Interference With Access To Counsel**

4. I am frustrated by the systemic interference with access to counsel at the detention center in Dilley, Texas.  In prisons across the country, attorneys can initiate free, confidential legal calls with their clients simply by contacting prison officials.  I cannot do this at the detention center in Dilley.

5. To make a legal call with any detained client, I must first request that CARA Family Detention Project (CARA) pro bono volunteers or staff at the detention center ask the Corrections Corporation of America (CCA) guards to bring my client to the legal visitation area; then I must wait for the CCA guards to actually bring my client to the legal visitation area; and then I can call into the detention center to speak with my client.  Unfortunately, this system unnecessarily burdens CARA volunteers, who already have too much to do as they try to meet the legal needs of hundreds of detained families.  This system is also unreliable and inefficient, as there are frequently lengthy delays between when a request to see a client is placed and when CCA guards actually bring the client to the legal visitation area.  The system breaks down entirely on weekends, when CARA pro

1

**Exhibit 99 - page 346**

bono staff typically are not at the facility.  On weekends, I have not been able to have any legal calls with my clients—including most recently on August 1 and 2, when I urgently needed to speak with a client scheduled for an upcoming merits hearing on August 4.

6.  During my visit to Dilley in January 2015, I met with ICE and CCA staff to arrange for free, confidential legal calls for my detained clients.  We set up a system whereby my office could set up legal calls with our clients by emailing Supervisory Detention and Deportation Officer Jose Garcia Longoria.  We used this system for legal calls from February to mid-March 2015.  But since March 2015, there has been no system in place for setting up confidential legal calls without burdening the CARA Project staff and volunteers.

7.  On nearly every trip I have made to Dilley, I have lost invaluable hours as I have waited for my clients to be brought to the legal visitation area.  For example, a team of Yale Law students and I were representing a mother scheduled for a withholding merits hearing on May 14, 2015.  On May 13, 2015, the students requested that our client be brought to the legal visitation area at approximately 2 p.m.  The students subsequently checked in on her whereabouts several times and were informed that guards had been looking for.  When I subsequently arrived at the detention center around 4 p.m., I also asked about our client's whereabouts.  She was finally brought to the legal visitation area at approximately 5 p.m.—three hours after we had initially requested to see her.  When we met with her, we learned that she had been in her cell requesting opportunities to meet with us throughout the afternoon.  But detention center guards had denied each of her requests to come to the legal visitation area.  This delay on the eve of her merits hearing could have been disastrous.

8.  On July 31, 2015, I again waited hours in an effort to talk with a mother  who I planned to represent at a withholding merits hearing on August 4, 2015.  Volunteer attorney Allegra Love requested that this mother be brought to the legal visitation area by 2 p.m., so that I could speak with her by phone.  Despite repeated follow ups by Ms. Love, this mother was not brought to the legal visitation area until 6:15 p.m.—more than four hours after Ms. Love had requested and at a time when I was no longer available for a legal call.  Again, this delay could have been disastrous as I had first spoken with this mother on July 30, 2015 and had an extremely limited time to prepare her case.

9.  During my August trip to Dilley, I observed other volunteer lawyers waiting hours to see their clients.  For example, on August 5, I saw Katherine Park and Gloria Chacon, both of whom are lawyers and legal fellows with the Immigrant Justice Corps, frustrated by lengthy delays.  Ms. Park waited between four and five hours to see her clients, and Ms. Chacon waited about three hours to see her clients.  Both Ms. Park and Ms. Chacon had followed up repeatedly to ask about their clients' whereabouts, to no avail.

10.  During the delays I face in meeting with clients at Dilley, I would like to use my time efficiently to prepare cases.  To prepare clients for bond hearings and merits hearings, I need to interview witnesses, collect witness affidavits, and gather other forms of evidence from both the United States and Central America. But I cannot do so from inside the

2

**Exhibit 99 - page 347**

detention center because of the prohibition on detainees' attorneys bringing in cell phones.  (In marked contrast, it appears that both CCA and U.S. Immigration and Customs Enforcement staff carry their cell phones around in the detention center.)  It would be far easier to complete legal work at Dilley if I could use my cell phone inside the facility.

11. The prohibition on cell phones for detainees' attorneys is inexplicable.  Detainees' attorneys could sign agreements limiting phone use to case preparation.  In conversations with ICE officials, I have been told that the ban on cell phones originates with CCA and that it does not seem to serve any legitimate purpose.

**Dilley Fails To Accommodate The Special Needs Of Children**

12. I do not know how many mothers at Dilley have agreed to removal orders because of the extreme psychological stress that being detained with their children causes.

13. I do know that the detention setting is demoralizing for mothers, especially mothers whose children have special needs.  As far as I can tell, the detention center fails to make any accommodations for children with special needs.  On August 5, 2015, volunteer attorney Lauren Paulus and I met with a mother with a strong claim for immigration relief during a recess of her Master Calendar Hearing.  I offered to represent her at her merits hearing for her withholding of removal case, as well as her son at his merits hearing for asylum.  But this mother was crying uncontrollably, and despite the repugnant violence and potential death that awaits her in Honduras, she insisted that she needed to return to Honduras because she could not stand being detained with her son any longer.  She explained her son had been suffering in detention and had lost nine pounds.  I later learned that her son also has autism.  Despite my efforts to explain that she could likely win her immigration case with only two more weeks in detention, she requested a removal order for herself and voluntary departure for her son on August 5.

14. In January 2015, I also represented a mother and her physically disabled son, both of whom were detained in Dilley.  Before I met the mother, she had been requesting accommodations for her son for over a month.  During that time, he experienced great difficulty in accomplishing basic daily tasks such as using the bathroom (he was afraid of falling into or off of the toilet), taking a shower (he could not reach the shower knobs), attending school (nothing in the classroom was adapted to his physical needs), and sleeping alone (without a bed guardrail he risked falling).  This child received one accommodative device (the bed guardrail) out of the many that were necessary to fully accommodate him.  However, when this family was subsequently moved to new sleeping quarters, guards failed to reinstall the device. No further accommodations were made until I made both oral and written requests for accommodations and explained that the lack of accommodations made Dilley an unsuitable environment for the child.  Just hours before the family's bond hearing, ICE officials procured the potty seat that we had requested.  Due to the lack of full accommodation, this child continued to experience unnecessary difficulties in his daily life at Dilley until his release.

3

**Exhibit 99 - page 348**

**Dilley Fails To Provide Appropriate Medical Treatment To All Children**

15. I am concerned by how many children detained at Dilley have failed to receive appropriate medical attention.

16. I have been dismayed by what happened to one family during my trip to Dilley in May 2015. At the time, volunteer attorney Katrina Kilgren and one of my Columbia Law students were representing a detained family that included a very sick daughter. The mother had noticed that her daughter was ill on the night of May 8, 2015; that day, her daughter was suffering from pain due to a swollen throat and a rash. Over the subsequent days, the mother repeatedly sought out medical treatment for her daughter, but was sometimes not given the medication that she needed. By May 13, 2015, her daughter's throat was so swollen that she was in intense pain and could not eat. By the morning of May 14, 2015, the young girl seemed unable to swallow or pass saliva. When her mother went to the pharmacy that morning, she could not bring her daughter with her because her daughter was so ill. The mother was told at the pharmacy that she would not be given any medication because her daughter was not present. The mother begged to see a doctor or anyone who could authorize medication for her daughter. Her repeated requests were refused. The family's bond hearing was scheduled for May 14, so the mother had to attend, but her daughter could not because she was so sick. While the mother was in the courtroom trailer, she was informed that her daughter was extremely unwell. Her daughter was transported that day first to the county hospital and then to the Children's Hospital of San Antonio by ambulance. Doctors at both hospitals diagnosed her daughter with strep throat and dehydration, and asked why the child had not been treated earlier.

**ICE Fails To Parole Eligible Families**

17. I am troubled by the misinformation given to families about whether and when they will be considered for release. For example, since July 2015, one of my Columbia Law students and I have represented a mother in withholding only proceedings and her asylum-eligible daughter. The mother was told by her Detention Officer during the week of July 13 that she should be considered for release on parole. My student and I then focused on gathering evidence in support of her parole application. The prospect of parole was particularly appealing for our client, as she was deeply distressed about the persecution she faced in El Salvador and the fatal heart attack her own mother had suffered during our client's time in detention. Given her hopes about parole, our client no longer wished to prepare for her merits hearing. But unfortunately, ICE never granted this family parole; instead, the mother and daughter faced their merits hearings while detained on August 5, 2015. This case is emblematic of the uncertainties and false hopes that are raised when ICE begins to consider a family for parole but then fails to complete the parole process.

18. On August 11, 2015, I conducted a non-exhaustive review of CARA client files for families detained at Dilley. I identified nine families where the mothers are in withholding only proceedings and their children are asylum eligible. Each of these families should have been paroled already, but they remain in detention. Each of these mothers has passed her Reasonable Fear Interview; each child has a positive Credible Fear Interview. Each family is in Immigration Court proceedings, with the exception of

4

**Exhibit 99 - page 349**

one family where the mother speaks Mam and has "no future hearing dates" in the system. Some of these families have been inexplicably detained for long periods of time. For example, one mother had her Reasonable Fear Interview on June 15, 2015, and her positive Reasonable Fear Determination is dated June 16, 2015. Although she should have been paroled in June, she still remained in detention on August 11, almost two months later, with her nine-year old son.

**ICE Requires Mothers To Sign Forms When They Are Particularly Vulnerable**

19. I am concerned that mothers at Dilley are forced to sign forms that they do not understand at times when they are particularly vulnerable. For example, on May 14, 2015, shortly before the start of her merits hearing, our client was called to "court"—i.e., the courtroom trailer—and required to attend a meeting with an ICE officer. One student from the Yale Law student and I announced that we would join her for the meeting. To our dismay, the Officer required our client to sign forms stating that she would comply with any deportation order. Our client had previously signed these forms multiple times. There was no need—other than for intimidation and malice—for her to sign the form again right before her merits hearing.

**ICE And CCA Guards Intimidate Journalists And Arbitrarily Refuse Them Access**

20. In May and June 2015, I have witnessed CCA guards and ICE officials intimidate journalists and arbitrarily refuse them access to the facility. In May 2015, I witnessed a CCA guard threaten to arrest a photographer for a national newspaper. This journalist had not snapped a single photograph or done anything inappropriate; she had merely stepped into the lobby at the Dilley detention center. CCA and ICE personnel subsequently escorted her off the premises. In June 2015, I witnessed ICE personnel prohibit a journalist for a national magazine from entering the detention center. This journalist wished to interview my clients, and my clients were eager to speak with her. But the journalist was not permitted to meet with my clients. ICE personnel spoke rudely with her and failed to offer any rational reason for the prohibition.

**ICE Fails To Return Documents That Families Are Entitled To**

21. I have represented multiple mothers who have been granted withholding of removal as well as their children who have been granted asylum. These families are entitled to have their original passports and other identity documents returned to them. But ICE has refused to return these documents to the families in multiple instances, despite my repeated requests for those documents. When families are denied these critical identity documents, they face difficulties in applying for benefits and complying with subsequent reporting requirements. This is yet another example of ICE's arbitrary policies and procedures, which continue to burden families even after their release from Dilley.

**More Than One Thousand Mothers And Children Remain Detained In Dilley**

22. I was informed yesterday that more than one thousand mothers and children remain detained in Dilley. Several of these families have been detained for nearly all of this year—including a family that I first met in Dilley in January. During my trips to Dilley, I have met with dozens and dozens of mothers and children. Each mother who I have spoken with tells me about suffering they have endured—whether at the hands of their

**Exhibit 99 - page 350**

abusive partners, their fathers, their male cousins, gang members, or the police in their home countries.  They tell me of brutal and serial rapes, the murders of their beloved family members, the slaughtering of their animals, and how they left everything behind in an effort to save their own lives and especially their children's lives.  Their suffering is manifest on their anguished faces and in their tears.  While I bring tissues on my trips to Dilley, there never seem to be enough.  While I bring toys, crayons, and notebooks for the children, these do not detract from their pain.

23. Based on my experiences, I believe that the Dilley detention center is out of compliance with the *Flores* Settlement Agreement and the Order issued by the Honorable Dolly Gee on July 24, 2015.


Executed on this 12th day of August, 2015, in New York, New York


_____
Elora Mukherjee, Esq.
Associate Clinical Professor of Law
Director, Immigrants' Rights Clinic
Columbia Law School
435 West 116th Street
New York, NY 10027

**Exhibit 99 - page 351**

# EXHIBIT 100

## DECLARATION OF JOHANA DE LEON

I, Johana De Leon, make the following declaration based on my personal knowledge and declare

under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I work as a full-time legal assistant at RAICES (Refugee and Immigrant Center

for Education and Legal Services) in San Antonio, Texas. RAICES is a 501(c)(3) nonprofit

agency that promotes justice by providing free and low-cost legal services to underserved

immigrant children, families and refugees in Central and South Texas.

2.      Since the summer of 2014, RAICES has been coordinating a project to provide

legal services to mothers who are detained along with their children at the Karnes County

Residential Center ("Karnes") in Karnes City, Texas. Karnes is an immigration detention facility

operated by a for-profit corporation called The GEO Group, Inc. ("GEO"). The mothers and

children detained at Karnes are in the custody of U.S. Immigration and Customs Enforcement

("ICE").

3.      I have been working as a bilingual legal assistant at RAICES since July 2014.

Before I worked at RAICES, I attended San Antonio College for two years. My immediate

supervisor is Manoj Govindaiah, who is an attorney and the Karnes Pro Bono Project

Coordinator.

4.      As the RAICES Legal Assistant assigned to Karnes, I take telephone calls from

newly arrived detainees at Karnes who need help preparing for their credible fear interviews

("CFIs"), which is an important part of the process for applying for asylum, and I enter their

information into our database. Our pro bono attorneys then assist them in preparing for their

CFIs. We also train other attorneys to help the mothers prepare for their CFIs. I help coordinate

**Exhibit 100 - page 352**

attorneys and law students who want to voluntarily provide legal services to Karnes detainees as well.

5.      As part of my job responsibilities, I travel to Karnes to conduct in-person intake interviews for mothers who receive positive findings of credible fear. I also help them to find pro bono attorneys.

6.      I assist the pro bono attorneys, who are located across the state, by traveling to Karnes to obtain signatures from their clients for various immigration application forms, declarations, and other legal documents. I assist clients and attorneys with administrative tasks as needed to help prepare for their cases.

7.      We have constant communication with the mothers through a hotline number that we provide them. They are able to call us toll free any day and at any time to communicate any problem that may arise with their case or their detention. As the main person responsible for answering hotline calls, I have established trust with the mothers and they are comfortable calling with any concerns that they might have.

8.      I have heard a variety of complaints from the mothers inside Karnes. One of the most common complaints is that their children are losing weight because they refuse to eat the cafeteria food. Mothers have reported that GEO medical staff take the weight of their children on a weekly basis but refuse to provide the mothers with the results. A majority of the mothers report that their children lost weight in detention because they compare them with a picture of when they first arrived at Karnes and the day they are released. When children do not lose weight, the mothers attribute this to the support of families outside of Karnes that deposit money into the mother's commissary account, which allows the mother to purchase food from the commissary so that her children do not have to eat in the cafeteria.

**Exhibit 100 - page 353**

9.      In my experience, based on the complaints of the mothers and my review of

medical records, the mothers and children at Karnes are not provided adequate medical care.

Mothers and children that have any type test done are not given their medical records unless the

mother requests the record multiple times. A mother seeking medical records faces many

obstacles. For example, mothers report that medical staff tell them that there is nothing wrong

with them so they do not need the results. Other times, a mother lodges a request for medical

records but it takes nearly a month to obtain copies of the records.

10.     Part of the population at Karnes includes indigenous language speakers from

Guatemala who speak languages like Mam, Kiche, Achi, Popti, Chuj, Canjobal, Acateco, and

who have very limited or no knowledge of Spanish or English. GEOdoes not provide interpreters

to communicate with this population. We have learned that indigenous language speaking

families would not go to the medical clinic because they could not communicate with the staff.

11.     In my experience, the children and mothers have been unable to receive proper

care until GEO and ICE receive pressure from outside sources, including media and family

members.

12.     One mother, who I will call Maria so as to protect her identity, arrived at Karnes

on May 9, 2015. She fled Honduras with her five-year-old son and ten-year-old daughter in order

to escape death threats. On May 15, Maria informed us that her daughter was sick and could not

tolerate any food she was eating. Maria took her daughter to the Karnes medical clinic for six

days straight but they would send her right back to her room. Only once did they give her

acetaminophen. On May 20, Maria's daughter had a high fever, was vomiting and did not want

to eat. They took her in a wheelchair to medical but she was only given some fluids and more

acetaminophen. Maria's lawful permanent resident husband lives in San Antonio, Texas and

**Exhibit 100 - page 354**

visited the facility on a daily basis. When he saw their daughter on May 20 and how bad she was, he requested to talk to a supervisor, and eventually the daughter was taken to an outside hospital. The hospital did additional tests and determined that she was suffering from a bacterial infection and had pus in her tonsils. If it was not for pressure that she and her husband placed on ICE and GEO, I don't think the family would have been released as soon as Maria passed her credible fear interview.

13.     I am aware of a total of five pregnant mothers that arrived at Karnes in April and May 2015. We learned about their pregnancies on June 3, 2015, and they spoke with media about their medical care. Specifically, they complained that they were not getting adequate food and medical treatment. The pregnant mothers reported that they would only receive one extra cookie and milk in addition to the regular food the rest of the population was receiving. One of the mothers said that apart from a urine test, the medical staff never called her again to check on her baby. All of them were in different stages of the immigration process but once the media began inquiring about the medical care these mothers were receiving, all five of them were released the next day.

14.     Gloria, another pseudonym, arrived at Karnes on December 12, 2014 with her young son and daughter. Her daughter's health was in bad shape since their arrival. The daughter had bad headaches that made her "fall to the floor." In February, the daughter was taken out of Karnes for some medical tests.  Everything was in English so Gloria did not know what the tests were, and received no explanation at all as to what the tests were. The daughter received some medication that helped but the medication ran out at the end of February.  When Gloria returned to the medical staff to refill the medication, the GEO medical staff informed her that she could not get any additional medication until ICE requested additional tests. The daughter's health kept

**Exhibit 100 - page 355**

deteriorating and on May 25, 2015, she was again taken out of Karnes to receive medical care for her condition. On May 26, 2015, only after a nationwide sign-on letter pushing for the family's release and after her attorney submitted a parole request to ICE, was the family released on parole on May 27, 2015.

Executed this 13th day of August, 2015 at San Antonio, Texas.


_/s/ Johana DeLeon___

Johana DeLeon

**Exhibit 100 - page 356**