# EXHIBIT 101

## DECLARATION OF KAREN S. LUCAS

I, Karen Siciliano Lucas, Esq., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am an attorney licensed and admitted to the bar in the State of New York. I am currently the Associate Director of Advocacy at the American Immigration Lawyers Association (AILA).

2. AILA is a national association of more than 13,000 attorneys and law professors who practice and teach immigration law. AILA and the American Immigration Council supported a massive pro bono representation effort at the family detention facility in Artesia, New Mexico, until the closure of that facility in December 2014. AILA is now one of four partner organizations that comprise the CARA Family Detention Pro Bono Project (CARA),[1] which facilitates pro bono legal representation to mothers and children held at the family detention facility in Dilley, Texas.

3. In my capacity as Associate Director of Advocacy, I communicate regularly with our partners on the ground as well as former volunteer attorneys to identify systemic challenges faced by mothers and children in family detention, including problems related to access to counsel and conditions of detention.  Based on this information, I liaise with government officials in Washington, D.C. to help resolve operational issues and to advocate for better detention policies and practices with the Administration and with Congress.

4. I submit this declaration for two purposes. First, this declaration provides information regarding the complaint filed by AILA, the American Immigration Council, and the Women's Refugee Commission, with the Department of Homeland Security's (DHS) Office of Civil Rights and Civil Liberties (CRCL) on June 30, 2015. This complaint concerned the psychological impact of family detention on mothers and children seeking asylum in the United States. Second, this declaration provides information regarding repeated and ongoing efforts by the CARA Project to conduct pre-release orientation

---

[1] CARA includes Catholic Legal Immigration Network, Inc., American Immigration Council, Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association.

**Exhibit 101 - page 357**

sessions for mothers detained at the family detention facility in Dilley, Texas, to provide mothers with information about their rights and responsibilities upon release.

**June 30, 2015 Complaint to CRCL regarding Psychological Impact of Detention**

5. Since July 2014, when AILA members from across the country began providing pro bono representation to mothers and children detained at Artesia, our staff and volunteers on the ground in both Artesia and Dilley have repeatedly observed the debilitating effects of detention, which have been confirmed by psychologists who have met with and evaluated detained children and their mothers. In an effort to improve the situation of detained families, AILA and its partners filed a complaint with DHS's Office of Civil Rights and Civil Liberties that included representative cases of ten mothers and children who were detained in the family detention facilities in Artesia, NM; Dilley and Karnes, TX; and Leesport, PA.

6. I personally coordinated the effort to file the CRCL complaint. To this end, I spoke with the attorneys for each of the ten mothers featured in the complaint, who provided the case information and psychological evaluations and/or affidavits submitted with the complaint. These psychological evaluations and affidavits illustrate that family detention creates or exacerbates trauma for detained mothers and children, and describe the severe anxiety, post-traumatic stress disorder, suicidal ideations and other symptoms of profound trauma observed in these detained families.

7. The complaint, which is attached hereto as Exhibit A, was formally filed with CRCL on June 30, 2015.

**Efforts by CARA to Conduct Pre-Release Orientation Sessions for Mothers at Dilley**

8. As soon as we learned of Immigration and Custom Enforcement's ("ICE") new release policy, which was announced on July 13, 2015, CARA prepared to adapt its services in preparation for the increased number of anticipated releases. I immediately contacted ICE and requested that they allow us to conduct pre-release orientation sessions at Dilley with women whose releases had been approved. The purpose of such presentations would be to explain the individuals' rights and obligations, including any reporting obligations, the importance of appearing for all scheduled court appearances, the need to file an asylum

**Exhibit 101 - page 358**

application in advance of the one-year filing deadline, and how to connect with pro bono attorneys in their cities of destination. That same day, CARA staff, including Lindsay Harris from the American Immigration Council and Michelle Mendez from the Catholic Legal Immigration Network, Inc., developed written materials in Spanish to be used in conjunction with this oral presentation.

9. Since my initial request to ICE to facilitate the pre-release orientations, my colleagues and I have repeatedly followed up with our agency contacts by phone and email in an attempt to ensure that the orientation sessions would be implemented as quickly as possible. While our contacts at ICE have repeatedly acknowledged our requests, CARA has not yet been permitted to provide this important service for the detained mothers and children. On July 20, 2015, ICE requested a written copy of the materials and information we planned to share at the pre-release orientations, which we provided in both Spanish and English.

10. On Tuesday July 21, 2015, I attended the White House Office of Public Engagement Access to Counsel meeting, with various stakeholders involved in advocacy efforts on behalf of unaccompanied minors and detained families. At the meeting, a DHS official confirmed that the agency had received our request to conduct pre-release orientations, agreed that it was a good idea, and informed us that the agency would be working with us to organize these sessions.

11. On Monday July 27, 2015, the CARA partner organizations sent a letter to ICE Director Sarah Saldaña, expressing concerns regarding the lack of transparency, coercion, disorganization, and confusion surrounding the releases of detained families that had occurred following the July 13, 2015, announcement. In this letter, attached as Exhibit B, we again raised the issue of pre-release orientations and explained their importance in ensuring compliance with reporting requirements and court appearances. This letter also highlighted the many reports we have received from our staff on the ground that ICE was misleading, coercing, or otherwise causing women to accept electronic ankle monitors, typically without any advice from their counsel.

12. On August 13, 2015, ICE contacted AILA and spoke with my supervisor, Gregory Chen, Director of Advocacy at AILA. Greg informed me that ICE has offered that it will allow CARA to provide pre-release orientations but only on Tuesdays, Thursdays and

**Exhibit 101 - page 359**

Saturdays.  Details of this plan are now being discussed and will need to be negotiated
with ICE.  AILA wants to ensure that every woman who is being released has the
opportunity to receive an orientation from the CARA project.

13. Although a month has passed since our initial request to provide pre-release orientation
sessions at Dilley, we have not been allowed to do so. We are extremely concerned that
the mothers and children released from Dilley during this period do not understanding
their rights and obligations and may thus fail to comply with their reporting requirements
and appear for their court hearings.

Executed this 13th day of August, 2015

*Karen Lucas*

SIGNATURE

Karen S. Lucas, Esq.
Associate Director of Advocacy
American Immigration Lawyers Association
1331 G Street NW, Suite 300
Washington DC, 20005
202-507-7645
klucas@aila.org

**Exhibit 101 - page 360**

# EXHIBIT 101.1

  

Megan Mack
Office of Civil Rights and Civil Liberties
Department of Homeland Security
Washington, DC 20528

June 30, 2015

**Re:    The Psychological Impact of Family Detention on Mothers and Children Seeking Asylum**

Dear Ms. Mack:

We submit the attached complaint to register our serious concerns over and begin to document the impact of confinement in Immigration and Customs Enforcement's (ICE) family detention facilities on the physical and mental well-being of the mothers and children detained there. Attached you will find affidavits as well as evaluations by mental health professionals documenting in detail the traumatic psycho-social impact of detention in any of ICE's family detention centers. These evaluations confirm what numerous studies and other expert testimony have long attested: that the detention of families has serious consequences for detained families' well-being, and either creates or exacerbates trauma in the women and children detained there.

We urge your office to immediately and thoroughly investigate these cases of trauma in family detention. We further request a complete investigation into psychological and physiological impact that family detention is having on children and mothers. While we recognize that increased access to meaningful mental and medical health services is crucial to the currently detained population, we are confident that even an improvement in access to services would be insufficient to address this urgent situation.

There is no humane way to detain families. No amount of services in family detention could mitigate the traumatic impact of confinement on children and mothers, especially given that many are survivors of trauma, violence, and are seeking protection in the United States. This cost is particularly unacceptable given that there are established alternatives that could address the government's legitimate interests in managing immigration and ensuring appearance without inflicting this trauma and at a lower financial cost.

The concerns outlined in the attached cases relate to all family detention facilities. ICE's rapid expansion of its family detention has resulted in an over 3,000 percent increase in the detention of mothers of children in the last year, with a doubling of the detention capacity anticipated at both Berks and Karnes. Given the difficulty that mental health care providers face in accessing individuals in family detention, as well as the sensitivity around the nature of these cases, it is likely that these cases represent only a small fraction of those experiencing trauma in and as a result of family detention.

*Impact of Detention on Asylum Seekers*

Numerous studies have documented the traumatizing impact of detention both in the U.S. and international context.[1] This impact is particularly acute for children, asylum-seekers, and other vulnerable populations. A 2003 study of the detention of asylum-seekers found that 77 percent had "clinically significant symptoms of anxiety," 86 percent exhibited symptoms of depression, and 50 percent of post-traumatic stress disorder.[2] In follow-up, those who continued to be detained showed even more "distress," and the study's "findings suggest detention of asylum seekers exacerbates psychological symptoms." A Canadian study on the impact of detention on the mental health of asylum seekers compared to non-detained asylum seekers found that "depression levels were 50% higher among detained than non-detained participants, with 78% of detained asylum seekers reporting clinical levels of depressive symptoms compared with 52% of non-detained asylum seekers."[3] A 2013 report by the Center for Victims of Torture of asylum seekers in U.S. immigration detention facilities found that detention is often re-traumatizing for survivors of torture, and "may lead survivors to relive their horrid experiences of torture, including the profound sense of powerlessness and loss of sense of self, contributing to further psychological damage."[4]

*Impact of Detention on Children and Families*

Detention has a particularly acute impact on children. The trauma and re-traumatization of children in ICE family detention settings described in the attached case stories consist not only feelings of hopelessness, but also severe cases of mental health concerns including anxiety, depression, and post-traumatic stress disorder. These cases, combined with existing research,

---

[1] *See, e.g.*, Coffey, G.J., et al. "The Meaning and Mental Health Consequences of Long-Term Immigration Detention for People Seeking Asylum." *Social Science and Medicine*. 70(2010): 2070-2079. *See also*, U.S. Commission on International Religious Freedom, *Report on Asylum Seekers in Expedited Removal* , Volume 1: Findings and Recommendations, and Volume II: Expert Reports. February 2005.

[2] Keller, A., Rosenfeld, B., et al. "Mental health of detained asylum seekers." *The Lancet*. 2003 (362). P. 1721. See also, Physicians for Human Rights and Bellevue/NYU Program for Survivors of Torture: *From Persecution to Prison: the Health Consequences of Detention for Asylum Seekers*. June 2003.

[3] Cleveland, Janet. "Psychological Harm and the Case for Alternatives." *Forced Migration Review*. September 2013. 7-8.

[4] Center for Victims of Torture, Torture Abolition and Survivor Coalition, International, and Unitarian Universalist Service Committee. *Tortured and Detained: Survivor Stories of U.S. Immigration Detention*. November 2013. P. 10.

underscore that this impact can be reduced and healing can begin only in environments in which individuals feel safe and empowered. We believe strongly that long-lasting reversal of these conditions cannot be achieved while the family remains detained.

In the 2007 report *Locking Up Family Values*, Women's Refugee Commission and Lutheran Immigration and Refugee Service documented extensively the inadequacy of mental health services for trauma-survivors and others in family detention settings and interviewed several current or former detainees. The report found that "all exhibited symptoms of psychological distress that have been previously linked to the trauma of detention, including visible fear, crying and expressing desire for medication to alleviate their depression and anxiety."[5] These concerns were echoed in the follow-up report *Locking Up Family Values, Again*, describing the resurgence of family detention as of June 2014, as well as other recent reports on family detention.[6] This matches what experts describe as the impact that detention has on women and children, in particular because detention triggers feelings associated with helplessness and disempowerment in the situations they fled.[7] In May 2015, Human Rights Watch released findings based interviews in which detained mothers shared that "all their children were exhibiting signs of depression, which they attributed to being detained," including one case of a mother describing her daughter's desire to hurt herself.[8]

Indeed, the impact of detention on children has been extensively documented in the U.S. and the international context. The International Detention Coalition's (IDC) 2012 report *Captured Childhood* found that the unique vulnerabilities of children place them especially at risk of health and development issues, and that evidence exists of a "detrimental effect on mental and physical health of children held in immigration detention *for short periods*"[9] (emphasis added). IDC found that "detention itself causes or reinforces children's mental and emotional health problems," and that detained children can exhibit various signs of anxiety, inability to sleep and

---

[5] Lutheran Immigration and Refugee Service (LIRS) and Women's Refugee Commission (WRC). *Locking Up Family Values*. February 2007. P. 23; fn 27.

[6] *See, e.g.*, Detention Watch Network: *Expose and Close: Artesia Family Residential Center*. September 2014 and LIRS and WRC: *Locking Up Family Values, Again*. October 2014.

[7] *See* remarks of Dr. Giselle Hass, "Statement regarding the Mental Health Needs of Women and Children Detained in Immigration Facilities," at a briefing entitled "Re-traumatizing and Inhumane: Detaining Immigrant Survivors of Violence Against Women and Children." January 2015. "The sole confinement, surveillance, security controls and harsher regime of detention aggravate the mental health problems of immigrant women and children because they replicate the dynamic of control and coercion that victims suffered in the past and induce the same sense of helplessness and victimization." P. 5, *available at*: http://www.asistahelp.org/documents/news/Mental_Health_Statement_GH_E49E41BF6BFF5.pdf. See also "Psychological Harm and the Case for Alternatives," FN 3 above.

[8] Human Rights Watch. *US: Trauma in Immigration Detention*. May 2015. http://www.hrw.org/news/2015/05/15/us-trauma-family-immigration-detention

[9] International Detention Coalition. *Captured Childhood*. May 2012. P. 50, emphasis added.

night terrors or nightmares, impaired cognitive development, or even more extreme psychological distress.[10]

The complaint we submit to you today is based on several evaluations that illustrate that family detention creates or exacerbates trauma for detained mothers and children. Many cite to severe anxiety, post-traumatic stress disorder, suicidal ideations and other symptoms of profound trauma in their clients. Multiple evaluations explicitly stated that these individuals would best be served by release from detention, yet these mothers and children continued to be detained for long periods of time – either they were offered no bond or humanitarian release or they were given excessively high bond amounts that they could not afford.

Describing the impact of detention on the mental health and development of immigrant families at the Karnes County Family Residential Center, Luis H. Zayas, the dean of the School of Social Work at the University of Texas at Austin and a licensed psychologist and clinical social worker, found that profound consequences on the well-being of detained families at Karnes manifested even though families had been detained only two to three weeks. Mothers and children of all ages generally showed high levels of anxiety, depression, and despair, and children showed signs of developmental regression. He writes that:

> *The psychological traumas experienced by these mothers and children—in their home countries, during their travel to the United States, and upon their detention in the United States—will require years of mental health services to alleviate. Moreover, the ongoing stress, despair, and uncertainty of detention—even for a relatively brief period of time— specifically compromises the children's intellectual and cognitive development and contributes to the development of chronic illness in ways that may be irreversible.[11]*

*Names in quotation denote pseudonyms*

**Complainant 1: "Cecilia"**  Cecilia was raped at 13 years old. She fled El Salvador because her life – as well as the life of her daughter – was being threatened by her own family members, as well as gang members demanding sex. At the time of Cecilia's psychological assessment in detention, her daughter was constantly sick, could not eat and was vomiting. The psychiatrist summarized the emotional and behavioral impact of detention on both mother and daughter:

> *[Cecilia's] daughter is getting more aggressive and is having fights with other children. This behavior she had never seen her daughter have before this imprisonment. [Cecilia] is very sad. [S]he doesn't want to do anything. She is upset all the time. She says this with tears flowing down her cheeks. Her head hurts. ... [S]he is not suicidal as she was when she was raped at 13, but she is very depressed. ...*

---

[10] *id*. P.51, fn 104.

[11] Declaration of Luis H. Zayas, PhD. December 10, 2014, *available at*: https://lofgren.house.gov/uploadedfiles/declaration_of_luis_zayas.pdf.

> *[Cecilia's] daughter cries every night. After her daughter goes to sleep she herself weeps*
> *every night. She cannot sleep. It is a mixture of awful memories and dread about being*
> *trapped in this prison. She eats not at all and then finds herself eating frantically. She*
> *demonstrates psychomotor retardation and agitation. She reports feeling exhausted. She*
> *feels worthless and hopeless. She feels extremely guilty about what her daughter has to*
> *go through. Sometimes during the interview she is crying so hard she can hardly talk.*
> *While [Cecilia] definitely has longstanding issues this depression is a result of being*
> *trapped and imprisoned in the prison at Artesia.*

The psychiatrist diagnosed Cecilia with "severe Post-Traumatic Stress Disorder," stating: "She has been threatened with death as has her daughter. She has been raped at 13 years old and again in her recent history she has been threatened with sexual violence and had to repulse an attempted rape. She has watched her sister sustain physical harm and been subjected to it herself. … She has recurrent, intrusive, and involuntary memories of the trauma she has had."

The psychiatrist concluded: "In addition she has a very troubled child and she herself is in a full-blown depressive episode which is worsening because there is no viable way out. She needs release as soon as possible. Her [$20,000] bond appears to me to be unreasonable and quite destructive to her mental health."

This assessment was issued November 24, 2014. Cecilia and her daughter were not released until January 29, 2015.

**Complainant 2: "Juliza"**  Juliza is an indigenous Guatemalan woman who suffered persecution throughout her whole life due to her indigenous ethnicity. Beginning at the age of 13, Juliza was raped by her father's family members, who referred to her as a "dirty indian" while they assaulted her. When she finally gained the courage to go to the police, she was sexually propositioned by the officers. After a family member continued to threaten her with death and more sexual violence, Juliza fled to the United States. When she told the Border Patrol officer that she feared returning, he said she was lying and deported her without a credible fear interview. Within a month of being back in her country of origin, Juliza was drugged, raped, and thrown into a river by the ladino family member who had been threatening her. Juliza fled to the United States again. She told the CBP officer again that she was scared, but was deported anyway.

Back in Guatemala and caring for her 8 year old son, gang members attempted to kidnap him. Juliza fled again, this time taking her son on the perilous journey with her. After more than eight months of detention, Juliza was granted relief by an Immigration Judge.

The licensed mental health counselor who evaluated Juliza concluded that she was suffering from PTSD in detention:

> *Difficulty sleeping and eating; recurrent nightmares related to various aspects of her*
> *experiences, a miscarriage brought on by the violence after one of her deportations is*
> *particularly distressing to her and the cause of many of the nightmares; intrusive*
> *memories of the fetus which she saw after the miscarriage; pervasive hear, shame and*

> *guilt from the many sexual assaults which make eye contact difficult; cognitive distortions typical of victims of such violence, i.e., being "worthless," and internalization of the horror so that she herself feels "horrible."*

The counselor concluded that detention was the wrong environment for her:

> *In order to process the traumatization that [Juliza] has experienced, she will need an extended period of time in a safe environment, free from harm. In her current situation, where she lives with fear of being returned to her country of origin where the violence took place, and is most probably going to continue, does not accord her the safety needed to heal from what has happened to her and keeps her PTSD symptoms active.*

**Complainant 3: Celia** Celia is an indigenous Guatemalan woman whose entire family has been persecuted because her father married outside his ethnic group, and for more than two decades she, her parents and her siblings endured serious physical attacks and death threats at the hands of her paternal relatives. At the age of sixteen, Celia married and moved into her husband's parents' home; after witnessing her father-in-law repeatedly abuse her mother-in-law, Celia intervened to stop a beating and then escorted her mother-in-law to the police. After reporting the domestic abuse, Celia's father-in-law attempted to attack her and threatened to murder her in the middle of the night. Celia fled to the United States, but she was deported without having an opportunity to speak to an asylum officer about her fear of returning to Guatemala. Upon returning to Guatemala, Celia received death threats from a paternal cousin, while her husband was personally threatened by gang members with connections to her paternal relatives. Celia also received renewed death threats from her father-in-law, who promised to kill her when she least expected it for previously reporting his domestic abuse to the police.

Celia again fled to the United States, this time with her 10-month-old son. Over nine months of detention, Celia suffered immense stress caring for a breast-feeding infant in jail-like conditions. Her hair started falling out. She was exhausted from staying up nights alone crying and caring for her infant son who had become listless. According to the licensed mental health counselor who evaluated her, Celia's prolonged detention extended the "reign of terror" she suffered in her home country, aggravating her PTSD.

While detained, Celia suffered from a painful chronic intestinal condition and an infected tooth but has received no treatment or medication in detention. Her son's physical well-being and emotional development were severely negatively impacted by prolonged detention. He became irritable, aggressive and was suffering from a chronic ear infection, congestion and diarrhea.

The counselor who evaluated Celia – with over 25 years of experience working in the field of family violence and sexual assault – found that detention was re-traumatizing her:

> *Detention has the effect of creating an environment that forces Celia to re-experience her trauma on a daily basis, which serves to re-traumatize her. ... She is experiencing intrusive memories night terrors and physical symptoms. ... The impact of detention on Celia is to create a situation that exacerbates the trauma she is already struggling with. ... The fear, uncertainty, and lack of control over her life that [she] lives with while being detained mimics the fear, uncertainty, and lack of control she experienced in Guatemala.*

The counselor described other psychological consequences for detained women and children:

> *It can be said that detention provides for women and children's basic needs; food and shelter. It is equally true that detention disempowers women and children. This lack of control over their future places women and children in positions of uncertainty, fear and isolation. ... [M]inimization of time spent in detention is strongly recommended.*

"Women like Celia who are trauma survivors are psychologically vulnerable and thus at increased risk for developing mental health problems in response to being detained," the counselor noted.

While parents often recall their child's first steps with joy, Celia felt only despair when her son learned to walk behind chained fences in Artesia and Dilley as it was, to her, a measure of how much of his young life was spent detained.

On April 9, 2015, an Immigration Judge granted Celia a form of humanitarian relief related to asylum ("Withholding of Removal"), and her son received asylum based upon the evidence of persecution to his mother.

**Complainant 4: Suny**  Suny and her 8-year-old son Angelo suffered almost six months of unnecessary detention at Dilley before she was granted relief by an Immigration Judge. Suny fled Honduras in January 2015 with her husband and her son after being persecuted for her vocal denouncements of police corruption, abuses and impunity. Her mother had also been an outspoken critic of police corruption and was murdered in 2006. Suny was also vocal at Dilley in her criticism of DHS and CCA practices.

Her son Angelo was scarred by the persecution his mother was receiving in Honduras.  He was inside their home when his mother was beaten by a police officer just outside. After the attack, he saw his mother with injuries and was deeply upset. Seeing her crying, he started crying himself and asking what was wrong. When Angelo himself was interviewed by an asylum officer, he stated that he is afraid of Honduras because "there is a lot of death" there. At age six, Angelo saw a dead body while staying with his grandparents.  He was evidently scarred by this experience, as the Asylum Officer during the interview noted how hard it was for him to discuss this incident, and how he laid his head on the desk when thinking about it.

Angelo's trauma was significantly exacerbated by his experiences in detention. Angelo was denied reunification with family members in the U.S. and nearly separated from his mother by ICE to be placed in Office of Refugee Resettlement (ORR) custody. An immigration judge ordered ICE three times to release Angelo from their custody to his aunt in the U.S. – first on March 12, 2015, then on April 9, 2015, and then on April 16, 2015. However, ICE inexplicably refused to release him directly to his aunt. Instead, on Saturday, April 4, 2015, with just thirty minutes notice to him and his mother, and no notice to his counsel, ICE tried to take Angelo from his mother and transfer him to what was described as an orphanage, i.e., the Office of Refugee Resettlement, for an indefinite period of time without providing any information on whether and when he might be released to his aunt.

When he heard that ICE was taking him away, Angelo began sobbing inconsolably. He could not
bear to be separated from his mother and taken to an unknown location with strangers for an
indefinite period of time. Shocked and distraught by the circumstances, Angelo and Suny chose
to stay together at the Dilley family detention center, instead of being separated indefinitely
without any guarantee that Angelo would eventually be released into his aunt's custody.

Angelo and Suny suffered terribly in detention. But on May 14, 2015, Suny won relief before an
Immigration Judge.

**Complainant 5: "Natalie"** Natalie fled with her 4-year-old son "David" after gang members
had threatened to kidnap her little boy if she could not meet their extortion demands. Natalie
sought safety with her U.S. citizen child in Texas and a lawful permanent resident (or "green
card") sister. Instead, ICE detained her for seven months with her son while he suffered
emotionally and received insufficient medical treatment for his eye condition, and while she
herself suffered untreated, undiagnosed continuous vaginal bleeding.

The Ph.D. clinical and forensic psychologist who evaluated Natalie and her son summarized the
combination of re-traumatization and new traumatization she experienced – the sense of
helplessness she felt at watching her son suffer bullying and being unable to obtain proper care
for his "lazy eye" condition, which needed surgery: "Now she wakens at night tormented by
painful images of the horrors she has experienced as well as from a sense of hopelessness and
despair at about the deterioration of her son's condition and her inability to take action on his
behalf."

The psychologist saw immediately that Natalie's prohibitively high bond had directly
contributed to her deteriorating mental state: "Since arriving at the Artesia center, she has grown
increasingly depressed and anxious, particularly after she was given a prohibitively high bond.
As their detention has continued for so many months, [she] is witnessing the progressive
deterioration of her son's emotional condition and feels a desperate level of frustration that she
cannot provide the security that he needs, nor get medical help for his strabismus."

Five months into her prolonged detention, the psychologist diagnosed Natalie with "Major
Depressive Disorder," "Post-Traumatic Stress Disorder," and Anxiety.

The psychologist further evaluated her 4-year-old son, David. She found that his anxiety was the
98th percentile compared to other boys his age and his depression is in the 95th percentile
compared to other boys his age. He also tested at 99th percentile for Post-Traumatic Stress
Disorder: "[Natalie] is witnessing the progressive deterioration of her son's emotional condition
and feels a desperate level of frustration that she cannot provide the security he needs, nor get
medical help for his strabismus." Furthermore, because of his eye, David "is the victim of
bullying by other children and is socially withdrawn. His severe emotional and social problems
put his cognitive functioning at risk as well."

Natalie and David were detained in early July 2014 and were not released until February 2015,
after the federal court injunction was issued in *R.I.L.R. v. Johnson* preventing DHS from
detaining mothers and children for the political purpose of deterring others from coming to the
U.S. When Natalie's attorney first met the family early in their detention at Artesia, David
always had a smile, never complained, and was always a good kid. By the week before

Thanksgiving 2014, the attorney could see he was changing. Natalie confirmed that David was crying at night, not eating, being very clingy. Then Natalie told her attorney something that broke her heart. When they were taken into Roswell to see the doctor, as they were leaving the detention center in the white ICE van, he said, "Look mom, we are leaving." Natalie was forced to explain to her 4-year-old that no, they were not being allowed to leave. Instead, they were transferred to Karnes a month later.

**Complainant 6: Melida** Melida and her 4-year-old daughter Estrella were detained for 11 months and 2 days. Estrella celebrated her fourth birthday at Artesia and spent roughly 20 percent of her young life in detention.

Melida also has a 10-year-old U.S. citizen daughter, a sister with a green card, and other U.S. citizen family and friends who were all waiting for her and Estrella in New York and willing to care for then while their case proceeds. Melida is terrified of returning to Guatemala, where the family of the gang member who was convicted of murdering her sister-in-law wants retribution.

Melida and Estrella suffered horribly in detention. Little Estrella was hospitalized for acute bronchitis and also suffered from acute pharyngitis, ear aches, fevers, diarrhea, and vomiting. Melida was diagnosed with PTSD, adjustment disorder with anxiety, and major depressive episode.

Then on May 15, 2015, the Dean of the University of Texas School of Social Work, Luis H. Zayas, personally evaluated Melida and Estrella. "The scientific literature is very uniform in its findings," he writes, on how detention – and experiencing their mother being detained – affects children. "Detention and child-rearing in prisons are major childhood traumatic stressors," he continues, "even under conditions of short or brief detentions." Science shows that such toxic stress has lifelong effects on the developing brain:

> *Adverse childhood experiences, such as trauma and detention, have detrimental effects on children's brain growth and neural development: childhood adversity increases the likelihood of psychopathy. Institutional rearing, that is, growing up in detention even for short periods of time – and particularly following the traumatic circumstances of migration – is one of the most adverse experiences for children. ... Stress under prolonged and intense conditions leads to structural and functional changes of some brain regions that are essential for self-regulation and other behaviors. As a result of the ongoing stress, despair and uncertainty of detention, children's brain development is compromised, impairing not just their intellectual and cognitive development but also contributing to the development of chronic illnesses that can last into adulthood.*

The psychological state of Melida and Estrella was especially dire. Estrella indicates "early childhood anxiety," Dean Zayas writes. "When asked to step outside while the examiner met with her mother, E- did so but returned within several minutes," Dean Zayas recounts. "She would not leave again even when urged by her mother. Estrella appeared anxious. Of note also is that when Melida spoke of the challenges of living in detention, Estrella was very keen in looking at her mother and showing a worried expression on her face."

Dean Zayas concludes:

> *The child is exquisitely attuned to her mother's emotional state. The fear of separation
> from her mother and the hypervigilance necessary to follow her mother's emotional
> moods are having corrosive social and emotional effects on Estrella.*

Melida herself "is extremely depressed" and is a suicide risk, Dean Zayas states. "While she
denied any tendency to act on her suicidal ideation, it was not a convincing or animated negation
and should give pause for the potential of a suicide attempt."

"It is my considered opinion that the continued detention of this child and her mother is
jeopardizing Estrella's developmental trajectory as well as Melida's capacity to provide adequate
parenting to her daughter," he writes, and explicitly recommends that both mother and child
should be released.

**Complainant 7: "Vilma"** Vilma has been detained with her 11-year-old daughter "Delmy" at
Berks for more than 10 months. Last month, Vilma discovered that Delmy had been sexually
abused by her ex-boyfriend. This news was completely devastating to Vilma, and she felt
extremely guilty that she had not been able to prevent it. She began to contemplate suicide. She
thought about hanging herself in the detention center bathroom. Instead of releasing Vilma and
Delmy to receive the help and safe surroundings they needed to heal, ICE refused to release them
and instead placed Vilma in solitary confinement, away from her daughter, for 3 straight days.

Vilma was first sexually abused at about age 8, by her father's cousin, who lived with her. Her
mother did not believe her. The abuse continued many years. She left at age 16 to escape the
abuse.

The father of her eldest child abused her physically and sexually and often tried to take her
daughter from her. The father of her two younger daughters was also abusive. For example, he
tried to choke her once while she was pregnant. After her second daughter was born, she did not
want any more children and began taking birth control pills. Her partner found out and labeled
her a "prostitute" and began raping her. When she later became pregnant, he publicly denied the
child was his and humiliated her.

"[Vilma] was very emotional throughout the interview," the licensed psychologist who
performed her evaluation explained. "At times, she was sobbing so hard that she had difficulty
speaking. She cried, wrung her hands and rubbed her forehead and neck repetitively during the
interview." The psychologist found her responses to be "indicative of severe depression."

The psychologist diagnosed Vilma with Post-Traumatic Stress Disorder as well as Recurrent and
Severe Major Depressive Disorder:

> *[Vilma] presents with a history of repeated trauma dating back to childhood, when she
> was the victim of sexual abuse by a family member. She went on to experience intimate
> partner violence by both of the fathers of her children. The cycle of abuse described by
> [Vilma] is, unfortunately, quite prevalent in victims of child sexual abuse. In fact, two out
> of three sexual abuse victims will be re-victimized. Specifically, child sexual abuse is also
> associated with rape and sexual victimization by a partner in adulthood. The experience*

*of repeated trauma and re-victimization increases feelings of shame and hopelessness, as endorsed by [Vilma].*

Moreover, the psychologist found that "[Vilma] is at extremely elevated risk for suicide, due to multiple factors, including her recent suicidal ideation and intent."

The psychologist concluded that Vilma is suffering from "serious and chronic mental health problems," and that "her detention likely exacerbates her mental health problems." The psychologist further concluded: "Given that her daughter may also be a victim of abuse, it is essential that [Vilma] receive the support she needs to heal, and to support her daughter's recovery as well."

On Friday, June 19, at 3 a.m. in the morning, Vilma and her daughter were pulled from their beds at Berks and wrongfully deported. In a rare move, a U.S. Court of Appeals judge has ordered ICE to immediately return the family to the United States. Vilma has pending proceedings before that court, and ICE's lawyer had assured the judge that they had no intention of deporting the family.

Earlier this year, Vilma had been one of the witnesses to the "institutional sexual assault" of a 19-year-old Honduran woman by a 40-year-old guard at the Berks detention center.

**Complainant 8: "Kira"** Kira and her four-year-old son "Luis" were detained for 5 months at Artesia Family Residential Center. Kira and her son fled Guatemala after suffering four years of horrific violence and constant threats at the hands of a powerful gang. The gang had previously targeted Kira's husband, "Andre," a deacon in the local church, for preaching his religious message of non-violence—in their eyes, a message of disloyalty and dissidence. Kira and Andre decided that he should flee to the United States in an attempt to save the family from harm. Immediately following Andre's escape, the gang began to persecute Kira. They threatened her with rape and murder, beat her face bloody on multiple occasions, threatened to cut her unborn child out of her belly, threatened to kidnap her son after he was born, and grabbed and held her son at knifepoint on multiple occasions. Kira went to the police for help twice, but they turned her away. Kira and her son fled to the United States in search of protection, but were instead detained.

A Ph.D. clinical and forensic psychologist diagnosed Kira with "very severe Post Traumatic Stress Disorder." The psychologist found that Kira was experiencing "very intensely" all five listed intrusive symptoms: unwanted thoughts and memories; distressing dreams of trauma; flashbacks; intense distress when reminded of events; physical reactions like palpitations or constricted breath.

The psychologist diagnosed Luis with "severe anxiety and depression." Luis's "condition has worsened physically and emotionally in the nearly five months that he and his mother have been in detention," the psychologist concluded:

> *[Luis] eats little and is losing weight. He has had a series of copious nosebleeds, the cause of which is still undiagnosed. He is socially withdrawn and keeps asking his*

*mother if they can leave this place. ... When his mother was emotional, he leaned against her as if to comfort her and reassure himself.*

Continued detention is "exacerbating her suffering and that of her young son." It is also putting Luis "at risk for lifelong emotional problems."  The psychologist recommended that Kira and Luis "be released from the Artesia center immediately and helped to reach a safe, supportive family environment."

**Complainant 9: "Olivia"** Olivia and her 3-year-old son were detained for over 3 months at the Artesia Family Residential Center. Olivia and her son fled Honduras to escape the violence perpetrated by her son's father. He repeatedly beat and raped her, sometimes twice a day and often in front of her son. The police did nothing to help Olivia and each time she tried to escape her abuser sent members of his gang to force her to return home. When her 3-year-old son interfered with his acts of abuse, Olivia's partner beat him with a belt and held a gun to his head before forcing the gun into Olivia's mouth.

Their detention had a detrimental impact on both of them. Her son would ask his mother if the ICE officer was going to shoot him when the ICE officer would reprimand him. His weight decreased dramatically throughout the time he was detained; he weighed 55 pounds when they left Honduras, and after a month in detention weighed 39 pounds. Olivia had nightmares and suffered from hair and weight loss.

Olivia was diagnosed with severe Post Traumatic Stress Disorder and Major Depressive Disorder in detention. One of the two psychologists who evaluated her concluded:

> *She has been repeatedly beaten and sexually violated. The beatings and sexual assaults became increasingly violent. The threats to her life were increasingly intense. ... She has profound shame about what has happened to her. She feels fear, horror, guilt and other trauma related emotions persistently. ... [She] is a profoundly traumatized young woman who has all the symptoms and more required to meet the criteria for a diagnosis of Post Traumatic Stress Disorder.*

Her son was diagnosed with Post Traumatic Stress disorder at age 3. His scores were above the 99th percentile for symptoms of Anxiety and Depression, and for post-traumatic symptoms in the Intrusive, Avoidant and Arousal/Reactive criterion clusters. "[He] also had a significantly high score for Sexual Concerns. This likely is another reaction to his traumatic witnessing of the repeated rape of his mother."

The second psychologist concluded: "[I]t is my opinion that both mother and son will continue deteriorating emotionally until they are in a safe family environment. [Olivia] is distraught to see her son becoming more anxious and depressed in spite of her best efforts to keep him happy."

**Complainant 10: Maria** Maria and her 9-year-old son "Daniel" were detained for 6 months at the Karnes County Residential Center. Maria and Daniel fled Honduras for the United States because of severe domestic violence that included the rape of Maria at knifepoint with Daniel

nearby. During their months in detention, Maria relied on her Christian faith to maintain hope and prayed constantly. Daniel lagged in school and regularly felt sick to his stomach.

In detention, Maria experienced "inconsolable crying, lack of appetite, headaches, extreme fear, and inability to sleep and to stay asleep." She shared with the counselor "the immense sadness and guilt she often feels about the abuse she has experienced."

Maria struggled to speak to her attorneys about the intimate violence she suffered. "I strongly believe she has been a victim and has survived severe domestic abuse," the licensed mental health counselor who evaluated Maria at Karnes concluded.

Throughout their session, Maria spoke of "her intense fear of her most recent ex-partner carrying out his threat of killing her for having him reported to the police, leaving him, and disobeying his threats." "In fact, leaving the abusive relationship considered the most dangerous part of domestic abuse," the counselor noted. "I fear that Ms. Lopez is in particular danger now that she has fled to the United States in an effort to escape her recent ex-partner and his abuse."

Young Daniel had witnessed many of the incidents of abuse and had been assaulted when he came to his mother's aid. A survivor of severe trauma in his own right, Daniel suffered further traumatization in detention. He "cries inconsolably, continues to have nightmares, has experienced enuresis and headaches, was set back a grade in school, and has ear pain." During his nightmares, he often cried out, "Let's go, don't leave me."

"[D]etention is related to negative and persistent mental health outcomes, including depression, PTSD, and anxiety," the counselor noted. "Detention is neither developmentally nor socially appropriate for children." The "controlling factor" of living in a detention center "leads to re-traumatization and intensifies fear in the survivor," she explained. This research was perfectly reflected in Daniel's case:

> [Daniel] specifically reported an inability to understand the reasons why they are locked up and cannot leave. [Daniel] expressed his immense sadness at seeing his friends leave the detention center and being left to wonder why he and his mother cannot leave.

"It is clear that [Daniel] needs therapeutic services related to the trauma he experienced and that detention impedes recovery for Ms. Lopez and her son," the counselor concluded.

*Conclusion*

The United Nations Committee on the Rights of the Child has found that "[t]he detention of a child because of their or their parent's migration status constitutes a child rights violation and always contravenes the principle of best interests of the child."[12] We urge your office to consider

---

[12] Recommendation 79, General Day of Discussion, 2012, *available at*: http://www2.ohchr.org/english/bodies/crc/docs/discussion2012/2012CRC_DGD-Childrens_Rights_InternationalMigration.pdf

the extensive evidence of the detrimental impact of detention on children and families, both internationally and in the current U.S. family detention context, as you investigate the attached complaints. These and similar cases so profoundly illustrate that the detention of children and their mothers in ICE's family detention facilities cannot be carried out humanely and without seriously damaging, potentially irreversibly, their health.


Respectfully submitted,

Karen Lucas
American Immigration Lawyers Association
klucas@aila.org

Katharina Obser
Women's Refugee Commission
katharinao@wrcommission.org

Beth Werlin
American Immigration Council
bwerlin@immcouncil.org

# EXHIBIT 101.2

July 27, 2015

Sarah Saldaña
Director
Immigration and Customs Enforcement
Department of Homeland Security
500 12th St., SW
Washington, D.C. 20536

Dear Director Saldaña:

The undersigned organizations, which jointly provide legal services to mothers and children detained in Dilley and Karnes, Texas, through the CARA Family Detention Pro Bono Project ("CARA"), write to raise urgent concerns regarding recent release practices at the South Texas Family Residential Facility in Dilley, Texas, and at the Karnes County Residential Center in Karnes City, Texas. We welcome your agency's recent announcement that Immigration and Customs Enforcement (ICE) "will generally not detain mothers with children, absent a threat to public safety or national security, if they have received a positive finding for credible or reasonable fear and the individual has provided a verifiable residential address." We note that the recent order with respect to the *Flores* settlement will impact most other cases and mandate their release, making the need for resolution of these issues all the more profound.

We are dismayed by the lack of transparency, and the coercion, disorganization, and confusion surrounding recent releases, as well as with the lack of support and information provided to families before they leave the facility. We also are deeply disturbed by recent ICE actions that undermine the right to counsel. Our organizations continue to urge the Administration to end family detention altogether. Until such time, however, it is critical that the following troubling practices be remedied.

The following are practices that CARA volunteers have observed over the past weeks:

- **Coercive Tactics Surrounding Use of Ankle Monitors/Deprivation of Access to Counsel:**  Over the past week at Dilley, ICE has used coercive tactics to persuade women to accept ankle monitors.  Specifically, ICE has summoned women to "court" appointments using post-it notes instructing them, "Ir a Corte" (Go to Court) within thirty minutes (see post-it note attached). The women have no idea why they are being summoned. Once inside the Executive Office for Immigration Review (EOIR) courtroom trailer, ICE officers told the women ankle monitors were a condition for release. For the women who had their bond reviewed and lowered by immigration judges, ICE officers proclaimed that the immigration judges' word has no value. We do not understand the authority that ICE has to issue ankle monitors after an immigration judge has reviewed and set the bond. The Miami Immigration Judges have been similarly perplexed, as authority to change the terms of the bond lies with the court via a motion for re-determination based on changed circumstances or with the Board of Immigration Appeals via an appeal. While ICE can offer terms less restrictive than the immigration judge's order, anything more restrictive is firmly within the purview of the courts.

1

**Exhibit 101.2 - page 375**

One woman represented by CARA reported that ICE gave her a choice between wearing an ankle monitor without paying any bond and wearing a monitor after paying a $1,500 bond. Although she asked to speak with her lawyer, ICE specifically denied her request. CARA is aware of at least one other woman who signed an ankle monitor agreement under duress after being denied access to counsel under nearly identical circumstances. In a third case, a CARA client's uncle attempted to pay her bond in New York, in accordance with an immigration judge's order, but ICE refused to accept payment because she had not yet received an ankle monitor.

- **Intimidation.**  Mothers at Dilley also have experienced intimidation as a result of speaking with counsel about their ankle monitors. One terrified CARA client reported that, on the night of July 23, 2015, at about 9:00 pm CST, officials went room-to-room wanting to know the names of the mothers who told CARA about the problems with the ankle monitors. These officials emphasized that they wanted the mothers' names. The client reported that the angry officials told the mothers that lawyers have nothing to do with this matter.

- **Clarity of Instructions**: The Refugee and Immigrant Center for Education and Legal Services ("RAICES") sends volunteers to the San Antonio bus station to conduct exit interviews with families following their release from detention. These interviews have revealed that many of the mothers do not understand the terms of their release. Although most of the women speak Spanish or indigenous languages, the documents that they receive upon release primarily are in English; reporting requirements and other conditions of release are buried in these documents. Consequently, the mothers have many questions about how their ankle monitors function, including how to charge them on a long bus ride and what will happen if they are unable to charge them for reasons outside of their control. Some mothers have indicated that they tried to ask their deportation officers these questions, but did not receive satisfactory answers.

- **Pre-Release Orientations:** ICE has not yet responded to CARA's request at Dilley to provide daily, brief presentations to groups of women shortly prior to their release.  The purpose of such presentations would be to explain reporting obligations, the importance of appearing for all scheduled appearances, the need to file an asylum application in advance of the one-year filing deadline, the individuals' rights and obligations, and how to connect with pro bono attorneys in their cities of destination. We believe these presentations will be an effective means of providing this information, especially given that CARA has established itself as a source trusted by the detainees. ICE's failure to allow this service, particularly combined with the poor information provided to those being released, decreases the likelihood that mothers will understand the next steps with EOIR and ICE Enforcement and Removal Operations (ERO), thus rendering them unable to comply with their reporting requirements and appear for their hearings. In short, ICE's refusal for CARA to offer pre-release orientations sets up the women for failure.

- **Timing and Other Circumstances of Release**: Mothers (and/or their sponsors) have routinely been given inaccurate information about how and when they would be released. One mother detained at Dilley, who is a native Caqchiquel speaker, has now had to

**Exhibit 101.2 - page 376**

purchase her third bus ticket because her family did not receive accurate information on when she would be released and what kind of ticket to buy. Several other mothers have missed, or are concerned about missing, flights and buses for which they already purchased tickets, adding considerable stress. Additionally, mothers and children have been dropped off at desolate bus stations in the middle of the night; a context reminiscent of situations where many of them were previously the victims of violence in their home countries.

We also have heard reports that ICE plans to maintain a presence at the bus station. Last week, an ICE agent attempted to force a mother and her children to return to Karnes after missing their bus, resulting in much confusion for volunteers, the mother, and her crying children. If ICE does indeed plan to have a presence at the bus station, ICE should coordinate with volunteers to ensure access to counsel, proper interpretation for families, and the ability for families who may miss their buses to stay with community based organizations rather than return to the detention facilities at unnecessary tax-payer expense.

- **Delays in Referring, Serving, and Filing Triggering Documents in Credible and Reasonable Fear Proceedings**: CARA has notified both ERO and the asylum office of several mothers who have been waiting more than two weeks for their initial fear interviews or to hear what decision the asylum office has rendered in their case. The asylum office reports that the problem appears to be delays in ERO's referral of fear claimants to the asylum office for an interview and service to detainees of the asylum office's decisions. In addition, CARA also has seen mothers who, after passing their credible or reasonable fear interviews, have then had to wait an additional two to three weeks to learn the date of their first scheduled master/bond hearing. The immigration court cannot schedule a hearing for an individual until ERO files the Notice to Appear (NTA) with the court to start the process, and we are concerned that this is not happening in a timely manner in these cases.

- **Access to Counsel in Bond Hearings:**  CARA volunteers report troubling instances of interference with access to counsel prior to bond hearings. Each morning bond hearings commence at 8 am CST. Previously, Corrections Corporation of America (CCA) guards called all the women scheduled on the docket to court by 7:15 am, and CARA attorneys were able to meet with their clients in the court waiting room to prepare for their hearings. On the morning of July 24, 2015, however, CCA and ICE locked the attorneys out of the courtroom, informing them that they could not enter until the hearings began. At 7:55 am CCA finally permitted the attorneys to meet with their clients. When a CARA attorney informed the presiding immigration judge that she had been denied access to her clients and needed time to prepare, the immigration judge pushed all of the hearings back by an hour. This type of interference with the attorney-counsel relationship wastes both judicial and pro bono resources.

- **Other Access to Counsel Concerns:**  CCA has further restricted access to counsel by prohibiting attorneys and other legal volunteers from using lockers in the security area of the facility to store their cell phones. Instead, legal staff must return to their cars in the

3

**Exhibit 101.2 - page 377**

parking lot to make calls and then undergo an additional security check upon re-entering the facility. There is no reasonable basis for this restriction, and it is a waste of time and resources that undermines the pro-bono efforts to provide representation. In addition, given the summer and overall heat in South Texas, leaving phones in a car means that that they may malfunction or be destroyed.

We have also witnessed troubling instances where legal personnel were denied to the facility without valid explanation. On July 24, 2015, psychologists who were previously pre-cleared for entry into the facility and whose examinations of the women were essential to establishing claims for protection were abruptly and without notice refused entry into the facility. That same day, in the afternoon, an attorney who has been zealous in his representation of his clients was removed from the facility while in the midst of a client interview and without explanation, and denied further admittance. This is not the first time we have confronted such an issue. In May of 2015, support personnel who had been cleared to enter other facilities, including Karnes and the west wing of the White House, were denied admission to Dilley for a time, again without reasonable explanation.

- **Release Criteria**: Secretary Johnson's directive, issued on July 13, 2015, indicates that women who have received a positive credible or reasonable fear determination and have a willing sponsor in the United States will be eligible for release. However, we are concerned with the false requirement that women have a U.S. citizen or lawful permanent resident sponsor. No specific immigration status should be required for a sponsor. Not allowing women to provide the name and address of the most appropriate sponsor undermines ICE's interest in tracking where women will actually live upon release and ensuring court appearances and may undermine the safety of women and their children.

  Moreover, CARA is aware of at least three cases at Dilley where women passed either a credible or reasonable fear interview, but remain in detention while the Board of Immigration Appeals reviews their cases. To date, these women have been detained for between five and seven months.  Psychiatrists have found that two of these women and their children are suffering from Post-Traumatic Stress Disorder.

- **Terms of Release:** There is no transparency or consistency regarding how ICE sets bond amounts, why certain individuals are required to pay a bond in addition to an ankle monitor, and why restrictive forms of supervision like ankle monitors are necessary to mitigate a particular flight risk. Based on information we have obtained from DHS officials at liaison meetings, we understand that ICE generally will be releasing families on alternatives to detention and that bonds are not appropriate—yet, as discussed more below, this does not seem to the be the practice on the ground.  Further, officials have indicated that the conditions will be eased over time (e.g., that ankle monitors may be removed at some point in the process). In advising clients before release from the facilities, it is important to know how long women released on ankle monitors must comply with reporting requirements before ICE will consider using alternative forms of supervision. We urge ICE to clarify the policy and to consider removal of the ankle monitor once a woman has demonstrated her compliance with reporting by appearing at the ERO office of relocation for the first time.

4

**Exhibit 101.2 - page 377**

At a minimum, we urge ICE to take the following steps immediately to remedy the problems
described above:

- Ensure that anyone who is eligible for release (either under the Secretary's directive or in
  accordance with *Flores*) indeed is released, and in an orderly and timely manner.

- Ensure that ICE make immediate referrals to the asylum office in each case where a
  mother expresses fear or indicates a desire to apply for asylum. Ensure that ICE promptly
  issues Notices to Appear after a credible or reasonable fear finding, and works in
  conjunction with the Executive Office of Immigration Review to file in the appropriate
  venue to facilitate the timely filing of the I-589 and efficient processing of the case.

- Respect that right to counsel, which is of paramount importance. ICE and CCA personnel
  must not interfere with this right and requests by individuals to talk to a lawyer should be
  facilitated immediately. Likewise, and deriving from the right to counsel, zealous
  representation is a professional obligation to which attorneys must adhere and such
  representation should not be negatively interpreted by ICE or CCA.

- Inform legal services providers about the agency's release plan, including the specific
  criteria being used to determine eligibility for release and appropriate conditions of
  release, as well as the logistics, including time of day, by which women and their children
  will be released. Women and children should be dropped off at the bus station only
  during daylight hours, and ICE should consider bus and airline schedules to prevent
  women from unnecessarily missing buses and flights for which they have purchased
  tickets.

- Permit CARA staff and volunteers to provide pre-release group presentations at the
  facility chapel, with indigenous language interpretation services.

- Provide accurate, clear, and complete information on applicable conditions of release to
  each woman in a language that she understands.  This should include an E-33 Change of
  Address Form, instructions on how to both lodge and formally file an I-589 asylum
  application, information on exactly when and where a woman must report to ICE, as well
  as information, if applicable, on the operation and obligations associated with ankle
  monitors.  Where necessary, ICE should provide Spanish and/or indigenous language
  interpretation and translation of any written materials that are distributed.

- Refrain from opposing motions to reopen any *in absentia* orders that result from the
  circumstances of the releases that have taken place before the release practices outlined
  above are instituted.

- Stipulate that asylum applications not filed within the one-year filing deadline are timely
  filed for those mothers who did not benefit from a CARA project Pre-Release Orientation
  and specific, clear instructions from ICE as to how and when the asylum application must
  be filed to preserve the filing deadline.

5

**Exhibit 101.2 - page 378**

While improvements to release procedures will certainly mitigate the harm resulting from the problems described above, we reiterate our call for an end to family detention. The chaos that currently surrounds the release of women and children from Dilley exemplifies the reasons that the government is not equipped to detain families.

We would welcome the opportunity to meet with you to implement these recommendations.

Sincerely,

Crystal Williams
American Immigration Lawyers Association

Ben Johnson
American Immigration Council

Jeanne Atkinson
Catholic Legal Immigration Network, Inc.

Jonathan Ryan
Refugee and Immigrant Center for Education and Legal Services

cc:     Leon Rodriguez
        Megan Mack
        Juan Osuna

6

**Exhibit 101.2 - page 379**

# EXHIBIT 102

## DECLARATION OF KATHERINE J. PARK

I, Katherine J. Park, Esq., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. My name is Katherine Jina Park.  I am an Immigrant Justice Corps fellow and I am an attorney licensed to practice law in the state of New York since March 2015.  I am working as a volunteer attorney at the Karnes and Dilley detention centers for the period August 3, 2015–August 14, 2015.  During the period from Monday, August 3, 2015 to Tuesday, August 11, 2015, I visited the South Texas Family Residential Center ("Dilley") in Dilley, Texas five times and the Karnes County Residential Center ("Karnes") in Karnes, Texas two times.

2. On Monday, August 3, 2015, I appeared on behalf of approximately ten mothers of Flores class members in bond and/or master calendar hearings at Dilley. ICE had set high bonds that the mothers were simply unable to post. It was not apparent from my interviews with these mothers that ICE had even determined how much the mothers could actually post in order to be released on a bond. After I presented information that these women did not pose substantial flight risks, the Immigration Judge lowered the ICE bonds by at least fifty percent in nearly every case I handled that morning.

3. One of the detained mothers I represented on August 3, 2015 could not move forward on her request for bond because ICE had not issued a Notice to Appear to her even though a Judge had vacated her negative credible fear determination more than ten days earlier. By this time, ICE had already detained this mother and her three class member children, ages three, eight, and eleven, for approximately two months. During the week of August 3, 2015–August 7, 2015, I met several other mothers in similar situations who had been detained on average for two months.

4. While I was at Dilley, I routinely experienced long delays while trying to meet and prepare my clients for critical steps in their immigration proceedings.  For example, on the afternoon of Wednesday, August 5, 2015, I went to Dilley to prepare a mother and her Flores class member child for an Immigration Judge review of a negative credible fear finding.  My clients had a court date the following morning on Thursday, August 6, 2015. In order to learn more about the facts of the case and prepare the clients for the hearing, I planned to spend several hours with them.  After submitting my request to see my clients at approximately 2:30 p.m., *I waited between four and five hours to meet with my clients*.  I checked in with visitation officers two or three times to ask about the whereabouts of my clients.  By the time that my interpreter and I got into an interview room with our clients, it was approximately 7:00 p.m.  Because the visitation room at Dilley closes at 8:00 p.m., I had less than an hour to meet with my clients, learn more facts about their claims, orient them about the upcoming hearing, and prepare them for their court date. No one at the facility provided any good reason for these extremely long delays that adversely impacted my ability to represent my clients.

1

**Exhibit 102 - page 380**

5.  I was not the only attorney who experienced long delays while waiting for clients.  I
    observed my colleague another fellow with the Immigrant Justice Corps, Gloria Chacon,
    wait for approximately three hours on Wednesday, August 5, 2015 in order to meet with
    her clients.  Ms. Chacon checked with visitation officers a number of times to ask about
    the whereabouts of her clients but did not receive any satisfactory answers.

6.  On Tuesday, August 11, 2015, I visited Karnes to try to meet with detained mothers and
    children.  ICE had set bond at $8,500 for two of the women. Neither woman had
    undergone a Credible Fear Interview, but ICE had issued a Notice to Appear for at least
    one of those women. In other words, ICE had exercised its discretion to issue this woman
    a Notice to Appear in removal proceedings, she was eligible for release from custody as
    is any other immigrant in ICE detention if they're not a flight risk or danger, yet ICE set
    her bonds at $8,500, effectively continuing their detention and the detention of their
    Flores class member children for no apparent rational reason whatsoever. ICE of course
    is not releasing Flores class members unless and until the agency releases their mothers.

Executed on the 12th day of August, 2015 at San Antonio, Texas.


Katherine J. Park

**Exhibit 102 - page 381**

# EXHIBIT 103

## DECLARATION OF KIMBERLY HUNTER

I, Kimberly Hunter, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my recollection:

1. I am an attorney licensed to practice in Minnesota since 1993.  My state bar number is 0238880.  For the past thirteen years, I have practiced immigration law exclusively, with a focus on deportation defense, asylum, and family cases.  I operate my own small private practice.

2. I traveled to Artesia, New Mexico at my own expense in July and September of 2014 to provide pro bono legal services to the women and children in custody there.  I also traveled to Denver to represent an Artesia detainee at her final asylum hearing (via video connection) in October 2014.  I have made four trips to the South Texas Family Residential Center in Dilley, Texas ("Dilley") to provide pro bono legal assistance to detained families.  I made three trips during March/April of this year, and my most recent trip was at the end of July.  For two of those four trips, my expenses were reimbursed all or in part through fundraising and assistance from non-profit organizations.  I also brought my Legal Assistant, Caroline Brown, on my most recent trip to Dilley.

3. My problems with accessing clients literally started on the first date that I attempted to enter the Dilley detention camp (March 28, 2015).  My colleague, Adele Franzblau and I, attempted to enter on a Saturday afternoon to do a "short shift" before the rest of our volunteer team arrived the next day.  Although there is no "pre-clearance" policy for attorneys to enter the secured camp, a Corrections Corporation of America (CCA)[1] employee initially informed us that we could not enter because we were not "on the list"

---

[1] CCA is the for-profit company with whom Immigration and Customs Enforcement have contracted to run the Dilley family detention facility.

**Exhibit 103 - page 382**

of individuals who were pre-cleared for the upcoming week.  We explained that while we understood CCA's policy was to pre-clear legal assistants, there was (and is) no such requirement for attorneys.  The CCA employee then asked for our bar cards, though Adele is licensed in a state that does not provide them.  However, even if her state issued cards, it would not have made a difference because the employee "did not recognize" my card - since it did not match the cards he had seen previously, which are from Texas.  After we insisted that he call for a second opinion, he did make a call, where we could hear his side of the conversation, where he reiterated that my bar card - again, from Minnesota - did not match those he had previously seen.  Though we asked him if we could please ask the person he had called to come to security, he refused, stating that whomever he had spoken with had backed him up.  We then asked him to call Immigration and Customs Enforcement, but he refused, stating the matter was over.  I called two cell phone numbers that I had been given by the outgoing volunteer team for ICE officials, and left messages at both, which were not returned.  Adele and I waiting for another 30-45 minutes after I made these calls before giving up and retreating to the hotel.  I estimate that had we been allowed into the facility that day, we could have seen at least 12, and possibly as many as 30 clients.

4. Because the CARA Family Detention Pro Bono Project[2] did not yet have staff in place, my role that week was to serve as "team lead," coordinating the work of a team of ten attorneys and legal assistants.  After working with an incredibly slow portable scanner that seriously impaired our efficiency in opening files and serving clients, I specifically

---

[2] The CARA Family Detention Pro Bono Project is comprised of four partners organizations -- Catholic Legal Immigration Network, Inc., the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association – who provide pro bono representation to children and mothers detained at Dilley.

**Exhibit 103 - page 383**

requested permission from Officer Longoria, then the SDO (which I believe stands for Supervisory Deportation Officer) to bring in a new combination printer/scanner. I also requested permission to store the scanner in the locked closet space where CARA was already storing the inefficient portable scanner and some legal reference materials. Officer Longoria denied my request to store the printer/scanner onsite, but stated we could bring in a new one, with the only caveat being that we had to bring it in to the facility and take it out each day. We proceeded to purchase a new printer/scanner, only to be told after a few days that it was "too big," because equipment was limited to a much smaller specific dimension, and denied the opportunity to continue using it. The printer/scanner is now part of the equipment in the CARA office at the detention camp, so the limitation regarding size was apparently lifted at some later point.

5. I attempted to bring in a container of almonds one day (as it was impractical to try to break for lunch outside the facility - because the security process was lengthy and ever-changing, one could not count on their ability to be back inside at a particular time for a scheduled court hearing or asylum office interview). The container of almonds had a plastic lid, paper sides, and a metallic bottom. I was instructed to put the container in a locker at security because "metal is not allowed" inside. I also had a travel-sized container of aspirin (with no more than 10 tablets), and had to leave the aspirin in a locker "because only 2 tablets are allowed."

6. The CARA volunteer team experienced significant periods of low productivity around the two-hour windows for lunch and dinner. Although the facility held approximately 600 people in total at that time and "residents" are entitled to bring their lunch with them (or have lunch brought to them for meetings), CCA staff consistently informed us that the

**Exhibit 103 - page 384**

particular clients we had put on our visiting lists could not be located.  These practices also significantly impaired our ability to effectively and efficiently represent our clients.

7.  During that weeklong trip I met two women who became my clients for their individual hearings.  The first, D from Guatemala, was nineteen years old, unable to write beyond her name, and her first language was Quiche.  However, D also had some functional Spanish skills.  Because of her comparatively good Spanish abilities, she was the de facto interpreter for all the Quiche women in Dilley.  Whenever one of her compatriots had a meeting with CARA attorneys, D was there to interpret because there were no other options available.  The court holds hearings for indigenous languages just one day per week -- on Wednesdays -- and if a particular interpreter is not available, the hearing is postponed until the next week.  The lack of indigenous language interpreters not only leads to significant court delays, but means that many of the women imprisoned at Dilley cannot communicate with *any* officials or medical staff.

8.  When I first met D, she had been detained for over two months with her three-year old son.  She had passed a credible fear interview, but was stuck because she was unable to complete the asylum form.  Further, she had no family in the U.S. and her friends could not afford to post bond. We completed the form together, and she was granted asylum at her hearing at the end of April 2015 - after more than three months in detention.

9.  I should note that during the early stages of the CARA Pro Bono Project, the decision was made not to offer individual representation to women through their final hearing. The reason for that decision was the sheer size of Dilley, which is approximately four times that of Artesia. At Dilley, the mothers who are detained the longest tend to fall into two categories: women who are in "withholding only" proceedings, and women who speak

**Exhibit 103 - page 385**

indigenous languages. ICE had previously taken the position that women who are in withholding only proceedings are not eligible for any form of release, and indigenous language speakers have multiple barriers to even filling out the asylum application form thereby prolonging their detention. Therefore, while individual volunteers who are part of the CARA Project have taken on individual representation of some families, it is simply beyond the project's capacity to offer individual representation through final hearings to all families.

10. I also represented J, a Honduran woman with a history of serious domestic abuse from two partners. When I first met J, she exhibited the classic "flat affect" indicative of trauma - she was completely emotionless, and told me she had given up - she was ready to sign for her deportation at her next master hearing. I asked her whether she would stay if CARA could find counsel for her, and secure her hearing by the end of the month. She agreed. J. was scheduled for an individual hearing at the end of April 2015.

11. The day before J's individual hearing date, she was notified by ICE that she was being released on parole as an arriving alien. I will note that previous colleagues and I had spoken with ICE in an effort to secure her release since, as an arriving alien she had presented herself at the border and made her asylum request. Prior to the family detention surge in 2014, arriving aliens who made fear claims were routinely paroled from custody. However, this was not the practice that was being employed at either Artesia or Dilley until this particular point in time.

12. Although I informed ICE officials that I would be taking J and her daughter to the bus station in San Antonio, there were delays in securing her release as ICE officials initially indicated they would not release her to me. Further, ICE also required proof of onward

**Exhibit 103 - page 386**

bus tickets before they would release J from Dilley.  That afternoon, J and her daughter were in fact released to me and I drove them to the bus station in San Antonio. When we arrived, there were three other women with their children waiting for buses who had been dropped off by ICE officials earlier in the day. When I went to assist J with checking in for her reservation, we discovered that her aunt had only purchased a ticket for J, and not her daughter. This failure to confirm tickets for both J and her daughter illustrates just one of the many problems CARA volunteers have experienced with ICE's "safe release plan" requirements. Though proof of onward travel is not required in any other ICE custody setting that I am aware of, ICE officials will not release mothers and children without onward travel plans. This is the case even though CARA volunteers have access to a church sponsored home in San Antonio where the mothers and children can stay for free, secure food and clothing, and make arrangements for onward travel free from the stress of incarceration.

13. I purchased a ticket for J's daughter, since her bus to Miami was leaving later that afternoon and I did not want her to have to wait another day.  In talking with the three other mothers who were waiting for their buses, I learned that none of them had any money or were given food upon their release from custody.  Each family had bus trips of one to three days ahead of them.  I divided up the cash I had among the women, depending upon the length of their upcoming journey.

14. I did not travel to Dilley again until July 22 of this year, when I brought my legal assistant Caroline Brown. Caroline and I experienced difficulties in accessing the facility and our clients on a daily basis during the six days we spent there. On July 22, we came to the facility immediately from our flight from Minnesota. We arrived in the late

**Exhibit 103 - page 387**

afternoon and I was wearing open toed shoes.  We were delayed in entering the facility because CCA questioned whether open toes shoes were allowed in the visitation trailer.

15. The next day, July 23, Caroline and I were delayed again upon entry due to the fact that we brought charging cords for our computers. The woman in security told us that though "our computers have been cleared," cords were not allowed. Caroline and I requested a locker, and I placed some extra cords in it, and proceeded to enter the facility with the cord that I needed in my bag. I was permitted to enter with both my computer and my iPad that day.  I also wore sandals that day, and upon entering visitation a CCA employee mentioned that "they are going to start enforcing the no open toed shoe rule."

16. On July 24, Caroline and I were stopped in security because I was told I could not bring in two electronic devices, meaning both my computer and my iPad. On that day, cords were apparently not an issue. I asked for clarification of this policy, and ICE's "compliance officer" came to security and reiterated that only one electronic device was allowed. I stated that I need to use my iPad as a hotspot, however, he was not persuaded and insisted that I lock it up for the day which I did. That date was also the first day that of a new policy that cell phones were not even allowed in lockers in security had taken effect. CCA claimed that the issue was a lack of locker space; however, this is nonsensical since lockers are available for iPads and cans of almonds.  It is not practical to leave a cell phone in one's car in the 100+ degree Texas heat; therefore, in order to check in with our offices or make calls, volunteers must leave the facility and return to their hotels in order to use their cell phones.  This in another unnecessary inefficiency which is detrimental to CARA's ability to effectively and efficiently serve a high volume

**Exhibit 103 - page 388**

of incarcerated mothers and their children, as well as recruit volunteers who leave their own practices behind while providing pro bono services.

17. Also on July 24, two staff from the CARA Project and I had informed ICE officials that we would be responsible for taking clients from the facility that evening. The night before, ICE officials had released families to us, and had stated they would call when the families were ready for pick-up which would be around 7:00 or 8:00 p.m. However, after CARA had not received a phone call by 10:00 on the 23rd, CARA Project staff attorney, Isabel Saavedra, and I drove to the detention center to check on the status of the clients. We were told that they had been ready to go since seven or eight o'clock, and they were brought out promptly. No officials offered any meaningful explanation as to why we had not been notified hours earlier that our clients were ready for release.

18. On July 24th, we informed visitation staff that we would not be leaving until we had secured our clients' release. After Isabel Saavedra, Aseem Mehta and I refused to leave when legal visitation closed at 8:00 p.m. the situation was escalated through several levels of CCA officers until one of them called the "assistant warden." She appeared sometime between 8:30 and 8:45, and insisted we had to move to security because that was where our clients would be released. We stated we were doing legal work, and needed to maintain access to our office equipment and space, particularly since CARA is supposed to have 24-hour access to it. The assistant warden threatened to call the police. Eventually, we agreed to move to the security trailer with the assistant warden's guarantee that she would also stay until our clients were released, which happened well after 9:00 p.m.

**Exhibit 103 - page 389**

19. On Saturday, July 25, Caroline and I entered the facility separately.  She entered in the morning and I came in the afternoon. I was stopped at security because I was again wearing open toed shoes. Several CCA employees gathered, including and employee from visitation who emphasized "(s)he's had been told" that open toed shoes were not permitted, and the assistant warden was eventually called.  I stated on multiple occasions that there is no closed toe shoe requirement in the Family Residential Standards; however, my comments were either ignored or ultimately the assistant warden and informed me that "we can set our own rules."  (I assumed that "we" meant CCA. The assistant warden eventually gave me "an exception" to enter for that day, since Caroline had been permitted to enter earlier wearing sandals. I was informed that under no circumstances would I be allowed back into the facility wearing open toed shoes. When I arrived the next day there was a handwritten sign taped over the window the sole portal style window in the front door reiterating the shoe policy. I would also note that on Monday, July 27 numerous DHS officials were touring Dilley from Washington DC, and the handwritten sign was been removed from the window.

20. In terms of specific client interactions, the sheer scale and persistency of medical problems, court delays, and problems with release itineraries were overwhelming. On July 23, I appeared in court to request an emergency bond hearing on behalf of a woman who had been detained since June 19, but did not have her credible fear interview until July 15.  She also had not seen or been scheduled to appear before the immigration judge, despite her positive credible fear result. During the five-week period spent in custody, her daughter lost over 11 pounds, going from 42 to 31 - one quarter of her body weight.

**Exhibit 103 - page 390**

Fortunately, the immigration judge ordered a low bond on July 24, and the family was released on Monday, July 27.

21. After receiving the judge's order for bond, on July 24, the same client came to legal visitation. She was very shaken up and angry. She told Caroline and me that an ICE officer whom she had not seen before came and retrieved her from her housing. Another woman went out of the housing unit with her so our client would not be alone with the ICE officer. The officer initially talked to her at a playground space, then took her to a room where they were alone (our client had told her friend it was ok for her to leave). The ICE officer asked our client how she was doing, and she told him she was not sleeping and her child was not eating. She also told him she was feeling better because she knew she was leaving first thing Monday morning, and her family would purchase plane tickets for her after they knew she was released. The officer told her that "if ICE hasn't called your family, you're not going anywhere." He also told her you "never know...anything can happen in 3-4 hours, they could take you out of here." While our client didn't understand who the officer meant by "they," the officer told her *not* to buy plane tickets because "you never know when you're going to get out." The officer told her he was going to look into what was going on and said "maybe I can help you." Cleaning staff then entered the room they were in and their meeting ended. Our client spent another sleepless night, fearful that she was being deported, before she met with us and we assured her we would help her family post bond and secure her release.

22. During the week we spent in Dilley, I estimate that I spoke with between 70 and 100 children. At least seventy percent of those children expect exhibited signs of respiratory distress, such as labored breathing, runny noses, and coughs. This was the case for these

**Exhibit 103 - page 391**

children regardless of whether they had just come from the Border Patrol's *hieleras*, or whether they had been in Dilley for more than a month.

23. Our client B-F[3] stands out in particular for having experienced serious issues with her sick child, failure to receive the *Orantes* advisals though she is a citizen El Salvador, and experiencing intimidation from ICE officials. Her declaration is attached to hereto as Exhibit A.

24. On Monday, July 27, I represented three women in bond hearings before the immigration court. The judge began the session asking for counsels' opinions on the effect of the *Flores* order. I stated that Judge Gee's decision affirmed the existing contract between DHS and the plaintiffs, meaning that children must be released under the least restrictive terms. The immigration judge ordered all three women released on conditional parole. One of those women was B-F, who had been previously ordered released on a $1500.00 bond, but her uncle was turned away by ICE officers when he attempted to pay it in New York. I cited the *Flores* decision and refusal to all her family member to post the prior bond as changed circumstances, and the judge agree to release B-F on parole.

25. At the end of the morning court session, I learned from my colleagues that N, the first client to be granted parole that day, was taken into a courtroom by ICE officers and placed on a GPS monitoring device – despite the judge's order, which did not call for such a condition – and taken to the bus station in San Antonio by 10:00 a.m. A motion to have the judge redetermine her GPS monitor is currently pending.

26. By 1:00 on July 27, CARA staff attorney Isabel Saavedra had notified ICE officials that CARA volunteers planned to take five families with us that evening: the remaining two

---

[3] B-F has granted permission to share her attached declaration for advocacy purposes.

**Exhibit 103 - page 392**

conditional parolees, two women whose families had posted bond, and a woman who had her individual hearing that afternoon (Isabel's notification regarding the final client was premised upon her winning relief, which she did).

27. I spoke with the only DO who answered his phone at approximately 4:20 in the afternoon, confirming the names and alien numbers of our five clients, and letting him know that we expected their release by 8:00. I also asked for an SDO to be sent over to visitation to confirm released timing; the DO told her he would send someone but no one came.

28. At 7:00 p.m. I informed the visitation staff that we would be staying in visitation again past 8:00 if our clients were not released by then. At a few minutes past 8:00, several CCA staff, including Captain Kimberly Johnson, confronted me, Caroline, and Aseem. They insisted we had to move to the security building.

29. Ms. Johnson told us that in order to meet clients in the visitation trailer after 8:00 p.m. we needed to submit a legal visitation list and have it approved by ICE in advance. Ms. Johnson threatened to call police if we didn't leave.   We explained that we have the right to meet with our clients 24 hours per day. Aseem proceeded to fill out a visitation list with our five clients' names on it. I offered that we would go to security and wait if we could use our laptops there; Ms. Johnson said we couldn't use our laptops in that area because "it's a rule." Aseem requested to see the written rule that Ms. Johnson referred to for clarification. Ms. Johnson refused to provide it. I told Ms. Johnson that we were doing legal work, and if she would not allow to use our laptops in the security area, then we needed to remain in visitation. Ms. Johnson demanded our first and last names and

**Exhibit 103 - page 393**

told us she would be calling the police.   I suggested she call ICE first but did not get a specific response from her.

30. Around 8:45 pm, ICE Officer Koby Williams came and spoke with us. He said that he didn't understand why our clients weren't released yet because he had signed for their release several hours earlier.  Captain Johnson proceeded to tell us, including ICE Officer Williams, that we all needed to leave. We explained that we would not leave until our clients were released. I also repeated our offer to take our computers to security, but Officer Johnson refused "because it's a rule."  We asked again for printed out rules and procedures, but Officer Johnson refused to provide us with any written documentation.

31. Officer Williams then took us to an office inside the intake trailer and near his office. Upon arrival in intake, we saw our clients assembled and waiting.  We waited in intake until about 9:15 p.m., when Officer Williams told us it was time to go.  He escorted us out of the building to the security trailer, and we expected our clients were coming with us.  When we asked why they weren't, he told us they were just waiting to be checked off a list by the (CCA) sergeant and that they would be out in 5-10 minutes. From then on, while we were waiting for the release of our clients in the security trailer, we were continuously told, "5-10 more minutes; we are just waiting for the sergeant."

32. At 9:45 pm, Aseem went to the front desk to ask to speak with Officer Williams.  The CCA employee at the desk said that Officer Williams had gone.  When Aseem asked how he knew that Officer Williams had left, the CCA employee told Aseem he didn't have to respond to him. Aseem demanded to be connected with Officer Williams over the phone. The CCA employee got out of his seat and approached Aseem until he was less than one foot away from him. Aseem asked the employee if the employee planned to touch him.

**Exhibit 103 - page 394**

The CCA official said he did not need to.  The CCA employee returned to his seat.  He
called back to Officer Williams at x86631 and told us they were still waiting for the
sergeant; it would only be another 5-10 minutes. He also said he would check on the
status and never got back to us.

33. As people started coming in for the 10:00 shift change, I asked two separate sergeants to
check the status of our clients.  Both said they would get back to us in 5-10 minutes, and
never returned.  At about 10:10, I asked a front desk employee to call for a sergeant; he
replied that they were in their nightly meeting and couldn't be disturbed.   Around 10:25
p.m., after more than one hour of waiting (after being told it would be another 5-
10 minutes over and over again) I went through the door from the security building
toward the legal trailer as other CCA workers passed through. The CCA worker behind
the desk yelled and ran after me.

34. When I entered visitation, one of the sergeants who had said he would check and be back
in 10 minutes (but had not done so), blocked me from going further than the entry/front
desk area of the trailer (which is before one can get to the CARA office).  I was
surrounded by multiple CCA employees.  I told the sergeant that we had been told our
clients would be released more than an hour ago, and we wanted to see them.  Captain
Johnson also appeared and was very agitated, and told me I was interfering with our
clients' release because "count" had not been cleared.  I asked why we were told that our
clients were ready if they were still subject to 'count' and she said she is the one in
charge of count and reiterated that I was delaying the process.   I told her there must be
some miscommunication between CCA and ICE, and that they should talk with each
other.  After a few minutes in the entryway, two ICE officers wearing black polo shirts

**Exhibit 103 - page 395**

were coming in and also told me I had to return to the security trailer.  I told them I was

not going to go without an explanation of where our clients were.  At about that time,

SDO Diaz (I believe this is his correct name and title) entered.  I agreed to follow him

back to security, where he also he was going to check on our clients and return in 5-10

minutes.  He left security, and when he returned, he did not explain the delay, but told us

it would be another 5-10 minutes.  We asked him to please check again, and when he

returned, our clients were finally behind him.  This was around 10:44 p.m.

35. There was another family in the waiting room who told Aseem, Caroline and me that they

had been waiting for their family member since 3 p.m. They had been called by ICE the

day before and told to pick their sister and her two children no later than 5:00 p.m. They

had driven four hours from Waco, and were planning to drive back that same night.

Ultimately, around 11:00 p.m., SDO Diaz confirmed with the family that their sister in

fact was NOT being released that night.  Despite the fact that they had literally waited for

eight hours and made repeated inquiries, the family did not learn that the release was not

happening until that point in time.


>

>

>

>

>

**Exhibit 103 - page 396**

Kimberly K. Hunter

Date

8-12-15

**Exhibit 103 - page 397**

# EXHIBIT 103.1

## DECLARATION OF BESSIA ASTRID FLORES MARQUEZ
### A 208-270-399

I, Bessia Astrid Flores Marquez, truth fully declare as follows under penalty of
perjury:

1. My name is Bessia Astrid Flores Marquez, I am 26 years-old, I am a citizen of
   El Salvador, and previously worked as a policewoman in El Salvador.

2. My daughter is named Katerin Maeylin Urbina Flores and she is 5 years old.

3. We entered the United States without documents on June 2, 2015 in McAllen,
   Texas. I encountered immigration officials within an hour of crossing the
   border. I didn't hide from them. When immigration officials shined a
   flashlight on us and told us to come here, we approached them.

4. They had us and the other women and children sit down in a line, and told us
   to wait until immigration came to pick us up.  They didn't ask me where I was
   from, and made no effort to differentiate us, they told us we were all going
   back to Honduras. Katerin looked at me and said: "Mom, are we from
   Honduras? "

5. They had us put all of our things in a bag, and told us once we got deported
   back to our country they would give it back.

6. They brought us to the detention center in McAllen, Texas in a van. It took
   about a few days for them to interview me. They didn't ask me what country I
   was from until the interview. I'm not exactly sure how much time passed
   because I couldn't tell the difference between night and day.

1

**Exhibit 103.1 - page 398**

7. We were sleeping on the dirt floor without a shower and the only food they gave us two pieces of frozen bread per day. Katerin didn't eat for the entire time we were in McAllen.

8. After a few days of detention at McAllen I had my screening interview with an immigration officer and that was the first time I was able to explain where I was from and the reasons why I came to the United States.  The immigration officer stated that he was going to pass my case on to an asylum officer.

9. After the interview I waited about twelve hours and then an immigration officer came and knocked on the door and called my name. The officer told me to sign a deportation order. I told him no, he slammed the door and left.

10. I waited a few more hours then immigration officers came and put me and other immigrants on a bus. They took us to a very cold room and had the children shower, but we the women didn't get to shower.  There were about 300 immigrants and they split us up into small rooms divided with sheets, there were about 50 immigrants per room.

11. When in the cold room Katerin got very sick with a fever and vomiting and wouldn't eat anything. The immigration officials took me to take her to the doctor. Katerin had an ear infection and a throat infection. The doctor gave Katerin 7 days worth of medication.

12. Two officials dressed in normal clothes came in with a list of about 50 names and told these immigrants to put on ADT ankle bracelets and have their family members book them travel plans. This was traumatic for me because I just kept sitting there wondering why my name wasn't being called and how the other immigrants were being picked to leave.

2

**Exhibit 103.1 - page 399**

13.  They said that everyone who was left was going to be taken to the corral. They put us on the bus and brought us to the South Texas Family Residential Facility in Dilley. We arrived here on June 6, 2015.

14. When we arrived in Dilley they gave us an orientation about the center, did a lice check, had us go shower, and went to find us clothes. We all had an opportunity to call our family and let them know where we were. We had about an entire day of intake and were then escorted to our rooms.

15.  After being escorted to our rooms, we were taken to a medical check. In the medical check I told the doctor about Katerin's medication, and that the immigration officials had turned it in to the center to administer. The doctor told me that she didn't need the medicine and had us leave back to our room. My daughter continued throwing up and getting sicker.

16. I took her to the clinic here at the facility and they told me she was sick from the heat and just needed to drink more and more water.

17. After 8 days of my daughter still being terribly sick we went to go see another doctor. She told me that my daughter still had a bad ear infection and that she was going to prescribe the same antibiotics again.

18. My daughter's condition didn't get any better, so another doctor came to see her. He was wearing a brown military uniform. He was really nice and showed me the infection in my daughter's ear. He compared both my daughter's ears and showed me how red, swollen, and bad the infection was in the left ear compared to the right. He said that all her past treatment didn't work because it wasn't indicated for the type of infection my daughter had, and that this was very serious because the ear infections are very close to the brain and can cause damage. He said the same infection that was in her ear was in her throat, and that's why she wasn't getting better. He prescribed a

3

**Exhibit 103.1 - page 400**

different medication, and my daughter got better. My daughter was terribly
sick for a total of about 20 days.

19. On June 25, 2015, I had my credible fear interview with an asylum officer. I
waited 7 days for an answer about my credible fear interview. On July 2, 2015
I got my positive result for my interview, and a $5,000 bond. I signed the
bond documents, but I checked the box that said I want the immigration
judge to review my bond.

20. I waited from July 2, 2015 to July 20, 2015 to have a judge review my bond. I
called the 1-800 number everyday to see if I had been scheduled for a bond
hearing with an immigration judge.

21. On July 14, 2015 after getting very anxious of not hearing anything, I wrote a
memo to my ICE Officer asking when I would find out about my hearing. I
didn't receive a written response from my officer until July 22, 2015, _after_ my
scheduled hearing. My court date was scheduled for July 20, 2015, I was only
made aware of my court date because the CARA attorney's called me for
preparation on Friday, July 17, 2015. If it weren't for the CARA attorneys, I
wouldn't have known about my court date.

22. On July 20, 2015, I had my bond review with the immigration judge. He set
my bond at $1,500, and my next hearing date for August 7, 2015 once I was
bonded out. I was told by an ICE officer to buy either a bus or plane ticket and
to send the ticket confirmation to trc.cda@ice.dhs.gov. I relayed this message
to my uncle, who bought our plane tickets.

23. On July 21, 2015, an ICE official came into my room to get me. All that the
officer told me was to go to court. When I got to the courtroom, there were
about ten women there and two ICE officials. The ICE officials said that we

4

**Exhibit 103.1 - page 401**

were going to leave the facility for free with ankle shackles. The ICE officials said "what we say is the authority; the judge's word has no value."

24. The meeting with ICE officials lasted about fifteen to twenty minutes. They had paperwork printed with all of our names, ready for us to sign. When the ICE officials tried to have me sign her paperwork, I raised my hand and asked about the bond the immigration judge had signed for me the day before and let them know that I had already been assigned a court date for when I got out of detention. The ICE officials responded that I did not need to pay the bond and that even if my uncle paid the $1,500 bond, I was going to leave this facility with an ankle bracelet and would wear one regardless. We were told that if we wanted to leave, we needed to sign the paperwork. I did not understand why if everyone was going to get an ankle bracelet anyways why my uncle would pay the bond, so I signed the paperwork.

25. I also told the ICE officials that my family had purchased a plane ticket for me for today at 5:00 pm and the officer said "no, you're all getting out Tuesday at 6:00." They said we would be getting out with an ankle bracelet because the facility was too saturated at this time. We lost the plane ticket.

26. The next day, July 22, 2015, I went to the visitation trailer to speak to the CARA Project pro bono attorneys. I told them that my family had purchased a plane ticket for me because ICE initially said I had to present a plane ticket with the paid bond in order to be released, but that we lost that plane ticket. I told the attorneys that ICE officials threatened and forced us to sign for the ankle bracelets even though the immigration judge had already lowered our bonds and we planned to pay the bond to be released.

27. That same day, July 22, 2015, my uncle, Gilberto Viera, went to the immigration office in New York at 6 am and attempted to pay my bond. My

5

**Exhibit 103.1 - page 402**

uncle was turned away and was told that she needed to take care of that where she was being detained.

28. On Thursday, July 24, 2015 around 9:00 pm two ICE officials came to room 233, my friend's room. The ICE officials asked my friend: "saben uds. de una mujer que dicen que tenía una fianza de $5,000 y el juez lo bajaron a $1,500? Ella se ha ido a ponerles quejas a las abogadas que no quiere ir con grillete" (Do you know a woman who had a $5,000 bond and the judge lowered it to $1,500? She has gone and complained to the attorneys that she does not want to go with an ankle monitor). Everyone told the officers that they didn't know.

29. I went to the bathroom around 9:15 pm and ran into my friend who the ICE officials talked with. My friend told me that she thought ICE officials were looking for me, and told me what had happened.

30. I went back to my room and told my roommate what was going on. She told me she saw the two ICE officials walking past. I was so scared. I didn't sleep the whole night because I thought ICE officials were going to come and get me, deport me, or never let me leave.

31. I have never seen any papers that include the name "Orantes." No U.S. government official has ever given me any information regarding any unique rights that I have as a citizen of El Salvador. I received a legal services list, but I don't know whether or not this is the same list that all detainees receive.

6

**Exhibit 103.1 - page 403**

32. This declaration was read to me in my native language, and I fully
    understand its contents.


_____        _____
Bessia Astrid Flores Marquez                Date

**Exhibit 103.1 - page 404**

# EXHIBIT 104

## <u>DECLARATION OF LAURA L. LICHTER, ESQ.</u>

I, Laura L. Lichter, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge:

1.       I am an attorney in private practice based in Denver, Colorado. Since my admission to the Colorado bar in 1994, I have practiced exclusively in the area of immigration and nationality law.  I have represented clients in immigration proceedings, including detained noncitizens, refugees and asylum seekers, for over 20 years.  I am a member of the Board of Governors and a Past President of the American Immigration Lawyers Association (AILA).

2.       Since July 2014, I have been heavily involved on a volunteer basis in the organization and leadership of the unprecedented efforts to provide pro bono legal services to women and children jailed by DHS, first in Artesia, New Mexico (prior to its closure), as well as Dilley and Karnes City, Texas.  In addition to training, mentoring and supervising legal volunteers and staff, I also have provided direct legal services on a pro bono basis for dozens, if not hundreds, of detained families related to case intakes, preparation and representation before the USCIS Asylum Office in credible and reasonable fear interviews, representation before the immigration courts and the Board of Immigration Appeals, as well as U.S. District and Circuit Courts of Appeal. Though I maintain that family detention is unlawful, inhumane and serves no legitimate purpose, I have also advocated for policy and operational changes to allow meaningful access to counsel, humane release policies, and the general amelioration of conditions of detention.

3.        Despite the marked drop in numbers of unaccompanied minors and families fleeing across the southern border, it was clear by late 2014 that DHS was committed not only to continuing, but actually to expanding family detention.  Though advocates had successfully fought to close the family detention facility in Artesia, New Mexico, the government began detaining families in Karnes City, Texas and constructed a new facility in Dillley, Texas that took capacity to over 3000 beds. In response, stakeholders committed to fighting the growing institutionalization of family detention came together to form the CARA Pro Bono Project. This group includes the Catholic Legal Immigration Network, the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services (RAICES), and the American Immigration Lawyers Association.

4.       I first visited the South Texas Family Detention Center, in Dilley, Texas the week of April 19, 2015.  I returned the weeks of May 12, May 26, and June 7.  My last trip to Dilley was July 24 to August 1, 2015, for a total of five week-long rotations. I am (reluctantly) contemplating yet another trip later this month if the question of family detention is not yet resolved. I have also sent associate attorneys from my office, under my direct supervision, for a week each; another second trip with an associate attorney and a paralegal is scheduled for the week of August 30.  Like other volunteers, I and other office staff have provided these services on a pro bono basis.

5.       Even when not in Dilley, I maintain constant communication with the CARA Project staff, legal volunteers and other stakeholders. I also serve as a point of contact for media, liaison, and stakeholders.  In addition, I monitor communications daily on internal list serves regarding

1

**Exhibit 104 - page 405**

trends and individual cases at both the Dilley and Karnes facilities, which include the input of over 500 volunteers and staff, though the majority of my in-person experience is in Dilley. This declaration is based on my own direct observations and personal experiences, as well as reports of incidents contemporaneously reported to me by volunteers and staff, including cases that I attempted to resolve and, where necessary, escalate with ICE, CCA and medical staff.

6.      Contrary to government assertions, the overwhelming majority of the women and children our volunteers see have not come to the United States as economic migrants, but instead fled their home countries for the perceived safety and protection we might offer.  It is extraordinarily rare for a volunteer to encounter a family without a defensible protection claim, and even rarer still for a family that is not seeking protection to have been detained.

7.      Even the government's own data consistently shows that the overwhelming majority of detained women and children are bona fide refugees with credible cases for protection.  For example, in recent months, approval rates for finding "credible fear" (where an applicant has established credibility in showing a significant possibility of qualifying for asylum) have hovered just under 90% of detainees; even for cases subject to the more rigorous standards of "reasonable fear" (related to the more restrictive relief of withholding of removal), the approval rate has been just under 80%. These numbers do not take into account that even more applicants have a negative finding vacated after further review by the immigration judge, and still more are successful with the assistance of project volunteers on requests for reinterview.  The most common bases for the refugee claims we continue to see involve sexual violence and forced sexual slavery by gangs; extreme domestic and/or family violence; targeting of individuals based on their sexual orientation; targeting of evangelicals by gangs; targeting of gang-resisters, and related claims.

8.      The South Texas Family Detention Center is located approximately 90 minutes from the San Antonio airport.  Few CARA volunteers are based in the San Antonio area, and the overwhelming majority fly in from out of state.  My personal travel from Denver has averaged over $400 in airfare per trip, or alternatively involves a 30+ hour round trip of approximately 2100 miles.  Generally, a vehicle is necessary to travel from San Antonio to Dilley (no direct bus or shuttle service), and to get around Dilley (no public transportation), averaging another $250-$300 in rental car fees and fuel for the week.  In addition to travel expenses, volunteers must also pay for hotel (approximately $500) and meals (another $200).

9.      Volunteers face a demanding week, both in terms of the hours they work and the sheer physical and emotional load of representing so many refugees under such challenging conditions. After arriving on Sunday afternoon, volunteers begin the week with several hours of legal training and facility/project orientation.  The rest of the week follows a set schedule:  arrival at the facility at 6:45 am to be able to make it through security in time to set up in the visitation trailer for asylum interviews scheduled at 7:30 am, court hearings beginning at 8:00 am and as many client visits as volunteers and staff can accommodate.  Volunteers generally work through the lunch hour, ending their day at the facility at 6:00 or 7:00 pm, sometimes later.  CARA staff and volunteers regroup in an evening meeting to review cases, discuss legal, media and advocacy strategy and review other challenges, which usually lasts until after 10 pm.  Volunteers often continue into the wee hours, preparing for hearings, researching legal questions, drafting pleadings or preparing applications or other requests for detainees.

**Exhibit 104 - page 406**

10.     The massive detention complex in Dilley—with a capacity of 2400—is run by the private, for-profit prison company, Corrections Corporation of America ("CCA").  Since April 2015, I saw the population of the detention center grow from a few hundred detainees to over 2000 women and children.  The number of legal volunteers fluctuates from a mere handful to over a dozen in a week; however, it has never been enough to meet the demand created by the number of women and children detained at that facility.

11.     During the weeks in May and June when CCA and ICE ramped up the capacity of the center, it was not unusual to hear that there were 80-100 new arrivals on an almost daily basis.  It was impossible to provide the needed level of legal services in the detention center for a variety of reasons.  The sheer number of new arrivals challenged our program's capacity to see new and existing clients.  We saw that the influx of detainees also compromised the facility, with detainees complaining that they had long lines for meals and medical care.  The increased numbers also overwhelmed the Asylum Office, with delays for interviews and decisions running into weeks, even months in some cases.

12.     Despite representations from both ICE and CCA that detainees had "free run" of the facility, we have consistently observed as well as heard from clients that both CCA employees and ICE officials routinely misinformed and misdirected detainees as to access to free legal services available through CARA volunteers.  Detainees consistently report to CARA staff and volunteers that they are told various incorrect "rules," such as that they are not allowed in the visitation trailer without an appointment; that they could not come to legal visitation unless they were summoned by a lawyer; or even at one point that they had to fill out a complicated and lengthy CCA-designed request form in triplicate, which many could not complete on their own or could not complete at all.

13.     At times, we have observed that the door of the visitation trailer—which was to be freely accessible by the detainees—was locked, contrary to the stated free access policy.  We also observed that CCA employees refused to get up to answer the locked door or admit detainees unless a person was extremely persistent, which was fairly rare.  Only after many complaints were we able to resolve the issues related to special forms and locked doors to the visitation trailer, but the other misinformation persists.  As of my last several visits, a CCA employee can be observed sitting only a few feet from the detainees' access door, physically blocking and routinely turning away women who cannot articulate their need to see an attorney or who appear without being on a list of some sort.

14.     Neither ICE nor CCA regularly or accurately advises detainees of the availability of free, on-site legal services. For new arrivals who are quarantined on entry to the facility (either because the existing population had some incidence of illness, such as varicella, or because the incoming cohort exhibited symptoms), it could be several days or even weeks before they became aware of the existence of legal services, usually by word of mouth from other detainees once they are admitted to the general population.

15.     For detainees whose primary language is an indigenous language, access to information is particularly limited and there is no meaningful access to legal help.  Although ICE and CCA state that they use language line telephonic interpreters, our clients consistently report that they must attempt to communicate in limited Spanish, via their children's limited but sometimes better Spanish, or through gestures.  None of our volunteers or staff speak indigenous languages and we have extraordinarily limited access to pro bono interpreters, making it nearly impossible

3

**Exhibit 104 - page 407**

for our volunteers to conduct intake, advise or represent families who primarily speak indigenous languages.

16.     Indigenous language speakers going through the credible fear or reasonable fear process are generally oriented in Spanish, and are encouraged to go through the interview process in Spanish in order to avoid lengthy delays.  This practice is in direct conflict with published USCIS guidance on rare languages requiring the Asylum Office to bypass the credible fear process and issue Notices to Appear if they cannot provide a suitable interpreter within 48 hours, but detainees are routinely not advised of this policy.  As a result, CARA volunteers have represented numerous indigenous women before the immigration courts and the Asylum Office to obtain review of negative findings resulting from a lack of access to counsel, lack of sufficient explanation of the process, failure to adequately explain the detainees' rights, and insufficient ability to adequately communicate a claim because of a lack of Spanish fluency.  In addition, these cases appear to be particularly vulnerable to delays (and more lengthy delays) as the families are unable to communicate their problems or access information, much less effectively advocate for their resolution.

17.     In the course of my work at Dilley over the last several months, I have observed that ICE has actively sought to discourage access to or even knowledge of the existence of free legal services.  In one incident, a nun noted that many of the women who sought her counsel were asking questions of a legal nature and were unaware of the existence of CARA's legal volunteers.  As a result, following religious services, she made an announcement informing the women that, if they had questions of a legal (as opposed to spiritual) nature, they could go to the visitation trailer to seek free legal help from CARA volunteers.  In response, she was summoned to a meeting with ICE officials who told her that she was not allowed to make such announcements and that to do so was a "conflict of interest."  She was told shortly thereafter by CCA that her contract was not being extended.

18.     Coinciding with the dramatic increase in new arrivals, in early June, CARA had begun to conduct small group orientations and advisals in order to leverage volunteer time and more efficiently and effectively advise clients on such common topics as how to prepare for an interview before the Asylum Office, how prepare for a bond hearings, and other standard processes.  CCA staff objected to these meetings, but CARA staff referred CCA management to the ICE Family Residential Standards showing that such meetings were not only allowed, but contemplated for legal service providers operating in the family detention setting.

19.     Shortly thereafter, CCA posted a notice stating that there was an occupancy limit of 60 people in the visitation trailer.  According to CCA staff and management, the posted limits— which appeared to have been hastily drafted on a personal computer as opposed to bearing any seal, reference, authority or citations typical of an "official" notice—would be strictly enforced based on the local "fire code."  In investigating this restriction, a volunteer, Pete Eikenberry, contacted the Dilley Fire Chief and was told "Dilley does not have a fire code."  The Fire Chief also noted to Mr. Eikenberry that, even if some version of a fire code applied, there was no one in Dilley nor even in Frio County, Texas (where Dilley is located) to enforce it.  CARA strenuously objected to the limitation (which, given the large size of the trailer, was baffling), citing impairment of the program's ability to see clients in a timely and efficient manner.  Nonetheless, CCA management continued to enforce this arbitrary limit.

4

Exhibit 104 - page 408

20.    For nearly two months, the 60 person limit severely restricted the ability of CARA to meet with and advise detainees, a fact of which both CCA and ICE were aware, but did nothing to ameliorate. The limit not only applied to detainees, but included all CCA staff (many of whom used the facility as a break or lunch area), the detainees' children (who generally accompany their mothers unless they are in "school" for a two hour period), as well as any ICE agents, CARA staff and volunteers, and other legal or family visitors. As a result, far fewer clients were allowed in the building and permitted to meet with volunteers—again, a fact that was repeatedly brought up to CCA and ICE for weeks without any result.

21.    Because of this arbitrary limit, detainees with urgent matters and appointments were routinely turned away and/or disallowed entrance to the trailer, and on occasion, clients were even forced to exit the trailer when ICE or CCA staff came in, even if the detainees were already meeting with or waiting to see an attorney.  Once a client left or was turned away, it often took hours for CCA staff to relocate the individual, with the result that the detainee might not return until the next day, if at all. After approximately two months of arbitrarily limiting the number of clients CARA volunteers could see, the capacity limit was recently raised to 135, again without explanation, citation, authority or other reference to an applicable fire code.

22.    As the number of detainees in the facility increased, CARA advised ICE that the number of private rooms provided for legal visitation was inadequate.  There are eight to ten private offices with phones (though the number fluctuates as CCA designates space for quarantined detainees).  There are an additional one to three private rooms without phones which are used for both regular and legal visitation, putting space at a premium.  The number of legal visitation rooms fluctuates with assignment and reassignment of space by CCA.  CARA legal volunteers are unable to bring in cell phones and are prohibited from using their laptops or other devices to make calls, making the need for access to rooms with a phone absolutely critical.  The existence of this restriction itself is baffling, as attorney cell phones were routinely allowed in the Artesia, New Mexico family detention center.

23.    When CARA staff approached ICE about increasing space for legal visitation, they were told such a request would not be approved, despite numerous public statements by DHS officials that the Department was committed to fostering and supporting access to legal services. On a daily basis, dozens of client interviews and interactions must be conducted in an open waiting area, in clear earshot of other detainees, CCA guards,  clients' children who may be roaming about the room, or anyone else in the area.  This is particularly troubling given that the substance of a many of the detainees' claims includes sexual and/or family violence, threats to children, violent incidents and other sensitive subjects.

24.    ICE routinely violates its own residential detention standards in ways that impede access to counsel and interfere with the attorney-client relationship.  For example, ICE requires all CARA volunteers to submit to a complete background check, despite the lack of any requirement for such screening.  CARA volunteers performing legal volunteer work have been arbitrarily refused entry, and even removed from the facility, preventing them from providing legal services.  ICE has also forcibly removed legal volunteers on various pretexts, and barred legal volunteers from the facility.  Other volunteers have been told they would not be allowed to enter to meet with clients or to attend court hearings, threatened with ejection, threatened with being banned from the facility, or even threatened with criminal prosecution for trespass and disorderly conduct simply for insisting that they be admitted to provide volunteer legal services.

5

**Exhibit 104 - page 409**

25.     I have personally been threatened by CCA staff, including CCA management, with being banned, ejected or subjected to criminal prosecution on multiple occasions for simply seeking admission to the facility with approved electronics.  On one occasion, I was threatened with removal from the facility, unspecified criminal charges, and even physically intimidated by a CCA guard while waiting in the nonsecure area of the public waiting room for clients who had yet to be released after winning their cases more than eight hours earlier.  On another occasion, I was held in the security trailer for over 45 minutes—while I was expected to have been in court representing multiple clients in bond proceedings—while CCA officers insisted that I could not come into the facility with more than a single electronic device (stating that I had to choose between my laptop and a tablet functioning as a hotspot to provide internet access).

26.     Both CCA and ICE are aware that all our client files and related documents are maintained in an online database, making a computer and internet access critical to court appearances.  The immigration judge, as well as ICE prosecutors, have computers and internet access in their courtrooms in Miami.  In a surreal twist, even though an ICE Supervisor ultimately allowed me to enter the facility with both my laptop and my tablet, the entire process was repeated less than 24 hours later, with a CCA employee stating "today is a new day" and that it didn't matter what ICE had said the day before.  On that occasion, while waiting in the security trailer for guidance from ICE, CCA Assistant Warden John Weaver directly threatened to have me removed and banned from the facility if I didn't "cut this out."  Despite multiple requests over many months to multiple individuals at ICE and CCA, including the warden, Janice Killian, no policies relating to legal visitation have ever been provided or posted in the facility.

27.     On multiple occasions, CCA guards prevented me from entering a public courtroom, even refusing to allow me to enter to talk with the immigration judges via the open televideo link.   Similarly, both CCA guards and a supervisory ICE officer tried to prevent me from using my computer in the court trailer because I was not "actively representing" the respondent in the court. I have also routinely been prevented from having brief conversations with clients prior to their hearings.  After complaining to an ICE supervisor, an attorney visitation room was provided.  That room has since been reallocated and once again, attorneys are not allowed to have even the briefest of conversations with their clients in advance of hearings without risking threats of expulsion and banishment from the facility.

28.     Detainees have no reliable way to receive important documents in support of bond or even their asylum cases other than email (for those that are familiar with and have access to computers) or fax to an ICE case officer.  Unfortunately, ICE officers routinely state they are unable to keep up with the documents sent to them for or on behalf of detainees.  As a result, ICE officers frequently tell detainees that they did either did not receive critical documents and/or refuse to provide copies of such documents to detainees, saying they do not have time to do so.

29.     CCA's management of the facility with regard to access by legal volunteers has been particularly troubling.  At times baldly hostile and harassing, at others, merely inconsistent or just plain incompetent, CCA employees' actions nearly always have the effect of impeding access by legal volunteers or interfering with client confidentiality or the attorney/client relationship.  For example, CCA (inconsistently) enforces an arbitrary dress code that is neither published nor posted and which, despite multiple requests, has not been provided to legal visitors.  At various times, CCA employees have: barred or attempted to bar legal volunteers for

**Exhibit 104 - page 410**

wearing underwire bras, open-toed shoes or sleeveless professional attire (despite CCA management being observed similarly dressed in the 104 degree heat); refused entry to a male volunteer who wore simple stud earrings; prevented volunteers from taking in burritos (because they were wrapped in aluminum foil), hand sanitizer (despite none being available in the facility), hand lotion, breath mints, headphones (because they were not an "authorized device"), or from taking in more than one "device" such as a computer or a hotspot.

30.     ICE, too, has consistently used arbitrary restrictions to impede legal services. Until recently, CARA volunteers had to bring in an entire law office daily, including files, paper forms and applications, office supplies, legal reference books, computers, printers, scanners, copiers and other items necessary to serve clients in the facility.  Volunteers would have to break it all down and remove the entire set up each night.  For several months, ICE prohibited CARA volunteers from bringing in standard business machines such as printers, scanners, copiers or all-in-one machines, citing "space limitations."  Despite the fact that full-size machines easily could (and previously did) pass through the metal detector and fit on office desks or tables in the visitation trailer, ICE limited machines to a specified shoebox size (which in turn meant that they were not rated for the heavy workload and routinely failed and required replacement).   Recently, a Pro Bono room was made available, though the facility refuses to honor the extended access hours necessitated by lengthy delays in releasing CARA clients from detention. A volunteer who sought to continue working in the pro bono room (where files, printers and other necessary items were located) until her clients were released was threatened with criminal charges and was notified three days ago that she has been banned from the facility because of accessing the pro bono room after (unposted, unpublished and nonexistent) visitation hours.  Notably, the key to the pro bono room which was presented to CARA is stamped with a notation of 24/7 access.

31.     For months, ICE and CCA refused to allow legal volunteers access to the detention center's public courtrooms, locking them out—and locking detainees in—unless the volunteer had formally entered an appearance in the case (most volunteers appear at the side of the detainee as a "Friend of the Court"); attempting to bar legal volunteers from using computers in the court trailer and courtrooms; barring legal volunteers from speaking with or meeting their clients prior to hearings; ordering legal volunteers to sit on a particular bench in a hallway, prohibiting contact with their clients, and barring entrance to the courtrooms; and breaking up attorney-client conferences taking place in the court trailer prior to or immediately after hearings.

32.     ICE has consistently, arbitrarily and deliberately restricted media access to the facilities. Journalists report that ICE routinely refused access, citing "staffing" issues and regularly denied requests for interviews with detainees or access to the courtrooms, stating that such requests required "weeks" of advance notice (despite clear rules to the contrary in the family residential standards).  Despite the immigration court being open to the public, ICE has attempted to restrict access by journalists wishing to attend hearings, telling them that such hearings were not public. I have personally overheard the ICE Public Information Officer state that she was denying access to a journalist seeking to visit the facility because "there's nothing in it for me."

33.     As part of screening cases, volunteers routinely ask about treatment by CBP officers, including screening for credible fear conditions.  Those responses, based on my interviews of individuals I have screened and/or represented, as well as the experiences of clients whose information was shared by other volunteer attorneys, routinely and consistently describe disturbing conduct by CBP officers and deplorable conditions in CBP custody.  Although some

**Exhibit 104 - page 411**

women described experiences with CBP going back more than five years, the experiences described applied equally to current and very recent past contact with CBP.

34.     As to the physical conditions of detention, women (including women traveling with children) related that during their detention by CBP (prior to being transferred to ICE custody or, in many cases, before being shackled and removed without an opportunity to pursue a protection claim) involved:  extreme cold (compounded by having had shoes and outerwear confiscated by CBP upon their detention, leaving them inadequately clothed for the temperature); filthy, unsanitary conditions in both processing areas and holding cells; little or no access to soap and often toilet paper in short supply; unsanitary toilets with toilet paper and human feces surrounding portable toilets in intake pens and built-in toilets in holding cells; lack of beds, bedding or any place to sleep; lights on 24/7; overcrowding; nowhere to sit or lie down other than on bare concrete benches or floors; being woken in the middle of the night simply "for fun" by guards banging on cell doors, laughing; being yelled at and even threatened with being kicked if lying on the floor; children and mothers having to sleep sitting up due to overcrowding; a lack of facilities to address basic hygiene, including no showers, no change of clothing or place to wash themselves or their clothing, no toothbrush or toothpaste; no comb or hairbrush; being fed cold, stale, and nearly inedible food, including food their children would not eat.

35.     CARA clients also routinely state that, while detained by CBP, they were either not informed of any legal rights or misinformed of their rights, or simply informed that they had no rights and that nothing would change the fact that they would be deported.  Clients who informed CBP officials that they had a fear of return regularly describe:  being told by CBP officers that it didn't make any difference; being called a liar; being told that they "did not have a case"; that even if they sought review of their claim, they would not be successful and would face months of detention.

36.     Detainees stated that they felt under considerable duress after days and nights without sleep, with inadequate food, without being able to change clothing, wash or even brush their teeth or hair, being subjected to rude, dismissive and abusive behavior, and generally being treated like animals.  Several clients reported being told by CBP officers that they "must" sign for their deportation; that no matter what they say or do, they will be deported; that no one cares what their problems are back home; being called liars or told that they didn't have a case; being told that if they didn't sign the paper, the officer would sign it for them; that they were not going to get out of custody unless and until they signed; being yelled at if they didn't sign; being humiliated in front of other prisoners for failing to sign; being told that if they didn't sign for their deportation that they would be prosecuted criminally.

37.     CARA clients regularly describe being interviewed by CBP officers at the time of their initial encounters, and later while in a processing facility.  The questions generally relate to routine biographic information; in many cases CARA clients state that they were not asked whether they had a fear of return. In cases where the question was asked, or the client had actually volunteered that she was afraid to return, that information was rarely recorded or recorded inaccurately.

38.     For women who were previously subjected to expedited removal and had reentered, subjecting them to the possibility of reinstatement, I can recall only a single case where a client found the CBP-drafted "sworn statement" and/or the officer's affidavit or "jurat" to be truthful (and I can only assume that is because she did not have or express a fear of return on her prior

8

**Exhibit 104 - page 412**

entry).  In dozens of other cases, client after client expressed shock, confusion and disbelief that the official CBP records stated that they had no fear of return and that they were coming to the United States for a limited time to seek employment or to attend school.

39.     These statements can be very damaging to a detainee's case:  USCIS will generally attempt to confirm with the applicant any information recorded in a sworn statement and/or jurat in order to evaluate credibility.  ICE trial attorneys often use these documents to impeach respondents in court, and ICE Deportation Officers may use the statements to allege fraud, as a negative discretionary factor or in assessing flight risk when setting bond or evaluating eligibility for parole. That USCIS Asylum Officers nonetheless find that nearly nine out of ten applicants has stated a credible fear, when CBP states the applicant claimed none, is telling.

40.     Most clients who were previously removed despite having a fear of return report that they either gave up because they (or their children) couldn't handle several days under such conditions and/or they were unaware that they had a right to screening by the Asylum Office and a hearing before a Judge.  Others report being told by CBP that, even if they did get to see a judge, it would be months before that happened and they would have to remain detained the entire time. Still other clients who insisted on review of their cases report being tricked into signing documents that purportedly would get them in front of a judge, only to find themselves shackled and put on a plane back to their home countries.

41.     At initial client intakes, CARA volunteers regularly assess eligibility for bond following the credible fear screening process, confirm bond amounts set by ICE and assess eligibility for parole for those who are not in a legal posture to ask the immigration judge for a custody redetermination, such as arriving aliens or those who have received positive reasonable fear determinations and are in withholding-only proceedings.  CARA volunteers have prepared hundreds of parole and bond packets, helping families present their cases for release before the immigration judge while appearing as a Friend of the Court. They also help families post bond and negotiate the byzantine process of actually being released once a bond has been posted or parole has been granted.

42.     Prior to the most recent announcements by Secretary Jeh Johnson, CARA volunteers saw virtually no release on parole with the exception of a handful of cases with severe medical issues. High ICE bonds were the rule, generally set at over $10,000; in some cases, further documentation resulted in ICE lowering the bond by a few thousand dollars, though it was rare to see an ICE bond set under $6,000.  These amounts remained out of reach for the vast majority of detainees, and some clients observed that ICE was merely operating as the last "coyote" in their journey to safety.  In custody hearings before immigration judges, bond amounts were usually set at $3,000 on the high end, and the minimum bond of $1,500 or even conditional parole on the low end.  Most, but not all detainees who were bond-eligible were able to post these bonds and left to continue their cases outside detention.  A large number of detainees whom ICE had arbitrarily chosen to charge as arriving aliens, as well as those in withholding-only proceedings following referrals from positive reasonable fear screenings, are not considered eligible to request release on bond by the immigration judge.

43.     Following the June 24 announcement by Secretary Johnson, we saw a large number of detainees offered release, but only if they were willing to wear ankle monitors.  The process was chaotic, with clients who had been detained in Dilley for more than two months ignored while a cellmate who had only recently arrived might be paroled out within days of arrival, apparently

9

Exhibit 104 - page 413

even before a credible fear claim had been evaluated by USCIS.  Many women contacted CARA to complain that they had been offered parole, but had not been processed for release.  Many more contacted CARA because they had not been advised that their cases were being considered at all.  Even more common and time sensitive were the number of families that had purchased open-ended but nonrefundable bus tickets or plane tickets at the direction of ICE, but whose releases were not being effected within the time period indicated  by the ICE officers. As a result, many lost their tickets or incurred heavy fees to have them reissued.  Clients are routinely released to CARA volunteers late in the evening, after hours of waiting, often well after 10 pm, without regard to there being young children in the mix.  Last week, a family that was to be released to CARA volunteers was instead released to an unidentified individual.  That person had arrived to pick up a different family as a favor to a friend, but because he spoke limited Spanish and did not know the family personally, he only realized his error after departing the facility. These miscommunications and financial losses continue to this day.

44.      In addition to the general chaos surrounding the implementation of the new policy, CARA volunteers began hearing from women that they were confused about the release program, having understood that they had no choice but to accept an ankle monitor if they wanted to leave detention.  After multiple clients contacted CARA staff and volunteers with similar questions, we learned that ICE was misleading the detainees about their rights related to custody determinations and coercing them into accepting ankle monitors over seeking bond before the immigration judge.

45.      Specifically, ICE officers routinely told women to "go to court" and held meetings regarding the release programs in the courtrooms, at times when the immigration judge was "present" and visible on the video screen.  ICE officers refused to allow CARA volunteers to be present during these sessions and in fact, forcibly removed an attorney who was present at such a meeting who sought to correct legal and factual inaccuracies in ICE's presentation.  That attorney has since been banned from the facility; an appeal of his exclusion from the facility, despite having clients in the facility, was recently upheld by the San Antonio Field Office Director.

46.      Since the announcement on June 24, CARA volunteers have noticed several cases involving significant delays in custody determinations, as well as delayed referrals or failures to refer the cases to the immigration court.  Specifically, numerous detainees have approached CARA two, three and even four weeks after they passed their credible fear or reasonable fear interviews, because they had yet to receive hearing notices from the immigration court.  That hearing process before the immigration court commences only after ICE files charging or referral documents generated by USCIS upon a positive credible or reasonable fear finding.  Only after the case has been initiated by ICE may an applicant be advised of her rights by an immigration judge, file an application, have her custody redetermined, or even start the process of seeking asylum or withholding of removal.

47.      Following numerous complaints from clients, CARA contacted ICE to determine why so many cases were not receiving hearing notices and was informed that "because things were moving so fast," Deportation Officers may not have been filing the charging or referral notices with the court at all. Instead, ICE had apparently unilaterally and without notice decided that it was "better" and "easier" to simply contact the detainees—often a week or more after they passed credible fear or reasonable fear—regarding release on an ankle monitor.  That way, an ICE Officer explained, they could avoid the additional work associated with transmitting the

**Exhibit 104 - page 414**

charging or referral documents, and ICE trial counsel did not have to deal with another court case or endure the hassle of filing a change of venue upon the client's release.

48.   Unfortunately for clients who wanted to seek an immigration bond redetermination before the immigration judge or to pursue their claims for asylum or withholding, or to challenge the propriety of their arrests, detention or even the commencement of removal proceedings, their cases could not be heard unless they could convince an ICE officer to forward the charging or referral documents. Detainees who were aware of their right to seek bond before the immigration judge were told by the officers that it could be an additional three weeks or more before they were able to have hearings. We have observed that the total length of detention in these cases is usually six to ten weeks by the time such individuals seek out CARA's help; many mothers could not countenance the impact of another three weeks of detention on their children and thus opted to accept an ankle monitor under duress.

49.   In addition to delays, CARA's on-the-ground experience is often at odds with the "new" family detention policies announced by ICE Director Saldana and Secretary Johnson, and with decisions by the San Antonio Field Office regarding cases in Dilley.

50.   Specifically, on May 13, Director Saldana announced that families would have their custody reviewed once they were held over 90 days, with priority being given to families held the longest, and additional reviews taking place every 45 days thereafter.  However, all of the families facing long-term detention with whom I worked were told their detention would be continued because ICE could not remove them while they were fighting their cases.  In none of the cases where CARA was advised of a denial (or where a custody review was simply declined) was there any indicia of danger to the community or any flight risk that could not have been ameliorated with some form of monitoring.  In fact, I am aware of no CARA client that was released pursuant to the May 13 policy.  Those cases ICE declined to release or review include approximately a half dozen withholding cases that were won on the merits by volunteers in late May and June 2015.

51.   On June 24, 2015, Secretary Johnson stated "once a family has established eligibility for asylum or other relief under our laws, long-term detention is an inefficient use of our resources and should be discontinued." Statement by Jeh Johnson on Family Detention Centers, June 24, 2015.  In light of this policy shift, according to Johnson, ICE would "offer release with an appropriate monetary bond or other condition of release to families at residential centers who are successful in stating a case of credible or reasonable fear of persecution in their home countries." Id.  He also noted that ICE was revising its "criteria for establishing a family's bond amount at a level that is reasonable and realistic, taking into account ability to pay, while also encompassing risk of flight and public safety."  Further guidance provided to stakeholders on July 13, 2015 stated simply:  "Going forward, ICE will generally not detain mothers with children, absent a threat to public safety or national security, if they have received a positive finding for credible or reasonable fear and the individual has provided a verifiable residential address."  See http://www.aila.org/infonet/ice-detention-mothers-children.

52.   While a number of families have been released since the new policies were announced, a significant number who fit squarely within the announced policies have been formally denied release, either without any explanation at all, for a stated reason that release would be  contrary to public policy, or for a stated reason that is not supported by record evidence.  Even more frustrating, all attempts to request explanations of these denials or failures to review the

11

**Exhibit 104 - page 415**

decisions have been fruitless. ICE's custody review denials after the May and June announcements—just like the custody review denials before the announcement—seem to be limited to two templates:  in one, the decision denying release simply fails to cite any basis for the decision that a family must remain in custody. The other denial format states that ICE will not release a family because it is the detainee's own fault that ICE cannot proceed with removal because the family is exercising their legal rights to seek asylum or withholding, and the case is still pending. The denial goes on to state that, once the case is resolved, ICE expects to have no difficulty in executing a removal, and the family thus must be kept in detention.

53.     A significant number of CARA clients remain in detention at, near or over the six-month mark.  Given ICE's continued denials of release along the lines outlined above, we expect more habeas petitions to be necessary, such as the one I and another CARA volunteer, Andrew Free, filed on August 3, 2015, in the Western District of Texas.  *See* 5:15-cv-00631-FB-PMA Gutierrez-Cruz v. Lucero et al.  Other habeas cases have been filed—including cases filed subsequent to Director Saldana's May 13 announcement—but were mooted out when families successfully won their asylum or withholding cases before their petitions could be heard.

54.     ICE continues to arbitrarily deny release without apparent recourse.  A third version of a custody denial has recently surfaced, illustrated by a Dilley case that I am still trying to resolve. On June 8, 2015, my client, a Mexican national, presented herself at a Port of Entry with her 2½-year-old daughter to request asylum.  She and the toddler were taken into custody, and on June 26, the pair received a positive credible fear determination from USCIS. On or about July 31, more than a month after being found to have a credible fear, ICE advised the mother that her request for parole had been denied, stating two reasons for her continued custody:  first, the letter stated "You have not established to ICE's satisfaction you would not pose a danger to the community or U.S. security, if you are paroled from detention."  A second basis for denial listed "Additional exceptional, overriding factors (e.g., law enforcement interests or potential foreign policy consequences) in your case militate against parole, as follows:  Border Patrol and Office of Field Operations Interviews and synopsis of the Interviews conducted contradicting prior asylum interviews and sworn statements taken under oath, sufficient evidence in file marked exhibit A, B, and C."

55.     Despite numerous requests for reconsideration or explanation in this case since she met with CARA volunteers on July 31, 2015, ICE has not provided any further information regarding the denial. Indeed, they have been remarkably uncommunicative and have not provided any explanation or authority for releasing only a partial file with significant redactions, and have recently directed me to submit a formal FOIA request for any further information from the file. When pushed to provide a copy of the referenced "exhibits A, B, and C," ICE instead provided a new parole denial letter, relying only on a finding that the applicant could not establish to ICE's satisfaction that she would not pose a danger to the community or U.S. security, if paroled from detention.  Neither the prior parole denial letter, nor any item identified as exhibit A, B, or C, was part of the file that was produced.

56.     Notably, the partial and redacted file that was produced for this case shows no criminal record, no allegations of fraud or misrepresentation, and no ties to gangs, drugs or human traffickers.  In fact, the government's own records show that the applicant provided evidence of her and her daughter's identities and even police clearances when she presented herself at the port of entry. Further, her sworn statement tracks exactly the information she provided to an asylum officer, who made a positive credible fear determination. Instead of reviewing or

**Exhibit 104 - page 416**

providing an explanation, ICE has simply set another custody review for September 8, 2015. The notice directs her to provide documentation in support of her claim, but without any direction on what forms the basis for ICE's lack of satisfaction, it is unclear how the results will be any different. Similarly, CARA has heard from multiple clients who have received positive reasonable fear determinations that ICE nonetheless told them that they would not be released because they are "Priority 1" for enforcement.

57.     These denials, directly contrary to the Secretary's publicly adopted position, are not only baffling, but cruel. On August 5, 2015, CARA volunteer attorneys accompanied a young mother to court for a second master calendar hearing. The matter had been reset from the prior week to allow ICE to consider release under the new policy because, as a withholding-only case, she was not eligible to request a bond from the immigration judge. The woman had been detained on May 29, 2015, but her reasonable fear interview did not take place until July 1; only after five weeks in detention, on July 3, did USCIS issue a positive reasonable fear determination.

58.     It is unclear when ICE served the woman's referral documents on the immigration court, but her initial hearing was nearly three and a half weeks after the USCIS decision was issued. Shortly before returning to court a second time, ICE officials told her she would not be considered for release. At her August 5 hearing, the ICE trial attorney confirmed that release had been denied, and the immigration judge indicated he would set the matter for filing of her withholding application so she could proceed to a merits hearing on her claim. Respondent presents a very strong claim and is terrified to return to Honduras for multiple reasons. She especially fears the father of her son, who raped her regularly for over six years, and gang members who threatened and targeted her because of her relationship with her son's father. The Asylum Officer found that she had suffered past persecution and that at least one central reason for fleeing Honduras was on account of her membership in a particular social group, specifically: Honduran women unable to leave a domestic relationship.

59.     By that time, the mother had been detained for ten weeks with her son who has been diagnosed with autism, Asperger's syndrome and hyperactivity. Her son was only allowed to go to school for 2½ hours a day, and not included in two hours of physical education. Many days—including the entire week preceding her hearing—he was removed from the classroom and kept in an office until she could pick him up. He was not eating, had lost 9 pounds and was acting out. The detention center does not provide any medication, any therapy, or any support in caring for him, making few, if any, accommodations for his disability. Having been told by both ICE and the immigration judge that the only way to get out of the facility was to accept deportation, the woman withdrew her withholding application and returned to her housing unit. There, she was presented with a phone message marked "urgent," which her family had left at 9:30 pm the night before. When she called her family, she heard the happy news that on August 4, the day before her hearing, ICE had contacted her family to let them know she was being released and to instruct them to purchase plane tickets for August 7. An emergency motion to stay the removal order was granted on August 7, and a motion to reopen was filed on August 11, but due to the uncertainty regarding the status of her case, ICE would not release her and her son. The motion to reopen was granted on August 12, and CARA volunteers were able to secure her release that same evening. Preparing, filing and arguing these motions, as well as trying to negotiate the family's release—a completely avoidable situation—involved approximately a half-dozen legal volunteers who contributed nearly 20 hours to the effort. The question of her release is yet to be resolved.

**Exhibit 104 - page 417**

60.     In response to the chaos and confusion following the increased number of releases in recent weeks, CARA staff have repeatedly requested access to clients to conduct "exit orientations" to advise families of their legal obligations, requirements to appear for court and ICE check-in appointments, how to update a change of address, how to obtain information regarding a case and even to facilitate representation by pro bono counsel in their destination cities.  ICE has repeatedly refused to advise CARA before and even after Project clients are released and has thus far refused to allow legal volunteers to provide these critical exit orientations before families depart the facility.  In several cases, ICE trial attorneys have failed to file motions to change venue upon release, delaying cases.  ICE deportation officers are failing to record and pass on complete addresses from the families prior to release, resulting in complaints by the court that hearing notices are being returned for insufficient addresses.

61.     Medical care continues to be inadequate and access to medical services insufficient, with CARA clients complaining that they must wait hours for care for sick children, only to be told to drink water. Many women report that the doctors prescribe antianxiety drugs like candy, but without explaining side effects such as unexplained weight gain, leaving many women isolated, listless and sleeping through the day.  Other clients report that social workers tell them that if they are depressed, their children will be taken from them.  During my most recent visit to Dilley, late in the day, a client had to stand her ground with CCA guards and insist on being admitted as a walk-in because her two-year-old, who had been running a fever for a week, wasn't getting medical attention.  She sought out a CARA staff member who was familiar with her case and knew that her child had been sick since earlier in the week.  After hearing that the child had not eaten solid food for four days and wasn't sleeping, we asked what medical had done. The mother related that medical staff said a temperature of 99.9 isn't a fever.  Even though the fever had been spiking higher at night, the mother was unable to get attention or even basic fever reducer for her daughter. She related further that the time she showed up at 12:30 am, she was turned away and told to come back in the morning.  The following day, instead of rushing to attend to her listless toddler, the medical staff told her that she would have to wait for six other patients ahead of her.  Her child had lost about three pounds since the fever's onset. It was only after CARA volunteers contacted ICE and threatened to call 911 that medical and compliance officers came to the trailer to address the mother's concerns. Health issues among the children are constant, with mothers stating that children detained for any length of time have lost interest in food; the majority of the children are sick, sniffling, coughing, suffering from diarrhea and dropping weight or at a minimum, failing to thrive.

62.     Some detainees who have been identified and approved for release on an ankle monitor, nonetheless seek custody redeterminations before the immigration judge.  When a family's bond is set at an amount they cannot afford, forcing them to opt for release on an ankle monitor, ICE often retaliates and refuses to release them.  This is part of a stated policy by the agency that detainees should not have "two bites" at the apple, seeking to punish applicants who chose to exercise their right to a custody review by the immigration judge and dissuade other detainees from seeking a bond before the immigration judge by making an example of those who do.  Although CARA volunteers were able to negotiate release for the first such case, ICE has now uniformly enforced a "deal or no deal" policy with regard to release under ankle monitors, effectively coercing detainees into foregoing their right to custody redetermination by a judge and accepting potentially onerous, open-ended supervision for the life of their cases.

63.     Despite clear authority for immigration judges to release detainees on conditional parole, DHS trial attorneys have put even more pressure on families to submit to intrusive monitoring

**Exhibit 104 - page 418**

and the stigma of an ankle monitor by vigorously opposing what is essentially release on recognizance.  Specifically, in the week following Judge Gee's order, ICE trial counsel informed the immigration judges that, not only would they strenuously object to any grant of conditional parole, but that they would appeal any grant, falsely intimating that an appeal would delay the family's ability to post bond by 30-60 days.  The result of this maneuver was that the immigration judges ceased issuing conditional paroles, which had been issued in a majority of cases the day before.

64.     The experiences of CARA staff and volunteers leave no doubt that family detention is no kinder or gentler than before, and that recent releases appear to have been calculated only to "pretty up" statistics in anticipation of filing the government's response.  Even if DHS were to suggest that the many issues we see on a daily basis were the result of training issues, a lack of effective supervision, or mere oversight, the lack of meaningful response or resolution in these cases tells otherwise.

Executed this 13th day of August, 2015 at Hygiene, Colorado.

_____
Laura Lichter
1601 Vine Street
Denver, CO 80206
303-554-8401
llichter@lichterimmigration.com

15

**Exhibit 104 - page 419**

# EXHIBIT 105

## DECLARATION OF LINDSAY M. HARRIS

I, Lindsay M. Harris, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney licensed and admitted in the State of California in December 2009. Following a Ninth Circuit Clerkship, I represented women and girls fleeing gender-based violence at the Tahirih Justice Center. I also developed and taught a course in Refugee and Asylum Law at George Mason University School of Law. From 2013-2015, I supervised students enrolled in a clinical program at Georgetown University Law Center representing detained and non-detained asylum seekers in immigration court proceedings.

2. I am currently a Legal Fellow with the American Immigration Council ("Council"). The Council is one of four partner organizations that comprise the CARA Family Detention Pro Bono Project (CARA),[1] which provides pro bono representation to mothers and children held at the South Texas Family Residential Center in Dilley, Texas ("Dilley facility"). The Council supports our on-the-ground staff and partners by assisting in identifying and resolving individual and systemic challenges faced by mothers and children in family detention, including problems related to access to counsel and conditions of detention.

3. The CARA Project is staffed on the ground in Dilley by two attorneys from Catholic Legal Immigration Network ("CLINIC"), Inc, a Pro Bono Coordinator from the Council, and a long-term volunteer from the Immigrant Justice Corps. The American Immigration Lawyers Association recruits seven to fifteen volunteer attorneys, paralegals, interpreters, and law students, to assist our on-the-ground staff each week from Sunday to Friday. Together, the CARA staff and volunteers see up to 140 mothers on a daily basis and assist in preparing them for, and often representing them in credible and reasonable fear interviews, bond hearings, and individual merits hearings in immigration court.

4. I submit this declaration to provide information regarding the medical conditions observed by our staff and volunteers at the Dilley facility, and to explain the process of compiling information for the complaint filed by all four CARA partners, Immigrant

---

[1] The CARA partners are the Catholic Legal Immigration Network, Inc., the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association.

**Exhibit 105 - page 420**

Justice Corps, and the Women's Refugee Commission, with the Department of Homeland Security's (DHS) Office of Civil Rights and Civil Liberties (CRCL) and the Office of the Inspector General (OIG) on July 30, 2015. This complaint, attached as Exhibit A hereto, concerned the failure of Immigration and Customs Enforcement (ICE) to provide adequate medical care to mothers and children in family detention facilities in Dilley and Karnes City, Texas, and Leesport, Pennsylvania.

5. CARA's work on behalf of detained mothers and children detained in Texas has revealed that children and their mothers are not receiving consistently adequate medical care. Over a six-week period between June 8 and July 24, 2015, our staff and volunteers on the ground at Dilley and Karnes documented more than eighty cases where the mother reported a problem in accessing medical care for her children or for herself. In each of these cases, CARA staff and volunteers inputted case notes into our electronic case management system and from this we were able to generate a spreadsheet to analyze the information. Troubling trends emerged, including a lack of information being given to mothers and their children regarding medical treatment; wait times of three to fourteen hours to receive medical care, even for serious and urgent conditions; a lack of appropriate follow up treatment, including prescribed tests and medications; the administration of an adult dosage of the Hepatitis A vaccine to more than 250 children in the early hours of the morning in early July; and the frequent prescription to "drink water" for all types of ailments and illnesses. As a result, CARA, along with our partners, determined it was necessary to bring these disturbing trends to the attention of CRCL and OIG.

6. Of the more than eighty cases from Dilley and Karnes, we chose a representative sample of eight cases to highlight in the complaint. The eight affected women signed releases authorizing us to share their personal details with the government. Seven of these women were, or still are, detained at the Dilley facility. For six of the seven families detained at Dilley, we received sworn affidavits and details of the cases through our on the ground staff and volunteers with the CARA Project.[2] A staff member or volunteer at Dilley interviewed the seventh mother and recorded the details of her medical problem. Both the

---

[2] Please note that one mother completed two affidavits, documenting the problems she encountered with her treatment for breast cancer, as well as the vaccinations administered to her children in the early hours of July 2, 2015. Therefore, there are a total of seven affidavits included for these six mothers and their children.

**Exhibit 105 - page 421**

affidavits for the six mothers and the notes from the seventh case are attached as Exhibit B.

7. One mother and her five-year-old child were detained at the Karnes facility. For that family, we communicated with Attorney Jessica Rofe, who represents the now released child and her mother and drafted a sworn affidavit documenting that mother's experience. That affidavit is attached as Exhibit C.

8. In addition to the eight mothers featured in the complaint from Dilley and Karnes, we communicated with Attorneys Carol Anne Donohue and Bridget Cambria who represent mothers and children at the Berks County Residential Center in Pennsylvania, and each provided a case example of the medical problems encountered at that facility.

9. In addition to the children and mothers whose cases are addressed in the CRCL complaint, other women completed detailed, sworn affidavits regarding the poor medical treatment they received. Some women did not complete affidavits, but met with CARA volunteers and staff members to share the details of their medical problems. For the twelve women who signed releases allowing us to share the details of their medical complaints in an anonymous fashion, their affidavits and notes describing their medical complaints are attached hereto as Exhibit D. Many of the mothers who brought complaints to our attention were released before we could find out if they were willing to authorize use of the details of their cases for advocacy purposes.

10. Together with our partners from AILA, CLINIC, RAICES and the Immigrant Justice Corps, we filed the attached cover letter and complaints with CRCL and OIG on July 30, 2015. For confidentiality reasons, we used pseudonyms in the publicly available version of the complaint. Names and alien numbers were included in the version of the complaint that we sent to CRCL and OIG, which is otherwise identical to the version attached as Exhibit A.

Executed this 12th day of August, 2015

Lindsay M. Harris, Esq.
American Immigration Council
1331 G Street NW, Suite 200
Washington DC, 20005

**Exhibit 105 - page 422**

202-507-7511
lharris@immcouncil.org

**Exhibit 105 - page 423**

# EXHIBIT 105.1

     

July 30, 2015

Megan Mack
Office of Civil Rights and Civil Liberties
Department of Homeland Security
Washington, DC 20528

John Roth
Office of Inspector General
Department of Homeland Security
Washington, DC 20528-0305

**RE: ICE's Failure to Provide Adequate Medical Care to Mothers and Children in Family Detention Facilities**

Dear Ms. Mack and Mr. Roth:

The undersigned organizations, American Immigration Council ("the Council"), American Immigration Lawyers Association ("AILA"), Catholic Legal Immigration Network, Inc. ("CLINIC"), Immigrant Justice Corps, Refugee and Immigrant Center for Education and Legal Services ("RAICES"), and the Women's Refugee Commission ("WRC") jointly file the present complaint on behalf of several mothers and their children who received substandard medical care while detained at the family detention facilities in Dilley and Karnes City, Texas, and Leesport, Pennsylvania. The cases summarized herein demonstrate that Immigration and Customs Enforcement (ICE) has failed to ensure adequate medical care for mothers and children in family detention facilities.  In particular, they illustrate the myriad ways that mothers and children have suffered due to inadequate access to and quality of care, a lack of opportunity for informed consent, inadequate oversight and accountability, and questionable medical ethics.

The complaints detailed below provide only a sample of the many stories of inadequate medical care that our organizations have encountered at the three family detention facilities.[1] Other women have declined to share their problems in accessing medical care for fear that it will negatively impact their immigration cases. These examples mirror the suffering of so many other mothers who, like the complainants, do not understand the medical decisions that are being made for them and their children, and who feel powerless to object or seek alternate help.

Mothers and children often enter the detention centers with injuries or illnesses that remain untreated throughout the duration of their detention. Others develop ailments throughout their stay. The detention of sick mothers and children, when they could be released to families, friends or community-based organizations willing to take them in, is inhumane. The examples detailed below, along with similar cases, so profoundly illustrate that the detention of children and their mothers cannot be carried out humanely, but instead causes or exacerbates serious and potentially irreversible damage to their health.  We urge your office to conduct a prompt and thorough investigation into these complaints and to take swift action to fully address the systemic problems highlighted by these complaints.

The cases summarized in this complaint reflect the following disturbing trends:

- **Medical professionals provide insufficient information about medical care to mothers and disregard their concerns, the information they provide, and their complaints.** For example, mothers reported not receiving information about the types of vaccinations their children received and being ignored when informing medical staff that their children had already received vaccinations. In one case from the Berks facility, a mother suffered from a heart condition and was never given a diagnosis.

---

[1] A previous complaint, filed by AILA, WRC, and the Council on June 30, 2015, raises serious concerns about the psychological impact of family detention on mothers and children seeking asylum.

**Exhibit 105.1 - page 423**

- **Medical staff frequently direct mothers and children to "drink more water" regardless of the illnesses or injuries presented,** including in cases of broken bones, concerns over weight loss, and following fainting spells. As described further in the complaints below, water was prescribed to treat a variety of ailments, including for a mother detained at Dilley who was vomiting with a fever after having her appendix removed at a hospital offsite. Similarly, another mother at Dilley was told to drink water after she presented with broken bones in her hand. Another child at Dilley suffering with diarrhea for over two weeks was told to drink water by a nurse after waiting in line for 6-7 hours a day for 7 days in a row. At Berks, a toddler who was vomiting blood was advised to drink hot or cold water.

- **Women and children reported wait times of three to fourteen hours to receive medical care.** These wait times routinely occur in cases of serious and urgent conditions. In at least one instance, a mother who had to  leave the medical line after waiting for hours was forced to sign a letter stating she refused medical care.

- **Lack of Appropriate Follow-Up Treatment:** For example, one mother detained at Dilley had been diagnosed with breast cancer and was promised an appointment with a breast cancer specialist that never took place. A prescribed follow-up appointment for a mother who had gallbladder surgery while held at Dilley also did not happen. The facilities have also failed to provide prescribed medications to some detained mothers and children. For example, even after two different outside doctors prescribed antibiotics for a five-year-old girl with a vaginal infection who was detained at Karnes, her medication never arrived.

- **Vaccinations were administered to children without meaningful informed consent from their mothers.** In early July, guards and medical staff woke families detained at Dilley between 4 and 6 am and directed them to the chapel, where vaccinations were administered to children. The mothers had received no prior notice of the appointments, were not told which vaccinations would be administered, and were denied any opportunity to provide existing vaccination records.  Moreover, medical staff ignored mothers who attempted to explain that their children had already received vaccinations.[2]  Over 250 children were subsequently injected with an adult dose of Hepatitis A.[3]  Further, the manner in which these vaccines were administered during the night without advance notice or informed consent by the mothers raises serious medical issues.

In addition to investigating the specific cases described above, we urge your offices to conduct a broader investigation of the medical care provided at ICE's family detention facilities. While consistent quality medical care is imperative for anyone in detention, our organizations do not believe that improved access to medical care would sufficiently mitigate the harm caused by family detention to justify this practice. Family detention is especially inappropriate given that most of the women and children detained at Dilley, Karnes and Berks could be released to

---

[2] *See* U.N. Children's Fund [UNICEF], State of the World's Children 2015 Country Statistical Information (last visited July 23, 2015), *available at* http://www.data.unicef.org/corecode/uploads/document6/uploaded_pdfs/corecode/SOWC_2015_all_countries-update_214.xlsx (showing at least 90% immunization coverage in El Salvador, at least 87% in Honduras, and at least 81% in Guatemala of the standard vaccines administered worldwide according to UNICEF).

[3] *See, e.g.,* Michael Bajaras, Houston Press, *Hundreds of Detained Kids in Texas Accidentally Given Overdose of Hepatitis A Vaccine,* (July 7, 2015), available at http://www.houstonpress.com/news/hundreds-of-detained-immigrant-kids-in-texas-accidentally-given-overdose-of-hepatitis-a-vaccine-7570228; Amy Silverstein, Dallas Observer, *Texas Immigrant Prison Accidentally Gave a Bunch of Kids an Adult-Strength Vaccine,* (July 9, 2015), available at http://www.dallasobserver.com/news/texas-immigrant-prison-accidentally-gave-a-bunch-of-kids-an-adult-strength-vaccine-7381479; Natalie Schachar, *Children at detention center given adult doses of hepatitis A vaccine,* L.A. TIMES (July 4, 2015), *available at* http://www.latimes.com/nation/nationnow/la-na-detention-center-hepatitis-20150704-story.html; Jason Buch, *Children at Dilley immigration detention center get adult dose of vaccine,* MYSANANTONIO.COM (July 3, 2015) available at http://www.mysanantonio.com/news/local/article/Children-at-Dilley-immigration-detention-center-6365815.php; Christina Costantini, *'Drink more water': Horror stories from the medical ward of a Texas immigration detention center,* FUSION.NET (July 14, 2015), available at http://fusion.net/story/165837/dilley-detention-center-horror-stories-from-the-medical-ward/.

**Exhibit 105.1 - page 424**

sponsors in the United States or—if none are available—community-based support programs that would facilitate access to medical care and other services. In the wake of U.S. District Court Judge Gee's recent ruling that family detention is incompatible with the standards set forth in the *Flores* Settlement Agreement, we further urge DHS to take this opportunity to end family detention once and for all.

Thank you for your attention to this troubling and urgent matter. We look forward to your prompt response.

Sincerely,

Beth Werlin
American Immigration Council
bwerlin@immcouncil.org

Aseem Mehta
Immigrant Justice Corps
amehta@justicecorps.org

Karen Lucas
American Immigration Lawyers Association
klucas@aila.org

Amy Fischer
Refugee and Immigrant Legal and Education Center
Amy.fischer@raicestexas.org

Michelle Mendez
Catholic Legal Immigration Network, Inc.
mmendez@cliniclegal.org

Katharina Obser
Women's Refugee Commission
katharinao@wrccommission.org

3

**Exhibit 105.1 - page 425**

**Complainant #1: "Jessica"**[1] Jessica is a 29-year-old mother of two who fled Honduras after the M-18 gang targeted her as a woman living without a male protector. Jessica and her two children, ages 4 and 6, received the varicella vaccination approximately five days after arriving at Dilley. When Jessica advised medical staff that her children had already received the varicella vaccination in Honduras, she was told that everyone detained at the facility had to get the vaccination. On July 1 or 2, two officials woke Jessica and her young children at 4:30 am and told them to go to the chapel for a medical appointment at 5 am, where they waited for two hours before being seen. Jessica took her children's vaccination cards with her to show the officials that their vaccinations were current. A uniformed official told Jessica that her children were still missing vaccinations, although he did not specify which vaccinations needed to be administered. Shortly afterward, women wearing white gave Jessica's son and daughter vaccinations, but did not tell her which ones or provide any documentation containing that information.  The next day, around 5:30 am, two officials woke the family and asked if the children had any fever or other problems. After Jessica indicated that the children were fine, the officials left.

When Jessica was forced to flee Honduras, she had been recently diagnosed with breast cancer. At Dilley, Jessica went to the clinic to try to speak to a doctor about her medical concerns. After waiting for five hours, in pain, in a cold room, clinic staff told Jessica that the doctors were there to see the children and there was nobody there to see her. She did not receive any pain medications. That night, a staff member told Jessica that a specialist would attend to her the next day. The following day, Jessica inquired at the medical clinic about the specialist, but an officer and a nurse confirmed that there was no specialist and sent her back to her room without any medicine. The next day Jessica had a headache so painful that she was vomiting, but having lost hope in the clinic, she decided not to return to attempt to seek treatment because she did not want to wait in the cold room and be turned away again. Jessica later suffered from vomiting for nine days, non-stop. When she first started vomiting, she waited to see the doctor for six hours without being seen. She returned, after seven days of vomiting, and waited seven hours to see the doctor. Jessica has lost thirteen pounds since being detained.

**Complainant #2: "Mira."** Mira is a 22-year-old Salvadoran woman detained with her three children, ages 6, 4, and 2. She is engaged to a U.S. citizen and had planned to enter the U.S. legally, but was forced to flee suddenly when gang members threatened her life in El Salvador. Before Mira even arrived at Dilley, she was held for a week by CBP and was sick, vomiting, and unable to eat, but refused medical care upon her request. At 5 am on June 30, CCA officials at Dilley woke Mira and informed her that her children had to go to a doctor's appointment. When Mira asked why, the officials did not respond, instead ordering her and her children to follow him. The official led them to a place outside the communal bathroom where more than 20 other mothers and children were gathered, having also just been woken up. The official then led the group to the chapel, which was filled with women and children. Mira learned from other women that the children were going to receive vaccinations. After they had waited for almost five hours, medical staff informed Mira and the other women that the vaccines were mandatory and handed them a list of vaccines the children would receive. When Mira informed medical staff that her children had already received all of the listed vaccines, the doctor told her that they would be administered again. Within two or three days, Mira's two-year-old child was vomiting, with a

---

[1] Pseudonyms are used to protect the identities of the mothers submitting this complaint. Full names and Alien registration numbers will be provided concurrently with this complaint to CRCL and OIG.

1

**Exhibit 105.1 - page 426**

high fever and a terrible cough. Mira has tried three times to take him to the clinic, but has been repeatedly told that she could not see a doctor without an appointment and advised to return the next day.

**Complainant #3: "Irena."** Irena is a 27-year-old woman from El Salvador who fled after gang members threatened to cut out her tongue because they believed she was reporting their activities to the police. She and her two-year-old son Oscar are detained at Dilley. Officers woke Irena and Oscar at 5:30 am and ordered them to go to the medical clinic. There, Oscar received five vaccinations. Although Irena told the officer that her son was up to date on his vaccinations, the officer responded that there was no way to prove that and her son thus needed to get all of the vaccinations. A nurse roughly administered the vaccinations into Oscar's leg. After the vaccinations, he could not walk. That night, he spiked a high fever. Irena did not take him to the clinic because she had heard from other women that the clinic staff would not do anything for a child with a fever following vaccinations. After a few days, a nurse came early in the morning to see if any children had developed fevers following the vaccinations and indicated that the children had received an adult dose of one of the vaccines. Later that day, Oscar developed a problem with his eyes. He cried and rubbed his eyes, unable to sleep. When Irena took him to the clinic, the doctor said his eye problem was viral and had nothing to do with the vaccinations. Since receiving the vaccinations, Oscar has eaten very little.

**Complainant #4: "Lillian."** Lillian fled Honduras after a gang beat her 10-year-old daughter and threatened both of their lives. She arrived at Dilley with ten-year-old Rosa on June 3, 2015. After a six-hour bus journey and waiting eleven hours to be showed to her room, Lillian got on her knees to pray, but around 8 pm she fainted. She awoke in a hospital, receiving intravenous fluids and oxygen. A cardiologist and neurologist examined her and she underwent various tests. Upon discharge from the hospital, Lillian received her medical records. Returning to Dilley at 4 am, she was transported directly to the medical clinic, where she handed over the papers she received at the hospital. Lillian was returned to her room with sleeping medication and woke up later that day to see the doctor. Lillian asked the doctor for her medical records and the doctor told her that she "did not need them" because the medical results were "fine."

On Thursday June 25, an official came to Lillian's room at 6am and woke her for a medical appointment at 9 am with a doctor. That day, Lillian and Rosa waited about 14 hours to see the doctor, with Rosa missing school. At 11 pm that night, Lillian told clinic officials that she needed to take Rosa, who had fallen asleep, to bed. She was told that her doctor's appointment would be rescheduled, but she never actually received another appointment. Lillian felt light headed and dizzy for the next five days until she fainted again on June 30. She awoke in the medical facility at Dilley, unable to speak or move. Lillian remembers medical personnel pounding her chest repeatedly and telling her to stay awake. For a week afterwards, Lillian's chest was swollen and bruised and ten-year-old Rosa applied cream to her mother's chest.

During this same incident on June 30, in an attempt to give Lillian intravenous fluids, two medical personnel pricked Lillian with a needle seven times and laughed each time they were unsuccessful locating a vein. Lillian cried out in pain for them to stop. Despite her request for them to stop, the women continued and found a vein in her other hand and inserted a tube with fluids. Lillian was then wheeled on a stretcher to an ambulance, where the EMT immediately took out the tube and showed Lillian that the needle was bent, saying "look what they did to you," telling her that the two women did not know how to insert the tube. At the hospital Lillian

**Exhibit 105.1 - page 427**

again received treatment from a cardiologist and neurologist, underwent various tests, and received oxygen. At one point a nurse handed Lillian paperwork, explaining that the doctor at Dilley would explain the results to her. When Lillian was brought back to Dilley, she saw a doctor who asked for the hospital paperwork. The doctor threw the papers on top of a black bin on the floor by a desk. Lillian asked if she could keep the papers because she may need them and tried to pull the papers out of the bin. The doctor then seized the papers, placing them behind her computer out of Lillian's reach. Lillian explained to the doctor that she was still having severe headaches, the right side of her face would become swollen, her right eye red, her left arm felt like pins and needles, and her hand become pale with purple spots on the palm. The doctor told Lillian she needed to see a psychologist.

Lillian has seen a psychologist on four occasions since arriving at Dilley, each time for around only ten minutes and each time in the presence of her ten-year-old daughter. Lillian desperately wanted to share what she was feeling with the psychologist but felt inhibited by the presence of her daughter, who would cry if Lillian started to tell her story. Lillian asked if her daughter could play outside the consultation room but the psychologist told Lillian that she needed to stay in the room and gave Rosa some gum to try to calm her down.

Lillian's concerns for Rosa are mounting. Rosa has asked her mother why they cannot leave and asked "what if we die? Can we leave then?" Only ten years old, Rosa has told her mother that she will never forget this experience. Distraught and overwhelmed about the effects of detention on Rosa, Lillian went to the bathroom intending to slit her wrists with a razor. After this event, Lillian met for the fourth time with the psychologist. After disclosing her suicide attempt to the psychologist, Lillian and Rosa were held in isolation for three days. Rosa cried and begged to leave the room but the psychologist told her that she had to stay with her mother. Rosa was bored, angry, and sad in isolation and Lillian felt immense guilt for separating Rosa from the other residents in the facility because of her depression and suicide attempt.

A doctor visited Lillian when she was in isolation, telling her he wanted to talk to her about test results revealing a "black shadow" in the upper right side of her face, where her headaches originate. He explained that they wanted to do tests in the morning and would be drawing a lot of blood. Lillian asked why she needed tests when the other doctors had told her that the previous test results had been fine and the doctor said, "I don't know why they didn't explain the results earlier." The doctor examined Lillian and found extreme pain on the left side of her body, near her womb. He told Lillian that he would order a prescription for her and that the next day she would have blood drawn. No one showed up the next day to draw blood. A psychologist came the next day and inquired about the blood tests, and when the psychologist realized the tests had not occurred, she told Lillian the blood would be taken the next morning. Again, the next morning, no tests were performed.

**Complainant #5: "Francisca."** Francisca fled Guatemala after a gang threatened her and her daughter. While Francisca was detained at Dilley, she felt a sharp pain in her stomach and arrived at the medical clinic at around 3 am. She waited at the clinic for nearly six hours before finally being transferred, in extreme pain, to a hospital. At the hospital, the decision was made to immediately remove her appendix. Francisca knew her child was being cared for by an official, but was concerned about his welfare. Francisca's appendix was removed on June 14 and she was transferred back to Dilley the same day. Even immediately after this surgery, Francisca had to walk from her room to the medical clinic twice a day to receive her pain medications. Following

3

**Exhibit 105.1 - page 428**

the surgery, she was running a high fever and constantly vomiting. She sought medical attention at the clinic, arriving at 9 am and was forced to wait for five hours to see a nurse, who told her to return to her room and drink water. The next day, Francisca felt even worse but had lost faith in the clinic, so did not return to the clinic for help because she knew she would not get any medical attention. Eventually, as her symptoms increased, she returned to the clinic and upon arrival fainted from exhaustion and sickness. She woke up in a bed and was told to go home and drink water.

**Complainant #6: "Melinda."** Melinda is a 20-year-old mother who fled a lifetime of abuse in El Salvador, beginning with rapes and physical abuse at the hands of her stepfather as a young girl, and then an abusive relationship that she entered into at age eleven with a partner who beat her so badly that she miscarried and used his connections to the gangs to intimidate and control her. Melinda arrived at Dilley with a broken hand after a gang kidnapped, raped, and beat her constantly for five days. She fled after the gang threatened to kill her after she sought treatment at the hospital. On arrival at Dilley Melinda showed officials her broken pinky finger, sticking out to the left of her hand. Officials told her that it did not matter, that nothing was wrong, and that she should drink some water. Melinda decided to see the doctor anyway. The doctor did not examine Melinda, but looked at her hand, told her nothing was wrong, and that she should drink water. Melinda continues to experience pain in her hand. She is unable to move two of her fingers and they are bent in the wrong direction. She has extreme pain in her wrist and hand and has trouble sleeping and writing. At one point, Melinda sought medical treatment for her son, who recently turned 4 in detention, who was vomiting with a fever. After four hours of waiting to see the doctor, the doctor told Melinda that her son should drink water and that he should see a psychologist, because there was nothing physically wrong with him. A second time, Melinda took her son, who again was vomiting with a fever, to the clinic. She was advised that she would have to wait for six hours, which she knew would only make her son sicker, so she left, after being forced to sign a form saying that she refused medical attention for her son. Melinda's son became so sick that he virtually stopped eating. She did not feel like she could take him to the clinic because she did not think she would get help and would only be told to have her son drink water. Her son wakes up from his sleep coughing. When she arrived at Dilley, her son weighed fifty pounds and now weighs only thirty-nine pounds.

**Complainant #7: "Yaniret."** Yaniret is a 24-year-old mother fleeing threats of death in her native Honduras. Yaniret was detained with her five-year-old daughter, Cecilia, at Karnes for fifty-two days. Yaniret and her daughter suffered with inadequate medical treatment and indignity at Karnes that left her feeling powerless, eventually resulting in self-harm. In early May, Yaniret took her daughter to the clinic at Karnes because she noticed her daughter had a strange vaginal secretion. The doctor at Karnes told Yaniret he would take a swab from the outer areas of little Cecilia's vaginal lips, but instead shoved a probe deep into her vagina. Cecilia screamed in pain. The same day, Yaniret and her daughter were taken to a clinic outside of the detention center. The doctor who examined Cecilia wrote a prescription for antibiotics for Cecilia's infection. Back at Karnes, however, Yaniret was never able to access these prescribed antibiotics for Cecilia. She felt very upset about how little power she had over the health of her daughter.

At the end of May, GEO staff members took Yaniret and Cecilia to a different outside doctor to examine her infection. Cecilia refused to be examined, crying and hysterical, because she was

4

**Exhibit 105.1 - page 429**

traumatized from the first doctor's rough handling and shoving of a probe into her vagina. In the first week of June, Yaniret spoke with a woman from the Honduran consulate who later accompanied Yaniret and Cecilia to another outside clinic. The doctor confirmed that Cecilia needed medicine and wrote a second prescription. Back at Karnes, however, Cecilia never received the prescribed medication. Several times Cecilia was told that she would be able to leave without a bond and several times ICE or GEO officials rescinded this offer. When Yaniret spoke with a journalist and showed her a diaper of Cecilia's secretion that was untreated, GEO staff members denied her food. Yaniret also spoke out when Congressional officials visited Karnes. Soon after this, she was assigned to another ICE deportation officer and her bond was set at $8500, an amount Yaniret was unable to pay. As her daughter suffered in detention, Yaniret felt that "ICE and GEO were taking away my ability to be a mother." She was unable to obtain a new pair of shoes for GEO when little Cecilia's shoes wore through at the sole, and was forced to send Cecilia to school in socks. At one point, GEO staff members threw food at Yaniret. Feeling powerless and depressed, Yaniret resorted to self-harm. She fainted and was put in isolation in the medical unit. She was stripped naked against her will, wearing only a heavy green jacket. Yaniret asked the doctor to speak to her attorney and he responded that she could not talk to anyone. Yaniret remained in isolation, but could hear her daughter crying from a room nearby. The same doctor later referenced Yaniret cutting herself in front of her five-year-old daughter, understandably not something that Yaniret wanted little Cecilia to know.

**Complainant #8: "Maria."** Maria arrived at the Berks family detention facility as a 19-year-old mother, fleeing severe domestic violence and gang violence in Honduras. She was detained for over 11 months with her toddler, Flor. Maria suffered from a heart condition, which manifested while in detention. Although there are at least two medically documented instances where she fell unresponsive and had to be revived in detention; she never had a formal diagnosis nor was she given medication. For a period of time, Maria was required to carry a heart monitor with her throughout the detention facility. She was regularly dizzy and suffered with blurry vision, chills, and losing consciousness. On one occasion, she collapsed in the bathroom and fell unconscious, resulting in a black eye, swollen cheek, and severe contusions on her arms. After coming to, she was simply told to lay down and drink water, rather than being sent for care or tests.

Flor also suffered from numerous illnesses in detention. After 10 months in detention, she started vomiting large amounts of blood. When Maria took Flor to the clinic, she was told that her daughter was fine, and simply to drink hot or cold water. Flor continued to vomit for three days, and was never taken for external medical care or hospitalized. Blood stained her clothing, bed, and the floor. Other mothers at the facility, terrified by this situation, attempted to reach out to local lawyers for help. It was not until Flor was struggling to walk and had not eaten to days that she was finally taken to the hospital. Although Maria had requested yogurt as something her daughter might eat, she was told that she would need a prescription for special food. Flor received no further testing or follow-up care after her hospitalization. A Berks physician also determined that she did not need the medication prescribed by a doctor outside the facility. Eventually, after Maria's lawyer notified an external pediatrician who, upon hearing the story and seeing photos of the bloodstained shirt, called the state child abuse hotline. After this, Flor received another doctor's appointment and an appointment with a specialist, scheduled for a month after her final court hearing. She was released from Berks – after 11 months detention – when she and her mother were granted relief. They are now receiving care outside the facility.

**Exhibit 105.1 - page 430**

**Complainant #9: "IliFlor."** IliFlor was detained at Berks with her two-year-old daughter for over 9 months. After 4 months of detention she began to experience severe headaches and blackouts. She was brought to an eye doctor outside of the facility who determined she suffers from glaucoma and is legally blind and referred her for an MRI because the doctor sensed a more serious condition.  It took several months and unexplained outside doctors' visits before she was finally given a diagnosis of Chiari malformation, a brain condition where the spinal cord does not full cover the brain tissue. IliFlor had already been diagnosed with Post-traumatic Stress Disorder, both by the in-house social worker and an outside psychiatrist. Despite these severe mental and physical health conditions, ICE refused to parole her.  She also had some dental issues and was taken on a 4-5 hour trip to Philadelphia because the staff insisted that five teeth had to be removed at once, and could only find a dentist in Philadelphia willing to do so.  Her face was very swollen from the tooth removal, and she could not eat or talk.  It was while she was in that condition that ICE ultimately decided to release IliFlor and her two-year-old daughter immediately.

**Complainant #10: "Jocelyn."** Jocelyn fled from her native El Salvador when gangs targeted and threatened her. She was detained at Dilley with her two-year-old son, Luis, for more than 2 months. During her detention, Luis had diarrhea for 15 days that was not treated. Jocelyn sought medical attention for him for at least 7 straight days and each day she was turned away after a six or seven hour wait. She only saw a nurse once and was told just to have her son drink water. Her son also has ball of flesh on his arm which was bleeding and secreting puss and the doctors did not do anything about this. At Dilley, her son cried from the pain in his arm.

**Exhibit 105.1 - page 431**