# EXHIBIT 105.2

**Declaration of** ████████████████████

1. On the morning of Monday June 29 or Tuesday June 30th at 5am one of the officials who works for CCA (Corrections Corporation of America) in a red shirt came to my room and woke me up. He told me that my children have to go to an appointment with the doctor.

2. I asked him why? I did not have an appointment with the doctor because neither my children nor I were sick. The official did not tell me anything further. He did not tell me what the appointment was for. He told me and my children to follow him.

3. He brought us outside of the bathroom in our quarters where there were more than twenty other children and mothers gathered. Everyone had just been woken up. We were told to follow him. The surprise was that instead of going to the medical facilities, we were taken into the church. And inside, it was filled. Filled with women and children. There must have been at least 50.

4. No one told us what was happening. I only learned from one of the other women there who had heard from someone else that there were giving vaccinations to the children.

5. We waited in that room for almost five hours. We just sat there.

6. Finally, it was our turn. We went to the part of the church where they were giving vaccines. The doctors told us that the vaccines were mandatory. They told me there were five vaccines that the kids would have to take. He showed me a piece of paper and said some names of vaccines – like varicella. I told him that my children already had had all of these vaccines. He didn't listen, he said that they would be administered again.

7. I have three children. The oldest one, age 6, was given three shots. The two young ones, age 2 and 4, were given five shots. The youngest was given the shots in his legs. The other two in their arms.

8. My youngest child, within two or three days, was vomiting and had an extremely high fever. He has a terrible cough. It has now been four days and his symptoms have not subsided. I have tried to take my child to the doctor, but each time I've went – three times now – they tell me that I don't have an appointment, I can't see a doctor and that I have to come back the next day. Then they just tell me the same thing all over again.

9. They are failing to uphold their responsibilities as doctors. Everything is a fight in here.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

████████████████████                        _____

████████████████████████████████

Date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to
████████████████ in Spanish.

_____            _____

**Exhibit 105.2 - page 432**

# Exhibit F-2

Affidavit of ███████████
A ██████

I, ████████████ being duly sworn, depose and state the following:

1) I, ████████ A ████████ arrived at Diley Detention Facility on ████ 2015 with my ████ year old daughter, ████████████, A ████████

2) ████████ and I arrived at Diley following a six hour bus ride. We got off the bus at 7 a.m. and we waited in line for about ten minutes. We were interviewed and then we waited for our room assignments. We entered our room at 6:30 p.m., approximately eleven hours after our arrival.

3) I remember that the room was cold. I got on my knees to pray. ████████ and my roommate were in the room with me. It was about 8 p.m. I fainted.

4) I woke up in a hospital attached to fluids and oxygen. I was examined by a neurologist and a cardiologist. I was put into a machine to examine my head. Then I had a urine test. I was taken back to my bed. I fell asleep. The officer woke me up and said we were leaving.

5) When I was discharged from the hospital I was given a copy of my records. I was drowsy from the medications I had been given but I remember that I put those papers under my tee shirt. I was brought back to Diley by a car at 4 a.m. I was taken directly to the medical facility. They took my blood pressure, and put something on my finger. They asked me for the papers I had been given at the hospital. I gave them the test results.

7) I was returned to my room, where ████████ awakened and screamed "Mommy, you are back." I had been given sleeping medication and I was drowsy and fell into sleep. I woke up at 10 a.m. with a severe headache. ████████ was sitting in the room. My roommate was there and told me what had happened. She told me that ████████ had been with a guard while I was at the hospital.

8) Later that day an officer came to my room to take me to the doctor. When I saw the doctor (Dr. ████████ ) I asked to see a copy of the medical papers from the hospital. Dr. ████ told me that I did not need them since the medical results were fine. Dr. ████ took my blood pressure and gave me some medication for my headache and let me go. ████████ was with me the entire time.

9) On Thursday, June 25 someone came to my room at about 6 a.m, awakened me, and told me I had an appointment to see a doctor at 9 a.m. I waited about fourteen hours with ████████ in the waiting room. ████████ missed school that day because I could not take her to the school. At 11 p.m. I told them that I had to take

████████████ who had fallen asleep, to her bed. I was told that my appointment with the doctor would be rescheduled. I never received another appointment.

10) I fainted again at about 1 p.m. on June 30, 2015. I was walking from the living room to the bedroom. I had been feeling light-headed and dizzy for the previous week.

11) When I woke up I was in the Diley medical facility here. Although I could not speak or move, I understood what was happening. I was in bed and I heard people talking in English. There were many people talking. I heard a male voice instructing me to keep my eyes open, and to stay awake. He said this every time I would close my eyes. I was fighting to keep my eyes open. When my eyes closed, someone rubbed their fist on my chest. The person (alternating man and woman, both wearing blue clothing) would press his fist hard against my chest and twist his fist like a drill. I would open my eyes and the drilling would stop. This happened so many times I lost count. (For one week after, my chest was swollen. It was bruised and purple from the knuckles pressing against my chest. During this week ████████ ████ applied cream to my chest.)

12) Two women at the Diley medical facility tried to find a vein to give me fluids I was pricked seven times. Both women laughed each time they were unsuccessful in locating a vein in which to insert a needle. It was painful. One of the women spoke a little Spanish so I asked her to "stop" because it was painful. They did not stop but they tried to find a vein in my other hand. They finally located a vein and inserted a tube with fluids.

13) I was then wheeled on a stretcher into an ambulance. During the transport the EMT immediately took out the tube. He inserted a new tube and connected me to fluids. The man spoke Spanish and said "look what they did to you" as he showed me the needle that was bent. He called the two women something like "puerca", telling me that the two women did not know how to insert the tube. I was taken to the hospital.

14) During my stay at the hospital I was treated by a neurologist, a cardiologist, and the staff took blood and urine to run tests. They ran tests on my head. They took me back to the room. I was given two pills for my headache and some orange juice. I did not fall asleep. Two tubes continued to be connected to my nose to deliver oxygen. My blood pressure was continuously monitored. At some point a nurse entered the room with my paperwork. She handed me the paperwork, saying that the doctor at Diley would explain the tests results to me. Then she left the room.

15) I was brought back to Diley's medical clinic at about 6 p.m. I saw a doctor. She took my blood pressure and asked for my hospital paperwork. I saw the doctor throw the hospital discharge papers on the top of a black bin on the floor by the desk. I asked her if I could keep the papers, saying that I might need them. The doctor told me I would not need them. I tried to pull the papers out of the bin. The

doctor immediately seized my records and placed them behind her computer so I could not reach them.

16) I asked the doctor why, if the tests they had run at the hospital were fine, I continued to have severe headaches daily. I explained that the headaches occurred without warning, at random times, on the right side of side of my face, often accompanied with a swollen and red right eye. I explained that when my head hurts on the right side, my left arm feels like pins and needles and my left hand becomes pale and purple spots on the palm. I told the doctor that when the headache happens during the evening, the headache lasts throughout the night and I am unable to sleep, and if the headache starts during the morning, it often lasts the entire day. The doctor told me that I needed to speak with a psychologist.

17) After I left the doctor's office, I went to look for my daughter and found her in the playground. ▓▓▓▓ was crying. She ran to me and hugged me.

18) I have seen a psychologist four times since my arrival, each time for about ten minutes. Each time I met with the psychologist ▓▓▓▓ was required to stay with me in the psychologist's office. As a result, I could not tell the psychologist everything. I felt inhibited- I wanted help for the depression I was experiencing but I also noticed that my daughter was crying when I tried to tell my story to the psychologist. While there is a play area outside of the consultation room where my daughter wanted to stay and play, the psychologist required my daughter to remain in the consultation room with us. During our first session, I was crying as I related my story to the psychologist. My daughter started to cry when she saw me crying. I asked the psychologist if ▓▓▓▓ could play outside of the consultation room. The psychologist told me that my daughter had to stay with the room with us. The psychologist gave my daughter some gum to try and calm ▓▓▓▓

19) One morning before school ▓▓▓▓ asked why we could not leave. I explained that we could not leave. ▓▓▓▓ asked "what happens if we die, can we leave then?" I consoled ▓▓▓▓ and dropped her off at school at 12:30. I was crying and worried about ▓▓▓▓ has told me that she will "never forget this experience," and I feel responsible. Thinking that at least ▓▓▓▓ could be free, I went into the bathroom, intending to slit my wrists with a razor. People kept coming into the bathroom. I was crying. A woman came into the bathroom and consoled me.

20) I met with the psychologist for a fourth session about three days after my suicide attempt. As always, ▓▓▓▓ was with me. The psychologist asked me if I had ever attempted suicide. I told her about my suicide attempt. She told me that I would not return to my room until I changed my mind about suicide.

21) ▓▓▓▓ and I were brought directly from the psychologist's office to a bedroom. There were no windows in the small bedroom. ▓▓▓▓ and I stayed in this room for three days (July 4, 5, 6) and two nights (July 4,5). Neither ▓▓▓▓

████ nor I were able to leave the room at any time. We were not able to get any of belongings. Our meals were brought to us on trays. We were given one change of underwear each, deodorant, and lotion. ████████ cried, begging to leave the room and go to the park. The officers told her ████████ could not leave the room, telling ████████ that "you have to stay with your mom."

22) A doctor visited our bedroom on Sunday afternoon at about 4 p.m. I was not feeling well so I was lying in bed. He told me that he wanted to talk to me about some test results that revealed a "black shadow" while pointing to the upper right side of my face, where my headaches always originate. He said that they wanted to do tests early the next morning, and that they would be drawing a lot of blood. When I asked why the tests were needed when the doctors had told me the test results had been fine, he replied "I don't know why they didn't explain the results earlier." I asked him what the tests showed and he said that the results would be explained to me in the morning. Then he said that there were some hormones being released to my body that were affecting me. He then asked if I had experienced pain on the left side of my body, near my womb. He reached out and pushed two fingers on the left side of my body again near my womb, asking if it hurt. I screamed in pain, telling him that I had experienced this pain before. He told me he would order a prescription for me. I never received a prescription or medication. He also told me that they would be come to my room the next morning (July 6) to draw blood. No one showed up.

22) During the time we were segregated from the rest of the residents, ████████ was very upset. She would cry, bite her nails, watch TV, sleep, and spend time coloring. She was bored, angry, and sad. I, too, was upset and sad because I felt responsible for separating ████████ from the friends she has made here. It is difficult for me to see my daughter suffer. I feel like ████████ is being punished because of my depression and suicide attempt.

23) I was allowed to leave the room one time, on July 6, to visit with my lawyer. ████████ accompanied me to the lawyer's room. When we returned to the room, the psychologist was waiting to speak with me. She wanted to know what the recent blood test results had shown. I told her that no one had come to the room to draw blood. The psychologist examined my arms, and finding no trace of blood tests, said she would make sure that the blood tests were done the morning of July 7. (No tests were performed). The psychologist also told us that we were "leaving here." ████████ became excited, thinking we were leaving the facility. ████████ cried when she learned that we were only "leaving" the room to return to the first room.

7/7/2015

I, Elizabet Bonilla, being duly sworn state that I am fluent in the Spanish and English languages. I have translated into English the foregoing affidavit from Spanish to the best of my ability. I certify that this translation is true and correct.

_7/7/2015_

# Exhibit F-3

**Declaration of** ▮▮▮▮▮▮▮▮▮▮  **A#** ▮▮▮▮▮▮

1. On June 13, I started feeling sharp pain in my stomach. I told an official who told me to go the medical clinic. I arrived to the clinic around 3am. I was in the clinic for nearly six hours. They just gave me a pill for the pain and had me wait. Finally, because the pain was so strong and unrelenting, they finally decided to transfer me to another facility. They sent 15 minutes away to a hospital. At that hospital they took my blood and asked me a number of questions. They did an X-ray. I learned that they had identified that my appendix was inflamed and infected. The doctors told me that if they did not operate, I would likely die. I signed a document giving my permission for them to operate. During this time, my child was in the care of an official. I was scared for him.

2. On Sunday June 14, they conducted an operation to remove my appendix at 9am. I was brought back to the detention facility at 4pm. In order to receive treatment, they make me walk to the medical clinic in the detention facility twice a day to get a painkiller. They only give me painkillers, they do not give me anything to fight the infection.

3. In the days after my operation, I had a very high fever and was vomiting constantly. I went the medical clinic twice. The first time I went to the clinic at 9am and was forced to wait for five hours. Finally, I did not even see a doctor. A nurse took my blood pressure and my temperature and told me nothing was wrong with me. She told me to return to my room and drink water. The guards and officials did not care that I had just had a medical procedure. They took me to a legal appointment even though I could barely stand. The lawyer saw my condition and asked me to rest.

4. Even though I was vomiting and feeling even worse the next day, I did not go to the clinic because I knew that there weren't giving me any attention.

5. But I kept feeling worse and so I went back on June 22nd. When I got to the clinic I fainted from exhaustion and sickness. I don't know what happened for the next many hours. All I know is that I woke up in a bed and they told me I should go home and drink water.

6. These doctors and medical staff did not help me when I needed it.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____     Date   6/30/15
Signed

I, _ASEEM MEHTA_____, certify that I am fluent in the English and Spanish languages and read an accurate oral translation of the above text in the Spanish language to ▮▮▮▮▮▮▮▮ ▮.

_____Aseem Mehta_____     Date   6/30/15
Signed

**Declaration of** ████████████████████  **A#** ██████████

1. On the third day after I arrived to the Dilley, June 11, I told the officials that my hand was broken. I showed them my broken pinky and how it was askew to the left. The officials told me that it did not matter. They told me that there was nothing wrong with my hand, and that I did not need to see a doctor. The official told me just to drink some water.

2. I decided to go see the doctor. I told the doctor that my hand was broken, that I had broken it on my journey. The doctor did not examine me. The doctor simply looked at my hand and told me that there was nothing work. He told me to drink lots of water. He never identified himself.

3. My hand is in terrible pain and has been in continued pain the entire time I have been here. I have two fingers that are broken. My pinky finger and the one next to it. I know that they are broken because they are bent in the wrong direction and I cannot move them. They connect to my wrist, which is also broken. I have extreme pain every time it is touched.

4. My hand was broken when I was in Honduras in the days before I left. I was kidnapped by a gangs for five days and was beaten constantly. The broke my hand and assaulted and raped me. When my mother paid them to release me, I went to the hospital to get treated. But the gang issued a death threat against me, so I had to leave. I traveled from Honduras to the US, broken.

5. Because of my injury I cannot write and I cannot sleep properly. I have been to the doctor two more times since I first arrived. I went to the doctor to get treatment for my child because I know that they will help me. But I need to take care of my child. The first time I went I had to wait six hours to see a doctor. My son was sick and fatigued and was vomiting and had a fever. When we finally saw the doctor, the doctor said that there was nothing wrong physically with my son. The doctor told him to drink water and said that if anything, it was a psychological problem and that he should see the psychologist.

6. Then, another time, in the middle of June, he was vomiting and had an intense fever again. I took him to the clinic and they said that I would have to wait for a minimum of six hours. This would only make my son more sick. So I left. They made me sign a form that said I refused medical attention for my son.

7. My son became so sick that he hardly ate more than a few bites per day for a full week. I couldn't take him to the clinic because they don't serve us and all they ever do is tell us to drink more water. He is still sick. He is coughing and has a cough that wakes him up every time he sleeps. He is about to turn four years old. When we came here, he weighed 50 pounds. Now he weighs 39 pounds.

8. The only thing I can do is lie to him. Every day I tell him, tomorrow we will join your grandmother. But that's never how tomorrow is.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

████████████████████

7 / 6 / 15
Date

I certify that I am proficient in the English and Spanish languages and that foregoing was read to ████████████ ████████ in Spanish.

*Aseem Mehta*
Aseem Mehta

7 / 6 / 15
Date

I ████████████████████ declare under penalty of perjury that the foregoing is true to the best of my knowledge:

My name is ████████████████████ I am from El Salvador. I am 27 years old. I have a 2-year-old son. My son's name is ████████████████

I arrived at the detention center at the end of June.

A few days before the Fourth of July, the officers woke us up and brought us around 5:30 in the morning to the medical clinic. They gave my son 5 vaccinations. 1 vaccination was for conjunctivitis. There were also 4 other vaccinations.

I told the officer that my son already had all of his vaccinations and that he didn't need anymore until he was 4 years old, but the officer told me that there was no way to show that and he needed to get all of the vaccinations.

A lady put the vaccinations in his leg. She did it roughly and for two days, my son could not walk.

That night, my son had a very high fever. I didn't bring my son to the clinic because a woman in my room had a child who also had received the vaccinations and who also had a fever. She brought her child to the clinic and they didn't give her anything. They said this was normal.

The next day, my son had a fever, but it had gone down a little bit. I still didn't go to the doctor.

The third day after the vaccination, my son's eyes became filled with mucus, and he could not open his eyes. His eyes watered, and they hurt him. He could not sleep. He cried and rubbed his eyes.

A nurse passed by the rooms early in the morning to check on fevers. He told us that one of the vaccinations given to the children was for adults.

The fourth day, I took my son to the doctor. I told the doctor he had the vaccinations, and the doctor said this had nothing to do with the vaccinations. This was just something viral. He gave me an eyedropper with some medicine.

Since the vaccinations, my son has eaten very little. He is still not eating much, and his eyes are a little bit better.

I wish they had believed me. My son had all of the vaccinations he needed. I did not want him to have more. The doctors here gave him all of the vaccinations he already received when he was just born. I wish they had not given him those a second time.

Exhibit 105.2 - page 440

## <u>Declaración médica/Medical Affidavit</u>

**Nombre/:**_REDACTED          **A#: REDACTED**_____

**Fecha de nacimiento/Date of Birth:** REDACTED NAME AND DOB OF

CHILD

CDB:

**¿Descripción breva del problema médico?Brief description of medical issue**

CHILD is 2 years old. He has had diarrhea for the past 7 days. She has

sought medical attention each day, and each day they just give him water.

They just keep telling him to drink more and more water.

**¿Usted tuvo el mismo condición en su país? Recibió tratamiento medico en su país?**
**Did you have the same condition in your country? Did you receive medical treatment in**
**your country?**
**No.**

**¿Usted ya buscó atención médica aquí?Have you sought medical attention**

**here/?**_____Yes_____

**¿Cuándo? When?** _Wed June 10, 2015_____

**¿Cuántas veces ?  How many times?**_Each day. And each day they are told they

are full and they cannot see him.

**¿Quién lo vio (médico, enfermera  trabajador social )? Who did you see (doctor, nurse,**

**social worker?** Just a nurse, once.

**Nombre de professional medico? Name of medical professional?** Doesn't remember.

**Exhibit 105.2 - page 441**

**¿Cuánto tiempo esperó para ser atendida?How long did you wait for medical attention/**
6-7 hours, each time.

**¿Qué hicieron por usted (examen médico, dar medicina)? What did they do for you**
**(medical exam, medicin**e) Looked at him and then told him to drink water.

**¿Resolvió su condición medica? Was the medical issue resolved?** Still ongoing.

**Si no, ¿Cómo le hubiera gustado ser tratado? If not, how would you have liked to be**
**treated?** Just some attention. As if someone cared.

**¿Cualquier otra cosa que le gustaría decir acerca de su experiencia médica ?**
**Anything else you would like to say about your medical experience?**
My son had an infected ball of flesh on his arm with blood and puss and they
just looked at it but wouldn't do anything. It kept growing, and he kept
crying. And they didn't do anything.

**Exhibit 105.2 - page 442**



**Declaration of** ████████████████████████

My name is ████████████████████████ my DOB is ████████████████ I
was born in Honduras. I am detained with my two children: ████████████████ A
████████████████████ DOB ███████ and ████████████████████
████████████ DOB ███████████

We arrived June 13, 2015 and received the varicella vaccination approximately 5
days later. My children had received this vaccination in Honduras and I told the
medical staff but they replied that they were administering the vaccination to
everybody. A few days later our arms really itched and were slightly inflamed.

Around the 1 or 2nd of July, two officials arrived to our beds around 4:30AM and said
we had a medical appointment at 5AM in one of the chapels. I brought my children's
vaccination cards and showed the official the vaccination cards that my children are
current on their vaccinations. The official said my children were still missing
vaccinations.

I don't know who was the official; he was wearing a light brown uniform. I don't
know if he is a guard or medical staff. Then we spoke with an officer in a blue
uniform and I also told him that my children had their vaccination and I showed him
the vaccination cards. He said we were still missing vaccinations. Neither of the
officers told me which vaccinations my children were missing.

They sent us to a group of women who were giving the vaccinations; one was
wearing white. They started with my son and they did not give him the varicella but
they gave him another vaccination; I don't know what it was. They did not give me
any documents. We were not allowed to keep any of the medical documents, only
the vaccination card that I brought from Honduras.

When they were giving my daughter the vaccinations the man wearing light brown
came and asked for my vaccination card. He went away for a short bit then came
back and said nothing else to me.

They gave my daughter three vaccinations. I do not know which vaccinations and
they gave me no documents. They wrote something on her vaccination record. They
told us to wait for 10 minutes then they let us leave.

On 2 July 2015 around 5:30 AM two officials arrived and asked me if my children
had any fever or problems. I said the children were fine and they left.

I declare under penalty of perjury that the foregoing is true and correct to the best
of my knowledge.

**Exhibit 105.2 - page 443**



07. 04. 2015

_____
4 July 2015

I, Ellen Miller, certify that I am fluent in English and Spanish and have read an accurate translation of the above text to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

*Ellen Miller* (signature)

07/04/2015

Ellen MILLER                                    _____
                                                4 July 2015

**Exhibit 105.2 - page 444**

**Declaration of** ████████████████████ **A** ████████████

My name is ██████████████████████████ my DOB is ████████████████ I
was born in Honduras. I am detained with my two children:
████████████ **DOB** ███████ and ████████████████████ **A**
████████ **DOB** ███████

Three years ago in Honduras a doctor found 6 cysts in one breast and five in the
other. I was referred to a cancer hospital in Honduras and proceeded with
mammogram and biopsy. I have received numerous procedures and exams on my
breasts in Honduras but the cysts continue; the pain continues.

The beginning of May 2015 my doctor told me one of the cysts was irregular. Soon
after that I had to flee my country and was not able to pursue medical treatment.

On Wednesday, 3 July 2015,  I went to speak with a doctor about my medical
concerns. I waited from 2PM until 7PM and then they told me that they could not
attend to me. The room was so cold and I was in pain. I was the last one in the
waiting room and they told me that the doctors were there for the children and
there was nobody to see me. They did not give me any medication for the pain.

That night medical person, who I think may be a nurse, told me that a specialist
would be here the next day and would attend to me.

On Thursday I stopped inquired in the medical clinic about the specialist. The officer
said there was no specialist; the nurse confirmed there was no specialist. They told
me to go back to my room, without medicine.

Friday I had such a bad headache that I was vomiting. I chose not to go back to the
medical clinic because I didn't want to wait and be turned away, and the medical
clinic is so cold that I could not sit there again.

I declare under penalty of perjury that the foregoing is true and correct to the best
of my knowledge.

████████████████████████████

_07 · 04 · 2015_
4 July 2015

I, Ellen Miller, certify that I am fluent in English and Spanish and have read an
accurate translation of the above text to ████████████████████████

_Ellen_

Ellen MILLER

_07/04/2015_
4 July 2015

**Exhibit 105.2 - page 445**

# EXHIBIT 105.3

**DECLARATION OF ███████████████████████ REGARDING CONDITIONS IN THE KARNES COUNTY RESIDENTIAL CENTER**

I, ███████████████████████, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the following is true and correct:

1. My name is ███████████████. I was born on ███████████████. I am twenty-nine years old. I was detained with my five-year old daughter, █████ by United States Immigration and Customs Enforcement ("ICE") for a total of fifty-two days, from May 6, 2015 until June 27, 2015. I came to the United States to survive and because I was afraid that I would be killed in my home country of Honduras.

2. In early May, my daughter, █████ and I were arrested by Customs and Border Patrol officials. We were detained for three days in the *hielera*, the ice box, and then transferred to the *perrera*, the dog kennel, where we stayed for four days. In both the hielera and in the perrera, my daughter and I had to sleep on the floor. After being detained in the perrera, we were transferred to the Karnes County Residential Center ("Karnes").

3. When I crossed the border, I never imagined that my only daughter and I would be locked up in detention for so long. My time in detention was one of the worst experiences of my life. While I was detained in Karnes, I was subject to retaliation from staff members for speaking out against abuses and for trying to exercise some control over my daughter's medical care. I felt a deep sense of powerlessness and despair, which led me to self-harm. Because of this, I was placed in medical isolation, stripped naked, and forced to lie in a room while staff members at Karnes laughed at me.

4. I write this statement now so that people can know of the abuses against me and against the other women who are still locked up in family detention. I also write this statement in hopes that GEO and ICE officials never again treat a child the way they treated my little girl.

5. In early May, 2015, I noticed that my daughter had a strange vaginal secretion. On May 15th, I took my daughter to the clinic at Karnes and told the doctor that my daughter had a problem with a secretion near her vaginal lips and that I wanted them to help cure her. The doctor who works in the Karnes clinic, Doctor Bryant, told me that he would take a swab from the outer areas of my daughter's vagina. Instead, however, he shoved a probe deep into her vagina. My daughter screamed and started crying from the pain. I grabbed my daughter, pulled her away from the doctor, and brought her outside. I told the doctor and the nurses that he could not do that to my daughter.

6. About three hours later, a GEO staff member came to get my daughter and me from our room to take us to a clinic outside of the detention center. The clinic was about an hour away by car. The doctor at the clinic said that my daughter needed antibiotics for her infection and wrote a prescription. I do not know exactly who this doctor was or what tests she performed on my daughter. My daughter was agitated and upset, because of how awful the first doctor had been to her. The new doctor handed a prescription to the GEO staff members who escorted us to the appointment. However, I was never given any

1

**Exhibit 105.3 - page 446**

medication for my daughter once we got back to Karnes. As a mother, it made me very upset how little power I had over the health of my daughter.

7. A few days later, two men who looked like police officers came to speak with me. They wore long sleeve shirts and had badges on their belts. They sat me down and asked me why I was lying. They stated that my daughter had come to the United States from Honduras with scratches on her vagina and that she had had this problem before arriving to Karnes. That, perhaps, someone had abused my little girl in Honduras. I was shocked by these accusations. I asked them how on earth they could conclude that, because my daughter had a secretion, that she had been abused in Honduras. I asked them why I would lie about something so delicate. I told them that I loved my daughter, that she is my only daughter, and that I could have no more children. It was important for me that they understood that I was trying to protect her.

8. The two men told me that if I thought that lying was going to help me in my immigration case, I was wrong. They told me that if I kept lying, they would take my daughter from me. They told me that, because I was lying, they were not going to help me with my immigration case. I do not know who these men were or what kind of power they had to follow through with the threats they made against me.

9. The two men with badges were accompanied by a woman whose name is Jacinda Andre. They told me that I had to let Ms. Andre speak with my daughter in private. She took my daughter to the social worker's office and asked my daughter questions there. When Ms. Andre was finished questioning my daughter, the group gave me two stuffed animals and a pillow and told me that everything was okay with my daughter. Then, they left. That day was the first and only time I saw those three people.

10. On May 29th, the same GEO staff members again took my daughter and me to a different outside doctor to look at her infection. We drove nearly two hours to get to this doctor. However, this time, my daughter refused to be examined. She was crying and hysterical. The doctor asked me why my daughter was crying so much. I explained to the doctor that during my daughter's first medical exam, the doctor had shoved a probe in her vagina. The doctor looked very angry when I told her that. She told me that my daughter had been traumatized by that experience, and that it was better for her not perform an exam. We left for Karnes without the doctor having conducted an exam.

11. Around the first week of June, a woman from the Honduran consulate came to Karnes. I spoke with her about my daughter's infection and she said that she would help me with it. On June 5th, she accompanied my daughter and me to another outside clinic, about an hour and a half away from Karnes. I told my daughter that she needed to let the doctor examine her because it would be good for her and that she should do it for me. My daughter let the doctor examine her, and the doctor saw that she still had the secretion. The doctor said that my daughter needed medicine. She wrote a prescription and gave it to a GEO staff member, but again, no one at Karnes ever provided  her with the medication. My daughter had seen four different doctors and never received the treatment she needed because the prescriptions were never filled.

2

**Exhibit 105.3 - page 447**

12. One of the GEO social workers, Doña Rebecca, told me that she was so sorry about what had happened to my daughter because Doctor Bryant is not a gynecologist. He is a general physician. She told me that because of the incident, I would be able to leave Karnes without a bond. This gave me hope, but that hope was dashed just a day or two later when an ICE officer told me that I could not leave without a bond, that he would not let me go without paying.

13. In the midst of all of the health problems my daughter was experiencing, I started talking to volunteers who work at RAICES, an organization in San Antonio that helps women at Karnes. I told them that my daughter had a vaginal infection and she was not receiving the medical treatment she needed. I was in tears when I talked to the volunteers at RAICES, telling them that the staff members at Karnes were not tending to my girl.

14. At some point, a journalist came to visit Karnes. I showed the journalist my daughter's diaper with the secretion that had not been treated. I also showed the journalist a fungus on my foot that had not been treated. Because of that, a GEO staff member told me that everyone was angry with me for having spoken to a journalist. Staff members began treating me even worse than before and started scolding me all of the time. They stopped letting me take any food from the dining hall. For example, I went to get some cornflakes and milk for my daughter, and a staff member told me to throw it away.

15. In mid-June, about a week and a half before my release from the Karnes, I was called to see my Deportation Officer, Officer Pacheco, at room 705. It was around lunchtime. When I came to the door, Officer Pacheco told me that I would be released from Karnes *bajo la palabra*, without a bond. However, he did not tell me why, and he did not tell me what day. Officer Pacheco called my sponsor, ██████, an old family friend, to let him know that I would be released. Unfortunately, however, ██████ did not answer the call because he was at work. Still, I left Officer Pacheco's office so happy.

16. After I left Officer Pacheco's office, I called staff members at RAICES to see if there was somewhere I could stay in San Antonio until I could speak with ██████. Staff members provided me the address and phone number of a house run by volunteers from a local church where I could stay until I could reach ██████. When I got off of the phone, I came and brought the address and phone number to Officer Pacheco. However, he told me that I could not leave Karnes any longer – that I would have to wait for a bond because ██████ did not answer the phone. All of a sudden, I felt so stressed. Nothing had changed, and now I was to pay a bond. I could not believe it – the officers and staff had caused my daughter and me so much pain, and still they wanted my family and me to pay for our release.

17. On or about June 19th, I was in the dining hall, and a GEO official told me that I acted like a dog. He told me that I had no manners. He was laughing at me, at all of us, and treating us so badly. After that, I lost my appetite. I am not accustomed to people making fun of me while I eat, so I just stopped.

18. The following Monday, June 22nd, some Congressional officials and their staff came to visit Karnes. They asked me about my experience in Karnes, and I told them everything. I

**Exhibit 105.3 - page 448**

told them that an officer from GEO, Officer Rincon, made a motion to hit me, and then stopped herself. I told them what the doctor at Karnes had done to my little girl. I told them that for nearly two months, I had complained about my daughter's vaginal secretion, and that no one had given me medication to treat my little girl. I told them that they treated us like dogs.

19. I spoke to the officials from Congress because I wanted to get my daughter treatment and I wanted to get out of that place. I felt powerless. My friends who were detained at Karnes with me told me that I should not be afraid of GEO staff, that I should tell the Congressional officials what really happened to my little girl and me, and that the officials could help me. My friends told me that I needed to speak out. Nobody ever thought that I would talk to the Congressional officials. And I never thought that ICE officials would later issue such a high bond for my release.

20. Very soon after I talked to the Congressional officials, ICE changed my Deportation Officer. When I reported to the new Deportation Officer, he told me that ICE had set my bond at $8,500. When he told me that, I cried and cried. How was I going to pay a bond so high? I was so depressed. I did not have that kind of money, but I could not stand being in Karnes any longer. My daughter continued to suffer, and I could do nothing to help her. I could not protect her. ICE and GEO were taking away my ability to be a mother.

21. The following day, June 23rd, on Tuesday morning, I went to get my daughter a new pair of shoes from Room 705, where GEO keeps the new pairs. The soles on her shoes had fallen off, and she could not go to school without shoes, so I needed to get a new pair. When I arrived, a GEO staff member refused to give me new shoes even though my daughter's old ones were broken. I tried to convince her to let me have new shoes so that my daughter could attend school, but it did nothing. I think the staff member believed that I was lying, that the other shoes were still not broken, and that I was just trying to get a second pair. I was forced to send my daughter to the school in her socks because of this.

22. When my daughter got to school wearing only her socks, the teacher refused to allow her in, and sent me back to the same GEO staff member as before. She again accused me of trying to get a second pair of shoes, so I angrily left because she was calling me a liar. About ten minutes later, the GEO staff member came to my room with two complaints about me, and told me that the complaints that she writes go to the immigration court. The complaints said that I was behaving badly and that I let my daughter walk around in socks without shoes.

23. After the GEO staff member left, Deportation Officer Peroni came in, as did another GEO officer who works in Room 613, where all of the staff members make their complaints about the residents. Officer Peroni told me that I had to sign the complaints. I refused. He told me that I had to do everything the officers said. I refused again. Officer Peroni told me that he would have no problem deporting me if I did not behave myself. Afterwards, a GEO staff member brought me a new pair of shoes for my daughter, and I took her to school.

4

**Exhibit 105.3 - page 449**

24. At around 10:00 A.M. that same Tuesday, while my daughter was in school, I was outside sitting on a bench, and a friend of mine gave me four bags of cheese. A GEO staff member who was sweeping the commissary came by, saw me with the four bags and said very nastily, "Why do you have four bags of cheese?" She made me display them for her. Another friend of mine came to defend me. She told the GEO staff member that someone else had given me four bags, two for me and two for my roommate. The GEO staff member told her to shut up, that she was not talking to her. She left us and continued sweeping. Minutes later, another GEO staff member took two bags of cheese from a food cart, ate one, and then threw the other one on the table, nearly hitting me. She said to me, "Here's your cheese! Eat it!" She started laughing and then left. I was really bothered by this because they treated us so badly, as if we're dogs.

25. After having food thrown at me, I went up to my room and I cut myself with a razor. I felt so bad, so powerless, like I had no control. The last time I cut myself was when I was eighteen years old. I started again at Karnes after ten years of not doing it. I was so stressed, I had this deep pain in my chest, and I just wanted to cry. When I feel like that, I cut myself and I feel better.

26. One of my roommates found me after I had cut myself. She left and called another friend who started cleaning the blood on my arm. My friends took me downstairs, and I fainted. I think I fainted because I was so scared that GEO or ICE would take my daughter away from me. When another mother who was detained at Karnes cut herself, ICE and GEO separated her from her daughter and then they deported them both.

27. When I woke up, I was in a stretcher in the medical unit. Nobody had cleaned my wounds or put any medication on them. Someone had placed a couple of Band-Aids on the cuts. Members of the medical staff were surrounding me. They ripped the Band-Aids off of me and began taking pictures. My cuts started bleeding again, so they covered them, but without cleaning the wounds. I was brought to another room where I was stripped naked against my will, and given a heavy green jacket, but nothing else. I asked the people doing this to me why I had to take my clothes off and wear the jacket. I told them I wasn't crazy. All I was told was that I had to wear the jacket because immigration officials were coming. No one from immigration ever came that day.

28. The GEO staff members kept me naked with only the green jacket, without clothes and without panties. They kept watching me. They did not let me go outside. But at some point, they told me that I was going to talk to my lawyer on the phone. Right before I talked to my lawyer, they gave me an orange pill and told me I had to take it so that I could feel better. The orange pill made it hard for me to think and to talk, but I told my lawyer that all I wanted to do was see my daughter. The lawyer told me that she would try and help me see my daughter.

29. After taking the orange pill, I got a severe stomachache and diarrhea. I was trembling and dizzy. I stayed like that for most of the day, leaning with my head against the window. At some point, I saw GEO staff members laughing at me.

5

**Exhibit 105.3 - page 450**

30. In the late afternoon, a doctor named Dr. Diaz came in and said that if I wanted to, I could sign a deportation order because the volunteers at RAICES were not going to help me. I told Dr. Diaz that I wanted to talk to my attorney, but Dr. Diaz told me I could talk to no one. He never told me why. I started crying and crying. Later, I heard my daughter crying from a room nearby. I also heard my daughter crying into the middle of the night.

31. Early on Wednesday morning, on June 24th, I was able to see my daughter for about half an hour before she went to school. Her hair was uncombed and she came in crying. I spent thirty minutes with her and then the people in charge took her away from me again. I asked a nurse if my daughter had been eating. She told me that she had been eating very little, only some fruit here and there. I was so angry.

32. A little later that morning, I talked to a female psychologist by video. She asked me why I was cutting. I told her I was so depressed because of what the doctor had done to my daughter, because my bond was so high, and because ICE and GEO were treating me so badly. I told her that I could not believe they were treating me like this when I had suffered so much in my country and asked for refuge here.

33. Also on Wednesday, June 24th, I managed to talk to another deportation officer. He gave me a paper saying that ICE officials had lowered my bond to $5,500. That same day, Dr. Diaz came in and told me that my bond had been lowered to $1,500. He told me that it had been lowered to the minimum, but that the person who was going to pay my bond had refused to pay it. I asked him how my bond could be lowered to $1,500 when I had just received a paper stating that my bond was set at $5,500. Caught in a lie, Dr. Diaz said nothing in response, and just left the room quickly.

34. At the end of the school day, around four o'clock, I saw my daughter again for about half an hour. After she left me, I heard her cry into the evening, until she fell asleep. In the middle of the night, she woke up crying again. One of the nurses came to get me from observation so I could calm her. I went to the room to lay with her until she fell asleep. While I was in her room, a male GEO staff member came into the room. I don't think he knew I was there. When he realized that I was in the room with my little girl, he ran out without saying a word. I was so upset. Male staff were not supposed to be in my daughter's room because she slept by herself. I don't know what would have happened if I had not been there.

35. On Thursday, June 25th, Dr. Diaz told me that I would be discharged from observation on Friday, June 26th. I was so happy to be able to go outside, see my friends, and ensure that my daughter would start eating. On Thursday, I was able to see my daughter for the day. I also talked to my lawyer on the phone. She said that she had filed an application with the court to ask for a new bond amount that was less than $5,500. She said that she would have liked to talk to me in person, but the staff would not let her.

36. On Friday, June 26th, Dr. Diaz did a final check in with me at around four o'clock in the afternoon. He told me that he was going to come back and check on me on Monday to see how I was doing, but that I would stay in observation over the weekend.

6

**Exhibit 105.3 - page 451**

37. I was feeling much better at that point; I had refused to take any more of the orange pills the nurses gave me, so my mind felt clear. I told Dr. Diaz that I thought I would be released from medical observation that day, but he told me I had to wait. My daughter was with me at this point and in front of her, Dr. Diaz said something like, "Mommy's not going to cut herself anymore, right ███? You're not going to cut yourself anymore, you're going to be better?" I asked him to stop saying that to my daughter because she does not know that I have a history of cutting. I told him that it was inappropriate to say that in front of her. He just looked at me, and walked away. I never saw him again.

38. The next day, on Saturday, June 27th, I was released in the early afternoon from Karnes with my daughter. My lawyer came to pick up my daughter and me. I called my sister immediately, and I started sobbing. I told my sister that I still could not believe I had been treated so badly. It was so horrible. The people who worked at Karnes treated us as if were nothing, as if we were less than human.

39. I decided to speak out about what happened to my little girl because I don't want ICE and GEO to be able to do this to other little girls. What they did to my little girl traumatized her, and as her mother, I couldn't do anything to stop them. I had no power, no control. I could not protect her.

7

**Exhibit 105.3 - page 452**

I, ██████████████████████ do swear and affirm that the foregoing statement is

true and correct.

██████████████████████                    __7/7/20\5__
                                              Date

Exhibit 105.3 - page 453

# EXHIBIT 106

<u>**DECLARATION OF LUIS H. ZAYAS**</u>

I, Luis H. Zayas, declare as follows:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

<u>**Qualifications**</u>

1.   I am a licensed psychologist and licensed clinical social worker in the State of Texas. Previously, I held psychology licenses in New York and Missouri and a clinical social work license in New York. I hold a master of science degree in social work (1975), and a master of arts (1984), master of philosophy (1985), and PhD (1986) in developmental psychology, all from Columbia University in the City of New York. I have been a practicing clinician since 1975 in child and adolescent psychiatry and primary care medicine.

2.   I am presently the Dean of the School of Social Work at the University of Texas at Austin. I also occupy the Robert Lee Sutherland Chair in Mental Health and Social Policy.

3.   I have previously provided declarations in this case of *Flores v. Johnson*, and those declarations set forth my additional qualifications, background, and experience. They also set forth my opinions and conclusions on the family detention facilities and policies used by the Department of Homeland Security. I affirm my prior opinions and continue to believe, based on my professional qualifications and experience, that that the trauma of family detention compounds the traumas already experienced by asylum-seeking children, and that DHS' family detention environments pose great risk of harm to the detained children's cognitive, behavioral and emotional development.

4.   On July 28, 2105, the Congressional Progressive Caucus, along with Democratic Members of the House Judiciary Committee and support from the Congressional Tri-Caucuses, held a forum

1

**Exhibit 106 - page 454**

on family detention. The forum took place in Washington DC in the Rayburn office building of the House of Representatives.

5.   I testified at the forum, along with three others. A true and complete copy of my testimony is attached hereto as Exhibit A.

6.   The goal of my testimony was to set forth an alternative model for processing of asylum-seeking–one that is based on the best interests of the child and the humanitarian needs of asylum-seeking families, rather than the punitive environments in DHS's family detention facilities as they are currently operated.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of August, 2015, at Austin, Texas.


_____

LUIS H. ZAYAS, PH.D.

2

**Exhibit 106 - page 455**

# EXHIBIT 106.1

**Testimony**

Given by

Luis H. Zayas, PhD

To the

Family Detention Forum

Hosted by

Congressional Progressive Caucus and the House Judiciary Democrats

With the support of

Congressional Hispanic Caucus

Congressional Asian Pacific American Caucus,

Congressional Black Caucus

July 28, 2015

Rayburn House Office Building

Washington, DC

**Exhibit 106.1 - page 456**

Good afternoon, Ladies and Gentlemen of Congress, distinguished guests, and fellow panelists.  My name is Luis H. Zayas.  I am Dean of the School of Social Work at The University of Texas at Austin. I am a licensed clinical social worker and license psychologist, specializing in child and adolescent mental health and family functioning.

I want to thank the Members of Congress, the Congressional Progressive Caucus, the Judiciary Democrats, the Congressional Hispanic Caucus, the Congressional Black Caucus, and the Congressional Asian Pacific American Caucus for the opportunity to address you.

My career—spanning forty years—has been devoted to serving low-income families, mostly African American and Hispanic.  Over those forty years I have seen my share of suffering.

But I have never seen anything like the devastation that prolonged detention has on already traumatized refugee children and mothers.  Detention is unnatural for children, particularly when it employs the penal mentality of private prison companies, treating them like criminals.

I have evaluated nearly 30 children and 18 mothers at the Karnes and at Dilley in the past year.  I hear from many mothers and children everything Ms. Sonia Hernandez[1] described. I have seen the damaging effects: regressions in children's behavior; suicidal ideation in teenagers; nightmares and night terrors; and pathological levels of depression, anxiety, hopelessness, and despair.  I have seen disrupted family relations, parental authority undermined; and I have evaluated deeply depress mothers, and one who attempted suicide by cutting her arms, as Ms. Hernandez mentioned.  Her attempt occurred after she was told by a prison guard that her bond would be $8500 and after her 4-year-old daughter had been denied medical care for over a week for a vaginal discharge.  Much of this is documented in the affidavit I provided for the *Flores Settlement* lawsuit.

These adversities will impair brain development and the functions that aid cognition, judgment, self-control, trust, and social interactions.  All of these disorders will take years of treatment to repair.

For over a year, the Department of Homeland Security and Immigration and Customs Enforcement have conducted a horrible experiment, one that would not pass any human subjects board of any great research institution.  I could go on and on about how the trauma of detention is heaped on already-traumatized children.  I could go on about scientific evidence. But I want to look forward not back.

We are delighted that Judge Gee in the Central District of California has ruled that the government is in violation of the *Flores Settlement*.  And I ask you to implore the government

---

[1] Witness testifying today held in detention with her three children for 315 days.

2

**Exhibit 106.1 - page 457**

*not to appeal* the judge's ruling.

In looking ahead, I want to offer a vision and suggest different approaches to managing refugee children and mothers.  There is still much to be done.

We must bring down the walls and the barbed wires, remove the prison guards, and change our entire approach.  And we must see to it that it never happens again.  If we are to apprehend mothers and children at the border, our government must act as guardian not prison guard, as protector not prosecutor.

If we must detain these mothers and children at the border then we need new models.

We need village-like environments that resemble communities, not prisons.  They should be operated by capable licensed non-profit social service and child welfare agencies using evidence-based best practices.  Staff should be counselors and advisors, case managers and aides.

We must insist that the detention of mothers and children seeking refuge *last no longer than 14 days*.  No mother I met ever expected to be permitted entry into our country without some accountability.  Mothers expected to be apprehended and detained.  But none ever imagined indefinite stays of 3, 6, even 10 months.

Detentions of up to two weeks—only a fraction of what some of our children spend in summer camp—would be time for recovery from the children's harrowing journeys and preparation for the life journey ahead.

Please imagine with me a two-week detention period filled with hope, help, and preparation.  Please imagine a highly programmed two-week period, an intensive camp-like experience, a resettlement period that would be a beehive of activity, not a dull, idle prison life.  Imagine that while dedicated attorneys are helping mothers with their asylum cases, others would be preparing mothers and children for the future.  Instead of a prisoner's existence, we would see:

1.  Pediatricians, family doctors, nurses, and dentists screening and immunizing children, treating illnesses and diseases, generating a medical record that families can take to their destinations;

2.  [We would see] Social workers conducting psychosocial evaluations and assessing family needs, and making connections to clinics, schools, churches, non-profit groups, and government agencies in their destination cities.  [We would see] psychiatric specialists assessing those with deep psychological disorders and prescribing treatments.

3

**Exhibit 106.1 - page 458**

3. [We would see] Law students and social work interns leading groups to help mothers and children adapt to life in American towns—to understand our legal system; how our school system works and how they can prepare for it; American culture and customs; and preparing them to fit into life in America.

4. Imagine seeing teachers teaching children English and operating classes the way we do in the U.S. to give children a glimpse of what it will be like.  These educators would document children's schooling needs, generating educational reports that follow children to their next schools.

5. [We would see] Dieticians and nutritionists teaching children and mothers about healthy cooking and eating, and the value of physical exercise.  Recreation and art therapists would be at work keeping children's imaginations active and engaged.

6. [We would see] At the end of a long day, family-style dinners prepared by the mothers would be served in small groups, approximating a home life, approximating normalcy.

Behavioral and social scientists, like me, would be conducting studies to examine the effects of short-term detention and evaluating the effectiveness of our programs.

Members of Congress, we can do this in fourteen days.   It must, however, operate in the spirit of safety and compassion, not punishment.  It must operate with the core principle of family law: the standard of the *best interest of the child* (and family).

Under such conditions, refugee children and mothers will be able to give witness to the compassionate nation that is the United States of America.

Thank you very much.

4

**Exhibit 106.1 - page 459**

# EXHIBIT 107

# DECLARATION OF MANOJ GOVINDAIAH

I, Manoj Govindaiah, depose and say:

1. I am an attorney licensed and admitted in the State of Texas since April
   2015. Since 2006 and 2012, respectively, I have also been licensed in Illinois
   and in Florida. I have been practicing law for nine years. From 2006 – 2012,
   I practiced at two nonprofit immigration legal services providers in Illinois.
   At those offices I primarily represented families seeking immigration
   benefits and naturalization, and detained, unaccompanied minors. From
   April 2012 – July 2014, I was a staff attorney at the Southern Poverty Law
   Center's Miami, Florida office where I litigated class action juvenile civil
   rights cases. In August 2014, I began working at the Refugee and Immigrant
   Center for Education and Legal Services ("RAICES") based in San Antonio,
   Texas, and was promoted to managing attorney in November 2014. As
   managing attorney, I oversee an office of approximately 20 employees, and
   supervise all of RAICES' immigrant family detention work.

2. In the summer of 2014, RAICES began providing legal services to mothers
   and children detained at the ICE Karnes County Residential Center ("Karnes
   detention center") in Karnes City, Texas, and eventually became the
   coordinator of the Karnes Pro Bono Project ("Project"). For purposes of
   coordinating the Project, RAICES maintains a free hotline that mothers and

Exhibit 107 - page 460

children call to reach RAICES staff. RAICES staff members visit the Karnes detention center 3-5 times per week and conduct intakes, provide pro se assistance and in-house representation, and screen and place cases for pro bono representation. RAICES has worked extensively at the Karnes detention center over the past year and has encountered hundreds of the mothers and children detained there by ICE.

3. RAICES is also one of four partner organizations that comprise the CARA Family Detention Pro Bono Project (CARA)[1] that provides pro bono representation to mothers and children held at the ICE South Texas Family Residential Center in Dilley, Texas ("Dilley detention center").

4. In the past few months, RAICES has also begun to focus on providing services to mothers and children following their release. RAICES employees, community volunteers, and pro bono attorneys staff both the San Antonio Greyhound bus station and a nearby home run by a local church. Following their release, mothers and children from the Karnes and Dilley detention centers are dropped off at the Greyhound bus station, and RAICES staff and volunteers complete a short intake form with them to obtain information on the conditions of their release and their final destinations. For those women and children who will not be leaving until later in the day or a

---

[1] The CARA partners are the Catholic Legal Immigration Network, Inc., the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association.

subsequent day, RAICES staff and volunteers transport them to the local home where they can shower, change their clothes, eat, and rest. RAICES staff, volunteers, and pro bono attorneys meet with as many mothers as possible at the local home to ensure that they understand their release obligations. Between May 26, 2015 and July 24, 2015, RAICES staff and volunteers met with a total of 332 released mothers at both the bus station and the local home. These mothers had come from both the Karnes and Dilley detention centers.

5. Since early July 2015, I have scheduled, coordinated, and supervised RAICES staff, volunteers, and pro bono attorneys who have worked at the Greyhound bus station and the local home. In that capacity, I have reviewed completed intake forms and notes, and provided guidance and assistance as needed to staff and volunteers. I submit this declaration to provide information I have learned in the course of my supervision of RAICES' work with these released mothers.

6. Generally, most of the mothers RAICES has encountered are *pro se* and unaware of what happens next in their cases. They are confused as to next steps and how to proceed in their cases. They do not realize that their immigration court cases continue despite their release from detention. Many of the women also report that they do not understand that they are required

to report changes of their addresses, will need to change the venue of their immigration proceedings to the location where they are destined, or that they may have future court hearings or Immigration and Customs Enforcement ("ICE") check-ins.

7. Many if not most mothers report that ICE did not provide them information in their native languages, or that ICE asked them to sign several English documents that were not translated to them and that they did not understand. While some women were provided change of address forms in English, they were not provided any explanation as to how to complete the form. No women were provided change of address forms in their native languages. Most women also did not understand that they are required to change their address with the immigration court, with ICE, and with U.S. Citizenship and Immigration Services ("USCIS").

8. Most of the mothers RAICES has encountered did not understand that it was their obligation to file a motion to change venue in order to have court hearings in their new locations. They believed that since it was ICE releasing them, that venue would automatically be changed, and were surprised to learn that if they failed to file a motion, their immigration court cases would continue in their current venues (San Antonio, Texas for those detained at

the Karnes detention center, and Miami, Florida for those detained at the
Dilley detention center).

9. Almost none of the mothers understood that they may have court hearings,
check-ins with their ICE deportation officers, and separate check-ins with a
private contractor if they were released with an ankle monitor. Mothers do
not understand their release paperwork, which would vary if they were
released on bond, parole, or orders of supervision. Those released on ankle
monitors also had additional paperwork that they did not understand.

10. Many mothers released on ankle monitors had separate concerns. Almost all
mothers were upset with the ankle monitor and worried that their children
would view them as criminals. Many mothers complain that the ankle
monitors are too tight, too bulky, or painful. Most mothers were concerned
about how they would charge their ankle monitors on two or three day bus
journeys, and how failure to do so might affect their release. Mothers on
ankle monitors are required to sit next to electric outlets and plug in the
ankle monitors to recharge the battery every few days, but this may not be
possible on a long bus journey.

11. One mother who was released to her lawful permanent resident husband,
who resides in San Antonio, Texas, reported that in order to charge the ankle
monitor, she must sit next to a power outlet for several hours at a time. She

has two young children and stated that the charging was nearly impossible for her because she must care for her children. She is not able to take the monitor off during charging. Additionally she stated that she is required to have a check-in with the private contractor responsible for her ankle monitor every Wednesday. This requirement causes significant inconvenience to her and her husband as she is unable to drive on her own to the contractor's office, and her husband must take time off of work every Wednesday. She also stated that the ankle monitor was incredibly painful, and when she informed the private contractor, the ankle monitor was moved to her other ankle, where she reports it is better, but still painful. A RAICES pro bono attorney attempted to represent this woman at one of her check-ins with the private contractor in an effort to have the ankle monitor removed. Although the attorney presented a properly executed G-28, Notice of Entry of Appearance, a commonly used form in immigration proceedings, the private contractor employee stated that he was unable to accept the G-28 and would not allow the attorney to accompany his client to the weekly check-in. The employee also stated he had no authority to remove the ankle monitor and that any concerns must be addressed directly to ICE.

12. Additionally, on July 28-29, 2015, pro bono attorneys meeting with released mothers at the Greyhound bus station and local home informed me that they

encountered several mothers released without documentation of any kind. These women had no idea of next steps in their cases, and it was nearly impossible for RAICES pro bono attorneys to guide them without any information.

13. ICE could substantially improve the appearance rate of released mothers by taking certain cost-effective and simple steps. The agency could easily provide released mothers with a written notice in English and Spanish (and at least verbally translate it for the few mothers who do not speak Spanish) informing the mothers of when, where and why they must appear and of the potential consequences of not appearing. ICE could easily provide released mothers with a list of available free legal services in the location where the mothers will reside. ICE could easily mail released mothers reminder notices of their scheduled appearance dates and locations. ICE could easily establish a toll-free hotline for mothers to call if they are unable to attend a scheduled interview. Setting bonds that mothers cannot post (or can only post after weeks or months in detention) or releasing them with ankle monitors is unnecessary to increase appearance rates.

14. It is our experience that whenever it wishes to (for example when bed space is limited because of the large number of mothers and children being detained) ICE routinely exercises its discretion to release mothers in

expedited removal or with reinstated removal orders and issues them a

Notice to Appear (NTA) in regular removal proceedings and/or to appear for

a credible or reasonable fear interview before a USCIS officer. Even though

these mothers have not yet been determined to possess a reasonable or

credible fear of return to their home countries, in our experience they are as

likely to appear for future proceedings as mothers who were only released

after USCIS determines that they possess a reasonable or credible fear of

return to their home countries. In both cases future proceedings are required

to determine whether they will be granted withholding of deportation based

upon their asserted fear. Far more significant to appearance rates are the

extent to which the released mother understands the process, understands

where, when and why she needs to appear, is able to locate counsel in the

area where she resides, and was treated fairly by ICE while in custody.

15. Since the Secretary of Homeland Security issued press releases on May 13

and June 24, 2015, announcing purported policy amendments with regards

to mothers and children in custody, we have seen some weeks in which more

mothers than usual were released and other weeks when less mothers than

usual were released. The averages reported in ICE's Declaration of Thomas

Homan, including at ¶ 27, are misleading. They include weeks in which due

to bed space ICE unilaterally decides to release recently apprehended

mothers and children. They also include cases in which Immigration Judges significantly lower bonds that ICE set but mothers were unable to post. They entirely fail to account for mothers and children who have been detained for much longer than the "averages" reported. They also fail to account for the length of time mothers and children have been detained who were *not* released within 30 days of encounter. Overall, a very large number of accompanied Flores class members continue to be detained for weeks or months longer than the Flores Settlement contemplates, and they continue to be detained in unsafe conditions in a lock-down facility that clearly does not meet the requirements of the Flores Settlement.

I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 12th day of August, 2015, in San Antonio, Texas.

Manoj Govindaiah
Managing Attorney
Refugee and Immigrant Center for
Education and Legal Services
5121 Crestway Drive, Suite 105
San Antonio, TX 78212
(210) 787-3745

# EXHIBIT 108

## DECLARATION OF MIRANDA A. GUERRERO

I, Miranda A. Guerrero, depose and say:

Background and Experience

1.      I am an attorney admitted and licensed in Texas since 2013.  I graduated with a
J.D. from St. Mary's Law School.  I received a Bachelor of Arts degree in Psychology from the
University of Texas at San Antonio in 2001. I have been practicing law since 2013.

2.      Since June 15, 2015, I have been employed as an attorney with RAICES (Refugee
and Immigrant Center for Education and Legal Services), a non-profit legal service provider
based in San Antonio, Texas.  I provide legal orientation and counseling to mothers and children
detained at the Karnes family detention center in Karnes City, Texas.

3.      I primarily provide legal information and pro se assistance regarding the
expedited removal process, particularly credible and reasonable fear interviews, and custody
issues, including bond, parole and other release conditions.  I also assist in the coordination of
securing pro bono counsel for mothers while at Karnes and post-release.  Any specific
information obtained in the course of our services is privileged and confidential.

4.      In my position, I have counseled approximately 75 mothers with their Flores class
member children.

5.      From July 2, 2015 when I provided my first counseling to the mothers detained at
Karnes family detention center to August 11, 2015, I have observed the following:

6.      From July 2, 2015 to July 30, 2015, Immigration and Customs Enforcement (ICE)
was placing the majority of mothers and their children into expedited removal proceedings; a
minority were placed directly into removal proceedings and issued Notices to Appear.

**Exhibit 108 - page 469**

7.    Since August 6, 2015, I have seen the opposite wherein a majority of mothers are being placed directly into removal proceedings through the issuance of a Notice to Appear.

8.    There is no discernible distinction between the mothers and children placed into expedited removal proceedings to await credible fear interviews and continue in detention, and the mothers placed into removal proceedings who are then given bonds for their release. According to the clients, ICE has not interviewed any of the mothers as to family ties in the United States, ability to post a bond, or the existence of claims for asylum or other relief, so these factors did not seem to be considered by ICE in its decision making. In fact, there was no indication of any individualized assessment of the family to determine whether ICE would place families in expedited removal or in regular removal proceedings before the Immigration Court. It appears the decision whether to issue a Notice to Appear in regular removal proceedings and set a bond, or detain mothers and reinstate their removal orders or place them in expedited removal, seems to be due to other factors unrelated to the mothers' individual circumstances.

9.    ICE has set the bond amount of $8500 in virtually every case I have seen where a bond was set. There does not appear to be any individualized assessment in the setting of the bond amount. In reviewing these clients' cases, I did not find any reasons for setting such a high bond, such as substantial flight risk. Most of the mothers with high bonds almost always seek to have their bond amount redetermined by an Immigration Judge (called bond redetermination hearings), which delays the release of said families for several additional weeks.

10.   For those individuals placed in expedited removal proceedings, it is taking approximately two weeks from the time a mother of a Flores class member expresses a fear of return to her home country, to the date she receives a credible fear interview. The average wait time for receipt of credible fear determinations is about 10 days. The women I have spoken with

have informed me the actual interview lasts about an hour. I am unaware of any deadline ICE has

set for itself to actually set bond in those cases in which the mother is found to possess a credible

fear of return to her home country. The fact that these mothers are being detained with Flores

class members does not appear to be a positive factor considered by ICE in setting bonds.

11.     It is my observation, in speaking with the mothers, that none of them were

allowed to explain why they feared return to their home countries when they were apprehended

by the Department of Homeland Security officers near the border. They were given an

opportunity to explain if they feared returning to their home country after they were apprehended

but before reaching Karnes Family Detention Center. Some of the mothers reported that the

officers insulted them and told them they were going to be deported.

12.     During our consultations the mothers who have young children, usually have their

young children present because there are no child care provisions at Karnes while the women are

meeting with an attorney. I have found the lack of child care makes the conversation with the

mother - regarding the circumstances of her family's situation - much more difficult because the

children are young, the children often require constant attention, and their mothers are often

reluctant to discuss sensitive issues about abuse and persecution in front of their children.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

12th day of August, 2015, in San Antonio, Texas.

Miranda A. Guerrero