# EXHIBIT 109

## DECLARATION OF CECILIA MENJÍVAR

I, Cecilia Menjívar, declare as follows:

 I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

### I. Qualifications

1. I am the Cowden Distinguished Professor in the School of Social and Family Dynamics at Arizona State University, a position I have held since 2008.

2. I received my Ph.D. in Sociology from the University of California, Davis in 1992. My doctoral dissertation was titled "Salvadoran Migration to the U.S.: The Dynamics of Social Networks in International Migration."

3. Since 1996, I have been a full-time faculty member at Arizona State University, where my teaching and scholarship has focused on women and gender in Central America, immigration, and sociological research methods.

4. In addition to my primary faculty position, I have and continue to serve as an affiliate of the Women's Studies Program, the Asian Pacific American Studies Program, and School of Transborder Studies at Arizona State University.

5. Additionally, in 2012-2013, I served as non-resident Senior Fellow at the Immigration Policy Institute, American Immigration Council, where I co-authored a report on immigrant women in the legalization process. I am currently a member of the National Academy of Sciences panel on immigrant integration. I am further responsible for summarizing and representing the most important sociological research about and from Central America for the Library of Congress' Handbook on Latin American Studies.

6. I am the author or editor of six books addressing violence, gender, and immigration, primarily focusing on the context of Central American states. My first published book, *Fragmented Ties: Salvadoran Immigrant Networks in America*, was named one of the twelve

1

**Exhibit 109 - page 472**

Case 2:85-cv-04544-DMG-AGR Document 187-1 Filed 08/14/15 Page 3 of 62 Page ID
#:3541
Case 1:15-cv-00011-JEB Document 38-1 Filed 04/17/15 Page 2 of 8

most influential books on the family since 2000 in a review published in the journal
*Contemporary Sociology*. My second monograph, *Enduring Violence: Ladina Women's Lives
in Guatemala*, was published by the University of California Press in 2011; the Spanish
translation was published in Guatemala in 2014. I just finished co-writing a book on
immigrant families that will be published in early 2016. In addition, I have edited several
volumes of essays and articles related to immigration and the lives of Central American and
migrant women.

7.     Since 1993 I have published more than 100 peer-reviewed scholarly articles, book
chapters, and contributions to encyclopedias, many of which present the results of original
quantitative and qualitative research about migration to the United States from Central
America. A complete list of my publications is included in my C.V.

8.     I currently sit on the Editorial Board of seven journals dedicated to the fields of
sociology and migration.

9.     Between 2011 and the present, I have previously provided affidavits or testimony as
an expert witness in nineteen cases in immigration court or asylum proceedings.

**II.     Summary of Findings and Opinions**

10.     I am providing this declaration to offer my considered opinion concerning the claims
made in three declarations – that of Tae D. Johnson, dated March 20, 2015, Ronald Vitiello,
dated March 10, 2015, and Thomas Homan, dated March 20, 2015 – regarding the deterrent
effects of the detention of families migrating from Central America.

11.     My opinions derive from the over two decades of study that I have carried out specific
to the topic of migration and gender; my hundreds of interviews with migrants and potential
migrants from Central America and their families (many of these being mothers who
migrated or attempted to migrate, both with and without their children); review of the
relevant research on the topic in my field of general migration, and more specifically of

2

**Exhibit 109 - page 473**

migration and gender, and gender and violence in Central America; and my understanding of prevailing norms of social science research methods as developed through my training, scholarship and teaching.

12.     It is my opinion that the Johnson, Vitiello, and Homan declarations (hereinafter, "declarations" unless otherwise differentiated) suffer from shared flaws that render their opinions regarding detention and its deterrent effects unreliable and invalid.

13.     First, the declarations misidentify the motives of migrant families who are traveling to the United States, specifically those who arrive seeking asylum.  Second, they are based on an inaccurate reading of recent statistics showing a decline in the number of Central American families apprehended at the border.

**The Misidentification of Motives of Migrant Families.**

14.     Over the course of my career, I have interviewed close to two hundred migrants from Guatemala, El Salvador, and Honduras in the United States, as well as potential migrants in their home countries. Most recently I have conducted and supervised long term research projects in El Salvador and Honduras addressing the effects of migration on those who stay in their countries of origin as well as "return migration" – the life of migrants who have returned (for whatever reason – be it deportation or voluntary departure) to Central America from the United States.

15.     Based on these interviews, which addressed the motivations underlying the decision to migrate, it is my conclusion that any perception of lax border enforcement or detention policies does not meaningfully contribute to the migration of families from Central America to the United States.

16.     Rather, the primary reason individuals and family units migrate from Central America is because of the conditions in their home countries. They are leaving countries that currently occupy the first, fourth and fifth place—Honduras, El Salvador and Guatemala,

3

**Exhibit 109 - page 474**

respectively—worldwide in homicide rates.[1] It is difficult to overstate the violence that has become endemic to the region, which is coupled with a breakdown of key state institutions, including the police and the judiciary. In the vacuum, gangs exert unchecked control, backed by violence over large swathes of the population. The States themselves are either powerless to control the violence or are complicit in the violence, oftentimes as the perpetrators of assaults against women in particular.[2]

17.      Under these general conditions, women's experiences are often exacerbated by gender ideologies and inequalities so that they suffer gendered violence (sexualized violence and brutality) and more poverty.[3] This context creates an overwhelming pressure to migrate in order to simply survive, and so migrants (and potential migrants) are willing to take significant risks so that they can live safely.

18.      Research conducted among Central American immigrants in the United States as well as with potential migrants in the origin countries has shown that families are aware of the considerable risks that accompany migration and choose to travel because the conditions considerably outweigh these risks.[4]

19.      These risks are mainly encountered along the passage north and through Mexico. Migrants not only expect but plan for risks such as robberies, kidnapping, and rape, to the

---

[1] In 2012, the homicide rate (reported as homicides per 100,000 people) was 90.4 in Honduras, 41.2 in El Salvador, and 39.9 in Guatemala. In comparison, the 2012 homicide rate in United States and Canada were 4.7 and 1.6, respectively, in 2012. *See* 2013 Global Study on Homicide, United Nations Office of Drugs and Crime 24, 126, *available at* http://www.unodc.org/documents/gsh/pdfs/2014_GLOBAL_HOMICIDE_BOOK_web.pdf.

[2] A wealth of literature addresses this topic, including my own book, *Enduring Violence. See also* Inter-American Commission on Human Rights ("IACHR"), *Annual Report of the Interamerican Commission on Human Rights 2012* (March 5, 2013); Christine Gervais & Betsy Estevez, *Security Through Solidarity: Honduran Women's Post-Coup Strategies of Support and Survival*, Journal of International Women's Studies 12(4), 2011.

[3] *See, e.g.*, Tacuazina Morales, *Honduras: Escalada de feminicidios (Honduras: Escalation of Femicides)*, SEMLAC (News Service on Women in Latin America and the Caribbean), March 14, 2011, http://amecopress.net/spip.php?article6376.

[4] A recent example of this scholarship is Leisy J. Abrego, *Sacrificing Families: Navigating Laws, Labor and Love Across Borders* (2014).

4

**Exhibit 109 - page 475**

Case 2:85-cv-04544-DMG-AGR Document 187-1 Filed 06/44/15 Page 6 of 62  Page ID
Case 2:15-cv-00011-JEB Document 38-1 Filed 04/17/15 Page 5 of 8
#:3544

point where women take contraceptive pills before embarking on the journey north. Death is
not infrequent, though the causes for many disappearances of migrants on the journey north
may be unknown for years. Migrants also expect and are prepared for apprehension,
detention, and deportation either by Mexican authorities or upon their arrival to the United
States.

20.　　As just one example, when speaking of the dangers people in Guatemala face daily
and the near impossibility to make a living there, a woman I interviewed in Guatemala for
one of my studies (published in my book, *Enduring Violence*), told me that she was
considering migrating to the United States because she "lived anguished." We spoke of the
dangers of the journey, enforcement at the border and the possibility of spending time in
detention in the United States. She responded, "I know that very well, everyone here knows
that, but what's the difference between dying on the road and dying little by little here?"[5]

21.　　This sentiment is consistent with the findings of another study which a student of
mine and I conducted in Honduras, in which interviews with the relatives of the migrants
showed that they too knew well of the dangers of the trip and the possibility of apprehension
and detention, as this information is conveyed clearly to those who are contemplating a trip
north.[6]

22.　　Conditions in the Northern Triangle are so dire that even those who have been
detained in and deported from the United States plan on re-migrating. One study of deportees
to El Salvador and a separate one of Honduran deportees found that these deported migrants

---

[5] Cecilia Menjívar, *Enduring Violence: Ladina Women's Lives in Guatemala* 171 (2011).
[6] Sean McKenzie and Cecilia Menjívar, *The Meanings of Migration, Remittances, and Gifts: The Views of Honduran Women Who Stay*, Global Networks: A Journal of Transnational Affairs, 11:63-81 (2011).

**Exhibit 109 - page 476**

Case 2:85-cv-04544-DMG-AGR Document 187-1 Filed 06/14/15 Page 7 of 62 Page ID
Case 1:15-cv-00011-JEB Document 38-1 Filed 04/17/15 Page 6 of 8
#:3545

face such difficult conditions in their origin countries, and reintegration in their communities
is so hard and traumatic, that they are highly likely to re-migrate.[7]

23.     Against this backdrop – a proper understanding of the conditions that lead to family
migration from Central America, and the motivations of the migrants as revealed in numerous
interviews – it is highly unlikely that increased detention of asylum seekers would have a
deterrent effect. That is because, given the dire context in which they have lived, detention,
either in the United States or Mexico, though traumatizing in itself, is one of the many
negative conditions that families have factored into their decision to leave. Compared to the
others expected risks – such as rape or death – detention is actually less serious and thus less
likely to function as a significant deterrent.

24.     In addition, the government's declarations appear to rely on statements given by
migrants, at least some of whom appear to be detained, to border patrol agents. *See, e.g.*,
Johnson Dec. ¶ 7; Vitiello Dec. ¶¶ 9, 10, 11. Such statements are inherently unreliable. Due
to a long history of human rights abuses by authorities in the Northern Triangle, these
migrants' fear of authorities clouds any interaction they may have with border patrol agents
(who are uniformed and represent authority/law enforcement). Thus, it would not be
surprising, especially in the context of interviews with migrants that take place while they are
detained, if individuals might have simply responded affirmatively to a question about
"permisos" in order to please the officer.

### The Lack of Causal Link Between the Government's Detention of Migrant Families and Recent Drop in Number of Families Apprehended at Border.

25.     A second problem of the declarations is the theorized causal link between family
detention policies and a recently reported short term decrease in the number of Central
American families detained along the border.

---

[7] Jacqueline Maria Hagan, Nestor Rodriguez and Brianna Castro, *Social Effects of Mass Deportations by the United States Government, 2000–10*, Ethnic and Racial Studies, 34 (8),1374-91 (2011).

**Exhibit 109 - page 477**

Case 2:85-cv-04544-DMG-AGR  Document 187-1  Filed 06/14/15  Page 8 of 62  Page ID
Case 1:15-cv-00011-JEB  Document 38-1  Filed 04/14/15  Page 7 of 8
#:3546

26.     As an initial matter, it is extremely difficult to establish a causal effect between

detention and deterrence. While there are scientifically valid methods capable of isolating

such causal effects, the declarations employ none of these. There are multiple other factors

that can influence the number of migrants who come to the United States, including, for

example seasonal changes, with travel sharply decreasing during the colder months. A basic

rule of sociological research is that examination of one factor alone is insufficient to predict

an outcome, especially an outcome as complex as migratory patterns.

27.     Yet the declarations relied upon by the government fail to take into account other

factors that could account for the short-term decrease in Central American families detained

along the border – most notably the massive increase during the past year in the Mexican

government's efforts to detain and deport migrants from Central America, most of whom are

en route to the United States.

28.     In the summer of 2014, the Mexican government announced a program to increase

border enforcement, entitled the "Southern Border Plan."[8] Statistics released by the Mexican

government show that this program has resulted in nearly double the number of deportations

of Central American migrants in January and February 2015 as compared to the same months

in 2014 – a jump from 12,830 to 25,069 deportations.[9] There has been a similarly sharp

increase in the number of deported minors from Mexico – from 1,605 in the first two months

of 2014 to 3,289 in the same period in 2015.[10]

---

[8] Nina Lakhani, *Mexico Deports Record Numbers of Women and Children in U.S. Driven
Effort*, The Guardian, February 4, 2015, *available at*
http://www.theguardian.com/world/2015/feb/04/mexico-deports-record-numbers-women-
children-central-america.
[9] Brianna Lee, *Mexico Steps Up Deportation of Central American Migrants*, International
Business Times (Apr. 6, 2015), *available at* http://www.ibtimes.com/mexico-steps-
deportations-central-american-migrants-1870618; Washington Office on Latin America
("WOLA"), *New Figures Show Sharp Increase in Deportations from Mexico*, Apr. 6, 2015,
http://www.wola.org/news/mexican_government_releases_new_figures_showing_sharp_incr
ease_in_deportations (summarizing official Mexican statistics).
[10] *See* WOLA summary, *supra* at n.9.

7

Exhibit 109 - page 478

29.     Without looking more specifically at the effect of Mexico's efforts, it is simply impossible to assess whether an expansion of family detention is having any deterrent effect on migration. Indeed, based on the numbers referenced above, it is far more likely that the decrease in the number of families apprehended at the U.S. border is the result of Mexico's new enforcement policies.

**III.     Compensation**

30.     I am not being compensated for my services on behalf of the Plaintiffs in this case.

31.     I reserve the right to amend or supplement this report as appropriate upon receipt of additional information or documents.

I declare under penalty of perjury under the laws of the United States and the District of Columbia that the foregoing is true and correct.

Executed this _15th__ day of April, 2015, at _Tempe, Arizona_____.

Cecilia Menjívar, Ph.D.

8

**Exhibit 109 - page 479**

# EXHIBIT 109.1

Case 2:85-cv-04544-DMG-AGR  Document 187-3  Filed 06/14/15  Page 11 of 62  Page ID
Case 1:15-cv-00011-JEB  Document 39-3  Filed 04/17/15  Page 1 of 14
#:3549



THE UNIVERSITY OF TEXAS AT AUSTIN
# SCHOOL OF SOCIAL WORK
INSTITUTE ON DOMESTIC VIOLENCE AND SEXUAL ASSAULT
CENTER FOR SOCIAL WORK RESEARCH

## DECLARATION OF LAURIE COOK HEFFRON

I, Laurie Cook Heffron, declare as follows:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

### I.      Qualifications

1.      I have a background as a social science researcher and licensed social worker on the topics of violence against women, human trafficking, and refugee and immigrant communities. My qualifications in education, research, teaching, social work practice, and serving as expert witness are summarized below.

*Research*

2.      I am currently the Associate Director for Research at the University of Texas at Austin's Institute on Domestic Violence and Sexual Assault (IDVSA) and Principal Investigator of a study that explores the experiences of, and relationships between, violence against women and migration, with a focus on migration from Central America to the US. Since 2010, I have served as IDVSA's Associate Director for Research and have designed and contributed to multiple research projects related to intimate partner violence, sexual assault, and human trafficking. Prior to serving in this role, I managed and directed research projects at IDVSA for 8 years. I have published multiple journal articles, book chapters, technical reports related to my areas of research. I regularly present at regional, statewide, and national conferences on these

areas of research. A full list of publications and conference presentations is included in the attached curriculum vitae.

*Social Work Practice*

3.      I am a Master's level social worker licensed by the Texas State Board of Social Work Examiners. The state board describes Master's level social work practice as involving the application of specialized knowledge and advanced practice skills in assessment, treatment, planning, implementation and evaluation, case management, mediation, counseling, supportive counseling, direct practice, information and referral, supervision, consultation, education, research, advocacy, community organization and developing, implementing and administering policies, programs and activities. My background includes direct social work practice with battered and exploited immigrant women. From 2003 to 2007, I was a social worker and Program Coordinator with Green Leaf Refugee Services in Austin, Texas.

*Expert Witness*

4.      I have served as an expert witness, providing either written and/or oral testimony, in 14 cases since 2012. These include 1 criminal case in Bexar County (not immigration related), 3 T visa applications, 1 U visa application, 4 cancellation of removal cases, 2 bond hearing cases, 1 credible fear interview appeal, and 2 asylum cases. I am also currently involved in coordinating the mental health experts available to provide pro bono assessments and testimony in the cases of women and children detained in the Karnes City and Dilley detention centers.

*Teaching*

5.      I have taught undergraduate courses in the School of Social Work at the University of Texas at Austin and am scheduled to teach a graduate course in forced migration at the University of Texas at Austin in spring 2015.

Case 2:85-cv-04544-DMG-AGR   Document 187-3   Filed 06/11/15   Page 13 of 62   Page ID
Case 1:15-cv-00011-JEB   Document 38-3   Filed 04/17/15   Page 3 of 14
#:3551

*Education*

      6.      I hold an undergraduate degree in Linguistics from Georgetown University (1996) and a Master's degree in Social Work from the University of Texas at Austin (2002). I am currently completing a PhD in Social Work at the University of Texas at Austin and expect to graduate in August 2015. I am a Harrington Fellow at the University of Texas at Austin.

      **II.**      **Basis for Conclusions**

      7.      I offer this declaration to provide my professional opinions about the impact of detention on immigrant women, children, and families from Central America who have migrated to the United States to seek asylum.  I have thoroughly reviewed the Declaration of Stephen M. Antkowiak ("Antkowiak Declaration") and Declaration of Tae D. Johnson ("Johnson Declaration"), and offer my opinions as to both the accuracy of the conditions described therein as well as the sufficiency of those conditions to adequately mitigate the inherently harmful nature of detention on psychologically vulnerable women and children.

      8.      I base these conclusions on my background as a social worker and researcher, as listed above.

*Scientific Literature*

      9.      In particular, I draw my conclusions from the evidence base of social science research and literature related to immigrant survivors of violence and trauma and immigrant detention. I have reviewed the relevant scientific literature in forming my conclusions and have cited those below.

*Research*

      10.      I also base the following conclusions on the social science research I have personally conducted on these topics. This includes in-depth, in-person interviews with at least

Case 2:85-cv-04544-DMG-AGR   Document 187-3   Filed 06/11/15   Page 14 of 62   Page ID
#:3552
Case 1:15-cv-00011-JEB   Document 38-3   Filed 04/17/15   Page 4 of 14

79 immigrant women with experiences of violence or trauma (19 from current dissertation

research and more than 60 from previous research).

*Interviews with and Assessments of Women*

11.     In addition to the many immigrant women I have interviewed for the purposes of

research, I have conducted another 13 in-depth interviews and assessments with the women on

whose cases I have provided expert witness testimony. I have testified in both written and oral

format as an expert witness in 2 immigration cases (cancellation of removal). I also provided a

written affidavit as expert witness but did not testify in court in 11 cases (related to asylum,

cancellation of removal, bond hearing, credible fear interview appeal, T visa, and U visa).

12.     Specifically related to the Karnes City detention facility, I have been to Karnes in

person on 4 occasions during the past 5 months. I have spoken directly with 5 families who are

currently or were previously detained at Karnes, all of whom had already passed or eventually

passed their credible fear interviews and were seeking asylum. These interviews were for the

purposes of research (1) and as an expert witness (4).  In connection with the 4 interviews I

conducted as an expert witness, I provided written testimony for all 4 and oral testimony for 2.

13.     In addition, I have received information from other mental health professionals

regarding their interviews with women and children detained in the Karnes and Dilley family

detention facilities. I am responsible for coordinating the efforts of a small network of mental

health professionals to volunteer their time to conduct expert witness evaluations, and

occasionally ongoing therapy, with women and children detained in Karnes and Dilley.  I

regularly speak with the volunteer mental health services providers regarding their experiences

and interviews at Karnes and Dilley.  The information that I have received from these other

providers is consistent with the information I have obtained in my own interviews of women and

Case 2:85-cv-04544-DMG-AGR  Document 187-30  Filed 06/11/15  Page 15 of 62  Page ID
Case 2:15-cv-00011-JEB  Document 38-3  Filed 04/17/15  Page 5 of 14
#:3553

children detained at Karnes and Dilley, so I rely on that information as well to reach my

conclusions.

### III.    Impact of Detention on Immigrant Women, Children, and Families

14.    Overall, the detention of survivors of violence and trauma and the detention of

children is highly problematic.  Both short-term and prolonged detention lead to the deterioration

of mental health and well being. The isolating and controlled environment of detention

exacerbates pre-existing mental health conditions and/or generates negative mental health

outcomes for women and children. Furthermore, detention prevents trauma survivors from

receiving much-needed services and supports from mental health professionals and from their

family members in the United States.

15.    The effects of detention on previously traumatized populations may include self-

harm, suicidal ideation and suicide attempts, depression, traumatic stress, and anxiety. This

negative emotional impact of detention has been well documented in the literature (Coffey,

Kaplan, Sampson, & Tucci, 2010; Keller, Rosenfeld, Trinh-Shevrin, Meserve, Sachs, Leviss,

Singer, Smith, Wilkinson, Kim, Allden, & Ford, 2003; Robjant, Hassan, & Katona, 2009; Silove,

Austin & Steel, 2007; Steel, Silove, Brooks, Momartin, Alzuhairi, & Susljik, 2006). Numerous

studies have shown that women who are detained are more likely to develop psychiatric

symptoms including depression, post-traumatic stress and anxiety (Coffey, Kaplan, Sampson, &

Tucci, 2010; Robjant, Hassan, and Katona, 2009; Steel, Silove, Brooks, Momartin, Alzuhairi, &

Suslijik, 2006). Detention is related to increased vulnerability to additional traumatic events and

even to suicide (Davis, 2014; Fazel & Stein, 2002). Furthermore, long-term detention is found to

produce lasting psychological harm (Coffey et al, 2010). The amount of time in detention is

linked to increased severity of mental health symptoms, and this impact is maintained after

Case 2:85-cv-04544-DMG-AGR   Document 187-3   Filed 06/11/15   Page 16 of 62   Page ID
#:3554
Case 1:15-cv-00011-JEB   Document 38-3   Filed 04/17/15   Page 6 of 14

release (Robjant, Hassan, & Katona, 2009). Detention may produce an overall increased need for mental health services (Davis, 2014). While much of the existing research has focused on the impact of long-term detention, my experience indicates that short-term detention has serious and negative impacts on the mental health and well-being of women and children as well.

16.     The adult women I interviewed at Karnes described traumatic histories in their home countries or during their journey to the United States, often including intimate partner violence and sexual abuse.  Individuals having suffered this type of trauma often suffer from mental health conditions such as PTSD.  Other mental health professionals have informed me that their interviews with women detained in the Karnes facility revealed similar trauma backgrounds.

17.     While I did not conduct testing designed to lead to diagnoses in my interviews at Karnes, the adult women I interviewed at Karnes reported a variety of symptoms that can accompany stress, anxiety, and PTSD consistent with the literature.  These symptoms included but were not limited to flashbacks, nightmares, physical reactions to reminders of past trauma, hyper arousal (feeling jittery and alert), negative changes in beliefs and feelings related to other relationships, difficulty sleeping, and anhedonia. It remains difficult to separate past traumatic experiences and the detention setting itself, as sources or causes of these symptoms. Regardless, the detention setting may trigger and/or exacerbate symptoms, even where those symptoms may have originally developed in response to trauma that occurred before migration or before detention.

18.     The concerns about the impact of detention on mental health are equally, if not more, relevant to detained children. Detention, whether it be brief or prolonged, is neither developmentally nor socially appropriate for children, particularly for children who are trauma

Case 2:85-cv-04544-DMG-AGR   Document 187-3   Filed 06/11/15   Page 17 of 62   Page ID
#:3555
Case 1:15-cv-00011-JEB   Document 38-3   Filed 04/17/15   Page 7 of 14

survivors and who have witnessed and/or experienced violence, which was the case with the children I interviewed at Karnes. Research on children in immigration detention centers shows evidence of a recent onset of mental and physical health difficulties, thought to be related to the detention experience itself (Fazel & Stein, 2002). Furthermore, children coming out of detention may be at increased risk of future stressors. In sum, children's developmental, nutritional, educational, and child protection needs are not adequately met in the detention setting, and detention is not in the best interest of children (Lorek, Ehntholt, Nesbitt, Wey, Githinji, Rossor, & Wickramasinghe, 2009; Silove, Austin & Steel, 2007).

19.     Interviews with women and children detained at Karnes revealed the following behaviors and concerns about children's physical and emotional well-being: difficulty adjusting to the imposed routine, behavior issues, such as temper tantrums and getting into fights with other children, onset of urinary incontinence, lack of developmentally appropriate and adequate independent play and physical activity, subdued mood, frequent crying, self-isolation, difficulty falling asleep, disturbed sleep, nightmares, waking up in the night screaming, trembling, and crying, the sense that someone is following them, loss of appetite.

20.     It is clear that children need therapeutic services related to the trauma they experienced and that detention impedes recovery for both mothers and their children. Trauma often ruptures a survivor's sense of safety and control over her life and also interferes with the survivor's ability to trust in relationships with others.  Recovery requires re-establishment of a sense of autonomy and safety as well as connections with loved ones and community. Settings based on choice, empowerment, and community are necessary for recovery, as opposed to those based on control, coercion, and containment, which may traumatize or re-traumatize individuals and families who are already vulnerable. Furthermore, approaches and settings that make recovery possible include the reduction and elimination of practices of seclusion and isolation, as well as

Case 2:85-cv-04544-DMG-AGR   Document 187-3   Filed 06/11/15   Page 18 of 62   Page ID
#:3556
Case 1:15-cv-00011-JEB   Document 39-3   Filed 04/17/15   Page 8 of 14

attention to workforce orientation, training, and support in trauma, violence and coercion (Ferencik & Ramirez-Hammond, 2013); Jennings, 2004; NASMHPD, 2005; SAMHSA, 2014). These elements of recovery are not available in a detention setting, such as at the Karnes and Dilley facilities.

21.     The scientific literature and my interviews with detained families also shed light on the negative impact of detention on parenting and mother-child relationships. Parents who are detained may become too depressed or anxious to provide adequate care for their children. Over time, if they are denied appropriate treatment, their symptoms may worsen, and this could impair their ability to care for their children. Family detention may generally cause disruptions to the family unit, create role reversal of parents and children, and undermine attachment relationships (Silove, Austin & Steel, 2007).

**IV.     Conditions of Detention**

22.     Both the Antkowiak and Johnson Declarations provide a brief sketch of the conditions of detention at the Karnes and Dilley facilities.  As explained below, these descriptions do not adequately describe the limitations on freedom of movement and the limited services available to the women and children at the Karnes facility.  However, regardless of conditions, the detention of mothers and children, particularly those with trauma in their past, exacerbates previous trauma and prevents appropriate care and treatment.

23.     The scholarly literature and my experience reflect that mental health services may not be fully effective in the detention setting for this population.  At best, they can act as a temporary band-aid. This is due to the setting of detention, with its restricted and controlled nature.  Detention exacerbates the lack of stability women and children feel, along with the persistent state of alertness, heightened fear, and hyper-vigilance.

**Exhibit 109.1 - page 487**

Case 2:85-cv-04544-DMG-AGR   Document 187-3   Filed 06/14/15   Page 19 of 62   Page ID
#:3557
Case 1:15-cv-00011-JEB   Document 38-3   Filed 04/17/15   Page 9 of 14

24.     The description of family detention centers provided in the Antkowiak and

Johnson Declarations do not provide a complete account of the restrictions of liberty experienced

by the women and children held there.  The Antkowiak Declaration states that the family

facilities, including Karnes, permit "free movement" of adult residents and for minors 12 years

and older, with the permission of a parent. Antkowiak Decl. ¶ 25; Johnson Decl. ¶ 17

("[r]esidents . . . enjoy free movement during waking hours"). While there may be a general

freedom of mobility in the facility, women and children report restrictions on their freedom of

movement as it relates meal times and sleep schedules, in particular. These include rigid

schedules for meals, for being in sleeping quarters, lights out, and waking times. I have received

accounts of these restrictions from the women and children I personally interviewed at Karnes,

and other mental health service providers have relayed similar accounts to me based on their

interviews with additional women and children.  I also received information, in my interviews

with detained women and children and in my interactions with other mental health providers,

indicating that women and children are sometimes awoken in the middle of the night by loud

alarms or guards conducting room checks. These sleep disruptions have a negative impact on

children, for whom sleep is necessary for development. Furthermore, these conditions exacerbate

the sleep disturbances for children who are already experiencing disrupted sleep related to

trauma, depression and general stress.

25.     These restrictions on women and children's freedom of movement and decision-

making are particularly problematic when considering their impact on survivors of violence and

trauma, particularly children. The lack of control over their movement and everyday activities

and over their futures places women and children in positions of uncertainty and isolation,

contributing to traumatic stress, depression and anxiety. These restrictions on liberty disempower

**Exhibit 109.1 - page 488**

women and children and hinder their ability to recover from trauma. It also sends messages of

wrongdoing to women and children, which can be re-traumatizing and further impede healing

and development. The restrictive nature of detention facilities and the highly controlled

movement and regimented schedule may also mirror and re-trigger negative mental health

outcomes associated with past gender-based violence experienced by women.

26.      Both the Antkowiak and Johnson Declarations state that medical and social

services are available at family detention facilities.  Antkowiak ¶ 13, Johnson ¶ 17.  Not all of the

women I interviewed at Karnes were able to access mental health services, although they all

would have benefitted from the intervention of trained mental health workers.  It would also be

very important to know whether the mental health and social services providers at the family

detention facilities have adequate Spanish language capabilities and training related to working

with survivors of trauma, domestic violence, sexual violence, or child welfare.  That information

is not available in the Antkowiak and Johnson Declarations.  Treatment by inadequately trained

mental health care providers can lead to the development or aggravation of negative mental

health symptoms or re-traumatization. It is also my understanding that the Karnes and Dilley

facilities are not licensed explicitly for the care of children. Licensing requirements in the child

welfare field are developed for the purpose of ensuring safety and well-being of children.

Without such requirements, there exists risk for greater harm to adults, children, and families.

27.      The Antkowiak Declaration states that additional resources and amenities are

provided, such as recreational areas for children.  Antkowiak Decl. 10.  These are no substitute

for comprehensive mental healthcare. For example, women have described a crochet class

offered in the past. While this activity might help distract them from the fear and stress of daily

Case 2:85-cv-04544-DMG-AGR  Document 183-3  Filed 09/14/15  Page 21 of 62  Page ID
#:3559
Case 1:15-cv-00011-JEB  Document 33-3  Filed 04/17/15  Page 11 of 14

lives while detained, it does not mitigate the negative effects of detention on mental health.  It is also my understanding that this crochet class has been recently discontinued.

28.      In sum, despite attention to the basic needs of detainees and regardless of the number and quality of amenities, resources, and trained staff available, detaining women and children in secure and controlled settings remains a harmful and highly problematic practice from a mental health perspective.

### V.      Trauma Response and Migration Decision-Making

29.      The Johnson Declaration theorizes that individuals migrating to the United States are drawn by a perception that they will be granted "permisos" and that the possibility that they will instead face detention will therefore deter future migration.  Johnson Decl. ¶ 7. The interviews I have conducted with multiple women from Central America indicate otherwise.  As a researcher and expert witness, I have conducted 64 interviews since 2007 with women who are seeking asylum and related relief in the United States, mostly from Guatemala, El Salvador and Honduras.  Based on these interviews, women who have survived traumatic experiences make the decision to migrate to the United States based on survival and on finding safety for themselves and their children, with those imperatives outweighing the expected risks they might experience during migration or after arriving in the United States.  These decisions are made in the context of life-threatening experiences or experiences perceived to be life threatening and are often made in a state of urgency and desperation. For example, many Central American women report a general awareness that rape is expected during migration through Mexico and while crossing the Mexico-US border. However, women report that their understanding of the likelihood of rape did not impact their decisions to leave their home countries, because their decisions were driven by the urgency and desperation to escape violence in their home countries.

**Exhibit 109.1 - page 490**

Case 2:85-cv-04544-DMG-AGR Document 187-3 Filed 09/14/15 Page 22 of 62 Page ID
#:3560
Case 1:15-cv-00011-JEB Document 38-3 Filed 04/17/15 Page 12 of 14

**VI.     Compensation**

I have received no compensation for my participation in this case.

I reserve the right to amend or supplement this report as appropriate upon receipt of additional information or documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13 day of April, 2015 in Austin, Texas.

_____

Laurie Cook Heffron, LMSW

# EXHIBIT 109.2

Case 2:85-cv-04544-DMG-AGR Document 187-30 Filed 08/14/15 Page 24 of 62   Page ID
Case 1:15-cv-00011-JEB   Document 38-6   Filed 04/17/15   Page 1 of 3
#:3562

## DECLARATION OF NESTOR RODRIGUEZ

I, Nestor Rodriguez, declare as follows:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows.

### I.  Qualifications

1.  I am currently a Professor in the Department of Sociology at the University of Texas at Austin in Austin, TX. I have held this position since September 2008. I have a B.A. in Sociology and Political Science, and an M.A. and Ph.D. in Sociology.  See Nestor Rodriguez faculty profile:  http://www.utexas.edu/cola/depts/sociology/faculty/npr62

2.  I have conducted research on Central American migration to the United States since the summer of 1985.  I published the first-ever journal article on Central American immigration in the United States.  The article, "Undocumented Central Americans in Houston: Diverse Populations," appeared in the peer-reviewed journal *International Migration Review*, volume 21, in 1987.  I have published 89 research papers since completing my doctoral studies, of which 52 concern migration research and 21 concern Central American migration.  I have a recent coauthored book, *Guatemala-U.S. Migration:  Transforming Regions*, which was published by the University of Texas Press in December 2014.  I have given congressional testimony before the Subcommittee on the Western Hemisphere of the Committee on Foreign Affairs of the House of Representatives. Hearings on Consequences of U.S.  Deportations of Immigrants to Latin American Countries.  110th Congress, first session, July 24, 2007 - http://archives.republicans.foreignaffairs.house.gov/110/36988.pdf.

3.  Previously, I provided a declaration, dated December 12, 2014, in which I presented my considered opinions on the causes of increased migration from Central America to the United

**Exhibit 109.2 - page 491**

States, including that of large numbers of women and children, and the effect or lack thereof of detention upon migration flows. That declaration responded, in part, to two declarations submitted by Department of Homeland Security attorneys in bond proceedings for detained Central American women and children seeking asylum: one by Philip T. Miller and the other by Tracy A. Lembke.

4.   My conclusion, based upon three decades of research into the causes of migration from Central America to the United States, was that changes in the detention policy of asylum seeking women and children from Central America will have no effect on migration patterns.

5.   In this declaration, I reaffirm my previous conclusions.

**II.  Opinion**

6.   I have reviewed the Declarations of Tae D. Johnson, Ronald Vitiello, and Thomas Homan. These declarations reiterate the theory that the expansion of family detention deters the migration of Central Americans. They offer two grounds for this claim.  The first is interviews with migrant Central Americans. Johnson ¶ 7, Vitiello ¶¶ 9, 10, 11, Homan ¶ 6.  The second ground is the presentation of recent statistics showing a short-term decrease in the number of families apprehended at the border.  Vitiello ¶ 14.

7.   The statements in the three declarations do not change my previous conclusions.

8.   The declarations do not present sufficient information or analysis to allow for conclusions to be reached using valid social science methodology. The experience and interviews described might give an idea of some of the factors to explore or to consider in analyzing migration trends or the relation between detention and migration.  However, the data presented are insufficient to reach conclusions.

9.   For example, the Vitiello Declaration offers conclusory statements regarding the effect of

2

**Exhibit 109.2 - page 492**

Case 2:85-cv-04544-DMG-AGR  Document 187-10  Filed 08/14/15  Page 26 of 62   Page ID
#:3564
Case 1:15-cv-00011-JEB  Document 38-6  Filed 04/17/15  Page 3 of 3

prior enforcement efforts, in 1989 and 2005, on migration. Vitiello ¶¶ 12, 13. Without any

further information – for example, the length of detention, type of migrant detained, changes in

conditions in the country of origin, or even simple demographic data showing the change in

numbers over time – these conclusions are unreliable, since they are not supported by empirical

data.  The claim that a recent decrease in families apprehended along the border is the result of

recent detention policies is similarly flawed, as it presents an untested hypothesis regarding an

extremely complex phenomenon that does not begin to address alternate factors that may

contribute to the change.  For instance, recent media reports have shown how the Mexican

government has stepped up immigration enforcement on its southern border with Guatemala and

returned thousands of unauthorized migrants back to Central America

(http://www.ibtimes.com/mexico-steps-deportations-central-american-migrants-1870618).  This

phenomenon may be an important factor in analyzing current numbers of arrivals of families at

the U.S. southern border.

10. My previous conclusion was based on three decades of social science research

concerning the causes of migration. The additional declarations do not change that conclusion:

the detention of asylum seeking families from Central America does not have an effect on

migration patterns.

### III.     Conclusion

I declare under penalty of perjury under the laws of the United States and the District of

Columbia that the foregoing is true and correct.

Executed this 13th day of April, 2015, at Austin, Texas.


Nestor Rodriguez
Nestor Rodriguez

3

**Exhibit 109.2 - page 493**

# EXHIBIT 110

## DECLARATION OF ROBYN BARNARD, ESQ.

I, Robyn Barnard, Esq., pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an associate attorney with Human Rights First's Refugee Representation team, 75 Broad Street, Floor 31, New York, New York 10004. Human Rights First provides *pro bono* representation to asylum seekers through its offices in New York, Houston, and Washington, D.C, often partnering with major law firms. The organization's *pro bono* clients include many asylum seekers who have been held in immigration detention, including mothers and Flores class member children who fled violence at home in Central America.

2. I am admitted to practice in New York State. My day-to-day practice involves working with indigent, detained asylum seekers in the United States and helping them find *pro bono* representation. I have represented clients in immigration proceedings in the United States for approximately one year and previously assisted asylum seekers in Australia. I am well-versed in the processes usually involved with immigrants in ICE detention who express a fear of returning to their home countries.

**Exhibit 110 - page 494**

3. From July 26 through August 1, 2015, I was in Dilley, Texas, where I served as a volunteer attorney with the CARA (CLINIC, American Immigration Council, RAICES and AILA) Family Detention *Pro Bono* Project, which provides free legal services for detained women and Flores class member children at the ICE South Texas "Family Residential Center." My trip to Dilley to provide *pro bono* services to the detained mothers and children required about eight hours of transportation, including about six hours by plane and an additional two hours by car.

4. I provide this declaration to document my observations regarding the detention conditions that families currently face.

5. I represented 40 mothers and their Flores class member children in bond and master calendar hearings before the Miami Immigration Court via video-link transmission. The families I represented had all previously passed a protection-screening interview and yet had not been released from detention under the terms of the policy changes announced by Department of Homeland Security (DHS) Secretary Johnson in two press releases issued in May and June 2015. None of these mothers had been released pursuant to the change in policy. In all cases where credible fear was found, Immigration and Customs Enforcement (ICE) officers had set initial bonds ranging from $7,000 to $9,500. The ability of indigent asylum seekers to post bonds in the

2

**Exhibit 110 - page 495**

amount set was severely limited, and indeed my clients could not post such
bonds and therefore remained incarcerated with their Flores class member
children.

6.   The vast majority of the mothers and children I represented had family ties
     within the United States and provided verifiable addresses where they would
     live with their family sponsors. Although the immigration court lowered the
     government's bonds during the bond hearings, the process resulted in the
     families having to spend additional weeks in detention as they awaited their
     hearings before the Immigration Judges. In the vast majority of cases the
     Immigration Judges significantly lower the bonds to an amount that the
     mothers can actually post.

**Notable Cases Encountered in Dilley in Late July 2015**

7.   I represented ten families detained at the facility in Dilley that had
     experienced delays in their release for up to six weeks:

     a.   On Tuesday, July 28, 2015, I represented an indigenous Guatemalan
          family before the Immigration Court. The mother had a negative
          Reasonable Fear Interview (RFI), but her three Flores class member
          children had positive Credible Fear Interviews (CFIs). The children were
          before the immigration judge for three master calendar hearings over

3

**Exhibit 110 - page 496**

three weeks but the Asylum Office had not referred the mother's case to the immigration judge for review so the class members' cases had been in a holding pattern while the immigration judge awaited referral of the mother's case. On Tuesday I found the mother's Form I-863, dated from two weeks prior (the form which referred her case to the court) in her documents folder. I informed the court that I had this document and the Immigration Judge requested that the DHS attorney check their records to see why the court had not received the referral. The DHS attorney had the Form I-863 in the ICE file and was unaware why it had not been provided to the court. This unnecessary delay cost the family weeks of uncertainty and prolonged detention. The Immigration Judge immediately scheduled the review of the mother's negative RFI for the afternoon of Friday, July 31, 2015. I represented the mother in this review, during which the court vacated the negative RFI decision. The family was in possession of their sponsor documents as of July 30, 2015, yet they waited eleven additional days *after* the court vacated the negative RFI decision before finally being released by ICE on August 11, 2015.

b. On Thursday, July 30, 2015, I represented three families in Immigration Judge review of negative RFI and a CFI. In all three of the following cases, the Immigration Judge vacated the decisions to deny the RFIs and

**Exhibit 110 - page 497**

CFI. Each family endured multiple, needless weeks in detention due to these administrative errors:

(i)     In the first negative RFI review, the Immigration Judge was expressed astonishment at the fact that the RFI finding was that the applicant had faced past persecution, and yet the final decision was that the mother did not have a reasonable fear of return to her country.

(ii)    In the second negative RFI review, the administrative officer found that the mother did have a reasonable fear of return to her country but checked the box on the form I-863 referring a negative decision to the immigration judge.

(iii)   In the negative CFI review, the 11-year-old daughter was interviewed separately from her mother about her experiences of persecution, which involved repeated attempts by a local gang to sexually assault the daughter and to recruit her into a gang. The mother reported this to the police.  When nothing was done, she approached the gang members to beg them to leave her daughter alone. The gang responded with threats to kill the mother and daughter. DHS nevertheless found that the mother had a reasonable

5

**Exhibit 110 - page 498**

fear of return to her country but that the daughter did not have a

credible fear of return.

c.  On Friday, July 31, 2015, I represented a mother and her Flores class

member daughter at a bond hearing. The mother and daughter were

issued Notices to Appear upon entry into the United States. The mother

had two sisters lawfully living in North Carolina, one of whom was

married to a United States citizen. The mother's family members

provided sponsor letters for her and her daughter so as facilitate release

from the detention facility.  Despite being issued a notice to appear, DHS

did not release the mother and daughter. The Immigration Judge granted

my request for conditional parole for the mother and daughter to be

released immediately, with the only condition being appearance for court

hearings and notifying the Immigration Court of any change of address. I

immediately notified ICE officials at the detention facility that the family

should be released per the Court's decision. According to my client, upon

returning to her dorm to collect her belongings, she was approached by

three male ICE officers, all members of the Alternatives to Detention

(ATD) Unit. Despite the Immigration Judge's order, the ICE officers

reportedly proceeded to tell the mother that she would not be released

until she signed an ATD agreement with a condition of an electronic

**Exhibit 110 - page 499**

monitoring ankle bracelet. The mother refused to sign the ATD

agreement. The ICE agents reportedly continued to pressure her and she

began crying. She refused to sign and told the officers she wanted to

speak with her lawyer "Robyn" and made her way to the visitation area

where I was located. I saw her walk in, visibly upset, followed by the

three ICE officers. She proceeded to explain to me and another CARA

attorney what transpired. The ICE officers notified me and the CARA

attorney that the family would be released that day and said nothing to us

about the requirement for an ankle bracelet. I took custody of the family

at about 5:30 p.m. so that they were released before the start of the

weekend.

d. During my week in Dilley, I met and represented five mothers in master

calendar hearings before the Immigration Court who all passed their RFIs

more than three weeks before I met with them. The families had all been

detained for close to a month. All of them provided ICE with documents

from their sponsors, which I was able to verify, and yet they remained in

detention with their class member children. I contacted ICE upon

learning of their cases and asked why they had not been released in line

with the June 24, 2015 reforms as soon as they passed their RFIs. I

received no response as to why they had not been released. One of these

7

**Exhibit 110 - page 500**

families was finally released after waiting six weeks after their positive
RFI results. Two families are still awaiting release

## Notable Trends in Dilley in Late July 2015

8. While at Dilley, I encountered approximately 20 mothers who had in their
possession ATD (ankle monitor) agreements from ICE. The vast majority of
the mothers who had these agreements told me they did not understand the
conditions of the agreement. Several told me they asked to have counsel
present and were told that that they were not allowed. The vast majority of
the mothers told me that conditions of the agreement were not explained to
them before signing and that they were pressured to sign in order to be
released. When I explained to the mothers that one condition of the ATD
agreement was the imposition of an ankle bracelet, they were very disturbed.
Some of the mothers were eligible for release on bonds set by Immigration
Judges. In those cases, if the Immigration Judge gave them the option of a
minimum or low bond—between $1,500 - $2,500—the families, according
to their conversations with me, would have preferred to pay that bond rather
than be released with the ankle bracelet.

9. During my time at the South Texas Family Residential Center in Dilley, I
met only one family being processed for release in an expeditious manner,

**Exhibit 110 - page 501**

that is, after spending 15 days in the detention facility. The majority of the

families that I met and represented lingered in detention for a month or

longer. Those in reinstatement proceedings, despite having passed their RFI,

lingered the longest, as demonstrated by the case examples above.

I declare under penalty of perjury that the abovementioned information is true and

correct

Executed on this thirteenth day of August 2015.

Robyn Barnard, Esq.

9

**Exhibit 110 - page 502**

# EXHIBIT 110.1

# human rights first

## American ideals. Universal values.

**FACT SHEET: August 2015**

# A One-Week Snapshot: Human Rights First at Dilley Family Detention Facility Post-*Flores* Ruling

All last week, a Human Rights First attorney and social worker visited the South Texas Family Residential Center in Dilley, Texas, where they provided legal and psychosocial assistance to families. This visit came immediately following a U.S. District Court for the Central District of California ruling that found that the federal government violated the 1997 *Flores* Settlement Agreement (*Flores*) by detaining children in family detention centers with their parents.

Human Rights First staff found that in the wake of this ruling, Immigration and Customs Enforcement (ICE) has begun advocating prohibitively high bonds and "vigorously contesting" release on conditional parole. In addition they noted that many of the children and their mothers experience trauma, sleep deprivation, and depression.

## Prohibitively High Bond Amounts

While recent reports indicated that ICE was setting bond at lower amounts or agreeing to release on parole in accordance with the June Department of Homeland Security (DHS) reforms, which called for release of families who had passed a protection (credible fear or reasonable fear) screening, last week ICE appeared to reverse its course.

Human Rights First assisted families in 40 cases where the family had already passed a protection screening. In all cases assisted by Human Rights First where credible fear was found, ICE officers set initial bonds at $7,000 to $9,500.These are unduly high levels that indigent asylum-seeking families cannot pay. The majority of these families had family ties within the United States and provided verifiable addresses for where they would live with their family sponsors. While immigration judges may ultimately lower high bonds during a custody

hearing, the extra days in detention and the additional time to conduct an immigration court hearing are a strain on families and often an unnecessary waste of government resources.

## Government Vigorously Contests Release of Mothers and Children in the Wake of Court Ruling

At a custody hearing in the Dilley immigration court on Tuesday, July 29, just two business days after the *Flores* ruling came down, an ICE trial attorney stated that he had received instructions to "vigorously contest" release of mothers and children on conditional parole and to "request high bond amounts" instead. Even when mothers had close family ties in the United States and presented no safety risks, ICE argued that the family was a flight risk as justification for denying release, or demanding high bonds or the imposition of intrusive ankle monitors.

In one case involving a family that had passed their credible fear screening, ICE officers had set the initial bond at $9,000. Later in court, Human Rights First advocated for release on conditional parole in light of the family's strong ties and positive credible fear result. The ICE trial attorney vigorously opposed the mother and child's release on conditional parole despite the fact that the mother's family members were living lawfully in the United States and had provided their address and copies of identification cards., The judge ultimately settled on a $3,000 bond due to ICE's strong opposition to anything less. Most families seeking protection in the United States are indigent and have extreme difficulty finding this level of funds to pay bond.

## Reasonable Fear Cases Linger the Longest

Human Rights First assisted approximately 20 cases in which families had already passed their reasonable fear screenings and remained in detention due to ICE's refusal to release the family. In many of these cases, since about one month had already passed since the family had received a positive result in the reasonable fear screening, the immigration judge inquired whether the family had made a request for parole. The Human Rights First attorney reported to the judge that ICE did not respond to repeated requests for information in connection with parole requests that had been filed weeks previously with all of the necessary supporting documents. This contradicts the June DHS policy, which calls for the release of families who have passed their reasonable fear screening. Families going through the reasonable fear process are often highly vulnerable; attorneys have identified many instances in which families were wrongfully turned away the first time they presented themselves at the border, forced to return to danger in their home countries.

## Detention's Impact on Mental Health of Children and Mothers

A Human Rights First social worker met with 15 mothers at the facility last week.  Many of the mothers suffered from post-traumatic stress disorder and major depressive disorder, resulting from the trauma they experienced in their home countries but greatly compounded by the stress and hardship faced in immigration detention. Many mothers also reported depressive and anxiety symptoms in their children, including bed wetting, lack of appetite, weight loss, nightmares, crying nightly, clinginess, headaches and gastrointestinal symptoms such as diarrhea.  These symptoms were already present in children who were detained for three or four weeks.  The severity of the symptoms increased the longer the mothers and their children were detained.

## Length of Stay in Detention

The government says that mothers and children are being released within two weeks, according to *The Washington Post*. However, based on Human Rights First's experience at Dilley last week this is not the case. Most mothers and children that Human Rights First assisted had been in detention for one to two months and some families at the facility had lingered for up to six months in detention. According to the Immigrant Justice Corps, at least 60 families at Dilley have waited two to four weeks simply to have their cases begin or to hear the result of their case, much less be released in that time period. Moreover, the locally-based CARA project reports that ICE is sending newly arriving families to detention at high rates—approximately 350 new arrivals have been sent to Dilley since the California district court decision came down less than two weeks ago.

# EXHIBIT 111

## DECLARATION OF SCOTT H. COOMES, ESQ.

I, Scott H. Coomes, Esq., hereby declare that the following statements are true and correct to the best of my knowledge, information and belief:

1. I am an Immigration Justice Corps Fellow at Immigration Equality, a nonprofit organization which serves low-income Lesbian, Gay, Bisexual, Transgender, and Human Immunodeficiency Virus (HIV)-positive immigrants. I am admitted to practice law in the State of New York, and my attorney registration number is 5351952.

2. Immigrant Justice Corps, my fellowship program based in New York, New York, arranged for me to work with detainees at Karnes County Correctional Facility ("Karnes") in conjunction with the volunteer attorney program at Refugee and Immigrant Center for Education and Legal Services ("RAICES") in San Antonio, Texas. My participation in this project lasted from June 14, 2015 through June 27, 2015. Immigrant Justice Corps sent me to Karnes with a Spanish-language interpreter, Maria "Mili" Chapado. My conversations with my clients were conducted through Ms. Chapado's interpretation assistance, in addition to my own limited knowledge of Spanish. I report the conditions at Karnes based upon recollections of my conversations with detainees, as well as my observations. I could not corroborate many of the statements I received from detainees.

3. I met with detainees at Karnes on approximately nine or ten occasions. I represented the detainees Laura and her son Jose in their bond redetermination matter.[1] I also represented Victoria at a Master Calendar Hearing at which I submitted an I-589, as well as her son as her derivative at an adjacent Master Hearing. Her son was not included on the application for his mother because she was only eligible for Withholding of Removal. In addition to serving as counsel of record for these two families, I also conducted meetings with approximately six or seven other women and their children. Some of these meetings were brief, while others involved more extensive work such as preparation for credible fear interviews. I also entered a G-28 in order to speak with Carla, who primarily worked with my colleague Jessice Rofé, Esq.

4. My conversations with the women and children detained at Karnes revealed consistent inadequacies in the facility's resources, as well as mismanagement on the part of the staff of Immigration and Customs Enforcement ("ICE") and GEO Group, Inc. ("GEO").

**Inadequate Medical Care & Conditions at Karnes:**

5. One such shortcoming at the facility was inadequate medical care. Many of the children that I met were sick, and their mothers reported that they had become ill while being processed in the *hieleras*. These children did not recover in the weeks or even months since their transfer to Karnes. According to my client Victoria, the medical staff at Karnes would typically treat symptoms with pain-killers and water while ignoring

---

[1] Throughout this declaration, I make use of pseudonyms in order to protect my clients.

**Exhibit 111 - page 505**

underlying health problems. Only when medical problems became especially critical did GEO staff transfer sick detainees to see specialists in San Antonio, Texas.

6. Another shortcoming at the facility was inadequate food and nutrition. The detainees I met described the food as repulsive and disgusting. I heard from multiple detainees that insects were found in their meals. To my recollection, several detainees described the food as being rotten. Several of the mothers I met explained that their small children were not eating because the food available to them was so unpalatable. I observed that several of the children I met appeared weak and thin, although I am not qualified to speculate whether their appearance was a consequence of malnourishment. To my knowledge, the GEO staff took no action to improve the food quality.

7. A further shortcoming at the facility was inadequate language support. I met with an indigenous family from Guatemala who were only fluent in Q'anjobalan, a Mayan language, and they spoke very limited Spanish. The family had been in the facility for over a month, and yet it was clear that ICE and GEO had failed to give them a proper orientation. This family had very little understanding of their legal situation or why they were even being detained. Although our communication with this family was limited, Ms. Chapado and I were able to come to the conclusion that ICE had not completed a Credible Fear Interview with the adult of the family because of inadequate language support. The procedural posture of the case was unclear, as the family claimed they had never received any paperwork or a Notice to Appear, but that they had been told that bond had been set. They had no way to pay this bond, and they did not seem to have the language skills to submit a bond redetermination application. It also appeared as if the family did not understand that their release from Karnes was contingent upon payment of bond.

**Lack of Visitation Clarity and Attorney Access:**

8. The management of the facility was inadequate because of arbitrary and confusing rules that applied to detainees and visitors alike. It was difficult for visitors to meet with detainees on the consistent basis. I witnessed a GEO staff person attempt to refuse entry to a visitor because she did not specifically have a Texas driver's license (which is only one means of proving identity). A GEO staff employee also attempted to deny entry to Ms. Chapado for a legal visit because she was not an attorney, even though she was qualified to make those visits as a Board of Immigration Appeals (BIA) accredited representative. It was only when ICE staff appeared that GEO employees would comply with rules for allowing visitors.

9. Detainees were subject to arbitrary rules. They were allowed to communicate with the outside world through Gmail email accounts, but they were not permitted to use any other email service. Detainees were not allowed to create their own Gmail accounts from within the facility, so they had to rely on somebody outside of the facility to create an account for them and then to share the log-in information. It was also reported by detainees to my colleagues and me that the clothing available to them was inadequate.

**Exhibit 111 - page 506**

10. According to detainees we met, GEO staff attempted to improve the appearance of the facility when Secretary of the Department of Homeland Security Jeb Johnson visited the facility on or about June 15, 2015. Detainees described receiving fresh fruit for the first time in the cafeteria on that day. I was told that when the mothers gathered around the cafeteria station where fruit was being served, GEO staff members mocked them and compared them to dogs feeding at a bowl. One detainee described a GEO staff member blowing bubbles in an outdoor recreation area on that day for the first time, with the intention that Secretary Johnson would view the children playing in the yard when they tried to catch the bubbles.

11. Jessica Rofé, Esq. and I worked with the detainee Carla. Ms. Rofé was the primary attorney who worked with this client, and my role was limited to assisting my colleague for several days before my involvement with the RAICES project ended. My account of Carla's experience is therefore incomplete. Carla was brought to our attention by the RAICES staff because she had been placed on suicide watch in medical isolation after she slit her wrists. Carla described injuring herself because she first had been led to believe that she would be released without having to pay a bond, but that later her bond had been set to a prohibitively high amount. When Ms. Rofé and I went to Karnes to meet with Carla, we were denied access to meet with her because she was on suicide watch and was not fully clothed. Ms. Rofé and I were able to speak with ICE officers and arrange communication with Carla over a telephone from within the facility while she was in medical isolation. We spoke with her in this matter for multiple days.

12. Ms. Rofé and I received contradictory information from ICE staff and Carla. An ICE officer spoke to me in the hallway and intimated that he would set the bond for a lower amount if Carla would comply with their request for an address for her sponsor. When I asked Carla for a sponsor address, she stated that she in fact had an address for a sponsor, that she had informed ICE that this address was written down among her belongings, but that ICE staff refused to allow her to access this address from her belongings. Carla also begged my colleague and me that she might see her daughter, who was being supervised by a GEO employee in a separate room. When I spoke with an ICE officer about allowing Carla's daughter to visit her mother in medical isolation, the ICE officer claimed that Carla was refusing to consent to her daughter visiting her. I had to convince the ICE officer that my client gave her consent, as my client's own oral consent was apparently inadequate. Carla also reported being offered forms to sign that were written in English without any translations in Spanish, which was her sole language. Since this information was communicated over a telephone, Mr. Rofé and I were unable to see which forms she was being asked to sign.

13. Carla also described the psychologist at Karnes as performing a non-neutral role in her immigration case. This psychologist possessed the sole authority to determine whether Carla would remain in medical isolation, and ICE and GEO staff referred to this authority as the rationale for their treatment of her. When Ms. Rofé and I attempted to speak to the psychologist about Carla's access to counsel, he was consistently unavailable to talk with us. Ms. Rofé attempted to arrange for an outside psychologist to meet with Carla while she was in medical isolation, and there was heavy resistance from GEO staff. We were

**Exhibit 111 - page 507**

given the excuse that Carla could meet only with a doctor while in medical isolation, even though the outside psychologist we were in contact with had adequate credentials. According to Carla, and to the best of my recollection of my conversations with my colleagues about the matter, the psychologist told Carla that Ms. Rofé and I were lying to her and she should not work with us.

**Bond Amounts:**

14. The bond amounts set by ICE were highly arbitrary. It seemed impossible to ascertain why some detainees were being given higher bond amounts than others. There was no systematic way for detainees to know how to advocate for lower bond amounts, beyond ICE requests for sponsor addresses. To my recollection, many bonds were set at about $7,500 to $8,500, but to my recollection we heard of bonds set at higher amounts. These amounts were prohibitively high for most detainees to pay, especially if they did not have family in the United States. I do not recall there being any consideration given to the ability of detainees or their families to pay. At bond redetermination hearings I observed and appeared at, DHS attorneys settled for bond amounts at consistent levels based upon the immigration status or citizenship of sponsors, without taking into account other positive equities.

I swear that the above is true to the best of my knowledge.

Signed: _____    Dated: ___08/13/2015___

Sworn to me this 13 th
Day of August 2015

_____
Notary Public

> CLEMENT KAI LEE
> Notary Public, State of New York
> No. 02LE6260591
> Qualified in New York County
> Commission Expires April 30, 2016

Exhibit 111 - page 508

# EXHIBIT 112

Declaration of Stephen W. Manning

I, Stephen W. Manning, depose and say:

1.  I am an attorney in a private practice based in Portland, Oregon and I am the director of the Innovation Law Lab, a non-profit in Oregon. I am an adjunct professor of law at Lewis & Clark Law School in Oregon where I teach immigration law. I am the recipient of the 2014 American Immigration Lawyers Association (AILA) Founder's Award for creating and organizing the pro bono project at the family detention center in Artesia, New Mexico, the 2010 Jack Wasserman Memorial Award for Excellence in Immigration Litigation, the 2009 Edith Lowenstein Memorial Award for Excellence in Advancing the Practice of Immigration Law, the 2008 Gerald R Robinson Award for Excellence in Immigration Litigation, among other awards and recognition. I am a former Commissioner for the City of Portland, Oregon's Human Rights Commission. I was elected a member of AILA's Board of Governors in 2012.

2.  The Innovation Law Lab, a non-profit I founded in 2014,  uses specialized technology and training programs to build the capacity of lawyers and non-profits throughout the United States. The Law Lab provides the technology platforms for the CARA Pro Bono Family Detention Project. The CARA Pro Bono Project is a collaboration between the Catholic Legal

Immigration Network, Inc., the American Immigration Lawyers Association, the Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Council. The CARA Pro Bono Project provides direct representation to any children and women detained at the DHS family detention center in Dilley, Texas. The project operates using the same successful model used at the family detention center in Artesia, New Mexico.

3. I was a lead coordinator for the pro bono project at the family detention center in Artesia, New Mexico. I created technology models and case processing models that were used in Artesia from August 2014 until the detention center was closed in December 2014.

4. I volunteer as a coordinator for the CARA Pro Bono Project at the family detention center in Dilley, Texas. In this role, I provide day-to-day guidance on legal questions and case processing. I provide support to the volunteers on the ground at the Dilley detention center as well as the numerous remote volunteer teams that produce bond motions, translations, and other pleadings. I also provide technological support to the CARA Project, train staff and volunteers, and manage the database systems used by more than 400 volunteers throughout the United States who are involved in the CARA Project.

5. The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my coordinating capacity for the CARA project.

The CARA Pro Bono Project

6. The CARA Project is a complex project that provides pro bono legal services to children and women detained in Karnes City and Dilley, Texas and undertakes advocacy and litigation to end family detention.

7. Since the Dilley detention center was opened, the CARA Project has represented approximately 5000 female heads of household and their accompanying children. The pro bono volunteers maintain detailed data about each client represented by the CARA Project, which they input into the project's client database. This information includes both privileged information and several data points that enable us to monitor the implementation of government policies and practices in real time. In particular, information about release practices, including the bonds set by the Department of Homeland Security and the redetermination of those bonds by the Immigration Judges, are recorded. I monitor these bond amounts regularly.

8. The data indicates that most children and women at the Dilley detention center have been released as a result of CARA advocacy before

3

**Exhibit 112 - page 511**

the Immigration Courts, not because of any DHS or ICE policy or recent modification of policy. Indeed, the data reveals that the releases have occurred in spite of the ongoing DHS practice of setting unreasonably high bonds.

9. I reviewed the bond data maintained by the CARA Project for clients served after both the May 13, 2015 and June 24, 2015 policy announcements by the Department of Homeland Security and Immigration and Customs Enforcement regarding the DHS release practices at the Dilley detention center. I reviewed 337 cases where the CARA project represented a child and mother at an immigration court hearing between May 13, 2015 and August 11, 2015. I did not exclude any CARA represented case.

10. There were 148 cases represented at a bond hearing by CARA from May 13, 2015 to June 23, 2015. In these cases, ICE had originally issued an order for mandatory detention under § 235(b) of the Immigration and Nationality Act or a no-bond order under § 236(a). In 107 cases, ICE made a subsequent custody determination and set bond in different amounts that ranged from a low of $4,000 to a high of $15,000. For 34 cases, a subsequent ICE bond amount was not recorded by the project. The average bond amount offered by ICE in the 107 cases was approximately $8,000. In all 139 cases, the CARA project requested review by the immigration courts

and in all 139 cases, an immigration court reduced the bond. For example, there were 7 cases in this first period where ICE issued bond orders of $15,000. The CARA project successfully demonstrated before the immigration courts that those bonds were unreasonably high and an immigration judge reduced the bonds to $1,500; $1,500; $1,500; $2,500; $2,500; $1,500; and $3,000. In sum, while the average ICE bond in the period immediately after the May 13 DHS announcement was approximately $8,000, the immigration courts reduced that amount uniformly to an average of $2,134.

11. In 9 of the 148 cases, ICE denied bond entirely under § 236(a) despite its discretionary power to release the affected individuals. In those 9 instances, immigration judges subsequently conducted individualized release determinations and granted bond in the amounts of $2,000; $2,500; $2,500; $1,500; $2,000; $2,500; $4,500; $2,000; and $3,000.

12. *Based on our data, there was no change in the field practice after the June 24, 2015 DHS policy announcement, with respect to ICE's setting of bond amounts*. From June 24, 2015 to August 11, 2015, CARA represented cases 188.  ICE issued bonds at an average amount of $6,000. This does not include 14 no-bond orders issued by ICE. Again, the ICE bond amounts were too high for the CARA clients to pay so CARA requested hearings

before the immigration courts. In every case, the immigration judge reduced the bond. The average immigration court bond was $1,901. In those 14 instances where ICE had issued a no-bond order (thus denying release), the immigration court eliminated the bond requirement entirely in three cases and ordered the mother and children released on conditional parole (which is the equivalent to release on recognizance) and, for the other 11 cases, issued bond orders ranging from $1,500 to a high of $2,000.

13. For many, bonds are not set until weeks after apprehension when DHS makes a determination that the mother possesses a reasonable or credible fear of return to her home country or decides to issue a Notice to Appear (NTA). It may therefore be several weeks before a bond is even set in any particular case. Because the amounts of bond set by ICE are high and do not appear to take into account the ability of the mother to post the bond amount set, many if not most CARA clients are unable to post the required amount set by ICE.  As a result, their detention is further prolonged and the length of time to receive a hearing before an immigration judge is increasing. From June 24, 2015 to August 11, 2015, the average wait for a mother of a Flores class member between her detention and the date the immigration court reduced her bond was approximately 34.6 days. However, the time periods vary and so some mothers and Flores class members may have a bond

reduced before about 34 days, while others wait much longer to eventually have an affordable bond set. When the mother or her family members are able to post the bond set by the Immigration Judge, several additional days may be required for the bond to be posted and for ICE administrative paperwork to be completed allowing the for the mother and child to actually leave the lock-down detention center.

14. Overall, the data we have collected discussed above shows that the imposition of high bonds continues to block the prompt release of very a significant number of Flores class member children and their mothers despite the DHS Secretary's recent media releases announcing changes in policy. More mothers considered for release are being required to wear GPS ankle bracelets. Based on my experience as described above, ICE has often in the past and could easily now parole mothers placed in expedited removal or with reinstated removal orders, or can issue them Notices to Appear and release them on reasonable bonds and conditions to secure their presence at future proceedings. ICE follows this course whenever it wishes to but for reasons that often do not appear related to the individual case. For mothers who ICE insists must remain in expedited removal proceedings and in custody with Flores class member children, if prompt and meaningful access to counsel is permitted, a mother and child's eligibility for a range of

benefits under the Immigration and Nationality Act, including possession of a credible fear of return, can be evaluated within a matter of days by ICE, identification and criminal background checks are done almost instantaneously, and release could take place promptly if ICE set reasonable bonds for the mothers taking into account in each case what the mother can actually afford to post.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of August, 2015, in the City of Portland, State of Oregon.

/s/ Stephen W Manning
Stephen W. Manning

# EXHIBIT 113

## DECLARATION OF SUSANNAH VOLPE

I, Susannah Volpe, hereby declare under penalty of perjury and say as follows:

1.      I am an attorney licensed to practice law in the state of Texas.  I am currently employed as an Associate Attorney at Walker Gates Vela PLLC in Austin, Texas.  I have worked at this firm since November 2013. I have practiced immigration law for four years.

2.      Over the past year, I have represented, as primary or co-counsel, four women who were detained, along with their children, by U.S. Immigration and Customs Enforcement ("ICE") at the Karnes County Residential Center in Karnes City, Texas.  I have not represented clients who were detained by ICE at the South Texas Family Residential Center in Dilley, Texas. I am a fluent Spanish speaker.

3.      The circumstances of the case of one client and her children are set forth below in greater detail. The information provided herein is based upon my familiarity with my client's case and circumstances, and documents from the families' immigration and detention case files.

My Client Margarita's Story

4.      My client Margarita (I am using pseudonyms to protect her and her children's true identities) arrived in the United States in December 2014 after fleeing an emotionally, physically, and sexually violent male partner in El Salvador. This partner was also violent toward Margarita's two children, who are ten and seven years old. At one point her partner picked up her 7 year old son, Neil, and threw him into a cinderblock wall, causing him severe injury.

5.      In December 2014, Margarita was detained along with her two children at Karnes County Residential Center (Karnes), where they remained until the end of May 2015. During this time, her ten year old daughter, Zoe, became increasingly ill, being taken to off-site doctors at least

1

**Exhibit 113 - page 517**

six times. Her symptoms included severe headaches, vomiting, and fainting. Each time, her mother accompanied her on the doctors' visits.

6.      The daughter's illness culminated in a hospital stay of approximately four days. During her hospital stay, Margarita accompanied her daughter Zoe and stayed at the hospital. However, ICE officials would not allow Margarita's seven year old son to accompany his mother and sister. As a result, ICE separated the seven year old boy from his mother and sister and detained him alone for nearly two days at the Karnes detention center. During that time, Margarita did not have any physical contact with him. This separation caused both the mother and son a great deal of stress. Margarita told me that when she reunited with her son, he had been crying and was very scared. He did not want to be separated from his mother and sister.

7.      In addition, ICE officials and GEO personnel did not properly inform Margarita about the nature of her daughter's illness. I asked Margarita several times about her daughter's diagnosis. She told me that ICE officials and GEO personnel did not answer her questions or give her information about her daughter's medical condition, her diagnosis, her treatment, or the reasons for her hospitalization. Even at the hospital, Margarita was never provided full information as to the nature of her daughter's condition.

8.      The details of Zoe's illness show that ICE did not provide her adequate screening, diagnosis or treatment. When Zoe arrived at Karnes, she began to have extreme headaches that would cause her to pass out and to wake up in the night crying from pain. Both Zoe and her brother, Neil, would eat only bread and would wake up at night crying and shaking. They did not receive any psychiatric treatment to help them deal with the trauma they had suffered. During her time at Karnes, Zoe fainted twice, both times falling into the concrete floor and bruising her face. After each episode, she went to the medical unit, but the Karnes medical personnel did not diagnose her

2

**Exhibit 113 - page 518**

or provide any appropriate treatment. Instead, these episodes were written up in Zoe's medical records as her having tripped and fallen.

9.      While at Karnes, Zoe began to have a lump growing on her neck, under her jawline. She was taken to offsite medical providers for CAT scans, and the offsite providers noted that she should be tested for autoimmune diseases, including HIV/ AIDS. These tests for autoimmune disease were never performed. Margarita was told she needed to give a milky white liquid to Zoe, which she did, and the lump began to recede. Karnes medical personnel never told Margarita the cause or diagnosis of the lump on Zoë's jawline.  They also did not tell her what the white liquid was that she was administering to Zoe.

10.     Zoe's medical problems at Karnes culminated in an episode where she was taken to the children's emergency ward in Methodist Hospital in San Antonio. Zoe began vomiting on a Thursday night and spent the entire day on Friday vomiting. On Saturday, Margarita took her to the Karnes medical unit, where she remained under observation, unable to keep down any food or liquid. Zoe was transferred to an offsite medical provider on Sunday and, on Monday, she was rushed to the emergency room at the Children's Methodist Hospital in San Antonio, to treat what was being diagnosed as Acute Renal Failure.

11.     I attempted to visit Margarita and Zoe when they were at the hospital. The hospital personnel informed me that the hospital had a contract with Karnes to provide for "confidential patients," and they escorted me out. I was not able to visit with Margarita and Zoe, despite identifying myself as Margarita's attorney. Margarita told me that Zoe underwent a procedure at the hospital on Tuesday morning and was on an IV drip since her admission, but neither the hospital nor GEO provided Margarita or me with information about the diagnosis, treatment, the procedure, or the results.

3

**Exhibit 113 - page 519**

12.     During the time his sister and mother were at the hospital, Neil spent approximately two days alone at Karnes, without his mother. I spoke with ICE and GEO officials, and I urged them to keep the family together, even if they were all sleeping in a hospital room, because that was preferable to having the seven year old boy alone in a secure detention facility with unrelated adults and guards. GEO and ICE refused to grant this request to reunite the family.

13.     Indeed, Margarita was told by other mothers at Karnes that they tried to have Neil sleep with them in their dorm rooms so he would not need to sleep alone and be scared. ICE and GEO personnel would not allow other mothers to provide this comfort to Neil. As a result, Neil remained alone, under supervision of GEO personnel, for nearly two days without his mother and sister.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12 day of Aug , 2015, at Austin , Texas .

SUSANNAH VOLPE

4

**Exhibit 113 - page 520**

# EXHIBIT 114



# South Texas ICE Detention Facility to House Adults With Children

**Release Date:** July 31, 2014

For Immediate Release
DHS Press Office
Contact: 202-282-8010

KARNES CITY, Texas— Tomorrow, August 1, U.S. Immigration and Customs Enforcement (ICE) will begin to use its civil detention facility in Karnes City to house adults with children in response to the influx of families that have recently illegally entered the United States. The newly modified Karnes County Residential Center is one of several facilities the Department of Homeland Security (DHS) is using to increase the capacity to detain and expedite the removal of adults with children illegally crossing the Southwest border. These facilities will help ensure more timely and effective removals, and deter others from taking the dangerous journey and illegally crossing into the United States, all while maintaining important due process and protection claims that individuals may have. In addition to the Karnes facility, ICE is also using a temporary facility in Artesia, New Mexico and a long-standing facility in Leesport, Pennsylvania.

"In the face of unprecedented levels of illegal migration of adults with children and unaccompanied children in the Rio Grande Valley, we have reiterated that our borders are not open to illegal migration; if you come here illegally, and don't have a legal basis to stay under our laws, we will send you back," said Secretary of Homeland Security Jeh Johnson. "The opening of this additional facility represents our continued commitment to provide temporary facilities for adults with children while they undergo removal proceedings, and it is part of DHS' sustained and aggressive campaign to stem the tide of illegal migration from Central America."

On July 11, 2014, ICE modified its contract with Karnes County, Texas, in order to transition the Karnes center from an existing immigration detention facility housing adults to a residential facility to house adults with children. This was done in order to expand the agency's capacity to house adults with children who have been apprehended at the border and placed into expedited removal proceedings. Karnes County Residential Center will be able to accommodate up to 532 adults with children.

ICE's family detention facilities are an effective and humane alternative to maintain family unity as families await the outcome of immigration hearings or return to their home countries. Adults with children will be housed in facilities that adequately provide for their safety, security, and medical needs. ICE ensures that family detention facilities operate in an open environment, which includes classrooms with state-certified teachers, access to an online legal library, and bilingual teachers.

For more information, visit www.dhs.gov.

### 

*Review Date: July 31, 2014*



**Exhibit 114 - page 521**

# EXHIBIT 115



🇺🇸 Official Website of the Department of Homeland Security

Report Crimes: Email or Call 1-866-DHS-2-ICE

# ICE Newsroom

News Releases

News Releases

TOP STORY
Enforcement and Removal
11/17/2014

## ICE's new family detention center in Dilley, Texas to open in December

ICE will transition out of the temporary facility in Artesia, New Mexico



WASHINGTON — U.S. Immigration and Customs Enforcement (ICE) will be expanding its detention capacity for adults with children at the South Texas Family Residential Center in Dilley, Texas, in December. In light of this upcoming expansion, ICE is transitioning out of the temporary family residential facility at the Federal Law Enforcement Training Campus (FLETC) in Artesia, New Mexico, and returning this facility full time to FLETC operations during the month of December.

> "With the opening of the Dilley facility, ICE will have the initial capacity to house up to 480 residents but the ultimate capacity to house up to 2,400 individuals," said Acting ICE Director Thomas S. Winkowski. "These facilities help ensure timely and effective removals that comply with our legal and international obligations, while deterring others from taking the dangerous journey and illegally crossing into the United States."

The South Texas Family Residential Center in Dilley is the fourth facility the Department of Homeland Security (DHS) has used to increase its capacity to detain and expedite the removal of adults with children who illegally crossed the Southwest border. ICE continues to use a newly modified residential center in Karnes City, Texas, and a long-standing facility in Leesport, Pennsylvania, to house adults with children.

"ICE opened the temporary facility in Artesia in June as a critical piece of the government's response to the unprecedented influx of adults with children at the Southwest border. Since then, the numbers of illegal migrants crossing into south Texas has gone down considerably," said Acting Director Winkowski. "However, we must be prepared for traditional, seasonal increases in illegal migration. The Dilley facility will provide invaluable surge capacity should apprehensions of adults with children once again surge this spring."

On Nov. 7, 2014, ICE ceased intake of individuals to its temporary family residential center in Artesia, New Mexico, and began the draw-down process to cease operations by the end of 2014.

ICE is screening the approximately 420 current residents of the Artesia facility on a case by case basis to identify those for whom transfer to another facility is appropriate. These individuals will be transferred before the end of the year to the family residential centers in Karnes City, Texas, and Dilley, Texas.

ICE's residential centers for adults with children are an effective and humane alternative to maintain family unity as families await the outcome of immigration hearings or return to their home countries. ICE ensures that these residential centers operate in an open environment, which includes medical care, play rooms, social workers, educational services, and access to legal counsel.



**Exhibit 115 - page 522**