CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
         pschey@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
T. Wayne Harman (Cal. Bar No. 254089)
Elena Garcia (Cal. Bar No. 299680)
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020
Email: wharman@orrick.com
         egarcia@orrick.com

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>          Plaintiffs,<br><br>- vs -<br><br>LORETTA E. LYNCH, Attorney General of the United States, *et al.*,<br><br>          Defendants.<br>—————————————————— | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CV 85-4544 DMG (AGRx)<br><br>**[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]** NOTICE OF MOTION AND MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR<br><br>Hearing: June 10, 2016.<br>Time: 9:30 a.m.<br><br>Courtroom 7, 312 N. Spring Street |

i

*Plaintiffs' counsel, continued*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:  (408) 280-2437
Facsimile:   (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org
        annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*/ / /*

To defendants and their attorneys of record:

PLEASE TAKE NOTICE that on June 10, 2016, at 9:30 a.m. or as soon thereafter as counsel may be heard, plaintiffs will and do hereby move the Court for an Order (1) requiring defendants to comply with the settlement filed herein on January 17, 1997 ("Settlement")[1] and this Court's Orders of July 24, 2015 [Doc. # 177] and August 21, 2015 [Doc. # 189], (2) appointing a Special Monitor, and (3) for such further relief as the Court deems appropriate.

This motion is based upon the annexed memorandum of points and authorities and upon all other matters of record herein, and is brought following several meetings of counsel pursuant to Local Rule 7-3 and ¶ 37 of the Settlement.[2]

Dated: May 17, 2016.                    Respectfully submitted,

                                        CENTER FOR HUMAN RIGHTS &
                                        CONSTITUTIONAL LAW
                                        Carlos Holguín
                                        Peter A. Schey

                                        ORRICK, HERRINGTON & SUTCLIFFE LLP
                                        William A. Molinski
                                        T. Wayne Harman
                                        Elena García

                                        LA RAZA CENTRO LEGAL, INC.
                                        Michael Sorgen
                                        Maria Victoria Castro
                                        Amanda Alvarado Ford

---

[1] *See* Plaintiffs' First Set of Exhibits in Support of Motion to Enforce Settlement, Exh. 1 [Doc. # 101.]

[2] This motion is made following conferences of counsel pursuant to L.R. 7-3 that took place on March 11, 2016. Further conferences were held on March 17, 2014, and March 25, 2016. Plaintiffs communicated concerns regarding Defendants' breaches of the Settlement in correspondence dated February 20, 2016. The parties have been unable to resolve their disagreement over Defendants' compliance with the Settlement and this Court's Orders. Plaintiffs' Exhibit 1 ¶ 16.

LAW FOUNDATION OF SILICON VALLEY - LEGAL ADVOCATES FOR CHILDREN & YOUTH
Jennifer Kelleher Cloyd
Katherine H. Manning
Kyra Kazantzis
Annette Kirkham

Of counsel:

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

/s/   *Peter Schey*
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II. STATEMENT OF FACTS .....................................................................................4

   1.  DEFENDANTS CONTINUE TO DETAIN CHILDREN IN DEPLORABLE AND UNSANITARY CONDITIONS IN CBP FACILITIES IN VIOLATION OF THE SETTLEMENT AND THIS COURT'S ORDERS ...................................................................................................... 4

      (A)  *Flores* Class Member children in CBP facilities suffer from inadequate access to food.................................................................................................................... 5

      (B)  *Flores* Class Member children in CBP facilities continue to suffer from inadequate access to clean drinking water ................................................................ 6

      (C)  *Flores* Class Member children are held in CBP facilities that are unsanitary and unfit for human habitation.......................................................................... 7

      (D)  *Flores* Class Member children continue to suffer from extremely cold temperatures in CBP detention facilities.......................................................... 9

      (E)  *Flores* Class Member children are held in inhumanely overcrowded CBP detention facilities and are forced to endure sleep deprivation ...................................10

   2.  FLORES CLASS MEMBER CHILDREN ARE ROUTINELY NOT ADVISED OF FLORES RIGHTS BY CBP OR ICE OFFICERS AS REQUIRED BY THE SETTLEMENT ...........................11

   3.  DHS FAILS TO MAKE AND RECORD ONGOING EFFORTS AIMED AT RELEASE OR PLACEMENT OF FLORES CLASS MEMBERS AS REQUIRED BY THE COURT'S ORDERS AND THE SETTLEMENT ...........................................................................................12

   4.  FLORES CLASS MEMBER CHILDREN ARE ROUTINELY COMMINGLED WITH UNRELATED ADULTS FOR EXTENDED PERIODS OF TIME IN VIOLATION OF THE COURT'S ORDERS AND THE SETTLEMENT...................................................................................14

   5.  FLORES CLASS MEMBER CHILDREN ARE ROUTINELY DETAINED FOR WEEKS OR MONTHS IN SECURE FACILITIES IN VIOLATION OF THE COURT'S ORDERS AND THE SETTLEMENT ...................................................................................................15

6.   DEFENDANTS ROUTINELY INTERFERE WITH CLASS MEMBERS' RIGHT TO COUNSEL ADVERSELY IMPACTING THEIR RIGHTS UNDER THE SETTLEMENT ......................................16

III.   ARGUMENT ........................................................................................ 17

1.   THE SETTLEMENT IS CONSTRUED AND ENFORCED AS A CONTRACT OR INJUNCTION…...............................................................................................18

2.   THIS COURT SHOULD ORDER DEFENDANTS TO COMPLY WITH THE SETTLEMENT…..........................................................................................19

3.   THIS COURT SHOULD APPOINT A SPECIAL MONITOR TO OVERSEE AND MONITOR DHS'S COMPLIANCE WITH THE SETTLEMENT AND THIS COURT'S ORDERS.............22

IV.  CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Balla v. Idaho State Bd. of Corr.*, 2011 U.S. Dist. LEXIS 1864, 2011 WL 108727 (D. Idaho Jan. 6, 2011) ..................................................................................................................................26

*Buckhannon Board & Care Home v. West Virginia Dep't of Health and Human Resources*, 532 U.S. 598; 121 S. Ct. 1835; 149 L. Ed. 2d 855 (2001)..................................................................18

*City of Las Vegas v. Clark County*, 755 F.2d 697 (9th Cir. 1985).........................................................18

*Floyd v. City of New York*, 959 F. Supp. 2d 668, 2013 U.S. Dist. LEXIS 113205, 2013 WL 4046217 (S.D.N.Y. 2013) ..................................................................................................................25

*Franco-Gonzalez v. Holder*, Docket No. CV-10-02211-DMG (DTBx) (C.D. Calif. 2015) ...............23

*Jeff D. v. Andrus*, 899 F.2d 753 (9th Cir. 1989) ................................................................................18

*Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1989) ....................................18

*Labor/Community Strategy Ctr. v. Los Angeles County Metro. Trans. Auth.*, 263 F.3d 1041 (9th Cir. 2001) ..................................................................................................................................25

*Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), *cert. denied sub nom. Maricopa Cty., Ariz. v. Melendres*, 136 S. Ct. 799, 193 L. Ed. 2d 711 (2016) ..............................................................25

*Nat'l Org. for Reform of Marijuana Laws v. Mullen, supra*, 828 F.2d 536 (N.D. Cal. 1985) .............25

*Reno v. Flores, supra*, 507 U.S. 292 (1993) ......................................................................................26

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367; 112 S. Ct. 748; 116 L. Ed. 2d 867 (1992).......18

*Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir. 1982)..................................................................................25

*United States v. Powers*, 629 F.2d 619, (9th Cir. 1980) ....................................................................19

*United States v. Rose*, 806 21 F.2d 931 (9th Cir. 1986) (per curiam.)...............................................19

/ / /

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   INTRODUCTION[1]

On February 2, 2015, Plaintiffs filed a motion to enforce the parties' consent decree ("Settlement"). The Court granted Plaintiffs' motion on July 24, 2015, finding that Defendants were in material breach of the Settlement. In Chambers Order re Plaintiff's Motion to Enforce Settlement of Class Action and Defendant's Motion to Amend Settlement Agreement [Doc. # 177] ("July 24, 2015 Order"). The Court ordered Defendants to release Class Members subject to specific provisions of the Agreement, while they await the results of removal proceedings. *Id*. at 24-25. The Court also gave Defendants an opportunity to respond to the Court's six-point remedy. *Id*.

On August 21, 2015 the Court issued its remedial Order requiring Defendants to comply in all regards with the Settlement. Order re Response to Order to Show Cause [Doc. # 189] ("August 21, 2015 Order"). The Court ruled that "Defendants must

---

[1] This Court retains subject matter jurisdiction to make the requested further Orders for two reasons: (1) Each issue currently under consideration by the Ninth Circuit would "remain[ ] unchanged" by the Proposed Orders; and (2) the Proposed Orders will "protect plaintiffs' rights in direct response to defendants' repeated and willful non-compliance with [the Court's] earlier orders." *Armstrong v. Brown*, 732 F.3d 955, 959 fn. 6 (9th Cir. 2013), *cert denied*, 134 S. Ct. 2725 (2014) (Affirming the district court's authority to issue modified orders requiring near immediate action by California state prison officials pending appeal of its judgment, which determined the rights of disabled prisoners and obligations of state officials).

1

implement the Court's remedies ... by October 23, 2015." *Id*. at 3.

Defendants did not seek a stay of this Court's August 21, 2015 Order. Instead, they filed a Notice of Appeal of the July and August Orders. Notice of Appeal [Doc. # 191]. The thrust of the appeal is that "the District Court erred in holding that the Agreement applies to accompanied ... minors ..." Bf for Appellants, Cir. Doc. #10-3 at 34-56.[2]

The evidence filed herewith shows that in violation of this Court's Orders and the Settlement, conditions for children at CBP detention facilities remain deplorable with children forced to sleep in over-crowded cells on cold concrete floors with no mattresses or blankets, no change of clothes, no soap, towels or washing facilities, and entirely inadequate food and dirty drinking water. The evidence also shows that in violation of this Court's Orders and the Settlement, *inter alia*, Class Members are not advised of their rights; continuous efforts are not made and recorded regarding the release of accompanied Class Members; accompanied Class Members are not placed

---

[2] On May 13, 2015, ICE announced that it would "discontinue invoking general deterrence as a factor in custody determinations in all cases involving families." DHS Press Release, Doc. # 153-1 at 2 (RE at 154). Homan Decl. Doc. # 184-1 at 4 (RE at 160-161 ¶7) ("ICE no longer uses deterrence as a factor in individual custody determinations . . .") Having "considered in detail the evidence Defendants presented of the deterrent effect of the detention policy," this Court concluded that "Defendants [failed to] proffer *any* competent evidence that ICE's detention of a subset of class members in secure, unlicensed facilities has deterred or will deter others from attempting to enter the United States." July 21, 2015 Order at 23 (emphasis added). In the Court of Appeals Defendants make a *volte face* and resurrect "deterrence" as "essential ... to signal to potential illegal entrants that individuals who do not make meritorious claims for relief will not be permitted to remain in the United States." Brief for Appellants, Ninth Circuit Doc. # 10-3 at 22.

with family members or in non-secure facilities licensed for the care of dependent children without unnecessary delay; and Defendants persistently interfere with Class Members' right to counsel.[3]

The harm caused to children by Defendants' detention policy has been explained to Defendants by child-welfare experts,[4] leaders of Congress,[5] faith-based leaders,[6] the American Bar Association,[7] children's advocacy groups[8] and this

---

[3] A *pro bono* coordinator with the American Immigration Lawyers Association observes: "Since the October 23, 2015 deadline set by the Court for the Government to come into compliance with its August 2015 Order, as documented in a letter to ICE and USCIS from AILA, CLINIC, RAICES, the Council and Human Rights First dated December 24, 2015 … practitioners and advocates in all three family detention facilities have witnessed practices that have entirely short-circuited the *Flores* settlement and class members' right to due process and access to counsel." Dec. of Karen Lucas Ex. 13 ¶21 (March 25, 2016).

[4] *See, e.g.,* Declaration of Dr. Luis Zayas, Exhibit 24 ¶¶ 1-6 [Doc. # 101-7]; Declaration of Genevra Berger, Exhibit 25 ¶¶ 25, 28 [Doc. # 101-8]; American Academy of Pediatrics (AAP) Letter to Sec. Johnson, Ex. 97.1 [Doc. # 187-7]; Declaration of Laurie Cook Heffron, LMSW, Ex. 109.2 [Doc. # 187-10]; Declaration of Professor Nestor Rodriguez, Ex. 109.4 [Doc. # 187-10].

[5] *See, e.g.,* 136 U.S. Representatives Respond to Sec. Johnson, Ex. 70 [Doc. # 187-2]; 33 U.S. Senators Respond to Sec. Johnson, Ex. 71 [Doc. # 187-2]; Comment of Senator Patrick Leahy (D-Vt.) on Changes to the Administration's Family Detention Practices, Ex. 72 [Doc. # 187-2]; Senator Reid Statement On Administration's Decision To Reform Family Detention Policies, (Ex. 74 [Doc. # 187-2]; "Democratic Members Say Reforming Family Immigrant Detention Isn't Enough", Ex. 78 [Doc. # 187-2].

[6] *See, e.g.,* Faith leaders representing churches, synagogues, and faith-based organizations in the United States letter to President Obama, Ex.81 [Doc. # 187-2]; 96 NGOs and Faith-Based Organizations respond to Sec. Johnson, Ex. 79 [Doc. # 187-2]; LIRS Statement regarding proposed DHS reforms to family immigration detention policies, Ex. 80 [Doc. # 187-2]; Lutheran Immigration and Refugee Service (LIRS) "LIRS Urges Administration to Abandon Symbolic Reforms and End Family Detention," Ex. 69 [Doc. # 187-2].

Court.9 Defendants have nevertheless ignored their obligation to treat children "with dignity, respect and special concern for their particular vulnerability as minors" (Settlement ¶ 11) and have continued to violate the Settlement and this Court's Orders enforcing the Settlement. Plaintiffs now seek Orders from this Court in the form lodged herewith (1) requiring Defendants to promptly comply with the Settlement and this Court's Order of August 21, 2015, and (2) appointing a Special Monitor to oversee Defendants' remedial efforts and compliance with the Settlement going forward.

II.   STATEMENT OF FACTS

1.   **Defendants continue to detain children in deplorable and unsanitary conditions in CBP facilities in violation of the Settlement and this Court's Orders**

After reviewing the evidence, this Court's July 24, 2015 Order held that Defendants "*wholly failed*" to meet even the "minimal standard[s]" of the Settlement, tolerating "overcrowded and unhygienic conditions" in CBP detention facilities. July

---

7 Letter from William C. Hubbard, President, American Bar Association to DHS Secretary Jeh Johnson, Exhibit 64 [Doc. # 136.]

8 *See, e.g.,* American Immigration Lawyers' Association (AILA), "Little Meaningful Change in ICE Announcement on Family Detention," Ex. 82 [Doc. # 187-2]; American Immigration Council "Government Shows No Signs of Backing Down on Family Detention," Ex. 83 [Doc. # 187-2]; "Texas advocates throw cold water on ICE's promises to 'fix family detention'," Ex. 84 [Doc. # 187-2]; Human Rights First "Reforms to Family Detention System Are Insufficient," Ex. 85 [Doc. # 187-2]; Refugee and Immigrant Center for Education and Legal Services (RAICES), "Obama Administration Policy on Family Detention Continues to Violate the Law & *Flores* Settlement," Ex. 86 [Doc. # 187-2].

9 July 24, 2015 Order [Doc. # 177]; August 29, 2015 Order [Doc. #189.]

24, 2015 Order at 18 (emphasis added).[10]

During the period from October 21, 2015 to December 3, 2015, the CARA Project conducted 228 screenings of individuals recently held at CBP facilities and "virtually all of them experienced abysmal conditions in CBP custody." Declaration of Alexander Mensing, Ex. 19 at ¶6.[11]

**(A)   *Flores* Class Member children in CBP facilities suffer from inadequate access to food**

Food provided to those detained at CBP facilities remains inadequate for *Flores* Class Members, both in quantity and quality. Many *Flores* Class Members were only fed semi-frozen, cold sandwiches once or twice per day rather than the two hot meals and three total meals per day required by CBP standards.[12]

---

[10] In its August 21, 2015, Order, the Court again found that "[n]one of Defendants' declarations challenged or contradicted the deplorable conditions Plaintiffs' declarants described" in CBP detention cells. *Id*. at 13. The Court ordered Defendants to comply with and monitor compliance with the Settlement. *Id*. at 15.

[11] *Flores* class counsel and volunteer attorneys interviewed mothers and children at CBP facilities in early 2016 well after Defendants October 2015 deadline to come into compliance with the Settlement and this Court's August 29, 2015 Order. Mothers and children uniformly reported being held for one to three nights in extremely cold holding cells, not being provided dry clothes, being held in severely overcrowded cells, having to sleep on cold concrete floors, not being provided mats or blankets, often having insufficient space to lay on the floor to sleep, having bright lights kept on all day and night, inadequate food, dirty drinking water, one cup for 30-40 people to share, no soap or paper towels to wash their hands, lack of privacy and cleanliness in toilet facilities, lack of access to medical treatment, no access to information regarding detainees' rights, and verbal abuse by some guards. Declaration of Class Counsel Peter Schey ("Dec. Peter Schey"), Ex. 1 ¶ 5.

[12] CBP National Standards on Transport, Escort, Detention, and Search, October 2015, Ex. 20 ¶ 5.6 ("Juveniles … will be offered a snack upon arrival and a meal at

Walter A██████████ ██████████, a thirteen-year old class member from El Salvador was detained by CBP on or about November 9, 2015 for two days at the Texas border: "The only food we got was sandwiches of 2 pieces of dry bread and one thin slice of ham and a small box of juice. We were fed three times over the two days we were there … We were hungry, very cold, scared, and unable to sleep." Declaration of Walter A██████████ ██████████, Ex. 22 ¶ 6.[13]

The evidence shows that CBP's provision of inedible and inadequate food to detained class member children is systemic and widespread.[14]

**(B)** ***Flores* Class Member children in CBP facilities continue to suffer from inadequate access to clean drinking water**

*Flores* Class Members and their mothers report that drinking water provided to

---

least every six hours thereafter, at regularly scheduled meal times. At least two of those meals will be hot. Juveniles … detainees must have regular access to snacks, milk, and juice.") *See* https://www.cbp.gov/sites/default/files/documents/cbp-teds-policy-20151005.pdf (last checked May 11, 2016).

[13] Sara E██████████ █████ and her Class Member daughter Nathaly M██████████ ██████████-█████ were apprehended on or about December 14, 2015, and detained at a CBP station in Welasco, Texas, for about two days and two nights: "We were fed a sandwich two times a day with some juice. My daughter refused to eat anything but the one slice of cold meat inside the sandwich. She was very hungry but we were not served any food other than the cold sandwiches." Declaration of Sara E██████████ █████ Ex. 24 ¶ 6; Victor R█████ ███████, a fifteen-year old national of El Salvador, was detained on or about October 14, 2015. He reported that he was only fed twice during the entire day and night that he was held in CBP detention and the food was frozen: "We had arrived at this station around 9 AM and were transferred out around 1 AM the next morning. While at this location we were fed twice, both times we were given a sandwich consisting of two frozen pieces of bread and one thin cold slice of ham." Declaration of Victor R█████ ███████, Ex. 21 ¶ 4.

[14] *See* Ex. 2, pp. 1-3 (excerpts of numerous declarations filed herewith regarding inadequate food and children's hunger at CBP facilities since October 2015).

them in CBP detention facilities is dirty or often tastes so strongly chlorinated that the families are afraid to drink it. "We did not drink any water because it was right near the bathroom and the container was disgusting. Instead, I would ration the small bags of juice for my son." Declaration of Karen Zxxxxx xxxxxxx, Ex. 39 ¶5.

*Flores* Class Members and their mothers report that they did not have any cups to drink water or that they had to share the same cups with numerous strangers held in their cells. *See, e.g.* Declaration of Katerin Yxxxxxxx xxxxxxx Ex. 34 ¶9. Class member Nathaly Mxxxxxx xxxxxxxxx-xxxxx' mother, Sara Exxxxxxxx xxxxx, was afraid to have her daughter drink the water: "The water tasted like bleach so we were scared to drink it." Declaration of Sara Exxxxxxxx xxxxx, Ex. 24 ¶6.

The evidence shows that CBP's failure to provide clean drinking water to children detained for one to three days is routine and pervasive.[15]

**(C)   *Flores* Class Member children are held in CBP facilities that are unsanitary and unfit for human habitation**

*Flores* Class Members and their mothers describe sleeping on hard cement floors covered in mud and littered with used sanitary napkins. Class Members are not allowed to shower, wash their hands with soap, or brush their teeth.

Alexander Mensing interviewed numerous *Flores* Class Members detained at CBP facilities and their mothers after October 2015:

---

[15] *See* Exhibit 2 pp. 3 (excerpts of numerous declarations filed herewith regarding inadequate and dirty drinking water).

In addition to the families lying near the toilets [to sleep], mothers recounted that detained men in the opposite cell had a clear view into the toilet area of the women's cells. The guards also had a view into this area; one mother reported that "we would ask someone to stand in front of us while we went to the bathroom with their hands in the air so that the officers their [sic] wouldn't watch us go to the bathroom."…Families arrived with mud caked on their shoes and thus the cell floors were covered with mud and dirt. Women and children had to sit and lie down in dirt floors. Families generally spent one to several days in a CBP station. Class members and their mothers had no opportunity to bathe during the time they were held at the hielera and the perrera. One … woman … was held for eight days without showering or bathing. Another mother reported that there was no garbage can, so used sanitary pads piled up on the floor by the toilets, and the mothers and children had to sleep next to the garbage, on the floor due to overcrowding.

Declaration of Alexander Mensing, Ex. 19 ¶¶12(8) and 12(12)

Mirna Mxxxxxx xxxxx describes the unsanitary conditions as follows:

The bathroom situation was very unsanitary. My youngest son and I got diarrhea and we didn't receive any medical attention. We weren't provided with any toiletries, and I wasn't able to bathe. The conditions were so bad that when I later arrived at Karnes, they found that I had fleas, which I hadn't had before being detained. Also, the bathrooms were not private there was only a little wall separating them from the cell, which anyone could look over.

Declaration of Mirna Mxxxxxx xxxxx, Ex. 25 ¶ 6.

Yessenia Exxxxxxxx xxxxxxx, a twelve-year old national from Guatemala, was detained at a CBP facility on or about January 21, 2016:

At this place we were kept in a very crowded cell. The cell was all concrete. … For three days we were given no soap to wash, no toothbrushes to brush our teeth, no paper towels to dry our hands when we washed our hands, nothing to brush our hair, no change of underwear or clothes, no pillows or blankets and no beds to sleep in.

Declaration of Yessenia E━━━━━━━━ ━━━━━━━, Ex. 27 ¶6. [16]

The problems of sanitation at CBP facilities described above are systemic and widespread.[17]

(D) **Flores Class Member children continue to suffer from extremely cold temperatures in CBP detention facilities**

The temperature in the CBP detention facilities remains extremely cold and both children and mothers complain of suffering from the cold. At night children are sometimes provided a thin mylar sheet, which does little to mitigate the cold.

Yessenia E━━━━━━━━ ━━━━━━━ declares:

The cell was all concrete … We had to try to sleep in the freezing cold cell on the concrete floor. We were exhausted physically and emotionally. On the third day I was finally given a silver foil to cover myself at night.

Declaration of Yessenia E━━━━━━━━ ━━━━━━━, Ex. 27 ¶6.

Nine-year old Class Member Yeslin L━━━━ ━━━━━━━ described cold conditions,

---

[16] Evelin J━━━━━ ━━━━━━━━, a national of El Salvador came to the United States with her Class Member son, Jeferson A━━━━━ ━━━━━ ━━━━━━ (DOB xx/xx/2013). She and her son were apprehended on or about January 30, 2016: "There was a bathroom in the CBP station cell, but it did not have a door. There were no diapers there. On Saturday Jeferson used the bathroom and his pants were wet. He still does not have pants to put on." Declaration of Evelin J━━━━━ ━━━━━━━━, Ex. 42 ¶ 7. Class member Yessenia E━━━━━━━━ ━━━━━━━ declares: "The Border Patrol agents took us to a border station close to the border. We spent that day and night in this location …Our clothes were wet and muddy but they didn't give us any dry clothes. They didn't let us shower or give us towels or soap to wash." Dec of Yessenia E━━━━━━━━ ━━━━━━━ (12 yrs old), Ex. 27 ¶¶ 6, 9. Mothers reported that they and their children were forced to sleep on or under the toilets, which were often the warmest place in the cell. One mother reported that the smell was horrible and that the other families used the toilets as she and her son lay next to it. Declaration of Alexander Mensing, Ex. 19 ¶12(7).

[17] *See* Ex. 2, pp. 4-6 (numerous excerpts of declarations filed herewith regarding overcrowded and uninhabitable CBP detention cells since October 2015).

lack of dry clothing and over-crowded cells:

> The Border Patrol agents took us to a border station … The first night we were there, we had to sleep sitting up on a bench because there were so many people there that there was no room to lay down. The next night, we slept on the floor. They did not give us any blankets and we were all wet and they didn't give us any dry clothes. I could only sleep a tiny bit because … the floor was cold and hard… In the middle of Sunday night, they took us to another place. We spent two nights in this place. It was very cold again and they only gave us aluminum blankets to cover ourselves...

Declaration of Yeslin L̲xxxx xxxxxxx̲ (age 9), Ex. 23 ¶¶ 4, 8.

Numerous Class Members and their mothers attest to the unnecessarily cold and unhealthy temperatures in CBP detention facilities.[18]

**(E)** ***Flores* Class Member children are held in inhumanely overcrowded CBP detention facilities and are forced to endure sleep deprivation.**

Due to the inhumane crowded conditions in CBP detention facilities, Class Members and their mothers often cannot lie down at night to sleep and must sit or stand in close proximity to strangers. Some cells are packed with up to 40 adults and children. Due to the overcrowding, some children are forced to sit up all night long.

Kenia Y̲xxxxx xxxxxxx̲, a national of Honduras, was detained with her daughter, Brijana B̲xxxxx-xxxxx̲. They entered the in Texas on or about December 18, 2015. She describes the crowded CBP cell where they were held:

> This facility was very crowded the whole time we were there. There [were] about 40 people in one room the size of a bedroom. There was no space to do anything. Every time we tried to stand up, they just kept yelling that we should sit or lay down, but there was barely any space.

---

[18] *See* Ex. 2, pp. 6-8 (numerous excerpts of declarations regarding freezing cold temperatures in CBP detention cells).

Declaration of Kenia Y████ ███████, Ex. 36 ¶ 8.

Yessenia E████████ ███████, a twelve-year-old national from Guatemala detained at a CBP station on or about January 21, 2016, declares:

> On the third day I was finally given a silver foil to cover myself at night. At times the cell was so crowded that it wasn't possible to lay down to try to sleep because there wasn't enough room. I was terrified by the whole experience.

Declaration of Yessenia E████████ ███████, Ex. 27 ¶ 6.

The experiences of Class Members described above are typical of the inhumanely overcrowded conditions in CBP detention facilities.[19]

**2.**   ***Flores* Class Member children are routinely not advised of *Flores* rights by CBP or ICE officers as required by the Settlement**

The evidence shows that *Flores* Class Members are routinely not advised of rights by CBP or ICE as required by the Settlement.

Victor R████ ███████, a fifteen-year-old national of El Salvador, crossed the border with his mother near Piedras Negras, Texas on or about October 14, 2015. They were apprehended by CBP and then detained at the Karnes facility for approximately three weeks before both were transferred to Berks, PA.[20] Victor declares: "At no time while we were detained at Karnes did any official tell me about the Flores case, give me any advisal of rights about the Flores case, or interview me

---

[19] *See* Ex. 2, pp. 8-11 (excerpts of numerous declarations regarding overcrowding and sleep deprivation in CBP cells).

[20] At the time of his interview on or about February 19, 2016 he had been at Berks for around three months and wanted to reunite with his Aunt in New York.

about being placed with a relative or adult designated by my mother or about being transferred to a licensed facility for minors." Declaration of Victor R~~xxxxx xxxxxxx~~, Ex. 21 ¶ 7.[21]

### 3. DHS fails to make and record ongoing efforts aimed at release or placement of *Flores* Class Members as required by the Court's Orders and the Settlement

The evidence shows that in violation of this Court's Orders and the Settlement, Defendants refuse to make and record continuous efforts aimed at the release of Class Member children and children are not released to relatives or friends under Paragraph 14 without unnecessary delay or placed in non-secure licensed facilities under Paragraph 19 within five days or as expeditiously as possible.[22]

Walter A~~xxxxxxxx xxxxxxxxx~~, a thirteen-year-old national of El Salvador, was

---

[21] "Not one of the *Flores* class members or mothers that I interviewed while volunteering at Dilley had received any information from CBP, ICE or Dilley staff about the rights class members have under the *Flores* case." Declaration of Natalia Ospina, Ex. 7 ¶8; Karen Z~~xxxxx xxxxxxx~~ and her son, nationals of El Salvador, were apprehended in Texas on or about August 29, 2015 and then detained at Dilley, TX. On or about October 28, 2015 they were transferred to the detention center at Berks, PA. Ms. Z~~xxxxx xxxxxxx~~ declares: "The officials and staff at the detention center in Dilley never advised me of my son's rights under the *Flores* case." Dec. of Karen Z~~xxxxx xxxxxxx~~, Ex. 39 ¶ 11. Walter A~~xxxxxxxx xxxxxxxxx~~, a thirteen-year-old national of El Salvador, was detained on or about November 9, 2015 at the Texas border. He declares that during several weeks of detention at Dilley "no officer told me anything about the Flores case or my rights under the Flores case." Declaration of Walter A~~xxxxxxxx xxxxxxxxx~~ Ex. 22 ¶ 9. After three weeks of further detention at Berks "no official has explained any rights I may have under the Flores case." *Id.* ¶12. *See also* Ex. 2, pp. 11-12 (excerpts of numerous declarations showing almost no Class Members are provided advisals of their rights as required by the Settlement).

[22] *See* Ex. 2, pp. 13-15 (excerpts of numerous declarations showing no ongoing efforts to release Class Members to relatives or place them in non-secure licensed programs).

detained on or about November 9, 2015 at the Texas border. He declares: "No one asked me about relatives or family friends who may be willing to take care of me here in the U.S. No official told me that any decision had been made about releasing or detaining me …" Declaration of Walter Axxxxxxxx xxxxxxxxx, Ex. 22 ¶9.[23]

Karen Zxxxxx xxxxxxx, detained with her Class Member son since on or about August 29, 2015, and still detained with her son eight months later, declares: "No official questioned me about relatives or friends in the U.S. able to care for my son. No one asked me if I wanted my son transferred to a licensed facility for children." Declaration of Karen Zxxxxx xxxxxxx, Ex. 39 ¶ 11.

Sara Exxxxxxxx xxxxx, mother of Class Member Nathaly Mxxxxxx xxxxxxxxx-xxxxx, fled to the U.S. after Sara's life was threatened in Guatemala and arrived in the U.S. on or about December 14, 2015. They were transferred to the Karnes detention facility on or about December 17, 2015. On February 3, 2016, about six weeks after being detained, Sara declared: "No one has talked to me about whether my daughter can be released to a friend or relative in the United States." Declaration of Sara Exxxxxxxx xxxxx, Ex. 24 ¶ 9.[24]

---

[23] After three weeks of further detention at Berks, Walter declared: "As best I am aware no steps have been taken to evaluate me for release to my father or any other relative living in the U.S. … To the best of my knowledge no official here has discussed my release with my mother." *Id.* ¶12.

[24] Pro bono attorney Leanne Purdum declares: "In none of the cases in which I interviewed Flores class members or their mothers did it appear that CBP or ICE or facility staff had taken any steps, let alone continuous and ongoing steps, to release

**4.    *Flores* Class Member children are routinely commingled with unrelated adults for extended periods of time in violation of this Court's Orders and the Settlement**

Raquel Axxxxxx xxxxxx fled Honduras with her daughter to escape threats of violence. Raquel and her daughter were held at a border patrol station for about two days and had been detained at the Karnes facility for 44 days when she declared: "We are detained with hundreds of other unrelated women and their children. Many people must share rooms and many of the children are sick because of the close quarters we share." Declaration of Raquel Axxxxxx xxxxxx, Ex. 26 ¶ 11.[25]

---

minors as expeditiously as possible to close relatives or friends in the United States or to place them in licensed programs if release to relatives or friends was not possible." Declaration of Leanne Purdum, Ex. 8 ¶12 (March 1, 2016); Allison Mxxxx xxxxx is a 14 year old citizen of El Salvador in ICE custody for several months with her sister and mother. She declares: "There was no need for me [or] my sister … to be placed in detention. Our father, Elias Mxxxxx xxxxx, lives in Dallas, Texas. He has been here for about 12 years. My mother also has a sister … who lives in Maryland and is a Legal Permanent Resident … My mom also has an aunt in Maryland who is a U.S. citizen … Immigration knows that we have family willing to care for us, and they have denied our release for the last 8 months." Dec. of Allison Mxxxx xxxxx, Ex. 40 ¶12 (2/19/16). Celina Sxxxxxx-xxxx is the mother of class member Jefferson Axxx xxxxxx xxxxxxx detained at the Berks detention center. They had been detained for about five months (since on or about November 10, 2015) when Ms. Sxxxxxx-xxxx declared: "During my time detained … no one has attempted to assess whether my son could be released to relatives in the United States. No officer questioned me about this or asked me for information of who could care for my son if he was released from detention." Dec. of Celina Sxxxxxx-xxxx, Ex. 28 ¶ 20. Jefferson's father lives in Virginia and is willing to care for his son unlawfully held in detention. *Id.* ¶ 23. Cesia Vxxxxxxxxx-xxxx is a 13-year-old class member detained for about six months when she declared: "No official here has questioned me to determine if I have a close family member to whom I could be released or whether I am willing to be placed in a licensed home if no relative is found to be capable of caring for me." Dec. of Cesia Vxx-xxxx, Ex. 29 ¶19.

[25] Karen Zxxxxx xxxxxxx fled El Salvador with her 5-year old son and is afraid to return. Karen and her son spent about two months at the Dilley facility and had been

The evidence shows that Defendants routinely comingle Class Member children with unrelated adults in violation of Paragraph 12A of the Settlement.[26] Young girls may even be detained with unrelated men.[27]

**5.** ***Flores* Class Member children are routinely detained for weeks or months in secure facilities in violation of this Court's Orders and the Settlement**

While Defendants have advised Class Counsel that they have reduced the "average" length of stay of Class Members in secure facilities to less than two weeks, as the declarations cited above show, many Class Members are detained in secure facilities (also not licensed for the care of dependent children) for weeks and months on end.[28] It is uncontested that the detention centers in Dilley and Karnes are fully secure. The evidence indicates that the facility in Berks in also secure.[29]

---

detained at the Berks facility for three months when Karen made her declaration: "Detained men here are comingled with detained mothers and children and this makes the children and woman very uncomfortable." Declaration of Karen Zxxxxx xxxxxxx, Ex. 39 ¶23. Attorney Robert Doggett discusses a case in which a 12-year-old Class Member was recently sexually abused by an unrelated adult and the abuser remains in the same detention facility as the abused Class Member. Ex. 18, ¶ 22.

[26] *See* Ex. 2, p. 17-18 (excerpts of numerous declarations showing class member children are routinely commingled for extended periods with unrelated adults).

[27] *See, e.g*. Dec. of Carol Anne Donohoe, Ex. 4 ¶ 4 (Accompanied *Flores* class member children are routinely comingled with unrelated men and women, including in sleeping quarters. "Concerned about the safety of some of my *Flores* clients, especially young girls sharing sleeping rooms with unrelated teenage and adult males, on or about October 16, 2015, I sent an email to Immigration and Customs Enforcement, Enforcement and Removal Operations (ICE-ERO) to express my concern about an eight year old girl made to share a room with her father and two unrelated adult males." She received no response.)

[28] *See* Ex. 2, pp. 30-31 (excerpts of declarations); Class Counsel's inspection and interviews at ICE detention facilities disclosed that since October 23, 2015, ICE has reduced what it calls the "average" detention length of Class Members to around 7-10

The detention facilities are also not licensed as required by the Settlement.[30]

**6.    Defendants routinely interfere with Class Members' right to counsel adversely impacting their rights under the Settlement**

Pro bono coordinator Karen Lucas observes that "ICE has consistently frustrated the ability of dedicated lawyers and legal assistants to access their clients and has systematically disregarded the attorney-client relationship." Dec. of Karen Lucas Ex. 13 ¶4.[31]

*Pro bono* attorney Jocelyn Dyer declares: "At the Dilley facility … legal representatives are forced to prepare clients for their credible or reasonable fear interviews in a minimal amount of time (sometimes as little as twenty minutes) and

---

days, however Defendants have not provided Class Counsel with the data relied upon to arrive at various "averages." In any event, inspections disclosed Class Member children who had been detained for weeks or months in violation of the Settlement, regardless of the "average" length of detention of Class Members. Dec. of Peter Schey, Ex. 1 ¶ 9.

29 *See* Declaration of Peter Schey, Ex. 1 ¶ 9 ("While facility staff at Berks claim all doors to the exterior are kept unlocked, they also clearly stated during Class Counsel's recent inspection that anyone who tried to leave would be promptly arrested.")

30 See Pennsylvania Dept of Human Services letter to Berks County dated January 27, 2016, Ex. 60 ("The Department is … revoking the certificate of compliance effective from February 21, 2016 … [because Defendants'] Berks County Residential Center is not operating as a child residential facility … Instead … [its residents] include[e] adults."); Declaration of Robert Doggett, Esq., Ex. 18 , ¶¶ 18-28 (details Defendants' to date unsuccessful efforts to obtain a license for their Dilley facility and the Texas Court's intention to review the propriety of a license obtained for their Karnes facility).

31 *Flores* Class Member children and their mothers are not afforded access to counsel at Border Patrol detention facilities even though they often spend at least 72 hours and sometimes longer in these facilities before being transferred to ICE detention. CARA staff and volunteers have served over 7,000 families since March 2015 but have yet to encounter any child or family who met with an attorney or secured representation at a CBP facility. Dec. of Lindsay Harris, Ex. 16 ¶13.

with virtually no access to outside sources such as legal treatises, country condition

experts, and medical or psychological experts who could perform forensic

examinations. This was a stark departure from my normal practice …" Dec. of

Jocelyn Dyer, Ex. 6 ¶7. Defendants have also transferred Class Members to distant

locations without advance notice to their counsel as required by Paragraph 27 of the

Settlement.[32]

The attached declarations establish an ongoing pattern and practice of

interference with Class Members' right to counsel that frustrates some Class

Members' ability to obtain immigration relief and impedes their ability to realize and

protect their rights under the Settlement.[33]

## III.   ARGUMENT

Detained children retain the essence of human dignity inherent in all persons. A

detention system that deprives detained children of decent food, water and sanitary

---

[32] *See, e.g.*, Declaration of Ed Mccarthy, Ex. 11 ¶10 (March 2, 2016) ("I notified my
clients' deportation officer that we planned to file a request for reconsideration with the
asylum office. The deportation officer told me to submit the reconsideration request
within the next few days … Three days after this conversation, I traveled to Karnes to
… submit the reconsideration request. When I arrived, I was informed that my clients
had been transferred to an ICE family detention facility in Berks Pennsylvania, without
any notice to me, their attorney. I could no longer meet with or even communicate with
my clients. The same thing happened with another mother and *Flores* class member
who I was representing. These transfers to Berks completely interfered with both the
mothers' and the *Flores* class members' right to counsel."). *See also* Ex. 2 pp. 26-31
(excerpts of *pro bono* attorney declarations regarding the transfer of Class Members
without prior notice to their counsel as required by the Settlement).

[33] *See* Ex. 2, pp. 26-31 (excerpts of numerous declarations re interference with right to
counsel and due process).

conditions, and forces them to sleep on a concrete floor, is incompatible with the concept of human dignity and has no place in a civilized society.

## 1.    The Settlement is construed and enforced as a contract or injunction

The Settlement is a contract, *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378; 112 S. Ct. 748; 116 L. Ed. 2d 867 (1992), and is therefore generally construed and enforced as such. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989).[34] Whether enforced as a contract or consent decree, the Court's task is largely the same. *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985) ("A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles."). As this Court has noted, "[w]here the contract is clear, the plain language of the contract governs." July 24, 2015 Order at 3 (citation omitted). If breached, the Court should issue orders "commanding or enjoining particular conduct." *TNT Marketing, Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986).[35]

---

[34] With limited exceptions, "federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party." *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989). The Settlement is also an order of the Court and therefore a consent decree. *Buckhannon Board & Care Home v. West Virginia Dep't of Health and Human Resources*, 532 U.S. 598, 604 n.7; 121 S. Ct. 1835; 149 L. Ed. 2d 855 (2001); *Rufo, supra*, 502 U.S. at 378 (settlement "a judicial decree that is subject to the rules generally applicable to other judgments and decrees.").

[35] Defendants have consistently violated the Settlement since the summer of 2014 and this Court's Orders since August 2015. Their conduct is lawless and contemptuous. *United States v. Powers,* 629 F.2d 619, 626, fn. 6 (9th Cir. 1980). Nevertheless, Plaintiffs do not at this time seek a contempt ruling against Defendants believing that it

**2.      This Court should Order Defendants to comply with the Settlement**

The Court has already found that the consent decree's language clearly and unambiguously applies to accompanied minors. July 24, 2015 Order at 4-7. The terms of the Settlement are clear and must be enforced.[36]

Regarding conditions in Defendants' CBP detention facilities, this Court made clear that "to the extent any Border Patrol station is out of compliance with the Agreement, those stations must comply with the Agreement and Defendants' own acknowledged standards and procedures." *Id*. at 13. Paragraph 12 of the Settlement requires that "[f]ollowing arrest, [Defendants] shall hold minors in facilities that are safe and sanitary and that are consistent with the [Defendants'] concern for the particular vulnerability of minors." *Id*.[37] The evidence overwhelmingly shows Defendants' CBP facilities are neither safe nor sanitary. Conditions in CBP detention cells are overcrowded and deplorable.

Paragraph 18 of the Settlement provides: "Upon taking a minor into custody, the [Defendants] … shall make and record the prompt and continuous efforts on its

---

would be more constructive to appoint a Special Monitor to help bring Defendants into compliance with the Settlement and this Court's Orders.

[36] The Court has already rejected Defendants' argument that compliance with the Settlement and this Court's prior Orders would somehow contravene their obligations under federal law. August 21, 2015 Order at 9 [Doc. # 189]. The Court has also made clear that compliance with the Settlement will not hamper Defendants' legitimate enforcement efforts. *Id*. at 11.

[37] Safe and sanitary conditions includes but are not limited to access to toilets and sinks, safe drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, and adequate temperature control and ventilation. *Id*.

part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in [Defendants'] custody." *Id*.[38] The evidence makes clear that Defendants routinely fail to make and record required steps to release children as promptly as possible.[39]

Paragraph 12A of the Settlement provides that "[i]f there is no one to whom [Defendants] may release the minor pursuant to Paragraph 14 … the minor may be placed in a[ ] … detention facility …. having separate accommodations for minors …"[40] Minors not subject to detention or placed with a family member under Paragraph 14 must be placed in a facility that "shall be non-secure" and licensed under

---

[38] The Settlement further requires that children *not* released pursuant to Paragraph 14 be placed in a licensed program provided for by ICE. Settlement ¶ 19. ICE does not have a single contract Class Counsel is aware of to place children pursuant to Paragraph 19 of the Settlement.

[39] While Defendants may have the statutory discretion to place certain Class Member children in "expedited" proceedings, "[i]t is uncontroverted that, prior to June 2014, ICE generally released children and parents upon determining that they were neither a significant flight risk nor a danger to safety." Order of July 24, 2015 at 9 [Doc. #177.] The statutory discretion to place children in expedited proceedings was enacted in 1996 well *before* the Settlement was finally executed by all parties and approved by the Court in 1997. Defendants may not now rely on that discretion to circumvent the terms of the Settlement requiring the prompt release of Class Member children and the prohibition against detaining them in secure facilities. At the same time, "[a] *de minimis* extension of the five-day requirement [for moving Class Member children out of secure detention facilities] *under individualized circumstances* will not necessarily result in a breach of the Agreement or contravene the INA ..." Order of August 21, 2015 at 10-11 [Doc. #189] (emphasis supplied).

[40] If a Class Member cannot be placed under Paragraph 14 or a licensed facility under Paragraph 19, with limited exceptions the child may be held for five days in secure facilities with "separate accommodations for minors …" Settlement ¶ 12A.

state law. Paragraph 6.[41] This Court has reiterated that accompanied Class Members are not to be housed in "unlicensed or secure facilities." August 21, 2015 Order at 14. The evidence shows that many Class Members are detained for weeks or months in secure facilities in violation of the Settlement.

Paragraph 24D of the Settlement provides that "[t]he [defendants] shall promptly provide each minor not released with (a) INS Form 1-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor)." Settlement ¶24D.[42] The evidence shows that Defendants ignore the Settlement's requirements regarding Class Member advisals.

Paragraph 27 of the Settlement provides that except in unusual and compelling circumstances "[n]o minor who is represented by counsel shall be transferred without advance notice to such counsel …" The evidence shows that Defendants have routinely ignored ¶ 27 of the Settlement and have in a range of ways persistently interfered with Class Members' right to counsel, impeding Class Members' ability to enjoy the above-described rights under the Settlement.

---

[41] The Settlement defines the exceptional circumstances in which Class Members may be held in "secure" facilities. *See, e.g.* ¶ 21 (charged with a crime); ¶ 22 (escape risks). Not passing a credible fear interview is *not* a recognized basis for secure detention.

[42] The Settlement makes clear that "[i]n order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility." Settlement ¶24C.

The harms being suffered by children as a result of Defendants' ongoing violations of the Settlement[43] strongly support the issuance of a further Order regarding compliance without waiting for the several months involved in appointment of a Special Monitor and the work that Monitor will engage in before s/he can report to the Court. A proposed Order lodged herewith seeks to clarify Defendants' clear obligations under the Settlement and requires that Defendants now take prompt steps to comply.

**3.     This Court should appoint a Special Monitor to oversee and monitor DHS's compliance with the Settlement and this Court's Orders**

The Supreme Court has noted in the context of a California overcrowding prison case that "[c]ourts faced with the sensitive task of remedying … unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers …" *Brown v. Plata*, 563 U.S. 493, 511, 131 S.Ct. 1910 (2011). Courts appointing monitors responsible for overseeing implementation of orders or settlements rely upon their equitable powers to enforce settlements, decrees and Orders, or Fed. R. Civ. P. 53.

In *Franco-Gonzalez v. Holder,* Docket No. CV-10-02211-DMG (DTBx) (C.D. Calif. 2015), this Court entered an Order appointing a monitor to oversee the DHS. *Franco-Gonzalez* involves a class of immigration detainees who have been determined to be incompetent to represent themselves by reason of mental disability.

---

[43] *See* Ex. 2, pp. 1-33.

Defendants' unsafe treatment of children continues unabated. The challenged conduct has in no significant way been voluntarily ceased. Rather than signaling a willingness to end their breach of the Settlement, Defendants have indicated to their private contractors that operate detention facilities a readiness to increase the detention of mothers and their children.[44]

Because of the complexities of the Settlement and because of the importance of Defendants' compliance with the Settlement, pursuant to Fed. R. Civ. P. 53 and this Court's inherent powers to enforce its Orders, the Court should now appointment a Special Monitor to ensure compliance with the Settlement and this Court's Orders.

Plaintiffs' propose in an Order lodged herewith:

• Appointment of a Special Monitor for twenty-four months to oversee compliance with the Settlement and this Court's July and August 2015 Orders. The Special Master should have broad discretion regarding how to exercise her authority. Her authority should be subject to oversight by the Court.

• The Special Monitor should have the authority to gather information and documentation from all parties in furtherance of her monitoring function.

• The Monitor should have the authority to receive from Class Members or their detained mothers or representatives communications regarding alleged violations

---

[44] In 2015 the GEO Group, which operates the Karnes detention facility, announced on a 2015 Earnings Conference Call that by "December 1, [2015,] we expect to complete a $36 million 626 bed expansion to the Karnes, Texas, Residential Center ... The new facility capacity will be 1,158 beds and will result in a new fixed monthly payment estimated to take place on December 1 of this year." *See* Dkt. #85-04544 Exhibit 88. GEO's leadership "remains committed to returning value to our shareholders by targeting a 75% to 80% dividend payout." *Id*. "[T]otal revenue for the year is expected to be approximately $1.86 billion …" *Id*.

of the Settlement and this Court's Orders and to investigate those claims, obtain Defendants' and Class Counsels' views, and recommend remedial action. The Special Monitor will advise all parties and the Court if her recommended remedial steps are not implemented.

• The Special Monitor should have the authority to mediate Plaintiffs' claims of non-compliance to reduce entanglement of the Court in future motions to the enforce the Settlement.

• The Special Monitor should not have the authority to issue orders or impose any sanctions, but may recommend to the Court various orders, including any contempt sanction.

• The Special Monitor's fees, costs and expenses, including with respect to the assistance of other experts or specialists, should be paid by Defendants.[45]

This litigation's history underscores that the mandated rights of vulnerable

children will be best protected if the Government's behavior is monitored.[46]

---

[45] *See* Declaration of Peter Schey, Ex. 1, ¶ 11("Plaintiff Class Members are indigent detained children and have no ability to share in the cost of a Special Monitor.")

[46] *See, e.g. Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), *cert. denied sub nom. Maricopa Cty., Ariz. v. Melendres*, 136 S. Ct. 799, 193 L. Ed. 2d 711 (2016) (injunctive relief to class of Latino persons against sheriff based on allegations of racial profiling; Court of Appeals affirmed: "In context, most of the provisions dealing with the scope of the Monitor's assessment authority are aimed at eliminating the constitutional violations found by the district court and therefore do not constitute an abuse of discretion"); *Plata v. Schwarzenegger*, 603 F.3d 1088, 1095 (9th Cir. 2010) (monitor to oversee remedies re California prison overcrowding); *Nat'l Org. for Reform of Marijuana Laws v. Mullen*, *supra*, 828 F.2d 536 (affirmed preliminary injunction and appointment of Special Master; neither a final determination of a constitutional violation nor a determination of intentional disregard required to justify appointment of a master under Fed. R. Civ. P. 53(b)); *Labor/Community Strategy Ctr. v. Los Angeles County Metro. Trans. Auth.,* 263 F.3d 1041, 1045 (9th Cir. 2001), *cert. denied*, 535 U.S. 951 (2002); *Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir. 1982) (overcrowding threatened prisoners health and safety; affirmed appointment of a Special Monitor); *Floyd v. City of New York*, 959 F. Supp. 2d 668, 2013 U.S. Dist. LEXIS 113205, 2013 WL 4046217 (S.D.N.Y. 2013) (permanent injunction as to defendant's unconstitutional stop-and-frisk policies; "It is within the power of a district

## IV.   CONCLUSION

It is obviously not the case that ICE must detain families together to keep them together. As the Supreme Court observed some 22 years ago:

> In the case of arrested alien juveniles, however, the INS cannot simply send them off into the night … The … Service must assure itself that someone will care for those minors … *That is easily done when the juvenile's parents have also been detained and the family can be released together* …

*Reno v. Flores*, 507 U.S. 292, 295 (292) (citations omitted; emphasis added).

For all of the reasons stated above, the District Court should Order Defendants to promptly comply with the Settlement's terms and appoint a Special Monitor to oversee Defendants' compliance with the Settlement and this Court's Orders.

Dated: May 17, 2016

| | |
|---|---|
| PETER A. SCHEY | Respectfully submitted,<br>T. WAYNE HARMAN |
| CARLOS R. HOLGUIN | ELENA GARCIA |
| CENTER FOR HUMAN RIGHTS AND<br>CONSTITUTIONAL LAW | ORRICK, HERRINGTON &<br>SUTCLIFFE LLP |
| AMANDA ALVARADO FORD | JENNIFER KELLEHER CLOYD |
| MICHAEL S. SORGEN | KATHERINE H. MANNING |
| LA RAZA CENTRO LEGAL, INC. | KYRA KAZANTZIS<br>ANNETTE KIRKHAM |
| ALICE BUSSIERE | THE LAW FOUNDATION OF SILICON VALLEY |
| VIRGINIA CORRIGAN | LEGAL ADVOCATES FOR CHILDREN AND YOUTH |
| YOUTH LAW CENTER | PUBLIC INTEREST LAW FIRM |
| OF COUNSEL FOR PLAINTIFFS | |
| | /s/ PETER SCHEY<br>ATTORNEYS FOR PLAINTIFFS |

court to order the appointment of a monitor to oversee judicially ordered reforms"); *Balla v. Idaho State Bd. of Corr.*, 2011 U.S. Dist. LEXIS 1864, 2011 WL 108727 (D. Idaho Jan. 6, 2011) (prison litigation reform: "The Court agrees with Plaintiffs that the most cost-effective and efficient route to resolving the unique challenges posed by this difficult case is through the appointment of a special master").

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On May 17, 2016, I electronically filed the following document(s): STIPULATED APPLICATION FOR LEAVE TO FILE DECLARATIONS OF ASYLUM APPLICANTS AND MEMORANDA IDENTIFYING ASYLUM APPLICANTS UNDER SEAL, PROPOSED ORDER GRANTING LEAVE, REDACTED DECLARATIONS OF ASYLUM APPLICANTS, AND REDACTED MEMORANDA IDENTIFYING ASYLUM APPLICANTS with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*