1  CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
   Peter A. Schey (Cal. Bar No. 58232)
2  Carlos Holguín (Cal. Bar No. 90754)
   256 South Occidental Boulevard
3  Los Angeles, CA 90057
   Telephone: (213) 388-8693
4  Facsimile: (213) 386-9484
5  Email: crholguin@centerforhumanrights.org
           pschey@centerforhumanrights.org
6
   ORRICK, HERRINGTON & SUTCLIFFE LLP
7  T. Wayne Harman (Cal. Bar No. 254089)
   Elena Garcia (Cal. Bar No. 299680)
8  777 South Figueroa Street, Suite 3200
   Los Angeles, CA 90017
9  Telephone:    (213) 629-2020
   Email: wharman@orrick.com
10         egarcia@orrick.com
11
12 *Attorneys for plaintiffs (listing continues on following page)*

13          UNITED STATES DISTRICT COURT
    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
14

15 JENNY LISETTE FLORES, *et al.*,        ) Case No. CV 85-4544 DMG (AGRx)
                                          )
16          Plaintiffs,                   )
                                          )
17 - vs -                                 ) [REDACTED VERSION OF DOCUMENT
                                          ) PROPOSED TO BE FILED UNDER SEAL]
18 LORETTA E. LYNCH, Attorney General of the ) EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION
   United States, *et al.*,               ) TO ENFORCE SETTLEMENT AND FOR
19                                        ) APPOINTMENT OF A SPECIAL MONITOR
                                          ) VOLUME 1 OF 2 [EXHIBITS 2, 3, AND 21- 35]
20          Defendants.                   )
21 ──────────────────────────────        ) Hearing: June 10, 2016.
                                            Time: 9:30 a.m.
22                                          Courtroom 7, 312 N. Spring Street

23

24

25

26

27

28 TTLEMENT

1

2    *Plaintiffs' counsel, continued*

3    LA RAZA CENTRO LEGAL, INC.
     Michael S. Sorgen (Cal. Bar No. 43107)
4    474 Valencia Street, #295
     San Francisco, CA 94103
5    Telephone: (415) 575-3500

6    THE LAW FOUNDATION OF SILICON VALLEY
     LEGAL ADVOCATES FOR CHILDREN AND YOUTH
7    PUBLIC INTEREST LAW FIRM
     Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
8    Katherine H. Manning (Cal. Bar No. 229233)
     Kyra Kazantzis (Cal. Bar No. 154612)
9    Annette Kirkham (Cal. Bar No. 217958)
     152 North Third Street, 3rd floor
10   San Jose, CA 95112
     Telephone:    (408) 280-2437
11   Facsimile:    (408) 288-8850
     Email: jenniferk@lawfoundation.org
12          kate.manning@lawfoundation.org
            kyrak@lawfoundation.org
13          jamesz@lawfoundation.org
            annettek@lawfoundation.org
14

15   *Of counsel:*

16
     YOUTH LAW CENTER
17   Alice Bussiere (Cal. Bar No. 114680)
     Virginia Corrigan (Cal. Bar No. 292035)
18   200 Pine Street, Suite 300
     San Francisco, CA 94104
19   Telephone: (415) 543-3379 x 3903

20

21   */ / /*

22

23

24

25

26

27

28

INDEX OF EXHIBITS

| | | |
|---|---|---|
| Exhibit 2. | Excerpts of Declarations in Support of Plaintiffs' Motion to Enforce | 1 |
| Exhibit 3. | Declaration of Bridget Cambria | 38 |
| Exhibit 21. | Declaration of Victor Rxxxxx xxxxxxx | 49 |
| Exhibit 22. | Declaration of Walter Axxxxxxx xxxxxxxx | 53 |
| Exhibit 23. | Declaration of Yeslin Lxxxx xxxxxxx | 57 |
| Exhibit 24. | Declaration of Sara  Exxxxxxx xxxxx | 60 |
| Exhibit 25. | Declaration of Mirna Mxxxxxx xxxxx | 63 |
| Exhibit 26. | Declaration of Raquel Axxxxx xxxxx | 66 |
| Exhibit 27. | Declaration of Yessenia Exxxxxxx xxxxxxx | 69 |
| Exhibit 28. | Declaration of Celina Sxxxxxx-xxxx | 72 |
| Exhibit 29. | Declaration of Cesia Vxxxxxxxx-xxxx | 77 |
| Exhibit 30. | Declaration of Isamar Sxxxxxx xxxxxx | 81 |
| Exhibit 31. | Declaration of Kelly Gxxxxxxx-xxxx | 87 |
| Exhibit 32. | Declaration of Maria Dxxxx xxxxxxx | 91 |
| Exhibit 33. | Declaration of Lindsey Gxxxx xxxxx | 95 |
| Exhibit 34. | Declaration of Katerin Yxxxxxx xxxxxxx | 100 |
| Exhibit 35. | Declaration of Sonia Axxxxx-xxxxxx | 104 |
| Exhibit 36. | Declaration of Kenia  Yxxxxx xxxxxxx | 107 |
| Exhibit 37. | Declaration of Bianca Cxxxxxxxx xxxxx | 111 |
| Exhibit 38. | Declaration of Astrid Dominguez | 115 |
| Exhibit 39. | Declaration of Karen Zxxxxxx xxxxxxx | 118 |
| Exhibit 40. | Declaration of Allison Mxxxx xxxxx | 121 |

Exhibit 41.    Declaration of Benina Cxxxxx xxxxx                           126

Exhibit 42.    Declaration of Evelin Jxxxxx xxxxxxxx                        130

Exhibit 43.    Declaration of Diana Cxxxxx xxxxx                            135

Exhibit 44.    Declaration of Amarilis Lxxxxx xxxxx                         138

Exhibit 45.    Declaration of Franklin Rxxxx xxxxxxxx                       141

Exhibit 46.    Declaration of Herson Lxxxxx xxxxx                           145

Exhibit 47.    Declaration of Vilma Sxxxx xx xxxx                           148

Exhibit 48.    Declaration of Leny Axxxxx xxxxx                             152

Exhibit 49.    Declaration of Edgardo Dxxxxx xxxxxxxx                       155

Exhibit 50.    Declaration of Flember Jxxx xxxxxxxx                         158

Exhibit 51.    Declaration of Karen Lxxxxx xxxxxxx                          161

Exhibit 52.    Declaration of Madelyn Mxxxxxxx-xxxxx                        164

Exhibit 53.    Declaration of Faustino Cxxx                                 167

Exhibit 54.    Declaration of Fanny Exxxxxxx xxxxxxxxx                      170

Exhibit 55.    Declaration of Josselyn Mxxxxx xxxxx                         173

Exhibit 56.    Declaration of Silvia Vxxxxx xxxx                            178

Exhibit 57.    Declaration of Yesenia Yxxxx xxxxx                           182

Exhibit 58.    Declaration of Eloisa Rxxxx xxxxx                            185

Exhibit 59.    Declaration of Melvin Mxxxxx xxxxx                           189

# Exhibit 2
## Publicly Filed

1   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
    Peter A. Schey (Cal. Bar No. 58232)
2   Carlos Holguín (Cal. Bar No. 90754)
    256 South Occidental Boulevard
3   Los Angeles, CA 90057
    Telephone: (213) 388-8693
4   Facsimile: (213) 386-9484
5   Email: crholguin@centerforhumanrights.org
              pschey@centerforhumanrights.org
6
    ORRICK, HERRINGTON & SUTCLIFFE LLP
7   T. Wayne Harman (Cal. Bar No. 254089)
    Elena Garcia (Cal. Bar No. 299680)
8   777 South Figueroa Street, Suite 3200
9   Los Angeles, CA 90017
    Telephone:    (213) 629-2020
10  Email: wharman@orrick.com
              egarcia@orrick.com
11
12  *Attorneys for plaintiffs (listing continues on following page)*

13              UNITED STATES DISTRICT COURT
         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
14

15  JENNY LISETTE FLORES, *et al.*,        )   Case No. CV 85-4544 DMG (AGRx)
                                           )
16          Plaintiffs,                    )
                                           )
17  - vs -                                 )   REDACTED VERSION OF DOCUMENT
                                           )   PROPOSED TO BE FILED UNDER SEAL
18                                         )   EXHIBIT 2 EXCERPTS OF DECLARATIONS IN
    LORETTA E. LYNCH, Attorney General of the )  SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE
19  United States, *et al.*,               )   SETTLEMENT AND FOR APPOINTMENT OF A
                                           )   SPECIAL MONITOR
20          Defendants.                    )
                                           )
21  ─────────────────────────────────

22

23

24

25

26

27

28  TTLEMENT

Exhibit 2 in Support of Plaintiff's Motion to Enforce Settlement

i

2

*Plaintiffs' counsel, continued*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org
        jamesz@lawfoundation.org
        annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*/ / /*

TABLE OF CONTENTS

1.   EXCERPTS OF DECLARATIONS: DEFENDANTS CONTINUE TO DETAIN CHILDREN IN DEPLORABLE
AND UNSANITARY CONDITIONS IN CBP FACILITIES .................................................................1

   (A)   Children in CBP facilities suffer from inadequate access to food .........................................1

   (B)   Flores class member children in CBP facilities continue to suffer from inadequate access
   to clean drinking water ...............................................................................................................3

   (C)   Flores Class Member Children are held in CBP facilities in unsanitary conditions ............4

   (D)   Flores class member children continue to suffer from extremely cold temperatures in CBP
   detention cells ...........................................................................................................................6

   (E)   Flores class member children are held in inhumanely overcrowded CBP detention cells
   and are forced to endure sleep deprivation. ..............................................................................8

2.   EXCERPTS OF DECLARATIONS: FLORES CLASS MEMBERS ARE ROUTINELY NOT ADVISED OF
FLORES RIGHTS BY CBP OR ICE OFFICERS.........................................................................11

3.   EXCERPTS OF DECLARATIONS: DHS FAILS TO MAKE AND RECORD ONGOING EFFORTS AIMED
AT RELEASE OR PLACEMENT OF CLASS MEMBERS ...............................................................13

4.   EXCERPTS OF DECLARATIONS: CLASS MEMBER CHILDREN NOT PROMPTLY RELEASED ARE NOT
BROUGHT BEFORE IMMIGRATION JUDGES FOR CUSTODY REVIEW HEARINGS......................................15

5.   EXCERPTS OF DECLARATIONS: FLORES CLASS MEMBER ARE ROUTINELY COMMINGLED FOR
EXTENDED PERIODS OF TIME WITH UNRELATED ADULTS ......................................................17

6.   EXCERPTS OF DECLARATIONS: PROLONGED DETENTION IS NOT NECESSARY TO ENSURE THAT
CLASS MEMBERS RECEIVE MEDICAL CARE; IN FACT, THEIR PHYSICAL AND MENTAL HEALTH IS PLACED
AT RISK IN DHS'S DETENTION CENTERS...............................................................................18

7.   EXCERPTS OF DECLARATIONS: DETENTION OF CHILDREN UNDERMINES AND FRUSTRATES ACCESS
TO COUNSEL...................................................................................................................26

8.   EXCERPTS OF DECLARATIONS: CLASS MEMBER CHILDREN AND THEIR MOTHERS ARE ROUTINELY
HELD PAST THE 3-5 DAYS ALLOWED UNDER THE SETTLEMENT. ..............................................31

9.   EXCERPTS OF DECLARATIONS: DECISIONS REGARDING PLACEMENT IN A FAMILY DETENTION
CENTER ARE ARBITRARY AND BASED PRIMARILY ON BED SPACE .............................................32

1.   **Excerpts of Declarations: Defendants continue to detain children in deplorable and unsanitary conditions in CBP facilities**

(A)   **Children in CBP facilities suffer from inadequate access to food**

Declaration of attorney Natalia Ospina, Ex. 7 ¶5 (3/10/16) ("A Guatemalan mother and child spent two days in the 'hielera,' the way mothers and children describe the Customs and Border Protection (CBP) holding facility where first detained… They were … unable to eat the two pieces of bread and a slice of ham that they were provided twice daily during their time in the hielera.")

Declaration of attorney Lindsay Harris, Ex. 14 ¶4(c) ("*Flores* class members and their mothers report being provided entirely inadequate food while at CBP facilities. The food consists of two to three sandwiches a day, each sandwich consisting of two pieces of dry bread and one thin slice of ham or bologna.").

Declaration of Herson L xxxxxx xxxxx, Ex.46 ¶ 8 (01/30/2016) ("Immigration gave us soup and a burrito only once a day. I was very hungry. I was sad, afraid, hungry, and desperate.").

Declaration of nine-year old class member Yeslin L xxxx xxxxxxx, Ex. 23 ¶¶ 4, 5, 8 ("The Border Patrol agents took us to a border station. We got there on a Saturday and were there for one night. They didn't give us much food. They gave us a little juice and cookies. In the middle of Sunday night, they took us to another place. We spent two nights in this place. They gave us bread with a little bit of ham, but it was all frozen, so I didn't eat much…").

Declaration of Mirna M xxxxxx xxxxx, Ex. 25 ¶5 ("There was not enough food. All we got were two slices of bread with a small slice of mozzarella and small juices. We got those sandwiches twice a day and once three times in a day.").

Declaration of Raquel A xxxxxx xxxxxx, Ex. 26 ¶7 ("They only gave us small amounts of food two times a day.").

Declaration of Faustino C xxx, Ex. 53 ¶5 (01/29/2016) ("When being transported here my son told me that while he was detained at the Border Patrol Station, like me… he was only given three thin sandwiches a day with one slice of cold meat, one for breakfast, one for lunch, and one for dinner.").

Declaration of Josselyn M xxxxx xxxxxx, Ex. 55 ¶12 (01/30/2016) ("The food here is not good. It is always the same –a bad sandwich. The sandwich is given three times a day. It is two pieces of bread and one slice of ham.").

Declaration of Silvia V xxxxxx xxxx, Ex.56 ¶6 (02/01/2016) ("Our only food has been two pieces of bread with one think slice of bologna or something that looks like meat these sandwiches are distributed for breakfast, lunch and dinner. Everyone also gets a small plastic container (250 ml) of "frutoso" twice a day. This taste like colored water with sugar. We are very hungry because of the lack of food ...").

Declaration of Yesenia Yxxxx xxxxx, Ex. 57 ¶10 (01/31/2016) ("We only get bread sandwiches with something in them. We have been given food twice since I have been here. Everyone in the cell is tired and hungry.").

Declaration of Yessenia Exxxxxxx xxxxxxx, Ex. 27 ¶ 7 (12 years old) ("For the three days we were there we were only given sandwiches to eat … two slices of stale bread with one slice of bologna in the middle. Nothing else was in the sandwiches. I also got some sugary juice…").

Declaration of Celina Sxxxxxx-xxxx, Ex. 28 ¶8 ("My son and I were fed only a bologna sandwich and juice").

Declaration of thirteen-year-old class member Cesia Vxxxxxxxxx-xxxx, Ex. 29 ¶5 ("The food was disgusting; it was just cold ham sandwiches").

Declaration of Isamar Sxxxxxx xxxxxx, Ex. 30 ¶7 ("We received food three times a day. It was the same, cookies, bread with mozzarella, and a really cold bottle of water").

Declaration of Kelly Gxxxxxxxx-xxxxx, Ex. 31 ¶7 ("The food was terrible: Just bread with one slice of cold ham.").

Declaration of Maria Dxxxx xxxxxxx, Ex. 32 ¶6 ("We were just given cold sandwiches with frozen ham inside, just one during the day and one at night.").

Declaration of Lindsey Gxxxx xxxxx, Ex. 33 ¶ 8 ("I was given food but it was not good. Only a sandwich that was frozen.").

Declaration of Katerin Yxxxxxxx xxxxxxx (12 yrs), Ex. 34 ¶9 ("The sandwiches were just two pieces of bread and one thin slice of meat. No butter or spread, no lettuce, no cheese, nothing.").

Declaration of Sonia Axxxxx-xxxxxx, Ex. 35 ¶6 ("To eat we only got a sandwich with one piece of ham, which was very cold as well. For the whole day and night that I was there, we only got two sandwiches and two little bottles of juice.").

Declaration of Sara Exxxxxxx xxxxx, Ex. 24 ¶ 6 ("We were only fed two times a day.").

Declaration of Kenia Yxxxx xxxxxxx, Ex. 36 ¶8 ("[T]hey gave me a sandwich of 2 slices of bread with a slice of cold meat, and juice. I didn't eat anything. I gave the bread to my daughter.").

Declaration of Maria Dxxxx xxxxxxx, Ex. 32 ¶ 7 ("After this, we were taken to another place, like a warehouse, that they called the perrera (dog house). ... The food was still bad. My son tried to eat the burritos twice, but both times he threw up afterwards.").

Declaration of Walter Axxxxxxxx xxxxxxxxx (13 yrs old), Ex. 22 ¶ 8 ("It was the same bread and ham but this time no juice, only a little water.").

Declaration of Bianca Cxxxxxxxx xxxxx (17yrs old), Ex. 37 ¶ 13 ("I have not been able to leave the cell except to get juice and bread and when they clean the cell. The food is always the same. It is 2 pieces of bread with one slice of bologna 3 times a day. I have eaten some bread since arriving.").

Declaration of Astrid Dominguez, Ex. 38 ¶ 6 ("They were given sandwiches three times a day, only a slice of bologna and two slices of bread.").

**(B)** ***Flores* class member children in CBP facilities continue to suffer from inadequate access to clean drinking water**

Declaration of Raquel A████████ ██████, Ex. 26 ¶ 7 ("The border patrol officials would not give us water. The only way we could get water was when we would be let into the room to get water from the sink in the bathroom. I was very thirsty and so was my daughter. I asked BP officials for water and they responded that they 'did not have that.'").

Declaration of Alex Mensing, Ex. 19 ¶10 ("Mothers also routinely reported that there is either not enough water, no access to potable water, or no cups with which to drink any water that may be provided.").

Declaration of attorney Lindsay Harris, Ex. 14 ¶4(c) ("Drinking water is usually in a dirty container and 30-40 detainees in the cell are often required to share one cup.").

Declaration of Bianca C████████ █████, Ex. 37 ¶ 11 (17 yrs old) ("The water they given me tasted dirty. So I have not drunk water since arriving.").

Declaration of Mirna M██████ ██████, Ex. 25 ¶ 5 ("There was not enough water for us to drink. There was some water that had a very odd taste, like chemicals.").

Declaration of Josselyn M██████ ███████, Ex. 55 ¶ 13 (01/30/2016) ("The water tastes like chlorine.").

Declaration of Alex Mensing attachment Exhibit P, Ex. 19 ¶18 (11/15/2015) ("We had to share a cup among all the women and children about 20 people and the water hurt my stomach.").

Declaration of Alex Mensing attachment Exhibit TT, Ex. 19 ¶ 8 ("I was really dehydrated and needed water but I couldn't drink the water because it made me want to vomit.").

Declaration of Alex Mensing, Ex. 19 at ¶ 13 ("mother reported that she and her eldest experienced pain urinating from a lack of water in the [CBP's] hielera.").

Declaration of Peter Schey, Ex. 1 ¶ 5 ("Mothers and children interviewed during the site inspections uniformly reported … dirty drinking water [and] one cup for 30-40 people to share… Conditions remain deplorable and inhumane.").

Declaration of Alex Mensing attachment Exhibit O, Ex. 19 ¶6 ("They gave us water but it tasted like it had a lot of chlorine in it and tasted horrible.").

Declaration of Alex Mensing attachment Exhibit W, Ex. 19 ¶9 ("The water wars terrible and tasted like chlorine. I couldn't drink it.").

Declaration of Alex Mensing attachment Exhibit HH, Ex. 19 ("[T]hey gave them a dirty water that had a bad smell.").

Declaration of Alex Mensing attachment Exhibit KK, Ex. 19 ("In the hielera they only gave water
that had a lot of chlorine and this caused my baby to get sick to his stomach.").

**(C)     *Flores* Class Member Children are held in CBP facilities in unsanitary conditions**

Declaration of Alex Mensing, Ex. 19 ¶12(13) ("One seventeen year old reported that she had a wet,
fully used sanitary napkin, was not given a replacement when she asked, and had to resort to tying
pants around her waist to avoid leaking blood. She reported being … embarrassed and humiliated.
One mother … also reported inadequate access to sanitary pads for bleeding. For two days, this
mother had blood all over her legs and clothes. Mothers also reported that cells frequently ran out of
toilet paper, which was not replaced in a timely way.").

Declaration of Alex Mensing, Ex. 19 ¶12(14) ("One mother recounted that her three-year-old class
member child urinated on himself, wetting his clothes: When she asked to wash his clothes, CBP
officials told her to take his clothes off and throw them in the trash. The agents provided a clean
diaper but informed the mother that there were no clothes available. The three-year-old boy was left
in a cold cell wearing only a diaper for two days and nights until the family was transferred to another
CBP facility.")

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11A (12/21/15) ("Moreover, while sick in CBP custody,
the mother said she was humiliated by having to use a bathroom stall with no doors and low walls,
thus depriving her of privacy. The bathroom, according to the mother, had no toilet paper or soap.")

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11C (12/21/15) ("The mother reported to me that while
in CBP custody, there was no toilet paper or opportunity for her or her children to bathe.")

Declaration of Allison Mxxxx xxxxx, Ex. 40 ¶ 6 ("There was no sink, but there was a toilet that was
open so that everyone could see you if you went to the bathroom.").

Declaration of Celina Sxxxxxx-xxxx, Ex. 28 ¶ 8 ("There was an open toilet in the room with no
toilet seat for everyone to use. Everyone could see if we were using the toilet.").

Declaration of Cesia Vxxxxxxxxx-xxxx (13 yrs), Ex. 29 ¶ 5 ("It was embarrassing to use the
bathroom, I felt bad about it because everyone could see me when I was using the bathroom. The
moms and kids would use their bodies to shield whoever had to use the toilet so that the male
immigration officers couldn't see us.").

Declaration of Karen Zxxxx xxxxxxx, Ex. 39 ¶6 ("We did not want to go to the bathroom because
there was no real door to the bathroom.").

Declaration of Kelly Gxxxxxxx-xxxxx, Ex. 31 ¶ 7 ("In the hielera, we were detained for one night,
there were toilets that were very visible to everyone, there was a low wall, so everyone could see
when I was using the bathroom.").

Declaration of Herson Lxxxxx xxxxx, Ex. 46 ¶ 8 (01/30/2016) ("We were not able to shower or
bathe or brush our teeth. We were not given any soap or towels.").

Declaration of Melvin Mxxxxx xxxxx, Ex. 59 ¶6 (01/20/2016) ("They did not let us shower or brush
our teeth. There was a toilet it was surrounded only by a shot wall. There was no privacy. There was

8

one toilet for everyone that was there. It was very crowed. There was space to sit down but there was no space to lie down.").

Declaration of Mirna Mxxxxxx xxxxx, Ex. 25 ¶ 6 ("Also the bathrooms were not private –there was only a little wall separating them from the cell, which anyone could look over.").

Declaration of Josselyn Mxxxxx xxxxxx, Ex. 55 ¶14 (01/30/2016) ("There is nowhere to shower or bathe. There is sink, but it is broken and no water comes out. There is no soap. They have not given me a brush, towel or toothbrush. There is no door on the bathroom, so there is not privacy.")

Declaration of Silvia Vxxxxx xxxx, Ex. 56 ¶ 5 (02/01/2016) ("We have no soap, no towels, no tooth brushes, no paper towels, no baby wipes, ETC. In the cell there are two metal toilets with no toilet seats and two small metal sinks (with no soap) used to wash our hands and for drinking. The sinks only have cold water. In the cell is a plastic container with water but often there are no cups to use to get water from the container.").

Declaration of Yesenia Yxxxx xxxxx, Ex. 57 ¶9 (01/31/2016) ("Since I was apprehended I have not been given any toiletries for myself or my son. In the cell there is a toilet and a small sink shared by about 30 people with no soap. It has a small wall to provide partial privacy. We have no Soap, toothbrushes, or combs.").

Declaration of Lindsey Gxxxx xxxxx, Ex. 33 ¶ 8 ("In the CBP Station, there are bathrooms but they are not private.").

Declaration of Katerin Yxxxxxxx xxxxxxx (12 yrs), Ex. 34 ¶ 9 ("The toilets at this station were out in the open, with only a short wall around them. I had to use the bathroom with no privacy.").

Declaration of Kenia Yxxxx xxxxxxx, Ex. 36 ¶ 8 ("The toilet at this station were out in the open, with only a short wall surrounding it. There is no privacy when using the toilet.").

Declaration of Maria Dxxxx xxxxxxx, Ex. 32 ¶ 6 ("There was only one toilet and it was very dirty and you had to use it in front of everyone. There were many people, maybe forty people in the cell, all mothers with children.").

Declaration of Walter Axxxxxxxx xxxxxxxxx, Ex. 22 ¶ 7 (13 yrs old) ("They had a metal toilet with no toilet seat in our cell.").

Declaration of Bianca Cxxxxxxxx xxxxx, Ex. 37 ¶¶ 10-12 (17 yrs old) ("When I use the restroom, there is no door on the stall.").

Declaration of Victor Rxxxx xxxxxxx (15 yrs old), Ex. 21 ¶ 4 ("They didn't let us shower or give us towels or soap to wash.").

Declaration of Walter Axxxxxxxx xxxxxxxxx (13 yrs old), Ex. 22 ¶ 7 ("There was a small metal sink but no soap to wash with and no towels to dry off with. We got no change of clothing.").

Declaration of Bianca Cxxxxxxxx xxxxx (17yrs old), Ex. 37 ¶¶ 10-12 ("This cell has a sink that does not work; no water comes out. There is no soap. I have not been given a brush, toothbrush, or toothpaste.").

Declaration of Benina C██████ █████, Ex. 41 ¶ 8 ("Since I was apprehended I have not been given any toiletries for me daughter … or me. In the cell there is a toilet and small sink shared by about 40 people with no soap or paper towels… We have no soap, no toothbrushes, no towels, nothing to brush our hair, no wastebaskets.").

**(D)    Flores class member children continue to suffer from extremely cold temperatures in CBP detention cells**

Declaration of Alex Mensing, Ex. 19 ¶12(3) ("The hieleras are very cold, and mothers reported that the air conditioning runs constantly. Some families reported being so cold that their 'bones began to ache,' that they 'lost feeling in hands and feet,' or that their hands and feet became 'numb.' One mother described the cold as 'unbearable' and recalled that while she herself was shaking with cold, children were crying from cold and hunger. Another mother reported that she woke up with a headache from the cold. One fifteen-year-old *Flores* class member reported that she could not feel her feet because she was so cold. One mother reported feeling like her hair was frozen and wrapping her sweater around her son's head to keep him warm. Another recounted that the 'cold penetrated me to the bones' and she wrapped her small children in her jacket in an effort to keep them warm. One mother reported that her ten-year-old *Flores* class member son's lips became so badly chapped from the cold that they burst, were bleeding, and he could not open his mouth to eat.").

Declaration of Alex Mensing, Ex. 19 ¶12(4) ("While some mothers and children received "aluminum" sheets to sleep under, others did not. Many mothers who received the sheets reported that they did not provide sufficient warmth. Other mothers were deterred from requesting the sheets after seeing how angrily officials reacted when other detained mothers asked for them. One mother reported that CBP officials made the families throw away the thin pieces of aluminum foil each day and then withheld "new ones as punishment if we asked too many times for help. " Other mothers reported that officers ordered the families held clean the cells. When the families did not comply to the officers' satisfaction, the officers reportedly punished them by taking away the remaining mylar sheets or ordering them to throw their sheets in the trash.").

Declaration of Sonia A██████-███████, Ex. 35 ¶6 ("We were transported to a border patrol station where we were held for one day and one night… It was very cold there… There were about 20 or 25 children in the cell and they were all crying because it was so cold.").

Declaration of Allison M████ █████, Ex. 40 ¶6 ("Every time more people came it seems to get colder in the room.").

Declaration of volunteer attorney Natalia Ospina, Ex. 7 ¶5 (3/10/16) ("A Guatemalan mother and child … informed me that they were unable to sleep due to the cold, lack of space, and wet floors.")

Declaration of CARA Pro Bono Project volunteer Leanne Purdum, Ex. 8 ¶ 5 (3/1/16) ("Mothers consistently told me that the hielera was very cold...")

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11A (12/21/15) ("The mother also reported that she and her son were freezing and shivering while they were in CBP custody because of the cold temperatures and the fact that they were forced to wear wet clothing for four days straight.")

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11B (12/21/15) ("The mother reported that she and her daughter were extremely cold at the hielera where they were initially detained at the border for three

days. She observed that the more crowded their cell became, the lower the CBP officials dropped the temperature.")

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶8 (11/2015) ("They reported that temperatures in the *hielera* were so low that their children got sick. They were given thin foil blankets, often only one per family, that would easily tear and rattle in the cold air blowing into their holding cells...")

Declaration of Celina Sxxxxxx-xxxx, Ex. 28 ¶5 ("The cell was extremely cold very crowded. I believe that as more people came into the room, the air conditioners were turned up.").

Declaration of Melvin Mxxxxxx xxxxx, Ex. 59 ¶6 (01/20/2016) ("We would sleep on the floor with no blankets or pillows, The place was very cold –we could not stand how cold it was.").

Declaration of Isamar Sxxxxxx xxxxxx, Ex. 30 ¶6 ("The temperature in the room was extremely cold. We were wet from crossing the river and forced to stay in our wet clothes the entire time. We were only given aluminum blankets to keep warm.").

Declaration of Karen Zxxxxx xxxxxxx, Ex. 39 ¶7 ("We could not sleep because the air conditioning was turned up high and we were very cold. We only had cement planks to lie on and they did not give us blankets. They gave us plastic sheets. My son was cold and wearing wet clothes, so he was so cold that his lips turned purple. I had to wrap him in a plastic sheet and hold him on my lap so that he would not have to sleep on the cold cement.").

Declaration of Kelly Gxxxxxxx-xxxxx, Ex. 31 ¶5 ("My son and I were taken, I believe to the McAllen Border Patrol station, which all detainees there called the hielera (ice box) because it was so cold.").

Declaration of Alex Mensing attachment Exhibit Y, Ex. 19 ¶2 ("They took us to the ICE holding facility. It was ice cold, and we were soaking wet from the river. Super cold. Woke up with a headache from the cold… Everyone was shivering. I hugged my child to keep him warm…We slept on the floor, and they gave us aluminum space blankets.").

Declaration of Amarilis Lxxxxxx xxxxx, Ex. 44 ¶7 (2/3/16) ("The border patrol station was very cold… [W]e had to sleep on a concrete bench, which was also a very cold temperature.").

Declaration of Kelly Gxxxxxxx-xxxxx, Ex. 31 ¶7 ("It was very cold in the hielera and my son and I did not have blankets").

Declaration of Kelly Gxxxxxxx-xxxxx, Ex. 31 ¶8 ("It was also very cold in the perrera.").

Declaration of Edgardo Dxxxxx xxxxxxxx, Ex. 49 ¶ 6 ("The cell was very cold. I did not have a jacket and was not provided a jacket to wear in the cold cell. I felt very, very cold in that cell.").

Declaration of Raquel Axxxxxx xxxxx, Ex. 26 ¶ 9 ("The temperature in the border patrol center was extremely cold. All I had was what I was wearing and it was very cold. There was a leftover space blanket in my room and I would use this, but they did not give us anything for the terrible cold.").

Declaration of Mirna Mxxxxxx xxxxx, Ex. 25 ¶ 4 ("The children began crying, and when they children cried they would turn the temperature down even further. ")

**(E)**   ***Flores*** **class member children are held in inhumanely overcrowded CBP detention cells and are forced to endure sleep deprivation.**

Declaration of Silvia V̲xxxxx xxxx, Ex. 56 ¶4 (02/01/2016) ("Here at the Border Patrol facility we are held in a cell with about thirty to forty other mothers, and children. The cell has no furniture. There is a concrete floor and concrete bench around the walls of the cell. People fill the floor and benches. Everyone sleeps on the concrete floors and benches side by side. The bright lights on the ceiling stay on all nights. We have no mattresses or pillows or blankets. We only have a thin silver paper to cover ourselves when trying to sleep. It is very hard to get any sleep because the floor is hard and cold, the cell is very crowded, the lights are on and very bright, and children are crying and coughing all night long.").

Declaration of attorney Lindsay Harris, Ex. 14 ¶4(b) ("*Flores* class members may be held in CBP facilities from one to three nights and are provided no mattresses, mats, blankets or pillows. They sleep on concrete floors or benches and are usually only provided a foil sheet to cover themselves with. Holding cells are often so overcrowded that Flores class members cannot lie down on the concrete to try to sleep. Lights are kept on all night adding to the extreme difficult children have sleeping in these cells.").

Declaration of Mirna M̲xxxxx xxxxx, Ex. 25 ¶ 4 ("We had to sleep on the floor, but it was so crowded in the cell that some people had to sleep on the floor of the bathroom near the toilet. We never got a mattress or a blanket… We were completely unable to sleep because it was so cold and because the lights were on all night.").

Declaration of CARA Pro Bono Project volunteer Leanne Purdum, Ex. 8 ¶ 5 (3/1/16) ("Mothers consistently told me that … the lights were kept on all night, and the rooms are sometimes so full that no one can lie down.")

Declaration of Alex Mensing attachment Exhibit PP, Ex. 19 ¶5 ("There was nowhere to lay down. There were only cement benches. The lights were always on… There were a lot of people in this hielera. I would guess more than thirty women and children.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶8 (11/2015) ("They were given thin foil blankets, often only one per family, that would easily tear and rattle in the cold air blowing into their holding cells. Because the lights were on at all times, they lost track of day and night. Detainees would get in trouble for lying down to sleep on the floor, though mothers and children reported this was the only place to sleep.")

Declaration of Allison M̲xxxx xxxxx Leiva (2/19/16), Ex. 40 ¶6 ("*There were so many people squeezed into the room. There were no beds, just a few cement slabs to lay on.*" [Emphasis added]).

Declaration of Celina S̲xxxxxx-xxxx (2/19/16), Ex. 28 ¶8 ("At the border patrol station there were about 50 other people in our cell. It was so crowded there was barely room for everyone. My son and I were freezing. There were no beds, it was just a room with cement floors and benches.").

Declaration of Amarilis L̲xxxxx xxxxx, Ex. 44 ¶7 (2/3/16) ("It was only concrete in my cell and we had to sleep on a concrete bench, which was also a very cold temperature. We were not given

12

mattresses or pillows for the concrete bench on which we had to sleep. It was very difficult to sleep.").

Declaration of Cesia Vxxxxxxxxx-xxxx (13 yrs) (4/23/16), Ex. 29 ¶5 ("[W]e slept on mattresses on the floor. There were some blankets in the cell but they were very dirty, so we didn't use them. It was very uncomfortable and it was hard to sleep. There were many people in our cell…The lights were on all night and there was just one small window.").

Declaration of Isamar Sxxxxxx xxxxxx (4/23/16), Ex. 30 ¶5 ("We were kept in a very small room with no beds. The only place to sleep was on the floor. But there were so many people in the room that there was not enough room for us all to lay down … It was also hard because we could not tell what time of day or night it was. It was hard to get any sleep there.").

Declaration of Kelly Gxxxxxxxx-xxxxx (5/1/16), Ex. 31 ¶7-8 ("The cell was very full so it was difficult to lie down. The only place to sleep was on the floor, there were no mattresses or beds. I didn't sleep that night. My son slept a little bit after the immigration officers returned him to me around midnight, we were sitting on a cement bench all night so it was hard to sleep… There was a mattress pad and we were given aluminum foil blankets. It was not possible to tell the day or the night because they kept the lights on the whole time and there were no windows.").

Declaration of Maria Dxxxx xxxxxxx (4/23/16), Ex. 32 ¶6 ("We slept on the floor, but there was barely any room to sleep because there were too many people in the cell. We had no blankets and it was hard to stay warm.").

Declaration of Maria Dxxxx xxxxxxx (4/23/16), Ex. 32 ¶7 ("After this, we were taken to another place, like a warehouse, that they called the perrera (dog house). We were given an aluminum blanket and thin mattress pads. There were even more people there than in the hielera...The lights were kept on all night and there were no windows.").

Declaration of Raquel Axxxxxx xxxxxx, Ex. 26 ¶ 9 ("My daughter was sick and she would not sleep and was coughing the whole night. We slept on cement slabs raised from the floor ... There were no pillows or anything like that and I could not sleep.").

Declaration of Sonia Axxxxxx-xxxxxx (2/3/16), Ex. 35 ¶6 ("…[T]here wasn't enough space to lie down. There were about 35 or 40 people in the cell. We had to try to sleep sitting up, which was very difficult… It was very cold there, making it very difficult to sleep. No blankets or mattresses were provided. There were about 20 or 25 children in the cell and they were all crying...").

Declaration of Alex Mensing attachment Exhibit R, Ex. 19 ¶1 (11/9/15) ("There were a lot of people. There were people who slept standing up. Even a woman who was 8 months pregnant with swollen legs slept standing up. … They didn't give us any form of blanket. …The lights were on all night.").

Declaration of Fanny Exxxxxxxx xxxxxxxxxx, Ex. 54 ¶ 4 (2/3/16) ("My son and I had to sleep on the floor. The room where we were held was … very crowded. We were not given mattresses or blankets. We were each given a foil sheet to use as a blanket. The floor we had to sleep on was very hard and very cold. Bright lights were kept on all day and all night long. With these conditions it was almost impossible to sleep for several days.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶8 (3/16) ("They were given thin foil

blankets, often only one per family, that would easily tear and rattle in the cold air blowing into their holding cells.")

Declaration of Elosia Gxxxxx, Ex. 58 ¶8 (01/29/2016) ("My daughter and I were taken to another facility, where we spent a day and a night. We were in a cell with about 60 people. We could not lie down to sleep. My clothes and my daughter's clothes were wet and we were not given dry clothes... After about 4 hours I was given a silver blanket.").

Declaration of Josselyn Mxxxxx xxxxxx, Ex. 55 ¶ 7 (01/30/2016) ("This cell is very crowed. I think there are 40 or 50 people here. Yesterday I think there were more than 70 people in this cell.").

Declaration of Josselyn Mxxxxx xxxxxx, Ex. 55 ¶ 10 (01/30/2016) ("The lights have been on since I got to this station. There are no beds or blankets here, just a piece of foil. I have slept on the concrete floor and a concrete bench that lines the wall... I wish there was a mattress or pillows here.").

Declaration of Edgardo Dxxxxx xxxxxxxx, Ex. 49 ¶ 6 ("We were required to sleep on the concrete floor… We had no pillows or blankets. Each minor was given a thin silver foil paper to cover ourselves with… But it didn't make much difference. Sleeping there was almost impossible. In the morning I was exhausted and the other minors also seemed exhausted.").

Declaration of Yesenia Yxxxx xxxxx, Ex. 57 ¶8 (01/31/2016) ("I was brought to this center last night in the middle of the night. I sat with my son on a concrete bench and was unable to sleep. No one is providing a mattress or pillow. If a person asks, they receive a silver paper, I did not ask and did not receive one.").

Declaration of Alex Mensing, Ex. 19 ¶12(5) ("At the hieleras, most mothers and children were forced to sleep on cold concrete floors.").

Declaration of Alex Mensing attachment Exhibit C, Ex. 19 ¶4 ("There were some aluminum sheets in the corner for us to cover ourselves with, but they were used, and there were not enough for everyone. There were no mattresses in our room.").

Declaration of Alex Mensing attachment Exhibit H, Ex. 19 ¶4 ("Every time an officer came to the door of the room to bring someone in or take someone out, I would ask the officer for a blanket for both of us or at least for my three year old son. I asked about ten different officers. They said they would bring me one but they never did.").

Declaration of Alex Mensing attachment Exhibit J, Ex. 19 ¶5 ("We had seen some people that had aluminum covers and we asked the Officers if we could have one. The Officers refused. I asked the Officer if he could please give one at least to my daughter and he still refused.").

Declaration of Alex Mensing attachment Exhibit U, Ex. 19 ¶7 ("the most difficult part about being in this station, also known as the 'Icebox,' was the cold, which was made worse by the fact that we slept directly on the floor and had no blankets.").

Declaration of Alex Mensing attachment Exhibit V, Ex. 19 ¶4 ("When I asked my children if they were provided blankets they said they were not and that they had to sleep on the floor.").

Declaration of Alex Mensing attachment Exhibit CC, Ex. 19 ¶2 ("I had to sleep on the floor with my daughter in a freezing cold room without any blankets.").

Declaration of Alex Mensing attachment Exhibit SS, Ex. 19 ¶5 ("We had to sleep on the cold concrete floor. I asked the officers for blankets and they told me to wait but never gave us blankets.").

**2.      Excerpts of Declarations: *Flores* class members are routinely not advised of *Flores* rights by CBP or ICE officers**

Declaration of CARA Pro Bono Project volunteer Leanne Purdum, Ex. 8 ¶11 (3/1/16) ("None of the Flores class members or their mothers that I interviewed indicated that they were told by any CBP, ICE or detention facility staff about the Flores case, or any rights that minors have under the Flores settlement or the District Court's August remedial Order.").

Declaration of Sara Exxxxxxxx xxxxx, Ex. 24 ¶ 9 ("I don't remember anyone explaining that my daughter had rights as a minor under the Flores case.").

Declaration of volunteer attorney Amanda Doroshow, Ex. 10 ¶6 (1/7/16) ("During the six days I spent at Dilley, I did not meet any *Flores* class member or mother who told me that the class member had been informed by CBP or ICE about his or her rights under *Flores*… It appeared to me that accompanied minors in Dilley were being treated as if they are not *Flores* class members at all.").

Declaration of volunteer attorney Ed McCarthy, Ex. 11 ¶11 ("None of the mothers and *Flores* class members who I interviewed or represented at Karnes from October 17, 2015 to October 30, 2015 told me that any CBP or ICE official, or staff member at Karnes, had informed them about any aspect of the *Flores* settlement including any rights that *Flores* class members may possess.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶12 (11/2015) ("Indeed, none of the family units I interviewed had been told anything about the Flores Settlement by CBP or ICE officers or by other staff employed at Dilley.").

Declaration of Allison Mxxxx xxxxx, Ex. 40 ¶10 (5/1/16) ("At no point did any officer or official ever talk to me, my sister, or my mom about our legal rights or the Flores case.").

Declaration of Allison Mxxxx xxxxx, Ex. 40 ¶11 (5/1/16) ("The entire eight months we have been detained neither me, nor my sister, nor my mother have ever been spoken to by officials about a case called Flores.").

Declaration of Celina Sxxxxxx-xxxx Ex. 28 ¶11 (4/23/16) ("During my time in Dilley, neither me nor my son were told by immigration officials about the Flores case. I have no knowledge of the Flores case.").

Declaration of Diana Cxxxxx xxxxx, Ex. 43 ¶6 (2/2/16) ("While I was in detention before my release the authorities never gave me any notice of my rights as a juvenile or under the Flores case.").

Declaration of Diana Cxxxxx xxxxx, Ex. 43 ¶9 (2/2/16) ("During our time here at Dilley no one has given me or my mother any notice about my rights as a minor or my rights under the Flores case.").

Declaration of Cesia Vxxxxxxxx-xxxx, Ex. 29 ¶19 (4/23/16) ("No officials have told me anything about Flores throughout all the months that I have been detained.").

Declaration of Isamar Sxxxxxx xxxxxx, Ex. 30 ¶33 Berks, (4/23/16) ("Immigration at Dilley never told us we had any rights under Flores for my daughter.").

Declaration of Kelly Gxxxxxxxx-xxxxx, Ex. 31 ¶8 (5/1/16) ("At no time while detained at this facility did any ICE agent or any other official tell me anything about my son's rights under the Flores case. To the best of my knowledge, no one explained anything about the Flores case to my son.").

Declaration of Maria Dxxxx xxxxxxx Ex. 32 ¶9 (4/23/16) ("No official at Dilley told me anything about the Flores case or any rights my son had under the Flores case.").

Declaration of Amarilis Lxxxxx xxxxx Ex. 44 ¶7 (2/3/16) ("No one at the border patrol facilities notified my son or I about the rights that my son had under the Flores case.").

Declaration of Franklin Rxxxx xxxxxxxx (16 yrs), Ex. 45 ¶12 (2/3/16) ("I have not been told about anything about any rights I may have under the Flores case at this detention facility.").

Declaration of Herson Lxxxxxx xxxxx (13yrs), Ex 46 ¶9 (2/3/16) ("To date, I have not been advised of my rights under the Flores case. My mother was not provided any information about my rights under the Flores case.").

Declaration of Mirna Mxxxxxx xxxxx, Ex. 25 ¶9 (2/3/16) ("On the afternoon of January 31, 2016, my sons and I were transported to Karnes where we have been detained since that time. No officer has explained any special rights my son may have under the Flores case.").

Declaration of Raquel Axxxxxx xxxxxx, Ex. 26 ¶11 (2/3/16) ("Since our arrest no official has told us anything about the Flores case.").

Declaration of Katerin Yxxxxxx xxxxxxx (12 yrs), Ex. 34 ¶13 (2/3/16) ("As best I remember I have not been told about my rights under the Flores case at this detention facility.").

Declaration of Sonia Axxxxx-xxxxxx, Ex. 35 ¶8 (2/3/16) ("I have not been told that my son has about my rights under the Flores case ...").

Declaration of Vilma Sxxxx xx xxxx, Ex. 47 ¶9 (2/3/16) ("No one here has told me anything about any rights my daughter has under the Flores case. No forms relating to the Flores case have been given to me.").

Declaration of volunteer attorney Natalia Ospina, Ex. 7 ¶9 (3/10/16) ("During the numerous interviews I conducted at the Dilley detention center I did not encounter a single Flores class member or Flores class member mother who indicated that they … had been provided any documents or advisals required by the Flores Settlement.").

Declaration of Bridget Cambria, Ex. 3 ¶12 ("At no point since my representation of families at the Berks County Residential Center began in June of 2014 has any child or mother in the facility been advised of their rights under the *Flores* Settlement.").

3.      **Excerpts of Declarations: DHS fails to make and record ongoing efforts aimed at release or placement of Class Members**

Declaration of attorney Jacqueline Kline, Ex. 5 ¶2 ("Despite the fact that in my experience about 95% of detained *Flores* class members at Berks have close family members to whom they could be released under Paragraph 14 of the *Flores* Settlement, to this date, despite the District Court's August Order, in none of my clients' cases (or other cases that I am aware of), has DHS made and recorded *any* ongoing efforts aimed at the placement of *Flores* class members with relatives or family friends as required by Paragraphs 14 and 18 of the Settlement. Based on my observations, discussions with my clients, and review of their files, I am aware of <u>no</u> effort to comply with the District Court's August Order requiring DHS to make continuous efforts to expeditiously release or place minors. Minors have been and are being detained at Berks for up to four months with no effort being made to release or place them as required by Paragraphs 14, 18 and 19 of the Flores Settlement.").

 Declaration of volunteer attorney Natalia Ospina, Ex. 7 ¶9 (3/10/16) ("During the numerous interviews I conducted at the Dilley detention center I did not encounter a single Flores class member or Flores class member mother who indicated that they had been interviewed or questioned by CBP or ICE officials to obtain information needed to expeditiously process class members for release to family or friends or placement in a facility licensed for the care of dependent children.").

Declaration of volunteer attorney Amanda Doroshow, Ex. 10 ¶6 (1/7/16) ("During the six days I spent at Dilley, I did not meet any *Flores* class member or mother who told me that the class member had been informed by CBP or ICE about … any way that continuous efforts were being made to explore release or placement under the <u>*Flores*</u> settlement. It appeared to me that accompanied minors in Dilley were being treated as if they are not *Flores* class members at all.").

Declaration of volunteer attorney Ed McCarthy, Ex. 11 ¶12 ("None of the mothers or *Flores* class members who I interviewed or represented at Karnes from October 17, 2015 to October 30, 2015 informed me that any efforts had been taken or were being taken that they were aware of to release or place *Flores* class members as expeditiously as possible under the terms of the <u>*Flores*</u> settlement.").

Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, Ex. 17 ¶16 ("When they arrived at the border, she and her daughters entered the United States and were detained at the Karnes detention center around January 26, 2016. Her son entered with an unrelated Brazilian man who traveled with them. Her son was classified as an unaccompanied minor and placed in the custody of the Office of Refugee Resettlement ("ORR"). Although Rina had relatives in Boston that were willing to sponsor her son for release from ORR custody, on February 10, 2016 ORR "reunified" Rina's son with her and ICE admitted him at the Karnes detention center.").

Declaration of attorney Jacqueline Kline, Ex. 5 ¶10 ("All these *Flores* class members and their mothers have family or friends ready to provide housing and care, no criminal history, and pose no threat of security or flight. Yet none have been released despite the terms of the Flores Settlement and the District Court's August remedial Order.").

Declaration of Bridget Cambria, Ex. 3 ¶12 (I have never been informed or seen any efforts be the Defendants to provide continuous efforts towards release except the period immediately prior to the Order of Judge Gee. Following the decision and order of Judge Gee and the release of many families who were detained for long periods of time, ICE nearly immediately began to detain class members for periods in violation of the [S]ettlement.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶ 11 (11/2015) ("I interviewed no *Flores* class members or their mothers who had been questioned during their several weeks of detention by CBP or USICE officers about relatives or friends who could care for the children upon release, nor had any class member or mother been questioned about the possibility of the class member being placed in a licensed facility for the care of dependent children. I saw absolutely no evidence either in my discussions with class members or their mothers, or when reviewing their administrative files, that DHS was in any way taking and recording steps to release Flores class members without unnecessary delay or as expeditiously as possible. In fact, I became aware of no efforts at all to release class members under Paragraph 14 or to place them under Paragraph 19 of the *Flores* Settlement. Based on my discussions with Flores class members and their mothers, and review of their files, it was clear that DHS continues to ignore Paragraph 18 of the Settlement which provides upon taking a minor into custody, DHS must make and record prompt and continuous efforts toward family reunification and the release of the minor pursuant to Paragraph 14.").

Declaration of Mirna M█████ █████, Ex. 25 ¶ 9 (2/3/16) ("No one at the border patrol station or here at Karnes has ever questioned me or discussed with me the possibility of my sons being released to relatives or friends here in the United States. I am not aware of any effort whatsoever being made to release one or both my sons to a relative or friend I designate here in the United States.").

Declaration of Raquel A█████ █████, Ex. 26 ¶11 (2/3/16) ("No officials have talked to me about whether we have relatives or close friends in the U.S. who could temporarily care for my daughter.").

Declaration of Katerin Y███████ ███████ (12 years old) Ex. 34 ¶13 (2/3/2016) ("No one asked where I was hoping to live in the United States, even though my dad lives in Virginia and my mom and I want to live with him.").

Declaration of Peter Schey, Ex. 1 ¶ 9 ("The inspections also clearly disclosed that whether Class Members were detained for days, weeks or months, continuous efforts are not made and recorded to release children under Paragraph 14 or place them under Paragraph 19, and all children end up detained in Defendants unlicensed or secure facilities commingled with unrelated adults.").

Declaration of Sonia A█████-█████, Ex. 35 ¶8 (2/3/16) ("No one at the border patrol station or here at Karnes has ever questioned me or discussed with me the possibility of my sons being released to relatives or friends here in the United States.").

Declaration of Vilma S████ ██ ████, Ex. 47 ¶9 (2/3/16) ("No one here has asked me any questions about whether my daughter has any relatives she could be reunited with in the U.S. or whether there was any responsible adult I want to designate for the care of my child if released from detention. As mentioned above, my sister lives in Boston and easily could take care of my daughter in a safe environment. No one here has told me anything about any rights my daughter has under the Flores case.").

Declaration of Leny A█████ █████ (15 yrs old) Ex. 48 ¶ 8 (2/3/16) ("To this day no officer or employee at Karnes has discussed with me or my mom the possibility that I could be released to my aunt in Houston. To the best of my knowledge no one has contacted my aunt to learn more about whether she can take care and custody of me.).

Declaration of Raquel A█████ █████, Ex. 26 ¶¶ 11-12 (2/3/16) ("My daughter is not a flight risk, a danger to herself or others, or are juvenile delinquent, yet not one official has talked to me in the past

month and a half to explore whether my daughter can or should be released to a family member or family friend.").

Declaration of Kelly G⬛⬛⬛⬛⬛⬛⬛⬛-⬛⬛⬛⬛⬛, Ex. 31 ¶14 (5/1/16). ("I have family here in the U.S., my brother lives here and he has TPS [Temporary Protected Status], he has been here for more than 20 years and lives in Houston. He would be willing to have my son live with him. No immigration officers at the border, at Karnes, or [at] Berks have ever asked me about my son going to live with my brother.").

Declaration of attorney Lindsay Harris, Ex. 14 ¶4(d) ("*Flores* class members in CPB facilities are not told by officials about any rights they may possess under the Flores settlement.").

4.      **Excerpts of Declarations: Class Member children not promptly released are not brought before Immigration Judges for custody review hearings**

Declaration of volunteer attorney Natalia Ospina, Ex. 7 ¶9 (3/10/16) ("According to the detainees I interviewed not one had been told that Flores class members have the right to a custody hearing before an immigration judge and none of the Flores class members had been taken before an immigration judge for a bond redetermination hearing.").

Declaration of Allison M⬛⬛⬛⬛ ⬛⬛⬛⬛⬛, Ex. 40 ¶10 (5/1/16) ("At no point [during our detention] did anyone ever talk to me or my sister about our rights as children. I was never talked to about any ability to be released to my dad or to receive a bond in front of an immigration judge.").

Declaration of volunteer attorney Amanda Doroshow, Ex. 10 ¶6 (1/7/16) ("During the six days I spent at Dilley, I did not meet any *Flores* class member or mother who told me that the class member had been informed by CBP or ICE …[that] they could have their status reviewed by an Immigration Judge, or had been brought before an Immigration Judge to review their custody status.").

Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, San Antonio, Texas, Ex. 17 ¶20 ("Children at the Karnes detention center have routinely told us that they were not informed of their rights to custody redetermination hearings, as required by the *Flores* settlement agreement, and the same is true of the class members I met with on February 3, 2016.").

Declaration of Victor R⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛, Ex. 21 ¶ 7 (4/23/16). ("No official told me I had any right to seek release from an immigration judge.").

Declaration of thirteen-year-old class member Cesia V⬛⬛⬛⬛⬛⬛⬛⬛⬛-⬛⬛⬛⬛, Ex. 29 ¶19 ("[n]o official … has informed me that I have a right to see an immigration judge about my custody status.").

Declaration of Kelly G⬛⬛⬛⬛⬛⬛⬛⬛-⬛⬛⬛⬛⬛, Ex. 31 ¶ 6 (5/1/16) (I was never told that my son had a rights under the Flores case to have an immigration judge review his bond situation or consider his release.").

Declaration of Victor R⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ (age 15), Ex. 21 ¶¶ 7, 11 (4/23/16) ("No one told me that I maybe had the right to ask an immigration judge to review my detention status or whether I should be released on bond or other conditions...").

Declaration of Walter A⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (age 13), Ex. 22 ¶ 8 (2/18/16) ("No one told me

about … seeking a judge about being held in detention.").

Declaration of Yeslin L xxxx xxxxxxx (age 9), Ex. 23 ¶ 7 (4/23/16) ("But they never told us that we go leave or that we could ask a judge to be released.").

Declaration of Diana C xxxxx xxxxx, Ex. 43 ¶10 (2/2/16) ("While here at Dilley for the past month no one working with the immigration has talked to me about … my right to see a judge to decide if I should be released. My mother has told me that while we have been detained here no one has spoken to her about … my right to see a judge about my release.").

Declaration of Edgardo D xxxxx xxxxxxxx, Ex. 49 ¶11 (2/2/16) ("no officer here at Dilley has said anything to me or my mother about … seeing an immigration judge to decide if I or I and my mother should be released from detention").

Declaration of twelve-year-old class member, Flember J xxxx xxxxxxxxx, Ex. 50 ¶8 (2/2/16) ("I have not been told that I can see a judge about my detention or release.").

Declaration of Karen L xxxxxx xxxxxxxx (12 years old), Ex. 51 ¶11 (2/2/16) ("I came to Dilley with my mother on Sunday, January 23, 2016. I have not been told that I can see a judge about my release.").

Declaration of Madelyn M xxxxxxx-xxxxx, Ex. 52 ¶10 (13 years old w/ mother, Elsy N xxxx xxxxx-xxxxx, (2/2/16) ("While here at Dilley for the past month no one working with the immigration has talked to me about … my right to see a judge to decide if I should be released. My mother has told me that while we have been detained here no one has spoken to her about … my right to see a judge about my release.").

Declaration of Yessenia E xxxxxxxx xxxxxxx (12 years old), Ex. 27 ¶10 (2/2/16) ("I have not been told that I can see a judge about my release.").

Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES in San Antonio, Texas, Ex. 17 ¶21 ("Class members also reported being placed with unrelated adults, which is also very common at the Karnes detention center too.").

Declaration of Amarilis L xxxxxx xxxxx, Ex. 44 ¶8 (2/3/16) ("I have not been told that I can see a judge about my detention or release.").

Declaration of Franklin R xxxx xxxxxxxx (age 16), Ex. 45 ¶ 14 ("[N]o officer here at Karnes has said anything to me (or my mother) about being released from detention or seeing an immigration judge to decide if I … should be released from detention. I feel like I am suspected of being a terrorist. I am not a flight risk. I will always appear as required if I am released from detention. I am not a criminal. I am not a danger to myself or to others. I think the only reason I have been treated so inhumanely is so the U.S. immigration authorities can use me and other detained minors as an example to convince other young people facing violence and even death in El Salvador to stay home, deal with the violence, risk death, but don't come here for protection.").

Declaration of Sonia A xxxxx-xxxxx, Ex. 35 ¶8 (2/3/16) ("I have not been told that my son … could see a judge about his detention or release.").

1

2
Declaration of Katerin Y█████████ ████████, Ex. 34 ¶7 (2/3/16) ("No one told me that I had a
right to see an Immigration Judge about my detention. … I have talked to my mother and my

3
mother has said that no one has told her about… any rights I may have to see an immigration
judge.").

4

5
**5.      Excerpts of Declarations: Flores class member are routinely commingled for extended
periods of time with unrelated adults**

6

7
Declaration of Amarilis L█████ █████, Ex. 44 ¶10. (2/3/16).("It is very disturbing for my child to
be detained here with several hundred unrelated adults. He is becoming more and more depressed and

8
anxious the longer we are in this detention center unsure of our future and detained with hundreds of
unrelated adults.").

9

10
Declaration of Alex Mensing, Exhibit Y ¶4, Ex. 19 (11/13/15) ("The room was about 3 meters wide
by 4 or 5 meters long. There were about 18 people inside. There were babies as young as 1 and a half

11
years old. The babies cried continuously. They kept loading in more and more women with children.
There wasn't enough space to sleep because we didn't fit.").

12
Declaration of attorney Robyn Barnard, Ex. 12 ¶18 ("It should also be noted that many class
members are still detained in secure lock-down facilities with unrelated adults for weeks or months

13
on end even if the claimed "average" detention is about twenty days.")

14
Declaration of attorney Jacquelyn Kline, Ex. 5 ¶ 9 (2/2016) ("Children remain detained at the BCRC
with their adult parents. Children remain detained with unrelated adults, yet another violation of State

15
law and the terms of the *Flores* Settlement.").

16
Declaration of Alex Mensing, Exhibit R, Ex. 19 (11/9/15) ("I was with my two kids and some other

17
people… There were a lot of people. There were people who slept standing up. Even a woman who
was 8 months pregnant with swollen legs slept standing up.").

18
Declaration of Maria M████████–█████████, Ex. 32 ¶ 6 (4/23/16) ("There were many people, maybe

19
forty people in the cell, all mothers with children").

20
Declaration of Yeslin L████ ████████ (9 years old), Ex. 23 ¶ 9 (4/23/16) ("Next, we were taken to a
detention center in Dilley, Texas… it was awful because we were being held in a big jail with

21
hundreds of other adults and children.").

22
Declaration of Karen Z█████ ████████ (5/1/16) , Ex. 39 ¶23 ("Detained men here are comingled with

23
detained mothers and children and this makes the children and woman very uncomfortable.").

24
Declaration of Victor R█████ ████████ (15 yrs old), Ex. 21 ¶¶ 8, 16 (4/23/16) ("I felt very depressed
at Karnes. It was very distressing and embarrasing being detained with a large number of unrelated

25
adults…Like at Karnes, it is very disturbing to be detained with other unrelated adults. Here both

26
adult men and women are detained with unrelated minors. This does not feel like a safe situation.").

27
Declaration of Alex Mensing, Exhibit GG, Ex. 19 ¶ 14 (11/13/15) ("On the plane, we were mixed in
with men… There were men who were handcuffed at the feet and at the wrist. We were really

28
uncomfortable. We didn't know what class of person they were. We worried about what these men
could do. Instead of having a relaxing trip, we wondered what would happen. We were worried the
whole time.")

6.      **Excerpts of Declarations: Prolonged detention is not necessary to ensure that Class Members receive medical care; in fact, their physical and mental health is placed at risk in DHS's detention centers**

Declaration of Walter A‌xxxxxxxx xxxxxxxxx, Ex. 22 ¶15 (13 years old) (2/18/16) ("Recently I suddenly got very tired and my heart started pounding and really hurting like someone was hitting me. I felt like I blacked out. I had a hard time breathing. They took me to see a doctor here at the Berks detention center. My mother said my lips were purple. The doctor said I was close to having a heart attack. The doctor told my mother that the stress made me like that. I think being detained here for so long caused this incident. I am exhausted and totally stressed. They never took me to the hospital. I am afraid it will happen again. I am too worried to eat properly.").

Declaration of Cesia V‌xxxxxxxxx-xxxx, Ex. 29 ¶13 (4/23/16) ("I have had problems with a sore tooth, it's been hurting me a lot since January 24 and the staff members keep saying that they are going to make an appointment for me. It's been more than three weeks and I still haven't seen a dentist. I also suffer from very bad menstrual cramps and the medical staff members do not really help me and they just give me Tylenol. My mom has been having stomach pain since she came here. The medical staff did two tests that came back and showed that she had a kidney infection, but about four or five days ago the medical staff said that they needed another opinion from an outside lab. My mother is still in pain and it's hard for me to see her suffering.").

Declaration of Dr. Luis Zayas, Dean of University of Texas School of Social Work, Ex. 61. ¶¶12, 13 ("Much of the research findings on children who have experienced periods of detention conclude that such children will require years of mental health services to alleviate the impact of living under restrictive conditions. The stress, despair, and uncertainty of detention – even for short periods – compromise children's intellectual and cognitive development and contribute to the development of chronic illnesses. Institutionalization and the threats faced by children in detention have impacts similar to those of other forms of trauma. During and after the detention period, children experience recurrent, distressing memories, nightmares, dissociative reactions, prolonged psychological distress, and negative alterations in cognition. . . The findings reported in the scientific literature on the detention of asylum-seeking mothers and children in facilities like those in Karnes City and Dilley, Texas, and Berks, Pennsylvania are very uniform in showing the deleterious impact of incarceration or detention on children.").

Declaration of Carol Anne Donohoe, Ex. 4 ¶¶8, 9 (Upon arrival, several of the children were determined to be ill by the staff at the Berks medical clinic, yet they had been transferred anyway. One child was not even admitted to Berks upon arrival but was instead taken directly to a hospital where she was diagnosed with pneumonia. She spent a few hours at the hospital and then was returned to detention to Berks.

Over the next few weeks in November, nearly every young child I interviewed at the Berks facility had a fever or a throat infection. In addition, there was a chicken pox outbreak. A five-year-old child I represent was given a chicken pox vaccine even though his mother told the Berks doctor that he had already had chicken pox. A couple of days later, the child came down with chicken pox and was quarantined in an isolation room with his mother for a week.").

Declaration of Dr. Luis Zayas, Dean of University of Texas School of Social Work, Ex. 61. ¶¶19-20 (explaining the deleterious effects of maternal incarceration with children in the criminal justice context and juvenile detention).

Declaration of Bridget Cambria, Ex. 3 ¶10 ("As their attorney I have observed the psychological effects on class members of prolonged detention. Children right now detained at Berks exhibit suicidal ideation, anxiety, stress, chronic depression, constant tearfulness, isolation and anger. It has manifested itself in isolation, thoughts of self-harm, crying, tantrums, slapping kicking, biting, spitting and other form of expressing their frustration.").

Declaration of Dr. Luis Zayas, Dean of University of Texas School of Social Work, Ex. 61. ¶32 ("For children and mothers detained in the residential detention centers in south Texas that I have visited, a significant issue in their lives is the jail-like physical plant and the law enforcement culture that dictates the rhythms of their days and weeks. While living under these psychologically injurious conditions, the families undergo high-stakes interviews (i.e., credible fear and reasonable fear interviews) with asylum officers and review and adjudication by immigration judges that could result in deportation or release and integration into the community. Their lives are punctuated by emotionally challenging interviews followed by long periods of uncertainty. Contrast this unaccompanied minors (UACs) that I have observed in settings operated by non-profit social service contractors for the Office of Refugee Resettlement and the toxic impact that detention has on children and parents becomes clearer. UACs are typically engaged with providers who are making plans for the children's release into the community from the day they arrive, not undergoing extensive interviews and scrutiny and uncertainty about deportation or release into communities. UACs enjoy field trips, greater freedom of movement, and absence of a correctional or prison-like culture. Meanwhile, mothers and children in detention centers like those in Karnes and Dilley feel incarcerated, their lives in suspension.").

Declaration of Dr. Luis Zayas, Dean of University of Texas School of Social Work, Ex. 61 ¶¶34-35 ("Based on my professional background and expertise, the knowledge derived from the scientific literature reviewed in this declaration on child development and psychopathology and parenting and family functioning, and based on my conversations with mothers and children in immigration detention, I can say with certainty that detention is inflicting emotional, psychological, physical health and neurological harms on these families, particularly the children, and that some of these effects will be long lasting, and very likely permanent as adduced by the scientific literature. The healing process, in my view, cannot begin while mothers and young children are detained. Indeed, my clinical experience and scientific literature indicate to me that even a few weeks of detention exacerbates the trauma experienced by refugee and immigrant families and added a new layer of hardship that, with respect to the children in particular, may be irreversible.").

Declaration of CARA Project volunteer Leanne Purdum, Ex. 8 ¶ 7 (3/1/16) ("Throughout the detention process, the children are under immense emotional stress, both from being detained and from watching their mothers try to navigate the legal process while in detention. At Dilley, I saw many children in distress over seeing their mothers cry. I especially remember one young boy continually reaching up to wipe the

tears from his mother's face, saying softly "No, don't cry mommy. Don't cry mommy." To distract him, we tasked him with finding tissues for mommy. I am sure this mother would have liked to have a private legal consultation with me. However the detention center is not conducive to allowing such consultations because many children are very worried about being separated from their mothers and, even where mother and child were both comfortable being separated, the childcare provided at the facility is limited. Also, there is a poster inside the visitation trailer that says "your children are your responsibility", making it clear that children need to be with the mothers. Family detention centers create situations where children are sometimes exposed to emotional stress by proximity. The children are very aware that they are being held inside of a facility surrounded by fences, which they are not allowed to leave.").

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11A (12/21/15) ("The four-year old boy suffers from asthma and a dangerous kidney condition. The mother told me that, in addition to a specialized diet, the boy requires medication every six hours in order for his kidneys to function properly. According to the mother, despite her repeated requests, the boy did not have access to a doctor, medical treatment, or medications the entire time he was in CBP custody. He had trouble breathing, caught a bad cough and a fever, and experienced stomach pains. Although the boy eventually obtained medical treatment at the Dilley facility, his mother said that he did not receive medications during the four days he was in CBP custody and for one day while at Dilley. In addition, his mother reported that she had a diarrheal illness while in CBP custody, but did not receive any medical treatment. When she asked to see a doctor, CBP officers reportedly told the mother that this would delay her family's processing through CBP, so she did not receive medical care.").

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11B (12/21/15) ("The daughter developed a bad cold in detention and her ears hurt her. However, the four-year-old girl received no medical treatment while she was detained by CBP.").

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11C (12/21/15) ("The mother reported that her children were sick, but CBP officers told her that there were too many sick people to treat, so her family did not receive medical care.").

Declaration of volunteer Theresa Wilkes, Ex. 6 ¶7 (11/2015) ("One of the mothers reported to me that, while detained at STFRC, she was taken to the regional hospital, diagnosed with pneumonia, and then promptly returned to the multi-family detention housing with her toddler as well as other mothers and their children, although her condition remained untreated. When I saw her a few days after her diagnosis, she was still coughing up phlegm to the degree that she was unable to speak to me for several minutes. When we met, her son was also congested and coughing.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. 62 ¶7 (1/28/16) ("During the tour, I was most struck by our discussion with the mental health staff. They explained to us that there were no Spanish-speaking mental health staff at Berks, that all services were provided through a phone interpreter, and that they had no problem with this arrangement. As a long time practitioner in the field of mental health, I found this arrangement concerning as the inability to communicate with clients effectively has a deleterious impact on a clinician's ability to build rapport and trust with a client. These are the bedrocks of the therapeutic relationship.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. 62 ¶ 8 (1/28/16) ("The mental health staff also explained that while they were required to meet with all the families following their arrival at Berks and regularly thereafter, they used no formalized assessment tools. I am concerned that there is no clear process of assessing for trauma, depression, or anxiety when families arrive at the facility, which makes it very difficult to treat these conditions—especially given the above-referenced language barriers.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. 62 ¶14 (1/28/16) ("I found that all of the mothers and children for whom I completed psychological evaluations were suffering from high levels of anxiety and depression. Additionally, most of the mothers also met the criteria for Post-traumatic Stress Disorder (PTSD). All of these families disclosed life threatening, traumatic experiences in their home countries, which caused them to flee. Many of the mothers also revealed that they had experienced childhood abuse, as well as intimate partner violence. This abuse almost always included regular experiences of rape. In families where the mothers had experienced intimate partner violence, the children had nearly always witnessed this violence and, in several families, the children had also been directly physically and emotionally abused.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. 62 ¶16 (1/28/16) ("My various interactions with mothers and children in the Dilley facility left no doubt that they were experiencing high levels of anxiety, depression, and in many cases PTSD. Despite the prevalence of mental health issues, mothers cited a lack of access to mental health staff despite their repeated requests for intervention at the medical clinic.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. 62 ¶18 (1/28/16) ("The mothers' lack of agency was particularly evident for those with sick children. Nearly every child I met at the Dilley facility had a deep, hacking cough and a fever at some point during detention. Mothers expressed anxiety and fear around their children's health, particularly given the long wait times at the clinic and the frequent failure of the medical staff to do anything other than recommend that their children drink water.").

Attachment X. to Declaration of attorney Lindsay Harris, CARA Project Complaint filed with the Office of Civil Rights and Civil Liberties and the Office of Inspector General on October , 2015, Ex. 15, Page 2 (The complaint includes fourteen case examples for children and mothers detained at Dilley, and explains:

"The cases summarized in this complaint reflect the continuation of the following disturbing trends identified in our July 30, 2015 complaint:
    • Children with fevers and infections or viruses are told to drink more water and, lately, prescribed Vicks Vaporub;
    • Mothers and children must often wait between four to eight hours to receive medical attention;
    • Lack of follow-up treatment and unavailability of specialist care.

In addition to these three ongoing trends, these cases also reflect the following problems with medical care at STFRC:
    • Mothers are routinely asked to sign forms saying that they have refused medical care if they leave the medical clinic, even after waiting many hours to be seen;

• Pre-existing conditions, including anemia, vision problems, chronic pain from gun-shot wounds, and high-blood pressure, are not being treated;
Doctors are not on site or available in the evening or during lunch."

Complaint filed by CARA Family Detention Pro Bono Project on March 28, 2016, with the DHS Office of Civil Rights and Civil Liberties and Office of Inspector General Re: Ongoing Concerns regarding the Detention and Fast-track Removal of Children and Mothers Experiencing Symptoms of Trauma, Ex. 63 Page 2, 15 (discussing how many detained mothers and children suffer from Post-traumatic Stress Disorder, anxiety, depression, or other emotional or cognitive disorders and that the fast track removal processes and detention to which they are subjected are "dangerously inadequate to ensure access to protections under U.S. law. . . "The majority of the predominantly Central American families held in family detention centers have fled gang violence, domestic abuse, or other trauma, which often has lasting effects. As documented above, traumatized individuals living with PTSD, depression, or other disorders face real struggles in communicating and disclosing the suffering they have endured to asylum officers. Disclosing traumatic events requires trust and a certain level of comfort that cannot be achieved in detention. Consequently, traumatized individuals may be deprived of due process and, ultimately, protection under U.S. law.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. 62 ¶21 (1/28/16) ("It is my professional assessment that the family members with whom I met at the Berks and Dilley facilities suffered an adverse emotional impact as a result of being held in detention. These adverse emotional consequences appeared to occur without regard to the length of detention.").

Declaration of attorney Lindsay Harris (medical), Ex. 15 ¶11(a) ("A mother who suffered from severe asthma but was not permitted to keep an inhaler with her in the Dilley facility until after she had experienced several asthma attacks and received oxygen for three or four hours. She constantly worried that her asthmatic eight-year-old son would experience similar symptoms.").

Declaration of attorney Lindsay Harris (medical), Ex. 15 ¶11(b) ("A four-year-old boy who suffers from asthma and a kidney condition for which he requires medication every six hours. This child was denied medical care while in the custody of Customs and Border Protection (CBP) prior to being transferred to Dilley and did not receive the necessary medications for his kidney conditions from November 6 to November 11. A doctor told the mother that they would try to get the son to a specialist in San Antonio, but could make no guarantees.").

Declaration of attorney Lindsay Harris (medical), Ex. 15 ¶11(c) ("A two-year-old boy with a cast on his fractured arm that was due to be removed on November 9, 2015, by a doctor in El Salvador. Although the boy and his mother saw doctors at Dilley a total of five times and repeatedly alerted doctors that the cast should be removed. On one occasion when the mother raised her concern about the cast, a doctor was simply unresponsive. On another occasion, on November 12, a doctor asked when the mother would receive a decision on her immigration case. The mother was made to feel that getting an appointment for her son's cast to be removed was dependent on the results of her credible fear interview. The cast was not removed until November 19, 2015, after attorneys from the CARA Project intervened and brought the case to the attention of ICE officials.").

Declaration of attorney Lindsay Harris (medical), Ex. 15 ¶11(d) ("A five-year-old boy transferred from Karnes to Berks who was vaccinated for varicella (chicken pox) at the Berks facility, despite being vaccinated as an infant… He developed chicken pox two days after the vaccination and he and

his mother were held in medical isolation for a week. *Id.* The mother describes how her son seems depressed, has stopped playing with other children, has become quiet, wants to go and says that he is in prison.").

Declaration of Allison Mxxxx xxxxx, Ex. 40 ¶21(5/1/16) ("I have only seen a mental health worker on one occasion. I suffer from depression and it's very hard to deal with being trapped every day. I believe I am suffering emotionally and in school.").

Declaration of Celina Sxxxxxx-xxxx, Ex. 28 ¶18 (4/23/16) "My was seen by a psychologist or social worker upon our initial entry into the Berks detention center. No mental health provider has seen my son since that time. I have discussed the problems that I am having with the mental health staff, but they have not offered my son any services. They have only told me what I must do in the facility when he acts that way. The only solution I was given was to take my son into my room until he calms down.").

Declaration of Celina Sxxxxxx-xxxx, Ex.28 ¶19 (2/19/16) ("I am diabetic. I have been hospitalized and taken from this center on one occasion. I receive diabetic medicine three times a day. At other times I receive an injection. Sometimes I am told by the doctor to rest, and they have asked staff members to watch my son as I recover. That request from the doctor was refused by Berks staff. On one occasion I was in the isolation room at Berks because I was suffering from a high fever, chills, and I had to be there for a whole day. I was with my son and had to wear a mask.").

Declaration of Isamar Sxxxxxx xxxxxx, Ex. 30 ¶29 (4/23/16) ("I never had any medical issues at Dilley, but as soon as I got to Berks, I got sick. I had a round ball on my backside. I went to medical to complain about the pain. But they didn't do anything. I went two times. I was only given treatment because I woke up one day and could not walk. The pain was very bad. I had to be taken to a hospital. Two staff members took me there, a man and a woman. On the way to the hospital, the man was driving. He kept looking back at me and laughing. At the hospital, a doctor was examining me. The doctor needed me to undress. The male staff member did not want to leave the room, but the doctor finally forced him to leave.").

Declaration of Isamar Sxxxxxx xxxxxx Ex.30 ¶30 (2/19/16) ("I was given 4 different antibiotics to take. The doctor told me that if the treatment didn't work, I would need surgery. The medicine has taken the pain away, but not the ball. I can still feel it. Also, the one medicine made me extremely dizzy. Even when I was feeling dizzy, I was expected to walk to medical to get my medications.").

Declaration of Isamar Sxxxxxx xxxxxx, Ex.30 ¶31 (2/19/16) ("One time, my daughter woke up crying saying her head hurt. When [we] got to medical, she started throwing up. She complained that her throat and stomach hurt. The whole next day she felt sick. Medical only gave her Tylenol. The whole next day she barely ate. I asked medical to give her pedialyte, but said she was fine and didn't need anything.").

Declaration of Maria Dxxxx xxxxxxx, Ex. 32 ¶9 (4/23/16) ("At Dilley, my son got an earache. I was not happy with the medical treatment received because my son was crying in pain and they made me wait for four hours before they saw him.").

Declaration of Maria Dxxxx xxxxxxx, Ex. 32 ¶12 (4/23/16) ("At Berks, my son has started wetting the bed at night. I believe it is from the stress and psychological harm of being held in detention. I have been putting diapers on him at night here at Berks, but I came across an officer who told me that

I could not use diapers because my son is too old. They told me I had to make an appointment with the doctor to get one diaper per night.").

Declaration of Theresa Wilkes, Ex. 9 ¶5 ("Most of the women and Flores class members I assisted during the week I spent at Dilley had horrible coughs. Treatment for these families in STFRC for their coughs ranged from nothing to cough drops or honey and water.")

Declaration of Victor R████ ███████, Ex. 21 ¶13 (4/23/16) ("I keep feeling very sick here. I was really sick for an entire week. I had diarrhea, was vomiting, and felt constantly nauseated. I couldn't eat because the food was so bad. I went to the doctor, but she just said that I should come back if it was still bad the next week, saying that I am old enough and I have a body to resist something like this. I have had a cold and sore, raw throat pretty much the whole time I have been here. Sometimes, like now, it gets really bad. For the past four nights, I have hardly been able to sleep because I keep coughing so much. But I don't want to go to the doctor again because she only tells me to gargle with water with salt. I also have a problem with my tooth. I have a filling that came loose. It is incredibly painful and feels like a hole in my teeth. A dentist who comes here and saw me said that it just a molar coming in and I didn't need to see an outside dentist. He said that I should just chew on the other side. I can't wait to get out of this place and see a dentist who can stop the pain in my mouth.").

Declaration of Victor R████ ███████, Ex. 21 ¶14 (4/23/16) ("I am still feeling depressed and like I have to get out of there. The staff called me to talk to a psychologist, but I did not want to talk to her because it turned out she does not speak Spanish so I would have to speak through an interpreter who works for this detention center.").

Declaration of Yeslin L████ ███████, Ex. 23 ¶¶15-17 (9 yrs) (2/19/16) ("I have been sick here many times. I feel a sharp pain in my chest, where my heart is. My mom brought me to the doctor, but they said that it could be because I feel sadness or anguish and have not done anything about it. My sister is also in a lot of pain. She can't even eat because there is something wrong with her molars. They have been hurting since she got here. Her fillings fell out and I can see the big holes in her teeth. She went to the dentist about a month ago. They said that she would need surgery, but would need an appointment with an outside doctor first. It has been a month and she still doesn't have an appointment or even know when they will fix it. Now, they just give her pain medicine, but it still hurts her.").

Declaration of Alex Mensing, attached Exhibit M, Ex. 19 ¶8 (10/27/15) ("My two younger children got colds in the *hielera* and began coughing. They are still not better. My daughter has a cyst problem for which she takes medication and they took it away from us.").

Declaration of Alex Mensing, attached Exhibit PP, Ex. 19 ¶8 (11/30/15) ("My children suffered from constant diarrhea, stomachaches and fever. We would wait for four hours or more to see a doctor and we would still not receive medicine. Even when my daughters had high fevers they were not given medicine. They were told to drink water. The water was disgusting and tasted like pure chlorine. All me and my children could do was pray.").

Declaration of Alex Mensing, attached Exhibit MM, Ex. 19 ¶7 (11/30/15) ("They took us to Dilley, Texas. The experience there was horrible. Two or three days after I arrived, blood started coming from my mouth and nose. I wasn't taken to a doctor. They told me to drink hot water. About a week later, they gave me pills for a sore throat. I was bleeding for five days before I got medicine. …Me and my son both had diarrhea for most of the time we were there. Eventually, my son got a cold and we went to go see a doctor at the office in Dilley. We waited from 8 in the morning until 3 in the

afternoon and then they just told us to come back the next day. We waited for three or four hours the next day and then the doctor just told my son to drink water. We had no food to eat while we waited, so we went hungry all day.").

Declaration of Alex Mensing, attached Exhibit MM, Ex. 19 ¶13 (11/30/15) ("My son has mostly been healthy in Berks but some of the other children have had facial swelling. When he had a fever and a cold, my son was taken to the emergency room. He had an infection in his eye but he hasn't been given medicine yet, we're still waiting for it.").

Declaration of Alex Mensing, attached Exhibit NN, Ex. 19 ¶11 (11/16/15) ("I kept having migraines, and waited for hours to receive medical attention or some pills and at the end they did not give me anything. I also asked for psychological help but no one responded.").

Declaration of Yesenia Y xxxx xxxxx, Ex. 57 ¶12 (01/31/2016) ("My son has diarrhea and I am pregnant. We have not seen a doctor.").

Declaration of Alex Mensing, attached Exhibit OO, Ex. 19 ¶9 (11/19/15) ("At. Dilley, we had problems with the medical care. My son was vomiting vomiting and when we went to the doctor, they said he had a fever and that he should just drink water. We had to wait: at least four hours to even see a doctor, and then they would just tell him to drink water again.").

Declaration of attorney Robert Doggett, Ex.18 ¶11 (12/2015) ("Dean Zayas has visited both the Karnes and Dilley facilities on multiple occasions. He testified about the conditions in the facilities, describing them as secure and highly restrictive, making them much like jails. He explained that multiple families are held in single sleeping and living cells together. He laid out his conclusion that the children held in the family detention facilities, even for relatively short periods of time, suffer negative and long-lasting impacts on their mental health. He also noted that the facilities do not resemble other childcare facilities, even residential facilities, because they do not have a therapeutic or child welfare purpose but rather serve a law enforcement purpose of immigration detention.").

Declaration of attorney Robyn Barnard, Ex. 12, ¶¶18-19 ("On February 19, 2016, Human Rights First published a brief summarizing medical complaints made by mothers at Berks, which include the written responses they received from their ICE Deportation Officers (DO). One mother wrote:

'My son suffers from a skin disease named ███████████ and since we arrived in the United States, it developed itself so much to the point he even has symptoms on his genitals. When scratched it bleeds and [the detention center health staff] did not give me any medications for it or to calm him down, also his behavior has changed, he cries because he does not want to stay here any longer, it has already been over four months and I am still here."

Her ICE DO advised her to make an appointment with the medical staff at Berks, not responding to her concerns that the medical staff had not helped her child despite visits to the medical department at the detention center. The ICE DO went on to say "You may accept your removal order and arrangements can be made for your removal from the United States. At this time your custody status remains unchanged.'

Another complaint reads:
'My daughter has been having diarrhea for about three weeks now and we went to see a doctor but they did not give us any medication not even serum. With every passing day her behavior is getting worse and the psychologist just tells me to be patient. I need you to give

me the adequate medication and that you give me the opportunity to take my case outside of here. I am not a criminal. You gave the opportunity to other persons that have been deported to leave, why did you not give it to me. It has been more than four months that I have been detained.'

ICE DOs response: "Thank you! You may disolve [sic] your case at any time and return to your country. Please use the medical department in reference to health related issues.'

These complaints are further evidence that DHS is not capable of providing appropriate care for the families that they detain in Berks and other family detention centers, and reinforces the well-established view that detention centers are no place for children and their families.").

7.      **Excerpts of Declarations: Detention of children undermines and frustrates access to counsel.**

Declaration of attorney Karen Lucas Ex. 13 ¶4 (3/25/16) ("ICE has consistently frustrated the ability of dedicated lawyers and legal assistants to access their clients and has systematically disregarded the attorney-client relationship.").

Attachment A to Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, San Antonio, Texas, Ex. 17, Exhibit A, Letter to San Antonio Field Office Director and ICE Headquarters regarding issues with access to counsel at the Karnes detention Center. The access to counsel issues raised include:

- Restrictions on the ability of law students working under supervision to meet with detained *Flores* class members and their parents. (Page 2)
- Delayed entry into the Karnes detention center for law students working under attorney supervision. (Page 2)
- The requirement that young children remain with their mothers during attorney/client meetings during which sensitive and traumatic information must often be disclosed and discussed. (Page 3).
- Restrictions on the ability of pro bono attorneys to enter the legal visitation area upon arrival at the Karnes detention center. (Page 4).
- Ongoing restrictions on the conducting of independent medical evaluations, a critical component of the legal case for *Flores* class members and their mothers. (Page 5).
- Requirement that visitation lists be submitted 24 hours in advance, despite the rapidly changing population at the detention center and remote location in Karnes City, Texas.
- Increasing restrictions on attorney phone calls with detained families.

Declaration of attorney Robyn Barnard Ex. 12 ¶12 (3/16) ("Given the large number of families involved, the remoteness of the Berks facility, and lack of rapid access to detainees ICE administrative files, effective representation for the great majority of detainees is impossible.").

Declaration of Alex Mensing, attached Exhibit PP, Ex. 19 ¶ 11 (11/30/2015) ("I was transferred to another detention facility away from my lawyers with no warning… It did not matter to immigration officials that I had a lawyer or that I was fighting my case. They still moved me.").

Declaration of attorney Robyn Barnard Ex. 12 ¶ 8 (3/16) ("In response to the extremely low rates of *pro bono* legal representation of families detained at the Berks facility, Human Rights First partnered with a local Berks County legal service provider, the Pennsylvania Immigrant Resource Center ("PIRC"), local private attorneys, Philadelphia-based law firms, and Pennsylvania law schools to attempt to provide *pro bono* legal representation for families detained at Berks. Nevertheless, because of the remote location of this detention center, effective and thorough legal representation for the majority of *Flores* class members and their mothers is virtually impossible.").

Declaration of attorney Robyn Barnard Ex. 12 ¶10 (3/16) ("Since October 28, the *pro bono* representation project at the Berks facility has screened at least 46 families, of which 31 were transferred from either the Dilley or the Karnes facilities. All of the 31 families had been held in one of the family detention facilities in Texas for more than 30 days by the time they arrived at the Berks facility; at least four of those families had been detained in Texas for two months before their transfer to Pennsylvania. All of the families who have been transferred to the Berks facility since October 22 received an initial "negative" fear determination from the Asylum Office that adjudicated their credible or reasonable fear interviews in Texas. The vast majority of these families, if not all of them, were transferred to the Berks facility without any prior notice to their families or their attorneys of record in Texas.").

Declaration of attorney Robyn Barnard Ex. 12 ¶11 (3/16) ("I have been informed by CARA attorneys that they have discussed the unannounced transfer of families from the Dilley and Karnes facilities to Berks with Immigration and Customs Enforcement (ICE) officials in Washington, D.C. and if they are counsel of record requested notice prior to any future transfers of their clients from the Texas facilities. As of this date, they report to me that they still do not receive prior notice for all of their clients who are scheduled to be transferred.").

Declaration of attorney Robyn Barnard Ex. 12 ¶18 (3/16) ("I am aware that since about July-August of 2014 DHS has detained class members apprehended with their mothers while almost always releasing or placing class members in non-secure settings if apprehended with their fathers or other relatives because the agency insists on conducting fear interviews prior to considering release or placement of these accompanied class members. I am also aware that since the District Court hearing in April 2015 at which time the Court tentatively indicated it intended to find the defendants in breach of the *Flores* settlement, defendants have attempted to speed up the credible fear interview process so that they could claim that the 'average' length of detention was reduced to about twenty days. Speeding up the process inevitably curtails class members' right to counsel and due process of law *because* of defendants' failure to cooperate with the small number of *pro bono* counsel attempting to represent as many class members and their mothers as possible, failure to notify counsel of record before transferring class members and their mothers from one facility to another, failure to promptly make administrative files available to pro bono counsel, and limiting pro bono counsel's access to detention facilities. It should also be noted that many class members are still detained in secure lock-down facilities with unrelated adults for weeks or months on end even if the claimed 'average' detention is about twenty days.").

Declaration of Alex Mensing, attached Exhibit GG, Ex. 19 ¶18 (11/13/15) ("I didn't know what was going to happen to my case because my lawyers were in Texas and I did not get to speak to them before I was transferred. My cousin here said he would look into getting me an attorney but there were already attorneys coming here.").

Declaration of Kathryn Shepherd, Ex. 69 ¶4 ("Because the Dilley detention center is located about 80

minutes outside of San Antonio, little to no legal representation exists for the up to 2400 detained children and mothers other than the services provided by the CARA project. Although Immigration and Customs Enforcement (ICE) refuses to give us a daily or even weekly population count, we estimate the population to currently be around 1500 children and mothers.").

Declaration of Alex Mensing, attached Exhibit PP, Ex. 19 ¶ 13 (11/30/2015) ("When we were transferred here I was afraid I had lost my lawyers. I felt like my case was over and that I would have no help. Here in Pennsylvania I heard that there were no lawyers here like in Texas. I was lucky enough to receive information about a lawyer from another detainee. We do not get legal access here in Berks like we did in Texas. The staff will not help us access legal help.").

Deaclaration of Kathryn Shepherd, Ex. 69 ¶¶9, 10 ("In the last month, the extremely limited child care capacity at Dilley has substantially increased the challenges we face in providing legal services. Mothers now must come to legal appointments with their young children in tow and tell us that while they attempted to drop off their children at the nursery, they were told that it was at capacity.... Of course, attorney-client meetings in which the mothers receive legal counsel and advice are highly sensitive and critically important to the family's legal case for protection in the United States. Many of these mothers, and sometimes the children too, are disclosing, for the very first time, traumatic events, including rape, sexual assault, incest, domestic violence, threats, and extortion. In my experience, mothers and older children are often reluctant and sometimes totally unable to articulate the fears that they have and the horrors they have endured with younger children or siblings present in the room.").

Deaclaration of Kathryn Shepherd, Ex. 69 ¶ 13 ("Another troubling recent development at Dilley regarding access to counsel is the sudden prohibition on telephonic psychological evaluations. Such evaluations by independent mental health experts are critical evidence that attorneys obtain in support of their client's legal claims, especially as it pertains to credible and reasonable fear determinations and the terms and timing of release from detention. The overwhelming majority of families detained at Dilley are fleeing violence in their home countries and seeking protection in the United States. As such, many of the children and mothers exhibit symptoms of trauma, and, when evaluated, many are diagnosed with Post-traumatic Stress Disorder, Major Depressive Disorder, Anxiety disorders, or other cognitive disabilities.").

Declaration of Alex Mensing, attached Exhibit NN, Ex. 19 ¶ 13 (11/15/2015) ("No one asked me if I had a lawyer before I was transferred to Berks and I didn't get to speak with anyone from the CARA. Project before I left.")

Declaration of volunteer attorney Amanda Doroshow, Ex. 10 ¶4 (1/7/16) ("Working with these clients I know firsthand how much time and patience it often takes to build trust and a rapport with a woman or a child, so that s/he is able to open up and talk about the violence or threats of violence experienced in their home country. It would not be unusual for an attorney (or a therapist or social worker) to spend weeks or months meeting with an asylum seeker to obtain a complete account of the factual basis for any claim they possess to qualify for asylum. It often also requires independent research to collect evidence in support of a claim. Based on my experience providing pro bono legal services at Dilley, unless the Government provided a bank of lawyers to represent *Flores* class members and mothers at Dilley, effective representation for all detained class members and their mothers is virtually impossible.")

Declaration of volunteer attorney Ed Mccarthy, Ex. 11 ¶9 ("Aside from the problems in translation, I faced problems in accessing my clients due to Immigration and Customs Enforcement's ("ICE's") decisions.").

Deaclaration of Kathryn Shepherd, Ex. 69 ¶ 22 ("On May 10, 2016… we had 163 families who wanted to attend the pre-release orientation. These are typically families who know they are about to be released within a day or two and have received a positive credible fear determination. A total of 84 families, more than half of whom wanted to attend to access this important information, were unable to attend because Building 100 was at capacity").

Declaration of attorney Jacqueline Kline, Ex. 5 ¶ 5 ("Access to counsel at Berks is extremely limited. A handful of pro bono and very low cost attorneys are available to represent detainees however there are hundreds of detainees.").

Declaration of attorney Jacqueline Kline, Ex. 5 ¶ 7 ("Still today, counsel is subject to search upon entry into the BCRC. We are not permitted to bring in certain items, like a purse/bag. We are not permitted to bring in cell phones. We are not permitted to bring in computers unless we have prior approval. We are not permitted to visit clients without notice. We were notified via email on November 23, 2015 of more restrictive rules regarding legal visitation requiring 24 hours' notice in order to see our clients. *See* Ex. A attached (Legal Access and Visitation Standard Operating Procedures). These more restrictive requirements have further impeded attorneys' access to the families in the detention facility.").

Declaration of attorney Lindsay Harris (Due Process), Ex. 16 ¶13 ("Available pro bono counsel resources are tremendously strained, the number of volunteers fluctuates week to week, and CARA Project staff and volunteers cannot possibly serve all detained families. Recently, for example, the CARA Project had one week in March when only two volunteers were able to travel to Dilley to provide services and representation to detained children and their mothers. In that same week, new intakes increased at the detention center and the on-the-ground volunteer and staff team of 8 had to handle 60 intakes of the mother's of newly arrived *Flores* class members and conduct approximately the same number of preparation sessions for credible and reasonable fear interviews each day that week. Volunteer fatigue has been increasing steadily, and we will face difficulty maintaining consistent levels of attorney volunteers at Dilley in the coming months.").

Declaration of attorney Lindsay Harris (Due Process), Ex. 16 at ¶13(". To give the court a sense of the volume of families that the CARA Project represents at this detention center where children and their mothers are detained en masse, here are some statistics from a week in April 2016, CARA staff and volunteers conducted:

a.  298 Intakes for newly arrived families
    239 Credible Fear interview preparation sessions
    75 Follow-up client meetings
    12 Bond Hearings before an immigration judge
    8 reviews of negative credible fear determinations before an immigration judge
    Information sessions regarding post-release rights and obligations with 222 families.)

Declaration of attorney Lindsay Harris (Due Process), Ex.16 ¶14 ("*Flores* class member children and their mothers are not afforded any access to counsel at Border Patrol processing stations– even though they often spend at least 72 hours and sometimes longer in these facilities before being transferred to ICE detention. CARA staff and volunteers at Dilley have served over 8000 families

since March 2015, but we have yet to encounter any child or family who met with an attorney or secured representation prior to their arrival at Dilley, despite having already been in the United States for several days, and sometimes considerably longer.").

Declaration of attorney Lindsay Harris (Due Process), Ex. 16 ¶15 ("The CARA Project faces difficulties in providing full representation to detained families, even as we work daily within the legal visitation trailer at the Dilley detention center. *Flores* class member children and their mothers are frequently called into meetings with ICE agents to discuss the terms and conditions of their release. Counsel are prohibited from attending those meetings, even with the customary Form G-28, Notice of Appearance as Attorney or Representative, on file with ICE. During those meetings, class members and their mothers are routinely coerced and misinformed about their right to request a bond hearing before an immigration judge, a right provided to class members under the original *Flores* settlement.").

Declaration of attorney Lindsay Harris (Due Process), Ex. 16 ¶16 ("A further challenge to representation of detained *Flores* class member children and their mothers is that ICE often does not give families copies of their charging documents, removal orders, or other paperwork at intake. This makes it difficult for CARA staff and volunteers to understand the procedural posture of the case – including key issues such as whether an individual is eligible for bond or can pursue a claim for asylum.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶ 3 (11/7/14) ("The loss of income from a whole week of unpaid work makes it impossible for me to repeat this experience, despite the desperate need of families detained at the STFRC for representation.").

Declaration of CARA Project attorney Ana Camila Colon, Ex. 64 ¶4, 6 (explaining the difficulties of providing representation where CBP routinely fails to provide charging documents to families sent to Dilley for detention – "In other words, over seventy-five percent of the families had not been issued charging/removal documents following their interviews with CBP officers prior to their arrival in Dilley, Texas. . . The government's failure to issue charging/removal documents to our clients is problematic because we cannot adequately represent them if we do not know the charges against them or whether they are subject to a reinstated order of removal. This means that we must file an individual request for each client's full immigration file. While we wait for this file, the preparation for the family's case is delayed and they must remain in detention."

Declaration of attorney Michelle Garza Pareja, Associate Executive Director of RAICES in San Antonio, Texas, Ex. 66 ¶ 8(comparing ORR custody and treatment of unaccompanied children versus the accompanied children placed in family detention centers with their mothers – "At Karnes mothers complain they do not feel comfortable during their fear interviews because officers are not friendly or sensitive to their stories of persecution. Officers are often hard to understand because they use a telephonic interpreter. Because child care is not easily available, mothers who want to be interviewed outside of the presence of their children to avoid the children being further traumatized by the mothers' testimony are unable to do so. Because of the remoteness of the detention site few attorneys are available to assist class members and when attorneys do agree to do so they must often wait for hours to see their clients. Most class members and their mothers go through fear interviews without the assistance of counsel. Children rarely are provided a separate interview even though they may possess independent fear claims. In most cases the asylum officers find that the minors or mothers are credible, and have been persecuted, but then deny the fear claim because when asked what "social group" the class member or mother belonged to that caused their persecution, they have no idea what

the question even means. Even the immigration judges and the courts have difficulty defining what "social groups" are.").

Attachment to Declaration of Amy Fischer, Policy Director, RAICES, Ex. , CARA Project Complaint submitted on December 10, 2015, to DHS Office of Civil Rights and Civil Liberties and the Office of Inspector General Re: Family Detention – Challenges Faced by Indigenous Language Speakers. (The complaint describes various challenges for indigenous language speaking children and mothers held in family detention centers, which implicate access to counsel. These issues include a lack of interpreting assistance for interactions with government officials, subcontractors (including medical staff), and service providers, and a lack of translated written materials, denial of educational opportunities, and a failure to explain conditions of release).

8.      **Excerpts of Declarations: Class Member children and their mothers are routinely held past the 3-5 days allowed under the Settlement.**

Declaration of CARA Project attorney Ana Camila Colon, Ex. 64 ¶7 (explaining that delays in the conducting of reasonable fear interviews result in prolonged detention for class members: "One case I worked [on] in November 2015 for the Flores class members from El Salvador waited 16 days for the reasonable fear interview. Another case I worked on in February 2016 for the Flores class members from Guatemala waited 19 days for the reasonable fear interview. A more recent case I worked on March 2016 for the Flores class members from El Salvador waited 20 days for the reasonable fear interview.")

Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, San Antonio, Texas, Ex. 17 ¶¶ 6-14 (discussing nine families who were detained (or remain detained) for between nine and nineteen plus weeks, originally at Karnes, with some of them eventually transferred to Berks).

Declaration of Lindsay Harris, Ex. 14, ¶5 (discussing the prolonged detention of children and their mothers at Dilley and Berks, including one six-year-old *Flores* class member who remains detained with his mother for more than eight months, a nine-year-old Peruvian girl held for more than a month at Dilley, and a nine-year-old girl and her eleven-year-old brother from El Salvador held for more than six weeks before being deported. Also stating, "As a result of my work with the CARA Pro Bono Project, I am aware of many more cases of families held in immigration detention centers who were not released "without unnecessary delay." Indeed, during my February 2016 visit to the Berks County Family Residential Center, all of the families with whom I met had been detained for more than four months. ").

Declaration of attorney Robyn Barnard, Ex. 12, ¶10 ("Since October 28, 2015, the *pro bono* representation project at the Berks facility has screened at least 36 families, of which 35 were transferred from either the Dilley or the Karnes facilities. All of the 35 families had been held in one of the family detention facilities in Texas for more than 30 days by the time they arrived at the Berks facility; at least four of those families had been detained in Texas for two months before their transfer to Pennsylvania.").

Declaration of Carol Anne Donohoe, Ex. 4 ¶14, ("There are several class members and mothers who have now been detained for over eight (8) months. Most of the other class members have been detained for several months and cannot be deported because of stays issued by the courts, Immigration Judges, or the Board of Immigration Appeals.").

Declaration of Kathryn Shepherd, Ex. 69 ¶26 ("In the hundreds of families I have represented detained at Dilley since October 2015, when I started volunteering in the detention center, I have never seen a family released in less than five days. Indeed, since the October 23, 2015 date for the government to comply with the Judge's August orders in Flores, according to CARA Project records, we have represented over 6,500 Class member children who have been held in detention for at least five days or longer. … I have routinely seen cases in which class members/parents are detained for longer than 20 days from apprehension to release. In those cases, we have Class member children and their mothers who have been held in detention in Dilley for months. More often, however, families in this position are transferred at some point to the detention center in Berks County, Pennsylvania, and their detention continues there instead of at Dilley. At any one time, we are usually working with around 150 families who have been detained for longer than 20 days.").

9. **Excerpts of Declarations:** Decisions regarding placement in a family detention center are arbitrary and based primarily on bed space

Declaration of attorney Jodilyn Goodwin, Ex. 65 ¶12 (explaining that based on her extensive experience representing immigrants in South Texas, "I do not perceive any difference between the families of mothers and children released after processing at the border, who have interacted with our volunteer attorneys, and the families sent to the family immigration detention centers. Based on information that I have received from the press, DHS statements and statistics and my conversations with immigration attorneys around the country, including AILA attorneys who volunteer at the family immigration detention centers, the families of mothers and children sent to immigration detention centers are almost all Central American families seeking asylum. The vast majority are apprehended shortly after crossing into the United States, although some families presented themselves to immigration officials before crossing into the United States. The families released at the border and those held in family detention appear to be very similar in national origin, size of family, reasons for arriving in the United States and manner of apprehension.").

Declaration of Carol Anne Donohoe, Ex. 4 ¶12 ("There appears to be no rational reason why some families are detained and others released other than the availability of ICE bed space and the sex of the parent apprehended with the class member child… Class members are not detained or released because of the Settlement or the Court's Orders. Class members are released because bed space is limited or because the mother eventually receives a positive credible fear or reasonable fear determination. Class member children at Berks are detained for weeks or months on end and denied parole requests, even with stays of deportation and diagnosed illnesses, and *not* because they are a flight risk or a danger to themselves or others.").

Declaration of Karen Lucas Re Flores detention facility Inspection, Ex. 68 ¶¶6-9 ("During the Ursula inspection, Class Counsel asked an ICE Enforcement and Removal Operations (ERO) official how ICE decides which class members and parents to release, and which to continue to detain…This is the decision-making process the ICE ERO officer described: If the family detention centers tell Ursula they have bed space, ICE then looks at the family's "composition," including the gender of the parent and the gender and age of the children (ages 2-14 at Dilley, ages 2-17 at Karnes, he said), to see if the family is suitable for any available family detention spaces, given the makeup of the currently detained population (e.g., because more than one family sleeps in the same room, the gender of the children is considered). They also look to see if the detention center in question can provide medical care needed by any or all of the family members…If the family does not "qualify" for detention, then they "qualify" for release, he said…With respect to male head-of-household families in particular, the official explained that the Dilley and Karnes detention centers do not accept male heads of household. So if Berks has bed space, the family could go to Berks – if not, they would be issued an NTA and

36

released.").

Declaration of Karen Lucas Re Flores detention facility Inspection, Ex. 68 ¶13 ("It …appeared to me that the decision to transfer a particular family from Ursula to a family detention center, rather than to release with an NTA, is completely arbitrary. It appears to be based on a combination of available bed space and characteristics like the age, gender, and medical conditions of parents and child(ren).").

# Exhibit 3
## Publicly Filed

## DECLARATION OF BRIDGET CAMBRIA

I, Bridget Cambria, declare and say as follows:

1. I am an attorney licensed to practice in the state of Pennsylvania. I am a partner in the law firm of Cambria & Kline, P.C. My practice includes regular representation of immigrant and refugee children and their parents detained pursuant to the Immigration and Nationality Act and housed at the Berks County Residential Center, a family detention center located in Leesport, Pennsylvania.

2. I have practiced immigration law for ten years and have represented immigrants, children and families before the Immigration Courts, the Board of Immigration Appeals, Federal District Courts and the Third Circuit Court of Appeals. I am a graduate of the Roger Williams School of Law, wherein my studies focused on immigration and public interest law. Prior to law school, on or about 2002, I was employed by the County of Berks wherein I was a staff member for one year of what is now called the "Berks County Residential Center" (hereinafter "BCRC", previously and alternatively known as the "Berks County Youth Center", "Berks Family Shelter", or the "Berks Family Detention Center").

3. In the course of my practice and previous employment by the family detention facility, I have regular occasion to observe, and therefore am familiar with, the

policies and practices of United States Immigration and Customs Enforcement (ICE) toward the detention, release, and treatment of children and mothers detained at BCRC. I have also had the opportunity to observe how those policies and practices have changed over time.

4. In the course of my representation of over 100 individuals in the Berks County Residential Center since June of 2014, I have also had occasion to observe and interact with families and children. Therefore, I have been advised by mothers and children of the physical, medical and psychological effects of their own detention. I am also aware of ICE's decisions on detention and have observed their continued refusal to follow requirements of the *Flores* Settlement.

5. In a previous declaration before this Honorable Court in November of 2014, I addressed the sharp change in ICE's practices toward the treatment and detention of Central American mothers and children in ICE custody as well as factual allegations addressing how the Department of Homeland Security and Immigration and Customs Enforcement failed to follow the requirements of the longstanding *Flores* Settlement. Following litigation, this Honorable Court issued an Order on August 21, 2015, instructing ICE that their family detention practices violated the Settlement, and that the remedies previously set forth by this Honorable Court must be implemented by October 23, 2015.

- 2 -

6. At the time of the July Order of this Honorable Court, ICE attempted to protect
their interests before this Honorable Court by voluntarily releasing every family
detained in the BCRC for a prolonged period of time. The time of detention at
the moment of these mass releases included class members who had been
detained for a period of up to 14 months.

7. A representative list of some *Flores* class members represented by this office
who were released because ICE violated the *Settlement* during the enforcement
period include:

   a. Juan M█████████████ (A███████████), age 16, who was detained
   in the BCYC from July 10, 2014 to July 10, 2015.

   b. Elida M███████████ (A███████████), age 16, who was
   detained in the BCYC from July 9, 2014 to July 10, 2015.

   c. Orbin A███████████ (A███████████), age 9, who was
   detained in the BCYC from May 14, 2014 to July 10, 2015.

   d. Yeimi C███████████ (A███████████), age 5, who was detained
   at the BCYC from June 3, 2014 to July 10, 2015.

   e. Yubitza C███████████ (A███████████), age 12, who was
   detained in the BCYC from July 22, 2014 to July 10, 2015. The only
   period of time this child was not in detention was the one month where

- 3 -

she and her mother were improperly removed from the United States in violation of a court order.

8. However, as this court recognized the voluntary cessation of activity that violated the *Flores* Settlement was not sufficient because ICE had the ability to reengage in the same or similar behavior to violate the *Flores* Settlement. ICE began reengaging in said behavior within months.

9. Beginning on or about August of 2015, following the mass release of Berks children and this Honorable Court's Decision of August 21, 2015, ICE began transferring families from the Texas family detention facilities of Karnes and Dilley to the BCRC. ICE transferred mothers and child class members from Texas to Berks, Pennsylvania once a family reached on or about 20 days of detention. Rather than work towards or effectuate preferred placement outside of detention according to *Flores*, ICE placed class members in continued prolonged detention at the BCRC. The following class members, represented by my office, are representative of others who remain detained right now at the Berks County Residential Center for periods up to and exceeding eight months:

   a. Steven A (A ), age 6, currently in detention at the BCRC, who was apprehended by ICE on or about August 29, 2015. Steven remains detained without release, despite being protected by a court ordered Stay of Removal. Steven and his mother have a sponsor

- 4 -

who provided information to ICE to effectuate release. All requests, including parole requests and family custody reviews have been summarily denied without an individual analysis to Steven's needs. Steven suffers from a contagious skin condition called "Molluscum Contagiosum" which is an uncomfortable skin disorder. Steven suffers from rashes and itching which spreads over his entire body and at times to his private areas. When Steven's mother asked ICE for help for her son's chronic medical condition she was advised by ICE to withdraw her case for protection and to accept removal to El Salvador. Steven exhibits extreme behavioral issues in detention including defiance, outbursts, aggression, and hyperactivity. Steven has continuously suffered from behavioral issues in detention which are unaddressed, and for which both ICE and the facility fail to accommodate based on a history of trauma and prolonged detention. He has endured events, on top of prolonged detention, at the BCRC which have affected him psychologically included where he and another child were involved in inappropriate touching. Steven on occasions will use his BCRC ID lanyard to simulate asphyxiating himself. There have been no efforts to effectuate release.

b.  Ludwin C███████ (A██████████), age 5, currently in detention at the BCRC, who was apprehended by ICE on or about October 10, 2015.

- 5 -

43

Ludwin remains detained without release, despite being protected by a

court ordered Stay of Removal. Steven and his mother have a sponsor

who provided information to ICE to effectuate release. As of this day all

parole requests and family custody reviews have been denied. Ludwin is

a shy child who is guarded. He has endured events, on top of prolonged

detention, at the BCRC which have affected him psychologically

included where he and another child were involved in inappropriate

touching of Ludwin, against his will, in February of 2016. Ludwin's

mother expressed that her son suffered mentally as a result of the event

and requested outside mental health services which were not provided.

There have been no efforts to effectuate release.

c. Estefany M███████ (A███████), age 16, and Allison M███

███ (A███████), age 14, sisters currently in detention at the BCRC,

who were apprehended by ICE on or about August 23, 2015. Estefany

and Allison remain detained without release, despite being protected by a

court ordered Stay of Removal. These sisters and their mother have

sponsors, including US citizen and LPR relatives, who provided

information to ICE to effectuate release. All requests, including parole

requests and family custody reviews have been summarily denied

- 6 -

without an individual analysis to these teenage girl's needs. Notably their mother reports that her daughters are suffering from profound depression.

d.  Ashley M█████████ (A█████████), age 5, currently in detention at BCRC was apprehended by ICE on or about October 1, 2015. Ashley remains detained without release, despite being protected by a court ordered Stay of Removal. Ashley's mother provided information to ICE to effectuate release. All requests, including parole requests and family custody reviews have been summarily denied without an individual analysis to the child's needs. There have been no efforts to effectuate release.

e.  Joshua L█████████ (A█████████), age 4, currently in detention at BCRC was apprehended by ICE on or about September 5, 2015. Joshua remains detained without release, despite being protected by a court ordered Stay of Removal. Joshua's mother provided information to ICE to effectuate release. All requests, including parole requests and family custody reviews have been summarily denied without an individual analysis to the child's needs. There have been no efforts to effectuate release.

f.  Jefferson A█████████ (A█████████), age 6, currently in detention at BCRC was apprehended by ICE on or about November 10, 2015.

- 7 -

Jefferson remains detained without release, despite being protected by a

court ordered Stay of Removal. Jefferson's mother provided information

to ICE to effectuate release. All requests, including parole requests and

family custody reviews have been summarily denied without an

individual analysis to the child's needs. Jefferson is extremely thin. At

best Jefferson reaches a 3.9 percent body weight on a child's milestone

grown chart, at his worst recording Jefferson exhibits a 1.9 percent body

weight. He is malnourished and in detention. Further, Jefferson exhibits

extreme behavioral issues in detention including defiance, outbursts,

aggression, and hyperactivity. Jefferson's mother has expressed concern

to BCRC staff about her son's behavior. No substantive evaluations have

been conducted. Further, neither ICE nor BCRC considers the effects

prolonged detention has on the behaviors of a child, growth and

development. There have been no efforts to effectuate release.

10. As their attorney I have observed the psychological effects on class members

of prolonged detention. Children right now detained at Berks exhibit suicidal

ideation, anxiety, stress, chronic depression, constant tearfulness, isolation and

anger. It has manifested itself in isolation, thoughts of self-harm, crying,

tantrums, slapping, kicking, biting, spitting and other forms of expressing their

frustration.

- 8 -

11. As previously indicated by counsel for the Defendant's, ICE instituted a 30 and
60 day family custody review for the mothers and children detained in family
detention. Despite providing information as requested on those custody
determinations, ICE routinely has denied release to class members. The denials
fail to address the individual needs of the child or mother but are simply a
boilerplate denial. Similarly, on or about March 28, 2016, 19 parole requests
were filed for mothers and children evidencing the availability of sponsors and
the effects of continued detention for periods of time between 4 and eight
months. To date we have received 17 denials and no approvals.

12. At no point since my representation of families at the Berks County Residential
Center began in June of 2014 has any child or mother in the facility been
advised of their rights under the *Flores* Settlement. No child has ever been
afforded a bond hearing before an immigration judge as is required under
*Flores.* I have never seen any efforts towards compliance on the part of ICE,
except the period immediately prior to the Order of Judge Gee. I have never
been informed or seen any efforts by the Defendants to provide continuous
efforts towards release except the period immediately prior to the Order of
Judge Gee. Following the decision and order of Judge Gee and the release of
many families who were detained for long periods of time, ICE nearly

- 9 -

immediately began to detain class members for periods in violation of the
settlement.

13. The Berks County Residential Center remains a secure facility. Since my last
declaration the State of Pennsylvania has seen fit to revoke and not renew the
license for the Berks County Residential Center for non-compliance.

14. Based on my observations, the government has not only not made a good faith
effort to comply with the *Flores* order but has actively attempted to circumvent
it. Practices and procedures regarding detention, bonds, and the processing of
credible fears are changed at random, with no warning to counsel or the
detained families and in an erratic fashion. The dangers of this callous conduct
is to send children, and indeed class members, to their death. Many of the class
members who are trapped in family detention are subject to court ordered stays
of removal. Since their removal is not imminent, ICE has an obligation to abide
by the Settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of April, 2016, at Reading, PA.

Bridget Cambria, Esq.

- 10 -

48

# Exhibit 21
## Conditionally Filed Under Seal

DECLARATION OF VICTOR R███████████

I, Victor R█████████, depose and say:

1. I am detained at the detention center in Berks, Pennsylvania. I was born the ██th of ████ 2001. I am fifteen years old. I was born in El Salvador.

2. I am detained by the immigration authorities with my mother, Jethzabel A█████ ████ who was born on the ██th of ████ 1976 in El Salvador. I have been detained for over four months.

3. We were apprehended near Piedras Negras, Texas. I think the date was October 14, 2015. We were apprehended in the morning.

4. The Border Patrol agents took us to a border station close to the border. We spent that day and night in this location. I was held in a cell with my mother and other adults. Our clothes were wet and muddy but they didn't give us any dry clothes. They didn't let us shower or give us towels or soap to wash. At night the cell was so cold my teeth were chattering. My mom asked the officials for something to cover me, but they only gave her a plastic sheet. That night we had to try to sleep on a cement block with no mats or mattresses to sleep on and no blankets. We had arrived at this station around 9 AM and were transferred out around 1 AM the next morning. While at this location we were fed twice, both times we were given a sandwich consisting of two frozen pieces of bread and one thin cold slice of ham.

5. The border patrol officer asked if we were afraid to return to El Salvador and we said yes. I was and still am terrified of being sent back there. The officer asked my mom if we had relatives in the U.S. and my mom said my dad's sister lives in New York and we could stay with her. During the time we were held at this border patrol station no official ever told me anything about the Flores case and no one questioned me about whether I had relatives in the U.S. who could care for me. Lawyers have now explained to me that I have certain rights under the *Flores* case. Throughout my time at this border patrol station I was shivering, cold and wet.

6. In the middle of the night, maybe around 1 AM, we were taken from this facility and driven to Karnes detention center. When we got to Karnes, the guards commented loudly about how muddy we were. We finally got to take showers and sleep a little bit.

7. We were detained at Karnes for about three weeks, until about November 8, 2015. At no time while we were detained at Karnes did any official tell me about the Flores case, give me any advisal of rights about the Flores case, or interview

1

me about being placed with a relative or adult designated by my mother or about being transferred to a licensed facility for minors. No official told me I had any right to seek release from an immigration judge. Now that I have learned something abosut the Flores case and talked to my mom about it, she has told me that no official at Karnes (or here at Berks) has ever told her anything about any rights minors have under the *Flores* case.

8. I felt very depressed at Karnes. I was constantly afraid that we were going to be deported to El Salvador. I hated the food there. I hardly ever ate dinner. I lost about five pounds while I was there. It was very distressing and embarrassing being detained with a large number of unrelated adults.

9. My mom had a fear interview on October 17, 2015. I was there too, but the asylum officer only asked me a few questions. A couple of days before the interview I believe my mom was given a list of local attorneys. But there were no free phones to call these attorneys and my mom was unable to get a lawyer to help us before the interview a couple of days later. At the interview the asylum officer never explained what it means to suffer persecution because of one's membership in a social group.

10. My mom got forms saying that we received negative credible fear determinations. I do not believe that they provided the decision in Spanish. Neither my mom nor I could not read the decision, but finally one of the volunteer lawyers was at Karnes explained what it said. As best I remember the decision was a form letter denial with various boxes checked off.

11. About a week later, my mom and I went before an immigration judge. No one told me that I maybe had the right to ask an immigration judge to review my detention status or whether I should be released on a bond or other conditions. We did not have a lawyer and I believe the immigration judge gave us a negative determination.

12. The immigration officials transferred us again on or about November 8, 2015. We were next transferred to Berks, PA, where I have now been detained for another 5 months. No official at Berks has told me anything about the Flores case or about any rights I may have under the Flores case.

13. I keep feeling very sick here. I was really sick for an entire week. I had diarrhea, was vomiting, and felt constantly nauseated. I couldn't eat because the food was so bad. I went to the doctor, but she just said that I should come back if it was still bad the next week, saying that I am old enough and I have a body to resist something like this. I have had a cold and sore, raw throat pretty much the whole time I have been here. Sometimes, like now, it gets really bad. For the past four

2

nights, I have hardly been able to sleep because I keep coughing so much. But I don't want to go to the doctor again because she only tells me to gargle with water with salt. I also have a problem with my tooth. I have a filling that came loose. It is incredibly painful and feels like a hole in my teeth. A dentist who comes here and saw me said that it just a molar coming in and I didn't need to see an outside dentist. He said that I should just chew on the other side. I can't wait to get out of this place and see a dentist who can stop the pain in my mouth.

14. I am still feeling depressed and like I have to get out of there. The staff called me to talk to a psychologist, but I did not want to talk to her because it turned out she does not speak Spanish so I would have to speak through an interpreter who works for this detention center.

15. I think that some of the doors are locked here and some are left unlocked. Either way, I know that I cannot leave the facility. We have been told that it is prohibited for us to leave and I am sure I would be captured very quickly if I try to leave and could suffer severe consequences including being separated from my mother and locked up in a separate facility. Since I have been here no one that I know of has tried to escape.

16. Like at Karnes, it is very disturbing to be detained with other unrelated adults. Here both adult men and women are detained with unrelated minors. This does not feel like a safe situation.

17. I really want to go to the home of my aunt, where I can continue studying in peace and want to have the freedom that all children want. I want this for me and I want this for my mother.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Signed on April 23, 2016, in Leesport, Pennsylvania.



Victor R

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and he confirmed its accuracy before he executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23rd day of April, 2016, in Leesport, PA.

Martha Sandoval-Reyna
Martha Sandoval Reyna

3

# Exhibit 22
## Conditionally Filed Under Seal

<u>**Declaration of Walter A███████ ██████**</u>

I, Walter A███████ ██████████, depose and say:

1. I am detained at the detention center in Berks County, Pennsylvania. Before this, I was detained Dilley, Texas.

2. I am thirteen years old and have been detained for about three months, since about November 9, 2015.

3. My date of birth ██████, 2003. I was born in El Salvador.

4. My mother, younger brother Carlos (10 years old), and I left El Salvador because the gang members threatened my family with death. I was threatened by gang members and also targeted for forced recruitment.

5. We were apprehended on or about November 9, 2015, almost immediately after entering the United States along the border in Texas. We were taken to a border patrol station and best I remember held there for two days.

6. We didn't know whether it was night or day because there were no windows. The lights were kept on all the time. We were given one aluminum blanket each. There were no mattresses or mats, and no blankets. We tried to sleep on a cold concrete floor with one aluminum blanket. There were about 15-20 people in the room. Me and my younger brother were separated from our mother. The room was extremely cold. It felt like an air conditioning was set at a very low temperature. The only food we got was sandwiches of 2 pieces of dry bread and one thin slice of ham and a small box of juice. We were fed three times over the two days we were there. We were hungry, very cold, scared, and unable to sleep. No official there told us anything about our rights under a case named Flores. No one told us about any rights that I can remember. Every time we would cry they would let us go see my mother for a short time. But one time the officer yanked us by the shoulder to push us back.

7. They had a metal toilet with no toilet seat in our cell. There was a small metal sink but no soap to wash with and no towels to dry off with. We got no change of clothing.

8. After a couple of days we were transported to another facility. It was even colder than the first place where we were held. It was made up of cages. They did give us mats to sleep on here. This time the officials separated me, my mother and my younger brother. There were about 25 in my area. Kids were crying and very scared. At this place no official talked to me about any rights I may have had under the Flores case. No one even mentioned the Flores case. No one asked me if I have any relatives in the U.S. who could

1

care for me. No one told me about making any decision about releasing me or about seeking a judge about being held in detention. Some guards were armed. There were no windows. It was the same bread and ham but this time no juice, only a little water. We were at this place for one day and one night.

9. Next, we were transferred together to a detention center in Dilley. When we left no one told us where we were going. The transportation took about five hours. At Dilley no officer told me anything about the Flores case or my rights under the Flores case. No one asked me about relatives or family friends who may be willing to take care of me here in the U.S. No official told me that any decision had been made about releasing or detaining me and no official told me I had the right to see an Immigration Judge. The best I remember were held at Dilley for about another 18 days.

10. During that time my mother had her interview with the asylum office. She told the officer that I was being threatened by the gang members and he told my mother "that's a fairy tale that every Salvadoran says." They asked me why I was coming here and I said I was being threatened and that's all they asked me. I really wasn't interviewed at all. The asylum officer never explained what it means to be a member of s social group. The asylum officer denied our credible fear interview. As best I remember the decision was basically a form letter denial. Then my mother went before a judge and the judge agreed with the asylum office.

11. The day after my mother went before the judge the staff told us that we were being released to go to my father who lives in Austin, Texas. We got so excited. At the last minute when we were in a waiting area to leave they told us we were really heading to a detention center called Berks. My mother was working with attorneys in CARA who were helping with our case in Dilley but now we were being transferred anyway.

12. We have now been detained at Berks since November 27, 2015. While here no official has explained any rights I may have under the Flores case. As best I am aware no steps have been taken to evaluate me for release to my father or any other relative living in the U.S. I have not been told about my right to see an Immigration Judge about my release. To the best of my knowledge no official here has discussed my release with my mother.

13. My mother has an attorney, Carol Anne Donohoe. She asked for another interview for my mother but it was denied. She also requested another interview for me but it was denied. The ACLU has included us in a habeas corpus it has filed in the federal court. I understand that the federal court recently ruled that it does not have authority over the case and this decision is being appealed.

14. The doors here at Berks are sometimes locked and sometimes unlocked. When we eat our meals they lock the doors so we have to stay in the cafeteria or the one room next to cafeteria. We cannot leave the cafeteria area. I know it is locked because they have to swipe a card. When it's locked the light is red, that's how I know it is locked when we have our meals. Even if the doors are unlocked, we cannot just leave because there are always guards by the doors.

15. Recently I suddenly got very tired and my heart started pounding and really hurting like someone was hitting me. I felt like I blacked out. I had a hard time breathing. They took me to see a doctor here at the Berks detention center. My mother said my lips were purple. The doctor said I was close to having a heart attack. The doctor told my mother that the stress made me like that. I think being detained here for so long caused this incident. I am exhausted and totally stressed. They never took me to the hospital. I am afraid it will happen again. I am too worried to eat properly. I cannot sleep properly because guards check on us about every fifteen minutes shining flash lights into our beds and waking us up in the process.

16. I want to go with my father who lives in Austin, Texas. I can't take it any longer. I'm afraid to go back to my country because they're probably waiting for me to kill me. I'm really scared to go back. I have a safe place to go with my father here in the United States.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief. Executed on February 18, 2016, in Leesport, Pennsylvania .



Walte

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and he confirmed its accuracy before he executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 18th day of February, 2016, in Leesport, PA.

Cindy Fernandez

# Exhibit 23
## Conditionally Filed Under Seal

DECLARATION OF YESLIN L██████████

I, Yeslin L██████████, depose:

1. I am detained at the detention center in Berks, Pennsylvania. I was born the ██st of ██████ 2007 in Guatemala. I am 9 years old.

2. I am detained with my mother, my younger sister and my younger brother.

3. We were arrested in Texas on the 28th of November, 2015, but I am not sure what town we were near.

4. The Border Patrol agents took us to a border station. We got there on a Saturday and were there for one night. We were kept together in one large cell.

5. They didn't give us much food. They gave us a little juice and cookies.

6. The first night we were there, we had to sleep sitting up on a bench because there were so many people there that there was no room to lay down. The next night, we slept on the floor. They did not give us any blankets and we were all wet and they didn't give us any dry clothes. I could only sleep a tiny bit because the lights were always on the whole time and the floor was cold and hard.

7. I was pretty much always with my mom at this place. No one there asked me or my mom if there was someone who could take care of me in the U.S. If they had, I would have told them that we could go stay with my dad in Billings, Montana. But they never told us that we go leave or that we could ask a judge to be released.

8. In the middle of Sunday night, they took us to another place. We spent two nights in this place. It was very cold again and they only gave us aluminum blankets to cover ourselves. We were still wearing our wet clothes and they didn't give us dry clothing. We asked if we could bath ourselves, but they said that we could, but they did not give us any towels, so we could not shower. They gave us bread with a little bit of ham, but it was all frozen, so I didn't eat much.

9. Next, we were taken to a detention center in Dilley, Texas. We got dry clothes and a bed, but it was awful because we were being held in a big jail with hundreds of other adults and children. When I was at Dilley, I cried probably everyday. My sisters cried most days too. I wanted to leave to be with my father and did not want to be there.

10. The only thing that I liked there was potato chips. The staff said that I should eat some of everything, but I did not like the food and didn't eat very much.

11. I was in Dilley about 20 days. Again, no official asked me about being released to my dad. No one told me I could see a judge about being released to my dad.

12. After almost three weeks at Dilley, they woke my mom and my sibling and me in the middle of the night, maybe about three o'clock in the morning. They told us that we were leaving to go stay with my dad. We were so happy. It was the happiest that I had been in a long time. But then they made us sit and wait until the middle of the day and put us on an airplane.

13. They did not take us to be with my dad, but instead took us to another detention center, this time in Pennsylvania. I cried and cried. I begged my mom to explain why they would not let us go. I do not understand why some children are allowed to go home to stay with family members, but I am not.

14. I am in the Berks detention center. I don't like the food here, but I don't want to eat anyway because being sad makes me not want to eat.

1

15. I have been sick here many times. I feel a sharp pain in my chest, where my heart is. My mom brought me to the doctor, but they said that it could be because I feel sadness or anguish and have not done anything about it.

16. My sister is also in a lot of pain. She can't even eat because there is something wrong with her molars. They have been hurting since she got here. Her fillings fell out and I can see the big holes in her teeth. She went to the dentist about a month ago. They said that she would need surgery, but would need an appointment with an outside doctor first. It has been a month and she still doesn't have an appointment or even know when they will fix it. Now, they just give her pain medicine, but it still hurts her.

17. When other people leave here, I cry because I want to leave too. I want to be able to go to my father. I am crying right now, but I know that it is important to explain what we are going through and I am hoping that someone will help me get released to go stay with my dad.

I certify under oath that the above statements are true and correct.

Signed on April 23, 2016, in Leesport, Pennsylvania.



Yeslin L█████████

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23rd day of April, 2016, in Leesport, PA.

Martha Sandoval Reyna
Martha Sandoval Reyna

2

59

# Exhibit 24
## Conditionally Filed Under Seal

DECLARATION OF SARA E▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

I, Sara E▓▓▓▓▓▓▓▓▓▓, depose and say:

1. I am twenty seven years of age and detained at the detention center in Karnes, Texas.

2. My date of birth is ▓▓▓▓▓, 1988. I was born in Guatemala.

3. I am detained here with my daughter, Nathaly M▓▓▓▓▓▓▓▓▓▓▓▓▓. She is 3 years old. Nathaly's date of birth ▓▓▓▓, 2012.

4. In summary, we left Guatemala because my sister-in-law verbally abused me and my daughter and in one instance tried to kill me with a knife. In another instance, she attacked me by my father's business. I was not able to fight back. She told me that I was too dark to be part of her family and that's why she would hurt me. No one in my village would help me, I think because of my skin color. I was scared she would return and hurt my child. The police do not intervene when people are threatened by violence or domestic abuse. This is not a complete explanation of why I fled Guatemala but briefly explains why I decided to seek protection in the United States.

5. My daughter and I were apprehended on December 14, 2015, at about nine in the morning, a little bit after entering the United States. We were first put in a truck. They took away all our belongings, including our shoe laces.

6. My daughter and I were then taken to a border patrol station in Welasco, Texas. To the best of my recollection, we were kept at the border patrol station two days and two nights. There were no windows, so I was not able to tell when it was day and when it was night. It was very confusing. We were fed a sandwich two times a day with some juice. My daughter refused to eat anything but the one slice of cold meat inside the sandwich. She was very hungry but we were not served any food other than the cold sandwiches. The water tasted like bleach so we were scared to drink it. We would sleep on the floor. The place was very cold. No one at the border patrol facilities notified me about rights my daughter had as a minor or any rights she had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. I think they tried to ask me why I left Guatemala, but I could not understand the officer's Spanish. I tried the best that I could to explain that I had received death threats in Guatemala. I explained that I was scared to go back to Guatemala, but no one seemed to understand or believe me. The officer kept saying he knew I came here to work and that I didn't really fear going back to Guatemala. When he was done interviewing me he asked me to sign a statement. I refused to sign because he did not believe why I came to the US and kept telling me I came here to work.

7. After that, we were transported to another border patrol station where we were held for about 24 hours. No one at the border patrol facilities notified me about rights my daughter had as a minor or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I could see. No one asked me why I left Guatemala.

8. During the three days at the border patrol facilities, may daughter was not able to shower, wash or change underwear or clothes. We were not given the opportunity to brush our teeth for three days.

9. I was brought to Karnes with my daughter on or about Thursday, December 17, 2015. We have now been detained here for a month and a half. To the best of my recollection, I don't remember anyone explaining that my daughter had rights as a minor under the Flores case. No one has talked to me about whether my daughter can be released to a friend or relative in the United States.

10. I didn't have my first credible fear interview until about January 3, 2015, about three weeks after I was detained at the border patrol facility and communicated my fear of returning to Guatemala. The immigrant official only spoke English, but someone translated for us over the phone. I received a Negative Credible Fear Finding four days later on Form I-869. The form did not set out any specific details about my case or why I received a negative credible fear finding. It was a form letter denial with a box checked that I did not qualify. No one communicated to me why I received a negative credible fear finding. On January 7, 2016 I was given a 2-page form in English that I could not understand. An officer told me that the form said I could not enter the U.S. and would be deported. I told him that I wanted to apply for asylum because I feared for my and my daughters life if we were sent back to Guatemala.

11. I requested a review of the denial by a judge. About four days after I received the negative fear finding, I was called to see a Judge. There was a translator there. She asked if I would like to continue my case. I answered "yes." Four days after that, I had my interview in front of the Judge. The interview was done by a video conference. That same day, he told me that I could not receive asylum and I would be deported. I called a lawyer at RAISES. Someone at RAISES told me that they would take my case. My lawyer filed a Request for Reconsideration on or about January 18, 2016. After about twenty days, I am still waiting for a response to my Request for Reconsideration.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes, Texas.



Sara E████, █████.

Certification of Translation.

I, Elena Garcia, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Dilley, Texas.

Elena Garcia

# Exhibit 25
## Conditionally Filed Under Seal

Declaration of Mirna M███████████

1. I am a citizen and national of El Salvador. I was born on █████ 1991.

2. I am currently detained at the ICE detention center in Karnes, Texas with my sons, Oscar R████████████ and Josue A████████████████████. Oscar was born on █████ 2007 and is eight years old. Josue was born on █████, 2013 and is two years old. Both of my sons were born in El Salvador.

3. I first entered the United States at midnight on Thursday, January 28, 2016 and was apprehended by U.S. Border Patrol early that morning.

4. I was held by the Border Patrol with my sons for about three days and two nights in McAllen, Texas. The treated us like animals there. They took all of our extra clothing and our children's blankets. They told us they were going to give us blankets but they never did. We had to sleep on the floor, but it was so crowded in the cell that some people had to sleep on the floor of the bathroom near the toilet. We never got a mattress or a blanket, and it was very cold. The children began crying, and when they children cried they would turn the temperature down even further. We were completely unable to sleep because it was so cold and because the lights were on all night.

5. There was not enough food. All we got were two slices of bed with a small slice of mortadella and small juices. We got those sandwiches twice a day and once three times in a day. There was not enough water for us to drink. There was some water that had a very odd taste, like chemicals. We were very hungry and thirsty the whole time we were there.

6. The bathroom situation was very unsanitary. My youngest son and I got diharrea and we didn't receive any medical attention. We weren't provided with any toiletries, and I wasn't able to bathe. The conditions were so bad that when I later arrived at Karnes, they found that I had fleas, which I hadn't had before being detained. Also, the bathrooms were not private – there was only a little wall separating them from the cell, which anyone could look over.

7. During this time no one told me that my son had any special rights under the Flores case. I tried to explain that I feared return to El Salvador, but they wouldn't listen to me and they told me they didn't want to hear my story. I refused to sign the form they gave me because no one told me anything about it and I didn't know what it said.

5. On or about January 30, 2016, I was woken at about 11 PM and my sons and I were transported to another place with a lot of metal fences that was very close to the first place we were held. I noticed that they had my birthday wrong on the forms and alerted the officials, and they took me and my sons back to the first place we were held in McAllen a few hours later. They corrected my birthday, and three hours later took us back to the place with metal fences.

6. On the afternoon of January 31, 2016, my sons and I were transported to Karnes where we have been detained since that time. No officer has explained any special rights my son may have under the Flores case. No one at the border patrol station or here at

1

Karnes has ever questioned me or discussed with me the possibility of my sons being released to relatives or friends here in the United States. I am not aware of any effort whatsoever being made to release one or both my sons to a relative or friend I designate here in the United States.

7. I decided to come to the United States because I was raped and I reported it. The man who attacked me was released and began to threaten me that he would kill me if I didn't leave. I have not yet had the chance to tell anyone my story and why I am afraid to return to my country.

8. The father of my younger child, Josue, lives in the United States and is pursuing asylum. No one has asked me whether my sons have family in the United States that they could be released to or made any efforts for my sons to be released to family members. In particular, no one has made any effort to release my son Josue to his father.

9. Being detained has affected my children. Every day, my children ask to leave and to see their father. My youngest son cries and cries and it is very difficult to console him.

I declare under penalty of perjury the foregoing is true and correct. Executed this 3rd day of February, 2016 in Karnes City, Texas.



Mirna M

Certification of Translation

I, Virginia Corrigan, depose and say: I am fluent in English and Spanish. I read the above declaration to Mirna M_____ and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Virginia Corrigan

65

# Exhibit 26
## Conditionally Filed Under Seal

DECLARATION OF RAQUEL A███████ ████████

I, Raquel A██████████████ depose and say:

1. I am 36 years old and detained at the detention center in Karnes City, TX.

2. My date of birth is ████████, 1980. I was born in Honduras.

3. I am detained here with my daughter, Amy V██████████████████, who is 2 years old.

4. I am afraid to return to Honduras because I received a threatening phone call while pregnant from the "aguacates," a drug selling organization. They asked me for money. I left to live with my grandmother in another place. My mother has also been threatened by the aguacates. Since being at the detention center, my uncle has told me that the aguacates are looking for me and I am afraid of what they could do to harm me.

5. We were apprehended on December 17, 2015 near Eagle Pass, TX.

6. We were transported together to a border patrol station near Eagle Pass where we were held for two days. No one at the border patrol facilities notified me about rights my child may have under the Flores case. I was not given a phone call to be able to tell my family that I was OK. No one told me that I could use a phone to call a lawyer.

7. The border patrol officials would not give us water. The only way we could get water was when we would be let into the room to get water from the sink in the bathroom. I was very thirsty and so was my daughter. I asked BP officials for water and they responded that they "did not have that." I do not know if the water I was drinking was safe to drink. They only gave us small amounts of food two times a day.

8. My daughter came with a bad cough and I asked BP officials if I could have medicine for my daughter and they responded that here there was no access to medical attention and that I would have to wait until she got to the next place to have medicine.

9. The temperature in the border patrol center was extremely cold. All I had was what I was wearing and it was very cold. There was a leftover space blanket in my room and I would use this, but they did not give us anything for the terrible cold. My daughter was sick and she would not sleep and was coughing the whole night. We slept on cement slabs raised from the floor but it was very cold and the cement would feel just as cold as the floor. There were no pillows or anything like that and I could not sleep.

10. On December 19, 2015 I was transferred to the Karnes County Residential Center with my daughter. I have been at this facility for 44 days now.

11. Since our arrest no official has told us anything about the Flores case. No officials have talked to me about whether we have relatives or close friends in the U.S. who could temporarily care for my daughter. We are detained with hundreds of other unrelated

1

women and their children. Many people must share rooms and many of the children are sick because of the close quarters we share. Many of the mothers and children here won't drink the water and which tastes like chlorine. A small bottle of water can be purchased here for about $1.30. I work for $3 for a 3-hour period once a day. I use most of this money to buy bottled water.

12. I have been informed by the visitors today obtaining statements that under the Flores case that minors should only be detained if they are a flight risk, a danger to themselves or others, or are juvenile delinquents. My daughter is not a flight risk, a danger to herself or others, or are juvenile delinquent, yet not one official has talked to me in the past month and a half to explore whether my daughter can or should be released to a family member or family friend.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.



Raquel A

Certification of Translation.

I, Tali Gires depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant Raquel A_____ and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Tali Gires

# Exhibit 27
# Conditionally Filed Under Seal

DECLARATION OF YESSENIA E

I, Yessenia E                            , depose and say:

1. I am twelve years of age and detained at the detention center in Dilley, Texas.

2. My date of birth is                2003. I was born in Guatemala.

3. I am detained here with my mother, Belen E                        , and my brother, Junior
L                              , who was born on            2011 and is four years old.

4. As we have explained in detail to the authorities, we fled Guatemala after gang members
threatened to kidnap me and threatened my family's safety.

5. We were caught by the border patrol on Thursday January 21, 2016, a few minutes after
entering the United States without inspection.

6. We were taken to a border patrol station in or close to McAllen, Texas, where we were
detained from Thursday, January 21, 2016 until Sunday, January 24, 2016. At this place we were kept in a
very crowded cell. The cell was all concrete. There was a toilet with a small wall around it. For three days
we were given no soap to wash, no toothbrushes to brush our teeth, no paper towels to dry our hands
when we washed our hands, nothing to brush our hair, no change of underwear or clothes, no pillows or
blankets and no beds to sleep in. We had to try to sleep in the freezing cold cell on the concrete floor. We
were exhausted physically and emotionally. On the third day I was finally given a silver foil to ocve
myself at night.  At times the cell was so crowded that it wasn't possible to lay down to try to sleep
because there wasn't enough room. I was terrified by the whole experience.

7. For the three days we were there we were only given sandwiches to eat – 3 a day. This was two
slices of stale bread with one slice of bologna in the middle. Nothing else was in the sandwiches.  I also
got some sugary juice.  In the three days I was there, the children were given cookies twice.

8. No one at the border patrol facilities told me about rights I had as a minor or any rights I had
under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to
use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free
legal aid programs to call posted anywhere that I could see. No one asked me if I had relatives in the
United States other than my mother who could care for me. No one told me that I had a right to see an
Immigration Judge about my detention. No one asked me if I feared return to my home country. '

9. On Sunday, January 24, 2016, my family and I were taken to another facility.  It was called La
Perrera (dog cage).  I was separated from my mother while we were at La Perrera, and I could not see her.
I was able to take a shower for the first time since before I came into custody, but I have spoken to my
mother and she says that neither she nor my brother was able to take a shower.

10. I came to Dilley with my mother on Sunday, January 24, 2016. Here at Dilley I cannot call an
attorney. The phones available cost money to use. I have not been told about any free phones that can be
used by minors (or adults) to speak with lawyers. I have not been told about any rights I may have under a
case called Flores. I have not been told about any decision about releasing me. I have not been told that I
can see a judge about my release.

11. On February 1, 2016 my mother and I were finally interviewed by an officer about whether we feared returning to Guatemala. We have not yet received a decision as a result of this interview.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.



Yessenia E█████████████████

### Certification of Translation.

I, Virginia Corrigan, depose and say:

I am fluent in English and Spanish. I read the above declaration to the declarant Yessenia E█████████████ and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.

Virginia Corrigan

# Exhibit 28
## Conditionally Filed Under Seal

**Declaration of Celina S█████████**

I, Celina S█████████ depose and say:

1. My name is Celina S█████████ and I am detained with my son at the detention center in Berks County, Pennsylvania. My six-year-old son and I have been detained for about six months.

2. My date of birth is █████████, 1979. I was born in El Salvador. I am 37 years old.

3. I am detained here with my son: Jefferson A█████████ Jefferson who was born in El Salvador on ████, 2009. He is six years old.

4. We left our home in El Salvador because of the worsening violence in El Salvador at the hands of the "maras" towards myself and my son. We cannot be protected by the government of El Salvador.

5. We were apprehended on or about November 10, 2015, shortly after entering the United States. We were taken to a Border Patrol station. My son and I were detained in a cell for a period of what I believe was two days. The cell was extremely cold very crowded. I believe that as more people came into the room, the air conditioners were turned up.

6. At one point I was interviewed by an Immigration Officer. I told the officer that I had a fear of return to El Salvador. I was showed papers in English which I did not understand and could not read. I refused to sign the papers because I could not understand what they said. I learned later through a volunteer attorney that the Border Patrol officer wrote on a form that I did not fear return to El Salvador even though I had told him that I did fear return to my home country because of widespread gang violence.

7. At no point in this Border Patrol station was I given any information or notice of my son's legal rights under the Flores case. No officer at any time told me anything about the Flores case. I am just learning about the Flores case now. I was never told that my son had a right under the Flores case to have an immigration judge review his bond situation or consider his release. I was not told that my son could speak with an attorney or given a list of free legal services until I was later taken to Dilley, TX, a detention center.

8. At the border patrol station there were about 50 other people in our cell. It was so crowded there was barely room for everyone. My son and I were freezing. There were no beds, it was just a room with cement floors and benches. The room was filled with mothers and young children. The older children I saw were separated from their mothers. We were not able to sleep. When my son and I would try to sleep, the officers would frequently come in the room and wake us up. My son and I were fed only a bologna sandwich and juice. There were no sinks that I saw in the room. There was an open toilet

in the room with no toilet seat for everyone to use. Everyone could see if we were using the toilet. There were no phones for us to use to contact family, friends or lawyers.

9. After two days we were taken to another detention center. I think this is called the perrera. The perrera can be described as a large room with cages. I was kept with my six year old son. However, I noticed that other children were separated from their mothers if they were older than my son. We were not able to use a phone. My son and I were in the perrera for one day.

10. In the middle of the night, my son and I were taken with about thirty other people to another detention center in Dilley, TX.

11. My son and I were held in the immigration detention center in Dilley, Texas for about 18 days. During my time in Dilley, neither me nor my son were told by immigration officials about the Flores case. I have no knowledge of the Flores case. At Dilley, I was never told about any right to seek a bond or release of my child. I have no knowledge of any efforts undertaken by the officials to release my son to relatives or friends or to place him in a program licensed to house minors. My son's father lives in Virginia.

12. When I was at Dilley it was the first time either me or my son was given a list of free legal services. I was not able to use a phone unless I had money. After about three days I was able to seek legal assistance from the CARA project in Dilley. I was assisted by Ana Camila Colon. There are so many families in Dilley that even though there are a few volunteers, there are far to few volunteers to help most of the families. After about five days I received a credible fear interview.

13. My interview lasted about an hour and a half. I was not able to have an attorney to be present with me at the credible fear interview. I was interviewed by a man and I was very nervous. The officer spoke English and they used a phone interpreter. There were times he would laugh at me. At no point did the officer speak to my son. Several days after this interview, I was called down to speak again to an asylum officer. He again asked me questions, this time about my son. At no time during the interview did the officer explain what it meant to be a "member of a social group." He never spoke directly to my son. Shortly after that I received a negative result from the interview. As best I remember it was a form letter denial with several boxes checked by the officer.

14. After the negative decision I went to see Ana Camila with CARA for her to explain the decision and to prepare for a hearing before the immigration judge. When she explained the papers in my negative decision, it was the first time that I realized that the border officer put false information on my interview from the border station where we were first detained. The officer wrote down that I did not have a fear, when I specifically said I was afraid for our safety and the life of my son. Ana Camila was my attorney before the Immigration Judge. The Judge at our hearing told us she agreed with asylum officer. The

judge asked me if I thought the immigration officer was lying at the border. I told her
"yes" he was lying, because I stated that I had a fear for myself and my son.

15. After about 18 days of detention and being denied by the Immigration Judge, my son and
I were taken to the Berks detention center. We did not know where we were going. It was
very traumatic for my son. No one would tell us where we were going. I was taken on a
plane with my son.

16. When my son arrived at Berks he was very upset. He was hoping we were being released
to go live with his father. He cried and did not want to leave the car. It was the middle of
the night. I had to physically carry him into the new detention center.

17. The prolonged detention is having a terrible effect on my son. He cries, kicks things,
throws things or himself on the floor. When he cries I just take him to our room and just
keep him there. We do not have a private room. We share a room with four other moms
and children. My son tells me all of the time that he blames me for being in this prison.
He has always been a good child, but now he is becoming aggressive with me. He has
begun to bite me. He throws himself on the ground. I feel like he is very angry with me
for our detention, but I came to the U.S. to protect him. When my son acts out the staff
get angry and they make faces and negative comments.

18. My was seen by a psychologist or social worker upon our initial entry into the Berks
detention center. No mental health provider has seen my son since that time. I have
discussed the problems that I am having with the mental health staff, but they have not
offered my son any services. They have only told me what I must do in the facility when
he acts that way. The only solution I was given was to take my son into my room until he
calms down.

19. I am diabetic. I have been hospitalized and taken from this center on one occasion. I
receive diabetic medicine three times a day. At other times I receive an injection.
Sometimes I am told by the doctor to rest, and they have asked staff members to watch
my son as I recover. That request from the doctor was refused by Berks staff. On one
occasion I was in the isolation room at Berks because I was suffering from a high fever,
chills, and I had to be there for a whole day. I was with my son and had to wear a mask.

20. Since I have been at Berks I have again been assisted by a volunteer attorney. There are
only three attorneys in this area and no free legal services programs that assist families in
detention. Bridget Cambria, Esq. has assisted me in requesting a re-interview before the
Asylum Office. That request was denied. During my time detained at Berks, no one has
attempted to assess whether my son could be released to relatives in the United States. No
officer questioned me about this or asked me for information of who could care for my
son if he was released from detention.

21. I have never attempted to leave the Berks facility with my son. I understand that if I attempt to leave with my son that the guards would arrest me and take my son away. I know they would find us, I can't do anything that would jeopardize my child's safety.

22. Here at Berks my son is detained with unrelated men and women. This does appear to me to be a safe situation.

23. I have family here in the U.S. The father of my son Jefferson is here in the U.S. He is living in Manassas, Virginia and is willing to provide care for my son and me. I also have U.S. citizen relatives and relatives that are legal permanent residents including cousins in Houston and Maryland. I also have brothers in Atlanta. No officer has asked about me or my son's preference to be released to his father.

24. I have absolutely no criminal history and I would appear for all future appointments and hearing upon any release. I am not going to run away because I want to pursue my case and seek protection in the United States. I have never received a bond hearing or been told that my son could receive a bond hearing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Signed on April 23, 2016, in Leesport, Pennsylvania.



Celina S

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23[th] day of April, 2016, in Leesport, PA.

Martha Sandoval-Reyna
Martha Sandoval

76

# Exhibit 29
## Conditionally Filed Under Seal

### Declaration of Cesia V█████

I, Cesia V█████████, depose and say:

1. I am a thirteen-year old girl detained at the detention center in Berks County, Pennsylvania. Before this, I was detained in Dilley, Texas from on or around November 6, 2016 until November 19, 2016, when I was transferred to Berks.

2. My date of birth is ████████ 2002. I was born in Honduras and I am now 13 years old. I am detained with my mother, Lesly Ma███████████. My mother was born in Honduras on ███████ 1977 and she is 38 years old.

3. In summary, I left my home country because gang members targeted my mother and I and we fled because gang members wanted to sexually assault me.

4. On or about November 4, 2015, I was walking with my mother and a group of people, including two of my mother's cousins, when agents from the U.S. Border Patrol stopped us shortly after we had crossed the border into the United States.

5. They took us to a room, that I think was the Rio Grande City Border Patrol station. The room was really cold and we slept on mattresses on the floor. There were some blankets in the cell but they were very dirty, so we didn't use them. It was very uncomfortable and it was hard to sleep. There were many people in our cell. The food was disgusting; it was just cold ham sandwiches. It was embarrassing to use the bathroom, I felt bad about it because everyone could see me when I was using the bathroom. The moms and kids would use their bodies to shield whoever had to use the toilet so that the male immigration officers couldn't see us. There was one small sink but no kind of soap or paper towels to dry with. The lights were on all night and there was just one small window.

6. Immigration agents asked our information and wanted my mom to sign deportation papers. My mom refused and the officer got mad and asked if I wanted him to do the fingerprints for me. He screamed at us to get in the cell and slammed the door behind us. They kept asking us again and again to sign our deportation papers. At one point, they told my mother to come outside and there was an immigration lawyer to help her there. They said if she signed the papers, then an immigration lawyer would help her. The immigration officers threatened that if my mother didn't sign for deportation she would regret it and she would be begging to be deported and they could deport us whenever they wanted to.

7. After one night at this border patrol station, at maybe 3 in the morning, they kicked us to wake us up and they transferred us to a different place, which is like a warehouse to hold people in cages like animals. At this place, I was taken away from my mother. I felt so bad and scared being away from my mother. I didn't know how long I would be separated from my mother. Thankfully, we were only there for less than a day when we were taken to the detention center in Dilley, Texas. We had to leave my mother's cousin and her daughter there, but we heard later that they were released to live with family in the United States.

8. No one at the border patrol facilities notified me about any rights I had as a minor or any rights under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer or family. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw.

9.  When my mother told border patrol officers that I had a fear of returning to Honduras, they said that's the same story we have been hearing over and over again. They humiliated my mother. They said to my mother –You have no right to be here? Why didn't you go to another country? This made me feel so bad seeing my mom treated this way by these men in uniform. The man yelling at my mom seemed so angry, I was scared he was going to hurt her. I started to cry.

10.  My mom had a credible fear interview on one day in November 2015. The next day, an asylum officer interviewed me. He didn't let me answer questions except to say yes or no. He made me very nervous and I started to cry. I didn't feel comfortable telling him my whole story or that I even had a chance to tell him my story. After this, we received a negative decision from an immigration judge appearing on a video. The immigration judge wouldn't allow my attorney to say anything to explain our case. Very quickly, the immigration judge said that we did not have a credible fear and that he was affirming the decision of the asylum officer.

11.  After the judge said the decision was negative in our case, I met with the CARA Project volunteer lawyers to prepare a declaration and to submit a request for a second interview. That request was eventually denied and I have never had the chance to actually explain my story and why I am afraid to go back to Honduras to any immigration official or judge.

12.  Even though we had been working with lawyers from the CARA Project and that was the only place that we felt safe, all of a sudden, on November 19, 2015, my mother and I were transferred from Dilley to Berks County, Pennsylvania. Immigration agents woke us at 4 in the morning and held us in an office. My mother was crying and asking the immigration agents where they were taking us. They told us that they were taking us to a safe place and not to be worried. We had no idea where we were going and we had no warning that we would be taken away from our lawyers. On the way here, some immigration officials said that they were taking us to our family, but that was a lie.

13.  My mother and I have now been at Berks for five months. I have had problems with a sore tooth, it's been hurting me a lot since January 24 and the staff members keep saying that they are going to make an appointment for me. It's been more than three weeks and I still haven't seen a dentist. I also suffer from very bad menstrual cramps and the medical staff members do not really help me and they just give me Tylenol. My mom has been having stomach pain since she came here. The medical staff did two tests that came back and showed that she had a kidney infection, but about four or five days ago the medical staff said that they needed another opinion from an outside lab. My mother is still in pain and it's hard for me to see her suffering.

14.  I feel so bad being here detained at Berks. It's now been over five months that I've been locked up and I feel trapped here. I don't like anything here. It feels like we are living in a nightmare. My mom tells me that I am losing weight and she worries about me. I don't want to eat the food here. My mom found out that the food that we eat, the bread and the milk, is expired. Sometimes the food looks like dog food to me.

15.  The staff here are not nice to us. They treat us like we have some kind of contagious disease. Some of them wear gloves when they think they have to touch us. They are not friendly or nice to us.

16. It is very hard to sleep here at night because the staff come and shine a flashlight in our eyes every fifteen minutes. Even if they didn't wake me up every 15 minutes, I wouldn't sleep well. I spend a lot of time crying at night. I ask my mother all the time, when are we leaving this place? Sometimes I want to crawl in bed with my mother because it's cold and the blankets have holes in them and I want to be warm and close to my mother, but the staff come and wake me up and tell me I have to sleep in my own bed.

17. The doors at this family detention center in Berks are usually locked during the day, you need a card, which is like a key to open them. We are allowed to be downstairs from 8am-8pm and then we have to be upstairs. I don't feel free to leave this detention center. It's is a prison for me and my mother. I know if we left, we would be caught. All I want is to be safe and be with my mom and my sister.

18. I want to be with my eight-year-old sister, who was held in immigration detention with her Dad in June 2015, and was separated from him. He was deported after five months of being detained. My sister was detained for a month and a half in some kind of detention center for children and she was then released to her aunt, in Arkansas. I really want to be with my little sister again.

19. No official here has informed me that I have a right to see an Immigration Judge about my custody status. My mom and I are being represented by the ACLU and have a habeas corpus case pending to review the denial of our credible fear claims. No official here has questioned me to determine if I have a close family member to whom I could be released or whether I am willing to be placed in a licensed home if no relative is found to be capable of caring for me. No officials have told me anything about Flores throughout all the months that I have been detained.

I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct to the best of my knowledge, information, and belief. Executed this 23rd day of April, 2016, in Leesport, Pennsylvania.



Cesia V

Certification of Translation

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23rd day of April, 2016, in Leesport, PA.

Martha Sandoval Reyna
Martha Sandoval Reyna

# Exhibit 30
## Conditionally Filed Under Seal

## DECLARATION OF ISAMAR S█████████

I, Isamar S█████████, whereby swear and affirm, under the penalties of perjury, that the following is true and correct to the best of my knowledge:

1. I am detained at the Berks detention center in Leesport, Pennsylvania. I was born on ██████ ██ 1992, in El Salvador.

2. I am detained with my daughter, Jacquelinne A█████████, who was born on ██████ 2008.

3. We left El Salvador on May 19, 2014. This is our first time in the United States. Jacquelinne's father abandoned us when she was only 2 months old. After he left us, I lived alone with my mother and my daughter. I sold food in order to provide for me and my daughter. Then the 18s started threatening our lives. They threatened me that if I did not pay them, money that I did not have to pay. The 18s killed my brother-in-law because he would not join them. I was so scared that they would kill us. We fled to the U.S. and crossed the river near McAllen, Texas. This was on May 30, 2014.

4. We were caught by border patrol after we crossed and were walking. They took us to the hielera, the border patrol station. We were detained there for two or three days.

5. We were kept in a very small room with no beds. The only place to sleep was on the floor. But there were so many people in the room that there was not enough room for us all to lay down. Some people had to sit. There was a bathroom in the room, but no privacy. If you used the bathroom, everyone could see you. There was a sink with the toilet, but it only had cold water. There were towels to dry your hands, but no soap.

6. The temperature in the room was extremely cold. We were wet from crossing the river and forced to stay in our wet clothes the entire time. We were only given aluminum blankets to keep warm.

7. We received food three times a day. It was the same, cookies, bread with mozzarella, and a really cold bottle of water.

8. The mom and children were kept together. There were very young children, around 1 ½ or 2 and some children as old as 7 years old all together with their mother's in the room.

9. It was hard being there. It was also hard because we could not tell what time of day or night it was. It was hard to get any sleep there. We did not have showers during those days.

10. The immigration officers were not very nice to us. One time, they put as all together in a line and shone a bright light on us. They were laughing and telling us that we were only going to be here 30 days before we were deported. They told us we'd only be with our families for 30 days, but hey, go see America.

11.

12. No one ever asked me if I had a fear of going back to El Salvador. The immigration officers never told me about any rights that me or my daughter had.

13. They did ask me where I would go, if released. I told immigration I would go to a friend in Atlanta. Immigration called her to ask if she knew me and to get documents from her.

14. Then one day, they took us to a bus station in Laredo. Immigration told us they decided to let us be free, but now we had to figure out how to get to our family or friends. They just left us there, with no money, no way to contact anyone. It was very scary. I asked a man to let me borrow his phone and called my friend. She bought me and my daughter bus tickets, but they were not until the next day. The man was kind enough to buy us some hamburgers and soda. We were at the bus station with other mothers and children. We had to spend the night sleeping on the street.

15. When immigration released us, they gave me a list of lawyers to call for help. This list was in English. I was told I would need to check in with immigration in Atlanta. I called the attorneys on the list, but no one ever answered. My father, who lived in Virginia, hired a lawyer in Virginia to represent me and my daughter.

16. This lawyer did not speak Spanish. He never talked to me with an interpreter. He never asked me to provide a statement, either with an interpreter, or written, about my fears of going back. He never asked me for proof that the gangs threatened me and my daughter. My mother and sister knew of the threats and could have written letters. The 18s left me threatening notes that were in El Salvador and I could have provided.

17. I had my hearing on January 12, 2015. I did not know this was my final hearing, or that I would be giving testimony on that day. Right before the hearing started, the lawyer showed me a paper and said it was my asylum application. He told me that the judge was going to ask if I agreed with what was in the application and to sign it. But I had never seen it and the attorney did not read it to me or have me look over it. The judge denied my case that day. From what the attorney explained, the judge denied my case because I did not provide any proof.

18. I asked the Judge if I could move to Virginia with my family and he said yes. I was supposed to check-in with immigration the next day. But the lawyer told me not to go. I was worried, so I went. Immigration told me I did not have permission to move to Virginia yet. The attorney was very angry when he found out I had gone to immigration and yelled at me. Basically, he told me that I was stupid and just to do what he said. He told me to move to Virginia immediately. He told me if I did not, he would drop my case. I moved to Virginia January 16, 2015.

19. After I moved, I wanted to check in with immigration in Virginia, but the lawyer told me that he knew what was going on with my case and just do to what he said. He told me not to go to immigration. He also never told me that we only had 30 days to appeal. And he did not appeal my case.

20. On January 2, 2016, I was at home with my daughter and partner.  Immigration came to our house around 6:30-7:00a.m.  We were sleeping when we heard banging on the door.  Immigration was yelling at us to open the door.  My daughter understands some English and knew that it was immigration and that they wanted us to open the door. She was scared and crying that she didn't want to go with them.   After about an hour, we thought immigration left.  But later, a friend's mother came to visit.  When we opened the door, immigration was there too and pushed into the house.  My daughter and I ran into a bedroom and locked the door. My partner was in the shower.  They grabbed him when he came out. Immigration forced him to open the door to where we were.  They took my and my daughter away.

21. We were sent to Dilley.  Immigration at Dilley never told us we had any rights under Flores for my daughter.

22. There were 120 of us who were caught at raids and taken to Dilley.  When we first got there, we were given food in a little green box.  It was an apple, water, and cold hamburger.  We arrived at Dilley at January 3, 2016.

23. We were in rooms with 6 beds to each room, it had a TV, and a table.  The bathrooms were very far away.  The food was not good, but a little better then where we are now, at Berks.  At Dilley there were more choices and more warm food.  Here at Berks, we mostly get canned food.

24. Immigration kept trying to force the raid families to sign their deportations. I kept asking about the right to an attorney, but the immigration officer lawyer laughed at me.  He told me if I hadn't had help from a lawyer in one year, I wasn't going to have help in the 2 days I would be there before I was deported. One time when I was meeting with my attorneys, an immigration official came in and told me he needed to meet with me individually at 3p.m.  He refused to talk to me with my lawyer, who was right there. He told the other raid families to meet too. But no one went because we thought immigration might try to force us to do something we didn't want to do.  Later, we saw this immigration official. He asked us if we were still not going to sign deportation papers.  We told him no, we were going to stay here. Then he laughed at us.

25. But I was finally able to get help from CARA lawyers at Dilley.  They filed papers in my case to stop my deportation.  My daughter and I were actually on our way to be deported, but the CARA lawyers got our deportation stopped.

26. In Dilley, there was a list of legal providers near the phone.  I didn't need to call my lawyers, because they were there at Dilley.

27. Towards the end of January, my daughter and I were moved to Berks.  We were not told why.

28. Here at Berks, we have to clean the facility.  They use the same washing machines to wash the mops and dirty rags to wash our clothes.

84

29. I never had an medical issues at Dilley, but as soon as I got to Berks, I got sick. I had a
round ball on her backside. I went to medical to complain about the pain. But they
didn't do anything. I went two times. I was only given treatment because I woke up one
day and could not walk. The pain was very bad. I had to be taken to a hospital. Two
staff members took me there, a man and a woman. On the way to the hospital, the man
was driving. He kept looking back at me and laughing. At the hospital, a doctor was
examining me. The doctor needed me to undress. The male staff member did not want
to leave the room, but the doctor finally forced him to leave.

30. I was given 4 different antibiotics to take. The doctor told me that if the treatment didn't
work, I would need surgery. The medicine has taken the pain away, but not the ball. I
can still feel it. Also, the one medicine made me extremely dizzy. Even when I was
feeling dizzy, I was expected to walk to medical to get my medications.

31. One time, my daughter woke up crying saying her head hurt. When got to medical, she
started throwing up. She complained that her throat and stomach hurt. The whole next
day she felt sick. Medical only gave her Tylenol. The whole next day she barely ate. I
asked medical to give her pedialyte, but said she was fine and didn't need anything.

32. At Berks I have not seen a list of legal providers near the phone. If we want to make free
calls to the lawyers, we have to ask the caseworkers to call them for us.

33. The immigration officials at Berks are mean to me. He does talks very loudly and in
angry way to me. Immigration never told me that I had any rights under Flores with
regards to my daughter.

34. The staff is also not nice to us here. My daughter won't eat the food here. One day, she
was drinking a chocolate drink and started to walk out of the cafeteria with it. One of the
staff jumped up and was very meanly telling her she can't take it out of the cafeteria. This
upset me because it was the only thing that she would eat.

35. Here, the staff does room checks all night long. They shine a light in our face every 15
minutes. And at 7:00a.m. they start yelling that we have to get up and do a room check.
I cannot let my daughter sleep past this time because we have to present ourselves to staff
to check our IDs.   And here, my daughter cannot sleep in my bed, as she did in Dilley.
One time, my daughter hid in my bed and the staff accused me of hiding her. They made
me and my daughter go to see the psychologist. We had to talk separately and they asked
my daughter why I hid her. She told them I did not. She just likes to sleep with me, it
comforts here. But I can't even give my daughter this.

36. Also, our movements are restricted here. There are some parts of the facility we can
access, but there are other places we cannot go without a staff member. If we want to go
outside, we have to have a staff member watch us. If there is not a staff member
available, we cannot go outside. After 8p.m. we are restricted from going downstairs. If
we are on the computers, we are told we have to leave and go upstairs at that time.

4

37. The food here is also poor quality. Many, many times I and my daughter have found hairs in our food. Lots of us have had moldy bread, pancakes, or tortillas. They are green with mold. We have been given expired milk.

38. Also, the sheets are stained and dirty. The blankets are so rough that they scratch the skin. I am allergic to the detergent, as are many people here. It makes me itch every time I wash my clothes.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief. Signed on April 23, 2016, in Leesport, Pennsylvania.

Isamar S██████████

I declare that I am competent to interpret from English to Spanish and Spanish to English, and that the above statement was interpreted from English to Spanish to Isamar S██████████ Ms. S██████████ agreed to the accuracy of the statement before executing her statement above. I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of April 2016.

Martha Sandoval Reyna
Martha Sandoval Reyna

86

# Exhibit 31
## Conditionally Filed Under Seal

**Declaration of Kelly G** █████████████

I, Kelly G ██████████████ depose and say:

1. I am detained at the detention center in Berks County, Pennsylvania. Before this, I was detained in Karnes City, Texas. My eleven-year-old son and I have been detained for over eight months.

2. My date of birth is █████, 1986. I was born in Honduras and I am now 29 years old.

3. I am detained here with my son, Gary J██████████████████, who was born in Honduras on ██████ 2004. He is eleven years old.

4. We left our home in Honduras because of domestic violence and threats of violence by gangs the government cannot or is unwilling to control.

5. We were apprehended on or about August, 28, 2015, soon after entering the United States. My son and I were taken, I believe to the McAllen Border Patrol station, which all detainees there called the *hielera* (ice box) because it was so cold. We stayed there for one night. When we got there, an immigration official separated me from my son. I told officials here that I was afraid to return to my home country. They told me that they didn't decide anything and that a Judge would decide.

6. At no point in the hielera or the "perrera," where we were taken next, was I given any notice of my son's legal rights under the Flores case. No officer told me anything about the Flores case. My son has shared his experiences with me at times we were separated and no official has mentioned anything about the Flores case to him. I am just learning about this now. I was never told that my son had a right under the Flores case to have an immigration judge review his bond situation or consider his release. I was not told that my son could speak with a lawyer or given a list of free legal services until I was taken to Karnes City, Texas, to a detention center.

7. In the hielera, we were detained for one night, there were toilets that were very visible to everyone, there was a low wall, so everyone could see when I was using the bathroom. The food was terrible: Just bread with one slice of cold ham. It was very cold in the hielera and my son and I did not have blankets. The cell was very full so it was difficult to lie down. The only place to sleep was on the floor, there were no mattresses or beds. I didn't sleep that night. My son slept a little bit after the immigration officers returned him to me around midnight, we were sitting on a cement bench all night so it was hard to sleep.

8. In the perrera, where we were taken next, my eleven-year-old son was taken away from me and I didn't see him for two nights. I could only see him from far away and immigration officials yelled at me if I tried to get to the edge of the cell to see him. It was also very cold in the perrera. There was a mattress pad and we were given aluminum foil blankets. It was not possible to tell the day or the night because they kept the lights on the whole time and there were no windows. I think we left sometime around dawn. I had no idea where we were going but immigration said the journey would be five or six hours.

At no time while detained at this facility did any ICE agent or any other official tell me anything about my son's rights under the Flores case. To the best of my knowledge, no one explained anything about the Flores case to my son.

9. Next, we were transported to the Karnes detention center. My son and I were held there from about August 31 to October 21. It was at Karnes that I went through the credible fear interview to explain why I was afraid to go home. It was sometime in September. A male asylum officer interviewed me using an interpreter by telephone. I didn't have a lawyer for any of this. I didn't understand everything that happened during the interview, in parts the asylum officer was short with me and didn't explain things. My son was there during the interview. The asylum officer asked him a few questions, maybe three or four only.  If during the fear interview asylum officer asked me whether I faced persecution in my home country because of my membership in a social group, I would not have understood that question and almost certainly would have either said I didn't understand the question or answered no. I do not recall that the term social group was ever explained to me during the fear interviews.

10. After I had received a negative decision, an officer told me I could look for a lawyer. It is very difficult to find a lawyer at Karnes because the detention center is far away from any cities and there are very few volunteer lawyers available in Karnes to help people. Phone calls cost money and this also makes communicating with lawyers very difficult. I found a lawyer but she couldn't assist me on the day my case was scheduled to be heard by an Immigration Judge. The Judge said that he had to review my case that day anyway. I asked for my case to be reviewed again by the asylum office. I believe my request for a second interview was denied. During our detention at Karnes, to the best of my knowledge ICE took no steps to assess whether my son could be released to relatives or friends in the U.S.  No officer questioned me about this or asked me for information about who could care for my son if he was released from detention. To the best of my knowledge, based on my discussions with my son, no official talked to my son about who he could be released to in the U.S. Also, no official discussed with me the possibility that my son could be released to a licensed facility that cares for children.

11. On or about October 21, 2015, my son and I were transferred to Berks County, Pennsylvania, to the family detention center here. We have now been here for about four months. I found a lawyer here, Carol Anne Donohoe. She filed another request for reinterview for me, and that was also denied. During our detention at Berks, to the best of my knowledge ICE has taken no steps to assess whether my son can be released to relatives or friends in the U.S.  No officer has questioned me about this or asked me for information about who could care for my son if he was released from detention. To the best of my knowledge, based on my discussions with my son, no official here has talked to my son about who he could be released to in the U.S. Also, no official has discussed with me the possibility that my son could be released to a licensed facility that cares for children.

12. Here at Berks my son who will be twelve years old in April is in class a few hours a day with children who are eight or nine years old. He gets bored and teachers tell him to do laps around the room or watch television and he finds that boring too. In his classroom, he is the oldest.

89

13. We also have a big problem sleeping at night. Every 15 minutes people who work for the facility come and shine flashlights in our eyes and wake us up. I have headaches at night and my son also has trouble sleeping because of the noise and the interruptions. Our room is by the laundry room and employees at this detention center do laundry at night and it's very noisy. It feels like a prison. This place is a prison for my son and I. When I let myself think about it, I start to cry. I feel so sad that my son has spent the last eight months of his childhood incarcerated.

14. I have family here in the U.S., my brother lives here and he has TPS, he has been here for more than 20 years and lives in Houston. He would be willing to have my son live with him. No immigration officers at the border, at Karnes, or Berks have ever asked me about my son going to live with my brother. I don't want to be separated from my son, but there is a safe place he could go.

15. I don't have any criminal history and I would appear for any future court hearings if I am released. I am not going to run away because I want to pursue my case and seek protection here in the United States. I have never received a bond hearing or been told that my son could receive a bond hearing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Signed on May 1, 2016, in Leesport, Pennsylvania.

Kelly G█████████

I declare that I am competent to interpret from English to Spanish and that the above statement was interpreted from English to Spanish to Kelly G█████████, Ms. G█████████ agreed to the accuracy of the statement before executing her statement above. I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of May, 2016, in Leesport PA.

Martha Sandoval Reyna
Martha Sandoval Reyna

# Exhibit 32
## Conditionally Filed Under Seal

### Declaration of Maria D█████████████

I, Maria D█████████████, depose and say:

1. I am detained at the detention center in Berks County, Pennsylvania. Before this, I was detained in Dilley, Texas.

2. My date of birth is ███████ 1993. I was born in El Salvador and I am now 23 years old.

3. I am detained here with my son, Joshua, who was born in El Salvador on ██████ 2009. He is six years old.

4. In summary, I left my home country with my son because a gang member was pursuing me and threatening me and my son. I believe he was targeting me because I was a single mother. The same gang member had targeted my younger brother for recruitment.

5. On or about September 5, 2015, soon after we crossed the border to enter the United States, Customs and Border Patrol picked me and my son up as we were walking with a group of people. We were with my younger brother, who was fleeing with us, and we were separated at the border. My brother was taken to another detention center.

6. We were transported to a border patrol station where we were held for two nights. I do not know the address of the border patrol station. We slept on the floor, but there was barely any room to sleep because there were too many people in the cell. We had no blankets and it was hard to stay warm. My six-year-old son barely slept and he was upset and crying all the time while we were there. There was only one toilet and it was very dirty and you had to use it in front of everyone. There were many people, maybe forty people in the cell, all mothers with children. We were just given cold sandwiches with frozen ham inside, just one during the day and one at night. We were not given a list of lawyers we could call for help. There were no phones we could use.

7. After this, we were taken to another place, like a warehouse, that they called the perrera (dog house). We were given an aluminum blanket and thin mattress pads. There were even more people there than in the *hielera*. The food was still bad. My son tried to eat the burritos twice, but both times he threw up afterwards. The lights were kept on all night and there were no windows.

8. No one at the border patrol facilities where we were detained notified me that my son had any rights under the Flores case. No one even mentioned the Flores case. No one gave us any papers about the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer or family. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. When I told them at the hielera that I had a fear of returning to El Salvador, they said very little. In fact, at one point immigration officials told us that we had to go back to our countries because we were not from the United States. When I got to Dilley and had my asylum interview, apparently the papers said that I did not express fear of return. That is not true. The paperwork also said that my son had told officials that he came to live in the United States for the rest of his life, but, in reality, the officials at the border never asked my six year old son any questions.

9. After one night in the *perrera*, they took us to the family detention center in Dilley, Texas, on or about the 8th of September, 2015. I was detained at Dilley with my son until October 31st, so it was about 52 days in Dilley. At Dilley, my son got an earache. I was not happy with the medical treatment received because my son was crying in pain and they made me wait for four hours before they saw him. No official at Dilley told me anything about the Flores case or any rights my son had under the Flores case. Best I am aware, no steps were taken to determine whether my son could be released to a relative here in the U.S. No one asked me whether I would like to designate an adult to whom my son could be released.

10. I was not given an interview about my fear of returning to El Salvador until about September 22, 2015. I received a Record of Negative Credible Fear Finding and Request for Review by Immigration Judge on or about September 25, 2015. I have no idea why the processing of my case was delayed. I worked with attorneys from the CARA Project at Dilley. My hearing with the immigration judge to review the negative determination did not occur, for some reason, until around October 27, 2015. The immigration judge affirmed the negative decision. After the hearing, while I was still detained at Dilley with my son, I worked with a CARA Project attorney, who requested reconsideration of my case. My request for reconsideration was eventually denied.

11. Even though I had been working with lawyers from the CARA Project, all of a sudden, on October 31, my son and I were transferred from Dilley, Texas to Berks County, Pennsylvania. We had no idea where we were going. They took my son and I out of my room and they told me that they didn't know where I was going. I was taken away from my lawyers with no warning.

12. At Berks, my son has started wetting the bed at night. I believe it is from the stress and psychological harm of being held in detention. I have been putting diapers on him at night here at Berks, but I came across an officer who told me that I could not use diapers because my son is too old. They told me I had to make an appointment with the doctor to get one diaper per night.

13. It is very hard to sleep here at night because the staff come and shine a flashlight in our eyes about every fifteen minutes. My son will sometimes come and try to sleep with me in my bed, but they don't allow that here, and they wake him up and make him go to his own bed.

14. The doors at this family detention center in Berks are sometimes open and sometimes locked. We are allowed to be downstairs from 8am-8pm. But, the staff have told us that if we left the facility we would be caught very quickly and we would have nowhere to go. I don't feel free to leave this facility. The kids sometimes talk about trying to escape, but best I am aware no one has tried to escape from this detention center since I arrived a few months ago.

15. My two brothers, my uncle, and several cousins live in the United States. The brother who crossed the border with my son and I was released to live with another brother in Virginia. No one has asked me whether my son's father resides here or whether any other family members in the United States could care for my son if he is released. Best I am aware, no efforts have been made to unite my son with his father who lives here in the U.S. or with other close relatives that we have here, including my brothers. As far as I know, no official has made any effort to release my son to his father or to any of my other family members living in the United States.

16. I have no criminal history and I would appear for any future immigration appointments or court hearings if I am released. My priority is pursuing my claim for protection through all available legal channels.

     I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct to the best of my knowledge, information, and belief. Executed this 23rd day of April, 2016, in Leesport, Pennsylvania.



Maria D

### Certification of Translation

     I, Martha Sandoval Reyna depose and say:

     I am fluent in English and Spanish. I read the above declaration to Maria ▇▇▇▇▇▇ and she confirmed its accuracy before executing the declaration.

     I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23rd day of April, 2016, in Leesport, PA.

*Martha Sandoval Reyna*
Martha Sandoval Reyna

# Exhibit 33
## Conditionally Filed Under Seal

Declaration of Lindsey G███████

I, Lindsay G███████, declare under penalty
of perjury the following is true and correct
to the best of my recollection and knowledge.

1. My name is Lindsay G███████.
2. I am 28 years old. I was born
   on ███████ 1987.
3. I am from Honduras.
4. I came to the United States
   accompanied by my three year old
   daughter Kenia J███████.
   Kenia was born on ███████, 2012.
5. I was apprehended by immigration
   officials yesterday, Sunday January 31, 2016.
   Around 2:30 pm. Since my apprehension
   I have been held in a border
   patrol station and at the Ursela
   detention Center.
6. The border patrol station was horrible.
   I think the government must make
   it horrible on purpose to punish
   the immigrants who come here. The
   officials in the border patrol station
   were very angry.

96

7. In the border patrol station I was placed in a concrete cell. It was very cold. There were other women and children in the cell. Many of the children were crying, like my daughter Kenia. Kenia was so cold she could not go to sleep. there were no beds, pillows or blankets. I held Kenia tight, wrapping my arms around her to keep her warm. I did that for over three hours ~~so she could~~ to help her sleep. She has a rash, and I was worried about her. She did not get to see a doctor or nurse while we were at the CBP station. Her hands started to turn colors, she was so cold.

8. In the CBP station, there are bathrooms, but they are not private. There was a sink, but no soap. I did not get to shower, brush my hair, or brush my teeth. I was given food but it was not good, only a sandwich that was frozen.

9. I am now at the Urseld detention Center. It is a little better because There are pads that I can lay on, which are better than the cold concrete floor. I still have not had a chance to shower, change my clothes, or brush my hair or teeth. I still have not gotten to sleep, and am very

tired. But this place is better than the CBP Station.

10. Since being placed in immigration custody I had not had access to a phone or been given the chance to make a phone call.

11. I have not been told I have a right to a lawyer or that my daughter has the right to a lawyer.

12. I have not been given a list of legal service providers.

13. This is my first time coming to the US. I came because I am afraid I will be killed in Honduras. I have been threatened. My husband, the father of my daughter, was recently killed. I told this to the immigration official who interviewed me by telephone and video at the CBP Station.

14. I have not seen a Judge or been told that I, or my daughter, have the right to see a Judge or ask for bond.

15. I do not know what will happen to me next.

X ███████                    2/1/16

98

Certification of Translation

I, Shalyn Fluharty, depose and say: I am fluent in English and Spanish. I read the above declaration to Lindsey G [redacted] and she confirmed its accuracy before she executed the declaration. I declare under penalty of perjury that the foregoing certification is true and correct. Executed this 1st day of February, 2016, in McAllen, Texas.

Shalyn Fluharty

# Exhibit 34
## Conditionally Filed Under Seal

DECLARATION OF KATERIN Y███████████████████R

I, Katerin Y████████████████, depose and say:

1. I am twelve years of age and detained at the detention center in Karnes, Texas.

2. My date of birth is ███████ 2003. I was born in Honduras.

3. I am detained here with my mother, Yessenia M████████████████████.

4. In summary, we left Honduras because my mother's cousin was killed by gang members who were involved in drugs. The gangs started threatening my mom and I because we were related to my mom's cousin. We started getting threatening phone calls and in person threats. It was very scary and we fled Honduras.

5. We entered the United States the evening of December 19, 2015 and were caught early morning on December 20, 2015, after we crossed the river.

6. We were taken to a border patrol office but I don't know where. I don't remember how long we were in the truck but it felt like forever. We were cold. The officers were yelling at us and very scary and rude.

7. After that, we were transported to a border patrol station where we were held for about 24 hours. No one at the border patrol station told me about rights I had as a minor or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones anyone else captured was using. No one gave me a list of lawyers I could call. No one asked where I was hoping to live in the United States, even though my dad lives in Virginia and my mom and I want to live with him. No one told me that I had a right to see an Immigration Judge about my detention. My mother was asked if we feared return to my home country. She said yes but they didn't ask anything else. I have talked to my mother and my mother has said that no one has told her about any rights that I have as a child, or any rights I may have to see an immigration judge.

8. The officers told us we had no rights and that we had no right to seek asylum. They then asked my mom several questions and because they said we had no right to asylum, she told them we came here so that I could have a better life. The officers showed my mom papers but they didn't explain anything that the papers said and she didn't want to sign them. My mom told them we can't return to Honduras because of what happened with her cousin. The officers were unfriendly and only wanted us to go back to Honduras.

9. The toilets at this station were out in the open, with only a short wall around them. I had to use the bathroom with no privacy. The cell was super cold. Everyone called it the "ice box." I did not have a jacket to keep me warm. We didn't have beds or sheets but we were given a thin silver paper to cover ourselves with but it didn't make much difference. There was water but there were no cups and when we asked, they wouldn't give them, so I couldn't drink water while I was there. Anyway, the container with water was filthy. They gave us sandwiches that were frozen, and juice. The

sandwiches were just two pieces of bread and one thin slice of meat. No butter or spread, no lettuce, no cheese, nothing. My mom didn't eat anything—she gave it all to me. I had a hard time eating this horrible food.

10. This facility was very crowded the whole time we were there. There was about 35 people in one room. There was no space to do anything. Every time we tried to stand up, they just kept yelling that we should sit or lay down, but there was barely any space. We didn't ask for medical help because the officers were so hostile.

11. After being in the "ice box" for two nights. We couldn't leave the room unless they wanted to talk to us, which was only that one time. No one explained anything that was going to happen to us. After the second night, we were moved to a third facility. We called this facility the "dog pound" because the holding rooms looked like cages. We were there one day. This facility was horrible because I was separated from my mother the whole time. I asked to see my mom and they let me see her for 5 minutes and that was it. There were tons of kids there—I was in a room with only girls, and I think we were all between 8 – 17 years old. There were no beds or sheets. They gave me a sandwich and some water, but that was it.

12. I came to Karnes with my mother on December 22, 2015. After being here for 18 days, we called a lawyer because we had failed our credible fear. Although they gave us a list of lawyers, other people here said no one answers so we didn't call. We were able to call a lawyer who is now helping us with our credible fear.

13. As best I remember I have not been told about my rights under the Flores case at this detention facility. I have not been told that any decision has been made about releasing me. My mom and I were interviewed by an asylum officer on January 2, 2016. My mom and I were interviewed together but the officer only asked me if I was married or widowed, if I had kids, if I was a gang member or a terrorist. The questions really bothered me. I don't know why they asked me those questions. My mom tried to explain everything that happened to us but the officer cut her off or told her to "keep your answers short."

14. On January 7, 2016, an asylum officer told us we failed our credible fear but didn't tell us anything else about what might happen next. It is just a form letter with a box checked saying didn't pass our fear interview. They didn't really explain anything and just gave us a stack of papers in English. My mom learned from a friend here that we will talk to a judge and that's when my mom started looking for a lawyer.

15. We had to call the lawyers at RAICES three times before we spoke with someone, and then they answered and have now started working on our case. They represented us in front of the judge on January 20, 2016. The judge let my mom explain her story better and only asked me a few questions but he didn't change the asylum officer's decision.

16. Our lawyers filed a request for reconsideration about 8 or 9 days ago and we had a new interview but don't have a decision yet.

17. Here at Karnes the food is terrible. I'm not eating and I've lost weight. This morning for breakfast all I ate was an apple.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Katerin Y

Certification of Translation.

I, Manoj Govindaiah, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Dilley, Texas.

Manoj Govindaiah

3

103

# Exhibit 35
## Conditionally Filed Under Seal

DECLARATION OF SONIA M███████████████████

I, Sonia ███████████, depose and say:

1. I am detained at the detention center in Karnes City, Texas.

2. My date of birth is ███████ 1986. I was born in Honduras.

3. I am detained here with my son Melvin M███████████ who was born in Honduras on ██████ 2013 and is two years old.

4. In summary, I left Honduras because a drug trafficker raped me. I was afraid of him because he continued to ask after me and threatened to kill me. So I decided to leave.

5. We turned ourselves in to U.S. Customs and Border Patrol on or about December 15, 2015 a soon after entering the United States.

6. We were transported to a border patrol station where we were held for one day and one night. Conditions at the facility were bad. It was very cold there, making it very difficult to sleep. No blankets or mattresses were provided. There were about 20 or 25 children in the cell and they were all crying because it was so cold. On top of that, I had to sleep on the floor, because there were wasn't enough space to lie down. There were about 35 or 40 people in the cell. We had to try to sleep sitting up, which was very difficult. To eat we only got a sandwich with one piece of ham, which was very cold as well. For the whole day and night that I was there, we only got two sandwiches and two little bottles of juice. Neither my son or I had the chance to wash or take a shower. We arrived in wet, muddy clothes, and we were not given a change of clothes or underwear. The wet clothes made it even colder, more uncomfortable, and more difficult to sleep.

7. No one at the border patrol facilities notified me that my son had as a minor or any rights he had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer or family. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. No one at the border patrol facility asked me whether I had a fear of returning to Honduras.

8. On or about December 16, 2016, we were transported to another place call La Perrera (dog cage). After a few hours in that place, we were transported to Karnes, where my son and I are currently detained. As far as I can recall, I have not been told that my son has about my rights under the Flores case or that he could see a judge about his detention or release.

9. I was not given an interview about my fear of returning to Honduras until December 22, 2016. I do not know why it took so long to receive a credible fear interview. During the credible fear interview, I told the interviewer that I had been raped by a person who works with drug traffickers and that he had threatened me.

10. I received a Record of Negative Credible Fear Finding and Request for Review by Immigration Judge on December 24, 2015. Although I did not understand this form because I do not read English, someone explained the form to me in Spanish and I stated that I wanted an immigration judge to

review my case.  I am not sure when the hearing with the immigration judge was held, but I know it was before December 30, 2015.  During the hearing, the judge said that he agreed with the asylum officer.

11.  After the hearing, I spoke with a lawyer and requested reconsideration of my case.  It has been about 20 days since I requested reconsideration and I have not heard a response.  I do not know what the status of my case is and I do not know what is causing the delay in the response to my request.

12.  My son's father lives in the United States.  No one has asked me whether my son's father resides in the United States or whether I would like my son to be released to his father.  As far as I know, no one has made any effort to release my son to his father or to any other responsible adult.

I declare under penalty of perjury that the foregoing facts are true and correct.  Executed this 3rd day of February, 2016, in Karnes City, Texas.

Certification of Translation.

Tali Gires

I, Virginia Corrigan, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Virginia Corrigan Tali Gires

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On May 17, 2016, I electronically filed the following document(s): STIPULATED APPLICATION FOR LEAVE TO FILE DECLARATIONS OF ASYLUM APPLICANTS AND MEMORANDA IDENTIFYING ASYLUM APPLICANTS UNDER SEAL, APPLICANTS' ORDER GRANTING LEAVE TO FILE DECLARATIONS OF ASYLUM APPLICANTS AND MEMORANDA IDENTIFYING ASYLUM APPLICANTS UNDER SEAL [PROPOSED], REDACTED DECLARATIONS OF ASYLUM APPLICANTS, AND REDACTED MEMORANDA IDENTIFYING ASYLUM APPLICANTS with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


/s/*Peter Schey*
*Attorney for Plaintiffs*