1  CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
2  Peter A. Schey (Cal. Bar No. 58232)
   Carlos Holguín (Cal. Bar No. 90754)
3  256 South Occidental Boulevard
   Los Angeles, CA 90057
4  Telephone: (213) 388-8693
   Facsimile: (213) 386-9484
5  Email: crholguin@centerforhumanrights.org
           pschey@centerforhumanrights.org
6
7  ORRICK, HERRINGTON & SUTCLIFFE LLP
   T. Wayne Harman (Cal. Bar No. 254089)
8  Elena Garcia (Cal. Bar No. 299680)
   777 South Figueroa Street, Suite 3200
9  Los Angeles, CA 90017
   Telephone:    (213) 629-2020
10 Email: wharman@orrick.com
           egarcia@orrick.com
11
12 *Attorneys for plaintiffs (listing continues on following page)*

13              UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
14

15 JENNY LISETTE FLORES, *et al.*,          ) Case No. CV 85-4544 DMG (AGRx)
                                            )
16          Plaintiffs,                     )
                                            ) PLAINTIFF'S EXHIBITS IN SUPPORT OF
17 - vs -                                   ) MOTION TO ENFORCE SETTLEMENT
                                            ) AND FOR APPOINTMENT OF SPECIAL
18 JEH JOHNSON, SECRETARY, U.S. DEPARTMENT  ) MASTER [PART 1: EXHIBITS 1-13]
   OF HOMELAND SECURITY, *et al.*,          )
19                                          ) Date:   June 17, 2016.
            Defendants.                     ) Time:   9:30 a.m.
20                                          ) Dept:   Courtroom 7
   _____ ) [HON. DOLLY M. GEE]
21
22
23
24
25
26
27
28

i

*Plaintiffs' counsel, continued*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:      (408) 280-2437
Facsimile:      (408) 288-8850
Email: jenniferk@lawfoundation.org
          kate.manning@lawfoundation.org
          kyrak@lawfoundation.org
          jamesz@lawfoundation.org
          annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*/ / /*

2016 Motion to Enforce Exhibit Index

1.  Declaration of Peter Schey                                                    1

2.  Excerpts of Exhibits                                                          66

3.  Declaration of Bridget Cambria                                               103

4.  Declaration of Carol Anne Donohoe                                            114

5.  Declaration of Jacqueline Kline                                             119

6.  Declaration of Jocelyn Dyer                                                  154

7.  Declaration of Natalia Ospina                                                159

8.  Declaration of Leanne Purdum                                                 162

9.  Declaration of Theresa Wilkes                                                166

10. Declaration of Amanda Doroshow                                               170

11. Declaration of Ed Mccarthy                                                   173

12. Declaration of Robyn Barnard w/ Exhibits                                     176

13. Declaration of Karen Lucas w/ Exhibits                                       212

14. Declaration of Lindsay Harris (Flores Violations)                           285

15. Declaration of Lindsay Harris (Medical Conditions) w/ Exhibits              290

16. Declaration of Lindsay Harris (Due Process)                                 375

17. Declaration of Manoj Govindaiah w/ Exhibit                                   385

18. Declaration of Robert Doggett w/Exhibis                                      409

19. Declaration of Alex Mensing w/ Exhibits                                      557

20. CBP Memorandum. Hold Rooms and Short Term Custody. June 2, 2008             810

21. Declaration of Victor Rxxxxx xxxxxxx                                         826

22. Declaration of Walter Axxxxxxxx xxxxxxxxx                                    830

23. Declaration of Yeslin Lxxxx xxxxxxx                                          834

24. Declaration of Sara  Exxxxxxxx xxxxx                                837

25. Declaration of Mirna Mxxxxxx xxxxx                                 840

26. Declaration of Raquel Axxxxxx xxxxxx                              843

27. Declaration of Yessenia Exxxxxxxx xxxxxxx                         846

28. Declaration of Celina Sxxxxxx-xxxx                                849

29. Declaration of Cesia Vxxxxxxxxx-xxxx                              854

30. Declaration of Isamar Sxxxxxx xxxxxx                              858

31. Declaration of Kelly Gxxxxxxxx-xxxxx                              864

32. Declaration of Maria Dxxxx xxxxxxx                                868

33. Declaration of Lindsey Gxxxx xxxxx                                872

34. Declaration of Katerin Yxxxxxxx xxxxxxx                           877

35. Declaration of Sonia Axxxxxx-xxxxxx                               881

36. Declaration of Kenia  Yxxxxx xxxxxxx                              884

37. Declaration of Bianca Cxxxxxxxxx xxxxx                            888

38. Declaration of Astrid Dominguez                                  892

39. Declaration of Karen Zxxxxx xxxxxxx                               895

40. Declaration of Allison Mxxxx xxxxx                                898

41. Declaration of Benina Cxxxxx xxxxx                                903

42. Declaration of Evelin Jxxxxx xxxxxxxx                             907

43. Declaration of Diana Cxxxxx xxxxx                                 912

44. Declaration of Amarilis Lxxxxxx xxxxx                             915

45. Declaration of Franklin Rxxxx xxxxxxxx                            918

46. Declaration of Herson Lxxxxxx xxxxx                               922

47. Declaration of Vilma Sxxxx xx xxxx                                925

48. Declaration of Leny A██████ ██████                                              929

49. Declaration of Edgardo D██████ ████████                                         932

50. Declaration of Flember J████ ██████████                                         935

51. Declaration of Karen L██████ ████████                                           938

52. Declaration of Madelyn M████████-██████                                         941

53. Declaration of Faustino C███                                                    944

54. Declaration of Fanny E█████████ █████████                                       947

55. Declaration of Josselyn M██████ ██████                                          950

56. Declaration of Silvia V██████ ████                                              955

57. Declaration of Yesenia Y████ █████                                              959

58. Declaration of Eloisa R██████ ██████                                            962

59. Declaration of Melvin M███████ █████                                            966

60. Pennsylvania Dept. of Human Services letter to Berks County dated

    January 27, 2016                                                                969

61. Declaration of Dr. Luis Zayas                                                   972

62. Declaration of Jessica Gorelick                                                 1005

63. CARA letter to CRCL and OIG dated March 28, 2016                                1010

64. Declaration of Amy Camila Colon                                                 1027

65. Declaration of Jodi Goodwin                                                     1030

66. Declaration of Michelle Garza Pareja                                            1035

67. Declaration of Amy Fisher                                                       1044

68. Declaration of Karen Lucas                                                      1048

69. Declaration of Katie Shephard                                                   1052

# Exhibit 1
## Publicly Filed

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
            pschey@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
T. Wayne Harman (Cal. Bar No. 254089)
Elena Garcia (Cal. Bar No. 299680)
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:     (213) 629-2020
Email: wharman@orrick.com
          egarcia@orrick.com

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| | ) |
| Plaintiffs, | ) EXHIBIT 1 IN SUPPORT OF PLAINTIFFS' MOTION |
| - vs - | ) TO ENFORCE SETTLEMENT AND FOR |
| | ) APPOINTMENT OF A SPECIAL MONITOR: |
| LORETTA E. LYNCH, Attorney | ) DECLARATION OF CLASS COUNSEL |
| General of the United States, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

1    *Plaintiffs' counsel, continued*

2

3    LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295

4    San Francisco, CA 94103
Telephone: (415) 575-3500

5

6    THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH

7    PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)

8    Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)

9    Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor

10    San Jose, CA 95112

11    Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850

12    Email: jenniferk@lawfoundation.org

13         kate.manning@lawfoundation.org
kyrak@lawfoundation.org

14         annettek@lawfoundation.org

15    *Of counsel:*

16    YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)

17    Virginia Corrigan (Cal. Bar No. 292035)

18    200 Pine Street, Suite 300
San Francisco, CA 94104

19    Telephone: (415) 543-3379 x 3903

20

21    / / /

22

23

24

25

26

27

28

DECLARATION OF PETER A. SCHEY

I, Peter A. Schey, depose and say:

1. This declaration is made in support of Plaintiffs' Motion to Enforce Settlement and Appoint a Special Monitor.

2. I serve as one of the Class Counsel in the instant litigation.

3. The following declaration is based on my inspections of Customs and Border Protection ("CBP") facilities (McAllen Station and CBP's Ursula facility) on February 1, 2016, the Immigration and Customs Enforcement ("ICE") facility in Dilley, Texas on February 2, 2016, the ICE detention facility in Karnes, Texas, on February 3, 2016, and the ICE facility in Berks, Pennsylvania on February 18, 2016. These inspections are authorized pursuant to Paragraph 33 of the *Flores* Settlement. In addition to inspecting the facilities, pursuant to Paragraph 33 Class Counsel interviewed numerous detained Class Members and their mothers. Paragraph 33 also permits Class Counsel to interview facility staff including ICE agents, however Defendants' counsel present during the inspections did not permit any significant interviewing of facility staff. Some staff did explain aspects of the detention operation to Class Counsel. At each location Class Counsel was accompanied by volunteer attorneys and paralegals who fully participated in the inspections and interviews with Class Members and mothers. As typically done, Class Counsel provided Defendants' Counsel with advance notice of the inspections and the dates of the inspections were mutually agreed upon. Numerous Class Members and mothers of class members have tendered declarations regarding Defendants' compliance with the Settlement and this Court's August 29, 2015 Order between October 23, 2015 and the present and those declarations are filed herewith.

4. In addition to the inspections referenced above, as Class Counsel I have communicated with approximately twenty-five attorneys who have provided representation to detained accompanied Class Members between October 23, 2015 and the present in order to assess compliance with the Settlement and this Court's remedial Order of August 29, 2015. Numerous attorneys have tendered declarations regarding Defendants' compliance with the Settlement and this Court's August 29, 2015 Order between October 23, 2015 and the present and those declarations are filed herewith.

5. Mothers and children interviewed during the site inspections uniformly reported being held for one to three nights in extremely cold Customs and Border Protection (CBP) holding cells, not being provided dry clothes, being held in severely overcrowded cells, having to sleep on cold concrete floors, not being provided mats or blankets, often having insufficient space to lay on the floor to sleep, having bright lights kept on all day and night, inadequate food, dirty drinking water, one cup for 30-40 people to share, no soap or paper towels to wash their hands, lack of privacy and cleanliness in toilet facilities, lack of access to medical treatment, no access to information regarding detainees' rights, and verbal abuse by some guards. Conditions remain deplorable and inhumane. I am informed and believe that these conditions are pervasive along the U.S.-Mexico border. In the case of *Doe v. Johnson*, (D.Ariz. Aug. 14, 2015, No. CV 15-250 TUC DCB) 2015 U.S. Dist. LEXIS 117285.), U.S. District Court Judge David Bury recently approved certification of a class and denied Defendants' motion to dismiss in a case alleging deplorable conditions in CBP stations in Casa Grande, Tucson, Nogales, Willcox, Sonoita, Bisbee and Douglas, Arizona. The alleged conditions are virtually the same as those described in the declarations of Class Members, mothers and attorneys filed herewith with regards the treatment of children.

4

6. While such conditions may be tolerable for a few hours, many Class Member children spend from one to three nights under these unhealthy, unsanitary and oppressive conditions. Paragraph 12 of the Settlement requires that "[f]ollowing arrest, [Defendants] shall hold minors in facilities that are safe and sanitary and that are consistent with the [Defendants'] concern for the particular vulnerability of minors." *Id*. The treatment of Class Members is inhumane and shows either an abysmal ignorance or total disregard of the particular needs and vulnerabilities of children, whether U.S. citizens or those seeking refuge from violence and persecution abroad.

8. The Agreement requires that upon apprehension Class Members be advised of certain rights, provided a list of currently available free legal services,[1] and that continuous efforts commence and are recorded aimed at the release of minors pursuant to Paragraph 14 or placement under Paragraph 19 in a licensed and non-secure facility. Despite many class members being held at CBP facilities for a day or several days, no efforts that Class Counsel is aware of are made by CBP staff to comply with Paragraphs 12A, 18 and 24D. Indeed, Border Patrol agents do not even appear to be aware of these obligations of the Settlement rather than intentionally violating them. Access to legal counsel at CBP stations is virtually non-existent. Not one of the Class Members and mothers interviewed during Class Counsel's inspections had any idea how to contact an attorney.

9. Class Counsel's inspection and interviews at all three ICE detention facilities used to detain accompanied Class Members disclosed that Since October 23, 2015, ICE has reduced what it calls the "average" detention length of Class Members to around 7-10 days, however Defendants have not provided Class Counsel with the data relied upon to arrive at various "averages." In any event, inspections disclosed Class Member children who had been detained for weeks or months in violation of the Settlement, regardless of the "average" length of detention of Class Members. The inspections also clearly disclosed that whether Class Members were detained for days, weeks or months, continuous efforts are not made and recorded to release children under Paragraph 14 or place them under Paragraph 19, and all children end up detained in Defendants unlicensed or secure facilities commingled with unrelated adults.[2]

---

[1] Paragraph 12A states that "[w]henever the [Defendant] takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing, if applicable." Paragraph 24D of the Settlement provides that "[t]he [defendants] shall promptly provide each minor not released with (a) INS Form 1-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district pursuant to [Defendants'] regulations (unless previously given to the minor)." Paragraph 18 of the Settlement provides: "Upon taking a minor into custody, the [Defendants] … shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in [Defendants'] custody." *Id*. (emphasis added).

[2] Paragraph 12A of the Settlement provides that if there is no one to whom Defendants may release the minor pursuant to Paragraph 14 or a licensed facility under Paragraph 19, with limited exceptions the child may be held for five (5) days in secure facilities with "separate accommodations for minors …"

10. Class Members and those representing them consistently report and declare in their declarations filed herewith that ICE agents in violation of the Settlement –

• do not "expeditiously process" accompanied Class Members (Paragraph 12A);

• do not provide accompanied Class Members with "a notice of rights," (Paragraph 12A), they do not "promptly provide each minor not released with (a) INS Form 1-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district, (Paragraph 24D);

• do not "make and record … prompt and continuous efforts … toward family reunification and the release of the minor pursuant to Paragraph 14," (Paragraph 18); and

• do not make prompt and continuous efforts to place children in licensed *non-secure* programs pursuant to Paragraph 19 if they cannot be released under Paragraph 14.

11. While facility staff at Berks claim all doors to the exterior are kept unlocked, they also clearly stated during Class Counsel's inspection that anyone who tried to leave would be promptly arrested.

12. Class Counsel is informed and believes as declarations filed herewith show that at ICE facilities access to health care including emergency care is inadequate and places children's health and well-being at risk.

13. Interviews with numerous Class Members and pro bono attorneys and pro bono program coordinators after October 2015 disclosed that access to counsel is a major concern for Class Members and attorneys employed by non-profit organizations or working pro bono to assist detained accompanied Class Members.  While Defendants have established video-conferencing for some of their staff involved in processing Class Members, attorneys and representatives must appear in person. The facilities Defendants have selected to detain Class Members are remote and far from any urban areas where at least some pro bono counsel and Government and privately funded free legal service programs are located.  Most *pro bono* attorneys must dedicate a full day to travel to and a full day to travel back from Defendants' remote facilities. The cost to do so is significant. These factors substantially lower the availability of free legal services and thus the availability of counsel for hearings that could mean life or death for some Class Member children. As discussed in declarations filed herewith, restrictions on attorney access to Class Member children, lack of access to research materials while in detention facilities, lack of access to copies of client's administrative files and the shortness of time available to interview clients and prepare for Credible and Reasonable Fear hearings are among several reasons why adequate representation of Class Members is difficult to impossible.

14. Based on early reports of these breaches in November and December 2015, on January 21, 2016, pursuant to ¶ 29 of the Settlement, I forwarded to Defendants' counsel a letter seeking information or documents relating to Defendants' non-compliance with the Settlement. *See* Attachment A. Defendants responded on February 20, 2016. *See* Attachment B. Defendants' response by and large confirms that almost no data exists that shows that Defendants are complying with the Settlement, including data that the Settlement requires be recorded (or obviously requires recordation even when not so stated in the Settlement) –

- No records appear to exist showing that Class Members have been or are being provided notices of their rights and reasons for their detention as required by Paragraphs 12A and 24D,

- no records appear to exist showing ongoing and continuous efforts to release children under Paragraph 14 as required by the Settlement,

- no records appear to existing showing ongoing and continuous efforts to place children who cannot be released under Paragraph 14 in non-secure licensed facilities as required under Paragraph 19,

- no records appear to existing showing that ICE even has contracted with facilities for the required placement of certain Class Members under Paragraph 19,

- no records appear to exist showing guidance issued to facility staff after this Court issued its July and August 2015 Orders, and

- no records provided to Class Counsel show anyone is seriously monitoring Defendants' compliance with the Settlement's various requirements.

15. When Class Counsel sought documentation regarding compliance as we did in January 2016, Defendants mostly respond that the information sought will not be provided because almost every request "does not seek information regarding implementation of the [Settlement.]." *See* Attachment B, *passim*. Class Counsel believes every request relates to "implementation of this Agreement," the very information Defendants are required to provide Class Counsel pursuant to Paragraph 29 of the Settlement.

16. Based on the foregoing, on February 20, 2016, Class Counsel submitted to Defendants' counsel a written notice of alleged non-compliance (Exhibit C attached) and pursuant to the meet and confer requirement of the Settlement and L.R. 7-3 conferred with Defendants' counsel on March 11, 2016, March 17, 2014, and March 25, 2016. The parties have been unable to resolve their disagreement over Defendants' compliance and while Class Counsel remains willing to confer with Defendants, such efforts in 2014, 2015 and 2016 have been fruitless. Plaintiffs seek an Order requiring Defendants to promptly comply with key provisions of the Settlement in the form lodged herewith. Plaintiffs also seek appointment of a Special Monitor and are lodging a separate proposed Order for such appointment.  Plaintiff Class Members are indigent detained children and have no ability to share in the cost of a Special Monitor. The need for appointment of a Special Monitor arises solely from Defendants' failure to comply with this Court's prior Orders and the terms of the *Flores* Stipulated Settlement Agreement.

I declare under penalty of the perjury that the foregoing facts are true and correct. Executed this 13th day of May, 2016, in Los Angeles, California.

Peter A. Schey

# Attachment to Exhibit 1
# Exhibit A

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone: (213) 388-8693 Facsimile: (213) 386-9484
www.centerforhumanrights.org

January 21, 2015

Sarah B. Fabian
Trial Attorney
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

*Via e-mail and first class mail*

　　　　Re: *Flores*, et al., *v. Johnson,* et al.*,* No. CV 85-4544 (C.D. Cal.).

Dear Ms. Fabian:

Plaintiffs ask defendants Attorney General, Department of Homeland Security (DHS), Department of Human Services and their subordinate entities ("defendants") the following questions pursuant to ¶ 29 of the settlement approved in the above referenced action on January 25, 1997 (Settlement). We request that responses be provided in writing within thirty (30) days. When asked to provide information contained in a document, report, instructions or guidance, please provide a copy of the document, report, instructions or guidance. If defendants refuse to provide such copies, then provide the date(s) of the document, report, instructions or guidance, its author(s), title(s) or subject(s) as set forth in the document, report, instructions or guidance identify the recipient(s), page length(s), provide information in the document, report, instructions or guidance requested, and identify by name, title and location the document's custodian. When asked to identify someone, please provide the person(s) name(s), title(s), and current work address if still employed by defendants (please state if the person is no longer employed by defendants and last date of employment).

1)　　　Provide information regarding documents that include guidance, instructions or directions DHS and/or its subordinate entities have issued to their employees from July 24, 2015, to the present regarding the detention and/or release of minors apprehended in the company of a parent.

3)　　　Provide information regarding documents that report on the number of ICE employees assigned to process accompanied minors or their parents detained at the Dilley, Karnes, and Berks family detention facilities from July 24, 2015 to the time of your response to this question.

4)　　　Provide information regarding documents that report on the number of CIS asylum officers assigned to process accompanied minors or their parents detained at the Dilley, Karnes, and Berks family detention facilities from July 24, 2015 to the time of your response to this question.

9

Sarah Fabian
January 21, 2016
Page 2 of 19

5)    Provide information regarding documents that discuss assigning additional ICE officers or improved efficiencies to process accompanied minors or their parents detained at the Dilley, Karnes, and Berks family detention facilities from July 24, 2015 to the time of your response to this question, including, for example, documents that discuss whether assigning additional ICE employees to the family detention facilities would speed up the release of accompanied minors or their accompanying parents.

6)    Provide information regarding documents that discuss any additional resources or improved efficiencies (such as additional ICE employees) dedicated by DHS or ICE or that DHS or ICE considered dedicating to decrease the length of detention of accompanied class members or their parents at Dilley, Karnes, and Berks family detention facilities between July 24, 2015, and the time of your response to this question.

7)    Provide information regarding documents that address assigning additional CIS asylum officers to process fear interviews or otherwise to make more efficient the process of conducting fear interviews or issuing decisions for accompanied minors or their parents detained at the Dilley, Karnes, and Berks family detention facilities from July 24, 2015 to the time of your response to this question.

8)    Provide information regarding documents that discuss any additional resources or improved efficiencies (for example, additional CIS asylum or ICE officers) actually dedicated by DHS or CIS to decrease the length of detention of accompanied class members or their parents at Dilley, Karnes, and Berks family detention facilities between July 24, 2015, and the time of your response to this question.

9)    Provide information regarding daily, weekly and monthly reports (statistical or otherwise) for the period from July 24, 2015, to the time of your response indicating the number of minors DHS or its subordinate entities apprehended (a) who were unaccompanied, and (b) who were accompanied by a parent or guardian, the location of apprehensions wherever they took place, and any other date collected by Defendants. If daily data is maintained, then please provide it. If only weekly data is maintained then please provide it. If data includes country of origin, or age of the child, or other information, please provide such date.

10)    Provide information regarding daily, weekly and monthly reports (statistical or otherwise) for the period from July 24, 2015, to the time of your response indicating the number of minors DHS or its subordinate entities apprehended within 100 miles of an international border who were accompanied by a parent or guardian who were placed in standard removal proceedings before an immigration judge rather than in expedited removal proceedings, including any information showing why they were placed in regular removal proceedings rather than expedited removal proceedings, and how long after they were apprehended they were placed in regular removal proceedings.

Sarah Fabian
January 21, 2016
Page 3 of 19

11) Provide information regarding instructions or guidance in effect from July 24, 2015 to the present, forms used (if any), and reports[1] dated from July 24, 2015 to the present showing defendants have assessed minors to determine if they have special needs as required by Paragraph 7 of the Settlement.

12) Paragraph 12A of the Settlement provides that "Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing that defendants' employees have been informed to comply with that part of Paragraph 12A set out above.

(b) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A set out above has been and is being complied with.

(c) Provide information regarding distribution of the notice of rights form required by that part of Paragraph 12A above that defendants must provide apprehended minors from July 24, 2015 to the present.[2]

(d) Identify who monitored defendants' compliance with Paragraph 12A between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 12A.

(e) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A set out above.

13) Paragraph 12A provides "Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with that part of Paragraph 12A set out above.

---

[1] Reports in this question refers to reports by employees showing that apprehended minors have been assessed for special needs rather than individual minors' assessment forms.

[2] This request is not seeking information regarding every individual form handed to every minor but rather information regarding the forms that were used to distribute to apprehended minors.

Sarah Fabian
January 21, 2016
Page 4 of 19

(b) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A set out above has been and is being complied with.

(c) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A set out above.

14)     Paragraph 12A of the Settlement provides "If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with that part of Paragraph 12A quoted above.

(b) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A quoted above has been and is being complied with.

(c) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A quoted above.

(d) Provide information regarding any statistical or other reports which show how many (1) apprehended unaccompanied minors and (2) minors apprehended with a parent or guardian between July 24, 2014 and the present have been placed in a detention facility, or other contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility, pursuant to that part of Paragraph 12A quoted above.

15)     With limited exceptions, Paragraph 12A provides that defendants "will transfer a minor from a placement under this paragraph to a placement under Paragraph 19, (i) within three (3) days, if the minor was apprehended in an [ICE] district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases …"

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with that part of Paragraph 12A quoted above.

(b) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A quoted above has been and is being complied with.

(c) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A quoted above.

(d) Provide information regarding any statistical or other reports prepared between July 24, 2015 and the present which show the number of days in which minors have been transferred to a placement under Paragraph 19, (i) if apprehended in an ICE district in which a licensed program was located and had space available and in cases in which the minor was apprehended in an ICE district in which a licensed program was not located that had space available.

16)   Paragraph 12A provides that "in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible …"

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with that part of Paragraph 12A quoted above.

(b) To the extent not provided in response to (a) above, provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing how defendants interpret or direct employees to interpret the term "as expeditiously as possible."

(c) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A quoted above has been and is being complied with.

(d) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A quoted above.

(e) Provide information regarding any statistical or other reports prepared between July 24, 2015 and the present which show during "an emergency or influx" of minors the number of days in which minors have been placed under Paragraph 19 pursuant to the requirement that they be so placed "as expeditiously as possible."

17)   Paragraph 12B provides "For purposes of this paragraph, the term 'emergency' shall be defined as any act or event that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided. Such emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term 'influx of minors into the United States' shall be defined as those circumstances where the [defendants] ha[ve], at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed about that part of Paragraph 12B quoted above.

(b) To the extent not provided in response to (a) above, provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing how defendants interpret or direct employees to interpret the term "emergency" as used in that part of Paragraph 12B quoted above.

(c) Provide information regarding any documents prepared by defendants' employees from July 24, 2015 to the present showing when defendants concluded they were operating under an "emergency" as set forth in 12B other than "natural disasters" or "influx" of minors as described in 12B.

(d) Provide information regarding any documents prepared by defendants' employees from July 24, 2015 to the present showing when defendants concluded they were operating under a "natural disaster[ ]" as described in 12B.

(e) Provide information regarding any documents prepared by defendants' employees from July 24, 2015 to the present showing when defendants concluded they were operating under an "influx" as described in 12B.

(f) Identify who monitored defendants' compliance with Paragraph 12B between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 12B.

18)   Paragraph 12C of the Settlement provides "In preparation for an 'emergency' or 'influx,' as described in Subparagraph B, the [defendants] shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children … The [defendants] shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed about that part of Paragraph 12C quoted above.

(b) Provide information regarding any "written plan[s] that describe[] the reasonable efforts that [defendants] will take to place all minors as expeditiously as possible" pursuant to Paragraph 12C that were in effect, modified or prepared between July 24, 2015 and the present, including any plans prepared by CBP, ICE and ORR.

(c) Provide information regarding any documents prepared by defendants' employees from July 24, 2015 to the present showing that defendants (including ICE and ORR) updated the listing of additional beds on a quarterly basis and provided Plaintiffs' counsel with information regarding these lists.

(d) Identify who monitored defendants' compliance with Paragraph 12A between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 12C.

(e) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12C quoted above.

19)     Paragraph 14 of the Settlement provides "Where the [defendants] determine[] that the detention of the minor is not required either to secure his or her timely appearance before the [ICE] or the immigration court, or to ensure the minor's safety or that of others, the [defendants] shall release a minor from its custody without unnecessary delay, in the following order of preference," to parents, legal guardians, adult relatives, an adult individual or entity designated by the parent or legal guardian, a licensed program, an adult individual or entity when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed about Paragraph 14 of the Settlement.

(b) Provide any statistical or other reports prepared between July 24, 2015 and the present which show the number of days in which minors have been in ICE custody before being transferred to a placement under Paragraph 14.

(c) Provide information regarding any statistical or other reports prepared between July 24, 2015 and the present addressing the number of days in which minors have been in ORR custody before being transferred to a non-ORR[3] placement under Paragraph 14.

(d) Identify who monitored defendants' compliance with Paragraph 14 between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 14.

(e) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 14 of the Settlement.

20)     Provide documents dated between January 1, 2015 and the present in which defendants (including DHS or ORR) assess or address the number of ORR employees or contractors needed to process unaccompanied minors in the custody of ORR for placement with family members, other adults or licensed programs identified in Paragraph 14 of the Settlement.

---

[3] A "non-ORR" placement refers to a placement with (A) a parent, (B) legal guardian, (C) adult relative, (D) adult or entity designated by a parent or guardian, (E) a licensed program not under contract with ORR, and (f) an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

21)     Provide documents dated between January 1, 2015 and the present in which defendants (including DHS or ORR) address the number of ORR employees or contractors actually assigned to process unaccompanied minors in the custody of ORR for placement with family members, other adults or licensed programs identified in Paragraph 14 of the Settlement.

22)     Provide documents dated between January 1, 2015 and the present in which defendants (including DHS or ORR) address the backlog in DHS or ORR conducting positive suitability assessments under Paragraph 17 of the Settlement or the number of days being taken to conduct such suitability assessments.

23)     Paragraph 18 of the Settlement provides "Upon taking a minor into custody, the [defendants], or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 18 of the Settlement.

(b) Provide information regarding any reports[4] prepared by defendants' employees from July 24, 2015 to the present showing that the requirements of Paragraph 18 have been and are being complied with.

(c) Identify who monitored defendants' compliance with Paragraph 18 between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 18.

(d) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 18.

24)     Paragraph 19 of the Settlement provides that "In any case in which [defendants] do[] not release a minor pursuant to Paragraph 14 … [e]xcept as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier ..."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 19 of the Settlement.

---

[4] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 18.

(b) Provide information regarding any reports[5] prepared by defendants' employees from July 24, 2015 to the present showing that the requirements of Paragraph 19 have been and are being complied with.

(c) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how many minors have been temporarily placed in licensed programs pursuant to Paragraph 19.

(d) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how long minors temporarily placed in licensed programs pursuant to Paragraph 19 have remained in such licensed programs before being transferred pursuant to Paragraph 14 of the Settlement.

(e) Identify all licensed programs in which minors have been placed pursuant to Paragraph 19 between July 24, 2015 and the present.

(f) Provide information regarding contracts between defendants and any licensed programs in which minors have been placed pursuant to Paragraph 19 between July 24, 2015 and the present.

(g) Identify who monitored defendants' compliance with Paragraph 19 between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 19.

(h) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 19.

25)    Paragraph 21 of the Settlement provides "[a] minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure ICE detention facility, or … contracted facility, having separate accommodations for minors" whenever the District Director or Chief Patrol Agent makes certain determinations set forth in the paragraph. Paragraph 22 defines escape risks.

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraphs 21-22 of the Settlement.

(b) Provide information regarding any reports[6] prepared by defendants' employees from July 24, 2015 to the present showing that the requirements of Paragraphs 21-22 have been and are being complied with.

---

[5] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 19.

(c) Provide information regarding any reports prepared by defendants' employees from
July 24, 2015 to the present showing how many minors have been detained pursuant to
Paragraph 21 and Paragraph 22.

(d) Provide information regarding any reports prepared by defendants' employees from
July 24, 2015 to the present showing how long minors detained pursuant to Paragraph 21
and Paragraph 22 have remained in detention.

(e) Identify all programs in which minors have been placed pursuant to Paragraphs 21-22
between July 24, 2015 and the present.

(f) Provide information regarding contracts between defendants and any facilities in
which minors have been placed pursuant to Paragraphs 21-22 between July 24, 2015 and
the present.

(g) Identify who monitored defendants' compliance with Paragraphs 21-22 between July
24, 2015 and the present, state how the monitoring was conducted and Provide
information regarding any monitoring reports regarding Paragraphs 21-22.

(h) Provide information regarding any documents in which defendants' employees have
expressed concerns about complying with Paragraphs 21-22.

26)     Paragraph 23 of the Settlement provides "The [defendants] will not place a minor in a
        secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are
        available and appropriate in the circumstances, such as transfer to (a) a medium security
        facility which would provide intensive staff supervision and counseling services or (b)
        another licensed program. All determinations to place a minor in a secure facility will be
        reviewed and approved by the regional juvenile coordinator."

        (a) Provide information regarding any instructions or guidance in effect from July 24,
        2015 to the present showing defendants' employees have been informed to comply with
        Paragraph 23 of the Settlement.

        (b) Provide information regarding any reports[7] prepared by defendants' employees from
        July 24, 2015 to the present showing that the requirements of Paragraphs 23 have been
        and are being complied with.

---

[6] This request is not seeking information regarding documents in individuals' files but rather any
reports whether of narrative or statistical nature that show compliance or monitoring of
compliance with Paragraph 22.

[7] This request is not seeking information regarding documents in individuals' files but rather any
reports whether of narrative or statistical nature that show compliance or monitoring of
compliance with Paragraph 23.

(c) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how many minors have been transferred to less restrictive alternatives pursuant to Paragraph 23.

(d) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how long minors detained pursuant to Paragraph 21 were detained before being transferred to less restrictive alternatives pursuant to Paragraph 23.

(e) Identify all programs in which minors have been transferred to pursuant to Paragraph 23.

(f) Identify who monitored defendants' compliance with Paragraph 23 between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 23.

(g) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 23.

27)  Paragraph 24A provides "A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 24A of the Settlement.

(b) Provide information regarding any documents that address unaccompanied minors in the custody of ORR and their right, if any, to administrative review of decisions not to release them or not to transfer them to parents, relatives, other adults or licensed programs identified in Paragraph 14 of the Settlement.

(c) Provide information regarding any reports[8] prepared by defendants' employees (including ORR employees) from July 24, 2015 to the present showing that the requirements of Paragraphs 24A have been and are being complied with.

(d) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how many minors have been afforded a bond redetermination hearing before an Immigration Judge pursuant to Paragraph 24A and how many have not been afforded such a hearing.

---

[8] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 24A.

(d) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how long minors have been detained before being brought before Immigration Judges for bond redetermination hearings pursuant to pursuant to Paragraph 24A.

(e) Identify who monitored defendants' compliance with Paragraph 24A between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 24A.

(f) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 24A.

28)   Paragraph 24C requires that "In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium. security facility."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 24C of the Settlement.

(b) Provide ten examples of notices provided minors not placed in licensed programs with the reasons for housing the minor in a detention or medium security facility issued between December 1 and 31, 2015.

(c) Provide information regarding any reports[9] prepared by defendants' employees (including ORR employees) from July 24, 2015 to the present showing that the requirements of Paragraphs 24C have been and are being complied with.

(d) Provide reports showing in how many cases between July 24, 2015 and the present defendants' employees provided minors with the reasons for housing the minor in a detention or medium security facility.

(d) Identify who monitored defendants' compliance with Paragraph 24C between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 24C.

(e) Provide documents showing what if any administrative review rights (by EOIR, ICE or HHS) have been provided to minors between July 24, 2015 and the present regarding decisions to house minors in a detention or medium security facility.

---

[9] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 24C.

(f) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 24C.

29)  Paragraph 24D of the Settlement provides "The [defendants] shall promptly provide each minor not released with (a) INS Form 1-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and ( c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor)."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 24D of the Settlement.

(b) Provide ten examples between December 1 and 31, 2015 of notices provided minors pursuant to Paragraph 24D, or records that show that the notices required by ¶ 24D were actually provided.

(c) Provide information regarding any reports[10] prepared by defendants' employees (including ORR employees) from July 24, 2015 to the present showing that the requirements of Paragraphs 24D have been and are being complied with.

(d) Provide reports showing in how many cases between July 24, 2015 and the present defendants' employees provided minors with the notices required by Paragraph 24D.

(e) Identify who monitored defendants' compliance with Paragraph 24D between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 24D.

(f) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 24D.

30)  Paragraph 27 of the Settlement provides "No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 27 of the Settlement.

---

[10] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 24D.

(b) Provide ten examples between December 1 and 31, 2015 of notices provided minors' counsel pursuant to Paragraph 27, or records that show that the notices required by ¶ 27 were actually provided.

(c) Provide information regarding any reports[11] prepared by defendants' employees (including ORR employees) from July 24, 2015 to the present showing that the requirements of Paragraphs 27 have been and are being complied with.

(d) Provide reports showing in how many cases between July 24, 2015 and the present defendants' employees provided minors' counsel with the notices required by Paragraph 27.

(e) Identify who monitored defendants' compliance with Paragraph 27 between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 27.

(f) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 27.

31)   Paragraph 28A provides "An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours. Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations. Statistical information will include at least the following: (1) biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility."

(a) Please identify the Juvenile Coordinator(s) who has/have served from July 24, 2015 to the present, including name, title, whether still employed by defendants, and dates served as the Juvenile Coordinator.

(b) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present issued to the Juvenile Coordinator involving the Flores settlement or its terms.

(c) Provide the weekly statistical reports the Juvenile Coordinator is required to obtain for the months of October and December 2015.

---

[11] This request is not seeking Provide information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 27.

(d) For the months October and December 2015 provide information regarding the
Juvenile Coordinator's collecting data "regarding the reasons for every placement of a
minor in a detention facility or medium security facility."

(e) Provide a copy of the most recent "up-to-date record of all minors who are placed in
proceedings and remain in INS custody for longer than 72 hours."

(d) Briefly explain what the Juvenile Coordinator has done with respect to the family
detention facilities at Dilley, Karnes and Berks (state separately for each facility) to
"monitor compliance with the terms of this [Flores] Agreement" from July 24, 2015 to
the present.

(e) Briefly explain what the Juvenile Coordinator has done with respect to medium and
secure facilities used to detain minors (state separately for each facility) to "monitor
compliance with the terms of this [Flores] Agreement" from July 24, 2015 to the present.

(f) Briefly explain what any employee of defendants has done with respect to ORR
facilities housing unaccompanied minors to "monitor compliance with the terms of this
[Flores] Agreement" from July 24, 2015 to the present.

(g) Provide information regarding any reports prepared by the Juvenile Coordinator
between July 24, 2015 and the present reporting on his or her or their "monitor[ing]
compliance with the terms of this [Flores] Agreement."

(f) Provide information regarding any documents in which defendants' employees have
expressed concerns about complying with Paragraph 28A.

32) Paragraph 30 of the Settlement provides "On an annual basis, commencing one year after
final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess,
and report to the court regarding compliance with the terms of this Agreement."

(a) Provide information regarding any reports or drafts of reports prepared for the
Juvenile Coordinator between January 1, 2014 and the present to comply with Paragraph
31.

(b) Provide information regarding any documents in which defendants' employees have
expressed concerns about complying with Paragraph 31.

33) Provide information regarding any documents addressing defendants' claim that releasing
foreign nationals from detention encourages additional unlawful migration, risks the
diversion of U.S. Customs and Border Protection's ("CBP") and ICE's limited resources,
or diminishes DHS's ability to conduct background investigations to ensure community
safety.

Sarah Fabian
January 21, 2016
Page 16 of 19

34) Provide information regarding any documents that show apprehension rates of minors (accompanied and unaccompanied) for each Border Patrol Station (not Sector) and ICE District Office from November 1, 2015 to the present.

35) Provide all documents or information regarding such documents used to determine that the average detention time for accompanied minors in or about July 2015 was 20 days as defendants informed the district court.

36) Provide information regarding how many minors defendants have detained, if any, at Joint Base Lackland in Texas, and the dates minors were housed there between July 24, 2015 and the present, the number of minors detained there, and how many days they were detained there.

37) Greene Family Camp in Bruceville-Eddy

   (a) Provide information regarding any contracts involving the detention of minors at the Greene Family Camp including contracts executed by defendants or by other government entities with Greene Family Camp.

   (b) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing Greene Family Camp's employees have been informed to comply with the terms of the Flores Settlement applicable to minors at Greene Family Camp.

   (c) Provide information regarding any reports from July 24, 2015 to the present showing that minors housed at Greene Family Camp have been treated in compliance with the Flores Settlement.

   (d) Provide information regarding any statistical or other reports prepared between July 24, 2015 and the present, which show the number of days, minors have remained at Greene Family Camp.

   (e) If not already provided in response to an earlier request, identify who monitored defendants' compliance with the Flores Settlement between July 24, 2015 and the present at the Greene Family Camp, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding such monitoring.

38) Dilley, Karnes and Berks family detention facilities:

   (a) For each facility provide information regarding any current licenses issued by any Government agencies and correspondence with those Government agencies between July 24, 2015 and the present.

   (b) For each facility provide information regarding the current contracts including contracts executed by someone on behalf of DHS and contracts the facilities have with other Government agencies.

24

(c) For each facility provide information regarding correspondence with the entities operating those facilities between July 24, 2015 and the present relating to the rights of minors described in the Flores Settlement.

(d) To the extent not responded in response to (c) above, for each facility provide information regarding correspondence with the entities operating the facilities dated between July 24, 2015 and the present dealing with compliance with the Flores Settlement or any of the Court Orders issued in the Flores case since July 24, 2015.

(e) For each facility provide information regarding the per-child and total monthly costs to DHS of detaining minors paid to non-federal Government agencies or private corporations from July 24, 2015 to the present.

39) In addition to the statement of principles Between the Department of Homeland Security and the Department of Health and Human Services Unaccompanied Alien Children Program, dated April 6, 2004, Exhibit 1 attached, and the memorandum from Victor Cerda, Acting Director, U.S. Immigration and Customs Enforcement, re: release procedures for unaccompanied children placed with and care for by the Office of Refugee Resettlement, Exhibit 2 attached, what other documents, including memoranda, email, etc., address the respective roles of DHS and HHS, or their subordinate agencies, regarding decisions to release or detain juveniles in ORR custody?

40) What role does Immigration and Customs Enforcement currently play in deciding whether to release or detain juveniles in ORR custody?

41) What role does Customs and Border Protection currently play in deciding whether to release or detain juveniles in ORR custody?

42) What are the names and office locations of DHS officials currently assigned to review the cases of juveniles whose release ORR is considering?

43) What private or non-federal public entities does ORR currently use to assess the suitability of potential custodians seeking the release of juveniles in its custody?

44) What are the mean and median amounts of payments from HHS to private or non-federal public entities to assess the suitability of potential custodians seeking the release of juveniles in ORR custody?

45) What time limits or targets, if any, does ORR have for completing assessments of potential custodians seeking the release of juveniles in ORR custody?

46) For the period from July 24, 2014 to the present, what are the mean and median lengths of time between a potential custodian's seeking the release of a juvenile in ORR custody and ORR's deciding to release or detain such juvenile?

Sarah Fabian
January 21, 2016
Page 18 of 19

47) For the period from July 24, 2014 to the present, what are the mean and median number of staff-hours required to screen a potential custodian seeking the release of a juvenile in ORR custody?

48) In addition to its guidance on immigration status and the sponsor placement process for unaccompanied children, *available at* http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2, what other documents, including memoranda, email, etc., address, clarify, or expand upon ORR's policy, practice or procedure for deciding whether to release a juvenile in its custody to an available sponsor? What do such documents, if any, state?

49)  What state or local government child welfare or juvenile justice entities, if any, did ORR consult in formulating its guidance on immigration status and the sponsor placement process for unaccompanied children, *available at* http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2? What are the names and office locations of state or local government officials, if any, whom ORR consulted?

50) What is ORR's policy regarding releasing or continuing to detain unaccompanied juveniles in its custody upon such juveniles' prevailing in removal proceedings or attaining lawful status in the U.S.?

51) What are the standards and process for ORR to approve or deny release recommendations of care providers, case managers, and case coordinators (Sec 2.7)?

52) Does ORR maintain data on the number of release recommendations that are not followed by ORR? If so, provide the available data for the period of July 24, 2014 to the present.

53) Provide information regarding the notice and opportunity to appeal available to a minor regarding a denial of release (Sec. 2.7.7).

Should defendants wish any clarification regarding the foregoing, I may be reached at the above address and telephone number, or via email to pschey@centerforhumanrights.org.

Thank you,

Peter A. Schey
Class Counsel for Plaintiffs

Sarah Fabian
January 21, 2016
Page 19 of 19

ccs:   Carlos R. Holguin, Center for Human Rights & Constitutional Law (Class Counsel)
         Alice Bussiere, Virginia Corrigan, Youth Law Center
         T. Wayne Harmon, Elena Garcia, Orrick, Herrington & Sutcliffe LLP
         Michael S. Sorgen, La Raza Centro Legal
         Katherine H. Manning, The Law Foundation of Silicon Valley
         Legal Advocates for Children and Youth

# Attachment to Exhibit 1
# Exhibit B

**1)** Provide information regarding documents that include guidance, instructions or directions DHS and/or its subordinate entities have issued to their employees from July 24, 2015, to the present regarding the detention and/or release of minors apprehended in the company of a parent.

> **RESPONSE**:  This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement (FSA) because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

> As a courtesy, Defendants provide the following documents: ERO Broadcast, Admission Processing at Family Residential Centers, December 15. 2015.

**2) THIS QUESTION WAS OMITTED.**

**3)** Provide information regarding documents that report on the number of ICE employees assigned to process accompanied minors or their parents detained at the Dilley, Karnes, and Berks family detention facilities from July 24, 2015 to the time of your response to this question.

> **RESPONSE**: This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

> As a courtesy, Defendants provide the following information: the ICE Family Residential Centers (FRCs) are staffed by a variety of entities, including ICE personnel.  Most of the day-to-day operations are handled directly by contractors or other entities.  With regard to processing unaccompanied minors and family units since July 24, 2015, ICE has provided sufficient staffing to ensure the processing of all minors is accomplished in an expeditious manner.

**4)** Provide information regarding documents that report on the number of CIS asylum officers assigned to process accompanied minors or their parents detained at the Dilley, Karnes, and Berks family detention facilities from July 24, 2015 to the time of your response to this question.

> **RESPONSE:** This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

> As a courtesy, Defendants provide the following information: USCIS provides onsite personnel at the FRCs at Dilley, Karnes, and Berks to timely complete credible and reasonable fear determinations.  Supervisory Asylum Officers, Asylum Officers and

clerical support are rotationally detailed to the FRCs as needed and as space is available to ensure that such determinations are accomplished in a timely manner.  With regard to processing fear claims since July 24, 2015, USCIS has provided sufficient staffing to ensure the credible fear and reasonable fear processing is accomplished in a timely manner.

**5)** Provide information regarding documents that discuss assigning additional ICE officers or improved efficiencies to process accompanied minors or their parents detained at the Dilley, Karnes, and Berks family detention facilities from July 24, 2015 to the time of your response to this question, including, for example, documents that discuss whether assigning additional ICE employees to the family detention facilities would speed up the release of accompanied minors or their accompanying parents.

> **RESPONSE:** This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Also, Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**6)** Provide information regarding documents that discuss any additional resources or improved efficiencies (such as additional ICE employees) dedicated by DHS or ICE or that DHS or ICE considered dedicating to decrease the length of detention of accompanied class members or their parents at Dilley, Karnes, and Berks family detention facilities between July 24, 2015, and the time of your response to this question.

> **RESPONSE**:  This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

> As a courtesy, Defendants provide the following information: The ICE FRCs are staffed by a variety of entities, including ICE personnel.  Most of the day-to-day operations are handled directly by contractors or other entities.   With regard to processing unaccompanied minors and family units since July 24, 2015, ICE has provided sufficient staffing to ensure the processing of all minors is accomplished in an expeditious manner.

**7)** Provide information regarding documents that address assigning additional CIS asylum officers to process fear interviews or otherwise to make more efficient the process of conducting fear interviews or issuing decisions for accompanied minors or their parents detained at the Dilley, Karnes, and Berks family detention facilities from July 24, 2015 to the time of your response to this question.

> **RESPONSE:** This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it

require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

As a courtesy, Defendants provide the following information: USCIS provides onsite personnel at the FRCs at Dilley, Karnes, and Berks to timely complete credible and reasonable fear determinations. Supervisory Asylum Officers, Asylum Officers and clerical support are rotationally detailed to the FRCs as needed and as space is available to ensure that such determinations are accomplished in a timely manner. With regard to processing fear claims since July 24, 2015, USCIS has provided sufficient staffing to ensure the credible fear and reasonable fear processing is accomplished in a timely manner.

**8)** Provide information regarding documents that discuss any additional resources or improved efficiencies (for example, additional CIS asylum or ICE officers) actually dedicated by DHS or CIS to decrease the length of detention of accompanied class members or their parents at Dilley, Karnes, and Berks family detention facilities between July 24, 2015, and the time of your response to this question.

      **RESPONSE:** Please see responses to Questions 6 and 7.

**9)** Provide information regarding daily, weekly and monthly reports (statistical or otherwise) for the period from July 24, 2015, to the time of your response indicating the number of minors DHS or its subordinate entities apprehended (a) who were unaccompanied, and (b) who were accompanied by a parent or guardian, the location of apprehensions wherever they took place, and any other date collected by Defendants. If daily data is maintained, then please provide it. If only weekly data is maintained then please provide it. If data includes country of origin, or age of the child, or other information, please provide such date.

      **RESPONSE**: Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph. To the extent this data is required, it is provided to counsel on a monthly basis as required by Court order.

**10)** Provide information regarding daily, weekly and monthly reports (statistical or otherwise) for the period from July 24, 2015, to the time of your response indicating the number of minors DHS or its subordinate entities apprehended within 100 miles of an international border who were accompanied by a parent or guardian who were placed in standard removal proceedings before an immigration judge rather than in expedited removal proceedings, including any information showing why they were placed in regular removal proceedings rather than expedited removal proceedings, and how long after they were apprehended they were placed in regular removal proceedings.

      **RESPONSE**: This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA. Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it

require the identification or production of documents or data maintained by the
Defendants, other than the data specifically identified in that Paragraph.

**11)** Provide information regarding instructions or guidance in effect from July 24, 2015 to the
present, forms used (if any), and reports[1] dated from July 24, 2015 to the present showing
defendants have assessed minors to determine if they have special needs as required by
Paragraph 7 of the Settlement.

**RESPONSE:**

As part of the regular intake process at FRCs, ICE officers conduct interviews to assess
particular needs and vulnerabilities.  In addition, FRC residents are provided with a
medical assessment upon arrival.  Consistent with the FSA, ICE has issued standards
applicable to its residential centers that include assessing any special needs of detainees,
including minors. These standards include assessments to determine educational and
medical needs among others.   Those standards may be accessed at:
https://www.ice.gov/detention-standards/family-residential.  Applicable standards include
ICE FRS "Educational Policy" 5.2 and Medical Care 4.3, although individuals with
special needs are mentioned in all sections.

Please also see relevant sections of ORR Operating Guide, and Children Entering the
United States Unaccompanied (hereafter "Policy Guide").

The remainder of this question is outside the scope of Paragraph 29 of the Flores
Settlement Agreement because it does not seek information regarding the implementation
of the Settlement Agreement. Paragraph 29 does not permit counsel to obtain the
information and data sought in this question nor does it require the identification or
production of documents or data maintained by the Defendants, other than the data
specifically identified in that Paragraph.

**12)** Paragraph 12A of the Settlement provides that "Whenever the INS takes a minor into
custody, it shall expeditiously process the minor and shall provide the minor with a notice of
rights, including the right to a bond redetermination hearing if applicable."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the
present showing that defendants' employees have been informed to comply with that part of
Paragraph 12A set out above.

**RESPONSE:**

This question is outside the scope of Paragraph 29 of the FSA because it does not seek
information regarding the implementation of the FSA.  Paragraph 29 does not permit
counsel to obtain the information and data sought in this question nor does it require the

---

[1]  Reports in this question refers to reports by employees showing that apprehended minors have
been assessed for special needs rather than individual minors' assessment forms.

identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

Nonetheless, as a courtesy, Defendants provide the following documents: JFRMU UAC and Family Unit Processing Training (2015). Legal Resource Guide, Introduction; Legal Resource Guide, Notice of Rights and Provision of Services; Legal Resource Guide, Know Your Rights Handout; Legal Service Provider list; Notice to Juvenile Aliens; California Legal Services Flyer; Relevant sections of ORR Policy and Operations Guides.

(b) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A set out above has been and is being complied with.

RESPONSE: This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. Paragraph 29 does not permit counsel to obtain the information and data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

(c) Provide information regarding distribution of the notice of rights form required by that part of Paragraph 12A above that defendants must provide apprehended minors from July 24, 2015 to the present.[2]

RESPONSE: A Notice of Custody Determination (Form I-286) is completed only in cases in which the alien is detained pursuant to section 236 of the Immigration and Nationality Act (INA).  In cases in which a Form I-286 is completed, it is maintained in the alien file.  Minors detained at family residential centers are given an opportunity for a bond redetermination hearing before an immigration judge. Minors in ICE custody will receive a notice of their right to a custody redetermination when they become eligible for a custody redetermination.

For ORR please see the response to question (a) above.

The remainder of this question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

(d) Identify who monitored defendants' compliance with Paragraph 12A between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 12A.

---

[2] This request is not seeking information regarding every individual form handed to every minor but rather information regarding the forms that were used to distribute to apprehended minors.

**RESPONSE:**

Please see responses to subsections (a) and (c) above. ICE officers receive training in the processing of aliens, including custody determinations and the service of notices of rights and notices of custody redeterminations and they are supervised by the appropriate ICE management.

ORR performs both desk monitoring and on-site monitoring.  For desk monitoring, reviews of all required annual and quarterly reports and documents are conducted, i.e. Program Description, Annual goals and objectives, Quarterly Program reports, Significant Incident Reports, and financial reports.  Desk monitoring includes frequent conversations with Program Directors and others, to review any questionable data found in these reports and documents as well as to become knowledgeable about the infrastructure and management systems of the individual programs.

ORR also performs on-site monitoring.  This consists of:

- An assessment of the program to identify what works and where improvements are needed to enhance outcomes.
- Review of compliance with ORR provisions.
- The provision of technical assistance in recommending program modifications to improve the program or resolve compliance issues.
- Follow-up assistance in assessing the effects of program improvements.

Final monitoring reports are filed with ORR.  Monitors will: 1. Have the grantee describe and/or demonstrate through source documentation how they provide access to legal services for UAC; 2. Describe how the grantee tracks the provision of legal services in case file documentation.  Monitors will observe if participation in a Know Your Rights Presentation is reflected in case files.  Monitors will confirm with UAC that they have opportunity to meet with their attorney (if applicable).  Monitors will confirm with pro bono attorneys that they have access to their clients.

As a courtesy, please also see Case File Checklist; ORR Policy Guide.

The remainder of this question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

(e) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A set out above.

**RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. Paragraph 29 does not permit counsel to obtain the information and data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**13)** Paragraph 12A provides "Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with that part of Paragraph 12A set out above.

    **RESPONSE**:   DHS is committed to providing appropriate care for everyone in its custody consistent with its legal obligations.  DHS agents and officers are required to treat all minors with dignity, respect, and special concern for their particular vulnerability. DHS makes every effort to take the best possible care of all alien children in its custody. Some of the steps taken during the recent influx included designating certain facilities for children alone (in order to further segregate them from unrelated adults and provide a secure environment), ensuring children had access to showers and clean clothes, providing three meals daily with access to drinks and snacks, and deploying FEMA Corps to assist with the general care of children, as well as providing recreational activities until such time as they could be transferred to the custody of HHS.

    Paragraph 29 does not permit counsel to obtain the information and data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

    Nonetheless, as a courtesy, please see the following documents: Family Residential Standards, available at: https://www.ice.gov/detention-standards/family-residential; U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search ("TEDS"), October 2015, available at: https://www.cbp.gov/sites/default/files/documents/cbp-teds-policy-20151005_1.pdf.

    For ORR, please see relevant sections of Policy and Operations Guides..

(b) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A set out above has been and is being complied with.

    **RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. Paragraph 29 does not permit counsel to obtain the information and data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

(c) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A set out above.

> **RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. Paragraph 29 does not permit counsel to obtain the information and data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**14)** Paragraph 12A of the Settlement provides "If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with that part of Paragraph 12A quoted above.

(b) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A quoted above has been and is being complied with.

(c) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A quoted above.

(d) Provide information regarding any statistical or other reports which show how many (1) apprehended unaccompanied minors and (2) minors apprehended with a parent or guardian between July 24, 2014 and the present have been placed in a detention facility, or other contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility, pursuant to that part of Paragraph 12A quoted above.

> **RESPONSE:** DHS follows the requirements of the Trafficking Victims Protection Reauthorization Act (TVPRA), and transfers all unaccompanied minors to the custody of HHS. ICE also has maintained 96 beds at the Berks facility for families who are apprehended together.
>
> To the extent the data requested in paragraph (d) is required, it is provided to counsel on a monthly basis as required by Court order.
>
> To the extent that this request seeks further information, the information requested is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA. Also, Paragraph 29 does not permit counsel to obtain the information and data sought in these questions nor does it require the

identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**15)** With limited exceptions, Paragraph 12A provides that defendants "will transfer a minor from a placement under this paragraph to a placement under Paragraph 19, (i) within three (3) days, if the minor was apprehended in an [ICE] district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases . . . ."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with that part of Paragraph 12A quoted above.

(b) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A quoted above has been and is being complied with.

(c) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A quoted above.

(d) Provide information regarding any statistical or other reports prepared between July 24, 2015 and the present which show the number of days in which minors have been transferred to a placement under Paragraph 19, (i) if apprehended in an ICE district in which a licensed program was located and had space available and in cases in which the minor was apprehended in an ICE district in which a licensed program was not located that had space available.

> **RESPONSE**: DHS complies with the TVPRA which requires the transfer of unaccompanied minors to HHS within 72 hours. Information regarding the transfer of juveniles is already provided to counsel on a monthly basis as required by court order. To the extent the information requested by the above question is not covered by the data already provided it is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA. Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**16)** Paragraph 12A provides that "in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible …"

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with that part of Paragraph 12A quoted above.

(b) To the extent not provided in response to (a) above, provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing how defendants interpret or direct employees to interpret the term "as expeditiously as possible."

(c) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing that the requirement of Paragraph 12A quoted above has been and is being complied with.

(d) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12A quoted above.

(e) Provide information regarding any statistical or other reports prepared between July 24, 2015 and the present which show during "an emergency or influx" of minors the number of days in which minors have been placed under Paragraph 19 pursuant to the requirement that they be so placed "as expeditiously as possible."

> **RESPONSE:**
>
> Please see relevant sections of attached ORR Policy and Operations Guides. In addition, information responsive to this question is being provided to counsel on a monthly basis in accordance with the Court's order. To the extent this question seeks additional information, it is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA. Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**17)** Paragraph 12B provides "For purposes of this paragraph, the term 'emergency' shall be defined as any act or event that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided. Such emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term 'influx of minors into the United States' shall be defined as those circumstances where the [defendants] ha[ve], at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed about that part of Paragraph 12B quoted above.

(b) To the extent not provided in response to (a) above, provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing how defendants interpret or direct employees to interpret the term "emergency" as used in that part of Paragraph 12B quoted above.

(c) Provide information regarding any documents prepared by defendants' employees from July 24, 2015 to the present showing when defendants concluded they were operating under an "emergency" as set forth in 12B other than "natural disasters" or "influx" of minors as described in 12B.

(d) Provide information regarding any documents prepared by defendants' employees from July 24, 2015 to the present showing when defendants concluded they were operating under a "natural disaster[ ]" as described in 12B.

(e) Provide information regarding any documents prepared by defendants' employees from July 24, 2015 to the present showing when defendants concluded they were operating under an "influx" as described in 12B.

(f) Identify who monitored defendants' compliance with Paragraph 12B between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 12B.

> **RESPONSE:** Please refer to the definitions of "emergency" and "influx of minors" in the FSA. To the extent a further response is required, this question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA. Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.
>
> As a courtesy, please see relevant sections of ORR Policy and Operations Guides.

**18)** Paragraph 12C of the Settlement provides "In preparation for an 'emergency' or 'influx,' as described in Subparagraph B, the [defendants] shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children … The [defendants] shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed about that part of Paragraph 12C quoted above.

(b) Provide information regarding any "written plan[s] that describe[] the reasonable efforts that [defendants] will take to place all minors as expeditiously as possible" pursuant to Paragraph 12C that were in effect, modified or prepared between July 24, 2015 and the present, including any plans prepared by CBP, ICE and ORR.

(c) Provide information regarding any documents prepared by defendants' employees from July 24, 2015 to the present showing that defendants (including ICE and ORR) updated the listing of additional beds on a quarterly basis and provided Plaintiffs' counsel with information regarding these lists.

(d) Identify who monitored defendants' compliance with Paragraph 12A between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 12C.

(e) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with that part of Paragraph 12C quoted above.

> **RESPONSE:** As noted in paragraph 12(C) of the FSA, "[t]he plan, without identification of the additional beds available, is attached as Exhibit 3."
>
> Under the TVPRA, all unaccompanied minors in U.S. Government custody are transferred to HHS for housing and placement in accordance with the TVPRA. HHS always has the ability to mobilize at least 80 licensed beds, or has 80 licensed beds available for use. As a courtesy, see influx flow chart attached.
>
> ICE maintains 96 beds at the Berks facility. DHS also has two additional residential facilities for housing family units. DHS has provided class counsel not only with the locations of those facilities, but with tours of the facilities which included information on the overall capacity of the residential centers.
>
> To the extent a further response is required, this question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA. Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**19)** Paragraph 14 of the Settlement provides "Where the [defendants] determine[] that the detention of the minor is not required either to secure his or her timely appearance before the [ICE] or the immigration court, or to ensure the minor's safety or that of others, the [defendants] shall release a minor from its custody without unnecessary delay, in the following order of preference," to parents, legal guardians, adult relatives, an adult individual or entity designated by the parent or legal guardian, a licensed program, an adult individual or entity when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed about Paragraph 14 of the Settlement.

(b) Provide any statistical or other reports prepared between July 24, 2015 and the present which show the number of days in which minors have been in ICE custody before being transferred to a placement under Paragraph 14.

(c) Provide information regarding any statistical or other reports prepared between July 24, 2015 and the present addressing the number of days in which minors have been in ORR custody before being transferred to a non-ORR[3] placement under Paragraph 14.

(d) Identify who monitored defendants' compliance with Paragraph 14 between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 14.

(e) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 14 of the Settlement.

> **RESPONSE:** Please see response to question 14 regarding the release of unaccompanied minors from custody.  With respect to family units, ICE continues to evaluate its processes to ensure that it processes families as expeditiously as possible to remain in compliance with the FSA and The Court's orders. The Court acknowledged that ICE may hold families subject to mandatory detention and, in cases where the parent or legal guardian is determined to pose a significant flight risk or a threat to others or the national security that cannot be mitigated by appropriate bond or other conditions of release, to maintain custody of the minor to ensure the safety and well-being of the minor. To the extent the data requested in paragraphs (b) and (c) is required, it is provided to counsel on a monthly basis as required by Court order.
>
> To the extent a further response is required this question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.
>
> As a courtesy please see the following documents: ORR Policy and Operations Guides; ACF Fact Sheet, available at:
> http://www.acf.hhs.gov/sites/default/files/orr/orr_uc_updated_fact_sheet_1416.pdf

**20)** Provide documents dated between January 1, 2015 and the present in which defendants (including DHS or ORR) assess or address the number of ORR employees or contractors needed to process unaccompanied minors in the custody of ORR for placement with family members, other adults or licensed programs identified in Paragraph 14 of the Settlement.

> **RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the

---

[3] A "non-ORR" placement refers to a placement with (A) a parent, (B) legal guardian, (C) adult relative, (D) adult or entity designated by a parent or guardian, (E) a licensed program not under contract with ORR, and (f) an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

Settlement Agreement. In addition, Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**21)** Provide documents dated between January 1, 2015 and the present in which defendants (including DHS or ORR) address the number of ORR employees or contractors actually assigned to process unaccompanied minors in the custody of ORR for placement with family members, other adults or licensed programs identified in Paragraph 14 of the Settlement.

> **RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. In addition, Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**22)** Provide documents dated between January 1, 2015 and the present in which defendants (including DHS or ORR) address the backlog in DHS or ORR conducting positive suitability assessments under Paragraph 17 of the Settlement or the number of days being taken to conduct such suitability assessments.

> **RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. In addition, Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**23)** Paragraph 18 of the Settlement provides "Upon taking a minor into custody, the [defendants], or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 18 of the Settlement.

(b) Provide information regarding any reports[4] prepared by defendants' employees from July 24, 2015 to the present showing that the requirements of Paragraph 18 have been and are being complied with.

---

[4] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 18.

(c) Identify who monitored defendants' compliance with Paragraph 18 between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 18.

(d) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 18.

> **RESPONSE:** To the extent that an accompanied minor is eligible for release under the immigration laws, ICE makes detention and release determinations on a case-by-case basis after consideration of the facts of the individual case and records these determinations in accordance with ICE procedures and practices.
>
> For ORR, staff are asked to describe their release and family reunifications procedures, and to be specific, providing step by step information, including staff responsibilities; to provide the name of the person responsible for release/ reunification services; to explain who follows-up with the field coordinator on the status of pending family reunification cases; to explain what are the release and reunifications rates for the current fiscal year; and to explain where family reunifications occur – at the facility or an off-site location.
>
> The remainder of this question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. In addition, paragraph 29 does not permit counsel to obtain the information and data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.
>
> As a courtesy please see the relevant sections of the ORR Policy and Operations Guides.

**24)** Paragraph 19 of the Settlement provides that "In any case in which [defendants] do[] not release a minor pursuant to Paragraph 14 … [e]xcept as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier . . . ."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 19 of the Settlement.

(b) Provide information regarding any reports[5] prepared by defendants' employees from July 24, 2015 to the present showing that the requirements of Paragraph 19 have been and are being complied with.

[5] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 19.

(c) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how many minors have been temporarily placed in licensed programs pursuant to Paragraph 19.

(d) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how long minors temporarily placed in licensed programs pursuant to Paragraph 19 have remained in such licensed programs before being transferred pursuant to Paragraph 14 of the Settlement.

(e) Identify all licensed programs in which minors have been placed pursuant to Paragraph 19 between July 24, 2015 and the present.

(f) Provide information regarding contracts between defendants and any licensed programs in which minors have been placed pursuant to Paragraph 19 between July 24, 2015 and the present.

(g) Identify who monitored defendants' compliance with Paragraph 19 between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 19.

(h) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 19.

> **RESPONSE:** To the extent that the information in (c) and (d) is required, it is being provided to counsel on a monthly basis in accordance with the Court's order.
>
> The remainder of this question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. In addition, paragraph 29 does not permit counsel to obtain the information and data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.
>
> As a courtesy please see the relevant sections of the ORR Policy and Operations Guides.

**25)** Paragraph 21 of the Settlement provides "[a] minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure ICE detention facility, or . . . contracted facility, having separate accommodations for minors" whenever the District Director or Chief Patrol Agent makes certain determinations set forth in the paragraph. Paragraph 22 defines escape risks.

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraphs 21-22 of the Settlement.

(b) Provide information regarding any reports[6] prepared by defendants' employees from July 24, 2015 to the present showing that the requirements of Paragraphs 21-22 have been and are being complied with.

(c) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how many minors have been detained pursuant to Paragraph 21 and Paragraph 22.

(d) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how long minors detained pursuant to Paragraph 21 and Paragraph 22 have remained in detention.

(e) Identify all programs in which minors have been placed pursuant to Paragraphs 21-22 between July 24, 2015 and the present.

(f) Provide information regarding contracts between defendants and any facilities in which minors have been placed pursuant to Paragraphs 21-22 between July 24, 2015 and the present.

(g) Identify who monitored defendants' compliance with Paragraphs 21-22 between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraphs 21-22.

(h) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraphs 21-22.

**RESPONSE:**

ICE reviews these cases individually on a case-by-case basis, taking into account ICE enforcement priorities to determine whether to place individuals in secure facility. Any facilities utilized are fully compliant with FSA requirements and ICE detention standards.

In reviewing ORR staff-secure providers, monitoring staff evaluate that providers have the following procedures:

- Provides a heightened level of staff supervision, communication, and services
- Service provision tailored to address the individual needs and underlying behavior and reasons for staff secure placement.
- Security and accountability maintained through procedures, staffing patterns, and effective communication.
- Secure outdoor recreation areas enclosed by a perimeter.
- In accordance with State licensing  alarm systems on doors and windows.

---

[6] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 22.

- No lockdown procedures .
- Staff licensed and certified in the use of non-violent crisis intervention.
- Positive methods of behavior modification utilized.
- Does not exceed the level of security necessary for the protection of the staff and resident population permitted under State law.
- Capability to upgrade supervision of a specific child from "line-of-sight" supervision to constant "line-of-sight and sound" staff supervision.
- All children have received a Notice of Placement in Secure/Staff Secure.
- Regularly assess UAC for appropriateness for transfer to less restrictive environments (shelter, group home, foster care) and family reunification.

Staff must have the grantee explain the program practices that are responsive to staff secure placements;  have the grantee explain their models of  behavioral management and mental health services for staff secure placement, ensure the grantee provides specialized training to staff regarding staff secure policies and procedures;  request that the grantee give examples of working with staff to implement program practices that are responsive to behavioral and mental health concerns of staff secure placements, explain how the grantee encourages and supports the participation of UAC in the implementation of the staff secure program.  Staff should ensure that case files include notice of placements in staff secure.    Staff should review personnel files to ensure employees received specialized training in non-violent crisis intervention and other staff secure behavior management techniques.   Monitors should ask provider staff to provide examples of responding to staff secure behavior management related scenarios.   Monitors should ask floor staff how they identify and respond to staff secure related concerns,  with whom they talk, and how they act on the information.

In reviewing secure providers, monitoring staff evaluate that providers have the following procedures:
- Secure perimeter to prevent escapes (security fence and gate).
- Heightened level of staff supervision, communication, and services to control problem behavior and prevent escapes.
- Qualified and well trained staff to control violent behavior and prevent escapes.
- Program tailored to address the individual needs and underlying behavior necessitating the secure placement.
- Written policies and procedures governing the room assignment of the residents that considers age, offense(s) and other history that would present endangerment to the program population (e.g., rival gang affiliations).
- Communication system between the control room and resident living areas
- Staff located in or immediately adjacent to resident living areas to permit monitoring and prompt response to emergency situations.
- Effective monitoring to control entry to and exit from the building
- Video monitoring and alarm systems are encouraged.
- Stricter security measures.
- Higher staffing ratios.
- Appropriate number of seclusion rooms as specified by State licensing

- Security risk assessments completed for all fixed and moveable equipment accessible to UAC.
- Written policies and procedures regarding use of restraints.
- Written policies and procedures regarding transportation.
- Notice of Placement in Secure/Staff Secure provided to each UAC
- Ongoing regular assessment of UAC for appropriateness for transfer to less restrictive environments and family reunification.

Monitoring staff have the grantee explain the program practices that are responsive to secure placements; have the grantee explain their models of care and services (educational, behavioral management and mental health services) for secure placements; determine whether the grantee provide specialized training to staff regarding special help for children with atypical behavior or development; request that the grantee give examples of working with staff to implement program practices that are responsive to behavioral and mental health concerns of secure placements; determine how the grantee encourages and supports the participation of UAC in the implementation of the secure program. Monitoring staff review case file notice of placements in secure. Monitoring staff review personnel files for notes of specialized training for secure program personnel, and for behavior management training. Monitoring staff ask staff to provide examples of responding to secure behavior management related scenarios, ask floor staff how they identify and respond to secure related concerns, with whom they talk, and how they act on the information.

This question is otherwise outside the scope of paragraph 29 of the FSA because it does not seek information regarding the implementation of the Settlement Agreement. In addition, Paragraph 29 does not permit counsel to obtain the data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

As a courtesy please see the relevant sections of the ORR Policy and Operations Guides.

**26)** Paragraph 23 of the Settlement provides "The [defendants] will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program. All determinations to place a minor in a secure facility will be reviewed and approved by the regional juvenile coordinator."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 23 of the Settlement.

(b) Provide information regarding any reports[7] prepared by defendants' employees from July 24, 2015 to the present showing that the requirements of Paragraphs 23 have been and are being complied with.

(c) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how many minors have been transferred to less restrictive alternatives pursuant to Paragraph 23.

(d) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how long minors detained pursuant to Paragraph 21 were detained before being transferred to less restrictive alternatives pursuant to Paragraph 23.

(e) Identify all programs in which minors have been transferred to pursuant to Paragraph 23.

(f) Identify who monitored defendants' compliance with Paragraph 23 between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 23.

(g) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 23.

**RESPONSE:**

Please see response to question 25.  ORR Monitoring staff also review case files for FAST tool.

The remainder of this question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. In addition, Paragraph 29 does not permit counsel to obtain the data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.as beyond the scope of Paragraph.

As a courtesy please see the relevant sections of the ORR Policy and Operations Guides.

**27)** Paragraph 24A provides "A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 24A of the Settlement.

---

[7] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 23.

(b) Provide information regarding any documents that address unaccompanied minors in the custody of ORR and their right, if any, to administrative review of decisions not to release them or not to transfer them to parents, relatives, other adults or licensed programs identified in Paragraph 14 of the Settlement.

(c) Provide information regarding any reports[8] prepared by defendants' employees (including ORR employees) from July 24, 2015 to the present showing that the requirements of Paragraphs 24A have been and are being complied with.

(d) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how many minors have been afforded a bond redetermination hearing before an Immigration Judge pursuant to Paragraph 24A and how many have not been afforded such a hearing.

(d) Provide information regarding any reports prepared by defendants' employees from July 24, 2015 to the present showing how long minors have been detained before being brought before Immigration Judges for bond redetermination hearings pursuant to pursuant to Paragraph 24A.

(e) Identify who monitored defendants' compliance with Paragraph 24A between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 24A.

(f) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 24A.

> **RESPONSE:** A Notice of Custody Determination (Form I-286) is completed only in cases in which the alien is detained by ICE pursuant to section 236 of the Immigration and Nationality Act (INA). In cases in which a Form I-286 is completed, it is maintained in the alien file. Accompanied minors detained at family residential centers are given an opportunity for a bond redetermination hearing before an immigration judge. Minors in ICE custody can also seek bond redetermination if they are detained pursuant to section 236 of the INA. Minors in ICE custody will receive a notice of their right to a custody redetermination when they become eligible for a custody redetermination.
>
> This paragraph is not applicable to HHS. HHS makes placement decisions regarding minors in its custody in accordance with the provisions of the TVPRA.
>
> This question is otherwise outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the Settlement Agreement. In addition, Paragraph 29 does not permit counsel to obtain the data sought in these questions nor does it require the identification or production of documents or data

---

[8] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 24A.

maintained by the Defendants, other than the data specifically identified in that Paragraph.as beyond the scope of Paragraph.

**28)** Paragraph 24C requires that "In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium. security facility."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 24C of the Settlement.

(b) Provide ten examples of notices provided minors not placed in licensed programs with the reasons for housing the minor in a detention or medium security facility issued between December 1 and 31, 2015.

(c) Provide information regarding any reports[9] prepared by defendants' employees (including ORR employees) from July 24, 2015 to the present showing that the requirements of Paragraphs 24C have been and are being complied with.

(d) Provide reports showing in how many cases between July 24, 2015 and the present defendants' employees provided minors with the reasons for housing the minor in a detention or medium security facility.

(d) Identify who monitored defendants' compliance with Paragraph 24C between July 24, 2015 and the present, state how the monitoring was conducted and provide information regarding any monitoring reports regarding Paragraph 24C.

(e) Provide documents showing what if any administrative review rights (by EOIR, ICE or HHS) have been provided to minors between July 24, 2015 and the present regarding decisions to house minors in a detention or medium security facility.

(f) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 24C.

    **RESPONSE:** Please see responses to questions 25 and 26.

    ICE houses children apprehended with adult parents in one of ICE's family residential centers.  In that case they are provided with Form I-286 as detailed in Question 28, minors detained at FRCs are given an opportunity for a bond redetermination hearing before an immigration judge. In the event an accompanied

---

[9]This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 24C.

minor is detained in ICE custody due to a serious delinquency, he or she is provided with Form I-286 as well.

The remainder of this question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  In addition, Paragraph 29 does not permit counsel to obtain the data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.as beyond the scope of Paragraph.

As a courtesy please see the relevant sections of the ORR Policy and Operations Guides.

**29)** Paragraph 24D of the Settlement provides "The [defendants] shall promptly provide each minor not released with (a) INS Form 1-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and ( c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor)."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 24D of the Settlement.

(b) Provide ten examples between December 1 and 31, 2015 of notices provided minors pursuant to Paragraph 24D, or records that show that the notices required by ¶ 24D were actually provided.

(c) Provide information regarding any reports prepared by defendants' employees (including ORR employees) from July 24, 2015 to the present showing that the requirements of Paragraphs 24D have been and are being complied with.

(d) Provide reports[10] showing in how many cases between July 24, 2015 and the present defendants' employees provided minors with the notices required by Paragraph 24D.

(e) Identify who monitored defendants' compliance with Paragraph 24D between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 24D.

(f) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 24D.

---

[10] This request is not seeking information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring of compliance with Paragraph 24D.

**RESPONSE:**

Please see prior responses on monitoring.  ORR Monitoring staff review case file to ensure that it contains the I-770 (Notice of Rights and Request for Disposition).

Federal regulations require DHS officers to give specific notices of rights to minors including but not limited to the Form I-770, which specifically states that minors have rights which cannot be taken away including the right to: an attorney, a hearing before an immigration judge, speak to your consular official, and use the telephone.  *See* 8 C.F.R. § 236.3(h). Additionally, minors are provided with the list of free legal services in their area and other notices as required including a Form I-286, if applicable.   As in Question 12, minors in ICE custody receive a notice of their right to a custody determination when they become eligible for a custody redetermination.

The remainder of this question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

As a courtesy, please see the following documents: JFRMU UAC and Family Unit Processing Training (2015); ORR Policy and Operations Guides; Legal Resource Guide, Introduction; Legal Resource Guide, Notice of Rights and Provision of Services; Legal Resource Guide, Know Your Rights Handout; Legal Service Provider list; Notice to Juvenile Aliens; California Legal Services Flyer; Case File Checklist.

**30)** Paragraph 27 of the Settlement provides "No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer."

(a) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing defendants' employees have been informed to comply with Paragraph 27 of the Settlement.

(b) Provide ten examples between December 1 and 31, 2015 of notices provided minors' counsel pursuant to Paragraph 27, or records that show that the notices required by ¶ 27 were actually provided.

(c) Provide information regarding any reports[11] prepared by defendants' employees (including ORR employees) from July 24, 2015 to the present showing that the requirements of Paragraphs 27 have been and are being complied with.

---

[11] This request is not seeking Provide information regarding documents in individuals' files but rather any reports whether of narrative or statistical nature that show compliance or monitoring

(d) Provide reports showing in how many cases between July 24, 2015 and the present defendants' employees provided minors' counsel with the notices required by Paragraph 27.

(e) Identify who monitored defendants' compliance with Paragraph 27 between July 24, 2015 and the present, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding Paragraph 27.

(f) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 27.

> **RESPONSE:** ORR and ICE comply with this requirement and provide notice to counsel of any transfers as required.
>
> The remainder of this question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA. Paragraph 29 does not permit counsel to obtain the data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.
>
> As a courtesy please see the relevant sections of the ORR Policy and Operations Guides; case File Checklist.

**31)** Paragraph 28A provides "An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours. Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations. Statistical information will include at least the following: (1) biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility."

(a) Please identify the Juvenile Coordinator(s) who has/have served from July 24, 2015 to the present, including name, title, whether still employed by defendants, and dates served as the Juvenile Coordinator.

(b) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present issued to the Juvenile Coordinator involving the Flores settlement or its terms.

(c) Provide the weekly statistical reports the Juvenile Coordinator is required to obtain for the months of October and December 2015.

of compliance with Paragraph 27.

(d) For the months October and December 2015 provide information regarding the Juvenile Coordinator's collecting data "regarding the reasons for every placement of a minor in a detention facility or medium security facility."

(e) Provide a copy of the most recent "up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours."

(d) Briefly explain what the Juvenile Coordinator has done with respect to the family detention facilities at Dilley, Karnes and Berks (state separately for each facility) to "monitor compliance with the terms of this [Flores] Agreement" from July 24, 2015 to the present.

(e) Briefly explain what the Juvenile Coordinator has done with respect to medium and secure facilities used to detain minors (state separately for each facility) to "monitor compliance with the terms of this [Flores] Agreement" from July 24, 2015 to the present.

(f) Briefly explain what any employee of defendants has done with respect to ORR facilities housing unaccompanied minors to "monitor compliance with the terms of this [Flores] Agreement" from July 24, 2015 to the present.

(g) Provide information regarding any reports prepared by the Juvenile Coordinator between July 24, 2015 and the present reporting on his or her or their "monitor[ing] compliance with the terms of this [Flores] Agreement."

(f) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 28A.

> **RESPONSE:** Please see prior ORR responses regarding instructions or guidance. Please see prior responses on ORR monitoring for secure and staff-secure care providers.
>
> ICE Field Office Juvenile Coordinators are responsible for monitoring compliance with all requirements of the FSA.    For example, Field Office Juvenile Coordinator responsibilities include but are not limited to:   ensuring that minors are placed in appropriate temporary holding cells or areas that are safe and sanitary, that minors are provided access to toilets and sinks, drinking water, juice, or milk, food and snacks, and that the locations have adequate temperature control and ventilation.   They are also responsible for ensuring there is adequate supervision to protect juveniles from others and to separate unaccompanied minors from unrelated adults whenever possible.   They obtain information regarding age, gender and criminality.   They provide the minor access to phone calls to a parent, legal guardian, relative, consular officer and legal representative. Juvenile Coordinators also attempt family reunification prior to ORR placement, request placement for a UAC with ORR, and monitoring minors or family so they do not stay in staging/holding longer than necessary.   They ensure that data regarding unaccompanied minors is accurately updated in ICE databases.   They provide guidance with current policy and procedures for juveniles and families to the ERO Field Office Director and

his/her designees in the region and assist with age determination guidance and reviewing forensic results.

The information required in Paragraph 28A is being provided to counsel on a monthly basis in accordance with the Court's order.

To the extent a further response is requested, this question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Also, Paragraph 29 does not permit counsel to obtain the data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**32)** Paragraph 30 of the Settlement provides "On an annual basis, commencing one year after final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the terms of this Agreement."

(a) Provide information regarding any reports or drafts of reports prepared for the Juvenile Coordinator between January 1, 2014 and the present to comply with Paragraph 31.

(b) Provide information regarding any documents in which defendants' employees have expressed concerns about complying with Paragraph 31.

> **RESPONSE**:  Paragraph 29 does not permit counsel to obtain the data sought in these questions nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**33)** Provide information regarding any documents addressing defendants' claim that releasing foreign nationals from detention encourages additional unlawful migration, risks the diversion of U.S. Customs and Border Protection's ("CBP") and ICE's limited resources, or diminishes DHS's ability to conduct background investigations to ensure community safety.

> **RESPONSE**:  This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**34)** Provide information regarding any documents that show apprehension rates of minors (accompanied and unaccompanied) for each Border Patrol Station (not Sector) and ICE District Office from November 1, 2015 to the present.

> **RESPONSE**:  This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the data sought in this question nor does it require the

identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**35)** Provide all documents or information regarding such documents used to determine that the average detention time for accompanied minors in or about July 2015 was 20 days as defendants informed the district court.

> **RESPONSE**:  This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA. Paragraph 29 does not permit counsel to obtain the data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**36)** Provide information regarding how many minors defendants have detained, if any, at Joint Base Lackland in Texas, and the dates minors were housed there between July 24, 2015 and the present, the number of minors detained there, and how many days they were detained there.

> **RESPONSE:**  This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph. As a courtesy ORR provides the following response: No minors were housed at such facility during the time frame.

**37)** Greene Family Camp in Bruceville-Eddy

(a) Provide information regarding any contracts involving the detention of minors at the Greene Family Camp including contracts executed by defendants or by other government entities with Greene Family Camp.

(b) Provide information regarding any instructions or guidance in effect from July 24, 2015 to the present showing Greene Family Camp's employees have been informed to comply with the terms of the Flores Settlement applicable to minors at Greene Family Camp.

(c) Provide information regarding any reports from July 24, 2015 to the present showing that minors housed at Greene Family Camp have been treated in compliance with the Flores Settlement.

(d) Provide information regarding any statistical or other reports prepared between July 24, 2015 and the present, which show the number of days, minors have remained at Greene Family camp.

(e) If not already provided in response to an earlier request, identify who monitored defendants' compliance with the Flores Settlement between July 24, 2015 and the present at the Greene Family Camp, state how the monitoring was conducted and Provide information regarding any monitoring reports regarding such monitoring.

**RESPONSE:** This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph. As a courtesy, HHS provides the following response: this camp was open for 20 days during the time frame specified. Please refer to previous ORR responses regarding instructions and guidance.

**38)** Dilley, Karnes and Berks family detention facilities:

(a) For each facility provide information regarding any current licenses issued by any Government agencies and correspondence with those Government agencies between July 24, 2015 and the present.

(b) For each facility provide information regarding the current contracts including contracts executed by someone on behalf of DHS and contracts the facilities have with other Government agencies.

(c) For each facility provide information regarding correspondence with the entities operating those facilities between July 24, 2015 and the present relating to the rights of minors described in the Flores Settlement.

(d) To the extent not responded in response to (c) above, for each facility provide information regarding correspondence with the entities operating the facilities dated between July 24, 2015 and the present dealing with compliance with the Flores Settlement or any of the Court Orders issued in the Flores case since July 24, 2015.

(e) For each facility provide information regarding the per-child and total monthly costs to DHS of detaining minors paid to non-federal Government agencies or private corporations from July 24, 2015 to the present.

      **RESPONSE**:  With respect to subsection (a), licensing information is publicly available information that is maintained by the states in which the facilities currently operate. ICE is not a party to the licensing decisions or status of the facilities in Pennsylvania and Texas. To the extent a further response is required, this question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.  Paragraph 29 does not permit counsel to obtain the data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**39)** In addition to the statement of principles Between the Department of Homeland Security and the Department of Health and Human Services Unaccompanied Alien Children Program, dated April 6, 2004, Exhibit 1 attached, and the memorandum from Victor Cerda, Acting Director, U.S. Immigration and Customs Enforcement, re: release procedures for unaccompanied children placed with and care for by the Office of Refugee Resettlement, Exhibit 2 attached, what other

documents, including memoranda, email, etc., address the respective roles of DHS and HHS, or their subordinate agencies, regarding decisions to release or detain juveniles in ORR custody?

> **RESPONSE**: This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA. Paragraph 29 does not permit counsel to obtain the data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**40)** What role does Immigration and Customs Enforcement currently play in deciding whether to release or detain juveniles in ORR custody?

> **RESPONSE:** This question is outside the scope of Paragraph 29 of the FSA because it does not seek information regarding the implementation of the FSA.

> As a courtesy, Defendants provide the following information: UACs apprehended by DHS who lack immigration status (and who are from non-contiguous countries), as well as unaccompanied minors from contiguous countries who meet certain criteria, are transferred to the custody of HHS not later than 72 hours after determining that such child is an unaccompanied child under the requirements of the TVPRA, 8 U.S.C. §1232(b)(3). Consistent with 8 U.S.C. § 1232(b)(1), care and custody of UACs is the responsibility of the Secretary of Health and Human Services. The Homeland Security Act also specifies that ORR consult with appropriate authorities to ensure appropriate placements. 6 U.S.C. § 279(b)(2).

**41)** What role does Customs and Border Protection currently play in deciding whether to release or detain juveniles in ORR custody?

> **RESPONSE:** Please see response to question 40.

**42)** What are the names and office locations of DHS officials currently assigned to review the cases of juveniles whose release ORR is considering?

> **RESPONSE**: This question is outside the scope of Paragraph 29 of the FSA because they do not seek information regarding the implementation of the FSA.

**43)** What private or non-federal public entities does ORR currently use to assess the suitability of potential custodians seeking the release of juveniles in its custody?

> **RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

44) What are the mean and median amounts of payments from HHS to private or non-federal public entities to assess the suitability of potential custodians seeking the release of juveniles in ORR custody?

    **RESPONSE:**   This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

45) What time limits or targets, if any, does ORR have for completing assessments of potential custodians seeking the release of juveniles in ORR custody?

    **RESPONSE:**   This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. As a courtesy please see the relevant sections of the ORR Policy and Operations Guides.

46) For the period from July 24, 2014 to the present, what are the mean and median lengths of time between a potential custodian's seeking the release of a juvenile in ORR custody and ORR's deciding to release or detain such juvenile?

    **RESPONSE:**   This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

47) For the period from July 24, 2014 to the present, what are the mean and median number of staff-hours required to screen a potential custodian seeking the release of a juvenile in ORR custody?

    **RESPONSE:**   This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

48) In addition to its guidance on immigration status and the sponsor placement process for unaccompanied children, *available at* http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-statesunaccompanied-section-2, what other documents, including memoranda, email, etc., address, clarify, or expand upon ORR's policy, practice or procedure for deciding whether to release a juvenile in its custody to an available sponsor? What do such documents, if any, state?

**RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. Paragraph 29 does not permit counsel to obtain the information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

**49)** What state or local government child welfare or juvenile justice entities, if any, did ORR consult in formulating its guidance on immigration status and the sponsor placement process for unaccompanied children, *available at:* http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-statesunaccompanied-section-2? What are the names and office locations of state or local government officials, if any, whom ORR consulted?

**RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

**50)** What is ORR's policy regarding releasing or continuing to detain unaccompanied juveniles in its custody upon such juveniles' prevailing in removal proceedings or attaining lawful status in the U.S.?

**RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

**51)** What are the standards and process for ORR to approve or deny release recommendations of care providers, case managers, and case coordinators (Sec 2.7)?

**RESPONSE:** Please see prior responses on instructions and guidance for release. The remainder of this question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

**52)** Does ORR maintain data on the number of release recommendations that are not followed by ORR? If so, provide the available data for the period of July 24, 2014 to the present.

**RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement.

**53)** Provide information regarding the notice and opportunity to appeal available to a minor regarding a denial of release (Sec. 2.7.7).

**RESPONSE:** This question is outside the scope of Paragraph 29 of the Flores Settlement Agreement because it does not seek information regarding the implementation of the Settlement Agreement. Paragraph 29 does not permit counsel to obtain the

information and data sought in this question nor does it require the identification or production of documents or data maintained by the Defendants, other than the data specifically identified in that Paragraph.

# Attachment to Exhibit 1
# Exhibit C

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone:  (213) 388-8693 Facsimile:  (213) 386-9484
www.centerforhumanrights.org

February 20, 2016

*Via email and first class mail to Ms. Fabian*
Sarah B. Fabian
Trial Attorney
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Michael Johnson (or successor-in-office)
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman (or successor-in-office)
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

Re: *Flores*, et al., *v. Lynch,* et al., No. CV 85-4544 DMG (C.D. Cal.).

Dear Madam/Sirs:

Pursuant to ¶ 37 of the settlement[1] approved in the above referenced action on January 25, 1997
(Settlement), plaintiffs hereby give notice of claims that defendants are breaching the Settlement
in the following particulars:

1. Paragraph 18 of the Agreement requires that upon taking an accompanied class member into
custody, Defendants shall make and record prompt and continuous efforts toward family
reunification and the release of the minor pursuant to Paragraph 14 of the Agreement. Such
efforts at family reunification shall continue so long as the minor is in ICE custody

2. Unless otherwise required by the Agreement or the law, Paragraph 14A of the Agreement
requires release of accompanied class members without unnecessary delay in first order of
preference to a parent. Class members not released pursuant to Paragraph 14 of the Agreement
will be processed in accordance with the Agreement, including, as applicable, Paragraphs 6, 9,

---

[1] Paragraph 37 provides in pertinent part as follows: "This paragraph provides for the
enforcement, in this District Court, of the provisions of this Agreement except for claims brought
under Paragraph 24.  The parties shall meet telephonically or in person to discuss a complete or
partial repudiation of this Agreement or any alleged non-compliance with the terms of the
Agreement, prior to bringing any individual or class action to enforce this Agreement."

21, 22, and 23.

3. With limited exceptions, Paragraph 12A requires that defendants will transfer a minor from a placement under this paragraph to a placement under Paragraph 19(i) within three (3) days, if the minor was apprehended in an ICE district in which a licensed program is located and has space available, or within five (5) days in all other cases

4. Subject to Paragraph 12A of the Agreement, class members shall not be detained by Defendants in unlicensed or secure facilities that do not meet the requirements of Paragraph 6 of the Settlement or, in appropriate cases, as set forth in the Agreement, in facilities that do not meet the requirements of Paragraphs 12A, 21, and 23. Defendants shall not selectively apply the "influx" provision of Paragraph 12C of the Agreement to house class members apprehended with a parent in facilities that do not comply with the Agreement.

5. To comply with Paragraph 14A of the Agreement and as contemplated in Paragraph 15, a class member's accompanying parent shall be released with the class member in accordance with applicable laws and regulations unless the parent is subject to mandatory detention under applicable law or after an individualized custody determination the parent is determined to pose a flight risk, or a threat to others or the national security.

6. Defendants shall monitor compliance with the Agreement and the District Court's August 2015 Order and shall provide Class Counsel on a monthly basis statistical information collected pursuant to Paragraph 28A of the Agreement. Paragraph 28A refers to all minors and is not limited to unaccompanied minors.

7. Paragraph 12A requires that following arrest, the Defendants shall hold minors in facilities that are safe and sanitary and that are consistent with the Government's concern for the particular vulnerability of minors. Facilities must provide, *inter alia*, access to toilets and sinks, drinking water and food as appropriate, and adequate temperature control and ventilation, and contact with family members who were arrested with the minor.

8. As contemplated in Paragraph 28A of the Agreement, Defendants or their Regional Juvenile Coordinator shall monitor compliance with their acknowledged standards and procedures for detaining class members in facilities that are safe and sanitary, consistent with concern for the particular vulnerability of minors, and consistent with Paragraph 12 of the Agreement.

9. As contemplated in Paragraph 24A, a minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

10. As contemplated in Paragraph 24C, in order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium. security facility.

Sarah Fabian
February 20, 2016
Page 3 of 3

11. As contemplated in Paragraph 24D, the defendants shall promptly provide each minor not released with (a) INS Form 1-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and ( c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor).

During the meet and confer we wish to address *inter alia* how breaches of the Settlement regarding accompanied minors may be cured, initiation of formal discovery, and the appointment of court-approved independent monitors to monitor CBP and ICE compliance going forward.

In accordance with ¶ 37 of the Settlement and Rule 7-3 of the Rules of the United States District Court for the Central District of California, plaintiffs request that defendants meet with plaintiffs telephonically or in person in the Central District of California within ten business days in a good faith effort to settle the aforementioned class-wide breaches of the Settlement.

Plaintiffs reserve the right to address with defendants related issues that may come to light as plaintiffs' investigation of the treatment and conditions class members experience is ongoing.

Should defendants wish any clarification regarding the foregoing, I may be reached at the above address and telephone number.

Sincerely,

Peter A. Schey
One of class counsel for plaintiffs


ccs:   Carlos Holguín, Center for Human Rights & Constitutional Law
       Alice Bussiere, Youth Law Center

# Exhibit 2
## Publicly Filed

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
T. Wayne Harman (Cal. Bar No. 254089)
Elena Garcia (Cal. Bar No. 299680)
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:     (213) 629-2020
Email: wharman@orrick.com
        egarcia@orrick.com

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| | ) |
| Plaintiffs, | ) EXHIBIT 2 IN SUPPORT OF PLAINTIFFS' MOTION |
| - vs - | ) TO ENFORCE SETTLEMENT AND FOR |
| | ) APPOINTMENT OF A SPECIAL MONITOR |
| JEH JOHNSON, SECRETARY, U.S. DEPARTMENT | ) |
| OF HOMELAND SECURITY, *et al.*, | ) REDACTED |
| | ) |
| Defendants. | ) Hearing: _____, 2016. |
| | ) Time: 9:30 a.m. |
| | ) |
| | Courtroom 7, 312 N. Spring Street |

*Plaintiffs' counsel, continued*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:      (408) 280-2437
Facsimile:      (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org
        jamesz@lawfoundation.org
        annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*/ / /*

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT        68

1. EXCERPTS OF DECLARATIONS: DEFENDANTS CONTINUE TO DETAIN CHILDREN IN DEPLORABLE AND UNSANITARY CONDITIONS IN CBP FACILITIES ................................................................................ 1

   (A)   *Children in CBP facilities suffer from inadequate access to food* ........................... 1

   (B)   *Flores class member children in CBP facilities continue to suffer from inadequate access to clean drinking water* ........................................................................................................ 3

   (C)   *Flores Class Member Children are being held in CBP facilities that are unfit for human habitation* ............................................................................................................................. 4

   (D)   *Flores class member children continue to suffer from extremely cold temperatures in CBP detention cells* ....................................................................................................................... 6

   (E)   *Flores class member children are held in inhumanely overcrowded CBP detention cells and are forced to endure sleep deprivation.* ............................................................................................ 8

2. EXCERPTS OF DECLARATIONS: *FLORES* CLASS MEMBERS ARE ROUTINELY NOT ADVISED OF *FLORES* RIGHTS BY CBP OR ICE OFFICERS ............................................................................................................. 11

3. EXCERPTS OF DECLARATIONS: DHS FAILS TO MAKE AND RECORD ONGOING EFFORTS AIMED AT RELEASE OR PLACEMENT OF CLASS MEMBERS ....................................................................................................... 13

4. EXCERPTS OF DECLARATIONS: CLASS MEMBER CHILDREN NOT PROMPTLY RELEASED ARE NOT BROUGHT BEFORE IMMIGRATION JUDGES FOR CUSTODY REVIEW HEARINGS ..................................................... 15

5. EXCERPTS OF DECLARATIONS: FLORES CLASS MEMBER ARE ROUTINELY COMMINGLED FOR EXTENDED PERIODS OF TIME WITH UNRELATED ADULTS ............................................................................................... 17

6. EXCERPTS OF DECLARATIONS: PROLONGED DETENTION IS NOT NECESSARY TO ENSURE THAT CLASS MEMBERS RECEIVE MEDICAL CARE; IN FACT, THEIR PHYSICAL AND MENTAL HEALTH IS PLACED AT RISK IN DHS'S DETENTION CENTERS ......................................................................................................................................... 18

7. EXCERPTS OF DECLARATIONS: DETENTION OF CHILDREN UNDERMINES AND FRUSTRATES ACCESS TO COUNSEL. 26

8. EXCERPTS OF DECLARATIONS: CLASS MEMBER CHILDREN AND THEIR MOTHERS ARE ROUTINELY HELD PAST THE 3-5 DAYS ALLOWED UNDER THE SETTLEMENT ......................................................................... 31

9. EXCERPTS OF DECLARATIONS: DECISIONS REGARDING PLACEMENT IN A FAMILY DETENTION CENTER ARE ARBITRARY AND BASED PRIMARILY ON BED SPACE ................................................................... 32

1.     **Excerpts of Declarations: Defendants continue to detain children in deplorable and unsanitary conditions in CBP facilities**

**(A)     Children in CBP facilities suffer from inadequate access to food**

Declaration of attorney Natalia Ospina, Ex. 7 ¶5 (3/10/16) ("A Guatemalan mother and child spent two days in the 'hielera,' the way mothers and children describe the Customs and Border Protection (CBP) holding facility where first detained… They were … unable to eat the two pieces of bread and a slice of ham that they were provided twice daily during their time in the hielera.")

Declaration of attorney Lindsay Harris, Ex. 14 ¶4(c) ("*Flores* class members and their mothers report being provided entirely inadequate food while at CBP facilities. The food consists of two to three sandwiches a day, each sandwich consisting of two pieces of dry bread and one thin slice of ham or bologna.").

Declaration of Herson Lxxxxx xxxxx, Ex.46 ¶ 8 (01/30/2016) ("Immigration gave us soup and a burrito only once a day. I was very hungry. I was sad, afraid, hungry, and desperate.").

Declaration of nine-year old class member Yeslin Lxxxx xxxxxxx, Ex. 23 ¶¶ 4, 5, 8 ("The Border Patrol agents took us to a border station. We got there on a Saturday and were there for one night. They didn't give us much food. They gave us a little juice and cookies. In the middle of Sunday night, they took us to another place. We spent two nights in this place. They gave us bread with a little bit of ham, but it was all frozen, so I didn't eat much…").

Declaration of Mirna Mxxxxx xxxxx, Ex. 25 ¶5 ("There was not enough food. All we got were two slices of bread with a small slice of mozzarella and small juices. We got those sandwiches twice a day and once three times in a day.").

Declaration of Raquel Axxxxxx xxxxxx, Ex. 26 ¶7 ("They only gave us small amounts of food two times a day.").

Declaration of Faustino Cxxx, Ex. 53 ¶5 (01/29/2016) ("When being transported here my son told me that while he was detained at the Border Patrol Station, like me… he was only given three thin sandwiches a day with one slice of cold meat, one for breakfast, one for lunch, and one for dinner.").

Declaration of  Josselyn Mxxxxx xxxxxx, Ex. 55  ¶12 (01/30/2016) ("The food here is not good. It is always the same –a bad sandwich. The sandwich is given three times a day. It is two pieces of bread and one slice of ham.").

Declaration of Silvia Vxxxxx xxxx, Ex.56 ¶6 (02/01/2016) ("Our only food has been two pieces of bread with one think slice of bologna or something that looks like meat these sandwiches are distributed for breakfast, lunch and dinner. Everyone also gets a small plastic container (250 ml) of "frutoso" twice a day. This taste like colored water with sugar. We are very hungry because of the lack of food ...").

Declaration of Yesenia Y█████ █████, Ex. 57 ¶10 (01/31/2016) ("We only get bread sandwiches with something in them. We have been given food twice since I have been here. Everyone in the cell is tired and hungry.").

Declaration of Yessenia E████████ ███████, Ex. 27 ¶ 7 (12 years old) ("For the three days we were there we were only given sandwiches to eat … two slices of stale bread with one slice of bologna in the middle. Nothing else was in the sandwiches. I also got some sugary juice…").

Declaration of Celina S█████-████, Ex. 28 ¶8 ("My son and I were fed only a bologna sandwich and juice").

Declaration of thirteen-year-old class member Cesia V██████████-████, Ex. 29 ¶5 ("The food was disgusting; it was just cold ham sandwiches").

Declaration of Isamar S██████ ██████, Ex. 30 ¶7 ("We received food three times a day. It was the same, cookies, bread with mozzarella, and a really cold bottle of water").

Declaration of Kelly G████████-█████, Ex. 31 ¶7 ("The food was terrible: Just bread with one slice of cold ham.").

Declaration of Maria D████ ███████, Ex. 32 ¶6 ("We were just given cold sandwiches with frozen ham inside, just one during the day and one at night.").

Declaration of Lindsey G████ █████, Ex. 33 ¶ 8 ("I was given food but it was not good. Only a sandwich that was frozen.").

Declaration of Katerin Y███████ ███████ (12 yrs), Ex. 34 ¶9 ("The sandwiches were just two pieces of bread and one thin slice of meat. No butter or spread, no lettuce, no cheese, nothing.").

Declaration of Sonia A█████-███████, Ex. 35 ¶6 ("To eat we only got a sandwich with one piece of ham, which was very cold as well. For the whole day and night that I was there, we only got two sandwiches and two little bottles of juice.").

Declaration of Sara E████████ █████, Ex. 24 ¶ 6 ("We were only fed two times a day.").

Declaration of Kenia Y████ ███████, Ex. 36 ¶8 ("[T]hey gave me a sandwich of 2 slices of bread with a slice of cold meat, and juice. I didn't eat anything. I gave the bread to my daughter.").

Declaration of Maria D████ ███████, Ex. 32 ¶ 7 ("After this, we were taken to another place, like a warehouse, that they called the perrera (dog house). ... The food was still bad. My son tried to eat the burritos twice, but both times he threw up afterwards.").

Declaration of Walter A█████████ █████████ (13 yrs old), Ex. 22 ¶ 8 ("It was the same bread and ham but this time no juice, only a little water.").

Declaration of Bianca C█████████ █████ (17yrs old), Ex. 37 ¶ 13 ("I have not been able to leave the cell except to get juice and bread and when they clean the cell. The food is always the same. It is 2 pieces of bread with one slice of bologna 3 times a day. I have eaten some bread since arriving.").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT          71

Declaration of Astrid Dominguez, Ex. 38 ¶ 6 ("They were given sandwiches three times a day, only a slice of bologna and two slices of bread.").

**(B)**   ***Flores* class member children in CBP facilities continue to suffer from inadequate access to clean drinking water**

Declaration of Raquel A xxxxxx xxxxx, Ex. 26 ¶ 7 ("The border patrol officials would not give us water. The only way we could get water was when we would be let into the room to get water from the sink in the bathroom. I was very thirsty and so was my daughter. I asked BP officials for water and they responded that they 'did not have that.'").

Declaration of Alex Mensing, Ex. 19 ¶10 ("Mothers also routinely reported that there is either not enough water, no access to potable water, or no cups with which to drink any water that may be provided.").

Declaration of attorney Lindsay Harris, Ex. 14 ¶4(c) ("Drinking water is usually in a dirty container and 30-40 detainees in the cell are often required to share one cup.").

Declaration of Bianca C xxxxxxxx xxxxx, Ex. 37 ¶ 11 (17 yrs old) ("The water they given me tasted dirty. So I have not drunk water since arriving.").

Declaration of Mirna M xxxxxx xxxxx, Ex. 25 ¶ 5 ("There was not enough water for us to drink. There was some water that had a very odd taste, like chemicals.").

Declaration of  Josselyn M xxxxx xxxxxx, Ex. 55 ¶ 13 (01/30/2016) ("The water tastes like chlorine.").

Declaration of Alex Mensing attachment Exhibit P, Ex. 19 ¶18 (11/15/2015) ("We had to share a cup among all the women and children about 20 people and the water hurt my stomach.").

Declaration of Alex Mensing attachment Exhibit TT, Ex. 19 ¶ 8 ("I was really dehydrated and needed water but I couldn't drink the water because it made me want to vomit.").

Declaration of Alex Mensing, Ex. 19 at ¶ 13 ("mother reported that she and her eldest experienced pain urinating from a lack of water in the [CBP's] hielera.").

Declaration of Peter Schey, Ex. 1 ¶ 5 ("Mothers and children interviewed during the site inspections uniformly reported … dirty drinking water [and] one cup for 30-40 people to share… Conditions remain deplorable and inhumane.").

Declaration of Alex Mensing attachment Exhibit O, Ex. 19 ¶6 ("They gave us water but it tasted like it had a lot of chlorine in it and tasted horrible.").

Declaration of Alex Mensing attachment Exhibit W, Ex. 19 ¶9 ("The water wars terrible and tasted like chlorine. I couldn't drink it.").

Declaration of Alex Mensing attachment Exhibit HH, Ex. 19 ("[T]hey gave them a dirty water that had a bad smell.").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT        72
3

Declaration of Alex Mensing attachment Exhibit KK, Ex. 19 ("In the hielera they only gave water that had a lot of chlorine and this caused my baby to get sick to his stomach.").

**(C)    *Flores* Class Member Children are being held in CBP facilities that are unfit for human habitation**

Declaration of Alex Mensing, Ex. 19 ¶12(13) ("One seventeen year old reported that she had a wet, fully used sanitary napkin, was not given a replacement when she asked, and had to resort to tying pants around her waist to avoid leaking blood.  She reported being … embarrassed and humiliated.  One mother … also reported inadequate access to sanitary pads for bleeding.  For two days, this mother had blood all over her legs and clothes.  Mothers also reported that cells frequently ran out of toilet paper, which was not replaced in a timely way.").

Declaration of Alex Mensing, Ex. 19 ¶12(14) ("One mother recounted that her three-year-old class member child urinated on himself, wetting his clothes: When she asked to wash his clothes, CBP officials told her to take his clothes off and throw them in the trash. The agents provided a clean diaper but informed the mother that there were no clothes available. The three-year-old boy was left in a cold cell wearing only a diaper for two days and nights until the family was transferred to another CBP facility.")

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11A (12/21/15) ("Moreover, while sick in CBP custody, the mother said she was humiliated by having to use a bathroom stall with no doors and low walls, thus depriving her of privacy.  The bathroom, according to the mother, had no toilet paper or soap.")

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11C (12/21/15) ("The mother reported to me that while in CBP custody, there was no toilet paper or opportunity for her or her children to bathe.")

Declaration of Allison Mxxxx xxxxx, Ex. 40 ¶ 6 ("There was no sink, but there was a toilet that was open so that everyone could see you if you went to the bathroom.").

Declaration of Celina Sxxxxxx-xxxx, Ex. 28 ¶ 8 ("There was an open toilet in the room with no toilet seat for everyone to use. Everyone could see if we were using the toilet.").

Declaration of Cesia Vxxxxxxxxx-xxxx (13 yrs), Ex. 29 ¶ 5 ("It was embarrassing to use the bathroom, I felt bad about it because everyone could see me when I was using the bathroom. The moms and kids would use their bodies to shield whoever had to use the toilet so that the male immigration officers couldn't see us.").

Declaration of Karen Zxxxx xxxxxxx, Ex. 39 ¶6 ("We did not want to go to the bathroom because there was no real door to the bathroom.").

Declaration of Kelly Gxxxxxxx-xxxxx, Ex. 31 ¶ 7 ("In the hielera, we were detained for one night, there were toilets that were very visible to everyone, there was a low wall, so everyone could see when I was using the bathroom.").

Declaration of Herson Lxxxxx xxxxx, Ex. 46 ¶ 8 (01/30/2016) ("We were not able to shower or bathe or brush our teeth. We were not given any soap or towels.").

Declaration of Melvin Mxxxxx xxxxx, Ex. 59 ¶6 (01/20/2016) ("They did not let us shower or brush our teeth. There was a toilet it was surrounded only by a shot wall. There was no privacy. There was

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT     73
4

one toilet for everyone that was there. It was very crowed. There was space to sit down but there was no space to lie down.").

Declaration of Mirna Mxxxxx xxxxx, Ex. 25 ¶ 6 ("Also the bathrooms were not private –there was only a little wall separating them from the cell, which anyone could look over.").

Declaration of Josselyn Mxxxxx xxxxx, Ex. 55 ¶14 (01/30/2016) ("There is nowhere to shower or bathe. There is sink, but it is broken and no water comes out. There is no soap. They have not given me a brush, towel or toothbrush. There is no door on the bathroom, so there is not privacy.")

Declaration of Silvia Vxxxxx xxxx, Ex. 56 ¶ 5 (02/01/2016) ("We have no soap, no towels, no tooth brushes, no paper towels, no baby wipes, ETC. In the cell there are two metal toilets with no toilet seats and two small metal sinks (with no soap) used to wash our hands and for drinking. The sinks only have cold water. In the cell is a plastic container with water but often there are no cups to use to get water from the container.").

Declaration of Yesenia Yxxxx xxxxx, Ex. 57 ¶9 (01/31/2016) ("Since I was apprehended I have not been given any toiletries for myself or my son. In the cell there is a toilet and a small sink shared by about 30 people with no soap. It has a small wall to provide partial privacy. We have no Soap, toothbrushes, or combs.").

Declaration of Lindsey Gxxxx xxxxx, Ex. 33 ¶ 8 ("In the CBP Station, there are bathrooms but they are not private.").

Declaration of Katerin Yxxxxxxx xxxxxxx (12 yrs), Ex. 34 ¶ 9 ("The toilets at this station were out in the open, with only a short wall around them. I had to use the bathroom with no privacy.").

Declaration of Kenia Yxxxx xxxxxxx, Ex. 36 ¶ 8 ("The toilet at this station were out in the open, with only a short wall surrounding it.  There is no privacy when using the toilet.").

Declaration of Maria Dxxxx xxxxxxx, Ex. 32 ¶ 6 ("There was only one toilet and it was very dirty and you had to use it in front of everyone. There were many people, maybe forty people in the cell, all mothers with children.").

Declaration of Walter Axxxxxxx xxxxxxxxx, Ex. 22 ¶ 7 (13 yrs old) ("They had a metal toilet with no toilet seat in our cell.").

Declaration of Bianca Cxxxxxxx xxxxx, Ex. 37 ¶¶ 10-12 (17 yrs old) ("When I use the restroom, there is no door on the stall.").

Declaration of Victor Rxxxx xxxxxxx (15 yrs old), Ex. 21 ¶ 4 ("They didn't let us shower or give us towels or soap to wash.").

 Declaration of Walter Axxxxxxx xxxxxxxxx (13 yrs old), Ex. 22 ¶ 7 ("There was a small metal sink but no soap to wash with and no towels to dry off with. We got no change of clothing.").

Declaration of Bianca Cxxxxxxx xxxxx (17yrs old), Ex. 37 ¶¶ 10-12 ("This cell has a sink that does not work; no water comes out. There is no soap. I have not been given a brush, toothbrush, or toothpaste.").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT      74
5

1   Declaration of Benina Cxxxxx xxxxx, Ex. 41 ¶ 8 ("Since I was apprehended I have not been given
2   any toiletries for me daughter … or me.  In the cell there is a toilet and small sink shared by about 40
    people with no soap or paper towels…  We have no soap, no toothbrushes, no towels, nothing to
3   brush our hair, no wastebaskets.").

4   **(D)   Flores class member children continue to suffer from extremely cold temperatures in**
    **CBP detention cells**
5

6   Declaration of Alex Mensing, Ex. 19 ¶12(3) ("The hieleras are very cold, and mothers reported that
    the air conditioning runs constantly. Some families reported being so cold that their 'bones began to
7   ache,' that they 'lost feeling in hands and feet,' or that their hands and feet became 'numb.' One
    mother described the cold as 'unbearable' and recalled that while she herself was shaking with cold,
8   children were crying from cold and hunger. Another mother reported that she woke up with a
9   headache from the cold. One fifteen-year-old *Flores* class member reported that she could not feel her
    feet because she was so cold. One mother reported feeling like her hair was frozen and wrapping her
10  sweater around her son's head to keep him warm. Another recounted that the 'cold penetrated me to
    the bones' and she wrapped her small children in her jacket in an effort to keep them warm. One
11  mother reported that her ten-year-old *Flores* class member son's lips became so badly chapped from
    the cold that they burst, were bleeding, and he could not open his mouth to eat.").
12

13  Declaration of Alex Mensing, Ex. 19 ¶12(4) ("While some mothers and children received
    "aluminum" sheets to sleep under, others did not. Many mothers who received the sheets reported that
14  they did not provide sufficient warmth. Other mothers were deterred from requesting the sheets after
    seeing how angrily officials reacted when other detained mothers asked for them. One mother
15  reported that CBP officials made the families throw away the thin pieces of aluminum foil each day
    and then withheld "new ones as punishment if we asked too many times for help. " Other mothers
16  reported that officers ordered the families held clean the cells. When the families did not comply to
    the officers' satisfaction, the officers reportedly punished them by taking away the remaining mylar
17  sheets or ordering them to throw their sheets in the trash.").

18  Declaration of Sonia Axxxxx-xxxxxx, Ex. 35 ¶6 ("We were transported to a border patrol station
19  where we were held for one day and one night… It was very cold there… There were about 20 or 25
    children in the cell and they were all crying because it was so cold.").
20

21  Declaration of Allison Mxxxx xxxxx, Ex. 40 ¶6 ("Every time more people came it seems to get
    colder in the room.").
22

23  Declaration of volunteer attorney Natalia Ospina, Ex. 7 ¶5 (3/10/16) ("A Guatemalan mother and
    child … informed me that they were unable to sleep due to the cold, lack of space, and wet floors.")

24  Declaration of CARA Pro Bono Project volunteer Leanne Purdum, Ex. 8 ¶ 5 (3/1/16) ("Mothers
    consistently told me that the hielera was very cold...")
25

26  Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11A (12/21/15) ("The mother also reported that she and
    her son were freezing and shivering while they were in CBP custody because of the cold temperatures
27  and the fact that they were forced to wear wet clothing for four days straight.")

28  Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11B (12/21/15) ("The mother reported that she and her
    daughter were extremely cold at the hielera where they were initially detained at the border for three

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT      75
6

days.  She observed that the more crowded their cell became, the lower the CBP officials dropped the temperature.")

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶8 (11/2015) ("They reported that temperatures in the *hielera* were so low that their children got sick. They were given thin foil blankets, often only one per family, that would easily tear and rattle in the cold air blowing into their holding cells...")

Declaration of Celina Sxxxxxx-xxxx, Ex. 28 ¶5 ("The cell was extremely cold very crowded. I believe that as more people came into the room, the air conditioners were turned up.").

Declaration of Melvin Mxxxxxx xxxxx, Ex. 59 ¶6 (01/20/2016) ("We would sleep on the floor with no blankets or pillows, The place was very cold –we could not stand how cold it was.").

Declaration of Isamar Sxxxxxx xxxxxx, Ex. 30 ¶6 ("The temperature in the room was extremely cold. We were wet from crossing the river and forced to stay in our wet clothes the entire time.  We were only given aluminum blankets to keep warm.").

Declaration of Karen Zxxxxx xxxxxxx, Ex. 39 ¶7 ("We could not sleep because the air conditioning was turned up high and we were very cold. We only had cement planks to lie on and they did not give us blankets. They gave us plastic sheets. My son was cold and wearing wet clothes, so he was so cold that his lips turned purple. I had to wrap him in a plastic sheet and hold him on my lap so that he would not have to sleep on the cold cement.").

Declaration of Kelly Gxxxxxxx-xxxxx, Ex. 31 ¶5 ("My son and I were taken, I believe to the McAllen Border Patrol station, which all detainees there called the hielera (ice box) because it was so cold.").

Declaration of Alex Mensing attachment Exhibit Y, Ex. 19 ¶2 ("They took us to the ICE holding facility. It was ice cold, and we were soaking wet from the river.  Super cold.  Woke up with a headache from the cold… Everyone was shivering. I hugged my child to keep him warm…We slept on the floor, and they gave us aluminum space blankets.").

Declaration of Amarilis Lxxxxxx xxxxx, Ex. 44 ¶7 (2/3/16) ("The border patrol station was very cold… [W]e had to sleep on a concrete bench, which was also a very cold temperature.").

Declaration of Kelly Gxxxxxxx-xxxxx, Ex. 31 ¶7 ("It was very cold in the hielera and my son and I did not have blankets").

Declaration of Kelly Gxxxxxxx-xxxxx, Ex. 31 ¶8 ("It was also very cold in the perrera.").

Declaration of  Edgardo Dxxxxx xxxxxxxx, Ex. 49 ¶ 6 ("The cell was very cold. I did not have a jacket and was not provided a jacket to wear in the cold cell.  I felt very, very cold in that cell.").

Declaration of Raquel Axxxxxx xxxxx, Ex. 26 ¶ 9 ("The temperature in the border patrol center was extremely cold. All I had was what I was wearing and it was very cold. There was a leftover space blanket in my room and I would use this, but they did not give us anything for the terrible cold.").

Declaration of Mirna Mxxxxxx xxxxx, Ex. 25 ¶ 4 ("The children began crying, and when they children cried they would turn the temperature down even further. ").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT     76
7

(E)   **_Flores_ class member children are held in inhumanely overcrowded CBP detention cells and are forced to endure sleep deprivation.**

Declaration of Silvia Vxxxxxx xxxx, Ex. 56 ¶4 (02/01/2016) ("Here at the Border Patrol facility we are held in a cell with about thirty to forty other mothers, and children. The cell has no furniture. There is a concrete floor and concrete bench around the walls of the cell. People fill the floor and benches. Everyone sleeps on the concrete floors and benches side by side. The bright lights on the ceiling stay on all nights. We have no mattresses or pillows or blankets. We only have a thin silver paper to cover ourselves when trying to sleep. It is very hard to get any sleep because the floor is hard and cold, the cell is very crowded, the lights are on and very bright, and children are crying and coughing all night long.").

Declaration of attorney Lindsay Harris, Ex. 14 ¶4(b) ("_Flores_ class members may be held in CBP facilities from one to three nights and are provided no mattresses, mats, blankets or pillows. They sleep on concrete floors or benches and are usually only provided a foil sheet to cover themselves with. Holding cells are often so overcrowded that Flores class members cannot lie down on the concrete to try to sleep. Lights are kept on all night adding to the extreme difficult children have sleeping in these cells.").

Declaration of Mirna Mxxxxxx xxxxx, Ex. 25 ¶ 4 ("We had to sleep on the floor, but it was so crowded in the cell that some people had to sleep on the floor of the bathroom near the toilet. We never got a mattress or a blanket… We were completely unable to sleep because it was so cold and because the lights were on all night.").

Declaration of CARA Pro Bono Project volunteer Leanne Purdum, Ex. 8 ¶ 5 (3/1/16) ("Mothers consistently told me that … the lights were kept on all night, and the rooms are sometimes so full that no one can lie down.")

Declaration of Alex Mensing attachment Exhibit PP, Ex. 19 ¶5 ("There was nowhere to lay down. There were only cement benches. The lights were always on… There were a lot of people in this hielera. I would guess more than thirty women and children.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶8 (11/2015) ("They were given thin foil blankets, often only one per family, that would easily tear and rattle in the cold air blowing into their holding cells. Because the lights were on at all times, they lost track of day and night. Detainees would get in trouble for lying down to sleep on the floor, though mothers and children reported this was the only place to sleep.")

Declaration of Allison Mxxxx xxxxx Leiva (2/19/16), Ex. 40 ¶6 ("_There were so many people squeezed into the room. There were no beds, just a few cement slabs to lay on._" [Emphasis added]).

Declaration of Celina Sxxxxxx-xxxx (2/19/16), Ex. 28 ¶8 ("At the border patrol station there were about 50 other people in our cell. It was so crowded there was barely room for everyone. My son and I were freezing. There were no beds, it was just a room with cement floors and benches.").

Declaration of Amarilis Lxxxxxx xxxxx, Ex. 44 ¶7 (2/3/16) ("It was only concrete in my cell and we had to sleep on a concrete bench, which was also a very cold temperature. We were not given

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT      77
8

mattresses or pillows for the concrete bench on which we had to sleep. It was very difficult to sleep.").

Declaration of Cesia Vxxxxxxxxx-xxxx (13 yrs) (4/23/16), Ex. 29 ¶5 ("[W]e slept on mattresses on the floor. There were some blankets in the cell but they were very dirty, so we didn't use them. It was very uncomfortable and it was hard to sleep. There were many people in our cell…The lights were on all night and there was just one small window.").

Declaration of Isamar Sxxxxxx xxxxxx (4/23/16), Ex. 30 ¶5 ("We were kept in a very small room with no beds. The only place to sleep was on the floor. But there were so many people in the room that there was not enough room for us all to lay down … It was also hard because we could not tell what time of day or night it was. It was hard to get any sleep there.").

Declaration of Kelly Gxxxxxxxx-xxxxx (5/1/16), Ex. 31 ¶7-8 ("The cell was very full so it was difficult to lie down. The only place to sleep was on the floor, there were no mattresses or beds. I didn't sleep that night. My son slept a little bit after the immigration officers returned him to me around midnight, we were sitting on a cement bench all night so it was hard to sleep… There was a mattress pad and we were given aluminum foil blankets. It was not possible to tell the day or the night because they kept the lights on the whole time and there were no windows.").

Declaration of  Maria Dxxxx xxxxxxx (4/23/16), Ex. 32 ¶6 ("We slept on the floor, but there was barely any room to sleep because there were too many people in the cell. We had no blankets and it was hard to stay warm.").

Declaration of  Maria Dxxxx xxxxxxx (4/23/16), Ex. 32 ¶7 ("After this, we were taken to another place, like a warehouse, that they called the perrera (dog house). We were given an aluminum blanket and thin mattress pads. There were even more people there than in the hielera...The lights were kept on all night and there were no windows.").

Declaration of Raquel Axxxxxx xxxxxx, Ex. 26 ¶ 9 ("My daughter was sick and she would not sleep and was coughing the whole night. We slept on cement slabs raised from the floor ... There were no pillows or anything like that and I could not sleep.").

Declaration of Sonia Axxxxx-xxxxxx (2/3/16), Ex. 35 ¶6 ("…[T]here wasn't enough space to lie down. There were about 35 or 40 people in the cell. We had to try to sleep sitting up, which was very difficult… It was very cold there, making it very difficult to sleep. No blankets or mattresses were provided. There were about 20 or 25 children in the cell and they were all crying...").

Declaration of Alex Mensing attachment Exhibit R, Ex. 19 ¶1 (11/9/15) ("There were a lot of people. There were people who slept standing up. Even a woman who was 8 months pregnant with swollen legs slept standing up. … They didn't give us any form of blanket. …The lights were on all night.").

Declaration of Fanny Exxxxxxxx xxxxxxxxx, Ex. 54 ¶ 4 (2/3/16) ("My son and I had to sleep on the floor.  The room where we were held was … very crowded. We were not given mattresses or blankets. We were each given a foil sheet to use as a blanket. The floor we had to sleep on was very hard and very cold. Bright lights were kept on all day and all night long. With these conditions it was almost impossible to sleep for several days.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶8 (3/16) ("They were given thin foil

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT          78

blankets, often only one per family, that would easily tear and rattle in the cold air blowing into their holding cells.")

Declaration of Elosia Gxxxxx, Ex. 58 ¶8 (01/29/2016) ("My daughter and I were taken to another facility, where we spent a day and a night. We were in a cell with about 60 people. We could not lie down to sleep. My clothes and my daughter's clothes were wet and we were not given dry clothes... After about 4 hours I was given a silver blanket.").

Declaration of Josselyn Mxxxx xxxxxx, Ex. 55 ¶ 7 (01/30/2016) ("This cell is very crowed. I think there are 40 or 50 people here. Yesterday I think there were more than 70 people in this cell.").

Declaration of Josselyn Mxxxx xxxxxx, Ex. 55 ¶ 10 (01/30/2016) ("The lights have been on since I got to this station. There are no beds or blankets here, just a piece of foil. I have slept on the concrete floor and a concrete bench that lines the wall... I wish there was a mattress or pillows here.").

Declaration of Edgardo Dxxxxx xxxxxxxx, Ex. 49 ¶ 6 ("We were required to sleep on the concrete floor… We had no pillows or blankets. Each minor was given a thin silver foil paper to cover ourselves with… But it didn't make much difference. Sleeping there was almost impossible. In the morning I was exhausted and the other minors also seemed exhausted.").

Declaration of Yesenia Yxxxx xxxxx, Ex. 57 ¶8 (01/31/2016) ("I was brought to this center last night in the middle of the night. I sat with my son on a concrete bench and was unable to sleep. No one is providing a mattress or pillow. If a person asks, they receive a silver paper, I did not ask and did not receive one.").

Declaration of Alex Mensing, Ex. 19 ¶12(5) ("At the hieleras, most mothers and children were forced to sleep on cold concrete floors.").

Declaration of Alex Mensing attachment Exhibit C, Ex. 19 ¶4 ("There were some aluminum sheets in the corner for us to cover ourselves with, but they were used, and there were not enough for everyone. There were no mattresses in our room.").

Declaration of Alex Mensing attachment Exhibit H, Ex. 19 ¶4 ("Every time an officer came to the door of the room to bring someone in or take someone out, I would ask the officer for a blanket for both of us or at least for my three year old son. I asked about ten different officers. They said they would bring me one but they never did.").

Declaration of Alex Mensing attachment Exhibit J, Ex. 19 ¶5 ("We had seen some people that had aluminum covers and we asked the Officers if we could have one. The Officers refused. I asked the Officer if he could please give one at least to my daughter and he still refused.").

Declaration of Alex Mensing attachment Exhibit U, Ex. 19 ¶7 ("the most difficult part about being in this station, also known as the 'Icebox,' was the cold, which was made worse by the fact that we slept directly on the floor and had no blankets.").

Declaration of Alex Mensing attachment Exhibit V, Ex. 19 ¶4 ("When I asked my children if they were provided blankets they said they were not and that they had to sleep on the floor.").

Declaration of Alex Mensing attachment Exhibit CC, Ex. 19 ¶2 ("I had to sleep on the floor with my daughter in a freezing cold room without any blankets.").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT   79
10

Declaration of Alex Mensing attachment Exhibit SS, Ex. 19 ¶5 ("We had to sleep on the cold concrete floor. I asked the officers for blankets and they told me to wait but never gave us blankets.").

2.      **Excerpts of Declarations: *Flores* class members are routinely not advised of *Flores* rights by CBP or ICE officers**

Declaration of CARA Pro Bono Project volunteer Leanne Purdum, Ex. 8 ¶11 (3/1/16) ("None of the Flores class members or their mothers that I interviewed indicated that they were told by any CBP, ICE or detention facility staff about the Flores case, or any rights that minors have under the Flores settlement or the District Court's August remedial Order.").

Declaration of Sara Exxxxxxxx xxxxx, Ex. 24 ¶ 9 ("I don't remember anyone explaining that my daughter had rights as a minor under the Flores case.").

Declaration of volunteer attorney Amanda Doroshow, Ex. 10 ¶6 (1/7/16) ("During the six days I spent at Dilley, I did not meet any *Flores* class member or mother who told me that the class member had been informed by CBP or ICE about his or her rights under *Flores*… It appeared to me that accompanied minors in Dilley were being treated as if they are not *Flores* class members at all.").

Declaration of volunteer attorney Ed McCarthy, Ex. 11 ¶11 (3/2016) ("None of the mothers and *Flores* class members who I interviewed or represented at Karnes from October 17, 2015 to October 30, 2015 told me that any CBP or ICE official, or staff member at Karnes, had informed them about any aspect of the *Flores* settlement including any rights that *Flores* class members may possess.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶12 (11/2015) ("Indeed, none of the family units I interviewed had been told anything about the Flores Settlement by CBP or ICE officers or by other staff employed at Dilley.").

Declaration of Allison Mxxxx xxxxx, Ex. 40 ¶10 (5/1/16) ("At no point did any officer or official ever talk to me, my sister, or my mom about our legal rights or the Flores case.").

Declaration of Allison Mxxxx xxxxx, Ex. 40 ¶11 (5/1/16) ("The entire eight months we have been detained neither me, nor my sister, nor my mother have ever been spoken to by officials about a case called Flores.").

Declaration of Celina Sxxxxxx-xxxx Ex. 28 ¶11 (4/23/16) ("During my time in Dilley, neither me nor my son were told by immigration officials about the Flores case. I have no knowledge of the Flores case.").

Declaration of Diana Cxxxxx xxxxx, Ex. 43 ¶6 (2/2/16) ("While I was in detention before my release the authorities never gave me any notice of my rights as a juvenile or under the Flores case.").

Declaration of Diana Cxxxxx xxxxx, Ex. 43 ¶9 (2/2/16) ("During our time here at Dilley no one has given me or my mother any notice about my rights as a minor or my rights under the Flores case.").

Declaration of Cesia Vxxxxxxxx-xxxx, Ex. 29 ¶19 (4/23/16) ("No officials have told me anything about Flores throughout all the months that I have been detained.").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT      80
11

Declaration of Isamar Sxxxxxx xxxxxx, Ex. 30 ¶33 Berks, (4/23/16) ("Immigration at Dilley never told us we had any rights under Flores for my daughter.").

Declaration of Kelly Gxxxxxxxx-xxxxx, Ex. 31 ¶8 (5/1/16) ("At no time while detained at this facility did any ICE agent or any other official tell me anything about my son's rights under the Flores case. To the best of my knowledge, no one explained anything about the Flores case to my son.").

Declaration of Maria Dxxxx xxxxxxx Ex. 32 ¶9 (4/23/16) ("No official at Dilley told me anything about the Flores case or any rights my son had under the Flores case.").

Declaration of Amarilis Lxxxxxx xxxxx Ex. 44 ¶7 (2/3/16) ("No one at the border patrol facilities notified my son or I about the rights that my son had under the Flores case.").

Declaration of  Franklin Rxxxx xxxxxxxx (16 yrs), Ex. 45 ¶12 (2/3/16) ("I have not been told about anything about any rights I may have under the Flores case at this detention facility.").

Declaration of Herson Lxxxxxx xxxxx (13yrs), Ex 46 ¶9 (2/3/16) ("To date, I have not been advised of my rights under the Flores case. My mother was not provided any information about my rights under the Flores case.").

Declaration of Mirna Mxxxxxx xxxxx, Ex. 25 ¶9 (2/3/16) ("On the afternoon of January 31, 2016, my sons and I were transported to Karnes where we have been detained since that time. No officer has explained any special rights my son may have under the Flores case.").

Declaration of Raquel Axxxxxx xxxxxx, Ex. 26 ¶11 (2/3/16) ("Since our arrest no official has told us anything about the Flores case.").

Declaration of Katerin Yxxxxxx xxxxxxx (12 yrs), Ex. 34 ¶13 (2/3/16) ("As best I remember I have not been told about my rights under the Flores case at this detention facility.").

Declaration of Sonia Axxxxx-xxxxxx, Ex. 35 ¶8 (2/3/16) ("I have not been told that my son has about my rights under the Flores case ...").

Declaration of Vilma Sxxxx xx xxxx, Ex. 47 ¶9 (2/3/16) ("No one here has told me anything about any rights my daughter has under the Flores case. No forms relating to the Flores case have been given to me.").

Declaration of volunteer attorney Natalia Ospina, Ex. 7 ¶9 (3/10/16) ("During the numerous interviews I conducted at the Dilley detention center I did not encounter a single Flores class member or Flores class member mother who indicated that they … had been provided any documents or advisals required by the Flores Settlement.").

Declaration of Bridget Cambria, Ex. 3 ¶12 ("At no point since my representation of families at the Berks County Residential Center began in June of 2014 has any child or mother in the facility been advised of their rights under the *Flores* Settlement.").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT     81
12

### 3.     Excerpts of Declarations: DHS fails to make and record ongoing efforts aimed at release or placement of Class Members

Declaration of attorney Jacqueline Kline, Ex. 5 ¶2 (3/2016) ("Despite the fact that in my experience about 95% of detained *Flores* class members at Berks have close family members to whom they could be released under Paragraph 14 of the *Flores* Settlement, to this date, despite the District Court's August Order, in none of my clients' cases (or other cases that I am aware of), has DHS made and recorded *any* ongoing efforts aimed at the placement of *Flores* class members with relatives or family friends as required by Paragraphs 14 and 18 of the Settlement.  Based on my observations, discussions with my clients, and review of their files, I am aware of <u>no</u> effort to comply with the District Court's August Order requiring DHS to make continuous efforts to expeditiously release or place minors. Minors have been and are being detained at Berks for up to four months with no effort being made to release or place them as required by Paragraphs 14, 18 and 19 of the Flores Settlement.").

 Declaration of volunteer attorney Natalia Ospina, Ex. 7 ¶9 (3/10/16) ("During the numerous interviews I conducted at the Dilley detention center I did not encounter a single Flores class member or Flores class member mother who indicated that they had been interviewed or questioned by CBP or ICE officials to obtain information needed to expeditiously process class members for release to family or friends or placement in a facility licensed for the care of dependent children.").

Declaration of volunteer attorney Amanda Doroshow, Ex. 10 ¶6 (1/7/16) )"During the six days I spent at Dilley, I did not meet any *Flores* class member or mother who told me that the class member had been informed by CBP or ICE about … any way that continuous efforts were being made to explore release or placement under the <u>*Flores*</u> settlement. It appeared to me that accompanied minors in Dilley were being treated as if they are not *Flores* class members at all.").

Declaration of volunteer attorney Ed McCarthy, Ex. 11 ¶12 (3/2016) ("None of the mothers or *Flores* class members who I interviewed or represented at Karnes from October 17, 2015 to October 30, 2015 informed me that any efforts had been taken or were being taken that they were aware of to release or place *Flores* class members as expeditiously as possible under the terms of the <u>*Flores*</u> settlement.").

Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, Ex. 17 ¶16 ("When they arrived at the border, she and her daughters entered the United States and were detained at the Karnes detention center around January 26, 2016. Her son entered with an unrelated Brazilian man who traveled with them. Her son was classified as an unaccompanied minor and placed in the custody of the Office of Refugee Resettlement ("ORR"). Although Rina had relatives in Boston that were willing to sponsor her son for release from ORR custody, on February 10, 2016 ORR "reunified" Rina's son with her and ICE admitted him at the Karnes detention center.").

Declaration of attorney Jacqueline Kline, Ex. 5 ¶10 (3/2016) ("All these *Flores* class members and their mothers have family or friends ready to provide housing and care, no criminal history, and pose no threat of security or flight. Yet none have been released despite the terms of the Flores Settlement and the District Court's August remedial Order.").

Declaration of Bridget Cambria, Ex. 3 ¶12 (I have never been informed or seen any efforts be the Defendants to provide continuous efforts towards release except the period immediately prior to the Order of Judge Gee. Following the decision and order of Judge Gee and the release of many families

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT     82
13

who were detained for long periods of time, ICE nearly immediately began to detain class members for periods in violation of the [S]ettlement.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶ 11 (11/2015) ("I interviewed no *Flores* class members or their mothers who had been questioned during their several weeks of detention by CBP or USICE officers about relatives or friends who could care for the children upon release, nor had any class member or mother been questioned about the possibility of the class member being placed in a licensed facility for the care of dependent children. I saw absolutely no evidence either in my discussions with class members or their mothers, or when reviewing their administrative files, that DHS was in any way taking and recording steps to release Flores class members without unnecessary delay or as expeditiously as possible. In fact, I became aware of no efforts at all to release class members under Paragraph 14 or to place them under Paragraph 19 of the *Flores* Settlement. Based on my discussions with Flores class members and their mothers, and review of their files, it was clear that DHS continues to ignore Paragraph 18 of the Settlement which provides upon taking a minor into custody, DHS must make and record prompt and continuous efforts toward family reunification and the release of the minor pursuant to Paragraph 14.").

Declaration of Mirna Mxxxxxx xxxxx, Ex. 25 ¶ 9 (2/3/16) ("No one at the border patrol station or here at Karnes has ever questioned me or discussed with me the possibility of my sons being released to relatives or friends here in the United States. I am not aware of any effort whatsoever being made to release one or both my sons to a relative or friend I designate here in the United States.").

Declaration of Raquel Axxxxxx xxxxxx, Ex. 26 ¶11 (2/3/16) ("No officials have talked to me about whether we have relatives or close friends in the U.S. who could temporarily care for my daughter.").

Declaration of Katerin Yxxxxxxx xxxxxxx (12 years old) Ex. 34 ¶13 (2/3/2016) ("No one asked where I was hoping to live in the United States, even though my dad lives in Virginia and my mom and I want to live with him.").

Declaration of Peter Schey, Ex. 1 ¶ 9 ("The inspections also clearly disclosed that whether Class Members were detained for days, weeks or months, continuous efforts are not made and recorded to release children under Paragraph 14 or place them under Paragraph 19, and all children end up detained in Defendants unlicensed or secure facilities commingled with unrelated adults.").

Declaration of Sonia Axxxxx-xxxxxx, Ex. 35 ¶8 (2/3/16) ("No one at the border patrol station or here at Karnes has ever questioned me or discussed with me the possibility of my sons being released to relatives or friends here in the United States.").

Declaration of Vilma Sxxxx xx xxxx, Ex. 47 ¶9 (2/3/16) ("No one here has asked me any questions about whether my daughter has any relatives she could be reunited with in the U.S. or whether there was any responsible adult I want to designate for the care of my child if released from detention. As mentioned above, my sister lives in Boston and easily could take care of my daughter in a safe environment. No one here has told me anything about any rights my daughter has under the Flores case.").

Declaration of Leny Axxxxx xxxxxx (15 yrs old) Ex. 48 ¶ 8 (2/3/16) ("To this day no officer or employee at Karnes has discussed with me or my mom the possibility that I could be released to my aunt in Houston. To the best of my knowledge no one has contacted my aunt to learn more about whether she can take care and custody of me.).

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT        83
14

Declaration of Raquel A███████ ██████, Ex. 26 ¶¶ 11-12 (2/3/16) ("My daughter is not a flight risk, a danger to herself or others, or are juvenile delinquent, yet not one official has talked to me in the past month and a half to explore whether my daughter can or should be released to a family member or family friend.").

Declaration of Kelly G██████████-██████, Ex. 31 ¶14 (5/1/16). ("I have family here in the U.S., my brother lives here and he has TPS [Temporary Protected Status], he has been here for more than 20 years and lives in Houston. He would be willing to have my son live with him. No immigration officers at the border, at Karnes, or [at] Berks have ever asked me about my son going to live with my brother.").

Declaration of attorney Lindsay Harris, Ex. 14 ¶4(d) ("*Flores* class members in CPB facilities are not told by officials about any rights they may possess under the Flores settlement.").

**4.     Excerpts of Declarations: Class Member children not promptly released are not brought before Immigration Judges for custody review hearings**

Declaration of volunteer attorney Natalia Ospina, Ex. 7 ¶9 (3/10/16) ("According to the detainees I interviewed not one had been told that Flores class members have the right to a custody hearing before an immigration judge and none of the Flores class members had been taken before an immigration judge for a bond redetermination hearing.").

Declaration of Allison M████ ██████, Ex. 40 ¶10 (5/1/16) ("At no point [during our detention] did anyone ever talk to me or my sister about our rights as children. I was never talked to about any ability to be released to my dad or to receive a bond in front of an immigration judge.").

Declaration of volunteer attorney Amanda Doroshow, Ex. 10 ¶6 (1/7/16) ("During the six days I spent at Dilley, I did not meet any *Flores* class member or mother who told me that the class member had been informed by CBP or ICE …[that] they could have their status reviewed by an Immigration Judge, or had been brought before an Immigration Judge to review their custody status.").

Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, San Antonio, Texas, Ex. 17 ¶20 ("Children at the Karnes detention center have routinely told us that they were not informed of their rights to custody redetermination hearings, as required by the *Flores* settlement agreement, and the same is true of the class members I met with on February 3, 2016.").

Declaration of Victor R█████ ████████, Ex. 21 ¶ 7 (4/23/16). ("No official told me I had any right to seek release from an immigration judge.").

Declaration of thirteen-year-old class member Cesia V███████████-████, Ex. 29 ¶19 ("[n]o official … has informed me that I have a right to see an immigration judge about my custody status.").

Declaration of Kelly G██████████-██████, Ex. 31 ¶ 6 (5/1/16) (I was never told that my son had a rights under the Flores case to have an immigration judge review his bond situation or consider his release.").

Declaration of Victor R█████ ████████ (age 15), Ex. 21 ¶¶ 7, 11 (4/23/16) ("No one told me that I maybe had the right to ask an immigration judge to review my detention status or whether I should be released on bond or other conditions...").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT     84

15

1

2   Declaration of Walter Axxxxxxxx xxxxxxxxx (age 13), Ex. 22 ¶ 8 (2/18/16) ("No one told me about … seeking a judge about being held in detention.").

3

4   Declaration of Yeslin Lxxxx xxxxxxx (age 9), Ex. 23 ¶ 7 (4/23/16) ("But they never told us that we go leave or that we could ask a judge to be released.").

5

6   Declaration of Diana Cxxxxx xxxxx, Ex. 43 ¶10 (2/2/16) ("While here at Dilley for the past month no one working with the immigration has talked to me about … my right to see a judge to decide if I should be released. My mother has told me that while we have been detained here no one has spoken to her about … my right to see a judge about my release.").

7

8   Declaration of  Edgardo Dxxxxx xxxxxxxx, Ex. 49 ¶11 (2/2/16) ("no officer here at Dilley has said anything to me or my mother about … seeing an immigration judge to decide if I or I and my mother should be released from detention").

9

10   Declaration of twelve-year-old class member, Flember Jxxx xxxxxxxxx, Ex. 50 ¶8 (2/2/16) ("I have not been told that I can see a judge about my detention or release.").

11

12   Declaration of Karen Lxxxxx xxxxxxx (12 years old), Ex. 51 ¶11 (2/2/16) ("I came to Dilley with my mother on Sunday, January 23, 2016. I have not been told that I can see a judge about my release.").

13

14   Declaration of Madelyn Mxxxxxx-xxxxx, Ex. 52 ¶10 (13 years old w/ mother, Elsy Nxxxx xxxx-xxxxx, (2/2/16)  ("While here at Dilley for the past month no one working with the immigration has talked to me about … my right to see a judge to decide if I should be released. My mother has told me that while we have been detained here no one has spoken to her about … my right to see a judge about my release.").

15

16

17

18   Declaration of Yessenia Exxxxxxxx xxxxxxx (12 years old), Ex. 27 ¶10 (2/2/16) ("I have not been told that I can see a judge about my release.").

19

20   Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES in San Antonio, Texas, Ex. 17 ¶21 ("Class members also reported being placed with unrelated adults, which is also very common at the Karnes detention center too.").

21

22   Declaration of Amarilis Lxxxxx xxxxx, Ex. 44 ¶8 (2/3/16) ("I have not been told that I can see a judge about my detention or release.").

23

24   Declaration of Franklin Rxxxx xxxxxxxx (age 16), Ex. 45 ¶ 14 ("[N]o officer here at Karnes has said anything to me (or my mother) about being released from detention or seeing an immigration judge to decide if I … should be released from detention. I feel like I am suspected of being a terrorist. I am not a flight risk. I will always appear as required if I am released from detention. I am not a criminal. I am not a danger to myself or to others. I think the only reason I have been treated so inhumanely is so the U.S. immigration authorities can use me and other detained minors as an example to convince other young people facing violence and even death in El Salvador to stay home, deal with the violence, risk death, but don't come here for protection.").

25

26

27

28

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT          85

16

Declaration of Sonia A[xxxxx-xxxxxx], Ex. 35 ¶8 (2/3/16) ("I have not been told that my son … could see a judge about his detention or release.").

Declaration of Katerin Y[xxxxxxx xxxxxxx], Ex. 34 ¶7 (2/3/16) ("No one told me that I had a right to see an Immigration Judge about my detention. …  I have talked to my mother and my mother has said that no one has told her about… any rights I may have to see an immigration judge.").

**5.     Excerpts of Declarations: Flores class member are routinely commingled for extended periods of time with unrelated adults**

Declaration of Amarilis L[xxxxxx xxxxx], Ex. 44 ¶10. (2/3/16).("It is very disturbing for my child to be detained here with several hundred unrelated adults. He is becoming more and more depressed and anxious the longer we are in this detention center unsure of our future and detained with hundreds of unrelated adults.").

Declaration of Alex Mensing, Exhibit Y ¶4, Ex. 19 (11/13/15) ("The room was about 3 meters wide by 4 or 5 meters long. There were about 18 people inside. There were babies as young as 1 and a half years old. The babies cried continuously. They kept loading in more and more women with children. There wasn't enough space to sleep because we didn't fit.").

Declaration of attorney Robyn Barnard, Ex. 12 ¶18 ("It should also be noted that many class members are still detained in secure lock-down facilities with unrelated adults for weeks or months on end even if the claimed "average" detention is about twenty days.")

Declaration of attorney Jacquelyn Kline, Ex. 5 ¶ 9 (2/2016) ("Children remain detained at the BCRC with their adult parents. Children remain detained with unrelated adults, yet another violation of State law and the terms of the *Flores* Settlement.").

Declaration of Alex Mensing, Exhibit R, Ex. 19 (11/9/15) ("I was with my two kids and some other people… There were a lot of people. There were people who slept standing up. Even a woman who was 8 months pregnant with swollen legs slept standing up.").

Declaration of Maria M[xxxxxxx–xxxxxxx], Ex. 32 ¶ 6 (4/23/16) ("There were many people, maybe forty people in the cell, all mothers with children").

Declaration of Yeslin L[xxxx xxxxxxx] (9 years old), Ex. 23 ¶ 9 (4/23/16) ("Next, we were taken to a detention center in Dilley, Texas… it was awful because we were being held in a big jail with hundreds of other adults and children.").

Declaration of Karen Z[xxxxx xxxxxxx] (5/1/16) , Ex. 39 ¶23 ("Detained men here are comingled with detained mothers and children and this makes the children and woman very uncomfortable.").

Declaration of Victor R[xxxxx xxxxxxx] (15 yrs old), Ex. 21 ¶¶ 8, 16 (4/23/16) ("I felt very depressed at Karnes. It was very distressing and embarrassing being detained with a large number of unrelated adults…Like at Karnes, it is very disturbing to be detained with other unrelated adults. Here both adult men and women are detained with unrelated minors. This does not feel like a safe situation.").

Declaration of Alex Mensing, Exhibit GG, Ex. 19 ¶ 14 (11/13/15) ("On the plane, we were mixed in with men… There were men who were handcuffed at the feet and at the wrist. We were really uncomfortable. We didn't know what class of person they were. We worried about what these men

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT     86
17

could do. Instead of having a relaxing trip, we wondered what would happen. We were worried the whole time.")

6.      **Excerpts of Declarations: Prolonged detention is not necessary to ensure that Class Members receive medical care; in fact, their physical and mental health is placed at risk in DHS's detention centers**

Declaration of Walter Axxxxxxxx xxxxxxxxx, Ex. 22 ¶15 (13 years old) (2/18/16) ("Recently I suddenly got very tired and my heart started pounding and really hurting like someone was hitting me. I felt like I blacked out. I had a hard time breathing. They took me to see a doctor here at the Berks detention center. My mother said my lips were purple. The doctor said I was close to having a heart attack. The doctor told my mother that the stress made me like that. I think being detained here for so long caused this incident. I am exhausted and totally stressed. They never took me to the hospital. I am afraid it will happen again. I am too worried to eat properly.").

Declaration of Cesia Vxxxxxxxxx-xxxx, Ex. 29 ¶13 (4/23/16) ("I have had problems with a sore tooth, it's been hurting me a lot since January 24 and the staff members keep saying that they are going to make an appointment for me. It's been more than three weeks and I still haven't seen a dentist. I also suffer from very bad menstrual cramps and the medical staff members do not really help me and they just give me Tylenol. My mom has been having stomach pain since she came here. The medical staff did two tests that came back and showed that she had a kidney infection, but about four or five days ago the medical staff said that they needed another opinion from an outside lab. My mother is still in pain and it's hard for me to see her suffering.").

Declaration of Dr. Luis Zayas, Dean of University of Texas School of Social Work, Ex. 61. ¶¶12, 13 ("Much of the research findings on children who have experienced periods of detention conclude that such children will require years of mental health services to alleviate the impact of living under restrictive conditions. The stress, despair, and uncertainty of detention – even for short periods – compromise children's intellectual and cognitive development and contribute to the development of chronic illnesses. Institutionalization and the threats faced by children in detention have impacts similar to those of other forms of trauma. During and after the detention period, children experience recurrent, distressing memories, nightmares, dissociative reactions, prolonged psychological distress, and negative alterations in cognition. . . The findings reported in the scientific literature on the detention of asylum-seeking mothers and children in facilities like those in Karnes City and Dilley, Texas, and Berks, Pennsylvania are very uniform in showing the deleterious impact of incarceration or detention on children.").

Declaration of Carol Anne Donohoe, Ex. 4 ¶¶8, 9 (Upon arrival, several of the children were determined to be ill by the staff at the Berks medical clinic, yet they had been transferred anyway. One child was not even admitted to Berks upon arrival but was instead taken directly to a hospital where she was diagnosed with pneumonia. She spent a few hours at the hospital and then was returned to detention to Berks.

Over the next few weeks in November, nearly every young child I interviewed at the Berks facility had a fever or a throat infection. In addition, there was a chicken pox outbreak. A five-year-old child I represent was given a chicken pox vaccine even though his mother told the Berks doctor that he had already had chicken pox. A couple of days later, the child came down with chicken pox and was quarantined in an isolation room with his mother for a week.").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT          87
18

Declaration of Dr. Luis Zayas, Dean of University of Texas School of Social Work, Ex. 61. ¶¶19-20 (explaining the deleterious effects of maternal incarceration with children in the criminal justice context and juvenile detention).

Declaration of Bridget Cambria, Ex. 3 ¶10 ("As their attorney I have observed the psychological effects on class members of prolonged detention. Children right now detained at Berks exhibit suicidal ideation, anxiety, stress, chronic depression, constant tearfulness, isolation and anger. It has manifested itself in isolation, thoughts of self-harm, crying, tantrums, slapping kicking, biting, spitting and other form of expressing their frustration.").

Declaration of Dr. Luis Zayas, Dean of University of Texas School of Social Work, Ex. 61. ¶32 ("For children and mothers detained in the residential detention centers in south Texas that I have visited, a significant issue in their lives is the jail-like physical plant and the law enforcement culture that dictates the rhythms of their days and weeks. While living under these psychologically injurious conditions, the families undergo high-stakes interviews (i.e., credible fear and reasonable fear interviews) with asylum officers and review and adjudication by immigration judges that could result in deportation or release and integration into the community. Their lives are punctuated by emotionally challenging interviews followed by long periods of uncertainty. Contrast this unaccompanied minors (UACs) that I have observed in settings operated by non-profit social service contractors for the Office of Refugee Resettlement and the toxic impact that detention has on children and parents becomes clearer. UACs are typically engaged with providers who are making plans for the children's release into the community from the day they arrive, not undergoing extensive interviews and scrutiny and uncertainty about deportation or release into communities. UACs enjoy field trips, greater freedom of movement, and absence of a correctional or prison-like culture. Meanwhile, mothers and children in detention centers like those in Karnes and Dilley feel incarcerated, their lives in suspension.").

**Declaration of Dr. Luis Zayas, Dean of University of Texas School of Social Work, Ex. 61 ¶¶34-35 ("Based on my professional background and expertise, the knowledge derived from the scientific literature reviewed in this declaration on child development and psychopathology and parenting and family functioning, and based on my conversations with mothers and children in immigration detention, I can say with certainty that detention is inflicting emotional, psychological, physical health and neurological harms on these families, particularly the children, and that some of these effects will be long lasting, and very likely permanent as adduced by the scientific literature. The healing process, in my view, cannot begin while mothers and young children are detained. Indeed, my clinical experience and scientific literature indicate to me that even a few weeks of detention exacerbates the trauma experienced by refugee and immigrant families and added a new layer of hardship that, with respect to the children in particular, may be irreversible.").**

Declaration of CARA Project volunteer Leanne Purdum, Ex. 8 ¶ 7 (3/1/16) ("Throughout the detention process, the children are under immense emotional stress, both from being detained and from watching their mothers try to navigate the legal process while in detention. At Dilley, I saw many children in distress over seeing their

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT   88
19

mothers cry. I especially remember one young boy continually reaching up to wipe the tears from his mother's face, saying softly "No, don't cry mommy. Don't cry mommy." To distract him, we tasked him with finding tissues for mommy. I am sure this mother would have liked to have a private legal consultation with me. However the detention center is not conducive to allowing such consultations because many children are very worried about being separated from their mothers and, even where mother and child were both comfortable being separated, the childcare provided at the facility is limited. Also, there is a poster inside the visitation trailer that says "your children are your responsibility", making it clear that children need to be with the mothers. Family detention centers create situations where children are sometimes exposed to emotional stress by proximity. The children are very aware that they are being held inside of a facility surrounded by fences, which they are not allowed to leave.").

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11A (12/21/15) ("The four-year old boy suffers from asthma and a dangerous kidney condition.  The mother told me that, in addition to a specialized diet, the boy requires medication every six hours in order for his kidneys to function properly.  According to the mother, despite her repeated requests, the boy did not have access to a doctor, medical treatment, or medications the entire time he was in CBP custody.  He had trouble breathing, caught a bad cough and a fever, and experienced stomach pains.  Although the boy eventually obtained medical treatment at the Dilley facility, his mother said that he did not receive medications during the four days he was in CBP custody and for one day while at Dilley.  In addition, his mother reported that she had a diarrheal illness while in CBP custody, but did not receive any medical treatment. When she asked to see a doctor, CBP officers reportedly told the mother that this would delay her family's processing through CBP, so she did not receive medical care.").

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11B (12/21/15) ("The daughter developed a bad cold in detention and her ears hurt her.  However, the four-year-old girl received no medical treatment while she was detained by CBP.").

Declaration of attorney Jocelyn Dyer, Ex. 6 ¶11C (12/21/15) ("The mother reported that her children were sick, but CBP officers told her that there were too many sick people to treat, so her family did not receive medical care.").

Declaration of volunteer Theresa Wilkes, Ex. 6 ¶7 (11/2015) ("One of the mothers reported to me that, while detained at STFRC, she was taken to the regional hospital, diagnosed with pneumonia, and then promptly returned to the multi-family detention housing with her toddler as well as other mothers and their children, although her condition remained untreated. When I saw her a few days after her diagnosis, she was still coughing up phlegm to the degree that she was unable to speak to me for several minutes. When we met, her son was also congested and coughing.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. __ ¶7 (1/28/16) ("During the tour, I was most struck by our discussion with the mental health staff.  They explained to us that there were no Spanish-speaking mental health staff at Berks, that all services were provided through a phone interpreter, and that they had no problem with this arrangement.  As a long time practitioner in the field of mental health, I found this arrangement concerning as the inability to communicate with clients effectively has a deleterious impact on a clinician's ability to build rapport and trust with a client. These are the bedrocks of the therapeutic relationship.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. __ ¶ 8 (1/28/16) ("The mental health staff also explained that while they were required to meet with all the families following their arrival at Berks and regularly thereafter, they used no formalized assessment tools. I am concerned that there is no clear process of assessing for trauma, depression, or anxiety when families arrive at the facility, which makes it very difficult to treat these conditions—especially given the above-referenced language barriers.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. __ ¶14 (1/28/16) ("I found that all of the mothers and children for whom I completed psychological evaluations were suffering from high levels of anxiety and depression. Additionally, most of the mothers also met the criteria for Post-traumatic Stress Disorder (PTSD).  All of these families disclosed life threatening, traumatic experiences in their home countries, which caused them to flee. Many of the mothers also revealed that they had experienced childhood abuse, as well as intimate partner violence. This abuse almost always included regular experiences of rape.  In families where the mothers had experienced intimate partner violence, the children had nearly always witnessed this violence and, in several families, the children had also been directly physically and emotionally abused.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. 62 ¶16 (1/28/16) ("My various interactions with mothers and children in the Dilley facility left no doubt that they were experiencing high levels of anxiety, depression, and in many cases PTSD. Despite the prevalence of mental health issues, mothers cited a lack of access to mental health staff despite their repeated requests for intervention at the medical clinic.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. 62 ¶18 (1/28/16) ("The mothers' lack of agency was particularly evident for those with sick children. Nearly every child I met at the Dilley facility had a deep, hacking cough and a fever at some point during detention. Mothers expressed anxiety and fear around their children's health, particularly given the long wait times at the clinic and the frequent failure of the medical staff to do anything other than recommend that their children drink water.").

Attachment X. to Declaration of attorney Lindsay Harris, CARA Project Complaint filed with the Office of Civil Rights and Civil Liberties and the Office of Inspector General on October , 2015, Ex. 15, Page 2 (The complaint includes fourteen case examples for children and mothers detained at Dilley, and explains:

"The cases summarized in this complaint reflect the continuation of the following disturbing trends identified in our July 30, 2015 complaint:
   • Children with fevers and infections or viruses are told to drink more water and, lately, prescribed Vicks Vaporub;
   • Mothers and children must often wait between four to eight hours to receive medical attention;
   • Lack of follow-up treatment and unavailability of specialist care.

In addition to these three ongoing trends, these cases also reflect the following problems with medical care at STFRC:
   • Mothers are routinely asked to sign forms saying that they have refused medical care if they leave the medical clinic, even after waiting many hours to be seen;

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT      90
21

• Pre-existing conditions, including anemia, vision problems, chronic pain from gun-shot wounds, and high-blood pressure, are not being treated;
Doctors are not on site or available in the evening or during lunch."

Complaint filed by CARA Family Detention Pro Bono Project on March 28, 2016, with the DHS Office of Civil Rights and Civil Liberties and Office of Inspector General Re: Ongoing Concerns regarding the Detention and Fast-track Removal of Children and Mothers Experiencing Symptoms of Trauma, Ex. 63 Page 2, 15 (discussing how many detained mothers and children suffer from Post-traumatic Stress Disorder, anxiety, depression, or other emotional or cognitive disorders and that the fast track removal processes and detention to which they are subjected are "dangerously inadequate to ensure access to protections under U.S. law. . . "The majority of the predominantly Central American families held in family detention centers have fled gang violence, domestic abuse, or other trauma, which often has lasting effects. As documented above, traumatized individuals living with PTSD, depression, or other disorders face real struggles in communicating and disclosing the suffering they have endured to asylum officers. Disclosing traumatic events requires trust and a certain level of comfort that cannot be achieved in detention. Consequently, traumatized individuals may be deprived of due process and, ultimately, protection under U.S. law.").

Declaration of Licensed Clinical Social Worker Jessica Gorelick, Ex. 62 ¶21 (1/28/16) ("It is my professional assessment that the family members with whom I met at the Berks and Dilley facilities suffered an adverse emotional impact as a result of being held in detention. These adverse emotional consequences appeared to occur without regard to the length of detention.").

Declaration of attorney Lindsay Harris (medical), Ex. 15 ¶11(a) ("A mother who suffered from severe asthma but was not permitted to keep an inhaler with her in the Dilley facility until after she had experienced several asthma attacks and received oxygen for three or four hours. She constantly worried that her asthmatic eight-year-old son would experience similar symptoms.").

Declaration of attorney Lindsay Harris (medical), Ex. 15 ¶11(b) ("A four-year-old boy who suffers from asthma and a kidney condition for which he requires medication every six hours. This child was denied medical care while in the custody of Customs and Border Protection (CBP) prior to being transferred to Dilley and did not receive the necessary medications for his kidney conditions from November 6 to November 11. A doctor told the mother that they would try to get the son to a specialist in San Antonio, but could make no guarantees.").

Declaration of attorney Lindsay Harris (medical), Ex. 15 ¶11(c) ("A two-year-old boy with a cast on his fractured arm that was due to be removed on November 9, 2015, by a doctor in El Salvador. Although the boy and his mother saw doctors at Dilley a total of five times and repeatedly alerted doctors that the cast should be removed. On one occasion when the mother raised her concern about the cast, a doctor was simply unresponsive. On another occasion, on November 12, a doctor asked when the mother would receive a decision on her immigration case. The mother was made to feel that getting an appointment for her son's cast to be removed was dependent on the results of her credible fear interview. The cast was not removed until November 19, 2015, after attorneys from the CARA Project intervened and brought the case to the attention of ICE officials.").

Declaration of attorney Lindsay Harris (medical), Ex. 15 ¶11(d) ("A five-year-old boy transferred from Karnes to Berks who was vaccinated for varicella (chicken pox) at the Berks facility, despite being vaccinated as an infant… He developed chicken pox two days after the vaccination and he and

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT      91
22

his mother were held in medical isolation for a week. *Id.* The mother describes how her son seems depressed, has stopped playing with other children, has become quiet, wants to go and says that he is in prison.").

Declaration of Allison Mxxxx xxxxx, Ex. 40 ¶21(5/1/16) ("I have only seen a mental health worker on one occasion. I suffer from depression and it's very hard to deal with being trapped every day. I believe I am suffering emotionally and in school.").

Declaration of Celina Sxxxxxx-xxxx, Ex. 28 ¶18 (4/23/16) "My was seen by a psychologist or social worker upon our initial entry into the Berks detention center. No mental health provider has seen my son since that time. I have discussed the problems that I am having with the mental health staff, but they have not offered my son any services. They have only told me what I must do in the facility when he acts that way. The only solution I was given was to take my son into my room until he calms down.").

Declaration of Celina Sxxxxxx-xxxx, Ex.28 ¶19 (2/19/16) ("I am diabetic. I have been hospitalized and taken from this center on one occasion. I receive diabetic medicine three times a day. At other times I receive an injection. Sometimes I am told by the doctor to rest, and they have asked staff members to watch my son as I recover. That request from the doctor was refused by Berks staff. On one occasion I was in the isolation room at Berks because I was suffering from a high fever, chills, and I had to be there for a whole day. I was with my son and had to wear a mask.").

Declaration of Isamar Sxxxxxx xxxxxx, Ex. 30 ¶29 (4/23/16) ("I never had any medical issues at Dilley, but as soon as I got to Berks, I got sick. I had a round ball on my backside. I went to medical to complain about the pain. But they didn't do anything. I went two times. I was only given treatment because I woke up one day and could not walk. The pain was very bad. I had to be taken to a hospital. Two staff members took me there, a man and a woman. On the way to the hospital, the man was driving. He kept looking back at me and laughing. At the hospital, a doctor was examining me. The doctor needed me to undress. The male staff member did not want to leave the room, but the doctor finally forced him to leave.").

Declaration of Isamar Sxxxxxx xxxxxx Ex.30 ¶30 (2/19/16) ("I was given 4 different antibiotics to take. The doctor told me that if the treatment didn't work, I would need surgery. The medicine has taken the pain away, but not the ball. I can still feel it. Also, the one medicine made me extremely dizzy. Even when I was feeling dizzy, I was expected to walk to medical to get my medications.").

Declaration of Isamar Sxxxxxx xxxxxx, Ex.30 ¶31 (2/19/16) ("One time, my daughter woke up crying saying her head hurt. When [we] got to medical, she started throwing up. She complained that her throat and stomach hurt. The whole next day she felt sick. Medical only gave her Tylenol. The whole next day she barely ate. I asked medical to give her pedialyte, but said she was fine and didn't need anything.").

Declaration of Maria Dxxxx xxxxxxx, Ex. 32 ¶9 (4/23/16) ("At Dilley, my son got an earache. I was not happy with the medical treatment received because my son was crying in pain and they made me wait for four hours before they saw him.").

Declaration of Maria Dxxxx xxxxxxx, Ex. 32 ¶12 (4/23/16) ("At Berks, my son has started wetting the bed at night. I believe it is from the stress and psychological harm of being held in detention. I have been putting diapers on him at night here at Berks, but I came across an officer who told me that

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT    92
23

I could not use diapers because my son is too old. They told me I had to make an appointment with the doctor to get one diaper per night.").

Declaration of Theresa Wilkes, Ex. 9 ¶5 (3/2016) ("Most of the women and Flores class members I assisted during the week I spent at Dilley had horrible coughs. Treatment for these families in STFRC for their coughs ranged from nothing to cough drops or honey and water.")

Declaration of Victor Rxxxxx xxxxxxx, Ex. 21 ¶13 (4/23/16) ("I keep feeling very sick here. I was really sick for an entire week. I had diarrhea, was vomiting, and felt constantly nauseated. I couldn't eat because the food was so bad. I went to the doctor, but she just said that I should come back if it was still bad the next week, saying that I am old enough and I have a body to resist something like this. I have had a cold and sore, raw throat pretty much the whole time I have been here.  Sometimes, like now, it gets really bad. For the past four nights, I have hardly been able to sleep because I keep coughing so much. But I don't want to go to the doctor again because she only tells me to gargle with water with salt. I also have a problem with my tooth. I have a filling that came loose. It is incredibly painful and feels like a hole in my teeth.  A dentist who comes here and saw me said that it just a molar coming in and I didn't need to see an outside dentist. He said that I should just chew on the other side. I can't wait to get out of this place and see a dentist who can stop the pain in my mouth.").

Declaration of Victor Rxxxxx xxxxxxx, Ex. 21 ¶14 (4/23/16) ("I am still feeling depressed and like I have to get out of there.  The staff called me to talk to a psychologist, but I did not want to talk to her because it turned out she does not speak Spanish so I would have to speak through an interpreter who works for this detention center.").

Declaration of Yeslin Lxxxx xxxxxxx, Ex. 23 ¶¶15-17 (9 yrs) (2/19/16) ("I have been sick here many times. I feel a sharp pain in my chest, where my heart is.  My mom brought me to the doctor, but they said that it could be because I feel sadness or anguish and have not done anything about it. My sister is also in a lot of pain. She can't even eat because there is something wrong with her molars.  They have been hurting since she got here. Her fillings fell out and I can see the big holes in her teeth. She went to the dentist about a month ago.  They said that she would need surgery, but would need an appointment with an outside doctor first.  It has been a month and she still doesn't have an appointment or even know when they will fix it.  Now, they just give her pain medicine, but it still hurts her.").

Declaration of Alex Mensing, attached Exhibit M, Ex. 19 ¶8 (10/27/15) ("My two younger children got colds in the *hielera* and began coughing. They are still not better. My daughter has a cyst problem for which she takes medication and they took it away from us.").

Declaration of Alex Mensing, attached Exhibit PP, Ex. 19 ¶8 (11/30/15) ("My children suffered from constant diarrhea, stomachaches and fever.  We would wait for four hours or more to see a doctor and we would still not receive medicine. Even when my daughters had high fevers they were not given medicine. They were told to drink water.  The water was disgusting and tasted like pure chlorine.  All me and my children could do was pray.").

Declaration of Alex Mensing, attached Exhibit MM, Ex. 19 ¶7 (11/30/15) ("They took us to Dilley, Texas. The experience there was horrible. Two or three days after I arrived, blood started coming from my mouth and nose. I wasn't taken to a doctor. They told me to drink hot water. About a week later, they gave me pills for a sore throat. I was bleeding for five days before I got medicine. …Me and my son both had diarrhea for most of the time we were there. Eventually, my son got a cold and we went to go see a doctor at the office in Dilley. We waited from 8 in the morning until 3 in the

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT          93

afternoon and then they just told us to come back the next day. We waited for three or four hours the next day and then the doctor just told my son to drink water. We had no food to eat while we waited, so we went hungry all day.").

Declaration of Alex Mensing, attached Exhibit MM, Ex. 19 ¶13 (11/30/15) ("My son has mostly been healthy in Berks but some of the other children have had facial swelling. When he had a fever and a cold, my son was taken to the emergency room. He had an infection in his eye but he hasn't been given medicine yet, we're still waiting for it.").

Declaration of Alex Mensing, attached Exhibit NN, Ex. 19 ¶11 (11/16/15) ("I kept having migraines, and waited for hours to receive medical attention or some pills and at the end they did not give me anything. I also asked for psychological help but no one responded.").

Declaration of Yesenia Y▮▮▮▮ ▮▮▮▮▮, Ex. 57 ¶12 (01/31/2016) ("My son has diarrhea and I am pregnant. We have not seen a doctor.").

Declaration of Alex Mensing, attached Exhibit OO, Ex. 19 ¶9 (11/19/15) ("At. Dilley, we had problems with the medical care. My son was vomiting and when we went to the doctor, they said he had a fever and that he should just drink water. We had to wait: at least four hours to even see a doctor, and then they would just tell him to drink water again.").

Declaration of attorney Robert Doggett, Ex.18 ¶11 (12/2015) ("Dean Zayas has visited both the Karnes and Dilley facilities on multiple occasions. He testified about the conditions in the facilities, describing them as secure and highly restrictive, making them much like jails. He explained that multiple families are held in single sleeping and living cells together. He laid out his conclusion that the children held in the family detention facilities, even for relatively short periods of time, suffer negative and long-lasting impacts on their mental health. He also noted that the facilities do not resemble other childcare facilities, even residential facilities, because they do not have a therapeutic or child welfare purpose but rather serve a law enforcement purpose of immigration detention.").

Declaration of attorney Robyn Barnard, Ex. 12, ¶¶18-19 ("On February 19, 2016, Human Rights First published a brief summarizing medical complaints made by mothers at Berks, which include the written responses they received from their ICE Deportation Officers (DO). One mother wrote:

'My son suffers from a skin disease named ▮▮▮▮▮▮▮▮▮ and since we arrived in the United States, it developed itself so much to the point he even has symptoms on his genitals. When scratched it bleeds and [the detention center health staff] did not give me any medications for it or to calm him down, also his behavior has changed, he cries because he does not want to stay here any longer, it has already been over four months and I am still here."

Her ICE DO advised her to make an appointment with the medical staff at Berks, not responding to her concerns that the medical staff had not helped her child despite visits to the medical department at the detention center. The ICE DO went on to say "You may accept your removal order and arrangements can be made for your removal from the United States. At this time your custody status remains unchanged.'

Another complaint reads:
'My daughter has been having diarrhea for about three weeks now and we went to see a doctor but they did not give us any medication not even serum. With every passing day her behavior is getting worse and the psychologist just tells me to be patient. I need you to give

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT     94
25

me the adequate medication and that you give me the opportunity to take my case outside of here. I am not a criminal. You gave the opportunity to other persons that have been deported to leave, why did you not give it to me. It has been more than four months that I have been detained.'

ICE DOs response: "Thank you! You may disolve [sic] your case at any time and return to your country. Please use the medical department in reference to health related issues.'

These complaints are further evidence that DHS is not capable of providing appropriate care for the families that they detain in Berks and other family detention centers, and reinforces the well-established view that detention centers are no place for children and their families.").

**7.      Excerpts of Declarations: Detention of children undermines and frustrates access to counsel.**

Declaration of attorney Karen Lucas Ex. 13 ¶4 (3/25/16) ("ICE has consistently frustrated the ability of dedicated lawyers and legal assistants to access their clients and has systematically disregarded the attorney-client relationship.").

Attachment A to Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, San Antonio, Texas, Ex. 17, Exhibit A, Letter to San Antonio Field Office Director and ICE Headquarters regarding issues with access to counsel at the Karnes detention Center. The access to counsel issues raised include:

- Restrictions on the ability of law students working under supervision to meet with detained *Flores* class members and their parents. (Page 2)
- Delayed entry into the Karnes detention center for law students working under attorney supervision. (Page 2)
- The requirement that young children remain with their mothers during attorney/client meetings during which sensitive and traumatic information must often be disclosed and discussed. (Page 3).
- Restrictions on the ability of pro bono attorneys to enter the legal visitation area upon arrival at the Karnes detention center. (Page 4).
- Ongoing restrictions on the conducting of independent medical evaluations, a critical component of the legal case for *Flores* class members and their mothers. (Page 5).
- Requirement that visitation lists be submitted 24 hours in advance, despite the rapidly changing population at the detention center and remote location in Karnes City, Texas.
- Increasing restrictions on attorney phone calls with detained families.

Declaration of attorney Robyn Barnard Ex. 12 ¶12 (3/16) ("Given the large number of families involved, the remoteness of the Berks facility, and lack of rapid access to detainees ICE administrative files, effective representation for the great majority of detainees is impossible.").

Declaration of Alex Mensing, attached Exhibit PP, Ex. 19 ¶ 11 (11/30/2015) ("I was transferred to another detention facility away from my lawyers with no warning… It did not matter to immigration officials that I had a lawyer or that I was fighting my case.  They still moved me.").

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT

26

95

Declaration of attorney Robyn Barnard Ex. 12 ¶ 8 (3/16) ("In response to the extremely low rates of *pro bono* legal representation of families detained at the Berks facility, Human Rights First partnered with a local Berks County legal service provider, the Pennsylvania Immigrant Resource Center ("PIRC"), local private attorneys, Philadelphia-based law firms, and Pennsylvania law schools to attempt to provide *pro bono* legal representation for families detained at Berks.  Nevertheless, because of the remote location of this detention center, effective and thorough legal representation for the majority of *Flores* class members and their mothers is virtually impossible.").

Declaration of attorney Robyn Barnard Ex. 12 ¶10 (3/16) ("Since October 28, the *pro bono* representation project at the Berks facility has screened at least 46 families, of which 31 were transferred from either the Dilley or the Karnes facilities.  All of the 31 families had been held in one of the family detention facilities in Texas for more than 30 days by the time they arrived at the Berks facility; at least four of those families had been detained in Texas for two months before their transfer to Pennsylvania. All of the families who have been transferred to the Berks facility since October 22 received an initial "negative" fear determination from the Asylum Office that adjudicated their credible or reasonable fear interviews in Texas.  The vast majority of these families, if not all of them, were transferred to the Berks facility without any prior notice to their families or their attorneys of record in Texas.").

Declaration of attorney Robyn Barnard Ex. 12 ¶11 (3/16) ("I have been informed by CARA attorneys that they have discussed the unannounced transfer of families from the Dilley and Karnes facilities to Berks with Immigration and Customs Enforcement (ICE) officials in Washington, D.C. and if they are counsel of record requested notice prior to any future transfers of their clients from the Texas facilities.  As of this date, they report to me that they still do not receive prior notice for all of their clients who are scheduled to be transferred.").

Declaration of attorney Robyn Barnard Ex. 12 ¶18 (3/16) ("I am aware that since about July-August of 2014 DHS has detained class members apprehended with their mothers while almost always releasing or placing class members in non-secure settings if apprehended with their fathers or other relatives because the agency insists on conducting fear interviews prior to considering release or placement of these accompanied class members. I am also aware that since the District Court hearing in April 2015 at which time the Court tentatively indicated it intended to find the defendants in breach of the *Flores* settlement, defendants have attempted to speed up the credible fear interview process so that they could claim that the 'average' length of detention was reduced to about twenty days. Speeding up the process inevitably curtails class members' right to counsel and due process of law *because* of defendants' failure to cooperate with the small number of *pro bono* counsel attempting to represent as many class members and their mothers as possible, failure to notify counsel of record before transferring class members and their mothers from one facility to another, failure to promptly make administrative files available to pro bono counsel, and limiting pro bono counsel's access to detention facilities. It should also be noted that many class members are still detained in secure lock-down facilities with unrelated adults for weeks or months on end even if the claimed 'average' detention is about twenty days.").

Declaration of Alex Mensing, attached Exhibit GG, Ex. 19 ¶18  (11/13/15) ("I didn't know what was going to happen to my case because my lawyers were in Texas and I did not get to speak to them before I was transferred. My cousin here said he would look into getting me an attorney but there were already attorneys coming here.").

Declaration of Kathryn Shepherd, Ex. 69 ¶4 ("Because the Dilley detention center is located about 80

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT      96

27

minutes outside of San Antonio, little to no legal representation exists for the up to 2400 detained children and mothers other than the services provided by the CARA project. Although Immigration and Customs Enforcement (ICE) refuses to give us a daily or even weekly population count, we estimate the population to currently be around 1500 children and mothers.").

Declaration of Alex Mensing, attached Exhibit PP, Ex. 19 ¶ 13 (11/30/2015) ("When we were transferred here I was afraid I had lost my lawyers.  I felt like my case was over and that I would have no help. Here in Pennsylvania I heard that there were no lawyers here like in Texas. I was lucky enough to receive information about a lawyer from another detainee.  We do not get legal access here in Berks like we did in Texas. The staff will not help us access legal help.").

Deaclaration of Kathryn Shepherd, Ex. 69 ¶¶9, 10 ("In the last month, the extremely limited child care capacity at Dilley has substantially increased the challenges we face in providing legal services. Mothers now must come to legal appointments with their young children in tow and tell us that while they attempted to drop off their children at the nursery, they were told that it was at capacity…. Of course, attorney-client meetings in which the mothers receive legal counsel and advice are highly sensitive and critically important to the family's legal case for protection in the United States. Many of these mothers, and sometimes the children too, are disclosing, for the very first time, traumatic events, including rape, sexual assault, incest, domestic violence, threats, and extortion. In my experience, mothers and older children are often reluctant and sometimes totally unable to articulate the fears that they have and the horrors they have endured with younger children or siblings present in the room.").

Deaclaration of Kathryn Shepherd, Ex. 69 ¶ 13 ("Another troubling recent development at Dilley regarding access to counsel is the sudden prohibition on telephonic psychological evaluations. Such evaluations by independent mental health experts are critical evidence that attorneys obtain in support of their client's legal claims, especially as it pertains to credible and reasonable fear determinations and the terms and timing of release from detention. The overwhelming majority of families detained at Dilley are fleeing violence in their home countries and seeking protection in the United States. As such, many of the children and mothers exhibit symptoms of trauma, and, when evaluated, many are diagnosed with Post-traumatic Stress Disorder, Major Depressive Disorder, Anxiety disorders, or other cognitive disabilities.").

Declaration of Alex Mensing, attached Exhibit NN, Ex. 19 ¶ 13 (11/15/2015) ("No one asked me if I had a lawyer before I was transferred to Berks and I didn't get to speak with anyone from the CARA. Project before I left.")

Declaration of volunteer attorney Amanda Doroshow, Ex. 10 ¶4 (1/7/16) ("Working with these clients I know firsthand how much time and patience it often takes to build trust and a rapport with a woman or a child, so that s/he is able to open up and talk about the violence or threats of violence experienced in their home country. It would not be unusual for an attorney (or a therapist or social worker) to spend weeks or months meeting with an asylum seeker to obtain a complete account of the factual basis for any claim they possess to qualify for asylum. It often also requires independent research to collect evidence in support of a claim. Based on my experience providing pro bono legal services at Dilley, unless the Government provided a bank of lawyers to represent *Flores* class members and mothers at Dilley, effective representation for all detained class members and their mothers is virtually impossible.")

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT        97

28

Declaration of volunteer attorney Ed Mccarthy, Ex. 11 ¶9 (3/2016) ("Aside from the problems in translation, I faced problems in accessing my clients due to Immigration and Customs Enforcement's ("ICE's") decisions.").

Deaclaration of Kathryn Shepherd, Ex. 69 ¶ 22 ("On May 10, 2016… we had 163 families who wanted to attend the pre-release orientation. These are typically families who know they are about to be released within a day or two and have received a positive credible fear determination. A total of 84 families, more than half of whom wanted to attend to access this important information, were unable to attend because Building 100 was at capacity").

Declaration of attorney Jacqueline Kline, Ex. 5 ¶ 5 (3/2016) ("Access to counsel at Berks is extremely limited. A handful of pro bono and very low cost attorneys are available to represent detainees however there are hundreds of detainees.").

Declaration of attorney Jacqueline Kline, Ex. 5 ¶ 7 (3/2016) ("Still today, counsel is subject to search upon entry into the BCRC. We are not permitted to bring in certain items, like a purse/bag. We are not permitted to bring in cell phones. We are not permitted to bring in computers unless we have prior approval.  We are not permitted to visit clients without notice.  We were notified via email on November 23, 2015 of more restrictive rules regarding legal visitation requiring 24 hours' notice in order to see our clients. *See* Ex. A attached (Legal Access and Visitation Standard Operating Procedures). These more restrictive requirements have further impeded attorneys' access to the families in the detention facility.").

Declaration of attorney Lindsay Harris (Due Process), Ex. 16 ¶13 (3/2016) ("Available pro bono counsel resources are tremendously strained, the number of volunteers fluctuates week to week, and CARA Project staff and volunteers cannot possibly serve all detained families. Recently, for example, the CARA Project had one week in March when only two volunteers were able to travel to Dilley to provide services and representation to detained children and their mothers. In that same week, new intakes increased at the detention center and the on-the-ground volunteer and staff team of 8 had to handle 60 intakes of the mother's of newly arrived *Flores* class members and conduct approximately the same number of preparation sessions for credible and reasonable fear interviews each day that week.  Volunteer fatigue has been increasing steadily, and we will face difficulty maintaining consistent levels of attorney volunteers at Dilley in the coming months.").

Declaration of attorney Lindsay Harris (Due Process), Ex. 16 at ¶13(". To give the court a sense of the volume of families that the CARA Project represents at this detention center where children and their mothers are detained en masse, here are some statistics from a week in April 2016, CARA staff and volunteers conducted:

   a.  298 Intakes for newly arrived families
        239 Credible Fear interview preparation sessions
        75 Follow-up client meetings
        12 Bond Hearings before an immigration judge
        8 reviews of negative credible fear determinations before an immigration judge
        Information sessions regarding post-release rights and obligations with 222 families.)

Declaration of attorney Lindsay Harris (Due Process), Ex.16 ¶14 ("*Flores* class member children and their mothers are not afforded any access to counsel at Border Patrol processing stations– even though they often spend at least 72 hours and sometimes longer in these facilities before being transferred to ICE detention. CARA staff and volunteers at Dilley have served over 8000 families

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT     98
29

since March 2015, but we have yet to encounter any child or family who met with an attorney or secured representation prior to their arrival at Dilley, despite having already been in the United States for several days, and sometimes considerably longer.").

Declaration of attorney Lindsay Harris (Due Process), Ex. 16 ¶15 (3/2016) ("The CARA Project faces difficulties in providing full representation to detained families, even as we work daily within the legal visitation trailer at the Dilley detention center. *Flores* class member children and their mothers are frequently called into meetings with ICE agents to discuss the terms and conditions of their release. Counsel are prohibited from attending those meetings, even with the customary Form G-28, Notice of Appearance as Attorney or Representative, on file with ICE. During those meetings, class members and their mothers are routinely coerced and misinformed about their right to request a bond hearing before an immigration judge, a right provided to class members under the original *Flores* settlement.").

Declaration of attorney Lindsay Harris (Due Process), Ex. 16 ¶16 (3/2016) ("A further challenge to representation of detained *Flores* class member children and their mothers is that ICE often does not give families copies of their charging documents, removal orders, or other paperwork at intake. This makes it difficult for CARA staff and volunteers to understand the procedural posture of the case – including key issues such as whether an individual is eligible for bond or can pursue a claim for asylum.").

Declaration of volunteer attorney Theresa Wilkes, Ex. 9 ¶ 3 (11/7/14) ("The loss of income from a whole week of unpaid work makes it impossible for me to repeat this experience, despite the desperate need of families detained at the STFRC for representation.").

Declaration of CARA Project attorney Ana Camila Colon, Ex. 64 ¶4, 6 (explaining the difficulties of providing representation where CBP routinely fails to provide charging documents to families sent to Dilley for detention – "In other words, over seventy-five percent of the families had not been issued charging/removal documents following their interviews with CBP officers prior to their arrival in Dilley, Texas. . . The government's failure to issue charging/removal documents to our clients is problematic because we cannot adequately represent them if we do not know the charges against them or whether they are subject to a reinstated order of removal. This means that we must file an individual request for each client's full immigration file. While we wait for this file, the preparation for the family's case is delayed and they must remain in detention."

Declaration of attorney Michelle Garza Pareja, Associate Executive Director of RAICES in San Antonio, Texas, Ex. 66 ¶ 8(comparing ORR custody and treatment of unaccompanied children versus the accompanied children placed in family detention centers with their mothers – "At Karnes mothers complain they do not feel comfortable during their fear interviews because officers are not friendly or sensitive to their stories of persecution. Officers are often hard to understand because they use a telephonic interpreter. Because child care is not easily available, mothers who want to be interviewed outside of the presence of their children to avoid the children being further traumatized by the mothers' testimony are unable to do so. Because of the remoteness of the detention site few attorneys are available to assist class members and when attorneys do agree to do so they must often wait for hours to see their clients. Most class members and their mothers go through fear interviews without the assistance of counsel. Children rarely are provided a separate interview even though they may possess independent fear claims. In most cases the asylum officers find that the minors or mothers are credible, and have been persecuted, but then deny the fear claim because when asked what "social group" the class member or mother belonged to that caused their persecution, they have no idea what

EXHIBIT 2 IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT          99

30

the question even means. Even the immigration judges and the courts have difficulty defining what "social groups" are.").

Attachment to Declaration of Amy Fischer, Policy Director, RAICES, Ex. , CARA Project Complaint submitted on December 10, 2015, to DHS Office of Civil Rights and Civil Liberties and the Office of Inspector General Re: Family Detention – Challenges Faced by Indigenous Language Speakers. (The complaint describes various challenges for indigenous language speaking children and mothers held in family detention centers, which implicate access to counsel. These issues include a lack of interpreting assistance for interactions with government officials, subcontractors (including medical staff), and service providers, and a lack of translated written materials, denial of educational opportunities, and a failure to explain conditions of release).

   8.   **Excerpts of Declarations: Class Member children and their mothers are routinely held past the 3-5 days allowed under the Settlement.**

Declaration of CARA Project attorney Ana Camila Colon, Ex. 64 ¶7 (explaining that delays in the conducting of reasonable fear interviews result in prolonged detention for class members: "One case I worked [on] in November 2015 for the Flores class members from El Salvador waited 16 days for the reasonable fear interview. Another case I worked on in February 2016 for the Flores class members from Guatemala waited 19 days for the reasonable fear interview. A more recent case I worked on March 2016 for the Flores class members from El Salvador waited 20 days for the reasonable fear interview.")

Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, San Antonio, Texas, Ex. 17 ¶¶ 6-14 (discussing nine families who were detained (or remain detained) for between nine and nineteen plus weeks, originally at Karnes, with some of them eventually transferred to Berks).

Declaration of Lindsay Harris, Ex. 14, ¶5 (discussing the prolonged detention of children and their mothers at Dilley and Berks, including one six-year-old *Flores* class member who remains detained with his mother for more than eight months, a nine-year-old Peruvian girl held for more than a month at Dilley, and a nine-year-old girl and her eleven-year-old brother from El Salvador held for more than six weeks before being deported. Also stating, "As a result of my work with the CARA Pro Bono Project, I am aware of many more cases of families held in immigration detention centers who were not released "without unnecessary delay." Indeed, during my February 2016 visit to the Berks County Family Residential Center, all of the families with whom I met had been detained for more than four months. ").

Declaration of attorney Robyn Barnard, Ex. 12, ¶10 ("Since October 28, 2015, the *pro bono* representation project at the Berks facility has screened at least 36 families, of which 35 were transferred from either the Dilley or the Karnes facilities. All of the 35 families had been held in one of the family detention facilities in Texas for more than 30 days by the time they arrived at the Berks facility; at least four of those families had been detained in Texas for two months before their transfer to Pennsylvania.").

Declaration of Carol Anne Donohoe, Ex. 4 ¶14, ("There are several class members and mothers who have now been detained for over eight (8) months. Most of the other class members have been detained for several months and cannot be deported because of stays issued by the courts, Immigration Judges, or the Board of Immigration Appeals.").

Declaration of Kathryn Shepherd, Ex. 69 ¶26 ("In the hundreds of families I have represented detained at Dilley since October 2015, when I started volunteering in the detention center, I have never seen a family released in less than five days. Indeed, since the October 23, 2015 date for the government to comply with the Judge's August orders in Flores, according to CARA Project records, we have represented over 6,500 Class member children who have been held in detention for at least five days or longer. … I have routinely seen cases in which class members/parents are detained for longer than 20 days from apprehension to release. In those cases, we have Class member children and their mothers who have been held in detention in Dilley for months. More often, however, families in this position are transferred at some point to the detention center in Berks County, Pennsylvania, and their detention continues there instead of at Dilley. At any one time, we are usually working with around 150 families who have been detained for longer than 20 days.").

9.   **Excerpts of Declarations:** Decisions regarding placement in a family detention center are arbitrary and based primarily on bed space

Declaration of attorney Jodilyn Goodwin, Ex. 65 ¶12 (explaining that based on her extensive experience representing immigrants in South Texas, "I do not perceive any difference between the families of mothers and children released after processing at the border, who have interacted with our volunteer attorneys, and the families sent to the family immigration detention centers. Based on information that I have received from the press, DHS statements and statistics and my conversations with immigration attorneys around the country, including AILA attorneys who volunteer at the family immigration detention centers, the families of mothers and children sent to immigration detention centers are almost all Central American families seeking asylum. The vast majority are apprehended shortly after crossing into the United States, although some families presented themselves to immigration officials before crossing into the United States. The families released at the border and those held in family detention appear to be very similar in national origin, size of family, reasons for arriving in the United States and manner of apprehension.").

Declaration of Carol Anne Donohoe, Ex. 4 ¶12 ("There appears to be no rational reason why some families are detained and others released other than the availability of ICE bed space and the sex of the parent apprehended with the class member child… Class members are not detained or released because of the Settlement or the Court's Orders. Class members are released because bed space is limited or because the mother eventually receives a positive credible fear or reasonable fear determination. Class member children at Berks are detained for weeks or months on end and denied parole requests, even with stays of deportation and diagnosed illnesses, and *not* because they are a flight risk or a danger to themselves or others.").

Declaration of Karen Lucas Re Flores detention facility Inspection, Ex. 68 ¶¶6-9 ("During the Ursula inspection, Class Counsel asked an ICE Enforcement and Removal Operations (ERO) official how ICE decides which class members and parents to release, and which to continue to detain…This is the decision-making process the ICE ERO officer described: If the family detention centers tell Ursula they have bed space, ICE then looks at the family's "composition," including the gender of the parent and the gender and age of the children (ages 2-14 at Dilley, ages 2-17 at Karnes, he said), to see if the family is suitable for any available family detention spaces, given the makeup of the currently detained population (e.g., because more than one family sleeps in the same room, the gender of the children is considered). They also look to see if the detention center in question can provide medical care needed by any or all of the family members…If the family does not "qualify" for detention, then they "qualify" for release, he said…With respect to male head-of-household families in particular, the official explained that the Dilley and Karnes detention centers do not accept male heads of household. So if Berks has bed space, the family could go to Berks – if not, they would be issued an NTA and

released.").

Declaration of Karen Lucas Re Flores detention facility Inspection, Ex. 68 ¶13 ("It …appeared to me that the decision to transfer a particular family from Ursula to a family detention center, rather than to release with an NTA, is completely arbitrary. It appears to be based on a combination of available bed space and characteristics like the age, gender, and medical conditions of parents and child(ren).").

# Exhibit 3
## Publicly Filed

## DECLARATION OF BRIDGET CAMBRIA

I, Bridget Cambria, declare and say as follows:

1. I am an attorney licensed to practice in the state of Pennsylvania. I am a partner in the law firm of Cambria & Kline, P.C. My practice includes regular representation of immigrant and refugee children and their parents detained pursuant to the Immigration and Nationality Act and housed at the Berks County Residential Center, a family detention center located in Leesport, Pennsylvania.

2. I have practiced immigration law for ten years and have represented immigrants, children and families before the Immigration Courts, the Board of Immigration Appeals, Federal District Courts and the Third Circuit Court of Appeals. I am a graduate of the Roger Williams School of Law, wherein my studies focused on immigration and public interest law. Prior to law school, on or about 2002, I was employed by the County of Berks wherein I was a staff member for one year of what is now called the "Berks County Residential Center" (hereinafter "BCRC", previously and alternatively known as the "Berks County Youth Center", "Berks Family Shelter", or the "Berks Family Detention Center").

3. In the course of my practice and previous employment by the family detention facility, I have regular occasion to observe, and therefore am familiar with, the

policies and practices of United States Immigration and Customs Enforcement (ICE) toward the detention, release, and treatment of children and mothers detained at BCRC. I have also had the opportunity to observe how those policies and practices have changed over time.

4. In the course of my representation of over 100 individuals in the Berks County Residential Center since June of 2014, I have also had occasion to observe and interact with families and children. Therefore, I have been advised by mothers and children of the physical, medical and psychological effects of their own detention. I am also aware of ICE's decisions on detention and have observed their continued refusal to follow requirements of the *Flores* Settlement.

5. In a previous declaration before this Honorable Court in November of 2014, I addressed the sharp change in ICE's practices toward the treatment and detention of Central American mothers and children in ICE custody as well as factual allegations addressing how the Department of Homeland Security and Immigration and Customs Enforcement failed to follow the requirements of the longstanding *Flores* Settlement. Following litigation, this Honorable Court issued an Order on August 21, 2015, instructing ICE that their family detention practices violated the Settlement, and that the remedies previously set forth by this Honorable Court must be implemented by October 23, 2015.

- 2 -

6.  At the time of the July Order of this Honorable Court, ICE attempted to protect their interests before this Honorable Court by voluntarily releasing every family detained in the BCRC for a prolonged period of time. The time of detention at the moment of these mass releases included class members who had been detained for a period of up to 14 months.

7.  A representative list of some *Flores* class members represented by this office who were released because ICE violated the *Settlement* during the enforcement period include:

    a.  Juan M███████████ (A███████), age 16, who was detained in the BCYC from July 10, 2014 to July 10, 2015.

    b.  Elida M███████████ (A███████), age 16, who was detained in the BCYC from July 9, 2014 to July 10, 2015.

    c.  Orbin A███████████ (A███████), age 9, who was detained in the BCYC from May 14, 2014 to July 10, 2015.

    d.  Yeimi C███████████ (A███████), age 5, who was detained at the BCYC from June 3, 2014 to July 10, 2015.

    e.  Yubitza C███████████ (A███████), age 12, who was detained in the BCYC from July 22, 2014 to July 10, 2015. The only period of time this child was not in detention was the one month where

- 3 -

she and her mother were improperly removed from the United States in violation of a court order.

8. However, as this court recognized the voluntary cessation of activity that violated the *Flores* Settlement was not sufficient because ICE had the ability to reengage in the same or similar behavior to violate the *Flores* Settlement. ICE began reengaging in said behavior within months.

9. Beginning on or about August of 2015, following the mass release of Berks children and this Honorable Court's Decision of August 21, 2015, ICE began transferring families from the Texas family detention facilities of Karnes and Dilley to the BCRC. ICE transferred mothers and child class members from Texas to Berks, Pennsylvania once a family reached on or about 20 days of detention. Rather than work towards or effectuate preferred placement outside of detention according to *Flores*, ICE placed class members in continued prolonged detention at the BCRC. The following class members, represented by my office, are representative of others who remain detained right now at the Berks County Residential Center for periods up to and exceeding eight months:

   a. Steven A▮▮▮▮▮ (A▮▮▮▮▮), age 6, currently in detention at the BCRC, who was apprehended by ICE on or about August 29, 2015. Steven remains detained without release, despite being protected by a court ordered Stay of Removal. Steven and his mother have a sponsor

- 4 -

who provided information to ICE to effectuate release. All requests, including parole requests and family custody reviews have been summarily denied without an individual analysis to Steven's needs. Steven suffers from a contagious skin condition called "Molluscum Contagiosum" which is an uncomfortable skin disorder. Steven suffers from rashes and itching which spreads over his entire body and at times to his private areas. When Steven's mother asked ICE for help for her son's chronic medical condition she was advised by ICE to withdraw her case for protection and to accept removal to El Salvador. Steven exhibits extreme behavioral issues in detention including defiance, outbursts, aggression, and hyperactivity. Steven has continuously suffered from behavioral issues in detention which are unaddressed, and for which both ICE and the facility fail to accommodate based on a history of trauma and prolonged detention. He has endured events, on top of prolonged detention, at the BCRC which have affected him psychologically included where he and another child were involved in inappropriate touching. Steven on occasions will use his BCRC ID lanyard to simulate asphyxiating himself. There have been no efforts to effectuate release.

b. Ludwin C███████ (A███████), age 5, currently in detention at the BCRC, who was apprehended by ICE on or about October 10, 2015.

- 5 -

108

Ludwin remains detained without release, despite being protected by a court ordered Stay of Removal. Steven and his mother have a sponsor who provided information to ICE to effectuate release. As of this day all parole requests and family custody reviews have been denied. Ludwin is a shy child who is guarded. He has endured events, on top of prolonged detention, at the BCRC which have affected him psychologically included where he and another child were involved in inappropriate touching of Ludwin, against his will, in February of 2016. Ludwin's mother expressed that her son suffered mentally as a result of the event and requested outside mental health services which were not provided. There have been no efforts to effectuate release.

c. Estefany M████████ (A███████████), age 16, and Allison M█████ ████ (A██████████), age 14, sisters currently in detention at the BCRC, who were apprehended by ICE on or about August 23, 2015. Estefany and Allison remain detained without release, despite being protected by a court ordered Stay of Removal. These sisters and their mother have sponsors, including US citizen and LPR relatives, who provided information to ICE to effectuate release. All requests, including parole requests and family custody reviews have been summarily denied

- 6 -

without an individual analysis to these teenage girl's needs. Notably their

mother reports that her daughters are suffering from profound depression.

d. Ashley M███████ (A███████), age 5, currently in detention at

BCRC was apprehended by ICE on or about October 1, 2015. Ashley

remains detained without release, despite being protected by a court

ordered Stay of Removal. Ashley's mother provided information to ICE

to effectuate release. All requests, including parole requests and family

custody reviews have been summarily denied without an individual

analysis to the child's needs. There have been no efforts to effectuate

release.

e. Joshua L███████ (A███████), age 4, currently in detention at

BCRC was apprehended by ICE on or about September 5, 2015. Joshua

remains detained without release, despite being protected by a court

ordered Stay of Removal. Joshua's mother provided information to ICE

to effectuate release. All requests, including parole requests and family

custody reviews have been summarily denied without an individual

analysis to the child's needs. There have been no efforts to effectuate

release.

f. Jefferson A███████ (A███████), age 6, currently in detention

at BCRC was apprehended by ICE on or about November 10, 2015.

- 7 -

Jefferson remains detained without release, despite being protected by a court ordered Stay of Removal. Jefferson's mother provided information to ICE to effectuate release. All requests, including parole requests and family custody reviews have been summarily denied without an individual analysis to the child's needs. Jefferson is extremely thin. At best Jefferson reaches a 3.9 percent body weight on a child's milestone grown chart, at his worst recording Jefferson exhibits a 1.9 percent body weight. He is malnourished and in detention. Further, Jefferson exhibits extreme behavioral issues in detention including defiance, outbursts, aggression, and hyperactivity. Jefferson's mother has expressed concern to BCRC staff about her son's behavior. No substantive evaluations have been conducted. Further, neither ICE nor BCRC considers the effects prolonged detention has on the behaviors of a child, growth and development. There have been no efforts to effectuate release.

10. As their attorney I have observed the psychological effects on class members of prolonged detention. Children right now detained at Berks exhibit suicidal ideation, anxiety, stress, chronic depression, constant tearfulness, isolation and anger. It has manifested itself in isolation, thoughts of self-harm, crying, tantrums, slapping, kicking, biting, spitting and other forms of expressing their frustration.

- 8 -

11. As previously indicated by counsel for the Defendant's, ICE instituted a 30 and
60 day family custody review for the mothers and children detained in family
detention. Despite providing information as requested on those custody
determinations, ICE routinely has denied release to class members. The denials
fail to address the individual needs of the child or mother but are simply a
boilerplate denial. Similarly, on or about March 28, 2016, 19 parole requests
were filed for mothers and children evidencing the availability of sponsors and
the effects of continued detention for periods of time between 4 and eight
months. To date we have received 17 denials and no approvals.

12. At no point since my representation of families at the Berks County Residential
Center began in June of 2014 has any child or mother in the facility been
advised of their rights under the *Flores* Settlement. No child has ever been
afforded a bond hearing before an immigration judge as is required under
*Flores.* I have never seen any efforts towards compliance on the part of ICE,
except the period immediately prior to the Order of Judge Gee. I have never
been informed or seen any efforts by the Defendants to provide continuous
efforts towards release except the period immediately prior to the Order of
Judge Gee. Following the decision and order of Judge Gee and the release of
many families who were detained for long periods of time, ICE nearly

- 9 -

immediately began to detain class members for periods in violation of the
settlement.

13. The Berks County Residential Center remains a secure facility. Since my last
declaration the State of Pennsylvania has seen fit to revoke and not renew the
license for the Berks County Residential Center for non-compliance.

14. Based on my observations, the government has not only not made a good faith
effort to comply with the *Flores* order but has actively attempted to circumvent
it. Practices and procedures regarding detention, bonds, and the processing of
credible fears are changed at random, with no warning to counsel or the
detained families and in an erratic fashion. The dangers of this callous conduct
is to send children, and indeed class members, to their death. Many of the class
members who are trapped in family detention are subject to court ordered stays
of removal. Since their removal is not imminent, ICE has an obligation to abide
by the Settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of April, 2016, at Reading, PA.

Bridget Cambria, Esq.

- 10 -

113

# Exhibit 4
## Publicly Filed

## DECLARATION OF CAROL ANNE DONOHOE

I, Carol Anne Donohoe, Esq., hereby swear and attest, under the penalty of perjury, that the
following is true and correct to the best of my knowledge and recollection:

1. I am a solo practitioner of immigration law in private practice in Reading, PA. I have
   been practicing immigration law in Reading since July of 2011. Prior to June of 2014, I
   never had occasion to represent detained families at the Berks Family Residential Center
   ("Berks"). I submit this declaration to supplement my previous declaration and to outline
   my observations and experiences at Berks since October 23, 2015 when Defendants were
   required to come into compliance with District Judge Gee's August 21, 2015, Order and
   the terms of the *Flores* Settlement.

2. In July of 2015, after the District Court in Flores issued its Order, the Government
   actually released several long-term detained mothers, fathers and children from Berks.
   These parents and children had been detained for over a year while they pursued their
   asylum claims. Quite tellingly, the same mothers, father, and children who were released
   had been told (after boilerplate custody reviews) less than a month prior to Judge Gee's
   July Order that continued detention in their cases was warranted. Every one of the
   mothers was released with an electronic ankle monitor, with no individual determination
   as to flight risk.

3. Following Judge Gee's August 2015 Order, the situation at Berks briefly changed
   drastically. For a short period of time, ICE stopped referring newly detained families to
   the asylum office for credible or reasonable fear interviews (CFI/RFI) and instead sent
   them directly before a judge for immigration bond hearings. However, shortly after the
   wave of bond hearings, ICE began referring detained families at Berks (mostly mothers
   and children) for credible/reasonable fear interviews with the USCIS asylum office. The
   vast majority of these detainees eventually received positive CFI/RFI determinations,
   particularly when represented. To the best of my knowledge, each and every parent who
   was released after passing a CFI/RFI was released with an electronic ankle monitor.
   There were no individualized determinations and few of these parents had access to
   attorneys to discuss terms and conditions of release, including their right to pursue bond
   hearings before an Immigration Judge prior to release.

4. Throughout my representation of families at Berks, there have almost always been a few
   men with children detained at the facility. By and large ICE's policy is not to detain
   fathers apprehended with children but only mothers. Accompanied *Flores* class member
   children are routinely comingled with unrelated men and women, including in sleeping
   quarters. Concerned about the safety of some of my *Flores* clients, especially young girls
   sharing sleeping rooms with unrelated teenage and adult males, on or about October 16,
   2015, I sent an email to Immigration and Customs Enforcement, Enforcement and
   Removal Operations (ICE-ERO) to express my concern about an eight year old girl made
   to share a room with her father and two unrelated adult males. Having toured the facility,

1

I am aware that the detainees use a shared bathroom with no door, only a short curtain. The ICE official assured me that she would get back to me. Even after a subsequent follow up email, I never received a response.

5. On or around October 20, 2015, my colleagues in Berks and I were notified by attorneys working at the family detention facility in Karnes City, TX, that a group of mothers and children were set to be transferred from that facility to Berks. We understood that the transfers were related to the Government's October 23, 2015 deadline for compliance with the *Flores* settlement. The Government decided that since Berks was supposedly a licensed facility, it would simply transfer *Flores* class members and their mothers to Berks. After the families arrived at Berks, the *Flores* class members and mothers told us that they were moved because they had been detained at Karnes for over a month.

6. On October 22, 2015, the Secretary of the Pennsylvania Department of Human Services (PA DHS) sent a letter to the Executive Director of the Berks Family Residential Center and the Berks County Commissioners stating that the Berks license was not in compliance with the existing statute and would not be renewed in February 2016. The same day, the PA DHS Secretary issued a press release clearly stating that Berks is a secure facility.

7. The above statements from the PA DHS did not deter further transfers from Texas to Berks. Over the following weeks at least thirty *Flores* class members and their mothers were transferred from the detention facilities in Dilley and Karnes City, Texas to Berks. Nearly all of these families were represented by attorneys in Texas at the time they were transferred. When I interviewed these recently arrived class members and mothers, I learned that many did not know where they were being transferred when moved out of Dilley or Karnes and were moved in the middle of the night. Some were falsely told that they were going to be reunited with their families which led them to believe that they were being released.

8. Upon arrival, several of the children were determined to be ill by the staff at the Berks medical clinic, yet they had been transferred anyway. One child was not even admitted to Berks upon arrival but was instead taken directly to a hospital where she was diagnosed with pneumonia. She spent a few hours at the hospital and then was returned to detention to Berks.

9. Over the next few weeks in November, nearly every young child I interviewed at the Berks facility had a fever or a throat infection. In addition, there was a chicken pox outbreak. A five-year-old child I represent was given a chicken pox vaccine even though his mother told the Berks doctor that he had already had chicken pox. A couple of days later, the child came down with chicken pox and was quarantined in an isolation room with his mother for a week.

2

10. The families arriving from Dilley and Karnes in November and December had received
    negative credible fear interviews despite having what appeared to be viable and
    approvable claims. My colleagues and I filed detailed requests for re-interviews with the
    Newark asylum office, but only one of over twenty of those requests has been granted.
    The mother who was granted a second interview received a positive fear determination
    and was released shortly thereafter. I represented her at that interview. Mothers with
    equally valid and compelling claims for protection have not been given the opportunity
    for re-interviews where they could fully articulate their claims.

11. Shortly after the transfers, I represented a mother whose case was referred to the
    Immigration Judge at Berks after she received a second negative credible fear
    determination in Texas (following a request for re-interview that had been granted prior
    to her transfer). On November 5, 2015, the Immigration Judge at York vacated her
    negative credible fear determination and that mother and child were then released after
    spending weeks or months in detention. Since that time, I believe ICE stopped referring
    individuals who have received a second negative credible fear determination to the
    Immigration Judge for review.

12. There appears to be no rational reason why some families are detained and others
    released other than the availability of ICE bed space and the sex of the parent
    apprehended with the class member child. Despite my work representing numerous
    accompanied class members and their mothers at Berks, I am not aware of any ongoing
    efforts made and recorded by ICE to release detained minors pursuant to Paragraph 14 of
    the Settlement or to place them in non-secure facilities pursuant to Paragraph 19. Class
    members are not detained or released because of the Settlement or the Court's Orders.
    Class members are released because bed space is limited or because the mother
    eventually receives a positive credible fear or reasonable fear determination. Class
    member children at Berks are detained for weeks or months on end and denied parole
    requests, even with stays of deportation and diagnosed illnesses, and *not* because they are
    a flight risk or a danger to themselves or others.

13. Class members may be released simply because they were apprehended with a father
    rather than a mother. I represented a mother detained with her one-year-old son after
    fleeing Honduras with her common-law husband and their seven-year-old son. They were
    separated at the river by the smugglers. The mother was detained with their one-year old
    child upon crossing. The mother and baby were transferred to the Dilley detention facility
    and weeks later to Berks. Her common law husband and older son were also apprehended
    but they were immediately released on their own recognizance to my client's mother in
    New Jersey. The entire family fled Honduras under the exact same circumstances.  When
    father and son would visit at Berks there was no way to explain why they were allowed to
    leave but mother and baby had to remain detained. Only after making repeated requests
    over several weeks was I finally able to get the mother and child released on parole. They
    had been unnecessarily detained for over two months. During their prolonged detention
    the baby came down with a fever and a throat infection.

3

14. Currently the majority of *Flores* class members and mothers at Berks are from Central America. Repeated requests to the ICE Field Office Director for parole and release have been denied. There are several class members and mothers who have now been detained for over eight (8) months. Most of the other class members have been detained for several months and cannot be deported because of stays issued by the courts, Immigration Judges, or the Board of Immigration Appeals. In my representation of numerous of these class members and their mothers, ICE has never informed me that the agency is detaining these class members because they are a flight risk or danger to themselves or others as defined in the *Flores* Settlement.

15. On March 28, 2016, we submitted 19 "parole" requests on behalf of *Flores* class members and mothers detained at Berks anywhere from three (3) to eight (8) months. All 19 families have stays of deportation. On April 26, 2016, we received five (5) denials of those parole requests from the Philadelphia Field Office Director.  See Exhibit A attached. The language in the denials is boilerplate and does not address the *Flores* directive to make and document continuous efforts toward release under Paragraph 14 or placement under Paragraph 19. None have been granted release. These class members are languishing in detention and being afforded no opportunity for release. The class member children range in age from two (2) to sixteen (16) years old.

16. My experiences as an attorney representing families at the Berks Family Residential Center have solidified my belief that ICE policy with regard to *Flores* class member children is both erratic and irrational. Over the past nearly two years, I have seen ICE shift from a policy of detaining families for long periods of time through their Individual Merits Hearings, to a bond-only policy, to a policy of releasing families after positive credible or reasonable fear determinations (but always with an electronic ankle monitor on the mother), to a very brief policy of fathers-only detention, to a policy of filling Berks primarily with female headed families transferred just before they hit twenty days' detention in unlicensed secure facilities in Texas, and, now, to a policy of prolonged detention of class members transferred by ICE to Berks from  Dilley and Karnes.  I have also observed that the Government has ignored and continues to ignore its several obligations under the District Court's July and August 2015 Orders and the *Flores* Settlement.

Dated: May 12, 2016

Carol Anne Donohoe, Esq.
Attorney-at-Law
PO Box 12912
Reading, PA 19612
Ph:  (610) 370-7956
Fax: (610) 743-8626

4

# Exhibit 5
## Publicly Filed

## DECLARATION OF JACQUELYN M. KLINE, ESQ.

I, Jacquelyn M. Kline, Esq., depose and say:

1. I am a partner at Cambria & Kline, P.C.  I, along with my partner, Bridget Cambria, Esq., have represented over 200 detainees at the Berks County Residential Center (hereinafter, "BCRC" or "Berks detention center") since 2014.  My business address is 123 N. 3RD Street, Reading, PA 19601.  From November 1, 2015, to the present, our firm has represented approximately more than 100 *Flores* class members and their mothers detained at Berks. I have seen no change in the Department of Homeland Security's (DHS) policies or practices with regards to the detention of accompanied *Flores* class members at Berks since the District Court issued its August 2015 Order requiring that the DHS comply with the terms of the Flores Settlement within 90 days.

2. Despite the fact that in my experience about 95% of detained *Flores* class members at Berks have close family members to whom they could be released under Paragraph 14 of the *Flores* Settlement, to this date, despite the District Court's August Order, in none of my clients' cases (or other cases that I am aware of), has DHS made and recorded *any* ongoing efforts aimed at the placement of *Flores* class members with relatives or family friends as required by Paragraphs 14 and 18 of the Settlement.  Based on my observations, discussions with my clients, and review of their files, I am aware of <u>no</u> effort to comply with the District Court's August Order requiring DHS to make continuous efforts to expeditiously release or place minors. Minors have been, and are being detained, at Berks for up to four months with no effort being made to release or place them as required by Paragraphs 14, 18 and 19 of the Flores Settlement.

3. Paragraph 24A of the Settlement provides that class members in removal proceedings should be be afforded a bond redetermination hearing before an immigration judge, unless the minor indicates on a Notice of Custody Determination form that he or she refuses such a hearing. Before the District Court's August Order and since that time I am not aware of any case in which DHS has complied with this requirement.

4. In recent months, the majority of BCRC detainees have been families who were transferred from the Karnes, Texas and Dilley, Texas facilities. Those families previously had been detained in the Texas facilities for several weeks. At Berks class members and their mothers are being held for several more weeks or months.

5. Access to counsel at Berks is extremely limited. A handful of pro bono and very low cost attorneys are available to represent detainees, however there are

approximately hundreds of detainees at a given time.

6. Berks is a secure facility. While doors are sometimes unlocked leading to the exterior, especially during visits and tours by outside groups, families are not allowed to leave the facility without supervision. Outside the facility, there is a line of cones that detainees are forbidden to cross. Philadelphia ICE Field Office Director Thomas Decker has informed me, and several other attorneys, that if detainees crossed the line of cones they would be charged with escape. Detainees have informed me that they have been told by ICE officials or facility staff they would be charged with a federal crime if they went past the cones. There are signs posted around BCRC which warn visitors that the Berks facility is "secure." From the beginning of my representation of clients detained at BCRC in 2014, I observed that it was operating as a secure facility. When I first went to visit clients at BCRC, the doors were locked and staff had to let us into, and out of, the building. Staff members stood in front of the exit door during our visits. Our clients told us that during certain hours they were locked into specific sections of facility, either through the doors being locked to prevent their egress or by staff (guards) standing in front of the doors to block their way.

7. Still today, counsel is subject to search upon entry into the BCRC. We are not permitted to bring in certain items, like a purse/bag. We are not permitted to bring in cell phones. We are not permitted to bring in computers unless we have prior approval. We are not permitted to visit clients without notice. We were notified via email on November 23, 2015 of more restrictive rules regarding legal visitation requiring 24 hours' notice in order to see our clients. *See* Ex. A attached (Legal Access and Visitation Standard Operating Procedures). These more restrictive requirements have further impeded attorneys' access to the families in the detention facility.

8. On October 31, 2014, the Pennsylvania Department of Human Services issued BCRC a license to operate a child residential facility pursuant to 55 Pa. Code Ch. 3800 (relating to Child Residential and Day Treatment Facilities) for the period of February 21, 2015, to February 21, 2016. However, on October 22, 2015, the State informed the County of Berks and DHS in writing that the Berks facility is not in compliance with the license because BCRC is not operating as a child residential and day treatment facility. This letter and a press release are attached to this declaration as Exhibit B.

9. Since the October 22, 2015, letter and announcement from Pennsylvania Department of Human Services, both BCRC and ICE have continued to detain families and children at BCRC. Children remain detained at the BCRC with their adult parents. Children remain detained with unrelated adults, yet another violation

State law and the terms of the *Flores* Settlement.

10. Every *Flores* class member and parent detained for more than three months now gets what ICE calls a "Family Residential File Custody Review." This appears to be a paper review of the file. For those of my clients who have been detained longer than three months, every one, without exception, has been denied release by ICE following their "Family Residential File Custody Review." All these *Flores* class members and their mothers have family or friends ready to provide housing and care, no criminal history, and pose no threat of security or flight. Yet none have been released despite the terms of the Flores Settlement and the District Court's August remedial Order.

I declare under penalty of perjury that the above facts are true and correct. Executed this 29th day of February, 2016, in Berks, Pennsylvania.


Jacquelyn M. Kline, Esq.

3

122

# Exhibit 5 Attachment Exhibit A

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
ENFORCEMENT AND REMOVAL OPERATIONS
STANDARD OPERATING PROCEDURES**

**Legal Access and Legal Visitation Standard Operating Procedures for ICE Family Residential Centers**

**Directive Number**: 11302
**Issue Date:** 10/30/2015
**Superseded:** None.
**Federal Enterprise Architecture Number:** 301-112-002b

1. **Purpose/Background.** These Standard Operating Procedures establish minimum legal access and legal visitation standards applicable to all Immigration and Customs Enforcement (ICE) Family Residential Centers (FRC) that are active and operational as of the above effective date.

2. **Policy.** ICE will promote access and visitation for residents by legal representatives as set forth in these standard operating procedures. In the event of an emergency that threatens the safety or security of FRC residents and/or staff, the facility administrator may temporarily suspend these procedures, in whole or in part. Any violation of the legal access and visitation rules by a visitor may result in corrective action, including suspension of access to the facility. Any criminal violations may lead to criminal arrest and prosecution. ICE will review these procedures on an annual basis or more frequently if operationally required.

3. **Definitions.** The following definitions apply for purposes of this SOP only.
   1) **Attorney.** Any person who is eligible to practice law in, and is a member in good standing of the bar, of the highest court of any State, possession, territory, or Commonwealth of the United States, or of the District of Columbia, and is not under any order suspending, enjoining, restraining, disbarring, or otherwise restricting him/her in the practice of law. 8 C.F.R. § 1.2.

   2) **Interpreter.** A person who provides an oral interpretation or written translation, from one language and converts to another language while retaining the same meaning.

   3) **Legal Assistant.** An individual (other than an interpreter) who, working under the direction and supervision of an attorney or legal Representative, assists with group presentations and in representing individual residents. Legal assistants may interview residents, assist residents in completing forms, and deliver papers to residents without the Attorney or Legal Representative being present.

   4) **Independent Medical Expert.** An individual who is licensed or otherwise authorized by a state to provide medical or mental health care services, including but not limited to physicians, registered professional nurses, and licensed social workers. Such individuals are not permitted under this SOP to provide medical or mental health care services to residents, but may be permitted to evaluate individual residents for purposes of preparing expert reports.

5) **Legal Representative.** Any person who is legally authorized to represent another, including accredited law school students under the direct supervision of a faculty member, licensed attorney, or accredited representative, and accredited law school graduates not yet admitted to a bar; "reputable individuals"; accredited representatives; accredited officials; and attorneys outside the United States. *See* 8 C.F.R. § 292.1.

4. **Responsibilities.**
   1) **The FRCs and Legal Visitors** are responsible for following the procedures in Section 5 of this directive.

   2) **Legal Representatives** are responsible for completing and submitting a Form G-28 to ICE/ERO if an attorney-client relationship has been established.   This requirement applies to both visitation with individual residents and to attorney-client group legal meetings.  Such forms will be available in the legal visitation reception area.  Each completed Form G-28 becomes a permanent part of the resident's administrative file, and it remains valid until ICE/ERO receives written notice of the relationship's termination from the resident or the legal representative.   Attorneys representing residents on legal matters unrelated to immigration are not required to complete a Form G-28.  In addition, Form G-28 is not required for pre-representation sessions provided by attorneys or legal representative.

5. **Procedures.**
5.1. **Notification of Visitation Rules and Hours.**  Every FRC will complete the following actions to promote access and availability of visitation rules and procedures:
   1) Provide existing and newly admitted residents with a resident handbook (or equivalent) upon admission, which shall include information regarding FRC visitation rules and hours in Spanish and English.

   2) Conspicuously post visitation rules and hours in Spanish and Englgh in common resident areas and housing units.

   3) Promote public access to visitation Rules and hours in both Spanish and English through conspicuous postings in the visitor waiting areas, in writing upon request, and telephonically via live voice or recorded message.

5.2. **Visitor Logs.**
   1) The PERC/LESC will complete a records check of the subject, including but not limited to, National Crime Information Center (NCIC) active wants and/or warrants, criminal history, immigration status, and docket location.

5.3. **Access to Communication Devices.**
   1) FRCs will maintain a land-line telephone in each legal visitation room for use by attorneys and residents for legal visitation purposes relevant only to the specific visit.
   2) Use of personal electronic devices (e.g., cell phones/ smart phones, and other Wi-Fi/cellular enabled devices) is generally prohibited.  The use of laptops, Wi-Fi and hot spot devices, and tablets are, however, permitted in the visitation area.  At the discretion of the ICE Facility Administrator, limited cell phones/smart phones may be permitted if functioning land-line telephones become unavailable.

## 5.4. Visiting Room Conditions.

1) Visiting areas will be appropriately furnished and arranged, and as comfortable and pleasant as practicable, including safe and appropriate accommodations for children.

2) Monitored care of children is available upon request as explained in the section below entitled "Legal Visitation Privacy."

3) As practicable space should be provided outside of the immediate visiting areas for the secure storage of visitors' coats, handbags, and other personal items.

4) The facility administrator will provide adequate supervision of all visiting areas. The visiting area staff will ensure that all visits are conducted in a quiet, orderly, and dignified manner.

## 5.5. Visitors' Food and Drink.

1) Visitors will be permitted to bring water and an appropriate amount of snacks for personal consumption.

2) FRCs will designate specific areas of the facility in which food and beverages may be consumed, generally inside the visitation area.

3) Food and beverages may not be shared with or otherwise provided to the residents.

4) All food and beverages will be subject to search upon entering the FRC.

5) FRC staff will ensure that food and beverage vending machines are stocked appropriately.

## 5.6. Pre-Screening Requirement For Designation of Legal Visitors and Independent Medical Experts.

1) For the safety and security of FRC residents and staff, FRCs will require all prospective Legal Visitors to pass pre-clearance/ record checks seventy-two (72) hours prior to the intial visit. The pre-clearance/records checks will include, but is not limited to, identity verification, current employment or educational status, arrest and criminal history, and verification of training, certification, and/ or skills underlying the applicant's request for legal/medical visitor designation.

2) Licensed attorneys may satisfy the pre-clearance/records check requirement with proof of identity and proof of admission and good standing in any state bar. Licensed attorneys satisfying these requirements will not be required to undergo the broader screening referenced above.

3) The ERO Field Office Director (FOD) for the area of responsibility (AOR) containing the respective FRC is the approving official forapplications for Legal Visitor designation.

**5.7.  Visits by Legal Representatives and Legal Assistants.**

1) Subject to the restrictions herein, individuals in the following categories are considered Legal Visitors:

    a.  Attorneys and Legal Representatives

    b.  Legal Assistants

        i.  Upon presentation of a letter of authorization from the legal representative under whose supervision the legal assistant is working, an unaccompanied legal assistant may meet with a resident during legal visitation hours.  The letter must state that the named legal assistant is working on behalf of the supervising legal representative for the purpose of meeting with the FRC resident(s).

    b.  Interpreters

        i.  Interpreters will be permitted to accompany legal representatives and legal assistants on legal visits, subject to visitor identification and search procedures detailed in the sections titled "Pre-Screening Requirement For Designation of Legal Visitors" and "Necessary Documentation to Prove Legal Representative and Legal Assistant Status."

    c.  Independent Medical Experts

        i.  Upon presentation of a written request by a legal representative under whose supervision the medical expert is working, and approval by the ERO Juvenile and Family Residential Management Unit, a medical or mental health professional will be permitted to conduct an independent medical or mental health examination of a specified resident. (Note: Such individuals are not permitted under this SOP to provide medical or mental health care services to residents.).  The written request must identify the individual resident to be examined and the purpose of such examination.  Neither ICE nor the facility may assume any cost for the examination.

2) Messengers who are not legal representatives or legal assistants will be permitted to deliver documents to and from the facility, but not visit residents.

3) Prior to each visit, all legal representatives and assistants will be required to provide identification.  State bar cards are preferred.  Attorneys who are members of a state bar that does not provide bar cards are required to present other documentation that verifies bar membership.  If such documentation is not readily available, the attorney will be required to report where he or she is licensed as an attorney and how this information may be verified.

4) Law students must have a government-issued identification card and a memorandum on letterhead from the supervising attorney who is a bar member in good standing acknowledging that the law student is a representative of the supervising attorney.

5) FRCs will ensure that local rules allow each resident to meet privately with current or prospective legal representatives and their legal assistants. The FRC and ICE staff may not inquire into the subject matter of visits with legal representatives and assistants.

6) A legal visitation request, using the appropriate facility form, should be completed and submitted to the facility at least twenty-four (24) hours prior to the requested visit time to ensure proper scheduling of a private meeting room.

   a. The legal visitation request form must identify the resident to be visited.

   b. Legal representatives and assistants are not required to provide, and FRC staff shall not inquire into a resident's A-number as a condition of visiting; FRC staff will make a good-faith effort to locate a resident if provided with sufficient information about the resident.

7) Legal representatives and assistants may call the facility in advance of a visit, to determine the custody status of a particular individual. These calls may be answered by facility staff or forwarded to a designated ERO officer within the facility or to the ERO field office within the respective AOR.

8) The FRCs will not reject qualified attorneys or pre-cleared legal visitors who fail to provide notice 24 hours in advance, but failure to provide such notice may result in the following:

   a. Notification to such legal visitors that their visit may be accommodated subject to space limitations, and only following the facilitation of legal visits of those who provided notice 24 hours in advance;

   b. Placement of such legal visitors in queue or an on-call list to replace no-shows or cancellations from legal visitors who provided advanced notice; and/ or

   c. The FRC's inability to identify or locate residents in a timely manner.

9) Legal representatives and assistants are subject to a search, at any time, of his/her person and belongings, pursuant to a reasonable and articulable basis, for the purpose of ascertaining the presence of contraband.

10) The FRCs will designate a Legal Access Communications Liaison Officer to administer legal access policies and procedures discussed in this SOP and facilitate legal access related communication between residents and the public, including legal visitors.

11) The FRC personnel will be required to complete Legal Access detention standards training and refamiliarize themselves with the provisions of this SOP at least once each fiscal year to ensure consistent and fair application of legal visitation rules.

**5.8.    Legal Visitation Hours.**

1) The FRCs will permit legal visitation seven (7) days a week, including holidays, for a minimum of eight (8) hours per day on regular business days, and a minimum of four (4) hours per day on weekends and holidays.

2) Notwithstanding the regular visitation hours, the FRC and ICE staff maintains discretion to extend or terminate legal visits at the end of the allotted time.

3) On regular business days, legal visitations may proceed through a scheduled meal period. If residents miss their scheduled meal as a result of a legal visit, the FRC staff will ensure that a meal is provided upon conclusion of the conflicting legal visit.

**5.9.    Pre-Representation Meetings.**  During regular legal visitation hours each FRC will permit residents to meet with prospective legal representatives.  Each FRC will document pre-representation meetings in the logbook for legal visitation.  For meetings that are pre-representational and no attorney-client relationship exists, legal service providers do not need to complete a Form G-28.

**5.10.    Legal Visitation Privacy.**

1) The substance of conversations during legal visits between legal representatives or assistants and a resident are confidential and will not be subject to auditory supervision by FRC or ICE staff.

2) FRC and ICE staff will not be present in the legal visitation room unless the legal representative or assistant requests the presence of staff; however, staff may observe the visit through a window or camera, and only to the extent necessary to maintain security.

3) If the legal representative requests to meet with a resident in a general visitor or other alternate visiting room, the request should be accommodated if practicable. Such meetings will be afforded privacy but only to the extent practical under the circumstances.

4) Due to the presence of children and the requirement to provide for attorney-client visitation, visitation areas will be constructed in a manner that allows for parents to view the activities of their children within the visitation area.   Furthermore, monitored care for children is available by staff at all FRCs should parents opt to use this amenity.

5) Legal visitors may occupy a meeting room for successive resident client visits but only if any other attorney is not waiting.  When there are attorneys waiting, the initial attorney may return to the queue and wait for an attorney client space to become available so as to meet with more clients.

6) FRC staff are generally prohibited from holding a room for a legal representative who leaves the FRC premises.  Exceptions will be considered and decided by the Legal Access Communications Liaison Officer.  Legal representatives who leave the facility and return at a later time may be placed back in queue should all rooms be filled with other attorneys and residents.

**5.11.   Dedicated Workspace.**

1) Recognizing the unique nature of FRCs, the vulnerability of the resident population, families and juveniles, and other unique qualities of families awaiting immigration case processing, the FRCs will reasonably provide registered pro-bono legal representatives with a dedicated workspace for use by the attorneys and legal representatives, and their legal assistants and interpreters, in the representation of the FRC residents.  Prior to using this workspace and equipment, the legal representative will be required to sign specific user agreements, which may permit, in the discretion of the FRC, for limited pre-cleared personal office equipment in the workspace.

2) Provisions for copy services for legal representatives will be instituted providing there is no cost to the government.

**5.12.   Materials Provided to Residents by Legal Representatives.**

1) The FRCs will allow residents and legal representatives to exchange documents that are relevant for legal representation purposes.

2) Legal representatives may provide one (1) business card per resident/client.

3) Written material provided by a legal representative to a resident during a legal visit may be inspected by an FRC staff, but not read.

4) Residents are entitled to retain legal material received for their personal use.

5) Quantities of blank forms or self-help legal material in excess of those required for personal use may be held for the resident with his or her stored property. The resident will be permitted access to these documents through the established avenues of communication.

**5.13.   Resident Access to Personal Medical Records.**

1) Any FRC resident may, at any time, request access to his/ her medical records that are maintained at the FRC, by submitting a medical records request form and a signed HIPAA-compliant waiver to a designated FRC staff.

2) The medical request and HIPAA forms shall be available in common areas.

3) Upon receipt of the properly completed request, the FRC staff will generally produce the medical records within five (5) business days of the receipt of the request.

4) Legal representatives and former residents may use the FOIA process to request medical records.

**5.14.   Request for Identity Documents.**  A copy of the resident's identity documents will be provided to the resident upon request.  The facility and/or ICE will maintain records of all documents provided to the requesting resident and/or their attorney of record.

**5.15.   Communication with Residents.**

1) FRC and ICE staff will utilize contracted interpreters and translators, when necessary, to facilitate communication between staff and the residents.

2) ICE contracted interpreters and translators will be strictly prohibited from facilitating any legal communication between a legal representative and a resident. This strict prohibition protects all parties from potential conflicts of interest, impermissible disclosures, and any ethical issues that may arise pertaining to attorney-client privilege.

**5.16.   Attorney-Client Group Legal Meetings.** Upon the request of a legal representative or assistant, the ICE facility administrator may permit a confidential meeting (with no staff present) involving the requester and two (2) or more residents. This may be for various purposes: pre-representational, representational, removal-related, etc. Such requests should be made to the Legal Access Communications Liaison. The FRCs should grant such requests to the greatest extent practicable. The ICE facility administrator will limit resident attendance according to the practical concerns of the facility, or the security concerns associated with the meeting in question. Attorney-client group legal meetings are distinct from legal rights group presentations, which are governed by ICE Family Residential Standard 6.3 (Legal Rights – Group Presentations).

**5.17.   Pro Bono List and Resident Sign-Up.**

1) The U.S. Department of Justice (DOJ), Executive Office For Immigration Review (EOIR) produces and updates a list of local pro bono legal organizations. FRCs will promptly and prominently post the most current list in common areas.

2) Any legal organization or individual on the current list may contact the ICE facility administrator to request the posting and/or general circulation of a sign-up sheet to facilitate attorney-client meetings. Upon approval, the ICE facility administrator will notify residents of the sign-up sheet's availability and, according to established procedures, ensure coordination with the pro bono organization.

**5.18.   Consequences for Violations of Visitation on Contraband Rules.** The following apply to FRC visitors:

1) Any visitor who violates any visitation rule, including adversely impacting the safety or security of the facility, may face corrective action, including visitation restrictions from all FRCs, immediate cancellation or termination of a visit, and/or suspension of future visitation privileges.

2) Any offense involving contraband or other criminal violations may lead to criminal arrest and referral for prosecution.

3) The ERO FOD, in the AOR of the relevant FRC, is designated as the deciding official on all corrective actions considered against legal visitors.

4) The FOD will confer with the AOR's Office of the Principal Legal Advisor Office of the Chief Counsel prior to taking corrective action taken against legal visitors.

5) The FOD must notify the ERO Assistant Director for Field Operations within two hours of any terminated or refused legal visit. Barred visitors will receive prompt basis for such restriction.

6) After five business days, visitors barred from the facility may submit a written request to the FOD requesting reinstatement of visitation privileges. The FOD, or designee, will provide a written response to each request.

6.   **Recordkeeping.** Records will be maintained as described in these Standard Operating Procedures.

7.   **Authorities/References.** Not applicable.

8.   **Attachments.** None.

9.   **No Private Right.** These guidelines, which may be modified, superseded, or rescinded at any time, are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

**Thomas Homan**
**Executive Associate Director**
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**

# Exhibit 5 Attachment Exhibit B



**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF HUMAN SERVICES

OCT 22 2015

Ms. Diane Edwards, Executive Director
Berks County Residential Center
1040 Berks Road
Leesport, Pennsylvania 19533

RE:    Licensure and Capacity
Berks County Residential Facility
1040 Berks Road
Leesport, PA  19533
License #: 224580

Dear Ms. Edwards:

This letter is in regard to the March 9, 2015 e-mail request to increase the licensed capacity of Berks County Residential Center (BCRC).  The Pennsylvania Department of Human Services (DHS) has issued the Berks County Commissioners a license, effective from  February 21, 2015 through February 21, 2016, to operate BCRC as a child residential facility pursuant to 55 Pa. Code Ch. 3800 (relating to Child Residential and Day Treatment Facilities).  The current maximum capacity of BCRC is 96 residents.  You seek an increase in capacity to 192 residents.

BCRC now serves only refugee immigrant families.  As a result, BCRC is no longer operating as the type of facility for which it was originally and continues to be licensed.  DHS licenses "child residential facilities" and Pennsylvania law makes no provision for DHS to license family residential facilities.

Due to this uncertainty in BCRC's future plans to operate as a licensed child residential facility, DHS will postpone acting on the request to increase capacity until BCRC once again operates as a child residential facility.  Please submit a complete renewal application if BCRC will resume operation as a child residential facility.  Should BCRC choose to continue providing services to families rather than children, DHS will take appropriate action and does not intend to renew BCRC's license when it expires on February 21, 2016.

In addition, please contact Mr. Matthew Jones, Director, Human Services Licensing, at (717) 772-4982 when BCRC again begins to provide child residential services so that DHS can schedule an inspection for the renewal of its license under 55 Pa. Code Ch. 3800 and disposition of the request to increase capacity or should you have any questions.

Sincerely

Theodore Dallas
Secretary

c:    The Honorable Christian Leinbach
The Honorable Kevin Barnhardt
The Honorable Mark Scott
Mr. Matthew Jones

OFFICE OF THE SECRETARY
625 Forster Street | Room 333 | Harrisburg, PA 17120 | 717.787.2600 | Fax 717.772.2062 | www.dhs.state.pa.us

134

# Exhibit 5 Attachment Exhibit C





Matthew J. Archambeault, Esq.
Direct 215-599-2189
matthew@ccmalaw.com

March 23, 2015

Pennsylvania Office of Attorney General
Attention: Attorney General Kathleen Kane, Esquire
16th Floor, Strawberry Square
Harrisburg, PA 17120

RE: Request for closure of the Berks County Residential Center due to unlawful imprisonment of children contrary to the laws of our Commonwealth

Dear Attorney General Kane:

As attorneys and advocates for the mothers, fathers and children imprisoned at the Berks County Residential Center (hereinafter "BCRC") we respectfully request that your office investigate the unlawful imprisonment of the children at this facility. We further respectfully request that your office immediately order the closure of BCRC and contemplate civil and criminal penalties against those responsible for this willful contravention of the laws of our Commonwealth resulting in the unlawful imprisonment of hundreds of children over the last several years.

The BCRC is licensed as Child Residential and Day Treatment Facility under Chapter 3800 of PA Code 55. The BCRC operates as a secure care facility which is defined in section 3800.5 as:

Secure care—Care provided in a 24-hour living setting to one or more children who are delinquent or alleged delinquent, from which voluntary egress is prohibited through one of the following mechanisms:

1.   Egress from the building, or a portion of the building, is prohibited through internal locks within the building or exterior locks.

The problem with the BCRC operating as a secure care facility is that none of the children detained within are delinquent or alleged delinquent. They are all refugees seeking asylum here in the United States. Prior to the acceptance of a juvenile to secure care the facility shall require the following documents from the committing court pursuant to section 3800.272:

(1) A description of the offenses and circumstances that make secure care necessary.
(2) The child's needs to be addressed during placement.
(3) The court order committing the child to a secure care facility.

1420 Walnut Street | Suite 1188 | Philadelphia, Pennsylvania 19102 | Office 215-609-4009 | Fax 215-790-6242 | www.ccmalaw.com

136



**Corpuz & Archambeault**
IMMIGRATION AND NATIONALITY LAW

Matthew J. Archambeault, Esq.
Direct 215-599-2189
matthew@ccmalaw.com

As advocates for many of the children currently and formerly imprisoned we can confidently state we have never seen a court order committing any of these children to the BCRC. These children are typically shipped there by Immigration and Customs Enforcement from the US southern border. None of them have committed acts, as defined in PA Code 200.3, which would lead them to being adjudicated delinquent in the Commonwealth of Pennsylvania. They are typically simply charged with the civil offense of unlawful entry into the United States. The children that have been imprisoned at the BCRC have been as young as 11 days old with many of them being under the age of 10. We also see no provision under Pennsylvania law that allows for the imprisonment of children under the age of 10.

Before last summer the BCRC was typically used to house families, usually a mother and a child or two, while ICE worked to reunited these vulnerable individuals with family here in the United States. The summer of 2014 saw a change in policy in which ICE has refused release of these refugees and has begun to hold them in long term detention. There is a mother and child currently at the BCRC since April of 2014. Eight to ten months of detention of these children is not unheard of any longer.

While some may sympathize with the intent of ICE's detention of these children seeking refuge here our country, their detention here in the Commonwealth of Pennsylvania is clearly contrary to our laws. Further, ICE's goal of ensuring that these children and their parents attend their immigration court proceedings and potential compliance with an order of removal can be accomplished with much less restrictive means such as electronic monitoring making this unlawful detention unnecessary.

Additionally, long term detention of refugees and their children have deleterious affects on these parents and children. Recently a BCRC guard, Daniel Sharkey, committed an institutional sexual assault against a young mother under his supervision. This guard, despite extensive video monitoring at the facility and constant supervision by other facility guards managed to have sexual intercourse on several occasions in a public bathroom with this young mother during late afternoon and early evenings hours. This lewd behavior was allowed to take place in an area open and available to children, in fact this lewd and illegal behavior by the guard was witnessed by a seven year old survivor of sexual violence from her home country in Central America. Sharkey is currently facing charges of Institutional Sexual Assault in Berks County.

Even more recently BCRC accepted into their facility a newborn baby who was only 14 days old at the time she was admitted. Many of the children have lost significant weight since they have been detained with some even vomiting blood due to the poor conditions within.

1420 Walnut Street | Suite 1188 | Philadelphia, Pennsylvania 19102 | Office 215-609-4009 | Fax 215-790-6242 | www.ccmalaw.com

137



≡ **Corpuz&**
**Archambeault**
IMMIGRATION AND NATIONALITY LAW

Matthew J. Archambeault, Esq.
Direct 215-599-2189
matthew@ccmalaw.com

These children are imprisoned with a parent; however, they are still imprisoned and there is no provision in the laws of this Commonwealth for the imprisonment of children who have not been ordered either dependent, delinquent or pending adjudication for delinquency. The BCRC has received a license from the PA Department of Human Services despite their clear violation of the laws of the Commonwealth.

We are calling upon your office to conduct an investigation into the circumstances behind the issuance and re-issuance of their license. In the mean time, it is clear that the operation of BCRC is unlawful and their license should be immediately revoked and BCRC should be immediately ordered to close. Further, an investigation into whether or not charges of false imprisonment under Title 18 Chapter 29 Section 2903 should be brought against the relevant individuals should be conducted immediately.

I am signing this request on the behalf of the below interested attorneys and advocates.

Sincerely,

Matthew J. Archambeault
Attorney at Law

On behalf of:

Ms. Bridgett Cambria
Cambria & Kline
123 North 3rd Street
Reading, PA 19601
484-926-2014

Ms. Carol Anne Donohoe, Esq
President, Greater Reading Immigration Project
539 Court Street
Reading, PA 19601
610-370-7956

1420 Walnut Street | Suite 1188 | Philadelphia, Pennsylvania 19102 | Office 215-609-4009 | Fax 215-790-6242 | www.ccmalaw.com

138



**Corpuz &**
**Archambeault**
IMMIGRATION AND NATIONALITY LAW

Matthew J. Archambeault, Esq.
Direct 215-599-2189
matthew@ccmalaw.com

Mr. David Bennion, Esq.
1706 N.2nd Street
Philadelphia, PA 19122
646-441-0741

Bryan Johnson, Esq.
1918 Union Boulevard
Bay Shore, NY 11706


cc.
Office of the Governor
Attn: Governor Tom Wolf
225 Capitol Bldg
Harrisburg, PA 17120

PA Department of Human Services
Attn: Acting Secretary Ted Dallas
P.O. Box 2675
Harrisburg, PA 17105-2675

Berks County Commissioners' Office
Attn: Commissioner Chair Christian Y. Leinbach
633 Court Street, 13th Floor
Reading, PA 19601

Berks County District Attorney's Office
Attn: John T. Adams, District Attorney
633 Court Street, 5th Floor Services Center
Reading, PA 19601

Immigration and Customs Enforcement
Attn: Field Office Director Thomas Decker
1600 Callowhill Street, 5th Floor
Philadelphia, PA 19130



Matthew J. Archambeault, Esq.
Direct 215-599-2189
matthew@ccmalaw.com

Berks County Residential Center
Attn: Director Diane Edwards
1040 Berks Road
Leesport, PA 19533

1420 Walnut Street | Suite 1188 | Philadelphia, Pennsylvania 19102 | Office 215-609-4009 | Fax 215-790-6242 | www.ccmalaw.com

140

# Exhibit 5 Attachment Exhibit D

# SHUT DOWN BERKS

## WHY PENNSYLVANIA MUST END ITS SUPPORT FOR FAMILY DETENTION

### BACKGROUND

The U.S. government has a long and disturbing tradition of family detention. Examples include the internment of indigenous peoples, the detention of immigrant families on Ellis and Angel Islands, and the internment of Japanese families during World War II. These policies have been used to oppress, abuse, and discriminate against families. Today, this disgraceful practice has been resurrected in Pennsylvania. In Berks County, immigrant families—often fleeing violent situations at home—are being detained under prison-like conditions while they await their immigration hearings.



As of August 21, 2015, seventy-seven men, women, and children were detained in the Berks County Detention Center ("BCDC").[1] Families in BCDC have been detained for unreasonably long amounts of time, despite the fact that many have relatives in the U.S. with whom they could reside. The BCDC is overseen by U.S. Immigration and Customs Enforcement ("ICE"). It is operated by Berks County, which in 2015 will receive $1.3 million in profits for leasing the detention facility to the federal government.[2]

On October 22, 2014, the Pennsylvania Department of Human Services ("PA DHS") recognized that BCDC is operating in violation of its license and state law.[3] While this public acknowledgement is an important step in the right direction, PA DHS must do more to fulfill its mission to "protect the health, safety, and well-being of children." These families cannot wait another day. We call on Ted Dallas, Secretary of PA DHS, to *immediately* revoke the license under which the BCDC is currently being operated in violation of state and federal law.

### BCDC'S UNLAWFUL LICENSE MUST BE REVOKED IMMEDIATELY

**Licensing BCDC as a Child Residential Facility is an abuse of discretion.** PA DHS has admitted that PA law makes no provision for the licensure of family residential facilities and has given Berks County until February 21, 2016, to "resume operation as a child residential facility."[4] Until then, however, children and adults continue to be detained in BCDC, in violation of state law.[5] Allowing BCDC to continue operating unlawfully endangers the safety and well-being of the immigrant families detained there. The laws governing child residential facilities do not address the presence of adults. Thus, they do not account for the practical and legal differences between child and adult care facilities, or contemplate the risks of having children reside with non-relative adults. There is no way that Berks County can lawfully carry out the services it has

contracted with ICE to provide—the detention of immigrant children and families. Therefore, PA DHS should not wait until February to revoke BCDC's license knowing that family detention is unlawful.

**The Berks County Detention Center is a secure detention facility**. PA DHS has recognized that BCDC is a "secure facility for refugee children and their families."[6] Firsthand accounts support this assertion. Advocates have reported that the doors of BCDC are locked and guarded by staff members.[7] The ICE Family Residential Standards, which govern BCDC, require that all resident-accessible areas be equipped with either deadbolts or deadlocks.[8] Families are not free to leave BCDC, and can be punished for attempting to do so.[9] The contract between Berks County and ICE calls for 24-hour guards to ensure around-the-clock visual supervision of immigrant families.[10] Throughout the night, parents and children are awoken from their sleep by guards conducting flashlight checks.[11]

**BCDC operates in violation of state laws regulating child residential facilities.** In addition to holding family units unlawfully, the detention of immigrant children in BCDC violates other requirements under PA law. First, children who are not dependent may not be placed in detention or shelter care. [12] Yet, accompanied immigrant children are detained in BCDC, in violation of this rule. State law also prohibits the detention of children under age nine in a secure detention facility.[13] BCDC has detained numerous children under age nine, including an eleven-day-old infant. [14] Lastly, as a matter of due process, no child may be held in secure care without a Pennsylvania court order committing the child to a secure care facility.[15]  No child in BCDC has received a Pennsylvania court order authorizing his or her detention.

## RIGHTS VIOLATIONS AT BCDC

**The treatment of children detained in BCDC violates their rights under PA law.** PA law governing the operation of BCDC states that children may not be deprived of their rights.[16] These rights include, among others: the right to be treated with fairness, dignity, and respect; the right to appropriate medical treatment; and, the right to rehabilitation.[17] Residents in BCDC reveal that conditions in the facility do not meet these basic standards. In one case, a three-year-old child who vomited blood was refused medical care by Berks staff for four days before she was taken to the hospital.[18]

The American Academy of Pediatrics has stated that the detainment of children "puts them at greater risk for physical and mental health problems and unnecessarily exposes [them] to additional psychological trauma." [19] A Human Rights First report states that the mental health program at BCDC does not appear to use any formal, evidence-based tools for screening or monitoring children and families, raising "'serious concerns about the care that detained families with compounded

> *"When I started my journey to the U.S., all I could think about was keeping my son safe . . . after several months locked up my son didn't even want to eat anymore. He cried all the time and kept telling me he wanted to leave . . . he still wakes up shaking with nightmares from the trauma."*[22]
>
> Christina
> Mother detained at Berks for 14 months

143

histories of trauma receive.'"[20] Moreover, the facility does not employ Spanish-speaking mental health staff, despite the population being mostly Spanish-speaking.[21]

In January 2015, a nineteen-year-old mother detained in BCDC was sexually assaulted by a guard.[23] ICE's only response to the sexual assault, other than firing the guard, was implementing a stringent dress code for the detained women.[24]

**Detention inhibits immigrant families' access to counsel.** Immigrants detained in BCDC have a hard time exercising their legal rights. While local organizations have intervened to improve access to counsel issues, such problems could be easily resolved by ending the practice of family detention and allowing immigrants to pursue their claims outside of the BCDC's walls.

> "*I represent a father with his 8 year old Guatemalan daughter . . . He told me that [he and his daughter are] sharing a room with . . . 2 other adult males, a 14-year-old boy, and one 9 year old girl. The two have been detained for over 2 months now . . . Her father told me there have been times when she was the only female in the room. . . . Her father says she cries a lot.*"[26]
>
> Carol Anne Donohoe, Esq.
> Attorney Representing Families in BCDC

Family detention inhibits immigrants' ability to effectively pursue their immigration claims. For example, the federal government is currently only permitted to detain immigrant families in licensed, secure facilities for 3-5 days. This short timeframe limits immigrant families' opportunity to find and secure an attorney—if they can afford one—before their Credible Fear Interview ("CFI"). A CFI is very important, as it is used to determine whether an individual will be permitted to pursue an asylum claim. Alarming reports have surfaced that ICE has coerced individuals detained in BCDC into waiving their right to have an attorney present during their CFIs.[25]

Another barrier to accessing counsel is the remote location of BCDC. The remote location of the facility negatively affects the availability of pro bono counsel who can consult with immigrant families before their CFIs. The facility's remote location also inhibits access to translators and culturally-appropriate community resources. Families who are released from detention have a much better chance to find a pro-bono or low-cost lawyer to help them understand their case requirements and advocate for protection.

As a result of these problems, BCDC has become a deportation mill. Deportations occur twice a week, with many individuals being deported without any due process.[27] In one case, an individual was awoken at 3:00 a.m. by BCDC staff and deported.[28]

144

## FAMILY DETENTION IS UNNECESSARY

The decision to detain certain families is arbitrary, inhumane, and has irreversible life-changing consequences for parents and their children.[29] In determining whether or not to detain a family, ICE does not consider the parent's or child's age, a family's reasons for coming to the U.S., family ties in the U.S., eligibility for lawful status, or credible fear of persecution abroad.[30] Further, not all immigrant families apprehended crossing the U.S. border are detained.[31] Many families captured by ICE are released to live with relatives or friends in the U.S. while they pursue their immigration cases.[32] The government's current policy of family detention is arbitrary and applied indiscriminately, evidencing that the entire scheme is completely unnecessary.

Further, the use of family detention resurfaced only recently. Prior to June 2014, ICE's general practice was to release children and parents upon a determination that those individuals were not a significant flight risk or a danger to the public.[36] However, in June 2014, ICE changed its policies and practices and began detaining all Central American families without the possibility of release on bond, supervision, or parole if it believed that those families arrived in the U.S. as part of the "surge" of unauthorized migrants.[37] Government policy changed in the face of increased media attention and political pressure to address the influx of immigrant families, primarily from Central America. Rather than bow to this political pressure, ICE could return to its longstanding general practice of not detaining immigrant families while they pursue their immigration claims because their detention is both unnecessary and inhumane.

## PA DHS SHOULD NOT COOPERATE WITH ICE

State and local governments are not required to cooperate with ICE. Instead, they may pass policies limiting their cooperation with ICE in the detention or deportation of undocumented immigrants. Today, an increasing number of state and local jurisdictions across the United States have limited their partnership, or refused to cooperate, with ICE.[38] Almost half of all counties in Pennsylvania have limited their cooperation with ICE in some way.[39]

## ELECTRONIC MONITORING DEVICES: NOT A SOLUTION TO DETENTION

Every individual released from BCDC is required to wear a GPS-enabled electronic monitoring ("EM") device. These are cumbersome bands, usually placed on the ankle, which cannot be removed.

Immigrants are forced to wear these onerous, privacy-invading devices at all times—beneath their clothes, in the shower, while they sleep—as they await a ruling from the courts. The devices must be plugged into a wall twice a day for two hours to charge—while still attached to the wearer.

Individuals released from detention with these devices reported symptoms that included swelling and infections of the ankle, severe leg cramps, headaches and dizziness, and skin burns when the device heats up during charging. Many also reported feeling shamed and humiliated by the devices.[33]

Electronic monitoring is done by BI Incorporated, a wholly-owned subsidiary of the for-profit corporation Geo Group, operating under contract with ICE. The new contract is "expected to generate approximately $47 million in annualized revenues," according to a press release from Geo Group.[34]

Family detention and electronic monitoring are unnecessary to ensure that families show up to their court hearings. In 2014, ninety-eight percent of individuals with representation appeared in court.[35]

145

While many states and local governments have opposed ICE policies, the Commonwealth of Pennsylvania—through PA DHS—has assisted ICE in the detention and deportation of immigrant families by licensing the BCDC. This cooperation is contrary to PA DHS's mission to protect the "health, safety, and well-being of children." It also violates federal law per the *Flores v. Reno* settlement.[40] A federal court order, issued by U.S. District Judge Dolly M. Gee on August 21, 2015, ruled that *Flores* requires the release of immigrant families and children from secure detention within five days.[41] BCDC unlawfully holds immigrant families in a secure setting for longer than five days. PA DHS must end its involvement in ICE's unlawful detention scheme by immediately revoking the license for BCDC.

## CALL TO ACTION

Secretary Ted Dallas of PA DHS took an important step on October 22, 2015 in confirming that BCDC is operating in violation of Pennsylvania law. However, immigrant families should not be left to suffer in unlawful detention for another day—let alone another four months. PA DHS has the authority to revoke BCDC's license *immediately*, and need not give ICE or Berks County time to come into compliance with state law.[42] History has shown that the detention of families is a serious mistake that should never be repeated. The conditions in BCDC illustrate the failure of detention to provide for the safety and welfare of families and negative effects on immigrants' ability to pursue their legal claims. We call on Secretary Dallas to correct these wrongs and to end the State's complicity in the detention of immigrant families in Berks County. PA DHS is not required to assist ICE in the detention of families and should join the many jurisdictions that have opposed unjust federal immigration policies.

**Immigrant Families Cannot Wait.
PA DHS must *immediately* revoke Berks County Detention Center's license to allow for the release of families incarcerated there.**



Prepared by the Sheller Center for Social Justice for Juntos
Written by Rhiannon DiClemente and Paige Joki

146

## ENDNOTES

[1] Anthony Orozco, *Dissension Heard on U.S. Judge's Immigration Detention Decision*, THE READING EAGLE, Sep. 15, 2015, *available at* http://www.readingeagle.com/news/article/dissension-heard-on-us-judges-immigration-detention-decision&template=mobileart.

[2] *Id.*

[3] Letter from Theodore Dallas, Sec'y, Pa. Dep't of Human Serv. to Diane Edwards, Exec. Dir., Berks Cnty. Residential Ctr. (Oct. 22, 2015).

[4] *Id.*

[5] BCDC is currently licensed as a "Child Residential and Day Treatment Facility." This license does not provide for the detention of both children and adults. 55 Pa. Code §3800.

[6] Press Release, Pa. Dep't of Human Serv., Dep't of Human Serv. Sec'y Issues Statement on Berks County Residential Center (Oct. 22, 2015).

[7] Decl. Bridget Cambria dated Nov. 7, 2014 at ¶ 6, Pls.' First Set Exhibits In Support Mot. Class-Wide Enforcement of Settlement 67 (Doc. 101-3), Flores v. Johnson, Case No. CV 85-04544 RJK (Px) (C.D. Cal. filed Feb. 2, 2015).

[8] ICE Residential Standard Key and Lock Control at 4, *available at* http://www.ice.gov/doclib/dro/family-residential/pdf/rs_key_and_lock_control.pdf.

[9] Berks Family Residential Center Resident Handbook at 28 (on file with authors); ICE Residential Standard on Use of Physical Force and Restraints at 1, *available at* http://www.ice.gov/doclib/dro/family-residential/pdf/rs_use_of_force.pdf.

[10] ICE Contract, Art. XVII.B.10 (on file with authors).

[11] Berks Family Residential Center Resident Handbook at 10; *see also* 55 Pa. Code § 3800.274(7).

[12] 42 Pa. C.S.A. § 6325.

[13] 55 Pa. Code § 3800.283(7).

[14] Letter from Matthew J. Archambeault to Kathleen Kane, Att'y Gen., Pa. Office of Att'y Gen. (Mar. 23, 2015).

[15] 55 Pa. Code § 3800.271.

[16] 55 Pa. Code § 3800.32.

[17] *Id.*

[18] Ed Pilington, *Child Immigrant Detainees: 'There's an Overwhelming Sadness Among Them'*, THE GUARDIAN, May 12, 2015, *available at* http://www.theguardian.com/us-news/2015/may/12/immigration-detention-centers-children.

[19] Letter from Sarah G. Hassink, President, Am. Acad. of Pediatrics to Jeh Johnson, Sec'y, U.S. Dep't of Homeland Sec. (Jul. 24, 2015) *available at* https://www.aap.org/en-us/advocacy-and-policy/federal-advocacy/Documents/AAP%20Letter%20to%20Secretary%20Johnson%20Family%20Detention%20Final.pdf.

[20] HUMAN RIGHTS FIRST, FAMILY DETENTION IN BERKS COUNTY, PENNSYLVANIA 8 (Aug. 2015) *available at* http://www.humanrightsfirst.org/sites/default/files/HRF-Family-Det-Penn-rep-final.pdf.

[21] *Id.*

[22] Press Release, We Belong Together, Formerly Detained Moms Call for End to Immigrant Detention (May 21, 2015) *available at* http://www.webelongtogether.org/press-releases/formerly-detained-moms-call-for-end-to-immigrant-detention.

[23] Maurice Chammam, *Long Shorts and Baggy Shirts*, THE MARSHALL PROJECT, Apr. 17, 2015, *available at* https://www.themarshallproject.org/2015/04/17/long-shorts-and-baggy-shirts.

[24] *Id.*

[25] Conversation with Caitlin Barry, Esq., Sept. 19, 2015 (on file with authors).

[26] Conversation with Carol Anne Donohoe, Esq., Oct. 3, 2015 (on file with authors).

[27] *Id.*

[28] *Id.*

[29] Fact Sheet, Family Detention is a Failed Policy, Women's Refugee Commission, *available at* http://imirj.org/wp-content/uploads/2013/10/Family-Detention-Infographic-2015.pdf.

[30] *See* Decl. of Bridget Cambria, *supra* note 7, at ¶ 5.

[31] LUTHERAN IMMIGR. AND REFUGEE SERV. & WOMEN'S REFUGEE COMM'N, LOCKING UP FAMILY VALUES, AGAIN 6 (Oct. 2014) *available at* http://lirs.org/wp-content/uploads/2014/11/LIRSWRC_LockingUpFamilyValuesAgain_Report_141114.pdf.

[32] *Id.*

147

[33] Jane Guskin, *"Something Better" than Detention for Immigrants?*, TRUTHOUT, May 21, 2015, *available at* http://www.truth-out.org/news/item/30913-something-better-than-detention-for-immigrants.

[34] *The GEO Group Awarded Contract by U.S. Immigration and Customs Enforcement for the Continued Provision of Services under Intensive Supervision and Appearance Program*, BUSINESSWIRE, Sep. 10, 2014, *available at* http://www.businesswire.com/news/home/20140910005643/en/GEO-Group-Awarded-Contract-U.S.-Immigration-Customs.

[35] Olga Byrne, *Don't Believe the Hype: Immigrant Families Show Up for Court Hearings*, HUMAN RIGHTS FIRST, Jul. 31, 2015, *available at* http://www.humanrightsfirst.org/blog/don-t-believe-hype-immigrant-families-show-court-hearings.

[36] *See* Decl. of Bridget Cambria, *supra* note 7, at ¶ 2.

[37] *Id.* at ¶ 3.

[38] TEMPLE UNIV. SHELLER CENTER FOR SOCIAL JUSTICE, A CHANGING LANDSCAPE: PENNSYLVANIA COUNTIES REEVALUATE POLICIES ON IMMIGRATION DETAINERS 1–2 (Mar. 2015) *available at* http://www2.law.temple.edu/csj/files/a-changing-landscape.pdf.

[39] *Id.* at 2.

[40] Stipulated Settlement Agreement, *Flores v. Reno*, Case No. CV 85-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997), *available at* https://www.aclu.org/files/pdfs/immigrants/flores_v_meese_agreement.pdf.

[41] Order Re Response to Order to Show Cause, *Flores v. Lynch*, Case No. CV 85-04544 DMG (Ex) (Doc. 189) (C.D. Cal. Aug. 21, 2015) *available at* https://www.documentcloud.org/documents/2298479-federal-ruling-on-detention-of-immigrants.html.

[42] See, e.g., *KC Equities v. Dep't of Pub. Welfare*, 95 A.3d 918, 930 (Pa. Commw. Ct. 2014); *Pine Haven Residential Care Home v. Dep't of Pub. Welfare*, 512 A.2d 59 (Pa. Commw. Ct. 1986).

# SHUT DOWN BERKS
## Action Timeline



**2015**

**Mar** | **Apr** | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct**

PA DHS issues letter stating that BCDC is in substantial compliance with regulatory requirements and is not a secure facility.
3/23/2015

Local lawyer writes letter requesting the revocation of BCDC's license and closure of the facility.
4/20/2015

Women detained in BCDC write a public letter demanding their release.
4/24/2015

Local lawyer writes letter requesting an investigation of BCDC and closure of the facility.

4/24/2015
Local lawyer issues letter stating that BCDC is a secure facility and that PA DHS must revoke its license.

4/30/2015
Local lawyer states that no child in BCDC may be lawfully detained there.

5/2/2015
Over 150 community members and activists protest at BCDC, calling for its closure.

6/9/2015
PA DHS recognizes that families have been detained for over a year, but states that it does not believe there is a basis to revoke BCDC's license.

6/11/2015
Ten women detained in BCDC launch a work strike against the center, demanding their release.

6/8/2015
Shut Down Berks Coalition press conference announces work strike of 15 women detained in BCDC.

6/22/2015
Berks host tour for DHS & NGOs interested in using BCDC as a model for LGBTQ detention. Families hold protest inside BCDC. Members of the LGBTQ Latino community protest outside in solidarity.

7/25/2015
Federal District Court Judge Dolly Gee orders closure of family detention centers and release of families.

7/11/2015
Over 200 community members, activists, and allies attend a liberation concert at BCDC. The final member of the work strike is released with her daughter after over a year of detention.

7/28/2015
Local lawyer issue letter stating that BCDC is in violation of federal law according to Judge Gee's order dated July 24, 2015.

9/14/2015
Shut Down Berks Coalition press conference at Philadelphia DHS. Calls on Ted Dallas to immediately revoke BCDC's license, not wait until February.

9/15/2015
100 woman 100 mile pilgrimage from PA to Washington, D.C. calling for the closure of all immigrant detention centers.

10/12/2015
Philadelphia muralist & community members spray paint the words of Ana, a women detained in BCDC, on the street in front of Philadelphia ICE building.

10/23/2015
Shut Down Berks Coalition responds to PA DHS announcement. Calls for Ted Dallas to immediately revoke BCDC's license.

10/22/2015
PA DHS sends letter to Berks County stating that BCDC is operating in violation of its license. PA DHS states that it will not renew BCDC license on Feb. 21, 2016 should families continue to be detained.

149

# Exhibit 5 Attachment Exhibit E



**FOR IMMEDIATE RELEASE**
October 22, 2015

**Department of Human Services Secretary Issues Statement on Berks County Residential Center**

**Harrisburg, PA** – Today, Secretary Ted Dallas sent a letter to Berks County stating that the Department of Human Services (DHS) believes that the current use of the Berks County Residential Center (BCRC) as a family residential center is inconsistent with its current license as a child residential facility. As a result, the Department has not taken final action on the request to expand the licensed capacity of the BCRC, in order to afford the facility the opportunity to transition to a use that is consistent with its current license. The current maximum capacity of BCRC is 96 residents; the facility is seeking an increase in capacity to 192 residents.

If the County commits to cease its current use of the BCRC as a secure facility for refugee children and their families and provides a plan to transition the facility to a use that is consistent with its existing license, the Department will act on the current capacity increase request.  Should the County choose not to transition the facility, the Department will take appropriate action including non-renewal of its existing license which expires in February 2016.

The Department remains committed to working with Berks County to provide assistance required to transition the facility to a use that is consistent with its current license.

**Media Contact:** Kait Gillis, 717.425.7606

###

Follow



Pennsylvania DHS @PAHumanServices · Oct 22
DHS official statement regarding Berks County Residential Center as a family residential facility:

 21    4    •••

151



## pennsylvania
DEPARTMENT OF HUMAN SERVICES

**FOR IMMEDIATE RELEASE**
October 22, 2015

### Department of Human Services Secretary Issues Statement on Berks County Residential Center

**Harrisburg, PA** – Today, Secretary Ted Dallas sent a letter to Berks County stating that the Department of Human Services (DHS) believes that the current use of the Berks County Residential Center (BCRC) as a family residential center is inconsistent with its current license as a child residential facility. As a result, the Department has not taken final action on the request to expand the licensed capacity of the BCRC, in order to afford the facility the opportunity to transition to a use that is consistent with its current license. The current maximum capacity of BCRC is 96 residents, the facility is seeking an increase in capacity to 192 residents.

If the County commits to cease its current use of the BCRC as a secure facility for refugee children and their families and provides a plan to transition the facility to a use that is consistent with its existing license, the Department will act on the current capacity increase request. Should the County choose not to transition the facility, the Department will take appropriate action including non-renewal of its existing license which expires in February 2016.

The Department remains committed to working with Berks County to provide assistance required to transition the facility to a use that is consistent with its current license.

**Media Contact:** Kait Gillis, 717.425.7606
                                    ###

| RETWEETS | LIKES | | | | | | |
|----------|-------|---|---|---|---|---|---|
| 21 | 4 |       | | | | | |

2:00 PM - 22 Oct 2015

                         • • •

---



**William Stock** @wstock215 · Oct 22
@PAHumanServices Kudos to PA Dept of Human Svcs for acting to stop family detention of refugees in Berks Cty Residential Ctr

2

3

© 2015 Twitter   About   Help   Terms   Privacy   Cookies   Ads info

# Exhibit 6
## Publicly Filed

### DECLARATION OF JOCELYN L. DYER, ESQ.

I, Jocelyn L. Dyer, Esq, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney admitted to practice law in the state of Massachusetts. I earned my Juris Doctor degree from the University of Pennsylvania Law School and my Bachelor's of Arts in Psychology from Cornell University. I have focused my career on the representation of asylum seekers in the United States.

2. I am a Washington, D.C.-based Staff Attorney with Human Rights First's Refugee Representation team.  Human Rights First provides pro bono representation to asylum seekers through its offices in New York, Washington, D.C., and Houston, often in conjunction with major law firms. Our organization's clients include many asylum seekers who are in, or who were previously held in, immigration detention facilities throughout the country, including mothers and *Flores* class-member children who fled their countries to seek protection in the United States.

3. In addition to representing clients seeking asylum, I help oversee the pro bono legal representation of indigent asylum seekers by providing support, mentoring, and training to volunteer lawyers in the Washington, D.C. metro area.

4. During the week of November 9, 2015, I traveled to Dilley, Texas, to assist in representation efforts for families detained at the South Texas Family Residential Center ("the Dilley facility"). I volunteered at the Dilley facility through the CARA Pro Bono Project.  (CARA is a collaborative of the Catholic Legal Immigration Network (CLINIC), the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services (RAICES), and the American Immigration Lawyers Association (AILA).)

5. I write this declaration to share my observations regarding the conditions that families currently experience while in immigration detention.

**Observations While at the Dilley Facility**

6. As an attorney with expertise in asylum law, I found it challenging to properly prepare women and their children for their credible or reasonable fear interviews at the Dilley facility.  In my daily practice at Human Rights First, I meet with clients multiple times and for numerous hours in order to formulate their particular social group asylum claims. My articulation of the particular social group is based on clients' detailed accounts, country conditions research, available witness statements, potential consultation with experts, and careful legal analysis.

7. At the Dilley facility, I observed that legal representatives are forced to prepare clients for their credible or reasonable fear interviews in a minimal amount of time (sometimes

as little as twenty minutes) and with virtually no access to outside sources such as legal treatises, country condition experts, and medical or psychological experts who could perform forensic examinations. This was a stark departure from my normal practice. While many individuals will be able to satisfy the required standard in the allotted time period, some trauma survivors who are at risk of persecution upon return to their home countries will *not* receive positive fear determinations.

8.  While I was in Dilley, due to the sheer number of families detained at the facility, I observed very few women and children with legal representation during their credible fear interviews. An attorney present during a credible fear interview can identify potential misunderstandings between the client and the asylum officer. An attorney can also take notes, which can be vital if the client receives a negative credible fear finding. Most critically, legal representatives can make closing statement, which may include the articulation of a viable particular social group.

9.  During the week I was at the Dilley facility, I was able to attend only one credible fear interview with a client. This was due to the heavy volume of clients that the CARA Project staff and volunteer team needed to prepare for their fear interviews. Given its limited resources, the Project prioritized meeting with each individual family prior to their interviews over attending the interviews themselves.

10. While I was at Dilley, the majority of families I met were exhausted, and confused about the legal process and the purpose of their detention. Many had fled horrific trauma and violence in their home countries and undergone a long and dangerous journey to get to the United States. Most of the mothers I worked with were visibly distressed. Their children were often present for my meetings with them. Some children sat listlessly in their mothers' arms while other children fussed and cried. Some of the women I worked with seemed uncomfortable describing violent incidents in front of their children. It was frequently challenging for them to focus on preparing their legal cases because they were concerned for the well-being of their children, many of whom were coughing, sneezing, or had runny noses.

*Notable Case Examples*

11. The following are noteworthy case examples of families with whom I met in the Dilley facility to document the conditions they experienced while in the custody of United States Customs and Border Protection (CBP) on the border and subsequently at the Dilley facility. To protect the identities of these clients, I share only the country of origin and ages of the children.

2

a. Four-year-old boy from Honduras detained at the Dilley facility with his mother. Before arriving at Dilley, the boy's mother told me that they had been held by CBP in a "*hielera*" (which the families refer to as the "ice box" because it is so cold) and then a "*perrera*" (which the families refer to as the "dog house," because these warehouse like facilities separated by chain-link fences look like cages). The four-year old boy suffers from asthma and a dangerous kidney condition. The mother told me that, in addition to a specialized diet, the boy requires medication every six hours in order for his kidneys to function properly. According to the mother, despite her repeated requests, the boy did not have access to a doctor, medical treatment, or medications the entire time he was in CBP custody. He had trouble breathing, caught a bad cough and a fever, and experienced stomach pains. Although the boy eventually obtained medical treatment at the Dilley facility, his mother said that he did not receive medications during the four days he was in CBP custody and for one day while at Dilley. In addition, his mother reported that she had a diarrheal illness while in CBP custody, but did not receive any medical treatment. When she asked to see a doctor, CBP officers reportedly told the mother that this would delay her family's processing through CBP, so she did not receive medical care. Moreover, while sick in CBP custody, the mother said she was humiliated by having to use a bathroom stall with no doors and low walls, thus depriving her of privacy. The bathroom, according to the mother, had no toilet paper or soap. The mother also reported that she and her son were freezing and shivering while they were in CBP custody because of the cold temperatures and the fact that they were forced to wear wet clothing for four days straight.

b. Four-year-old girl from Nicaragua detained at the Dilley facility with her mother. The mother reported that she and her daughter were extremely cold at the hielera where they were initially detained at the border for three days. She observed that the more crowded their cell became, the lower the CBP officials dropped the temperature. The mother told me that she and her daughter were treated like "dogs" while they were in CBP custody. She told me there were no mattresses at the hielera and that she and her daughter were forced to sleep on the cold floor. While the mother felt that adults could endure this poor treatment, she said it was unfair for the children. The daughter developed a bad cold in detention and her ears hurt her. However, the four-year-old girl received no medical treatment while she was detained by CBP.

3

c.   <u>Ten-year-old girl and eight-year-old boy from Honduras detained with their</u>
     <u>mother at the Dilley facility</u>.  The mother reported to me that while in CBP
     custody, there was no toilet paper or opportunity for her or her children to bathe.
     The mother reported that her children were sick, but CBP officers told her that
     there were too many sick people to treat, so her family did not receive medical
     care.  While detained by CBP, the family was forced to sleep on the floor.  At the
     "ice box," the mother and two children were given only one sheet of foil to share
     for warmth.  At the second facility, which she referred to as the "dog house," the
     ten-year-old girl was taken away from her family and detained separately.  In the
     Dilley facility, the mother reported that the family was treated with an utter lack
     of respect.  Some Dilley facility employees referred to their personal belongings
     as "trash."

 I declare under penalty of perjury that the foregoing is true and correct to the best of my
information, knowledge, and belief.

Executed on this $\underline{5^{th}}$ day of May 2016.

_____
     Jocelyn L. Dyer, Esq.

4

# Exhibit 7
## Publicly Filed

### Declaration of Natalia Ospina, Esq.

1. I am an attorney licensed to practice bar in California. I earned my J.D. from the Northwestern School of Law of Lewis & Clark College. I clerked with the Portland Regional Office of Legal Aid Services of Oregon, primarily in their Domestic Violence Project, from June to August 2014.

2. Since January 2016, I have been employed as a Staff Attorney at California Rural Legal Assistance in Oxnard, California.

3. During the week of November 1, 2015, I traveled to Dilley, Texas on a volunteer basis to assist in representation efforts for families detained at the South Texas Family Residential Center (STFRC). I travelled with a team of four lawyers and law students from Portland, Oregon. During that week, I conducted 24 intake screening interviews with detained mothers, assisted 10 mothers and older *Flores* class member children with preparation for credible or reasonable fear interviews, and offered six groups of mothers introductory presentations.

4. I am providing this declaration to share the experiences of some of the clients I assisted during my week at Dilley.

5. A Guatemalan mother and child spent two days in the "hielera," the way mothers and children describe the Customs and Border Protection (CBP) holding facility where first detained. They informed me that they were unable to sleep due to the cold, lack of space, and wet floors. They were also unable to eat the two pieces of bread and a slice of ham that they were provided twice daily during their time in the hielera.

6. Several mothers mentioned the aggressive and sometimes racist attitudes of the guards in the hielera and later in the "perrera," the second CBP facility where they were taken from the hielera. One mother from El Salvador reported to me that officials in the hielera told her five-year-old son that the children were "pigs" and "if they continued to act like pigs, they would be deported." Another mother reported seeing a toddler held in a cage in the perrera alone for several days. When she asked why he was there, she was told he had misbehaved. One mother said the guards in the perrera threw their aluminum blankets at them.

7. A Honduran mother and her five-year-old daughter reported spending four days in the hielera. On their second day, they were called out for a meeting and returned to find that their shoes had been thrown away. They were not provided with replacement shoes for two days, by which time they were moved to the perrera.

8. Not one of the *Flores* class members or mothers that I interviewed while volunteering at Dilley had received any information from CBP, ICE or Dilley staff about the rights class members have under the *Flores* case.

9.  During the numerous interviews I conducted at the Dilley detention center I did not encounter a single *Flores* class member or *Flores* class member mother who indicated that they had been interviewed or questioned by CBP or ICE officials to obtain information needed to expeditiously process class members for release to family or friends or placement in a facility licensed for the care of dependent children. Not one mother or class member indicated to me that they had been provided any documents or advisals required by the *Flores* Settlement. According to the detainees I interviewed not one had been told that *Flores* class members have the right to a custody hearing before an immigration judge and none of the *Flores* class members had been taken before an immigration judge for a bond redetermination hearing.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 10 day of March, 2016, in Oxnard, State of California.

_____
Natalia Ospina, Esq.

# Exhibit 8
## Publicly Filed

Declaration of Leanne Purdum

I, Leanne Purdum, depose and say:

1. I am a Doctoral Student in the Department of Geography at the University of Georgia and a citizen concerned with the treatment of immigrants in the United States. For the last five years I have dedicated my studies to the areas of national and international immigration policies and U.S. immigration law.

2. From November 7-14 of 2015, I volunteered with the CARA Pro Bono Project in Dilley, Texas to provide legal assistance to women detained with their children. This was my third time volunteering for a week at the South Texas Family Residential Center. Previously I spent time at the center in June and August, 2015.

3. The cost to travel to Dilley makes it difficult to repeatedly volunteer at the detention center. I know of several people who want to offer services but are simply unable to travel that far and cover the expenses.

4. I am writing to document some of the events and stories I witnessed during my week volunteering in the detention center. During my week I estimate that I met with forty mothers detained with their *Flores* class member children. I conducted intake screening interviews for approximately ten mothers and I counseled approximately twenty women on what the Credible Fear interviews involve and their purpose. The population of the center at the time was approximately 700 mothers and *Flores* class members.

5. Almost every mother I consulted with had experienced some form of mistreatment in the initial Customs and Border Protection (CBP) processing centers, which they called the "hielera" (ice box) and the "perrera" (dog kennel). Mothers consistently told me that the hielera was very cold, the lights were kept on all night, and the rooms are sometimes so full that no one can lie down. Mothers also told me, I estimate fifteen times in the week I was there, that the children were separated from the women in at least one of the two facilities where the families were held. I heard many times that "they separate children eight years old and up from their mothers." Perhaps the saddest story I heard about separation in the hielera was from a mother whose eight-year-old son had been put in another area away from her. The young boy was so afraid that he continually tried to run back towards his mother, yelling out for her. Each time, an officer pushed him back up against the wall, and his mother tried to ask him to stop running to her out of fear that he would be hurt.

6. Many mothers told me that border officers yelled at and attempted to discipline the mothers and their children in the middle of the night at the hielera. One woman told me a long, disturbing story. Her two-year-old son had wet his pants and she was made to throw the pants away and was not given another pair. Shortly thereafter, the officers made her and everyone else in the hielera throw their blankets in the trash because two young women had forgotten to remove their blankets from the room when it was being cleaned.

1

163

As a result, the woman, her three-year-old daughter, and her two year old son with no pants, were left to sleep directly on the cold floor for more than 24 hours.

7. Throughout the detention process, the children are under immense emotional stress, both from being detained and from watching their mothers try to navigate the legal process while in detention. At Dilley, I saw many children in distress over seeing their mothers cry. I especially remember one young boy continually reaching up to wipe the tears from his mother's face, saying softly "No, don't cry mommy. Don't cry mommy." To distract him, we tasked him with finding tissues for mommy. I am sure this mother would have liked to have a private legal consultation with me. However the detention center is not conducive to allowing such consultations because many children are very worried about being separated from their mothers and, even where mother and child were both comfortable being separated, the childcare provided at the facility is limited. Also, there is a poster inside the visitation trailer that says "your children are your responsibility", making it clear that children need to be with the mothers. Family detention centers create situations where children are sometimes exposed to emotional stress by proximity. The children are very aware that they are being held inside of a facility surrounded by fences, which they are not allowed to leave.

8. The speed at which cases are processed at Dilley makes mistakes inevitable.  For example, one mother came in to see a legal volunteer because she received a negative credible fear determination. In assisting her, my job for the morning was to try and determine if the interview had been conducted properly. As I interviewed the woman, it became clear that she had misunderstood the questions about her ability to move away from her home town and to be safe inside her home country. Instead of "can you move to another part of your country and be safe?" she thought she had been asked, "apart from your country, can you move away and be safe?" Her answer was "yes", indicating her need to leave her country to be safe. The asylum officer seemed unaware that she had misunderstood the question, and the woman had no clue about the significance this twist of words would have on her case.

9. During my time at Dilley, I also met several teenagers who were experiencing extreme anxiety.  One such teenager, a thirteen-year-old, was the son of the women I described in the previous paragraph. In May of 2015 he was riding home from school despite threats from rival gangs. About ten hooded men pulled one of his fellow students out of the pick-up and shot him in the woods to send a message that the local gang would not tolerate students from his part of town. Now detained with his mother at STFRC in Dilley, Texas, this young man struggled to understand the U.S. legal system while sitting in meetings with his mother. He tried to help her read and write, remember dates, and prepare for court. While her son was next to her, she told me me, "I can't let him go back there. I can't let them kill my son."

10. A second teen who stands out in my mind is a thirteen-year-old girl. She and her fifty-year-old mother were detained for about ten days when I met with them, during which time the mother did her best to familiarize herself about the legal process and make sound decisions. The mother was very clear that she wanted to avoid being released with an

ankle monitor, and thought she was in the process of asking for a bond when she met with me. However, a simple look at the mother's administrative papers showed that she had unknowingly signed a document accepting release on an ankle monitor. She was shocked because the officer had told her that her signature would confirm that she had been detained, and that she had time to discuss bond with her family.

11. None of the *Flores* class members or their mothers that I interviewed indicated that they were told by any CBP, ICE or detention facility staff about the Flores case, or any rights that minors have under the *Flores* settlement or the District Court's August remedial Order.

12. In none of the cases in which I interviewed *Flores* class members or their mothers did it appear that CBP or ICE or facility staff had taken any steps, let alone continuous and ongoing steps, to release minors as expeditiously as possible to close relatives or friends in the United States or to place them in licensed programs if release to relatives or friends was not possible.

13. In none of the cases in which I interviewed *Flores* class members or their mothers did it appear that ICE had taken steps to provide minors with custody hearings before immigration judges.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 1 day of March, 2016, in the City of Athens, State of Georgia.

Leanne Purdum

3

165

# Exhibit 9
## Publicly Filed

**Declaration of Theresa B. Wilkes, Esq.**

1. I am an attorney admitted to practice law in the state of New Mexico. I earned my J.D. from the University of New Mexico School of Law.

2. Between November 7-14, 2015, I volunteered my time with the CARA Family Detention Pro Bono Project in Dilley, Texas, where I assisted in representing *Flores* class members and their mothers detained at the South Texas Family Residential Center (STFRC).

3. At the time I volunteered with the CARA Family Detention Pro Bono Project in Dilley, Texas, I was self-employed, and my practice included immigration cases.

4. The loss of income from a whole week of unpaid work makes it impossible for me to repeat this experience, despite the desperate need of families detained at the STFRC for representation.

5. In my practice I have worked with survivors of domestic violence, sexual assault and other crimes. Based on these experiences, I know that the process of establishing trust with clients who have suffered trauma can take a long time. All the STFRC clients I encountered reported recent traumatic experiences.

6. Most of the women and *Flores* class members I assisted during the week I spent at Dilley had horrible coughs. Treatment for these families in STFRC for their coughs ranged from nothing to coughdrops or honey and water.

7. I observed many *Flores* class members and their mothers wearing donated winter coats indoors. The strikingly low temperatures inside the STFRC portable buildings where we worked caused several of the CARA volunteers to get sick even though we were wearing sweaters and scarves. I developed a cold and a persistent cough during my time at Dilley.

8. One of the mothers reported to me that, while detained at STFRC, that she was taken to the regional hospital, diagnosed with pneumonia, and then promptly returned to the multi-family detention housing with her toddler as well as other mothers and their children, although her condition remained untreated. When I saw her a few days after her diagnosis, she was still coughing up phlegm to the degree that she was unable to speak to me for several minutes. When we met, her son was also congested and coughing.

9. I conducted intakes with about twenty-five mothers of *Flores* class members during my volunteer time at Dilley. Without exception, these women reported atrocious conditions in CBP custody: Most of them first in the "*hielera*" (ice box) and then in the "*perrera*" (dog pen). They reported that temperatures in the *hielera* were so low that their children got sick. They were given thin foil

1

167

blankets, often only one per family, that would easily tear and rattle in the cold air blowing into their holding cells. Because the lights were on at all times, they lost track of day and night. Detainees would get in trouble for lying down to sleep on the floor, though mothers and children reported this was the only place to sleep.

10. The *perrera* was usually considered a step up from the *hielera* because those detained there were given thin pads to sleep on. However, the poor treatment by guards and inadequate food (usually three pieces of bread and ham a day) remained the same.

11. During my volunteer time at Dilley I assisted about ten clients preparing for their credible fear interviews. There were far too few volunteer attorneys to be able to help prepare the majority of *Flores* class members or their mothers prepare for the credible fear interviews adequately. In each case, I found that before *Flores* class members or their mothers met with lawyers associated with the CARA Project, they had no idea what a credible fear interview involved. Nor were most prepared to tell the whole truth about their experiences in their home countries to the U.S. Government officer who would conduct the credible fear interviews both because they were still traumatized by their long and dangerous journey to the U.S. and often because of experiences with corrupt authorities in their home countries. Detainees were also very hesitant to talk about their experiences because of fear that their statements would get back to their governments' authorities and lead to further persecution if they were eventually deported.

11. I interviewed no *Flores* class members or their mothers who had been questioned during their detention by CBP or USICE officers about relatives or friends who could care for the children upon release. No class member or mother with whom I spoke had been questioned about the possibility of the class member being placed in a licensed facility for the care of dependent children. Based on my discussions with *Flores* class members and their mothers, and review of their files, it was clear that DHS continues to ignore Paragraph 18 of the Settlement which provides that upon taking a minor into custody, DHS must make and record prompt and continuous efforts toward family reunification and the release of the minor pursuant to Paragraph 14.

12. Based on my interviews at Dilley and review of class members' and their mothers' files, it became clear to me that DHS was also ignoring Paragraph 24A which requires that class members in removal proceedings must be afforded a bond redetermination hearing before an immigration judge unless the minor indicates on a Notice of Custody Determination form that he or she refuses such a hearing. None of the class members in the family units I interviewed had been informed by DHS about their right to be brought before an immigration judge to review their custody status. Indeed, none of the family units I interviewed had been told anything about the *Flores* Settlement by CBP or ICE officers or by other staff employed at Dilley.

2

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 5th day of May, 2016, in the County of Santa Fe, State of New Mexico.

Theresa B Wilkes, Esq.

# Exhibit 10
## Publicly Filed

**Declaration of Amanda W. Doroshow, Esq.**

1. I am an attorney admitted to practice law in the state of New York. I earned my J.D. from the City University of New York (CUNY) School of Law.  I was admitted to practice in New York in January 2013. I primarily practice immigration law with an emphasis of working with survivors of domestic violence and other trauma.

2. The week of November 16, 2015, I traveled to Dilley, Texas as a volunteer attorney to work with the CARA Pro Bono Project to assist in representation efforts for Flores class members and their mothers detained at the South Texas Family Residential Center (STFRC).

3. I write to share the experiences of some of the clients I represented that week as well as the challenges I faced as an attorney. It should be noted that the cost to pro bono attorneys in terms of lost income is substantial. The remote areas in which detention facilities are located mean that pro bono attorneys must often dedicate about two days. To make the trip worthwhile and become familiar with policies and practices at the facilities and to assist more than a handful of people, several additional days of volunteer time are necessary. It is difficult for me to see how the pro bono effort can be sustained especially in light of challenges attorneys face once at the detention site.

4. I have been working with survivors of domestic violence, rape, and other trauma since I started law school, which now amounts to over five years of experience working with this population. Working with these clients I know firsthand how much time and patience it often takes to build trust and a rapport with a woman or a child, so that s/he is able to open up and talk about the violence or threats of violence experienced in their home country. It would not be unusual for an attorney (or a therapist or social worker) to spend weeks or months meeting with an asylum seeker to obtain a complete account of the factual basis for any claim they possess to qualify for asylum. It often also requires independent research to collect evidence in support of a claim. Based on my experience providing pro bono legal services at Dilley, unless the Government provided a bank of lawyers to represent *Flores* class members and mothers at Dilley, effective representation for all detained class members and their mothers is virtually impossible.

5. For example, one thirty-three-year-old mother of a class member I assisted at Dilley was fleeing abuse by her partner in Honduras. A few weeks before I met with the client, she reported that she was violently raped by a domestic partner and then fled her country. When I met with this mother, she had never spoken to anyone about being raped until she told me. She was still in shock and traumatized about the event. I only had an hour to build trust with this client, hear her story, and help orient her about what to expect at a credible fear interview. This was entirely insufficient time to adequately prepare her for the interview or for her to be ready to fully explain why she fled her home country.

6. During the six days I spent at Dilley, I did not meet any *Flores* class member or mother who told me that the class member had been informed by CBP or ICE about his or her rights under *Flores*, or provided a notice about why they were not being released, or had

been told they could have their status reviewed by an Immigration Judge, or had been
brought before an Immigration Judge to review their custody status, or had been informed
in any way that continuous efforts were being made to explore release or placement under
the _Flores_ settlement. It appeared to me that accompanied minors in Dilley were being
treated as if they are not _Flores_ class members at all.


I declare under penalty of perjury under the laws of the United States that the foregoing is true
and correct to the best of my knowledge, information, and belief. Executed this 7 day of May,
2016, in the City of New York , State of New York .



Amanda Doroshow, Esq.

172

# Exhibit 11
## Publicly Filed

## DECLARATION OF EDWARD MCCARTHY

1. My name is Edward McCarthy, and I am an immigration attorney currently employed at Brooklyn Defender Services in Brooklyn, New York.

2. From October 17, 2015 until October 30, 2015, I worked as a pro bono attorney with the Refugee and Immigrant Center for Education and Legal Services (RAICES) in San Antonio, Texas.

3. As a pro bono attorney, I represented mothers and children from Central America who had traveled to the United States and wanted to apply for asylum here. Upon their arrival from Central America, the United States Government incarcerated the mothers and children, detaining them at the ICE facility in Karnes, Texas.

4. I observed no change in ICE policy in the detention of accompanied *Flores* class members during my pro bono work at Karnes.

5. Each of the mothers with whom I met expressed frustration with their initial credible fear and reasonable fear interviews. They told me that their interviews took place with asylum officers who did not speak Spanish. Spanish language interpretation occurred over speakerphone.

6. My clients told me that the interpreters had a very difficult time understanding them and translating. When applicants tried to relay their stories to the asylum officers, the interpreters constantly interrupted the clients' narratives in order to translate. Then, before the applicants could recommence where they had left off, the asylum officer would ask a new question. This effectively cut off the applicant's ability to tell their whole stories.

7. On one occasion I represented a Karnes client in a credible fear interview. The interview in question took place on October 30, 2015. As a fluent Spanish speaker, I could tell when inaccuracies and problems occurred in translation. During the interview, on numerous occasions, the interpreter mistranslated things that my client said. On other occasions, the interpreter just left out important things that my client had said. Further, the interpreter frequently jumbled the questions asked by the asylum officer, making it very difficult for the client to understand what was being asked of her. When the client attempted to convey her narrative, either the interpreter or the asylum officer would tell the client to stop so that what she had said previously could be translated. Once the interpreter had conveyed what my client had said, instead of allowing my client to continue the narrative, the asylum officer would immediately ask a new question, preventing my client from telling her whole story. The asylum officer asked whether the persecution my client experienced was a result of her membership in a social group. My client did ot understand this question. In my experience, very few asylum seekers would understand this question. Even the Immigration Judges, the Board of Immigrtaion Appeals and the federal courts struggle with what it means to be a member of a social group.

8. Based on my pro bono work at Karnes from October 17, 2015 until October 30, 2015, it became clear to me that most credible fear and reasonable fear interviews do not take place with counsel present.

9. Aside from the problems in translation, I faced problems in accessing my clients due to Immigration and Customs Enforcement's ("ICE's") decisions.

10. In one instance, I represented a mother and three Flores class member children whose husband/father had been murdered by members of the MS-13 gang for refusing to join their gang. My client and her children fled El Salvador after it came to the attention of the MS-13 gang members that she had assisted the police in investigating the crime. I represented these clients in proceedings before an Immigration Judge who affirmed the negative fear decision. I notified my clients' deportation officer that we planned to file a request for reconsideration with the asylum office. The deportation officer told me to submit the reconsideration request within the next few days, that there was no rush because ICE had not begun the deportation process yet. Three days after this conversation, I traveled to Karnes to finalize and submit the reconsideration request. When I arrived, I was informed that my clients had been transferred to an ICE family detention facility in Berks Pennsylvania, without any notice to me, their attorney. I could no longer meet with or even communicate with my clients. The same thing happened with another mother and Flores class member who I was representing. These transfers to Berks completely interfered with both the mothers' and the Flores class members' right to counsel.

11. None of the mothers and Flores class members who I interviewed or represented at Karnes from October 17, 2015 to October 30, 2015 told me that any CBP or ICE official, or staff member at Karnes, had informed them about any aspect of the Flores settlement including any rights that Flores class members may possess.

12. None of the mothers or Flores class members who I interviewed or represented at Karnes from October 17, 2015 to October 30, 2015 informed me that any efforts had been taken or were being taken that they were aware of to release or place Flores class members as expeditiously as possible under the terms of the _Flores_ settlement.

13. To the best of my knowledge, none of the Flores class members who I represented in Karnes from October 17, 2015 to October 30, 2015 had been brought before an Immigration Judge to review their custody status even though most of the class members had been detained for several weeks.

I declare under penalty of perjury that the above facts are true and correct to the best of my knowledge. Executed this 2 day of May, 2016, in the City of Brooklyn, State of New York.

_____
Edward McCarthy

175

# Exhibit 12
## Publicly Filed

## DECLARATION OF ROBYN BARNARD, ESQ.

I, Robyn Barnard, Esq., pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an associate attorney with Human Rights First's Refugee Representation team, 75 Broad Street, Floor 31, New York, N.Y. 10004.  Human Rights First provides *pro bono* representation to asylum seekers through its offices in New York, Washington, D.C., and Houston, Texas, often in conjunction with major law firms.  Our organization's clients include many mothers and *Flores* class-member children who fled their countries to seek protection in the United States.

2. I am admitted to practice in New York.  My day-to-day practice involves interviewing and assisting indigent asylum seekers in immigration detention and helping them find *pro bono* legal representation.  I have represented asylum seekers in the United States for approximately one year and previously assisted asylum seekers in Australia.

3. I provide this declaration to document the conditions that some families currently in immigration detention face, to explain the effects on detained families transferred from one facility to another, and the challenges that transferring families between facilities poses for *pro bono* legal services providers.

## BERKS COUNTY RESIDENTIAL CENTER *PRO BONO* REPRESENTATION PROJECT

4. On August 11, 2015, I toured the Berks County Family Residential Center (the "Berks facility") located in Leesport, Pennsylvania.  I was accompanied by lawyers from Human Rights First and Philadelphia law firms, a social worker, and pediatricians.  We had the opportunity to speak with approximately sixteen parents and some of their children, in a

1

group setting, about their experiences at the Berks facility.  At least some of these families included *Flores* class members.

5.  When our group asked the parents how many had *pro bon,* or any type of legal representation, only two knew with certainty that they had a lawyer.  One thought that she had a lawyer, but had never spoken with the attorney.

6.  On August 19, 2015, Human Rights First published a report documenting our research and findings in relation to the Berks facility.  (See Ex. 1.)

7.  That report concluded, among other things, that "[d]etention worsens the situation for already vulnerable children and parents."  Parents held in family detention appear to suffer from depression and children appear to experience "behavioral regressions, depression, anxiety, and increased aggression toward both parents and other children." (*Id.* at 1.)

8.  In response to the seemingly low rate of *pro bono,* or other types of, legal representation of families detained at the Berks facility, Human Rights First partnered with a local Berks County legal service provider, the Pennsylvania Immigrant Resource Center (PIRC); local private attorneys; Philadelphia-based law firms; and Pennsylvania law schools ("*pro bono* representation project") to attempt to provide *pro bono* legal representation for families detained at Berks, many of whom include *Flores* class members. Nevertheless, because of the remote location of this detention center, effective and thorough legal representation for the majority of *Flores* class members and their mothers is very challenging.

9. In early November 2015, Refugee and Immigrant Center for Education and Legal Service (RAICES), CARA Pro Bono Project attorneys,[1] and other attorneys representing detained *Flores* class members informed me that several families had disappeared from the Dilley and Karnes detention centers in Texas. It turned out that the families had been transferred to the Berks facility.

10. Since October 28, 2015, the *pro bono* representation project at the Berks facility has screened at least 51 families, of which 44 were transferred from either the Dilley or the Karnes facilities. At least 31 of these transferred families had been held in the Dilley or Karnes facilities for more than 20 days before they were transferred to the Berks facility; and at least six of those families had been detained in Texas for more than two months before their transfer to Pennsylvania. All of the families who have been transferred to the Berks facility since late October received an initial "negative" fear determination from the asylum office that adjudicated their credible or reasonable fear interviews in Texas.

11. In reviewing approximately 44 "negative" fear interview records for *Flores* class members and their mothers transferred from the two Texas family detention facilities to the Berks facility, I observed evidence of conditions that may prevent accurate assessments of credible fear:

(a) Inadequate interpretation services;

(b) lack of an adequate explanation to the class members and mothers regarding the purpose of the interview or review hearing;

---

[1]   CARA is a collaborative effort to provide pro bono legal services to families in detention made up of RAICES, the American Immigration Lawyers Association, Catholic Legal Immigration Network, and the American Immigration Council.

(c) failure to explain to class members and mothers what it means to be a member of a
"social group" (the basis for most denials);

(d) use of form-letter denials that do not explain the individualized basis for the denial,
thus precluding effective review by immigration judges or federal courts; and

(e) families represented by counsel in Texas, who had requested review of denials of their
credible or reasonable fear interviews before immigration judges, were transferred to
Berks before their immigration judge hearings had taken place.

12. Once a transfer takes place, our collective in Pennsylvania must rush to identify newly
transferred families, attempt to find volunteers to interview them about their fear of return
and the circumstances surrounding their prior fear interviews and review hearings in
Texas, and hastily assemble and file requests for re-interview with the Newark Asylum
Office before the families are deported.  Given the large number of families involved, the
remoteness of the Berks facility, and delayed access to detainees' Immigration and
Customs Enforcement (ICE) administrative files, effective representation for the majority
of detainees is very difficult.

13. I have observed no changes in ICE policies or practices regarding *Flores* class members
since the District Court issued its remedial Order on August 12, 2015.  The Court ordered
that as required by Paragraph 18 of the Settlement, "Defendants, upon taking an
accompanied class member into custody, shall make and record prompt and continuous
efforts toward family reunification and the release of the minor pursuant to Paragraph 14
of the Agreement."  Review of the administrative files for class members and mothers we
have interviewed at Berks, when finally obtained, show no compliance with this part of
the Court's Order.

4

14. On February 19, 2016, Human Rights First published summary of medical complaints made by mothers at Berks, which include the written responses they received from their ICE deportation officers (DO).  (Ex. 3.)  One mother wrote:

> My son suffers from a skin disease named ███████████ and since we arrived in the United States, it developed itself so much to the point he even has symptoms on his genitals. When scratched it bleeds and [the detention center health staff] did not give me any medications for it or to calm him down, also his behavior has changed, he cries because he does not want to stay here any longer, it has already been over four months and I am still here.

In their response, her ICE DO advised her to make an appointment with the medical staff at Berks, not addressing her concerns that the medical staff had not helped her child despite visits to the medical department at the detention center.  The ICE DO went on to say, "[y]ou may accept your removal order and arrangements can be made for your removal from the United States. At this time your custody status remains unchanged." Another complaint reads:

> My daughter has been having diarrhea for about three weeks now and we went to see a doctor but they did not give us any medication not even serum. With every passing day her behavior is getting worse and the psychologist just tells me to be patient. I need you to give me the adequate medication and that you give me the opportunity to take my case outside of here. I am not a criminal. You gave the opportunity to other persons that have been deported to leave, why did you not give it to me. It has been more than four months that I have been detained.

ICE DOs response: "Thank you! You may disolve [sic] your case at any time and return to your country.  Please use the medical department in reference to health related issues."

I declare under penalty of perjury that the above facts are true and correct to the best of my knowledge.

Executed this 9th day of May 2016, in the city of New York, state of NY.

Robyn Barnard, Esq.

6

182

# Exhibit 12 Attachment Exhibit 1





# Family Detention in Berks County, Pennsylvania

**August 2015**



**ON HUMAN RIGHTS**, the United States must be a beacon. Activists fighting for freedom around the globe continue to look to us for inspiration and count on us for support. Upholding human rights is not only a moral obligation; it's a vital national interest. America is strongest when our policies and actions match our values.

Human Rights First is an independent advocacy and action organization that challenges America to live up to its ideals. We believe American leadership is essential in the struggle for human rights so we press the U.S. government and private companies to respect human rights and the rule of law. When they don't, we step in to demand reform, accountability, and justice. Around the world, we work where we can best harness American influence to secure core freedoms.

We know that it is not enough to expose and protest injustice, so we create the political environment and policy solutions necessary to ensure consistent respect for human rights. Whether we are protecting refugees, combating torture, or defending persecuted minorities, we focus not on making a point, but on making a difference. For over 30 years, we've built bipartisan coalitions and teamed up with frontline activists and lawyers to tackle issues that demand American leadership.

*Human Rights First is a nonprofit, nonpartisan international human rights organization based in New York and Washington D.C. To maintain our independence, we accept no government funding.*

© 2015 Human Rights First All Rights Reserved.

**Acknowledgements**

The principal author of this report was Olga Byrne. Additional research, comments or edits were contributed by Eleanor Acer, Meredith Kucherov, and Corinne Duffy. Sarah Graham designed the report and its cover. Human Rights First expresses its appreciation to the refugees, asylum seekers, pro bono attorneys, legal representation organizations, and others who provided information that informed this update, and the organization gratefully acknowledges the support of its donors—both foundations and individuals—including the generous support of the Oak Foundation.

**This report is available online at humanrightsfirst.org**

WHERE TO FIND US

| | | |
|---|---|---|
| 75 Broad Street, 31st Floor | 805 15th Street, N.W., #900 | 1303 San Jacinto Street, 9th Floor |
| New York, NY 10004 | Washington, DC 20005 | at South Texas College of Law, Houston, TX 77002 |
| | | |
| Tel: 212.845.5200 | Tel: 202.547.5692 | Tel: 713.955.1360 |
| Fax: 212.845.5299 | Fax: 202.543.5999 | Fax: 713.510.1935 |

www.humanrightsfirst.org

*"We are not delinquents who should be imprisoned."*

– Eleven-year-old girl on her detention
at Berks County Residential Center

# CONTENTS

**Summary and Recommendations**..................................................................................1

    **Recommendations**............................................................................................... 3

**Background** .............................................................................................................4

**Detention Harms Children's Health and Well-Being** .................................................6

**Implementation of June Reforms: Progress and Short-Comings**............................9

**Advocates Object to the Licensing of Berks by the State of Pennsylvania** ............10

**Conclusion** ............................................................................................................11

**Endnotes**...............................................................................................................12

# Summary and Recommendations

The Berks County Residential Center is a facility in Pennsylvania where U.S. Immigration and Customs Enforcement detains immigrant and asylum-seeking families. The Berks facility is currently one of three family detention centers in the United States along with the South Texas Family Residential Center in Dilley, Texas and the Karnes County Residential Center in Karnes City, Texas. The Berks County Residential Center is operated by the County of Berks.

Since June 2014, when the Obama Administration announced its plans to send large numbers of families from Central America seeking asylum into immigration detention, families detained at the three detention facilities—Dilley, Karnes, and Berks—have suffered the detrimental effects on their physical and mental health associated with being detained, lengthy detention stays, and lack of access to legal counsel. Some have even suffered abuse, including a 19-year-old mother who reported being sexually assaulted by a staff member and an eight-year-old girl who witnessed the assault at the Berks facility earlier this year.

Detention is not only harmful to children and families, but also expensive to taxpayers at an average daily cost of $343 per person. The American Academy of Pediatrics, the American Bar Association, Catholic and Lutheran Bishops, Members of Congress, and an array of other voices have called on the administration to end the practice of family detention.

On June 24, 2015, Secretary of Homeland Security Jeh Johnson announced a series of reforms, including measures aimed at reducing the length of family detention stays for families who had passed a protection screening (credible fear or reasonable fear) interview.[1] On July 24,

2015, the U.S. District Court for the Central District of California issued an order instructing the government to show why it should not be ordered to comply with the *Flores* Settlement Agreement, which articulates the legal standards for the detention, release, and treatment of children by immigration authorities. That ruling was preceded by a February 2015 ruling of a federal court in Washington D.C., which also called into question the administration's policy of holding families in immigration detention facilities.

Over the last few months, including just last week, Human Rights First staff visited the Berks family detention facility and met with asylum seekers—parents and children—held at the facility, some for many months. Despite the reforms announced by the U.S. Department of Homeland Security (DHS) this summer and even in the wake of the federal court's July 24 ruling, Human Rights First found that:

■ **Detention damages children's health and well-being**. Consistent with medical and mental health research, parents detained at the Berks facility—including those who have been detained for two or three weeks—related symptoms of their children's behavioral regressions, depression, anxiety, and increased aggression toward both parents and other children. Many families are coming from situations in which they have experienced trauma, abuse, or exploitation. Detention worsens the situation for already vulnerable children and parents. Parents held in family detention also appear to be suffering from depression, including feelings of helplessness with regard to the care and health of their children.

- **Obstacles to release and counsel remain.** Six weeks after the DHS reform announcement, detained families continue to face obstacles to release such as unaffordable bonds, delays in interview processes, and/or lack of counsel. While many of the families who had been held for months on end were released in the weeks following the reform announcement, other families, who were detained more recently, have already been held at the Berks detention facility for two to six weeks. At least one family has been detained there for four months. Some families are asked to pay bonds of $5000 or more—far too high for indigent asylum seekers to afford—blocking or delaying their release from detention. Moreover, many families detained at the Berks facility do not have legal representation.

- **Advocates oppose licensing Berks as a "child residential facility."** Advocates have called upon the Pennsylvania authorities to revoke the license it granted to the Berks County Residential Center as a child residential facility for dependent and delinquent youth. Notwithstanding the Pennsylvania Department of Public Welfare's belief that Berks is "not operating as a secure facility," children and parents who are detained at Berks have expressed distress over being "incarcerated" or "imprisoned."

- **Frequent room checks disrupt sleep, cause fear and anxiety**. The practice of entering and shining flashlights into the rooms of sleeping families every 15 minutes throughout the night causes insomnia, fear, and anxiety in children and parents held at the Berks facility.

- **Lack of Spanish-speaking mental health staff undermines ability to assist children and families**. Berks does not have Spanish-speaking mental health providers, even though the majority of families sent to family detention in the United States are Spanish-speaking and many have suffered high rates of trauma, physical and sexual violence, and exploitation. Additionally, only 23 of the total staff at Berks (or less than 40 percent) reportedly speak some Spanish (with the level of fluency ranging from conversational to bilingual), making it difficult for many staff members to effectively communicate with children and their parents. It appears that many facility staff must rely heavily on telephonic interpreters, for everything from essential services, such as mental health, to daily interactions with children and their parents.

The federal district court in the *Flores* case recently denied the government's request for oral argument and it is expected that the court will issue its final order in the coming weeks. That ruling may prevent U.S. immigration authorities from detaining immigrant children with their parents for more than three to five days. Regardless of the court's decision, the Obama Administration and DHS should stop sending families into immigration detention. As the American Academy of Pediatrics told DHS Secretary Jeh Johnson in its July 24, 2015 letter: "The act of detention or incarceration itself is associated with poorer health outcomes, higher rates of psychological distress, and suicidality making the situation for already vulnerable women and children even worse."

Detaining families is also expensive. The DHS Congressional Budget Justification for fiscal year 2016 indicates an average daily cost of $343 per person (or $1,029 for a family of three), whereas alternative measures cost as little as 17 cents per day, and even intensive community-based programs are a fraction of the cost of detention.[2]

Instead of holding children and their families in detention, U.S. immigration authorities should

refer families' immigration cases to removal proceedings before the U.S. Department of Justice's Executive Office for Immigration Review and release them to the care of family members living in this country. In fact, as the government states in its reply to the *Flores* order to show cause, this is what happens in the majority of cases involving families apprehended at the southern border. In cases where additional appearance support is determined necessary, Immigration and Customs Enforcement (ICE) can refer families to cost-effective alternative measures, and families who may lack housing options can be referred to social service providers. The administration has the tools it needs to manage the arrival of families seeking asylum without resorting to policies that harm children and undermine American ideals, due process, and human rights commitments.

## Recommendations

- **End family detention**. The Obama Administration and DHS should comply with the recent ruling in the U.S. District Court for the Central District of California, which found that family detention violates the *Flores* Settlement Agreement and effectively prohibits the detention of families for more than a few days. Moreover, medical experts confirm that detention damages the physical and mental health of asylum seekers and can be especially traumatizing to children and families. Even a few days of detention can be damaging to children. Detention also impedes access to counsel and due process. As many members of Congress have urged, the Obama Administration should end family detention.

- **Implement community-based alternatives to detention programs**. The vast majority of families seeking protection in the United States have relatives living in this country with

whom they can live. ICE can refer their cases to the immigration court nearest that location. In cases where additional support is needed—such as housing, mental health services, or appearance support—ICE should refer families to community-based programs, which provide an array of holistic social services and case management services and have proven successful in ensuring immigrants' appearance for immigration proceedings and other monitoring obligations. Lutheran Immigration and Refugee Service and the U.S. Conference of Catholic Bishops' Migration and Refugee Service recently piloted community-based models showing initial results with program compliance rates of 96 to 97 percent. Alternative to detention programs are also much less expensive than detention, which costs $1,029 per day for a family of three. Past studies show that even intensive community-based programs come at only 20 percent of the cost of detention. ICE should only use ankle devices in select cases when an individualized assessment using a validated instrument has shown that other less intrusive and stigmatizing measures cannot assure appearance, and the use of such measures must be regularly reviewed, including by a court.

- **Implement release reforms and improve access to counsel**. While DHS should stop sending families into immigration detention, it should more effectively implement the reforms it announced in June 2015 for as long as it continues to detain families. Indigent asylum-seeking families should not be blocked from release by bonds that are too high for them to afford. Many asylum-seeking families can and should be released without the need to pay bond. Any conditions of release should be reasonable, and bond—to the extent ICE requires it in an individual case rather than

allowing release on parole or recognizance—should be affordable. In addition, the government should fund legal counsel for families, as well as ensure access to legal information through the EOIR-funded Legal Orientation Program before families are scheduled for protection screening interviews. Berks should also ensure that lawyers are permitted to bring in laptops and other devices that enhance effective representation for meetings with clients.

- **Review and consider revoking the Berks facility license issued pursuant to child care regulations**. Given the evidence of detrimental effects of any period of detention on already vulnerable children and parents, as well as allegations by advocates that the facility does not comply with licensing requirements, the Pennsylvania Department of Human Services should deny ICE's request to expand its license and consider revoking the license entirely, leading to a closure of Berks as a family detention center. In cases of families who do not have relatives or friends in the United States with whom they can live, ICE can refer these families to community-based social service programs. Where ICE has determined that families require additional support to ensure appearance for court hearings or otherwise, community-based appearance support models, which have been proven effective, should be used instead of detention.

# Background

On June 24, 2014, in response to the increasing number of children and families seeking protection at the southern U.S. border (and, ironically, falling exactly on World Refugee Day), the Obama Administration announced plans to significantly increase capacity to detain children fleeing to the United States with their parents from Honduras, Guatemala, and El Salvador. DHS quickly erected a 700-bed detention facility in Artesia, New Mexico, which was later closed. It repurposed and expanded a detention facility in Karnes County, Texas, which holds up to 500 individuals, and erected the South Texas Family Residential Center in Dilley, Texas, which recently expanded to a capacity of 2,400 individuals, making it the largest immigration detention center in the country. In June 2015, DHS announced that it would expand from a capacity of 96 beds to nearly 200 beds at the Berks County Residential Center in Leesport, Pennsylvania.

Over the past year, a wide array of groups has spoken out against the government's policy of detaining families. In a March 26, 2015 letter to President Obama, faith leaders from across the country called for an end to family detention and the use of detention to deter families from seeking asylum: —As faith leaders representing churches, synagogues, and faith-based organizations in the United States who are deeply committed to upholding this country's moral leadership to protect children and the sanctity of the family, we call on you to end the harsh policy of family detention and employ alternatives to detention where deemed necessary. We believe this practice to be inhumane and harmful to the physical, emotional, and mental well-being of this vulnerable population." Human Rights First and other organizations focused on refugee protection wrote in a November 2014 letter to President Obama, ―These policies of detention and attempts at deterrence violate U.S. human rights and refugee protection commitments." Instead, ―U.S. border policies should respect basic human rights standards and set an example for other countries faced with much greater challenges."

In May 2015, the New York City Bar Association called for an end to family detention, stating that

detention harms children and their parents, raises due process concerns, and does not achieve its stated goals. Pro bono leaders have decried the many obstacles to legal representation, and medical and mental health experts, including the American Academy of Pediatrics, have cited the known detrimental health effects on children. The overwhelming majority of Democratic congressional leaders have opposed family detention, with 178 House Democrats recently calling on DHS to end its "controversial" family detention program.[3]

The escalation of family detention has also sparked litigation in the federal courts. In December 2014, in *RILR v. Johnson*, mothers and children filed a class action lawsuit in the U.S. District Court for the District of Columbia alleging that the government's "no-release policy" caused them irreparable harm. On February 20, 2015, the court ordered a preliminary injunction, preventing the government from considering deterrence as a factor in individual custody determinations.

Also in February 2015, lawyers for children detained in family detention centers filed a motion with the U.S. District Court for the Central District of California to enforce the *Flores* settlement agreement, which was reached in 1997 and governs the detention, release, and treatment of children in immigration custody. On July 24, 2015, the court ruled that the federal government's family detention policy violated the terms of the settlement agreement by failing to release children promptly and by holding children in secure, unlicensed facilities.[4]

The court ordered the government to implement a series of remedies, which include releasing children within three to five days with the accompanying parent. In cases where release is not possible due to a significant flight risk or safety risk that cannot be mitigated by conditions of release, the government must place children in licensed programs in accordance with the settlement agreement. The court noted, referencing the government's own argument, "there is no state licensing process available now—nor was there in 1997—for facilities that hold children in custody along with their parents or guardians."

Despite the public outcry, the government's so-far failed efforts to defend its policy in the courts, and the high cost of detaining families, the administration has continued to send children and their parents into immigration detention. In its Congressional Budget Justification for fiscal year 2016, DHS requested substantial additional funding to expand family detention at an average daily cost of $343 per person, or $1,029 for a family of three.

In June, when Secretary of Homeland Security Jeh Johnson announced reforms to DHS family detention policy, including measures to reduce detention times for families, the announcements made clear that despite re-evaluating some of the harsher policies enacted last year, the government would continue to send families into detention. In the *Flores* case, rather than accepting the judge's order requiring the government to remedy its breaches of the settlement agreement, the government filed a brief requesting that the judge reconsider her order, claiming that family detention was needed to "dis-incentivize future surges of families crossing the Southwest border," essentially confirming plans to continue to use detention to deter or discourage families from seeking asylum in the United States. As Members of Congress have emphasized in their statements to the government recommending an end to family detention, it is perfectly legal to seek asylum.

Over the last year, Human Rights First attorneys have visited the four family detention facilities in Artesia, New Mexico, Berks County, Pennsylvania, Karnes County, Texas, and Dilley, Texas, meeting with scores of families detained at

these facilities. Our staff has also interviewed many nonprofit, pro bono, and other attorneys who provide legal counsel to families held at these facilities, and met with government officials and contractors overseeing the facilities, both locally and nationally. Human Rights First has visited the Berks facility twice, interviewed or met with 23 families who were or had been detained there, interviewed attorneys who provide legal services to families at Berks as well as the EOIR-funded Legal Orientation Program provider, and spoken with ICE and Berks County representatives.

Unlike the two detention centers in Texas and the now-closed facility in Artesia, which all became operational since Secretary Johnson's June 24, 2014 announcement, the Berks County Residential Center has been detaining families for nearly fifteen years. According to the *Reading Eagle*, "Berks County was selected as the site in 2000 because of its excellent working relationship with the federal government when it was housing illegal aliens in the county jail."[5] Financial considerations and the economic impact were cited by media as benefits to the county.[6] Initially, the program was a "money maker" for Berks County, according to a statement by Berks County Commissioner Chairman Mark C. Scott reported in the *Reading Eagle*, but this changed in 2004 when federal regulations prohibited governmental agencies from profiting by providing service programs.[7]

Berks is located at a former nursing home in a picturesque part of central Pennsylvania, and children and families detained at the facility have some degree of limited free movement within the facility and its outdoor grounds during set hours, giving it a less severe appearance than other immigration detention centers. However, while the scenic landscape and availability of limited activities for children might be positive, children and families are still deprived of their liberty and these features do not appear to have lessened the

detrimental effects of detention on children and families, as described in the following section.

*The New York Times* reported in 2009 that although Berks had been "eclipsed by the criticism of Hutto"—a highly controversial family detention center in Texas—it too had "a history of problems."[8] In 2007, Lutheran Immigration and Refugee Services (LIRS) and the Women's Refugee Commission (Women's Commission) reported a range of problems, including prohibiting children from speaking as a form of punishment and reportedly sending some children to the juvenile detention facility without a court order.[9] LIRS and the Women's Commission also reported that at that time, some families were being held at Berks for years. This particular problem of long-term detention at Berks has persisted—when Human Rights First visited Berks in late June, several families had been held there for over a year.

# Detention Harms Children's Health and Well-Being

There is clear evidence that detention for immigration purposes is harmful to the health and well-being of children and families.[10] Studies have indicated that children in immigration detention can have high rates of psychiatric symptoms, including self-harm, suicidal ideation, depression, developmental regressions, and post-traumatic stress disorder, and may suffer physical health problems, such as weight loss and frequent infections.[11]

The American Academy of Pediatrics wrote in a July 2015 letter to Secretary Johnson that the detention of families unnecessarily exposes families with high rates of previous trauma, physical and sexual abuse, and exploitation to additional psychological trauma, putting children

and their parents -at greater risk for physical and mental health problems."[12] Professional medical associations in the United Kingdom and Australia have drawn similar conclusions on family detention.[13] The Royal Academy of Paediatrics and Child Health, together with the Royal College of General Practitioners, Royal College of Psychiatrists, and the UK Faculty of Public Health, concluded that —almost all detained children suffer injury to their mental and physical health as a result of their detention, sometimes seriously."[14]

Even brief periods in immigration detention are harmful for children. A recent study of the family detention system in Canada found that the experience of detention is -acutely stressful [for children] and, in some cases, traumatic—even when detention is brief." The families who participated in the study had a median length of detention of 13.5 days (the average length was 56 days, due to a few particularly long stays) and were detained at facilities that provide education for children and permitted some amount of free movement. Despite the fact that most families were detained for less than two weeks, the researchers found that the detrimental effects mirrored those of children detained for much longer periods of time, noting that their findings suggest —that any incarceration, even under relatively safe conditions, is damaging for immigrant children, especially those with high levels of previous trauma exposure."[15]

Human Rights First has met with or interviewed 23 families who have been detained at the Berks facility, including families that were held at the facility for a few weeks as well as families who had been detained over a year. Families who were detained for a few weeks reported symptoms of depression, behavioral regression, and anxiety in their children, as confirmed by two highly experienced pediatricians who accompanied Human Rights First on a visit to the facility on August 11, 2015. After speaking with

families who had been detained at Berks for periods ranging from two to six weeks, Dr. Alan Shapiro, Senior Medical Director for Community Pediatric Programs at the Children's Hospital at Montefiore, described his conclusion: —Notwithstanding this range [of time spent in detention], we observed significant stress and symptoms of mental health conditions in the group with whom we met."

Families who have been detained at the Berks facility have described numerous ways in which their children were suffering. For example:

- One mother, who had been detained with her child for less than one month, told Human Rights First that her child's mental health and behavior had deteriorated since their detention, and that her child had expressed suicidal thoughts.

- Several parents who had been detained with their children for several weeks indicated that their children had lost their appetites, lost weight, started acting out, and/or behaved aggressively toward other children.

- An eleven-year-old girl told Human Rights First, choked-up in tears, —I knew a few days after I arrived here and I realized that this was going to be very hard. I try to go outside, distract myself with some activities. We are not delinquents who should be imprisoned."

- When Human Rights First visited Berks in June, some of the children and parents made t-shirts with slogans. Mothers wore t-shirts saying, "I need my liberty." One child, who looked about ten years old, wrote in broken English: "We get out of here." Other children painted tears on their faces.

Certain practices imposed by the facility may cause additional stress, beyond that associated with the deprivation of liberty and the process of seeking asylum. Many families have complained

that Berks staff perform constant checks throughout the night by entering their rooms and shining a flashlight onto each person. This led to disruptions in sleep, fear, and nightmares. One mother, who had been detained at Berks for four months, told Human Rights First that this practice caused her daughter to be afraid of the staff who would enter their room. Her daughter had recurring nightmares about the facility, even two months after having been released.[16] ICE officials told Human Rights First that they are required by the state of Pennsylvania to engage in these room checks every 15 minutes.

Detention can also leave children and their parents vulnerable to other harms associated with incarceration. In January 2015, a staff member from Berks was arrested and charged with seven counts of sexual assault in response to allegations he had sexually assaulted a 19-year-old mother who was detained there. An eight-year-old girl, who was also detained at the facility, told police she had walked in on the guard and the detainee in the bathroom stall. After that incident, the little girl was afraid to leave her mother's side. According to three mothers who were detained at Berks at the time of the assaults and during the aftermath, the facility did not take measures to provide coping therapies or alleviate fear and anxiety among women or children who would have felt particularly vulnerable. In an interview with MSNBC, the victim described being made felt that she was "the guilty one." She stated: "Nobody approached me to help or ask me how I was."[17] Instead, according to three local attorneys who represented families during the time of the incident and its aftermath, the facility began to monitor women's choice of clothing more closely.[18]

Some families reported problems with the medical care available at Berks. One mother, whose six-year-old daughter lost eight kilograms (approximately 18 pounds), explained an instance

in which her daughter was sent to the emergency room and the medical provider at the hospital prescribed acetaminophen to lower her fever and another medication. When they returned to Berks, the healthcare staff refused to fill the prescriptions, saying they had done their own assessment and determined it was not necessary. Other mothers spoke of bringing their children to medical staff with high fevers and being told only to "drink more water," and denied any sort of fever reducer, such as acetaminophen.

According to an attorney who represents several families at Berks, one mother had to obtain a prescription in order to give yogurt to her daughter—who had lost considerable weight and was persistently ill. However, while many concerns about the medical care were expressed by families who had spent several months or longer at Berks, families that met with Human Rights First in August 2015, and who had spent between two and six weeks at the facility, generally did not have complaints about the medical care.

Despite some efforts by DHS to improve conditions at family detention centers, certain essential services appear to fall short. As noted by Dr. Shapiro, the mental health program at the facility did not appear to use "any formal, evidence-based validated tools for screening or monitoring" children and families, raising "serious concerns about the care that detained families with compounded histories of trauma receive." Moreover, the facility did not employ Spanish-speaking mental health staff, despite the population being overwhelmingly Spanish speaking.

Medical professionals have questioned whether ICE can provide appropriate care for children, particularly given the degree of past trauma suffered by asylum-seeking families. As noted in their letter urging Secretary Johnson to "do what's best for [children's] health and well-being," the

American Academy of Pediatrics stated: "we question whether the existing family detention facilities are capable of providing generally recognized standards of medical and mental health care for children."[19]

# Implementation of June Reforms: Progress and Short-Comings

Earlier this year, among the many concerns raised by human rights advocates, lawyers, health professionals, faith leaders, children's and women's groups, members of Congress, and others, was the fact that many families were in indefinite and highly prolonged detention. On June 24, 2015, Secretary of Homeland Security Jeh Johnson announced a series of reforms to family detention, which included measures to reduce detention times for families. Prior to this, some families were held in detention for many months and even over a year. When Human Rights First visited Berks on June 22, just two days before the announcement, several families had been detained at Berks for close to or over a year.

ICE did release the families who had been detained long-term at Berks within about a month of Secretary Johnson's announcement. In its brief responding to the U.S. District Court for the Central District of California where it argued why the court's July 24, 2015 order should not be implemented, DHS stated: "ICE anticipates that, in the future, families who assert a claim of fear at the time of their encounter by DHS will be processed, screened for reasonable or credible fear, and released under appropriate conditions within an average of 20 days of making that assertion." DHS officials told the *Washington Post* Editorial Board that most families are released in about two weeks,[20] but pro bono attorneys working at these facilities report that many families are held much longer. Attorneys have noted various practices by ICE that have caused families to be delayed and blocked from release.[21] The June announcement specified criteria had been developed and approved "for establishing a family's bond amount at a level that is reasonable and realistic, taking into account ability to pay, while also encompassing risk of flight and public safety."

Yet, when Human Rights First visited the Berks facility in August 2015, it was clear that some families had already been detained for about one month or six weeks, and the longest length of stay at Berks was 120 days. Moreover, in some cases, ICE continues to set bond amounts at Berks too high for families to pay, effectively blocking or delaying release from detention. Human Rights First met families detained at Berks who expressed anxiety over the bond amounts they had either received or anticipated receiving based on what they had heard from others. Several families expressed concerns that they could not afford to pay a $5,000 bond, and some stated they were poor or indigent. One father said that $1,500 (the statutory minimum in cases where monetary bond is the condition of release) would be more than he could afford.[22] ICE representatives told Human Rights First that $5,000 was a typical amount for bond to be set at Berks.

In addition to developing measures to reduce detention times, the June announcement included "additional measures to ensure access to counsel, attorney-client meeting rooms, social workers, educational services, comprehensive medical care, and continuous monitoring of the overall conditions at these centers." In general, immigrants in detention face much greater difficulties securing legal counsel. Studies have shown that approximately 80 percent of immigrants held in detention do not have legal

representation.[23] Legal counsel can vastly improve an individual's chances of obtaining relief from removal, and those who are represented appear for their hearings at high rates.[24] Recent data released by EOIR reveal that families with legal representation are fourteen times more likely to be successful in their cases than families without a lawyer.[25]

Of the 16 families Human Rights First met with on August 11, 2015 who had been detained for periods ranging from two to six weeks, only three of those families had secured, or potentially secured, legal representation. The local non-profit legal provider is overstretched and under-staffed, and does not have the legal staff necessary to provide legal representation or individualized legal counseling to families in connection with their screening interviews, release requests, custody hearings in immigration court, or in preparation for any immigration court merits hearings. The legal provider has limited funding for conducting legal orientation presentations (LOPs), but that funding is not permitted to be used for legal representation, and it does not have other funding sources that would allow it to hire additional attorneys to provide direct representation for families held at the Berks facility. The extraordinary volunteer models that have been set up at the larger Dilley and Karnes facilities in Texas have not been launched at the Berks facility. But those initiatives are also unable to meet the massive legal needs of the families in the U.S. immigration, asylum, and detention systems.

Many families were in need not only of legal counseling about their cases, but actual legal representation to assist them with their protection screening interviews, release requests, and bond hearings. Several families in the group had been detained for approximately one month and indicated that they had not yet had their protection (credible fear or reasonable fear) screening

interview, meaning that they may have several more weeks in detention, if not longer, to have the interview, wait for the result, and move forward with some potential option for release.

With respect to education, while Berks follows the public school system standards and calendar, Human Rights First noted that the summer reading program, which ICE stated was not required, was not conducted by a teacher who could explain the assignment to the children in Spanish. Two girls who participated in the program told Human Rights First that their assignments were given to them in English, which they could not yet understand. As a result, the reading session was not very meaningful to the children as they did not understand the instructions. ICE stated that while they hire bilingual teachers during the school year, during the summer months they had only engaged English-speaking teachers.

## Advocates Object to the Licensing of Berks by the State of Pennsylvania

Unlike the detention facilities in Dilley and Karnes, which are not licensed by any state authority to hold children in custody, the Pennsylvania Department of Human Services has licensed the Berks County Residential Center as a child residential facility for dependent and delinquent children.[26] The current license allows Berks to operate with 96 beds as a child residential facility. ICE is seeking an expansion of that license to hold up to 192 individuals and has completed renovations at the facility to allow for the immediate placement of new families.

Lawyers who represent children and their parents at the facility have written to the Pennsylvania authorities, arguing that the facility should not be

licensed by the state as there are no dependent or delinquent children in custody.[27] In general, the licensing regulations that apply to the Berks County Residential Center have been applied to facilities providing care to children who are under the jurisdiction of Pennsylvania courts, such as children who have been deemed dependent or who have been alleged or adjudicated delinquent.[28] However, none of the children at Berks are dependent, by definition, since they are with at least one of their parents, and they have not been alleged or adjudicated delinquent.

Attorneys have also argued that Berks operates as a secure care facility, in violation of Pennsylvania law.[29] ICE consistently refers to its "family residential centers" as "detention" and Judge Gee defined "secure" as "a detention facility where individuals are held in custody and are not free to leave."[30] Under Pennsylvania law, secure care calls for particular requirements—most importantly, children cannot be admitted to a secure facility unless they have been committed to such a facility by an order from a court with jurisdiction over the child.[31] Secure care is defined in the code as care in a 24-hour living setting where voluntary egress is prohibited through either internal locks within the building, exterior locks, or secure fencing around the perimeter of the building. Families, as well as lawyers who represent families at Berks, have stated that internal locks and guards prevent families from moving around within or out of the facility, except at certain limited times of the day. Finally, the nightly 15-minute observations, described above, are required only for secure detention under the Pennsylvania code. When asked during the Human Rights First tour on August 11, 2015 whether this practice was followed at Berks, the ICE representative stated that she was specifically required by the State of Pennsylvania to conduct the 15-minute checks.

Children and parents have expressed feelings of stress and anxiety over their detention and lack of ability to leave. When Human Rights First met with parents and children who had been detained for periods ranging from two to six weeks, it was clear that despite most not having legal representation and many stating they had received little information related to the nature or progress of their cases, they expressed a feeling of injustice over not being able to leave the facility. A number of the parents and children detained at Berks told Human Rights First: "We want our liberty." One young girl stated, "We are not delinquents who should be imprisoned." Another mother, detained along with her children at the Berks facility, asked, "We have not robbed or killed; why are we imprisoned?"

# Conclusion

Detention—even for relatively short periods of time—is harmful to children. The medical and mental health research, as well as interviews with families detained at the Berks County Residential Center, makes clear that children who have been detained for a few weeks display symptoms of depression, behavioral regression, and anxiety. Even if DHS can succeed in implementing its reforms to limit detention times, children will suffer during the weeks they are detained, and some children will be detained for much longer than the proposed average of 20 days. In addition, detention is costly to taxpayers, with family detention costing an average of $343 per day per person. Community-based alternative programs are less expensive and have been proven effective in securing appearance at court hearings, and can also provide families with the social service supports they need. The Obama Administration should end its policy once and for all of sending families seeking asylum to immigration detention centers. ■

# Endnotes

[1]  Secretary of Homeland Security Jeh Johnson stated in his June 24, 2015 announcement that he had accepted and approved a plan "to offer release with an appropriate monetary bond or other condition of release to families at residential centers who are successful in stating a case of credible or reasonable fear of persecution in their home countries." As part of that plan, Director of Immigration and Customs Enforcement (ICE) Sarah Saldaña presented "criteria for establishing a family's bond amount at a level that is reasonable and realistic, taking into account ability to pay, while also encompassing risk of flight and public safety."

[2]  U.S. Department of Homeland Security Congressional Budget Justification FY 2016, stating that the proposed increase in funding would fund 2,760 family beds at an average rate of $342.73. Even intensive community-based programs may cost only 20 percent the cost of detention. *See* Oren Root, The Appearance Assistance Program: An Alternative to Detention for Noncitizens in U.S. Immigration Removal Proceedings, *available at* http://www.vera.org/sites/default/files/resources/downloads/aap_speech.pdf. The contractor for the government-funded Intensive Supervision Appearance Program (ISAP) charges $0.17 per day per participant for telephonic only monitoring; $4.41 per day for GPS monitoring; and an average of $8.37 per day per participant for full-service supervision, which includes case management as well. U.S. Department of Homeland Security Office of Inspector General, "U.S. Immigration and Customs Enforcement's Alternatives to Detention," February 4, 2015, OIG-15-22. The Government Accountability Office found, in February 2015, that in fiscal year 2013, ICE-funded ATD programs cost, on average, $10.55 per person per day. The GAO's estimate included the cost of ICE personnel, whereas previous DHS estimates have only included the cost billed by the contractor operating the program. U.S. Government Accountability Office, Report to Congressional Committees, Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness, November 2014.

[3]  Letter to Vice President Joseph R. Biden Jr. from the Association of Pro Bono Counsel, September 19, 2014; Letter to the Honorable Jeh Johnson, Secretary of Homeland Security from the American Academy of Pediatrics, July 24, 2015; Press Release: 178 House Democrats to DHS: End Family Detention Now, July 31, 2015, *available at* https://lofgren.house.gov/news/documentsingle.aspx?DocumentID=397976.

[4]  In addition, the California district court found that the conditions at Border Patrol facilities—where immigrants have complained of the notorious *hieleras* ("ice boxes"), mylar blanket coverings, sleeping standing up due to overcrowding, the absence of trash cans, and 24-hour fluorescent lighting—did not meet *Flores'* standard that temporary initial custody be "safe and sanitary."

[5]  Holly Herman, "Berks County might stop housing illegal aliens," Reading Eagle, August 21, 2009.

[6]  Mary E. Young, "ICE Facility to stay in Berks, saving 60 jobs," Reading Eagle, February 1, 2012.

[7]  Holly Herman, 2009.

[8]  Nina Bernstein, "U.S. to Reform Policy on Detention of Immigrants," August 5, 2009.

[9]  Lutheran Immigration and Refugee Service and the Women's Commission for Refugee Women and Children, "Locking Up Family Values: The Detention of Immigrant Families," February 2007.

[10]  *See* Sarah Mares, Louise Newman, Michael Dudley, and Fran Gale, Seeking refuge, loosing hope: parents and children in immigration detention, 10 Australasian Psychiatry 2, June 2002; Z. Steel and S. Momartin, et al., Psychiatric status of asylum seeker families held for a protracted period in a remote detention centre in Australia, 28 Australian and New Zealand Journal of Public Health 527 (2004); Australian Human Rights Commission, The Forgotten Children: National Inquiry into Children in Immigration Detention (2014); Intercollegiate Briefing Paper, citing Lorek et al, The mental and physical health difficulties of children held within a British immigration detention centre: A pilot study. Child Abuse and Neglect: 33: 573-585 (2009); Physicians for Human Rights and the Bellevue/NYU Program for Survivors of Torture, From Persecution to Prison: The Health Consequences of Detention for Asylum Seekers (June 2003); see also A. S. Keller, et al, The Mental Health of Detained Asylum Seekers, 362 The Lancet 1721 (2003); United States Commission on International Religious Freedom, Report on Asylum Seekers in Expedited Removal: Volume 1: Findings and Recommendations (February 2005), p. 197-198.

[11]  Royal College of Paediatrics and Child Health, et al., "Intercollegiate Briefing Paper: Significant Harm—the effects of administrative detention on the health of children, young people and their families," December 2009, *available at* https://www.rcpsych.ac.uk/pdf/Significant%20Harm%20intercollegiate%20statement%20Dec09.pdf; Rachel Kronick and Cecile Rousseau, "Asylum-Seeking Children's Experiences of Detention in Canada: A Qualitative Study," American Journal of Orthopsychiatry, Vol. 85, No. 3, 287-294 (2015).

[12]  Letter from Sandra G. Hassink, MD, FAAP, to Secretary of Homeland Security Jeh Johnson, dated July 24, 2015.

[13]  The Royal Australasian College of Physicians, Leading paediatricians call for the immediate end to children in detention, 2 May 2013; Royal College of Paediatrics and Child Health, 2009.

14 Royal College of Paediatrics and Child Health, et al., "Intercollegiate Briefing Paper: Significant Harm—the effects of administrative detention on the health of children, young people and their families," December 2009, *available at* https://www.rcpsych.ac.uk/pdf/Significant%20Harm%20intercollegiate%20statement%20Dec09.pdf.

15 Rachel Kronick and Cecile Rousseau, "Asylum-Seeking Children's Experiences of Detention in Canada: A Qualitative Study," American Journal of Orthopsychiatry, Vol. 85, No. 3, 287-294 (2015). The authors noted that "any incarceration, even under relatively safe conditions, is damaging for immigrant children, especially those with high levels of previous trauma exposure."

16 Researchers have also found that the effects of detention on children's mental health do not necessarily end upon release. *See, e.g.,* Rachel Kronick, *et al.*, finding that "Most families reported ongoing emotional distress, such as separation anxiety, selective mutism, sleep difficulties, and posttraumatic symptoms in their children after detention, though some noted their children's symptoms improved on release."

17 Amanda Sakuma, "Assaulted and shamed in family detention," MSNBC, August 4, 2015.

18 Berks Family Residential Center, Resident Handbook. The Resident Handbook includes a dress code, which applies to residents age five years and older, and forbids certain types of clothing, including "form fitting pants" as well as dresses and skirts, unless dresses or skirts are approved for religious purposes.

19 Letter from Sandra G. Hassink, MD, FAAP, to Secretary of Homeland Security Jeh Johnson, dated July 24, 2015. Healthcare in immigration detention centers is provided by the ICE Health Service Corps.

20 The Washington Post Editorial Board, "Confining asylum-seeking children," August 4, 2015.

21 *See* Human Rights First, "A One-Week Snapshot: Human Rights First at Dilley Family Detention Facility Post-*Flores* Ruling," August 2015.

22 Many criminal justice experts have said that lowering bail amounts is not enough and that the use of monetary bail should be abolished altogether. In New York City in 2013, 31 percent of non-felony defendants remained locked up because they couldn't pay $500 or less. Vera Institute of Justice, "Incarceration's Front Door: The Misuse of Jails in America," February 2015. In Washington, D.C., which has been cited as a model jurisdiction, monetary bail has been nearly eliminated (and private bail bondmen are illegal). Monetary bail is only used as a last resort and when defendants can actually afford to pay it—only 5 percent of cases. The vast majority, 80 percent, of people charged with an offense are released on nonfinancial options, such as release on recognizance or community supervision. Justice Policy Institute, "Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail," September 2012.

23 One study that reviewed nationwide data found that 86 percent of immigrants in detention had not had legal representation at any point during their immigration proceedings. Nina Siulc, et al, Legal Orientation Program: Evaluation and Performance and Outcome Measurement Report, Phase II, Vera Institute of Justice, May 2008. More recent studies have shown higher rates of representation. For example, a study conducted in New York in 2011 revealed that immigrants detained in New York are represented in 40 percent of cases, immigrants detained in Newark, New Jersey, are represented in 22 percent of cases, and immigrants who are apprehended in New York but later transferred to detention facilities in locations outside of New York are represented in only 19 percent of cases. New York Immigrant Representation Study, Accessing Justice: The Availability and Adequacy of Counsel in Immigration Proceedings, December 2011.

24 New York Immigrant Representation Study Report: Part II, Accessing Justice II: A Model for Providing Counsel to New York Immigrants in Removal Proceedings, December 2012; Philip Schrag, Andrew Schoenholtz, and Jaya Ramji-Nogales, Refugee Roulette: Disparities in Asylum Adjudication and Proposals for Reform, NYU Press, 2011.

25 Transactional Records Access Clearinghouse, "Representation Makes Fourteen-Fold Difference in Outcome: Immigration Court Women with Children' Cases," July 15, 2015.

26 Berks County Residential Center is licensed under title 55, chapter 3800 of the Pennsylvania Code, license number 224580. The certificate of compliance, which was effective February 21, 2014 to February 21, 2015, states that the BCRC is licensed to provide "Residential Services—community-based, dependent & delinquent." The purpose of the 3800 regulations that govern the licensing of child residential and treatment facilities "is to protect the health, safety and well-being of children receiving care in a child residential facility through the formulation, application and enforcement of minimum licensing requirements."

27 Letter to Attorney General Kathleen Kane, Esq., Pennsylvania Office of Attorney General, from Matthew J. Archambeault, Esq., March 23, 2015; Letter to Roseann Perry, Director, Bureau of Child and Family Services, Pennsylvania Department of Human Services from Bryan S. Johnson, March 23, 2015; Letter to Jay Bausch, Deputy Secretary for Administration, Commonwealth of Pennsylvania, Department of Public Welfare from Bryan S. Johnson, Esq., April 24, 2015; Letter to Jay Bausch, Deputy Secretary for Administration, Commonwealth of Pennsylvania, Department of Public Welfare from Bryan S. Johnson, Esq., April 30, 2015; Letter to Doris M. Leisch, Chief Counsel, Office of General Counsel, Pennsylvania Department of Human Services, July 28, 2015 from David Bennion, Esq., et al.

[28] *See, e.g.*, Bureau of Planning and Preparedness Pennsylvania Emergency Management Agency and Office of Children, Youth, and Families Pennsylvania Department of Public Welfare, Child Residential or Day Treatment Facilities Emergency Planning Guide, October 12, 2011, referencing the 3800 regulations, "There are a variety of facilities that provide care for juveniles under the jurisdiction of courts, ranging from facilities for children/youth with special needs to juvenile detention centers."

[29] *See* letters to Pennsylvania authorities cited in endnote 27. The Pennsylvania Department of Public Welfare stated, in a letter dated April 20, 2015 from Jay Bausch, Deputy Secretary for Administration of the Department of Public Welfare to Bryan S. Johnson, Esq. The letter states that the Pennsylvania Bureau of Human Services' regulators conducted an inspection and confirmed that BCRC is not operating as a secure care facility and has no locks preventing resident children or their families from gaining egress from the building."

[30] *See, e.g.,* U.S. Department of Homeland Security Congressional Budget Justification FY 2016; Defendants' Response to the Court's Order to Show Cause Why the Remedies Set Forth in the Cout's July 24, 2015 Order Should Not Be Implemented, *Flores v. Lynch*, U.S. District Court for the Central District of California, Case No. CV 85-4544-DMG, August 6, 2015.

[31] Section 3800.271 states that "Secure care is permitted only for children who are alleged delinquent, or adjudicated delinquent and court ordered to a secure facility."

---

**HUMAN RIGHTS FIRST**



| | | |
|---|---|---|
| 75 Broad Street, 31st Floor,<br>New York, NY 10004 | 805 15th Street, N.W., #900<br>Washington, DC 20005 | 1303 San Jacinto Street, 9th Floor<br>at South Texas College of Law, Houston, TX 77002 |
| Tel: 212.845.5200<br>Fax: 212.845.5299 | Tel: 202.547.5692<br>Fax: 202.543.5999 | Tel: 713.955.1360<br>Fax: 713.510.1935 |

human rights first.org

# Exhibit 12 Attachment Exhibit 2



**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF HUMAN SERVICES

OCT 2 2 2015

Ms. Diane Edwards, Executive Director
Berks County Residential Center
1040 Berks Road
Leesport, Pennsylvania 19533

      RE:     Licensure and Capacity
              Berks County Residential Facility
              1040 Berks Road
              Leesport, PA  19533
              License #: 224580

Dear Ms. Edwards:

        This letter is in regard to the March 9, 2015 e-mail request to increase the licensed capacity of Berks County Residential Center (BCRC).  The Pennsylvania Department of Human Services (DHS) has issued the Berks County Commissioners a license, effective from February 21, 2015 through February 21, 2016, to operate BCRC as a child residential facility pursuant to 55 Pa. Code Ch. 3800 (relating to Child Residential and Day Treatment Facilities).  The current maximum capacity of BCRC is 96 residents.  You seek an increase in capacity to 192 residents.

        BCRC now serves only refugee immigrant families.  As a result, BCRC is no longer operating as the type of facility for which it was originally and continues to be licensed.  DHS licenses "child residential facilities" and Pennsylvania law makes no provision for DHS to license family residential facilities.

        Due to this uncertainty in BCRC's future plans to operate as a licensed child residential facility, DHS will postpone acting on the request to increase capacity until BCRC once again operates as a child residential facility.  Please submit a complete renewal application if BCRC will resume operation as a child residential facility.  Should BCRC choose to continue providing services to families rather than children, DHS will take appropriate action and does not intend to renew BCRC's license when it expires on February 21, 2016.

        In addition, please contact Mr. Matthew Jones, Director, Human Services Licensing, at (717) 772-4982 when BCRC again begins to provide child residential services so that DHS can schedule an inspection for the renewal of its license under 55 Pa. Code Ch. 3800 and disposition of the request to increase capacity or should you have any questions.

                    Sincerely,

                    Theodore Dallas
                    Secretary

c:     The Honorable Christian Leinbach
       The Honorable Kevin Barnhardt
       The Honorable Mark Scott
       Mr. Matthew Jones

OFFICE OF THE SECRETARY
625 Forster Street | Room 333 | Harrisburg, PA 17120 | 717.787.2600 | Fax 717.772.2062 | www.dhs.state.pa.us

205

# Exhibit 12 Attachment
# Exhibit 3

# Health Concerns at the Berks Family Detention Center

**February, 2016**

In summer 2014 the Obama Administration announced their intention to detain large numbers of asylum-seeking families from Central America as part of a new policy aimed at deterring other families and children from migrating to the United States. The Berks County Residential Center in Pennsylvania, which has been in operation for 15 years, is one of three family immigration detention centers where U.S. Immigration and Customs Enforcement (ICE) detains families. While ICE has presented family detention as a "humane alternative" to preserve family unity during immigration proceedings, a growing body of research shows that detention, even for limited periods of time, is harmful to the health and development of children.

The Pennsylvania Department of Human Services (PA DHS) licensed the Berks County facility as a child residential facility for dependent and delinquent children. However, in October 2015, PA DHS issued a decision that the license, which expires on February 21, 2016, would not be renewed due to the fact that the facility holds asylum-seeking families, as opposed to only children, as the license allowed. The facility has appealed the decision to not renew its license to the Bureau of Hearings Appeals—an administrative body within Pennsylvania's Department of Human Services.

## Mothers at Berks Raise Health Concerns—ICE Suggests Removal in Response

In December 2015, mothers at the Berks facility expressed concern over their prolonged detention and the negative impact it has had on their children's health in written complaints to ICE. Human Rights First obtained copies of seven such complaints which include the written responses they received from their ICE Deportation Officers (DO). We have removed the mothers' names and translated their messages.

Each mother expressed concern for her child's unresolved medical and/or mental health issues. One mother, who had been detained for four months at the time of her complaint, told the ICE DO of her son's skin condition that had spread over his body, leading to continuous scratching and bleeding.

> My son suffers from a skin disease named ███████████ and since we arrived in the United States, it developed itself so much to the point he even has symptoms on his genitals. When scratched it bleeds and [the detention center health staff] did not give me any medications for it or to calm him down, also his behavior has changed, he cries because he does not want to stay here any longer, it has already been over four months and I am still here.

The ICE DO responded that she should make an appointment to see the medical department in the facility, without addressing her concerns that previous visits with health staff were unhelpful. The ICE DO went on to state, "You may accept your removal order and arrangements can be made for your removal from the United States. At this time your custody status remains unchanged."

Another mother with a five-year-old daughter issued the following grievance to ICE and received the answer below.

> Mother's request: My daughter has been having diarrhea for about three weeks now and we went to see a doctor but they did not give us any medication not even serum. With every passing day her behavior is getting worse and the psychologist just tells me to be patient. I need you to give me the adequate medication and that you give me the opportunity to take my case outside of here. I am not a criminal. You gave the opportunity to other persons that have been deported to leave, why did you not give it to me. It has been more than four months that I have been detained.

> ICE's response: Thank you! You may disolve [sic] your case at any time and return to your country. Please use the medical department in reference to health related issues.

Other mothers brought up behavioral changes in their children including lack of appetite, difficulty sleeping, increased crying, and feelings of desperation and distress. Some noted the length of time they had already been detained—upwards of four months—and others expressed frustration over having relatives (including, in one case, the child's father) in the United States who would welcome them to stay pending the resolution of their case. All received seemingly uniform responses from ICE either directing them to make an appointment with facility medical staff or suggesting they accept an order of deportation.

These documents demonstrate serious concerns and warranted immediate action from the ICE officers overseeing these families while they are in detention. The ICE DOs' responses exemplify why the Obama Administration's system of family detention is incapable of satisfying basic obligations for the health and well-being of the children and families in their custody.

On February 5, 2016, thirty mothers at the facility wrote an open letter asking for their release. They wrote:

> [Our] children have suffered psychological damage, and many of them have suffered health-wise, because of this confinement, and not to mention the racist abuse and poor treatment from certain members of the staff in this detention center, but especially by the agents of ICE that play and mock our dignity as immigrants. We came here seeking refuge. We came to this country to save our lives and the lives of our children.

## Ongoing Federal Litigation to End Family Detention

On July 24, 2015, the U.S. District Court for the Central District of California ruled in _Flores v. Lynch_ that the federal government had failed to comply with a settlement agreement that sets standards for the detention and release of children in federal immigration custody. In its notice of appeal, the government argued that family detention is "becoming short-term in most cases" and its family detention facilities are "processing centers" where individuals could be interviewed and screened "rather than detained for a prolonged period of time."

The families detained for months on end at Berks stand in stark contradiction to the government's assertion. At present, all of the families at Berks are asylum seekers and the vast majority are mothers from Central America who have been detained for upwards of one month, with one family detained by ICE since August 2015—nearly six months.

## Detention is Harmful to Children's Health

The types of health and behavioral concerns raised by the mothers at Berks are not uncommon to children held in immigration detention. Human

208

Rights First, along with pediatricians and a social worker, spoke with families at Berks in August 2015. The parents—including those who have been detained for two or three weeks—related symptoms of their children's behavioral regressions, depression, anxiety, and increased aggression toward both parents and other children.

Even if the government were able to process families within 20 days—the self-imposed timeline it created in the *Flores* litigation—research has shown that any period in detention can be detrimental to children's health and development. Attorneys, children's rights advocates, and medical professionals have repeatedly called for an end to the detention of families, citing the negative health impacts. Despite ICE reform announcements and subsequent changes at the detention centers, the fact remains that ICE is not suited to care for children and these centers remain instruments of confinement.

On July 24, 2015, the American Academy of Pediatrics wrote a letter to Secretary of Homeland Security Jeh Johnson stating, "We question whether the existing family detention facilities are capable of providing generally recognized standards of medical and mental health care for children." The letter also noted the particular vulnerability of asylum seekers who have already experienced significant trauma, noting that the "detainment of any children and mothers in the existing [family detention] facilities puts them at greater risk for physical and mental health problems and unnecessarily exposes children and mothers to additional psychological trauma."

Attorneys and advocates for the families have also raised privacy and safety concerns with the facility operator and ICE. Since families are typically placed in rooms that accommodate six individuals (often three parent-child dyads), children have been forced to share a room with unrelated adults. They must sleep, dress, and use the restroom with no door or privacy from adults, who may be of the opposite sex, in the same room.

## Recommendations

- The Obama Administration should end its misguided policy of detaining immigrant families. The license to operate the Berks County Residential Center expires on February 21, 2016 and will not be renewed. In light of this clear message from child welfare authorities, the federal government should end family detention once and for all and immediately release the families who are currently detained at Berks. Community-based alternatives to detention programs have proven effective in ensuring appearance for court hearings. Moreover, most families detained at Berks have legal counsel—and government data shows that 98 percent of families who are represented by legal counsel are in compliance with their immigration court obligations.

- Berks County should abandon its appeal to the Pennsylvania Bureau of Hearings and Appeals. Detaining asylum-seeking children and their parents is harmful to their health and well-being. Many local groups have spoken out against Berks County's involvement in family detention and called for the facility's closure.

- The Pennsylvania Department of Human Services should seek an emergency removal of residents, if ICE and Berks County continue to detain families at the Berks County Residential Center after the license expires.∎

# Addendum

## Redacted Correspondence

---

**Complaint #1**

Name: ▮▮▮▮▮▮   A#: ▮▮▮▮▮▮

Date: December 7, 2015

My son suffers from a skin disease named ▮▮▮▮▮ and since we arrived in the United States, it developed itself so much to the point he even has symptoms on his genitals. When scratched it bleeds and they did not give me any medications for it or to calm him down, also his behavior has changed, he cries because he does not want to stay here any longer, it has already been over four months and I am still here.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/2015  Staff Member: ▮▮▮▮▮

If your child is experiencing medical issues please make an appointment to see the medical department here at the facility. Your attorney filed a motion in the Eastern District Court of PA which temporarily stays your removal. You may ask your attorney to withdraw that motion. You may accept your removal order and arrangements can be made to your removal from the United States. At this time your custody status remains unchanged.

---

**Complaint #2**

Name: ▮▮▮▮▮   A#: ▮▮▮▮▮

Date: December 7, 2015

My son is 6 years old, he is desperate because of such confinement. It worries me a lot that something bad could happen to him here. He's very hyperactive, aggressive, the desperation has made him this way. He cries a lot because of this despair. I am afraid that something bad will happen to him. I need you to help me and to give me the opportunity to take my case out of here.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/15  Staff Member: ▮▮▮▮▮

If you are experiencing issues related to your safety/ security or well-being at the shelter please report these incidences to county staff. If you are experiencing other issues related to medical/ psychological, please make an appointment to see the medical staff or to speak with a psychologist. At this time your custody status will remain unchanged.

---

**Complaint #3**

Name: ▮▮▮▮▮   A#: ▮▮▮▮▮

Date:      December 7, 2015

I need information about my case, we have been here for three months already. My girls do not even want to eat anymore and seeing them like this hurts me. This is why I am asking you to review my case, we want to leave.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/15  Staff Member: ▮▮▮▮▮

Your attorney filed a motion to the Eastern District Court of PA requesting a temporary stay of your removal. If you wish to have your attorney withdraw that motion please do so. If that motion is withdrawn arrangement can be made for your removal from the United States. At this time your custody status remains unchanged.

---

**Complaint #4**

Name: ▮▮▮▮▮   A#: ▮▮▮▮▮

Date:December 7, 2015

My daughter has been having diarrhea for about three weeks now and we went to see a doctor but they did not give us any medication not even serum. With every passing day her behavior is getting worse and the psychologist just tells me to be patient. I need you to give me adequate medication and that you give me the opportunity to take my case outside of here. I am not a criminal. You gave the opportunity to other persons that have been deported to leave, why did you not give it to me. It has been more than four months that I have been detained.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/15  Staff Member: ▮▮▮▮▮

Thank you! You may dissolve [sic] your case at any time and return to your country. Please use the medical department in reference to health related issues.

**Complaint #5**

Name: ▮▮▮▮▮▮   A#: ▮▮▮▮▮▮

Date: December 7, 2015

I am worried my two-year-old son is distressed due to so much detention. We have been detained for almost two months. He does not want to eat, he cries a lot during the night. Please, help us.

I am asking you to give me the opportunity to resolve my case outside of the detention center and I would like to have an update on my case as well.

Thank you

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/15  Staff Member: ▮▮▮▮▮

Your attorney has filed a motion in the Eastern District Court of PA requesting a temporary stay of your removal. If you wish to have your attorney withdraw that motion please do so. If the motion is withdrawn arrangements can be made for your removal from the United States. At this time your custody status will remain unchanged.

**Complaint #6**

Name: ▮▮▮▮▮▮   A#: ▮▮▮▮▮

Date: December 7, 2015

My case is that my children are desperate and do not want to eat anymore. Just cry and get depressed. I don't know what to do anymore because they want to be with their father. Their father is in Austin and they tell me they want to be with him. Please help me, please give me the opportunity to defend my case out of detention. Please because I want to help my children. Please help me.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/15  Staff Member: ▮▮▮▮▮

Your attorney filed a request for reconsideration with the Newark Asylum office. That request is still pending. You may ask your attorney to withdraw that request, if you wish to do so. If that request is withdrawn arrangements can be made for your removal from the United States. At this time your custody status will remain unchanged.

**Complaint #7**

Name: ▮▮▮▮▮▮   A#: ▮▮▮▮▮

Date: December 7, 2015

My problem is that I don't sleep and I have headaches because I think a lot about my case and my family. My son cries a lot because he does not want to be here. We have been detained for a long time; three months, and we do not want to stay here, I feel badly for my son.

My problem would be solved if you could let me go to be with my family here and if you could review my case because it has been a long time.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/15  Staff Member: ▮▮▮▮▮

If you are experiencing medical issues please see the medical staff here at the facility. Your attorney filed a motion in the Eastern District Court of PA requesting a temporary stay of your removal. If you wish to have your attorney withdraw that motion please do so. If the motion is withdrawn, arrangements can be made for your removal from the United States. At this time your custody status will remain unchanged.



75 Broad Street, 31st Floor, New York, NY 10004
Tel: 212.845.5200  |  Fax: 212.845.5299

805 15th Street, N.W.,#900, Washington, DC 20005
Tel: 202.547.5692  |  Fax: 202.543.5999

1303 San Jacinto Street, 9th Floor
at South Texas College of Law, Houston, TX 77002
Tel: 713.955.1360  |  Fax: 713.955.1359

humanrightsfirst.org

# Exhibit 13
## Publicly Filed

## DECLARATION OF KAREN S. LUCAS

I, Karen Siciliano Lucas, Esq., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am an attorney licensed and admitted to the bar in the State of New York. I am currently the Associate Director of Advocacy at the American Immigration Lawyers Association (AILA).

2. AILA is a national association of more than 14,000 attorneys and law professors who practice and teach immigration law. AILA and the American Immigration Council supported a massive pro bono representation effort at the family detention facility in Artesia, New Mexico, until the closure of that facility in December 2014. AILA is one of four partner organizations that comprise the CARA Family Detention Pro Bono Project (CARA),[1] which facilitates pro bono legal representation to mothers and children held at the family detention center in Dilley, Texas (formally known as the "South Texas Family Residential Center" and hereinafter referred to as "STFRC").

3. In my capacity as Associate Director of Advocacy, I communicate regularly with our partners on the ground as well as former volunteer attorneys to identify systemic challenges faced by mothers and children held in family detention centers, including problems related to access to counsel and conditions of detention.  Based on this information, I liaise with government officials in Washington, D.C. in an effort to resolve operational issues and to advocate for better detention policies and practices with the Administration and with Congress.

4. I have observed in this capacity that CARA Pro Bono Project staff and volunteers face substantial hurdles to meaningful representation at Dilley. ICE has consistently frustrated the ability of dedicated lawyers and legal assistants to access their clients and has systematically disregarded the attorney-client relationship.

5. This declaration is submitted for several purposes. First, this declaration provides information regarding a formal complaint filed with the Department of Homeland Security's (DHS) Office of Civil Rights and Civil Liberties (CRCL) and Office of the

---

[1] CARA is a partnership among Catholic Legal Immigration Network, Inc., American Immigration Council, Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association.

Inspector General (OIG) on September 30, 2015 by AILA, the American Immigration Council, Refugee and Immigrant Center for Education and Legal Services (RAICES), and Catholic Legal Immigration Network, Inc. (CLINIC). The complaint (attached hereto as Exhibit A) documents, with sworn statement by detained mothers, case after case in which ICE employed coercive tactics (including misinformation, intimidation, and denying attorneys access to their clients) to force detained mothers to forfeit their right to pursue bond hearings before immigration judges and instead to accept electronic ankle monitors as a condition of release.

6. Second, this declaration provides the court with an updated picture of further instances of coercion and interference with counsel that have taken place since the September 30, 2015 CRCL/OIG complaint by summarizing and attaching sworn statements by 12 mothers detained with their children.

7. Third, this declaration provides information regarding a letter sent to ICE and USCIS by AILA, CLINIC, RAICES, the Council and Human Rights First dated December 24, 2015. The letter (attached hereto as Exhibit Q) describes the rapid deportation strategy DHS has carried out since the deadline this Court set for compliance with its August 21, 2015 Order. Specifically, the letter documents several new practices that DHS instituted since October 23, 2015 that short-circuit due process and place vulnerable, traumatized children and mothers in already flawed expedited removal procedures, leading to the unlawful deportation of families who appear to have legitimate claims for asylum or other protection under U.S. law.

**September 30, 2015 Complaint Regarding Coercion and Interference with Counsel**

8. I coordinated the effort to file this complaint.  To this end, I read each of the supporting sworn declarations signed by detained mothers. I further spoke directly with the CARA team members who had worked with these mothers to record their statements, as well as with AILA member attorney David Kolko and law student volunteer Katherine Shattuck, who also provided their sworn statements based on their experiences providing *pro bono* legal representation at the STFRC in Dilley, Texas.

9. The sworn statements upon which the CRCL complaint is based present case after case at the STFRC in which ICE employed coercive tactics (including misinformation,

intimidation, and denying attorneys access to their clients) to force detained *Flores* class members and their mothers to forfeit their right to pursue bond hearings before immigration judges and instead for mothers to accept electronic ankle monitors as a condition of release.

10. Specifically, the complaint documents that ICE has blocked attorneys from accessing their clients during compulsory ICE questioning regarding the terms and conditions of their release. During this questioning, which may take place in the court trailer, an ICE meeting room, at the door of a family's dormitory, or in a children's play area, ICE presents documents for signature that include a waiver of the right to seek a bond hearing before an immigration judge.

11. This denial of access to counsel has enabled ICE to use the following coercive tactics during these meetings:

    a. **Substantially misinforming detained mothers and/or *Flores* class members about the possibility of release on bond**. The cases contained in the attached complaint demonstrate that ICE deportation officers lead mothers to believe that ankle monitors are the only viable option for release. To this end, ICE has misinformed mothers of *Flores* class members both about the length of time they would have to remain in detention in order to seek bond as well as the likely amount of any bond to be set. Further, officers have actively dissuaded mothers from asserting their right to a bond hearing. Nor have we ever seen ICE provide Flores class members with notice of their independent right to bond review hearings before Immigration Judges as required by Paragraph 24A of the Settlement or scheduled class members for custody hearings before Immigration Judges as required by Paragraph 24A of the Settlement.

    b. **Resorting to intimidation and threats**. These tactics include threatening to withhold medical care for children if mothers choose to seek bond hearings instead of accepting ankle monitors and threatening mothers with deportation if they raise concerns about how long the process is taking or inquire about the status of their cases.

    c. **Coercing signatures even when detained mothers do not understand the documents**. The complaint documents that ICE has forced mothers of class members to sign documents they do not understand and to sign documents with

pre-checked boxes waiving their right to a custody redetermination by an Immigration Judge.

12. By way of background, when mothers and *Flores* class members detained at STFRC receive a positive credible or reasonable fear determination by the Asylum Office, ICE (instead of the Asylum Office) will inform them of that result (contrary to the regulations, which plainly delegate the duty of informing an individual of the results of an interview to the asylum officer, *see* 8 C.F.R. § 208.30(f)). The declarations accompanying the complaint demonstrate that the way in which ICE often informs detained mothers and/or class members of their fear interview result is to call detainees, often in large groups of as many as 30 mothers or more, into a room in the trailer used for immigration court proceedings. In fact, the detainees are specifically told that they must "go to court" ("ir a corte") for this meeting with ICE.

13. As the declarations attest, at these meetings ICE collectively informs the detainees in attendance that they have received a positive fear determination from the Asylum Office. ICE then informs the mothers, sometimes in front of their children, that they are eligible for release. ICE officers sometimes tell the mothers that they can either pursue bond before an immigration judge or be released immediately on an electronic monitoring device shackled to the mother's ankle. At other times, ICE simply tells the detainees that they will be released soon on an ankle monitor, no mention is made of bond, and ICE hands the mothers documents to sign. Little explanation or translation or interpretation of these documents from English into Spanish or the mother's primary language is given.

14. If a mother expresses interest in pursuing bond before an Immigration Judge, ICE routinely tries to dissuade her from doing.

15. ICE further requires the mothers who are present at these meetings to sign documents. Specifically, ICE presents the mothers with the Notice of Custody Determination (I-286) (a redacted example of which is attached to this declaration as Exhibit B), which requires a signature. Mothers have consistently reported to CARA that ICE pre-checked the box on this form that waives their right to an immigration judge custody redetermination hearing (bond hearing). As one mother stated in her declaration attached to the complaint, "I was not given the opportunity to check this box myself, and consequently not allowed to make this decision myself. … [T]he officer made it difficult for me to say no to the ankle monitor." (See CRCL Complaint at p. 6, quoting from declaration of *Lillian.)

16. ICE deportation officers also present the mothers with an agreement to accept an ankle shackle  (a redacted example of which is attached to this declaration as Exhibit C). This form also requires a signature.

17. Despite repeatedly raising objections to the process with ICE and DHS Headquarters officials, ICE continues to categorically block all attorneys and legal representatives from accompanying their clients to these meetings.

**Further Instances of Coercion and Interference with Counsel**

18. To provide an updated picture of further instances of coercion and interference with counsel that have taken place since the September 30, 2015 CRCL/OIG complaint, sworn declarations from 12 mothers documenting their experiences are summarized below and attached as exhibits. These declarations, which are redacted for confidentiality purposes, describe the following coercive situations that have occurred since September 30:

    a.   "**Ana,**" Exhibit D. Ana, a mother detained with a class member, was mocked by an ICE officer when she opted to pursue bond rather than accept an ankle shackle. Ana first found out that she had a positive credible fear determination from her own, non-detained mother (her class member child's grandmother) "because the immigration officers called my mother [in Virginia] and shared this confidential news with her before telling me."  When ICE did inform Ana of the positive fear determination later that day, Ana told the officer she wanted to pursue bond. After asking if she had "thought hard enough" about this, the officer "then told me it would make his boss mad to see that I picked a bond." Ana asked if it would affect her case negatively, and the officer said that his "supervisor would be angry." The supervisor then came over and asked what Ana had chosen. Ana explained that the officer said she had chosen bond "because of 'my mommy.' He was doing it in a way that was mocking me. … They kept smiling at me in a mocking manner." Nonetheless, she pursued her bond hearing before an immigration judge, who set a minimal bond of $1,500. She paid the bond and has since been released with her class member child.

    b.   "**Dalia,**" Exhibit E. A mother who tried to assert her right to a bond hearing but was manipulated by ICE in an effort to dissuade her from doing so. On November 17, 2015, an ICE officer told Dalia that if she wanted to pursue bond rather than

an ankle monitor, she would have to wait between 80 and 100 days[2] in detention with her class member child before she could be released. "He told me not to think about myself but to think about my son who was standing next to me. He asked my son directly if he wanted to leave the detention center at that moment, to which my son responded yes, but my son then said that he was with me and he would be ok with whatever decision I made. The officer then said to me that the schooling my son is receiving at the detention center is a joke, that it was a lie of a school." From there, the pressure continued, with the officer trying to persuade Dalia that the shackle "would be a much better option" than bond. Dalia states in her declaration: "He said that since he was no longer going to be my deportation officer that my case was going to take a long time for me to get out of here. The officer kept saying that he had the power to just make a phone call right then and there and get me out of here."

c.   **"Luz,"** Exhibit F. Another mother was mocked by an ICE officer when she said she wanted bond. When going over her documents, Luz states, the ICE officer saw she checked the box indicating she wanted to pursue a bond hearing. The officer said "You like the food here?" When she replied yes, the officer said "'oh I guess that's why you don't want to leave here.' It was obvious that he was making fun of me," she said. After she finished signing the documents, the officer taunted her: "'Ok, now we're going to call your family. Oh wait, I forgot you aren't going to leave.'"

d.   **"Claudia,"** Exhibit G. A mother whose family members in the U.S. faced direct and intentional pressure from ICE to withdraw their offer to pay her bond, leaving her instead to take the ankle shackle or remain in custody with her class member child. When Claudia first spoke with her aunt and uncle in the U.S., they agreed bond would be a better choice than the ankle shackle for her "because they only should put that kind of thing on a criminal, and I am not a criminal. I am here because I am fleeing violent persecution by my ex-partner." Her aunt and uncle then sent all required supporting documents for bond to her pro bono CARA Project attorneys at Dilley.  Then, on November 24, Claudia states, "an

---

[2] In the CARA Project's experience, if ICE timely files required documentation with the court, then pursuing an immigration judge bond would take around 7-10 days.

immigration officer called my uncle [] to confirm his address [and] that he was willing to receive me. I had not yet been told whether I had a positive or a negative credible fear decision, but we were still wanting to request a bond when the decision came if it was positive." On that same day she was given an appointment to go to the court at 3 pm. When Claudia arrived in the court trailer, ICE officers informed Claudia, along with a group of other women, that she had received a positive fear determination. . When Claudia told the officer she would like to pursue a bond hearing, the officers took her and the other women who wanted bond to another room. "Then he asked me if I was sure my family would be able to pay the amount of money that the bond would be set by a judge." The officer then called her uncle on the phone. Claudia states that the officer "told him that it would be expensive and that he would have to pay two bonds, one for me and one for my [class member] daughter. That it could be up to $20,000. They told my uncle I might have to wait three more weeks to get out if I asked for a bond." All of this persuasion paid off for ICE. "The officer managed to convince my uncle that the bond would be too expensive and would take too long, so he decided that I should leave with the ankle monitor. … Since my aunt and uncle will support me and would have to pay the bond, I will go with their decision." The next day, a guard told her to get ready to leave. Claudia had a 1:30 pm meeting scheduled with her lawyers, and when she told ICE she wanted to attend, some of the officers initially told her there was no time. But when she pressed them (this time finding an officer who spoke Spanish), they finally agreed, but told her she had to hurry. They then placed the ankle shackle on her before she went to the meeting. When Claudia and her lawyers spoke with her uncle again, he agreed she should pursue bond, and he cancelled her travel ticket. After CARA Project staff advocated with ICE, they eventually removed the shackle and allowed Claudia to pursue a bond hearing. An immigration judge set a bond of $2,000 for Claudia and her class member daughter to be released, which her family paid.

e.  **"Razida,"** Exhibit H. Another mother whose family members in the U.S. faced direct pressure from ICE *not* to pay bond before she even knew she had a positive credible fear determination. Razida had spoken with her family on December 3,

7

and all agreed that bond would be preferable to an ankle monitor. Then on December 4, Razida's sister told her that ICE had called and said she was about to be released with an ankle monitor, so they should make travel arrangements. Her sister was surprised because she knew Razida wanted to pursue bond.  But ICE told Razida's sister that the bond would take a very long time, and that the maximum amount of time she would be on the ankle monitor would be six months. Razida's sister then told her that, based on her conversation with ICE, she had changed her mind and she now thought it would be better for Razida to leave with an ankle monitor. Razida still did not want to leave with the ankle shackle, and when she spoke with her family later that day, they all reaffirmed that bond would be the best option. At about 8:00 or 8:30 that night, ICE called Razida and about fifteen other mothers to the court building and told them that they had received positive fear decisions. When Razida raised her hand and said she wanted to pursue a bond hearing, the officers then tried to talk her out of that decision, saying she and her class member child would have to stay longer, that bond would cost thousands of dollars, and that her family would have to pay the bond for each person – her daughter and herself. "'Imagine paying $15,000,'" Razida recalls him saying. "He was very insistent that I sign to leave with an ankle monitor," she said in her declaration.  But Razida stuck with her decision and was subsequently released on a $4,000 bond.

f.   **"Johana,"** Exhibit I. Another mother who states that ICE called her friend to arrange for her release on an ankle shackle without first asking her whether she wanted to pursue a bond hearing or accept the ankle shackle – or even advising her that she had received a positive credible fear determination in her case, making her eligible for release.

g.   **"Angelica,"** Exhibit J. Another mother who was told that her that if she wanted bond, it would be set separately for herself and her class member daughter at $10,000 each. Angelica declares: "I was confident about my decision because the CARA Pro Bono Project had already given m[e] information about the bond. I knew that the ICE officer was not telling the truth. I am very concerned about other mothers that are too timid to stand up for themselves." In fact, she relates, that very night, one of the other mothers requested a bond hearing, but the officer

8

did not respond. When the officer began walking out of the room, this mother walked after him but was stopped by the other officers "who told her that she could not change her mind because the officer that assisted her had already left."

h.   **"Talia,"** Exhibit K. A Quiche-speaking mother who did not understand the papers she was being asked to sign to secure her release, which included an agreement to accept an electronic ankle monitor. Talia declares: "I asked 'what are these papers' and the officer said 'they are so you can leave'. I asked if they were for deportation, and he said no. … I was confused because I was scared that I was going to be deported. But when I saw our plane tickets on top of those papers I believed him that they were for my release. They said they weren't doing anything wrong. So I signed the papers. The official did not say anything about an ankle shackle. I had no idea I was signing for an ankle monitor. He just told me to sign for myself and my [class member] daughter."

i.   **"Arelis,"** Exhibit L. A mother who was not properly informed about the possibility of bond before signing her documents. Arelis states that the officer "didn't explain to me the bond option, he only said that I would have to stay detained longer if I opted for the bond, because I would have to file some documents. … When we started going through the release documents the officer told me to mark that I wanted to be released with a shackle without further explaining the differences between the shackle and the bond."

j.   **"Glenis,"** Exhibit M. Another mother who was not informed about her right to a bond hearing before signing away that right. Glenis states that an ICE officer came to her room at 9:30 pm one night, with another woman, and told both of them that they were going to be released. "They gave us a paper and told us to sign it. They told us that the next day we could leave with an ankle shackle. The officials did not tell us that we had any other option or anything. They only told us that we had to sign the paper to get the shackle and leave the next day."

k.   **"Yunis,"** Exhibit O. A mother who was misled about both the likely amount of bond and the nature of the documents she was signing. Yunis states that on November 13, ICE called her into a meeting with 20-25 other women. She wanted to be released on bond. "The officer spoke very fast and I could not understand what he was saying." The officer informed Yunis and the other women that the

9

bond would be very high – "about $20,000 for three people [a mother and two children]." The officer told her "'this is very expensive and your family probably won't be able to pay that.'"  "I signed the doc[ument]s because the officer said 'it was only to prove that you were here detained in this center.' … I did not understand that I was signing a document agreeing to leave with the grillete [ankle bracelet]."

l.   **"Maritza,"** Exhibit N. Another mother given misinformation about bond as well as documents with pre-checked boxes waiving her right to a bond hearing. Maritza states that ICE officers told her on December 1 that she would have to wait one month before she and her class member child could leave if she wanted bond. She insisted that she wanted a bond. "They presented me with a document to sign and the box to leave with the shackle was already checked by the officers, so they made me check the other box and put my initials beside it." "I was worried that they were going to pressure me a lot because I have seen them do it to other women." The Notice of Custody Determination that Maritza signed clearly includes boxes that were pre-checked by computer before Maritza signed the documents. (See Exhibit B.)  Despite this pressure to accept an ankle monitor from ICE, Maritza pursued a bond hearing and paid the $1,500 bond set by the immigration judge.

m.   **"Yolanda,"** Exhibit P. Another mother who felt pressured to waive her right to a bond hearing. Yolanda states that at 9:30 pm on December 14, ICE told her and other mothers to go to the children's play area, where ICE officers collectively informed them that they had positive fear determinations and could be released. When Yolanda said she wanted to pursue a bond hearing instead of accepting release on an ankle monitor, the officer told her that the judge could make her pay two bonds: one for herself and one for her class member child. Yolanda felt the pressure: "The officer made me feel like he really wanted me to leave with an ankle shackle. He kept repeating the same thing over and over telling me to sign the papers so I could leave sooner. I didn't understand why he wasn't respecting my decision when I said I didn't want to leave with the shackle and he made me repeat myself three times." Yolanda had to repeatedly insist on her right to a bond hearing before an immigration judge. When she finally had that hearing on

10

December 22, the immigration judge set a bond of $2,500, and she has since been released.

19. The above supplemental coercion-related declarations point to continuing as well as additional trends:

    a. ICE officers communicating outcomes of detained individuals' confidential credible and reasonable fear interviews to sponsors before notifying the detained individuals and without obtaining their consent.

    b. Officers mocking, degrading, and manipulating mothers and class members into forfeiting their right to a bond redetermination before an immigration judge.

    c. Officers pressuring sponsors not to pay bond and instead to require detained mothers to accept release on an ankle monitor.

    d. Officers misinforming detained mothers that they would have to pay more than one bond, overinflating the likely bond amounts by two or three times the actual likely amount.

    e. Pre-checking the box indicating waiver of bond hearing on forms or pressuring mothers to sign documents they do not understand.

    f. All of the above practices delaying the release of Flores class members and their mothers.

    g. Practices that fail to comply with  Paragraph 24A of the settlement which provides that  "[a] minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing."

20. The presence of counsel in the room during ICE's meetings with detained mothers and/or class members about their terms and conditions of release could prevent these due process violations from taking place. *In addition to prohibiting counsel of record (that is, attorneys who have already submitted Form G-28 Notice of Entry of Appearance as Attorney) from attending these meetings, ICE fails even to notify counsel of record when these meetings will take place. ICE also does not serve the mothers' or class members' counsel with copies of documents that their clients signed during meetings with ICE officers regarding the terms and conditions of their release.*

11

223

**December 24, 2015 Letter to ICE and USCIS Regarding Rapid Deportation Strategy Implemented Since *Flores* Order Compliance Deadline**

21. Since the October 23, 2015 deadline set by the Court for the Government to come into compliance with its August 2015 Order, as documented in a letter to ICE and USCIS from AILA, CLINIC, RAICES, the Council and Human Rights First dated December 24, 2015, attached as Exhibit Q, practitioners and advocates in all three family detention facilities have witnessed practices that have entirely short-circuited the *Flores* settlement and class members' right to due process and access to counsel. For example:

   a. USCIS' negative fear determinations are often flawed, with numerous substantive problems evident in the transcripts of initial fear interviews. Further, USCIS has adjudicated requests for reconsideration of negative fear determinations based on a heightened standard, which has led to the removal of families with viable claims for protection.

   b. USCIS and ICE have deprived parents and class members of their statutory right to immigration judge review of a second negative fear determination.

   c. USCIS has deprived certain class member children of the opportunity to assert their claims for asylum by refusing to fully consider class members' claims independently of their parents' claims.

   d. ICE has deported represented parents and class member children while their cases are still in progress. In particular, ICE has disregarded pending and scheduled requests for reconsideration by a USCIS asylum officer, pending civil rights complaints, and pending petitions for review to the federal courts.

   e. DHS has transferred represented mothers and class member children away from counsel sometimes without any notice and more recently, without meaningful notice.

22. As the letter documents, these changes have led to the unlawful deportation of many class members and their mothers who appear to possess legitimate claims for asylum or other protection under U.S. law. These problems also illustrate why ICE's use of expedited removal routinely results in violations of both the *Flores* settlement and the due process rights of class members and their mothers.

Executed this 7th day of May, 2016, in Washington DC.

Karen S. Lucas, Esq.

# Attachment to Exhibit 13 Exhibit A

Megan Mack
Office of Civil Rights and Civil Liberties
Department of Homeland Security
Washington, DC 20528

John Roth
Office of Inspector General
Department of Homeland Security
Washington, DC 20528

September 30, 2015

**Re: Complaint Regarding Coercion and Violations of the Right to Counsel at the South Texas Family Residential Center in Dilley, Texas**

Dear Ms. Mack and Mr. Roth:

We write to express serious concerns regarding tactics employed by Immigration and Customs Enforcement (ICE) at the South Texas Family Residential Center (STFRC) in Dilley, Texas to coerce detained mothers into accepting electronic ankle monitors as a condition of release and forfeiting their right to pursue bond hearings before immigration judges.[1]

As evidenced by the cases discussed below, ICE is substantially misinforming the mothers about the possibility of release on bond. Furthermore, ICE is repeatedly meeting with and obtaining signatures from detained mothers – including those the government knows to be represented by counsel – without informing counsel or allowing counsel to be present. ICE has also employed other unlawful tactics to intimidate detained mothers and thereby prevent them from asserting their rights. These tactics include threatening to withhold medical care for children if mothers choose to seek bond hearings instead of accepting ankle monitors, and threatening mothers with

---

[1] After an individual who is initially placed into expedited removal proceedings under INA § 235 establishes a "credible fear" of persecution or torture, she is placed into removal proceedings before an immigration judge under INA § 240.  She is also eligible for a custody redetermination hearing before an immigration judge, except in certain specifically designated cases. *See* INA § 236(a); 8 C.F.R. §§ 1236.1(c)(11); 1003.19(h)(2)(i); *see also In re X-K-,* 23 I&N Dec. 731 (BIA 2005).

Recent judicial decisions similarly establish that noncitizens subject to reinstatement of removal under INA § 241(a)(5) who have received positive reasonable fear determinations are also detained under INA §236(a), and thus eligible for custody reviews prior to the completion of their withholding proceedings. *See, e.g., Guerra v. Shanahan*, 2014 U.S. Dist. LEXIS 176850, *11-12 (S.D.N.Y. Dec. 23, 2014) ("The majority of federal courts that have assessed the administrative finality of reinstated removal orders have agreed that such orders cannot be final while withholding applications are pending.") (collecting cases).

deportation if they raise concerns about how long the process is taking or inquire about the status of their cases.

These practices are designed to intimidate vulnerable and traumatized asylum seekers who are detained with their young children. In the words of one mother, **Olga**,[2] "[i]t gives me fear, sometimes, the way the ICE officers respond to our questions and constantly telling us that they can deport us immediately if they want."

These practices also directly interfere with a detained mother's right to counsel under the Administrative Procedure Act (APA)[3] and applicable federal regulations.[4] Detained children and their mothers who are seeking asylum and other protection under U.S. law are among the most vulnerable individuals in our immigration system.  Accordingly, we request that CRCL and OIG immediately investigate ICE's custody determination and release practices at STFRC to ensure that they are free from coercion and are based on individualized assessments rather than categorical or arbitrary determinations. We further request that CRCL investigate systemic interference at STFRC with the mothers' right to counsel and to fair process.

     A.  Misinforming Detainees Regarding Bond and the Judicial Process

The cases contained in this Complaint demonstrate that mothers are led to believe that ankle monitors are the only viable option for release. To this end, ICE misinforms mothers both about the length of time they would have to remain in detention in order to seek bond as well as the likely amount of any bond to be set. Further, the officers actively dissuade mothers from asserting their right to a bond hearing.

---

[2] Declarations from each of the highlighted individuals are attached to this Complaint. All names of detained mothers have been changed to pseudonyms to protect confidentiality.

[3] *See* 5 U.S.C. § 555(b) ("A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative."). Detained mothers whom ICE summons to discuss the terms of their release are undoubtedly "compelled" to appear. As discussed below, mothers receive very little, if any, notice of these meetings, and ICE or CCA guards typically instruct the mothers to go to the courtroom trailer either verbally or by using post-it notes. The mothers have no option to decline to attend these meetings.

[4] *See* 8 C.F.R. § 292.5(b); *see also* 60 Fed. Reg. 6647-48 (Feb. 3, 1995) (stating that attorneys may engage in "full representation" during examinations before immigration officers). When an ICE officer interviews a detained mother for purposes of making a custody determination, the officer must assess whether she poses a risk to public safety or a flight risk. If the mother is deemed eligible for release on an ankle monitor, the ICE officer must obtain her consent to this restriction on her liberty and a waiver of her right to a bond hearing before proceeding with her release. Given the gravity of these decisions, the opportunity to consult with counsel is critical to ensure that the mother's rights are protected.

2

For example, Olga reports that on September 9, 2015, ICE summoned about thirty mothers into a meeting about ankle monitors. According to Olga, at the beginning of the meeting the officer told the women that they were leaving with ankle monitors. Then, Olga recounts, "a neighbor of mine asked about the bond, and [the officer] said that that option exists but it is too expensive and not worth it for our families." The officer further "told us that he did not recommend leaving with a bond, because it was going to be too expensive, around ten thousand dollars,[5] and that it was too long of a process, perhaps 6 months." Similarly, another mother, **Juliana**, states in her sworn declaration that on the television in her room at Dilley – during a "Know Your Rights" program on Channel 60 – it was announced that bond was $10,000 or more.

When ICE summoned yet another mother, **Yesenia**, to the court trailer after she had received a positive credible fear determination, she inquired about the possibility of bond. An ICE officer made clear that all the detained mothers would leave with ankle monitors, and that "it would take another four weeks of being detained with [their] children to receive bond."

**Lidia** states that ICE officials told her that she and her child would have to remain detained for an additional four *months* before she could see a judge if she did not accept the ankle monitor. Likewise, **Beatriz** states that the ICE officer "told [her] that it would be weeks or months before a judge could see [her] to set a bond because they have so many files."

Complicating this situation further, ICE and its contractor, Corrections Corporation of America (CCA), use the apparent authority of the immigration court to influence the mothers' decisions to accept ankle monitors. ICE and/or CCA summon mothers to these meetings by instructing them to go "to court."[6] ICE and/or CCA then hold the meetings regarding terms of release in the court trailer and sometimes in an actual courtroom. Using the courtroom manipulates the situation and leaves mothers confused as to whether the information provided and decisions made in that setting come from the judge or from ICE.

### B.  Blocking Attorneys' Access to Their Clients

ICE continues to refuse to allow attorneys to be present when its officers summon the mothers to discuss the terms of their release. During these interactions with ICE, mothers are asked to sign documents "voluntarily" accepting ankle monitors in lieu of asserting their rights to bond

---

[5] *See* Declaration of Attorney Stephen Manning dated August 13, 2015 (attached to this Complaint), in which he states that from June 24, 2015 to August 11, 2015, of 188 cases in which CARA represented detained mothers at bond hearings at Dilley, the average bond amount issued by an Immigration Judge was just $1,901.

[6] In a complaint submitted to ICE Director Sarah Saldaña on July 27, 2015, the four organizations comprising the CARA Family Detention Pro Bono Project highlighted ICE's coercive practice of holding discussions regarding alternatives to detention in immigration courtrooms, including at least one occasion where the video monitor was left on and an immigration judge, working remotely in Miami, appeared to be endorsing the meetings.

3

hearings – again, without counsel present to ensure that accurate information is conveyed and all available options are considered.

The case of **Juliza** is illustrative of the problems caused by a lack of access to counsel when an ICE officer summons a detained mother to discuss the terms of her release. On Friday, September 4, while she was meeting with a CARA Family Detention Pro Bono Project (CARA) volunteer in the legal visitation trailer, a uniformed CCA officer interrupted their conversation and ordered her to go to the court trailer. Initially, the officer would not reveal the purpose of the meeting. As indicated in Juliza's attached sworn declaration, she felt nervous because she "had no idea what was about to happen."

The CARA volunteer, a law student named **Katherine Shattuck**, insisted that the CCA officer inform them of the purpose of the meeting, as Juliza did not have a court hearing scheduled for that day. The CCA officer then clarified that ICE was waiting for Juliza in the court trailer. Ms. Shattuck showed the officer a signed G-28 for CARA Project Lead Attorney Brian Hoffman and asked to accompany Juliza to court. When Ms. Shattuck arrived at the court trailer, she showed ICE the signed G-28 authorizing the CARA Project to represent Juliza and asked to join the meeting. As Ms. Shattuck notes in her sworn declaration, "The officer said that was not possible. He said that ICE and the CARA Project had agreed that counsel could only be present at 'legal proceedings.'"[7]

When Juliza reached the court trailer, she was told "that [she] was so late for [her] meeting that [she] had missed it, and would be called back again later." Based on a subsequent conversation with Ms. Shattuck, Juliza "was confused about the nature of the meeting, and fearful of meeting with ICE without a legal representative. She reiterated several times that she had not been notified in advance of the meeting.  [She] was tearful, and appeared intimidated and humiliated."

The next day, when ICE called Juliza back into courtroom (which she describes as a room with "long wooden benches"), she "still did not know why [she] was there or what was going on." The officer simply asked Juliza for her family's contact information. Upon receiving it, he immediately called the family and, in front of Juliza, told them to buy her a bus ticket. Juliza recalls, "I was excited because I thought that soon I would get to leave … I thought I could leave without having to pay bond or wear an ankle monitor." However, when Juliza left that meeting, she still had no idea about the terms of her release.

Over the next few days, Juliza was called back into "court" several times to arrange the purchase of a bus ticket, which one ICE officer told her must be open for ten days. When she mentioned this to another ICE officer, "he said that [she] must be lying because [she] shouldn't be able to buy bus tickets before [her] credible fear interview."

---

[7] This statement is in no way accurate. ICE and the CARA Project have not come to such an agreement. Moreover, as noted above, the mothers detained at Dilley – like all noncitizens – have a right to be represented whenever they are compelled to appear before DHS. *See* 5 U.S.C. § 555(b).

By September 15 – almost two weeks after Juliza was first called into "court," she still did not have any clarity from ICE about when her release would actually take place or what the terms would be. According to Juliza:

> I do not think that what they did to me is fair. They should not have told me that I was getting out soon. My son was also excited that we were getting out. Now my family and I are all disappointed that we have to wait in detention. I wish that my attorney had been allowed to come with me when I was asked to come to court.[8]

In addition to prohibiting attorney access to the meetings to which represented mothers are summoned to discuss alternatives to detention and terms of release, ICE also undermines the attorney-client relationship and impugns the reputation of CARA Project staff and volunteers during those meetings. At the September 9, 2015 meeting to which Olga was summoned, an ICE officer said that the "lawyers from that place [CARA]" were "lying" to the mothers.

**David Kolko**, an immigration attorney who has practiced for nearly thirty years, was personally denied entry when ICE examined one of his clients who had been instructed to appear "in court" on September 3, 2015. Even after Mr. Kolko filed a G-28 Entry of Appearance, ICE communicated with his client about the terms of her release, without informing or notifying him. ICE also visited Mr. Kolko's client in her residential unit to question her, and served her with documents, including a positive credible fear determination and a Notice to Appear, without serving copies on counsel.

In sum, ICE violates the rights of detained asylum seekers by prohibiting access to counsel during compulsory meetings at which the timing and conditions of their release are determined. These practices prevent the mothers from obtaining full and accurate information and make them even more vulnerable to coercion.

    C.   Discouraging Mothers From Exercising Their Rights By Threatening to Deport or Withhold Medical Care from Detained Families

Several detained mothers have experienced direct intimidation and threats when they sought to exercise their rights to bond hearings or to inquire about the progress of their cases. On September 4 – after an immigration judge had already ordered her release on a $1,500 bond that her family was pulling together – ICE called **Renita** and about thirteen other mothers into Chapel #2, where they faced pressure to accept ankle monitors in lieu of bond. According to Renita's sworn declaration, the meeting was led by a woman, whose name she did not remember, and a male ICE officer. These representatives told the mothers that there was nothing wrong with ankle monitors, which are neither heavy nor painful, and that they should just accept them. Under these circumstances, every mother except Renita accepted an ankle monitor. Although some of these women were represented, their attorneys were not notified about or allowed to attend this meeting. Renita says, "I wish that I had lawyers with me when ICE pressured me, on

---

[8] As of September 30, 2015, Juliza was still detained at Dilley. Her credible fear interview took place on September 15, 2015.

four separate occasions, to accept the ankle monitor. I found the process confusing and frightening."

Another mother, Beatriz, faced even more serious threats. ICE called Beatriz and some forty other mothers into a meeting about release terms, where an officer informed them that ankle monitors were their best option. Beatriz was the only mother in the group who insisted that she wanted to seek bond. According to Beatriz, the ICE officer told her, in front of the group, that "they were offering our freedom with the shackle, and if we refuse the shackle, we are refusing [our] freedom, and wouldn't get any further help from ICE because we are choosing to stay here." The officer also informed Beatriz that it would be "weeks or months before a judge could see [her] to set a bond because they have so many files." The officer even went so far as to warn that if her child got sick, she "might not get help from them" because she was "choosing" to stay detained.

Similarly, on September 9, 2015, ICE summoned Olga to a meeting with around thirty other mothers. During that meeting, an ICE officer directly discouraged the mothers from making inquiries about the progress of their cases and threatened deportation if they did. As Olga explains, the officer "told us at the meeting that if we thought that process was taking too long, we should let him know and he, himself, would start the process of deporting us back to our countries the next day."

    D.   <u>Forcing Mothers to Sign Documents that They Do Not Understand and Pre-Checking Boxes Waiving the Right to Review by an Immigration Judge</u>

Mothers report that when ICE summons them to discuss conditions of release, they are asked to sign documents, sometimes in English, that they do not understand. Further, mothers report that ICE officers pre-check a box on the Notice of Custody determination to indicate that the mother does not request immigration judge review of her custody determination.

In her sworn declaration, **Lillian** shares that on September 18, ICE summoned her along with about forty other mothers to a meeting, where an ICE officer informed them that "getting a bond would take about 35 or more days and that the quickest option out of the detention center is the ankle monitor...." In addition, an ICE officer made her sign the "Notice of Custody Determination" "without explaining … what [she] was signing." She states further that he – not she – checked the "I do not request an immigration judge review of this custody determination" box "without explaining to [her] why he checked it." According to Lillian, "I was not given the opportunity to check this box myself, and consequently not allowed to make this decision myself." She states that had the ICE officer provided accurate information, she would have opted for a bond hearing before an immigration judge. In Lillian's words, "[t]he officer made it difficult for me to say no to the ankle monitor."

Similarly, the first time ICE summoned Yesenia to discuss the conditions of her release, she remembers signing a document that she did not understand. Two days later, ICE summoned her to a second meeting, where several ICE officers reiterated that the mothers "would have to wait for four weeks if [they] wanted … a bond hearing." At this meeting, Yesenia signed the ankle monitor agreement because she felt she had no other choice: "The agreement was in English and

6

no one translated or interpreted it for me, the officer just told me to sign. I didn't really understand what I was signing, but I thought that if I didn't sign, my children and I would be deported." Reflecting on this experience, Yesenia states, "I wish that an attorney had been with me during these meetings.  I would have felt better, understood more what was going on, and been more comfortable asking questions."

     E.  <u>Conclusion</u>

The cases cited in this Complaint strongly suggest that ICE has used misinformation and, in some cases, direct threats and intimidation to discourage detained mothers from inquiring about their cases, persuade them to shortcut the judicial process available to them, and coerce them into accepting ankle monitors. The cases also demonstrate that ICE has repeatedly undermined the detained mothers' right to counsel. We urge your offices to immediately investigate the attached examples of the coercion around ankle monitors and interference with statutorily mandated access to counsel.


Sincerely,

Lindsay Harris
American Immigration Council
lharris@immcouncil.org

Karen Lucas
American Immigration Lawyers Association
klucas@aila.org

Ashley Feasley
Catholic Legal Immigration Network, Inc.
afeasley@cliniclegal.org

Amy Fischer
Refugee and Immigrant Center for Education and Legal Services
Amy.fischer@raicestexas.org

# Attachment to Exhibit 13
# Exhibit B

DEPARTMENT OF HOMELAND SECURITY
## NOTICE OF CUSTODY DETERMINATION

Alien's Name: ▓▓▓▓▓▓▓▓▓▓▓▓

A-File Number ▓▓▓▓▓▓▓

Date: ▓▓▓▓▓▓

Event ID: ▓▓▓▓▓▓

Subject ID: ▓▓▓▓▓

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and Part 236 of Title 8, Code of Federal Regulations, I have determined that pending a final administrative determination in your case, you will be:

☐ Detained by the Department of Homeland Security

☑ Released

    ☐ Under bond in the amount of _____

    ☑ On your own recognizance

    ☑ Under other conditions. [Additional document(s) will be provided.]

J 748T BEZEONES

_____
Name and Signature of Authorized Officer

1/28/2016 13:15
_____
Date and Time of Custody Determination

Supervisory Detention & Deportation Officer
_____
Title

South Texas Family Residential Center 300
El Rancho Way, Dilley, TX 78017
_____
Office Location/Address

---

You may request a review of this determination by an immigration judge.

☐ I acknowledge receipt of this notification, and

    ☑ I do request an immigration judge review of this custody determination.

    ☐ I do not request an immigration judge review of this custody determination.

_____
Signature of Alien

1-28-2016
_____
Date

---

The contents of this notice were read to KARLA BARAHONA-MELENDEZ in the Spanish language.
    (Name of Alien)    (Name of Language)

_____
Name and Signature of Officer

_____
Name or Number of Interpreter (if applicable)

Deportation Officer
_____
Title

DHS Form I-286 (1/14)

Page 1 of 2

235

# Attachment to Exhibit 13
# Exhibit C

Programa de Comparecimiento bajo Supervisión Intensiva (ISAP) | Actualizado por última vez en noviembre de 2014

## Acuerdo del participante para tomar parte voluntariamente en el Programa de monitoreo electrónico (GPS) de ISAP

Los participantes será monitoreado mediante una unidad de rastreo BI ExacuTrack® One.

1. Yo, _____ estoy autorizado a viajar a _____ (dirección) en la ciudad de _____ (ciudad y estado) dentro de los Estados Unidos. Estoy de acuerdo en llegar a esta ubicación final para _____ (m/d/yyy HH:MM). Al llegar a esta ubicación final, ERO-ATD hace una determinación final sobre los próximos pasos.

2. Estando en el Programa de monitoreo electrónico, acepto usar un brazalete GPS quenoes removible será otorgada por un especialista del caso ISAP.

3. Reconozco que a recibido la unidad de rastreo con número de identificación: _____.

4. Acepto que es mi responsabilidad de mantener el acceso al servicio eléctrico durante mi tiempo en el Programa de monitoreo electrónico.

5. Acepto en cargar la unidad de rastreo ExacuTrack One diario y según sea necesario. Entiendo y estoy de acuerdo con los requisitos de cuidado y mantenimiento de la unidad de rastreo GPS.

6. Acepto a no quitar o alterar la unidad de rastreo GPS excepto si es necesario en una emergencia o con la aprobación previa del especialista del caso ISAP.

7. Acepto permitir al personal autorizado inspeccionar y mantener la brazalete.

8. En caso de emergencia (por ejemplo, médica), debo llamar a la línea directa de emergencia al _____. Entiendo que este número no debe usarse nunca para situaciones que no sean de emergencia.

9. Entiendo que es posible que se me haga responsable de la unidad de rastreo ExacuTrack One y puede ser que se me exija reembolsar el costo de reemplazo o reparación a BI Incorporated por cualquier pérdida y/o dano del equipo.

Reglas locales y Otras condiciones:

**Mi firma a continuación reconoce que he recibido una copia de las reglas y que se me han explicado. También reconozco que había servicios de traducción si pedido. Entiendo que debo cumplir con estas reglas hasta haber llevado a cabo el Programa de monitoreo electrónico, o hasta que reciba notificación de lo contrario a través de mi Especialista del Caso ISAP. También entiendo que cualquier violación de estas reglas podría causar el término de mi participación en este programa y mi regreso a detención.**

| Número de registro de extranjero del participante: | |
|---|---|
| Firma del participante: | |
| Firma del especialista del caso: | Fecha: |
| | Fecha: |

© 2014 BI Incorporated
Propiedad de BI y Confidencial

-1-

237

# Attachment to Exhibit 13
# Exhibit D

I, █████████████████ swear that the following is true and correct to the best of my knowledge:

1. I am writing this declaration to explain how I and other women are being forced to take shackles when we are eligible for and would prefer bonds.

2. I am in immigration detention in Dilley Texas. I have been here for 12 days.

3. This Monday December 7, 2015 I learned that I had passed my credible fear interview. I learned this from talking to my mother because the immigration officers called my mother and shared this confidential news with her before telling me.

4. Later that day, around 5 immigration officers called several women and me to meet to tell us that we had received positive results from our credible fear interviews from the asylum office. One officer announced to our little group that we had all received positive decisions and that each one of us now had to talk to an officer.

5. The male officer I met with gave me paperwork to sign to indicate if I wanted a bond or a shackle. I opted for the bond. After seeing that I chose a bond, the officer asked me several times if I had thought hard enough about this and why didn't I want a shackle. I told him I was sure, that I had talked to my mother about this and we wanted the bond. He then told me that it would make his boss mad to see that I picked a bond. I asked if it would affect my case negative and he said that supervisor would be angry. The supervisor then asked my deportation officer what did she choose. The officer said I was choosing a bond because of "my mommy." He was doing it in a way that was mocking me. The supervisor responded – we already talked to her mom and we know she's choosing a bond. They kept smiling at me in a mocking manner. The officer with me then said "remember it is you who is locked up, not your mom." Then he told me opting for a bond I would be here for 10 more days or more. I refused to sign some of his paperwork because it was all in English. He put the paper down harshly on the desk and asked me if I thought an immigration official would lie. I told him that I had already made the decision and I left.

6. Afterwards, I was afraid that since he said it angered his supervisor that they would start to treat me badly here. I went to talk to a lawyer to tell them about this. The lawyer told me I had a right to a bond.

7. Immigration did not give me a bond. I had to go before an immigration judge and ask for one. The immigration judge gave me a minimum bond of $1500. My family is paying that and I will leave soon.

239

8. Other women in my sleeping quarters have told me that the officers do not tell them that they have two options after a positive fear finding: (1) bond or (2) shackle. Instead the officers just tell them to sign and put shackles on them. One woman told me that her deportation officer told her that the bond would be $10,000 for her and another $10,000 for her child - $20,000!

9. I believe that this deception and intimidation to take a shackle is unfair. We have a right to a bond and the officer should not be pressuring us into accepting shackles.

Date: December 10, 2015

CERTIFICATION

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to _____ in Spanish.

Helen Lawrence

12/10/2015

Date

240

# Attachment to Exhibit 13
# Exhibit E

**Declaration of** ██████████████ **A#** █████████

My name is ██████████████████ I was born in El Salvador on ████████████ My son is with me, his name is ████████████████████ and he is 10 years old. We were detained on November 4, 2015. I crossed the border through McAllen, Texas. We were detained by the McAllen Texas Border Patrol Station.

Yesterday, on November 17, 2015, the deportation officer Ivan Astacio called me to go to court because he wanted to talk to me, he asked me if I was ready to leave since I had received a positive decision after my credible fear interview. He told me that if I wanted to get a bond it would take anywhere between 80 days and 100 days for me to get released. He told me to not think about myself but to think about my son who was standing next to me. He asked my son directly if he wanted to leave the detention center at that moment, to which my son responded yes, but my son then said that he was with me and he would be ok with whatever decision I made. The officer then said to me that the schooling my son is receiving here at the detention center is a joke, that it was a lie of a school. He also kept saying that the bond would be anywhere between $5,000- $10,000 and that the shackle would be a much better option because I would only have to wear it for about 2 months. He also said that I would lose the $5,000 paid for the bond, that it was a lot of money to lose. He said that since he was no longer going to be my deportation officer that my case was going to take a long time for me to get out of here. The officer kept saying that he had the power to just make a phone call right then and get me out of here. He said that he could call my cousin immediately so that my cousin could purchase the airplane tickets and I could be released with the shackle.

There has been about 3 different times when immigration officers tell me the same thing, pressuring me to get the shackle and forget about the bond. Each one of them has told me that it will take between 80-100 days to get released if I decide to get a bond.

I have been very clear multiple times that I want to get a bond and that I am not interested in getting the shackle but the officers keep insisting I should get the shackle.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection:



_____
Signature

11/18/2015
_____
Date

I, Jose Alberto Cruz Guadarrama, certify under penalty of perjury that I am fluent in the English and Spanish languages and that I read this document to the affiant in Spanish who verified that its contents are true and accurate.

So sworn this 18 day of November, 2015.

_____
Jose Alberto Cruz Guadarrama

# Attachment to Exhibit 13
# Exhibit F



**Declaration of** ███████████ **A#** ███████████

1. My name is ███████████ **A#** ███████████ and I was born in ███████████ El Salvador on ███████████.
2. I have been detained in the South Texas Family Detention Center since November 18, 2015 with my son ███████████ **A#** ███████████.
3. On November 26, 2015, I was called to the play area in the Red Parrot neighborhood with seven or eight other people.
4. There were about four ICE officers present.
5. They told us we had all received positive decisions on our fear interviews.
6. They told us that we would all be leaving with a shackle unless we wanted to go in front of a judge to ask for a bond.
7. I said that I wanted to leave with a bond. I was the only person to do so.
8. They told me that the process would be as long as a month or longer and that the bond was going to be a lot of money.
9. They continued the conversation about what the release with the shackle would look like.
10. Afterwards, an ICE officer called me over to table and told me how to sign the documents. On the area where it says that I want to ask for a bond from a judge, he said, "Oh that's right, you want to leave with a bond. You like the food here?" I responded that yes, I do. He said "oh I guess that's why you don't want to leave here." It was obvious that he was making fun of me from the way that he spoke to me and looked at me.
11. He asked me who had told me to leave with a bond, and I told him it was my family.
12. He repeated that release with a bond was take a long time.
13. After I finished signing all the documents he said "Ok, now we're going to call your family. Oh wait, I forgot you aren't going to leave."
14. He made me feel embarrassed because he spoke loud when he said that I didn't want to leave because of the food, and other women could hear him.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

_____                           11- 27- 2015
███████████                                         **Date**

I certify that I am proficient in the English and Spanish languages and I accurately and truthfully read the aforementioned in the Spanish language to the client.

_____                           11/27/15
Ian Philabaum                                       **Date**

# Attachment to Exhibit 13
# Exhibit G

**Declaration of** ████████████████████ (A████████████

1. I, ████████████████████ (A████████████), fled Honduras in October of 2015 with my daughter ██████████ (DOB ████████) to seek asylum in the United States of America. I entered the US on November 14, 2015 and am currently detained at the South Texas Family Residential Center in Dilley, Texas.

2. While receiving legal services from the CARA Pro Bono Project I learned that if I were given a positive decision after my credible fear interview I could choose to leave with an ankle monitor or to request a bond.

3. I spoke with my aunt and uncle and we discussed the ankle monitor or the bond. They agreed that the bond would be better. They agreed that a monitor is bad because they only should put that kind of thing on a criminal, and I am not a criminal. I am here because I am fleeing violent persecution by my ex-partner.

4. My family members sent all of the necessary documents to my lawyers so that I could ask for a bond. My aunt ████████████████ is a US citizen who is very happy to receive me and give me a place to live and help me get settled and go to court for my asylum claim. Her husband, my uncle ████████████████ is also a US citizen who is willing to support me. They have enough money to pay a reasonable bond amount and are willing to pay it.

5. My aunt and uncle sent copies of their US passports, their driver's licenses, notarized letters of support ensuring that they would give me a place to stay, support me in everything I need, and that they "guarantee that [we] will attend all [our] immigration hearings and that the minor will be enrolled and attend school."

6. My aunt and uncle and I were all very much in agreement that I should request a bond so if we were able to pay the amount I would not have to wear the ankle monitor. We understand that if the bond amount set by the judge is too much for us to pay, I will still be able to leave with an ankle monitor.

7. Yesterday, 11/24/2015, an immigration officer called my uncle ██████████ in the morning to confirm his address and that he was willing to receive me. I had not yet been told whether I had a positive or a negative credible fear decision, but we were still wanting to request a bond when the decision came if it was positive.

8. Later on the same day I was given an appointment to go to the court building at 3pm. I left my daughter at the daycare center and went to court. I arrived late, but the person who had given me the appointment took me to a room with various other women and we were told to wait. The same man kept entering to tell us not to be afraid. We were all nervous about what our decisions might be.

9. Around 5:00 or so four immigration officials showed up and called all of us by name to go into a larger room. One of them explained some paperwork saying that we had been given positive decisions and that we could choose between leaving with the ankle monitor or ask for a bond. After he talked about how we had to go to court after leaving he asked if we had any questions, and we started asking questions.

10. I mentioned that I wanted the bond. He asked if I was sure I wanted the bond, and I said that I was sure. He said that a judge had to decide the amount of the bond.

11. Then the officers read a list of the women's names and asked if they wanted the monitor or the bond. When I said I wanted a bond they took me to another room. In the other room there were two officers. One other women had said she wanted the bond, so one official was speaking with her and one with me.

12. I wonder why when we ask for bonds they take us to a different room, and why that room. If you ask for a bond why do they separate us? Why not speak to us in the same room?

13. The officer who spoke to me told me he was Mexican when I asked where he was from. He has cinnamon-colored skin, a circle beard and a bit of a belly.

14. This official went through the paperwork with me and told him I wanted the bond.

15. Then he asked me if I was sure that my family would be able to pay the amount of money that a bond would be set by a judge. I said that my aunt and uncle were willing to pay a bond that a judge set.

16. Then the official asked for my uncle's phone number and called him. He spoke to my uncle and started explaining the bond and the monitor to my uncle. The official made my uncle afraid, he asked if he could pay a bond, and said that if he could not pay a bond I could also leave with an ankle monitor. He began explaining the ankle monitor to my uncle. Then he started talking to my uncle about the bond again and told him that it would be expensive and that he would have to pay two bonds, one for me and one for my daughter. That it could be up to $20,000. They told my uncle I might have to wait three more weeks to get out if I asked for a bond.

17. The officer managed to convince my uncle that the bond would be too expensive and take too long, so he decided that I should leave with an ankle monitor. The officer did not ask me again if I wanted the bond. Since my aunt and uncle will support me and would have to pay the bond, I will go with their decision.

18. The officer showed me where to sign the paperwork and told me "have a good trip." He asked me if I was going to work, or what I was planning to do. He also asked what my aunt does for work. He asked me where I was from and I told him Honduras. He said "oh, too bad, Mexico won the soccer game between Honduras and Mexico."

19. They told me that the travel ticket would be for the following day, today, in the afternoon.

20. Today someone in a red shirt told me to get my things ready to leave. Then they took me to where I came in to this place.

21. I was scheduled for a meeting with the lawyers at the legal visitation room for 1:30 and I told the officers that I wanted to go to that meeting. Some of them said there was not time for me to go. Then I found someone who spoke Spanish and explained that it was important and I told them that I was represented by a lawyer. They said I could go but that I had to hurry.

22. First they put an ankle monitor on me and then they allowed me to go to the legal visitation room.

23. One of the people who works with the CARA Project spoke with me and looked at my papers. Then we spoke with my uncle and my uncle said that they had told him that the bond would be $3,000 to $10,000 each and that we would have to wait a long time, so he was worried and agreed that I should leave with an ankle monitor.

24. Some officials came to speak with the lawyers and the seemed angry, but when we spoke to my uncle again he agreed that we would try to get a bond and so he canceled the ticket. One of the

officials asked me if I was sure I wanted a bond and I said that yes I wanted a bond. Then he said that I would be allowed to ask for a bond and I could go and have them take off the ankle monitor.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

11/25/15
Date

I, Alexander Mensing, certify under penalty of perjury that I am fluent in the English and Spanish languages and that I read this document to the affiant in Spanish who verified that its contents are true and accurate.

Signature

11/25/15
Date

248

# Attachment to Exhibit 13
# Exhibit H

**Declaration of** ████████████████ (A███████████

1. I, ████████████████████ fled my home country of El Salvador on November 10th
   with my daughter ████████████ (DOB ████████) to seek asylum in the United
   States of America. I entered the US on November 21st and was detained. I am currently detained
   at the South Texas Family Residential Center in Dilley, Texas.

2. I understand that if I receive a positive decision I can leave with an ankle monitor or I can ask to
   pay a bond. I had heard from some people that the immigration officials say that the bond is ten
   or fifteen thousand dollars, but the pro bono lawyers say that it is usually less money.

3. On Tuesday of this week I spoke to my brother-in-law, ████████████████ and spoke with
   him about the bond option. He said that my family might be able to get the money together for a
   bond if it were an affordable amount.

4. On Wednesday, December 2nd, I was given a credible fear interview.

5. I spoke with my family again on Thursday December 3rd about the bond option and we did not
   have a set decision yet about the money, but we all agreed that it would be better to leave with a
   bond because if I leave with a monitor I will have to spend time going to the immigration office
   and they will be calling me to tell me to go there. It is better if I only have to go to court.

6. I also do not want the monitor because I would have to charge it and it makes noises and I could
   go out and it would be beeping.

7. On Friday, December 4th, I had not yet been given any official decision by immigration agents
   about my credible fear interview.

8. During the day on December 4th I called my brother-in-law's wife, ████ and she told me that ICE
   had called her and said that I was going to be released with an ankle monitor and that she
   should be ready to make travel arrangements for me. She told me she had been surprised that
   they called her to say that, because she knew I wanted to ask for a bond. The officer told her
   that the bond would take a very long time to get and that the maximum amount of time I would
   have a monitor would be six months.

9. I told ████ that I had not told anyone I wanted to leave with an ankle monitor and that ICE had
   not told me any of that and had not given me any decision yet. Then she said that because the
   ICE officer had said it would take a long time to get a bond it is better if I leave with a monitor.

10. I was surprised about what had happened. It is very strange that they call your family members
    without telling you anything or giving you an answer. I was disappointed about maybe having
    to leave with the monitor because I want to leave with a bond.

11. I spoke with my family again on the evening of Friday, December 4th. We spoke about the bond
    and the ankle monitor and reaffirmed that it would be best for me to request a bond.

12. After speaking to my family, around 8:00pm or 8:30pm, some people with red shirts came to
    my room and took me to the court building. There were about 15 other women there.

13. There were officers there, some of them had jackets on that said "police" on the back. There
    were about eight officers.

14. They told us that we all had positive decision. They asked if everyone was going to leave with
    an ankle monitor. I raised my hand and said that I did not want to leave with the monitor and
    that I wanted to ask for a bond. Then the officers said that the people who wanted to leave with

a bond would have to stay longer.

15. Then they met with us individually to sign the documents. I was at a desk in the courtroom with an officer, the other women with different officers in the courtroom.

16. The officer asked me if I was able to pay the bond. He said we could call my family to confirm that they were able to pay a bond. I said that was not necessary because I had already spoken with them and we had agreed to request a bond.

17. He showed me the phone number he had for my family and it was the wrong phone number. I gave him the correct phone number because otherwise they would call the wrong person.

18. He told me that the bond would cost thousands of dollars. He said it could be $8,000, or even $15,000. "Imagine paying $15,000," he said to me. He told me that my family would have to pay one bond for me and another bond for my daughter, that the bond amount was for each person, not both.

19. He told me it could take up to two weeks to be released with a bond.

20. He was very insistent that I sign to leave with the ankle monitor and not request a bond. He told me that if we called my family and they said they were not sure they could pay the bond I would have to sign for the ankle monitor.

21. The officer did not introduce himself when I sat down with him or tell me his name. I looked at his uniform for his name but he had no nametag.

22. I kept my decision to request a bond.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.



12/6/15
Date

I, Alexander Mensing, certify under penalty of perjury that I am fluent in the English and Spanish languages and that I read this document to the affiant in Spanish who verified that its contents are true and accurate.

So sworn this 6th day of December, 2015.

Signature

251

# Attachment to Exhibit 13
# Exhibit I

My name is ███████████████████ and I am from Honduras. I have been detained since October 29, 2015 with my son, ████████████████. I entered the United States and was taken to the Macali station.

I spent 4 nights and 3 days in the ICE holding facility. The holding facility was incredibly cold. I believe I got pneumonia at the holding facility because of how cold it was. Everyone's aluminum blanket was rattling in the air and it felt like my hair was frozen. I wrapped my sweater around my son's head to keep him warm and I only had a t-shirt on.

We received 3 sandwiches every day. It consisted of bread with ham and juice. The ham and bread were frozen. There was enough water, but it was cold. The food was always the same. The children wouldn't eat it because they were all sick.

I did not shower. They didn't have soap, but they had toilet paper and pads. The kids needed soap when they went to bathroom. We were all dirty from having been in the river, but there was no soap with which to wash up. There's a view to the men's area from the women's bathroom – when you sit/stand, the men can see and they are looking. There were no doors on the bathrooms.

We slept on the floor. The lights were left on all night. Some women had to sleep next to the toilet because there was no room. We were stepping on each other because couldn't see with all the aluminum blankets – even stepping on pregnant women.

Everyone was coughing, but nowhere to lodge medical complaint. I believe I contracted pneumonia because of the place.

When the officers wanted us to sign the deportation orders, one of my friends asked for an interpreter so she knew what she was signing and they told her there were no interpreters. Officer [name unknown] told me that he would sign for me if I wouldn't sign, and that they were just going to send me back.

The conditions of the ICE holding facility were very bad. There was no soap, not enough food and people were starving from their journeys. It was so cold and they had to watch the children deal with the cold/hunger.

The officers were telling us all they had to stand up and couldn't lie down. Every time an official came, us had to stand up instead of lying down. White officers treated me well, but the Hispanic officers were the ones who treated me poorly.

Today, November 10, 2015, I spoke with my friend on the phone who indicated that she received a phone call from an ICE officer – Officer Martinez I would be released today at 5pm on the ankle bracelet and to be sure that she buys me tickets. He gave her instructions on how to have the tickets faxed here and she did it. I have never met Officer Martinez, and no one ever told me I was going to be released. Even now, a few hours before I am to be released, no one has come to speak with me about the fact that I will be released with an ankle bracelet.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

███████████████████

11 / 10 / 15
Date

**Interpretation Certification:** I certify that I am proficient in the English and Spanish languages and that the foregoing was read to above signed individual in Spanish.

Theresa Willer

11 / 10 / 15

Signed                                                          Date

# Attachment to Exhibit 13
# Exhibit J

**Coercion Declaration of** ████████

I, ████████ declare under penalty of perjury under the laws of the United States that the following statements are true and correct to the best of my knowledge and recollection:

1. My name is ████████ A# ████████.

2. Currently, I am detained at the South Texas Family Residential Center (STFRC) in Dilley, Texas with my daughter. I have been detained at STFRC since November 28, 2015.

3. On December 9, 2015 around 9:00 pm, two ICE officers came by to my room located in the Brown Bear neighborhood at STFRC. They told me to go straight to the playroom. When I got the playroom there were approximately twelve mothers and six ICE officers. The officers told us that we had all gotten positive determinations in our interviews. They said that we were going to get tired because we had to sign a lot of papers.

4. When I got my turn, the ICE officer required me to sign some documents. I stopped signing the papers and asked him if I was signing for the ankle monitor. I explained to him that I wanted the bond and that my brother was willing to pay it. The officer replied that I had to pay $10,000 for a bond. He specifically said that I had to pay $10,000 for myself and another $10,000.00 for my daughter. I told him that it was fine and that I wanted to go through with it anyways.

5. I was confident about my decision because the CARA Pro Bono Project had already given my information about the bond. I knew that the ICE officer was not telling me the truth. I am very concern about other mothers that are too timid to stand up for themselves.

6. Actually, that night one of the mothers wanted to request a bond. However, the ICE officer dismissed her request. After the ICE officers left the playroom, she went after him. However, she was turned down by the other ICE officers who told her that she could not change her mind because the officer that assisted her had already left.

This affidavit was read to me in Spanish and it is a true statement of what I have said.

████████

December 10, 2015
Dilley, Texas

I, Ana Camila Colón, certify that I am proficient in the English and Spanish languages and that the foregoing text was read to ████████ in Spanish. I further certify that the English translation of the Spanish statement, to the best of my abilities, to be true and accurate.

*Ana Camila Colón*
Ana Camila Colón

255

# Attachment to Exhibit 13
# Exhibit K

Declaration of █████████████████ (A# ██████████

I, ████████████████████ fled Guatemala with my daughter ████████ ████████ (A# ██████████ to seek asylum in the United States of America. I was detained by US border patrol agents on October 17, 2015. I am now detained at the South Texas Family Residential Center in Dilley, Texas.

I am from ██████████ Guatemala and I speak Quiche. I speak some Spanish but my native language is Quiche.  I have a hard time understanding Spanish.

I did not receive an interview with the asylum office because I speak Quiche. On Monday I had a meeting with an official, I am not sure who it was, I think I was in a courthouse. He asked me where I was going after I got out and he called my husband and had him buy my plane ticket.

Two nights ago at around 9 PM 4 ICE officers came to my room looking for me. One of them told me that I had to sign some papers because I was leaving now. They took me to a playroom with 8-9 other women. They said that we have to sign the papers and call our family members and tell them that we could leave now. One of the other women had already signed papers – "la salida" - and she asked ICE why she had to sign more papers. The officer replied that they had to sign the papers in order to leave.

All 9 of the women signed the papers. All of us received the same papers. Some of them have already left. Only one other woman did not speak Spanish well, she spoke Mam. But no one asked what the papers were, and I am not sure why they did not ask. I asked "what are these papers" and the officer said "they are so you can leave". I asked if they were for deportation and they said no.

I was confused because I was scared that I was going to be deported. But when I saw our plane tickets on top of those papers I believed him that they were for my release. They said they weren't doing anything wrong. So I signed the papers. The official did not say anything about an ankle shackle. I had no idea that I was signing for an ankle monitor. He just told me to sign for myself and for my daughter and I did.

I am nervous about having an ankle monitor. I am happy that I am going to be safe and leave here. But I am worried that I will have problems going in stores or that people will judge me because I will have the ankle monitor. I am worried that people will think that I am a criminal.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection:

█████████████████                              10/28/2015

Signature                                          Date

257

I, Catalina Restrepo, certify under penalty of perjury that I am fluent in Spanish and English and that I worked with a certified translator to translate the following into Quiche and that the document was read to the affiant in Quiche who verified that its contents are true and accurate.

_Catalina Restrepo_                                    _10/28/2015_

Signature                                                          Date

# Attachment to Exhibit 13
# Exhibit L

**Declaration of** ███████████████  A# ███████████

My name is ███████████  I was born in El Salvador on ███████████  My
daughter is with me, her name is ███████████  and she is 17 years old. We were
detained on November 8, 2015. I crossed the border through McAllen, Texas. We were detained by
the McAllen Texas Border Patrol Station.

Yesterday, on November 18, 2015, the deportation officer called me to go sign my release
documents because I received a positive CFI decision. He didn't explain to me the bond option, he
only said that I would have to stay detained longer if I opted for the bond, because I would have to
file some documents.

When we started going through the release documents the officer told me to mark that I wanted to
be released with a shackle without further explaining the differences between the shackle and the
bond.

I declare under penalty of perjury under the laws of the United States that the above statements
are true and correct to the best of my knowledge and recollection:



11 / 19 / 2015

Signature                                                Date

I, Jose Alberto Cruz Guadarrama, certify under penalty of perjury that I am fluent in the English
and Spanish languages and that I read this document to the affiant in Spanish who verified that its
contents are true and accurate.

So sworn this 19 day of November, 2015.

Jose Alberto Cruz Guadarrama

260

# Attachment to Exhibit 13
# Exhibit M

**DECLARATION OF** ███████████████

My name is ███████████████ Last night at 9:30, ICE officials came into my room. They asked another woman to sit down with me. They told us that we had been granted our release and we could leave the detention center in a few days. They gave us a paper and told us to sign it. They told us that the next day we could leave with an ankle shackle. The officials did not tell us that we had any other option for bond or anything. They only told us that we had to sign the paper to get the shackle and leave the next day.

Signed this 18th of November, 2015

███████████████████

_____

I certify that I am proficient in the Engligh and Spanish languages and that the foregoing was read to me in Spanish.

GRACE SCHOENLANK

# Attachment to Exhibit 13
# Exhibit N

**Declaration of** ███████████ **A#** ██████

1. My name is ████████████ **A#** ██████ and I am from ████████ El Salvador,
2. My son, ████████████ **A#** █████████ and I have been detained in the South Texas Family Detention Center since November 20, 2015.
3. On December 1, 2015 I was called to a meeting in court at 10:00am.
4. I arrived at the court and an officer marked my name on a list in the front room. I went in to another room where there was another woman waiting, and then a third woman arrived.
5. The immigration officers called us up one by one, and when they called my name the two officers told me that I had received a positive decision on my interview. Then they asked me to sign a document so I could leave the following day with the shackle.
6. I told the officers that I didn't want to leave with the shackle, and that I wanted to leave with a bond.
7. The officers told me that if I applied for a bond I would have to wait one month before I could leave.
8. I told the officers that I still wanted to leave with a bond.
9. They presented me with a document to sign and the box to leave with the shackle was already checked by the officers, so they made me check the other box and put my initials beside it.
10. I was worried that they were going to pressure me a lot because I have seen them do it to other women. For example, one time they came to my room and told a Guatemalan woman that the bond was going to be $20,000.
11. I was confident that I wanted to leave with a bond and told the officers just that, and they didn't bother me too much.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

███████████████

████████████

**Date**  12/2/15

I certify that I am proficient in the English and Spanish languages and I accurately and truthfully read the aforementioned in the Spanish language to the client.

Ian Philabaum

**Date**  12/2/15

264

# Attachment to Exhibit 13
# Exhibit O

### ANKLE MONITOR COERCION AFFIDAVIT

OF ███████████████ A# ████████ AND ████████████████████ A#

- My name is ███████████ My daughter, ███████████ and I were detained on November first along with my son, ████████████
- Today I attended a meeting with ICE .The meeting took place in a court past a long hall, in a room with one desk and long wood benches.
- It took place November 13, 2015, 3:30pm.
- There were about 20-25 women in the meeting.
- The women were from various houses in the center.
- There were 6 ICE officers in the meeting.1) Un trigeno con lentes y sin pelo, 2) un senor bajito y ya era mayor (50s etc), 3) un muchacho blanco blanco y rubio,4) uno de buena estatura y buen mozo,  5) 30 años algo gordito y estatura normal (Martinez) pantalones negros a beige shirt and a beige ICE jacket,6) un senor bajito y delgado.
- The meeting was about leaving here tomorrow.
- I did not want to leave with grillete. I had asked my daughter in Minnesota to help pay my bond.
- The officer spoke very fast and I could not understand what he was saying.
- I understood that those who passed through the bridge would not have grillete.
- They said if someone was not ok with taking the grillete they had to pay a bond, and he said the cost was very high. They said that it was about $20,000 for three people.
- He told me, "You can decide, there is time to call your family and ask about a bond but this is very expensive and your family probably won't want to pay that. "
- I signed the docs because the officer said it was "only to prove that you were here detained in this center."
- They told me that they didn't know much about the grillete after we leave because they said it depends on the state
- We have seen on TV channel 60 and up some information about how to ask for a bond and saying there are free lawyers.
- I did not understand that I was signing a document agreeing to leave with grillete.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection:

_____

Signature                                                                                      13-11-15

                                                                                                        Date

_____

Signature                                                                                      13-11-15

                                                                                                        Date

I certify that I am proficient in the English and Spanish languages and that I read this to the declarants in Spanish.

_____                              11-13-15

Signature Leanne Purdum                                                          Date

1

266

# Attachment to Exhibit 13
# Exhibit P

**Declaration of** ████████████████████ **A#** ████████

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

1. My name is ████████████████ A# ██████████ and I was born in ████████████ ████████, Honduras on ████████████

2. On or about December 1, 2015 I was detained with my daughter ████████████████ (A# ████████████ by the United States Border Patrol, and on December 2, 2015 I was moved to the South Texas Family Detention Center.

3. On December 11, 2015 I had my credible fear interview in the asylum office.

4. On December 14, 2015 at 9:30pm five ICE officers came to my room and called my name and told me to go to the play room to sign some paperwork.

5. I went to the play room with my daughter and there were two CCA guards and nine other women.

6. The ICE officer told us as a group that we had all received positive decisions on our fear interviews and that we were all being prepared for our release. The officer told us that they had some paperwork for us to sign.

7. The officers started calling us one by one to sign the paperwork. When they called me the officer told me that the papers he wanted me to sign were so I could be released with the ankle shackle. He told me that if I signed right away I could leave on Wednesday, December 16, 2015. I told him that I did not want to leave with the ankle shackle and that I want a bond.

8. The officer told me that the process would be two weeks or more, and that the judge could give me and my daughter separate bonds and they could be from $1,000 to $12,000 each.

9. The officer told me three times to call my family to tell them that the process could be very long and make sure they actually want to pay the bond. I told him that I didn't need to call my family because I had already talked to them and we were confident in our decision to ask for a bond.

10. The officer made me feel like he really wanted me to leave with the ankle shackle. He kept repeating the same thing over and over telling me to sign the papers so I could leave sooner. I didn't understand why he wasn't respecting my decision when I said I didn't want to leave with the shackle and he made me repeat myself three times.

████████████████████

_12/15/2015_
**Date**

I certify that I am proficient in the English and Spanish languages and I accurately and truthfully read the aforementioned in the Spanish language to the client.

_Ian Philabaum_ (signature)

**Ian Philabaum**

_12/15/2015_
**Date**

268

# Attachment to Exhibit 13
# Exhibit Q

    

December 24, 2015

León Rodríguez
Director, U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, NW
Washington, DC 20529

Sarah Saldaña
Director, Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street, SW
Washington, DC 20536

Dear Director Rodríguez and Director Saldaña:

The undersigned organizations provide legal assistance to parents and children detained in Dilley and Karnes City, Texas and Berks County, Pennsylvania.[1]  We write to raise urgent concerns regarding egregious due process violations taking place inside family detention centers.

On August 21, 2015, Judge Dolly Gee ordered the Department of Homeland Security (DHS) to comply with the *Flores* Settlement Agreement by October 23, 2015.[2] Since that deadline, practitioners and advocates on the ground in all three family detention facilities have witnessed the implementation of a rapid deportation strategy that has short-circuited due process, rivaling the unlawful processes in place during the summer of 2014 at the Artesia, New Mexico family detention center.

The vast majority of mothers and children detained at the Dilley, Karnes, and Berks facilities have fled the regional refugee crisis caused by extreme violence in the Northern Triangle of Central America, which continues to escalate. The United States has both a legal and a moral obligation to give these families a meaningful opportunity to establish their claims for protection before taking steps to deport them. The danger of wrongfully returning someone — especially a child — to the very danger that prompted his or her family's flight, is very real. *The Guardian*

---

[1] Catholic Legal Immigration Network (CLINIC), the American Immigration Council, Refugee and Immigrant Center for Education and Legal Services (RAICES), and the American Immigration Lawyers Association (AILA) are partners in the CARA Family Detention Pro Bono Project, which provides legal services at the Dilley and Karnes detention facilities.  Human Rights First (HRF) coordinates pro bono representation for some families detained at the Berks facility.
[2] *Flores, et al. v. Lynch, et al.*, No. 2:85-cv-04544, 2015 U.S. Dist. LEXIS 112911 (C.D.Ca. Aug. 21, 2015).

recently reported more than eighty confirmed cases since January 2014 in which Central
Americans deported from the U.S. were killed upon return.[3]

Yet the U.S. government has deported many vulnerable, traumatized mothers and children with
viable claims for protection based on a flawed credible and reasonable fear process.  These
problems have been compounded since October 23, because DHS has introduced practices that
offend fundamental principles of due process and run rough-shod over key protections built into
the expedited removal process.  Specifically:

- USCIS' negative fear determinations are often flawed, with numerous substantive problems
  evident in the transcripts of initial fear interviews.  Further, USCIS is adjudicating requests
  for reconsideration of negative fear determinations based on a heightened standard, which
  has led to the removal of families with viable claims for protection.

- USCIS and ICE have deprived parents and children of their statutory right to immigration
  judge review of a second negative fear determination.

- USCIS is effectively depriving certain children of the opportunity to assert their claims for
  asylum by refusing to fully consider children's claims independently of their parents' claims.

- ICE has deported represented parents and children while their cases are still in progress. In
  particular, ICE has disregarded pending and scheduled requests for reconsideration by a
  USCIS asylum officer, pending civil rights complaints, and pending petitions for review to
  the federal courts.

- DHS has transferred represented mothers and children away from counsel sometimes without
  any notice and more recently, without meaningful notice.

These changes, which are discussed in more detail below, have led to the unlawful deportation of
many families who have legitimate claims for asylum or other protection under U.S. law. These
problems also illustrate why expedited removal is simply the wrong approach for a traumatized
population of families, many of whom have survived horrendous violence, rape or domestic
violence.

## I.     Flawed fear interviews and use of a heightened standard to adjudicate requests for reconsideration of negative fear determinations

There are many reasons why an initial fear interview, which is often conducted within days of
apprehension, can go awry.  Asylum-seeking mothers, who are frequently sick from their
journeys and from their time in Customs and Border Protection (CBP) short-term holding
facilities prior to arriving at Dilley, Karnes, or Berks, are often far too traumatized to reveal
personal details of rape or other abuse, especially in front of their children or if the asylum
officer is male.  Those who speak indigenous languages may not be able to communicate at all.

---

[3] Sibylla Brodzinsky and Ed Pilkington, *U.S. Government deporting Central American migrants to their death*, THE
GUARDIAN, Oct. 12, 2015, http://www.theguardian.com/us-news/2015/oct/12/obama-immigration-deportations-
central-america  (last visited Dec. 22, 2015).

These hurdles are compounded in the case of a child. It often takes experienced asylum attorneys many hours or even days to build a relationship of trust with a client before she is ready to reveal the circumstances that prompted her to flee to the United States.[4]

Immigration judge review, while very important in the asylum pre-screening process, does not replace the need for reconsideration.  Immigration judge review does not always involve testimony and seldom involves attorney participation.  At Dilley, CARA Project attorneys receive the next day's immigration court docket in the late afternoon, usually around 3:30 or 4:00 pm. With hearings beginning at 8:00 am the next morning, our clients have little to no time to prepare for their immigration judge reviews. At Karnes, RAICES pro bono attorneys do not even receive the docket from the San Antonio immigration court, which poses obvious challenges to representation and preparation for negative fear reviews before immigration judges. Consequently, families at Karnes often do not access legal representation until after an immigration judge has affirmed a negative fear determination. The reconsideration process provides a critical opportunity to correct factual errors, provide additional explanation, and ensure that individuals with meritorious cases can meaningfully access the protections our law affords. The CARA Project typically spends at least twenty hours per family for those who request reconsideration.

USCIS' new approach to reconsideration requests has undermined its regulatory charge to prevent the erroneous deportation of bona fide asylum seekers.  USCIS has the regulatory authority to reconsider a negative credible fear determination. 8 C.F.R. § 1208.30(g)(2)(iv)(A) ("the Service … may reconsider a negative credible fear finding that has been concurred upon by an immigration judge after providing notice of its reconsideration to the immigration judge."). Under longstanding agency policy, the government has previously exercised its discretion to reconsider an asylum seeker's negative credible fear determination when she "has made a reasonable claim that compelling new information" in her case exists and should be considered. *See* Michael A Benson, Executive Assoc. Commissioner for Field Operations, Immigration & Naturalization Service, Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997).

However, on or around October 23, 2015, USCIS changed its approach and now will only reconsider a negative fear determination under egregious circumstances. Under 8 C.F.R. § 208.30(e), USCIS should find a credible fear where the facts and law give rise to a "significant possibility" that an individual will prove a claim for asylum.  Given the life and death consequences of an erroneous fear determination, any type of error by USCIS — whether egregious or not — indicating that an applicant may in fact meet this standard, should prompt reconsideration.

Data collected by the CARA Project at Dilley demonstrate the consequences of USCIS' new standard, which coincided with a substantial increase in denials of requests for reconsideration. Notably, the denial rate jumped from 23% to 66% in the weeks following October 23.  During

---

[4] *See, e.g.*, Jane Herlihy, et al., *Asylum Claims and Memory of Trauma: Sharing Our Knowledge*, THE BRITISH JOURNAL OF PSYCHIATRY, June 2007, 191 (1) 3-4, http://bjp.rcpsych.org/content/191/1/3 (last visited Dec. 22, 2015); Dr. Julian Gojer et al., *Post-Traumatic Stress Disorder and the Refugee Determination Process in Canada: Starting a Discourse*, UNHCR POLICY DEVELOPMENT AND EVALUATION SERVICE, March 2014, http://www.unhcr.org/53356b349.pdf (last visited Dec. 22, 2015).

3

272

the same period, the length of time USCIS takes to adjudicate a request for reconsideration was sharply reduced. Whereas USCIS previously took a week or more, the Houston Asylum Office now issues a decision on a request for reconsideration within twenty-four to forty-eight hours, and sometimes on the same day that the request was submitted.

The data strongly suggest that USCIS has shifted its approach to the reconsideration process to match its twenty-day representation to Judge Gee about processing times — notwithstanding the grave risk to bona fide asylum seekers who will be unlawfully deported as a result. A substantive comparison of recent denials with pre-October 23 approvals does not reveal any distinguishable characteristics. Specifically, CARA Project staff have observed that requests for reconsideration by families articulating the same type of fear, very similar past persecution, and a comparable fear of future persecution, which were frequently granted in the past, are now denied.

The impact of USCIS's new approach on bona fide asylum seekers is plain. Neither its heightened standard for reconsideration nor the pace of its adjudications aligns with a desire for accuracy. For example:

- During "Sofia's"[5] credible fear interview at the Dilley facility on November 25, 2015, she had trouble understanding the interpreter, was extremely nervous, and felt sick. She and her twelve-year-old daughter "Carolina" felt paralyzed by fear during their interview. These difficulties prevented Sofia from explaining the threats her daughter faces from a known sexual predator and gang member in Honduras, as well as her fears that any attempt to protect her daughter could provoke lethal retaliation from the gang. On December 3, without allowing any attorney participation, the immigration judge affirmed Sofia's negative credible fear finding. On December 6, CARA Project attorneys submitted a request for reconsideration detailing the significant threats that Sofia and her daughter would face if forced to return to Honduras. These new facts demonstrate that Sofia and Carolina have faced past persecution and have a well-founded fear of future persecution on account of Sofia's political opinion against the gang preying on her child, as well as her membership in the particular social group of young women without male protection in Honduras. The trauma that Sofia and Carolina have suffered, coupled with Sofia's severe anxiety during her initial fear interview, prevented her from fully presenting the facts of her case and warrant reconsideration. Nonetheless, the Asylum Office denied her request for reconsideration on December 8. On December 15, the CARA Project submitted a request for reconsideration for Sofia's daughter, which the Asylum Office denied the very next day. The family is at risk of imminent deportation while Sofia's attorneys try to persuade USCIS to reconsider her case.

- An asylum officer interviewed "Martiza" at the Karnes facility on November 24, 2015. Although she had suffered severe domestic violence at the hands of her husband, who started abusing her while she was pregnant with their second son and repeatedly threatened to kill her, Martiza only discussed the threats she received from MS-13 gang members during her credible fear interview. For Martiza, who comes from El Salvador, a country where domestic violence is common, the threats from the MS-13 gang members,

---

[5] For confidentiality reasons, pseudonyms are used in all case summaries.

4

who had threatened to kill her in an effort to extort money, seemed more important.[6] Moreover, the asylum officer never inquired about her experience of domestic violence. Martiza received a negative fear determination, which was affirmed by the immigration judge.  On December 7, her counsel filed a request for reconsideration outlining new information that had not been covered in her initial interview.  On December 9, the Asylum Office denied the request. On December 10, Martiza filed a new request for reconsideration, including additional evidence. On December 14, the Asylum Office denied the new request.  Martiza, who was deported on December 15, never had an opportunity to explain the domestic violence she endured to an asylum officer.

- "Adriana" fled El Salvador with her daughter due to threats from gangs and sexual harassment of her daughter at school. On October 17, 2015, while detained at the Karnes facility, Adriana had her initial credible fear interview.  On October 23, she received a negative determination, which an immigration judge affirmed on November 2.  That same day, her attorneys submitted a request for reconsideration, citing interpretation problems, the fact that the asylum officer had repeatedly cut Adriana off, and additional information regarding her daughter's case that had not been elicited in the initial interview. The Asylum Office denied this request. Adriana's attorneys placed multiple phone calls with asylum officers and eventually secured a second interview for her daughter on the basis that the child's first interview did not meet the USCIS child asylum guidelines.  In the course of this process, Adriana and her daughter were placed in medical isolation after refusing to sign their removal orders because they were still trying to fight their case. The family was finally released more than a month after their initial detention.

- When "Kezia" was ten years old, her uncle raped her. Now in her early twenties, she has a three-year-old daughter and remains unmarried.  Before leaving her home country, Kezia and her daughter lived in a small village without male protection. Shortly before they fled to the United States, Kezia received an anonymous letter making it clear that local gang members had targeted Kezia and her daughter for sexual assault.  Convinced that the police could not protect them, Kezia and her daughter fled the country. Following their arrival in the United States, they were detained at Dilley.

  During Kezia's initial fear interview, she did not have an opportunity to explain all the problems that had led to flee her home country and why she was afraid to return.  As Kezia explained to CARA staff, "The officer only allowed me to make very short answers, or to answer 'yes' or 'no' to her questions." She received a negative fear determination, which an immigration judge affirmed two days later without allowing any attorney participation in the process.  Kezia subsequently requested reconsideration, but the Asylum Office denied her request.

---

[6] While persecution based on threats of extortion is an evolving area of asylum law, a recent decision from the Fourth Circuit Court of Appeals held that nexus to a protected ground exists between gang extortion threats and the proposed particular social groups in that case. *See Ortega Oliva v. Lynch*, Slip Op. No. 14-1780, __ F.3d __, 2015 WL 7568245 (4th Cir. Nov. 25, 2015).

## II.    Refusing to afford immigration judge review of negative fear determinations.

DHS has interfered with our clients' statutory right to administrative review by an immigration judge.  The Immigration and Nationality Act (INA) and the applicable regulations require that all individuals who receive negative credible fear determinations have access to administrative review by an immigration judge. INA § 235(b)(1)(B)(iii)(III) ("The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination under subclause (I) that the alien does not have a credible fear of persecution."); 8 C.F.R. 1208.30(g)(2)(i) (unless an applicant specifically declines immigration judge review, "[t]he asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge[.]").  The immigration judge's decision "is final and may not be appealed." 8 C.F.R. § 1208.30(g)(2)(i).

Likewise, an asylum officer may reconsider a negative determination. 8 C.F.R. § 1208.30(g)(2)(iv)(A).  Upon reconsideration, the Asylum Office may grant a positive finding or may re-interview the noncitizen. The process for credible fear interviews, whether initial or subsequent, is laid out in INA § 235(b)(1)(B), which contains mandatory procedural protections that apply to all such interviews.  Thus, a written record is required in the event of a negative determination, INA § 235(b)(1)(B)(iii)(II), and the applicant has a right to administrative review by an immigration judge, INA § 235(b)(1)(B)(iii)(III).

Longstanding agency policy makes clear that when a noncitizen requests and receives a re-interview, the procedural protections set forth by statute and regulation, including the right to seek administrative review of any negative credible fear determination, attach. *See* Michael A. Benson, Executive Assoc. Commissioner for Field Operations, Immigration & Naturalization Service, Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997) ("Re-interviews will occur when the Office of International Affairs determines that the alien has made a reasonable claim that compelling new information concerning the case exists and should be considered. Districts should cooperate by continuing to detain the alien until the second adjudication, and potentially also a second review by the immigration judge, is completed.").

Notwithstanding these procedural protections, sometime after November 5, 2015, USCIS and ICE began refusing to file necessary paperwork with the immigration courts to allow parents and children to avail themselves of their statutory right to immigration judge review of a negative credible fear determination following a re-interview by USCIS.[7]  In several cases where parents and children independently filed motions with the immigration courts to obtain such review, immigration judges denied these motions.

---

[7] Recently, USCIS appears to have adopted another new practice.  After an immigration judge has reviewed certain cases and affirmed negative determinations, instead of granting a new interview, USCIS has purported to conduct follow-up questioning to the initial § 235(b)(1)(B) interview.  But that practice seems statutorily problematic. The statute authorizes asylum officers to undertake particular duties, and the regulations further delineate and constrain those duties. INA § 235(b)(1)(B) provides the only authority for interviewing a noncitizen for purposes of making a fear determination, and that section requires a written negative finding at the conclusion of the interview – not in the middle. Moreover, every negative finding requires immigration judge review.

- "Juliza" and her three children were apprehended on October 7, 2015. Fearing that gang members would target her family if they were forced to return to El Salvador, Juliza expressed her intent to seek asylum in the United States. On October 14, while detained at the Dilley facility, Juliza was interviewed by an asylum officer, who rendered a negative decision. Juliza explained during that interview that she only understood "a little, not much" of what the officer was asking her. On October 20, without allowing any attorney participation in the review, an immigration judge affirmed the negative determination. On November 5, Juliza requested reconsideration by the Asylum Office. Her request was granted, but her second interview was interrupted because one of her children was very sick. At the conclusion of the interview, Juliza was told that if "the asylum officer determines that you do not have a credible fear of persecution or torture, you may ask an Immigration Judge to review the decision. If you are found not to have a credible fear of persecution or torture and you do not request review, you may be removed from the United States as soon as travel arrangements can be made."  The asylum officer subsequently issued a negative determination in writing.

Despite Juliza's statutory and regulatory right to have an immigration judge review that decision, DHS refused to facilitate that process. On or about November 9,  immigration officials refused to refer Juliza's case to the immigration judge for review of the negative determination. On or about November 12, immigration officials from USCIS and ICE informed Juliza's representatives that ICE had refused to refer her case to EOIR because she was not entitled to administrative review and would be scheduled for deportation.

On or about November 13, Juliza filed a motion with EOIR requesting review under INA § 235(b)(1)(B)(iii)(III). On November 16, DHS filed an opposition brief stating that Juliza is not entitled to administrative review and erroneously relied upon 8 C.F.R. § 235.3(b)(7), which applies solely to review of expedited removal orders rather than immigration judge review of adverse fear determinations. DHS also erroneously stated that Juliza is a Mexican national. On November 17, EOIR refused to undertake an administrative review and denied Juliza a hearing. Recognizing that USCIS had granted Juliza a new credible fear interview pursuant to 8 C.F.R. § 1208.30(g)(2)(iv)(A), EOIR declined to review that determination because she "does not have the opportunity for any further review by statute or regulation."

On November 17, ICE initiated the removal of Juliza and her three children and advised that they would be deported without any administrative review. Immigration officials took Juliza and her children to the airport to put them on a flight to El Salvador. However, due to a health concern Juliza had for one of her children, she and her family were taken back to the Dilley facility at the last minute. Three days later, Juliza and her children were deported. Since they arrived in El Salvador, Juliza and her children have received threats from members of the same gang who had targeted them before they fled. Juliza's husband, who lives in the United States, remains terrified that they will be harmed.

## III.   Failing to consider a child's asylum claim independently from the parent's claim.

INA § 235(b)(1) sets forth the scheme through which foreign nationals subject to expedited removal <u>shall</u> be referred to the Asylum Office for a fear determination if they indicate an intention to apply for asylum or a fear of persecution, which may be expressed any time prior to deportation.  This rule does not exclude minors who have been placed in expedited removal from being referred for a fear determination.[8]

Recognizing children's unique vulnerabilities, USCIS created a special set of guidelines for analyzing children's asylum claims.[9]  These guidelines require asylum officers to view events from the child's perspective, taking into account the unique physical and psychological capacity of a child who is developing.[10] Thus, children may have claims distinct from their parents or stronger claims based on the same facts.[11]

Notwithstanding the USCIS guidelines, asylum officers have often failed — in the name of expeditiously processing families — to carry out their duty to conduct comprehensive, individualized screenings of children.  In recent weeks, attorneys have observed that many requests for independent, initial interviews or re-interviews for children have been denied. Further, many initial credible fear "interviews" of children have lasted only a few minutes and have involved only brief, perfunctory questioning in the middle of, or immediately after, the mother's interview.  Immigration judges often affirm the resultant negative findings without even speaking with the affected children. Given ICE's refusal to refer negative fear determinations issued after reconsideration to immigration judges for review, these children will receive *less* process than other asylum seekers – although they are among the most vulnerable asylum seekers the government encounters. The children's lack of review safeguards available to other asylum seekers prejudices them in establishing eligibility for asylum.

- Nine-year-old "Danny" was never given the chance to speak to an asylum officer or an immigration judge before being deported with his five-year-old brother, two-year-old sister, and mother (see Juliza's story in section II, above). Danny was terrorized by a Mara 18 gang member who accosted him outside the grounds of his school. The gang member threatened to take Danny away if he did not deliver a certain amount of money. On October 16, 2015, without speaking to Danny, the Asylum Office issued him a

---

[8] The regulations specifically note that a noncitizen may be – but does have to be – included in the principal's credible fear determination.  *See* 8 C.F.R. § 208.30(b) Treatment of dependents (providing that a spouse or child who arrived in the United States concurrently with the principal "may have his or her credible fear evaluation and determination made separately, if he or she expresses such a desire").

[9] Memorandum from Jeff Weiss, Acting Director, Office of International Affairs, to Asylum Officers, Immigration Officers and Headquarters Coordinators (Refugees and Asylees), "Guidelines for Children's Asylum Claims" (December 10, 1998), http://www.aila.org/infonet/ins-guidelines-for-childrens-asylum-claims.

[10] Asylum Officer Basic Training Course Lesson Plan, "Guidelines for Children's Asylum Claims," at 37 (Sept. 1, 2009), http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/AOBTC%20Lesson%20Plans/Guidelines-for-Childrens-Asylum-Claims-31aug10.pdf.

[11] The practice of subjecting *any* minor to the expedited removal process is questionable for reasons beyond the scope of this letter. One question that bears mention is whether there could ever be a jurisdictional basis for lodging the necessary predicate charge under INA § 212(a)(6) or (a)(7) against a minor – especially an infant – who plainly lacks the capacity to form the intent required under either provision.

negative credible fear determination, solely on the basis of his mother's interview. On October 20, an immigration judge, who also did not speak to Danny, affirmed this determination. As previously discussed, Danny's mother requested reconsideration of the fear finding by USCIS because, as she clearly stated during her initial interview, she understood only "a little, not much" of what the officer was asking her. Danny's mother's reconsideration interview had to be interrupted because her daughter was sick. When the interview was completed, the Asylum Office again issued a negative determination. Danny's mother sought immigration judge review of that decision, which was denied on or around November 9. On November 17, the CARA Project requested that the Asylum Office conduct an independent interview of Danny; that request was denied on November 18. In the early morning hours of November 20, Danny and his family were deported.

- Twelve-year-old "Carolina" was asked only nine questions in the middle of her mother's credible fear interview (see Sofia's story in section I, above). None of these questions addressed whether she was afraid to return to Honduras or, if so, why. The asylum officer, who was male, spoke to Carolina for only a few minutes before resuming her mother's interview and then issued a negative determination for both Carolina and her mother. But Carolina has a strong asylum claim of her own, separate and apart from her mother's. Carolina was repeatedly and directly targeted for predatory sexual acts and has been aggressively stalked, at times with knives and machetes, by a gang member who raped her friend. Carolina fears not only that this man will rape or kill her, but also the consequences of having reported her friend's rape to her mother and community members and of having defied the wishes of a gang member. The questioning Carolina received during her mother's credible fear interview was brief, perfunctory, and wholly insufficient to elicit information from a terrified preteen girl. She states in the declaration accompanying her own request for reconsideration that she had not even shared with her mother many of the harrowing details of the sexual harassment to which she was subjected. Despite Carolina's inability to explain the persecution she faces during the original credible fear interview, the Asylum Office denied her request for reconsideration. Carolina and her mother are now in danger of imminent deportation. Meanwhile, her attorneys are continuing to try to persuade USCIS to reconsider her case.

- "Eliana," a Guatemalan Mam-speaking mother, and her four children, ages four, five, nine, and thirteen, were detained at Dilley for more than a month. An asylum officer interviewed Eliana on November 18, 2015. But the transcript of the interview revealed clear communication difficulties because Eliana could not understand the particular dialect spoken by the Mam interpreter, who in turn spoke to a telephonic Spanish interpreter, who then communicated with the asylum officer. On multiple occasions, Eliana asked for a different interpreter and stated she did not understand the language being used, but the asylum officer responded that this was "proably [sic] as good as it gets" and forged ahead with the interview. At two points of the interview, the interpreter service was disconnected, first for twenty minutes and then for five minutes. The only child to whom the asylum officer spoke was "Jorge," Eliana's eldest child.  The officer asked Jorge only six questions, not one of which was meaningfully designed or intended to elicit evidence regarding a credible fear for a child; like his mother, Jorge understood little of what was said. Yet on the basis of that flawed interview, the asylum officer

concluded that neither Eliana nor any of her children had a fear of return.  Without allowing any attorney participation, an immigration judge affirmed that decision for the entire family.  Eliana requested reconsideration, but the Asylum Office denied that request. The family's attorneys then requested an initial interview for Eliana's daughter as well as a re-interview for Jorge, who had never been meaningfully interviewed in the first place. The Asylum Office denied those requests, too, and the family was scheduled for deportation. The family's return to danger was only stayed at the last minute after Eliana's attorneys filed a complaint with the DHS Office for Civil Rights and Civil Liberties.

- As an eleven-year-old boy, "Ricardo" found the fear determination process very intimidating. He was so nervous during his initial fear interview that his hands were sweaty and shaking and he "was crying a little bit." Since the age of five, Ricardo has suffered from memory retention problems, which prevented him from fully explaining his fear of return to the asylum officer. Throughout his childhood, Ricardo endured severe trauma. His grandfather physically abused his mother and murdered his grandmother.  On one occasion, Ricardo's grandfather locked him in the house with his mother, walked around with a machete, and threatened to kill both of them. Despite significant case law establishing that domestic violence constitutes persecution and that gangs specifically target boys Ricardo's age without male protection, the asylum officer only questioned Ricardo briefly during his mother's interview.  His subsequent request for an independent interview was denied, and Ricardo and his mother were deported the next day.

## IV. Disregarding pending and scheduled requests for reconsideration and other ongoing legal processes.

Since early November 2015, ICE has disregarded pending requests for reconsideration and other ongoing legal processes in deporting families.  Previously, when attorneys informed the Asylum Office that they were preparing requests for reconsideration on behalf of particular families, the Asylum Office would request stays of removal for those families with their ICE counterparts.  This practice changed around early November, when ICE's Office of Chief Counsel informed CARA Project staff on the ground at the Dilley facility that this "gentleman's agreement" would no longer be honored. As a result of this change in practice, several families with valid claims for protection have been deported, sometimes even after a request for reconsideration has been granted and a re-interview has been scheduled. In addition, CARA Project staff have also observed that ICE effectuates deportations regardless of other pending legal processes, including in certain instances stay requests with federal courts of appeals, of which CARA staff routinely notify ICE upon filing.

- In May 2014, three M-18 gang members attacked "Iliana" and her sisters and held them hostage for ransom in their home country of Honduras. In August 2015, the same gang members began threatening Iliana again and, on one occasion, grabbed her, held a knife to her neck, and demanded money. The gang members later appeared at her home and again threatened her if she refused to pay. Once the gang members realized that Iliana lived alone with her twelve-year-old son, they repeatedly returned to her home, threatening to kill her and her son if she did not pay. In early September 2015, Iliana fled

10

to the United States with her son. They were detained at the Karnes facility, and Iliana did not receive any legal advice prior to her initial credible fear interview on October 10, 2015. After the Asylum Office issued a negative decision on October 12, Iliana's attorneys filed a request for reconsideration, which was granted on October 29. The Asylum Office scheduled Iliana's new credible fear interview for November 3 at 8 am. However, when an attorney arrived at the Karnes facility and attempted to attend the re-interview, Iliana could not be found. Shortly thereafter, the Asylum Office confirmed that Iliana had been deported on the evening of November 2, despite having a re-interview scheduled for the following morning.

- "Yatzil" an indigenous K'iche-speaking woman, fled her home country of Guatemala after non-indigenous men from a neighboring community repeatedly targeted and threatened her. The threats began around August 2015 when a masked man came into Yatzil's store, grabbed her daughter, and threatened to kidnap her if Yatzil did not give him money. After fleeing to the United States, Yatzil and her daughter were detained at Karnes on September 28, 2015. Yatzil underwent a credible fear interview, which was conducted in Spanish, on October 8 and received a negative determination.  On October 26, CARA attorneys submitted a request for reconsideration, explaining that Yatzil's credible fear interview had been conducted in Spanish even though she is a K'iche speaker. The request explained further that Yatzil had received new information from her mother that members of the gangs who had previously threatened her had returned to their home.

  Yatzil's request for reconsideration was submitted by e-mail with attachments in excess of 10 MB. Given that the e-mail did not bounce back, her attorneys presumed it had been delivered.  Having received no acknowledgement from the Asylum Office, they resubmitted the request on October 27, and copied a specific asylum officer. The attorneys also directly contacted ICE to alert them that the request was pending.  The ICE officer who responded advised that Yatzil's deportation was imminent, and that he would continue moving forward until he heard otherwise. On October 28, the attorneys again contacted the Asylum Office to confirm that Yatzil's request had been received.  That day, for the first time, the Asylum Office advised the attorneys that their servers could not accept attachments in excess of 10 MB. Accordingly, the attorneys re-submitted the request for reconsideration for the third time in as many days, in three separate emails. Later that day, the Asylum Office advised Yatzil's attorneys that they could not adjudicate the request because Yatzil had been deported that morning. Since her return to Guatemala, Yatzil has lived in hiding, afraid to leave her house because she knows that the men who were threatening her before she left still want to kill her and her daughter.

- As a single mother, "Lillian" was targeted and repeatedly raped over a period of seven months by her former employer.  She and her thirteen-year-old daughter "Maribel" fled Guatemala after known rapists and drug traffickers began targeting Maribel.  Armed men known for raping young girls chased Maribel on two separate occasions. Lillian and Maribel's decision to seek protection in the United States was driven in part by the nearly identical recent experiences of two other girls around Maribel's age, who had been

pursued and raped. Additionally, the same men went to Lillian's home and threatened to harm her if she refused to work for their drug trafficking ring.

On November 10, 2015, an Asylum Officer interviewed Lillian and issued a negative fear determination. The asylum officer never interviewed Maribel, even though Lillian's claims focused on protecting her daughter. On November 20, the immigration judge affirmed the negative determination.  On November 24, CARA attorneys filed a request for reconsideration, which the Asylum Office denied the following day. On December 2, CARA attorneys filed another request for reconsideration based on additional information, including a declaration detailing the danger that Maribel faced. The Asylum Office denied that request the same day.

When Lillian arrived in the United States, she was suffering from an infection that required surgery, but she did not receive adequate medical attention while detained. Instead, after going to the medical clinic and complaining of her pain on three separate occasions, she was given pain medication. When ICE attempted to deport Lillian and Maribel, they were removed from the airplane due to concern that Lillian would be traveling under dangerous conditions because she did not have an adequate supply of her medication.

Despite pending claims under the Federal Torts Claim Act on behalf of Lillian and Maribel, ICE deported them on December 14, in direct violation of the agency's policy not to deport any individual with a pending civil rights claim against the government.[12] Lillian and Maribel are currently living in hiding in Guatemala. Already, in the weeks since their return, Lillian has received two letters under her door threatening to kidnap Maribel if Lillian refuses to cooperate in drug trafficking.

## V.      Transferring Represented Families Without Notice to Counsel

Shortly after October 23, the CARA Project and Human Rights First became aware that DHS was transferring families from Dilley and Karnes to Berks after they had been detained in the Texas facilities for around seventeen days. Very often, the families who were transferred had either a pending request for reconsideration or a scheduled re-interview.

On November 2, 2015, the CARA Project sent DHS and ICE Headquarters a list of nineteen client families who had been transferred from Dilley to Berks, along with six client families who had been transferred from Karnes to Berks, without any prior notice to their counsel.  Prior to these transfers, the lawyers for each of the clients had a G-28 (Notice of Appearance as Attorney or Representative) on file with the local ICE office. On November 16, the CARA Project advised ICE that the *Flores* Settlement Agreement requires *advance* notice to counsel of any transfer of a child in DHS custody.[13] Since then, the advance notice provided has often not been meaningful

---

[12] Memorandum of Understanding, Director John Morton, *Prosecutorial Discretion:  Certain Victims, Witnesses and Plaintiffs* (June 17, 2011).
[13] Flores Settlement Agreement, No. CV-85-4544 (C.D.Cal. 1997), at para. 27, https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf (last visited Dec. 22, 2015).

because ICE does not tell counsel when a family is scheduled for transfer — only that the family will at some indeterminate time in the future be transferred, making it nearly impossible for attorneys to take steps to prepare their clients.

The transfer of represented families has interfered with representation efforts by the CARA Project and caused our clients a great deal of stress.  For example:

- The CARA Project notified ICE on October 28, 2015 that one client, "Jenny," had been transferred from the Dilley facility to the Berks facility with no notice to counsel. CARA staff explained that Jenny was a particularly vulnerable client whose mental state was very fragile. In fact, on October 25, a licensed clinical social worker at Dilley had found that Jenny was suffering from Post-traumatic Stress Disorder (PTSD) with anxiety features and depression. When Jenny learned that she had received a negative credible fear determination, she ran to the bathroom, vomited, and then had a panic attack — after which she was rushed out of the legal visitation trailer on a stretcher. After an immigration judge affirmed the asylum officer's negative fear determination, Jenny had another panic attack outside the court trailer. By that point, Jenny and her children, ages six and three, had been detained for more than five weeks. Despite Jenny's submission of a request for reconsideration on October 27, she and her children were transferred to the Berks facility the following day with no warning to her or her counsel.

  Transferring Jenny away from her attorneys, with whom she had built trust through numerous meetings to prepare her case, worsened her fragile psychological state. On November 7, following her transfer to the Berks facility, a licensed clinical social worker who met with Jenny reported that she appeared highly fearful and distraught during most of the interview and had again displayed symptoms consistent with PTSD. As CARA staff have observed with many other transfers, ICE officials did not tell Jenny where she was going when they took her to the airport.  Jenny and her children were transported on a flight with a number of men and women shackled at the back of the plane. Jenny was so afraid that she refused to allow her six-year-old daughter to use the bathroom at the rear of the plane and instead diapered her for the duration of the flight.  Following her arrival at the Berks facility, her attorneys had to refile Jenny's request for reconsideration with the Newark Asylum Office and secure local counsel at the Berks facility. Jenny's request for reconsideration was ultimately granted, and her re-interview resulted in a positive determination.

- "Alejandra's" husband was killed by local MS-13 gang members in her home country of El Salvador on June 20, 2015. After her husband's murder, Alejandra had contact with the police in the course of getting papers signed for her husband's life insurance policy. Because she was seen in a police car, certain gang members assumed she was cooperating with the police and began threatening her and her children. After two months in hiding, Alejandra and her children fled to the United States.  While detained at the Karnes facility, Alejandra received a negative reasonable fear determination and her children received negative credible fear determinations. CARA attorneys filed G-28s for Alejandra and her children before their cases were reviewed by an immigration judge, who subsequently affirmed the negative determinations. On October 26, 2015,

Alejandra's attorney called her deportation officer to alert him that a request for reconsideration was being prepared.  However, only after filing the request on October 28 did Alejandra's attorney learn that she and her children had been transferred to the Berks facility.  Her attorneys received no prior notice of the transfer.

### Conclusion

The shifts in USCIS and ICE practices detailed in this letter undermine due process protections for the vulnerable population of families fleeing violence in Central America and seeking protection in the United States. These shifts underscore the reality that this Administration's experiment with family detention has failed. We hope that this letter will prompt your agencies to reconsider the implications of these practices and to immediately end the misguided policy of detaining children and their parents in Texas and Pennsylvania.

Benjamin Johnson

American Immigration Council

Jeanne Atkinson

Catholic Legal Immigration Network, Inc.

Victor D. Nieblas Pradis

American Immigration Lawyers Association

Jonathan Ryan

Refugee and Immigrant Center for Education and Legal Services

Eleanor Acer

Human Rights First

14

283

cc:

Cecilia Muñoz, Assistant to the President and Director, White House Domestic Policy Council

Alejandro Mayorkas, Deputy Secretary, Department of Homeland Security

Esther Olavarria, Senior Counselor to the Secretary of Homeland Security

Serena Hoy, Senior Counselor to the Deputy Secretary of Homeland Security

Juliet Choi, Chief of Staff, U.S. Citizenship and Immigration Services

Leonard P. Joseph, Chief of Staff, U.S. Immigration and Customs Enforcement

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On May 19, 2016, I electronically filed the following document(s): NOTICE OF MOTION AND MOTION TO ENFORCE SETTLEMENT AND FOR APPOINTMENT OF SPECIAL MASTER WITH SUPPORTING EXHIBITS with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*