1
2
3
4
5
6

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

7
8
9
10
11

ORRICK, HERRINGTON & SUTCLIFFE LLP
T. Wayne Harman (Cal. Bar No. 254089)
Elena Garcia (Cal. Bar No. 299680)
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:    (213) 629-2020
Email: wharman@orrick.com
        egarcia@orrick.com

12

*Attorneys for plaintiffs (listing continues on following page)*

13
14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

15
16
17
18
19
20
21

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>        Plaintiffs,<br>- vs -<br><br>JEH JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>        Defendants.<br>_____ | ) Case No. CV 85-4544 DMG (AGRx)<br>)<br>) PLAINTIFF'S EXHIBITS IN SUPPORT OF<br>) MOTION TO ENFORCE SETTLEMENT<br>) AND FOR APPOINTMENT OF SPECIAL<br>) MASTER [PART 2: EXHIBITS 14-18]<br>)<br>) Date:   June 17, 2016.<br>) Time:   9:30 a.m.<br>) Dept:   Courtroom 7<br>) [HON. DOLLY M. GEE] |

22
23
24
25
26
27
28

i

*Plaintiffs' counsel, continued*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:     (408) 280-2437
Facsimile:     (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org
        jamesz@lawfoundation.org
        annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*/ / /*

2016 Motion to Enforce Exhibit Index

1.  Declaration of Peter Schey                                               1

2.  Excerpts of Exhibits                                                    66

3.  Declaration of Bridget Cambria                                        103

4.  Declaration of Carol Anne Donohoe                                      114

5.  Declaration of Jacqueline Kline                                        119

6.  Declaration of Jocelyn Dyer                                            154

7.  Declaration of Natalia Ospina                                          159

8.  Declaration of Leanne Purdum                                           162

9.  Declaration of Theresa Wilkes                                          166

10. Declaration of Amanda Doroshow                                         170

11. Declaration of Ed Mccarthy                                             173

12. Declaration of Robyn Barnard w/ Exhibits                              176

13. Declaration of Karen Lucas w/ Exhibits                                212

14. Declaration of Lindsay Harris (Flores Violations)                     285

15. Declaration of Lindsay Harris (Medical Conditions) w/ Exhibits        290

16. Declaration of Lindsay Harris (Due Process)                           375

17. Declaration of Manoj Govindaiah w/ Exhibit                            385

18. Declaration of Robert Doggett w/Exhibis                               409

19. Declaration of Alex Mensing w/ Exhibits                               557

20. CBP Memorandum. Hold Rooms and Short Term Custody. June 2, 2008        810

21. Declaration of Victor Rxxxxx xxxxxxx                                   826

22. Declaration of Walter Axxxxxxxx xxxxxxxxx                              830

23. Declaration of Yeslin Lxxxx xxxxxxx                                    834

24. Declaration of Sara  Exxxxxxxx xxxxx                                837

25. Declaration of Mirna Mxxxxxx xxxxx                                840

26. Declaration of Raquel Axxxxxx xxxxxx                              843

27. Declaration of Yessenia Exxxxxxxx xxxxxxx                         846

28. Declaration of Celina Sxxxxxx-xxxx                                849

29. Declaration of Cesia Vxxxxxxxxx-xxxx                              854

30. Declaration of Isamar Sxxxxxx xxxxxx                              858

31. Declaration of Kelly Gxxxxxxxx-xxxxx                              864

32. Declaration of Maria Dxxxx xxxxxxx                                868

33. Declaration of Lindsey Gxxxx xxxxx                                872

34. Declaration of Katerin Yxxxxxxx xxxxxxx                           877

35. Declaration of Sonia Axxxxx-xxxxxx                                881

36. Declaration of Kenia  Yxxxxx xxxxxxx                              884

37. Declaration of Bianca Cxxxxxxxx xxxxx                             888

38. Declaration of Astrid Dominguez                                  892

39. Declaration of Karen Zxxxxx xxxxxxx                               895

40. Declaration of Allison Mxxxx xxxxx                                898

41. Declaration of Benina Cxxxxx xxxxx                                903

42. Declaration of Evelin Jxxxxx xxxxxxxx                             907

43. Declaration of Diana Cxxxxx xxxxx                                 912

44. Declaration of Amarilis Lxxxxxx xxxxx                             915

45. Declaration of Franklin Rxxxx xxxxxxxx                            918

46. Declaration of Herson Lxxxxxx xxxxx                               922

47. Declaration of Vilma Sxxxx xx xxxx                                925

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

48. Declaration of Leny Axxxxx xxxxxx                                    929

49. Declaration of Edgardo Dxxxxx xxxxxxxx                               932

50. Declaration of Flember Jxxx xxxxxxxxxx                               935

51. Declaration of Karen Lxxxxxx xxxxxxxx                                938

52. Declaration of Madelyn Mxxxxxxx-xxxxx                                941

53. Declaration of Faustino Cxxx                                        944

54. Declaration of Fanny Exxxxxxxx xxxxxxxxx                             947

55. Declaration of Josselyn Mxxxxx xxxxxx                                950

56. Declaration of Silvia Vxxxxxx xxxx                                   955

57. Declaration of Yesenia Yxxxx xxxxx                                   959

58. Declaration of Eloisa Rxxxxx xxxxxx                                  962

59. Declaration of Melvin Mxxxxxx xxxxx                                  966

60. Pennsylvania Dept. of Human Services letter to Berks County dated

    January 27, 2016                                                    969

61. Declaration of Dr. Luis Zayas                                       972

62. Declaration of Jessica Gorelick                                     1005

63. CARA letter to CRCL and OIG dated March 28, 2016                    1010

64. Declaration of Amy Camila Colon                                     1027

65. Declaration of Jodi Goodwin                                         1030

66. Declaration of Michelle Garza Pareja                                1035

67. Declaration of Amy Fisher                                           1044

68. Declaration of Karen Lucas                                          1048

69. Declaration of Katie Shephard                                       1052

# Exhibit 14
## Publicly Filed

### Declaration of Lindsay M. Harris, Esq.

1. I am an attorney admitted to practice law in the state of California. I earned my J.D. from the University of California, Berkeley School of Law (Boalt Hall) and my L.L.M. in Advocacy from Georgetown University Law Center. My practice has focused on representing individuals fleeing gender-based and other harm overseas and seeking protection in the United States.

2. I am currently a Legal Fellow with the American Immigration Council in Washington D.C. My business address is 1331 G Street NW, Washington DC 20003. The focus of my fellowship is family detention and I work to support the on the ground staff with the CARA Family Detention Pro Bono Project working at the detention facilities in Dilley and Karnes City, Texas. Previously, I supervised students representing detained and non-detained asylum seekers seeking relief in immigration court at Georgetown University Law Center's asylum clinic. Prior to that, I was a staff attorney and Equal Justice Works fellow at the Tahirih Justice Center, representing women and girls fleeing gender-based violence and seeking protection in the United States. Immediately after graduating from law school, I completed a clerkship on the Ninth Circuit where I focused primarily on immigration and asylum appeals.

3. During the week of October 26, 2015, I traveled to Dilley, Texas to assist in representation efforts through the CARA Project for families detained at the South Texas Family Residential Center (STFRC). I also receive ongoing reports from volunteers and paid staff attorneys working with the CARA Project representing *Flores* class members and their mothers detained at Dilley and Karnes. This declaration is based upon my visit to Dilley in late October 2015, and the initial paragraphs below describe my experiences during that visit. The declaration is also based on my daily engagement in advocacy and legal efforts on behalf of individual families and detained families as a whole and the daily contact and routine reports I receive on a weekly basis from attorneys representing *Flores* class members and their mothers at Dilley, Karnes, and Berks.

4. I write to share the experiences of some of the clients I represented that week. To protect the identities of these clients, I am sharing only the country of origin and ages of the children. As detailed below, my knowledge of these families and their legal cases is based on my advocacy and representation efforts on their behalf.

   a. A six-year-old boy from El Salvador and his mother who fled their country after a gang member targeted them. This family was apprehended when they entered the United States on September 5, 2015. By the time I met with them to prepare for a court hearing on October 26, 2015, the family had been detained for more than seven weeks. The credible fear interview for the mother occurred on September 22, 2015 and resulted in a negative determination. Despite advocacy with the local ICE office by CARA Project attorneys Brian Hoffman and Isabel Saavedra, the immigration judge review of the negative decision was not scheduled until October 27, 2015. The immigration judge affirmed the negative determination. In doing so, he refused to consider the motion I had filed seeking to vacate the

negative determination on the basis the decision should be vacated due to the extreme delay in the immigration judge's review of the credible fear finding. Under the regulations, review of a negative credible fear determination should take place within 24 hours, or seven days at the longest. The failure of the asylum office and ICE to refer this case to court for review for more than a month was egregious delay that I argued warranted vacatur. Following the immigration judge review, the mother met with a CARA Project volunteer attorney to prepare a detailed declaration in support of a request to re-interview by the asylum office. However, before we could file the request for re-interview, these clients were abruptly transferred to the family detention facility in Berks County, Pennsylvania on October 31, 2015 – four days after the immigration judge review. Counsel was notified of the transfer only *after* the family had been transferred. Unfortunately, this family remains detained at the Berks detention center today. I visited Berks in February 2016 and it was heartbreaking to see this little boy and his mother, still detained in a secure detention center after eight months.

b.  A nine-year-old girl from Peru and her mother, who were detained by ICE on September 25, 2015. This family had been held at Dilley for more than a month when I first met with them to prepare for the immigration judge review of the asylum office's negative determination in the mother's case. I represented the family in court on October 27, 2015, and the immigration judge vacated the asylum office's negative determination, finding that the mother had established a significant possibility of success on her asylum claim. This client was still in detention on October 28, 2015, when I left Dilley. CARA Project staff never received notification of her release, despite having a G-28 Notice of Appearance as Attorney on file, but — as of November 8 ‾ the ICE online detainee locator system indicated that she was no longer in custody.

c.  Thirteen-year-old and ten-year-old brothers from El Salvador and their mother, all of whom had been targeted by gangs. The boys told me that, before arriving at Dilley, they had been detained by Customs and Border Protection (CBP), known as "hieleras" (ice boxes) because of extremely cold temperatures in these facilities and then in a "perrera" (dog house). The families I interacted with used these terms to refer to short-term holding facilities operated by CBP – the hielera was so named because of the cold indoor temperature and the perrera derived its name from the cage like rooms in a warehouse separated by chain-link fencing. These two boys reported to me that they were separated from their mother in the hielera, which was very cold. Although the younger boy got sick, he did not receive any medical assistance. The boys slept on the floor for two days and two nights. During the second night, at 1am, they were transferred to the perrera. The family had difficulty communicating with CBP officials, who did not seem to speak Spanish fluently. The mother received only frozen bread to eat, and the boys received bread and ham three or four times during their few days in CBP custody. The boys found it difficult to sleep in the hielera because the lights were on all night, they were cold, and they were separated from their mother. This family was held by the Department of Homeland Security from October 22 to October 31, but

found their time in detention very distressing. They were released and reunified with family in Houston after the mother passed her credible fear interview.

d.  A nine-year-old girl and her eleven-year-old brother from El Salvador detained with their mother at Dilley. DHS first detained this family on October 7, 2015. By the time I met with the mother on October 28, 2015, to assist in preparing the mother's request for re-interview, the family had been detained for more than twenty days. The boy suffered from a seizure disorder, had memory problems, and was very nervous during his credible fear interview. The results for the family of the requests for re-interview for the mother and the son were all negative. In the past, as recently as early November 2015, a family in this situation would have been able to seek review of the asylum officer's negative determination by an immigration judge. In this case, however, ICE did not file the required paperwork with the court. Although CARA Project attorneys filed a motion requesting that the court review of the decisions, the immigration judge denied that motion. The family was deported on November 17, 2015, after being detained for more than six weeks.

5.  As a result of my work with the CARA Pro Bono Project, I am aware of many more cases of families held in immigration detention centers who were not released "without unnecessary delay." Indeed, during my February 2016 visit to the Berks County Family Residential Center, all of the families with whom I met had been detained for more than four months. I submit this declaration simply to share my personal experiences interacting with and representing the four families referenced above.

6.  As an attorney with extensive experience handling gender-based asylum cases, I felt uncomfortable having to determine within minutes of meeting a client the particular social group to which she belonged for purposes of her asylum claim.

7.  In my prior positions with the Tahirih Justice Center, where I maintained a caseload of approximately 60-80 survivors of gender-based violence, most of whom were seeking asylum or other protection in the United States, and Georgetown University Law Center's clinical program, where I supervised students on similar cases, crafting the particular social group and establishing the nexus of the persecution she fears to that protected ground under our asylum laws was often the very last piece of the legal case to come together. This penultimate moment of case preparation often happens after painstaking hours of client interviewing, declaration drafting, soliciting statements from family members and witnesses, thorough research on country conditions, and consultation with experts on the client's country of origin.

8.  Working with survivors of domestic violence, rape, and other trauma requires patience and often a long process of helping a survivor realize that the harm perpetrated against her was not her fault. I recall working with one survivor of extreme domestic violence for twenty-seven client interviews of two to three hours each before I understood her full story and before she could articulate what her abusive spouse had done and why. I am certain that this woman, a true survivor of gender-based persecution who was later

granted asylum, would not have received a positive credible fear determination at Dilley and would have been wrongfully deported, likely to her death in her home country.

9. Based on my remote work supporting on the ground staff with the CARA Project at Dilley, as well as the time I spent working in the facility myself in late October, I believe that the quality of asylum case preparation and presentation is severely undermined by the clients' placement in detention. Attorneys and advocates are not able to meet with clients for long periods of time or with adequate time for clients and attorneys to recover between stressful and highly emotionally charged meetings. Clients are not able to speak freely about their experiences and trauma because of their fear and stress from the detention placement. If these clients were not placed in detention, they could work more closely with their attorneys in preparing their asylum cases, gathering documents and testimony, and ultimately securing protection in the United States.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Lindsay M. Harris, Esq.

5-5-2016

Date

289

# Exhibit 15
## Publicly Filed

## DECLARATION OF LINDSAY M. HARRIS

I, Lindsay M. Harris, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney licensed and admitted to the California bar in December 2009. Following a Ninth Circuit clerkship, I represented women and girls fleeing gender-based violence at the Tahirih Justice Center in Falls Church, VA. I also developed and taught a course in Refugee and Asylum Law at George Mason University School of Law. From 2013-2015, I supervised students enrolled in a clinical program at Georgetown University Law Center representing detained and non-detained asylum seekers in immigration court proceedings.

2. I am currently a Legal Fellow with the American Immigration Council ("Council"). The Council is one of four partner organizations that comprise the CARA Family Detention Pro Bono Project (CARA),[1] which provides pro bono representation to mothers and children held at the South Texas Family Residential Center in Dilley, Texas ("Dilley facility"). The Council supports our on-the-ground staff and partners by assisting in identifying and resolving individual and systemic challenges faced by mothers and children in family detention, including problems related to access to counsel and conditions of detention.

3. The CARA Project is currently staffed on the ground in Dilley by two attorneys funded by the Catholic Legal Immigration Network ("CLINIC"), Inc., along with a Project Coordinator and Project Consultant funded by the Council. Each week, the American Immigration Lawyers Association recruits seven to fifteen volunteer attorneys, paralegals, interpreters, and law students to assist our on-the-ground staff from Sunday to Friday. Together, the CARA staff and volunteers see up to 140 mothers on a daily basis and assist in preparing them for, and often representing them in, credible and reasonable fear interviews, bond hearings, and immigration judge reviews of negative credible and reasonable fear determinations, and requests for reinterview as necessary..

4. I previously submitted a declaration in this litigation in August 2015 regarding medical conditions in family detention facilities. I submit this declaration to provide updated information regarding the medical conditions observed by CARA Project staff and volunteers at the Dilley facility and to explain the process of compiling information for the second complaint filed by all

---

[1] The CARA partners are the Catholic Legal Immigration Network, Inc., the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association.

four CARA partners with the Department of Homeland Security's (DHS) Office of Civil Rights and Civil Liberties (CRCL) and the DHS Office of the Inspector General (OIG) on October 6, 2015. This complaint, attached as Exhibit A hereto, concerned the failure of Immigration and Customs Enforcement (ICE) to provide adequate medical care to mothers and children held at the Dilley facility.

5. CARA's work on behalf of mothers and children detained in Texas has consistently revealed that children and their mothers are not receiving adequate medical care. Unfortunately, troubling trends that we documented in our July 30, 2015 complaint, previously submitted to this court, persist. These trends include failure to provide complete information to mothers and their children about medical treatment they receive; wait times of four to eight hours to receive medical attention for time-sensitive medical needs; a lack of appropriate follow up treatment, and the unavailability of specialist care. Our staff and volunteers have also observed additional problems, including: routine requests by medical staff at the facility that mothers sign forms saying that they have refused medical care if they leave the medical clinic temporarily, even after waiting many hours to be seen; failure to treat pre-existing conditions, including anemia, vision problems, chronic pain from gun-shot wounds, and high-blood pressure; and unavailability of doctors, who are not on site or available in the evenings or during lunch.

6. As a result, the CARA Project again determined it was necessary to bring these disturbing trends to the attention of CRCL and OIG. We filed the attached cover letter and complaints with CRCL and OIG on October 6, 2015. For confidentiality reasons, we used pseudonyms in the publicly available version of the complaint. Names and alien numbers were included in the version of the complaint that we sent to CRCL and OIG, which is otherwise identical to the version attached as Exhibit A.

7. The October 6, 2015 complaint compiled individual complaints filed electronically on behalf of eight families with CRCL and OIG between July 31 and September 15, 2015. These complaints are detailed in bullet points in the first two pages of the cover letter to the October 6, 2015 complaint. The names and alien numbers for these individual families were submitted to CRCL and OIG when the complaints were originally filed.

8. The October 6, 2015 complaint also included declarations from fourteen additional mothers each of whom asserted inadequate medical care in some form for themselves or their children. CARA

Project staff and volunteers collected these sworn declarations from mothers detained at the Dilley facility between September 16 and October 5, 2015.

9. The trends described in our October 6, 2015 have continued up to and after the October 23, 2015 deadline for the government to comply with the court's August 21, 2015 order.

10. To provide the court with an updated picture of some of the troubling instances of inadequate medical care at the Dilley facility, sworn declarations from thirteen mothers documenting problems they or their children experienced are summarized below and attached as exhibits. These declarations, which are redacted for confidentiality purposes, describe the following situations that occurred prior to the Flores compliance deadline on October 23, 2015:

   a. A ten-year-old child who had a fever for twelve days who repeatedly sought medical care at the Dilley clinic. When his mother took her son a third time for treatment his ear was swollen and the staff person at the clinic advised that he should take ibuprofen and drink more water. The child eventually experienced liquid pus coming out of his ear. When he suffered with the same ailment in El Salvador, doctors successfully treated the ear infection with antibiotics. Ex. A.

   b. A four-year-old child who had to visit the medical clinic at Dilley seven times, with wait times sometimes as long as five hours, for a doctor to prescribe the necessary antibiotics, allergy medication, and eye medicine to treat her sore throat, irritated eyes, cough, and fever. Ex. B.

   c. A child with chronic stomach pain due to a hernia who did not receive any investigation into this condition. His mother informed medical professionals at Dilley about his hernia and the doctor told the mother he would get back to her about the hernia. She received no follow-up information or communication from the medical clinic. Ex. C.

   d. A mother whose allergy medication was confiscated from her when she entered into the custody of Customs and Border Protection. Although she received medication while detained at Dilley, it did not relieve the symptoms manifested on her face, including swelling, redness, and a burning sensation. Ex. D.

   e. A three-year-old girl who fell from the top bunk, temporarily immobilizing an arm and a leg, did not receive any medical attention for three hours. Ex. E.

   f. A mother whose medication for anemia and a kidney condition was taken away when she entered the facility at Dilley. Doctors performed an independent medical examination to

verify the diagnosis of these conditions.  Eight days later, she had not received any test results or medication for her ongoing symptoms, including a chronic cough that caused pain in her kidney. Ex. F.

g.  A five-year-old boy with cold symptoms who waited from eight o'clock in the morning until three in the afternoon to see a doctor at Dilley and was then told to come back the next day. The following day the boy and his mother again waited for three or four hours, only to be told to drink more water. Ex. J at ¶ 7. The boy's mother had also suffered for five days at Dilley with bleeding from her mouth and nose before receiving medication. *Id.*

h.  A six-year-old boy who went to the doctor at Dilley because he was vomiting and although the doctor said he had a fever, he was only told to drink water and not even given anything to reduce the fever. Ex. L at ¶ 9. His mother reported waiting at least four hours to see a doctor and being told, again, just to have her son drink water. *Id.*

i.  A mother detained at Dilley who reported being sick, with stomach problems, for two days before she was seen by a doctor. She described the medical care as "terrible" and reported many children sick with fevers just told by medical personnel to drink more water. Ex. M at ¶4.

j.  Twin eleven-year-old girls detained at Dilley for a month and a half, and now Berks, whose mother reported that the girls suffered from constant diarrhea, stomachaches, and fevers. The family waited for more than four hours to see the doctor and, after the wait, the doctor gave no medicine to reduce the fevers. Instead, medical personnel advised the girls to drink water that tasted of chlorine. Dec. N at ¶ 8.

11. The following situations arose after the October 23, 2015 deadline to comply with the most recent order in the *Flores* case. These are just a few of the concerning medical situations that have arisen following the deadline, in the month following the deadline, but unfortunately CARA Project staff at Dilley and Karnes continue to see troubling inadequate medical care. We have repeatedly asked ICE Headquarters in DC for a detailed breakdown of the staffing in the detention centers, but have yet to receive a response.

a.  A mother who suffered from severe asthma but was not permitted to keep an inhaler with her in the Dilley facility until after she had experienced several asthma attacks and

received oxygen for three or four hours. She constantly worried that her asthmatic eight-year-old son would experience similar symptoms. Ex. G.

b. A four-year-old boy who suffers from asthma and a kidney condition for which he requires medication every six hours. This child was denied medical care while in the custody of Customs and Border Protection (CBP) prior to being transferred to Dilley and did not receive the necessary medications for his kidney conditions from November 6 to November 11. A doctor told the mother that they would try to get the son to a specialist in San Antonio, but could make no guarantees. Ex. H.

c. A two-year-old boy with a cast on his fractured arm that was due to be removed on November 9, 2015, by a doctor in El Salvador. Although the boy and his mother saw doctors at Dilley a total of five times and repeatedly alerted doctors that the cast should be removed. On one occasion when the mother raised her concern about the cast, a doctor was simply unresponsive. On another occasion, on November 12, a doctor asked when the mother would receive a decision on her immigration case. The mother was made to feel that getting an appointment for her son's cast to be removed was dependent on the results of her credible fear interview. The cast was not removed until November 19, 2015, after attorneys from the CARA Project intervened and brought the case to the attention of ICE officials. Ex. I.

d. A five-year-old boy transferred from Karnes to Berks who was vaccinated for varicella (chicken pox) at the Berks facility, despite being vaccinated as an infant. Ex. K at ¶ 19. He developed chicken pox two days after the vaccination and he and his mother were held in medical isolation for a week. *Id.* The mother describes how her son seems depressed, has stopped playing with other children, has become quiet, wants to go and says that he is in prison. *Id.* at ¶23.

12. We have received little response to the complaints raised with CRCL and OIG regarding medical treatment for immigrant families held in detention. On August 11, 2015, the Office of Inspector General sent a letter in response to our July 30, 2015, complaint, advising that the U.S. Government Accountability Office was "currently reviewing medical care at detention facilities and the results of this review are scheduled to be released in mid-November of this year." Ex. V

(OIG August 11, 2015, letter). The OIG letter requested permission to send our July 30 complaint to GAO for their review. On August 28, 2015, we responded to OIG and gave written permission for the complaints to be shared with GAO. *See* Ex. W. As of December 2, 2015, GAO has not issued a report on medical care at detention facilities.[2]

13. At a meeting with CRCL on September 30, 2015, CRCL staff advised that they were looking into the July 30, 2015, medical complaint and were unsure whether they were going to open a complaint.

14. As of May 5, 2016, we have received no response from either OIG or CRCL to the October 6, 2015 complaint we filed regarding inadequate medical care for families detained at the South Texas Family Residential Center in Dilley, Texas.

Executed this 5th day of May, 2016

_5·5·2016_

Lindsay M. Harris, Esq.
American Immigration Council
1331 G Street NW, Suite 200
Washington DC, 20005
202-507-7511
lharris@immcouncil.org

---

[2] *See* http://www.gao.gov/browse/date/sixmonths (last visited Dec. 2, 2015).

# Attachment to Exhibit 15
# Exhibit A

I, ████████████████████████████ fled my country of origin. El Salvador, with my son ████████████████████████ 10 years old ██████████████, to seek asylum from the United States of America.

I arrived on September 8, 2015 to the South Texas Residential Facility in Dilley, Texas. I live in the residential area known as the Brown Bear at the facility.

My son ██████ has had a fever since Thursday, September 24th. I went to the clinic the first day he had a fever and they gave him a 3 day treatment of liquid ibuprofen. It did not help his fever.

The following Monday I went back and they told me that he might have a virus and that they did not have the treatment for it so they gave him ibuprofen again for 2 days.

On Saturday, October 3rd, his ear began aching. I took him to the clinic and they gave him ibuprofen again, in pill form this time. The medical personnel told me it was a virus, not an infection.

██████'s ear is now very swollen because of the virus. The person at the clinic said it should go away with more ibuprofen and if he drinks lots of water.

Now it is Monday, October 5th, and he still has an ear ache and this morning a yellow liquid came out of his ear. One time something like this happened to him back in El Salvador, but they gave him antibiotics and it went away.

"I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection, followed by the date and signature.

████████████████████████    10/5/15
                              Date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to me in Spanish.

Alex Mensing                  10/5/15
CARA Volunteer                Date

# Attachment to Exhibit 15
# Exhibit B



Declaration of ███████████ (A ████████████

I, ████████████████ ██████████ fled El Salvador with my daughter ███████
██████████ (DOB ██████████) to seek asylum in the United States of America. We were detained
on September 25th, 2015 and are currently being held at the South Texas Family Residential Center in
Dilley, Texas.

On September 28th, the day we arrived in Dilley, my daughter was healthy and was given a medical
checkup.

After five days here, on about October 2nd, my daughter began to get sick. Her eyes were irritated, her
throat hurt, she had a cough and a fever. I thought, though, that they only did a checkup. I didn't know I
could go to the clinic here.

The other women told me I could go to the clinic, but that they would not give me medicine. But I went
on October 9th anyways because she had a very high fever. They gave her ice to eat and on her head and
gave her a tylenol.

Her fever got worse again later that day so I went back to the clinic. I waited five hours for them to see
us, and meanwhile I tried to bring her fever down by dabbing her forehead with a moist towel. By the
time a nurse saw her, the fever was a bit lower and they told me that there was nothing wrong with her,
but they told me they had given me an appointment.

So on the 10th I waited from noon until 6pm for them to see us. They took her temperature, her pressure
and her weight and told me they were not seeing any patients any more so I could come back the next
day if I wanted to.

I was very upset, so I didn't go. They came to see me but I didn't go because they had done nothing. I
filed a report with a woman with a blue uniform and orange letters to complain about the lack of
medical service.

A couple days later someone who I think was an immigration official asked if I had filed the report and
recorded the details of what had happened. She told me that if I went to the clinic again and they did
not see me I should speak to a supervisor or anyone with a blue uniform.

But my daughter got worse. She had fever every night. It seems like she had an infection in her eyes.
Her throat didn't hurt any more but her head hurt and she still had a cough. So I went back on the 13th
or 14th and waited for three hours. I told them I was going to leave, and then they saw us. They gave her
three days of tylenol.

On Saturday the 17th she had a very bad fever. I took her to the blue clinic at about 1:30pm just as the
doctor was leaving and said that she would not be seeing anyone else, that I could go back at 4:30. I
took her at about 6pm because she had fever again. They told me that they weren't seeing anyone
anymore there and that I should go to a different clinic.

I was fed up so I didn't want to go. An official who had seen my daughter crying in our room saw us
and said I should take her to the clinic. He offered to take us to the clinic. They took my ID and said
they would see me. I dabbed her forehead with moist towels again and by the time they saw me her
temperature was normal, so the nurse didn't give her anything except two small packets of honey for

the cough.

That visit on Saturday October 17th, while we were talking through an interpreter, whose name is Gloria, the interpreter got upset with me and told me only to answer what the nurse asked me. She said what I was saying was not what the nurse was asking me. So I began to answer only yes or no. She said they would make an appointment for me for the next day for a doctor to see my daughter.

Sunday the 18th I went at 10am which was when my appointment was. After twenty or thirty minutes the nurse took her weight, pressure and temperature and then said I had to go to another clinic in order to see a doctor. So I went to the other clinic. But it turned out that there was only a nurse there, not a doctor. I said I needed to see a doctor because I had seen lots of nurses and they all tell me the same thing. The nurse called me in and said only she was there. I was upset at this point and said that they had sent me from clinic to clinic, I had been to all of them, and that if she was going to see me that she do it and if not I was going to go. I am tired of my daughter being sick every night and getting up and needing water and having fever, and that the nurses don't give her anything.

So she asked if we had eaten. It was about noon. I said that not yet, and she asked if my daughter had been eating. I told her she had eaten almost nothing for four days. She said to go have her eat a bit and to come back at 2pm and she would see me.

I went back at 2pm and she saw us. She was very nice and gave my daughter ibuprofen and saline solution. She also made another appointment for me to see a doctor today at 10am.

Today, October 19th, I went to the doctor and gave her an antibiotic, an allergy medicine, an eye medicine and something for her nose.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.



_____            10/19/15
                                   Date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to me in Spanish.

Abx Mensing            10/19/15
CARA Volunteer         Date

301

# Attachment to Exhibit 15
# Exhibit C

Declaration of  A#

- On what I believe was September 30th (though it may not have been that exact day) I went to the doctor because my son was sick with a fever and an infection. Also my son had been told in Guatemala that he had a hernia and some related complications that required an operation, but I did not have the resources to have this done. He has chronic stomach pain and also in other parts of his body, I believe because of this problem.
- I told the doctor about the fever and infection, and also that my son was in need of treatment for a hernia or related issue. The doctor said he would get back to me about the hernia, but that my son did not have a fever and was fine. As his mother it was very obvious to me my son is sick so I told the doctor no that my son is definitely sick and needs help.
- Finally the doctor agreed to give my son medicine, and thank God after taking the medicine for six days the fever and infection are gone.
- However, the doctor never did tell me anything more about the hernia and no one from the medical office has followed up with me about that. I believe that my son at least deserves to have this problem investigated and if the doctor agrees that more treatment is needed my son should be allowed to see a specialist or go to a hospital.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

10/07/2015
Date

I certify that I am proficient in the English and Spanish languages and that foregoing was read to
in Spanish.

David Mullins

10/07/2015
Date

303

# Attachment to Exhibit 15
# Exhibit D

## AFFIDAVIT

My name is ███████████████████ I am a citizen of El Salvador. I entered the United States on October 12, 2015. My Alien number is ███████ My date of birth is ██████████ I was admitted to the South Texas Family Residential Center on Wednesday, October 14, 2015.  At the time I entered the US I had in one of my pockets a little bottle that contained the medication I was using to treat an allergy condition on my face. Soon after entering the US, an Immigration Officer ordered me to take all my personal items and put them inside a plastic bag. At the time, I tried to explain to the Immigration Officers the reasons why I needed to keep using the medication (topical lotion) in order to treat the allergy on my skin. The Immigration Officer dismissed all of my demands, and took away my allergy medication. On Wednesday, October 14th of this year, I explained to a CCA staff that I was having issues with my allergy and that my face was swollen and that I was experiencing burning sensation on my face. The CCA staff referred me to the medical center and I was giving some pink liquid medication to treat my symptoms. The medication that was given to me on 10/14 has not have any effect on me and to this date, I am still experiencing redness and burning sensation on my face. I am in desperate need to retrieve the prescription medication I had on me at the time of entering the US.

███████████████████████████

CERTIFICATE OF TRANSLATION

I certify that I, MARTHA E. ARISTIZABAL, am proficient in the English and Spanish languages and that the foregoing was read to me in Spanish.

Martha E. ARISTIZABAL

# Attachment to Exhibit 15
# Exhibit E

## Medical Affidavit of ███████████

I, ███████████ declare under penalty of perjury under the laws of the United States that the following statements are true and correct to the best of my knowledge and recollection:

1. My name is ███████████ (A# ███████ and I was born on ███████ in ███████ El Salvador.

2. Currently, I am detained at the South Texas Family Residential Center in Dilley, Texas with my daughter ███████████ (A# ███████

3. On October 8, 2015 around 9:00 p.m., my three years old daughter fell from the top bunk hurting her right arm and leg.

4. I urged an officer to escort me to the medical facility. I checked in with one of the CCA officers and told him what had happened. He proceeded to tell me to wait while seated.

5. **I waited for three (3) hours without any type of medical assistance or triage intervention or assessment.**

6. I was very scared because my daughter was not able to move her arm or leg.

7. While I was there, another resident wanted to leave because she had been waiting too long because without getting any medical help. I overheard when one of employees informed the lady that if she wanted to leave she had so to sign a document attesting that she refused to get medical assistance.

This affidavit was read to me in Spanish and it is a true statement of what I have said.



I, Ana Camila Colón, certify that I am proficient in the English and Spanish languages and that the foregoing text was read to ███████████ in Spanish. I further certify that the English translation of the Spanish statement, to the best of my abilities, to be true and accurate.

*Ana Camila Colón*

Ana Camila Colón

10 / 26 / 15

307

# Attachment to Exhibit 15
# Exhibit F

AFFIDAVIT

1. My name is ███████████████ I am from Honduras. I have one child, ████████ who is with me today ████████ is eight years old. We were first detained by immigration officials in the United States on September 27, 2015.

2. My daughter had a medical exam on the first that that we arrived in Dilley, on Sunday, but they only checked her vision and her cough—they did not do a full medical exam. I did not have a medical exam until Tuesday, two days after I arrived. When I first arrived, I told them about my medical condition, but they took away my medication and made me wait for an exam. They first gave me an appointment for first thing in the morning at 6 a.m. on Monday, but when I got there they told me to come back at 7 p.m. that same day. When I went back, they told me the doctor had left for the day, and that I had to come back at 6 a.m. on Tuesday.

3. My doctor in my country diagnosed me with a serious anemia, and a problem with my right kidney. My right kidney has fallen from it's proper place, closer to my lower back. This means that if I cough a lot or if I move a lot, my kidney hurts me a lot. My doctor in my country had given me medication to protect the kidney from harm and to prevent infection because it is more susceptible to harm.

4. When I first arrived, I had medication with me that my doctor in my home country had prescribed. She had told me that this medication was necessary for my live, and to ensure my wellbeing. When I was detained, they took away my medication, even though I told them that I needed the medication. I was told I needed a medical exam first.

5. During my medical exam, I believe that I was meeting with a doctor. I had to speak with him through a telephone interpreter. I told the doctor about my condition and explained that I needed my medication. I told him that I had documents with me explaining my condition and the medication that I needed, and but the doctor never gave me the opportunity to show him the proof. I was told by the doctor that regardless of the documents, they needed to do their own tests to see if I have the medical condition that I'm claiming, and in order to get the medication that I need. I did not feel like I understood what was going on. They did not explain to me whether they're going to give me the treatment I need, or how long I'd have to wait.

309

6. It has been eight days since I had the medical exam, and I still don't know the results. Eight days later I still don't have the medication that I need for my serious condition. I feel weak because of my anemia, and my kidney hurts me a lot. I also have a cough, and it hurts my kidney when I cough. I know my body, and I know that I'm not well and I need my medication. I have not gone back to the clinic because they told me that they would let me know when to return.

7. I feel that I haven't received any care here. All I had with the interview, but they haven't actually done anything for my health. I feel bad because I really need this care. It bothers me that I can't have my medication, even when I have the proof of my condition.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

10/7/15
date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to me in Spanish.

Lindsey Kaley                              10/7/15
                                           date

310

# Attachment to Exhibit 15
# Exhibit G

### Medical Affidavit of 

I, ████████████████ declare under penalty of perjury that the following is true to the best of my recollection and knowledge, and that the following statement has been read to me in the Spanish language:

1. My name is ████████████████ (A# ████████). I was born on ████████████ in Honduras.

2. I arrived at the South Texas Family Residential Center on November 6, 2015 along with my two children: ████████████ (11 years old) ████████████ (8 years old).

3. I have suffered from severe asthma since I was five (5) years old. When I first arrived at this detention center I told the doctor my son and I both suffer from asthma.

4. Since **Saturday, November 14th** I felt sick. At first, I figured I just had a cold. The next day I started to have pain in my chest. Sunday night, around 8:00pm, I went to the clinic for help because I could tell the pain in my chest was a bad sign and I was having difficulty breathing.

5. When I got to the clinic, the nurse asked me why I had waited to come at night because there are no doctors at night. I told her that I was not aware that they didn't have doctors available at night and explained that I was suffering from pain in my chest and am having trouble breathing. The nurse gave me two pills for the pain in my chest. I think they gave me Tylenol.

6. I told the nurse I need an inhaler. I explained to her that this has happened to me before and that I have asthma attack. They told me that they cannot give me the inhaler unless I talk to the doctor. They gave me an appointment to see the doctor on **Monday** November 16th at 2:00 pm.

7. On Monday I came back to the clinic for my appointment at 2:00 pm. The doctor did a check up and asked me questions. I told him that I had asthma and what was happening to me and that I had a lot pain in my throat. He checked my lungs and noticed something was wrong. They took me to a room to put a mask on me to help me breath. After using the mask the doctor came back and prescribed medicine. They let me use the inhaler, but said that I would have to come to the pharmacy to use it. MI would have to come back in

the morning and afternoon as I needed it. I insisted that I need it with me because I know my case, but he wouldn't let me keep it with me. He wouldn't give me a reason why.

8. Tuesday and Wednesday I was able to go the clinic to take my medication. However, the pain in my chest never went away and I was still having problems breathing. I told them every time I came to the clinic. Every time I asked to keep the inhaler. They still would not let me keep it.

9. **Wednesday**, November 18th night I was not feeling well. I went to sleep and around 11:30pm I woke up because I couldn't breathe. I ran out of the room to seek help. I went out to the hall way, checked the laundry room and the game room and could not find anyone. I was very desperate since I could not breath. After this, I found an officer that **didn't** speak Spanish and could not understand that this was an emergency. Finally, another officer came along and took me to the clinic.

10. My children had to stay at the room because they were sleeping. I was very worried because my younger son also suffers from asthma and was sick and was using his inhaler.

11. Once at the clinic, I finally had access to the inhaler.

12. They asked me why I didn't keep the inhaler with me. I told them that I asked to keep it with me but my request had been denied and told that I had to keep it here. They asked me why they wouldn't let me bring the inhaler with me and I said I did not know.

13. After a few minutes in the clinic I think my lungs went into shock and things got worse. I started to turn purple in the face and could not breathe. I couldn't see the people around me. All I could see was the white light. I was taken to the machine to help me breath and someone ran to find oxygen to put in my nose. I was with the oxygen for three (3) or four hours.

14. During these three (3) hours while I was trying to breath I was worried for my children. Every breath I took I took it for them.

15. Once they thought my breathing was more stable they let me leave and finally gave me my inhaler to keep with me. I did not sleep at all that night. I thought I was going to die and all I could think about were my children.  My son has asthma too and I'm petrified if this were to happen to him while we are here.

16. On **Thursday**, November 19th, 2015 I went back to the medical facility because I still do not feel good and feel like I am still having problems breathing. To me surprise, there was no record of my respiratory failure that I suffered just the day before.

17. I was not given the attention I need. I still feel like I have not been given the treatment I need and that I will continue to have problems breathing.

18. I have been dealing with my asthma problem since the age of five. I know when my body is in danger of shutting down because I can't breathe. That is what happened to me and I'm afraid it will happen again soon because I still am having problems.

19. In my country when that happens they give me an IV and take x-rays to see there is pneumonia. They also put a nebulizer on my face. They do the nebulizer three times every fifteen minutes. They did none of those things here. They gave me the nebulizer but only once. However, they have not done any x-rays or given me the IV, which I really think I need. I also think that if I was able to keep my inhaler with me that would have helped me, but they would not let me.

I declare under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge and recollection:



11 / 20 / 2015

Date

I certify that I am proficient in the English and Spanish languages and that foregoing was read to ⬛⬛⬛⬛⬛ in Spanish.

Ana Camila Colón

11 / 20 / 2015

Date

314

# Attachment to Exhibit 15
# Exhibit H

<u>**Declaration of**</u> ▮▮▮ (A# ▮▮▮
<u>**Regarding My Son,**</u> ▮▮▮ **Medical Condition**

I, ▮▮▮ (A# ▮▮▮ declare under penalty of perjury that the following is true to the best of my recollection and knowledge, and that the following statement has been read to me in the Spanish language:

1. My name is ▮▮▮ I was born on ▮▮▮ in Honduras.
2. I fled to the United States to seek asylum. After a long and challenging journey, my 4-year-old son, ▮▮▮ and I arrived in Texas on November 6, 2015.
3. ▮▮▮ has suffered from numerous medical conditions in his young life, one of them is asthma. I made sure to take his asthma medication with me when we fled Honduras, but we lost it when I was carrying ▮▮▮ in the rain on the way here.
4. ▮▮▮ also suffers from a dangerous kidney condition. His body makes too much calcium and too little potassium. ▮▮▮ had two surgeries back in Honduras. The most recent one was January 28, 2015. ▮▮▮ also must take medication every 6 hours in order for his kidneys to function properly. If he doesn't have medication, he can get very sick. ▮▮▮ will be experience fevers, urinary tract infections, and kidney stones. Because ▮▮▮ body is so small, he cannot pass the kidney stones. In addition to taking medication, ▮▮▮ has to follow a very specialized diet. For example, he cannot eat any foods with food coloring in them or consume milk and dairy products. After ▮▮▮ last surgery, his doctor wanted ▮▮▮ to come in for a follow-up ultrasound to make sure his scars were healing and that the medications were working. ▮▮▮ doctor back home was supposed to see him on November 16, 2015.
5. ▮▮▮ did not have access to a doctor, medical treatment, or medications the entire time we were at the hielera and la perrera. As a result, he has become very sick. While we were held by CBP, my son had trouble breathing, was coughing, stomach pain, and had a fever.
6. When we arrived in Dilley on November 10, 2015, I took ▮▮▮ for medical treatment. They gave him Tylenol and a spray for his asthma, but nothing to treat his kidney condition.
7. Since we've been detained, I've also had trouble with ▮▮▮ diet. He cannot eat many of the foods here, and has little appetite since he has been so sick.
8. Today, I was contacted by the pharmacy here at Dilley, and told to report before closing time at 7pm. I do not know whether they are going to have the medication my son needs, or if they are just giving me the Tylenol that my son also needs to treat his fever.
9. I am very worried about my son. He is so sick right now, and even if he has medication, there's no way for me to ensure that his dietary needs can be met while we are in detention. My son's doctor in Honduras said that ▮▮▮ needs an ultrasound of his kidneys, which we were supposed to receive on by November 16, 2015. I'm afraid he won't be able to receive his ultrasound while we are in detention.

I declare under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge and recollection:

316



_11/10/15_
Date

I certify that I am proficient in the English and Spanish languages and that foregoing was read to
in Spanish.

Sandra Lopez

Date          _11/10/15_

317

# Attachment to Exhibit 15
# Exhibit I

Medical Affidavit of ██████████████

My name is ████████████████ I was born in ████████████ El Salvador. My Alien Number is ████████████ I was detained by Immigration border patrol officials on November 4, 2015. I'm currently detained at South Texas Family Detention Center in Dilley, Texas 78017 with my two year old boy ████████████████████ (DOB: ████████

I entered the Detention Center in Dilley, Texas on November 6, 2015. On this first day, my son and I were examined by the detention center's doctor where I informed the doctor that my son's arm was fractured and that his cast needed to be removed by November 9, 2015 as it was instructed by the doctor in El Salvador. She told me that they were going to have him under observation and told me as well that tomorrow (Saturday, November 7, 2015) they were going to bring a specialist to look at ████ arm. ████ and I spent the night in one of the rooms of the facility's clinic because they were going to examine his arm in the morning. The next morning, the supposed specialist arrived and examined ████ s arm. She only checked to see that ████ could move his fingers and told me to be attentive that his fingers could move and won't turn purple. I told the specialist that ████ s cast needed to be removed on November 9th.

On the evening of Monday, November 9, 2015 I got the notification from the doctor telling me that ████ had an appointment at 1pm on Tuesday, November 10. I thought it was going to be to take his cast but when I arrived to ████ s appointment they told me that the appointment was for his vaccinations. The doctor saw ████ 's cast and asked me what had happened and I told her that his cast was supposed to have been taken off yesterday. She didn't say anything about it. They only made copies of his vaccination card and told me to come back tomorrow.

On Wednesday, November 11, 2015 my son and I went to the doctor again and saw the same doctor who I had just seen yesterday. My son was given two vaccinations but the doctor didn't tell me anything about his arm again.

On the morning, Thursday, November 12, 2015 I took ████ to be examined by the doctor. I took ████ to the clinic because he was having problems breathing. I was only given vicks vaporub. I saw a different doctor during this visit, who also asked me about ████ 's cast. I told her that it was supposed to be taken off on Monday Nov. 9th and asked me whether I had already received the judge's decision on my case. I told her that I had my interview Wednesday November 11, 2015 and that I was getting the results by Friday. She then told me that was probably why I hadn't received an appointment for ████ yet. She made me feel that getting an appointment for ████ depended on my interview results.

On Friday, November 13, 2015 I went to the clinic because ████ had a cough and I asked again about ████ 's cast. I saw the same doctor who had asked me on Thursday

about my case' results. She asked me again about the results of my interview. I told her they were positive. She instructed me to ask the clinic's reception if ███ had a pending appointment but at the reception they told me that they didn't know anything.

The receptionist told me to go to the clinic in the "Oso Pardo" building clinic and ask when the doctors were going to be there. I ask my cousin ███ who is staying at "Oso Pardo" to ask for me if the doctors were going to be there Saturday. She was told that they were not going to be there on Saturday. I went to "Oso Pardo" on the morning of Sunday to ask if the doctors were there or if I have a pending appointment for ███'s cast to be removed. They told me that I had an appointment for Monday, November 16. I went to this appointment only thinking that they were going to finally remove his cast when I found out that the appointment was a dental appointment. I told them again about ███'s cast but they didn't say anything about it.

On Thursday, November 19, 2015 I had my court hearing at 8am. I was represented by one of the volunteer lawyers from the CARA pro-bono project. After the hearing, the lawyer who helped me (Maria Andrade) and I discussed my son's cast. I told Ms. Andrade about El Salvador's doctor note to take off my son's cast on November 9, 2015.

Finally on Thursday, November 19, 2015 an officer approached me and told me that I had a doctor's appointment for my son. They took me to the hospital where they finally removed his cast. If it wasn't for the CARA volunteer lawyer my son ███ would still had his cast on.

**I declare under the penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.**



_11 – 20 – 15_
**Date**

## CERTIFICATE OF TRANSLATION

I, Gloria E. Jimenez, certify that I am proficient in the English and Spanish languages and that the foregoing was verbally expressed to me in Spanish.

_____
Gloria E. Jimenez

_11/20/2015_
Date

# Attachment to Exhibit 15
# Exhibit J

**DECLARATION OF** ███████████████████████

I, ███████████████████████ swear under the penalties of perjury that the following information is true and correct to the best of my knowledge and belief:

1.  My name is ███████████████████████ I was born in El Salvador. I am 33 years old. I am detained at the Berks County Residential Center in Leesport, PA, with my son ████████ ███████████████ who is five years old. He was born in El Salvador.

2.  My son and I have been detained at Berks County Residential Center for more than twenty days. Before this, I was detained for twenty one days in Dilley, Texas and spent a day each in a Hielera and a Perrera. I have been in detention since October 10, 2015, so it has now been almost two months.

3.  I fled El Salvador because members of my family were being threatened by gangs. My nephew, who is only fourteen years old, left the country because a gang was trying to recruit him. Another nephew of mine was beaten because the gang demanded that he give them money and he did not have any. The gang looks for young children to do their work and I am afraid my son will be recruited. They gang regularly meets at a house two doors down from me and are very present in my neighborhood. I am afraid of what will happen if I stay there.

4.  When I first arrived in the United States, I was taken to a Hielera, an ice box or freezer in McAllen, Texas. It was crowded, about 60 or 70 people were there, and there were no mattresses or blankets. We slept on the concrete. It was very, very cold. We were given bread and frozen ham sandwiches to eat. The lights were on the entire night, never turned off. There were no windows and only one door which was locked. I did not get much sleep because there was no place to lie down. There were many young babies and children there. One little girl fainted, some children were vomiting. Some children were taken to the doctor, then they were returned. When I arrived, my clothes were wet and muddy from crossing the river. The officer made me take off and turn over the extra pair of pants I was wearing. There was one bathroom for everyone there to use and we were not allowed to shower.

5.  I spent one day in the Hielera, before being moved to a Perrera, a warehouse where they hold people. We were given blankets that were like paper. I slept on a mattress but the floor was filthy. There were about twenty people in our small room, and a public bathroom with no privacy.

6.  After one day in a Perrera, I was woken up and put on a bus. They did not tell us where we were going. When someone would ask a question about where we were going or what was happening, the officials on the bus would tell us that they didn't know. I thought they were taking me to see my family, who live in Denver.

7.  They took us to Dilley, Texas. The experience there was horrible. Two or three days after I arrived, blood started coming from my mouth and nose. I wasn't taken to a doctor. They told me to drink hot water. About a week later, they gave me pills for a sore throat. I was bleeding for five days before I got medicine. At Dilley, I was able to take a shower. I had a

mattress, blanket and pillow. There was more food to eat, but it made a lot of us sick. Me and
my son both had diarrhea for most of the time we were there. Eventually, my son got a cold
and we went to go see a doctor at the office at Dilley. We waited from 8 in the morning until
3 in the afternoon and then they just told us to come back the next day. We waited for three
or four hours the next day and then the doctor just told my son to drink water. We had no
food to eat while we waited, so we went hungry all day.

8.  I saw about four different lawyers at Dilley with the CARA Project. They sent a note that
    said we could request a lawyer and told us to get in touch with them. I went to the office at
    the center and filled out a request for a lawyer. Some of the other people at the center told
    me where to go; the staff didn't tell me anything about getting a lawyer. The attorneys were
    free, so I didn't need to get money to pay for them. I trusted the lawyers, and they helped file
    a request for re-interview but I didn't get to have one because I was taken from Dilley before
    it could happen.

9.  Around November 1st, I was taken from Dilley. I didn't know where I was going, I thought
    they were sending me back to El Salvador. When I asked the officials where they were
    taking me, they said they couldn't tell me. They took my son's passport and my
    identification card. I didn't get them back. We left Dilley around 10:30 in the morning. We
    were taken to a room where they usually do vaccinations, and we were given a sandwich and
    water. We drove to the airport in a truck with another mother and child. We got on a plane
    with two agents, it was filled with regular passengers. We were only allowed to have water
    in the airport and on the plane, but the agents bought pizza. My son was crying because he
    was hungry, but they didn't have food for him. They never asked if I had a lawyer or what
    the status of my case was.

10. At Dilley, the consulate for El Salvador came to visit. The woman from the consulate was
    there to get documents if we had to return to El Salvador.

11. We arrived at the detention facility in Berks County around 3 am. My son and I didn't have
    anything to eat except for the sandwich they gave us in Texas all day. We were interviewed
    for about an hour and then we got to eat. They examined us, took blood pressure, and
    searched our belongings. A few days later, they took blood from my son.

12. When I first got to Berks County I was afraid that I lost my lawyer. They told me that I could
    contact a lawyer here but I didn't know how to do that.

13. My son has mostly been healthy in Berks but some of the other children have had facial
    swelling. When he had a fever and a cold, my son was taken to the emergency room. He had
    an infection in his eye but he hasn't been given medicine yet, we're still waiting for it. Staff
    members come in at night every fifteen minutes with flashlights. My son sleeps through the
    night but I don't. My son cries sometimes, he asks why we can't be free, why we're still
    here. He mostly listens to me but he gets in trouble here and there, he's mischievous.

14. When I was in Texas, an Official told me that I had to sign papers or that I was going to be in jail. I didn't know what I was signing and I thought they were deportation papers.

15. I'm scared now because in the middle of the night here, they take people and deport them. I'm afraid every night that I'm going to be taken next.

16. I feel frustrated and worried that all of my time spent getting here will not amount to anything, but I have hope that it'll work out because I am afraid to return to my country.

17. I keep fighting because I have hope. I have hope that my lawyer will present my case well.

18. I have heard your case goes better if you leave the center, and I would like to be with my family so they can help me.

11/30/15

DATE



CERTIFICATE OF INTERPRETATION

I, Richard Mullen , certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to ███████████ in the Spanish language and that she understood the contents of the Declaration.

Richard Mullen

[signature][name]

324

# Attachment to Exhibit 15
# Exhibit K

**DECLARATION OF** ███████████████

1. I am a thirty two year old woman from El Salvador. I fled my home country with my five-year-old son because we were in danger.

2. I arrived in the U.S. on September 23, 2015. Immigration officials brought me to the hielera, where we were held for two days. The conditions were very bad -- they made my son and I sleep on the floor. The only thing we could cover us with is an aluminum blanket and they treated us badly. The officers were really mean. They yelled at us. When the cleaning crew would come around they made us sleep on the wet floor. Immigration officers screamed at us, "Get up you lazies/crazies."

3. The food was really bad. They gave us juice that gave us acid reflux. They gave us frozen sandwiches. Both kids and adults got sick from the acid.

4. I asked the officers if they could turn down the air conditioning because the kids were getting very chilly, but after I asked they actually made it colder. My five-year-old son was completely desperate. He was shaking and the only thing he had to cover himself was the aluminum blanket. Sometimes the officers yelled to the kids to shut up because the children were crying so loud because of the cold.

5. After two days, officers transferred my son and I to the perrera. They call it that because they put us into rooms that look like kennels. They put us behind bars. They're like prison cells. There are no walls anywhere. There are just bars. Anytime there was a transfer from the hielera to the perrera they took people in the early morning and they would not say anything – we had no idea where we were going.

6. In both the hielera and the perrera, there were no windows. The lights were kept on all the time. After we crossed the river, our clothes were still wet. They wouldn't let us change clothes even though it was very cold. The whole time I was in the hielera I was in wet clothes. My son was dry because I carried him on my back to keep him dry when crossing the river. But there were other kids who were definitely wet. Some of them got sick with a fever and they received no treatment.

7. Also in the hielera and the perrera, the officials had guns and uniforms. My son would say "Oh, we're in prison." He would ask "Why are we detained? Why are we here if we didn't do anything?" I was sad, depressed, down because of what he said. Because I came here, trying to make a better life, I risked my life to leave danger in El Salvador and I thought that I would be free, but I ended up in prison.

326

8. In the perrera they gave us a mattress but still the same aluminum blanket and it was still very cold. They gave us frozen ham sandwiches.  Three times a day it was the same thing, a frozen ham sandwich. My son did not eat. We were in the perrera about one day. It was hard to tell because I didn't know if it was day or night because there were no windows and the lights were on all the time.

9. After the perrera, I was taken to the detention center in Karnes, Texas. When they brought us to Karnes, they just gathered together a group of mothers and children and said they were being transferred, I wasn't sure if it was the morning or night but we got to Karnes at 8:00 a.m. on September 26, 2015. It was very difficult in Karnes because the officers did not treat us well. When people lined up for food, they just threw a tray at us. They didn't hand it to us, they would toss it at us.

10. They didn't treat the children well. Sometimes they would yell at them or scold them for playing with things. Guards and officers would say, "don't touch those toys. Don't touch that." For the kids who did not go to school, they would take their toys out of the room and just make them cry. They were just very mean to them.

11. In Karnes, I was given an interview by the asylum officer but I did not have a lawyer during that interview. My family contacted a lawyer. They paid her $2,000. She met with me once and told me she thought I would get a negative result in front of the judge. She was supposed to be with me in front of the judge but she did not show up. I told the judge how my husband had physically abused me in El Salvador and about threats from the gangs. He said he understood but then he agreed with the asylum officer.

12. After I got my negative decision from the judge, I didn't know that I was able to get a lawyer. It wasn't until one of the staff at Karnes told me "you know you can get a lawyer" and gave me the number of RAICES but said "don't tell anyone that I gave you this number." So I contacted the attorneys at RAICES. I met with them many times and they told me they would request another interview. They also told me that if anyone in the prison gave me anything to sign to not sign it, that I already had a lawyer. I trusted the lawyers I worked with at RAICES. They gave me a lot of confidence in them. I thought they would be able to help me.

13. Around October 20, 2015, at 7:00 p.m., ICE officers told me that I was going to be sent to Pennsylvania because they needed more space in Karnes. At 11:00 that night they woke up me and my son and took us out.  They told us that we were going to a "home type" place and that there would be a woman there to welcome us.  To get transferred here they made me sign papers. They said "if you sign or don't sign it doesn't matter, you'll still be moved there." I was afraid that I was signing my deportation papers.  I was scared

because a friend of mine from Guatemala had been told to sign deportation
papers and she was sent back.

14. On the plane, we were mixed in with men. They gave us no food just the
frozen ham sandwiches again. There were men who were handcuffed at the
feet and at the wrist. We were really uncomfortable. We didn't know what
class of person they were. We worried about what these men could do.
Instead of having a relaxing trip, we wondered what would happen. We were
worried the whole time. My five-year-old son tried to reassure me that it
would be OK, he said, "No mommy, I'm a man, you don't have to worry with
me." If we had to go to the bathroom, we had to pass by them. The officials
working there told us "don't look. Look forward and you won't have
problems."

15. My son is scared of going on trips or traveling so the plane from Texas to
Pennsylvania was scary for him. In Mexico, the house we were in was when
the Zetas and the Negros gang were forming. ████ had seen that these two
gangs were encroaching on the territory because they were facing off. He saw
a lot of people with guns. The gangs knew there were immigrants in the
house, and they made the owner of the house pay for each head. My son saw
everything and he was really scared. He almost never slept the rest of the
way to the U.S. I was sorry to have to put him on a plane with more scary
men again.

16. I thought that my case was closed, that coming here to Berks would mean
deportation.

17. When we got here there were some people waiting for us, doctors, nurses,
and caseworkers. I thought, "Oh, we're coming back to the same thing as
Karnes." It was a little better in that the food was better but the officials here
– some are good, some are bad.

18. I didn't know what was going to happen to my case because my lawyers were
in Texas and I did not get to speak to them before I was transferred. My
cousin here said he would look into getting me an attorney but there were
already attorneys coming here.

19. Since I was here, my son got sick with chicken pox. He already had chicken
pox when he was 1-1/2 years old.  They gave him a vaccine for varicella here
and two days later he got chicken pox. I told them he'd already had chicken
pox in El Salvador but they said some times they can get it a second time.  I
think he got the chicken pox from the vaccine because before that he was
fine.

20. Because my son was sick, we spent a week in isolation. It was horrible. It was
too much; when the staff would deal with us they were all covered in gloves

and a suit, a hat. You could only see their eyes. I got really mad because it was over the top. Mothers feel really bad. My son was not able to leave the room, only me. Even if he had to leave the room, they would have to put a mask on him, he was not able to touch anything. Nothing near kids, he couldn't play with the kids. They would really discriminate. It was painful.

21. They put us in the isolation room, there was a window with a curtain and they would peep in all the time. They would always pass by and sit down and open the curtain and sit and watch. I felt like I had no privacy.  We were locked in there for a week. Afterward, they would have some guy follow us around even when we were outside so my son wouldn't touch any chairs, don't touch wood, don't touch toys.

22. With the chicken pox, the only thing they would do is take my son's temperature. They would give him Tylenol and that was it.

23. Sometimes my son gets depressed. He's always been calm but he's almost just stopped playing with other kids.  He's a lot quieter now since we have been detained. He says he wants to go. He says he's in prison. In the beginning, the officials told the children not to go near him as if something was wrong with him.

24. I did not expect that when I came to the United States my son and I would be put in a detention center. I wish that this never existed.

I, ████████████████████ declare under the penalty of perjury that the above declaration is true to the best of my belief and recollection.

11/13/2015

DATE

████████████████████

CERTIFICATE OF INTERPRETATION

I, <u>Martha Sandoval Reyna</u> certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to ████████████████ in the Spanish language and that she understood the contents of the Declaration.



Martha Sandoval Reyna

330

# Attachment to Exhibit 15
# Exhibit L

DECLARATION OF ███████████

I, ███████████ swear under the penalties of perjury that the following information is true and correct to the best of my knowledge and belief:

1. My names is ███████████ and my A number is ███████ I am 24 years old and I was born in Honduras. My son is here with me, he is six years old and he was also born in Honduras.

2. I have been detained since September 28, 2015. I was detained in Dilley, Texas for one month and then I was transferred to Berks on October 28.

3. I am still afraid of returning to Honduras because there are still death threats against me and my family, nothing has changed. I am also afraid for my son because he should have the right to live without being threatened and fearing for his life.

4. I entered the US on 28 of September. I don't know where we were, but it was somewhere by the river. I was picked up by immigration right away. They took us to the icebox or *hielera*.

5. It was a bad experience. They don't treat people well in the icebox. I was there for 2 days. It was cold, really cold. We had to sleep on a dirty floor. We were given frozen ham sandwiches. That is not healthy for children. There were so many children there, even little toddlers. The lights were on constantly. There are no windows, no privacy. The floor is disgusting. They mistreat people there. They tell us that we're all liars and that we should just go home. They took our identification and never gave it back to us.

6. They took us to another place after the icebox, what we called the "dog pound" or the *perrera*. We were still incarcerated, like inside of a cage. We didn't have beds, they just gave us these cots to sleep on.

7. After that they put us on a bus, which was also freezing. They told us we were going to a "family center." We had no idea what was happening.

8. We wanted to go to North Carolina to live with my uncle. He is ready to take us in whenever we are released.

9. Instead, they took us to Dilley and put us in detention. At Dilley, we had problems with the medical care. My son was vomiting and when we went to the doctor, they said he had a fever and that he should just drink water. We had to wait at least four hours to even see a doctor, and then they would just tell him to drink water again.

10. While I was at Dilley, I had a lawyer from the CARA Project. When we arrived at Dilley, the staff told us that we could submit a request for a lawyer, so I did that and I was

assigned to a legal team. It wasn't always the same person. I worked with a few different people. They were free lawyers. We probably met five different times. I shared my personal information with them, and one of the women I really trusted. She said she would help me.

11. After I received my first negative asylum decision, the lawyers tried to help me. We went to court to see a judge, and I explained my fears again. The judge didn't believe me. After my hearing, the lawyers wrote a letter asking the judge to change his mind.

12. One of the immigration officials was always mean to me, I don't know why. If someone got a negative decision, they would tell them to give up and ask us what we were still doing there. They told me to give up and stop fighting my case because I would never win.

13. Before they transferred me to Berks, I told them that I had a lawyer from CARA. The day that they took me to Berks, I had an appointment with my lawyer to call my family in Honduras for the first time, but I didn't get to do that.

14. Immigration came to our bedroom around 1:00 in the morning and told us to pack. I had no idea what was happening. They told us we were going to see "our family." I didn't know what that meant. I had no idea where we were going.

15. We took a bus to the airport, and then we got on the plane. We were with other families, about eleven mothers and their children. We were put on the plane with a lot of men who were in shackles, we didn't know who they were. We had to change planes several times, so by the time we arrived in Berks it was dark outside. They had given us maybe one sandwich in 24 hours. They searched all of our bags and they washed all of our clothes. They inspected our bodies and searched our hair for lice.

16. My son was very sick by this time. He had been sick for weeks. He was having trouble breathing when we got here. We went to the hospital and he had to stay for three days. They prescribed medicine, but it hasn't arrived here yet.

17. When I got to Berks, I had no idea what was going to happen with my lawyers. After I came here, I met a lawyer who gave me her card. She is a great but I have to pay her.

18. A lot of people here are sick. There are two mothers here that have chicken pox, they're in quarantine. There is also a child here who has an infection in his eye that makes his eyes water.

19. Most of the staff here treat us ok, but some treat us like we're going to infect them. They wear gloves when they come in the room and they cross the hallway so they don't have to touch us. They act like we're dirty. At night, we have to leave the door open and they come in every fifteen minutes and shine a flashlight on us.

20. My son doesn't eat much here. He cries a lot because he doesn't want to be in jail. He asks me why others get to leave and we don't. He gets picked on by the other kids so I don't want him to play sometimes and he gets upset. I feel like I have to watch him all the time. I'm so worried that something is going to happen to him.

21. You just feel so terrible to be here. You feel like you must be the worst criminal in the world to be here, or else why would they do this to us. I worry that my son will be traumatized and think there is something wrong with him. He asks why we're in imprisoned all the time. They call it a family care center, but it's a prison. They don't take care of us, they monitor us and make us feel like criminals. Why would you put someone in prison just for being afraid?

22. I am still fighting because I don't want to go back to Honduras, but I think what they are doing to the families is so wrong.

4/19/15

DATE

### CERTIFICATE OF INTERPRETATION

I, Caitlin Barry, certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to ▮▮▮▮▮▮▮▮ the Spanish language and that she understood the contents of the Declaration.

# Attachment to Exhibit 15
# Exhibit M

## DECLARATION OF ███████████

1. My name is █████████████ A████████ I was born on █████ in ████████
   ████ El Salvador. I am detained with my sixteen-year-old daughter, ████████
   ████ My daughter and I have been detained since August 24, 2015, it has been more
   than three months now.

2. We were encountered by immigration in McAllen, Texas. They took us to the detention
   center at Dilley. They never told us why we were detained, or how long we would be
   there. First they took us to the icebox or the *hielera*, then we came to Dilley and were put
   in prison.

3. My first interview with immigration was on September 25, 2015, one month after I was
   detained. I did not have a lawyer, I was by myself. I never talked to a lawyer or knew
   how to find one. I told them why I was afraid of returning to El Salvador. I received a
   negative decision. After I was interviewed, I was able to find a lawyer when they came to
   the detention center. I talked to the lawyers, and they told me that I would see a judge and
   they could represent me. They worked with CARA Project. There were two lawyers, I
   think their names were Alex and Brian. They worked for free and said I didn't have to
   pay them anything. I liked the lawyers that we had, they were so helpful and they spent
   time explaining what was happening and what to expect. They listened to our story and
   said they would try to help us.

4. In Dilley, the medical care was terrible. I got sick, something in my stomach, and went to
   see the doctor. They made me wait two days because no one was available, then they just
   gave me something to drink. There were so many sick children there, with fevers, and
   they always just tell them to drink water.

5. In the court hearing, the Judge asked me the same questions. The lawyers were not
   allowed to say anything, they could just take notes. The hearing on was on October 5,
   2015. Afterwards, I hoped that I would get a new interview, but it still hasn't happened.

6. We were moved to Berks on October 28, 2015. We were given no notice and ICE
   officials never told us why. We were never even given a phone call to call our lawyers
   and tell them that they we were being transferred. They just put us on a plane. They came
   to our room about 7 at night and told us to pack our things. I hoped they were moving us
   to be closer to our families, but I had no idea what was happening. One lady asked why
   they were moving us, and they told us that we were going to Pennsylvania to wait for the
   judge's decision, and that if we received negative decisions, we would be deported.

7. Two weeks after we arrived in Berks, they took us and put us on a plane. They were
   going to deport us. They woke us up at 3 in the morning. We had no opportunity to call
   our lawyers, they just said we were leaving in thirty minutes. It was me, my daughter and
   another woman and her kids. My daughter tried to ask why we were leaving and they told

her to shut up. We packed our things and they took us to an airport. Then they told us we were going back, with no explanation. Apparently a lawyer found out what was happening and had called immigration and stopped it. The other woman was deported. They have taken many families away at 3 in the morning.

8. I am still waiting for my new interview. They haven't told me when it will happen. My lawyers in Texas can't help me anymore. I was able to find a lawyer in Pennsylvania, but I have to pay her. There are no free lawyers at Berks like there are in Texas.

9. I was in Dilley for two months, and now I have almost one month at Berks. There are many families trapped like this.

10. I have a sister in Maryland and cousins and uncles across the US, and my husband is in Dallas. If we are released, we want to join my husband, but we could go live with any of my family. They would all take us in.

11. Last week, they gave us a letter saying they will review our detention on December 18, 2015, which will be almost four months.

11/19/15
DATE

CERTIFICATE OF INTERPRETATION

I, Caitlin Barry_____, certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to ████████████ in the Spanish language and that she understood the contents of the Declaration.

# Attachment to Exhibit 15
# Exhibit N

**DECLARATION OF** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

I, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ declare under penalty of perjury that the following is true to
the best of my recollection and knowledge, and that the following statement has been read to me
in the Spanish language:

1. My name is ▉▉▉▉▉▉▉▉▉▉▉▉▉ My A# is ▉▉▉▉▉▉▉▉ I am thirty-years-
   old and I am detained at the Berks County Residenial Center with my twin eleven-year-
   old daughters, ▉▉▉▉ and ▉▉▉

2. I have been in the U.S. since September 19, 2015. I know that I am currently detained in
   Pennsylvania, but this is the fourth place that my daughters and I have been detained.

3. My daughters and I are still afraid of returning to El Salvador. I am especially fearful for
   my daughters because of their age and because of our contact with gangs in El Salvador. I
   fear that they may suffer severe physical and sexual violence if returned.

4. We are a devout religious family. I am the daughter of a pastor and a devout Christian.

5. The three of us were apprehended in Texas on September 19, 2015. When immigration
   apprehended us they took us to a hielera where we stayed for seven days. The condition
   in the hielera were cruel for my children. It was as cold as a freezer. It was so cold that
   the children were crying and turning purple. There was nowhere to lay down. There were
   only cement benches. The lights were always on. There were no windows. There were a
   lot of people in this hielera. I would guess more than thirty women and children. Only
   the very young children received foil blankets. The only food we were given was a small
   piece of bread and ham. There were no showers. There was one toilet in the room for
   everyone. There was no privacy. My children suffered.

6. While I was in the hielera, I saw a woman go into labor. They took her out of the hielera
   to give birth, but then she was immediately returned to the hielera with her newborn. She
   was not gone long enough to receive any kind of proper treatment. I was under the
   impression that all they did was clean her and the baby off and returned them to the
   center.

7. During this time we were taken to a place we called the dog pound, or the "perrera". We
   called it the dog pound because it was a room with a lot of cages like you were trapping
   animals. When we were in the dog pound, they gave me a mattress, but they took my
   children away. I believe it was so that they could shower.

8. An officer then came in and took us to a place they called a family ranch in Dilley, Texas.
   I was at that center for about a month and a half. At the center there was a lot of
   sickness. My children suffered from constant diarrhea, stomachaches and fever. We
   would wait for four hours or more to see and doctor and we still would not receive

medicine. Even when my daughters had high fevers they were not given medicine. They were told to drink water. The water was disgusting and tasted like pure chlorine. All me and my children could do was pray.

9.  When I was at the family ranch, I was able to meet lawyers and other staff of the CARA Project who were willing to help me for free. I remember their names were Ian and Brian. They were very nice to us. And I wanted a lawyer to help me. I only knew I had a right to a lawyer because I was told by other detainees. The staff refused to talk to me. They also refused to read papers to me that I was given in English. That is why the lawyers were helpful. I would see these lawyers often, more than several times a week. I trusted my lawyers and I told them everything, all of my personal details and everything that I was afraid of for my daughters. These lawyers appeared in court on my behalf.

10. There came a time when I was threatened by an immigration official in the Dilley facility. His name was Officer Mendoza and he was a deportation officer. One day I was called down to court. I assumed that I was going to see the judge. However, when I got there, Mendoza took me into a room. My attorney wasn't there. He put papers in front of me that I could not read because they were in English. He told me that I had to sign some papers for my removal. When I refused, Officer Mendoza became very angry and he threatened to put me in jail and to take my children away. I was scared, so I signed the papers. I did not want to sign for my deportation, but I was afraid that immigration would take my children. I know now that the document was so that they could get a passport to deport me, but my daughters cannot be deported because I fear for their lives and safety.

11. I was then transferred to another detention facility away from my lawyers with no warning. On or about October 31, 2015, I was moved to the Berks County Residential Facility where I am still detained to this day. My daughters and I were taken from the facility at night and put on a plane with other detainees. It was frightening for my daughters to be in front of other male detainees who were shackled and in handcuffs. It did not matter to Immigration officials that I had a lawyer or that I was fighting my case. They still moved me.

12. When my daughters and I got to Berks we again had to go through an admission process. They checked my daughters' bodies again. My daughters were embarrassed because they were for the first time talked to about whether they had sexual intercourse. They made my 11 year old daughters take a pregnancy test.

13. When we were transferred here I was afraid that I had lost my lawyers. I felt like my case was over and that I would have no help. Here in Pennsylvania I heard that there were no lawyers here like in Texas. I was lucky enough to receive information about a lawyer from another detainee. We do not get legal access here in Berks like we did in Texas. The staff will not help up access legal help.

14. I am fighting for my daughters' lives and for their safety. I fight to be strong for them. I try to encourage them to respect others and to be well despite the fact that it kills me to see them trapped in detention. If we were to be released, we could live with family in the United States and continue our case. The father of my daughters is here, and so is my sister and brother in Kansas. That is where we would go and wait for our turn to present our immigration case.

15. My daughters and I are currently in detention with a stay of removal granted by a Federal District Court. Although I have received a negative decision from the Asylum Office, I am supposed to have the right to see a judge to consider that negative decision. From what I understand, Immigration does not want to give me that hearing, even though I was told by the Asylum office that I would have that opportunity.

16. Instead, my daughters and I have been in detention for almost three months. I know my children are depressed and suffering but I will do my best to comfort them, and let them know that one day we will be free.



11/30/2015

DATE

CERTIFICATE OF INTERPRETATION

I, Martha Sandoval-Reyna certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to ███████████████ n the Spanish language and that she understood the contents of the Declaration.

Martha Sandoval-Reyna

341

# Attachment to Exhibit 15
# Exhibit O

Declaration of ███████████████████ A# ██████████

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

1. My name is ███████████████ A# ████████ and I was born on ██████████ in ████████████ Honduras.

2. My daughter ████████████████ A# ██████████ and I have been detained in the US since November 14, 2015.

3. My daughter and I arrived at the South Texas Family Detention Center on or around November 17, 2015.

4. Since my daughter and I arrived at the detention center, I have been to the medical clinic about ten times. Every time I go to the clinic, I am always dissatisfied with the medical service my daughter and I receive.

5. On or about November 18, 2015 we went to the medical clinic for our first physical examination. My daughter and I were both sick with cold and a cough, and my daughter had a fever after having spent days in the holding cell at the US-Mexico border. The nurses asked us questions and I told them that my daughter had a fever, but they said it wasn't a fever and didn't give us anything to help our sicknesses.

6. The next time I went was a few days later, because my daughter's fever had gotten worse. The just gave us honey and Vicks VapoRub.

7. We went back to our room and I gave her the Vicks VapoRub but my daughter didn't get any better and she wouldn't stop crying.

8. That same night, in the early morning at 2am, CCA agents came to my room because my daughter wouldn't stop crying. They told me that the other women and children were having trouble sleeping because my daughter was crying so loud. They took me back to the clinic to see what was wrong.

9. One nurse checked my daughter when we got to the clinic and said that she didn't have a fever. The nurse just told me to give my daughter a bath and put wet towels with cold water on her.

10. Two days later the medical clinic called us back to check on my daughter and they said that she was fine other than a small virus that she had. They told me that she just needed to drink more water.

11. On November 29, 2015 my daughter began vomiting. She vomited four times in the early morning.

12. On November 30, 2015 she vomited three times in the early morning.

13. On December 1, 2015 my daughter woke up and vomited three times in the early morning. I called a CCA agent over to see how sick she was. The CCA agent told me to take her to the clinic. I told the CCA agent that I wasn't going to take her to the clinic because they weren't going to help her or give her anything for her sickness.

14. On December 2, 2015 I took her to the clinic. Her stomach was hurting a lot so they gave her a suppository to try to help her have a bowel movement. My daughter left the clinic feeling a little better, but she still had gas in her stomach.

15. On December 3, 2015 my daughter woke up in the early morning and vomited two times. I gave her water and cleaned her and we went back to bed.

16. Later the same day I took my daughter back to the clinic and the looked at her stomach. There was a doctor present and the doctor asked me when the last time my daughter had a bowel movement and I told her it was when she was given a suppository the day before.  The doctor then gave my daughter some Pedialyte.
17. My daughter is still constipated and in a lot of pain. She cries all day.
18. There has not been a day in the South Texas Family Detention Center when my daughter hasn't cried extensively.
19. It is so hard to know my daughter is in so much pain and there is hardly anything I can do about it. I feel like no one else really wants to help my daughter and I often cannot help but cry with her.
20. I have been feeling a lot of depression lately because I feel like nobody wants to help me.
21. I have seen the psychologist five times because of my depression.
22. I told the psychologist that I feel incapacitated for my inability to do anything to help my daughter.

[signature redacted]

$\underline{\phantom{xx}12/4/15\phantom{xx}}$
**Date**

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to [redacted] in Spanish.

[signature]

**Ian Philabaum**

$\underline{\phantom{xx}12/4/15\phantom{xx}}$
**Date**

# Attachment to Exhibit 15
# Exhibit P

## Medical Declaration of ███████████

I, ███████████ declare under penalty of perjury under the laws of the United States that the following statements are true and correct to the best of my knowledge and recollection:

1. My name is ███████████ (A# ████████ and I was born on ███████████

2. Currently, I am detained at the South Texas Family Residential Center (STFRC) in Dilley, Texas with my daughter. I have been detained at STFRC since November 28, 2015.

3. Last week, around 2:00 am. I went to the STFRC clinic because I felt very sick. I had a bad headache and my ears and stomach hurt. There was no doctor available, so the nurse gave me acetaminophen.

4. The next day I went back to STFRC clinic. When the doctor saw me, he dismissed my symptoms. Even though I insisted I felt very sick, he told me that I was perfectly fine and a healthy person.

5. Two days later, I went back to the STFRC clinic because I was vomiting and my stomach hurt. The nurse told me she could not give me any medication because my medical record reflected that I had previously refused to be checked by the doctor. I told her that that was impossible because I had insisted on my symptoms and the doctor did not check me. The doctor did not even take my vitals.

This affidavit was read to me in Spanish and it is a true statement of what I have said.

███████████████

████████████

December 10, 2015
Dilley, Texas

I, Ana Camila Colón, certify that I am proficient in the English and Spanish languages and that the foregoing text was read to ███████████ in Spanish. I further certify that the English translation of the Spanish statement, to the best of my abilities, to be true and accurate.

*Ana Camila Colón*

Ana Camila Colón

346

# Attachment to Exhibit 15
# Exhibit Q

**Medical Declaration of** ███████████████ (A# █████

I, ███████████████ declare under penalty of perjury under the laws of the United States that the following statements are true and correct to the best of my knowledge and recollection:

1. Since December 2, 2015, I have been detained at the South Texas Family Residential Center in Dilley, Texas with my two-year-old daughter ████████████ A# ████████ ). From that very first day we arrived my daughter was suffering from vomits and diarrhea.

2. On December 3, 2015, around 1:00 am, I took my daughter to the main clinic and told the nurse that my daughter had been choking on her own vomit in the middle of the night. The nurse told me to give my daughter water. She added that there were **no doctors available** and that I had to come back later for an appointment. Around 8:30 am I went back to the main clinic. I was sent from the main clinic to the clinic at the "red bird" neighborhood. From the "red bird", they sent me to the clinic at the "brown bear". From the clinic at the "brown bear", they sent me to the clinic at the "blue butterfly". From the "blue butterfly", they sent me back to the main clinic. **I spent more than four (4) hours being sent from clinic to clinic.** Once we were back at the main clinic, the nurse took her temperature and told me **I had to wait until the following day to see the doctor**.

3. On December 4, 2015 at 9:00 am, I went back to the main clinic for the doctor's appointment. **We waited for four (4) hours without any type of medical assistance or triage intervention or assessment.** Finally, we were called in at 1:00 pm. I told the doctor that my daughter had been choking on her own vomit in the middle of the night. The doctor performed a physical exam. Later, he recommended me to wash the baby's hands and give her water.

4. I still very concerned about my daughter's health because she is still suffering from vomits and diarrhea.

I declare under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge and recollection:

███████████████                                    12/8/15
                                                    Date

I certify that I am proficient in the English and Spanish languages and that foregoing was read to ███████████████ in Spanish.

Ana Camila Colón                                    12/8/15
Ana Camila Colón                                    Date

348

# Attachment to Exhibit 15
# Exhibit R

**Declaration of** ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ A▮

I, ▮▮▮▮▮▮▮▮▮▮ declare that this is an accurate statement regarding the health my daughter, ▮▮▮▮▮▮▮▮ A▮▮▮▮▮▮▮ who is 4 years old and the lack of medical attention received at the Dilley detention center where we currently are detained. We are from Honduras. We arrived at the detention center on Saturday, December 13, 2015 after being detained by CBP.

1. When we arrived the inspected us. I think they took my daughter's blood pressure. Then they took a needle and pricked my daughter's arm. I'm not sure what it was for maybe to get a blood test. I showed them the sores and dark spots on my daughter's legs, private parts and her bottom. I told them that she had this skin condition since she was a toddler. They called someone on the phone describing my daughter's condition and discussed the symptoms. However, neither the staff that saw her nor the person on the telephone said they had no idea what it was. They didn't say anything else and they didn't give her anything for her sores.

2. On Sunday the sores were better but by Monday morning, they were flaring up again, so in the afternoon, I took her to another nurse in the center. The nurse checked and looked at the sores. The woman said her niece had it and that it was fine, so she told me to go. Since I've been here nobody from the medical staff has been able to tell me what she has and no medical treatment has been given.

3. I'm worried for her because these sores have been appearing on my daughter's skin since she was 5 months old. In Honduras, when she was 4 years old I took her to a nurse to vaccinate her. I asked the nurse what those sores were and she told me that my daughter's weak immune system was causing these sores.

4. Every time the sores appear she scratches them and bleeds. This causes bruising and scarring on her skin.

5. As a mother, I'm so concerned for my daughter's condition and since arriving at the center I'm feeling helpless with the lack of medical services.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16/12/205
**Date**

**CERTIFICATE OF TRANSLATOR'S COMPETENCE**

I, Néstor Allende-Asparó, hereby certify that the above is an accurate translation of this declaration from Spanish to English and that I am competent in both English and Spanish to render such translation.

DATE: 16/12/2015      Signature of Translator:

350

# Attachment to Exhibit 15
# Exhibit S



I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

1. My name is ███████████ (A# ██████████ and I was born on ███████████ in Guatemala.

2. My daughter, ███████████████ (A# ██████████, and I were picked up by border patrol and taken to the Rio Grande City, TX station.

3. On December 6, 2015 at the "hielera", those that were detained were asked to remove coats and to take everything out of their pockets.  When the official saw I had a bag with prescription medicine, shoe laces, hair bands and a poncho, he angrily screamed at me and asked why I had not removed these things earlier, and that we were told at the river to not take anything with us. The contents of the bag were taken from me. I did not ask to keep my medicine, did not challenge the officer for fear that by not following directions I would be immediately returned to Guatemala.

4. The medicine is to treat a medical problem that I have been having for the last two months. The symptoms I was suffering from were intense thirst, frequent urination, dry mouth, headaches and fatigue.

5. My daughter and I arrived at Dilley Detention Center on December 8th, 2015. I was given a physical exam and told the person who did the exam that I had had medicine taken from me. I was not asked what they were prescribed for and there was no more inquiry or mention about the reason for the medicine.

6. On Monday night, December 14, 2015, I started feeling very poorly.  I experienced severe chest pain, headache, blurred vision and thirst.  I was taken to the clinic at the center, assessed for cardiac trouble which was negative, but her urine came back with very high glucose levels.  I was transferred to a local hospital, given insulin and returned to the detention center on Tuesday the 15th in time for my CFI.

7. It wasn't until I got back to the South Texas family detention center that they told me that I have diabetes. I had been detained here for one week without my medicine, even though I had told them I needed it and had this problem. It wasn't until my physical problem was so horrible that they actually listened to me and tried to figure out what was wrong.

8. It worries me that they don't have the capacity to care for all the women and children that they detain here. They should give more attention to these problems because someone could die.

9. I don't understand why I was treated like a criminal and they did not assess the medical problem that I informed them of. If they had just listened to me I would not have had the severe problem that I did. The situation here frightens me because my medical

problem could have ended up worse and I don't know what would have happened with my daughter.

████████████████████████          12/18/15
                                   **Date**

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to ███████████ in Spanish.

_Ian Philabaum_                     12/18/15
Ian Philabaum                       **Date**

353

# Attachment to Exhibit 15
# Exhibit T

**Declaration of**  **A#**

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

1. My name is ██████████████ (A# ██████████ and I was born on ██████████ in ██████████ Guatemala.

2. My son ████████████████████ (A# ██████████), and I were picked up by United States Border Patrol on December 6, 2015.

3. On December 8, 2015 we were transferred to the South Texas family detention center.

4. When we arrived at the South Texas family detention center my son's health was good but I had some stomach pains.

5. My son was given a physical exam on his first day here, but I was never given a physical exam. I asked the staff working in the central clinic if I could have a medical appointment because I wasn't feeling well. They told me that if it was urgent I had to go to the medical trailer in the "Brown Bear" neighborhood.

6. I went to the medical trailed in the Brown Bear trailer and met with a nurse. I explained the pains in my stomach and she told me she would make an appointment for me to meet with a doctor in the clinic. I was never called back to the clinic for my appointment.

7. On Wednesday, December 16, 2015 my son woke up sick. We already had an appointment that day with the clinic for my son to get his vaccinations, so I decided I would tell the medical staff at that appointment.

8. At the appointment I asked the nurse if she could check my son's eyes, and she told me that she was only supposed to administer the vaccinations, and that I should ask the medical staff at the front desk how to check on his eyes.

9. I went to the front desk and asked for another appointment that same day for my son's eyes. They told me that he could be seen if we went to the clinic in the Brown Bear neighborhood.

10. We went to the Brown Bear clinic and they saw us after a short wait. The nurse gave my son a thorough check up – she checked his lungs, his eyes, his ears. Afterwards she told me that he had a general allergy, and she gave my son a liquid medicine for the allergy and liquid acetaminophen. She gave me a prescription for a pill for the allergy, and more acetaminophen, but I couldn't get it for another 6 hours, and we left in the afternoon.

11. I told the nurse that I thought my son had an eye infection and he needed eye drops to fix the problem. The nurse told me that it was just an allergy like she had said.

12. That night my son's eyes were getting worse and I was really worried. He couldn't sleep and we were up all night because his eyes were so irritated.

13. The next morning I went to the pharmacy to get more medicine. I gave him the medicine for the allergy, but his eyes just kept getting worse. I went back to the pharmacy in the afternoon to get a different medicine that would work actually help my son but they said they could only give me acetaminophen.

14. I haven't gone back to the clinic because they only give my son medicine that doesn't work, and it seems like it actually makes it worse.

15. It makes me so upset to see my son so sick. His eyes are so irritated and every night his eyes are stuck together and I feel so bad because I don't have any resources to help my son. I wish I could take him to the clinic and they would give him medicine that would help him, but they don't.

16. I just wish I was out of this place so I could make sure that my son would get the medical attention he needs.

████████████████████            12/18/15
                                 **Date**

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to █████████████████ in Spanish.

_Ian Philabaum_                  12/18/15
Ian Philabaum                    **Date**

356

# Attachment to Exhibit 15
# Exhibit U

**Declaration of** ████████████ / A█████████

I ████████████████ declare from my personal knowledge and under penalty of perjury that the following is true:

1. With the help of a lawyer, I have prepared this declaration because my son ███████ A#██████████ was denied critical medical care. My son is only two years old and he is here with me in the South Texas Family Residential Center. We have been here since approximately Friday, December 18th.

2. I was born on ██████████ in ████████ Honduras. I have never committed a crime and I have never been charged with a crime in any part of the world.

3. I fled Honduras because I was in fear for my life and the life of my son. I had no alternative but to bring my child with me so we could both stay alive. Unfortunately, the journey was long and excruciating. My child and I had to sleep in the cold mountain and traveled on top of a train called "La Bestia"(no inside, but on top of the cargo train cart). My child and I endured freezing temperatures as we had to sleep in the mountains and on top on the train for days, we did not have clothes or blankets to protect us from the inclement weather. We walked during at night for hours under pouring rain. Crossed the river, and we again became wet, which caused the cold to be worse, I feared that we would not make it out alive, I was not feel my arms and legs and my two year old son trembled from the cold. My child was ill, he was unable to breathe, he was wheezing, coughing, and had a burning fever. By the time we were with the immigration authorities of the United States, I told the officers that my child was sick. I desperately tried to get effective medical attention for my child as his condition became worse. In the "hielera" he was given some medication that was completely ineffective and his condition became worse.

4. A few days after arriving here I went to the clinic to ask for medical services for my son and they only gave me vicks vaporub and a liquid medicine which they said was for allergies that were causing his cough. They gave me that medicine twice a day for a few days, but he did not get better at all.

5. On 12/30/2015 I was called in to the medical facility so my child could get vaccinated. I waited at the clinic from 8am until 1:30pm for them to see me with my son ill and now he had a fever, which was getting worse. I alerted the medical personnel that my child had a high fever. My child had and continues to have as of the time I signed this declaration, a fever that is extremely high. Despite my pleads for medical assistance for my child, he did not receive any medication or treatment for the fever. I am afraid that my child will have convulsions or brain damage as a result of having such a high fever and not being treated for it.

6. On the evening of 12/30/2015 I was in the visitation trailer and my son's fever was so bad that the lawyers and I asked a prison employee to take me to the clinic. In the clinic they told me to sit and wait. After five minutes I stood up and told the people at the clinic that my son was very very bad and needed to be seen, and they

1

told me I had to wait. After a few minutes I got up and insisted again that they see my son, whose face was very red and who was not speaking, and he was writhing. Only then did they finally give him medical attention. They checked his temperature, they checked his throat, and then they gave him medicine. They said he had fever and a throat infection. They prescribed him antibiotics and tylenol.

Under penalty of perjury under the laws of the United States of America, I declare that the above statements are true and accurate to the best of my knowledge and recollection.

_____                    12-30-15
                                                   _____
                                                            Date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to ████████████████ in the Spanish language.

_____                    12/31/15
                                                   _____
Alexander Mensing                                           Date

2

359

# Attachment to Exhibit 15
# Exhibit V



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

AUG 1 1 2015

Beth Werlin
American Immigration Council

Karen Lucas
American Immigration Lawyers Association

Michelle Mendez
Catholic Legal Immigration Network, Inc.

Aseem Mehta
Immigrant Justice Corps

Amy Fischer
Refugee and Immigrant Legal and Education Center

Katharina Obser
Women's Refugee Commission

Dear Nongovernmental Organization Representatives:

Thank you for your July 30, 2015, letter requesting that the Office of
Inspector General (OIG) investigate complaints about U.S. Immigration
and Customs Enforcement's (ICE) failure to provide adequate medical
care to mothers and children in family detention facilities in Dilley and
Karnes City, Texas, and Leesport, Pennsylvania.

As you may be aware, the U.S. Government Accountability Office (GAO)
is currently reviewing medical care at detention facilities and the results
of this review are scheduled to be released in mid-November of this year.
GAO is reviewing: (1) the medical care standards the Department of
Homeland Security (DHS) uses at detention facilities; (2) the extent to
which DHS assesses and oversees compliance with medical care
standards at detention facilities; (3) how DHS manages and oversees
medical care costs and expenditures at detention facilities; and (4) how
DHS obtains and addresses any complaints received from detainees or
others regarding medical care in detention facilities. With your
permission, I would like to send the allegations in your complaint to GAO
to help inform their review. Because we coordinate with GAO and try to
avoid duplication of effort, we will not initiate any reviews based on your



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

request at this time. Once the GAO report is issued, we will review it and evaluate whether we should perform additional work in this area. Additionally, we are referring your specific allegations to ICE, with a request that they immediately determine the current condition and status of the individuals to ensure they have received or are receiving proper medical care, if they are still in ICE's custody.

We are also currently conducting a follow-up review of recommendations we made to ICE in our March 2011 report, *Management of Mental Health Cases in Immigration Detention* (OIG-11-62). We are assessing ICE's progress in implementing its proposed actions to address our recommendations and its compliance with relevant mental health standards, protocols, and guidance developed since we issued our report.

We look forward to hearing from you regarding permission to refer these complaints. Should you have any questions, please contact Anne Richards, Assistant Inspector General for Inspections and Evaluations, at (202) 254-4100.

Sincerely,

John Roth
Inspector General

cc: Megan Mack, Officer for Office of Civil Rights and Civil Liberties

362

# Attachment to Exhibit 15
# Exhibit W

August 28, 2015


John Roth
Office of Inspector General
Department of Homeland Security
Washington, DC 20528-0305

> **Re:    Investigation of complaints regarding ICE's failure to provide adequate medical care in family detention facilities**

Dear Mr. Roth:

We write on behalf of the undersigned organizations to respond to your August 11, 2015, letter regarding our complaint filed on July 30, 2015, with the Office of Inspector General (OIG). This complaint discussed ten cases illustrating U.S. Immigration and Customs Enforcement's (ICE) failure to provide adequate medical care to children and mothers in family detention facilities in Dilley and Karnes City, Texas, and Leesport, Pennsylvania.

We are aware of U.S. Government Accountability Office's (GAO) broader review of medical care at detention facilities, which you reference in your August 11 letter.  Pursuant to your request, we grant you permission to share the allegations in our complaint with GAO to help inform their review of these critically important and troubling issues. When the forthcoming GAO report is released, we would be happy to meet with you to share our perspective on the report and on any new developments regarding medical care in family detention facilities.

We are grateful to you for referring the specific complaints raised by our July 30 complaint to ICE so that they can immediately determine the current condition and status of the individuals concerned.

Further, we are pleased to learn that OIG is currently conducting a follow-up review of recommendations made to ICE in your March 2011 report, *Managing of Mental Health Cases in Immigration Detention*. We would highlight, for your review, the attached complaint filed by three of the undersigned organizations on June 30, 2015, on the negative psychological impact of detention for immigrant children and their mothers. This was originally filed only with the DHS Office of Civil Rights and Civil Liberties (CRCL), but we hope you will find it useful as you undertake your follow-up review of mental health issues in immigration detention. We understand that CRCL forwarded at least two of these cases to you, as of correspondence dated August 20, 2015 (the two cases were 15-09-ICE-0545 and 15-09-ICE-0544).

We recently filed five additional complaints regarding problems with medical care at the Dilley facility with CRCL, attached here for your review and forwarding to GAO and to ICE. We will continue to document the ongoing, extreme, and often urgent problems in these facilities until the Government ends family detention. Thank you again for your attention to these urgent issues.


Sincerely,

Beth Werlin
American Immigration Council
bwerlin@immcouncil.org

Karen Lucas
American Immigration Lawyers Association
klucas@aila.org

Michelle Mendez
Catholic Legal Immigration Network, Inc.
mmendez@cliniclegal.org

Aseem Mehta
Immigrant Justice Corps
amehta@justicecorps.org

Amy Fischer
Refugee and Immigrant Legal and Education Center
Amy.fischer@raicestexas.org

Katharina Obser
Women's Refugee Commission
katharinao@wrccommission.org


Cc. Megan Mack

# Attachment to Exhibit 15
# Exhibit X

   

October 6, 2015

Megan Mack
Office of Civil Rights and Civil Liberties
Department of Homeland Security
Washington, DC 20528

John Roth
Office of Inspector General
Department of Homeland Security
Washington, DC 20528

**RE: ICE's Continued Failure to Provide Adequate Medical Care to Mothers and Children Detained at the South Texas Family Residential Center**

Dear Ms. Mack and Mr. Roth:

The undersigned organizations, Catholic Legal Immigration Network, Inc. (CLINIC), American Immigration Council (Council), Refugee  and Immigrant Center for Education and Legal Services (RAICES), and American Immigration Lawyers  Association (AILA), jointly file the present complaint on behalf of fourteen mothers and their children who received or are still receiving substandard  medical care while detained at the South Texas Family Residential Center (STFRC), the family detention facility in Dilley, Texas.

Unfortunately, this complaint highlights the very same problems that we brought to the attention of the Office of Civil Rights and Civil Liberties and the Office of the Inspector General in our previous complaint, filed on July 30, 2015.[1] That complaint was filed on behalf of ten mothers and children who received inadequate medical care at the STFRC, as well as the two other family detention centers in Karnes City, Texas, and Berks County, Pennsylvania. Eight additional complaints, supplementing the original July 30 complaint, were filed with your offices between July 31 and September 15, 2015. Brief summaries of those eight cases, in chronological order of their submission to your office, are provided below:

- A seven-year-old boy who repeatedly sought medical care at the clinic in Dilley, but was repeatedly turned away. When a urine test was finally taken, he was rushed to a hospital in San Antonio where he was kept for five days and diagnosed with juvenile diabetes. Despite his condition, the boy and his mother were returned to the detention facility. When they went to the STFRC clinic for a scheduled follow-up appointment for his

---

[1] On July 30, 2015, the four CARA Pro Bono Project partners, signatories to this complaint, along with Women's Refugee Commission and Immigrant Justice Corps, submitted a complaint regarding ICE's Failure to Provide Adequate Medical Care to Mothers and Children in Family Detention Facilities.

juvenile diabetes, they were told they would be called back because there were too many people in line. They were never called back to the clinic. (*Submitted August 20, 2015*)

- A four-year-old girl who presented at the medical clinic with a fever and a nosebleed. The nurse told the mother that there was only one doctor, who was too busy to see the child because it was not an emergency, but gave her acetaminophen. The child later vomited out the acetaminophen and remained ill. When the mother returned to the clinic, she waited another four hours with her child to see a doctor. (*Submitted August 20, 2015*)

- On the day of her arrival at Dilley, clinic staff examined a twelve-year-old girl identified her as potentially suffering from diabetes. She was promised a follow-up appointment with a specialist that was not scheduled until three months after she and her mother were first detained. On another occasion, she and her mother had to wait five hours to see a doctor for a scheduled appointment at the medical clinic at Dilley. (*Submitted August 21, 2015*)

- A child who lost weight during the more than two months she spent in detention. Her mother sought medical care for her at the clinic three times, but it was not until the child collapsed and the clinic held her overnight that her illness was properly treated. (*Submitted August 25, 2015*)

- A mother who suffered from a chronic condition involving the secretion of pus from her breast experienced pain and discomfort throughout her more than three months in detention at Dilley. During this time, her condition went untreated although she reported it to medical staff on three occasions.  (*Submitted August 25, 2015*)

- A two-year-old girl who presented with a virus that a nurse at the clinic said "all of the children here" have. The child developed asthma in the facility, but the mother had to seek medical care on seven separate occasions before a doctor finally diagnosed her and prescribed medication that the toddler has to take twice a day, along with an inhaler, which she is now using four to eight times daily to treat her asthma.  (*Submitted August 31, 2015*)

- A mother who waited for seven hours with her three-year-old child to receive pain medication for a migraine. She finally left the clinic without receiving any medication at three in the morning, when she was told she would have to wait another two hours to see a doctor. Later, when her daughter presented with cold-like symptoms, this mother felt it was pointless to return to the medical clinic. *(Submitted September 15, 2015)*

- A registered nurse with ten years of experience was detained at Dilley with her four-year-old child, who contracted a cough and lost eight pounds while detained. When this mother took her child to the clinic, a nurse told her that the child's refusal to eat was normal and that "some days children eat, some days they don't." The nurse informed the mother that no doctor was on site, that she was not authorized to prescribe medication, and that she needed to attend to the long line of other mothers and children waiting. The nurse then advised the mother to have the child drink water and gave her Pedialyte.  After this interaction, this mother, an experienced nurse, felt that there was no point in returning to the clinic. (*Submitted September 15, 2015*)

To date, we have received no meaningful response to the ten original complaints submitted to CRCL and OIG or to these eight additional complaints. Nor have we seen any improvement in the quality of medical care in the family detention centers.

The fourteen cases summarized below demonstrate that the level of medical care provided by Immigration and Customs Enforcement (ICE), and its contractor, the Corrections Corporation of America (CCA), in family detention facilities remains woefully inadequate. STFRC holds up to 2,400 children and mothers. At one point in mid-August, the number of detained individuals dropped to around 1,050, but at certain points in September, that number almost doubled. The sworn declarations attached to this complaint from fourteen detained mothers exemplify our concerns about the quality of medical care provided by the clinic currently operating at the STFRC.

The cases summarized in this complaint reflect the continuation of the following disturbing trends identified in our July 30, 2015 complaint:

- Children with fevers and infections or viruses are told to drink more water and, lately, prescribed Vicks Vaporub;
- Mothers and children must often wait between four to eight hours to receive medical attention;
- Lack of follow-up treatment and unavailability of specialist care.

In addition to these three ongoing trends, these cases also reflect the following problems with medical care at STFRC:

- Mothers are routinely asked to sign forms saying that they have refused medical care if they leave the medical clinic, even after waiting many hours to be seen;
- Pre-existing conditions, including anemia, vision problems, chronic pain from gun-shot wounds, and high-blood pressure, are not being treated;
- Doctors are not on site or available in the evening or during lunch.

* * *

**Complainant #1: "Alma."[2]** At six o'clock in the evening of September 20, 2015, suffering from a terrible migraine, Alma sought medical assistance at the clinic with her six-year-old daughter. By ten o'clock that evening, Alma decided that she needed to take her daughter home to sleep. She was unable to see a doctor to get a prescription for pain medication and was forced to sign a release saying that she had refused medical care after her four-hour wait. While she was waiting, Alma witnessed a child convulsing with a fever, who had already been to the medical clinic on two occasions. The mother told Alma that she was afraid her child would die because he was not getting adequate medical attention.

**Complainant #2: "Leonora."** Around September 5, 2015, in the evening, Leonora and her two-year-old son went to the medical clinic because she and her son were both suffering from a cough, a cold, and a fever. The nurse who saw Leonora told her that nurses were not authorized to prescribe medicine and that doctors were not on site at nine o'clock. Leonora and her son returned to the clinic on four more occasions, still sick and in need of care. On one occasion Leonora and her son waited for four hours, but did not get to see a doctor because he was out to lunch. When Leonora sought help for the sixth time, she was given ibuprofen and Vicks Vaporub for her son, who had been vomiting and

---

[2] Pseudonyms are used to protect clients' identities in the publicly submitted version of this complaint, but all the complainants have agreed to share their names and Alien registration numbers with CRCL and OIG. Signed, sworn declarations that include this information are included with this complaint.

unable to eat for days. The doctor and nurses told Leonora that her son's sickness was "normal and just a virus going around" and that if he just "drank more water," he would be fine. Leonora was left with the impression that the medical clinic either does not "have medicine or they just aren't giving it out."

**Complainant #3: "Josefina."** Josefina's twelve-year old daughter, Ariela, received treatment in El Salvador for problems with her vision. The family was forced to flee without Ariela's glasses. Upon arrival at Dilley, Josefina indicated to STFRC staff that her daughter needed glasses. Her daughter underwent eye testing on August 15, after which doctors repeatedly assured Josefina that she would receive glasses. As of September 25, 2015, almost six weeks later, Ariela had not yet received them. In the meantime, she continues to suffer from headaches and has trouble seeing the computer screen at school. Her teacher sent a letter to her mother indicating that Ariela's eyes are tearing up because she cannot see the screen. Josefina is concerned that Ariela's vision will worsen without glasses.

**Complainant #4: "Carolina."** Carolina's three-year-old daughter, Grace, became sick with a fever, diarrhea, vomiting, coughing, and clutched her ear in pain. Carolina took Grace to the medical clinic, where she waited for more than five hours to see a nurse. The nurse examined Grace and said she looked dehydrated and like her eardrum had exploded. After examining Grace, a doctor concluded that she had either a virus or an infection that would go away in two to three weeks. The doctor prescribed Vicks Vaporub. Since that appointment, Grace has lost weight and is still sick. Carolina has not returned to the medical clinic because the doctor made it clear that they would not do anything to help. Still detained as of October 5, she remains very worried about her daughter's health.

**Complainant #5: "Mariana."** Prior to fleeing Honduras, Mariana's four-year-old son, Silas, experienced hair loss and a problem with his right eye. His hair loss has intensified in detention; his right eye is swollen, red, and painful, and tears continuously flow from that eye. On September 14, 2015, Mariana tried to get medical help for her son at Dilley. A doctor at the clinic did a vision test and told Mariana that Silas's problems were probably due to allergies. The doctor indicated further that a specialist would be required to treat Silas's hair loss. Another doctor told Mariana that the problem seemed urgent and that she should take her son to see a specialist immediately after they were released. Silas and his mother have already been detained for three weeks, and he is still not receiving the care that he needs.

**Complainant #6: "Sofia."** Sofia is a twenty-two-year-old mother from Guatemala who has been detained at Dilley since September 3, 2015. About a month before she left Guatemala, Sofia sought medical attention for a urinary infection and a hemorrhaging ulcer in her uterus. The Guatemalan doctor advised Sofia that these symptoms could be an indication of cancer and directed her to return to for a follow-up visit. Sofia was forced to leave Guatemala before her follow-up appointment. When she arrived at Dilley, she told a doctor about her ongoing stomach pain, infection, and possible uterine cancer. The doctor told Sofia that they could not treat her at Dilley, took a urine sample, but did not examine her.[3] Sofia also experienced delays in accessing medical care for her five-year-old daughter, who fell and hurt her lip. Sofia sought medical assistance for her daughter, whose lip was bleeding, around seven o'clock at night, but a doctor did not arrive until midnight. As of October 2, 2015, nearly a month after her arrival at Dilley, Sofia remained detained and did not know whether she has cancer.

---

[3] Although the population at Dilley consists entirely of mothers and children, there was reportedly no gynecologist on staff at STFRC as of September 30, 2015.

**Complainant #7: "Mayra."** Mayra's three-year-old daughter, Aracely, experienced a severe earache, a headache, and knee pain. On September 8, Mayra took her to the clinic, where she was advised that her daughter was "going to be fine" and should drink water. On September 16, Aracely came down with a fever and a cough. This time, after Mayra and Aracely waited for six hours at the clinic, a clinic staff person told them Aracely would be rescheduled for the next day. The next day, after waiting four more hours with a sick three-year-old, Mayra left the clinic because she did not think they would do anything to help her child. To leave, she had to sign a document in English that she did not really understand. Still detained as of October 5, Mayra worries about her daughter's health and has no faith in the medical care at Dilley.

**Complainant #8: "Johanna."** Johanna's four-year-old son, Andres, was diagnosed with anemia when he was an infant. In El Salvador, he received regular medical treatment. Upon arriving at Dilley, sometime on or around August 27, 2015, Johanna told the medical staff that her son needed assistance. As of September 24, 2015, Andres had not received medical care, despite Johanna's repeated efforts to seek help for her son. Andres complains of pain in his head, his lips turn purple, and he shakes from being cold, even in the heat of South Texas. He vomits, is constantly fatigued and does not play with other children.

**Complainant #9: "Melinda."** Melinda is detained at Dilley with her nineteen-month-old and five-year-old children. A few weeks after she arrived at Dilley, Melinda took her children to an appointment at the clinic to be vaccinated. She had to wait five hours to see the nurse. A few days later, Melinda became ill – her body ached, her ears and throat hurt, and she had chills, dizziness, and a fever. She went to the medical clinic with her children, but was not permitted to bring a stroller, in which her baby was sleeping, into the clinic. Though extremely sick, she held the baby in her arms and watched her five-year-old while she waited. When Melinda fairly quickly determined that she was too sick to wait and decided to return to her room to lie down, medical clinic staff made her sign a form saying that she did not want to wait and that she understood that she could not return that night. After she returned to her room, a guard saw that Melinda was still not doing well. The guard said she would send Melinda to the clinic as an emergency. When Melinda returned to the clinic, the guard who had made her sign the form laughed, shook his head, and told her to wait in the room. Melinda waited three hours, only to realize that the guard had not added her to the list of people to be seen. Distraught, Melinda left without getting medical attention. When she raised her treatment at the clinic the next morning with an ICE officer, the officer told her that he would investigate whether she was lying to him and, if so, he did not want to hear from her again.

**Complainant #10: "Heidi."** Heidi is detained at Dilley with her two children.  She did not find out that there was a medical clinic at Dilley until more than a week after she arrived.  On September 7, she took her four-year-old daughter, Lidia, who had a fever of 104 degrees, to the clinic, where she waited five hours to see a doctor. The doctor gave the child ibuprofen. When the fever did not subside, Heidi brought Lidia back to the clinic for the next three days.  Each time, they waited five hours to receive ibuprofen. After this, Heidi decided there was no point in returning, but a friendly guard saw that Lidia was sick and brought them back to the medical clinic. After a five-and-a-half hour wait, the doctor apologized that he did not have any medicine other than ibuprofen to give Lidia. On their sixth visit to the clinic, a doctor finally prescribed a medication to treat Lidia's sore throat. The medication helped, but lost more than four and a half pounds while detained.  According to Heidi: "Last Thursday when we went to the infirmary, they told me that [Lidia] had lost four and a

371

half pounds, but she has lost even more weight since then. Her ribs are visible, and the pants that fit
her when she arrived here are so loose they fall down." Subsequently, Heidi's twelve-year-old son
was sent home from school because the teacher thought he had conjunctivitis.  Due to the delays she
had encountered with Lidia, Heidi was reluctant to seek help at the medical clinic for her son.

**Complainant #11: "Suzanne."** Suzanne is detained at Dilley with her children, ages seven and
nine.  Her nine-year-old daughter Emilia suffers from tachycardia, an excessively fast heartbeat.
When Suzanne took Emilia to see a doctor on September 28, she experienced a four-hour wait.
Because the doctors went to lunch before attending to Emilia, Suzanne missed her scheduled legal
appointment and her children missed lunch. When Suzanne asked a nurse if she could leave the
clinic to get lunch for her children, the nurse advised that the doctors were on their way.  However,
Suzanne and her children then waited another two hours. When a doctor finally arrived, he informed
Suzanne that he would refer Emilia to a cardiologist, but Emilia has not yet seen a specialist and to
Suzanne's knowledge, as of October 5, no appointment has been scheduled. Emilia continues to
experience chest pain. Suzanne also asked about her son's two loose teeth and the doctor told her
that it would take a month to see a dentist. Suzanne also has not received the care she herself needs.
When she was detained at the border, she was not allowed to take a shower and developed a urinary
tract infection. Although she was given medication to treat the infection, her condition has not
improved. When Suzanne raised this with a doctor at STFRC on September 25, she was told to drink
water and continue taking the medication.

**Complainant #12: "Brenda."** Brenda is detained at STFRC with her five-year-old child. She fled
El Salvador because gang members shot her twice in the stomach and back. Following the shooting,
she underwent surgery in El Salvador, but continues to suffer pain because of the damage to her ribs
and intestines. On September 27, six days after her arrival at Dilley, Brenda saw a doctor. Although
she told the doctor about her constant discomfort and intense pain, the doctor did not prescribe any
pain medication or advice on pain management. Sometimes when her pain is very intense, Brenda
has trouble taking care of her young daughter, who becomes anxious when she sees her mother in
pain.

**Complainant #13: "Cristina."** Before fleeing El Salvador, Cristina took a daily medication,
Enalapril, to manage her high blood pressure. Six days after her arrival at STFRC, on September 25,
Cristina saw a doctor for the first time. Cristina informed the doctor about her condition and her
need for medication. The doctor said that she would find out if the medication was available at
Dilley and that a nurse would come to check Christina's blood pressure on a daily basis. As of
October 2, Cristina had heard nothing about the medication, and no one had checked her blood
pressure. When Cristina attempted to go to the clinic to follow up, a guard turned her away, even
after she explained her situation, because she did not have an appointment. Cristina has now been
without her medication for more than three weeks and is experiencing chronic headaches, constant
fatigue, and blurred vision. She has difficulty taking care of her four-year-old daughter in this
condition.

**Complainant #14: "Ana."** Ana is detained at STFRC with her thirteen-year-old daughter, Belin,
and her six-year-old son, Marcos. Several weeks after they arrived at Dilley, Marcos began
experiencing nausea, a sore throat, a fever, and vomiting. When Marcos' fever reached 103, Ana
took him to the medical clinic, where he was given a three-day supply of Tylenol. After the three
days, however, Marcos' condition did not improve. Ana took him back to the clinic at ten o'clock at

night, but no doctor was on site.  After they had waited for three hours, the nurse on duty gave Marcos a few more Tylenol and told them to come back the next day for an appointment at one o'clock in the afternoon. That night, Marcos was inconsolable and did not sleep at all. The next day, Ana and Marcos arrived early for their appointment, but they still had to wait until four o'clock to be seen. The doctor quickly examined Marcos and determined that he needed to go to hospital. Ana requested that she be allowed to tell her thirteen-year-old daughter, Belin, that they were leaving for the hospital, but was denied permission to speak with her child. Desperate to get medical care for her son, Ana left for the hospital, after the guards assured her that they would notify Belin. Unfortunately, this never happened.  Left alone at the detention facility with no explanation, Belin became distressed and concerned about her brother's condition and contacted a family member outside the detention facility. Only after the family member alerted CARA Project attorneys that Belin had been left alone was Belin able to speak to her mother and learn of her brother's condition. Meanwhile, the doctors at the hospital diagnosed Marcos with a virus and treated his symptoms.

***

The fourteen complaints detailed above and in the attached sworn declarations represent only a sampling of the many stories of inadequate medical care that CARA staff and volunteers have encountered at STFRC since we filed our July 30, 2015 complaint. Several mothers have declined to officially share the   problems they have encountered in accessing medical care for fear that it will negatively impact their immigration cases. The examples contained herein mirror the suffering of many other families who, like the complainants, lost faith in the medical clinic at the STFRC.

As discussed in our July 30 complaint, CARA staff and volunteers have seen mothers and children who entered family detention centers with injuries or illnesses that remained untreated throughout the duration of their detention. Many others have developed ailments while detained.  The fourteen cases included in this complaint further illustrate that the detention of  children and their mothers can result in serious and potentially  irreversible damage to their health, development, and well-being.[4]

In addition to investigating the  specific cases described above, we urge your offices to conduct a broader  investigation into the adequacy of the medical care provided at the STFRC, as well as the other family detention facilities in Karnes City, Texas, and Berks County, Pennsylvania. While this follow-up complaint focuses solely on cases arising from the STFRC, the troubling practices and low standard of care at the other family detention facilities have yet to be addressed.

While consistent quality medical care  is imperative for anyone in detention, our organizations do not believe that improved access to medical care would  sufficiently mitigate the harm caused by family detention to justify this practice. Accordingly, we advocate that detained children and their mothers be released to sponsors in the United States or, in the rate case where none are available, to community-based support programs that would facilitate access to medical care and other services. Ultimately, we urge the Administration to end the heinous practice of detaining families.

Thank you for your renewed attention to this urgent matter. We look forward to your prompt response.

---

[4] A previous complaint, filed by AILA, the Council, and the Women's Refugee Commission on June 30, 2015, raises serious concerns about the  psychological impact of family detention on mothers and children seeking asylum.

Sincerely,

Lindsay M. Harris
American Immigration Council
lharris@immcouncil.org

Michelle N. Mendez
Catholic Legal Immigration Network,
Inc.
mmendez@cliniclegal.org

Karen S. Lucas
American Immigration Lawyers
Association
klucas@aila.org

Amy Fischer
Refugee and Immigrant Center for
Education and Legal Services
Amy.fischer@raicestexas.org

374

# Exhibit 16
## Publicly Filed

## DECLARATION OF LINDSAY M. HARRIS

I, Lindsay M. Harris, depose and say:

1. I am an attorney licensed and admitted to practice in the State of California since 2009.
   From 2009 to 2010, I clerked on the Ninth Circuit Court of Appeals, focusing on
   immigration and asylum matters. From 2010-2013, I represented immigrant survivors of
   gender-based violence seeking protection in the United States for a non-profit legal
   services provider in Falls Church, Virginia. From 2013-2015, as a Clinical Teaching
   Fellow and Supervising Attorney at Georgetown University Law Center's asylum clinic, I
   supervised students representing detained and non-detained asylum seekers in immigration
   court. Since July 2015, I have worked as a legal fellow with the American Immigration
   Council, a partner in the CARA Family Detention Pro Bono Project ("CARA").[1] CARA
   provides pro bono representation to *Flores* class member children and their mothers
   detained at the Immigration and Customs Enforcement ("ICE") South Texas Family
   Residential Center in Dilley, Texas ("Dilley") and the Karnes County Residential Center
   in Karnes City, Texas.  I spend most of my time focusing on advocacy on behalf of
   immigrant families detained at Dilley and on ensuring that CARA's operations at the
   Dilley detention center run smoothly.

2. At Dilley, CARA staff members and volunteers spend much of our time preparing and
   representing families in the expedited removal process. Families with a fear of return go
   through an initial credible or reasonable fear interview with an asylum officer from U.S.
   Citizenship and Immigration Services ("USCIS"). If USCIS determines that the family has

---

[1]The CARA partners are the Catholic Legal Immigration Network, Inc., the American Immigration Council, the
Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers
Association.

a negative credible or reasonable fear, the family can request that an immigration judge
review the negative fear determination. If the immigration judge affirms the negative fear
determination, the family can file a request to USCIS for reconsideration of the negative
fear determination. There is no limit to the number of requests for reconsideration that can
be filed.  Due to the traumatic nature of the violence these families have experienced in
their home countries and during their journeys to the United States, we often require
several meetings to establish trust with our clients. Therefore, we often have to file
multiple requests for reconsideration if trauma prevents detained family members from
fully disclosing their fear of return the first time we meet with them, and because USCIS
has recently been quickly denying the requests for reconsideration with apparently very
little review of the documents and evidence submitted.

3.  I am in daily contact with CARA's Managing Attorney at Dilley, Katie Shepherd, along
with CARA's Advocacy Coordinator, Ian Philabaum. In addition to formal weekly check-
in phone calls, we frequently speak on the phone in between check-ins and communicate
over email throughout the day and often at night. I submit this declaration to explain the
due process challenges that CARA clients, including *Flores* class members and their
mothers, have faced while detained in Dilley. These include: 1) problems with
adjudication of credible fear interviews for children and their mothers by asylum officers
and processing of requests for reconsideration, 2) problems with detained families gaining
access to counsel at critical stages in the process, 3) problems with USCIS' interviewing
of *Flores* class member children.

**Flawed Credible Fear Interviews and a Heightened Standard of Review for Requests for
Reconsideration**

4.  There are many reasons why an initial fear interview, which is often conducted within

    days of a child's apprehension by immigration officers, can go awry. Asylum-seeking

    mothers, who are frequently sick from their journeys and from their time in Customs and

    Border Protection (CBP) short-term holding facilities prior to arriving at Dilley, are often

    far too traumatized and/or afraid to reveal personal details of rape or other abuse,

    especially in front of their children or if the asylum officer is male. Those who speak

    indigenous languages may not be able to communicate at all.

5.  The hurdles that any asylum seeker faces are obviously compounded in the case of a child

    or a traumatized survivor of gender-based violence. It often takes experienced asylum

    attorneys many hours, often over days or even weeks, to build a relationship of trust with a

    client before a child or a survivor is ready to reveal the circumstances that prompted her to

    flee to the United States. Immigration judge review, while very important in the asylum

    pre-screening process, does not replace the need for reconsideration of negative fear

    determinations by USCIS. Immigration judge review does not always involve testimony

    and, due to an immigration court practice manual rule, seldom involves attorney

    participation. At Dilley, CARA Project attorneys receive the next day's immigration court

    docket in the late afternoon, usually around 3:30 or 4:00 pm. With hearings beginning at

    8:00 am the next morning, attorneys have little to no time to prepare class members and

    their mothers for immigration judge reviews of negative credible and reasonable fear

    determinations.

6.  The reconsideration process through USCIS thus provides a critical opportunity to correct

    factual errors, provide additional explanation, and ensure that class members and families

with meritorious cases can meaningfully access the protections that U.S. law affords for individuals fleeing persecution and torture. The CARA Project typically spends at least twenty to thirty hours per family for those who request reconsideration.

7. Unfortunately, at the end of October and the beginning of November 2015, shortly after the October 23 compliance deadline in the *Flores* case, USCIS seemingly adopted a new approach to reconsideration requests. Under 8 C.F.R. § 1208.30(g)(2)(iv)(A), USCIS "may reconsider a negative credible fear finding that has been concurred upon by an immigration judge after providing notice of its reconsideration to the immigration judge."

8. Under longstanding agency policy, the government has previously exercised its discretion to reconsider an asylum seeker's negative credible fear determination when she "has made a reasonable claim that compelling new information" in her case exists and should be considered. This policy is set forth in a 1997 INS memorandum, attached as Exhibit 1.

9. However, on or around October 23, 2015, USCIS changed its approach and now appears only to reconsider negative fear determinations under more egregious circumstances. Under 8 C.F.R. § 208.30(e), USCIS must find a credible fear where the facts and law give rise to a "significant possibility" that an individual will prove a claim for asylum. Given the life and death consequences of an erroneous fear determination, any type of error by USCIS — whether egregious or not — indicating that an applicant may in fact meet the credible fear standard, should prompt reconsideration.

10. Data collected by the CARA Project at Dilley demonstrate the consequences of USCIS' new approach, which coincided with a substantial increase in denials of requests for reconsideration. Notably, the denial rate jumped from 23% prior to October 23, 2015 to 66% in the weeks following the October 23 deadline for the Department of Homeland

Security to comply with the July and August 2015 orders in the *Flores* case. During the same period, USCIS sharply reduced the length of time it takes to adjudicate a request for reconsideration. Whereas USCIS previously took a week or more, the Houston Asylum Office now regularly issues a decision on a request for reconsideration within twenty-four to forty-eight hours, and sometimes on the same day that the request is submitted. In recent weeks, we have seen requests for reconsideration denied within one to four of submission of the documents by USCIS.

11. The data strongly suggest that USCIS has shifted its approach to reconsideration of negative fear determinations -- notwithstanding the grave risk to bona fide asylum-seeking *Flores* class members who have been unlawfully deported as a result. A substantive comparison of recent denials with pre-October 23 approvals does not reveal any distinguishable characteristics. Specifically, CARA Project staff members have observed that requests for reconsideration by families articulating the same type of fear, very similar past persecution, and a comparable fear of future persecution, which were frequently granted in the past, are now denied.

12. Another change that we began to see in the beginning of November 2015 was with regards to immigration judge review of negative credible fear determinations. Previously, where an individual underwent a second credible fear interview and the result was, again, a negative determination, that individual then appeared before an immigration judge who reviewed the determination de novo, as outlined by the statute and regulations. After the October 23 deadline, however, the USCIS asylum office and Immigration and Customs Enforcement (ICE) stopped filing the appropriate paperwork with EOIR to trigger review

of a negative credible fear determination resulting from a second interview. For those families, the process is cut short and deportation effectuated as quickly as possible.

**Access to Counsel**

13. Available pro bono counsel resources are tremendously strained, the number of volunteers fluctuates week to week, and CARA Project staff and volunteers cannot possibly serve all detained families. Recently, for example, the CARA Project had one week in March when only two volunteers were able to travel to Dilley to provide services and representation to detained children and their mothers. In that same week, new intakes increased at the detention center and the on-the-ground volunteer and staff team of 8 had to handle 60 intakes of newly arrived *Flores* class members and conduct approximately the same number of preparation sessions for credible and reasonable fear interviews each day that week.  Volunteer fatigue has been increasing steadily, and we will face difficulty maintaining consistent levels of attorney volunteers at Dilley in the coming months. To give the court a sense of the volume of families that the CARA Project represents at this detention center where children and their mothers are detained en masse, here are some statistics from a week in April 2016, CARA staff and volunteers conducted:

a.  298 Intakes for newly arrived families

239 Credible Fear interview preparation sessions

75 Follow-up client meetings

12 Bond Hearings before an immigration judge

8 reviews of negative credible fear determinations before an immigration judge

Information sessions regarding post-release rights and obligations with 222 families.

14. *Flores* class member children and their mothers are not afforded any access to counsel at
Border Patrol processing stations– even though they often spend at least 72 hours and
sometimes longer in these facilities before being transferred to ICE detention. CARA staff
and volunteers at Dilley have served over 8000 families since March 2015, but we have
yet to encounter any child or family who met with an attorney or secured representation
prior to their arrival at Dilley, despite having already been in the United States for several
days, and sometimes considerably longer.

15. The CARA Project faces difficulties in providing full representation to detained families,
even as we work daily within the legal visitation trailer at the Dilley detention center.
*Flores* class member children and their mothers are frequently called into meetings with
ICE agents to discuss the terms and conditions of their release. Counsel is prohibited from
attending those meetings, even with the customary Form G-28, Notice of Appearance as
Attorney or Representative, on file with ICE. During those meetings, class members and
their mothers are routinely coerced and misinformed about their right to request a bond
hearing before an immigration judge, a right provided to class members under the original
*Flores* settlement. On September 30, 2015, the CARA Project filed a complaint with the
DHS Office of Civil Rights and Civil Liberties and the Office of Inspector General
documenting numerous instances of coercion and a lack of access to counsel in these
compelled meetings with ICE. This complaint is attached as Exhibit 2. Unfortunately,
these problems remain ongoing at the time of this writing. Similarly, where an individual
*Flores* class member and his or her mother are released under an "alternative to
detention," which invariably is an electronic ankle monitor, ICE does not inform the

family that they can seek to ameliorate the conditions of release with an immigration judge within seven days.

16. A further challenge to representation of detained *Flores* class member children and their mothers is that ICE often does not give families copies of their charging documents, removal orders, or other paperwork at intake. This makes it difficult for CARA staff and volunteers to understand the procedural posture of the case – including key issues such as whether an individual is eligible for bond or can pursue a claim for asylum.

**Inadequate Interviews of Children Seeking Protection in the United States**

17. Almost all of the *Flores* class member children and mothers we serve at Dilley have fled violence in their home countries of Guatemala, El Salvador, and Honduras. Once these families express a fear of return, the government places them in the credible/reasonable fear interview process.

18. Typically, where a mother has a fear of return, any of her children under the age of 21 can be considered derivative beneficiaries of her claim. If the mother receives a positive credible fear determination, USCIS issues the whole family a Notice to Appear in immigration court, where the mother can pursue her claim for asylum.

19. Where a mother is in reinstatement proceedings and therefore is only eligible for withholding of removal, which would not benefit her children, or where the mother has or will receive a negative credible fear determination, the asylum officer interviews her children. Recently, for a period in March 2016, the asylum office also started interviewing children where the mother's credible fear interview is positive, unnecessarily traumatizing and confusing young children who should be beneficiaries of their mother's claims.

20. These interviews of *Flores* class member children, when they occur, are often perfunctory and do not even follow USCIS's own guidelines for interviewing children. In these instances, the children do not receive the benefit of a full and independent interview. If a child receives a negative determination, an immigration judge often affirms it without ever hearing testimony from the child or the mother or even allowing an attorney to speak. As discussed above, USCIS' standard for reconsideration of an original negative decision seems to have become more difficult to meet. Therefore, a child may be deported without answering more than a few cursory questions about his or her fear of return.

21. CARA staff members have never seen *Flores* class member children appointed child advocates or guardians ad litem.


I declare under penalty of perjury that to the best of my knowledge, information, and belief that the above facts are true and correct.

Executed this 5th day of May in Washington, DC.

Lindsay M. Harris

Legal Fellow
American Immigration Council
1331 G Street NW #200
Washington DC 20005
(202) 507-7511

# Exhibit 17
## Publicly Filed

## DECLARATION OF MANOJ GOVINDAIAH

I, Manoj Govindaiah, depose and say:

1. I am an attorney licensed and admitted in the State of Texas since April 2015. Since 2006 and 2012, respectively, I have also been licensed in Illinois and in Florida. I have been practicing law for nine years. From 2006 – 2012, I practiced at two nonprofit immigration legal services providers in Illinois. At those offices I primarily represented families seeking immigration benefits and naturalization, and detained, unaccompanied minors. From April 2012 – July 2014, I was a staff attorney at the Southern Poverty Law Center's Miami, Florida office where I litigated class action juvenile civil rights cases. In August 2014, I began working at the Refugee and Immigrant Center for Education and Legal Services ("RAICES") based in San Antonio, Texas, and was promoted to managing attorney in November 2014. In January 2016 I became the Director of Family Detention Services. In this position, I oversee a staff of approximately 10 employees and supervise all of RAICES' immigrant family detention work.

2. In the summer of 2014, RAICES began providing legal services to mothers and children detained at the ICE Karnes County Residential Center ("Karnes detention center") in Karnes City, Texas, and eventually became the coordinator of the Karnes Pro Bono Project ("Project"). For purposes of

coordinating the Project, RAICES staff maintains a free hotline that mothers and children call to reach RAICES staff. RAICES staff members and pro bono partners visit the Karnes detention center 5-6 times per week and conduct intakes, provide pro se assistance and representation, and screen and place cases for pro bono representation. RAICES has worked extensively at the Karnes detention center since it opened and has encountered hundreds of the mothers and children detained there by ICE. RAICES does not receive a list of the families detained at the Karnes detention center, rather families must contact RAICES or otherwise be referred for us to assist them.

3. RAICES is also one of four partner organizations that comprise the CARA Family Detention Pro Bono Project (CARA)[1] that provides pro bono representation to mothers and children held at the ICE South Texas Family Residential Center in Dilley, Texas.

4. At the Karnes detention center, RAICES staff spends much of our time preparing and representing families in the expedited removal process. Families go through an initial credible or reasonable fear interview with an asylum officer from U.S. Citizenship and Immigration Services ("USCIS"). Due to the volume of families detained at the Karnes detention center and our limited resources, we are rarely able to represent families in their initial

---

[1] The CARA partners are the Catholic Legal Immigration Network, Inc., the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association.

credible fear interviews; however we provide pro se preparation and information to as many families as we can reach. If USCIS determines that the family has a negative credible or reasonable fear, the family may seek immigration judge review of the negative fear determination. Again, due to limited resources and access to information about the families detained at the Karnes detention center, we are not able to represent all families proceeding before the immigration judge. If the immigration judge affirms the negative fear determination, the family can file a request for USCIS for reconsideration of the negative fear determination. There is no limit to the number of requests for reconsideration that can be filed, and due to the traumatic nature of the violence these families have experienced and their difficult journeys to the United States, we often require several meetings to establish trust with our clients. Therefore, it is not unusual that we may be forced to file multiple requests for reconsideration if the trauma prevents a detained family from fully disclosing their fear of return in the initial stages of the attorney-client relationship.

5. Since the beginning of 2016 up until last month, we noticed significant changes in the processing time for requests for reconsideration filed with USCIS. Previously, requests for reconsideration were often adjudicated very quickly; once the request was electronically filed we typically received a

response within 1-2 days. If the request was approved, a new interview was scheduled almost immediately, and a final decision was issued within 2-3 days after the new interview. Beginning in 2016, however, these timelines changed significantly and we worked with several families currently or previously detained at the Karnes detention center who were detained for months while waiting for a decision on their requests for reconsideration. We were unable to represent many of these families at their initial credible fear interviews or during their immigration judge review hearing. I submit this declaration to discuss these families that have lingered in detention for several months. Since April 2016, processing times for requests for reconsideration appear to have hastened, however many of these families remain detained.

6. Cynthia[2] fled Honduras after experiencing severe violence at the hands of members of a transnational criminal organization, including rape. She and her two-year-old son arrived in the United States around December 14, 2015 and were transferred to the Karnes detention center on approximately December 17, 2015. USCIS issued a negative credible fear determination on December 24, 2015, and the immigration judge affirmed that decision on December 29, 2015. Our office submitted a request for reconsideration on

---

[2] In order to protect our clients' confidentiality, all names of asylum-seekers provided in this declaration are pseudonyms.

January 5, 2016. That request was denied on January 7, 2016, but after
additional meetings with Cynthia, during which she eventually disclosed her
rape, we submitted a new request for reconsideration on January 14, 2016.
USCIS did not respond to our second request for reconsideration until March
1, 2016. USCIS conducted an interview on March 2, 2016, and issued a
positive credible fear determination on March 3, 2016. Cynthia and her son
were finally released from the Karnes detention center on March 4, 2016,
after 11 weeks of detention.

7. Yazmin and her 12-year-old daughter fled violence at the hands of a
transnational criminal organization in Honduras and arrived in the United
States around December 19, 2015. They were placed at the Karnes detention
center around December 22, 2015. USCIS issued a negative credible fear
determination on January 7, 2016 which the immigration judge affirmed on
January 20, 2016. We filed a request for reconsideration with USCIS on
January 22, 2016 which USCIS granted on January 26, 2016. Yazmin and
her daughter had additional credible fear interviews on January 27, 2016. On
February 2, 2016, USCIS informed us that a decision was still pending. On
March 3, 2016, USCIS again informed us that a decision was still pending.
On March 14, 2016, Yazmin and her daughter were transferred from the
Karnes detention center to the Berks family detention center in Leesport,

Pennsylvania. USCIS issued a decision on March 30, 2016, that we received
on April 22, 2016, affirming the negative credible fear finding. Yazmin and
her daughter have since retained other counsel, but the ICE online detainee
locator indicates that they remain detained at the Berks detention center, for
a total detention time of nearly 18 weeks.

8.  Silvia and her two-year-old daughter fled gang and family violence in
Guatemala and arrived in the United States around December 14, 2015 and
were placed at the Karnes detention center around that same time. USCIS
issued a negative credible fear determination on January 7, 2016 which an
immigration judge affirmed on January 11, 2016. We filed a request for
reconsideration on January 15, 2016. USCIS approved the request on
January 19, 2016 and conducted an interview on January 20, 2016. On
February 2, 2016, USCIS confirmed that a decision is still pending. On
March 8, 2016, the family was transferred to the Berks family detention
center in Leesport, Pennsylvania. The family was issued a positive credible
fear decision on March 23, 2016 and released soon after, completing 13
weeks of detention.

9.  Karen fled dangerous violence by members of a transnational criminal
organization in Honduras and arrived in the United States around January
25, 2016 with five-year-old and three-year-old daughters.  The family was

placed at the Karnes detention center on approximately January 27, 2016. USCIS issued a negative credible fear determination on February 10, 2016 which an immigration judge affirmed on February 17, 2016. We submitted a request for reconsideration on February 19, 2016, which remained pending until March 9, 2016 when USCIS denied our request. We submitted a second request for reconsideration with additional evidence on March 25, 2016, which was approved on March 26, 2016. USCIS conducted an additional credible fear interview on March 28, 2016 and issued a positive decision on March 29, 2016. Karen and her children were released from detention on April 1, 2016, after 9 weeks of detention.

10. Violet fled violence by a transnational criminal organization from El Salvador and arrived in the United States around December 18, 2015 with her four-year-old daughter and her husband. The family entered the United States together, and CBP separated the family upon apprehension. Violet's husband was transferred to the Batavia detention center in Buffalo, New York, while Violet and her daughter were placed at the Karnes detention center on approximately December 21, 2015. USCIS issued a negative credible fear determination on January 7, 2016 which the immigration judge affirmed on January 20, 2016. We filed a request for reconsideration on January 29, 2016, which USCIS denied on February 1, 2016. After

discussing her situation further, and discovering additional grounds for

asylum eligibility, we filed a second request for reconsideration on February

3, 2016 which was denied on February 4, 2016. We then advocated for

reconsideration or other accommodations for her with the Department of

Homeland Security's Office of Civil Rights and Civil Liberties, and USCIS

indicated on March 4, 2016 that they would not change their decision. On

March 14, 2016, Violet and her daughter were transferred to the Berks

family detention center in Leesport, Pennsylvania. On March 15, 2016, with

additional evidence, we submitted a new request for reconsideration to

USCIS, which was denied on March 29, 2016. On April 6, 2016, we

submitted another request for reconsideration to USCIS—the fourth such

request for Violet and her daughter—which was granted on April 18, 2016

and resulted in a positive credible fear finding. Violet and her daughter were

released from detention on April 20, 2016, after 16 weeks of detention.

11. Kimberly fled domestic violence and threats from a transnational criminal

organization in Honduras with her two year old daughter and arrived in the

United States around December 18, 2015 and was placed at the Karnes

detention center shortly thereafter. USCIS issued a negative credible fear

decision on January 7, 2016 which the immigration judge affirmed on

January 20, 2016. We submitted a request for reconsideration for

Kimberley's daughter on January 22, 2016, which USCIS denied on January 26, 2016. We then filed a request for reconsideration for Kimberly on January 29, 2016, which USCIS denied that same day. After obtaining documentary evidence to support their asylum claim, we submitted a third request for reconsideration on February 10, 2016 which was denied the following day. We then advocated for reconsideration or other accommodations for her with the Department of Homeland Security's Office of Civil Rights and Civil Liberties, and USCIS indicated on March 8, 2016 that they would not change their decision. On March 10, 2016, we submitted a new request for reconsideration—the fourth such request for this family— which was denied on March 11, 2016. On that same day, the family was transferred to the Berks family detention center in Leesport, Pennsylvania. Although the family has retained other counsel, the ICE online detainee locator indicates the family remains detained and is going on 19 weeks of detention.

12. Fran and her three-year-old son fled Honduras due to violence by a transnational criminal organization. They arrived in the United States around December 18, 2015 and were placed at the Karnes detention center around the same date. USCIS issued a negative credible fear determination on January 8, 2016 which an immigration judge affirmed on January 14, 2016.

We filed a request for reconsideration on January 22, 2016 which was denied on January 25, 2016. We then advocated for reconsideration or other accommodations for her with the Department of Homeland Security's Office of Civil Rights and Civil Liberties, and USCIS indicated on March 4, 2016 that they would not change their decision. On March 9, 2016, ICE informed Fran that she and her son would be transferred to the Berks family detention center in Leesport, Pennsylvania. On March 25, 2016, we filed a new request for reconsideration with USCIS, which was denied on April 15, 2016. The family has since retained other counsel, but the ICE online detainee locator indicates that this family remains detained, after over 18 weeks of detention.

13. Maria and her two children, ages ten and nine, fled violence at the hands of a transnational criminal organization in Honduras and arrived in the United States around December 25, 2015, and were placed at the Karnes detention center around December 31, 2015. USCIS issued a negative credible fear determination on January 11, 2016 which an immigration judge affirmed on January 14, 2016. We filed a request for reconsideration with USCIS on January 29, 2016, which was denied on February 1, 2016. We then advocated for reconsideration or other accommodations for her with the Department of Homeland Security's Office of Civil Rights and Civil

Liberties, and USCIS indicated on March 4, 2016 that they would not change their decision. On March 7, 2016, ICE informed us that the family would be transferred to the Berks family detention center in Leesport, Pennsylvania. On March 10, 2016, we submitted a new request for reconsideration with USCIS which resulted in an additional interview on March 24, 2016. USCIS issued a positive credible fear decision on March 29, 2016 and the family was released that same day after nearly 13 weeks of detention.

14. Fatima and her 12-year-old son and nine-year-old daughter fled gang and family violence in Honduras and arrived in the United States around January 12, 2016, and were placed at the Karnes detention center around that same date. USCIS issued a negative credible fear determination on January 25, 2016 which an immigration judge affirmed on January 27, 2016. We submitted a request for reconsideration on February 2, 2016 which USCIS denied on February 3, 2016. We then submitted a request for reconsideration specifically for Fatima's twelve-year-old son on February 5, 2016 because USCIS conducted only cursory questioning during the credible fear interview and he has independent claims for asylum. After submitting an inquiry almost a month later with USCIS on March 4, 2016, we received a denial of our request. Fatima and her children were deported that same day.

15. While families that receive positive credible fear decisions from USCIS or the immigration judge are generally released from detention relatively quickly, the above examples highlight those families who seek reconsideration of negative agency decisions, and the length of time they must wait for responses. As I previously mentioned, although this timeframe has varied in the past month, many families seeking reconsideration still languish in detention for lengthy periods of time in excess of 20 days.

16. An additional case I want to highlight is that of Rina, who fled violence in Brazil with her three children—two daughters and a six-year-old son. During her journey, she was told by people she was traveling with that the United States would not allow her to enter with three children. When they arrived at the border, she and her daughters entered the United States and were detained at the Karnes detention center around January 26, 2016. Her son entered with an unrelated Brazilian man who traveled with them. Her son was classified as an unaccompanied minor and placed in the custody of the Office of Refugee Resettlement ("ORR"). Although Rina had relatives in Boston that were willing to sponsor her son for release from ORR custody, on February 10, 2016 ORR "reunified" Rina's son with her and ICE admitted him at the Karnes detention center. After the family established a positive credible fear, they were released from detention around February

16, 2016. While the son was able to rejoin his family, these actions appear to violate the Flores settlement agreement's requirement that the child be released to the least restrictive setting possible. Additionally, in order to avoid the family separation, I believe ICE should have allowed Rina and her daughters to be released from detention, rather than allowing her son to be detained with her at the Karnes detention center.

17. An additional, and troubling concern, is that over the past several weeks, we have seen increasing restrictions on our ability to meet with families at Karnes and access to counsel generally. After multiple attempts to discuss these issues with ICE including through local and national meetings and other correspondence, we submitted a letter summarizing the specific problems, instances that these issues have occurred, and their impact. The letter is attached as Exhibit A. I emailed the letter to the recipients within ICE on April 6, 2016. Although some of these issues have been resolved, we have yet to receive a formal response from ICE on any of these concerns.

18. Finally, I also want to discuss the monitoring visit that I participated in with Peter Schey, counsel in this matter, on February 3, 2016 of the Karnes detention center. During that visit, I had the opportunity to speak with ICE and GEO (the private prison company that ICE has contracted with to run

the Karnes detention center) officials, to have a tour of the Karnes detention center, and to interview individual class members and their mothers.

19. Some of the information provided by ICE contradicts what we are actually seeing at Karnes. For example, an ICE official informed us that children under the age of two are not detained at the Karnes detention center, however in the past six weeks we have seen multiple children under age two that are detained there. In certain instances, mothers who are breastfeeding their children in the visitation area have been told that they need to stop or they need to have themselves completely covered.

20. Children at the Karnes detention center have routinely told us that they were not informed of their rights to custody redetermination hearings, as required by the *Flores* settlement agreement, and the same is true of the class members I met with on February 3, 2016.

21. Many children we have worked with have also described unacceptable conditions at CBP facilities. Some children have reported being separated from their parents depending on age and gender, even though the family entered together. Many class members reported CBP facilities to be very cold, cramped, and without any privacy for using the bathroom. Class members also reported being placed with unrelated adults, which is also very common at the Karnes detention center too.

I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 5th day of May, 2016, in San Antonio, Texas.

Manoj Govindaiah

Director of Family Detention Services
Refugee and Immigrant Center for
Education and Legal Services (RAICES)
1305 N. Flores St.
San Antonio, TX 78212
(210) 787-3745
Manoj.govindaiah@Raicestexas.org

# Attachment to Exhibit 17
# Exhibit A

April 6, 2016

Enrique Lucero
Field Office Director
U.S. Immigration and Customs Enforcement
1777 NE Loop 410, Suite 1500
San Antonio, Texas 78217
Email: enrique.m.lucero@ice.dhs.gov

Deborah Achim
Deputy Field Office Director
U.S. Immigration and Customs Enforcement
1777 NE Loop 410, Suite 1500
San Antonio, Texas 78217
Email: Deborah.Achim@ice.dhs.gov

John Amaya
Senior Advisor & Deputy Chief of Staff
U.S. Immigration and Customs Enforcement
Email: John.Amaya@ice.dhs.gov

**RE:    Significant impediments regarding access to counsel at Karnes**

Director Lucero:

Thank you for discussing issues at Karnes with us on Thursday, March 24 during the ICE/CARA biweekly meeting. We also recently met with ICE staff at Karnes on April 4, 2016. Despite the conversations on both days, I write to inform you of urgent impediments to the provision of legal representation for families detained at the Karnes County Residential Center. As you know, RAICES provides pro bono legal services to detained families through the CARA Family Detention Pro Bono Project, and its predecessor the Karnes Pro Bono Project.

Recent and unexpected restrictions on legal access, discussed below, have occurred from one day to the next without any prior notice or explanation.  These sudden changes inhibit our ability to recruit pro bono volunteers and to provide pro bono legal services.

Many of our concerns involve issues that we resolved with DHS over a year ago in order to facilitate access to pro bono services, ensure the right to counsel, and promote compliance with both the Family Residential Standards and the *Orantes* settlement agreement. Access to counsel issues have repeatedly been addressed in letters to Deborah Achim from Steven Shulman, Pro Bono Counsel at Akin Gump Strauss Hauer & Feld LLP, dated September 13, 2014 and February 26, 2015, and many of the current issues were documented in a letter to Director Saldana from legal services providers dated April 20, 2015. The recent changes at Karnes also contradict Secretary Jeh Johnson's June 24, 2015 policy directive to implement measures to enhance access to counsel.

<u>Restrictions on ability of law students to meet with detained individuals</u>

In recent weeks, ICE and GEO personnel have insisted that law students must be supervised by an on-site attorney during their visits to Karnes, even after they have been cleared to enter the detention center as legal representatives. For example, on Saturday, March 26, 2016, a group of law students from St. Mary's University arrived at Karnes before their supervising attorney. An ICE officer informed the students that they could not be present in the visitation area without an attorney to supervise them and required that they wait in the waiting room outside of security until their supervisor arrived. The GEO visitation attendant informed the ICE officer that some of the mothers were already in the visitation area waiting to meet with the law students; however the ICE officer prohibited the students from going to the visitation area until their supervisor had arrived.

This restriction contradicts both Family Residential Standard 5.8, section V.10.c and 8 CFR § 292.1, neither of which require that law students be accompanied by an attorney. Law students, if supervised by a licensed attorney, may independently meet with detained individuals and should be permitted to do so at Karnes.

This restriction, as it relates to Salvadoran families detained at Karnes, also violates the *Orantes* settlement agreement. The settlement agreement provides that attorneys and paralegals shall have reasonable access to class members and that paralegals working under the supervision of counsel may meet with class members without the presence of an attorney. Surely, law students, who are explicitly permitted to practice immigration law under the regulations, must be treated in the same manner.

<u>Delayed entry for law students</u>

There have been significant delays in the physical admittance of law students into the detention center, shortening the amount of time available to these legal representatives to meet with detained individuals after they have traveled long distances. Law students have reported that the GEO front desk attendant does not have a list of students who have received clearance, and will not accept an email displayed on a phone to allow admission, leading to delays.

For example, on February 26, 2016, law students from the University of Texas who are Pro Bono Project volunteers arrived at Karnes and had electronic versions of their clearance approvals on their phones. The GEO front desk attendant would not accept those versions and the students spent nearly an hour trying to print the approval letters so that the GEO attendant could review them in hard copy form despite the fact that the students had been cleared weeks earlier.

Similarly, the GEO front desk attendant refuses to accept a printed email from ICE stating that all students have been cleared. In the case of St. Mary's Law School students (previously mentioned above), the students did not, and have never, received individual letters stating that they were cleared. Instead ICE only provided a general email listing the names of the St. Mary's students and stating that they had been cleared. The GEO attendant stated that the email was insufficient and that the students could not be allowed in without individual letters. It was only after an ICE officer arrived and reviewed the printed email that the students were allowed in.

Students from Loyola Law School, who visited Karnes the week of March 21, 2016, and from the University of Houston Law School, who visited Karnes the weekend of March 4, 2016, dealt with similar delays and difficulties despite being cleared ahead of time, and having proof of their clearance at Karnes.

These delays violate the *Orantes* settlement agreement, which requires that attorneys who have provided advance notice to ICE have access to their clients within 15 minutes, and no longer than 30 minutes, after arrival.

These delays are unacceptable. The majority of law students and non-lawyer volunteers are cleared for set periods of time (for example, the Loyola Law School students were cleared for four days), and there appears to be no reason that neither ICE nor GEO has a list of cleared non-lawyer volunteers at the front desk at all times.

<u>Requirement that children be with their mothers during attorney/client meetings</u>

A new requirement that children remain with their mothers during legal visits has a significant negative impact on access to legal counsel as it impedes the ability of mothers to share information with their legal representatives, limits the time that detained individuals may spend with their legal representatives, and puts legal representatives in the position of conducting client meetings under unjustifiably challenging conditions that require simultaneous childcare and legal interviewing and counseling tasks.

On Saturday, March 26, 2016, a GEO staff member in the visitation area informed the St. Mary's law students that children could no longer play in the corner of the visitation area (where there are toys and a children's play area) if their mothers were in a private meeting room with an attorney. The staff member explained that the children must be supervised by their mothers at all times—that the children would either need to be in the private meeting rooms with their mothers, or that the mothers must meet with their lawyers in the main visitation area while their children play in the corner.

GEO staff informed Pro Bono Project volunteer attorneys of this same requirement on Sunday, May 27, 2016. Since that time, GEO staff members have informed Pro Bono Project volunteers of this requirement every day.

It is our understanding that ICE Officer Rodriguez informed Pro Bono Project attorneys on Wednesday, March 29, 2016 that the children may remain in the Karnes "daycare" center if there is capacity (apparently priority is given to those mothers with court or medical appointments), and that the daycare can only accommodate approximately 40 children. Additionally, the daycare closes at 4 p.m. each day, even though legal visitation extends until 8 p.m.

This policy is unacceptable and seriously limits access to counsel. Many of these mothers have experienced trauma and violence of which their children are unaware. Requiring that the mothers have their children with them at all times means that many mothers will be unwilling to disclose to their attorneys the full extent of their experiences in their home countries. The alternative, that

the mothers meet with their attorneys in the main visitation area, in full earshot of GEO and ICE staff, other attorneys, or other detained individuals, is a violation of an individual's right to confidential communications with her attorney and completely inappropriate.  Family Detention Standard 5.8, sec. Sec.V.10.i.

Previously, children were allowed to play in the corner of the visitation area while their mothers met with attorneys in the privacy of a meeting room. This is an appropriate policy to which ICE must either return, or facilitate private attorney-client meetings by dramatically increasing the capacity and hours of the on-site "daycare" center.

It is worth noting that during the 2007 federal court litigation regarding conditions at the Hutto family detention center, U.S. District Judge Sam Sparks instructed DHS to immediately cease requiring children to be present with their mothers during attorney visits.

ICE staff regularly observing the visitation area

In recent weeks, ICE officers have been seen regularly entering the visitation area and observing the conduct of Pro Bono Project volunteers. Although ICE staff previously entered the visitation area during visitation hours, such appearances were relatively rare and for short periods of time. Because our Project works in an ICE-contracted detention center, and both GEO and ICE staff may be present in the visitation area, we rarely meet with clients in the main visitation area due to concerns about confidentiality.

Due to the inappropriate restriction that children be with their mothers at all times (previously discussed), and therefore attorney-client meetings may need to take place in the main visitation area, it is completely unacceptable that ICE officers regularly patrol the visitation area. These actions also demonstrate that the prior policy regarding children be reinstated, or that capacity and access to the "daycare" center be expanded, all the more urgent.

Restrictions on ability to enter visitation area upon arrival to Karnes

As discussed during our March 24 biweekly meeting, over the past approximately two weeks, ICE has informed Pro Bono Project members that we cannot go into the visitation area until mothers are there waiting for us. Instead, we must wait in the waiting room or in the pro bono room. This wait has varied, from around 20 minutes to nearly 90 minutes.

We fully understand that upon our arrival, mothers may not already be in the visitation area. However, this restriction limits the time that we are able to meet with mothers and inhibits our ability to provide legal services. As the pro bono room is not located in the visitation area, our volunteer attorneys must retrieve their internet hot spot, as well as a variety of documents and other materials from the pro bono room each morning and set them up in the visitation area. We also use the visitation area to provide orientation to our volunteers, advise them as to the layout of the visitation space, review our visitation list to assign out clients, and answer basic questions before the mothers arrive. Not having access to the visitation area upon arrival means that we cannot efficiently use all of our available time to counsel and represent detained clients.

ICE officers have referred to an SOP that prohibits us from waiting in the visitation area while our clients are arriving; however to date, we have not been provided a copy of this SOP. In fact, volunteers have been allowed to enter the visitation area while waiting for clients since ICE first began detaining families at Karnes. Nothing in the Family Residential Standards states that we are prohibited from being in the visitation area while waiting for our clients to arrive. As previously mentioned, these delays also violate the *Orantes* settlement agreement.

In order to ensure that we are able to maximize our time at Karnes, and limit confusion and interruptions for ICE and GEO staff, we request that the current policy be rescinded and that we be allowed to enter the visitation area upon arrival at Karnes.

<u>Restrictions on independent medical evaluations</u>

For the past approximately two months, ICE has required that the attorney of record be present at Karnes when an independent medical evaluation takes place. Our understanding is there is no written policy confirming this requirement, which was made by the San Antonio ERO office and conveyed orally to ICE staff at Karnes.

Requiring that the attorney of record be on-site while an independent medical evaluation takes place severely limits the ability of independent medical evaluators to conduct these evaluations. These evaluators have already been cleared by ICE, and many of them are providing pro bono services; as a result, most often they are only available nights and weekends. However if the attorney of record is not available at those times, the evaluation cannot take place. As our Pro Bono Project is staffed primarily with volunteers, these restrictions often make it nearly impossible to conduct mental health evaluations. It is also unclear how unrepresented individuals would be able to access independent medical evaluations without an attorney of record.

Additionally, for independent medical evaluations taking place via telephone, we have received contradictory information. On April 4, 2016, Assistant Field Office Director Juanita Hester advised that an attorney does not need to be present for a telephonic evaluation; however on April 5, 2016, ICE Officers Rodriguez and Acosta indicated that a Pro Bono Project staff person must be on site to facilitate the phone call.

Nothing in the Family Residential Standards supports this requirement and there is simply no basis for such policy. An independent psychological evaluation often yields key evidence to support legal arguments, and undermining access to such experts and evaluations is an unacceptable restriction on the provision of legal services.

<u>Requirement that visitation lists be submitted 24 hours in advance</u>

On Friday, April 1, 2016, the GEO front desk attendant told Denise Gilman, a Pro Bono Project volunteer from the University of Texas Law School Immigration Clinic, that ICE had informed GEO that all visitation lists must be submitted 24 hours in advance. Additionally, over the past two weeks, ICE staff has informed us that visitation lists are expected to be submitted 24 hours in advance.

As previously mentioned, over a year ago through various correspondence, ICE indicated that 24 hour notice for visitation lists was preferred, rather than required, and that ICE understood that such notice would not always be possible. It is frustrating that ICE has chosen to backtrack on this agreement at this time. As you know, with the rapidly changing detained population at Karnes, it is often impossible to provide advance notice of the clients we visit.

Additionally, requiring 24 hour advance submission of visitation lists violates the *Orantes* settlement agreement, which specifically states that advance notice is not required at all. If the attorney chooses to provide advance notice—which is the attorney's decision—"advance" means two hours prior to the visit, and such notice may be provided by telephone, fax, or in-person. This requirement also violates Family Residential Standard 5.8, sec. V.10.e.

Attorney phone calls with detained individuals

Previously, attorneys who wanted to arrange phone calls with their clients were able to contact a GEO staff person to arrange the call. The GEO staff member would locate the detained individual, take them to one of the private visitation rooms within the visitation area, and assist the detained individual in calling their attorney.

Recently this policy changed with no explanation. Now attorneys must contact GEO staff members who will provide a written message to each detained individual but will not provide that individual with any other assistance in making the phone call, including allowing the call to happen from a private visitation room. It is unclear where these phone calls will now take place, how ICE will ensure their confidentiality, whether detained individuals will be required to pay for them, and how ICE will ensure that detained individuals receive and understand the written message.

We request that ICE immediately return to its previous policy.

Follow up on items discussed on March 24, 2016

Additionally, I wanted to follow up on the items we discussed at the March 24, 2016 ICE/CARA biweekly meeting:

1. On April 4, 2016 we submitted a proposed signup sheet to ICE staff at Karnes for approval. You stated during our meeting that ICE staff would be able to return a complete sheet to us at the end of the day. While we are willing to try the signup sheet, we continue to request that women also be allowed to come to the visitation area and provide their names and A numbers as a way of requesting to see us. We are willing to leave paper or a form with the visitation attendant through which families can inform us that they wish to be seen.

2. Please advise as to whether the CARA Project flyer can be included in the Karnes orientation packet.

3. Please advise as to our ability to take both of our portable printers from the pro bono

room to the visitation area. If you continue to believe that the larger of the printers is too large for the visitation area, please advise why the printer must be considered "portable" and what the acceptable printer dimensions are.

Your immediate attention to all of the above matters is expected. I can be reached at manoj.govindaiah@raicestexas.org or (210) 787-3745.

Sincerely,

Manoj Govindaiah                          Barbara Hines
Director of Family Detention Services     Senior Emerson Fellow
RAICES                                    Emerson Collective


Amy Fischer                               Dennis Windscheffel
Policy Director                           Senior Counsel
RAICES                                    Akin Gump Strauss Hauer & Feld LLP


Cc: Juanita Hester, Assistant Field Office Director, Karnes County Residential Center

# Exhibit 18
## Publicly Filed

# DECLARATION OF ROBERT DOGGETT

I, Robert Doggett, hereby declare:

1.      I make this declaration based on my own personal knowledge and, if called to testify, I could and would do so competently as follows:

2.      I have been a licensed Texas attorney since 1990. I hold the position of General Counsel with Texas RioGrande Legal Aid, Inc. (TRLA).  My office address is 4920 North IH-35, Austin, Texas, 78751.

3.      I currently represent Grassroots Leadership, Inc., a non-profit organization, and recent immigrants that have fled Central America that have been detained in a lawsuit for declaratory judgment against the Texas Department of Family and Protective Services ("DFPS") that is pending in the Travis County District Court in Austin, Texas.  Originally, the suit challenged the agency's "emergency" adoption of a regulation allowing for the licensing of family immigration detention facilities operating in Karnes City ("the Karnes facility") and Dilley, Texas ("the Dilley facility").  As will be explained further below, once the court invalidated the emergency rule, DFPS adopted another licensing regulation using normal adoption procedures. Subsequently, our suit was amended to include claims that the new rule conflicts with Texas law, and was enacted without statutory authority.  On May 4, 2016, the court issued a temporary restraining order prohibiting further implementation of the new rule pending a temporary injunction hearing set for May 13, 2016.

4.      DFPS promulgated the emergency rule through publication on September 18, 2015.  The rule was promulgated more than a year after family immigration detention began operating at the Karnes facility in August 2014 and almost a year after family immigration detention began at the Dilley facility in December 2015.

5.      DFPS explicitly invoked the July 24, 2015 federal district court decision in *Flores v. Johnson*, CV 85-4544 DM0 (C.D. Cal. July 24, 2015) as its only rationale for emergency action. Specifically, the agency said that, the "court's ruling *highlights a gap* in the oversight of the children housed in facilities covered by the settlement agreement. There are two such facilities in Texas: the South Texas Family Residential Center in Dilley, Texas and the Kames County Residential Center in Karnes City, Texas. Both are family residential facilities designed for detention of adults with children. Neither is currently licensed by the Child-Care Licensing Division of DFPS."  *See* Attachment 1, DFPS Emergency Rule.

6.      While seeking to allow licensing on an emergency basis, DFPS did not take any steps to bring the facilities into compliance with the state's own Minimum Standards for General Residential Operations, which are the standards normally in place for childcare facilities regulated and licensed by DFPS. The emergency regulations specifically exempted the Karnes and Dilley facilities from several key minimum standards.  The exemptions waived compliance with minimum standards that: 1) impose a limit on the number of children sharing a bedroom, 2) provide for adequate space in bedrooms, 3) preclude children from sleeping in the same bedroom

with unrelated adults, and 4) preclude unrelated children of opposite genders from sharing a bedroom.

7.      On September 30, 2015, counsel for Grassroots Leadership, Inc. filed a Petition for Declaratory Judgment, Application for Temporary Restraining Order, and Application for Temporary and Permanent Injunction in the Travis County District Court.  The petition asserted that DFPS had deprived Grassroots Leadership, Inc. of its statutory right to comment on DFPS's vague licensing rule, and its statutory right to require the agency's written responses to all public comments *prior* to implementation of a licensing rule and potential licensing of the facilities.

8.      At the time of the filing of the lawsuit, the Corrections Corporation of America and the GEO Group, Inc., which manage the Dilley facility and the Karnes facility respectively, had filed applications for licensing under the emergency regulation.  There was an imminent risk that DFPS would license the two facilities under the emergency regulations that exempted the facilities from compliance with the minimum standards that govern facilities utilized for housing children.  On October 8, 2015, the parties reached agreement stipulating that DFPS would not proceed with licensing of the Karnes and Dilley facilities until at least October 23, 2015.

9.      A hearing on the temporary injunction request was scheduled for October 23, 2015.  However, DFPS removed the case to federal court on that date, leading to a delay in the temporary injunction hearing in the Travis County District Court.  The United States District Court for the Western District of Texas promptly remanded the case back to the Travis County District Court.  On October 30, 2015, after argument on the petition, the Travis County District Court granted a temporary restraining order halting the implementation of the emergency rule and set a hearing on the request for temporary injunction for November 11, 2015.

10.     An evidentiary hearing on the request for temporary injunction finally took place on November 11, 2015.  I offered legal argument and with approval from the court introduced several documents into evidence, including a petition opposing the licensing of the Karnes and Dilley facilities signed by 140 individuals and organizations.

11.     Among other witnesses, Professor Luis Zayas testified as an expert at the hearing.  Luis Zayas is the Dean of the School of Social Work at the University of Texas at Austin and a well-recognized expert on the impacts of immigration proceedings and detention on migrant youth.  Dean Zayas has visited both the Karnes and Dilley facilities on multiple occasions.  He testified about the conditions in the facilities, describing them as secure and highly restrictive, making them much like jails.  He explained that multiple families are held in single sleeping and living cells together.  He laid out his conclusion that the children held in the family detention facilities, even for relatively short periods of time, suffer negative and long-lasting impacts on their mental health.  He also noted that the facilities do not resemble other childcare facilities, even residential facilities, because they do not have a therapeutic or child welfare purpose but rather serve a law enforcement purpose of immigration detention.  Professor Zayas testified that the facilities are more closely akin to juvenile detention centers but cannot be treated as juvenile detention centers for regulation purposes, because the children held there have not been accused or found to be offenders.  Finally, he concluded that the conditions for children would not be improved if the Karnes and Dilley facilities were licensed under the emergency regulation and its exemptions,

411

because the minimum standards waived under the emergency regulations are critical to
protecting child safety and welfare.

12.     On November 20, 2015, Judge Karin Crump of the 250th District Court, Travis County,
Texas, granted a temporary injunction of the DFPS emergency regulation.  *See* Attachment 2,
Temporary Injunction Decision.  The Court held that Grassroots Leadership, Inc. was entitled to
a temporary injunction, because the organization had a "probable right to a declaratory
judgment" declaring the emergency regulation invalid on the grounds that there was no basis for
the agency's emergency action to regulate the Karnes and Dilley facilities.  The ruling further
found that Grassroots Leadership, Inc. would be irreparably harmed without an injunction,
because the organization would be deprived of its ability to comment on the agency's regulatory
actions before the regulation was enacted and potential licensing took place.

13.     The November 20, 2015 ruling found that the emergency regulation "disregards the fact that
that [the Karnes and Dilley facilities] have been in operation in Texas for well over a year" and
also "removes [the facilities'] obligations to comply with current Texas Minimum Standards for
General Residential Operations that pertain to the safety and welfare of children"  (footnote
omitted).

14.     Finally, the November 20, 2015 decision concluded that the emergency rule allows for
"significantly less oversight" than the existing state standards for child welfare in residential
operations and fails to "provide for 'regular and comprehensive' oversight'" of the Karnes and
Dilley facilities.  The Travis County District Court issued the temporary injunction to preserve
the status quo until a trial could take place on the matter.

15.     Two days after the temporary injunction hearing, on November 13, 2015, DFPS
published a proposed non-emergency regulation that would allow for licensing of the Karnes and
Dilley facilities.  *See* Attachment 3, Proposed Regulation.  The non-emergency proposed
regulation includes the same exemptions from the minimum standards that would otherwise
apply in the state of Texas to residential childcare operations.  The exemptions waive compliance
with minimum standards that impose a limit on the number of children sharing a bedroom, that
provide for adequate space in bedrooms, that preclude children from sleeping in the same
bedroom with unrelated adults and preclude unrelated children of opposite genders from sharing
a bedroom.  In addition, the non-emergency proposed regulation explicitly declines to address
whether the facilities meet other requirements relating to their nature as "secure" or "non-secure"
facilities.  Finally, the proposed regulation allows for additional waivers and exemptions from
the child welfare standards that are otherwise applicable under state law.

16.     Interested parties were given until December 14, 2015 to offer public comment on the
regulation.  On December 9, 2015, a public hearing was held on the proposed permanent
regulation.  *See* Attachment 4, Transcript of Public Hearing.  The transcript of the hearing
reflects that dozens of speakers testified in opposition to the proposed regulation, alerting the
agency to the conditions of detention in the facilities, and informing the agency that the
exemptions from the state's own minimal standards would greatly undermine child health and
safety for the children detained at Karnes and Dilley.  No public statements were made in favor

of the regulation or licensing of the facilities.  Written comments on the regulation were provided by many individuals and organizations, including a number of Texas state legislators, as well.

17.     The period for public comment on the non-emergency proposed regulation allowing for licensing of the Karnes and Dilley facilities closed on December 14, 2015.  Under the regular rule-making process, the agency is required to respond to all public comments on the regulation. The agency then will reach a determination as to whether it will implement the regulation.

18.     In the February 26, 2016 edition of the Texas Register, the agency adopted the new version of the regulation with few changes.  Specifically, it labeled the facilities "family residential centers," and categorized them as a "general residential operation" (GRO) with the following characteristics:

>    a.   The center is operated by or under a contact with United States Immigration and
>         Customs Enforcement;
>    b.   The center is operated to enforce federal immigration laws;
>    c.   Each child at the center is detained with a parent or other adult family member,
>         who remains with the child at the center; and
>    d.   A parent or family member with a child provides the direct care for the child
>         except for specific circumstances when the child is cared for directly by the center
>         or another adult in the custody of the center.
>
>    Title 40, Part 19, Chapter 748, Subchapter A, Rule § 748.7(a) (effective March 1,
>    2016), published in 41 TEX. REG. 1493-1502 (Feb. 26, 2016). *See* Attachment 5,
>    new regulation.

19.     Notably, the new regulation also states "The department does not oversee requirements that pertain to other law, including whether the facilities are classified as secure or in compliance with any operable settlement agreements or other state or federal restrictions." Rule 748.7(b) (2016).

20.     Similar to the emergency rule that was invalidated by the Court, the new rule also makes some exceptions from the minimum standards the agency normally requires of child-care facilities: the rule waives the limitation of room occupants to four, the limitation on a child sharing a bedroom with an adult, and the limitations on children of the opposite sex sharing a room.  Rule 748.7(c) (2016).

21.     One of the plaintiffs in the amended case who is currently being detained has already suffered an assault because of conditions and practices in the facilities that would be legalized by the rule, and that the elimination of these minimum standards interferes with or threatens to interfere with or impair a legal right or privilege of all the individual Plaintiffs and those in the family detention centers.

22.     Plaintiff EGS has been detained with her 12 year old daughter in Karnes County Residential Facility since March 24, 2016.  She fled El Salvador after gang members murdered

her brother-in-law and raped and robbed her.  The gang members then started stalking her daughter and threatened to rape her too.  After arriving in Texas she says:

> My worst nightmare became a reality when my daughter was sexually assaulted in jail by a woman we were forced to share a room with. My daughter's abuser remains in this detention center and we must see her every day. My daughter is afraid to be without me for even a minute. She currently sleeps in my small bottom bunk bed each night out of fear someone will harm her while she is sleeping.

> Declaration of EGS, May 2, 2016, exhibit from the Second Amended Petition, Grassroots Leadership, Inc., et al. v. Texas DFPS, et al., *see* Attachment 6.

23.    Grassroots Leadership, Inc., joined by four current detainees of one of the detention centers, filed an amended suit against the agency on May 3, 2016.  As explained in the amended petition, DFPS issued its rule in direct contravention of the Texas Legislature's prohibition on confining a child in a secure immigration detention facility, "regardless of whether the facility is publicly or privately operated."  Tex. Fam. Code § 54.011(f).  DFPS's official explanation asserts that § 54.011(f) does not deprive it of authority to issue § 748.7 because DFPS believes that this statute applies only to facilities operated by juvenile justice agencies and not to "federal facilities."

24.    DFPS provides no authority or explanation to support this position, nor does anything in the term "publicly or privately operated" exclude a detention facility operated by a private corporation under contract with ICE.  41 TEX. REG. at 1500-01.  DFPS makes no attempt at all to explain what change in law or facts, if any, could justify DFPS's current view that a child-care license is required of immigration detention facilities under TEX. HUM. RES. CODE § 42.041, when for ten years DFPS had repeatedly asserted that it lacked statutory authority to license these facilities.  41 Tex. Reg. at *passim*.

25.    DFPS recognizes but fails to address serious concerns of how child-care regulation can be consistent with not only parental custody, but also with serious mental health needs at the facilities covered by § 748.7.  *See, e.g.,* 41 TEX. REG. at 1501 (no response to comment about deficient access to psychiatrists and psychologists); *id.* at 1498-99 (mental harm may be inevitable consequence of immigration detention); *id.* at 1500 (DFPS itself claims that it "lacks authority to appoint an independent medical and psychological team to investigate reports of abuse, neglect and exploitation").

26.    DFPS admits that § 748.7 attempts an entirely new branch of child-care licensing in Texas.  41 TEX. REG. at 1497 ("From the outset, DFPS recognized that the character of the FRCs is without an identical counterpart in the current regulatory structure.").

27.    In addition to the conflict with Texas Family Code § 54.011(f), Plaintiffs claim the agency lacks statutory authority to enact the licensing rule because DFPS and its predecessors

have not done so before in some 75 years of child-care licensing (and have claimed that they have no jurisdiction up until now); because child care is not the primary purpose of the facilities, and no specific legislative authorization or historical need for or capacity to conduct child-care licensing of these facilities has been alleged or shown; and because the agency altered the statutory definition of "general residential operation" that appears in TEX. HUM. RES. CODE § 42.002(4) by classifying immigrant detention facilities as "general residential operations" even when they do not provide 24-hour care for children.

28.     On May 4, 2016, the state court conducted a hearing on Plaintiffs' application for a temporary restraining order and at the conclusion of the hearing the judge ordered that the agency desist and refrain from licensing the Dilley facility until further order of the court (the Karnes facility was licensed by the agency on or about May 2, 2016).  *See* Attachment 7.  The court indicated it would take up possible remedies regarding the Karnes facility at the temporary injunction hearing on May 13, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th of May, 2016 at Austin, Texas.

_____
Robert Doggett

415

# Attachment to Exhibit 18
# Attachment 1

## DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES

### ORDER ADOPTING EMERGENCY RULES

**Regarding Minimum Standards for General Residential Operations**

### AMENDMENT to 40 TAC § 748.7

As authorized by Government Code, §2001.034, the Executive Commissioner may adopt emergency rules without prior notice or hearing, if the Executive Commissioner finds that an imminent peril to the public health, safety, or welfare requires adoption of the rules on fewer than 30 days' notice. Emergency rules adopted under Government Code, §2001.034, may be effective for not longer than 120 days and may be renewed for not longer than 60 days.

The emergency rule and the preamble to the rules, as attached, are incorporated by reference in this Order as though set forth verbatim herein.

IT IS THEREFORE ORDERED BY the Texas Health and Human Services Executive Commissioner that the rules listed above are hereby adopted.

The effective date of the rules is the date the rules are filed with the Texas Register.

DATE ISSUED: 9-2-15

CHRIS TRAYLOR, or Designee
Executive Commissioner
Health and Human Services Commission

417

September 2, 2015

On behalf of the Department of Family and Protective Services (DFPS), the Health and Human Services Commission adopts, on an emergency basis, new § 748.7 of Title 40, concerning the applicability of Chapter 42, Human Resources Code, and licensing rules and statutes in general to residential family centers operated by contractors of U.S. Immigration and Customs Enforcement (ICE). The new section is adopted on an emergency basis pursuant to § 2001.034, Government Code, which allows emergency rulemaking if a state agency finds an imminent peril to the public health, safety, or welfare.

On July 24, 2015, a federal district court determined that ICE's policy of detaining female-headed families in family residential centers, which are unlicensed and secure, violated the terms of a 1997 settlement agreement requiring, *inter alia*, that minors in custody be released without unnecessary delay and that, while they are detained, they be housed in non-secured, state-licensed facilities. *Flores v. Johnson,* CV 85-4544 DMG (C.D. Cal. July 24, 2015). The court noted that the purpose of the licensing provision in the settlement agreement "is to provide class members the essential protection of regular and comprehensive oversight by an independent child welfare agency."

The court's ruling highlights a gap in the oversight of the children housed in facilities covered by the settlement agreement. There are two such facilities in Texas: the South Texas Family Residential Center in Dilley, Texas and the Karnes County Residential Center in Karnes City, Texas. Both are family residential facilities designed for detention of adults with children. Neither is currently licensed by the Child-Care Licensing Division of DFPS. Because there is no regular and comprehensive oversight of the care of children housed in the facilities by an independent agency, there is an imminent peril to the public's health, safety, or welfare.

Title 40, Social Services & Assistance, Part 19, Dept. of Family and Protective Services

Chapter 748, Minimum Standards for General Residential Operations

Subchapter A, Purpose and Scope

TAC Section Number(s) §748.7

Emergency Action

X      New

Effective Date:

X      Other (Specify)

        Immediately on Filing

The new section is adopted under § 40.0505, Human Resources Code, and § 531.0055, Government Code, which provide that the Health and Human Services Executive Commissioner shall adopt rules for the operation and provision of services by the health and human services agencies, including the Department of Family and Protective Services. Adoption of this rule as an emergency rule is authorized under § 2001.034, Government Code, which allows emergency rulemaking if a state agency determines that it is necessary to address an imminent peril to the public health, safety, or welfare.

The new section implements § 42.042(a), Human Resources Code.

§ 748.7. How are these regulations applied to family residential centers?
    (a) Definition. A family residential center is one that meets all of the following requirements:

        (1) The center is operated by or under a contract with United States Immigration and Customs Enforcement;

        (2) The center is operated to enforce federal immigration laws;

(3) Each child at the center is detained with a parent or other adult family member, who remains with the child at the center; and

(4) A parent or family member with a child provides the direct care for the child except for specific circumstances when the child is cared for directly by the center or another adult in the custody of the center.

(b) Classification. A family residential center is a general residential operation (GRO) and must comply with all associated requirements for GROs, unless the family residential center is approved for an individual waiver or variance or an exception is provided in this section. The department is responsible for regulating the provision of childcare as authorized by Chapters 40 and 42, Texas Human Resources Code and Chapter 261, Texas Human Resources Code.  The department does not oversee requirements that pertain to other law, including whether the facilities are classified as secure or in compliance with any operable settlement agreements or other state or federal restrictions.

(c) Exceptions. A family residential center is not required to comply with all terms of the following Minimum Standards:

(1) the limitation of room occupants to four in § 748.3357 of this title (related to What are the requirements for floor space in a bedroom used by a child?);
(2) the limitation on a child sharing a bedroom with an adult in § 748.3361 of this title (related to May a child in care share a bedroom with an adult?); and
(3) the limitations on children of the opposite gender sharing a room in § 748.3363 of this title (related to May children of opposite genders share a bedroom?)
(d) Limitation of exception. Notwithstanding subsection (c), the department retains the authority for placing conditions on the scope of the exceptions authorized for a family residential center, including conditions related to limiting occupancy in accordance with fire safety standards, limitations related to allowing children and adults of the opposite gender to occupy the same room only if they are part of the same family, and any other limitation determined by the department to be necessary to the health, safety, or welfare of children in care.

(e) Division of responsibility. In addition to the application materials described in 40 TAC § 745.243(6), an applicant for a license under this section must submit the policies, procedures, and any other documentation that the department deems necessary to clarify the division of supervisory and caretaking responsibility between employees of the facility and the parents and other adult family members who are housed with the children.  The department must approve the documentation during the application process and any subsequent amendments to the policies and procedures.

This agency hereby certifies that the proposal has been reviewed by legal counsel and found to be within the agency's legal authority to adopt.


Issued in Austin, Texas, on  _____.

# Attachment to Exhibit 18

# Attachment 2

COPY

Filed in The District Court
of Travis County, Texas

NOV 2 0 2015

At_____ 5:00 P.M.

Velva L. Price, District Clerk

No. D-1-GN-15-004336

GRASSROOTS LEADERSHIP, INC., §
                               §
*Plaintiff,*                   §
                               §
v.                             §
                               §
TEXAS DEPARTMENT OF FAMILY     §
AND PROTECTIVE SERVICES (DFPS),§
JOHN J. SPECIA, Jr. in his official capacity §
as DFPS Commissioner, TEXAS    §
HEALTH AND HUMAN SERVICES      §
COMMISSION (HHSC), and         §
CHRIS TRAYLOR, in his official capacity §
as HHSC Executive Commissioner,§
                               §
*Defendants.*                  §
                               §
                               §

IN THE DISTRICT COURT OF

TRAVIS COUNTY, TEXAS

353rd JUDICIAL DISTRICT

(All proceedings assigned
to the 250th Judicial District Court)

## TEMPORARY INJUNCTION

On November 12, 2015, the Court considered Plaintiff's Application for a Temporary Injunction (the "Application"). Plaintiff and Defendants Texas Department of Family and Protective Services ("DFPS"), Texas Health and Human Services Commission (HHSC), and their Commissioners appeared through counsel of record. The record of testimony was duly reported by the court reporter for the 250th Judicial District Court.

Plaintiff asserts a cause of action for declaratory relief under TEX. GOV'T CODE § 2001.038(a), also known as the Administrative Procedure Act (APA), by challenging the validity of the emergency rule adopted by DFPS and published in the Texas Register on September 18, 2015 as Title 40, Part 19, Chapter 748, Subchapter A, Rule § 748.7 (herein the "Emergency Rule"), effective immediately and without notice and comment rulemaking procedures.

After reviewing the Application, testimony, evidence presented, and all other documents filed in this case to date, the arguments of counsel, and applicable law, the Court FINDS:

1.  Plaintiff has demonstrated a probable right to a declaratory judgment as to the Emergency Rule's invalidity because no imminent peril to public health, safety or welfare exists as required by TEX. GOV'T CODE § 2001.034(a)(1) to support the agency's use of emergency procedures, and no federal or state law required the agency to use emergency procedures;

2.  Plaintiff will suffer immediate and irreparable harm absent a temporary injunction because money damages are unavailable against the state agency, and Plaintiff will be deprived of the statutory rights granted to Plaintiff by TEX. GOV'T CODE §§ 2001.001 to 2001.038, including the rights to adequate notice and the opportunity to comment prior to implementation of agency rules, as well as the right to review and challenge the adequacy of reasons that the agency states in writing in response to Plaintiff's comments, as provided in Tex. Gov't Code §§ 2001.029 to 2001.030; and

3.  The temporary injunction is necessary to preserve *the status quo* while the challenge to the validity of the agency's Emergency Rule proceeds to final trial pursuant to TEX. GOV'T CODE § 2001.038.

I.   **Background Information**

   A.   *Flores v. Johnson Settlement Agreement – January 1997*

On July 11, 1985, a class of plaintiffs initiated a lawsuit against U.S. Immigration and Customs Enforcement (ICE) and other defendants in the District Court of Central California.

*Flores v. Johnson,* CV 85-4544 DMG (C.D. Cal). On January 28, 1997, the parties entered into court approved a class-wide settlement of the lawsuit (the *"Flores* Settlement Agreement"). The *Flores* Settlement Agreement provided that, if a minor is not released and detained, the minor shall be placed temporarily in an unsecure[1] and licensed program. The *Flores* Settlement Agreement defines a "licensed program" as a "program, agency or organization *that is licensed by an appropriate State agency* to provide residential, group, or foster care services for dependent children ...." The Defendants in this case were not parties to the *Flores* case or subject to any timelines under the *Flores* Settlement Agreement.

B.    *ICE Family Residential Centers in Texas – 2006 to present*

In March 2006, the Correction Corporation of America, an ICE contractor, notified DFPS that it intended to house families with children in a Family Residential Center (FRC) at the T. Don Hutto Residential Center in Taylor, Texas and that it would soon request a license to do so.

Instead of initiating rule-making procedures regarding licenses for FRCs, DFPS notified the Correction Corporation of American that the T. Don Hutto Residential Center was exempt from the licensure requirements under Texas administrative law for child care facilities. The T. Don Hutto Residential Center continued in operation without DFPS licensure until the facility closed in 2009.

In the summer of 2014, in response to a wave of Central Americans arriving at the U.S.-Mexico border, ICE began detaining women and children in two secure and unlicensed facilities in Texas. On July 31, 2014, the GEO Group, another ICE contractor, opened the Karnes County Residential Center in Karnes City, Texas. On December 18, 2014, the Correction Corporation of America opened the South Texas Family Residential Center in Dilley, Texas. Both facilities

---

[1] "Secure" refers to a detention facility where individuals are held in custody and are not free to leave, while "non-

have been housing women with children without any licensure by DFPS.

C.    *Flores v. Johnson Enforcement Action - July 2015*

On February 2, 2015, certain class members in *Flores v. Johnson* filed a motion to enforce the *Flores* Settlement Agreement.  Among other claims, the class members specifically challenged ICE's failure to comply with the *Flores* Settlement Agreement through its policies and practice of confining minors in secure and unlicensed facilities.

On July 24, 2015, the *Flores* Court issued an Order related to enforcement of the *Flores* Settlement Agreement (the "*Flores* Enforcement Order").  The Defendants in this case were not party to the enforcement action and the *Flores* Enforcement Order does not require Texas to adopt a Texas rule on fewer than 30 days' notice.

The purpose of the licensing provision of the *Flores* Settlement Agreement is to provide "the essential protection of regular and comprehensive oversight by an independent child welfare agency." *See Flores* Enforcement Order at p. 14.  The fact that the Texas FRCs do not comply with the *Flores* Settlement Agreement does not, in and of itself, create an emergency. *See Flores* Enforcement Order at pp. 12-13.

D.    *DFPS' Emergency Rule § 748.7 - September 2015*

TEX. GOV'T CODE § 2001.034 provides that a state agency may adopt an emergency rule without prior notice or hearing, or with an abbreviated notice and a hearing that it finds practicable, if the agency finds that an imminent peril to the public health, safety, or welfare, or a requirement of state or federal law, requires adoption of a rule on fewer than 30 days' notice. Section 2001.034 further requires that the agency shall set forth in an emergency rule's preamble

---

secure" facilities are those where individuals are not held in custody.

Temporary Injunction
No. D-1-GN-15-004336

4

the finding imminent peril to the public health, safety, or welfare.

On September 2, 2015, DFPS adopted and published the Emergency Rule in the Texas Register.   As required by TEX. GOV'T CODE § 2001.034 (a)(2), Defendants set forth the Emergency Rule's preamble with findings to purportedly support that an imminent peril to the public health, safety, or welfare required adoption of the Emergency Rule:

**40 TAC §748.7**

On behalf of the Department of Family and Protective Services (DFPS), the Health and Human Services Commission adopts, on an emergency basis, new §748.7 of Title 40, concerning the applicability of Chapter 42, Human Resources Code, and licensing rules and statutes in general to residential family centers operated by contractors of U.S. Immigration and Customs Enforcement (ICE). The new section is adopted on an emergency basis pursuant to §2001.034, Government Code, which allows emergency rulemaking if a state agency finds an imminent peril to the public health, safety, or welfare.

On July 24, 2015, a federal district court determined that ICE's policy of detaining female-headed families in family residential centers, which are unlicensed and secure, violated the terms of a 1997 settlement agreement requiring, *inter alia*, that minors in custody be released without unnecessary delay and that, while they are detained, they be housed in non-secured, state-licensed facilities. *Flores v. Johnson*, CV 85-4544 DMG (C.D. Cal. July 24, 2015).  The court noted that the purpose of the licensing provision in the settlement agreement "is to provide class members the essential protection of regular and comprehensive oversight by an independent child welfare agency."

The court's ruling highlights a gap in the oversight of the children housed in facilities covered by the settlement agreement. There are two such facilities in Texas: the South Texas Family Residential Center in Dilley, Texas and the Karnes County Residential Center in Karnes City, Texas.  Both are family residential facilities designed for detention of adults with children. Neither is currently licensed by the Child-Care Licensing Division of DFPS.  Because there is no regular and comprehensive oversight of the care of children housed in the facilities by an independent agency, there is an imminent peril to the public's health, safety, or welfare.

The Emergency Rule's preamble findings rely on the *Flores* Enforcement Order as a basis for implementing the Emergency Rule; the preamble does not state that federal law requires adoption of the Emergency Rule on fewer than 30 days' notice as allowed under TEX. GOV'T CODE § 2001.034.

The Emergency Rule's preamble references the two Texas FRCs that have operated in

Texas without any license, but disregards the fact that each has been in operation in Texas for well over a year.

The Emergency Rule removes a FRC's obligations to comply with current Texas Minimum Standards for General Residential Operations[2] that pertain to the safety and welfare of children. Specifically, the Emergency Rule exempts the FRCs from complying with: (1) limitations on room occupants; (2) children sharing a room with an adult that may be unrelated; and (3) children sharing a room with children of the opposite gender.

The Emergency Rule demonstrates that Defendants utilized the emergency rule power for administrative purposes rather than to address a true emergency. The Emergency Rule allows for significantly less oversight of FRCs than DFPS's own Minimum Standards for General Residential Operations. The Emergency Rule does not address an actual emergency or provide for "regular and comprehensive oversight" of the FRCs.

## II.  Injunctive Relief

IT IS ORDERED, ADJUDGED, AND DECREED that the following Temporary Injunction shall be issued:

1. THE TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES and the TEXAS HEALTH AND HUMAN SERVICES COMMISSION, and all of their officials, agents, servants, employees, and attorneys are hereby ORDERED to desist and refrain from implementing the regulation that the agency published in the Texas Register as 40 Tex. Admin. Code § 748.7 on September 18, 2015 (the "Emergency Rule)", which includes relying on the Emergency Rule to license any residential facility until expiration or

---

[2] *See* June 2015 Minimum Standards for General Residential Operations issued by Licensing Division of DFPS.

Temporary Injunction
No. D-1-GN-15-004336

amendment of this Order.  Nothing in this Order, however, shall prevent or preclude Defendants from proceeding through the traditional rule adoption procedures outlined in TEX. GOV'T CODE § § 2001.023 and 2001.029.

2.  IT IS FURTHER ORDERED that the bond that Plaintiff has already executed and filed with this Court shall be held sufficient for issuance of this Temporary Injunction in conformity with Rule 684 of the Texas Rules of Civil Procedure to ensure that Plaintiff will abide by the decision which may be made in the cause, and that Plaintiff will pay all sums of money and costs that may be adjudged against it.

3.  The clerk shall forthwith, when so requested by Plaintiff, issue a writ of Temporary Injunction in conformity with the law and the terms of this Order.

## III.  Final Hearing

IT IS FURTHER ORDERED that final trial on the merits in this case will be held on May 9, 2016 at 9:00 o'clock a.m.

IT IS FURTHER ORDERED that this Order is effective immediately upon execution by the Court.

SO ORDERED this _20th_ day of _November_, 2015 at _5:10_ o'clock _p_ .m.

JUDGE PRESIDING
KARIN CRUMP

Temporary Injunction
No. D-1-GN-15-004336

7

428

# Attachment to Exhibit 18
# Attachment 3

**CHAPTER 748. MINIMUM STANDARDS FOR GENERAL RESIDENTIAL OPERATIONS**

**SUBCHAPTER A. PURPOSE AND SCOPE**

**40 TAC §748.7**

On behalf of the Department of Family and Protective Services (DFPS), the Health and Human Services Commission proposes new §748.7, concerning the applicability of Chapter 42, Human Resources Code, and licensing rules and statutes in general to residential family centers operated by contractors of U.S. Immigration and Customs Enforcement (ICE), in its chapter concerning Minimum Standards for General Residential Operations.

On July 24, 2015, a federal district court determined that ICE's policy of detaining female-headed families in family residential centers, which are unlicensed and secure, violated the terms of a 1997 settlement agreement requiring, *inter alia,* that minors in custody be released without unnecessary delay and that, while they are detained, they be housed in non-secured, state-licensed facilities. *Flores v. Johnson,* CV 85-4544 DMG (C.D. Cal. July 24, 2015). The court noted that the purpose of the licensing provision in the settlement agreement "is to provide class members the essential protection of regular and comprehensive oversight by an independent child welfare agency."

The court's ruling highlighted a gap in the oversight of the children housed in facilities covered by the settlement agreement. There are two such facilities in Texas: the South Texas Family Residential Center in Dilley, Texas and the Karnes County Residential Center in Karnes City, Texas. Both are family residential facilities designed for detention of adults with children. Prior to September 2, 2015, neither facility was licensed by the Child-Care Licensing Division of DFPS (CCL). Because there was no regular and comprehensive oversight of the care of children housed in the facilities by an independent agency, DFPS determined there was an imminent peril to the public's health, safety, or welfare and adopted a temporary, emergency rule with the same content as this proposed rule in the September 18, 2015, issue of the *Texas Register* (40 TexReg 6229).

This proposal ensures the continued protection of children housed in the facilities by making the facilities subject to the regulatory authority of CCL along with its associated requirements, with limited exception.

Section 748.7 defines the term "family residential center" and makes family residential centers subject to regulation as General Residential Operations (GROs), requiring them to comply with all associated requirements unless a waiver or variance is granted by CCL or an exception is specifically provided in the rule. The section clarifies that CCL's authority extends only to certain enabling Texas laws, sets out specific exceptions for Minimum Standards with which family residential centers are not required to comply, and reserves to CCL the authority to place conditions or limits on any exceptions granted by the rule. Finally, the section requires family residential centers to submit materials to clarify the supervisory and caretaking responsibilities of the center staff and the parents or other adult family members housed with the children.

Tracy Henderson, Chief Financial Officer of DFPS, has determined that for the first five-year period the proposed section will be in effect there will be no fiscal implications for state or local government as a result of enforcing or administering the section.

Ms. Henderson also has determined that for each year of the first five years the section is in effect the public benefit anticipated as a result of enforcing the section will be that the quality of care for children housed in family residential centers will be enhanced.

There will be costs to persons required to comply with this section. For each of the first five years the section is in effect, the costs to Facility 1 will be: Fiscal Year (FY) 2016 $5,294,256; FY 2017 $5,280,350; FY 2018 $5,280,350; FY 2019 $5,280,350; and FY 2020 $5,280,350. For each of the first five years the section is in effect, the costs to Facility 2 will be: FY 2016 $27,620,807; FY 2017 $27,553,351; FY 2018 $27,553,351; FY 2019 $27,553,351; and FY 2020 $27,553,351.

In order to gauge the fiscal impact of becoming licensed as a general residential operation (GRO), CCL sought analyses and estimates from the two affected facilities. The costs related to (1) increased staff to meet child-to-caregiver ratios under Minimum Standards (MS) for GROs; (2) hiring and retaining a Child-Care Administrator, separate from the staff costs related to child-to-caregiver ratios; (3) compliance with square footage standards; and (4) ancillary expenses for the required public hearing, CPR certification, and background checks. The estimated costs varied considerably, partly based on the varied size of the facilities.

Facility 1 cost estimates: (1) This facility had 532 residents, of which 372 are estimated to be children. Given its current population, this facility stated 107 new employees would be required to meet the 1:8 ratio during the first two shifts and 1:24 ratio during the night time shift, including the application of a relief factor 1.62% to insure coverage while staff are on leave. The facility estimated the annual cost for the 107 new employees to be $5,200,000. This appears to be a logical cost for the new employees with an average total annual cost (including benefits) for each employee to be $48,598. (2) Facility 1 estimated $95,700 for a Child-Care Administrator's salary, taxes, and benefits. Facility 2 estimated $65,000 for a Child-Care Administrator's salary, taxes, and benefits, including initial recruitment costs. For purposes of this cost estimate, the two facilities costs have been averaged for a total annual cost for each facility for a Child-Care Administrator of $80,350. (3) No additional costs were required to comply with the square footage requirements. (4) This facility only supplied estimated costs of $5,080 for the public hearing requirements. Since no costs were provided for CPR certifications and background checks, CCL is making the following assumptions for these costs: CCL is assuming a 25% of similar costs to facility 2 (facility 1 is approximately 25% the size of facility 2) for CPR certifications of $5,512 ($22,050/4). CCL is assuming the costs for background checks is $3,314, which is the cost for the current 79 caregivers times the cost per individual background check ($41.95). It is assumed that new employees will be responsible for obtaining their own background checks. The total ancillary costs for this facility is $13,906, which are one-time costs. TOTAL FACILITY 1 COSTS For First Year: $5,294,256.

Facility 2 cost estimates: (1) Facility 2 has 2400 residents, of which it is estimated that 1,344 are children (600 children under 5 years of age, and 744 children from 6 - 17 years of age). Facility 2

stated they calculated the child/caregiver ratio of 1:8 during waking hours and 1:24 during sleeping hours to reach an estimated increase in caregiver salaries and benefits of $82,160,387 per year. A current number of caregivers was not provided by the facility, but this cost appears to be too high for this required change in ratios even though it is unclear what this facility's current staff ratio is. If you only look at the number of children involved, Facility 2 is approximately 3.61 times larger than Facility 1 (1344/372). If you look at the total number of residents facility 2 is approximately 4.51 times larger than facility 1 (2400/532). Taking the larger number (4.51), the increase in caregiver costs is estimated to be $24,453,001 (the facility 1 costs of $ 5,200,000 X 4.51), which should cover the costs for an additional 482 caregivers at a total annual cost per caregiver of $48,598. (2) Facility 2 estimated $65,000 for a Child-Care Administrator's salary, taxes, and benefits, including initial recruitment costs. Facility 1 estimated $95,700 for a Child-Care Administrator's salary, taxes, and benefits. For purposes of these cost estimates, the two costs have been averaged for a total annual cost for each facility for a Child-Care Administrator of $80,350. (3) The facility estimated that it would incur a minimum of $44,863,398 in costs to comply with square footage standards that would require the demolition and relocation of bedroom walls, building two additional "neighborhoods", and acquiring additional land. It is not clear at this time whether these changes are required to meet the square footage requirements. However, assuming these costs are accurate an amortization of this amount over 30 years with a 5.25% interest rate, the annual payments would be approximately $3,000,000 per year. (4) This facility's estimated one-time ancillary costs were $87,456 ($22,050 to obtain CPR certifications; $45,362 to obtain the appropriate background checks; and $20,044 for preparations for the public hearing). TOTAL FACILITY 2 COSTS For First Year: $27,620,807.

Ms. Henderson has determined that the proposed new section does not restrict or limit an owner's right to his or her property that would otherwise exist in the absence of government action and, therefore, does not constitute a taking under §2007.043, Government Code.

Questions about the content of the proposal may be directed to Audrey Carmical at (512) 438-3854 in the DFPS Office of General Counsel. Electronic comments may be submitted to *Audrey.Carmical@dfps.state.tx.us.* Written comments on the proposal may be submitted to Texas Register Liaison, Legal Services-537, Department of Family and Protective Services E-611, P.O. Box 149030, Austin, Texas 78714-9030, within 30 days of publication in the *Texas Register.*

The new section is proposed under §40.0505, Human Resources Code, and §531.0055, Government Code, which provide that the Health and Human Services Executive Commissioner shall adopt rules for the operation and provision of services by the health and human services agencies, including the Department of Family and Protective Services.

The new section implements §42.042(a), Human Resources Code.

*§748.7.How are these regulations applied to family residential centers?*

(a) Definition. A family residential center is one that meets all of the following requirements:

(1) The center is operated by or under a contract with United States Immigration and Customs Enforcement;

(2) The center is operated to enforce federal immigration laws;

(3) Each child at the center is detained with a parent or other adult family member, who remains with the child at the center; and

(4) A parent or family member with a child provides the direct care for the child except for specific circumstances when the child is cared for directly by the center or another adult in the custody of the center.

(b) Classification. A family residential center is a general residential operation (GRO) and must comply with all associated requirements for GROs, unless the family residential center is approved for an individual waiver or variance or an exception is provided in this section. The department is responsible for regulating the provision of childcare as authorized by Chapters 40 and 42, Texas Human Resources Code and Chapter 261, Texas Human Resources Code. The department does not oversee requirements that pertain to other law, including whether the facilities are classified as secure or in compliance with any operable settlement agreements or other state or federal restrictions.

(c) Exceptions. A family residential center is not required to comply with all terms of the following Minimum Standards:

(1) the limitation of room occupants to four in §748.3357 of this title (relating to What are the requirements for floor space in a bedroom used by a child?);

(2) the limitation on a child sharing a bedroom with an adult in §748.3361 of this title (relating to May a child in care share a bedroom with an adult?); and

(3) the limitations on children of the opposite gender sharing a room in §748.3363 of this title (relating to May children of opposite genders share a bedroom?).

(d) Limitation of exception. Notwithstanding subsection (c) of this section, the department retains the authority for placing conditions on the scope of the exceptions authorized for a family residential center, including conditions related to limiting occupancy in accordance with fire safety standards, limitations related to allowing children and adults of the opposite gender to occupy the same room only if they are part of the same family, and any other limitation determined by the department to be necessary to the health, safety, or welfare of children in care.

(e) Division of responsibility. In addition to the application materials described in §745.243(6) of this title (relating to What does a completed application for a permit include?), an applicant for a license under this section must submit the policies, procedures, and any other documentation that the department deems necessary to clarify the division of supervisory and caretaking responsibility between employees of the facility and the parents and other adult family members

433

who are housed with the children. The department must approve the documentation during the application process and any subsequent amendments to the policies and procedures.

The agency certifies that legal counsel has reviewed the proposal and found it to be within the state agency's legal authority to adopt.

Filed with the Office of the Secretary of State on November 2, 2015.

TRD-201504663

Trevor Woodruff

General Counsel

Department of Family and Protective Services

Earliest possible date of adoption: December 13, 2015

For further information, please call: (512) 438-3854

# Attachment to Exhibit 18
# Attachment 4

1

Texas Department of Family and Protective Services

Public Hearing Regarding Proposed 40 TAC §748.7

Wednesday, December 9, 2015

10:00 a.m. to 2:00 p.m.

John J. Winters Building

Public Hearing Room 125-E

701 West 51st Street

Austin, Texas 78751

2

1              A P P E A R A N C E S

2   Commissioner John J. Specia, Jr.

3   Mr. Paul Morris, Assistant Commissioner for Child Care
    Licensing
4
    Mr. Trevor Woodruff, General Counsel
5

6   Ms. Jean Shaw, Director of Residential Child Care
    Licensing
7
    Ms. Colleen McCall, Child Protective Services, Director
8   of Field

9   Ms. Tina Martin, Department of Family and Protective
    Services, Council Chairwoman
10
    Cecile Young, Chief of Staff, Health and Human Services
11  Commission

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1                      P R O C E E D I N G S

2                        (10:03 a.m.)

3              MR. SPECIA:  Good morning, ladies and

4    gentlemen.  Thank you for being here today.

5              We are here to discuss the licensing

6    requirements for General Residential Operations.  This

7    is an important issue, and we want to hear your

8    feedback.

9              Joining us today are Paul Morris,

10   Assistant Commissioner for Child Care Licensing; Jean

11   Shaw, Director of Residential Child Care Licensing;

12   Colleen McCall, Child Protective Services, Director of

13   Field; Tina Martin, the Department of Family and

14   Protective Services Council Chairwoman; Trevor Woodruff,

15   General Counsel for the Department of Family and

16   Protective Services; and Cecile Young, Chief of Staff at

17   Health and Human Services Commission.

18             Paul Morris will provide background on

19   this situation.  And Trevor Woodruff will go over some

20   of the hearing procedures.  And then we will open it up

21   for public comment.

22             Paul.

23             MR. MORRIS:  Thank you, Commissioner.

24             Initially, the Department of Family and

25   Protective Services determined that 24-hour facilities
```

4

1    where children are housed with adult parents to not meet

2    the DFPS definition of a residential facility and could

3    not be licensed.  However, a recent federal court

4    decision concerning the South Texas Family Residential

5    center in Dilley, which is operated by Corrections

6    Corporation of America, and the Karnes County

7    Residential Center, which is operated by the GEO Group,

8    Incorporated, caused DFPS to reevaluate whether such

9    facilities fall under DFPS jurisdiction.  In its

10   decision, the Court determined that while detained by

11   Immigration and Customs Enforcement, families must be in

12   state-licensed facilities to provide essential

13   protection of regular and comprehensive oversight by an

14   independent child welfare agency.  That was the United

15   States District Court, Central District of California,

16   in July of 2015, Flores versus Johnson.

17           Although the ruling did not require DFPS

18   to license the facilities, as DFPS was not a party to

19   the lawsuit, it did highlight a gap in the oversight of

20   the children at these types of facilities.  The proposed

21   new DFPS rules will close that gap by requiring state

22   licensure.  To our knowledge, the Karnes City and Dilley

23   facilities are the only ones in Texas to meet the

24   criteria of the proposed rule.  Upon passage of the

25   proposed rule, these facilities would have to apply for

1  a license.  Both are family residential facilities

2  designed for the detention of adults with children and

3  both contract with ICE.

4           If the two facilities were regulated by

5  the residential child care licensing division of DFPS,

6  they would be required to meet minimum standards and any

7  granted variances for residential operations that are

8  designed to ensure the safety and welfare of children.

9  Upon successful completion of the initial application

10 process, a residential care facility would receive an

11 initial license which would be subject to review in six

12 months to determine whether it should be continued or

13 modified.

14          My staff will make periodic inspections of

15 the facilities, and they'll investigate any allegations

16 of abuse and neglect and any other alleged violation of

17 minimum standards or the other laws that DFPS is

18 responsible for enforcing.  If during the initial

19 license period the facilities demonstrate the ability to

20 comply with minimum standards and otherwise meet

21 licensure requirements, they would receive a renewable

22 license.

23          Trevor is now going to go over the

24 procedures for today's hearing.

25          MR. WOODRUFF:  Thank you, Paul.

1          The purpose of today's meeting is to

2    obtain feedback from the public on the proposed rule.

3    Agency leadership will be here to listen, but not

4    respond, to each of your comments.  We have a court

5    reporter here to transcribe the comments so they can be

6    included as part of the public input that the Agency has

7    received.  We are also recording the meeting.  The

8    recording will be placed on our website later.

9          We have a sign-in sheet for general

10   registration and a sign-in sheet for those who wish to

11   give public testimony.  The sign-in sheets are just

12   outside the public hearing room to the side over here.

13          I will call the names of individuals who

14   have signed in to provide comments in the order that

15   they appear on my list.  We will adhere to a

16   strict three-minute time limit per person to ensure that

17   people have an opportunity to speak.  There will be

18   no amalgamation of time.

19          A timekeeper will keep us on schedule.  He

20   or she will be seated next to me.  They will hold up a

21   yellow card when the speaker has one minute left and

22   will ring the bell when time is expired.

23          We have a Spanish translator if needed,

24   who will also have a three-minute time limit.

25          Our hearing concludes at 2:00 p.m.  If

1  your name is not called because it's further down on the

2  list, we will gladly take your written statement.

3  Please provide any written statements by

4  December 14th to Audrey Carmical.  Audrey's email

5  address can be found on today's agenda.

6              We'll now get started with testimony.

7              Jonathan Ryan.

8              MR. RYAN:  Good morning.  My name is

9  Jonathan Ryan.  I'm an immigration attorney and the

10  executive director of Raices.

11              On November 18th, our client and her

12  11-year-old daughter were both detained at the Karnes

13  Family Prison, refused to sign the paperwork to be

14  deported back to El Salvador, the country they fled to

15  escape extreme violence.  When the mother refused to

16  sign her paperwork, the officials inside Karnes told

17  her, "We don't care about your lives.  Haven't we given

18  you food?  Haven't we given you clothes?"  Later that

19  night, other officials threatened to take away the mom's

20  11-year-old daughter.

21              Does that sound like child care?  Do those

22  sound like officials who should be responsible for

23  caring for children?

24              Raices is part of the CARA pro bono

25  project, a partnership of four organizations that

1  provides pro bono legal services to mothers and children

2  held at both the Dilley and Karnes family prisons,

3  meaning that we are in these jails every day.

4           The CARA pro bono project has provided

5  legal services to thousands of families detained at

6  Karnes and Dilley in the past year.  Through that work,

7  we have documented the myriad of ways that Dilley and

8  Karnes are unfit for mothers and children.

9           First, there is the systemic failure to

10  provide adequate medical care to children.  Nearly all

11  children in detention are sick.  Children are routinely

12  told to simply drink water to treat any illness or

13  ailment regardless of severity.  We have filed two

14  formal complaints with the Department of Homeland

15  Security about these atrocious medical conditions, and

16  we have not seen any improvement.

17           Two, children are routinely left in the

18  care of guards, not certified child care practitioners.

19  The proposed rules specifically allows for this without

20  any acknowledgment that prison guards are not

21  appropriate caregivers for children or any limitations

22  on the circumstances when and for how long children can

23  be left alone with guards.

24           Three, multiple families share living

25  spaces, allowing for children to share bedrooms with

1  adults to whom they are not related and with non-related

2  children of other opposite genders.  There are

3  already -- there have already been multiple reports of

4  child sexual abuse likely due to these concerning living

5  arrangements.  The proposed regulations, which have

6  lowered existing standards to allow for this, will only

7  provide institutional support for these precarious

8  living circumstances -- for the precarious living

9  circumstances these families currently endure.

10              There is so much more to say regarding the

11  atrocious conditions inside.  But I want to clarify that

12  enabling DFPS to remedy these poor conditions is no

13  reason to approve licensing.  Yes, there needs to be

14  oversight.  Yes, there needs to be investigation.  But

15  licensing is not necessary to respond to the incidents

16  of abuse and neglect.  Your agency is obligated to

17  investigate --

18              (Bell rings)

19              MR. RYAN:  -- reports of abuse and neglect

20  a person -- by a person responsible for a child's care,

21  custody, and welfare, including personnel or a volunteer

22  of a public or private residential institution.

23              MR. WOODRUFF:  Mr. Ryan, thank you for

24  your comment.

25              MR. RYAN:  Thank you very much.

1              MR. WOODRUFF:  Elissa Steglich.

2              MS. STEGLICH:  Good morning and thank you.

3   My name is Elissa Steglich.  I'm also an immigration

4   attorney immigration attorney and clinical professor at

5   the University of Texas Immigration Clinic.

6              With its family detention policies, the

7   United States Department of Homeland Security now

8   confines women and children and child survivors of

9   domestic and other violence in jails.  The two family

10  detention centers being considered for licensing under

11  proposed Section 748.7 can hold approximately 3,500

12  women and children at any given time.

13              Multiple families are placed in the same

14  sleeping and living quarters together, while guards and

15  fences keep the families confined.  The median age of

16  the children in these jails is six years old.

17              The Department of Homeland Security is

18  asking the DFPS to support its decision to use jails

19  instead of community support and shelters for trauma

20  survivors.  Child welfare experts should know better

21  than to agree to such a proposition.  Licensing the

22  jails will not turn them into shelters.

23              The federal litigation, Flores v. Johnson,

24  on which the Department relies in promulgating 748.7

25  does not require jails to be licensed.  In fact, the

1   litigation began in 1985 to prevent specifically

2   children from being held in jails solely for immigration

3   reasons.  The Flores Court requires children to be

4   housed in non-secure environments that would be

5   appropriate for placement of our state's own wards.

6              Flores requires that facilities be

7   licensed because of child welfare assurances that the

8   license and regulations provide.  It is not just a box

9   to check or a paper to have.  Licensing the Karnes and

10  Dilley jails will not accomplish what Flores promises.

11  It's tempting to think that child welfare agency

12  oversight of these jails can help.  This is misguided.

13  Section 748.7 handicaps the Agency where it is most

14  needed.  It permits the status quo to become the

15  standard rather than holding the federal government and

16  its private contractors accountable to minimum child

17  welfare standards.

18              A new licensing scheme for family jails

19  would be a stark and unprecedented downward departure

20  from the State's current standards.  The State would be

21  compromising the best interest of the children by

22  allowing people who are untrained in child care to set

23  rules for children, allowing adult strangers to sleep in

24  the same enclosed room with young children, and allowing

25  children to be warehoused in prison-like environments.

1    The State would be violating its own values and minimum

2    standards of child welfare if it enacted such a

3    licensing scheme.  DFPS can best safeguard the welfare

4    of the children detained at Dilley and Karnes by

5    withdrawing Section 748.7.

6               Thank you.

7               MR. WOODRUFF:  Laurie Cook Heffron.

8               MS. EFRON:  Good morning, and thank you

9    for hearing from us today.

10              My name is Dr. Laurie Cook Heffron.  I'm a

11   social worker and a researcher.

12              As someone who conducts empirical research

13   and regularly reviews the evidence base, the existing

14   social science literature, and as a social worker with

15   experience working directly with Central-American women

16   and children and serving as a pro bono expert witness in

17   immigration cases, my role here today is to provide the

18   context around the evidence base related to two main

19   areas.

20              First, the pre-migration violence and

21   trauma that propel women and children to seek safety and

22   protection in the U.S.  And second, the psychosocial

23   impact of detention on survivors of violence and trauma.

24              The women and children detained at Karnes

25   and Dilley are survivors of violence and trauma.

1   They've directly experience violence and have witnessed

2   violence or were exposed to tremendous suffering and

3   traumatic events prior to being detained in the U.S.

4   Many explicitly fled severe domestic violence and sexual

5   violence in Central America, leaving loved ones and

6   social support networks behind in search of safety and

7   protection for themselves and their children.

8           These experiences are compounded by high

9   rates of gang violence, human trafficking and femicide,

10  or the killing of women.  Women and children carry these

11  backgrounds of violence and trauma with them when they

12  become detained.  Conditions of detention then mirror,

13  or reflect, women's experience with violence.  That is,

14  the strategies and tactics of control and abuse used by

15  abusers and traffickers are often repeated through the

16  conditions, the rules and the protocols and the

17  structures of immigrant family detention centers.

18          The restrictive nature of detention

19  facilities and the highly controlled movement and

20  regimented schedules re-triggers negative mental health

21  outcomes associated with past gender violence.  The

22  negative impact of detention is well documented in the

23  scientific literature.  Detention leads to the

24  deterioration of mental health and well-being and may

25  result in outcomes, such as self-harm, suicidal

1  ideation, suicide attempt, depression, post-traumatic

2  stress, and anxiety.

3          Research on children in immigration

4  detention centers shows that children may develop mental

5  and physical health difficulties directly from the

6  detention experience itself.  Research also finds that

7  children's developmental, nutritional, educational, and

8  child protection needs are not adequately met in

9  detention settings.  Furthermore, research shows that

10  family detention may disrupt the family unit and

11  undermine attachment relationships.

12          Research suggests that settings based on

13  choice, empowerment, and the community are necessary for

14  recovery.  Alternatively, settings based on control,

15  coercion, and containment may traumatize or

16  re-traumatize individuals and families who are already

17  vulnerable.  Furthermore, approaches and settings that

18  make recovery possible require the elimination of

19  practices that seclude, isolate, and restrict mothers'

20  and children's mobility and decision-making.

21          Despite any attention to the basic needs

22  of women and children in detention and regardless of the

23  number and quality of the amenities, the resources, the

24  protocols in place, the evidence is clear.  Detaining

25  mothers and children, particularly those who have

1  experienced trauma and violence, remains a harmful and
2  highly problematic practice and one that does not
3  support what we know about mental health needs of trauma
4  survivors and those who flee violence.
5           Thank you.
6           MR. WOODRUFF:  Greg Hansch.
7           MR. SPECIA:  I had a court reporter for a
8  long time.  If you need a break or somebody is talking
9  too fast, please tell us.
10          MR. HANSCH:  Good morning, and thank you
11  for this opportunity.  My name is Greg Hansch.  I work
12  as Public Policy Director for the Texas Affiliate of the
13  National Alliance on Mental Illness, NAMI Texas.  My
14  testimony is in opposition to the proposed rule.
15          NAMI Texas has nearly 2,000 members made
16  up of individuals living with mental illness,
17  family members, friends, and professionals.  Our purpose
18  is to help improve the lives of people affected by
19  mental illness, through education, support, and
20  advocacy.  We have grave concerns about the endorsement
21  of potential -- and potential licensing of family
22  immigration centers as child care facilities.
23          The evidence is clear that these detention
24  centers in no way fall in line with the defined
25  requirements of a child care facility.  On the contrary,

1  the conditions that exist in the Karnes and Dilley

2  detention centers have shown serious negative impacts on

3  the psychological health and mental well-being of the

4  families being held there.  Both mothers and children in

5  these facilities commonly show symptoms of anxiety,

6  depression and feelings of despair.  The anxiety of

7  children is often related to being physically separated

8  from their mothers in these centers.  The effect that

9  these conditions have on a child's development must also

10  be considered.

11         It is not child care when children are not

12  only being blocked from achieving normal milestones, but

13  are also experiencing regression in their developmental

14  pathway.  Well-known in the mental health community is

15  the impact that trauma has on the incidence of mental

16  illness.  What is being observed in Karnes and Dilley

17  exemplifies this preventable phenomenon.  The traumas

18  that families are experiencing under lockup have shown

19  in some cases to cause major psychiatric disorders, such

20  as major depression, and symptoms including suicidal

21  ideation.

22         The stress and hardship experienced by

23  these families in their home countries and on their

24  journeys to the U.S. is compounded by the reality of

25  life in the detention centers.  These are circumstances

1  that will require years of treatment and services to

2  address.  On top of this is the reality that medical

3  care within these facilities often has long wait times,

4  no specialized care, and improper treatment.

5             At a time, when Texas leadership is

6  building capacity and infrastructure in the mental

7  health system, yet the advances are still not keeping up

8  with the increasing demands, it is especially

9  counterproductive to be adding to the population of

10 people needing services.  Prevention and early

11 intervention are critical to address head-on.  This is

12 recognized by the creation of the new House Select

13 Committee on Mental Health in the Texas Legislature.

14 State agencies are increasingly coordinating their

15 efforts to address mental illness in our society.  We

16 cannot justify endorsing a structure that sets our

17 families and our system back.

18             The psychological distress, fear,

19 nightmares, and developmental regression that

20 characterize life in these facilities are direct

21 contributors to serious mental illness in our society.

22             Thank you.

23             MR. WOODRUFF:  Satsuki Ina.

24             MS. INA:  My name is Satsuki Ina.  Over 70

25 years ago, I was incarcerated with my parents in a

18

1    federal family detention facility in Crystal City,

2    Texas.  We had not committed a crime, and our rights to

3    the due process of law was exempted and bypassed as hate

4    and fear gripped the country in 1941.

5                    We were held for four years and three

6    months for what was later determined the result of

7    hysteria, racism, and the failure of political

8    leadership.

9                    As a Japanese-American and former victim

10   of the trauma of unjust and indeterminate incarceration

11   I'm appalled by the possibly that the State of Texas

12   would consider exempting the two facilities that

13   currently house thousands of children from basic

14   regulations deemed essential for care and welfare

15   services of children.  Bending the rules to justify the

16   incarceration of children in a prison-like environment

17   is no less than putting lipstick on a pig.

18                    In April and in May of this year, I

19   visited children and their mothers in what is

20   euphemistically called the South Texas Family

21   Residential Center in Dilley, Texas.  Not unlike the

22   prisons where my family and hundreds of other

23   Japanese-American children were held.  Our prisons were

24   named relocation centers and family camps in order to

25   mask the truth of our circumstances.  As a child

1  therapist specializing in the treatment of trauma, I was
2  deeply disturbed by what I witnessed and heard from the
3  children and their mothers during my visit.

4              Stern, unfriendly guards led me and my
5  fellow visitors through locked doors to the visitation
6  room after requiring us to leave all our belongs,
7  including art supplies and writing materials in lockers
8  outside.  During my visit, I met with six families who
9  had been held for varying lengths of time.  Aside from
10 the intense anxiety, depressed mood, and grief expressed
11 by the mothers, I noticed significant signs of what I
12 would consider captivity trauma of the children.
13 Hypervigilant checking of the guards, fearful clinging
14 to the mothers, sad and guarded demeanor signaled the
15 child's consciousness of being under guard.  No doubt
16 these children have previously been traumatized in their
17 home country and then during the uncertain journey to
18 the U.S. border, and now their incarceration, living
19 with strangers who arrive and depart with no regularity
20 while under the constant watchful eye of prison guards.
21 When visitation time was up, the children clearly
22 rule-bound and fearful would immediately stand and leave
23 the room like little automatons.

24             Confining innocent children and their
25 parents in prison settings is cause for long-term

1  consequences leading to mental health problems.  For the

2  past 30 years, I have served as a therapist to Japanese

3  Americans who were like myself, children incarcerated

4  during World War II.  Decades later, having lived in a

5  state of long-term anxiety, separated from familiar

6  surroundings, sharing intimate space with total

7  strangers, being held in the arms of anxious mothers,

8  not only set an emotional baseline of fear and mistrust.

9  We know now from research and neuroscience --

10              (Bell rings)

11              MS. INA:  -- that the constant release of

12  stress hormones under such circumstances has a negative

13  effect on the developing brain.

14              MR. WOODRUFF:  Thank you.

15              MS. INA:  Let us learn from our past. Do

16  not waiver in the face of current climate of fear that

17  is gripping our country today.

18              Thank you.

19              MR. WOODRUFF:  Thank you.

20              [Applause]

21              MR. WOODRUFF:  Cristina Parker.

22              MS. PARKER:  Hello, y'all.  Good morning.

23  My name is Cristina Parker, and I'm the immigration

24  programs director at Grassroots Leadership.  Thank you

25  very much for holding this public hearing today and

1  allowing us to have a minute to speak to you about why
2  we're against Proposed Rule 40.
3           Grassroots Leadership is an Austin-based
4  national organization that fights against the
5  criminalization of immigrants.  We are against the
6  for-profit private industry, including immigrant
7  detention centers and family detention centers like the
8  ones we see in South Texas.
9           I'll keep my comments really brief.  We
10 would like you not to adopt proposed Rule 40, because
11 family detention and detention of immigrants is abuse;
12 it isn't child care.  And the main thing I'd like to say
13 is that although this room is full, I have a stack here
14 of 800 petitions from people who feel the same way.  And
15 each of these pieces of paper represents someone who
16 couldn't be here today but who wants you to know that we
17 shouldn't call family detention centers child care
18 facilities.
19           Thank you so much.
20           MR. SPECIA:  Ms. Parker, we'll -- thank
21 you -- be glad to take those as public comment.
22           MR. WOODRUFF:  Mary Overton.
23           Ms. OVERTON:  My name is Mary Overton, and
24 today I'm testifying as a member of First Unitarian
25 Church of Austin and on behalf of the National Unitarian

1   Universalist Association.

2          We appreciate the opportunity to provide

3   comments on the possibility of the State of Texas

4   licensing immigrant family detention centers as child

5   care facilities and specifically oppose adopting

6   proposed Rule 40, Texas Administrative Code

7   Section 748.7.

8          This year, the delegates at the Unitarian

9   Universalist Association's annual general assembly

10  passed and action immediate witness, calling to end

11  immigrant child and family detention now.  Based on this

12  and the principles of Unitarian Universalism, the

13  Unitarian Universalist Association cannot support the

14  licensing of the immigrant family detention in Texas as

15  child care facilities and calls for these detention

16  centers to be shut down immediately.

17         The first principle of our association

18  affirms the inherent worth and dignity of every person.

19  Children at the Karnes and Dilley  Family Detention

20  Centers have been exposed to conditions that child

21  welfare experts have called inappropriate, neglectful,

22  and abusive.  Class action litigation and reports of

23  multiple organizations have documented systemic

24  violations of basic human rights and dignity in the

25  detention centers.  These violations have irreparably

1  harmed the children held there.

2  The second principle of our association

3  affirms justice, equity, and compassion in human

4  relations.  Licensing under reduced standards will not

5  ensure child protection but condone neglect and abuse.

6  It is not possible for DFPS to regulate or license

7  family immigration detention centers without skirting

8  the rules it normally requires facilities to follow in

9  order to keep these children and mothers healthy and

10 safe.  The detention centers are unlike any daycare,

11 foster home, domestic violence center, residential

12 treatment center, or U.S. Office of Refugee Resettlement

13 contracted shelter for unaccompanied minors, which is

14 regulated by the DFPS as part of its mandate to ensure

15 the welfare in children.

16 Allowing exceptions like permitting

17 children sharing a single one with an unrelated adult

18 and with unrelated children of opposite genders is

19 unacceptable.  By lessening the standards already in

20 place to protect children safety and well-being, the

21 DFPS would allow inequitable treatment and care of these

22 children who have already been traumatized by leaving

23 their homes.

24 If proposed Rule 40 is adopted, immigrant

25 children who have traveled without adult supervision

1  will be treated better by the State of Texas than

2  children whose mothers have made the journey with them.

3  In 2013, the Association passed a statement of conscious

4  on immigration as a moral issue, stating that moral

5  immigration policy would provide alternatives to

6  detention for those not considered a threat to society

7  and humane treatment for those being detained, referring

8  especially to these families with children.

9            (Bell rings)

10            MS. OVERTON:  In conclusion, the Unitarian

11  Universalist Association strongly requests that DFPS

12  reject the proposed Rule 40.

13            Thank you for your time today.

14            MR. WOODRUFF:  Olivia Lopez.

15            MS. LOPEZ:  Good morning.  My name is

16  Dr. Olivia Lopez.  I'm a professor of social work.  And

17  from October of 2014 to April of 2015, I was the lead

18  licensed social worker for Geo Group at Karnes City

19  Residential Center.  I'm here today to share my

20  experience and knowledge about family detention and

21  highlight institutional practices and procedures with

22  respect to mental health and medical care and practices

23  that condone psychological abuse, coercive interrogation

24  tactics, and the use of isolation and sensory

25  deprivation against children and their mothers as

1  punishment and behavior modifications.

2          These practices also include mandates of

3  perjury and withholding information from federal

4  officials, omission of resident information on written

5  documents, and the hiring of employees as social workers

6  who do not have degrees in social work nor licensure to

7  practice as such.

8          These practices and procedures create a

9  situation where families cannot feel safe, exacerbate

10  levels of anxiety and increase depression, can lead to

11  suicidal ideation and gestures and attempts.  The

12  effects of family detention impact the development of

13  children across the lifespan and impact the level of

14  functioning within their families and their communities

15  and society.

16          In my position, I was tasked with

17  psychosocial assessments, individual treatment,

18  facilitating stress management groups, and women's

19  health education groups, as well as assisting with

20  weekly mental health checks.

21          Additionally, I attended weekly meetings

22  with facility leadership and immigration officials and

23  supervised two staff who were titled as social workers,

24  but who do not have a degree nor licensure to do so.

25          Social work at Karnes City meant something

1  very different from the social work that I am trained

2  and licensed to do.  For example, during the weekly

3  mental health checks, I recorded any issues raised by

4  the women regarding medical or mental health concerns on

5  the form.  However, I was reprimanded by my immediate

6  supervisor for doing so.  He was very clear that Geo did

7  not want a paper trail.  He informed me that the only

8  note taking regarding residents' concern should read

9  residents educated on the referral process.

10         I was also reprimanded for informing

11  residents of the grievance process at Geo and

12  subsequently forbidden from providing any information

13  about the grievance or assisting residents to complete

14  the necessary forms to do so and for also allowing

15  residents to see a map of the United States to inform

16  them where they were in Texas and the proximity to their

17  family in the United States.

18         Finally, I was told not to inform

19  residents that they had a right to request their medical

20  and mental health records, because, as I recall, quote,

21  Their goal is to use these records to support their

22  asylum claim.

23         While at Karnes, families reported to me

24  that they are frequently turned away when they presented

25  with serious issues --

1        (Bell rings)

2        MS. LOPEZ:  So the most -- examples

3  include a toddler being taken four different times to

4  medical with severe abdominal pain.  This child was

5  later sent to Methodist Children's Hospital where he

6  underwent emergency appendectomy.  Another took her

7  seven-week-old son to the medical department and had to

8  convince nursing staff of his illness.  He was later --

9        MR. WOODRUFF:  Ms. Lopez, thank you for

10  your time.  Your time has expired.

11        MS. LOPEZ:  Thank you.

12        MR. WOODRUFF:  Lenna Baxter.

13        MS. BAXTER:  Good morning.  My name is

14  Linda Baxter.  Thank you for this opportunity.

15        I have spent 40 years of my professional

16  life as an advocate for children and families.  Until my

17  retirement in 2010, I was a licensed child care

18  administrator and a licensed child placement

19  administrator and served in administrative positions at

20  the San Antonio Children's Shelter and as the chief

21  executive officer of Boysville Home for Children in San

22  Antonio.

23        I'm a strong advocate for the maintenance

24  of standards in child care and felt -- as I feel that

25  this is essential to ensuring that children are

1  protected.

2            I encouraged others in my field to pursue

3  a national accreditation that exceeded the Texas minimum

4  standards required of residential child care facilities

5  as a way to continue to provide the very best for Texas

6  children.

7            I'm here today to voice my concern that

8  the Texas Department of Family and Protective Services

9  is considering issuing licenses that would certify the

10 Karnes and Dilly Detention Facilities as residential

11 child care centers.

12            As a member of the Interfaith Welcome

13 Coalition in San Antonio, I am knowledgeable about the

14 conditions in these two facilities and know clearly that

15 they are not healthy environments for children.

16            Many children have become ill, lost

17 weight, and experienced additional trauma during their

18 time at the Karnes and Dilley Detention Facilities, and

19 I believe that this is as a result of the environment on

20 these children.

21            I understand that the standards being

22 addressed here today are TDFPS minimum standards, and I

23 stress the word "minimum."  I am appalled that the State

24 of Texas would consider reducing the minimum standards

25 even more or to allow a for-profit publicly-held

1  corporation specializing in correction and detention to
2  be licensed for the care of children.  I know from
3  experience the importance of advocating for and ensuring
4  that licensing standards are maintained in facilities
5  and programs serving children.  No amount of licensing
6  can protect children from the harm that comes from being
7  held in a detention center.  And to consider your plan
8  would not even require these centers to meet the minimum
9  standards that are required in other Texas residential
10  care centers.  It is abhorrent and against everything
11  that the licensing division of the Texas Department of
12  Family and Protective Services has embodied since the
13  inception of standards in residential child care.
14          I have worked my whole life to ensure that
15  children have a safe, nurturing, and simulating
16  environment and families to love and protect them.  I
17  implore you to consider that the children who have been
18  imprisoned in Karnes and Dilley Detention Facilities are
19  God's children, and we need to look at them with the
20  same compassion and hope as we see in our own children.
21          Thank you.
22          MR. WOODRUFF:  Sister Susan Mika.
23          SISTER MIKA:  Good day.  I'm Sister Susan
24  Mika, and I'm with the Benedictine Sisters.  Our
25  monastery is in Bourne.  And I'm part, also, of the

1  Interfaith Welcome Coalition and part of the Leadership

2  Conference of Women Religious; our region is 12.  And

3  we've been very involved with the coalition there in San

4  Antonio, and we are speaking today against this

5  licensing.

6            These family detention facilities are

7  jails, and we really feel that they are inhuman and

8  immoral.  They're restricting and punishing, really, the

9  children and the families.  And, as you know, so many of

10 my colleagues have already testified about, you know,

11 what they endured even to get here to our country, and

12 then we're re-traumatizing them.  And we just feel like

13 putting these vulnerable women and children in these

14 facilities is not the answer.  And we certainly don't

15 feel that our Texas agencies should not be issuing a

16 license permitting these facilities to operate as

17 suitable places to house children.

18            Our sisters -- at one point, we had a

19 child care center, and it would be nothing like these

20 jails, you know, that we're talking about here.  We just

21 feel that these facilities do not comply with general

22 child welfare principles.  And we do hope that you will

23 investigate these abuse claims in the facilities and

24 work with law enforcement and social services to rectify

25 those abuses.

1              We really do not feel like the State of

2    Texas should be enforcing our current administration's

3    policy of family detention, and we feel that licensing

4    these facilities is not the answer to this problem and

5    that children will not be served better by doing this.

6              And I guess in closing I would just like

7    to challenge each one of you in the sense of, like,

8    you're the decision-makers here and listening to

9    everything that we've already said and the people to

10   come.  You've got names, emails, phone numbers.  There's

11   so much wealth of knowledge about what is going on in

12   these centers in this room today.  I hope that each of

13   you will take advantage of that, because people are

14   speaking out of the -- their gut.  It's very deeply

15   engrained, I think, in us that have been involved in

16   these situations.  And I really do hope that personally

17   each of you will take what we're saying.  And if there's

18   any questions that you have, get ahold of people and

19   hear more of what all of this is, because there is so

20   much going on underneath.

21             And just in -- in conclusion, I just want

22   to again, these family detention centers are jails.  We

23   feel like they are inhuman and immoral.

24             Thank you.

25             MR. MORRIS:  Sister, thank you very much

1  for your comments.

2              MR. WOODRUFF:  Reverend Kelly Allen.

3              REV. ALLEN:  Thank you for holding this

4  hearing.

5              My name is Reverend Kelly Allen.  I'm the

6  pastor of University Presbyterian Church in San Antonio,

7  Texas, part of the Presbyterian Church USA, which has

8  spoken out very loudly on a national level and produced

9  a documentary about the harm of family detention, along

10  with just about every major other religious community in

11  this nation and Christian denomination who have spoken

12  at a national level about the harm of family detention.

13             I also chair the Interfaith Welcome

14  Coalition.  You've heard a couple of folks refer to

15  their membership in that organization.  We came into

16  existence in response to the Central-American refugees

17  coming across the border last year and have particularly

18  focused on the mothers and children in detention through

19  visitation, through advocacy support, through receiving

20  women and children at the bus station and taking them to

21  the airport, and beginning, along with the Mennonite

22  Church, a shelter program within San Antonio for these

23  families, some of whom you will hear from later today.

24             On my church grounds is a nationally

25  accredited children's center that has a mission to

1  support the well-being and education, spiritual, and
2  emotional care of children.  That organization has a
3  mission to care for children.
4              The Dilley and Karnes Detention Facilities
5  do not have a mission to care for children; they have a
6  contract to lock up families.  To legitimize this
7  licensing, to give them a license that will legitimize
8  the existence of these facilities demeans and diminishes
9  the value of every other kind of licensing that this
10 entity does.
11             We do not need family detention.  Family
12 detention centers have not always existed.  They are a
13 recent invention and a recent policy decision, and they
14 exist only in Texas and one place in Pennsylvania.  It's
15 an embarrassment to our state, and it's an embarrassment
16 to the religious community, which has rallied an
17 enormous amount of support for these families that have
18 come through San Antonio and now are elsewhere in the
19 nation with their families, awaiting their immigration
20 cases to be heard in the community.
21             The appropriate caregivers for these
22 children are their mothers, and their mothers are able
23 to care for them.  And it is determined whether they are
24 abusive mothers or not, and they -- they bring their
25 family -- they can bring their families to elsewhere in

1  the country and live with family members and integrate

2  into the community while they're awaiting for their

3  immigration cases to be heard.  They do not need other

4  people to care for their children for them.  They need

5  to be in communities of support, including the religious

6  communities, which will support them and help walk them

7  through the legal process for their asylum cases to be

8  heard.

9           Thank you.

10          (Applause)

11          MR. WOODRUFF:  Sister Jean Thomas Dwyer.

12          SISTER DWYER:  Good morning.

13          I am Sister Jean Thomas Dwyer, a Daughter

14  of Charity, and living in San Antonio, an hour from

15  Dilley, an hour and 15 minutes from Karnes.

16          The Daughters of Charity have been

17  ministering continually in Texas since 1895 with a

18  special concern for persons who are marginalized and

19  vulnerable.  In 1958 and '59, prior to my becoming a

20  sister, I was a teacher in a residential child care

21  center in Birmingham, Alabama.  The center had about 70

22  children in care.  The Daughters administered and

23  staffed such institutions, and much larger ones, in many

24  states throughout our country at that.  However, a

25  research progressed and professionals became aware that

35

1  large residential facilities did not serve a child's

2  best interest, even in an environment that was very

3  loving and the staff was trained in child development.

4  The Daughters and others running such centers -- and

5  you-all are very aware of this -- began to promote

6  foster care in small, home-like settings in place of

7  these institutional ones.

8            I come today to register my opposition to

9  the proposed licensing of the south Texas residential

10 center in Dilley and the Karnes County residential

11 center as Texas residential child care facilities.

12           The findings of those who do research

13 related to child development indicate that with infants

14 who live with their mothers in detention centers, there

15 is often a disruption of their emotional attachment to

16 their mothers.  This affects the general growth and

17 development of the brain, as well as social functioning.

18 Likewise, the research shows negative effects from

19 detention with older children, particularly with their

20 psychological health, resulting in depression, suicidal

21 tendencies, and other negative behaviors.

22           I am very familiar with the environment at

23 Karnes and Dilley facilities.  I live with three sisters

24 who visit there and two who provide translation services

25 for the women and their lawyers.  Other, like myself, do

1  the transportation that you've heard about from the

2  hospitality house to the bus station or to the airport

3  after the women and children are released from the

4  centers.

5            So my question to you is, what is the good

6  you see that could come from licensing and inherently

7  harmful environment, which is staffed with workers the

8  majority of whom have no training or experience working

9  with traumatized children and their moms?  How is this

10 constant with the DFPS mission to promote the welfare of

11 children?

12           There is no amount of oversight that could

13 change the detention centers into an environment that

14 would promote the welfare of children being detained

15 there.  As the Catholic bishops have stated, it is

16 inhumane to house young mothers and children in

17 restrictive detention facilities.  It is appalling to me

18 that your licensing --

19           (Bell rings)

20           Sister Dwyer:   -- plan would exempt

21 Karnes and Dilley from some of the minimum standards,

22 and particularly disturbing that you would permit

23 teenage boys and teenage girls that are of different

24 genders and are unrelated to each other to serve the

25 same bedroom facilities to be housed there.

1           Please do not move forward with the

2  adoption of proposed Rule 40.   Thank you.

3               MR. WOODRUFF:  Sister Sharon Altendorf.

4               Thank you, Sister.

5               SISTER ALTENDORF:  Good morning.  I'm

6  Sister Sharon Altendorf.  And after hearing what has

7  been said by my other colleagues, I would just like to

8  say I'd like to associate my remarks with them.

9               I'm a presentation sister.  We're involved

10  all over the world, and our special care is for women

11  and children.

12               I associate myself also with detention

13  is -- is not child care.  There are other ways of caring

14  for children, and especially, I'd say, of housing them

15  with their families that are here in the United States.

16  Our Catholic bishops have written a letter, an

17  instruction called "Unlocking Human Dignity," which

18  speaks against this practice.

19               It is immoral to incarcerate innocent

20  people.  And when we think of especially, it's children.

21  This just cannot be accepted.

22               I have been involved since the beginning

23  of the Interfaith Welcome Coalition in visiting with

24  mothers and their children in both Karnes and Dilley.

25  In Karnes, I visited with two families who were there 11

1    months.  Can you imagine what effect that has had on

2    those children?  In Dilley, two that were there for

3    seven months.  And I've also continued to be with people

4    in the shelters in San Antonio.

5             I'd like to say that when I visited in

6    Karnes City, the military culture was very much an

7    obvious, even by their titles and by -- how the children

8    have to respond to them.  The fact that they had to be

9    taken out of their beds early in the morning for count,

10   to be outside.  Think of this:  The same workers who are

11   taking care of these children were the ones who were in

12   charge of the men's prison before.  What do you expect?

13            I'd like to tell you the story of one of

14   the children, 11 months.  Somebody asked me, "What's

15   wrong with that child?  Their head is so big."  And I

16   said, "It's because he has not been eating."  He is

17   physically and emotionally and mentally scarred for the

18   rest of his life.

19            And I'd like to tell you about a child in

20   Dilley who was hurt along the way.  His leg was badly

21   scraped.  He received no attention in what they call the

22   "perrera," the dog house, or in the refrigeration place

23   either.  And he was not helped in Dilley by any medical

24   facilities.

25            (Bell rings)

1            SISTER ALTENDORF:  Please, use other

2   methods for taking care of our children.  They don't

3   have to be citizens to have good attention.

4            Thank you.

5            [Applause]

6            MR. WOODRUFF:  Rebecca O. Flores.

7            MS. FLORES:  Hello.  Thank you for having

8   us this hearing today.  My name is Rebecca Flores, and I

9   live in San Antonio.  And I come before you to oppose

10  the adoption of a proposed Rule 40.

11            I, as my other friends, participate with

12  the Interfaith Welcome Coalition and began visiting the

13  mothers and the children in Karnes earlier this year.

14  And I met and talked to a number of women and their

15  children and was horrified about what they had gone

16  through in their own countries, the violence that had

17  been perpetuated on them by the gangs, by the military,

18  by their spouses.  And so they -- since those countries

19  are so small, there was no way they could escape any of

20  the violence.  And so finally they just picked up one

21  day and took their kids and fled.  They fled through

22  their countries, through all of Mexico, and then crossed

23  the border.

24            In one instance, one of them women that I

25  met and I still talk to right now, her son witnessed the

1  killing of his best friend by a gang member in order to
2  recruit him into the gang, to scare him enough so that
3  he would be recruited into the gang.  So the mother
4  picked him up and said, We're going.  And so she left,
5  went through all those countries and through Mexico and
6  went through some very, very difficult times in Mexico
7  to try to get to U.S. border, finally came in.  And as
8  you have heard, they go through this -- "la hielera,
9  which is a place in McAllen, where they freeze them.
10  This has been going on ever since the beginning, and I
11  don't know why it is.
12          So the women come out of the river and
13  they're wet.  They get picked up by the border patrol.
14  They're put into this place where they sleep on the
15  cement floor, and they give them one of those aluminum
16  covers to cover themselves.  That is our country.  That
17  is our bored patrol agency.  They stay there two nights,
18  and then they're transferred to a place called "la
19  perrera," which you who spook Spanish know what that is.
20          And so they lie down.  They lie down on
21  these beds again.  And then, finally, they get sent to
22  Karnes.  And, gosh, I hope I had more time.  But let me
23  just be really quick.
24          Yesterday, I spoke to two children, one 12
25  and one 9.  They fled Honduras with their mother.  And I

1  asked them, "How did you feel when you were in Dilley?"

2  They were both in Dilley.  They had been there nine

3  days.  And they said to me, "It was a prison."  The girl

4  said, "It was a prison.  There was no residence -- there

5  was not a residence.  We could not escape."  There was

6  no way to get out of there.  The food was very, very

7  sweet.  They just -- they'd found nothing good in any of

8  those two situations --

9            The other young man that I have been

10  following -- now he's 12 years old -- when he was in

11  Karnes, he regressed so badly because of the treatment

12  that he got there that he started wetting the bed.  He

13  wouldn't get out of bed.  He wouldn't take a bath.  And

14  so now this young child is in L.A., trying to master and

15  figure his way out through school.  And I think that

16  that young boy --

17            (Bell rings)

18            MS. FLORES:   -- is going to have such

19  severe problems in his future, and I hope to God he

20  doesn't.

21            Thank you very much.

22            MR. WOODRUFF:  Dr. Laura Guerra-Cardus.

23            DR. GUERRA-CARDUS:  Hello.  My name is

24  Laura Guerra-Cardus.  I'm with the Children's Defense

25  Fund of Texas.

1          For 40 years nationally and more than 15

2   years in Texas, CDF has worked to ensure that every

3   child has a healthy start and a safe start in life.  As

4   advocates who have only children's best interest in

5   mind, we are here to strongly oppose the licensing of

6   immigration detention centers as child care facilities

7   and, in fact, are confused as to why DFPS would even

8   consider licensing these centers.

9          It has been well documented that

10  institutionalized rearing, as happens in these centers,

11  even for short periods of time, is terrible for

12  children's health and well-being.  Growing up in

13  settings of ongoing stress interferes with children's

14  normal development, causing deep psychological stress,

15  as well as intellectual and cognitive impairments.

16  These impacts can have repercussions throughout a

17  child's life.

18          As you have heard, reports for Karnes and

19  Dilley show that children are suffering.  They're

20  experiencing weight loss, hair loss, regression to

21  infantile state behaviors, widespread anxiety, and

22  suicidal ideation.

23          DFPS's mission is to protect children from

24  abuse, neglect, and exploitation and to ensure

25  compliance with minimum standards of child care.  And

1  child care licensing exists for one reason only:  To

2  designate facilities as being safe for children.  We do

3  not see how it would be within the Agency's scope,

4  mission, or best interest to license these unsafe

5  environments.  Even with the reduction in minimum

6  standards that this rule proposes, it will be impossible

7  to address the basic developmental needs of children

8  detained there.  You cannot remove the elements of

9  deprivation and threat, which exists in these centers to

10 provide -- and these things are required to provide safe

11 environments for children.

12            Whether you study these centers now or in

13 six months, how will causing deep and long lasting

14 psychological stress meet any minimum standards for

15 child care?  By making our state agency responsible for

16 an impossible situation, we put ourselves at risk for

17 legal recourse and accountability measures that at the

18 very least would strain DFPS's limited resources.  If

19 DFPS wishes to get involved to help protect the

20 well-being of detained children, it is clear under

21 existing law that there is authorization to do that

22 without the need for licensing.  This includes

23 implementing periodic investigations and the authority

24 to investigate and address any allegations of abuse.

25            Licensing these centers will only allow

1  the circumventing of previous judicial authority which

2  aim to prevent children from being held in unsafe

3  environments.  And we strongly urge DFPS to have no rule

4  in legitimizing these centers as appropriate for

5  children.

6                    Thank you for the opportunity to testify.

7                    [Applause]

8                    MR. WOODRUFF:  Peggy Morton.

9                    MS. MORTON:  Hello, Commissioner Specia,

10  and members of the board.  Thank you for hearing my

11  testimony today.

12                    I'm a retired Texas public schoolteacher,

13  a current board member of the Texas Unitarian

14  Universalist Justice Ministry, and one who has visited

15  women and children held in the Karnes Detention Center,

16  run by the for-profit prison corporation, Geo, and I

17  don't want you to approve Rule 40.

18                    As a UU, I affirm the inherent worth and

19  dignity of everyone, and I'm appalled that our country

20  props up private prison companies to make obscene

21  profits from incarcerating mothers and children, most

22  who have fled their home countries to seek legal

23  protection from violence and abuse only to receive more

24  mistreatment.  And my beloved United States, this is

25  un-American.

1          I'm glad to see with proposed Rule 40 that

2   the quality of care for children housed in family

3   residential centers will be enhanced.  But it begs the

4   question, why wasn't this implemented over the past year

5   that both Geo and CCA have been detaining children and

6   their moms?

7          I have serious concerns about the Texas

8   DFPS expending time and energy on this proposal, because

9   I can't imagine why you would consider licensing either

10  of the two Texas family detention centers as child care

11  centers if you've actually visited them.  However, I

12  know they have a good way of putting on a dog-and-pony

13  show.

14         When I visited women and children in

15  Karnes, I personally heard guards snap at us because we

16  hugged too long.  And I've heard stories of guards

17  threatening children that if they don't walk the line,

18  they'll be taken from their parents.  That's not child

19  care.  It's the kind child abuse and exploitation I want

20  the DFPS to investigate, not to decide to license.

21         I've personally heard two young children

22  share their memories of incarceration after being

23  released.  One said he had made a paper airplane because

24  he wanted to fly people to freedom, and a guard yelled

25  at him and wadded up his handmade toy.  Does this sound

1  like child care?  Would that behavior cultivate a

2  child's creativity?  Would his mom's complaint get

3  heard?  It didn't.

4            Another child told me he was glad to have

5  been released from detention because now he's gone into

6  U.S. homes where he's seen we treat dogs nicely, like

7  children should be treated.

8            These immigrants moms wanted simply to

9  take their children to the home of the brave and the

10  land of the free, not even realizing that most of the

11  guns and violence in their homelands had been caused by

12  our failed U.S. economic policies and militarization of

13  their formerly fertile farmland.

14            We are all part of an interdependent web

15  of existence, and I expect more from my fellow

16  Americans.  Please don't license these prisons as day

17  care centers.

18            We've heard from Catholics,

19  Presbyterians --

20            (Bell rings)

21            MS. MORTON:   -- Unitarians.  We have a

22  faith community who is ready to help.

23            Thank you.

24            [Applause]

25            MR. WOODRUFF:  Bob Libal.

47

1              MR. LIBAL:  Thank you for hearing this

2    testimony today.  My name is Bob Libal.  I'm the

3    executive director at Grassroots Leadership.  We're a

4    national organization based here in Austin.  And we've

5    been engaged in advocacy in family detention since 2006,

6    when immigration and customs enforcement first detained

7    immigrant families in Texas at the T. Don Hutto

8    Detention Center in Taylor, Texas.  That facility was a

9    family detention facility until 2009.

10             And during our three years of advocacy

11   around the detention center in Taylor, we found

12   conditions at the Hutto detention center, made it a

13   national and international scandal.  Reports emerged

14   that children as young as eight months old wore prison

15   uniforms, lived in prison cells with open toilets, were

16   subject to highly restrictive movement and threatened

17   with alarming disciplinary tactics, including threats of

18   separation from their parents if they cried too much or

19   played too loudly.  Medical treatment was inadequate,

20   and there were reports of children as young as one years

21   old losing weight.  We've watched with dismay as this

22   history has repeated itself at the Karnes County

23   residential center in Karnes City, Texas and at the

24   south Texas family residential facility in Dilley,

25   Texas, both of which were opened last year.

1        I personally was able to tour the Karnes

2   County Detention Center in September of 2014, and I was

3   told by women there at the facility that their children

4   were losing weight, again because of stress and poor

5   nutrition, and that they were threatened with separation

6   from their children as a disciplinary measure.

7        Family detention centers are operated for

8   the purpose of enforcing federal immigration law, not

9   caring for children detained with their mothers.  In

10  Texas, they are operated exclusively by for-profit

11  private prison corporations, whose specialty is in

12  incarcerating an adult population.  The corrections

13  Corporation of America operates the Dilley facility, and

14  the Geo Group operates the Karnes facility, and neither

15  as expertise or experience in the care of children.

16  And, in fact, both corporations have an abysmal track

17  record of abuse and neglect when they are charged with

18  overseeing vulnerable populations, including families,

19  young people, women, and asylum seekers.

20        In fact, the Texas Youth Commission

21  canceled a contract with the Geo Group in 2007 for its

22  Coke County juvenile justice facility after officials

23  there discovered the over use of pepper spray, a lack of

24  programming or education, feces-smeared cells,

25  unsanitary, and insect-infested food and the serious

1 understaffing that the TYC director at the time said

2 that Geo should be ashamed, and she called the facility

3 a disgrace.

4          We are very concerned that proposed Rule

5 40 waives important minimum standards for child care

6 licensing in Texas.  If these standards had been put in

7 place for the benefit of children's welfare, why would

8 they now -- why would they now apply to some children

9 but not others?

10          And I would also want to note that --

11          (Bell rings)

12          MR. LIBAL:  Well, I'll finish with -- to

13 say that to license these facilities would not increase

14 the welfare of the children, and the facilities would

15 continue to put the children at risk and would also put

16 Texas' stamp approval on that neglect and abuse.

17          Thank you.

18          MR. WOODRUFF:  Virginia Raymond.

19          MS. RAYMOND:  Thank you, Judge Specia, and

20 all of y'all for letting us talk today.

21          I'm here to oppose Rule 748.7.  And my

22 opposition comes from my experience as a lawyer

23 representing on a pro bono basis many of the families

24 detained at Karnes since it opened in August of 2014 as

25 a "residential center."  I had also been there

1 representing a young man from Guatemala before it

2 underwent its change; not a great change.  They did add

3 some blue colors and some benches out front.  But the

4 detention center, from what I could hear from my

5 clients, was the same as the residential center.

6 There are many reasons why I oppose the

7 adoption of this rule.  But I want to turn to one

8 contradiction in 748.7A4.  There, the proposed rule

9 provides that a parent or family with a child provides

10 the direct care for the child except for specific

11 circumstances.  And, of course, if you didn't have

12 748.7A4, the staffing requirements under the proposed

13 rule would be very different.  You have to have a --

14 hire a lot more staff as a minimum standard.

15 This is a central contradiction and a very

16 cruel one, because what you're doing is assigning the --

17 assigning responsibility but no authority to the

18 mothers.  Mothers are inmates.  They love their children

19 fiercely, but they get to make no decisions about their

20 children's welfare while they are in detention in this

21 jail facility in Karnes or Dilley.  Their movements are

22 regulated.  Every moment, the cameras are on them.  They

23 don't get to decide when their children get up in the

24 morning or when they go to sleep, what they can do, who

25 they can see.

1            A central function of parenting is to help

2    children grow from babies to toddlers to children to

3    adolescents.  We guard our children as they move further

4    away from us into the world.  We teach them how to cross

5    the street, how to go grocery shopping, how to do

6    laundry, and all these tasks.  Mothers who are detained

7    don't get to raise their children.  They can love them

8    fiercely, but that's about all they can do in the

9    center.

10           When a staff member says, Drink more

11   water, because your child is having terrible headaches

12   or terrible stomachaches, they can't say, "I need to go

13   get a second opinion.  Let me go to a different clinic.

14   Let me find another doctor who will give me a better

15   answer."  Then can't assign chores.  They can't teach --

16   interact with the schools as equals.  They can't decide

17   who their children spend time with or even who their

18   children live with or sleep in the same room with.

19           It's a cruel irony and contradiction of

20   this rule to pretend that children are going to be cared

21   for by their parents when you give them no

22   responsibility.  They are inmates in the detention

23   center with their children, and they cannot protect

24   their children from staff who call them racist names or

25   make fun of them or threaten to separate them from their

1  mothers and their siblings if they are not in the room

2  that they were assigned at count.

3          (Bell rings)

4          MS. RAYMOND:  And I've given you an

5  example of that disciplinary notice, that one of my

6  clients, who was then 15 at the time, made me this

7  bracelet, and has now won asylum and living with her

8  sisters and mother in peace and trying to put her life

9  back to normal, because she did deserve asylum, and the

10  judge agreed.

11          Thank you very much.

12          [Applause]

13          MR. WOODRUFF:  Ian Philabaum.

14          MR. PHILABAUM:  Good morning.  My name is

15  Ian Philabaum, and I am the underground project

16  coordinator for the CARA pro bono project in Dilley,

17  Texas.  I have been the project coordinator working in

18  Dilley, Texas since July.  And since then, I have worked

19  with thousands of families detained in the Dilley South

20  Texas Family Residential, as it is called, but as we

21  refer to, as baby jail, because that's what we see every

22  single day.  We see incarcerated children.

23          Six days a week, I walk into this

24  facility, and I meet with over 150 mothers who with them

25  are their children who all are sick.  They are crying.

1   They have fevers.  They are constipated.  They are

2   bloated.  They have diarrhea.  We have been seeing eye

3   infection rampant on a weekly basis.  And we see, most

4   of all, with every single child what we now refer to as

5   "the Dilley cough."

6                    That's what's normal.  That is what we see

7   every single day.  And it is a sign of both the

8   inadequacy of the child care that is provided and also

9   the inhuman standards in which these children are put,

10  erroneously titled a residential facility, but what is

11  actually an incarceration facility.

12                   And there's a cyclical nature to what

13  happens to these children while they're within this

14  facility, because this becomes a stress that affects the

15  mothers.  And that stress and that psychological damage

16  and that re-traumatization of what they have already

17  been experiencing, that which caused them to flee their

18  home, inhibits their ability to provide the care that a

19  mother would want to and should be able to give to their

20  child, especially in what would be deemed residential

21  facility.  This is why we call it a baby jail.

22                   And another aspect the highlights the

23  inability of this facility to even conceive what would

24  be proper child care, on a recent tour that I was

25  finally given after four months of employment in this

54

 1  facility, the children's nursery, which in Spanish

 2  translates to "guardería," is called a "vivero," which

 3  is a plant nursery.  They can't even make the basic

 4  translation to know what is actually happening here.

 5              So when we see these children going

 6  through, with fevers that come out being told that it's

 7  just the change of climate and they need to drink more

 8  water, that they need to bathe their children better and

 9  treat them with wet, cold towels, when they are so

10  constipated, they are staying up all night, crying and

11  crying, that CCA employees come and pull them from their

12  rooms because they're bothering other people, because

13  they're disturbing the other people that they share the

14  close quarters with.  And so I challenge the idea that

15  this is a child care facility or even has the basis to

16  be able to provide child care, because not only is the

17  medical care inadequate, it is irresponsible.

18              CCN employees are not child care

19  professionals.  They are trained in corrections.

20              (Bell rings)

21              MR. PHILABAUM:  They come from facilities

22  that have dealt with dangerous men.  And they are held

23  in inadequate conditions.  And I implore you to not

24  license child abuse and to not lower a standard to meet

25  a level that is already failing.

```
 1                    (Applause)

 2                    MR. WOODRUFF:  We've been going for some

 3     time now.  I want to make sure the court reporter has a

 4     break.  So we're going to take a very brief five-minute

 5     recess, and then we'll convene with testimony after

 6     that.

 7                    Thank you.

 8                    (Break taken)

 9                    MR. WOODRUFF:  Okay.  We're ready to

10     convene again.  If everyone wants to take your seat.

11                    We're ready to come to order.  If

12     everybody would please take your seat.

13                    We'll resume with public comment.

14                    Emily Acker.

15                    MS. ACKER:  Hi.  My name is Emily Acker,

16     and I'm a student at Trinity University.  And I am a

17     volunteer at the Mennonite House with the women and

18     children after they are released from detention centers.

19                    And I wanted to start off by saying that

20     wanting a better life for your family is not a crime.

21     And from the moment these women are put in the "hielera"

22     to the moment they're released with the ankle bracelet,

23     they are treated like criminals.

24                    I've worked with these children in the

25     house and with the women.  And I've seen children, and
```

1   I've seen that as soon as they're released, the negative

2   effects of being in family detention centers are not

3   just turned off.  These children are withdrawn, they're

4   depressed, they're sick.  Overall, they're sick.

5   They've been denied care while they were in the family

6   detention center, and they're traumatized.  These

7   children are behind developmentally, and they're not --

8   they don't behave like normal children.

9               Family detention centers are an

10   illegitimate practice.  And to licensee these centers as

11   child care facilities would legitimize this practice,

12   and that is not fair to these women, and that is not

13   fair to these children.

14               Detaining women and children in the family

15   detention centers is a human rights violation.  And I

16   know that all of you are here because you have

17   children's -- children are -- sorry -- children are your

18   primary interest.  And I implore you to not legitimize

19   this practice and to not authorize the family detention

20   centers as child care facilities.

21               Thank you.

22               MR. SPECIA:  Emily, quick question.  What

23   year are you at Trinity University?

24               MS. ACKER:  I'm a senior.

25               MR. SPECIA:  Thank you.  Yours is the

1  first youthful voice that we've heard.  So thank you for

2  that.

3          MR. WOODRUFF:  Will Francis.

4          MR. FRANCIS:  I'd like to think I

5  categorize as a youthful voice as well.

6          My name is Will Francis.

7          MR. SPECIA:  Will, you're dreaming.

8          MR. FRANCIS:  I am the government

9  relations director for the National Association of

10 Social Workers, Texas Chapter.  Thank you for the

11 opportunity to testify.

12         CCL should not be required to amend their

13 licensing criteria to the rule.  These rules signify the

14 regulatory minimum of what has been determined to keep

15 children safe.  Relaxing the rules for room occupancy,

16 children staying in rooms with adults, and children

17 staying in rooms with children of the opposite gender

18 may be a common practice in the context of a detention

19 centers, but these amendments to the rules are not

20 appropriate under the guidelines layed out under CCL.

21         Altering criteria specifically developed

22 by DFPS to protect children is not an appropriate action

23 to take regarding the well-being, abuse, and care.  Any

24 child within the purview of CCL and under the

25 responsibility of Child Protective Services in a secure,

1   locked facility without a behavioral or mental

2   health issue falls outside the entire mission and

3   service delivery standards of DFPS and CCL and will not

4   be able to monitor their health, safety, and well-being.

5            The level of attention and resources CCL

6   will be able to devote to the regulation is

7   questionable.  And any evaluations or recommendations

8   for change must be framed within the capacity of the

9   facility.  It was never intended for or developed to be

10  under CCL regulations.  CCL is already strained when it

11  comes to resource allocation.  And while DFPS reports

12  the costs will be borne by the centers themselves and

13  not the department, there are almost 3,000 beds in total

14  at these facilities.  The staff needed to monitor this

15  many new children and families will almost certainly

16  become both a physical cost and a draining of resources.

17           DFPS is not asking for regulatory

18  oversight because they saw issues at these centers and

19  voiced a need to intervene or because of complaints of

20  child welfare.  But, rather, the Health and Human

21  Services Commission is asking for CCL regulation because

22  these centers were determined to be outside of

23  compliance by the court system.

24           DFPS website states that a major

25  responsibility of CCL is regulating all child care

1   operations and child placing agencies to protect the

2   health, safety, and well-being of children in care.  A

3   detention center is neither a child care operation nor a

4   child placing agency.  And by diluting the mission of

5   CCL and lowering the minimum standards for care, CCL is

6   setting a dangerous precedent regarding their

7   willingness to amend the rules.

8              Additionally, if in the future a shortage

9   of placement of beds presents itself as issue to the

10  department, then what guarantee is there that the child

11  placing unit won't utilize one of these centers as a

12  placement?  This would be incredibly harmful to any

13  child in the foster care system.  This rule will cost

14  the department too much and is ultimately less about the

15  best interest of children and more about using CCL in a

16  way it was never built for.

17             Thank you for your time.

18             (Applause)

19             MR. WOODRUFF:  Dr. Jeff Patterson.

20             DR. PATTERSON:  Thank you.  I'm Dr. Jeff

21  Patterson.  I'm executive director of the Texas Catholic

22  Conference of Bishops, and I'm here today to ask for

23  your mercy and for your compassion.

24             You've heard the academic research this

25  morning.  You've heard from the people who have seen and

1  experienced in these detention centers the damage that

2  is being done.

3          Warehousing in an incarceration is not

4  child care.  It's horrible.  It's immoral.  We're in

5  this situation because these women and children are

6  victims of the failures of the governments in their own

7  countries to take care of them.  We're in this situation

8  because the failures of the federal government to

9  adequately address this issue, both in the United States

10  Congress and in the White House, and these -- there's no

11  sense in Texas becoming a party to these failures by

12  participating in making this rule change.

13          These are children and these are women who

14  are trying to find a better life for themselves.  When I

15  have been to these facilities and when we saw these

16  people coming across the border, I could see my own

17  children.  I could see in their eyes.  I could see the

18  needs of these children.  And I would hate to think that

19  if my children or I were in the same situation that we

20  would be forced into the same kind of treatment.

21          We are better than this.  You are better

22  than this.  This agency is better than this.  Texas

23  expects more from us than this.  I'm going to ask you to

24  please do the right thing and find a solution for these

25  families, but not through this rule-making procedure.

1          We here in the Catholic Church are here to

2    help.  You have heard from other denominations today

3    that are more than willing to step up to provide some

4    nonrestrictive environments for these families and these

5    children.  And we're happy to do that.  But this isn't

6    the solution.

7          The last thing I'll say is, being a

8    lifelong Catholic and former Altar Boy and in a Catholic

9    school, you've heard from the Benedictine Sisters, the

10   Sisters of Charity.  There's a little saying in the

11   Catholic church, "Woe two those who ignore the sisters."

12         That's the one piece of advice I can

13   really give you today.

14         Thank you for this opportunity.

15         (Applause)

16         MR. WOODRUFF:  Claudia Cano.

17         MS. CANO:  Good morning.  My name is

18   Claudia Cano, and I'm here to testify before you as a

19   professional in the field of child care and immigration

20   shelter over eight years.

21         I'm employed as the director of training

22   and education at Southwest Key Programs in immigrant

23   child care shelters for unaccompanied minors.

24   Fortunately, we have laws which protect them today,

25   thanks to advocates who have fought for their rights to

1  humane treatment.

2          Southwest Key operates shelters for

3  unaccompanied children since 1998, when Flores

4  settlement was settled for national policy, detention

5  centers and treatment of children in INS custody.  I

6  implore you today to not allow state licensing to bend

7  the rules.  This policy, in order for ICE to maintain

8  the founding systems, has been found by and judged to

9  violate the Flores settlement.

10         As a trainer at Southwest Key Programs, it

11 is my job to know the policies inside and out.  And we

12 ask you to review this carefully.

13         State licensing standards are here to

14 protect the children.  And, as you have created these

15 standards and developed by parents and lawyers and

16 doctors and other experts in the field in which the GRO

17 is set up for.  Thus we look at the citizens of Texas to

18 consider reasonable and minimum standards.  But if this

19 new ruling for families in detention centers is posed,

20 then the minimum standards apply for all residential

21 child care centers, because family detention centers do

22 not meet these minimum standards.

23         It flies with your mission that we are

24 here to protect the children, elderly, and the people

25 with disabilities from abuse and neglect and exploration

1  of an involvement of clients and families in

2  communities, to not protect ICE family detention centers

3  from closing.

4            This new ruling of family detention

5  centers will not be required to comply with child care

6  licensing centers that set the limits for four children

7  to one bedroom, which undermines the state licensing

8  standard requirements for the floor space in bedrooms

9  used for children.  A bedroom with at least 60 square

10  feet space for each occupant is more than four occupants

11  per room are permitted even in square footage of the

12  room that would allow -- accommodate more than four of

13  them.  This new rule proposes that -- and will be

14  limitation, keeping children from sharing rooms with

15  adults and on other limitations on keeping children from

16  sharing bedrooms with the opposite gender.

17            As a child care licensing administrator

18  and in having years of experience --

19            (Bell rings)

20            -- I ask -- and thank you for your time.

21  And really evaluate what is going to happen.

22            Thank you.

23            MR. WOODRUFF:  Yanira Lopez Lucas.

24  Ms. Lopez Lucas will use an interpreter, so we'll set

25  the time at six minutes, please.

1          THE INTERPRETER:  We're also going to do a

2     simultaneous as opposed to her speaking, me translating,

3     to make this move along a little better.

4          MR. WOODRUFF:  Yes, ma'am.  However it

5     works best for you.

6          MS. LUCAS:  Hello.  Everyone has talked

7     about what the centers are like.  Everybody's talked all

8     about the centers.  And it's true; I was one of them

9     mothers that was in one of these centers.

10         My name is Yanira.  I'm from Guatemala.  I

11    came with my three children, 15, 13, 4 years old.

12         We went through the "hielera."  They threw

13    a -- a bed down on the floor.  They separated me from my

14    children.  I was unable to speak with my children.  Like

15    we were delinquents.  The officials there said that I

16    couldn't speak with my children.

17         Until we got out of there, then we went to

18    the Karnes Center.  They put us in a room where there

19    were eight people.  They took us food, raw.  The beans

20    were raw.  We couldn't eat it.  We went without food.

21         Then I took my children because they --

22    the middle child, they had hit his hand, and his hand

23    was very inflated.  The doctor that's there gets there

24    and he says, "Nothing's wrong with him."  I asked for

25    medicine; they didn't give me any medicine.  They had

65

1  to -- time went by, and they got the inflammation down

2  with ice.

3           And I talked with someone from immigration

4  to ask him what was it that they had told him that my

5  son had.  They called him, and he said he didn't have

6  anything.  He would complain about pain.  I had to cry

7  in the room with him, because I didn't have anything to

8  give him.

9           My littlest, my daughter, had fever.  I

10 took her to the doctor.  I was hours at the doctor's

11 office.  The only thing they told me to give her was

12 water with a little bit of salt in it, to turn on the

13 water faucet, and with the vapor from the water it would

14 go away.  What I did was grabbed napkins, put them in

15 the microwave, and -- to heat up her chest and her lungs

16 and her chest to avoid pneumonia.

17           I didn't expect that.  I came to this

18 country because of traumatic experience that we went

19 through in Guatemala, asking help from this country, and

20 this is the manner that we're received.  We're not

21 criminals.  And we're not harming anyone.  The only

22 reason we came here was to ask for help, because of the

23 difficult situations in which we find ourselves, that --

24 what we went through our country.

25           That's the reason that we came here to

1  this place with my three children.  And thank God we got

2  out.

3            We're in a house of refuge right now,

4  helping all the mothers that get out of detention

5  centers.  And the same thing keeps happening.  I talk

6  with them.  And the same thing keeps going on.  And they

7  say, "Nobody asked you to come top this country.  Go

8  back."  You're telling them your case, and they say,

9  "Just a moment.  I don't need to know anything about

10  this.  Sign your deportation papers, or we'll take your

11  child away from you."

12            I can't return to my country because of

13  the situation that's going on right now.  And the

14  officials at that center -- and what they do is insult

15  the mothers.  And in front of the children they tell

16  them they're deporting -- they're deporting them if they

17  don't follow the laws that they have.  And they're the

18  ones that are going to determine whether they get

19  deported or not.

20            One child got to the house.  We went out

21  to go walking a while.  He heard a police car, and what

22  happens is he starts shaking.  We came back and went

23  inside the house again, because he kept saying he didn't

24  want them to take him away.

25            Thank you for listening to me.  It's a

1  very difficult situation.  And the children are better

2  taken care of than with their family and their children.

3                Thank you.

4                (Applause)

5                MR. WOODRUFF:  Judith Sadegh.

6                MS. SADEGH:  Hello.  My name is Judith

7  Sadegh.  I'm a master's degree in social work, and I've

8  worked in protective services for over 35 years.

9                As a state employee in protective

10  services, I was charged with protecting children and

11  families, as all of you are here.  I believe that it's a

12  travesty of justice and all that family and protective

13  services stands for to change the standards for these

14  prison-like facilities to be licensed for child care.

15                I noticed that there's a fiscal note that

16  says there will be no cost to doing this.  I don't see

17  how that could be possible.  These are two huge

18  facilities.  And if there's no monetary cost, then

19  certainly there will be cost in the loss of resources

20  that are badly needed to monitor other facilities.

21                There's been a lot of testimony with which

22  I agree here.  It's difficult to add to that.

23                One other thing I would like to say is

24  that I recently heard that Pennsylvania said it would

25  not renew the license for the Berks facility, which is

68

1    the only other family detention center in the country.

2    They have been licensing that facility for 12 years, and

3    some administrator there apparently said it would not be

4    relicensed because it does not meet the definition for a

5    child care facility.

6              I hope that Texas can take this

7    opportunity not to go down that road and stop it here.

8              Thank you.

9              (Applause)

10             MR. WOODRUFF:  Johana De Leon.

11             MR. AMADAO:  Hi.  My name's Johana De

12   Leon, and I'm a legal assistant with Raices, which is

13   part of the pro bono project that offers representation

14   to the women at Karnes and Dilley.

15             I've been working for the past 14 months

16   in visiting these detention centers.  I've spoken to

17   hundreds of mothers and children that are suffering

18   inside this detention center.  No child that I ever

19   spoken to has called this residential center a good

20   place to live, although they've called it a prison.

21             These children are escaping violence, some

22   of them sexual abuse; and instead of receiving help,

23   they are put in a prison.  Too many times I've heard the

24   story of a guard screaming to a child because he was

25   misbehaving.  As a threat, if they don't behave, they

1  will write them up, and that wold affect their

2  immigration case.  And even though this is not true,

3  even though these companies don't have a right over

4  their immigration case, the children get scared, and

5  they spend all of the nights crying because they're

6  afraid that they will be deported.

7              I've talk to children who say they prefer

8  to be dead than be in a detention center.  Some of them

9  blame and shout to their mother, screaming, "Why did you

10  make that journey?  We would be better if we're in our

11  country."

12             I've also spoken to four mothers who

13  actually tried to commit suicide because they were in a

14  detention center.  They feel like they have no other

15  option.  They feel like they don't have control over

16  taking care of their kids, and they can't provide a

17  better place for their kids.

18             Some of the children don't eat because

19  they don't have the adequate food for them.  And a lot

20  of them actually lose weight.

21             The licensing of these facilities will

22  only allow for the continued traumatization of these

23  children.

24             Thank you.

25             (Applause)

1              MR. WOODRUFF:  Melissa Biggs.

2              MS. BIGGS:  My name is Melissa Biggs.  I

3    hold a doctorate in anthropology with an area of

4    specialization in Latin America.

5              For the past 18 months, I have been

6    providing translation and other assistance to lawyers

7    working with women and children held in the family

8    detention centers in Karnes City and Dilley.

9              Before I completed my graduate studies, I

10   worked in the field of early childhood education for 12

11   years as a teacher, teacher trainer, and director of

12   state-licensed nationally accredited child development

13   center.  As a center director, it was my responsibility

14   to make sure that our center met the standards set by

15   the State of Texas for child care facilities.  This

16   included ensuring a safe physical environment for both

17   staff and children, maintaining communication with

18   parents, and perhaps most importantly, making sure that

19   the teachers who work with the children in our care were

20   well-trained and prepared for their responsibilities.

21             As the national association for the

22   education of young children called for excellent states

23   to guide their decisions about practice, all early

24   childhood teachers need to understand the developmental

25   changes that typically occur in the years from birth

1 through age eight and beyond, variations in development

2 that may occur, and how best to support children's

3 learning and development during these years.

4            Research demonstrates the developmentally

5 appropriate care is even more important for children who

6 have experienced trauma, such as that experienced by the

7 children held in Dilley and Karnes City.  The trauma of

8 violence and displacement, the trauma of detention and

9 uncertainty.  The detention centers are not able to meet

10 these criteria.

11            Many of the accounts I translated were

12 written by children held in the centers.  These accounts

13 included incidents in which the adults working at the

14 detention center called them names, including racial

15 slurs, threatened them or their mothers, and

16 descriptions of food, water, and medical care being

17 denied to them or other children in the facility.

18            Dedicated professionals at the Texas

19 Department of Family and Protective Services work hard

20 every day to safeguard the health and welfare of

21 children and other vulnerable people.  Please reject the

22 request that DFPS set aside its standards and allow the

23 emergency licensing of detention facilities as child

24 care facilities.

25            Thank you for your time and attention.

1          (Applause)

2          MR. WOODRUFF:  Ken Zarifis.

3          MR. ZARIFIS:  Good morning.  Thank you for

4   this opportunity to speak before you.

5          My name is Ken Zarifis.  I'm president of

6   Education Austin, the teacher and school employees union

7   for AISD.  We represent 3,000 members.  I'm also a

8   teacher.  I taught for 12 years at Burnet Middle School

9   in north central Austin, with a highly mobile and

10  immigrant population.

11         I have three children, a 16-year-old, a

12  9-year-old, and a 2-year-old.  My wife is a teacher and

13  licensed day care or child care provider, who had her

14  own child care facility.  I understand through teaching

15  and licensing how important it is and the high standards

16  that are expected of child care providers and of

17  teachers in the state.  And those standards are there

18  for a reason, and it's important that we have them and

19  that we respect them.

20         It's important that we do not go back on

21  those standards and compromise those standards.  We have

22  to ask ourselves, is it the children that we support or

23  is it the industrial complex, the prison industrial

24  complex that we want to support?  Detention centers are

25  detention centers.  Child care providers are child care

1  providers.  Teachers and child care providers are not

2  guards, nor are guards teachers and child care

3  providers.

4          It is very important, as we discuss this,

5  to listen to what we're saying.  We're talking about

6  lowering standards for child care.  Listen to that.

7  Lower standards for child care.  In any other context,

8  we would laugh at that notion.  Think about your own

9  children.  Think about your grandchildren.  Think about

10  the time you had to take them to a day care or that

11  first day you went to school and dropped your kids off.

12  Did you not want the highest care for those children at

13  that moment and every minute that your child, your

14  grandchild is in that room or in that facility?  Do you

15  not want the highest qualified person to deal with your

16  child or your grandchildren?  And if the answer to that

17  is yes, then the answer must be yes for everybody else.

18  We cannot lower standards.  It's appalling that we're

19  even considering the motion of lowering standards for

20  children and child care.

21          It doesn't matter how we feel about

22  immigration, immigration reform, and the issues -- the

23  political issues that surround that.  This discussion is

24  about children and the care that we provide for

25  children.  We brag about this great country, yet we

1  treat children and their families like this.  And we've

2  heard countless examples of appalling conditions.  It

3  seems to me that this -- that we have plenty of work to

4  do right now on improving the conditions that these

5  children and these families are existing in at this

6  moment without reducing standards that can undermine an

7  already problematic system.

8              Who are we?  Who do we care about?  Where

9  are our priorities?

10             (Bell rings)

11             MR. ZARIFIS:  Are we supportive of

12  prisons, or are we supportive of children?

13             (Applause)

14             MR. WOODRUFF:  Monserrat Garibay.

15             MS. GARIBAY:  Good afternoon.  Thank you

16  for taking the time to listen to our -- what we have to

17  say.  I am here to testify against detention centers

18  having a child care license.

19             I am a national board certified teacher,

20  and I am the vice president for certified employees with

21  Education Austin.  I taught early childhood for eight

22  years and have worked with many immigrant families as a

23  they transition to the public schools.

24             Let's be clear.  A child care is a place

25  where children can be cared for to ensure that they are

1  learning basic social, cognitive, and language skills.

2  They are happy places that can help children grow and

3  flourish.  People that work at child care centers have

4  to get many certifications, and the places have to get

5  certified to have many -- so they can meet many

6  requirements to ensure that children are safe.

7  Detention centers are not.  They are inappropriately

8  staffed.  They don't have the proper resources.  And the

9  workers don't have the proper professional development

10  to deal with young children.

11          The families have already suffered too

12  much.  Too much pain is in their heart and their souls

13  already.  Let's not make this more hurtful for them.  We

14  are in the 21st Century, and we should respect all

15  people, especially children.  Children, it doesn't

16  matter where they're from, if they have papers, or if

17  they not.  We should care for them because they're the

18  future of the our country and the world.

19          So, please, let's not give these licenses

20  to the detention centers.

21          Thank you.

22          (Applause)

23          MR. WOODRUFF:  As a note, I've heard cell

24  phones pinging or ringing.  Out of respect for our folks

25  giving testimony, please silence your phones.

1    Reverend Chuck Freeman.

2    REVEREND FREEMAN:  Good morning, or

3    afternoon, whatever it is by now.

4    I thank you for the sacred trust that you

5    have undertaken.  And what everyone here hopes and prays

6    for is that you will make the decision in keeping with

7    the Golden Rule that will allow you to lay your head

8    down on your pillow at night and sleep with a clear

9    conscious.

10    I am the executive director of our Texas

11    Unitarian Universalist Justice Ministry representing 33

12    congregations and over 5,000 Unitarian Universalists.

13    This morning I'm going to read a statement from the

14    Unitarian Universalist Service Committee, who is one of

15    our national and international partners in justice.

16    The Unitarian Universalist Service

17    Committee strongly objects to the State of Texas issuing

18    child care licenses to immigration and custom

19    enforcement immigrant family detention centers.  For

20    your consideration, we are submitting a longer statement

21    documenting our objection to granting the licenses,

22    along with our recent professional mental health study

23    assessing the impact of the center's policies,

24    practices, and personnel on detained mothers and

25    children.  And the letter is signed by 31 national

1  mental heath care experts opposing such licensure as
2  further evidenced.
3          The purpose of the family detention
4  centers at Karnes City and Dilley has been to hold
5  families in custody while they undergo immigration and
6  asylum proceedings.  Guards and other detention
7  personnel have a specific role to play with specific
8  competencies and requirements.  Their training,
9  temperament and policies are antithetical to those of
10 child care professionals.  In fact, our research
11 documents abuses in human rights violations families
12 face in these facilities.  These cannot be remedied by
13 the proposed rule.
14         The provision and exceptions to the
15 proposed rule make it clear that this change in the
16 State of Texas child care regulations is not well
17 thought out, but is rather a last-minute attempt to make
18 the detention center conform to the Flores agreement.
19 This tries to legitimize the detention of children when
20 federal courts have deemed it unacceptable.
21         We urge you not to issue any child care
22 licenses to ICE family detention centers and to abandon
23 the proposed rule change.
24         Thank you.  And I have documents here to
25 enter into the records.

78

1           MR. WOODRUFF:  Thank you, Reverend.

2           Elissa Underwood Marek.

3           MS. MAREK:  Thank you for the opportunity

4     to speak.

5           My name is Elissa Underwood Marek.  I'm an

6     attorney, a graduate student in UT's Department of

7     American Studies, focusing on incarceration and food,

8     and I'm also a parent.  I'm here to speak in opposition

9     of the proposed rules.

10          The licensing of immigration prisons as

11    child care facilities is not in the best interest of

12    children, but rather would perpetuate violence, neglect,

13    and abuse against them.  As others have commented today,

14    the prison-like conditions of these facilities,

15    including unhealthy food, inadequate medical care, and

16    unsafe living spaces are causing further physical and

17    emotional trauma for families and children who are

18    escaping dangerous conditions in their home countries

19    only to face similar injustices here.

20          As a mother, I can only imagine the great

21    sense of loss that comes with the State taking away your

22    right to care for your children simply because you tried

23    to leave a dangerous situation and bring your kids to

24    safety.  You have heard detailed testimony about the

25    inhumane conditions in these facilities.

1          I urge the agency to investigate claims of

2    abuse and neglect rather than skirting its

3    responsibilities and causing further irreparable harm to

4    families and children by licensing prisons as child care

5    facilities.

6          Thank you.

7          (Applause)

8          Irma Hernández.

9          INTERPRETER:  Good afternoon.  I'm Ana

10   González with Workers Defense Project, and I'll be

11   interpreting for Ms. Hernández.

12          MS. HERNANDEZ:  My name is Irma Hernández,

13   and I am a member of Workers Defense Project.  I'm here

14   as the mother of three daughters, one of whom was just

15   released from a detention center in Dilley, Texas.  She

16   came to the U.S. fleeing the violence in her country and

17   looking for a better life for her 5-year-old son.  I'm

18   here to ask the Department of Family and Protective

19   Services not to allow family detention centers to be

20   licensed as child care facilities.  I ask this on behalf

21   of my daughter and her son, and I would like to share

22   her story.

23          My daughter and grandson made it to this

24   country and were arrested by immigration that day.  When

25   they were arrested, they were first taken to a place

1  known as the cooler for almost two days.  During this

2  time, my daughter gave any food she was given to her

3  son.  The cold was unbearable.

4              After that place, they were taken to a

5  place called the dog pound.  They called it that because

6  you literally sleep in cages.  Finally, my daughter and

7  grandson were taken to a detention center in Dilley,

8  Texas, where they were prisoners for 28 days.  I say

9  "prisoners," because that's what that place is.  It's a

10 prison where tell you when to wake up, eat, and sleep.

11             The toys that my grandson played with at

12 that prison were lent to him and also had a schedule.

13 Six people slept in the same room with their children.

14 Children are not allowed to play inside or shout.

15 Guards will scold you if your child is crying.  If you

16 need personal hygiene products, you have to buy them,

17 and they are sold at a high price that is unaffordable

18 to most of the people who are in the center.

19             When my grandson was sick, they took him

20 to the infirmary with a high fever.  The only medical

21 care he received there was that they put rags with water

22 on his forehead and told him to drink water.  On the day

23 that they were released, the paperwork was finished by

24 1:00 p.m.  They were unable to leave until 7:00 p.m. for

25 no reason.  My daughter, grandson, and others stand the

1  whole day without eating and without drinking water,
2  listening to their kids cry, while they watched the
3  guards eat.
4              Now my daughter and grandson are with me.
5  She was able to leave with an ankle monitor and under
6  other conditions.  I am happy to have my daughter and my
7  grandson with me, knowing that they are safe and that
8  they can eat and are no longer in that prison.
9              I ask you not to grant licenses to these
10 places --
11             (Bell rings)
12             MS. HERNÁNDEZ:   -- because, for all the
13 reasons I mentioned, clearly, they are not child care
14 facilities.
15             Thank you so much for your time and for
16 giving me the opportunity to speak today.
17             (Applause)
18             MR. WOODRUFF:  Maya Pilgrim.
19             MS. PILGRIM:  Hello.  My name is Maya
20 Pilgrim, and I'm with the Texas Association Against
21 Sexual Assault.  I also have professional experience in
22 refugee resettlement.  Thank you for the important work
23 that you do and this opportunity to speak.
24             You've been charged with protecting
25 children in Texas, which is why we're all here today.

1  We all care about the well-being of all children in

2  Texas.  TAASA believes in the value of trauma-informed

3  care, care designed to specifically address the

4  consequences of trauma, facilitating healing, and

5  actively resisting re-traumatization for all survivors

6  of sexual violence.

7          According to your own website and your

8  training module, it creates opportunities for survivors

9  to rebuild a sense of control and empowerment.  And we

10 appreciate that DFPS shares this value with us.  And we

11 hope that the Department will act in the best interest

12 of children seeking safety and security and whose

13 families have done exactly what is required to seek

14 asylum.

15         Detaining families who have fled or

16 survived violence is counter to trauma-informed care.

17 ICE facilities have neither the expertise nor the

18 imperative to provide trauma-informed care.  We know

19 that detaining children exacerbates developmental risks,

20 threatens bonds with their caregivers, limits

21 opportunities, has destructive psychological impacts,

22 and compounds the impacts of other traumas.  In the

23 words of Rachael Kronik, a Canadian researcher who has

24 published studies on detained children, she said, "I can

25 say from a mental health perspective that it's not okay

1  for children to be detained at all."  And by licensing

2  these jails as general residential centers, DFPS is

3  giving the impression to the detriment of the children

4  confined there.

5          Thank you very much for your time.

6          (Applause)

7          MR. WOODRUFF:  Irasema Cavazos.

8          MS. CAVAZOS:  I don't have any licenses.

9  I'm a mother.  I raised two boys -- well, they're not

10 boys anymore; they're men.  Okay.

11         When I was raising my children, if I

12 needed help and I needed to go to a child care facility,

13 I wanted to make sure that it was going to be safe for

14 them there.  So I looked to make sure that there was a

15 license, that these facilities had some supervision.

16 And this value that we give to our agencies that license

17 cannot be diminished.  This should be enhanced, not

18 degraded.

19         As a mother, I know, because I'm a Latina

20 mother, how we will stick with our kids through thick

21 and thin -- thick and thin.  We will keep our children

22 with us.  And that is why these mothers have come across

23 a continent to protect their children.  Are we going to

24 dimmish that sentiment, that feeling of protection that

25 they're looking for by lowering the standards here where

1  they have come seeking refuge?

2          This is a wrong policy.  Would you take

3  your child to one of these places as a child care

4  facility?  Would you want your sister and her children

5  to be there?  Be logical.  Put yourself in that place.

6  It is wrong to license a prison as a child care

7  facility.  I ask that you not do this.

8          In fact, you should be raising a voice

9  against the detention of these women and children in

10  these places, knowing that -- all the testimony from all

11  these people, all these wonderful people with all their

12  licenses and research -- your voice should be there too

13  advocating for the closure of these places because they

14  are -- deterring the health.  They are wrong for the

15  children, wrong for these mothers.  Your voice should be

16  against this.  Not for or licensing it.

17          Thank you for the opportunity to speak.

18          (Applause)

19          MR. WOODRUFF:  Tom Kolker.

20          MR. KOLKER:  Good afternoon.  My name is

21  Tom Kolker.  And I hope to communicate one thing to you

22  in this short talk, and that is the total lack of

23  accountability and an apparent institutional commitment

24  to arbitrariness and indifference that rules the day at

25  these ICE private detention centers.

1          I'm not a child care professional, social

2    worker, therapist.  I'm not even an immigration lawyer,

3    but I am married to an immigration lawyer, and I'm a

4    good driver.  And I have spent many hours at the Karnes

5    and other private detention facilities here in Texas.

6          And as a lawyer for the past 38 years, I

7    really thought I had seen it all.  But the pettiness,

8    the attitude, the rules that change from day-to-day,

9    from person to person.  It's unbelievable.  It is really

10   unbelievable.

11         At the beginning I was so outraged, and I

12   was, like, well, this can't be.  There's no way, hearing

13   about people who were denied access, because one time

14   they filled out a form as an interpreter and then

15   corrected it as a paralegal and were permanently barred

16   from coming in as a paralegal.  One instance where a

17   paralegal for my wife was not permitted to come in,

18   because when he sent the fax in, or she did, 24 hours in

19   advance as was required, it said the week that he would

20   be visiting.  And when he traveled to the facility, it

21   was not -- he was told he could not come in, because

22   that letter did not say what specific day and time he

23   would be there.  It took me getting on the phone,

24   tracking down the general counsel for the private

25   company that owned the facility saying this is the most

1  ridiculous thing I've ever heard.  And then this person,

2  this counsel was saying, well, here's the warden's cell

3  phone number.  You call him up and tell him I said it

4  was okay.  This is the kind of institution that we have

5  here.

6           Now, add to that that when you see these

7  arbitrary rule changes, you're dealing with people who

8  are administering them with a complete law enforcement

9  mentality.  The idea -- I can't say that I've ever seen

10  the child care facility or what goes on.  But I can tell

11  you that at every other level, it's amazing.  And to

12  think that a government could have such a type of

13  situation is really difficult to believe.  Adding in the

14  fact that children are there.  It's really astounding.

15           I would invite any of you to go down there

16  one day to Karnes.  Been there many times.  Just don't

17  say you're coming, and don't say who you are.  And say,

18  I would like to visit so-and-so person, and see what

19  kind of reception you get.  And then you might go back

20  two days later and find out that all the things you were

21  told the first time had completely changed with no

22  notice, no writing.

23           That's what I've seen and I just wanted to

24  relay that.  Thank you.

25           (Applause)

1          MR. WOODRUFF:  Celina Moreno.

2          MS. MORENO:  Good afternoon.  My name is

3  Celina Moreno, and I'm an attorney with the

4  Mexican-American Legal Defense and Educational Fund.

5  And MALDEF is here in strong opposition to the proposed

6  rule.

7          You've heard feelings expressed of

8  confusion, and we too are baffled.  And that's because

9  this proposed rule stand at odds with the 1997 Flores

10  settlement agreement, with federal case law, and with

11  DFPS' own mission.

12          The federal immigration detention centers

13  at Dilley are not established nor designed to provide

14  child care, but instead they're meant to secure the

15  custody of detainees in order to execute federal

16  immigration law.

17          To date, DHS and other federal agencies

18  have received numerous complaints regarding the lack of

19  safe and developmentally appropriate child care --

20  appropriate conditions for children at Karnes.  And

21  these have included basic access to medical, dental, and

22  health care services, continued care for pre-diagnosed

23  medical conditions, basic nutrition, age-appropriate

24  educational services and basic developmental needs such

25  as diapers, cribs, and space and time for crawling and

1    physical activity.

2            Neither Karnes nor Dilly has private

3    changing areas for the women and children held there or

4    restrictions on interaction between children based on

5    gender or age.  And there have been a number of

6    allegations of assault and sexual abuse and potential

7    sexual abuse because of these lack of age and gender

8    restrictions between detainees of the facilities and a

9    lack of proper training and supervision for facility

10   staff.  MALDEF and our allies have filed two federal

11   complaints to that effect.

12           In addition to the U.S. Commission on

13   Civil Rights, after an extensive investigation, after

14   hearing voluminous testimony from MALDEF and others and

15   after on-site visits, found that DHS and its contractors

16   are not holding children in conditions that are the

17   lease restrictive setting in accordance with Flores.

18   The Commission concluded that ICE is not complying with

19   the prison Rape Elimination Act solitary confinement

20   practices concerning children and has not adequately

21   addressed staff misconduct regarding sexual assault and

22   abuse.

23           The Commission also found that Karnes has

24   failed to comply with the federal standards for medical

25   care, including ignoring serious medical conditions and

1   failing to administer proper medical protocols.  These

2   reports evidence the need for heightened accountability,

3   not a decrease in the standards for children as proposed

4   in the regulations for licensing.

5            If DFPS truly seeks to hold family

6   detention centers accountable for the safety, health,

7   and well-being of children, it could've respond to the

8   multiple requests for investigation and investigated and

9   inspected these facilities, and instead we're here today

10  with this rule that seeks to license and provide the

11  State's seal of approval on facilities that are

12  fundamentally and irreversibly flawed and unsuitable for

13  children.  And we implore you to abandon the proposed

14  rule today.  Thank you very much.

15            (Applause)

16            MR. WOODRUFF:  Yvette Mendez.

17            MS. MENDEZ:  Good afternoon.  I think it's

18  the afternoon.  My name is Yvette Mendez.  I'm currently

19  a graduate student at the University of Texas in San

20  Antonio School of Public Policy.  I've also been a

21  schoolteacher, a licensed schoolteacher for the State of

22  Texas.  And I'm part of an organization called the

23  Indigenous Women's Network and Alma de Mujer.  But today

24  I come to you as a mother.  I come to appeal to the

25  hearts and minds of each and every one of you that's

1   here today.

2            As human beings, that common bond that

3   unites us as civilized people, and I wonder, as I stand

4   here, and see all these amazing people who have come

5   here with their expertise, with their professionalism,

6   and I wonder, why are we even here having this kind of a

7   conversation?  Why is it even a question whether or not

8   it's proper to have children incarcerated and to license

9   such a facility as a child care facility?

10           I find it disturbing, and I find it very

11  sad that here we are in the year 2015, as supposedly one

12  of the world's most powerful nations.  We are supposed

13  to be civilized human beings, and yet here we are trying

14  to have a discussion as to whether or not we should

15  license a prison system to have children, these very

16  children who have parents just like each and every one

17  of you.

18           Perhaps you also are grandparents.  And I

19  ask you what kind of a world do we live in today when we

20  have to come to a bureaucracy as this to try to decide

21  over the lives of small children and of women?

22           I think it is embarrassing.  I think it is

23  appalling.  And I think it is shameful that we even have

24  to sit in an institution like this, most of us college

25  graduates, to try to rationalize in our mind and

1   determine whether this is right or wrong.  What kind of
2   a civilization have we become when we cannot even figure
3   that out as common sense?
4                And I ask you and I implore you to your
5   common humanity as human beings that you make the right
6   choice, that you make the right decision --
7                (Bell rings)
8                MS. MENDEZ:   -- and that you not take the
9   "human" out of the Texas Department of Human Services.
10  Thank you.
11               (Applause)
12               MR. WOODRUFF:  Robert Painter.
13               MR. PAINTER:  Good afternoon.  My name is
14  Robert Painter.  I'm an attorney and the director of pro
15  bono services American Gateways.  And I'm here today to
16  voice our opposition to the proposed rule.
17               American Gateways is a Central Texas
18  nonprofit dedicated to providing immigration legal
19  services to low-income immigrants in our community.
20  We've been a part of this community for almost 30 years
21  now.  We currently operate in four immigration detention
22  facilities throughout the region, including the Karnes
23  and Dilley facilities in question today.  We provide
24  legal orientation programs, pro se workshops, and pro
25  bono representation at those facilities.  Our staff

1   attorneys are on the ground meeting with families

2   several days per week for hours at a time.  I have

3   personally given these presentation workshops.  And I

4   think we all know what's at stake here.

5               You have heard and will

6   hear the myriad of examples of why family detention and

7   child care represent a contradiction in terms.  Beyond

8   these specific concerns, we wish to remind this panel

9   the vast majority of these families are asylum seekers,

10  refugees, meaning that they have suffer significant

11  trauma in their home countries and in transit to the

12  United States, talking about rapes, beatings, witnessing

13  the murder of family members, torture.

14              It's well understood that among

15  immigration practitioners and many people in this room

16  that detention conditions only serve to exacerbate the

17  psychological damage that these families have suffered.

18  The fundamental question here is whether it's sound

19  policy or morally right that the children in question

20  are being locked into a climate of pervasive tension,

21  uncertainty, and fear; and we say absolutely not.

22              Our position remains that family detention

23  stands in direct opposition to child welfare, and we

24  strongly oppose the licensing of these facilities.

25  Thank you.

```
 1              (Applause)
 2              MR. WOODRUFF:  Diana Furiegas.
 3              MS. FURIEGAS:  Hello.  I'm Diana Furiegas
 4    from San Antonio.  I brought my Blue Santa hat for the
 5    cops.  Right.
 6              I've been to T.D.  Hutto, and it saddened
 7    me too, it makes me cry, for all this I didn't even
 8    know -- that they were having kids in detention centers
 9    that have not done anything, you know.  No crying.
10    Innocent children, our future children who maybe one day
11    will be sitting right there where you are at.  And
12    hopefully none of your kids are in their positions, you
13    know, your -- your grandkids or whatever, nephews,
14    nieces or whatever, any family members, because you
15    will -- they will see what they've been through.
16              I don't think it's right what y'all are
17    doing.  I know there's a lot of -- a lot of people out
18    here that would love to take these kids, especially me.
19    You know, I would love to take all these kids, because
20    God said, Come to me.  You know, and I will -- I would
21    take some of these kids if you would give them to me.
22              It hurts me a lot that I know that
23    y'all -- y'all have the power to hear us out, and at the
24    end, it doesn't really matter what we think or say.  In
25    your hearts, you could have a warm heart that God gave
```

1   you or a cold heart, like the Yang Yang, good or bad.

2                    We've suffered so much.  My people suffer

3   so much, like Hitler's time.  Is that what y'all want to

4   do to our children?  You want to bring this back again?

5   We don't want that.  Please be a good -- good people,

6   the way God wants us.

7                    This is the country of the free, but I

8   don't see it free.  I never have.  People who want to

9   come over to make a better life for themselves.

10  Everybody's told you all this already.  But y'all still

11  don't want to give it to them.  So I don't see no land

12  of the free here.

13                    Can you show me that land of free?  Where

14  is it at?  Where is this promised land at?  We celebrate

15  Christmas.  Jesus Christ --

16                    (Bell rings)

17                    MS. FURIEGAS:  -- was he from here?  We

18  are from here.  We are -- there's no borders in this

19  world.  The Creator didn't put any borders.  He walked

20  the land.

21                    MR. WOODRUFF:  Ms. Furiegas, if you would

22  like to conclude your remarks, your time --

23                    MS. FURIEGAS:  Please, y'all do the right

24  thing.  These children are suffering.  They're

25  suffering.  And if y'all are going to make them

1  detention day cares, well, please provide them good --
2  good health and good food.  You know, take care of them
3  better, the way you would like to be taken care.
4          MR. WOODRUFF:  Thank you, Ms. Furiegas,
5  for your time.
6          MS. FURIEGAS:  Please --
7          MR. WOODRUFF:  Thank you very much.  We'll
8  move on to the next speaker.
9          MS. FURIEGAS:   -- don't license these
10 things, only if you're going to make it better for the
11 people in there.
12          Thank you.
13          (Applause)
14          MR. DIAZ:  I believe I'm next.  My name is
15 Antonio Diaz.
16          MR. WOODRUFF:  Yes, sir.  Please go ahead.
17          MR. DIAZ:  I'm the spokesperson for Texas
18 Indigenous Council.  And we had an effort of three years
19 of going to Taylor, Texas, confronting CCA's T. Don
20 Hutto.  It was the very same conditions.  And in 2010 or
21 2009, nearing 2010, those children were and said that
22 they would no longer be separated from their families,
23 and they were sent to Berks Pennsylvania.  And now we're
24 hearing that Berks is no longer being licensed for child
25 care.  And yet now here in Texas, your family --

1   department of services -- family services is

2   considering -- or actually, y'all have already licensed

3   one, right, but now you're gong to do it at large for

4   all these facilities, all these private prisons.

5                We've heard all the inhumane conditions

6   that people are put through and people that have come

7   with all sorts of trauma; children psychologically

8   traumatized already and then arriving and being

9   traumatized still further.

10                We used to petition y'all to come and help

11  us when we were protesting at T. Don Hutto, and y'all

12  said it was not within your jurisdiction.  Well, now

13  somehow it's going to be.  You-all are making the

14  decision to license these facilities.  And I strongly,

15  strongly oppose this as an advocate for human rights.

16                We indigenous people of Texas and

17  throughout this continent have been deported, displaced,

18  removed, since the arrival of the Europeans on our land.

19  So I have this vantage point, this viewpoint of inhumane

20  treatment from one human being to another.  You-all on

21  this commission should not license, should revoke the

22  licenses that y'all have already given out to that

23  facility, because they are not child care centers.  They

24  are not.  They are prisons.  Plain and simple.  They are

25  prisons for profit.

1          This private industry has grown legs and

2  is getting stronger and stronger and gaining more and

3  more monetary power.  And, yes, money talks and

4  everything else walks.  But, please, make the right

5  decision.  Do not license these facilities.

6          Thank you very much.

7          (Applause)

8          MR. WOODRUFF:  We've been going for some

9  period of time.  So we're going to take another short

10  break to give the court reporter a chance to stretch her

11  fingers.  And we'll convene in five minutes.

12          Thank you.

13          (Break taken)

14          MR. WOODRUFF:  All right.  We're ready to

15  come to order.  We have just a few folks left.

16          Benito Miller.

17          MR. MILLER:  Good afternoon.  I come to

18  you as one of several coordinators of the Hospitality

19  House in San Antonio, Texas.  It's a partnership of many

20  faith communities, the Interfaith Welcome Coalition,

21  Raices, and the four organizations of CARA, among dozens

22  of very dedicated volunteers.

23          We're often the first place that release

24  families from both Dilley and Karnes -- are coming

25  within hours of being released.  And we provide these

1   families housing, most of them very short term, while

2   they prepare to either get on a Greyhound bus or an

3   airplane to destinations all across the country to

4   reunite with families and to continue with their asylum

5   cases.

6              During their short stay with us, we

7   provide them with clothing, which has been critical now

8   that the winter months are coming, and these women often

9   are released with not even a sweatshirt going to places

10  in the far north.  We provide them with meals of

11  familiar food from the places they're from prepared by

12  one of the people you've heard speak today.  And then we

13  help explain their Greyhound transfers throughout the

14  country, and also if they have connecting flights, and

15  to help navigate TSA and so forth, because it's, for

16  many, their first time traveling.

17             On October 23rd through November 1st, we

18  became a catch-all for these facilities as they began to

19  come into compliance with the decision.  And in that

20  week alone, we saw over 350 people at our shelter, which

21  is set up on a typical day to house maybe 30.  During

22  that time, we dealt with a situation that we see all too

23  often.  So during our daily intake process, we're

24  capturing different information pieces and then

25  offering, for example, very basic medicine for fevers,

1  for coughs, and so forth.  We had a mother from Honduras

2  with a 5-year-old daughter who was showing a very high

3  fever.  We gave her some ibuprofen and monitored the

4  situation throughout the night.

5              That night, we received about 55 people.

6  At about midnight, we heard hysterical crying from this

7  5-year-old.  Long story short, we took her to the

8  children's ER, because when we took her temperature, it

9  was at a 105.5.  We were worried that we would have a

10  fatality on our hands, and so we rushed her to the ER.

11  At 6:00 a.m. the next morning, we left the facility to

12  go get the medicines for pneumonia.  And I do not pry

13  into people's medical records, but I felt compelled to

14  read the child's medical records, which every person

15  leaving these facilities --

16              (Bell rings)

17              MR. MILLER:  Just very quickly, they were

18  cleared for travel, no mention of this condition, no

19  mention of the fact that this family was going to get on

20  a Greyhound bus the next morning and travel for two and

21  a half days and maybe risk the life of that 5-year-old.

22              So I just ask you and warn you that

23  licensing these facilities that have been completely

24  unaccountable in the history, run by for-profit prison

25  companies is being complicit in that coverup, and the

```
 1   fact that both facilities were built in isolated towns
 2   in Texas, means they want to keep that out of sight, out
 3   of mind.
 4                   Please, please protect children.
 5                   Thank you very much.
 6                   (Applause)
 7                   MR. WOODRUFF:  Rosalie Weisfeld.
 8                   MS. WEISFELD:  Good afternoon.  My name is
 9   Rosalie Weisfeld.  And I thank you all for giving us the
10   opportunity to come before you to justify against
11   designating detention centers, prisons, as licensed
12   child care centers.
13                   A prison is not an appropriate place to be
14   designated as a child care center.  You have heard
15   overwhelming testimony here today from many
16   eyewitnesses.  I as well am one.  I was born and reared
17   in McAllen, una comunidad en la frontera de Texas, a
18   gateway through which many, probably most of the women
19   and children currently being detained in these prison
20   facilities, first entered Texas.  I have seen firsthand
21   some of these mothers with their children.
22                   When they first entered into the United
23   States, many of them were given safe haven at Sacred
24   Heart Church in downtown McAllen.  They came seeking
25   refuge and comfort from the violence and chaos that they
```

1  were fleeing from their home countries.  As one of the

2  hundreds of volunteers who offered assistance to these

3  refugees, I saw these women, small women, with small

4  children, who arrived hungry and tired to a place they

5  didn't know, with hollow eyes and weak stomachs.  All

6  they could keep down was a bowl of broth, a little bit

7  of soup, and maybe a few crackers, a glass of water.

8  That's all they asked for.

9                 They were given a place to shower and a

10  set of clean clothes to change into, because they fled

11  hurriedly from the violence that they left behind.  They

12  came wearing only what was on their backs.  Some of them

13  had a few little items wrapped in a small bag.  But

14  mostly they just came holding onto the hands of their

15  children.  They came seeking hope.  They came seeking a

16  safe place for their children.  As one woman said, and I

17  translate, "Better to die on the road to safety than to

18  die on my footstep."

19                 These mothers have suffered enough.  They

20  are not criminals.  They are refugees seeking safety.

21  They were fleeing violence and poverty.

22                 Allow the children to stay with their

23  mothers.  Do not give the prisons a veil of human

24  respectability by granting them a child care license.

25                 If it is within your control to release

1  these mothers and children, please do so.  If not, just,

2  please, do not license prisons as child care facilities.

3          By opening our hearts, together we can

4  give these women with their children the opportunity to

5  see what the United States can really offer, what they

6  came to this country seeking, a place of love and hope,

7  a better future for all.

8          Thank you so much.

9          (Applause])

10          MR. WOODRUFF:  Sarah Watkins.

11          MS. WATKINS:  Do you have something

12  detachable?  Otherwise, I can yell.

13          Can you hear me?

14          MS. HAWKINS:  Yes.

15          MS. WATKINS:  Oh, good.  Good.  Excellent.

16          My name is Sarah Watkins, and I'm here

17  today to join dozens of others in opposing the licensing

18  of these detention centers as child care facilities.

19          Since January, I've worked with a

20  coalition of lawyers and advocates as a volunteer legal

21  advocate, helping many of these women and children and

22  families to exit detention centers.  And I can tell you

23  that anything that looks like a prison should not be

24  licensed as a child care center.

25          I come to this work from disability rights

1   work where I've spent many, many years looking at how we

2   deinstitutionalize children with assorted disabilities,

3   right.  And the State has said -- the Department of

4   Aging and Disability Services has said, and DFPS has

5   said for years, that children belong in families, that

6   children do not belong in large institutions.  And we've

7   begun to make strides in bringing children with

8   disabilities into family settings and to reunite them

9   with their families in the community.  And I have to

10  ask, how is this any different?

11              If you look at the sort of trauma that

12  these mothers and their children have experienced, this

13  is the sort of trauma that falls under disability; and

14  whether this trauma is temporary and creates temporary

15  mental health issues or whether this trauma is long-term

16  and creates permanent disabilities has a lot to do with

17  how long these children and these mothers spend in

18  detention and with what sort of treatment they receive

19  upon exiting detention centers.

20              So if DFPS -- if this state is really

21  serious being about making sure that children do not

22  remain in institutions, then that needs to apply to all

23  children.

24              So I ask you, please do not license these

25  facilities as child care centers, because they are not.

1           Thank you.

2           (Applause)

3           MR. WOODRUFF:  Commissioner, this

4  concludes the list of persons who have signed up to

5  provide public comment.

6           MR. SPECIA:  Thank you, Trevor.

7           Has anyone signed a card and has not been

8  afforded an opportunity to testify?

9           (No response)

10          MR. SPECIA:  Okay.  I want to thank

11 everyone for being here today and making the time to be

12 here and share your responses and concerns.  I

13 appreciate and value your input.

14          We will review all comments and all

15 written testimony as we go through the process.  If you

16 have any additional comments or there are people that

17 were not able to be here today and you want to present

18 written comments, you can submit those to Audrey

19 Carmical by December 14th.  She will be -- her email

20 address is on the agenda today.

21          So, again, thank you very, very much.  I'm

22 going to adjourn this hearing.  Being that we said we

23 would be available until 2 o'clock, Mr. Morris and

24 Mr. Woodruff are going to stay.  If someone happens to

25 come late, we will take their testimony.

105

1          So thank you.

2          (Record remained open until 2:05 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2    STATE OF TEXAS      )

 3    COUNTY OF TRAVIS  )

 4            I, Dalia F. Inman, Certified Shorthand Reporter

 5    in and for the State of Texas, do hereby certify that

 6    the above-mentioned matter occurred as hereinbefore set

 7    out.

 8            I FURTHER CERTIFY THAT the proceedings of such

 9    were reported by me or under my supervision, later

10    reduced to typewritten form under my supervision and

11    control and that the foregoing pages are a full, true,

12    and correct transcription of the original notes.

13            IN WITNESS WHEREOF, I have hereunto set my hand

14    and seal this 11th day of December 2015.

15

16

17

18

19

20    _____
      DALIA F. INMAN, CSR, RPR
21    Certified Shorthand Reporter
      CSR No. 7423-Expires 12/31/17
22
      Firm Registration No. 276
23    Kennedy Reporting Service, Inc.
      7800 North Mopac, Suite 120
24    Austin, Texas 78759
      512.474.2233
25
```

# Attachment to Exhibit 18
# Attachment 5

<<Prev Rule
Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 40 | SOCIAL SERVICES AND ASSISTANCE |
| PART 19 | DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES |
| CHAPTER 748 | MINIMUM STANDARDS FOR GENERAL RESIDENTIAL OPERATIONS |
| SUBCHAPTER A | PURPOSE AND SCOPE |
| RULE §748.7 | How are these regulations applied to family residential centers? |

(a) Definition. A family residential center is one that meets all of the following requirements:

  (1) The center is operated by or under a contract with United States Immigration and Customs Enforcement;

  (2) The center is operated to enforce federal immigration laws;

  (3) Each child at the center is detained with a parent or other adult family member, who remains with the child at the center; and

  (4) A parent or family member with a child provides the direct care for the child except for specific circumstances when the child is cared for directly by the center or another adult in the custody of the center.

(b) Classification. A family residential center is a general residential operation (GRO) and must comply with all associated requirements for GROs, unless the family residential center is approved for an individual waiver or variance or an exception is provided in this section. The department is responsible for regulating the provision of childcare as authorized by Chapters 40 and 42, Texas Human Resources Code and Chapter 261, Texas Human Resources Code. The department does not oversee requirements that pertain to other law, including whether the facilities are classified as secure or in compliance with any operable settlement agreements or other state or federal restrictions.

(c) Exceptions. A family residential center is not required to comply with all terms of the following Minimum Standards:

  (1) the limitation of room occupants to four in §748.3357 of this title (relating to What are the requirements for floor space in a bedroom used by a child?), except that nothing in this exception shall be construed to require fewer than 60 square feet per child;

  (2) the limitation on a child sharing a bedroom with an adult in §748.3361 of this title (relating to May a child in care share a bedroom with an adult?), if the bedroom is being shared in order to allow a child to remain with the child's parent or other family member; and

  (3) the limitations on children of the opposite gender sharing a room in §748.3363 of this title (relating to May children of opposite genders share a bedroom?), except that nothing in this exception shall be construed to permit children from different families who are over the age of six and members of the opposite gender to share a bedroom.

(d) Limitation of exception. Notwithstanding subsection (c) of this section, and as further described in §745.8313 of this title (relating to Is a waiver or variance unconditional?), the department retains the

authority for placing conditions on the scope of the exceptions authorized for a family residential center, including conditions related to limiting occupancy in accordance with fire safety standards, limitations related to allowing children and adults of the opposite gender to occupy the same room only if they are part of the same family, and any other limitation determined by the department to be necessary to the health, safety, or welfare of children in care.

(e) Division of responsibility. In addition to the application materials described in §745.243(6) of this title (relating to What does a completed application for a permit include?), an applicant for a license under this section must submit the policies, procedures, and any other documentation that the department deems necessary to clarify the division of supervisory and caretaking responsibility between employees of the facility and the parents and other adult family members who are housed with the children. The department must approve the documentation during the application process and any subsequent amendments to the policies and procedures.

Source Note: The provisions of this §748.7 adopted to be effective March 1, 2016, 41 TexReg 1493

Next Page    Previous Page

List of Titles    Back to List

HOME    TEXAS REGISTER    TEXAS ADMINISTRATIVE CODE    OPEN MEETINGS

# Attachment to Exhibit 18
# Attachment 6

**DECLARATION** ███████████████ **(E.G.S.)**

I, ███████████████ , declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. My name is ███████████████ . I was born on ███████ in El Salvador. I have been detained at the Kames County Residential facility with my 12 year old daughter, ███████████████ (A.E.S.G.), since around March 24, 2016.

2. I fled to the United States for protection and safety. Prior to being placed in this jail, the Mara murdered my brother-in-law in El Salvador. The same four members of the Mara then raped me multiple times and robbed and stalked me. My rapists then stalked my daughter and repeatedly threatened to rape her too. They also threatened to kill my husband if I told anyone what they did to me.

3. In detention in the United States my suffering continues. I do not feel safe or comfortable in this jail because I cannot trust the jailers who want to detain and deport me to look out for my best interests or the best interests of my daughter. I cannot trust the strangers with whom I must cohabitate in jail either because I have experienced great harm at the hands of strangers in the past.

4. My worst nightmare became a reality when my daughter was sexually assaulted in jail by a woman we were forced to share a room with. My daughter's abuser remains in this detention center and we must see her every day. My daughter is afraid to be without me for even a minute. She currently sleeps in my small bottom bunk bed each night out of fear someone will harm her while she is sleeping.

5. My daughter and I would like to be released from jail so that we can access the therapy and help we need. Living in detention under the threat of deportation is traumatizing. It reminds me of my experience being watched, followed and raped in El Salvador. We cannot sleep or eat as usual, are hypervigilant, cry and feel depressed. We want to be well and safe and hope other families do no suffer as much as we are currently suffering.

*My Childhood in El Salvador*

6. I suffered greatly in El Salvador throughout my childhood. My mother had 12 children and I am the fifth youngest of my siblings. My father was an alcoholic and he was extremely violent with my mother, me and my siblings. He was never sexually abusive to me, but one of my older sisters said that he tried to sexually abuse her. Since my mother had so many children, she couldn't care for all of us. As each of my siblings got older, we began working to help care for the younger siblings. My mother never supported us. I think she was depressed. She never gave us any advice or help growing up.

7. I only went to school for 3 years when I was 7 years old until I was 9 years old. I cannot read or write. I started working as a domestic worker at the age of 10. I worked for many different families and frequently lived within the home of the family I was working for.

8. Although working as a domestic worker was always tough, one job in particular was the

546

worst. When I was 14 years old I went to live with a family to take care of their children and the house. The family included the mother, father, and two children. My first day on the job, the mother was working her shift as a nurse. The father raped me and told me to leave the house. I went back to my mother's house and told her what had happened, but she did not believe me.

*My Life with My Husband and Children in El Salvador*

9. When I was 21 years old I married my husband M.M.S.G. Together we had three beautiful children. In addition to A.E.S.G., we also have an 11 year old daughter and a 9 year old son. I love my children greatly.

10. My husband and I lived for two years in Canton Primavera, and then moved to Canton Piedrapacha. We have lived in Piedrapacha with our family in the same house since then. The house belongs to one of my husband's friends in the United States, but he lets us live in the house. My husband has worked in the fields, and I've sold jewelry to try and support our family. We have little money and no assets.

*My Nightmare in El Salvador*

11. The nightmare that lead to my journey to the United States began in January, 2016. Members of the Mara 18 killed my brother-in-law. He was the husband of my sister. He had previously lived in the United States with my sister and their three sons, two of whom were born in the United States. He was deported back to El Salvador last year. One day when my brother-in-law was leaving his house in the early morning to go to work, he was shot and killed in the street.

12. We had a wake for my brother-in-law at his mother's house. In El Salvador, when we have a wake, it's customary for all of the neighbors to join around the house in the patio and on the street. A wake for us is like a party - there's food and drinks and lots of noise. It's custom for the family of the deceased person to offer coffee to all of the neighbors who join to celebrate the life of the person who passed away.

13. I was handing out coffee to neighbors outside around the house. It was dark, around 1:00 a.m. There were four gang members on the edge of the crowd outside near the gate of the house. Suddenly they grabbed me and took me to an area away from the house by a canal. No one saw what happened or heard since there was a lot of noise. The men were known gang members. I had seen them before and had seen their tattoos. The four of them were always together.

14. The men beat me and threw me around between themselves asking who was going to be the first. After they each raped me, they told me I already knew who they were, meaning that I knew they were gang members. They told me not to tell anyone what they had done. The men said that I had already seen what they could do - they had killed my brother-in-law. They said they would kill my husband and rape my daughter if I told anyone what they did to me. They said that my daughter was pretty and they wanted the same from her.

15. The men finally left me there, and I went back to the wake and went to lay down. No one asked me where I had been or what had happened because they thought I was grieving my brother-in-law.

547

16. On January 28th, classes started at school.  The same four gang members began to harass my daughter A.E.S.G.  They would stand outside of her school.  They would tell young boys at school during breaks in the school day to tell A.E.S.G. that "those guys over there say hi." She'd turn around and see the four of them standing there looking at her. This happened every day until we left El Salvador.

17. Later in January, at the very end of the month, those four men robbed me. I was on my way to my house after having been out collecting money from jewelry sales I had made that month.  I was planning to go home then to go to the jewelry store to pay off what I had owed from the jewelry I had taken to sell during the month of January.  I had $150 dollars with me, which is a large quantity of money in El Salvador. There's an open area near my house, and the four gang members were waiting for me there.  They told me to give them the money, and that I already knew what would happen to me if I didn't.  I understood that to mean that if I didn't give them the money, they would rape me again.

18. Again, in February, the four men robbed me of my earnings for the month.  That time, I had only collected $50.  The men knew that at the end of the month I collected money from my sales.  They were waiting for me again in the open area nearby my house. Again, they told me if I didn't give them my money, I knew what would happen.

19. They raped me again around March 2nd.  Where we live there are only classes in the morning. I was alone at the house while my children were in school and my husband was out working in the fields. Then suddenly the same four men showed up.  They came in and shut the door. They told me I knew what was coming and not to make noise or do anything.  Each one of them raped me.  They didn't say anything else but they laughed.

*My Decision to Come to the United States*

20. The next day I made plans to come to the United States.  I asked my husband for permission to leave, and he asked why.  I told him that it was so that we could have a better future for our children. My husband does not know that I was raped by the mara or that they threatened to kill him. Even though my husband does not know everything that happened, he was willing to support my decision to come to the U.S.

21. I cannot be safe in El Salvador because the police cannot and will not protect me and the Mara will complete their threats if I seek police protection. The Mara kill police officers and retaliate when someone goes to the police for help. For example, around August of 2015, a woman where I live made a report to the police after she was robbed by the Mara. The police detained the man who robbed her for only a few days, then released him.  When he was released, the Mara went to the woman's house to kill her. They mixed up the houses though, and went to the neighbor's house with masks and guns.  When the woman found out, she fled to save her life. The mother of my brother-in-law also made a police report about his murder. The police did not investigate his death at all.

22. There is nowhere safe for my daughter and I to live in El Salvador. The Maras is well connected and finds people when they relocate within El Salvador. I've been raped numerous times and cannot bear the thought of the same thing happening to my daughter. My daughter and I left El Salvador in search of protection and safety in the United States in March 2016.

*My Nightmare in the United States*

23. When I crossed over the U.S.-Mexico border I felt relief. I had hope that my daughter and I were going to be ok, that we would finally be safe and protected. When immigration officials first saw us they screamed at us. They treated us like criminals and my daughter and I were very afraid.

24. We were taken to an immigration processing station. Many people call it the "hielera", or freezer, because it is very cold there. We were placed in a concrete cell. There were lots of women and children in the cell and we barely had enough room to sit down. We were exhausted, but there were no blankets or beds. The floor was concrete and very cold. There was a toilet in the cell, but there was no door or privacy. It is embarrassing to go to the bathroom when other people can see you. There were no showers. We were cold, tired, hungry and scared.

25. When it was my turn to speak with an immigration officer, he asked me why I came to the United States. I told him because of the economy and because I was raped. He told me that he didn't have anything to do with the problems in my country. When he told me that, I didn't continue to try to talk with him about how I had been raped and my family threatened. It is very intimidating to talk to a man in uniform in a non-confidential space about something so private.

26. My daughter and I were in the hielera for a number of days. We were then transferred to another place that most people call the "perrera", or dog cage. Lastly, we were sent to a jail in Karnes, Texas.

27. Living in Karnes has been very difficult for me and my daughter. We are being held by immigration officials who want to deport us. Although I have never lived in jail before, the feeling I have here – of always being watched, of being controlled, of being forced to do one thing or another – is a feeling I am very familiar with. This is how I felt every day in El Salvador, where I was raped, stalked, robbed and beaten. Life in this place reminds me of the life I fled, the life I am desperate to escape and protect my daughter from.

28. In the beginning of my stay at Karnes my daughter and I were placed in isolation because my daughter was very sick. We were in isolation for four days and could not come out. It was horrible.

29. We were then placed in a room with another family, a mother and a daughter. We were apprehensive to share a room with strangers, but at Karnes, there was no choice. The mother quickly started doing things that made us feel uncomfortable. She told us she liked men and women. She started explaining the sexual things she likes to do to women. She started to touch my daughter on the shoulder and the back, playing with her. Or at least at that time, I thought it was a joke.

30. These jokes continued, and quickly crossed the line. The woman asked me to sleep in her bed. She asked me to pass her my daughter, so she could sleep in her bed. She lifted up her shirt and flashed my daughter. This made us feel so uncomfortable. Neither my daughter nor I could sleep at night. We were afraid the woman's jokes would become reality. My daughter started sleeping in my bed, as she was too afraid to sleep alone.

31. I was fearful something would happen to my daughter. I approached an officer and asked to be [549]

switched to another room. He told me there was nothing he could do. His response was very ugly. It reinforced how unsafe and unprotected I feel in this jail.

32. Wednesday, April 13th, we were all in our room. My daughter said she had to go to the bathroom. While she was in the bathroom, the women opened the bathroom door while she was naked. Scared, my daughter shut the door. The woman opened the door again two times. After, my daughter came back into the room, the woman said vulgarly that my daughter's body had changed and that she had pubic hair. My daughter felt very ashamed.

33. On Saturday, April 16th, my daughter went to our room to shower. Shortly thereafter, the woman also went to our room. I followed a few minutes later. By the time I got to the room, the woman had again opened the bathroom door. My daughter quickly put her clothes on because she was afraid. My daughter told me what had happened. I told our roommate not to open the door again when my daughter was showering. She just smiled.

34. The next day, Sunday April 17th, after the 8PM count of prisoners, we were returning to our room when I saw the woman grab my daughter's private parts. I asked her why she did this. Again, she just smiled. I went directly to report this to an official. I think this would have been prevented, if they had taken my report seriously the first time.

35. My daughter and I were moved to another room. For two nights we were in a room alone. During that time, my daughter slept in her own bed. We were then moved to a room with 8 other people. My daughter started sleeping in my bed again.

36. I helped my daughter fill out a form to report the sexual assault. I have been interviewed in person twice at Karnes by separate officials, and my daughter has been interviewed three times. I am not sure who all these individuals were, but each time my daughter and I explained in detail the incidents, gave information about the woman who hurt my daughter, and answered all of the officials' questions. I also reported the sexual assault by phone to the Department of Family and Protective Services. I have not been contacted again by any of the officials who have interviewed me. I am willing to answer any further questions and help the investigation in any way I can.

37. I hope that at least someone to whom I have reported will take this sexual assault against my daughter seriously, because I don't want this type of abuse to happen again to someone else. Since she was assaulted my daughter has had trouble sleeping and she is not interested in playing ball with the other children here like she used to. She is scared, has lost her appetite, and wants to spend the weekends sleeping. As for me, I also have trouble sleeping and have headaches. But most of all, I am devastated that I brought my daughter to try to escape the sexual abuse that I suffered in El Salvador and with which she was threatened there. Instead, she has suffered what we were fleeing.

*My Desire to Fight My Immigration Case and Be Free*

38. I was ordered deported without a lawyer and without the opportunity to request asylum on March 21, 2016. Although I was granted the opportunity to speak with an Asylum Officer on April 2, 2016 about my fear to return to El Salvador before my deportation was executed, the Asylum Officer did not believe that I can win asylum in the United States. During my interview I told the Asylum Officer about my brother-in-law's murder, being robbed, and the ongoing harassment my daughter experienced from the Mara. I did not talk about being raped because my daughter does not know what happened to me and she was present in the room throughout my interview because

she is afraid to leave my side in the jail.

39. After my interview with the Asylum Officer, I started working with *pro bono* attorneys from the CARA Family Detention Pro Bono Project. My lawyers believe I qualify for asylum and should have the opportunity to apply. My lawyers submitted a Request for Reconsideration or Re-interview to the Asylum Office on April 19, 2016. It was denied on April 21, 2016. They filed a complaint with the Office of Civil Rights and Civil Liberties on April 22, 2016 and a Request for Precautionary Measures with the Inter-American Commission on Human Rights on April 27, 2016.

40. My daughter and I are not doing well in detention. We are both sad and we both cry. We feel like criminals. We cannot go anywhere without permission. Guards walk through our bedroom at night every 15 to 30 minutes. This wakes us up and makes us feel afraid. We are rounded up and counted three times a day. We feel like prisoners. We are not the only ones who feel this way. There is another woman here who has been here longer than us. She always cries and her child has stopped eating.

41. I am worried about myself and think I need help. I cannot sleep and feel very on edge. I spend all day thinking about my past and being in jail. I feel trapped and hopeless. I think I need to talk with someone but am scared to talk about my past and present with the people who work here. I know they work for the jail that wants to deport me and my daughter. Everything is bottled up inside of me. I wish I was free so that I could go see a psychologist and have mental health support. I feel so desperate for help that approximately three weeks ago I made a request to see a psychologist here in the jail. I still have not seen a psychologist or received a response.

42. I worry the most about my daughter. She is afraid here. She lives in fear that she will be assaulted again within this place. She cannot sleep and never wants to leave my side. She has made some friends, but they keep coming and going. Some are released. Some are deported. My daughter asks me "When will we go?" "How long will we be here?" "Will we be deported?" I don't know what to tell her.

43. I wish I was free so that I had control over the medical care my daughter and I receive. Getting access to medical care is not easy here. In order to receive medical attention, you need to wait for a long period of time. When my daughter and I got here she was very sick. She had a headache, was very weak, and her bones hurt. We went to request medical attention and waited for someone to assist us for 2 hours. After two hours, my daughter was too weak to continue waiting so I took her back to our room to lay down. The next day we went back. This time we were not attended until midnight, after waiting for four hours.

44. Another reason I wish I was free is so that I could control what I eat and when. I have diabetes. The stress of wondering if or when I will be free again and whether or not I will be deported has not been good for my condition. It is hard to monitor and control my blood sugar.

45. The first thing I would do if I was free is call my husband in El Salvador. I have not been able to speak with my husband or two children since entering the United States. I worry about them and wonder if they are ok. I do not know if the Mara has come after them. I need to hear their voices and to tell them I love them. I also think my husband could help me gather evidence for my immigration case.

551

46. If I was free I would have the chance to be supported by people who know and love my daughter and I. We could be with our family. They could come with us to immigration court and be a moral support. We would be safe and comfortable with them. We could start, little by little, to recover from all we have gone through.

My name is E.G.S. (full named redacted). I was born on redacted. I am currently incarcerated at the Karnes County Residential Center which is located at 409 FM 1144, Karnes City, TX 78118.

I declare under penalty of perjury that all information in the attached document titled, Declaration of E.G.S. (full named redacted), is true and correct. This declaration was read to me in Spanish, a language in which I am fluent.

Signed in Karnes County, Texas on May 2, 2016.

X _____

E.G.S. (full named redacted)

# Attachment to Exhibit 18
# Attachment 7

Filed In The District Court
of Travis County, Texas

MAY 0 4 2016

No. D-1-GN-15-004336

At _____ 4:43 P.M.

Velva L. Price, District Clerk

| | | |
|---|---|---|
| GRASSROOTS LEADERSHIP, et al. | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| TEXAS DEPARTMENT OF FAMILY | § | |
| AND PROTECTIVE SERVICES (DFPS), | § | |
| et al. | § | 353rd Judicial District Court |
| | § | (All proceedings assigned to the |
| *Defendants*. | § | 250th Judicial District Court) |

## TEMPORARY RESTRAINING ORDER

On May 4, 2016, the Court considered Plaintiffs' application for a temporary restraining order. Plaintiffs appeared by teleconference through their attorney of record, Robert Doggett. Defendants appeared by teleconference through their attorney of record, Kara Holsinger. After considering the pleadings, exhibits, and all other documents filed in this case to date, the arguments of counsel, and the applicable law, the Court is of the opinion that Plaintiff's application for a temporary restraining order should be, and is, GRANTED for the following reasons:

(1) pursuant to TEX. GOV'T CODE § 2001.038(a), Plaintiffs have shown a probable right to a declaratory judgment that the following regulation adopted by the Texas Department of Family and Protective Services is invalid because it was adopted without statutory authority: Title 40, Part 19, Chapter 748, Subchapter A, Rule § 748.7 (effective March 1, 2016), published in 41 TEX. REG. 1493-1502 (Feb. 26, 2016);

(2) Plaintiffs will suffer immediate and irreparable harm absent a temporary restraining order because money damages are unavailable against the state agency and incapable of certain determination; and

TRO

1

555

(3) the temporary restraining order is necessary to preserve the *status quo* while the validity of the agency's regulation is litigated pursuant to TEX. GOV'T CODE § 2001.038.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiffs' Application for Temporary Restraining Order be and is hereby GRANTED.

ACCORDINGLY, THE TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, and its agents, servants, employees, and attorneys are hereby ORDERED to desist and refrain from implementing 40 Tex. Admin. Code § 748.7 to issue any license to the owner or operator of the South Texas Family Residential Center in Dilley, Texas, until further order of the Court.

IT IS FURTHER ORDERED that the bond Plaintiffs have already executed and filed with this Court shall be held sufficient for issuance of this temporary restraining order in conformity with Rule 684 of the Texas Rules of Civil Procedure to ensure that Plaintiffs will abide by the decision which may be made in the cause and that Plaintiffs will pay all sums of money and costs that may be adjudged against them.

The clerk shall forthwith, when so requested by Plaintiffs, issue a writ of temporary restraining order in conformity with the law and the terms of this Order.

IT IS FURTHER ORDERED that Plaintiff's application for a temporary injunction will be heard before this Court on May 13, 2016 at 9:00 o'clock a.m.

IT IS FURTHER ORDERED that this order expires no later than fourteen days after issuance or when amended by order of this Court, whichever occurs first.

SO ORDERED this 4th day of May, 2016 at 4:39 o'clock p.m.

_____
JUDGE PRESIDING
KARIN CRUMP

2

556

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On May 19, 2016, I electronically filed the following document(s):  NOTICE OF MOTION AND MOTION TO ENFORCE SETTLEMENT AND FOR APPOINTMENT OF SPECIAL MASTER WITH SUPPORTING EXHIBITS with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*