1  CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
2  Peter A. Schey (Cal. Bar No. 58232)
   Carlos Holguín (Cal. Bar No. 90754)
3  256 South Occidental Boulevard
   Los Angeles, CA 90057
4  Telephone: (213) 388-8693
   Facsimile: (213) 386-9484
5  Email: crholguin@centerforhumanrights.org
          pschey@centerforhumanrights.org
6
   ORRICK, HERRINGTON & SUTCLIFFE LLP
7  T. Wayne Harman (Cal. Bar No. 254089)
   Elena Garcia (Cal. Bar No. 299680)
8  777 South Figueroa Street, Suite 3200
   Los Angeles, CA 90017
9  Telephone:   (213) 629-2020
   Email: wharman@orrick.com
10        egarcia@orrick.com
11
12 *Attorneys for plaintiffs (listing continues on following page)*

13              UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
14

15 JENNY LISETTE FLORES, *et al.*,          )  Case No. CV 85-4544 DMG (AGRx)
                                            )
16          Plaintiffs,                     )  PLAINTIFF'S EXHIBITS IN SUPPORT OF
                                            )  MOTION TO ENFORCE SETTLEMENT
17 - vs -                                   )  AND FOR APPOINTMENT OF SPECIAL
                                            )  MASTER [PART 5: EXHIBITS 20-47]
18 JEH JOHNSON, SECRETARY, U.S. DEPARTMENT  )
   OF HOMELAND SECURITY, *et al.*,          )
19                                          )  Date:  June 17, 2016.
                                            )  Time:  9:30 a.m.
20          Defendants.                     )  Dept:  Courtroom 7
                                            )  [HON. DOLLY M. GEE]
21 _____ )
22
23
24
25
26
27
28

                              i

1

2

*Plaintiffs' counsel, continued*

3

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)

4

474 Valencia Street, #295
San Francisco, CA 94103

5

Telephone: (415) 575-3500

6

THE LAW FOUNDATION OF SILICON VALLEY

7

LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM

8

Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)

9

Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)

10

152 North Third Street, 3rd floor
San Jose, CA 95112

11

Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850

12

Email: jenniferk@lawfoundation.org

13

       kate.manning@lawfoundation.org
       kyrak@lawfoundation.org

14

       jamesz@lawfoundation.org
       annettek@lawfoundation.org

15

16

*Of counsel:*

17

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)

18

Virginia Corrigan (Cal. Bar No. 292035)

19

200 Pine Street, Suite 300
San Francisco, CA 94104

20

Telephone: (415) 543-3379 x 3903

21

22

*/ / /*

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2016 Motion to Enforce Exhibit Index

1.  Declaration of Peter Schey                                                    1

2.  Excerpts of Exhibits                                                         66

3.  Declaration of Bridget Cambria                                              103

4.  Declaration of Carol Anne Donohoe                                           114

5.  Declaration of Jacqueline Kline                                             119

6.  Declaration of Jocelyn Dyer                                                 154

7.  Declaration of Natalia Ospina                                               159

8.  Declaration of Leanne Purdum                                                162

9.  Declaration of Theresa Wilkes                                               166

10. Declaration of Amanda Doroshow                                              170

11. Declaration of Ed Mccarthy                                                  173

12. Declaration of Robyn Barnard w/ Exhibits                                    176

13. Declaration of Karen Lucas w/ Exhibits                                      212

14. Declaration of Lindsay Harris (Flores Violations)                           285

15. Declaration of Lindsay Harris (Medical Conditions) w/ Exhibits              290

16. Declaration of Lindsay Harris (Due Process)                                 375

17. Declaration of Manoj Govindaiah w/ Exhibit                                  385

18. Declaration of Robert Doggett w/Exhibis                                     409

19. Declaration of Alex Mensing w/ Exhibits                                     557

20. CBP Memorandum. Hold Rooms and Short Term Custody. June 2, 2008             810

21. Declaration of Victor Rxxxxx xxxxxxx                                        826

22. Declaration of Walter Axxxxxxxx xxxxxxxxx                                   830

23. Declaration of Yeslin Lxxxx xxxxxxx                                         834

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24. Declaration of Sara  Exxxxxxxx xxxxx                          837

25. Declaration of Mirna Mxxxxxx xxxxx                          840

26. Declaration of Raquel Axxxxxx xxxxxx                        843

27. Declaration of Yessenia Exxxxxxxx xxxxxxx              846

28. Declaration of Celina Sxxxxxx-xxxx                            849

29. Declaration of Cesia Vxxxxxxxx-xxxx                          854

30. Declaration of Isamar Sxxxxxx xxxxxx                        858

31. Declaration of Kelly Gxxxxxxxx-xxxxx                         864

32. Declaration of Maria Dxxxx xxxxxxx                           868

33. Declaration of Lindsey Gxxxx xxxxx                           872

34. Declaration of Katerin Yxxxxxxx xxxxxxx                   877

35. Declaration of Sonia Axxxxx-xxxxxx                           881

36. Declaration of Kenia  Yxxxxx xxxxxxx                         884

37. Declaration of Bianca Cxxxxxxxx xxxxx                      888

38. Declaration of Astrid Dominguez                              892

39. Declaration of Karen Zxxxxx xxxxxxx                         895

40. Declaration of Allison Mxxxx xxxxx                           898

41. Declaration of Benina Cxxxxx xxxxx                          903

42. Declaration of Evelin Jxxxxx xxxxxxxx                        907

43. Declaration of Diana Cxxxxx xxxxx                            912

44. Declaration of Amarilis Lxxxxxx xxxxx                       915

45. Declaration of Franklin Rxxxx xxxxxxxx                      918

46. Declaration of Herson Lxxxxxx xxxxx                         922

47. Declaration of Vilma Sxxxx xx xxxx                           925

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

48. Declaration of Leny Axxxxx xxxxxx                               929

49. Declaration of Edgardo Dxxxxx xxxxxxxx                          932

50. Declaration of Flember Jxxx xxxxxxxxxx                          935

51. Declaration of Karen Lxxxxxx xxxxxxxx                           938

52. Declaration of Madelyn Mxxxxxxx-xxxxx                           941

53. Declaration of Faustino Cxxx                                   944

54. Declaration of Fanny Exxxxxxxx xxxxxxxxx                        947

55. Declaration of Josselyn Mxxxxx xxxxxx                           950

56. Declaration of Silvia Vxxxxxx xxxx                              955

57. Declaration of Yesenia Yxxxx xxxxx                             959

58. Declaration of Eloisa Rxxxxx xxxxxx                            962

59. Declaration of Melvin Mxxxxxx xxxxx                            966

60. Pennsylvania Dept. of Human Services letter to Berks County dated

    January 27, 2016                                              969

61. Declaration of Dr. Luis Zayas                                 972

62. Declaration of Jessica Gorelick                               1005

63. CARA letter to CRCL and OIG dated March 28, 2016              1010

64. Declaration of Amy Camila Colon                               1027

65. Declaration of Jodi Goodwin                                   1030

66. Declaration of Michelle Garza Pareja                          1035

67. Declaration of Amy Fisher                                     1044

68. Declaration of Karen Lucas                                    1048

69. Declaration of Katie Shephard                                 1052

v

# Exhibit 20
## Publicly Filed

(b)(7)(E)

**U.S. Department of Homeland Security**
Washington, DC 20229



**U.S. Customs and
Border Protection**

JUN 0 2 2008

MEMORANDUM FOR:   All Chief Patrol Ag (b)(6) & (b)(7)(C)

FROM:                          David V. Aguilar
                                    Chief
                                    U.S. Border Patrol

SUBJECT:                    Hold Rooms and Short Term Custody

Attached is the new Hold Rooms and Short Term Custody policy.  Effective immediately, this policy will supersede all existing detention and hold room policies utilized by the U.S. Border Patrol, including the "Interim Guidance Regarding Unaccompanied Juveniles in Custody" memorandum, dated September 2, 2005.

This directive establishes national policy for the short term custody of persons arrested or detained by Border Patrol Agents and detained in hold rooms at Border Patrol stations, checkpoints and processing facilities.  It also contains requirements regarding the handling of juveniles.  Chief Patrol Agents will ensure that this policy is made available to all managers, supervisors, and agents in their sectors and that they are familiar with it.  A training roster should be completed at each station, which documents receipt of the policy.  Forward all training rosters to your respective sector training department.  Additionally, you will ensure that a copy of this policy is posted and visible in all station processing areas.

This policy has been reviewed by representatives from both the Office for Civil Rights and Civil Liberties of the Department of Homeland Security (DHS) and the DHS Inspector General and remedies a number of issues raised during previous inspections.

Staff may direct questions to the Detention and Removal Operations liaison officer within the Planning Branch, Operations Planning and Analyses Division at (b)(6),(b)(7)(C)

811

## U.S. BORDER PATROL POLICY

**SUBJECT:  DETENTION STANDARDS**
**Reference Number:** (b)(7)(E)
**DATE:  January 31, 2008**

## HOLD ROOMS AND SHORT TERM CUSTODY

**1.      PURPOSE.**  This directive establishes national policy for the short-term custody of persons arrested or detained by Border Patrol Agents and detained in hold rooms at Border Patrol stations, checkpoints, processing facilities, and other facilities that are under the control of U.S. Customs and Border Protection (CBP).

**2.      AUTHORITIES/REFERENCES.**

2.1.    Title 8, United States Code, Section 236

2.2.    Title 8, Code of Federal Regulations, Section 236

2.3.    *Border Patrol Handbook*

2.4.    *Officers Handbook* (M-68)

2.5.    *The Law of Arrest, Search and Seizure for Immigration Officers* (M-69)

2.6.    *Flores v. Reno*, Stipulated Settlement Agreement, No. CV 85-4544-RJK (Px) (C.D. Cal. Jan. 17, 1997).  Also, *"Flores."*

2.7.    Homeland Security Act of 2002, Section 462

2.8.    "Interim Guidance Regarding Unaccompanied Juveniles in Custody" Memorandum to All Chief Patrol Agents from David V. Aguilar, Chief, U.S. Border Patrol (September 2, 2005).

2.9.    Immigration and Customs Enforcement guidelines on age determination.

**3.      DEFINITIONS.**

3.1.    <u>Bedding</u>.  Any combination of pillow, sheets, blanket, sleeping bag, or mattress.

3.2.    <u>Custody</u>.  The period of time in which a detainee is under arrest or is detained in a Border Patrol hold room.

-2-

3.3.    Hold Room.  An area such as a detention cell, a search room, or an interview room in which detained persons are temporarily held pending processing or transfer.

3.4.    Open Area.  An area within a secure facility where the detainee is not in a locked room but where there are locked doors to prevent escape (e.g., a processing room).

3.5.    Direct Supervision.  Detaining a person in a location where the employee assigned detention duties can constantly observe or hear the detainee.

3.6.    Family Group.  (b)(7)(E)

3.7.    Intermittent Supervision.  Detaining a person in a hold room where a detainee may be occasionally out of view and/or hearing of the employee assigned detention duties.

3.8.    Juvenile.  A person under 18 years of age.

3.8.1.  Persons under the age of 18 who have been emancipated by a state court or convicted and incarcerated for a criminal offense as an adult are NOT considered juveniles.  Such individuals must be treated as adults for all purposes, including confinement and release on bond.

3.8.2.  If a reasonable person would conclude that an individual claiming to be a juvenile is really an adult, that person will be treated as an adult for all purposes, including transportation, confinement, and release on bond or own recognizance.  Age determination will be conducted, if necessary, in accordance with Immigration and Customs Enforcement guidelines on age determination.

3.8.3.  An unaccompanied alien child (UAC) is defined in Section 462 (g) (2) of the Homeland Security Act of 2002 as a child who:

a.  Has no lawful immigration status in the United States;

b.  Has not attained 18 years of age; and

c.  With respect to whom—

1.    There is no parent or legal guardian in the United States; or

2.    No parent or legal guardian in the United States is available to provide care and physical custody.

4.    RESPONSIBILITIES.

-3-

4.1.    The Chief, Office of Border Patrol, is responsible for policy oversight, which includes formulating and implementing guidelines and procedures.

4.2.    Chief Patrol Agents (CPAs) are responsible for managing the implementation of this program at the sector level and monitoring compliance with the procedures to ensure uniformity of application, as well as for ensuring that all employees under their direction receive proper training concerning this policy and these procedures.

4.3.    Patrol Agents in Charge (PAIC) are responsible for monitoring compliance at the station level.

4.4.    Supervisory Border Patrol Agents are responsible for fulfilling all of their duties specified herein, and for ensuring that Border Patrol Agents under their direction are familiar with this policy and these procedures, and comply with them.

## 5.    POLICY.

5.1.    All persons arrested or detained by the Border Patrol will be held in facilities that are safe, secure, and clean.  Detainees will be provided food, water, properly equipped restrooms and hygiene supplies as set forth in this directive.

5.2.    Detainees will be promptly processed and turned over to U.S. Immigration and Customs Enforcement (ICE), Office of Detention and Removal Operations (DRO); the Office of Refugee Resettlement (ORR); the U.S. Marshals Service; or an other agency (OA), as appropriate.

## 6.    PROCEDURES.

6.1.    Detention Cells, Search Rooms, and Hold Rooms.

6.1.1. Supervisors are responsible for designating areas as detention cells, search rooms, and/or hold rooms and ensuring that employees under their direction are familiar with such designations and intended uses.  Dual designation of a particular room is authorized, i.e, a detention cell may also be used as a search room.

6.2.    Duration of Detention.

6.2.1. Whenever possible, a detainee should not be held for more than (b)(7)(E). Every effort will be made to promptly process, transfer, transport, remove, or release those in custody as appropriate and as operationally feasible.

814

-4-

6.2.2.  The PAIC or the senior shift supervisor will be notified of all detentions at the station level that reach or exceed ███████, and they shall make every effort to promptly move the detainee(s).

6.2.3.  The Sector Staff Duty Officer must be notified when the detention period reaches or exceeds ███████, and the Staff Duty Officer or their designee shall make every effort to promptly move the detainee(s).

6.2.4.  When the detainee is an unaccompanied alien child (UAC), every effort must be made to move them out of the Border Patrol facility and into ORR placement within ███; however, there are times when placement by ORR may take longer than ███████. The PAIC must be notified immediately when a UAC's detention exceeds ███; ██████ever, it is strongly encouraged that the PAIC be notified when the detention exceeds ███████. The PAIC or their designee will ensure that the ICE/DRO Field Office Juvenile Coordinator (FOJC) has been notified and ensure that the UAC is being held in accordance with this policy.  The reason for the extended detention and the time and date that the PAIC and FOJC were notified will be documented in the Unaccompanied Alien Children Detention Log and retained for a period of two years.

6.2.4.1. In accordance with the *Flores v. Reno* Stipulated Settlement Agreement, UAC must be placed in an ORR-approved facility within ███████. In cases where the PAIC has reason to believe that the UAC's detention will exceed ███████ or exceeds ███████ hours, the PAIC or their designee will notify a sector staff officer immediately.  This notification may occur well before the ███████ time period is reached if information is provided at an earlier time that indicated the UAC placement won't be met under current conditions.  The sector staff officer will contact the local ICE DRO Field Office Director for assistance and intervention.

6.2.4.2. Under extenuating circumstances, the maximum time allowed for placing UAC in an ORR-approved facility is five days.  In cases where UAC are detained longer than five days, sector staff will immediately contact the DRO liaison officer at the Office of Border Patrol via telephone and e-mail for further guidance and assistance, ensuring that all pertinent information and actions taken thus far are provided.  Sector staff may contact the DRO liaison officer earlier when they deem appropriate or necessary.

6.3.   <u>Exceptions to Short-Term Detention in Border Patrol Hold Rooms.</u>



6.3.1. ███████████████████ (b)(7)(E) ███████████████████.

6.3.2. ███████████████████ (b)(7)(E) ███████████████████

-5-



**6.3.5.** Direct supervision and control of detainees must be maintained at all facilities that do not have hold rooms.

**6.4.** Master Detention Log.

**6.4.1.** The ENFORCE apprehension log will serve as the master detention log. It will contain at a minimum the detainee's:

      a.     Name

      b.     Sex

      c.     Age and date of birth

      d.     Alien registration number

      e.     Nationality

      f.     Reason detained

      g.     Final disposition

-6-

6.4.2.  Any alien detained in custody for removal proceedings or voluntarily returned
must be transferred via an I-216 created in ENFORCE.

6.5.    Hold Room Monitoring.

6.5.1.  Although video surveillance is an outstanding tool, it is not a replacement for
physical checks.  Holding cells must be physically checked regularly.  Physical checks
give processing agents better control of the aliens in their hold rooms, provide a
deterrent for misconduct, and provide detainees with an opportunity to communicate
issues such as health or safety concerns to the processing agent.

6.5.2.  Juveniles.  Unaccompanied alien children require direct supervision.  Physical
checks are a critical aspect of monitoring UACs.  Holding cells must be physically
checked regularly and recorded in a log.  Each station will be responsible for creating a
hold room check sheet to verify the physical checks of juveniles.

6.5.3. (b)(7)(E)



6.6.    Alien Booking Record (I-385).  An Alien Booking Record (I-385) will be generated
for each detainee that requires **special handling** (i.e., a detainee held for prosecution
or removal or a detainee awaiting a voluntary return with a medical condition, or an
unaccompanied juvenile).  The Alien Booking Record will be posted near the entrance
to the hold room or in a secure area. (b)(7)(E)

The sheet will be maintained until the detainee
is released from CBP custody. (b)(7)(E)

. The Alien Booking Record will be created in ENFORCE and
contain the following detainee information:

    a.    Name

    b.    Alias

-7-

    c.       Sex

    d.       Date of birth

    e.       Place of birth

    f.       Country of citizenship

    g.       Alien registration number

    h.       Date apprehended

    i.       Responsible station or office

    j.       Medical alert—an annotation indicating that the person has a medical condition that requires medical care or prescribed medication, has a communicable disease, is suffering from depression, or appears to be suicidal.

    k.       Remarks—for example, the person is an escape or flight risk, is a high risk detainee, is an asylum claimant, or is an accompanied or unaccompanied alien child.

6.7.    <u>Medical Issues.</u>

6.7.1.    (b)(7)(E)

6.7.2.  Such detainees will be evaluated by qualified personnel:

    a.       an emergency medical technician (EMT) or a paramedic (Border Patrol or local); or

    b.       a physician, physician's assistant, or nurse practitioner.

6.7.3.    b)(7)(E)

6.7.4.  A supervisor will be notified as soon as possible of detainees needing medical attention.

-8-

6.7.5. Medications. Border Patrol Agents will **not** administer or inject any medication unless they are certified EMTs or paramedics practicing under the direction of a medical director and the administration of such medicine is within their scope of practice and is authorized under the protocols of their medical practice. Medication prescribed in the United States, in a properly identified container, with the specific dosage indicated, may be self-administered under the supervision of a Border Patrol Agent. Administration of prescribed medication, medical assistance, or refusal of the same will be noted on the Alien Booking Record. Medications will not be left in the possession of the detainee. They will be secured separately, preferably with the detainee's property. ████████████ (b)(7)(E) ████████████.

6.8.    Meals. Detainees will be provided snacks and juice every four hours. Detainees whether in a hold room or not, will be provided a meal if detained more than 8 hours or if their detention is anticipated to exceed 8 hours. Regardless of the time in custody, juveniles will be provided with meal service, and at least every six hours thereafter; two of three meals must be hot. Juveniles, small children, toddlers, babies, and pregnant women will have regular access to snacks, milk, or juice at all times. When an adult detainee requests a snack or meal before the next meal service, the processing agent may grant the request on the basis of the circumstances. Agents should be sensitive to the culinary, cultural, and religious dietary restrictions and/or differences of all detainees and should provide a meal that conforms to the dietary restrictions, if feasible.

6.9.    Drinking Water. Potable drinking water will be available to detainees. The supervisor is responsible for ensuring that drinking water is available.

6.10.   Restrooms. Restrooms will be available to detainees. Detainees using the restrooms will have access to toilet items, such as soap, toilet paper, and sanitary napkins. Families with small children will also have access to diapers and wipes.

6.11.   Bedding. Detainees requiring bedding will be given clean bedding. Only one detainee will use this bedding between cleanings. This bedding will be changed every three days and cleaned before it is issued to another detainee. Vinyl or rubber-coated mattresses will be disinfected before being reissued.

6.12.   Inspection of Personal Property. Purses, handbags, backpacks, and luggage will be inspected for weapons and contraband. They will be secured separately from the detainee until release or removal.

6.13.   Control and Safeguarding of Detainees' Personal Property. The control and safeguarding of detainees' personal property will include the secure storage of funds, valuables, baggage, and other personal property. All property will be receipted on the appropriate Form I-77. All items belonging to the detainee will be properly receipted and placed in a secure area.

6.13.1. All property and legal papers that are in the juvenile's possession, or are served upon the juvenile during processing, shall accompany the juvenile upon transfer to any other agency or facility. Property of the juvenile that is in the custody of the Border Patrol that exceeds the limit of the transporting agency shall be shipped to that facility in a timely manner.

6.14.   Showers.  Agents will make reasonable efforts to provide a shower for any detainee held for more than 72 hours. Detainees that are showering will be provided a clean towel and basic toiletries. Agents will make every reasonable effort to provide unaccompanied alien children who are held more than 48 hours with access to a shower and clean towel, clean clothing, and basic hygiene articles as soon as practicable. These items may be provided to UACs sooner, depending on availability and the condition of the juvenile.

6.15.   Inspection.  Detention cells will be routinely inspected for evidence of tampering.

6.16.   Cleaning and Sanitization. Supervisors will ensure that detention cells are regularly cleaned and sanitized. Employees will not be expected nor required to perform such tasks.

6.17.   Smoking.  Smoking is prohibited in hold rooms.

6.18.   Evacuation.  Every station will have an evacuation plan and will post it in the processing area. The PAIC is responsible for ensuring that agents are familiar with procedures in the evacuation plan.

6.19.   Search Procedures.  All detainees that are under arrest will be thoroughly searched before being placed into a Border Patrol hold room. (b)(7)(E)

6.20.   Restraint Procedures.  (b)(7)(E)
This should be annotated on an Alien Booking Record. Any detainee restrained in a holding room requires direct supervision. (b)(7)(E)

6.21.   Telephones.  Persons detained more than 24 hours will be given access to a telephone for the purposes of contacting an attorney or other party as stated on the I-826 *Notice of Rights and Request for Disposition* and will be given access at a minimum of once per day until they are no longer in Border Patrol custody. Detainees who wish to make other than a local call must use a calling card or collect call. Processing agents may, at their discretion, grant telephone access to any alien. Unaccompanied alien children will be given access to telephones as soon as practicable to aid in locating family members.

6.22.  <u>Segregation.</u>  

6.23.  <u>Privacy.</u>  Border Patrol hold rooms should have privacy screens in toilet areas whenever possible.

6.24.  <u>Juveniles.</u>  The following is a summary of guidelines from the *Flores v. Reno* Settlement Agreement, and the Homeland Security Act of 2002.  The terms of the Settlement are binding and must be adhered to.

6.24.1.  <u>Access to Legal Counsel and Consular Officials.</u>  All UACs shall be advised of their rights as per Form I-770 *Notice of Rights and Request for Disposition*, which includes their right to make a telephone call to any persons mentioned in the notice.  If the juvenile is under 14 or is unable to understand the form, the I-770 must be read and explained in a language that the juvenile understands.  The UAC's consular official must be notified as soon as possible, and notification of the UAC's family must be in accordance with Form I-770.  All UAC processed for removal must be given a list of free legal service providers.  Each CPA, or designee, will ensure that the lists of free legal services providers are current, accurate, and provided to juvenile detainees.  Free legal service providers must represent juveniles in removal proceedings.  Updated lists will be distributed regularly to all Border Patrol stations.

6.24.2.  <u>Authority of the Office of Refugee Resettlement.</u>  ORR has assumed authority for decisions related to the care and placement of UACs detained in federal custody.  The current procedure requires stations to immediately contact an ICE/DRO Field Office Juvenile Coordinator (FOJC) to coordinate UAC placement in an ORR facility.

6.24.3.  Procedures for Processing Juveniles.

As soon as practicable after determining that a detainee is a UAC and will require detention, the processing agent should contact an ICE/DRO FOJC to obtain pre-authorization to place the unaccompanied alien child with ORR.  The agent must obtain pre-authorization from the FOJC regardless of a UAC's anticipated time in detention and must provide the following information:  the juvenile's name, any aliases, alien registration number, country of citizenship, sex, date of birth, age, date of entry, place of entry, manner of entry, date of custody, custody location, and indication regarding whether or not the juvenile is a criminal or non-criminal.  The FOJC must have this information to secure placement for the UAC with ORR.  The FOJC will contact the local ORR representative who will locate an appropriate

-11-

placement and notify the FOJC when that is completed. The FOJC will coordinate the placement transfer.

6.24.4. 

6.24.5.

6.24.6. Requirements for Juvenile Hold Rooms. Juveniles detained longer than 24 hours will be given access to basic hygiene articles, a blanket, and a mattress (a pillow is optional), etc. If showers are available, the juveniles will be permitted to take one shower every 48 hours and be provided with a clean towel. Agents and supervisors may give these items and privileges to any juvenile at any time based on the availability and the condition of the juvenile.

6.24.7. All hold rooms used for unaccompanied alien children must provide access to the following:

    a.    Toilets and sinks

    b.    Drinking water

    c.    Adequate temperature control and ventilation

    d.    Clean blankets and mattresses

    e.    Meals, which must be offered every six hours (two of three meals must be hot)

    f.    Emergency medical assistance

    g.    Direct supervision

6.24.8. Unaccompanied Alien Children Detention Log. Each Border Patrol station must maintain a separate detention log (example attached) for all juveniles placed in custody. The log will be kept on file at the station for two years. The log will contain, at minimum, the following information about each juvenile:

    a.    Name

-12-

b.    Sex

c.    Age

d.    Alien registration number

e.    Nationality

f.    Reason for placement

g.    Date and time in

h.    Date and time FOJC was notified

i.    Date and time out (transferred or released)

j.    Final disposition

k.    Comments

l.    Times that meals were provided

6.24.9. <u>Meals.</u>  Juveniles must receive the next meal served, regardless of the time in custody and must have regular access to snacks, milk, juice, etc.  Meals must be offered every six hours (two of three meals must be hot).

6.24.10. <u>Transfers</u>.  Each station must complete an I-216 in ENFORCE for all UACs transferred to ORR or DRO custody.  A hard copy of the I-216 will be kept on file at the station for two years for the purposes of auditing and oversight.

6.24.11. <u>Training Requirements</u>.  The Border Patrol Academy will include training on the conditions of the *Flores* v. *Reno* Settlement Agreement as a part of Border Patrol basic training.  All CPA's, PAIC's and Border Patrol Agents will take at least one hour per year of refresher training on *Flores* and associated Border Patrol policy.  Pertinent training updates will be well-posted in Border Patrol station processing areas to ensure awareness and adherence.

6.24.12. <u>Family Groups (with Juveniles)</u>.  The following are examples of family groups as defined in section 4.6 of this directive.  The following groups will be detained as a unit.



a.  (b)(7)(E)

b.  (b)(7)(E)

c.  (b)(7)(E)

-13-

d. 

e. ■■■■■■■■■■■■■■■■■■■■■■

**6.24.13** <u>Documentation.</u>  Times of meals, showers, telephone use, and visual checks of juveniles who are held in custody will all be recorded.

**7.      PERFORMANCE MEASUREMENTS.**  All detainees will be held under safe and humane conditions.  Unaccompanied alien children in Border Patrol custody will be treated with dignity, respect and special concern for their particular vulnerability as minors.

**7.1.**    <u>Performance Measurement 1</u>:  All detainees will be held in appropriate conditions of confinement that ensure their safety and security.  Juveniles will be held in the least restrictive setting appropriate for their age and special needs as minors.

**7.1.1.** Detainees are segregated according to sex, age, risk, family group.

**7.1.2.** Detention space capacity will not be exceeded.

**7.1.3.** Hold rooms will be kept clean and free of contraband and other potentially hazardous or dangerous materials.

**7.2.**    <u>Performance Measurement 2</u>:  All detainees will be held under humane conditions of confinement that provide for their well being and general good health.

**7.2.1.** Detainees have access to sanitary facilities and restrooms.

**7.2.2.** Detainees are provided food and water.

**7.2.3.** Detainees have access to appropriate medical services, prescriptions, medications, and emergency medical treatment.

**7.2.4.** Detention spaces are appropriately maintained and provide detainees with appropriate comfort items – housekeeping and clean bedding.

**7.3.**    <u>Performance Measurement 3</u>:  The time of detention for detainees is minimized.

**7.3.1.** The period of detention does not exceed (b)(7)(E) and commonly does not exceed (b)(7)(E) for UACs.

**7.4.**    <u>Performance Monitoring Tools:</u>

      a.       Sector and/or Station Detention Logs

-14-

    b.      Form I-216 Record of Persons and Property Transferred

    c.      Supervisor oversight

    d.      Local inspection programs

    e.      Reporting of deficiencies

    f.      Periodic compliance summary reports

8.    **CANCELLATION.**  This policy remains in effect until cancellation by an updated version.

9.    **NO PRIVATE RIGHTS CREATED.**  This document is an internal policy statement of U.S. Customs and Border Protection and does not create or confer any rights, privileges, or benefits on any person or party.

10.    **ATTACHMENTS.**

Appendix 1: Unaccompanied Alien Children Detention Log

(b)(6) & (b)(7)(C)

David V. Aguilar
Chief
U.S. Border Patrol

# Exhibit 21
## Conditionally Filed Under Seal

DECLARATION OF VICTOR R▮▮▮▮▮▮▮▮

I, Victor R▮▮▮▮▮▮▮▮, depose and say:

1. I am detained at the detention center in Berks, Pennsylvania. I was born the ▮th of ▮▮▮▮ 2001. I am fifteen years old. I was born in El Salvador.

2. I am detained by the immigration authorities with my mother, Jethzabel A▮▮▮▮ ▮▮▮▮ who was born on the ▮th of ▮▮▮▮▮ 1976 in El Salvador. I have been detained for over four months.

3. We were apprehended near Piedras Negras, Texas. I think the date was October 14, 2015. We were apprehended in the morning.

4. The Border Patrol agents took us to a border station close to the border. We spent that day and night in this location. I was held in a cell with my mother and other adults. Our clothes were wet and muddy but they didn't give us any dry clothes. They didn't let us shower or give us towels or soap to wash. At night the cell was so cold my teeth were chattering. My mom asked the officials for something to cover me, but they only gave her a plastic sheet. That night we had to try to sleep on a cement block with no mats or mattresses to sleep on and no blankets. We had arrived at this station around 9 AM and were transferred out around 1 AM the next morning. While at this location we were fed twice, both times we were given a sandwich consisting of two frozen pieces of bread and one thin cold slice of ham.

5. The border patrol officer asked if we were afraid to return to El Salvador and we said yes. I was and still am terrified of being sent back there. The officer asked my mom if we had relatives in the U.S. and my mom said my dad's sister lives in New York and we could stay with her. During the time we were held at this border patrol station no official ever told me anything about the Flores case and no one questioned me about whether I had relatives in the U.S. who could care for me. Lawyers have now explained to me that I have certain rights under the *Flores* case. Throughout my time at this border patrol station I was shivering, cold and wet.

6. In the middle of the night, maybe around 1 AM, we were taken from this facility and driven to Karnes detention center. When we got to Karnes, the guards commented loudly about how muddy we were. We finally got to take showers and sleep a little bit.

7. We were detained at Karnes for about three weeks, until about November 8, 2015. At no time while we were detained at Karnes did any official tell me about the Flores case, give me any advisal of rights about the Flores case, or interview

1

me about being placed with a relative or adult designated by my mother or about being transferred to a licensed facility for minors. No official told me I had any right to seek release from an immigration judge.  Now that I have learned something absout the Flores case and talked to my mom about it, she has told me that no official at Karnes (or here at Berks) has ever told her anything about any rights minors have under the *Flores* case.

8.  I felt very depressed at Karnes. I was constantly afraid that we were going to be deported to El Salvador. I hated the food there. I hardly ever ate dinner. I lost about five pounds while I was there. It was very distressing and embarrassing being detained with a large number of unrelated adults.

9.  My mom had a fear interview on October 17, 2015.  I was there too, but the asylum officer only asked me a few questions. A couple of days before the interview I believe my mom was given a list of local attorneys. But there were no free phones to call these attorneys and my mom was unable to get a lawyer to help us before the interview a couple of days later. At the interview the asylum officer never explained what it means to suffer persecution because of one's membership in a social group.

10. My mom got forms saying that we received negative credible fear determinations. I do not believe that they provided the decision in Spanish. Neither my mom nor I could not read the decision, but finally one of the volunteer lawyers was at Karnes explained what it said. As best I remember the decision was a form letter denial with various boxes checked off.

11. About a week later, my mom and I went before an immigration judge. No one told me that I maybe had the right to ask an immigration judge to review my detention status or whether I should be released on a bond or other conditions. We did not have a lawyer and I believe the immigration judge gave us a negative determination.

12. The immigration officials transferred us again on or  about November 8, 2015. We were next transferred to Berks, PA, where I have now been detained for another 5 months. No official at Berks has told me anything about the Flores case or about any rights I may have under the Flores case.

13. I keep feeling very sick here. I was really sick for an entire week. I had diarrhea, was vomiting, and felt constantly nauseated. I couldn't eat because the food was so bad. I went to the doctor, but she just said that I should come back if it was still bad the next week, saying that I am old enough and I have a body to resist something like this. I have had a cold and sore, raw throat pretty much the whole time I have been here.  Sometimes, like now, it gets really bad. For the past four

2

nights, I have hardly been able to sleep because I keep coughing so much. But I don't want to go to the doctor again because she only tells me to gargle with water with salt. I also have a problem with my tooth. I have a filling that came loose. It is incredibly painful and feels like a hole in my teeth.  A dentist who comes here and saw me said that it just a molar coming in and I didn't need to see an outside dentist. He said that I should just chew on the other side. I can't wait to get out of this place and see a dentist who can stop the pain in my mouth.

14. I am still feeling depressed and like I have to get out of there.  The staff called me to talk to a psychologist, but I did not want to talk to her because it turned out she does not speak Spanish so I would have to speak through an interpreter who works for this detention center.

15. I think that some of the doors are locked here and some are left unlocked. Either way, I know that I cannot leave the facility. We have been told that it is prohibited for us to leave and I am sure I would be captured very quickly if I try to leave and could suffer severe consequences including being separated from my mother and locked up in a separate facility. Since I have been here no one that I know of has tried to escape.

16. Like at Karnes, it is very disturbing to be detained with other unrelated adults. Here both adult men and women are detained with unrelated minors. This does not feel like a safe situation.

17. I really want to go to the home of my aunt, where I can continue studying in peace and want to have the freedom that all children want. I want this for me and I want this for my mother.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Signed on April 23, 2016, in Leesport, Pennsylvania.



Victor R

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and he confirmed its accuracy before he executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23rd day of April, 2016, in Leesport, PA.

Martha Sandoval Reyna
Martha Sandoval Reyna

3

829

# Exhibit 22
## Conditionally Filed Under Seal

**Declaration of Walter A▮▮▮▮▮ ▮▮▮▮▮▮▮▮**

I, Walter A▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, depose and say:

1. I am detained at the detention center in Berks County, Pennsylvania. Before this, I was detained Dilley, Texas.

2. I am thirteen years old and have been detained for about three months, since about November 9, 2015.

3. My date of birth ▮▮▮▮▮▮, 2003. I was born in El Salvador.

4. My mother, younger brother Carlos (10 years old), and I left El Salvador because the gang members threatened my family with death. I was threatened by gang members and also targeted for forced recruitment.

5. We were apprehended on or about November 9, 2015, almost immediately after entering the United States along the border in Texas. We were taken to a border patrol station and best I remember held there for two days.

6. We didn't know whether it was night or day because there were no windows. The lights were kept on all the time. We were given one aluminum blanket each. There were no mattresses or mats, and no blankets. We tried to sleep on a cold concrete floor with one aluminum blanket. There were about 15-20 people in the room. Me and my younger brother were separated from our mother. The room was extremely cold. It felt like an air conditioning was set at a very low temperature. The only food we got was sandwiches of 2 pieces of dry bread and one thin slice of ham and a small box of juice. We were fed three times over the two days we were there. We were hungry, very cold, scared, and unable to sleep. No official there told us anything about our rights under a case named Flores. No one told us about any rights that I can remember. Every time we would cry they would let us go see my mother for a short time. But one time the officer yanked us by the shoulder to push us back.

7. They had a metal toilet with no toilet seat in our cell. There was a small metal sink but no soap to wash with and no towels to dry off with. We got no change of clothing.

8. After a couple of days we were transported to another facility. It was even colder than the first place where we were held. It was made up of cages. They did give us mats to sleep on here. This time the officials separated me, my mother and my younger brother. There were about 25 in my area. Kids were crying and very scared. At this place no official talked to me about any rights I may have had under the Flores case. No one even mentioned the Flores case. No one asked me if I have any relatives in the U.S. who could

1

care for me. No one told me about making any decision about releasing me or about seeking a judge about being held in detention. Some guards were armed. There were no windows. It was the same bread and ham but this time no juice, only a little water. We were at this place for one day and one night.

9. Next, we were transferred together to a detention center in Dilley. When we left no one told us where we were going. The transportation took about five hours. At Dilley no officer told me anything about the Flores case or my rights under the Flores case. No one asked me about relatives or family friends who may be willing to take care of me here in the U.S. No official told me that any decision had been made about releasing or detaining me and no official told me I had the right to see an Immigration Judge. The best I remember were held at Dilley for about another 18 days.

10. During that time my mother had her interview with the asylum office. She told the officer that I was being threatened by the gang members and he told my mother "that's a fairy tale that every Salvadoran says." They asked me why I was coming here and I said I was being threatened and that's all they asked me. I really wasn't interviewed at all. The asylum officer never explained what it means to be a member of s social group. The asylum officer denied our credible fear interview. As best I remember the decision was basically a form letter denial. Then my mother went before a judge and the judge agreed with the asylum office.

11. The day after my mother went before the judge the staff told us that we were being released to go to my father who lives in Austin, Texas. We got so excited. At the last minute when we were in a waiting area to leave they told us we were really heading to a detention center called Berks. My mother was working with attorneys in CARA who were helping with our case in Dilley but now we were being transferred anyway.

12. We have now been detained at Berks since November 27, 2015. While here no official has explained any rights I may have under the Flores case. As best I am aware no steps have been taken to evaluate me for release to my father or any other relative living in the U.S. I have not been told about my right to see an Immigration Judge about my release. To the best of my knowledge no official here has discussed my release with my mother.

13. My mother has an attorney, Carol Anne Donohoe. She asked for another interview for my mother but it was denied. She also requested another interview for me but it was denied. The ACLU has included us in a habeas corpus it has filed in the federal court. I understand that the federal court recently ruled that it does not have authority over the case and this decision is being appealed.

14. The doors here at Berks are sometimes locked and sometimes unlocked. When we eat our meals they lock the doors so we have to stay in the cafeteria or the one room next to cafeteria. We cannot leave the cafeteria area. I know it is locked because they have to swipe a card. When it's locked the light is red, that's how I know it is locked when we have our meals. Even if the doors are unlocked, we cannot just leave because there are always guards by the doors.

15. Recently I suddenly got very tired and my heart started pounding and really hurting like someone was hitting me. I felt like I blacked out. I had a hard time breathing. They took me to see a doctor here at the Berks detention center. My mother said my lips were purple. The doctor said I was close to having a heart attack. The doctor told my mother that the stress made me like that. I think being detained here for so long caused this incident. I am exhausted and totally stressed. They never took me to the hospital. I am afraid it will happen again. I am too worried to eat properly. I cannot sleep properly because guards check on us about every fifteen minutes shining flash lights into our beds and waking us up in the process.

16. I want to go with my father who lives in Austin, Texas. I can't take it any longer. I'm afraid to go back to my country because they're probably waiting for me to kill me. I'm really scared to go back. I have a safe place to go with my father here in the United States.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief. Executed on February 18, 2016, in Leesport, Pennsylvania .



Walte

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and he confirmed its accuracy before he executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 18th day of February, 2016, in Leesport, PA.

Cindy Fernandez

833

# Exhibit 23
## Conditionally Filed Under Seal

DECLARATION OF YESLIN L██████████

I, Yeslin L█████████, depose:

1. I am detained at the detention center in Berks, Pennsylvania. I was born the ██st of █████████ 2007 in Guatemala. I am 9 years old.
2. I am detained with my mother, my younger sister and my younger brother.
3. We were arrested in Texas on the 28th of November, 2015, but I am not sure what town we were near.
4. The Border Patrol agents took us to a border station. We got there on a Saturday and were there for one night. We were kept together in one large cell.
5. They didn't give us much food. They gave us a little juice and cookies.
6. The first night we were there, we had to sleep sitting up on a bench because there were so many people there that there was no room to lay down. The next night, we slept on the floor. They did not give us any blankets and we were all wet and they didn't give us any dry clothes. I could only sleep a tiny bit because the lights were always on the whole time and the floor was cold and hard.
7. I was pretty much always with my mom at this place. No one there asked me or my mom if there was someone who could take care of me in the U.S. If they had, I would have told them that we could go stay with my dad in Billings, Montana. But they never told us that we go leave or that we could ask a judge to be released.
8. In the middle of Sunday night, they took us to another place. We spent two nights in this place. It was very cold again and they only gave us aluminum blankets to cover ourselves. We were still wearing our wet clothes and they didn't give us dry clothing. We asked if we could bath ourselves, but they said that we could, but they did not give us any towels, so we could not shower. They gave us bread with a little bit of ham, but it was all frozen, so I didn't eat much.
9. Next, we were taken to a detention center in Dilley, Texas. We got dry clothes and a bed, but it was awful because we were being held in a big jail with hundreds of other adults and children. When I was at Dilley, I cried probably everyday. My sisters cried most days too. I wanted to leave to be with my father and did not want to be there.
10. The only thing that I liked there was potato chips. The staff said that I should eat some of everything, but I did not like the food and didn't eat very much.
11. I was in Dilley about 20 days. Again, no official asked me about being released to my dad. No one told me I could see a judge about being released to my dad.
12. After almost three weeks at Dilley, they woke my mom and my sibling and me in the middle of the night, maybe about three o'clock in the morning. They told us that we were leaving to go stay with my dad. We were so happy. It was the happiest that I had been in a long time. But then they made us sit and wait until the middle of the day and put us on an airplane.
13. They did not take us to be with my dad, but instead took us to another detention center, this time in Pennsylvania. I cried and cried. I begged my mom to explain why they would not let us go. I do not understand why some children are allowed to go home to stay with family members, but I am not.
14. I am in the Berks detention center. I don't like the food here, but I don't want to eat anyway because being sad makes me not want to eat.

1

15. I have been sick here many times. I feel a sharp pain in my chest, where my heart is. My mom brought me to the doctor, but they said that it could be because I feel sadness or anguish and have not done anything about it.

16. My sister is also in a lot of pain. She can't even eat because there is something wrong with her molars. They have been hurting since she got here. Her fillings fell out and I can see the big holes in her teeth. She went to the dentist about a month ago. They said that she would need surgery, but would need an appointment with an outside doctor first. It has been a month and she still doesn't have an appointment or even know when they will fix it. Now, they just give her pain medicine, but it still hurts her.

17. When other people leave here, I cry because I want to leave too. I want to be able to go to my father. I am crying right now, but I know that it is important to explain what we are going through and I am hoping that someone will help me get released to go stay with my dad.

I certify under oath that the above statements are true and correct.

Signed on April 23, 2016, in Leesport, Pennsylvania.



Yeslin L█████████

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23rd day of April, 2016, in Leesport, PA.

*Martha Sandoval-Reyna*
Martha Sandoval Reyna

2

# Exhibit 24
## Conditionally Filed Under Seal

DECLARATION OF SARA ██████████

I, Sara █████████████, depose and say:

1. I am twenty seven years of age and detained at the detention center in Karnes, Texas.

2. My date of birth is ██████, 1988. I was born in Guatemala.

3. I am detained here with my daughter, Nathaly M████ █████████. She is 3 years old. Nathaly's date of birth ██████, 2012.

4. In summary, we left Guatemala because my sister-in-law verbally abused me and my daughter and in one instance tried to kill me with a knife. In another instance, she attacked me by my father's business. I was not able to fight back. She told me that I was too dark to be part of her family and that's why she would hurt me. No one in my village would help me, I think because of my skin color. I was scared she would return and hurt my child. The police do not intervene when people are threatened by violence or domestic abuse. This is not a complete explanation of why I fled Guatemala but briefly explains why I decided to seek protection in the United States.

5. My daughter and I were apprehended on December 14, 2015, at about nine in the morning, a little bit after entering the United States. We were first put in a truck. They took away all our belongings, including our shoe laces.

6. My daughter and I were then taken to a border patrol station in Welasco, Texas. To the best of my recollection, we were kept at the border patrol station two days and two nights. There were no windows, so I was not able to tell when it was day and when it was night. It was very confusing. We were fed a sandwich two times a day with some juice. My daughter refused to eat anything but the one slice of cold meat inside the sandwich. She was very hungry but we were not served any food other than the cold sandwiches. The water tasted like bleach so we were scared to drink it. We would sleep on the floor. The place was very cold. No one at the border patrol facilities notified me about rights my daughter had as a minor or any rights she had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. I think they tried to ask me why I left Guatemala, but I could not understand the officer's Spanish. I tried the best that I could to explain that I had received death threats in Guatemala. I explained that I was scared to go back to Guatemala, but no one seemed to understand or believe me. The officer kept saying he knew I came here to work and that I didn't really fear going back to Guatemala. When he was done interviewing me he asked me to sign a statement. I refused to sign because he did not believe why I came to the US and kept telling me I came here to work.

7. After that, we were transported to another border patrol station where we were held for about 24 hours. No one at the border patrol facilities notified me about rights my daughter had as a minor or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I could see. No one asked me why I left Guatemala.

838

8. During the three days at the border patrol facilities, may daughter was not able to shower, wash or change underwear or clothes. We were not given the opportunity to brush our teeth for three days.

9. I was brought to Karnes with my daughter on or about Thursday, December 17, 2015. We have now been detained here for a month and a half. To the best of my recollection, I don't remember anyone explaining that my daughter had rights as a minor under the Flores case. No one has talked to me about whether my daughter can be released to a friend or relative in the United States.

10. I didn't have my first credible fear interview until about January 3, 2015, about three weeks after I was detained at the border patrol facility and communicated my fear of returning to Guatemala. The immigrant official only spoke English, but someone translated for us over the phone. I received a Negative Credible Fear Finding four days later on Form I-869. The form did not set out any specific details about my case or why I received a negative credible fear finding. It was a form letter denial with a box checked that I did not qualify. No one communicated to me why I received a negative credible fear finding. On January 7, 2016 I was given a 2-page form in English that I could not understand. An officer told me that the form said I could not enter the U.S. and would be deported. I told him that I wanted to apply for asylum because I feared for my and my daughters life if we were sent back to Guatemala.

11. I requested a review of the denial by a judge. About four days after I received the negative fear finding, I was called to see a Judge. There was a translator there. She asked if I would like to continue my case. I answered "yes." Four days after that, I had my interview in front of the Judge. The interview was done by a video conference. That same day, he told me that I could not receive asylum and I would be deported. I called a lawyer at RAISES. Someone at RAISES told me that they would take my case. My lawyer filed a Request for Reconsideration on or about January 18, 2016. After about twenty days, I am still waiting for a response to my Request for Reconsideration.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes, Texas.



Sara E▮▮▮▮ ▮▮▮▮▮▮▮

Certification of Translation.

I, Elena Garcia, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Dilley, Texas.

Elena Garcia

2

839

# Exhibit 25
## Conditionally Filed Under Seal

<u>Declaration of Mirna M████████████</u>

1. I am a citizen and national of El Salvador. I was born on ██████ 1991.

2. I am currently detained at the ICE detention center in Karnes, Texas with my sons, Oscar R████████████████ and Josue A█████████████████████. Oscar was born on ████████ 2007 and is eight years old. Josue was born on ████████, 2013 and is two years old. Both of my sons were born in El Salvador.

3. I first entered the United States at midnight on Thursday, January 28, 2016 and was apprehended by U.S. Border Patrol early that morning.

4. I was held by the Border Patrol with my sons for about three days and two nights in McAllen, Texas. The treated us like animals there. They took all of our extra clothing and our children's blankets. They told us they were going to give us blankets but they never did. We had to sleep on the floor, but it was so crowded in the cell that some people had to sleep on the floor of the bathroom near the toilet. We never got a mattress or a blanket, and it was very cold. The children began crying, and when they children cried they would turn the temperature down even further. We were completely unable to sleep because it was so cold and because the lights were on all night.

5. There was not enough food. All we got were two slices of bed with a small slice of mortadella and small juices. We got those sandwiches twice a day and once three times in a day. There was not enough water for us to drink. There was some water that had a very odd taste, like chemicals. We were very hungry and thirsty the whole time we were there.

6. The bathroom situation was very unsanitary. My youngest son and I got diharrea and we didn't receive any medical attention. We weren't provided with any toiletries, and I wasn't able to bathe. The conditions were so bad that when I later arrived at Karnes, they found that I had fleas, which I hadn't had before being detained. Also, the bathrooms were not private – there was only a little wall separating them from the cell, which anyone could look over.

7. During this time no one told me that my son had any special rights under the Flores case. I tried to explain that I feared return to El Salvador, but they wouldn't listen to me and they told me they didn't want to hear my story. I refused to sign the form they gave me because no one told me anything about it and I didn't know what it said.

5. On or about January 30, 2016, I was woken at about 11 PM and my sons and I were transported to another place with a lot of metal fences that was very close to the first place we were held. I noticed that they had my birthday wrong on the forms and alerted the officials, and they took me and my sons back to the first place we were held in McAllen a few hours later. They corrected my birthday, and three hours later took us back to the place with metal fences.

6. On the afternoon of January 31, 2016, my sons and I were transported to Karnes where we have been detained since that time. No officer has explained any special rights my son may have under the Flores case. No one at the border patrol station or here at

1

841

Karnes has ever questioned me or discussed with me the possibility of my sons being released to relatives or friends here in the United States. I am not aware of any effort whatsoever being made to release one or both my sons to a relative or friend I designate here in the United States.

7. I decided to come to the United States because I was raped and I reported it. The man who attacked me was released and began to threaten me that he would kill me if I didn't leave. I have not yet had the chance to tell anyone my story and why I am afraid to return to my country.

8. The father of my younger child, Josue, lives in the United States and is pursuing asylum. No one has asked me whether my sons have family in the United States that they could be released to or made any efforts for my sons to be released to family members. In particular, no one has made any effort to release my son Josue to his father.

9. Being detained has affected my children. Every day, my children ask to leave and to see their father. My youngest son cries and cries and it is very difficult to console him.

I declare under penalty of perjury the foregoing is true and correct. Executed this 3rd day of February, 2016 in Karnes City, Texas.



Mirna M

Certification of Translation

I, Virginia Corrigan, depose and say: I am fluent in English and Spanish. I read the above declaration to Mirna M█████████████ and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Virginia Corrigan

842

# Exhibit 26
## Conditionally Filed Under Seal

DECLARATION OF RAQUEL A█████ █████████

I, Raquel A█████████████ depose and say:

1. I am 36 years old and detained at the detention center in Karnes City, TX.

2. My date of birth is ████████, 1980. I was born in Honduras.

3. I am detained here with my daughter, Amy V███████████████, who is 2 years old.

4. I am afraid to return to Honduras because I received a threatening phone call while pregnant from the "aguacates," a drug selling organization. They asked me for money. I left to live with my grandmother in another place. My mother has also been threatened by the aguacates. Since being at the detention center, my uncle has told me that the aguacates are looking for me and I am afraid of what they could do to harm me.

5. We were apprehended on December 17, 2015 near Eagle Pass, TX.

6. We were transported together to a border patrol station near Eagle Pass where we were held for two days. No one at the border patrol facilities notified me about rights my child may have under the Flores case. I was not given a phone call to be able to tell my family that I was OK. No one told me that I could use a phone to call a lawyer.

7. The border patrol officials would not give us water. The only way we could get water was when we would be let into the room to get water from the sink in the bathroom. I was very thirsty and so was my daughter. I asked BP officials for water and they responded that they "did not have that." I do not know if the water I was drinking was safe to drink. They only gave us small amounts of food two times a day.

8. My daughter came with a bad cough and I asked BP officials if I could have medicine for my daughter and they responded that here there was no access to medical attention and that I would have to wait until she got to the next place to have medicine.

9. The temperature in the border patrol center was extremely cold. All I had was what I was wearing and it was very cold. There was a leftover space blanket in my room and I would use this, but they did not give us anything for the terrible cold. My daughter was sick and she would not sleep and was coughing the whole night. We slept on cement slabs raised from the floor but it was very cold and the cement would feel just as cold as the floor. There were no pillows or anything like that and I could not sleep.

10. On December 19, 2015 I was transferred to the Karnes County Residential Center with my daughter. I have been at this facility for 44 days now.

11. Since our arrest no official has told us anything about the Flores case. No officials have talked to me about whether we have relatives or close friends in the U.S. who could temporarily care for my daughter. We are detained with hundreds of other unrelated

1

844

women and their children. Many people must share rooms and many of the children are sick because of the close quarters we share. Many of the mothers and children here won't drink the water and which tastes like chlorine. A small bottle of water can be purchased here for about $1.30. I work for $3 for a 3-hour period once a day. I use most of this money to buy bottled water.

12. I have been informed by the visitors today obtaining statements that under the Flores case that minors should only be detained if they are a flight risk, a danger to themselves or others, or are juvenile delinquents. My daughter is not a flight risk, a danger to herself or others, or are juvenile delinquent, yet not one official has talked to me in the past month and a half to explore whether my daughter can or should be released to a family member or family friend.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.



Raquel A

Certification of Translation.

I, Tali Gires depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant Raquel A                    , and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Tali Gires

2

# Exhibit 27
## Conditionally Filed Under Seal

DECLARATION OF YESSENIA E█████████████████

I, Yessenia E█████████████████, depose and say:

1. I am twelve years of age and detained at the detention center in Dilley, Texas.

2. My date of birth is █████████ 2003. I was born in Guatemala.

3. I am detained here with my mother, Belen E█████████████████, and my brother, Junior L█████████████████, who was born on █████ 2011 and is four years old.

4. As we have explained in detail to the authorities, we fled Guatemala after gang members threatened to kidnap me and threatened my family's safety.

5. We were caught by the border patrol on Thursday January 21, 2016, a few minutes after entering the United States without inspection.

6. We were taken to a border patrol station in or close to McAllen, Texas, where we were detained from Thursday, January 21, 2016 until Sunday, January 24, 2016. At this place we were kept in a very crowded cell. The cell was all concrete. There was a toilet with a small wall around it. For three days we were given no soap to wash, no toothbrushes to brush our teeth, no paper towels to dry our hands when we washed our hands, nothing to brush our hair, no change of underwear or clothes, no pillows or blankets and no beds to sleep in. We had to try to sleep in the freezing cold cell on the concrete floor. We were exhausted physically and emotionally. On the third day I was finally given a silver foil to cove myself at night. At times the cell was so crowded that it wasn't possible to lay down to try to sleep because there wasn't enough room. I was terrified by the whole experience.

7. For the three days we were there we were only given sandwiches to eat – 3 a day. This was two slices of stale bread with one slice of bologna in the middle. Nothing else was in the sandwiches.  I also got some sugary juice.  In the three days I was there, the children were given cookies twice.

8. No one at the border patrol facilities told me about rights I had as a minor or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I could see. No one asked me if I had relatives in the United States other than my mother who could care for me. No one told me that I had a right to see an Immigration Judge about my detention. No one asked me if I feared return to my home country. '

9. On Sunday, January 24, 2016, my family and I were taken to another facility.  It was called La Perrera (dog cage).  I was separated from my mother while we were at La Perrera, and I could not see her. i was able to take a shower for the first time since before i came into custody, but i have spoken to my mother and she says that neither she nor my brother was able to take a shower.

10. I came to Dilley with my mother on Sunday, January 24, 2016. Here at Dilley I cannot call an attorney. The phones available cost money to use. I have not been told about any free phones that can be used by minors (or adults) to speak with lawyers. I have not been told about any rights I may have under a case called Flores. I have not been told about any decision about releasing me. I have not been told that I can see a judge about my release.

11. On February 1, 2016 my mother and I were finally interviewed by an officer about whether we feared returning to Guatemala. We have not yet received a decision as a result of this interview.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.



Yessenia E

Certification of Translation.

I, Virginia Corrigan, depose and say:

I am fluent in English and Spanish. I read the above declaration to the declarant Yessenia E                                    and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.

Virginia Corrigan

848

# Exhibit 28
## Conditionally Filed Under Seal

<u>**Declaration of Celina S**</u>█████████

I, Celina S█████████ depose and say:

1. My name is Celina S█████████ and I am detained with my son at the detention center in Berks County, Pennsylvania. My six-year-old son and I have been detained for about six months.

2. My date of birth is █████████, 1979. I was born in El Salvador. I am 37 years old.

3. I am detained here with my son: Jefferson A█████████ Jefferson who was born in El Salvador on █████, 2009. He is six years old.

4. We left our home in El Salvador because of the worsening violence in El Salvador at the hands of the "maras" towards myself and my son. We cannot be protected by the government of El Salvador.

5. We were apprehended on or about November 10, 2015, shortly after entering the United States. We were taken to a Border Patrol station. My son and I were detained in a cell for a period of what I believe was two days. The cell was extremely cold very crowded. I believe that as more people came into the room, the air conditioners were turned up.

6. At one point I was interviewed by an Immigration Officer. I told the officer that I had a fear of return to El Salvador. I was showed papers in English which I did not understand and could not read. I refused to sign the papers because I could not understand what they said. I learned later through a volunteer attorney that the Border Patrol officer wrote on a form that I did not fear return to El Salvador even though I had told him that I did fear return to my home country because of widespread gang violence.

7. At no point in this Border Patrol station was I given any information or notice of my son's legal rights under the Flores case. No officer at any time told me anything about the Flores case. I am just learning about the Flores case now. I was never told that my son had a right under the Flores case to have an immigration judge review his bond situation or consider his release. I was not told that my son could speak with an attorney or given a list of free legal services until I was later taken to Dilley, TX, a detention center.

8. At the border patrol station there were about 50 other people in our cell. It was so crowded there was barely room for everyone. My son and I were freezing. There were no beds, it was just a room with cement floors and benches. The room was filled with mothers and young children. The older children I saw were separated from their mothers. We were not able to sleep. When my son and I would try to sleep, the officers would frequently come in the room and wake us up. My son and I were fed only a bologna sandwich and juice. There were no sinks that I saw in the room. There was an open toilet

850

in the room with no toilet seat for everyone to use. Everyone could see if we were using the toilet. There were no phones for us to use to contact family, friends or lawyers.

9. After two days we were taken to another detention center. I think this is called the perrera. The perrera can be described as a large room with cages. I was kept with my six year old son. However, I noticed that other children were separated from their mothers if they were older than my son. We were not able to use a phone. My son and I were in the perrera for one day.

10. In the middle of the night, my son and I were taken with about thirty other people to another detention center in Dilley, TX.

11. My son and I were held in the immigration detention center in Dilley, Texas for about 18 days. During my time in Dilley, neither me nor my son were told by immigration officials about the Flores case. I have no knowledge of the Flores case. At Dilley, I was never told about any right to seek a bond or release of my child. I have no knowledge of any efforts undertaken by the officials to release my son to relatives or friends or to place him in a program licensed to house minors. My son's father lives in Virginia.

12. When I was at Dilley it was the first time either me or my son was given a list of free legal services. I was not able to use a phone unless I had money. After about three days I was able to seek legal assistance from the CARA project in Dilley. I was assisted by Ana Camila Colon. There are so many families in Dilley that even though there are a few volunteers, there are far to few volunteers to help most of the families. After about five days I received a credible fear interview.

13. My interview lasted about an hour and a half. I was not able to have an attorney to be present with me at the credible fear interview. I was interviewed by a man and I was very nervous. The officer spoke English and they used a phone interpreter. There were times he would laugh at me. At no point did the officer speak to my son. Several days after this interview, I was called down to speak again to an asylum officer. He again asked me questions, this time about my son. At no time during the interview did the officer explain what it meant to be a "member of a social group." He never spoke directly to my son. Shortly after that I received a negative result from the interview. As best I remember it was a form letter denial with several boxes checked by the officer.

14. After the negative decision I went to see Ana Camila with CARA for her to explain the decision and to prepare for a hearing before the immigration judge. When she explained the papers in my negative decision, it was the first time that I realized that the border officer put false information on my interview from the border station where we were first detained. The officer wrote down that I did not have a fear, when I specifically said I was afraid for our safety and the life of my son. Ana Camila was my attorney before the Immigration Judge. The Judge at our hearing told us she agreed with asylum officer. The

judge asked me if I thought the immigration officer was lying at the border. I told her "yes" he was lying, because I stated that I had a fear for myself and my son.

15. After about 18 days of detention and being denied by the Immigration Judge, my son and I were taken to the Berks detention center. We did not know where we were going. It was very traumatic for my son. No one would tell us where we were going. I was taken on a plane with my son.

16. When my son arrived at Berks he was very upset. He was hoping we were being released to go live with his father. He cried and did not want to leave the car. It was the middle of the night. I had to physically carry him into the new detention center.

17. The prolonged detention is having a terrible effect on my son. He cries, kicks things, throws things or himself on the floor. When he cries I just take him to our room and just keep him there. We do not have a private room. We share a room with four other moms and children. My son tells me all of the time that he blames me for being in this prison. He has always been a good child, but now he is becoming aggressive with me. He has begun to bite me. He throws himself on the ground. I feel like he is very angry with me for our detention, but I came to the U.S. to protect him. When my son acts out the staff get angry and they make faces and negative comments.

18. My was seen by a psychologist or social worker upon our initial entry into the Berks detention center. No mental health provider has seen my son since that time. I have discussed the problems that I am having with the mental health staff, but they have not offered my son any services. They have only told me what I must do in the facility when he acts that way. The only solution I was given was to take my son into my room until he calms down.

19. I am diabetic. I have been hospitalized and taken from this center on one occasion. I receive diabetic medicine three times a day. At other times I receive an injection. Sometimes I am told by the doctor to rest, and they have asked staff members to watch my son as I recover. That request from the doctor was refused by Berks staff. On one occasion I was in the isolation room at Berks because I was suffering from a high fever, chills, and I had to be there for a whole day. I was with my son and had to wear a mask.

20. Since I have been at Berks I have again been assisted by a volunteer attorney. There are only three attorneys in this area and no free legal services programs that assist families in detention. Bridget Cambria, Esq. has assisted me in requesting a re-interview before the Asylum Office. That request was denied. During my time detained at Berks, no one has attempted to assess whether my son could be released to relatives in the United States. No officer questioned me about this or asked me for information of who could care for my son if he was released from detention.

21. I have never attempted to leave the Berks facility with my son. I understand that if I attempt to leave with my son that the guards would arrest me and take my son away. I know they would find us, I can't do anything that would jeopardize my child's safety.

22. Here at Berks my son is detained with unrelated men and women. This does appear to me to be a safe situation.

23. I have family here in the U.S. The father of my son Jefferson is here in the U.S. He is living in Manassas, Virginia and is willing to provide care for my son and me. I also have U.S. citizen relatives and relatives that are legal permanent residents including cousins in Houston and Maryland. I also have brothers in Atlanta. No officer has asked about me or my son's preference to be released to his father.

24. I have absolutely no criminal history and I would appear for all future appointments and hearing upon any release. I am not going to run away because I want to pursue my case and seek protection in the United States. I have never received a bond hearing or been told that my son could receive a bond hearing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Signed on April 23, 2016, in Leesport, Pennsylvania.



Celina S

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23[th] day of April, 2016, in Leesport, PA.

_Martha Sandoval-Reyna_
Martha Sandoval

# Exhibit 29
# Conditionally Filed Under Seal

### Declaration of Cesia V█████████

I, Cesia V█████████ depose and say:

1. I am a thirteen-year old girl detained at the detention center in Berks County, Pennsylvania. Before this, I was detained in Dilley, Texas from on or around November 6, 2016 until November 19, 2016, when I was transferred to Berks.

2. My date of birth is █████ 2002. I was born in Honduras and I am now 13 years old. I am detained with my mother, Lesly Ma█████████. My mother was born in Honduras on █████ 1977 and she is 38 years old.

3. In summary, I left my home country because gang members targeted my mother and I and we fled because gang members wanted to sexually assault me.

4. On or about November 4, 2015, I was walking with my mother and a group of people, including two of my mother's cousins, when agents from the U.S. Border Patrol stopped us shortly after we had crossed the border into the United States.

5. They took us to a room, that I think was the Rio Grande City Border Patrol station. The room was really cold and we slept on mattresses on the floor. There were some blankets in the cell but they were very dirty, so we didn't use them. It was very uncomfortable and it was hard to sleep. There were many people in our cell. The food was disgusting; it was just cold ham sandwiches. It was embarrassing to use the bathroom, I felt bad about it because everyone could see me when I was using the bathroom. The moms and kids would use their bodies to shield whoever had to use the toilet so that the male immigration officers couldn't see us. There was one small sink but no kind of soap or paper towels to dry with. The lights were on all night and there was just one small window.

6. Immigration agents asked our information and wanted my mom to sign deportation papers. My mom refused and the officer got mad and asked if I wanted him to do the fingerprints for me. He screamed at us to get in the cell and slammed the door behind us. They kept asking us again and again to sign our deportation papers. At one point, they told my mother to come outside and there was an immigration lawyer to help her there. They said if she signed the papers, then an immigration lawyer would help her. The immigration officers threatened that if my mother didn't sign for deportation she would regret it and she would be begging to be deported and they could deport us whenever they wanted to.

7. After one night at this border patrol station, at maybe 3 in the morning, they kicked us to wake us up and they transferred us to a different place, which is like a warehouse to hold people in cages like animals. At this place, I was taken away from my mother. I felt so bad and scared being away from my mother. I didn't know how long I would be separated from my mother. Thankfully, we were only there for less than a day when we were taken to the detention center in Dilley, Texas. We had to leave my mother's cousin and her daughter there, but we heard later that they were released to live with family in the United States.

8. No one at the border patrol facilities notified me about any rights I had as a minor or any rights under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer or family. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw.

9.  When my mother told border patrol officers that I had a fear of returning to Honduras, they said
    that's the same story we have been hearing over and over again. They humiliated my mother.
    They said to my mother –You have no right to be here? Why didn't you go to another country?
    This made me feel so bad seeing my mom treated this way by these men in uniform. The man
    yelling at my mom seemed so angry, I was scared he was going to hurt her. I started to cry.

10. My mom had a credible fear interview on one day in November 2015. The next day, an asylum
    officer interviewed me. He didn't let me answer questions except to say yes or no. He made me
    very nervous and I started to cry. I didn't feel comfortable telling him my whole story or that I
    even had a chance to tell him my story. After this, we received a negative decision from an
    immigration judge appearing on a video. The immigration judge wouldn't allow my attorney to
    say anything to explain our case. Very quickly, the immigration judge said that we did not have a
    credible fear and that he was affirming the decision of the asylum officer.

11. After the judge said the decision was negative in our case, I met with the CARA Project volunteer
    lawyers to prepare a declaration and to submit a request for a second interview. That request was
    eventually denied and I have never had the chance to actually explain my story and why I am
    afraid to go back to Honduras to any immigration official or judge.

12. Even though we had been working with lawyers from the CARA Project and that was the only
    place that we felt safe, all of a sudden, on November 19, 2015, my mother and I were transferred
    from Dilley to Berks County, Pennsylvania. Immigration agents woke us at 4 in the morning and
    held us in an office. My mother was crying and asking the immigration agents where they were
    taking us. They told us that they were taking us to a safe place and not to be worried. We had no
    idea where we were going and we had no warning that we would be taken away from our
    lawyers. On the way here, some immigration officials said that they were taking us to our family,
    but that was a lie.

13. My mother and I have now been at Berks for five months. I have had problems with a sore tooth,
    it's been hurting me a lot since January 24 and the staff members keep saying that they are going
    to make an appointment for me. It's been more than three weeks and I still haven't seen a dentist.
    I also suffer from very bad menstrual cramps and the medical staff members do not really help
    me and they just give me Tylenol. My mom has been having stomach pain since she came here.
    The medical staff did two tests that came back and showed that she had a kidney infection, but
    about four or five days ago the medical staff said that they needed another opinion from an
    outside lab. My mother is still in pain and it's hard for me to see her suffering.

14. I feel so bad being here detained at Berks. It's now been over five months that I've been locked
    up and I feel trapped here. I don't like anything here. It feels like we are living in a nightmare.
    My mom tells me that I am losing weight and she worries about me. I don't want to eat the food
    here. My mom found out that the food that we eat, the bread and the milk, is expired. Sometimes
    the food looks like dog food to me.

15. The staff here are not nice to us. They treat us like we have some kind of contagious disease.
    Some of them wear gloves when they think they have to touch us. They are not friendly or nice to
    us.

16. It is very hard to sleep here at night because the staff come and shine a flashlight in our eyes every fifteen minutes. Even if they didn't wake me up every 15 minutes, I wouldn't sleep well. I spend a lot of time crying at night. I ask my mother all the time, when are we leaving this place? Sometimes I want to crawl in bed with my mother because it's cold and the blankets have holes in them and I want to be warm and close to my mother, but the staff come and wake me up and tell me I have to sleep in my own bed.

17. The doors at this family detention center in Berks are usually locked during the day, you need a card, which is like a key to open them. We are allowed to be downstairs from 8am-8pm and then we have to be upstairs. I don't feel free to leave this detention center. It's is a prison for me and my mother. I know if we left, we would be caught. All I want is to be safe and be with my mom and my sister.

18. I want to be with my eight-year-old sister, who was held in immigration detention with her Dad in June 2015, and was separated from him. He was deported after five months of being detained. My sister was detained for a month and a half in some kind of detention center for children and she was then released to her aunt, in Arkansas. I really want to be with my little sister again.

19. No official here has informed me that I have a right to see an Immigration Judge about my custody status. My mom and I are being represented by the ACLU and have a habeas corpus case pending to review the denial of our credible fear claims. No official here has questioned me to determine if I have a close family member to whom I could be released or whether I am willing to be placed in a licensed home if no relative is found to be capable of caring for me. No officials have told me anything about Flores throughout all the months that I have been detained.

I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct to the best of my knowledge, information, and belief. Executed this 23rd day of April, 2016, in Leesport, Pennsylvania.



Cesia V

Certification of Translation

I certify that I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23rd day of April, 2016, in Leesport, PA.

Martha Sandoval Reyna

# Exhibit 30
## Conditionally Filed Under Seal

## DECLARATION OF ISAMAR S███████████

I, Isamar S███████████, whereby swear and affirm, under the penalties of perjury, that the following is true and correct to the best of my knowledge:

1. I am detained at the Berks detention center in Leesport, Pennsylvania. I was born on ████ ██ 1992, in El Salvador.

2. I am detained with my daughter, Jacquelinne A███████████, who was born on ████ 2008.

3. We left El Salvador on May 19, 2014. This is our first time in the United States. Jacquelinne's father abandoned us when she was only 2 months old. After he left us, I lived alone with my mother and my daughter. I sold food in order to provide for me and my daughter. Then the 18s started threatening our lives. They threatened me that if I did not pay them, money that I did not have to pay. The 18s killed my brother-in-law because he would not join them. I was so scared that they would kill us. We fled to the U.S. and crossed the river near McAllen, Texas. This was on May 30, 2014.

4. We were caught by border patrol after we crossed and were walking. They took us to the hielera, the border patrol station. We were detained there for two or three days.

5. We were kept in a very small room with no beds. The only place to sleep was on the floor. But there were so many people in the room that there was not enough room for us all to lay down. Some people had to sit. There was a bathroom in the room, but no privacy. If you used the bathroom, everyone could see you. There was a sink with the toilet, but it only had cold water. There were towels to dry your hands, but no soap.

6. The temperature in the room was extremely cold. We were wet from crossing the river and forced to stay in our wet clothes the entire time. We were only given aluminum blankets to keep warm.

7. We received food three times a day. It was the same, cookies, bread with mozzarella, and a really cold bottle of water.

8. The mom and children were kept together. There were very young children, around 1 ½ or 2 and some children as old as 7 years old all together with their mother's in the room.

9. It was hard being there. It was also hard because we could not tell what time of day or night it was. It was hard to get any sleep there. We did not have showers during those days.

10. The immigration officers were not very nice to us. One time, they put as all together in a line and shone a bright light on us. They were laughing and telling us that we were only going to be here 30 days before we were deported. They told us we'd only be with our families for 30 days, but hey, go see America.

11.

12. No one ever asked me if I had a fear of going back to El Salvador. The immigration officers never told me about any rights that me or my daughter had.

13. They did ask me where I would go, if released. I told immigration I would go to a friend in Atlanta. Immigration called her to ask if she knew me and to get documents from her.

14. Then one day, they took us to a bus station in Laredo. Immigration told us they decided to let us be free, but now we had to figure out how to get to our family or friends. They just left us there, with no money, no way to contact anyone. It was very scary. I asked a man to let me borrow his phone and called my friend. She bought me and my daughter bus tickets, but they were not until the next day. The man was kind enough to buy us some hamburgers and soda. We were at the bus station with other mothers and children. We had to spend the night sleeping on the street.

15. When immigration released us, they gave me a list of lawyers to call for help. This list was in English. I was told I would need to check in with immigration in Atlanta. I called the attorneys on the list, but no one ever answered. My father, who lived in Virginia, hired a lawyer in Virginia to represent me and my daughter.

16. This lawyer did not speak Spanish. He never talked to me with an interpreter. He never asked me to provide a statement, either with an interpreter, or written, about my fears of going back. He never asked me for proof that the gangs threatened me and my daughter. My mother and sister knew of the threats and could have written letters. The 18s left me threatening notes that were in El Salvador and I could have provided.

17. I had my hearing on January 12, 2015. I did not know this was my final hearing, or that I would be giving testimony on that day. Right before the hearing started, the lawyer showed me a paper and said it was my asylum application. He told me that the judge was going to ask if I agreed with what was in the application and to sign it. But I had never seen it and the attorney did not read it to me or have me look over it. The judge denied my case that day. From what the attorney explained, the judge denied my case because I did not provide any proof.

18. I asked the Judge if I could move to Virginia with my family and he said yes. I was supposed to check-in with immigration the next day. But the lawyer told me not to go. I was worried, so I went. Immigration told me I did not have permission to move to Virginia yet. The attorney was very angry when he found out I had gone to immigration and yelled at me. Basically, he told me that I was stupid and just to do what he said. He told me to move to Virginia immediately. He told me if I did not, he would drop my case. I moved to Virginia January 16, 2015.

19. After I moved, I wanted to check in with immigration in Virginia, but the lawyer told me that he knew what was going on with my case and just do to what he said. He told me not to go to immigration. He also never told me that we only had 30 days to appeal. And he did not appeal my case.

20. On January 2, 2016, I was at home with my daughter and partner. Immigration came to our house around 6:30-7:00a.m. We were sleeping when we heard banging on the door. Immigration was yelling at us to open the door. My daughter understands some English and knew that it was immigration and that they wanted us to open the door. She was scared and crying that she didn't want to go with them. After about an hour, we thought immigration left. But later, a friend's mother came to visit. When we opened the door, immigration was there too and pushed into the house. My daughter and I ran into a bedroom and locked the door. My partner was in the shower. They grabbed him when he came out. Immigration forced him to open the door to where we were. They took my and my daughter away.

21. We were sent to Dilley. Immigration at Dilley never told us we had any rights under Flores for my daughter.

22. There were 120 of us who were caught at raids and taken to Dilley. When we first got there, we were given food in a little green box. It was an apple, water, and cold hamburger. We arrived at Dilley at January 3, 2016.

23. We were in rooms with 6 beds to each room, it had a TV, and a table. The bathrooms were very far away. The food was not good, but a little better then where we are now, at Berks. At Dilley there were more choices and more warm food. Here at Berks, we mostly get canned food.

24. Immigration kept trying to force the raid families to sign their deportations. I kept asking about the right to an attorney, but the immigration officer lawyer laughed at me. He told me if I hadn't had help from a lawyer in one year, I wasn't going to have help in the 2 days I would be there before I was deported. One time when I was meeting with my attorneys, an immigration official came in and told me he needed to meet with me individually at 3p.m. He refused to talk to me with my lawyer, who was right there. He told the other raid families to meet too. But no one went because we thought immigration might try to force us to do something we didn't want to do. Later, we saw this immigration official. He asked us if we were still not going to sign deportation papers. We told him no, we were going to stay here. Then he laughed at us.

25. But I was finally able to get help from CARA lawyers at Dilley. They filed papers in my case to stop my deportation. My daughter and I were actually on our way to be deported, but the CARA lawyers got our deportation stopped.

26. In Dilley, there was a list of legal providers near the phone. I didn't need to call my lawyers, because they were there at Dilley.

27. Towards the end of January, my daughter and I were moved to Berks. We were not told why.

28. Here at Berks, we have to clean the facility. They use the same washing machines to wash the mops and dirty rags to wash our clothes.

3

861

29. I never had an medical issues at Dilley, but as soon as I got to Berks, I got sick. I had a round ball on her backside. I went to medical to complain about the pain. But they didn't do anything. I went two times. I was only given treatment because I woke up one day and could not walk. The pain was very bad. I had to be taken to a hospital. Two staff members took me there, a man and a woman. On the way to the hospital, the man was driving. He kept looking back at me and laughing. At the hospital, a doctor was examining me. The doctor needed me to undress. The male staff member did not want to leave the room, but the doctor finally forced him to leave.

30. I was given 4 different antibiotics to take. The doctor told me that if the treatment didn't work, I would need surgery. The medicine has taken the pain away, but not the ball. I can still feel it. Also, the one medicine made me extremely dizzy. Even when I was feeling dizzy, I was expected to walk to medical to get my medications.

31. One time, my daughter woke up crying saying her head hurt. When got to medical, she started throwing up. She complained that her throat and stomach hurt. The whole next day she felt sick. Medical only gave her Tylenol. The whole next day she barely ate. I asked medical to give her pedialyte, but said she was fine and didn't need anything.

32. At Berks I have not seen a list of legal providers near the phone. If we want to make free calls to the lawyers, we have to ask the caseworkers to call them for us.

33. The immigration officials at Berks are mean to me. He does talks very loudly and in angry way to me. Immigration never told me that I had any rights under Flores with regards to my daughter.

34. The staff is also not nice to us here. My daughter won't eat the food here. One day, she was drinking a chocolate drink and started to walk out of the cafeteria with it. One of the staff jumped up and was very meanly telling her she can't take it out of the cafeteria. This upset me because it was the only thing that she would eat.

35. Here, the staff does room checks all night long. They shine a light in our face every 15 minutes. And at 7:00a.m. they start yelling that we have to get up and do a room check. I cannot let my daughter sleep past this time because we have to present ourselves to staff to check our IDs.   And here, my daughter cannot sleep in my bed, as she did in Dilley. One time, my daughter hid in my bed and the staff accused me of hiding her. They made me and my daughter go to see the psychologist. We had to talk separately and they asked my daughter why I hid her. She told them I did not. She just likes to sleep with me, it comforts here. But I can't even give my daughter this.

36. Also, our movements are restricted here. There are some parts of the facility we can access, but there are other places we cannot go without a staff member. If we want to go outside, we have to have a staff member watch us. If there is not a staff member available, we cannot go outside. After 8p.m. we are restricted from going downstairs. If we are on the computers, we are told we have to leave and go upstairs at that time.

37. The food here is also poor quality. Many, many times I and my daughter have found hairs in our food. Lots of us have had moldy bread, pancakes, or tortillas. They are green with mold. We have been given expired milk.

38. Also, the sheets are stained and dirty. The blankets are so rough that they scratch the skin. I am allergic to the detergent, as are many people here. It makes me itch every time I wash my clothes.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief. Signed on April 23, 2016, in Leesport, Pennsylvania.

Isamar S█████████

I declare that I am competent to interpret from English to Spanish and Spanish to English, and that the above statement was interpreted from English to Spanish to Isamar S█████████ Ms. S█████████ agreed to the accuracy of the statement before executing her statement above. I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of April 2016.

Martha Sandoval Reyna

5

863

# Exhibit 31
## Conditionally Filed Under Seal

**Declaration of Kelly G███████████**

I, Kelly G███████████ depose and say:

1. I am detained at the detention center in Berks County, Pennsylvania. Before this, I was detained in Karnes City, Texas. My eleven-year-old son and I have been detained for over eight months.

2. My date of birth is ████, 1986. I was born in Honduras and I am now 29 years old.

3. I am detained here with my son, Gary J███████████████, who was born in Honduras on ████ 2004. He is eleven years old.

4. We left our home in Honduras because of domestic violence and threats of violence by gangs the government cannot or is unwilling to control.

5. We were apprehended on or about August, 28, 2015, soon after entering the United States. My son and I were taken, I believe to the McAllen Border Patrol station, which all detainees there called the *hielera* (ice box) because it was so cold. We stayed there for one night. When we got there, an immigration official separated me from my son. I told officials here that I was afraid to return to my home country. They told me that they didn't decide anything and that a Judge would decide.

6. At no point in the hielera or the "perrera," where we were taken next, was I given any notice of my son's legal rights under the Flores case. No officer told me anything about the Flores case. My son has shared his experiences with me at times we were separated and no official has mentioned anything about the Flores case to him. I am just learning about this now. I was never told that my son had a right under the Flores case to have an immigration judge review his bond situation or consider his release. I was not told that my son could speak with a lawyer or given a list of free legal services until I was taken to Karnes City, Texas, to a detention center.

7. In the hielera, we were detained for one night, there were toilets that were very visible to everyone, there was a low wall, so everyone could see when I was using the bathroom. The food was terrible: Just bread with one slice of cold ham. It was very cold in the hielera and my son and I did not have blankets. The cell was very full so it was difficult to lie down. The only place to sleep was on the floor, there were no mattresses or beds. I didn't sleep that night. My son slept a little bit after the immigration officers returned him to me around midnight, we were sitting on a cement bench all night so it was hard to sleep.

8. In the perrera, where we were taken next, my eleven-year-old son was taken away from me and I didn't see him for two nights. I could only see him from far away and immigration officials yelled at me if I tried to get to the edge of the cell to see him. It was also very cold in the perrera. There was a mattress pad and we were given aluminum foil blankets. It was not possible to tell the day or the night because they kept the lights on the whole time and there were no windows. I think we left sometime around dawn. I had no idea where we were going but immigration said the journey would be five or six hours.

At no time while detained at this facility did any ICE agent or any other official tell me anything about my son's rights under the Flores case. To the best of my knowledge, no one explained anything about the Flores case to my son.

9.  Next, we were transported to the Karnes detention center. My son and I were held there from about August 31 to October 21. It was at Karnes that I went through the credible fear interview to explain why I was afraid to go home. It was sometime in September. A male asylum officer interviewed me using an interpreter by telephone. I didn't have a lawyer for any of this. I didn't understand everything that happened during the interview, in parts the asylum officer was short with me and didn't explain things. My son was there during the interview. The asylum officer asked him a few questions, maybe three or four only.  If during the fear interview asylum officer asked me whether I faced persecution in my home country because of my membership in a social group, I would not have understood that question and almost certainly would have either said I didn't understand the question or answered no. I do not recall that the term social group was ever explained to me during the fear interviews.

10.  After I had received a negative decision, an officer told me I could look for a lawyer. It is very difficult to find a lawyer at Karnes because the detention center is far away from any cities and there are very few volunteer lawyers available in Karnes to help people. Phone calls cost money and this also makes communicating with lawyers very difficult. I found a lawyer but she couldn't assist me on the day my case was scheduled to be heard by an Immigration Judge. The Judge said that he had to review my case that day anyway. I asked for my case to be reviewed again by the asylum office. I believe my request for a second interview was denied. During our detention at Karnes, to the best of my knowledge ICE took no steps to assess whether my son could be released to relatives or friends in the U.S.  No officer questioned me about this or asked me for information about who could care for my son if he was released from detention. To the best of my knowledge, based on my discussions with my son, no official talked to my son about who he could be released to in the U.S. Also, no official discussed with me the possibility that my son could be released to a licensed facility that cares for children.

11.  On or about October 21, 2015, my son and I were transferred to Berks County, Pennsylvania, to the family detention center here. We have now been here for about four months. I found a lawyer here, Carol Anne Donohoe. She filed another request for reinterview for me, and that was also denied. During our detention at Berks, to the best of my knowledge ICE has taken no steps to assess whether my son can be released to relatives or friends in the U.S.  No officer has questioned me about this or asked me for information about who could care for my son if he was released from detention. To the best of my knowledge, based on my discussions with my son, no official here has talked to my son about who he could be released to in the U.S. Also, no official has discussed with me the possibility that my son could be released to a licensed facility that cares for children.

12.  Here at Berks my son who will be twelve years old in April is in class a few hours a day with children who are eight or nine years old. He gets bored and teachers tell him to do laps around the room or watch television and he finds that boring too. In his classroom, he is the oldest.

866

13. We also have a big problem sleeping at night. Every 15 minutes people who work for the
facility come and shine flashlights in our eyes and wake us up. I have headaches at night
and my son also has trouble sleeping because of the noise and the interruptions. Our room
is by the laundry room and employees at this detention center do laundry at night and it's
very noisy. It feels like a prison. This place is a prison for my son and I. When I let
myself think about it, I start to cry. I feel so sad that my son has spent the last eight
months of his childhood incarcerated.

14. I have family here in the U.S., my brother lives here and he has TPS, he has been here for
more than 20 years and lives in Houston. He would be willing to have my son live with
him. No immigration officers at the border, at Karnes, or Berks have ever asked me about
my son going to live with my brother. I don't want to be separated from my son, but there
is a safe place he could go.

15. I don't have any criminal history and I would appear for any future court hearings if I am
released. I am not going to run away because I want to pursue my case and seek
protection here in the United States. I have never received a bond hearing or been told
that my son could receive a bond hearing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true
and correct to the best of my information, knowledge, and belief.

Signed on May 1, 2016, in Leesport, Pennsylvania.

Kelly G

I declare that I am competent to interpret from English to Spanish and that the above statement
was interpreted from English to Spanish to Kelly G          . Ms. G          agreed
to the accuracy of the statement before executing her statement above. I declare under penalty of
perjury that the foregoing is true and correct. Executed this 1st day of May, 2016, in Leesport PA.

Martha Sandoval Reyna
Martha Sandoval Reyna

3

867

# Exhibit 32
## Conditionally Filed Under Seal

### Declaration of Maria D██████████

I, Maria D████████████, depose and say:

1.  I am detained at the detention center in Berks County, Pennsylvania. Before this, I was detained in Dilley, Texas.

2.  My date of birth is ████████ 1993. I was born in El Salvador and I am now 23 years old.

3.  I am detained here with my son, Joshua, who was born in El Salvador on ████████ 2009. He is six years old.

4.  In summary, I left my home country with my son because a gang member was pursuing me and threatening me and my son. I believe he was targeting me because I was a single mother. The same gang member had targeted my younger brother for recruitment.

5.  On or about September 5, 2015, soon after we crossed the border to enter the United States, Customs and Border Patrol picked me and my son up as we were walking with a group of people. We were with my younger brother, who was fleeing with us, and we were separated at the border. My brother was taken to another detention center.

6.  We were transported to a border patrol station where we were held for two nights. I do not know the address of the border patrol station. We slept on the floor, but there was barely any room to sleep because there were too many people in the cell. We had no blankets and it was hard to stay warm. My six-year-old son barely slept and he was upset and crying all the time while we were there. There was only one toilet and it was very dirty and you had to use it in front of everyone. There were many people, maybe forty people in the cell, all mothers with children. We were just given cold sandwiches with frozen ham inside, just one during the day and one at night. We were not given a list of lawyers we could call for help. There were no phones we could use.

7.  After this, we were taken to another place, like a warehouse, that they called the perrera (dog house). We were given an aluminum blanket and thin mattress pads. There were even more people there than in the *hielera*. The food was still bad. My son tried to eat the burritos twice, but both times he threw up afterwards. The lights were kept on all night and there were no windows.

8.  No one at the border patrol facilities where we were detained notified me that my son had any rights under the Flores case. No one even mentioned the Flores case. No one gave us any papers about the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer or family. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. When I told them at the hielera that I had a fear of returning to El Salvador, they said very little. In fact, at one point immigration officials told us that we had to go back to our countries because we were not from the United States. When I got to Dilley and had my asylum interview, apparently the papers said that I did not express fear of return. That is not true. The paperwork also said that my son had told officials that he came to live in the United States for the rest of his life, but, in reality, the officials at the border never asked my six year old son any questions.

9. After one night in the *perrera*, they took us to the family detention center in Dilley, Texas, on or about the 8th of September, 2015. I was detained at Dilley with my son until October 31st, so it was about 52 days in Dilley. At Dilley, my son got an earache. I was not happy with the medical treatment received because my son was crying in pain and they made me wait for four hours before they saw him. No official at Dilley told me anything about the Flores case or any rights my son had under the Flores case. Best I am aware, no steps were taken to determine whether my son could be released to a relative here in the U.S. No one asked me whether I would like to designate an adult to whom my son could be released.

10. I was not given an interview about my fear of returning to El Salvador until about September 22, 2015. I received a Record of Negative Credible Fear Finding and Request for Review by Immigration Judge on or about September 25, 2015. I have no idea why the processing of my case was delayed. I worked with attorneys from the CARA Project at Dilley. My hearing with the immigration judge to review the negative determination did not occur, for some reason, until around October 27, 2015. The immigration judge affirmed the negative decision. After the hearing, while I was still detained at Dilley with my son, I worked with a CARA Project attorney, who requested reconsideration of my case. My request for reconsideration was eventually denied.

11. Even though I had been working with lawyers from the CARA Project, all of a sudden, on October 31, my son and I were transferred from Dilley, Texas to Berks County, Pennsylvania. We had no idea where we were going. They took my son and I out of my room and they told me that they didn't know where I was going. I was taken away from my lawyers with no warning.

12. At Berks, my son has started wetting the bed at night. I believe it is from the stress and psychological harm of being held in detention. I have been putting diapers on him at night here at Berks, but I came across an officer who told me that I could not use diapers because my son is too old. They told me I had to make an appointment with the doctor to get one diaper per night.

13. It is very hard to sleep here at night because the staff come and shine a flashlight in our eyes about every fifteen minutes. My son will sometimes come and try to sleep with me in my bed, but they don't allow that here, and they wake him up and make him go to his own bed.

14. The doors at this family detention center in Berks are sometimes open and sometimes locked. We are allowed to be downstairs from 8am-8pm. But, the staff have told us that if we left the facility we would be caught very quickly and we would have nowhere to go. I don't feel free to leave this facility. The kids sometimes talk about trying to escape, but best I am aware no one has tried to escape from this detention center since I arrived a few months ago.

15. My two brothers, my uncle, and several cousins live in the United States. The brother who crossed the border with my son and I was released to live with another brother in Virginia. No one has asked me whether my son's father resides here or whether any other family members in the United States could care for my son if he is released. Best I am aware, no efforts have been made to unite my son with his father who lives here in the U.S. or with other close relatives that we have here, including my brothers. As far as I know, no official has made any effort to release my son to his father or to any of my other family members living in the United States.

16. I have no criminal history and I would appear for any future immigration appointments or court hearings if I am released. My priority is pursuing my claim for protection through all available legal channels.

I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct to the best of my knowledge, information, and belief. Executed this 23rd day of April, 2016, in Leesport, Pennsylvania.



Maria D

### Certification of Translation

I, Martha Sandoval Reyna depose and say:

I am fluent in English and Spanish. I read the above declaration to Maria ████ and she confirmed its accuracy before executing the declaration.

I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 23rd day of April, 2016, in Leesport, PA.

Martha Sandoval Reyna
Martha Sandoval Reyna

# Exhibit 33
## Conditionally Filed Under Seal

Declaration of Lindsey G█████

I, Lindsay G██████, declare under penalty of perjury the following is true and correct to the best of my recollection and knowledge.

1. My name is Lindsay G██████.
2. I am 28 years old. I was born on ██████████ 1987.
3. I am from Honduras.
4. I came to the United States accompanied by my three year old daughter Kenia J█████████. Kenia was born on ██████████, 2012.
5. I was apprehended by immigration officials yesterday, Sunday January 31, 2016. Around 2:30 pm. Since my apprehension I have been held in a border patrol station and at the Ursela detention Center.
6. The border patrol station was horrible. I think the government must makes it horrible on purpose to punish the immigrants who came here. The officials in the border patrol station were very angry.

873

7. In the border patrol station I was placed in a concrete cell. It was very cold. There were other women and children in the cell. Many of the children were crying, like my daughter Kenia. Kenia was so cold she could not go to sleep. There were no beds, pillows or blankets. I held Kenia tight, wrapping my arms around her to keep her warm. I did that for over three hours ~~so she could~~ to help her sleep. She has a rash, and I was worried about her. She did not get to see a doctor or nurse while we were at the CBP station. Her hands started to turn colors, she was so cold.

8. In the CBP station, there are bathrooms, but they are not private. There was a sink, but no soap. I did not get to shower, brush my hair, or brush my teeth. I was given food but it was not good, only a sandwich that was frozen.

9. I am now at the Urseld detention Center. It is a little better because there are pads that I can lay on, which are better than the cold concrete floor. I still have not had a chance to shower, change my clothes, or brush my hair or teeth. I still have not gotten to sleep, and am very

tired. But this place is better then the CBP Station.

10. Since being placed in immigration custody I have not had access to a phone or been given the chance to make a phone call.

11. I have not been told I have a right to a lawyer or that my daughter has the right to a lawyer.

12. I have not been given a list of legal service providers.

13. This is my first time coming to the US. I came because I am afraid I will be killed in Honduras. I have been threatened. My husband, the father of my daughter, was recently killed. I told this to the immigration official who interviewed me by telephone and video at the CBP Station.

14. I have not seen a Judge or been told that I, or my daughter, have the right to see a Judge or ask for bond.

15. I do not know what will happen to me next.

X ████████                    2/1/16

Certification of Translation

I, Shalyn Fluharty, depose and say: I am fluent in English and Spanish. I read the above declaration to Lindsey G ████████ and she confirmed its accuracy before she executed the declaration. I declare under penalty of perjury that the foregoing certification is true and correct. Executed this 1st day of February, 2016, in McAllen, Texas.

Shalyn Fluharty

# Exhibit 34
## Conditionally Filed Under Seal

DECLARATION OF KATERIN Y███████████████████R

I, Katerin Y██████████████, depose and say:

1. I am twelve years of age and detained at the detention center in Karnes, Texas.

2. My date of birth is█████ 2003. I was born in Honduras.

3. I am detained here with my mother, Yessenia M████████████████.

4. In summary, we left Honduras because my mother's cousin was killed by gang members who were involved in drugs. The gangs started threatening my mom and I because we were related to my mom's cousin. We started getting threatening phone calls and in person threats. It was very scary and we fled Honduras.

5. We entered the United States the evening of December 19, 2015 and were caught early morning on December 20, 2015, after we crossed the river.

6. We were taken to a border patrol office but I don't know where. I don't remember how long we were in the truck but it felt like forever. We were cold. The officers were yelling at us and very scary and rude.

7. After that, we were transported to a border patrol station where we were held for about 24 hours. No one at the border patrol station told me about rights I had as a minor or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones anyone else captured was using. No one gave me a list of lawyers I could call. No one asked where I was hoping to live in the United States, even though my dad lives in Virginia and my mom and I want to live with him. No one told me that I had a right to see an Immigration Judge about my detention. My mother was asked if we feared return to my home country. She said yes but they didn't ask anything else. I have talked to my mother and my mother has said that no one has told her about any rights that I have as a child, or any rights I may have to see an immigration judge.

8. The officers told us we had no rights and that we had no right to seek asylum. They then asked my mom several questions and because they said we had no right to asylum, she told them we came here so that I could have a better life. The officers showed my mom papers but they didn't explain anything that the papers said and she didn't want to sign them. My mom told them we can't return to Honduras because of what happened with her cousin. The officers were unfriendly and only wanted us to go back to Honduras.

9. The toilets at this station were out in the open, with only a short wall around them. I had to use the bathroom with no privacy. The cell was super cold. Everyone called it the "ice box." I did not have a jacket to keep me warm. We didn't have beds or sheets but we were given a thin silver paper to cover ourselves with but it didn't make much difference. There was water but there were no cups and when we asked, they wouldn't give them, so I couldn't drink water while I was there. Anyway, the container with water was filthy. They gave us sandwiches that were frozen, and juice. The

878

sandwiches were just two pieces of bread and one thin slice of meat. No butter or spread,
no lettuce, no cheese, nothing. My mom didn't eat anything—she gave it all to me. I had
a hard time eating this horrible food.

10. This facility was very crowded the whole time we were there. There was
about 35 people in one room. There was no space to do anything. Every time we tried to
stand up, they just kept yelling that we should sit or lay down, but there was barely any
space. We didn't ask for medical help because the officers were so hostile.

11. After being in the "ice box" for two nights. We couldn't leave the room unless
they wanted to talk to us, which was only that one time. No one explained anything that
was going to happen to us. After the second night, we were moved to a third facility. We
called this facility the "dog pound" because the holding rooms looked like cages. We
were there one day. This facility was horrible because I was separated from my mother
the whole time. I asked to see my mom and they let me see her for 5 minutes and that
was it. There were tons of kids there—I was in a room with only girls, and I think we
were all between 8 – 17 years old. There were no beds or sheets. They gave me a
sandwich and some water, but that was it.

12. I came to Karnes with my mother on December 22, 2015. After being here for
18 days, we called a lawyer because we had failed our credible fear. Although they gave
us a list of lawyers, other people here said no one answers so we didn't call. We were
able to call a lawyer who is now helping us with our credible fear.

13. As best I remember I have not been told about my rights under the Flores case
at this detention facility. I have not been told that any decision has been made about
releasing me. My mom and I were interviewed by an asylum officer on January 2, 2016.
My mom and I were interviewed together but the officer only asked me if I was married
or widowed, if I had kids, if I was a gang member or a terrorist. The questions really
bothered me. I don't know why they asked me those questions. My mom tried to explain
everything that happened to us but the officer cut her off or told her to "keep your
answers short."

14. On January 7, 2016, an asylum officer told us we failed our credible fear but
didn't tell us anything else about what might happen next. It is just a form letter with a
box checked saying didn't pass our fear interview. They didn't really explain anything
and just gave us a stack of papers in English. My mom learned from a friend here that we
will talk to a judge and that's when my mom started looking for a lawyer.

15. We had to call the lawyers at RAICES three times before we spoke with
someone, and then they answered and have now started working on our case. They
represented us in front of the judge on January 20, 2016. The judge let my mom explain
her story better and only asked me a few questions but he didn't change the asylum
officer's decision.

16. Our lawyers filed a request for reconsideration about 8 or 9 days ago and we
had a new interview but don't have a decision yet.

17. Here at Karnes the food is terrible. I'm not eating and I've lost weight. This
morning for breakfast all I ate was an apple.

879

I declare under penalty of perjury that the foregoing facts are true and correct.
Executed this 3rd day of February, 2016, in Karnes City, Texas.



Katerin Y███████████████

Certification of Translation.

I, Manoj Govindaiah, depose and say: I am fluent in English and Spanish. I read
the above declaration to the declarant and she confirmed its accuracy before she executed
the declaration. I declare under penalty of the perjury that the foregoing certification is
true and correct. Executed this 3rd day of February, 2016, in Dilley, Texas.

Manoj Govindaiah

3

880

# Exhibit 35
## Conditionally Filed Under Seal

DECLARATION OF SONIA M███████████████████s

I, Sonia ████████████, depose and say:

1. I am detained at the detention center in Karnes City, Texas.

2. My date of birth is ██████ 1986. I was born in Honduras.

3. I am detained here with my son Melvin M████████████ who was born in Honduras on ██████ 2013 and is two years old.

4. In summary, I left Honduras because a drug trafficker raped me. I was afraid of him because he continued to ask after me and threatened to kill me. So I decided to leave.

5. We turned ourselves in to U.S. Customs and Border Patrol on or about December 15, 2015 a soon after entering the United States.

6. We were transported to a border patrol station where we were held for one day and one night. Conditions at the facility were bad. It was very cold there, making it very difficult to sleep. No blankets or mattresses were provided. There were about 20 or 25 children in the cell and they were all crying because it was so cold. On top of that, I had to sleep on the floor, because there were wasn't enough space to lie down. There were about 35 or 40 people in the cell. We had to try to sleep sitting up, which was very difficult. To eat we only got a sandwich with one piece of ham, which was very cold as well. For the whole day and night that I was there, we only got two sandwiches and two little bottles of juice. Neither my son or I had the chance to wash or take a shower. We arrived in wet, muddy clothes, and we were not given a change of clothes or underwear. The wet clothes made it even colder, more uncomfortable, and more difficult to sleep.

7. No one at the border patrol facilities notified me that my son had as a minor or any rights he had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer or family. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. No one at the border patrol facility asked me whether I had a fear of returning to Honduras.

8. On or about December 16, 2016, we were transported to another place call La Perrera (dog cage). After a few hours in that place, we were transported to Karnes, where my son and I are currently detained. As far as I can recall, I have not been told that my son has about my rights under the Flores case or that he could see a judge about his detention or release.

9. I was not given an interview about my fear of returning to Honduras until December 22, 2016. I do not know why it took so long to receive a credible fear interview. During the credible fear interview, I told the interviewer that I had been raped by a person who works with drug traffickers and that he had threatened me.

10. I received a Record of Negative Credible Fear Finding and Request for Review by Immigration Judge on December 24, 2015. Although I did not understand this form because I do not read English, someone explained the form to me in Spanish and I stated that I wanted an immigration judge to

review my case. I am not sure when the hearing with the immigration judge was held, but I know it was before December 30, 2015. During the hearing, the judge said that he agreed with the asylum officer.

11. After the hearing, I spoke with a lawyer and requested reconsideration of my case. It has been about 20 days since I requested reconsideration and I have not heard a response. I do not know what the status of my case is and I do not know what is causing the delay in the response to my request.

12. My son's father lives in the United States. No one has asked me whether my son's father resides in the United States or whether I would like my son to be released to his father. As far as I know, no one has made any effort to release my son to his father or to any other responsible adult.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Certification of Translation.

*Tali Gires*

I, Virginia Corrigan, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Virginia Corrigan *Tali Gires*

# Exhibit 36
## Conditionally Filed Under Seal

DECLARATION OF KENIA Y██████████████████

I, Kenia Y█████████████, depose and say:

1. I am 23 years old and detained at the detention center in Karnes City, Texas. My date of birth is ██████ 1992. I was born in Honduras.

2. I am detained here with my daughter, Briana B████████. She is two-years old.

3. In summary, we left Honduras because a gang member that my dad met in jail began threatening me. He started coming to my house and making advances. When I would refuse, he would make threats that I was his and he could do anything to me. I was terrified of him and fled Honduras with my daughter.

4. We entered the United States the afternoon of December 18, 2015. We were taken to a border patrol office but I don't know where. We were cold in the cell. The officers took my daughter's diapers but didn't give her dry clothes.

5. After that, we were transported to a border patrol station where we were held for about 2 nights. No one at the border patrol facilities notified me about rights my daughter had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers anywhere that I saw. No one told me that I had a right to see an Immigration Judge about my detention or my daughter's detention. An officer asked why I left Honduras and I told him I was afraid. He laughed and jokingly said "afraid of what." He then laughed with other officers.

6. No one talked to me about whether my daughter had a relative or if there was a friend I would consent to have my daughter released to. My daughter's father lives in Georgia. He could take care of my daughter. We were planning to live with him in Georgia.

7. We arrived on a Friday, and on Sunday they interviewed me over video. The officer asked me basic questions and then another officer told me to sign several documents. They were all in English and no one explained them to me so I didn't sign anything.

8. We were there for 2 nights and it was bad. The toilet at this station were out in the open, with only a short wall surrounding it. There is no privacy when using the toilet. The cell was very cold. Freezing cold. The detainees called it the "ice box." I had no jacket and was freezing cold. My clothes were still very wet from my journey and I had nothing to change into. My daughter's pants were very wet as was her diaper. I asked the officers for a diaper for her but it took several hours for us to get one. During that time she didn't have a diaper or pants on. We used the silver paper they gave us to cover her body. There were no beds or pillows. There was water but it tasted bad, and they gave me a sandwich of 2 slices of bread with a slice of cold meat, and juice. I didn't eat anything. I gave the bread to my daughter. This facility was very crowded the whole time we were there. There was about 40 people in one room the size of a bedroom. There was no space to do anything. Every time we tried to stand up, they just kept yelling that we should sit or lay down, but there was barely any space. We didn't ask for medical help because the officers were so hostile.

885

9. After being in this "ice box" for two nights we were moved to another place—the "dog pound." This was better, but still not good. The food was a little better and they gave us a cot. My daughter and I were together here. At neither of these offices did they explain anything about my daughters rights under the Flores case or give me any documents about my daughters rights under the Flores case. On one ever asked me anything about whether my daughter could be released to a relative or close friend in the U.S.

10. I came to Karnes with my daughter on December 21, 2015. Although they gave us a list of lawyers, other people here said no one answers so we didn't call. Also, we have no money to make phone calls and there are no free phones to call and consult with lawyers.

11. As best I remember I have not been told about my daughter's rights under the Flores case at this detention facility. I have not been told that any decision has been made about releasing me or my daughter. No one has questioned me about whether we have relatives here who could care for my daughter if she is released.

12. My daughter and I had our credible fear interview on December 29, 2015 and it was about 15 minutes. Then the officer told me they'd call me again for another interview, and that was on January 2, 2016 and was about 30 minutes. Then they said we'd have another interview and that was on January 5, 2016. I don't really know why there were so many interviews. Despite all of these interviews, the officer never really let me explain my story—the officers were different at each interview and they would stop me in the middle of my sentences so the interpreter could talk, and then wouldn't let me continue.

13. On January 7, 2016, an asylum officer told us we failed our credible fear but didn't explain why. I cannot understand the decision because its in English but it looks like a form letter with a few boxes checked. They gave me a stack of documents in English and said I'd see a judge soon. I learned from a friend here about what would happen next and she gave me the number of RAICES, lawyers that work here.

14. I called RAICES and they met with me and represented me in front of the judge on January 20, 2016. The judge didn't change the asylum officer's decision.

15. Since that time, my lawyers at RAICES have done two requests for reconsideration but both have been denied. They told me they're still working on my case.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.



Kenia Y

Certification of Translation.

I, Manoj Govindaiah, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant Kenia Y                     and she confirmed its accuracy before

2

she executed the declaration. I declare under penalty of the perjury that the foregoing
certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Manoj Govindaiah

# Exhibit 37
## Conditionally Filed Under Seal

Declaration of Bianca ███████████

I, Bianca ███████████, declare under penalty of perjury the following is true to the best of my recollection and knowledge.

1. My name is Bianca ██████████████

2. I am from Brazil. I was born on ████ 1998.

3. I am 17 years old. I arrived with my father, Claudeo C████████

4. This is my 3rd time coming to the US. The first time I arrived on a 6 month visa, and overstayed. The second time I was deported from the airport. This is my 3rd time.

5. I was apprehended by immigration on Friday, February 29, 2016. I have been here for 4 days. I was apprehended around 8 p.m.

6. I have been in a cement cell with other women and their children separated from my father the last 4 days. I have been able to talk to my dad for 10-15 minutes three times since arriving to this Station.

The food is always the same. It is 2 pieces of bread with one slice of bologne 3 times a day.

The concrete is very cold. this makes it hard to sleep. My cell is very crowded. There is about 40 people here. Yesterday, there was double now.

This cell does not have a sink, no water, no soap. There is no soap. I have not been given a brush, toothbrush, or toothpaste.

7. I do not know what will happen to me if I return to Brazil. My dad risked everything to bring me here. We have both been robbed numerous times and my house was broken into.

8. I have eaten some bread since arriving.

9. I have slept on the cement floor. I did not have a mattress, pillow or blanket, just a ~~foil~~ piece of foil. The lights have been on since I arrived.

10. I have not been able to shower.

11. The water they have given me tastes dirty, so I have not drank water since arriving.

12. When I use the bathroom, there is no door on the stall.

13. I have not been able to leave the cell except to get juice and bread, and when they clean the cell. I have not been able to go outside a single time.

14. I was told I can not see a Judge because I was deported before.

15. I was not given a phone call or told I can make ~~one~~ a call.

16. I was not given a call to my consulate.

17. I was not given a list of lawyers. or told I can get a lawyer

890

18. This is not a place for humans.

19. I am fluent in English and ~~Spanish.~~ Portuguese.

_____ ▓▓▓▓▓▓▓▓▓▓ 02/01/2016

I, Shalyn Fluharty, declare that I am proficient in English and Spanish. I obtained the above declaration from _____ and read it to her in the Spanish language. She affirmed its accuracy before executing the above declaration. I declare under penalty of perjury the above facts are true and correct.

Executed February 1, 2016
in McAllen, Texas

891

# Exhibit 38
## Conditionally Filed Under Seal

Declaration of Astrid Dominguez

I, Astrid Dominguez, depose and say:

1. I so interviewed Erika J█████████ from Guatemala, born on █████████, 1984.

2. She fled Honduras with her two children, Jocelyn N█████████, 15 years old, ~~and~~ born on █████████ 2000, and her son Steven J█████████, born on █████████, 2013, because it was not safe for her and her children.

3. She was apprehended by Border Patrol on January 29, 2016 near McAllen, Texas.

4. She was taken to a Border Patrol Station where she stayed for three nights. During her stay at the facility she had to sleep on the floor (concrete floor), with no mattress or blanket. They gave her an aluminum silver sheet to cover herself a day after she arrived.

5. She stated that she was held in a cell with more than 40 people, it was so crowded that Sisme had to sleep on the toilet area.

6. ~~Shes~~ they were given sandwiches three days, only a slice of bologne a two slices of bread.

893

(2) Erika J ███████

7. When she arrived at the Ursula facility her oldest daughter was separated from her. She has not talked to her since their arrival.

I declare under penalty of perjury that the forgoing facts were declared to me. Executed this 1st day of February, 2016 in McAllen, TX.

*Astrid Dominguez*

894

# Exhibit 39
## Conditionally Filed Under Seal

DECLARATION OF KAREN Z███████████

I, Karen Z█████████, depose and say:

1. I am detained at the detention center in Berks, Pennsylvania.  I was born in El Salvador on ████████, 1993.
2. I am detained with my son, who was born on the ████████, 2010.
3. We were apprehended near Piedras Negras in Texas on the 29th of August, 2015.
4. Border Patrol agents took us to a border station.  We were not told the location of the border patrol station.  We arrived around 11 a.m.
5. Conditions at the facility were very bad.  For every meal, they gave children small portions of the same thing: corn, macaroni and cheese, and nuggets.  After two meals, my son would not eat the food anymore.  They only gave me one burrito for each meal.  We did not drink any water because it was right near the bathroom and the container was disgusting.  Instead, I would ration the small bags of juice for my son.
6. We were not given the chance to take a bath or shower.  We did not want to go to the bathroom because there was no real door to the bathroom.  There was one small sink with only cold water.  There was no soap to use to wash our hands and no paper towels to dry our hands.  We had nothing to brush our teeth or brush our hair.  We had no change of clothes.  Our clothes were soaking wet from crossing the river and our pants and shoes were full of mud.  They did not give us dry clothes or shoes to wear.
7. We could not sleep because the air conditioning was turned up high and we were very cold.  We only had cement planks to lie on and they did not give us blankets.  They gave us plastic sheets.  My son was cold and wearing wet clothes, so he was so cold that his lips turned purple.  I had to wrap him in a plastic sheet and hold him on my lap so that he would not have to sleep on the cold cement.
8. No one told me about my son's rights under the *Flores* agreement.  They never told me that I could call a lawyer for free, nor did they give me a list of lawyers and I never saw one posted anywhere.
9. They asked me if I was afraid to return to El Salvador and I said yes.
10. The officers told me that I could be released to stay with a family member.  They told me to call the person who I could stay with and have him send money so that I could buy bus tickets.  When we left this facility, they told me that I was going to a bus station where we could take a bus to Houston to stay with my son's uncle.  But, when I got out of the border patrol vehicle, I was at a detention center in Dilley, Texas.  This was a terrible surprise because no one had told me that we were going to a detention center.
11. The officials and staff at the detention center in Dilley never advised me of my son's rights under the *Flores* case.  No official told me that my son had any right to seek release from an immigration judge.  No official questioned me about relatives or friends in the U.S. able to care for my son.  No one asked me if I wanted my son transferred to a licensed facility for children.  The first time I was told of any rights was when I met with the pro bono lawyers at the detention center.
12. My credible fear interview took place over two weeks after I was first detained, I think around the 15th of September 2015.  I spoke to the asylum officer about why I fled El Salvador.  I had no idea what it means to be persecuted because of membership in a social group and no one explained this to me.
13. About three days later, I got a negative credible fear determination.  This is a form denial which did not explain on an individual basis why my case was denied.  They did not provide the notice in Spanish.  The officer used a telephonic interpreter to translate it, but

896

the technical and legal terms confused me and the only thing I understood was that the
determination was negative.

14. About the 22nd of September, I was told that an immigration judge would review that
decision. On the 23rd of September, I had a review with the immigration judge, who
appeared by video. Later that afternoon, I was told that I got a negative determination
again.

15. At Dilley, I was never informed by any officials at Dilley that under the Flores case I had
the right to seek release for my son in front of a judge.

16. I was finally represented by a CARA pro bono lawyer at Dilley.

17. My son and I were unexpectedly transferred to the detention center in Berks on or about
28th of October of 2015. Officers told us we were being transferred for release to my
family, but it turned out this was not true. We have now been here for about over six
months. My son's and my detention exceeds eight months in total. At this time I have a
habeas corpus appeal pending in the federal court and have received a temporary stay
from the court.

18. No staff member at Berks has ever told me about the Flores agreement or that I have the
right to ask a judge to consider releasing my son.

19. I have been given many custody reviews, but every time they told me that they decided
not to release me or my son.

20. I am now represented by volunteer attorney Bridget Cambria in my immigration case at
Berks. The ACLU is handling the habeas corpus case which I am told deals only with the
denial of my fear claim.

21. The conditions here at Berks are horrible for my son. We cannot get a real night's rest
here. At night, the staff members open the doors loudly and shine lights in our faces
every 15 minutes. If my son is cold or afraid, he sometimes sleeps with me. If the guards
see that he has moved to my bed, they wake us up and make him move. In the middle of
the night my son often cries uncontrollably.

22. The food here is disgusting. They often give us expired food, including milk and yogurt,
and bread. Sometimes the bread even has mold. My son refuses most of the food here.

23. Detained men here are comingled with detained mothers and children and this makes the
children and woman very uncomfortable.

24. Staff members wash their mops and oily rags from the kitchen in the same place that we
wash our clothes. This leaves dirt in our clothes that gives us rashes.

I declare under penalty of perjury under the laws of the United States that the foregoing is true
and correct to the best of my information, knowledge, and belief. Signed on May 1, 2016, in
Leesport, Pennsylvania.

Karen Z▇▇▇

I declare that I am competent to interpret from English to Spanish and Spanish to English, and
that the above statement was interpreted from English to Spanish to Karen Z▇▇▇▇. Ms.
Z▇▇▇▇ agreed to the accuracy of the statement before executing her statement above. I
declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of
May, 2016.

Martha Sandoval Reyna
Martha Sandoval Reyna

2

897

# Exhibit 40
## Conditionally Filed Under Seal

<u>Declaration of Allison M█████████████</u>

I, Allison M█████████████ depose and say:

1.  My name is Allison M█████████████, and I am detained with my 16 year old sister    and my mother at a detention center in Berks County, Pennsylvania. I have been detained by immigration with my sister and mother for six months.

2.  My date of birth is █████████, 2001. I was born in El Salvador and am 14 years old.

3.  I am detained here with my sister, Estefany A█████████████ who was born in El Salvador on █████████ 1999. She is 16 years old. I am also detained with my mother, Carmen L█████████. She was born in El Salvador on ██████ 1975 and is 40 years old.

4.  We left our home in El Salvador because of violence directed at my family and the growing violence against women and girls without protection committed by the gangs in El Salvador. We cannot be protected by the government of El Salvador.

5.  We were apprehended on or about August 23, 2015, after entering the United States. We were apprehended while walking. Border Patrol took us to an empty road and took our hair ties, our shoelaces, our phones and identification. We were taken to a holding cell. I am not sure where this was located..

6.  Every time more people came it seems to get colder in the room. There were so many people squeezed into the room. There were no beds, just a few cement slabs to lay on. There was no sink, but there was a toilet that was open so that everyone could see you if you went to the bathroom. We had to use a trashcan to block ourselves so other people could not see us using the bathroom.

7.  Our mother told the immigration officials that we have a fear of return. My mom told us that immigration was mad at her that she said she was afraid for us. We were not permitted to use a phone.

8.  We were afterwards taken to the *perrera* . I know we were taken sometime at night. It is called a *perrera* because we are treated like dogs. It looks like a dog kennel and we are the little dogs. It is a giant room with lots of cages where people are kept. The lights are always on. I was kept with my sister, but I was separated from my mother for two nights. On one occasion I was able to visually see my mom, but I was prevented from talking with her.

9.  At 2 AM officers came into our cage and kicked our mattress.That is what they would do to kids all throughout the night. But it usually meant that you were leaving. So when they came in and kicked our mattress we were happy because we thought we were going with

our dad in Dallas, Texas. We were not taken to our father, however, we were taken with our mother to a detention center in Dilley, TX. We were taken there by bus and it was full.

10. At no point did any officer or official ever talk to me, my sister, or my mom about our legal rights or the *Flores* case. We had no notice that we had a right to an attorney. At no point did anyone ever talk to me or my sister about our rights as children. I was never talked to about any ability to be released to my dad or to receive a bond in front of an immigration judge.

11. The entire eight months we have been detained neither me, nor my sister, nor my mother have ever been spoken to by officials about a case called Flores.

12. There was no need for me, my sisters or my mom to be placed in detention. Our father, Elias Mendez Avala, lives in Dallas, Texas. He has been here for about 12 years. My mother also has a sister, Sonia Escobar, who lives in Maryland and is a Legal Permanent Resident. She has a husband who is a resident and children who are U.S. Citizens. My mom also has an Aunt in Maryland who is a U.S. citizen, her name is Blanca Menjivar. We also have a cousin named Jose Menjivar. Immigration knows that we have family willing to care for us, and they have denied our release for the last 8 months.

13. I did not know that there was a Flores case that requires immigration to provide me with continuous efforts to release me from detention. Why then has 240 days passed, and me and my sister are still in detention?

14. When we were in Dilley, my mother, sister and I received an interview from the Asylum office. We were all separated. The officer spoke English and we had an interpreter by phone. They interviewed me, my mom and my sister. I know that I was very nervous and scared for the interview. I didn't understand completely the interview, but all I knew was how I answered was going to decide whether I could live in safety. It was a lot of pressure.

15. In my interview I told the officer that I was afraid to be deported. I told the officer that I was afraid to return because of the violence that has happened to my family and because of the dangers of the gangs. It is not safe for girl in El Salvador, especially when our house was just women, my mother, my sister and I. The officer never explained to me that it is a requirement that I face persecution because of my membership in a social group or what that means.

16. We received a negative decision. I believe this was a form letter denial. My mother then went in front of an Immigration Judge. Even though my sister and I were interviewed by the Asylum Office, my sister and I were not permitted to go before the Immigration Judge. I believe that this is wrong because some children my age were allowed to talk to the judge and had their cases granted. In my case, I was never allowed to see a judge, only my mother.

17. The Judge agreed with the negative decision. We were told at this time that we were being transferred to another detention center in Berks, Pennsylvania. So the three of us were sent from Texas to the detention in Pennsylvania even though our dad lives in Dallas, Tx.

18. In Berks, every morning at 6:30AM the staff bangs on our doors to wake up. We are stuck in one building, corralled in common areas all day long. It is boring. At night, we cannot sleep through the night because the guards shine flashlights in our faces every 15 minutes. We must go to bed at 9:00PM no matter the day. They do not permit us out of the room after 9:00 PM. This has been every day for eight months.

19. One night my mother, sister and I were woken at 3:00AM. by Immigration officials. At that time I had never seen anyone deported. So I initially thought, again, that we were being sent to our family. That was not the case. They were trying to deport us. We had been working with attorneys in Texas and had asked for help from Bridget Cambria, an attorney who works with people in the Berks facility. She had filed a request for a re-interview with the asylum office.

20. We were taken out of the facility at 3AM. We were being taken to the airport. At the airport we noticed that immigration was talking on their phones. They were angry. They found out that they were not permitted to deport me or my sister or my mom because we had a request for a re-interview pending.

21. I have only seen a mental health worker on one occasion. I suffer from depression and it's very hard to deal with being trapped every day. I believe I am suffering emotionally and in school.

22. I have never attempted to escape from the Berks facility and neither has my family. Because I am in the custody of immigration, it is my belief that if I would attempt to leave that the guards would arrest me. I am scared. I know that we are in a facility that is locked. At certain parts of the day we are only permitted in certain areas and blocked from certain parts of the facility. There are key pads throughout the facility. I watch the staff members use a key card to enter certain parts of the facility. I see the staff use key cards to unlock internal doors which prevent us from passing. After 8 PM we are kept only on the second floor. We are not permitted to return to the first floor. Our movement is stopped by Berks staff and by some doors. I just want to be safe, and I believe I can best fight my case with my family, outside of detention. Like I said before we have family here in the U.S., including my father, who is able to provide care for my sister, my mother and I.

23. I am a 14 year old girl. I am scared for me and my sister. I can see how this time here, these eight months are destroying us. It is hurting my relationships with my mother and my father. I am suffering from emotional distress and depression. I do not want to run. I want to continue to fight to seek protection in the United States for myself, my sister and my family. I have absolutely no criminal history and I would appear for all future appointments and hearing upon any release. I am not going to run away because I want to pursue my case. I have never received a bond hearing or been told that my son could receive a bond hearing.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Signed on May 1, 2016 in Leesport, Pennsylvania

5/1/16
_____
Date

Allison M█████████

I declare that I am competent to interpret from English to Spanish and that the above document was interpreted from English to Spanish to Allison M███████████ Ms. M███████ agreed to the accuracy of the statement before executing her statement above. I declare under the penalty of perjury that the foregoing is true and correct. Executed this 1st day of May, 2016 in Leesport, PA.

Martha Sandoval Reyna
Martha Sandoval Reyna

# Exhibit 41
## Conditionally Filed Under Seal

DECLARATION OF BENINA C███████

I, BENINA C████ ████, DEPOSE & SAY:

1. I AM A CITIZEN OF HONDURAS.

2. MY DATE OF BIRTH IS ████ 1984.

3. I LEFT HONDURAS BECAUSE MY FATHER WAS MURDERED AND I WAS THREATENED. I FEARED FOR MY LIFE IN HONDURAS.

4. I FLED HONDURAS WITH MY CHILD NAMED CRITZA S██████████████, BORN ON ███████████, 2013.

5. I CAME INTO CONTACT WITH U.S. BORDER PATROL AGENTS ABOUT 15 MINUTES AFTER ENTERING THE U.S. ON FRIDAY JANUARY 29, 2016, NEAR MCALLEN, TEXAS. I WAS APPREHENDED WITH MY DAUGHTER.

6. I HAVE BEEN DETAINED BY BORDER PATROL SINCE FRIDAY JANUARY 29, 2016.

7. FRIDAY NIGHT AND SATURDAY NIGHTS MY DAUGHTER AND I SLEPT ON THE CONCRETE FLOOR OF OUR CELL ALONG WITH ABOUT 40 PEOPLE. THE CELL FLOOR IS FILLED WITH PEOPLE SLEEPING ON THE CONCRETE FLOORS. THEY ARE ALL MOTHERS AND CHILDREN OF ALL AGES. NO ONE IS PROVIDED A MATTRESS. EACH PERSON IS GIVEN A SILVER PAPER BLANKET. NO ONE IS GIVEN A PILLOW OR ANY TOILETRIES.

8. SINCE I WAS APPREHENDED I HAVE NOT BEEN GIVEN ANY TOILETRIES FOR MY DAUGHTER OR ME. IN THE CELL THERE IS A TOILET AND SMALL SINK SHARED BY ABOUT 40 PEOPLE WITH NO SOAP

904

OR PAPER TOWELS. THE TOILET IS NOT PRIVATE.
IT HAS A SMALL WALL TO PROVIDE PARTIAL
PRIVACY. WE USE TOILET PAPER TO DRY
OUR HANDS. WE HAVE NO SOAP, NO
TOOTHBRUSHES, NO TOWELS, NOTHING TO
BRUSH OUR HAIR, NO WASTE BASKETS.

9. THE CONCRETE FLOOR WE SLEEP ON
IS HARD AND COLD. THE LIGHTS STAY
ON ALL DAY AND ALL NIGHT. CHILDREN
ARE CRYING ALL THE TIME. MOTHERS
AND CHILDREN ARE EXHAUSTED, SLEEP-
DEPRIVED AND HUNGRY.

10. THE ONLY FOOD I HAVE BEEN GIVEN IS
THREE SANDWICHES PER DAY. EACH
SANDWICH IS TWO SLICES OF BREAD
AND ONE SLICE OF MORTADELA. MY
CHILD HAS ALSO ONLY BEEN GIVEN THE
SAME THREE SANDWICHES A DAY.

11. THERE ARE NO PHONES I CAN USE TO
CALL MY SISTER WHO LIVES IN VIRGINIA
AND IS MARRIED TO A U.S. CITIZEN.
MY SISTER COULD CARE FOR MY DAUGHTER
IF NECESSARY BUT NO EFFORT THAT
I KNOW ABOUT HAS BEEN UNDERTAKEN
BY THE BORDER PATROL TO RELEASE
MY DAUGHTER TO MY SISTER.

I DECLARE UNDER PENALTY OF
PERJURY THE ABOVE FACTS ARE TRUE.
EXECUTED THIS 1ST DAY OF FEBRUARY, 2016,
IN ~~EL PASO~~ McALLEN, TEXAS.

BENINA C █████████

905

Certification of Translation

I, Astrid Dominguez, depose and say: I am fluent in English and Spanish. I read the above declaration to Benina C███████ and she confirmed its accuracy before she executed the declaration. I declare under penalty of perjury that the foregoing certification is true and correct. Executed this 1st day of February, 2016, in McAllen, Texas.

Astrid Dominguez

# Exhibit 42
## Conditionally Filed Under Seal

Declaration of Evelin J███████████

I, Evelin J███████████, declare under
penalty of perjury the following is true and
correct to the best of my recollection and knowledge.

1. My name is Evelin J███████████.
   I was born in El Salvador on ███/1994.
   I am 21 years old.

2. I came to the US with my son,
   Jeferson A███████████ He is
   2 years old and was born on ███/2013.

3. I am currently detained at the
   Ursela Detention Center. I was
   apprehended by immigration on Saturday
   evening - January 30, 2016. I was
   taken to two different CBP
   stations before being brought here.

4. When at the 2nd CBP station
   I was interviewed by an immigration
   official. He told me I had to sign
   a paper agreeing to be deported. I told
   him I was afraid to return to ES.
   He told me it didn't matter, that I
   was going to be deported and that
   if I didn't sign, he would sign
   for me. I asked him if I could

908

*There was a bathroom in the CBP station cell, but it didn't have a door. There were no different. I didn't have a bathroom and his pants were to. He still doesn't have pants put on.*

fight my case. He said "What for?"
That it would be a waste of
time because I would be deported no
matter what.

5. The CBP stations - both of them - were
awful. They were freezing. There
were no beds, blankets or pillows.
We had to lay on the cold concrete
floor. The lights were always on.
I was transpated multiple times,
once around 2 am and
another time around 11 pm. I
am now very tired. Both my son
and I are also now sick.

6. Since my detention) I have not
been allowed a phone call or
told that I or my son have a
right to make a phone call)

*I would like my son (also my son is sorry who's in the US)*

7. No one has told me my son
or I have the right to see a
Judge. In fact they told me
we couldn't. No one told me
I can have a lawyer nor gave
me a list of lawyers either.

8. I also haven't had the chance to see a
Consulate

10. I have not had a chance to shower, change
my clothes, or been given any toiletries

909

while in CBP custody - not even
here at Ursula.

2/1/16

910

Certification of Translation

I, Shalyn Fluharty, depose and say: I am fluent in English and Spanish. I read the above declaration to Evelin J█████████████ and she confirmed its accuracy before she executed the declaration. I declare under penalty of perjury that the foregoing certification is true and correct. Executed this 1st day of February, 2016, in McAllen, Texas.

Shalyn Fluharty

# Exhibit 43
## Conditionally Filed Under Seal

Declaration of Diana C█████████

I, Diana C█████████, depose and say:

1. I am seventeen years of age and detained at the detention center in Dilley, Texas.

2. My date of birth is █████████ 1998. I was born in El Salvador.

3. I am detained here at Dilley with my mother, Ana C█████████.

4. In brief, we left El Salvador because of threats of violence against me and my family in our village.

5. I entered the United States with my mother on or about June 2014. We entered without inspection and were quickly apprehended near McAllen, Texas. We were detained at border patrol facilities in McAllen for a few days and then transferred to El Paso for processing. My family and I were released and we went to Atlanta, Georgia, where we lived with my uncles all of which are U.S. citizens. I attended school in Atlanta for a year and a half.

6. While I was in detention before my release the authorities never gave me any notice of my rights as a juvenile or under the Flores case.

7. In Atlanta, my mother was supposed to appear in court but made a mistake and missed her court date. Once she realized her error she immediately presented herself at the local ICE office. As a result she was placed with ankle monitor and reported to her bi-monthly reports and I believe did not miss further appointments. In addition, my siblings and I appeared with my mother before an Immigration Judge. We had three court hearings and best I know we always appeared as required. The judge eventually issued an order of deportation. Our attorney, Rathy Roa, assured us that she would get our family a stay of removal and permission to stay in the country.

8. On or about January 3, 2016, immigration agents came to our house and arrested my family. They took us to the immigration office in Atlanta. We were searched and around 5 PM we were put on an airplane and brought to Dilley. None of the opfficers advised me or my mother of any rights that I had as a detained minor under the Flores case. We have now been here for about one month.

9. During our time here at Dilley no one has given me or my mother any notice about my rights as a minor or my rights under the Flores case. We have received word from our family back in El Salvador that a family from Dilley that was deported has been killed upon arrival at the airport by gang members. In addition, our photos were used in a media report on Telemundo and broadcast in El Salvador. As a result, our family has been threatened to the point that no one will even pick us up at the airport if we are deported for fear of being murdered.

10. While here at Dilley for the past month no one working with the immigration has talked to me about being released or my right to see a judge to decide if I should be

released. My mother has told me that while we have been detained here no one has spoken to her about us being released or my right to see a judge about my release.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.

Diana C█

### Certification of Translation

I, Christopher Clay, depose and say: I am fluent in English and Spanish. I read the above declaration to Diana C█████ and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.

Christopher Clay

2

914

# Exhibit 44
## Conditionally Filed Under Seal

DECLARATION OF AMARILIS L████████████

I, Amarilis L████████████, depose and say:

1. I am 28 years old and detained at the detention center in Karnes City, TX.

2. My date of birth is ████████ 1986. I was born in Guatemala.

3. I am detained here with my son, Diego ████████████████. My son is 6 years old.

4. In summary, we left Guatemala because MS gang members threatened to kill my son, my husband, and me if we did not agree to pay them extortion money. They threatened us with death multiple times.

5. We were apprehended on January 23, 2016 near El Paso, TX.

6. We were transported to a border patrol station. I do not know where it was located. I was there for about 3 days with my son. When we arrived it was about 5 pm and my son and I were very hungry. I asked for food from the officials but they refused to give us any food. They later said that they would only give my son food, and all they gave him was a juice and a cookie. I went to sleep hungry. The next day all they gave us was soup for our 3 meals and we were still very hungry because it was not enough food. They gave us only 1 small bottle of water and a juice bottle for my son each day.

7. The border patrol station was very cold. It was only concrete in my cell and we had to sleep on a concrete bench, which was also a very cold temperature. We were not given mattresses or pillows for the concrete bench on which we had to sleep. It was very difficult to sleep. My son was very cold during the night and I asked to get my son his sweater that was kept outside of the room with out belongings but the officials said no. My son was crying because of the cold and I did not know what to do. We could not leave the cell at night. One night I had to use the restroom, which was located outside of the room, and I knocked for an official to open the door so that I could use the restroom. The officials did not answer me so I could not relieve myself until the next day and it was very painful. The whole experience was a total nightmare for my son. We were treated like animals.

7. No one at the border patrol facilities notified my son or I about the rights that my son had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. No one asked me if I had relatives in the United States that could care for my son. No one told me that I had a right to see an Immigration Judge about my detention.

8. I came to the Karnes County Detention Center on January 26, 2016 with my son. The phones available cost 10 cents a minute and someone needs to deposit funds to use the phones. I am not aware of any free phones that can be used by minors or adults to speak

1

916

with lawyers.  Neither my son nor I have not been told anything about his rights under the
Flores case at this detention facility. I have not been told why my son and I are being
detained. I have not been told that any decision has been made about releasing me. I have
not been told that I can see a judge about my detention or release. Since the time we were
apprehended no one has asked me any questions about whether I have any relatives or
friends my son could live with in the U.S.

9. I had a credible fear interview with an asylum officer on February 2nd, 2016. I
explained to the asylum officer that the reasons why my son and I fled Guatemala was
because MS gang members threatened to kill me multiple times and extorted my family, I
have not received any notification of a decision from the interview. In the meantime, no
one at the detention center has told me how long it will take for me to be able to be
released from detention or if I can be released on bond. No one has discussed with me the
release of my son.

10. The water here is very chlorinated. My stomach hurts when I drink the water. I have
to buy the bottled water using my commissary money because it is very difficult to drink
the water from here. Each bottle costs about $1.30. It is very hard to be able to buy these
bottles because I do not have much money so we try to consume as little water as
possible. My son is having a very difficult time eating and no longer wants to eat the food
here. My son and I have become sick from being here because of the cold temperature
and large number of people in our room (8 people). It is very disturbing for my child to
be detained here with several hundred unrelated adults. He is becoming more and more
depressed and anxious the longer we are in this detention center unsure of our future and
detained with hundreds of unrelated adults.

    I declare under penalty of perjury that the foregoing facts are true and correct.
Executed this 3rd day of February, 2016, in Karnes, Texas.


Amarilis L

Certification of Translation.

I, Tali Gires, depose and say: I am fluent in English and Spanish. I read the above
declaration to the declarant and she confirmed its accuracy before she executed the
declaration. I declare under penalty of the perjury that the foregoing certification is true
and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.



Tali Gires

2

917

# Exhibit 45
## Conditionally Filed Under Seal

DECLARATION OF FRANKLIN R█████████████████████████.

I, Franklin R█████████████████ depose and say:

1. I am 16 years old and detained at a detention center in Karnes City, Texas.

2. My date of birth is █████ 1999. I was born in El Salvador.

3. I am detained here with my mother, Raquel de█████████████████████

4. In short, we left El Salvador because the MS gang members recruited me to join the gang and told me that if I did not join they would kill my mother and I. They told me this various time.

5. We were apprehended on January 22, 2016. I do not know where we were apprehended.

6. We were transported together to a border patrol station in McAllen for two days. I know my mother was held at the same place because later we were transported together to a second facility known as La Perrera (dog kennel). We spent two days here at La Perrera. After this we were transported together and we have been detained together at Karnes City.

7. At the border patrol station in McAllen I was held in an over-crowded cell with about 20 other minors. The cell was only concrete and had a concrete bench around the edge of the cell except where there was a metal toilet with a short wall around two sides. The toilet was a silver metal and had no toilet seat. There was a silver metal sink right on top of the toilet. There was no soap and no hand dryer or paper towels. Bright lights were left on all nightlong making it difficult to sleep and border patrol officials were constantly coming in and out of the cell. Making it even harder to sleep, we were not given mats or mattresses to sleep on. We were required to sleep on the concrete floor, which was also very cold. We had no pillows or blankets. Sleeping there was almost impossible. In the morning I felt completely weak and wasted.

8. The first day that I was there they gave me a cookie for breakfast, a sandwich (2 pieces of bread with one thin slice of meat) for lunch, and another cookie for dinner. I was very hungry all day because this was not enough food. The officials put a container with water in our room and gave us one cup to share amongst the 20 people in my cell. The water tasted very bad and the container was not clean. Very few minors held in my cell were willing to drink the water.

9. I was detained by border patrol for about two nights and two days and was not allowed to see my mother during that time. The first time I again saw my mother was when we were transported together to Karnes City.

10. No one at the border patrol facility notified me about any rights I had under the Flores case. I never heard of the Flores case until I was interviewed to provide this declaration. No one at the border patrol station asked me any questions about whether I had any

1

relatives or family friends to whom I could be released in the United States. My mother
was with me when I was interviewed and provided this declaration and she also says that
no one ever asked her about any relatives or close friends we have in the U.S. that could
take care of me if I was released from detention. I do have an uncle named Leandro Ortiz
Garcia, and he has permission to be in the United States and travels in and out of the
country frequently. He lives in San Antonio, Texas and he could care for me if I am
released from custody. My uncle owns his house. He works in construction. My uncle's
address is 12809 Old Spanish Trl. Live Oak, San Antonio, TX 78233. My uncle could
pick me up from Karnes City if I were released. My mother and I were planning to travel
to San Antonio, TX to live with my uncle. But no one has made any effort to reunite me
with my uncle. Since being detained and being in close contact with many other detained
minors and talking to them every day, to the best of my knowledge not one minor in
custody has been questioned about relatives in the U.S. or close family friends to whom
they could be released. Release is not an option if you are arrested with your mother.

11. No one with the border patrol told me that I could use a phone to call a lawyer. No
made a free phone available to me so I could have conversations with lawyers to help me
get released. No one told me that I had a right to see an Immigration Judge about my
detention. I have talked to my mother and my mother has said that no one told her about
any rights that I have as a minor, or any rights I may have to see an immigration judge, or
any rights I may have under the Flores case.

12. I came to Karnes City with my mother on January 25, 2016. Here at Karnes City the
phones available cost 10 cents a minute and someone needs to deposit funds to use the
phones. I cannot call an attorney when I want to. It is difficult for me to use the phone
because I do not have money in my account often. I am not aware of any free phones that
can be used by minors or adults to speak with lawyers. I have not been told about
anything about any rights I may have under the Flores case at this detention facility. I
have not been told that any decision has been made about releasing me. I have not been
told that I can see a judge about my detention or release. No one here has interviewed me
or my mother or asked us any questions about me being released to a relative or close
family friend here in the U.S.

13. On February 2, 2016, my mother and I were finally interviewed by an officer about
whether we fear returning to El Salvador. I told the officer I had been harrassed by the
MS gang in El Salvador who demanded that I join them and if I refused, they told me that
they would kill my mother or myself. They threatened me multiple times and on
December 26th they broke into my house to find me and I hid in my room. My mom and
I left for the U.S. on January 5th. As of now, we have not heard a result from our asylum
interview and no one has told us when we will find out this result.

14. In the meantime, no officer here at Karnes has said anything to me (or my mother)
about being released from detention or seeing an immigration judge to decide if I or my
mother should be released from detention. I feel like I am suspected of being a terrorist. I
am not a flight risk. I will always appear as required if I am released from detention. I am
not a criminal. I am not a danger to myself or to others. I think the only reason I have
been treated so inhumanely is so the U.S. immigration authorities can use me and other

2

detained minors as an example to convince other young people facing violence and even death in El Salvador to stay home, deal with the violence, risk death, but don't come here for protection.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Franklin R█

Certification of Translation.

I, Tali Gires, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and he confirmed its accuracy before he executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Tali Gires

3

921

# Exhibit 46
## Conditionally Filed Under Seal

Declaration of Herson L█████████████

I, Herson Le██████████████, depose and say:

1. I am thirteen years of age and detained at the detention center in Karnes City, Texas.

2. My date of birth is █████████ █ 2002. I was born in El Salvador.

3. I am detained here at Karnes with my mother, Vanessa H█████████████ █████████.

4. In brief, we left El Salvador because of threats of violence against me. The MS 13 gang was trying to recruit me and I did not want to join them. I was not able to go to school because of the threats to my life. Once they entered our house and threatened my whole family.

5. We came to the United States before when I was four years old. My mother was concerned about the gangs, who were starting to take hold in the area where we lived. Immigration detained me and my mother during that time, although I don't remember everything that happened. I do remember being afraid of a room in the detention center where a man had committed suicide. We were deported.

6. I entered the United States with my mother on or about January 30, 2016. We tried to enter the United States at the bridge in El Paso, Texas. As my mother and I were walking through the inspection station, Border Patrol officers grabbed us from behind. An officer pulled my arm behind me and took me and my mother into a room.

7. When we were in that first room, an officer came to us and started telling us that we had broken the law and had no right to be in the United States. My mother tried to explain why we had come to seek protection and the officer said that he had no interest.

8. We were taken to another room that was quite cold. My mother called it the "heilera." The room was very small. We were given a small thin cushion to sleep on. We were not able to shower or bathe or brush our teeth. We were not given any soap or towels. Immigration gave us soup and a burrito only once a day. I was very hungry. I was sad, afraid, hungry, desperate.

9. We were detained at the border patrol facility there at the border crossing for about three nights until the early morning of February 2, 2016. My mother and I were taken my plane to the detention center in Karnes. To date, I have not been advised of my rights under the Flores case. My mother was not provided any information about my rights under the Flores case.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

████████████████████████████████████

Herson L████████████████

923

Certification of Translation

I, Elissa Steglich, depose and say: I am fluent in English and Spanish. I read the above declaration to Herson Le███████████████ and he confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Elissa Steglich

2

924

# Exhibit 47
## Conditionally Filed Under Seal

Declaration of Vilma S██████████

I, Vilma S██████████ depose and say:

1. My name is Vilma S██████████ I am the mother of Yeimi N███████ ███, who is four years old. She was born on ██████ 2011 in El Salvador. We are both detained at the Karnes City, Texas detention center.

2. We came to the United States with my husband, Jose F████████ seeking protection. As soon as immigration arrested us, they took my husband away. I have not been able to contact him since that time. I believe that he is detained in New Jersey.

4. We left El Salvador because a gang the government was unable or unwilling to control was threatening our lives.

5. My husband and daughter and I entered the United States on December 18, 2015 by crossing the river along the US-Mexico border. Immigration officers arrested us almost immediately. We were all still wet when they brought us to a border patrol station called hielera in Rio Grande City, Texas. They separated us from my husband. I haven't been able to speak to him since.

6. In the hielera, my daughter and I were held with about 15 other mothers and their children. We were only fed two times a day. I watched as every one else was taken out to be interviewed and to give their statement. I thought it was strange that I was not being taken to give my statement and to ask for protection. Finally, an officer came and told me to sign my deportation papers. I refused. He chastised me for not cooperating.

7. The next day, December 19, 2015, an officer came and tried to get me to sign my deportation papers again. I refused. I was never advised of my rights other than to contact my consulate or given any opportunity to ask for protection or explain how afraid I was to return to El Salvador. I was never provided any information about the Flores case with regards my child's rights. I asked to get my documents, which the officer had taken the day before together with my husband's ID. The officer got my ID and my daughter's birth certificate, but still refused to let me see or speak to my husband.

8. Officers then took me and my daughter to a car, and I thought we were being deported. Instead, we were transported to the "perreira" about an hour and a half away. There, my daughter and I were kept with about 25 or 30 other mothers and their children. It was still very cold. No one there asked me any questions about whether my daughter had any relatives she could be reunited with in the U.S. or whether there was any responsible adult I wanted to designate for the care of my child if released from detention. I have a sister who has temporary protected status and lives in Boston and could easily care for my daughter. No one there told me anything about any rights my daughter had under the Flores case. No forms relating to the Flores case were given to me.

926

9. After two nights in the perreira, at 4 am on December 21, my daughter and I
were taken by bus to the Karnes detention center. When I got here, another of the women
said that I should write a note to immigration to explain my fear of return. I did so, and
put the note in the immigration box on December 22nd or December 23rd. No one here
has asked me any questions about whether my daughter has any relatives she could be
reunited with in the U.S. or whether there was any responsible adult I want to designate
for the care of my child if released from detention. As mentioned above, my sister lives in
Boston and easily could take care of my daughter in a safe environment. No one here has
told me anything about any rights my daughter has under the Flores case. No forms
relating to the Flores case have bee given to me.

10. After almost a week, I finally received information about the credible fear
process.

11. Almost a week later, on January 5, 2016, I had an interview with the asylum
officer. The asylum officer showed me the documents that I had refused to sign at the
border patrol station. They were filled with lies. They said that I was coming to the US
to work and to live with relatives in Houston. They said that I was not afraid to return to
El Salvador. I felt that I had been deceived. I came fleeing for my life, and the officers
just made things up that have hurt my case. I think that they just took the information
from my ID and my daughter's birth certificate to prepare the documents. The part about
working in Houston, they just made up. My sister lives in Boston, not Houston, and my
motive in coming was to protect my family from harm.

12. The interview with the asylum officer went poorly. My daughter was with me
and was playing with the phone and very distracted. She began to cry, and we had to
interrupt the interview while I took her to childcare. The officer asked her questions that
didn't have anything to do with why we came, like if she was afraid of the dark or of
spiders. That night, she told me, "Mommy, I'm not afraid of the dark or spiders. I'm
afraid of the guns." She was thinking of the gangs, but the officer never heard that
information.

13. Two days after my interview, I was told that I failed to show asylum
eligibility. I asked to see the judge. At that point, I contacted RACIES whose attorneys
are now helping me.

14. It took a couple of weeks to see the judge. On January 20, 2016, the judge
denied my review. I can't understand why no one can see how much danger my family
faces. I cannot go back to El Salvador.

15. RAICES is helping me to ask the asylum office to reconsider its decision. I
know that officers come in the middle of the night to deport families. I go to bed every
night afraid.

16. My daughter and I have been detained 45 days. I still have not been able to
communicate with my husband. Additionally, no one has asked if I have any other family
here in the United States willing to house Yeimi. My sister lives in Boston, and of course
would open her home to my daughter or to our entire family.

2

927

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes, Texas.



Vilma S

Certification of Translation

I, Elissa Steglich, depose and say: I am fluent in English and Spanish. I read the above declaration to Vilma S[          ] and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Elissa Steglich

3

928

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am not a party to this action. I am
employed in the County of Los Angeles, State of California. My business address is
256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On May 19, 2016, I electronically filed the following document(s):  NOTICE
OF MOTION AND MOTION TO ENFORCE SETTLEMENT AND FOR APPOINTMENT OF SPECIAL
MASTER WITH SUPPORTING EXHIBITS with the United States District Court, Central
District of California by using the CM/ECF system. Participants in the case who are
registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*