CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
T. Wayne Harman (Cal. Bar No. 254089)
Elena Garcia (Cal. Bar No. 299680)
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:     (213) 629-2020
Email: wharman@orrick.com
        egarcia@orrick.com

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>           Plaintiffs,<br><br>- vs -<br><br>JEH JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CV 85-4544 DMG (AGRx)<br><br>PLAINTIFF'S EXHIBITS IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND FOR APPOINTMENT OF SPECIAL MASTER [PART 6: EXHIBITS 48-69]<br><br>Date:    June 17, 2016.<br>Time:   9:30 a.m.<br>Dept:   Courtroom 7<br>[HON. DOLLY M. GEE] |

i

*Plaintiffs' counsel, continued*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:     (408) 280-2437
Facsimile:     (408) 288-8850
Email: jenniferk@lawfoundation.org
          kate.manning@lawfoundation.org
          kyrak@lawfoundation.org
          jamesz@lawfoundation.org
          annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2016 Motion to Enforce Exhibit Index

1.  Declaration of Peter Schey                                              1

2.  Excerpts of Exhibits                                                    66

3.  Declaration of Bridget Cambria                                          103

4.  Declaration of Carol Anne Donohoe                                       114

5.  Declaration of Jacqueline Kline                                         119

6.  Declaration of Jocelyn Dyer                                             154

7.  Declaration of Natalia Ospina                                           159

8.  Declaration of Leanne Purdum                                            162

9.  Declaration of Theresa Wilkes                                           166

10. Declaration of Amanda Doroshow                                          170

11. Declaration of Ed Mccarthy                                              173

12. Declaration of Robyn Barnard w/ Exhibits                               176

13. Declaration of Karen Lucas w/ Exhibits                                  212

14. Declaration of Lindsay Harris (Flores Violations)                       285

15. Declaration of Lindsay Harris (Medical Conditions) w/ Exhibits          290

16. Declaration of Lindsay Harris (Due Process)                             375

17. Declaration of Manoj Govindaiah w/ Exhibit                              385

18. Declaration of Robert Doggett w/Exhibis                                 409

19. Declaration of Alex Mensing w/ Exhibits                                 557

20. CBP Memorandum. Hold Rooms and Short Term Custody. June 2, 2008         810

21. Declaration of Victor Rxxxxx xxxxxxx                                    826

22. Declaration of Walter Axxxxxxxx xxxxxxxxx                               830

23. Declaration of Yeslin Lxxxx xxxxxxx                                     834

24. Declaration of Sara  Exxxxxxxx xxxxx                    837

25. Declaration of Mirna Mxxxxxx xxxxx                     840

26. Declaration of Raquel Axxxxxx xxxxxx                   843

27. Declaration of Yessenia Exxxxxxxx xxxxxxx              846

28. Declaration of Celina Sxxxxxx-xxxx                     849

29. Declaration of Cesia Vxxxxxxxx-xxxx                    854

30. Declaration of Isamar Sxxxxxx xxxxxx                   858

31. Declaration of Kelly Gxxxxxxx-xxxxx                    864

32. Declaration of Maria Dxxxx xxxxxxx                     868

33. Declaration of Lindsey Gxxxx xxxxx                     872

34. Declaration of Katerin Yxxxxxxx xxxxxxx                877

35. Declaration of Sonia Axxxxx-xxxxxx                     881

36. Declaration of Kenia  Yxxxxx xxxxxxx                   884

37. Declaration of Bianca Cxxxxxxxx xxxxx                  888

38. Declaration of Astrid Dominguez                       892

39. Declaration of Karen Zxxxxx xxxxxxx                    895

40. Declaration of Allison Mxxxx xxxxx                     898

41. Declaration of Benina Cxxxxx xxxxx                     903

42. Declaration of Evelin Jxxxxx xxxxxxxx                  907

43. Declaration of Diana Cxxxxx xxxxx                      912

44. Declaration of Amarilis Lxxxxxx xxxxx                  915

45. Declaration of Franklin Rxxxx xxxxxxxxx                918

46. Declaration of Herson Lxxxxxx xxxxx                    922

47. Declaration of Vilma Sxxxx xx xxxx                     925

48. Declaration of Leny A███████ ███████     929

49. Declaration of Edgardo D███████ █████████     932

50. Declaration of Flember J███ ██████████     935

51. Declaration of Karen L███████ █████████     938

52. Declaration of Madelyn M█████████-██████     941

53. Declaration of Faustino C███     944

54. Declaration of Fanny E█████████ ██████████     947

55. Declaration of Josselyn M███████ ███████     950

56. Declaration of Silvia V███████ █████     955

57. Declaration of Yesenia Y█████ ██████     959

58. Declaration of Eloisa R███████ ███████     962

59. Declaration of Melvin M███████ ██████     966

60. Pennsylvania Dept. of Human Services letter to Berks County dated

     January 27, 2016     969

61. Declaration of Dr. Luis Zayas     972

62. Declaration of Jessica Gorelick     1005

63. CARA letter to CRCL and OIG dated March 28, 2016     1010

64. Declaration of Amy Camila Colon     1027

65. Declaration of Jodi Goodwin     1030

66. Declaration of Michelle Garza Pareja     1035

67. Declaration of Amy Fisher     1044

68. Declaration of Karen Lucas     1048

69. Declaration of Katie Shephard     1052

# Exhibit 48
## Conditionally Filed Under Seal

DECLARATION OF LENY A███████████████████

I, Leny A██████████████████, depose and say:

1. I am detained at the detention center in Karnes City, Texas, with my mother, Blanca R██
██████████, who was born in El Salvador on ████████ 1969.

2. My date of birth is ████ 2000. I was born in El Salvador.

3. In summary, I left El Salvador because I suffered death threats. I have explained my situation in detail to the immigration authorities.

4. My mother and I arrived in the United States on January 21, 2016 and presented ourselves to U.S. Customs and Border Patrol soon after entering the United States.

5. My aunt, named Blanca A████, lives at █████████████████████████ and is a United States citizen. She has told me that she would like me to live with her, and I would also like to go live with her in Houston. My aunt works in a restaurant and would be able to take care of me in her home, where she lives with her son, my cousin. My mother would also like me to go live with my ~~aunt~~ mother. If I were released today, my aunt could pick me up and take me to her home. However, as explained below, for the past two weeks no official has talked to me or my mother about who I could be released to pending the outcome of my case.

6. On January 21, 2016, my mom and I were transported to a border patrol station where we were held for about a day and a half. We spent one night in the border patrol station. At that border patrol station, my mother did a video interview. I wasn't present during the interview but she told me about it. She told me that they asked her if she had family in the United States, and she told them that my aunt (my father's sister) lived here and gave them my aunt's address. My mother told me that during the interview, nobody mentioned the possibility that I could be released to my aunt or asked any questions about whether my aunt could take custody of me.

7. On or about January 23, 2016, we were taken to a place called La Perrera (dog cage). After a few hours, we were transported to Karnes, where we are still detained.

8. To this day no officer or employee at Karnes has discussed with me or my mom the possibility that I could be released to my aunt in Houston. To the best of my knowledge no one has contacted my aunt to learn more about whether she can take care and custody of me.

9. I am not a flight risk. I am not a danger to myself or anyone else. I am not a juvenile delinquent. I have fled a violent situation hoping to find protection and safety in this country. Instead, I am being detained with hundreds of unrelated adults and have no idea when or how I will ever be released.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.



Leny A██████████████

Certification of Translation.

I, Virginia Corrigan, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant Leny A█████████████ and he confirmed its accuracy before he executed the declaration.

I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Virginia Corrigan

# Exhibit 49
## Conditionally Filed Under Seal

DECLARATION OF EDGARDO D█████████████████,

I, Edgardo D█████████████, depose and say:

1. I am fourteen years of age and detained at the detention center in Dilley, Texas.

2. My date of birth is █████ 2001. I was born in El Salvador.

3. I am detained here with my mother, Francisca M█████████████.

4. In summary, we left El Salvador because I was threatened with death if I refused to join a gang and my mother was threatened with death if she refused to pay extortion money to a gang.

5. We were apprehended on Monday January 18, 2016, around San Miguel Aleman a few minutes after entering the United States.

6. We were transported to a border patrol station in McAllen where we were held for about 24 hours. We were separated and held in different cells. I know my mother was held at the same place because later we were transported together to a second facility known as La Perrera (dog kennel) and later we have been detained together at Dilley. At the border patrol station in McAllen I was held in a crowded cell with about 15 other minors. The cell was all concrete and had a concrete bench around the edge of the cell. There was a toilet with a short wall around it. The toilet was metal and had no toilet seat. There was one roll of toilet paper. There was a metal sink right above the toilet. There was no soap and no hand dryer or paper towels. Anyone could look over the short wall into the toilet area. The cell was very cold. I did not have a jacket and was not provided a jacket to wear in the cold cell.  I felt very, very cold in that cell. The cell had bright lights on the ceiling. These lights were left on all night long making it very had to sleep. Making it even harder to sleep, we were not given mats or mattresses to sleep on. We were required to sleep on the concrete floor, which was also super cold. We had no pillows or blankets. Each minor was given a thin silver foil paper to cover ourselves with. The minors were so cold we would wrap the foil around us all the time. But it didn't make much difference. Sleeping there was almost impossible. In the morning I was exhausted and the other minors also seemed exhausted.

7. For the one night and next day I was there I was only given one sandwich to eat. This was two slices of dry bread with one slice of bologna in the middle. Nothing else was in the sandwich. The cell had a cooler of water but there was only one cup for all the minors to share and the cooler was very dirty so very few of the minors drank that water.

8. My mom told me later that she asked to see me while we were detained by the border patrol but her request was denied. I was detained by border patrol for two nights and two days and was not allowed to see my mother during that time. The first time I again saw my mother was when we were transported together to Dilley.

9. No one at the border patrol facilities notified me about rights I had as a minor or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. No one asked me if I had relatives in the United States other than my mother who could care for me. I do

have an uncle named Francisco Martinez, a lawful permanent resident, living in Maryland who could care for me if I am released from custody. My mother and I were planning to travel to Maryland to live with my uncle. No one told me that I had a right to see an Immigration Judge about my detention. No one asked me if I feared return to my home country. I have talked to my mother and my mother has said that no one has told her about any rights that I have as a minor, or any rights I may have to see an immigration judge.

10. I came to Dilley with my mother on Wednesday, January 20, 2016. Here at Dilley I cannot call an attorney. The phones available cost 10 cents a minute and someone needs to deposit funds to use the phones. I am not aware of any free phones that can be used by minors or adults to speak with lawyers. As best I remember I have not been told about my rights under the Flores case at this detention facility. I have not been told that any decision has been made about releasing me. I have not been told that I can see a judge about my detention or release. On January 25, 2016 my mother and I were finally interviewed by an officer about whether we feared returning to El Salvador. I told the officer I had been harassed by gangs (Pandeas 18) in El Salvador who demanded I join them or would be killed. If I did not join, they said, they would kill me. This happened about a month before we fled the country. My mother explained that she was also threatened with death if she refused to pay the gang "rent" for running a small used book store. Four days later, on January 29, 2016, we received a decision denying our claim of fear. A form denial is used with a box checked that says there is "no significant possibility that you could establish that the harm you fear would be inflicted by, or at the instigation of, or with the consent or acquiescence of, a government official …"

11. No individualized reasons are given for the denial. We had told the officer during our interview that the police are accomplices with the gangs in their extortion and violence against youth and store owners. We even explained that we faced arrest by the police if we failed to pay extortion by the gangs. We have appealed the negative decision to an Immigration Judge. In the meantime, no officer here at Dilley has said anything to me or my mother about being released from detention or seeing an immigration judge to decide if I or I and my mother should be released from detention. We do not know  how long it will take to see an Immigration Judge about the denial of our fear claim.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.

Certification of Translation.

I, Christopher Clay, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and he confirmed its accuracy before he executed the declaration. I declare under pealty of the perjury that the foregoing certification is true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.

Christopher Clay

2

934

# Exhibit 50
## Conditionally Filed Under Seal

DECLARATION OF FLEMBER J██████████████

I, Flember J██████████████ depose and say:

1.      I am twelve years of age and detained at the detention center in Dilley, Texas.

2.      My date of birth is ████████ 2003. I was born in El Salvador. I am detained here with my mother, Claudia C████████████ and sister Angie F██████████████ (5 years old).

3.      We left El Salvador with my mother, sister and father.  We left because my parents were being extorted for money by gang members every month.  Our family didn't have the money, so the gang members threatened to kill me.  We couldn't move to any other city in El Salvador because we had a non-payment target on our back.

4.      We were apprehended on January 26, 2016, after crossing the river and entering the United States.

5.      After that, we were transported to a border patrol station where we were held for about two days and three nights. I was separated from my family the whole time. I was not allowed to see my mother or my father. I was held with other boys. I barely slept because the floor was too cold, the temperature was very cold, and I was scared. I got very sick, and my nose bled. When I complained of my nose bleeds, the officers said they couldn't do anything. We were give three baloney sandwiches a day. The water tasted like it had bleach and my stomach hurt when I drank it. Later my mom told me that she was given the same thing. My sister who is 5 years old was not given any special food or blankets. The officer threw away the sweater my mom used to keep my sister warm. During the three nights we were there, I was not given the opportunity to shower or brush my teeth. I wore the same clothes the whole time. My mother also told me that she was separated from my father. The toilets at this station were out in the open, with only a short wall surrounding it. The toilet had not water. Everyone could see me when I used the toilet. I had to use the bathroom with no privacy. There was no soap to wash my hands. My sister got sick and threw up.

6.      No one at the border patrol facilities notified me about rights I had as a minor or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. No one told me that I had a right to see an Immigration Judge about my detention. My mother later told me that the officers at the border patrol took her fingerprints. After the second night, my mother was asked if we feared return to my home country. She said yes and explained that we received death threats from the gang. I have talked to my mother and my mother has said that no one has told her about any rights that I have as a minor, or any rights I may have to see an immigration judge.

7.      After being in the border patrol facility for three nights, we were moved to a second place. We were there one day.  My father was not with us anymore.  My mother and sister were separated from me. There were no beds or blankets, only mattresses on the floor. We were given a burrito to eat.

8.  I came to Dilley with my mother and sister on Friday, January 29, 2016 and 11:00PM.  Right now, I cannot use the phones because I have used up all my three free minutes. I am not aware of any free phones that can be used by minors or adults to speak with lawyers. As best I remember I have not been told about my rights under the Flores case at this detention facility. I have not been told that any decision has been made about releasing me. I have not been told that I can see a judge about my detention or release. We have not yet had our credible fear interview.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.



Flember

Certification of Translation.

I, Elena Garcia, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and he confirmed its accuracy before he executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.

Elena Garcia

937

# Exhibit 51
## Conditionally Filed Under Seal

## DECLARATION OF KAREN L██████████████

I, Karen L█████████████, depose and say:

1. I am twelve years of age and detained at the detention center in Dilley, Texas.

2. My date of birth is ████ 2003. I was born in El Salvador.

3. I am detained here with my mother, Ana B██████████████████████

4. In summary, we left El Salvador because I was threatened with death if I refused to be of "service" to a gang and my mother was threatened with death if she refused to hand me over to the gang. The gang then killed and mutilated two of my cousins. My mother and I left El Salvador shortly after.

5. We were apprehended on January 21, 2016, a few minutes after crossing the river and entering the United States.

6. We were first put in a truck with a cage. We called this the "dog catcher." The immigration officers kept us in the truck for a couple of hours. We were still soaking wet. My mother told the officer that we were wet but instead of giving us clothes, he turned up the air conditioner. There were four of us in the truck. My mother and I were then taken to a station and held for 2 hours. The officers took down all our information but didn't inform us of any rights. We were not given any food or water.

7. After that, we were transported to a border patrol station where we were held for about 24 hours. No one at the border patrol facilities notified me about rights I had as a minor or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer. I did not see any telephones we could use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of legal programs to call posted anywhere in my cell. None of the officers questioned me about any relatives I had in the U.S. who could care for me. I do have an uncle named Eliezer living in California who could care for me if I am released. My mother and I were planning to travel to California to live with my uncle.

8. No one told me that I had a right to see an Immigration Judge about my detention. My mother was asked if we feared return to my home country. She said yes and explained that we received death threats from the gang. I have talked to my mother and my mother has said that no one spoke to her about my legal rights as a child, or anything about my right to see an immigration judge. Instead, we were told that we had to sign a deportation paper. My mother told them she would not, and the officer told my mother that he could sign for her. My mother refused to sign this form because the officers refused to read the form back to me. We later found out that the officers filled out the "Record of Sworn Statement" with false information. For example, when asked if we fear persecution upon our return, my mother answered "Yes" and explained our situation. But the form reads "No." When asked why we left our Country, my mother answered that it was because of the gang threats, but the form reads "to find work."

9. The toilets at this station were out in the open, with only a small wall around the toilet. Everyone could see me when I used the toilet. I had to use the bathroom with no privacy. The cell was very cold. We called it the "ice box." I did not have a jacket and was not given a jacket to wear

in the ice cold cell. My clothes were still wet from my journey. Each minor was given a thin silver paper to cover ourselves with but it didn't make much difference. We didn't have beds, blankets or pillows. We were given water that tasted like bleach. This facility was very crowded the whole time we were there. There was about 60 people in one room. There was no space to sit or lay down. We could not sleep because there was no space. I got sick from the cold and also had a really bad headache. We didn't ask for medical help because the officers were so hostile.

10. After being in the "ice box" for about one day, we were moved to a third facility. We called this facility the "dog pound" because the holding rooms looked like cages. We were there one day, and one night. First, they checked us for lice. This facility was horrible because I was separated from my mother the whole night. Later, my mom told me she asked to be put in a room with me or to visit me, but that the officers refused. My mom was put in a room with only adults. I slept on a mattress that night. We were not given any food upon our arrival there. We were only given one sandwich to eat the next morning. This was two slices of dry bread with one slice of ham in the middle. Nothing else was in the sandwich.

11. I came to Dilley with my mother on Sunday, January 23, 2016. Here at Dilley I cannot call an attorney because I cannot afford the phone calls. The phones cost 10 cents a minute. I am not aware of any free phones that can be used by minors (or anyone else) speak with lawyers. My mother feels as though there aren't enough resources to call attorneys and inquire about representation. I have not been told about my rights under the Flores case at this detention facility. I have not been told that any decision has been made about releasing me. I have not been told that I can see a judge about my release.

12. On January 28, 2016 my mother and I were finally interviewed by an officer about whether we fear returning to El Salvador. I told the officer I had been harassed by gangs in El Salvador who demanded I join them or would be killed. They told my mother that if I was not given over to them, they would kill my family. My mother explained the death threats she received and also explained that my cousins had been killed by the same gang. My mom presented the death certificates for my cousin's death which indicated how they were killed. We have not yet received a decision regarding our claim of fear.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.



Karen L[redacted]

Certification of Translation.

I, Elena Garcia, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 2nd day of February, 2016, in Dilley, Texas.

Elena Garcia

940

# Exhibit 52
# Conditionally Filed Under Seal

Declaration of Madelyn M█████████

I, Madelyn M█████████, depose and say:

1. I am thirteen years of age and detained at the detention center in Dilley, Texas.

2. My date of birth is █████████ 2002. I was born in El Salvador.

3. I am detained here at Dilley with my mother, Elsy N█████████.

4. In brief, we left El Salvador because of threats of violence against me at the school I was attending.

5. I entered the United States with my mother on or about May 12, 2015. We entered without inspection and were quickly apprehended near McAllen, Texas. We were detained at border patrol facilities in McAllen for a few days and then transferred to Dilley. We were detained at Dilley for about a month and eight days and then released on a bond of $5,000 after it was found that we had a fear of return to El Salvador. We went to Atlanta, Georgia, where we lived with my father Joel Edgardo Menjivar. I attended school in Atlanta starting in August 2015. While I was in detention before my release the authorities never gave me any notice of my rights as a juvenile or under the Flores case.

6. In Atlanta I appeared with my mother before an Immigration Judge. This was about July 2015. We did not have a lawyer with us. The judge told us we had to come next time with an attorney. We went back to the court in about August and this time had an attorney my mother or father paid for. The judge gave us another date to appear in about September. In September we went to court with the attorney and were told there was an order of deportation against us. I did not understand what was happening in the hearing. The attorney told us not to worry that she was going to get us permission to remain in the country for another year.

7. During this time I continued in public school in the seventh grade and we lived with my father. My mother told me around December that our attorney was still saying that she would soon get us papers to remain in the United States.

8. On January 3, 2016, immigration agents came to our house and arrested my mother and me. I was still on school break. They took us to the immigration office in Atlanta. Around 5 PM we were put on an airplane and brought back to Dilley. We have now been here for about one month.

9. During our time here at Dilley no one has given me or my mother any notice about my rights as a minor or my rights under the Flores case. No one has questioned me about release and placement back with my father. To the best of my knowledge my father has never been arrested or charged with any crimes in the United States. My father works as a painter and rents a 4 bedroom house in Atlanta. He has never abused me or my mother in any way that I am aware of. He took good care of me while we were living with him in Atlanta.

942

10. While here at Dilley for the past month no one working with the immigration
has talked to me about being released or my right to see a judge to decide if I should be
released. My mother has told me that while we have been detained here no one has
spoken to her about us being released or my right to see a judge about my release.

11. Here at Dilley there is a high fence surrounding us and we cannot leave the
detention center. There are guards everywhere. It is too far from Atlanta for my father to
visit us. We share a room with three other families. Guards come into our rooms at night
every hour to check on us. I am always afraid that we are close to being deported and
returned to El Salvador where we will not be safe. I am very depressed and worry every
day about our situation. I am told that our removal from the country has been temporarily
blocked. I have no idea how long this process is going to take. I did not run away when
we were released before and I have no idea why I am being detained now with unrelated
adults, without a hearing and without being released until our case is resolved.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed
this 2nd day of February, 2016, in Dilley, Texas.



Madelyn M█████████

Certification of Translation

I, Christopher Clay, depose and say: I am fluent in English and Spanish. I read the above
declaration to Madelyn M██████████ and she confirmed its accuracy before she executed the
declaration. I declare under penalty of the perjury that the foregoing certification is true and
correct. Executed this 2nd day of February, 2016, in Dilley, Texas.

Christopher Clay

2

943

# Exhibit 53
## Conditionally Filed Under Seal

1

Declaration of FAUSTINO C██████

I, Faustino C████ depose and say:

1. I am a citizen of Guatemala.

2. My date of birth is ████████ 1983.

3. I left Guatemala with my son, WILLIAM S████████████████, born ████████ 1999, because my brother was killed in 2015 and it was not safe for us to remain in the country. My son and I were apprehended by US Border Patrol on Friday January 29, 2016, near McAllen, Texas.

4. Since our arrest, I have not been allowed to visit with my son. We were detained in a Border Patrol station for 3 nights. We were held in different cells. We finally were together for a few minutes when we were transported to the Ursula facility where we are now detained in separate pods.

5. When being transported here my son told me that while he was detained at the Border Patrol Station, like me, he had to sleep for about three nights on a cold concrete floor, he had no mattress or blanket, and he was given a silver sheet to cover himself at night. Like me he was only given three thin sandwiches a day with one slice of cold meat, one for breakfast, one for lunch, and one for dinner.

6. Both my son and I asked to visit each other and these requests have been denied. My son told me when being transported here that no one with the border patrol has told him anything about his rights and

945

② FAUSTINO C█████

no one has told me about his rights as a ~~te~~ minor. No one has told me about my son's rights under the Flores cases

7. I am informed that I may soon be released with my son because the authorities here only detain mothers with children.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 1st day of February 2016 in McAllen, Texas.

█████████████████████

FAUSTINO C█████

I Astrid Dominguez declare that I'm proficient in English and Spanish. I obtained the above declaration from Faustino C█████ and read it to him in the Spanish language. He affirmed its accuracy before executing and dating the above declaration.

I declare under penalty of perjury that the above paragraph istrue and correct. Executed this 1st day of February, 2016, in the city of McAllen, TX

946

# Exhibit 54
## Conditionally Filed Under Seal

Declaration of Fany E███████████████████

1. I am a citizen and national of Honduras. I was born on ████████, 1991.

2. I am currently detained at the ICE detention center in Karnes Texas with my son, Kenner S████████████. Kenner was born on ████████, 2012 in Honduras.

3. I first entered the United States on Thursday December 17, 2015 and was apprehended by U.S. Border Patrol on Friday December 18, 2015.

4. I was held by the Border Patrol with my son for two days and two nights. I do not know the location where I was detained. My son and I had to sleep on the floor. The room where we were held was very cold and very crowded. We were not given mattresses or blankets. We were each given a foil sheet to use as a blanket. The floor we had to sleep on was very hard and very cold. Bright lights were kept on all day and all night long. With these conditions it was almost impossible to sleep for several days. There was no soap to wash with. There were no cloth or paper towels to dry ourselves with. There was only a metal toilet with no toilet seat everyone had to share, and a small sink sitting right above the dirty toilet with only cold water. We got very little food while there. We got food two times a day but the quantities were tiny and Kenner and I were very hungry the whole time we were detained. This experience was terrifying for both of us. We were exhausted from lack of sleep, hungry, had no access to telephones, and were locked down in a dirty overcrowded cell for two days and nights. During this time no one told me that my son had any special rights under the Flores case. I tried to explain that I feared return to Honduras, but no one seem to care and I was having trouble communicating because I felt very sick from the trip.

5. On or about December 20, 2015, I was woken at about 4 AM and Kenner and I were transported to Karnes where we have been detained since that time. Here at Karnes no officer has explained any special rights my son may have under the Flores case.

6. I was finally given a fear interview about fifteen days after arriving here at Karnes. I do not know why it took about two weeks to schedule the fear interview. I was interviewed over the course of a few days, on January 4, 6, and 7, 2016. I do not know why I was interviewed on three different days. I did not have an attorney present to help me during the interview.

7. On January 8, 2016 I received a negative determination on my credible fear interview and received a notice of referral to an immigration judge. I cannot read the form because its in English but I have been told one box is checked saying that there is a significant possibility that my statements underlying my claim could be found credible in a full asylum hearing but that I have not established a credible fear of persecution. I am afraid to return to Honduras because I was threatened by the people who killed my cousin. I was working with my cousin and I saw people come into the place we were working. I fled and my cousin was killed. After that, I received threats because the

1

948

people who killed my cousin believed I would report on them. They threatened to kill me. I told the person who interviewed me all of this.

8. I did not receive a hearing before the immigration judge until January 16, 2016. I do not know why it took so long to receive a hearing before an immigration judge. The judge affirmed the decision of the asylum officer.

9. My attorney asked for a reconsideration of my case shortly after my hearing before the immigration judge. That request was not denied until on or about January 29, 2016. I do not know why it took so long for my request to be denied.

10. Since being at the Karnes facility, my son has not been eating anything but apples and bananas. We have not been able to drink much water because it tastes like chlorine. Being detained this long has really been affecting my son negatively. I have been having trouble sleeping because I am so worried for my son.

I declare under penalty of perjury the foregoing is true and correct. Executed this 3rd day of February, 2016 in Karnes City, Texas.



Fany E█████████████████████z

Certification of Translation

I, Virginia Corrigan, depose and say: I am fluent in English and Spanish. I read the above declaration to Fany E███████████████████ and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes City, Texas.

Virginia Corrigan

2
949

# Exhibit 55
## Conditionally Filed Under Seal

Declaration of Josselyn M████████

I, Josselyn M████████, declare
under penalty of perjury that the following
is true to the best of (my recollection
and knowledge, and that the following
statement has been read to me in Spanish.
1. My name is Josselyn M████████
2. I am from El Salvador.
3. I am 14 years old. I was born ████ /200█
4. I came to the US with my father,
   JOSE A█████████████████████, and
   my brother, Oscar H████████████
   ████████. Oscar is 17 years old.
5. I was am not sure when immigration
   caught me. I think it was Saturday
   January 30, 2016 around 6 pm.
6. Since I was apprehended I have not
   spoken to immigration officials or been
   interviewed. They have not explained
   anything to me or given me any
   papers.
7. I have been held in a cement cell
   with other women and their children.
   I have not seen or spoken to my
   father or brother since being placed in
   this cell. This cell is very crowded.
I think there are 40 or 50 people here. Yesterday I think
   there were more than 70 people in this cell.

8. I am afraid to return to El Salvador. My two brothers were killed. I cannot think about this without crying. I have cried a lot since arriving to this station. I want to tell someone who can help me that I am afraid.

9. I have not seen a Judge and no one has told me that I have a right to see one.

10. The lights have been on since I got to this station. There are no beds or blankets here, just pieces of foil. I have slept on the concrete floor and a concrete bench that lines the wall. They are very cold. I wish there was a mattress or pillows here.

11. I have not been told I can have a lawyer or been given a list of phone numbers for lawyers.

12. The food here is not good. It is always the same - a bad sandwich.

13. The water tastes like chlorine.

14. There is no door on the bathroom, so there is not privacy.

15. I have not been given access to a phone or told I can make a phone call. I would like to call my mom, because she is in the United States.

16. I have not been told I can speak to my consulate.

There is no where to shower or bathe. There is a sink, but it is broken and a water comes out. There is no soap.

They have not given me a brush, towel or toothbrush.

The sandwich 3 times a day. It is 2 pieces of bread and one slice of ~~bologna~~ ham.

17. I have only been taken out of this cell when they clear it and when they distribute the food. I have not had the chance to go outside or play.

18. This place makes me scared and sad.

19. I also want to talk about the way the people here treat me. They are very mean and angry. They scream.

20 I want to get out of here as quickly as possible and do not understand why I have been here so long.

2/1/2016

Certification of Translation

I, Shalyn Fluharty, depose and say: l am fluent in English and Spanish. I read the above declaration to Josselyn M███████ and she confirmed its accuracy before she executed the declaration. I declare under penalty of perjury that the foregoing certification is true and correct. Executed this 1st day of February, 2016, in McAllen, Texas.

Shalyn Fluharty

954

# Exhibit 56
# Conditionally Filed Under Seal

DECLARATION OF SILVIA V█████████

I, SILVIA V█████████, DEPOSE AND SAY:

1. I AM A CITIZEN OF GUATEMALA. I AM PROVIDING THIS STATEMENT WHILE DETAINED AT A BORDER PATROL FACILITY IN McALLEN, TEXAS.

2. MY DATE OF BIRTH IS █████, 1996. I WAS BORN IN MONJAS, JALAPA, GUATEMALA.

3. I LEFT GUATEMALA WITH MY MOTHER, BLANCA ESTELA LIMA GARCIA, MY THREE YEAR OLD BROTHER ALVARO C███ ████, AND MY TWO YEAR OLD SON JUNIOR A█████████ █ ██. WE FLED GUATEMALA AS A RESULT OF VIOLENT DOMESTIC ABUSE INCLUDING VIOLENT PHYSICAL ATTACKS AND DEATH THREATS. WE WERE APPREHENDED BY U.S. BORDER PATROL AS SOON AS WE ENTERED THE COUNTRY CLOSE TO McALLEN, TEXAS.

4. HERE AT THE BORDER PATROL FACILITY WE ARE HELD IN A CELL WITH ABOUT THIRTY TO FOURTY OTHER MOTHERS AND CHILDREN. THE CELL HAS NO FURNITURE. THERE IS A CONCRETE FLOOR AND CONCRETE BENCH AROUND THE WALLS OF THE CELL. PEOPLE FILL THE FLOOR AND BENCHES. EVERYONE SLEEPS ON THE CONCRETE FLOORS AND BENCHES SIDE BY SIDE. THE BRIGHT LIGHTS ON THE CEILING STAY ON ALL NIGHTS. WE HAVE NO MATTRESSES OR PILLOWS OR BLANKETS. WE ONLY HAVE A THIN SILVER FOIL PAPER TO COVER OURSELVES WHEN TRYING TO SLEEP. IT IS VERY HARD TO GET ANY SLEEP BECAUSE THE FLOOR IS HARD AND COLD, THE CELL IS VERY CROWDED, THE LIGHTS ARE ON & VERY BRIGHT, AND CHILDREN ARE CRYING AND COUGHING ALL NIGHT

② SILVIA ████

LONG.

5. WE HAVE NO SOAP, NO TOWELS, NO TOOTHBRUSHES, NO PAPER TOWELS, NO BABYWIPES, ETC. IN THE CELL THERE ARE 2 METAL TOILETS WITH NO TOILET SEATS AND TWO SMALL METAL SINKS (WITH NO SOAP) USED TO WASH OUR HANDS AND FOR DRINKING. THE SINKS ONLY HAVE COLD WATER. IN THE CELL THERE IS A PLASTIC CONTAINER WITH WATER BUT OFTEN THERE ARE NO CUPS TO USE TO GET WATER FROM THE CONTAINER.

6. OUR ONLY FOOD HAS BEEN TWO PIECES OF BREAD WITH ONE THIN SLICE OF BOLOGNE OR SOMETHING THAT LOOKS LIKE MEAT. THESE SANDWICHES ARE DISTRIBUTED FOR BREAKFAST, LUNCH AND DINNER. EVERYONE ALSO GETS A SMALL PLASTIC CONTAINER (250 ML) OF "FRUTOSO" TWICE A DAY. THIS TASTES LIKE COLORED WATER WITH SUGAR. WE ARE VERY HUNGRY BECAUSE OF THE LACK OF FOOD AND EXHAUSTED BECAUSE OF LACK OF SLEEP AT THIS FACILITY.

7. WE HAVE NO PHONES TO CONTACT LAWYERS OR FAMILY MEMBERS. YOU HAVE TO REQUEST TO USE A PHONE AND PERMISSION MAY BE GRANTED OR DENIED. EITHER WAY, THERE ARE NO PHONES WHERE YOU CAN HAVE A CONFIDENTIAL CONVERSATION WITH A LAWYER,

8. NO EFFORTS HAVE BEEN MADE BY THE BORDER PATROL TO RELEASE MY BROTHER OR MY SON TO TWO UNCLES LIVING IN CONNECTICUT, U.S.

957

③   SILVIA ▋▋▋▋▋

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE & CORRECT. EXECUTED THIS FIRST DAY OF FEBRUARY, 2016, IN McALLEN, TEXAS.

▋▋▋▋▋

SILVIA V▋▋▋▋▋▋

I Astrid Dominguez declare that I'm proficent in English and Spanish. I obtained the above declaration from silvia V▋▋▋▋ and read it to her in Spanish language, she affirmed its accuracy before executing and dating the above declaration

I declare under penalty of perjury that the above paragraph is true and correct. Executed this 1st day of February, 2016, in the city of McAllen, TX

958

# Exhibit 57
## Conditionally Filed Under Seal

DECLARATION OF Yesenia Y███████ A# _____

I, Yesenia Y███████, declare under penalty of perjury that the following is true to the best of my recollection and knowledge, and that the following statement has been read to me in the Spanish language:

1. I am a citizen of El Salvador.

2. My date of birth is ███ , 1992.

3. I left El Salvador with my son, whose name is Dinien A████████ His date of birth is ███ 2014.

4. I left El Salvador because I was afraid for my life and the life of my son.

5. I came into contact with and presented myself to U.S. Border Patrol Agents about 20 minutes after entering the U.S. on Sunday, January 31, 2016, near McAllen, Texas. I presented with my son.

6. I have been detained by Border Patrol since Sunday, January 31, 2016.

7. After presenting myself, my son and I waited for about 8 hours by the side of a road. I was not given any food. I waited with my son from about 4 p.m. to about midnight.

8. I was brought to this center last night in the middle of the night. I sat with my son on a concrete bench and was unable to sleep. No one is provided a mattress or pillow. If a person asks, they receive a silver paper. I did not ask and did not receive one. No one receives any toiletries.

9. Since I was apprehended I have not been given any toiletries for myself or my son. In the cell there is a toilet and a small sink shared by about 30 people with no soap. It has a small wall to provide partial privacy. We have no soap, toothbrushes, or combs.

10. The cells have the lights on all the time. We only get bread sandwiches with something in them. We have been given food twice since I have been here. Everyone in the cell

███████████████                    February 1, 2016          (see
                                                           overleaf)
                                   Date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to

Yesenia Y███████ _____ in Spanish.

[signature]                              February 1, 2016

~~Maria Fortino~~ Virginia Corrigan              Date

960

is tired and hungry.

11. I have not had the chance to use the phone to call anyone. I have not had the chance to speak to an attorney about my immigration case.

12. My son has diharrea and I am pregnant. ~~Nothing~~ We have not seen a doctor.

13. I want to leave this place. I am very uncomfortable.

February 1, 2016

961

# Exhibit 58
## Conditionally Filed Under Seal

Declaration of Eloisa R█████████

1. My name is Eloisa R█████████

2. I am a citizen of Mexico.

3. My date of birth is █████, 1976.

4. I left Mexico because my husband and family were threatened. I feared for my life in Mexico.

5. I fled Mexico with my husband and my daughter. My daughter is named Laura L████████████, born on █████, 1998.

6. I came into contact with U.S. Customs and Border Patrol on Friday or Saturday, January 29 or 30, 2016. I was apprehended with my husband and daughter.

7. After I was apprehended, I was taken with my husband and daughter to a facility where my fingerprints were taken. My husband was separated from me and I have not seen him since.

8. My daughter and I were taken to another facility, where we spent a day and a night. We were in a cell with about 60 people. We could not lie down to sleep, we were not given mattress. My clothes and my daughter's clothes were wet and we were not given dry clothes. I was very cold. After about 4 hours I was given a silver blanket.

9. My daughter and I had a joint interview on the phone. I told the agent I was afraid to return to Mexico.

10. I arrived at this facility around 5 in the afternoon on Sunday, January 31, 2016. My daughter was separated from me. I have only spoke to her for half an hour since.

11. I have not had the opportunity to make a telephone call since coming into custody.

12. I was very cold at night in the first facility.

13. When I was interviewed, I wasn't given any paperwork.

963

about my rights or about attorneys.
I declare ~~~~~~~under penalty of perjury that the above facts ar.
true and correct. Executed this 1st day of February, 2016 in
McAllen, Texas.

Certification of Translation

I, Virginia Corrigan, depose and say: I am fluent in English and Spanish. I read the above declaration to Eloisa R█████████ and she confirmed its accuracy before she executed the declaration. I declare under penalty of perjury that the foregoing certification is true and correct. Executed this 1st day of February, 2016, in McAllen, Texas.

Virginia Corrigan

# Exhibit 59
## Conditionally Filed Under Seal

## DECLARATION OF MELVIN M████████

I, Melvin M████████, depose and say:

1.  I am sixteen and detained at the detention center in Karnes, Texas.

2.  My date of birth is ████████, 1999. I was born in Honduras.

3.  I am detained here with my mother, Oneyda G████████

4.  We left Honduras because we were targeted by the gang. I was walking down the street on my way to school on November 7, 2015; during this walk, several men from a gang approached me. The gang told me that if I did not join the gang and sell drugs, that they would kill me and my mother. I told them I could not, so they beat me up. On November 12, 2015, the gang members started called my house many times to threaten to kill me. They told my mom that if I did not sell drugs, they would also kill me and her. The calls continued for about a month. On December 17, 2015, the gang told my mother that if I did turn my son over, that they would kill us. We left Honduras on December 20, 2015.

5.  We were apprehended on or about January 20, 2016 after crossing the river. We were first put in a truck. They took away all our belongings, even our shoelaces. They threw away my asthma medicine.

6.  My mom and I were then taken to the McAllen Border Patrol Station. We called this the "ice box." We were there one day and a half. They separated me from my mom. I was told I was too old to be with my mom. We were fed a sandwich three times a day with some juice. They did not let us shower or brush our teeth. We would sleep on the floor with no blankets or pillows. The place was very cold – we could not stand how cold it was. There was a toilet it was surrounded only by a short wall. There was no privacy. No one at the border patrol facilities notified me about rights my rights as minors or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. There was one toilet for everyone that was there. It was very crowded. There was space to sit down but there was no space to lie down. While there, they took my fingerprints but did not ask any questions. Later, I found that there was a Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act (Form I-867A), but I didn't see any form at the station, was not asked to sign it, and was not even asked any questions. For example, the form has a transcript of questions I was allegedly asked, but I was *not asked one question*. In answer to the question "Why did you leave your home country or country of last residence?" the form indicates I answer "I came to work," when in fact, I was not even asked the question. The form indicates that I refused to sign this form, but I was not asked to sign this form.

7.  My mother told me that in McAllen, she tried to explain why were scared to go back to Honduras. When she tried to explain it, the officer told her that he didn't care about our story. The officer made her cry.

8.  After that, we were transported to another border patrol station where we were held for another day and half. They separated me from my mother again. No one at the border patrol

facilities notified me about rights my daughter or son had as minors or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. No one asked me why I left Honduras. They fed us a burrito, small water bottle and some chips. Here, we could not shower or brush our teeth.

9. I came to Karnes with my Mother on or about January 23, 2016. To the best of my recollection, I don't remember anyone explaining that I had any rights as a minor under the Flores case. In fact I knew nothing about the Flores case until today when lawyers came to visit Karnes to check about minors' treatment under the Flores case. My mother has a friend who lives in the United States - she has known him for 16 years. No one with the border patrol or here at Karnes has talked to me or my mother about whether her friend could care for me and house me if I am released from this detention center. I am not aware of any steps taken by the authorities to get me released from custody.

10. I didn't have my first credible fear interview until about February 1, 2016. This was about ten days after I was detained at the border patrol facility and my mother communicated our fear of returning to Honduras. The interview lasted more than two hours. They asked questions to both me and my mother. The immigrant officer only spoke English, but someone translated for us over the phone. I told the officer about the death threats I received from the gangs.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 3rd day of February, 2016, in Karnes, Texas.

Melvin M███████

Certification of Translation.



I, ~~Elena Garcia~~ Virginia Corrigan, depose and say: I am fluent in English and Spanish. I read the above declaration to the declarant and she confirmed its accuracy before she executed the declaration. I declare under penalty of the perjury that the foregoing certification is true and correct. Executed this 3rd day of February, 2016, in Karnes, Texas.

~~Elena Garcia~~
Virginia Corrigan

968

# Exhibit 60
## Publicly Filed



**pennsylvania**
DEPARTMENT OF HUMAN SERVICES

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
**MAILING DATE:**   JAN 2 7 2016

Ms. Diane Edwards, Executive Director
Berks County Commissioners
633 Court Street
Reading, Pennsylvania 19601

RE:   Berks County Residential Center
1040 Berks Road
Leesport, Pennsylvania 19533
License #: 224580

Dear Ms. Edwards:

The Department of Human Services (Department) is not renewing the certificate
of compliance issued to the Berks County Commissioners to operate the Berks County
Residential Center as a child residential facility pursuant to the Article IX of the Human
Services Code, 62 P.S. §§ 901 et seq., Article X of the Human Services Code, 62 P.S.
§§ 1001 et seq., and 55 Pa. Code Chaps. 20 and 3800 when your current certificate of
compliance expires on February 21, 2016.  The Department is also revoking the
certificate of compliance effective from February 21, 2016 to February 21, 2017, issued
on November 9, 2015.  As the Department notified you by letter of November 17, 2015,
that certificate was issued as a result of a systems error.  (See Attachment 1.)

This decision to NON-RENEW and REVOKE the certificates of compliance is
based on the Department's determination that Berks County Residential Center is not
operating as a child residential facility under the Human Services Code or the
Department's regulations.  Instead, Berks County Residential Center is operating as a
residential center for the detention of immigrant families, including adults.

By letter of October 22, 2015, the Department informed Berks County Residential
Center that it does not license family residential centers.  (See Attachment 2.)  On or
about October 30, 2015, Berks County Residential Center filed a petition to appeal the
October 22, 2015 letter.  That appeal is currently pending before the Department's
Bureau of Hearings and Appeals at docket number 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.  After receiving the
petition, by letter of November 10, 2015, the Department requested that Berks County
clarify its intent to operate Berks County Residential Center as a child residential facility.
(See Attachment 3.)  By letter of November 23, 2015, counsel for Berks County and the
Berks County Residential Center confirmed the county's intent to continue operating
Berks County Residential Center as a family detention center.  (See Attachment 4.)

Bureau of Human Services Licensing
625 Forster Street, Room 631 | Harrisburg, PA 17120 | 717.783.3670 | F 717.783.5662 | www.dhs.state.pa.us

970

Ms. Diane Edwards                          2

The Department will not issue or renew a certificate of compliance for a type of facility or agency that the applicant does not, and does not intend, to operate. If you choose to operate a child residential facility for children who are not accompanied by their parents or other responsible adults in the future, you must first apply for and obtain the appropriate certificate of compliance.

Based on the decision to NON-RENEW and REVOKE your certificates of compliance because Berks County Residential Center is not a child residential facility, the Department also DENIES your March 9, 2015 request to increase the maximum capacity specified on the certificate of compliance.

If you disagree with the decision to NON-RENEW and REVOKE your certificates of compliance, you have the right to appeal through hearing before the Bureau of Hearings and Appeals in accordance with 1 Pa. Code Part II, Chaps. 31-35. If you decide to appeal this decision, you must submit a written request for an appeal, even if you have other appeals pending before the Bureau of Hearings and Appeals or any other forum. Any appeal of this decision must be received within 10 days of the date of this letter by:

>Jacob Herzing, Enforcement Manager
>Human Services Licensing
>Department of Human Services
>Room 631 Health and Welfare Building
>625 Forster Street
>Harrisburg, Pennsylvania 17120

This decision is final 11 days from the date of this letter, or if you decide to appeal, upon issuance of a decision by the Bureau of Hearings and Appeals.

>Sincerely,
>
>Matthew J. Jones
>Director

Enclosures

# Exhibit 61
## Publicly Filed

## DECLARATION OF LUIS H. ZAYAS

I, Luis H. Zayas, declare as follows:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

## I.  Qualifications

1.   I am presently the Dean of the School of Social Work at the University of Texas at Austin.   I also occupy the Robert Lee Sutherland Chair in Mental Health and Social Policy.

2.   I hold a Master of Science degree in social work (1975), and a Master of Arts (1984), Master of Philosophy (1985), and Doctor of Philosophy (1986) in developmental psychology, from Columbia University in the City of New York.

3.   Prior to becoming Dean at the University of Texas, I was the inaugural Shanti K. Khinduka Distinguished Professor of Social Work, and a Professor of Psychiatry, School of Medicine at Washington University in St. Louis.  I was also founding director of the Center for Latino Family Research.  Prior to my ten years at Washington University, I was professor of social work at Fordham University where I also directed the Center for Hispanic Mental Health Research; visiting associate professor of family medicine and visiting associate professor of psychiatry at Albert Einstein College of Medicine; and

973

assistant professor of social work at Columbia University in the City of New York.

4.   I have been a practicing clinician since 1975 in child and adolescent psychiatry and primary care medicine.  I am a licensed psychologist and licensed clinical social worker in the State of Texas, and have held psychology licenses in New York and Missouri and a clinical social work license in New York.

5.   This background encompasses clinical practice, teaching and research in child and adolescent mental health, child development, child-rearing, and family functioning.  I have been a clinician in general acute care hospitals and in outpatient mental health clinics in inner city settings.  My specialty has been on minority and immigrant families and their children, and I have conducted research in prenatal and postpartum depression, child-rearing values, alcohol use among Hispanic men, ethnicity and psychiatric diagnosis, suicide attempts of young Hispanic females, and effects of deportation on U.S. citizen-children of undocumented immigrants.

6.   My research has been funded by the National Science Foundation and the National Institutes of Health (specifically, National Institute of Mental Health; National Institute of Child Health and Human Development; National Institute on Minority Health and Health Disparities).  Since 2006, I have focused my clinical and research attention on the U.S.-born and foreign-born children of undocumented immigrants, mostly from Mexico and Central America.

7.   I have published over 100 papers and chapters in scientific and professional journals and books.  I have authored two books, *Latinas Attempting Suicide: When Cultures, Families, and Daughters Collide* (Oxford University Press, 2011), and *Forgotten Citizens:*

974

*Deportation, Children, and the Making of American Exiles and Orphans* (Oxford University Press, 2015).

8.   I have previously testified as an expert witness in eleven cases in immigration court. I have also testified in Texas circuit court in the case of *Grassroots Leadership, Inc., v Texas Department of Family and Protective Services et al.* (2015).  I have given numerous scientific talks on the subject of the effects of detention on refugee and immigrant children's mental health, including a presentation before the U.S. House of Representatives.

9.   A copy of my curriculum vitae is attached hereto as Exhibit A to provide further information on my professional career.

10.   In this declaration, I provide an overview of the scientific literature that addresses the health and mental health impact of immigration and detention on children and adults of different nationalities, ethnic and racial groups under various circumstances.  Where there was insufficient evidence on immigration detention per se, I extrapolated from the literature covering the effects on children of parents' incarceration and juvenile detention (e.g., Elkington, 2015).  The synthesis of this scientific literature is supported by my 40 years of experience as a clinical mental health practitioner and researcher.

11.   I am making this declaration to provide a scientific basis for understanding the damaging psychological and developmental effects that immigration detention has on children and their parents.  Appended to this declaration is a reference list of all relevant scientific literature cited in this declaration and that were used in forming my conclusions.

## II. Summary of the Scientific Literature on Children in Detention

12.  Much of the research findings on children who have experienced periods of detention conclude that such children will require years of mental health services to alleviate the impact of living under restrictive conditions.  The stress, despair, and uncertainty of detention –even for short periods—compromise children's intellectual and cognitive development and contribute to the development of chronic illnesses. Institutionalization and the threats faced by children in detention have impacts similar to those of other forms of trauma.  During and after the detention period, children experience recurrent, distressing memories, nightmares, dissociative reactions, prolonged psychological distress, and negative alterations in cognition.

### A.      Detention of Asylum-Seekers and other Migrants

13.  The findings reported in the scientific literature on the detention of asylum-seeking mothers and children in facilities like those in Karnes City and Dilley, Texas, and Berks, Pennsylvania are very uniform in showing the deleterious impact of incarceration or detention on children.  Valdez, Valdez, and Sabo (2015) report that in interviews with detainees and volunteers who assisted refugee mothers and children, one of the major themes that emerged was the "dehumanization of detention," referring to the cold, windowless rooms that they occupied.

14.  Depression, self-harm and suicidal behavior, and emotional disturbances in young children in immigration detention have been reported (Silove et al., 2007).  Children and adolescents in immigration detention facilities report, according to Fazel et al. (2014), increased rates of deliberate self-harm and suicidal behavior, voluntary starvation, severe

depression, sleep difficulties, somatic complains, anxiety, and PTSD reactions, along with poor nutrition, regression in language development, bedwetting, and social withdrawal. The self-harm and suicidal ideation and action while in detention is often born of the boredom, sleeplessness, depression and even psychotic symptoms that occur during detention.

15.   Research findings suggest that detaining asylum seekers, both children and adults, exacerbates symptoms of depression, anxiety, and PTSD.  Refugees and immigrants with PTSD due either to pre- and peri-migration trauma, as well as post-detention trauma, may exhibit psychological dissociation and altered states of consciousness that may cause them to give inappropriate answers to questions posed by interviewers, guards, and other detention personnel (Silove et al., 2000).  In an examination of the incidence of suicide and self-harm among asylum seekers in the U.K, both in detention centers and in the community, Cohen (2008) found that detention raises the risk of self-harm and suicide attempts.

16.   Steel et al. (2006) investigated the long-term mental health effects of mandatory detention on 241 adult refugees.  Their results show that the most negative experiences of detention came from fear of being returned to their home country, separation from family, worries about family back home, and boredom.  Other results by Steel et al. show that many of the symptoms that detainees showed after detention were feeling extreme sadness and hopelessness; sudden and upsetting memories of detention; images of threatening and humiliating events in detention; nightmares about detention; and feeling numb since being in detention.  Keller et al. (2003) interviewed 70 asylum seekers in detention facilities in

New York, New Jersey, and Pennsylvania.  At baseline, 77% of participants had clinically significant symptoms of anxiety, 86% of depression, and 50% of PTSD.

17.  Detention of parents and children together is also known to have negative effects on parenting.  The negative impact comes from the lack of opportunities for adults to provide adequate caring of their children in detention centers as a result of the disruption in the family unit and from the illness of parents, role reversals, and parental guilt at not being able to protect and provide for their children (Silove et al., 2007).  Detention disrupts family life, parenting capacity, and parental discipline (i.e., parents are not the final decision makers in their children's lives while in detention).  Parenting is thwarted, from being unable to prepare meals for their children to not being able to provide comforting words about their futures (Mares & Zwi, 2015).  Because the lives of adolescent refugees are laden with uncertainty, Afifi et al. (2013) studied the existence of elevated levels of uncertainty (i.e., lack of confidence in one's ability to predict future outcomes) on personal security.  Results show that uncertainty regarding personal security is highly related to levels of hopelessness.  Of greater concern in these findings is that a child's personal sense of uncertainty is not mitigated by mothers' supportive communication.   The sense of indeterminacy in detention is acute and thus becomes a major contributor to negative health and mental health symptoms, particularly for those seeking recognition as refugees, as shown by Afifi et al. (2013).

18.  The deprived conditions of detention—in which children cannot experience developmentally normative activities, events and milestones, and parents cannot be adequate parents—also affects peer and family relations (Newman & Steel, 2008).

Detention hinders the development of appropriate peer relations, creates imbalances in the parent-child dynamics, and undermines the attachment bonds between parent and child and among siblings.  Overall, negative peer and family relations have negative impacts on overall mental health.

**B.     Maternal Incarceration with Children in the Criminal Justice Context and Juvenile Detention**

19. Research in the context of mothers jailed in the criminal justice system whose infants and children remain with them in jail shows that such children often have more maladaptive social and emotional development, academic failure, and later criminal involvement compared to other children (Byrne et al., 2012).  With infants, the disruption of their emotional attachment to their mothers, as a result of the restricted institutional environment, can lead to insecure bonding of the infant with the mother.  Since attachment also predicts future behavior, insecure levels of attachment will result in suboptimal development.  Indeed, disruptions in attachment affect general growth and development of the brain as well as social functioning, aggression, and reactions to stress.  Disruptions in attachments to parents and caring adults is particularly traumatizing to already vulnerable children and is associated with disorganized attachment (Newman & Steel, 2008).

19.  Detention or institutionalized living, and child-rearing in prisons, is a major childhood traumatic stressor, even under conditions of short or brief detentions (Foster & Hagan, 2013).  Findings show that the childhood trauma from such experiences increases depressive symptoms among children long after they leave the institution. Longitudinally,

979

children who have experienced childhood trauma between the ages of 5 to 14 are at increased risk for dropping out of high school later in their lives.  Likewise, children exposed to childhood trauma between birth to 5 years and then from 11 to 16 years show high levels of depression and other internalizing behaviors (i.e., withdrawal, rumination) as well as externalizing behaviors (i.e., aggression, defiance and oppositionalism, fighting, vandalism, cruelty).  Such externalizing behaviors in children often mask clinical depressive symptoms and suicidality (as seen in aggressive, provocative behavior toward persons in authority often police and law enforcement that can lead to fatal encounters, commonly known as "suicide by cop").

20.  The scientific literature from the juvenile detention context also shows the negative effects of children's detention or incarceration on their future psychological health.  Of 1,829 youth who were in juvenile detention during their teen years, 27% of males and 14% of females had what are known as "co-morbid" psychiatric disorders, that is, co-occurring problems (Abram et al., 2014).  Most commonly, the comorbidity involved major depression and anti-social behavior (oppositional defiant disorders) with alcohol abuse among males.  The comorbidities for females were post-traumatic stress (PTSD), anxiety, and anti-social personality disorder and substance abuse.  Note that in this comorbidity, depression occurs with an externalizing disorder, that is, oppositionalism.   We see therefore that both internalizing and externalizing disorders are likely to be the outcomes of maternal and/or child detention.  This has led researchers to conclude that incarceration-specific experiences place children at higher risk for maladjustment than exposure to general environmental risk in community settings (Dallaire et al., 2014).

C.      **Developmental and Cognitive Impacts of Detention**

21.  It is noteworthy that consideration must be given to more than the external indicators of the effects of detention—even short periods—on children. Stress under prolonged and intense conditions activates the release of hormones that lead to structural and functional changes of some brain regions that are essential for self-regulation and other behaviors.  As a result of the ongoing stress, despair, and uncertainty of detention, children's brain development is compromised, impairing not just their intellectual and cognitive development but also contributing to the development of chronic illnesses which can last into adulthood (Evans & Kim, 2013).

22.  Adverse childhood experiences, such as trauma and detention, have detrimental effects on children's brain growth and neural development.   Research in the neurobiology of trauma and brain development shows that as childhood adversity increases, the likelihood of psychopathology also increases (McLaughlin, Sheridan, & Lambert, 2014). Nim Tottenham, the renowned neuropsychologist, writes that "experiences that occur during sensitive periods of development have an extraordinary power to shape neural trajectories. Sensitive periods tend to occur early in life, making early experiences particularly important to understand. . . . [Brain] development can be shaped by adverse events that occur during these sensitive moments.  Based on the instructions received by the system from early environments, the brain may adapt to optimize for the expectation of a similar environmental condition in the future."  This leaves children vulnerable to

981

functioning *as if* they are or will be detained again.

23.  Under the conditions of prolonged and intense stress, the body's natural stress responses that aid in the flight-fight response and coping are over-used.  The psychoneuroendocrinology of stress shows that the hypothalamic-pituitary-adrenal (HPA) axis regulates the secretion of stress-responding hormones.  The primary hormonal secretions that mediate stress are cortisol and epinephrine (i.e., adrenalin).  Although these hormones offer protection for the body, when they are in overuse they damage the body.  Damage to the body occurs over time leading to impairments to the cardiovascular system, cognitive and intellectual functioning, and emotional and behavioral reactivity.

24.  Dysregulation of the HPA axis heightens the risk for depression and for long-term chronic illness.  The term "allostatic load" refers to the burden placed on the HPA axis through exogenous sources.  The allostatic load can be thought of as the wear and tear on the body that comes about as a result of prolonged exposure to repeated or chronic stress (McEwen & Stellar, 1993).  The body's stress responses are frequently activated in response to the stress in order for the person to cope with the moments of acute or chronic threats.  This enduring stress causes the physiological system to fluctuate or raise the level of neural and neuroendocrine system to respond.

25.  The environmental conditions faced in detention (and in the immigration process itself) shape the development of stress reactivity and HPA axis function in children and adults.  In consideration of the adverse experiences of fleeing violent conditions in their home countries and then experiencing detention, it is known that these are risk factors for poor mental health and other problems especially during peak incidence in childhood and

982

adolescence are elevated (Simmons et al., 2016).  These are many of the signs that the research literature and clinical observations indicate are evinced in children in detention, risking their long-term health.

26.  In a study by Ganella and colleagues (2015), 91 adolescents (49 males, 42 females) were studied in mother-child dyadic interaction tasks when they were approximately 12 years old.  These children reported on childhood maltreatment and stressful life events when they were approximately 15 years old, and underwent two waves of structural magnetic resonance imaging (MRI) scans, when they were approximately 16 and 19 years old.  Childhood maltreatment predicted accelerated pituitary gland volume (PGV) development in females, and maternal dysphoric behavior predicted accelerated PGV development in the whole sample.  The results suggest an effect of early life stress on altered HPA axis function across mid- to late adolescence when critical preparation for post-secondary education and entry into occupational roles occurs.

27.  Institutional rearing, that is, growing up in detention even for short periods of time—and particularly following the traumatic circumstances of migration—is one of the most adverse environments that scientists have studied, commonly called in the literature "complex adverse experiences."  The two distinct but powerfully determinant elements of the trauma of these adverse experiences are *deprivation* (i.e., absence of expected developmentally appropriate environmental inputs and complexity) and *threat* (i.e., the presence of experiences that represent an immediate or ongoing threat to the child's physical integrity and psychological security) (McLaughlin, Sheridan, & Lambert, 2014). The condition of chronic deprivation and threat stresses affect neural or brain development

which in turn determines cognitive and behavioral functioning in children.  PTSD is known to affect executive functions, that part of the brain that regulates and controls cognitive processes, including working memory, reasoning, task flexibility, and problem solving as well as planning and execution (Olff et al., 2014).

28.  In summary, detention is known to cause adverse effects on the mental health of adults, children, and families.  Moreover, these effects can last well beyond the point of the detention period and, in the case of children, create long-lasting impairments in cognitive, behavioral, and emotional functioning.  Brain development in children is altered significant and often permanently, affecting their academic performance and future occupational achievement.

## IV. Opinion

29.  Reviews of the literature in two of the most respected scientific journals—the Journal of the American Medical Association (JAMA) and the British Journal of Psychiatry— conclude that research consistently points to the negative effects of detention on refugee and immigrant mental health.  Writing in JAMA, Silove, Steel, and Watters (2000) state that "the potentially deleterious effect of detention on the mental health of asylum seekers has been raised repeatedly" (p. 608).  These authors note that the evidence is strong that post-migration stress facing asylum seekers, particularly those who have been detained, adds to the effects of previous trauma, thus elevating the risk of ongoing PTSD and other psychiatric symptoms.  Robjant, Hassan, and Katona (2009) conclude in their systematic review of the literature that scientific studies consistently show high levels of mental health

problems in detainees with anxiety, depression, self-harm, suicidal ideation, and PTSD being the most commonly reported disturbances.   Layered upon this research showing the harmful consequences of detention on refugees and asylum-seekers, the literature shows that children in detention suffer deprivation and constant threat, they feel constant sadness and fear (Mares & Zwi, 2015) and live without a sense of what their futures hold. Complicating the children's development are the disrupted family roles and dynamics in which children see their mothers treated very poorly by staff and witnessing their mothers' vulnerability and helplessness.  Children need the security and protection of their parents and the conditions of detention militate against mothers' capacity to provide that kind of comfort for their children.

30.  In the prestigious journal *The Lancet*, Fazel et al. (2014) conclude that children should not be separated from their accompanying families or caregivers.  As a result, true alternatives to detention must be considered.  For the cycle of violence to not be perpetuated, systems are needed to share good practice and coordinate efforts to eliminate further exposure to harm for children and their parents who flee their home countries seeking refugee protection.

31.  In an in-depth examination of the experiences of detained children in Canada, a group of psychiatric researchers from McGill University (Kronick, Rousseau, & Cleveland, 2015), conclude, as much of the literature on children in immigration detention does that detention " appears to be a frightening experience of deprivation that leaves children feeling criminalized and helpless.  Family separation further shatters children's sense of well-being.  Children's emotional and behavioral responses to separation and to detention

suggest that the experience is acutely stressful and, in some cases, traumatic— even when detention is brief.  Distress and impairment may persist months after release.  Given the burden of psychological suffering and the harmful consequences of separating families, children should not be detained for immigration reasons and parents should not be detained without children" (p. 287).

32.  For children and mothers detained in the residential detention centers in south Texas that I have visited, a significant issue in their lives is the jail-like physical plant and the law enforcement culture that dictates the rhythms of their days and weeks.   While living under these psychologically injurious conditions, the families undergo high-stakes interviews (i.e., credible fear and reasonable fear interviews) with asylum officers and review and adjudication by immigration judges that could result in deportation or release and integration into the community.  Their lives are punctuated by emotionally challenging interviews followed by long periods of uncertainty.  Contrast this unaccompanied minors (UACs) that I have observed in settings operated by non-profit social service contractors for the Office of Refugee Resettlement and the toxic impact that detention has on children and parents becomes clearer.  UACs are typically engaged with providers who are making plans for the children's release into the community from the day they arrive, not undergoing extensive interviews and scrutiny and uncertainty about deportation or release into communities.  UACs enjoy field trips, greater freedom of movement, and absence of a correctional or prison-like culture.  Meanwhile, mothers and children in detention centers like those in Karnes and Dilley feel incarcerated, their lives in suspension.

33.  Taking together the scientific literature on immigrant and refugee children and

families, and the impact of detention, incarceration, and institutionalization on the immediate and future psychological and social functioning of children, I conclude that trauma is being layered onto the trauma that led many refugees to flee their countries as a result of detention.   These impacts occur while Eide and Hjern (2013) note that the support that unaccompanied refugee children receive during the first years after resettlement is vital to their adjustment and long-term outcomes.

34.  Based on my professional background and expertise, the knowledge derived from the scientific literature reviewed in this declaration on child development and psychopathology and parenting and family functioning, and based on my conversations with mothers and children in immigration detention, I can say with certainty that detention is inflicting emotional, psychological, physical health and neurological harms on these families, particularly the children, and that some of these effects will be long lasting, and very likely permanent as adduced by the scientific literature.

35.  The healing process, in my view, cannot begin while mothers and young children are detained.  Indeed, my clinical experience and scientific literature indicate to me that even a few weeks of detention exacerbates the trauma experienced by refugee and immigrant families and added a new layer of hardship that, with respect to the children in particular, may be irreversible.

## VI.    Compensation

36.  I have received no compensation for my participation in this case.

987

37.  I reserve the right to amend or supplement this report as appropriate upon receipt of additional information or documents.

I declare under penalty of perjury under the laws of the United States and the District of Columbia that the foregoing is true and correct.

Executed this 11th day of December, 2015, at Austin, Texas.

_____

Luis H. Zayas, Ph.D.

References

Abram, K. M. (2015). Comorbidity and continuity of psychiatric disorders in youth after detention: A prospective longitudinal study. *JAMA Psychiatry*, *72*, 84-93.

Afifi, W. A., Afifi, T. D., Nimah, N., & Robbins, S. (2013). The relative impacts of uncertainty and mothers' communication on hopelessness among Palestinian refugee youth. *American Journal of Orthopsychiatry*, *83*, 495-504.

Byrne, M. W., Goshin, L., & Blanchard-Lewis, B. (2012). Maternal separations during the reentry years for 100 infants raised in a prison nursery. *Family Court Review*, *50*, 77-90.

Cohen, J. (2008). Safe in our hands?: A study of suicide and self-harm in asylum seekers. *Journal of Forensic and Legal Medicine*, *15*, 235-244.

Dallaire, D. H., Zeman, J. L., & Thrash, T. M. (2014). Children's experience of maternal incarceration-specific risks: Predictions to psychological maladaptation. *Journal of Clinical Child & Adolescent Psychology*, *43*, 1-14.

Eide, K., & Hjern, A. (2013). Unaccompanied refugee children-vulnerability and agency. *Acta Paediatrica*, *102*, 666-668.

Elkington, K. S., Teplin, L. A., Abram, K. M., Jakubowski, J. A., Dulcan, M. K., & Welty, L. J. (2015). Psychiatric disorders and violence: A study of delinquent youth after detention. *Journal of the American Academy of Child & Adolescent Psychiatry*, *54*, 302-312.

Evans, G. W., & Kim, P. (2013). Childhood poverty, chronic stress, self-regulation, and coping. *Child Development Perspectives, 7,* 43-48.

Fazel, M., Karunakara, U., & Newnham, E. A. (2014). Detention, denial, and death: Migration hazards for refugee children. *The Lancet Global Health*, *2*, e313-e314.

Foster, H., & Hagan, J. (2013). Maternal and paternal imprisonment in the stress process. *Social Science Research*, *42*, 650-669.

Ganella, D.E., Allen, N.B., Simmons, J.G., Schwartz, O., Kim, J.H., Sheeber, L., & Whittle, S. (2015). Early life stress alters pituitary growth during adolescence—A longitudinal study. *Pyschoneuroendocinology, 53*, 85–194.

Keller, A. S., Rosenfeld, B., Trinh-Shervin, C., Meserve, C., Sachs, E., Leviss, J. A., Singer, E., Smith, H., Wilkinson, J., Kim, G., Allden, K., & Ford, D. (2003). Mental health of detained asylum seekers. *Lancet*, *362*, 1721-1723.

Kronick, R., Rousseau, C., & Cleveland, J. (2015). Asylum-seeking children's experiences of detention in Canada: A qualitative study. *American Journal of Orthopsychiatry*, *85*, 287-294.

Mares, S., & Zwi, K. (2015). Sadness and fear: The experiences of children and families in remote Australian immigration detention. *Journal of Paediatrics and Child Health*, *51*, 663-669.

McEwen, B. S., & Stellar, E. (1993). Stress and the individual mechanisms leading to disease. *Archives of Intern Medicine, 153,* 2093-2101.

McLaughlin, K. A., Sheridan, M. A., & Lambert, H. K. (2014). Childhood adversity and neural development: Deprivation and threat as distinct dimensions of early experience. *Neuroscience and Biobehavioral Reviews*, *47*, 578-591.

Newman, L. K., & Steel, Z. (2008). The child asylum seeker: Psychological and developmental impact of immigration detention. *Child & Adolescent Psychiatric Clinics*, *17*, 665-683.

Olff, M., Polak, A. R., Witteveen, A. B., & Denys, D. (2014). Executive function in posttraumatic stress disorder (PTSD) and the influence of comorbid depression. *Neurobiology of Learning and Memory*, *112*, 114-121.

Robjant, K., Hassan, R., & Katona, C. (2009). Mental health implications of detaining asylum seekers: Systematic review. *The British Journal of Psychiatry*, *194*, 306-312.

Valdez, E.S., Valdez, L. A., & Sabo, S. (2015). Structural vulnerability among migrating women and children fleeing Central America and Mexico: The public health impact of "humanitarian parole". *Frontiers in Public Health*, *3*, 1-8.

Silove, D., Austin, P., & Steel, Z. (2007). No refuge from terror: The impact of detention on the mental health of trauma-affected refugees seeking asylum in Ausralia. *Transcultural Psychiatry*, *44*, 359-393.

Silove, D., Steel, Z., & Watters, C. (2000). Policies of deterrence and the mental health asylum of seekers. *Journal of the American Medical Association*, *284*, 604-611.

Simmons, J. G., Badcock, P. B., Whittle, S. L., Byrne, M. L., Mundy, L., Patton, G. C., Olsson, C. A., & Allen, N. B. (2016). The lifetime experience of traumatic events is associated with hair cortisol concentrations in community-based children. *Psychoneuroendocrinology*, *63*, 276-281.

Steel, Z., Silove, D., Brooks, R., Momartin, S., Alzuhairi, B., & Susljik, I. (2006). Impact of immigration detention and temporary protection on the mental health of refugees. *British Journal of Psychiatry*, *188*, 58-64.

Tottenham, N. (2014). The importance of early experiences for neuro-affective development. *Current Topics in Behavioral Neurosciences, 16*, 109–129.

Zayas, L.H. (2011).  *Latinas Attempting Suicide: When Cultures, Families, and Daughters Collide*. New York: Oxford University Press.

Zayas, L.H. (2015). *Forgotten Citizens: Deportation, Children, and the Making of American Exiles and Orphans*.  New York: Oxford University Press.

**Exhibit A**

**LUIS H. ZAYAS**

**Education**

| | | | |
|---|---|---|---|
| PhD | 1986 | Columbia University | Developmental Psychology |
| MPhil | 1985 | Columbia University | Developmental Psychology |
| MA | 1984 | Columbia University | Developmental Psychology |
| MS | 1975 | Columbia University | Social Work |
| BA | 1973 | Manhattan College | Economics/Liberal Arts |
| Certificate | 1989 | Westchester Center for the Study of Psychoanalysis & Psychotherapy Training in Psychoanalysis & Psychotherapy (1985-1989) | |

**Current Positions**

**Academic**

2012-   Dean
        Robert Lee Sutherland Chair in Mental Health and Social Policy
        University of Texas at Austin, School of Social Work
2013-   Affiliated faculty, Lozano Long Institute for Latin American Studies/Benson, The
        University of Texas at Austin, College of Liberal Arts

**Previous Academic Experience**

2002-11   Washington University in St. Louis
          Shanti K. Khinduka Distinguished Professor of Social Work (2002-2011)
          Associate Dean for Faculty (2005-2007).
          Director, Center for Latino Family Research (2005-2011)
          Professor of Psychiatry, Washington University School of Medicine (2004-11).
1990-05   Albert Einstein College of Medicine   Visiting Associate Professor of Family
          Medicine (1995-2005)
          Associate Professor of Family Medicine (1992-95)
          Visiting Clinical Assistant Professor of Psychiatry (1995-2002)
          Assistant Clinical Professor Psychiatry (1990-95)
1991-02   Fordham University
          Professor of Social Work (1999-2002)
          Associate Professor (1995-1999)
          Director, Center for Hispanic Mental Health Research (1999-2002)
          Director, Pre-Doctoral Research Training in Minority Mental Health (2001-03)
          Research Associate, Hispanic Research Center (1991-95)
          Adjunct Associate Professor of Psychology (1989-95)
          Ford Foundation Postdoctoral Fellow (1987-88)
1980-89   Columbia University
          Adjunct Associate Research Scholar (1988-89)

Assistant Professor of Social Work (1982-88)
Lecturer (1980-82)
Project Director, Hispanic Development Project (1985-88)
Faculty Field Instructor, Puerto Rican Community Mental Health Project
(1980-82)

## Clinical Practice and Pre-Professional Experience

1980-2000 Independent practice (part-time). Psychotherapy and family therapy
1990-95 Montefiore Medical Center, Department of Family Medicine
Psychosocial Unit Coordinator, Comprehensive Health Care Center (1992-95)
Psychosocial Faculty/Assistant Attending Psychologist, Residency Program in Social Medicine
1988-89 Fordham-Tremont Community Mental Health Center, NY, Clinical Supervisor
1978-80 The New York Hospital-Cornell Medical Center
Clinical Social Worker in child & adolescent psychiatric OPD
Payne-Whitney Psychiatric Clinic
1975-78 Blythedale Children's Hospital, NY, Pediatric Social Worker
1974-75 Lenox Hill Hospital, NY, Medical Social Work Intern

## Awards and Honors

2012 Fellow, American Academy of Social Work and Social Welfare (inducted November 2012)
2007 Distinguished Faculty Award, George Warren Brown School of Social Work, Washington University
2006 Leadership Award, New York City Latino Social Work Task Force
2004-05 Excellence in Mentoring Doctoral Students Award, George Warren Brown School of Social Work, Washington University
2004-05 Outstanding Faculty Mentor, Graduate Student Senate of Washington University,
2002 Leadership Award, National Association of Puerto Rican/Hispanic Social Workers
2000 Rafael Tavares, M.D., Award for scholarship in Hispanic mental health, Association of Hispanic Mental Health Professionals, Inc., NY
1993 Economic and Cultural Diversity Award (for work with AIDS orphans and their families), American Family Therapy Academy ($2,500 award)

## Research & Training Grants

2015 National Institute on Minority Health and Health Disparities—Principal Investigator "Undocumented, Unaccompanied, and Citizen: Charting Research Directions for Children of Immigration" (R13 MD010415-01). Funded: $50,000

994

| | |
|---|---|
| 2102-15 | Health Resources and Services Administration—Principal Investigator "Mental and Behavioral Health Education and Training Program" (MO1HP25200) Funded: $480,275 |
| 2011-13 | National Institute of Child Health and Human Development—Principal Investigator "Exploring the Effects of Parental Deportation on U.S. Citizen Children" (R21HD068874-01) Funded: $426,856 |
| 2010-11 | Fathers' Support Center, Saint Louis—Project Director of Manual Development for "Family Formation Program" Funded: $31,218 |
| 2011 | Fathers' Support Center, Saint Louis—Program Evaluator "Citibank Financial Education Curriculum Program." Funded: $8,641 |
| 2010-11 | Lutheran Foundation of Saint Louis—Project Director, "Mental Health Service for *Casa de Salud*" Funded: $75,000 |
| 2010-12 | National Institute of Mental Health—Principal Investigator "Adapting Interventions for Diverse Ethnocultural Families" (R13MH086306) Funded: $156,000 |
| 2008-11 | National Institute of Mental Health—Co-Principal Investigator "Systems of Care for New Moms: Integrating Depression Treatment" (R34 MH083085) Funded: $450,000 |
| 2008-10 | Procter & Gamble Fund—Project Director "Inspiring Leaders Improving Our Communities" speakers' series Funded: $10,000 |
| 2005-10 | New York Council on Adoptable Children (from Administration for Children and Families/DHHS)—Co-Investigator, Program Evaluator "Realizing Open Adoption Dreams" Funded: $1,500,000 |
| 2006-11 | Puerto Rican Family Institute, Inc. (from Administration for Children and Families/DHHS)—Co-Investigator, Program Evaluator "Building Pathways for Latino Fathers" Funded: $900,000 |
| 2006-09 | National Institute of Mental Health—Principal Investigator "Developing Interventions for Latino Children, Youth and Families" (R13 MH077403-01) Funded: $189,320 |
| 2005-10 | National Institute of Mental Health—Associate Director (2005-2006) (Enola Proctor, PI) "Mental Health Services Pre-doctoral and Post-doctoral Training Program" (T32 MH19960-11) |
| 2005-10 | National Institute of Mental Health--Principal Investigator "Sociocultural Processes in Latina Teen Suicide Attempts" (R01 MH070689-01A1) Funded: $1,733,337 |
| 2003-05 | National Institute of Mental Health—Principal Investigator "Hispanicity, Language and Psychiatric Diagnosis" (R21 MH065921) Funded: $278,560 |
| 2001-03 | National Institute of Mental Health—Principal Investigator "Predoctoral Research Training in Minority Mental Health" (T32 MH20074) Funded $1,117,503 |
| 1999-2003 | National Institute of Mental Health—Principal Investigator "Center for Hispanic Mental Health Research" (R24 MH60002) Funded $2,245,368 Minority Supplement to grant for Manny J. Gonzalez, D.S.W., ($212,192) |

| 1998-2003 | National Institute of Mental Health—Principal Investigator: "Reducing Perinatal Depression and Enhancing Parenting" (R24 MH57936) Funded $1,321,503 Minority Supplement to grant for Zulema E. Suárez, Ph.D. ($242,000) |
|---|---|
| 1993-95 | National Institute of Child Health and Human Development—Co-Investigator (Busch-Rossnagel, P.I.),: "Development in Puerto Rican and Dominican Toddlers" (1 RO1 HD30590) Funded $500,000 |
| 1993-95 | Department of Family Medicine, Montefiore Medical Center Chairman's Fund Faculty Research Grants" Co-Principal Investigator (with Philip Ozuah, MD) "Mercury Use in *Espiritismo*" Funded: $2,500 Co-Principal Investigator (with Marji Gold, MD) "Barriers to Ophthalmic Screening among Hispanic Diabetics" Funded $2,500 |
| 1991-93 | Alcoholic Beverage Medical Research Foundation—Principal Investigator "Factors associated with alcohol use by Hispanic men in early adulthood" Funded: $75,000 |
| 1988-89 | National Science Foundation—Principal Investigator "Attachment and Mastery Motivation in Hispanic Infants" (RII-8812284 planning grant) Funded: $12,000 |
| 1987-88 | National Research Council—Ford Foundation Postdoctoral Fellow (Developmental Psychology) Funded: $25,000 plus research expenses |
| 1974-75 | NIMH Psychiatric Traineeship, Columbia University (Full tuition) |

## Professional Affiliations and Licenses

American Psychological Association
Council on Social Work Education
National Association of Social Workers
Society for Social Work and Research

State of Texas Licensed Psychologist #36381 (issued 2012)
State of Texas Licensed Clinical Social Worker #57642 (issued 2013)
State of Missouri Licensed Psychologist #2002030464 (2002-2013)
State of New York Licensed Psychologist # 010116 (1989-2005)
State of New York Licensed Clinical Social Worker # 017492 (1975-2005)

## Publications
### Books

**Zayas, L.H.** (2015). *Forgotten Citizens: Deportation, Children, and the Making of American Exiles and Orphans.* New York: Oxford University Press.
**Zayas, L.H.** (2011). *Latinas Attempting Suicide: When Cultures, Families, and Daughters Collide.* New York: Oxford University Press.
Recipient, 2016 Honorable Mention of the Society for Social Work and Research Outstanding Social Work Book Award

### *Articles in Peer-Reviewed Journals*

95. Gulbas, L. E., **Zayas, L. H.**, Yoon, H., Szlyk, H., Aguilar-Gaxiola, S., & Natera, G. (in press). Deportation experiences and depression among U.S. citizen-children with undocumented Mexican parents. *Child: Care, Health, and Development.*

94. Sanchez, D., Whittaker, T., Hamilton, W., & **Zayas, L. H.** (2015). Exploring the links between marianismo, perceived discrimination, substance use, psychological distress and sexual risk behaviors in Latina preadolescent girls. *Cultural Diversity and Ethnic Minority Psychology.*

93. Gulbas, L., Hausmann-Stabile, C., De Luca, S., Tyler, T.R., & **Zayas, L.H.** (2015). An exploratory study of non-suicidal self-injury and suicidal behavior in adolescent Latinas.  *American Journal of Orthopsychiatry, 85,* 302-314.

92. **Zayas, L. H.**, Aguilar-Gaxiola, S., Yoon, H., & Natera Rey, G. (2015).  The distress of citizen-children with detained and deported parents. *Journal of Child and Family Studies, 24* (11), 3213-3223.

91. Gulbas, L.E. & **Zayas, L.H.** (2015) Examining the interplay among family, culture, and Latina teen suicidal behavior. *Qualitative Health Research, 25(5),* 689-699.

90. **Zayas, L.H.**, & Bradlee, M. (2014).  Exiling children, creating orphans: When immigration policies hurt citizens. *Social Work, 59,* 167-175.

89. Sampson, M., **Zayas, L.H.,** & Seifert, S.B. (2013). Treatment engagement using motivational interviewing for low-Income, ethnically diverse mothers with postpartum depression. *Clinical Social Work Journal, 41,* 387-394

88. Hausmann-Stabile, C., Gulbas, L., & **Zayas, L.H.** (2013). Aspirations of Latina adolescent suicide attempters: "Tomorrow I won't have to wake up to my future." *Hispanic Journal of Behavioral Sciences, 35,* 390-406.

87. **Zayas, L.H.**, & Gulbas, L.E. (2012). Are suicide attempts by adolescent Latinas a cultural idiom of distress? *Transcultural Psychiatry, 49,* 719- 735.

86. Nolle, A.P., Gulbas, L., Kuhlberg, J.A., & **Zayas, L.H.** (2012). Sacrifice for the sake of the family: Expressions of familism by Latina teens in the context of suicide. *American Journal of Orthopsychiatry, 82,* 319–327.

85. Peña, J. B., **Zayas, L. H.,** Cabrera-Nguyen, P., & Vega, W. A. (2012).  U.S. cultural involvement and its association with suicidal behavior among youths in the Dominican Republic. *American Journal of Public Health, 102,* 664–671.

84. Hausmann-Stabile, C., Kuhlberg, J.A., **Zayas, L.H.**, Nolle, A.P., & Cintron, S. (2012). Means, intent, lethality, behaviors, and psychiatric diagnoses in Latina adolescent suicide attempters. *Professional Psychology: Research and Practice, 43*(3), 241-248.

83. Hausmann-Stabile, C., **Zayas, L.H.,** Hauser, D., Carvajal, C., Mejia, C., & Nieves, D. (2011). Challenges and solutions for Latin American-trained international medical graduates in psychiatry residency. *International Journal of Mental Health, 40,* 29-40.

82. **Zayas, L.H.**, Hausmann-Stabile, C., & Kuhlberg, J.A. (2011).  Can mother-daughter relations reduce the chance of a suicide attempt among Latinas? *Depression Research and Treatment.*

81. Hausmann-Stabile, C., **Zayas, L.H.,** Runes, S., Abenis-Cintron, A., & Calzada, E. (2011). *Ganando confianza*: Research focus groups with immigrant Mexican mothers. *Education and Training in Developmental Disabilities, 46,* 3-10.

80. Peña, J.B., Matthieu, M.M., **Zayas, L.H.**, Masyn, K.E., & Caine, E.D. (2011). Co-occurrence of risk behaviors among White, Black, and Hispanic US high school adolescents who have attempted suicide, 1999 to 2007. *Social Psychiatry and Psychiatric Epidemiology, 47*, 29-42.

79. Peña, J.B. Kuhlberg, J.A., **Zayas**, L.H., Baumann, A.A., Gulbas, L., Hausmann-Stabile, C., & Nolle, A.P. (2011) Familism, family environment, and suicide attempts among Latina youth. *Suicide and Life-Threatening Behavior, 41,* 330-341.

78. Gulbas, L.E., **Zayas, L.H.**, Nolle, A.P., Hausmann-Stabile, C., Kuhlberg, J.A., Baumann, A.A., & Peña, J.B. (2011). Family relationships and Latina teen suicide attempts: Reciprocity, asymmetry, and detachment. *Families in Society, 92,* 317-323.

77. **Zayas, L.H.,** Drake, B., & Jonson-Reid, M. (2011). Overrating or dismissing the value of evidence-based practice: Consequences for clinical practice. *Clinical Social Work Journal, 39,* 400-405.

76. Baumann, A.A., Kuhlberg, J.A., & **Zayas, L.H.** (2010). Familism, mother-daughter mutuality, and suicide attempts of adolescent Latinas. *Journal of Family Psychology, 24,* 616-624.

75. **Zayas, L.H.** (2010). Protecting citizen-children safeguards our common future. *Journal of Health Care for the Poor and Underserved, 21, 809-814.*

74. Kuhlberg, J.A., Peña, J.B., **Zayas, L.H.** (2010). Familism, parent-adolescent conflict, self-esteem, internalizing behaviors and suicide attempts among adolescent Latinas. *Child Psychiatry and Human Development, 41,*425-440.

73. **Zayas, L.**, Gulbas, L.E., Fedoravicius, N., & Cabassa, L.J. (2010). Patterns of distress, precipitating events, and reflections on suicide attempts by young Latinas. *Social Science and Medicine, 70,* 1773-1779.

72. **Zayas, L.H.** (2010). Seeking models and methods for cultural adaptation of interventions: Commentary on the special section. *Cognitive and Behavioral Practice, 17,* 198-202.

71. **Zayas, L.H.,** Bright, C., Alvarez-Sanchez, T., & Cabassa, L.J. (2009). Acculturation, familism and mother-daughter relations among suicidal and non-suicidal adolescent Latinas. *Journal of Primary Prevention, 30,* 351-369.

70. **Zayas, L.H.**, Hausmann-Stabile, C., & Pilat, A.M. (2009).  Recruiting urban Latina adolescents and their families: Challenges and lessons learned in suicide attempts research. *Youth & Society, 40,* 591-602.

69. **Zayas, L.H.** & Torres, L.R. (2009). Culture and masculinity: When therapist and patient are Latino men. *Clinical Social Work Journal, 37,* 294-302.

68. **Zayas, L.H.**, Torres, L. R., & Cabassa, L.J. (2009). Clinician ethnicity in diagnostic, symptom, and functional assessments of Hispanic outpatients. *Community Mental Health Journal, 45*, 97-105.

67. Peña, J.B., Wyman, P.A., Brown, C.H., Matthieu, M.M., Olivares, T.E., Hartel, D., & **Zayas, L.H.** (2008). Immigration generation status and its association with suicide attempts,

substance use, and depressive symptoms among Latino adolescents in the United States. *Prevention Science, 9,* 299-310*.*

66. **Zayas, L.H.** (2008). Commentary on Rojas et al. 2007 in Lancet. *Evidence-Based Mental Health.*

65. **Zayas, L.H.**, & Pilat, A.M. (2008)*.* Suicidal behavior in Latinas: Explanatory cultural factors and implications for intervention. *Suicide and Life-Threatening Behavior, 38,* 334-342.

64. Torres, L.R., Cabassa, L.J., **Zayas, L.H.**, & Alvarez-Sánchez, T.A. (2008). Assessing psychosocial stressors in Hispanic outpatients: Does clinician ethnicity matter? *Psychiatric Services, 58,* 690-692.

63. Torres, L.R., Peña, J.B., Westhoff, W.W. & **Zayas, L.H.** (2008). A cross-national comparison of adolescent alcohol and drug use behaviors: U. S. Hispanics and youth in the Dominican Republic. *Journal of Drug Issues, 38,*149-170.

62. Goldston, D., Molock, S.D., Whitbeck, L., Murakami, J.L., **Zayas, L.H.**, & Nakayama Hall, G. (2008). Cultural considerations in adolescent suicide prevention and psychosocial treatment. *American Psychologist, 63,* 14-31.

61. Drake, B., Hovmand, P., Jonson-Reid, M., & **Zayas, L.H.** (2007). Adopting and teaching evidence-based practice in masters level social work programs. *Journal of Social Work Education, 43,* 431-446.

60. Torres, L. R., **Zayas, L.H.**, Cabassa, L. J., & Perez, M.C. (2007). Diagnosing co-occurring substance related disorders: Agreement between SCID, Hispanic and non-Hispanic clinicians. *Journal of Clinical Psychiatry, 68,* 1655-1662

59. Cavazos-Rehg, P., **Zayas, L.H.**, & Spitznagel, E.L. (2007). Legal status, emotional well-being and subjective health status of Latino immigrants. *Journal of the National Medical Association, 99*, 1126–1131.

58. Aisenberg, E., Trickett, P. Mennen, F. Saltzman, W., & **Zayas, L.H.** (2007).  Maternal depression and adolescent behavior problems: An examination of mediation among immigrant Latino mothers and their adolescent children exposed to community violence. *Journal of Interpersonal Violence, 22*, 1227-1249

57. **Zayas, L.H.**, Cabassa, L. J., Perez, M. C., & Cavazos-Rehg, P. (2007). Using interpreters in diagnostic research and practice: Pilot results and recommendations. *Journal of Clinical Psychiatry, 68,* 924-928.

56. Cabassa, L. J. & **Zayas, L.H.** (2007). Latino immigrants' intentions to seek depression care.  *American Journal of Orthopsychiatry, 77,* 231-242.

55. Cabassa, L. J., Lester, R., & **Zayas, L.H.** (2007). "It's like being in a labyrinth:" Hispanic immigrants' perceptions of depression and attitudes toward treatments.  *Journal of Immigrant Health, 9,* 1-16.

54. Cavazos-Rehg, P., **Zayas, L.H.**, Walker, M.S., & Fisher, E.B. (2006). Evaluating an abbreviated version of the Hispanic Stress Inventory for Immigrants. *Hispanic Journal of Behavioral Sciences, 28,* 498-515*.*

53. McKee, M. D., **Zayas, L.H.**, Fletcher, J., Boyd, R. C., & Nam, S. H. (2006). Results of an intervention to reduce perinatal depression among low-income minority women in community primary care. *Journal of Social Service Research, 32,* 63-81.

52. Cabassa, L. J., **Zayas, L.H.**, & Hansen, M. (2006). Latino adults' access to mental health services: A review of epidemiological studies. *Administration and Policy in Mental Health and Mental Health Services Research, 33,* 316-330.

51. Boyd, R. C., **Zayas, L.H.**, & McKee, M. D. (2006). Mother-infant interaction, life events and prenatal and postpartum depressive symptoms among urban minority women in primary care. *Maternal and Child Health Journal, 10,* 139-148.

50. **Zayas, L.H.**, Cabassa, L. J., Perez, M. C., & Howard, M. O. (2005). Clinician-patient ethnicity in psychiatric diagnosis: A pilot study with Hispanics. *Journal of Ethnic & Cultural Diversity in Social Work, 14,* 93-109.

49. **Zayas, L.H.**, Cabassa, L. J., & Perez, M.C. (2005). Capacity-to-consent in psychiatric research: Development and preliminary testing of a screening tool. *Research on Social Work Practice, 15,* 545-556.

48. **Zayas, L.H.**, Lester, R. J., Cabassa, L. J., & Fortuna, L. R. (2005). "Why do so many Latina teens attempt suicide?": A conceptual model for research. *American Journal of Orthopsychiatry, 75,* 275-287.

47. **Zayas, L.H.**, Jankowski, K.R.B., & McKee, M. D. (2005). Parenting competency across pregnancy and post-partum among urban minority women. *Journal of Adult Development, 12,* 53-62.

46. **Zayas, L.H.**, McKee, M. D., & Jankowski, K.R.B. (2004). Adapting psychosocial intervention research to urban primary care environments: A case example. *Annals of Family Medicine, 2,* 504-508.

45. McKee, M. D., Jankowski, K. R. B., & **Zayas, L.H.** (2004). Breastfeeding intention and practice in an urban minority population: Relationship to maternal depressive symptoms and mother-infant closeness. *Journal of Reproductive and Infant Psychology, 22,* 167-181.

44. 53.　**Zayas, L.H.**, Gonzalez, M. J., & Hanson, M. (2003) "What do I do now?": On teaching evidence-based interventions for social work practice. *Journal of Teaching in Social Work, 23,* 59-72.

43. **Zayas, L.H.**, Jankowski, K., & McKee, M. D. (2003). Prenatal and postpartum depression among low-income Dominican and Puerto Rican women. *Hispanic Journal of Behavioral Sciences, 25,* 370-385.

42. Fisher, C. B., Hoagwood, K., Boyce, C., Duster, T., Frank, D. A., Grisso, T., Levine, R. J., Macklin, R., Spencer, M. B., Takanishi, R., Trimble, J. E., & **Zayas, L.H.** (2002). Research ethics for mental health science involving ethnic minority children and youth. *American Psychologist, 57,* 1024-1040.

41. Turner, S., Kaplan, C., **Zayas, L.H.**, & Ross, R. (2002). Suicide attempts by adolescent Latinas: An exploratory study of individual and family correlates. *Child and Adolescent Social Work Journal, 19,* 357-374.

40. **Zayas, L.H.**, & Rojas-Flores, L. (2002). Learning from Latino parents: Combining etic and emic approaches to designing interventions. In J. M. Contreras, K. A. Kerns, & A. M.

Neal-Barnett (Eds.), *Latino children and families in the United States* (pp. 233-249). Westport: Greenwood/Praeger Publishers.

39. Cunningham, M., & **Zayas, L.H.** (2002). Reducing depression in pregnancy: Designing multimodal interventions. *Social Work, 47,* 114-123.

38. **Zayas, L.H.**, Cunningham, M., McKee, M. D., & Jankowski, K. R. B.  (2002). Depression and negative life events among pregnant African-American and Hispanic women. *Women's Health Issues, 12,* 16-22.

37. **Zayas, L.H.** (2001). Incorporating struggles with racism and ethnic identity in therapy with adolescents. *Clinical Social Work Journal, 29,* 361-373.

36. McKee, M. D., Cunningham, M., Jankowski, K. R. B., & **Zayas, L.H.**  (2001). Health-related functional status in pregnancy: Relationship to depression and social support in a multi-ethnic population. *Obstetrics and Gynecology, 97,* 988-993.

35. Dyche, L., & **Zayas, L.H.** (2001).  Cross-cultural empathy and training the contemporary psychotherapist. *Clinical Social Work Journal, 29*, 245-258.

34. Malgady, R. G., & **Zayas, L.H.** (2001). Cultural and linguistic considerations in psychodiagnosis with Hispanics: The need for an empirically informed process model. *Social Work, 46,* 39-49.

33. Evans, M. E., Mejía-Maya, L. J., **Zayas, L.H.**, Boothroyd, R., & Rodriguez, O. (2001). Conducting research in culturally diverse inner city neighborhoods: Some lessons learned. *Journal of Transcultural Nursing, 12,* 6-14.

32. Kail, B., **Zayas, L.H.**, & Malgady, R. G. (2000). Depression, acculturation, and motivations for alcohol use among young Colombian, Dominican, and Puerto Rican men. *Hispanic Journal of Behavioral Sciences, 22,* 64-77.

31. **Zayas, L.H.**, Kaplan, C., Turner, S., Romano, K., & Gonzalez-Ramos, G.  (2000). Understanding suicide attempts by adolescent Hispanic females. *Social Work, 45*, 53-63.

30. 37.   Morrison, R.S., **Zayas, L.H.**, Mulvihill, M., Baskin, S.A., & Meier, D. E. (1998). Barriers to completion of health care proxies: An examination of ethnic difference. *Archives of Internal Medicine, 158*, 2493-2497.

29. Morrison, R. S., **Zayas, L.H.**, Mulvihill, M., Baskin, S. A., & Meier, D. E. (1998). Barriers to completion of health care proxy forms: A qualitative analysis of ethnic differences. *Journal of Clinical Ethics, 9*, 118-126.

28. **Zayas, L.H.**, Rojas, M., & Malgady, R. G. (1998). Alcohol, drug use, and depression among Hispanic men in early adulthood. *American Journal of Community Psychology, 26,* 425-438.

27. Gonzalez-Ramos, G., **Zayas, L.H.**, & Cohen, E. V. (1998). Child-rearing values of low income, urban Puerto Rican mothers of preschool children. *Professional Psychology: Practice and Research, 29,* 377-382.

26. **Zayas, L.H.**, Evans, M. E., Mejía, L., & Rodriguez, O. (1997). Cultural competency training for staff serving Hispanic families with a child in psychiatric crisis. *Families in Society, 78,* 405-412.

25. Planos, R., **Zayas, L.H.**, Busch-Rossnagel, N. A. (1997). Mental health factors and teaching behaviors among low income Hispanic mothers. *Families in Society, 78*, 4-12.

24. **Zayas, L.H.**, Torres, L., Malcolm, J., & DesRosiers, F. S. (1996). Clinicians' definitions of ethnic-sensitive practice. *Professional Psychology: Research and Practice, 27,* 78-82.

23. Dyche, L., & **Zayas, L.H.** (1995). The value of curiosity and naiveté for the cross-cultural psychotherapist. *Family Process, 34,* 389-399.

22. **Zayas, L.H.** (1995). Family functioning and child rearing in an urban environment. *Journal of Developmental and Behavioral Pediatrics, 16* (Suppl.), 21-24.

21. Planos, R., **Zayas, L.H.**, Busch-Rossnagel, N. A. (1995). Acculturation and teaching behaviors of Dominican and Puerto Rican mothers. *Hispanic Journal of Behavioral Sciences, 17,* 225-236.

20. **Zayas, L.H.** (1994). Hispanic family ecology and early childhood socialization: Health care implications. *Family Systems Medicine, 12,* 315-325.

19. **Zayas, L.H.**, & Solari, F. (1994). Early childhood socialization in Hispanic families: Culture, context, and practice implications. *Professional Psychology: Research and Practice, 25*, 200-206.

18. **Zayas, L.H.** (1992). Childrearing, social stress and child abuse: Clinical considerations with Hispanic families. *Journal of Social Distress and the Homeless, 1,* 291-309.

17. **Zayas, L.H.**, and Busch-Rossnagel, N. A. (1992). Pregnant Hispanic women: A mental health study. *Families in Society, 73,* 515-521.

16. **Zayas, L.H.**, & Dyche, L. A. (1992). Social workers training primary care physicians: Essential psychosocial principles. *Social Work, 37*, 247-252.

15. **Zayas, L.H.** (1989). Data collection in child assessment: Approaches to student supervision. *The Clinical Supervisor, 7,* 75-88.

14. **Zayas, L.H.** (1989). A retrospective on the "suicidal fit" in mainland Puerto Ricans. *Hispanic Journal of Behavioral Sciences, 11,* 46-57.

13. Schilling, R. F., Schinke, S. P., Nichols, S. E., **Zayas, L.H.**, Miller, S. O., Orlandi, M. A., & Botvin, G. J. (1989). AIDS prevention research with black and Hispanic drug users. *Public Health Reports, 104,* 2-11.

12. **Zayas, L.H.**, & Katch, M. (1989). Contracting with adolescents: An ego-psychological approach. *Social Casework, 70,* 3-9.

11. **Zayas, L.H.** (1988). Thematic features in the manifest dreams of expectant fathers. *Clinical Social Work Journal, 16,* 282-296.

10. Schinke, S. P., Moncher, M. S., Palleja, J., **Zayas, L.H.**, & Schilling, R. F. (1988). Hispanic youth, substance abuse, and stress: Implications for prevention research. *International Journal of the Addictions, 23*, 809-826.

9. **Zayas, L.H.**, & Palleja, J. (1988). Puerto Rican familism: Considerations for family therapy. *Family Relations, 37,* 260-264.

8. **Zayas, L.H.** (1987). As son becomes father: Reflections of expectant fathers on their fathers in dreams. *The Psychoanalytic Review, 74,* 443-464.

7. **Zayas, L.H.**, Schinke, S. P., & Casareno, D. (1987). Hispanic adolescent fathers: At risk and underresearched. *Children and Youth Services Review, 9,* 235-248.

6. **Zayas, L.H.** (1987). Toward an understanding of suicide risks in young Hispanic females. *Journal of Adolescent Research, 2*, 1-11.

5.  Schinke, S. P., Schilling, R. F., Palleja, J., & **Zayas, L.H.** (1987). Prevention research among ethnic-racial minority group adolescents. *The Behavior Therapist, 10*, 151-155.

4.  **Zayas, L.H.** (1987). Psychodynamic and developmental aspects of expectant and new fatherhood: Clinical derivatives from the literature. *Clinical Social Work Journal, 15*, 8-21.

3.  Bryant, C., & **Zayas, L.H.** (1986). Initial moves with school-family conflicts: Entering, engaging, and contracting. *Child and Adolescent Social Work Journal, 3*, 87-100.

2.  **Zayas, L.H.**, & Lewis, B. H. (1986). Fantasy role-playing for mutual aid in children's groups: A case illustration. *Social Work with Groups, 9*, 53-66.

1.  **Zayas, L.H.**, & Bryant, C. (1984). Culturally-sensitive treatment of adolescent Puerto Rican girls and their families. *Child and Adolescent Social Work Journal, 1*, 235-253.

## Chapters

17.  **Zayas, L. H.** (in press). Foreword. In A.J. Dettlaff & R. Fong (Eds.), *Immigrant and refugee children and families: Culturally responsive practice.*  New York: Columbia University Press.

16.  **Zayas, L. H.**, & Bradlee, M. (2015). Children of undocumented immigrants: Imperiled developmental trajectories. In E. P. Salett & D. R. Koslow (Eds.), *Race, ethnicity and self* (pp. 63-84). Washington, DC: National Association of Social Workers.

15.  **Zayas, L.H.**, Hausmann-Stabile, C., & De Luca, S.M. (2014). Suicidal behaviors and U.S. Hispanic youth: Social, psychological, and cultural factors and challenges for interventions.  In D. A. Lamis & N. J. Kaslow (Eds.), *Advancing the science of suicidal behavior: Understanding and intervention* (pp. TBA). Hauppauge, NY: Nova Science Publishers.

14.  **Zayas, L.H.**, & Sampson, M. (2013).  Perinatal depression and treatments for U.S. Latinas: A review of research findings.  In S. Lara-Cinisomo & K. Wisner (Eds.), *Perinatal depression among Spanish-Speaking Women: A Global perspective on prevalence, treatment, and outcomes* (pp. 65-82). NY: Springer.

13.  **Zayas, L.H.,** Bellamy, J.L., & Proctor, E. (2012). Considering the multiple service contexts in cultural adaptations: The case for parenting interventions.  In R. Brownson, G. Colditz, & E. Proctor, *Dissemination and implementation research in health: Translating science to practice* (pp. 483-497). New York: Oxford University Press.

12.  **Zayas, L.H.,** Torres, L.R., & Kyriakakis, S. (2010). Culturally competent assessment of Latino clients. In R. Furman & N. Negi (Eds.), *Social Work Practice with Latinos: Key Issues and Emerging Themes* (pp. 161-183).  Chicago, IL: Lyceum Books.

11.  **Zayas, L.H.,** Borrego, J., & Doménech Rodríguez, M. (2009). Parenting interventions for Latino familias and children. (Invited chapter). In F. Villaruel, G. Carlo, M. Azmitia, N. Cabrera, & J. Chahin (Eds.), *Handbook of Latino Psychology: Developmental and Community Based Perspectives* (pp. 291-307). Sage Publications.

10.  **Zayas, L.H.** (2003). Service-delivery factors in the development of practice guidelines. In A. Rosen & E. K. Proctor (Eds.), *Developing practice guidelines for social work*

*interventions: Issues, methods, and research agenda* (pp. 193-206). New York: Columbia University Press.

9.  Canino, I., & **Zayas, L.H.** (1997). Puerto Rican children. In G. Johnson-Powell, J. Yamamoto, G. E. Wyatt, & W. Arroyo (Eds.), *Transcultural child development: Psychological assessment and treatment* (pp. 61-79) New York: Wiley & Sons.

8.  **Zayas, L.H.**, Canino, I., & Suárez, Z. E. (2001). Parenting in mainland Puerto Rican families: Child-rearing for health and success.  In N.B. Webb (Ed.), *Multicultural parent-child and family relationships* (pp. 133-156). New York: Columbia University Press.

7.  **Zayas, L.H.** (1999). Family and culture in HIV care for a Latino adolescent. In J. Blustein, C. Levine, & N. N. Dubler (Eds.), *The adolescent alone: Decision making in health care in the United States* (pp. 239-242). New York: Cambridge University Press.

6.  Romano, K., & **Zayas, L.H.** (1997). Motherless children: Family interventions with AIDS orphans. In E. Congress (Ed.), *Multicultural perspectives in working with families* (pp. 109-124). New York: Springer.

5.  **Zayas, L.H.**, & Dyche, L. A. (1995). Suicide attempts in Puerto Rican adolescent females: A sociocultural perspective and family treatment approach. In J.K. Zimmerman & G.M. Asnis (Eds.), *Treatment approaches with suicidal adolescents* (Volume 12, The Einstein Psychiatry Monograph Series, pp. 203-218). New York: John Wiley.

4.  Zimmerman, J. K., & **Zayas, L.H.** (1995). Suicidal adolescent Latinas: Culture, female development, and restoring the mother-daughter relationship. In S. Canetto & D. Lester (Eds.), *Women and suicide* (pp. 120-132). New York: Springer.

3.  **Zayas, L.H.**, & Romano, K. (1994). Adolescents and parental death from AIDS. In B. O. Dane & C. Levine (Eds.) *The new orphans: AIDS and the family* (pp. 59-76). Westport. CT: Auburn House.

2.  Busch-Rossnagel, N. A., & **Zayas, L.H.** (1991). Hispanic adolescents. In R. Lerner, A. Peterson, & J. Brooks-Gunn (Eds.), *Encyclopedia of adolescence* (pp. 492-498). NY: Garland Publishing.

1.  Rodriguez, O., & **Zayas, L.H.** (1990). Hispanic adolescents and antisocial behavior: Sociocultural factors and treatment implications. In A. R. Stiffman & L. Davis (Eds.), *Ethnic issues in adolescent mental health* (pp. 147-171). Beverly Hills, CA: Sage.

# Exhibit 62
## Publicly Filed

## DECLARATION OF JESSICA GORELICK, LCSW

I, Jessica Gorelick, LCSW, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a licensed clinical social worker in the states of New York and Pennsylvania. I am currently employed at Human Rights First. Human Rights First provides pro bono representation to asylum seekers through its offices in New York, Washington, D.C., and Houston, often in conjunction with major law firms. Our organization's clients include many asylum seekers who are in, or who were previously held in, immigration detention facilities throughout the country, including mothers and *Flores* class-member children who fled their countries to seek protection in the United States. As a licensed clinical social worker, I provide psychosocial assessments and support to asylum seeker clients at Human Rights First. My expertise lies in the diagnosis and therapeutic treatment of mental health disorders.

2. My professional experience and training includes diagnostic assessment and care of individuals with mental health disorders, including depression, anxiety and Post-traumatic Stress Disorder (PTSD), in a variety of settings including public schools, behavioral and mental health clinics, a psychoanalytic institute, and my own private psychotherapy practice.

3. I have been providing therapeutic treatment to clients for twelve years. I have worked with several hundred trauma survivors in the course of my work. I have been trained by Doctors of the World in the psychological evaluation of survivors of torture and ill-treatment.

4. Based on these qualifications, I have knowledge of the matters stated in this declaration. Where my knowledge is based on information and belief, I have stated the basis of such information and belief.

5. I provide this declaration to document my observations regarding the conditions that children and their parents face in immigration detention in Berks County, Pennsylvania and in Dilley, Texas.

### Findings from Visit to Berks County Residential Center

6. I toured the Berks County Residential Center on August 11, 2015, with a group of legal, social service, and medical providers. We toured the facility and had the opportunity to meet with approximately fifteen families at the end of the tour.

7. During the tour, I was most struck by our discussion with the mental health staff. They explained to us that there were no Spanish-speaking mental health staff at Berks, that all services were provided through a phone interpreter, and that they had no problem with this arrangement. As a long time practitioner in the field of mental health, I found this

arrangement concerning as the inability to communicate with clients effectively has a deleterious impact on a clinician's ability to build rapport and trust with a client. These are the bedrocks of the therapeutic relationship.

8. The mental health staff also explained that while they were required to meet with all the families following their arrival at Berks and regularly thereafter, they used no formalized assessment tools. I am concerned that there is no clear process of assessing for trauma, depression, or anxiety when families arrive at the facility, which makes it very difficult to treat these conditions—especially given the above-referenced language barriers.

9. At the end of the tour, we met with at least fifteen families who were detained at the facility. Most of the families reported that they had been in detention for between four to six weeks. One mother recounted her eleven year old son's severe shift in behavior and suicidal ideation since being detained for approximately one month. He was aggressive and disinterested in play, which was a shift from his previous presentation. She was tearful and felt powerless to help her child. Although the mental health staff had intervened at some point, her son's symptoms persisted.

10. Many of the mothers also reported that they and/or their children had frequent issues around insomnia and food refusal, which mothers cited as a change from previous behaviors. In addition, they expressed concerns about the educational opportunities available to their children in the detention facility. There are just two classrooms, which means that children of various ages and grade levels must be in the same classroom.

11. Nearly all of the mothers cried and reported that they and their children experienced high levels of anxiety and depression. They talked about feeling powerless to control their futures, and frustrated that they did not understand the immigration process and how or when they might leave the facility. They also discussed a lack of agency in caring for their children as they are unable to move freely and provide for them as they see fit.

## Findings from My Time at South Texas Family Residential Center

12. From September 28 to October 2, 2015, I volunteered with the CARA Pro Bono Project. (CARA is a collaborative of the Catholic Legal Immigration Network (CLINIC), the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services (RAICES), and the American Immigration Lawyers Association (AILA)). During that week, I assisted with the legal cases of women and children detained at the South Texas Family Residential Center in Dilley, Texas ("the Dilley facility"). During my time at the Dilley facility, I met with members of over thirty detained families, who had been held in detention for anywhere from a few days to about five weeks.

13. My work included providing eight psychological evaluations for submission as evidence prior to immigration judge reviews of negative credible or reasonable fear interviews, or in support of requests to the asylum office to reconsider a negative determination and conduct a new credible or reasonable fear interview. I also conducted ten preparation sessions with families before their credible or reasonable fear interviews.

14. I found that all of the mothers and children for whom I completed psychological evaluations were suffering from high levels of anxiety and depression. Additionally, most of the mothers also met the criteria for Post-traumatic Stress Disorder (PTSD). All of these families disclosed life threatening, traumatic experiences in their home countries, which caused them to flee. Many of the mothers also revealed that they had experienced childhood abuse, as well as intimate partner violence. This abuse almost always included regular experiences of rape. In families where the mothers had experienced intimate partner violence, the children had nearly always witnessed this violence and, in several families, the children had also been directly physically and emotionally abused.

15. During the credible or reasonable fear interview preparation sessions, nearly all of the mothers expressed high levels of anxiety about having to disclose their traumatic history to a government official. Many of these women had suffered humiliation, along with physical, emotional, and sexual violence, and would become tearful and overwhelmed when articulating their traumatic experiences.

***Perceived Impressions of the Mental Health Impact on Families in Immigration Detention***

16. My various interactions with mothers and children in the Dilley facility left no doubt that they were experiencing high levels of anxiety, depression, and in many cases PTSD. Despite the prevalence of mental health issues, mothers cited a lack of access to mental health staff despite their repeated requests for intervention at the medical clinic.

17. Mothers expressed a sense of lack of control over their and their children's lives and profound helplessness. Many seemed to feel that they had been stripped of their role as parent because they were unable to adequately care for their children. Children frequently would ask their mother when they could leave the facility and why they were detained, and their mothers' inability to respond significantly undermined the sense of protection and stability that parents should be able to provide for their children.

18. The mothers' lack of agency was particularly evident for those with sick children. Nearly every child I met at the Dilley facility had a deep, hacking cough and a fever at some point during detention. Mothers expressed anxiety and fear around their children's health, particularly given the long wait times at the clinic and the frequent failure of the medical staff to do anything other than recommend that their children drink water.

19. Most of the mothers described a constant sad mood, insomnia, somatic complaints (including trembling, headaches, and heart palpitations), poor appetite, anhedonia (inability to experience pleasure), fatigue, hypervigilance, angry outbursts, and intrusive thoughts of past traumatic experiences.  Some had never experienced these feelings until being detained with their children. Many had previously experienced these types of symptoms in relation to past traumas and noticed a sharp increase in these feelings while detained.  There were a number of mothers that were experiencing passive suicidal ideation.

20. Most of the mothers described a variety of concerning symptoms of their children including insomnia, lack of interest in play, regression, nightmares, aggression, crying, and tantrums.  Mothers discussed a noticeable increase in these symptoms and a shift in the behavior of their children since entering detention. Mothers who had only been detained for a short period of time with their children, often less than a week, frequently reported that their children demonstrated these same symptoms.

**Conclusion**

21. It is my professional assessment that the family members with whom I met at the Berks and Dilley facilities suffered an adverse emotional impact as a result of being held in detention. These adverse emotional consequences appeared to occur without regard to the length of detention.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___ day of January 2016.


Jessica Gorelick, LCSW

New York License # 73082791
Pennsylvania License # CW015083

# Exhibit 63
## Publicly Filed



March 28, 2016

Megan Mack
Office of Civil Rights and Civil Liberties
Department of Homeland Security
Washington, DC 20528

John Roth
Office of Inspector General
Department of Homeland Security
Washington, DC 20528

**Re:    Ongoing Concerns regarding the Detention and Fast-Track Removal of Children and Mothers Experiencing Symptoms of Trauma**

Dear Ms. Mack and Mr. Roth:

We submit this complaint to register our ongoing concern regarding the detention of traumatized mothers and children in Immigration and Customs Enforcement's (ICE) family detention centers. On June 30, 2015, the American Immigration Council, the American Immigration Lawyers Association and the Women's Refugee Commission submitted a complaint to the Office of Civil Rights and Civil Liberties (CRCL), which included evaluations by mental health professionals and sworn declarations documenting in detail the traumatic psycho-social effects of detention in the South Texas Family Residential Center (STFRC) in Dilley, Texas; the Karnes County Residential Center in Karnes City, Texas, the Berks Family Residential Center in Leesport, PA, and the now closed Artesia Family Residential Center in Artesia, NM.[1]

The CARA Family Detention Pro Bono Project[2] submits this second complaint to further document our concerns with the detention of traumatized mothers and children.

---

[1] Letter from American Immigration Lawyers Association et al. to the U.S. Department of Homeland Security Office of Civil Rights and Civil Liberties regarding the psychological impact of family detention on mothers and children seeking asylum, June 30, 2013, http://www.aila.org/advo-media/press-releases/2015/impact-family-detention-mental-health/complaint-crcl.

[2] The CARA Family Detention Pro Bono Project is a partnership of four organizations: Catholic Legal Immigration Network, Inc. (CLINIC), American Immigration Lawyers Association (AILA), Refugee and Immigrant Center for Education and Legal Services (RAICES), and the American Immigration Council (Council). Since April 2015, CARA has provided legal counsel and representation to several thousand

The eight cases included herein continue to demonstrate that many detained families suffer from Post-traumatic Stress Disorder (PTSD), anxiety, depression or other emotional or cognitive disorders. They represent an extremely vulnerable population for which detention is rarely appropriate. Numerous studies show that the negative mental health consequences of detention are particularly acute for children, asylum seekers, and other vulnerable populations.[3] Detention re-traumatizes survivors of violence[4] and sharply limits access to legal counsel and mental health services.[5] Experts confirm that detention poses risks to children's health that can be immediate and long-lasting.[6]

These cases also demonstrate the ways in which fast-track removal processes, to which the Department of Homeland Security (DHS) currently subjects all children and their mothers in family detention centers, are dangerously inadequate to ensure access to protections under U.S. law. These procedures are least appropriate for the most vulnerable: those suffering from the symptoms of Post-traumatic Stress Disorder, cognitive infirmities, or other mental health impairments.

The attached declarations and evaluations for eight mothers held in family detention centers demonstrate the particular difficulties that individuals suffering from the psychological consequences of trauma face. Many of the mental health evaluations contained in this complaint specifically document mothers' inability to share their stories with an asylum officer or an immigration judge in the first instance due to trauma symptoms.

DHS now deports the vast majority of noncitizens without ever bringing them before the immigration court. Fast-track removal processes like expedited removal and reinstatement of removal put deportation decisions directly in the hands of enforcement agents and often deny asylum seekers the chance to present valid claims in court. Many

children and mothers detained at the South Texas Family Residential Center (STFRC) in Dilley, Texas and the Karnes County Residential Center ("Karnes") in Karnes City, Texas.

[3] *See, e.g.*, Australian Human Rights Commission, *The Forgotten Children: National Inquiry into Children in Immigration Detention* (2014), https://www.humanrights.gov.au/sites/default/files/document/publication/forgotten_children_2014.pdf; Jon Burnett, et al., *State Sponsored Cruelty, Children in Immigration Detention*, Medical Justice (2010), http://www.statewatch.org/news/2010/sep/uk-medical-justice-statesponsored-cruelty-report.pdf; *see also* Guy J. Coffey, et al., *The Meaning and Mental Health Consequences of Long-Term Immigration Detention for People Seeking Asylum*, 70 Soc. Sci. & Med. 2070, A430 (2010); Masao Ichikawa, et al., *Effect of Post-Migration Detention on Mental Health Among Afghan Asylum Seekers in Japan*, 40 Austl. & N.Z.J. Psychiatry 341 (2006); Allen S. Keller, et al., *From Persecution to Prison: The Health Consequences of Detention for Asylum Seekers*, Physicians for Human Rights & The Bellevue/NYU Program for Survivors of Torture (2003), http://physiciansforhumanrights.org/library/reports/from-persecution-toprison.html (describing the traumatic effects of detention on adults).

[4] *See* Rachel Kronick, et al., *Asylum-Seeking Children's Experiences of Detention in Canada: A Qualitative Study*, 85 Am. J. Orthopsychiatry 287, A1788 (2015); *see also From Persecution to Prison* at 1638-39.

[5] Craig Haney, Conditions of Confinements for Detained Asylum Seekers Subject to Expedited Removal, Rep. on Asylum Seekers in Expedited Removal, U.S. Commission on Int'l Religious Freedom 178 (Feb. 2005), http://www.uscirf.gov/reports-briefs/special-reports/report-asylum-seekers-in-expedited-removal.

[6] Brief for the American Academy of Child and Adolescent Psychiatry (AACAP) and the National Association of Social Workers (NAWS) as *Amici Curiae* Supporting Appellees and in Support of Affirmance of District Court Judgement, Flores et al.  v. Lynch, No. 15-56434 (9th Cir. Feb. 23, 2016).

factors contribute to the due process failures of expedited removal and reinstatement of removal, including: (1) these processes rely on initial screenings by Border Patrol officials that are often wholly inaccurate, ignore expressions of fear, and/or provide noncitizens with insufficient information about their rights and responsibilities; (2) threshold eligibility determinations for asylum and other protections take place rapidly in jail-like facilities many miles from major cities and pro bono legal and mental health resources; and (3) the government does not guarantee legal counsel, at its own expense if necessary, to ensure that all individuals subject to removal have a fair chance to present their claims.

Given these substantial due process concerns, we urge DHS to significantly curtail its use of expedited and reinstatement of removal, which currently account for more than 80 percent of DHS removals each year.[7] For mothers detained with their children and suffering from the symptoms of trauma or cognitive impairment, these fundamentally unfair procedures are particularly detrimental. As evidenced by several of the cases discussed in this complaint, many extremely vulnerable individuals, including children, are deported without having a meaningful opportunity to present valid claims for relief. [8]

We urge your offices to immediately and thoroughly investigate the cases below. In addition, we renew our request for a complete investigation into the psychological and physiological impact of family detention on children and mothers. Such an investigation should pay particular attention to the capacity of mothers and children who are suffering from trauma and other psychological or cognitive disorders to have a meaningful opportunity to present their claims during the credible or reasonable fear process. We further urge that the information contained in this complaint be considered by the OIG as it begins its investigations into ICE detention facilities.  While we recognize that increased access to meaningful mental and medical health services is crucial for the currently detained population, we are confident that even a vast improvement in access to such services would not address the plight of the most vulnerable mothers and children, including those whose cases are discussed in the complaint.

There remains no humane way to detain families. The costs of this flawed policy remain particularly unacceptable given that there are established alternatives, including case management, which could address the government's legitimate interests in tracking asylum seekers and ensuring their appearance at hearings without inflicting additional trauma.

Given the difficulty that mental health care providers face in accessing individuals in family detention, as well as the sensitive nature of these cases, the examples discussed

---

[7] Office of Immigration Statistics, U.S. Department of Homeland Security, *Immigration Enforcement Actions*: FY2013, https://www.dhs.gov/sites/default/files/publications/ois_enforcement_ar_2013.pdf.
[8] *See* UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras and Mexico* (October 2015): 1 ("Since 2008, UNHCR has recorded a nearly fivefold increase in asylum-seekers arriving to the United States from the Northern Triangle region of El Salvador, Guatemala, and Honduras. Over the same period, we have seen a thirteenfold increase in the number of requests for asylum from within Central America and Mexico – a staggering indicator of the surging violence shaking the region.").

herein likely represent only a small fraction of those experiencing trauma in, and as a result of, family detention. They underscore that instead of being detained and subject to fast-track removal, the use of which is fully discretionary,[9] families should be issued Notices to Appear (NTA) and placed into regular removal proceedings before the immigration court under Immigration and Nationality Act (INA) Section 240.[10]

The complaints included below are a sample of a much larger set of detained families in which one or more family members has manifested clear symptoms of Post-traumatic Stress Disorder, Major Depressive Disorder, or other mental health disorders. Despite clear indications of trauma, DHS continues to subject detained families to credible and reasonable fear interviews. Where a mother is too traumatized to explain the circumstances of her plight, the violence she has experienced and observed, or the reasons for her fear of return to her home country, she typically receives a negative credible fear determination, which is usually affirmed by an immigration judge. Through heroic advocacy efforts and continual follow up, some of these families have been saved from erroneous deportation, while others, unfortunately, have been returned to the harm from which they fled.

\* \* \*

**Complainant 1: "Sara[11]."** Sara fled El Salvador with her three children, ages nine, ten, and twelve after receiving death threats from a powerful transnational criminal organization, the MS-13, in her home town. Sara was raped by the brother of an MS-13 member; when her rapist died shortly thereafter, his mother blamed Sara for his death and vowed to kill her. Her family has informed her that MS-13 members continue to look for and threaten to kill her. She fears that she and her children will be killed if they return.

Sara was unable to disclose the sexual assault and subsequent death threats during her credible fear interview due to the trauma she continued to experience. In her declaration, Sara explains:

> *I live in deep trauma. I'm scared of what could happen to me. I get nervous even thinking about it when I'm alone. I didn't share this*

---

[9] Brief of Immigrants Rights Organizations as *Amici Curiae* in Support of Plaintiffs-Appellees and in Support of Affirmance of District Court Judgement, Flores v. Lynch, No. 15-56434 (9th Cir. Feb. 23, 2016) (explaining that detention is not required in summary removal proceedings and that prior to the summer of 2014, the Government processed claims of accompanied minors and their mothers without the use of summary proceedings), http://www.aila.org/infonet/ca9-amicus-brief-in-flores.

[10] In regular removal proceedings, legal counsel is permitted to play an active role and immigration judges have authority to prescribe safeguards where necessary to protect an individual's due process rights. *See Matter of M-A-M-,* 25 I&N Dec. 474 (BIA 2011) (holding that if an individual Respondent in immigration court proceedings manifest indicia of incompetency, the immigration judge must undertake an inquiry to determine whether the Respondent is competent for the purposes of immigration proceedings, and, if not, the immigration judge must evaluate appropriate safeguards).

[11] Pseudonyms have been used to maximize confidentiality for these families, many of whom are still actively pursuing their claims for protection in the United States. The CARA Project has provided CRCL and OIG with the names and alien registration numbers matched with the pseudonyms, along with sworn declarations and psychological evaluations for each individual, where conducted.

> *information with the asylum officer because of my fear. I don't want to ever have to think about this again. I get really scared talking about it. I just want it to all disappear.*

Initially detained on February 10, Sara received a negative credible fear determination from the asylum office on February 17. Appearing before the immigration judge on February 24 for review of her negative determination – during which no attorney participation was allowed[12] – was so stressful for Sara that it triggered a severe migraine. Sara was only able to talk about the fact of her sexual assault and the death threats *after* the immigration judge affirmed the negative determination. When she was finally able to disclose these facts to her attorney, Sara experienced another debilitating migraine.

Aware of these new facts, her attorneys worked diligently to obtain an independent psychological evaluation to submit as a critical piece of evidence to support her request for reconsideration by the asylum office. No fewer than twelve requests to ICE to obtain clearance for this evaluation delayed the scheduling of this evaluation, and attorneys were forced to submit Sara's request for reconsideration before the evaluation could be obtained. Eventually, Dr. Ricardo Castaneda, a psychiatrist, was able to evaluate Sara and diagnosed her with three psychiatric and cognitive conditions, social phobia, learning disabilities, "dyslexia and Dycaculia that are indicative of cognitive impairment," and PTSD. He specifically found that these "conditions significantly impaired her capacity to comprehend and fully answer questions posed to her by the asylum office and subsequently by the immigration court." As Dr. Castaneda explained, Sara's ability to recount her story to the asylum officer and the immigration judge were impaired by her mental health conditions:

> *More relevant to her current situation, a review of her history and her mental status makes clear that her initial accounts of her story were significantly impeded by a state of severe social anxiety in the stressful context of the court, where she reports having felt utterly frozen by fear, unable to remember not only her history of sexual and physical abuse but also the death threats made to her by the mother of her former abuser. Such failure to remember traumatic events is consistent with the dissociative symptoms of PTSD.*

On February 29, Sara submitted a request for reconsideration, including Dr. Castaneda's psychological evaluation, to the Asylum Office. This request was denied on March 21. Sara and her three children have now been detained for more than six weeks, initially at Dilley and now at the Berks detention center.

---

[12] This review took place in front of an immigration judge who, citing the Immigration Court Practice Manual, categorically prohibits the participation of attorneys during reviews of negative credible fear determinations.  *See* Imm. Court Practice Manual Chap. 7.4(d)(iv)(C) (Feb. 2016).("the alien is not represented at the credible fear review. Accordingly, persons acting on the alien's behalf are not entitled to make opening statements, call and question witnesses, conduct cross examinations, object to evidence, or make closing arguments.").

**Complainant 2: "Nessa."** Nessa and her eight-year-old daughter were detained on Christmas Eve 2015 after fleeing Guatemala to ensure her daughter's safety. Nessa grew up in an abusive household where her father regularly beat her mother, and at the age of nine, two of Nessa's teenage cousins started to sexually abuse her; the abuse continued until she was around twelve years old. Nessa was later abused and raped by her spouse and the father of her child.

Only after undergoing both a credible fear interview (on January 5, 2016) and review by an immigration judge of her negative credible fear determination (on January 13), which was ultimately affirmed, did Nessa finally feel able to share with CARA attorneys at the Dilley detention center what she had endured in Guatemala and her deep desire to protect her daughter from the abuse that she had suffered as a child. Dr. Allen Keller conducted a psychological evaluation of Nessa. Dr. Keller diagnosed Nessa with PTSD, explaining that:

> *Since these traumatic events, [Nessa] describes suffering significant symptoms of emotional distress. She continues to feel a profound sense of shame and humiliation because of these events. She reports continuing to be extremely fearful of men, and fearful of being raped again. She is also intensely focused on fear for the safety of her daughter. She tries to avoid thinking about what happened, and does find solace in prayer. Nevertheless, concern for her daughter's safety is a constant trigger for her of these terrifying memories.*

Although Nessa expressed a preference for a female asylum officer to immigration officials before the day of her interview, a male officer conducted her credible fear interview. It was not until midway through the interview that the officer asked whether she felt comfortable with a male officer and whether Nessa's eight-year-old daughter, who knew nothing about her mother's traumatic past, could stay in the room. As Dr. Keller explains, however, these conditions did not make it possible for her to share what she had endured:

> *It is my professional opinion that there is clinical evidence explaining why [Nessa] did not reveal critical details of her trauma history, notably a history of rape and sexual assault, during her Credible Fear Interview. Furthermore, as noted above, she was very uncomfortable talking about anything related to her sexual assault with me. As such it is unrealistic to expect that she would or should have revealed her rape and sexual assault during her Credible Fear Interview given the circumstances, including a male Asylum Officer.*

Dr. Keller explains further:

> *Based on my professional experience of more than 25 years interviewing, evaluating and caring for survivors of severe trauma, including victims of sexual assault and rape, it is not uncommon, even under the best of*

1016

> *circumstances for individuals to not be immediately forthcoming about*
> *these details. It is my professional opinion that the circumstances of the*
> *interview were not only far from ideal, but were such that it is predictable*
> *that [Nessa] would not reveal this very private information during the*
> *credible fear interview.*

Nessa submitted a request for reconsideration to the asylum office on January 17, including Dr. Keller's psychological evaluation diagnosing her with PTSD and explaining how her symptoms impeded earlier sharing of the trauma she had endured. Nessa's own sworn declaration, submitted with the request for reconsideration, explains:

> *I did not tell the asylum officer or the Immigration Judge about what*
> *happened to me when I was growing up or with my ex husband. I was*
> *embarrassed and ashamed to tell anyone about the abuse I have suffered.*
> *This is the first time I am telling anyone ever about this abuse. It's been*
> *very difficult for me.*

The request for reconsideration also included a sworn affidavit from Professor Judith Herman, explaining the effects of incestuous abuse, along with articles addressing issues of rape, memory, trauma, and stress.[13] Despite all this, USCIS denied Nessa's request for reconsideration on January 19. The very next day, January 20, Nessa and her daughter were deported.

**Complainant 3: "Beatriz."** Beatriz fled Guatemala to find safety for herself and her two children, ages two and eight, in the United States. She suffered an abusive childhood and later went on to endure severe domestic violence at the hands of the father of one of her children, including repeated rapes and one incident where she was burned with a hot iron.

Beatriz and her children were held at the Dilley detention center. During her credible fear interview on January 4, 2016, Beatriz was unable to disclose the information about her past abuse because of the trauma she had endured and the deep shame she felt whenever she recalled these experiences. Beatriz was able to relate the facts underlying her fears to her attorneys after the interview, and she submitted a declaration of these new, material facts to the immigration judge who was about to review the negative credible fear determination. The declaration detailed her childhood growing up in an abusive home and the subsequent domestic violence she suffered at the hands of her partner, which included repeated rapes. The immigration judge could see no reason why Beatriz would have failed to state these facts during the interview, found her not to be credible, and affirmed the asylum officer's decision on January 11.[14]

---

[13] Oliver T. Wolf, *Stress and Memory in Humans: Twelve Years of Progress?* 1293 Brian Research 142-154 (2009); Jenkins et al, *Learning and Memory in Rape Victims with Posttraumatic Stress Disorder*, Am. J. of Psychiatry 155:2 (Feb. 1998).

[14] Again, this review took place in front of an immigration judge who, citing the Immigration Court Practice Manual, categorically prohibits the participation of attorneys during reviews of negative credible fear determinations.  *See supra* note 12.

Beatriz's attorneys then obtained an independent psychological evaluation by Dr. Allen Keller, who explains what happened during Beatriz's initial credible fear interview with an asylum officer and why she did not disclose the violence she had suffered in Guatemala:

> When asked why, [Beatriz] stated that she was ashamed. She reports that "Something very bad came over me. I was feeling like I wanted to throw up." She reports that the officer, whom she describes as respectful and courteous, noticed that she was feeling very badly, and asked her if she wanted to stop and have a drink of water. She reports the officer, who noticed she continued to look bad, also told her that they could continue the interview on another day. [Beatriz] reports she told the officer she could continue because she just wanted to get the interview over with.

As Dr. Keller reports, Beatriz had never told anyone, not even her own mother, about the abuse she endured, and felt too afraid and ashamed to share these details with the asylum officer. Dr. Keller found that Beatriz suffers from symptoms of depression and "extremely severe" symptoms of PTSD. As Dr. Keller explains, Beatriz, like many others suffering from PTSD, exhibits one of the hallmark symptoms – avoidance:

> Of particular note she describes extreme symptoms of avoidance, which is one of the central diagnostic criteria for PTSD. During our interview, she explained why she avoided and in fact was unable to reveal the traumatic events she had suffered during her credible fear interview. That she did not reveal central parts of her traumatic history is understandable and highly consistent with her diagnosis of PTSD.

Dr. Keller also verified that the scarring on Beatriz's body is consistent with her claim that she was burned with a hot iron during an abusive incident with her partner.

Beatriz submitted a request for reconsideration to the asylum office on January 15, which included Dr. Keller's evaluation, explaining Beatriz's diagnosis and symptoms. USCIS denied this request for reconsideration on January 19. Beatriz's legal representatives quickly filed a second request for reconsideration, but Beatriz and her children were deported the same day, January 20.

**Complainant 4: "Yessica."** Yessica fled Honduras with her fifteen-year-old son and fourteen-year old daughter to seek protection in the United States. In Honduras, a transnational criminal organization threatened and beat her son in an effort to convince him to join their organization. The same entity killed Yessica's uncle because he was critical of the gangs, cutting out his eyes and teeth when they murdered him. Yessica herself suffered sexual assault at the hands of the gangs and witnessed collaboration between the gangs and the police that put her at risk.

Yessica never had an opportunity to undergo a psychological evaluation while she was detained at Karnes from October 2, 2015 to November 3, 2015. Yessica's fifteen-year-old son, having been beaten and threatened by gangs, also manifested symptoms of trauma, waking up at the detention center in the middle of the night with nightmares. Her son and fourteen-year-old daughter also began to refuse to eat while they were detained. Yessica received a negative credible fear determination, which an immigration judge later affirmed.  Although a private attorney not affiliated with the CARA Project attended Yessica's review, he never met with her prior to the hearing or prepared her in any way. On the same day that the immigration judge affirmed Yessica's negative determination, she almost threw herself off a balcony at the detention center. When she finally met with CARA staff just a day before she was deported, Yessica told them that she had heard voices in her head telling her to throw herself off the balcony so that she would be freed.

Although both Yessica and her son manifested symptoms of trauma, they were never treated for these symptoms; they also never received a psychological evaluation during their month-long detention at Karnes. They were deported back to Honduras on November 3, 2015.

**Complainant 5: "Penelope."** Penelope fled her native El Salvador after suffering domestic violence for eight years at the hands of her partner and receiving threats from a powerful transnational criminal organization. Penelope met her abusive partner when she was just eighteen years old, and for years she suffered physical, verbal, and emotional abuse. Her partner regularly hit, slapped, and punched her, and routinely told her she was "worthless." He even beat her when she was pregnant with his child, injuring her back. On one occasion, he beat her so badly that her head started bleeding, and since then she has had persistent migraines. On other occasions, Penelope's partner hit her so hard that she was knocked unconscious. He also raped her throughout the relationship.

Dr. Susanna Francies, a licensed clinical psychologist, conducted a psychological evaluation while Penelope was detained. She diagnosed Penelope with PTSD, chronic, with dissociative features, and reports that Penelope manifested the following symptoms:

> [S]ignificant avoidance symptoms, such as trying to forget about a bad time, avoiding people and places that remind her of a traumatic event, trying not to think of upsetting events in the past, and blocking out memories.

Dr. Francies also reports that Penelope suffered "feelings of anxiety and shame," and never told anyone what happened to her. Dr. Francies explains that Penelope also suffers from dissociative symptoms of PTSD, which include:

> [F]eeling like you are in a dream, 'spacing out,' and feeling like things aren't real. [Penelope] also reports: not feeling like your real self, having trouble remembering details of something bad that happened, and feeling like you are watching yourself from far away.

Dr. Francies explains that prior to her arrival in the United States, Penelope never explained the abuse she suffered, "as it was a source of shame." Dr. Francies concludes that Penelope's

> [C]oping style may have helped [Penelope] to endure severe ongoing abuse, but it has interfered with her ability to advocate for herself in the form of disclosure of her trauma history. This is a common phenomenon among immigrant survivors of abuse, especially when sexual abuse is involved.

During her credible fear interview, Penelope did not feel comfortable disclosing the intimate details of her domestic violence history to the male asylum officer. In her declaration, she states that she did not understand some of the asylum officer's questions and had a hard time explaining herself. Unrepresented at the immigration judge's review of her negative credible fear determination, Penelope again found it difficult to explain herself. Penelope finally connected with CARA Project attorneys, who have since filed two requests for re-consideration with the asylum office, both of which were denied without any explanation.

Penelope and her six-year-old son were detained at Karnes from October 14 until their transfer to Berks on November 14. Only after attorneys filed a writ of habeas corpus on Penelope's behalf were she and her son released from Berks on November 24, 2015. Penelope's pro bono attorney is submitting a third request for reconsideration in the hope that Penelope will finally have the chance to disclose the story that she is ready and able to recount now that she is no longer in detention.

**Complainant 6: "Melina."** Melina fled Guatemala with her one-year-old son. At the age of fourteen, a man in his thirties kidnapped Melina, held her in a room for a month, and raped her repeatedly. Neither Melina's family nor the police were able to capture or stop her attacker, who is a known drug-trafficking criminal in the mountains of Guatemala where Melina was raised. Years later, she fled Guatemala suddenly after she encountered her attacker because she felt afraid to continue living in her country. At the time she fled, Melina had also been experiencing threats and extortion from members of a powerful transnational criminal organization, who threatened her life if she did not pay "renta" and shot at her small store.

Licensed clinical social worker Susan Wolfson conducted an evaluation of Melina while she was detained. She diagnosed Melina with PTSD as a result of the trauma she endured as a young girl. Ms. Wolfson recounts:

> [Melina] said she felt nervous when thinking about what had happened to her, that she got severe headaches from talking about it, that the headaches often moved to an ache behind her right eye, and her right arm.  She said she has difficulty sleeping and has nightmares of what happened to her.  Whenever she remembers it or talks about it, it feels to her like she is reliving the experience all over again.

Melina and her young son were detained on November 20, 2015 and held at the Dilley detention center. Following Melina's first credible fear interview, the asylum officer rendered a negative credible fear determination. An immigration judge affirmed that decision without allowing any attorney participation[15] or giving Melina an opportunity to explain what happened during the asylum interview. Melina describes her experience before the immigration judge as follows:

> ...I find it very difficult to talk about the rape and the abuse that I have suffered. It causes me pain whenever I think about it. When I went to my IJ Review last week, I was not able to focus on the questions. The same problems came up. I experienced these same exact symptoms during the hearing.

Although the immigration judge affirmed the negative decision, the asylum office later granted Melina's request for reconsideration, which included the psychological evaluation, and conducted a second credible fear interview. Melina was represented by an attorney at her second interview, where she was able to fully recount her story and her fear of return to Guatemala. After just over a month of detention in Dilley, Melina and her son were released on December 21, 2015.

**Complainant 7: "Michaela."** Michaela and her three-year-old son fled El Salvador and sought protection in the United States in the beginning of March 2016. During her childhood, Michaela, her mother, and her siblings were subjected to daily abuse at the hands of her father. As an adult, Michaela's husband regularly verbally abused her and started forcibly raping her in December 2015. Michaela also feared harm at the hands of a powerful transnational criminal gang in her neighborhood, and fled after her husband raped her for the third time in February 2016.

Michaela and her son have been detained at the Dilley detention center since approximately March 4, 2016. Michaela's credible fear interview on March 10 lasted less than one hour. During that interview, Michaela did not share the fact that her husband had repeatedly raped her.  As she later explained in a sworn declaration:

> I did not share this information with the asylum officer because I consider it a very intimate part of my life. I wish I never had to think about it again. I've never told anyone about this abuse. Talking about the abuse I have suffered makes me physically ill. I got a headache as I was speaking to my attorneys about this abuse. The asylum officer didn't ask me very many questions. She didn't seem very interested in what I had to say.

After the interview, which resulted in a negative determination, Michaela revealed to CARA Project staff that she had been raped by her husband.  Before an immigration

---

[15] Again, this review took place in front of an immigration judge who, citing the Immigration Court Practice Manual, categorically prohibits the participation of attorneys during reviews of negative credible fear determinations.  *See supra* note 12.

judge reviewed her case on March 17, she submitted the above-referenced declaration explaining these experiences. The judge did not allow attorney participation in the credible fear review by the immigration judge, per the Immigration Court Practice Manual,[16] and affirmed the negative determination despite Michaela's declaration explaining why she had not disclosed the abuse during her credible fear interview.

Following the immigration judge's affirmance of Michaela's negative credible fear determination, CARA attorneys filed a request for reconsideration with the asylum office on March 21. USCIS granted this request, and Michaela was re-interviewed on March 23. She is currently awaiting a second credible fear determination in her case. CARA staff members are in the process of attempting to secure a psychological evaluation for Michaela to corroborate her statements that her shame and trauma prevented her from fully disclosing the abuse she had suffered during the first interview. Given the short timeline for these cases, CARA staff cannot always able to secure pro bono psychological evaluations, which often carry significant weight with the asylum office.

**Complainant 8: "Cristina."** Cristina fled Honduras with her nine-year-old and eleven-year-old children. In 2013, Cristina was accosted, kidnapped, and repeatedly raped by two men whom she believes to be members of a transnational criminal organization. In 2014, she suffered domestic violence at the hands of a romantic partner. She fled Honduras to escape further harm from all these men, to protect her son from recruitment into a gang, and to protect her daughter from violence in Honduras targeting young girls. A few days before fleeing Honduras, Cristina received a phone call from a gang member threatening to kill her and her children if she refused to submit to his demands for sex and for her to become his "woman."

Cristina and her children have been detained at the Dilley detention center since approximately March 7, 2016. Cristina's credible fear interview took place on March 11. During that interview, which resulted in a negative determination, she did not reveal all of the threats that she faced in Honduras. An immigration judge conducted a review of the negative determination on March 17, where Cristina also failed to disclose all of the circumstances that prompted her to flee Honduras. She explains, in a sworn declaration, why she was unable to tell her full story:

> *During my review with the Immigration Judge, I was extremely nervous. I still had a headache and felt very stressed, especially because I haven't slept. Like I said before, I did not feel comfortable sharing my entire story. I am afraid it will put my family's life in danger.*

Cristina also explained that since being detained at Dilley, she has lost her appetite and is unable to sleep more than two hours a night. She explained, "Sometimes, it is difficult just to breathe and I have had a throbbing headache for

---

[16] Again, this review took place in front of an immigration judge who, citing the Immigration Court Practice Manual, categorically prohibits the participation of attorneys during reviews of negative credible fear determinations. *See supra* note 12.

three days." Cristina also shared that her nine-year-old and eleven-year-old children are not eating in the detention center.

Dr. Albana Dassori evaluated Cristina and diagnosed her with PTSD and Major Depressive Disorder. Dr. Dassori explained that:

> *[Cristina] endorses intrusive thoughts and nightmares about trauma, constant distrust, avoidance of situations that remind her of the trauma. She is constantly scanning her environment for safety and avoids talking about the traumas she experienced. Talking about them increases her sadness and makes her unable to control tears and negative thoughts.*

Further, Dr. Dassori elaborated in her evaluation that:

> *Throughout her life, [Cristina] faced violent situations in which she felt helpless. It is this learned helplessness that may impact her interactions with persons in position of authority. In these situations, she is likely to feel overpowered, return to a subservient stance and become passive and confused.*

Like many survivors of trauma, Cristina needed time to feel comfortable enough to fully disclose her past traumatic experiences and fears. On March 21, CARA attorneys submitted a request for reconsideration, which was quickly granted and resulted in the issuance of a Notice to Appear for this family. Without the assistance of counsel, which not all detained families are able to access; Cristina and her children would have been deported to Honduras and the harm from which they fled.

**Previously Submitted Cases Highlighting the Same Challenges for Traumatized Families Subject to Detention and Fast-Track Processing of Fear-Based Claims**

Between January and March 2016, CARA sent CRCL and OIG fourteen cases involving families from El Salvador, Guatemala, and Honduras. In each family, the mother had suffered threats and physical harm resulting in diagnoses of Post-Traumatic Stress Disorder, Major Depressive Disorder, or Generalized Anxiety. We appreciate CRCL's attention to these fourteen cases, which illustrate broader trends we observe in family detention centers on a daily basis. The fourteen cases are summarized below:

- A Salvadoran mother who survived child abuse and incest, and fled gang threats, seeking protection with her five-year-old son. She was detained at Dilley and then Berks for three months and diagnosed with PTSD and Major Depressive Disorder.

- A mother detained with her seven-year-old son who fled after receiving threats from the transnational criminal organization that shot her husband in El Salvador. She was diagnosed with PTSD and suffers from Generalized Anxiety. The family has been detained, first at Dilley and now at Berks, since December 15, 2015.

1023

- A mother who was threatened with a gun by members of a transnational criminal organization and subsequently fled El Salvador with her six-year-old son. She was diagnosed with Major Depressive Disorder and PTSD. The family has been detained, first at Dilley and now at Berks, since December 17, 2015.

- A mother who suffered domestic violence in Honduras at the hands of her spouse, and fled after she was raped and shot in the hand by a well-known drug trafficker. She was diagnosed with PTSD and depression and detained with her two-year-old son for over two months.

- A mother who fled death threats and extortion by a transnational criminal organization in El Salvador. She was detained with her three-year-old son for almost three months and diagnosed with Major Depressive Disorder along with symptoms of PTSD and Generalized Anxiety.

- A mother who fled El Salvador with her two-year-old and eight-year-old daughters after suffering child abuse, incest, domestic abuse, and threats from a transnational criminal organization. The family was detained for almost three months, and the mother was diagnosed with PTSD and Major Depressive Disorder.

- A Honduran mother who was raped at knifepoint at the age of 12, and later targeted by a man who stalked her and threatened to kill her daughter if she did not marry him. The mother and her three-year-old daughter have been detained, first at Karnes and now at Berks, since December 21, 2015. More than three months later, they remain detained, and the mother has been diagnosed with PTSD.

- A Honduran mother who fled with her four-year-old child and has been detained since December 17, 2015. A well-known hit man threatened to kill her unless she married him, and she later faced threats because she witnessed her cousin's murder at the hands of a transnational criminal organization. She was diagnosed with PTSD and remains detained, initially at Karnes and now at Berks.

- A Honduran mother who fled with her nine-year-old and ten-year-old children. She was threatened by her estranged husband, who joined a powerful transnational criminal organization. The family has been detained for almost three months – initially at Karnes and now at Berks. The mother was diagnosed with PTSD.

- A Guatemalan mother whose primary language is Mam, who suffers from cognitive impairment and was diagnosed with PTSD and Generalized Anxiety. She and her eight-year-old son fled Guatemala after members of a transnational criminal organization repeatedly threatened and assaulted her. The family was held in detention at Dilley for more than seven weeks.

1024

- A Salvadoran mother and her ten-year-old son fled after receiving threats from members of a transnational criminal organization. A mental health expert diagnosed the mother with PTSD. The family has been detained since February 17 and is currently held at Dilley and their request for reconsideration with the Asylum Office is pending.

- A Mexican mother and her two daughters, ages fifteen and four, fled after receiving threats from members of a transnational criminal organization, who attempted to kidnap the fifteen-year-old girl. The fifteen-year-old girl manifested symptoms of trauma, and counsel were actively working to secure a psychological evaluation when the family was apparently transferred from Dilley to Berks on March 25.

- A Guatemalan mother who sought protection in the United States after being raped by a man who stalked her for nearly four years. The mother and her fourteen-year-old daughter have been detained at the Karnes detention center since approximately February 20. The mother has been diagnosed with PTSD.

- A Salvadoran mother who fled with her three-year-old daughter after receiving death threats from members of a transnational criminal organization. The mother and daughter have been held at the Karnes detention center since approximately February 21. CARA attorneys recently submitted a second request for reconsideration, including a psychological evaluation diagnosing the mother with PTSD, but the request was quickly denied.

**Conclusion**

The eight cases highlighted above illustrate that the detention of traumatized mothers and their children cannot be carried out humanely. Additionally, these cases demonstrate that forcing traumatized mothers and their children to quickly undergo credible fear interviews in detention undermines asylum officers' ability to accurately assess fear of return and may lead to erroneous deportations. Three of the families whose cases are discussed above were deported before they ever had a meaningful opportunity to discuss their fear of return with an asylum officer or immigration judge.

The majority of the predominantly Central American families held in family detention centers have fled gang violence, domestic abuse, or other trauma, which often has lasting effects. As documented above, traumatized individuals living with PTSD, depression, or other disorders face real struggles in communicating and disclosing the suffering they have endured to asylum officers. Disclosing traumatic events requires trust and a certain level of comfort that cannot be achieved in detention. Consequently, traumatized individuals may be deprived of due process and, ultimately, protection under U.S. law. We urge your offices to conduct a full investigation into detention and fast-track removal of families struggling with mental health challenges.

Respectfully submitted,


Lindsay M. Harris
American Immigration Council
lharris@immcouncil.org


Karen S. Lucas
American Immigration Lawyers Association
klucas@aila.org


Ashley Feasley
Catholic Legal Immigration Network, Inc.
afeasley@cliniclegal.org


Amy Fischer
Refugee and Immigrant Legal and Education Services
afischer@raicestexas.org

# Exhibit 64
## Publicly Filed

**Declaration of CARA Project Attorney Ana Camila Colón**
**Regarding the Government's Failure to Issue Charging/Removal Documents to Families**
**Detained in Dilley, Texas**

I, Ana Camila Colón, declare under penalty of perjury that the following is true to the best of my recollection and knowledge:

1.  I am a Project Attorney with the CARA Family Detention Pro Bono Project (CARA). I work daily with detained children and mothers at the South Texas Family Residential Center (STFRC) in Dilley, Texas. I began working full time as a staff member with the CARA Project on October 26, 2015. I previously worked in a volunteer capacity from October 5, 2015 to October 9, 2015.

2.  Throughout the week of November 30, 2015, CARA staff noticed that a large percentage of mothers detained at the STFRC did not have charging or removal documents. They came into the legal visitation trailer to meet with our staff and volunteers with just the documents that Corrections Corporation of America (CCA) gave them, including flyers on how to charge phone cards and forms to request information from their Deportation Officers. CCA is the private prison contractor operating the STFRC.

3.  When we inquired about the lack of charging/removal documentation, the mothers told us that they had not received any documents while detained at the holding facilities operated by Customs and Border Protection (CBP). Previously, mothers would receive their charging document in the CBP holding facilities and arrive with them at the STFRC. The charging documents allowed CARA staff to assess each mother's legal proceedings and provide proper counsel.

4.  This problem has been quite pervasive. For example, on Friday, December 4, 2015 we conducted intake screening interviews with approximately fifty-six mothers detained with their children. Forty-three of those families had absolutely no charging/removal documents. In other words, over seventy-five percent of the families had not been issued charging/removal documents following their interviews with CBP officers prior to their arrival at the STFRC in Dilley, Texas.

5.  On December 1st, 2015, the ICE Deputy Chief Counsel suggested that the mothers must have lost or misplaced their charging/removal documents. On December 4, 2015, while we were conducting intake screening interviews, we called over the Assistant Deputy Chief Counsel so he could see for himself the amount of mothers that did not have their charging/removal documents because CBP had not served them.

6. The government's failure to issue charging/removal documents to our clients is problematic because we cannot adequately represent them if we do not know the charges against them or whether they are subject to a reinstated order of removal. This means that we must file an individual request for each client's full immigration file. While we wait for this file, the preparation of the family's case is delayed and they must remain in detention.

7. One case I worked in November 2015 for the Flores class members from El Salvador waited 16 days for the reasonable fear interview. Another case I worked on February 2016 for the Flores class members from Guatemala waited 19 days for the reasonable fear interview. A more recent case I worked on March 2016 for the Flores class members from El Salvador waited 20 days for the reasonable fear interview.

8. Not having access to the charging or removal documents of our clients is a barrier to providing a meaningful opportunity to be heard.

Signed on this 28th day of March, 2016, in Dilley, Texas,

Ana Camila Colón-Villafañe                    3/28/16
                                              Date

1029

# Exhibit 65
## Publicly Filed

## DECLARATION OF JODILYN GOODWIN

I, Jodilyn Goodwin, hereby declare:

1.      I make this declaration based on my own personal knowledge and, if called to testify, I
could and would do so competently as follows:

Background

2.      I have been a licensed attorney in Texas since 1995. I specialize in immigration law and
have my own private immigration firm located in Harlingen, Texas, which is in South Texas near
the Texas/Mexico border.  I also engage in extensive pro bono immigration work with a range of
immigration organizations, including Texas Rio Grande Legal Aid, ProBAR and others. I am a
member of the Advisory Committee to the American Bar Association Commission on
Immigration, and I am an active member in the American Immigration Lawyers Association
(AILA).  I have directly represented many asylum seekers and other migrants in removal
proceedings, including many who were detained by immigration authorities in border facilities
and at immigration detention centers.  I have taught numerous continuing legal education
sessions and other trainings and classes on detention, immigration removal proceedings and
asylum and refugee law. I mentor other attorneys in these areas of immigration practice as well.

3.      Because I practice immigration law in South Texas, I am very familiar with trends
regarding the processing of children and families apprehended at or near the Texas/Mexico
border by immigration authorities.  Relatives of children and families often contact me to learn
about the processing and location of detained loved ones, and I also consult regularly with
children and families regarding their legal cases after they are released by immigration
authorities.  Furthermore, I have been involved in pro bono and charitable efforts to serve the
needs of children and families apprehended at the border, as I will describe in further detail
below.

4.      After the Department of Homeland Security ("DHS") ceased using the T. Don Hutto
detention center to hold families in 2009, up until June 2014, I rarely learned of families who
were sent by DHS to detention centers after apprehension at the border.  A very small number of
families apprehended at the border were sent to the Berks family detention center in
Pennsylvania, but detention at Berks was the unusual exception.  In most cases, DHS processed
families at border facilities, for a few hours up to a few days, and then released them.  The vast
majority of those who were processed and released received Notices to Appear placing them into
removal proceedings under Section 240 of the Immigration and Nationality Act, where they
could seek asylum or other relief available under the immigration laws before an Immigration
Judge.   The families went to live with relatives or friends in communities around the country as
their cases proceeded forward.

5.      Beginning in 2014, immigration attorneys and social service providers in South Texas
noted that larger numbers of Central American migrant families were arriving at or near the
Texas/Mexico border and were apprehended by DHS.  These families mostly consisted of a

mother and one or more children, but some families included a father as well or consisted of a father and children alone.

6.      By reading DHS announcements and the press and through my conversations with other immigration attorneys around the country, I learned that new family detention facilities were opened to hold women and their children, beginning in June 2014.  I learned that many families apprehended at or near the South Texas border were sent to immigration detention centers beginning in June 2014.  Initially, families of children and their mothers were sent to a facility in Artesia, New Mexico.  Then, between August and December 2014, DHS opened two large family immigration detention centers in in Karnes City and Dilley, Texas.

7.      Even after DHS opened the new family immigration detention centers in the summer of 2014, however, DHS continued to release families apprehended at or near the border in South Texas, after a few hours or days of processing at the short-term border facilities.  To this date, DHS releases families apprehended at or near the border every day after processing them in short-term border facilities.  These released families are more commonly families of mothers and children, although fathers traveling alone with their children also are sometimes released after processing at the border as well.

8.      In June 2014, Catholic leaders in South Texas recognized that the families released by DHS after processing at the border had undertaken long journeys to arrive at the Texas/Mexico border and had often spent several days without sufficient food or sleep in tight quarters at the border processing facilities.  Volunteers began to offer basic social services and assistance with onward travel to the released Central American families at the Sacred Heart Catholic Church in McAllen, Texas.  These services are still provided to date.  Each day, when DHS releases families after processing at the border facilities, the agency takes the families to the local bus station.  From there, they are transported to Sacred Heart Catholic Church for services and then returned to the bus station to continue their travel.

9.      Also in the summer of 2014, the legal community began to provide assistance to the families released after processing at short-term border facilities.   Many of the families released by DHS indicated that they were fleeing violence in Central America and wished to seek asylum in the United States.  The families received little information about their legal cases from the immigration authorities before release and required orientation to the U.S. legal system in order to effectively present their claims.  With other attorneys, I organized a system for providing basic legal information to the released families who were being served at Sacred Heart Catholic Church.

10.     Specifically, beginning in late June of 2014, a group of attorneys committed to volunteer their time to provide legal orientations to the released families.  While there have been periods when the volunteer legal orientation program has been less active or more active, based on the numbers of families who are released, the effort has continued to provide legal orientation up to the present.  At first, the legal orientation was provided twice daily to accommodate the numbers of families being released, then when the numbers of families released decreased, the legal orientation began being provided only once per day by volunteer attorneys.  On a rotating basis,

one or two volunteer attorneys meet with the families released by DHS at the border on a
particular day at Sacred Heart Catholic Church.

11.     Since the beginning of this volunteer effort, I have coordinated the volunteer program by
reaching out to additional volunteer attorneys, training volunteer attorneys and establishing
calendars for volunteers to ensure that attorneys will be available to provide the orientation as
many days as possible.  I also volunteer directly at the Sacred Heart Catholic Church.  Through
my own interactions with families at the Sacred Heart Catholic Church and through information I
have received from the volunteers, I have a good understanding of the characteristics of the
families who are released after processing at the border in the short-term border facilities.

12.     I do not perceive any difference between the families of mothers and children released
after processing at the border, who have interacted with our volunteer attorneys, and the families
sent to the family immigration detention centers.  Based on information that I have received from
the press, DHS statements and statistics and my conversations with immigration attorneys
around the country, including AILA attorneys who volunteer at the family immigration detention
centers, the families of mothers and children sent to immigration detention centers are almost all
Central American families seeking asylum.  The vast majority are apprehended shortly after
crossing into the United States, although some families presented themselves to immigration
officials before crossing into the United States.  The families released at the border and those
held in family detention appear to be very similar in national origin, size of family, reasons for
arriving in the United States and manner of apprehension.

13.     Over the last several weeks, at my request, the volunteer attorneys working with released
families at Sacred Heart Catholic Church have recorded details regarding the demographic
profiles of the families they encounter each day.  During the period between November 29, 2015
and December 10, 2015, the volunteer attorneys saw more than 50 family units of mothers and
children.  Each day that volunteers met with families, the volunteers saw between four and nine
families of mothers with children.

14.     All of the children in the families had been issued a Notice to Appear placing them in
removal proceedings under Section 240 of the Immigration and Nationality Act; none of the
children had been placed in expedited removal, reinstatement of removal or any other form of
proceeding.  Of the mothers, 95% had been issued a Notice to Appear placing them in removal
proceedings under Section 240 of the Immigration and Nationality Act.  A few mothers were
placed into another form of proceeding, usually reinstatement of removal based on a prior
removal order.

15.     The following demographic information describes the mother-headed families seen by
volunteers at the Sacred Heart Catholic Church since November 29, 2015.

        a.  Almost all of the families came from the Central American countries of El
            Salvador, Honduras and Guatemala.  The greatest number of families arrived
            from El Salvador, with more than 20 families hailing from that country.  The
            second largest number came from Honduras, and the smallest number came from
            Guatemala.  Only four families were not from those three countries.

1033

    b.   The majority of the family units of mothers and children involved the mother and only one child.  More than 30 families included only one child.  Mothers arriving with three children or more were rare.

    c.   The majority of the children were six years old and under or 12 years old and over.  Several dozen children were six years old or younger.

16.    This information regarding the numbers and characteristics of families of mothers and children is consistent with the patterns that I have observed regarding the families released after processing at the border since we began our legal orientation efforts in the summer of 2014.  I have noticed a few changes in recent months, however, which are not captured in this information.  First, I have seen an increasing number of fathers traveling alone with their children who are released after processing at the border facilities.    Second, I have noted that almost all mothers released after processing at the border facilities are now placed on electronic ankle monitors.  Before the summer of 2015, we saw virtually no mothers placed on electronic ankle monitors who were released after being apprehended at or near the border and processed at border facilities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of May, 2016 at Harlingen, Texas.

_____
Jodilyn M. Goodwin

1034

# Exhibit 66
## Publicly Filed

DECLARATION OF MICHELLE GARZA PAREJA

I, Michelle Garza Pareja, depose and say:

1. I am an attorney licensed and admitted in the State of Texas. I have been
   employed at the Refugee and Immigrant Center for Education and Legal Services
   (RAICES) in San Antonio, Texas, as an attorney since October of 2010 and was
   admitted to practice in the State of Texas on November 4, 2010. I am currently
   employed as the Associate Executive Director of RAICES, however I was hired
   on November 4, 2010 as a Staff Attorney within the RAICES Children's Program,
   which focuses on representation of unaccompanied immigrant minors. In that
   capacity, I regularly visited children detained in the custody of the Office of
   Refugee Resettlement ("ORR"). I estimate that since becoming a licensed
   attorney, I have made at least one hundred sixty visits to ORR detention centers,
   and have visited eight different ORR detention centers. After approximately two
   years as a Staff Attorney, I was promoted to Director of the Children's Program
   in which I supervised the RAICES' Children's Program's work with
   unaccompanied children. RAICES is subcontracted to provide free legal services
   to unaccompanied children and also assigns pro bono representation through
   pro bono mentoring.

2. Over the past year, as a result of my experience with children, I was involved
   with RAICES' family detention work and have provided legal services to families
   detained in Immigration and Customs Enforcement ("ICE") custody at the
   Karnes County Residential Center ("Karnes"), in Karnes City, Texas. In that

1

capacity, I have visited Karnes at least ten times to meet with families in detention, and have represented families while detained at Karnes. I continued to work with families that are released from the Texas family detention centers who are transported to San Antonio and are awaiting their bus/airplane departure to other parts of the country until November of 2015.

3. In my work dealing with hundreds of unaccompanied minors in the custody of the Office of Refugee Resettlement (ORR) and accompanied minors at Karnes, I have noticed significant differences in the approach the government has taken to these "surges" in various populations even though all children are protected by the *Flores* settlement agreement.

4. The Government's approach to the "surge" of unaccompanied children was extremely organized and child welfare focused. Government agencies experienced in working with refugees and trauma victims, such as ORR and the Federal Emergency Management Agency ("FEMA") were placed in charge of addressing the treatment of and services to the increased numbers of unaccompanied children. ORR and FEMA made clear that the unaccompanied children were not in the custody of ICE and would not be treated as such. The goal was to ensure that the children were safe, received services appropriate to trauma victims, and were released as quickly as possible to family members or placed in programs licensed for the care of dependent children.

5. Each child in the care of ORR had a clinician assigned to them to ensure they received appropriate counseling, treatment and mental health services caused by

2

any persecution they had experienced in their home countries or trauma experienced while journeying to the United States. At Karnes, *Flores* class members are not assigned clinicians. I have spoken with several mothers at Karnes who report that they had requested that a counselor speak to them and their children but their requests were not granted. Mothers expressed grave concern for their children as many had begun wetting their beds and losing significant weight. Both mothers and children describe Karnes like a prison. They are forced to do a "roll call" in the middle of the night by screaming officers. Instead of a clinician or a case manager, the government official that is in charge of their cases and speaks with them periodically is their ICE "Deportation Officer."

6. Instead of placing unaccompanied *Flores* class members in "expedited removal" proceedings, the ICE officers place these minors (and minors arrested with their fathers) in regular removal proceedings so they can be promptly released, with unaccompanied minors released to ORR custody. In the cases of unaccompanied minors, ICE routinely delayed the filing of Notices to Appear (NTAs) with the San Antonio Immigration Court for sixty days. The Notice to Appear is the charging document that begins regular removal proceedings. By delaying the filing of the charging document, it can be filed with the immigration court in the venue closest to the unaccompanied child's final destination. Unaccompanied children and their families then have more time to obtain legal counsel which maximizes their appearance rate and minimizes the chance of receiving removal

1038

orders *in absentia*. At Karnes, the mothers and accompanied class members are routinely placed in "expedited removal" proceedings in which they are scheduled for interviews with asylum officers to determine whether they have a credible or reasonable fear of returning to their countries. If the mothers do not receive a positive determination after one interview, then ICE seeks to deport them as quickly as possible. During the fear interviews accompanied class members play almost no role as asylum officers focus almost all of their attention on the accompanying mothers' cases.

7. In unaccompanied cases, each child has a case manager assigned to focus on assisting the child's family member's through the reunification process so that the child may be reunited as soon as possible. The children have periodic meetings with their case managers so the child can call their family members and receive updates on their release. A majority of the children we served in ORR custody during the surge were released and reunified with family members within approximately one week. In contrast, the government's approach to *Flores* class members accompanied by their mothers has been the exact opposite. At Karnes, mothers and children are detained for weeks or months on end.

8. At Karnes mothers complain they do not feel comfortable during their fear interviews because officers are not friendly or sensitive to their stories of persecution. Officers are often hard to understand because they use a telephonic interpreter. Because child care is not easily available, mothers who want to be interviewed outside of the presence of their children to avoid the children being

1039

further traumatized by the mothers' testimony are unable to do so. Because of
the remoteness of the detention site few attorneys are available to assist class
members and when attorneys do agree to do so they must often wait for hours to
see their clients. Most class members and their mothers go through fear
interviews without the assistance of counsel. Children rarely are provided a
separate interview even though they may possess independent fear claims. In
most cases the asylum officers find that the minors or mothers are credible, and
have been persecuted, but then deny the fear claim because when asked what
"social group" the class member or mother belonged to that caused their
persecution, they have no idea what the question even means. Even the
immigration judges and the courts have difficulty defining what "social groups"
are. Finally, decisions are not individualized but rather are issued on forms with
boxes checked off by the asylum officers. Thus, neither the class members nor
their mothers nor their legal counsel, if they have counsel, nor immigration
judges reviewing denials can really understand why the asylum officer denied
the fear claim.

9. At Karnes, if mothers and children are approved for release, the mothers are
almost always only released if they agree to wear a GPS ankle monitor. They are
provided entirely inadequate information about their responsibility to appear in
the future and the consequences for failing to do so. They are dropped off at the
San Antonio bus station unless their family members come to the detention
center to pick them up.  They are dropped off without any money or interpreter

5

and left to figure out how to obtain a bus ticket, read their ticket, and understand bus transfers and delays. In addition, many times class members and their mothers have been dropped off outside of business hours in downtown San Antonio.

10. Since August 2015 when the District Court in *Flores* issued its remedial Order requiring that DHS comply with the terms of the *Flores* settlement, we are aware of no changes in ICE policy or practices with regards accompanied class members. ICE still does not make and record continuous efforts aimed at the release of class members under Paragraph 14 or placement in a licensed facility under Paragraph 19. ICE still does not advise class members of their right to a bond redetermination hearing before immigration judges or arrange for class members to appear before immigration judges to review their custody status. ICE still does not advise class members or their mothers about any rights the minors possess under the *Flores* settlement. ICE continues to hold accompanied class members with unrelated adults for weeks and months at a time. In short, ICE continues to operate as if the *Flores* settlement has *no* application to accompanied minors and as if the District Court *never* issued its August remedial Order.

11. ICE clearly has the authority to release accompanied class members and their mothers without placing them in "expedited removal" proceedings and then detaining them for prolonged periods as they do with almost all minors apprehended with their fathers or apprehended alone. Nevertheless, if ICE

6

persists in conducting fear interviews with class members and their mothers before deciding whether to release them, these interviews could be conducted promptly in a manner consistent with class members' right to fair treatment and their rights under the *Flores* settlement but this would require adjustment of ICE's policies and practices. First, CBP and ICE would have to provide class members with prompt access to counsel rather than delaying such access for several days. Second, CBP and ICE would have to immediately provide class members and their mothers lists of local free legal services and access to free telephones to contact attorneys. Third, CBP and ICE would have to remove unnecessary obstacles to counsel having access to meet with class members and their mothers. Fourth, CBP and ICE would have to promptly provide counsel with copies of administrative records pertaining to class members and their mothers. Fifth, CBP and ICE would have to assign the resources necessary to make continuous efforts aimed at release or placement of detained minors as required by the settlement. Sixth, as required by the settlement ICE would have to contract with licensed facilities for the care of dependent children (as ORR does). Sixth, the practice of not explaining what is meant by a "social group" during fear interviews and issuing form letter denials which make review difficult should be corrected. Seventh, the government could provide prompt review of adverse fear determinations before the immigration judges. Eighth, as required by the settlement, ICE should arrange for prompt custody status

1042

reviews before immigration judges for any class member not released or placed

in a licensed facility within a few days.

I declare under penalty of perjury that the foregoing facts are true and correct to

the best of my knowledge. Executed this 12th day of May, 2016, in the City of Dallas,

State of Texas.

Michelle Garza Pareja

8

# Exhibit 67
## Publicly Filed

## DECLARATION OF AMY FISCHER

I, Amy Fischer, depose and say:

1. I hold a Master's Degree in Public Policy from the University of Maryland with a specialization in Social Policy.

2. I am currently the Policy Director at the Refugee and Immigrant Center for Education and Legal Services (RAICES). RAICES is one of four organizations that comprise the CARA Family Detention Pro Bono Project (CARA),[1] which provides pro bono legal representation to mothers and *Flores* class members detained at the South Texas Family Residential Center in Dilley, Texas and the Karnes County Residential Center in Karnes City, Texas. RAICES is primarily involved in coordinating pro bono legal representation at the Karnes County Residential Center in Karnes City, Texas. As of December 17, 2015, the population at Karnes was approximately 602 residents, due to a recent expansion of the center.

3. RAICES operates a shelter known as Casa RAICES in San Antonio, Texas, which houses women and class members released from family detention centers while they await travel to their destination cities, typically to reunite with family members. The shelter can accommodate twenty-five families, most of whom stay for less than forty-eight hours while they await buses or flights to other cities such as Los Angeles, Houston, New York, Washington, DC, and New Orleans. Families typically arrive at our shelter in one of two ways: (1) Immigration and Customs Enforcement (ICE) releases families without bus or plane tickets to RAICES directly, or (2) RAICES has staff and volunteers at the San Antonio bus station where ICE releases families who have bus tickets. If a family misses their scheduled bus or has a long wait before their departure time, our staff and volunteers bring them to our shelter to re-book their travel or await their departure. While at the shelter, RAICES staff and volunteers provide hot food, a place to rest, additional clothing, diapers, toys, and assistance with coordinating travel to their new homes. RAICES staff also collect information from the families that pass through the house and

---

[1] The CARA project includes the Catholic Legal Immigration Network, Inc., the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association.

1045

the San Antonio bus station to facilitate access to post-release representation and to document any issues families faced while detained.

4. In my role as Policy Director at RAICES, I work closely with on the ground staff and volunteers in the Dilley and Karnes Family Detention Centers, the bus station, and Casa RAICES to identify and resolve systemic issues that impact mothers and children in family detention centers. This includes language access problems for those families who speak indigenous languages.

5. I submit this declaration to provide information regarding the challenges that indigenous language speaking mothers and class member children face while detained in Immigration and Customs Enforcement's (ICE) detention centers. I will also explain the procedure for collecting the information that was included in a complaint submitted to the Department of Homeland Security's (DHS) Office of Civil Rights and Civil Liberties (CRCL) and Office of the Inspector General (OIG) by all four CARA partners on December 10, 2015. This complaint, attached as Exhibit A hereto, concerns the failure of Customs and Border Protection (CBP), ICE and U.S. Citizenship and Immigration Services (USCIS) to provide indigenous language speakers adequate access to justice.

6. Through our online case management system, CARA staff and volunteers identified over 250 families, primarily from Guatemala, who speak variations of Akateco, Kanjobal, Quiche, Kekchi, Mam, Maya, Popti, Achi, Garifuna, Kaqchikel, Chuj, Ixil, Lenca, and other Mayan languages. CARA staff and volunteers undertook a review of these 250 cases to determine what, if any, language access issues consistently arose in these cases. Based on our review, several trends emerged, including: (1) inadequate screening of language ability by CBP and ICE both at the border and in the family detention facilities; (2) DHS's failure to provide written materials concerning *Flores* rights or asylum in indigenous languages; and (3) DHS's failure to provide indigenous language interpreters to enable government officials, detention center staff and service providers to convey critical information. These language access problems are discussed in more detail in our complaint to CRCL and OIG, which is attached as Exhibit A.

7. Of the more than 250 cases identified from both Dilley and Karnes, we selected twelve cases to highlight in the complaint, in addition to one case of a father detained at the Berks Family Residential Center in Leesport, Pennsylvania. Many more of the 250

2

1046

identified cases had stories highlighting issues with language access while detained. Some families, however, were unable to fully understand the consent procedure for sharing their information with government officials due to interpretation difficulties.

8. Together with our partners from AILA, the American Immigration Council, and CLINIC, we filed the attached complaint with CRCL and OIG on December 10, 2015. To protect the confidentiality of the families included in the complaint, we released the complaint to the public using pseudonyms. Full names and alien numbers were included in the version of the complaint that was sent directly to CRCL and OIG, which is otherwise identical to the version attached here as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of March, 2016, in Washington DC.

Amy Fischer

# Exhibit 68
## Publicly Filed

## <u>DECLARATION OF KAREN S. LUCAS</u>

I, Karen Siciliano Lucas, Esq., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct the best of my knowledge, information, and belief.

1. I am an attorney licensed and admitted to the bar in the State of New York. I am currently the Associate Director of Advocacy at the American Immigration Lawyers Association (AILA).

2. AILA is a national association of more than 14,000 attorneys and law professors who practice and teach immigration law.

3. On February 1, 2016, I accompanied Class Counsel in *Flores v. Lynch* to participate as a volunteer attorney in their inspection of two Customs and Border Protection (CBP) facilities in McAllen, Texas. Such inspections are authorized pursuant to Paragraph 33 of the *Flores* Settlement Agreement ("Agreement").

4. This declaration is based on conversations during the inspection between Class Counsel and accompanying volunteers, including myself, and Immigration and Customs Enforcement (ICE) officials at the facility located at 3700 W. Ursula Ave, McAllen ("Ursula").

5. By way of background, after being fully processed at Ursula, some class members and their accompanying parents are transferred to one of the three family detention centers – Berks, Karnes or Dilley – with an expedited or reinstatement of removal order. Other class members and their accompanying parents are released directly from Ursula – with or without an alternative to detention (ATD) ankle monitor – and issued a Notice to Appear (NTA) in regular removal proceedings before an Immigration Judge.

6. During the Ursula inspection, Class Counsel asked an ICE Enforcement and Removal Operations (ERO) official how ICE decides which class members and parents to release, and which to continue to detain.

7. This is the decision-making process the ICE ERO officer described: If the family detention centers tell Ursula they have bed space, ICE then looks at the family's "composition," including the gender of the parent and the gender and age of the children (ages 2-14 at Dilley, ages 2-17 at Karnes, he said), to see if the family is suitable for any available family detention spaces, given the makeup of the currently detained population

<div align="center">1</div>

(e.g., because more than one family sleeps in the same room, the gender of the children is considered). They also look to see if the detention center in question can provide medical care needed by any or all of the family members.

8.  If the family does not "qualify" for detention, then they "qualify" for release, he said.

9.  With respect to male head-of-household families in particular, the official explained that the Dilley and Karnes detention centers do not accept male heads of household. So if Berks has bed space, the family could go to Berks – if not, they would be issued an NTA and released (unless the father has a criminal history).

10. In cases in which a release decision has been made, CBP issues the NTA.

11. The official concluded that if a family is issued an NTA instead of an expedited removal order, it is because ICE has already decided to release them because, on the day the decision was made, they did not "qualify" for family detention.

12. It appeared to me from this inspection that Defendants were not making and recording prompt and ongoing efforts to release accompanied class members pursuant to Paragraphs 14 or 19 of the Agreement at Ursula.

13. It further appeared to me that the decision to transfer a particular family from Ursula to a family detention center, rather than to release with an NTA, is completely arbitrary. It appears to be based on a combination of available bed space and characteristics like the age, gender, and medical conditions of parents and child(ren).

14. Defendants regularly fail to release accompanied class member children and their parents at the earliest opportunity: when their apprehension and processing is completed at the border. When Defendants *do* release families at the border, they appear to do so not based on criteria that are defined within the Agreement, but rather based on logistical criteria like bed space and the unpredictable age and gender makeup of other families in detention at that time.

15. Thus, Defendants appear to be approaching their responsibilities under the Agreement backwards. The Agreement requires Defendants to make prompt and ongoing efforts to release accompanied class members after apprehension, and only permits detention when it is "*required* either to secure [the minor's] timely appearance before the [DHS] or the immigration court, or to ensure the minor's safety or that of others." (Agreement ¶¶ 14, 18) [emphasis added]. Instead, *when presented with the opportunity to release at Ursula,*

2

Defendants only release those class members who fail to "qualify" for detention on that particular day.

Executed this 12th day of May, 2016, in Washington DC.

_____

Karen S. Lucas, Esq.

# Exhibit 69
## Publicly Filed

## Declaration of Kathryn E. Shepherd

I, Kathryn E. Shepherd, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney licensed and admitted to the practice of law before all courts and agencies of the State of New York, all courts and agencies of the State of Texas, and the U.S. Department of Justice Executive Office for Immigration Review, and I was admitted to the practice of law in New York in March 2009 and in Texas in May 2012. I have focused my career on representing survivors of trauma seeking protection in the United States and continue to engage in this work representing detained children and mothers in Dilley, Texas.

2. Since December 2015, I have been the Managing Attorney with the CARA Family Detention Pro Bono Project ("CARA"), which provides pro bono representation to mothers and children detained at the South Texas Family Residential Center in Dilley, Texas ("Dilley detention center" or "Dilley").

3. The CARA Family Detention Pro Bono Project consists of four partner organizations: Catholic Legal Immigration Network, Inc. ("CLINIC"), the American Immigration Council ("Council"), the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), and the American Immigration Lawyers Association ("AILA"). I manage a team of five CARA staff members at Dilley, including two attorneys and three non-attorneys. I also currently supervise a fellow who has spent the past few months at Dilley from the Immigrant Justice Corps.

4. Because the Dilley detention center is located about 80 minutes outside of San Antonio, little to no legal representation exists for the up to 2400 detained children and mothers other than the services provided by the CARA project. Although Immigration and Customs Enforcement (ICE) refuses to give us a daily or even weekly population count, we estimate the population to currently be around 1500 children and mothers. Currently the asylum office is conducting up to 60 credible and reasonable fear interviews per weekday and an additional 25 interviews on Saturdays.

5. To provide pro bono representation to this enormous detained population, AILA and others recruit volunteer attorneys, paralegals, interpreters, and law students, from all over the country who travel at their own expense to assist our on-the-ground staff each week from Sunday to Friday. Together, the CARA staff and volunteers see as many as 150 mothers on a daily basis. We assist them in preparing for credible and reasonable fear interviews, bond hearings, negative credible and reasonable fear reviews before an immigration judge, and, occasionally, individual merits hearings. When possible, we also represent who we deem to be the most vulnerable clients at their credible and reasonable fear interviews, file motions to reopen removal orders as necessary, place individual merits hearings as needed with other pro bono attorneys, and represent every single family who does not otherwise have counsel at all Dilley bond hearings.

**6.** I submit this declaration to provide information regarding conditions that I and my team of staff and volunteers at the Dilley detention center have observed and to speak specifically to some of the most recent problems with access to counsel that we face. Previous declarations to this Court have documented many of the ways in which detention fundamentally undermines access to counsel by Class Members and their mothers. Recently, this problem has manifested in some new and challenging ways.

**A Lack of Adequate Childcare at the Dilley Detention Center Undermining Access to Counsel**

7. Since January 2016, we have seen a spike in the number of very young children. Indeed, the numbers of children under the age of 2 seem to be rising every month. While in January, only 3 of our client families included children under the age of 2 (and less than 1% of our total client population), by April, we had close to 100 children under the age of 2 we were representing as clients, along with their mothers, and this represented 9% of our total client population.

8. The increase in the infant and toddler population at Dilley, combined with the changes in the provision of childcare at Dilley, described below, has profoundly affected our ability to deliver legal services and to adequately prepare these children and mothers for the legal process to which they are subjected.

9. In the last month, the extremely limited child care capacity at Dilley has substantially increased the challenges we face in providing legal services. Mothers now must come to legal appointments with their young children in tow and tell us that while they attempted to drop off their children at the nursery, they were told that it was at capacity. The play area in the legal visitation trailer – an alternative place to occupy children while their mothers speak with their attorneys – has a capacity of only ten children, which is far from sufficient for the number of families detained seeking legal services every day. The children who cannot be left at the nursery or in the play area must sit with their mothers during legal meetings.

10. Of course, attorney-client meetings in which the mothers receive legal counsel and advice are highly sensitive and critically important to the family's legal case for protection in the United States. Many of these mothers, and sometimes the children too, are disclosing, for the very first time, traumatic events, including rape, sexual assault, incest, domestic violence, threats, and extortion. In my experience, mothers and older children are often reluctant and sometimes totally unable to articulate the fears that they have and the horrors they have endured with younger children or siblings present in the room. However, this is precisely the kind of information that these mothers and children must be ready to share at their credible or reasonable fear interview before the Asylum Office, which usually occurs the very next day after we meet with them. Given the volume of intakes, the limited and constantly fluctuating number of CARA volunteers, and the fact that we usually do not meet a family until the day before their credible fear interview is scheduled, we often do not have an option of waiting to prep a mother or child until there is room in the play area or the nursery for the children whose little ears should not be exposed to these traumatic stories.

11. As an attorney with substantial experience interviewing and preparing asylum seekers, I can attest to the effects that having a child, who may often be sick, crying, or simply craving attention from his or her mother, in the room while a mother is attempting to prepare for a critically important legal interview or court date. In almost all cases, it totally undermines a client's ability to concentrate, focus, and to adequately weigh her legal options and pay attention to the advice of her attorney.

12. This week, on Monday May 9, the issue of inadequate childcare at Dilley during attorney-client meetings became even more problematic. On this day, our clients were told for the first time that they categorically could not use the child care nursery during attorney-client meetings – even though the nursery was empty that morning. We have not been offered a reason for the rule change. It seems nonsensical for a facility that seeks licensure as a childcare facility under Texas state law to apparently be unable or unwilling to provide childcare for mothers undergoing the legal process for which they are ostensibly being held and detained.

**Restrictions on Independent Psychological Evaluations at the Dilley Detention Center Are a Fundamental Access to Counsel Issue**

13. Another troubling recent development at Dilley regarding access to counsel is the sudden prohibition on telephonic psychological evaluations. Such evaluations by independent mental health experts are critical evidence that attorneys obtain in support of their client's legal claims, especially as it pertains to credible and reasonable fear determinations and the terms and timing of release from detention.  The overwhelming majority of families detained at Dilley are fleeing violence in their home countries and seeking protection in the United States. As such, many of the children and mothers exhibit symptoms of trauma, and, when evaluated, many are diagnosed with Post-traumatic Stress Disorder, Major Depressive Disorder, Anxiety disorders, or other cognitive disabilities.

14. The ways in which symptoms of these disorders manifest can adversely affect a mother or a child's ability to successfully undergo the expedited removal process. The credible or reasonable fear interview process involves telling an asylum officer, a stranger and U.S. immigration official, the worst things that have ever happened to that child or mother. Some of these kids and moms are simply not ready or able to do this. For those families, who usually then receive a negative determination from the asylum office, we must prepare them for a review before an immigration judge, and, if they are still unable to articulate their fear or to explain their story and the judge affirms the negative determination, we prepare a request for reconsideration (RFR) with the asylum office.

15. Securing a psychological evaluation is a critical piece of evidence that has been proven, time and time again, to make a difference at the immigration judge review level and at the RFR level. For the months of July- December 2015, for example, data pulled from our client files shows that Judges are far more likely to vacate (overturn) an asylum officer's negative determination where a psychological evaluation is submitted. Indeed, the immigration judge overseeing the Dilley docket who most frequently affirms the asylum office's negative determinations actually vacated 79% of negative credible fear

determinations during that five month period where a psychological evaluation was submitted to the court. Where a psychological evaluation was not submitted to the court, that same judge only vacated 56% of the negative credible fear determinations made by the asylum office. Unfortunately, submitting a psychological evaluation before an immigration judge review has become increasingly rare due to the difficulties in finding pro bono psychological professionals to conduct the evaluations and obtaining clearance from ICE to conduct those evaluations.

16. Finding pro bono psychologists, psychiatrists, or licensed clinical social workers willing to travel to Dilley, Texas, to conduct one or more psychological evaluations is, of course, extremely challenging. While we have had some individuals come and spend a few days or even a week at Dilley, these busy professionals are often not able to leave their own work commitments and families to be here on a routine basis. Thus, at least since I started representing clients at Dilley in October 2015, we have been able to work with psychological professionals to conduct evaluations of children and mothers by phone. We have to secure permission from ICE ahead of time to do this and often experience delays in receiving that permission, which undermines our legal case and sometimes puts children and their mothers at risk of removal.

17. Recently, we have been facing volunteer fatigue with many prior psychological evaluators who are over-extended and unable to commit to additional telephonic evaluations. We have been making efforts to reach out to work with organizations such as Physicians for Human Rights and the American Academy of Pediatrics to expand our pro bono network of psychological experts. In those discussions, we learned that more professionals would be willing to volunteer their time and feel more comfortable conducting the evaluations remotely if we could facilitate the evaluations by videoconferencing technology, such as Skype.

18. Accordingly, in an effort to meet the need for pro bono psychological evaluations for the children and mothers we represent, we made a request at the local level with ICE to start using Skype and explained the rationale for doing so. Not only was our request to use videoconferencing technology rejected, but ICE decided to arbitrarily change their policy with regards to telephonic psychological evaluations, and, as of May 10, Norma Lacy with the ICE San Antonio field office informed me that Field Office Director Henry Lucero will no long allow telephonic evaluations and will only permit in-person psychological evaluations to be conducted at Dilley. This is extremely distressing for the most vulnerable detained families that we have. Just this week, for example, I had 6 telephonic evaluations for experts tentatively scheduled to support RFRs that we plan to file with the asylum office. ICE's arbitrary new rule change will directly affect these families and the strength of the legal case that we are able to mount for them.

19. This is a fundamental access to counsel issue. A psychological evaluation can make or break a case and the unreasonable restrictions on conducting evaluations for a population that ICE knows and acknowledges to be traumatized and fleeing horrific violence is incomprehensible.

**Inability to Conduct Pre-Release Orientations to Inform Children and Mothers of their Rights and Responsibilities Upon Release**

20. In a prior declaration submitted to this Court, Karen Lucas, the Associate Director of Advocacy at the American Immigration Lawyers Association attested that the CARA Partners had first requested back in July 2015 that ICE agree to allow CARA staff at Dilley to deliver pre-release orientation sessions to the mothers and children. After months of delays by ICE, we did not conduct our first orientation until November 10, 2015. ICE never gave us permission to conduct the sessions on a daily basis, as we had requested, but permits us to deliver the sessions to interested families twice a week. The sessions are offered in Building 100 on Tuesdays and Thursdays from 9-10am. We had requested a different time for this meeting because there are only three attorney staff members and bond hearings occur regularly with the three immigration judges handling the Dilley docket in three different courtrooms in the mornings. This has sometimes been a scheduling issue for us, but when we raised it with ICE, they refused to work with us to find a more appropriate time for these sessions that would not require an attorney being unable to represent clients in court that morning.

21. Given the recent increase in the population of the detention center, however, new problems have emerged. ICE allows us only one particular space in which to conduct these presentations, and that space allows only 49 people to be in the room – and that number includes both mothers and children. Unfortunately, given the childcare limitations described above – by which the detention center does not provide childcare to mothers attending legal meetings – children are forced to attend these orientations, regardless of whether they are old enough to understand the critically important content that their mothers must understand in order to pursue their claims for protection in the United States.

22. On May 10, 2016, for example, we had 163 families who wanted to attend the pre-release orientation. These are typically families who know they are about to be released within a day or two and have received a positive credible fear determination. A total of 84 families, more than half of whom wanted to attend to access this important information, were unable to attend because Building 100 was at capacity. The building is simply not large enough to accommodate all of the mothers and children who wish to receive this advice and counsel regarding their terms and conditions of release and next steps upon release. We have asked to use a larger space, such as the chapel, which is used for Legal Orientation Programs (LOP) offered through the Executive Office for Immigration Review's formal contracting partner, American Gateways, but have been told the chapel is in use for other activities at those times. When we have expressed flexibility (and indeed a preference for conducting these orientations during non-court hours), ICE has still been unwilling to work with us on a more appropriate time and location.

23. At the May 10th pre-release orientations, a total of 17 children were in the first group of mothers who came to receive the information and a total of 23 children were in the second group. This meant that 40 other families were blocked from sending a representative from their family simply due to the lack of childcare available.

24. The information shared at the pre-release orientation is critically important to the mothers and children understanding their rights and obligations upon release from the detention center. Many are confused about the complex reporting requirements – with ICE, potentially with ICE's contractor who administers electronic ankle monitors, and also court dates. They also fail to understand the one year filing deadline to apply for asylum and immigration authorities do not inform them of this deadline, or explain the fact that they have not yet been granted any legal relief and must pursue their case in immigration court. These sessions help the families to understand the road that lies ahead and assists them in navigating a foreign, overwhelmed, and often confusing system.

**Length of Detention of Children and Families at the Dilley Detention Center**

25. ICE seems to have interpreted this Court's August 2015 Order as blanket permission to hold all accompanied children and their parents in detention for periods far in excess of the requirements under Paragraphs 12A, 14 and 19 of the *Flores* Settlement Agreement.

26. In the hundreds of families I have represented detained at Dilley since October 2015, when I started volunteering in the detention center, I have never seen a family released in less than five days. Indeed, since the October 23, 2015 date for the government to comply with the Judge's August orders in *Flores*, according to CARA Project records, we have represented over 6,500 Class member children who have been held in detention for at least five days or longer. While the CARA Project fundamentally disagrees that an average of 20 days would come close to complying with the requirements of the Settlement and this Court's prior orders, I have routinely seen cases in which class members/parents are detained for longer than 20 days from apprehension to release.  In those cases, we have Class member children and their mothers who have been held in detention in Dilley for months. More often, however, families in this position are transferred at some point to the detention center in Berks County, Pennsylvania, and their detention continues there instead of at Dilley. At any one time, we are usually working with around 150 families who have been detained for longer than 20 days.

Executed this 12th day of May 2016 in Dilley, Texas.

Kathryn E. Shepherd, Esq.
P.O. Box 18070
Dilley, TX 78017

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On May 19, 2016, I electronically filed the following document(s): NOTICE OF MOTION AND MOTION TO ENFORCE SETTLEMENT AND FOR APPOINTMENT OF SPECIAL MASTER WITH SUPPORTING EXHIBITS with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*