BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division
LEON FRESCO
Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel, District Court Section
Office of Immigration Litigation
     P.O. Box 868, Ben Franklin Station
     Washington, D.C. 20044
     Tel:  (202) 532-4824
     Fax:  (202) 305-7000
     Email:  sarah.b.fabian@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES; *et al.*, | ) | Case No. CV 85-4544 |
| | ) | |
|     Plaintiffs, | ) | **DEFENDANTS' RESPONSE IN** |
| | ) | **OPPOSITION TO PLAINTIFFS'** |
|     v. | ) | **MOTION TO ENFORCE SETTLEMENT** |
| | ) | **AND APPOINT A SPECIAL MONITOR** |
| LORETTA E. LYNCH, Attorney | ) | |
| General of the United States; *et al.*, | ) | Hearing Date:  June 24, 2016 |
| | ) | Time: 11:00am |
|     Defendants. | ) | Dept: Courtroom 7, Los Angeles - Spring |
| | ) | Street Courthouse |
| | ) | |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................1

II.  BACKGROUND..........................................................................................3

     A.   CBP Has Implemented Standards and Procedures That Ensure
Compliance With The Agreement, Complies With Those
Standards and Procedures, And Adequately Monitors
Compliance With Those Standards And Procedures ............................3

        1.   CBP Has Standards And Procedures In Place That Ensure
Compliance With The Agreement ................................................6

        2.   CBP Monitors Compliance With The Agreement At Its
Facilities ......................................................................................8

        3.   CBP Facilities Comply With The Agreement And With
Applicable Standards And Policies ............................................11

            a.   CBP Provides Minors In Its Facilities With
Appropriate And Adequate Access to Food.....................11

            b.   Minors in CBP Facilities Have Access To Potable Water
At All Times.................................................................... 13

            c.   CBP Facilities Are Kept In A Safe And Sanitary
Condition And Detainees Have Access To Hygiene
Products ......................................................................... 14

            d.   The Temperature At CBP Facilities Is Carefully
Regulated And Monitored To Ensure That It Is Kept At
Safe And Comfortable Level........................................... 18

            e.   While CBP Facilities Are Designed For Short-Term
Custody, And Are Not Designed For Sleeping,
Juveniles Generally Are Provided With Some Form Of
Bedding And Are Processed As Quickly As Possible ............. 20

            f.   All Minors In CBP Custody Are Given An I-770 Notice
Of Rights ......................................................................... 23

i

B.    ICE Family Residential Centers Are Operating In A Manner That Is Fully Consistent With The Agreement And With This Court's July And August Orders ...................................................................................23

III.    ARGUMENT..............................................................................................28

A.    The Court Should Not Allow Plaintiffs To Re-Litigate The Issue of CBP's Compliance With The Agreement, And If It Does, Should Do So Only After Discovery And An Evidentiary Hearing............................28

B.    Defendants Advise Juveniles Of Their Rights...........................................32

C.    Defendants Make And Record Ongoing Efforts To Release All Family Units Eligible For Release, And The Agreement Permits The Continued Detention Of Family Units Who Are Detained Pending Removal, Subject To Mandatory Detention, Or Where The Parent Has Been Determined To Be A Flight Risk ...............................................33

D.    Defendants Make And Record Ongoing Efforts To Release All Family Units Eligible For Release, And The Agreement Permits The Continued Detention Of Family Units Who Are Detained Pending Removal, Subject To Mandatory Detention, Or Where The Parent Has Been Determined To Be A Flight Risk ...................................36

E.    Accompanied Minors Are Detained With Their Parents At ICE Family Residential Centers ......................................................................37

F.    Defendants Do Not Interfere With Any Minor's Right To Counsel ............39

IV.    CONCLUSION............................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Avendano–Ramirez v. Ashcroft*,
   365 F.3d 813 (9th Cir. 2004) ..................................................................... 27

*Callie v. Near*,
   829 F.2d 888 (9th Cir. 1987) ..................................................................... 30

*Diaz–Rodriguez v. Holder*,
   No. 14-31103, 2014 WL 10965184 (5th Cir. 2014) ................................... 27

*In re City Equities Anaheim, Ltd.*,
   22 F.3d 954 (9th Cir. 1994) ....................................................................... 30

*Li v. Eddy*,
   259 F.3d 1132 (9th Cir. 2001) ................................................................... 27

*Meng LI v. Robert C. Eddy,*
   324 F.3d 1109 (9th Cir. 2003) ................................................................... 27

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................... 27

*Castro v. DHS*, Case No. 15-6153,
   2016 WL 614862 (E.D. Pa. 2016) ............................................................. 27

*Pena v. Lynch*,
   815 F.3d 452 (9th Cir. 2015) ..................................................................... 27

*Reno v. American-Arab Anti-Discrimination Committee*,
   525 U.S. 471 (1999) ................................................................................... 37

## **STATUTES**

8 U.S.C. § 1221-1231 ........................................................................................... 37

8 U.S.C. § 1225 ..................................................................................................... 38

8 U.S.C. § 1225(b) ................................................................................................ 37

8 U.S.C. § 1225(b)(1) ........................................................................................... 27

8 U.S.C. § 1231 ............................................................................................... 35, 37

8 U.S.C. § 1252 ..................................................................................................... 38

8 U.S.C. § 1252(f)(1) ....................................................................................... 36, 37

iv

## I.      **INTRODUCTION**

The Court's August 21, 2015 Order Re Response to Order to Show Cause (ECF No. 189) ("August Order"), required the Government to implement six remedies prior to October 23, 2015. Although the Government appealed this Order, it did not seek to stay these remedies. On the contrary, the Government deployed significant personnel, funding, and infrastructure to quickly ensure its compliance with the Court's directives.

Simply put, not only has the Government complied with this Court's August Order since October 2015, it has carefully monitored and documented its compliance. The Government can conclusively dispute a number of the allegations made by the Plaintiffs in their May 19, 2016, Motion to Enforce Settlement and Appoint a Special Monitor (ECF No. 201) ("Motion"). Indeed, further litigation could have been avoided had Plaintiffs discussed their factual allegations with the Government prior to filing as required by the Local Rules and the *Flores* Settlement Agreement ("Agreement") so that their mistaken impressions could be clarified, or if there were any legitimate concerns, those could be addressed. But Plaintiffs chose not to do that here.

In fact, when looked at more closely, Plaintiffs' Motion appears to take issue not with the Government's conduct, but with the Court's August Order. But a motion to enforce is not a tool to lodge a an untimely motion for reconsideration. Each of Plaintiffs' claims seeks an end-run around the Court's August Order, and should be denied.

For instance, Plaintiffs cannot use this motion as a means to re-litigate the issue of whether a special monitor should be appointed to oversee the conditions at U.S. Customs and Border Protection ("CBP") facilities. The Court already considered this issue in

Plaintiffs' last enforcement action, and concluded that even to the extent that CBP facilities were in breach of the Agreement, the appropriate remedy was to require CBP to "monitor compliance with their acknowledged standards and procedures" for complying with the Agreement (or to use a special monitor for those purposes, but only if both parties agreed to that appointment). August Order at 14-15. As shown below, CBP has taken extensive steps to monitor its compliance with the Agreement.

Plaintiffs have filed a number of unreliable hearsay (and hearsay within hearsay) declarations in support of their contention that CBP still is not in compliance with the Agreement such that oversight by a special monitor is required. But as CBP demonstrates below, CBP complies with the Agreement and monitors that compliance as ordered by the Court. Based on CBP's evidence, the Court should conclude that Plaintiffs have provided no basis for the Court to reconsider the August Order, and should deny Plaintiffs' Motion with regard to CBP. In any event, the Court should not reconsider its August Order and order the supplemental relief that Plaintiffs are seeking unless and until the clearly disputed factual issue of CBP's compliance with the Agreement is fully and fairly explored and resolved at an evidentiary hearing.

Additionally, Plaintiffs' claims regarding U.S. Immigration and Customs Enforcement ("ICE") family residential centers are an attempt to re-litigate issues already resolved by the Court's August Order, and appear to take issue with the fact that the August Order allowed those facilities to continue to operate at all.

Plaintiffs' claims challenge the system of expeditious processing and release for the vast majority of family units that the Court found entirely permissible in its August

Order. Their claims further challenge the continued detention of a small number of family units who are being detained in order to remove them from the United States, including families subject to expedited removal orders who have failed to establish eligibility for the relief or protection sought and are subject to mandatory detention, and families subject to final orders of removal whose head of household has been determined to be a flight risk. Plaintiffs' challenges ignore the fact that the Court's July and August Orders specifically found that in such instances it is permissible to continue to detain these family units, and that keeping the child with the parent is both permissible and preferable.

Further, Plaintiffs make claims that are inaccurate, misleading, or an attempt to improperly substitute their judgment regarding the operations of ICE family residential centers in place of the judgment of those authorized by Congress to administer these facilities. Plaintiffs have provided no basis to find that ICE family residential centers are operated in a manner that is inconsistent with the Court's August Order and the Agreement as it has been interpreted by the Court. Therefore, Plaintiffs' Motion with regard to ICE family residential centers also should be denied.

## II.   BACKGROUND

### A.   CBP Has Implemented Standards And Procedures That Ensure Compliance With The Agreement, Complies With Those Standards And Procedures, And Adequately Monitors Compliance With Those Standards And Procedures.

CBP's hundreds of short-term detention and processing facilities are located throughout the United States, both at and between U.S. ports of entry. *See* Declaration of Ronald D. Vitiello ("Vitiello Decl."), ¶ 1, attached hereto as Exh. 1; Declaration of Todd. C. Owen ("Owen Decl."), ¶ 2, attached hereto as Exh. 2 These facilities are operated by

Border Patrol (between ports of entry), and the Office of Field Operations ("OFO") (at ports of entry throughout the United States). *See* Vitiello Decl. ¶ 1; Owen Decl. ¶ 2. Juveniles in CBP custody following apprehension or encounter may be held at any of these facilities depending on the manner and location of their apprehension. Because these facilities operate throughout the United States in areas with different visitor and immigrant flows and populations, and different security and operational concerns, there can be no one-size-fits-all manner in which the Agreement is applied at CBP facilities.

The Agreement requires that "[f]ollowing arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors." Agreement ¶ 12.A. More specifically, the Agreement requires CBP to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor." *Id.*

In its July 24, 2015 Order ("July Order") in this case, this Court reviewed documentary evidence presented by Plaintiffs regarding conditions allegedly experienced by a juveniles at CBP facilities in the Rio Grande Valley area of Texas over a very short period of time during or immediately following the 2014 immigration surge. Based only on this limited evidence, the Court concluded that "Defendants have wholly failed to meet even [the] minimal standard [set forth in the Agreement]." July Order at 18. In its August Order, the Court then clarified that it was not finding that all CBP facilities were in breach of the Agreement, but was holding that "to the extent any Border Patrol station

is out of compliance with the Agreement, those stations must comply with the Agreement and Defendants' own acknowledged standards and procedures." August Order at 13. The Court further ordered that CBP should "monitor compliance with their acknowledged standards and procedures" for complying with the Agreement, or in the alternative should agree to the appointment of a special monitor for that purpose. *Id.* at 14-15.

As discussed more fully below, CBP complies with the Agreement, and complies with the Court's order to monitor that compliance. Following the Court's August Order, CBP took nationwide action to ensure that it had implemented systems that could effectively monitor compliance with the requirements of the Agreement at all Border Patrol and OFO facilities. *See generally* Declaration of Justin Bristow ("Bristow Decl."), attached hereto as Exh. 3; Declaration of Todd Hoffman ("Hoffman Decl."), attached hereto as Exh. 4. CBP headquarters also communicated with leadership at all Border Patrol and OFO facilities regarding the importance of monitoring, and ensured that all agents were trained with regard to any new monitoring requirements. *See* Vitiello Decl. ¶¶ 29-31; Owen Decl. ¶¶ 18-35. In October 2015, CBP put into place new nationwide standards that comprehensively govern detention at all CBP facilities, including those aspects of detention covered by the Agreement. *See* U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search ("TEDS"), October 2015, available at: https://www.cbp.gov/sites/default/files/documents/cbp-teds-policy-20151005_1.pdf. Finally, CBP put into place an additional, comprehensive system of inspection that will review the conditions at Border Patrol and OFO facilities nationwide. *See generally* Declaration of Sean Mildrew ("Mildrew Decl."), attached hereto as Exh. 5.

These changes, combined with the already existing processes and procedures used by CBP to ensure compliance with the Agreement, ensure that CBP is at all times "hold[ing] minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors." Agreement ¶ 12.A.

### 1. *CBP Has Standards and Procedures In Place That Ensure Compliance With The Agreement.*

In the August Order, the Court found that CBP had put forth evidence of "Defendants' own acknowledged standards and procedures[,]" and therefore ordered CBP to "monitor compliance with their acknowledged standards and procedures" for complying with the Agreement. August Order at 13, 14-15; *see also* Defendants' Response in Opposition to Plaintiffs' Motion to Enforce Settlement of Class Action, Feb. 27, 2015, ECF No. 121, at 20-25, and supporting exhibits. Plaintiffs do not contend anywhere in their motion that CBP does not have such standards in place. Therefore, there is no dispute that CBP has standards and procedures in place that require compliance with the Agreement. Border Patrol and OFO policies have long emphasized the importance of treating juveniles in accordance with the terms of the Agreement. *See* Owen Decl. ¶¶ 13-15; Vitiello Decl. ¶¶ 8-10.

Moreover, in October 2015, TEDS was put into place. TEDS provides comprehensive nationwide standards that govern all aspects of detention at CBP facilities, including those standards required by the Agreement. Specifically, TEDS requires that at-risk populations, including juveniles, should be treated "with dignity, respect and special concern for their particular vulnerability." TEDS § 5.1. Juveniles should be placed in the "least restrictive setting appropriate to their age and special needs,

provided that such setting is consistent with the need to ensure the safety and security of the detainee and that of others[,]" and efforts should be made to minimize time in custody by expediting processing time. TEDS § 5.6.

Where possible, family units should not be separated, or when they must be separated, the reasons for that separation should be documented in the applicable system of record. *Id.* Unaccompanied Alien Children ("UACs") must be held separately from unrelated adult detainees. *Id.* Every effort should be made to transfer those UACs not permitted to withdraw their application for admission to the custody of the U.S. Department of Health and Human Services as quickly as possible, and any delay in transfer over 72 hours must be logged and a reason provided in the appropriate system of record. *Id.*

Juveniles are provided access to basic hygiene items, clean bedding, and clean clothes where available. *Id.* Juveniles are offered a snack upon arrival, and a meal at least every six hours thereafter, at regularly scheduled meal times, with at least two of those meals being hot meals. *Id.* Juveniles also must have regular access to snacks, milk, and juice. *Id.* Age appropriate food such as formula or baby food also must be made available. *Id.* Reasonable efforts should be made to provide juveniles with a shower if they approach 48 hours in CBP custody. *Id.*

TEDS specifically provides that hold rooms for juveniles must provide: toilets and sinks; professional cleaning and sanitizing at least once per day; drinking fountains or clean drinking water along with clean drinking cups; adequate temperature control and ventilation; and clean bedding. *Id.* Hold rooms where juveniles are held should be

regularly checked, and those checks should be recorded in the applicable system of record. TEDS § 5.1. If any injury or illness is observed by a CBP agent or officer, it should be reported to a supervisor, and appropriate medical care should be provided or sought. TEDS § 5.6. Emergency services also are called immediately in the event of a medical emergency. *Id.*

TEDS further restricts the number of individuals who may be held in a CBP hold room to less than the capacity of that room, and requires regular hold room checks to be conducted and recorded "to ensure proper occupancy levels, safety, hygiene, and the availability of drinking water." TEDS § 4.7. "All facilities or hold rooms used to hold detainees must be regularly and professionally cleaned and sanitized." *Id.* Finally, TEDS requires that the temperature at CBP facilities should be maintained "within a reasonable and comfortable range for both detainees and officers/agents[,]" and that "[u]nder no circumstances will officers/agents use temperature controls in a punitive manner." *Id.*

## 2. *CBP Monitors Compliance With The Agreement At Its Facilities.*

Border Patrol records its custodial actions using a system called e3DM. *See* Bristow Decl. ¶¶ 2, 5-12. OFO tracks custodial actions for individuals in custody at ports-of-entry using a system called SIGMA. Hoffman Decl. ¶¶ 3-11.[1] To ensure and monitor compliance with the Court's August Order, Border Patrol and OFO instituted system-wide changes to both e3DM and SIGMA to provide even more comprehensive tracking related to juveniles, so that CBP could more effectively monitor compliance with all

---

[1] Border Patrol and OFO also maintain paper forms that can be used to record the necessary information in the event that e3DM or SIGMA become inoperable; that information is entered into the applicable system once it returns to operation. Bristow Decl. ¶ 14; Hoffman Decl. ¶ 13.

aspects the Agreement. Bristow Decl. ¶¶ 13, 15; Hoffman Decl. ¶¶ 12, 14; Vitiello Decl. ¶¶ 28-31; Owen Decl. ¶¶ 20-35.

CBP systems are used to monitor compliance with the Agreement as follows:

- <u>Documenting family units</u>: These systems are used to track whether a juvenile is accompanied by a claimed family member or legal guardian, or is unaccompanied.

- <u>Separation of juveniles from family members</u>: If a juvenile is separated from a family member the reason (for example: it was operationally infeasible to keep them together, there was a security or medical concern, or the family relationship was in question), must be noted. If separation occurs, the system also provides for documenting whether contact is allowed. If contact is not allowed, the reason will be noted.

- <u>Conditions</u>: Both e3DM and SIGMA track the following conditions in all cells in which juveniles are placed: whether water is available; whether the fixtures (such as toilets and sinks) are functioning; whether the cell is clean and sanitary; and whether the temperature of the cell is between 66 and 80 degrees. If the conditions of a cell are not compliant, the officer or agent must note the reasons for the anomaly and any steps being taken to fix the problem.

- <u>Food</u>: Every time food is offered to a juvenile, it must be documented. If the food is refused, that must be documented as well.

- <u>Medical assistance</u>: All medical care provided to each juvenile must be recorded, including whether that medical care was provided by CBP employees or by third party medical providers.

- <u>Welfare checks</u>: Welfare checks are regular checks of hold rooms to ensure the safety and well-being of those in the room. Welfare checks include a visual check of the area to ensure that the hold room continues to be safe and sanitary, that the juvenile has access to drinking water and a functional toilet, and that the ventilation system for the area is operational. Every time a welfare check is conducted it is noted in the applicable systems.

Bristow Decl. ¶¶ 13, 15-16; Hoffman Decl. ¶¶ 12, 14-16. Agents and officers at CBP facilities nationwide are aware of the requirement that they document these actions, have been instructed by their leadership on the importance of this requirement, and regularly do so. Declaration of Paul A. Beeson ("Beeson Decl.), ¶¶ 63-76, attached hereto as Exh.

9

6; Declaration of Mario Martinez ("Martinez Decl."), ¶¶ 56-67, attached hereto as Exh. 7; Declaration of Brian S. Hastings ("Hastings Decl."), ¶¶ 59-75, attached hereto as Exh. 8; Declaration of Rodney S. Scott ("Scott Decl."), ¶¶ 53-68, attached hereto as Exh. 9; Declaration of Manuel Padilla, Jr. ("Padilla Decl."), ¶¶ 24-39, attached hereto as Exh. 10; Declaration of Pete Flores Romero ("Romero Decl."), ¶¶ 48-50, attached hereto as Exh. 11; Declaration of Robert E. Perez ("Perez Decl."), ¶¶ 42-47, attached hereto as Exh. 12; Declaration of William Brooks ("Brooks Decl."), ¶¶ 58-69, attached hereto as Exh. 13; Declaration of Michele M. James ("James Decl."), ¶¶ 49-61, attached hereto as Exh. 14.

In addition to systems monitoring, following the Court's August Order CBP's Management and Inspection Division ("MID"), a separate component of CBP that is not a part of either Border Patrol or OFO, was charged with implementing an inspection program to monitor CBP's overall compliance with the Agreement. *See* Mildrew Decl. ¶ 8. This inspection process includes the physical inspection of CBP facilities as well as review of the compliance information that is being electronically recorded. *Id.* ¶¶ 9-13. The overall inspection process consists of three phases, and is intended to be ongoing through at least 2018. *Id.* ¶¶ 14-24.[2] These MID inspections already have had a positive effect in ensuring that CBP facilities are complying with the requirements of the Agreement and the Court's August Order. *See* Martinez Decl. ¶¶ 39, 69; Beeson Decl. ¶ 84.

---

[2] Oversight is further provided by the Office of Professional Responsibility ("OPR") within CBP. *See* Declaration of Carla Provost ("Provost Decl."), ¶¶ 1, 4, attached hereto as Exh. 15. OPR is responsible for investigating any allegations of misconduct by CBP personnel, including allegations by detainees relating to abuse or excessive uses of force. *Id.* ¶¶ 4, 5, 16. Signs posted at CBP facilities advise detainees that they may report any such incidents, and provides information on how they may do so. *Id.* ¶ 17.

Detainees also are regularly provided the opportunity to meet with their consular representatives. This provides a system through which detainees may register questions, complaints and concerns, and the consular staff will frequently share those with CBP employees who then may provide answers to detainees' questions or solutions to any complaints or concerns. *See* Brooks Decl. ¶ 53; Hastings Decl. ¶ 51; Romero Decl. ¶ 44; James Decl. ¶ 9; Perez Decl. ¶ 10; Beeson Decl. ¶ 19; Scott Decl. ¶ 52; Martinez Decl. ¶¶ 11, 23-24; Padilla Decl. ¶ 93; Provost Decl. ¶ 21.

   3.   *CBP Facilities Comply With The Agreement And With Applicable Standards And Policies.*[3]

   a.   *CBP Provides Minors In Its Facilities With Appropriate and Adequate Access To Food.*

Plaintiffs allege that the food provided in CBP facilities is "inadequate" for *Flores* class members. Their assertion relies on the declarations of multiple individuals who recall receiving limited meals while in custody at a small number of CBP facilities within the Rio Grande Valley area of operation. Motion at 5-6.

Available records show that many of these statements are inaccurate or misleading. *See* Plaintiffs' Exh. 45 and Declaration of David W. Strange ("Strange Decl."), Exh. A, attached hereto as Exh. 16 (individual claims that he was provided only 2 cookies and 1 ham sandwich during his first day in CBP custody, but Border Patrol records indicate that he was provided ten meals in the just over 48 hours he was in

---

[3] Given the two week response time for Defendants' opposition brief, Defendants are not providing declaratory evidence regarding every CBP facility throughout the United States. However, the declarations provided reflect a nationwide sample including declarations from CBP headquarters (Hoffman, Bristow, Vitiello, Owen, Provost, Mildrew), Border Patrol facilities (Padilla, Beeson, Scott, Hastings, Martinez), and OFO facilities including both land ports of entry and airports (James, Perez, Romero, Brooks).

custody); Plaintiffs' Exh. 23 and Strange Decl. Exh. K (individual claims she was only
given frozen ham sandwiches at Ursula, but Border Patrol records show she was served
five meals at Ursula, including "hot meal" served noted four times); Plaintiffs' Exh. 19,
Dec. M and Strange Decl. Exh. F (individual states that she and her three children were
provided cold sandwiches and juice three times a day; Border Patrol records show the
children accepting five meals on 10/22/15); Plaintiffs' Exh. 19, Dec. R and Strange Decl.
Exh. H (individual states she and her two sons were not given a meal when they arrived
at the Border Patrol station, however Border Patrol records show them being
apprehended at 9:52 pm and accepting a meal at 12:20am; she also states that, for the
entire day on 11/1/15, they ate only two ham sandwiches, and the children had juice,
however Border Patrol records show that they accepted three meals, at 5:47 am, 12:27
pm, and 6:10 pm, and two more meals at 12:52 am and 2:17 am).

CBP facilities nationwide ensure that juveniles are provided meals at regularly
scheduled meal times, with at least two of those meals being hot meals, along with
regular access to snacks, milk, and juice. Beeson Decl. ¶¶ 27-32; Martinez Decl. ¶¶ 21,
25-28; Hastings Decl. ¶¶ 21-25; Scott Decl. ¶¶ 20-24; Padilla Decl. ¶¶ 45-54; Romero
Decl. ¶¶ 19-21; Perez Decl. ¶¶ 22, 30; Brooks Decl. ¶¶ 21-25; James Decl. ¶¶ 22-24;
Mildrew Decl. ¶ 19 (noting that MID inspections found hot meals, snacks, milk and juice
available for juveniles at all locations that were inspected). This regular provision of
meals and snacks provides appropriate and adequate food to juveniles at CBP facilities.[4]

_____

[4] Notably, in a class action currently pending in the District of Arizona concerning the
conditions in Tucson Sector Border Patrol stations, *Doe, et al. v. Johnson, et al.* Case No.
CV-15-0250 (D. Ariz.), experts reviewed the provision of meals to detainees at those

b. *Minors in CBP Facilities Have Access To Potable Water At All Times.*

In support of their allegation that CBP is failing to comply with the Agreement's requirement to provide access to drinking water, Plaintiffs submit declaratory evidence that they did not drink the water at a limited number of CBP facilities in Texas because it was "dirty" or tasted strongly of chlorine. Motion at 6-7. Some Plaintiffs also allege that they could not drink water because they did not have access to cups. *Id.* Again, available CBP records show that some of the declarations on which Plaintiffs rely are inaccurate or misleading. *See* Plaintiffs' Exh. 19, Dec. H and Strange Decl. Exh. E (individual states she and her son only had access to tap water, but Border Patrol amenity reports show that her son had access to bottled or jug water); Plaintiffs' Exh. 19, Dec. R and Strange Decl. Exh. H (individual alleges she and her two sons drank water from a sink with their hands; amenity reports from both children show that they had access to bottled or jug water).

CBP facilities provide all detainees with access to drinking water at all times. In Border Patrol stations in the Rio Grande Valley, access to water is provided by water fountain fixtures in the hold rooms. *See* Padilla Decl. ¶ 55; *see also* Martinez Decl. ¶ 29 (same setup); Beeson Decl. ¶ 33 (same setup); Scott Decl. ¶ 25 (same setup); Romero Decl. ¶ 22 (same setup); Brooks Decl. ¶ 26 (same setup); Hastings Decl ¶ 26 (same

---

stations – which is consistent with the provision of meals at other CBP facilities – and concluded that the meals provided are nutritionally safe and adequate for individuals who are held in short-term detention in Border Patrol stations, and that detainees were not being deprived of access to food. *See* Declaration of Diane Skipworth ("Skipworth Decl."), ¶¶ 122-25, attached hereto as Exh. 17; Declaration of Richard Bryce ("Bryce Decl."), ¶¶ 61-72, attached hereto as Exh. 18; Declaration of Philip Harber ("Harber Decl."), ¶ 59, attached hereto as Exh. 19.

setup).[5] Water may also be provided through the use of plastic water coolers with disposable cups, which are regularly filled and kept clean[6] by the cleaning staff. Padilla Decl. ¶ 55; Martinez Decl. ¶ 29; Beeson Decl. ¶ 33; Scott Decl. ¶ 25; Brooks Decl. ¶ 26. The water available to detainees is local water, and is the same water available to agents at the station. *See* Padilla Decl. ¶ 55; Scott Decl. ¶ 25 (water coolers filled from city water supply); Beeson Decl. ¶ 33 (water coolers filled from tap water processed by local municipality).  Some facilities may also provide bottled water or other water sources as appropriate. *See* Perez Decl. ¶ 22 (water available from sink and kept in refrigerator); Romero Decl. ¶ 22 (bottled water provided for children); Brooks Decl. ¶ 26 (bottled water available); Hastings Decl ¶ 26 (bottled water provided); Scott Decl. ¶ 24 (bottled water available); Beeson Decl. ¶ 33 (one gallon plastic water jugs provided to individuals upon apprehension in the desert and sometimes retained when brought to CBP facilities).

### c. *CBP Facilities Are Kept In A Safe And Sanitary Condition And Detainees Have Access To Hygiene Products.*

CBP keeps its facilities in a safe and sanitary condition. The majority of facilities have cleaning contracts that provide for the regular cleaning of all hold rooms where detainees are kept. Padilla Decl. ¶ 60; James Decl. ¶ 32; Romero Decl. ¶ 31; Brooks Decl. ¶ 33; Perez Decl. ¶ 31; Martinez Decl. ¶¶ 35-36; Hastings Decl ¶¶ 31-32; Scott Decl. ¶¶ 31-33; Beeson Decl. ¶¶ 42-44. These cleaning contracts also provide for the restocking of

---

[5] The Governments' experts in *Doe* noted that the stainless steel drinking fountains provided in Tucson Sector Border Patrol hold rooms – which are similar to those found in other CBP facilities – are of the same type that are frequently found in holding cells, jails, and prisons, and provide access to sanitary and potable water. *See* Skipworth Decl. ¶¶ 127-28, 131; Bryce Decl. ¶¶ 74-75.

[6] Bleach is not used to clean these water coolers in the Rio Grande Valley. *See* Padilla Decl. ¶ 56.

bathroom supplies such as toilet paper and soap, and the emptying of any trash bins that are kept in the hold rooms. Padilla Decl. ¶ 60-61; Romero Decl. ¶ 31; Perez Decl. ¶ 31; Martinez Decl. ¶ 36; Hastings Decl. ¶¶ 32, 40; Scott Decl. ¶¶ 32, 36; Beeson Decl. ¶¶ 43-44, 47; *see also* Skipworth Decl. ¶ 45 (assessing statements of work for Tucson Sector Border Patrol cleaning contracts and concluding that they "are consistent with the current TEDS standard and other industry standards, and contain cleaning provisions sufficient to ensure a hygienic and safe environment for detainees").

Sinks and soap or hand sanitizer in the hold rooms provide detainees the opportunity to wash their hands after using the toilet. Padilla Decl. ¶¶ 85, 86; Romero Decl. ¶ 29; Brooks Decl. ¶ 36; Perez Decl. ¶ 22; Hastings Decl ¶ 40; Scott Decl. ¶ 36; Beeson Decl. ¶¶ 42, 47. Some CBP facilities provide paper towels, while others use an air dry method for hand drying. Padilla Decl. ¶¶ 85, 86; Hastings Decl ¶ 41; Scott Decl. ¶ 37; Beeson Decl. ¶¶ 47, 48. Using an "air-drying method" for handwashing has been recognized by the Centers for Disease Control as an effective hand drying method, and may be necessary because detainees sometimes throw the paper towels on the floor or put them into the toilet. *See* Skipworth Decl. ¶¶ 83-84.

Regular checks of all hold rooms where juveniles are held are conducted to ensure that water is available, the toilets and sinks are in working order, and the room is sanitary. Padilla Decl. ¶ 28, 34; James Decl. ¶ 57; Romero Decl. ¶ 28; Brooks Decl. ¶ 37; Perez Decl. ¶ 26; Martinez Decl. ¶ 62; Hastings Decl ¶ 69; Scott Decl. ¶ 27, 62; Beeson Decl. ¶¶ 35, 66, 71. The results of these checks are recorded in e3DM or SIGMA, and any problems are reported to a supervisor and resolved as quickly as possible. Padilla Decl.

¶¶ 29-32; James Decl. ¶ 57; Romero Decl. ¶ 32; Perez Decl. ¶ 45; Martinez Decl. ¶¶ 57-60; Hastings Decl ¶¶ 65-66, 69; Scott Decl. ¶¶ 58-60, 62; Beeson Decl. ¶ 36 (noting report of inoperable toilet in unaccompanied juvenile cell; other cells were used to hold juveniles until the problem could be fixed), 66-69.

Not all CBP facilities have showers or access to showers. Padilla Decl. ¶ 68; Brooks Decl. ¶ 34; Martinez Decl. ¶ 37; Scott Decl. ¶ 35; Beeson Decl. ¶ 46. In the Rio Grande Valley, the vast majority of juveniles are transferred to the CPC-Ursula facility as soon as possible after their processing is complete, and at that facility they are provided an opportunity to shower, have their clothes laundered, and receive a change of clothes. Padilla Decl. ¶¶ 68-74; *see also* Romero Decl. ¶ 24 (noting the availability of changes of clothes for juveniles in the San Diego area facilities that are distributed as needed). Juveniles at CPC-Ursula are also provided a towel, toothbrush, toothpaste, mouthwash, soap, and shampoo. Padilla Decl. ¶ 75; *see also* Romero Decl. ¶ 25 (similar items provided in San Diego area facilities). In other areas, reasonable efforts are made to provide showers to juveniles who must remain in CBP custody longer than 48 hours. James Decl. ¶ 33; Romero Decl. ¶ 26; Brooks Decl. ¶¶ 34-35; Hastings Decl. ¶ 39; Scott Decl. ¶ 35. Thus, to the extent Plaintiffs' evidence suggests that showers are not made available to juveniles in CBP custody, that evidence is inaccurate or misleading. *See* Plaintiffs' Exh. 19, Dec. M and Strange Decl. Exh. F (individual states her three children were not able to bathe while in CBP custody, but Border Patrol records show all three children receiving a shower on 10/22/15 at 6:36 pm at CPC Ursula); Plaintiffs' Exh. 37 and Strange Decl., Exh. B (individual states that she was not provided a shower, but

Border Patrol records indicate that she was provided a shower at 7:13 am on February 2,
2016).

     CBP facilities also stock other personal and hygiene products which are provided
to detainees upon request, including diapers and wipes, feminine hygiene products,
toothbrushes, toothpaste, and soap. Padilla Decl. ¶¶ 73, 75, 77-78; James Decl. ¶ 26;
Romero Decl. ¶¶ 24-26; Brooks Decl. ¶ 36; Perez Decl. ¶ 22; Scott Decl. ¶ 24; Skipworth
Decl. ¶¶ 78-91 (describing items provided to detainees by Tucson Sector Border Patrol,
and specifically noting that Border Patrol "takes special care regarding families").[7]

     Plaintiffs complain that there is a lack of privacy in CBP facilities, particularly
with regard to the toilets. Motion at 7-9. Some lack of privacy is to be expected given the
nature of CBP hold rooms. Padilla Decl. ¶ 84; James Decl. ¶ 25; Martinez Decl. ¶ 30;
Hastings Decl ¶ 27; Scott Decl. ¶ 26; Beeson Decl. ¶ 34. The screen walls used by the
toilet area in the hold rooms allow for an environment where the individual using the
toilet has some privacy while using the facilities, but can still be monitored and protected

---

[7]  Plaintiffs raise no specific claims regarding the availability of medical care in CBP
facilities. However they generally allege that the conditions at these facilities are
unhealthy, and create a risk to the health of minors. *See* Motion at 4-11. Medical care for
any emergent issue is readily available to all individuals held at a CBP facility both from
trained CBP employees, and off-site local medical professionals. Padilla Decl. ¶¶ 80-83;
James Decl. ¶¶ 36-37; Romero Decl. ¶¶ 34-40; Brooks Decl. ¶¶ 41-43; Perez Decl. ¶¶ 27-
28; Martinez Decl. ¶¶ 42-44; Hastings Decl ¶¶ 42-43; Scott Decl. ¶¶ 42-44; Beeson Decl.
¶¶ 8, 14, 54-56. In *Doe*, the Government's medical expert assessed the system by which
the Tucson Sector Border Patrol facilities provided access to medical care – the same
system used at the majority of CBP facilities nationwide – and concluded that the system
in place "provides detainees medical care and treatment, including emergency treatment
and prescription medication, when needed." Harber Decl. ¶¶ 22-23, 26-37, 50-56. He
further concluded that the conditions at the Tucson Sector Border patrol facilities, which
are comparable to those at other CBP facilities nationwide,  did not "indicate . . . any
serious medical or health risk to detainees." *Id.* ¶¶ 24, 57-73.

for the safety of all detainees and CBP employees. Padilla Decl. ¶ 84; James Decl. ¶ 25;
Romero Decl. ¶ 27; Martinez Decl. ¶ 30, Exhibit C; Hastings Decl ¶ 27; Scott Decl. ¶ 26,
Exhibit B; Beeson Decl. ¶ 34. Private toilets are available for detainees in some facilities,
including CPC-Ursula, where the majority of juveniles apprehended in the Rio Grande
Valley are housed. Padilla Decl. ¶ 85; Brooks Decl. ¶ 28; Perez Decl. ¶¶ 23, 24 . Cameras
in CBP facilities do not provide sight lines to the toilets, or they blur out any view of the
toilet areas. Padilla Decl. ¶ 86; James Decl. ¶ 26; Romero Decl. ¶ 28; Martinez Decl. ¶
31; Hastings Decl ¶ 28; Scott Decl. ¶ 27; Beeson Decl. ¶ 35.

> ### d.   The Temperature At CBP Facilities Is Carefully Regulated And Monitored To Ensure That It Is Kept At Safe And Comfortable Level.

Plaintiffs allege that they were forced to endure "extremely cold" temperatures
while in custody at CBP facilities. CBP records indicate, however, that the temperatures
at the time some of these allegations were made were being maintained at comfortable
and appropriate levels. *See* Plaintiffs' Exh. 44 and Hoffman Decl Exh. A (individual
indicates that it was "very cold," but the temperature while she was in custody was
recorded as being between 69.4-72.2 degrees; also claims it was too cold to sleep, but
OFO records note "sleeping" at various times on January 24, 25, and 26, 2016);
Plaintiffs' Exh. 19, Dec. M and Strange Decl. Exh. F (individual states that it was very
cold, but Border Patrol recorded the temperature at four different welfare checks on
10/23/15 as 77, 73, 72, and 73 degrees, and the amenity log also shows compliant
temperatures); Plaintiffs' Exh. 26 and Strange Decl. Exh. M (individual claims it was
"extremely cold" and neither she nor her daughter could sleep, but Border Patrol records

show the temperature was between 69-71); Plaintiffs' Exh. 27 and Strange Decl. Exh. M (individual claims McAllen Station was "freezing cold," but Amenity Check shows temperature was within acceptable range); Plaintiffs' Exh. 28 and Strange Decl. Exh. O (individual claims McAllen Station was "freezing," but Amenity Check shows temperature was within acceptable range).

The temperature at CBP facilities is regulated, and is maintained at a level that is safe and comfortable for both detainees and officers. Padilla Decl. ¶ 62; James Decl. ¶ 28; Brooks Decl. ¶ 31; Martinez Decl. ¶ 33; Hastings Decl ¶ 36; Scott Decl. ¶ 28; Beeson Decl. ¶ 37; *see also* Skipworth Decl. ¶ 133 ("Temperatures in detention facilities should normally be kept within a range of 68.5 to 80.5 degrees Fahrenheit for comfort, depending on the season."); Bryce Decl. ¶ 82 ("According to agents I interviewed, Tucson Sector Border Patrol hold room temperatures are maintained at 68 to 80 degree Fahrenheit, which is standard in detention centers."). In response to the Court's August Order, CBP facilities purchased thermometers and regularly monitor the temperatures in all hold rooms in which juveniles are being detained, and agents record any issues with those temperatures being outside the acceptable range. Padilla Decl. ¶ 66; James Decl. ¶¶ 29, 58; Romero Decl. ¶ 30; Brooks Decl. ¶ 31; Perez Decl. ¶ 23; Martinez Decl. ¶ 63; Hastings Decl ¶ 70; Scott Decl. ¶ 63; Beeson Decl. ¶ 72. If the temperature in any hold room in which a juvenile is being held is found to be outside the acceptable range of 66-80 degrees Fahrenheit, it must be recorded in SIGMA or e3DM, immediate steps must be taken to bring the temperature to an acceptable level, and alternate accommodations may be made for holding the affected individuals until the situation is remedied. Padilla Decl.

¶ 65-66; James Decl. ¶¶ 30-31; Brooks Decl. ¶¶ 31-32; Perez Decl. ¶ 42; Martinez Decl.

¶¶ 34, 63; Hastings Decl ¶¶ 37, 70; Scott Decl. ¶ 30, 63; Beeson Decl. ¶¶ 39-40, 72.

> e.  *While CBP Facilities Are Designed For Short-Term Custody,
> And Are Not Designed For Sleeping, Juveniles Generally Are
> Provided With Some Form Of Bedding And Are Processed As
> Quickly As Possible.*

CBP facilities in which detention occurs are 24/7 facilities designed for short-term

custody during immigration processing. Padilla Decl. ¶ 78; Romero Decl. ¶ 43; Hastings

Decl ¶ 50; Scott Decl. ¶ 9. CBP makes every effort to process juveniles as quickly as

possible and either release them, or transfer them to more long-term facilities. Padilla

Decl. ¶ 41, 96; James Decl. ¶ 17 (noting detainees are generally held for less than 8

hours); Romero Decl. ¶ 11 (noting that juveniles receive priority attention); Romero Decl.

¶ 43; Perez Decl. ¶ 15 (noting family units generally are not held longer than 24 hours);

Martinez Decl. ¶¶ 51, 53; Hastings Decl ¶¶ 50, 54; Scott Decl. ¶ 6 (noting that

unaccompanied minors spend an average of 42 hours in custody, while family groups

spend an average of 46 hours in custody), 9; Beeson Decl. ¶ 13 (noting that juveniles

receive priority processing), 60, 62. Because individuals are coming and going in the

majority of CBP facilities at all hours of the day and night, the lights at CBP facilities

remain on at all times for the safety and security of both detainees and CBP employees.

Padilla Decl. ¶ 78; James Decl. ¶ 34; Romero Decl. ¶ 33; Brooks Decl. ¶ 38; Perez Decl.

¶ 25; Martinez Decl. ¶ 40; Hastings Decl ¶ 30; Scott Decl. ¶ 39; Beeson Decl. ¶¶ 9, 50.

Unaccompanied juveniles generally are kept in hold rooms, or in a specific area of

the particular facility, divided by age and gender, and separated from unrelated adults.

Padilla Decl. ¶ 18; James Decl. ¶ 21 (noting juveniles are not always placed in hold

rooms, but are placed in the least restrictive setting possible in that facility); Romero Decl. ¶¶ 13-14; Brooks Decl. ¶ 18; Perez Decl. ¶¶ 12, 14; Martinez Decl. ¶¶ 15, 16 (noting that if a hold room is not available to keep an unaccompanied juvenile separated from unrelated adults, the juvenile will be placed in another area of the station where he or she can be monitored by agents); Hastings Decl. ¶¶ 16-17; Scott Decl. ¶ 12; Beeson Decl. ¶ 21. Families are kept together to the greatest extent possible in order to maintain family unity, and may be kept in hold rooms or other areas of the facility with other family units. Padilla Decl. ¶ 18; James Decl. ¶ 16; Romero Decl. ¶ 16 (noting that the San Ysidro facility has designated additional space for families if needed); Brooks Decl. ¶ 18; Martinez Decl. ¶ 16; Hastings Decl. ¶ 17; Scott Decl. ¶ 13; Beeson Decl. ¶ 21.[8] The numbers of individuals in a hold room will fluctuate based on the numbers of apprehensions in any given day, but when overcrowding occurs, agents will take all possible steps to alleviate it, including moving individuals between hold rooms and even between different stations in a given operating area. Padilla Decl. ¶ 21; James Decl. (noting no problem with overcrowding); Romero Decl. ¶ 17 (noting the availability of other facilities used to house single adults to ensure adequate space for family units and

---

[8] Plaintiffs raise no specific legal claim that minors are not provided access to family members. To the extent they suggest this is the case through their declarations, however, they are mistaken. CBP facilities make every effort to maintain family unity. Padilla Decl. ¶ 37; James Decl. ¶ 60; Brooks Decl. ¶ 66; Perez Decl. ¶ 46; Martinez Decl. ¶ 65; Hastings Decl ¶ 72; Scott Decl. ¶ 65; Beeson Decl. ¶ 74. If a family group is separated, that separation and the reason for the separation are documented. Padilla Decl. ¶ 37; James Decl. ¶ 60; Brooks Decl. ¶ 66; Perez Decl. ¶ 46; Martinez Decl. ¶¶ 65; Hastings Decl ¶ 72; Scott Decl. ¶ 66; Beeson Decl. ¶ 74. If separation occurs contact is facilitated, and if it is not the reason for the lack of contact also is documented. Padilla Decl. ¶¶ 37-28; James Decl. ¶¶ 60-61; Brooks Decl. ¶ 66-67; Perez Decl. ¶ 46; Martinez Decl. ¶¶ 65-66; Hastings Decl ¶¶ 72-73; Scott Decl. ¶ 66-67; Beeson Decl. ¶¶ 74-75.

unaccompanied children); Brooks Decl. ¶ 19 (noting agents remain mindful of capacity issues to ensure sufficient space); Martinez Decl. ¶ 19; Hastings Decl ¶ 20 (noting no issue with overcrowding); Scott Decl. ¶ 6 (noting a relatively low number of unaccompanied juveniles and family groups in custody at any one time), 16; *see also* Plaintiffs' Exh. 22, Padilla Decl. ¶ 17 and Strange Decl. Exh. J (individual states that there were 15-20 people in his cell; no hold cell in McAllen Station has a capacity of less than 22 adult individuals).

In the majority of CBP facilities, Mylar or other disposable blankets are provided to detainees to be used for bedding, and for additional warmth if needed. Padilla Decl. ¶ 88; James Decl. ¶ 35; Brooks Decl. ¶ 39; Perez Decl. ¶ 29; Martinez Decl. ¶ 41; Hastings Decl ¶ 41; Scott Decl. ¶¶ 28, 40; Beeson Decl. ¶ 51. Mylar blankets limit the spread of disease, and eliminate the problems that many facilities previously experienced of being unable to keep up with the laundry required to provide cloth blankets. Brooks Decl. ¶ 39; Perez Decl. ¶ 29; Beeson Decl. ¶ 51; Scott Decl ¶ 40; Martinez Decl. ¶ 41; Padilla Decl. ¶ 88.[9] Many facilities also may provide mattresses or mattress pads to juveniles where space and supplies are available and it is operationally feasible. Padilla Decl. ¶¶ 88, 89; Romero Decl. ¶ 25 (folding mats, foam sleeping mats, and blankets provided); Brooks Decl. ¶ 40 ("EZ Bunk," mats, or cots may be provided); Scott Decl. ¶ 41 (bedroll provided); Beeson Decl. ¶ 53 (mattress pads provided).

---

[9] Where feasible, some facilities do provide access to cloth blankets that can be regularly laundered. Romero Decl. ¶ 25; Perez Decl. ¶ 23 (noting the availability of cloth blankets and pillows in family rooms).

f.   *All Minors In CBP Custody Are Given An I-770 Notice Of Rights.*

CBP has not historically provided an I-770 to accompanied juveniles, but current CBP policy requires that all CBP officers and agents provide a Form I-770 to all juveniles, whether accompanied or unaccompanied. Bristow Decl. ¶ 19; Hoffman Decl. ¶ 18. This policy is implemented by offices and agents at CBP stations and ports-of-entry around the country. Padilla Decl. ¶ 91; James Decl. ¶ 41; Romero Decl. ¶¶ 41-42; Brooks Decl. ¶ 50; Perez Decl. ¶ 34; Martinez Decl. ¶ 48; Hastings Decl ¶ 47. CBP officers and agents also provide a list of free legal services to juveniles CBP processes for removal. Hastings Decl ¶ 48; Scott Decl. ¶ 50; Beeson Decl. ¶ 57; Brooks Decl. ¶ 51; James Decl. ¶ 42; Perez Decl. ¶ 45; Martinez Decl. ¶ 49; Padilla Decl. ¶ 92.

**B.   ICE Family Residential Centers Are Operating In a Manner That Is Fully Consistent With The Agreement And With This Court's July and August Orders.**

In the August Order, the district court indicated that the Government's target of a 20-day average detention time "may fall within the parameters of Paragraph 12A of the Agreement . . . ." August Order at 10. The Court also explained that in periods of influx – as defined in the Agreement – family units may be housed at residential centers for the limited period necessary to conduct asylum and other protection-related screenings, so long as the length of detention is "as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear . . . especially if the brief extension of time will permit the DHS to keep the family unit together." August Order at 10. Notably, in the July Order the Court also recognized that in a "situation where the mother . . . has been deemed a flight or safety risk . . . ,

23

Defendants would be justified in detaining both mother and child in that case . . . ." July Order at 9 n.5.

Karnes County Residential Center ("Karnes"), South Texas Family Residential Center ("Dilley"), and Berks County Family Residential Center ("Berks"), are being operated in a manner that is fully consistent with the July and August Orders of this Court. As the Government has previously described to this Court (ECF No. 184 at 11-18), ICE family residential centers operate primarily as short-term intake and processing facilities. *See* Declaration of Juanita Hester ("Hester Decl."), ¶¶ 3-4, attached hereto as Exh. 20; Declaration of Valentin de la Garza ("de la Garza Decl."), ¶¶ 3-4, attached hereto as Exh. 21.  Since 2015, ICE has implemented several improvements at its family residential centers including increased staff, additional residential resources, improved legal access, and increased oversight of operations. Declaration of John Gurule ("Gurule Decl."), ¶¶ 5-12, attached hereto as Exh. 22.[10] ICE also continues to evaluate and

---

[10] Plaintiffs do not specifically raise any claims challenging the conditions at ICE family residential centers, but they submit multiple declarations that raise allegations regarding those conditions. To the extent the Court determines that these allegations should be considered in evaluating Plaintiffs' claims, Defendants submit significant evidence challenging the reliability of these allegations, and disputing that the conditions in these facilities are as Plaintiffs describe. *See* Hester Decl. ¶¶ 5-8; de la Garza Decl. ¶¶ 5-8; Reid Decl. ¶¶ 3-5, 9-28; Gurule Decl. ¶¶ 6-12, 17; Declaration of Philip T. Farabaugh, Exh. 23; Declaration of Gustavo I. Cadavid, Exh. 24; Declaration of Todd M. Tovarek, Exh. 25 (Exhs. 23-25 are not attached to this brief in order to protect to the greatest extent possible the medical privacy of the individuals discussed in those declarations; however, Defendants are willing and able to provide them to the Court upon request if necessary to assist in adjudication of any of Plaintiffs' claims); Dilley Video, available at: https://www.dvidshub.net/video/402665/ice-media-b-roll-south-texas-family-residential-center (South Texas FRC Apr. 29, 2015) (last visited May 31, 2016); Dilley Video, available at: https://www.dvidshub.net/video/381829/south-texas-family-residential-center (last visited May 31, 2016); Karnes Video, available at: https://www.dvidshub.net/video/400168/karnes-county-residential-center (Karnes County

improve its processes to ensure that families in its custody are evaluated expeditiously and, if eligible, released on appropriate conditions. *Id.* ¶ 15.

For the vast majority of individuals who move through these facilities, the length of time they remain in detention is limited to the amount of time it takes to screen them for credible or reasonable fear. Hester Decl. ¶ 3; de la Garza Decl. ¶ 3. The Secretary of Homeland Security's June 2015 policy announcement directed U.S. Citizenship and Immigration Services ("USCIS") to "conduct credible fear and reasonable fear interviews within a reasonable timeframe." DHS Press Release, ECF No. 164-1, at 1. For those able to establish credible or reasonable fear, the goal is that "the detention of families will be short-term in most cases." *Id.*

Under a class action settlement agreement in the U.S. District Court for the Northern District of California, USCIS has agreed to achieve a national average of 10 business days for completing reasonable fear determinations for detained individuals, with no single reasonable fear determination taking more than 20 business days (not including tolling or delays due to exceptional circumstances). *Alfaro Garcia, et al. v. Johnson, et al.,* No. 14-01775 (N.D. Cal.). As a result, USCIS has implemented changes to its reasonable fear screening procedures which continue to speed up its review of such claims. *See* Declaration of John L. Lafferty ("Lafferty Decl."), ¶¶ 8-12, attached hereto as Exh. 26. USCIS also took specific steps at ICE family residential centers to increase its resources and streamline its procedures, thereby further reducing processing times for

Residential Center Apr. 17, 2015) (last visited May 31, 2016); Berks Video, available at: https://www.dvidshub.net/video/408791/berks-family-residential-center-may-2015 (Berks Family Residential Center May 2015) (last visited May 31, 2016).

both credible fear and reasonable fear cases. *Id.* ¶¶ 5-7. Thus, for credible fear and reasonable fear cases screened in ICE family residential centers, USCIS's current processing time is approximately 4-10 calendar days from USCIS's receipt of a referral from ICE, to service of a determination on the individual. *See id.* ¶ 4.

For those individuals who are not found to have a credible fear or reasonable fear, and who seek review before an immigration judge, the average processing time at family residential centers between November 1, 2015 and May 24, 2016 was three days. *See* Declaration of Brett Endres ("Endres Decl."), ¶ 3, attached hereto as Exh. 27. Of the 1,070 cases in credible fear review proceedings, the immigration judge vacated USCIS's decision and found credible fear 587 times, and for the 114 cases involving reasonable fear review proceedings, the immigration judge vacated USCIS's decision and found reasonable fear 78 times. *Id.* ¶¶ 4-5.

As a result, for the 18,706 residents initially booked into ICE family residential facilities from October 23, 2015, to May 18, 2016, and subsequently released or removed as of May 16, 2016, the average length of stay was 11.8 days. Gurule Decl. ¶ 13. Of these 18,706 residents, 58% were released or removed in 10 days or less, 96% in 20 days or less, and 99% in 30 days or less. *Id.* Of those detained as of May 16, 2016, the average length of stay is 17.7 days. Of those detained as of May 16, 2016, 44% have been detained 10 days or less; 88%, 20 days or less, and 94%, 30 days or less. *Id.*

A small percentage of individuals do remain in ICE family residential centers for longer periods of time, but this too is consistent with the Agreement and the Court's orders. This is because these individuals fall into one of three categories: (1) individuals

who are subject to mandatory detention because they have not established a credible fear, but who have asked USCIS to reconsider their screening determination, and have sought and received stays of removal; (2) individuals who have received a negative credible fear determination, are awaiting removal, and are subject to mandatory detention;[11] or (3) individuals in family units with final orders of removal where the parent has been determined to constitute a flight risk. *See* Gurule Decl. ¶ 14 and Exh. 9; *see also* Declaration of Joshua G. Reid ("Reid Decl."), ¶¶ 18, 28, attached hereto as Exh. 28.

[11] The vast majority of aliens who have been detained at family residential facilities for longer than 20 days are individuals who have been determined to lack credible fear of persecution or torture upon removal after being interviewed by a USCIS asylum officer, having that determination reviewed by a supervisory asylum officer, and having his or her claim of credible fear heard by an Immigration Judge. They are therefore subject to mandatory detention pending their removal from the United States. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii). Although execution of their expedited removal orders is required by 8 U.S.C. § 1225(b)(1), these aliens filed constitutional challenges to the credible fear process and their expedited removal orders in federal district court starting in November 2015. *See Castro v. DHS*, Case No. 15-6153, 2016 WL 614862 at *1-2 (E.D. Pa. Feb.16, 2016). Although the Government briefed the issues in this case in an expedited manner, the District Court stayed these aliens' removal for three months only to then dismiss their case, finding that "Petitioners' contentions have been rejected by almost every court to address them." *Id.* This includes the Ninth Circuit in *Pena v. Lynch*, 815 F.3d 452 (9th Cir. 2015); *Avendano–Ramirez v. Ashcroft*, 365 F.3d 813, 819 (9th Cir. 2004); *Li v. Eddy*, 259 F.3d 1132, 1134–35 (9th Cir. 2001), opinion vacated as moot on reh'g, 324 F.3d 1109 (9th Cir. 2003), and the Fifth Circuit (where Karnes and Dilley are located) in *Diaz–Rodriguez v. Holder*, No. 14-31103, 2014 WL 10965184 (5th Cir. Dec. 16, 2014). Again, rather than acquiescing in their removal, these individuals then sought and successfully obtained a stay from the Third Circuit on February 26, 2016 in an order that did not explain the basis for granting the stay as required by *Nken v. Holder*, 556 U.S. 418, 425-26 (2009). *See Castro, et al v. DHS*, Case No. 16-1339 at Doc. No. 003112218692.  This case was argued on May 19, 2016 and a decision is expected shortly. The Government submits that this order should – and will most likely – accord with the decision of every circuit to consider this matter, including the Ninth and Fifth Circuits. Detention of these individuals pending the decision by the Third Circuit does not raise a systemic problem of non-compliance with this Court's Order, but rather a discrete instance where a group of aliens whose removal should already have been executed have been successful in postponing their removal by making arguments that have been rejected by every Circuit Court that has considered them.

III.     **ARGUMENT**

   A.     **The Court Should Not Allow Plaintiffs To Re-Litigate The Issue of CBP's Compliance With The Agreement, And If It Does, Should Do So Only After Discovery And An Evidentiary Hearing.**

   In 2015 this Court considered Plaintiffs' allegations that CBP facilities were not in compliance with the Agreement and concluded that even to the extent that CBP facilities were in breach of the Agreement, the appropriate remedy was to require CBP to "monitor compliance with their acknowledged standards and procedures" for complying with the Agreement. August Order at 14-15. As explained extensively above, CBP is doing so. Therefore, CBP has complied fully with the Court's August Order.

   Nonetheless, Plaintiffs' latest Motion raises the same allegations as were previously litigated and resolved by the Court's August Order, only this time Plaintiffs' contend that oversight by a special monitor is required. However, Plaintiffs have provided no good reason why the Court should re-litigate this issue or order any additional remedy against CBP.

   Plaintiffs base their Motion on declaratory evidence that consists largely of inadmissible hearsay allegations relating to only a small number of CBP facilities. Relying on that limited evidence, Plaintiffs ask the Court to conclude that "[t]he evidence overwhelmingly shows Defendants' CBP facilities are neither safe nor sanitary." Motion at 19. But this is far from true. Plaintiffs' evidence is unreliable, and in many instances is countered by CBP's records regarding the declarant. Plaintiffs have not shown that appointment of a monitor would uncover any additional information than what is already being maintained by CBP, and it would therefore simply be an unnecessary use of limited

taxpayer resources. Therefore the Court should not revisit this already settled issue, and should deny Plaintiffs' Motion with regard to CBP facilities.

Moreover, even if the Court does decide that further litigation on this issue is necessary, the evidence still does not support any immediate finding in Plaintiffs' favor. Plaintiffs certainly have provided no basis for the Court to find a breach in any facility which is not clearly and specifically identified in any of their supporting declarations. And for those facilities for which Plaintiffs did provide evidence of a possible breach, even in only the short time provided between the time Plaintiffs shared that evidence with CBP and the filing of this response, CBP was able to provide evidence that in several instances Plaintiffs' evidence is unreliable or misleading. *See* Defendants' Objections, attached hereto as Exh. 29.

At the same time, as discussed above, CBP has provided significant evidence that CBP and its facilities as a whole – including both those referenced by Plaintiffs' evidence and those that are not – comply with the Agreement and with the Court's requirement in its August Order that CBP monitor that compliance. Thus, if the issue is to be re-litigated based solely on the evidence submitted by the parties in this briefing, there is good reason to find that Plaintiffs simply have not established any breach of the Agreement on the part of CBP.

Finally, the incomplete and unreliable nature of the evidence submitted by Plaintiffs, and the substantial rebuttal evidence submitted by CBP, gives good reason for the Court, at the least, to decline to rule on Plaintiffs' motion without first holding an evidentiary hearing to further examine the evidence submitted by both parties. *See Callie*

30

*v. Near*, 829 F.2d 888, 890 (9th Cir. 1987) ("[W]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing."); *see also In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 958-59 (9th Cir. 1994) (holding that "a court has no discretion to enforce a settlement where material facts are in dispute; an evidentiary hearing must be held to resolve such issues.").[12]

Moreover, before any evidentiary hearing is held each party should be permitted to explore the evidence presented by the opposing side. Defendants were not provided any opportunity to review the evidence submitted with Plaintiffs' Motion until after the Motion was filed with the Court. After Plaintiffs served a meet and confer letter on Defendants on February 20, 2016 (*see* Plaintiffs' Exhibit 1-C, ECF No. 201-1) that contained nothing more than a recitation of the provisions of the Agreement Plaintiffs alleged were being breached, Defendants made repeated efforts to persuade Plaintiffs to share with Defendants the factual allegations on which they intended to rely in this Motion so that Defendants could seek to provide a response and thereby avoid the need

---

[12] In the August Order, the Court denied Defendants' request for an evidentiary hearing on the issue of conditions in CBP facilities because Defendants did not ask for such a hearing until after the Court had ruled on Plaintiffs' enforcement motion, finding that Defendants had not submitted responsive evidence to Plaintiffs' evidence regarding the conditions at CBP Facilities, and concluding that "it [was] too late for a second bite at the apple." August Order at 13. This time, it is Plaintiffs who are seeking a second bite at the apple, by asking the Court to re-litigate these same claims regarding CBP conditions that were resolved in the Court's August Order. Moreover, this time around Defendants are submitting to the Court exactly what the Court found was lacking the last time around: significant evidence that CBP facilities comply with the Agreement. Therefore, if the Court determines that this issue should be re-litigated, then Defendants contend that resolution can only be had after a full and fair exploration of all of the evidence from both parties, and an evidentiary hearing before the Court that is conducted after sufficient time is provided to depose any proffered witnesses.

for litigation. *See* Declaration of Sarah B. Fabian, ECF No. 204-1, at ¶¶ 4 -5. However, despite repeated requests by Defendants' counsel, Plaintiffs' counsel did not provide any of these factual allegations to Defendants. *Id.* ¶ 6. Therefore, Defendants have had no opportunity, prior to the time that the Motion was filed, to respond to those allegations, or to discuss with Plaintiffs whether any of those factual allegations could be resolved without the need for litigation. *Id.*; *see also* Local Rule 7-3; Agreement ¶ 37.[13]

Plaintiffs thus are asking this Court to find Defendants in breach before Defendants have been provided a meaningful opportunity to review and respond to the evidence upon which Plaintiffs ask the Court to rely. This is particularly problematic where Plaintiffs' evidence consists in large part of declarations by individuals that Defendants have shown in many cases are inconsistent with available evidence, and whose declarants Defendants have had no opportunity to investigate or examine

---

[13] In addition, although Plaintiffs provided unsealed versions of some of the redacted declarations submitted with their Motion, Plaintiffs did not provide unredacted copies of several other of the declarations included with their Motion. *See* Plaintiffs' Exhs. 12, 13, 15, 19. Only after multiple requests from Defendants did Plaintiffs' counsel send over a list of some of the names and Alien #s ("A#s") for the redacted individuals in those declarations, and for other individuals only the names were provided. As of this writing, for at least ten other declarations Plaintiffs never provided any names or A#s. The information that was provided, was provided barely one week before Defendants' opposition brief was due to the Court. This failure to provide timely information, and to provide identifying information that allows Defendants to easily locate files on each individual, has compounded the challenges that Defendants are facing in responding to allegations by between fifty and one hundred declarants in only one or two weeks, and in some cases without all of the necessary information. At a minimum, if the Court intends to rely on these redacted declarations for which late or no identifying information was provided to Defendants, the Court should order Plaintiffs to disclose to Defendants the names and A#s of all individuals upon whose statements they wish to rely, and provide Defendants with an additional opportunity to respond to those statements. In the alternative, there is good reason to strike all of those declarations because it would be unfair to the Defendants to allow Plaintiffs to rely on those statements without having provided Defendants with a meaningful opportunity to respond.

regarding these inconsistencies. The Court should decline to make a factual finding that the Agreement is being breached based only on this evidence. Therefore, if the Court believes that Plaintiffs' evidence is sufficient to warrant further exploration of the issue then the Court should order additional fact-finding and an evidentiary hearing.

## B.    Defendants Advise Juveniles Of Their Rights.

Plaintiffs generally claim that Defendants are violating Paragraph 24D, because juveniles are not being given any advisals of their rights under the Agreement. Plaintiffs base their contention on statements by numerous individuals that they had not been advised of their "rights under *Flores*." *See* Plaintiffs Exh. 2 at 11-12. The Agreement lists three specific advisals ((1) the Form I-770; (2) the Notice of Right to Judicial Review; and (3) a list of legal service providers) that DHS is required to give to juveniles. Plaintiffs have not identified any additional rights advisals that they contend are required under the Agreement.

In fact, current CBP policy is to provide Form I-770 to all juveniles it processes for removal, whether accompanied or unaccompanied. Padilla Decl. ¶ 91; James Decl. ¶ 41; Romero Decl. ¶¶ 41-42; Brooks Decl. ¶ 50; Perez Decl. ¶ 34; Martinez Decl. ¶ 48; Hastings Decl ¶ 47.[14] CBP facilities also provide a list of free legal services to those juveniles it processes for removal. Hastings Decl ¶ 48; Scott Decl. ¶ 50; Beeson Decl. ¶ 57; Brooks Decl. ¶ 51; James Decl. ¶ 42; Perez Decl. ¶ 45; Martinez Decl. ¶ 49; Padilla

---

[14] Although Form I-770 is provided to accompanied minors in order to comply with the Court's August Order and its interpretation of the Agreement, it should be noted that the Form advises that the minor has a right to a hearing before an immigration judge, and this right does not actually apply to accompanied minors who are, with their parent or guardian, being placed into expedited removal proceedings.

Decl. ¶ 92. ICE also provides information about free legal service providers, as well as a legal services orientation, and free phone calls to a number of legal service providers and consular officials. Hester Decl. ¶¶ 6, 14, 15; de la Garza Decl. ¶¶ 14-15; Reid Decl. ¶¶ 9, 10. Therefore, Plaintiffs are incorrect that there is no policy or practice in place to ensure that rights advisals are provided to juveniles.

With regard to the Notice of Right to Judicial Review, Defendants acknowledge that the precise notice provided in Exhibit 6 to the Agreement is not provided to juveniles in family residential centers. However, since Plaintiffs have identified this as an area concern and thereby brought this issue to ICE's attention, ICE is willing to provide such notice and is working to implement a procedure to provide the notice to accompanied minors at ICE family residential centers. *See* Hester Decl. ¶ 10; de la Garza Decl. ¶ 10; Reid Decl. ¶ 11. This oversight, which is easily and gladly remedied once it was brought to ICE's attention, is not sufficient reason to find Defendants in breach of the Agreement and order substantial additional remedies such as the appointment of a special master.

> **D.** **Defendants Make And Record Ongoing Efforts To Release All Family Units Eligible For Release, And The Agreement Permits The Continued Detention Of Family Units Who Are Detained Pending Removal, Subject To Mandatory Detention, Or Where The Parent Has Been Determined To Be A Flight Risk.**

Plaintiffs claim that the current use of ICE family residential centers violates Paragraphs 14 and 18 of the Agreement. In essence, Plaintiffs are asking the Court to reconsider its August Order that any use of the facilities is permissible and in accordance with the Agreement. As discussed above, ICE moves as expeditiously as possible to process the credible fear and reasonable fear claims of individuals in its custody. Thus, of

the 18,706 residents initially booked into the FRCs from October 23, 2015, to May 18, 2016, and subsequently released or removed as of May 16, 2016, the average length of stay was 11.8 days.  Gurule Decl. ¶ 13. This is entirely consistent with the Agreement and with the Court's July and August Orders.

Plaintiffs cannot show that ICE fails to make immediate and continuous efforts to release family units once their eligibility for release has been established. At both Karnes and Dilley, ERO officers obtain contact information from each family on family members located in the United States, if available. Hester Decl. ¶¶ 11; de la Garza Decl. ¶ 11. Upon a positive credible fear or reasonable fear finding either by USCIS or an immigration judge, at Karnes and Dilley ICE Enforcement and Removal Operations ("ERO") then serves the charging document on the resident and makes a custody determination. Hester Decl. ¶¶ 4, 11; de la Garza Decl. ¶ 11. For residents who are being released, ERO then utilizes family information obtained during intake and any additional information that the resident provides, and processes the resident for release. Hester Decl. ¶ 11; de la Garza Decl. ¶ 11. Release generally occurs within 24-48 hours at Karnes, and 48-72 hours at Dilley, from the time the charging document is served on the resident. Hester Decl. ¶ 11; de la Garza Decl. ¶ 11.[15]

Moreover, the continued detention of a limited number of family units who are subject to mandatory detention, or who have a final order of removal and the parent has been determined to constitute a flight risk, does not violate the Agreement or this Court's orders. *See supra* Section II.B. Notably, in previous litigation in this case, Plaintiffs have

---

[15]  This time frame is may also be dependent on the resident's travel arrangement preference and family/sponsor availability. Hester Decl. ¶ 11; de la Garza Decl. ¶ 11.

acknowledged that the authority to detain individuals for purposes of removal under 8 U.S.C. § 1231 applied to minors, and was not precluded by the Agreement so long as it did not otherwise violate the statute. *See* ECF No. 19 at 31 ("[N]othing in the settlement precludes defendants from detaining a child in the course of physically removing him or her, but neither does it permit months or years of open-ended incarceration."); *id.* at 32 (acknowledging that detention in secure facilities to effectuate removal is proper if there is a "reasonable expectation that they will be able to effect removal promptly").

Finally, despite Plaintiffs' suggestions to the contrary, nothing in the Court's orders requires Defendants to separate those minors from their parents to comply with the Agreement. In fact, the Court's July Order recognized that continued detention of the child with his or her parent in those instances is permissible and preferable. *See* July Order at 9 n.5. Moreover, even if the Court were to order such a result, ICE does not have the resources or the institutional experience to assess whether an adult seeking custody of a minor is a suitable custodian who will house the minor in a suitable home environment. Gurule Decl ¶ 16. The average length of custody of an unaccompanied minor in HHS custody is 34 days. *See* http://www.acf.hhs.gov/programs/orr/about/ucs/facts-and-data. That is how long it takes HHS on average to reunite unaccompanied minors with suitable adults in suitable home environments in accordance with the reunification requirements in the Trafficking Victims Protection Reauthorization Act. ICE should not direct its resources to engaging in such efforts for only a small number of families, when its overall goal for the vast majority of families in its custody is to remove the entire family promptly or to release the entire family together within 20 days. Every resource ICE

would spend on a suitability analysis of the proposed custodian and the proposed home would be a resource that could not be spent processing families out of the facility as quickly as possible. *See* Gurule Decl. ¶ 16.

Defendants have made every effort to conform the use of ICE family residential centers to the Court's interpretation of the Agreement, and the requirements laid out in the Court's August Order. In order to comply with the Court's Order, ICE has implemented many improvements at its family residential centers including increased staff, improved processes, additional residential resources, improved legal access, and increased oversight of operations in order to expedite the processing of families through its centers. *See* Gurule Decl. ¶¶ 9, 15. The fact that Plaintiffs may disagree with the Court's order, and the use of ICE family residential centers that it permits, is not good reason to reopen the prior litigation, or to permit Plaintiffs to seek untimely reconsideration of the August Order. Therefore, the Court should Deny Plaintiffs' challenges to Defendants' permissible use of ICE family residential centers.

E.      **8 U.S.C. § 1252(f)(1) Precludes This Court From Entering Class-Wide Injunctive Relief Requiring Release of Those Properly Detained Under the Immigration and Nationality Act.**

To the extent Plaintiffs are asking the Court to reconsider its August Order, and to find that the Agreement requires the release of individuals who are lawfully detained under the Immigration and Nationality Act ("INA"), such a reading of the Agreement is prohibited. *See* 8 U.S.C. § 1252(f)(1); *see also Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999) ("By its plain terms, and even by its title, [8 U.S.C. § 1252(f)] is nothing more or less than a limit on injunctive

relief."). Specifically, 8 U.S.C. § 1252(f)(1) provides that "no court other than the Supreme Court shall have jurisdiction or authority to enjoin or restrain the operations of the provisions of [8 U.S.C. §§ 1221-1231], other than with respect to an individual alien against whom proceedings under such part have been initiated."

In the August Order, the Court made clear that it did not intend to order that ICE release individuals who were properly detained under the INA, stating that Defendants' "fears that the remedial order will contravene the INA are unfounded." August Order at 9. Yet Plaintiffs now contend that the Government is violating the August Order and the Agreement by continuing to hold individuals who are subject to mandatory detention under 8 U.S.C. § 1225(b), or who are being detained pending removal under 8 U.S.C. § 1231, and have been found to constitute a flight risk. If this is true, then the August Order and the Agreement would constitute impermissible restrictions, on a class-wide basis, on the operations of these sections of the INA, in violation of 8 U.S.C. § 1252(f)(1). The Court cannot and should not read the Agreement to impose restrictions or requirements that are prohibited by the statute, and therefore Plaintiffs' request that the Court read such restrictions into the Agreement should be denied.

### F.   Accompanied Minors Are Detained With Their Parents At ICE Family Residential Centers.

Plaintiffs claim that ICE family residential centers violate the Agreement because they require that minors be housed with unrelated adults. Motion at 14-15. As an initial matter, this argument is an attempt to end-run around the fact that the Court's August Order left intact some permissible use for ICE family residential centers, by striking at their very existence. This should not be allowed.

Moreover, the Agreement's prohibition in 12.A regarding the placement of minors with unrelated adults clearly states that it is referring to "unaccompanied minors." *See* Paragraph 12.A.[16] Therefore, there is good reason to find that this prohibition in the Agreement is not violated by the system of housing at ICE family residential centers. Accompanied minors who are housed at ICE family residential centers remain with their parents, who are responsible for their oversight and care. *See* Hester Decl. ¶ 17; de la Garza Decl. ¶ 17; Reid Decl. ¶ 3. When children attend school or day-care at the facilities, they are supervised by licensed education professionals or other staff trained in childcare. Hester Decl. ¶ 17. In Karnes, all children are assigned to a suite with their parent, and adults are prohibited from congregating in those suites. Hester Decl. ¶ 17. In Dilley, adults are prohibited from entering a suite other than the one assigned to them. de la Garza Decl. ¶ 17.

In Berks, family units, including those with a male head of household, may commingle in the common areas, but all adults are prohibited from commingling in the bedrooms, and both male and female residents are precluded from entering the bedrooms occupied by an adult of the opposite sex. Reid Decl. ¶ 17. In addition, anytime an unrelated child is present in a bedroom, adult residents, regardless of his/her sex, must have staff supervision while in that bedroom if the child's parent is not present. *Id.* Children may enter their parent's bedroom only in the company of their parents. *Id.*

---

[16] And to be precise, Paragraph 12A refers to the initial custody after apprehension, now conducted by CBP, and not to longer-term detention, then under 8 U.S.C § 1252, and now conducted by ICE under 8 U.S.C. §§ 1225, 1226, and 1231.

Because accompanied children at ICE family residential centers remain with their parents, the Agreement's prohibition on placing unaccompanied minors with unrelated adults does not apply. Moreover there are additional protections in place even above those required by the Agreement to ensure the protection of residents at ICE family residential centers. Therefore, the Court should find that ICE family residential centers do not violate the Agreement in this regard.

### G.   Defendants Do Not Interfere With Any Minor's Right To Counsel.

The Agreement does not provide any right to counsel, and Plaintiffs cite to no provision of the Agreement that they claim is being breached by Defendants in this regard. As noted above, both CBP and ICE provide family units with lists of legal services providers. Hastings Decl ¶ 48; Scott Decl. ¶ 50; Beeson Decl. ¶ 57; Brooks Decl. ¶ 51; James Decl. ¶ 42; Perez Decl. ¶ 45; Martinez Decl. ¶ 49; Padilla Decl. ¶ 92; Hester Decl. ¶¶ 14, 15; de la Garza Decl. ¶¶ 14, 15; Reid Decl. ¶¶ 10. At ICE family residential facilities, residents also receive a legal services orientation, and have the ability to make free phone calls to a number of legal service providers and consular officials. Hester Decl. ¶¶ 14, 15; de la Garza Decl. ¶¶ 14, 15; Reid Decl. ¶¶ 10. Attorneys also regularly visit all of the facilities, and residents are free to meet with them when they are there. Hester Decl. ¶ 14; de la Garza Decl. ¶ 14; Reid Decl. ¶ 10. Therefore, Plaintiffs cannot credibly claim that they are being denied access to legal services at ICE family residential centers.

Plaintiffs further claim that Defendants violate the Agreement by transferring individuals from ICE family residential centers without providing notice to their counsel,

in violation of Paragraph 27A of the Agreement. Motion at 17. However, except in unusual and compelling circumstances, ICE ERO does provide advance notice to counsel regarding the transfer of a resident if that counsel has entered an appearance as counsel with ICE. *See* de la Garza Decl. ¶ 20; Hester Decl. ¶ 16; Reid Decl. ¶ 10.

## IV.   **CONCLUSION**

For the foregoing reasons, the Government requests that the Court deny Plaintiffs' Motion.

DATED:        June 3, 3016                 Respectfully submitted,


                                           BENJAMIN C. MIZER
                                           Principal Deputy Assistant Attorney General
                                           Civil Division

                                           LEON FRESCO
                                           Deputy Assistant Attorney General
                                           Civil Division

                                           WILLIAM C. PEACHEY
                                           Director, District Court Section
                                           Office of Immigration Litigation

                                           WILLIAM C. SILVIS
                                           Assistant Director, District Court Section
                                           Office of Immigration Litigation

                                           */s/ Sarah B. Fabian*
                                           SARAH B. FABIAN
                                           Senior Litigation Counsel
                                           Office of Immigration Litigation
                                           District Court Section
                                           P.O. Box 868, Ben Franklin Station
                                           Washington, D.C. 20044
                                           Tel: (202) 532-4824
                                           Fax: (202) 305-7000
                                           Email: sarah.b.fabian@usdoj.gov

                                           *Attorneys for Defendants*

1

CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2016, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.


/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants