**DEFENDANTS' EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, )<br>Plaintiffs, )<br>)<br>)<br>v. )<br>)<br>Loretta E. Lynch, Attorney )<br>General of the United States, *et al.*, )<br>Defendants. )<br>_____) | No. CV 85-4544 DMG (AGRx) |

**DECLARATION OF RONALD D. VITIELLO**

1. I am the Acting Chief of the United States Border Patrol ("Border Patrol"), U.S. Customs and Border Protection ("CBP"). I have been in this role since December 2015. I have been a Border Patrol Agent since 1985. I served as the Assistant Patrol Agent in Charge ("PAIC") of the Nogales Station in the Tucson Sector from June 1999 through November 2002, as well as the Chief Patrol Agent for the Rio Grande Valley Sector from June 2007 through June 2010. I became the Deputy Chief of the Border Patrol in June of 2010, where I remained until my appointment to my current role. In my capacity as the Acting Chief of the Border Patrol, I am responsible for executing the missions of the Department of Homeland Security ("DHS"), CBP, and the Border Patrol. The Border Patrol is the primary federal law enforcement organization responsible for preventing the entry of terrorists and their weapons and for preventing the illicit trafficking of people and contraband from entering or leaving the United States between official CBP ports of entry.

1

      The Border Patrol has a workforce of over 21,000 agents who patrol more than 6,000 miles of the United States land borders. As Acting Chief, I am also responsible for the daily operations of the Border Patrol, including the development and implementation of all nationwide policy decisions.

2. I make this declaration on the basis of my own knowledge, as well as the documents and the information made available to me in my position.

3. I am familiar with the policies and procedures that govern the apprehension, processing, and temporary detention of aliens, including juveniles. As Acting Chief of the Border Patrol, I am responsible for ensuring that all Border Patrol agents receive, understand, and comply with these policies.

4. I am familiar with the terms of the *Flores* Settlement Agreement ("Agreement"), including the requirements therein. Those requirements include that the Border Patrol hold juveniles in facilities that are safe and sanitary; that juveniles be provided access to food, drinking water, toilets, sinks, medical care, and adequate ventilation; and that CBP monitor its own compliance with these terms. I am aware that these terms apply to all juveniles, regardless of whether they are accompanied or unaccompanied by their parents or legal guardians.

5. The Border Patrol regularly apprehends juveniles, both accompanied and unaccompanied, between the ports of entry, predominantly on the Southwest Border. Upon apprehension, all aliens are transported to a Border Patrol station for processing and an eventual immigration disposition, absent medical issues requiring emergent attention. Border Patrol maintains custody only for the short period necessary to transfer an individual to another federal, state or local law enforcement agency, remove or, less commonly, release the individual. In general, Border Patrol maintains custody over individuals while they await

either expedited removal or transfer to U.S. Immigration and Customs Enforcement ("ICE") or, in the case of unaccompanied alien children ("UACs"), the U.S. Department of Health and Human Services ("HHS") custody.

6. I am similarly familiar with the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"). I am familiar with the interim guidance issued by then Chief David Aguilar, U.S. Border Patrol, on March 20, 2009, providing guidance to agents on the implementation of the TVPRA. I am also familiar with Border Patrol's 2008 policy governing the detention of all individuals in our custody, including juveniles.

7. The Border Patrol recognizes that the apprehension, processing, and temporary detention of juveniles requires particular awareness of their vulnerability and special needs. It is Border Patrol's policy and practice to detain juveniles in safe, secure, and clean facilities, and provide them with access to food, water, toilets, medical care, appropriately-ventilated hold rooms, and basic hygiene supplies.

8. For instance, Border Patrol's policies specifically provide that all detainees will be held in safe, clean, and adequately ventilated facilities, with access to food, water, functioning restrooms, hygiene products, and medical care. I expect that Border Patrol agents will adhere to these policies, and make these expectations clear to the Border Patrol senior leadership.

9. All detainees must be provided juice and snacks at regular intervals between meals. They can choose to decline any offers of food. Juveniles and pregnant women are required to have regular access to milk, juice, or snacks. In addition, all juveniles must be offered a meal upon arrival to a Border Patrol station, and every six hours after that, regardless of their time in custody. All detainees must have access to drinking water and a hold room

3

that is regularly cleaned and sanitized. All detainees must have access to toiletries such as soap, toilet paper, and sanitary napkins, and families with small children must have access to diapers and wipes. Juveniles must be provided access to clean bedding and basic hygiene items.

10. Supervisors must be notified of any detainee requiring medical care of any kind. The Border Patrol transports detainees to local emergency rooms, ensuring that those who require urgent medical care are properly evaluated by qualified medical personnel.

11. In addition to ensuring that all juveniles are held in appropriate conditions, the Border Patrol has consistently recognized that juveniles should be processed and transferred to other agencies as expeditiously as possible. The TVPRA requires that CBP transfer custody of all UACs to the HHS Office of Refugee Resettlement ("ORR") no later than 72 hours after determining that a juvenile is a UAC.

12. Consistent with the spirit of the TVPRA and its concern for juveniles' particular vulnerability, Border Patrol policies require that every effort be made to transfer UACs as quickly as possible to HHS ORR, normally well less than the 72 hour period. In addition, immediately after apprehending a UAC, and in no circumstance more than 48 hours thereafter, Border Patrol agents are required to contact the Juvenile Coordinator within ICE's Enforcement and Removal Operations (previously Detention and Removal Operations) and receive approval to begin processing the UAC for placement. It is my understanding that, upon receiving this notification, ICE contacts HHS ORR to begin the process of finding bed space for that UAC. This policy was developed to expedite the processing and transfer of UACs to HHS custody.

13. Border Patrol policies implementing the TVPRA require agents to screen UACs to determine whether or not they have been a victim of human trafficking, or if credible evidence exists to conclude that they are at risk of being trafficked if they return to their home country. Border Patrol and the Office of Field Operations leadership have instructed stations to prominently display a poster explaining the dangers of human trafficking, in both English and Spanish, to further encourage potential trafficking victims to self-report.

14. In addition, Border Patrol agents must provide all juveniles (including, where appropriate the parents or legal guardians of an accompanied juvenile) with a copy of Form I-770, Notice of Rights and Requests for Dispositions. A true and accurate copy of this form is attached hereto as Exhibit A. If a juvenile is under the age of 14 or otherwise unable to understand the Form I-770, a Border Patrol agent must read and explain the document to the juvenile in a language that he understands. Border Patrol agents have access to language services if the juvenile or other detainee does not speak a language in which the Border Patrol agents are conversant.

15. Pursuant to Border Patrol policy, Border Patrol agents must ensure that all information pertaining to a detainee's treatment, as well as a juvenile's transfer out of CBP custody, be documented in the e3 Detention Module (e3DM), the Border Patrol's electronic system of records. If at any time this system is offline or unavailable, Border Patrol agents must use paper forms to record the relevant information.

16. During the early months of 2014, unprecedented numbers of juveniles began entering the United States along the Southwest border. Many of these children were unaccompanied, but a significant number came with their parents or legal guardians. CBP, particularly the Border Patrol, became the front line for this urgent issue. Border Patrol apprehended

68,541 UACs and 68,445 family units in fiscal year 2014. The vast majority of these apprehensions occurred in the Rio Grande Valley Sector in South Texas.

17. In 2014, due to the rapidly increasing number of juveniles crossing the border, HHS quickly ran out of bed space. As a result, the Border Patrol was unable to expeditiously transfer juveniles who were also UACs out of its stations to HHS. Accordingly, the number of UACs in CBP custody increased dramatically. With the limited resources available at stations designed for short-term custody, Department of Homeland Security (DHS) leadership began its best efforts to provide care for these UACs. Agents were pulled from their front-line enforcement duties to provide care and supervision to these juveniles. Over 100 agents were reassigned from around the country, and ICE similarly sent 40 additional employees. Specially-trained Border Patrol agents, such as EMTs, began providing basic medical care to juveniles in CBP custody, and determining which detainees needed to go to a hospital for medical treatment.

18. I was aware at the time of the influx that individual Border Patrol agents, particularly in the Rio Grande Valley, which experienced the greatest influx of juveniles, also began their own efforts to care for the UACs in their custody, by providing supplies such as toys, diapers, and clothing from their own funds. Although these efforts were not taken in response to any official agency policy, they represented a desire by Border Patrol agents to use the resources at their disposal to provide UACs with the best possible treatment under the circumstances.

19. As the numbers of juveniles crossing the border continued to increase, DHS leadership recognized the need for an integrated, agency-wide strategy to address the influx. Accordingly, the Secretary of Homeland Security determined that a "Level IV" condition

of readiness was appropriate to exercise control over the influx. This is the highest level of readiness within DHS, and requires the appointment of a Federal Coordinator to coordinate resources within the Department. I was appointed as the Federal Coordinator on or about May 13, 2014.

20. On or about June 1, 2014, President Obama directed the Secretary of Homeland Security to establish a Unified Coordination Group (UCG) among various agencies of the federal government. This enabled the coordination of the relevant parts of the federal government, rather than just DHS, to respond to this situation. The Administrator of FEMA was named the chair of the UCG. A true and accurate copy of the President's order is attached as Exhibit B.

21. During the influx of 2014, the UCG implemented a wide variety of actions to manage the influx of juveniles and family units. For example, HHS worked with the Department of Defense to open new facilities to temporarily house UACs. This enabled CBP to more quickly transfer UACs out of our custody, and better comply with the time requirements of the TVPRA. In addition, CBP worked with DHS to continue to provide medical care to juveniles in our custody.

22. The Border Patrol's main focus during the influx of 2014 was to ensure the health and safety of the juveniles in our custody. Operational constraints such as HHS' limited capacity made it difficult to expeditiously transfer juveniles out of CBP custody. Accordingly, ensuring the health and safety of those juveniles in our care became even more important.

23. Subsequent to the 2014 influx, CBP incorporated lessons learned to continue to refine its policies governing detention. As part of this ongoing process, CBP issued the *National*

*Standards on Transport, Escort, Detention, and Search* ("TEDS") in October 2015. TEDS provides national, agency-wide standards governing the treatment of detained individuals, and reflects CBP's continuing commitment to protect the health, safety, and security of all those in CBP's custody. TEDS builds on previously-enacted CBP policies to ensure that best practices continue to govern CBP detention.

24. Consistent with Border Patrol's existing practices, TEDS requires that all detainees be transferred out of CBP custody as soon as operationally feasible. As UACs must, by law, be transferred within 72 hours, Border Patrol monitors the length of time that UACs remain in Border Patrol custody. Border Patrol also monitors the average hours in custody over a five day period, as well as the number of placements made to HHS.

25. TEDS also reiterates the importance of maintaining family unity at all times; protecting the best interests of juveniles at all times; providing juveniles with meals, snacks, and potable water; providing juveniles with toilets, sinks, and appropriate hygiene products; ensuring adequate ventilation in CBP hold rooms; providing appropriate screening protections to juveniles; and documenting all actions taken with respect to juveniles in e3DM.

26. I am aware that this Court issued two Orders in the above referenced Agreement, the first on July 24, 2015 and the second on August 21, 2015. I understand that the District Court, in its August Order, required, among other things, CBP to monitor its compliance with the standards and procedures for detaining class members in facilities that are safe and sanitary, consistent with the concern for the particular vulnerability of minors, and consistent with Paragraph 12 of the *Flores* Settlement Agreement.

27. After receiving this Order, the Border Patrol took steps to ensure that we were routinely able to show our compliance with the terms of the Agreement, including as articulated in the Court's Order. Accordingly, we decided to make changes to e3DM that would allow each station to maintain statistical information and pull specific information related to compliance.

28. Although individual Border Patrol agents were already entering all relevant information into e3DM, Border Patrol leadership implemented changes to the system in order to ensure that the Border Patrol maintained a robust, unified data system from which to pull nationwide statistics.

29. On October 16, 2015, the former Chief of the Border Patrol, Michael Fisher, issued a memorandum outlining the importance of complying with the Court Order. The memorandum also described the changes to e3DM that would allow for more complete monitoring of stations' compliance with the terms of the Agreement. Chief Fisher attached a copy of the Court's August 21, 2015 Order to his memorandum.

30. The enhanced e3DM processing tools were implemented in addition to already existing policies and practices, and were designed to further enhance the Border Patrol's screening and protection of juveniles in our custody. The requirements do not supersede any existing policies.

31. The Border Patrol, including staff at headquarters, has taken the need to monitor compliance with the Court's order seriously. This has included, for instance, directing agents to monitor the electronic records created related to Flores compliance to ensure that issues are expeditiously addressed.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____
Ronald D. Vitiello
Acting Chief
U.S. Border Patrol

# Exhibit A

| U.S. Department of Homeland Security | **Notice of Rights and Request for Disposition** |
|---|---|

Alien's Name: _____

A Number (if any): A-_____

---

**Your Rights.**

You have been arrested because Immigration Officers believe that you are illegally in the United States. When you are arrested in the United States you have certain rights. No one can take these rights away from you. This paper explains your rights.

**You have the right to use the telephone.**

You may call your mother or father or any other adult relative. You may call your adult friend. If you do not know how to use a telephone, the immigration agent will help you.

**You have the right to be represented by a lawyer.**

Attached to this paper is a list of lawyers who can talk to you, and help you, for free. A lawyer can fully explain all your rights to you, and can represent you at a hearing.

**You have the right to a hearing before a judge.**

The judge will decide whether you must leave or whether you may stay in the United States. If for any reason you do Not want to go back to your country, or if you have any fears of returning, you should ask for a hearing before a judge. If you do not want to have a hearing before a judge, you may choose to go back to your country without a hearing.

---

**Reading this Notice:**
☐ I have read this notice.
☐ This notice has been read to me.

**Right to Use Telephone:**
☐ I have contacted my parent(s) or a legal guardian by telephone.
☐ I have contacted an adult friend or relative by telephone.
☐ I do not want to talk to anyone by telephone.

**Completion of the following is optional:**
The person contacted is: (Relationship)

The person contacted is: (Name)

**Right to be Represented by a Lawyer:**
☐ I have spoken with a lawyer.
☐ I do not want to speak with a lawyer.

**Right to a Hearing:**
☐ I understand my right to a hearing before a judge.

---

☐ **I request a hearing before a judge.**

Signature:_____   Date:_____

---

☐ **I do not want a hearing before a judge.**
   I am in the United States illegally and ask that I be allowed to return to my country, which is named below.

Country:_____

Signature:_____   Date:_____

Form I-770 (08/01/07) (Prior editions may not be used)

# INSTRUCTIONS TO OFFICERS

This advisal is required to be given to all persons who are taken into custody and who appear, are known, or claim to be under the age of eighteen and who are not accompanied by one of their natural or lawful parents. No such person can be offered or permitted to depart voluntarily from the United States except after having been given this notice.

The required procedure distinguishes between two classes of minors.

1) The first class are those minors apprehended in the immediate vicinity of the border and who permanently reside in Canada or Mexico. These persons shall be informed that they have a right to make a telephone call to any of the persons mentioned in the notice. The purpose of this call is so that they can seek advice as to whether they should voluntarily depart or whether they should request a deportation hearing. We are required to make a record of any refusal to accept our offer of a telephone call.

2) As to all other minors, **they must not only be given access to a telephone, they must establish communication, telephonic or otherwise, with one of the persons listed in the notice** before they can be offered voluntary departure.

The DHS retains the right to decide when to allow telephone calls. The only prohibition is that the minor cannot be asked to voluntarily depart until after telephone access is provided. If the minor is not offered voluntary departure but is put into deportation proceedings by issuance of a Notice to Appear, this procedure is not necessary. It is our duty to make reasonable efforts to contact the person of the minor's choice, but after unsuccessful efforts to reach that person, we can facilitate contact with another such person. Whenever the minor elects to pursue a process, such as a call to a foreign country, which is operationally unacceptable, we can always proceed to issue a Notice to Appear.

The minor must tell the type of person that he/she talked to but need not give us that person's name or identifying information. If a minor, *of his/her own volition,* asks to contact a consular officer, this will satisfy the requirements of the notice.

The officer need not read the notice to the minor unless the minor is under 14 years of age, or unable to understand the notice. The officer must ask the minor whether he/she wanted to make a call, whether a communication was made and, if made, to whom. The officer must also verify whether the minor wanted voluntary departure or a hearing, and must sign and date the form to show this was done.

**Officers are not to offer any advise to any minor as to what he/she should or should not do.**

---

**To be completed by the Officer:**

*I verify that:* _____   **A-** _____

1.a. ☐  The subject named was given this notice to read.
  b. ☐  I read this notice to the name subject in the following language: _____

2.  ☐  I asked this subject whether he/she wanted to make a telephone call, and offered assistance in the use of the telephone.

3.a. ☐  The subject told me that he/she did not want to make a telephone call, or
  b. ☐  The subject told me that he/she established communication and the form was marked to indicate it;
  c. ☐  The subject was unable to establish telephone communication with the desired individual. The following number of attempts were made: _____

4.a. ☐  The subject requested a hearing.
  b. ☐  The subject admitted deportability and requested to return to his/her country voluntarily, without a hearing.
5.a. ☐  A Notice to Appear was issued because, the subject was unable to establish contact with any of the individuals specified after making the number of attempts indicated above (Item **3** c), and after assistance to establish contact was given or offered.

_____        _____
**Signature of Officer**                                                                  **Date**

Form I-770 (08/01/07) (Prior editions may not be used)        Page 2 of 2

# Exhibit B

the WHITE HOUSE    PRESIDENT BARACK OBAMA



SHARE THIS


TWITTER


FACEBOOK


EMAIL

## Briefing Room

Your Weekly Address

Speeches & Remarks

Press Briefings

Statements & Releases

White House Schedule

Presidential Actions

    Executive Orders

    **Presidential Memoranda**

    Proclamations

Legislation

Nominations & Appointments

Disclosures

**The White House**

Office of the Press Secretary

For Immediate Release                                                                                   June 02, 2014

# Presidential Memorandum -- Response to the Influx of Unaccompanied Alien Children Across the Southwest Border

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

SUBJECT: Response to the Influx of Unaccompanied Alien Children Across the Southwest Border

The influx of unaccompanied alien children (UAC) across the southwest border of the United States has resulted in an urgent humanitarian situation requiring a unified and coordinated Federal response. Accordingly, I have directed the Secretary of Homeland Security (Secretary) to establish an interagency Unified Coordination Group to ensure unity of effort across the executive branch in responding to the humanitarian aspects of this situation, consistent with the Homeland Security Act of 2002 and Homeland Security Presidential Directive-5 (Management of Domestic Incidents)(HSPD-5), including coordination with State, local, and other nonfederal entities. The Secretary shall establish and manage this Unified Coordination Group consistent with the authorities in 6 U.S.C. 111(b)(1)(D), 112(a)(3), 112(b)(1), 112(c), and HSPD-5. The Secretary has advised me that he will direct the Administrator of the Federal Emergency Management Agency (Administrator), subject to the oversight, direction, and guidance of the Secretary, to serve as the Federal Coordinating Official who shall lead and coordinate the Unified Coordination Group consistent with the functions of the Administrator pursuant to 6 U.S.C. 313, 314(a)(1) and (10). As the Federal Coordinating Official, the Administrator (or his designee) shall lead and coordinate Federal response efforts to ensure that Federal agency authorities and the resources granted to the departments and agencies under Federal law (including personnel, equipment, supplies, facilities, and managerial, technical, and advisory services) are unified in providing humanitarian relief to the affected children, including housing, care, medical treatment, and transportation. The Administrator shall execute these responsibilities consistent with all applicable laws and regulations, including legal requirements governing the appropriate care and custody of UAC.

Nothing in this memorandum alters, or impedes the ability to carry out, the authorities of Federal departments and agencies to perform their responsibilities under law. All Federal departments and agencies are directed to provide their full and prompt cooperation, resources, and support, as appropriate and consistent with their own responsibilities for addressing this situation, and shall cooperate with the Secretary and the Federal Coordinating Official to ensure a unified Federal response. The Secretary shall lead the coordination of the Federal response to this urgent humanitarian situation and other departments and agencies supporting this effort shall provide support to address this situation as appropriate and to the extent permitted by law.

This memorandum does not obligate any agency to reimburse another agency for the resources used to address the UAC humanitarian situation nor does it limit the use of the Economy Act (31 U.S.C. 1535), as appropriate.

SHARE THIS

TWITTER

FACEBOOK

EMAIL

BARACK OBAMA

SHARE THIS

| HOME | BRIEFING ROOM | ISSUES | THE ADMINISTRATION | PARTICIPATE | 1600 PENN |

TWITTER

En Español | Accessibility | Copyright Information | Privacy Policy | USA.gov

FACEBOOK

EMAIL