**DEFENDANTS' EXHIBIT 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*,<br>　　*Plaintiffs,*<br><br>v.<br><br>Loretta E. Lynch, Attorney<br>General of the United States, *et al.*,<br>　　*Defendants.* | No. CV 85-4544 DMG (AGRx) |

### DECLARATION OF TODD C. OWEN

1.  I am the Assistant Commissioner of the Office of Field Operations ("OFO"), U.S. Customs and Border Protection ("CBP"). I have been employed in this role since Feb. 8, 2015. I began my career with the U.S. Customs Service in 1990 as an import specialist. Since then, I have served as the Area Port Director of New Orleans, Louisiana, where I was responsible for overseeing all operations in the state of Louisiana. From July 2011 through my appointment to my current position, I served as the Director of Field Operations ("DFO") for CBP's Los Angeles Field Office, where I supervised all OFO activities for the greater Los Angeles area, including at Los Angeles International Airport, Los Angeles and Long Beach seaports, and the Las Vegas International Airport.

2.  In my role as the Assistant Commissioner, I am responsible for executing the missions of the Department of Homeland Security ("DHS"), CBP, and OFO. CBP's mission includes facilitating the flow of legal immigration and trade, while preventing the illegal trafficking of people and contraband. OFO is the primary federal law enforcement organization

1

responsible for preventing the entry of terrorists and their weapons at official CBP ports of

entry ("POEs"), and for preventing the illicit trafficking of people and contraband from

entering or leaving the United States at POEs.  In my position I supervise more than 28,000

employees, with operations at 20 major field offices, 328 POEs, and 70 locations in over 40

countries internationally.  On average OFO processes over 1,048,000 passengers and

pedestrians a day; 308,000 incoming international air passengers and crew; 54,000

passengers and crew arriving by vessel; 72,000 truck, rail, and sea containers; and 282,000

incoming privately owned vehicles.

3.     I make this declaration on the basis of my own knowledge, as well as the documents and

the information made available to me in my position.

4.     I am familiar with the policies and procedures that govern the arrest, processing, and

temporary detention of aliens, including juveniles.  As the Assistant Commissioner, I am

responsible for ensuring that all CBP officers ("CBPOs") receive, understand, and

implement these policies.

5.     I am familiar with the *Flores* Settlement Agreement.  I am familiar with the terms of the

*Flores* Settlement Agreement ("Agreement"), including the requirements therein.  Those

requirements include that OFO hold juveniles in facilities that are safe and sanitary; that

juveniles be provided access to food, drinking water, toilets, sinks, medical care, and

adequate ventilation; and that CBP monitor its own compliance with these terms.  I am

aware that pursuant to Court order, these terms apply to all juveniles, regardless of whether

an adult relative or family member accompanied them.

6.     I am similarly familiar with the William Wilberforce Trafficking Victims Protection

Reauthorization Act of 2008 ("TVPRA").  I am familiar with the interim guidance issued

2

by then Assistant Commissioner Thomas S. Winkowski on March 19, 2009, providing guidance to CBPOs on the implementation of the TVPRA.

7.    OFO conducts immigration inspections of all individuals who wish to enter the United States through a POE.  When OFO encounters an individual who is inadmissible to the United States, OFO detains the individual for a short period of time for processing and an eventual immigration disposition, absent any medical issues requiring emergent attention. OFO maintains custody of detainees only for the short period necessary to transfer a detainee to another federal, state, or local law enforcement agency, or less commonly, release the individual.  Most commonly, OFO maintains custody over individuals while they await either expedited removal or transfer to U.S. Immigration and Customs Enforcement ("ICE"), or, in the case of unaccompanied alien children ("UACs"), to the U.S. Department of Health and Human Services ("HHS") custody.  At times, OFO will transfer UACs to the custody of Border Patrol in the Rio Grande Valley sector, given the higher volume of processing performed by Border Patrol and the availability of the Centralized Processing Center (CPC) in the sector.  In any event, I am aware that pursuant to the TVPRA, OFO must transfer a UAC to HHS' Office of Refugee Resettlement ("ORR") within 72 hours of a determination that the individual is a UAC, absent exceptional circumstances.

8.    OFO recognizes that the processing and temporary detention of juveniles requires particular awareness of their vulnerability and special needs.  It is OFO's policy and practice to detain juveniles in safe, secure, and clean facilities, and to provide them with access to food, water, toilets, medical care, appropriately-ventilated hold rooms, and basic hygiene supplies.

9.    For instance, OFO's policies and practices emphasize the importance of processing all
      detainees as expeditiously as possible, of retaining family unity to greatest extent
      operationally feasible, and of providing juveniles with food, water, toilets, medical care,
      and appropriately-ventilated hold rooms.

10.   OFO policy provides that an individual should only be detained for the least amount of
      time necessary to complete processing. Due to OFO's limited custodial resources, an
      individual should generally not be detained at a POE for more than 24 hours. Many of
      OFO's ports of entry are airports. As such, individuals detained at these locations are often
      detained only for the period necessary for them to embark on the next available aircraft to
      return them to the port of embarkation.

11.   Although the TVPRA requires that a UAC be transferred to HHS ORR within 72 hours
      after determining that a juvenile is a UAC, OFO policy requires that POEs should strive to
      transfer a UAC to ORR within 24 hours. If it is not possible to transfer a UAC within 24
      hours, the POE management works with ERO/HHS to expedite placement. In addition,
      immediately after discovering that a juvenile is a UAC, and in no circumstance more than
      48 hours thereafter, the POE must contact the Juvenile Coordinator within ICE's
      Enforcement and Removal Operations (previously Detention and Removal Operations) and
      receive approval to begin processing the UAC. It is my understanding that, upon receiving
      this notification, ICE contacts HHS ORR to begin the process of finding bed space for that
      UAC. This policy was developed to expedite the processing and transfer of UACs to HHS
      custody.

12.   OFO policy implementing the TVPRA requires that all UACs be screened to determine
      whether or not they have been a victim of human trafficking, or if credible evidence exists

4

to conclude that they are at risk of being trafficked if they return to their home country. OFO also encourages POEs to prominently display a poster explaining the dangers of human trafficking, in both English and Spanish, to further encourage potential trafficking victims to self-report, depending on the feasibility for each POE.

13. While in OFO custody, OFO policy has long required that all detainees who have been detained for more than six hours be provided with a meal. Juveniles and pregnant women are required to have access to snacks, milk, or juice at all times, and all juveniles are provided with meal service, regardless of the amount of time they remain in custody. Detainees always have the option to refuse food. All detainees must have access to drinking water, either through the use of bottled water or disposable cups. All detainees must have access to restrooms at any time, as well as hygiene items such as soap, toilet paper, feminine hygiene products, diapers, and wipes. Detainees using the restroom are directly supervised for their own safety as well as the safety of others; however, every effort is also made to respect the detainee's privacy to the greatest extent possible given these safety concerns. All hold rooms or detention cells must be routinely cleaned and sanitized.

14. Not all juveniles in OFO custody are detained in traditional hold rooms or cells. Many POEs do not have space for such facilities. Accordingly, in order to ensure that juveniles are detained in the least restrictive setting appropriate for their age and needs, many juveniles are detained in areas ordinarily used for secondary processing, or other temporary hold areas. At times this may include an empty office or other similar space. This practice is done in order to ensure that, when juveniles must be detained, they are as comfortable as

possible.  Juveniles detained in these areas are required to be directly supervised by a
CBPO.

15.   All detainees in OFO custody are provided medical care, if needed.  In an emergency
situation, CBPOs must contact appropriate emergency services and notify their shift
supervisor.  This process ensures that those who require urgent medical care are properly
evaluated by qualified medical personnel.  If a detainee requires off-site medical care, at
least one CBPO will accompany the detainee.

16.   As part of CBP's ongoing process to improve and expand its policies governing detention,
as well as incorporate lessons learned from the 2014 UAC influx, CBP issued the *National
Standards on Transport, Escort, Detention, and Search* ("TEDS") in October 2015.  TEDS
provides uniform national, agency-wide standards governing the treatment of detained
individuals, and reflects CBP's continuing commitment to protect the health, safety, and
security of all those in CBP's custody.  TEDS builds on previously-enacted CBP policies to
ensure that best practices continue to govern CBP detention.

17.   Consistent with OFO's existing policies, TEDS requires that all detainees, including
juveniles, be transferred out of CBP custody as soon as operationally feasible.  TEDS
reiterates the importance of maintaining family unity at all times; protecting the best
interests of juveniles at all times; providing juveniles with meals, snacks, and potable
water; providing juveniles with toilets, sinks, and appropriate hygiene products; ensuring
adequate ventilation in CBP hold rooms; providing appropriate screening protections to
juveniles; and the importance of documenting all actions taken with respect to juveniles in
OFO's electronic system of records, the Secured Integrated Government Mainframe Access
("SIGMA").

6

18. I understand that this Court issued two Orders regarding the above-referenced Agreement, the first on July 24, 2015 and the second on August 21, 2015. I am aware that the District Court, in its August Order, required, among other things, CBP to monitor its compliance with the standards and procedures for detaining class members in facilities that are safe and sanitary, consistent with the concern for the particular vulnerability of minors, and consistent with Paragraph 12 of the *Flores* Settlement Agreement.

19. OFO takes compliance with all Court orders seriously. We were made aware of the Court's order shortly after its issuance. My staff immediately began working to ensure that OFO was and continues to be compliant with the Court's Order.

20. In order to ensure its compliance with the Court's Order of August 21, 2015, OFO took steps to ensure that we were routinely able to show our compliance with the terms of the Agreement, including as articulated in the court's Order. Although individual CBPOs have always entered all relevant information into SIGMA, OFO leadership implemented changes to the system in order to ensure that OFO maintained a robust, unified data system from which to pull nationwide information related to the detention of juveniles.

21. As part of ensuring that OFO was compliant with the Court's Order, OFO Headquarters directed each POE to purchase a mechanism to determine the temperature in any facility where a juvenile may be detained. So, for instance, I am aware that the New Orleans Field Office purchased laser infrared thermometers in September 2015 in order to have no fewer than two thermometers on hand at any POE.

22. In developing and implementing these changes, OFO sought to ensure that information could be tracked not only at the local level, but could also be examined by management at the Headquarters level. The capability of monitoring OFO's operations at multiple

7

managerial levels is important in an organization which has more than 28,000 employees
and operates at 328 POEs.

23.    On October 19, 2015, I issued a memorandum to all DFOs informing them of the substance
of the August 21, 2015 Order, highlighting OFO's continuing obligation to comply with the
terms of the Agreement, and describing the changes to SIGMA that would allow for this
more complete monitoring of all POEs' compliance with the terms of the Agreement.  I
attached a copy of the Order to my memorandum, and directed that the memorandum be
provided to all POEs across the country.

24.    The enhanced SIGMA processing requirements were implemented in addition to  existing
policies and practices, and were designed to further enhance OFO's ability to detain all
juveniles in accordance with the terms of the Agreement.  The requirements do not
supersede any existing policies.

25.    In my memorandum, I outlined that all efforts to provide food, medical care, and other
requirements to juveniles in OFO custody must be documented in SIGMA, and explained
the new processing capabilities that would allow enhanced tracking.  I also emphasized
that, regardless of resource constraints at a particular POE, all juveniles in OFO custody
must have access to toilets, food, drinking water, medical care, reasonable temperatures,
and family members, as well as receive protection from unrelated adults.

26.    Also on October 19, 2015, the Enforcement Programs Division at OFO Headquarters
issued a Weekly Muster to the field providing more details on the new SIGMA tracking
requirements.  The muster emphasized that all relevant information must be entered into
SIGMA at any time that a juvenile enters or remains in OFO custody.  The muster also
explained that, even if a juvenile is detained in a location other than a hold room (*i.e.*, due

8

to a desire to detain the juvenile in the least restrictive setting or due to lack of hold room availability), the information must still be recorded.

27. Pursuant to the Muster, before placing a juvenile in any detention space, and on a daily basis when the space is occupied by a juvenile, a CBPO must visually inspect the space to ensure that it is safe and sanitary and that the juvenile will have access to drinking water and a functional toilet, and must ensure that the temperature of the room is between 66 to 80 degrees Fahrenheit.

28. The CBPO must enter the results of this inspection into an individual juvenile's record in SIGMA. If any of the above requirements has not been met, the CBPO must note the problem in SIGMA and immediately notify port management. The POE must then take all steps to fix the problem as quickly as possible, which may include moving the juvenile to a different location.

29. Any problems not resolved within 12 hours must be brought to the attention of the Port Director and the Office of Chief Counsel.

30. Each POE must ensure that detention spaces in the POE are professionally cleaned, and ensure that cleaning logs are properly maintained. In general, OFO does not maintain cleaning contracts for individual POEs, as the facilities are often either run by the General Services Administration or leased from a state port authority. Cleaning is generally performed by these agencies.

31. Once a juvenile is detained, CBPOs must conduct welfare checks at regular intervals. CBPOs must verify that the juvenile continues to have access to water and a toilet, and that the temperature and ventilation continue to be operational. CBPOs must record the welfare check in SIGMA.

32. CBPOs must record all offers of food, as well as a juvenile's refusal of the offered food, in SIGMA. CBPOs must also record all medical assistance provided to a juvenile.

33. With the exception of processing or other analogous short, routine actions, POEs must facilitate contact between a juvenile and his family members during any separation of the juvenile and the family. If such contact cannot be facilitated, the POE must document the reasons for the lack of contact, using one of the following options:

    a. Operational infeasibility;

    b. Security concerns;

    c. Lack of certainty regarding the familial relationship;

    d. Medical concerns;

    e. The family remains in OFO custody for fewer than four hours; or

    f. With supervisory approval, other reasons (these reasons must be specifically detailed in SIGMA).

34. On October 21, 2015, all CBPOs received training, via Powerpoint, on how to enter the above information into SIGMA. CBPOs also received paper forms to be used to record all relevant information during any period in which SIGMA is offline or otherwise unavailable. The SIGMA processing changes went live on October 21, 2015.

35. On October 22, 2015, OFO leadership sent messages to all POEs reminding them of the importance of family reunification. Accordingly, leadership reminded CBPOs that they are required to ask every accompanied juvenile who must be separated from his or her legal guardian about other family members in the United States. CBPOs must record this information and provide it to HHS.

36.   In my role as Assistant Commissioner, I am responsible for implementing and ensuring

compliance with these policies.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare that the foregoing is true and correct to

the best of my knowledge, information, and belief.

Todd C. Owen
Assistant Commissioner                     5/31/16
Office of Field Operations,
U.S. Customs and Border Protection

11