DEFENDANTS' EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISON

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, )<br>    *Plaintiffs* )<br>)<br>v. )<br>)<br>Loretta E. Lynch, Attorney )<br>General of the United States, *et al*, )<br>    *Defendants* )<br>_____) | Case No. CV 85-4544 DMG (AGRx) |

**DECLARATION OF SEAN MILDREW**

1. I am the Chief Accountability Officer (CAO) within the Office of Administration of United States Customs and Border Protection (CBP). I was appointed as the first CBP Chief Accountability Officer in March 2015. This newly-created position has oversight over CBP Planning, Programming, Budgeting, and Accountability, as well as ongoing efforts to streamline and effectuate a new enterprise governance process. In my capacity as CAO, I serve as the Senior Component Accountable Official (SCAO) overseeing all Government Accountability Office (GAO) and Office of Inspector General (OIG) reviews impacting CBP. I also lead the management inspections programs as well as the Commissioner's Management Staff. In addition to the programs in CAO, I serve as CBP's Performance Improvement Officer and provide leadership and direction on the development of the annual CBP Commissioner's Priorities as well as the development of the annual CBP business plan.

2. Prior to being appointed CAO, I served for three years as the CBP Budget Executive Director. Previously, I served for twenty-three years in the U.S. General Services Administration (GSA) in various position, including, Assistant Commissioner for Budget and

Financial Management for the GSA's Public Buildings Service, Assistant Commissioner for Organizational Resources, and PBS Budget Officer with the GSA Office of the Chief Financial Officer (CFO).

3. In my current role as CAO, I am responsible for overseeing the Management and Inspections Division (MID) within the Office of Administration.

4. MID is generally responsible for maintaining and implementing a broad-based management inspection and audit oversight program that provides CBP senior leadership with information concerning performance and effectiveness of operations and management. MID performs several types of inspections including the Self-Inspection Program, Management Assurance Reviews, and Focused Assessments. In addition, MID oversees the coordination for all GAO and OIG audits impacting CBP.

5. Through its programs, MID provides CBP senior leadership with diagnostic tools to measure the overall health of the organization and to identify operational and procedural deficiencies and vulnerabilities. Where applicable, MID provides recommendations for changes in policies, procedures, or practices to resolve programmatic issues, strengthen internal controls, or address impediments to CBP achieving its mission and goals. MID works to ensure systemic deficiencies and vulnerabilities identified through inspections, validations, reviews and GAO/OIG audits are corrected, thereby proactively helping to ensure the integrity, efficiency, and effectiveness of CBP operations. MID's proactive approach allows it to serve the agency as an advance indicator of potential concerns, which enhances CBP's overall operational effectiveness and integrity, and serves as a deterrent to fraud, waste, abuse, and mismanagement. The MID inspection teams perform expeditious but thorough assessments of targeted functions to determine whether the particular office is properly implementing

established administrative and operational policies and procedures, complying with federal laws and regulations, and ensuring the prudent utilization of funds, property, and agency resources.

6. I make this declaration on the basis of my own knowledge, as well as the documents and the information made available to me in my position.

7. I am aware of the above captioned matter, including the *Flores* Settlement Agreement. In particular, I am aware that it requires juveniles be detained in facilities that are safe and sanitary, consistent with CBP's concern for the particular vulnerability of juveniles. Those requirements include that CBP detains juveniles in those areas which are safe and sanitary, which provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who are apprehended with the minor.

8. I am familiar with the Court's order entered August 21, 2015. I understand that, among other things, the Court ordered CBP to "monitor compliance with their acknowledged standards and procedures for detaining class members." In my role as CAO, in addition to other steps taken by CBP, the Commissioner of CBP charged me, through MID, to implement a program to conduct inspections to serve as part of CBP's overall efforts to monitor its compliance with the *Flores* Settlement Agreement.

9. MID thus now has the responsibility to evaluate the agency's internal controls and examine its compliance with the *Flores* Settlement Agreement. CBP instituted these inspections to ensure that CBP has a sufficient process in place to monitor its compliance. As part of this inspection process, CBP ensures that it sends individuals to physically inspect the facilities

and observe whether there is compliance. MID has also developed a process to monitor CBP's compliance with the requirements to electronically record information in the CBP systems of record.

10. When developing its inspection protocol for CBP facilities, MID had access to the appropriate documents including the *Flores* Settlement Agreement, CBP policies and procedures, and the Court's orders of July 24, 2015 and August 21, 2015. Moreover, MID examined the documents created by Border Patrol and OFO to communicate the changes made to their processes and procedures in light of the Court's August 21, 2015 order. Based on these policies, procedures and other information, MID developed an inspection protocol to examine each facility.

11. This protocol consists of a physical inspection of the selected site as it is at the time of inspection, a current review of select records onsite if available, and a historical review of the records maintained by each facility. For Border Patrol, this information generally comes from E3. For OFO, this information generally comes from SIGMA.

12. MID's inspection protocol includes, but is not limited to examining the records since October 23, 2015 for a statistically significant set of juveniles at a particular location to determine if those records are sufficient to demonstrate that those juveniles were offered food and water; whether welfare checks were consistently conducted for those juveniles; whether the temperature was consistently monitored and any variance from appropriate room temperature were recorded and addressed; whether staffing was sufficient to ensure the safety of those juveniles; whether those juveniles were provided emergent medical services; and whether, if any of those juveniles were apprehended with family members, contact was facilitated consistent with *Flores*.

13. MID also performs physical inspections. These physical inspections include examining whether the facility is safe and sanitary. The inspection protocol includes examining whether the toilets and sinks in holding area are functioning, and ensuring that potable water is available to each juvenile. Moreover, at the time of inspections MID checks the temperature at the facility and the ventilation. MID inspects to determine whether there is a presence of pests in holding areas, segregation of juveniles, adequate supervision, and cleaning logs. Inspections also include physical examination of whether the facility has sufficient materials present to adequately provide food, potable water, bedding and other requirements to juveniles expected to be in custody at the facility.

14. The program MID developed is to be implemented in three phases. Phase I consists of MID inspections of twenty-one selected USBP and OFO holding facilities and is ongoing. The facilities are being inspected in accordance with the inspection protocol describe above. Any deficiencies, questions or concerns are noted during the physical inspection and electronic examination. Similarly, any questions, deficiencies or concerns with respect to record keeping will be noted in the MID work papers. To the extent that MID discovers any misconduct by an officer or agent during the inspection process, that will be reported through the normal process as required by CBP policies and procedures.

15. Following each inspection, MID debriefs CBP local personnel at each holding facility as to their findings and recommendations to correct any issues identified. This includes explaining any electronic record keeping issues or concerns. In addition, USBP and OFO leadership, as well as CBP senior leadership, will subsequently be provided with feedback on each inspection, any observed deficiencies noted during the physical inspection and electronic

record examination, and an explanation of what corrective actions locations have taken or will take, if any, to comply with the *Flores* mandates.

16. Phase II will consist of MID continuing to inspect OFO and USBP holding facilities, in accordance with the protocol described above, with the goal being to visit fifty facilities during Phases I, II and III. Following each inspection, MID will continue to provide debriefings and issue feedback to local and senior leadership. During this phase, MID will also finalize a Self-Inspection Program (SIP) worksheet which will allow CBP facilities to conduct self-assessments of their compliance with *Flores* mandates. Finally, in addition to reviewing and monitoring the status of recommendations and corrective actions taken by OFO and USBP in response to *Flores* inspections, MID will issue a comprehensive report to CBP senior leadership on Phase I inspections.

17. Phase III MID will analyze the results of the MID inspections, to identify any trends and systemic issues while updating its inspection protocol, which may include the SIP worksheets previously completed by CBP holding facilities under Phase II. The SIP process will continue into Phase III as well.

18. During Phase III, MID will also examine whether there are any appropriate changes that should be made to the overall inspection process. Finally, MID will issue a comprehensive report to senior leadership on Phase I and II inspections.

19. MID first began initial inspections in November and December 2015 to test its protocol, known as "beta testing" inspections for Phase I. The first official inspections were held in January 2016. MID has completed inspections at thirteen locations as of the date of this declaration (eight at USBP facilities and five at OFO facilities). MID has observed no instances of misconduct during its inspections that required referral through an internal

reporting process. The type of issues that MID has generally raised as part of these physical inspections are issues such as an individual non-working toilet or sink, a particular light fixture being dim, or a need to address other physical maintenance issues like chipping paint. MID has found adequate supervision, segregation of UACs from unrelated adults, bedding, drinking water, food, and appropriate temperatures at nearly every facility that it has inspected. In one facility the bedding was not immediately located but was subsequently identified by the facility management. Moreover, in every facility MID inspected they found the presence of hot meals, as well as snacks, milk and juice available to juveniles.

20. MID is scheduled to complete inspections at eight additional locations (five USBP facilities and three OFO facilities) by the end of 2016. Following each inspection, MID will debrief the local leadership regarding what corrective action, if any, should be taken.

21. For example, following the inspection of the OFO Laredo POE on January 11, 2016, MID met with port management to discuss its findings and corrective action that needed to be taken. The Laredo POE subsequently cleaned sinks, repaired walls, and painted various parts of the facility. Similarly, following the inspection of the Ajo BP station on May 18, 2016, MID met with USBP station management to discuss its findings and corrective action that needed to be taken. The Ajo BP station immediately issued work orders to address issues.

22. MID has also begun sending overview documents to the management of each location, highlighting any issues, deficiencies or concerns noted during the physical inspection and electronic record examination. MID provides an initial, high level discussion of what corrective active, if any, may be appropriate in light of the issues raised.

23. Moreover, MID will provide quarterly written updates to senior leadership on the status of the inspections and any corrective actions taken with respect to issues identified during MID

inspections. If senior leadership recommends any changes to the inspection process, or general practices or policies in CBP holding facilities, MID will continue its processes to monitor whether any such changes are effectuated.

24. Phase II will be conducted in 2017. Phase III will be conducted in 2018.

25. I declare that the foregoing is true and correct to the best of my knowledge and belief.

DATED:

June 1, 2016

Sean M. Mildrew
Chief Accountability Officer
Office of Administration
United States Customs and Border Protection