DEFENDANTS' EXHIBIT 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | | |
|---|---|---|
| Jenny Lisette Flores, *et. al.* | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | No. CV 85-4544 |
| | ) | |
| Jeh Johnson, Secretary | ) | |
| U.S. Department of | ) | |
| Homeland Security | ) | |
| *Defendants* | ) | |

### DECLARATION OF ROBERT E. PEREZ

1. I am the Director Field Operations (DFO), ES-1895, for the New York Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP). I have been employed in this capacity since August of 2008. In my capacity as the DFO, I am responsible for executing the mission of the Department of Homeland Security (DHS) and CBP, and I oversee and direct all CBP operations at the ports of entry in the New York Field Office area of responsibility (AOR), which includes the Port of New York/Newark (NY/NWK) and John F. Kennedy International Airport (JFK Airport). CBP's mission includes facilitating the flow of legal immigration and trade, while preventing the illegal trafficking of people and contraband.

2. I make this declaration on the basis of my own knowledge, as well as the documents and information made available to me in my position.

3. As DFO for the New York Field Office, OFO/CBP, I direct the activities of over 3,000 CBP employees. I oversee CBP's national security and anti-terrorism operations, immigration and

1

agriculture inspections, and the Agency's commercial trade enforcement efforts throughout
the New York metropolitan area, where in fiscal year 2015, more than 20 million
international travelers and over $259 billion in imported goods entered the U.S.  The New
York Field Office area of responsibility extends almost 130 miles from Newark, New Jersey,
to Montauk, New York, and 140 miles from Manasquan, New Jersey, to Poughkeepsie, New
York, through some of the most densely populated urban areas in the country.

4. I am familiar with the policies and procedures that govern the apprehension, processing, and
temporary detention of aliens. As DFO, I am responsible for ensuring that those policies and
procedures are communicated to the CBP Officers, overseen by the supervisors, as well as
implemented and adhered to by the whole of the CBP Officers in New York and New Jersey
on a daily basis.

5. I am familiar with the Flores Settlement Agreement.  I am familiar with the terms of the
Flores Settlement Agreement ("Agreement"), including the requirement that juveniles be
held in facilities that are safe and sanitary; the requirement that juveniles be provided access
to food, drinking water, toilets, sinks, medical care, and adequate ventilation; and that CBP
monitor its own compliance with these terms.  I am aware that these terms apply to all
juveniles, regardless of whether they are accompanied by adult family members.

6. JFK Airport processed and detained a total of three (3) unaccompanied minors and/or Family
Units[1] in Fiscal Year 2012, four (4) in 2013, eleven (11) in 2014, three (3) in 2015, and six
(6) to date in 2016.

7. Similarly, the Port of NY/NWK processed and detained a total of 7 unaccompanied minors
and/or Family Units in 2012, 16 in 2013, 36 in 2014, 1 in 2015, and to date zero in 2016.

---

[1] A Family Unit consists of at least one alien child under the age of 18, accompanied by at least one alien parent(s)
or legal Guardian(s), and all are inadmissible and/or subject to removal

8.  I am similarly familiar with the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA).  I am also familiar with the guidance issued on or about March 19, 2009, regarding the implementation of the TVPRA.

9.  I understand that this Court issued two Orders in the above-referenced case, the first on July 24, 2015 and the second on August 21, 2015.  I am aware that the District Court, in its August Order required, among other things, CBP to monitor its compliance with the standards and procedures for detaining class members in facilities that are safe and sanitary, consistent with the concern for the particular vulnerability of minors, and consistent with Paragraph 12 of the Flores Settlement Agreement.

**Operations and Processing**

10.  When an individual is processed at JFK Airport or the Port of NY/NWK, biographical information is obtained, and biometrics are taken and entered into CBP's systems of records. After a detainee is identified, he or she is then fully processed, including the preparation of any arrest report, immigration processing, service of immigration forms, consular notifications, and communication with family members and consular officials, as appropriate.

11. Special care is exercised when processing and detaining persons under the age of 18.  At all stages of CBP processing, CBP Officers take precautions to ensure that all juveniles' rights are protected, that they are treated with respect and concern, and that they are processed in accordance with the Flores Settlement Agreement.  CBP Officers place each detained juvenile in the least restrictive setting appropriate to the juvenile's age and special needs, provided that such setting is consistent with the need to ensure the juvenile's timely appearance in compliance with the National Standards on Transport, Escort, Detention and Search (TEDS), and to protect the juvenile's well-being and that of others.  Minors have

access to restrooms, drinking water, food, and medical assistance if needed.  Minors are not
restrained unless they have shown or threatened violent behavior, have history of criminal
activity, or there is an articulable likelihood of escape.  Unaccompanied minors and minors
accompanied by a Family Unit are allowed reasonable access to their parents or legal
guardians.

12. Unaccompanied minors are not held with unrelated adults.  CBP Officers do not release a
minor to any person or agency that they have reason to believe may harm or neglect the
minor or fail to present the child for any proceedings.  Alien children who must be separated
from the family unit become unaccompanied alien minors and treatment is guided by the
Flores Settlement Agreement and the TVPRA.

13. Prior to detention, the CBP Officer determines whether an individual is a juvenile, that is,
under the age of 18.  Further, CBP Officers ascertain if the alien child has, or is eligible for,
lawful immigration status in an effort to determine if the alien child is an Unaccompanied
Alien Child (UAC) as defined by Section 462(g) of the Homeland Security Act of 2002 [6
U.S.C. § 279(g)].  In compliance with national Office of Field Operations (OFO) guidance,
Admissibility Processing and Family Units, CBP Officers must determine if individuals
processed are considered a Family Unit (FAMU).

14. At the Port of NY/NWK and JFK Airport, after each UAC and/or FAMU is initially
processed and may be detained, he or she will be referred to Passport Control Secondary
(PCS), isolated from unrelated adults and processed expeditiously.  Once a determination of
inadmissibility has been made, an initial email is sent to the placement agency Office of
Refugee Resettlement (ORR) Health and Human Services (HHS), the ICE ERO Field Office
Juvenile Coordinator (FOJC), CBP JFK and NY/NWK Upper Management, including the

NY Field Office Managers, and I am also notified. The FOJC coordinates placement of the juvenile in a facility designated by ORR/HHS. Pre-authorization is obtained regardless of the amount of anticipated time in detention.

15. The POEs are aware that in compliance with the National Standards on Transport, Escort, Detention, and Search (TEDS), reasonable efforts must be made to provide showers, soap and clean towels to juvenile detainees who are approaching 48 hours in custody. In my experience, however, family units are not detained for over 24 hours in the port of NY/NWK or JFK Airport.

16. In both the Port of NY/NWK and JFK Airport, FAMU and UACs are processed through the use of the Secure Integrated Government Mainframe Access (SIGMA).

17. The Flores Compliance Check-List, a paper form back-up for information that is recorded in SIGMA, is utilized in the event of system unavailability. When system function resumes, the Flores Compliance Check-List information must be added into the electronic record. Also, in accordance with CBP national guidance, a Master Detention Log Sheet and Personal Detention Log Sheet is maintained.

18. In accordance with the March 19, 2009 national guidance regarding implementation of the TVPRA, if CBP seeks to remove a UAC from the United States, he/she is referred for removal proceedings under section 240 of the Immigration and Nationality Act (INA). NY/NWK conducts UAC screening via CBP Form 93 which is maintained in the case file. CBP Officers record the location of any parents/legal guardians, as well as the location and contact information for any relatives in the United States for unaccompanied alien children.

19. Upon detention of a UAC, personal property would be secured via a 6051R Form (Receipt for Property) pending transfer to the ICE/ERO FOJC for placement with HHS.

20. For those individuals who are processed and who have children accompanying them, in my experience, CBP Officers normally ask about other contacts in the United States including contact information. That information is placed into CBP systems of records and made available to ICE.  Specifically, recordation of known addresses and contact information for all relatives residing in the United States, as well as any legal guardians for UACs, are recorded in SIGMA.  This information is populated into the ICE custodial system, Enforce Alien Removal Module (EARM), and ICE/ERO FOJC furnishes this information to HHS/ORR.

21. The Port of NY/NWK has three holding cells, which are equipped with audio and video capability that may be monitored by Passport Control Secondary (PCS) Officers as well as port management.  Monitoring systems are located in areas with the highest traffic of CBP Officers to ensure holding cell videos are consistently monitored.

22. In the Port of NY/NWK, prior to placing a juvenile in the holding cell, a CBP Officer visually determines the area is safe and sanitary with access to drinking water and a functional toilet.  True and accurate copies of pictures of a juvenile holding cell are attached as Exhibit 1.  The holding cell is also checked to ensure that the temperature of the room is within the normal range, 66-80 Fahrenheit.  The holding cells are equipped with a sink, toilet, blankets, and soap.  Pre-packaged heated meals, diapers, and feminine products may be furnished upon request.  The FAMU room is equipped with male/female restrooms (shower, sinks, and toilets), refrigerator with water, heated meals, diapers, feminine products, blankets, and soap.  True and accurate copies of pictures of a FAMU room are attached as Exhibit 2.

23. At JFK Airport, all unaccompanied minors in CBP custody have access to the following: emergency medical care, toilets, drinking water, and food.  JFK Airport also has a family

6

room with couches, blanket, pillows, toys, etc.  This room is well ventilated and the

temperature is monitored by the hour.  True and accurate copies of pictures of the FAMU

room are attached as Exhibit 3.

24. At the Port of NY/NWK and JFK Airport, FAMU toilets are gender specific with locking

doors.  Holding cells provide semi-private areas furnished with a toilet and sink.

25. At both POEs, lights remain on at all times while holding cells are occupied to maintain

visual control over the holding cells to ensure the safety and security of the detainees.

26. CBP Officers in both the Port of NY/NWK and JFK Airport conduct welfare checks in 15-

minute intervals consistent with current policy observing whether the area where the juvenile

is held continues to be safe and sanitary, that the juvenile has access to drinking water and a

functional toilet, and that the ventilation system for the area is operational.

27. In case of a health-related emergency, JFK Airport's protocol and standard operating

procedure is to call the 24/7 hours Port Authority Police Department (PAPD) emergency

phone number.  After the initial response, the minor is taken to Jamaica Hospital.  In

addition, JFK Advanced Medical, PC, has been contracted by CBP at JFK Airport to provide

medical services to detainees on an as-needed basis, and is located on JFK Airport grounds.

28. At the Port of NY/NWK, if upon questioning, detainees have a health or medical issue, the

PAPD and local Emergency Medical Technicians (EMT) are contacted in an effort to provide

medical attention. The subject(s) may request transfer to the local hospital, which will be

honored, even after preliminary medical clearance.

29. All holding cells at the Port of NY/NWK and JFK Airport are equipped with "throw-away"

blankets which obviates the necessity to utilize laundry services.

30. The Port of NY/NWK and JFK Airport maintain food and supplies that are made available to UACs and FAMUs.  UACs and FAMUs are provided food, meals or supplies upon request, which would be recorded in SIGMA.  An example of some of the food and supplies maintained by the POEs include: cases of water; Animal Crackers; pretzels; juice boxes; Rice Krispy Treats; yogurt melts; Enfamil milk; baby food; microwave meals; low-fat organic milk; travel kits (containing personal hygiene items including a plastic comb, toothbrush, tooth paste, small stick deodorant, hand sanitizer and shampoo/body bath gel); paper linens consisting of 1 flat sheet, 1 fitted sheet, 1 pillow case; and plastic utensils.  Food is ordered upon initial acknowledgment of low supply, obviating the waste of food products due to expiring dates.  True and accurate copies of pictures of the food supply maintained at JFK Airport are attached as Exhibit 4.

31. At the Port of NY/NWK and JFK Airport, a local contracted cleaning service is maintained. CBP may contact the 24-hour service when needed.  Holding Cells are cleaned regularly and trash is regularly removed.

32. In compliance with the TVPRA, at the Port of NY/NWK and JFK Airport, each UAC is screened for possible victimization concerns. That screening is conducted utilizing the CBP Form 93—Unaccompanied Alien Child Screening Addendum.

33. Consistent with the TVPRA, CBP Officers may only reunify unaccompanied alien children with parents or legal guardians who are in possession of supporting documentation and are within the United States.  HHS is responsible for the determination that any other proposed guardian, including a family member who lacks documentation of guardianship (e.g. grandparent, aunt/uncle, or brother/sister), is capable of providing care and physical custody.

34. Prior to the Court's order of August 21, 2015, CBP's policy was to provide unaccompanied alien children with a Form I-770.  Currently, in light of the Court's order, all alien children in the Port of NY/NWK and JFK Airport, whether accompanied or unaccompanied, are provided a Form I-770.  This form provides children with a notice of their rights consistent with the Flores Settlement Agreement.  This form, upon completion, must be placed in the child's Alien File (commonly known as the "A File"). Consistent with CBP policy the apprehending agent and the child must both sign the I-770.

35. Consistent with the TVPRA and based on their immigration status, all children are provided with a list of free legal services at the time of processing.

36. Ports of Entry are not designed for long-term care and detention.  Every effort is made to promptly process, transfer or remove those in custody as appropriate. Those actions are taken as quickly as operationally feasible.

37. Although CBP is committed to providing consular access, its facilities do not provide sufficient space nor time in custody to permit access to legal counsel in its facilities. As such, individuals who will be detained for a longer period of time are provided access to counsel upon being transferred to ICE ERO.  Individuals who are detained for a short period may obtain counsel upon release from custody if they remain in removal proceedings, such as those proceedings under INA 240.

38. At both the Port of NY/NWK and JFK Airport, UACs are permitted to make phone calls to family members.

39. Detainees are transferred out of CBP custody as quickly as possible. For family units, those individuals are normally transferred to the custody of ICE ERO.  CBP may only transfer UACs to the custody of HHS/ORR.  Although infrequent, a receiving agency is sometimes

unable to receive a detainee due to a breakdown in their intake procedures or lack of space. In such circumstances, transfer from CBP will not be accepted until the receiving agency resolves any issues on their end. However, both the Port of NY/NWK and JFK Airport have maintained compliance with CBP's National Standards on Transport, Escort, Detention, and Search (TEDS) by not exceeding the policy's 72-hour mandate of detainee transfer.

**Specific Steps Taken in Compliance with Court Order**

40. As part of the CBP's efforts to comply with the terms of the Agreement, all CBP Officers at the Port of NY/NWK and JFK Airport have received training and memos/musters regarding the requirements of both the Flores Agreement and TVPRA, including training on enhancements to SIGMA relating to the Flores Agreement and Family Units.

41. Consistent with the October 19, 2015 national guidance, I ensured that all CBP Officers in my AOR were reminded that they must conduct a thorough check of each hold room before placing a juvenile in the room to visually determine that the area appears safe and sanitary, ensure that the juvenile has access to drinking water, a functional toilet, and that the ventilation system for the area is operational.

42. Consistent with the October 19, 2015 guidance, I ensured that each POE within my AOR made the necessary changes to SIGMA with respect to the ability to track those necessary functions in a cell, such as access to drinking water, the availability of a functioning toilet, and to check that the temperature of the room is within the normal range, 66-80 degrees Fahrenheit. To the extent the temperature is outside the range of 66-80 degrees Fahrenheit, the circumstances of this anomaly must be documented in SIGMA.

43. Moreover, consistent with the October 19, 2015 guidance, at a muster each CBP Officer was reminded that the POEs must also conduct checks at intervals consistent with current policy

of each hold room occupied by a juvenile, to observe that the area where the juvenile is held continues to be safe and sanitary, that the juvenile has access to drinking water and a functional toilet, and that the ventilation system for the area appears operational. In general, after conducting these checks, CBP Officers are recording these checks on a routine basis.

44. Also, consistent with the October 19, 2015 guidance, CBP Officers will confirm in SIGMA each time food is offered to the juvenile, and will record if the juvenile declines food offered. CBP Officers will also record all medical assistance provided to a juvenile, including emergent medical care. Cleaning logs will also be maintained for areas where juveniles are detained.

45. If, upon a check, a particular hold room does not meet the required standards, the issue must be immediately reported to port management. All steps to address the problem, including if appropriate, moving the juvenile to a different location, must be taken as quickly as operationally feasible. Consistent with the October 19, 2015 guidance, any issue not addressed within 12 hours that continues to affect the juveniles will require notification to the Port Director and local office of Associate Chief Counsel.

46. If SIGMA becomes unavailable, the Flores Compliance Check-List is utilized. When system function resumes, the information must be added into the electronic record. In accordance with CBP national guidance, a Master Detention Log Sheet and Personal Detention Log Sheet is maintained.

47. Consistent with longstanding CBP practice, the Ports of NY/NWK and JFK Airport attempt to maintain family unity for those in its custody. Pursuant to the October 19, 2015 guidance, CBP Officers at the Port of NY/NWK and JFK Airport must facilitate contact between a juvenile and his or her family members in situations involving separation of a juvenile from

11

his or her family for reasons other than processing or other short routine removal from a

holding area where the family is otherwise held together.  If family contact with the juvenile

cannot be facilitated, the reason must be documented based on one of the following reasons:

operational infeasibility, security concerns, family relationship in question, medical or other

concerns, not in custody long enough for contact to be facilitated (i.e. when the family spends

less than 4 hours in CBP custody), or some other reason with supervisor approval.  And the

particular circumstances can be specifically detailed on the nature of the inability to provide

contact.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___1ST___ day of June, 2016.

Robert E. Perez
Director, Field Operations
U.S. Customs and Border Protection
New York, New York

# EXHIBIT 1











# EXHIBIT 2



# EXHIBIT 3





# EXHIBIT 4











