<span style="color:red">DEFENDANTS' EXHIBIT 13</span>

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et. al.* )<br>*Plaintiffs* )<br> )<br>v. )<br> )<br>Jeh Johnson, Secretary )<br>U.S. Department of )<br>Homeland Security )<br> *Defendants* ) | No. CV 85-4544 |

## DECLARATION OF WILLIAM BROOKS

1. I am the Director of Field Operations, SES, for the Tucson, Arizona Field Office, which is within the Office of Field Operations (OFO) for U.S. Customs and Border Protection (CBP). I have been employed in this capacity permanently since February 9, 2014 and temporarily, in acting capacity, from March 2012 to June 2013. I began my career with the former U.S. Customs Service and have more than 32 years of service. In my capacity as the Director of Field Operations I am responsible for executing the missions of the Department of Homeland Security (DHS) and CBP. I am responsible for operations and enforcement activities at international ports of entry in Arizona. CBP's mission includes facilitating the flow of legal immigration and trade while preventing the illegal trafficking of people and contraband.

2. I make this declaration on the basis of my own knowledge, as well as the documents and information made available to me in my position as Director of Field Operations.

3. The Tucson Field Office is comprised of eight international ports of entry (POE): San Luis, Phoenix, Douglas, Naco, Tucson, Sasabe, Lukeville, and Nogales, Arizona. I oversee all

1

eight ports of entry within the Tucson Field Office and am responsible for the oversight of the processing of 24 million people; more than 8.1 million vehicles; close to 462,000 commercial trucks and railcars; and $23 billion in international trade each year. I have oversight of the day-to-day law enforcement operations of Tucson Field Office, including the apprehension and processing of aliens.

4. I am familiar with the policies and procedures that govern the apprehension, processing, and temporary detention of aliens, including juveniles. As Director of Field Operations, I am responsible for ensuring that those policies and procedures are communicated to the officers, overseen by the supervisors, as well as implemented and adhered to by all of the officers under my command.

5. I am familiar with the terms of the Flores Settlement Agreement (Agreement), including the requirement that juveniles be held in facilities that are safe and sanitary; the requirement that juveniles be provided access to food, drinking water, toilets, sinks, medical care, and adequate ventilation; and that CBP monitor its own compliance with these terms. I am aware that these terms apply to all juveniles, regardless of whether they are accompanied by adult family members.

6. I am similarly familiar with the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). I am familiar with the guidance issued by the then Assistant Commissioner providing guidance to CBP on the implementation of the TVPRA on March 19, 2009.

7. I understand that this Court issued two Orders in the above-referenced case, the first on July 24, 2015 and the second on August 21, 2015. I am aware that the District Court, in its August Order required, among other things, CBP to monitor its compliance with the

standards and procedures for detaining class members in facilities that are safe and sanitary, consistent with the concern for the particular vulnerability of minors, and consistent with Paragraph 12 of the Flores Settlement Agreement.

**Operations and Processing**

8. Individuals apprehended at a POE within the Tucson Field Office Area of Responsibility (AOR) remain at the POE for processing.

9. Processing generally begins once it is determined the individual(s) have no lawful status in the United States and/or the individuals are requesting asylum/claiming fear of persecution.

10. Each individual is searched for contraband, documents, weapons, and currency. Outer clothing (coats, sweaters) are removed along with any baggage. This procedure exists for officer safety and safety for all detainees. Outer clothing is generally returned to family units and Unaccompanied Alien Children (UAC). All personal property taken from detainees is bagged in some manner or left in a type of tote container. The items are then tagged with a CBP Form I-77—Baggage Check Form—and a Form 6051D—Custody Receipt—is created.

11. Any currency, either foreign or domestic, is counted and verified in the presence of the individual, the currency is then returned to the individual. All property other than currency is stored in an area that is not accessible by detainees. Personal property is returned to the individuals after verifying ownership when the detainee is transferred out of CBP custody.

12. During this stage a "Pat-down sheet" is completed and the amount of any currency is recorded. Additionally, a "Detention/Medical Screening Processing checklist" is completed. This process may slightly vary from POE to POE as to the order in which the steps are completed.

13. Case processing begins once the individual(s) are moved to that specific POE's designated processing area, which differs from POE to POE. During processing, biographical information is obtained, any biometrics are taken and entered into Secured Integrated Government Mainframe Access (SIGMA), a CBP/OFO system of records. During processing, any arrest reports are created, A-files are opened and a Record of Proceeding (ROP) is created, immigration forms/notices are served, foreign consulate notification is completed (if requested or required), family member notification is completed and/or attempted, and individual telephone calls are offered.

14. Customs and Border Protection Officers (CBPOs) use all available information—such as documents presented or found on an individual, consulate officials, and foreign country internet-based searches—to properly determine the ages of those either believed to be, or claiming to be, under 18 years of age (i.e., a juvenile). CBPOs determine if the juvenile is traveling alone or accompanied with a parent, legal guardian, or other family member and if the claimed family member is truly related.

15. Consistent with the OFO guidance on the TVPRA, during questioning CBPOs are required to record the location of any parents, as well as the location and contact information of any other relatives in the United States for unaccompanied alien children (UAC). CBPOs record this information in the I-213 narrative section, which is retained in SIGMA, and CBPOs also print a U.S. Postal Service address verification which is incorporated into the A-file. This information is later made available to Immigration and Customs Enforcement (ICE)/Enforcement Removal Operations (ERO) and the Department of Health and Human Services/Office of Refugee Resettlement (HHS/ORR).

16. Ports within the Tucson Field Office are not identical. In fact some POEs are designated historical buildings. There are general similarities in layout and procedures; however, POE specifics vary from port to port.

17. When detainees are brought inside of a POE's designated processing area, they may be placed in hold rooms, holding areas, offices, or large open areas that have been converted to temporary holding areas and/or facilities. Factors that a POE uses to determine where detainees are placed include, but are not limited to: age, gender, claimed gender, family unit, medical conditions, presence of UAC, potential for violence, and if they are suspected of a serious crime or have prior criminal convictions.

~~18.~~ Juveniles are separated from unrelated adults as quickly as possible, family units are generally detained together and are segregated from the rest of the detained population. Generally, where a detainee is placed during the time period they are at the POE is where they will remain unless circumstances require them to be moved.

~~19.~~ Each holding area is kept safe, secure, and clean. The size of the areas designed to hold individuals varies; however, CBPOs are mindful of room capacity limitations to ensure sufficient space.

20. In accordance with the Flores Settlement Agreement, OFO's March 19, 2009 Memorandum on the TVPRA, and the CBP National Standards on Transportation, Escort, Detention and Search (TEDS) directive, all areas where juveniles are held provide unrestricted access to toilets, sinks, drinking water, food and snacks, adequate temperature, ventilation, and adequate supervision to protect juveniles from others. Emergency medical assistance is always available at local clinics. Areas designated as holding areas also have informational signage consistent with OFO policy.

21. For the general detainee population and depending on the port, there is a meal schedule. Detainees are to be feed every 4-6 hours. Juveniles, pregnant females and other at risk detainee populations are included in this meal schedule. Additionally, detainees are given meals throughout the period of time they are in custody at the POE upon request. The 4-6 hour meal time schedule is served regardless of the length of custody. If a detainee is preparing to leave at meal time, they leave with a meal. The scheduled meal times generally consist of a hot meal of different types of burritos and soup. Items are also kept on hand for vegetarian diets. Any detainee may request a meal at any time outside of the meal time schedule, which will normally be granted. Snacks consisting of a variety of crackers and juices are also available at all times.

22. Additionally, formula and bottles, along with toddler-type foods are available when appropriate.

~~23.~~ All meals, snacks, juice, baby/toddler food is recorded in the SIGMA detention module and monitored continuously by a designated CBPO at the respective port to ensure the meal times schedule is tracked and followed.

24. Each POE purchases food and other items used for detainees through Fiscal Year budget monies assigned to the respective Ports.

25. In Fiscal Year 2015, the Tucson Field Office through the POEs spent $37,336 on food, equipment, and services directly for detainees. As of May 23, 2016, for Fiscal Year 2016, $91,564 has been spent on food, equipment, and services directly for detainees.

26. Clean drinking water is always available. Potable water for detainees is provided via a water fountain type fixture in the holding area, five gallon water coolers with cups are placed in

6

certain holding areas, and some POEs also provide bottled water. All three water dispensing types are generally available at each POE.

27. Any item that becomes inoperable to dispense water is quickly repaired or replaced.

28. Bathroom facilities vary from POE to POE; some ports have a "Wet Cell" that have a toilet in the cell. Some ports have bathroom facilities in the processing area that are separate from the holding area; however, unrestricted access is provided. Some ports have taken other bathroom facilities and converted them solely for detainee use. There are baby changing stations located in bathrooms (both male and female) within holding areas.

29. To ensure the safety of detainees, holding areas generally are monitored by camera. CBPOs also visually check each holding area.

30. Large and small trash cans are available throughout the processing and holding areas.

31. Port facilities, including HVAC systems, are maintained and generally controlled by GSA. Some ports have access to temperature control devices. In other ports, the temperature control device is directly controlled by GSA. In all cases, the port either continually monitors temperature control devices or works with GSA to maintain a comfortable temperature. Every time a juvenile enters a holding area the temperature is recorded into SIGMA.

32. During HVAC or ventilation system malfunctions, additional steps are taken to either relocate detainees and/or provide additional blankets and any extra clothing that the detainee may have in their property. If necessary, ports are also authorized to purchase additional clothing for detainees on a case-by-case basis. In all cases, an emergency work-order call is sent into the GSA mega-center for immediate repair of the damaged ventilation system.

33. The Tucson Field Office Mission Support Function manages the cleaning contract and GSA administers the contract through the normal bidding process. Currently, there are different

cleaning contracts for servicing the POEs: Douglas – KCORP, Naco - Lita's Janitorial/RCD, Nogales Deconcini - CMC inc., Nogales Mariposa - M&M Management, Sasabe - Lita's Janitorial/RCD, Lukeville – KCORP, San Luis 2 - Lita's Janitorial/RCD, and San Luis 1 - Lita's Janitorial/RCD. The Tucson and Phoenix POE cleaning contracts are administered by the host airport authority.

34. TEDS dictates that reasonable efforts will be made to provide showers, soap, and a clean towel to detainee juveniles who are approaching 48 hours in custody. Because POEs are not long term holding facilities, generally there are no shower facilities within the detainee holding areas. It is the intent of Tucson Field Office to intake and process every detainee, and transfer them to their next destination as quickly as operationally reasonable, so that in most cases detainees will not reach this length of time in custody.

35. Certain POEs have shower facilities which have been designated for use by detainees should they be required in accordance with the TEDS directive. Showers are also made available if needed for medical purposes or if hygienically necessary. Disposable body towels are available for after shower use. Because not all facilities have shower capabilities, if Tucson Field Office were to allow every detainee to shower upon arrival at a POE it would require significant structural changes to POE facilities, or it would require that every detainee be transferred to a location with shower facilities. In either case, it would have a significant impact on the time in custody for all detainees.

36. Each POE purchases hygiene items for use by the detainee. The items available include: tooth brush/paste, body/bath soap, disposable towels, disposable clothing or other permanent clothing if detainee's current clothing is unusable. These items allow detainees to wash their hands before eating, after utilizing the facilities, or to help with personal hygiene.

37. During each shift change, a walkthrough is conducted by a supervisor or officer in accordance with POE policy to check serviceability of the facility and its cleanliness. The POE logs this walkthrough in accordance with POE policy.

38. Generally, lights remain on at all times for security reasons and operational needs. Light controls may be dimmed in some areas at certain POEs. However, the CBPOs must maintain visual control over the holding areas to ensure the safety and security of the detainees.

39. Generally, the Ports within Tucson Field Office use the Graham Professional Medical Economy Yellow blankets. These blankets are constructed of insulated Mylar material consisting of tissue and polyester. These blankets are typically used in the medical field to cover patients during recovery or transport. The blankets provide a cost effective way to provide warmth, comfort, and bedding to detainees. The blankets are disposable and are disposed of once the detainee is transferred. Additional blankets are available upon request. The use of these blankets was necessary to provide cost effective bedding which did not require routine laundering (which can be operationally challenging) and did not transmit communicable diseases such as lice or scabies.

40. For sleeping, POEs generally use a product called an "EZ Bunk" sold by CORTECH. The EZ Bunk is a one piece molded sleep surface and can be stacked for storage. Some POEs also have mats and/or cots available for bedding to use in combination with the economy yellow blankets mentioned previously.

41. While Some POEs do have trained EMTs; primary medical services are provided by the nearest local hospital or clinic which services the POE's location.

42. Depending upon the specific POE and the service required, some of the more common hospitals utilized include: Copper Queen Community Hospital –Bisbee, AZ; Canyon Vista

Medical Center – Sierra Vista, AZ; Holy Cross Hospital – Nogales, AZ; Yuma Regional Medical – Yuma, AZ; as well as various hospitals in Phoenix and Tucson, AZ.

43. For emergency care, all POEs use the local EMS system. Transfer to medical facilities is determined by the EMS responders. During processing, if a medical issue becomes apparent, or if at any time during detention medical attention becomes necessary, the CBPOs will provide basic first aid until advanced medical personnel arrive on scene for transfer to the local treating facility. Officers are initially trained during the basic officer course to provide basic emergency medical care. Similarly, if a detainee requires medication, transport to a doctor will be arranged and medication will be acquired from the local hospital or pharmacy. This medication will then be made available to the detainee for self-administration as prescribed.

44. Every CBPO, in accordance with the Assistant Commissioner's March 19, 2009, guidance on the TVPRA, is required to screen each UAC for being a victim of human trafficking or for potentially being at risk of being a victim of human trafficking. Additionally, screening is conducted for any fear of persecution or torture in returning to a foreign country or a request for asylum. This screening is conducting using the CBP form 93—Unaccompanied Alien Child Screening Addendum.

45. POE personnel notify the ICE/ERO Field Office Juvenile Coordinator and the Department of Health and Human Services/Office Refugee Resettlement (HHS/ORR) as soon as possible after identifying a child as a UAC. Every effort is made to notify HHS/ORR and ICE/ERO as quickly as possible and all notifications are made well prior to the 48-hour requirement from the time of apprehension and/or discovery of a UAC. Notification to HHS/ORR is made by all POEs using the HHS/ORR UAC Portal. Additionally, HHS/ORR and ICE/ERO are

notified at the time the UAC is entered into the UAC Portal via email to HHS/ORR: orrducs_intakes@acf.hhs.gov and ICE/ERO: juvPlacement.PHO@ice.dhs.gov.

46. In accordance with the TVPRA, CBPOs within Tucson Field Office only reunify UACs with parents or legal guardians who possess supporting documentation of custody. HHS/ORR is responsible for determining any other guardians or other family members and any release of the UAC.

47. The Nogales Port of Entry is the placement request and transportation hub for detainees from the Douglas, Naco, Nogales, and Sasabe POEs. Detainees requiring further detention and/or transfer to a long term facility, or transfer to ICE/ERO for a custody determination or onward travel to an HHS/ORR contract facility, are transferred to Nogales to coordinate the placement of a detainee once outside CBP custody.

48. The Lukeville, San Luis, Phoenix, and Tucson POEs secure and provide placement request and transportation for detainees from their individual respective ports.

49. Detainees are transferred out of POE custody as quickly as possible. Family units are normally transferred directly to ICE/ERO. If a UAC is placed in a HHS/ORR contract facility within the State of Arizona, the POE generally transfers the UAC directly to that contract facility with acknowledgement through ICE/ERO. If the UAC is being placed at a HHS/ORR contract facility outside of the State of Arizona, the POE transfers custody of the UAC to ICE/ERO.

50. During processing, POE's provide Form I-770—Notice of Rights and Request for Disposition—to all juveniles, unaccompanied or accompanied. The Form I-770 once completed and signed becomes a permanent part of the juvenile's A-File. The Form I-770 is generated in SIGMA during processing.

51. The Assistant Commissioner's March 19, 2009, guidance on the TVPRA require all CBPOs to provide children with a list of free legal services at the time of processing and a copy is placed in the A-file.

52. Due to facility design and the nature of ports, POEs do not provide rooms for private conversations between detainees and others.

53. During initial processing, all detainees are advised of their rights to contact a consular official. Generally, Consular Officials from the Consulate of Mexico visit the larger POEs (Douglas, Nogales, and San Luis) to speak with nationals of Mexico. Other Consulate Officials at times will speak to nationals of their respective countries if the Consulate Office/Official is able to be contacted. Many times, other Consulate Officials are available through an electronic media such as fax or contacted via telephone and voice mails are left. Allowing unfettered access between detainees and their consulate provides an additional opportunity for detainees to share needs with their consular officials, who, in return, often relay that information to the OFO. This process is routinely used to ensure quick responses to personal needs, such as family issues, concerns, medical needs or questions related to procedures and their ultimate dispositions.

54. Although, POEs are committed to providing consular access, its facilities do not provide sufficient space nor time in custody to permit access to legal counsel in its facilities. As such, individuals who will be detained for a longer period of time are provided access to counsel upon being transferred to ICE/ERO. Individuals who are detained for a short period may obtain counsel upon release from custody if they remain in removal proceedings.

~~55.~~ During processing, family members in the U.S. are contacted if contact information is provided. When contact is established, or attempted, it is logged into SIGMA.

## Specific Steps Taken in Compliance with Court Order

56. As part of Tucson Field Office's efforts to comply with the terms of the Agreement, all POEs were notified of the changes made to SIGMA requiring the electronic documentation of conditions in each facility's hold areas.

57. Each Port Director received a copy of the Assistant Commissioner's October 19, 2015 memorandum regarding the implementation of the August 21, 2015 Court Order to implement at their respective ports

58. Under the new SIGMA processing policies, each Port Director was to ensure that all CBPOs in the Tucson Field Office were reminded that they must conduct a thorough check of each holding area before placing a juvenile in the room.

59. Consistent with the October 19, 2015 guidance, I ensured that each of the POEs within Tucson Field Office made the necessary changes with respect to the ability to track those necessary functions in a holding area, such as the availability of a functioning sink or toilet.

60. After conducting these checks a CBPO must confirm and report information on water accessibility, temperature, and safe and sanitary conditions into SIGMA. CBPOs are also to be mindful of the functionality of facilities, presence of pests, and ventilation.

61. If, upon a check, a particular hold room does not meet the required standards, the observing CBPO must report the problem to his or her direct supervisor. The supervisor will then make a report to correct the problem with the GSA contractor.

62. Consistent with the October 19, 2015 guidance, CBPOs log each time that a juvenile is offered any food. In addition to the above requirements, CBPOs must also document in SIGMA any provision of medical care.

63. Consistent with OFO's longstanding practice, CBPOs must conduct visual or welfare checks regularly and report these in SIGMA.

64. Although OFO has long maintained a consistent and comfortable temperature in its POEs, in response to the Court's August 21, 2015 order in this case, Tucson Field Office also obtained infrared thermometers to take the temperature in any hold area prior to placing a juvenile in that room. Consistent with the October 19, 2015 guidance, CBPOs record if the temperature is within range (66-80 degrees Fahrenheit) or must specifically note when the temperature is out of range. If the temperature is out of range, CBPOs must immediately inform their supervisors who will make a report to the GSA contractor.

65. If SIGMA is offline or otherwise not available at any time, the Tucson Field Office has paper forms available to document the information and retain the paper until the information can be entered into SIGMA.

66. Consistent with longstanding CBP practice, the Tucson Field Office attempts to maintain family unity for those in its custody. Consistent with the October 19, 2015 guidance, Tucson Field Office now records any separation of a juvenile from his or her family. Where separation does occur, CBPOs will also record any contact that occurs during the period of separation, and when the family can be reunified.

67. If such contact cannot be facilitated, the CBPOs must document the reasons for the lack of contact, which may be due to:
    a. Operational infeasibility;
    b. Security concerns;
    c. Lack of certainty regarding the familial relationship; or
    d. Medical concerns.

    e. This information must also be documented in paper form at any time that SIGMA is offline or otherwise unavailable.

68. Consistent with OFO's practice, I ensured that CBPOs were reminded that they are required to ask every unaccompanied juvenile separated from his or her legal guardian about other family members in the United States. CBPOs must record this information and provide it to HHS and ICE/ERO.

69. All CBPOs who work with detainees in Tucson Field Office received training, via Powerpoint, on how to enter the above information into SIGMA.

**Investigations**

70. In late October/early November 2015, a Program Manager from Tucson Field Office traveled to each POE in its AOR to provide training on how to comply with the court order and inspect each facility. These same inspections and training occurred again in late January/early February 2016 when a Program Manager again traveled to each POE within Tucson Field Office.

71. During these visits, data entry into SIGMA was reviewed with supervisors. Holding areas were inspected as to cleanliness, food/water availability, food storage, temperature, blankets, and hygiene items. Checks were also made on expiration dates of perishable items. Actions were also taken as to availability of equipment.

72. As part of the visits by the Program Manager, areas of concern arose concerning the scope of work of the current cleaning contracts. As a result, Tucson Field Office is in the process of amending the scope of work of the current cleaning contracts to provide a more specific scope of work to the contracting cleaning agencies.

73. On March 17, 2016, the San Luis POE was inspected by the Office of Inspector General (OIG). Following the inspection, Tucson Field Office was not advised of any items needing to be corrected.

74. In May 2016, the Naco POE was inspected by Management Inspection Division (MID). As a result of this inspection a work order was placed for light bulbs that were burned out. The work order was placed that day and the problem was corrected the following day. Data entry into SIGMA was also noted as an area which could be improved. In response, all POEs in Tucson Field Office will have training on June 7, 2016, to ensure that CBPOs are again reminded of SIGMA data entry requirements.

75. Tucson Field Office has a Program Manager who frequently reviews data from SIGMA to ensure that CBPOs throughout Tucson Field Office are properly documenting conditions of detention and processing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __31ST__ day of May, 2016.

*William K. Brooks*
William Brooks
Director, Field Operations
U.S. Customs and Border Protection
Tucson, Arizona