**DEFENDANTS' EXHIBIT 18**

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director, District Court Section
ELIZABETH J. STEVENS
Assistant Director
SARAH B. FABIAN
Senior Litigation Counsel
DILLON A. FISHMAN (SBA 024259)
W. DANIEL SHIEH
Trial Attorneys
Office of Immigration Litigation
Civil Division, United States Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 598-2377
Facsimile: (202) 305-7000
E-mail: dillon.a.fishman@usdoj.gov
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe #1, *et al.*, <br><br>  Plaintiffs, <br><br> v. <br><br> Jeh Johnson, Secretary of Homeland Security, *et al.*, <br><br>  Defendants. | Case No. 4:15-cv-00250-DCB <br><br> **DECLARATION OF RICHARD BRYCE** |

I, Richard Bryce, hereby declare:

**I.   INTRODUCTION**

1. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would competently testify thereto.

2. I have over 33 years of experience in the law enforcement and custodial field.

3. For the last six years of my law enforcement career, I was Undersheriff of the Ventura County Sheriff's Department in California, which employed 1,355 individuals, including four Chief Deputies who reported directly to me, and had an operational budget in excess of $140,000,000.00.

4. My other law enforcement and custodial positions included Assistant Sheriff, Commander, Lieutenant, Sergeant, and Deputy/Senior Deputy.

5. Since 1993, I have been an expert witness 34 times, for both plaintiffs and defendants, in cases in California, Texas, and Louisiana, including in *Alberti v. Harris County*, regarding crowding in detention facilities.

6. I have been an expert consultant in California, Oregon, Texas, and Oklahoma.

7. I have worked in, inspected, managed, constructed, or toured over 120 jails and prisons throughout the United States.

8. My education includes a Master of Public Administration and a Bachelor of Science in Criminal Justice, as set forth on my resume, a true and accurate copy of which is attached. *See* Attach. A.

## II. ASSIGNMENT

9. I have been asked by Defendants' counsel to offer my opinion on the confinement conditions of Tucson Sector Border Patrol hold rooms.

## III. MATERIALS RELIED UPON

10. I have reviewed Plaintiffs' Motion for Preliminary Injunction, and related declarations, exhibits, and filings in this case.

11. From January 26-28, 2016, I conducted inspections of Tucson Border Patrol Station, Douglas Border Patrol Station, Nogales Border Patrol Station, and the Casa Grande Border Patrol Station.

12. I was accompanied by attorney Dillon Fishman of the U.S. Department of Justice.

13. I have read the declarations of Diane Skipworth and Philip Harber, and believe their accounts of the conditions at Tucson Sector Border Patrol stations fairly and accurately represent substantially the same conditions I observed during my inspections.

14. The standards used for this report include U.S. Customs and Border Protection ("CBP") National Standards on Transportation, Escort, Detention, and Search,

October 2015 ("TEDS") and the Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition, published by the American Correctional Association ("ACA").

**IV. SUMMARY OF OPINIONS AND GENERAL OBSERVATIONS**

15. Tucson Sector detention facilities are professionally run, adequately maintained, and meet their intended purpose of short-term detention during immigration processing.

16. Tucson Sector facilities and hold rooms are safe, and have sufficient safeguards and procedures in place for the well-being of both detainees and staff.

17. I have worked in, inspected, managed, constructed or toured over 120 jails and prisons throughout the United States. I have been in facilities that were in deplorable condition, some from an issue of age and lack of maintenance, and others from a lack of management oversight. I have also been in and managed facilities that were as clean and well-maintained as a model hospital. Based on my inspections of the Nogales Station, Douglas Station, Tucson Station, and Casa Grande Station, and my review of the evidence, I believe these Tucson Sector facilities are clean and well-maintained.

18. I prepared for my site inspections by carefully reviewing the allegations of the Plaintiffs, and the reports of their experts. The facilities described in Plaintiffs' filings bore no resemblance to the sites I inspected throughout the Tucson Sector. Given Plaintiffs' allegations, I was frankly surprised when I viewed the facts for myself.

19. I saw no facts to support the conditions described in Plaintiffs' papers, including Mr. Vail's declaration. For example, Plaintiffs' Complaint refers to detainees being held "incommunicado" for days in terrible conditions. *See* Compl. at 2. But at the Tucson Station, one of the first things I observed was a consular representative speaking to a large group of detainees. I also saw signs posted throughout the facilities, informing detainees in several languages about the procedures to request consular assistance in person or by telephone.

20. During my inspections I learned that Official consular representatives visit Tucson Station twice daily. Because Tucson Station is both the operational hub for

- 3 -

Case 2:85-cv-04544-DMG-AGR Document 214-4 Filed 06/03/16 Page 4 of 18 Page ID
Case 4:15-cv-00250-DCB Document 140-5 Filed 02/25/16 Page 4 of 18
#:6250

detainee processing, and the busiest of the stations, any significant problems from other stations would come to light during these visits even if the other stations did not have the routine presence of consular representatives—though they do. As an example, the Mexican Consulate has a scheduled visit at the Nogales Station each day at 8:00 a.m. and 4:00 p.m., and someone from the Mexican Consulate is present at Tucson Station at least daily. Through the regular presence of consular representatives, Tucson Sector has an established process for detainees to voice concerns and complaints, and to promptly resolve any issues.

21. I was also impressed by the way that Tucson Sector's leadership invites visitors to its station to discuss issues with the Border Patrol Agents, including non-profit leaders and members of the bar. For example, on January 13, 2016, several Ninth Circuit chief judges, lawyers, and others with them, including Judge Collins from the District of Arizona, conducted a site visit to Nogales Station.

22. The consistent presence of official consular representatives and the solicitation of feedback from third-party visitors to Tucson Sector stations showed me that Tucson Sector leadership has nothing to hide.

23. This detracted from the credibility of Plaintiffs' other claims, and cast serious doubt upon their experts' opinions.

24. For instance, throughout the stations, I also saw signs informing detainees to ask for assistance for food, water, or injuries. These signs, and the many facts discussed further below, led me to conclude that Plaintiffs had significantly exaggerated or had cherry-picked facts to support what they already wanted to say.

25. Along those lines, I searched intently for evidence of punitive measures that Plaintiffs claim exist, and found none. As a career law enforcement officer, I carefully observed the demeanor, attitude, and behavior of Border Patrol agents and employees. I found them to be professional, polite, and concerned about doing the right thing.

26. I specifically noticed the way Border Patrol agents treated detainees with care, especially women and children, and was impressed by their evident care and

- 4 -

concern. I saw agents providing toys and special food to children, and observed the reaction of the children toward the agents that confirmed a genuine comfort level.

27. Based on my training and experience, this could not have been staged because the environment in the Tucson Station was exceptionally calm and the attitude of Border Patrol agents I encountered was professional. No detainees were agitated or on edge, no one was being mistreated, and the rapport between agents and detainees was professional and cooperative throughout the Tucson Sector stations I visited.

28. I also paid particular attention to the attitude of the agents in charge, carefully observed the actions of subordinate employees, and randomly asked impromptu questions to line agents, contract custodial workers, and civilian employees to ensure that my overall impression was accurate and based on unscripted sources. Without exception, everyone I encountered displayed professionalism and concern for detainee welfare and safety. For instance, I observed one agent taking the time to instruct a detainee about how to best use a Mylar blanket.

29. In addition, I witnessed agents ensuring that detainees received additional food, and that water was in place throughout the facilities. Supervisors inspected to ensure that standards were upheld.

30. Cumulatively, my observation of many such acts and review of the evidence led me to conclude that Plaintiffs' claims regarding the overall conditions at these Tucson Sector stations are not accurate.

31. In reality, the physical layout and general conditions of the Tucson Sector hold rooms are adequate and sanitary, and are comparable to those found in the intake, hold room, and booking areas of jails and detention centers around the nation.

**V.   PLAINTIFFS USE THE WRONG STANDARD**

32. I respectfully disagree with the opinions and characterizations of Plaintiffs' expert Mr. Sheldon Vail on various points, the most serious of which is his repeated improper comparison between Border Patrol's short-term immigration processing facilities and long-term detention facilities such as prisons and jails. This error also

undermines Mr. Vail's other opinions. No other law enforcement agency in the United States faces the unique issue of populations subject to fluctuation based on the entry patterns of aliens, which Mr. Vail does not address at all.

33. One example of Mr. Vail's inappropriate comparison of Tucson Sector processing centers with jails and prisons, is his quote of an excerpt from the Washington University Journal of Law and Policy to justify his claim that temporary overcrowding in Tucson Sector holding rooms increases the safety risk for detainees: "There is widespread agreement among correctional experts that *chronic idleness* in prisons produces negative psychological and behavioral effects." Vail Decl'n at 9 (emphasis added). Most detainees are processed and transferred within 24 hours, a time period that cannot be accurately described as "chronic idleness." Also, only 9.4% of those apprehended in the Tucson Sector were in Border Patrol custody for 48 hours or more and only 2.79% of aliens (476 out of 17,034) were in Border Patrol custody for 72 hours or more. And even 72 hours can hardly be compared to the type of "chronic idleness" that could give rise to real problems in jails and prisons.

34. This highlights the problem with Mr. Vail's approach. Tucson Sector facilities should not be compared to jails and prisons made to house individuals for extended time periods. Because Tucson Sector facilities are intended for detaining individuals briefly for identification and processing, a better comparison is to short-term holding cells. Yet Mr. Vail does not address this critical distinction. Nor does he indicate that ACA standards themselves are voluntary, and have been criticized for being inconsistently applied and supervised following initial certification.

35. When compared to short-term holding cells around the country, Tucson Sector's facilities are on par, and are adequate to ensure detainee safety and welfare during processing and temporary detention.

36. For example, the evidence also does not support Mr. Vail's generalization that Tucson Sector facilities are "regularly overcrowded." Vail Decl'n at 6. Upon a careful review of the evidence, it became clear to me that Mr. Vail selected photographs

- 6 -

and unsworn statements to shore up his overcrowding opinion.

37. As a recognized expert on the issue of jail and prison crowding, my review of the data, interviews of Border Patrol leadership, and inspection of Tucson Sector facilities does not show evidence to support Plaintiffs' claim of overcrowding, much less that Tucson Sector facilities are "regularly overcrowded."

38. Rather, the evidence shows that populations in Tucson Sector facilities fluctuate based on the immigration patterns of individuals who are apprehended, which Border Patrol cannot control. Detainee processing times depend on many factors, including criminal history, immigration claims, and the size of a group detained. But even with all of these factors, Border Patrol processes nearly all detainees within 48 hours.

39. Along the same lines, two facilities I inspected, Nogales Station and Douglas Station, had a significant number of empty cells. Nogales Station had no detainees when I arrived. Douglas Station had two detainees. Casa Grande Station had six adult male detainees in Cell #9, with a posted cell capacity of 24, and four adult male detainees in Cell #8, with a posted cell capacity of 24. Tucson Sector had approximately 100 detainees, in facilities and cells with ample space, and was readily processing them throughout the time I was visiting the station.

40. Even a careful review of the photographs and numbers Plaintiffs selected shows the exact opposite of Mr. Vail's claim—and makes clear that the facilities are not crowded, let alone "regularly overcrowded."

## VI. CLEANING AND MAINTENANCE OF FACILITIES

41. In my opinion, Border Patrol's hold rooms, processing areas, and detention facilities are professionally cleaned and sanitized on a regular basis, and are sufficiently clean for purposes of short-term immigration processing detention.

42. Tucson Sector has procedures in place to ensure proper maintenance and upkeep of the facilities through paid professional custodial contractors. I interviewed several of the contractors, and confirmed that they perform regular cleaning services in

1 Tucson Sector hold rooms to ensure a safe, sanitary, and functional environment.

2 43. I also have reviewed the Tucson Sector and Casa Grande statements of work for cleaning. They cover sanitation required for detention facilities, in my opinion.

44. During my inspections, I found the hold rooms in Tucson Sector to be clean and serviceable, and consistent with the cleanliness and serviceability I have seen in many similar facilities throughout the country. Based on the claims of the Plaintiffs, I made sure to inspect hold room floors, bathroom areas, walls, benches, and fixtures, and found all to be satisfactory.

45. Even the paint and general appearance of the hold rooms and facilities was good, especially given the number of detainees Border Patrol processes.

46. I also paid particular attention to the stainless steel toilet/sink combination units (or "bubblers"), which are common in detention facilities I have inspected. I found no issues or concerns with these units in any facility, and I tested them to make sure they were functioning properly. I also sampled the water from a bubbler in Douglas, and found that it tasted the same as water from a drinking fountain.

47. Another item I reviewed was Border Patrol's system of maintenance. My rationale was to further inspect to ensure that Border Patrol has a process through which to identify and remedy routine maintenance needs. I randomly asked a Border Patrol agent at each station to explain their station's system of reporting and tracking an item in need of repair, such as a sink, toilet, or door handle. All four stations had systems in place through which supervisors submit and monitor requests for maintenance and repairs.

48. Border Patrol's system of documenting inspections of hold rooms reinforced my observations that Tucson Sector is attentive to overall hold room maintenance and upkeep.

49. Toilet privacy walls in Tucson Sector are consistent with those in most jails, and are positioned and elevated to a height that affords a reasonable level of privacy for the user while still providing appropriate security visibility for custodial personnel.

- 8 -

50. I inspected camera monitors and, in every case in which the interior of the toilet area was in view of the camera, Border Patrol had blacked out the monitor for detainee privacy.

### VII. BORDER PATROL ADEQUATELY FEEDS DETAINEES

51. It is my opinion that Border Patrol provides food to detainees that is adequate for short-term detention, along with juice.

52. It is my opinion that Border Patrol never uses food or water as a punishment, and that Plaintiffs' claims to the contrary are unsupported.

53. The primary indicator to me that Plaintiffs' claim of food deprivation were false was the presence of freezers and refrigerators stocked with burritos at the stations I inspected. Each station also had large supplies of crackers and juice, and a variety of food items for children and babies.

54. The facilities I inspected in Tucson Sector have a system in place to ensure detainees receive a burrito, crackers, and juice upon their arrival. Adults receive a burrito, crackers, and juice every eight hours. Juveniles receive a burrito, crackers, and juice every six hours. Detainees also receive snacks and juice between meals.

55. At the Nogales Station, for instance, I witnessed an agent provide an incoming detainee a burrito, crackers, juice and a Mylar blanket. At the Douglas Station I observed two detainees arrive and begin being processed. They were both given burritos, crackers, juice, and blankets. I noticed that they consumed the crackers and juice but not the burritos. When I asked if they were still hungry, they smiled and said they had eaten just before they were brought to the facility.

56. Each facility also had signs posted in Spanish, clearly visible to all detainees, instructing them to ask for additional food if they were hungry.

57. Upon arrival at Tucson Station, detainees are served juice and crackers. Thereafter, adults are provided three meals per day, consisting of burritos, crackers, and juice and a snack between each meal. At Tucson Station, juveniles are provided four meals per day, with a snack between each meal. *See* Attach. B (USA000649-650).

- 9 -

58. At Nogales Station, detainees are served burritos, crackers, and juice upon arrival. Detainees are then provided the same foods at 12:00, 4:00, and 8:00 around the clock. Detainees may request additional servings of these items at any time.

59. At Casa Grande Station, detainees are served juice and crackers upon arrival. Thereafter, juice, crackers, and burritos are distributed at 1:00 a.m., 7:00 a.m., 1:00 p.m., and 7:00 p.m. Detainees can take several of each item of food. *See* Attach. B (USA000649-650).

60. At Douglas Station, detainees are served burritos, crackers, and juice upon arrival, and then again every eight hours or every six hours if they are juveniles. Additionally, signs were posted in every holding cell instructing detainees to notify agents if they are hungry. *See* Attach. B (USA000649-650).

61. I also specifically inspected the food Border Patrol serves. The burritos were bean and cheese, beef, and red chili beef. The burritos range from 330 to 360 calories each, and are maintained and served in the original packaging.

62. The crackers average 190 calories per package, and are cheese crackers filled with cheddar cheese or toast crackers filled with peanut butter. I sampled both a burrito and crackers, and found them to be comparable to food I have purchased in retail grocery stores.

63. Border Patrol also serves detainees grape juice and fruit punch.

64. I spot-checked the stored supplies of food items in each of the four facilities, and found them to be well within the labeled time frame for consumption.

65. All of the facilities with the exception of the Casa Grande Station have commercial burrito ovens. These ovens keep the burritos at about 170 degrees. Each oven has a rotation schedule posted to keep the burritos fresh and ready to serve.

66. Nogales, Tucson Station, and Douglas heat the burritos in restaurant style food warmers. Casa Grande heats burritos in microwave ovens. *See* Attach. C (photos).

67. I observed baby formula, baby bottles, and toddler foods at each station.

68. In addition, the Tucson Station had goldfish crackers, cheese filled

- 10 -

Case 2:85-cv-04544-DMG-AGR Document 214-4 Filed 06/03/16 Page 11 of 18 Page ID
Case 4:15-cv-00250-DCB Document 140-5 Filed 02/25/16 Page 11 of 18
#:6257

crackers, and 100% juice boxes available in plastic containers outside family hold rooms.

69. At the Tucson Station, mothers and children were free to go outside of the hold rooms to help themselves to food items from carts. *See* Attach. C (photos).

70. Consistent with the signs posted throughout the Sector, Border Patrol employees provide additional portions of food upon request.

71. A careful review of the declarations Plaintiffs submitted confirmed my own inspections and review of the evidence. While some detainees did not prefer the type of food they were served, it is not my opinion that they were deprived of food.

72. Overall, I found the food and beverage selections to be appropriate for short-term detention, and see no evidence that anyone in Tucson Sector is ever deprived of food, much less that it is intentionally or punitively denied.

**VIII. POTABLE DRINKING WATER IS AVAILABLE TO DETAINEES**

73. All of the holding cells in each of the four facilities I inspected had either a five-gallon sport water cooler with a supply of paper cups, or water bubblers above the sinks (and sometimes both). *See* Attach. C (photos).

74. Hold rooms are equipped with toilet and sink combination units, which also serve as drinking fountains. These stainless steel units are common in holding cells, jails, and prisons across the nation.

75. The potable water supplied by combination sink units is sanitary.

76. Mr. Vail states that paper cups were never given to detainees during a five day period at Casa Grande captured on video, and that detainees shared a single one-gallon water jug. Vail Decl'n at 17. But I specifically inspected and confirmed that all multi-occupancy cells in the Casa Grande Station are equipped with water bubblers. In addition, Border Patrol does not issue one-gallon water jugs to incoming detainees, but allows incoming detainees to retain water jugs they have brought with them. *See* Declaration of George Allen (Allen Decl'n) at 15, ¶ 45.

77. Border Patrol agents regularly provide water to dehydrated individuals found in distress as part of its efforts to prevent injuries and deaths to individuals in the

- 11 -

Case 2:85-cv-04544-DMG-AGR Document 214-4 Filed 06/03/16 Page 12 of 18 Page ID
#:6258
Case 4:15-cv-00250-DCB Document 140-5 Filed 02/25/16 Page 12 of 18

desert. Border Patrol leaders explained their humanitarian efforts. I also noticed that the Border Patrol stations displayed posters and videos warning detainees of the dangers of crossing through the harsh Arizona desert, and not to trust alien smugglers "coyotes."

78. Based on all of the evidence, it is my opinion that detainees in Tucson Sector are never deprived of potable water, punitively or otherwise.

### IX. HOLD ROOM TEMPERATURES ARE ACCEPTABLE

79. It is my opinion after a careful inspection and review of the evidence that Border Patrol never uses temperatures punitively.

80. The TEDS Temperature Controls standard requires, "When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents. Under no circumstances will officers/agents use temperature controls in a punitive manner." *See* TEDS (USA000633).

81. Border Patrol agents do not control temperatures locally at stations, except at Nogales Station. Agents at all other stations must contact facilities management personnel to report temperature problems. *See* Allen Decl'n at 6 ¶¶ 14-16.

82. According to agents I interviewed, Tucson Sector Border Patrol hold room temperatures are maintained at 68 to 80 degree Fahrenheit, which is standard in detention centers.

83. All facilities I visited felt warm and comfortable. I spot checked some holding cell temperatures with a hand-held thermometer. At the Nogales Station, temperatures ranged from 68.5 to 71.9 degrees Fahrenheit. There, a supervisor had drawn a specific mark in each cell to ensure supervisors took the temperature in the same location (using a hand-held laser thermometer). At the Douglas Station, temperatures I took ranged from 73.5 to 75.1 degrees Fahrenheit. At the Casa Grande Station, temperatures ranged from 71.4 to 71.9 degrees Fahrenheit.

84. Border Patrol leadership provides appropriate oversight of holding cell temperatures, and supervisors take holding cells temperatures each shift and document

Case 2:85-cv-04544-DMG-AGR Document 214-4 Filed 06/03/16 Page 13 of 18 Page ID
Case 4:15-cv-00250-DCB Document 140-5 Filed 02/25/16 Page 13 of 18
#:6259

them on a log. Hold room checklists I reviewed supported this as well.

88. Detainees are required to remove outer layers of clothing, belts, and shoelaces for safety and security of agents and detainees. This is standard and proper law enforcement practice in detention facilities, and ensures that detainees cannot conceal contraband or weapons. If Tucson Sector did not have this type of procedure in place, there could be a legitimate risk of detainees and agents being exposed to unacceptable risks of knife attacks, strangulation, illegal drugs, or fire hazards, among other dangers.

86. Children are allowed to keep outerwear. Each facility I inspected had a store of clothing available for distribution to detainees in need of additional or replacement clothing. This fact was verified by Mr. Vail during his inspection of the Douglas Station when he observed that Border Patrol agents had provided every detainee with a sweatshirt/jacket. Vail Decl'n at 25. Mr. Vail's experience with Border Patrol's response to an air conditioning unit's malfunctioning is consistent with my finding that Border Patrol takes appropriate steps to ensure detainees are not exposed to unnecessary hardships during their immigration processing.

87. Any clothing items that a detainee removes are placed in the detainee's property, which is tagged and returned to detainees upon their transfer out of Border Patrol's custody. This is accepted practice throughout corrections institutions.

## X. PERSONAL HYGIENE ITEMS ARE SUFFICIENT

88. It is my opinion that Border Patrol provides detainees with access to necessary personal hygiene items, and adequately stocks personal hygiene items for men, women, and children.

89. The TEDS Hygiene standard § 4.11 requires, "Detainees must be provided with basic personal hygiene items, consistent with short term detention and safety and security needs. Families with small children will also have access to diapers and baby wipes. Reasonable efforts will be made to provide showers, soap, and a clean towel to detainees who are approaching 72 hours in detention. Detainees using the restroom will have access to toiletry items, such as toilet paper and sanitary napkins. Whenever

Case 2:85-cv-04544-DMG-AGR Document 214-4 Filed 06/03/16 Page 14 of 18 Page ID
Case 4:15-cv-00250-DCB Document 146-5 Filed 02/25/16 Page 14 of 18
#:6260

operationally feasible, soap may be made available." *See* TEDS (USA 000634).

90. Border Patrol keeps baby wipes, diapers, and diaper cream near to family hold rooms.

91. I also found toilet paper adequately stocked in hold rooms, and observed large supplies of hygiene items such as toothbrushes, soap, and sanitary napkins for females at each station.

92. Each facility issues detainees a toothbrush containing toothpaste either upon request, or at a regularly scheduled interval. For example, at the Tucson Station every detainee who wants one is issued a toothbrush at 5:00 a.m.

93. It is my opinion that Border Patrol leaders take detainee health and hygiene seriously. For instance, at Tucson Station, Border Patrol has cells equipped with blinds in which detainees can shower, if needed.

94. Border Patrol takes special care regarding families, and provides personal hygiene supplies, including diapers, diaper rash cream, baby wipes, lip balm, and sanitary napkins on an accessible cart outside the family hold rooms at Tucson Station. *See* Attach. C (photos).

## XI. BORDER PATROL PROVIDES APPROPRIATE BEDDING

95. Detainees are brought to holding facilities at all hours of the day and night, and must be processed for transfer or repatriation as soon as possible.

96. I am very familiar with processing individuals apprehended for various criminal allegations. In many facilities this administrative process is called booking or screening.

97. In Border Patrol, this processing is unique. Unlike ordinary law enforcement agencies, Border Patrol has to run extensive criminal and immigration checks. It also has to coordinate large groups apprehended at once.

98. In my experience, and based on my inspections and interviews, this type of processing can sometimes be completed in hours. But if detainees arrive in large groups or have unusual criminal or immigration issues, their cases may take an extended time to

- 14 -

Case 2:85-cv-04544-DMG-AGR Document 214-5 Filed 06/03/16 Page 15 of 18 Page ID
#:6261
Case 4:15-cv-00250-DCB Document 140-5 Filed 02/25/16 Page 15 of 18

process.

99. Like other short-term facilities I have seen, Border Patrol tries to process detainees as quickly as possible. Agents explained to me that to move detainees through the system as rapidly as possible, it is necessary to continue the process, regardless of the time of day or night. In my opinion, this practice is appropriate, especially given the potential for a group apprehension at any time.

100. It is necessary to remove detainees from their holding cells to complete processing. Similar to booking, immigration processing usually involves asking questions, taking fingerprints, and taking photographs of detainees. The agent also has to complete several required forms and computer checks, which takes time.

101. Along the same lines, in my opinion it is operationally necessary to keep lights on in the hold cells to facilitate this processing. If detainees were not processed during the hours of darkness, it would only increase their detention time. Leaving holding cells illuminated also serves the law enforcement purpose of enhancing security, which ensures that agents and detainees are properly supervised and protected.

102. I disagree that having Tucson Sector's short-term holding cells illuminated is improper or punitive. Based on my review of the unique requirements of short-term immigration detention, it is my opinion that leaving lights on in holding cells serves the important operational purpose of expediting processing. Ultimately, this law enforcement practice benefits detainees by enhancing security and speed of processing.

103. I inspected the bedding available to detainees. Each of the facilities had a supply of sleeping or mattress pads when I inspected them on January 26 – 28, 2016. These pads are similar in size and composition to those commonly found in jails, and are used as mattress pads. Detainees all receive blankets. The blankets are comfortable and effective, and can be used even in outdoor environments for survival to ensure retention of 90 percent of body heat.

104. Tucson Sector hold rooms are equipped with benches for detainees to sit on until they are transported to another facility or processed for repatriation. The hold

Case 2:85-cv-04544-DMG-AGR Document 214-4 Filed 06/03/16 Page 16 of 18 Page ID
Case 4:15-cv-00250-DCB Document 140-5 Filed 02/25/16 Page 16 of 18
#:6262

rooms were never designed to accommodate beds.

105. However, Mr. Vail wrongly compares these processing centers to jails and prisons, where inmates are confined for long periods of time, and then opines that they fall short based on that comparison. In my opinion, this is a misleading comparison. As discussed, Border Patrol facilities are processing centers, not jails or prisons. Detainees are held for the sole purpose of processing and transfer to other facilities or deportation. In my opinion, they are properly suited for that task, and are run effectively.

**XII. MEDICAL SCREENING AND CARE ARE SUFFICIENT**

106. Medical Screening Forms provided to me by Border Patrol staff, although basic, meet the purposes outlined in the statement quoted by Mr. Vail from the "Core Jail Standards." The forms ask specific questions of the detainee regarding their health and then require the interviewing agent to make specific observations regarding illnesses and or injuries displayed by the detainee.

107. This inspection is similar to that used in other short-term facilities. In my opinion, it is adequate in these facilities because they are merely processing centers. Individuals spend a relatively brief period of time there, and are then repatriated or transferred to another facility where a more thorough screening may be conducted.

108. Detainees displaying medical issues are either treated at the facility by agents who are licensed emergency medical technicians ("EMTs") or, if the injury or illness is beyond the capabilities of the EMT, transported to a local hospital for treatment.

109. Many city police departments function as processing centers for arrestees, much like the Border Patrol's holding facilities. They arrest an individual suspected of committing a crime, transport the arrestee to the police station, interview or interrogate the arrestee for a period of time, and then transport the arrestee to a county jail for confinement. They do not conduct any medical screening beyond merely asking a few basic questions, much like those asked of Border Patrol detainees. Police officers make the same visual inspection of the arrestee. If an arresting officer discovers that the arrestee has medical issues, they transport the arrestee to a hospital for treatment or a

Case 2:85-cv-04544-DMG-AGR Document 214-4 Filed 06/03/16 Page 17 of 18 Page ID
Case 4:15-cv-00250-DCB Document 140-5 Filed 02/25/16 Page 17 of 18
#:6263

1 medical clearance before they take them to the county jail. This practice is proper and widely accepted.

110. Just as is done at local police stations or precincts, detainees in Tucson Sector are not issued prescription medication. Pills they bring in must be confiscated as potential narcotics, unless accompanied by a prescription. This is routine, and is good law enforcement practice for safety of detainees and agents, especially because narcotics and controlled substances are widely available near the Southwest Border.

111. Individuals with any emergency medical needs, or who require a prescription, are taken to a local hospital emergency room. This happens regularly.

112. In my opinion, this practice further illustrates Border Patrol's professionalism and concern toward detainees. Based on the short duration of the detention in these facilities, and the emergency medical services available, this process is sufficient and appropriate. It is reasonable and raises no concerns from my perspective.

## XIII. CONCLUSION

113. Taking into consideration my experience of over 33 years of working in, managing, and administering large and small correctional facilities, reviewing the documents provided to me in this case, and my personal observations made while inspecting each of the four facilities mentioned in Plaintiffs' allegations, I firmly believe that the Border Patrol provides safe and humane conditions for detainees.

114. Tucson Sector facilities are clean, sanitary, and well maintained.

115. Tucson Sector hold rooms are maintained at a comfortable temperature, and Mylar blankets are provided to every detainee for additional warmth and comfort.

116. Adequate food and water are provided to each detainee upon their admittance, and are continuously resupplied throughout their detention in Tucson Sector.

117. Personal hygienic supplies, e.g., toothbrushes, soap, diapers, sanitary napkins and toilet paper, are provided to each detainee in Tucson Sector stations.

118. The health screening process Border Patrol agents conduct is consistent with the process utilized by officers running short term holding facilities throughout the

nation. It provides adequate protection for the health and welfare of detainees, and ensures those who are injured get help in an emergency room.

119. The fact that Tucson Sector stations are designed to be processing centers, not jails or prisons, necessitates around-the-clock processing, and warrants continued illumination to facilitate this ongoing processing.

120. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed this 24TH day of February, 2016.

RICHARD S. BRYCE

- 18 -