**DEFENDANTS' EXHIBIT 19**

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director, District Court Section
ELIZABETH J. STEVENS
Assistant Director
SARAH B. FABIAN (MA BBO# 660662)
Senior Litigation Counsel
DILLON A. FISHMAN (SBA 024259)
W. DANIEL SHIEH (NY 4486890)
Trial Attorneys
Office of Immigration Litigation
Civil Division, United States Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 598-2377
Facsimile: (202) 305-7000
E-mail: dillon.a.fishman@usdoj.gov
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe #1, *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>Jeh Johnson, Secretary of Homeland Security, *et al.*,<br><br>  Defendants. | Case No. 4:15-cv-00250-DCB<br><br>**DECLARATION OF PHILIP HARBER** |

I, Philip Harber, hereby declare:

**I.  INTRODUCTION**

1. I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify thereto.

2. I am a medical doctor, and have been a Professor of Public Health at the Mel and Enid Zuckerman College of Public Health, University of Arizona since 2011.

3. I am also a Professor Emeritus at the University of California, Los Angeles, where I held various positions from 1981-2011 including Professor of Medicine, Professor of Family Medicine, and Chief of the Division of Occupational-Environmental Medicine.

4. I have been licensed to practice medicine in California since 1981 and Arizona since 2012.

5. My education includes an M.P.H from Johns Hopkins University (1980), an M.D. from the University of Pennsylvania (1972), and a B.S. from Muhlenberg College (1968).

6. My post-graduate training includes: Johns Hopkins University (Fellowships in Pulmonary Diseases and Occupational Medicine, 1978-80); Washington Veterans Hospital/Georgetown University (Internal Medicine Residency, 1977-78); Thomas Jefferson University Hospital (Radiation Oncology Residency, 1974-75); Hospital of the University of Pennsylvania (Anesthesia/Critical Care Residency, 1973-74); and Rhode Island University/Brown University (R-1 Medical, 1972-73). A true and correct copy of my current curriculum vitae is attached as Attachment A.

7. My expertise is in the areas of occupational-environmental (preventive) medicine, pulmonary medicine, and internal medicine.

8. I have served in several professional organizational positions such as chair of the Study Section for The National Institute for Occupational Safety and Health/Centers for Disease Control and Prevention; Vice Chair for Preventive Medicine RC of the American Accreditation Council for Graduate Medical Education; and two terms on the Board of the American College of Occupational Environmental Medicine.

9. I am an academic and a researcher, and in the course of my professional activities I visit diverse environments to assess conditions and potential impact on health.

10. In 35 years as a practicing physician, I also have significant experience in the direct care of many patients.

11. I have not previously served as an expert witness for the Department of Justice.

**II.  ASSIGNMENT**

12. I have been asked by Defendants' counsel to offer my opinion on the overall health conditions of Tucson Sector Border Patrol hold rooms and, in particular,

the medical screening and care of detainees in Tucson Sector.

### III. MATERIALS RELIED UPON

13. I have reviewed Plaintiffs' Motion for Preliminary Injunction, and related declarations, exhibits, and filings in this case.

14. I conducted environmental inspections of the Tucson Coordination Center (TCC) on November 30, 2015 and the Nogales Border Patrol Station on December 2, 2015. I also interviewed agents and employees, and observed Border Patrol operations.

15. I was accompanied by attorneys Sarah B. Fabian, Daniel Shieh, and Dillon Fishman of the U.S. Department of Justice.

16. Diane Skipworth was present during the inspections I conducted, and I have read her declaration. I believe her account of the conditions fairly and accurately represents substantially the same conditions I observed.

17. I read the declaration of Richard Bryce, and believe that it fairly and accurately describes substantially the same conditions I observed during site inspections.

18. I reviewed documents related to medical screening and care in Tucson Sector Border Patrol, including: medical care records; cleaning service contracts; logs of time in custody; OSHA records; and health care policy and training documents.

19. The policy standards used for this report include U.S. Customs and Border Protection ("CBP") National Standards on Transportation, Escort, Detention, and Search, October 2015 ("TEDS") (USA000618-648).

20. I also reviewed numerous health-related documents provided to Plaintiffs, most of which Plaintiffs' experts failed to mention.

### IV. SUMMARY OF OPINIONS AND OBSERVATIONS

21. It is my observation that Tucson Sector Border Patrol conducts screening of each detainee, including for basic medical concerns, multiple times.

22. In my opinion, Border Patrol in Tucson Sector has a system of medical care in place for detainees. This system provides detainees medical care and treatment, including emergency treatment and prescription medication, when needed.

- 3 -

23. Considering the short duration of the detention in these facilities, and the plan in place related to health of detainees, Tucson Sector Border Patrol's process of medical screening and care is an appropriate system under the circumstances.

24. It is also my opinion that Plaintiffs' filings do not demonstrate any actual adverse medical effects to individuals in Tucson Sector Border Patrol facilities. Nor do the conditions in Tucson Sector indicate to me any serious medical or health risk to detainees. Discussed below are some of the deficiencies in Plaintiffs' claims.

25. The overall conditions in the Tucson Sector hold rooms are sanitary, and are adequate to protect detainee health and wellness.

## V. BORDER PATROL PROVIDES CONSISTENT MEDICAL SCREENING AND REGULAR ACCESS TO MEDICAL CARE

26. The TEDS standard states: "Upon a detainee's entry into any CBP hold room, officers/agents must ask detainees about and visually inspect for any sign of injury, illness, or physical or mental health concern and question . . . about prescription medications." *See* USA000631. It also states: "Observed or reported injuries or illnesses should be communicated [and] documented[,] and appropriate medical care should be sought in a timely manner." *Id.*

27. In my opinion, this policy is appropriate to identify imminent medical problems. I understand from my inspections and interviews with agents that TEDS is an official policy that applies to Tucson Sector Border Patrol. It requires that agents affirmatively ask questions, but does not require documentation if no appropriate information or visual clues are noted. Hence, the absence of a note does not imply that medical questioning and inspection did not occur.

28. Further, other medical guidance in Section 4.10 of TEDS shows that Border Patrol has specific policies to address health problems proactively. *See, e.g.*, USA 000631, 634 (discussing required medical screening and ongoing care in hold rooms). Those include medication administration policy, which seems appropriate when dealing with individuals who may have a variety of licit or illicit medications or prescription

- 4 -

medicines that may be of uncertain quality or safety. *Id.*; *see also* USA000124-130 ("Authorizations for Health Care Services for Persons in Custody of U.S. Customs and Border Protection and U.S. Border Patrol" dated September 12, 2013 (discussing pharmacy and prescription policies for detainees)); USA000154 ("Abandoned Medication and the Administering of Medication to Detainees" dated August 2012) (describing procedures for prescriptions for detainees).

29. Based on my inspections, interviews, and review of documents, it is my understanding that detainees are preliminarily screened in the field by apprehending agents, and are asked basic health questions before they are transported. *See* Attach. C (requiring Border Patrol agents to arrange immediate medical treatment for any injured individual encountered). Detainees with urgent medical conditions are immediately taken to an emergency room. *Id.* Upon arrival at one of the stations in Tucson Sector, detainees are again asked basic questions related to their health. *See* USA000631 (TEDS policy).

30. Border Patrol has a basic medical screening form regarding illnesses and injuries displayed by detainees. *See* Attach. B (USA 000082). The attached Medical Screening Form demonstrates a specific medical screening approach including questioning detained persons about symptoms in a manner that is appropriate, given Border Patrol's operations.

31. Because Border Patrol facilities are merely processing centers where individuals spend a relatively brief period of time before they are transferred or repatriated, this inspection assessment is sufficient to identify significant medical conditions requiring immediate attention.

32. I also observed in my inspections that Border Patrol agents have ongoing interaction with detainees from the moment of apprehension through their time in detention. This is important because regular observation during immigration processing gives agents the opportunity to observe detainee health conditions, including signs and symptoms of illness, and any acute medical conditions that may develop or present

- 5 -

thereafter.

33. Detainees displaying medical issues are either treated at the station by agents who are qualified Emergency Medical Technicians or, if the injury or illness is beyond the capabilities of the on-site agents, detainees are transported to a local hospital emergency room for treatment.

34. Detainees are taken to a local hospital emergency room for any emergency medical needs, significant identified health conditions, or to receive prescription medication. I questioned several agents, and they confirmed that this is standard practice.

35. My review of medical care records concerning 2,648 entries for Fiscal Years 2015 and 2016 reveals that Border Patrol regularly provides medical screening, care, and treatment to detainees in Tucson Sector. These records support my own observations and interviews of agents, and document care provided for both minor and more serious conditions in all stations.

36. It is significant to me that many of these medical care notations document detainee reports of medical issues that are less serious, such as skin problems and headaches. That indicates that Border Patrol treats detainee health complaints seriously. The examples of medical conditions reported, ranging from scabies to loss of consciousness, shows that Border Patrol consistently responds to detainee complaints for a full range of medical issues.

37. Based on my site inspections, interviews of agents, and review of these medical records, it is my opinion that Tucson Sector Border Patrol's system for screening detainees and responding to their medical needs is consistently applied and effective.

38. On the other hand, I have reviewed the statement of Dr. Goldenson, and the declarations in Plaintiffs' filings related to medical screening and care. These statements do not document any actual physical harm from the healthcare deficiencies alleged by the Plaintiffs. Nor do they document that Dr. Goldenson has conducted sufficient analysis to establish any medical diagnosis. Dr. Goldenson did not visit any detention sites. Dr. Goldenson simply repeats the declarants' brief statements.

39. For example, Dr. Goldenson refers to one individual's 2014 complaint of "head pain and sickness." Goldenson Decl'n at 10 ¶ 46. But the actual translated statement of that individual is extremely brief, stating: "I was sick when I arrived. My head hurt and I did not feel well." ECF No. 2-3, Ex. 39 ¶ 4. Dr. Goldenson does not state that he performed any examination, and has not actually diagnosed any "sickness." Rather, he has simply restated the terms "sick" and "not feeling well," which are non-specific terms. The original terms used in Spanish are not even provided, and he does not state any other information he relied upon. This is not a medical diagnosis, nor is it sufficient to draw any medical conclusions.

40. Dr. Goldenson repeats these errors numerous times. *See*, *e.g.*, Goldenson Decl'n at 10 ¶ 46 (citing ECF No. 2-2, Ex. 19 ¶ 19) (concluding that patient's characterization of "ear infection" was correct but not showing any medical documentation of ear infection symptoms); Goldenson Decl'n at 10 ¶ 46 (citing ECF No. 2-2, Ex. 30 ¶¶ 20, 21) (changing "my son and I had a bad cough" to describe presence of a "severe cough" without providing any additional information such as whether the cough was associated with sputum or dyspnea, whether a fever was present, and if it was a persistent problem); Goldenson Decl'n at 10 ¶ 46 (citing ECF No. 2-3, Ex. 35 ¶ 30) (restating complaint regarding head and stomach hurting but failing to provide any reported symptom of diagnostic medical significance or any medical diagnosis); Goldenson Decl'n at 10 ¶ 46 (ECF No. 2-1, Ex. 7 ¶ 17) (restating declaration's characterization that "Someone in the cell was suffering from an allergy attack" but not providing any medical details or medical diagnosis); Goldenson Decl'n at 10 ¶ 46 (citing ECF No. 2-1, Ex. 9 ¶ 13) (reiterating statements about "fever" and "headache" but failing to provide any details or diagnosis regarding reported conditions).

41. Assessing the significance of an expressed concern must consider the degree to which a statement is likely to be accurate. Many of the statements upon which Dr. Goldenson relies are extremely brief. Some are not even from the person providing a declaration, but rather represent a report of a brief overheard snippet of conversation. No

case description includes any documented significant adverse health outcome. If indeed there were significantly adverse impacts of the screening approach, one would anticipate that he would have identified such outcomes. It is therefore my opinion that there is no objective basis for Dr. Goldenson's statement that effective health screening did not occur.

42. Dr. Goldenson's description of a two-step screening (Goldenson Decl'n at 3, ¶ 13) also does not seem to take into consideration the processes in place in Tucson Sector. For example, he does not acknowledge the fact that preliminary or triage screening already occurs, and that medical referrals are regularly conducted in Tucson Sector. *See, e.g.*, Attach. B (USA 000082) (health screening form); Attach. C (USA000044-47) (2007 guidance requiring agents to provide assistance); TEDS (USA000631) Section 4.3 (requiring agents to conduct health inspection and examination upon detainee's entry to hold room). Thus, the "visual inspection" Dr. Goldenson describes as lacking appears in reality to be what already occurs. The 2,648 documented entries of various medical issues addressed in Fiscal Years 2015-2016 show me that Border Patrol's screening is in fact working.

43. Dr. Goldenson's description of a more thorough medical and mental health screening seems to be appropriate upon admission to a longer-term facility, and it is my understanding that this is what occurs to detainees who are transferred to long-term detention facilities such as Immigration and Customs Enforcement or the Bureau of Prisons.

44. In my opinion, longer-term detention facilities are the appropriate venue for a more formal medical screening. Individuals may be there for a longer time, so that more chronic conditions may be identified and addressed. For example, screening for latent tuberculosis infection is both infeasible and inappropriate in the initial setting where the majority of detainees are present for less than 24 hours. Tuberculosis screening requires placement of the skin test and follow-up to assess several days later or, alternatively, obtaining a blood sample to be sent to a distant laboratory for analysis.

45. While Dr. Goldenson reports that health-related records are not documented and are not transferred to the detention facility (Goldenson Decl'n at 4 ¶ 17), this is inconsistent with my observations during site inspections, interviews of agents, and the Attachment B (USA 000082), which I understand is included in the standard records of detainees.

46. Dr. Goldenson also emphasizes that failure to screen at entry creates a "risk" because detainees will not have access to care. Goldenson Decl'n at 6 ¶ 29. This is inconsistent with the actual procedures I observed. There is considerable interaction between officers and detainees quite frequently. This may differ from the standard jail situation, in which individuals are simply placed in holding facilities. In this case, detainees move from location to location quickly, appear multiple times for questioning, and undergo various processing actions. Each of these steps affords the opportunity for visual inspection, officer-initiated communication, and detainee-initiated communication. During one of my site visits, I observed that this interaction actually occurred.

47. Dr. Goldenson places particular emphasis on the possibility of infections such as scabies in Border Patrol facilities. Goldenson Decl'n at 7 ¶ 30. During my site inspections and interviews, I spoke with several officers who acknowledged that scabies is sometimes present. Agents reported to me that they provide treatment locally, or refer such individuals for treatment at a hospital emergency room. I also reviewed documents from Border Patrol demonstrating that agents received training for identifying and responding to scabies, and showing the procedures in place to address scabies.

48. Agents I interviewed also confirmed that they receive training for treatment and detection of contagious diseases, including skin diseases such as scabies.

49. Dr. Goldenson notes that Border Patrol relies on emergency rooms and ambulance staff for medical treatment. Goldenson Decl'n at 9 ¶ 41. My site inspections, review of documents, and interviews confirm that this observation is consistent with Border Patrol practices. Border Patrol also has numerous trained EMTs on staff. While reliance on emergency rooms may not be optimal for longer-term, chronic care, this

- 9 -

approach provides round-the-clock availability of well-qualified medical facilities and personnel. Having on-site physicians or nurse practitioners/physician assistants, as Dr. Goldenson appears to support, would likely reduce the access to care since the number of referrals is inadequate to justify complete 24-hour coverage. Therefore, in my opinion, the current practice exists based on the operational requirements, and is medically sufficient.

## VI. BORDER PATROL'S EXISTING HEALTH CARE POLICIES ADEQUATELY PROTECT DETAINEE WELFARE

50. My review of documents concerning medical policy demonstrates that Border Patrol in Tucson Sector has procedures in place for identifying and managing medical conditions ranging from minor to major. The "Medical Responsibilities" document (August 2012) explicitly defines responsibility for providing care in Tucson Sector. *See* Attach. C (USA000044-47) (written guidance regarding encounters with injured subjects issued November 6, 2007); Attach. D (USA000164-169); Attach. E (USA000350-355) (suicide prevention memorandum dated November 5, 2014).

51. Documents I reviewed confirmed assessments I made during interviews and site inspections. Border Patrol has a longstanding practice of providing medical care and assistance to injured individuals, from first encounter to apprehension. In particular, Border Patrol's policy entitled "Encounters with Injured Subjects" issued November 6, 2007, Attach. C (USA000044-47), demonstrates to me that Border Patrol leadership takes this responsibility seriously.

52. Border Patrol's 2007 policy requires agents to assist individuals who are injured or require medical assistance, regardless of their immigration status, citizenship, or involvement in potential criminal activity. *See* Attach. C (USA000045). Agents are required to take "immediate action" to obtain medical attention for such individuals upon first encounter. *Id.* A Border Patrol "Medical Responsibilities" document dated August 2012 states: "Detainees should never be repatriated in lieu of being given medical attention." Attach. D (USA000164). When I questioned various Border Patrol agents

and employees during my site inspections, their answers confirmed that agents follow this guidance and take these responsibilities seriously.

53. Documents I reviewed and interviews during my inspections showed me that Border Patrol trains its agents and employees to recognize illnesses, injuries, and outbreaks. *See, e.g.*, Attach. C (USA000044-47) (written guidance regarding encounters with injured subjects issued November 6, 2007); Attach. D (USA000164-169) (discussing medical responsibilities, care of pregnant detainees, chiggers, and scabies); Attach. E (USA000350-355) (suicide prevention memorandum dated November 5, 2014). Border Patrol also trains its personnel to ensure that detainees receive appropriate medical screening and care, and to protect the wellness and health of detainees and employees. For example, Border Patrol has documents on scabies, and provides training to ensure detainees are treated for scabies and know how to respond to prevent scabies outbreaks among detainees. *See, e.g.*, Attach. D (USA000167).

54. Border Patrol has other policies in place that further support my conclusion that agents in Tucson Sector receive training and guidance to care for detainees, and that detainee welfare is a priority. There is specific guidance concerning topics such as preventing and responding to sexual assault in CBP holding facilities (Attach. F) (USA000051-57), and preventing detainee suicide (Attach. G) (USA000039-43).

55. It is my opinion that the healthcare policies delineated in TEDS, and the related policies, are adequate to protect the health of Tucson Sector detainees.

56. Because characteristics of the detainee population differ from those of individuals brought to county or municipal jails, it is incorrect to directly apply recommended medical guidelines such as those set forth by Dr. Goldenson, Mr. Vail, and Dr. Powitz to Border Patrol facilities. The guidelines upon which they base their opinions include "Core Jail Standards" and "Performance-Based Standards for Adult Local Detention Facilities-American Correctional Association." Given the differences in the population, the short-term duration of the detention, and the medical screening and care procedures in place, it is my opinion that the TEDS standard better addresses

healthcare requirements for detention in Border Patrol facilities in Tucson Sector.

## VII. OVERALL CONDITIONS IN TUCSON SECTOR FACILITIES

57. While the facilities in Tucson Sector are clearly designed for short-term processing, it is my opinion that Border Patrol provides basic health necessities for detainees.

58. My inspections, review of Plaintiffs' filings, and interviews of Border Patrol agents lead me to conclude that Border Patrol provides detainees with food, water, and basic hygiene items.

59. The available burritos, drinks (including water), and other food items are adequate to meet nutritional demands on a limited-time basis. While long-term nutrition requires a greater diversity and more fresh items, in my opinion the food provided is acceptable for the very short term needed. In addition, I observed that detainees always have access to potable water. Therefore, the complaint about absent food and water based upon current conditions appears to be unwarranted.

60. The overall conditions at the Border Patrol facilities I visited are sanitary.

61. The report of Ms. Diane Skipworth documents similar conclusions for the holding facilities she inspected in the Sector, and is consistent with my inspections.

62. Contrary to the statement that cells are not regularly or properly cleaned, statements of agents indicate that they are indeed cleaned on a regular basis by professional contractors. I reviewed the contracts for services that require regular cleaning, and these validate that professional cleaning services are in place.

63. While Plaintiffs complain that holding cell conditions further endanger detainees suffering from exposure related to medical impairments, there are in fact functional systems in place to provide medical care, and detainees do not face dehydration or undernutrition.

64. My review of data regarding detention duration shows that detention beyond 48 hours is relatively uncommon. Further, the TEDS standard specifically includes a policy goal of processing detainees in 72 hours or less. *See* TEDS

(USA000631). This is based on operational conditions. *Id.* My interviews of supervisors demonstrated a commitment to process individuals as rapidly as possible, which is supported by the data I have reviewed showing detention times in Tucson Sector.

65. Plaintiffs' concern about the inability of detainees to get adequate sleep was not consistent with my observations. During the visits to Nogales and Tucson facilities, there was sufficient physical space for individuals to lie as well as stand or sit in every one of the rooms I observed. Further, some mattresses were present. While inadequate sleep may lead to impaired ability to drive, operate machinery, etc., the detainees were not in a situation where such activities would be conducted. Therefore, any lack of full alertness would not lead to physical hazards to the detainees.

66. The holding rooms I observed had appropriate temperature conditions during the inspections. In addition, I reviewed the temperature logs, showing that temperatures were not in a range that could be described as "painfully cold." Compl. at 24. In my opinion, the temperatures I observed on the temperature logs and during site inspections do not pose any danger to the health of detainees.

67. I also observed that detainees were uniformly given blankets. This was confirmed by interviews with officers on site. The blankets were of Mylar rather than cloth material. Such blankets are known to be effective for thermal protection. They also offer the advantage of a higher level of hygiene than is possible with more traditional cloth blankets since they are disposable and may be more readily cleaned.

68. While daily bathing may be desirable, there are no demonstrated medical consequences of any inability to bathe during the short detention time. I understand that Border Patrol policy is to provide showers, if possible, to the small number of individuals detained for over 72 hours, and in my opinion that is sufficient for health purposes.

69. I have reviewed Dr. Powitz's statement regarding inadequate ventilation concerns. Powitz Decl'n at 21, ¶¶ 109-110. While concern about total and ambient ventilation aspects is valid, the application to this specific instance is purely theoretical

- 13 -

Case 2:85-cv-04544-DMG-AGR Document 214-5 Filed 06/03/16 Page 14 of 15 Page ID
Case 4:15-cv-00250-DCB Document 149-9 Filed 02/25/16 Page 14 of 15
#:6278

and not applicable. Low oxygen content in the breathing air is very unlikely to occur since the rooms I inspected are large, and were not completely sealed. Tucson Sector hold rooms do not constitute a "confined space" that might give rise to real concerns. The rooms I visited appeared to be ventilated. Further, Dr. Powitz's concerns about mildly increased carbon dioxide levels as a marker of inadequate ventilation do not lead to physiologic consequences. Thus, his comments are completely speculative.

70. I have reviewed Dr. Powitz's comments regarding "public health risks." Powitz Decl'n at 22-23. Much of the material he quotes is irrelevant. For example, standards for holding laboratory animals, typically for prolonged times, have no relevance to management of detainees in this context.

71. Dr. Powitz also refers to the potential for spread of infectious diseases through fomites or airborne spread. Powitz Decl'n at 22 ¶ 114. He is correct that there is potential for such spread. However, Border Patrol's practice of removing individuals with evident disorders for medical care mitigates this risk. In addition, his concern about spread during the prodromal phases of infections (i.e., before the infection is actually diagnosable), is purely theoretical. There is comparable theoretical concern about spread during prodromal stages applicable to travel on an airplane or bus, sitting in a university classroom, or going to the supermarket. This poses no unacceptable health risk.

72. Other items Dr. Powitz mentions are a "risk of unintentional injury because of limited free movement by detainees" and potential musculoskeletal injuries from inadequate space. These are also purely hypothetical, and present no significant concern. Detainees are able to move about the rooms, and are not confined to any particular position. In my inspections, detainees had adequate room to walk, sit, and sleep, and the ability to move about. Therefore, these concerns also present no unacceptable health risk.

73. Dr. Powitz also appears to speculate about potential risk to staff members due to "unhygienic" conditions in these facilities. However, OSHA records and interviews with officers have not shown any outbreaks; nor has he provided any documentation that these actually occur.

## VIII. CONCLUSION

74. In my opinion, the policies and environmental conditions in Tucson Sector Border Patrol facilities are adequate to protect the health of detainees, and public health and safety.

75. Review of the extensive written materials provided and my on-site visits have not shown any medical harm to detained persons from the detention facilities or processes, or any serious risk of future harm.

76. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed this 25 day of February, 2016.

*[signature]*

PHILIP HARBER, M.D.