DEFENDANTS' EXHIBIT 21

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES; *et al.*, | ) | Case No. CV 85-4544-DMG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC H. HOLDER, JR., Attorney | ) | |
| General of the United States; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DECLARATION OF VALENTIN DE LA GARZA

I, Valentin de la Garza, hereby declare that the following statements are true and correct

to the best of my knowledge, information and belief:

1.      I am the Assistant Field Office Director (AFOD), San Antonio Field Office, Enforcement

and Removal Operations (ERO), employed by the U.S. Immigration and Customs

Enforcement (ICE), U.S. Department of Homeland Security (DHS), in Dilley, Texas.  I

have served as AFOD of the South Texas Family Residential Center (STFRC or Dilley)

since March of 2015.  As AFOD of ICE's largest family residential center (FRC), I am

familiar with the daily activities of the contractor Corrections Corporation of America

and am responsible for the immigration enforcement and removal operations of 90 ERO

staff assigned to STFRC.  I have served ICE and its legacy predecessor, Immigration and

Naturalization Service (INS), in a law enforcement capacity since March 1996.  I began

my career as a Detention Enforcement Officer (DEO) at the Port Isabel Detention Center

in Port Isabel, Texas, and was promoted to a Lead DEO in 1999, a Supervisory DEO in 2002, a Deportation Officer at the T. Don Hutto Family Residential Center in 2006, and a Supervisory Detention and Deportation Officer in 2012. Prior to becoming the AFOD at STFRC, I served as AFOD of the Port Isabel Detention Center from November 2014, where I managed a workforce of approximately 199 personnel, 565 contract staff and 78 ICE Health Services Corps (IHSC) staff.

2.     I am familiar with the conditions at the STFRC and have reviewed the individual declarations submitted under seal in the instant action. The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my official capacity.

## I.   IMMIGRATION PROCESSING OF FAMILIES AT SOUTH TEXAS FAMILY RESIDENTIAL CENTER

3.     At the STFRC, ICE/ERO moves as expeditiously as possible to process families who assert a claim of fear, refers them to U. S. Citizenship and Immigration Services (USCIS) for the appropriate screenings and, if eligible, releases them under the appropriate conditions. ICE continues to evaluate its processes to ensure that eligible families are safely and appropriately released to pursue their immigration cases.

4.     Since October 2015, ICE/ERO has updated its procedures to ensure families are processed as expeditiously as possible. For example, upon arrival at STFRC, ERO staff verify that all necessary documentation, based on the type of case, is completed and properly served on the family. ERO FRC staff will begin efforts to identify sponsors and future release options as soon as practicable after a family is booked into STFRC. ERO FRC staff will interview the head of household to determine if the child or children has another parent or legal guardian in the United States to whom that child or children may

be released.  For families who claim fear of return, ERO refers them to USCIS for the appropriate adjudication as soon as practicable.

5.     During their stay at STFRC, families receive a medical and mental health evaluation, a physical exam, a dental screening, and any medically necessary dental, health, or mental health referrals.  Children are offered any needed immunizations, which parents may decline.  Children also receive a development assessment in the Well-Child clinics.  ICE further identifies and treats families diagnosed with communicable diseases while they are at the STFRC.  Following initial medical, dental and mental health screenings, Residents can utilize necessary medical, dental, mental health counseling and social work services.

6.     Families are offered the opportunity to participate in a legal orientation program (LOP) from a certified pro bono organization, which, for many, may be their first opportunity to learn of their rights and responsibilities under the immigration laws of the United States.

7.     Family Residential Centers, like the STFRC, enable families to remain together during immigration proceedings, maintaining family unity.   Under the open plan of STFRC, families can move about unescorted and avail themselves of educational and recreational opportunities, including contact visitation from friends, relatives, attorneys, and others. Families have freedom of movement throughout the facility from 6:00 a.m. to 10:00 p.m., and may receive visitors seven days per week, from 8:00 a.m. to 8:00 p.m.  All school age children receive education in accordance with state regulations with state-certified bilingual teachers.  The cafeteria, which is open from 6:00 a.m. to 7:00 p.m., provides three meals per day.  Non-institutional clothing is provided and residents have the option of maintaining personal attire for daily wear.  Residents have access to recreation

3

resources including gymnasiums, exercise classes, athletic fields, board games, books, age-appropriate toys, television, video games, and movie nights. Residents have access to playrooms, study areas, libraries, and regularly re-stocked refrigerators with healthy snacks. Religious services are available daily, and STFRC features a large library with hundreds of books, legal resources, and internet access. Temporary monitored care is provided for parents who prefer not to have their children present for attorney visits, immigration hearings, medical or dental appointments, and administrative interviews.

8.      ICE FRCs operate under the ICE Family Residential Standards (FRS), first issued on December 21, 2007. These standards promote a unique, open, and stimulating environment in which the residents are free to move about the center. The FRS were developed with input from medical, psychological, and educational experts, as well as civil rights organizations, with the goal of mirroring community standards and ensuring that all residents are treated with dignity and respect. (*See* ICE Family Residential Standards, available at: https://www.ice.gov/detention-standards/family-residential (last visited May 24, 2016).

## II. GENERAL ALLEGATIONS BY INDIVIDUAL RESIDENTS

9.      I have reviewed the individual declarations filed under seal and provide the following information in response:

10.     *Notice of Rights under the Flores Settlement Agreement*:  Many declarants indicate that they were never informed of their rights under the *Flores* Settlement Agreement (FSA) while residing at STFRC. To my knowledge, ICE (or legacy INS) has not provided the notice in Exhibit 6 of the FSA to accompanied children. However, ICE is committed to

4

providing the Exhibit 6 notice and will be working to implement a procedure to provide the notice to accompanied minors at STFRC.

11.     ***Family Reunification and Release Efforts***:  Many declarants assert that no immigration official questioned them or took any steps to identify any relatives in the United States to whom they could be released, including the following:

> Exhibit 22, Walter Mxxxx-Xxxxxxxxx
>
> Exhibit 28, Celina Sxxxxxx-Xxxx
>
> Exhibit 32, Maria Mxxxxxxx-Xxxxxxx
>
> Exhibit 39, Karen Zxxxxx-Xxxxxxx

Upon intake at STFRC, ERO officers obtain information from each family on family members located in the United States, if any.  Upon a positive fear finding either by USCIS or an immigration judge, ERO serves the charging document on the resident and makes a custody determination.  For residents who will be released, ERO utilizes the family information obtained during intake and any additional information that the resident provides, and processes the resident for release.  Release generally occurs within 48-72 hours from the time the charging document is served on the resident, depending on the resident's travel arrangement preference and family/sponsor availability.

12.     ***Release of Children to Family Members in the United States***:  A number of declarants assert that ICE should not have detained a child or children because there is another parent, family member, or friend living the United States who could have taken care of them:

> Exhibit 22 – Walter Mxxxx-Xxxxxxxxx
>
> Exhibit 23 -- Yeslin Lxxxx-Xxxxxxx

Exhibit 28 – Celina Sxxxxxx-Xxxx

Exhibit 29 – Cesia Vxxxxxxxxx

Exhibit 32 – Maria Mxxxxxxx-Xxxxxxx

Exhibit 40 – Allison Mxxxxx-Xxxxx

Exhibit 49 – Edgardo Cxxxxxxx-Xxxxxxxx

At the time of their detention at STFRC, the declarants above were placed in expedited removal

proceedings, had failed to establish that they were eligible to apply for the relief sought, and thus

were subject to mandatory detention.

13.   ***Notice of Right to a Bond Hearing***:  Multiple declarants allege that they were never

notified of their right to have an Immigration Judge redetermine their custody status

while residing at STFRC, including:

Exhibit 27 – Yessenia Rxxxxxxxx-Xxxxxxx

Exhibit 28 – Celina Sxxxxxx-Xxxx

Exhibit 40 – Allison Mxxxxx-Xxxxx

Exhibit 49 – Edgardo Cxxxxxxx-Xxxxxxxx

Exhibit 50 – Flemer Pxx-Xxxxxxxxx

Exhibit 51 – Karen Mxxxx-Xxxxxxxx

At the time of their detention at STFRC, declarants above were in expedited removal

proceedings and subject to mandatory detention.  Many individuals detained at a FRC are

not eligible for bond.  For example, individuals who are processed as reinstatements of

previously-issued final orders of removal or as arriving aliens are not eligible for a bond

hearing before an immigration judge.  For individuals in the expedited removal process,

detention is mandatory unless the individual is determined to possess a credible fear of

persecution or torture if returned to his or her country.  Individuals determined not to

possess a credible fear remain in the expedited removal process and are generally

detained until removal.   Once an individual is determined to possess a credible fear, he

or she is referred to an immigration judge for standard removal proceedings under section

240 of the Immigration and Nationality Act, 8 U.S.C. § 1229a, and is generally eligible to

be considered for discretionary release.  In some cases, once an individual has established

a positive credible fear, he or she would be eligible and is provided a notice of custody

determination (Form I-286) by ICE.  Should ICE determine that continued detention is

necessary in those cases, the individual has a right to challenge that determination by

requesting a bond hearing before an immigration judge.  In these cases, the individual

declarants, at the time of their detention, had failed to establish a positive credible fear

and were not eligible for a custody determination or a bond hearing.

14.    *Legal Access*:  Many declarants allege that they were never informed of the procedures

and timelines of their credible fear process at STFRC.  American Gateways, an

immigration legal services pro bono organization from Austin, Texas, conducts the

EOIR-sponsored LOP at STFRC 2-3 times per week, depending on the number of

incoming residents.  In addition, throughout the day, a "Know Your Rights" video is

aired on televisions throughout the facility, including the intake and release areas, suites,

dayrooms, medical waiting area and library.  (*See* Exhibit ("Exh.") 5 for a true and

correct copy of the "Know Your Rights" booklet in Spanish and Exh. 6 for a description

of the American Bar Association's "Know Your Rights" video and a link to stream the

video).   Also, to the extent that residents have any questions about their case or the

immigration process, pro bono attorneys are present at the facility seven days per week.

(*See* STFRC Resident Handbook in English and Spanish, true and correct copies of which are attached as Exhs 1 & 2). Residents are verbally informed of the availability of the onsite pro bono attorneys during the intake process. There are CARA posters advertising the pre-release orientations. (*See* Exh. 4 for true and correct copies of the CARA flyers posted at the STFRC). Residents can walk into the visitation trailer to speak to the pro bono CARA attorneys without an appointment. Moreover, residents are also free to call a pro bono lawyer free of charge. (Exh. 1 at 47-48, 69).

15.    *Free Access to Calls to Pro-Bono Legal Providers*: Many declarants allege they were not aware that any phone calls to legal providers could be made without charge. Upon intake, each resident is provided a "List of Legal Services" which provides contact information for attorneys that will provide legal services for little or no cost. (*See* Exh. 3 for a true and correct copy of the List of Legal Services available at the STFRC). Each resident is also provided a copy of the STFRC Resident Handbook, which is provided either in English or Spanish, depending on the resident's preferred language. (*See* Exs. 1 & 2 and Exhs. 7-8 for true and correct copies of the forms STFRC Orientation for New Residents and CCA-STFRC Handbook Issuance Form in which residents acknowledge they receive an orientation and handbook after arrival)). The STFRC Resident Handbook informs residents that calls to pro bono attorneys may be made free of charge. (Exh. 1 at 47-48). Calls to a consulate and to attorneys listed on the "List of Legal Services Providers" are also free. (*Id*.) Residents may access telephones in all common areas as well as within each resident suite. Information on phone use is posted above or next to each phone. Indigent residents may also make free telephone calls to legal assistance

organizations, families and others within the United States by speaking to their case manager or by completing a Resident Request form. (*See id.*).

16. ***Notification of Case Status***:  Several declarants have alleged that they were not notified of the status of their cases or why they were being detained. In addition to the legal resources described above, ICE personnel at the STFRC regularly respond to verbal and written inquiries from the residents, which include requests regarding the status of their immigration cases.  In responding to such inquiries, ICE does not provide legal advice regarding the resident's immigration case.  Instead, individuals in proceedings are notified by the court of their next proceeding and, if they have a concern about when their next hearing is, they can call EOIR's Automated Case Information Hotline at 800-898-7180 to obtain the date of their next hearing.

17. ***Residing with Unrelated Adults***.  Several declarants disliked that they were detained with other adults and children.  Family residential centers like STFRC enable families to remain together during immigration proceedings, maintaining family unity.  STFRC holds only family units with female heads of household.  Therefore, children are not held with male adults.  Moreover, residents are only allowed to enter the apartment to which they are assigned, which promotes the safety of the residents. (*See* Exh. 1 at 16).  For added security, photos of the authorized residents and notices that only authorized residents are permitted to enter are posted outside of each residential area. While in STFRC, children remain with the accompanying parent. When children attend school or day care, they are supervised by licensed education professionals or other staff trained in childcare.  Also, STFRC staff are available to ensure the safety and security of residents and to assist them with any issues or needs.  Residents are also provided with a handbook

upon arrival which outlines acceptable behavior and the consequences of inappropriate actions or behavior.  (Exh. 1 at 13-15).

18.   ***Food***:  Several declarants asserted they did not like the food at STFRC.  STFRC provides its residents with quality and nutritional food.  Residents are provided three meals per day.  Residents also have access to snacks, juices, and other drinks at various locations throughout the STFRC, including the housing areas.  Registered dieticians plan the menu to provide variety and also consult with residents to ensure that they are given food that they like to eat.  (*See* a true and correct copy of the Sample Six-Week Menu, attached hereto as Exhibit 9).  Residents may also supplement their meals by purchasing additional food items at the STFRC commissary.

## III. SPECIFIC ALLEGATIONS BY INDIVIDUAL DECLARANTS

### Exhibit 29 – Cesia Vxxxxxxxxx-Xxxx

19.   Cesia and her mother entered the United States illegally on or about November 4, 2015, and they were placed in expedited removal proceedings.  They were transferred to STFRC on November 5, 2015.  USCIS issued a finding that the family failed to demonstrate they were eligible to apply for the relief sought on November 14, 2015, and an Immigration Judge affirmed the finding on November 17, 2015.  On November 19, 2015, the family was transferred to BFRC.

20.   Ex. 29 ¶12 ("Even though we had been working with lawyers from the CARA project and that was the only place that we felt safe, all of a sudden, on November 19, 2015, my mother and I were transferred from Dilley to Berks County, Pennsylvania.  Immigration agents woke us at 4 in the morning and held us in an office.  My mother was crying and asking the immigration agents where they were taking us.  They told us that they were

taking us to a safe place and not to be worried. We had no idea where we were going and we had no warning that we would be taken away from our lawyers. On the way here, some immigration officials said that they were taking us to our family, but that was a lie.") As noted in the paragraph above, during her residence at STFRC, Cesia and her mother were in expedited removal proceedings, had failed to demonstrate they were eligible for the relief sought, and thus were not eligible for release. ERO did collect information on potential family and sponsors present in the United States in the event she became eligible for release.   However, there is no right to remain in a particular FRC, and the transfer of the family from STFRC to BFRC is permissible. Except in unusual and compelling circumstances, ERO at STFRC generally does provide advance notice to counsel of transfers of residents if a G-28 is on file. Moreover, there is no evidence in the relevant case records that any immigration agent made any misrepresentations to her.

**Exhibit 30 – Isamar Sxxxxxx-Xxxxxx**

21.      Isamar and her daughter entered the United States illegally on or about May 30, 2014, and were placed in removal proceedings and served with a Notice to Appear. An Immigration Judge in Atlanta, Georgia, ordered the family removed to El Salvador on January 12, 2015. Isamar and her daughter reserved appeal but failed to perfect their appeals, and the Immigration Judge's removal orders became final on February 12, 2015. Isamar was subsequently enrolled in the Alternatives to Detention (ATD) program pending the issuance of travel documents. She violated the terms of the ATD program by failing to report as directed and by removing her GPS tracking unit without authorization. On October 25, 2015, the Loudon County Sheriff's Office in Loudoun, Virginia, reported finding her GPS tracking unit submerged in a waterway. On January 2, 2016, ERO

apprehended Isamar and her daughter in Sterling, Virginia, based on their final orders of

removal, and she was transferred to STFRC for removal on or about January 3, 2016.

ERO obtained travel documents for the family on January 6, 2016, and arranged for their

air transport to El Salvador. After receiving notice from ERO of the family's impending

departure, attorneys for Isamar filed an untimely notice of appeal and sought a stay of the

family's removal with the Board of Immigration Appeals ("Board"). On January 9, 2016,

the Board granted the stay of removal without allowing the government to respond. The

family was transferred to BFRC on or about January 29, 2016.

22.    Ex.30 ¶20 ("On January 2, 2016, I was at home with my daughter and partner.

Immigration came to our house around 6:30-7:00 a.m. We were sleeping when we heard

banging on the door. Immigration was yelling at us to open the door. My daughter

understands some English and knew it was immigration and that they wanted us to open

the door. She was scared and crying that she didn't want to go with them. After about an

hour, we thought immigration left. But later, a friend's mother came to visit. When we

opened the door, immigration was there too and pushed into the house. My daughter and

I ran into a bedroom and locked the door. My partner was in the shower. They grabbed

him when he came out. Immigration forced him to open the door to where we were.

They took me and my daughter away."). Our records confirm that ERO had lawful

permission to enter the residence where Isamar was living. On January 2, 2016, ERO

Officers from the Washington, DC Field Office conducted an operation in an effort to

locate the Isamar as part of Operation Border Resolve. Officers targeted an address in

Sterling, VA, where there was credible information that Isamar was currently residing. At

approximately 9:45 a.m., ERO officers encountered and were granted consent to enter
and consent to search the residence by a lawful resident of the listed address.

23.     Ex. 30 ¶24 ("Immigration kept trying to force the raid families to sign their deportations.
I kept asking about the right to an attorney, but the immigration officer lawyer laughed at
me. He told me if I hadn't had help from a lawyer in one year, I wasn't going to have
help in the 2 days I would be there before I was deported. One time when I was meeting
with my attorneys, an immigration official came in and told me he needed to meet with
me individually at 3pm. He refused to talk to me with my lawyer, who was right there.
He told the other raid families to meet too. But no one went because we thought
immigration might try to force us to do something we didn't want to do. Later, we saw
this immigration official. He asked us if we were still not going to sign deportation
papers. We told him no, we were going to stay here. Then he laughed at us."). There is
no evidence in the relevant case records confirming Isamar's allegations.

     **Exhibit 32 – Maria Mxxxxxxx-Xxxxxxx**

24.     Maria and her two children entered the United States illegally on or about September 5,
2015, and were placed in expedited removal proceedings. They were transferred to
STFRC on September 8, 2015. On September 25, 2015, USCIS issued its finding that the
family failed to demonstrate they were eligible to apply for the relief they sought, and an
Immigration Judge affirmed the finding on October 27, 2015. The family was
transferred to BFRC on October 30, 2015.

25.     Ex. 32 ¶10 (Although Maria requested a review of USCIS' decision of September 25,
2015, by an Immigration Judge, her hearing was not scheduled until October 27, 2015. "I
have no idea why the processing of my case was delayed.") A review of the case records

13

indicates that ERO forwarded the request for a hearing with an immigration judge on September 28, 2015. The Executive Office for Immigration Review schedules immigration court hearings, not ERO.

26. Ex. 32 ¶11 ("Even though I had been working with lawyers from the CARA Project, all of a sudden, on October 31, my son and I were transferred from Dilley, Texas to Berks County, Pennsylvania. We had no idea where we were going. They took my son and I out of my room and they told me that they didn't know where I was going. I was taken away from my lawyers with no warning."). As noted in Paragraph 24, above, during her residence at STFRC, Maria and her son were in expedited removal proceedings, had failed to demonstrate they were eligible for the relief sought, and thus were not eligible for release. There is no right to remain in a particular FRC, and the transfer of the family from STFRC to BFRC is permissible.

**Exhibit 43 – Diana Cxxxxx-Xxxxx**

27. Diana, her mother, and three siblings entered the United States illegally on or about June 29, 2014, were apprehended by CBP and released on June 30, 2014, to pursue removal proceedings in immigration court. On November 4, 2014, an Immigration Judge ordered the family removed to El Salvador, and Diana's mother waived the family's right of appeal. On January 3, 2016, the mother and her children were encountered at her residence in Norcross, Georgia, taken into custody, and transferred to STFRC. On January 5, 2016, the mother filed a second application for stay of deportation or removal with ICE and an untimely notice of appeal and motion to stay with the Board of Immigration Appeals. The Board granted the stay on the same day. On January 6, 2016,

ICE denied the mother's second application for a stay. On February 5, 2016, the family was transferred to BFRC. The family's appeal with the Board remains pending.

28.    Ex. 43 ¶9 (Diana notes that "our photos were used in a media report on Telemundo and broadcast in El Salvador. As a result our family has been threatened to the point that no one will even pick us up at the airport if we are deported for fear of being murdered." She also notes that she received word "that a family from Dilley that was deported has been killed upon arrival at the airport by gang members"). While Diana provides no substantive support for her allegations, our relevant case files indicate that Diana's mother voluntarily agreed to be interviewed by National Telemundo News Correspondent Janet Rodriguez while represented by counsel and signed the Detainee Interview Release form.

**Exhibit 52 – Medela Mxxxxxxx-Xxxxx**

29.    Medela and her mother entered the United States illegally on or about May 14, 2015, were apprehended by CBP, and placed in expedited removal proceedings. They were transferred to STFRC on May 14, 2015. On or about June 10, 2015, USCIS conducted an interview and issued its finding that the family was eligible to apply for the relief sought. On June 16, 2015, ICE conducted a custody review and ordered the family released on a $5,000 bond. After paying the bond, the family was released on June 22, 2015. On September 24, 2015, an Immigration Judge ordered the family removed. The family waived appeal. On January 3, 2016, ICE took the family into custody and transferred them to STFRC the same day. Attorneys for the family filed an emergency stay and untimely appeal with the Board of Immigration Appeals, which granted the stay the same day, without allowing DHS to respond. ICE received a travel document on or about

15

January 6, 2016, which would have permitted the family who had final removal orders to be removed to El Salvador but for the Board's stay.  On or about February 2, 2016, the family was released under an order of supervision from STFRC.  The family's appeal remains pending with the Board.

30.     Ex. 52 ¶11 ("Here at Dilley there is a high fence surrounding us and we cannot leave the detention center.").  Medela's declaration was signed on February 2, 2016, and the family was released the same day.  STFRC has an open campus and residents are allowed freedom of movement through the common facility areas from 6:00 a.m. to 10:00 p.m. However, because the family was being held for removal under the Immigration and Nationality Act, they were subject to being detained.

31.     Ex. 52 ¶11 ("Guards come into our rooms at night every hour to check on us.").  STFRC staff do conduct room checks/well-being checks during overnight hours to ensure resident safety.  During these checks the staff is required to visually observe each resident to verify their well-being; however, the checks are done with as little disruption as possible.

32.     Ex. 52 ¶11 ("We share a room with three other families.").  At STFRC, each family unit is assigned to a specific residential area and bed and families are expected to share common equipment such as telephones, televisions, tables, laundry facilities and machines, recreational games and equipment. (*See* Exh. 1at 16).  Each residential area has designated living room and sleeping space.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct

to the best of my knowledge, information and belief.

Executed on this $\underline{3}$ day of June, 2016.


Valentin de la Garza
Assistant Field Office Director
San Antonio Field Office – South Texas Family Residential Center
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

INDEX OF EXHIBITS

1.  STFRC Resident Handbook (English revised Mar. 20, 2016)

2.  STFRC Resident Handbook (Spanish revised Mar. 20, 2016)

3.   List of Legal Services (STFRC)

4.  CARA Family Detention Pro Bono Project:  Pre-Release Orientations Flyer (English & Spanish)

5.  Know Your Rights Monograph, American Bar Association (2013) (Spanish)

6.  "Description of "Know Your Rights," Video, American Bar Association, at www.americanbar.org/groups/public_services/immigration/projects_initiatives/knowyourrights.html (last visited Jun. 2, 2016); Video available at: www.americanbar.org/news/abanews/aba-news-archives/2013/08/know_your_rights.html (last visited Jun. 2, 2016).

7.  Sample Form:  STFRC Orientation for New Residents (redacted)

8.  Sample Form:  CCA-STFRC Handbook Issuance Form (redacted)

9.  Six-Week Menu – STFRC March 24, 2016

DE LA GARZA DECLARATION

EXHIBIT 1

# South Texas Family Residential Center

## *Resident Handbook*

300 El Rancho Way
Dilley, TX 78017

## CONTENTS

INTRODUCTION ...................................................................6

STAFF ORGANIZATION AND CONTACT INFORMATION.........................7
   *Facility Staff* .................................................... 7

CONTACTING IMMIGRATION...............................................9

THE RESIDENT INFORMATION CENTER ..................................10

RESIDENT HANDBOOK.........................................................10

RESIDENT RIGHTS AND RESPONSIBILITIES .............................11

RESIDENT PROGRAM RULES .................................................13

RESIDENT REQUESTS ..........................................................15

LIVING ARRANGEMENTS .....................................................16
   *Bedrooms*.......................................................... 16
   *Children Time* ...................................................... 17
   *Overnight Checks*................................................... 17

FREE MOVEMENT ...............................................................17
   *Outdoor Campus Access* ........................................... 18

CLOTHING.........................................................................19
   *Center Clothing* .................................................... 19
   *Resident Dress Code* ............................................... 19

LINENS.............................................................................20

LAUNDRY..........................................................................21

PERSONAL HYGIENE ...........................................................21
   *Issued Personal Hygiene Items*.................................... 22

PERSONAL PROPERTY ..........................................................23
   *Allowable Property*................................................. 23
   *Other Property* ...................................................... 24
   **Rules for Storing or Mailing Property** ........................... 25

Staff Processing of Baggage and Personal Property Other
Than Funds and Valuables ............................................... 26

Release ........................................................................ 27

Claims ......................................................................... 27

Stolen ................................................................27

Lost/damaged .....................................................28

Processing ..........................................................30

Investigation.......................................................30

Replacement .......................................................31

Reimbursement ...................................................31

Property lost by another center / facility / agency ......32

CONTRABAND.................................................................32

WRITING INSTRUMENTS AND PAPER .................................33

GENERAL SAFETY/EVACUATION DRILLS .............................33

RESIDENT CENSUS ..........................................................35

MEALS ...........................................................................35

Snacks and Drinks.......................................................... 37

Special Diets.................................................................. 37

RELIGIOUS SERVICES .......................................................38

Religious Services Coordinator (RSC) ............................... 38

MEDICAL SERVICES .........................................................39

Emergency Medical Situations ....................................... 39

Sick Call........................................................................ 39

Urgent Care................................................................... 40

Dental Services.............................................................. 40

Mental Health Services................................................... 41

Medications .................................................................. 42

Medical Department Conduct ......................................... 42

Complaint or Grievance about Medical Care.................... 42

SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION ......43

MONITORED CARE SERVICES .............................................................. 46

RESIDENT CHORES .......................................................................... 47

TELEPHONE ACCESS ....................................................................... 47

    *ICE Free Access Telephone Calls ............................................. 48*

    *Indigent Resident Telephone Access........................................ 48*

    *Legal Assistance Telephone Access.......................................... 48*

FINANCES/RESIDENT FUNDS/MONEY ORDERS .................................. 48

COMPLAINT AND GRIEVANCE PROCEDURES ...................................... 50

    *Emergency Grievance Procedures ............................................ 52*

    *Non-Grievable Matters............................................................ 53*

    *Staff Misconduct .................................................................... 53*

DISCIPLINE AND BEHAVIOR MANAGEMENT ....................................... 53

    *Discipline Hearing Appeals ...................................................... 56*

    *Discipline Proceeding Postponements ...................................... 56*

    *Corrective Actions for Children................................................ 56*

    *Corrective Actions for Adults................................................... 57*

DESCRIPTION OF OFFENSES ............................................................. 58

    *Low Offenses......................................................................... 58*

    *Moderate Offenses................................................................. 60*

    *Major Offenses...................................................................... 61*

EDUCATION .................................................................................... 63

    *Special Needs Information ....................................................... 64*

LIBRARY......................................................................................... 65

    *General Library ...................................................................... 65*

    *Legal Information / Law Library / Access to Legal Materials ...... 65*

    *Materials Provided By Legal Representatives ............................ 66*

    *Free Legal Assistance.............................................................. 66*

RECREATIONAL PROGRAM ............................................................... 67

MARRIAGES ................................................................................... 67

VOLUNTARY WORK PROGRAM................................................. 68

VISITATION .......................................................................... 69

   *Social Visitation........................................................... 69*

   *Legal Aid Visitation ..................................................... 70*

   *Consular Visitation ...................................................... 71*

   *Visitor Dress Code ....................................................... 71*

ROUTINE SANITATION AND SAFETY INSPECTIONS ............................. 71

NON-ROUTINE SEARCHES.................................................... 72

   *Searches of Persons ..................................................... 72*

MAIL / CORRESPONDENCE .................................................. 73

   *Addressing Envelopes ................................................... 73*

   *Indigent Resident Mail ................................................. 74*

   *Special Correspondence ................................................ 74*

   *Postage and Envelopes ................................................. 75*

   *Distribution of Incoming Mail ...................................... 75*

   *Posting of Outgoing Mail.............................................. 76*

NOTARY PUBLIC................................................................... 77

PHOTOCOPIES...................................................................... 77

HAIR CARE SERVICES ............................................................ 77

CONVENIENCE STORE............................................................ 77

SMOKE-FREE ENVIRONMENT ............................................... 78

SITE MAP ............................................................................. 79

**INTRODUCTION**

The South Texas Family Residential Center (the Center) is operated by CCA. The Center's mission is to allow families to remain together while in ICE custody in the least restrictive setting available while enforcing rules necessary to ensure the safety and well-being of residents and staff alike. The Juvenile and Family Residential Unit (JFRMU) monitors activity at this Center. JFRMU is a unit within U.S. Immigration and Customs Enforcement and is responsible for all operations where ICE families are housed. JFRMU and the ICE Detention Services Monitor are responsible for monitoring the health, safety and security of residents placed here. These officers ensure the Center complies with federal standards relating to a variety of topics including food service, sanitation, medical care, visitation, and legal rights.

MAILING ADDRESS
**South Texas Family Residential Center**
**300 El Rancho Way/P.O. Box 608**
**Dilley, TX 78017**

## STAFF ORGANIZATION AND CONTACT INFORMATION

### *Facility Staff*

Brief descriptions of the roles of certain staff members and their primary functions are listed below.

*Facility Administrator* – Chief Administrative Officer of the Facility/Center. Directs, administers, oversees, and coordinates the activities of the Center;

*Assistant Facility Administrator(s)* – coordinate(s) the professional Center management in the areas of security, unit operations, case management and programs operations;

*Chief of Security* – responsible for the overall security plan, including staff and post assignments;

*Chief of Unit Management* – supervises the overall operation of the housing unit management teams;

*Health Services Administrator* – manages the Center's medical program activities and provides overall direction and leadership in compliance with all applicable policies, procedures, laws, regulations, and standards;

*Education Supervisor/Principal* – responsible for the overall operation of the education department;

*Shift Supervisor* – responsible for the supervision of the administrative and operational security activities on a specific shift;

*Unit Manager* – responsible for all matters relating to the housing units, including case management, security, programs, safety and sanitation;

*Chaplain/Religious Services Coordinator* – coordinates religious services, activities and volunteers. Performs pastoral work, including pastoral counseling;

*Case Manager and Resident Counselor* – the primary contacts for the residents in an apartment complex. Acts as a liaison between the resident and other staff;

*Resident Supervisor* – the first line supervisor for residents, a member of the unit team and supports the Center mission, and unit and Center programs. Resident Supervisors are assigned to specific

posts/apartment complexes and will assist residents with questions regarding housing, supplies and other issues that may arise during the Resident's stay at the Center;

*Recreation Supervisor* – is responsible for planning and supervising the total recreational program for the Center;

*Grievance Coordinator* – acts as a liaison between the resident and other staff regarding the grievance process;

*Assistant Shift Supervisor* – assists in the supervision of the administrative and operational security activities for the Center. Directly supervises Resident Supervisors assigned to the shift and may serve as acting Shift Supervisor in the absence of the Shift Supervisor. Provides for the protection of each resident and the preservation of each resident's legal rights.

Residents may contact any staff by speaking to him/her in person or by completing a Resident Request Form, available in each apartment complex's activity room. Residents may contact the main office of CCA by calling directly to 1-877-834-1550 or in writing to:

**Managing Director, Division VI**
**Corrections Corporation of America**
**10 Burton Hills Boulevard**
**Nashville, TN 37215**

## CONTACTING IMMIGRATION

Specific ICE staff are assigned to immigration cases and they conduct a minimum of weekly scheduled visits to answer immigration concerns. Residents may visit with these officers during their scheduled visits and also submit written questions, requests or concerns to them by

completing a Resident Request Form. These forms are available in each apartment complex's activity room. Completed forms are to be placed in the mailbox labeled "Requests." These forms are collected each business day and routed to an ICE officer for resolution. Residents may obtain assistance from another resident or staff member in preparing request forms. The ICE visit schedule is posted on each apartment complex's information board in the activity room.

Residents may contact the Department of Homeland Security, Office of Inspector General by calling directly to 1-800-323-8603, by using the free call system programmed into the telephones or by writing to:

**Department of Homeland Security**
**Office of the Inspector General**
**245 Murray Drive, S.E., Building 410**
**Washington, D.C. 20538**

## THE RESIDENT INFORMATION BOARD/ACTIVITY ROOM

The Resident Information Board is located in each apartment complex' activity room. Forms and mailboxes are posted in that location relating to legal assistance, ICE communication requests, grievances, sick call, mail, program services information, recreational activities, a copy of the current resident handbook and required postings, among other things.

## RESIDENT HANDBOOK

The purpose of this handbook is to provide residents with specific rules, regulations, policies and procedures that must be followed while residing at the Center. The handbook will also provide a general overview of the programs and services offered. Upon admission to the

Center, each family is provided with a copy of the resident handbook. It is the residents' responsibility to become familiar with the contents of this handbook and to ask staff questions if there is anything they do not understand. Questions may be directed to any of the staff. A copy of the current resident handbook is also available in each apartment complex's activity room. Occasionally, changes need to be made to the resident handbook. When this occurs, residents will be given the updates and the updates will also be communicated and available in each apartment complex's Resident Information Center.

## RESIDENT RIGHTS AND RESPONSIBILITIES

It is the Center's philosophy to treat residents with dignity and respect while maintaining a safe, secure, and sanitary residential facility. It is expected that staff will receive each resident's full cooperation while in residence here. Although staff may not know newly admitted residents by name, they are always expected to address residents in an appropriate and respectful manner. Residents are expected to address other residents and staff in the same manner.

- Residents have the right to be informed of the rules, procedures and schedules concerning the operation of the Center; residents have the responsibility to know and abide by them;
- Residents have the right to freedom of religious affiliation and voluntary religious worship; residents have the responsibility to recognize and respect the rights of others in this regard;
- Residents have the right to contact their consulate or embassy and have those officials call and visit during a resident's stay at the Center; *see the sections on telephone usage and visitation for more information*;

- Residents have the right to receive regular health care, nutritious meals, proper bedding and clothing, regular shower opportunities, hygiene products, proper indoor climate control, and regular exercise opportunities, among other things; it is the resident's responsibility to seek medical care as needed, to not waste food, to follow the laundry schedule, to maintain proper hygiene and keep living quarters clean;

- Residents have the right to protection from personal abuse, corporal punishment, unnecessary and excessive use of force, personal injury, disease, property damage and harassment;

- Residents have the right to freedom from discrimination based on race, religion, national origin, sex, handicap, political beliefs, or sexual orientation;

- Residents have the right to pursue grievances in accordance with written procedures outlined in this handbook;

- Residents have the right to due process, including the prompt resolution of administrative disciplinary matters as outlined in this handbook;

- Residents have the right to unrestricted and confidential access to the courts;

- Residents have the right to pursue legal assistance at no cost to the United States Government;

- Residents have the right to use the law library; it is the resident's responsibility to use those resources responsibly and to respect the rights of other residents in the use of the space and materials;

- Residents have the right to freely correspond with persons or organizations;

- Residents have the right to have family members and friends visit; residents have the responsibility to conduct themselves properly during visits;
- Residents have the right to take advantage of activities and programing, which may aid in an enjoyable stay at the Center; residents have the responsibility to abide by the rules governing the use of such activities and programs;
- School-aged children have the right to attend school and receive instruction equal to that of their peers; residents have the responsibility to ensure their children attend school and study for assigned class work and homework;
- Children have the right to participate in all age-appropriate activities and programing when not in school; residents have the responsibility to encourage their children to participate in leisure activities, ensure they abide by all of the Center's rules, including respecting the personal space of others and refraining from bullying behavior.

## RESIDENT PROGRAM RULES

Residents must:

- follow the directives that are given by the Center staff;
- wear Center identification at all times and report any damage or loss to staff so a replacement may be made;
- treat all residents and staff with respect and courtesy, regardless of race, religion, ethnicity, gender or age;
- attend to the physical and emotional needs of their children while modeling appropriate behavior;

- monitor their child's behavior and use only approved behavior modification techniques when necessary. Corporal/physical punishment is prohibited;
- not file knowingly false complaints, grievances or other reports;
- not speak disrespectfully, or be verbally or physically aggressive towards other residents or staff; should a resident encounter others displaying this behavior, they should report it immediately to staff;
- not have physical or intimate contact with other residents or staff while at the Center; *see the section on sexual abuse and assault prevention for more information*;
- not possess contraband while at the Center;
- respect the rights of other residents and staff;
- not take or borrow other residents' property;
- comply with census procedures;
- perform assigned chores;
- maintain proper hygiene;
- clean bedroom every morning;
- behave in an orderly manner during meals, clear immediate area after each meal and ensure their children's area is also cleaned;
- (for students) follow classroom rules that are established by the teachers and the Center staff;
- promptly report broken items or damaged property to staff;
- alert staff immediately of any problems or concerns;
- ask a staff member if Center rules are not understood or remembered;
- abide by the room visitation policy; *see the section concerning bedrooms for more information*;

- not borrow or trade clothing, hygiene products, jewelry or make-up;
- not deface or otherwise damage Center property;
- comply with the dress code found in this handbook;
- not use or possess tobacco products in any form, drink alcohol or chew gum;
- not waste food; and
- not use profanity.

Failure to follow the above rules may result in the initiation of disciplinary proceedings. Serious and/or continuous infractions may lead to a review of continued suitability for placement in this residential setting. *See the section on disciplinary procedures for more information.* Residents who act in an aggressive manner and/or attempt to cause harm to themselves or others may be passively restrained under the Center's restrictive procedure policy to protect themselves and others.

## RESIDENT REQUESTS

Generally, residents can have questions answered and obtain services merely by speaking to staff. For those who would rather request information formally, the official method is by completing a Resident Request form. All the information requested on the forms must be completed. Residents may obtain assistance from another resident or staff member in preparing request forms. Completed forms are to be placed in the drop off box labeled "Requests" located in each apartment complex's activity room. These forms are collected each business day and routed to a unit team member for resolution. This procedure is not to be used for submitting formal grievances. *See the section on grievance procedures for more information.*

**LIVING ARRANGEMENTS**

Residents are expected to share common equipment such as telephones, televisions, tables, laundry facilities and machines, recreational games and other equipment. Each living area and apartment has a television with both Spanish and English programs available. There will be a listing posted in the apartment complex of channels available. Generally, all activity will cease after children's bedtime; however, parents may use this time for reading or quiet time activities as long as they do not disturb the sleep of others. During quiet hours, residents may only use provided headphones to view television or listen to music.

### *Bedrooms*

Each family unit is assigned to a specific apartment and bed. Residents are only allowed to enter the apartment to which they are assigned. Residents should make their beds and straighten up their immediate area each morning. When not in use, beds should remain made. Beds and furniture are not to be moved.

Residents are permitted to decorate their rooms with personal items so long as the decorations do not present a health or safety hazard, do not peel paint off the walls or otherwise deface Center property. No items are allowed to cover light fixtures, doors, or windows. Items are not to be hung from vents, sprinkler heads, or beds. Due to the communal nature of the Center, residents must only disrobe in the shower rooms, bathroom, or when utilizing the privacy screens provided in the apartments.

Approved property will be stored inside provided storage units. *See the section on allowed personal property for more information.* No food or

drinks are allowed to be stored in bedrooms. All hygiene items must be stored in provided storage units. Toys are allowed in bedrooms during free movement hours. After free movement, all Center-owned toys must be taken back to the common areas so that they can be sanitized (if appropriate) for the following day; however, personal toys may be kept overnight. *See the section on free movement for more information.*

## Children Time

Children's bedtimes are set to promote a routine for the Center's children and to allow for their restful attendance in class. The general bedtime for children 4 years old and younger is 8:30pm Sunday through Thursday. The general bedtime for children 5 years old up to 17 years of age is 9:00pm Sunday through Thursday. Bedroom lights shall be turned off no later than 15 minutes after the set times. Parents are encouraged to continue (or develop) their children's bedtime routines while at the Center.

## Overnight Checks

Staff will conduct room checks/well-being checks every 30 minutes during overnight hours to ensure resident safety. During these checks the staff is required to visually observe each resident to verify their well-being; however, the checks will be done with as little disruption as possible.

## FREE MOVEMENT

Barring temporary restrictions due to medical or security reasons, free movement hours are from 8:00am to 8:00pm each day. During this time, adult residents are allowed to move freely throughout their assigned neighborhood and all programming areas of the Center

without first asking staff permission or notifying staff where they are going. Children age 12 and older may participate in free movement, when issued a pass by their parent. This pass may be given, suspended and reinstated by the parent at any time of their choosing. Residents not receiving free movement passes for their children at admission may request these passes by completing a Resident Request Form. These forms are collected each business day and routed to **a member of staff** for resolution. Residents may obtain assistance from another resident or staff member in preparing request forms.

Children age 12 and older who do not currently have a pass and all children under 12 years old are expected to be under the direct supervision of their parent at all times when not in school or participating in an organized activity.

Outside of free movement hours, residents are expected to remain in their apartment complex.

## *Outdoor Campus Access*

Barring temporary restrictions due to medical, environmental or security reasons, the outdoor campus is open from 8:00am to dusk or 8:00pm, whichever comes first. Outdoor recreation equipment may be checked out by speaking with assigned neighborhood recreation coordinators and may be used only on assigned neighborhood recreation yards. These items must be returned prior to going back inside the Center. Residents must report any loss or breakage to staff so the equipment stays in good working order and is replaced as needed. Drinking water is available at each recreation park and bathrooms have been located adjacent to the living areas and recreation parks. As a rule, residents must stay within the boundaries of their assigned

neighborhood unless participating in programs or services available on Main Street.

## CLOTHING

Residents must be properly dressed when outside of their bedrooms. *See the section on resident dress code for more information.* Each resident is allowed to keep 10 sets of clothing in their rooms. Children, newborn to age 5 years may have 12 sets. These sets may be clothing brought in to the Center, clothing provided by the Center or clothing purchased during a resident's stay, or a combination of these. Underwear, bras and socks will be exchanged as needed. Residents in need of new underwear or clothes should submit a Resident Request form. Residents will not be allowed to have more items than those listed above, except when authorized by the Facility Administrator.

### Center Clothing

Indigent residents and residents not arriving at the Center with a suitable amount of seasonally appropriate clothing will be issued a minimum of six sets of Center clothing to use during their stay. These items include six shirts, six pairs of pants, six bras, six pairs of socks, and six pairs of panties or boxer/briefs, and residents ages 12 and under may receive up to three sets of pajamas at their parent's request. Should additional or seasonally-appropriate clothing be needed, residents should speak with their Resident Supervisor or submit a Resident Request form.

### Resident Dress Code

Residents five years and older:

- Must wear clothing which covers shoulders, chest, stomach and all areas of the anatomy between the naval (belly button) and mid-thigh when seated;
- The top or neckline of clothing shall be no lower than the underarm in the front and in the back;
- Sheer (see-through) clothing is prohibited;
- Shoes shall be worn at all times while outside the apartment complex;
- Shirts shall be worn at all times;
- "Gang colors" or other signs are prohibited;
- No "sagging" (pants will be worn at waist).

## LINENS

The following linens are provided to each resident upon admission to the Center:

- 2 towels;
- 2 washcloths;
- 2 sheets;
- 1 pillowcase;
- 1 blanket; and
- 1 laundry bag.

These linens, other than blankets, will be exchanged for clean linens no less than once a week, or more frequently as needed. Should an occasion arise when clean linens are needed outside the normal exchange day, residents should speak with staff. All linens must be returned when a resident departs from the Center.

## LAUNDRY

It is the resident family's responsibility to maintain clothing in a clean and sanitary condition. For that purpose, a laundry facility is provided in each apartment complex. Written procedures are posted in both English and Spanish in the laundry area. Residents' bedding (sheets and pillowcases) will be collected and laundered once a week using Center-wide services. Blankets will be collected and laundered monthly. Each neighborhood is scheduled to turn in their bedding on an assigned day. The schedules are posted in each apartment complex's activity room. In the event bedding/crib sheet becomes soiled between scheduled laundry times, residents should ask their Resident Supervisor for additional linens. When a resident leaves the Center, all Center-issued clothing must be returned for cleaning and recycling, with the exception of undergarments (bras, socks, and panties or boxer/briefs) and one set of center issued clothing, which residents may keep.



## PERSONAL HYGIENE

At the Center, residents will be living in close proximity with other families, so personal hygiene is essential. Each resident is expected to bathe daily and keep their hair clean. Upon arrival to the Center, each resident is issued hygiene products. These items will be replenished during weekly hygiene distribution.  Feminine hygiene items are

available in the female toilet room in each apartment complex and female residents are allowed to keep a supply in their bedroom.

### *Issued Personal Hygiene Items*



- 1 bar of bath soap, or equivalent;
- 1 comb;
- 1 tube of toothpaste;
- 1 toothbrush;
- 1 bottle of shampoo, or equivalent;
- 1 container of skin lotion;
- Other items designated as necessary by JFRMU; and
- Feminine hygiene items will be accessible, as needed.

Residents have free access to showers seven days a week. The shower rooms are labeled according to gender (male and female). Children 9 years and older will shower in their gender-specific shower areas during open shower times. Phase 2-showers are available 24/7 in the apartment complex – 8 female and 8 male showers are available, with shower changing rooms. Should a resident's child need assistance and is older than 9, residents should see staff for accommodations. Children 8 years and younger will shower only under the direct supervision of their parent so as to not disturb other residents using the shower room.

Adults may wear their own make-up. All make-up must fit in the resident's assigned bedroom storage unit or placed into storage. Razors

are available at any time by speaking with Resident Supervisors, but
must be returned immediately following use for proper disposal.

## PERSONAL PROPERTY

### *Allowable Property*

Upon admission to the Center, residents will receive a copy of Form 14-
100A, Allowable Personal Property List, which residents are permitted
to retain in their apartment/bedroom. These items include:

- Sets of clothing (10) per resident (shirts, pants, underwear, bra,
  socks);
- Coat (seasonal);
- Shoes (2 pair), $60/athletic pair maximum value;
- Pajamas (3 sets, ages 12 and under);
- Newborn to five-year-old clothing (12 sets);
- Pillow (1 per person; must be flame retardant);
- Authorized personal hygiene items;
- Legal documents, legal papers, and legal Information;
- Photos (no nudity), loose, 5x7 or smaller;
- Photo album;
- Medical prostheses (i.e., eyeglasses, dentures, etc.), maximum
  value determined by ownership and medical direction;
- Personal reference materials (i.e., address/phone book and/or
  list of relatives and/or friends);
- Religious items (approval by the Center RSC required; *see the
  RSC section for more information)*;
- Newspapers, magazines, books ($25 maximum value) and other
  literature (limited to any combination of 10 at a time to ensure

accumulations do not produce and/or effect fire safety standards);

- Convenience store purchases;
- Postage stamps (book or loose);
- Personal correspondence;
- Writing paper, pads (2), loose paper, and drawings (within reason to ensure accumulations do not produce and/or effect fire safety standards);
- Artwork, crafts, etc., created at the Center during stay (limited to 10 items);
- Wedding band (plain, no stones), $50 maximum value;
- Religious medallion/chain, $50 maximum value;
- Rosary (plastic).

Any items not included on the above list will be considered contraband.

## *Other Property*

Additional personal property must be approved by the Facility Administrator prior to purchase / possession. Identity documents such as passports and birth certificates, are to be held in each resident's A-file for safekeeping by ICE until the resident is removed or until the removal proceedings are resolved; however, upon written request, ICE staff shall provide the resident a copy of the requested document, certified to be a true and correct copy.

Electronic information recovered from phones or other electronic sources belonging to a resident and maintained by the Center with personal property may be accessed upon request to staff, to include contact information stored in cell phones.

**Rules for Storing or Mailing Property**

To prevent overcrowding and related storage problems, staff shall encourage residents to send extra suitcases, televisions, electronic devices, and other "soft" (not illegal or dangerous) contraband to a third party of their choosing.

The resident will be provided the opportunity to designate the disposition on the 14-100C Disposition of Non-Allowable Personal Property in one of the following manners:

- The Center may make shipping arrangements for a resident requiring such help, and shall assume the cost if the resident cannot afford postage;
- If a resident does not provide an appropriate mailing address within 30 days, the Center may make reasonable accommodations to store the property; however, ordinarily, the amount stored may not exceed 40 lbs.;
- If a resident does not provide an appropriate mailing address, or is financially able but unwilling to pay the postage, the Facility Administrator may dispose of the property after providing the resident with 30 days written notice;
- When personal property is shipped, staff shall prepare an inventory record of the property that was shipped, the shipment addressee, and maintain a copy of the property inventory and shipping information in the resident's file.

## Staff Processing of Baggage and Personal Property Other Than Funds and Valuables

The procedures listed below do not apply to identity documents, such as passports and birth certificates, which are held in each resident's A-file.

If a resident has no baggage, a Center container shall be provided to store his or her personal property. After being properly inventoried and inspected for contraband, all baggage and Center containers shall be tagged as follows:

- A pre-numbered, three-part inventory form shall be issued for each separate container or item of baggage;
- Each form shall bear the resident's full name, A-number or Center resident number, and the date;
- The resident's signature must appear on the form;
- The top portion of the form shall be attached to the resident's property, and the center portion to the resident's booking card or residential file. A brief description of the property container shall be made on this portion of the inventory form; for example, "black suitcase" or "paper bag";
- The resident shall be given the bottom portion of the inventory form; the back portion of the form shall also contain a brief description of the property container.

All resident luggage and Center containers used for storing resident property shall be secured in a tamper-resistant manner (such as a tamper-proof, numbered tie strap) and shall only be opened in the presence of the resident. A logbook shall be maintained, listing the resident's name, A-number or Center resident number, inventory form number, security tie-strap number, property disposition, date issued,

and date returned. Tagged baggage and other property tagged on an inventory form shall then be stored in the property storage area.

## Release

Prior to a resident's release, transfer or removal from custody, a complete inventory of the resident's personal property will be conducted by a designated employee. The inventory should be completed in the presence of the resident.

The resident will sign the 14-100B Allowable Personal Property Inventory/Receipt and be given a copy. The original will be maintained by the Center in the permanent property file. The resident will be given all property in storage at the time of release. The resident will be required to sign for all property received. Staff will ensure that all Center property has been collected and does not leave the Center.

## Claims

Only items outlined on the Allowable Property list will be eligible for claim investigation. Residents being transferred or released from the Center may also submit property claims.

### Stolen

- If a resident claims allowable personal property was stolen, the resident may request a claim investigation by completing the 14-100G Lost / Damaged / Stolen Personal Property Claim, which is available from the unit team and forwarding it to the Property Officer;
- Proof of ownership and value must be available upon investigation;

- The Center will attempt to recover property stolen by other residents; however, the Center will not be responsible for the reimbursement of those property items unless it is proven through investigation to be the result of Center negligence.

### *Lost/damaged*

- Property that has been lost or damaged due to CCA employee negligence will be eligible for claim investigation.
  - If a resident wishes to request an investigation on property that has been lost or damaged due to CCA employee negligence, the resident must complete the 14-100G Lost / Damaged / Stolen Property Claim and forward it to the Property Officer;
  - Proof of ownership and value must be available upon investigation.
- The designated ICE representative shall be immediately notified when properly-receipted resident property is reported missing or damaged. Supervisory staff shall investigate and, if necessary, take prompt action to prevent further loss. If the property is not recovered or is recovered in a damaged condition, staff shall prepare a report to the Facility Administrator and ICE/DRO, providing the following information:
  - Name and A-number or Center resident number of the resident claiming ownership;
  - Description of the property and, if applicable, the noted damage;
  - Date and time the loss or damage was discovered;
  - Name(s) of person(s) discovering the loss or damage;

- The circumstances under which the person(s) discovered the loss or damage and the cause of the loss or damage to the property, if determined;
- Names and statements of the resident and all witnesses;
- Place, date, and time the property was last seen (before reported missing or damaged); and
- The circumstances under which the property was last seen (before reported missing or damaged).

- A resident being transferred, released, or removed who has a claim for lost or damaged property shall be allowed to initiate the claim before leaving the Center. A standard claim form (SF95) shall be provided to the resident for making his or her claim. The Facility Administrator shall send the result of the investigation of the resident's claim and his or her claim form to the Office of the Principal Legal Advisor, CALD, at 425 I Street, N.W. Room 6100, Washington, DC 20536 for further resolution of the claim.

- In addition, to the procedures listed above, ICE/DRO staff must complete a Report of Resident Missing Property for lost (but not damaged) property (Form I-137). The original copy of this form shall be placed in the resident's A-file, with a copy retained by the Center. The Facility Administrator shall send the result of the investigation of the resident's claim, a copy of the Form I-137, and the resident's SF95 to the Office of the Principal Legal Advisor, CALD, at 425 I Street, N.W. Room 6100, Washington, DC 20536 for further resolution of the claim.

- A copy of the completed forms shall be forwarded to the JFRMU for a determination of any additional required reporting.

*Processing*

The Property Officer will assign the claim a number and maintain a 14-100H Lost / Damaged / Stolen Personal Property Log that includes the following information:

- Claim number;
- Date the claim was received;
- Resident's name;
- Resident's A-number;
- Area where alleged loss / damage / theft occurred;
- Staff member assigned to investigate and date of assignment;
- Date investigation was completed;
- Disposition of the claim; and
- Date of replacement or reimbursement, if applicable.

The Property Officer shall forward the claim to the Center Investigator within three calendar days of receipt. When appropriate, the Facility Investigator may designate a staff member to complete the investigation.

*Investigation*

- The designated staff member shall complete the investigation within seven calendar days;
- The designated employee shall take the appropriate steps in reaching a determination of the validity of the claim;
- Once the investigation has been completed, the 14-100G and any corresponding paperwork will be returned to the Property Officer for logging;
- If the claim proves valid, the Investigator will forward the claim to the Facility Administrator, who will be the final authority in the award of any compensation;

- The Facility Administrator shall review and approve / disapprove the claim within five calendar days of receipt.

### Replacement

- Attempts will be made to replace property with like items. If the replacement of the property is not possible, a reimbursement will be made;
- Prior to receipt of replacement property, the resident will sign the 14-100G;
- Replacement items shall be issued to the resident within 30 calendar days of the Facility Administrator's approval.

### Reimbursement

- Reimbursement of property will be limited to the maximum amount determined by the Facility Administrator, which will be included in the Resident Handbook.
- If residents choose to acquire personal property valued above the maximum reimbursable amount designated by the Facility Administrator, they do so at their own risk. A claim, if found valid, will only result in the maximum reimbursable amount stated above.
- In addition to the maximum reimbursable amount, the following depreciation schedule will be used to calculate the normal wear and tear of residents' personal property:

| Age of Property (in months) | Percentage of Original/Maximum Reimbursable Value |
|---|---|
| Less than 12 months | 100% |
| 12-23 months | 75% |
| 24-35 months | 50% |
| 36 or more months | 25% |

- Prior to receipt of reimbursement funds, the resident will sign the 14-100G.
- Reimbursement shall be issued to the resident within thirty (30) calendar days of the Facility Administrator's approval.

### *Property lost by another center / facility / agency*

If property is found to be missing when a resident is received at the Center, the Center will assist the resident in determining what procedures to follow. CCA is not responsible for property that another center / facility / agency may have lost or destroyed. The Center will notify ICE personnel in the event of property claims against another center / facility / agency.

## CONTRABAND

Contraband is any material prohibited by law or regulation or that can cause physical injury, is inherently dangerous as a weapon or tool of violence, affects the safety of Center residents or staff, or creates dangerous or unsanitary conditions in the Center. Examples would be knives, guns, flammable liquids, keys, intoxicants, prohibited currency, controlled substances, cigarettes, alcohol, scissors, pornography, any medications, food or drink brought to the Center, etc. Any item that is deemed contraband shall be seized by staff. If the contraband is not illegal under criminal statutes and would not otherwise pose a threat to security, the staff will inventory and receipt the property, and store with the resident's other stored personal property.

Religious property will not be treated as contraband or seized without consultation with the Center Religious Services Coordinator (RSC) and the Facility Administrator. However, if a religious item is deemed

contraband, it will be seized and disposed of in accordance with contraband disposal procedures. Staff will discard all food (including uneaten fast food, drinks, and opened baby food or formula) at the time of admission. When the ownership of a contraband item is in question, an investigation will be conducted to determine ownership. Staff shall inventory and store the item(s) pending verification of ownership. The resident shall have seven days to verify ownership of the listed item(s). If a resident cannot establish ownership and/or ownership cannot be reasonably established, the property may be destroyed.

## WRITING INSTRUMENTS AND PAPER

Writing instruments, paper and envelopes are available at the Resident Supervisor station. Pens, pencils, arts supplies (colored pencils, crayons) are available in each apartment complex's activity room and at the Resident Supervisor's stations or by completing a Resident Request Form. Parents must supervise young children using art supplies so as to not deface Center property.

## GENERAL SAFETY/EVACUATION DRILLS

The Center staff makes every effort to ensure the safety of all residents and staff. Residents also have a responsibility for aiding in their family's safety in the following ways:

- Cleaning up spills or request staff assistance to do so;
- Paying attention to posted warnings, such as wet floor signs and use reasonable care when in these areas;
- Notifying staff immediately if a fire, emergency or other possible hazard is observed.

During an emergency, loud alarms may sound and bright lights may flash. At these times residents must refrain from conversation unless it is directed to staff and concerns the immediate issue at hand. Resident's family safety depends on the ability to hear, understand, and follow staff direction during an emergency. During an emergency, staff is required to evacuate all residents and staff to a predetermined outdoor evacuation location. Staff will confirm everyone has left the building by counting the residents and staff when they arrive at that location. If family members become separated during a total evacuation the procedures listed below will be followed:

- Once in a secure location, a census will be conducted to verify all residents are present and accounted for;
- All separated residents will be staged in a central location, as identified by the supervisor in charge, until reunited with their family unit;
- All residents are to immediately inform the nearest resident supervisor if they become separated from their family unit, or if a member of their family is missing;
- Staff will immediately notify the supervisor in charge of any missing/separated residents;
- The supervisor in charge will then check with the 'separated resident' staging area for the resident. Once positive identification has been made, the family unit will be reunited as soon as it is safe to do so.

Residents should familiarize themselves with the evacuation route plan and rally point posted in each apartment, which shows the location of the outdoor evacuation location. There are exit diagrams posted around the Center that show the location of all emergency exits.   Should an emergency occur while a resident is near a fire exit, they should not wait

for staff, but should exit to the outdoor evacuation location and wait for staff to arrive. Per local, state and federal laws, the Center is required to perform evacuation drills. The Center performs several drills each month, at varied times of the day and night. These drills are not designed to inconvenience residents, but rather to comply with regulations and ensure resident and staff safety in the case of an actual emergency. Parents should advise and discuss these drills with their children.

## RESIDENT CENSUS

At this Center, resident accountability is done through resident reporting for censuses three times during each 24-hour period. Check-in times are:

7:00am to 8:00am, daily (apartment complex)
11:00am to 1:00pm, M-F (during dining check-in)
10:00am to 2:00pm, Sat & Sun (during dining check-in)
8:00pm to 9:00pm, daily (apartment complex)

Residents will report to the Resident Supervisor as a family unit in their assigned apartment complex during the times listed above. If residents are at an appointment near the close of the census time, the staff supervising the appointment will report the resident's location. Residents who do not check in properly during census will be counseled regarding the requirement.

## MEALS

All menus are designed to be nutritionally balanced and are approved by a certified dietician. Residents are provided three meals each day in the dining room.

**Monday through Friday Schedule**

Breakfast 5:30am to 7:45am*
Lunch 11:00am to 1:00pm
Dinner 4:30pm to 6:30pm

*Children will not be awakened until 6:30am Monday through Friday; however, breakfast service will begin daily at 5:30am. Residents may voluntarily awaken early to eat should they choose to do so, but this is not required.

### Saturday and Sunday Schedule

Continental Breakfast 6:00am to 8:00am
Brunch 10:00am to 2:00pm
Dinner 4:30pm to 6:30pm

Seating in the dining room is not assigned. Residents may sit wherever they desire for each meal. High chairs and booster seats are available in the dining room. Small children are expected to be seated during meals to encourage sound eating habits.  At the end of each meal, residents are required to clear their family's immediate area and return all utensils and trays to be cleaned. Residents are allowed unlimited trips to the self-service bars in the dining room, but must use a clean tray on every trip. It is the resident's responsibly to eat what is taken to reduce



food waste. All food or drink must be consumed during the meal – no food or drink may be taken from the dining room.

## *Snacks and Drinks*

Fruit, snacks and health drinks and baby formula are available 24 hours a day. Residents are not allowed to take more food or drinks than they

will consume at one sitting. This food is replenished in each apartment complex two times a day. Food is to be consumed the day that it is taken from the refrigerator. These items are not allowed to be consumed or stored in the sleeping area.



## *Special Diets*

Therapeutic/medical diets shall be prepared and provided according to the orders of the Center's medical department physician. Religious diets shall be prepared and provided for residents whose religious beliefs

require the adherence to religious dietary laws. Residents are required to meet with the RSC for religious diet approval. *See the section on the Religious Services Coordinator (RSC) for more information.*

## RELIGIOUS SERVICES



All residents have access to religious resources, services, instructions and counseling while residing at the Center. These services include individual counseling, group prayer, Bible study and various church / worship services. These onsite religious services are provided through outside religious organizations and community volunteers. The Center RSC addresses all questions or concerns regarding religious opportunities or practices, will assist in obtaining materials on various faiths and may, upon request, be able to facilitate visits by ministers of particular religious faiths.

Outside religious persons may also freely visit with residents, either by appointment made by the RSC or during visitation hours. *See the section on visitation for more information.* A list of scheduled services is posted in each apartment complex's activity room. These services are open to all who wish to attend and are only limited by the occupancy of the chapel space. If this occurs, additional arrangements will be made. Should residents wish accommodation such as for special religious observances, they should speak to the RSC who will coordinate the request, if possible.

**ADDITIONAL INFORMATION MAY BE PROVIDED BY VENDOR AFTER SELECTION.**

### *Religious Services Coordinator (RSC)*

Residents may request appointments with the Chaplain by speaking with him/her, or by completing a Resident Request form.

## MEDICAL SERVICES

CCA wants resident families to be healthy during their stay, so appropriate and necessary health care is provided free of charge.

### *Emergency Medical Situations*

If residents or a family member is experiencing a medical emergency and/or need immediate medical attention while at the Center, they should notify any staff member and stay calm – medical will respond. If a resident cannot go to staff due to the medical situation, residents should request any other resident in the area to alert staff to help. Medical responds to all areas within the Center.

### *Sick Call*



If residents or their children are feeling sick or have a medical, dental or mental health problem, they can access the medical department through the sick call process. Sick call is conducted seven days a week. Sick call is held at specific times each day and the times are posted in each apartment complex's Resident Information Center. Staff is also available to provide information on how to access routine medical care.

## *Urgent Care*

Urgent care is defined as care that cannot wait for routine sick call but may not require hospitalization. If a resident is having an urgent medical, mental health or dental condition, they should notify staff so the medical department can be contacted. Examples of urgent care situations include, but are not limited to, an accident or injury, fever, difficulty breathing, or bleeding. If the condition reported is determined not to be non-urgent, residents may be requested to report to sick call for an appointment.  Urgent care is available 24 hours a day.   Residents should not use the urgent care process for routine medical care because it slows down the medical process for everyone.

## *Dental Services*

The South Texas Family Residential Center's Medical Clinic is equipped to assess dental concerns. Upon admission to the Center, residents will receive a dental screening. All children will receive a comprehensive



examination within 30 days of arrival to the facility.  Routine and emergency dental care is also available. Emergency dental care includes, but is not limited to, dental infections, painful teeth, facial swelling, or trauma to teeth. To receive dental treatment, residents should access the medical department through the sick call process. An appointment will be made to address dental concerns in a timely manner. The appointment time will depend on the seriousness of the problem.

## Mental Health Services

Routine mental health services are available upon request. Residents should use the sick call process if the concern is routine in nature. Residents should notify a staff member if they are feeling suicidal or one of their children is expressing suicidal or thoughts of self-harm. This is considered a medical emergency and the medical staff is here to help.

Mental health services are available for all residents at the South Texas Family Residential Center. If you, a family member, or someone at the facility is feeling suicidal, expressing a desire to self-harm or experiencing a severe emotional crisis, it is considered a medical emergency and services are available 24 hours a day. For ALL mental health emergencies, IMMEDIATELY notify a staff member so the appropriate health care services can be provided.

Non-emergency mental health services, are available. Individuals seek mental health services for many reasons. Some individuals are being treated for illnesses such as depression, bipolar disorder or attention deficit disorder. Others seek mental health services to better cope with significant life stressors such as parenting a child with conduct problems, coping with the loss of a loved one or processing recent trauma. Residents are encouraged to request mental health services for themselves or their children if they notice a significant change in behavior or experience challenges in adapting to the routines of the facility.

The medical department is available to help you and your children.

## *Medications*

If a resident or family member
is prescribed medication, they
will be educated to the name,
frequency, and purpose of the
medication. These
medications will be prepared
and administered at scheduled
intervals via a "pill-line."
Residents should report to the
"pill-line" as scheduled to assist in



ensuring that they receive timely and appropriate medical care.

## *Medical Department Conduct*

The general rules of conduct at the Center will be followed while in the
medical department. Parents are required to supervise their children at
all times. The clinic is a busy place; parents are to keep their children in
sight at all times and ensure that they are not engaging in any activity
that may lead to an injury, such as running around or jumping off chairs.
There may be medical equipment in the area such as scales; parents are
to ensure that their children are not playing on these items.

## *Complaint or Grievance about Medical Care*

Residents are encouraged to discuss the medical care that they or family
members are receiving with the medical staff. If a resident needs to
discuss the care that they or a family member receives, they should
report to sick call and staff can answer their questions. If it is an urgent
matter, residents should ask the Resident Supervisor in each apartment
complex to contact the medical department. If residents are not

satisfied with the outcome of the discussion with medical staff or continue to have concerns about medical services provided, they may choose to complete a medical grievance, which will be submitted to the Facility Grievance Coordinator for further review. *See the section on grievances for more information.*

## SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION

This Center has a Sexual Abuse and Assault Prevention and Intervention Program in place to protect residents and staff against all forms of sexual abuse and assault. There is zero-tolerance for all forms of sexual abuse and assault. Such conduct prohibited, includes resident-on-resident sexual abuse and assault; staff-on-resident sexual abuse and assault; and any contractor or civilian-on-resident sexual abuse or assault.

Sexual Assault is abusive sexual contact for the purpose of sexual gratification or arousal, intentional touching, either directly or indirectly or through the clothing, of the genitalia, anus, groin, breast, inner thigh or buttocks of any person.

Staff on resident sexual misconduct is any behavior or act of a sexual nature toward a resident by an employee, volunteer, official visitor, or agency representative. Romantic relationships between employees and residents are considered sexual assault. Sexual acts include intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to arouse or gratify sexual desire; or attempted, threatened, or requested sexual acts; or occurrences of indecent exposure, invasion of privacy or employee voyeurism for sexual gratification without a sound security reason.

## REPORTING

If residents feel unsafe at any time during their stay at the Center because of threats of sexual abuse or assault, or if they are sexually abused or assaulted, it should be immediately reported. There will be no retaliation against residents who report Sexual Assault/Abuse; this shall not negatively impact the resident's immigration proceedings. Sexual Abuse and Assault may be reported by any of the following methods:

Reporting concern to any staff member

Submitting a request to meet with Health Services staff and/or reporting to a Health Services staff member during sick call

Calling the facility's twenty-four (24) hour toll-free notification telephone numbers as posted in cottages.

Forwarding a letter, sealed and marked "confidential", to the Facility Administrator or any other employee

Calling or writing someone outside the facility who can notify facility staff

Contacting the respective consular office

Forwarding a letter to the FSC PREA Coordinator at the following address:

10 Burton Hills Boulevard

Nashville, TN 37210

File an emergency grievance stating the nature of the problems and emergent needs. *See section on grievances for more information.*

Contact ICE by completing a Resident Request Form or calling 1-888-351-4024 or 9116#

File a complaint directly to the Department of Homeland Security

Contact the Office of the Inspector General (OIG) through the free phone call system or by:

Writing:   DHS OIG Hotline
245 Murray Drive, S.E., Building 410
Washington, D.C. 20538
Emailing: DHSOIGHOTLINE@DHS.GOV
Telephoning: 1-800-323-8603 or 518#

Calling the Rape Crisis Center located in San Antonio, Texas dialing 258# or:
Writing: Rape Crisis Center
P.O. Box 27062
San Antonio, Texas 78227

## STAYING SAFE

There are several behaviors that can be practiced to assist in preventing sexual misconduct, sexual assault and sexual abuse:

Avoid situations that encourage sexual misconduct such as conversations about sexual activity.

Leave a situation where you are uncomfortable and fear that there is sexual risk.

Look around and be aware of your surroundings. Avoid areas that are secluded or where you can't be seen by staff and other residents.

Say NO to advances from others seeking sexual contact.

Don't accept gifts such as commissary purchases or personal property. Don't get into debt to other residents.

If you are the victim of sexual abuse or assault, the most important thing you can do is tell someone who can help you. Your report will be handled with confidentiality. And you will be protected.

Information about sexual abuse and assault is available at the Resident Information Center. All residents have the right to be free from

retaliation for reporting sexual abuse and sexual assault. Reporting sexual abuse or sexual assault shall not negatively impact the resident's immigration proceedings.

Counseling and other support services are available to all residents.

## MONITORED CARE SERVICES

Parents and/or legal guardians are expected to provide direct supervision of children while they are not in school or participating in other organized activities. Monitored care is a service available for short term child care services (M-F, 8:00a-8:00p) for those instances in which a parent is attending court, meeting with a legal representative, participating in an administrative interview, or for other short-term absences (i.e., medical appointments) when approved by an ICE representative.

Children cannot remain in the Monitored Care Center overnight or for multiple days. If a parent or



guardian is going to be away from the Residential Center overnight or for a period of more than one day, and their children are not allowed to go, ICE staff will work with the family to make appropriate arrangements for the care of children during that time.

## RESIDENT CHORES

Residents are responsible for maintaining their bedrooms in a neat and sanitary condition. Residents are expected to make their beds each morning and pick up after themselves and their children.

## TELEPHONE ACCESS

Resident telephones are located in each apartment complex and apartment and are available 24 hours a day.  "CCA does not monitor conversations on any of the telephones, however all calls are subject to monitoring by federal agencies."

There are sanitizing wipes available to clean the phones before or after use. Accommodations shall be made for residents with communication impairments (ex: hearing / speech impaired), or residents who wish to communicate with such persons, by speaking with Resident Supervisors or completing a Resident Request form.

Calls outside of the United States to legal assistance organizations, immediate family or others may be made in cases of emergency or compelling need by speaking to a Resident Supervisor or by completing a Resident Request form.

Attorneys, friends and family may call the Center to leave messages for residents by calling 830-378-6500. The call-in number is posted on each apartment complex's activity room's information board. Emergency messages will be delivered to the resident as soon as possible and non-urgent messages will be delivered within 24 hours.

*ICE Free Access Telephone Calls*

Residents may contact a variety of organizations at no cost. Information is posted on each apartment complex's information board and near the phone bank(s) on calling consulates, immigration courts, the American Bar Association, the ICE Public Advocate Hotline, the Office of Inspector General and a variety of other government and non-governmental offices.

*Indigent Resident Telephone Access*

In addition to the ICE free telephone calls mentioned above, indigent residents may also make free calls to legal assistance organizations, family and others within the United States by speaking to their case manager or by completing a Resident Request Form. Additionally, calls outside of the United States to legal assistance organizations, immediate family or others may be made in cases of emergency or compelling need by speaking to Resident Supervisors or by completing a Resident Request form.

*Legal Assistance Telephone Access*

Telephone calls to legal providers and courts are not monitored or recorded at any time. To access a more private area from which to make legal assistance calls, residents should speak to their case manager or complete a Resident Request form.

## FINANCES/RESIDENT FUNDS/MONEY ORDERS

Residents are not allowed to have money (paper or coin) or funds in their possession while at the Center. If any money is found in a resident's possession, disciplinary action may be taken. Upon admission,

all U.S. currency will be deposited into an account for which residents have access during their stay. Any non-U.S. currency will be placed into resident's valuable stored property. Residents will receive a receipt for any funds processed during their stay at the Center. Residents may receive funds (cash or Western Union /Cash Box) from family and friends.

For residents who choose to participate in the Center's voluntary work program, those payments will also be deposited into their account. Residents coming from another center will have their funds credited to their account on the next business day. Upon discharge, residents will receive the balance of any funds they have in their Center account, in cash.

In the event of an emergency or abandonment of funds or property, the Center shall report and turn over to ICE/DRO all resident's abandoned property for management and disposition.

Residents who need funds/monies sent (such as mail fees, legal fees, to persons, etc.) must complete a Personal Funds Withdrawal Slip. Residents should list only one item per withdrawal slip and be sure to specify the purpose of the funds. The slip must be filled out completely, signed by the resident, verified by the unit manager or case manager,



and forwarded to the accounting clerk. If the check requires mailing, a stamped, self-addressed envelope must accompany the withdrawal slip.

# COMPLAINT AND GRIEVANCE PROCEDURES

Staff will not harass, discipline, punish or otherwise retaliate against a resident who files a grievance or complaint. Any allegations of this nature will be thoroughly investigated by the Facility Administrator. Residents have access to the formal grievance system at all times, but are encouraged to try to resolve small complaints informally whenever possible.

**Informal Process** – The informal route involves discussing the issue with staff in an attempt to resolve the matter. Residents may choose to speak with staff, caseworker, or supervisor. They may also submit a complaint on a Resident Request form, which a unit manager or designee will review and attempt to resolve. The informal route is less time consuming than the formal route and may offer resolution more quickly. Residents dissatisfied with the response they receive may file a formal grievance as outlined below.

**Formal Process** – If a resident does not receive a desired resolution through the informal process, or wishes to bypass the informal process, that resident may file a grievance on a grievance form. These forms are available at the Apartment Complex Activity Room. If an attempt was made to resolve the matter first informally, residents should indicate on the grievance form who they spoke with informally. Grievance forms should be completed



and placed in the mailbox located in each neighborhood, marked "Grievance." Only the grievance coordinator has access to this mailbox, and will keep the grievance as confidential as possible. This mailbox will be checked and emptied each business day.

The ICE Grievance Coordinator is responsible for (daily) picking up the grievances from the "ICE/Medical Grievance" mailboxes located throughout the facility.  After the grievance form is time-stamped, entered into electronic log, it will be routed to the Assistant Health Services Administrator (AHSA) or designee.

If a resident is unsatisfied with the resolution suggested by the AHSA, he/she may elect to appeal the decision to the Medical Local Governing Board (MLGB).

If a resident feels the grievance is of a sensitive nature or that their safety or well-being would be jeopardized if others read the grievance, it may be sealed in an envelope marked as "Sensitive" and delivered directly to the Facility Administrator. Residents should see their Resident Supervisor for an envelope if needed and information on how to deliver it directly to the Facility Administrator. Grievances should be filed as soon as possible after the alleged incident. Delays in filing may make it more difficult to investigate the issue. Residents may ask other residents, family members, legal representatives or staff for assistance in completing the grievance form. Residents are not allowed to submit a grievance on behalf of another resident unless they are the parent of the resident who has a problem.

Residents may write about one single complaint, or several closely-related complaints concerning a single subject on each grievance form. When completing the forms residents should try to clearly identify the

issue, complaint or area of concern. If the form is not clear, it will be returned for further information. The responsible department head will meet with the resident, conduct an investigation, and return a written decision to the resident within five days of receipt of the grievance. If the resident disagrees with the first step formal decision, **the resident may** submit an appeal to the grievance coordinator. The grievance coordinator will respond to the appeal within five days and serve the resident with the written decision and basis of that decision.

**If the resident disagrees with the grievance coordinator's second-step formal decision, the resident may appeal to the Facility Administrator. Prior to submission the resident must complete the section on the grievance form described as "State Reason(s) for Appeal" and return it to the grievance coordinator, or place it in a sealed envelope, which may be placed in the grievance mailbox or handed directly to any supervisor or manager of the facility.  The Facility Administrator will render a written decision on the appeal within five business days of receipt.**

If the resident does not accept the Facility Administrator's decision, the resident may appeal to ICE/ERO or communicate directly with ICE officials.  The resident shall complete the appeal section of the grievance and place it in a sealed envelope, which may be placed in the ICE mailbox or handed directly to any ICE/ERO staff.  A written decision shall be provided to the resident within five days of receiving the appeal.

Emergency Grievance Procedures

An emergency grievance is initiated when a resident verbally notifies staff that they have a complaint that immediately affects their safety or

welfare. The staff receiving the resident's report will bring the matter to the immediate attention of the Facility Administrator, Administrative Duty Officer or shift supervisor.

Non-Grievable Matters

The following matters are not grievable through the Center grievance procedure:

State and Federal Court decisions;

State and Federal laws and regulations;

Final decisions on grievances;

ICE policies, procedures, or decisions (i.e., institutional transfers, releases, removals etc.);

Disciplinary hearing decisions. Disciplinary appeals may be submitted on the disciplinary form after the hearing.

Residents who demonstrate a pattern of filing nuisance complaints or otherwise abuse the grievance system may have those complaints returned unprocessed.

## *Staff Misconduct*

If a resident suspects, sees, or is the recipient of staff misconduct, they may report the activity by speaking to any staff member or by writing a letter or statement, following the instructions in the Staff Organization and Contact section at the beginning of this manual. Or they may choose to follow the grievance reporting procedures listed in the Complaint and Grievance Procedure section above.

## DISCIPLINE AND BEHAVIOR MANAGEMENT

Prohibited acts are divided into three categories: "Major," "Moderate," and "Low." The corrective actions authorized for each category will be

imposed only if the resident is found to have committed a prohibited act and no other method of behavioral modification has been found to be effective. Due to the family residential nature of the Center, corrective actions are used as a last resort and only as a means to correct behavior that threatens the safety and welfare of residents, staff, and visitors. Action or attempted action by any resident that violates established Center rules or poses a threat to the safety and orderly operation of the Center shall be dealt with through appropriate disciplinary action. Action or attempted action by any resident that violates the laws of the United States may also be actionable in a United States criminal court of law.

Staff will attempt to correct minor violations of Center rules informally through conversation and counseling whenever possible. This informal procedure may include consequences which are mutually acceptable by the resident and staff, such as temporary floor restrictions, privilege loss, and for children, time outs. Children will only be interviewed concerning violations in the presence of their parent (unless the allegation involved an incident between a parent and child). Discipline will never be of a nature or administered in a way that is degrading or humiliating to residents.

Staff will never impose the following corrective actions: corporal punishment; deviations from normal food services; denial of legal assistance; deprivation of correspondence, telephone, or visitation privileges; deprivation of physical exercise or access to recreation, deprivation of school or education. No punishment shall require confinement in any locked room or space. Only in mental health situations may deprivation of clothing, bedding, or items of personal hygiene occur and if so, these decisions will be made by the medical

department. In the event a staff member believes that a resident is committing an offense that cannot be handled through the informal procedure, the staff member will complete an incident report. The assigned supervisor will begin an investigation of incident reports within 24 hours of receipt. Residents under investigation have the right to:

- Remain silent during every stage of the disciplinary process. Silence will not be used to support a finding against the resident;
- Receive the Incident Report/Notice of Charges at least 24 hours before the start of administrative proceedings;
- Have an initial hearing before a Management Review Committee (MRC) within 24 hours of receiving the Notice of Charges for low to moderate violations.

During hearings before the MRC, residents have the right to:

- Present evidence and statements on their own behalf;
- Attend the hearing (except deliberation), unless behavior poses a safety concern;
- Have an interpreter present if the hearing is in a language not understood by the resident;
- Appeal the committee's determination through the appeal process.

Incidents involving major violations of Center rules, or unresolved cases will be referred to an Executive Review Panel (ERP). During hearings before the ERP, residents have the right to:

- Call witnesses and present evidence and statements on their own behalf;

- Attend the hearing (except deliberation), unless behavior poses a safety concern;
- Have an interpreter present if the hearing is in a language not understood by the resident;
- Request a staff representative to assist in the case;
- Waive the hearing and admit committing the offense in question;
- Appeal the committee's decision through the appeal process.

## Discipline Hearing Appeals

Residents may appeal disciplinary panel decisions following their hearing by giving their written appeal to one of the panel members. The panel will submit the appeal to the Facility Administrator who will provide a written response.

## Discipline Proceeding Postponements

Disciplinary proceedings may be postponed for reasons such as defense preparation, physical or mental illness, security concerns, escape, disciplinary transfer, pending criminal prosecution, etc.

## Corrective Actions for Children

Corrective Actions 1 through 4 below may be imposed by the MRC. Corrective Actions 1 through 5 may be imposed by the ERP.

1. Referral to counseling;
2. Restriction to their apartment complex, not to exceed 72 hours;
   a. When a child is restricted to housing, they must be afforded a minimum of one hour of outdoor activity time daily.

b. The child may be restricted to the activity room but may not be forced to remain in his/her room except during a time out period.

c. No corrective action may restrict a child from attending required school classes or religious practices.

3. Children 12 years old and older may have their free movement privilege suspended for up to 14 days. Such a suspension would require that the parent supervise all activities for that time period.

4. Loss of extracurricular activity time such as movie night.

5. Loss of field trip privileges for up to 45 days.

Corrective action may not interfere with such daily functions as eating and sleeping. Disciplinary actions may not adversely impact a child's health, physical or psychological well-being or deny a child regular meals, sufficient sleep, exercise, medical care, the right to correspondence, or legal assistance.

### *Corrective Actions for Adults*

Corrective Action 1 through 4 below may be imposed by the MRC. Corrective Action 1 through 5 may be imposed by the ERP.

1. Referral to counseling;

2. Require attendance in parenting classes;

3. Additional work details, such as general housekeeping;

4. Loss of convenience store privileges;

5. Restriction to their apartment complex, not to exceed 72 hours. Imposition of such a corrective action must take into account the ages of children and the negative impact this corrective

action would have on minors who were not involved in the charged offense. In addition, access to outside recreation must be afforded for at least one hour a day for adults in these situations.

## DESCRIPTION OF OFFENSES

### *Low Offenses*

(101) *Being in an Unauthorized Area* – Being an area that is designated through verbal, written, or posted orders as "off limits" to residents.

(102) *Disorderly Conduct* – Behavior such as loud talking, yelling, or pushing, which disrupts the orderly running of the Center.

(103) *Failure of Parent/Legal Guardian to Appropriately Manage Children's Behavior* – For parents who allow their children to be unruly, disrespectful, or insubordinate while in their presence.

(104) *Failure to Follow Verbal or Posted Rules and/or Regulations* – Not following specific rules and/or orders which have been designated for the clean, safe, orderly operation of the Center, and that residents have been told in advance through posting or have been given verbally by an employee of the Center or person who has charge of the resident at the time. This includes not following the procedures established by the Center for taking count.

(105) *Fighting* – Exchange of words or body contact in anger wherein no injury requiring medical attention occurs, such as horseplay.

(106) *Gambling* – Operate or act in any game of chance involving betting or waging of goods or other valuables.

(107) *Possession of Gambling Paraphernalia* – Having in one's control, items for use in operating or acting in any game of chance involving betting and wagering of goods or other valuables.

(108) *Self-Mutilation* – Inflicting injury on one's self; such as cutting on one's own body or tattooing.

(109) *Smoking* – Smoking or using tobacco of any form in any area of the Center.

(110) *Unauthorized Receipt or Possession of any Item of Value* – Receiving or having in one's possession any item of value which has been obtained through false pretenses, threats, or stealing.

(111) *Unexcused Absence from Place of Assignment* – Being away, without authorization from an appropriate supervisor, from the place of assignment, such as housing area, recreation area, health services, etc.

(112) *Use of Vulgar, Abusive, or Obscene Phrases/Language.*

(113) *Failure to Maintain Personal Hygiene or Personal Hygiene of Child* – Not having a clean body or clothes.

(114) *Unsanitary and Disorderly Housing Conditions* – Not keeping a clean, neat living area. The area should be kept in a manner so that all possessions are stored in an organized manner in areas designated for such. The area should be free from dirt and clutter.

(115) *Possession of Non-Dangerous Contraband (Soft Contraband)* – Possession of contraband items that are not allowed at the Center but are not capable of causing serious injury or harm to self or others, including tobacco products.

(116) *Unauthorized Use of Telephone* – Using the telephone during unauthorized times.

(201) *Refusal to Submit to a Reasonable Suspicion Drug Test* – Not providing a urine sample for use in reasonable suspicion drug testing.

## Moderate Offenses

(202) *Positive Reasonable Suspicion Drug Test* – Testing positive for an illegal drug or non-prescribed controlled substance.

(203) *Theft* – Unauthorized taking of something that belongs to someone else.

(204) *Destruction, Alteration, or Damage to Property (under $1,000)* – destroying, changing or hurting property of the Center or any other person.

(205) *Forgery or Unauthorized Reproductions of Documents or Articles (Excluding Money)* – Counterfeiting, forging, or reproducing without approval, any document, article, identification, or security document.

(206) *Hindering an Employee in the Performance of His or Her Duties* – Acting in such a way to interrupt an employee during work time, such as causing delays or giving false information.

(207) *Refusal to Submit to a Reasonable Suspicion Search.*

(208) *Child Neglect* – Failure to give care and proper attention to a child (non-injury).

(209) *Verbal Sexual Harassment of a Resident* – Acting in such a manner as to create a hostile residential environment for other residents, regardless of age or gender.

## *Major Offenses*

(301) *Arson* – Starting or causing to be started a fire which could or does cause damage to person(s) or property.

(302) *Assault/Battery* – A non-sexually-related attack upon the body of another person with the intention of harming or causing serious injury.

(303) *Rape or Sexual Contact* of any person without his or her consent; or of a person who is unable to consent or refuse; and contact between the penis and the vagina or the penis and anus, including penetration, however slight; or contact between the mouth and the penis, vagina, or anus; or penetration of the anal genital opening of another person by a hand, finger, or other object (i.e., penetration or oral sodomy).

(303) *Sexual Assault* – Abusive contact of any person without his or her consent for the purpose of sexual gratification or arousal or of a person who is unable to consent or refuse; and intentional touching, either directly or indirectly or through the clothing of the genitalia, anus, groin, breast, inner thigh or buttocks of any person. Sexual assault excludes incidents involving penetration or oral sodomy.

(304) *Attempt/Conspiracy to Commit a Major Offense* – An offense for residents who do not actually commit the offense but participate in one (1) or more of the following ways:

> (304a) attempts to commit the major offense;

> (304b) solicits another or others to commit the major offense;

(304c) conspires with another or others to commit the major offense; and/or

(304d) facilitates the action of another or others in committing the major offense.

(305) *Child Abuse* – Treating a child cruelly, roughly, wrongly, improperly, or in an insulting manner.

(306) *Child Neglect* – Failure to give care and proper attention to a child, resulting in endangerment or injury to a child.

(307) *Confirmed STG Affiliation/Activity* – Affiliated or participating in a gang-related activity.

(308) *Counterfeiting, Forgery, or Unauthorized Reproduction of Money.*

(309) *Death of Any Person* – Any act in which the end result is the death of any person, including employees, visitors/volunteers, and/or other residents.

(310) *Destruction, Alteration, or Damage to Property ($1,000 or more)* – Destroying, changing or hurting the property of the Center or of any other person.

(311) *Hostage Taking* – Holding a person(s) against their will as security for the fulfillment of certain terms.

(312) *Escape* – Leaving the grounds of the Center or from the custody of an employee outside of the Center without permission.

(313) *Insurrection* – Participation or encouraging another to participate in unauthorized activity such as protesting or rioting.

(314) *Possession of Dangerous Contraband (Hard Contraband)* –
Possession of contraband items that are not allowed at the Center and
are capable of causing serious injury or harm to self or others. This
includes deadly weapons, items altered to be used as weapons, drugs
and drug paraphernalia.

(315) *Sexual Misconduct* – This includes, but is not limited to, the
following acts:

> (315a) Exposing the genitals or buttocks to an employee,
> visitor/volunteer, or resident for the purpose of sexual
> gratification or arousal.

> (315b) *Masturbation* where an employee, visitor/volunteer, or
> other resident can see the act.

(316) *Intimidating or Threatening Another with Harm* – Telling someone,
through actions or words, that harm will come to them.

(317) *Possession of Drugs or Intoxicants* – Possession of any drugs or
intoxicants that have not been prescribed or approved by the health
services department for use.

(318) *Violation of Any Federal, State, or Local Law* – Any act, though not
specifically listed in this policy, that would be considered either a felony
or misdemeanor under federal law or under the state law in which the
resident is housed.


## EDUCATION

*Only applies during scheduled school semester*

The Center operates an on-site school during the school year. The Center school provides educational services to all children who are at least four years old on August 1 of the current school year. Attendance in the educational program is mandatory and is provided in a structured classroom setting Monday through Friday.



Each school-aged child will be assigned to a morning or afternoon class schedule.

The basic academic areas include Science, Social Studies, Math, Language Arts, and Physical Education. All children four years old and over will be tested upon their admission to the Center and placed into the appropriate classroom. When school is in session parents are required to physically drop off their children in the proper Center classroom at the beginning of the school day. Parents must return to their children's classroom at the end of each school day to pick up their children, unless otherwise told by staff of schedule changes. School hours, holidays and breaks will be announced and posted on each apartment complex's information board.

### *Special Needs Information*

Although each child is evaluated for special needs after admission, parents who believe their children may have educational deficiencies or learning disabilities may also initiate a special needs evaluation request. Parents may request this evaluation by speaking with their child's teacher, an assigned case manager, or by completing a Resident

Request form. The educational unit will meet with the parent and test the child. If found to be eligible for special needs instruction, the child will receive an Individual Educational Plan (IEP). The child's educational program, and any necessary modifications, will be driven by their IEP.

## LIBRARY

### *General Library*

Rules for general library use will be posted in the library. Library hours are posted on each apartment complex's information board.



### *Legal Information / Law Library / Access to Legal Materials*

The law library is located on campus and is open as per the building schedule, which is posted on each apartment complex's information board. If residents cannot access the law library due to the resident limit (based on available work stations), they should speak with a supervisor who will make arrangements to use the law library. Any residents not using the law library for its intended purpose will be asked to leave. Typewriters and computers are available in the law library for preparation of legal documents and for legal research.

The computers contain a "Lexis Nexis" application which has a variety of publications on immigration law and other related publications. There may be other legal, immigration or non-governmental organization

related research on the bookshelves in the law library. Residents may request off site law related materials by completing a Resident Request form.

For instruction on accessing the Lexus Nexus application, to sign up for the orientation or for questions concerning use of the law library equipment, residents should speak with the library aide or complete a Resident Request form. Residents should speak to the library aide for paper, computer storage disks to store documents and/or to report malfunctioning of law library equipment.

## *Materials Provided By Legal Representatives*

Documents or other written material provided to a resident during a legal aid visit shall be inspected, but not read. Residents may keep legal materials in their bedrooms. Quantities of blank forms or self-help legal material in excess of that required for personal use may be held for the resident in their property. The resident will be permitted access to these documents by speaking with staff or by completing a Resident Request form.

## *Free Legal Assistance*

Pro bono (free) legal assistance may be requested by contacting the pro bono legal assistance organizations posted in each apartment complex's Resident Information Center. The Executive Office for Immigration Review supplies this list.

## RECREATIONAL PROGRAM

There are a variety of recreation activities offered to residents during their stay at the Center. Residents are authorized to use the recreation facilities within their neighborhood during open movement. Other activities as scheduled



are available, and times and locations shall be posted weekly. Residents are expected to take care of supplies and equipment issued to them and to return the items after use.

Residents will be responsible for any recreational or leisure item until it has been returned. Staff will schedule specific activities for pleasure and fitness and ask that residents cooperate and participate in these activities; and encourage their children to participate. Some on-site activities are scheduled on particular days and times, while others are available for use independently. Recreation postings, information and schedules are posted on each apartment complex's information board.

## MARRIAGES

Residents and their legal representative may request permission to have a marriage ceremony while at the Center from the Chief, JFRMU in writing. The request must specifically state:

- That the resident is legally eligible to be married;
- That he or she is mentally competent, as determined by a qualified medical practitioner;
- That the intended spouse wants to marry the resident, as attested by a written affirmation of intent to marry the resident by the intended spouse.

The affirmation must be included as part of the request. Failure to obtain approval from the Chief, JFRMU could result in a delay or cancellation of any ceremonies or approved visits for the purpose of marriage. *(See religious services staff for more information.)*

## VOLUNTARY WORK PROGRAM

Adult residents may participate in the Center's voluntary work program. Residents will receive any necessary training and are required to sign a voluntary work program statement prior to beginning to work. Residents participating in the voluntary work program will be paid $1.00 per day for their participation. Residents should see their counselor or unit manager to sign up for the voluntary work program or complete a Resident Request form.

Residents may also volunteer for temporary work details that occasionally arise. Temporary work generally lasts from several hours to several days. Residents assigned to special work areas shall be provided appropriate protective clothing and instruction in accordance to the requirements of the job. Work assignments are strictly voluntary. Unsatisfactory work performance and or disciplinary cases could result in removal from the voluntary work program.

## VISITATION

Residents are allowed
social, legal and
consular visits as
outlined in those
related sections in this
handbook. All visitors
must present
identification as
required by FRS
Section 5.8. At the
supervisor's
discretion, a minor
visitor without positive identification may be admitted if the
accompanying adult visitor vouches for his/her identity. Minors will
remain under the direct supervision of the adult visitor, so as to not
disturb other visitors.



Disruptive conduct by visitors or residents may cause termination of the
visit. Any property brought to a visit intended to be given to a resident
must be turned over to staff for inventorying and receipting, prior to
entering the visitation area. No items may be given directly to a resident
during a visit. Residents are not allowed to receive contraband or
perishable food items. *See the sections on allowable personal property
and contraband for more information.*

### Social Visitation

Social visitation is conducted seven days a week from 8:00am to
8:00pm, Sunday through Saturday. Residents may have an unlimited

number of visits. Generally, visits will be a minimum of 60 minutes per visit.

All visitors may be checked against various law enforcement databases to determine their criminal history. Should the check determine the visitor has no criminal arrests or convictions, the visit is approved to take place. The number of visitors per visit may be restricted due to the volume of visits at any given time. Residents may also request a special visitation accommodation if their visitors are traveling significant distances or have other special circumstances.

### *Legal Aid Visitation*

The Center permits legal visitation seven days a week, including holidays. Legal visitation hours are from 8:00am through 8:00pm, seven days a week, Sunday through Saturday. Legal visits are by appointment only. Legal aid visitors may contact the Center to schedule legal visitation appointments. Should a legal aid provider need to arrange an appointment at other than the times listed above, they may contact a supervisor for assistance. Legal visits may proceed through a scheduled meal period. In such cases, the resident shall receive a tray or sack meal after the visit, or may choose to eat during the visit. Attorneys must present a US state issued bar membership card. Persons allowed during a legal visit:

- Attorneys and other legal representatives;
- Legal assistants;
- Upon presentation of a letter of authorization from the legal representative under whose supervision he/she is working, an unaccompanied legal assistant may meet with a resident during legal visitation hours. The letter shall state that the named legal

assistant is working on behalf of the supervising legal representative for purposes of meeting with the ICE resident(s);

- Approved Interpreters to aid the legal representatives or assistants.

## *Consular Visitation*

The Center permits visits by consular officers at any time. Consular officers should contact the Center to schedule appointments. Should a consular officer need to arrange an appointment at other than the times listed above, they may contact a supervisor for assistance.

## *Visitor Dress Code*

Visitors five years and older:

- Must wear clothing which covers shoulders, chest, stomach and all areas of the anatomy between the naval (belly button) and mid-thigh when seated;
- The top or neckline of clothing shall be no lower than the underarm in the front and in the back;
- Sheer (see-through) clothing is prohibited;
- Shoes shall be worn at all times;
- Shirts shall be worn at all times;
- "Gang colors" or other signs are prohibited;
- No "sagging" (pants will be worn at waist).

## ROUTINE SANITATION AND SAFETY INSPECTIONS

Sanitation and fire safety inspections are conducted weekly in all living and program areas of the Center. During these inspections, staff inspects for proper sanitary conditions and compliance with other

regulations. When inspecting bedrooms during these inspections, the residents living in the room will be requested to be present. Parents are requested to be present when staff are checking their child's bedrooms.

## NON-ROUTINE SEARCHES

A non-routine search of housing or programing areas is done when there is reasonable suspicion to believe contraband or a threat to resident or staff safety is present. A non-routine search of a resident's bedroom or personal items will only be done after the resident is notified and is present, unless urgent circumstances exist (such as in a self-harm situation). In these cases, the resident will be notified after the search is conducted.

### *Searches of Persons*

- *Visual Inspection* – A visual search for contraband without physical contact.
- *Pat Search* – A physical inspection of a resident while clothed. It will only be conducted by a staff member of the same gender. The inspector uses their sense of touch when patting or running the hands over the resident's body. A pat search does not require the resident to remove clothing, although the inspection may include a search of the resident's clothing and personal effects. Pat searches will only be conducted on any resident if there is reasonable and articulable suspicion – that they possess contraband. No children under 15 years of age will be the subject of a pat search without the explicit authorization of the Facility Administrator and JFRMU.

## MAIL / CORRESPONDENCE

Residents may send and receive correspondence and a variety of other items through the mail, including prepaid envelopes, and other "allowable" items, as per the policy. Residents shall be permitted to receive and send at their own expense:



- An unlimited amount of general correspondence mail. The amount will only be limited when a public safety or Center security and order situation exists;
- An unlimited amount of special correspondence including correspondence with a legal representative, potential legal representative, courts and other governmental agencies and news organizations. *See the section on special correspondence for more information;*
- Packages containing personal property. Packages may neither be sent nor received without advance arrangements approved by the Facility Administrator. To get instructions and approval to send or receive packages, residents should complete a Resident Request form addressed to their counselor or unit manager. Residents will be instructed on the procedure for sending and receiving packages.

### *Addressing Envelopes*

When sending mail, the resident should write his/her name, "A" number, and the Center address legibly in the return address area of the

envelope or package. They should also write the name and address of who the mail is being sent, legibly.

## Indigent Resident Mail

Residents who do not have adequate funds to purchase postage will be permitted to send at no cost:

- A reasonable amount of "special correspondence" mail. Should the Center consider the related amount "unreasonable," the ICE Office of Chief Counsel will be consulted prior to suspending mail postings;
- At least five general correspondence letters per week;
- Any packages that are deemed necessary by ICE Enforcement and Removal Operations (ERO), such as clothing, personal items, and items needed for return to country of origin;
- Packages containing personal property when it is determined that space is limited for the proper storage of the items.

Residents who are indigent and wish to use this service provided should contact their Resident Counselor for proper approval and processing.

## Special Correspondence

Special correspondence is written correspondence to or from attorneys and other legal representatives, judges, courts, embassies/consulates, the President and Vice President of the United States, members of Congress, the Department of Justice, the Department of Homeland Security, the U.S. Public Health Service, and representatives of the news media. Correspondence will only be treated as Special Correspondence if the title and office of the sender (for incoming mail) or addressee (for outgoing mail) are unambiguously identified on the envelope and the envelope is labeled "Special Correspondence." Incoming special