**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JENNY LISETTE FLORES,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>LORETTA E. LYNCH, Attorney<br>General, Attorney General of<br>the United States; JEH JOHNSON,<br>Secretary of Homeland<br>Security; U.S. DEPARTMENT OF<br>HOMELAND SECURITY, and its<br>subordinate entities; U.S.<br>IMMIGRATION AND CUSTOMS<br>ENFORCEMENT; U.S. CUSTOMS<br>AND BORDER PROTECTION,<br>*Defendants-Appellants.* | No. 15-56434<br><br>D.C. No.<br>2:85-cv-04544-<br>DMG-AGR<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted June 7, 2016
Pasadena, California

Filed July 6, 2016

Before: Ronald M. Gould, Michael J. Melloy[*],
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

## SUMMARY[**]

### Immigration

The panel affirmed in part and reversed in part the district court's order granting the motion of a plaintiff class to enforce a 1997 Settlement with the government which set a nationwide policy for the detention, release, and treatment of minors detained in Immigration and Naturalization Service custody, and remanded for further proceedings.

The panel held that the Settlement unambiguously applies both to minors who are accompanied and unaccompanied by their parents. The panel held, however, that the district court erred in interpreting the Settlement to provide release rights to accompanying adults. The panel also held that the district court did not abuse its discretion in denying the government's motion to amend the Settlement.

---

[*] The Honorable Michael J. Melloy, Senior Circuit Judge for the U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Leon Fresco (argued), Deputy Assistant Attorney General; Sarah B. Fabian, Senior Litigation Counsel; William C. Peachey, Director, District Court Section; Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division; United States Department of Justice, Office of Immigration Litigation, Washington, D.C.; for Defendants-Appellants.

Peter Anthony Schey (argued) and Carlos R. Holguin, Center for Human Rights and Constitutional Law, Los Angeles, California; T. Wayne Harman and Elena Garcia, Orrick, Herrington & Sutcliffe LLP, Los Angeles, California; for Plaintiff-Appellee.

## OPINION

HURWITZ, Circuit Judge:

In 1997, the plaintiff class ("Flores") and the government entered into a settlement agreement (the "Settlement") which "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." Settlement ¶ 9. The Settlement creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards.

In 2014, in response to a surge of Central Americans attempting to enter the United States without documentation, the government opened family detention centers in Texas and New Mexico. The detention and release policies at these centers do not comply with the Settlement. The government,

however, claims that the Settlement only applies to unaccompanied minors and is not violated when minors accompanied by parents or other adult family members are placed in these centers.

In 2015, Flores moved to enforce the Settlement, arguing that it applied to all minors in the custody of immigration authorities. The district court agreed, granted the motion to enforce, and rejected the government's alternative motion to modify the Settlement. The court ordered the government to: (1) make "prompt and continuous efforts toward family reunification," (2) release class members without unnecessary delay, (3) detain class members in appropriate facilities, (4) release an accompanying parent when releasing a child unless the parent is subject to mandatory detention or poses a safety risk or a significant flight risk, (5) monitor compliance with detention conditions, and (6) provide class counsel with monthly statistical information. The government appealed, challenging the district court's holding that the Settlement applied to all minors in immigration custody, its order to release parents, and its denial of the motion to modify.

Although the issues underlying this appeal touch on matters of national importance, our task is straightforward—we must interpret the Settlement. Applying familiar principles of contract interpretation, we conclude that the Settlement unambiguously applies both to accompanied and unaccompanied minors, but does not create affirmative release rights for parents. We therefore affirm the district court in part, reverse in part, and remand.

## BACKGROUND

### I.  History of the Litigation

In 1984, the Western Region of the Immigration and Naturalization Service ("INS") adopted a policy prohibiting the release of detained minors to anyone other than "a parent or lawful guardian, except in unusual and extraordinary cases." *Reno v. Flores*, 507 U.S. 292, 296 (1993) (quotation marks omitted).  The next year, Flores filed this action in the Central District of California, challenging that policy and the conditions under which juveniles were detained pursuant to the policy.  *Id.*

In 1986, the district court certified two classes:

> 1. All persons under the age of eighteen (18) years who have been, are, or will be arrested and detained pursuant to 8 U.S.C. § 1252 by the Immigration and Naturalization Service ("INS") within the INS' Western Region and who have been, are, or will be denied release from INS custody because a parent or legal guardian fails to personally appear to take custody of them.

> 2. All persons under the age of eighteen (18) years who have been, are, or will be arrested and detained pursuant to 8 U.S.C. § 1252 by the Immigration and Naturalization Service ("INS") within the INS' Western Region and who have been, are, or will be subjected to any of the following conditions:

>> a. inadequate    opportunities    for exercise or recreation;

    b.   inadequate educational instruction;

    c.   inadequate reading materials;

    d.   inadequate opportunities for visitation with counsel, family, and friends;

    e.   regular contact as a result of confinement with adult detainees unrelated to such minors either by blood, marriage, or otherwise;

    f.   strip or body cavity search after meeting with counsel or at any other time or occasion absent demonstrable adequate cause.

In 1987, the court approved a consent decree settling the detention condition claims. *Id.* That agreement required the government to "house all juveniles detained more than 72 hours following arrest in a facility that meets or exceeds" certain standards, except in "unusual and extraordinary circumstances."

    The district court then granted the Flores class partial summary judgment on the claim that the INS violated the Equal Protection Clause by treating alien minors in deportation proceedings differently from alien minors in exclusion proceedings, the latter of whom were sometimes released to adults other than their parents. *Id.* In response, the INS adopted a rule allowing juveniles to be released to their parents, adult relatives, or custodians designated by their parents; if no adult relative was available, the rule gave the INS discretion to release a detained relative with the child. *Id.* at 296–97; *see* Detention and Release of Juveniles,

53 Fed. Reg. 17449, 17451 (1988) (now codified, as
amended, at 8 C.F.R. § 236.3). The Supreme Court upheld
the INS rule against Flores' facial Due Process challenge.
*Flores*, 507 U.S. at 315.

## II. The Settlement

In 1997, the district court approved the Settlement. The
Settlement defines a "minor" as "any person under the age
of eighteen (18) years who is detained in the legal custody
of the INS," except for "an emancipated minor or an
individual who has been incarcerated due to a conviction for
a criminal offense as an adult." Settlement ¶ 4. The
Settlement defines the contracting class similarly, as "[a]ll
minors who are detained in the legal custody of the INS."
*Id.* ¶ 10.

The Settlement provides that "[w]henever the INS takes
a minor into custody, it shall expeditiously process the minor
and shall provide the minor with a notice of rights." *Id.* ¶
12(A). "Following arrest, the INS shall hold minors in
facilities that are safe and sanitary and that are consistent
with the INS's concern for the particular vulnerability of
minors." *Id.* Within five days of arrest, the INS must
transfer the minor to a non-secure, licensed facility; but "in
the event of an emergency or influx of minors into the United
States," the INS need only make the transfer "as
expeditiously as possible." *Id.*

The Settlement creates a presumption in favor of release
and favors family reunification:

> Where the INS determines that the detention
> of the minor is not required either to secure
> his or her timely appearance before the INS
> or the immigration court, or to ensure the

minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

    A.  a parent;

    B.  a legal guardian;

    C.  an adult relative (brother, sister, aunt, uncle, or grandparent);

    D.  an adult individual or entity designated by the parent or legal guardian . . .

    E.  a licensed program willing to accept legal custody; or

    F.  an adult individual or entity seeking custody . . .

*Id.* ¶ 14; *see also id.* ¶ 18 (requiring "prompt and continuous efforts . . . toward family reunification and the release of the minor"). But, if the INS does not release a minor, it must place her in a "licensed program." *Id.* ¶ 19. A "licensed program" is one "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children," which must be "non-secure as required under state law" and meet the standards set forth in an exhibit attached to the Settlement. *Id.* ¶ 6. Those standards include food, clothing, grooming items, medical and dental care, individualized needs assessments, educational services, recreation and leisure time, counseling, access to religious services, contact with family members, and a reasonable right to privacy. Some minors, such as those who have

committed crimes, may be held in a juvenile detention facility instead of a licensed program. *Id.* ¶ 21.

The Settlement generally provides for the enforcement in the Central District of California, *id.* ¶ 37, but allows individual challenges to placement or detention conditions to be brought in any district court with jurisdiction and venue, *id.* ¶ 24(B). The Settlement originally was to terminate no later than 2002. *Id.* ¶ 40. But, in 2001, the parties stipulated that the Settlement would terminate "45 days following defendants' publication of final regulations implementing this Agreement." The government has not yet promulgated those regulations.

## III.    Developments Subsequent to the Settlement

Before 2001, "families apprehended for entering the United States illegally were most often released rather than detained because of a limited amount of family bed space; families who were detained had to be housed separately, splitting up parents and children." *Bunikyte ex rel. Bunikiene v. Chertoff*, No. 1:07-cv-00164-SS, 2007 WL 1074070, at *1 (W.D. Tex. Apr. 9, 2007). "In the wake of September 11, 2001, however, immigration policy fundamentally changed," with "more restrictive immigration controls, tougher enforcement, and broader expedited removal of illegal aliens," which "made the automatic release of families problematic." *Id.*

In 2001, the INS converted a nursing home in Berks County, Pennsylvania ("Berks") into its first family detention center. *Id.* Because Pennsylvania has no licensing requirements for family residential care facilities, Berks has been monitored and licensed by state authorities under the state standards applicable to child residential and day treatment facilities. *Id.* at *8.

In 2002, Congress enacted the Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135, abolishing the INS and transferring most of its immigration functions to the newly-formed Department of Homeland Security ("DHS"), in which Immigration and Customs Enforcement ("ICE") is housed. 6 U.S.C. §§ 111, 251, 291. The Homeland Security Act transferred responsibility for the care and custody of unaccompanied alien children to the Office of Refugee Resettlement in the Department of Health and Human Services. 6 U.S.C. § 279(a), (b)(1)(A), (g)(2).

In 2006, DHS converted a medium security prison in Taylor, Texas into its second family detention facility, the Don T. Hutto Family Residential Center ("Hutto"). *Bunikyte*, 2007 WL 1074070, at *1. In 2007, three children at Hutto, who were not represented by Flores' class counsel, filed suit in the Western District of Texas, contending that the conditions at Hutto violated the Settlement. *Id.* at *1–2. In response, the government argued that the Settlement applied only to unaccompanied minors. The district court rejected that argument, holding that "by its terms, [the Settlement] applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors." *Id.* at *2–3 (quoting Settlement ¶ 9). The court then concluded that the minors' confinement at Hutto violated the Settlement's detention standards, *id.* at *6–15, but rejected the claim that the Settlement entitled the plaintiffs to have their parents released with them, *id.* at *16. The suit settled before trial. *In re Hutto Family Det. Ctr.*, No. 1:07-cv-00164-SS, Dkt. 94, (W.D. Tex. Aug. 26, 2007).

In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044 (principally codified in relevant part at 8 U.S.C. § 1232).

TVPRA partially codified the Settlement by creating statutory standards for the treatment of unaccompanied minors. *See, e.g.*, 8 U.S.C. § 1232(c)(2)(A) (an unaccompanied alien child "shall be promptly placed in the least restrictive setting that is in the best interest of the child," subject to considerations of flight and danger).

## IV.    The Enforcement Action and *R.I.L-R v. Johnson*

In 2014, a surge of undocumented Central Americans arrived at the U.S.-Mexico border. In response, ICE opened family detention centers in Karnes City and Dilley, Texas, and Artesia, New Mexico. It closed the Artesia center later that year. The detention centers operate under ICE's Family Residential Detention Standards, which do not comply with the Settlement.

In January 2015, a group of Central American migrants, who were not represented by *Flores* class counsel, filed a putative class action, claiming that the government had adopted a no-release policy as to Central American families, and challenging that alleged policy under the Due Process Clause. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 170 (D.D.C. 2015). On February 20, 2015, the U.S. District Court for the District of Columbia granted the plaintiffs' motion for a preliminary injunction. *Id.* at 171. The court found that ICE had not adopted a blanket no-release policy, but found ample support for the plaintiffs' alternative contention that "DHS policy directs ICE officers to consider deterrence of mass migration as a factor in their custody determinations, and that this policy has played a significant role in the recent increased detention of Central American mothers and children." *Id.* at 174. The court preliminarily enjoined the government from using deterrence as a factor in detaining class members. *R.I.L-R v. Johnson*, No. 1:15-cv-00011-JEB, Dkt. 32 (D.D.C. Feb. 20, 2015).

In May 2015, the government notified the court that it had decided "to discontinue, at this time, invoking deterrence as a factor in custody determinations in all cases involving families, irrespective of the outcome of this litigation," while maintaining that it could lawfully reinstate the policy. *Id.* Dkt. 40. In June 2015, by the agreement of the parties, the district court in *R.I.L-R* dissolved the preliminary injunction and closed the case, allowing plaintiffs to move to reinstate the preliminary injunction if the government again invoked deterrence in custody determinations. *Id.* Dkt. 43.

Meanwhile, on February 2, 2015, Flores filed a motion in the U.S. District Court for the Central District of California to enforce the Settlement, arguing that ICE had breached it by (1) adopting a no-release policy, and (2) confining children in the secure, unlicensed facilities at Dilley and Karnes.[1] The government argued in response that the Settlement does not apply to accompanied minors, and filed an alternative motion to amend the Settlement to so provide. On July 24, 2015, the district court granted Flores' motion, denied the government's motion to amend, and also held that the Settlement requires release of a minor's accompanying parent, "as long as doing so would not create a flight risk or a safety risk."[2] On August 21, 2015, the district court filed a remedial order. The government timely appealed. We have jurisdiction under 28 U.S.C. § 1292.

---

[1] Flores also argued that the government breached Paragraph 12(A) by exposing children in temporary Border Patrol custody to "harsh, substandard" conditions. That issue is not implicated in this appeal.

[2] The case was reassigned to Judge Dolly M. Gee, because the original judge, Robert J. Kelleher, had died.

## STANDARD OF REVIEW

The Settlement is a consent decree, which, "like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree." *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005). We review the district court's interpretation of the contract de novo. *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985). "Motions for relief from judgment under Rule 60(b) are reviewed for abuse of discretion." *Asarco*, 430 F.3d at 978.

## DISCUSSION

## I. The Settlement Applies to Accompanied Minors

We agree with the district court that "[t]he plain language of the Agreement clearly encompasses accompanied minors." First, the Settlement defines minor as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS"; describes its scope as setting "nationwide policy for the detention, release, and treatment of minors in the custody of the INS"; and defines the class as "[a]ll minors who are detained in the legal custody of the INS." Settlement ¶¶ 4, 9, 10. Second, as the district court explained, "the Agreement provides special guidelines with respect to unaccompanied minors in some situations," and "[i]t would make little sense to write rules making special reference to unaccompanied minors if the parties intended the Agreement as a whole to be applicable only to unaccompanied minors." *See id.* ¶ 12(A) ("The INS will segregate unaccompanied minors from unrelated adults."); *id.* ¶ 25 ("Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except . . . ."). Third, as the district court reasoned, "the Agreement expressly identifies

those minors to whom the class definition would not apply"—emancipated minors and those who have been incarcerated for a criminal offense as an adult; "[h]ad the parties to the Agreement intended to exclude accompanied minors from the Agreement, they could have done so explicitly when they set forth the definition of minors who are excluded from the Agreement." *See id.* ¶ 4.

The government nevertheless argues that certain terms of the Settlement show that it was never meant to cover accompanied minors. The Settlement defines "licensed program" as "any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors." *Id.* ¶ 6. The government contends that this makes only "dependent minors" eligible for licensed programs; that Black's Law Dictionary defines dependent minors to exclude accompanied minors, *see Child, Black's Law Dictionary* (10th ed. 2014); and that it would make little sense for the Settlement to apply to accompanied minors but exclude them from licensed programs. We reject this argument. That a program is "licensed . . . to provide . . . services for dependent children" does not mean that only dependent children can be placed in that program. And, the definition of "licensed program" does not indicate any intent to exclude accompanied minors; rather, its obvious purpose is to use the existing apparatus of state licensure to independently review detention conditions.

At oral argument, the government cited a provision of the Settlement requiring that, "[b]efore a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134)

and an agreement to," among other things, provide for the minor's well-being and ensure the minor's presence at immigration proceedings. Settlement ¶ 15. The government claims that the reference to the "custodian" demonstrates that the Settlement did not contemplate releasing a child to an accompanying parent. The government is right in one sense—the Settlement does not contemplate releasing a child to a parent who remains in custody, because that would not be a "release." But, it makes perfect sense to require an aunt who takes custody of a child to sign an affidavit of support, whether or not the child was arrested with his mother.

The government correctly notes that the Settlement does not address the potentially complex issues involving the housing of family units and the scope of parental rights for adults apprehended with their children. For example, Exhibit 1, which sets forth requirements for licensed programs, does not contain standards related to the detention of adults or family units. But, the fact that the parties gave inadequate attention to some potential problems of accompanied minors does not mean that the Settlement does not apply to them. *See Bunikyte*, 2007 WL 1074070, at *3 ("Though it is no defense that the *Flores* Settlement is outdated, it is apparent that this agreement did not anticipate the current emphasis on family detention. . . . Nonetheless, the *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors.") (quoting Settlement ¶ 9); *id.* ("Paragraph 19 sets out the foundation of the detention standards applicable to any minor in United States immigration custody, and there is no reason why its requirements should be any less applicable in a family detention context than in the context of unaccompanied minors.").

The government next argues that the Complaint and certified classes were limited to unaccompanied minors, and that the parties therefore could not have entered into a Settlement granting rights to accompanied minors. To be sure, this litigation initially focused on the problems facing unaccompanied minors, who then constituted 70% of immigrant children arrested by the INS. *See Flores*, 507 U.S. at 295. But, the Complaint was not limited to unaccompanied minors. The conduct Flores challenged—INS detention conditions and the Western Region release policy—applied to accompanied and unaccompanied minors alike. *See* Complaint ¶ 50 (challenging the INS' "policy to indefinitely jail juveniles, particularly those whose parents INS agents suspect may be aliens unlawfully in the United States, unless and until their parent or legal guardian personally appears before an INS agent for interrogation and to accept physical custody of the minor."); *id.* ¶¶ 65, 70–79 (challenging juveniles' condition of confinement in INS facilities, including the lack of education, recreation, and visitation, and the imposition of strip searches). So did the remedies sought and the classes the district court certified. *See id.* at 29 ¶ 4 (requesting an order that the INS admit juveniles to bail without requiring that their parents or legal guardians appear before INS agents); Order re Class Certification (certifying a class for the release claims and a class for the detention conditions claims).

The government has not explained why the detention claims class would exclude accompanied minors; minors who arrive with their parents are as desirous of education and recreation, and as averse to strip searches, as those who come alone. As for release, the government focuses narrowly on the release class definition. *See* Order re Class Certification at 2 (defining the release class to include all minors arrested in the INS' Western Region "who have been, are, or will be

denied release from INS custody because a parent or legal
guardian fails to personally appear to take custody of them").
But, the release class was certified expressly to challenge the
Western Region's policy of not releasing detained minors to
anyone other than a parent or guardian.  Complaint ¶ 50; *see
also Flores*, 507 U.S. at 296.  That policy applied equally to
accompanied minors, such as a boy detained with his mother
who wanted to be released to his aunt but was refused
because his father "fail[ed] to personally appear to take
custody of [him]."  *See* Order re Class Certification at 2.**3**

The government also contends that, because the four
named plaintiffs in the Complaint were unaccompanied, a
class including accompanied minors would run afoul of the
requirements of typicality and representativeness.  *See* Fed.
R. Civ. P. 23.   The government's factual premise is
questionable: one of the named plaintiffs was accompanied
at the time of arrest by her adult brother, although he was
released without her.   Complaint ¶ 34.   But, more
importantly, the government waived its ability to challenge
the class certification when it settled the case and did not
timely appeal the final judgment.  And, to the extent this and
other arguments are aimed at providing extrinsic evidence of
the meaning of the Settlement, they fail because the

---

**3** Even if the Complaint only sought to assert the detention and release
rights of unaccompanied immigrant children, it is far from clear that a
settlement governing detention and release for all immigration children
would be invalid.  A consent decree may "provide[ ] broader relief than
the court could have awarded after a trial"; the law only requires that the
agreement "come within the general scope of the case made by the
pleadings." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
478 U.S. 501, 525 (1986) (alterations, citations, and quotation marks
omitted).

Settlement unambiguously applies to accompanied minors. *See Asarco*, 430 F.3d at 980.

## II.  The Settlement Does Not Require the Government to Release Parents

Flores' motion to enforce argued that ICE's purported no-release policy, which allegedly denied accompanying parents "any chance for release," frustrated the minor class members' right to preferential release to a parent, and that to safeguard that right, ICE was required to give parents individualized custody determinations.  After the district court tentatively agreed, Flores went further, proposing an order providing that "Defendants shall comply with the Settlement ¶ 14(a) by releasing class members without unnecessary delay in first order of preference to a parent, including a parent subject to release who presented her or himself or was apprehended by Defendants accompanied by a class member."

While acknowledging that "the Agreement does not contain any provision that explicitly addresses adult rights and treatment in detention," the district court nonetheless reasoned that "ICE's blanket no-release policy with respect to mothers cannot be reconciled with the Agreement's grant to class members of a right to preferential release to a parent."  The court also found that the regulation upheld in *Flores*, 507 U.S. at 315, supported the release of an accompanying relative.  *See* 8 C.F.R. § 212.5(b)(3)(ii) ("If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released with an accompanying relative who is in detention.").  It also found support for that conclusion in ICE's practice, until June 2014, of generally releasing parents who were not flight or safety risks.

The district court therefore concluded that the government "must release an accompanying parent as long as doing so would not create a flight risk or a safety risk," and it ordered:

> To comply with Paragraph 14A of the Agreement and as contemplated in Paragraph 15, a class member's accompanying parent shall be released with the class member in accordance with applicable laws and regulations unless the parent is subject to mandatory detention under applicable law or after an individualized custody determination sthe parent is determined to pose a significant flight risk, or a threat to others or the national security, and the flight risk or threat cannot be mitigated by an appropriate bond or conditions of release.

The district court erred in interpreting the Settlement to provide release rights to adults. The Settlement does not explicitly provide any rights to adults. *Bunikyte*, 2007 WL 1074070 at *16. The fact that the Settlement grants class members a right to preferential release to a parent over others does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice. Because "the plain language of [the] consent decree is clear, we need not evaluate any extrinsic evidence to ascertain the true intent of the parties." *See Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 861 (9th Cir. 2007). In any case, the extrinsic evidence does not show that the parties intended to grant release rights to parents. "In fact, the context of the *Flores* Settlement argues against this result: the Settlement was the product of litigation in which unaccompanied minors argued that release to adults other

than their parents was preferable to remaining in custody until their parents could come get them." *Bunikyte*, 2007 WL 1074070 at \*16. The regulation the district court relied upon at most shows that the parties might have thought about releasing adults when executing the Settlement, not that they agreed to do so in that document. And, there is no evidence that ICE once released most children and parents because of the Settlement, rather than for other reasons.

Flores suggests that we construe the district court's order narrowly, arguing that it only requires, as she initially requested, that the government grant accompanying parents individualized custody determinations "in accordance with applicable laws and regulations," just as it would single adults. But, the district court plainly went further. A non-criminal alien detained during removal proceedings generally bears the burden of establishing "that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight." *In re Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006). But, the district court placed the burden on the government, requiring it to release an accompanying parent "unless the parent is subject to mandatory detention under applicable law or after an individualized custody determination the parent is determined to pose a significant flight risk, or a threat to others or the national security." In addition, the order requires a "significant flight risk" to justify detention, while the usual standard is merely "a risk of flight." *Id.* More importantly, parents were not plaintiffs in the *Flores* action, nor are they members of the certified classes. The Settlement therefore provides no affirmative release rights

for parents, and the district court erred in creating such rights in the context of a motion to enforce that agreement.[4]

## III.    The District Court Correctly Denied the Government's Motion to Amend the Settlement

Even if the Settlement applies to accompanied minors, the government argues that it is "no longer equitable" to apply it as written.  *See* Fed. R. Civ. P. 60(b)(5) (allowing relief from judgment if "applying it prospectively is no longer equitable"); *Horne v. Flores*, 557 U.S. 433, 447 (2009) ("Rule 60(b)(5) serves a particularly important function in what we have termed 'institutional reform litigation.'").  The district court denied this motion.  We review that decision for abuse of discretion.  *Asarco*, 430 F.3d at 978.

"[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.  If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance."  *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992).  When the basis for modification is a change in law, the moving party must establish that the provision it seeks to modify has become "impermissible."  *Id.* at 388.

---

[4]  In so holding, we express no opinion whether the parents of accompanied minors have a right to release, or if so, the nature of that right.  Nor do we express an opinion whether the alleged no-release policy would violate the Settlement.  We hold only that the Settlement is not the source of any affirmative right to release.

The government first argues that the Settlement should be modified because of the surge in family units crossing the Southwest border.   "Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385.  The Settlement expressly anticipated an influx, and provided that, if one occurred, the government would be given more time to release minors or place them in licensed programs.  Settlement ¶ 12.  And, even if the parties did not anticipate an influx of this size, we cannot fathom how a "suitably tailored" response to the change in circumstances would be to exempt an entire category of migrants from the Settlement, as opposed to, say, relaxing certain requirements applicable to all migrants.  *See Rufo*, 502 U.S. at 383.

The government also argues that the law has changed substantially since the Settlement was approved.  It cites Congress' authorization of expedited removal—but that occurred in 1996, before the Settlement was approved.  *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, § 302, 110 Stat. 3009-546, 579–85 (1996).   The government also notes that the Homeland Security Act of 2002 reassigned the immigration functions of the former INS to DHS; but there is no reason why that bureaucratic reorganization should prohibit the government from adhering to the Settlement.  *See* Settlement ¶ 1 ("As the term [party] applies to Defendants, it shall include their . . . successors in office.").

The government also argues that some provisions of the TVPRA regarding the detention and release of unaccompanied minors are inconsistent with the Settlement.  At most, that might support modification of the conflicting provisions so that they no longer apply to the unaccompanied minors covered by the TVPRA.  But, the

creation of statutory rights for *unaccompanied* minors does not make application of the Settlement to *accompanied* minors "impermissible." The district court did not abuse its discretion in denying the motion to amend on the record before it.

## CONCLUSION

We hold that the Settlement applies to accompanied minors but does not require the release of accompanying parents. We therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.[5] Each party shall bear its own costs.

---

[5] We note that a second motion to enforce is pending in the district court.