CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

Holly S. Cooper
Director, Immigration Law Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

*Of counsel:*
YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*Attorneys for plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, | Case No. CV 85-4544-DMG (AGRx) |
| Plaintiffs, | MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT |
| v. | |
| Jeh Johnson, Secretary, Dept. of Homeland Security, *et al.*, | Hearing:  September 9, 2016<br>Time:     9:30 a.m.<br>Room:    Spring St. courtroom 7 |
| Defendants. | |

## Outline of Contents

I       Introduction ..................................................................................... 1

II      The Court should enforce the Settlement pursuant to its plain terms. ......... 3

III     The TVPRA nowhere excuses ORR's refusal to afford detained
        juveniles a bond hearing. ................................................................... 5

IV      ORR's ad hoc detention protocol falls far short of satisfying ¶ 24A. ........... 15

V       ORR's opaque and peremptory detention decisions inflict irreparable
        injury on vulnerable youth. ................................................................ 20

VI      Conclusion ....................................................................................... 25

TABLE OF AUTHORITIES

**Cases**

*Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011) ................................. 14

*Flores v. Johnson*, No. CV85-4544 (C.D. Cal.), Order re: Plaintiffs' Motion to Enforce Settlement, etc., July 24, 2015 (Dkt. 177) ..................... 3, 5, 8

*In re S.D.,* 102 Cal.App.4th 560; 125 Cal.Rptr.2d 570 (2002) .................................. 18

*In Re: Aguilar-Ramirez*, A206 775 662 (BIA 2016) ................................... 13

*In Re: Rodriguez-Lopez*, 2004 WL 1398660 (BIA 2004) ............................ 12

*Jeff D. v. Kempthorne*, 365 F.3d 844 (9th Cir. 2004) ................................. 6

*Matter of A--*, 2005 Immig. Rptr. LEXIS 54924 (BIA 2005) ........................ 13

*Matter of Granados-Gutierrez*, A206 848 455 (I.J. 2014) ........................ 14

*Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006) ..................................... 13

*Matter of Uluochoa*, 20 I. & N. Dec. 133 (BIA 1989) ............................... 20

*Orantes-Hernandez v. Gonzales*, 2006 U.S. Dist. LEXIS 95388 (C.D. Cal. 2006) ................................................................. 6

*Railway Employees' v. Wright*, 364 U.S. 642; 5 L. Ed. 2d 349; 81 S. Ct. 368 (1961) ................................................................. 6

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367; 112 S. Ct. 748; 116 L. Ed. 2d 867 (1992) ................................................. 6

*Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011) ...................................... 18

*United States v. Atlantic Refining Co.*, 360 U.S. 19; 79 S. Ct. 944; 3 L. Ed. 2d 1054 (1959) ................................................. 5

*Zadvydas v. Davis*, 533 U.S. 678, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001) ................................................................. 15

**Statutes**

28 U.S.C. § 2412(d) ...................................................................... 25

6 U.S.C § 279 ............................................................................... 1

6 U.S.C. § 279 ........................................................................ 10, 11

6 U.S.C. § 552(c) ......................................................................... 12

8 C.F.R. § 1003.19.................................................................. 2, 19, 20

8 C.F.R. §§ 1236.1(d) ................................................................... 2

8 U.S.C. § 1232 ............................................................................. 3

8 U.S.C. § 1232 ......................................................................... 9,18

Homeland Security Act, Pub. L. 107-296 ........................................ *passim*

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub.L. 104-208, Div C, § 309(a), 110 Stat. 3009 (1996) ........................ 2

William Wilberforce Trafficking Victims Protection Reauthorization
    Act of 2008, 110 Pub. L. 457, 122 Stat. 5044 ............................... *passim*

**Other Authority**

H. R. Rep. 110-430, 110th Cong., 1st Sess. (2007) .................................. 8

Immigration Court Practice Manual. Office of the Chief Immigration
    Judge, IMMIGRATION COURT PRACTICE MANUAL ........................................ 19

Staff Report, U.S. Senate Permanent Subcommittee on
    Investigations, *Protecting Unaccompanied Alien Children from
    Trafficking and Other Abuses*, January 2016 ................................... 16

I        INTRODUCTION

On January 28, 1997, the Court approved a class-wide settlement of this action. Exhibits in Support of Motion to Enforce Settlement, February 3, 2015 [Dkt. 101], Exhibit 1 ("Settlement"). The Settlement sets minimum standards for the detention and release of non-citizen juveniles detained on charges of being in the U.S. without authorization. The Settlement binds the successor agencies to the former Immigration and Naturalization Service ("INS"), including Department of Health and Human Services' Office of Refugee Resettlement ("ORR").[1]

---

[1] The Settlement protects "all minors who are detained in the legal custody of the INS," and binds the INS and Department of Justice, as well as "their agents, employees, contractors, and/or successors in office." Settlement ¶ 1.

In 2002, the Homeland Security Act, Pub. L. 107-296 (H.R. 5005) ("HSA"), dissolved the INS and transferred most of its functions to the Department of Homeland Security ("DHS"). 6 U.S.C § 279. Congress directed, however, that the ORR should have authority over unaccompanied minors detained pursuant to the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq*. ("INA"). *Id*.

The HSA included savings provisions that continue the Settlement in effect as to the INS's successor agencies. HSA §§ 462(f)(2), 1512(a)(1). HHS has recognized that the Settlement continues to protect juveniles in its custody. *E.g.,* www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2 and www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3#3.1 (last checked December 4, 2015); www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services (last checked December 4, 2015).

MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

For some 19 years[2] the Settlement has guaranteed children whom the Government refuses to release the right to a bond redetermination hearing, *see* 8 C.F.R. §§ 1003.19(a), 1236.1(d) (2015), as a procedural check against wrongful detention: "A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing." Settlement ¶ 24A.[3] Paragraph 24A encourages the Government to comply with its "general policy favoring release" of juveniles and ensures that minors may be heard on whether continued detention is "required either to secure [their] timely appearance ... or to ensure the minor's safety or that of others..." Settlement ¶ 14. Defendants, however, now insist that they needn't comply with ¶ 24A:

> It is also [ORR and ICE's] position that ... [b]ecause the TVPRA clearly places
>
> all authority for these placement decisions and review of those decisions

---

[2] Although the Settlement contains a five-year sunset clause, in 2001 the parties stipulated that it shall remain binding until "45 days following defendants' publication of final regulations implementing this Agreement." Dkt. 101. Defendants have never published such regulations.

[3] Effective April 1, 1997, administrative proceedings to determine a non-citizen's right to be or remain in the United States have generally been re-designated as "removal," rather than "deportation" proceedings. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. 104-208, Div C, § 309(a), 110 Stat. 3009 (1996).

with HHS, and because no statute or regulation provides an immigration

judge with the authority to review the determination made by HHS,

Paragraph 24A of the Flores Agreement cannot be applied to this case.

Email from Sarah Fabian, Office of Immigration Litigation, November 23, 2015,

Exhibit 1-ORR.[4]

The parties thus appear to disagree solely over whether the William

Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 110 Pub. L.

457, 122 Stat. 5044, *codified in pertinent part at* 8 U.S.C. § 1232 ("TVPRA"),

abrogates Settlement ¶ 24A. In plaintiffs' view, it does not.

II   THE COURT SHOULD ENFORCE THE SETTLEMENT PURSUANT TO ITS PLAIN TERMS.

About a year ago this Court affirmed its jurisdiction to enforce the

Settlement and set out the principles apposite to its interpretation. Order re:

Plaintiffs' Motion to Enforce Settlement, etc., July 24, 2015 (Dkt. 177), at 3 (2015

_____

[4] On December 28, 2015, plaintiffs wrote to request that defendants meet pursuant to Local Rule 7-3 and Settlement ¶ 37 in an effort to settle their differences. Exhibit 2-ORR. The parties did so on January 7, 2016, but to no avail.

On February 9, 2016, defendants emailed to advise that "HHS ... is open to considering some changes in the reconsideration process. That said, you need to be aware that any reconsideration process that HHS would be willing or able to implement would likely be informal, and not a full administrative hearing." Exhibit 3-ORR. On February 12, 2016, plaintiffs replied that HHS would at least need to afford detained children "a prompt administrative hearing, either in-person or via video conference, to redetermine the grounds for continuing [them] in custody ..." *Id*. Plaintiffs heard nothing further from defendants about this matter thereafter.

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

Enforcement Order). The cardinal principle the Court articulated is simple:

"'Where the contract is clear, the plain language of the contract governs.'" *Id*. at 3.

And the Settlement is *wholly* clear: detention is inimical to the well-being of youth; defendants must therefore release minors to qualified custodians[5] "without unnecessary delay" unless detention is "required either to secure ... timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others ..." Settlement ¶ 14.[6] If defendants wish to continue detaining a child, they must afford him or her a bond hearing. *Id*. ¶ 24A. Absent a fundamental change in law, then, the Court should enforce ¶ 24A according to its plain terms.

Nor does the TVPRA strip detained children of their right to a bond hearing. To the contrary, the law's *raison d'être* is to confer *greater* protection on unaccompanied children, not expose them to peremptory detention.

---

[5] The Settlement directs defendants to release a child "in order of preference" to parents and then to other qualified custodians, including licensed juvenile shelters. Settlement ¶ 14.

[6] Further ensuring that the detention of children would be a last resort, Settlement ¶ 18 provides, "Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, *shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor* pursuant to Paragraph 14 above.

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

III    THE TVPRA NOWHERE EXCUSES ORR'S REFUSAL TO AFFORD DETAINED JUVENILES A BOND HEARING.

Defendants' sole defense to the instant motion is that the TVPRA relieves ORR of its duty to afford class members an opportunity to be heard regarding the loss of their personal liberty. Yet if defendants believed ORR's giving class members a bond hearing would violate the TVPRA, it was incumbent on them to ask the Court to reform the Settlement, rather than ignore it. *United States v. Atlantic Refining Co.*, 360 U.S. 19, 23; 79 S. Ct. 944; 3 L. Ed. 2d 1054 (1959) (that modification might be justified does "not warrant our substantially changing the terms of a decree … without any adjudication of the issues.").

The law, in all events, is clear: plaintiffs are entitled to the benefits of the Settlement except to the extent defendants carry —

"the burden of establishing that a significant change in circumstances warrants revision of the decree." "A party seeking modification of a consent decree may meet its initial burden by showing either a significant change either in factual conditions or in law." *Id*. *The change in the law must be so significant that complying with both statute and a prior agreement would be "impermissible*."

2015 Enforcement Order at 20 (citations omitted; emphasis added).

Defendants must therefore establish that complying with ¶ 24A would now require them "'to violate the law,'" *Jeff D. v. Kempthorne*, 365 F.3d 844, 854 (9th Cir. 2004), or that providing youth a meaningful opportunity to be heard regarding their confinement would convert the Settlement into "an instrument of wrong." *Railway Employees' v. Wright*, 364 U.S. 642, 647; 5 L. Ed. 2d 349; 81 S. Ct. 368 (1961).[7]

Precedent teaches that to void a consent decree's provision a purported conflict in law must be clear and irreconcilable. In *Railway Employees*, *supra*, non-union employees sued a railroad and its unions for discriminating against them in violation of the Railway Labor Act (RLA). The parties entered a consent decree that prohibited a union shop, a restriction that mirrored the RLA at the time. Several

---

[7] Even assuming, *arguendo*, the TVPRA were to prohibit giving detained children bond hearings, that would hardly justify stripping them process equivalent to what the Settlement requires. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 391; 112 S. Ct. 748; 116 L. Ed. 2d 867 (1992) (where "changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires."); *Orantes-Hernandez v. Gonzales*, 2006 U.S. Dist. LEXIS 95388, 13-26 (C.D. Cal. 2006) (same).

If defendants believe the TVPRA actually conflicts with ¶ 24A, they may move to modify the Settlement so that, for example, HHS would itself provide class members process equivalent to a bond hearing.

MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

years later Congress amended the RLA to permit union shops. The Court held modification warranted:

> When the decree in this case was originally made, union shop agreements were prohibited ... Congress has since, *in the clearest terms,* legislated that bargaining for and the existence of a union shop contract ... are not forbidden discriminations ... That provision was well enough under the earlier Railway Labor Act, but to continue it after the 1951 amendment would be to render protection in no way authorized by the needs of safeguarding statutory rights at the expense of a privilege denied and deniable to no other union.

*Id*. at 648; *see also Orantes-Hernandez, supra, at*, 13-26 (assessing multiple alleged conflicts between advisal re: asylum, etc., required under permanent injunction and changed statute).

Here, in contrast, nothing in the TVPRA makes it "wrong" or "unlawful" to provide detained children a bond hearing. Congress's intent was rather to grant unaccompanied minors *greater* protections, not fewer: namely —

> [1 to] require[] *better* care and custody of unaccompanied alien children to be provided by the Department of Health and Human Services (HHS); [and]
>
> [2 to] *improve[] procedures* for the placement of unaccompanied children in safe and secure settings ...

H. R. Rep. 110-430, 110th Cong., 1st Sess., 57 (2007) (emphasis added).

Clearly, the TVPRA has no quarrel with affording children an opportunity to be heard regarding cause for detaining them. As this Court notes, the TVPRA is "*consistent with the Agreement's preference for release provision*, such as the TVPRA's requirement that CBP find '[s]afe and secure placements' for children 'in the least restrictive setting that is in the best interests of the child'—typically, 'a suitable family member.'" 2015 Enforcement Order at 22 (emphasis added). Stripping class members of their right to be heard regarding detention hardly "improves procedures" for placing them in least restrictive settings.

Nor does the text of the TVPRA conflict with ¶ 24A.[8] Indeed, one searches the act in vain for anything approximating the *volte-face* dispositive in *Railway Employees*.

_____

[8] Substantively, the TVPRA prescribes the following general changes:

TVPRA § 235(b)(1) directs defendants, to "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize ... children..." TVPRA § 235(b)(2) directs HHS to place children "in the least restrictive setting that is in the best interest of the child." TVPRA § 235(b)(3)(A) provides that HHS shall not place "an unaccompanied alien child ... with a person or entity unless ... the proposed custodian is capable of providing for the child's physical and mental well-being."

These changes largely mirror the Settlement. *E.g.*, Settlement ¶ 11 ("The INS shall place each detained minor in the least restrictive setting ..."); *id.* ("Nothing herein shall require the INS to release a minor to any person or agency whom the INS has

TVPRA § 235(b), *codified at* 8 U.S.C. § 1232(b), which strives to "[c]ombat[]

child trafficking and exploitation in the United States," *id*., provides as follows:

> (1) Care and custody of unaccompanied alien children.-- Consistent with
>
> section 462 of the Homeland Security Act of 2002 (6 U.S.C. 279), ... the care
>
> and custody of all unaccompanied alien children, including responsibility for
>
> their detention, where appropriate, shall be the responsibility of the
>
> Secretary of Health and Human Services.

Section 235(b) nowhere prohibits ORR from affording children a bond

hearing. At most, defendants may argue that by vesting HHS with authority for the

"care and custody" of unaccompanied class members the TVPRA *sub silentio*

denies immigration judges authority to review ORR decisions to deny class

members' release. But whatever its superficial appeal, that argument falls far

short of justiyfing ORR's claiming autocratic detention authority, a claim that is not

only violative of the Settlement, but also of prevailing child welfare standards and

fundamental fairness.

First, § 235(b) does not materially enlarge the authority ORR has had over

unaccompanied class members since 2002. The HSA "transferred to [ORR] ...

_____

reason to believe may harm or neglect the minor...."); *id*. at ¶ 17 ("A positive
suitability assessment may be required prior to release ...").

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

functions ... with respect to the care of unaccompanied alien children that were vested by statute in, or performed by, the [INS] ...” prior thereto. 6 U.S.C. § 279(a).[9]

At the time the HSA became law, the INS was responsible for “the detention, release, and treatment of minors in [its] custody...” Settlement ¶ 9, as well as for “plac[ing] each detained minor in the least restrictive setting appropriate to the minor's age and special needs ...” *Id*. ¶ 11. The INS was not to release a minor to anyone who might “harm or neglect the minor or fail to present him or her before the INS or the immigration courts ...” *Id*. Until released, minors “remain[ed] in INS legal custody.” *Id*. at ¶ 19.

Prior to 2002, then, the former INS was *wholly* responsible for the “care and custody” of class members, and the HSA transferred this authority to ORR *in toto*. The TVPRA’s giving HHS responsibility for “the care and custody” of

---

[9] HSA § 462(b) further provides that ORR shall be responsible for “coordinating and implementing the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status..., ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child; [and] making placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status...”

10

unaccompanied class members, and "responsibility for their detention," therefore reiterates, rather than expands, the authority ORR has exercised since 2002.[10]

In TVPRA § 235(b)(1) Congress also directed HHS to exercise the authority conferred by that section "*[c]onsistent[ly] with section 462*" of the HSA. (Emphasis added.) *The TVPRA thus incorporates the HSA's savings clauses*, again preserving the Settlement.[11] Yet until the TVPRA, class members in ORR custody were clearly entitled to bond hearings.

---

[10] The HSA directed HHS to "consult with [Immigration and Customs Enforcement] to ensure that such determinations ensure that unaccompanied alien children ... (i) are likely to appear for all hearings or proceedings ... and (iii) are placed in a setting in which they are not likely to pose a danger to themselves or others..." 6 U.S.C. § 279(b)(2).

Here again, TVPRA § 235(c)(2) breaks no new ground: "*Subject to section 462(b)(2) of the Homeland Security Act of 2002* (6 U.S.C. § 279(b)(2)), an unaccompanied alien child in the custody of the Secretary of Health and Human Services shall be promptly placed in the least restrictive setting that is in the best interest of the child. In making such placements, the Secretary may consider danger to self, danger to the community, and risk of flight." (Emphasis added.)

In *both* the HSA and TVPRA, then, Congress directed that ORR *not* have sole competence to determine minors' dangerousness or likelihood to abscond. Nothing in the HSA or the TVPRA suggests that ORR's views regarding flight-risk or dangerousness merit any special deference, much less abject obeisance.

[11] The TVPRA neither repealed nor amended 6 U.S.C. § 279, which reads today exactly as it has since 2002.

HSA § 462(f)(2) provides: "Subsections (a), (b), and (c) of section 1512 shall apply to a transfer of functions under this section in the same manner as such provisions

At least twice prior to the TVPRA, the Board of Immigration Appeals (BIA)

held, albeit in non-precedent decisions,[12] that immigration judges could review

ORR custody decisions despite ORR's authority over unaccompanied minors. In *In

Re: Rodriguez-Lopez*, 2004 WL 1398660 (BIA 2004), Exhibit 8-ORR, an immigration

judge redetermined a juvenile's custody notwithstanding that ORR was detaining

him. Although the judge found detention warranted to "to ensure the

respondent's appearance at future proceedings," *id*. at 1, jurisdiction *ab initio* was

never questioned. The BIA affirmed on the ground that the juvenile had failed to

---

apply to a transfer of functions under this Act to the Department of Homeland
Security." HSA § 1512(a) in turn provides:

> (1) *Completed administrative actions of an agency shall not be affected* by
> the enactment of this Act or *the transfer of such agency to the Department,
> but shall continue in effect according to their terms* until amended,
> modified, superseded, terminated, set aside, or revoked in accordance with
> law by an officer of the United States or a court of competent jurisdiction,
> or by operation of law.

> (2)  For purposes of paragraph (1), the term "completed administrative
> action" includes orders, ... *agreements*, grants, contracts, certificates,
> licenses, registrations, and privileges.

*Id*. (emphasis added); *see also* 6 U.S.C. § 552(c) ("pending civil actions shall
continue notwithstanding the enactment of this Act or the transfer of an agency to
the Department, and in such civil actions, proceedings shall be had, appeals taken,
and *judgments rendered and enforced in the same manner and with the same
effect as if such enactment or transfer had not occurred*." (emphasis supplied)).

[12] Only decisions designated as precedents formally bind the BIA. 8 C.F.R. §
1003.1(g). Still, the BIA will cite non-precedent decisions in deciding similar cases.
*E.g., Matter of De la Rosa*, 14 I. & N. Dec. 728 (BIA 1974).

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

"demonstrate that his release would not pose a danger to property or persons and that he is likely to appear at any future proceedings..." *Id*. at 2. Implicit in the BIA's disposition was that the immigration judge properly exercised jurisdiction to redetermine the twin factors traditionally considered in bond hearings: dangerousness and flight-risk. *E.g., Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006).

In *Matter of A--*, 2005 Immig. Rptr. LEXIS 54924 (BIA 2005), Exhibit 7-ORR, the BIA reversed an immigration judge's order disavowing jurisdiction to review ORR's continuing to detain a minor:

> We find, however, that, notwithstanding 6 U.S.C. § 279, *an Immigration Judge retains jurisdiction over the threshold issue of whether an unaccompanied minor should be detained at all*. Were an Immigration Judge to determine that an unaccompanied minor should be detained, then the ORR would have exclusive authority over decisions relating to the care and placement of the unaccompanied minor.

*Id*. (emphasis supplied).[13]

---

[13] More recently, the Board has reversed course to hold that immigration judges lack jurisdiction over ORR detention decisions, partly because no statue or regulation confers it. *See In Re: Aguilar-Ramirez*, A206 775 662 (BIA 2016), Exhibit 3-ORR.

Immigration judges exercise statutory authority delegated by the Attorney General. The statute that authorizes general immigration-related detention and

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

And even were the TVPRA ambiguous, the Court should construe it so as to avoid constitutional questions. *E.g., Diouf v. Napolitano*, 634 F.3d 1081, 1086 (9th Cir. 2011) ("prolonged detention ... without adequate procedural protections, would raise 'serious constitutional concerns.' ... To address those concerns, we apply the canon of constitutional avoidance."). Here, contorting the TVPRA to grant ORR unbridled authority to deny children bond hearings would raise profound constitutional concerns.

First, immigration judges clearly retain authority to review the detention of *accompanied* minors. *E.g., Matter of Granados-Gutierrez*, A206 848 455 (I.J. 2014), Exhibit 9-ORR. In defendants' view, youth with a parent to help them receive bond hearings, *whereas those without a parent do not*. Sujecting only the *most defenseless* children to peremptory confinement is not only inimical to the TVPRA, it is irrational. *Cf. Nordlinger v. Hahn*, 505 U.S. 1, 10; 112 S.Ct. 2326; 120 L.Ed.2d 1

---

release, 8 U.S.C. § 1226(a), reads exactly as it did prior to the demise of the INS, an entity within the Department of Justice, and it still authorizes *only* the Attorney General to take aliens into custody, detain them, set bond, etc. Immigration judges' reviewing ORR's custody decisions is no more inconsistent with § 1226(a) than is their reviewing ICE's custody decisions.

The BIA also ignores that the Settlement (a) prevails over inconsistent regulations, Settlement ¶ 9 ("This Agreement ... shall supersede all previous INS policies that are inconsistent with the terms of this Agreement."); (b) requires defendants to "publish the ... terms of this Agreement as a Service regulation," *id*.; and (c) requires that "[t]he final regulations shall not be inconsistent with the terms of this Agreement." *Id*. Defendants' breaching the Settlement's rulemaking requirement can hardly excuse their breaching the bond hearing requirement.

(1992) (equal protection guarantee bars "treating differently persons who are in all relevant respects alike.").

Second, ORR's refusal to release class members to parents, as the Settlement and TVPRA require, implicates their substantive due process interest in parental care. *Smith v. Organization of Foster Families*, 431 U.S. 816, 843; 97 S. Ct. 2094; 53 L. Ed. 2d 14 (1977).

Third, if defendants wish to lock up children as dangerous or flight-risks, the Due Process Clause requires they have a meaningful opportunity to be heard. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 690, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001) ("Freedom from ... government custody, detention, or other forms of physical restraint ... lies at the heart of the liberty [the Due Process] Clause protects.").

These constitutional concerns are wholly at odds with ceding ORR *carte blanche* to detain unaccompanied class members.

The Court should order defendants to resume complying with ¶ 24 forthwith.

IV    ORR's AD HOC DETENTION PROTOCOL FALLS FAR SHORT OF SATISFYING ¶ 24A.

ORR fails to afford unaccompanied children procedural protection against misguided detention even roughly equivalent to a bond redetermination. The procedure ORR nominally follows when denying class members release appears

nowhere in the Code of Federal Regulations or even a published manual.[14] Rather, in January 2015, the agency posted the following on its web page:

2.7.7 Appeal of Release Denial

ORR must notify a parent or legal guardian in writing if they are denied the release of a child. The denial notification letter must include: The basis for the denial [and] [i]nformation on the process for requesting reconsideration of the decision[.]

A parent or legal guardian who wants to request reconsideration of a release decision should submit a request to the ACF Assistant Secretary within 30 business days of receipt of the denial notice. The request should include the basis for the request along with any additional information that

---

[14] ORR recently came under fire for releasing class members into bondage to custodians whom the agency had never seen. Staff Report, U.S. Senate Permanent Subcommittee on Investigations, *Protecting Unaccompanied Alien Children from Trafficking and Other Abuses*, January 2016, at 26, *available at* www.hsgac.senate.gov/download/majority-and-minority-staff-report_-protecting-unaccompanied-alien-children-from-trafficking-and-other-abuses-the-role-of-the-office-of-refugee-resettlement (last visited August 9, 2016).

The staff report calls ORR to task for the "lack of transparency" in its detention and release procedures: "... ORR's policies are kept and revised in an ad hoc manner. ... Under its current practice, ORR can make major changes to its placement procedures without notice ... Setting governmental policy on the fly ... is inconsistent with the accountability and transparency that should be expected of every administrative agency." The bond redetermination procedure, in contrast, is both stable and transparent, features ORR seems to embrace reluctantly, if at all.

the requestor would like the ACF Assistant Secretary to consider.

The ACF Assistant Secretary will conduct a review of the decision and notify

the requestor of the results.

Sponsors other than parents or legal guardians who would like to request

reconsideration of a release decision should submit a letter to ORR

requesting a reconsideration of the decision.

Exhibit 5-ORR; *also available at* www.acf.hhs.gov/programs/orr/resource/

children-entering-the-united-states-unaccompanied-section-2#2.1 (last visited

August 10, 2016).

Several aspects of this procedure are remarkable: First, it fails to recognize

that *detained children* have a cognizable, independent right to be heard on

whether they will be detained. ORR is concerned *exclusively* with proposed

*custodians*' rights, and then begrudgingly affords only parents a path to cursory

administrative review of decisions to keep their children detained.

Second, the agency nowhere accords children or available custodians any

right to examine the evidence that purportedly warrants continued confinement.

Third, ORR fails to restrain itself to deciding on the basis of relevant and

reliable evidence; it does not pretend to employ any articulable standard of proof

or even to allocate evidentiary burdens. *Cf. Singh v. Holder*, 638 F.3d 1196, 1203-

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

04 (9th Cir. 2011) (Government must produce clear and convincing evidence of flight-risk or dangerousness to prolong immigration detention).

Fourth, nowhere does ORR grant children or proposed custodians the right to be represented by retained counsel.[15] *See* 8 U.S.C. § 1232(c)(5) ("The Secretary of Health and Human Services shall ensure, to the greatest extent practicable ... that all unaccompanied alien children who are or have been in the custody of the Secretary ... have counsel to represent them in legal proceedings or matters ...").

Fifth, ORR's procedure fails to set any limit on the time it may take to decide a child's fate, nor is there any requirement that detained children, proposed custodians, or counsel of record receive notice of ORR's decision within any time certain once a decision is made.

Finally, nowhere does ORR grant children or their proposed custodians the right to an actual hearing on the reasons for detaining a child.

ORR's *ad hoc* procedure falls far short of affording class members the process due under ¶ 24.

---

[15] Nor does ORR recognize that the interests of detained children and proposed custodians may conflict, such that they should be separately represented. *E.g.*, *In re S.D.,* 102 Cal.App.4th 560, 563; 125 Cal.Rptr.2d 570 (2002) (state law requires appointing children in dependency proceedings independent counsel focused solely on their best interests).

In marked contrast, bond redeterminations are governed by both regulation, 8 C.F.R. § 1003.19(b), and the Immigration Court Practice Manual. Office of the Chief Immigration Judge, IMMIGRATION COURT PRACTICE MANUAL, § 9.3(c), *available at* www.justice.gov/eoir/office-chief-immigration-judge-0 (last visited March 2, 2016). Key protections this process provide include the following:

Upon being notified that a respondent wishes to be heard on the matter of his or her detention, "the Immigration Court schedules the hearing *for the earliest possible date*." *Id*. § 9.3(d) (emphasis added).

At the hearing "the alien may be represented at no expense to the government." *Id*. § 9.3(e)(ii). The detainee has the right to "make an oral statement . . . addressing whether the alien's release would pose a danger to property or persons, whether the alien is likely to appear for future immigration proceedings, and whether the alien poses a danger to national security." *Id*. at § 9.3(e)(v). Although bond hearings are not transcribed or recorded, "[t]he Immigration Judge creates a record, which is kept separate from the Records of Proceedings for other Immigration Court proceedings involving the alien." *Id*. § 9.3(e)(iv).

The immigration judge must base his or her decision on the evidence *"filed in open court* or, if the request for a bond hearing was made in writing, together with the request." (emphasis added). The judge must inform the parties, orally or

19

in writing, of the reasons for the custody decision. 8 C.F.R. § 1003.19(f). A detainee who disagrees with the judge's custody decision is entitled to appeal adminsitratively to the Board of Immigration Appeals. *Id.*; 8 C.F.R. § 1003.38.[16]

These are the safeguards immigrants have historically enjoyed as a hedge against wrongful confinement, and these are the procedures the Settlement provides detained children should have. This, then, is the process the Court should order defendants to observe if they wish to confine a child.

V    ORR'S OPAQUE AND PEREMPTORY DETENTION DECISIONS INFLICT IRREPARABLE INJURY ON VULNERABLE YOUTH.

Class member Bryan Ortiz was living with his father after having completed a sentence for juvenile delinquency, when ICE arrested him and sent him to ORR. Declaration of Bryan Ortiz, January 12, 2016, Exhibit 14-ORR, ¶ 1. ORR thereafter incarcerated him at juvenile halls, including Yolo County's, from February to May 2013. *Id*. at ¶¶ 2-3. Bryan describes the Kafkaesque experience he and his family endured in trying to win his freedom:

> Two weeks after the initial 30 days [of detention] had passed, a women in charge of ORR detainees came ... I told her that my mother had been trying

---

[16] Bond redetermination is not a one-time event. A detainee is entitled to be re-heard upon a showing that her or his circumstances have changed materially after the initial bond hearing. 8 C.F.R. § 1003.19(e). *Matter of Uluochoa*, 20 I. & N. Dec. 133 (BIA 1989).

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

for weeks to have me released to her custody and had done everthing she

could so that ORR would approve a home study ... She told me I would be

able to get released within the next few weeks. My lead ORR case manager

[told me the] same ... I was so happy that day, ....

I had an immigration court on May 11, 2015 ... After I had returned from

court, ... I was told that the woman who told me I would be released had

changed her mind. ... I did not receive anything in writing about this denial.

The ORR official who had promised my release never bothered to speak to

me again...

*Id.* at ¶¶ 11-15.[17]

Two days later, on May 13, 2015, Bryan turned 18; ORR transferred him to

ICE. *Id.* at ¶ 17. Thereafter, an immigration judge found Bryan was neither a flight-

risk nor dangerous and ordered him released. *Id.* at ¶ 19. "I could not understand,"

Bryan soberly observes, "why my delinquent acts were so serious I could not be

---

[17] *Accord* Declaration of Megan Stuart, July 29, 2016, Exhibit 11-ORR (Stuart), ¶ 12 ("In multiple cases ... I have advised ORR of the availability of less restrictive placements, including release to parents, guardians, or other appropriate custodians, yet in my experience ORR generally ignores such alternatives or rejects them without providing detained children, their parents or other proposed custodians, or their counsel a coherent explanation of why it believes release would be inappropriate, nor does ORR provide any meaningful opportunity to examine, much less explain or rebut, any evidence it may have to support having denied children's release."); Affidavit of Lorilei Williams, August 5, 2016, Exhibit 10-ORR, ¶ 17 (Williams) (same).

released safely when I was a minor, yet somehow they did not matter so much once I turned 18." *Id*.[18]

Megan Stuart, an attorney who formerly represented unaccompanied minors detained in New York,[19] describes the case of Sandra Igihozo, a young client

---

[18] Hector Boteo, a 15-year old Guatemalan, first detained in August 2015 and still confined at Yolo Juvenile Hall in March 2016, expressed similar bewilderment over his fate:

> In November or December [2015, detention facility personnel] informed me that I had passed the psychological evaluation, but that they were going to keep me detained for maybe another month, until they could finish evaluating my mom's house. Currently, it has been one month or one and a half months since the informed me that the evaluation of my mom's house had also been positive, but I remain detained, and I have no idea when I will leave detention.

Declaration of Hector Estiven Boteo, March 1, 2016, Exhibit 12-ORR.

On May 26, 2016, class counsel was compelled to object to defendants' having shackled Hector during transport from Yolo to San Francisco and back, so that he might be interviewed on his asylum application. Exhibit 15-ORR.

[19] Between 2009 and 2013, ORR gave the Vera Institute of Justice nearly $40 million to provide legal services to detained minors. Exhibit 16-ORR at 51. Vera then sub-contracts with non-profit legal services providers to deliver those services. *Id.* at 7-9. ORR funding, however, is no unalloyed boon:

> ORR also appears to have done its best to insulate its decisions to continue children in detention from judicial review. When I discussed [a client's] plight with my supervisors at Catholic Charities in Houston, I was told explicitly that we could not take legal action against ORR because our Vera Institute funding to help detained children would be at risk.

who fled Rwanda after being tortured because of her sexual orientation. In July

2013, after being raped and impregnated en route to join family in Canada, Sandra

was arrested and consigned to ORR detention. Stuart ¶¶ 15-17.

On October 2, 2013, Ms. Stuart pressed ORR to release Sandra to an

accredited youth shelter, to no avail. *Id*. at ¶ 18 and Exhibit B. In December 2013,

she tried again, warning that if Sandra were not released before January 30,

2014—her 18th birthday—she would be consigned to an ICE adult detention

facility, or discharged into homelessness, during her third trimester of pregnancy.

Ms. Stuart reminded ORR that Covenant House, a licensed youth shelter,

had agreed to care for Sandra and her baby though Sandra's 21st birthday. *Id*., at ¶

18 and Exhibit C. She describes her efforts as follows:

> Between October and December 2013 I made several additional requests to
>
> ORR for Sandra to be released so that she could enter foster care, all of
>
> which were denied without any explanation of the reasons for the decision,
>
> the standards employed, or the evidence upon which the decision was
>
> based. Sandra remained in ORR custody until January 10, 2014 ... [when
>
> ORR] released Sandra into URM care, though ORR never offered any
>
> explanation for reversing its decision to detain Sandra.

Williams ¶ 16; *id*. ¶¶ 19-20 (ORR "hobbles free legal services providers who
undertake to represent detained children."); Stuart ¶¶ 22-24 (same).

*Id*. at ¶¶ 18-21.[20]

Lorilei Williams, another legal services lawyer who formerly represented unaccompanied minors detained in Houston and New York, emphasizes the trauma ORR's opaque practices inflict on detained youth:

Although I am not a mental health professional, I have noted the deleterious effects ORR's opaque and oft-delayed release and step-down decisions have on detained youth... [F]acility staff repeatedly encourage[] my clients, their parents, and myself to believe that ORR would release my clients promptly, whereas in truth and fact the agency delayed its decisions for weeks or months, leaving children, their parents, and their lawyer twisting in the wind, awaiting a decision from on high that might or might not be favorable and that would never be explained other than in the barest of conclusory terms. In the face of such extended and faceless uncertainty, detained children—already traumatized by horrific experiences in their countries of origin—have expressed to me feeling profound helplessness and despair, to the point where they are prepared to take extreme measures, including opting for voluntary return to countries in which they know their lives and

---

[20] Ms. Stuart asked Immigration Judge Patricia Rohan to order Sandra's release over ORR's objection. The judge declined, stating, "I do not believe I have authority to order the release or placement of the respondent. I would wish that I had such authority, but I do not." *Id*. at Exhibit A2.

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

freedom will be in jeopardy, rather than continue to live day after day in

ORR's detention facilities never knowing if or when they will be reunited

with their families.

Williams ¶ 18.

VI   CONCLUSION

For the foregoing reasons, this Court should grant this motion and enter an

order in the form lodged concurrently herewith.[21]

Dated: August 12, 2016.                    Respectfully submitted,
                                           Center For Human Rights &
                                           Constitutional Law
                                           Carlos Holguín
                                           Peter A. Schey


                                           Holly Cooper
                                           University of California Davis School of
                                           Law


                                           Youth Law Center
                                           Alice Bussiere
                                           Virginia Corrigan


                                           /s/ Carlos Holguín
                                           _____

_____

[21] Plaintiffs will separately move the Court to award them attorney's fees and costs incurred in the prosecution of this motion pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)