CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

Holly S. Cooper
Director, Immigration Law Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

*Of counsel:*
YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*Attorneys for plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Jeh Johnson, Secretary, U.S. Department of Homeland Security, *et al.*, <br><br> Defendants. | Case No. CV 85-4544-DMG (AGRx) <br><br> PLAINTIFFS' EXHIBITS [ORR-PT.1] <br><br> [Exhibits 1–11] <br><br> Hearing: September 9, 2016 <br> Time: 9:30 a.m. <br> Courtroom 7, 312 N. Spring Street |

INDEX TO EXHIBITS

| No. | Description | Page |
|-----|-------------|------|
| 1 | Email from Defendants to Plaintiffs, November 23, 2015 | 1 |
| 2 | Letter from Plaintiffs to Defendants, December 28, 2015 | 5 |
| 3 | Email from Plaintiffs to Defendants, February 12, 2016 | 11 |
| 4 | Statement of Principles Between DHS and HHS Unaccompanied Alien Children Program, April 6, 2004 | 15 |
| 5 | Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Section 2, January 30, 2015 | 18 |
| 6 | In re: Pablo Alexander Aguilar-Ramirez, A206 775 662 (BIA 2016) | 37 |
| 7 | *Matter of A--*, 2005 Immig. Rptr. LEXIS 54924 (BIA 2005) | 40 |
| 8 | *In Re: Rodriguez-Lopez*, 2004 WL 1398660 (BIA 2004) | 42 |
| 9 | *Matter of Granados-Gutierrez*, A206 848 455 (I.J. 2014) | 46 |
| 10 | Affidavit of Lorilei Alicia Williams, August 5, 2016 | 81 |
| 11 | Declaration of Megan Stuart, July 29, 2016 | 93 |
| 12 | Declaration of Hector Estiven Boteo, March 1, 2016 | 121 |
| 13 | U.S. Dept. of Homeland Security, Form I-770 Notice of Rights and Request for Disposition, August 1, 2007 | 135 |
| 14 | Declaration of Bryan Ortiz, January 12, 2016 | 138 |
| 15 | Letter from Plaintiffs to Defendants, May 26, 2016 | 146 |
| 16 | Contract Between Department of Health and Human Services and Vera Institute of Jutice, Inc., July 31, 2009 | 160 |

1

2    Dated: August 12, 2016        CENTER FOR HUMAN RIGHTS &

3                         CONSTITUTIONAL LAW
                              Carlos Holguín

4                         Peter A. Schey

5                         Holly Cooper

6                         University of California Davis School of
                         Law

7

8                         YOUTH LAW CENTER
                         Alice Bussiere

9                         Virginia Corrigan

10

11   / / /                      /s/Carlos Holguín _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1-ORR

Subject: RE: Flores class member denied bond redetermination hearing
From: "Fabian, Sarah B (CIV)" <Sarah.B.Fabian@usdoj.gov>
Date: Mon, 23 Nov 2015 23:58:30 +0000
To: Carlos Holguín <crholguin@centerforhumanrights.org>
CC: "Silvis, William (CIV)" <William.Silvis@usdoj.gov>, Ashley Melwani <Ashley@lsc-sf.org>, Peter Schey <pschey@centerforhumanrights.org>, "Alice Bussiere" <abussiere@ylc.org>

Dear Carlos:

Thank you for your email.  I want to initially note that the individual in question will turn 18 on December 5, and if he is transferred to ICE custody, will have the opportunity for a custody determination and bond hearing under 8 U.S.C. 1226(a) and implementing regulations.

Moreover, it is the Government's position in this case that the UAC's custody is governed by the TVPRA, as discussed in the DHS brief you attached to your email.  The BIA decision that you included was decided before the TVPRA was enacted, and does not control here.  It is also our position that Paragraph 24A of the Flores Agreement cannot control over 8 U.S.C. 1232(c)(2)(A), which authorizes the Secretary of Health and Human Services (HHS) to make placement decisions for UACs, and to prescribe review procedures for those placement decisions.  Because the TVPRA clearly places all authority for these placement decisions and review of those decisions with HHS, and because no statute or regulation provides an immigration judge with the authority to review the determination made by HHS, Paragraph 24A of the Flores Agreement cannot be applied to this case.  *See System Federation No. 91, Railway Employees Department v. Wright*, 364 U.S. 642 (1961) ("But just as the adopting court is free to reject agreed-upon terms as not in furtherance of statutory objectives, so must it be free to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives. . . The parties have no power to require of the court continuing enforcement of rights the statute no longer gives.").

Please let me know if you have any other questions or would like to discuss this further.

Thank you,
Sarah


Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Carlos Holguín [mailto:crholguin@centerforhumanrights.org]
**Sent:** Thursday, November 19, 2015 5:10 PM
**To:** Fabian, Sarah B (CIV)
**Cc:** Silvis, William (CIV); Ashley Melwani; Peter Schey; Alice Bussiere
**Subject:** Re: Flores class member denied bond redetermination hearing

I'm attaching the IJ's order denying Mr. Zamora a bond redetermination for the reasons the trial attorney argued in the motion to reconsider sent previously.

When may we expect to hear back from defendants on this?

Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law

**2**

256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
213.386.9484 (fax)
http://www.centerforhumanrights.org

On Nov 16, 2015, at 12:16 PM, Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:

Carlos:

Thank you for your email.  I will look into this issue.  Please let me know if there are any changes or
new information in the meantime.

Thank you,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Carlos Holguín [mailto:crholguin@centerforhumanrights.org]
**Sent:** Monday, November 16, 2015 2:55 PM
**To:** Fabian, Sarah B (CIV)
**Cc:** Silvis, William (CIV); Ashley Melwani; Peter Schey; Alice Bussiere
**Subject:** Flores class member denied bond redetermination hearing

Dear Sarah,

I've been contacted by Legal Services for Children regarding *Flores* class member Brian
Manuel Zamora-Maldonado, A205 982 484.

Counsel advises that the immigration court in San Francisco recently refused to grant Mr.
Zamora a bond redetermination hearing, adopting the trial attorney's position that "[a]s
respondent is in the care and custody of ORR and the Department has made no decision about
his custody, this court lacks … lacks jurisdiction to order the release of
respondent." *See* attached at 2-4.

As you will recall, ¶ 24A of the *Flores* settlement provides: "A minor in deportation
proceedings shall be afforded a bond redetermination hearing before an immigration judge in
every case, unless the minor indicates on the Notice of Custody Determination form that he or
she refuses such a hearing." The BIA has held that IJs retain authority to redetermine bond for
juveniles despite their being in ORR custody. *See* attached.

I'm hoping to prevail upon you informally to remind ORR and ICE of their obligation under
the settlement to provide *Flores* class members, including Mr. Zamora, bond redetermination
hearings. Please let me know if you'd rather plaintiffs proceed as ¶ 37 of the *Flores* settlement
provides.

3

Thank you,

Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
213.386.9484 (fax)
http://www.centerforhumanrights.org

4

Exhibit 2-ORR

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone:  (213) 388-8693 Facsimile:  (213) 386-9484
www.centerforhumanrights.org

December 28, 2015

Sarah B. Fabian
Trial Attorney
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Michael Johnson (or successor-in-office)
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman (or successor-in-office)
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

*Via first class mail (and email to Ms. Fabian)*

Re: *Flores*, et al., *v. Lynch*, et al*.,* No. CV 85-4544 DMG (C.D. Cal.).

Dear Madam/Sirs:

Pursuant to ¶ 37 of the settlement[1] approved in the above referenced action on January 25, 1997
(Settlement), plaintiffs hereby give notice of claims that defendants are breaching the Settlement
in the following particular:

Paragraph 24A of the Settlement provides: "A minor in deportation proceedings shall be
afforded a bond redetermination hearing before an immigration judge in every case, unless the
minor indicates on the Notice of Custody Determination form that he or she refuses such a
hearing."

By electronic mail dated November 23, 2015, defendants advised:

---

[1] Paragraph 37 provides in pertinent part as follows: "This paragraph provides for the
enforcement, in this District Court, of the provisions of this Agreement except for claims brought
under Paragraph 24.  The parties shall meet telephonically or in person to discuss a complete or
partial repudiation of this Agreement or any alleged non-compliance with the terms of the
Agreement, prior to bringing any individual or class action to enforce this Agreement."

6

Sarah Fabian
December 28, 2015
Page 2 of 5

> It is also our position that Paragraph 24A of the *Flores* Agreement cannot control over 8 U.S.C. 1232(c)(2)(A), which authorizes the Secretary of Health and Human Services (HHS) to make placement decisions for UACs, and to prescribe review procedures for those placement decisions. Because the TVPRA clearly places all authority for these placement decisions and review of those decisions with HHS, and because no statute or regulation provides an immigration judge with the authority to review the determination made by HHS, Paragraph 24A of the *Flores* Agreement cannot be applied to this case.

Defendants are accordingly expressly violating ¶ 24A of the Settlement, and the justification they offer therefor falls far short of excusing their breach.

To begin, the Settlement is fully binding on HHS. By its terms, the Settlement protects "all minors who are detained in the legal custody of the INS." The Settlement binds the INS and Department of Justice, as well as "their agents, employees, contractors, and/or successors in office."

In 2002 the Homeland Security Act, Pub. L. 107-296, 116 Stat. 2135 ("HSA"), transferred the former INS's authority over the care and custody of unaccompanied children to the HHS's Office of Refugee Resettlement. 6 U.S.C. § 279. However, Congress included "savings" provisions in the HSA providing, *inter alia*, that the Settlement should remain binding on those agencies now charged with exercising the former INS's authority and functions. HSA §§ 462(f)(2) and 1512(a)(1).[2]

The Settlement nowhere denies juveniles any of its protections because they are unaccompanied or placed with ORR. To the contrary, by its plain terms the agreement applies to *all* minors detained because of their immigration status, regardless of whether they are accompanied or not.

---

[2] HHS recognizes that the Settlement continues to cover juveniles transferred to its custody, *e.g.*, http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2 and http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3#3.1 (last checked December 4, 2015), and even includes the Settlement among its "key documents for the Unaccompanied Children's Services Program." *See* http://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services (last checked December 4, 2015).

The Congressional Research Service, among others, agrees. *See, e.g.*, C.R.S., *Unaccompanied Alien Children—Legal Issues: Answers to Frequently Asked Questions*, R43623, at 15-16 (July 18, 2014).

Finally, defendants have repeatedly asserted in briefs and arguments to the United States District Court overseeing this matter that the Settlement applies to unaccompanied minors, all of whom the HSA commits to ORR's authority. *E.g.*, Defendants' Response in Opposition to Plaintiffs' Motion to Enforce Settlement of Class Action, February 2, 2015 (Dkt. 121) at 10.

*See* Order Re Plaintiffs' Motion to Enforce Settlement of Class Action, etc., July 24, 2015 (Dkt. 177), at 4-5.

The Board of Immigration Appeals has held that notwithstanding the transfer of authority over unaccompanied minors to ORR, "an Immigration Judge retains jurisdiction over the threshold issue of whether an unaccompanied minor should be detained at all." Exhibit A.

Defendants nonetheless insist that § 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 110 Pub. L. 457, 122 Stat. 5044, *codified at* 8 U.S.C. § 1232, fundamentally alters the foregoing. It does not. To the contrary, insofar as is relevant here, Congress's intent in enacting § 235 was twofold:

> [1 to] require[] better care and custody of unaccompanied alien children to be provided by the Department of Health and Human Services (HHS); [and]

> [2 to] improve[] procedures for the placement of unaccompanied children in safe and secure settings ... assist children in complying with immigration orders, assist children in accessing pro bono representation and, in certain cases involving particularly vulnerable children, to obtain guardians ad litem.

H. R. Rep. 110-430, 110th Cong., 1st Sess., 57 (2007).

The TVPRA provides that the authority 8 U.S.C. § 1232(b)(1) confers on HHS is to be exercised "[c]onsistent[ly] with section 462 of the Homeland Security Act of 2002 (6 U.S.C. 279) ..." TVPRA § 235(b)(1). Nowhere, then, does the TVPRA strip detained juveniles of protections they enjoyed prior to enactment of the HSA, including those of the Settlement. To the contrary, in enacting the TVPRA Congress intended to confer *greater* protections on unaccompanied children, not strip them of a fundamental and long-established procedural protection against misguided or unnecessary deprivations of personal liberty.

Nor is there anything in what the TVPRA actually prescribes to support a contrary result.

TVPRA § 235(b)(1) directs HHS, *et al.*, to "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity..."

TVPRA § 235(b)(2) requires HHS to place children "in the least restrictive setting that is in the best interest of the child."

TVPRA § 235(b)(3)(A) provides that HHS shall not place "an unaccompanied alien child ... with a person or entity unless ... the proposed custodian is capable of providing for the child's physical and mental well-being."

None of these provisions qualitatively enlarges the authority the HSA has conferred on HHS/ORR since 2002: to wit, "coordinating and implementing the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration

Sarah Fabian
December 28, 2015
Page 4 of 5

status..., ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child; [and] making placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status..." 6 U.S.C. § 279.[3]

Further, none of these provisions even arguably vests ORR with unreviewable authority to determine that a juvenile should be continued in custody because she or he is a flight risk or dangerous, the twin factors immigration judges have historically redetermined. *See Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006); *Matter of Adeniji*, 22 I. &N. Dec. 1102 (BIA 1999); *Matter of Patel*, 15 I. & N. Dec. 666 (BIA 1976).

Plaintiffs are further informed and believe that ORR's class-wide breach of Settlement ¶ 24A is unlawfully prolonging class members' detention contrary to the Settlement's general policy favoring release, as well as violating the "least restrictive" placement requirement of TVPRA § 235(c)(2), and the Due Process Clause of the Fifth Amendment.

Plaintiffs are further informed and believe that ORR's class-wide breach of Settlement ¶ 24A is in derogation of detained children's right to legal counsel and in violation of 6 U.S.C. § 279(b)(1)(A), TVPRA § 235(c)(5), and the Due Process Clause of the Fifth Amendment.

In accordance with ¶ 37 of the Settlement and Rule 7-3 of the Rules of the United States District Court for the Central District of California, plaintiffs accordingly request that defendants HHS/ORR and U.S. Immigration and Customs Enforcement ("ICE")[4] meet with plaintiffs telephonically or in person in the Central District of California within ten business days in a good faith effort to settle the aforementioned class-wide breach of the Settlement.

Plaintiffs reserve the right to address with defendants related issues that may come to light as plaintiffs' investigation of the treatment and conditions class members experience proceeds.

---

[3] If anything, the TVPRA appears to have *reduced* the authority HSS/ORR had under the HSA to determine flight-risk and dangerousness. 6 U.S.C. § 279(b)(2)(A) provides that in making custody determinations ORR shall "ensure that unaccompanied alien children ... are likely to appear for all hearings or proceedings in which they are involved... [and] are placed in a setting in which they are not likely to pose a danger to themselves or others ..." The TVPRA confers no analogous authority upon HSS/ORR.

[4] Plaintiffs know of no authority pursuant to which ICE trial attorneys may lawfully represent HHS of ORR before the Executive Office of Immigration Review, yet in at least one case previously brought to defendants' attention, they appear to have done so. Plaintiffs are also informed and believe that ICE regularly directs or influences ORR decisions  to detaine or release class members. Plaintiffs accordingly direct the instant request to meet and confer to both HHS/ORR and ICE.

Sarah Fabian
December 28, 2015
Page 5 of 5

Should defendants wish any clarification regarding the foregoing, I may be reached at the above address and telephone number, or via email to crholguin@centerforhumanrights.org.

Sincerely,

Carlos Holguín
One of the attorneys for plaintiffs

ccs:   Peter A. Schey, Center for Human Rights & Constitutional Law
       Alice Bussiere, Youth Law Center

# Exhibit 3-ORR

**From:** **Carlos Holguín** crholguin@centerforhumanrights.org
**Subject:** Re: Flores meet/confer conference call
**Date:** February 12, 2016 at 11:26 AM
**To:** Fabian, Sarah B (CIV) Sarah.B.Fabian@usdoj.gov
**Cc:** Silvis, William (CIV) William.Silvis@usdoj.gov, Schey Peter pschey@centerforhumanrights.org, Bussiere Alice abussiere@ylc.org



Dear Sarah,

As explained during the parties' January 7, 2016, conference, in general terms plaintiffs believe an acceptable process for reviewing decisions to retain juveniles in custody should include the following:

> Recognition that detained minors have standing as primary interested parties throughout ORR's custody and release deliberations, including, when a parent is available, a core interest in family integrity.
> The right to a prompt statement, in a language the detained minor understands, of substantive criteria consistent with the *Flores* Settlement, which ORR will consider in deciding to release a juvenile, as well as an explanation of the allocation and quality of evidentiary burdens.
> The right to the assistance of retained counsel throughout release and custody determinations, to include counsel's prompt access to a detained juvenile's ORR file.
> The right to a prompt written decision explaining the factual and legal basis for a decision to retain a juvenile in custody.
> The right to a prompt administrative hearing, either in-person or via video conference, to redetermine the grounds for continuing a minor in custody, including the right to introduce written and testimonial evidence in support of release, to inspect and rebut any evidence offered in opposition thereto, and to a verbatim record of the proceedings.
> The right to a prompt written decision at the conclusion of the hearing setting forth the factual and legal basis for retaining a juvenile in custody.
> The right to prompt optional administrative review of a hearing decision against release.
> Periodic review of a juvenile's continued custody at regular intervals, and the right to have custody reconsidered in light of changed circumstances.

Plaintiffs remain willing to negotiate over how these general principles should be implemented so as to bring ORR's practice into line with either accepted child welfare principles or EOIR bond redetermination practice. I take it from your email, however, that HHS is unwilling to afford detained children anything akin to either framework. If I am wrong in this, please advise. Otherwise, I share your view that further discussions would indeed be futile.

Thank you,

Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
213.386.9484 (fax)
http://www.centerforhumanrights.org

> On Feb 9, 2016, at 11:52 AM, Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:
>
> Dear Carlos:
>
> HHS has continued to discuss the issues raised at our meet and confer a few weeks ago. While HHS continues to hold the view that the Flores settlement agreement does not govern these issues, the agency is open to considering some changes in the reconsideration process.
>
> That said, you need to be aware that any reconsideration process that HHS would be willing or able to implement would likely be informal, and not a full administrative hearing. Keeping that in mind, they have asked me to request that you put into writing (even it is just bullet points), some ideas for what you would like to see ORR do to implement such a process so that we can see if there is any common ground that would make further discussions on this issue fruitful.
>
> Please let me know whether you are willing to send us your ideas in writing and if so, when we should expect to see them.
>
> Thank you.
> Sarah
>
> Sarah B. Fabian
> Senior Litigation Counsel
> Office of Immigration Litigation - District Court Section
> (202) 532-4824
>
> -----Original Message-----
> From: Carlos Holguín [mailto:crholguin@centerforhumanrights.org]

From: Carlos Holguin [mailto:crholguin@centerforhumanrights.org]
Sent: Wednesday, January 20, 2016 3:49 PM
To: Fabian, Sarah B (CIV)
Cc: Silvis, William (CIV); Schey Peter; Bussiere Alice
Subject: Re: Flores meet/confer conference call

Thank you for the update.

I suppose it should go without saying that plaintiffs cannot be expected to wait indefinitely for HHS to decide how it wishes to proceed.

Plaintiffs would prefer to save the time and expense of readying for litigation, but absent a decision from HHS within the next ten days plaintiffs intend to proceed with an enforcement motion before the district court.

Sincerely,

Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
213.386.9484 (fax)
http://www.centerforhumanrights.org

> On Jan 19, 2016, at 3:34 PM, Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:
>
> Hi Carlos:
>
> HHS has discussed your ideas about an additional administrative appeal process, and they are continuing discuss them.  At this point, they have determined that if any action were to be taken, this discussion would have to be raised to the Secretary.  They are willing to do so, but as you might imagine, this will take some more time.  That means that for now I do not have a response for you as to what actions HHS might be willing to take in response to our discussion.  As soon as they are able to raise this discussion to the necessary level, I will let you know their response.
>
> Thank you,
> Sarah
>
> Sarah B. Fabian
> Senior Litigation Counsel
> Office of Immigration Litigation - District Court Section
> (202) 532-4824
>
> -----Original Message-----
> From: Carlos Holguín [mailto:crholguin@centerforhumanrights.org]
> Sent: Wednesday, January 13, 2016 12:25 AM
> To: Fabian, Sarah B (CIV)
> Cc: Silvis, William (CIV); Schey Peter; Bussiere Alice
> Subject: Re: Flores meet/confer conference call
>
> Yes, of course.
>
> Carlos Holguín
> General Counsel
> Center for Human Rights & Constitutional Law
> 256 S. Occidental Blvd.
> Los Angeles, California 90057
> 213.388-8693 x.309 (v)
> 213.386.9484 (fax)
> http://www.centerforhumanrights.org

>> On Jan 12, 2016, at 8:07 PM, Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:
>>
>> All:
>>
>> I heard from HHS counsel today, and she asked me to pass on to you a request for a few extra days to get back to you regarding your proposal from our meet and confer last Thursday.  HHS would like to give your proposal full consideration and therefore would like to meet to discuss your proposal, but have been unable to set a time to discuss that would include all necessary participants in time to give you a response by this Thursday because of folks being out on leave.   Would you be willing to extend their time to get back to you until Tuesday of next week?
>>
>> Thank you.

13

Sarah


Sent from my Verizon Wireless 4G LTE smartphone


-------- Original message --------
From: Carlos Holguín <crholguin@centerforhumanrights.org>
Date: 1/6/2016 10:58 AM (GMT-06:00)
To: "Fabian, Sarah B (CIV)" <sfabian@CIV.USDOJ.GOV>
Cc: "Silvis, William (CIV)" <WSilvis@civ.usdoj.gov>, Schey Peter <pschey@centerforhumanrights.org>, Bussiere Alice <abussiere@ylc.org>
Subject: Flores meet/confer conference call

Here is the dial-in information for Thursday's 2:00 pm eastern/11:00am pacific conference:

605.475.3220
access code: 1038088#

Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
213.386.9484 (fax)
http://www.centerforhumanrights.org

14

# Exhibit 4-ORR




STATEMENT OF PRINCIPLES
BETWEEN
THE DEPARTMENT OF HOMELAND SECURITY
AND
THE DEPARTMENT OF HEALTH AND HUMAN SERVICES

UNACCOMPANIED ALIEN CHILDREN PROGRAM

This Statement of Principles addresses several major issues regarding implementation of
the unaccompanied alien children (UAC) program.  This document does not resolve all
outstanding issues, and the parties will continue to work to develop agreement on policies
and procedures in remaining areas of mutual concern.

The parties recognize that, pursuant to the Homeland Security Act, the laws and
regulations that applied to functions related to unaccompanied alien children performed
by the Immigration and Naturalization Service on February 28, 2003 now apply to both
the Department of Homeland Security (DHS) and the Office of Refugee Resettlement
(ORR), Administration for Children and Families, Department of Health and Human
Services, in the performance of their respective responsibilities.  The parties recognize
the same principle with respect to the provisions of the *Flores* Settlement Agreement.

The parties note that the functions related to unaccompanied alien children have been
divided between the agencies into two general areas: (1) immigration benefits and
enforcement; and (2) care and placement.  DHS will continue to be responsible for
apprehension, processing, and immigration actions.  These actions include placement in
immigration proceedings; removal from the United States where appropriate; decisions,
after consultation with ORR, regarding consent to the jurisdiction of a state court when a
child in the UAC program wishes to pursue Special Immigrant Juvenile (SIJ) status; and
adjudication of petitions for SIJ status.  ORR's primary function is to make
determinations regarding the care and placement of unaccompanied children who have
been referred by DHS for placement and have been accepted by ORR in the UAC
program.  ORR will have the authority to make decisions regarding such a child's
medical care while the child is in custody.  ORR is responsible for making placement
determinations, and for providing care and placement of such children.  ORR is not
responsible for children placed in facilities without ORR approval.

The parties are committed to working cooperatively to ensure that United States
immigration laws are effectively enforced and that the interests of unaccompanied alien
children are considered in decisions and actions relating to their care and placement.

The parties recognize the principles set out in the *Flores* Settlement Agreement, which
direct that unaccompanied alien children in the federal government's custody be treated
with dignity, respect and special concern for their particular vulnerabilities as children.
The *Flores* Settlement Agreement also provides that there is a general policy favoring
release to custodians, when an appropriate custodian is available per the settlement's

Page 2

terms and when detention is not necessary either to secure the child's timely appearance before DHS or the immigration court, or to ensure the child's safety or that of others. ORR will be responsible for determining whether an unaccompanied alien child will be released to a custodian until such time as removal is imminent.  In making this determination, ORR will consult with DHS and will follow established ORR guidelines.

The parties will work together, as needed, to develop regulations implementing the *Flores* Settlement Agreement and section 462 of the Homeland Security Act.  Each agency, in consultation with the other party, will develop or revise procedures, as necessary, to carry out their respective responsibilities with respect to the unaccompanied alien children program.

DHS will submit to ORR its anticipated detention requirements for reference in the annual ORR budget request by March of each year.

The parties will conduct a joint review of the unaccompanied alien children program on an annual basis to ensure operational and programmatic objectives are being met.

The parties will meet regularly to discuss day-to-day operations, individual cases and procedures.

If there is disagreement about the parties' roles and responsibilities or about individual cases, the undersigned, or individuals designated by them, will resolve the dispute.

Statement of Principles Signatures:


Date: _____ APR  6 2004 _____

Wade F. Horn, Ph.D.
Assistant Secretary
        for Children and Families
Department of Health and Human Services


Date: _____ APR  6 2004 _____

Michael J. Garcia
Assistant Secretary for U.S. Immigration
        and Customs Enforcement
Department of Homeland Security

Exhibit 5-ORR

Case 2:85-cv-04544-DMG-AGR   Document 239-2   Filed 08/12/16   Page 22 of 123   Page ID #:7042

# OFFICE OF REFUGEE RESETTLEMENT
An Office of the Administration for Children & Families

Listen

# Children Entering the United States Unaccompanied: Section 2
Safe and Timely Release from ORR Care

Published: January 30, 2015

Categories: Unaccompanied Children's Services

## 2.1 Summary of the Safe and Timely Release Process

The Office of Refugee Resettlement (ORR) has policies and procedures in place to ensure the care and safety of children who are apprehended in the United States without a parent or legal guardian available to provide care and custody and without immigration status. These policies require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as "sponsors." Safe and timely release must occur within a setting that promotes public safety and ensures that sponsors are able to provide for the physical and mental well-being of children.

ORR evaluates potential sponsors' ability to provide for the child's physical and mental well-being, as the law requires ORR to protect children from smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity. The process for the safe and timely release of an unaccompanied child from ORR custody involves many steps, including: the identification of sponsors; the submission by a sponsor of the application for release and supporting documentation; the evaluation of the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child, background checks, and in some cases home studies; and planning for post-release.

*Posted 1/27/15*

## 2.2 Application for the Safe and Timely Release of an Unaccompanied Child from ORR Care

ORR begins the process of finding family members and others who may be qualified to care for an unaccompanied child as soon as the child enters ORR's care.  Parents, other relatives, or close family friends can apply to have the child released to their care.

*Posted 1/27/15*

### 2.2.1 Identification of Qualified Sponsors

The **care provider (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Care Provider)**, the ORR funded facility that cares for the child, interviews the child as well as parents (see the section below on how ORR confirms relationship with child), legal guardians, and/or family members to identify qualified custodians ("sponsors").  If a child is either too young or there are other factors that prohibit the care provider from obtaining potential sponsor information from the unaccompanied child, the care provider may seek assistance from the child's home country consulate in collaboration with the **ORR Federal Field Specialist (ORR/FFS) (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)** or from a reputable family tracing organization. Finding a sponsor for the child is an ongoing process that continues during the unaccompanied child's stay in ORR care and custody in the event that the primary potential sponsor or primary release plan is not approved.

ORR releases children to a sponsor in the following order of preference[1]: parent; legal guardian; an adult relative (brother, sister, aunt, uncle, grandparent or first cousin); an adult individual or entity designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship); a licensed program willing to accept legal custody; or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody.  ORR has grouped these release options into the following categories[2]:

- **Category 1:** Parent or legal guardian (This includes qualifying step-parents that have legal or joint custody of the child or teen)
- **Category 2:** An immediate relative--a brother, sister, aunt, uncle, grandparent or first cousin. (This includes biological relatives, relatives through legal marriage, and half-siblings)
- **Category 3:** Other sponsor, such as distant relatives and unrelated adult individuals
- **Category 4:** No sponsors identified

19

Case 2:85-cv-04544-DMG-AGR   Document 239-2   Filed 08/12/16   Page 23 of 123   Page ID #:7043

Although ORR gives preference to a parent or legal guardian when determining release plans, there are instances when ORR would not release an unaccompanied child to a parent or legal guardian. These include:

- There has been a court ordered termination of parental rights over the child.
- There is substantial evidence that the child would be at risk of harm if released to the parent or legal guardian.

In some cases, an unaccompanied child enters the United States with her biological child. In those cases, ORR will identify a sponsor for the unaccompanied child as well as for the infant or toddler. In most instances, it is in the best interest of the unaccompanied child and her biological child to be released to the same sponsor. When that occurs, the sponsor is assigned the same category for the infant as for the UC mother. This is true even if the potential sponsor would be assigned a different category (based on their relationship status) if he or she were to sponsor the infant alone.

*Revised 4/11/16*

## 2.2.2 Contacting Potential Sponsors

The child's **care provider (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Care Provider)** is responsible for implementing safe screening methods when contacting and communicating with potential sponsors. These methods are to ensure that a potential sponsor does not pose a risk to the unaccompanied child, to other children in the care provider facility or to care provider staff.
These safe screening methods include:

- Use of appropriate interpreters
- Identity of the sponsor is obtained
- Verification of family relationships
- Coordination with the unaccompanied child's parents, legal guardians, or closest relatives prior to contacting non-relative adult potential sponsors
- Screening for exploitation, abuse, trafficking, or other safety concerns
- Engaging the child to communicate openly with care provider staff about his or her own sense of safety

*Posted 1/27/15*

## 2.2.3 The Application for Release

All potential sponsors must complete an application in order for a child to be released to them from ORR custody (the "Family Reunification Application").

Within 24 hours of identification of a potential sponsor for a child or youth, the care provider or the ORR National Call Center sends the sponsor a package with the application and related documents (called the Family Reunification Packet or FRP).

The application package includes the following documents:

- A flyer with contact information on organizations offering a Legal Orientation Program for Custodians (LOPC)
- Family Reunification Packet Cover Letter
- Authorization for Release of Information
- Family Reunification Application
- Family Reunification Checklist for Sponsors
- Sponsor Care Agreement
- (If applicable) Fingerprint instructions
- Sponsor Handbook
- (If parent or legal guardian wishes to specify) Letter of Designation for Care of a Minor

The care provider is available to help the potential sponsor complete the application and will remind potential sponsors of the deadlines for completing the forms. The sponsor may also receive assistance in completing the application at some fingerprinting locations.

*Revised 8/24/15*

## 2.2.4 Required Documents for Submission with the Application for Release

In addition to completing and signing the Family Reunification Application and the *Authorization for Release of Information*, sponsors must provide supporting documentation to show proof of their relationship to the child in ORR's care. Sponsors must submit the following documents (see also **The Family Reunification Checklist for Sponsors (http://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors))**:

- Proof of sponsor identity
  --a copy of a government issued ID (such as a State issued driver's license or ID card or ID from the sponsor's country of origin, such as a Passport) AND

Case 2:85-cv-04544-DMG-AGR　Document 239-2　Filed 08/12/16　Page 24 of 123　Page ID
#:7044

--copy of his or her birth certificate (if necessary, some identity documents from a sponsor's country of origin may be used in lieu of the birth certificate)

- Proof of unaccompanied child's identity
  --Copy of unaccompanied child's birth certificate

- Proof of relationship
  --Copies of birth certificates, marriage certificates, court records, guardianship records, or other documents to provide proof of a relationship between the sponsor and the unaccompanied child
  --Category 3 sponsors who may have a distant relationship with the youth but no supporting documentation of it or who have no relationship with the youth must submit an explanation of their relationship with the unaccompanied child or the child's family.  Care providers should confirm the relationship with the unaccompanied child and the child's family, if possible.

- Court records, police reports or proof of rehabilitation
  -- If a sponsor has been charged with or convicted of any crime or investigated for the physical abuse, sexual abuse, neglect, or abandonment of a minor, the sponsor must provide court records, police records, and/or governmental social service records related to the incident

- Proof of address (any potential sponsor other than parents or legal guardians)
  -- a copy of a current lease, a copy of a mortgage statement, a letter from the sponsor's landlord confirming the sponsor's address, or a copy of mail, preferably a utility bill, addressed in the sponsor's name from the past two months

*Posted 1/27/15*

## 2.2.5 Legal Orientation Program for Custodians

All potential sponsors of children and youth under the care of ORR should attend a presentation provided by the Legal Orientation Program for Custodians (LOPC). The purpose of this program is to inform potential sponsors of their responsibilities in ensuring the child's appearance at all immigration proceedings, as well as protecting the child from mistreatment, exploitation, and trafficking, as provided under the Trafficking Victims Protection Reauthorization Act of 2008. The program also provides information about possible free legal counsel (pro bono legal services) for the youth or child during the immigration court process.

The Office of Legal Access Programs (OLAP), within the Executive Office for Immigration Review (EOIR) at the U.S. Department of Justice, manages the LOPC and contracts with legal service organizations around the country to provide LOPC services to potential sponsors in their local communities or in metropolitan areas served by the program. EOIR is the entity in the federal government that is also responsible for adjudicating immigration cases by fairly, expeditiously, and uniformly interpreting and administering the nation's immigration laws.

The unaccompanied child's **case manager (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)**is responsible for informing potential sponsors about all procedures related to the child's case--including attendance at an LOPC presentation. The Family Reunification Packet (FRP) that goes to each potential sponsor includes an *Authorization for Release of Information* that the sponsor must sign before the case manager may schedule an appointment for LOPC services. All potential sponsors should submit the *Authorization for Release of Information* immediately and prior to submitting the complete FRP to ensure timely scheduling of their LOPC session.

Upon receipt of the *Authorization*, the case manager schedules an appointment for a potential sponsor to attend a presentation with one of the LOPC providers around the country. Alternatively, the case manager contacts the **LOPC Call Center for Unaccompanied Immigrant Minors at (888) 996-3842** and arranges for the Call Center to schedule an LOPC appointment for the potential sponsor or mail an LOPC Information Packet to the sponsor.

*Posted 1/27/15*

## 2.2.6 Additional Questions and Answers about this Topic

**Q: Will sponsors receive the Family Reunification Packet through the mail or electronically?**
A: Case managers will work with sponsors to identify the best way to get the packets to them, whether electronically or by fax transmission or postage paid overnight mail.

**Q: Do sponsors need assistance from an attorney or a paid representative to complete the packet?**
A: No. The unaccompanied child's case manager will be able to help the potential sponsor complete the form and explain the process.

**Q: Is it possible for an unaccompanied child's spouse to be a sponsor?**
A: ORR considers release to an unaccompanied child's adult spouse on a case by case basis.

**Q: Is it possible for family members in the United States to proactively contact ORR about children who may have entered the country unaccompanied?**
A: ORR has a **UC Parent Hotline at (800) 203-7001** to answer any questions family members may have[3].

*Posted 1/27/15*

## 2.3 Key Participants in the Release Process

ORR's sponsor assessment and release decision process requires coordination among care provider staff, nongovernmental third-party reviewers (Case Coordinators), ORR staff, other Federal agencies, stakeholders, and Child Advocates, where applicable.

**Case Managers (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)** communicate with potential sponsors, gather necessary information and documentation, talk to any relevant stakeholders, and assess sponsors to formulate a recommendation to the Case Coordinator.  **Case Coordinators (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Coordinators)** concurrently review all assessment information on an unaccompanied child and sponsor to also make a recommendation.  Once Case Managers and Case Coordinators agree on a particular recommendation for release, the recommendation will be sent to the **ORR/FFS (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)** for a final release decision.  If the Case Manager and Case Coordinator cannot agree on a recommendation, the case is elevated to the ORR/FFS for further guidance.

*Revised 8/1/16*

### 2.3.1 ORR/Federal Field Specialists (ORR/FFS)

ORR/FFS are ORR's field staff located regionally throughout the country and are assigned to a group of care providers within a region. They have the authority to approve all unaccompanied children transfer and release decisions; oversee care providers to ensure all services, policies, and procedures are properly provided and implemented; and serve as a liaison to local stakeholders, including other Federal agencies, local legal service providers, local communities, Child Advocates, etc. ORR/FFS also provide guidance, direction, and technical assistance to care providers.

With regard to the release process, ORR/FFS oversee individual unaccompanied children cases and review Case Manager, Case Coordinator, and Child Advocate recommendations; and make final release and transfer decisions for ORR. ORR/FFS also make final decisions whether home studies are conducted and/or post-release services are provided.[4] ORR/FFS coordinate all aspects of a child's case with care provider staff, Case Coordinators, stakeholders, and other Federal agencies.

*Revised 8/1/16*

### 2.3.2 Case Managers

Care provider Case Managers perform a variety of duties, including coordinating the completion of assessments of unaccompanied children, completing individual service plans, assessing potential sponsors, making transfer and release recommendations, and coordinating the release of a child or youth from ORR care and custody. (The care provider provides a range of services through other trained staff that are described in Section 3: Services.)

The role of the Case Manager within the release process is to initiate and maintain ongoing communication with the potential sponsor, gather sponsor information, and assess whether the potential sponsor is a suitable sponsor who can safely provide for the physical and mental well-being of the child or youth.  When communicating with the potential sponsor, the Case Manager may:

- Provide direct assistance on completing the sponsor application packet and ensuring provision of supporting documentation;
- Involve the sponsor in making a plan for individualized services for the unaccompanied child, as appropriate;
- Keep the sponsor informed of the child's progress and current functioning;
- Provide the sponsor with detailed information about the child's needs in order to fully assess the sponsor's ability to provide care and services;
- Discuss services that are available in the sponsor's community for the child; and
- Share relevant information on the unaccompanied child in accordance with applicable privacy and information-sharing policies and in collaboration with the unaccompanied child and the child's clinician in a way that best serves the child's safety and well-being.

The Case Manager's role is also to ensure that information is gathered or shared with the appropriate staff and stakeholders during the sponsor assessment process. The Case Manager provides weekly status updates to the unaccompanied child's Case Coordinator and ORR/FFS on the progress in achieving a safe and timely release with family members as well as potential challenges that may delay a release. The Case Manager informs other stakeholders of the progress of a child's case, including notification that an unaccompanied child may not have a potential sponsor, and any final release decisions. Stakeholders may include local legal service providers and attorneys of record, other local service providers, Child Advocates, post-release and home study providers, and other Federal agencies. Case Managers, in collaboration with the ORR/FFS and Case Coordinator, will also work with law enforcement officials regarding an unaccompanied child's pending release if the minor has outstanding criminal charges or other issues.

*Revised 8/1/16*

### 2.3.3 Case Coordinators

Case Coordinators are non-governmental contractor field staff assigned to one or more care providers primarily to review unaccompanied children cases and provide transfer and release recommendations to ORR staff. The Case Coordinator is responsible for integrating all areas of assessment from the Case Manager, Child Advocates, where applicable, and other stakeholders into a release plan that will provide for the unaccompanied child's physical and mental well-being. After staffing and reviewing a case, Case Coordinators and Case Managers must agree on a release recommendation. If there is a disagreement or a particularly complex case, then the case will be elevated to the ORR/FFS for further guidance.

8/10/2016 Children Entering the United States Unaccompanied: Section 2 | Office of Refugee Resettlement | Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 26 of 123 Page ID #:7046

- Providing timely review and assessment of potential sponsors and unaccompanied children to make recommendations for release to ORR in conjunction with the Case Manager;
- Assisting ORR in ensuring that children are placed in the least restrictive setting while receiving all appropriate services;
- Meeting with individual unaccompanied children and care provider staff at designated ORR-funded care provider sites;
- Providing targeted child welfare-based assistance to care provider staff, as directed by ORR staff;
- Making recommendations for home study and post-release services for at-risk children;
- Making placement recommendations for children who require more specialized levels of care, such as long-term foster care and residential treatment centers;
- Participating in collaborative meetings with local stakeholders; and
- Participating in staffing of cases with care providers and designated ORR staff.

*Revised 8/1/16*

## 2.3.4 Child Advocates

ORR may appoint **Child Advocates (http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Child Advocate)** for victims of trafficking and other vulnerable children. Child Advocates are third parties who make independent recommendations regarding the best interests of a child. Their recommendations are based on information that is obtained from the child and other sources (e.g., the child's parents, potential sponsors, government agencies, and other stakeholders). Child Advocates formally submit their recommendations to ORR and/or the immigration court in the form of Best Interest Determinations (BIDs). ORR considers BIDs when making decisions regarding the care, placement, and release of unaccompanied children, but it is not bound to follow BID recommendations.

As required by the TVPRA, ORR provides Child Advocates with access to information necessary to effectively advocate for the best interests of children with whom they are working. After providing proof of appointment, Child Advocates have access both to their clients and to their clients' records. Child Advocates may access their clients' entire original case files at care provider facilities, or request copies from care providers.[5] Further, they may participate in case staffings.

Child Advocates and ORR maintain regular communication, informing each other of considerations or updates that impact service provision and release planning.

Child Advocates' duties include:

- Client Visits: The Child Advocate meets with the unaccompanied child regularly and speaks with the child's care provider staff in order to understand the child's background and current situation.
- Decision Making: The Child Advocate helps the unaccompanied child understand legal and care-related issues, explains the consequences of decisions made in response to those issues, and assists the child in making decisions when the child requests such help.
- Best Interests Advocacy: The Child Advocate develops a service plan containing best-interest recommendations with respect to the care, placement, and release options; and keeps the care provider, ORR, and the legal service provider or attorney of record apprised of the plan and advocacy efforts.
- Case updates: The Child Advocate collaborates and regularly communicates with the care provider, ORR, and other stakeholders in the planning and performance of advocacy efforts. For children who have been released from ORR care, Child Advocates provide timely updates as appropriate or as requested by ORR.

In most cases, ORR appoints Child Advocates while children are in its custody.  However, in its discretion, ORR may appoint Child Advocates for unaccompanied children after their release from ORR care.

*Posted 8/1/16*

## 2.4 Sponsor Assessment Criteria and Home Studies

As noted in the **Section 2.2 Application for Safe and Timely Release of an Unaccompanied Child from ORR Care**, the application process for release of an unaccompanied child involves a number of steps, including background checks (see **Section 2.5 ORR Policies on Requesting Background Checks**) and submission of the application by the sponsor.  This section describes the criteria ORR uses to assess each potential sponsor's ability to provide for the physical and mental well-being of the unaccompanied child, and the role of home studies in the process.

The sponsor assessment reviews a sponsor's strengths, resources, risk factors and special concerns within the context of the unaccompanied child's needs, strengths, risk factors, and relationship to the sponsor. ORR also determines whether to conduct a home study, as required by the law or as necessary to ensure the welfare of the child

*Revised 3/15/16*

## 2.4.1 Assessment Criteria

Case 2:85-cv-04544-DMG-AGR   Document 239-2   Filed 08/12/16   Page 27 of 123   Page ID
#:7042

ORR considers the following factors when evaluating family members and other potential sponsors:

- The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied child's family, if a relationship exists.
- The sponsor's motivation for wanting to sponsor the child or youth.
- The unaccompanied child's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian has designated a sponsor).
- The child or youth's views on the release and whether he or she wants to be released to the individual.
- The sponsor's understanding of the unaccompanied child's needs, as identified by ORR and the care provider.
- The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.
- The sponsor's understanding of the importance of ensuring the unaccompanied child's presence at all future hearings or proceedings, including immigration court proceedings.
- The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.
- The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.
- The unaccompanied child's current functioning and strengths in relation to any risk factors or special concerns, such  as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

*Posted 1/27/15*

## 2.4.2 Home Study Requirement

The care provider screens each case to determine whether to conduct a home study of the potential sponsor as required under the **Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) (http://www.gpo.gov/fdsys/pkg/BILLS-110hr7311enr/pdf/BILLS-110hr7311enr.pdf)**. Information about the child is collected during initial placement into an ORR facility and throughout his or her stay. The care provider then uses the information collected about the child in conjunction with the sponsor assessment process to determine whether to conduct a **home study (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Home Study)**.  The TVPRA requires home studies under the following circumstances:

1. The child is a victim of a severe form of trafficking in persons;
2. The child is a special needs child with a disability as defined by section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102(2));[6]
3. The child has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened; or
4. The child's sponsor clearly presents a risk of abuse, maltreatment, exploitation or trafficking, to the child based on all available objective evidence.

ORR also requires a home study before releasing any child to a non-relative sponsor who is seeking to sponsor multiple children, or has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children. ORR requires a home study for children who are 12 years and under before releasing to a non-relative sponsor.

In circumstances in which a home study is not required by the TVPRA or this section, the Case Manager and Case Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child. (See **Footnote 4**)

### Home Study Report and Final Recommendation

A home study consists of interviews, a home visit, and a written report containing the home study case worker's findings. A home study assesses the potential sponsor's ability to meet the child's needs, educates and prepares the sponsor for the child's release, and builds on the sponsor assessment conducted by the care provider staff to verify or corroborate information gathered during that process. The home study is conducted as a collaborative psycho-educational process in which the home study case worker identifies areas where additional support, resources, or information are needed to ensure a successful sponsorship, and provides corresponding psycho-educational assistance. The final recommendation must present a comprehensive and detailed assessment of the sponsor's ability to care for the needs of the child and address any additional information that emerges during the course of the home study regarding the sponsor, the sponsor's household or the child.

The home study provider must contact the care provider within 24 hours of home study referral acceptance, and must also contact the sponsor to schedule the home visit within 48 hours of referral acceptance. The home study provider makes a recommendation to ORR about release with the sponsor. The ORR Federal Field Specialist takes the home study provider's recommendation into consideration when making a release decision. ORR has final authority on release decisions.

The home study provider submits the written report within 10 business days of receipt of the referral. Any requests by the home study provider to extend beyond 10 business days or to cancel a home study must be submitted in writing to the ORR Federal Field Specialist for consideration.

24

8/10/2016 Children Entering the United States Unaccompanied: Section 2 | Office of Refugee Resettlement | Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 28 of 123 Page ID #:7048

All releases following home studies require post-release services.

**Must a child receive a Trafficking Eligibility or Interim Assistance Letter from HHS prior to being referred for a TVPRA-mandated home study under #1 above?**

No, a child does not need to receive a Trafficking Eligibility Letter from HHS prior to being referred for a home study. A care provider may refer a child for a home study under #1 above if, during the assessment for trafficking, the care provider determines the child is a victim of a severe form of trafficking in persons.

**In determining whether a TVPRA-mandated home study is required under #3 above, care providers consider the following questions:**

**What is physical abuse?**

Physical abuse is an act that results in physical injury, such as red marks, cuts, welts, bruises, broken bones, missing or broken teeth or muscle strains. Acts of physical abuse include but are not limited to punching, beating, kicking, biting, hitting (with a hand, stick, strap or other object), burning, strangling, whipping, or the unnecessary use of physical restraint.

**Is physical abuse intentional?**

Generally, physical abuse is intentional; however, physical abuse can occur when physical punishment goes too far. In other words, an accidental injury of a child may be considered physical abuse if the act that injured the child was done intentionally as a form of punishment.

**Must a child have physical injuries to meet the standard for physical abuse under #3?**

No, in some cases, a child may not have physical injuries at the time the care provider makes an assessment. Children may be in various stages of the healing process or thoroughly healed from the physical abuse by the time they arrive in ORR care.

**For the purposes of #3, who can physically or sexually abuse a child?**

A parent, legal guardian, caregiver or other adult with a special relationship to the child can physically or sexually abuse a child.

**Who is considered to be a caregiver or adult with a special relationship?**

A caregiver is defined as any person who is entrusted with the child's care and who lives with the child. Other adults with a special relationship to the child could include a teacher, priest, or health care provider.

**What is sexual abuse?**

Sexual abuse of a child by a parent, legal guardian, caregiver or other adult with a special relationship to the child includes any of the following acts, with or without the consent of the child or youth:

- Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
- Contact between the mouth and the penis, vulva, or anus;
- Contact between the mouth and any body part where the adult has the intent to abuse, arouse, or gratify sexual desire;
- Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument where the adult has the intent to abuse, arouse, or gratify sexual desire;
- Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks where the intent is to abuse, arouse, or gratify sexual desire;
- Any attempt, threat, or request by the adult to engage in the activities described above;
- Any display by the adult of his or her uncovered genitalia, buttocks, or breast in the presence of the child; and
- Voyeurism.

State laws on statutory rape are not the standard in assessing whether a youth has been sexually abused for the purposes of #3. Care providers use the definition from the ORR rule concerning sexual abuse and harassment; however, for the purposes of determining when a home study is required, the perpetrator is limited to a parent, legal guardian, caregiver or other adult with a special relationship to the child.

**Under what circumstances is a child's health or welfare considered to have been significantly harmed or threatened?**

Care providers assess the totality of the circumstances in determining whether a child's health or welfare has been significantly harmed or threatened. In evaluating a specific case, care providers take into consideration not only the definitions of physical and sexual abuse listed

above, but also the circumstances surrounding the incident and any behaviors that the child or youth exhibits as a result of the abuse. Circumstances to consider include but are not limited to: the amount of time that has passed since the abuse, the period of time in which the abuse occurred, the cultural context in which the abuse occurred, the age of the child or youth at the time of the abuse, and the relationship between the youth and the perpetrator.

8/10/2016 Children Entering the United States Unaccompanied: Section 2 | Office of Refugee Resettlement | Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 29 of 123 Page ID #:6049

Care providers take into consideration the situations and behaviors listed below, but do not make a determination based solely on the presence or absence of one of them.

- The child experiences on-going medical issues from physical injuries.
- The child exhibits negative or harmful behaviors, thoughts or emotions, such as, but not limited to, excessive hostility or aggression towards others, fire setting, cutting, depression, eating disorders suicidal ideation or substance abuse.

In evaluating difficult cases, the care provider should consult with their ORR/FFS.

*Revsied 5/9/16*

### 2.4.3 Additional Questions and Answers on This Topic

**Q: What happens if a new sponsor is identified during the sponsor assessment process?**
A: If there are multiple potential sponsors, the ORR-funded care provider will exhaust all efforts to facilitate a release to a parent or legal guardian while also contacting and evaluating other potential sponsors concurrently. ORR has release order preferences and will evaluate sponsors concurrently in accordance with the preference orders to determine the best placement for the child.

*Posted 1/27/15*

## 2.5 ORR Policies on Requesting Background Checks of Sponsors

In order to ensure the safety of an unaccompanied child and consistent with the statutory requirements under the TVPRA of 2008, ORR requires a background check of all potential sponsors. Depending on the circumstances, this process may involve background checks on criminal history, child abuse/neglect checks (CA/N), and immigration background checks for the sponsor and, if applicable, adult household members and adult care givers identified in a sponsor care plan. The background check takes place as soon as the potential sponsor has been identified, agreed to the background check, completed the *Authorization for Release of Information* form, if applicable, and provided a copy of a valid government issued photo identification. Adult household members and adult care givers identified in a sponsor care plan requiring background checks through non-public registries or searches are also required to submit an *Authorization for Release of Information* and a copy of a valid government issued photo identification.[7]

*Revised 3/15/16*

### 2.5.1 Criteria for Background Checks

The background check process varies, depending in part on the relationship of the potential sponsor to the unaccompanied child:

- Parents and legal guardians (Category 1)
- Other immediate adult relatives, such as brother, sister, aunt, uncle, grandparent or first cousin (Category 2)
- Distant relatives and unrelated adults (Category 3)

As a part of the process, all potential sponsors must undergo a public records check. The following indicates the **minimum** requirements for the process for sponsors. ORR may require additional checks, verifications, or procedures for sponsors in any category if there are any unresolved issues or questions related to the well being of the child.

The following table lists the types of background checks performed, and explains when they are performed, based on the potential sponsor's relationship to the unaccompanied child and other release considerations. (See also Section **2.7.4 (http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4)**, listing findings barring release)

| Type of Background Check | Purpose | Persons Checked | When Performed |
| --- | --- | --- | --- |
| Public Records Check | Identifies arrests or convictions of sponsors, adult household members, or others. If a check reveals a criminal record or safety issue, it will be used to evaluate the sponsor's ability to provide for a child's physical and mental well-being. | Potential Sponsors in Categories 1-3 | In all cases |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan | In all cases |
| Sex Offender Registry Check, conducted through the U.S. Department of Justice **NSOPW** and **Public Registry Sites** where available | Identifies sponsors and others that have been adjudicated as sex offenders through a national search and, if available, a local Public Registry search. | Potential Sponsors in Categories 1-3 | In all cases |
| | | Non-sponsor adult household members and adult care givers | In all cases |

26

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 30 of 123 Page ID #:7050

| | | | identified in a sponsor care plan | |
| --- | --- | --- | --- |
| Immigration Status Check conducted through the Central Index System (CIS), the immigration database of non-citizens maintained by USCIS | Provides information about immigration court actions and immigration statuses, including information about orders of removal. The information is used primarily to verify immigration status. If a potential sponsor has immigration issues that could lead to his or her removal from the United States, the sponsor will be required to have a safety plan for the unaccompanied child in the event the sponsor leaves the United States. (ORR does not disqualify potential sponsors on the basis of their immigration status.) As follow-up to the Immigration Status Check, the Executive Office for Immigration Review (EOIR) Hotline provides the latest immigration court information. | Potential Sponsors in Category 1 | Category 1 cases where there is a documented risk to the safety of the unaccompanied child, the child is especially vulnerable, and/or the case is being referred for a home study |
| | | Potential Sponsors in Categories 2-3 | In all cases |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied child, the child is especially vulnerable, and/or the case is being referred for a home study |
| National (FBI) Criminal History Check, based on digital fingerprints or digitized paper prints | Determines whether a sponsor or adult household member has a criminal history, has been convicted of a sex crime, or has been convicted of other crimes that compromise the sponsor's ability to care for a child. | Potential Sponsors in Category 1 | Where there is a documented risk to the safety of the unaccompanied child, the child is especially vulnerable, and/or the case is being referred for a home study |
| | | Potential Sponsors in Categories 2-3 | In all cases |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied child, the child is especially vulnerable, and/or the case is being referred for a home study |
| Child Abuse and Neglect (CA/N) Check, obtained on a state by state basis as no national CA/N check repository exists | Checks all localities in which the sponsor or household member has resided in the past 5 years | Potential Sponsors in Categories 1-2 | In cases that require a home study, and cases where a special concern is identified |
| | | Potential Sponsors in Category 3 | In all cases |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan | In any case where a special concern is identified |
| State Criminal History Repository Check and/or Local Police Check | Assists in locating police or arrest records, or other criminal offense details, as needed. | Potential Sponsors in Categories 1-3 | Used on a case-by-case basis when there is an unresolved criminal arrest or issue that is still in process |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan | |

*Revised 4/11/16*

### 2.5.2 Results of Background Checks on Release Decisions

As an entity providing for the health and well-being of children and youth, ORR uses the results from background checks to determine whether release to a potential sponsor is safe. A potential sponsor may be denied a release request, based on the results of a background check, and a release decision may remain undecided until ORR obtains the results of a potential sponsor's criminal history, immigration background checks, or child abuse and neglect reports.

**Criminal History**

In the event that a background check of a potential sponsor or, if applicable, adult household member, reveals criminal history or a safety risk, the care provider and ORR evaluate this information and request the potential sponsor to provide any additional information that may demonstrate the potential sponsor's ability to provide for the child's physical and mental well-being.

Case 2:85-cv-04544-DMG-AGR  Document 239-2  Filed 08/12/16  Page 31 of 123  Page ID
#:7051

If release is not barred by Section **2.7.4 (http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4)**, the decision to release a child or youth to a sponsor in these circumstances is based on all the following considerations:

- The severity of the criminal and/or child abuse/neglect history;
- The length of time that has passed since the criminal act or child abuse/neglect allegation occurred;
- The relationship of the potential sponsor and other adult household members to the child or youth; and
- The evidence, if any, of rehabilitation since the criminal act or child abuse/neglect allegation occurred.

In cases where the proposed sponsor or other adult household member has been charged with, but not convicted of, a crime, ORR may postpone a final release decision until the legal issue is resolved.

If the sponsor has an outstanding order of removal, or a pending order of removal that is related to an underlying criminal act, the decision to release a child or youth to a sponsor in these circumstances is based on the considerations described above.

### Sponsor Immigration Status

ORR does not disqualify potential sponsors on the basis of their immigration status. ORR uses status information to determine whether a sponsor care plan is necessary in the event the sponsor is required to leave the United States. (See Section **2.6 (http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.6)** Effect of Sponsor Immigration Status on Release of Unaccompanied Children)

### Summary Table of Results of Background Checks and Next Steps

The following table shows procedures following the results of background checks.

| Background Check Results | Next Steps |
|---|---|
| No arrest record; check completed | Proceed with release decision-making process. See Section **2.7 Recommendations and Decisions on Release**. |
| Criminal arrest record and/or substantiated adverse child welfare findings; check completed | Determine whether release is barred. See Section 2.7.4 Deny Release Request. If release is not barred, elevate safety issues for third party review. For any findings that could affect safe release, care provider and/or ORR will obtain additional documents to determine current situation (e.g. sponsor is on probation, criminal charges are resolved, etc.). Final release decision shall take into account the criminal records and all other relevant information that is available. |
| Immigration status concern (e.g. out of status, no legal status, prior order of removal, or no immigration record for non-citizen) | Review FBI record and CIS database report, and/or Department of Justice/Executive Office of Immigration Review's case status hotline for information related to possible unresolved immigration issues. |
| Pending results; check not complete | ORR/FFS will provide instructions to care provider |

*Posted 1/27/15*

## 2.5.3 Additional Questions and Answers on This Topic

**Q1: Where can a sponsor get his or her fingerprints taken?**
A1: ORR funds a network of digital fingerprint providers at locations that are not affiliated with law enforcement entities. Sponsors may also go to any local police department for paper fingerprinting services in the event a digital fingerprint provider is not conveniently located near a sponsor's location. Fingerprinting services are not available at ORR headquarters and offices.

**Q2: Is there a deadline for complying with a fingerprinting request?**
A2: Yes. When required, fingerprints should be provided within 3 business days of the request. Release may be delayed if fingerprints are not provided promptly.

**Q3: Are potential sponsors required to disclose to the care provider that they have a record of a criminal charge or child abuse?**
A: Yes. The sponsor must immediately advise the care provider of this situation and gather detailed documentation of the charges, dispositions, police reports, and evidence of rehabilitation.

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 32 of 123 Page ID #:7052

**Q4: What happens if a public records or sex offender registry check reveals disqualifying findings for a sponsor, adult household member, or adult caregiver identified in the sponsor care plan?**

A4: The Case Manager informs the sponsor, and provides the sponsor with a copy of the results. The sponsor and household member/adult care giver may dispute the results, and provide further evidence or information that a check was not performed correctly (e.g., the wrong date of birth was used, the individual's name was spelled incorrectly, etc.). The Case Manager will rerun the check using the corrected information. If further information is required, such as additional background checks, the Case Manager will work with the sponsor and household member/adult caregiver to obtain the information, or make other arrangements so that the safety risk to the unaccompanied child is mitigated (e.g., taking steps so that the household member no longer resides in the sponsor's home, identifying a new adult care giver, etc.).

**Q5: What happens if an adult household member refuses to cooperate with a background check?**

A5: ORR may deny release when an adult household member refuses to have a background check. When an adult household member refuses to cooperate with a background check, ORR will review the circumstances of the refusal and all other relevant information that is available to determine whether the release process will continue. A determination is made by judging what is in the best interests of the child. A child may not be released to any sponsor until a determination is made that it is safe to do so.

*Posted 1/27/15*

## 2.6 Sponsor Immigration Status and Release of Unaccompanied Children

ORR does not disqualify potential sponsors on the basis of their immigration status. ORR does seek immigration status information, but this is used to determine if a sponsor care plan will be needed if the sponsor needs to leave the United States; it is not used as a reason to deny a family reunification application.

*Posted 1/27/15*

### 2.6.1 Application Process

**How does ORR obtain information about immigration status?**

ORR asks potential sponsors for their Alien Registration Number on the Authorization for Release of Information form. In addition, as described below, ORR requires certain sponsors to provide fingerprints for background checks, and those checks may produce information about the individual's immigration status. During the sponsor assessment process, case managers also ask sponsors about their immigration status.

*Posted 1/27/15*

### 2.6.2 Fingerprints

**Who must provide fingerprints as part of the release process?**

All non-parents and some parents and legal guardians are subject to fingerprinting requirements. Parents and legal guardians must submit fingerprints if there is a documented risk to the safety of the unaccompanied child, the child is especially vulnerable, and/or the case is being referred for a home study.

**What does ORR use the fingerprints for?**

Using digital fingerprints or digitized paper prints, the HHS Office of Security and Strategic Information (OSSI), on behalf of ORR, conducts a check of the FBI national criminal history and state repository records.

**What information does ORR obtain from the FBI criminal history and state repository check?**

The FBI criminal background and state repository check provides immigration arrests by immigration authorities, such as an illegal entry, and criminal arrests, such as DUI and assault.

*Revised 3/15/16*

### 2.6.3 Other Background Checks Related to Immigration

**What other checks related to immigration status might be conducted?**

OSSI, on behalf of ORR, may conduct a check of the Central Index System (CIS), the immigration database of non-citizens. In addition, if OSSI has an alien registration number for the potential sponsor, OSSI calls the Executive Office for Immigration Review (EOIR) Hotline for immigration court status.

**When does ORR conduct a CIS check?**

All non-parents and some parents and legal guardians are subject to CIS checks. Parents and legal guardians undergo a CIS check if there is a documented risk to the safety of the UC, the UC is especially vulnerable, and/or the case is being referred for a home study.

**What does the CIS check provide?**

The CIS check provides immigration court actions and information about orders of removal or other immigration status.

*Revised 3/15/16*

### 2.6.4 Results of Immigration-Related Checks

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 33 of 123 Page ID #:7353

**What does ORR do with the results of the FBI fingerprint and CIS checks?**

The information may be used to determine if a sponsor care plan will be needed in the event that the sponsor needs to leave the United States. In addition, if the basis for an immigration action is underlying criminal activity, ORR and its grantee will review the underlying criminal activity to determine if it is reason to disqualify the potential sponsor, as ORR does when evaluating other criminal activity uncovered during the fingerprint process, but unrelated to immigration actions.

**Who else may have access to the results of the FBI fingerprint checks?**

ORR does not release the results of the FBI fingerprints to outside organizations or individuals, other than ORR grantees that are caring for the children. The FBI and DHS databases contain overlapping records, and the FBI system automatically initiates a notification to the DHS system if a particular record has been searched.

**What is in a sponsor care plan?**

A sponsor care plan identifies the individual that will assume care of an unaccompanied child if the sponsor becomes unable to care for the child. The care plan also has guidance for sponsors on participating in post-release services and on other areas of care critical to the child's adjustment in the family and the community, such as maintaining mental health services for the unaccompanied child, accessing any needed special education, helping the child avoid drugs and alcohol, and using appropriate parenting techniques.

*Posted 1/27/15*

## 2.7 Recommendations and Decisions on Release

After the ORR care provider has evaluated the sponsor, completed the background checks, and collected necessary documentation to prove a sponsor's identity and relationship to the child or youth, the care provider must determine whether to recommend release of the child to the potential sponsor. Such recommendation must take into consideration all relevant information, including the report and recommendations of a home study, if conducted, and be made only when the ORR care provider concludes that the release is a safe release and that the sponsor can care for the health and well-being of the child.

- The care provider **Case Manager (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)**and the **Case Coordinator (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Coordinators)**must make a recommendation to the **ORR/FFS (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)** on the release of the unaccompanied child to a particular sponsor.  If the Case Manager and Case Coordinator cannot agree on a particular recommendation, or if the case is particularly complicated, they may refer the case directly to an ORR/FFS for guidance on how to proceed.
- Once a recommendation is made, the **ORR/FFS (http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)**or other **ORR/Headquarters staff (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Headquarters Staff)**reviews the recommendation.
- The ORR/FFS makes a release decision in consideration of the recommendations from the care provider, the Case Coordinator, and other stakeholders, including the home study provider and the Child Advocate where applicable.

Only ORR has the authority to make the final decision on a release. The Case Manager and Case Coordinator and other stakeholders hold important roles of making recommendations, based on all available information, the laws and statutes governing the process, and other factors that may contribute to a particular case. In some cases, the ORR/FFS may send a case back to the Case Coordinator and Case Manager with the request to obtain additional information before he/she will make a release decision.

The ORR/FFS will make one of the following release decisions:

- Approve release to sponsor
- Approve release with post-release services
- Conduct a home study before a final release decision can be made
- Deny release
- Remand for further information

*Revised 8/1/16*

## 2.7.1 Approve Release Decisions

A recommendation for a release without a home study or post-release services is made after a thorough assessment of the sponsor, the sponsor's family unit, and the needs of the child or youth are taken into consideration.  The ORR/FFS makes this release decision when he/she determines that the release is a safe release, the sponsor can care for the health and well-being of the child, and the sponsor understands that the child is to appear for all immigration proceedings.

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 34 of 123 Page ID #:7054

*Posted 1/27/15*

### 2.7.2 Approve Release with Post-Release Services

The ORR/FFS may approve a release with post-release services when the release is determined to be safe and appropriate, but the unaccompanied child and sponsor need additional assistance to connect them to appropriate resources in the community or to address other concerns, such as mental health or other needs that could benefit from ongoing assistance from a social welfare agency. The sponsor must consent before services may be provided and may withdraw his or her consent at any time after services have begun, since post-release services are a voluntary service. These services are provided for 6 months after the unaccompanied child is released to the sponsor, unless ORR determines that services should be provided for a shorter or longer period of time. Post- release services do not continue under any circumstances beyond an unaccompanied child's 18th birthday.

*Posted 1/27/15*

### 2.7.3 Conduct a Home Study Before a Final Release Decision Can Be Made

The Case Manager and Case Coordinator will recommend to the ORR/FFS that a home study be conducted prior to making a release recommendation.  If the ORR/FFS agrees, he/she will approve that a home study be conducted before a final release decision can be made.  The home study provider uses a standardized template to complete the review; however, the provider may include any additional supporting documentation regarding the sponsor or the child or youth, as applicable.

Once the Case Manager and Case Coordinator receive the home study results, they will review the case in light of the home study and make a release recommendation to the ORR/FFS. (**See Section 2.4.2 Home Study Requirements. (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.4.2)**)

*Posted 1/27/15*

### 2.7.4 Deny Release Request

ORR *will* deny release to a potential sponsor if any one of the following conditions exists:

- The potential sponsor is not willing or able to provide for the child's physical or mental well-being;
- The physical environment of the home presents risks to the child's safety and well-being; or
- Release of the unaccompanied child would present a risk to him or herself, the sponsor, household, or the community.

ORR *may* deny release to a Category 1 potential sponsor, and *will* deny release to a Category 2 or Category 3 potential sponsor,[7] if any one of the following conditions exists:

- The potential sponsor or a member of the potential sponsor's household:
  - Has been convicted of (including plea of no contest to) a felony involving child abuse or neglect, spousal abuse; a crime against a child or children (including child pornography); or a crime involving violence, including rape, sexual assault or homicide;
  - Has been convicted within the last five years of a felony involving physical assault, battery, or drug-related offenses;
  - Has been convicted of a misdemeanor for a sex crime, an offense involving a child victim, or a drug offense that compromises the sponsor's ability to ensure the safety and well-being of the child;
  - Has been convicted of alien smuggling or a crime related to trafficking in persons; or
  - Has other criminal history or pending criminal charges or child welfare adverse findings from which one could reasonably infer that the sponsor's ability to ensure the safety and well-being of the child is compromised;

or

- A potential sponsor or a member of the potential sponsor's household has one of the following substantiated adverse child welfare findings:[9]
  - Severe or chronic abuse or neglect;
  - Sexual Abuse or other sexual offenses;
  - Abuse or neglect of other children in the household;
  - Long-term mental illness or deficiency;
  - Long-term alcohol or drug induced incapacity; or
  - Involuntary termination of the parental rights to another child.

*Revised 3/15/16*

### 2.7.5 Remand Release Request – Decision Pending

The ORR/FFS may remand the release request, which means that the ORR/FFS is sending the recommendation back to the Case Manager for additional information or additional actions before a final release decision can be made.  ORR records the date of the remand and the decision will be pending further review until the documentation is provided or actions are taken.

Case 2:85-cv-04544-DMG-AGR   Document 239-2   Filed 08/12/16   Page 35 of 123   Page ID #:7055

Posted 1/27/15

## 2.7.6 Issues Related to Recommendations and Decisions

**Safety Plan**

Case managers, in consultation with Case Coordinators, will prepare a safety plan, as needed, to address any outstanding needs the child may have after he/she is released and to ensure the child's safe and successful integration into the sponsor family unit and community. The goal of the safety plan is to ensure the child's safety.

**Sponsor Care Plan**

Unlike safety plans, sponsor care plans are only used for sponsors without immigration status. If a sponsor does not have immigration status, ORR will require the sponsor to ensure that a sponsor care plan is in place in the event that the sponsor needs to leave the United States or is otherwise unable to care for the child. The plan identifies the individual who will assume care of the child and will abide by the terms of the sponsor care agreement. The goal is to ensure an unaccompanied child has a caregiver, despite any complications resulting from the sponsor's immigration situation.

Posted 1/27/15

## 2.7.7 Appeal of Release Denial

ORR must notify a parent or legal guardian in writing if they are denied the release of a child. The denial notification letter must include:

- The basis for the denial
- Information on the process for requesting reconsideration of the decision

A parent or legal guardian who wants to request reconsideration of a release decision should submit a request to the ACF Assistant Secretary within 30 business days of receipt of the denial notice. The request should include the basis for the request along with any additional information that the requestor would like the ACF Assistant Secretary to consider.

The ACF Assistant Secretary will conduct a review of the decision and notify the requestor of the results.

Sponsors other than parents or legal guardians who would like to request reconsideration of a release decision should submit a letter to ORR requesting a reconsideration of the decision.

Posted 1/27/15

## 2.8 Release from Office of Refugee Resettlement (ORR) Custody

Release from the ORR custody is a three-step process:

- After care planning, which occurs during the entire safe and timely release process.
- Transfer of physical custody of the child, which occurs as soon as possible once an unaccompanied child is approved for release.
- Closing the case file, which occurs within 24 hours of the unaccompanied child's discharge.

Posted 1/27/15

## 2.8.1 After Care Planning

Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs.  This involves working with the sponsor and the unaccompanied child to:

- Prepare them for post-ORR custody
- Assess the sponsor's ability to access community resources
- Provide guidance regarding safety planning (if applicable) and accessing services for the child

Once the sponsor assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to comply with the following provisions (see **Sponsor Care Agreement**) **(http://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors)**:

- Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.
- For those who are not the child's parent or legal guardian, make best efforts to establish legal guardianship with the local court within a reasonable time.
- Attend a legal orientation program provided under the Department of Justice/Executive Office for Immigration Review's (EOIR) Legal Orientation Program for Custodians (Sponsors), if available where he or she resides.

8/10/2016 Children Entering the United States Unaccompanied: Section 2 | Office of Refugee Resettlement | Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 36 of 123 Page ID #:7056

- Depending on where the unaccompanied child's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the child's behalf. A "change of venue" is a legal term for moving an immigration hearing to a new location.)
- Notify the DHS/U.S. Citizenship and Immigration Services within 10 days of any change of address by filing an Alien's Change of Address Card (AR-11) or electronically at **http://www.uscis.gov/ar-11 (http://www.uscis.gov/ar-11)**
- Ensure the unaccompanied child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR.
- Ensure the unaccompanied child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.
- Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)
- Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the unaccompanied child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)
- Notify ICE at 1-866-347-2423 if the unaccompanied child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)
- In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the *Sponsor Care Agreement*.
- In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied child and is unable to temporarily transfer physical custody, notify ORR at the UC Parent Hotline, 1-800-203-7001.

The agreement includes the notice that the release of the unaccompanied child to the sponsor's care does not grant the child any legal immigration status and that the child must present himself or herself for immigration court proceedings.

The care provider also provides the sponsor with a Sponsor Handbook that outlines the responsibilities in caring for the unaccompanied child's needs for education, health, obtaining legal guardianship, finding support to address traumatic stress, keeping children safe from child abuse and neglect and from trafficking and exploitation. The handbook reiterates the importance of continuing with immigration proceedings and includes links to EOIR's website and forms. The handbook discusses laws related to employment, such as the Federal law prohibiting minors under the age of 18 from working in hazardous occupations.

After care planning includes the care provider explaining the following to the unaccompanied child and the sponsor:

- The U.S. child abuse and neglect standards and child protective services that are explained on the Administration for Children and Families **Child Welfare Information Gateway (https://www.childwelfare.gov/)**website.
- Human trafficking indicators and resources
- Basic safety and how to use the 9-1-1 number in emergency situations.

The care provider notifies all stakeholders of the child's discharge date and change of address and venue, as applicable. Where applicable, ORR also provides Child Advocates with access to their clients' documents and forms, and helps child advocates to remain informed about their clients' after-care plans and legal proceedings. The care provider coordinates with the legal service provider or attorney of record to help complete the necessary legal forms. Stakeholders notified of the change of address and, if applicable, request for change of venue for the immigration case include the U.S. Immigration and Customs Enforcement (ICE) Office of Chief Counsel and the U.S. Executive Office for Immigration Review (EOIR) Immigration Court Administrator.

*Revised 8/1/16*

## 2.8.2 Transfer of Physical Custody

Once ORR approves an unaccompanied child for release, the care provider collaborates with the sponsor to ensure physical discharge happens as quickly as possible (within 3 calendar days after ORR approves the release). The care provider notifies DHS prior to the physical release to allow DHS an opportunity to comment on the imminent release as well as time to prepare any DHS paperwork for the ICE Chief Counsel's office.

The care provider ensures that all the child's belongings—including those he or she had at the time they entered ORR custody and any they acquired during their stay—are given to the child and sponsor at time of release. The care provider also makes sure that the child and sponsor have copies of files or papers needed for the child to obtain medical, educational, legal or other services following release.
Whenever possible, sponsors are expected to come to the care provider or to an offsite location designated by the care provider for the transfer of physical custody of the child.

Under extenuating circumstances (e.g., a sponsor cannot travel due to a medical condition), ORR may approve an unaccompanied child to be escorted to a sponsor. Similarly, if a sponsor pick-up would result in delay of a timely release of the child, ORR may approve an escort for an unaccompanied child.

8/10/2016    Children Entering the United States Unaccompanied: Section 2 | Office of Refugee Resettlement | Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 37 of 123 Page ID #:6057

If an unaccompanied child's final destination involves air travel and the sponsor will not be traveling with the child, the care provider must follow the procedures in the table below concerning care provider escorts and airline escorts.

Unaccompanied children who are under the age of 14 years old traveling via air may only be escorted by care provider staff, unless an ORR/FFS Supervisor has approved the use of an airline escort in advance.

The sponsor is responsible for the unaccompanied child's transportation costs and, if the care provider is escorting the child, for the care provider's transportation or airfare. If an airline escort is used, the sponsor is responsible for paying the airline's unaccompanied minor service fee.

Under no circumstances will ORR pay for the sponsor's airfare.

The following table summarizes procedures for each method of transfer.

| Method of Transfer | Pre-transfer Steps | At point of Transfer |
|---|---|---|
| Sponsor pick-up at care provider facility | <ul><li>Case manager collaborates with the sponsor on selecting a date and time for the sponsor to pick-up the child</li><li>Case manager notifies the sponsor that he/she is required to bring the same valid government issued photo identification previously submitted by the sponsor in the FRP (see Section **2.2.4**)</li></ul> | <ul><li>Care provider checks the sponsor's identification upon arrival by comparing it to the identification previously submitted by the sponsor in the FRP (see Section **2.2.4**)</li><li>If the sponsor's identification matches the identification previously submitted, care provider gives the sponsor the unaccompanied child's release documents and personal possessions</li><li>Care provider advises the sponsor, if traveling by airplane, to check in the child at the ticket counter with a copy of the child's DHS form I-862, Notice to Appear</li><li>Care provider may not release the child unless the sponsor presents the same valid government issued photo identification he or she submitted in the FRP.</li></ul> |
| Care provider escort to offsite transfer location | <ul><li>Case manager collaborates with the sponsor in selecting a time and location for transfer, and flights for the child and care provider escort</li><li>Case manager notifies the sponsor that he/she is required to bring the same valid government issued photo identification previously submitted by the sponsor in the FRP to the transfer location</li><li>Case manager arranges for the sponsor to pay for the child and care provider escort's transportation costs, including airline tickets where applicable</li><li>Case manager prepares a copy of the sponsor's identification that was submitted in the FRP, for the care provider escort to take to the transfer location</li></ul> | <ul><li>If traveling by air, at the departure airport, care provider escort checks in the child at the ticket counter with a copy of the child's DHS form I-862, Notice to Appear</li><li>At the transfer location, care provider escort compares the sponsor's identification with the copy previously submitted by the sponsor in the FRP. If the identification documents correspond, care provider escort releases the child to the sponsor and provides the sponsor with the release documents and the child's personal effects and papers</li><li>Care provider escort may not release the child unless the sponsor presents the same valid government issued photo identification he or she submitted in the FRP. If the sponsor does not produce valid identification, if the care provider escort has concerns regarding the sponsor's identity, or if the care provider escort has concerns regarding the safety of the situation upon meeting the sponsor, the care provider escort will return with the child to the care provider facility</li></ul> |
| Travel via airline's unaccompanied minor escort policy (only for youth 14 years of age and older) | <ul><li>Case manager contacts the airline to obtain information on airline escort requirements, in order to ensure that they are adequate to protect the safety of the child, and to ensure that both the sponsor and the care provider can meet the requirements</li><li>Case manager arranges for the sponsor to pay for the child's airplane ticket and for the airline unaccompanied minor escort fee</li><li>Case manager ensures that the government issued photo identification submitted by the sponsor in the FRP will be acceptable to the airline to complete custody transfer</li><li>The care provider instructs the sponsor to meet the unaccompanied child and escort at the airport with the identification they submitted in</li></ul> | <ul><li>At the departure airport, care provider checks in the unaccompanied child at the ticket counter with a copy of the DHS form I-862, Notice to Appear, and a copy of the approved identification of the sponsor picking up the child</li><li>At the departure airport, care provider gives the child their personal possessions and documents and a copy of the sponsor's approved identification, and mails an additional copy of the release documents to the sponsor</li><li>At the destination airport, the sponsor arrives two hours before the child's arrival time, and contacts the care provider immediately to check in.</li><li>The airline follows its standard procedures for escorting a child traveling alone to the designated parent or guardian</li><li>The care provider contacts the sponsor shortly after the child's scheduled arrival time to confirm the child's transfer from the airline representative to the sponsor</li><li>If the sponsor fails to arrive at the airport or fails to contact the care provider upon arrival at the airport, the care provider will notify the ORR/FFS and the Project Officer, and the child will either be returned to the care provider or taken to another nearby care provider facility.</li></ul> |

34

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 38 of 123 Page ID #:7058

| | the FRP, and to follow the requirements of the airline's unaccompanied minors escort policy |
|---|---|

When arranging for children to travel with airline escorts, care providers should also refer to the U.S. Department of Transportation recommendations for unaccompanied minors traveling by air ("**When Kids Fly Alone (http://airconsumer.ost.dot.gov/publications/kidsalone.pdf)**").

*Revised 3/14/16*

## 2.8.3 Closing the Case File

The care provider completes a Discharge Notification form within 24 hours of the physical discharge of a youth, and then emails the form to DHS and other stakeholders. Once a child is released to a sponsor, ORR's custodial relationship with the child terminates.

Although the custodial relationship ends, the care provider keeps the case file open for 30 days after the release date in order to conduct the Safety and Well Being Follow Up Call (see Section **2.8.4**) and document the results of the call in the case file. The care provider closes the case file record after completing the Safety and Well Being Follow Up Call.

*Revised 3/14/16*

### Section 2.8.4 Safety and Well Being Follow Up Call

Care providers must conduct a Safety and Well Being Follow Up Call with an unaccompanied child and his or her sponsor 30 days after the release date. The purpose of the follow up call is to determine whether the child is still residing with the sponsor, is enrolled in or attending school, is aware of upcoming court dates, and is safe. The care provider must document the outcome of the follow up call in the child's case file, including if the care provider is unable to contact the sponsor or child after reasonable efforts have been exhausted. If the follow up call indicates that the sponsor and/or child would benefit from additional support or services, the care provider must refer the sponsor or child to the ORR National Call Center and provide the sponsor or child the Call Center contact information. If the care provider believes that the child is unsafe, the care provider must comply with mandatory reporting laws, State licensing requirements, and Federal laws and regulations for reporting to local child protective agencies and/or law enforcement.

*Revised 3/14/16*

### 2.8.5 Post-Release Services for UC with Zika Virus Disease or Infection

**Testing**

ORR follows CDC guidance and recommendations for Zika virus laboratory testing. CDC recommends testing for all pregnant UC without symptoms, but who are from or traveled through areas with ongoing Zika virus transmission and are within 2–12 weeks of arrival in the United States. Other UC who develop two or more symptoms consistent with Zika may be tested for Zika virus upon consultation with a healthcare provider.

**Post-Release Referrals**

Pregnant UC who are diagnosed with Zika virus disease, have laboratory results compatible with Zika virus infection, or have laboratory results that cannot rule out Zika virus infection will be referred for post-release services. Similarly, UC who delivered while in ORR care will be referred for post-release services if they were diagnosed with Zika virus disease, had laboratory results compatible with Zika virus infection, or had laboratory results that cannot rule out Zika virus infection while pregnant.

In some cases, asymptomatic pregnant UC are released pending lab results. In those cases, ORR will communicate their test results to them and their new healthcare provider. If their results are compatible with Zika virus infection or if Zika virus infection cannot be ruled out, ORR will refer them for post-release services.

**Post-Release Services**

Post-release services for eligible UC described above include the full range of post-release services with a focus on connecting the UC to prenatal care and maternal-child resources.

For more information about the Zika virus, please go to the CDC website at: **www.cdc.gov/zika/index.html (http://www.cdc.gov/zika/index.html)**

*Posted 5/2/16*

---

## Footnotes

1. As per the release order preference outlined in *Flores v. Reno* Stipulated Settlement Agreement, No. 85-4544-RJK (Px) (C.D. Cal., Jan 17, 1997).

Case 2:85-cv-04544-DMG-AGR Document 239-2 Filed 08/12/16 Page 39 of 123 Page ID #:7059

2. Categories created for program use to help identify potential sponsors are not intended to replace the legal order of preference.

3. The care provider uses a tool called the *Checklist of Impairments That Substantially Limit Life Activities*, to make a determination.

4. ORR/FFS Supervisors are the final authority for approving discretionary home studies (See Section **2.4.2**)

5. Child advocates must keep the information in the casefile, and information about the child's case, confidential from non-ORR grantees, contractors, and Federal staff.

6. The Change of Venue motion must contain information specified by the Immigration Court. A Change of Venue motion may require the assistance of an attorney. For guidance on the "motion to change venue," see the Immigration Court Practice Manual at **http://www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm (http://www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm)**. For immigration case information please contact EOIR's immigration case information system at 1-800-898-7180. Visit EOIR's website for additional information at: **http://www.justice.gov/eoir/formslist.htm (http://www.justice.gov/eoir/formslist.htm)**

7. An *Authorization for Release of Information* is not required for sponsors, adult household members, or adult care givers identified in a sponsor care plan undergoing a sex offender registry check. An *Authorization for Request of Information* also is not required for sponsors, adult household members, and adult caregivers identified in a sponsor care plan undergoing a public records check. However, sponsors will receive notice that public records and sex offender registry checks will be performed, and will have an opportunity to explain the results of these checks to ORR. ORR will also provide a method for disputing the results of checks. (See Section **2.5.3 (http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.5.3)**, Q4).

8. ORR will also reject any sponsor care plans that identify an adult care giver who has any of the disqualifying criteria.

9. *See* U.S. Dept. of Health and Human Services, Children's Bureau. *Grounds for involuntary termination of parental rights*, at 2. Washington, DC: Child Welfare Information Gateway, Jan. 2013.

---

**<Back (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-1) - Next (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3)>**

---

Last Reviewed: August 1, 2016

Exhibit 6-ORR

**U.S. Department of Justice**                                 Decision of the Board of Immigration Appeals
Executive Office for Immigration Review

Falls Church, Virginia 22041

---

File:   A206 775 662 – San Francisco, CA          Date:          **JUN 2 8 2016**

In re: PABLO ALEXANDER AGUILAR-RAMIREZ

IN BOND PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Holly S. Cooper, Esquire

ON BEHALF OF DHS:   Jennifer L. Castro
                    Assistant Chief Counsel

APPLICATION:   Redetermination of custody status

The respondent, a native and citizen of El Salvador, is an unaccompanied alien child ("UAC") in the custody of the U.S. Health and Human Services ("HHS"), Office of Refugee Resettlement ("ORR"). On February 9, 2016, the Immigration Judge denied the respondent's motion for a bond hearing, concluding that he lacked jurisdiction. The Immigration Judge issued a memorandum on March 7, 2016, further explaining the reasoning for his decision. The respondent has appealed the Immigration Judge's decision and the Department of Homeland Security ("DHS") has filed a response brief. The appeal will be dismissed.

The Board reviews an Immigration Judge's findings of fact for clear error. 8 C.F.R. § 1003.1(d)(3)(i). We review issues of law, discretion, or judgment de novo. 8 C.F.R. § 1003.1(d)(3)(ii).

We affirm the decision under review. It is well established that Immigration Judges only have authority to consider matters that are delegated to them by the Attorney General and the Immigration and Nationality Act. *Matter of A-W-*, 25 I&N Dec. 45, 46 (BIA 2009). Furthermore, the jurisdiction of Immigration Judges to redetermine custody status under 8 C.F.R. 1236.1(d) is limited to cases in which the DHS has made a custody determination (I.J. Bond Memo. at 1). *See* 8 C.F.R. § 1003.19(a) ("Custody and bond determinations made by the *service* pursuant to 8 CFR part 1236 may be reviewed by an Immigration Judge pursuant to 8 CFR part 1236.") (emphasis added). The Immigration Judge properly denied the respondent's motion due to lack of jurisdiction because the respondent is in the custody of the ORR and not the DHS. In this regard, the respondent has identified no statute or regulation authorizing Immigration Judge review of ORR custody decisions involving UAC's.

The respondent argues that the Homeland Security Act of 2002 ("HSA"), Pub. L. 107-296, 116 Stat. 2135, and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044, expanded protection for UAM's and thus provide authority for a custody hearing before an Immigration Judge when a UAC is detained by the ORR. However, these laws specifically provide that the responsibility for care

A206 775 662

and custody of UAM's is transferred *from* the Commissioner of the former Immigration and
Naturalization Service *to* HHS/ORR. *See* 6 U.S.C. § 279(a), (b)(1)(A); 8 U.S.C. § 1232(b)(1)
(emphasis added). Both the TVPRA and the HSA also outline specific procedures for the safety
and welfare of UAC's that do not include Immigration Judge jurisdiction over placement or
release of UAC's in HHS custody. *See* 6 U.S.C. §§ 279(a)-(b); 8 U.S.C. §§ 1232(b)-(c). We
therefore reject the respondent's argument that the HSA and TVPRA provide jurisdiction for an
Immigration Judge to determine the custody of UAM's like the respondent who are detained by
ORR.

We also disagree with the respondent's contention that the *Flores* Settlement Agreement
("FSA"), *see Flores v. Reno*, Case No. 85-4544 (C.D. Cal. July 11, 1985), requires UAC's in
ORR's custody to be afforded a bond hearing before an Immigration Judge. By enacting the
HSA and the TVPRA after the FSA, Congress gave the Secretary of HHS—and not the DHS or
Immigration Judges—the authority to make and review placement decisions for UAC's. *See*
8 U.S.C. § 1232(c)(2)(A). We hold that in so doing, Congress superseded ¶ 24 of the FSA. *See*
*Milwaukee v. Illinois*, 451 U.S. 304, 313-15 (1981).

Finally, the Board is not empowered to determine the constitutionality of the statutes and
regulations that we administer. *See Matter of C-*, 20 I&N Dec. 529, 532 (BIA 1992);
*Matter of Valdovinos*, 18 I&N Dec. 343, 345-46 (BIA 1982). Congress has provided that HHS is
charged with administering the statutes at issue here. Therefore, we decline to decide whether
the procedures created by Congress governing the care and custody of UAM's do not comport
with due process, as the respondent argues on appeal.

Accordingly, the following order is entered.

ORDER: The appeal is dismissed.

FOR THE BOARD

39

Exhibit 7-ORR

## *2005 Immig. Rptr. LEXIS 54924*

Board of Immigration Appeals

SEP 23 2005

A- - Seattle

### *BIA & AAU Non-Precedent Decisions* Reporter

2005 Immig. Rptr. LEXIS 54924

## Matter of -

## Core Terms

***unaccompanied***, detain, threshold issue

## Headnotes

[*1]

The Board vacated finding that Immigration Judge ("IJ") lacked jurisdiction over case involving ***unaccompanied minor*** and remanded matter for further consistent proceedings upon finding that threshold issue of whether such ***minor*** should be detained is within purview of court.

## Counsel

COUNSEL: ON BEHALF OF RESPONDENT: Christopher H. Howard, Esquire

**Opinion By:** Opinion by: N/A

## Opinion

This is an appeal by the respondent from an Immigration Judge's March 17, 2005, bond order finding that she lacked jurisdiction over the instant case, which involves an ***unaccompanied minor***. The record will be remanded.

The Immigration Judge, in her May 3, 2005, bond memorandum, found that, pursuant to *6 U.S.C. § 279*, the Department of Health and Human Services' ***Office of Refugee Resettlement*** (the ORR), had jurisdiction over the respondent's custody matters. We find, however, that, notwithstanding *6 U.S.C. § 279*, an Immigration Judge retains jurisdiction over the threshold issue of whether an ***unaccompanied minor*** should be detained at all. Were an Immigration Judge to determine that an ***unaccompanied minor*** should be detained, then the ORR would have [*2] exclusive authority over decisions relating to the care and placement of the ***unaccompanied minor***.

Accordingly, we find it appropriate to remand the record for the Immigration Judge to consider the threshold issue of whether the respondent should be detained.

ORDER: The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision. _____ #00002077#

BIA & AAU Non-Precedent Decisions
Copyright missing, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**End of Document**

Exhibit 8-ORR

2004 WL 1398660 (BIA)

** THIS IS AN UNPUBLISHED DECISION - NOT INTENDED FOR CITATION AS PRECEDENT **

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

IN RE: RUBEN DE LOS ANGELES RODRIGUEZ-LOPEZ

File: A79 238 898 - Los Angeles
March 29, 2004

IN BOND PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:

Reagan Demas, Esquire

APPLICATION: Change in custody status

ORDER:

 *1  PER CURIAM. The respondent, an unaccompanied minor, appeals the Immigration Judge's July 30, 2003 denial of his request to have a friend of his family, Ms. Rosa Moreno, declared as his sponsor and to be released from the custodial authority of the <mark>Office of Refugee Resettlement</mark> (ORR) to Ms. Moreno. The respondent's appeal is dismissed.

The respondent is a 16-year old native and citizen of Honduras seeking to be released from custody. He asserts that he can be cared for by Ms. Moreno, who claims to be a friend of the respondent's family. On June 2, 2003, Ms. Moreno submitted a sponsor packet to the ORR, the agency now charged with coordinating and implementing the care and placement of unaccompanied alien children who are in federal detention. On June 13, 2003, the ORR initially indicated that the sponsorship request had been approved, but subsequently, on July 11, 2003, the ORR indicated that its prior letter had been incorrectly sent and that a home assessment of Ms. Moreno's home first needed to be conducted, after which the ORR would evaluate the information and arrive at a determination on Ms. Moreno's suitability as a sponsor for the respondent. [1]

On July 30, 2003 the respondent appeared before an Immigration Judge, represented by counsel, and sought release from custody to the guardianship of Ms. Moreno. In support of his request, the respondent submitted various filings from Ms. Moreno, including a brief statement in support of the respondent dated May 15, 2003, an Affidavit of Support (I-134), a utility bill, wage and earnings information, a copy of her driver's license, a juvenile sponsor worksheet, and a completed questionnaire for applicants who want to gain custody of minors under the nationwide settlement in *Flores et al v. Reno*, which pertains to detention and release standards for unaccompanied minors. Ms. Moreno, however, did not appear before the Immigration Judge in support of the respondent's request for release. <mark>The Immigration Judge denied release on bond, finding that release to Ms. Moreno was insufficient to ensure the respondent's appearance at future proceedings.</mark> More importantly, the Immigration Judge

found insufficient evidence that release to Ms. Moreno would adequately provide for the guardianship and protection of the respondent. This appeal followed.

Initially, we note that the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2153 (enacted Nov. 25, 2002) (HSA), transferred to the ORR the functions under the immigration laws of the United States with respect to the care of unaccompanied alien children in detention. More specifically, the HSA transferred to the ORR the exclusive responsibility for coordinating and implementing the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status. *See* 6 U.S.C. § 279(b)(1)(A-L). This function was previously carried out by the Office of Juvenile Affairs of the Immigration and Naturalization Service, now part of the Department of Homeland Security (DHS).

 *2  The Immigration Judge's authority to redetermine conditions of custody under 8 C.F.R. § 1236.1(d) extends only to certain custody determinations by the Attorney General, not the ORR. Thus, the Immigration Judge is wholly without authority to make any determination regarding the placement of the respondent. The respondent's contention, on appeal, that the Immigration Judge erred in denying Ms. Moreno's sponsor application is without merit as the Immigration Judge had no authority under the law to grant Ms. Moreno's sponsor application. Moreover, the respondent's argument that this Board should require the ORR to provide reasons for not approving Ms. Moreno as the respondent's sponsor is also without merit as such decisions are solely within the purview of the ORR and we have no authority under the HSA to order the ORR to provide reasons for its sponsorship decisions.

Our review here pertains solely to whether the Immigration Judge erred in denying the request of an unaccompanied minor to be released from custody under 8 C.F.R. § 1236.1(d). The respondent's custody proceedings are governed by section 236(a) of the Immigration and Nationality Act. In custody proceedings under section 236(a) of the Act, the respondent must demonstrate that his release would not pose a danger to property or persons and that he is likely to appear at any future proceedings. *See Matter of Adeniji*, 22 I&N Dec. 1102 (BIA 1999); *Matter of Patel*, 15 I&N Dec. 666 (BIA 1976); 8 C.F.R. § 1236.1(c)(8).

In the instant case, the respondent has failed to establish that he is likely to appear at any future proceedings. The respondent failed to establish any substantial family or community ties to the United States. Moreover, the Immigration Judge correctly determined that the assurances of Ms. Moreno that she will present the respondent for his removal hearings are insufficient, particularly where the ORR has not determined that the respondent can safely be placed in her care.

In addition, we find that the Immigration Judge was properly concerned about the welfare of the respondent if released to an unknown individual. We agree that unaccompanied children should not be held in detention unnecessarily pending the determination of their eligibility to remain in the United States. Indeed, that appears to be the premise behind the settlement in *Flores, et al v. Reno*. Neither should they, however, be released to unknown persons who have not been cleared by the ORR, which is the agency with demonstrated child-welfare expertise upon whom such decisions are now conferred under the HSA. Therefore, we find no fault with the Immigration Judge's decision in this regard, and we are not persuaded that the Immigration Judge erred in denying the respondent's request for release from custody. Accordingly, the respondent's custody appeal is dismissed.

<Signature>

FOR THE BOARD

Footnotes

1    The respondent states, through counsel on appeal, that on July 30, 2003 the ORR telephonically indicated that the release of the respondent to Ms. Moreno had been denied. Subsequently, counsel indicates that the ORR informed counsel that the results of the home assessment had led to the conclusion that Ms. Moreno's home would not be a good environment for the respondent.

2004 WL 1398660 (BIA)

IN RE: RUBEN DE LOS ANGELLES RODRIGUEZ-LOPEZ, 2004 WL 1398660 (2004)

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 9-ORR

PAGE 2/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO2MS/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## ARTESIA, NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF )<br><br>)<br>)<br>GRANADOS-GUTIERREZ, Maria Teresa (LEAD) )<br>GUTIERREZ-GRANADOS, Herson Yonatan (MINOR) )<br>)<br>)<br>Respondents )<br>_____ ) | IN BOND PROCEEDINGS<br><br>File Nos.: A206-848-455<br>A206-848-456 |

**MOTION:**      Motion for Bond and Release Pursuant to the Flores Settlement Agreement

**On Behalf of Respondent:**
Rachel S. Bloomekatz, Esq.
Jones Day
325 John H. McConnell Blvd.
Columbus, OH 43215

**On Behalf of DHS:**
Karen Donoso Stevens
Senior Attorney - ICE
1901 S. Bell Street, Suite 900
Arlington, VA 22202

## ORDER OF THE IMMIGRATION JUDGE

### I.      BACKGROUND AND PROCEDURAL HISTORY

The hearing in this matter was conducted in Artesia, New Mexico, through videoconference pursuant to INA § 240(b)(2)(A)(iii). Maria Teresa Granados-Gutierrez, Lead Respondent, and her son Herson Yonatan Gutierrez-Granados, Minor Respondent, are natives and citizens of El Salvador. On July 10, 2014, the Department of Homeland Security (DHS) issued Notices to Appear (NTAs), charging Respondents with removability under INA § 212(a)(6)(A)(i) as aliens present in the United States without having been admitted or paroled. Respondents accepted the factual allegations and conceded removability as charged. Respondents further indicated that they would be filing I-589 applications for asylum, withholding of removal, and relief pursuant to the Convention Against Torture (CAT).

On July 16, 2014, Respondents were denied bonds by DHS and were to remain in detention pending the outcome of removal proceedings. Respondents reserved an appeal of this determination. On August 14, 2014, Respondents presented their case for bond and custody redeterminations to this Court. DHS maintained its position that Respondents were flight risks whose release would posit national security concerns. Respondents advocated for discretionary release based on their pending asylum claims, ties to the community, and the Flores Settlement

PAGE 3/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MS/22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 2 of 34

Agreement. The Court rendered its decision designating a family bond of $30,000.[1] Alternatively, the Court maintained its jurisdiction in order to contemplate whether one or both Respondents were eligible for release from custody pursuant to the Flores Settlement Agreement.

The case was re-set for a custody redetermination hearing on September 9, 2014. The issue now before the Court concerns Respondents' eligibility for release pursuant to the Flores Settlement Agreement. For the reasons contained herein, the Court will grant Minor Respondent Herson Yonatan Gutierrez-Granados' request for release from custody, but will deny Lead Respondent Maria Teresa Granados-Gutierrez's request. Minor Respondent will be released pursuant to conditional parole under section 236(a)(2)(B) of the Immigration and Nationality Act ("INA" or the "Act") into the custody of his aunt, Rosa Mundo, while Lead Respondent will remain in custody pursuant to a proportionately reduced bond of $15,000.

## II.   EVIDENCE

### A.   Documentary Evidence

The Bond Proceedings record contains the following evidence:

| | |
|---|---|
| **Group Exhibit 1:** | Respondent's Memorandum and Documentary Evidence in support of her Motion for Bond and for Child's Release pursuant to the Flores Settlement Agreement, including the following: |
| **Tab A** | Copy of Rosa Mundo's birth certificate, with corresponding translation; |
| **Tab B** | Copy of Rosa Mundo's Legal Permanent Resident Card; |
| **Tab C** | Copy of Rosa Mundo's Certification of Completion of Naturalization Test; |
| **Tab D** | Copies of Rosa Mundo's documents including her Texas driver's license, electric bill, and mortgage payment receipt; |
| **Tab E** | Copies of Rosa Mundo's social security card and a pay stub; |
| **Tab F** | Letter to the Immigration Judge from Rosa Mundo; |
| **Tab G** | Complete Affidavit of Support (Form I-134) for Respondents on behalf of Rosa Mundo; |
| **Tab H** | Respondents' identity documents (birth certificates and identification card) with translations; and |

---

[1] Respondents appealed that decision to the Board of Immigration Appeals on August 18, 2014. This Court may entertain a bond redetermination request even where there is an appeal pending before the Board of Immigration Appeals. *Matter of Valles*, 21 I&N Dec. 769 (BIA 1997).

PAGE 4/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO2MS/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 3 of 34

| | | |
|---|---|---|
| **Tab I** | | Letter of Minor Respondent's school principal in El Salvador with certified translation. |
| **Group Exhibit 2:** | | The Department of Homeland Security's Submission of Documentary Evidence, including therein: |
| | **Tab A** | Declaration of Philip T. Miller, Assistant Director of Enforcement and Removal Operations ("ERO") and Immigration and Customs Enforcement ("ICE") Field Operations, dated August 7, 2014; |
| | **Tab B** | Declaration of Traci A. Lembke, Assistant Director of Investigative Programs for Homeland Security Investigations ("HSI") and ICE, dated August 7, 2014; |
| | **Tab C** | Written testimony of DHS Secretary, Jeh Johnson, before the House Committee on Homeland Security, hearing titled "Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border," release date June 24, 2014; |
| | **Tab D** | Preston and Archibald, "U.S. Moves to Stop Surge in Illegal Immigration," *N.Y. Times*, June 20, 2014; |
| | **Tab E** | Preston, "New U.S. Effort to Aid Unaccompanied Child Migrants," *N.Y. Times*, June 2, 2014; |
| | **Tab F** | Shear and Peters, "Obama asks for $3.7 Billion to Aid Border," *N.Y. Times*, July 8, 2014; |
| | **Tab G** | Dwyer, "A 12-Year-Old's Trek of Despair Ends in a Noose at the Border," *N.Y. Times*, April 19, 2014; |
| | **Tab H** | Preston, "Snakes and Thorny Brush, and Children at the Border Alone," *N.Y. Times*, June 25, 2014; |
| | **Tab I** | "Guatemalan Boy Sought Care for Family in the U.S. and Died Crossing Border Desert," *The Guardian*, July 2, 2014; |
| | **Tab J** | "72 Bodies Found in Mexico were Immigrants, Officials Say," *CNN Wire*, August 25, 2010; and |
| | **Tab K** | *Matter of D-J-*, 23 I&N Dec. 572 (AG 2003). |
| **Exhibit 3:** | | Additional documents in support of Respondents' Motion, including an "Agreement Pursuant to Flores Settlement Agreement" signed by Rosa |

PAGE 5/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSG/22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 4 of 34

Mundo for Minor Respondent and a copy of Respondents' agreement with current counsel for continued representation in all future immigration proceedings.

## B.    Testimonial Evidence

In addition to the evidence listed above, Lead Respondent was questioned in these proceedings. That testimony will be summarized here to the extent it is relevant to the Court's decision.

Respondents, through counsel, prefaced all questioning with a summary of Respondents' background. Namely, counsel indicated that Respondents have "significant ties to the United States" with two close relatives who are lawful permanent residents and two additional close relatives who reside in the United States pursuant to Temporary Protected Status. Lead Respondent's older sister and Minor Respondent's aunt, Rosa Mundo, is a lawful permanent resident who resides in Spring, Texas outside the Houston Metropolitan Area. Counsel indicated that her law firm has an office in Houston, Texas and that, should Respondents be released, counsel would continue representation pursuant to a previously executed retainer agreement. Counsel emphasized that Respondents have pending asylum applications that demonstrate a high likelihood on the merits and a plausible future avenue to adjust status once Rosa Mundo is naturalized.

After this summation of the facts was provided by Respondents' counsel, Government counsel conducted questioning of Lead Respondent. Lead Respondent testified that she paid a smuggler to gain passage to the United States. Specifically, Lead Respondent paid $7000 for her and Minor Respondent to cross the United States border on a raft with a group of people. The smuggler did not cross the river with Respondents. Lead Respondent was able to pay the $7000 fee with some money she borrowed and other money her partner (hereinafter "husband") sent from the United States. Lead Respondent indicated that her husband and sister, Rosa Mundo, were aware of her plans to enter the United States illegally. Both were aware that Lead Respondent would be travelling with Minor Respondent. Lead Respondent's husband is the father of Minor Respondent and he currently lives in Dallas, Texas. Were Respondents to be released, they would live with Rosa Mundo in Houston. Lead Respondent's husband would then relocate to reside in Rosa's home. Lead Respondent reiterated that neither she nor Minor Respondent had ever entered the United States previously. Also, she explained that she had not made any attempts to procure a visa or other means of entering the United States legally before engaging with the smuggler and crossing the United States border.

## III.    RESPONDENTS' POSITION

Lead Respondent requests that this Court release her and Minor Respondent from custody pursuant to 8 C.F.R. § 1003.19 or the Flores Settlement Agreement. Respondents argue that they meet the requirements for release from custody under the standard traditionally prescribed by the Board of Immigration Appeals. *See Matter of Patel*, 15 I&N Dec. 666 (BIA 1976). More specifically, Lead Respondent argues that because she and Minor Respondent have strong claims for asylum, significant community ties, a permanent address for residency, no criminal history,

PAGE 6/35 ' RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] ' SVR:NAF/X02MSI/22 ' DNIS:6057 4 ' CSID: ' DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 5 of 34

and no attempts to evade immigration laws or officers, that neither party presents a flight risk or
threat to society.

Lead Respondent also contends that the release of neither she nor Minor Respondent would give
rise to national security concerns. Respondents aver that the Government's position in this case
regarding *Matter of D-J-*, 23 I&N Dec. 572 (BIA 2003) is incorrect. Principally, Respondents
argue that *Matter of D-J-* was not designed to create a policy that amounts "to an assertion that
no one from Central America can receive release on bond" or a blanket national security threat
that would disallow a single immigrant from three countries to be released from custody.
*Respondents' Memorandum in Support*, at *7-8. Such an assertion would be overbroad and
against the individualized custody determination that is required pursuant to section 235 of the
Act. *Id.* at *7-8. In fact, Respondents argue that allowing DHS to apply a nationality or race-
based policy on these grounds would be unconstitutional. *Id.* at *8. Alternatively, Respondents
provide that even if *Matter of D-J-* were a valid source of contention, it is inapplicable to this
case as the facts are distinguishable. *Id.* Specifically, *Matter of D-J-* repeatedly emphasized that
the immigrants attempted to evade arrest which created a flight risk. Respondents state that this
risk is not at issue in their applications for release. Moreover, the immigrants in *Matter of D-J-*
did not have viable claims to asylum and were coming from a country which was a staging point
for illegal immigration by sea. *Id.* Respondents argue that the holdings from *Matter of D-J-* do
not apply to their custody determinations because they possess valid claims for asylum and there
is no higher-level national security risk in their case.

Lastly, at a minimum, Lead Respondent argues that Minor Respondent must be released to his
aunt in accordance with the Flores Settlement Agreement. Lead Respondent states that Minor
Respondent must be released under the Flores Settlement Agreement unless it is determined his
detention is necessary to secure his presence before the Court. Because this is not at issue in
Minor Respondent's case, and because his aunt has provided the necessary affidavit in support as
required by the Flores Settlement Agreement, Minor Respondent must be released from custody.
Respondents request that, pursuant to the Flores Settlement Agreement, Minor Respondent be
released on his own recognizance, or alternatively, on a low bond.

## IV.    GOVERNMENT'S POSITION

Department of Homeland Security (DHS) maintains a "no bond, high bond" position regarding
the release of aliens at the border under the current circumstances. This policy is to apply to
adults, juveniles, and unaccompanied minors alike due to the issues at play involving the current
influx of undocumented immigrants at the United States border. DHS has submitted two
affidavits, various news articles, and a copy of *Matter of D-J-*, 23 I&N Dec. 572 (AG 2003) in
support of its position.

The first affidavit provided by Mr. Philip Miller (acting Assistant Director of Field Operations
for Enforcement and Removal Operations) advocates for the "no bond, high bond" policy in light
of national security concerns developing from current Central American mass migration. *DHS'
Documents*, Tab A, at *2 ¶ 11. Mr. Miller explains that detention is crucial during instances of
mass migration because annual surveys of Central Americans show that one key instigating

PAGE 7/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXX02MS/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 6 of 34

factor is the existence of an "active migration network." *Id.* Immigrants released on bond are considered members of this "network." As a result, allowing detainees to bond out would have "an indirect yet significant adverse" effect on national security as it "undermines the integrity of our borders." *Id.* Mr. Miller attests that immigrants will continue to migrate under the impression that they will be released from detention if a policy favoring release is implemented. *Id.* Also, Mr. Miller explains that significant resources have been directed to the border in order to conduct hearings and investigations, as well as to dismantle criminal smuggling organizations. By reducing the current influx of foreign nationals, including adults with children, from Guatemala, El Salvador, and Honduras, DHS will again be able to reallocate resources to handle "other priorities" such as criminal and dangerous aliens. Further, at least the "no bond, high bond" policy would allow DHS officials more time to screen detainees to properly identify those individuals who present threats to the community and/or national security. *Id.*

The second affidavit provided by Ms. Traci Lembke (acting Assistant Director of Investigative Programs for Homeland Security Investigations) relays many of the same concerns. The only major distinction is that her affidavit places heavy emphasis on the "serious threat" that human trafficking poses to United States national security and immigrants. *DHS' Documents*, Tab B, at *6. The affidavit provides details on the operations of human smuggling organizations and how, by focusing on the border and current mass migration concerns, resources are being redirected from other priorities. *Id.* at *7. Ms. Lembke concludes that "[i]mplementing a 'no bond' or 'high bond' policy would help alleviate these disruptions by deterring future mass migration." *Id.* at *7, ¶ 20.

Both affidavits are critical to the Government's position as they maintain that "national security" concerns substantiate the need for a "no bond, high bond" policy pursuant to *Matter of D-J-*, 23 I&N Dec. 572 (AG 2003). In *Matter of D-J-*, the Attorney General held that Immigration Judges faced with concerns of mass migration must consider national security threats as well as evidence presented by the Government from sources in the Executive Branch with relevant expertise which establishes significant national security interests are implicated. 23 I&N Dec. at 581. Significantly, the Attorney General held that encouraging unlawful mass migration from a foreign country is inconsistent with sound immigration policy and important national security interests and thus, constitutes a "reasonable foundation" for the exercise of discretion to deny a release on bond pursuant to the Act. *Id.* at 579. DHS maintains that the current situation is analogous to that at issue in *Matter of D-J-* and thus, the "no bond, high bond" policy is the best option to be implemented.

Specific to Respondents' requests for release, DHS is unsatisfied with Respondents' evidence as presented. Namely, DHS maintains that no bond is proper in light of Respondents' blatant violations of U.S. immigration law and policy. DHS further argues that Respondents have not shown that they warrant relief under *Matter of Guerra*, 24 I&N Dec. 37, 38 (BIA 2006) or *Matter of Patel*, 15 I&N Dec. 666 (BIA 1976). Thus, DHS posits that given the significant national security concerns and the fact that Respondents have not demonstrated any favorable factors necessary for release, both Respondents have not carried their burden of proof and should remain detained with no bond or, at least a very high family bond.

PAGE 8/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MS1/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 7 of 34

V.   SUMMARY OF LAW

**A.   The Flores Settlement Agreement**

This section will first summarize the procedural posture and relevant holdings that gave rise to the Flores Settlement Agreement (FSA). It will then outline the relevant parameters of the FSA. Lastly, it will summarize any subsequent legislation relevant to minors[2] in custody and persuasive case law arising from the terms of the FSA.

**1.   History of the FSA**

The cases giving rise to the FSA and, in fact what urged the need for the FSA originally, was the increasing number of unaccompanied juveniles who entered the United States dating all the way back to the 1980's. *See Reno v. Flores*, 507 U.S. 292, 294, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). Based upon a policy adopted to handle the influx of unaccompanied juveniles, the former Immigration and Naturalization Service (INS) limited the release of detained minors to "a parent or lawful guardian." *Id.* at 295 (citations omitted). Only where a case presented "unusual and extraordinary" circumstances could a juvenile be released to "a responsible individual who agrees to provide care and be responsible for the welfare and wellbeing of the child." *Id.*

Later, in July of 1990, four unaccompanied juveniles initiated a class action lawsuit in the District Court for the Central District of California challenging the INS policies on constitutional, statutory, and international law grounds. *Id.* This lawsuit led to the uniform deportation-exclusion rule (presently 8 C.F.R. §§ 236.3, 1236.3 former 8 C.F.R. § 242.24(1992)), which provided that alien juveniles shall be released to family members in a descending preferred order so long as those relatives were not in detention, unless INS determined that the detention of the juvenile was required to secure timely appearance before the Court. *Id.* at 296-97. A parent or legal guardian in custody could provide an affidavit to designate a caretaker for the juvenile so long as that custodian executed an agreement to care for the juvenile and ensure presence at future hearings. *Id.* at 297. Lastly, in unusual and compelling circumstances and within the discretion of INS, a juvenile could be released to other adults who executed a care and attendance agreement. *Id.* Juveniles who were unable to be released remained in "legal custody" at a suitable facility accommodating for juveniles. *Id.* at 298. Additionally, pursuant to the Alien Minors Care Program implemented by the Department of Justice, the INS had to place alien juveniles in a facility meeting or exceeding specific standards within 72 hours of apprehension. *Id. citing See* Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention, *Flores v. Meese*, No. 85–4544–RJK (Px) (CD Cal., Nov. 30, 1987).

---

[2] Although not proper to do so in all contexts, throughout this opinion the Court will use the terms "minor" and "juvenile" interchangeably. Both the regulations and FSA discussed in this opinion govern "individuals in custody under the age of eighteen" but the regulations employ the term "juvenile" while the FSA designates them as "minors." The Court notes that when it references either term in this decision – it is collectively referring to "individuals in custody under the age of eighteen." *FSA,* ¶10; 8 C.F.R. § 1236.3(a).

PAGE 9/35 · RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] · SVR:NAFX02MSG/22 · DNIS:6057 4 · CSID: · DURATION (mm-ss):16-12

A/#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 8 of 34

Although this regulation was adapted as an attempt to remedy the class members' concerns, the class decided to maintain litigation as a challenge to the new regulation upon their constitutional claims. *Flores*, 507 U.S. at 289-99. One week after the regulation went into effect, an unpublished decision of the District Court granted summary judgment to the class members and invalidated the former 8 C.F.R. § 242.24 for three reasons: (1) the court ordered INS to release minors otherwise eligible for release to not only the listed parties but also to any "other responsible adult party; (2) it dispensed with the requirement that unrelated caretakers must execute an affidavit; and (3) it rewrote the regulation to provide for an initial determination of prima facie removability and release conditions with review available by an immigration judge. *Id.* citing *Flores v. Meese*, No. CV 85–4544–RJK (Px) (CD Cal., May 25, 1988). The Ninth Circuit initially reversed the District Court with a divided panel, but subsequently affirmed all the District Court's holdings en banc. *See Flores v. Meese*, 934 F.2d 991 (9th Cir. 1990); *Flores v. Meese*, 942 F.2d 1352, 1365 (1991).

The Ninth Circuit's opinion was appealed to the Supreme Court. Before the Supreme Court, the class members attacked the regulation on constitutional grounds including substantive and procedural due process. The class members also argued that the Attorney General exceeded the authority delegated to her office by enacting the INS regulation. The Supreme Court denied all of the class's claims.

Principally, the Supreme Court held that the parameters of the Juvenile Care Agreement, adopted by the new regulation, did not create a physical restraint so severe as to invoke substantive due process concerns. *Reno* 52 U.S. at 302. Moreover, the Supreme Court reasoned that the class members raised no fundamental rights, and thus, INS only need to advance guidelines which were a "best fit" to protecting the interests of the children. *Id.* The Supreme Court found that this standard was met and therefore, the regulation was valid. The Supreme Court reasoned that juveniles necessarily required some form of "custody" as minors under the law and that no fundamental right, even if one existed, was violated by placing them in the custody of a government institution. *Id.* at 302-303. The Supreme Court went further and stated that if custody is not unconstitutional, neither is it unconstitutional just because it is merely not in the "best interests of the child" to receive private alternative placement. *Id.* Considering the Fifth Amendment, the Supreme Court opined that procedural due process was satisfied without requiring the *automatic* review of decisions by an Immigration Judge. *Id.* at 308-309. Lastly, the Supreme Court held that the Attorney General had not exceeded her discretion because the basis for the regulation was "reasonable" insofar as it struck a balance between the "concern for the welfare of the juvenile" and the fact that INS possessed "neither the expertise nor the resources to conduct home studies for placement of each juvenile released." *Id.* at 310 (citations omitted).

In conclusion, the Supreme Court stated: "We think the INS policy now in place is a reasonable response to the difficult problems presented when the Service arrests unaccompanied alien juveniles. It may well be that other policies would be even better, but 'we are [not] a legislature charged with formulating public policy… [o]n its face, INS regulation 242.24 accords with both the Constitution and the relevant statute.'" *Id.* at 315 (citations omitted). The case was remanded for further proceedings. Those further proceedings gave rise to the FSA.

PAGE 10/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFAX02MS/22 * DNIS:6057:4 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Henson Yonatan
Page 9 of 34

2.    **The FSA**

After litigation had been pending for nine years, on January 17, 1997, the parties in the case *Flores v. Reno* reached a settlement agreement. The Flores Settlement Agreement (FSA) was created to set out a "nationwide policy for the detention, release, and treatment of minors in the custody of INS [which] shall supersede all previous INS policies." *FSA,* ¶ 9.

The FSA provided that plaintiffs included all minors (persons under eighteen years of age) who are detained in the legal custody of INS. *Id.* at ¶ 1, 3, 4, 10. Moreover, the class of plaintiffs and defendants referenced within the agreement included all "their agents, employees, contractors, and/or successors in office." *Id.* at ¶ 1.

While the FSA outlines at length the guidelines applicable to the facilities which are set to house juveniles, the most relevant provisions for the issues before the Court today pertain to the release of minors. *See FSA,* ¶ 12-18 (Release Provisions), ¶ 19-23, Exhibit 1 (Custody Provisions).

First, the FSA generally notes that all minors should be expeditiously processed and given proper notice of their rights, including the right to a bond redetermination where applicable. *FSA,* ¶ 12.A. In relation to "expeditious processing," the FSA states that minors should be released or placed in licensed facilities within a certain timeframe of three to five days. *Id.* INS will not be held to this timeline of proper placement without release if, among other circumstances, there is an "emergency or influx of minors into the United States." *Id.* An "influx of minors into the United States shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program...including those who have been so placed or are awaiting such placement." *Id.* at ¶ 12.B.

Setting a "General Policy Favoring Release" the FSA states:

> Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS **shall release a minor from its custody without unnecessary delay,** in the following order of preference, to:

> A.    a parent;

> B.    a legal guardian;

> C.    an adult relative (brother, sister, aunt, uncle, or grandparent);

> D.    an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

PAGE 11/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02/MIS/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 10 of 34

E.     a licensed program willing to accept legal custody;

F.     an adult individual or entity seeking custody, in the discretion of INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

*FSA*, ¶ 14. Before any minor is released pursuant to these rules, a custodian must execute an "Affidavit of Support (Form I-134)" as well as an agreement which states, among more specific details, that the custodian will properly provide for the child, ensure appearance at future proceedings, notify the INS of any change in address, and notify the INS at least five days prior to departing the United States and of any initiation of dependency proceedings. *Id.* at ¶ 15. The INS retains the ability to terminate custody arrangements if the custodian fails to comply with the executed agreement. *Id.* at ¶ 16. Moreover, a positive "suitability assessment" may be required prior to the release of any minor. *Id.* at ¶ 17. If a minor is not immediately released to a relative outlined within the agreement, the "efforts at family reunification shall continue so long as the minor is in INS custody." *Id.* at ¶ 18.

A minor may be held or transferred to a suitable facility, including a secure or medium-security facility, whenever it is determined that the minor "must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees." *FSA*, ¶ 21.

After a determination is made by INS, "[a] minor in deportation proceedings shall be afforded a bond redetermination hearing before an Immigration Judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such hearing." *Id.* at ¶ 24.A. Additionally, any minor who disagrees with his or her placement "in a particular facility" or who contends that the facility of placement "does not comply with the standards set forth in Exhibit 1 attached hereto" may seek judicial review in the United States District Court with jurisdiction and venue. *Id.* at ¶ 24.B. The challenge can cover the placement determination or allege noncompliance with the FSA's standards. *Id.* Any resulting action by a District Court related to an action brought under these provisions "shall be limited...to solely...the individual claims of the minor bringing the action." *Id.*

3.     **Post-FSA: Legislation and Litigation**

Since the date of the FSA's enactment, much in the landscape of immigration law and policy has changed.[3] Most notably, the INS is no longer a federal agency. Instead, the Homeland Security Act (HSA) of 2002 "transferred" the INS to the Department of Homeland Security (DHS), while the Executive Office for Immigration Review (EOIR) remained in the Department of Justice.

---

[3] *See* Rebeca M. Lopez, *Codifying the Flores Settlement Agreement: Seeking to Protect Immigrant Children in U.S. Custody*, 95 MARQ. L. REV. 1635 (2012)(providing a history and background of the Flores Settlement Agreement).

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. As a result, it has been accepted that DHS and its component part, Immigration and Customs Enforcement (ICE), are the successors to INS and thus, the FSA is binding upon them. FSA ¶ 1 (FSA is stated to be binding upon INS successors); *See Bunikyte v. Chertoff*, 2007 WL 1074070, at *2 (W.D. Tex. 2007); *see also* H.R. REP. 110-181, 43-44, 2008 (Congressional appropriations committee acknowledging that the FSA is binding upon DHS and ICE and that they must enact policies for compliance).

Additionally, since 1997, the HSA and the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008 have enacted pertinent statutory revisions regarding immigrant juveniles. The HSA set out preliminary procedures for the placement and handling of unaccompanied juveniles. The HSA transferred responsibility for unaccompanied minors to the Office of Refugee Resettlement (ORR) with the directive to create a national plan ensuring that the interests of the child were considered when making care and custody determinations. 6 U.S.C.A. § 279(b)(1)(A). Aside from the creation of ORR, however, little in the way of guidance was actually provided by the HSA.

Thereafter, TVPRA was enacted and subsequently reenacted, with the purpose of preventing illegal human trafficking. Pub. L. No. 110-457, 122 Stat. 5044 (2008). TVPRA contains provisions specific to unaccompanied juveniles including that the juvenile "shall be promptly placed in the least restrictive setting that is in the best interests of the child." TVPRA, § 235(c)(6). Further, TVPRA states that children must be placed in ORR custody within 72-hours of apprehension. TVPRA, § 235(b)(3). All of these provisions are similar to those guidelines contained in the FSA. However, they are limited to unaccompanied minors and do not necessarily enact the entirety of the FSA into law. Consequently, the FSA continues to govern DHS and its policies regarding the detention of minors.

Since the FSA remains controlling, immigrant juveniles have brought various lawsuits pursuant to its provisions in District Courts over the past decade. None of the decisions are published and many provide little insight into the FSA and how it should be applied. In large part, the decisions find that the juveniles who bring suit do not have a cognizable right, fundamental or otherwise, which render DHS' regulations and policies to be improper under the Constitution. *Walding v. United States*, 2009 WL 4930897 (W.D. Texas 2009)("undisputed that the Flores settlement agreement, which is in effect a remedial decree, does not in and of itself confer any constitutional rights upon the plaintiffs"); *see also Walding v. United States*, 2009 WL 902423 (W.D. Tex. 2009). Other decisions deny relief because the plaintiffs cannot sustain their burden against the government under specific causes of action such as *Bivens* claims, injunctive relief, or under the Federal Tort Claims Act. *Fabian v. Dunn*, 2009 WL 2567866 (W.D. Texas 2009)(finding a *Bivens* claim could not be found pursuant to the FSA because there was no respondeat superior liability, among other reasons of this same nature).

Nonetheless, the FSA was utilized to successfully create a settlement agreement that resulted in the closing of the much-publicized Don T. Hutto Family Residential Center ("Hutto"). *In re Hutto Family Detention Center*, Case No. A-07-CA-164-SS (W.D. Texas 2007). The predecessor decision of the District Court that gave rise to the Hutto settlement agreement is extremely

PAGE 13/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO2MS/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 12 of 34

enlightening on the FSA and its role today. In *Bunikyte v. United States*, the minor plaintiffs
brought suit stating that the Hutto family facility was not properly licensed or compliant with the
terms of custody generated for minors under the FSA. 2007 WL 1074070, at *6-15. The
plaintiffs further alleged that the FSA created a favored policy of release for minors and that this
policy mandated the children and their detained parents be released. *Id.* at *16-20.

First, the District Court discussed that immigration policy, particularly regarding the release of
family groups, has critically changed since the tragedies of September 11, 2001 insofar as there
are more restrictive policies in place with tougher enforcement and broad expedited removal of
illegal aliens throughout the country. *Id.* at *1. As the plaintiffs brought their claim pursuant to
the FSA, in light of this change in policy, the District Court observed:

> Of course, the provisions of this settlement agreement, entered into over ten years
> ago, were never intended to be permanent authority, much less the only binding
> authority setting standards for the detention of minor aliens. The Flores
> Settlement was intended as a stopgap measure until the United States could
> promulgate reasonable, binding standards for the detention of minor[s] in
> immigration custody. Flores remains in force until "45 days following defendants'
> publication of final regulations implementing this Agreement." [ ] Yet the United
> States does not contest that the Flores settlement is still in effect. Despite the
> passage of just over a decade, neither DHS nor Congress has yet promulgated
> binding rules regarding the standards for the detention of minors. In fact, it
> appears that Flores is the only binding legal standard directly applicable to the
> detention of minor aliens by the United States government, despite the passage of
> time and the drastic changes in immigration policy since this judgment was first
> enacted.

*Id.* at *2. The District Court went on to state that it is no defense that the FSA may be outdated,
but it is "apparent the FSA did not anticipate the current emphasis on family detention, where the
parole of adult family members is limited by acts of Congress and the judicial branch." *Id.* at *3.

With ultimately finding that the FSA was still binding upon the parties[4], the District Court stated
that the FSA governs procedure for all minors in the custody of ICE and DHS. *Id.* Further, the
District Court reasoned that the FSA favored the release of minors when possible pursuant to the
standards set out by the FSA's provisions so long as detention is not necessary to secure the
minor's appearance in immigration court and there were no safety concerns for the minor or the
public. *Id.* After considering the applicable terms of the FSA, the opinion states that judicial
review of ICE's detention policy for a specific minor is guaranteed review before an immigration
judge, unless like the plaintiffs in this case, they are arriving aliens without right to that review.
*Id.* at *4. In those circumstances, it is valid that the plaintiffs bring suit in District Court pursuant
to the FSA's provisions governing that form of valid jurisdiction. *Id.*

---

[4] "The Settlement Agreement is, in essence, a Court-approved contract binding on ICE and DHS. *See e.g. United States v. ITT Continental Baking Co.*, 420 U.S. 223, 237, 95 S.Ct. 926, 43 L.Ed.2d. 148 (1975). It is also a court order directing the parties to comply with its terms. *Id.* at n.10." *Bunikyte*, at *8.

PAGE 14/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAF-X02IMS/22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 13 of 34

Considering all the plaintiffs' allegations, the District Court determined that the Hutto facility was likely in violation of the FSA's operating standards. *Bunikyte*, at *16. However, the District Court held it could not grant injunctive relief because, although there was a likelihood of success on the merits, the relief sought by plaintiffs was unsupported by the FSA. Namely, plaintiffs sought "immediate release from Hutto *with their parents* as a remedy for Defendants' alleged *Flores* violations." *Id.* (emphasis in original). "The Flores settlement, however, does not provide any particular rights or remedies for adult detainees." *Id.*

**B.    Immigration Judges – Authority and Custody Determinations**

Immigration judges are creatures of statute; they receive powers and duties directly from Congress or by delegation from the Attorney General. 8 U.S.C.A. 1252(b); 1103; *see also Lopez-Telles v. INS*, 564 F.2d 1302, 1303 (9th Cir. 1977). An immigration judge is generally limited to making determinations regarding the grounds of removability as well as whether there has been an abuse of discretion by DHS in the exercise of its particular discretionary powers. *Lopez-Telles*, 564 F.2d at 1304.

The regulations promulgated by the Attorney General have the force and effect of law. *Matter of Cubor-Cruz*, 25 I&N Dec. 470, 471 (BIA 2011) *citing* INA §103(a), 8 U.S.C. § 1103(a); *Matter of Anselmo*, 20 I&N Dec. 25, 30 (BIA 1989); 8 C.F.R. §§ 1003.1(d)(1)(i), 1003.10(b). Courts construe the language of the regulations following the same principles of interpretation applied to statutory provisions. *Id. citing Matter of Villarreal-Zuniga*, 23 I&N Dec. 886, 889 (BIA 2006). "Regulations, like statutes, must be interpreted to give effect to the entire regulatory scheme." *Id.* at 471-72, *citing Matter of C-W-L-*, 24 I&N Dec. 346, 348 (BIA 2007). However, the regulation that specifically addresses the issue at hand is controlling. *Id.* at 472 (citations omitted).

One of the specific areas designated to the Attorney General is that of custody determinations regarding aliens within the United States. Specifically, pursuant to section 1102 of the HSA, "the Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to [the HSA], although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether the alien will remain in custody during removal proceedings." *Matter of D-J-*, 23 I&N Dec. 572, 574, n.3 (A.G. 2003).

Subject to certain exceptions, the Attorney General may arrest and detain an alien pending a decision on whether the alien is to be removed from the United States. INA § 236(a)(1). Likewise, the Attorney General has the power to release the alien on either a bond of at least $1500 with security and conditions or on conditional parole. INA § 236(a)(2). Nevertheless, the Attorney General retains the power to revoke a bond or parole authorized pursuant to the Act at any time under the original warrant. INA § 236(b). Section 236 of the Act does not give a detained alien any right to be released on bond; rather, the Attorney General exercises broad discretion and has the ability to release a detained alien if he concludes such action is warranted. *Carlson v. Landon*, 342 U.S. 542, 534 (1952).

PAGE 15/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MS1/22 * DNIS:6057 4 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 14 of 34

As section 236 of the INA conveys this authority to the Attorney General, that authority has
explicitly been delegated to Immigration Judges by regulation at 8 C.F.R. §§ 1003.19, 1236.1(d).
Pursuant to this authority, the Immigration Judge may "exercise the authority in section 236 of
the Act...to detain the alien in custody, release the alien, and determine the amount of bond, if
any, under which the respondent may be released[.]" 8 C.F.R. § 1236.1(d).

With this authority, certain guidelines for custody determinations have been promulgated by the
Board of Immigration Appeals (BIA). Prominently, an alien must establish to the satisfaction of
the Immigration Judge that he or she does not present a danger to persons or property, is not a
threat to national security, and is not a flight risk or likely to abscond. *Matter of Guerra*, 24 I&N
Dec. 37, 38 (BIA 2006); *see also Matter of Patel*, 15 I&N Dec. 666 (BIA 1976). Despite these
traditional factors that should be considered, it is still consistently recognized that the Attorney
General has extremely broad discretion in deciding matters of custody. *Id.* at 39. As a result, the
Act does not limit an Immigration Judge to only these three factors in determining whether to
detain an alien pending the outcome of removal proceedings. *Id.*

Other factors offered by the BIA for consideration are: (1) whether the alien has a fixed U.S.
address; (2) the alien's length of residency in the U.S.; (3) the alien's family ties to the U.S. as
well as whether those ties may result in relief for the alien; (4) employment history; (5) the
alien's record of appearance in court; (6) the alien's criminal history, including that history's
recency, extensiveness, and seriousness; (7) the alien's history of immigration violations; (8) any
attempts by the alien to flee prosecution or authorities; and (9) the alien's manner of entry into
the U.S. *Guerra*, 24 I&N Dec. at 40 (citations omitted). Also, as a general rule, it is found that
those respondents with a greater likelihood of being granted relief have a greater motivation to
appear for his or her hearing. *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

## C.    Bond and Conditional Parole

Traditionally, an Immigration Judge conducts bond redeterminations for adult aliens in the
custody of DHS. The Immigration Judge has the authority to conduct bond and custody
proceedings under 8 C.F.R. §§ 1003.19, 1236.1; *see also* INA § 236. Bond redeterminations are
well developed under the law and typically involve a weighing of the factors discussed above in
the preceding section of this opinion.

Despite this area of the law being well founded with many guidelines for general practice, the
proper avenues for release regarding juveniles in family detention is much less obvious. The
regulations actually assume that release is conducted by bond, parole, or release on recognizance
by the time a custody determination is necessary. 8 C.F.R. § 1236.3(b). Both the FSA and
regulations apply obligatory language ("shall be released"), but provide no actual guidance on
how such a release is to be effectuated under the regulatory jurisdiction of an Immigration Judge.
And, of particular concern to this Court, where a custodian is available and the minor presents no
risk of flight or danger, it could be improper to issue a bond against the minor in light of such
compulsory language, especially considering that their "unaccompanied minor" counterparts in
family detention do not face these same issues. Instead, unaccompanied minors are either
released by DHS or placed in an ORR facility – few, if any, reach the level of necessity where he

PAGE 16/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPXO2MS1/22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 15 of 34

or she must challenge their custody in a family facility before an Immigration Judge, as is the case here. *See generally* TVPRA § 235(b)(3).

DHS' regulations provide express guidance that juveniles may be paroled into the United States pursuant to section 212(d)(5) of the Act. 8 C.F.R. § 212(b)(3). In particular, DHS' regulations state that juveniles eligible for release pursuant to 8 C.F.R. § 236.3 (the exact companion to EOIR's 8 C.F.R. §1236.3) may be paroled into the custody of a preferred adult for "urgent humanitarian reasons" or "significant public benefit" if he or she presents neither a security risk nor a risk of absconding. 8 C.F.R. §212(b)(3).

While this may be a viable option for DHS officials, the Immigration Judge's power to "parole" aliens has been a long-standing point of controversy. The BIA has consistently held that DHS is the sole entity possessing the power to parole an alien into the United States by way of 8 C.F.R. § 212(a). *Matter of Matelot*, 18 I&N Dec. 334, 336 (BIA 1982). According to this precedent, because of the Attorney General's express delegation of the parole power, neither Immigration Judges nor the BIA has jurisdiction to exercise the parole powers. *Id. citing Matter of Castellon*, 17 I&N Dec. 616 (BIA 1981); *Matter of Niayesh*, 17 I&N Dec. 231 (BIA 1980); *Matter of Lepofsky*, 14 I7N Dec. 718 (BIA 1974); *Matter of Conceiro*, 14 I&N Dec. 278 (BIA 1973). The Court does not dispute that it lacks jurisdiction to parole aliens into the United States under section 212 of the Act. However, since this is a regulatory avenue available to DHS that is not readily available to this Court, what then is the proper mechanism for this Court (where bond may be improper) to release a juvenile? *See* 8 C.F.R. § 1236.3.

Pursuant to 8 C.F.R. § 1003.19(d), this Court has been delegated all authority available to the Attorney General under section 236 of the Act, which expressly includes the ability to "conditionally parole" aliens pending the outcome of removal proceedings. INA § 236(a)(1)(B). Although this Court cannot parole in the same fashion as DHS, it may conditionally parole a juvenile to effectuate his or her proper release pursuant to 8 C.F.R. § 1236.3.

Circuit Courts and the BIA alike have recognized that the power and effects of "parole" and "conditional parole" are not one in the same. *Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010) *aff'd Castillo-Padilla v. Attorney General*, 417 Fed.Appx. 888 (11th Cir. 2011)(unpublished).[5] Namely, the BIA has held that a "release from custody on conditional parole does not amount to being paroled into the United States." *Id.* at 258. Comparing "parole" under section 212 of the Act and "conditional parole" under section 236 of the Act, the BIA explained that "parole" requires urgent humanitarian concerns or a public benefit with strict conditions, whereas "conditional parole" inheres no such restrictions and instead "the alien is merely released from detention 'pending a decision on whether the alien is to be removed from the United States.'" *Id.* at 259 *citing* INA § 236. The BIA continued to reason that the authority to make custody determinations under section 236 of the INA is shared by both the Attorney General and Secretary of Homeland Security, but that section 212 of the Act is separate and

---

[5] *See also Ortega-Cervantes v. Gonzales*, 501 F.3d 1111 (9th Cir. 2007)(deferring to *Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010) in its entirety); *Cruz-Miguel v. Holder*, 650 F.3d 189 (2nd Cir. 2011)(the same); *Delgado-Sobalvarro v. Attorney General*, 625 F.3d 782 (3d Cir. 2010)(the same).

PAGE 17/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAF-X02MS/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 16 of 34

exclusively delegated to DHS. *Id.* at 261. Because the Attorney General no longer possesses the power to parole under section 212(d)(5)(A), "it would be inconsistent with the regulations to consider the two types of parole as equivalent." *Id.* Based on the foregoing, the BIA concluded that an alien who is "conditionally paroled" under section 236 of the INA gains no benefits for relief akin to those received under section 212 of the Act; rather, a conditionally paroled alien is merely released from custody pending the outcome of his or her removal proceedings. *Id.* at 261-63.

Despite this case law and the contradictory precedent stating that an Immigration Judge has "no parole authority," the BIA has consistently declined in unpublished decisions to outline the parameters of the Immigration Judge's authority to conditionally parole aliens under section 236 of the INA.[6] The only point provided by the BIA on the subject directly is an implication that the features of conditional parole may actually "present more onerous conditions on a respondent than the minimum bond" set by an Immigration Judge. *See In re Sanchez-Tello*, A 200 670 873, 2011 WL 1792611, at *1, n. 1 (BIA 2011).

## VI.   FINDINGS AND ANALYSIS

### A.   The Applicability of the FSA

It is evident that the FSA remains valid and controlling upon ICE today. Various sources confirm this contention including the express terms of the FSA, law interpreting settlement agreements, FSA litigation, Congressional directives, and ICE internal operating policies.

The FSA was amended by stipulated order to indicate that it would remain in effect until "45 days after the federal government promulgates final regulations implementing the Agreement."[7] It is clear from a multitude of sources that no such regulations have been enacted to establish compliance with the FSA and its terms.[8] Accordingly, the Court finds that, as a general matter, the FSA and its terms still govern custody determinations for minors.

[6] *See In re Navarro-Solajo*, A 087 966 841, 2011 WL 1792597, at *1, n.1. (BIA 2011)("We acknowledge the respondent's argument that he should have been released on conditional parole pursuant to section 236(a)(2)(B) of the Act. It is not necessary here to address the extent of an Immigration Judge's authority as to conditional parole. A release on conditional parole as provided under section 236(a)(2)(B) of the Act could present more onerous conditions on a respondent than the minimum bond set by the Immigration Judge in this case. Moreover, the respondent requested and was granted the minimum bond. The Immigration Judge's decision to impose a monetary bond was the proper disposition for this case.").

[7] *Flores v. Reno*, Case No. CV 85-4544-RJK(Px), Stipulation Extending the Settlement Agreement and for Other Purposes, and Order Thereon (C.D. Cal., Dec. 7, 2001) (copy on file with the authors). A settlement agreement is a court-approved contract binding upon its parties as well as a court order directing parties to comply with its terms. *U.S. v. ITT Continental Baking Co.*, 420 U.S. 223, 237 (1975). Neither party can "unilaterally avoid a material contract term" to render the agreement void. *See Police Ass'n ex rel Cunnatella v. City of New Orleans*, 100 F.3d 1159, 1173 (5th Cir. 1996).

[8] *See Bunikyte v. United States*, 2007 WL 1074070 at *2; *see also* H.R. REP. 110-181, 43-44, 2008 U.S.C.C.A.N. 1336, 1376-77(recognition by the House Appropriations Committee that the Flores Settlement Agreement is binding upon DHS, ICE, and ORR and mandating compliance with the terms therein); Juvenile Protocol Manual, *Juvenile Aliens: A Special Population*, at *2, (2006) *available at* http://www.ice.gov/doclib/foia/dro_policy_memos/juvenileprotocolmanual2006.pdf (attaching the FSA as an exhibit

PAGE 18/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MS/22 * DNIS:6057 4 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 17 of 34

What seems more difficult to discern is who is bound by the terms of the FSA. The Government argued before this Court that the FSA is only binding upon the Office of Refugee Resettlement ("ORR"). Respondents contend that DHS and ICE are both bound by the FSA as successor agencies to INS. *See FSA*, ¶1. The Court agrees with Respondents.

The language of the FSA is unambiguous. The defendants bound by the FSA as bargained for by INS, includes "their agents, employees, contractors, and/or successors in office." *Id.* At least one court has found, and ICE has seemingly conceded within its own policies, that DHS and ICE are bound by the FSA under its plain language. *See Bunikyte v. United States*, 2007 WL 1074070 at *3; *see also* Juvenile Protocol Manual, *Juvenile Aliens: A Special Population*, at *2, (2006) *available at* http://www.ice.gov/doclib/foia/dro_policy_memos/juvenileprotocolmanual2006.pdf. This conclusion is habitually reached by way of the express language of the Homeland Security Act (HSA) that created DHS and ICE. Specifically, the HSA "transferred" the INS and its responsibilities to DHS. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. Consequently, DHS is the successor agency to INS and became a "defendant" within the parameters of the FSA. *See also Bunikyte*, at *2 ("The *Flores* settlement is binding on ICE and DHS as successor organizations to INS."). The Court finds, on account of these cumulative sources, that the FSA is binding upon DHS and ICE.

Aside from arguing that the FSA is not binding upon ICE, the Government also contends that the FSA only applies to "unaccompanied minors" as opposed to all minors.[9] It would follow then that Minor Respondent is not covered by the Flores Agreement because, while he is fourteen years of age, he is accompanied by his mother. Though the Court understands DHS' argument, it disagrees and finds it to be a patently incorrect interpretation of the FSA.

The provisions of the FSA expressly indicate that, while unaccompanied minors were the actual plaintiffs in the lawsuit, the entire class action was certified to encompass all minors in INS custody. This is supported by the background, definitions, and class description sections of the FSA. *FSA*, ¶1, 3, 4, 10. Specifically, the FSA states that "Plaintiffs" includes "all class members." *FSA*, ¶1. "Class member(s)" applies to persons described in paragraph 10. *FSA*, ¶3. Paragraph 10 of the FSA states: "The certified class in this action shall be defined as follows: 'All minors who are detained in the legal custody of the INS.'" *FSA*, ¶10. The term "minor(s)" is defined as "any person under the age of eighteen (18) years who is detained in the legal custody of INS." *FSA*, ¶14. It seems that, although the actual plaintiffs were unaccompanied minors, the FSA was designed to create a nationwide policy for the detention of all minors, not only those

---

and acknowledging that it sets out many "common-sense principles" for the detention of juveniles which comprise a binding policy on ICE operations); *see generally* Congressional Research Service. *Unaccompanied Alien Children – Legal Issues: Answers to Frequently Asked Questions*, at *3-4, July 18, 2014, *available at* http://fas.org/sgp/crs/homesec/R43623.pdf.
[9] In essence, this argument would bolster DHS' position that only ORR is bound by the FSA because only ORR handles unaccompanied minors. Presently, within DHS, ICE handles the detention and enforcement of all aliens in custody, including minors who enter the country with adults, and is in charge of detaining unaccompanied children until they can be placed in an ORR facility. 6 U.S.C. §§251, 279(b)(1)(A), 291.

PAGE 19/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO2MS/22 * DNIS:6057A * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 18 of 34

who are unaccompanied. *See FSA*, ¶9. This interpretation of the FSA and its reach is confirmed
by persuasive case law confronting issues under the FSA as well as general policy guidance
issued by ICE. *Bunikyte*, at *3 ("The *Flores* Agreement, by its terms, applies to all 'minors in
custody' of ICE and DHS, not just unaccompanied minors."); *see also* ICE Juvenile Protocol
Manual, *Juvenile Aliens: A Special Population*, at *2, (2006). As such, the Court finds that the
FSA is designed to cover **all minors** as opposed to the more narrow interpretation of only
unaccompanied minors.

Therefore, the Court concludes overall that the FSA is binding upon DHS and ICE to govern
custody determinations for all minors, including Minor Respondent in this case.

**B.     FSA and Immigration Courts**

Pursuant to this Court's regulatory authority to conduct custody redeterminations, it finds that it
must contemplate the FSA either because, it too is quasi-bound by its terms or because ICE is
bound by its terms and both the FSA and regulations indicate that release of minors under the
circumstances presented in this case is generally proper.

To some extent, it appears that EOIR could be bound by the FSA as a legacy component of INS.
Although EOIR was in existence prior to the creation of the FSA, the FSA governs custody
determinations and the successor agencies of INS which handle those determinations. It is clear
from the terms of the HSA that the power of INS to render custody determinations is split and
shared between EOIR and DHS. The HSA made evident that pursuant to section 103(g) of the
Act, the Attorney General retained all authorities and functions delegated by law prior to the
HSA's enactment. Effectively, this means that the Attorney General retained his power to render
custody determinations pursuant to section 236 of the Act, but that the power will be shared with
the Secretary of Homeland Security who must render initial custody determinations in removal
proceedings. INA §103(a); Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat.
2135, 2274. As the power to manage the custody of minors is shared, it would appear that the
responsibility to comply with the FSA would also be shared.[10]

Regardless of whether responsibility under the FSA is shared with this Court, at a minimum, the
Court must consider the FSA's parameters in custody redeterminations as those guidelines are
binding upon ICE and a necessary component of ICE's initial custody determination. The
importance of this reality becomes especially apparent considering that the Attorney General is
the only authority able to review the custody determinations made by ICE – there is no other

---

[10] On its face, this seems logical. However, the Court does not rest its decision to contemplate the FSA on these
grounds alone. In large part, this is because the FSA does not designate EOIR as a party to the agreement although it
could have done so in its plain language. Cases interpreting the FSA as binding authority apply the tenants of
contract law and thus, such an omission within the FSA could render the plausibility of EOIR's part in the FSA to be
attenuated at best. *See Bunikyte*, at *8 ("The Settlement Agreement is, in essence, a Court-approved contract binding
on ICE and DHS. *See e.g. United States v. ITT Continental Baking Co.*, 420 U.S. 223, 237, 95 S.Ct. 926, 43
L.Ed.2d. 148 (1975). It is also a court order directing the parties to comply with its terms. *Id.* at n.10."). The Court
does not reach a conclusion as to whether the FSA is or is not binding upon this Court; rather, it finds that the FSA
should be applied because the very authority that is at issue in the FSA is in fact shared by EOIR and DHS.

SEP-08-2014   17:26

PAGE 20/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02IMS/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 19 of 34

avenue for relief under the Act or FSA excepting limited circumstances regarding habeas petitions in federal court. *See* INA § 236(e)("The Attorney General's discretionary judgment regarding...this section shall not be subject to review...[n]o court may set aside any action or decision...regarding the detention or release of an alien[.]"); INA § 236A(b)(1)("Judicial review of any action or decision relating to this section...is available exclusively in habeas corpus proceedings...[e]xcept as provided in the preceding sentence, no court shall have jurisdiction to review, by habeas corpus petition or otherwise, any such action or decision.")[11]. To conclude otherwise would effectively allow ICE complete control over custody determinations regarding minors which is not the intent of the INA or HSA.

Furthermore, to consider the FSA in custody redeterminations regarding the release of minors goes hand in hand with applying 8 C.F.R. §§ 236.3, 1236.3, identical regulations which govern minor custody status for both DHS and EOIR. These regulations adopt language that is highly analogous to the language of the FSA. This is logical considering that the regulations were a product of the litigation that gave rise to the FSA. Significantly, both the FSA and regulations govern persons under the age of eighteen ("juveniles" or "minors") and explain that those persons "shall be released" to certain persons enumerated as a parent, guardian, or other adult relative (brother, sister, aunt, uncle, or grandparent). 8 C.F.R. §§ 236.3, 1236.3; *FSA*, ¶14. The regulations also indicate that these "juveniles" shall be released upon the posting of a bond, with conditional parole, or on their own recognizance. 8 C.F.R. §§ 236.3, 1236.3. As the binding regulations and FSA embrace the same policy favoring release of these juveniles under particular circumstances, it would appear that both are relevant to the Court's custody determination for Minor Respondent.

Lastly, while Immigration Judges may not be compelled to enforce the FSA's provisions, this Court finds it should, at the very least, consider the FSA and "best interests of the child" in rendering custody determinations as a matter of discretion. *Matter of Guerra*, 24 I&N Dec. 37, 38 (BIA 2006)(holding that the Court has wide discretion in the factors it may consider when acting pursuant to the Attorney General's authority under section 236 of the Act).

Therefore, whether it is as a party to the FSA, pursuant to governing regulations, or under the Attorney General's broad discretionary authority, this Court must consider and apply the terms of the FSA to the extent it does not conflict with controlling statutes and regulations. And,

---

[11] The FSA seemingly embraces this reality within its own terms as well. It indicates that a minor may bring suit in District Court due to a disagreement "with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards ...attached hereto[.]" *FSA*, ¶24.B. Meanwhile, it leaves the jurisdiction of a "bond redetermination" to the immigration judge. *FSA*, ¶24.A. While the FSA expressly sets out terms for the release of minors, nowhere within its language does it provide a relevant jurisdictional provision to contest the initial determination whether a minor should or should not be released. Considering the authority delegated to the Attorney General, as well as the mandatory bond redetermination required by the FSA, it seems that the FSA inherently accepts that the review of the initial custody determination made by ICE is reviewable in a "bond redetermination." This conclusion is only supported further by the fact that bond and custody redeterminations are all governed by the exact same statutes and regulations.

PAGE 21/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO2MS1/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 20 of 34

because the FSA is controlling upon DHS, as a matter of discretion this Court will consider the policy and provisions of the FSA in rendering its custody redetermination.

## C.  Custody Redetermination of Minor Respondent

Contemplating the statutes and regulations binding upon this Court, as well as the FSA and BIA precedent, the Court will consider various factors in rendering its custody determination for Minor Respondent.

Preliminarily, to "whom" Minor Respondent shall be released will be governed by regulations binding upon this Court. *See* 8 C.F.R. §1236.3. Next, as both the FSA and BIA precedent analyze certain factors, those factors will undeniably be considered by this Court in the decision at hand. Specifically, the Court will consider if Minor Respondent is a flight risk, if he is a national security threat, and if he posits a danger to the community. Other factors normally considered by the BIA in adult custody determinations, such as the likelihood of success on an underlying claim of relief, family ties, a permanent address, and criminal history are also relevant to this Court's determination and will be briefly considered.[12] Lastly, the Court will examine other pertinent factors that relate specifically to those custody determinations regarding minors. In particular, the Court will consider the best interests of the child as well as conduct a fact-specific inquiry as to whether there is sufficient documentation to support release of Minor Respondent to the designated custodian. Such an analysis will provide a reasonable evaluation of the unique discretionary factors apparent in this case while also dispelling any implications that advocating release of Minor Respondent effectively creates a "catch-and-release" policy. *See Bunikyte*, at *2(noting that family detention may be favored over automatic release of family units because release only encourages parents to subject their children to the dangers of illegal immigration.).

### 1.  *Custodian for Release*

As briefly touched upon previously, the FSA and regulations governing the release of minors are extremely similar. The FSA and 8 C.F.R. § 1236.3 adopt almost analogous lists of criteria to establish a proper custodian by order of preference, as (1) a parent; (2) a legal guardian; and (3) other adult relative (brother, sister, aunt, uncle, or grandparent). *FSA*, ¶14; 8 C.F.R. § 1236.3(b)(1). Further, both indicate that the parent or guardian, if otherwise unavailable to accept responsibility for the minor, may designate an adult individual by way of an affidavit to accept responsibility for the minor in his or her stead. 8 C.F.R. § 1236.3(b)(4). Critically, both

---

[12] The Court designates these factors as critical because it is probable that in most instances involving minors, some of the factors proposed by the BIA will be irrelevant. Principally, employment history, manner of entry, and evidence of other immigration violations are difficult to weigh against a minor respondent. Minors generally have no employment history and, if a minor enters with his or her parent, it would be difficult to render them ineligible for release where that minor enters illegally at the direction of an adult respondent. *See Phyler v. Doe*, 457 U.S. 202, 223 (1982)(acknowledging that children should not be stigmatized or receive a lifetime of hardship due to their illegal status in part because they are "not accountable for their disabling status."). As such, although these are factors that could possibly be important to a minor Respondent, they are the least so and the Court will not necessarily reach them in rendering this decision.

PAGE 22/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO2MS1/22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 21 of 34

provisions indicate that the minor **"shall be released"** from detention to a custodian. *Id.* (emphasis added).

Although the bulk of the FSA and regulation are similar, they begin to differ after the foundation criteria. The regulation dictates that the minor shall be released first to a parent, guardian, or other adult relative who is not detained and, only where those individuals are unavailable, may a minor be released to a parent, legal guardian, or adult relative in detention. 8 C.F.R. § 1236.3(b)(1)(iii). More specifically, "simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis." *Id.* The regulation goes on to consider less preferential means for release of a minor and states that a parent or legal guardian may submit an affidavit for the release of the minor to a specific third-party, or that under unusual and compelling circumstances, a juvenile can be released to another adult not within the list who executes an agreement to ensure the juvenile's well-being and presence at all future proceedings. 8 C.F.R. §§ 1236.3(b)(3), 1236.3(b)(4).

In contrast, the FSA, also in descending order of preference after a parent, legal guardian, or adult relative, states that a minor shall be released to an adult individual or entity designated by a parent or custodian who is capable of caring for the child, a licensed program willing to accept legal custody, or an adult individual or entity seeking custody, in the discretion of DHS, if there is no likely alternative to long-term detention and family reunification does not appear to be a reasonable possibility. *FSA*, ¶14.

At least one District Court has considered the apparent rift between the FSA and conflicting regulations and determined that the inconsistency is a product of the rise in the number of minors in family detention. The District Court for the Western District of Texas, in an unpublished opinion, reasoned the following:

> The *Flores* Settlement was drafted in response to the complaint of *unaccompanied* minor aliens. Its provisions, though applicable to minors detained with their families, do not specifically contemplate family detention. Though family unification is a stated goal of both the Flores Settlement and U.S. immigration policy generally, nothing in the settlement agreement expresses a preference for releasing parents who have violated immigration laws.
>
> ...
>
> [I]t appears possible for ICE to comply fully with the settlement terms by releasing the children to adult relatives not in custody, adult friends designated by their parents, or even state-operated foster care. ... It therefore appears that nothing in this rule [8 C.F.R. §§ 236.3, 1236.3] or in the terms of the Flores settlement would prevent release of the children to an adult relative not in ICE custody.

*Bunikyte*, at *16-*17(emphasis in original). Therefore, although the District Court recognized that there appeared to be a critical inconsistency between the FSA and regulation, it concluded

PAGE 23/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPFX02MS1/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 22 of 34

that that there was no actual inconsistency through implementation. Instead, in instances involving family detention, the District Court concluded that the outcome under the FSA and regulations would be the same – a preference of release to a non-detained individual.

Accordingly, applying the same logic, this Court will apply the hierarchy prescribed by 8 C.F.R. §1292.3 and, in doing so, will be applying the policy and provisions of the FSA.

In Minor Respondent's case, his mother is currently detained. Although minor Respondent's father is not presently in DHS custody, neither Respondent advocates for the release of Minor Respondent to his father. Rather, they advocate release of Minor Respondent to his adult aunt as his "other relative." The Court finds that this designation is valid and, if Minor Respondent is to be released, he will be released to his aunt Rosa Mundo.

    2.    *Flight Risk, Safety Concerns, and National Security*

The statutes, regulations, FSA, and BIA precedent all indicate that this Court must consider certain factors in rendering custody determinations for minors and, in fact, all aliens in custody. In particular, the FSA and BIA mandate that this Court consider if Minor Respondent is a flight risk and whether or not detention is required for his own safety or the safety of others. *FSA*, ¶14, ¶21; *Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006).

    a.    **Flight Risk**

Typically, a detained alien will be deemed a flight risk and will remain detained if it is determined that his detention is necessary to secure timely appearance before DHS or the Immigration Court. *Matter of Ellis*, 20 I&N Dec. 641, 643 (BIA 1993). In most cases, an individual is deemed to present a lesser flight risk if he or she is statutorily eligible for any form of relief. *Id.*; *see also Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987). Moreover, certain factors evidence a lesser or greater risk such as stable employment history, a significant length of residence in the community, the existence of family ties, a record of nonappearance at court proceedings, and previous criminal or immigration law violations to determine if he or she is a poor bail risk. *Andrade*, 19 I&N Dec. at 489.

The FSA adopts the proposition that a minor who presents a flight risk is ineligible for release. *FSA*, ¶14 ("Where the INS determines that the detention of the minor is not required…to secure his or her time appearance before…the immigration court…the INS shall release the minor from its custody without unnecessary delay[.]"). Further, a minor who is an "escape-risk" may be subjected to mandatory juvenile detention. *FSA*, ¶21("a minor may be held in or transferred to a… juvenile detention facility or INS detention facility…whenever…[it is determined] that the minor …is an escape-risk."). Under the FSA, in determining whether a minor constitutes an "escape-risk" factors to be considered include, but are not limited to, whether the minor is currently under a final order of removal, if the minor's immigration history indicates a breach of bond, failure to appear before any agency, or evidence that the minor is indebted to organized

PAGE 24/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAF-X02MS1/22 * DNIS:6057A * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 23 of 34

smugglers, and if the minor has previously absconded or attempted to abscond immigration
custody. *FSA*, ¶22.

Considering both sets of factors, and giving all equal weight, the Court finds that Minor
Respondent does not present a substantial flight risk. In particular, Minor Respondent has
already filed a claim for asylum and that claim is entirely based upon his own fears of returning
to El Salvador. Group Exh.1, Tab I. In addition, Minor Respondent has no previous criminal or
immigration law violations and has significant family ties to the Houston, Texas area. Minor
Respondent is too young to possess a stable employment history and thus, this factor will not
count for or against his case.

The only negative factors of record are Minor Respondent's length of residency and manner of
entry. Minor Respondent has not resided in his community for any significant amount of time –
his only residency in the United States is limited to his time in detention. Moreover, the manner
of his entry is troublesome to the Court. Lead Respondent indicated that they paid a smuggler
and knowingly entered the United States illegally by raft. While the Court recognizes the
enormity of these actions, it finds that they carry lesser weight in this case as Minor Respondent
entered the United States illegally at the direction of his mother, his parent and the adult figure in
his life. *See Plyler v. Doe*, 457 U.S. 202, 223 (1982)(acknowledging that children should not be
stigmatized or receive a lifetime of hardship due to their illegal status in part because they are
"not accountable for their disabling status."). Also, the evidence does not suggest that Minor
Respondent owes the smuggler an outstanding sum or that he ever evaded authorities. Such
circumstances further diminish the severity of Minor Respondent's actions. This too is in light of
the fact that Minor Respondent does not present an extensive history of immigration law
violations or any other criminal history.

Considering Minor Respondent's vulnerable position as a juvenile, as well as the facts in Minor
Respondent's case, it is clear he does not present a flight risk. As such, Minor Respondent has
met this requirement to secure his release pursuant to both the FSA and regulations.

**b.   Safety of the Minor and Community**

Combining the requirements of the FSA and the BIA, the Court must consider if Minor
Respondent needs to be detained for his own safety or the safety of the community.

The FSA dictates that both requirements are necessary for the release of a minor. Regarding the
safety of the minor, the FSA provides that a minor may "be held in a secure facility for his or her
own safety." *FSA*, ¶21. 14. The FSA further elaborates that this provision is applicable "when
[DHS] has reason to believe that a smuggler would abduct or coerce a particular minor to secure
payment of smuggling fees." *FSA*, ¶21.

In contrast to these guidelines, the FSA does not expressly define what constitutes a danger to
others. Rather, the FSA provides that a minor may be held where he or she presents any criminal
history that does not involve specific petty or isolated offenses, has committed or made credible

PAGE 25/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSV22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 24 of 34

threats to commit violent or malicious acts while in DHS custody or before a DHS officer, or where the minor has been unacceptably disruptive to the normal functioning of another custody placement and a new restricted placement is necessary for the welfare of the minor or others. *Id.*

While the BIA does not expressly adopt a requirement to consider the safety of the minor, it has consistently held that Courts are to consider whether or not an individual presents a danger to the community. Principally, aliens who present a danger to persons or property should not be released during the pendency of removal proceedings. *Guerra*, 24 I&N Dec. at 38. Similar to the loose guidance of the FSA, the BIA generally considers the criminal history of a respondent to determine if he or she presents a danger to the community. *Id* However, Immigration Judges are not limited to considering only criminal history and instead may consider any evidence in the record that is probative specific to the relevant analysis. *Id.* at 40-41.

Considering the foregoing, the Court finds that Minor Respondent's case presents no instance of danger to himself or the community.

Initially, although Minor Respondent utilized a smuggler to gain entry into the United States, there is no evidence to indicate that he must subsequently be detained for his own safety. The FSA provides that detention may be proper if there is evidence that a "particular minor" will be abducted or coerced for the payment of outstanding smuggling fees. *FSA*, ¶21. While DHS presents evidence of human trafficking schemes and the smugglers' pervasive persistence in trafficking individuals across the border, there is no particularized evidence that Minor Respondent continues to be in danger on account of his past connection to a human smuggler. Group Exh. 2, Tabs D-J. In fact, Lead Respondent testified that the smuggler did not even cross into the United States during their journey. No evidence suggests that the smuggler is looking for Respondents, that they have any outstanding fees, or that the smuggler is present in the United States. The totality of the circumstances reveals that there is little to no evidence that Minor Respondent should remain detained for his own safety pursuant to the FSA.

Likewise, there is no evidence to suggest that Minor Respondent presents any danger to the community or others. Minor Respondent alleges that he has no criminal history and DHS does not contest this fact. Minor Respondent has not indicated to DHS officials nor outside parties that he intends to commit violent acts against others should he be released.  Despite Minor Respondent's solitary civil immigration infraction, there is no evidence that suggests he may be a danger to the community.

In weighing all considerations present in this case, the Court determines that Minor Respondent does not need to be detained for his own safety or the safety of others.

    **c.**    **National Security**

The Attorney General held in *Matter of D-J-* that: "[I]n all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national

PAGE 26/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSJ2MS/22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 25 of 34

security interests are implicated, IJs and the BIA shall consider such interests." *Matter of D-J-*, 23 I&N Dec. 572, 581 (A.G. 2003).[13]

The national security concerns at issue in *Matter of D-J-* were two-fold. First, the Government stated that the "threat of future mass migration" presented national security concerns. Specifically, the Government asserted "that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage mass migration attempts." *Matter of D-J-*, 23 I&N Dec. at 578. It was posited in affidavits from Executive Branch officials that not only is the mass migration surge a problem in and of itself, but that the continued mass migration also drew resources away from other areas of need and demand. *Id.* at 579. The second concern was that released undocumented aliens from Haiti, a staging point for migration of Pakistanis and Palestinians, without adequate verification of their background, associations, and objectives, increased the national security interest in curbing the use of that migration route. *Id.*

Considering the evidence in its entirety, the Attorney General concluded that "releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to adverse consequences for national security and sound immigration policy." *Id.* The Attorney General reasoned that the Executive Branch's declarations demonstrated a substantial prospect that the release of these types of aliens would encourage future surges of migration by sea. *Id.* "Encouraging such unlawful mass migration is inconsistent with sound immigration policy and important national security interests." *Matter of D-J-*, 23 I&N Dec. at 581. As a result, the Attorney General concluded that the drain on resources coupled with the need to protect national security and implement sound immigration policy, presented a "reasonable foundation" to exercise discretion to deny release on bond under the Act. *Id.*

In addition to the national security interests, the Attorney General held that the respondent was ineligible for bond because he presented a flight risk and did not have a high likelihood of being granted any form of relief from removal. *Id.* Specifically, respondent had evaded law enforcement apprehension during his illegal entry and had already been denied asylum by the Immigration Court. *Id.* 581-82.

In the case presently before this Court, DHS is urging for no release, no bond, and, at a minimum, a very high family bond. The cornerstone of the Government's argument rests on the fact that there is a mass migration crisis, which would be encouraged by the release of any immigrant who is detained at the border. DHS contends that to release these individuals,

---

[13] It is obvious that the Attorney General's opinion was rendered a number of years after the FSA. The FSA does not expressly provide that issues of national security should be considered when rendering custody determinations for minors. Despite its lack of inclusion on this point, the Court must consider national security interests pursuant to the Attorney General's binding precedent. However, the Court points out that doing so is not actually in contention with the FSA. The FSA provides that the Court is to consider whether or not releasing a minor presents a danger to the community. Considering matters of national security is, in essence, nothing more than considering whether or not release of the minor would present a dangerous situation at our nation's borders. As a result, although not expressly indicated to be a factor under the FSA, it appears that the broad language of the FSA would accept national security concerns to qualify as a valid consideration.

PAGE 27/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02FAX5/22 * DNIS:6057/4 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 26 of 34

including Minor Respondent, would embrace unsound immigration policy and go against prominent national security concerns. In support of these contentions, DHS has submitted two declarations from Executive Branch officials which indicate that many of the immigrants similarly-situated to Respondents are migrating in mass due to the prospect of release to join other members of their network. The focus on the mass migration at the border is taking efforts and funds away from the agencies' abilities to destruct human smuggling rings and to properly handle other areas involving illegal migration. Among these concerns, the declarations also attest that large criminal organizations are profiting from smuggling these aliens across the border, that proper background checks are not being conducted for these detainees, and that this continued cycle renders the nation vulnerable to crime and other security risks.

Respondents maintain that *Matter of D-J-* is incorrectly interpreted by DHS to create a blanket policy of detaining immigrants who come from three separate nations under the guise of national security concerns. Respondents believe that such an interpretation is contrary both to the actual policy dictated by the Attorney General in his opinion as well as the intention of Congress to provide an individualized custody determination for Respondents pursuant to section 236 of the Act. Aside from these overarching points, Respondents state that *Matter of D-J-* is factually distinguishable from their case. First, Respondents have viable claims to relief not yet denied by an immigration judge and present no grounds as flight risks. Second, Respondents' situations do not embody the same heightened security risk as was the case with the respondent from Haiti in *Matter of D-J-* because El Salvador is not a staging point for other nationals to enter the United States illegally without proper background investigations. Lastly, Respondent posits that the holdings of *Matter of D-J-* are narrow and only set to apply to one set of migrants who attempted in mass to enter the United States by sea, on the same boat, on the same day.

The Court disagrees with Respondents' interpretation that *Matter of D-J-* is a narrow holding which cannot create a blanket policy favoring detention for national security concerns. To the contrary, the decision is clear that mass migration concerns, when supported by the proper evidence, can give rise to the denial of bond pursuant to the discretionary authority of the Attorney General. Further, the Court understands the Attorney General's opinion to indicate that such evidence has to be considered by both Immigration Courts and the BIA should it be presented. Thus, the Court must consider the evidence presented by DHS and it is not enough to merely distinguish *Matter of D-J-* on its facts. Instead, the evidence must be seriously considered in light of all the evidence presented in "all future proceedings."

Therefore, considering DHS' evidentiary support, the Court finds that Respondents' situations present similar national security interests. The three major interests, as reflected by the declarations of record and considered by *Matter of D-J-*, are encouraging mass migration, the diversion of resources due to this mass migration, and the inability to conduct background investigations to ensure the safety of the community. Yet, despite presenting a similar instance of national security concern, the Court recognizes that it is but one factor for this Court to consider. While it is a factor the Court shall consider, it is not the only factor controlling on this Court's decision.

PAGE 28/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MS1/22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 27 of 34

Accordingly, with careful consideration of all the evidence presented on this obviously important issue, the Court finds that meaningful national security concerns are apparent in Respondents' cases under the Attorney General's discretion. This critical concern will be weighed in conjunction with the other factors relevant to the Court's analysis in this opinion.

### 3. Best Interests of the Child

The foregoing interests are necessary to this Court's analysis. Nevertheless, under the circumstances, with a "border crisis" at hand, many of the above factors will be consistently presented in a similar manner throughout custody determinations. Many individuals may be entering for the first time, a multitude of minors may not present with a criminal history, and during a mass migration the same national security concerns are present in almost every case. This renders the Court's decision to be a difficult one. However, because this Court has wide discretion in rendering custody determinations, it will use the FSA and other authority to consider additional factors tailored to minors and their respective unique custody determinations.

There are no BIA decisions which render a case analysis for the custody of a minor pursuant to 8 C.F.R. §1236.3. Rather, the BIA decisions contemplating this regulation are limited to instances involving allegations of improper notice subsequent to the minor's release from custody. *See Matter of Cubor-Cruz*, 25 I&N Dec. 470 (BIA 2011); *Matter of Calderon-Arrazola*, 2006 WL 729764 (BIA 2006)(unpublished); *see also Lopez-Dubon v. Holder*, 609 F.3d 642 (5th Cir. 2010). Conversely, there are various cases which cite to DHS's companion regulations governing the release of juveniles at 8 C.F.R. §263.3. However, while there are a plethora of cases citing to the companion regulation, none are exactly on point regarding the issue of custody of a juvenile. Those cases also deal with notice and the various nuances of juvenile asylum claims. No opinions guide this Court on how to handle the root of these cases – whether or not the juvenile should be released pursuant to the regulation in the first instance.

Although the regulation is clear as to whom a juvenile can be released to, and in fact, that the juvenile should be released, it does not account for additional outside requirements that bind this Court such as the aforementioned requirements for the release of any alien and the countervailing interests of a minor in light of those additional requirements. By considering the arguments put forth by Respondents in this case, the Court will be better able to render its custody determinations as required by the regulations. Accordingly, the Court will consider any relevant evidence that has been presented as being in the best interests of Minor Respondent.

The Court understands that the "best interests of the child" is not a standard of law; it further acknowledges that the factor in and of itself is not dispositive in rendering a custody decision. *See Reno v. Flores*, 507 U.S. 292, 304 (1993)("the best interests of the child' is not the legal standard"). However, the "best interests of the child" concept is applied in other contexts as a factor in custody determinations for immigrant children such as in Special Immigrant Juvenile Status and under TVPRA. *See* 8 U.S.C. § 1101(a)(27)(J)(mandating that relief be predicated on a finding that it is not in the best interests of the child to return to a home country); TVPRA § 235(c)(6). Further, and highly on point, the interests and welfare of the child is named a relevant factor for ICE and ORR to consider when placing a juvenile in a facility or the custody of

P.028                                                                SEP-08-2014  17:30

PAGE 29/35 ˙ RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] ˙ SVR:NAFX02MIS/22 ˙ DNIS:6057 4 ˙ CSID: ˙ DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 28 of 34

another relative.[14] Seeing as a minor's best interests are generally considered by every other agency rendering a similar decision, it would be inconsistent for this Court not to consider that factor in rendering its own decision pursuant to its discretion. Especially since all sources governing this Court's decision indicate that the safety or welfare of the juvenile is necessary to this Court's decision. 8 C.F.R. §§ 236.3, 1236.3.

Based upon the foregoing, Minor Respondent has presented three general points that purvey it would be in his best interest to be released into the custody of his aunt. First and crucially, Lead Respondent, as Minor Respondent's mother, indicated that this was not a decision that was taken lightly. In this particular case, both Respondents believe that releasing Minor Respondent into the custody of his aunt is the best course for their family. Respondents also argue that Minor Respondent is at a critical stage of development. Lead Respondent believes that stifling Minor Respondent's development by remaining detained will be indefinitely detrimental. Lastly, and quite compelling, Lead Respondent stated that she wishes for Minor Respondent to reside with his aunt and similarly-aged cousin to attend school.

DHS presented no countervailing arguments to show that release is not necessarily in the best interests of Minor Respondent specifically; rather DHS maintains that it is not in the community's best interests because of the national security concerns at stake.

As previously discussed, the policy favoring release under the FSA as well as under controlling regulations is in line with Lead Respondent's position that release from custody would be best for Minor Respondent. The legislative history of 8 C.F.R. § 236.3 indicates that for all juveniles, even juvenile offenders, "release of minors to parents or adult relatives is the preferred method." *Detention and Release of Juveniles*, 53 FR 17449-01, 17450 (1988). In particular that the welfare of a minor is of "paramount concern" to the Government and as a result, the word "shall" is explicitly utilized in the regulation to emphasize the notion that "reunification represents service policy, with detention being the exception." *Id.* There is a strict emphasis placed on the preferred release of minors for a multitude of reasons. The Court cannot ignore that minors, possibly unlike adults, have critically been targeted as needing release from custody wherein detention is the exception to that rule. This general policy reflects the best interests of Minor Respondent and thus, weighs heavily in favor of his release.

Further, it is critical that no educational resources are presently being offered in Artesia, New Mexico. It is long-standing Supreme Court precedent that forsaking illegal alien children access to public education violates the Constitution. *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382 (1982)(holding that the denial of a free public education to a discrete group of innocent children must be justified by some substantial interest to be valid). While there are no constitutional questions presented here, the emphasis on providing educational resources to detained children is consistent. The utter lack of educational resources available coupled with no timeline for such

---

[14] The legislative history of the former 8 C.F.R. §242.24 (now 8 C.F.R. §236.3) states: "The paramount concern of INS with respect to minors in custody is the welfare of the minor." *See Detention and Release of Juveniles*, 53 FR 17449-01; *See also* 6 U.S.C.A. §279(b)(1)(B)(ORR is responsible for "ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child.")

PAGE 30/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAPXO2MS1/22 * DNIS:6057/4 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 29 of 34

services being offered in the future is troublesome to the Court. Considering all sources, including Supreme Court guidance and the FSA, it appears to be a matter of consensus that receiving an education is within the best interests of the minor and something that is relevant to this Court's decision.[15]

On the other hand, Respondents' contentions regarding inhibition of development are less persuasive. The Court understands Lead Respondent's concerns, but there is nothing to support her position. Additionally, such concerns do not have a foundation in either the regulation applicable to the case or any other jurisprudential source. Significantly, without any substantiation in this case, conclusory concerns regarding mental development fall to the way side of the "best interests" analysis as constructed by the Supreme Court in *Reno v. Flores*. In *Reno v. Flores*, the Court was clear that the best interests of the child can and shall be subjugated by other concerns including the interests of other children, their parents, or their guardians so long as basic minimum requirements of child care are met. *Flores*, 292 U.S. at 303-304. The evidence does not suggest that the minimum requirements of child care are not being met generally in the Artesia facility as it pertains to Minor Respondent's mental development. Accordingly, while it may be true that it is better for Minor Respondent to be non-detained for his mental growth, the Court does not necessarily consider this factor to be persuasive that release is in Minor Respondent's best interests.

In the aggregate, the Court recognizes two points that are critical in its determination pertaining to Minor Respondent's release. Principally, there is a generally recognized policy favoring release which is inherently based on the best interests of a minor in custody. Then, as the Artesia facility currently operates, it is providing no educational resources for minors. Such resources are acknowledged as critical to illegal aliens by the Supreme Court and the Government has provided no reason as to why educational resources are unavailable. Without demonstrating some form of countervailing interest to the lack of educational resources, the Court cannot find any justification for forcing Minor Respondent to remain in custody and forego the educational opportunities that would otherwise be available to him upon his release. These two factors, although not determinative, demonstrate that release is within the best interests of Minor Respondent and weigh in favor of his release.

### 4.    *Custodian's Documentation*

Both the regulations and FSA require the execution of specific documents or affidavits for the release of a minor to an adult relative. Purposely, 8 C.F.R. § 1236.3(b)(3) provides that where a parent or guardian is in detention with the minor, that the parent or legal guardian may execute an affidavit to attest that another designated adult relative is willing and capable to care for the minor's well-being. The regulation further states that the designated adult relative must execute an agreement to care for the juvenile and to ensure the juvenile's presence at all future immigration proceedings. 8 C.F.R. § 1236.3(b)(3). The FSA outlines similar requirements by requiring an adult relative designated by a parent or guardian to execute an agreement or

---

[15] The FSA, within its "conditions for custody" expressly includes that minors have access to educational resources throughout the length of their detention. *FSA*, Exhibit 1.

PAGE 31/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO2MSI22/22 * DNIS:6057A * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 30 of 34

declaration under penalty of perjury that he or she is capable and willing to care for the minor's well-being. *FSA*, ¶14. Further, any party taking custody of a minor must execute an Affidavit of Support (Form I-134) and an agreement to provide for the minor's well-being, ensure presence at all future proceedings, notify the Government of all address changes, as well as a promise not to transfer custody or depart the United States without notice and/or permission. *FSA*, ¶15.

In this case, Minor Respondent's preferred custodian, Rosa Mundo, as designated by Lead Respondent (his mother) before the Immigration Court, has submitted numerous documents to that effect. The documents are in compliance with all the foregoing requirements as well as substantiated by other support that show her ties to the community, commitment to bring Minor Respondent to proceedings, and stability to care for the Minor Respondent. Specifically, Rosa Mundo has submitted a copy of her legal permanent resident card, her certification for the U.S. Naturalization test, copies of bills and the mortgage on her own home, pay stubs, the I-134 Affidavit of Support, and both a letter and agreement affirming Rosa Mundo's commitment to care for Minor Respondent and attend all future hearings before the Government in any capacity. Group Exh. 1.

Contrary to DHS's position, this evidence strongly shows that Rosa Mundo will take proper custody of Minor Respondent. First, she plainly meets the documentary requirements outlined by the regulations and FSA. Further, her active participation in Minor Respondent's life upon release mitigates any apprehension advanced by DHS. DHS is concerned that Minor Respondent presents a flight risk because Rosa Mundo knew of his illegal entry and permitted him to break the immigration laws of the United States. While these actions are highly inappropriate, the concerns surrounding that situation are critically outweighed by the overwhelming evidence submitted by Rosa Mundo.

Considering all the factors related to a party being a flight risk or poor candidate for bond, Rosa Mundo meets almost all of them excepting one which is mitigated by the very fact that she herself has legally resided in the United States for nearly three decades. Rosa Mundo evidences strong ties to the community by owning a home, she has resided in the United States for approximately twenty-five years, her paystubs indicate that she has steady employment, she is in the United States legally, and she presents no criminal history. The only negative factor is that she allowed Respondents to enter the United States illegally. Yet, her very own legal residence for an extended period of time diminishes any doubt that she does not respect the law or immigration regulations. DHS's own emphasis on the factors from *Matter of Guerra* and *Matter of Patel* draws a conclusion contrary to their position. Instead, giving custody to Rosa Mundo is proper under these precedents and diminishes the already trivial flight risk of Minor Respondent.

Accordingly, the Court finds that Rosa Mundo has provided the requisite documentation to establish she is a proper custodian under the regulations and FSA. Moreover, it finds that her good status in the United States mitigates the already unsubstantial concerns DHS maintains

PAGE 22/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFX02MSJ22 * DNIS:60574 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 31 of 34

regarding Minor Respondent to be a flight risk. Considering all points in the aggregate, the Court
concludes that the release of Minor Respondent from custody is truly proper. [16]

5.    *Minor Respondent's Avenue for Release*

While the BIA has failed to provide the outlines of an Immigration Judge's conditional parole
authority, its other precedent, as well as its silence in denying the existence of such authority all
together, indicates that Immigration Judges have the ability to conditionally parole aliens
pending removal proceedings pursuant to section 236 of the Act.

Considering the policy favoring release of minors embodied by both the FSA and juvenile
regulations, conditional parole by an Immigration Judge may provide the equivalent opportunity
for release without bond as would be afforded to unaccompanied juveniles or all minors were
DHS to release them initially. Minor Respondent's custody status is controlled by the same
regulations as unaccompanied juveniles or other minors not in family facilities, and, as such,
must receive the same benefits or abilities for release as delegated under the regulations.

8 C.F.R. § 1236.3 expressly provides that **"[j]uveniles for whom bond has been posted, for
whom parole has been authorized, or who have been ordered released on recognizance,
shall be released."** It is clear that this Court could likely comply with its regulatory obligations
by issuing a bond on this minor. However, Minor Respondent presents an extremely compelling
case that no bond is required for his release. This Court finds that Minor Respondent presents no
flight risk and no danger to the community. As a result, bond is seemingly entirely unreasonable.
*See Matter of Patel*, ("Generally, an alien is **not and should not be detained or required to
post bond** except on a finding that he is a threat to the national security, or that he is a poor bail
risk.")(emphasis added). Conditional parole, however, provides for the obligatory release of
Respondent without imposing an unnecessary and improper bond upon Minor Respondent.
While the Court recognizes that releasing Minor Respondent on recognizance may lead to the
same result, it does not have the express power to release an alien on recognizance pursuant to
the INA. Additionally, as Minor Respondent must be released into the custody of a responsible
adult, releasing Minor Respondent on own recognizance is counter-intuitive and contradictory to
procedure. *See Flores-Chavez v. Ashcroft*, 362 F.3d 1150 (9th Cir. 2004)(holding that juveniles
must be released to a responsible adult because it is presumed that juveniles are unable to appear
at immigration proceedings without the assistance of an adult custodian.) As such, although
release on own recognizance is mentioned in the juvenile regulations, the Court will not grant
this exact request for release of Minor Respondent.

---

[16] The Court wants to emphasize that its decision on these specific facts will not present an avenue for all minors in
family detention under all circumstances to be released from custody. The law and regulations are clear, to even be
considered for release, a minor must provide a proper custodian with the proper documentation. That high burden
has been met in this case and thus, Minor Respondent's release is warranted. A custodian of this kind will not be
available in all cases. Moreover, the Respondents in this case made clear that they preferred release of Minor
Respondent over staying in detention with his parent, Lead Respondent. Not all Respondents will elect to take this
option. Under these facts, the Court concludes that release is in line with all binding precedent and regulations as
well as sound immigration policy pertaining to minors.

PAGE 33/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAF-X02MS/22 * DNIS:6057 * CSID: * DURATION (mm-ss):16-12

A#206-848-455/456
GRANADOS-GUTIERREZ, María Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 32 of 34

Rather, because Minor Respondent has presented the proper documentation as well as significant
evidence to indicate he is not a flight risk or a danger to the community or himself, the Court will
release him pursuant to conditional parole into the custody of Rosa Mundo pending the outcome
of his removal proceedings.

**D.      Lead Respondent and Bond**

While the FSA and regulations contemplated thus far indicate that Minor Respondent should be
released under the circumstances, they do not indicate that the Lead Respondent, as an adult,
should also be released. Rather, Courts have found quite the opposite. In *Bunikyte*, the District
Court precisely and logically reasoned that both the FSA and regulations favored release of a
minor to a party not in custody before it should be determined whether a minor may be
simultaneously released with his or her parent in custody. *Bunikyte*, at *16-17. Specifically, the
Court concluded:

> Neither *Flores* nor any federal rule or statute mandates the simultaneous release
> of parents and children from detention. ... It therefore appears that nothing in [8
> C.F.R. §236.3] or in the terms of the *Flores* settlement would prevent release of
> the children to an adult relative not in custody. This illustrates the fact that the
> *Flores* Settlement gives the minor Plaintiffs enforceable rights, but does not create
> rights in the parents separate from their children's rights.... As *Flores* creates no
> rights in the parents of detained minors, Plaintiffs have not established any basis
> for releasing of the parents of the minor Plaintiffs.

*Id.* The same logic applies to Lead Respondent's case for release. Respondents seemingly do not
contest this conclusion in any form. Accordingly, Lead Respondent will remain detained for the
same reasons outlined by the original determination of this Court. This conclusion remains valid
because the mitigating circumstances presented by Minor Respondent's case are not apparent in
her own custody determination. Rather, she presents less favorable factors to outweigh the
significant concerns of DHS.

Although Lead Respondent will remain detained for the same reasons previously expressed by
this Court, her bond must be proportionately reduced for the initial bond was a "family bond"
including Minor Respondent in its sum. To reflect the release of Minor Respondent, Lead
Respondent's bond will be respectively reduced to $15,000. Accordingly, she will remain
detained pursuant to a $15,000 bond.

## VII. CONCLUSION

In sum, the Court finds that the release of Minor Respondent in this case is proper pursuant to the
Flores Settlement Agreement and governing regulations binding upon this Court. Minor
Respondent offers a proper custodian for release and that custodian has presented the relevant
amount of evidence to indicate that she has the means and intentions to care for the minor,
present him at future hearings, and provide for his best interests. Further, Minor Respondent
himself presents a great interest in appearing for his future hearings on account of his viable

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 33 of 34

application for asylum. Moreover, despite entering the United States illegally, he presents no other grounds to indicate he would be a flight risk or danger to the community. His record is void of any other immigration violations or criminal history.

The Court acknowledges the great weight involving national security concerns in this case and all others presented as a result of mass migration. However, this custody decision is not one for every minor in detention. Rather, it is that the weight of the evidence presented by Respondent in this specific case outweighs the national security concerns presented by DHS. The Attorney General's opinion indicates that national security concerns surrounding mass migration shall be considered by this Court. What the Attorney General did not hold is that those concerns should be found necessarily to trump all evidence presented in a respondent's favor when rendering a custody determination. Here, Minor Respondent presents no of the adverse factors. Instead, he has submitted ample evidence to outweigh the significant national security concerns in his particular case. Under the policy favoring release as well as the regulations that indicate release of minors is proper under these circumstances, the Court cannot find that he should be detained with no bond or even on a high bond.

As a result, because Minor Respondent demonstrates that he should be released pursuant to the regulations, the FSA, the traditional requirements of the BIA, and other factors pertinent to a minor custody determination, the Court will release Minor Respondent from custody pursuant to conditional parole under section 236(a)(2)(B) of the Act. The Court acknowledges that conditional parole is not the standard avenue for release; however, it will release Minor Respondent on conditional parole because it best embodies the regulations and policy governing minors. Conditional parole, without bond, is proper given the compulsory nature of the regulations as well as the unique circumstances presented by minors in family detention facilities. The overwhelming evidence indicates that this avenue for release is proper.

Conversely, Lead Respondent will remain in detention pursuant to a bond. No new circumstances to mitigate a high bond have been evidenced in her case specifically. And, unfortunately, she has no rights to release under the FSA or juvenile regulations in this case. Thus, Lead Respondent is to remain in custody pursuant to a $15,000 bond.

Based upon the above and foregoing the Court enters the following orders:

It is Ordered:                    The Motion for Release of Minor Respondent, Herson Yonatan Gutierrez-Granados, **IS GRANTED**, and he is hereby **RELEASED PURSUANT TO CONDITIONAL PAROLE UNDER SECTION 236(a)(2)(B) OF THE INA INTO THE CUSTODY OF HIS AUNT, MS. ROSA MUNDO.**

It is Further Ordered:            The Motion of Lead Respondent, Maria Teresa Granados-Gutierrez, for Release **IS DENIED.**

PAGE 35/35 * RCVD AT 9/8/2014 5:15:48 PM [Eastern Daylight Time] * SVR:NAFXO2MS/22 * DNIS:6057# * CSID:# * DURATION (mm-ss):16-12

TOTAL P.036

A#206-848-455/456
GRANADOS-GUTIERREZ, Maria Teresa
GUTIERREZ-GRANADOS, Herson Yonatan
Page 34 of 34

<u>It is Further Ordered:</u>        The Motion of Lead Respondent, Maria Teresa Granados-Gutierrez, for Bond Redetermination **IS GRANTED**, whereas Lead Respondent shall remain **DETAINED PURSUANT TO A $15,000 BOND**.

_9-9-14_
Date

Roxanne C. Hladylowycz
United States Immigration Judge

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:     MAIL (M)    PERSONAL SERVICE (P)
TO:   ( ) ALIEN   ( ) ALIEN c/o Custodial Officer   ( ) ALIEN's ATT/REP    ( ) DHS
DATE:_____ BY: COURT
STAFF_____

Attachment(s): ( ) EOIR-33  ( ) EOIR-28 ( ) Legal Services List ( ) Other

# Exhibit 10-ORR

DECLARATION OF LORILEI ALICIA WILLIAMS

I, Lorilei Alicia Williams, declare and say as follows:

1.  I am an attorney licensed to practice in the states of Texas and New York. I joined Staten Island Legal Services, part of Legal Services NYC, in January 2016 as the Immigration Unit Director.

2.  From September 2012 until April 2014, I worked as a staff attorney in the unaccompanied minors program of the St. Frances Cabrini Center for Immigration Legal Assistance at Catholic Charities of the Archdiocese of Houston-Galveston. In the course of my practice I regularly represented unaccompanied juveniles detained pursuant to the Immigration and Nationality Act (INA) and housed by the Office of Refugee Resettlement of the Department of Health and Human Services (ORR) at the following detention facilities: Southwest Key Conroe, Shiloh, Southwest Key Casa Houston, Southwest Key Mesa, Baptist Children and Family Services Baytown, Catholic Charities St. Michael's, and the Children's Center in Galveston.

3.  From May 2014 until January 2016, I worked as a staff attorney in the unaccompanied minors program of Catholic Charities Community Services of the Archdiocese of New York. During this period I regularly represented unaccompanied juveniles detained ORR detained at the following facilities: MercyFirst, the Children's Village, Cayuga Centers, Abbott House, Leake and

82

Watts, New York Foundling, the Children's Home of Poughkeepsie, the Children's Home of Kingston, Lincoln Hall, and Cardinal McClosky, among others.

4. My representation included assisting detained juveniles contest removal, seek affirmative immigration benefits such as asylum and special immigrant juvenile status, as well as seeking their release to parents or other custodians and advocating for their placement in the least restrictive setting. I have accordingly had regular occasion to observe, and am intimately familiar with, ORR's policies and practices, as well as those of United States Immigration and Customs Enforcement (ICE), toward the detention, release, and treatment of juveniles. I am also familiar with how those policies and practices have changed over time.

5. In the Houston area, Southwest Key Mesa was primarily a shelter-level facility, although it did have staff-secure beds. Shiloh was primarily a residential treatment center, although for some time it also had staff-secure beds. In New York, the Children's Village was primarily a shelter-level facility with two cottages dedicated to staff-secure beds. MercyFirst has both shelter-level beds and residential treatment center beds.

6. Children are placed in staff-secure beds if ORR determines that they require a higher level of supervision than the general population of detained immigrant and refugee youth. Staff-secure placement is more restrictive than shelter placement or placement in transitional foster care. In all aforementioned

- 2 -

facilities, I observed that children placed in staff-secure beds oftentimes remained at staff-secure level for several months. In a few cases, ORR released such children to sponsors or transferred them directly to a less secure long-term placement (such as ORR-funded long-term foster care or the Unaccompanied Refugee Minors (URM) program). In most cases, however, ORR required that the child earn the right to be "stepped-down" from staff-secure level to shelter level before it would release the child or transfer him or her to a long-term placement. It was common to see children detained for six months or longer in staff-secure placements.

7. ORR places children at residential treatment centers (RTCs) when it believes they need psychological or medical intervention. Most children I worked with at RTCs suffered from post-traumatic stress disorder. Many had thoughts of self-harm or suicide, or had experienced psychotic episodes. (A few had no extraordinary psychological needs, but had heightened medical conditions such as deafness, muteness, autism, or epilepsy.) Many children suffering from PTSD or other psychological trauma also had alleged criminal history closely associated with such trauma. Similar to staff-secure children, ORR would sometimes release RTC children directly from RTC, but most often would refuse to release them until they had first stepped down to a less secure placement. In both staff-secure and RTC placements, children suffered greater restrictions on their liberties, such as

- 3 -

84

being denied permission to leave the facility to attend school or recreational activities.  In my experience, children in staff-secure or RTC placements also reported shelter abuses more frequently, such as excessive use of force when restraining a child, threatening children with removal, and general hostility towards the children.

8. I am informed and believe that the *Flores* settlement and § 235(c)((2) of the 2008 Trafficking Victims Protection Act (TVPRA) require ORR to place detained juveniles in the least restrictive setting that is in the best interests of the child. I am further informed and believe that the *Flores* settlement and the TVPRA require ORR to minimize the detention of juveniles by releasing them to their parents and other reputable custodians except where a particular minor is an extraordinary flight-risk or to ensure his or her safety or the safety of others. I am further informed and believe that the *Flores* settlement guarantees juveniles whom ORR refuses to release notice and a meaningful opportunity to be heard regarding the grounds for continuing to detain them. In my  opinion, ORR is clearly in breach of these requirements: ORR is needlessly extending the juveniles' time in detention, placement in staff-secure beds and RTCs, and it affords detained youth little or no opportunity to examine or contest the grounds for continuing to detain them or house them in restrictive settings. The following examples illustrate ORR's policies and practices.

- 4 -

85

9. Alan Yair Cruz Mar, a 16-year-old born in Mexico, A 205 907 243, was detained by Customs and Border Protection (CBP) on August 24, 2015. Alan's father is a U.S. citizen who recognized his paternity over Alan and agreed to provide him with financial support until he turns 18, thereby making Alan a derivative U.S. citizen effective the date of his birth. A derivative citizen does not need to apply for citizenship: he or she is a citizen at birth. Alan did not know that he had this claim to citizenship until I met with him and also spoke with his father.

10. On November 6, 2015, I informed ORR and ICE that Alan was a U.S. citizen and therefore not subject to detention under the INA. ICE's Enforcement and Removal Operations (ERO) unit terminated removal proceedings against Alan during the fourth week of November because of his probative claim to U.S. citizenship and, advised ORR regarding his U.S. citizenship claim. ORR nevertheless continued to detain him for months without affording him any meaningful opportunity contest such detention and despite my best efforts to have him released to his father.

11. In an effort to have Alan released to his father, I reached out multiple times via telephone and email to David Fink, ORR's Federal Field Specialist (FFS) supervisor, and James "Jim" de la Cruz, also an FFS supervisor, both out of Washington, D.C. On multiple occasions, they simply refused to respond to inquiries regarding why Alan was being detained in lieu of release to his father. A

- 5 -

local FFS, Karla Mansilla, instructed me to bring up the question with ORR's legal

counsel, but when I asked for their counsel's contact information, she refused to

give it to me. (I considered filing a petition for habeas corpus contesting Alan's

continued detention, but as explained below, I was then funded by the Vera

Institute pursuant to a contract with ORR; both ORR and Vera Institute informally

discourage Vera-funded lawyers from taking any legal action against ORR lest

they cut off funds entirely for assisting unaccompanied minors.)

12. I successfully had Alan's removal proceedings terminated in immigration

court in mid-January 2016, but it took more than a week for ORR to release Alan

to his grandmother. At no time did ORR provide Alan, his father, his

grandmother, or me any written explanation of its reasons for continuing to detain

him. At no time did ORR present Alan for a bond redetermination hearing. At no

time did ORR disclose to Alan, his father, his grandmother, or to me the evidence

supporting its decision to continue Alan in detention. At no time did ORR grant

Alan, his father, or his grandmother a hearing regarding the grounds for continuing

to detain Alan. The most ORR could muster was to advise me informally that they

did not want release Alan because they were concerned about his father's criminal

history.

13. Another of my clients who suffered needless detention was William

Alberto Alvarez Argaeta, A 205 298 892, from El Salvador. (William recently

- 6 -

87

passed away at the age of 14 in a fishing accident.)  CBP apprehended William on December 26, 2011, when he was nine years old.  ORR first detained William at the IES Harlingen Foster Program, and then at the Children's Center in Galveston, Texas.  On January 4, 2012, ORR transferred him to Shiloh RTC.  William was diagnosed with Attention-Deficit/Hyperactivity Disorder, Combined Type; Posttraumatic Stress Disorder; and, Bipolar I Disorder, with episodes that have been mixed, severe with psychotic features.

14.  William's psychological difficulties stemmed from a long and tragic history of sexual abuse in El Salvador.  He had been abandoned by extended family with whom his parents had left him, and for at least a year he lived alone, homeless, and defenseless on the streets of El Salvador; he was eight years old and easy prey for sexual predators.  William's parents eventually managed to find him and arranged to have him brought to Dallas, Texas, where they lived.

15.  I began representing William in October 2012. On numerous occasions he was uncooperative and exhibited clear indicia of mental illness. During this initial period of detention, William had no next-friend or child advocate, so I undertook to advocate for release to his parents. Being reunified with his parents was William's only clear wish, and I believed his parents would speak for him during removal proceedings.  ORR refused to release William. As was the case with Alan, the agency refused to provide any written explanation of why a child of

- 7 -

88

such tender age and suffering from such trauma needed to be detained for more than a year when his parents were ready, willing and able to care from him and lived only a few hours away. Again, at no time did ORR present William for a bond redetermination hearing. At no time did ORR disclose to William's parents or to me the evidence supporting its decision to continue William in detention. At no time did ORR grant William or his parents any hearing regarding its reasons for continuing to detain their nine year old child.

16. ORR also appears to have done its best to insulate its decisions to continue children in detention from judicial review. When I discussed William's plight with my supervisors at Catholic Charities Houston, I was told explicitly that we could not take legal action against ORR because our Vera Institute funding to help detained children would be at risk. I determined, then, that my only recourse was to attempt to terminate William's removal proceedings on the basis of his incompetency. In January 2013, I submitted a motion to the immigration court. I also reached out to ORR and asked them if William's psychiatrist and clinician would be able to testify in court as to William's competency. I believe an individual hearing date was either for April or June 2013, but I do not recall the exact date. Some time prior to the competency hearing, ORR suddenly and without explanation released William to his parents; he had by that time spent almost a year and a half needlessly detained.

- 8 -

89

17. As the foregoing cases illustrate, in practice I have never known ORR to provide any written explanation for its decisions against releasing juveniles from staff-secure or RTC detention. In my experience, ORR affords neither detained juveniles nor their parents or other proposed custodians any transparent, meaningful opportunity to be heard on the matter of children's release, no opportunity to see, explain or rebut whatever evidence ORR believes justifies a child's continued secure confinement, or any effective way to appeal ORR's custody decisions administratively. Although ORR publishes on its website that parents may send a letter to the ACF Assistant Secretary appealing the denial, this is not communicated clearly to the parents or children.  In sum, in denying juveniles' release to their parents or other caregivers, ORR provides—

- no notice of the reasons for housing them in a staff-secure or RTC facility;

- no bond redetermination or other hearing on the reasons for continuing to detain them;

- no written information regarding when or if it will reach a decision on whether to detain or release a child;

- no written information regarding when or if it will "step down" a child from a staff-secure or RTC placement to a non-secure licensed placement;

- 9 -

90

- no explanation of the right of judicial review; and

18. Although I am not a mental health professional, I have noted the deleterious effects ORR's opaque and oft-delayed release and step-down decisions have on detained youth. In both Alan's and William's cases, facility staff repeatedly encouraged my clients, their parents, and myself to believe that ORR would release my clients promptly, whereas in truth and fact the agency delayed its decisions for weeks or months, leaving children, their parents, and their lawyer twisting in the wind, awaiting a decision from on high that might or might not be favorable and that would never be explained other than in the barest of conclusory terms. In the face of such extended and faceless uncertainty, detained children— already traumatized by horrific experiences in their countries of origin—have expressed to me feeling profound helplessness and despair, to the point where they are prepared to take extreme measures, including opting for voluntary return to countries in which they know their lives and freedom will be in jeopardy, rather than continue to live day after day in ORR's detention facilities never knowing if or when they will be reunited with their families.

19. Additionally, although ORR boasts of providing free legal services to detained minors, it hobbles free legal service providers who undertake to represent detained children. While working for both Catholic Charities in Houston and in New York, I was funded by ORR to represent detained unaccompanied minors.

- 10 -

ORR provides such funds pursuant to the TVPRA to the VERA Institute of Justice, which then sub-contracts with nonprofit legal service organizations to provide direct legal services to ORR detainees, among others.

20.  In cases where ORR insisted upon detaining children for unusually long periods of time, pursuing relief in federal court was not an option, so my only recourse was to maintain open communication with shelter staff and ORR personnel in the hopes that a positive long-term stakeholder relationship would work to detained children's benefit.  On more than one occasion, shelter staff and I strategized together on how to persuade ORR to release a child, but these measures were no substitute for a fair and transparent procedure by which detained children and their parents could understand and test the government's case for refusing release.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5 day of August, 2016, at Staten Island, NY.

Rachel W W Granfield
Notary Public, State of New York
No. 02GR6333769
Qualified in Richmond County
My Commission Expires 11-30-19

Lorilei Alicia Williams

- 11 -

92

Exhibit 11-ORR

## DECLARATION OF MEGAN STUART

I, Megan Stuart, declare and say as follows:

1. I am an attorney licensed to practice in the state of New York. Since 2011, I have been  employed by the Urban Justice Center and work for the Peter Cicchino Youth Project ("PCYP")

2. The Peter Cicchino Youth Project provides free civil and immigration legal services to homeless and incarcerated youth under 25 in New York, with a particular focus on LGBTQ youth. PCYP works to interrupt cycles of poverty and criminalization that prevent homeless and street-involved young people in New York City from living their lives to the fullest. We do so by providing holistic, client-centered legal services and case management. PCYP operates legal clinics in drop-in centers and youth programs where homeless youth congregate to access food, showers, laundry, medical care, social services, and community. To meet the needs of undocumented youth, we have partnerships with service providers and community activists who are able to connect homeless immigrant youth with us.

3. My immigration practice involves representing clients in a wide array of affirmative immigration applications, including Special Immigrant Juvenile Status, U Visas, Asylum, Green Card replacements, adjustment

94

of status and naturalization as well as defensive applications for clients in removal proceedings.

4. PCYP clients are a mix of young people who were brought here as children or who fled their home country because of sexual orientation/gender identity-based persecution. Some of these clients have had no contact with immigration, while others are in removal proceedings and homeless.

5. In the course of my practice I have represented unaccompanied juveniles detained pursuant to the Immigration and Nationality Act (INA) and housed by the Department of Health and Human Services' Office of Refugee Resettlement (ORR) at Children's Village, Union County Juvenile Detention Center, Shenandoah, NOVA and Sandy Pines.

6. My representation of these youth includes both advocacy for release from detention and placement in the least restrictive setting possible as well as immigration representation, including applications for various immigration benefits and defense in removal proceedings.

7. Through this work, I have had regular occasion to observe, and am accordingly familiar with, the policies and practices of the ORR and United States Immigration and Customs Enforcement (ICE), toward the detention, release, and treatment of juveniles detained at Children's

- 2 -

95

Village and Union County, which I am informed and believe are generally representative of ORR policies and practices nationwide.

8. The Union County facility in New Jersey and NOVA in Virginia, are secure detention facilities for adjudicated juvenile delinquents; to my knowledge, these facilities are neither licensed nor suited to house dependent, non-delinquent minors. The facilities are surrounded by a secure perimeter fence, and ingress and egress take place through sally ports. To my knowledge, juveniles detained at Union County and NOVA are never allowed outside the facility. Schooling takes place inside the locked gates of the facility; visitation is rare and tightly regulated.

9. In sum, juveniles held at the Union County facility live under palpably prison-like conditions, and those placed there by ORR or ICE are treated little differently from the adjudicated delinquents with whom ORR and ICE detainees are wholly commingled and have regular daily contact.

10. I am informed and believe that pursuant to the 2008 Trafficking Victims Protection Act (TVPRA) as well as the 1997 settlement in *Flores v. Lynch*, No. 85-4544 (C.D. Cal.), neither ORR nor ICE is permitted to place minors in secure juvenile facilities unless no less restrictive alternative is available and appropriate under the circumstances.

- 3 -

11. I am further informed and believe that the *Flores* settlement requires ORR and ICE to minimize the detention of juveniles by releasing them to their parents and other reputable custodians except where a particular minor is an extraordinary flight-risk or to ensure his or her safety or the safety of others. In light of what I have observed in the abovementioned facilities, I believe ORR and ICE are clearly in breach of these requirements.

12. In multiple cases of youth detained in these facilities, I have advised ORR of the availability of less restrictive placements, including release to parents, guardians, or other appropriate custodians, yet in my experience ORR generally ignores such alternatives or rejects them without providing detained children, their parents or other proposed custodians, or their counsel a coherent explanation of why it believes release would be inappropriate, nor does ORR provide any meaningful opportunity to examine, much less explain or rebut, any evidence it may have to support having denied children's release. At best, ORR's policies and procedures for determining whether to release a juvenile are ad hoc and adhere neither to accepted standards of due process in immigration proceedings nor to those accepted in the context of child welfare.

- 4 -

13. In my experience, ORR never provides a child denied release (i) a written explanation for refusing to release the minor from either Union County or Children's Village facility; a bond redetermination hearing before an immigration judge; a Form I-770; an explanation of the child's right to seek judicial review of ORR's release or placement decisions; or a list of free legal services providers. In effect, ORR affords detained juveniles no meaningful opportunity to be heard on the matter of their release, to see or explain any evidence ORR believes justifies their continued secure confinement, or to appeal ORR's custody or placement decisions administratively.

14. Among my clients whose experience is illustrative of the foregoing are E.S., Roberto Montealegre, and Sandra Igihozo.

15. Sandra Igihozo is a now 20- year-old native and citizen of Rwanda and a member of the class protected under the *Flores* settlement, who was previously detained at the Children's Village in New York.

16. Sandra, who had a stable middle-class childhood, fled Rwanda after she was tortured because of her sexual orientation. During her journey to join her family in Canada, Sandra was sexually assaulted.

17. Sandra was taken into custody by CBP in July 2013, and was placed at Children's Village a few days later. She entered ORR care pregnant and

- 5 -

without family in the United States. In July 2013, ORR determined that Sandra would be detained in lieu of release on bond, recognizance, supervision or parole. In October 2013, I requested that the immigration court review ORR's no-release decision and the $20,000 bond set before her transfer to ORR. In a decision dated October 31, 2013, and affirmed December 19, 2013, the immigration court declined to redetermine bond because she believed that she only had jurisdiction over certain custody determinations made by the Attorney General, and not the Office of Refugee Resettlement. Sandra accordingly remained detained. A true and correct copy of this decision is attached as Exhibit A to this declaration.

18. During the pendency of the Bond redetermination motion, I also made a request on October 2, 2013 for ORR to release Sandra into the custody and care of a licensed youth shelter that had agreed to provide her foster care until her 21st birthday. On October 24, 2013, ORR field specialist Elcy Velez denied this request, advising via email that "ORR has no plans to release Sandra at this time." ORR provided no explanation for its decision, nor did it disclose—much less allow Sandra to explain or rebut—any evidence it may have had to support its decision. A true and correct copy of my request and ORR's denial thereof are attached as Exhibit B to this declaration.

- 6 -

19. Between October and December 2013, I made several additional requests to ORR for Sandra to be released so that she could enter foster care, all of which were denied without any explanation of the reasons for the decision, the standards employed, or the evidence upon which the decision was based.

20. Sandra remained in ORR custody until January 10, 2014, 20 days before her 18th birthday. I believe the threat of a habeas petition is what motivated ORR and the Attorney General to release Sandra into URM care, though ORR never offered any explanation for reversing its decision to detain Sandra.

21. Despite the stress that months of detention imposed on Sandra and her child, Sandra was eventually able to become a Legal Permanent Resident.

22. In my experience, the Vera-funded legal service providers seem reluctant to aggressively advocate or take legal action when ORR refuses to release a minor or places them in an overly restrictive setting.

23. Although most Vera-funded providers are personally committed to representing immigrant youth with the utmost vigor, the current funding structure deters many from zealously advocating for unaccompanied minors with respect to ORR's often arbitrary detention decisions.

24. Though I am uniquely situated in terms of capacity and expertise to represent youth in ORR detention, I have been told that because of my advocacy for my clients, Vera-funded providers are not to refer cases to me, or risk losing their funding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of August 2016.

Megan Stuart

- 8 -

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
26 FEDERAL PLZ 12TH FL.,RM1237
NEW YORK, NY  10278


URBAN JUSTICE CENTER
123 WILLIAM STREET 16TH FL.
NEW YORK, NY  10038

IN THE MATTER OF            FILE A 205-710-232     DATE: Oct 31, 2013
IGIHOZO, SANDRA

___ UNABLE TO FORWARD - NO ADDRESS PROVIDED

___ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE.  THIS DECISION
IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
MUST BE MAILED TO:   BOARD OF IMMIGRATION APPEALS
                     OFFICE OF THE CLERK
                     5107 Leesburg Pike, Suite 2000
                     FALLS CHURCH, VA  20530


___ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS.  IF YOU FILE A MOTION
TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                     IMMIGRATION COURT
                     26 FEDERAL PLZ 12TH FL.,RM1237
                     NEW YORK, NY  10278

___ OTHER: _____
       _____

                              COURT CLERK
                              IMMIGRATION COURT                    FF

    CC: DISTRICT COUNSEL, NYC DISTRICT
        26 FEDERAL PLAZA, ROOM #1130
        NEW YORK, NY,  10278

Ex A1

102



**U.S. Department of Justice**

Executive Office for Immigration Review
*Immigration Court*

26 Federal Plaza, 12th Floor Room 1237
New York, New York 10278

File: A205 710 232 - New York
-------------------------------------------x

In the Matter of
IGIHOZO, Sandra                                         In Removal Proceedings
Respondent.
-------------------------------------------x

On behalf of Respondent:                      On behalf of DHS:
Megan Stuart, Staff Attorney                  Fen Lu, Assistant Chief Counsel

### Decision on Motion for Bond Redetermination

The respondent is a seventeen year old, female, who is a native and citizen of Rwanda. She is alleged to have entered the United States upon presentation of a false passport in an assumed name on or about July 13, 2013 at Dulles International Airport. On or about July 29, 2013, she was apprehended by U.S. Border Patrol Agents near the Canadian border. She explained to the agents that she was attempting to enter Canada. She was placed in custody and served with a Notice to Appear on that date. On the following day, she was served with Form I-286, informing her that DHS had made a determination that she be released from custody under bond in the amount of $20,000.[1]

The respondent was previously before Immigration Judge Gabriel C. Videla when, through counsel, she indicated she wished a bond redetermination. Judge Videla instructed counsel to file the motion by October 9, 2013, and the Department to reply by October 17, 2013. The Department did not respond. On October 17, 2013, the matter was assigned to me for consideration. I granted the Department an extension to respond, and they have filed a memorandum in opposition to the respondent's motion. The respondent has replied to that memorandum in opposition.

As more fully described in her pending motion, the respondent was forced to flee Rwanda after she was detained by the police and threatened with death when her sexual orientation

---

[1]The Record of Proceeding does not include Form I-286. However, respondent has supplied a copy of such document (Exhibit C to Reply to DHS Opposition), and the Form I-213 (Exhibit B to Emergency Motion filed by respondent) confirms that such determination was made at the time of her apprehension. Respondent indicated on Form I-286 that she requested a redetermination of this custody decision by an immigration judge.

(lesbian) was discovered.  Her mother made arrangements with a step-cousin to take the respondent to Canada, where she has family.  Unfortunately, en route to the United States, she was raped by her step-cousin.  In the United States, she sought to escape from him and took a cab to the US-Canadian border where she was apprehended and these proceedings were initiated. [2] The respondent asserts that she is pregnant as a result of the rape by her step-cousin, and is due to deliver a child approximately one month after her 18th birthday.

Respondent is currently housed at Children's Village in Dobbs Ferry, New York.  She asserts that she is not comfortable in that setting, has no educational opportunities there, and most of the children are much younger than she is.  In Rwanda, she had completed most of her high school education and speaks three languages.  She has presented documentation to show that she has been accepted into the Safe Horizon's Streetwork Project, and has offered a "detailed release plan" written by that office's social worker.  However, the Office of Refugee Resettlement ("ORR"), through its Federal Field Specialist, Elcy Valdez, has declined to allow such placement and informed counsel for respondent, as recently as October 24, 2013,  that it has "no plan to release Sandra at this time."

Respondent asserts that the immigration judge has authority to order the release of the respondent.  DHS asserts that it does not.  I have carefully considered the memoranda and evidence, and arguments made by both sides and have concluded that an immigration judge has authority to review the decision of the DHS with respect to determinations relating to bond, but that it has no authority to interfere with the care and custody of the minor child as determined by ORR.

The respondent has offered an unreported decision of the Board of Immigration Appeals to support her position.  That decision is supportive of my conclusion that I continue to have jurisdiction with respect to bond, and could order the $20,000 bond reduced or that she be released on conditional parole, but I can not require the Office of Refugee Resettlement to make any particular determination regarding the placement of the respondent.  The Immigration Judge's authority to determine conditions of custody under 8 C.F.R. 1236.1(d) extends only to certain custody determinations by the Attorney General, not the Office of Refugee Resettlement. I have no authority under the Homeland Security Act of 2002 to order the ORR to provide any particular custody arrangements, or to require them to provide reasons for their custody decisions.  The Director of ORR is charged with "coordinating and implementing the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status." 6 U.S.C. 279(b)(a)(A).  The Director has jurisdiction to make placement determinations, but that does not strip jurisdiction from the Immigration Judge to determine if custody is warranted in the first place.  Clearly, the overriding consideration in separating the custody decisions made by the Attorney General from those care and custody issues determined

---

[2] The respondent asserts that her baby is due in February (about a month after her 18th birthday).  The respondent claims that she was raped by her step-cousin, Didier, while in Uganda. The time-frame of these events is not clear, although it would seem that respondent became pregnant in approximately May, 2013, nine months prior to her anticipated delivery in February, 2014.

104

by ORR highlights the need for the expertise of those charged with the best placement of the child for the best interests of the child. The ORR has social workers and experts in these issues, whereas an immigration judge does not. In a hypothetical situation, I might conclude that a seven-year old child should not be detained in custody or be required to post a bond. However, it would be for ORR to decide where that child should be placed and by whom the child should be cared for. While I may feel quite confident, based on the representations of counsel for respondent, that the suggested placement with Safe Horizons appears suitable, apparently ORR does not, and there is no mechanism for me to override their determination as to this child's care and placement. The care of this very vulnerable child has been determined by ORR to be best served at Children's Village.

Having reached the conclusion that I lack the authority to override that determination, I note that DHS has determined that a $20,000 bond is necessary to ensure the respondent's appearance at hearings. The immigration judge does have jurisdiction to review that determination. Unless the DHS wishes to re-evaluate whether such bond, or any bond, is necessary, a hearing will be set solely for the purpose of considering that bond so that when it is determined that respondent may be placed in another setting, or she is over 18 and no longer subject to the care of ORR, the redetermination of the bond, to which she is entitled, will have been completed. The issue of the care and custody exercised by ORR will not be part of the hearing and the sole issues will be whether respondent's release would pose a danger to property or persons and whether she is likely to appear at any future proceedings.

ORDER: IT IS ORDERED that the motion for bond redetermination is Granted in part, and Denied in part.

Patricia A. Rohan
Immigration Judge

Dated: Oct. 31, 2013

THIS DOCUMENT WAS SERVED
                          ALIEN/ATTY   TA'S
IN PERSON              ☐   ✓        ☐
VIA US MAIL            ☑            ☑
VIA FEDERAL EXPRESS    ☐            ☐
DATE 10/31/13  BY       CLK

**U.S. Department of Justice**

Executive Office for Immigration Review

Office of the Immigration Judge

File A _079 238 898_

In the Matter of                                    In _Removal_ Proceedings

_Iginozo, Sandra_

**Order of the
Immigration Judge**

Supplemented Decision
on Bond Redetermination

I hereby incorporate, in its entirety, my decision of October 31, 2013. I do not believe I have authority to order the release or placement of the respondent. I would wish that I had such authority, but I do not. The DHS has withdrawn any bond requirement. It is, in my opinion, for ORR to find an appropriate placement for her as soon as possible given the respondent's situation.

Date: _Dec 19 2013_

Place: _NYC_

_(Immigration Judge)_

2. ALIEN'S COPY

ExA2

106

EOIR-23
MAR. 84

**URBAN JUSTICE CENTER**   **PETER CICCHINO YOUTH PROJECT**

October 2, 2013

The Childrens Village
1 Echo Hills Road
Dobbs Ferry, NY 10522

**Re: Pre 18 Release Plan**
**Sandra Igihozo, A# 205-710-232**

Dear Ms. Valdez, Ms. Claudio, and Ms. Roman,

My name is Gretchen Begley and I am a Case Manager at the Peter Cicchino Youth Project ("PCYP") of the Urban Justice Center. PCYP addresses the legal needs of homeless and street involved youth. I work with the Urban Justice Center's legal team as a social service provider to help released children transition into the community and towards independence. In order to facilitate this transition, I create and carry out individualized social service and education plans.

This plan is submitted in support of Sandra's pre-18 release from Children's Village.[1] As you know, Sandra is pregnant and has no long-term federal care options which means that she is in grave danger of being discharged into homelessness on her 18th birthday and in her third-trimester of pregnancy. Our primary concern, which I know you share, is that Sandra and her child have access to the best long-term care available so that they both have a change at a safe and supported life. Given this, the best long-term option for Sandra is for her to get into State Foster Care, which requires her release from Children's Village before her 18th birthday. Additionally, given that Sandra's life will undoubtedly get more difficult as her pregnancy advances, a release as soon as possible is in her best interest.

The plan detailed below considers Sandra's: A) future housing, B) education, C) medical care and mental health, D) immigration case, E) need for identification, and F) extracurricular enrichment opportunities.  Each component of this plan has been identified based upon my recent conversations with Sandra, her attorney Megan Stuart, and my experience working with numerous unaccompanied youth in New York City.  This plan has been discussed with Sandra and he has agreed to participate.  I have done my best to incorporate information regarding the programs and social service agencies I have identified for Sandra in order to provide context for the services available to unaccompanied children generally in the New York City area.

My proposed Plan for Sandra is as follows:

---

[1] Although it is certainly in Sandra's best interest to transition to foster care upon release from the Children's Village, I have been working concurrently on a pre/post18 plan for Sandra, so that, in the event Sandra does not transfer to Foster Care, his transition to the community is as smooth as possible.

ExB

107

**A.  Housing:**

Independent housing opportunities for youth like Sandra in New York City, are funded by the New York Department of Youth and Community Development ("DYCD").  Generally, DYCD housing services include three separate elements: 1) Crisis Shelters, 2) Transitional Independent Living, and 3) Borough-Based Drop-in Centers.

1. Crisis Shelters: Crisis Shelters offer emergency shelter for runaway and homeless youth up to the age of 21.[2] The shelters are the **entry-point** for the DYCD's Runaway and Homeless Youth system. These voluntary, short-term residential programs provide emergency shelter and crisis intervention services aimed at reuniting youth with their families or, if family reunification is not possible, arranging appropriate transitional and long-term placements.  In other words, in order for a youth to enter a transitional and long-term housing placement in New York, he or she must first begin in a DYCD "Crisis Shelter", who have the ability to make a referral.

   There are three Crisis Shelters in New York City that Sandra is eligible for: Streetworks and the Covenant House.  Both programs are tasked with ensuring a youth's transition to long-term placement when other reunification options or placements do not exist.  In order to ensure children transition to permanency as quickly as possible, DYCD limits the length of stay for a child in a Crisis Shelter to 30 days, with the possibility of a 30 day extension.  Both Streetworks and Covenant House accept children on a first-come first serve basis, however, their intake procedures are different as follows:

   a.  Streetworks (209 W. 125th. St., New York, NY 10027, Phone: 212.695.2220)
      i.  I have contacted Streetworks about Sandra, and they have agreed to accept her into their crisis shelter. Letter from Streetworks, attached.
      ii.  Generally, youth seeking acceptance into the Streetworks program must complete two intake interviews.  The youth must come to the shelter from 10am-12pm on Monday, Tuesday, Thursday, or Friday.  Streetworks only takes the first four youth who arrive on any given day for intake. It is best to arrive 15 minutes prior to the opening time.  If Streetworks has a bed available once a youth completes the intake process, the youth is placed immediately.  If however a bed is not available, youth are placed on the waitlist.  A youth placed on the waitlist must call Streetworks daily in order to determine if and when a bed is available.

   b.  Covenant House (460 W 41st St, New York, NY 10026)
      i.  Covenant House will conduct an intake of a youth at any time, day or night.  Youth will be placed immediately, if a bed is available.  If a bed is not available, youth are referred to adult crisis shelters.  Due to Urban

---

[2] Please note that the term "homeless and runaway" youth is broadly defined by the McKinney-Vento Act as a youth who has a primary nighttime residence a publicly or privately operated program, including transitional housing.  The definition of homeless, as defined by the federal statute, is so broad that it deems children who are in ORR facilities "homeless" as well as children who are in independent living placements that provide housing to youth for years.

Justice Center's long-standing relationship with the Covenant House, we frequently communicate directly with Covenant House Legal Director Nancy Downing when a client of ours is expected to arrive for intake. [3] We have already communicated with Nancy Downing about Client's case, and she is prepared to coordinate Client's placement at the Covenant House if and when necessary.

c. Ali Forney Center ("AFC") (321 W 125th St New York, NY)
   i. AFC offers a scattered-site emergency housing program for LGBTQ youth with sites in Queens and Brooklyn. They offer temporary housing in safe, staff-supervised homelike apartments. LGBTQ youths are able to reside in our emergency housing program for up to six months while we assist them in moving on to more permanent housing. Currently AFC has 4 emergency housing apartments and a total of 49 beds.

Both the Covenant House and Streetworks provide the following services to their residents:

- Crisis Center
- Community Centers
- Street Outreach
- Transitional Housing Program
- Health Services
- Mental Health Services
- Mother & Child Programs
- Regional Training Centers
- Substance Abuse Services
- Vocational Training Institute

2. Transitional Independent Living: Transitional Independent Living (TIL) facilities provide homeless youth between the ages of 16 and 21 with support and shelter as they work to establish an independent life.  As mentioned above, a young person in need of long-term residential services must first visit a Crisis Shelter and obtain a referral to a Transitional Independent Living facilities.  Youth may stay in the Transitional Independent Living facilities for up to 18 months. Services offered at TILs include:

- Educational programs
- Vocational training
- Job placement assistance
- Counseling
- Basic life skills training
   a. There are three long-term programs specifically designed for pregnant and parenting teens, however to be eligible for the program a youth needs to be referred from one of the Crisis Centers.

---

[3]*See http://www.covenanthouse.org/homeless-charity/new-york*

      i.    Independence Inn mother-child program;
     ii.    Covenant House mother-child program
   iii.    Inwood house

3. Borough-Based Drop-in Centers: Drop-In Centers are located in each of the five boroughs of New York City, one per borough. The Drop-In Centers provide youth up to the age of 24 and their families with essentials like food, clothing and immediate shelter as well as access to counseling, support, and referrals to relevant services. Drop-In Centers are open 6 days a week. Drop-In Centers frequently have close connections to TIL programs, and in limited circumstances, may be able to conduct an intake for possible placement at a partner TIL.

### B. <u>Education:</u>

We would like to enroll Sandra into a traditional high school. We think she would succeed in a traditional educational environment because she is fluent in English and completed all but one month of high school in Rwanda. New York Law guarantees Sandra the right to an education and once she is released, we will take her  the local enrollment center so that she can be immediately placed into a high school.

### C. <u>Medical Care and Mental Health:</u>

Upon release, we will enroll Sandra into Child's Health Plus, New York Sate's low-income insurance plan for youth. Unlike traditional Medicaid, undocumented immigrants are eligible for insurance until they turn 19. We imagine that by the time Sandra is 19, she will have immigration status, thereby becoming eligible for Medicaid.

### D. <u>Immigration Case:</u>

Sandra and her attorney, Megan Stuart, will continue to work together on her immigration applications. Sandra is eligible for the following forms of relief, which she and Megan will peruse. I will escort Sandra to all immigration court appearances, the next of which is on October 17th at 1pm.

      i.    Asylum
          a.    Sandra is prima facie eligible for asylum because she was persecuted in Rwanda because of her sexual orientation. Sandra is working with Megan to develop her asylum application, which will be submitted before Sandra turns 18. Because an asylum application requires Sandra to re-live an extremely traumatic period in her life, it requires several meetings between Sandra and Megan.

     ii.    SIJS
          a.    Sandra is also prima facie eligible for SIJS. Upon release, Sandra and Megan will petition the appropriate family court for a special findings order that they can then submit to USCIS.

   iii.    U-Visa/T-Visa

a.  Sadly, Sandra is also eligible for a U  and/or T visa based upon the sexual assault from her relative who was entrusted with her care. Sandra and obtain the necessary certifications either by reporting the crime to law enforcement locally, or thu the family court. This process will be started in the next few weeks. Once the requisite certificates are obtained, Sandra and Megan will meet to write a supporting affidavit and then submit the application ASAP.

## E.  Identification:

We want to ensure Sandra has all needed identification.  Youth under the age of 18 are able to obtain free picture identification at New York Parks and Recreation.  These identifications include membership to all Park and Recreation centers in NYC, and are only free for youth under 18 years of age.  Upon release, we will escort Sandra to obtain this ID. We believe the New York Parks and Recreation I.D. qualifies as a government issued I.D. because it is issued by NYC.  A Parks and Recreation center is located near our offices at 80 Catherine Street.  Sandra need only bring a birth certificate to become a member and obtain an I.D.

## F.  Extracurricular Activities:

In order to ensure Sandra is has access to extracurricular programming and additional supportive services, after her release we will assist Sandra in becoming a member of the Door and Ali Forney Center. The Ali Forney Center is a drop-in space for LGBTQ youth who provides a variety of social services as well as a place for LGBTQQ youth to congregate and socialize. The Door a comprehensive youth empowerment organization.[4] The Door provides a wide range of services to meet the needs of New York City youth aged 12-21, including, but not limited to:

College Advisement & Tutoring
The Talent Search program provides the support and guidance you need to make your way to high school graduation, college and beyond.

Counseling
Counselors are here to listen and help with a range of issues, including anger management, crisis intervention, gender identity, and much more.

Creative Arts
Regularly scheduled, free creative arts classes include a range of performing and visual arts, music and dance.

English Language (ESOL)
The Door offers a flexible schedule of classes for young people who would like to learn English.

Foster Care
If you are in foster care, The Door can provide the additional support you may need to reach your goals.

---

[4] *See* http://www.door.org/about-door

111

GED
The Door offers a variety of programs to help you get your GED and move on to a career, college or a vocational/training program.

Health & Dental Services
The Adolescent Health Center (AHC) offers comprehensive health and dental services to all Door members, regardless of ability to pay.

Jobs & Internships
Jobs & Internships programs give you the chance to explore different career paths and gain skills to help you find the right job and keep it.

Leadership
The Door offers a range of opportunities to learn key leadership skills that will help you in school, work and everyday life.

Legal & Immigration Services
The Legal Services Center provides different kinds of legal counsel, including support for immigrant youth. Services are offered in English, Spanish, Mandarin and French.

LGBTQ
The Door provides a range of programs geared towards Lesbian, Gay, Bisexual, Transgender or Questioning (LGBTQ) members.

Recreation
Games, workshops, and fitness and performance opportunities are offered on a daily basis.

Runaway and Homeless Youth
If you are homeless or have run away from home, The Door can help you find essentials like food, clothing and shelter, as well as help with your specific needs.
Sexual Health & Birth Control
The Adolescent Health Center (AHC) offers a comprehensive list of services to meet your sexual health and birth control needs.

Supportive Housing
In December of 2010, in partnership with Common Ground, The Door opened The Lee, a supportive housing building located on the Lower East Side.  The Lee currently houses 55 young people living in their own apartments, often for the first time.

In sum, Sandra is quickly approaching her 18th birthday and we would like to do as much as possible to ensure that she is best situated for her transition to independent living in the community should he not have access to foster care.  This requires that Sandra attend numerous appointments and we truly appreciate your help in transporting Client so that he can have the best chance possible upon release from the Children's Village.

112

I look forward to working with you.  Thank you for your assistance.


Sincerely,


Gretchen Begley, MSW
Case Manager

# COVENANT HOUSE ⛪ NEW YORK
### 460 WEST 41ST STREET, NEW YORK, N.Y. 10036 • (212) 613-0300

December 18, 2013

Megan Stuart
Staff Attorney
Peter Cicchino Youth Project
Urban Justice Center
123 William Street, 16th Floor
New York, NY 10038

RE:    Sandra Igihozo (DOB: 01/30/1996)

Dear Attorney Stuart,

This will confirm that Covenant House New York will accept Sandra Igihozo into our Crisis Center Program. We are aware that Sandra is a minor and we will provide for her essential needs during her stay at Covenant House. She will be placed in our Mother/Child program located at 427 West 52nd Street, New York, NY 10019. Covenant House is a crisis intervention center for homeless and runaway youth, under 21 years of age. We provide shelter, food, clothing, as well as a number of services including medical services, counseling services, employment and education services. Caseworkers and a case manager work with each youth to develop a case plan, and to help each youth meet his/her goals with the longer term goal of becoming a self-sufficient adult. If Sandra is in need of services that we do not offer, we will work with her to obtain services through an outside agency.

Please be advised that because we are a licensed Runaway and Homeless Youth Program (licensed by NYS Office of Children and Family Services), we provide all services and must act in accordance with the New York State Runaway and Homeless Youth Act and the relevant Runaway and Homeless Youth Regulations.

Please feel free to contact me should you need any additional information. We look forward to having Sandra Igihozo in our Crisis Center Program, and assisting her in any way possible. Thank you for your kind assistance in this matter.

Sincerely,

Nancy Downing
Director of Advocacy/Legal Services

ExC

114



US Department of Health and Human Services          Sponsor's Agreement to Conditions of Release

# OFFICE OF REFUGEE RESETTLEMENT
## Division of Unaccompanied Children's Services

| | |
|---|---|
| **Name of Minor:** Sandra Igibozo | **Minor A #:** 205-710-232 |
| **Aliases (if any):** | **FINS #:** |
| **Name of Sponsor:** Covenant House New York/Under 21 I.D. | **Date:** 12/18/13 |

Pursuant to Section 462 of the Homeland Security Act, the Office of Refugee Resettlement (ORR) will place the above-named minor into your care and custody, provided that you, as the minor's custodian, agree to:

- Provide for the physical, mental, and financial well-being of the minor.

- Ensure the minor's presence at all future proceedings before the Department of Homeland Security (DHS)/Immigration and Customs Enforcement (ICE) and the Executive Office for Immigration Review (EOIR).

- Ensure the minor reports for removal from the United States if so ordered.

- Notify DHS/ICE and EOIR within (5) five days of any change of residence.

- Notify DHS/ICE at least (5) five days prior to your own departure from the United States and indicate whether the departure is voluntary, pursuant to a grant of voluntary departure, or an order of removal.

- Notify DHS/ICE if dependency proceedings involving the minor are initiated and also notify the dependency court of any immigration hearings pending against the minor.

- Receive written permission from DHS/ICE if you decide to transfer custody of the minor to another person.  Please note that in the case of an emergency (serious illness, destruction of home, etc), you may temporarily transfer physical custody of the minor to another person prior to securing permission from ICE, but you must notify ICE as soon as it becomes practical and no later than (72) seventy-two hours.

- Notify DHS/ICE as it becomes practical and no later than 72 hours of your learning that the minor has disappeared, has been threatened, or has been contacted in any way by an individual or individuals believed to represent an alien smuggling syndicate or organized crime.

**I Understand** that release of the above-named minor from the Office of Refugee Resettlement to my custody does not grant the minor any legal immigration status and that the minor must present himself/herself for immigration court proceedings.

**Check the circle that applies:**

- ⭕ I received a copy of the above-named minor's Notice to Appear, DHS Form I-862 (NTA).
- ⬤ I was not provided a copy of the above-named minor's Notice to Appear, DHS Form I-862 (NTA).

### Sponsor's Agreement to Conditions of Release

I hereby acknowledge that I have read/had explained to me in my own language, and agree to these conditions of release of the above named minor into my custody. I further understand that DHS/ICE may refer the minor to ORR, and ORR may resume custody if I do not comply with the conditions of the release agreed to in this form.

_Nancy J. Downing_  Director of Advocacy /Legal  for          12/18/13
Signature of Sponsor                                            Date
Covenant House New York / Under 21, Inc.

Notary Seal:         Subscribed to before me this
                     18th day of December, 2013.
                     _Alice Obida_
                              ALICE OBIDA
                              Notary Public, State of New York
                              No. 31-4667734
                              Qualified in New York County
                              Commission Expires  8-23-14

Sponsor's Agreement to Conditions of Release, Rev. 3/21/05
ORR R-420
[OMB 0970-0278, valid through 06/30/2008]

115



U.S. Department of Health and Human Services

Office of Refugee Resettlement
Sponsor Care Agreement, Rev. 04/30/2012

## OFFICE OF REFUGEE RESETTLEMENT
### Division of Children's Services
### SPONSOR CARE AGREEMENT

| Name of Minor: | Sandra Igihozo | Minor A #: | 205-710-232 |
|---|---|---|---|
| Aliases (if any): | | Minor DOB: | 01/30/1996 |
| Name of Sponsor: | Covenant House New York / Under 21, Inc | Date: | 12/18/13 |

You have applied to the Office of Refugee Resettlement (ORR) to sponsor an unaccompanied alien child in the care and custody of the Federal Government pursuant to the <u>Flores v. Reno</u> Stipulated Settlement Agreement, No. 85-4544-RJK (Px) (C.D. Cal., Jan. 17, 1997), Section 462 of the Homeland Security Act of 2002 and Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008. If your sponsorship application is approved, you will receive an ORR *Verification of Release* form and will enter into a custodial arrangement with the Federal Government in which you agree to comply with the following provisions while the minor is in your care:

- Provide for the physical and mental well-being of the minor, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.

- If you are not the minor's parent or legal guardian, make best efforts to establish legal guardianship with your local court within a reasonable time.

- Attend a legal orientation program provided under the Department of Justice/Executive Office of Immigration Review (EOIR)'s Legal Orientation Program for Custodians (Sponsors), if available where you reside.

- Depending on where the minor's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within five (5) days of any change of address or phone number of the minor, by using an Alien's Change of Address form (Form EOIR-33). In addition if necessary, file a Change of Venue motion on the minor's behalf. The Change of Venue motion must contain information specified by the Immigration Court. Please note that a Change of Venue motion may require the assistance of an attorney. For guidance on the "motion to change venue," see the Immigration Court Practice Manual at http://1.usa.gov/e0H9zL. For immigration case information please contact EOIR's immigration case information system at 1-800-898-7180. Visit EOIR's website for additional information at: http://www.justice.gov/eoir/formslist.htm

- Notify the Department of Homeland Security (DHS)/U.S. Citizenship and Immigration Services) within ten (10) days of any change of address, by filing an Alien's Change of Address Card (AR-11) or electronically, at http://1.usa.gov/Ac5MP

- Ensure the minor's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR. For immigration case information, contact EOIR's case information system at: 1-800-898-7180.

- Ensure the minor reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order. The minor is assigned to a Deportation Officer for removal proceedings.

- Notify local law enforcement or your state or local Child Protective Services if the minor has been or is at risk of being subjected to abuse, abandonment, neglect, or maltreatment or if you learn that the minor has been threatened, has been sexually or physically abused or assaulted, or has disappeared. Notice should be given as soon as it becomes practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.

U.S. Department of Health and Human Services

Office of Refugee Resettlement
Sponsor Care Agreement, Rev. 04/30/2012

- Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the minor disappears, has been kidnapped, or runs away. Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the minor's disappearance.

- Notify ICE if the minor is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. Provide notification as soon as possible or no later than 24 hours after becoming aware of this information. You can contact ICE at 1-866-341-2423.

- In the case of an emergency (serious illness, destruction of home, etc), you may temporarily transfer physical custody of the minor to another person who will comply with the terms of this *Sponsor Care Agreement.*

- If you are not the child's parent or legal guardian, in the event you are no longer able and willing to care for the minor and unable to temporarily transfer physical custody, and the minor meets the definition of an unaccompanied alien child, you should notify ORR at 202-401-5709.

- The release of the above-named minor from the Office of Refugee Resettlement to your care does not grant the minor any legal immigration status and the minor must present himself/herself for immigration court proceedings.



U.S. Department of Health and Human Services

Office of Refugee Resettlement
Letter of Designation for Care of a Minor, 04/30/2012

## OFFICE OF REFUGEE RESETTLEMENT
### Division of Children's Services
### LETTER OF DESIGNATION FOR CARE OF A MINOR

The Office of Refugee Resettlement (ORR) takes custody of unaccompanied alien children ("UAC") referred by a Federal entity pursuant to the Flores v. Reno, Stipulated Settlement Agreement, No. 85-4544-RJK (Px) (C.D. Cal., Jan. 17, 1997), Section 462 of the Homeland Security Act of 2002, and Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008. ORR has authority under the law to transfer custody of a UAC to a sponsor. Your child has been classified as a UAC pursuant to the Homeland Security Act of 2002 §462(g)(2). ORR strongly encourages parents and legal guardians to designate a sponsor for their child.  In the event that you are unavailable to sponsor your child, ORR asks that you designate a sponsor to care for your child (subject to ORR's approval).

I/We are the parent(s) or legal guardian(s) of, _____Sandra Igihozo_____ , born on _01_, _30_, _1996_.
*(name of child)* *(MM/DD/YYYY)*

I/We designate, _Covenant House New York / Under 21, Inc._ , to sponsor our child.
*(name of sponsor)*

**I consent that the above named sponsor may:**

- Have temporary care-giving authority for my child, until such time as my child is returned to my physical custody; or his/her custody status is altered by a Federal, State, or local agency; or changed by a court of law
- Provide for medical, dental, and mental health care for my child
- Provide for my child's physical and mental well-being, including but not limited to providing, food, shelter, and clothing
- Enroll my child in  school
- Temporarily transfer physical custody of my child in the event of an emergency (serious illness, destruction of home, etc.) to another person who will comply with the *Sponsor Care Agreement*.

| Name of parent(s) or legal guardian(s) signing the form | |
|---|---|
| | (1)_____ |
| | (2)_____ |
| If one of the child's biological parents or other legal guardian is unable to consent please check why | ☐ Deceased    ☐ Mentally or physically unable to give consent |
| | ☐ Abandoned child    ☐ No longer has legal custody of child |
| | ☐ Child's other parent/legal guardian resides in another location *(ORR may send them a separate copy of this form to sign)*    ☐ Other *(ORR may request an explanation)* |
| Address of parent(s) or legal guardian(s) signing the form | |
| Parent(s) or legal guardian(s) signature* | (1)_____ _____(DATE) |
| | (2)_____ _____(DATE) |

\* Please note that by signing this form you are NOT terminating your parental or guardianship rights to your child. You maintain legal custody over your child pursuant to relevant Federal and State law. ORR encourages you to stay in close contact with your child and the child's sponsor in order to help make decisions for the child's care and for medical, educational, and other service. Please also note that if you do not designate a sponsor, ORR may transfer custody of your child to a sponsor identified by ORR.

## NOTARY SEAL:

Letter of Designation for Care of a Minor, 04/30/2012
ORR UAC/FRP-9
ORR UAC Program Operations Manual 2012

118



**Urban Justice Center**
123 William Street, 16th Floor, New York, NY 10038
Tel: (646) 602-5600 • Fax: (212) 533-4598
www.urbanjustice.org

December 9, 2013

Office of Refugee Resettlement
Department of Health and Human Services
370 L'Enfant Promenade, S.W.
Washington, D.C. 20447
*Via email to*:
Elcy Valdez Elcy.Valdez@acf.hhs.gov
David Fink David.Fink@ACF.hhs.gov

Re: IGIHOZO, Sandra
A 205-710-232

Dear Elcy and David:

I am writing today to demand the release of Sandra Igihozo by **Friday December 13, 2013.**

As you are well aware, a pre-18 release will allow Sandra to access state-foster care, which is the only way for Sandra to receive the care and support she needs to successfully transition into motherhood and adulthood. Foster care will ensure that Sandra receives the supportive services she needs to develop healthy coping skills for the traumatic events she suffered in Rwanda; on her journey to safety in the United States and the continued uncertainty that plagues her detention here in New York.

If Sandra is not released before her 18th birthday, she will face one of two brutal futures while she applies for lawful status. Upon her 18th birthday, Sandra will either be taken into ICE custody and placed in adult detention, or released from ORR and discharged into homeless while in her third trimester of pregnancy. The second possibility forces Sandra to survive without access to food, clothing, shelter and medical care. Both of these futures are bleak for both Sandra and her unborn child and place her health and life in imminent risk of harm.

Accordingly, I write to demand that Sandra be released to Covenant House, Streetworks or the Children's Village Sanctuary Program, all state-licensed programs. As outlined in the pre-18 release plan previously submitted, upon release, our social worker will facilitate Sandra's transition into foster care and will provide all other necessary social services. Failure to release Sandra violates the terms of the *Flores* settlement, which states that "[ORR] shall release a minor from its custody without unnecessary delay…"

ExD

*individual rights • social change*

119



**Urban Justice Center**
123 William Street, 16th Floor, New York, NY 10038
Tel: (646) 602-5600 • Fax: (212) 533-4598
www.urbanjustice.org

In the alternate, I write to demand that you cease the unlawful detention of Sandra by Friday, December 13th. In our previous conversations, ORR and ICE have taken the position that Sandra is in the sole legal and physical custody of ORR. If this is true, then ORR has no authority to *detain (*rather than *care for*) Sandra. *See* Homeland Security Act § 462(b)(A)-(L), 6 U.S.C.A. § 279(b)(1)(A–L). According to the act, being in DHS custody is a statutory prerequisite for ORR's detention authority over unaccompanied children.

If you have any questions, please do not hesitate to contact me at 646-602-5643 or via email at mstuart@urbanjustice.org.

I look forward to your response,

Megan Stuart
Attorney for Sandra Igihozo

*Cc:*
Toby Biswas Toby.Biswas@ACF.hhs.gov

*individual rights • social change*