BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division
LEON FRESCO
Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel, District Court Section
Office of Immigration Litigation
     P.O. Box 868, Ben Franklin Station
     Washington, D.C. 20044
     Tel:  (202) 532-4824
     Fax:  (202) 305-7000
     Email:  sarah.b.fabian@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | ) Case No. CV 85-4544 |
| | ) |
|     Plaintiffs, | ) |
| | ) **DEFENDANTS' RESPONSE IN** |
| | ) **OPPOSITION TO PLAINTIFFS'** |
|     v. | ) **MOTION TO ENFORCE SETTLEMENT** |
| | ) |
| LORETTA E. LYNCH, Attorney | ) Hearing Date:  September 16, 2016 |
| General of the United States; *et al.,* | ) Time: 10:00am |
| | ) Dept: Courtroom 7, Los Angeles - Spring |
|     Defendants. | ) Street Courthouse |
| | ) |
| _____ | ) |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND ......................................................................................................... 3

    A.  The Original *Flores* Litigation ....................................................................... 3

    B.  Revelant Provisions of the *Flores* Settlement Agreement ........................... 4

    C.  Revelant Changes in the Legal Framework Since the *Flores* Agreement .... 6

        i.  The Homeland Security Act of 2002 ................................................. 6

        ii.  Trafficking Victims Protection Reauthorization Act of 2008 ........... 7

III.  ARGUMENT .............................................................................................................. 9

    A.  The Court Should Deny Plaintiffs' Motion Because the TVPRA Has
        Superseded the Provision of The Agreement They Seek To Enforce .......... 9

    B.  Plaintiffs Cannot Challenge The Constituionality of HHS's Procedures for
        Custody Determinations Through A Motion To Enforce The *Flores*
        Agreement .................................................................................................. 16

    C.  The Court Should Deny Plaintiffs' Motion Because The Statute Plaintiffs
        Challenge (and Defendants' Interpretation Of That Statute) Has Been In
        Effect And Well-Known For The Past Eight Years, And The Filing Of An
        Enforcement Motion At This Late Date Violates Equitable Rules Of
        Contract Enforcement................................................................................. 19

        i.  Laches ........................................................................................... 19

        ii.  Equitable Estoppel and Waiver..................................................... 19

IV.  CONCLUSION ........................................................................................................ 24

CERTIFICATE OF SERVICE

i

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Abrego Abrego v. The Dow Chemical Co.*,
    443 F.3d 676 (9th Cir. 2006)...................................................................... 11

*AirWair Int'l Ltd. v. Schultz*,
    84 F. Supp. 3d 943 (N.D. Cal. 2015)........................................................ 23

*Bergmann v. Michigan State Transp. Comm'n*,
    665 F.3d 681 (6th Cir. 2011)............................................................... 19, 20

*Boone v. Mech. Specialties Co.*,
    609 F.2d 956 (9th Cir. 1979)..................................................................... 20

*Brennan v. Nassau,*
    *Cnt.y*, 352 F.3d 60 (2d Cir. 2003)............................................................. 20

Cannon *v. Univ. of Chi.*,
    441 U.S. 677 (1979)................................................................................... 11

*Choudhry v. Hosmer*, No. 02 CIV. 2540 (DC),
    2004 WL 1065539 (S.D.N.Y. May 11, 2004).......................................... 17

*Cook v. City of Chicago*,
    192 F.3d 693 (7th Cir. 1999)..................................................................... 20

*D.B. v. Cardall*, -- F.3,
    d --, 2016 WL 3387884 (4th Cir., June 20, 2016)................................... 12

*D.B. v. Poston*,
    --F.Supp.3d --(2015),2015 WL 4647932 ................................................ 15

*Danjaq LLC v. Sony Corp.*,
    263 F.3d 942 (9th Cir. 2001)..................................................................... 20

*Davies v. Grossmont Union High School Dist.*,
    930 F.2d 1390 (9th Cir. 1991)................................................................... 22

*Flores v. Meese*,
    934 F.2d 991 (9th Cir. 1990).................................................................. 3, 4

*Holmberg v. Armbrecht,*
   327 U.S. 392 (1946) ................................................................ 20

*Honig v. San Francisco Planning Dep't,*
   127 Cal. App. 4th 520 (2005) .................................................. 22

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.,*
   304 F.3d 829 (9th Cir. 2002) ............................................ 20, 21

*Lukovsky v. City & Cty. of San Francisco,*
   535 F.3d 1044 (9th Cir. 2008) ................................................ 22

*Marks-Foreman v. Reporter Pub. Co.,*
   12 F. Supp. 2d 1089 (S.D. Cal. 1998) .................................... 17

*Matter of A-W-,*
   25 I. & N. Dec. 45 (BIA 2009) .............................................. 14

*Matter of Cazares,*
   21 I. & N. Dec. 188 (BIA 1996, 1997; A.G. 1996) ................. 14

*Matter of D-J-,*
   23 I. & N. Dec. 572 (A.G. 2003) ............................................ 14

*Matter of Guerra,*
   24 I&N Dec. 37 (BIA 2006) ................................................... 13

*Reno v. Flores,*
   507 U.S. 292 (1993) ............................................................ 3, 4

*Rodriguez-Lopez,*
   2004 WL 1398660 (BIA, March 29, 2004) ........................... 14

S. *Pac. Co. v. Bogert,*
   250 U.S. 483 (1919) ................................................................ 20

*San Francisco Bay Area Rapid Transit Dist. v. Gen. Reinsurance Corp.,*
   111 F. Supp. 3d 1055 (N.D. Cal. 2015)................................... 22

*Superior Dispatch, Inc. v. Ins. Corp. of N.Y.,*
   181 Cal. App. 4th 175 (2010)................................................... 22

*System Federation No. 91, Railway Employees Department v. Wright,*
  364 U.S. 642 (1961) ...................................................................... 2, 16

*Thompson v. Enomoto,*
  915 F.2d 1383 (9th Cir. 1990) ............................................................ 19

*United States v. Georgia-Pac. Co.,*
  421 F.2d 92 (9th Cir. 1970) ............................................................... 21

*United States v. LeCoe,*
  936 F.2d 398 (9th Cir. 1991) ............................................................. 11

*Watkins v. U.S. Army,*
  875 F.2d 699 (9th Cir. 1989) ............................................................. 23

## **STATUTES**

6 U.S.C. § 279(a) ...................................................................... 7, 10

6 U.S.C. § 279(b)(l)(A) ................................................................... 10

6 U.S.C. § 279(b)(l)(C) .................................................................... 7

6 U.S.C. § 279(b)(l)(D) .................................................................... 7

6 U.S.C. § 279(b)(2) ...................................................................... 7

6 U.S.C. § 279(b)(2)(B) ................................................................ 8, 15

6 U.S.C. § 279(f)(2) ..................................................................... 15

6 U.S.C. § 279(g)(2) ...................................................................... 7

6 U.S.C. § 542 ........................................................................... 6

8 U.S.C. § 1101(a)(27)(J) ................................................................ 10

8 U.S.C. § 1226(a) ...................................................................... 13

8 U.S.C. § 1232 .......................................................................... 6

8 U.S.C. § 1232(b)(1) .................................................................. 7, 10

8 U.S.C. § 1232(b)(1)(A) ............................................................... 7, 10

iv

8 U.S.C. § 1232(b)(3) ................................................................... 8

8 U.S.C. § 1232(c)(2) ................................................................ 9, 18

8 U.S.C. § 1232(c)(2)(A) ...................................................... 1, 9, 10, 12

8 U.S.C. § 1232(c)(3) ................................................................... 8

8 U.S.C. § 1232(c)(3)(A) ..................................................... 1, 8, 13, 15

8 U.S.C. § 1232(c)(3)(B) .......................................................... 8, 16

8 U.S.C. § 1232(c)(4) ............................................................. 8, 16

## **REGULATIONS**

8 C.F.R. § 1003.19(a) ................................................................. 14

8 C.F.R. § 1236.1(d) ................................................................. 14

## **OTHER AUTHORITIES**

Cal. Code of Civ. P. § 337 ........................................................... 20

Pub. L. No. 107-296, 116 Stat. 2135 ............................................... 3, 6

HSA § 462(a) ............................................................................ 7

Pub. L. No. 110-457, § 235 122 Stat. 5044, 5074-5082 (Dec. 23, 2008) .................... 6, 11

## I.        **INTRODUCTION**

In the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. §§ 1232(c)(2)(A) and (c)(3)(A), Congress unanimously[1] set forth mandatory procedures requiring the U.S. Department of Health and Human Services ("HHS") to maintain custody of a small subset of unaccompanied alien children ("UACs") in cases where HHS determines that a child poses a danger to self or others or constitutes a flight risk, and in cases where there is not a suitable custodian available who is capable of providing for the minor's physical and mental well-being.

Plaintiffs contend that Defendants' adherence to the plain language of the TVPRA—which was enacted 12 years after the *Flores* Settlement Agreement ("Agreement") was executed—violates the Agreement in cases where a minor in HHS custody is not specifically granted the ability to challenge their continued detention before an immigration judge (even if other administrative and judicial remedies currently exist for minors to challenge their placement in HHS custody).  Plaintiffs' motion is meritless and contrary to existing case law, and should be summarily denied for several reasons.

First, Plaintiffs' contention that the Government should provide bond hearings before an immigration judge to UACs in HHS custody fails because Paragraph 24A of the Agreement has plainly been superseded by the unanimous action of Congress, as expressed in the Homeland Security Act of 2002 ("HSA") and the TVPRA, which placed

---

[1] *See* https://www.govtrack.us/congress/bills/110/hr7311.

all authority for custody and placement decisions for UACs in the hands of HHS (the agency that has developed expertise and experience over the past fourteen years in determining the placement that is in the best possible interest of UACs in federal custody). Moreover, even if the Court is sympathetic to Plaintiffs' end goal of obtaining custody reviews before an immigration judge, such review is no longer possible or even feasible under the existing statutory and regulatory scheme. Therefore, even if the provision has not been strictly superseded, the Court should decline to enforce it. *See System Federation No. 91, Railway Employees Department v. Wright*, 364 U.S. 642, 652 (1961) ("The parties have no power to require of the court continuing enforcement of rights the statute no longer gives.").

Second, to the extent Plaintiffs seek to raise a constitutional challenge to HHS's custody decisions and review procedures, they should not be permitted to do so in the context of an enforcement motion. The Court's jurisdiction over this Motion is limited to its powers to enforce the Agreement, and should not be expanded to hear constitutional claims that are not grounded in the Agreement itself.  Any such claims should be made separately in a district court with jurisdiction and venue to hear such claims.

Finally, equitable rules of contract enforcement give good reason to deny Plaintiffs' Motion because it is untimely, and raises issues that could have – and should have – been raised years before. The reservation of these issues for a later motion allowed Plaintiffs to avoid highlighting the inherent tension between the TVPRA and the Agreement in their earlier motions, and thus prejudiced Defendants. Class counsel should

not be permitted to file an endless series of enforcement motions where they could have filed one motion addressing all issues at the same time.

For all of these reasons, the Court should deny Plaintiffs' Motion.

## II.        BACKGROUND

### A.    The Original *Flores* Litigation

The original complaint in this action was filed on July 11, 1985. ECF No. 1.  The issue at the heart of the *Flores* litigation was the practices of the legacy Immigration and Naturalization Service ("INS")[2] with regard to unaccompanied minors in the INS's Western Region subject to removal who were eligible for discretionary release from detention, but who could not be released because there was no immediately available custodian to whom the INS could release them. *See Reno v. Flores*, 507 U.S. 292, 294-95 (1993). The Government could not "simply send them off into the night on bond or recognizance [but] must assure itself that someone will care for those minors pending resolution of their deportation proceedings." *Id.* at 295. To address this problem, the INS's Western Regional Office "adopted a policy of limiting the release of detained minors to a parent or lawful guardian, except in unusual and extraordinary cases, when the juvenile could be released to a responsible individual who agrees to provide care and be responsible for the welfare and well-being of the child." *Id.* at 295-96 (quoting *Flores*

---

[2]      In the HSA, Congress abolished the legacy INS, and its immigration functions relevant here were assigned to the newly-formed DHS and its components, as well as to HHS.  Pub. L. No. 107-296, 116 Stat. 2135.

*v. Meese*, 934 F.2d 991, 994 (9th Cir. 1990), *vacated*, 942 F.2d 1352 (9th Cir. 1991) (en banc)) (internal quotations omitted).

Plaintiffs' lawsuit challenged this policy and sought to compel the release of unaccompanied minors to non-parental guardians or private custodians. *Id.* at 302. Their lawsuit was brought on behalf of a certified class of minors "who have been, are, or will be denied release from INS custody because a parent or legal guardian failed to personally appear to take custody of them." Order Re Class Certification, Aug. 12, 2086; *see also Reno*, 507 U.S. at 296. The original complaint asserted two claims challenging the INS's release policy related to unaccompanied minors, and five claims challenging detention conditions for unaccompanied minors not released. *Reno*, 507 U.S. at 296. In 1993, the Supreme Court rejected Plaintiffs' facial challenge to the constitutionality of INS's regulation concerning care of juvenile aliens. *Id.* at 305.

**B.    Relevant Provisions of The *Flores* Settlement Agreement**

In 1996, the parties entered into the Agreement to resolve the case, and it was approved by the Court in 1997. The Agreement, in large part, addressed the procedures and practices that the parties agreed should govern the INS's discretionary decisions to release or detain these unaccompanied minors, and to whom they should or may be released. *See* Agreement ¶¶ 14-18 (describing the general framework for release of unaccompanied minors from INS custody and the procedures and priorities for release). The "general policy favoring release" provision of the Agreement provides the order of

preference for the persons into whose custody these unaccompanied minors should be released.[3]

The Agreement also addresses what to do in a situation where a minor cannot be released and must remain in the custody of the INS. *See* Agreement ¶¶ 19-24. In such a situation, the Agreement requires that the minor be placed in a licensed facility. Agreement ¶ 19. In certain situations where a minor has committed certain crimes, or otherwise been determined to be a danger or an escape risk, the Agreement further allows that he or she "may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors . . . ." Agreement ¶¶ 21-22. A secure facility should not be used, however, if there is a less restrictive alternative such as a medium-security facility or another licensed program that is "available and appropriate in the circumstances . . . ." Agreement ¶ 23. The Agreement provides that for minors in immigration proceedings, a bond hearing should be provided in all cases unless waived by the minor. Agreement ¶ 24A. It also provides that a minor may challenge his or her

---

[3] Specifically, the Agreement states the order of preference as follows: "A) a parent; B) a legal guardian; C) an adult relative (brother, sister, aunt, uncle, or grandparent); D) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship; E) a licensed program willing to accept legal custody; or F) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."  Agreement ¶ 14.

placement in a particular type of facility "in any United States District Court with jurisdiction and venue over the matter . . . ." Agreement ¶ 24B.[4]

**C.    Relevant Changes in the Legal Framework Since the *Flores* Agreement.**

      *i.*   *The Homeland Security Act of 2002*

In 2002, Congress enacted the HSA.  Pub. L. No. 107-296, 116 Stat. 2135. The HSA created the U.S. Department of Homeland Security ("DHS"), transferring most immigration functions formerly performed by INS to the newly-formed DHS and its components, including U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). *See also* Department of Homeland Security Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (also set forth as a note to 6 U.S.C. § 542).

Notably, Congress transferred to HHS, Office of Refugee Resettlement ("ORR"), the responsibility for the ***care*** of UACs "who are in Federal custody by reason of their

---

[4] The Agreement was originally set to expire within five years, but on December 7, 2001 the Parties agreed to a termination date of "45 days following defendants' publication of final regulations implementing this Agreement."  Stip., Dec. 7, 2001. To date, no such regulations have been published. However, as discussed more fully below, many material portions of the Agreement were codified with the enactment of section 235 of the TVPRA, Pub. L. No. 110-457, § 235 122 Stat. 5044, 5074-5082 (Dec. 23, 2008) (codified in principal part at 8 U.S.C. § 1232).  *See e.g.* Carla L. Reyes, "GENDER, LAW, AND DETENTION POLICY: UNEXPECTED EFFECTS ON THE MOST VULNERABLE IMMIGRANTS" 25 Wis. J.L. Gender & Soc'y 301 (Fall 2010) ("The Flores Settlement Agreement serves as the primary foundation for UAC [unaccompanied alien children] detention policy, and the [TVPRA] recently codified many of its provisions.")

6

immigration status." HSA § 462(a), (b)(1)(A); 6 U.S.C. § 279(a), (b)(1)(A). The HSA

defined an "unaccompanied alien child" as:

> a child who-
> (A) has no lawful immigration status in the United States;
> (B) has not attained 18 years of age; and
> (C) with respect to whom-
> > (i) there is no parent or legal guardian in the United States;
> > or
> > (ii) no parent or legal guardian in the United States is
> > available to provide care and physical custody.

6 U.S.C. § 279(g)(2). The HSA also transferred to ORR the responsibility for making all

placement decisions for UACs, and required ORR to coordinate these placement

decisions with DHS. The HSA also prohibited ORR from releasing UACs on their own

recognizance. *See* 6 U.S.C. § 279(b)(l)(C), (D), (b)(2).

> ii.   *Trafficking Victims Protection Reauthorization Act of 2008*

The TVPRA was signed into law on December 23, 2008. The TVPRA codified

protections related to the processing and detention of UACs that encompass several

material terms of the Agreement. The TVPRA built on the HSA, and further required that

"the ***care and custody*** of all unaccompanied alien children, including responsibility for

their detention, where appropriate, shall be the responsibility of the Secretary of Health

and Human Services." 8 U.S.C. § 1232(b)(1) (emphasis added).  It also required that:

> Except in the case of exceptional circumstances, any
> department or agency of the Federal Government that has an
> unaccompanied alien child in custody shall transfer the
> custody of such child to the Secretary of Health and Human
> Services not later than 72 hours after determining that such
> child is an unaccompanied alien child.

7

8 U.S.C. § 1232(b)(3).

The TVPRA made clear that HHS, and not DHS or its components, is responsible for all placement decisions for UACs in its custody, and provides guidelines for the reunification of UACs by HHS, including dictating the requirements for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(c)(3). The TVPRA does provide that a child may be placed with a proposed custodian, however, the UAC may not be:

> placed with a person or entity unless [HHS] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being.  Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child.

8 U.S.C. § 1232(c)(3)(A). In some instances, HHS must conduct a home study for certain UACs before placing the UAC with a proposed custodian. 8 U.S.C. § 1232(c)(3)(B). In the event that the proposed custodian is found to be a suitable custodian to whom an unaccompanied child may be released, the potential custodian must complete a legal orientation presentation addressing their responsibility to ensure the juvenile's appearance at all immigration proceedings, and to protect the child from mistreatment, exploitation, and trafficking. *See* 8 U.S.C. § 1232(c)(4). Finally, when reunification is complete, HHS must conduct follow-up services, during the pendency of removal proceedings, on children for whom a home study was conducted. 8 U.S.C. § 1232(c)(3)(B).

The statute further requires that UACs who remain in HHS custody must be "promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2). It delegates to the Secretary of HHS the authority to make such placement decisions, considering "danger to self, danger to the community, and risk of flight." *Id.*

For children placed in a secure environment, such as a juvenile detention facility, the statute also explicitly delegated to the Secretary of HHS the authority to create "procedures" that would be used so that HHS may determine if a less restrictive environment for custody would be suitable.[5] Specifically, secure placements "shall be reviewed, at a minimum, on a monthly basis, in accordance with procedures prescribed by the Secretary, to determine if such placement remains warranted." 8 U.S.C. § 1232(c)(2)(A).[6] These procedures have been in place since at least 2008, and have been known by class counsel for the past eight years, yet counsel have raised no prior challenges to HHS being the final administrative decision-maker in UAC custody cases.

---

[5]   Notably, the TVPRA contains more restrictive requirement for "secure" custody than did the *Flores* Agreement, providing another example of how the TVPRA in many respects superseded such Agreement. The Agreement permits placement in a  juvenile detention facility if a minor is an escape risk. Agreement ¶ 21. By contrast, the TVPRA limits a secure facility placement to a child who "poses a danger to self or others or has been charged with having committed a criminal offense." 8 U.S.C. § 1232(c)(2)(A).

[6]   In any case where HHS denies the release of a child to a parent or legal guardian, the parent or legal guardian may request reconsideration of the denial by the Secretary of HHS' Administration of Children and Families. *See* ORR Guide:  Children Entering the United States Unaccompanied § 2.77, U.S. Department of Health and Human Services, Office of Refugee Resettlement, Jan. 30, 2015, *available at*: http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied (last visited Aug. 25, 2016).

## III.     **ARGUMENT**

### A.     **The Court Should Deny Plaintiffs' Motion Because The TVPRA Has Superseded The Provision of The Agreement They Seek To Enforce.**

When the Agreement was finalized in 1996, the INS was responsible for the care and custody of all UACs, and had the authority to make all decisions regarding their custody and release. When Congress created DHS, through the HSA, it also transferred the care of UACs from the INS to HHS. 6 U.S.C. § 279(a), (b)(1)(A). Then, in 2008, the TVPRA further established that "the *care and custody* of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1) (emphasis added). In the TVPRA, Congress expressly authorized the Secretary of HHS to make placement decisions for UACs, and to prescribe review procedures for those placement decisions. 8 U.S.C. 1232(c)(2)(A). This eliminated any existing authority held by DHS to make custody decisions for UACs, and placed it solely in the hands of HHS. It also placed the responsibility for developing procedures to review those decisions with the Secretary of HHS, and not with the immigration courts. This statutory requirement that any review of placement decisions for UACs be conducted by the Secretary of HHS, specifically under "procedures" developed by the Secretary,  clearly superseded the bond hearing requirement of Paragraph 24A.[7]

---

[7]  Notably, the TVPRA cemented HHS's full responsibility for not just care, but also custody, of unaccompanied children by also amending section 1101(a)(27)(J) of Title 8,

Plaintiffs contend that the Court should find that Paragraph 24A is not superseded by the TVPRA because nothing in the TVPRA clearly prohibits the Government from providing a bond hearing to UACs in HHS custody. This argument fails, because the TVPRA does not need language specifically prohibiting bond hearings. Rather, the custody and review provisions of the TVPRA are so clearly incompatible with a system that would provide bond hearings before an immigration judge, that this Court should conclude that Congress acted purposefully in enacting these provisions.

When Congress enacted the TVPRA, it should be assumed that it knew the currently-existing law and procedures governing the custody and release of UACs. *See, e.g., Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 683-84 (9th Cir. 2006) ("Faced with statutory silence on the burden issue, we presume that Congress is aware of the legal context in which it is legislating.") (citing Cannon *v. Univ. of Chi.*, 441 U.S. 677, 696-97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law . . . ."); *United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir. 1991) ("Congress is, of course, presumed to know existing law pertinent to any new legislation it enacts.")). Congress stated that in enacting the TVPRA it intended to "improve[] procedures for the placement of unaccompanied children in safe and secure

United States Code. Whereas prior to the TVPRA, children in HHS custody required the "specific consent" of DHS to alter their custodial setting when petitioning for special immigrant juvenile status, the TVPRA vested the specific consent function with the Secretary of HHS for all UACs in the custody of HHS. Section 235(d)(1)(B)(i) Pub. L. 110-457. This change demonstrates Congress' recognition that the TVPRA finally made HHS the sole agency responsible for the custody of UACs not returned to their home countries.

11

settings." *See* H.R. REP. 110-430(I); 154 Cong. Rec. H10888-01. Not only did Congress include not even one provision regarding bond hearings, but it made a conscious decision to state that secure placements, at least, would be subject to review under the Secretary's "procedures." 8 U.S.C. § 1232(c)(2)(A). This should be construed as an intentional decision by Congress to place custody decisions for UACs, and the review procedures for those decisions, in the hands of HHS, and not within the jurisdiction of immigrations judges.[8]

It should also be noted that such a presumption is not unreasonable, nor is it inconsistent with the purposes of the TVPRA, because immigration judges are not experts in child-welfare issues, and possess significantly less expertise in determining what is in the best interest of the child than does HHS.[9] Once in HHS custody, a UAC

---

[8]   Notably, the Fourth Circuit recently found that HHS's authority to make custody decisions for UACs is not tied to their immigration proceedings. *See D.B. v. Cardall*, -- F.3d --, 2016 WL 3387884, at \*\*10-13 (4th Cir., June 20, 2016). This is consistent with a finding that Congress did not intend that an immigration judge would have jurisdiction to review HHS's custody decisions, because it recognizes the purpose of the HSA and the TVPRA to separate the care and custody functions of HHS from the immigration enforcement functions of DHS and the immigration courts. *See id.* at \*5 (quoting 153 Cong. Rec. S3001, S3004 (daily ed. Mar. 12, 2007) (statement of Sen. Feinstein)) ("This change [transferring to HHA the care of UACs that was formerly performed by INS] finally resolved the conflict of interest inherent in the former system that pitted the enforcement side of the [INS] against the benefits side of that same agency in the care of unaccompanied alien children."). Plaintiffs point to nothing that would suggest that HHS has an interest in maintaining UACs in their custody unnecessarily, or that their custody determinations are designed to further anything other than the best interests of the child.

[9]   *See* Children Entering the United States Unaccompanied, Safe and Timely Release from ORR Care, § 2.1 ("The process for the safe and timely release of an unaccompanied child from ORR custody involves many steps, including:  the identification of sponsors; the submission by a sponsor of the application for release and supporting documentation;

cannot be released "unless the Secretary of Health and Human Services makes a

determination that the proposed custodian is capable of providing for the child's physical

and mental well-being." 8 U.S.C. § 1232(c)(3)(A). By contrast, an immigration judge is

not empowered to make the type of assessments that the TVPRA requires HHS to make

before releasing a UAC from custody. Rather, an immigration judge's authority to

conduct a bond hearing is governed by 8 U.S.C. § 1226(a), and his or her scope of review

is limited to considering whether or not the alien is a present danger to persons or

property, a threat to national security, or a flight risk. *Matter of Guerra*, 24 I&N Dec. 37,

38 (BIA 2006) (internal citations omitted).

Congress's intent to set up a statutory scheme that did not include review of

HHS's custody decisions by an immigration judge is further evident from the fact that

Congress's decision not to provide any statutory authority for bond hearings for UACs in

---

the evaluation of the suitability of the sponsor, including verification of the sponsor's
identity and relationship to the child, background checks, and in some cases home
studies; and planning for post-release."); § 2.3 ("ORR's sponsor assessment and release
decision process requires coordination among care provider staff, nongovernmental third-
party reviewers (Case Coordinators), ORR staff, other Federal agencies, stakeholders,
and Child Advocates, where applicable. Case Managers communicate with potential
sponsors, gather necessary information and documentation, talk to any relevant
stakeholders, and assess sponsors to formulate a recommendation to the Case
Coordinator.  Case Coordinators concurrently review all assessment information on an
unaccompanied child and sponsor to also make a recommendation.  Once Case Managers
and Case Coordinators agree on a particular recommendation for release, the
recommendation will be sent to the ORR/FFS for a final release decision.  If the Case
Manager and Case Coordinator cannot agree on a recommendation, the case is elevated to
the ORR/FFS for further guidance."), available at:
http://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-
section-2#2.3 (last visited Aug. 25, 2016).

the TVPRA means that immigration judges lack the authority to conduct bond hearings for UACs in HHS custody. "Immigration judges only have the authority to consider matters that are delegated to them by the Attorney General and the Immigration and Nationality Act." *Matter of A-W-*, 25 I. & N. Dec. 45, 46 (BIA 2009) (citing 8 C.F.R. § 1003.10(b) (2009); *Matter of D-J-*, 23 I. & N. Dec. 572, 575 (A.G. 2003); *Matter of Cazares*, 21 I. & N. Dec. 188, 193 (BIA 1996, 1997; A.G. 1996)). The authority of an immigration judge to re-determine custody status under 8 C.F.R. § 1236.1(d) is also limited to custody decisions made by DHS. *See* 8 C.F.R. § 1003.19(a); *Matter of A-R-* (BIA June 18, 1016), Plaintiffs' Exh. 6, ECF No. 239-2.[10] As a practical matter, it should also be noted that HHS does not make any bond decision that could be redetermined by an immigration judge. Congress's decision not to provide any statutory jurisdiction for immigration judges to hold bond hearings for UACs in HHS custody should be

---

[10]   In cases decided between the enactment of the HSA and the TVPRA, the Board of Immigration Appeals ("BIA") appears to have taken inconsistent positions on whether some authority remained for immigration judges to conduct bond hearings for UACs in the custody of HHS. *Compare Matter of Rodriguez-Lopez*, 2004 WL 1398660 (BIA, March 29, 2004) ("The Immigration Judge's authority to redetermine conditions of custody under 8 C.F.R. § 1236.1(d) extends only to certain custody determinations by the Attorney General, not the ORR. Thus, the Immigration Judge is wholly without authority to make any determination regarding the placement of the respondent."), with *Matter of A-* (BIA Sept. 23, 2005), Plaintiffs' Exhibit 7, ECF No. 239-2. However, since the enactment of the TVPRA, in the only case to address the issue, the BIA has made clear that the HSA and the TVPRA superseded Paragraph 24A of the Agreement, and eliminated the authority of immigration judges to hold bond hearings for UACs in HHS custody. *See Matter of A-R-* (BIA June 18, 1016), Plaintiffs' Exh. 6, ECF No. 239-2. Thus, even if earlier BIA cases suggest that after the HSA some authority remained for immigration judges to review custody determinations for UACs, since the enactment of the TVPRA the BIA has clearly taken the position that no such authority exists.

14

considered purposeful, and is good reason to find that Paragraph 24A has been superseded by the TVPRA.[11]

Finally it should be noted that other provisions of the HSA and TVPRA are inconsistent with the notion that immigration judges should have jurisdiction to review the custody determinations for UACs made by HHS. Most notably, HHS may not release children upon their own recognizance. 6 U.S.C. § 279(b)(2)(B). The TVPRA does provide that a child may be placed with a proposed custodian, however, the UAC may not be:

> placed with a person or entity unless [HHS] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being.  Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child.

8 U.S.C. § 1232(c)(3)(A).  In some instances, HHS must conduct a home study for certain UACs before placing the UAC with a proposed custodian. 8 U.S.C. §

---

[11] Throughout Plaintiffs' Motion are several references to the "savings" clause of the HSA, 6 U.S.C. § 279(f)(2).  Defendants do not dispute that the savings clause maintained the Agreement in effect as a consent decree (for example, in creating a hierarchy for release to certain sponsors). But, as applied to HHS, the consent decree applies only to the extent it was not superseded or in conflict with subsequent laws. The savings clause, in itself, should not be viewed as rigidly freezing in place provisions aimed at the now defunct INS, or as creating free-standing authority for actions Congress did not authorize in either statute. HHS serves a different, child-welfare-related function than did the INS, and HHS is not a part of the immigration enforcement scheme. *See, e.g., D.B. v. Poston*, --F.Supp.3d -- (2015), 2015 WL 4647932, at *10, *affirmed in part by D.B. v. Cardall*, --F.3d --, 2016 WL 3387884 (4th Cir., June 20, 2016) (stating that UACs are not "in 'immigration detention,'" but rather "in the custody of HHS/ORR, a federal agency that has no responsibility for adjudicating the immigration status of any individual.").

1232(c)(3)(B). In the event that the proposed custodian is found to be a suitable custodian to whom an unaccompanied child may be released, the potential custodian must complete a legal orientation presentation addressing their responsibility to ensure the juvenile's appearance at all immigration proceedings, and to protect the child from mistreatment, exploitation, and trafficking. *See* 8 U.S.C. § 1232(c)(4). Finally, when reunification is complete, HHS must conduct follow-up services, during the pendency of removal proceedings, on children for whom a home study was conducted. 8 U.S.C. § 1232(c)(3)(B). These specific requirements are all inconsistent with the scheme proposed by Plaintiffs in which an immigration judge could order a UAC released even where HHS has determined that no suitable custodian is available to take custody of the UAC.

Because Paragraph 24A has been rendered inconsistent and incompatible with the existing statutory and regulatory scheme, this Court should find that Paragraph 24A has been superseded by the TVPRA, should decline to enforce Paragraph 24A, and should deny Plaintiffs' Motion. *System Federation No. 91*, 364 U.S. at 652.

## B. <u>Plaintiffs Cannot Challenge The Constitutionality Of HHS's Procedures For Custody Determinations Through A Motion To Enforce The *Flores* Agreement.</u>

Plaintiffs spend nearly half of their Motion raising a challenge to the constitutionality of the custody determination procedures used by HHS (*see* Motion at 14-25), but this Motion is not the proper vehicle for them to bring these claims. This Court has jurisdiction over Plaintiffs' enforcement Motion because "[u]nder federal law, the Court has inherent authority to enforce a settlement agreement in an action pending

before it." *Marks-Foreman v. Reporter Pub. Co.*, 12 F. Supp. 2d 1089, 1092 (S.D. Cal. 1998). But this authority should not be extended to hear Plaintiffs' constitutional challenges to the TVPRA and to the procedures HHS developed under the TVPRA, which should be brought, if at all, in a separate action in a court with venue and jurisdiction to hear such claims. *See, e.g.*, *Choudhry v. Hosmer*, No. 02 CIV. 2540 (DC), 2004 WL 1065539, at *3 (S.D.N.Y. May 11, 2004) (denying motion for an order declaring plaintiffs and their counsel to be in breach of the settlement agreement because the claims raised by defendants related to issues that were not included in the underlying pleadings or the settlement agreement).

Moreover, to the extent that Plaintiffs argue that their constitutional claims are part of their efforts to enforce the Agreement because they are asking the Court to review the constitutionality of HHS's procedures to determine if they are a sufficient replacement for Paragraph 24A's bond hearing requirement, this request is inconsistent with Plaintiffs' own contention that the Court should read the Agreement according to its plain terms. The parties entered into the Agreement at a time when INS was responsible for both the custody and care of UACs, as well as the enforcement of their immigration cases. In that context, the Agreement reflect the parties' agreement that bond hearings – which would have been available to review custody determinations made by the INS – were the appropriate administrative remedy to review custody determinations regarding UACs. Where today's existing statutory scheme does not provide any jurisdiction for such bond hearings to occur, Plaintiffs cannot simply ask the Court to read into the

Agreement a requirement that procedures developed by HHS under the TVPRA must provide the same protections and procedures as are available in a bond hearing before an immigration judge.

As discussed above, had Congress wished to require HHS to develop such procedures it could have – and would have – said so in the TVPRA. Instead, Congress provided that HHS should develop its own administrative review proceedings related to their custody determinations. 8 U.S.C. § 1232(c)(2). Plaintiffs cannot ask this Court to rule that the review procedures provided by Congress are inadequate, simply because they contend that a broad reading of the Agreement suggests that the parties would have required more. To the contrary, had the parties wished to require certain procedures or protections for the review of UAC custody determinations in the event that bond hearings no longer were available under a future statutory scheme, they could have said so in the Agreement.

In the context of this enforcement Motion, Plaintiffs should not be permitted to ask this Court to go beyond the Agreement and review the constitutionality of HHS's custody determination and review procedures under the TVPRA. Such claims have no nexus to the Agreement or to Plaintiffs' efforts to enforce the Agreement, and therefore should be denied.

**C.** **The Court Should Deny Plaintiffs' Motion Because The Statute
Plaintiffs Challenge (and Defendants' Interpretation Of That
Statute) Has Been In Effect And Well-Known For The Past Eight
Years, And The Filing Of An Enforcement Motion At This Late
Date Violates Equitable Rules Of Contract Enforcement.**

Plaintiffs challenge HHS's position that the TVPRA requires HHS to serve as the

final administrative decision-maker regarding the care and custody of unaccompanied

minors, such that UACs are not entitled to a bond hearing under Paragraph 24A of the

Agreement. However, despite the fact that Plaintiffs have filed at least two other

enforcement motions under the Agreement over the past two years, Plaintiffs have not

previously raised this claim even though HHS has not provided bond hearings before an

immigration judge, but instead has had in place internal custody review procedures, since

even before the TVPRA was enacted in 2008. Thus, equitable rules of contract

enforcement provide good reason for this Court to deny Plaintiffs' Motion because

Plaintiffs waited eight years after the enactment of the TVPRA to bring their Motion.

      *i.*    *Laches*

While a motion to enforce a settlement agreement, which operates like a consent

decree, may be treated according to breach of contract principles governing in the situs

state of California, *see Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990); July

24, 2015 Order ECF 177, at 3, multiple circuit courts of appeal have held that because the

requested enforcement in such cases is an equitable remedy, that remedy is "subject to

the usual equitable defenses." *Bergmann v. Michigan State Transp. Comm'n*, 665 F.3d

681, 683 (6th Cir. 2011) (quoting *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir.

1999)). Those courts therefore have held that the equitable doctrine of laches, rather than

the state statute of limitations, applies. *Bergmann*, 665 F.3d at 683; *Brennan v. Nassau*

*Cnt.y*, 352 F.3d 60, 63–64 (2d Cir. 2003) (per curiam); *see also Cook*, 192 F.3d 693, 695

(7th Cir. 1999); *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). This defense is

governed in such instances by federal common law. *See Holmberg v. Armbrecht*, 327

U.S. 392, 397 (1946) (applying federal common law to laches defense).

Under the doctrine of laches, Plaintiffs' claims should be precluded because of

their unreasonable delay in asserting their claims, to Defendants' prejudice. "Laches is an

equitable defense that prevents a plaintiff, who 'with full knowledge of the facts,

acquiesces in a transaction and sleeps upon his rights.'" *Danjaq LLC v. Sony Corp.*, 263

F.3d 942, 950–51 (9th Cir. 2001) (quoting S. *Pac. Co. v. Bogert*, 250 U.S. 483, 500

(1919) (McReynolds, J., dissenting))." The doctrine bars an action where a party's

unexcused or unreasonable delay has prejudiced his adversary." *Boone v. Mech.*

*Specialties Co.*, 609 F.2d 956, 958 (9th Cir. 1979). The Ninth Circuit has stated that

"[w]hile laches and the statute of limitations are distinct defenses, a laches determination

is made with reference to the limitations period for the analogous action at law. If the

plaintiff filed suit within the analogous limitations period, the strong presumption is that

laches is inapplicable." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835

(9th Cir. 2002). Here, the analogous statute of limitations would be one for breach of

contract in California, which is four years. Cal. Code of Civ. P. § 337.

Defendants have taken the position that the TVPRA supersedes the Agreement at least since the TVPRA's enactment in 2008 and, thus, that (1) UACs in ORR's care and custody are not entitled to a bond hearing, and (2) immigration judges lack jurisdiction to review the continued placement of a UAC in HHS's care and custody. Plaintiffs' lack of formal opposition to this position during the past eight years has led Defendants to invest significant administrative resources in solidifying its policies and procedures governing the care and custody of UACs as separate and apart from the Agreement's terms, and it is patently unreasonable for Plaintiffs to wait so long to assert this claim, and unfair for Defendants to have to defend their policies under the TVPRA at this late juncture. *See Jarrow*, 304 F.3d at 840. Therefore, the Court should find that the doctrine of laches bars Plaintiffs' claims.

     *ii.*    *Equitable Estoppel and Waiver*

The doctrines of equitable estoppel and waiver also provide this Court with good reason to deny Plaintiffs' Motion. "Equitable estoppel is a doctrine adjusting the relative rights of parties based upon consideration of justice and good conscience." *United States v. Georgia-Pac. Co.*, 421 F.2d 92, 95 (9th Cir. 1970). The doctrine "prevents a party from assuming inconsistent positions to the detriment of another party." *Id .*at 96. Under California law,

> equitable estoppel requires that:(1) the party to be estopped must be apprised of the facts; (2) that party must intend that his or her conduct be acted on, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) the party asserting the estoppel must reasonably rely on the conduct to his or her injury.

21

*Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1051–52 (9th Cir. 2008) (quoting *Honig v. San Francisco Planning Dep't*, 127 Cal. App. 4th 520 (2005)).[12] Defendants assert a specific type of equitable estoppel, "codified in Evidence Code section 623, which provides that whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." *San Francisco Bay Area Rapid Transit Dist. v. Gen. Reinsurance Corp.*, 111 F. Supp. 3d 1055, 1070 (N.D. Cal. 2015) (quoting *Superior Dispatch, Inc. v. Ins. Corp. of N.Y.*, 181 Cal. App. 4th 175, 186–87 (2010)).

Meanwhile, "[t]o establish a waiver by [an opposing party] of its right to enforce the settlement agreement, [the movant] must show either: that the [the opposing party], with full knowledge of the facts and an intent to waive the right, made a clear expression of its intent; or that [it] has carried his burden of establishing that the [opposing party's] conduct warrants the inference that it has relinquished that right." *Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1395 (9th Cir. 1991) (applying California law and stating that a waiver argument "may alternatively be characterized as one of estoppel").

---

[12] The Ninth Circuit has found that "California equitable estoppel is . . . similar to and not inconsistent with federal common law, as both focus on actions taken by the defendant which prevent the plaintiff from filing on time." *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1052 (9th Cir. 2008).

Here, both doctrines preclude Plaintiffs from bringing their motion to enforce. There is no basis on which it can be found that Plaintiffs were not aware that the Government does not provide bond hearings to UACs in HHS custody, and has not done so since even before the enactment of the TVPRA. Yet Plaintiffs chose not to litigate the issue until now, while bringing multiple other enforcement motions in the meantime. Defendants have operated consistent with their interpretation of the TVPRA unchallenged for eight years, and have invested significant administrative resources in establishing the policies and procedures governing custody decisions for UACs, and related review procedures. Plaintiffs' conduct warrants the inference that Plaintiffs agreed with Defendants' interpretation of the TVPRA, and Defendants have acted in reliance by proceeding to implement those provisions of law. Thus, the Court should further deny Plaintiffs' motion on waiver and equitable estoppel grounds. *See Watkins v. U.S. Army*, 875 F.2d 699, 701 (9th Cir. 1989) (equitable estoppel); *AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943, 958 (N.D. Cal. 2015) (waiver).

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

DATED:          August 26, 2016                    Respectfully submitted,


                                                   BENJAMIN C. MIZER
                                                   Principal Deputy Assistant Attorney General
                                                   Civil Division

                                                   LEON FRESCO
                                                   Deputy Assistant Attorney General
                                                   Civil Division

                                                   WILLIAM C. PEACHEY
                                                   Director, District Court Section
                                                   Office of Immigration Litigation

                                                   WILLIAM C. SILVIS
                                                   Assistant Director, District Court Section
                                                   Office of Immigration Litigation

                                                   */s/ Sarah B. Fabian*
                                                   SARAH B. FABIAN
                                                   Senior Litigation Counsel
                                                   Office of Immigration Litigation
                                                   District Court Section
                                                   P.O. Box 868, Ben Franklin Station
                                                   Washington, D.C. 20044
                                                   Tel: (202) 532-4824
                                                   Fax: (202) 305-7000
                                                   Email: sarah.b.fabian@usdoj.gov

                                                   *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2016, I served the foregoing pleading on all

counsel of record by means of the District Clerk's CM/ECF electronic filing system.


/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants