CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

HOLLY S. COOPER
Director, Immigration Law Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

*Of counsel:*
YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

*Attorneys for plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Jeh Johnson, Secretary, U.S. Department of Homeland Security, *et al.*,<br><br>Defendants. | Case No. CV 85-4544-DMG (AGRx)<br><br>PLAINTIFFS' EXHIBITS [ORR-PT.3]<br><br>[Exhibits 17-20]<br><br>Hearing:   September 16, 2016<br>Time:      10:00 a.m.<br>Courtroom 7, 312 N. Spring Street |

INDEX TO EXHIBITS

| No. | Description | Page |
|-----|-------------|------|
| 17 | Letter [undated] from Robert Carey, Director, Office of Refugee Resettlement, to Evelyn Ramirez Sanchez ...................... 1 |
| 18 | Declaration of Carlos Holguín, September 1, 2016 ....................... 5 |
| 19 | Brief for Appellants, *Flores v. Lynch*, No. 15-56434 (9th Cir.) ............................................................................... 8 |
| 20 | Declaration of Helen Lawrence, September 2, 2016................... 91 |

Dated: September 2, 2016

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey

HOLLY COOPER
University of California Davis School of
Law

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

/s/Carlos Holguín _____

/ / /

Exhibit 17



**ADMINISTRATION FOR**
# CHILDREN & FAMILIES

330 C Street, S.W., Washington, DC 20201 | www.acf.hhs.gov

Ms. Evelyn Lissete Ramirez Sanchez

Los Angeles, CA

Re: Status of Application for Family Reunification – ████████████████ A# 206-775-662

Dear Ms. Ramirez Sanchez:

You submitted an application to the Office of Refugee Resettlement (ORR) to have your son, ████████ released to your care. Based on the information below, we regret to inform you that ORR denies your request at this time.

Prior to releasing a child, ORR must determine that the proposed custodian is capable of providing for the child's physical and mental well-being. The determination must include verification of the custodian's identity, relationship to the child, and verification that the proposed custodian has not engaged in any activity that would present a potential risk to the child. In certain cases ORR must conduct a home study as required under the Trafficking Victims Protection Reauthorization Act of 2008 and ORR policy. Due to the concerns regarding ████ being a victim of physical abuse, his past substance abuse, and his history of gang involvement, ORR referred the case for home study. The home study was completed on October 03, 2014.

After reviewing your application, the results of the home study, and interviews with you and Anthony's current care and service providers, ORR concluded that ████ cannot be released for the following reasons:

• Your son poses a safety risk to the community.

If you wish to request reconsideration of this decision, please submit a request within 30 days from the date of this letter to:

Mark H. Greenberg, Acting Assistant Secretary
Administration for Children and Families
Mary E. Switzer Building
330 C Street SW
Washington, D.C. 20201

Subject: UC Release Denial Reconsideration

4

Case 2:85-cv-04544-DMG-AGR   Document 253   Filed 09/02/16   Page 5 of 108   Page ID
#:7341
Case 2:16-cv-01511-TLN-EFB   Document 6-11   Filed 07/08/16   Page 2 of 3

Page 2 – Ms. Evelyn Lissete Ramirez Sanchez

If you have questions about the information in this letter, please contact James De La Cruz, Senior Federal Field Specialist Supervisor, at james.delacruz@acf.hhs.gov or 202-680-9355.

Sincerely,

Robert Carey
Director
Office of Refugee Resettlement

Case 2:85-cv-04544-DMG-AGR   Document 253   Filed 09/02/16   Page 6 of 108   Page ID
#:7744
Case 2:16-cv-01511-TLN-EFB   Document 6-11   Filed 07/08/16   Page 3 of 3



**U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES**
ministration for Children and Families

Washington, D.C. 20447

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

Mrs. Evelyn Lissete Ramirez Sanchez

Los Angeles, CA

9004732747 0041

Exhibit 18

DECLARATION OF CARLOS HOLGUIN

I, Carlos Holguín, declare and say as follows:

1. I am General Counsel with the Center for Human Rights and Constitutional Law Foundation. I have served in this capacity since 1984. The Center is a non-profit, public interest legal foundation dedicated to defending the civil, constitutional and human rights of immigrants, refugees, children and the poor. My practice focuses on legal, legislative and educational work on behalf of immigrants and refugees. I have served as lead and co-counsel in numerous impact cases involving deportation, political asylum, and the rights of juveniles. I am one of the attorneys for the certified plaintiff class in *Flores v. Johnson*, No. CV 85-4544 (C.D. Cal.); I participated in investigating, filing, litigating that action, and in negotiating the class-wide settlement thereof approved by this Court on January 28, 1997. I do not, however, normally represent *Flores* class members individually. I execute this declaration in support of plaintiffs' motion to enforce ¶ 24A of the *Flores* settlement (Dkt. No. 239).

2. I regularly receive and review census reports and correspondence from defendants related to the *Flores* settlement. At no time did defendants notify class counsel that defendants Office of Refugee Resettlement would not follow ¶ 24A of the *Flores* settlement with respect to class members in its custody. I instead first became aware that ORR was systematically breaching ¶ 24A in the second half of 2015, as a result of communications with legal services providers, almost all of whom ORR funds through the Vera Institute of Justice to serve unaccompanied juveniles in its custody. These providers include Legal Services for Children in San Francisco, California, the CAIR Coalition in Washington, D.C., HIAS in Philadelphia, Pennsylvania, and Immigration Counseling Services in Portland, Oregon.

8

3. Plaintiffs delayed seeking remediation for ORR's breaching ¶ 24A for some months because of an inability to locate Vera-funded lawyers willing to go on the record regarding ORR's policies and practices for determining whether to detain class members in lieu of releasing them to their parents or other available custodians. Vera-funded legal services lawyers uniformly advised that they could not openly support litigation against ORR to enforce ¶ 24A lest their Vera Institute funding be jeopardized and, *a fortiori*, their ability to help children in ORR custody at all. Ultimately, I succeeded in locating a small number of lawyers who formerly worked for Vera-funded programs, but who no longer do so, and are accordingly at liberty to offer testimony on their experiences representing children in ORR custody. Plaintiffs moved promptly thereafter to compel ORR's compliance with ¶ 24A.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of September, 2016, at Santa Clarita, California.

_____
Carlos Holguín

/ / /

2

9

# Exhibit 19

Case 2:85-cv-04544-DMG-AGR Document 253 Filed 09/02/16 Page 11 of 108 Page ID
Case: 15-56434, 03/15/2016, DktEntry: 10-3, Page 2 of 84 (7 of 90)
#:7347

No. 15-56434

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JENNY LISETTE FLORES, et al.
Plaintiffs-Appellees,

v.

LORETTA E. LYNCH, Attorney General of the United States, et al.
Defendants-Appellants.

ON APPEAL FROM A FINAL JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
D.C. No. 2:85-cv-04544-DMG-AGR

BRIEF FOR APPELLANTS

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney
General
Civil Division

LEON FRESCO
Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4824
Fax: (202) 305-7000
Email: sarah.b.fabian@usdoj.gov

*Attorneys for Defendants-Appellants*

(8 of 90)

Case 2:85-cv-04544-DMG-AGR Document 253 Filed 09/02/16 Page 12 of 108 Page ID
Case 15-56434, 01/15/2016, ID: 9829961, DktEntry: 10-3, Page 2 of 84
#:7348

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................................. 1

JURISDICTIONAL STATEMENT ................................................................................................. 3

STATEMENT OF THE ISSUES ..................................................................................................... 4

STATEMENT OF THE CASE ........................................................................................................ 4

    I.     FACTUAL AND LEGAL BACKGROUND .................................................................. 4

          A.   The Original Flores Litigation ...................................................................... 4

          B.   The Flores Settlement Agreement ............................................................... 6

          C.   Significant Changes Since the Flores Agreement ........................................ 9

               1.   The Border Surge .............................................................................. 9

               2.   Changes in the Legal Framework .................................................... 12

                     i.   Illegal Immigration Reform and Immigrant Responsibility Act ...................................... 12
                    ii.   The Homeland Security Act of 2002……………………………… .............. 15
                   iii.   Trafficking Victims Protection Reauthorization Act of 2008……… ............................ 16

               3.   The Government 's Use of Family Detention ................................... 18

                    i.   Family Detention Prior to the Agreement .................................................. 18

                   ii.   Berks Family Residential Center ............................................ 19

                  iii.   T. Don. Hutto Residential Center ........................................... 19

                  iv.   Family Residential Center Opening in 2014-2015 ...................... 21

                  v.   Family Residential Centers post-August 2015 ....................... 23

    II.    PROCEEDINGS BELOW ........................................................................... 25

STATEMENT OF THE ARGUMENT ........................................................... 29

ARGUMENT ................................................................................................................................ 34

I.     The District Court Erred in Holding that the Agreement Applies to Accompanied Alien Minors and their Adult Alien Parents ......................................................................................................... 34

        A.    Governing Law ............................................................................................................... 34

        B.    The District Court incorrectly concluded that the Agreement unambiguously applies to accompanied minors ............................................................................................................. 35

            1.    The Agreement unambiguously applies only to unaccompanied minors in discretionary immigration detention ......................................................................................... 36

            2.    Even if the Agreement is ambiguous, extrinsic evidence makes clear that it was not intended to refer either to minors who are part of family units or to their adults parents ............... 44

            3.

        C.    The District Court improperly found that the Agreement, on its face, requires the release of the adult member of the family unit ............................................................................................. 57

        D.

II.     In the Alternative, the district court incorrectly denied the Government's motion to amend the Agreement ................. 62

# TABLE OF AUTHORITIES

*AILA v. Reno,*
18 F. Supp. 2d 38, 54-56 (D.D.C. 1998), *aff'd* 199 F.3d 1352 (D.C. Cir. 2000) ...................................... 57

*Alliance to End Repression v. City of Chicago,*
742 F.2d 1007 (7th Cir. 1984) ............................................................................................................. 65

*Brady v. Grendene USA, Inc.,*
No. 12-604, 2015 WL 3539702 (S.D. Cal. June 3, 2015) ................................................................. 38

*Bunikyte, ex rel. Bunikiene v. Chertoff,*
2007 WL 1074070 (W.D. Tex., Apr. 9, 2007) .......................................................................... passim

*Cartledge v. Office of Personnel Management,*
No. 2008-3133, 2009 WL 89674 (Fed. Cir. Jan. 15, 2009) ............................................................. 59

*Castaneda v. Dura–Vent Corp.,*
648 F.2d 612 (9th Cir. 1981) ............................................................................................................. 45

*City of Las Vegas v. Clark County,*
755 F.2d 697 (9th Cir. 1985) ............................................................................................................. 34

*Crestview Cemetery Ass'n v. Dieden,*
54 Cal.2d 744, 8 Cal. Rptr. 427, 356 P.2d 171 (1960) ..................................................................... 47

*Flores v. Meese,*
934 F.2d 991 (9th Cir. 1990) ............................................................................................................... 5

*Frew ex rel. Frew v. Hawkins,*
540 U.S. 431 (2004) ............................................................................................................... 42, 63, 70

*Heath v. De Courcy,*
888 F.2d 1105 (6th Cir. 1989) ..................................................................................................... 64, 73

*Hook v. Ariz. Dep't of*
*Corr.,* 120 F.3d 921 (9th Cir. 1997) ................................................................................................. 64

*Horne v. Flores,*
557 U.S. 433 (2009) ..................................................................................................................... 63, 64

*I.C.C. v. Holmes Transp., Inc.,*
983 F.2d 1122 (1st Cir. 1993) ........................................................................................................... 45

*In re Hooper's Estate,*
359 F.2d 569 (3d Cir. 1966) ............................................................................................................. 60

i

*Jeff D. v. Kempthorne*,
   365 F.3d 844 (9th Cir. 2004) ........................................................................................41

*Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*,
   902 F.2d 1074 (2d Cir. 1990) ......................................................................................37

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland*,
   478 U.S. 501 (1986) .....................................................................................................42

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
   514 U.S. 52 (1995) .......................................................................................................35

*McGrath v. Potash*,
   199 F.2d 166 (D.C. Cir. 1952) ....................................................................................63

*Miller v. French*,
   530 U.S. 327 (2000) .....................................................................................................63

*Miller v. Safeco Title Ins. Co.*,
   758 F.2d 364 (9th Cir. 1985) .......................................................................................35

*N.Y. St. Ass'n for Retarded Children, Inc. v. Carey*,
   706 F.2d 956 (2d Cir. 1983) ........................................................................................65

*Philadelphia Welfare Rights Org. v. Shapp*,
   602 F.2d 1114 (3d Cir. 1979) ......................................................................................65

*Reno v. Flores*,
   507 U.S. 292 (1993) .............................................................................................passim

*Rincon v. Dep't of Homeland Sec.*,
   539 F.3d 1133 (9th Cir. 2008) .....................................................................................57

*Rufo v. Inmates of Suffolk County Jail*,
   502 U.S. 367 (1992) .............................................................................................passim

*Union Pac. R.R. Co. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*,
   549 F.2d 114 (9th Cir. 1976) .......................................................................................38

*United States v. Armour & Co.*,
   402 U.S. 673 (1971) ...............................................................................................34, 56

*United States v. Asarco Inc.*,
   430 U.S. 972 (9th Cir. 2005) .......................................................................................34

ii

(12 of 90)

Case 2:85-cv-04544-DMG-AGR Document 253 Filed 09/02/16 Page 16 of 108
Case 2:15-30464, 03/15/2016 Document 83299611, DktEntry-107, Page 16 of 84 Page ID
#:7352

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995) .................................................................. 67

*United States v. ITT Continental Baking Co.*,
    420 U.S. 223 (1975) ........................................................................... 45

*United States v. Western Elec. Co., Inc.*,
    46 F.3d 1198 (D.C. Cir. 1995) ...................................................... 68, 70

*Utah Power & Light Co. v. United States*,
    243 U.S. 389 (1917) ........................................................................... 60

*vacated*,
    942 F.2d 1352 (9th Cir. 1991) ............................................................ 5

## STATUTES

28 U.S.C. § 1291 ...................................................................................... 4

6 U.S.C. § 279(b)(l)(C),(D), (b)(2) ....................................................... 16

6 U.S.C. § 279(g)(2) ......................................................................... 16, 18

8 U.S.C. § 1182(d)(5)(A) ....................................................................... 54

8 U.S.C. § 1225 ...................................................................................... 41

8 U.S.C. § 1226 ...................................................................................... 41

8 U.S.C. § 1226(a) ...................................................................... 14, 53, 54

8 U.S.C. § 1229a ............................................................................... 14, 53

8 U.S.C. § 1231 ...................................................................................... 48

8 U.S.C. § 1231(a)(2) ............................................................................. 54

8 U.S.C. § 1231(a)(5) ........................................................................ 12, 14

8 U.S.C. § 1232 ................................................................................... 9, 18

8 U.S.C. § 1232(b)(1) ............................................................................. 17

8 U.S.C. § 1232(b)(3) ........................................................................ 17, 72

8 U.S.C. § 1232(c) .................................................................................. 17

iii

8 U.S.C. § 1232(c)(2) ............................................................................................ 17, 72

8 U.S.C. § 1232(c)(2)(A) ........................................................................................ 72

8 U.S.C. § 1252 ..................................................................................................... 6

8 U.S.C. § 1231(a) ............................................................................................ 14, 15

8 U.S.C. §§ 1225 ............................................................................................... 18, 41

8 U.S.C. §§ 1232(a)(2)(B) ................................................................................... 13, 18

8 U.S.C. § 1225(b)(1)(B) ..................................................................................... 13

8 U.S.C. §§ 1225(b)(1)(C) ................................................................................... 13

8 U.S.C. § 1252(a)(1) .......................................................................................... 52

8 U.S.C. § 1226(a) ............................................................................................... 14

8 U.S.C. § 1232(b)(3) ........................................................................................... 72

U.S.C. § 279(a) ................................................................................................... 16

## FEDERAL REGULATIONS

69 Fed. Reg. 48 .................................................................................................. 12

62 Fed. Reg. 444 ................................................................................................ 61

## FEDERAL RULES OF CIVIL PROCEDURES

Fed. R. Civ. P. 60(c)(1) ....................................................................................... 64

Fed. R. Civ. P. 65(d) ........................................................................................... 56

Federal Rule of Civil Procedure 60(b)(5) ............................................................. 63

## REGULATIONS

8 C.F.R. § 208.30(f) ............................................................................................ 14

8 C.F.R. § 236.1(c)(8) .......................................................................................... 53

8 C.F.R. § 1003.42(d) .......................................................................................... 13

8 C.F.R. § 208.31(f) ........................................................................................................... 14

8 C.F.R. §§ 1003.42(c) ...................................................................................................... 15

8 C.F.R. §§ 208.30 ............................................................................................................. 13

8 C.F.R. §§ 208.31(e) ........................................................................................................ 15

8 C.F.R. § 208.31(g)(1) ...................................................................................................... 15

8 C.F.R. § 208.31(b) ........................................................................................................... 14

### ADMINISTRATIVE DECISION

*Matter of X-K-*,
  23 I. & N. Dec. 731 (BIA 2005) .................................................................................. 14

### PUBLISHED LAW

Pub. L. No. 104–208, Illegal Immigration Reform and Immigrant Responsibility Act ..................... passim

Pub. L. No. 107-296, Homeland Security Act of 2002 ............................................................... passim

Pub. L. No. 110-457, Trafficking Victims Protection and Reauthorization Act ................................ passim

v

# **INTRODUCTION**

This appeal concerns the proper interpretation and scope of the *Flores* Settlement Agreement ("Agreement"). The Agreement resolved a lawsuit brought by detained *unaccompanied* minors (*i.e.*, minors apprehended without their parents) in the custody of the legacy Immigration and Naturalization Service ("INS"). The terms and specifications of the Agreement were plainly designed to address children who were detained alone, without a parent or legal guardian ("parent"). In July and August 2015, nearly two decades after the settlement was executed, the district court vastly expanded the Agreement's scope by finding that it also was intended to govern and constrain the Government's immigration detention and processing authority for *accompanied* minors — and the parents with whom those accompanied minors are apprehended.

The district court erred by ruling that, in resolving litigation limited solely to *unaccompanied* minors, the Government expressed its unambiguous intent to reach far beyond the scope of the pleadings of the underlying litigation to permanently restrict its immigration detention and processing authority over both *accompanied* minors and their adult parents. The result impermissibly limits the Government's statutory detention authority and processing flexibility to address surges of adults with children crossing the Southwest border. The first surge began in the summer of 2014 and subsided after the Government instituted a series of initiatives (including

Case 2:85-cv-04544-DMG-AGR Document 253 Filed 09/02/16 Page 20 of 108 Page ID
#:7356
Case: 15-56434, 09/15/2016, ID: 10130913, DktEntry: 10-3, Page 20 of 84 (16 of 90)

family detention). Beginning in August 2015, the number of family units apprehended by the Border Patrol each month began to significantly increase again – exceeding the number of family units apprehended in the same month during the prior year. The Government's capacity to respond, consistent with humanitarian protections, is constrained by the district court's ruling. To respond to the current and future circumstances, the Department of Homeland Security ("DHS") must have available—if necessary—all of the legal authorities for detaining and processing *accompanied* children and their parents that Congress and the Constitution provide the Executive Branch.

To be clear, the Government does not contest its obligations with regard to the care and custody of *unaccompanied* alien minors, whose protections are set forth in the Agreement (although those provisions have in large part been superseded and preempted by the Homeland Security Act of 2002 ("HSA") and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")). The Government is fully implementing those protections. The Government also recognizes and complies with its legal obligations regarding the protections available to adults with children who assert a fear of persecution or torture.

Rather this appeal presents a specific legal issue, namely the district court's mistaken expansion of a voluntary settlement agreement beyond its scope so as to

limit the Government's authority and capacity to respond to adults crossing the border with their children. Alternatively, the district court erred when it refused to amend the Agreement to conform it to the scope of the underlying litigation—*i.e.,* unaccompanied minors. Modification of the Agreement, particularly in light of both significant intervening legal changes and serious border security imperatives, is necessary to restore the Government's constitutional and statutory authorities to process and detain families without legal status who are apprehended at the border, including through the use of safe and humane family residential facilities.

## JURISDICTIONAL STATEMENT

On February 2, 2015, Plaintiffs filed a motion to enforce the Agreement. *See Flores v. Johnson,* No. 85-cv-4544 (C.D. Cal.), ECF Nos. 100, 101. The Government responded on February 27, 2015, both opposing Plaintiffs' motion and filing an alternative motion to amend the Agreement. *See* ECF Nos. 120, 121. On July 24, 2015, the district court granted Plaintiffs' motion to enforce, denied the Government's alternative amendment motion, and ordered the Government to show cause why the court's proposed remedies for breach of the Agreement should not be imposed. *See* ECF No. 177. After further briefing, the district court issued a final decision on August 21, 2015, imposing new obligations on the Government to be implemented by October 23, 2015, pursuant to the Court's interpretation of the Agreement that

extended its application to accompanied alien minors and their parents. *See* ECF No. 189.

On September 18, 2015, the Government timely filed a Notice of Appeal of both district court orders. Record Excerpts ("RE") 185. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

This appeal raises the following issues:

I.   Did the district court err by concluding that a nearly two-decade-old settlement agreement resolving a lawsuit challenging the detention and processing of *unaccompanied* minors also governs the detention and processing of *accompanied* minors *and* their parents?

II.  If the Agreement's scope is not limited to *unaccompanied* minors, did the district court err by refusing to amend the Agreement in light of significant intervening changes in law and fact since the Agreement was executed in 1996 and approved in 1997?

## STATEMENT OF THE CASE

## I.   FACTUAL AND LEGAL BACKGROUND

### A.   The Original *Flores* Litigation

The original complaint in this action was filed on July 11, 1985. ECF No. 1 (RE 193).  The issue at the heart of the *Flores* litigation was the practices of the legacy INS [1] with regard to unaccompanied minors in the INS's Western Region

---

[1]  In the Homeland Security Act of 2002, Congress abolished the legacy INS, and its immigration functions relevant here were assigned to the newly-formed DHS and its components, as well as to the U.S. Department of Health and Human Services ("HHS").   Pub. L. No. 107-296, 116 Stat. 2135.

subject to removal who were eligible for discretionary release from detention, but who could not be released because there was no immediately available custodian to whom the INS could release them. *See Reno v. Flores*, 507 U.S. 292, 294-95 (1993). The Government could not "simply send them off into the night on bond or recognizance [but] must assure itself that someone will care for those minors pending resolution of their deportation proceedings." *Id.* at 295. To address this problem, the INS's Western Regional Office "adopted a policy of limiting the release of detained minors to a parent or lawful guardian, except in unusual and extraordinary cases, when the juvenile could be released to a responsible individual who agrees to provide care and be responsible for the welfare and well-being of the child." *Id.* at 295-96 (quoting *Flores v. Meese*, 934 F.2d 991, 994 (9th Cir. 1990), *vacated*, 942 F.2d 1352 (9th Cir. 1991) (en banc)) (internal quotations omitted).

Plaintiffs' lawsuit challenged this policy and sought to compel the release of unaccompanied minors to non-parental guardians or private custodians. *Id.* at 302. Their lawsuit was brought on behalf of a certified class of minors "who have been, are, or will be denied release from INS custody because a parent or legal guardian failed to personally appear to take custody of them." Order Re Class Certification, Aug. 12, 2086 (RE 41); *see also Reno*, 507 U.S. at 296. The original complaint asserted two claims challenging the INS's release policy related to unaccompanied minors, and five claims challenging detention conditions for unaccompanied minors

5

not released. *Reno*, 507 U.S. at 296. In 1993, the Supreme Court rejected Plaintiffs'

facial challenge to the constitutionality of INS's regulation concerning care of

juvenile aliens. *Id.* at 305.

## B.    The Flores Settlement Agreement

In 1996, the parties entered into the Agreement to resolve the case, and it was

approved by the court in 1997. The Agreement's second WHEREAS clause noted that

"the district court ha[d] certified th[e] case as a class action . . . ." Agreement at 3 (RE

46).  In that class certification order, the district court defined the certified class as

consisting of "[a]ll persons under the age of eighteen (18) years who have been, are,

or will be arrested and detained pursuant to 8 U.S.C. § 1252 [1994] by the

Immigration and Naturalization Service within the INS' Western Region and who

have been, are, or will be denied release from INS custody because a parent or legal

guardian fails to personally appear to take custody of them." Order at 2 (RE 42). The

Agreement, in referencing the court's class certification ruling, described it as

"ha[ving] certified this case as a class action on behalf of all minors apprehended by

the INS in the Western Region of the United States." Agreement at 3 (RE 46).. Other

portions of the Agreement use similar language. *See* Agreement ¶ 10 (RE 50) ("The

certified class in this action shall be defined as follows: 'All minors who are detained

in the legal custody of the INS.'"); Agreement ¶ 4 (RE 47) (defining "minor" as "any

person under the age of eighteen (18) years who is detained in the legal custody of the

6

INS"); Agreement ¶ 9 (RE 49-50) (explaining that the Agreement's purpose is to "set[] out nationwide policy for the detention, release, and treatment of minors in the custody of the INS").

The Agreement then addressed the procedures and practices that the parties agreed should govern the INS's discretionary decisions to release or detain these unaccompanied minors, and to whom they should or may be released. *See* Agreement ¶¶ 14-18 (RE 52-55) (describing the general framework for release of unaccompanied minors from INS custody and the procedures and priorities for release). The "general policy favoring release" provision of the Agreement provides the order of preference for the persons into whose custody these unaccompanied minors should be released.[2] The Agreement also addressed conditions at facilities used to house the covered minors who could not be released and needed to remain in the custody of the INS:

- Agreement ¶ 12.A (RE 50-51) - Addressing the conditions that apply to facilities that hold the covered minors immediately following their arrest or apprehension by the INS; requiring that following arrest, a minor should be transferred to a facility that complies with ¶ 19 of the Agreement within 3-5

---

[2] Specifically, the Agreement states the order of preference as follows: "A) a parent; B) a legal guardian; C) an adult relative (brother, sister, aunt, uncle, or grandparent); D) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship; E) a licensed program willing to accept legal custody; or F) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."   Agreement ¶ 14 (RE 52-53).

days, except in the case of an emergency or influx,[3] in which case the covered
minor should be transferred "as expeditiously as possible";

- Agreement ¶ 19 (RE 55) - Requiring that covered minors who remain in INS
  custody must "be placed temporarily in a licensed program[4] until such time as
  release can be effected in accordance with Paragraph 14 above or until the
  minor's immigration proceedings are concluded, whichever occurs earlier";

- Agreement, Exhibit 1 (RE 67-71) - Defining the minimum standards for
  licensed programs;

- Agreement ¶ 14 (RE 52-53) - Providing that a covered minor need not be
  released from Government custody if his or her detention is "required either to
  secure his or her timely appearance before the INS or the immigration court, or
  to ensure the minor's safety or that of others . . . .";

- Agreement ¶¶ 25-27 (RE 56-59) - Addressing the transportation and transfer
  of covered minors;

- Agreement ¶¶ 28-33 (RE 59-62) - Addressing the various reporting, oversight,
  and enforcement actions to be taken by the parties.

The Agreement indicates that it was finalized on August 12, 1996, as noted on

the right corner of the first page. Agreement at 1 (RE 44). The Agreement was

executed on behalf of the Government on September 16, 1996. Agreement at 22 (RE

65). The district court approved the Agreement on January 28, 1997. Stip., Jan. 28,

---

[3] The Agreement defines an "influx" as any circumstance where "the INS has, at any given time, more
than 130 minors eligible for placement in a licensed program . . . ." Agreement ¶ 12.B (RE 52).
[4] The Agreement defines a "licensed program" as "any program, agency or organization that is licensed
by an appropriate State agency to provide residential, group, or foster care services for dependent children
. . . ." Agreement ¶ 6 (RE 47-48).

(23 of 90)

Case 2:85-cv-04544-DMG-AGR Document 253 Filed 09/02/16 Page 27 of 108 Page ID
Case: 15-56434, 09/15/2016, ID: 10122901, DktEntry: 10-3, Page 27 of 84
#:7363

1997 (RE 90-95). The Agreement became effective upon its approval by the district

court, and provides for continued oversight by that court.[5]

### C.    Significant Changes Since the *Flores* Agreement

### 1.    The Border Surge

In 1993, the Supreme Court recognized that a surge of "more than 8,500"

unaccompanied alien minors apprehended in 1990 represented a "problem," and that

the problem "is a serious one." *Flores*, 507 U.S. at 294. Prior to 2012, the number of

unaccompanied alien children ("UACs") apprehended by the Government remained

---

[5] The Agreement was originally set to expire within five years, but on December 7, 2001 the Parties agreed to a termination date of "45 days following defendants' publication of final regulations implementing this Agreement." Stip., Dec. 7, 2001 (RE 97). To date, no such regulations have been published. However, the material portions of the Agreement have been codified with the enactment of section 235 of the TVPRA, Pub. L. No. 110-457, § 235 122 Stat. 5044, 5074-5082 (Dec. 23, 2008) (codified in principal part at 8 U.S.C. § 1232). *See e.g.* Carla L. Reyes, "GENDER, LAW, AND DETENTION POLICY: UNEXPECTED EFFECTS ON THE MOST VULNERABLE IMMIGRANTS" 25 Wis. J.L. Gender & Soc'y 301 (Fall 2010) ("The Flores Settlement Agreement serves as the primary foundation for UAC [unaccompanied alien children] detention policy, and the [TVPRA] recently codified many of its provisions.")

(24 of 90)

Case 2:85-cv-04544-DMG-AGR / Document 253-9 Filed 09/02/16 Page 28 of 108 Page ID
Case 4:15-cv-04544-DMG-AGR / Document 190-1 Fokus/12/10-8 Page 29 of 108 Page ID
#:7364

relatively consistent.[6] Beginning with Fiscal Year ("FY") 2012, apprehensions of UACs exponentially increased. While 15,949 unaccompanied minors were apprehended along the Southwest border in FY 2011, this number increased to 24,403 in FY 2012, 38,759 in FY 2013, and 68,541 in FY 2014.[7] During that same period, the number of family units apprehended at the Southwest border increased at an even more rapid pace, rising from approximately 10,000 in FY 2012, to 14,855 in FY 2013, to 68,445 in FY 2014.[8] During the spring and summer of 2014, the already escalating numbers of both UACs and family units surged, with apprehensions of UACs and family units exceeding 10,000 per month for each group separately in May and June 2014.[9]

---

[6] *See* U.S. Department of Health and Human Services, Administration for Children and Families, Office of Refugee Resettlement, Unaccompanied Alien Children Program, *Fact Sheet*, (May 2014) (stating that, prior to FY 2012, an average of 7,000 to 8,000 UACs were typically placed in to ORR custody each year), a*vailable at* https://-/www.acf.hhs.gov/sites/default/files/orr/unaccompanied_childrens_services_ fact_sheet.pdf.

[7] *See* United States Border Patrol, *Total Monthly UAC Apprehensions by Sector (FY 2010 - FY 2015)*, *available at* https://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20 UACs%20by%20Sector%2C%20FY10-FY15.pdf.

[8] *See* United States Border Patrol, *Total Monthly Family Unit Apprehensions by Sector (FY 2013-FY 2015)*, *available at*, https://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20 Family%20Units%20by%20Sector%2C%20FY13-FY15.pdf; *see also* Bipartisan Policy Center, *UAC and Family Apprehensions: Fiscal Year Ends in Surge*, (Nov. 9. 2015), *available at* http://bipartisanpolicy.org/blog/uac-and-family-apprehensions-fiscal-year-ends-in-surge/.

[9] The Border Patrol apprehended 10,578 UACs and 12,772 family units on the Southwest border in May 2014, and 10,620 UACs and 16,330 family units on the Southwest border in June 2014. *See* United States Border Patrol, *Total Monthly UAC Apprehensions by Sector (FY 2010 - FY 2015)*, *available at* https://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20 UACs%20by%20Sector%2C%20FY10-FY15.pdf; *See* United States Border Patrol, *Total Monthly Family Unit Apprehensions by Sector (FY 2013-FY 2015)*, *available at*, https://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20 Family%20Units%20by%20Sector%2C%20FY13-FY15.pdf.

In response to this surge, DHS initiated a number of steps in late FY 2014 and FY 2015 to detain and process family units (including accompanied minors), to assess claims for relief or protection (including asylum and related claims), to release qualifying families under appropriate conditions, and to remove those who could not demonstrate a legal basis for remaining in the United States. Among those steps was the opening and operation of additional family residential centers to detain accompanied minors and their parent(s). Thereafter, the number of apprehended family units along the Southwest border during FY 2015 (in comparison to FY 2014) decreased by approximately 42% to 39,838, and the number of UACs apprehended along the Southwest border decreased by approximately 42% to 39,970.[10]

However, during the first three months of FY 2016, which began on October 1, 2015, the numbers along the Southwest border have again increased significantly—with family unit apprehensions rising by 187% when compared to the same three months in FY 2015, and unaccompanied alien child ("UAC") apprehensions increasing by 117%.[11] The number of family units apprehended along the Southwest border in the first quarter ("Q1") of FY 2016 significantly exceeds the

---

[10] *See* United States Border Patrol, Southwest Border Family Unit and UAC Apprehensions (FY 2014 - FY 2015), *available at:* https://www.cbp.gov/sites/default/files/documents/BP%20Southwest% 20Border%20Family%20Units%20and%20UAC%20Apps%20-%20FY14-FY15.pdf
[11] *See* United States Border Patrol, Southwest Border Family Unit and UAC Apprehensions (FY 2015 - FY 2016), *available at:* https://www.cbp.gov/sites/default/files/documents/BP%20Southwest% 20Border%20Family%20Units%20and%20UAC%20Apps%20-%20Dec.pdf.

comparable period in Q1 FY 2014 (the fiscal year during which the number of families was at its highest). In Q1 of FY 2014, 8,511 family units were apprehended on the Southwest border, compared to 21,469 during Q1 of FY2016 (a 152% increase). *See infra,* notes 8, 11.

### 2. Changes in the Legal Framework

### i. *Illegal Immigration Reform and Immigrant Responsibility Act*

On September 30, 1996, after the Agreement's terms were finalized and signed by the Government, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Division C of Pub. L. No. 104–208, 110 Stat. 3009-546. IIRIRA both enacted the current "expedited removal" and associated detention provisions, 8 U.S.C, § 1225, and significantly expanded the applicability of reinstatement of removal, 8 U.S.C. § 1231(a)(5), and became effective of April 1, 1997.

Expedited removal, codified at 8 U.S.C. § 1225(b), provides an accelerated removal process for certain aliens, such as those apprehended at or near the border. *See* 69 Fed. Reg. 48,877 (Aug. 11, 2004). It explicitly mandates the detention of aliens who are in the expedited removal process and have not been determined to have a credible fear of persecution. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear,

12

until removed."). Congress later prohibited the use of expedited removal for UACs in section 235 of the TVPRA, but Congress left intact expedited removal and its detention mandate with respect to minors arriving with a parent (or any other aliens). *See* 8 U.S.C. §§ 1232(a)(2)(B), (a)(3), (a)(5)(D).

If an individual in expedited removal proceedings asserts a fear of return, and a US Citizenship and Immigration Services ("USCIS") asylum officer determines that the individual has a credible fear of persecution or torture, the individual may seek asylum or other relief or protection from removal before an immigration judge. 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. §§ 208.30, 235.3(b)(4). If the asylum officer determines the applicant does not have a credible fear of persecution or torture, the applicant may request review of that determination by an immigration judge, without further appeal.[12] *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42(d), (f). If an alien ultimately fails to demonstrate a credible fear of persecution or torture, he or she may be removed from the United States. 8 U.S.C. § 1225(b)(1)(B)(iii); *see also* 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii).

If either the asylum officer or the immigration judge determines that the individual has demonstrated a credible fear of persecution or torture, expedited removal proceedings are vacated, and the alien is referred for standard removal

proceedings before an immigration judge under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). At that point, the authority for detention may shift to the discretionary detention provisions of 8 U.S.C. § 1226(a). *See Matter of X-K-*, 23 I. & N. Dec. 731, 735-36 (BIA 2005) (holding that immigration judges may, pursuant to 8 U.S.C. § 1226 and its implementing regulations, re-determine the custody of certain aliens determined to have a credible fear).

"Reinstatement" of removal applies to aliens who have previously been removed. DHS may reinstate a prior order of removal if an alien "has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal." 8 U.S.C. § 1231(a)(5). An alien in the reinstatement process may be detained pursuant to 8 U.S.C. § 1231(a). If the individual expresses fear of returning to the country of removal, the alien is referred to USCIS for an interview by an asylum officer to determine whether the alien possesses a "reasonable fear" of persecution or torture. 8 C.F.R. § 208.31(b). If the asylum officer determines that the alien has not established a reasonable fear of persecution or torture, the alien may request review of that determination by an immigration judge.  8 C.F.R. § 208.31(f). If the immigration judge concurs with the determination that no

---

[12] The review by an immigration judge is conducted *de novo* and includes an opportunity for the alien to be heard and questioned by the immigration judge, who also may receive into evidence any relevant oral or written statement. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. §§ 1003.42(c) and (d).

reasonable fear of persecution or torture exists, DHS may for execute the reinstated order of removal, and no administrative appeal is available. 8 C.F.R. § 208.31(g)(1).

If the asylum officer or, upon *de novo* review, an immigration judge, determines that the alien has established a reasonable fear of persecution or torture, the alien is placed in proceedings before an immigration judge for consideration of withholding or deferral of removal only (aliens with reinstated orders of removal are not eligible to apply for asylum or other relief from removal). 8 C.F.R. §§ 208.31(e), 1208.31(g). Because an alien's removal order remains administratively final throughout such "withholding-only" proceedings, 8 U.S.C. § 1231(a) continues to provide the statutory authority for her detention.

    ii.    *The Homeland Security Act of 2002*

In 2002, Congress enacted the HSA.  Pub. L. No. 107-296, 116 Stat. 2135. The HSA created DHS, transferring most immigration functions formerly performed by INS to the newly-formed DHS and its components, including USCIS, U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). *See also* Department of Homeland Security Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (also set forth as a note to 6 U.S.C. § 542).

Notably, however, Congress transferred to HHS, Office of Refugee Resettlement ("ORR"), the responsibility for the care of UACs "who are in Federal

15

custody by reason of their immigration status." HSA § 462(a), (b)(1)(A); U.S.C. § 279(a), (b)(1)(A). The HSA defined an "unaccompanied alien child" as:

> a child who-
>
> (A) has no lawful immigration status in the United States;
>
> (B) has not attained 18 years of age; and
>
> (C) with respect to whom-
>
>> (i) there is no parent or legal guardian in the United States; or
>>
>> (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

6 U.S.C. § 279(g)(2). The HSA also transferred to ORR the responsibility for making all placement decisions for UACs, and required ORR to coordinate these placement decisions with DHS, and to ensure that UACs are not released upon their own recognizance. *See* 6 U.S.C. § 279(b)(l)(C), (D), (b)(2). The HSA did not, however, address minors who lack lawful immigration status but who do have a parent or legal guardian in the United States available to provide care and custody (which typically includes those accompanied when they arrive), as they do not meet the definition of a UAC.

### iii. Trafficking Victims Protection Reauthorization Act of 2008

The TVPRA was signed into law on December 23, 2008. The TVPRA contained statutory protections relating to UACs, and codified protections related to

16

the processing and detention of UACs that encompass the material terms of the Agreement. The TVPRA built on the HSA, and further required that "the care *and custody* of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1) (emphasis added). It also required that:

> Except in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child.

8 U.S.C. § 1232(b)(3). The TVPRA made clear that HHS is responsible for all placement decisions for UACs in its custody, and for conducting suitability assessments for those placements. 8 U.S.C. § 1232(c). It requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child," and it provides guidelines for the reunification of UACs by HHS. 8 U.S.C. § 1232(c)(2), (3).

The TVPRA did not address non-UACs (*i.e.*, minors who have a parent or legal guardian in the United States available to provide care and custody (which typically includes those accompanied when they arrive)) because they do not meet the HSA's definition of a UAC, and therefore do not fall under the provisions of the TVPRA. *See* 6 U.S.C. § 279(g)(2); 8 U.S.C. § 1232. Instead, the detention or release of families,

17

including accompanied minors and their parent(s), is solely governed by the standard detention provisions of the Immigration and Nationality Act ("INA"), and is administered by ICE. *See* 8 U.S.C. §§ 1225, 1226, 1231.

### 3. The Government's Use of Family Detention

#### i. *Family Detention Prior to the Agreement*

The detention requirements of the INA governing expedited removal and reinstatement of removal apply to all adults, including those who arrive with children, and to *accompanied* minors. They do not, however, apply to UACs, since they cannot be subjected to expedited removal or reinstatement. *See* 8 U.S.C. §§ 1232(a)(2)(B), (a)(3), (a)(5)(D).

At the time the parties finalized the terms of Agreement, the only minors detained by INS were *unaccompanied* minors. INS did not detain minor children in immigration custody with their parents pending the completion of their immigration proceedings, families were not apprehended crossing the border illegally in any significant numbers, and INS did not maintain family residential centers for immigration custody of children with their parents. *See* Declaration of Tae D. Johnson, ECF No. 120-1 at ¶¶ 10, 12 (RE 144) ("Johnson Decl."); Declaration of Thomas Homan, ECF No. 184-1 at ¶¶ 8-9 (RE 161-62) ("Homan Decl.").

18

ii.      *Berks Family Residential Center*

In 2001, to ensure family unity and safety while acting in furtherance of the detention and expedited removal authority provided by Congress in IIRIRA, ICE opened the Berks County Detention Center ("Berks") in Leesport, Pennsylvania. *See* Johnson Decl. ¶¶ 13, 15 (RE 144-45). By and large, from 2001 to the present, Berks has housed adults with children who are in expedited removal proceedings, or who are subject to a final order of removal and awaiting removal. *See* Homan Decl. ¶ 16 (RE 165). Nearly 5,000 individuals have been housed at Berks since 2001 and, as of early August 2015, the average length of stay for individuals who had been housed at the facility since it opened was 66 days. *See id.* Prior to filing their 2015 motion, Plaintiffs never challenged the detention of minors with their parents at Berks as a violation of the Agreement.

iii.      *T. Don. Hutto Residential Center*

From 2006-2009, ICE used the T. Don Hutto Residential Center in Texas to house families with children during their removal proceedings and pending removal. During that time period, attorneys representing individual accompanied minors – not *Flores* class counsel – filed a lawsuit alleging that the facility did not comply with the Agreement. *See In re Hutto Family Detention Ctr.*, No. A-07-CV-164-SS, ECF No. 92-2, Aug. 26, 2007 (W.D. Tex.).

19

In the course of that litigation, the *Hutto* court found that the Agreement was "never intended to be permanent authority, much less the only binding authority setting standards for the detention of minor aliens[,]" and that the Agreement "did not anticipate the current emphasis on family detention." Nevertheless, the court concluded that the Agreement's language regarding detention conditions applied to the Hutto facility because the Agreement referenced all "minors." *Bunikyte, ex rel. Bunikiene v. Chertoff*, 2007 WL 1074070, at *2-3 (W.D. Tex., Apr. 9, 2007). However, and significantly, the *Hutto* court rejected the plaintiffs' request that it order the release of both parents and minors under the Agreement, concluding that "[n]either Flores nor any federal rule or statute mandates the simultaneous release of parents and children from detention." *Id.* at *16.[13]

The parties resolved the litigation through a settlement that allowed family detention at the Hutto facility to continue under prescribed conditions. *See In re Hutto Family Detention Ctr.*, No. A-07-CV-164-SS, ECF No. 92-2, Aug. 26, 2007 (W.D. Tex.). Notably, at the time that the settlement was being considered and approved by the court, *Flores* class counsel raised no objection to the settlement agreement, nor did they bring any action on behalf of the *Flores* class as a whole alleging that the fact of family detention pursuant to the Hutto settlement agreement violated the

---

[13]  Because plaintiffs did not seek release of the individual accompanied minors without their parents (taking the position that separating minors from their parents was not in the minors' best interests), the

20

Agreement. The Hutto facility was converted to an adult detention facility housing women only in September 2009.

### iv. *Family Residential Centers Opening in 2014-2015*

In 2014, a surge of UACs and families were apprehended on the Southwest border. *See* Johnson Decl. ¶ 14 (RE 145); Homan Decl. ¶ 10 (RE 162-63). Many of these families were subject to the expedited removal and reinstatement statutes outlined above, including their detention provisions. Homan Decl. ¶ 8 (RE 161). However, DHS initially lacked significant capability to detain minors apprehended with a parent as a family unit during the expedited removal or reinstatement process. *Id.* ¶ 9 (RE 161-62).

As a part of its overall response to the surge, DHS opened family residential centers in Artesia, New Mexico, in June 2014, in Karnes City, Texas in July 2014, and in Dilley, Texas in December 2014. *See* Homan Decl. ¶ 17 (RE 165). The Artesia center, which was a temporary facility, closed in December 2014. *Id.* Each center was designed to house minor children with their parents in a safe residential setting that would maintain them in custody while allowing the family to remain together.[14]

---

court ultimately denied plaintiffs' request for release. *Id.* at *21.

[14] ICE has Family Residential Standards ("FRS") that govern all aspects of care and custody at family residential centers. *See* Johnson Decl.. at ¶ 17 (RE 145). The ICE Enforcement and Removal Operations' Juvenile and Family Residential Management Unit oversees the ICE family residential centers and ensures compliance with the FRS. *See id* at ¶ 19 (RE 146). The family residential centers are also subject to inspections by the ICE Office for Professional Responsibility's Office of Detention Oversight, the DHS Office for Civil Rights and Civil Liberties, and an independent compliance inspector. *See id*.

Family residential centers have a number of facilities that provide for the needs of residents, including living quarters, common areas, libraries, classrooms, computer rooms, video game rooms, outdoor and indoor exercise and recreational facilities, medical care facilities, and dining areas. *See* Declaration of Stephen M. Antkowiak, ECF No. 121-2, RE 100-136.

The centers are an essential component of an integrated response designed to signal to potential illegal entrants that individuals who do not make meritorious claims for relief will not be permitted to remain in the United States. *See* Johnson Decl. ¶¶ 7-8 (RE 141-43); Declaration of Kevin W. Oaks, ECF No. 121-1 ("Oaks Decl.") ¶¶ 26-27 (RE 152). They enable DHS to use the tools Congress provided in the INA (including expedited removal and reinstatement of removal and associated detention authority) to ensure the efficient processing at the residential center and, where appropriate, removal of family units who cannot demonstrate a claim to remain. The availability of these authorities allows DHS to respond to the ever-changing trends in immigrant populations crossing the border and to ensure compliance with the obligation to appear at immigration proceedings and for removal. *See* Homan Decl. ¶¶ 8-9 (RE 161-62).

(37 of 90)

Case 2:85-cv-04544-DMG-AGR  Document 253  Filed 09/02/16  Page 41 of 108   Page ID
#:7377
Case: 15-56434, 09/15/2016, ID: 10126449, DktEntry: 10-3, Page 31 of 84

v.        *Family Residential Centers Post-August 2015*

In accordance with the Remedies Order, ICE family residential centers are
currently operating as short-term intake and processing facilities.[15] The district court
indicated that the Government's target of a 20-day average detention time "may fall
within the parameters of Paragraph 12A of the Agreement,"[16] but did not provide
further clarity as to the parameters of the Government's family detention authority
and appeared to envision continual judicial oversight of DHS's processing times.
The only further guidance in the district court's order is that in periods of influx – as
defined in the Agreement – family units may be housed at residential centers for the
limited period necessary to conduct asylum and other protection-related screenings so

---

[15] Under current policies, the length of time individuals remain in detention is related to the amount of
time it takes to screen them for credible or reasonable fear. The Secretary's June 2015 policy
announcement directed USCIS to "conduct credible fear and reasonable fear interviews within a
reasonable timeframe." DHS Press Release, ECF No. 164-1, at 1 (RE 156). For those able to establish
credible or reasonable fear, the goal is that "the detention of families will be short-term in most cases." *Id.*
As the Government explained to the district court, for credible fear cases screened from October 2014
through June 2015, USCIS's Asylum Division has completed more than 90% of the cases in 14 calendar
days or less. Declaration of John Lafferty, ECF No. 184-3, ¶ 22 (RE 182) ("Lafferty Decl."). Under a
class action settlement agreement in the U.S. District Court for the Northern District of California, USCIS
has agreed to achieve a national average of 10 business days for completing reasonable fear
determinations for detained individuals, with no single reasonable fear determination taking more than 20
business days (not including tolling or delays due to exceptional circumstances). *Alfaro Garcia, et al. v.
Johnson, et al.,* No. 14-01775 (N.D. Cal.).
[16] As explained by the Government in the proceedings below, DHS set an average target of 20 days in
detention for families housed in its residential centers. *See* Homan Decl. ¶ 28 (RE 164).

23

41

(38 of 90)

Case 2:85-cv-04544-DMG-AGR Document 253 Filed 09/02/16 Page 42 of 108 Page ID
#:7378
Case: 15-56434, 09/15/2016, ID: 10123901, DktEntry: 10-3, Page 32 of 84

long as the district court deems the length of detention to be "as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear." Order, Aug. 21, 2015, ECF No. 189 ("Remedies Order") at 10 (RE 35).

A reasonable period of detention—which must be flexible based on circumstances, resources, and competing needs—is necessary to afford DHS the essential time to conduct important activities that balance the Government's security needs, legal obligations, and humanitarian goals with regard to family units. *See* Homan Decl. ¶¶ 29-30 (RE 170-72). It provides DHS time to conduct background checks, provide health screenings and immunizations, make individuals available for credible or reasonable fear screenings, and release individuals who establish eligibility to apply for relief or protection from removal under reasonable conditions that maximize the likelihood of appearance at immigration proceedings. *Id.*[17] The district court's order left many critical questions unanswered with regard to the

---

[17] Within this period, the family receives a medical and mental health evaluation, a physical examination, a dental screening, and medically necessary health or mental health referrals. Homan Decl. ¶ 29 (RE 170-71). Children receive needed immunizations and a developmental assessment in the Well-Child clinics. *Id.* Family units diagnosed with communicable diseases can be treated or begin treatment while in the facility, which promotes the health of the affected family units and protects the U.S. public. *Id.* Family units are also offered the opportunity to participate in a legal orientation program from pro bono organizations, which, for many individuals, will be their first opportunity to learn of their rights and responsibilities under the immigration laws. *Id.* Families can contact their consulates and family members in the United States, and can provide ICE with proof of identity, a verifiable address, and sponsor information so that ICE can effectively assess flight risk and consider the family unit for release under appropriate conditions. *Id.*

24

detention of families for longer than the target of 20 days—given that that the broadest possible reading of the district court order potentially could limit the Government's statutory and constitutional authority to detain families.

## II.     PROCEEDINGS BELOW

On February 2, 2015, Plaintiffs filed a motion to enforce the Agreement, alleging that the defendants were in violation of the Agreement on the grounds that: (1) the Agreement applied to *accompanied* minors detained with a parent and required release of the detained parent (absent limited specified circumstances) along with the minor in order to effectuate the release of the minor; and (2) that the family residential centers at Dilley and Karnes violated the Agreement's "licensing" requirement for facilities that house children.   ECF No. 100.[18]

The Government opposed Plaintiffs' motion (Opp., ECF No. 121), and filed an alternative motion to amend the Agreement (Mot. ECF No. 120) to permit operation of family residential centers in the event the district court adopted Plaintiffs' interpretation of the Agreement. The Government's principal contention was that the Agreement could not be interpreted to apply to aliens other than unaccompanied minors because the Government had never agreed to limit its statutory detention

---

[18] The Motion also alleged that CBP facilities failed to meet the conditions requirements laid out in the Agreement for the custody of children immediately following arrest.   This issue is not part of this appeal.

authority over accompanied alien minors or their adult alien parents in order to settle litigation pertaining solely to unaccompanied minors. Specifically, the Government argued: (1) that the Agreement was never intended to apply to ICE family residential centers because such facilities did not exist at the time that the Agreement was executed, and because the Agreement does not apply to accompanied minors; (2) the "preference for release" provision does not apply to accompanied minors in family residential centers; and (3) the "licensing" provision does not apply to family residential centers. In its concurrently-filed motion to amend the Agreement, the Government argued that, if the district court found that the Agreement applies to accompanied minors and family units, the court should amend the Agreement to accommodate ICE family residential centers, given the significant changes in law and circumstances that have occurred since the Agreement was signed. Following oral argument, the parties engaged in approximately two months of settlement negotiations without resolution. *See* Status Report, ECF No. 170.

On July 24, 2015, the district court issued its order on the two pending motions. Order, ECF No. 177 ("Merits Order") (RE 1-25). The Merits Order granted Plaintiffs' motion to enforce the Agreement in its entirety, and denied the Government's motion to amend the Agreement. Specifically, the district court held that the Government was violating the "preference for release" provision of the Agreement, because the "plain language of the Agreement clearly encompasses accompanied minors." Merits Order

26

at 4-7 (RE 4-7). The district court reasoned that the Agreement's use of the term "all

minors" meant that the parties had intended to provide relief to a significantly broader

scope of individuals than what was originally contemplated by Plaintiffs' lawsuit.

Merits Order at 5 (RE 5).

The district court further held that the Agreement not only required release of

the accompanied minor, but also required the release of the accompanying parent, "as

long as doing so would not create a [significant] flight risk or a safety risk."[19] Merits

Order at 8-9 (RE 8-9). The district court reasoned that, because the existing regulatory

framework in 1997 permitted the INS to release accompanied minors and their parents

together, the Agreement must be interpreted as requiring such release because the

parties "would have contemplated releasing an accompanying relative."   Merits

Order at 6, 9 (RE 6, 9).

---

[19] Although this sentence of the Court's order did not use the term "significant flight risk," the Court's
remedies order requires release of a parent apprehended with a minor unless the parent is a "significant
flight risk." Remedies Order at 14, ¶ 4 (RE 39).

27

Finally, the district court held that the Government breached the Agreement by holding accompanied children in secure, unlicensed facilities.[20] Merits Order at 12-16 (RE 12-16). The court reasoned that, because the Agreement applies to "all minors," any minor who is detained must be housed in a non-secure facility that is licensed by the state to house dependent children. *Id.*

The district court then ordered the Government to show cause why the remedies proposed by the court (which mirrored those proposed by the Plaintiffs) should not be implemented within 90 days. The Government filed a response to the show cause order on August 6, 2015 (Resp. ECF No. 184), and Plaintiffs replied on August 13, 2015 (Reply, ECF No. 186).

On August 21, 2015, the district court issued its Remedies Order, maintaining its conclusion that the Agreement governed the detention of accompanied minors and their parents. The court clarified that, when the "influx" provision of the Agreement is satisfied, based on the number of minors in Government custody, the Government had some leeway with regard to the length of time before minors must be transferred to

---

[20] The district court misstated in a footnote offering no analysis, that "'non-secure' facilities are those where individuals are not held in custody." Merits Order at 3 n.3 (RE 3). This is contrary to the plain language of the Agreement, which states that "[a]ll homes and facilities operated by licensed programs . . . shall be non-secure *as required by state law*." Agreement ¶ 6 (emphasis added) (RE 47-48). The court's interpretation of the term "non-secure," failed to give effect to the Agreement's operative language, "as required by state law," and conflicted with the additional requirement that the individual remain in the custody of DHS. *See* Agreement ¶ 19 (RE 55) ("All minors placed in such a licensed program remain in the legal custody of the INS . . . ."). Although there is no issue at the moment for this Court to resolve with regard to the Government' compliance with that aspect of the Agreement, the

28

licensed facilities under the Agreement. Under these circumstances, family units could be housed at residential centers for the limited period necessary to conduct credible or reasonable fear so long as the district court deems the length "as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear." Remedies Order at 10 (RE 35).

## SUMMARY OF THE ARGUMENT

The district court erred in ruling that the Agreement governs the processing and detention of *accompanied* minors and their parents who are in immigration custody as family units. The Agreement, both on its face and in the context of its creation, was clearly intended to resolve Plaintiffs' legal challenge to the authority of the Government (at the time, the INS) to hold *unaccompanied* minors in *discretionary* detention pending the outcome of their removal proceedings. Nothing in the Agreement indicates that the Government intended to unilaterally surrender its statutory detention authority over accompanied alien minors and their adult alien parents—especially for those subjected to mandatory immigration detention, which existed only in rare circumstances at the time that the Agreement was signed—in order to settle a lawsuit involving only unaccompanied minors. In fact, many of the

---

Government raises this issue here in order to preserve its ability to challenge any future decisions that might turn upon the district court's erroneous footnote.

provisions of the Agreement are rendered nonsensical when applied to minors who are apprehended along with their parents. The plain language of the Agreement incorporates the definition of minors contained in the class certification order, which defines the covered class as minors who do not have a parent available to take custody of them (i.e., unaccompanied minors).

Even if the Agreement could be construed as Plaintiffs argue, at most the language of the Agreement is ambiguous. In determining the parties' intent, extrinsic evidence—the circumstances at the time of the Agreement and the course of dealing since its execution—confirms that the Agreement was limited to *unaccompanied* minors in Government immigration custody. At the time the Agreement was drafted by the parties and signed by the Government, INS did not detain accompanied minors in immigration custody with their parents during their immigration proceedings (nor were many of the key detention provisions prompting the use of family detention yet in existence). There is no basis to find that the parties considered – or even anticipated – the future use of family detention, or that the Agreement would cover such detention.

The parties' post-Agreement conduct further confirms the Government's interpretation. Although the Government has operated ICE family residential centers since 2001, Plaintiffs waited until 2015 to allege that the use of family detention violates the Agreement. Moreover, *Flores* class counsel did not object to the

30

48

resolution of the *Hutto* case that permitted the detention of individuals who *Flores* counsel now assert are covered by the Agreement (even though the Hutto facility remained open as a family residential center for 2 years after that settlement was reached in 2007). *Flores* counsel also has received regular reports under paragraphs 28 and 29 of the Agreement that pertain only to unaccompanied minors since 1997, and has never complained that these reports should include accompanied minors. Therefore, the Court demonstrably erred when it found that the parties' post-Agreement course of dealing indicated that the Agreement prohibited family detention.

The district court further erred in holding that the Agreement applies to the parents detained as part of a family unit, and mandates their release in many circumstances. Nothing in the Agreement references the release of detained parents or adults, nor do the circumstances surrounding its signing suggest that the parties ever intended any portion of the Agreement to apply to the release of detained parents or adults.

The district court's interpretation also cannot be viable given the statutory provisions of the INA that govern – and in some circumstances compel – the detention of adults who cross the border with their children without legal status. The decision is grounded on the unfounded assumption that the Government intended to diminish its statutory detention authority with regard to accompanied minors and their

31

parents—including mandatory detention upon arrival and detention to effectuate the removal of family units with administratively final removal orders—in order to settle a lawsuit solely pertaining to unaccompanied minors.

Plaintiffs have provided no record of any discussions between the parties pertaining to whether the agreement would apply to family units, and a fair reading of the agreement as a whole shows that the parties were undoubtedly addressing the treatment of unaccompanied minors. An intent to vitiate critical statutory authorities in circumstances no party to the agreement was considering at the time cannot be based on vague and inconclusive provisions, including the provision that used the short hand "minors" to refer to the class covered by the litigation. Nor is such an intent indicated anywhere else in the record of the case.

Finally, even if the Agreement could be properly interpreted to cover the immigration detention of both accompanied minors and their adult parents, it must be amended to take into account significant changes in legal and factual circumstances since its execution. A long series of cases involving institutional reform litigation holds that courts should reexamine consent decrees like the Agreement that have been in existence for a considerable period of time when there is a change in law and/or fact that affects the operation of the consent decree.

Over recent years, the United States has experienced surges of family units crossing the Southwest border seeking entry into the United States.  The legal

32

(47 of 90)

Case 2:85-cv-04544-DMG-AGR   Document 253   Filed 09/02/16   Page 51 of 108   Page ID
Case: 15-56434, 05/15/2018, ID: 10862990, DktEntry: 10-3, Page 41 of 84
#:7387

landscape also has fundamentally shifted. Congress has enacted several major laws governing immigration custody, and processing, including a law requiring mandatory detention of individuals placed into expedited removal proceedings, and other laws specifically addressing UACs. It is therefore appropriate to modify this Agreement to exclude the custody of accompanied minors and their adult parents from its ambit. Such a modification would not undo the Agreement, but rather, would simply restore the status quo that existed between 2001 and the district court's final order in August 2015, that had never previously been challenged by the Plaintiffs.

The Government has a compelling interest in retaining all of the options that Congress has provided to meet the substantial challenges presented by ever-changing immigration dynamics. The district court's orders significantly and erroneously constrain that authority and flexibility to detain minors and adults who enter as family units.

# ARGUMENT

## I.  The District Court Erred In Holding that the Agreement Applies to Accompanied Alien Minors and their Adult Alien Parents.

The plain language of the Agreement is clear that its scope is limited to unaccompanied minors.  And even if the Agreement were ambiguous on that point, extrinsic evidence of the parties' intent would require that the Agreement be interpreted to apply only to unaccompanied minors.

### A.  Governing Law

The Agreement became effective in 1997 upon its approval by the district court, and is subject to its continued oversight.  It is thus a consent decree, and should be interpreted using general contract principles. *See Rufo* v. *Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992); *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985) ("A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles."); *see also United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005) ("[C]ourts treat consent decrees as contracts for enforcement purposes.").  Like a contract, a consent decree "must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree." *Asarco*, 430 F.3d at 980; *see also United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy

34

(49 of 90)

Case 2:85-cv-04544-DMG-AGR   Document 253   Filed 09/02/16   Page 53 of 108   Page ID
#:7389
Case: 15-56434, 09/15/2016, ID: 10129901, DktEntry: 10-8, Page 49 of 84

the purposes of one of the parties to it."). The consent decree "should be read to give

effect to all of its provisions and to render them consistent with each other."

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

"The interpretation of a contract is a mixed question of law and fact. When the

district court's decision is based on an analysis of the contractual language and an

application of the principles of contract interpretation, that decision is a matter of law

and reviewable de novo. When the inquiry focuses on extrinsic evidence of related

facts, however, the trial court's conclusions will not be reversed unless they are clearly

erroneous." *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985).

### B.    The District Court incorrectly concluded that the Agreement unambiguously applies to accompanied minors

The Agreement, when read as a whole, shows that it was designed to govern

the treatment of minors who are in custody unaccompanied by their parents. First, the

Agreement states expressly that it was entered into to resolve a dispute regarding the

treatment of unaccompanied minors in immigration custody. Second, the Agreement

incorporates the class definition, which is limited to unaccompanied minors. Third,

the Agreement nowhere addresses the treatment of accompanied minors, making it

highly unlikely that the parties contemplated the issue. Finally, it would be highly

unusual for the government to forgo significant and important enforcement authorities

with respect to family units without any discussion of the issue reflected in the Agreement.

The district court's reasoning – which relies on the language of Paragraph 10 of the agreement defining the class as including "[a]ll minors who are detained…" – does not account for the other aspects of the Agreement incorporating the class definition as being unaccompanied minors, or the structure of the Agreement as a whole, which shows it was plainly designed for the handling of minors taken into custody without a parent. The district court compounded its error by failing to consider the evidence of the circumstances surrounding both the formation and subsequent interpretation of the Agreement, which demonstrate that the Agreement did not address accompanied children or the detention of family units. At most, the tension between the various provisions shows that there was not a meeting of the minds with respect to the treatment of accompanied minors, which precludes the district court's contrary ruling.

1. *The Agreement unambiguously applies only to unaccompanied minors in discretionary immigration detention.*

Contrary to the district court's ruling, the Agreement, when read as a whole, shows that it was designed to govern the treatment of minors who were taken into custody unaccompanied by their parents.

<u>First</u>, the Agreement states expressly that it was entered into to resolve a lawsuit challenging "the constitutionality of [the INS's] policies, practices, and regulations regarding the detention and release of *unaccompanied minors* . . . ." Agreement at 3 (RE 46) (emphasis added); *see also Reno*, 507 U.S. at 294 (noting that the litigation applied to "alien juveniles who are not accompanied by their parents or other related adults"). Thus, the parties acknowledged on the face of the Agreement that they were seeking to resolve issues in the underlying litigation that related only to unaccompanied minors.

<u>Second</u>, the agreement expressly incorporates the class definition, which is limited to unaccompanied minors. The second recital "Whereas" paragraph of the Agreement states that "*the District Court has certified this case as a class action* on behalf of all minors apprehended by the INS in the Western Region of the United States." Agreement at 3 (RE 46) (emphasis added). Accordingly, throughout the Agreement, the reference to "all minors" cannot be read in isolation but must be read in conjunction with the class certification to which it explicitly refers. *See Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1077 (2d Cir. 1990) ("Although the 'Whereas' clauses of a contract do not determine its operative effect, they do furnish a background in relation to which the meaning and intent of the operative provisions can be determined."); *Brady v. Grendene USA, Inc.*, No. 12-604, 2015 WL 3539702, *4 (S.D. Cal. June 3, 2015) (noting that whereas clauses may be useful in interpreting

37

ambiguous operative clauses). The original 1986 order on class certification makes clear that, on the issue of the INS's detention of minors, the certified class included only minors "who have been, are, or will be denied release from INS custody *because a parent or legal guardian failed to personally appear to take custody of them*." *See* Order at 2 (RE 42) (emphasis added). It follows that the class definition contained in the Agreement, when it referenced "[a]ll minors[,]" was meant to cover this same group of individuals originally certified as a class by the district court: namely those who are under 18, and are in custody because a parent or legal guardian failed to appear. For accompanied minors, the parents have not "failed to appear," but instead have arrived with their children and are themselves detained with their children under governing law. The district court failed to address this key point. *See Union Pac. R.R. Co. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 549 F.2d 114, 117 (9th Cir. 1976) ("That these expressions appear in the recitals does not negate their import upon our inquiry into the intentions of these contracting railroad companies. No express contract provision conflicts with this manifestation of intention.") (citations omitted).

Third, the agreement nowhere addresses the treatment of accompanied minors – and the complicated issues that would arise in handling the custody of a family unit or the separation of the members of that unit from one another – making it highly unlikely that the parties intended to address the issue. Nothing in the language of the

38

(53 of 90)

Case 2:85-cv-04544-DMG-AGR   Document 253   Filed 09/02/16   Page 57 of 108   Page ID
Case: 15-56434, 09/15/2016, ID: 10123901, DktEntry: 10-3, Page 74 of 84
#:7393

Agreement makes reference to the housing of family units (*i.e.*, accompanied minors with their parents). Nor does anything in the Agreement address the release of a family unit, or how to handle a situation that might arise when either the parent or the minor poses a security or flight risk and the family unit wants to remain together.

In fact, the Agreement's references to housing are entirely inconsistent with the idea that the parties intended the Agreement to cover the housing of adults with children. The Agreement provides that, as an alternative to releasing a minor held in custody to a potential custodian, "[i]n any case in which the INS does not release a minor . . . such minor shall be placed temporarily in a licensed program . . . ." Agreement ¶ 19 (RE 55). Under the Agreement, a "licensed program" is defined as a "program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for *dependent children* . . . ." Agreement ¶ 6 (RE 47-48) (emphasis added). The reference to licensing for facilities to house "dependent children" clearly does not reference housing for adults, or for children who are accompanied by a parent. *See, e.g.,* Black's Law Dictionary (defining a dependent child as "[a] needy child who has been deprived of parental support or care because of the parent's or other responsible person's death, absence from the home, physical or mental incapacity, or (in some cases) unemployment").

39

57

By definition, a family unit consisting of parents and children cannot be housed in a facility that is licensed only for dependent children.[21]

Moreover, the Agreement also requires that a "licensed program" comply with substantial requirements related to the conditions at any such facility. Agreement ¶ 6 (RE 47-48), Exhibit 1 (RE 67-71). But nothing in Exhibit 1, which sets forth those requirements, references any standards or conditions that would apply to adults housed at any such facility, or would suggest that the parties anticipated that a "licensed facility" would ever be used to house minors accompanied by an adult. *See, e.g.*, Agreement, Exhibit 1 at ¶ A (RE 68). (providing that "[l]icensed programs shall comply with all applicable *state child welfare laws and regulations* and . . . shall provide or arrange or arrange for the following *services for each minor* in its care") (emphasis added). If the Agreement had, in fact, been intended to apply to family units, the terms would surely make at least some reference to the presence of adults when outlining the required conditions of custody. Because the district court's

---

[21] Notably, by tying the "influx" provision in the Agreement contained in paragraph 12(B) (setting influx trigger at "more than 130 minors eligible for placement in a licensed program") to the numbers of minors available for placement in licensed programs for dependent children, the parties confirmed their focus on unaccompanied minors, and not family units including accompanied minors. Under the reading proposed by Plaintiffs and adopted by the district court, a surge of family units – which by definition do *not* include dependent children – would have no effect on triggering the influx provision of the Agreement. Thus, even if there were a surge involving millions of family units seeking entry into the United States without lawful status in one year, the "influx provision" would not be triggered if there were fewer than 130 unaccompanied minors in Government custody at a given time. This absurd result further underscores that the parties did not intend the Agreement to govern the custody of accompanied minors in family units.

40

conclusion leads to implausible results, it cannot be sustained as a reasonable interpretation of the Agreement.

Fourth, it would be highly unusual for the Government to forgo significant and important enforcement authorities with respect to family units without any discussion of the issue reflected in the Agreement. In order to reach this conclusion, the district court would have had to find that the Government had the unambiguous intent to unilaterally surrender its statutory detention authority over both accompanied minors and their adult parents under 8 U.S.C. §§ 1225, 1226, and 1231 as part of a settlement of a case involving only *unaccompanied* minors.[22] *See Jeff D. v. Kempthorne*, 365 F.3d 844, 852 (9th Cir. 2004) (holding that a consent decree "must also come within the general scope of the case made by the pleadings, and must further the objectives of the law upon which the complaint was based"). In fact, such a conclusion is counter intuitive where the Agreement makes specific references to the underlying litigation and the class of individuals under consideration in that litigation. Moreover, the parties do not state in the Agreement that they had any intent to provide relief to a broader group. In the face of clear references to the class that the

---

[22] Importantly, the Agreement must be analyzed as a settlement agreement and not a court-ordered injunction issued over the Government's objection. That is critical because the Court must examine whether it is clear and unambiguous that the Government actually agreed to surrender its statutory detention authority in the way Plaintiffs contend. There simply is no such stated intent included in the Agreement. Moreover, the district court had no authority to order any additional injunctive relief that the Government did not specifically agree to, and much of the Court's remedies order imposes additional limitations and obligations onto the Government that can be found nowhere within the Agreement.

parties did intend to cover in the Agreement, the district court's conclusion that the
Agreement should benefit individuals outside that class is misplaced. *See Frew ex rel.
Frew v. Hawkins*, 540 U.S. 431, 437 (2004) ("[A] federal consent decree must spring
from, and serve to resolve, a dispute within the court's subject-matter jurisdiction;
*must come within the general scope of the case made by the pleadings*; and must
further the objectives of the law upon which the complaint was based") (emphasis
added).

The district court nonetheless found otherwise, relying on the premise that a
consent decree may "benefit individuals who were not victims of a defendant's illegal
practices and provide 'broader relief than the court could have awarded after a trial.'"
Merits Order at 5 (RE 5) (quoting *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO
v. City of Cleveland*, 478 U.S. 501, 525 (1986)). But the court did not explain on
what basis it concluded that the Government intended this Agreement to benefit
individuals who were not part of the underlying litigation, who were clearly outside of
the scope of the pleadings, and who were nowhere referenced in the Agreement.

Finally, in reaching its conclusion, the district court relied almost exclusively
on the term "all minors" in paragraph 10 of the Agreement, which states:

> The certified class in this action shall be defined as follows:   "All minors who
> are detained in the legal custody of the INS."

42

(57 of 90)

Case 2:85-cv-04544-DMG-AGR Document 253 Filed 09/02/16 Page 61 of 108 Page ID
#:7397
Case: 15-56434, 09/15/2016, ID: 10119990, DktEntry: 10-3, Page 51 of 84

Agreement ¶ 10 (RE 50). But in resting on this statement, the court in effect read out of the Agreement all of the references showing that the term "all minors" was used in the Agreement to refer, as broadly as possible, to the group of *unaccompanied* minors that were the subject of the lawsuit. The best evidence of this is the recital, which also used the term "all minors" to refer to the fact that the "district court has certified in this case a class action on behalf of *all minors* apprehended by the INS in the Western Region of the United States." Agreement at 3 (RE 46) (emphasis added). But that class certification referenced by the court was limited to unaccompanied minors, and it is to that group that the parties were referring when using the language "all minors" in those two places and elsewhere in the Agreement.[23]

The district court's interpretation is even less plausible give that, in order to make sense, it would require the Government to release detained adults who are

---

[23] Paragraph 10 of the Agreement served a purpose entirely different from plaintiffs' claim that it expanded the class to include accompanied minors; rather, the purpose of the provision was to expand the class to nationwide coverage, rather than limiting it to the "Western Region of the United States" as it was in the class certification order. *Compare* Agreement at 3 (RE 46) (prior class certification applied to "all minors apprehended by the INS in the Western Region") *with* Agreement ¶ 10 (RE 50) (certified class shall be "[a]ll minors who are detained in the legal custody of the INS" without limitation); *see* Agreement ¶ 9 (RE 49-50) (purpose of agreement is to "set[] out nationwide policy for the detention, release, and treatment of minors in the custody of the INS"). Nationwide application would have been a much more important issue to the parties at the time than the handling of accompanied minors. The parties plainly drafted these provisions with that focus in mind, which explains why the differences between the recital and Paragraphs 9 and 10 are clear on the change with respect to the nationwide scope, but they use the ambiguous references to "minors" or "all minors" which in all three cases simply incorporates those unaccompanied minors that were the subject of the suit and the original class definition.

43

accompanied by minor children under terms that are wholly inconsistent with the governing statutory scheme. *See* Johnson Decl. ¶ 11 (RE 144); Oaks Decl. ¶¶ 25-27 (RE 152); *see also infra* at 52-52. The district court compounded this error by placing the burden of proof on the Government to show that the Agreement intended to exclude accompanied minors, rather than holding Plaintiffs to the burden of proving that the Agreement explicitly intended to expand the scope of the litigation to include accompanied minors. Merits Order at 5 (RE 5). Furthermore, after acknowledging that "the Agreement does not contain any provision that explicitly addresses adult rights and treatment in detention," Merits Order at 8 (RE 8), the district court proceeded to declare the existence of such rights.

This reading is both unreasonable and internally inconsistent, and, for the reasons explained above, inconsistent with the correct reading of the Agreement as a whole. The only reasonable interpretation of the Agreement, as a whole, is that the parties intended it to apply only to minors in immigration custody who are unaccompanied by a parent.

  2. *Even if the Agreement is ambiguous, extrinsic evidence makes clear that it was not intended to refer either to minors who are part of family units or to their adult parents.*

At a minimum, the Agreement does not *unambiguously* apply to accompanied minors and their parents, whose circumstances were not at issue in the underlying lawsuit that the Agreement settled. A contract is ambiguous if reasonable people

44

62

could find its terms susceptible to more than one interpretation. *Castaneda v. Dura–Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981). And an examination of the extrinsic evidence—which includes the circumstances surrounding the Agreement and the parties' subsequent course of conduct, which the district court declined to consider—demonstrates the parties' intent to limit the Agreement's scope to the unaccompanied minors who comprised the plaintiff class. *Cf. United States v. ITT Continental Baking Co.*, 420 U.S. 223, 235–237 (1975) ("Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree."); *I.C.C. v. Holmes Transp., Inc.*, 983 F.2d 1122, 1127 n.5 (1st Cir. 1993) (observing that "subsequent conduct of the parties to a consent decree may aid the interpretation of its intended scope…").

The factual circumstances surrounding the creation of the Agreement, and the parties' subsequent conduct, show that the Agreement was not meant to cover families detained by DHS or, at least, does not reflect a meeting of the minds between the parties to apply the Agreement to the custody of family units. At the time the Agreement was drafted by the parties and signed by the Government, the INS did not house children in immigration detention with their parents, Johnson Decl. ¶ 12 (RE

45

144), nor were some of the key provisions enacting mandatory detention associated with expedited removal yet enacted or in effect. This crucial fact makes clear that, at the time they signed the Agreement, the parties clearly were not considering or responding to any current or anticipated issues related to Government custody of family units.

There also is no indication or reason to believe that the parties anticipated that family residential centers would be developed, or that they anticipated the significant increases in the numbers of family units seeking entry into the United States without legal immigration status that would necessitate the development of such facilities. See Johnson Decl. ¶¶ 7-8 (RE 41-43); Oaks Decl. ¶¶ 25-28 (RE 152-53). Indeed, there is no record of any discussion of family units at all in the litigation in the run up to resolution of the case, while there is ample evidence that the case was focused on unaccompanied children. *See Reno*, 507 U.S. at 294 (litigation concerned "alien juveniles who are not accompanied by their parents or other related adults"). Where the parties were entering into an agreement to settle litigation that related only to the custody of unaccompanied minors, and where there is no basis to believe that the parties contemplated the possibility that the Government would someday need to maintain custody of family units, it stands to reason that there can have been no meeting of the minds regarding the application of the Agreement to accompanied children or family units.

46

Moreover, the parties' course of conduct since the Agreement was signed further evidences that the Agreement does not apply to accompanied minors and family units. The district court concluded that the Government was in breach of the Agreement in part by reviewing "Defendants' conduct over the last two decades since the Agreement was signed . . . ." Merits Order at 8-9 (RE 8-9) (citing *Crestview Cemetery Ass'n v. Dieden*, 54 Cal.2d 744, 754, 8 Cal. Rptr. 427, 356 P.2d 171 (1960)). But the district court erred in disregarding the significant body of evidence submitted by the Government that shows the parties behaved, until this claim was filed, with the understanding that the Agreement did not apply to family detention.

Berks has been in operation, and has housed accompanied children with parent(s) (*i.e.*, family units), since 2001. *See* Johnson Decl. ¶¶ 13, 15; Homan Decl. ¶ 16. By and large, during that time, Berks has been used to house family units who are in expedited removal proceedings, or who are subject to a final order of removal and awaiting removal. *See Johnson Decl.* ¶¶ 13, 15 (RE 144, 145); Homan Decl. ¶ 16 (RE 165). In fact, nearly 5,000 individuals were housed at Berks between 2001 and early August 2015, and the average length of detention for individuals housed there since its inception was, as of that time, about 66 days. Homan Decl. ¶ 16 (RE 165). Nonetheless, until this action, Plaintiffs never challenged the detention of minors with their parents at Berks as violating the Agreement.

47

In fact, in 2004, Plaintiffs filed an action seeking enforcement of the Agreement, and raised 13 different challenges to the Government's practices with regard to the detention of minors (including *de minimis* technical violations), but raised no challenge to the housing of accompanied minors at Berks.  *See* District Court ECF Nos. 18, 19 (RE 195).  Moreover, and significantly for families detained under the reinstatement statute, during the course of that litigation, Plaintiffs acknowledged that the authority to detain individuals for purposes of removal under 8 U.S.C. § 1231 applied to minors, and was not precluded by the Agreement.  *See* ECF No. 19 at 31 ("[N]othing in the settlement precludes defendants from detaining a child in the course of physically removing him or her, but neither does it permit months or years of open-ended incarceration."); *id.* at 32 (acknowledging that detention in secure facilities to effectuate removal is proper if there is a "reasonable expectation that they will be able to effect removal promptly").

Similarly, in the 2007 challenges to family detention at the Hutto facility brought by a different group of attorneys representing individual plaintiffs, *Flores* class counsel did not object to a settlement expressly authorizing family detention. In *Hutto*, the district court recognized that "it is apparent that this agreement did not anticipate the current emphasis on family detention, where the parole of adult family members is limited by acts of Congress or the judicial branch."  *Bunikyte*, 2007 WL 1074070, at *3; *see also id.* (noting that the Agreement does not "address[] the

concerns specific to family detention" and "was the result of litigation regarding unaccompanied minors, not minors in a family group"). The parties reached a settlement agreement in which ICE was permitted to place family units who were in expedited removal in family detention. *See In re Hutto Family Detention Ctr.*, No. 07-164, ECF No. 92-2 at ¶ 6.A, Aug. 26, 2007 (W.D. Tex.). This was a clear indication that the parties to the *Hutto* litigation did not understand the Agreement to apply to those in expedited removal and who were thereby subject to mandatory detention. Moreover, it is notable that *Flores* class counsel never intervened in that case or sought to challenge the *Hutto* settlement in any court.

It also should be considered that in their course of dealings since the Agreement was signed, Plaintiffs' counsel has received reports from Defendants under paragraphs 28 and 29 of the Agreement that have included only information related to UACs. Defendants have only included accompanied minors in those reports following the district court's Remedies Order, which required them to do so. Prior to this 2015 litigation, Plaintiffs never challenged these reports as inadequate because they did not contain information relating to accompanied minors detained with a parent in a family residential center.

Finally, it is notable that in February 2009, one of the organizations currently serving as counsel for Plaintiffs in this litigation co-authored a report stating that DHS "has the authority" to maintain custody over children "if they are apprehended with

49

and are detained with their parent" and in cases where "children receive a final order
of removal and are transferred back to DHS so that DHS can effect physical removal."
HALFWAY HOME: Unaccompanied Children in Immigration Custody, Women's
Refugee Commission and Orrick Herrington & Sutcliffe LLP, at 12 and n.81, ECF No
185, available at http://www.refworld.org/pdfid/498c41bf2.pdf. The report added that
"Flores was intended to protect the rights and well-being of *unaccompanied* juveniles
in INS custody" and that "ICE should not have custody of any children *other than
those in family detention*, those who have been ordered removed (and whom ICE is in
the process of removing) or those whom ICE is transferring within 72 hours."  *Id.* at
84 n.13; 6-7 and n.33. Plaintiffs' counsel thus acknowledged that family detention
was permissible under the circumstances in which DHS now utilizes it.

Contrary to the clear implication of this post-agreement conduct – that the
Agreement was never designed to address family detention – the district court
erroneously concluded that "ICE's conduct subsequent to the formation of the
Agreement bolsters Plaintiffs' argument that the preference for release provision
requires the release of the accompanying mother along with the child, so long as she
does not present a significant flight risk or danger to safety." Merits Order at 9 (RE 9).
In support of that conclusion, the district court stated only that "[i]t is uncontroverted
that, prior to June 2014, ICE generally released children and parents upon
determining that they were neither a significant flight risk nor a danger to safety."  *Id.*

50

This statement overlooks that ICE and DHS in fact used two family detention facilities in the years after the Agreement was entered into—including one from 2001 up until the present day—and Plaintiffs did not lodge any objection. Moreover, the Government's practice of releasing family units over the years has been based on multiple factors; it does not speak to the scope of the Agreement, and the district court identified no evidence of a connection between the release practice and the Agreement. If anything is to be gleaned from the Government's history of releasing most families, it is that because that was the practice at the time the Agreement was signed, the Plaintiffs would not have had any reason to be concerned about accompanied minors and their parents when *Flores* was being litigated. This reality precludes the district court's ruling here.

The interpretation of the Agreement as applying to accompanied minors and their parents also conflicts with the Government's detention authority under the INA, and thus improperly limits the Government's ability to fully use expedited removal and the reinstatement of prior removal orders as tools to respond to violations of the immigration law. *See* Remedies Order at 10-11 (RE 35-36); 14, ¶¶ 2-3 (RE 39). Even the district court's order allowing some flexibility for detention in the event of an "influx" is inadequate because it impermissibly limits the Government's statutory authority and imposes an uncertain standard with regard to detention of adults (and

51

(66 of 90)

Case 2:85-cv-04544-DMG-AGR Document 253 Filed 09/02/16 Page 70 of 108
Case: 15-56434, 09/15/2016, ID: 10123901, DktEntry: 10-8, Page 66 of 84 Page ID
#:7406

accompanied minors) that interferes with DHS's ability to appropriately exercise its detention and removal authority under the INA.

As noted above, the original *Flores* litigation challenged detention under what was, at the time, the discretionary detention statute applicable to aliens in deportation proceedings. *See Reno*, 507 U.S. at 309 ("Respondents contend that the regulation goes beyond the scope of the Attorney General's discretion to continue custody over arrested aliens under 8 U.S.C. § 1252(a)(1)"). However, the district court's order not only limits the Government's discretionary detention authority, but also would impede detention of family units subject to mandatory detention, as well as potentially restricting the time families can be detained while DHS is attempting to execute an administratively final order of removal. There is no basis to find that the Agreement should be read to affect such detention.

The Agreement, by its terms, clearly reflects an intention to apply only to discretionary detention under the INA. This is clear from the Agreement's general policy favoring release in cases where the Government otherwise determines that the minor is not a flight risk or a danger to himself or others (which is a similar standard to the discretionary detention regime both at the time and at present). *Compare* Agreement ¶ 14, *with*, 8 U.S.C. § 1226(a) *and* 8 C.F.R. § 236.1(c)(8). Consistent with this conclusion, the district court acknowledged that where a parent is considered a

significant flight risk, the Government is justified in continuing to detain the parent.[24] *See* Merits Order at 9 n.5 (RE 9).

Although the district court's ruling acknowledges DHS's detention authority in cases where a parent presents a significant flight risk, the ruling interferes with (but does not address) a number of other bases for detention. One of those is detention in relation to expedited removal. Congress clearly intended to give the Government the authority to place aliens into expedited removal under 8 U.S.C. § 1225(b), rather than removal proceedings before an immigration judge under 8 U.S.C. § 1229a. If DHS places an individual into expedited removal, he or she is subject to mandatory detention, and may only be considered for parole under the limited criteria of 8 U.S.C. § 1182(d)(5)(A), and not discretionary release under 8 U.S.C. § 1226(a). The INA precludes the release of such an alien based simply on finding no flight risk or danger. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); 8 U.S.C. § 1182(d)(5)(A) (DHS may in its "discretion parole into the United States temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to

---

[24] The district court's use of the term "significant flight risk" is not a term that appears in any statute, regulation, or even in the Agreement itself. Rather, this term originates from Plaintiffs' proposed

53

the United States . . . ."); *see also* 8 C.F.R. §§ 235.3(b)(2)(iii) and 235.3(b)(4)(ii) (parole of aliens in the expedited removal-credible fear process "may be permitted only when the [Secretary of Homeland Security] determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective").

The district court's order also interferes with detention of individuals who have previously been removed, illegally reentered, and had their prior orders of removal reinstated. Those individuals are subject to administratively final orders of removal, and DHS is entitled to detain them to effectuate their removal. 8 U.S.C. § 1231(a)(2). However, the district court's order may require that DHS conduct an individualized determination of significant flight risk or dangerousness for these individuals before any reasonable fear screening has even been completed, if the screening cannot be completed quickly enough to pass the district court's muster.  This is contrary to the statute, which is designed to ensure that individuals who have previously been removed and reenter can be removed promptly without the opportunity to abscond.

The Agreement could not have contemplated reinstatement of removal, or expedited removal, because - as discussed above - neither existed in its current form at the time the Agreement was executed by the Government. The Agreement cannot

---

remedies order.  This "significant flight risk" standard has no actual legal basis and should not be inadvertently referenced or incorporated into in any decision by this Court.

plausibly be interpreted as having preemptively forfeited the Government's prerogative to use the reinstatement of expedited removal procedures and its responsibility to comply with the related statutory mandates.

Moreover, although the district court's Remedies Order provides some flexibility for detention related to these provisions in the event of an "influx," this does not sufficiently resolve this problem because it unduly limits the Government's authority beyond the intent of the Agreement and imposes uncertainty that continues to interfere with the Government's ability to exercise its detention and removal authority under the INA. The district court found that an influx of dependent minors as defined under the Agreement (as is occurring now and is likely to recur) allows the Government to detain family units at its residential centers for a brief period necessary to conduct initial screenings. Remedies Order at 10 (RE 35). But this exception only permits a period that the district court deems "as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear." *Id.*

The district court indicated that the Government's stated goal of a 20-day average screening time to comply with the district court's order "may fall within the parameters of Paragraph 12A of the Agreement," but gave no further guidance. The Government thus has no certainty, particularly in the context of future operations, should the immigration landscape continue to shift or change dramatically as is likely.

*See* Fed. R. Civ. P. 65(d).[25] The vague standard also exposes the Government to an unacceptable risk of future litigation given the district court's major expansion of the Agreement to accompanied minors and their parents. And it creates significant uncertainty regarding detention authority for what may be an extended period to remove an alien who has failed to establish a credible or reasonable fear, and pursues further litigation designed to contest his or her removal.[26]

The district court's order left many critical questions unanswered. For example, the district court provided no guidance definitively resolving whether DHS can detain families for longer than 20 days if they have failed to establish credible or reasonable fear and execution of their removal order is reasonably foreseeable. The district court also provided no guidance on whether DHS has detention authority for longer than 20 days in cases where a family is among the 10-15% of families who cannot establish credible fear, Lafferty Decl. at ¶8, but are attempting to obtain some form of Article

---

[25] As written, the Court's order also would allow the district court continued oversight of the boundaries of permissible detention under the INA for one category of individuals (family units) in expedited removal or reinstatement proceedings. *See* Remedies Order at 10-11 (RE 35-36) (concluding that a "*de minimis* extension of the five-day requirement under individualized circumstances will not necessarily result in a breach of the Agreement or contravene the INA in all cases"). The Agreement should not be read to provide the district court with such expansive oversight absent a clear statement of intent by the parties to provide such authority. *Armour*, 402 U.S. at 681 ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.").

[26] In fact, Plaintiffs have already indicated to this Court that they intend to further litigate DHS's allocation of employees, costs of operations, and internal security operations to determine whether DHS is doing enough in their view to expedite the release of these detained family units from ICE family residential centers into the interior of the United States. *See* Ninth Circuit Appeal, Document No. 8 at 11-12.

(71 of 90)

Case 2:85-cv-04544-DMG-AGR  Document 253  Filed 09/02/16  Page 75 of 108  Page ID
Case: 15-56434, 05/15/2018, Document 265, Docket: 7-10-8, Page 56 of 84 Page ID
#:7411

III review of their denial.[27] Nor did the court provide clarity with regard to cases
where a family does not assert a fear of return until significantly after the time of
apprehension. The constraints on the Government's expedited removal and
reinstatement detention authority must be limited to those contained in the INA (along
with its implementing regulations) and required by the Constitution, not those
artificially imposed by the district court's underdeveloped interpretation of an
ambiguous and inapplicable settlement agreement.

For all of these reasons, even if it finds that the term "all minors" is ambiguous
as used in the Agreement, this Court should find that the parties intended it to refer
only to unaccompanied children, and should reverse the conclusion of the district
court that the Agreement applies to family units in ICE family residential centers.[28]

## C. **The district court improperly found that the Agreement, on its face, requires the release of the adult member of a family unit.**

Even if the Agreement was correctly interpreted to apply broadly to
accompanied minors, the district court nonetheless erred in requiring DHS to release

---

[27] This is currently the situation at the Berks facility, where over 30 families at Berks have effectively
obtained district court stays of removal while seeking habeas review of their negative credible fear
determinations even though the ability to obtain district court habeas review in this context has been
foreclosed by other courts to have considered the issue. *See Castro, et al. v. DHS, et al.*,
5:15-cv-06153-PD (E.D. Pa.); *see also Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1141
(9th Cir. 2008); *AILA v. Reno*, 18 F. Supp. 2d 38, 54-56 (D.D.C. 1998), *aff'd* 199 F.3d 1352 (D.C. Cir.
2000).

not only accompanied minors but also their accompanying *parents* (unless the parent

presents "a significant flight risk or danger to safety"). Merits Order at 8-9 (RE 8-9).

The Remedies Order requires:

> To comply with Paragraph 14A of the Agreement and as
> contemplated in Paragraph 15, a class member's
> accompanying parent shall be released with the class
> member in accordance with applicable laws and regulations
> unless the parent is subject to mandatory detention under
> applicable law or after an individualized custody
> determination the parent is determined to pose a significant
> flight risk, or a threat to others or the national security, and
> the flight risk or threat cannot be mitigated by an
> appropriate bond or conditions of release.

Remedies Order at 14, ¶ 4 (RE 39). This release requirement reflects the Court's

fundamental misreading of the Agreement as regulating the release of an

accompanying parent in any circumstance. *See e.g. Bunikyte*, 2007 WL 1074070 at

*16 ("The *Flores* settlement, however, does not provide any particular rights or

remedies for adult detainees."); *id.* at *31 (holding that "*Flores* creates no rights in the

parents of detained minors, Plaintiffs have not established any basis for releasing the

parents of the minor Plaintiffs.")

---

[28] Applying the Agreement to unaccompanied minors, thereby keeping it within the original scope of the *Flores* litigation, does not provide the Government with *carte blanche* authority to do what it pleases with regard to family detention. The Government's custody of families is still constrained by the Constitution, and the INA. Any individuals with standing to challenge family detention can raise their constitutional or statutory claims in the proper forum.

Case: 15-56434, 09/15/2016, ID: 10126799, DktEntry: 1-1, Page 67 of 84

There is simply no provision in the Agreement that addresses the treatment of
parents at all (including those detained for removal), let alone a provision that
specifically requires the release of an adult so that he or she may take custody of an
accompanying child with whom the adult sought to enter as a family unit without
legal status. *See* Merits Order at 8 (RE 8). Indeed, the district court itself recognized
that "[i]t is true that the Agreement does not contain any provision that explicitly
addresses adult rights and treatment in detention." *Id.*  Nonetheless, the district court
relied on the Agreement's provision of a "preferential right of release to a parent"
(Agreement ¶ 14 (RE 53)), and concluded that the Agreement requires the release of
an accompanying parent along with the minor. Merits Order at 8 (RE 8). This reading
of the Agreement is simply implausible because it is uncontested that, at the time the
Agreement was signed, family detention did not exist, and nothing in the Agreement
addresses the detention of adult parents. *See* Johnson Decl. ¶¶ 10, 12 (RE 144).[29] As

---

[29] Mandating the release of adults also may contravene legal mandates by Congress that require detention
in certain circumstances, drawing into question the validity of such a provision. Several INA provisions
require the detention of adults in specific circumstances. See 8 U.S.C. §§ 1225(b), 1231. In turn, the plain
language of the Agreement specifically provides that the parties "know of nothing in this Agreement that
exceeds the legal authority of the parties or is in violation of any law." Agreement ¶ 41 (RE 65).  Given
that conflict, it is even more unlikely that the parties intended the agreement to require the release of
adults. *See Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917) ("[T]he United States is
neither bound by nor estopped by acts of its officers or agents in entering into an arrangement or
agreement to do or cause to be done what the law does not sanction or permit."); *Cartledge v. Office of
Personnel Management*, No. 2008-3133, 2009 WL 89674, at *4 (Fed. Cir. Jan. 15, 2009) (citing *Utah
Power* for the proposition that, if a settlement agreement was executed contrary to law, OPM would not
be bound by this agreement); *In re Hooper's Estate*, 359 F.2d 569, 577 (3d Cir. 1966) ("It is well settled
that contracts with agents of the Government must be in strict conformity with the authority conferred.").

such, it is not plausible that the parties could have intended for the Agreement to speak to a situation where a child and parent are in immigration detention together.

The district court suggested that the 1997 regulatory framework shows that the parties "would have contemplated releasing an accompanying relative." Merits Order at 9 (RE 9). But the court's selective reliance on a single regulatory reference to divine what the parties "would have" contemplated or agreed to had family detention existed and been under consideration at the time the Agreement was signed is speculative, is not the issue here, and underscores the reality that the Agreement did not address children who are accompanied by a parent.[30] The question is the parties' actual intent. Because there is no textual basis in the Agreement itself, nor extrinsic evidence, upon which the district court could properly conclude that the Agreement was intended to govern the custody or release of adults who are accompanied by children, all portions of the district court's order that would require such release under any standard other than those that apply to all adults under the INA should be reversed.

---

[30] Moreover, the "existing regulatory framework," upon which the district court purports to rely, does not support its conclusion that the parties "would have contemplated releasing an accompanying relative." Merits Order at 9 (RE 9). This is because, pending the district court's approval of the Agreement, the Government specifically tailored the then-existing regulatory framework to limit the release of all aliens in the expedited removal process (including families) to those cases involving medical emergencies or a legitimate law enforcement objective. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444, 478 (proposed Jan. 3, 1997) (codified at 8 C.F.R. §§ 235.3(b)(2)(iii) and (b)(4)(ii)).

60

Moreover, if, as the Government asserts, the Agreement does not govern the release of adults who are detained as part of a family unit, then it necessarily follows that the Government did not breach the Agreement by operating family residential facilities as a means of keeping families together during the pendency of the removal process. The Agreement stipulates that the "preference for release" provisions apply only where "detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others . . . ." Agreement ¶ 14 (RE 53-53).

The Government has contended that family residential centers do not violate the Agreement, "because separating a child from his or her parent endangers the minor's safety, [and] its policy of detaining an accompanied minor together with his or her parent, rather than releasing the minor to another individual, falls within the exception set forth in Paragraph 14 of the Agreement, which allows for continued detention 'to ensure the minor's safety or that of others.'" Merits Order at 7-8 (RE 7-8); *see also Bunikyte*, 2007 WL 1074070, at *6 ("[S]eparating the minor Plaintiffs from their parents by releasing the children to adult relatives would be traumatizing and detrimental to them."). Thus, if the Agreement does not require DHS to release a parent detained as part of a family unit, then the language of Paragraph 14 permitting detention of minors in a manner that would "ensure the minor's safety" provides

61

ample justification for concluding that family detention is not prohibited by the Agreement.

## II.    In the Alternative, the district court incorrectly denied the Government's motion to amend the Agreement

For the reasons stated above, the district court erred in construing the Agreement to cover accompanied minors and their parents who were not part of the plaintiff class and whose situation was not contemplated by the parties when they settled the case. If, however, this Court were to agree with the district court's construction, it should reverse the district court's order denying the Government's motion to amend the Agreement to account for the significantly changed legal and factual circumstances in the two decades since the Agreement was signed.

In this alternative scenario, the Government is seeking to amend the Agreement to apply solely to unaccompanied minors such that the care and custody of accompanied alien minors and their adult parents shall be governed only by the Constitution and the INA. This amendment would restore the proper scope of the Agreement to its intended purpose of resolving the specific issues presented in the underlying litigation, rather than expanding the Agreement to cover scenarios not contained in the pleadings, and not anticipated at the time that it was signed. The amendment would not diminish the obligations governing unaccompanied minors that

the Government agreed to adopt and has implemented since 1997 consistent with the
Agreement and subsequent statutory enactments, including the TVPA.

Under Federal Rule of Civil Procedure 60(b)(5), the Court may relieve a party
from "a final judgment, order, or proceeding [if] applying [the prior action]
prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *see also Frew*, 540
U.S. at 441; *McGrath v. Potash*, 199 F.2d 166, 167-68 (D.C. Cir. 1952). The party
seeking relief "bears the burden of establishing that a significant change in
circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383. That burden
may be met by showing "a significant change either in factual conditions or in law."
*Id.* at 384; *see also Horne v. Flores*, 557 U.S. 433, 447 (2009) ("[T]he passage of time
frequently brings about changed circumstances – changes in the nature of the
underlying problem, changes in governing law or its interpretation by the courts, and
new policy insights – that warrant reexamination of the original judgment."").
"Prospective relief must be 'modified if, as it later turns out, one or more of the
obligations placed upon the parties has become impermissible under federal law.'"
*Miller v. French*, 530 U.S. 327, 347-48 (2000) (quoting *Rufo*, 502 U.S. at 388). A
motion under this section must be brought "within a reasonable time . . . ." Fed. R.
Civ. P. 60(c)(1).

The Agreement is an example of what the Supreme Court has termed
"institutional reform litigation." *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at

63

81

380). In *Rufo*, the Court noted that the district court's ability to modify a decree in response to changed circumstances is heightened in the context of institutional reform litigation. 502 U.S. at 380. "Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." *Id.* Moreover, "the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Id.* at 381 (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)).

Amendment should be allowed where there have been "changes in circumstances that were beyond the defendants' control and were not contemplated by the court or the parties when the decree was entered." *Id.* at 380-81 (discussing *Philadelphia Welfare Rights Org. v. Shapp*, 602 F.2d 1114, 1119-21 (3d Cir. 1979); *see also Hook v. Ariz. Dep't of Corr.*, 120 F.3d 921, 924-25 (9th Cir. 1997) (noting that "there is no evidence which suggests that, at the time the Department entered into the decree, it foresaw the explosion in the number of incarcerated prisoners or . . . controlled substance abusers" and that "[t]he Department also presented uncontroverted evidence that mandatory sentencing legislation was enacted after the Department entered into the decree[, which] was an unforeseen development which resulted in longer prison sentences" and therefore concluding that "the district court

64

abused its discretion in determining the Department did not meet its burden of demonstrating that changed factual circumstances warrant a modification."); *Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1020 (7th Cir. 1984) (en banc) (Posner, J.) ("District judges who preside over 'institutional reform litigation' in this circuit should be mindful of Judge Friendly's recent observation that, 'As experience with this type of litigation increases, a consensus is emerging among commentators in favor of modification with a rather free hand.'") (quoting *N.Y. St. Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 970 (2d Cir. 1983)).

Here, there have been two significant changes in the factual and legal circumstances since the Agreement was drafted that warrant amendment of the agreement.

First, as discussed above, the facts have changed, given a 2014 (and present) surge of family units crossing the Southwest border of the United States on a scale far beyond anything that could have been anticipated when the parties entered into the Agreement. The current numbers – not to mention the surge of 2014 – make family detention an essential option for immigration enforcement. As a reminder, in 1993, the Supreme Court described the apprehension of 8,500 UACs in one year as a serious

problem. *Reno*, 507 U.S. at 294. In just the first three months of FY 2016, CBP has already apprehended 17,370 UACs, and 21,469 family units.[31]

The Government submitted substantial evidence from high-level officials (declarations by senior officials charged by Congress to enact policies that protect the security and sovereignty of the border while also respecting the humanitarian needs of aliens) regarding the importance of family detention as a permissible measure authorized by the INA for responding to unauthorized entry into the United States. However, the district court erroneously dismissed this evidence in summary fashion. Merits Order at 23 (RE 23) ("Nor do Defendants proffer any competent evidence that ICE's detention of a subset of class members in secure, unlicensed facilities has deterred or will deter others from attempting to enter the United States."); Remedies Order at 11 (RE 36) ("This statement is speculative at best, and, at worse, fear-mongering.").

That summary rejection was erroneous. The evidence submitted by the Government, and ignored by the district court, along with more recent evidence of which this Court may take judicial notice, makes clear that there has been a steady rise in the numbers of family units without lawful status entering the United States over the last five years, and that this number spiked during the surge in the summer of

---

[31] *See* United States Border Patrol, Southwest Border Family Unit and UAC Apprehensions (FY 2015 - FY 2016), *available at*: https://www.cbp.gov/sites/default/files/documents/BP%20Southwest%

2014.[32] After the Government responded with multiple efforts to address this surge, including expanded family detention and expedited removal and reinstated removal orders for these populations, the numbers decreased. The Government's ability to use family detention–and correspondingly to use the removal tools provided in the INA that require the use of detention for family units–is important in the immigration landscape that exists now in 2015-16. The current number of apprehensions is far beyond the scale that was contemplated at the time of the Agreement, which described an "influx of minors" as "circumstances where the INS has . . . more than 130 minors eligible for placement," a number that is exponentially lower than the number of families and children crossing the border in 2014 and currently. This is exactly the type of change in factual circumstances that the courts have found warrants amendment of this sort of decades-old agreement. *See, e.g., United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995) (modifying antitrust consent decree because Kodak no longer had the same market power); *United States v. Western Elec. Co., Inc.*, 46 F.3d 1198 (D.C. Cir. 1995) (modification of decree was warranted because a change in fact warranted waiver of antitrust consent decree provision barring long-distance telecommunications company's proposed merger with cellular telephone

---

20Border%20Family%20Units%20and%20UAC%20Apps%20-%20Dec.pdf.
[32] *See infa* at Section I.C.1.

service provider which held interests in cellular systems in which telephone regional

holding companies held majority interest).

Second, the applicable law has changed substantially, also justifying a

modification of the Agreement. IIRIRA manifestly changed the immigration detention

landscape in ways not covered by the Agreement. As discussed earlier, the Agreement

when drafted did not foresee the need to detain families in expedited removal or

reinstatement proceedings pursuant to IIRIRA, which created expedited removal and

dramatically expanded the scope of reinstatement. As of FY 2013, expedited removal

orders accounted for 44 percent of all removals, while reinstatements of final orders

accounted for 39 percent of all removals. *See* DHS Office of Immigration Statistics,

Immigration Enforcement Actions: 2013 5 tbl. 7, *available at*,

https://www.dhs.gov/sites/default/files/publications/ois_enforcement

_ar_2013.pdf.

In addition, the HSA and the TVPRA reassigned the immigration functions

formerly performed by the INS, redefined the requirements for the Government's

custody of UACs, and limited the forms of removal proceedings that could be used

with respect to UACs. As discussed above, the HSA and the TVPRA created an

entirely new procedure that governs the processing of all unaccompanied children

who seek to enter the United States unlawfully across the Southwest border and that

involve multiple agency components and different considerations from those

68

applicable in 1997. The TVPRA expresses congressional consideration of the very

issue addressed in the *Flores* litigation, and reflects Congress's considered conclusion

that unaccompanied children should receive special protection when crossing our

border, but that children who are accompanied by their families are adequately

handled by the existing immigration regime.

Accordingly, to the extent the Agreement is incorrectly interpreted to extend

beyond unaccompanied children, amendment is warranted given Congress's

consideration of the issue and determination to provide *Flores* Agreement-like

procedures only for UACs. Most notably, the TVPRA has mandates for the timing for

the transfer of UACs, and has taken all decision-making regarding the custody and

transfer of UACs completely out of the hands of DHS, and placed it exclusively

within HHS, which does not share the immigration enforcement mission of DHS.

The district court agreed that the Government's evidence regarding recent

increases in illegal immigration "describe a serious problem" but nonetheless did not

find that they constituted a changed circumstance that warranted amendment. Merits

Order at 23 (RE 23). In reaching this conclusion, the district court conducted the

wrong analysis. The court looked at whether the Agreement itself caused the recent

surge of family units, and concluded that it had not, while correspondingly finding

that the Government had not established that family detention was a solution to the

problem. *Id.* The real issue, however, is whether the Agreement should be applied in a

69

manner that limits congressionally-provided, and legislatively mandated, authority to use detention – and therefore to use other removal tools that require the use of detention – to respond meaningfully to the current circumstances or any future surge that might occur. The district court did not conduct that analysis, and in failing to do so committed reversible error. Such an analysis would show that the Agreement, as incorrectly interpreted by the district court, poses an obstacle to addressing the significant problem of the recent surge of families crossing the border without authorization under the authorities Congress provided for protecting the border. *See also Frew*, 540 U.S. at 441-42 ("*Rufo* rejected the idea that the institutional concerns of government officials were 'only marginally relevant' when officials moved to amend a consent decree, and noted that 'principles of federalism and simple common sense require the [district] court to give significant weight' to the views of government officials.") (quoting *Rufo*, 502 U.S. at 392, n.14).

It should also be considered that the TVPRA has effectively codified, and superseded, significant portions of the Agreement with regard to the processing, custody, and release of UACs. While the parties agreed that the Agreement would expire upon the issuance of regulations reflecting the Agreement (Stip. (RE 97)), the fact that a significant portion of the Agreement has now in fact been codified means that regulations implementing the Agreement are no longer necessary, and in some instances would conflict with the TVPRA. Where Congress has spoken so definitively

70

and expansively on the issue, there is good reason to modify the Agreement's requirement that regulations be codified to implement it (or to conclude that the provision triggering termination has now been satisfied).

Numerous interpretive challenges also arise when seeking to apply the Agreement in the context of this new statutory scheme, which could not have been anticipated when the Agreement was executed. Some examples of these challenges – which relate to central provisions of the Agreement – include the following:

- Paragraph 14 of the Agreement provides a policy for the order of preference for release of unaccompanied minors and requires release of UACs following that order of preference. Yet, under the TVPRA, CBP may not release a UAC from its custody other than by returning her to her home country if she is a national or habitual resident of a contiguous nation and meets certain screening criteria, 8 U.S.C. § 1232(a)(2)(A)-(B), (a)(4); or by transferring her to HHS custody within 72 hours of determining that she is a UAC. 8 U.S.C. § 1232(b)(3). HHS then must place the child "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2).

- Paragraph 12.A of the Agreement provides the Government up to 3 days to transfer a UAC to a licensed program in the same district, and up to 5 days to transfer a UAC to a licensed facility outside the area. Under the TVPRA CBP may only release a child to HHS, and must do so within 72 hours of determining that the child is a UAC except in "exceptional circumstances." 8 U.S.C. § 1232(b)(3).

- Paragraph 21 of the Agreement provides that following apprehension a minor may be transferred to a suitable state or county juvenile detention facility (or secure INS facility) under certain conditions. That provision permits "the District Directors or Chief Patrol Agent" to make that determination. However, under the TVPRA, CBP may only transfer UACs to the custody of HHS, 8 U.S.C. § 1232(b)(3), and any decisions regarding placement in a secure facility are assigned to HHS. 8 U.S.C. § 1232(c)(2)(A).

71

The importance of amending of the Agreement is thus further underscored by the fact that the termination section of the Agreement is already satisfied by the enactment of the TVPRA (which codifies the outcomes created by the Agreement but, as described above, achieves those objectives in a different manner). It was therefore inappropriate for the district court to *expand* the scope of the Agreement nearly 20 years after it was executed when the Agreement is most likely now subject to termination.

In considering the effect of these substantial changes in law and factual circumstances on the application of the Agreement, and whether amendment of the Agreement is equitable, it also must be considered that this is not a case where modification is being sought to diminish the Government's obligations under the long-standing understanding of the Agreement, or to restore the parties to the state of affairs that existed prior to the filing of the original lawsuit.   This situation is unique in that the only modification the Government seeks is the restoration of its obligations under the status quo that existed between 2001 and 2015 (a 15-year period in which Plaintiffs never once asserted that operation of family residential facilities violates the Agreement). The fact that family residential centers are even more necessary today than they have been in past years, and that DHS has recently expanded its use of these facilities, means that the most equitable action is not to expand the reach of the Agreement to preclude future use of these facilities, but to amend the Agreement so

72

(87 of 90)

Case 2:85-cv-04544-DMG-AGR   Document 253   Filed 09/02/16   Page 91 of 108   Page ID #:7427
Case: 15-56434, 09/15/2016, ID: 10122901, DktEntry: 110-3, Page 91 of 84

that it does not suddenly preclude DHS from using these facilities at the time when they are needed more than ever.

The dangers of applying the decades-old Agreement to today's substantially-changed immigration landscape are clear. *See Bunikyte*, 2007 WL 1074070, at *20 ("[B]oth Congress and the *Flores* settlement recognize the release of detained families is secondary to the strong public interest in ensuring that illegal immigrants appear for all necessary legal proceedings. Congress has delegated to DHS and ICE the authority to balance the public interest in family unification and supervised release against the public interest in enforcing immigration law. Given the fact that as many as 39% of aliens issued a Notice to Appear by DHS never actually appear for immigration proceedings, the Court cannot say DHS has abused its mandate by exploring family detention.").  Enforcing the Agreement as the district court's orders require is inequitable, and "'impact[s] on the public's right to the sound and efficient operation of its institutions.'" *Rufo*, 502 U.S. at 381 (quoting *Heath*, 888 F.2d at 1109). Thus, for all of these reasons, the district court erred where it concluded that these significant changes do not require modification of the Agreement. If this Court concludes that the Agreement applies to family detention, the Agreement should be modified to permit the Government to operate family residential centers in the manner that it determines protects the public, enforces the

(88 of 90)

Case 2:85-cv-04544-DMG-AGR  Document 253  Filed 09/02/16  Page 92 of 108  Page ID
Case: 15-56434, 03/15/2016, ID: 9903901, DktEntry: 10-3, Page 82 of 84
#:7428

immigration laws, and addresses the humanitarian situation presented at the border

consistent with the protections in the Constitution and all applicable statutes.

DATED:        January 15, 2016          Respectfully submitted,

                                        BENJAMIN C. MIZER
                                        Principal Deputy Assistant Attorney General
                                        Civil Division

                                        LEON FRESCO
                                        Deputy Assistant Attorney General
                                        Civil Division

                                        WILLIAM C. PEACHEY
                                        Director, District Court Section
                                        Office of Immigration Litigation

                                        */s/ Sarah B. Fabian*
                                        SARAH B. FABIAN
                                        Senior Litigation Counsel
                                        Office of Immigration Litigation
                                        District Court Section
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, D.C. 20044
                                        Tel: (202) 532-4824
                                        Fax: (202) 305-7000
                                        Email: sarah.b.fabian@usdoj.gov

                                        *Attorneys for Defendants-Appellants*

# Exhibit 20

Declaration of Helen Lawrence

I, Helen Lawrence, declare and say as follows:

1. I am a member in good standing of the State Bar of California. My California bar license number is 267094. I graduated from the University of California, Los Angeles in 2004 with bachelors of arts degree and I earned my Juris Doctorate at Harvard Law School in 2009. I submit this declaration in support of plaintiffs' motion to enforce ¶ 24A of the *Flores* settlement (Dkt. No. 239).

2. I currently serve as a staff attorney for Legal Services for Children, a non-profit legal services provider in San Francisco, California. In the course of my employment I currently represent Hector Estiven Boteo Fajardo ("Estiven"), whom I have represented since February 2016. I have met with Estiven at Yolo weekly or bi-weekly since February of 2016. I have a G28 and E28 filed in his case.  I have met with Estiven at Yolo weekly or bi-weekly since February of 2016.

3. Estiven has been in ORR custody since August 16, 2015 upon his first and only entry to the United States. Estiven's ORR file reflects that he was initially placed in a licensed juvenile shelter, and that in November 2016 ORR moved Estiven to a secure juvenile hall in Shenandoah, Virginia.  On

January 16, 2016, ORR transferred Estiven to Yolo, where he remains. Estiven has no criminal convictions or juvenile adjudications, nor has he ever been charged with delinquency or crime. At this point, Estiven has been in ORR custody for over one full year. He recently passed his 16th birthday confined at Yolo.

4. According to Estiven's ORR file, and as reported by YCJH staff, Estiven has had very few behavioral issues at Yolo. He wears a t-shirt color, which the Yolo facility bestows only upon youth demonstrating the highest level of good behavior.

5. Nevertheless, over the course of representing Estiven I have observed a marked deterioration in his mental functioning. His aspect has transformed from one of optimism and hope to depression and hopelessness, which he attributes to prolonged detention with no end in sight. He reports suffering from fatigue, despair, and insomnia. He now appears isolated from his peers, and reports a preference for being alone. Estiven said that Yolo is "not a detention center, but an insane asylum" and has worried about his own mental health status after so much time detained. Although I am not a mental health professional, I conclude from the foregoing that prolonged and indefinite detention at YCJH is highly injurious to Estiven's well-being,

2

particularly since he is a child who reports having suffered severe trauma in both Guatemala and Mexico. Prolonged and indefinite confinement in a prison-like juvenile hall has all but depleted his willingness and stamina to persevere in seeking asylum. In my experience, relief and release are inextricably intertwined. A child is in a much stronger position to persist in seeking asylum or other relief from deportation if she or he does not have to endure endless confinement in prison-like conditions for howsoever long adjudication of an asylum application may take. At this point, I despair that prolonged and indefinite detention will wear away Estiven's brave and stoic resolve to win refuge in the United States, that he will give up, opt to be deported, and take his chances at surviving the horrific violence that awaits him in Guatemala.

6. I also believe that ORR's confining Estiven, particularly at YCJH, is unnecessary. Estiven's mother, Elsa, lives in the Los Angeles area. She drives up to Yolo to visit with Estiven every two weeks without fail. This drive takes at minimum seven hours each way. During these visits, Elsa participates in family therapy with Estiven. In addition, Elsa participates in weekly telephonic family therapy sessions with her son. Elsa calls me approximately every two weeks to ask about progress on her son's asylum

3

application or release. She often cries during these calls. ORR has not explained to her why Estiven is still detained, nor has the agency done anything else to alleviate her anxiety. Recently Elsa called me, again in tears, to lament her concern that Estiven would spend yet another Christmas confined at Yolo. She would like to bring her son his favorite food, but Yolo policy will not allow it. Elsa wants nothing more than to reunite with her son.

7.  It is my understanding that Elsa has complied fully with every request ORR has made of her and that ORR has no reason to deem her an unfit parent. Elsa has told me she does not know what more she can do to persuade ORR to release her son. Estiven has likewise told me he does not know what else he can possibly do to win release to his mother. Both Elsa and Estiven have asked me to tell them if there is anything more they can do, anything at all, to end Estiven's prolonged confinement. Frankly, I have no idea what more either of them can do.

8.  Despite being Estiven's counsel of record, ORR has given me no opportunity to examine, explain, or rebut the evidence it thinks warrant detaining Estiven in lieu of releasing him to his mother. ORR has not given me access to Estiven's complete file. From what it has permitted me to see, it appears

4

97

ORR did a psychological evaluation of Estiven on October 7, 2015, the results of which ORR received on November 10, 2015. The report states that Estiven "would benefit from being reunified with his mother." It is now nine months later, Estiven remains detained, and ORR has yet to give me a final decision on Estiven's release, nor advise me when it will reach one.

9. On March 17 and 18 of 2016, I filed Freedom of Information Act (FOIA) and ORR File Requests. Pursuant to the latter request, ORR permitted me to see part of Estiven's file. I have yet to receive anything in response to the FOIA request. I received a second and different portion of Estiven's file from the Office of Immigration Litigation following a request from *Flores* class counsel. The specific reason Estiven's reunification has been stalled appears nowhere in the materials the Government has permitted to see, nor has ORR told me what evidence it has for denying Estiven release. ORR offers no hearing at which Estiven may explain or rebut any such evidence, or otherwise prove that he may be released safely to his mother.

10. In my opinion, Estiven's prolonged confinement at Yolo has profoundly prejudiced his legal defense against removal and his right to apply for affirmative immigration benefits. In my judgment, Estiven is eligible for at least two forms of relief: asylum, based on past persecution and a well-

5

founded fear of future persecution in Guatemala, and Special Immigrant

Juvenile Status (SIJS), due to abuse, abandonment and neglect he suffered

at the hands of his father. He has been unable to apply for SIJ because the

Yolo County Superior Court will not assume jurisdiction over him or issue

predicate orders, which Estiven must have to apply for SIJ, so long as he is

confined at YCJH.

11. Estiven applied for asylum on April 1, 2016.  He was scheduled for an

interview on his asylum application in San Francisco on May 20, 2016.

Normally, these interviews are held at the Asylum Office, which has initial

jurisdiction over the asylum applications of unaccompanied minors. Shortly

before the interview, ORR advised that it would not present Estiven for

interview at the San Francisco Asylum Office, but insisted the interview

take place at the Yolo detention facility itself. I objected on the ground that

the TVPRA vests initial jurisdiction over an asylum application filed by an

unaccompanied immigrant child with Citizenship and Immigration Services,

rather than an immigration court, so that unaccompanied minors would

have their cases heard in a more child-friendly setting. ORR finally agreed to

present Estiven for interview on the 6th floor of the Federal Building at 630

Sansome Street, in San Francisco— a secure area of a secure building.

12. At approximately 7:00 a.m. that morning, Yolo personnel tightly shackled Estiven, placed him alone in the back of vehicle with two guards, and drove him, still in shackles to San Francisco. They then took him to the 6th floor of the Federal Building for his asylum interview. Despite having Estiven in a secure area, the Yolo guards refused to unshackle Estiven. He was so tightly restrained that I observed Estiven's veins distend as he struggled even to raise a hand to his face. He was then 15 years old.

13. Though I objected strenuously to Estiven's being shackled during the interview, the guards refused to remove the restraints. I advised Estiven appearing before an asylum officer in restraints could profoundly prejudice his asylum claim, and he agreed that the interview should not go forward with him in shackles. The two guards drove Estiven, alone and shackled, back to Yolo, where the shackles were finally removed. At no time did ORR tell me that Estiven manifested imminent escape behavior, made violent threats, or demonstrated violent behavior. At no time did Yolo County Juvenile Hall or ORR tell me they had made an individualized determination that Estiven posed a high risk of violence or escape if unrestrained.

14. Unwilling to endure another shackling, Estiven agreed to interview by an asylum office inside the YCJH. On June 3, 2016, the interview went forward,

but in my opinion, forcing Estiven to be interviewed in a prison setting is

antithetical to the child-protective provisions of the TVPRA and plainly

contravenes 8 C.F.R. § 208.9(b), which requires that asylum interviews be

conducted in a non-adversarial manner. I know of no other instances of a

child—or for that matter, an adult—being forced to go through an asylum

interview in restraints or having the availability of an interview free of

physical restraints conditioned on having the interview in a detention

center.  ORR and Yolo have recently stated that they have changed this

policy and will now transport asylum applicants from Yolo to the ICE office

in San Francisco for an unshackled asylum interview.  We have yet to

confirm this new policy through experience.

15. Estiven has now been waiting for decision on his asylum case since early

June, and we do not know when a decision will be made. At this point,

Estiven and I have completed everything that can be done to pursue legal

status for him so long as he remains confined at Yolo.

16. There are two other clients who I represent who are in similar situations at

Yolo County Juvenile Hall.

17. One is Edwin David Aguayo Zavalza. I have a G28 and E28 filed in his case.  I

have represented Edwin since February of 2016 and continue to represent

him.  I am familiar with the facts of his case through my regular meetings

with him and reviews of parts of his file that I have.

18. Edwin is eligible for at least two clear forms of relief from deportation. He is

eligible for asylum based on past persecution and a well-founded fear of

future persecution in Guatemala.  Edwin is also eligible for Special

Immigrant Juvenile Status (SIJS) based on abuse, abandonment or neglect

of his father. Edwin completed his asylum interview on July 21, 2016 and

has been waiting for decision on his asylum case since that date. Edwin is

unable to pursue SIJS based on his detention at Yolo.[1] At this point, Edwin

and I have completed everything that can be done from Yolo to pursue

legal status for him.

19. Seventeen-year-old Edwin is presently detained in Yolo County Juvenile

Hall ("Yolo") in the custody of ORR.  Edwin has been in ORR custody since

May 4, 2015 upon his first and only entry to the United States.  Initially he

was in an ORR shelter in Phoenix, Arizona, but later in May 2015, ORR

moved Edwin to a facility in Portland, Oregon. Around September of 2015,

---

[1] In order to apply for Special Immigrant Juvenile Status (SIJS) he must first be
granted a predicate order from a local family court finding that he has been
abused, abandoned, or neglected by his father.  The county family court does not
have jurisdiction over Edwin until he has been released and is residing with his
mother.

ORR transferred Edwin to an ORR facility in Shenandoah, Virginia and in February of 2016, ORR transferred Edwin to Yolo.  Edwin has been in ORR custody for sixteen months.

20. Edwin has no convictions, juvenile adjudications or charges of any kind.

21. Since February of 2016, I have been meeting with Edwin Yolo once a week or once every other week.

22. It is my understanding that Edwin has been at the highest level of good behavior for most of his time at Yolo and has had very few behavioral issues at Yolo.  He wears a t-shirt color, which the Yolo facility bestows only upon youth demonstrating the highest level of good behavior. He is extremely well-liked by the Yolo guards/staff members who interact with him. Because of his good behavior, Yolo has given him certain privileges such as cleaning an old juvenile hall pod.

23. In a recent visit, Edwin told me he was excited about his upcoming birthday. I was confused because his birthday is in May -  nine months away.  He told me he is very excited to turn eighteen years old because that will mean he is eligible for a bond and other process that is afforded to adults, but not children.  Edwin is counting the days until he becomes an adult.

10

24. Although I am not a mental health expert, in my experience prolonged detention is impacting Edwin's mental health. Detention fatigue impacts a child's willingness and stamina to continuing fighting his relief to deportation.  In my experience, relief and release are inextricably intertwined. A released child is in a much stronger position to fight for relief from deportation. I am extremely concerned that Edwin's prolonged detention will wear away at his brave and stoic efforts to seek protection in the United States. I worry that in one of my visits he will tell me he has given up and no longer wants to fight his case. In the past, Edwin has communicated clear timelines to me that if certain action or progress does not happen in his case by a certain date, he may give up out of desperation being detained so long. Fighting or giving up his case is one of the only things Edwin can control in his life right now.

25. After so much separation, Edwin wants nothing more than to reunify with his mother.

26. Edwin's mother, Flor Yadira Zavalza Salcedo ("Yadira"), lives in Los Angeles, California. She has come to visit Edwin in Yolo which is at least a seven-hour drive one way. Yadira has been suffering some health problems that have limited her ability to make the long drive and visit more frequently.

27. At one point, ORR told Yadira she needed to move homes to a safer neighborhood in order to receive Edwin. She moved homes, but Edwin has still not been reunified with her.

28. Edwin entered the United States with his two siblings. ORR quickly reunified Edwin's younger brother his mother, but Edwin and his sister remain in ORR custody without explanation.

29. Edwin's mother wants nothing more than to reunify with her son.  Edwin does not know what he needs to do to reunify with his mother.  Yadira does not know what more she needs to do to reunify with her son. As Edwin's attorney, I do not know what either of them need to do to reunify. It is my understanding that there is no final decision on Edwin's reunification.

30. I have not been given the opportunity to confront the evidence being used to delay or deny Edwin's reunification with his mother. I do not know why Edwin's reunification has been stalled. ORR provides no legal mechanism for me to challenge Edwin's prolonged detention and stalled reunification.

31. It is my belief, as Edwin's attorney, that his prolonged detention is severely negatively impacting both his legal case and his well-being.

32. A third client who I am currently representing while he is being detained at Yolo is Cesar Ismail Villalobos Lima. I have a G28 and E28 filed in his case.  I

have represented Cesar since February of 2016 and continue to represent him.  I am familiar with the facts of his case through my regular meetings with him and from reviewing the parts of his ORR and immigration files that I have.

33. In July of 2015, the Maryland police arrested Cesar who was sixteen at the time.  The charges against Cesar were ultimately completed dismissed. He has no adjudicated delinquency charge, nor any criminal history.

34. Despite the dismissal of Cesar's juvenile charges, ORR decided to take Cesar back into custody and transferred him to YCJH in the custody of ORR.

35. Cesar eligible for asylum based on past persecution and a well-founded fear of future persecution in Guatemala. Cesar completed his asylum interview on June 24, 2016 and has been waiting for decision on his asylum case since that date. At this point, Cesar and I have completed everything that can be done from Yolo to pursue legal status for him.

36. Seventeen-year-old Cesar is presently detained in Yolo.  Cesar has been in ORR custody since February of 2016.  Cesar has been in ORR custody for six months.

37. Since February of 2016, I have been meeting with Cesar once a week or once every other week.

38. Although I am not a mental health expert, in my experience prolonged detention is impacting Cesar's mental health. Detention fatigue impacts a child's willingness and stamina to continuing fighting his relief to deportation.  In my experience, relief and release are inextricably intertwined. A released child is in a much stronger position to fight for relief from deportation. I am extremely concerned that Cesar prolonged detention will wear away at his brave and stoic efforts to seek protection in the United States. I worry that in one of my visits he will tell me he has given up and no longer wants to fight his case.

39. Cesar wants nothing more than to reunify with his mother.

40. Cesar's mother, Magda Marisol Lima de Villalobos, lives in Baltimore, Maryland, around 3,000 miles from where ORR has placed her son.

41. Legal Services for Children's Social Worker Erin Maxwell has had communication with Cesar's mother who is distraught about his detention. His mother calls and emails Erin Maxwell asking for information about Cesar's release. Her mental health has suffered and she has said that she suffers from "los nervios" from having her son so far away. She often cries during these phone calls. She doesn't seem to understand why her son hasn't been released to her.

14

42. Cesar's mother wants nothing more than to reunify with her son.   Cesar does not know what he needs to do to reunify with his mother.  Cesar's mother does not know what more she needs to do to reunify with her son. As Cesar's attorney, I do not know what either of them need to do to reunify. It is my understanding that there is no final decision on Cesar's reunification.

43. I have not been given the opportunity to confront the evidence being used to delay or deny Cesar's reunification with his mother. I do not know why Cesar's reunification has been stalled. ORR offers no legal mechanism for me to challenge Cesar's prolonged detention or stalled reunification.

44. As Cesar's attorney it is my strong belief that his prolonged detention is severely negatively impacting both his legal case and his well-being.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Executed this 2nd day of September, 2016, at Oakland, California.

_Helen Lawrence_

_____

Helen Lawrence

15