VAN DER HOUT, BRIGAGLIANO & NIGHTINGALE, LLP
Zachary M. Nightingale (Cal. Bar No. 184501)
E-mail: ZN@vblaw.com
180 Sutter Street, 5th Floor
San Francisco, CA 94104-4029
Telephone: 415-981-3000
Facsimile: 415-981-3003

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
Douglas W. Baruch (*Of Counsel*)
E-mail: Douglas.Baruch@friedfrank.com
Karen T. Grisez (*Of Counsel*)
E-mail: Karen.Grisez@friedfrank.com
Ted M. Nissly (*Of Counsel*)
E-mail: Ted.Nissly@friedfrank.com
801 17th Street, N.W.
Washington, D.C. 20006
Telephone: 202-639-7000
Facsimile: 202-639-7003

AMERICAN IMMIGRATION COUNCIL
Melissa Crow (*Of Counsel*)
E-mail: mcrow@immcouncil.org
1331 G Street, N.W.
Washington, D.C. 20006
Telephone: 202-507-7523
Facsimile: 202-742-5619

Attorneys for *Amici Curiae* American Immigration Council and American Immigration Lawyers Association

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | CV 85-4544 DMG (AGR) |
| Plaintiffs, | **BRIEF OF IMMIGRANT RIGHTS ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR** |
| vs. | |
| LORETTA E. LYNCH, *et al.*, | |
| Defendants. | Date:     Oct. 6, 2016, 10:00 AM |
| | Dept.:    Courtroom 7 |
| | Judge:    Hon. Dolly M. Gee |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................... 1

SUMMARY OF ARGUMENT ....................................................................... 2

ARGUMENT .................................................................................................. 4

I.   THE SETTLEMENT DOES NOT ALLOW DEFENDANTS TO
     PREVENT TIMELY RELEASE OF ACCOMPANIED CHILDREN
     THROUGH DECISIONS CONCERNING THE PARENTS ....................... 4

     A.   The Ninth's Circuit's Ruling Concerning Accompanied
          Children Compels the Government to Re-Examine its Family
          Detention Policies ......................................................................... 4

     B.   Current Processing Times for Class Members in the Family
          Detention Context Far Exceed Those Allowed by the
          Settlement Agreement ................................................................... 7

          1.   The Expedited Removal Process As Currently
               Implemented Cannot Be Completed Within Five Days of
               Apprehension ......................................................................... 8

          2.   The INA Does Not Require Expedited Removal
               Proceedings for Accompanied Class Members ....................... 11

     C.   Any Attempt to Cure Violations of the Settlement Release
          Provisions by Accelerating The Expedited Removal Process
          Would Raise Serious Due Process Concerns .................................... 12

II.  THE SETTLEMENT MUST BE INTERPRETED STRICTLY AND
     FAITHFULLY ......................................................................................... 17

     A.   Accompanied Children Must be Released within Five Days or
          as Expeditiously As Possible ............................................................ 18

     B.   The Grant of Additional Time to Process an "Influx" of
          Accompanied Minors Did Not Eliminate the Settlement's Other
          Provisions ........................................................................................ 21

i

**Page**

III.   THE COURT SHOULD COMPEL OR CREATE MECHANISMS TO MONITOR AND ENFORCE COMPLIANCE WITH THE SETTLEMENT ............................................................................................22

    A.   Self-Monitoring By the Government Has Proven Inadequate............22

    B.   The Court Has Wide Latitude to Order Appropriate Remedies .........23

CONCLUSION ............................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Clark v. California,*
739 F. Supp. 2d 1168 (N.D. Cal. 2010)................................................24

*Davies v. Grossmont Union High School Dist.,*
930 F.2d 1390 (9th Cir. 1991) ............................................................23

*Flores v. Lynch,*
No. 15-56434, 2016 WL 3670046 (9th Cir. July 6, 2016).............7, 12, 17, 18

*Flores v. Lynch,* No. 15-56434
(9th Cir. Jan. 15, 2016) .......................................................................5

*Hook v. Arizona, Dep't of Corrections,*
972 F.2d 1012 (9th Cir. 1992) ............................................................23

*Hoptowit v. Ray,*
682 F.2d 1237 (9th Cir. 1982) ............................................................24

*Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.,*
263 F.3d 1041 (9th Cir. 2001) ............................................................24

*Maricopa Cnty., Ariz. v. Melendres,*
136 S. Ct. 799 (2016)..........................................................................24

*Matter of E-R-M- & L-R-M-,*
25 I&N Dec. 520 (BIA 2011)..............................................................11

*Melendres v. Arpaio,*
784 F.3d 1254 (9th Cir. 2015) ............................................................24

*Miller v. Healy,*
No. C-91-0676 SBA, 1992 U.S. Dist. LEXIS 4605
(N.D. Cal. Mar. 24, 1992)...................................................................24

*Nat'l Org. for Reform of Marijuana Laws v. Mullen,*
828 F.2d 536 (9th Cir. 1987) ..............................................................24

*Shillitani v. United States,*
384 U.S. 364 (1966)............................................................................23

iii

**Page**

*Stone v. City & Cnty. of City of San Francisco*,
No. 91-16927, 1992 U.S. App. LEXIS 14436 (9th Cir. Mar. 10, 1992)...........24

*United States v. Suquamish Indian Tribe*,
901 F.2d 772 (9th Cir. 1990) ................................................................24

*United States v. Yacoubian*,
24 F.3d 1 (9th Cir. 1994) ...................................................................23

**STATUTES**

8 U.S.C. § 235(b) .................................................................................11

8 U.S.C. § 1225 .................................................................................2, 5

8 U.S.C. § 1229 ....................................................................................5

8 U.S.C. § 1101(a)(27)(J) ....................................................................15

Immigration and Nationality Act
§ 235 ..........................................................................................5
§ 235(b) ..................................................................................3, 11
§ 235(b)(1)(A)(i) .........................................................................11
§ 235(b)(1)(B) ............................................................................16
§ 235(b)(1)(B)(iii)(III) .................................................................17
§ 240 ..........................................................................................5

**REGULATIONS**

8 C.F.R. § 208.30(f) ..............................................................................9

8 C.F.R. § 235.6(1)(ii) ...........................................................................9

**RULES**

Federal Rule of Civil Procedure 53 .......................................................23

**OTHER AUTHORITIES**

9 *Moore's Federal Practice* § 53.10 (Matthew Bender 3d ed.)................24

AILA, *Due Process Denied:  Central Americans Seeking Asylum and Legal
Protection in the United States* 13 (2016) ...........................................13

American Bar Association Commission on Immigration, *Family Immigration Detention: Why the Past Cannot Be Prologue* at 19 (July 31, 2015) ................................................................................................6

Asylum Officer Basic Training Course Lesson Plan, *Guidelines for Children's Asylum Claims* at 37 (Sept. 1, 2009) ...............................15

*CRCL Complaint on Challenges Faced by Indigenous Language Speakers in Family Detention* (Dec. 10, 2015) ......................................16

Hearing on the Review of the President's Emergency Supplemental Request for Unaccompanied Children and Related Matters, Before the S. Comm. on Appropriations (July 10, 2014) (statement of Jeh Johnson, Sec'y of Homeland Sec. of the United States).................................................5

Letter from CARA Family Detention Pro Bono Project to Megan Mack, Office of Civil Rights and Civil Liberties, Department of Homeland Security, and John Roth, Office of Inspector General, Department of Homeland Security, *Re: Ongoing Concerns regarding the Detention and Fast-Track Removal of Children and Mothers Experiencing Symptoms of Trauma* (Mar. 28, 2016) ........................................................16

Letter from Pa. Dept. of Human Services re: *Berks County Residential Center* (Jan. 27, 2016) .......................................................6

*Letter to USCIS and ICE Concerning Due Process Violations at Detention Facilities* (Dec. 24, 2015) ............................................15, 16

Memorandum from Jeff Weiss, Acting Director, Office of International Affairs, re: *Guidelines for Children's Asylum Claims* (Dec. 10, 1998)............14

THE GEO GROUP, INC., http://www.geogroup.com/maps/locationdetails/23?_sm_au_=iHVRZSs WH1f6kTsr (last visited Sept. 19, 2016)........................................20

USCIS Asylum Division, Family Facilities Credible Fear, FY 2014Q4 – FY2016Q2 Statistics .....................................................10

U.S. Commission on International Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (Aug. 2, 2016)................................................................9

# **INTRODUCTION**

The American Immigration Council ("Immigration Council") and the American Immigration Lawyers Association ("AILA") (referred to hereinafter jointly as "*amici*") file this brief as *amici curiae* in support of Plaintiffs' Motion to Enforce Settlement and Appoint a Special Monitor (ECF 201) (the "Motion"). *Amici* sought leave to file this brief in a preceding application, which contains statements of interest for each organization.

Most importantly with respect to the issues involved in this case, the Immigration Council and AILA collaborate with the Catholic Legal Immigration Network ("CLINIC") and the Refugee and Immigrant Center for Education and Legal Services in the CARA Family Detention Project ("CARA Project"), which advocates on behalf of the mothers and children detained in both Karnes and Dilley, Texas with the ultimate goal of ending family detention. AILA, the Immigration Council, and CLINIC coordinate and provide direct legal services for families detained in Dilley through the Dilley Pro Bono Project.

This case is of critical concern to *amici* in light of their longstanding commitment to promoting and securing immigrants' rights and their advocacy on behalf of detained children in particular. *Amici* seek to protect the rights of immigrant children in accordance with the *Flores* Settlement Agreement (the "Settlement") and thereby ensure that the children are not subject to unnecessary or prolonged detention.

BRIEF OF *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR

On May 19, 2016, Plaintiffs filed the Motion, which seeks an Order from this Court requiring Defendants to comply with the Settlement and this Court's Orders. Among other claims, Plaintiffs' brief alleges that Defendants routinely fail to release children as required by the Settlement and interfere with their access to counsel. Motion at 20.

With respect to Defendants' assertions in their June 3, 2016 Opposition to the Motion (ECF 208) (the "Opposition") that they are in compliance with the Settlement, Opposition at 6-11, *amici*, in their capacity as advocates for detained children, have firsthand knowledge of the operating procedures at Defendants' family detention facilities, and *amici* offer herein direct observations on Defendants' lack of compliance with the release provisions of the Settlement and the Court's Orders and the implications of that noncompliance on the due process rights of class members. Additionally, *amici* support Plaintiffs' proposal that this Court devise and implement an independent and efficient means to monitor and force Defendants' future compliance with the Settlement and this Court's Orders.

## SUMMARY OF ARGUMENT

This Court held, and the Ninth Circuit affirmed, that accompanied children are class members protected by the Settlement. The Settlement requires that accompanied children either be released, preferably to a parent, or placed temporarily in a non-secure, licensed facility within no more than five days of apprehension. Settlement ¶¶ 12, 19. Defendants have invoked the expedited removal statute, 8 U.S.C. §1225

2

(Immigration and Nationality Act ("INA") § 235(b)), to process accompanied children and their parents as part of a larger immigration "deterrence" strategy, but those proceedings cannot be completed within the five-day limit set forth in the Settlement and, in fact, usually take much longer.

In response to increased number of unaccompanied children and families who arrived at the southwest border in 2014, this Court held that the Settlement allowed Defendants flexibility to extend the processing period for accompanied children.  ECF 189 (the "Aug. 2015 Order") at 10.  This Court issued its order in light of the extenuating circumstances confronting Defendants during the initial phase of the influx, and found that "if 20 days is as fast as Defendants, in good faith and in the exercise of due diligence, can possibility go in screening family members," such an extension "may fall within the parameters" of the Settlement. *Id.*  However, since that time, Defendants have adopted an average 20-day processing time benchmark as the *de facto* standard for all accompanied children, even though the Settlement requires that each accompanied child be processed within five days or "as expeditiously as possible."  Settlement ¶¶ 12, 19.  But the Court never adopted an average processing time standard; nor did it hold that a 20-day processing time would be acceptable in all instances.  In any event, now that Defendants have had time to adapt to the influx and augment its border resources, the extended 20-day period is no longer warranted.

Moreover, nothing the Court said allows Defendants to ignore the Settlement's other requirements.  Defendants' blanket use of expedited removal disregards their

obligations to make prompt and continuous efforts towards releasing an accompanied child to a parent and to place an accompanied child in a licensed, non-secure facility if release to a parent is not immediately possible.  Settlement ¶¶ 14, 18.

Notably, no law requires Defendants' use of expedited removal for accompanied children and their parents, and no exception defined in the Settlement justifies its use.  Defendants therefore must re-examine their current expedited removal "deterrence" strategy and process accompanied children in a way that is consistent with the Settlement.  Any attempt to accelerate processing under expedited removal would exacerbate existing flaws systemic to the credible fear interview process and raise serious due process concerns.

Given Defendants' difficulties in complying with the terms of the Settlement and this Court's Orders, *amici* submit that additional oversight and an efficient process for addressing compliance issues is warranted.  This Court has wide latitude to create mechanisms to monitor and enforce compliance.

## ARGUMENT

**I. THE SETTLEMENT DOES NOT ALLOW DEFENDANTS TO PREVENT TIMELY RELEASE OF ACCOMPANIED CHILDREN THROUGH DECISIONS CONCERNING THEIR PARENTS.**

**A. The Ninth Circuit's Ruling Concerning Accompanied Children Compels Defendants to Re-Examine Family Detention Policies.**

Until the Ninth Circuit's July 6, 2016 ruling, Defendants maintained the erroneous position that accompanied children are not covered by the Settlement.  Prior

4

to June 2014, this did not pose a significant problem, because class members and their accompanying parents almost always were placed into full removal proceedings under 8 U.S.C. § 1229 (INA § 240)[1] and were released at the border with a Notice to Appear in immigration court. *See* David J. Venturella, *Memorandum re: Family Detention and Intake Guidance* (Aug. 14, 2009) at 2, attached hereto as Ex. 1 ("Venturella Memo") ("DHS has broad authority to decide whether to remove aliens through expedited removal . . . Effective immediately, discretion is to be exercised broadly in charging family unit cases so that they are placed in removal proceedings pursuant to Section 240 of the INA.").

As the number of arriving family units increased beginning in 2014, Defendants changed their approach to focus on deterrence. Brief for Appellants, *Flores v. Lynch*, No. 15-56434 (9th Cir. Jan. 15, 2016), ECF 10-3 ("Appellants' Brief") at 10 (noting that the number of family units apprehended at the southwest border exceeded 10,000 in both May and June 2014). Defendants abandoned their longstanding approach to children accompanying a parent seeking asylum, and began instead to invoke expedited removal proceedings against class members and their parents. The expedited removal process took time, but Defendants did not appear to be particularly

---

[1] The term "full removal proceedings" refers to Immigration Court proceedings under INA § 240, initiated by the service of a Notice to Appear ("NTA"), which provides access to a range of claims for relief from removal, as well as access to administrative and judicial review. This contrasts markedly with "expedited removal proceedings" authorized by 8 U.S.C. § 1225 (INA § 235), which provide very limited procedural protections, allows only fear-based claims, and limits review to three narrow factual issues.

BRIEF OF *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR

concerned about the number of days required to complete it because they did not believe that their *Flores* obligations extended to this group of children. *Id.* at 34-57.

The use of expedited removal is a cornerstone of the Defendants' current strategy. To deter Central Americans from leaving their countries and seeking asylum in the United States, Defendants modified or constructed massive family detention facilities in New Mexico and then Texas to hold these families during expedited removal proceedings.[2] These were secure facilities that were not licensed to detain families.[3] Again, the Defendants did not appear to be concerned with their Settlement obligations with respect to these actions because they did not believe that children accompanied by parents were *Flores* class members.

Now, however, the legal landscape has changed in dramatic fashion. This Court held, and the Ninth Circuit has affirmed, that accompanied children *are*

---

[2] Although DHS previously had tried and then abandoned family detention, by mid-2014 the only existing family detention facility was Berks, which had the capacity to detain up to 96 people. American Bar Association Commission on Immigration, *Family Immigration Detention: Why the Past Cannot Be Prologue* ("ABA Report") at 19 (July 31, 2015)*, available at* https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/FINAL%20ABA%20Family%20Detention%20Report%208-19-15.authcheckdam.pdf.

[3] *See* Order Re: Plaintiffs' Motion to Enforce Settlement of Class Action and Defendants' Motion to Amend Settlement Agreement, ECF 177 at 15 (characterizing ICE's family detention centers as "secure, unlicensed facilities"); Order of the Travis County District Court, Civil Action No. D-1-GN-15-004336 (June 3, 2016) (enjoining licensing by the state of Texas of the Dilley facility and setting a trial date for litigation challenging the legality of the regulations promulgated by the state to license the Karnes and Dilley facilities); Letter from Pa. Dept. of Human Services re: *Berks County Residential Center* (Jan. 27, 2016) http://services.dpw.state.pa.us/Resources/Documents/Pdf/ViolationReports/20160128 22458.pdf (stating that effective February 21, 2016, the Berks center's license as a child residential facility was revoked and not renewed).

included within the *Flores* class.  ECF 177 (the "July 2015 Order") at 4-7; *Flores v. Lynch*, No. 15-56434, 2016 WL 3670046, at *7 (9th Cir. July 6, 2016).  Consequently, Defendants now must be charged with full knowledge of their *Flores* obligations when their choices as to the treatment of accompanied class members are evaluated. Defendants' historical use of expedited removal and noncompliant family detention facilities can no longer withstand scrutiny.

> **B.     Current Processing Times for Class Members in the Family
> Detention Context Far Exceed Those Allowed by the Settlement
> Agreement.**

For more than two years, DHS consistently has used expedited removal and concomitant detention against thousands of *Flores* class members in a manner that is inconsistent with paragraphs 12, 14 and 19 of the Settlement.[4]  As the Ninth Circuit has noted, the Agreement "creates a presumption in favor of releasing minors[.]"  *See Flores*, 2016 WL 3670046, at *2.  Unless one of two narrow exceptions applies, "the [government] shall release a minor from its custody without unnecessary delay," either to a parent – which is the preferred course of action – or to certain other specified individuals or entities listed in order of preference.  Settlement ¶ 14.  Unless an emergency or influx of minors into the United States has occurred — which, as discussed below is not the case here, the minor generally must be released or placed temporarily in a non-secure, licensed facility within no more than five days of

---

[4] Since its inception, the Dilley Pro Bono Project alone has represented approximately 20,000 mothers and children.  More than half of these individuals are or were *Flores* class members.

apprehension depending on the availability of licensed shelters.  Settlement ¶¶ 12, 19.

Even in an emergency or influx situation, continuous efforts towards release and

family reunification must be made, and release or placement in a licensed shelter must

take place "as expeditiously as possible."  Settlement ¶ 12.

**1.  The Expedited Removal Process As Currently Implemented Cannot Be Completed Within Five Days of Apprehension.**

DHS has conceded that expedited removal proceedings cannot be completed

within five days, Decl. of Thomas Homan, ¶ 33, ECF 184, Ex.1 ("Homan Decl."), and

that *Flores* class members routinely are detained in excess of five days.  ECF 184

("Defs.' Aug. 2015 Resp.") at 7 (explaining that DHS' new policy is "*designed* to

ensure that the majority of individuals in family facilities will be there only during the

*relatively short time* needed for essential processing (to reach an anticipated average

of *approximately 20 days*")) (emphasis added); *see also* Homan Decl. ¶ 28.  Indeed,

Defendants have represented to this Court that, as of June 3, 2016, an average of 17.7

days was required to process individuals in expedited removal proceedings.  Decl. of

John Gurule, ¶ 13, ECF 217, Ex. 1 ("Gurule Decl.").[5]   A recent report by the U.S.

Commission on International Religious Freedom, based on firsthand observations of

the expedited removal process and interviews with DHS officials, among others,

clarifies that initial screening by U.S. Customs and Border Protection ("CBP")

---

[5] *But see* Opposition at 26 ("Of the 18,706 residents initially booked into the FRCs [Family Residential Centers] from October 23, 2015, to May 18, 2016, and subsequently released or removed as of May 16, 2016, the average length of stay was 11.8 days.") (citing Gurule Decl. ¶ 13).

typically takes 24 to 48 hours, and that initial credible fear interviews typically are conducted within 14 days after U.S. Citizenship and Immigration Services ("USCIS") receives a referral from CBP.[6]  Thus, the time period between apprehension and receipt of a credible fear determination may be as long as 16 days.

Even after expedited removal proceedings conclude and release is authorized, class members still are detained for a number of additional days, because DHS must issue and serve charging documents – to commence § 240 removal proceedings before an immigration judge – for those individuals who received positive credible fear determinations.[7]  Based on data collected by the CARA Project for mothers and children held at the Dilley detention center and subsequently released between July 15, 2016 and September 14, 2016, the median period between the date of NTA issuance (which generally happens within 24 hours of a positive credible fear determination) and the date of NTA service was one day, and the median period between the date of NTA service and the actual date of release was five days.[8]  Thus,

---

[6] *See* U.S. Commission on International Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*, at 11 n.9, 12 (Aug. 2, 2016), *available at* http://www.uscirf.gov/reports-briefs/special-reports/barriers-protection-the-treatment-asylumseekers-in-expedited-removal.

[7] After a person in expedited removal proceedings is found to have a "credible fear of persecution," the expedited removal order entered against her is vacated, an NTA is issued, and removal proceedings under INA § 240 should then commence. *See* 8 C.F.R. § 208.30(f); 8 C.F.R. § 235.6(1)(ii).

[8] Decl. of Stephen Manning, ¶¶ 12-13, attached hereto as Ex. 2 ("Manning Decl.").

DHS generally took at least an additional six days *after* rendering a positive credible fear determination to release mothers and children detained at Dilley.[9]

This prolonged detention plainly violates the Settlement unless an exception to Paragraph 14's release provisions applies.  There are just two exceptions to Paragraph 14's presumption of release, and the plain language of the Settlement imposes a high threshold of proof before DHS can invoke either exception. Settlement ¶ 14.  The first exception applies only if a class member's detention is "required" to secure his or her timely appearance before the agency or the immigration court.  *Id.*  The second exception applies only if detention is "required" to ensure the minor's safety or that of others.  *Id.*  The experience of the CARA partners demonstrates that neither of these exceptions applies in the vast majority of cases of children held in family detention centers, most of whom eventually are released.[10]

---

[9] Based on data collected by the CARA project for 2,661 children and mothers held at the Dilley detention center and subsequently released between July 15, 2016 and September 14, 2016, the median period between the date of detention and the date of release was 15 days.  Manning Decl. ¶ 11.

[10] USCIS's publicly available statistics show that, between July 2014 and June 2016, nearly 87% of families in expedited removal proceedings who were referred for credible fear interviews received positive determinations.  *See* USCIS Asylum Division, Family Facilities Credible Fear, FY 2014Q4 – FY2016Q2 Statistics, https://www.uscis.gov/sites/default/files/USCIS/Outreach/Upcoming%20National%20Engagements/PED_CF_RF_FamilyFacilitiesFY14_16Q2.pdf.  Families receiving positive fear determinations are referred for full removal proceedings under INA § 240 and typically released from detention during that process. Homan Decl. ¶ 8.

### 2.  The INA Does Not Require Expedited Removal Proceedings for Accompanied Class Members.

It is undisputed that the use of expedited removal for accompanied class members or their parents is not mandated by the law in any way.  *See Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 521 (BIA 2011) (agreeing with the "DHS argu[ment] that it is not required to process aliens described in section 235(b)(1)(A)(i) of the Act in section 235(b) expedited removal proceedings and that it has the discretion to place these aliens directly into section 240 removal proceedings.").  DHS is not obligated under any statute to use expedited removal against class members or their parents. *See* 8 U.S.C. § 235(b); Venturella Memo at 2.

The blanket use of expedited removal has meant blanket detention of class members and their accompanying parents, for at least the period between placement in expedited removal and the credible fear interview, and often for longer periods where individuals are forced to seek reconsideration of a negative fear determination by an asylum officer or review by an immigration judge. The Defendants' decision to place a class member and an accompanying parent into expedited removal and family detention has meant that Defendants then stop any efforts towards release of the child in each such case.  Defendants never have argued that release of class members to and with their accompanying parents is impossible for any reason other than their own decision to initiate expedited removal proceedings and detain for that purpose.  In fact, Defendants implicitly have acknowledged that the class members placed in family

detention are releasable to and with their accompanying parents, because ultimately they do release class members placed in family detention to and with their accompanying mothers following a favorable credible fear finding.

Notably, recourse to the expedited removal process is not among the two enumerated exceptions to the release provision.  Settlement ¶ 14.  Although DHS could have included expedited removal as an exception, the plain language of the Settlement indicates that it did not.  Settlement ¶ 14; *Flores*, 2016 WL 3670046, at *27.  Accordingly, DHS's decision to place class members and their parents in expedited removal proceedings does not justify detaining class members at all, much less in a secure, unlicensed facility for more than five days after apprehension.

**C.    Any Attempt to Cure Violations of the Settlement's Release Provisions by Accelerating The Expedited Removal Process Would Raise Serious Due Process Concerns.**

Because expedited removal is a tool available to Defendants under the INA, albeit one that they have complete discretion not to employ, they may now be tempted, in light of the Ninth Circuit's recent decision, to try to comply with their Settlement obligations by completing the expedited removal process more quickly. Any attempt to achieve compliance with the Settlement by further accelerating the required screening and interviewing steps required during the expedited removal process should be rejected by this Court.

Ample evidence demonstrates that the Defendants' implementation of expedited removal in the family context has been plagued by myriad due process

problems.[11]  Because the possibility of relief from removal for class members depends in almost every case on the outcome of the claim of the mother, an accompanied child generally cannot successfully establish eligibility for relief when his mother's access to counsel is restricted or she is given inadequate process in connection with her fear claim.  As a result, many class members are deprived permanently of a meaningful opportunity to be heard despite the strength of their asylum claims.[12]  Deportation with an expedited removal order is the result.

One critical defect in the family detention context is the denial of access to counsel.  Notwithstanding the time consumed by the expedited removal process, access to counsel has been limited – often related to the fact that the three existing family detention centers are secure facilities.[13]  The record is replete with reports of attorneys whose ability to provide effective legal representation to children and mothers in family detention centers has been impeded and impaired.[14]

---

[11] In a 2016 report, AILA described how the decision to place families in summary removal proceedings results in their detention, which "sharply curtails access to counsel and makes it extremely difficult to gather evidence and present a legal claim." AILA, *Due Process Denied:  Central Americans Seeking Asylum and Legal Protection in the United States* 13 (2016), *available at* http://www.aila.org/infonet/report-due-process-denied.

[12] *See* American Immigration Council Special Report, *Detained, Deceived, and Deported:  Experiences of Recently Deported Central American Families* (May 2016), *available at* https://www.americanimmigrationcouncil.org/special-reports/deported-central-american-families.

[13] The placement of *Flores* class members only in secure detention facilities is a further violation of the Settlement Agreement.  *See* July 2015 Order at 15.

[14] *See, e.g.*, Decl. of Lindsay Harris (Due Process), ¶ 15, ECF 201-2, Ex. 16 (explaining that counsel are prohibited from attending meetings among *Flores* class member children and their mothers and ICE agents to discuss the terms and conditions of their release, even when the customary Form G-28, Notice of Appearance as

Another critical defect is that children unfairly are denied the opportunity to present independent claims for protection.  Children may have seen or experienced events unknown to their accompanying parent, or they may perceive the harm differently in light of their developing cognitive, psychological, or even physical capacities.  Notwithstanding the special guidelines governing the evaluation of children's asylum claims that have existed since 1998, the independent claims that class member children may have are either overlooked completely or given short shrift.[15]  More recently, although interviews of children alone or in the presence of their mothers are allowed at times, Dilley Pro Bono Project attorneys report that (i)

---

Attorney or Representative, is on file with ICE, and stating that "[d]uring those meetings, class members and their mothers are routinely coerced and misinformed about their right to request a bond hearing before an immigration judge, a right provided to class members under the original *Flores* settlement"); Decl. of Jacqueline Kline, ¶ 7, ECF 201-1, Ex. 5 ("Still today, counsel is subject to search upon entry into BCRC . . . We are not permitted to bring in cell phones.  We are not permitted to bring in computers unless we have prior approval.  We are not permitted to visit clients without notice.  We were notified via email on November 23, 2015 of more restrictive rules regarding legal visitation requiring 24 hours' notice in order to see our clients."); *see also* Decl. of Manoj Govindaiah, ECF 201-2, Attachment to Ex. 17 (raising several access to counsel issues, including: the requirement that visitation lists be submitted 24 hours in advance, despite the rapidly changing population at the detention center and remote location in Karnes City, Texas; the increasing restrictions on attorney phone calls with detained families; the restrictions on the ability of pro bono attorneys to enter the legal visitation area upon arrival at the Karnes detention center; the requirement that young children remain with their mothers during attorney-client meetings during which sensitive and traumatic information must often be disclosed and discussed, among others).

[15] *See* Memorandum from Jeff Weiss, Acting Director, Office of International Affairs, re: *Guidelines for Children's Asylum Claims* (Dec. 10, 1998), *available at* https://www.uscis.gov/sites/default/files/USCIS/Laws%20and%20Regulations/Memoranda/Ancient%20History/ChildrensGuidelines121098.pdf; Asylum Officer Basic Training Course Lesson Plan, *Guidelines for Children's Asylum Claims* at 37 (Sept. 1, 2009), *available at* https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/AOBTC%20Lesson%20Plans/Guidelines-for-Childrens-Asylum-Claims-31aug10.pdf.

requests for independent initial interviews or re-interviews of children often are denied; (ii) many initial "interviews" of children last only a few minutes and involve brief, perfunctory questioning in the middle of, or immediately after, the mother's interview; and (iii) immigration judges often affirm negative fear determinations without ever speaking with the affected children.[16]  Thus, many children are denied a fair opportunity to independently present their asylum claims during summary proceedings.[17]

Additionally, initial credible fear interviews frequently are flawed.  The asylum seeker may be too tired, sick, or traumatized to tell her full story and may not comprehend or be able to comply with the opening charge to "tell everything" in that first interview.[18]

---

[16] *See Letter to USCIS and ICE Concerning Due Process Violations at Detention Facilities* ("Letter to USCIS and ICE") at 2-5 (Dec. 24, 2015), *available at* http://www.aila.org/advo-media/aila-correspondence/2015/letter-uscis-ice-due-process.

[17] In addition, the credible and reasonable fear screening process fails to assess the potential eligibility of detained children for Special Immigrant Juvenile status ("SIJS"), denying them another avenue of protection.  SIJS can be requested from USCIS following a finding by a state court with jurisdiction over juveniles: that a child has been abused, abandoned, or neglected by at least one parent; that reunification with the parent(s) is not viable; and that it is not in the child's best interests to be returned to the home country.  *See* 8 U.S.C. § 1101(a)(27)(J).  Although traveling with one parent, many children are potentially eligible for SIJS status based on actions by the other parent.

[18] *See* Letter from CARA Family Detention Pro Bono Project to Megan Mack, Office of Civil Rights and Civil Liberties, Department of Homeland Security, and John Roth, Office of Inspector General, Department of Homeland Security, *Re: Ongoing Concerns regarding the Detention and Fast-Track Removal of Children and Mothers Experiencing Symptoms of Trauma* (March 28, 2016) ("CARA Letter") at 2, *available at* http://www.aila.org/advo-media/press-releases/2016/cara-crcl-complaint-concerns-regarding-detention (explaining that detention re-traumatizes survivors of violence and that being in detention severely limits access to mental health services).

Many asylum seekers do not even understand the role of the interviewing officer and, as a result, lack sufficient trust to reveal their entire history, which may include details of sexual abuse, domestic violence, and/or rape.  CARA Letter, *supra* note 18, at 15.  Interpretation difficulties also are a common problem, particularly for indigenous asylum seekers.[19]  The use of telephonic interpretation interposes yet another source of misunderstanding or miscommunication.

Although there are opportunities to attempt to overcome a negative credible fear finding, the procedures are cumbersome.  The Asylum Office has the discretion as to whether or not to grant a re-interview.  *See* INA § 235(b)(1)(B).  While initial negative fear determinations are sometimes reversed, the approval rate reportedly has decreased recently.  *See* Letter to USCIS and ICE, *supra* note 16, at 3-4. And while review of a negative credible fear determination is available from an immigration judge, INA § 235(b)(1)(B)(iii)(III), many of these proceedings take place on the same flawed record made initially before the asylum officer because the applicant has not yet been able to fully articulate her story.  Critically, however, pursuing these options in an attempt to overturn a negative credible fear determination further prolongs detention and makes compliance with the Settlement's release provisions even more

---

[19] The CARA Project filed a complaint with DHS's Office of Civil Rights and Civil Liberties ("CRCL") and Office of Inspector General ("IG") detailing challenges in procuring access to justice faced by indigenous language-speaking mothers and children in family detention centers. *See CRCL Complaint on Challenges Faced by Indigenous Language Speakers in Family Detention* (Dec. 10, 2015), *available at* http://www.aila.org/advo-media/press-releases/2015/crcl-complaint-challenges-faced-family-detention.

unlikely.  The tension between a fair process and a prompt process must be resolved in favor of fairness and access to protection.

These due process deficiencies are exacerbated further when it comes to children.  Screening, interviewing, reaching a decision and communicating have not always been effective in the family detention context.  Reaching fair determinations, particularly for children, cannot be done in a meaningful way if the process is rushed even further.

## II.  THE SETTLEMENT MUST BE INTERPRETED STRICTLY AND FAITHFULLY.

The Settlement governs the relationship between Defendants and all minors in their custody, regardless of whether they are accompanied or unaccompanied at the time of entry.  *Flores*, WL 3670046, at *14, 28.  Unless modified by agreement of the parties or order of the Court, disputes regarding treatment of accompanied minors by the Defendants must be resolved to give maximum effect to the provisions of the Settlement.[20]

This Court has found that "an 'influx of minors into the United States, [under] Paragraph 12A [of the Settlement] gives Defendants some flexibility to reasonably exceed the standard five-day [release] requirement so long as the minor is placed with

---

[20] The imperative for strict adherence to the terms of the original Settlement is reflected in this Court's rejection of Defendants' prior Motion to Amend.  July 2015 Order at 20-24. And, it is reflected in the Ninth Circuit's recent decision concerning inclusion of accompanied minors. *See Flores*, 2016 WL 3670046, at *7.

an authorized adult or in a non-secure licensed facility, in order of preference under Paragraph 14 [of the Settlement], 'as expeditiously as possible.'" Aug. 2015 Order at 10 (emphasis added). However, Defendants' treatment of accompanied children held in family detention violates these provisions of the Settlement, because (i) Defendants' current detention of accompanied minors well beyond the five-day limit is no longer tied to an influx and therefore is not justified; and (ii) Defendants fail to make continuous efforts to release children through placement with a parent, even though a parent is accompanying the child and thus is available at the time of initial apprehension by Defendants.

### A. Accompanied Children Must be Released within Five Days or as Expeditiously as Possible.

The Settlement recognizes that detention is harmful to children and, as a result, generally requires their release from custody within no more than five days of initial apprehension. Settlement ¶¶ 12, 19. The influx provision of the Settlement, however, permits additional processing time in the event "the [Government] has, at any given time, more than 130 minors eligible for placement." Settlement ¶ 12.B. After the levels of unaccompanied children and family units arriving at the southwest border reached unexpected highs in the late summer and fall of 2014, Defendants were overwhelmed by the numbers and sought to modify the Settlement Agreement to lessen requirements regarding processing children coming into their custody. ECF 120 ("Defs.' Feb. 2015 Mot. to Amend").

BRIEF OF *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR

On August 21, 2015, this Court acknowledged the additional workload confronting Defendants and held that the influx provisions in Paragraph 12.B justified allowing some flexibility in processing times for new arrivals.  Aug. 2015 Order at 10. This was a clear effort by the Court to balance the Settlement's requirement of prompt release with the goal of avoiding the separation of children from their parents.  Even so, this Court did not modify the Settlement such that 20 days replaced the original time period in Paragraph 12, nor did the Court hold that the 20-day extended period was authorized across the board.

After this Court's August 2015 Order, Defendants quickly abandoned any pretense of complying with the Settlement's original requirement of no more than five days.  Opposition at 26 (stating that for one period "the average length of stay was 11.8 days" and more recently "the average length of stay is 17.7 days.").[21]  Defendants began treating the possible extension to 20 days in some specific cases as if it were the new deadline.[22]

The Defendants' embrace of an *average* of 20 days as a marker of compliance with the Settlement is misplaced, because: (i) an average period of detention is not contemplated under the Settlement and does not exempt Defendants from compliance

---

[21] These figures do not appear to account for the period between apprehension by CBP and transfer to ICE custody.

[22] Anecdotally, transfers out of Dilley and Karnes after 18 or 19 days of detention became all too common, sometimes because the family was granted release on bond or an ankle monitor or occasionally humanitarian parole, but other times due to a transfer to another detention facility, usually the Berks Family Residential Center in Leesport, PA.

with the Settlement on an individualized basis; (ii) Defendants' position reads the "as expeditiously as possible" language out of the Settlement entirely; and (iii) the position ignores that the situation that gave rise to the 20-day exception no longer exists.  This Court never said that 20 days would be acceptable in all cases during an influx.

And, now, at this "given time," there is no record of ongoing extenuating circumstances that would authorize detention in excess of five days.[23]  Nevertheless, after creating infrastructure and building and staffing permanent installations, Defendants would have this Court believe they are still facing an unprecedented influx that requires exceptional measures.  It assumes that the flexibility in time initially permitted for detention of some children should now, two years later, be regarded with the same leniency allowed while it initially struggled to develop its response.  The Court should revisit the question of the length of time that satisfies the "as expeditiously as possible" standard under today's changed circumstances.  Part of that determination must include an examination of whether Defendants are allocating

---

[23] An examination of Defendants' course of conduct from 2014 to the present illustrates why it is no longer entitled to an exception.  The Artesia, New Mexico facility, stood up in haste in summer 2014 and operated by ICE itself, was rapidly shuttered in January 2015 after only a few months.  *See* ABA Report, *supra* note 2, at 19, 21.  According to Defendants, the South Texas Family Residential Center in Dilley, Texas that replaced Artesia was built specifically for its current use as a family detention facility.  *See id.* at 22.  The facility now has capacity for 2400 beds.  *See id.* A parallel process has taken place at the Karnes County facility.  A detention center that formerly housed only adults was converted to a family detention center.  *See id.* at 21.  Building modifications were made, contracts were amended to provide for family detention, and new staff members were hired.  *See id.* at 21-22.  Karnes now has a capacity of 532 beds.  *See* The GEO Group, Inc., http://www.geogroup.com/maps/locationdetails/23?_sm_au_=iHVRZSsWH1f6kTsr (last visited Sept. 19, 2016).

resources appropriately to demonstrate good faith compliance with the requirements

of the Settlement.

**B.      The Grant of Additional Time to Process an "Influx" of Accompanied Minors Did Not Eliminate the Settlement's Other Provisions.**

As described above, Defendants initially chose to respond to the "influx" of

children accompanying their parents with expedited removal proceedings.  Having

secured some latitude in processing times as they reacted to the unexpected number of

new arrivals, Defendants then ignored not only the five-day limit, but other Settlement

requirements as well.  For example, the blanket use of expedited removal ignores the

Defendants' obligation under Paragraph 18 to make prompt and continuous efforts

towards release to a parent in accordance with Paragraph 14.  Defendants appear to

take the position that "once in family detention, always in family detention."

However, no such modification has ever been made or allowed by this Court.

Likewise, continuing use of expedited removal contravenes the Settlement's

requirement for placement in a licensed, non-secure facility if such release is not

immediately possible.   Family detention is inconsistent with the Settlement.

Defendants should forego the discretionary use of expedited removal in cases of

family members travelling together and thereby facilitate release of accompanied

children to their parents.  If they refuse to do so, the Court must respond accordingly.

## III. THE COURT SHOULD COMPEL OR CREATE MECHANISMS TO MONITOR AND ENFORCE COMPLIANCE WITH THE SETTLEMENT.

### A. Self-Monitoring By Defendants Has Proven Inadequate.

The continuing concerns with both Defendants' inclination and ability to comply with the terms of the Settlement call for additional oversight of its compliance with the terms of the Settlement and this Court's Orders, along with a more efficient process for addressing disputes regarding that compliance. Both are within this Court's purview to order. The need to monitor and enforce compliance in light of the Ninth Circuit's recent decision concerning accompanied minors is particularly acute.

The following factors weigh in favor of a more rigorous reporting and enforcement framework:

(1) This Court found Defendants non-compliant with the Settlement in the recent past. *See* July 2015 Order at 7-9;

(2) Even more recently, Defendants have admitted non-compliance with the Settlement. *See* Opposition at 34 ("Defendants acknowledge that the precise notice provided in Exhibit 6 to the [Settlement] Agreement is not provided to juveniles in family residential centers.");

(3) Defendants' admitted non-compliance calls into question the Defendants' ability or dedication of resources necessary to properly "monitor compliance with the Settlement and this Order" as instructed by the Court. *See* Aug. 2015 Order at 15;

22

(4)     As discussed above, Defendants improperly have used this Court's prior flexibility concerning "influx" to avoid the language and spirit of the Settlement; and

(5)     As discussed above, Defendants' use of expedited removal is at odds with the release provisions of the Settlement.

Further, given the nature of the Settlement, additional, factually-complex questions concerning Defendants' compliance likely will arise in the future.  Thus, the interests of prompt dispute resolution and judicial economy warrant development of alternative monitoring/reporting and enforcement procedures.

**B.     The Court Has Wide Latitude to Order Appropriate Remedies.**

This Court has the latitude to fashion appropriate remedies to enforce settlements and orders.  *See*, *e.g.*, FED. R. CIV. P. 53; *United States v. Yacoubian*, 24 F.3d 1, 5 (9th Cir. 1994) ("There [is] no question that courts have inherent powers to enforce compliance with their lawful orders.") (quoting *Shillitani v. United States*, 384 U.S. 364 (1966)); *Hook v. Arizona, Dep't of Corrections*, 972 F.2d 1012, 1014 (9th Cir. 1992) ("A district court retains jurisdiction to enforce its judgments, including consent decrees.") (citation omitted); *Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1393 (9th Cir. 1991) ("[D]istrict courts have power to enforce their own orders.").

Plaintiffs' proposal for an independent special monitor[24] would address the prior compliance failures described above.[25]   At the very least, this Court should consider and order some variation of the following: an independent audit by an appointed expert of Defendants' self-monitoring efforts and compliance with the terms of both the Settlement and this Court's Orders; periodic reporting of detention statistics and other information by Defendants combined with independent review of such reports; and a more efficient process for adjudicating allegations of non-compliance.   *See Clark v. California*, 739 F. Supp. 2d 1168, 1172-75, 1210, 1229, 1233-35 (N.D. Cal. 2010) (ordering that since defendants were "not capable of systematically identifying and correcting compliance problems," additional remedial orders were necessary, including, among other things, instituting a new training regimen created with the assistance of experts and requiring defendants to consult

---

[24] The Ninth Circuit has upheld the use of special masters to monitor compliance with court orders and consent decrees. *See, e.g., Melendres v. Arpaio*, 784 F.3d 1254, 1266-67 (9th Cir. 2015), *cert. denied sub nom. Maricopa Cnty., Ariz. v. Melendres*, 136 S. Ct. 799 (2016); *Hoptowit v. Ray*, 682 F.2d 1237, 1263 (9th Cir. 1982); *Nat'l Org. for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 542-44 (9th Cir. 1987); *Miller v. Healy*, No. C-91-0676 SBA, 1992 U.S. Dist. LEXIS 4605, at *15 (N.D. Cal. Mar. 24, 1992).

[25] It is well within the Court's powers to direct such oversight. *See, e.g.,* 9 *Moore's Federal Practice* § 53.10 (Matthew Bender 3d ed.) ("A court may appoint a special master to monitor future implementation of any injunctive features of the court's decree or of a settlement agreement."); FED. R. CIV. P. 53 advisory committee's note to 2003 amendment ("[A] master might conduct evidentiary hearings on questions of compliance."); *Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 263 F.3d 1041, 1045 (9th Cir. 2001) (the district court appointed a master to facilitate the resolution of the disputes among parties concerning defendants' implementation of the settlement agreement); *Stone v. City & Cnty. of City of San Francisco*, No. 91-16927, 1992 U.S. App. LEXIS 14436, at *27 n.18 (9th Cir. Mar. 10, 1992) ("Federal courts repeatedly have approved the use of special masters to monitor compliance with court orders and consent decrees."); *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 774 (9th Cir. 1990) ("Masters may be appointed to aid a district court in the enforcement of its decree.").

1

2

3

4

5

6

with experts regarding their self-audit process and the implementation of that self-monitoring tool).   Defendants have proven themselves incapable of demonstrating their compliance with the Settlement.   Almost two decades after the Settlement was reached, Defendants are still wrestling with how — and even in what circumstances — to honor the terms of the Settlement.

7

8

### **CONCLUSION**

9

10

11

12

For the following reasons and the reasons set forth in Plaintiffs' Motion, the Court should grant the motion to enforce and adopt appropriate mechanisms to ensure future compliance with the Settlement.

13

14

15

16

17

18

19

20

21

22

Dated: September 19, 2016          VAN DER HOUT, BRIGAGLIANO &
                                   NIGHTINGALE, LLP

                                   */s/ Zachary M. Nightingale*
                                   Zachary M. Nightingale (Local Counsel)
                                   ZN@vblaw.com

                                   FRIED, FRANK, HARRIS SHRIVER &
                                   JACOBSON LLP
                                   Douglas W. Baruch (Of Counsel)
                                   Karen T. Grisez (Of Counsel)
                                   Ted M. Nissly (Of Counsel)

                                   AMERICAN IMMIGRATION COUNCIL
                                   Melissa Crow (Of Counsel)

                                   Attorneys for *Amici Curiae* American
                                   Immigration Council and American
                                   Immigration Lawyers Association

23

24

25

26

27

28

BRIEF OF *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1



*Office of Detention and Removal Operations*

**U.S. Department of Homeland Security**
500 12ᵗʰ Street, SW
Washington, DC  20536

**U.S. Immigration
and Customs
Enforcement**

August 14, 2009

MEMORANDUM FOR:   Field Office Directors

FROM:   David J. Venturella
Acting Director

SUBJECT:   Family Detention and Intake Guidance

Purpose

All Office of Detention and Removal Operations (DRO) Field Office Directors (FODs) shall review this guidance and ensure adherence to revised detention and intake procedures for the detention and placement of family units who qualify for placement in a family residential center.  The only facility authorized to accept family units at this time is the Berks Family Residential Center (BFRC) in Leesport, PA.

Family Unit Defined

A family unit is narrowly defined and must include a non-United States citizen child or children under the age of eighteen accompanied by his/her/their parent(s) or legal guardian(s).  In determining the existence of this relationship for custody purposes, DRO should seek to obtain reliable evidence of this relationship.  All members of the apprehended family unit must be non-criminal and/or non-delinquent and have no history of violence or substance abuse.

Action Required

Effective August 17, 2009, when a family unit is identified and apprehended by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement, the DRO Field Office for that area of responsibility will assume custody of the family unit after the apprehending organization has completed initial arrest processing, including issuance and service of a Notice to Appear (NTA) or other appropriate charging document.  Transfer to the DRO Field Office should be completed within 12 hours of notification by the apprehending organization.

After assuming custody, the responsible DRO Field Office will make an independent custody determination, based upon review of all available information, and also ensure that those detained meet the family unit definition set forth in this guidance.  If in the course of the independent review, the DRO Field Office determines that the child under the age of 18 is not

Exhibit 1
1

Family Detention and Intake                                                    2

accompanied by a parent or legal guardian, a Field Office Juvenile Coordinator will immediately contact the Office of Refugee Resettlement (ORR), Department of Health and Human Services for placement of the Unaccompanied Alien Child(ren) (UAC). While pending placement and transportation to an ORR facility, established protocols will remain in effect with regard to the care and treatment of UAC.

Currently, the majority of all family units that are apprehended are placed in expedited removal under Section 235 of the Immigration and Nationality Act (INA). However, DHS has broad authority to decide whether to remove aliens through expedited removal; INA § 235(b)(1)(A)(iii)(I); 69 Fed. Reg. 48877. Effective immediately, discretion is to be exercised broadly in charging family unit cases so that they are placed in removal proceedings pursuant to Section 240 of the INA. The exercise of this discretion is not intended to foreclose reinstatement of prior removal orders under Section 241(a)(5) of the INA.

<u>Custody Determination</u>

FODs shall ensure that the independent case review of each family unit is conducted and a custody determination made within 48 hours of arrest as required by 8 C.F.R. § 287.4(d). When making a custody determination with respect to a family unit and keeping in mind the operational needs of ICE, FODs will exercise their discretionary authority to detain or release with an emphasis on utilization of alternatives to detention programs such as releases on an Order of Supervision, Order of Recognizance, the Intensive Supervision and Appearance Program, electronic monitoring, or the use of parole and/or bond. This custody determination should be made prior to initiating a transfer of the family unit to the BFRC. Following transfer to BFRC, absent any statutory or regulatory requirements for mandatory detention, DRO should continue an ongoing evaluation of the family unit's eligibility for alternatives to detention and/or discretionary release.

<u>Mandatory Detention</u>

When a determination is made that a family unit is subject to mandatory detention, the DRO Field Office with custody of the family unit shall request space at the BFRC. The attached flow chart describes the processes to be followed when requesting placement into the BFRC.

In the event that the BFRC is at capacity and unable to make an immediate placement, family units may be held in local hotels under DRO supervision for a maximum period of 72 hours, excluding weekends and holidays. In the event that bed space is still unavailable after 48 hours of detention at a local hotel, the DRO Field Office with custody of the family unit will contact (b)(6),(b)(7)(C) Chief, Juvenile and Family Residential Management Unit at (202) 732-(b)(6),(b)(7)(C) (desk) or (202) 345-(b)(6),(b)(7)(C) (blackberry) to report the possibility of a Flores Settlement Agreement violation and discuss other detention options.

Any questions concerning this guidance may be directed to (b)(6),(b)(7)(C) Chief, Juvenile and Family Residential Management Unit at (202) 732-(b)(6),(b)(7) (desk) or (202) 345-(b)(6),(b)(7)(C) (blackberry).

*Office of Detention and Removal Operations*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

| | | |
|---|---|---|
| MEMORANDUM FOR: | Field Office Directors | SEP 18 2009 |
| FROM: | David J. Venturella<br>Acting Director | (b)(6),(b)(7)(C) |
| SUBJECT: | Intake Procedures at the T. Don Hutto Residential Center | |

Purpose

Effective August 17, 2009, the T. Don Hutto Residential Center (TDHRC) ceased accepting alien family units. Upon removing the final remaining family unit from the TDHRC, the mission of the facility will transition to one of housing only adult female aliens.

This document sets forth the specific procedural changes necessitated by this transition. All requests for placement will be conducted through a Central Intake Call Screening Station located at the TDHRC in Taylor, Texas. Intake staff shall screen all requests prior to acceptance and placement.

Placement Eligibility

The TDHRC currently maintains 500 residential beds for level one (1) and level two (2) non-violent criminal adult female aliens with no illegal drug convictions. These beds are available to all Office of Detention and Removal Operations (DRO) Field Offices, and case management is assigned to the San Antonio Field Office. All adult female aliens with classification non-violent criminal conviction levels of one (1) or two (2), with the exception of those who have criminal convictions involving the use, abuse, possession, or trafficking of illegal substances are, considered eligible for placement in this facility at this time. Adult female aliens with a history of escape from a secure institution are not eligible for placement at TDHRC.

The TDHRC staff will conduct and approve all intake screening. While transportation to the facility is the responsibility of the field office requesting placement, transportation from the Austin-Bergstrom International Airport, Austin, Texas, or within the San Antonio Field Office's area of responsibility (AOR), continues to be provided by the San Antonio Field Office or contracted transportation providers.

www.ice.gov

SUBJECT: Interim Intake Procedures at the T. Don Hutto Residential Center
Page 2

<u>Procedures</u>

1.  The DRO Field Office seeking placement shall telephone (512) 269 [(b)(6), (b)(7)(C)] and provide the Intake Officer with all requested information.

2.  The Intake Officer will initially screen the request and will then require from the Field Office a completed Intake Checklist Form. If the DRO Field Office requesting placement does not have the form, the Intake Officer will fax or e-mail one to be completed.

3.  The DRO Field Office requesting placement will complete the Intake Screening Form and forward it to the Intake Officer for review and approval.

    a.  The Intake Officer will ensure that the detainee meets all criteria for placement into the TDHRC.
    b.  The Intake Officer will ensure that the DRO Field Office is aware of all required paperwork that must be received prior to the detainee's placement into the TDHRC.
    c.  The Intake Officer will ensure that space is reserved for the detainees.

4.  Upon acceptance, the Intake Officer will notify the local DRO Field Office of the acceptance and instruct the Officer/Agent to make travel arrangements to the respective assigned facility through the local field office.

5.  When the DRO Field Office requesting placement cannot reach the Intake Officer within 30 minutes of placing the initial request, the following numbers may be called, in order of succession:

    a.  TDHRC Intake Phone:          (512)269 [(b)(6),(b)(7)(C)]
    b.  TDHRC Intake Supervisor:     (512)801
    c.  SNA Operations Center:       (866)441
    d.  TDHRC JFRMU Duty Officer     (202)391
    e.  JFRMU HQ Duty Officer:       (202)421
    f.  JFRMU Chief:                 (202)345

6.  It is the responsibility of the DRO Field Office requesting placement to arrange transportation to the San Antonio AOR.

Exhibit 1
4

1
2
3
4
5
6
7 **Exhibit 2**
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Declaration of Stephen W. Manning

I, Stephen W. Manning, declare and say:

1.  I am an attorney in a private practice based in Portland, Oregon, and I am the director of the Innovation Law Lab, a non-profit in Oregon. I am an adjunct professor of law at Lewis & Clark Law School in Oregon where I teach immigration law. I am the recipient of the 2014 American Immigration Lawyers Association (AILA) Founder's Award for creating and organizing the pro bono project at the family detention center in Artesia, New Mexico, the 2010 Jack Wasserman Memorial Award for Excellence in Immigration Litigation, the 2009 Edith Lowenstein Memorial Award for Excellence in Advancing the Practice of Immigration Law, the 2008 Gerald R. Robinson Award for Excellence in Immigration Litigation, among other awards and recognition. I am a former Commissioner of Portland, Oregon's Human Rights Commission. I was elected a member of AILA's Board of Governors in 2012.

2.  The Innovation Law Lab, a non-profit I founded in 2014, uses specialized technology and training programs to build the capacity of lawyers and non-profits throughout the United States. The Law Lab provides the technology platforms for the CARA Family Detention Project.

3.  The CARA Family Detention Project is a collaboration among four organizations— the Catholic Legal Immigration Network (CLINIC), the American Immigration Council (Council), the Refugee and Immigrant Center for Education and Legal Services (RAICES), and the American Immigration Lawyers Association (AILA)—to promote and strengthen the rights of immigrants, with a particular focus on ending family

**Exhibit 2**

detention. CARA advocates on behalf of the women and children subjected to family detention in Karnes, Texas and Dilley, Texas. RAICES coordinates and provides legal services for families detained in Karnes through the Karnes Pro Bono Project, and AILA, the Council, and CLINIC coordinate and provide legal services for families detained in Dilley through the Dilley Pro Bono Project.  The Dilley Pro Bono Project operates based on the same successful model used at the family detention center in Artesia, New Mexico.

4.   I was a lead coordinator for the pro bono project at the family detention center in Artesia, New Mexico. I created technology models and case processing models that were used in Artesia from August 2014 until the detention center was closed in December 2014.

5.   I volunteer as a coordinator for the CARA Project at the family detention center in Dilley, Texas. In this role, I provide day-to-day guidance on legal questions and case processing. I provide support to the volunteers on the ground in Dilley as well as the numerous remote volunteer teams that produce bond motions, translations, and other pleadings. I also provide technological support to the CARA Project, train staff and volunteers, and manage the database systems used by more than 1,000 volunteers throughout the United States who are involved in the CARA Project.

6.   The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my coordinating capacity for the CARA Project.

7.   Since the Dilley detention center was opened, the Dilley Pro Bono Project has represented approximately 20,000 family units comprised of a female head of household and accompanying children. The pro bono volunteers maintain detailed data about each

client represented, which they input into the client database. This information includes both privileged information and several data points that enable us to monitor the implementation of government policies and practices in real time. In particular, we maintain information about release practices.

8.   Using the Law Lab, I analyzed the data maintained by the CARA Project for children and woman held at the Dilley detention center between July 15, 2016 and September 14, 2016.

9.   I analyzed four categories of detention and release data, including:  (i) the length of time between when each individual was apprehended by CBP and when the individual was released from detention; (ii) the length of time between when each individual was issued a Notice to Appear (NTA) before an immigration judge and when the individual was served with the NTA; (iii) the length of time between when each individual was served with the NTA and when the individual was released; and (iv) the length of time between when each individual was issued a NTA and when the individual was released.

10. For each of the four categories, I only analyzed individual entries for which the CARA Project was able to collect every relevant data point. Because of restrictions on access to counsel imposed by DHS and the private prison contractor operating the Dilley facility, some data points are made unavailable to the CARA Project.

11. I reviewed data maintained by the CARA Project for 2661 children and mothers held at the Dilley detention center and subsequently released between July 15, 2016 and September 14, 2016. On average over this time period, children and mothers were held for 15.43 days before they were released.  The median number of days between the date of detention and the date of release was 15 days.  Over this time period, the range of time

for which children and mothers were detained was from 3 days to 46 days.  Nearly all of the CARA clients, 2656 of 2661 individuals, or 99.8%, experienced detention of 6 days or longer. The majority, 1446 of 2661individuals, or 54.3%, experienced detention of 15 days or longer.

12.   I reviewed the data maintained by the CARA Project for 179 children and mothers who were issued and served with NTAs while held at the Dilley detention center between July 15, 2016 and September 14, 2016.  On average over this time period, children and mothers waited 1.12 days between the date their NTAs were issued and the date their NTAs were served.  The median number of days between the date of NTA issuance and the date of NTA service was 1 day.  Over this time period, children and mothers waited up to seven days from the date their NTAs were issued to the date their NTAs were served.

13.   I reviewed the data maintained by the CARA Project for 102 children and mothers who were released from the Dilley detention center after being served NTAs between July 15, 2016 and September 14, 2016.  On average over this time period, children and mothers waited 5.42 days to be released after their NTAs were served.  The median number of days between the date of NTA service and the date of release was 5 days. Over this time period, children and mothers waited up to 12 days to be released once their NTAs were served.

14.   I reviewed the data maintained by the CARA Project for 107 children and mothers who were issued NTAs while held at the Dilley detention center between July 15, 2016 and September 14, 2016 and were subsequently released.  On average over this time period, children and mothers waited 6.5 days to be released after their NTA were issued.

The median number of days between the date of NTA issuance and the date of release was 6 days.  Over this time period, children and mothers waited up to 12 days to be released once their NTAs were issued.

15.   Overall, the data collected, analyzed, and discussed above shows that most children and mothers at the Dilley detention center have been detained for longer than the 5-day outer limit specified in the Flores settlement for the temporary detention of children in secure, unlicensed facilities.  On average, children and mothers are being held three times longer than this outer limit.  In fact, many have been held for longer than the 20-day period *potentially* permissible during "influx" situations under the *Flores* settlement, including one family held for 46 days – more than double the *potentially* permissible time.  Ironically, the data indicates that most families were released 5 days *after* being served with a NTA, which suggests that, but for the government's use of expedited removal, they would be in compliance with the *Flores* settlement.


I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of September, 2016, in the City of Portland, State of Oregon.

Stephen W. Manning

**Exhibit 2**