CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020
Email: egarcia@orrick.com

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| Plaintiffs, | ) |
| | ) PLAINTIFFS' COMBINED REPLY IN |
| - vs - | ) SUPPORT OF MOTION TO ENFORCE |
| | ) SETTLEMENT AND APPOINT A SPECIAL |
| | ) MONITOR AND OPPOSITION TO |
| LORETTA E. LYNCH, Attorney | ) DEFENDANTS' MOTION FOR |
| General of the United States, *et al.*, | ) EVIDENTIARY HEARING |
| | ) |
| Defendants. | ) Hearing: October 6, 2016. |
| | ) Time: 10:00 a.m. |
| | |
| | Courtroom 7, 312 N. Spring Street |

i

1   *Plaintiffs' counsel, continued*

2

3   LA RAZA CENTRO LEGAL, INC.
    Michael S. Sorgen (Cal. Bar No. 43107)

4   474 Valencia Street, #295
    San Francisco, CA 94103

5   Telephone: (415) 575-3500

6

7   THE LAW FOUNDATION OF SILICON VALLEY
    LEGAL ADVOCATES FOR CHILDREN AND YOUTH

8   PUBLIC INTEREST LAW FIRM
    Jennifer Kelleher Cloyd (Cal. Bar No. 197348)

9   Katherine H. Manning (Cal. Bar No. 229233)
    Kyra Kazantzis (Cal. Bar No. 154612)

10  Annette Kirkham (Cal. Bar No. 217958)

11  152 North Third Street, 3rd floor
    San Jose, CA 95112

12  Telephone:  (408) 280-2437

13  Facsimile:  (408) 288-8850
    Email: jenniferk@lawfoundation.org

14          kate.manning@lawfoundation.org

15          kyrak@lawfoundation.org

16          annettek@lawfoundation.org

17  *Of counsel:*

18

19  YOUTH LAW CENTER
    Alice Bussiere (Cal. Bar No. 114680)

20  Virginia Corrigan (Cal. Bar No. 292035)

21  200 Pine Street, Suite 300
    San Francisco, CA 94104

22  Telephone: (415) 543-3379 x 3903

23

24  / / /

25

26

27

28

# TABLE OF CONTENTS

**I.  INTRODUCTION** .................................................................................................1

**II. ARGUMENT** ......................................................................................................**4**

1.  DEFENDANTS' OPPOSITION FAILS TO IDENTIFY MATERIAL ISSUES OF FACT IN DISPUTE REGARDING CBP CONDITIONS...........................................................4

2.  DEFENDANTS HAVE FAILED TO SHOW WHY AN EVIDENTIARY HEARING IS NECESSARY OR WOULD BE HELPFUL IN ADJUDICATING THE PENDING MOTION..............9

3.  THE 1996 AMENDMENTS TO THE INA CREATING THE EXPEDITED REMOVAL PROCESS DO NOT PERMIT THE GOVERNMENT TO CIRCUMVENT THE 1997 SETTLEMENT BY THE EXPEDIENT OF PLACING CLASS MEMBERS IN EXPEDITED REMOVAL................14

4.  DEPOSITIONS OF THREE ICE OFFICERS IN CHARGE OF THE FAMILY DETENTION FACILITIES SHOW THE IMPORTANCE OF APPOINTING A SPECIAL MONITOR AND ISSUING FURTHER ORDERS RE COMPLIANCE ............................................................18

5.  THIS COURT SHOULD APPOINT A SPECIAL MONITOR TO OVERSEE AND MONITOR DHS'S COMPLIANCE WITH THE SETTLEMENT AND THIS COURT'S ORDERS ............27

**III. CONCLUSION** ..................................................................................................**29**

/ / /

# TABLE OF AUTHORITIES

**Cases**

*Bailey v. Roob*, 567 F.3d 930 (7th Cir. 2009) ............................................................... 14

*Brown v. Plata*, 563 U.S. 493, 131 S.Ct. 1910 (2011). ................................................. 31

*Flores v. Lynch*, ___ F.2d ___ WL 3670046 (9th Cir. July 6, 2016) ...................... 5, 33

*Franco-Gonzalez v. Holder,* Docket No. CV-10-02211-DMG (DTBx) (C.D. Calif.
       2015) ......................................................................................................... 31

*Lockett v. Ericson*, 656 F.3d 892 (9th Cir. 2011) ......................................................... 17

*Villa-Anguiano v. Holder*, 727 F.3d 873 (9th Cir. 2013) .............................................. 18

**Other Authorities**

Federal Rule of Civil Procedure 43(c) ............................................................................ 16

Fed. R. of Evidence 102 .................................................................................................. 13

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ................................................................................... 18

8 C.F.R. § 208.30(f) ........................................................................................................ 18

Arthur R. Miller, Federal Practice and Procedure, 9A Fed. Prac. & Proc. Civ. ........... 16

8 James Wm. Moore, Moore's Federal Practice—Civil ................................................. 16

/ / /

PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR AND OPPOSITION TO DEFENDANTS' MOTION FOR EVIDENTIARY HEARING

## I.   INTRODUCTION

On February 2, 2015, Plaintiffs filed a motion to enforce the parties' consent decree ("Settlement"). The Court granted Plaintiffs' motion on July 24, 2015. In Chambers Order re Plaintiff's Motion to Enforce Settlement of Class Action and Defendant's Motion to Amend Settlement Agreement [Doc. # 177] ("July 24, 2015 Order"). On August 21, 2015 the Court issued its remedial Order requiring Defendants to comply in all regards with the Settlement. Order re Response to Order to Show Cause [Doc. # 189] ("August 21, 2015 Order"). The Court ruled "Defendants must implement the Court's remedies … by October 23, 2015." *Id*. at 3.

Defendants did not seek a stay of this Court's August 21, 2015 Order. Instead, they filed a Notice of Appeal of the July and August Orders. Notice of Appeal [Doc. # 191]. The Ninth Circuit Court of Appeals affirmed this Court's August Order in all significant respects, agreeing that accompanied children in defendants' custody are class members, affirming the decision to deny Defendants' motion to modify the Settlement, and agreeing with the Court's remedial Order other than a provision regarding class members' mothers. *Flores v. Lynch*, ___ F.2d ___ WL 3670046 (9th Cir. July 6, 2016).[1]

_____

[1] The panel held that the Settlement unambiguously applies both to minors who are accompanied and unaccompanied by their parents. The panel held, however, that the district court erred in interpreting the Settlement to provide release rights to

1

Monitoring in late 2015 and early 2016 disclosed that Defendants were still not complying with the Settlement. A new motion supported by numerous declarations and exhibits alleges that --

1. Defendants continue to detain Class Members in deplorable and unsanitary conditions in CBP facilities in violation of the Settlement and this Court's Orders. Class Member children in CBP facilities suffer from inadequate access to food (Motion at 5-6), inadequate access to clean drinking water (id. at 6-7), are held in unsanitary conditions unfit for human habitation (id. at 7-9), suffer from extremely cold temperatures (Motion at 9-10), are held in inhumanely overcrowded CBP detention facilities and are forced to endure sleep deprivation. *Id*. at 10-11.

2. Class Member children are routinely not advised of *Flores* rights by CBP or ICE officers as required by the Settlement. *Id*. at 11-12.

3. Defendants continue to fail to make and record ongoing efforts aimed at release or placement of Class Members as required by the Settlement and the Court's Orders. *Id*. at 12-13.

4. Class Members are routinely commingled with unrelated adults for extended periods of time in violation of the Settlement and this Court's Orders. *Id*. at 14-15.

5. Class Members are routinely detained for weeks or months in secure facilities in violation of this Court's Orders and the Settlement. *Id*. at 15-16.

---

accompanying adults. The panel also held that the district court did not abuse its discretion in denying the government's motion to amend the Settlement. *Id*.

6.  Defendants routinely interfere with Class Members' right to counsel adversely impacting their rights under the Settlement. *Id*. at 16-17.

Plaintiffs seek Orders in the form lodged with the Motion requiring Defendants to promptly comply with the Settlement and this Court's Order of August 21, 2015, and appointing a Special Monitor to oversee Defendants' remedial efforts and compliance with the Settlement going forward.

Defendants oppose the Motion providing generalized statements regarding CBP conditions rather than refuting the vast majority of Plaintiffs' specific allegations, and basically admit that they are entirely disregarding the terms of the *Flores* Settlement and this Court's August 2015 Order by now relying on "discretion" they claim to possess to place all accompanied class members in expedited removal and then claiming they cannot be released under the Settlement.

Defendants' argument is almost as strong as their argument--now tossed on the rubbish heap of policy mistakes--that accompanied children are not even Class Members, a position this Court and the Court of Appeals have clearly rejected. Defendants' legal position is untenable and their absolute intransigence when it comes to good faith compliance with the Settlement more than ever mitigates in favor of appointing a Special Monitor to assess why *Flores* is not being implemented, how officers and agents can be trained and provided guidance on reasonable steps required for compliance, and what steps can be taken to end sleep deprivation, severe overcrowding and other treatment at CBP stations that violate the Settlement and

likely involve violations of fundamental human rights of children under international standards.

II.    ARGUMENT

    **1.    Defendants' Opposition Fails to Identify Material Issues of Fact in Dispute regarding CBP conditions**

Briefly, the claims and alleged counter-claims, may be summarized as follows –

While Class Members and their mothers complained of being held in over-crowded cells for up to 72 hours making it impossible or difficult for children to sleep, Defendants responded that CBP facilities "are not designed for sleeping." Opposition at 20.[2] Defendants offer no declarations, reports or data records refuting the claims of numerous Class Members regarding severe sleep deprivation that can hardly be considered consistent with Defendants' obligation to treat all Class Members "in [their] custody with dignity, respect and special concern for their particular vulnerability as minors." Settlement ¶ 11. A Special Monitor could carefully assess why CBP is unable to adopt policies and practices that assure children of the opportunity to sleep after a certain amount of time in custody and make recommendations to the Court (ands to Defendants) regarding appropriate remedies.

Class Members allege that they have not been provided blankets or were

---

[2] Defendants admit that at one CBP station "unaccompanied minors spend an average of 42 hours in custody, while family groups spend an average of 46 hours in custody." *Id*. at 20, citing Scott Decl. ¶ 6. If the "average" is 42 or 46 hours then some class members are obviously held by CBP for longer than these times. Even 42-46 hours is an unacceptably long time for a child to experience sleep deprivation.

provided one Mylar blanket that did not allow them to sleep in very cold temperatures in CBP cells. Defendants respond that in the "majority" of CBP stations (*i.e.* some unknown number more than 50%), Class Members are provided "disposable blankets." *Id*. at 22. Defendants also claim that Class Members "*generally* are provided with some form of bedding [i.e. a disposable blanket]." *Id*. at 20 (emphasis added). A Special Monitor may help assess how many Class Members are or are not getting blankets, why some are not getting blankets, and may make recommendations to the Court about how to arrive at a solution so that Class Members have access to blankets.

Defendants nowhere contest Class Members' and their mothers' allegations that children are provided no mats, cots or mattresses to sleep on even when detained by CBP for 24-72 hours. It does not appear that Defendants in any way monitor and record when Class Members have been forced not to sleep for 24, 48 or 72 hours. In any event, Defendants offer no firm commitment or policy to insure that Class Member children are not forced to remain awake for periods of 24 hours or longer. *Defendants can spend over $200 million on private contractors to detain Class Members and their mothers, but they cannot afford to transport children to locations (other CBP stations, ICE facilities, trailers, etc.) where they can sleep.* A Special Monitor could assess where Class Members are provided mats, mattresses or cots and where not, and make recommendations on how mats may be distributed at CBP stations that hold children overnight.

Regarding persistent allegations by Class Members and their mothers of gross

over-crowding in CBP cells, Defendants respond (without ever sharing their actual

capacity policies or practices) that "agents [are] mindful of capacity issues to ensure

sufficient space …" *Id*. at 22. Defendants have *refused* to disclose their policies or

practices regarding capacity in CBP cells or even the capacity limits imposed by local

fire permits their detention facilities obviously must comply with. A Special Monitor

may help uncover what capacity limits Defendants now operate under and how if at all

compliance with such capacity limits are monitored.

In any event, stating that Defendants' agents are "mindful" of capacity limits

does not create a meaningful dispute about the material facts alleged in Plaintiffs'

declarations regarding severe overcrowding in CBP group cells.

Class Members and their mothers allege that children could not sleep because

they were forced to sleep on cold concrete floors with cells at "freezing temperatures."

Defendants concede that CBP systems "used to monitor compliance with the

Agreement" assess whether the temperature of cells is "between 66 and 80 degrees."

*Id*. at 9. For children from Central America forced to sleep on a concrete floor with no

mat or mattress, a CBP holding cell at 66 degrees may well feel freezing and prevent

sleep, though acceptable under Defendants' "monitoring" program.

At bottom, Defendants do not care enough about whether children in their

custody sleep to maintain monitoring records. Defendants are therefore unable to and

have not countered the numerous declarations by Class Members and their mothers

discussing unacceptably long periods of sleep deprivation.

Regarding the lack of soap, towels, etc. at border patrol stations, Defendants point out that at "CPC-Ursula [Class Members are] provided a towel, toothbrush, toothpaste, mouthwash, soap, and shampoo." *Id*. at 16. This is one of many CBP facilities and Class Members may be held in border patrol stations for days before being transferred to CPC-Ursula or may never be transferred to CPC-Ursula.

Defendants admit that they may only provide "hand sanitizer," not soap, to detained Class Members and only *"[s]ome* CBP facilities provide paper towels …" *Id*. at 15 (emphasis added).

Defendants claim that Class Members "are provided meals at regularly scheduled meal times, with at least two of those meals being hot meals …" *Id*. at 12. Defendants do not refute Class Members' claims of being fed frozen meals or that the only meals they received were small burritos and "sandwiches" with nothing more than 2 pieces of dry bread with a single slice of bologna.[3] Defendants claim that "available [Border Patrol] records" show that some declarants received more "meals" than they claimed in their declarations. *Id*. at 11. These records it seems are only "available" to Defendants' declarants. Defendants have refused to provide copies of these records relating to Plaintiffs' declarants despite Plaintiffs request for copies of records

---

[3] For example, a Class Member claimed he was provided "only 2 cookies and 1 ham sandwich during his first day in CBP custody," but Defendants respond that Border Patrol records indicate that he was provided "ten meals" in "over 48 hours he was in custody." *Id*. at 11. This response does not create a material factual dispute since "meals" can be provided upon request and the Class Member may have gone hungry during the first 24 hours of custody and then was provided ten "meals" (small frozen burritos or sandwiches with a slice of bologna) on the second day and night.

Defendants' declarants relied on to prepare the factual claims in their declarations.[4]

Finally, Defendants admit that their agents were not "provid[ing] [the] I-770 [Flores notice of rights] to accompanied juveniles" until after the present motion to enforce was filed. *Id.* at 23 (see declarations cited therein).

Defendants claim that "CBP systems are used to monitor compliance with the [*Flores*] Agreement" including whether "water is available"; whether cells are clean and sanitary; whether the temperature of cells is "between 66 and 80 degrees"; whether when food is offered to a juvenile it is documented; and whether regular "welfare checks" are conducted to "ensure the safety and well-being of those in the room." *Id.* at 9.[5]

While Defendants' monitoring program may be well-intentioned, it is hardly transparent, it does not cover many of the issues raised in the Motion and its effectiveness is unknown. Its mere existence does not create any material issues of fact in dispute. However, a Court-appointed Monitor could interface and cooperate with defendants' monitoring team to provide the Court with reports and recommendations to

_____

[4] The fact that less than a handful of mothers' declarations are allegedly contradicted by some undisclosed records hardly creates a material issue of fact regarding the numerous other mothers' and Class Members' sworn statements that food was insufficient for Class Members, nutritionally and in terms of quantities of food served.

[5] Defendants have not provided Plaintiffs with copies of any "monitoring" reports, have not identified all the Border Patrol stations that have been monitored, have not provided the dates of monitoring, have not identified the monitors, have not explained the qualifications of the monitors, have not provided any documentation created by the monitors, and have not described any instructions or training received by the monitors.

insure full compliance with the terms of the Settlement.

Defendants are now in the process of deposing Plaintiffs' declarants. While Plaintiffs' noticed depositions of CBP declarants in July 2016, to date not a single CBP declarant has been made available by Defendants for deposition.[6]

However, even without the benefit of deposition testimony, it is clear that on several issues Defendants' CBP declarants entirely fail to address claims in Class Members' and mothers' declarations. On other issues Defendants' declarations discuss what "some CBP facilities" provide children, or tell us that Border Patrol agents are "mindful" of rules about issues like overcrowding (though precisely what they're "mindful" of is a secret). While claiming that there is a wide range of contested material facts in dispute, Defendants have yet to file a formal Statement of Controverted Facts as a party does, for example, when opposing a motion for summary judgment.

### 2.   Defendants have failed to show why an Evidentiary Hearing is necessary or would be helpful in adjudicating the pending Motion

Defendants Motion for an evidentiary hearing argues "this Court should not make findings of fact with regard to Plaintiffs' Motion without first holding a full evidentiary hearing under Federal Rule of Civil Procedure 43(c)." Motion for Evidentiary Hearing at 1.

---

[6] Defendants recently provided dates for some CBP declarants to be deposed in the days shortly before the scheduled hearing on Plaintiffs' Motion but not in time to address in this reply brief.

Defendants note that the Federal Rules of Evidence exist "to the end of ascertaining the truth and securing a just determination." Motion for Evidentiary Hearing at 2, *quoting* Fed. R. Evid. 102. Yet Defendants have declined to share with the Court and Plaintiffs the best and most accurate evidence regarding compliance with the Settlement: Relevant pages from Class Member declarants' ICE "A" files where almost all actions regarding the Class Member are routinely recorded.

Defendants argue that Plaintiffs' request for the appointment of a Special Monitor asks the Court to order a "coercive remedy" to ensure compliance with the Settlement and that such a remedy should only be granted based on clear and convincing evidence. Motion for Evidentiary Hearing at 2, *citing Bailey v. Roob*, 567 F.3d 930, 934- 35 (7th Cir. 2009) ("The parties agree that this circuit's case law requires the part seeking sanctions to demonstrate that the opposing party is in violation of a court order by clear and convincing evidence."). Much if not all of Plaintiffs' case regarding Defendants' failure to make and records efforts at release, holding children in secure facilities, holding children in unlicensed facilities, holding children with unrelated adults, etc. is based on Defendants' admissions, declarations and recent deposition testimony. From these sources alone there is more than "clear and convincing" evidence that these claims are factually accurate. Defendants don't deny the facts; they have instead offer a legal argument that Defendants are statutorily required to detain accompanied Class Member children regardless of the *Flores* terms.

Defendants never identify any of the "many" genuine disputes of material fact

they claim exist. Defendants simply state that they have submitted "numerous declarations … detailing Defendants' factual responses to Plaintiffs' allegations." *Id*. The fact that Defendants have submitted numerous declarations that offer "responses" to Plaintiffs' allegations does not mean Defendants have placed material facts in dispute such that the Motion could not be heard without an evidentiary hearing.[7]

Defendants nevertheless requested the opportunity to take discovery of Plaintiffs' witnesses before the Court ruled on "any disputed material factual." (ECF No. 219).[8] Even though Defendants had not identified any disputed material facts, on June 23, 2016, the Court granted Defendants' request for discovery and permitted Plaintiffs to depose Defendants' declarants. (Dkt # 227)

In addition to vaguely arguing that unidentified material issues of fact are in dispute,[9] Defendants now argue that "several allegations raised in Plaintiffs'

---

[7] Despite their failure to identify any significant disputed material facts, Defendants agree that they have raised "several legal defenses to Plaintiffs' Motion that may be dispositive …" *Id*, at 5.

[8] In the recent depositions of attorney declarants Robyn Barnard and Edward McCarthy conducted by Defendants, the witnesses were questioned for several hours but Defendants failed to inquire into a single alleged disputed material fact. Plaintiffs have not yet received these deposition transcripts but will file relevant portions when received.

[9] Defendants argue that "the allegations in Plaintiffs' declarations are refuted by the declarations submitted with Defendants' June 3, 2016, Response in Opposition to Plaintiffs' Motion." *Id*. at 7.  As "examples" of these material facts in dispute, Defendants simply cite to *"*Defendants' Exhibit 10 and supporting Exhibits (ECF Nos 211-2 and 212-1) (describing conditions at U.S. Border Patrol facilities in the Rio Grande Valley), and Defendants Exhibits 20-21, 28 (describing conditions at ICE

declarations have absolutely no bearing on any of the legal issues in Plaintiffs'

Motion," *id*. at 6, and "[f]inally, many of these declarations contain inadmissible

hearsay." *Id*. Again, Defendants fail to identify what statements in what declarations

they are referring to.

Obviously, if some statements in Plaintiffs' declarations have "absolutely no

bearing" on any of the legal issues in Plaintiffs' Motion, or "contain inadmissible

hearsay," the Court will exclude them once these statements are actually identified by

Defendants.

Federal Rule of Civil Procedure 43(c) gives broad discretion to the District

Court whether to take oral testimony in deciding motions pending before it. In cases

such as this one, involving largely legal issues and facts that have not been specifically

contested, and witnesses detained by one of the parties thousands of miles away,

hearing oral testimony is hardly the only way for the Court to resolve the pending

Motion. This is not a case in which questions of credibility predominate.[10]

---

Family Residential Centers)." *Id*. at 7. Defendants never explain what particular facts
are disputed that are material to deciding the pending Motion.

[10] *See* 8 James Wm. Moore, Moore's Federal Practice—Civil § 43.05[2] (3d ed. 2012)
("A district court has considerable discretion to decide Rule 43(c) motions solely on
the basis of affidavits or to take oral testimony at a hearing …" Only when disputed
facts or credibility predominate, is the district court usually required to hear oral
testimony); Arthur R. Miller, Federal Practice and Procedure, 9A Fed. Prac. & Proc.
Civ. § 2416 (3d ed.) (when "questions of fact or credibility predominate, a district
court's decision not to hear oral testimony often is found to be an abuse of discretion").

Based on the admissions made in Defendants' Opposition, declarations and three depositions, it appears there are *no* material issues of fact regarding Plaintiffs' claims involving (1) Defendants' failure to make and record continuous and ongoing efforts aimed at the release or availability of release under Paragraphs 14 and 19 of the Settlement, (2) failure to hold Class Members in licensed programs, (3) holding class members for weeks or months in locked secured facilities, and (4) failure to detain children apart from unrelated adults. Defendants have not identified any material facts in dispute regarding these claims.

Similarly, regarding Plaintiffs' CBP conditions claims, Defendants have not identified any material factual disputes raised by conflicting hearsay declarations necessary to decide Plaintiffs' Motion that may require the Court to exclude a particular declaration or a part of a declaration or conduct an evidentiary in accordance with the Federal Rules of Evidence.

Whether Defendants may in effect suspend *Flores* for all accompanied Class Members by placing them in expedited removal is primarily a matter of law. Because the Settlement's language clearly and unambiguously resolves the question, the Court need not consider the parties' subjective, unexpressed intent. *See, e.g., Lockett v. Ericson*, 656 F.3d 892, 897 (9th Cir. 2011) ("[A]s is typical in contract cases, if the terms are clear and unambiguous, we will not look further.") (internal quotation marks and citation omitted); 11 Williston on Contracts § 31:4 (4th ed.) ("Except in cases of ambiguity . . . the object in interpreting or construing

a written contract is to ascertain the meaning and intent of the parties as expressed

in and determined by the words they used, irrespective of their supposed actual,

subjective intent") (footnotes omitted).

   **3.   The 1996 Amendments to the INA creating the expedited removal
         process do not permit the Government to circumvent the 1997
         Settlement by the expedient of placing Class Members in Expedited
         Removal.**

   The Government's argument that the 1996 amendments to the INA require

them to place Class Members in expedited removal and then call their detention

"mandatory" was raised in the prior motion proceedings and has already been

rejected.[11]

   Plaintiffs long ago explained that Defendants' Board of Immigration

Appeals has agreed with ICE that "it is not required to process aliens described in

section 235(b)(1)(A)(i) of the Act in section 235(b) expedited removal proceedings

and that it has the discretion to place these aliens directly into section 240 removal

proceedings." 25 I&N Dec. 520, 521 (BIA 2011). Dkt. #186, p. 18.

_____

[11] Defendants unsuccessfully argued long ago that "Congress has explicitly mandated
the detention of individuals who are in the expedited removal process and have not
been found to have a credible fear of persecution." Dkt # 184 p. 20, citing 8 U.S.C. §
1225(b)(1)(B)(iii)(IV).  *See also id*. at 28 ("expedited removal requires detention until
eligibility for relief is established"). However, showing the discretionary nature of
how Defendants proceed, they admit that "[i]f either the asylum officer or the
immigration judge determines that the alien has a credible fear of persecution or
torture, expedited removal proceedings are vacated and the alien is referred for
standard removal proceedings before an immigration judge ..." *Id. citing* 8 C.F.R. §
208.30(f).

We have also pointed out that in *Villa-Anguiano v. Holder*, 727 F.3d 873, 878 (9th Cir. 2013), this Circuit agreed with Defendants' decision in *Matter of E-R-M- & L-R-M-*, holding that reinstatement of a prior removal order is neither "automatic" nor "obligatory …"; nothing "deprives the agency of discretion to afford an alien a new plenary removal hearing" (internal quotation marks omitted)). See Dkt. # 186 at fn. 24.[12]

Also clearly showing that placing Class Members apprehended close to the border into expedited removal proceedings (then claiming "now they're subject to mandatory detention") is not statutorily required, on november 20, 2014, Jeh Johnson, Secretary of Homeland Security, issued a Memorandum on Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants at 2. He states that pursuant to 8 U.S.C. § 1182(d)(5)(A), DHS may, in its discretion, "parole [class members] into the United States temporarily under such conditions as [the Secretary] may prescribe … for urgent

_____

[12] *See also*, Dkt # 187-6, Ex. 93, ¶17 (ICE issued Notices to Appear, rather than going through the expedited removal process for certain families detained at Berks); Dkt # 187-9, Ex. 107, ¶14 (ICE has bypassed the expedited removal process and instead issued Notices to Appear and paroled families into the United States); Dkt # 187-9, Ex. 108, ¶¶6-8, (ICE has during various periods placed families into removal proceedings through the issuance of a Notice to Appear); Dkt # 187-10, Ex. 112, ¶14, (ICE has often and can easily parole mothers placed in expedited removal or with reinstated removal orders or can issue Notices to Appear and release the families on reasonable bonds); Dkt # 187-6, Ex. 91, ¶6 (same). In addition, Defendants' own data makes clear that nearly 87% of families who assert a credible fear of persecution receive positive fear findings and are already being referred for removal proceedings before the IJ. Lafferty Decl. ¶ 8 [Doc. # 184.3].

humanitarian reasons or significant public benefit ...” Dkt. #186 at fn. 25.[13]

The Ninth Circuit’s decision in this case states:

The government also argues that the law has changed substantially since the Settlement was approved. It cites Congress’ authorization of expedited removal—*but that occurred in 1996, before the Settlement was approved*. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, § 302, 110 Stat. 3009-546, 579–85 (1996). The government also notes that the Homeland Security Act of 2002 reassigned the immigration functions of the former INS to DHS; but *there is no reason why that bureaucratic reorganization should prohibit the government from adhering to the Settlement*. See Settlement ¶ 1 (“As the term [party] applies to Defendants, it shall include their . . . successors in office.”).

Slip Op. at 22 (emphasis added).

As this Court held in August 2015:

As an initial point, the Court notes that the parties in the Flores consent decree expressly stated that they knew “of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law.” Agreement ¶ 41. And the Court in its July 24, 2015 Order already rejected Defendants’ contention that the consent decree rendered the INA unenforceable due to organizational changes in the INS…

It may [even] be the case that a minor’s parent is in mandatory detention. In that situation, in order to effectuate the least restrictive form of detention for the child, Defendants must follow an order of preference for the minor’s release to an available adult under Paragraph 14 of the Agreement. Under Paragraph 14, the order of preference begins with the parent, followed by a legal guardian, an adult relative (brother, sister,

_____

[13] Class counsel and the Court are left to wonder, if a Court Order requiring Defendants to comply with the Settlement with regards class members accompanied by their mothers would somehow force DHS to violate the INA, why is this not an insurmountable challenge for Defendants when it comes to their release of class members accompanied by their fathers, uncles, brothers or their grandmothers or grandfathers?

aunt, uncle, grandparent), an adult individual or entity designated by the parent or legal guardian, a licensed program willing to accept legal custody, and ending with an adult individual or entity seeking custody. Agreement ¶ 14.

August 2015 Order at 9.

Historically, as this Court and the Ninth Circuit have recognized, Defendants in fact released Class Members apprehended with a parent. 9th Cir. Slip op. at 9-11. A small number of Class Members were held at Berks after 2001, a facility Defendants claimed was licensed and not secure. *Id*. Now Defendants argue they can avoid all the *Flores* terms by simply placing Class Members in "expedited removal" proceedings and detain them for weeks and months on end in unlicensed facilities comingled with unrelated adults while making *no* efforts aimed at possible release under Paragraphs 14 and 19 of the Settlement.

The Settlement sets forth the specific circumstances in which Class Members are not offered release or placement under Paragraphs 14 and 19. These include cases of substantial flight risks (carefully defined in Paragraph Paragraphs 21D and 22), certain criminal conduct (carefully defined in pargraph 21A), the Class Member has created unacceptable disturbances after previously being placed in a licensed program (Paragraph 21C), and when if released a minor may cause harm to herself or others (Paragraph 21E). Nowhere does the Settlement include the category of Class Members subject to detention Defendants have now created: Class Members Defendants decide to place in expedited removal proceedings.

Not only does Defendants' new no release policy conflict with the terms of the Settlement, it makes little sense from the standpoint of what the parties obviously intended when the Settlement was executed. Defendants' position essentially means that Plaintiffs agreed that in virtually every case of an apprehended minor, whether accompanied or not in 1997, Defendants could circumvent all of the *Flores* terms by simply placing the minor in expedited removal. Since the vast majority of minors are apprehended along the borders, this would have made the Settlement a nullity for most Class Members. Only an insignificant number of Class Members apprehended in the interior of the United States would have been assured of the Settlement's protections. Its highly unlikely Plaintiffs agreed to and the Court approved such a meaningless settlement.

Defendants offer no new arguments why the Court should reverse course and conclude that *Flores* plays no role in the detention and processing of accompanied Class Members simply because Defendants opt to place them in expedited removal.

### 4. Depositions of Three ICE Officers in Charge of the Family Detention Facilities Show the Importance of Appointing a Special Monitor and Issuing further Orders re Compliance

The three depositions Plaintiffs have taken of ICE officials in charge of the three family detention facilities where Class Members are held disclose the urgent need for appointment of a Special Monitor who may both monitor compliance and recommend to the Court and the parties ways in which Defendants may achieve and sustain compliance through training, guidance and instructions. The testimony also shows the

importance of the Court again Ordering Defendants to insure that their officers and agents involved in the custody and care of Class Members are familiar with the basic terms of the Settlement and this Court's August 2016 Order.

Valentin De La Garza, the ICE officer in charge of the Dilley detention facility, testified at a deposition on September 9, 2016. See Exhibit 1 (unsigned deposition transcript). He has held that position since April 2015. Ex. 1 at 6, line 21. He does not know who decides how many ICE agents are assigned to process Class Members at the facility. Id. at 7, 16-17. He agreed that the more agents assigned "the faster you're going to get things done." *Id*. 9 at lines 6-7.

Mr. de la Garza admitted that Defendants do not track the time lapse between the time of apprehension of Class Members and the time of ICE's initial interview at which time whether the Class Member or his or her mother has a fear of return may be expressed and recorded. *Id*. at 15 line 3-16. Nor does ICE track the time between when a Class Member or his or her mother express a fear of return and the time they have a fear interview. *Id*. at 15, lines 17-24; 18 line 16. Nor is the time between a Class Member entering the Dilley facility and getting a fear interview tracked. *Id*. at 17 line 20.

He testifies that ICE does not track the length of time it takes for USCIS to make fear determinations. *Id*. at 23, lines 7-10.

When asked whether he could state "the most recent time that you received any training about the requirements of the Flores Settlement," Mr. de la Garza "They

haven't had any training …" *Id*. at 20, lines 14-19. While he received "an email" about this Court's August Order, he could not recall when he received it or who sent it to him. *Id*. at 24, line 4. He testified that he has received no training regarding the Court's August Order. *Id*. at 21, lines 7-10. He is unaware of any training received by ICE agents at Dilley regarding the Court's August Order. *Id*. 21 lines 18-23.

Asked whether he could "identify any licensed facility where ICE, … anytime while you have been in charge of the Dilley facility, has placed minors, pursuant to paragraph 19 of the Flores Settlement," de la Garza responded "I don't know what … paragraph 19 says, so sir, I can't answer that question." *Id*. at 26 line 23 to 27 line 4. When explained what Paragraph 19 requires, his response remained the same. *Id*. at 27 line 17.

Mr. de la Garza admitted that the Dilley facility does not have a license to house minors. *Id*. at 21, line 24 to p. 22 line 3.

Mr. de la Garza admitted that Dilley is a "secure" lock down facility that Class Members are not free to leave. *Id*. at 22, lines 5-17.

The witness could not state the longest time a Class Member had been held at Dilley during the past six or twelve months. *Id*. at 36 line 25 to 37 line 13 ("I don't know"). Mr. de la Garza had no idea how many Class Members had been detained at Dilley for 30 days or longer at the time he signed his declaration. *Id* at 70,lines 4-7. He testified that the cases of everyone detained at Dilley for longer than 15 days are

"monitored," but could not explain what if anything was done differently in these cases. *Id*. at 71 line 15 to 73 line 22.

The witness agreed that if ICE agents made efforts to comply with Paragraphs 14 or 19 of the Settlement, these efforts would likely be recorded in the Class Member's ICE "A" file. *Id*. at 40 lines 3-10. Defendants have failed to provide a single page from any Class Member declarant's "A" file showing efforts to comply with Paragraphs 14 and 19 that are required to be recorded.

Asked "Are you aware of any efforts made by agents working at Dilley to comply with paragraphs 14 and 19 if a class member's fear claim or the class member's mother's fear claim has been approved," Mr. de la Garza answered "No." *Id*. at 41 lines 12-18.

Asked "[h]ave your agents at Dilley been provided with any instructions or guidance about the amount of bond they should set on a class member whose fear claim or whose mother's fear claim has been approved, and if so, when was that instruction provided to those agents," Mr. de la Garza answered "No." *Id*. 42 line 24 to 43 line

Asked whether it is "ICE policy at Dilley to provide either detained class members or their mothers with a notice of the class members' right to a bond redetermination hearing," the witness responded, "I don't know." *Id*. at 45, lines 2-9.

While Mr. de la Garza's declaration states that ICE accomplishes the processing of Class Members as expeditiously as possible, he was unable to explain what he

meant by that statement. *Id*. at 68-69. He agreed that if Defendants assigned additional

agents to Dilley, processing of Class Members could be accomplished more rapidly. *Id*.

at 76 lines 8-12.

Asked, "Do you know what paragraph 14 of the settlement requires?" Mr. de la

Garza responded "No." *Id*. at 24 lines 4-16. Asked, "Do you know what paragraph 19

of the settlement requires," Mr. de la Garza responded "No." *Id*. lines 17-19.

Asked whether during initial processing Class Members or their mothers are

asked for information needed to comply with Paragraph 14, Mr. de la Garza responded

"[we] [j]ust ask them where were they going to be staying in the United States … with

what family members or friends." *Id*. at 25 lines 3-17. It is obvious form his response

that no inquiries are made to comply with Paragraphs 14 and 19 of the Settlement. Nor

does ICE attempt to determine the suitability of potential placements under Paragraph

14 as required by the Settlement. *Id*. at 25 line 23 to 24 16 line. Asked "Are you aware

whether any agent, during the -- the previous 12 months, has conducted a suitability

assessment prior to release of a class member to any individual or program, pursuant to

paragraph 14 of the settlement," Mr. de la Garza responded "No. I don't know." *Id*. at

48 lines 7-13.

Asked "[p]rior to the Asylum interview, have your agents been instructed to take

any steps aimed at the release or the placement of the minors under the Flores

Settlement," Mr. de la Garza responded "No, sir." *Id*. 26, lines 8-12. When explained

the basic requirements of Paragraph 14 of the Settlement, Mr. de la Garza testified that

his officers have not received any training to comply with Paragraph 14 after a

negative fear determination is issued by USCIS. *Id* at 28 line 19 to 29 line 16. No effort

is made to release minors under the Settlement after a negative fear determination

because "They'll become mandatory detention at that time." *Id*. at 32 line 25.  He

testified "My guidance is to hold them [until they receive a fear determination] -- until

they become a mandatory [detention case]." *Id*. at 32 line 23. Indeed, "all the cases" at

Dilley have been treated as "mandatory detention" cases. *Id*. at 39 lines 18-21.

Asked "[h]ave ICE agents working at Dilley during the past 12 months been

provided with any training or direction or instructions regarding the assessment of

escape risks under paragraph 22 of the settlement," the witness responded "No. I don't

know." *Id*. at 49, lines 7-14.

The witness was asked: "Paragraph 23 of the settlement provides that ICE will

not place a minor in a secure facility if there are less restrictive alternatives that are

available and appropriate in the circumstances. Are you aware of whether ICE agents

at Dilley have received any training, instructions, or guidance regarding paragraph 23

of the settlement?" The witness responded, "I don't know …" *Id*. at 49 lines 15-24.

Asked "Are you aware, during the previous 12 months, if any ICE agent at

Dilley has made and recorded continuous efforts aimed at family reunification and

release of class members pursuant to paragraph 14 of the settlement," Mr. de la Garza

honestly answered "No." *Id*. at 48 lines 14-21.

Juanita Hester, the ICE Officer in charge of ICE operations at the Karnes

detention center, was deposed. See Exhibit 2. Regarding any changes in policy or

practice in October 2015 as a result of this Court's August Order, Ms. Hester testified

she may received something from someone, could not recall if it was oral or in writing,

and when asked to recall what the instruction or guidance was, replied "I don't recall

..." *Id*. at 2-13.

Question: Is anything happening now at Karnes, as a result of Judge Gee's

August 2015 order, that you know about?

…THE WITNESS: I was not privy to Judge Gee's rulings … so I -- I'd be unable

to answer your question." *Id*. 12 lines 7-15.

Ms. Hester explained Defendants' current policy and practice fairly succinctly:

"We ha[ve] the ability to release residents if they [are] found with a positive credible

fear finding or a reasonable fear finding … [they can] wait [for further proceedings]

outside versus in custody." *Id*. at 22 lines 14-19. The terms are Flores are suspended

*before* a fear interview and *after* a denied fear interview. Class Members are, at

defendants' discretion, simply placed into what Defendants call "mandatory"

detention. Flores terms are now effectively suspended for all accompanied class

members solely because ICE has purportedly exercised discretion to place every

accompanied minor in expedited removal proceedings, issuing them an expedited

removal order, and entirely suspend the terms of Flores. As Ms. Hester testified:

"[A]nybody that is at the Residential Center and they're going through the process,

they're final orders of removal. *They would not be eligible for any type of a release …*" *Id*. at 40 lines 12-15 (emphasis added). Defendants have in effect eliminated the Settlement's protections for probably close to 100% of all accompanied class members in Defendants' custody.[14]

Joshua Reid, the ICE officer in charge of the Berks detention facility which houses the longest held Class members, testified in deposition. See Exhibit 3. Asked "Can you tell me when was the most recent time that you received either training, guidance or instruction regarding the requirements of the 1997 Flores settlement," Mr. Reid responded "I don't recall receiving anything that was particularly [about the Settlement]." *Id*. at 6 line 5 to 7 line 3. Asked "And are you … aware of when the most recent time was that other ICE officers working at Berks received instruction, training or guidance regarding the 1997 Flores settlement," Mr. Reid responded "I'm not aware when they received guidance." *Id*. at 7 lines 5-13. He also was unaware of any training or guidance issued relating to this Court's August 2015 Order. *Id*. at 7 lines 16-21.

Asked "do you know who the class members are in the Flores case," Mr. Reid responded "No. I'm not particularly aware of who are the class members." *Id* at 7 line

---

[14] Ms. Hester's remaining responses disclosed a total unfamiliarity with the terms of the Flores Settlement or this Court's August 2015 Order. With regards guidance, instructions, training or modification of policies or practices as a result of this Court's August Order, her responses are functionally the same as those offered by Mr. de la Garza in charge of the Dilley facility.

23 to 8 line 2. Mr. Reid did not know anything about the release and placement requirements of Paragraphs 14 and 19 of the Settlement. *Id*. at 8 lines 2-9.

Mr. Reid was unaware of "any written instructions to ICE agents at Berks explaining … how during [intake] process[ing] [of Class Members] they are to apply or comply with paragraphs 14 or 19 of the Flores settlement."  *Id*. at 37 line 8 to 16 ("I don't know").

Asked "What currently is the length of detention for the longest detained child at Berks," Mr. Reid testified "I don't know …" *Id*. at 37 lines 19-20. When pressed he finally responded that one Class Member has been detained at Berks "*about 13 months*." *Id*. at 38, line 6 (emphasis added). He agreed that "several" Class Members have been detained at Berks for six months or longer. *Id*. at lines 14-22.

While Mr. Reid testified that some detainees at Berks had been released for medical reasons, he could not recall any "instance in which someone was released … because of application of the 1997 Flores settlement." *Id*. at 14 lines 7-19.

Nor could he recall a single case in which a Class Member was released as a result of this Court's August Order. *Id* at 14 line 21 to 15 line 1 ("I am not aware of such release").

While Defendants pretend that Berks is not a secure facility, Mr. Reid affirmed his statement in his declaration at paragraph 22 that "if somebody left without authorization [s/he] would be considered a fugitive and subsequently may be arrested." *Id*. at 22 line 15 to 23 line 17 (they are in "ICE custody"). See also p. 26 line 23 to 27

line 1 ("When residents are admitted to the center they are given a handbook and that book details what are the potential offenses, and one of them is leaving the center without authorization"). In the handbook this conduct is defined as an "escape." *Id*. at 27 line 25 to 18 line 1.

Mr. Reid testified that he is not aware whether Berks is a licensed facility. *Id*. at 31 line 7. In fact, Berks' license has been cancelled by State authorities.

Mr. Reid conceded that Class Members are comingled at Berks on a daily basis with unrelated adult males and female detainees. *Id*. at 32 line 16 to 33 line 10.

Given his overall responses it was not surprising that when asked "[a]re there any parts of Judge Gee's August 2015 order that you can tell us about," Mr. Reid responded "there is nothing …" *Id* at 39 line 6 to 10.

> **5.     This Court should appoint a Special Monitor to oversee and monitor DHS's compliance with the Settlement and this Court's Orders**

The Supreme Court has noted in the context of a California overcrowding prison case that "[c]ourts faced with the sensitive task of remedying … unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers …" *Brown v. Plata*, 563 U.S. 493, 511, 131 S.Ct. 1910 (2011). Courts appointing monitors responsible for

overseeing implementation of orders or settlements rely upon their equitable powers to enforce settlements, decrees and Orders, or Fed. R. Civ. P. 53.[15]

Defendants' unsafe treatment of children continues unabated. The challenged conduct has in no significant way been voluntarily ceased. Rather than signaling a willingness to end their breach of the Settlement, Defendants have indicated to their private contractors that operate detention facilities a readiness to increase the detention of mothers and their children.

Because of the complexities of the Settlement, the showing in the ICE depositions discussed *supra* that ICE agents are hopelessly uninformed about the terms of the Settlement, and because of the importance of Defendants' compliance with the Settlement, pursuant to Fed. R. Civ. P. 53 and this Court's inherent powers to enforce its Orders, the Court should now appointment a Special Monitor to ensure compliance with the Settlement and this Court's Orders.

This litigation's history and the recent unsuccessful efforts to even obtain agreement on minimum standards for the treatment of children in CBP custody underscore that the mandated rights of vulnerable children will be best protected if a Special Monitor is appointed to collect information on compliance, report to the Court

---

[15] In *Franco-Gonzalez v. Holder*, Docket No. CV-10-02211-DMG (DTBx) (C.D. Calif. 2015), this Court entered an Order appointing a monitor to oversee the DHS. *Franco-Gonzalez* involves a class of immigration detainees who have been determined to be incompetent to represent themselves by reason of mental disability.

on areas of compliance or non-compliance and recommend ways in which

deficiencies in compliance may be cured.

## III.   CONCLUSION

The Ninth Circuit Court of Appeals recently held in this case that "[t]he

Settlement creates a presumption in favor of releasing minors and requires placement

of those not released in licensed, non-secure facilities that meet certain standards."

*Flores v. Lynch*, Slip Op. at 3. Under Defendants' new interpretation of the Settlement,

it creates a presumption of detention for minors and does *not* require placement of

those detained in licensed, non-secure facilities that meet certain standards.

Defendants' current interpretation of the Settlement turns the Ninth Circuit's view of

the Settlement on its head.

For all of the reasons stated above, the Court should Order Defendants to

promptly comply with the Settlement's terms and appoint a Special Monitor to assist

the Court in gathering the facts regarding compliance and making recommendations

as needed to insure consistent and good faith compliance.

Dated: September 19, 2016                    Respectfully submitted,

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey
Carlos Holguín

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena García

LA RAZA CENTRO LEGAL, INC.

1
2
3

Michael Sorgen
Maria Victoria Castro
Amanda Alvarado Ford

4
5

LAW FOUNDATION OF SILICON VALLEY -
LEGAL ADVOCATES FOR CHILDREN &
YOUTH

6
7
8

Jennifer Kelleher Cloyd
Katherine H. Manning
Kyra Kazantzis
Annette Kirkham

9

Of counsel:

10
11
12

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

13

/s/__Peter Schey_____
*Attorneys for Plaintiffs*

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On September 19, 2016, I electronically filed the following document(s):

PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR AND OPPOSITION TO DEFENDANTS' MOTION FOR EVIDENTIARY HEARING with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*

1