1
2
3
4
5
6
7

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
          crholguin@centerforhumanrights.org

8
9
10
11
12
13

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

14

*Attorneys for plaintiffs (listing continues on following page)*

15

UNITED STATES DISTRICT COURT

16
17

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

18
19
20
21
22
23
24
25

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,　　　　) | Case No. CV 85-4544 DMG (AGRx) |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　Plaintiffs,　　　　　　　) | EXHIBIT 1 – DEPOSITION OF VALENTIN |
| - vs -　　　　　　　　　　　　　) | DE LA GARZA – PART 1 |
| 　　　　　　　　　　　　　　　　) | |
| LORETTA E. LYNCH, ATTORNEY　　) | Hearing: October 6, 2016 |
| GENERAL OF THE UNITED STATES, *et al.*,) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　Defendants.　　　　　　　) | |
| ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿） | |

26
27
28

*Plaintiffs' counsel, continued:*

1

2   LA RAZA CENTRO LEGAL, INC.
    Michael S. Sorgen (Cal. Bar No. 43107)
3   474 Valencia Street, #295
    San Francisco, CA 94103
4   Telephone: (415) 575-3500

5

6   THE LAW FOUNDATION OF SILICON VALLEY
    LEGAL ADVOCATES FOR CHILDREN AND YOUTH
7   PUBLIC INTEREST LAW FIRM
    Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
8   Katherine H. Manning (Cal. Bar No. 229233)
    Kyra Kazantzis (Cal. Bar No. 154612)
9   Annette Kirkham (Cal. Bar No. 217958)
    152 North Third Street, 3rd floor
10  San Jose, CA 95112
    Telephone:    (408) 280-2437
11
    Facsimile:    (408) 288-8850
12  Email: jenniferk@lawfoundation.org
13          kate.manning@lawfoundation.org
            kyrak@lawfoundation.org
14          annettek@lawfoundation.org

15  *Of counsel:*

16
    YOUTH LAW CENTER
17  Alice Bussiere (Cal. Bar No. 114680)
    Virginia Corrigan (Cal. Bar No. 292035)
18  200 Pine Street, Suite 300
    San Francisco, CA 94104
19  Telephone: (415) 543-3379 x 3903

20

21

22

23

24

25

26

27

28

```
 1              UNITED STATES DISTRICT COURT
             CENTRAL DIVISION OF CALIFORNIA,
 2                  WESTERN DIVISION

 3   JENNY LISETTE FLORES, et    '
     al.,                        '
 4                               '
          PLAINTIFFS,            '
 5                               '
     VS.                         '  CIVIL ACTION NO.
 6                               '  CV 85-4554 DMG (AGRx)
     LORETTA E. LYNCH,           '
 7   ATTORNEY GENERAL OF THE     '
     UNITED STATES, et al.,      '
 8                               '
          DEFENDANTS.            '
 9   * * * * * * * * * * * * * * * * * * * * * * * * * *

10            ORAL AND TELEPHONIC DEPOSITION OF

11               VALENTIN DE LA GARZA

12                 SEPTEMBER 9, 2016

13

14   * * * * * * * * * * * * * * * * * * * * * * * * * *

15            ORAL AND TELEPHONIC DEPOSITION OF

16               VALENTIN DE LA GARZA,

17   produced as a witness at the instance of the Plaintiff,

18   was taken in the above-styled and numbered cause on the

19   9th day of September, 2016, from 9:16 a.m. to 1:14 p.m.,

20   before Jessica Butts, CSR, in and for the State of Texas,

21   reported by machine shorthand, at The United States

22   Attorney's Office, 601 North West 1604 Loop, Suite 600,

23   San Antonio, Texas 78216, pursuant to the Federal Rules

24   and the provisions stated on the record or attached

25   hereto.
```

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4        MR. PETER SCHEY
          THE CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
 5        256 South Occidental Boulevard,
          Los Angeles, California 90057
 6        Telephone:      (213) 388-8693
          Fax:            (213) 386-9484
 7        E-mail: pschey@centerforhumanrights.org
          (Present by telephone)
 8

 9        MR. MANOJ GOVINDAIAH
          THE REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND
10        LEGAL SERVICES
          5121 Crestway Drive, Suite 105,
11        San Antonio, Texas 78239
          Telephone:      (210) 226-7722
12        Fax:            (210) 212-4856
          E-mail: manoj.govindaiah@raicestexas.org
13

14   FOR THE DEFENDANTS:

15        MS. SARAH B. FABIAN
          THE U.S. DEPARTMENT OF JUSTICE
16        CIVIL DIVISION
          TRIAL ATTORNEY
17        P.O. Box 868
          Ben Franklin Station
18        Washington, D.C. 20044
          Telephone:      (202) 532-4824
19        Fax:            (202) 616-8962
          E-mail: sarah.b.fabian@usdoj.gov
20

21        MR. GARY L. ANDERSON
          THE U.S. DEPARTMENT OF JUSTICE
22        UNITED STATES ATTORNEY'S OFFICE
          ASSISTANT UNITED STATES ATTORNEY
23        601 North West Loop 410, Suite 600
          San Antonio, Texas 78216
24        Telephone:      (210) 384-7365
          Fax:            (210) 384-7312
25        E-mail: gary.anderson@usdoj.gov
```

Deposition of Valentin De La Garza                                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1                    (APPEARANCES CONTINUED)

 2

 3          MR. NATHAN L. HERBERT
            THE U.S. DEPARTMENT OF HOMELAND SECURITY
 4          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
            DEPUTY CHIEF COUNSEL, OFFICE OF THE CHIEF COUNSEL
 5          300 El Ranchero Way
            Dilley, Texas 78017
 6          Telephone:     (830) 378-6626
            E-mail: nathan.l.herbert@ice.dhs.gov
 7

 8          MR. JUSTIN F. ADAMS
            THE U.S. DEPARTMENT OF HOMELAND SECURITY
 9          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
            DEPUTY CHIEF COUNSEL, OFFICE OF THE CHIEF COUNSEL,
10          OFFICE OF THE PRINCIPAL LEGAL ADVISOR
            8940 Fourwinds Drive
11          San Antonio, Texas 78239
            Telephone:     (210) 967-7237
12          Fax:           (210) 967-7118
            E-mail: justin.f.adams@ice.dhs.gov
13

14          MR. THOMAS F. ZIMMERMAN
            THE U.S. DEPARTMENT OF HOMELAND SECURITY
15          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
            DISTRICT COURT LITIGATION DIVISION
16          ASSOCIATE LEGAL ADVISOR
            500 12th Street, South West
17          Washington, D.C. 20256
            Telephone:     (202) 732-5993
18          E-mail: thomas.f.zimmerman@ice.dhs.gov

19

20

21   ALSO PRESENT:

22          MS. JESSICA BUTTS,
            TEXAS CERTIFIED SHORTHAND REPORTER
23

24

25
```

Deposition of Valentin De La Garza                                              Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1                          I N D E X

 2                                                            PAGE

 3   APPEARANCES.....................................      2

 4   THE WITNESS:   VALENTIN DE LA GARZA

 5   Examination by Mr. Schey.....................      5

 6   Examination by Ms. Fabian....................    119

 7   Examination by Mr. Schey.....................    120

 8   Signature and Changes........................    137

 9   Reporter's Certificate.......................    139

10   Further Certification........................    142

11

12

13                E X H I B I T   I N D E X

14   EXHIBIT

15   NO.              DESCRIPTION           PAGE MARKED

16   Exhibit  1    Declaration of Valentin De La Garza...    66

17

18

19

20

21

22

23

24

25
```

Deposition of Valentin De La Garza

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1              P R O C E E D I N G S

 2          (Proceedings began at 9:16 a.m.)

 3              VALENTIN DE LA GARZA,

 4    having been duly sworn, testified under his oath as

 5    follows:

 6          MS. FABIAN:  Peter, you can ago ahead.

 7              EXAMINATION

 8    BY MR. SCHEY:

 9      Q.   Okay.  Mr. De La Garza, can you tell us which

10    detention center you have authority over?

11      A.   Good morning, Mr. Schey, and yes, I can.  I --

12    One fa -- I oversee the Dilley, Texas, facility.  They

13    call it the South Texas Family Residential Center.

14      Q.   And approximately how many ICE agents are

15    currently assigned to that facility?

16      A.   Approximately 125.

17      Q.   And do they work full time at that facility?

18      A.   Yes, sir.

19      Q.   And is that current number -- is that unusual,

20    or -- or for how long has that been the approximate

21    number?

22          MS. FABIAN:  Object to form.

23          THE WITNESS:  Sir, that's what -- That's the

24    number that it -- that's been assigned there right now.

25          Could you repeat the question again?
```

1    Q.    (By Mr. Schey)  Yeah.  For -- Is that unusual, or

2    for approximately how long has that number been --

3    approximate number been assigned to that facility?

4           MS. FABIAN:  Object to form.

5           THE WITNESS:  I'm not sure exactly how long it's

6    been.  It's been like that for a while, though.

7    Q.    (By Mr. Schey)  Okay.  And how long have you been

8    assigned to that facility?

9    A.    The permanent -- the permanent facility?  Since

10   it -- Since we transitioned from phase one, which is

11   initially where it was started.  I've been there since

12   phase two came into effect.

13   Q.    (By Mr. Schey)  And when --

14   A.    And a --

15   Q.    -- was --

16   A.    -- couple --

17   Q.    -- that?

18   A.    Can't --

19   Q.    Approximately.

20   A.    -- remember.  I think it was -- Don't mark me on

21   the date, but it's -- I think it was April 19th, 2015.

22   Prior to --

23   Q.    Okay.

24   A.    -- that, I was --

25   Q.    And --

1    A.    -- there -- prior to that, I was there a couple

2    months when we were in phase one.

3    Q.    Okay.  And when you started to be in charge of

4    that facility, what -- how many ICE agents were there,

5    approximately?

6    A.    I don't remember, sir.

7    Q.    Was it more or less than now?

8    A.    It was less, but I don't remember the exact

9    number or the approximate --

10    Q.    What --

11    A.    -- number.

12    Q.    And who decides how many agents will be -- ICE

13    agents will be assigned to that facility?

14    A.    You'd have to get with my chain of command on

15    that, sir.

16    Q.    But do you have any idea who makes that decision?

17    A.    No, sir.

18    Q.    Okay.  And for how many months have there been

19    that approximate number of agents there?

20    A.    Sir, I can't recall.

21    Q.    And is the speed with which you are able to

22    process people dependent, in part, on the number of agents

23    assigned there?

24         MS. FABIAN:  Object to form.

25    Q.    (By Mr. Schey)  You can answer the question.

1    A.   Yes.   I guess -- Could you rep -- repeat the

2    question again?

3    Q.   Yeah.   Is the numbers of agents assigned to the

4    facility one of the factors that determines how quickly

5    you can process people?

6         MS. FABIAN:   Object to form.

7    Q.   (By Mr. Schey)   Is that --

8    A.   You're asking for an opinion.

9    Q.   In other words --

10   A.   Eh...

11   Q.   Let me -- But it -- It -- I'm sorry.   Is that a

12   "yes"?

13   A.   No.   I just said, "Uh."   I'm -- I'm --

14   Q.   Okay.   Well, if that's a complicated question, I

15   can put it a different way.   Let's say only 10 agents were

16   assigned there.   Would the processing take longer?

17        MS. FABIAN:   Object to form.

18        THE WITNESS:   Well, it's -- It all depends on the

19   individuals, sir, and how fast they work.   But yeah.

20   Q.   (By Mr. Schey)   But --

21   A.   Our numbers --

22   Q.   -- would you say that --

23   A.   -- you know -- the --

24   Q.   But --

25   A.   -- more --

```
 1        Q.    -- would you --

 2        A.    -- numbers you --

 3        Q.    -- say --

 4        A.    -- have --

 5        Q.    -- that --

 6        A.    -- the -- the faster you're going to get things

 7   done, yeah, of course.

 8        Q.    Okay.  So the more agents you have there, the

 9   faster you'd get things done; is that fair to say?

10             MS. FABIAN:  Ob -- Object to form.

11             THE WITNESS:  That's hard to say, I mean, but in

12   a real -- in the real world -- or in a perfect world, yes.

13   If each individual --

14        Q.    (By Mr. Schey)  Okay.

15        A.    Each individual is different, you know.  It --

16   It's -- It's -- But yes, sir.

17        Q.    But would -- Okay.

18             When a person expresses a -- a fear, you set up

19   an interview with the CIS agents; is that correct, an

20   Asylum agent?

21        A.    No, sir.  We don't set up the interview.  We just

22   refer the case to CIS, and they do everything --

23        Q.    Okay.

24        A.    -- else.

25        Q.    And what -- Why don't you explain to us how you
```

1    refer the case to CIS?  Tell us exactly what happens to

2    accomplish that.

3         A.   Well, as soon as the individual expresses fear,

4    there's certain documents that CIS requires.  Those ones

5    are completed and then handed over to them, and they take

6    over.  They take jurisdiction of the case.

7         Q.   And what doc -- what document do you give them?

8         A.   I don't remember the exact document, sir.

9         Q.   And is that document communicated to them

10   digitally or on paper?

11        A.   To who?  To CIS, you're --

12        Q.   I --

13        A.   -- saying?

14        Q.   -- didn't look up -- Yes, to -- to CIS.

15        A.   Yes, sir.  We -- We -- We make -- we make hard

16   copies then hand them over to them.

17        Q.   Okay.  And you -- Do you not remember what the

18   document is that you give to them?

19        A.   No, sir.  I'd be guessing if I'd tell you.

20        Q.   Okay.  And how -- You say they're given a hard

21   copy transfer.  Explain, for the record, exactly how that

22   happens.

23             (Mr. Anderson exited the conference room)

24             THE WITNESS:  Well, sir, we just get the

25   documents they require.  If it's something out of the file

```
 1    that would -- they require, then we make a copy, and we
 2    walk it over to them.  They're on-site.
 3        Q.   (By Mr. Schey)  Oh.
 4             And is this a document that you fill out only
 5    when somebody expresses a fear of return to -- to their
 6    home country?
 7             MS. FABIAN:  Object to form.
 8             THE WITNESS:  That I know of, yes, sir.
 9        Q.   (By Mr. Schey)  Okay.  And how do you determine
10    whether somebody has a -- a -- a -- a fear or not?  When
11    and how does that happen?
12             MS. FABIAN:  Object --
13             THE WITNESS:  We --
14             MS. FABIAN:  -- to form, foundation.
15             THE WITNESS:  We don't determine that, sir.  It
16    was -- The alien expresses -- The -- The -- The resident
17    expresses that to us, and at that point, we -- we start
18    the fear process with CIS.
19        Q.   (By Mr. Schey)  Okay.  And how do you -- How
20    did -- How does the detainee know to express a fear to
21    you?
22        A.   We ask --
23             MS. FABIAN:  Ob --
24             THE WITNESS:  -- them.
25             MS. FABIAN:  I'm sorry.  Object to form.
```

```
 1            THE WITNESS:  -- if --

 2       Q.   (By Mr. Schey)  And --

 3       A.   -- they have --

 4       Q.   -- when --

 5       A.   -- the --

 6       Q.   -- do --

 7       A.   -- a --

 8       Q.   -- you ask them?

 9       A.   Excuse me?

10       Q.   When -- When do you ask them?

11       A.   At the point of admission, when they enter the

12  facility; and if they claim fear after that, you know,

13  it's -- at any time when they're -- their time in custody

14  with us.

15       Q.   All right.  So you're saying, when they come to

16  the facility, they're interviewed by an ICE agent?

17       A.   Yes, sir.

18       Q.   Okay.  And does that interview normally take

19  place -- Or how -- how long after they arrive at the

20  facility does that initial interview normally take place?

21       A.   It's at the point of intake, sir.  I can't tell

22  you exactly what time, but it's while they're still being

23  processed into the facility.

24       Q.   Okay.  And -- And you're saying, during that

25  time, they are -- they are -- they are asked whether or
```

```
 1    not they have a fear of return to their home country?

 2         A.    Yes, sir.

 3         Q.    Are they advised if -- Let's say, parents of an

 4    accompanying minor, are they advised that the minor can

 5    file a -- or make a Shepherd's Claim?

 6         A.    I'm sorry.  Could you clarify the question, sir?

 7    You were asking...

 8         Q.    Are -- Are they advised that if -- if -- if they

 9    are with an accompanying minor that that accompanying

10    minor can make a Shepherd's claim?

11              MS. FABIAN:  Object to form, foundation.

12              THE WITNESS:  No, sir, I don't think we make the

13    distinction between that.  We just ask them, in general,

14    if they've -- if they're afraid to return to their

15    country.

16         Q.    (By Mr. Schey)  Okay.  And what -- And -- And --

17    And if they say, "Yes, I am," does this form that you fill

18    out capture information about why they have that fear?

19         A.    To my rec --

20              MS. FABIAN:  Object to form.

21              THE WITNESS:  To my recollection, no, sir.  It's

22    just forms indicating what the process is going to be next

23    or what -- what steps are going to be taken next.  They're

24    being referred to IN -- CIS for an interview.

25         Q.    (By Mr. Schey)  Do -- Do your agents maintain any
```

1    data which shows that -- which would show, in any

2    individual case, how long it took from the time of entry

3    into the facility or from the time of apprehension to

4    obtain the information from the detainee regarding their

5    fear?

6              MS. FABIAN:  Object to form.

7              THE WITNESS:  Could you be a little bit more

8    specific on the question, sir?

9         Q.   (By Mr. Schey)  Yeah.  Do the agents who work for

10   you -- are they required to fill out any information or

11   record info -- any information that could be used to

12   measure the time between either apprehension or entry into

13   the facility and the time the person is interviewed, among

14   other things, to determine whether they have a fear of

15   return?

16        A.   I'm not sure exactly what you're asking here.

17   You're asking if we track the time frame between the claim

18   and the interview, or...

19        Q.   Well, initially, I'm asking, Do you track the

20   time frame between apprehension and the time you interview

21   them to determine whether they have a fear or not?

22        A.   I don't know how to answer that question, sir.

23   I'm not clear on it.  We --

24        Q.   Okay.  Do your agents -- do your agents fill out

25   anything that would track the time that expired between

1   the time of apprehension and the time of that initial

2   interview to determine if they have a fear?

3       A.   We don't track it, sir, but I mean, that --

4   it's -- The time of apprehension is recorded by the -- by

5   the arresting agency, because we get the document on that.

6   The time they come into our facility, you know, we got a

7   date of that.  The date that we serve -- or that the --

8   the -- the -- the case is referred to CIS, we track that,

9   too.  To answer your question, I don't know if that does

10  it or not, but -- but...

11      Q.   Okay.  My -- My -- My question was, Do you

12  maintain any data that compiles the time that it took from

13  the time of apprehension to the time they were interviewed

14  by an ICE agent to determine whether they have a credible

15  fear?  Do you track that data or not?

16      A.   No.  We don't track that data.

17      Q.   Okay.  How about the time between the time they

18  express a credible fear and the time they have a credible

19  fear interview?

20      A.   We don't track that data either, but I'll tell

21  you -- if -- I'm telling you, we know when they get -- the

22  day they get interviewed and -- the day they claim it and

23  the day they get interviewed.  Those are documented, but

24  we're not tracking it.  Does that answer your question?

25      Q.   Yeah.  For the moment.

1       When you question -- When your agents question

2   people about whether they have a credible fear, what

3   does -- what specific question do your agents ask the

4   detainees based on the form that they are filling out?

5           MS. FABIAN:  Object to form.

6           THE WITNESS:  What specific questions do we ask

7   them on the form they're filling out?  Is that what you

8   said?

9       Q.   (By Mr. Schey)  Yes, to determine whether they

10  have a credible fear.  In other words, there are different

11  ways you could ask that question.  You could say, "Do you

12  have a fear of return?"  You could say, "Do you believe

13  your government will persecute you if you were returned?"

14  I'm sure there are many ways to ask that question.

15          How do you ask the -- How do your agents ask that

16  question?

17      A.   Sir, I don't know how they ask them.  I just know

18  that we ask them if they're returning to their -- do

19  they -- if they have any fear of return to their country.

20  How they phrase that, I don't know.

21      Q.   And do you know in the past, let's say,

22  approximately, three months, how long at Dilley it is

23  taking, on average, from the time detainees arrive there

24  to the time they are interviewed to determine if they have

25  a fear of returning home?

```
 1        A.    Okay.  Could you repeat that one more time?

 2        Q.    Yeah.  Do you have any data that would tell us,

 3   let's say over the past three or four, five months or six

 4   months, how long it took, on average, between the time a

 5   detainee arrives at Dilley and the time they were

 6   interviewed to determine -- interviewed by an ICE officer

 7   to determine if they have a credible fear?

 8              MS. FABIAN:  Object to form.

 9              THE WITNESS:  We don't determine if they have a

10   credible fear, sir.  We just determine if they have fear.

11        Q.    (By Mr. Schey)  All right.

12        A.    When we --

13        Q.    Do --

14        A.    -- do -- we --

15        Q.    -- you --

16        A.    -- do --

17        Q.    -- have any --

18        A.    -- that --

19        Q.    -- data --

20        A.    -- we don't -- we don't track it.  All I'm

21   telling you is that we -- we monitor -- I mean, we ask

22   them the question when they get there, and they claim

23   fear.  If they've already claimed fear at the point of

24   entry, or of -- at the point of apprehension, we refer

25   them to -- to CIS.
```

1    Q.    Okay.  Do you have any data over the past few

2    months -- three months, five months, six months -- about

3    how long it takes for you to conduct that interview from

4    the time the detainee arrived at Dilley?

5    A.    Sir, it's -- it's at the --

6          MS. FABIAN:  Object --

7          THE WITNESS:  -- point --

8          MS. FABIAN:  -- to form.

9          THE WITNESS:  It's at the point of admission,

10   sir, that we ask them.  We don't keep that data.

11   Q.    (By Mr. Schey)  Okay.  Okay.  Do you have any

12   data about how long it takes, on average, over the past

13   few months, six months, three months, between the time

14   that you, ICE, determines somebody has a fear and the time

15   they are interviewed by a CIS Asylum officer?

16   A.    No.  We don't keep that data.

17   Q.    How many Asylum officers are currently assigned

18   to Dilley?

19   A.    I don't know, sir.

20   Q.    If additional agents were assigned to -- If

21   additional Asylum officers were assigned to Dilley, could

22   the fear interviews by those Asylum officers be conducted

23   more expeditiously?

24         MS. FABIAN:  Objection; foundation.

25         THE WITNESS:  Again, sir, because I don't know

 1    for sure, logically thinking --

 2         Q.    (By Mr. Schey)   In -- In your experience, how

 3    long is it taking, on average, between the time that you

 4    refer a case to ICE for a fear interview and the time that

 5    interview takes place?

 6              MS. FABIAN:   Ob -- Object to foundation.

 7              I -- I think -- I think you misspoke, Peter.   You

 8    said "refer to ICE."   Did you mean "CIS"?

 9              MR. SCHEY:   Correct.

10              MS. FABIAN:   Okay.   Maybe if you -- you a --

11    re-ask the question and say "CIS."

12         Q.    (By Mr. Schey)   Yeah.   Do you have any data over

13    the past several months, three months, six months, about

14    how long it takes from the time ICE conducts its initial

15    interview and the time a -- a fear interview is conducted

16    by a CI -- CIS Asylum officer?

17         A.    No, sir.   They don't keep that data.

18         Q.    Can you identify any -- ju -- just list them;

19    I -- I don't have copies of them.   But can you list any

20    documents that you reviewed in order to prepare the

21    declaration that you signed in this case other the

22    documents attached to your declaration?

23         A.    It's just the --

24         Q.    Are there --

25         A.    -- attachments.

```
 1        Q.    -- any other -- are there any --

 2              THE WITNESS:  Did David --

 3        Q.    (By Mr. Schey)  -- other documents that you --

 4              MS. FABIAN:  No.

 5        Q.    (By Mr. Schey)  -- relied --

 6              THE WITNESS:  No?

 7        Q.    (By Mr. Schey)  -- upon to execute your --

 8        A.    No.

 9        Q.    -- declaration?

10        A.    No, sir.  There's no other documents, other than

11   the database that we took everything off, and that's what

12   we -- that's what -- I've given it to my attorneys here

13   today.

14        Q.    Okay.  And can you -- can you tell us when was

15   the most recent time that you received any training about

16   the requirements of the Flores Settlement and who provided

17   you that training?

18              MS. FABIAN:  Object to form.

19              THE WITNESS:  They haven't had any training, sir.

20        Q.    (By Mr. Schey)  And can you tell us whether you

21   have read the August decision, issued by Judge Gee, in the

22   Flores case?

23        A.    I read it, sir.

24        Q.    Okay.  And can you tell us when and who provided

25   you a copy of that decision?
```

```
 1        A.    No, sir.  I couldn't.  I got it on e-mail.

 2        Q.    Can you tell -- can you tell us approximately

 3  when you received that decision and how you received it?

 4        A.    I don't remember the exact date.  It was --

 5  pretty much as soon as my agency found out about it, I got

 6  it.

 7        Q.    And can you tell us, have you ever received any

 8  training about that court decision, and if so, who

 9  provided you that training?

10        A.    No, sir.  It's a "no" to both -- both questions.

11        Q.    During the time that you have been in charge of

12  matters at Dilley, can you tell us when the agent -- the

13  ICE agents working there have been provided training about

14  the requirements of the Flores Settlement, and who

15  provided that training?

16              MS. FABIAN:  Object to form, foundation.

17              THE WITNESS:  It's "no" to that one, too.

18        Q.    (By Mr. Schey)  And during the time that you have

19  been -- Or since August of 2015 and the present, can you

20  identify any time when the ICE agents working at Dilley

21  were provided training about Judge Gee's order, and who

22  provided that training to them?

23        A.    It's "no" to those questions, too, sir.

24        Q.    Can you tell us what, if any, type of license

25  Dilley currently has, a -- a state-issued or -- or a
```

```
 1   county-issued license?
 2          MS. FABIAN:  Ob -- Object to form.
 3          THE WITNESS:  To my knowledge, sir, we don't have
 4   one -- or they don't have one.
 5      Q.   (By Mr. Schey)  And is it fair to say that Dilley
 6   is a secure facility?
 7          MS. FABIAN:  Object to form.
 8      Q.   (By Mr. Schey)  You can answer the question.
 9      A.   Yes.
10          If it's -- Is it a secure --
11      Q.   And --
12      A.   -- facility?  Has anybody -- Everybody's freedom
13   of movement there, sir.
14      Q.   Okay.  Are people free to leave the facility if
15   they want to?
16      A.   No, sir.  Not until we tell them it's -- it's
17   okay to leave.
18      Q.   And in that facility, are chi -- are children
19   half detained with their fathers?
20      A.   No, sir.
21          MS. FABIAN:  Object to form.
22      Q.   (By Mr. Schey)  And is that facility limited to
23   detention of children with mothers?
24          MS. FABIAN:  Object to form.
25          THE WITNESS:  Yes.  It's just adult mothers with
```

| 1 | their children, their minor children. |
| 2 | Q.   (By Mr. Schey)   And in your experience, what |
| 3 | happens to a -- adult fathers with their minor children -- |
| 4 | A.   I wouldn't -- |
| 5 | Q.   -- when they are ap -- when they are apprehended? |
| 6 | A.   I don't know, sir. |
| 7 | Q.   And how long, on a -- Or do you maintain data, or |
| 8 | does ICE maintain data, on how long, on average, it is |
| 9 | taking for U.S. CIS to make these fear decisions? |
| 10 | A.   No, sir.   I don't keep that data. |
| 11 | Q.   Have you received any instructions or directions |
| 12 | telling you what ICE agents should do to comply with |
| 13 | paragraph 14 of the Flores Settlement prior to U.S. CIS |
| 14 | issuing its fear decision? |
| 15 | MS. FABIAN:  Object to form.  And I'm -- I'm |
| 16 | going to just object as -- in -- to the extent you're |
| 17 | asking privileged information that he's heard from his |
| 18 | lawyers.  I'm going to tell him -- direct him not to |
| 19 | answer -- |
| 20 | MR. SCHEY:  Got it. |
| 21 | MS. FABIAN:  -- about any -- any -- |
| 22 | MR. SCHEY:  Yep. |
| 23 | MS. FABIAN:  -- such information. |
| 24 | Q.   (By Mr. Schey)   Right.   Other than -- other than |
| 25 | from your -- other than from any ICE lawyer? |

1    A.    Could you repeat the question again, sir?

2    Q.    Could the court reporter repeat the question,

3  please.

4    THE REPORTER:   QUESTION:   "Have you received any

5  instructions or directions telling you what ICE agents

6  should do to comply with paragraph 14 of the Flores

7  Settlement prior to U.S. CIS issuing its fear decision"?

8         THE WITNESS:   I guess, sir, that -- To answer

9  your question, it's -- we monitor the cases closely; we

10 then -- we process the cases expeditiously; you know, we

11 monitor CIS; we monitor each case individually and ensure

12 that they stay within the -- the required time frame the

13 judge has -- has asked us to -- to do.

14   Q.    (By Mr. Schey) Okay.  Do you know what paragraph

15 14 of the settlement requires?

16   A.    No.

17   Q.    Do you know what paragraph 19 of the settlement

18 requires?

19   A.    No, sir.

20   Q.    When your agents first interview people upon

21 their entry to the facility, do you gather information

22 about the detainees' friends or relatives in the United

23 States with -- with a wish to reside or with whom they

24 wish to reside?

25   A.    We ask them at the point of -- of admission.

1    Q.    And -- And what -- What do you ask them?

2    A.    What you just asked me to answer, sir.  Just --

3  Just ask them where were they going to be staying in the

4  United States and with what family members or friends.

5    Q.    Do you get a list of all family members or just

6  the family member or friends with a wish to reside?

7    A.    Just whatever they provide.

8    Q.    Okay.  My question was, Do you request that they

9  give you all their family members or friends in the United

10  States or simply with a wish to reside?

11    A.    It's just one question we ask them, you know,

12  and -- and it's pretty much a general saying, where they

13  were going to be resi -- residing here in the United

14  States and with who.  It's whatever they provide after

15  that.  We don't -- If it's more than one, then it's more

16  than one.  If it's just one, or if it's none, it -- it's

17  whatever they provide, sir, if they provide anything.

18    Q.    And prior to the credible fear interview, do your

19  agents make any effort to determine the suitability of

20  that relative or friend to provide for the care and

21  custody of the minor?

22    A.    What do you mean exactly, "suitability"?

23    Q.    Whether -- Do your agents -- Prior to the CIS

24  Asylum interview, or fear interview, do your agents in --

25  take any action to investigate the appropriateness of

1    placing the minor with a relative or friends that the

2    minor or the mother have identified, and if so, what is

3    the nature of that investigation?

4            MS. FABIAN:  Object to form.

5            THE WITNESS:  No, sir.

6    Q.   (By Mr. Schey)  Prior to the -- Well, let's call

7    it the Asylum interview with the Asylum officers.  Prior

8    to the Asylum interview, have your agents been instructed

9    to take any steps aimed at the release or the placement of

10   the minors under the Flores Settlement?

11           MS. FABIAN:  Object to form, foundation.

12           THE WITNESS:  No, sir.

13   Q.   (By Mr. Schey)  And prior to the Asylum

14   interview, have your agents been issued any instructions

15   to make efforts to release or place the minors, pursuant

16   to Judge Gee's -- to anything in Judge Gee's August 2015

17   order?

18           MS. FABIAN:  Object to form.

19           THE WITNESS:  And you're saying that's prior to

20   the Asylum interview?

21   Q.   (By Mr. Schey)  Correct.

22   A.   No, sir.

23   Q.   And can you identify any licensed facility where

24   ICE, anytime in the past -- anytime while you have been in

25   charge of the Dilley facility, has placed minors, pursuant

```
 1    to paragraph 19 of the Flores Settlement?

 2              MS. FABIAN:  Object to form, foundation.

 3              THE WITNESS:  I don't know what the nine -- the

 4    paragraph 19 says, so sir, I can't answer that question.

 5         Q.   (By Mr. Schey)  Okay.  In -- In summary,

 6    paragraph 19 states that if a placement is not possible

 7    under paragraph 14, which involves placement with

 8    relatives or other -- other adults, responsible adults --

 9         (Mr. Anderson reentered the conference room)

10         Q.   (By Mr. Schey)  -- then placement may be made to

11    a licensed facility.  Have -- Are you aware of any

12    licensed facility that ICE has used for that purpose?

13              MS. FABIAN:  Object to form.

14              THE WITNESS:  Again, prior to the interview?

15         Q.   (By Mr. Schey)  Correct.

16         A.   No, sir.  I'm not aware of any.  Haven't

17    encountered --

18         Q.   Okay.  Can --

19         A.   -- anything --

20         Q.   -- we --

21         A.   -- like that in my facility.

22         Q.   Okay.  Can we go off the record for a moment,

23    please?

24              MS. FABIAN:  Yep.  Sure.

25              (Break taken from 9:52 a.m. to 9:52 a.m.)
```

1          MR. SCHEY:  Can the court reporter -- court

2     reporter please just read the deponent's response to my

3     question?

4          THE REPORTER:  You wanted the previous response?

5          MR. SCHEY:  Yeah.  Just tell me his response.

6          THE REPORTER:  ANSWER:  "No, sir.  I'm not aware

7     of any.  Haven't encountered anything like that in my

8     facility."

9          MR. SCHEY:  Okay.  Thank you.

10     Q.   (By Mr. Schey)  Have your officers, or agents,

11     received any training, and if so, by who and when,

12     regarding implementation of paragraph 14 of the settlement

13     if the Asylum officer rejects the -- the fear claim?

14          MS. FABIAN:  Object to form.

15          THE WITNESS:  Again, I'm not sure what 14 is

16     referring to -- paragraph 14 refers to.  I know you just

17     said it, but I don't remember the -- I'm not sure I can

18     answer that question accurately.

19     Q.   (By Mr. Schey)  Okay.  Paragraph 14 basically

20     states that where the ICE determines or where the -- where

21     ICE determines that the detention of a minor is not

22     required to secure a minor's primary appearance before the

23     agency or the immigration court, or to -- it's for the

24     minor's safety or the safety of others, the ICE shall

25     release a minor from its custody without unnecessary delay

```
 1   in a certain order of preference, starting with the

 2   parents and then going to a legal guardian, then going to

 3   other adult relatives, et cetera.  So that's basically

 4   paragraph 14.

 5          And my question was, To your knowledge, have the

 6   ICE agents received any training while you have been in

 7   charge, and if so, when, and who provided that training

 8   regarding implementation of paragraph 14 if and when

 9   U.S. CIS rejects a credible fear claim?

10          MS. FABIAN:  I'm going to object to form and

11   foundation, as far as the characterization of paragraph

12   14.

13       Q.   (By Mr. Schey)  You may answer the question.

14       A.   I mean, if your -- your interpretation of the

15   paragraph 14, or your -- your statement of paragraph 14,

16   I'm going to say "no."

17       Q.   And have -- Have you yourself re -- received any

18   direction or training on how to implement paragraph 14 if

19   U.S. CIS denies a fear claim, and if so, who provided you

20   that direction or training?

21          MS. FABIAN:  I'm going to object to form and

22   foundation.

23          THE WITNESS:  It came from my field officer, and

24   it was just -- just the direction of what to -- that we

25   were supposed to be taking.
```

1    Q.   (By Mr. Schey)  Say that again, please.

2    A.   It -- It came from my chain of command, sir,

3   and it was --

4    Q.   Yes.

5    A.   -- direction on --

6    Q.   But --

7    A.   -- how to handle negative -- negative fear

8   findings.

9    Q.   And -- And -- And -- And -- And what direction

10  did you receive, and when did you receive it, and who did

11  you receive it from, regarding implementation of paragraph

12  14 if a credible fear is denied?

13       MS. FABIAN:  Object to form and foundation.

14       THE WITNESS:  I can't remember exactly who it

15  came from, sir, but it's my chain of command.

16   Q.   (By Mr. Schey)  And when did you receive that

17  direction?

18   A.   I don't remember exactly, sir.

19   Q.   And how did you receive it, if you remember?  Do

20  not --

21   A.   Huh.

22   Q.   -- speculate.

23   A.   Okay.  I'm not going to speculate, then.  I don't

24  know.  I don't remember.

25   Q.   And what did that direction state, if you recall?

```
 1        A.    Basically what we're doing, sir.
 2        Q.    No.   I mean, what did that direction tell you, if
 3   you recall?   Do not speculate.
 4        A.    That negative -- Negative findings are a final
 5   order, sir.   We would -- we would proceed with the removal
 6   order.
 7        Q.    Okay.   My question was not about proceeding with
 8   removal, so let's back up.
 9              My question was, Have you received any guidance,
10   instructions, or training regarding how you should
11   implement paragraph 14, dealing with the release of minors
12   in a certain order of preference in the event the credible
13   fear claim is denied.   Just ye -- Yes or no.   You've
14   either received that kind of training, instructions, or
15   guidance, or you have not.
16        A.    Guidance, yes.
17              MS. FABIAN:   Object to form.
18              THE WITNESS:   I'm sorry.
19              I'm sorry.   I walked over my counsel's responses.
20   Guidance.   We received guidance, sir.
21        Q.    (By Mr. Schey)   Okay.   And -- And what guidance
22   have you received about implementing paragraph 14, or
23   complying with paragraph 14, if a child's credible or --
24   or fear claim has been denied by U.S. CIS?
25        A.    They'll become mandatory detention at that time.
```

1    We'd proceed with the -- the removal order.

2        Q.   Okay.   My question was not whether they become

3    subject to mandatory detention if their -- if their fear

4    claim is denied.   My question was, Have you received any

5    instructions to comply with paragraph 14, regarding the

6    release of minors if that minor's claim, fear claim, has

7    been rejected?

8            MS. FABIAN:   Ob -- Object to form and foundation.

9            I think he's answered your question to the best

10   of his ability.

11       Q.   (By Mr. Schey)   Okay.   You may answer this

12   question.

13       A.   Yes, sir.   Our guidance is that, at that point,

14   they are a final order; they become a mandatory detention,

15   and we proceed with the removal.

16       Q.   Okay.   So in other words, you have not received

17   any instruction or guidance regarding the release of

18   minors under paragraph 14 if their fear claim has been

19   denied; is that fair to say?

20           MS. FABIAN:   Object to form, foundation.

21           THE WITNESS:   My answer's going to be the same

22   thing, sir.   My guidance is to hold them to -- until they

23   become a mandatory --

24       Q.   (By Mr. Schey)   Okay.

25       A.   -- detention and to proceed with the removal.

1    Q.   Okay.  Same question with regards to paragraph

2    19, would your response be the same?  Again, paragraph 19

3    involves placement in a licensed program.  Would your

4    response be the same?

5              MS. FABIAN:  Object to form.

6              MR. SCHEY:  You -- We're waiting for your

7    response.

8              THE WITNESS:  Yeah.  I'm trying to -- trying to

9    put together what you were -- what you're saying.  I'm --

10   You're saying paragraph 19.  Could you just say that one

11   more time?

12   Q.   (By Mr. Schey)  Sure.  Let me repeat for you.

13            Paragraph 19, in -- in summary, states that, in

14   any case in which ICE does not release a minor pursuant to

15   paragraph 14, minors shall remain in ICE legal custody.

16   Minors shall be tempora -- shall be placed temporarily in

17   a licensed program until such time as release can be

18   effective, in accordance with paragraph 14 above, or until

19   the inter -- the minor's immigration proceedings are

20   concluded.  That, in a nutshell, is what paragraph 19

21   states.

22            So my question was, Have you received any

23   direction or guidance that you should comply with

24   paragraph 19 if a child's fear claim has been rejected?

25            MS. FABIAN:  I'm going to object to form and

1    foundation and the characterization of paragraph 19.

2              THE WITNESS:  If what you're telling me is

3    accurate for par -- paragraph 19, yes.

4        Q.   (By Mr. Schey)  So I'm -- I'm not sure I

5    understand your response.  You -- You're -- You're

6    saying -- You -- You're saying that you had re -- received

7    the instructions to release minors to a licensed program

8    under paragraph 19 if their credible fear claim is denied

9    and there's no placement available under paragraph 14; is

10   that what you're testifying to?

11             MS. FABIAN:  Object to form.

12             THE WITNESS:  No.  No.

13       Q.   (By Mr. Schey)  Okay.  So if it -- It's -- So --

14   So would it be fair to say that if a credible fear -- that

15   if a fear claim is denied, you do not consider the minor

16   for release under paragraph 19 to a licensed program; is

17   that fair to say?

18             MS. FABIAN:  Object to form.

19             THE WITNESS:  No.  They're -- Yeah.  Yeah, you're

20   correct.  It's -- We're saying -- I'm saying, "No, we

21   don't."

22       Q.   (By Mr. Schey)  Okay.  And -- And what you do at

23   that point is, you subject them to mandatory detention?

24       A.   Yes.

25       Q.   Is that fair to --

Deposition of Valentin De La Garza                                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1        A.    Yes.
 2        Q.    And -- And that mandatory detention can -- can
 3   last for days, weeks, or months, depending on ICE's
 4   ability to obtain travel documents for that minor and/or
 5   his or her accompanying parent, or depending on any
 6   administrative or judicial review that may be sought by
 7   the mother or the child; is that fair to state?
 8              MS. FABIAN:  Object to form.
 9              THE WITNESS:  You're asking me to speculate, sir.
10   I -- I can't.
11        Q.    (By Mr. Schey)  Say that again.  I'm sorry?
12        A.    I said, "You're asking me to guess and give my
13   opinion."
14              Could you rephrase that question --
15        Q.    I'm asking --
16        A.    -- so it's a "yes" or "no"?
17        Q.    I -- Yeah.  I'm asking you, In your experience,
18   may it take weeks or months to effect the minor's removal,
19   either because you have to obtain travel documents or
20   because the minor, or the minor's parent, is seeking some
21   review of the denial of their fear claim?  Is that fair to
22   say?
23              MS. FABIAN:  Object to form.
24              THE WITNESS:  To be fair, sir, it could take a
25   day; it could take a couple of days; it could take a week.
```

1  Each case is -- is a -- different.  It's hard to say.

2      Q.   (By Mr. Schey)  Could it take a month?

3      A.   Sir, that -- It -- It's hard to say, sir.  It

4  could take a day; it could take a month; it could take a

5  week; it could take a couple of days.

6      Q.   Okay.

7      A.   I --

8      Q.   So, it -- it -- it -- it -- it really depends on

9  each individual case, how long it --

10     A.   Correct.

11     Q.   -- will take; is that fair to say?

12     A.   Yes.  It is.

13     Q.   And at what point are mothers and children

14 transferred out of Dilley?

15          MS. FABIAN:  Object to form.

16          THE WITNESS:  At what point are mothers

17 transferred out of Dilley, or -- is that what you --

18     Q.   (By Mr. Schey)  Yes.

19     A.   -- asked?

20          Mothers or families?

21     Q.   Mothers and children.

22     A.   Depends, sir, on the case status, sir, but we've

23 had a few that we transferred to Berks, and each case is

24 different.

25     Q.   What's -- During the past six months, what's the

1   longest time that a mother and child has spent at Dilley,

2   approximately?

3        A.   I don't know, sir.  I don't know the exact date,

4   approximately.

5        Q.   At any time in the past 12 months, have -- have

6   you attempted, or anyone else, to your knowledge,

7   attempted to determine what's the longest time that a

8   Flores Class member has spent at Dilley?

9             MS. FABIAN:  Object to foundation.

10            THE WITNESS:  Oh.  I haven't gone in there and

11   specifically looked at them and looked for that

12   information in the past 12 months.  I wouldn't have that

13   information for you, sir.  I don't have it.

14        Q.   (By Mr. Schey)  And are some -- Have -- During

15   the past 12 months, have any class members been

16   transferred from Dilley to any ICE facility other than

17   Berks?

18        A.   No.  I -- I can -- I can say that that's a "no,"

19   because everybody that we've transferred out of that

20   facility has gone to Berks.

21        Q.   So it is your testimony that no class members

22   have been transferred from Karnes -- I mean, from Dilley

23   to Karnes?

24        A.   Oh.  I can't answer that question for sure.  You

25   just -- You just enlightened me to something here I've

1   forgotten about.  But class members, I -- I -- I don't --

2   I can't recall, sir.

3       Q.   Before Dilley was opened -- Or -- or at the time

4   that Dilley was opened, where were you working?

5            MS. FABIAN:  Object to form.

6            THE WITNESS:  Port Isabel.

7       Q.   (By Mr. Schey)  I'm sorry?

8       A.   Port Isabel, Texas.

9       Q.   And prior to Dilley and Karnes opening, when

10  mothers with children were apprehended, how were they

11  processed?

12           MS. FABIAN:  Object to foundation.

13           THE WITNESS:  I don't know, sir.

14      Q.   (By Mr. Schey)  Prior to the opening of Dilley

15  and Karnes, where did you -- what did you do with mothers

16  and children who were apprehended at the border or close

17  to the border?

18      A.   I wouldn't know, sir.  You'd have to talk to the

19  arresting agencies on that.

20      Q.   Okay.  But once the arresting agency, let's say

21  with CBP, transferred mothers and children to ICE custody,

22  what -- what did you do with those mothers and children

23  prior to the opening of Karnes and Dilley?

24      A.   I don't know, sir.

25           THE WITNESS:  May I get a glass of water?

1          MS. FABIAN:   Yeah.

2      Q.   (By Mr. Schey)   If an ICE agent at Dilley made

3   efforts to place a child -- to place a class member under

4   paragraph 14 or paragraph 19 of the settlement, where

5   would that agent's activity most likely be recorded?

6          MS. FABIAN:   Object to form, foundation.

7          THE WITNESS:   Could -- Could you repeat that one

8   more time?

9      Q.   (By Mr. Schey)   Yeah.   Could the reporter repeat

10  it, please?

11         THE REPORTER:   QUESTION:   "If an ICE agent at

12  Dilley made efforts to place a child -- to place a class

13  member under paragraph 14 or paragraph 19 of the

14  settlement, [where] would that agent's activity most

15  likely be recorded?"

16     Q.   (By Mr. Schey)   Yeah.   Where -- Where -- Where

17  would that agent's activity likely be recorded?

18     A.   Can't answer that question, sir, because all the

19  cases that we've encountered here have not been at that

20  point to where we have to -- they've all been mandatory

21  detention.   Haven't encountered that situation yet.

22     Q.   Okay.   Let's say if that -- if that activity were

23  to take place, where would it most likely be recorded?

24         MS. FABIAN:   Object to form --

25     Q.   (By Mr. Schey)   Well, let me --

1      MS. FABIAN:  -- foundation.

2      THE WITNESS:  It's --

3      Q.   (By Mr. Schey)  Well, let me re -- let -- let me

4  rephrase the question to help you.

5      If that activity did take place, would it most

6  likely be recorded in that class member's A-file?

7      MS. FABIAN:  Ob -- Object to form, foundation.

8      THE WITNESS:  If it were to happen, that would be

9  one of the places.  That would be, probably, the most

10 likely place that we'd put it.

11     Q.   (By Mr. Schey)  And the A-file is an

12 individualized file that is unique to each individual

13 detainee; is that correct?

14     A.   Correct.

15     Q.   If U.S. CIS decides to approve a fear claim, how

16 long does it normally take for your agents to make a

17 custody determination?

18     A.   As soon as we receive written notification that

19 that's occurred, then it's within 24 to 72 hours.

20     Q.   And have your agents received training on the

21 factors to consider when making those custody

22 determinations, and if so, who provided that training, if

23 you know?

24     A.   I don't know.

25     Q.   And have your -- the agents at Dilley received

```
 1    any training to comply with paragraph 14 of the settlement
 2    if a credible fear claim is approved by U.S. CIS, and if
 3    so, who provided that training, and when was it provided?
 4            MS. FABIAN:  Object to form.
 5            THE WITNESS:  They haven't received that
 6    training, sir.  We haven't --
 7        Q.   (By Mr. Schey)  Same question -- same question
 8    with regards to paragraph 19.  Would -- Would it be the
 9    same response?
10            MS. FABIAN:  Object to form.
11            THE WITNESS:  Yes, sir.
12        Q.   (By Mr. Schey)  Are you aware of any efforts made
13    by agents working at Dilley to comply with paragraphs 14
14    and 19 if a class member's fear claim or the class
15    member's mother's fear claim has been approved?
16        A.   No, sir.
17        Q.   Was that a "no"?
18        A.   Yes.  That's a "no."
19        Q.   If, upon a fear claim of a class member or mother
20    being approved, and a -- a bond is set for the release of
21    the class member, what happens to that class member if he
22    or she or his or her mother or a friend or relative are
23    unable to post that bond?
24            MS. FABIAN:  Object to form.
25            THE WITNESS:  I haven't encountered that, sir, so
```

1  I don't know.  I don't recall if we ever encountered
2  something like that, so I don't know.
3      Q.    (By Mr. Schey)  Typically, if a bond is set and
4  cannot be met, is that person continued in custody?
5          MS. FABIAN:  Object to form.
6          THE WITNESS:  Haven't encountered that either.
7      Q.    (By Mr. Schey)  So you are testifying that you
8  have never encountered a situation in which a detained
9  person couldn't -- could not meet a bond; is that your
10  testimony?
11      A.    You're asking if I've never encountered it.  Are
12  we -- we referring just to what we've en -- what I've
13  dealt with here in Dilley or my whole career?
14      Q.    Let's say just at Dilley.
15      A.    I have -- to my recollection, we have not
16  encountered that, sir.
17      Q.    And have you made any efforts, or -- or has
18  anyone, to your knowledge, made any effort to determine,
19  on average, how long it -- it takes for bonds to be posted
20  for class members that -- who have had a bond set in their
21  cases?
22          MS. FABIAN:  Object to form.
23          THE WITNESS:  No.
24      Q.    (By Mr. Schey)  Have your agents at Dilley been
25  provided with any instructions or guidance about the

```
 1   amount of bond they should set on a class member whose

 2   fear claim or whose mother's fear claim has been approved,

 3   and if so, when was that instruction provided to those

 4   agents?

 5            MS. FABIAN:  Object to form.

 6            THE WITNESS:  No.

 7        (Mr. Anderson reentered the conference room)

 8        Q.   (By Mr. Schey)  At Dilley at this time, is the

 9   notice of rights to judicial review provided to class

10   members or their mothers?

11        A.   I don't recall the notice of rights, what exactly

12   it contains, so I'm going to have to answer, "No, I don't

13   know."

14            MS. FABIAN:  Peter, I think if you clarify which

15   document you're talking about, it would be helpful.

16        Q.   (By Mr. Schey)  Yeah.  I believe it is Exhibit 6

17   to the agreements.  Does that remind you?

18        A.   If it's the form I'm thinking of, yes, sir, we --

19   we provide it to them.

20        Q.   And what do you fill in on that form?

21        A.   You're asking me to try to remember.  I'm going

22   off of just memory.

23        Q.   Yeah.  Just from your memory.

24        A.   Date, names of the individuals being it served

25   on, and the person serving it.
```

1    Q.    And when did you start issuing that form to class

2    members or to their mothers?

3    A.    I don't remember exactly.

4    Q.    Have you been provided any training regarding

5    the -- the exhibits to the Flores Settlement, and if so,

6    when, and who provided you with that training?

7    A.    No to all three questions.

8    Q.    Are -- Do your agents currently provide minors at

9    Dilley with a notice of their right to a bond

10   redetermination hearing?

11   A.    I didn't catch that first part of that question.

12   Q.    Do your agents provide class members detained at

13   Dilley with a notice of their right to a bond

14   redetermination hearing, or -- or -- or -- or -- or --

15   or do they provide that to class members' mothers or to

16   neither?

17        MS. FABIAN:   Object to form.

18        THE WITNESS:   Provide it to everybody that's

19   eligible for --

20   Q.    (By Mr. Schey)  Okay.  Let me --

21   A.    -- that form of --

22   Q.    Let me --

23   A.    -- custody determination.

24   Q.    Let -- Let me rephrase the question, because my

25   question is -- I -- I'm trying to limit my questions to

```
 1    class members.
 2            At -- At the present time, is it ICE policy at
 3    Dilley to provide either detained class members or their
 4    mothers with a notice of the class members' right to a
 5    bond redetermination hearing, and if so, how is -- what
 6    notice is provided to them?
 7            MS. FABIAN:  Object to form.
 8            THE WITNESS:  I don't know, sir, because I don't
 9    know the status, other than your kept class members.
10       Q.   (By Mr. Schey)  Say that again?
11       A.   I don't know the -- the -- I said, "I don't
12    know."  It all depends on the class member's immigration
13    status, as far as their case goes.
14       Q.   Okay.  Well, if it depends on their status,
15    what -- can you explain what you mean by that?
16       A.   If they're eligible to be released on bond or to
17    be released on another form of re -- if they're eligible
18    to be released under that, well then, yes, we do provide
19    them with a notice of custody --
20       Q.   And -- And --
21       A.   -- redetermination, which basically --
22       Q.   And is --
23       A.   -- explains to them they have a right to ask for
24    an immigration -- a bond -- a bond hearing.
25       Q.   And is that provided to class members whose fear
```

1    claims or whose mother's fear claims have been approved

2    and a custody determination made by ICE?

3        A.   Yes, sir.  We serve it to them at that point.

4        Q.   And what form is used to advise them of the right

5    to a bond redetermination hearing?

6        A.   The notices -- Well -- Well, the name -- the name

7    of the form just slipped my mind, but it's the notice of

8    redetermination of custody status, I believe.

9        Q.   And typically, is the fact that the person was

10   provided that notice, noted in their A-file?

11       A.   Yes, sir.

12       Q.   And what language is that notice provided in, the

13   written notice?

14       A.   It's -- No, I don't remember.  I know it's in

15   English, but I believe there's a Spanish version also.

16       Q.   And what -- what notice is provided to class

17   members or their mothers who do not speak English or

18   Spanish?

19       A.   Same one, sir.

20       Q.   But what if they do not read English and Spanish?

21       A.   We interpret it to them.  We -- We -- We read it

22   to them in their language.  If we need an interpreter --

23       Q.   Okay.

24       A.   -- then we --

25       Q.   And --

1      A.   -- need an interpreter.

2      Q.   And how do you get an interpreter?

3      A.   There's language lines that we call on the

4  telephone, sir.

5      Q.   And can you tell us, in Dilley, are -- are there

6  any rules regarding the separation of class members from

7  unrelated adults, and if so, what are those rules?

8           MS. FABIAN:  Object to form.

9           THE WITNESS:  I don't know if we've ever

10 separated anybody that's a class member, sir.  I don't

11 recall.

12     Q.   (By Mr. Schey)  To your knowledge, is ICE

13 currently attempting to obtain a license for Dilley, a

14 license to hold children?

15     A.   No, sir.  We're not.

16     Q.   Have the agents working at Dilley received any

17 instruction to determine whether a youth detained at

18 Dilley is, in fact, a minor, and if so, when did they

19 receive those instructions and from whom?

20          MS. FABIAN:  Objection to form.

21     Q.   (By Mr. Schey)  If you don't know, just --

22     A.   Huh.  Yeah.  I'm going to --

23     Q.   -- say you don't know.

24     A.   I don't know.

25     Q.   Okay.  Are you aware of any case during the past

1    12 months in which ICE agents based at Dilley have a --

2    attempted to obtain an affidavit of support and an

3    agreement to provide for a minor's well-being from a

4    relative or adult willing to care for the minor upon

5    release?

6        A.   No.

7        Q.   Are you aware whether any agent, during the --

8    the previous 12 months, has conducted a suitability

9    assessment prior to release of a class member to any

10   individual or program, pursuant to paragraph 14 of the

11   settlement?

12            MS. FABIAN:  Object to form, foundation.

13            THE WITNESS:  No.  I don't know.

14       Q.   (By Mr. Schey)  Are you aware, during the

15   previous 12 months, if any ICE agent at Dilley has made

16   and recorded continuous efforts aimed at family

17   reunification and release of class members, pursuant to

18   paragraph 14 of the settlement?

19            MS. FABIAN:  Object -- Object to form,

20   foundation.

21            THE WITNESS:  No.

22       Q.   (By Mr. Schey)  Are you aware, during the

23   previous 12 months, of any efforts by ICE agents at Dilley

24   to determine whether a minor could be transferred to a

25   suitable state or county juvenile detention facility or a

1    secure ICE facility because the agent determined that --

2    that the minor had been charged or convicted of a crime

3    identified in paragraph 21 of the settlement?

4              MS. FABIAN:  Object to form, foundation.

5              THE WITNESS:  I don't know what paragraph 21 is,

6    but no to all the rest of everything else that you asked.

7         Q.    (By Mr. Schey)  Have ICE agents working at Dilley

8    during the past 12 months been provided with any training

9    or direction or instructions regarding the assessment of

10   escape risks under paragraph 22 of the settlement, and if

11   so, when was such training, guidance, or instructions

12   provided to those agents?

13             MS. FABIAN:  Objection to form, foundation.

14             THE WITNESS:  No.  I don't know.

15        Q.    (By Mr. Schey)  Paragraph 23 of the settlement

16   provides that ICE will not place a minor in a secure

17   facility if there are less restrictive alternatives that

18   are available and appropriate in the circumstances.

19             Are you aware of whether ICE agents at Dilley

20   have received any training, instructions, or guidance

21   regarding paragraph 23 of the settlement?

22             MS. FABIAN:  Object to form, foundation,

23   characterization of paragraph 23.

24             THE WITNESS:  I don't know, sir.

25        Q.    (By Mr. Schey)  Paragraph 24 of the settlement

1 | states that a minor in deportation proceedings shall be

2 | afforded a bond redetermination hearing before an

3 | immigration judge unless the minor indicates, on a notice

4 | of custody determination form, that he or she refuses such

5 | a hearing.

6 |        Are you aware of any records maintained by ICE at

7 | Dilley that would record compliance with that paragraph of

8 | the settlement?

9 |        MS. FABIAN:  Object to form, foundation, and

10 | characterization of paragraph 24.

11 |        THE WITNESS:  No.  We haven't encountered that,

12 | so...

13 |    Q.  (By Mr. Schey)  And I believe your prior

14 | testimony is that a bond redetermination hearing may only

15 | be triggered if a class member's fear claim has been

16 | approved by U.S. CIS and a custody determination for that

17 | class member has been made by ICE and that class member

18 | which is -- wishes to have that determination reviewed by

19 | an immigration judge; is that correct?

20 |        MS. FABIAN:  Ob -- Object to form, foundation.

21 |        THE WITNESS:  If they are eligible for it, yes,

22 | sir.

23 |    Q.  (By Mr. Schey)  Have ICE agents at Dilley

24 | received any training, direction, or instructions, and if

25 | so, by whom and when, if you know, regarding that part of

1   paragraph 27 of the settlement which states that no minor

2   who is represented by counsel shall be transferred without

3   advance notice to such counsel, except in unusual and

4   compelling circumstances, such as where the safety of the

5   minor or others is threatened or the minor has been

6   determined to be an escape risk or if counsel has waived

7   such notice?

8          MS. FABIAN:   Object to form, foundation.

9          THE WITNESS:   We received direction to notify the

10   attorney of records.

11      Q.   (By Mr. Schey)   And when did you receive that

12   direction and from whom?

13      A.   From my chain of command.   When, I don't know.

14   Can't remember.   Don't recall.

15      Q.   Was it within the past two months?

16      A.   It's been a while, sir.

17      Q.   Would it be within the past six months?

18      A.   It was right around the time the order came out

19   from Judge Gee that we had to do it, but I don't know when

20   that was, sir.   I can't rem -- I can't recall.

21      Q.   And when is notification provided to an attorney

22   of record?

23      A.   No less than 24 hours.   Could be -- Hold on.   Am

24   I trying to -- I'm trying to phrase it, sir.   If -- It's

25   at any time as soon as we find out that we were going to

1  transfer.  But no, at least 24 hours out before the date

2  of the transfer.

3       Q.   And -- And -- And you're -- you're saying notice

4  is provided 24 hours before the transfer or within 24

5  hours of the transfer?

6       A.   It's provided -- We give them at least 24 hours'

7  notice.  Sometimes, we give them more.

8       Q.   And how is that notice provided to the attorney

9  of record?

10      A.   E-mail, telephone, face-to-face.  It all depends.

11      Q.   And is the fact that that notice has been

12 provided recorded in the class member's A-file?

13      A.   Recorded?  No.

14      Q.   Have you had any communication with the ICE

15 juvenile coordinator?

16      A.   No, sir.

17      Q.   Do you know who the ICE juvenile coordinator is

18 at this time?

19      A.   I don't know exactly who you're referring to, but

20 no, sir.

21      Q.   During the -- the past 12 months, have you

22 been -- ha -- have you provided any information to anyone

23 involving data showing compliance with the Flores

24 Settlement by ICE agents working at Dilley?

25           MS. FABIAN:  Object to form, foundation.

```
 1              THE WITNESS:  I don't know.

 2         (Mr. Zimmerman exited the conference room)

 3      Q.   (By Mr. Schey)  At Dilley, mothers and children

 4   are assigned to different sleeping quarters; is that

 5   correct?

 6              MS. FABIAN:  Object to form.

 7              THE WITNESS:  You're talking about -- Could you

 8   clarify that, sir?  Because I'm a little confused at what

 9   you're saying.  You're saying I'm separating families, or

10   I'm keeping families together, or different families --

11      Q.   (By Mr. Schey)  Let me re -- Let me repeat the

12   question.

13           At Dilley, is it correct that mothers and their

14   children are assigned sleeping quarters?

15      A.   Yes.  They are.

16      Q.   And in a typical sleeping quarters, how many

17   mothers and children may share that space?

18      A.   It's all dependent on the configuration of the

19   family, sir.  There's different groups that we have here

20   or there that we just don't mix certain age groups and

21   certain sexes together.  It's all dependent on the

22   configuration of the family.  But there's 12 beds in --

23      Q.   Okay.

24      A.   -- each suite -- in each suite.  In essence, if

25   you must speak hypothetically, if there's one mother and
```

1    one child and they fall within one of the groups, in the

2    same groups, then we can house up to 12 -- I mean, six

3    mothers and six different children in one room.

4        Q.   Okay.  Most of the suites accommodate

5    approximately 12 people?

6        A.   There's -- They -- They can accommodate up to 12

7    people, correct.

8            (Mr. Zimmerman reentered the conference room)

9        Q.   (By Mr. Schey)  And how many suites are there,

10   approximately?

11       A.   I don't recall, sir.

12       Q.   And may adults enter the suites they have been

13   assigned to at any time during the day?

14       A.   If they're assigned to a suite, they can -- they

15   can walk in and out of that suite at any time of the day

16   or night, sir.

17       Q.   And if -- if there are class members in that

18   suite, may mothers assigned to that suite still go in and

19   out of the suite during the day?

20       A.   Yes.

21       Q.   And if -- if a class member was in a suite during

22   the day, and an unrelated mother wished to go into that

23   suite during that -- the day, could she do so?

24       A.   If she's assigned to that one, yes.

25       Q.   And if a class member was in a suite during the

1    day and an unrelated mother wanted to go into that suite

2    during the day, would she have to be accompanied by a

3    staff member to do so?

4        A.   It's only assigned unrelated mothers, any room,

5    can enter a suite.  If it's an unrelated mother and it's

6    not assigned to that room, we ask them not to.  We tell

7    them not to.  We're -- The contractors tell them not to.

8        Q.   And how is that monitored?

9        A.   By the CCA staff member that's assigned to that

10   neighborhood, or complex.

11       Q.   And -- And how would that staff member assigned

12   to that suite monitor whether a mother not assigned to the

13   suite had entered the suite or not?

14       A.   Outside of each suite, there's a photograph of

15   each individual that's assigned to that suite.

16       Q.   And how would -- How do they monitor that, is my

17   question.  In other words, do they sit on a chair outside

18   each suite, or how do they monitor who is going in and out

19   of the suites?

20       A.   That -- That's up to the resident supervisor how

21   they're doing it, sir.

22       Q.   So you --

23       A.   It --

24       Q.   -- do not know how they're doing it?

25       A.   No, sir.  I don't.  Not exactly.

1   Q.   And when you said that you assign mothers and

2   their children to suites depending on certain criteria,

3   why don't you explain to us how that works?

4   A.   I don't know that by heart, sir.  I can't recall

5   exactly.  There's different age groups, and the sexes have

6   to also -- have to come into -- they take that into

7   consideration.  And I don't assign them; the contractors

8   do.

9   Q.   Okay.  And who -- Do -- Does it -- Is it the

10  contractor that decides those configurations?

11  A.   No, sir.  That's at a higher level than my chain

12  of command.

13  Q.   And during the day when -- or the evening when

14  class members are not in their suites, do they commingle

15  with unrelated adults in common areas of the facility?

16       MS. FABIAN:  Object to form.

17       THE WITNESS:  The common areas are open to

18  everybody, sir.  They choose to.  There's other members,

19  and if there's other families in there, then it's

20  possible.

21  Q.   (By Mr. Schey)  Re -- Regarding the configuration

22  that you mentioned about placement into sleeping quarters,

23  is that configuration based on any state or federal rules,

24  if you know?

25  A.   No, sir.  I don't.

1    Q.    If a parent did not want her class member child

2    to be in contact with unrelated adults at Dilley, how --

3    how, if at all, could that decision be honored by ICE?

4    A.    Haven't encountered that, sir, so I wouldn't

5    know.

6    Q.    Have any provisions been made, if you know, to

7    deal with that type of request from a mother of a class

8    member?

9    A.    I don't recall ever reading anything about that,

10   sir, so I wouldn't know.

11   Q.    Is there any rule at Dilley that you are aware of

12   that would require staff supervision at any time an

13   unrelated child is present in a bedroom and another adult

14   resident of that suite wanted to enter the suite?

15   A.    Okay.  I'm confused at the question again.  I'm

16   sorry.  Could you repeat it?

17   Q.    Are you aware of any rule at Dilley that, any

18   time an unrelated child is present in a bedroom, adult

19   residents must have staff supervision while in the bedroom

20   if the child's parent is not also in the bedroom?  Are you

21   aware -- are you -- with any such rule?

22   A.    I don't recall.

23   Q.    How soon after class members and their mothers

24   enter Dilley are they provided a legal orientation by any

25   attorneys, if you know?

1    A.    Legal orien -- orientation presentations are done

2    three times a week, Mondays, Wednesdays, and Thurs -- I

3    mean, Fridays.  Those are the only ones I'm really aware

4    of, other than the "Know Your Rights" videos that are

5    played constantly.  Actually, they're on rotation in the

6    intake area.  As soon as they arrive, there's a -- it's on

7    a constant rotation on the TV monitors there in the

8    building.

9    Q.    When class members arrive at Dilley, you said

10   they're processed; is that correct?  They go through some

11   interview with ICE -- with an ICE officer; is that

12   correct?

13        MS. FABIAN:  Object to form, foundation.

14        THE WITNESS:  They're processed into the

15   facility, sir.

16   Q.    (By Mr. Schey)  And -- And -- And that involves

17   an interview with an ICE agent?

18   A.    As far as an interview goes, it's basically just

19   the interview process just to get them in -- into the

20   facility.

21   Q.    And how long, just on average, does that

22   interview take?

23   A.    Oh, sir, I wouldn't know.

24   Q.    Well, based on your observations and experience,

25   on average, approximately, how long does that interview

1    take?

2        A.    I think that -- I mean, I don't know, sir.

3    You're asking me to guess.  Telling you from firsthand

4    experience from me when I've done them, maybe it would

5    take it from 15 minutes to two hours, so it all depends on

6    the individual and what I'm looking -- what -- you know,

7    the information they're providing there and what documents

8    I'm doing and how I'm serving them, if I'm charging them

9    with something, if their documents are correct or

10   incorrect, you know.  I mean, it's -- it's -- it -- a

11   little while, I mean 15, two hours.  That's just from --

12   from the ones that I've done, sir.  Here in the facility,

13   I haven't timed it.

14       Q.    And if the class member's fear claim is approved,

15   is the class member or his or her mother reinterviewed in

16   order to make a custody determination, or is that

17   determination based, generally, on the initial processing,

18   on the information obtained during the initial process?

19            MS. FABIAN:  Object to form.

20            THE WITNESS:  Each custody redetermination is

21   done on a case-by-case basis, sir.  You know, the merits

22   and other factors are all taken into consideration of each

23   case.

24       Q.    (By Mr. Schey)  But my question was, Does that

25   require a -- typically, does that require a second

```
 1   interview, or is the custody determination made based on

 2   information that was collected during the initial

 3   processing?

 4       A.   It's the -- it's the whole thing, sir.  It could

 5   be a second one; it could be no.  I mean, each case is

 6   done on a case-by-case basis, sir.

 7       Q.   And in those cases where a second interview is

 8   conducted, do you maintain any data about how long it

 9   takes to conduct a second interview?

10       A.   No, sir.  We don't -- we don't keep that data.

11       Q.   Are you aware whether any instructions, training,

12   or guidance has been issued to --

13            (Mr. Adams exited the conference room)

14       Q.   (By Mr. Schey)  -- ICE agents at Dilley, and if

15   so, when, and who provided such training, guidance, or

16   direction regarding any efforts that should be made by ICE

17   agents making custody determinations?

18       A.   No, sir.  I'm not aware.

19       Q.   Generally, under what circumstances may a mother

20   of a class member be denied release if they have a

21   positive fear determination?

22       A.   Haven't encountered that yet, sir, so...

23       Q.   So is it your testimony that every mother with a

24   positive fear determination is released, regardless of if

25   they are a flight risk or a danger to themselves or
```

1    others?

2        A.    No.   If the -- Each case is, you know, done on a

3    case-by-case basis.   Those flight risks are taken into

4    consideration also, but anybody -- everybody --

5        Q.    And --

6        A.    -- that's qualified to be given a custody

7    redetermination form at that time, it's -- you know, I

8    haven't encountered somebody that I've -- I've had

9    withheld because of those reasons or any other factors.

10       Q.    If a mother was denied release because she was

11   considered a flight risk or a danger to herself or

12   others --

13           (Mr. Adams reentered the conference room)

14       Q.    (By Mr. Schey)  -- would that come to your

15   attention?

16       A.    Yes.

17       Q.    And it is your testimony that -- Or is it your

18   testimony that, during the previous 12 months, no mother

19   has ever been determined to be a flight risk or a danger

20   to herself or others once they were approved on their fear

21   claim?

22           MS. FABIAN:   Object to form.

23           THE WITNESS:   To my recollection yes, sir.

24   Everybody that's pretty much gotten a positive credible

25   fear findings have been -- have been redetermined, and

```
 1   they -- they've been released and gotten a redetermination

 2   in front of an immigration judge that would release them

 3   on a -- on a order of recognizance with an alternative

 4   detention, monitor --

 5       Q.   (By Mr. Schey)  Are --

 6       A.   -- them.

 7       Q.   -- you aware -- are you aware, during the past 12

 8   months, of any mother who came into ICE custody who was

 9   released with her child prior to a fear determination

10   being made?

11       A.   Prior to a fear determination being made, no.

12            MS. FABIAN:  Peter, I'm just wondering how much

13   longer you have.  I might need a -- a break here if

14   there's --

15            MR. SCHEY:  Sure.  Let's take a break.  How long

16   do you want to break for?  About 10 minutes?

17            MS. FABIAN:  Just 10 minutes.

18            MR. SCHEY:  10 minutes?

19            MS. FABIAN:  Yes.

20            MR. SCHEY:  Okay.  That's fine.  Why don't you

21   just call me back in 10 minutes?

22            MS. FABIAN:  Okay.

23            MR. SCHEY:  Thank you.

24        (Break taken from 11:12 a.m. to 11:37 a.m.)

25            MS. FABIAN:  Go ahead, Peter.
```

1    MR. SCHEY:  Okay.  Is Manoj back in the room?

2    MS. FABIAN:  Yes.

3    Q.   (By Mr. Schey)  Mr. Garza, you -- you indicated

4  in your declaration that -- that -- Oh, excuse me,

5  Mr. De La Garza.  I'm sorry.

6        You've indicated in your declaration that some of

7  the statements are based on your personal knowledge and --

8  and -- and others were -- are based on information that

9  was provided to you in your official capacity.  Who

10  provided you with that other information?

11    MS. FABIAN:  Object to form.

12    THE WITNESS:  My a -- My attorneys.

13    Q.   (By Mr. Schey)  I'm sorry.  Say that again?

14    A.   My attorneys.

15    Q.   Okay.  And which in -- which information -- I

16  assume you have your declaration there; is that correct?

17    MS. FABIAN:  We don't have it in front of him,

18  Peter.  I didn't get any exhibits from you, so we

19  didn't -- we didn't prepare anything.

20    MR. SCHEY:  All right.  Do you -- Do you have

21  a -- his declaration that you can show him?

22    MS. FABIAN:  I mean, I can, if he needs it to

23  refresh his recollection.  Are you -- Are you submitting

24  it as an exhibit?  I mean, if you want him to testify on

25  it, it needs to be submitted --

```
 1              MR. SCHEY:  Well --

 2              MS. FABIAN:  -- as an exhibit.

 3              MR. SCHEY:  Well, it is.  It's already an exhibit

 4   in the case.  It does not have --

 5              MS. FABIAN:  Well --

 6              MR. SCHEY:  -- to be --

 7              MS. FABIAN:  Sure.

 8              MR. SCHEY:  -- a separate --

 9              MS. FABIAN:  But it's not --

10              MR. SCHEY:  -- exhibit.

11              MS. FABIAN:  -- a -- it's not a dep -- it's not a

12   deposition exhibit.

13              MR. SCHEY:  Well, I -- I -- I -- I'm happy to

14   make it a deposition exhibit.  Let -- Let -- Let's call it

15   Exhibit 1.  I think that's unnecessary.

16       Q.   (By Mr. Schey)  I -- I'm wondering which of

17   the --

18              MS. FABIAN:  I mean, are you asking me to provide

19   our copy of it?  I mean -- I mean --

20              MR. SCHEY:  Yes.

21              MS. FABIAN:  Generally --

22              MR. SCHEY:  If you --

23              MS. FABIAN:  -- when I've --

24              MR. SCHEY:  -- have one --

25              MS. FABIAN:  -- done --
```

```
 1              MR. SCHEY:  -- I'm happy --

 2              MS. FABIAN:  -- depositions, if you want to

 3    appear by phone, you've got to provide me with -- with

 4    copies of your exhibits if you want him to be testifying

 5    on exhibits.  I mean, we have a copy here.  I can provide

 6    it to him and -- and put it in as an exhibit, but you

 7    know, I'm not going to do that going forward.  You've got

 8    to prepare and provide us with your exhibits in advance.

 9              MR. SCHEY:  Well -- Well, that's fine.  If you

10    have one and you can show it to him, that's fine.

11        Q.    (By Mr. Schey)  I -- Oth -- Other than -- Other

12    than --

13              MS. FABIAN:  Are you submitting this, then, as

14    Exhibit 1 to the deposition?

15              MR. SCHEY:  Yes.

16        Q.    (By Mr. Schey)  Other than --

17              MS. FABIAN:  And then do you want it to in --

18    does that include his exhibits?

19              MR. SCHEY:  No, I don't think that's necessary.

20              MS. FABIAN:  So do you intend to ask him about

21    the exhibits?

22              MR. SCHEY:  Not at this moment.  I may later.  It

23    depends on his responses.  So, if we can get back --

24              MS. FABIAN:  All right.

25              MR. SCHEY:  -- to --
```

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On September 19, 2016 I electronically filed the following document(s):

- **PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR AND OPPOSITION TO DEFENDANTS' MOTION FOR EVIDENTIARY HEARING**

- **EXHIBIT 1 – DEPOSITION OF VALENTIN DE LA GARZA**

- **EXHIBIT 2 – DEPOSITION OF JUANITA HESTER**

- **EXHIBIT 3 – DEPOSITION OF JOSHUA RIED**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/___Peter Schey_____
*Attorney for Plaintiffs*