1

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)

2

Carlos Holguín (Cal. Bar No. 90754)

3

256 South Occidental Boulevard
Los Angeles, CA  90057

4

Telephone: (213) 388-8693

5

Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org

6

        crholguin@centerforhumanrights.org

7

8

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)

9

egarcia@orrick.com

10

777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017

11

Telephone:  (213) 629-2020

12

13

14

*Attorneys for plaintiffs (listing continues on following page)*

15

UNITED STATES DISTRICT COURT

16

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

17

18

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| | ) |
| 19    Plaintiffs, | ) |
| 20  - vs - | ) EXHIBIT 1 – DEPOSITION OF VALENTIN DE LA GARZA – PART 2 |
| | ) |
| 21 | ) Hearing: October 6, 2016 |
| 22  LORETTA E. LYNCH, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*, | ) |
| | ) |
| 23 | ) |
| 24    Defendants. | ) |
| ———————————————— | ) |
| 25 | |

26

*Plaintiffs' counsel, continued:*

27

28

1

2   LA RAZA CENTRO LEGAL, INC.
    Michael S. Sorgen (Cal. Bar No. 43107)
3   474 Valencia Street, #295
    San Francisco, CA 94103
4   Telephone: (415) 575-3500

5
    THE LAW FOUNDATION OF SILICON VALLEY
6   LEGAL ADVOCATES FOR CHILDREN AND YOUTH
    PUBLIC INTEREST LAW FIRM
7   Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
    Katherine H. Manning (Cal. Bar No. 229233)
8   Kyra Kazantzis (Cal. Bar No. 154612)
    Annette Kirkham (Cal. Bar No. 217958)
9   152 North Third Street, 3rd floor
    San Jose, CA 95112
10  Telephone:   (408) 280-2437
    Facsimile:   (408) 288-8850
11  Email: jenniferk@lawfoundation.org
12          kate.manning@lawfoundation.org
            kyrak@lawfoundation.org
13          annettek@lawfoundation.org
14
    Of counsel:
15
16  YOUTH LAW CENTER
    Alice Bussiere (Cal. Bar No. 114680)
17  Virginia Corrigan (Cal. Bar No. 292035)
    200 Pine Street, Suite 300
18  San Francisco, CA 94104
    Telephone: (415) 543-3379 x 3903
19
20

21

22

23

24

25

26

27

28

Case 2:85-cv-04544-DMG-AGR   Document 262-2   Filed 09/19/16   Page 3 of 80   Page ID #:7628

Deposition of Valentin De La Garza                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1            MS. FABIAN:  Well, we need --

 2            MR. SCHEY:  -- discovery --

 3            MS. FABIAN:  -- to let the court reporter mark

 4    this, then, as Exhibit 1.

 5                    (Exhibit 1 marked)

 6            MS. FABIAN:  And do you want me to show him

 7    Exhibit 1?  Is that what you'd like to do?

 8            MR. SCHEY:  Well, I'd like to have it in front of

 9    him in case he wants to refer to it at some point to

10    refresh his memory.

11            MS. FABIAN:  I've -- I've presented Exhibit 1 to

12    the witness.

13            MR. SCHEY:  Thank you.

14       Q.   (By Mr. Schey)  Your dec -- Your declaration

15    indicates that ICE moves as expeditiously as possible to

16    process families who assert a claim of fear.  What is your

17    understanding of -- of -- of what the agency does to

18    accomplish this, as you say, as, quote, expeditiously,

19    unquote, as possible?

20       A.   My guidance is to do it expeditiously, within the

21    Judge Gee's order that was -- that she issued on, I

22    believe, it was October 23rd of last year.

23       Q.   And what -- When -- When you say that the agency

24    moves as expeditiously as possible, what -- what

25    information do you rely upon to make that statement?
```

```
 1              MS. FABIAN:  Object to form.
 2              THE WITNESS:  I'm not sure I understand the
 3    question, sir.  What do you mean, "what information"?
 4         Q.   (By Mr. Schey)  Well, you must have some
 5    information or data upon which that statement is made, or
 6    is it just your personal walking around the hallways, just
 7    personal observations?
 8         A.   Expeditiously --
 9              MS. FABIAN:  Object to form.
10              THE WITNESS:  Expeditiously as -- I mean, if
11    you're asking for a monitoring tool, it -- it's the length
12    of stay everybody stays there in the facility, sir.
13         Q.   (By Mr. Schey)  I -- I do understand your
14    response.
15              My question is, What -- What factors did you
16    consider when you stated that the agency was moving,
17    quote, as expeditiously as possible, unquote?  What --
18    What are the factors that lead you to conclude that that
19    is happening?
20         A.   The average length of stay of everybody there in
21    the facility, sir.
22         Q.   Okay.  And when you wrote this declaration, what
23    was the average length of stay in that facility?
24         A.   I don't remember exactly.
25         Q.   And --
```

1    A.   Are -- Are you asking me --

2    Q.   And --

3    A.   -- prior -- prior to Judge Gee's order or after?

4    Q.   Well, I'm saying when you signed your

5    declaration.

6    A.   Oh.

7    Q.   That's long after Judge Gee signed her order.

8    A.   Oh.  I don't know how -- what it was at that

9    time, sir.

10    Q.   Okay.  And do you know -- But there was some

11    average; is -- is that correct, that somebody told you

12    about?

13    A.   Oh, yes, sir.

14    Q.   Okay.  So this information did not come from

15    legal counsel.  That -- This is information you gathered

16    from ICE; is that correct?

17    A.   No.  This -- I got this from -- Are you talking

18    about the exhibit here?

19    Q.   No, I'm just talking about your statement that

20    the agency was moving, quote, as expeditiously as

21    possible.  At -- Where did you get the information that --

22    based upon --

23    A.   Just --

24    Q.   -- what you stated, that ICE moves as

25    expeditiously as possible to process families for a fear

 1   determination?

 2          Where -- Where did you get the information?  Was

 3   that from your legal counsel or from ICE?

 4       A.   Oh.

 5       Q.   If you know, if you remember.

 6       A.   No, sir.  We monitored --

 7       Q.   If you don't remem --

 8       A.   We monitor this, you know.  My chain of command

 9   monitors this, our average length of stay there from --

10       Q.   So -- So -- So then they monitor every detainee's

11   length of stay; is that correct?

12       A.   We monitor the average length of stay of every

13   detainee in custody --

14       Q.   Okay.

15       A.   -- from month to month, and --

16       Q.   Well, when you say "the average stay of every

17   detainee," do you mean --

18       A.   I mean it --

19       Q.   -- I believe you mean that you monitor the stays,

20   and based on that information, your -- the agency

21   calculates an average; is that fair --

22       A.   Correct.

23       Q.   -- to say?

24          MS. FABIAN:  Object to --

25          THE WITNESS:  That's --

1          MS. FABIAN:  -- form.

2          THE WITNESS:  That's correct, sir.

3      Q.   (By Mr. Schey)  Okay.  So during the -- let's

4  say, the period between Judge Gee's order and -- and the

5  time you signed the declaration, how many detainees, let's

6  say, had stayed there for more than 30 days, if you know?

7      A.   I don't know, sir.

8      Q.   And did you know that at the time you signed your

9  declaration?

10     A.   No, sir.

11     Q.   Okay.  And -- And at the time you signed your

12  declaration, did you know that -- say, during that same

13  time period, how many families had been detained there for

14  more than, say, 20 days?

15     A.   No, sir.

16         MS. FABIAN:  Object --

17         THE WITNESS:  I --

18         MS. FABIAN:  -- to --

19         THE WITNESS:  -- mean, I --

20         MS. FABIAN:  -- form.

21     Q.   (By Mr. Schey)  Would it -- would it be fair to

22  say that -- that about the only thing you knew, and I'm

23  not saying it's good or bad, but would it be fair to say

24  that about the only thing you knew at the time you signed

25  your declaration was the average length of stay?

```
 1              MS. FABIAN:  Object to form.
 2              THE WITNESS:  No, sir.  Let me -- Let me -- Let
 3    me correct you, ju -- just to -- We monitor, daily, what
 4    cases we have that are pretty much 15 days and older.  To
 5    tell you how many we had on the time I signed this
 6    declaration, I don't remember.  But we do monitor that.
 7    We do monitor --
 8         Q.   (By Mr. Schey)  Over what ca --
 9         A.    -- monitor all the cases that are 15 days and
10    older.
11         Q.   Okay.  And when you say you monitor those, how do
12    you -- what does that mean, other than for our purposes
13    about determining expeditiously, whether things are done
14    expeditiously?  Is there different data that's supported
15    about their length of stay?
16         A.   There's not different data.  It's just those
17    cases that are older than -- 15 days and older that we --
18    we -- we flag, but those are also included into our
19    average length of stay for the overall population that
20    we --
21         Q.   Okay.  And when you -- when you -- Let's talk
22    about that for a second.  When you flag those -- well, how
23    are those cases treated differently from other cases?
24              MS. FABIAN:  Object to form, foundation.
25              THE WITNESS:  They're all treated the same, sir.
```

```
 1    We just monitor their process through the immigration

 2    process that --

 3        Q.   (By Mr. Schey)  And do --

 4        A.   -- we have.

 5        Q.   And -- And -- And what does that mean that you

 6    monitor them?  How -- How are they monitored or treated

 7    differently from --

 8        A.   If it's something that we --

 9             MS. FABIAN:  Object.

10        Q.   (By Mr. Schey)  -- class mem -- class members who

11    have been there for less than 15 days?

12             MS. FABIAN:  Object to form, foundation.

13             THE WITNESS:  If it's -- We're looking at their

14    case status, sir.  All right?  And if it's something --

15        Q.   (By Mr. Schey)  Okay.

16        A.   -- that -- that is -- that can be addressed

17    because it's -- it's -- some of them, maybe somebody --

18    speaking hypothetically here, but if somebody oversaw or

19    that maybe is -- they're lacking information, or

20    they're -- I mean, it could be at -- in any of the ca...

21        Q.   Is -- Is a new line of officers brought in, at

22    that point, to do something, you know, to put more time

23    into those cases, or just the same officers continue to

24    work on those cases?

25             MS. FABIAN:  Object to form.
```

1          THE WITNESS:  I guess, sir, it all depends on

2    what -- what the -- what stage they're at in the

3    processing times.

4        Q.   (By Mr. Schey)  After their interview, you --

5    you -- you had --

6        A.   If --

7        Q.   -- mentioned --

8        A.   If they're --

9        Q.   -- that --

10       A.   -- all --

11       Q.   -- there's a --

12       A.   They're all -- they're all going to be monitored

13   closer.  We pay attention to them a lot -- a lot more than

14   we would those that are moving along, you know, without

15   any hiccups or -- or issues.

16       Q.   Okay.  And so when you say you monitor that,

17   is -- is -- is there written instruction telling ICE

18   officers that they need to monitor cases where people have

19   been there for more than 15 days?

20       A.   Written instructions, no, sir.  It's just our --

21   our procedures that we got there.  It's just -- it just --

22   trying to --

23       Q.   It's just what you --

24       A.   -- trying --

25       Q.   -- do --

```
 1        A.    -- to process the cases expeditiously.
 2        Q.    Okay.  So at 15 days, there's no written
 3   instruction; but as a matter of practice --
 4        A.    Well --
 5        Q.    -- you -- you -- you start to monitor those cases
 6   more intensely; is that fair to say?
 7              MS. FABIAN:  Object --
 8              THE WITNESS:  Yes.
 9              MS. FABIAN:  -- to form, foundation.
10        Q.    (By Mr. Schey)  Okay.  But it is fair to say; is
11   that --
12        A.    That --
13        Q.    -- fair to say?
14        A.    Yes, sir.
15        Q.    Okay.  And -- And -- And -- And -- And as I
16   understand it, that means that, maybe, an ICE agent would
17   look at that case more often to see if there's something
18   that can be done to move it along; is that fair to say?
19        A.    Yes, sir.
20        Q.    And when -- I -- I think we've already covered
21   this, but in -- in order, let's say, to move things along
22   more expeditiously, that would -- it -- can you tell me
23   that, just given your experience, what are the two or
24   three things that -- that -- that you believe could be
25   done if one wanted to move things along more
```

```
 1    expeditiously?  Just simple, I don't mean complicated --

 2         A.   It's --

 3              MS. FABIAN:  Object to --

 4         Q.   (By Mr. Schey)  -- strategies.

 5              MS. FABIAN:  -- form.

 6         Q.   (By Mr. Schey)  What -- What are the two or three

 7    things that you might recommend could be done or believe

 8    could be done to move things along more expeditiously?

 9              MS. FABIAN:  Object to form.

10         Q.   (By Mr. Schey)  Do you understand the question?

11         A.   Yeah.  I understand it completely, sir.  It's

12    just --

13         Q.   In other words, if you got a directive --

14         A.   It could be --

15         Q.   -- from the chain of command, and they said,

16    "Chief," or whatever your -- shoot, I believe you have a

17    pretty good title, I know, "De La Garza, we want to

18    increase the expeditiousness of what we're doing there by

19    25 percent.  What" -- "What" -- "What" -- "What could be

20    done to achieve that?"

21              MS. FABIAN:  Object to form, foundation.

22              THE WITNESS:  I don't know how to answer that

23    one, sir.  I think we've pretty much done everything

24    possible.  Maybe a fresh new sets of eyes to come inside

25    there to re -- to oversee what I've -- what we've already
```

```
 1    got established.

 2        Q.    (By Mr. Schey)  Let me -- Well, let me put it

 3    this way:  If -- If additional agents -- I -- I -- I

 4    thought we covered this earlier and you agreed, that if

 5    additional agents were assigned -- I -- I -- I think you

 6    said you had, what, 125 agents; is that correct?

 7        A.    It's approximately that, sir.

 8        Q.    Let's say you had 200 agents or 175 agents,

 9    could -- could the process move along quicker than it

10    currently does?

11        A.    A logical thinker, sir, would -- It's obvious.

12    Yes.

13        Q.    Let's --

14        A.    So --

15        Q.    -- say -- Let's say, assuming --

16        A.    Well -- Well, I --

17        Q.    -- that --

18        A.    You know what, I --

19        Q.    -- if --

20        A.    I take that back.  I could be able to process

21    more people in with more people, but the process we

22    already have in place, I mean, that -- that's -- that's

23    pretty much -- we can't -- we can't change that.

24        Q.    It's not whether --

25        A.    So bringing --
```

```
 1      Q.   -- you want --

 2      A.   -- more --

 3      Q.   -- to --

 4      A.   -- people --

 5      Q.   -- change --

 6      A.   -- in --

 7      Q.   -- that.

 8           The question -- the question is --

 9           MS. FABIAN:  Peter --

10      Q.   (By Mr. Schey)  -- not --

11           MS. FABIAN:  He's still --

12      Q.   (By Mr. Schey)  -- whether you --

13           MS. FABIAN:  He's still --

14      Q.   (By Mr. Schey)  -- can't --

15           MS. FABIAN:  -- answering --

16      Q.   (By Mr. Schey)  -- change that --

17           MS. FABIAN:  -- your question.  He's -- He --

18      Q.   (By Mr. Schey)  I'll just -- Go -- Go ahead.

19  Sorry.

20      A.   To bring more people in is not going to change my

21  processing time, sir.  You know, there's -- there's still

22  the CIS factor; there's still the medical factor; there's

23  still, you know, our processes that we have to do.  I

24  can't change those times.  Bring more people in, I can

25  process more people into the facility or out of the
```

```
 1   facility.

 2        Q.   Okay.  That's --

 3        A.   But our --

 4        Q.   -- more --

 5        A.   -- established --

 6        Q.   -- between that.  Is --

 7        A.   The --

 8        Q.   -- there --

 9        A.   -- established time frames, as far as the

10   immigration process goes, the CIS process goes, I mean

11   I -- I can't -- I can't change those.

12        Q.   Right.  So we --

13        A.   So bringing more --

14        Q.   We --

15        A.   -- people in --

16        Q.   -- agree --

17        A.   -- just may not -- may not increase or

18   decrease --

19        Q.   Right.  It would not increase or decrease the 15

20   minutes to two hours that you said it takes you to

21   process; is that correct?  You'd still have to do that;

22   correct?

23        A.   Yes.

24        Q.   Exactly.  And it wouldn't increase or decrease

25   the amount of time it takes to conduct a credible fear
```

1    interview by CIS; is that correct?

2        A.   That's correct.

3        Q.   Or most likely.

4             And it wouldn't affect how much time it would

5    take your agents to make a custody determination for each

6    individual; is that correct?

7        A.   That's correct.

8        Q.   Okay.  So -- So those individual things would

9    probably stay the same, but I think we've agreed that it's

10   obvi -- I think you said it was obvious that if you had

11   more agents, if they had 200 agents, that people could be

12   processed in and out more rapidly; is that fair to say?

13            MS. FABIAN:  Ob -- Object to form and foundation.

14            THE WITNESS:  No, sir.  I want to correct that.

15       Q.   (By Mr. Schey)  Okay.  So --

16       A.   What I was referring to --

17       Q.   Okay.

18       A.   -- I'd just be able to process more people into

19   the facility.  I'm not --

20       Q.   Right.

21       A.   -- going to -- It's not going to increase or

22   decrease -- it's not going to decrease my processing

23   times.

24       Q.   Right.

25       A.   So...

Deposition of Valentin De La Garza                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1        Q.    Exactly.

 2              But you could process in more people, and you

 3   could process out more people.

 4        A.    That's correct.

 5        Q.    Correct?

 6        A.    That --

 7        Q.    More --

 8        A.    That --

 9        Q.    More --

10        A.    I mean --

11        Q.    -- quickly?

12        A.    Logically thinking, yes.

13        Q.    Yeah.  I -- Exactly.

14              And -- And -- And -- And would be the same true

15   if you could increase your efficiencies, such as having

16   digital communication with CIS?

17              MS. FABIAN:  Ob -- Object to form and foundation.

18              THE WITNESS:  That, I don't know, sir.  I haven't

19   tried digital communication with them before.  They're at

20   this --

21        Q.    (By Mr. Schey)  Okay.

22        A.    -- facility.  It's -- It's all been in person, so

23   I can't -- I --

24        Q.    Okay.

25        A.    -- can't --
```

1    Q.    But --

2    A.    I can't answer that.

3    Q.    But -- But we're agreed that if you had more

4    officers, you could get to people quicker, because if you

5    have 20 people coming in and you only have four officers

6    to interview them, it's going to -- not talking about the

7    processing time, when you're actually dealing with them,

8    it's going to take you X amount of time to get to those 20

9    people because you have 4 officers.  If you had 8

10   officers, you could obviously get to those people quicker.

11   We're agreed on that much; is that correct?

12   A.    That's correct.

13        MS. FABIAN:  Object to form.

14   Q.    (By Mr. Schey)  All right.  And similarly, I

15   think that it's fairly clear that if the number of

16   officers you were assigned to do these things was reduced

17   by 50 percent, it would probably take twice as long to get

18   everything done, even though the interviews would take the

19   same amount of time; is that fair to say?

20        MS. FABIAN:  Object to form, foundation.

21   Q.    (By Mr. Schey)  Are -- Are we agreed on that?

22   A.    Yeah.  If -- If we were all -- Assuming --

23   Q.    Okay.

24   A.    -- that everything -- you know, everybody was --

25   I don't know.  One plus one is two.  Everybody agrees to

```
 1    that.  Same thing here.
 2        Q.   All right.
 3        A.   It's in the face; it's logic.
 4        Q.   And -- And -- And -- And -- And -- And -- And --
 5    And -- And is there anything -- I'm thinking along the
 6    same lines, you know, thinking, Well, we're not going to
 7    change how long it takes to conduct the interview; that's
 8    a given, but thinking about the -- the downtime, because
 9    you said that an interview's 15 to -- minutes to roughly
10    two hours on average.
11        A.   I'm saying out of my experience --
12        Q.   So -- Yeah, based on --
13        A.   -- from the --
14        Q.   -- your --
15        A.   -- ones that I've --
16        Q.   -- experience.
17        A.   -- done.
18        Q.   I'm not -- And -- And -- And -- And that sounds
19    reasonable.  But in -- in your experience -- I know you're
20    not an Asylum officer, but how long, on average, do you
21    think these Asylum interviews take?
22             MS. FABIAN:  Object --
23             THE WITNESS:  I --
24             MS. FABIAN:  -- to form, foundation.
25             THE WITNESS:  I wouldn't know.
```

1    Q.   (By Mr. Schey)  Would -- Would -- Would you find

2    it unreasonable if -- if, on average, they take an hour to

3    two hours?  Would you -- would you think that that's

4    unreasonable or reasonable?

5           MS. FABIAN:  Object to form, foundation.

6           THE WITNESS:  I wouldn't know, sir.  I've never

7    done --

8    Q.   (By Mr. Schey)  Okay.  But --

9    A.   -- done an Asylum interview.

10   Q.   All right.  And then -- and then how -- how long,

11   in your experience, it -- is it taking your officers to

12   conduct a -- an individual custody determination for a

13   mother and child, on average?

14   A.   How long does it take?

15   Q.   Yes, to make that determination.

16   A.   Sir, each one is a case-by-case situation that

17   goes on --

18   Q.   I --

19   A.   -- which --

20   Q.   -- understand that.

21   A.   Yeah.  I'm not doing the work, sir.  I don't

22   know, sir, and I haven't monitored it, so --

23   Q.   All right.

24   A.   -- I don't know.

25   Q.   So nobody -- So is anybody else monitoring how

```
 1    long that takes that you know about?

 2         A.   I don't think nobody's monitoring it.  We just do

 3    it.  My --

 4         Q.   Okay.

 5         A.   -- guys are just doing it.

 6         Q.   All right, sir.  So do you know, as it is being

 7    done, how long it takes usually -- to the best of your

 8    knowledge, it's not currently being monitored.  In your

 9    own experience, how long does it take to make a custody

10    determination --

11              MS. FABIAN:  Object to --

12         Q.   (By Mr. Schey)  -- und -- understanding --

13    understanding it's a case-by-case determination.  Every

14    case is different.  I mean, on average, what's your

15    experience?

16              MS. FABIAN:  Object to form.

17              (Mr. Anderson exits the conference room)

18              THE WITNESS:  You're asking me to guess, to go

19    off experience --

20         Q.   (By Mr. Schey)  Just based on --

21         A.   -- but --

22         Q.   -- your experience when you have done these.  And

23    you can give a range, just -- just the way you did before

24    for the processing.

25         A.   Whatever amount of time it takes to review the
```

```
 1    file and make sure there's nothing in there and just the

 2    case status, where they're at and everything -- all the

 3    other merits that are along with the case, you know, it --

 4         Q.   Would it --

 5         A.   It's hard --

 6         Q.   It --

 7         A.   -- to say --

 8         Q.   It --

 9         A.   -- you know.

10         Q.   Okay.  If I suggested to you that, on average,

11    it -- to make the custody determination in terms of

12    actually working on that case -- I -- I -- I don't mean

13    the time between -- you know, you look at it for -- you do

14    some work for 15 minutes; you set it aside for a day or

15    two, do some more work.  I'm saying in total, how much

16    time to make this custody determination, and I understand

17    it may -- may be --

18         A.   Sir, it doesn't take it --

19         Q.   It may be --

20         A.   It doesn't take --

21         Q.   I --

22         A.   -- it --

23         Q.   I would -- If -- If I -- if I said to you it

24    would normal -- you know, on average, it's going to take

25    one to four or five hours.  Would -- Would -- Would you
```

```
 1    think that that's reasonable?

 2             MS. FABIAN:  Object to form.

 3             THE WITNESS:  It shouldn't take that long, sir.

 4        Q.   (By Mr. Schey)  Okay.

 5        A.   Unless there's errors; documents, you know,

 6    missing; information they need to require --

 7        Q.   I --

 8        A.   -- you know.  It -- It all depends on the --

 9    on --

10        Q.   Are --

11        A.   -- on each case -- on each case.  It's -- It's

12    hard to say.

13        Q.   Right.

14        A.   You know --

15        Q.   Right.

16        A.   -- on average?

17        Q.   I -- I know --

18        A.   You know, it's -- it's -- it's very hard to say.

19        Q.   Yeah.

20        A.   And --

21        Q.   I --

22        A.   -- I'm --

23        Q.   I --

24        A.   -- reluctant to --

25        Q.   I --
```

```
 1        A.    -- commit --

 2        Q.    -- agree.

 3        A.    -- to it right now.

 4        Q.    All right.  I agree, and I'm -- I'm -- I'm -- I'm

 5   just asking you, if, based on your experience --

 6        A.    Huh.

 7        Q.    -- and all I did was give you, based on my

 8   experience of 45 or so years of dealing with ICE and not

 9   anything else.  And -- And I gave the five that's sort

10   of -- what, I think, is probably a -- a longer average.

11   And I think I agree with your comment that it -- it's

12   probably, on average, short of that, but every case is --

13   is individual; is that fair to say?

14              MS. FABIAN:  Objection to form.

15              THE WITNESS:  Every -- Every case is a case.

16   It's individual.  It's got its own merits and factors.

17   But I --

18        Q.    (By Mr. Schey)  Okay.

19        A.    -- will say because, you know, we usually do it

20   the same day.  That's what we're doing here, and --

21        Q.    All right.  And -- And if you -- if -- if -- if

22   you had twice as many officers, people, approximately, you

23   know, in a case by case, but approximately twice as many

24   people could be -- could have their -- their bond custody

25   determinations made; right?
```

Deposition of Valentin De La Garza

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

1      What -- What happens -- If the -- If the average

2  detention time, whether it's 10 days -- or is 10 days at

3  Dilley, would that sound about right to you?

4           MS. FABIAN:  Object to form, foundation.

5           THE WITNESS:  Each -- Each day it changes, and I

6  haven't --

7      Q.   (By Mr. Schey)  Would --

8      A.   -- gotten --

9      Q.   -- some length --

10     A.   I -- I --

11     Q.   -- of --

12     A.   -- haven't --

13     Q.   -- time --

14     A.   I haven't -- I haven't gotten -- I haven't looked

15  at that average here for -- for -- for a while.  I look at

16  the daily average of everybody that's in custody, you

17  know.  It's taken eight to 10 days, maybe 12 days.  It

18  varies, sir, depending on the population, depending on...

19     Q.   And during -- Ha -- Have you ever attempted to

20  determine during all those days and -- and -- and,

21  including for some people who were maybe there for 20 days

22  or 30 days, have -- have you ever attempted to determine

23  how much of their time is actually spent on either the

24  initial processing; the intake processing; or the Asylum

25  interview, the time it takes to make that decision; and

1   then decision on custody?  Have you attempt -- ever

2   attempted to determine how -- how much of that time people

3   spend in custody is -- is actually dedicated to those --

4   those four activities?

5          MS. FABIAN:  Object to form.

6          THE WITNESS:  Like I said earlier, sir, we don't

7   track that, but that information, you know, is in the

8   A-file.  When we -- When -- When CIS takes jurisdiction of

9   the case; how long it takes before they make the

10  interview; how long it takes before we get -- you know,

11  they get the determination; and then when -- when we

12  release them.  So overall, we monitor the whole thing.

13      Q.   (By Mr. Schey)  Now, I mean, it's -- I -- It --

14  It -- I -- I think what you're saying, and I don't

15  disagree with it, is that that information is in the

16  A-files; it could be extracted from the A-files.

17      A.   It's in all the --

18          MS. FABIAN:  Object --

19      Q.   (By Mr. Schey)  Is that --

20          MS. FABIAN:  -- to --

21      Q.   (By Mr. Schey)  -- fair to say?

22          MS. FABIAN:  Object to form.

23          THE WITNESS:  It's in all the --

24      Q.   (By Mr. Schey)  But --

25      A.   -- documents --

```
 1        Q.    -- what --
 2        A.    -- that are being served on the re -- on the --
 3   on the residents, sir.
 4        Q.    Right.  And -- And -- And are those, generally --
 5   I'm not saying in every single case, but is it generally
 6   the -- the -- the practice to -- to enter those highway
 7   marks in the -- in the alien's A-file?
 8             MS. FABIAN:  Object to form, foundation.
 9             THE WITNESS:  Yes, sir.  Those are all -- all
10   those dates that I'm referring to, all those actions that
11   I'm referring to, are documents that we -- we -- we -- we
12   serve on the resident, and all those documents --
13        Q.    (By Mr. Schey)  Is --
14        A.    -- we serve on the resident are placed in the
15   A-file.
16        Q.    What is -- Is -- And -- And I know this may be a
17   tough question.  You may not know the answer, but is -- is
18   the time that processing is concluded, like on the I-213,
19   it -- it -- it -- or whatever forms you use, is that noted
20   somewhere, not just the date but, you know, the time that
21   processing was concluded?
22        A.    The time that -- What processing, sir?
23        Q.    That the -- In -- Intake processing, when they
24   first arrive?
25        A.    The overall in --
```

1    Q.    In other words --

2    A.    The overall intake process, sir, or the admission

3  process that we have here is recorded by the contractors

4  that are on-site there, so when they enter the building

5  and when they exhibit the building.

6    Q.    Okay, but --

7    A.    As far as --

8    Q.    Let's --

9    A.    -- for each individual department that is inside

10  there, each unit that's in there --

11    Q.    Well, I don't --

12    A.    -- I'm not --

13    Q.    -- mean --

14    A.    -- of any --

15    Q.    -- about the --

16    A.    I'm not --

17    Q.    -- staff.

18    A.    -- aware of anybody documenting.

19    Q.    Okay.  But I'm not talking about the -- the staff

20  working for the contractor.  I'm just talking about ICE

21  and it -- and does ICE record, when it is concluded, its

22  intake processing when people arrive at the facility?

23    A.    No, sir.

24    Q.    Does ICE make a -- does ICE make a record of when

25  they conclude that?

```
 1        A.    No, sir.
 2        Q.    And does ICE make a record of when the person
 3   makes a fear claim?
 4              MS. FABIAN:   Object to form.
 5        Q.    (By Mr. Schey)   In other words --
 6        A.    If it --
 7        Q.    -- if I wanted to determine when -- when did a
 8   person make a claim, it might say that in the I-213 that
 9   was prepared by the Border Patrol.
10        A.    Huh.
11        Q.    Then I would know from the I-213, and that's
12   usually dated, and there's a time on it; but let's say
13   there is no credible fear, and the person makes a credible
14   fear -- but not a credible fear.  Excuse me -- makes a --
15   a fear claim during initial processing.  Now they're done
16   with processing.  Is anything put in their A-file that
17   would indicate when they got done with intake processing?
18              MS. FABIAN:   Object to form.
19              THE WITNESS:   That would be noted on the
20   documents we serve on the -- on the residents that --
21        Q.    (By Mr. Schey)   Okay.
22        A.    -- the CIS requires and retains --
23        Q.    And that --
24        A.    -- jurisdiction over.
25        Q.    And does that -- Does any -- I know that includes
```

```
 1   a date, but does it also include a time?

 2       A.   No, sir.

 3       Q.   But does --

 4       A.   My --

 5       Q.   -- someone --

 6       A.   -- recollection -- my recollection, I don't think

 7   there's a time.  It's not on there.

 8       Q.   Okay.  And how about when the person gets a

 9   notice that they're going to be interviewed by CIS and

10   during the -- the date and the time of that notice, is the

11   receipt -- is the receipt of that notice by the mother or

12   the class member recorded anywhere in the A-file?

13       A.   I don't think --

14       Q.   If you --

15       A.   -- that --

16       Q.   -- know.

17       A.   I don't -- I'm not sure.

18       Q.   Okay.

19       A.   I'm not sure.  I don't -- I don't --

20       Q.   I mean --

21       A.   -- think -- I don't -- My recollection, I don't

22   think we keep note of that.  That's just --

23       Q.   Okay.

24       A.   I mean, we don't -- we don't do that.  That's not

25   our -- our record there.
```

```
 1        Q.    Okay.  And then the A-file would indicate the
 2   date of the -- of the interview; right, date of
 3   the inter --
 4        A.    Yes.
 5        Q.    -- Asy -- Asylum interview?
 6              And it's probably going to have the decision?
 7              MS. FABIAN:  Object to form.
 8              Peter, you've got to let him answer the question.
 9   We -- We have to know when the question's over and then
10   give him a chance to answer.  It's -- It's a little hard
11   to tell.
12        Q.    (By Mr. Schey)  Yeah.  Question's over.
13              MS. FABIAN:  Okay.
14              THE WITNESS:  That would be on the document CIS
15   provides us.
16        Q.    (By Mr. Schey)  Yep.  And then, when the custody
17   determination is made, and it's -- it -- it's -- is the
18   date and time entered by the officer?  The date -- date --
19   date -- time that he or she made the determination, is
20   that recorded on the form?
21        A.    No, sir.  I -- My recollection, no.  The date is,
22   not the time, though.
23        Q.    Yeah.  I -- I'm just wondering if -- if -- if
24   none of these things are recorded or monitored, in terms
25   of how long it's actually taking to do the initial
```

 1   processing; how long it took to get them an -- an

 2   interview before a CIS officer; how long it took to make a

 3   custody determination.  None of those things have been

 4   recorded, at least to the best of your recollection,

 5   and -- and they're -- and -- and they're not being -- data

 6   is not being compiled and shared with you.  I'm wondering

 7   how you can conclude that the process is taking place as

 8   expeditiously as possible.

 9           MS. FABIAN:  Object to form.  Is that a question?

10   I --

11           MR. SCHEY:  Yes.

12           MS. FABIAN:  I don't -- I don't hear it.

13      Q.   (By Mr. Schey)  How can you --

14           MS. FABIAN:  Can you --

15      Q.   (By Mr. Schey)  -- how can --

16           MS. FABIAN:  -- rephrase that?

17      Q.   (By Mr. Schey)  -- you --

18           MS. FABIAN:  I don't --

19      Q.   (By Mr. Schey)  -- state --

20           MS. FABIAN:  -- I just don't hear a question

21   there.

22           MR. SCHEY:  Sure.

23      Q.   (By Mr. Schey)  How -- Under those circumstances,

24   how can you state that the process is happening as

25   expeditiously as possible?

```
 1              MS. FABIAN:  Object to form.
 2       Q.    (By Mr. Schey)  Without that kind of monitoring
 3   and data?
 4              MS. FABIAN:  Object to form.
 5       Q.    (By Mr. Schey)  Do you understand --
 6       A.    Sir, it --
 7       Q.    -- the question?
 8       A.    I think so.
 9       Q.    Or do you -- or -- or do you want me to rephrase
10   it?
11       A.    Just rephrase it, can you?
12       Q.    Let me try to rephrase it.
13              When -- I think that when you say that the
14   processing is happening as expeditiously as possible, I
15   don't think you really are referring to global time that
16   people spend in detention, because that involves resource
17   allocations; it involves efficiencies.  I don't think
18   that's what you're talking about.
19              I think what you're saying, but correct me if I'm
20   wrong -- I think what you're saying is that when we
21   process somebody at intake, it takes X amount of time, and
22   we've agreed that that was whatever you said, an hour to
23   three hours to 15 minutes to two hours or three hours, and
24   I don't -- and I think what you're saying is, "We're doing
25   that as expeditiously as possible."  And I think what
```

1   you're saying is, "When we finally get around to being

2   able to make a custody determination because there's a

3   positive fear claim, and we've got to sit down, and now

4   we've got to make the custody determination, we're making

5   that determination as expeditiously as possible."  I think

6   that's what you're saying; is that correct?

7          MS. FABIAN:  Object to form.

8          Are you -- Are you asking him, just, whether he

9   agrees with that statement; is that the que --

10         MR. SCHEY:  Yeah.

11     Q.   (By Mr. Schey)  Is that correct?

12     A.   Everything we do there, sir, on our side of the

13  house is done same day, depending on the time of day,

14  because everything is done within a 24-hour time frame.

15     Q.   Right.

16     A.   You know, so...

17     Q.   And -- And -- And -- And -- And -- And again,

18  what -- what you're referring to is the time that it takes

19  you, per individual, to do an initial processing when they

20  first appear; correct?

21         MS. FABIAN:  Object to form.

22         THE WITNESS:  "Per individual," sir?

23     Q.   (By Mr. Schey)  In other words, what you're

24  saying is, "When we have an individual receiving here and

25  we have to do an individual processing for that person,

1   and it normally takes us 15 to 20 minutes, and we always

2   try to do that to everybody, and that's as expeditiously

3   as we can do it"; correct?

4          MS. FABIAN:  Object to form.

5          THE WITNESS:  Yes.

6      Q.   (By Mr. Schey)  Okay.  What about the

7   transportation out of there?  How much delay is involved

8   with that?

9          MS. FABIAN:  Object to form.

10     Q.   (By Mr. Schey)  Let's say somebody's been there

11  for whatever, 14, 20, 25 days, 30 days, how is

12  transportation, and who arranges it to be transferred to

13  Berks?

14         MS. FABIAN:  Object to form, foundation.

15         THE WITNESS:  I don't make those arrangements,

16  sir.  I just get the instructions on what to -- when it's

17  going to occur.  We just put in a request, and they tell

18  us.

19     Q.   (By Mr. Schey)  So you put in a request after a

20  person has been there for how long?

21     A.   I don't know, sir.  Fr -- From one day to 10

22  days, twen -- 15 days, you know, it all depends.  I don't

23  know.  I don't know how to answer that question.  It's --

24  It's -- It's --

25     Q.   Okay.  Have you --

1    A.    Whenever we make --

2    Q.    -- received --

3    A.    -- a --

4    Q.    -- any --

5    A.    -- determination that we're going to transfer

6    somebody, we put in the instructions.

7    Q.    Have you received --

8    A.    We tell them, and somebody else tells us when

9    it's going to occur, because we don't make those

10   transportation arrangements.

11   Q.    Okay.  And -- And -- And who do you put in your

12   request to?

13   A.    To -- It's to my --

14   Q.    The trans --

15   A.    -- fie -- it's my field office.  They have --

16   They make those arrangements.

17   Q.    And who do they make it to?  Who does your

18   request go to?

19   A.    It's the contractor.

20   Q.    And the contractor then does the transportation?

21   A.    Excuse me?

22   Q.    The contractor actually does the transportation

23   to --

24   A.    I'm not --

25   Q.    -- Berks?

```
 1        A.    Sir, I'm not sure who does them.
 2        Q.    Okay.  And how long does that normally take from
 3   the time you put in a request to the time the person is
 4   actually transferred to Berks, if you know?
 5        A.    Oh, I don't know.
 6        Q.    And during that time when the custody
 7   determination takes place, have officers been instructed
 8   to comply with paragraph 14 of the settlement, if you
 9   know?
10             MS. FABIAN:  Object to form, foundation.
11             THE WITNESS:  We haven't encountered that, sir,
12   because once we've determine that they're going to be
13   released, we release them with the mother.  And when
14   you -- when you referred to -- to a claimant, or -- you're
15   referring to the child; right?
16        Q.    (By Mr. Schey)  Correct.
17        A.    All right.
18        Q.    Paragraph 14 only applies to the child.
19        A.    Oh, I was...
20        Q.    I'm sorry.  What was your response?
21        A.    All right, sir.
22        Q.    I -- I'm sorry.  Are you saying "yes," or -- I'm
23   not sure what you're saying.
24             MS. FABIAN:  I think --
25             THE WITNESS:  To -- To the question, it was, "we
```

```
 1    haven't encountered that, sir, because we usually release

 2    the mother with the child."

 3         Q.   (By Mr. Schey)  Is any effort --

 4         A.   Once we've --

 5         Q.   -- made during -- During custody determination,

 6    is any effort made to determine whether placement under

 7    paragraph 14 of the settlement would be more appropriate

 8    than release with the mother?

 9         A.   We haven't --

10              MS. FABIAN:  Object --

11              THE WITNESS:  -- encount --

12              MS. FABIAN:  -- to form.

13              THE WITNESS:  We haven't encountered that, sir,

14    because we've released everybody with the mother if we've

15    come to that de -- that determination.

16         Q.   (By Mr. Schey)  Has any instruction been issued

17    for officers during custody delineation to determine

18    whether release to someone other than the mother under

19    paragraph 14 would be more appropriate for the class

20    member?

21              MS. FABIAN:  Object to form --

22         Q.   (By Mr. Schey)  Has any --

23              MS. FABIAN:  Found --

24         Q.   (By Mr. Schey)  Has any such instruction been

25    issued?
```

```
 1              MS. FABIAN:  Object to form, foundation.

 2              THE WITNESS:  You know, the guidance was given

 3    out when Judge Guidance -- I mean, that Judge Gee's first

 4    order came out in October of last year, but we haven't

 5    needed to apply that because we've released everybody

 6    under -- with the mother.

 7       Q.   (By Mr. Schey)  Okay.  Except for the people who

 8    did not pass the fear interview; correct?

 9       A.   That's correct, because those cases were final

10    orders and subject to mandatory detention.

11       Q.   Going back to this question about keeping people

12    at Dilley, prior -- prior to release, we -- we've

13    discussed how additional resources, person power, could

14    decrease their detention time.  What about any -- ha --

15    any -- has anyone in -- investigated, or to your

16    knowledge, whether the length of detention could be

17    decreased by increasing any efficiencies?

18              MS. FABIAN:  Object to form.

19              THE WITNESS:  Can you define who -- Has anybody?

20       Q.   (By Mr. Schey)  Yeah.  In other words, has --

21    a -- are -- are you aware of any discussion or efforts to

22    decrease detention time by increasing efficiencies, such

23    as, you mentioned, people workers exchange between ICE and

24    CIS Asylum officers, for example, that could be done

25    digitally; if additional Asylum officers could be assigned
```

```
 1    to conduct more interviews.  Are -- Are you aware of any

 2    discussions to determine whether detention bond could be

 3    reduced by increasing efficiencies?

 4              MS. FABIAN:  Object to form.

 5              THE WITNESS:  As far as our processes, sir, we

 6    are constantly reviewing them every day for any -- any

 7    deficiencies to see if we can improve it.  As far as

 8    everybody else --

 9         Q.   (By Mr. Schey)  Okay.

10         A.   You're going to talk to everybody else.

11              MS. FABIAN:  Peter, can we go off the --

12         Q.   (By Mr. Schey)  Okay.

13              MS. FABIAN:  -- record one second and just talk

14    about timing?

15              MR. SCHEY:  Well, sure.

16              MS. FABIAN:  Okay.  Just -- Can we just off the

17    record for one...

18         (Break taken from 12:24 p.m. to 12:25 p.m.)

19              MS. FABIAN:  Go ahead, Peter.

20         Q.   (By Mr. Schey)  Who determines what configuration

21    of space would be available at Dilley to accept different

22    family unit types from Border Patrol?

23              MS. FABIAN:  Object to --

24              THE WITNESS:  We --

25              MS. FABIAN:  -- form.
```

1    THE WITNESS:  We are provided what's available by

2    the contractor, and then we provide it to the -- or

3    through a -- through my field office who, in turn, talks

4    to the Border Patrol and lets them know what's available.

5        Q.   (By Mr. Schey)  And what are the categories of

6    units that are available?

7        A.   Sir -- I don't know that by memory, sir.

8        Q.   Well, just approximately.  Best that -- the best

9    that you can recall.

10       MS. FABIAN:  Object to form.

11       THE WITNESS:  Like I said, sir, it -- it's all

12   dependent on the child's ages and then their sexes.

13       Q.   (By Mr. Schey)  Okay.  So they're divided by age

14   and -- and sex, and how many options are there,

15   approximately?

16       A.   Depending on what the population --

17       Q.   I don't --

18       A.   -- is that we have in custody and then what's

19   available with those categories.

20       Q.   Right, but I'm -- Right.  But you're saying it

21   depends on the age and sex.

22       A.   Correct.

23       Q.   So are there, like, two different units that are

24   divided, or is it three, or is it four, or is it a

25   hundred?  Just approximately.

```
 1              MS. FABIAN:  Object to --
 2      Q.   (By Mr. Schey)  I mean --
 3              MS. FABIAN:  -- form.
 4      Q.   (By Mr. Schey)  -- just the options that are
 5   available.
 6              MS. FABIAN:  Object to form.
 7              THE WITNESS:  Again, it's what's available at the
 8   day with the population that we already have in custody.
 9      Q.   (By Mr. Schey)  Right.  But you're saying that
10   there's different configurations; correct?
11      A.   Correct.
12      Q.   Okay.  Just approximately, not -- you don't have
13   to be precise.  I'm just trying to get a ballpark.  How
14   many con -- different configurations are there --
15      A.   Oh.
16      Q.   -- that -- that the facility can acco --
17   accommodate?
18      A.   My recollection, there's just five.
19      Q.   Okay.  Now, when -- When Border Patrol has
20   people, they would contact ICE to determine availability;
21   is that correct?
22      A.   Correct.
23      Q.   And if -- if space is not available, what is your
24   understanding of what happens to those people in CBP
25   custody?
```

1       A.   I'm not sure, sir.  I know they don't come to the

2   facility.

3       Q.   That they do not come to the facility; is that

4   correct?

5       A.   That's correct.

6       Q.   And at this point, you have no -- Based on your

7   experience, what happens to those people, historically?

8            MS. FABIAN:  Object --

9       Q.   (By Mr. Schey)  What would -- What would --

10           MS. FABIAN:  -- to form.

11      Q.   (By Mr. Schey)  -- most --

12           THE WITNESS:  I don't got no experience because

13  I've never worked at the Border Patrol station to -- to

14  know what's actually happening.

15      Q.   (By Mr. Schey)  Okay.  Are you aware of whether

16  or not -- Has anybody ever informed you -- If space is not

17  available at Dilley or at Karnes, has anybody ever

18  informed you what -- what is done with those mothers and

19  class members in the custody of CBP?

20      A.   I've never confirmed any of that information,

21  but, you know, yeah.  They -- They -- They -- You know,

22  there's -- there's -- I'm not going to say there are

23  rumors, but there's information saying that -- that they

24  may release them; they may transfer them to Karnes; they

25  may transfer them to Berks, you know.  I mean, I don't

1    know.  I'm not sure what happening.  I don't ask them.

2        Q.   And --

3        A.   I don't directly ask --

4        Q.   -- when--

5        A.   -- the Border Patrol.  I don't speak with them,

6    so I'm -- I can't tell you.

7        Q.   Okay.  Now -- But when they make their request

8    to -- to -- for space at Dilley, does that request come to

9    ICE, or does that go to the contractor at Dilley?

10       A.   No, sir.  It's to ICE.

11       Q.   Comes to ICE?

12       A.   Yes.

13       Q.   And -- And -- And -- And ICE then assigns someone

14   to pick up those people, to bring them to Dilley or,

15   possibly, to Karnes.

16           MS. FABIAN:  Object to form.

17       Q.   (By Mr. Schey)  Is that correct?

18       A.   Once -- Once they've been determined and come to

19   our facility, arrangements are made for them to come to --

20   we make those transportation arrangements.

21       Q.   Okay.  And if somebody at -- If -- If Border

22   Patrol, let's say, had a person who -- they were a family

23   unit who they wanted to transfer to your facility, do you

24   send ICE officers to pick them up, or do you send a

25   contractor to pick them up?

1    A.   Contractors.

2    Q.   So you contact the contractor and tell them,

3  "Please, go pick up X number of people at a particular

4  location"?

5    A.   Yes, sir.  My staff at the facility contacted

6  contractors to pick them up.

7    Q.   Okay.  And how many contractors do you have, or

8  is it just one?

9         MS. FABIAN:  Object to form.

10    Q.   (By Mr. Schey)  Is there more than one contractor

11  or just one?

12    A.   For --

13         MS. FABIAN:  Object to form.

14    Q.   (By Mr. Schey)  I'm sorry?

15    A.   Do we -- You're talking about that -- to pick

16  them up?

17    Q.   Yes.

18    A.   We utilize one contractor.

19    Q.   Okay.  And does that contract -- Do you have any

20  idea how many vehicles that contractor has?

21    A.   No, sir.

22    Q.   Generally, what is your experience in the delay

23  in the contractor picking people up and bringing them to

24  ICE custody?

25         MS. FABIAN:  Object to form.

1        THE WITNESS:  Sir, delays?  I haven't really had

2    any delays.

3        (Mr. Anderson reentered the conference room)

4    Q.   (By Mr. Schey)  And if you had delays, is --

5    would that be of concern to you or people looking for you?

6    Is that something you'd want to discuss with the

7    contractor?

8        MS. FABIAN:  Object to form.

9        THE WITNESS:  Those are contract issues, sir.

10   If -- If they were to arise, then, yes, we definitely --

11   we'd definitely be addressing them.

12   Q.   (By Mr. Schey)  And is the contractor reimbursed

13   based on the number of miles traveled and -- and the

14   number of people transported?

15   A.   I'm not -- I don't know all the particulars of

16   the contra -- on that contract, sir.

17   Q.   I understand.

18        And over the past six months, approximately, what

19   has been the -- Or strike that.

20        Let -- Let me put it this way:  During -- During

21   the past three months, have conditions at Dilley been

22   overcrowded?

23        MS. FABIAN:  Object to form.

24        THE WITNESS:  Over -- No, sir.

25   Q.   (By Mr. Schey)  Or did Di -- Do you have any

```
 1   idea, during any period you want to tell us, like the --

 2   the previous month, the previous three months, previous

 3   six months -- do you have any idea about how much of the

 4   bed space has been used on average at Dilley?

 5        A.   On every what?

 6        Q.   I -- Do you have any idea how much of the bed

 7   space had actually been used at Dilley?

 8             MS. FABIAN:  Object to form.

 9             THE WITNESS:  Do you --

10        Q.   (By Mr. Schey)  In -- In other words --

11        A.   Yeah.

12        Q.   Let me -- Ma -- Maybe the question is confusing.

13   In other words, let's start with this:  Approximately, how

14   many beds are available at Dilley?

15        A.   Well, that varies from day to day , sir --

16        Q.   No, no --

17        A.   -- week to week --

18        Q.   -- how many are --

19        A.   -- month to month.

20        Q.   -- available?  Not -- Not -- Not how many are

21   used.  How many are available for use --

22        A.   I --

23        Q.   -- approximately?

24             MS. FABIAN:  Ob -- Objection to form.

25             THE WITNESS:  Again, that varies from day to day,
```

```
 1   sir.  In -- We have 2,400.
 2        Q.   (By Mr. Schey)  No.  I -- I -- I don't mean -- I
 3   don't mean how many are empty and available.  I'm sorry
 4   I -- I'm not very clear.  I mean, How many beds are at
 5   Dilley?
 6        A.   There's 2,400 total beds, sir.
 7        Q.   Okay.  And -- And -- And let's say, if you know,
 8   do -- in -- in -- in recent months, how many of those
 9   20 -- 2,400 have been used, on average?  How many get used
10   on average?
11            MS. FABIAN:  Objection to form.
12            THE WITNESS:  That -- That -- That varies from --
13   day to day, sir, but we've been hovering around 1,500 the
14   past three or four months.
15        Q.   (By Mr. Schey)  Okay.  And so, generally, there's
16   roughly -- not, obviously, every day, but generally,
17   there's roughly been 900 beds available?
18            MS. FABIAN:  Object -- Object to form.
19            THE WITNESS:  Not necess --
20        Q.   (By Mr. Schey)  Is that fair to say?
21        A.   Not necessarily, sir.
22        Q.   Okay.  But there have been -- generally, there
23   have been beds -- generally, you say, there's 2,400 beds.
24   And -- And -- And you would say, generally, you've been
25   hovering for the last three months at -- what did you say?
```

1    Roughly 1,500, I think?

2        A.    Yes.

3        Q.    Was -- Was that correct?  Okay.

4            And it -- It -- It -- Let's say in the past three

5    months, six months, have you ever had a situation where

6    every bed was filled, you'd run out of space at Dilley?

7            MS. FABIAN:  Object to form.

8            THE WITNESS:  No.

9        Q.    (By Mr. Schey)  And the -- the -- the contractor

10   that you use to transport people from CBP custody to your

11   custody, did that truck -- did that contractor tend to go

12   to all of the Border Patrol facilities that are in some

13   geographic area there in Texas?

14       A.    They -- They'll go wherever we tell them to go --

15       Q.    Okay.

16       A.    -- here in Texas.

17       Q.    And, I'm sorry.  I -- I wasn't sure what you had

18   responded to when I asked you earlier, what -- Oh, I think

19   you said that you didn't know when I -- when I asked you,

20   "Do they bill by the number of people or by the mile?" and

21   I think you said you don't know; is -- is that correct?

22       A.    Yeah.  I don't know all the --

23            MS. FABIAN:  Object to form.

24            THE WITNESS:  Yes, sir.  I don't know all the

25   details to that contract.

1    Q.    (By Mr. Schey)  All right.  There were certain

2    statements that you made in your declaration about

3    declarations that were made by individuals, detainees.

4    Did those -- The -- The statements that you made were

5    based upon any information that may have been recorded in

6    their A-files; is that correct?

7        A.    Their A-files?  If I remember correctly, sir, I

8    put the databases, because that's what I reviewed for this

9    declaration.

10       Q.    Okay.  And what databases did you refer to?

11       A.    I don't remember what the acronym stands for, but

12   it's the Enforcement -- it's EA -- we -- we refer to it as

13   EARM.

14       Q.    And did you refer to any other databases or just

15   that database?

16       A.    No.  I think that was it.

17       Q.    And what -- what does that database tell you that

18   was useful to you for your declaration?

19       A.    Those dates -- For dates, when they were admitted

20   to the facility and when they were released.

21       Q.    Okay.  Anything else?

22       A.    The immigration -- Some of the immigration case

23   history.

24       Q.    Okay.  Anything else?

25       A.    That's basically what I looked at there, sir, if

```
 1   I remember correctly.
 2       Q.   Okay.  And you said their A -- their A-file,
 3   normally, their -- the database would tell you when they
 4   saw counsel.  Would it -- Legal counsel.  Would it?
 5       A.   If we get a -- The documents stating that there's
 6   going to be -- there's a legal counsel going to legally
 7   represent them, then they'll notify us, and we refer to
 8   that form as a G-28.  We annotate it in the database also.
 9       Q.   Well, the G-28, you don't -- you don't file a
10   G-28 every time you interview somebody.  You only file a
11   G-28 when you first make a notice of appearance.  So are
12   you testifying that -- that every time somebody sees a
13   lawyer --
14       A.   Oh.
15       Q.   -- that that's noted in their A-file in this
16   database?
17       A.   No.  No.
18       Q.   No?
19       A.   If they go --
20       Q.   How about --
21       A.   -- see --
22       Q.   How about --
23            Go ahead.
24       A.   If they're seeing a lawyer, sir, we don't
25   annotate that.  We don't -- we don't -- we don't --
```

```
 1        Q.    So --

 2        A.    -- document that.

 3        Q.    So neither the A-file nor the database is likely

 4   to refer to any alleged difficulties that they've had

 5   communicating with their lawyer; is that fair to say?

 6        A.    That's correct.

 7              MS. FABIAN:  Object to form.

 8        Q.    (By Mr. Schey)  And neither the database nor

 9   their A-file will probably reflect the type of food they

10   got or they didn't get; is that fair to say?

11        A.    I'm sorry.  What was the last part of the

12   question?

13        Q.    Neither the A-file nor the database, unless they,

14   of course, gave you a written re -- complaint, and maybe

15   you put it in the A-file -- but short of something like

16   that, the A-file and the database is not going to reflect

17   the type of food they got, or -- right --

18              MS. FABIAN:  Object to --

19        Q.    (By Mr. Schey)  -- their complaints about food?

20        A.    Are you -- are you --

21              MS. FABIAN:  Object to form.

22              THE WITNESS:  Are you saying "food"?

23        Q.    (By Mr. Schey)  Yeah.

24        A.    No.  It's not going to -- We're not going to keep

25   a record of that in that -- those two -- the A-file or the
```

```
 1    database.
 2         Q.    I'm wondering what -- what type of allegations
 3    that they made in their declarations would -- would --
 4    would you be able to refute or contest, other than the
 5    proceedings, records; other than that, what else would the
 6    A-file or the database -- what other information would it
 7    give you?
 8              MS. FABIAN:  Objection to form.
 9              Are you a -- are you asking what his declaration
10    says?
11              MR. SCHEY:  Yeah.  If it's based on anything
12    other than those two sources.
13              THE REPORTER:  I'm sorry?
14              THE WITNESS:  We're not catching the last part of
15    your question.
16              MS. FABIAN:  We -- We didn't hear the last thing
17    you said, Peter.
18         Q.   (By Mr. Schey)  If it's based on anything other
19    than those sources.
20              MS. FABIAN:  Object to form.
21              THE WITNESS:  Again, I didn't -- I didn't
22    understand what you're saying.
23         Q.   (By Mr. Schey)  Oth -- Other than looking at the
24    A-files and -- and database, the database, and information
25    that's been -- your legal counsel gave you, what -- were
```

```
 1   there any other sources or any other information which --

 2   on which you -- you relied upon for you declaration?

 3        A.   Other than the exhibit, sir?

 4        Q.   Other than -- yeah, other than the exhibit.

 5        A.   One thing, I didn't have the A-file.  Actually,

 6   it was the EARM, the one I referred --

 7        Q.   I'm sorry?

 8        A.   I didn't have the A-file.

 9        Q.   Say that again?

10        A.   I didn't have --

11        Q.   You did not --

12        A.   -- the --

13        Q.   -- have --

14        A.   -- A-file.

15        Q.   -- the A-file?

16        A.   So it was the database --

17        Q.   Okay.  Let --

18        A.   -- and --

19        Q.   -- me --

20        A.   -- the --

21        Q.   -- just --

22        A.   -- attachments.

23        Q.   -- ask -- Okay.

24             So you did not review the A-file?

25        A.   Correct.
```

1     Q.   Okay.  Were you actually given copies of the

2  declarations of the declarants or not?

3     A.   Sir, I signed it.

4     Q.   No.  I mean, I know you signed your declaration.

5     A.   Huh.

6     Q.   I -- I'm sorry.  I'm talking about declarations

7  that were signed by class members or by their mothers.

8  Were you ever provided copies of those declarations?

9     A.   I don't recall.

10    Q.   Okay.  I have no further questions.  If you want

11  to go off the record for a minute so we can discuss

12  getting this deposition transcript time.

13         MS. FABIAN:  I actually have a couple of

14  questions for the witness first.

15         MR. SCHEY:  Okay.

16              (Examination ended at 12:46 p.m.)

17

18

19                      EXAMINATION

20  BY MS. FABIAN:

21    Q.   Mr. De La Garza, we talked earlier about any

22  training or guidance that occurred after August of last

23  year.  What -- Well, has there been any -- any training or

24  guidance at all that has come out in the last year since

25  the -- since Judge Gee's August order?

```
 1        A.    We got guidance from the field office and the

 2   chain of command in memorandum format.  I can't remember

 3   who was the one that generated that.  But yeah, we had

 4   some guidelines that we had to meet, some criteria that we

 5   had to follow.

 6              As far as training, my -- my -- my first-liners,

 7   the ones that are on the front lines doing all the works,

 8   we gave them the guidance.  We gave the -- all the

 9   temporary people that are assigned there to the facility,

10   you know, that -- that -- that are coming from throughout

11   the country that are assisting us there in 45-day

12   stints -- it's a -- an orientation.  We give them a

13   basic -- basic information as to what -- what they need to

14   do there while they're there, as far as our processes,

15   what's being implemented based off that memo.  But...

16        Q.    And when did that memo come out?

17        A.    It came out in O -- right around October 23rd,

18   when Judge Gee's first order came out of last year.

19        Q.    In the facility -- Well, first of all, do you

20   understand who the class members are?

21        A.    Right now, when Mr. -- Mr. Schey was -- was

22   mentioning that, I was -- I was assuming he was referring

23   to that -- the adult, but it's the child; right?

24        Q.    Correct.

25        A.    Then I was mistaken on that.
```

1       Q.   In your facility, are class members on their own,

2   or are they in the custody of their mothers?

3       A.   They're in the custody of their adult mother.

4       Q.   Would it be likely that you would find a class

5   member alone in the facility?  Would that -- Not -- Not

6   with their mother?

7       A.   The only time that would occur is if -- when they

8   were in school.  No.  They would not be alone other than

9   that.  Their mother would be with them.

10      Q.   I have no further questions.

11         MS. FABIAN:  Peter, do -- Ready to go off the

12  record now?

13         MR. SCHEY:  No.  I have a couple of follow-up

14  questions.

15              (Examination ended at 12:49 p.m.)

16                   EXAMINATION

17  BY MR. SCHEY:

18      Q.   You -- With regard to this -- this -- this

19  question about your training or guidance since Judge Gee's

20  order, let -- let -- let's go back to that for a second.

21         Ha -- Have you received any in-person training?

22  Somebody came and trained you and told you, "This is what

23  Judge Gee's order said; this is what you have to do."

24  Anything like that?

25      A.   No.

1    Q.   Has -- Have you received guidance from anyone

2    other than legal counsel about what to do about Judge

3    Gee's order?

4    A.   Just from my -- my chain of command, sir.  I've

5    received guidance.

6    Q.   Did -- And -- And -- And did you -- So you got

7    something in writing; is that correct?

8    A.   Yes.

9    Q.   Okay.  Did -- Did anybody telephone you or

10   videoconference with you to explain what you were supposed

11   to do?

12   A.   My chain of command.

13   Q.   Okay.  They videoconferenced with you, or they

14   telephoned you?  Which one was it?

15   A.   If I remember correctly, it was the telephone.

16   Q.   Okay.  If you're remembering correctly, it was

17   telephoned; is that --

18   A.   Yes.

19   Q.   Is that what you said?

20   A.   Yes, sir.

21   Q.   And -- And when did that take place?

22   A.   Right around the time the judge's order came out,

23   sir.

24   Q.   Okay.  And -- And somebody telephoned you; is

25   that correct?

```
 1        A.    Yes.

 2        Q.    And who telephoned you?

 3        A.    It'd be my supervisor.

 4        Q.    I'm sorry.  Who was that?

 5        A.    My supervisor.

 6        Q.    Who is that?

 7        A.    Ms. Deborah Achim.

 8        Q.    I'm sorry?

 9        A.    Deborah Achim.

10        Q.    How do you spell the last name?

11        A.    D-E-B-O-R-A-H.  That's her first name.

12        Q.    And --

13        A.    Last name is A-C-H-I-M.

14        Q.    And where does she work?

15        A.    The field office right here in San Antonio.

16        Q.    And she called you; is that correct?

17        A.    If I remember correctly, yes, she would be the

18   one that would have called me.

19        Q.    I'm sorry.  I could not hear that.

20        A.    If I remember correctly, yes, she would be the

21   one that would have called me.

22        Q.    Okay.  And -- And do you recall, was -- was

23   anybody with you, or was just -- the call was just to you?

24        A.    It would be to me, sir.  It would have been to --

25        Q.    Okay.
```

1    A.    -- me.

2    Q.    And -- And had she sent you any documents to look

3  at prior to the call or to prepare for the call?

4    A.    If I remember correctly, sir, it was that

5  memorandum, the new directions.  I don't know how to --

6    Q.    And so -- and so she was calling you about the

7  memorandum that she had shared with you?

8    A.    Yes.

9    Q.    And do you still have that memorandum?

10   A.    Yes.

11   Q.    Okay.  Do you have it with you today?

12   A.    No.

13   Q.    Okay.  And how many pages long was the

14 memorandum?

15   A.    I don't remember, sir.

16   Q.    Approximately.  I mean, was it more like one page

17 or 20 pages?

18   A.    I'm not going to even try to guess on that one.

19 It was more than one.

20   Q.    Okay.  And what did that -- what does -- what did

21 the memorandum tell you?  What -- What did you learn from

22 the memorandum?

23   A.    It gave us guidance on how we were going to

24 categorize the cases that we had.

25   Q.    I'm sorry.  Say that again?

1    A.    Categorize the cases, the immigration cases, that

2    we had.

3    Q.    So the memorandum told you to categorize the

4    cases?

5    A.    How we were going to categorize the cases, at

6    what stage --

7    Q.    I'm -- I -- I'm sorry.  Say that again?

8    A.    How we were going to categorize the cases that we

9    had in custody, sir.

10   Q.    And -- And -- And what -- What did the memorandum

11   tell you about that?  How -- How were you supposed to

12   categorize cases?

13   A.    I can't remember all of them, sir.  We only deal

14   with the --

15   Q.    Did --

16   A.    -- mandatory detention and then the fear cases.

17   That's really, basically, what applied to us here.

18   Q.    And so what did the memorandum tell you to do

19   differently?

20   A.    Other than to redetermine our cases as soon as we

21   got a positive finding from their fear claim and to do

22   what we're doing now, as far as releasing them, if we find

23   them eligible for release.

24   Q.    Okay.  But what -- what did it tell you to do

25   different than you had done before, than you'd done in

1    June and July of 2015?  What -- What -- What, if anything,

2    changed -- that's what I'm trying to understand -- based

3    on that memorandum?

4        A.   Well, I didn't see a whole lot of changes on

5    there, sir, other than that our processing times were just

6    going to be brought down.  Well, not our processing time,

7    but our average length of stay was going to be brought

8    down dramatically because of it.

9        Q.   But you -- you said that the only thing you

10   remember is that the average detention time was to be

11   reduced; is that correct?

12       A.   No.  It was going to -- It's just our processing

13   times, our -- our -- our -- our way of -- our efficiency

14   was going to improve, and we were going to, pretty much,

15   be releasing them a lot faster than we were before.

16       Q.   Okay.  And -- And how -- And -- And -- And how

17   were you to accomplish that?

18       A.   Well, for one thing, it was just to -- just

19   streamlining our processes, sir, in order to minimize our

20   length of stay.

21       Q.   And -- And -- And -- And -- And how were you to

22   do that?  How -- What processes were you to streamline?

23       A.   One thing, we got more staff on-site.

24       Q.   I'm sorry.  Say that again?

25       A.   For one thing, we got more staff on-site.  And

Deposition of Valentin De La Garza                          Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1    I --
 2        Q.   And -- And --
 3        A.   And we --
 4        Q.   And how many more staff -- how many more staff
 5    did you get?
 6        A.   We went from about 90 to 125, sir.
 7        Q.   Okay.  And -- And -- And -- And that -- that
 8    decreased detention time?
 9        A.   That is -- That helped, but so did our way of
10    thinking and how we processed our cases there, as far as
11    how I -- how we designated work to each --
12        Q.   And since --
13        A.   -- each -- each area, and it -- it -- it -- it
14    definitely --
15        Q.   Tell -- Tell us -- Tell us again, in a way that
16    we would understand, what else were you instruct --
17        A.   Everything --
18        Q.   -- were you --
19        A.   Everything --
20        Q.   -- instruct --
21        A.   -- that we were doing, sir, on our side of the
22    house, was done immediately, within 24 hours.
23        Q.   And -- And prior to that, anything you were going
24    to do could have taken longer than 24 hours, or -- or not?
25        A.   Well, we had processes in place that, you know,
```

1    it would take a day or two, up to three days, sometimes,

2    before we would refer the case to CIS.

3        Q.    Okay.  So you started to refer the cases to CIS

4    quicker; is that what you're saying?

5        A.    Yes, sir.

6        Q.    And -- And -- And -- And when you say you would

7    start to refer them to CIS quicker, do -- do you mean

8    that, instead of taking two or three days, you would try

9    to do it in one day?

10       A.    No.  We were doing it in one day.

11       Q.    I'm sorry.  You were already doing it in one day?

12       A.    Uh-huh.  We started doing it in one day, sir.

13   Everything.

14       Q.    Oh.  I missed that.

15            And then -- Well, was there anything else you did

16   to increase efficiency?

17       A.    Just release them fast -- as fast as we can, sir,

18   because once we made that determination that they were

19   going to release them, you know, to minimize their stay --

20       Q.    Right.  That's --

21       A.    -- and do everything as --

22       Q.    Right.

23       A.    -- expeditiously --

24       Q.    That's --

25       A.    -- as possible.

```
 1      Q.   Right.   That -- That's definitely the goal.

 2   But -- But I'm trying to understand how you -- what you

 3   were instructed to do to achieve that goal.  You -- You've

 4   said that they were -- more people were assigned, and

 5   you've said that you would try to reduce the time it took

 6   to get a referral to CIS from one, two, or three days to

 7   one day.  What else, precisely, were you told to do to

 8   increase efficiency --

 9        (Mr. Zimmerman exited the conference room)

10      Q.   (By Mr. Schey)  -- and -- and decrease detention

11   time?

12      A.   Sir, on our side of the house, that's about all

13   we could do.  We use what -- We needed the decision from

14   CIS in order to make a determination on whether we were

15   going to continue detention or not.

16      Q.   And when is the custody determination typically

17   made?  Is it after you -- after you get the decision from

18   CIS?

19      A.   Yes, sir.  As soon as we got a written -- written

20   decision from them, it's done a -- it's done at -- within

21   the 24-hour time frame from receiving that -- that

22   decision.

23      Q.   And, in general, how long does it take to release

24   people once a custody determination has been made, if

25   they're amenable for release?
```

1        MS. FABIAN:  Peter, I think you're going outside

2    the scope of cross, now.  You're going back to testimony.

3        MR. SCHEY:  Okay.  I with -- I withdraw that

4    question.

5    Q.   (By Mr. Schey)  Turning to the business about the

6    mothers being with the children, how -- how do you know

7    that mothers are with their children all the time?  I'm

8    just trying to understand.  I -- I've been to this

9    facility, and people were wandering around all over the

10   place.  Children were following me.  No -- Nobody was

11   ensuring that the child -- the child was, like, within

12   reach of the mothers all the time.  On -- On --

13   A.   That's --

14   Q.   On what basis do you just say that --

15   A.   It's the responsibility --

16   Q.   -- mothers are with their --

17       MS. FABIAN:  Ob --

18       THE WITNESS:  I'm sorry.

19       MS. FABIAN:  Object --

20       THE WITNESS:  I -- I'm --

21       MS. FABIAN:  -- to --

22       THE WITNESS:  -- interrupting.

23       MS. FABIAN:  -- form.

24       THE WITNESS:  I'm interrupting.  I'm sorry.

25   Q.   (By Mr. Schey)  No, go ahead.  Go ahead.

1    A.    That's dependent on the mother, sir.  We have not

2    encountered somebody that's been left alone, or they're...

3    Q.    Well, by -- by "left" --

4    A.    That's been --

5    Q.    -- "alone" --

6    A.    -- left to --

7    Q.    There is no rule that I have read that deals with

8    mothers at Dilley that says that the mother and the child

9    always have to be within reach or within eyesight.  Are

10   you aware of any such rule?

11   A.    I believe it's in the detainee handbook where the

12   mother has to have oversight over a child which is

13   their -- they're the responsible for that child, for their

14   children.

15   Q.    Well, I think there's a big difference between

16   having responsibility for a child and -- and always being,

17   you know, within physical presence of that child.  I --

18   I'm -- I'm talking about -- You seemed to testify that

19   mothers are always with their children, within physical

20   presence.  Now you're saying -- The times I've been, the

21   children are walking in and out of their rooms; walking in

22   and out of the dining area; walking here; walking there.

23   Mothers would come in and see the lawyers, but -- but they

24   were definitely not in the same physical spot all the

25   time.  And I'm wondering on what basis you assert that

```
 1   they're always physically together?

 2        (Mr. Zimmerman reentered the conference room)

 3           MS. FABIAN:  Ob --

 4           THE WITNESS:  It's --

 5           MS. FABIAN:  Objection.

 6           THE WITNESS:  -- incumbent --

 7           MS. FABIAN:  I --

 8           THE WITNESS:  -- on --

 9           MS. FABIAN:  I think that mischaracterizes his

10   testimony.

11           MR. SCHEY:  Okay.  Well, then, maybe I

12   misunderstood his testimony.

13       Q.   (By Mr. Schey)  Well, would it be fair to say

14   that it was not your testimony, that you did not intend to

15   testify, that mothers in Dilley are always physically in

16   the same location as their children?  Is that fair to say?

17       A.   It's -- It's incumbent on the mothers.  They're

18   responsible for their children.

19       Q.   Yeah.  Yeah.  We -- We -- We -- We -- We agree

20   that that's your testimony.

21       A.   It's -- It's -- We have -- I have not

22   encountered, or I have not been informed, that there --

23   somebody has been left -- a class member's been left un --

24   unattended.

25       Q.   So is there any -- Let's go back to this:  Would
```

1   you expect that -- if a child went to the commissary, a

2   14-year-old went to the commissary, without her mother,

3   that you're going to get a report about that?

4       A.   I should.

5       Q.   Is that what you're -- is that what you're

6   saying?

7       A.   I should, sir.

8       Q.   Okay.  And why should you?  Is there any written

9   rule that is given to the mothers that says, "Your child

10  has to always be in your physical presence"?  Is there any

11  such rule that you are aware of?

12      A.   I'm not sure it's exactly said like that, sir.

13  I'd have to look at the -- look at everything, all the

14  policies and everything again.  But I -- I'd have to

15  double-check on that, if it exactly says it the way you're

16  saying it.

17      Q.   Okay.  So if -- if people observe that mothers

18  and children were not always in the same exact physical

19  location, in -- in -- in -- in your mind, that -- that

20  would violate something, and -- and you should receive a

21  report about that; is that correct?

22      A.   Well, you know what, I may not receive a report.

23  They'll address it.  It should be addressed with the

24  mother.  It's only if it's an egregious information, but I

25  haven't -- I have not received any -- any information,

```
 1   saying that a class member was left unattended.

 2       Q.    So when a mother goes to see a lawyer, you --

 3   you're saying that that child would be left unattended,

 4   even if the child was left with another adult, another

 5   adult detainee?

 6       A.    No.

 7       Q.    You -- You would consider --

 8       A.    The mother --

 9       Q.    -- that to --

10       A.    The mother --

11       Q.    -- be okay?

12       A.    -- has an option.  The mothers have an option

13   of -- of leaving their child with a monitored care -- in

14   the Monitored Care Division if they want to conduct

15   business with immigration, interview or something, and

16   their child not be present.

17       Q.    Ha -- Have you ever -- What are you -- You're

18   saying that when you -- I -- I assume you have visited

19   Dilley often; is that correct?

20       A.    I'm sorry?

21       Q.    Are you based -- Oh.  Are you based at Dilley?

22       A.    I'm at ba -- I'm based at Dilley, sir.

23       Q.    Okay.  So I assume that you've walk around the --

24   the -- the common areas used by detainees often; is

25   that --
```

1      A.    Yes, sir.

2      Q.    And -- And -- And it is your testimony that

3   children -- that mothers must keep their children, and do

4   keep their children, physically with them at all times; is

5   that correct, that wherever you see a mother, you're going

6   to see children?  You're going to see that mother's child?

7            MS. FABIAN:  Objection to form.

8            THE WITNESS:  I haven't been informed that they

9   haven't, sir, that they haven't encountered anything --

10     Q.    (By Mr. Schey)  Okay.

11     A.    -- like that.

12     Q.    So when the child goes to the library, you're

13  saying the mother always goes to the library; right, and

14  when the mother goes to the infirmary, the same child

15  always goes to the infirmary?

16     A.    Huh.  That's the way it should be, sir.

17     Q.    Okay.  I have no further questions.

18           MS. FABIAN:  Okay.  We can go off the record.

19           (Break taken from 1:07 p.m. to 1:12 p.m.)

20           MR. SCHEY:  Okay.  So the agreement is that the

21  court reporter is going to get me a rough transcript,

22  hopefully by Monday, by e-mail, and will expedite the

23  transcript for this deposition and the next deposition

24  today.  She will send the original to Sarah Fabian and

25  will send a copy to me.  I would also like a digital

Case 2:85-cv-04544-DMG-AGR  Document 262-2  Filed 09/19/16  Page 72 of 80  Page ID
#:7697
Deposition of Valentin De La Garza                                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

 1   version that can be copied and pasted and open.

 2        The witness will have the opportunity to review

 3   and sign his transcript and make any corrections he wishes

 4   to make and -- as expeditiously as possible, and get it to

 5   Sarah who will get it back to me.  Is that agreeable,

 6   Sarah?

 7        MS. FABIAN:  Yes.  I believe I get it back to the

 8   court reporter then, but I will also share it -- it with

 9   you, if we have any corrections.

10        MR. SCHEY:  Okay.  Court reporter, can she just

11   get that directed back to me?  Is that an issue?

12        THE REPORTER:  I'm sorry?

13        MR. SCHEY:  Can she just forward the original,

14   once signed, back to me?

15        MS. FABIAN:  If -- If we do errata, I need to

16   send it to her so she can make it part of the final -- the

17   final transcript.  That -- That's --

18        MR. SCHEY:  I guess you normally would.  All

19   right.  But the way I've seen that happen, you normally

20   would just add your changes at the end on a page, a blank

21   page, that's for that purpose.

22        MS. FABIAN:  Right.  Right.  The errata form, and

23   then I get that back to it -- to her so she can make that

24   part of the record, and you have the opportunity to then

25   decide if you want to reopen the deposition.

```
 1              MR. SCHEY:  Oh.  I -- I -- I will not want to

 2    reopen it, so she can just send the sheet directly to me.

 3    Is that fine with you, madame --

 4              MS. FABIAN:  I --

 5              MR. SCHEY:  -- court --

 6              MS. FABIAN:  I'll --

 7              MR. SCHEY:  -- reporter?

 8              MS. FABIAN:  -- send it to -- to both.  I'll --

 9              MR. SCHEY:  Okay.

10              MS. FABIAN:  I'll send you any --

11              MR. SCHEY:  That's fine.

12              MS. FABIAN:  -- edits we have, but I -- I will

13    just also send it to her so she can complete her process.

14              MR. SCHEY:  That's fine.  Okay.  Then this

15    deposition has concluded.

16              (Proceedings concluded at 1:14 p.m.)

17                           -OOo-

18

19

20

21

22

23

24

25
```

Case 2:85-cv-04544-DMG-AGR   Document 262-2   Filed 09/19/16   Page 74 of 80   Page ID
#:7699
Deposition of Valentin De La Garza                                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1                 CHANGES AND SIGNATURE

 2    WITNESS NAME: VALENTIN DE LA GARZA      DATE: SEPTEMBER 9,
                                                    2016
 3    PAGE/LINE          CHANGE                REASON

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

Deposition of Valentin De La Garza                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
1              I, VALENTIN DE LA GARZA, have read the

2    foregoing deposition and hereby affix my signature that

3    same is true and correct, except as noted above.

4

5                              _____

6                              VALENTIN DE LA GARZA

7

8

9    THE STATE OF TEXAS          )

10   COUNTY OF BEXAR             )

11

12

13            Before me, _____, on this day

14   personally appeared VALENTIN DE LA GARZA, known to me (or

15   proved to me under oath of through _____) to be the

16   person whose name is subscribed to the foregoing

17   instrument and acknowledged to me that they executed the

18   same for the purposes and consideration therein expressed.

19            Given under my hand and seal of this office

20   this _____ day of _____, 2016.

21

22

23            _____

24            NOTARY PUBLIC IN AND FOR
              THE STATE OF TEXAS
25            LICENSE EXPIRES ON _____
```

```
 1                UNITED STATES DISTRICT COURT
                 CENTRAL DIVISION OF CALIFORNIA,
 2                     WESTERN DIVISION

 3   JENNY LISETTE FLORES, et    '
     al.,                        '
 4                               '
          PLAINTIFFS,            '
 5                               '
     VS.                         '  CIVIL ACTION NO.
 6                               '  CV 85-4544 DMG (AGRx)
     LORETTA E. LYNCH,           '
 7   ATTORNEY GENERAL OF THE     '
     UNITED STATES, et al.,      '
 8                               '
          DEFENDANTS.            '
 9
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10

11                 REPORTER'S CERTIFICATION
      ORAL AND TELEPHONIC DEPOSITION OF VALENTIN DE LA GARZA
12                     SEPTEMBER 9, 2016

13           I, JESSICA BUTTS, a Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16           That the witness, VALENTIN DE LA GARZA, was duly

17   sworn by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by the

19   witness;

20           That the original deposition transcript was

21   delivered to _____;

22           That a copy of this certificate was served on all

23   parties and/or the witness shown herein on

24   _____.

25           I further certify that pursuant to FRCP Rule
```

Deposition of Valentin De La Garza

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1    30(f)(1) that the signature of the deponent was requested

 2    by the deponent or a party before the completion of the

 3    deposition and that the signature is to be before any

 4    notary public and returned within 30 days from date of

 5    receipt of the transcript.  If returned, the attached

 6    Changes and Signature Page contains any changes and the

 7    reasons therefor.

 8             I further certify that the amount of time used by

 9    each party at the deposition is as follows:

10             Mr. Schey:          3 Hours  21 Minutes

11             Ms. Fabian:         0 Hours  03 Minutes

12             That pursuant to information given to the

13    deposition officer at the time said testimony was taken,

14    the following includes counsel for all parties of record:

15             MR. PETER SCHEY, ATTORNEY FOR PLANTIFFS;

16             MR. MANOJ GOVINDAIAH, ATTORNEY FOR PLAINTIFFS;

17             MS. SARAH B. FABIAN, ATTORNEY FOR DEFENDANTS;

18             MR. GARY L. ANDERSON, ATTORNEY FOR DEFENDANTS;

19             MR. NATHAN L. HERBERT, ATTORNEY FOR DEFENDANTS;

20             MR. JUSTIN F. ADAMS, ATTORNEY FOR DEFENDANTS;

21             MR. THOMAS F. ZIMMERMAN, ATTORNEY FOR DEFENDANTS;

22             I further certify that I am neither counsel for,

23    related to, nor employed by any of the parties of

24    attorneys in the action in which this proceeding was

25    taken, and further that I am not financially or otherwise
```

1   interested in the outcome of the action.

2           Further certification requirements pursuant to

3   Federal Rules will be certified to after they have

4   occurred.

5           Certified to by me on this _____ day of

6   _____, 2016.

7

8           _____

9           Jessica Butts
            Texas CSR #9441
10          Expiration Date: December 31, 2018

11          HOFFMAN REPORTING AND VIDEO SERVICE
            Firm # 93
12          206 E. Locust St.
            San Antonio, Texas 78212
13          Telephone:    (210) 736-3555
            Fax:          (210) 736-6679
14          www.hoffmanreporting.com

15

16

17

18

19

20

21

22

23

24

25

Deposition of Valentin De La Garza                                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1    COUNTY OF BEXAR            )
                                 )
 2    STATE OF TEXAS             )

 3
              I hereby certify that the witness was notified on
 4
      _____ that the witness has 30 days
 5
      after being notified by the officer that the transcript is
 6
      available for review by the witness and if there are
 7
      changes in the form or substance to be made, then the
 8
      witness shall sign a statement reciting such changes and
 9
      the reasons given by the witness for making them:
10
              That the witness' signature was/was not returned
11
      as of _____.
12
              Subscribed and sworn to on this _____ day
13
      of _____, 2016.
14

15

16

17           _____
             Jessica Butts
18           Texas CSR #9441
             Expiration Date: December 31, 2018
19
             HOFFMAN REPORTING AND VIDEO SERVICE
20           Firm # 93
             206 E. Locust St.
21           San Antonio, Texas 78212
             Telephone:    (210) 736-3555
22           Fax:          (210) 736-6679
             www.hoffmanreporting.com
23

24

25
```

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On September 19, 2016 I electronically filed the following document(s):

- **PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR AND OPPOSITION TO DEFENDANTS' MOTION FOR EVIDENTIARY HEARING**

- **EXHIBIT 1 – DEPOSITION OF VALENTIN DE LA GARZA**

- **EXHIBIT 2 – DEPOSITION OF JUANITA HESTER**

- **EXHIBIT 3 – DEPOSITION OF JOSHUA RIED**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/   *Peter Schey*
*Attorney for Plaintiffs*