CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
   crholguin@centerforhumanrights.org


ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020



*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| Plaintiffs, | ) |
| - vs - | ) EXHIBIT 2 – DEPOSITION OF JUANITA HESTER – PART 1 |
| | ) |
| LORETTA E. LYNCH, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*, | ) Hearing: October 6, 2016 |
| | ) |
| Defendants. | ) |
| ———————————— | ) |

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:   (408) 280-2437
Facsimile:   (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org
        annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

Case 2:85-cv-04544-DMG-AGR Document 262-3 Filed 09/19/16 Page 3 of 56 Page ID #:7708

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DIVISION OF CALIFORNIA,
 2                    WESTERN DIVISION

 3   JENNY LISETTE FLORES, et  '
     al.,                      '
 4                             '
          PLAINTIFFS,          '
 5                             '
     VS.                       '  CIVIL ACTION NO.
 6                             '  CV 85-4544 DMG (AGRx)
     LORETTA E. LYNCH,         '
 7   ATTORNEY GENERAL OF THE   '
     UNITED STATES, et al.,    '
 8                             '
          DEFENDANTS.          '
 9   * * * * * * * * * * * * * * * * * * * * * * * * *

10            ORAL AND TELEPHONIC DEPOSITION OF

11                      JUANITA HESTER

12                    SEPTEMBER 9, 2016

13

14   * * * * * * * * * * * * * * * * * * * * * * * * *

15        ORAL AND TELEPHONIC DEPOSITION OF JUANITA HESTER,

16   produced as a witness at the instance of the Plaintiff,

17   was taken in the above-styled and numbered cause on the

18   9th day of September, 2016, from 2:14 p.m. to 5:02 p.m.,

19   before Jessica Butts, CSR, in and for the State of Texas,

20   reported by machine shorthand, at The United States

21   Attorney's Office, 601 North West 1604 Loop, Suite 600,

22   San Antonio, Texas 78216, pursuant to the Federal Rules

23   and the provisions stated on the record or attached

24   hereto.

25
```

Deposition of Juanita Hester                                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1              A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         MR. PETER SCHEY
           THE CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
 5         256 South Occidental Boulevard,
           Los Angeles, California 90057
 6         Telephone:     (213) 388-8693
           Fax:           (213) 386-9484
 7         E-mail: pschey@centerforhumanrights.org
           (Present by telephone)
 8

 9         MR. MANOJ GOVINDAIAH
           THE REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND
10         LEGAL SERVICES
           5121 Crestway Drive, Suite 105,
11         San Antonio, Texas 78239
           Telephone:     (210) 226-7722
12         Fax:           (210) 212-4856
           E-mail: manoj.govindaiah@raicestexas.org
13

14    FOR THE DEFENDANTS:

15         MS. SARAH B. FABIAN
           THE U.S. DEPARTMENT OF JUSTICE
16         CIVIL DIVISION
           TRIAL ATTORNEY
17         P.O. Box 868
           Ben Franklin Station
18         Washington, D.C. 20044
           Telephone:     (202) 532-4824
19         Fax:           (202) 616-8962
           E-mail: sarah.b.fabian@usdoj.gov
20

21         MR. GARY L. ANDERSON
           THE U.S. DEPARTMENT OF JUSTICE
22         UNITED STATES ATTORNEY'S OFFICE
           ASSISTANT UNITED STATES ATTORNEY
23         601 North West Loop 410, Suite 600
           San Antonio, Texas 78216
24         Telephone:     (210) 384-7365
           Fax:           (210) 384-7312
25         E-mail: gary.anderson@usdoj.gov
```

```
 1                 (APPEARANCES CONTINUED)

 2


 3        MR. NATHAN L. HERBERT
          THE U.S. DEPARTMENT OF HOMELAND SECURITY
 4        U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
          DEPUTY CHIEF COUNSEL, OFFICE OF THE CHIEF COUNSEL
 5        300 El Ranchero Way
          Dilley, Texas 78017
 6        Telephone:    (830) 378-6626
          E-mail: nathan.l.herbert@ice.dhs.gov
 7


 8        MR. JUSTIN F. ADAMS
          THE U.S. DEPARTMENT OF HOMELAND SECURITY
 9        U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
          DEPUTY CHIEF COUNSEL, OFFICE OF THE CHIEF COUNSEL,
10        OFFICE OF THE PRINCIPAL LEGAL ADVISOR
          8940 Fourwinds Drive
11        San Antonio, Texas 78239
          Telephone:    (210) 967-7237
12        Fax:          (210) 967-7118
          E-mail: justin.f.adams@ice.dhs.gov
13


14        MR. THOMAS F. ZIMMERMAN
          THE U.S. DEPARTMENT OF HOMELAND SECURITY
15        U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
          DISTRICT COURT LITIGATION DIVISION
16        ASSOCIATE LEGAL ADVISOR
          500 12th Street, South West
17        Washington, D.C. 20256
          Telephone:    (202) 732-5993
18        E-mail: thomas.f.zimmerman@ice.dhs.gov

19


20


21   ALSO PRESENT:

22        MS. JESSICA BUTTS,
          TEXAS CERTIFIED SHORTHAND REPORTER
23


24


25
```

Deposition of Juanita Hester                                      Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1                      I N D E X

 2                                                    PAGE

 3    APPEARANCES.................................      2

 4    THE WITNESS:  JUANITA HESTER

 5    Examination by Mr. Schey.....................     5

 6    Signature and Changes.......................    103

 7    Reporter's Certificate......................    105

 8    Further Certification.......................    108

 9

10

11                 E X H I B I T   I N D E X

12    EXHIBIT

13    NO.              DESCRIPTION          PAGE MARKED

14    Exhibit  1    Declaration of Juanita Hester.......    43

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            P R O C E E D I N G S

 2           (Proceedings began at 2:14 p.m.)

 3                 JUANITA HESTER,

 4    having been duly sworn, testified under oath as follows:

 5                  EXAMINATION

 6    BY MR. SCHEY:

 7         MS. FABIAN:  Peter, you can ago ahead.  We're

 8    getting a lot of background noise from you.

 9      Q.   (By Mr. Schey)  Okay.  Is that better?

10         MS. FABIAN:  I think so.

11      Q.   (By Mr. Schey)  Okay.  Ms. Hester, in October

12    2015, ICE updated its procedures to ensure families are

13    processed as expeditiously as possible.  Can you tell us,

14    with regards to updating procedures at Karnes, how -- what

15    instructions were you given to update these procedures?

16    Was it in writing, or was its oral?

17         MS. FABIAN:  Objection; form, foundation.

18      Q.   (By Mr. Schey)  I did not hear any response.

19         MS. FABIAN:  Yeah, it's -- She's thinking.

20         THE WITNESS:  Could you repeat the question?

21      Q.   (By Mr. Schey)  Yeah.  Did you get the

22    instructions orally or in writing to update procedures

23    around October 2015, if you recall?

24      A.   I don't recall if it was in writing or a verbal.

25      Q.   But you do recall getting instructions to update
```

1    procedures?

2        A.   I didn't update procedures.  Procedures were

3    updated; process was updated for us.

4        Q.   Okay.  And -- And did somebody -- Did anybody

5    give you a copy of Judge Gee's August orders in the Flores

6    case?

7        A.   No.  I've never seen anything from the -- from

8    Judge Gee.

9        Q.   I'm sorry.  Say that again?

10       A.   I -- I haven't seen anything from Judge Gee.

11       Q.   Okay.  And in October of 2015, did -- did you get

12   any information in writing from anybody about updating

13   procedures at Karnes to ensure families were processed as

14   expeditiously as possible?

15           MS. FABIAN:  Objection to form.

16           THE WITNESS:  As I stated earlier, I -- I don't

17   recall if it was in writing or verbal.  I know that there

18   were some updates to the process.

19       Q.   (By Mr. Schey)  And were -- were you tasked to do

20   anything with regards to updating procedures to ensure

21   families were processed more expeditiously in -- in or

22   about October 2015?

23       A.   What do you mean by "tasked"?

24       Q.   Were you assigned any -- any -- anything to do

25   to -- to speed up the processing of families in October?

```
 1            MS. FABIAN:  Objection to form.
 2            THE WITNESS:  As I stated earlier, if there was
 3    something in writing or verbal, I don't recall what it
 4    was.  I -- I know that that process was updated.  I don't
 5    recall if --
 6       Q.   (By Mr. Schey)  I --
 7       A.   -- it was in verbal or -- or writing.
 8       Q.   Do you recall what that communication said,
 9    whether it was in writing or oral?
10       A.   I wouldn't like to speculate on that.  I'd -- I'd
11    actually have to see something in writing first to be able
12    to --
13       Q.   Okay.
14       A.   -- tell --
15       Q.   But you --
16       A.   -- you.
17       Q.   You said before it may have been oral, may have
18    been in writing; you're not sure.
19            But my question is just today, Can you recall
20    anything that you were directed to do around October 2015
21    that was different from the way you were doing things
22    before?
23       A.   I don't know if this was related to October 2015;
24    however, when a family unit received a positive credible
25    fear or a reasonable fear, we were able to parole them or
```

1    look at options for release for the family unit.

2         Q.   And didn't that change come about several months

3    earlier through a statement issued by the -- by the head

4    of DHS?

5         A.   I don't recall.  I don't know.

6         Q.   All right.  Do you -- Do -- Do you recall being

7    instructed to do anything different in October or November

8    of 2015 as the result of Judge Gee's August order?

9    Initially, what do you remember about that?

10        A.   As I stated earlier, it -- if there was -- you're

11   talking about October of 2015.  I don't know if it was in

12   writing or verbal.  You know, as I stated, the process

13   that we worked with is that if a family received a -- a

14   positive credible fear finding or a reasonable fear

15   finding from Asylum, we were able to process them for

16   release, and it could be any type of release from the

17   Residential Center.  We parole --

18        Q.   And how --

19        A.   -- or order supervision or order of recognizance.

20        Q.   And how was that different from what you were

21   doing before?

22             (Mr. Anderson exited the conference room)

23             THE WITNESS:  Families were going to court and

24   finishing the entire asylum process there at the

25   Residential Center versus leaving and having that process

1  completed from outside.

2      Q.    (By Mr. Schey)  And -- And did that mean that

3  families were being released sooner, much sooner, than

4  prior to this change, at least those who passed the CFI?

5      A.    When we made the -- the changes, a specific date,

6  I can't tell you that.  I don't know; however, when

7  families did get positive credible fear or a reasonable

8  fear finding from Asylum, we released them -- it could be

9  under parole; it could be order of recognizance; it --

10     Q.    And --

11     A.    It --

12     Q.    -- what --

13     A.    -- would be -- it would be sooner because they

14  weren't staying for the actual asylum hearing in front of

15  a judge.

16     Q.    And when they stayed for their asylum hearing in

17  front of the judge, they could also appeal that judge's

18  decision; correct, or seek -- or seek reconsideration?

19  Correct?

20          MS. FABIAN:  Ob -- Object to form.

21          THE WITNESS:  Could you repeat the question?

22  What is it you're trying --

23     Q.    (By Mr. Schey)  When there --

24     A.    -- to --

25     Q.    -- was -- Before the change in October, they were

1   staying there to complete proceedings before immigration

2   judges or any request for reconsideration; correct?

3          MS. FABIAN:  Object --

4          THE WITNESS:  Yes.

5          MS. FABIAN:  -- to form.

6      Q.  (By Mr. Schey)  Was that a "yes"?

7      A.  You're asking if they stayed to go in front of an

8   immigration judge for their asylum hearing?

9      Q.  Yes.

10     A.  Prior --

11     Q.  Or --

12     A.  -- to --

13     Q.  -- to --

14     A.  -- that?

15     Q.  -- seek rec -- yes, or to seek reconsideration of

16  a denial.

17     A.  If a family unit was found with a positive

18  credible fear finding or a reasonable fear finding, they

19  would go in front of the judge to complete the asylum

20  process.

21     Q.  And that --

22     A.  The --

23     Q.  The -- To com -- How long, on average, would it

24  take to complete that asylum process in front of a judge?

25     A.  That varies case to case.

1    Q.   So it could be a few weeks; it could be a few

2    months?

3    A.   As I stated, it varies on every case.  I wouldn't

4    want to speculate to -- to what --

5    Q.   Okay.

6    A.   -- the average is.

7    Q.   And those folks, if they'd gotten a negative

8    decision from the immigration judge, could they appeal to

9    the Board of Immigration Appeals?

10   A.   If an Asylum judge -- or -- I'm sorry.  If an

11   immigration judge denied their claim for asylum?

12   Q.   Yes.

13   A.   They'd have an appeal process.

14   Q.   And -- And -- And -- And --

15   A.   That's --

16   Q.   Would --

17   A.   -- if they requested when --

18   Q.   Bef --

19   A.   -- in front of judge -- in front of the judge.

20   Q.   And before the change in policy, if they pursued

21   an appeal, would they still continue in custody?

22        MS. FABIAN:  Objection to form, foundation.

23        THE WITNESS:  If somebody was found, didn't

24   receive a positive from the immigration judge in reference

25   to asylum, they're a final order removal.  They -- They

 1  have no relief at that time.

 2      Q.   (By Mr. Schey)  And other than that change in

 3  policy that you'd mentioned, are -- were any other changes

 4  made in October or November, that you know of, at Karnes

 5  as a result of Judge Gee's August order?

 6      A.   I don't recall.

 7      Q.   Okay.  Is -- Is anything happening now at Karnes,

 8  as a result of Judge Gee's August 2015 order, that you

 9  know about?

10          MS. FABIAN:  Ob -- Object to form.

11          THE WITNESS:  I was not privy to Judge Gee's

12  rulings, so I've never seen it --

13      (Mr. Anderson reentered the conference room)

14          THE WITNESS:  -- so I -- I'd be unable to answer

15  your question.

16      Q.   (By Mr. Schey)  Did the -- Were any additional

17  ICE agents assigned to Karnes around September or October

18  or November 2015 in order to decrease the average length

19  of detention of detainees?

20      A.   Karnes has always had detailed staff assisting

21  us, from the -- the very beginning when they turned into a

22  Family Residential Center in August of 2014.

23      Q.   And -- And -- And how many ICE agents were first

24  assigned to Karnes when they first opened, approximately?

25      A.   I was not there when it first opened, so I would

```
 1   be unable to tell you that.
 2        Q.    And when did you start there?
 3        A.    November 2014.
 4        Q.    And in November 2014, approximately how many ICE
 5   agents were assigned to Karnes?
 6        A.    I don't have those numbers in front of me.
 7        Q.    Just approximately.
 8        A.    I'd hate to speculate.
 9        Q.    Was it more than a hundred, if you remember?
10        A.    No.  It -- It wasn't more than a hundred.
11        Q.    To the best of your recollection, was it more
12   than 50 or more than 75?
13             MS. FABIAN:  Object to form.
14             THE WITNESS:  I don't know.
15        Q.    (By Mr. Schey)  To the best of your recollection,
16   was it somewhere between 50 and a hundred --
17        A.    I'd --
18        Q.    -- or --
19        A.    -- be --
20        Q.    -- less than 50?
21        A.    I -- I'd be un -- unable to tell you.  I don't
22   have those numbers in front of me, and I'd hate to
23   speculate.
24        Q.    Okay.  But when you started there, you did see
25   ICE agents present at the facility; is that correct?
```

 1      A.   Yes.   There was staff from Immigration and

 2 Customs Enforcement, yes.

 3      Q.   Okay.   And -- And -- And at this time, you have

 4 no recollection whether the -- it was approximately under

 5 50 or over 50; is that correct?

 6           MS. FABIAN:   Objection to form.

 7           THE WITNESS:   I don't have those numbers in front

 8 of me to tell you exactly what the amount of people that

 9 were assigned there at that time.

10      Q.   (By Mr. Schey)   I understand.   I'm just asking

11 for your best estimate based on your personal

12 observations, your powers of observation, what would be

13 your best estimate today of the number of ICE agents who

14 were working there when you first started to work there in

15 November of 2014?

16           MS. FABIAN:   Objection to form.

17           THE WITNESS:   I -- I would hate to guess that --

18 at a number.   As I answered earlier, I can definitely say

19 it was less than a hundred.

20      Q.   (By Mr. Schey)   Okay.   Do you think it was less

21 than 10?

22      A.   No.   I'd say it has to be over 10 people.

23      Q.   Okay.   So the best of your recollection, it was

24 somewhere in between 10 and 100; is that fair to say, or

25 would you like to try to narrow it a bit more?

```
 1                MS. FABIAN:  Object to form.
 2                THE WITNESS:  Yes.  It was between 10 and 100, a
 3     number in --
 4         Q.   (By Mr. Schey)  Okay.
 5         A.   -- between there.
 6         Q.   Now, you started in November of 2014.  At any
 7     time from November 2014 to the present, has the number of
 8     ICE agents assigned to Karnes increased?
 9         A.   Could you clarify the question?  Are -- Are you
10     talking about all agents assigned?
11         Q.   ICE agents.
12         A.   Okay.  Please repeat the question one more time.
13         Q.   At any time from November 2014 to the present,
14     has the number of ICE agents assigned to Karnes increased?
15         A.   Yes.  ICE agents, the -- the number of staff
16     assigned to Karnes has increased.
17         Q.   And in 2015, in -- did the numbers increase in
18     2015?
19                MS. FABIAN:  Object to form.
20                THE WITNESS:  Do you have a specific date in 2015
21     that you're --
22         Q.   (By Mr. Schey)  No.
23         A.   -- talking --
24         Q.   No.
25         A.   -- about?
```

1   Q.   No.  No.  I'm trying to find out from you, when

2   did these increases take place, best of your recollection?

3   A.   The increases at Karnes have taken place

4   throughout the entire time.  There's people that leave and

5   people that come on board, so it's constantly --

6   Q.   Okay.

7   A.   -- changing.

8   Q.   Okay.  Well, when -- We're not talking about

9   changing; we're talking about increases.  So have -- The

10  increases have just been gradual all the time; is that

11  your testimony?

12  A.   The increases at Karnes have been gradual

13  increases throughout the -- at least since I've been

14  there, yes, November 2014.

15  Q.   Was there any unusual increase or substantial

16  increase in October or November or December of 2015 that

17  you can remember?

18  A.   Not that I remember.

19  Q.   And how many agents are there now?

20  A.   When I wrote my declaration, I believe we had 52

21  permanent staff.

22  Q.   Okay.  And -- And today, how many are there,

23  approximately, at this time?

24  A.   You're probably looking at maybe 5 to 7 more

25  people, give or take, staff.

1    Q.    So maybe roughly 57, 59 people now?

2    A.    Approximately.

3    Q.    And -- And it takes each one of those staff

4    members a -- a -- a certain amount of time to conduct the

5    initial intake processing of detainees; is that correct?

6         MS. FABIAN:  Object to form.

7         THE WITNESS:  Would you please repeat the

8    question?

9    Q.    (By Mr. Schey)  Yes.  It -- It -- It takes the

10   ICE agents a set amount of time to process detainees

11   coming into the facility; is that correct?

12        MS. FABIAN:  Object to form.

13        THE WITNESS:  No.  It -- It doesn't take set

14   amount of time.

15   Q.    (By Mr. Schey)  It takes a certain amount of

16   time -- takes time; right, to process them?

17        MS. FABIAN:  Ob -- Object to form.

18   Q.    (By Mr. Schey)  Let -- Let me rephrase the

19   question.

20        In your experience, approximately how long does

21   it take for ICE agents to process somebody into the

22   facility when they first arrive?

23   A.    That varies.  I mean, every person's --

24   Q.    And --

25   A.    -- different --

1    Q.    -- I --

2    A.    -- and every person -- every resident that comes

3    to the Residential Center is different.  Some answer

4    quickly; some answer slower; so you're asking for -- for

5    me to speculate on a -- a time, and a -- I -- I can't --

6    I'm not able to do that.

7    Q.    Okay.  I'm not asking you to speculate on the

8    time of any particular case.  I'm saying, You have a large

9    number of agents who work for you.  I assume, in the past,

10   you yourself have engaged in processing.  Correct me if

11   I'm wrong.  And I'm wondering, in light of your experience

12   and in light of your observation of the people who work

13   under your direction, what is the approximate, average

14   time it takes to process somebody into Karnes?  Just even

15   a -- a -- a frame, for example.

16        I believe the average is one to three hours or 15

17   minutes to two hours.  It doesn't have to be a precise

18   number; it could be a range.  But what is your experience

19   with the average range that it may take?

20        MS. FABIAN:  Object to form, foundation.

21        THE WITNESS:  You're -- You're wanting me to

22   guest -- guess at a -- a number or give an average?  Every

23   case is different.

24   Q.    (By Mr. Schey)  So at -- at this time, I -- I --

25   I assume, you -- you do not have any data regarding how

1    long it is taking, on average, to process the incoming

2    detainees at Karnes; is that fair to say?

3            MS. FABIAN:  Object to form, foundation.

4            THE WITNESS:  I have no data in front of me.

5       Q.   (By Mr. Schey)  And you have not made any effort

6    to obtain such data; is that fair to say?

7            MS. FABIAN:  Object to form.

8            THE WITNESS:  I don't know if that data is

9    available to me.

10      Q.   (By Mr. Schey)  Okay.  But you -- You -- You've

11   not inquired about that, and you're not aware of it; is

12   that correct?

13      A.   I'm not aware of anything.

14      Q.   When processing is completed, what is generally

15   the final form that's filled out that says, "Okay,

16   processing is done; I can move on to the next alien."

17   What is that final form that's filled out?

18           MS. FABIAN:  Object to form.

19           THE WITNESS:  The officers use a database --

20      Q.   (By Mr. Schey)  And --

21      A.   -- to update --

22      Q.   And what is --

23      A.   -- for -- for our purposes on certain items for

24   processing.

25      Q.   And what -- What is that -- What's the name of

1    that database?

2        A.    We have two different databases that are used.

3    One is the Enforce Apprehension Booking Module, and the

4    other one is Enforce Arrest and Removal Module, E-A-R-M.

5        Q.    And what information is put into the first

6    database; and what information is put into the second

7    database?

8              MS. FABIAN:    Object --

9              THE WITNESS:   The --

10             MS. FABIAN:    -- to --

11             THE WITNESS:   -- first --

12             MS. FABIAN:    -- form.

13             Go ahead.

14             THE WITNESS:   The first database inputs where the

15   resident is at, the location.   The second database updates

16   case information that will be used later.

17       Q.    (By Mr. Schey)   Let's go back to the first

18   database.   It puts in a location.   Does it put in the date

19   the person entered that facility and the date they depart

20   that facility, or is it just -- just the name of the

21   facility?

22       A.    It will state what time -- what date they arrive,

23   and it does, as well, when they leave, when you close that

24   out --

25       Q.    Is any --

1      A.    -- as well.

2      Q.    Is any data put in there?

3      A.    I'm sorry.  I didn't hear you.

4      Q.    Is any other data put into that system?

5      A.    That's the data I know about.  That -- That's

6   what I use it for.

7      Q.    Okay.  And is any effort made to determine --

8   When processing is completed, is that recorded anywhere?

9   In other words, the time of completion of intake

10  processing?

11          (Mr. Anderson reentered the conference room)

12          MS. FABIAN:  Object to form.

13          THE WITNESS:  Not that I'm aware of.  There's no

14  time stamp anywhere.

15     Q.    (By Mr. Schey)  Okay.  And have you been able to

16  reduce detention time as a result of having additional ICE

17  agents assigned to Karnes?

18          MS. FABIAN:  Object to form, foundation.

19          THE WITNESS:  The time in custody has been

20  lowered, decreased; however, we were striving to do that

21  long before other people showed up and were assisting us.

22     Q.    (By Mr. Schey)  So that's -- But it's always a

23  goal to reduce detention time; is that fair to say?

24     A.    One more time?

25     Q.    It's always a goal to reduce detention time, if

```
 1   somebody has a remedy available to them in the United

 2   States; is that fair to say?

 3            MS. FABIAN:  Object to form.

 4            THE WITNESS:  At Karnes, we don't want somebody

 5   in our custody if they have relief available and they're

 6   able to be released.  We're going to make every effort to

 7   have that happen as soon as possible.

 8       Q.   (By Mr. Schey)  Now, other than increased -- an

 9   increase in the number of ICE officers assigned to Karnes,

10   what else was done around October, November, December of

11   2015 to reduce detention time at Karnes?

12            MS. FABIAN:  Object to form, foundation.

13            THE WITNESS:  I believe I answered that question

14   earlier, and that was, We had the ability to release

15   residents if they were found with a positive credible fear

16   finding or a reasonable fear finding; and instead of them

17   staying for the -- their actual asylum hearing in front of

18   the immigration judge, we were able to get them released

19   so they could wait outside versus in custody.

20       Q.   (By Mr. Schey)  Are you aware of any effort that

21   has been made to track the amount of time while Flores

22   Class members are at Karnes, between the activities

23   involved with the initial intake, a fear interview, and

24   making a decision on custody if a positive determination

25   was issued as a result of the fear interview?  Are you
```

1    aware of any such effort to measure the time?

2        A.   Did --

3             MS. FABIAN:  Object to form.

4             THE WITNESS:  I think you have several questions

5    in there.  Can you just re -- go question by question so I

6    can respond?

7        Q.   (By Mr. Schey)  Are you -- A -- A -- A certain

8    amount of time is taken up when somebody first comes in to

9    do intake processing; correct?

10            MS. FABIAN:  Object to form.

11       Q.   (By Mr. Schey)  Is that correct?

12       A.   In -- Intake process is the first item that is

13   completed when somebody arrives at --

14       Q.   And that --

15       A.   -- Karnes.

16       Q.   -- takes -- and that takes a certain amount of

17   time; correct?

18       A.   Yes.  The time varies.

19       Q.   When a person goes to a credible fear interview,

20   that takes a certain amount of time to go be interviewed;

21   correct?

22            MS. FABIAN:  Object to --

23            THE WITNESS:  The --

24            MS. FABIAN:  -- form.

25            THE WITNESS:  The time varies as well, but

```
 1   there's the -- probably some -- it -- it takes time after

 2   they're processed in -- into the -- to the Residential

 3   Center, yes.

 4        Q.   (By Mr. Schey)  And -- And -- And it takes time

 5   to go to the interview; correct?

 6        A.   Yes.  The resident has to be interviewed by

 7   Asylum.

 8        Q.   And then it takes -- and then, thirdly, it takes

 9   time for ICE to make a custody determination, if there's a

10   possible fear determination; is that correct?  It takes

11   some time to do that; is that correct?

12             MS. FABIAN:  Object to form and foundation.

13             Peter, I think you said ICE makes the

14   determination.  I -- I just --

15             MR. SCHEY:  Custody determination.

16             MS. FABIAN:  Oh.  I'm sorry.  You were saying the

17   custody determination.  I apologize.

18        Q.   (By Mr. Schey)  It takes a little time to make

19   custody determination; correct?

20        A.   Once we receive a decision from Asylum, and we --

21        Q.   Yes.

22        A.   -- have a notice to appear in hand, within 24

23   hours, we're serving that document to the resident.

24        Q.   And -- And -- And -- And then you make a custody

25   determination?
```

1      A.    It -- It's done at the same time.

2      Q.    Okay.  And how long, on average, does it take to

3   make a custody determination?  I understand it's case by

4   case; but on the average, how long does it take to make a

5   custody determination?

6      A.    When we're serving the notice to appear, as I

7   stated earlier, within 24 hours, we're making those

8   decisions.

9      Q.    Okay.

10     A.    We're getting those --

11     Q.    Now --

12     A.    -- documents --

13     Q.    Has anybody --

14     A.    We're getting the documents issued to the

15   resident and the family member.

16     Q.    Okay.  So the custody determination is normally

17   taking 24 hours or less; is that fair to say?

18     A.    It's within 24 hours.

19     Q.    So, setting aside the time that it takes to

20   process people, to interview them for asylum, and to make

21   a custody determination, are you aware -- has anybody

22   attempted to assess how much time -- the balance of the

23   time is for these detainees?

24          MS. FABIAN:  Object to form.

25          THE WITNESS:  Could you reph -- rephrase the

1    question?

2        Q.    (By Mr. Schey)   Let me just ask you a different

3    question.

4            At -- At the present time, what is -- are -- are

5    you aware how many people at Karnes have been there for

6    more than 30 days at the present time?

7        A.    Right now, no.   I'm not aware of how many.

8        Q.    Are you aware of how many have been there for

9    more than 20 days?

10       A.    No.   I -- I -- I have no documents in front of me

11   to -- to be able to answer that question for you.

12       Q.    Okay.   Do you -- Do you -- Does somebody gather

13   reports and give them to you from time to time, or do you

14   gather any information about how many people have been

15   there for 30 days or more or 40 days or more, 10 days or

16   more?   Do you gather that information?

17           MS. FABIAN:   Object to form.

18           THE WITNESS:   I -- I personally don't gather that

19   information.

20       Q.    (By Mr. Schey)   Okay.

21       A.    But that is --

22       Q.    Does --

23       A.    -- a re --

24       Q.    -- anybody share that in -- does anybody share

25   that information with you?

 1     A.    There is a report.

 2     Q.    And how often is that report distributed?

 3     A.    Pardon me?

 4     Q.    How often is that report shared with you?

 5     A.    That is a daily report that we have there at

 6  Karnes.

 7     Q.    And that daily report, does it tell you how many

 8  people have been there for 30 days or more or -- or 20

 9  days or more?

10           MS. FABIAN:  Object to form.

11     Q.    (By Mr. Schey)  -- or any num -- or -- or any

12  number of days or more -- or more?

13           MS. FABIAN:  Objection --

14     Q.    (By Mr. Schey)  Does it provide you with that --

15  does it provide you with that information?

16           MS. FABIAN:  Object to form.

17           THE WITNESS:  There is a report that is

18  submitted, and it is sent to the field office.

19     Q.    (By Mr. Schey)  And what does that -- what does

20  it report on?

21     A.    The report shows -- what we look at is 15 days in

22  custody or more.

23     Q.    Okay.  So it does -- it does indicate the total

24  number of people who have been there -- as of that day,

25  who've been there for 15 days or more; is that fair to

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

1   say?

2       A.    The report shows who's been in custody 15 days or

3   more at the Karnes facility.

4       Q.    And does it have a tabulation to say that there's

5   this many people or that many people who've been here for

6   15 days or more, or is it just -- each individual is

7   listed so you could tell if they've been there for 15 days

8   or more?

9       A.    There's no tabulation.  It's just a list.

10      Q.    It's -- It's a list of individuals; is that

11  correct?

12      A.    It is a list of heads of household.

13      Q.    Does it also list their children or just the

14  heads of the household?

15      A.    The report only lists the heads of household, the

16  mothers.

17      Q.    And it states that -- Does it state the date of

18  apprehension?

19      A.    I don't have the report in front of me to -- to

20  be able to tell you yes or no.

21      Q.    Okay.  Does it -- Does it list the date that they

22  entered Karnes?

23      A.    That would be the same question.  I don't have

24  the report in front of me to be able to tell you that.

25      Q.    Well, just from --

```
 1        A.    If it --

 2        Q.    -- your memory.  It's a daily -- it's a daily

 3   report, and you have said that it --

 4        A.    It --

 5        Q.    It --

 6        A.    -- lists --

 7        Q.    -- does list if the person --

 8        A.    I'm sorry.  Go ahead.

 9        Q.    You -- You -- You've testified, It does list if

10   the person's been there 15 days or more.  And I'm

11   wondering, does it list the date they entered Karnes and

12   the date they departed Karnes?

13             MS. FABIAN:  Object --

14             THE WITNESS:  It --

15             MS. FABIAN:  -- to form.

16             THE WITNESS:  It does not list when somebody has

17   left the Residential Center.  It does show how many days

18   they have been in custody; however, not having the report

19   in front of me, I can't tell you exactly if it specifies

20   when they actually arrived at Karnes or not.

21        Q.    (By Mr. Schey)  Now, have the agents -- or --

22   or -- Strike that.  I'm sorry.

23             Family -- The family has freedom of movement

24   throughout the facility basically from 6:00 a.m. to

25   10:00 p.m.; is that correct?
```

1    A.    There is a correction on that.  Families are able

2    to -- Sunday through Thursday, it's 6:00 to 8:00, and that

3    is due to school, and then the weekends, 6:00 to 10:00.

4    Q.    And if a -- Let's say you had a 13, 12-year-old

5    child, and if they were going to attend the school, is

6    there any written rule that says their mother has to walk

7    them into the classroom, or could they walk there on their

8    own?

9    A.    Repeat the question on the age.

10   Q.    If that kid was 12 years old, is there any rule

11   that says the mother has to walk them and deliver them,

12   basically, to the teacher in the classroom, or -- or -- or

13   is the -- is the -- the minor permitted to walk there on

14   their own?

15        MS. FABIAN:  Object to form.

16        THE WITNESS:  The mother takes the children to

17   school.  She drops them off.

18   Q.    (By Mr. Schey)  And is it -- My question wasn't

19   what mothers do or don't do, but my question was, Is there

20   any written rule that requires the mother to walk them to

21   school?

22   A.    I'm not aware if there's a written rule.

23   Q.    Okay.  Are -- Are the mothers instructed that if

24   the mother's in a common area, sitting around talking to

25   some other buddies, and her 12-year-old is going off to

1   the classroom, have the mothers been orally instructed

2   and, if so, by whom that they have to walk their -- their

3   child to the classroom, they cannot let the child go to

4   the classroom on their own?

5           MS. FABIAN:  Object to form.

6       Q.   (By Mr. Schey)  Has it -- Has any such oral

7   instruction been issued to the mothers, and if so, by

8   whom?

9           MS. FABIAN:  Object to form.

10          THE WITNESS:  I'm not privy to -- to what is said

11  to each resident on what needs to be done.

12      Q.   (By Mr. Schey)  I've looked --

13      A.   It --

14      Q.   -- at --

15      A.   It --

16      Q.   -- the manual that you attached as an exhibit in

17  your deposition, and -- and, I guess, it's on the

18  operations of Karnes, and I -- I'm sure you're familiar

19  with that manual, or handbook.  I -- I don't see anything

20  in there that tells mothers that they have to always be in

21  the physical presence of their children.  It -- It -- Is

22  there any part of that handbook for detainees that you can

23  point me to that would inform mothers that they -- it's

24  their obligation to stay within the physical presence of

25  their children at all times?

1    A.    You want -- Could you rephrase the question?

2  What I'm hearing you say is that you want to know if

3  there's a section in the handbook that specifies that?

4    Q.    Correct.

5    A.    Okay.  I don't have the handbook in front of me

6  to be able to tell you if there's something that specifies

7  that exactly as you were asking.

8    Q.    Is there -- Do -- Do you recall ever seeing a --

9  anything like that in the handbook that you attached as an

10  exhibit to your declaration?

11        (Mr. Adams exited the conference room)

12        THE WITNESS:  I -- I don't have the handbook in

13  front of me.  I don't have that memorized.  I'd be unable

14  to tell you yes or no.

15    Q.    (By Mr. Schey)  Okay.  Are you aware of any rule

16  that would say that -- if the cafeteria is open, that a

17  10-year-old, 12-year-old, 14-year-old could only go into

18  the cafeteria if he or she is accompanied by his or her

19  mother?  Are you aware of any such rule?

20    A.    I -- I'm not aware of that rule.  Monday through

21  Friday, children eat lunch in the cafeteria with the

22  school, so they go as a classroom.

23    Q.    How about breakfast, dinner?

24    A.    Pardon me?

25    Q.    How about breakfast or dinner?

```
 1        A.    Breakfast or dinner?  I believe they go as a
 2   family.
 3        Q.    Okay.  So the family -- We're talking about
 4   breakfast or dinner, so they're not in school, or we're
 5   talking about a Saturday or a Sunday -- is there any rule,
 6   that you are aware of, that says children can only go into
 7   the cafeteria if they're accompanied by their mother;
 8   otherwise, they cannot come in?
 9             MS. FABIAN:  Object to --
10        Q.    (By Mr. Schey)  Are you aware of any such rule?
11             MS. FABIAN:  Object to form.
12             THE WITNESS:  I'm not aware of that rule that
13   you're asking about.
14        Q.    (By Mr. Schey)  And is -- Is there any rule that,
15   if a mother was going to a medical clinic or a dental
16   clinic or for an administrative interview or to see a
17   lawyer, that she must bring her child with her or deliver
18   her child to temporary monitoring care provided by the
19   facility?  Is there any such rule that you're aware of?
20        A.    Could you repeat the question?
21        Q.    Yeah.  Are you --
22        A.    I just want to --
23        Q.    Are you aware of any --
24        A.    I want to be able to confirm exactly what you're
25   saying.
```

```
 1        Q.    Sure.   Yeah.   My question is, Are you aware of

 2   any rule that has been communicated, orally or in writing,

 3   to the mothers at Karnes, saying, in effect, in so many

 4   words, "If you are going to the medical clinic; if you are

 5   going to the dental clinic; if you are going to an

 6   attorney visit; if you are going to an administrative

 7   interview, you must either take your child with you, or

 8   you must deliver your child for temporary monitored care

 9   by the facility."  Are you aware of any such rule that has

10   been communicated to the mothers?

11             MS. FABIAN:  Object to form.

12             THE WITNESS:  I don't know if there's a rule, but

13   the -- the mothers have the opportunity to drop their

14   child off if they're not in school.

15        Q.    (By Mr. Schey) I understand that.  That's -- I

16   was not asking you about the opportunity.  I was asking

17   you if there's any rule that they have to do that, if they

18   don't want to take their child to an appointment with

19   them?

20             MS. FABIAN:  Object to form.

21        Q.    (By Mr. Schey) Or is that just an option?

22             MS. FABIAN:  Object to form.

23             THE WITNESS:  Your -- Your question's very vague

24   and open, because there's many different answers for

25   many --
```

```
 1    Q.    (By Mr. Schey)  Well --

 2    A.    -- different --

 3    Q.    Let me -- Let me --

 4    A.    -- scenarios.

 5    Q.    -- get more sp -- Let -- Let me be more specific.

 6          If a mother is going to something that she wants

 7    to go to, maybe a religious service; it may be a doctor's

 8    appointment.

 9          (Mr Adams reentered the conference room)

10    Q.    (By Mr. Schey)  It may be a dental appointment;

11    it may be with -- a visit with a lawyer; it may be an

12    administrative interview with ICE.  Under those

13    circumstances, is there -- have the mothers been told any

14    rule that they must either -- that they have two choices.

15    They can either take their kid with them, or they must

16    drop their child off for temporary monitored care by the

17    facility.  Has any such rule, to your knowledge, been

18    communicated to the mothers?

19          MS. FABIAN:  Object to form.

20          THE WITNESS:  To my knowledge, no.  I'm not aware

21    of any such rule that has been verbalized to the mothers.

22    Q.    (By Mr. Schey)  Is -- Is ICE assigning now --

23    distributing what is Exhibit 6, the notice of the right to

24    judicial review, to class members or their mothers at

25    Karnes, if you know?
```

```
 1        A.    Exhibit 6 of -- I -- I didn't hear you.  All I
 2   heard was Exhibit 6.
 3        Q.    Yeah.  It's Exhibit 6.  It's a notice of the
 4   right to judicial review.  Is that being distributed to
 5   class members or their mothers at Karnes at this time, if
 6   you know?
 7              MS. FABIAN:  Object to form.
 8        Q.    (By Mr. Schey)  If you don't know, just --
 9        A.    Exhibit --
10        Q.    -- say --
11        A.    -- 6 --
12        Q.    -- you don't know.
13        A.    -- of the Flores Service Agreement is being
14   issued out to juveniles, yes.
15        Q.    Okay.  And when did that start?
16        A.    Several months ago, I think, is when that
17   directive came out.
18        Q.    Okay.  Now, in your declaration, you -- you
19   described certain detainees, or former detainees, and
20   you -- you indicate when they were released -- some of
21   them were released.  Do you know when -- when they were
22   first apprehended?  For those -- for those who you
23   identified as being released, do you know when they were
24   first apprehended?
25        A.    I don't have that information in front of me.
```

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1        Q.    If -- If -- You refer, in your declaration, to

 2   Exhibit 5, which was the declaration of Sonia, and you

 3   state in your declaration that -- that she was released on

 4   March 4th, and it -- she was detained on December the

 5   15th.  Can you provide us with any information about why

 6   it took from December 15th to March 4th of 2016 to reach

 7   the conclusion that she possessed a reasonable, or

 8   credible, fear of -- of persecution and could be released?

 9            MS. FABIAN:  Object to form, foundation.

10            THE WITNESS:  I'm unable to -- to answer that

11   question for you.  I don't have documents in front of me.

12   I don't have that declaration.

13        Q.    (By Mr. Schey)  And would -- would that be the

14   same for all the others?  Would it be the same response if

15   I gave you the date of apprehension that I understand to

16   be the case, and -- and then you looked at the date in

17   your declaration of release.  Would it be fair to say

18   that, if I went through each one of them, your response

19   would be the same, that you do not have the information

20   that would -- or could explain what the delay was in that

21   particular case?  Is that fair to say?

22            MS. FABIAN:  Object to form.

23            THE WITNESS:  I don't have any information in

24   front of me to -- to say whether or not there was even a

25   delay.
```

1   Q.   (By Mr. Schey)  Right.  But whatever -- Maybe I

2   misspoke when I used the -- the word "delay."

3        Whatever the time period was, from the -- from

4   the time of apprehension to the time of release, is it

5   fair to say that -- I mean, I can go through each one of

6   these, but -- but I'm trying to move forward here.  Is it

7   fair to say that you would not, today, possess the

8   information necessary to explain why it took however long

9   it took in each individual case?

10        MS. FABIAN:  Ob -- Object to form.

11        Peter, she only has documents in front of her if

12   you put them in front of her, and you haven't put any in

13   front of her, so...

14        MR. SCHEY:  I don't have any documents to put in

15   front of her.  That's not my question.

16   Q.   (By Mr. Schey)  My question is, Do you -- Do you

17   have any information on any of these cases that you could

18   share with us in these individual cases about what caused

19   the length of time that it took from the date of

20   apprehension to the date of release?  What caused that

21   length of time?  Do you have any information about that on

22   any of these cases?

23        MS. FABIAN:  Object to form.

24        THE WITNESS:  I have no information in front of

25   me to be able to answer your question.

```
 1      Q.   (By Mr. Schey)  Okay.  At the time that you
 2   prepared your declaration, did you have that -- did you
 3   look into that information; namely, what caused the time
 4   span -- I won't call it a delay -- between the time of
 5   apprehension and the time of release?  Did -- Did you look
 6   into that information when you prepared your declaration?
 7           MS. FABIAN:  Object to form.
 8           THE WITNESS:  I looked into the question that was
 9   being asked of each case.  I don't believe there was any
10   question about the time or the length it took for their
11   case.
12      Q.   (By Mr. Schey)  All right.  Just so -- So, no --
13   You were asked to look into the -- the date the person was
14   released and to mention that, but you were not asked to
15   look into and put in your declaration the reason why it
16   took from the date of apprehension to the date of release,
17   why it took whatever time it took?  You were not asked to
18   look into that; is that fair to say?
19           MS. FABIAN:  Object to form.
20           THE WITNESS:  I don't recall if that question was
21   being asked of any of the residents that are listed on the
22   declaration.
23      Q.   (By Mr. Schey)  Okay.  Did you draft the
24   declaration, or did somebody else draft it for you and
25   share it with you to review?
```

```
 1        A.    I provided the information for the declaration.

 2        Q.    Now, during the time that these people were

 3   detained, the ones you talk about in your declaration, the

 4   individuals that you talk about, did you see anything in

 5   their A-file that indicated that, prior to a custody

 6   determination being made, subsequent to a positive fear

 7   determination, that any efforts were made to release the

 8   child, pursuant to paragraph 14 of the Flores Settlement?

 9              MS. FABIAN:  Object to form, foundation.

10              THE WITNESS:  I don't have the Flores Agreement

11   in front of me to tell you specifically what that section

12   is saying; however, anybody that is at the Residential

13   Center and they're going through the process, they're

14   final orders of removal.  They would not be eligible for

15   any type of a release at that time.

16        Q.    (By Mr. Schey)  My question, I -- I -- I know

17   that that is the position of the government, but my

18   question was a little bit different; not whether you

19   consider them eligible for release.

20              My question was, During -- when you looked at

21   these -- Well, let me back up.

22              On these individuals that you discussed, did --

23   did you look at the -- at the -- the two databases that

24   you previously mentioned?

25              MS. FABIAN:  Object to form, foundation.
```

```
 1              THE WITNESS:  The databases were checked to
 2    retrieve some information.
 3         Q.   (By Mr. Schey)  Okay. And did you do that, or did
 4    you have somebody else do that for you?
 5         A.   I didn't hear your last part of this question.
 6         Q.   Did you -- Did you check the databases yourself,
 7    or did you have somebody else do that for you, or did
 8    somebody else do that for you?
 9         A.   It was myself and two supervisors, that we --
10         Q.   Okay.  So you -- You had two supervisors who
11    helped you?
12         A.   Who assisted me, yes.
13         Q.   Okay.  At your request?
14         A.   Yes.  At my request.
15         Q.   Okay.  And then they reported data back to you
16    from the database; is that correct?
17              MS. FABIAN:  Object to form.
18              THE WITNESS:  They printed documents for me, so I
19    should be able to review them.  They didn't verbally.
20         Q.   (By Mr. Schey)  Okay, so --
21         A.   -- tell --
22         Q.   -- they --
23         A.   -- me; they printed it so I could look at it.
24         Q.   Okay, so they printed documents from the
25    database.
```

```
 1              MR. SCHEY:  Sarah, I just want to note that we --

 2      we have requested documents that any witness relied upon,

 3      so this seems to fall into that category.

 4              MS. FABIAN:  And I will note back that we are

 5      willing to provide those, as soon as you can get us back

 6      the stipulated protective order and we can get that on

 7      file.  We're happy to provide those.  They'll be redacted

 8      for --

 9              MR. SCHEY:  Okay.

10              MS. FABIAN:  -- privilege and law enforcement

11      sensitive information.

12              MR. SCHEY:  Okay.

13        Q.   (By Mr. Schey)  Was -- Were there any other

14      documents that you relied upon in order to prepare that

15      part of your declaration that addresses a certain -- a --

16      a small number of actual individuals?  Were there any

17      other documents you relied upon, other than these

18      print-outs from the databases?

19        A.   For the entire declaration, or are you just

20      talking about a specific group of people?

21        Q.   Yeah.  I'm just talking about -- in one part of

22      your declaration, I believe it's paragraph 11, you --

23      that's what I'm focused on.  You identified about six or

24      seven --

25              MS. FABIAN:  Would -- Peter, would you like to
```

1   enter the -- the declaration so she can take a look at it?

2   Is that -- Would that be helpful to your questioning?

3           MR. SCHEY:  Well, it's -- It's an exhibit, and I

4   don't think it has to be entered, but she's certainly

5   welcome to look at it.

6           MS. FABIAN:  I mean, she can answer your

7   questions to the best of her ability without it, or we can

8   enter it as an exhibit, and I'll have -- and then she can

9   answer questions from it.

10          MR. SCHEY:  Sure.  Let's enter it as an exhibit.

11  Let me -- Label it as Exhibit 1.

12          MS. FABIAN:  All right.  This will be Exhibit 1.

13                  (Exhibit 1 marked)

14          MS. FABIAN:  Okay.  Peter, it's -- it's --

15  Hester's declaration has been marked as Exhibit 1, and I'm

16  handing it to her now.

17          MR. SCHEY:  Thank you.

18          THE WITNESS:  Could you repeat --

19      Q.   (By Mr. Schey)  Did you have --

20      A.   -- your --

21      Q.   I -- Yeah.  The question is a simple one.

22          It's -- When you look at paragraph 11, you

23  discussed several individuals.  Did you rely upon any

24  documentation, other than the -- whatever came from the

25  two databases that you previously mentioned, to prepare

1    your statements in paragraph 11?

2        A.    No.  It would be the -- the two databases would.

3        Q.    Did --

4        A.    -- be --

5        Q.    -- you --

6        A.    -- where I received --

7        Q.    Did you -- Did you review these individuals'

8    A-files prior to putting this information in your

9    declaration?

10       A.    If somebody was still at the Residential Center,

11   I would have the opportunity to look at the A-file.  If

12   they had already departed, I would not have that document

13   in front of me.

14       Q.    Okay.  So are -- are you testifying that, for

15   those people, including Exhibit 21, Victor, or Exhibit 24,

16   Sara, Exhibit 26, Raquel, et cetera, you're saying that

17   you did review their A-file?  I -- I did not ask you if

18   they were available to you to review, if you wanted to

19   review them.  I asked -- My question is, Did you, in fact,

20   review their A-files?

21       A.    The question that was asked of these residents

22   that are listed, that information I was able to get off of

23   those two databases.

24       Q.    Okay.  But you're still not answering my

25   question.  In -- In preparing your declaration, you -- you

```
 1    got information out of two databases.  But did you

 2    review -- did you actually go and review the A-files or

 3    have them brought to you of these people, any of these

 4    people and, if so, who?

 5        A.   Okay.  The residents that are listed that show

 6    that they were no longer at the Residential Center, I

 7    would not have had those files available to me.

 8        Q.   Understood.

 9        A.   The other people that are listed, I did have

10    those files available for me; however, the question that

11    was asked of these families, or these -- these residents,

12    I -- it did not require me to look into that file to get

13    the answer.

14        Q.   Okay.

15        A.   As I said -- stated --

16        Q.   So --

17        A.   -- I could get that from the two databases that I

18    was looking at.

19        Q.   Okay.  So the -- the -- the short answer is, "No,

20    to the best of my ability, I did not look at the A-files";

21    is that fair to say?  "Because -- Because I could get the

22    data I needed from the database"; is that fair to say?

23             MS. FABIAN:  Object to form.

24             THE WITNESS:  The files were available to me.  To

25    the best of my knowledge, I don't recall if I looked at
```

```
 1    the ones that were there.
 2        Q.   (By Mr. Schey)  Okay.  Did you interview any of
 3    the ICE agents who had either conducted the intake
 4    processing or the custody determinations for these
 5    particular detainees?
 6        A.   I didn't.  I did not interview any of the
 7    immigration agents or deportation officers for any of
 8    these residents.
 9        Q.   Okay.  And -- And -- And in order to respond
10    about these residents, did you interview any -- anyone
11    employed by the contractor that runs Karnes or not?
12            MS. FABIAN:  Object to form.
13            THE WITNESS:  For paragraph 11?
14        Q.   (By Mr. Schey)  Yes.
15        A.   No.  I did not talk to any contractors.
16        Q.   Okay.  Just, again, with regards to paragraph 11,
17    did you review any of the contractors' files relating to
18    these individuals?
19        A.   No.  I did not.
20        Q.   Okay.  Same question, but with regard to
21    paragraph 12, then maybe we can make this go quicker,
22    because now, I think, you understand the questions.
23            With -- With regards to anybody there, mentioned,
24    discussed, in paragraph 12, did you either check their
25    A-file; discuss their cases with an ICE agent who had
```

1   processed them or made a -- a speed determination; or

2   discussed their cases with someone employed by the

3   contractor; or reviewed the contractor's file about tho --

4   these individuals; or would it be the same responses as

5   for 11?

6        A.   I did not talk to any contractors, and on

7   paragraph 12, that information would be available on the

8   one database that I looked at, which was the EARM.

9        Q.   Now, I notice in your declaration, you've --

10  toward the end of paragraph 11, you mentioned that ICE

11  maintains discretion to parole aliens subject to expedited

12  removal orders, under certain circumstances.  At Karnes,

13  in -- let's say, in the past six months, has ICE exercised

14  its discretion to release mothers and Flores Class members

15  for any reason, you know, short of -- short of an approval

16  of a fear determination?

17            MS. FABIAN:  Object to form.

18            THE WITNESS:  Would you please rephrase the

19  question?  I just want to make sure I understand what

20  you're -- what you're asking.

21       Q.   (By Mr. Schey)  Yeah.  In paragraph 11 towards

22  the end, you say, ICE maintains limited discretion to

23  parole aliens subject to expedited removal orders, and you

24  say, when required to meet a medical emer -- emergency or

25  as necessary for legitimate law enforcement objectives.

1    I'm wondering, has that ever happened in the past

2   six months, that -- under your supervision, and somebody

3   has been released, even though they do not have a positive

4   or -- positive credible fear determination?

5        A.   Yes.  We have released residents.  I would be

6   unable to give you a number or the names.  But we have

7   released residents on medical emergencies, as it states

8   there, or it could be -- well, I guess it all -- it would

9   all fall under medical emergencies.  We -- That would be

10  such as a -- a pregnant female.  We don't house pregnant

11  females there at the Residential --

12       Q.   So --

13       A.   -- Center.

14       Q.   So -- And -- And -- And -- And anybody else you

15  can think of who had been released as a matter of

16  discretion, even though they've not had an affirmative

17  credible fear determination, other than pregnant women?

18       A.   There probably have been a couple of medical

19  cases, but I'd be unable to tell you exactly what they

20  are.

21       Q.   And when mothers are pregnant, they are released.

22  Do you -- Are -- Are -- Are they only released if they're

23  a certain number of months pregnant?  Or -- Or -- Or is it

24  just that they're pregnant, or what -- or is there --

25  what -- what is the policy in that, or -- or the practice

```
1    in that regard?

2              MS. FABIAN:  Object to form.

3              THE WITNESS:  Karnes Residential Center does not

4    hold pregnant females.  There's no specific "how many

5    months along you are."  We just don't house pregnant

6    females.

7        Q.   (By Mr. Schey)  Okay.  If a mother is pregnant,

8    determined to be pregnant, then her and her accompanying

9    child will be released?

10       A.   Pardon me?

11       Q.   If a mother is determined to be pregnant, then

12   the mother and her accompanying child are -- are generally

13   released, as a matter of discretion; is that correct?

14             MS. FABIAN:  Object to form.

15             THE WITNESS:  Any head -- head of household,

16   anybody that comes into the Residential Center that is

17   pregnant is not held.  They are released.

18       Q.   (By Mr. Schey)  Let's switch gears for a moment.

19             You -- I understand you have a contract with a

20   contractor to transport detainees from Border Patrol to

21   Karnes; is that correct?

22             MS. FABIAN:  Object to form, foundation.

23             THE WITNESS:  There is a contract for

24   transportation from --

25       Q.   (By Mr. Schey)  And does -- If Border Patrol
```

1   wants to transfer Flores Class members and their mothers

2   to Karnes, do they call the transportation company?  Or do

3   they contact ICE?  Or who do they contact to determine if

4   there's space available?

5          MS. FABIAN:  Object to form.

6          THE WITNESS:  Immigration and Customs

7   Enforcement, Enforcement and Removal Operations.

8      Q.   (By Mr. Schey)  And --

9      A.   They're -- The resident is in their custody when

10  they are transferred to us.

11     Q.   Right.  But -- But you said that ICE -- I

12  understand ICE has a contract with a contractor to

13  transport people from CBP to ICE; is that correct? I mean,

14  you just said that's correct.

15         MS. FABIAN:  Object to form.

16         THE WITNESS:  I know of a contract.  I'm not -- I

17  don't have a contract in front of me.  I don't know what

18  it -- specifically who the contract is with.

19     Q.   (By Mr. Schey)  When -- CBP does not just send

20  people to Karnes without determining if there's bed space

21  available; is that correct?

22         MS. FABIAN:  Object to form, foundation.

23         THE WITNESS:  Anybody that is wanting or needing

24  to send somebody to the Residential Center goes through a

25  process for -- to get approval.  They will submit the

1    information of the family, and then that family is vetted

2    on whether or not they meet the criteria to come to the

3    Residential Center.

4         Q.   (By Mr. Schey)  And there's different criteria

5    for different groups; right?  Family groups, different

6    categories; is that correct?

7              MS. FABIAN:  Object to form.

8              THE WITNESS:  There is criteria in reference to

9    housing families together.

10        Q.   (By Mr. Schey)  Now, what -- what happens if a --

11   if CBP wants to transfer a family to Karnes and there is

12   no bed space available for that family's configuration,

13   because of sex or age?  What -- What happens to those

14   people?

15             MS. FABIAN:  Object to form, foundation.

16             THE WITNESS:  The only information I get are

17   families that are approved to come to the Residential --

18   Residential Center.  I don't make the decision on who

19   comes to our center.

20        Q.   (By Mr. Schey)  Okay.  When -- When CBP wants to

21   send people to Karnes and they want to determine if

22   there's space -- bed space available for those people, for

23   that family unit, let's say, who do they contact to

24   determine the availability of bed space?

25             MS. FABIAN:  Object to form.

1  Q.   (By Mr. Schey)  I don't mean the name of the

2  person.  I just mean, do they contact somebody at ICE, or

3  do they contact somebody, a private contractor, or who do

4  they contact to determine bed space?

5  A.   They forward the request to an e-mail, and then

6  it is reviewed to determine --

7  Q.   And --

8  A.   -- if --

9  Q.   And --

10  A.   -- there's bed space available for that family.

11  Q.   And is that reviewed by somebody working under

12  your supervision?

13  A.   No.

14  Q.   I'm sorry?

15  A.   No.

16  Q.   Okay.  Who is that reviewed by?

17  A.   It is a -- It's called the San Antonio Family

18  Intake Center, and they review --

19  Q.   And that's --

20  A.   -- all requests for any Family Residential Center

21  within San Antonio.

22  Q.   And that's an ICE office?

23  A.   Yes.

24  Q.   And -- And -- And in turn, they are provided some

25  type of daily report about bed availability from Karnes so

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1   that they know whether a family can be moved to Karnes or

 2   not; is that correct?

 3            MS. FABIAN:  Object to form.

 4            THE WITNESS:  We send information on a daily

 5   basis of what space is available.

 6       Q.   (By Mr. Schey)  And when families are

 7   transferred, or -- Strike that.

 8            What is the bed capacity in Karnes,

 9   approximately?

10       A.   The -- The maximum population for the Karnes

11   Residential Center is 830 residents.

12       Q.   And -- And approximately how many beds are

13   currently occupied?

14       A.   I don't have that number in front of me for

15   today.

16       Q.   I -- I don't mean for today.  I just mean this

17   past week, the past few days, past week, past few weeks,

18   what generally has been your -- your actual usage of those

19   bed spaces?

20            MS. FABIAN:  Object to form.

21            THE WITNESS:  Yesterday, we -- Our population was

22   594.

23       Q.   (By Mr. Schey)  Okay.  And -- And -- And -- And

24   the available bed space was what, again?  The total --

25       A.   What the --
```

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On September 19, 2016 I electronically filed the following document(s):

- **PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR AND OPPOSITION TO DEFENDANTS' MOTION FOR EVIDENTIARY HEARING**

- **EXHIBIT 1 – DEPOSITION OF VALENTIN DE LA GARZA**

- **EXHIBIT 2 – DEPOSITION OF JUANITA HESTER**

- **EXHIBIT 3 – DEPOSITION OF JOSHUA RIED**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/   *Peter Schey*
*Attorney for Plaintiffs*