1

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
2
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
3
256 South Occidental Boulevard
Los Angeles, CA  90057
4
Telephone: (213) 388-8693
5
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
6
       crholguin@centerforhumanrights.org

7

8
ORRICK, HERRINGTON & SUTCLIFFE LLP
9
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
10
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
11
Telephone:  (213) 629-2020

12

13

14
*Attorneys for plaintiffs (listing continues on following page)*

15
UNITED STATES DISTRICT COURT

16
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

17

18
JENNY LISETTE FLORES, *et al.*,            )   Case No. CV 85-4544 DMG (AGRx)
19                                          )
        Plaintiffs,                         )   EXHIBIT 2 – DEPOSITION OF JUANITA
20                                          )   HESTER – PART 2
- vs -                                      )
21                                          )
LORETTA E. LYNCH, ATTORNEY                  )   Hearing: October 6, 2016
22
GENERAL OF THE UNITED STATES, *et al.*,     )
23                                          )
        Defendants.                         )
24  ─────────────────────────────────      )

25

26
*Plaintiffs' counsel, continued:*

27

28

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org
        annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

1    Q.    -- available --

2    A.    -- population can be?

3    Q.    Yeah.  The total number of beds.

4    A.    Total number of beds at the Residential Center is

5  830.

6    Q.    Okay.

7    A.    That's what we can house there.

8    Q.    So, as of yesterday, there were approximately 300

9  or so empty; is that correct?

10    A.    Yeah.  If I -- If I told you, I think I said 594

11  was the population...

12    Q.    That's correct.

13    A.    Okay.  Then you're looking at probably 236.

14    Q.    And if -- If, at -- At any time in the last one

15  month, have you been at capacity at Karnes?

16    A.    No.

17    Q.    How about in the previous two months?

18    A.    Same question?  At capacity?

19    Q.    Yes.

20    A.    No.

21    Q.    When was the most recent time that you can recall

22  that you were at capacity in terms of bed space in -- at

23  Karnes, if ever?

24    A.    I'd be un -- unable to answer that.  I don't

25  recall.

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1      Q.    You have no recollection when the last time was
 2   that you were at capacity?
 3            MS. FABIAN:  Was that -- Is that a question,
 4   Peter?
 5            MR. SCHEY:  Yeah.
 6            MS. FABIAN:  Object to form.
 7            THE WITNESS:  I don't recall the last time we
 8   were at capacity at the Karnes Residential Center.
 9      Q.    (By Mr. Schey)  Okay.  Do you believe it was in
10   2016, or do you believe it was before then?
11      A.    I don't -- and I'm -- I'm unable to answer that
12   because I don't know.  I don't have that information.
13      Q.    And since you have been there, approximately how
14   many times have you been at capacity in terms of bed
15   space?
16      A.    We were at capacity before the expansion.
17         (Manoj Govindaiah exited the conference room)
18      Q.    (By Mr. Schey)  When was the expansion?
19      A.    The expansion was January of 2015.
20      Q.    Ever since January of 2015, is there any time
21   that you recall that you were at capacity?
22      A.    And actually, I -- Let me correct that.
23            That was -- That should be January 2016.
24      Q.    This year?
25      A.    Yes.  I may have my dates confused, but I believe
```

1    it's January 2016.

2       Q.    Okay.  Any time since January 2016, can you

3    remember any time that the facility was at capacity?

4       A.    No.

5       Q.    And the -- the -- the current -- current capa --

6    the current use of bed space, leaving roughly, let's call

7    it, 200 empty beds, has that been relatively consistent in

8    2016?  Or were there -- or were there times when you were

9    close to running out of space?  Or has it rel -- been

10   relatively consistent?

11            MS. FABIAN:  Object to form.

12            THE WITNESS:  Could you repeat your question,

13   please?

14      Q.    (By Mr. Schey)  Yeah.  I'm just wondering if,

15   right now, with your 500 plus people there, has that been,

16   roughly, an average, or is it high or low, for 2016?

17      (Manoj Govindaiah reentered the conference room)

18            THE REPORTER:  Was that 2015 or 2016?

19      MR. SCHEY:  '16.

20            THE WITNESS:  I don't have the numbers in front

21   of me to be able to answer that for you.  As I stated

22   earlier, we've -- we haven't been at capacity from 2016,

23   as you asked.

24      Q.    (By Mr. Schey)  And -- And at any time between

25   October of 2015 and the present, have ICE agents working

1   at Karnes been instructed to take any actions under

2   paragraph 14 of this settlement, regarding placement of

3   Flores Class members with certain listed adults?

4          MS. FABIAN:  Object to form.

5          THE WITNESS:  I don't have the paragraph of the

6   Flores Service Agreement you're talking about in front of

7   me to be able to answer that properly.

8      Q.   (By Mr. Schey)  Okay.  Paragraph 14.  Did -- Do

9   you recall anything about paragraph 14 or 19 of the

10  settlement?

11     A.   I don't have the service agreement in front of

12  me.

13     Q.   Okay.  All right.  I know you don't.  My question

14  was, Do you -- do you recall any of the requirements of

15  paragraph 14 or 19 of the Flores Settlement Agreement?

16     A.   No.  I don't have that document in front of me to

17  be able to -- to answer that.

18     Q.   Paragraph 14 basically provides that, where ICE

19  determines that the detention of a minor is not required

20  to secure his or her primary appearance before the agency

21  or the immigration courts or to ensure the class member's

22  safety or that of others, the agency shall release a minor

23  from its custody without unnecessary delay, and then it

24  provides an order of preference.  Do you -- Do you have

25  any recollection what that order of preference is?

Case 2:85-cv-04544-DMG-AGR  Document 262-4  Filed 09/19/16  Page 7 of 58  Page ID #:7768

Deposition of Juanita Hester                                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

1          MS. FABIAN:  Object to form, foundation, and

2    characterization of paragraph 14.

3          Q.    (By Mr. Schey)  You may answer the question.

4          A.    That I know of, I believe a family member, which

5    is usually the parent or a parent, that is probably the

6    first priority.

7          Q.    And do you recall any of the other priorities or

8    options?

9          A.    Legal guardian.

10         Q.    And other than that, do you recall any others?

11         A.    I -- Probably another relative, but I don't have

12   that in front of me to be able to tell you exactly who

13   that is.

14         Q.    And do you recall any training received by agents

15   working at Karnes between -- let's say in 2015 or '16,

16   regarding compliance with the Flores Settlement?  And, if

17   so, tell us when that training took place and who provided

18   the training.

19         MS. FABIAN:  Object to form.

20         THE WITNESS:  There's been various training for

21   staff at the Residential Center.  Specific to Flores,

22   un -- I'm -- I'm unable to tell you if there was training

23   and on what date that took place.

24         Q.    (By Mr. Schey)  Okay.  But my question was -- was

25   just, Do you recall any such training on the Flores

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

1    Settlement taking place?  It's a "yes" or "no."

2        A.    I don't recall.

3        Q.    Okay.  And do you recall any training that you

4    have received regarding the Flores Settlement and, if so,

5    when and who provided you with that training?

6        A.    I'd have to say the same thing.  I don't recall.

7        Q.    Okay.  At any time in the -- in 2016, have you

8    reviewed any A-files to determine whether information is

9    recorded in those A-files that would show whether or not

10   ICE agents at Karnes have made efforts aimed at the

11   release of Flores Class members, pursuant to paragraphs 14

12   or 19 of the Flores Settlement?

13           MS. FABIAN:  Object to form, foundation.

14        (Mr. Anderson reentered the conference room)

15           THE WITNESS:  As I stated earlier, I don't have

16   those paragraphs of the Flores Service Agreement in front

17   of me.

18        Q.    (By Mr. Schey)  And -- And -- Have -- Have you

19   reviewed any A-files to see if -- if any information is

20   recorded regarding the efforts undertaken to release

21   minors under the Flor -- the terms of the Flores

22   Settlement?

23           MS. FABIAN:  Object to form, foundation.

24           THE WITNESS:  I have reviewed files, but when I'm

25   reviewing files, the residents, whether it be the mother

1  or the child, are at that time final orders.  They're not

2  eligible for any type of release.

3   Q. (By Mr. Schey)  Are you aware of any facility

4  that ICE operates or contracts with that is a licensed

5  program where children could be placed if they're not able

6  to be released under paragraph 14 of this settlement?

7     MS. FABIAN:  Objection to form, foundation.

8     THE WITNESS:  I don't have, as I stated earlier,

9  the Service Agreement, the Flores Service Agreement, in

10  front of me to -- to be specific, those paragraphs you're

11  talking about, to be able to say "yes" or "no" to that.

12   Q. (By Mr. Schey)  Okay.  My -- My question was a

13  little different.

14     My question was, Are you aware of any arrangement

15  or agreement that ICE has with a licensed program for

16  minors to be placed in if they cannot be released to a

17  relative under paragraph 14?  Are you aware of any such

18  agreement with a licensed program?

19     MS. FABIAN:  Object to form and foundation.

20     THE WITNESS:  I don't know what licensing that

21  you're talking about or what agreement.

22   Q. (By Mr. Schey)  Okay.  Are -- Or -- Let -- Well,

23  let me try to be helpful.  Under paragraph 19, and I'm

24  paraphrasing, of the agreement, in any case in which the

25  INS, or -- excuse me, in any case in which ICE does not

1   release a minor, pursuant to paragraph 14, to a relative

2   or other adult, a minor remains in ICE legal custody with

3   some exceptions, and that minor may be placed or shall be

4   placed temporarily in a licensed program until such time

5   as release can be effected under paragraph 14.

6           Are -- Are you aware -- In that context, are you

7   aware of any options that you have, or that your agents

8   have, to authorize the release of a minor to a licensed

9   program under paragraph 19 of the Flores Settlement?

10          MS. FABIAN:  Object to form, foundation.

11          THE WITNESS:  As you paraphrased, I'm not aware

12  of any, as you --

13      Q.   (By Mr. Schey)  Are --

14      A.   -- said, contract or agreement.  I'm -- I'm not

15  sure.

16      Q.   Okay.  And -- And at any time in, let's say 2015

17  or '16, are you aware of any Flores Class member who was

18  detained at Karnes, who was released to a licensed program

19  for children?  Are you -- Are you aware of any such case?

20          MS. FABIAN:  Object to form.

21          THE WITNESS:  I know I have had several cases

22  that the resident or the family unit ended up not being a

23  family unit, so the -- the adult female went to one

24  location, and the unaccompanied child at that time went to

25  Office of Refugee and Resettlement.

1    Q.   (By Mr. Schey)  I understand.

2         Setting aside those cases, are you -- can you

3    recall any other case in which any Flores Class member was

4    placed in a licensed program under paragraph 19 of the

5    Flores Settlement?

6         MS. FABIAN:  Object to form, foundation.

7         THE WITNESS:  I'm not aware, and I don't have the

8    document in front of me to be able to say specifically

9    what that paragraph says.

10   Q.   (By Mr. Schey)  All right.  In your declaration,

11   you state in paragraph 11, the end of paragraph 11, that

12   release generally occurs within 24 to 48 hours from the

13   time the charging document is served on the resident.

14   Now, how -- how long does it take from the time a positive

15   determination is made on a fear claim to the time a

16   charging document is served on the resident?

17   A.   I believe that question should be referred to

18   Citizenship and Immigration Services.  I don't issue the

19   actual notice to appear.  They do.

20   Q.   So CIS issues the notice to appear, not ICE?

21   A.   Correct.

22   Q.   And do you have any idea how long it takes, on

23   average, for the -- for the notice to appear, which I

24   guess is the charging document, to be served on detainees

25   after a positive fear determination has been made?

```
 1               MS. FABIAN:  Object to form, foundation.
 2       Q.   (By Mr. Schey)  Does --
 3               MS. FABIAN:  She -- She --
 4       Q.   (By Mr. Schey)  Do you --
 5               MS. FABIAN:  -- just --
 6       Q.   (By Mr. Schey)  -- have any --
 7               MS. FABIAN:  -- answered that.
 8       Q.   (By Mr. Schey)  -- idea how long -- do you have
 9   any idea how long that takes --
10               MS. FABIAN:  Objection.
11       Q.   (By Mr. Schey)  -- on --
12               MS. FABIAN:  Form.
13       Q.   (By Mr. Schey)  -- average?
14               MS. FABIAN:  Objection; form, foundation.
15               THE WITNESS:  As I stated earlier, that question
16   would be better answered by Citizenship and Immigration
17   Services, as they are the ones that issue the actual
18   notice to appear, and we -- we serve the document;
19   however, they're the ones that issue the document.
20       Q.   (By Mr. Schey)  Okay.  And then once they're
21   served with that document, or once you serve them with
22   that document, you say it generally takes 24 to 48 hours
23   to make a custody determination; is that correct?
24               MS. FABIAN:  Object to form.
25               (Mr. Zimmerman exited the conference room)
```

```
 1              THE WITNESS:  As I stated earlier, when the

 2    notice to appear is served on the resident, the custody

 3    determination is taking place at that time as well.

 4         Q.   (By Mr. Schey)  It -- The -- I'm sorry.  You said

 5    the custody determination is what?

 6         A.   Is be -- Is being completed at that same time

 7    there's a determination --

 8         Q.   And when --

 9         A.   -- made.

10         Q.   But when you say it's being completed, is it --

11    is it -- I'm not quite sure what that means.  Does -- Does

12    that mean it is completed prior to serving them with the

13    notice to appear, and they're served with both at the same

14    time?  Or does it mean that they're served with the notice

15    to appear, and then somebody starts to make the custody

16    determination?  Or could it just be both?  I -- I -- I'm

17    not sure I understand.

18              MS. FABIAN:  Object to form.

19              THE WITNESS:  The notice to appear in custody

20    determination, it is served at the same time.

21         Q.   (By Mr. Schey)  And that, generally, would --

22    and -- and -- and how long is that, if you know, after a

23    positive fear determination, in general?

24         A.   Repeat the question.

25         Q.   How long does that usually take, from the time of
```

1  a positive credible fear determination or reasonable fear

2  determination?

3      MS. FABIAN:  Object to form.

4      THE WITNESS:  As I stated earlier, Asylum issues

5  that notice to appear, so I'd be unable to tell you how

6  long that takes.

7  Q.  (By Mr. Schey)  And when a person of a positive

8  determination, credible fear determination, is it fair to

9  state that you're not required to release that person,

10  that that person is released as a matter of discretion?

11      MS. FABIAN:  Object to form.

12      THE WITNESS:  The question, one more time.

13  Q.  (By Mr. Schey)  Well, in -- In your declaration,

14  you say that, in paragraph 13, that if a person is found

15  to have a credible fear, and you said they're generally

16  eligible to be considered for discretionary release.  So

17  my question was just that -- is that an accurate

18  statement?

19      (Mr. Zimmerman reentered the conference room)

20      THE WITNESS:  Where is that, in the declaration,

21  you're talking about?

22  Q.  (By Mr. Schey)  It's in paragraph 13, about four

23  sentences from the end of the paragraph, or three

24  sentences.

25  A.  Okay.  And your question was?

1   Q.   When you release mothers and children because

2   they have had a positive fear determination, is it correct

3   that you're exercising your discretionary authority to

4   release them?

5           MS. FABIAN:  Object to --

6           THE WITNESS:  The --

7           MS. FABIAN:  -- form.

8           THE WITNESS:  The resident, or the family unit,

9   if they get a positive credible fear finding or a positive

10  reasonable fear finding, and a notice to appear has been

11  issued by Citizenship and Immigration Services, then we

12  release them on an order of recognizance or parole,

13  depending on what case that may be.

14  Q.   (By Mr. Schey)  Okay.  And -- And you exercise

15  your discretion to do that; is that correct?

16  A.   I don't want to say it's my discretion.  It --

17  It's discretion of the service.

18  Q.   Right.  Discretion of some agent; correct --

19          MS. FABIAN:  Object to --

20  Q.   (By Mr. Schey)  -- not yours personally?

21          MS. FABIAN:  Object to form.

22          THE WITNESS:  The service has that discretion.

23  Q.   (By Mr. Schey)  Okay.  And -- And -- And you say

24  that individuals determined not to prese -- possess a

25  credible fear remain in the expedited removal process and

1  are generally detained until removal.  When are they not

2  detained until removal?

3      A.    If somebody that has not been found to have a

4  positive credible fear finding or a possible reasonable

5  fear finding and they are ordered removed, we attempt

6  to re -- to remove them to their country as soon as

7  possible.

8      Q.    Okay.  Do you enter the order of removal at the

9  same time as you -- as they receive their negative fear

10  determination?

11      A.    We will serve that document once Citizenship and

12  Immigration Services has issued a -- a finding.

13      Q.    And -- And -- And you say that, then, in the

14  second to the last sentence of paragraph 13, you say that

15  then, these -- these detainees are generally detained

16  until removal.  Under what circumstances are they not

17  detained?  Because you do not say they are all detained.

18  You say they generally are detained.  I'm wondering, In

19  what cases do you exercise your discretion not to detain

20  this population?

21          MS. FABIAN:  Object to form, foundation.

22          THE WITNESS:  I don't recall if there's been an

23  instance where somebody has been released and had the

24  final order.

25      Q.    (By Mr. Schey)  Okay.  Well, for example, just a

 1   few minutes ago, I think you testified that if somebody

 2   had a medical condition, or somebody had -- that was

 3   pregnant, they would be released.  I'm -- I'm wondering

 4   if, are there any other circumstances that you can think

 5   of where you would exercise your discretion to release

 6   somebody, even though they have a -- a negative fear

 7   determination?

 8       A.   Okay.  The -- What I stated earlier was medical

 9   cases, pregnant females.  This, what you're asking me, is

10   once they have a negative finding, which I think is

11   different.

12       Q.   Okay.  So if somebody has a negative finding,

13   and -- and -- and -- and two days later, you find out that

14   they are pregnant.  Would you continue to detain that

15   person or release them?

16       A.   We would know upon intake if they were pregnant,

17   and they'd be released within that time frame.  We do not

18   house pregnant females, so they would be released

19   immediately.

20       Q.   All right.  But if you didn't discover it until

21   after they had a negative determination, would you, then,

22   release that person or detainee?  Or you don't know?

23           MS. FABIAN:  Object to form.

24           THE WITNESS:  Pregnant females are released upon

25   intake immediately.  They -- They would not stay a day or

```
 1   two.  It's -- It's a quick process.  So they would never

 2   have that opportunity to be in front of a -- Asylum to

 3   have a hearing.  So, I'd -- I would be unable to answer

 4   your question because it's speculating.

 5       Q.   (By Mr. Schey)  Now, are class members detained

 6   at Karnes -- at any time before a credible fear

 7   determination has been made, are they afforded any type of

 8   a bond redetermination before an immigration judge?

 9       A.   We have expedited removals that come into the

10   Residential Center.  They are final orders at the time of

11   arrival.  They would not be eligible for any type of

12   relief.

13       Q.   Okay.  And what if somebody comes in and does not

14   have a final order?

15       A.   We accept --

16       Q.   Let's say that --

17       A.   We take --

18       Q.   Let's say that --

19       A.   -- expedited --

20       Q.   -- it's a first-time --

21       A.   We take expedited removals.  They -- They have to

22   have a final order.

23       Q.   Well, they don't have a final order when they

24   come into the facility; right?

25            MS. FABIAN:  Object to --
```

1    Q.   (By Mr. Schey)  You -- You only -- You only issue

2    a -- an order of removal -- I mean, they may, but most

3    don't; right?  Mo -- If it's a first-time apprehension,

4    that has not been previously deported, when they come into

5    Karnes, they -- they do not have an existing order of

6    removal; isn't that correct?

7            MS. FABIAN:  Object to form, foundation.

8            THE WITNESS:  Cases that are accepted at Karnes

9    are final orders of removal.  If they're an expedited

10   removal case, they are coming in with a final order of

11   removal.

12   Q.   (By Mr. Schey)  And so, who has issued those

13   final orders of removal before they come into Karnes?

14   A.   It would be the arresting agency.

15   Q.   So you -- Do you -- You're saying that, best of

16   your knowledge, before CBP transfers these family units to

17   you, they -- CBP issues an order of removal; is that your

18   understanding?

19           MS. FABIAN:  Object to form.

20           THE WITNESS:  The individuals are in the

21   expedited removal process --

22   Q.   (By Mr. Schey)  Well, I --

23   A.   -- and --

24   Q.   -- know --

25   A.   -- they --

```
 1      Q.    -- they're in the expedited removal.

 2      A.    Okay.

 3      Q.    That's --

 4            MS. FABIAN:  She --

 5      Q.    (By Mr. Schey)  -- not --

 6            MS. FABIAN:  She --

 7      Q.    (By Mr. Schey)  -- what we're --

 8            MS. FABIAN:  She was still answering.

 9      Q.    (By Mr. Schey)  -- discussing.

10            MS. FABIAN:  Peter, you -- She --

11            MR. SCHEY:  Oh.

12      Q.    (By Mr. Schey)  Go -- Go ahead.

13            THE WITNESS:  If they claim credible fear, then

14    they go in front of Asylum.  But if they don't claim fear,

15    they're a final order of removal, and we will process them

16    and have them returned to their country as soon as

17    possible.

18      Q.    (By Mr. Schey)  Right.  We know all that.

19    What -- What -- What we're trying to understand is, Who

20    issues those final orders of removal, and I think you're

21    saying it is the Border Patrol that does that before they

22    come to Karnes; is that correct?

23            MS. FABIAN:  Object to form, foundation.

24            THE WITNESS:  Their process does an expedited

25    removal.  We accept --
```

```
1      Q.   (By Mr. Schey)  Right.  We --

2      A.   -- them --

3      Q.   -- all --

4      A.   -- as a --

5      Q.   -- know that --

6      A.   -- final order of removal at Karnes.

7      Q.   Okay.  So let me -- I -- I didn't quite hear

8  that.  You said they're issued a final order of removal at

9  Karnes?

10     A.   No.  That's not what I said.

11     Q.   Okay.

12     A.   I said, "We accept them at Karnes as final orders

13 of removal.  They come in as an expedited removal

14 process."

15     Q.   Right.  They're all placed in expedited removal.

16 No question about that.

17     A.   Okay.

18     Q.   What we're discussing is a separate question.

19 Somebody can be in expedited removal proceedings but not

20 have an order of removal.  And I'm wondering, When is the

21 order of removal issued?  And does that happen at --

22 assuming it's a first-time apprehension, a person that

23 does not have an old order of deportation.  I'm assuming

24 that they're apprehended, come to Karnes; they say they

25 have a fear; they get an interview; interview is --
```

```
 1    credible fear is denied.  Now, we're getting ready to
 2    remove them.  Who issues the order of removal --
 3              MS. FABIAN:  Object --
 4        Q.   (By Mr. Schey)  -- and when is it issued?
 5              MS. FABIAN:  Object to foundation.
 6              And -- And, Peter, I'm -- I'm just going to
 7    clarify it.  An expedited removal order is a final order
 8    of removal.  I think -- I think that's she's trying to
 9    say.  I'll let her say if I'm wrong, but I -- I just think
10    that's where the disconnect is.  I don't know if that
11    helps.
12              MR. SCHEY:  Okay.  Well, maybe you can clarify
13    this for us.
14              MS. FABIAN:  Okay.  I -- Maybe, I'll -- I'll let
15    Ms. Hester see if -- if -- if I just give that
16    explanation, maybe I can put the two of you together, and
17    she can explain it so -- so that you can understand it a
18    little better.
19        Q.   (By Mr. Schey)  Okay.  Go ahead, Ms. Hester.
20        A.   If somebody comes to the Residential Center and
21    they have a expedited removal, they're a final order of
22    removal at that time.  They're not eligible for relief.
23    If they --
24        Q.   And --
25        A.   -- claim credible fear or reasonable fear, either
```

1    one, they'll go through the process with Asylum to -- to

2    have that interview; however, if they don't claim fear,

3    they will be removed to their -- to their country.  They

4    are already a final order.

5        Q.   And when they get that denial, and -- do you

6    remove people from the United States from Karnes, or are

7    they transported to some other place before you -- they're

8    removed?

9        A.   If somebody's being removed from Karnes --

10   Honduras?  Honduran families must be removed commercially,

11   so we would remove them from the -- the last port of

12   departure within the United States.  Guatemalan, El

13   Salvador, can be removed via ICE Air.  And any other

14   country, it will depend on what's re -- what's required.

15       Q.   Okay.  Let me switch gears for a second.  Are

16   you -- Have you received any training regarding

17   implementation of paragraph 21 of the settlement, dealing

18   with transfer of minors under certain circumstances to

19   state or county juvenile deten -- facilities or secure ICE

20   detention facilities?  Have you received any training in

21   implementation and --

22       A.   I don't --

23            MS. FABIAN:  Ob --

24            THE WITNESS:  -- have --

25       Q.   (By Mr. Schey)  -- the trans --

1          MS. FABIAN:  I'm going to object to form and

2    foundation and the characterization of the agreement.

3      Q.    (By Mr. Schey)  But do you remember receiving

4    such training?

5      A.    I don't --

6          MS. FABIAN:  Same --

7          THE WITNESS:  -- have --

8          MS. FABIAN:  -- objections.

9          THE WITNESS:  -- that -- I don't have that

10   service agreement in front of me to be able to answer that

11   question for you correctly.

12     Q.    (By Mr. Schey)  Okay.  Ha -- Have you -- The --

13   The -- The agreement I'm talking about is actually a

14   settlement agreement; it's not a service agreement.

15          Do you recall when -- ever reading the 1997

16   Flores Settlement Agreement?

17     A.    The 1997 Service Agreement -- or the Settlement

18   Agreement?

19     Q.    Yeah.

20     A.    I probably --

21     Q.    The Settlement Ag --

22     A.    I most likely had something to do with that back

23   in 1997, if they sent something out, but that -- that's a

24   long time ago.  I'd be unable to tell you exactly when,

25   and -- and if I had anything that was received.

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

1    Q.    Okay.  And are you aware of whether agents

2  working at Karnes have received any training on the

3  definition of an escape risk under the Flores Settlement,

4  the 1997 Settlement?

5          MS. FABIAN:  Object to form.

6          THE WITNESS:  I'm not aware.

7    Q.    (By Mr. Schey)  And have you yourself -- Do -- Do

8  you recall receiving any training about what it means to

9  be an escape risk under the terms of the Flores

10  Settlement?  And if so, when did you get that training,

11  and who gave it to you?

12          MS. FABIAN:  Object to form.

13          THE WITNESS:  I'm unaware.  I -- I'm not able to

14  answer that question.

15    Q.    (By Mr. Schey)  Okay.

16          MS. FABIAN:  Sorry.  Ms. Hester would like a -- a

17  quick break, Peter.

18          MR. SCHEY:  Sure.  Do you want to take, what, 10

19  minutes and call me back?

20          MS. FABIAN:  Yeah.  I mean, even less.  Well,

21  we'll just take a couple of minutes, and we'll call you

22  right back.

23          MR. SCHEY:  All right.  Thank you.

24          MS. FABIAN:  Yep.

25               (Break taken from 4:14 to 4:19)

```
 1              (Mr. Anderson exited the conference room)
 2              MS. FABIAN:  Go ahead.  Did you -- Peter, did you
 3    hear me?  We're good.
 4              MR. SCHEY:  Yeah.  Okay.
 5         Q.   (By Mr. Schey)  I know I touched on it before,
 6    but I -- I -- I don't recall.  I -- I -- I asked you
 7    whether you could recall any case in which a class member
 8    was released, even though he or she did not have a
 9    possible -- a positive fear determination, and you said
10    you could not recall such a case.  I -- I -- I'm just not
11    sure if I asked you within the past month or two or
12    this -- 2016 or '15, so I just wanted to revisit that and
13    just ask you if at any time you can recall such a case --
14              MS. FABIAN:  Object to form --
15         Q.   (By Mr. Schey)  -- any --
16              MS. FABIAN:  -- and --
17         Q.   (By Mr. Schey)  -- time since -- since -- since
18    you've been there at Karnes?
19              MS. FABIAN:  Object to form and foundation and
20    characterization of prior testimony.
21              THE WITNESS:  Could you repeat the -- the part of
22    your question that you want answered?  I -- I just --
23         Q.   (By Mr. Schey)  Yeah.  Can you recall any time
24    since you've been at Karnes when a class member was
25    released, even though he or she one or their mother did
```

1    not get a positive fear determination?

2       A.   I -- I just don't recall any cases.  I mean,

3    if there were some --

4       Q.   Okay.

5       A.   I -- I'd -- I'd have to go back and -- and

6    research that.  I don't have that information in front of

7    me.

8       Q.   And -- And have you received any training or

9    instructions to the effect that, even if a class member or

10   her or his mother is denied a fear claim, that, in your

11   discretion, they can still be assessed for release under

12   the Flores Settlement?  Has anybody ever given you that

13   type of instruction or direction?

14          MS. FABIAN:  Object to form and foundation.

15          THE WITNESS:  I'm not sure what type of training

16   you're talking about.  The --

17      Q.   (By Mr. Schey)  Is there anything in the current

18   written instructions to ICE agents making custody

19   determinations that would indicate to those agents that,

20   under some circumstances, a minor with a final order,

21   because he or she is in expedited removal, may,

22   nevertheless, be released from custody?

23      A.   Oh, okay.  I -- Could you just repeat your last

24   part?

25      Q.   Yeah.  It's hard to just repeat the last part

```
 1    without the first part there.

 2              Are -- Are you aware of any instructions in

 3    writing that have been issued to ICE agents making custody

 4    determinations for class members and their mothers that,

 5    under this or that or whatever circumstance, which we can

 6    then discuss, class members may be released from custody,

 7    even though they have a negative fear determination?  Are

 8    you aware of any such written instruction?

 9              MS. FABIAN:  Object to form.

10              THE WITNESS:  I -- I'm not aware.

11        Q.   (By Mr. Schey)  And are you aware of any practice

12    that has not been in the form of a written instruction,

13    or -- or -- or -- Scratch that.  Strike that.

14              Are -- Are you aware of any current policy that

15    would -- if someone was denied credible fear, it would,

16    nevertheless, mean, in the exercise of the agent's

17    discretion, the minor could be released from custody?

18              MS. FABIAN:  Object to form.

19              THE WITNESS:  You're talking if a child received

20    a negative?

21        Q.   (By Mr. Schey)  Child or the mother received a

22    negative determination.  Are you aware of any policy

23    that -- that tells ICE agents that they still have

24    discretion to release that class member under certain

25    circumstances?
```

1    A.    I don't know.

2    Q.    Okay.  Are you aware of any practice among your

3  agents at Karnes to -- in appropriate cases, based on the

4  exercise of discretion, to release Flores Class members,

5  even though they have an ex -- an expedited order removal?

6         MS. FABIAN:  Object to form.

7         THE WITNESS:  The cases I had talked about

8  earlier, medical cases, you know --

9    Q.    (By Mr. Schey)  Okay.

10   A.    -- those are the cases that --

11   Q.    Are --

12   A.    -- we would look at.

13   Q.    Okay.  Are you -- Or are you aware of any

14  instruction, or -- or -- or -- Well, let me strike that.

15        Are -- Are you aware, or -- or do you believe

16  that, currently, ICE agents making custody determinations

17  for class members who have received a negative fear

18  determination, or their parent has, would be -- or,

19  perhaps, would have the authority to consider a wide range

20  of things, such as the minor's immigration history, or any

21  prior breaches of bond, or failures to appear, matters

22  such as that where the minor has previously absconded, the

23  typical things that would go into a custody determination,

24  and -- and based on -- on -- on all of those factors,

25  decide that the minor should be released, even though he

 1   or she has a final order of removal?

 2            MS. FABIAN:  Object to form.

 3            THE WITNESS:  You were asking if the ICE agent

 4   would be able to do that?

 5       Q.   (By Mr. Schey)  Yeah.  Whether they currently do

 6   that, to the best of your knowledge.  It sounds to me that

 7   they don't.  It sounds to me, based on your testimony,

 8   that the position is no, because they're not eligible for

 9   release.  They're -- They're subject to mandatory

10   detention, but I just want to be clear about that.

11            MS. FABIAN:  Object to form, foundation.

12            THE WITNESS:  In the -- They're all deportation

13   officers now.  The officer would ask -- actually go up to

14   the supervisor or chain of command if they had any

15   questions on a case that you're --

16       Q.   (By Mr. Schey)  Okay.

17       A.   -- referring to.

18       Q.   Let's see.  When you want to transfer -- Or at

19   what point do you transfer people out of Dilley to -- I

20   mean, out of Karnes to Berks?

21            MS. FABIAN:  Object to form.

22            THE WITNESS:  It varies.  Some people get

23   transferred, if we're -- if there's something available

24   and we -- we're needing bed space in any way, that could

25   happen.  There -- It's -- It's a case-by-case basis.  I

```
 1   wouldn't say that's a regular occurrence.

 2       Q.   (By Mr. Schey)  All right.  Did -- Did you

 3   testify earlier about a -- there's a 15-day mark at which

 4   something is supposed to happen, or at least, the case is

 5   monitored a little bit more carefully?

 6           (Mr. Adams exited the conference room)

 7       Q.   (By Mr. Schey)  Did you testify about that

 8   earlier?

 9       A.   You --

10           MS. FABIAN:  Object; form, foundation.

11           THE WITNESS:  You --

12       Q.   (By Mr. Schey)  I'm sorry?

13       A.   -- asked if there was a report, and I said, "Yes,

14   there was a report."

15       Q.   And -- And -- And so what, if anything, different

16   happens at 15 days?

17           MS. FABIAN:  Object to form, foundation.

18       Q.   (By Mr. Schey)  I'm sorry?  Oh.  Okay.

19           MS. FABIAN:  That was just an objection.

20           MR. SCHEY:  Yes.

21           THE WITNESS:  That -- That's a tool.  We -- You

22   know, like I said, that report is submitted to the field

23   office.  But that's a tool for -- for anyone working there

24   to -- to look at those cases.  They're already looking at

25   them as it is, but those are the ones that would spark
```

 1   anybody's attention to -- to see what -- what is

 2   happening.

 3        Q.   (By Mr. Schey)  And -- And -- And are they

 4   required to record anywhere different than they would just

 5   normally record it anyway what's happening or what's --

 6   what's not happening?  You -- Are -- Are -- Are they

 7   required to report that as part of the 15-day review,

 8   or -- or -- or consideration?

 9        A.   Any --

10             MS. FABIAN:  Object to form and foundation.

11             THE WITNESS:  Any information that they have on

12   those cases, they're going to put that in the database

13   because they're checking on the case.

14        Q.   (By Mr. Schey)  So at the 15-day mark, additional

15   information is put into the database?

16        A.   Any day, that information would be placed in the

17   database, not just at the 15.

18        Q.   And -- Okay.  I understand that, but what I'm --

19   what I am having difficulty understanding and -- and --

20   and it's probably just me, but what -- what happens that's

21   different after 15 days at Karnes versus before 15 days at

22   Karnes?

23             MS. FABIAN:  Object to form and foundation.

24             THE WITNESS:  There isn't necessarily anything

25   done differently.  Those are just cases that, like I said,

```
 1    it's -- kind of like an -- an internal watch list for us.

 2    We -- We need to know what's happening.  So...

 3         Q.   (By Mr. Schey)  So, in other words, there --

 4    there's reporting, and it -- if some of these have been

 5    there for 15 days or more, does -- does that get flagged

 6    into one of the databases?

 7         A.   No.  It does not.

 8         Q.   Okay.  So other than -- I -- I -- I'm still just

 9    not understanding what happens that's any different.  All

10    I have -- I heard you say that nothing happens that's any

11    different.  But does anything happen, and is anything --

12    is there a process where you get to the -- when you say,

13    "It's -- It's day 15; A, B, and C needs to happen"?

14              MS. FABIAN:  Object to form.

15              THE WITNESS:  No.

16         Q.   (By Mr. Schey)  Okay.  And -- And -- And how

17    was -- how was this 15-day mark communicated to you?

18         A.   As I stated earlier, there -- there's a report.

19         Q.   Do -- Do you have to issue a report every 15

20    days?

21              MS. FABIAN:  Ob --

22              THE WITNESS:  No.

23              MS. FABIAN:  Object to foundation.

24              THE WITNESS:  I said there is a daily report --

25         Q.   (By Mr. Schey)  Correct.
```

1    A.   -- of cases that are 15 days or -- or more.

2    Q.   Okay.  But let me get this straight.  There is a

3    daily report of cases that have been at Karnes for 15 days

4    or more; is that correct?

5    A.   There's a report that we submit to the field

6    office and amongst -- within our own office, as well, to

7    show us cases that are 15 days or more in custody.

8    Q.   I see.  Does that report there also include cases

9    that have been 15 days or less in custody?  Or is it only

10   15 days or more in custody?

11   A.   The report I look at?  It's 15 days or more.

12   Q.   Got it.  And at the last report that you --

13   and -- and that's a daily report; correct?

14   A.   Yes.  That's the daily report.

15   Q.   Okay.  And at -- And the most recent report that

16   you looked at, what -- when was the most recent report you

17   looked at?  Did you look at yesterday's report?

18   A.   Yesterday would be my last report I looked at.

19   Q.   And what -- what did that indicate, in terms of

20   how many people there were, how many -- how many family

21   units, or how many mothers of children there were 15 days

22   or more?

23   A.   I don't have the report in front of me.  It

24   wasn't that many, the best I can -- best I can remember

25   for you.

1    Q.   Can you remember approximately what the number

2    was?  I don't want you to just guess, but if you have some

3    recollection of the approximate number, that would be

4    helpful.

5    A.   I would think less than 10.

6    Q.   Okay.  And if -- And -- And so, is it -- Are --

7    Are you saying that it is part of your goal to have that

8    population down to the lowest number possible?  Would that

9    be fair to say, that that's part of the objective of ICE

10   units?

11         MS. FABIAN:  Object to form.

12         THE WITNESS:  No.  As I stated earlier, it's --

13   it's for us to be -- to be able to look at and -- and look

14   at cases, and what I consider, you know, somebody in 15 --

15   15 days in custody or more.

16   Q.   (By Mr. Schey)  Right.  But my -- my point is

17   that -- that you -- obviously, you're looking at 15 days

18   or more because someone is concerned about those cases;

19   right?  That there's some different level of concern about

20   those cases and, therefore, you're tracking those; is that

21   correct?

22         MS. FABIAN:  Object to form, foundation.

23         THE WITNESS:  No.  That -- That case is no

24   different than any other case at the Residential Center.

25   They're all important.  Those are just cases that I -- I

1    want to see.  Not necessarily are they a -- a special case

2    in any way.

3        Q.  (By Mr. Schey)  Do you -- Do you also get a

4    report for people who've been there for 30 days or more?

5        A.   No.  I don't have a report like that.

6        Q.   Okay.  And can you tell us the extent of the

7    number of people who -- who -- is it part of -- of your

8    mission, if people are not going to be removable in a

9    certain amount of time, fairly promptly, to transfer them

10   to Berks?

11       A.   Okay.  The first part of your question was very

12   mumbled.

13       Q.   It -- It -- It -- If it appears that a -- a class

14   member cannot be promptly removed, for whatever reason, is

15   it -- do you keep that class member at Karnes?  Or -- Or

16   do you -- or do you attempt to transfer that class member

17   to Berks?

18            MS. FABIAN:  Object to form.

19            THE WITNESS:  The policy is, We don't move

20   somebody because they can't be removed to another

21   location.  You -- You're asking me if it's a -- a policy

22   of ours to move somebody, if they can't be removed from

23   Karnes, to transfer --

24       Q.   (By Mr. Schey)  Yeah.

25       A.   -- them?

```
 1        Q.    Not so much a policy but a practice, if -- if
 2  people cannot -- it -- it -- it seemed to me, I could be
 3  wrong, that most people at Berks came from either Karnes
 4  or Dilley, and I'm trying to just understand why that is.
 5  Why were they sent to Berks from Karnes?
 6             MS. FABIAN:  Object --
 7        Q.    (By Mr. Schey)  Let -- Let --
 8             MS. FABIAN:  -- to form.
 9        Q.    (By Mr. Schey)  Let's start with this.  How many
10  people, over the past month or three months or six months,
11  have been sent from Karnes to Berks?  How many class
12  members, approximately?
13             MS. FABIAN:  Object to form.
14             THE WITNESS:  I don't have that information in
15  front of me.  But in reference to your question, it is not
16  a practice to move them.
17        Q.    (By Mr. Schey)  So if -- if a person is pursuing
18  a reconsideration of a denial or -- or some matter in
19  front of a judge, and that is going to take several weeks
20  or months, by anyone's estimation, right now, the policy
21  would be -- or the practice would be to keep that person
22  at Karnes; not to transfer them to Berks.  Is that
23  correct?
24             MS. FABIAN:  Object to form, foundation.
25             THE WITNESS:  There are cases at Karnes that go
```

1   in front of the judge, and they have not been transferred

2   because of that reason.  As I stated earlier, it's not a

3   practice of ours to move them to Berks, as you were

4   asking.

5       Q.   (By Mr. Schey)  And was it previously a practice

6   to move class members to Berks?

7           MS. FABIAN:  Object to form.

8           THE WITNESS:  It has never been a practice of

9   ours.

10      Q.   (By Mr. Schey)  Did -- Did -- Can you -- Can you

11  explain, if you know, why pretty much all of the -- or --

12  (Mr. Anderson and Mr. Adams reentered the conference room)

13      Q.   (By Mr. Schey)  -- or a very substantial number

14  of the class member detainees at Berks right now came from

15  either Karnes or Dilley?  How -- How -- If it -- If it's

16  not your policy to transfer people from Karnes to Dilley,

17  how did they -- if they were detained at Karnes before,

18  why were they forwarded to Dilley -- or transferred, I

19  mean, to Berks?

20          MS. FABIAN:  Object to form and foundation.

21          THE WITNESS:  Your question to me earlier was if

22  it was a practice to move them because they were going in

23  front of a judge, and I stated that is not a practice.

24  Have we transferred some people to Berks?  Yes, we have.

25  To tell you when and how many, I'd be unable to answer

1    that question for you.

2        Q.    (By Mr. Schey)  Oh, I see.  Okay.

3            So it has happened, and you could not justify

4    a -- about when -- when it happened or how many class

5    members it involved; is that fair to say?

6            MS. FABIAN:  Object to form, foundation.

7            THE WITNESS:  As I stated earlier, it's not a

8    practice to transfer people, family units, to Berks

9    because they are, you know, going in front of a judge.

10            As I stated, Have we transferred family units to

11    Berks since August 2014?  Yes, we have.  How many, I'd be

12    unable to tell you how many and why they were transferred.

13    There could be many reasons.

14        Q.    (By Mr. Schey)  Okay.  Thank you for that.

15            MS. FABIAN:  Peter, I just want to remind you

16    that we do have a hard stop at 5:00 o'clock per building

17    management, so we have 15 minutes.

18            MR. SCHEY:  Okay.  Let me ju -- just try to --

19    getting close to the end here.

20        Q.    (By Mr. Schey)  I'm trying to understand your

21    current practice.  As -- As I understand it, or -- or --

22    or you process people as they come into the facility.  You

23    have a contract that's unlicensed to operate in the

24    facility; they provide the services.  If the person

25    expresses a credible fear, you schedule them for, or -- or

 1   you request that CIS interview them; and if that's

 2   positive, within 24 to 48 hours, you try to make a

 3   decision, custody decision; and if it's negative, you

 4   detain them because you believe they're subject to

 5   mandatory detention.  Is that a fair summary of what's

 6   taking place now in the field?

 7            MS. FABIAN:  Ob -- Object to form, foundation.

 8            THE WITNESS:  No.  I don't agree --

 9   Q.   (By Mr. Schey)  Okay.

10   A.   -- with --

11   Q.   Why --

12   A.   -- you.

13   Q.   -- don't you cor -- correct it, wherever it needs

14   correcting?

15   A.   Well, state your first part, and then I'll go by

16   it piece by piece.

17   Q.   So basically, when -- when people come into your

18   custody, your officers, or -- your officers do not start

19   determining what this or that paragraph means, under

20   Flores; what they do is they, as expeditiously -- you

21   state, as expeditiously as possible, try to schedule

22   them -- process them in and try to schedule them for an

23   interview --

24   A.   When a family --

25   Q.   -- with a CIS officer; is that correct so far?

| | |
|---|---|
| 1 | MS. FABIAN:  Object to form. |
| 2 | THE WITNESS:  No.  It's not correct.  We will -- |
| 3 | Q.   (By Mr. Schey)  Okay. |
| 4 | A.   We will process them, what we call the intake |
| 5 | process.  If they claim credible fear at that time, we |
| 6 | will make sure those documents get to Asylum.  Asylum |
| 7 | schedules them for their interviews, not ERO, not ICE. |
| 8 | CIS does. |
| 9 | (Mr. Anderson exited the conference room) |
| 10 | Q.   (By Mr. Schey)  Right.  But you have to advise |
| 11 | them that there's a person here that needs to be |
| 12 | interviewed; right? |
| 13 | A.   We give you them the documents of anybody that's |
| 14 | claiming credible fear or reasonable fear, yes.  But do -- |
| 15 | I do not -- |
| 16 | Q.   Let me -- |
| 17 | A.   -- schedule -- |
| 18 | Q.   -- ask this -- |
| 19 | A.   -- them. |
| 20 | Q.   At -- At the time, during their -- their intake |
| 21 | interview, you have an I-213 -- your officers have an |
| 22 | I-32 -- 213 where Border Patrol has already listed the |
| 23 | person's closest relatives or destination in the U.S., in |
| 24 | most cases; is that correct? |
| 25 | A.   I'd say "no."  Every case is different.  There |

1    may be somebody that doesn't have that information when

2    being asked the first time.

3        Q.    Right.  I said in most cases, Border Patrol will

4    question people about their destination and relatives in

5    the U.S.; correct, and puts that information into the

6    I-213?  Correct?

7            MS. FABIAN:  Object to form, foundation.

8            THE WITNESS:  I can't speak for Border Patrol

9    on --

10       Q.    (By Mr. Schey)  Okay.

11       A.    -- what questions they do --

12       Q.    So --

13       A.    -- ask.

14       Q.    -- do you get the --

15       A.    However, if they have that on the 213, yes, it

16   would be on there.

17       Q.    Okay.  Now, when -- Do your offices -- Have your

18   officers re -- received any training or guidance or

19   instructions that, upon receipt of that information, they

20   need to initiate contact with those people to determine

21   the appropriateness of the -- of the class member being

22   released to that person?  Have they received any

23   instructions to that effect?

24           MS. FABIAN:  Object to form.

25           THE WITNESS:  I'm not aware of that specific

```
 1   training you're talking about, that they have to take it
 2   from the 213 and check --
 3       Q.    (By Mr. Schey)  Have --
 4       A.    -- on that.
 5       Q.    Have -- Have -- Have your officers, to the best
 6   of your knowledge, received any training, direction, or
 7   guidance telling them that, during the intake, they should
 8   gather up any additional information about potential
 9   adults or institutions where the minor could be placed,
10   pursuing paragraph 14 of the settlement, even if they're
11   not told that that's pursuant to the settlement, but just
12   that this is what needs to be done, and there -- that
13   information needs to be -- that contact needs to be
14   developed with those people who may be appropriate
15   placements for the child, to determine their suitability?
16   Has any such instruction been issued, or guidance or
17   training, that you know of?
18            MS. FABIAN:  Object to form.
19            THE WITNESS:  The staff requests that
20   information.  They'll ask every individual.  For the
21   agreement you were talking about, paragraph 14, I don't
22   have that in front of me to say specifically they've been
23   trained in that specific area.
24       Q.    (By Mr. Schey)  So let's get this straight now,
25   because I don't think that's what you testified to
```

```
 1   earlier.  Let's get this straight.

 2            You -- You're saying that the several options

 3   that are listed in paragraph 14, that agents are gathering

 4   that information?

 5            MS. FABIAN:  Objection.

 6       Q.   (By Mr. Schey)  Is that -- Is that what you're

 7   actually saying now?

 8            MS. FABIAN:  Objection.  I don't think that's

 9   what she said.

10            MR. SCHEY:  Okay.  That's what I thought I heard.

11       Q.   (By Mr. Schey)  Paragraph 14, as you perhaps know

12   or don't know, has several options for release.  My

13   question is, Has anybody been given any training,

14   guidance, or directions to pursue those options, gather

15   information about those options?  I don't mean about one

16   contact, "Give us one relative where you're going."  Have

17   any instructions been given, that you're aware of, to

18   explore those options with the class member or -- or his

19   or her mother, to your knowledge?

20       A.   I'm una --

21            MS. FABIAN:  Objection to form.

22            THE WITNESS:  I'm unaware.  I don't recall if

23   there was any training.

24       Q.   (By Mr. Schey)  Okay, then.  And -- Or -- Or --

25   Or -- Or in written instructions.  I don't just mean
```

1  trainings, but just any form of it, not just trainings.

2  Any directions, written directions?

3          MS. FABIAN:  Object to form.

4          THE WITNESS:  I'm unaware.  I -- I don't have --

5      Q.   (By Mr. Schey)  Okay.

6      A.   -- information in front of me to be --

7      Q.   Now --

8      A.   -- able to tell you.

9      Q.   Have -- Have there been any instructions that

10  you're aware of, or guidance or training, to not only

11  gather that information but to actually follow up with

12  those people to determine their suitability?

13          MS. FABIAN:  Object to form.

14          THE WITNESS:  I don't know that.

15      Q.   (By Mr. Schey)  Now, as a matter of practice, a

16  sense of what is actually happening today, is part of the

17  assignment of the processing agents to gather -- setting

18  aside -- forget about the -- calling it the Flores

19  Settlement, but just the pertinent -- just the directions,

20  just -- just what's actually happening.  Are they

21  gathering the information on all the -- on -- on -- on

22  several of -- of the options and investigating their

23  suitability on a daily basis?

24          MS. FABIAN:  Object to form.

25          THE WITNESS:  I don't understand your question,

 1    sir.  You're -- You're talking Flores Agreement, then you

 2    said "no" -- Could you rephrase your question?

 3         Q.   (By Mr. Schey)  Yeah.  Give me a second.  I'll

 4    try to rephrase it.

 5              During -- As a matter of practice, because --

 6    because you're kind of in charge of these folks, as a

 7    matter of practice right now, to the best of your

 8    knowledge, when agents are doing intake processing of a

 9    child with a mother, do they make inquiries about the

10    availability, obviously in the United States, of a parent,

11    legal guardian, adult relatives, an adult individual or

12    entity that might be designated by the parent, or a

13    licensed program that might be willing to accept legal

14    custody?  Do they make inquiry to gather that information

15    right now, to the best of your knowledge?

16              MS. FABIAN:  Object to form.

17              THE WITNESS:  During the intake process, our

18    staff always inquires about what relatives or sponsorship

19    they have within the United States; however, when they're

20    coming here -- when they go in -- into Karnes, they are

21    final orders of removal, and they're not eligible for

22    relief at that time.  But we do gather that information,

23    relatives or legal guardians, another parent.  But, you

24    know, it's going to vary case to case.  Some people have

25    that information, and some do not.

```
 1      Q.    (By Mr. Schey)  Okay.  So, there's a big

 2   difference between, and I'm -- and -- and -- and I'm

 3   familiar with the general practice, every time somebody's

 4   apprehended, we gather information about a primary

 5   relative in the United States or destination, and that

 6   wasn't my question.

 7           My question was -- it's just a "yes" or "no."  My

 8   question was, Right now, in practice, when agents are

 9   processing, into ICE custody, children mothers -- they all

10   seem to be with mothers -- do they query the -- the child

11   or the mother, if a child is young, to determine -- to

12   obtain information about the availability to take custody

13   of the child within the United States and their parent and

14   a legal guardian and whether there is an adult relative,

15   such as a brother or sister or aunt, uncle, grandparent,

16   and whether there may be some other individual designated

17   by the mother?

18           Let's stop there.  If you know, is that the

19   current practice, to gather information on each one of

20   those items that I mentioned?  It's just a "yes" or "no"

21   or "I don't know."

22           MS. FABIAN:  Ob -- Object to form.

23        (Mr. Anderson reentered the conference room)

24           THE WITNESS:  The officers, when they're

25   processing during intake, they will ask if they have
```

1    family, could be a parent, could be a relative, or a

2    friend, legal --

3        Q.   (By Mr. Schey)  Okay.

4        A.   -- guardian.

5        Q.   Let's say the person --

6        A.   I mean --

7        Q.   -- says, "Yes."

8        A.   They're going to ask that question to each

9    resident that comes in, and if the child's too young, the

10   mother would respond for the child.

11       Q.   Okay.  Let's say the person says, "Yes.  I have

12   relatives in the United States."

13       A.   Okay.

14       Q.   What -- What -- What does the Border Patrol

15   agent -- I mean, the ICE agent do then?

16       A.   They're going to take that inform --

17       Q.   Is -- Is the ICE agent instructed to gather the

18   names of that person's parent, legal guardian, and adult

19   relatives in the United States, and adult individuals or

20   entities designated by the parent?  Is that what they're

21   instructed to do, to gather all those things?

22            MS. FABIAN:  Object to form.

23            THE WITNESS:  The officers will take that

24   information, update the database reference --

25       Q.   (By Mr. Schey)  So it's --

```
 1      A.    -- so they have --

 2      Q.    So --

 3      A.    -- that --

 4      Q.    So --

 5      A.    -- information.

 6      Q.    -- it's your testimony -- As I'm understanding

 7   it, it's your testimony that when we look -- Well, maybe I

 8   should back up a moment.

 9            This information is recorded in the person's

10   A-file; is that correct?

11      A.    That's not correct.

12      Q.    Okay.  Where -- Where would this information be

13   recorded, where -- where the agent has -- has -- has asked

14   the child or the mother to identify a parent, any legal

15   garden -- won't be too many of those -- adult relatives in

16   the United States, any adult individual or entity maybe

17   designated by the mother, a licensed program willing to

18   accept legal custody?  The fact that the agent has -- has

19   inquired as to all of those options and then got a

20   response, where would that be recorded?

21            MS. FABIAN:  Object to form and foundation.  I...

22            THE WITNESS:  As I stated earlier, the

23   information in reference to family, friends, relative,

24   that information would be in the database, not necessarily

25   in their A-file.  Later on, they may --
```

```
 1        Q.    (By Mr. Schey)  But --

 2        A.    -- get --

 3        Q.    -- then --

 4        A.    -- that --

 5        Q.    And --

 6        A.    -- information, and it may be in their A-file,

 7   but at the time, it's going to be placed in the database

 8   first.

 9        Q.    And which database would that be placed into?

10        A.    The E-A-R-M.

11              MS. FABIAN:  Peter, we're -- We're out of time

12   here.  We're -- We're going to have to leave the building.

13              MR. SCHEY:  Okay.  Well, we obviously need to

14   continue this.  So, well --

15              MS. FABIAN:  I mean --

16              MR. SCHEY:  Let me just --

17              MS. FABIAN:  -- if we're going to --

18              MR. SCHEY:  -- go with, as --

19              MS. FABIAN:  -- continue this, and I'm --

20              MR. SCHEY:  -- fast as --

21              MS. FABIAN:  -- going to come --

22              MR. SCHEY:  -- is possible --

23              MS. FABIAN:  -- back to San Antonio, I'm going to

24   ask you to come back to -- come to San Antonio to do it as

25   well.
```

1    MR. SCHEY:  Well, it's -- There's no reason we

2    cannot do it telephonically or by videoconference.  I

3    mean, you -- you don't have to travel there in this day

4    and age.

5           MS. FABIAN:  I -- I'm -- I -- I disagree on that.

6           MR. SCHEY:  But let's go off --

7           MS. FABIAN:  I mean --

8           MR. SCHEY:  -- the record.

9           MS. FABIAN:  -- we could --

10          MR. SCHEY:  Let's -- Let's -- We should go off

11   the record.

12          MS. FABIAN:  Well, I mean, we have to leave the

13   building, so we can talk about this on Monday at our next

14   deposition.

15          MR. SCHEY:  Very well.  All right.

16          Thank you so much, Ms. Hester.

17          THE WITNESS:  Thank you.

18          MR. SCHEY:  Thank you -- Thank you, Ms. -- madame

19   court reporter.

20          THE REPORTER:  You're welcome.

21           (Proceedings concluded at 5:02 p.m.)

22                         -oOo-

23

24

25

1                    CHANGES AND SIGNATURE

2    WITNESS NAME: JUANITA HESTER        DATE: SEPTEMBER 9, 2016
     PAGE/LINE          CHANGE           REASON
3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25

1    I, JUANITA HESTER, have read the foregoing

2    deposition and hereby affix my signature that same is true

3    and correct, except as noted above.

4

5                                    _____

6                                    JUANITA HESTER

7

8

9    THE STATE OF TEXAS              )

10   COUNTY OF BEXAR                 )

11

12

13        Before me, _____, on this day

14   personally appeared JUANITA HESTER, known to me (or proved

15   to me under oath of through _____) to be the person

16   whose name is subscribed to the foregoing instrument and

17   acknowledged to me that they executed the same for the

18   purposes and consideration therein expressed.

19        Given under my hand and seal of this office

20   this _____ day of _____, 2016.

21

22

23                      _____

       NOTARY PUBLIC IN AND FOR
24     THE STATE OF TEXAS
       LICENSE EXPIRES ON _____

25

```
 1                UNITED STATES DISTRICT COURT
                  CENTRAL DIVISION OF CALIFORNIA,
 2                      WESTERN DIVISION

 3   JENNY LISETTE FLORES, et    '
     al.,                        '
 4                               '
          PLAINTIFFS,            '
 5                               '
     VS.                         '  CIVIL ACTION NO.
 6                               '  CV 85-4544 DMG (AGRx)
     LORETTA E. LYNCH,           '
 7   ATTORNEY GENERAL OF THE     '
     UNITED STATES, et al.,      '
 8                               '
          DEFENDANTS.            '
 9
     * * * * * * * * * * * * * * * * * * * * * * * * * *
10

11                  REPORTER'S CERTIFICATION
        ORAL AND TELEPHONIC DEPOSITION OF JUANITA HESTER
12                     SEPTEMBER 9, 2016

13        I, JESSICA BUTTS, a Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16        That the witness, JUANITA HESTER, was duly sworn

17   by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by the

19   witness;

20        That the original deposition transcript was

21   delivered to _____;

22        That a copy of this certificate was served on all

23   parties and/or the witness shown herein on

24   _____.

25        I further certify that pursuant to FRCP Rule
```

Case 2:85-cv-04544-DMG-AGR   Document 262-4   Filed 09/19/16   Page 55 of 58   Page ID #:7816

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1   30(f)(1) that the signature of the deponent was requested
 2   by the deponent or a party before the completion of the
 3   deposition and that the signature is to be before any
 4   notary public and returned within 30 days from date of
 5   receipt of the transcript.  If returned, the attached
 6   Changes and Signature Page contains any changes and the
 7   reasons therefor.
 8            I further certify that the amount of time used by
 9   each party at the deposition is as follows:
10            Mr. Schey:         2 Hours  43 Minutes
11            Ms. Fabian:        0 Hours  00 Minutes
12            That pursuant to information given to the
13   deposition officer at the time said testimony was taken,
14   the following includes counsel for all parties of record:
15            MR. PETER SCHEY, ATTORNEY FOR PLANTIFFS;
16            MR. MANOJ GOVINDAIAH, ATTORNEY FOR PLAINTIFFS;
17            MS. SARAH B. FABIAN, ATTORNEY FOR DEFENDANTS;
18            MR. GARY L. ANDERSON, ATTORNEY FOR DEFENDANTS;
19            MR. NATHAN L. HERBERT, ATTORNEY FOR DEFENDANTS;
20            MR. JUSTIN F. ADAMS, ATTORNEY FOR DEFENDANTS;
21            MR. THOMAS F. ZIMMERMAN, ATTORNEY FOR DEFENDANTS;
22            I further certify that I am neither counsel for,
23   related to, nor employed by any of the parties of
24   attorneys in the action in which this proceeding was
25   taken, and further that I am not financially or otherwise
```

 1    interested in the outcome of the action.

 2          Further certification requirements pursuant to

 3    Federal Rules will be certified to after they have

 4    occurred.

 5          Certified to by me on this _____ day of

 6    _____, 2016.

 7

 8          _____

 9          Jessica Butts
            Texas CSR #9441
10          Expiration Date: December 31, 2018

11          HOFFMAN REPORTING AND VIDEO SERVICE
            Firm # 93
12          206 E. Locust St.
            San Antonio, Texas 78212
13          Telephone:   (210) 736-3555
            Fax:         (210) 736-6679
14          www.hoffmanreporting.com

15

16

17

18

19

20

21

22

23

24

25

```
 1   COUNTY OF BEXAR              )
                                  )
 2   STATE OF TEXAS              )

 3

 4          I hereby certify that the witness was notified on

 5   _____ that the witness has 30 days

 6   after being notified by the officer that the transcript is

 7   available for review by the witness and if there are

 8   changes in the form or substance to be made, then the

 9   witness shall sign a statement reciting such changes and

10   the reasons given by the witness for making them:

11          That the witness' signature was/was not returned

12   as of _____.

13          Subscribed and sworn to on this _____ day

14   of _____, 2016.

15

16

17          _____

18          Jessica Butts
            Texas CSR #9441
19          Expiration Date: December 31, 2018

20          HOFFMAN REPORTING AND VIDEO SERVICE
            Firm # 93
21          206 E. Locust St.
            San Antonio, Texas 78212
22          Telephone:    (210) 736-3555
            Fax:          (210) 736-6679
23          www.hoffmanreporting.com

24

25
```

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On September 19, 2016 I electronically filed the following document(s):

- **PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR AND OPPOSITION TO DEFENDANTS' MOTION FOR EVIDENTIARY HEARING**

- **EXHIBIT 1 – DEPOSITION OF VALENTIN DE LA GARZA**

- **EXHIBIT 2 – DEPOSITION OF JUANITA HESTER**

- **EXHIBIT 3 – DEPOSITION OF JOSHUA RIED**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/  *Peter Schey*
*Attorney for Plaintiffs*