CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>          Plaintiffs,<br>- vs -<br><br>LORETTA E. LYNCH, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,<br><br>          Defendants.<br>_____ | Case No. CV 85-4544 DMG (AGRx)<br><br>EXHIBIT 3 – DEPOSITION OF JOSHUA REID – PART 1<br><br>Hearing: October 6, 2016 |

*Plaintiffs' counsel, continued:*

1

2   LA RAZA CENTRO LEGAL, INC.
    Michael S. Sorgen (Cal. Bar No. 43107)
3   474 Valencia Street, #295
    San Francisco, CA 94103
4   Telephone: (415) 575-3500

5
    THE LAW FOUNDATION OF SILICON VALLEY
6   LEGAL ADVOCATES FOR CHILDREN AND YOUTH
    PUBLIC INTEREST LAW FIRM
7   Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
    Katherine H. Manning (Cal. Bar No. 229233)
8   Kyra Kazantzis (Cal. Bar No. 154612)
    Annette Kirkham (Cal. Bar No. 217958)
9   152 North Third Street, 3rd floor
    San Jose, CA 95112
10  Telephone:   (408) 280-2437
    Facsimile:   (408) 288-8850
11  Email: jenniferk@lawfoundation.org
            kate.manning@lawfoundation.org
12          kyrak@lawfoundation.org
            annettek@lawfoundation.org
13
14  *Of counsel:*

15  YOUTH LAW CENTER
    Alice Bussiere (Cal. Bar No. 114680)
16  Virginia Corrigan (Cal. Bar No. 292035)
    200 Pine Street, Suite 300
17  San Francisco, CA 94104
    Telephone: (415) 543-3379 x 3903
18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____ :
                                   :
JENNY LISETTE FLORES, et al.,      :
            Plaintiffs             :      Case No. CV 85-4544
vs.                                :
                                   :
LORETTA A. LYNCH, Attorney         :
General for the United             :
States, et al.,                    :
            Defendants             :
_____ :


            Taken By:    Peter Schey, Esquire

            Date:        Monday, September 12, 2016
                         1:30 p.m.

            Place:       York County Prison
                         3400 Concord Road
                         York, Pennsylvania

JOSHUA REID  -  9/12/2016

```
1      APPEARANCES: Center for Human Rights and Constitutional Law

2
    PETER SCHEY, ESQUIRE
3         CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
          256 South Occidental Boulevard
4         Los Angeles, California  90057
          pschey@centerforhumanrights.org
5

6             For - The Plaintiffs

7         SARAH B. FABIAN, ESQUIRE
          Office of Immigration Litigation
8         P.O. Box 868, Ben Franklin Station

9         Washington, D.C.  20044

10        sarah.b.fabian@usdoj.gov

11            For - Defendants
    ALSO PRESENT:
12    Bridget Cambria, Esquire
      Jaqueline Kline, Esquire
13    Geraldine K. Richardson, Esquire

14    Ambler Napalitano, Esquire

15    Wendy L. Wallace, ICE Office Principal

16

17

18

19

20

21

22

23

24

25
```

```
  1                    INDEX TO WITNESSES

  2

       WITNESS
  3
       Joshua Reid - By Mr. Schey - 4
  4

  5

  6
                       INDEX TO EXHIBITS
  7
       DEPOSITION
  8    EXHIBIT NO.                              MARKED

  9    1 - Declaration and Handbook              22

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

1                        JOSHUA REID,
   called as a witness, having been duly sworn or

2  affirmed, was examined and testified as follows:

3             MS. FABIAN:  Peter, before you start, I'm

4  going to state an objection on the record.  We have

5  Bridget Cambria and Jaqueline Kline appearing in the

6  deposition today.  They're also witnesses in this

7  case, as they have submitted declarations to the

8  extent they intend to testify in the case.  We would

9  object to their appearing as both counsel in the

10 case and as witnesses in the case.

11            MR. SCHEY:  Okay.  I understand.  I guess

12 the same would be true of me since you want to

13 depose me.

14            MS. FABIAN:  It is also true of you.

15            MR. SCHEY:  Okay.

16            MS. FABIAN:  But I'll state that objection

17 at your deposition as well.

18            We're ready, Peter.  You can go ahead.

19                      EXAMINATION

20 BY MR. SCHEY:

21            Q.    Mr. Reid, are you ready to proceed?

22            A.    Yes, sir.

23            Q.    If you do not understand any of my

24 questions please just let me know.

25            A.    Okay.

JOSHUA REID - 9/12/2016

1      Q.      And if you can make an estimate of

2   something and then go ahead and make an estimate,

3   but do not guess or speculate, okay?

4           A.      Okay.

5           Q.      All right.  Can you tell me when was

6   the most recent time that you received either

7   training, guidance or instruction regarding the

8   requirements of the 1997 Flores settlement and who

9   provided you with that training, guidance or

10  instruction?

11          A.      I mean --

12          Q.      If you do not recall, just so state.

13          A.      We received training in and guidance

14  for different ICE policies all the time.  As far as

15  something that's, you, know definitely tied to the

16  Flores settlement, I do not recall.

17          Q.      Okay.  When was the most recent

18  time, if you recall, that you received any training,

19  guidance or instructions regarding an order that

20  Judge Gee issued in August 2015 in the Flores case,

21  and if you received any such training guidance or

22  instructions, who did you receive it from, if you

23  recall?

24          A.      I just became involved with the

25  Berks Family Center in March.  There might have been

JOSHUA REID - 9/12/2016

1    policies or guidance that came out prior to my

2    involvement, but I don't recall receiving anything

3    that was particularly since I've been involved

4    related to that.

5            Q.    And are you other than yourself

6    personally are you aware of when the most recent

7    time was that other ICE officers working at Berks

8    received instruction, training or guidance regarding

9    the 1997 Flores settlement if you know?

10           MS. FABIAN:  Objection to form.  You can

11    answer.

12           THE WITNESS:  I'm not aware when they

13    received guidance, particularly related to the

14    Flores settlement.

15    BY MR. SCHEY:

16           Q.    Okay.  And same question with

17    regards to Judge Gee's August 2015 order.

18           Would it be the same response?

19           MS. FABIAN:  Object to form.

20           THE WITNESS:  Yes.  It would be the same

21    response.

22    BY MR. SCHEY:

23           Q.    And do you know who the class

24    members are in the Flores case?

25           A.    No.  I'm not particularly aware of

JOSHUA REID -   9/12/2016

1      who are the class members.

2                Q.      Okay.   Are you aware of what

3      paragraph 14 of the Flores settlement requires?

4                A.      I don't know specifically what

5      paragraph 14 states, sir.

6                Q.      Are you aware of what paragraph 19

7      states?

8                A.      I do not know specifically what

9      paragraph 19 states.

10               Q.      Are you in charge of supervising the

11     ICE offices that work at Berks?

12               A.      Yes.   I'm the assistant field

13     director over the family cases.

14               Q.      And how many ICE officers work at

15     Berks approximately?

16               A.      We just had a few just transferred.

17     I believe we're at nine officers.

18               Q.      And before the transfer how many

19     were there?

20               A.      Eleven officers, not including the

21     supervisors or support staff.

22               Q.      When you say supervisors, do you

23     mean ICE supervisors?

24               A.      Correct.

25               Q.      And how many ICE supervisors are

JOSHUA REID  -  9/12/2016

1        assigned to Berks?

2                A.      Two.

3                Q.      And is one of the factors relevant

4        to how rapidly ICE officers can process cases at

5        Berks the number of officers assigned to Berks?

6                MS. FABIAN:   Object to form.

7                THE WITNESS:   Can you please explain what

8        you mean by process?

9                MR. SCHEY:   Certainly.

10       BY MR. SCHEY:

11               Q.      In your declaration you talk about

12       various things that ICE officers do to assess cases

13       for release from custody or to process them for

14       removal.

15               Do you recall discussing that in general

16       in your declaration?

17               MS. FABIAN:   Object to form.

18               THE WITNESS:   General things of that

19       nature, yes.  But when you say process, what

20       specifically are you talking about?  You talked

21       about essentially three or four different things

22       there.

23       BY MR. SCHEY:

24               Q.      Why don't you briefly tell us what

25       the ICE officers do there?

JOSHUA REID  -  9/12/2016

Page 10

 1              MS. FABIAN:  Object to form.
 2              THE WITNESS:  They are responsible for
 3     managing the cases of the families that are at the
 4     center.
 5     BY MR. SCHEY:
 6              Q.    When you say managing the cases,
 7     what does that mean?
 8              A.    Well, as they go through proceedings
 9     making certain they are served with any forms.  If
10     they receive a final order of removal, obtaining
11     travel documents and scheduling removal.  If they
12     are going through the credible fear process,
13     assisting CIS with serving forms, things of that
14     nature.
15              Q.    Okay.  So as to those functions, can
16     we call that processing for convenience?
17              A.    Sure.
18              Q.    Would that processing be speeded up
19     or slowed down if you had additional ICE officers
20     assigned to Berks?
21              MS. FABIAN:  Object to form.
22              THE WITNESS:  Our officers are processing
23     things in a quick manner to begin with, so I think
24     we're at adequate staff to process things quickly
25     and efficiently.

```
 1    BY MR. SCHEY:
 2              Q.    Okay.  My question was a little
 3    different.
 4              Let's say you went down to one officer.
 5    Would that speed things up or slow them down or do
 6    you think everything would stay the same?
 7              MS. FABIAN:  Object to form.
 8              THE WITNESS:  If we only had one officer,
 9    yeah, it would probably slow things down.
10    BY MR. SCHEY:
11              Q.    Okay.  Isn't it fair to say that if
12    you had more officers it would speed things up?
13              A.    Not necessarily.  If we had 20
14    officers but there's only one thing to do that day,
15    20 officers aren't going to be able to accomplish
16    the same task that one officer could accomplish
17    faster or more efficiently.
18              Q.    Okay.  And what if you didn't have
19    just one thing to do with 11 officers in a day?  If
20    you had many things to do in a day, would it then
21    speed things up if you had more staff under your
22    supervision?
23              MS. FABIAN:  Object to form.
24              THE WITNESS:  As I haven't really
25    encountered situations where I don't have the staff
```

JOSHUA REID -  9/12/2016

1    to meet our goals and expectations.  I don't want to

2    speculate on that.

3    BY MR. SCHEY:

4            Q.    What is the bed capacity there?

5            A.    I believe it's 96.

6            Q.    How many beds are currently

7    occupied?

8            A.    We currently have 67 residents at

9    the center.

10           Q.    To the best of your knowledge, are

11   any written materials relating to the 1997 Flores

12   settlement currently being distributed to detainees

13   at Berks?

14           MS. FABIAN:  Object to form.

15           THE WITNESS:  Yes.

16   BY MR. SCHEY:

17           Q.    What is being distributed to

18   detainees at Berks that's required by the 1997

19   Flores settlement?

20           MS. FABIAN:  Object to form.

21           THE WITNESS:  The notice of rights.

22   BY MR. SCHEY:

23           Q.    Which notice of rights?

24           A.    It's a notice of rights to residents

25   that advises the juveniles of their rights in

JOSHUA REID -  9/12/2016

```
 1     connection with the Flores settlement.
 2               Q.    I'm not sure what you mean.  What
 3     rights does it advise them of?
 4               A.    It basically states that juveniles
 5     are to be housed in an open setting and not in
 6     detention facilities.  If they believe they have
 7     been inappropriately placed, they can request for a
 8     federal judge to review that.
 9               Q.    When did you start distributing that
10     notice?
11               A.    I don't recall the specific dates,
12     but it was sometime towards the end of July of 2016.
13               Q.    I notice in your declaration that
14     you mentioned that ICE maintains limited discretion
15     to parole detainees subject to expedited removal
16     when parole is required to meet medical emergency or
17     it is necessary for legitimate law enforcement
18     objectives.
19               Do you recall making that statement in
20     your declaration?
21               A.    Yes, sir.
22               Q.    Since you have been there in --
23     starting in March 2016, are you aware of any minor
24     who was released pursuant to the 1997 Flores
25     settlement?
```

```
 1                    MS. FABIAN:  Object to form.

 2                    THE WITNESS:  I'm aware of minors and

 3       residents that have been released, but I don't know

 4       if there was pursuant to directly pursuant to the

 5       Flores settlement.

 6       BY MR. SCHEY:

 7               Q.    Can you recall any specific instance

 8       in which someone was released not because of a

 9       medical emergency or a legitimate law enforcement

10       objective, but instead because of application of the

11       1997 Flores settlement?

12                    MS. FABIAN:  Objection to form.  Asked and

13       answered.

14       MR. SCHEY:

15               Q.    Are you aware of any such case?

16                    MS. FABIAN:  Object to form.

17                    THE WITNESS:  I'm not aware of any case

18       that was released specifically in conjunction with

19       the Flores settlement.

20       BY MR. SCHEY:

21               Q.    How about same question in

22       conjunction with Judge Gee's August 2015 order.

23               Are you aware of any such release?

24                    MS. FABIAN:  Object to form.

25                    THE WITNESS:  I'm not aware of such
```

1    release.  We release families based on applicable

2    guidelines and policies.  Some of those might have

3    been in conjunction, but honestly I'm not sure.

4    BY MR. SCHEY:

5              Q.     When you say applicable policies,

6    are you referring to what you stated in your

7    declaration, namely, that there is a medical

8    emergency or a legitimate law enforcement objective.

9    Those are the only two things that you mentioned in

10   the declaration.

11             Is that what you were referring to?

12             MS. FABIAN:  Object to form, foundation

13   and characterization of his declaration.  Go ahead.

14             THE WITNESS:  Those wouldn't be the only

15   things we consider, no.

16   BY MR. SCHEY:

17             Q.     What are the other things you

18   consider?

19             A.     There's a variety of policies and

20   procedures.  For example, the DHS enforcement

21   priorities, you know, the ICE directive relating to

22   the parole of aliens found to be credible fear,

23   policies such as those.

24             Q.     So you said one was the credible

25   fear.  What was the other one?

JOSHUA REID  -  9/12/2016

Page 16

1          A.    The DHS Department Homeland Security

2    Enforcement priorities that were set in place by DHS

3    Secretary Johnson.

4          Q.    And what are the criteria in those

5    enforcement policies that could result in a release

6    of a minor?

7          A.    They're not really specific to

8    minors, but they to -- they are specific to the

9    decision whether to apprehend, detain or remove

10    aliens in general.

11          Q.    Let's say aliens in general.  What

12    are those enforcement policies specifically with

13    regard to release?

14          A.    I'm sorry.  Did you say enforcement

15    priorities relating to release?

16          Q.    Yes.  That you have been referring

17    to.

18          A.    Well, the memorandum states if an

19    alien falls within the priorities, depending on the

20    level, ICE should typically pursue apprehension,

21    detention and removal unless there's exceptional or

22    compelling circumstances against other or alien

23    demonstrates they're eligible for some form of

24    relief removal, either asylum or some other forms.

25          Q.    Okay.  And other than if they

1      qualify for relief or have a positive fugitive

2      nation, what are the other priorities that you

3      mentioned solely with regards to release?

4                  MS. FABIAN:  Object to form.

5                  THE WITNESS:  That's what it basically

6      says regarding release.

7      BY MR. SCHEY:

8            Q.    What is it that it says regarding

9      release, other than if they're eligible for some

10     form of relief?  What are the other priorities?

11                 MS. FABIAN:  Object to form.  Foundation.

12                 THE WITNESS:  There's several priorities

13     in there.  I mean --

14     BY MR. SCHEY:

15           Q.    Are there --

16           A.    Do you want to know specifically who

17     falls within the priorities?

18           Q.    Yes.

19           A.    Aliens with criminal convictions,

20     aliens that are apprehended at the border or other

21     ports of entry while trying to unlawfully enter,

22     aliens that receive a final order of removal.  After

23     a certain time period, all of those fall within the

24     priorities.  Those are some of them, not all of

25     them.

JOSHUA REID - 9/12/2016

1          Q.     But my question was, who falls
2     within the priorities?  Who's eligible for release?
3     Not for ongoing detention.
4               MS. FABIAN:  Object to form.
5     BY MR. SCHEY:
6               Q.     Other than people who appear to
7     qualify for relief from removal?
8               MS. FABIAN:  Object to form.
9               THE WITNESS:  Aliens that -- that would be
10    it, that appear to be eligible for some type of
11    relief or removal or can demonstrate exceptional
12    circumstances.
13    BY MR. SCHEY:
14              Q.     What does that mean, the exceptional
15    circumstances?
16              A.     There's a variety of things that
17    could be taken into play.  It could be a medical
18    condition a medical condition of their family
19    member; numerous factors.
20              Q.     Other than -- so far you mentioned
21    medical conditions and they qualify for some relief
22    from removal.
23              Other than those two, what are the other
24    priorities that could result in release?
25              A.     Well, you keep stating what are the

JOSHUA REID - 9/12/2016

1  priorities that result in release.  The priorities

2  are used to determine when somebody should be taken

3  into custody generally.

4        Q.    I'm talking just about release, not

5  taken into custody.  Are there any other priorities

6  you can recall that would permit release other than

7  a person appears to qualify for relief from removal

8  or there is a medical emergency.  Other than those

9  two, is there any other that you can recall that

10  would precipitate a persons release?

11        MS. FABIAN:  Object to form.

12        THE WITNESS:  Like I said, in compelling

13  and exceptional circumstances, there's different

14  factors and circumstances that we would take into

15  consideration.

16  BY MR. SCHEY:

17        Q.    And this policy, does it provide any

18  examples of these compelling or exceptional

19  circumstances?

20        A.    I would have to look at the policy

21  memorandum to answer that, sir.

22        Q.    Okay.  Can you recall any without

23  looking at it?

24        A.    Not without looking at it, no.

25        Q.    If a mother is determined to be

JOSHUA REID -  9/12/2016

1    pregnant at Berks, is that a basis upon which the

2    mother and her accompanying child may be released?

3            A.     That we would take that

4    consideration into factor and, yes, it could be.

5            Q.     Other than to attend a removal

6    hearing, can you recall the most recent example of

7    when a class member, a Flores class member, was

8    authorized to leave the grounds of Berks?

9            MS. FABIAN:  Object to form.  Foundation.

10   I just want to state at the beginning, you asked him

11   if he understood what constituted a class member,

12   and I think he said, no, I don't know.  If you want

13   to define class member for the purposes of your

14   question.

15           MR. SCHEY:  Okay.  That's a good point.

16   Thank you.

17   BY MR. SCHEY:

18           Q.     Can you recall the most recent time

19   that a child and mother were authorized to leave the

20   Berks facility, not be released, but just

21   temporarily leave the facility for something like

22   shopping or to go to a library or visit friends?

23   Can you recall any such incident?

24           MS. FABIAN:  Object to form.

25           THE WITNESS:  I don't recall or know of a

1    specific date, but residents including mothers and

2    children, go on different trips outside of the

3    center regularly.

4    BY MR. SCHEY:

5         Q.    And when they do that they are

6    accompanied by who?

7         A.    Berks staff usually accompany them.

8         Q.    You state in your declaration at

9    paragraph 22, as the residents are in ICE custody,

10   they are prohibited from leaving the center and the

11   grounds without authorization or supervision.

12        Have you authorized any such departures

13   since March that you can recall?

14        MS. FABIAN:  Object to form.  Foundation.

15        THE WITNESS:  I'm sorry.  Can you repeat

16   that, sir?

17   BY MR. SCHEY:

18        Q.    You state insofar as the residents

19   are in ICE custody they are prohibited from leaving

20   the center and the grounds without authorization or

21   supervision.

22        Can you recall authorizing such a

23   departure from the grounds between March 2016 and

24   the present?

25        MS. FABIAN:  Same objections.

JOSHUA REID -  9/12/2016

1              THE WITNESS:  The authorization doesn't

2      have to specifically come from ICE.  You just

3      mentioned possibly different field trips whatnot.

4      The county medical appointments, county staff is

5      able to make that decision.

6      BY MR. SCHEY:

7              Q.   If a person left without

8      authorization or without supervision you state that

9      that person can be arrested by ICE officers; is that

10     correct?

11             MS. FABIAN:  Object to form.

12             THE WITNESS:  What context are we talking

13     about?

14     BY MR. SCHEY:

15             Q.   I'm just reading from your

16     declaration, and you said at paragraph 22 that if

17     somebody left without authorization it would be

18     considered a fugitive and subsequently may be

19     arrested.

20             Is that an accurate statement?

21             MS. FABIAN:  Are you asking him if he said

22     that.  Do you want me to give him his declaration as

23     an exhibit like we did before.

24             MR. SCHEY:  I'm fine with that.  Maybe

25     introduce his declaration as Exhibit 1.

JOSHUA REID -  9/12/2016

1          MS. FABIAN:  I wasn't sure if you were

2     asking if he said that, in which case it would be

3     helpful to have it.  This will be marked.

4          (Deposition Exhibit Number 1 marked.)

5          MS. FABIAN:  It's been marked and handed

6     to the witness.

7     BY MR. SCHEY:

8          Q.   At paragraph 22, the residents are

9     in ICE custody.

10          Can you explain what that means?

11          A.   Yes.  When residents are

12     apprehended, whether it be CBP or inspections, they

13     are turned over to ICE.  And when it's families they

14     are going to be housed at a family residential

15     center, but they are advised they are in custody.

16     And like I stated in my declaration, if they would

17     like to leave the center they would need permission.

18          Q.   Are you aware of any case between

19     March and the present when a detainee at Berks was

20     permitted to leave the facility without supervision?

21     If so, tell us when that happened.

22          MS. FABIAN:  Object to form.

23          THE WITNESS:  There have been several

24     residents that have been released from the center.

25     MR. SCHEY:

JOSHUA REID -  9/12/2016

```
 1              Q.    I'm talking about if they are
 2      allowed to leave, not released.  They are allowed
 3      to.
 4              Can you recall any circumstance between
 5      March and the present?  If so, explain it to us.
 6              A.    Well, --
 7              Q.    When a detainee was allowed to
 8      temporarily leave the facility without supervision?
 9              MS. FABIAN:  Object to form.
10              THE WITNESS:  Can you give an example,
11      leave the facility for what?
12      BY MR. SCHEY:
13              Q.    Go shopping, go to the movies, go to
14      the library take their child to a school, anything
15      like that.
16              Can you recall any such circumstance
17      between March and the present?  If so, tell us about
18      it.
19              MS. FABIAN:  Object to form.
20              THE WITNESS:  No.  I can't recall that
21      they were allowed to leave without supervision by
22      Berks counselors.
23      BY MR. SCHEY:
24              Q.    And can you recall any situation
25      between March and the present in which a detainee
```

JOSHUA REID - 9/12/2016

1      was allowed to temporarily leave the facility

2      without authorization?  If so, tell us about it.

3                  MS. FABIAN:  Object to form.

4                  THE WITNESS:  I'm not aware of any time a

5      resident was allowed to leave the center without

6      authorization, no.

7      BY MR. SCHEY:

8                  Q.    Would it be fair to say, as I

9      believe you said in your declaration, paragraph 22,

10     that if a parent or his or her child left the

11     facility without authorization or supervision that

12     they would be considered a fugitive.

13                 Is that fair to say?

14                 A.    The fact and circumstances of each

15     case is different.  If a resident left the center

16     along with their children without authorization a

17     decision wouldn't be made in the vacuum.  It would

18     be made by ICE management, ICE headquarters, the

19     juvenile family management residential unit as to

20     what steps would be taken next.

21                 Q.    What did you mean in your

22     declaration when you said that they may be

23     considered a fugitive?

24                 A.    What was stated, that they could be

25     considered a fugitive.

JOSHUA REID - 9/12/2016

Page 26

```
 1                    Q.    Okay.  And has that ever happened to
 2         your knowledge?
 3                    A.    Not since I've been involved in the
 4         center, no.
 5                    Q.    How about before you were involved?
 6                    A.    I wouldn't know before I was
 7         involved.
 8                    Q.    Okay.  And is it your understanding
 9         that no detainees at Berks walk away from that
10         facility because they just do not want to?  Why did
11         you think they do not just walk away from the
12         facility?
13                    MS. FABIAN:  Object to form.  Foundation.
14         Calls for speculation.
15                    THE WITNESS:  Exactly, I'm not going to
16         speculate why the resident choose to stay or choose
17         not to walk away.
18         B MR. SCHEY:
19                    Q.    Are the residents informed that if
20         they walk away without supervision and authorization
21         they may be considered a fugitive and arrested by
22         ICE officers?  Are they informed of that?
23                    A.    When residents are admitted to the
24         center they are given a handbook and that book
25         details what are the potential offenses, and one of
```

1    them is leaving the center without authorization.

2              Q.    Did you attach that as an exhibit to

3    your declaration, that handbook?

4              A.    Yes.  The resident handbook in one

5    of the exhibits, correct.

6              Q.    Can you point to the language that

7    tells detainees when you told us?

8              A.    I would have to review the handbook

9    itself, sir, to find that.

10             MS. FABIAN:  I did not hand him the

11   exhibits because you had me not do that on Friday.

12   I can do that now, if you would like.  We can

13   include that exhibit as part of the exhibit.

14             MR. SCHEY:  That's fine.

15             MS. FABIAN:  I'm amending one to be the

16   declaration including all of the attached exhibits.

17             THE WITNESS:  On page 28 of the resident

18   handbook it states, leaving the grounds of the

19   facility or from the custody of an employee outside

20   the facility without permission is a disciplinary

21   offense.

22   BY MR. SCHEY:

23             Q.    What number is that?

24             A.    That's under number 312.

25             Q.    That's called escape?

JOSHUA REID - 9/12/2016

1          A.     Correct.

2          Q.     And in the earlier parts of that

3    instruction, it talks about the rights of detainees

4    and that's on page 6.  Anywhere in the rights of

5    detainees does it indicate that they are free to

6    leave the facility?

7          A.     I would need to review them, sir.

8          Q.     Take a look.

9          A.     Can you repeat the question, sir?

10         Q.     Is there anything among the list of

11   rights of detainees that tells them that they have

12   the right to leave the facility?

13         A.     No.

14         Q.     Is Berks currently a licensed

15   facility or unlicensed?

16         MS. FABIAN:  Object to form.

17         THE WITNESS:  As the license is pending

18   litigation, I don't feel I'm qualified to make that

19   determination.

20   BY MR. SCHEY:

21         Q.     When you say it's pending

22   litigation, what litigation is that?

23         A.     You would need to consult with the

24   attorneys that are involved in that litigation to

25   get the specifics.

JOSHUA REID -  9/12/2016

```
 1              Q.     And who is involved in that
 2    litigation?
 3              A.     Berks County attorneys, I believe.
 4              Q.     And are you aware or unaware while
 5    that litigation may be pending at the present time
 6    whether Berks has a license or does not have a
 7    license?
 8              MS. FABIAN:  I'm going to object to form
 9    and I'm going to object to the extent you are asking
10    him things his lawyers may have told him.  I'm going
11    to direct him not to answer as to anything his
12    lawyers have told him on the grounds of privilege.
13    BY MR. SCHEY:
14              Q.     Do you know, other than what your
15    lawyers have told you, whether Berks is currently
16    licensed or unlicensed?
17              A.     As it's a matter of pending
18    litigation, you would need to consult with the
19    attorneys.
20              Q.     Do you know or not know whether it's
21    licensed or unlicensed at the present time?
22              MS. FABIAN:  Object to form.
23              THE WITNESS:  As stated, you would have to
24    consult with the attorneys on that and the pending
25    litigation.
```

JOSHUA REID -  9/12/2016

1      BY MR. SCHEY:

2              Q.    Okay.  Aside from the fact that I

3      have to consult with the attorneys, the question is

4      do you know, I think it's a yes-or-no question, do

5      you know whether Berks currently has a license?

6      Yes, I know or  no, I don't know.

7              A.    Operations are continuing as usual.

8              Q.    Okay.  Do you know whether Berks

9      currently has a license?

10             MS. FABIAN:  Object to form.

11             THE WITNESS:  As it's a matter of pending

12     litigation, the status of the license, you would

13     need to consult with the attorneys.

14     BY MR. SCHEY:

15             Q.    Okay.  Do you know whether Berks

16     currently has a license or not?

17             MS. FABIAN:  I'm going to object to form.

18     Peter, he's answered the question.

19             MR. SCHEY:  I don't believe he has.  He

20     says it's a matter of litigation.  I'm not asking is

21     the license currently a matter of litigation, and

22     his response would be responsive.  I'm asking, do

23     you know whether Berks currently has a license or

24     not?

25             MS. FABIAN:  Whether Berks has a license

JOSHUA REID - 9/12/2016

1    is a legal question.  Then I think the best answer

2    is the attorneys are those who can answer that

3    question.

4            MR. SCHEY:  He may answer the question, if

5    he knows.

6            THE WITNESS:  As it's a matter of pending

7    litigation, the attorneys are aware.  I'm not.

8    BY MR. SCHEY:

9            Q.    Okay.  Tell us briefly prior to your

10   current position at Berks starting in March of 2016,

11   what position did you hold before that?

12           A.    A supervisory detention and

13   deportation officer position.

14           Q.    Where was that?

15           A.    The York County Prison.

16           Q.    How long were you in that position?

17           A.    Since January of 2012.

18           Q.    And currently how many fathers of

19   children are retained at Berks?

20           A.    There are no fathers currently.

21           Q.    And do you know why all the

22   accompanying parents at Berks are mothers and not

23   fathers?

24           MS. FABIAN:  Object to form.

25           THE WITNESS:  We accept fathers there.

1    I've had fathers detained.  We don't dictate what

2    request we receive.  We review them as they come

3    from either the arresting officers or San Antonio

4    ICE.

5    BY MR. SCHEY:

6              Q.    My question was, do you have any

7    idea why all of the accompanying parents are mothers

8    and no fathers?

9              MS. FABIAN:  Object to form.  Foundation.

10             THE WITNESS:  As stated, we don't control

11   who requests families to be housed at the center.

12   So when fathers come to the center, when we receive

13   requests from fathers, we review them similar to any

14   other request and have accepted fathers in the past.

15   BY MR. SCHEY:

16             Q.    When was the most recent time that

17   you had a father detained with a child at Berks?

18             A.    I don't know the specific dates, but

19   it's couple weeks ago we had a few fathers.

20             Q.    And when you have fathers there

21   during the daytime, do they use common areas that

22   children may also use?

23             A.    Yes.  As it's an open center that

24   doesn't restrict the movement of residents, yes,

25   they use the common areas as the mothers and

JOSHUA REID - 9/12/2016

1     children.

2              Q.     And would the same be true of the

3     mothers?

4              A.     The same would be true of the

5     mothers.

6              Q.     To your knowledge, has ICE

7     considered segregating unrelated fathers from other

8     children in the common areas at Berks, if you know?

9              A.     I'm not aware of ICE considering

10    that, no.

11             Q.     And of the detainees at Berks, can

12    you tell us, are some of these detainees transferred

13    from Delhi {phonetic} or Karnes to Berks?

14             A.     Yes, sir.

15             Q.     And approximately what percentage,

16    in your experience, are transferred from Delhi

17    {phonetic} or Karnes to Berks?

18             MS. FABIAN:  Object to form.

19             THE WITNESS:  I don't know the

20    approximate.

21    BY MR. SCHEY:

22             Q.     Is it approximately 50 percent or

23    more or less?  What's your best estimate?

24             A.     If I was to estimate I would say

25    it's over 50 percent.

JOSHUA REID -  9/12/2016

Page 34

1              Q.     Are the mothers still on a hunger
2      strike at Berks at this time?
3              MS. FABIAN:  Object to foundation.
4              THE WITNESS:  There are several adult
5      residents that are refusing to accept meals, but
6      they have access to food 24/7 outside of meal
7      periods.
8      BY MR. SCHEY:
9              Q.     How long has that been going on
10     approximately?
11             A.     Several mothers have been refusing
12     meals for a few weeks.
13             Q.     And --
14             A.     Off and on.
15             Q.     And I assume you have familiarized
16     yourself with why they are refusing food?
17             MS. FABIAN:  Object to form.  Foundation.
18             THE WITNESS:  I know what they have
19     stated.
20     BY MR. SCHEY:
21             Q.     In brief, tell us what they have
22     stated?
23             A.     Some not all have stated they are
24     refusing meals until they are released.
25             Q.     Do you know why they have not been

JOSHUA REID -   9/12/2016

```
 1     released?
 2              MS. FABIAN:  Object to form.
 3              THE WITNESS:  There's various policies and
 4     procedures that govern their custody.  Not every
 5     case is the same.  They are all different.
 6     BY MR. SCHEY:
 7              Q.    Berks has an outdoor area around the
 8     building; is that correct?
 9              A.    There is an outside recreational
10     area, that is correct.
11              Q.    Is that currently fenced or
12     unfenced?
13              A.    There is a post and rail fence
14     around that recreational area.
15              Q.    Are detainees allowed in that area
16     without supervision or do they use that area with
17     supervision if you know?
18              A.    There's typically a counselor
19     present when residents are outside of the center.
20              Q.    And is there an agreement between
21     ICE and the contractor that operates Berks?
22              MS. FABIAN:  Object to form.
23              THE WITNESS:  Agreement related to what,
24     sir?
25     BY MR. SCHEY:
```

JOSHUA REID - 9/12/2016

```
 1            Q.    To the operation of Berks?
 2            A.    I'm sure there's a contract of some
 3    sort, yes.
 4            Q.    And what does that contract say with
 5    regards to the obligations of the -- what you call
 6    the counselors with regards to ensuring that
 7    detainees do not leave Berks without supervision?
 8            MS. FABIAN:  Object to form.  Foundation.
 9            THE WITNESS:  I would need to review the
10    contract to see if it contains anything regarding
11    that.
12    BY MR. SCHEY:
13            Q.    In paragraph 7 of your declaration,
14    and feel free to look at it.  Currently, is --
15    strike that.
16            Currently, do the ICE agents who review
17    the family's files and briefly interview the head of
18    household, to the best of your knowledge do they
19    have any instructions, written instructions, about
20    how to apply paragraphs 14 or 19 of the Flores
21    settlement during this review that is discussed in
22    paragraph 7?
23            MS. FABIAN:  Object to form.
24            THE WITNESS:  I'm sorry.  Give me a minute
25    to read paragraph 7.
```

JOSHUA REID -  9/12/2016

```
 1                Can you repeat the question, please?
 2       BY MR. SCHEY:
 3                Q.    Certainly.  I'm looking at the third
 4       sentence that begins with, soon after arrival, ERO
 5       will review the family's alien files --
 6                A.    Okay.
 7                Q.    -- and interview the head of
 8       household.  Are you aware of any written
 9       instructions to ICE agents at Berks explaining to
10       them how during this process they are to apply or
11       comply with paragraphs 14 or 19 of the Flores
12       settlement?  And if so, tell us about those
13       instructions, if you know about them.
14                MS. FABIAN:  Object to form.
15                THE WITNESS:  As I'm not familiar with
16       paragraph 14 and 19 of the settlements, I don't
17       know.
18       BY MR. SCHEY:
19                Q.    What currently is the length of
20       detention for the longest detained child at Berks?
21                A.    I don't know off the top of my head
22       what the longest would be exactly, sir.
23                Q.    Let's not try to be exact, because I
24       know that would be difficult or impossible.  Let's
25       just say approximately, what is the longest held
```

JOSHUA REID -  9/12/2016

1    child that you have at Berks at the present time?
2    Approximately.
3              A.    Approximately --
4              MS. FABIAN:  Object to form.
5              THE WITNESS:  Approximately, I would say
6    probably about 13 months.
7    BY MR. SCHEY:
8              Q.    And approximately how many children
9    have been held at Berks for more than 12 months?
10             A.    I don't know.
11             Q.    What would your best estimate be?
12             A.    I don't want to speculate on that,
13   to be honest.  I don't know on that one.
14             Q.    Okay.  And at the present time,
15   approximately how many children have been held at
16   Berks for more than six months?  I realize you don't
17   have the exact number, but I'm just saying your best
18   estimate based on your function at the facility?
19             A.    I would have to review the custody
20   information.  I don't want to even give you an
21   approximate on that.  There's several, but a number
22   I don't know.
23             Q.    Are there any other requirements of
24   the 1997 Flores settlement that you can tell us
25   about today?

1          MS. FABIAN:  Object to form.

2          THE WITNESS:  As I stated, I'm not

3    intimately familiar with all of the requirements of

4    the settlement.  I don't know.

5    BY MR. SCHEY:

6          Q.   Are there any parts of Judge Gee's

7    August 2015 order that you can tell us about today?

8          MS. FABIAN:  Object to form.

9          THE WITNESS:  As I'm not intimately

10   familiar with the order, no, there is nothing.

11   BY MR. SCHEY:

12         Q.   Are there any parts of Judge Gee's

13   order of August 2015 that you could describe to us

14   today that are just based upon your vague

15   understanding as opposed to intimate understanding

16   of her order?

17         MS. FABIAN:  Object to form.

18         THE WITNESS:  There's various policies and

19   procedures we follow in relation to the center, but

20   I couldn't tell you if they are specifically related

21   to Judge Gee's order.

22   BY MR. SCHEY:

23         Q.   Can you identify any case between

24   March of 2016 and the present in which a child was

25   released from Berks for law enforcement reasons?

JOSHUA REID - 9/12/2016

```
 1              MS. FABIAN:  Object to form.  Foundation.
 2              THE WITNESS:  Give me a minute to think
 3     about that.  We released several families.  Let me
 4     think.  No, not that I'm aware of.
 5     BY MR. SCHEY:
 6          Q.    And between March of 2016 and the
 7     present, can you recall any child released from
 8     Berks because of a medical emergency?
 9          A.    There has been several children
10     along with their parents that have been released
11     because of medical reasons, yes.
12          Q.    My question was because of the
13     medical emergency between March and the present
14     time?
15              MS. FABIAN:  Object to form.
16              THE WITNESS:  As stated, there has been
17     several residents that have been released based on
18     medical concerns, yes.
19     BY MR. SCHEY:
20          Q.    When you say paragraph 17, that
21     children may enter their parents' bedroom only in
22     the company of their parents, are detainees advised
23     of that in the detainee handbook you previously
24     referred to?  And if so, tell us where they are so
25     advised.
```

JOSHUA REID -  9/12/2016

```
 1              A.    Give me a minute to review the
 2      statement.  I would have to review the whole
 3      handbook to answer that.
 4              Q.    And so at this time you do not know?
 5              A.    Correct.  I would have to review the
 6      handbook to answer that question.
 7              Q.    In paragraph 18, the end of
 8      paragraph 18, you refer to several families who
 9      received stays of deportation from various courts.
10              Approximately how long, how many months
11      have those stays of deportation been in effect?
12              A.    I would have to look at each
13      family's case to answer that, sir.
14              Q.    On average is that a matter of more
15      a matter of days, weeks or months?
16              MS. FABIAN:  Object to form.
17              THE WITNESS:  Once again, I would have to
18      look at their cases to answer that accurately.
19      MR. SCHEY:
20              Q.    In your experience working at Berks
21      when people obtain a stay from a federal court, is
22      that stay usually in effect for several months?
23              MS. FABIAN:  Object to form.  Foundation,
24              THE WITNESS:  Each case is different.
25      Sometimes, yes.  Sometimes, no.
```

```
 1      BY MR. SCHEY:

 2              Q.     Have you attempted to determine how

 3      long the longest detained children have been at

 4      Berks because they or their mothers received a stay

 5      of deportation,  either from the Board of

 6      Immigration Appeals or an immigration judge or a

 7      federal court?

 8              MS. FABIAN:  Object to form.

 9      BY MR. SCHEY:

10              Q.     Have you attempted to determine

11      that?

12              MS. FABIAN:  Objection to form.

13              THE WITNESS:  Sorry.  Can you repeat that,

14      please?

15      MR. SCHEY:

16              Q.     Have you attempted to determine how

17      long the longest held children and mothers have been

18      at Berks as a result of stays issued by an

19      immigration judge or the Board of Immigration

20      Appeals or a federal court?

21              MS. FABIAN:  Object to form.

22              THE WITNESS:  I would need to look at

23      their cases to determine that.  Have I specifically

24      attempted to determine that?  No.

25      BY MR. SCHEY:
```

JOSHUA REID - 9/12/2016

```
1                 Q.    Looking at paragraph 19 of your
2      declaration, you indicate that mothers and children
3      detained at Berks are subject -- or they're subjects
4      of final expedited removal, and are therefore,
5      statutorily ineligible for bond hearings before
6      immigration judges.
7                 Have you received any guidance,
8      instruction or training, and if so from whom and
9      when, relating to any exception to this rule that
10     may be provided by the 1997 Flores settlement?
11                 MS. FABIAN:  Object to form.  Foundation.
12                 THE WITNESS:  I'm not sure how the rule
13     applies on the Flores settlement.  I don't know how
14     to answer that one.
15                 MS. FABIAN:  Do you want a break?
16                 THE WITNESS:  That's fine.
17                 MR. SCHEY:  I don't mind.
18                 MS. FABIAN:  Call this number back in 10
19     minutes.
20                 (A brief recess was taken.)
21                 MS. FABIAN:  Back on the record now.
22     MR. SCHEY:
23                 Q.    Has anyone with final removal
24     orders, following expedited removal, been released
25     from Berks in the previous two months?  And if so,
```

JOSHUA REID - 9/12/2016

1      can you explain why and tell us about those cases?

2              MS. FABIAN:  Object to form and

3      foundation.

4              THE WITNESS:  Honestly, sir, I would have

5      to look back over the records, the final order.  ER

6      cases have been released within the last two years.

7      There's been several cases released.  Without

8      looking at the specifics of the case, I don't

9      remember if they were ER cases or other cases.

10             MS. FABIAN:  Just to put on the record,

11     one thing.  Since we don't have protective a order

12     on file yet, and you are asking a couple questions

13     about specifics, I don't know if the witness will

14     have specific answers.  But can we agree if you do

15     ask any questions and he gives any answers that are

16     covered by the protective order, it will be governed

17     by the protective order when we get it on file?

18             MR. SCHEY:  Yes, we can agree.  And we can

19     agree that any responses he provides would be

20     covered by that protective order to the extent that

21     it includes what would typically be confidential

22     information about a particular detainee.

23             MS. FABIAN:  Thank you.  Go ahead.

24     MR. SCHEY:

25             Q.    Can you provide any examples of

JOSHUA REID -  9/12/2016

```
 1     people who are released in the past two months who
 2     had final orders of expedited removal?
 3               MS. FABIAN:  Object to form.  Foundation.
 4               THE WITNESS:  I would have to look at the
 5     -- like I said, there has been several releases over
 6     the last several months.  I would have to look at
 7     each case to see if they're ERs or IG orders or
 8     reinstates, things of that nature.  Without looking
 9     at the case I'm not 100 percent sure.
10     BY MR. SCHEY:
11               Q.    In your declaration at paragraph 21,
12     you said that the doors to the cafeteria are not
13     locked during the meal period.
14               Is there any kind of card required to open
15     and close those doors, if you know?
16               A.    I believe outside of meal periods it
17     requires a key to enter it.  During meal periods
18     they are not locked; they are open.
19               Q.    During attorney visits are attorneys
20     permitted to bring their laptops into the facility
21     when they are interviewing their clients?
22               A.    Yes.
23               Q.    Are they permitted to bring their
24     cell phones into the facility when interviewing
25     clients?
```

JOSHUA REID -  9/12/2016

1          A.    Typically, no.  If there is a
2     circumstance that would warrant it, possibly.  Each
3     circumstance is different.
4          Q.    Do you have a -- do you know who's
5     included on this list of free legal services that is
6     provided to detainees?
7          A.    I would have to review the form,
8     sir.
9          Q.    Who prepares that form?
10          A.    I believe it's the Executive Office
11     of Immigration Review.
12          Q.    So the not ICE?
13          A.    To my knowledge, no.
14          Q.    And when was the most recent time
15     that you received an updated list from EOIR?
16          A.    I do not recall.
17          Q.    Was it within the previous six
18     months, if you know?
19          A.    I do not recall.
20          Q.    Could it have been two years ago?
21          A.    Possibly.  I don't remember.
22          Q.    Do you know how this list was
23     prepared?
24          A.    It's prepared by the Executive
25     Office of Immigration Review.

JOSHUA REID  -  9/12/2016

1              Q.     Have you ever reviewed that form to

2     determine its accuracy?  And if so, when did you

3     most recently review it?

4              A.     As ICE does not prepare the list,

5     the UAR does, they review it for accuracy, not ICE.

6              Q.     And are detainees permitted to make

7     free phone calls to lawyers who are not on that list

8     of free legal services?

9              A.     Residents at the center are

10    permitted, yes.

11             Q.     They can make free calls to any

12    lawyer whether or not they are on that list; is that

13    correct?

14             A.     That is correct.

15             Q.     And are they special phones for that

16    purpose, or do they use the same phones they would

17    use to contact relatives?

18             A.     There's several areas for that

19    purpose.  As all local calls are free, a good

20    percentage of the residents are represented by local

21    attorneys.  If they don't request a private room

22    when speaking with them and they use the normal

23    telephone rooms, sometimes it might be in the

24    presence of others.  However, if they request

25    private rooms, the county staff will accommodate.

JOSHUA REID  -  9/12/2016

1          Q.     And what if a resident is

2     represented by a lawyer who's not in the list of

3     free legal services and is not within the local area

4     for free calls?  Are they provided free calls, or is

5     that something that they must have a phone card to

6     use?

7                 A.     No.  They can request a free call

8     from the county counselors.

9                 Q.     In your declaration in several

10    paragraphs you state that a detainee has made a

11    statement in their declaration and you provided a

12    response to their statements, and you do that in

13    numerous paragraphs.

14                For example, paragraph 24, 25 and others.

15    Can you tell us exactly what records you consulted

16    in order to provide your responses?

17                A.     I would have to look at each

18    paragraph, sir.

19                Q.     Why don't you feel free to do that.

20                A.     Please point out which paragraph you

21    are referring to.

22                Q.     Start with paragraph 21.

23                A.     What specifically in 21 are you

24    referring to?

25                Q.     Well, I'm just referring to your

JOSHUA REID - 9/12/2016

1    response.  And I'm just wondering what documents, if

2    any, you reviewed in order to provide your response?

3            A.    It depends on what section.  What

4    section are you referring to of paragraph 21?

5            Q.    Just tell us about all of the

6    sections of the response and tell us what documents,

7    if any, you referred to to provide that response?

8            A.    Like I said, I prefer you pick out

9    -- there's different things that are addressed in

10   that paragraph.  So if you want to tell me which one

11   you are asking about, I can refer to where I

12   consulted.

13           I can give you an example.  The cafeteria

14   is open.  I've been at the center at multiple meal

15   times and have seen the doors are open at resident

16   meal periods.  I also talked to county staff about

17   that.

18           Q.    You also mention that residents can

19   freely move within the program areas without

20   permission of the staff.  And you say that would

21   include housing areas, day room, shower rooms,

22   activity rooms, et cetera.

23           Is there any rule that you are aware of in

24   the resident handbook, and if so, can you take a

25   look at the resident handbook and point us to that

JOSHUA REID - 9/12/2016

1    rule that would say that if a mother went to any of

2    those areas, she is required to have her child with

3    her, physically with her?

4            A.    I would need to review the whole

5    handbook, sir, to answer that.

6            Q.    Can you recall any such provision

7    without reviewing it?

8            A.    Without reviewing it, no I cannot.

9    Well, let me change that.  I mean, it does -- I

10   would have to look through but I believe the

11   resident handbook does state that parents are

12   responsible for the supervision of their children.

13           Q.    Correct.  Possibly correct.  But my

14   question is different.

15           Can you recall any section that says a

16   parent must keep their child physically with them at

17   all times?

18           A.    I would think the section that

19   states that they are responsible for the supervision

20   of their child would cover that.

21           Q.    Do you recall that sometime in the

22   previous two months ICE has released about four

23   families?  Do you recall that?

24           MS. FABIAN:  Object to form.

25           THE WITNESS:  I know we released several

JOSHUA REID -   9/12/2016

Page 51

1    families.  Whether it's four or not, I would have to
2    look back through our information and whatnot.
3    BY MR. SCHEY:
4         Q.    During that same time period, do you
5    know -- or do you know if any families with habeas
6    stays are released?
7         A.    Since I've been involved in the
8    center, I can say families with stays, not
9    necessarily habeas, could have been a third circuit
10   stay, have been released.  But I don't know if it's
11   been in the last two months.
12        Q.    Are off-site religious services
13   provided for detainees?
14        A.    There is a full-time chaplain at the
15   center that helps arrange for volunteers of various
16   religious denominations to come in and perform
17   religious services.
18        Q.    Since March of 2016 when you became
19   -- when you took on your current position, can you
20   recall any instance in which a family was permitted
21   to leave the facility to attend off-site religious
22   services?
23        A.    No, I cannot recall since I've been
24   involved in the center.  Like I said, I know that we
25   bring in various religious denominations.

```
 1              For example, there's a Jehovah's Witness.
 2    We arranged for ministers to come in and meet with
 3    her regularly and allow her to participate by
 4    televideo on a weekly basis for services.
 5              MS. FABIAN:  Peter, are you gone?
 6              THE WITNESS:  Hello?
 7              MR. SCHEY:  Yes.
 8    BY MR. SCHEY:
 9         Q.    If a family left the facility
10    without permission or supervision, the handbook
11    indicates that they would face some consequences.
12              What might those consequences involve?
13         A.    As the facts and circumstances of
14    each case is different, I'm not going to hypothesize
15    what the consequences would be.
16              However, I know the handbook does outline
17    some of the potential consequences for disciplinary
18    offenses.
19         Q.    Is incoming mail for detainees
20    reviewed by anyone before distribution?
21         A.    I believe it is, according to the
22    handbook.
23         Q.    And may incoming mail be read by
24    either ICE agents or staff members at the facility
25    prior to distribution to the detainees?
```

1          A.    I would need to look at the family

2    residential standards, what it states to determine

3    what it says and what's permissible, because I don't

4    usually deal with that.  I haven't dealt with that

5    or encountered that question.

6          MS. FABIAN:  I'm going to state on the

7    record an objection to your questions about

8    conditions at the facility to the extent you're

9    trying to do discovery not related to the current

10   motion.  The judge specifically said that that

11   wasn't the purpose of our current discovery period.

12   So I want to state that objection on the record.

13   BY MR. SCHEY:

14         Q.    Are detainees at Berks subject to

15   being searched by staff at that facility?

16         A.    Since I've been involved, I'm not

17   familiar with any personal search of a resident at

18   the center.  I would --

19         Q.    Okay.  I was not asking if you were

20   aware of a search of a particular person.

21         My question was, are they subject to being

22   searched?

23         A.    I'm not aware of any time where we

24   have searched them.  But this is -- I would think if

25   there was an emergent circumstance with some

1    contraband that could potentially be dangerous, I'm

2    sure they would be subject to search.  But as I

3    stated, I'm not familiar with that ever occurring

4    since I've been involved.

5            Q.    Are you aware that on page 34 of the

6    manual or the booklet given to detainees, it

7    describes how they are subject to searches,

8    including patdown searches of their bodies, which

9    could include running the hands over the resident's

10   body.

11           Are you aware of that on page 34?

12           MS. FABIAN:  Object to form.

13           THE WITNESS:  As the resident handbook is

14   what, 39 pages, I'm not familiar with all of it.  So

15   I would have to consult it.  But looking at the

16   handbook, on page 34 it states that.

17   BY MR. SCHEY:

18           Q.    Has the policy been changed since

19   the handbook was written, if you know?

20           A.    I don't know -- I know the handbook

21   is occasionally updated.  Whether that policy was

22   changed, I don't know.

23           Q.    Are you aware of any changes in this

24   handbook that you wish to bring to our attention?

25           MS. FABIAN:  I object to form.

1              THE WITNESS:  Can you be more specific?

2      Changes related to what, sir?

3      BY MR. SCHEY:

4              Q.    Is there any part of this handbook

5      that has been modified where the modification does

6      not appear on this document that we're looking at?

7              A.    If it's been updated since,

8      honestly, I don't know.

9      BY MR. SCHEY:

10             Q.    And room searches, this manual and

11     handbook also provides for room searches.  Are you

12     aware of any changes to the handbook with regards to

13     room searches?

14             A.    I'm not aware.

15             Q.    Going back to the ability of

16     detainees to leave the facility.  I notice they have

17     on page 28, Number 312, this as a major offense,

18     quote, it states, unquote, which is defined as

19     leaving the grounds of the facility or from the

20     custody of an employee outside of the facility

21     without permission.

22             Are you aware has that provision been

23     changed or modified?

24             A.    Modified.

25             Q.    Or to the best of your knowledge

1   does it remain the same?

2          MS. FABIAN:  Object to form.  Foundation.

3   He said he's not aware of any changes to the

4   handbook.

5          THE WITNESS:  I don't know if there has

6   been an updated version since we submitted this one,

7   sir.

8   BY MR. SCHEY:

9          Q.    And under 304 it would appear that

10  not only is an escape considered a major offense,

11  but also an attempt or soliciting another or

12  conspiring with another to commit a major offense

13  would themselves be considered a major offense.

14         To the best of your knowledge, has that

15  continued to be the rule?

16         MS. FABIAN:  Object to form.

17         THE WITNESS:  As I'm not aware of any

18  updates, I don't know if there has been an update,

19  so I don't know how to comment on that.

20  BY MR. SCHEY:

21         Q.    I see on page 26 that the handbook

22  describes consequences or corrective measures for

23  children and adults.

24         Has anybody advised you that those

25  provisions regarding sanctions for children and

JOSHUA REID - 9/12/2016

1    adults have been changed?

2              MS. FABIAN:  Object to form.

3              THE WITNESS:  As I don't know if it's been

4    updated, I don't know.

5    BY MR. SCHEY:

6              Q.    My question was not whether it's

7    been updated.  My question was whether anybody has

8    advised you that those sections have been changed?

9              A.    Have I specifically been advised

10   that that particular section has been changed?  No.

11             Q.    If you look at paragraph 23 of your

12   declaration in responding to providing your

13   response, can you recall what documentation you

14   looked at?

15             A.    I do not recall what specific

16   documentation I looked at for that paragraph.

17             Q.    How about the same question with

18   regards to paragraph 24?

19             A.    As it's stated in the paragraph, the

20   resident handbook and  --

21             Q.    Do you recall looking at that

22   resident's A file or any databases about that

23   resident?

24             A.    In the family residential standards

25   too, as it states in there, we are consulted on

JOSHUA REID - 9/12/2016

```
 1    that.
 2              Do I specifically recall looking at that
 3    alien's A file?  Are you talking in context of this
 4    paragraph or in general?
 5              Q.    Either one.
 6              A.    I mean, I don't specifically recall
 7    looking at her A file but I definitely reviewed
 8    electronic records relating to her case.
 9              Q.    When you say electronic records
10    relating to her case, tell us exactly what
11    electronic records you reviewed?
12              A.    It's the Enforcement Removal Module,
13    ERM.  It's basically a case management system.
14              Q.    You said that's called the
15    enforcement removal?
16              A.    Module.
17              Q.    And did you look at any other
18    databases?
19              A.    Not that I can recall.
20              Q.    Are there any other databases
21    available to you about individual detainees other
22    than the Enforcement Removal Module?
23              A.    There's several other databases that
24    we use.
25              For instance, we use certain databases to
```

JOSHUA REID - 9/12/2016

1    run checks on residents or aliens.  But the main one

2    that's utilized, that contains the most information,

3    would be the Enforcement Removal Module.

4            Q.    What are the other databases you

5    mentioned?

6            MS. FABIAN:  I'm going to object.  The

7    agency would invoke law enforcement privilege to the

8    extent he would list the databases.  So I'll let him

9    -- if there are answers that would not be law

10   enforcement privileged, he can tell you those

11   databases.  But certain aspects of those, I'm going

12   to object and direct him not to answer any of things

13   that would be privileged.

14   MR. SCHEY:

15           Q.    Why don't you tell us the names of

16   the other databases?

17           A.    Didn't we say that was privileged?

18           MS. FABIAN:  If there is law enforcement

19   privileged databases that we wouldn't --

20           THE WITNESS:  Okay.

21           MS. FABIAN:  -- make public, then don't

22   list those.  But any other databases that wouldn't

23   be covered by law enforcement privilege you can tell

24   us.

25           THE WITNESS:  I think one would be TECS,

1    which is the Treasury Enforcement System that we run

2    checks in.

3    BY MR. SCHEY:

4            Q.    What are the acronyms for that?  I

5    think you said it was TEX OR TECS?

6            A.    T-E-C-S.

7            MS. FABIAN:  Can we go off the record real

8    quick so we can discuss the privilege to make sure

9    that he doesn't respond with any privileged

10   information.

11           MR. SCHEY:  Sure.  We can go off the

12   record.

13               (Discussion held off the record.)

14           MS. FABIAN:  Go ahead.

15           MR. SCHEY:  Just give me a second.

16   BY MR. SCHEY:

17           Q.    So you mention TECS is another one.

18   And TECS stand for what?  Treasury Enforcement --

19           A.    I don't recall what the C stands

20   for, to be honest with you.  And S is system, I

21   think.

22           Q.    All right.  Are there other

23   databases that you could consult to get updates on a

24   detainee's situation?

25           A.    There's other databases we use to

JOSHUA REID -  9/12/2016

Page 61

1    run checks and whatnot.

2              Q.    Tell us what are those?

3              A.    One would be PSQS, which is the

4    Person Centric Query System.

5              Q.    Sorry?

6              A.    Centric Query System.

7              Q.    Okay.

8              A.    And another would be CCD, the

9    Counselor Consolidated Database.

10             Those are all that I can really think of

11   off the top of my head.

12             Q.    What was the final one?

13             A.    CCD, which is Counselor Consolidated

14   Database.

15             Q.    And are these databases -- would any

16   of them include information such as the date of

17   apprehension, the date a person had a fear

18   interview, the date they got a decision, and the

19   date a custody determination was made?  Would any

20   one of those database services include those items?

21             A.    I don't know that I'm permitted to

22   disclose what each system does, sir.

23             Q.    I think your lawyer would object if

24   she thinks it's privileged.

25             MS. FABIAN:  The privilege belongs to the

JOSHUA REID - 9/12/2016

 1      agency.  I think -- let me go off the record real

 2      quick.

 3                  MR. SCHEY:  Sure.  You can put me on hold.

 4                  (Discussion held off the record.)

 5                  MS. FABIAN:  Back on the record.  Go

 6      ahead.

 7      BY MR. SCHEY:

 8                  Q.    Mr. Reid, when the detainees at

 9      Berks, or any other detainees are apprehended, based

10      on your experience as an ICE officer, where is the

11      date of apprehension recorded?

12                  A.    Date of apprehension would be in

13      EARM.

14                  Q.    Is that EARM for Enforcement Alien

15      Removement Module?

16                  A.    Yes.

17                  Q.    And generally, am I correct that the

18      time of apprehension is recorded?

19                  A.    I'm not sure, to be honest with you,

20      sir, in EARM if that is recorded.  There is a

21      processing system that I forgot to mention.  It's

22      EAGLE.  I don't know what the full acronym stands

23      for.  But I believe the apprehension time would be

24      recorded in EAGLE.

25                  Q.    And is EAGLE something used by both

JOSHUA REID - 9/12/2016

1    CBP and ICE or just CBP?

2              A.    No.  CBP and ICE both use it.  If

3    ICE arrests someone at a local jail, that's the

4    system they process them in.

5              Q.    Okay.  And would that information

6    also be recorded -- and when information is put into

7    EAGLE, does it include the person's name, at least

8    the name they provided?

9              A.    Yes, sir.

10             Q.    And does it include an A number that

11   they have been assigned?

12             A.    Yes, sir.

13             Q.    And does it include their date of

14   birth?

15             A.    Yes, sir.

16             Q.    Does it include their country of

17   origin?

18             A.    Country of citizenship and country

19   of birth.

20             Q.    Okay.  And does it include the

21   approximate area or border patrol sector of

22   apprehension?

23             A.    Yes, sir.

24             Q.    Okay.  And would it include that

25   some sort of a security check or fingerprint check

1   has already been run, or has not been run or -- let

2   me rephrase that.

3           If a fingerprint check has been run on the

4   person, and let's say it comes back negative, is

5   that information put into EAGLE?

6           MS. FABIAN:  I think, Peter, I think now

7   we're bordering on potential law enforcement

8   sensitive responses, and we don't have a law

9   enforcement sensitive protective order in place.

10  I'm not sure how this is relevant to Flores.  So if

11  we can avoid this line of questioning, I think --

12  otherwise, we're going to have to talk about what we

13  can answer here without any protective order in

14  place.

15          MR. SCHEY:  Okay.  Let me try --

16          MS. FABIAN:  You had given us your high

17  water earmarks.  I think it would be helpful to

18  stick to those.  I think it doesn't run us afoul of

19  the privilege or sensitive data concerns.

20  BY MR. SCHEY:

21          Q.    Generally, when somebody is being

22  processed, whether apprehended by ICE or by CBP,

23  generally is the fingerprint check run within -- how

24  soon in the process is a fingerprint check run, just

25  generally?

JOSHUA REID -  9/12/2016

```
 1              MS. FABIAN:  I mean, I think if --
 2      MR. SCHEY:
 3              Q.    In other words, let me explain.
 4      Part of Flores is the speed with which certain
 5      things are done.  I think everybody has a
 6      fingerprint check run.  I'm just trying to determine
 7      is that something that -- of course, every case is
 8      different.  But is that something that's  typically
 9      done during the initial processing or whatever it
10      takes to process, or is that something that's done
11      on the second day, the third day, for some
12      legitimate reason?
13              MS. FABIAN:  I would say if the witness
14      knows,  that's something -- I mean, that's done by
15      ICE.
16              MR. SCHEY:  Let me put it this way to the
17      witness.
18      BY MR. SCHEY:
19              Q.    If somebody was apprehended close to
20      York in Pennsylvania and they were a family unit and
21      they were brought -- their initial arrest, and they
22      are brought to Berks.
23              How quickly do you run a fingerprint check
24      on those people?
25              A.    It's usually done at the time they
```

JOSHUA REID -  9/12/2016

1    would be taken into custody.

2            Q.    Okay.  And that's usually in -- I

3    mean, not in every single case, but usually in,

4    what, the first hour or two or three of their having

5    been apprehended?

6            MS. FABIAN:  I mean, I think you're not

7    asking questions about Berks.  I'm not sure about

8    the apprehension piece.

9            MR. SCHEY:  Not Berks.  Just in his

10   experience.

11   BY MR. SCHEY:

12           Q.    You say it's done initially as part

13   of the initial processing, which I don't think is

14   controversial.  I think everybody agrees with that.

15   I'm trying to get a sense at Berks, how long does

16   that initial processing take, in general?

17           MS. FABIAN:  I think the first question

18   might be are there any families at Berks who are

19   initially processed at Berks at this time?  I just

20   think you're not asking about -- the scenario you've

21   given does not relate to individuals who are

22   currently at Berks.

23   BY MR. SCHEY:

24           Q.    Is it just in your experience that

25   when somebody is detained is the fingerprint check

1    generally run within the first few hours of

2    detention of apprehension?

3            MS. FABIAN:  By ICE?

4            MR. SCHEY:  By ICE.

5            MS. FABIAN:  If you know the answer to

6    that.

7            THE WITNESS:  Yes.

8    BY MR. SCHEY:

9            Q.    Okay.  And would the date and time

10   of apprehension would that also likely be in the

11   person's A file?

12           A.    Likely documented in a 213 in the A

13   file, yes.

14           Q.    And as I understand it, the I-213

15   basically records circumstances, it records the

16   person's name, date of birth, county of citizenship,

17   some other things I'm sure I'm forgetting.  And then

18   it has a narrative section in the middle where the

19   circumstances of the apprehension are briefly

20   described.  And usually if a person makes a

21   statement, that's -- there will be a summary of that

22   statement.

23           Is that a fairly accurate description of

24   the I-213?

25           MS. FABIAN:  Object to form.  Foundation.

JOSHUA REID -  9/12/2016

```
 1              THE WITNESS:  Each case is different.
 2      Does 213 --
 3      MR. SCHEY:
 4              Q.    I'm talking about the form.  I'm not
 5      talking about the case.
 6              A.    What's contained in 213 is relevant
 7      to each specific case.  So it's different.  Does it
 8      contain some of that information?  Yes, it does,
 9      generally.
10              Q.    I'm just addressing what the form
11      calls for, not what people write into the form.
12              But that's basically what the form calls
13      for, correct?
14              MS. FABIAN:  Object to form.
15              THE WITNESS:  As I stated, each case is
16      different.  So there's no specific one set 213.  It
17      depends on the alien's immigration history, the
18      criminal history and other factors could be listed
19      on there.  So there's no one set.  Does it contain
20      some of the information you listed?  Yes, it does.
21      BY MR. SCHEY:
22              Q.    Okay.  And then in the cases at
23      Berks, the cases you are familiar with, at what
24      point is the order of expedite reissued?
25              MS. FABIAN:  Object to form.  Foundation.
```

JOSHUA REID - 9/12/2016

```
1                   THE WITNESS:  It's usually issued by the
2        apprehending agency.  As to the specific time they
3        issue it, I don't know.
4        BY MR. SCHEY:
5                   Q.    And if the apprehending agency or --
6        strike that.
7                   When a person expresses a fear of return,
8        is that recorded in that person's A file?
9                   MS. FABIAN:  Object to form.
10                  THE WITNESS:  It would depend on when they
11       expressed the fear.
12       BY MR. SCHEY:
13                  Q.    Okay.  Can you just explain that?
14                  A.    If they express a fear of returning
15       to their home country at the time of apprehension,
16       yes, it would typically be documented in the A file.
17                  Q.    Where would it be in the A file?  Is
18       there a particular form that's used for that?  Where
19       would it be?
20                  A.    There's several different forms.  It
21       could be a sworn statement or the record of
22       deportable alien.
23                  Q.    And if they expressed it
24       subsequently to the time of apprehension, where
25       would that be?
```

JOSHUA REID - 9/12/2016

1          A.     It could be in the A file; it could
2     be in EARM documented.
3          Q.     And if it was in the A file, where
4     would it likely be documented?
5          A.     It depends on how they express the
6     fear.  Once again, it could be in several different
7     forms.
8          Q.     Can you just explain that?
9          A.     I can give you an example that would
10    be we have ICE resident request forms.  So it's --
11    if a resident at Berks, came to Berks, they could
12    write on the resident request form that they have a
13    fear of returning to their country.
14         Q.     That would probably be put into the
15    A file?
16         A.     Likely, yes.
17         Q.     Is there any other place where it
18    would be in the A file?
19         A.     There's probably others.
20    Specifically, off the top of my head, I can't think
21    of any.
22         Q.     Okay.  But an officer would enter
23    that into the EARM system?
24         A.     Yes.
25         Q.     Would it be fair to say -- has the

```
1        putting data into the EARM system in some ways
2        replaced putting data into the old paper A files?
3                MS. FABIAN:  Object to form.
4                THE WITNESS:  No.  Not necessarily.
5   MR. SCHEY:
6                Q.    Is some data put into the EARM
7        system, such as a person expressing a fear that may
8        not be put into the person's A file somewhere?
9                MS. FABIAN:  Object to form.
10               THE WITNESS:  I don't want to speculate on
11       that.  But if an alien expresses a fear, it could be
12       in the A file and not in the EARM at all, or it
13       could be vice versa.
14   BY MR. SCHEY:
15               Q.    But it's going to be in at least one
16       place and it could be in both.
17               Is that true?
18               A.    It could be in either, yes.
19               Q.    And would the date that the person
20       requested or made a fear statement, would the date
21       be recorded in either the EARM or in the A file?
22               A.    It should be, yes.
23               Q.    And would the time be recorded, if
24       the time was known?
25               A.    I don't know about that.
```

1            Q.    And then when CIS is notified that
2     this person has expressed a fear, how are they
3     notified?  Just tell us, how is that accomplished?
4            A.    It's typically done via e-mail
5     notification.
6            Q.    Okay.  And so the ICE officer who
7     would -- would the ICE officer get directly in touch
8     with CIS, or does that go through a particular ICE
9     officer so all the requests go to that ICE officer
10    and that ICE officer forwards them to CIS?
11           MS. FABIAN:  Object to form.
12           THE WITNESS:  You're talking in general,
13    or are you talking about York or somewhere specific?
14    BY MR. SCHEY:
15           Q.    I'm talking about York.  But if it's
16    different from the general, let us know.
17           A.    I don't know if there's a general
18    way.  Each office, I'm sure, does it differently.
19           Q.    And how do you do it at York?
20           A.    At York there is an enforcement
21    removal assistant that's the designated point of
22    contact with CIS.
23           Q.    So your offices would communicate
24    this to your -- what did you call that person?
25           A.    It's called ERA, enforcement removal

JOSHUA REID -  9/12/2016

```
 1        assistant.
 2                    Q.    So normally your offices would
 3        communicate to your ERA and then your ERA would get
 4        in touch with CIS; is that correct?
 5                    A.    For York, correct.
 6                    Q.    And when your officer gets the
 7        request from one of the agents, is that
 8        communication recorded anywhere?  I mean, I know --
 9        sorry.  Go ahead.
10                    A.    I don't know.
11                    Q.    And --
12                    MS. FABIAN:  Just to clarify you want to
13        ask about Berks, correct, not about the York
14        facility?
15                    THE WITNESS:  Yes.  About Berks.
16                    MS. FABIAN:  You've been asking him about
17        York, which is a separate facility.
18        BY MR. SCHEY:
19                    Q.    Same question.  If I change the
20        questions to Berks, would anything change?
21                    A.    Yes.
22                    Q.    Tell us.
23                    MS. FABIAN:  Object to form.
24                    MR. SCHEY:  I have to go back.  I don't
25        remember all of the questions, to be honest.
```

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On September 19, 2016 I electronically filed the following document(s):

- **PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR AND OPPOSITION TO DEFENDANTS' MOTION FOR EVIDENTIARY HEARING**

- **EXHIBIT 1 – DEPOSITION OF VALENTIN DE LA GARZA**

- **EXHIBIT 2 – DEPOSITION OF JUANITA HESTER**

- **EXHIBIT 3 – DEPOSITION OF JOSHUA RIED**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/   *Peter Schey*
*Attorney for Plaintiffs*