CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
          crholguin@centerforhumanrights.org


ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>          Plaintiffs,<br><br>- vs -<br><br>JEH JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>          Defendants. | Case No. CV 85-4544 DMG (AGRx)<br><br>PLAINTIFFS' EXHIBITS 1-5 [PART 1 OF 6]<br><br>Hearing: January 30, 2017 |

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

1

2

## INDEX OF EXHIBITS

3

4

1.  Declaration of Stephen Manning…………………………………………...…………... 1

2.  Deposition of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. – Transcript Excerpts……………………………………………………………………… 10

3.  Deposition of Chief Patrol Agent – El Centro Sector, CBP, Rodney Scott – Transcript Excerpts……………………………………………………………….……………… 36

4.  Deposition of Chief Patrol Agent – Tucson Sector, CBP, Paul Beeson – Transcript Excerpts…………………………………………………………………...…………59

5.  Deposition of Chief Patrol Agent – Laredo Sector, CBP, Mario Martinez – Transcript Excerpts……………………………………………………….……………… 77

6.  Deposition of Karnes Assistant Field Office Director, Enforcement and Removal Operations, ICE, Juanita Hester – Transcript Excerpts…………………………………………….... 101

7.  Deposition of Dilley Assistant Field Office Director, Enforcement and Removal Operations, ICE, Valentin de la Garza – Transcript Excerpts……………………………………….. 121

8.  Deposition of Berks Assistant Field Office Director, Enforcement and Removal Operations, ICE, Joshua Reid – Transcript Excerpts……………………………………………..... 149

9.  Deposition of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller – Transcript Excerpts…………………………………….……….193

10. Deposition of Class Member Mother Ritza Mxxx xxxxxxx – Transcript Excerpts…………………………………………………………………… 230

11. Deposition of Class Member Mother Celina Sxxxxxx-xxxx – Transcript Excerpts………………………………………………………………… 244

12. Deposition of Class Member Franklin Rxxxx xxxxxxxxxx– Transcript Excerpts……………………………………………………………….... 263

13. Deposition of Class Member Mother Karina Vxxxx xxxxxxx – Transcript Excerpts……………………………………………………………….……….289

14. Deposition of Class Member Mother Lindsay Gxxxx xxxxx – Transcript Excerpts…………………………………………………………… 316

15.  Deposition of Class Member Mother Mirna Mxxxxxx xxxxx – Transcript Excerpts………………………………………………………………… 341

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16. Deposition of Class Counsel Peter Schey – Transcript Excerpts…………………..……… 361

17. Deposition of Class Member Mother Sara Exxxxxxxx xxxxx – Transcript
    Excerpts……………………………………………….………………………………….. 381

18. Deposition of Class Member Yeslin Lxxxx xxxxxxx – Transcript
    Excerpts…..……………………………………………………………………………… 399

19. Deposition of Class Member Mother Yessenia Exxxxxxxx xxxxxxx –
    Transcript Excerpts………...……………………………………………………………418

20. Deposition of Class Member Mother Zulma Mxxxxxxx xxxxxxx –
    Transcript Excerpts……………………………………………………………………… 432

21. Deposition of Attorney Bridget Cambria  – Transcript Excerpts…………………..………458

22. Deposition of Attorney Amanda Doroshow – Transcript Excerpts………………….….. 467

23. Deposition of Attorney Robyn Barnard – Transcript Excerpts……………………………476

24. Deposition of Attorney Edward McCarthy – Transcript Excerpts…………………....…. 505

25. Deposition of Jacqueline Kline – Transcript Excerpts…………………………………… 528

26. Declaration of Attorney Robert Doggett…………………………………..……………. 537

27. Declaration of Chapman Noam…………………………………………..…………. 543

# Exhibit   1

Publicly Filed

Declaration of Stephen W. Manning

I, Stephen W. Manning, declare and say:

1.      This declaration updates my declaration dated August 13, 2015 which appears in the record in this matter, *Flores v. Lynch*, Cv. 85-4544 DMG (CD Cal.), as Plaintiffs' Exhibit 112. [Dkt. # 187-10].

2.      I am an attorney in a private practice based in Portland, Oregon, and I am the director of the Innovation Law Lab, a non-profit organization based in Oregon. I am an adjunct professor of law at Lewis & Clark Law School where I teach immigration law. I am the recipient of the 2014 American Immigration Lawyers Association (AILA) Founder's Award for creating and organizing the pro bono project at the family detention center in Artesia, New Mexico, the 2010 Jack Wasserman Memorial Award for Excellence in Immigration Litigation, the 2009 Edith Lowenstein Memorial Award for Excellence in Advancing the Practice of Immigration Law, and the 2008 Gerald R. Robinson Award for Excellence in Immigration Litigation. I am a former Commissioner of Portland, Oregon's Human Rights Commission. I was elected to AILA's Board of Governors in 2012.

3.      The Innovation Law Lab, a non-profit group I founded in 2014, uses specialized technology and training programs to build the capacity of lawyers and non-profits throughout the United States representing immigrants and asylum seekers. The Law Lab provides the technology platforms for the CARA Family Detention Project.

4.      The CARA Family Detention Project is a collaboration among four organizations— the Catholic Legal Immigration Network (CLINIC), the American Immigration Council (Council), the Refugee and Immigrant Center for Education and Legal Services (RAICES), and the American Immigration Lawyers Association (AILA)—to promote and strengthen the rights of immigrants, with a particular focus on ending family detention. CARA advocates on behalf of

2

the women and children subjected to "family detention" in Karnes, Texas and Dilley, Texas. RAICES coordinates and provides legal services for families detained in Karnes through the Karnes Pro Bono Project.  AILA, the Council, and CLINIC coordinate and provide legal services for families detained in Dilley through the Dilley Pro Bono Project.  The Dilley Pro Bono Project operates based on the same successful model previously used at the family detention center in Artesia, New Mexico.

5.      I was a lead coordinator for the pro bono project at the family detention center in Artesia, New Mexico. I created technology models and case processing models that were used in Artesia from August 2014 until the detention center was closed in December 2014.

6.      I volunteer as a coordinator for the CARA Project at the family detention center in Dilley, Texas. In this role, I provide day-to-day guidance on legal questions and case processing. I provide support to the volunteers on the ground in Dilley as well as the numerous remote volunteer teams that produce bond motions, translations, and other pleadings. I also provide technological support to the CARA Project, train staff and volunteers, and manage the database systems used by more than 1,000 volunteers throughout the United States who are involved in the CARA Project.

7.      The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my coordinating capacity for the CARA Project.

8.      Since the Dilley detention center was opened to implement the Immigration and Custom Enforcement's new 2014 policy of detaining *Flores* class members and their mothers, the Dilley Pro Bono Project has represented approximately 25,000 family units comprised of *Flores* class members and their mothers. The *pro bono* volunteers maintain detailed data about each class member and mother represented, which they input into the client database. This information includes both privileged information and several data points that enable us to monitor the

implementation of the government policies and practices in real time. In particular, we gather

and maintain information about release practices regarding *Flores* class members and their

mothers.

9.      According to Defendants at the Hearing dated October 6, 2016 the current average time

in detention for class members appears to be "around 11 or 12 days currently." 10/06/16 Hearing

45:18-45:20. In their Opposition to Plaintiffs' Motion to Enforce they also suggested that "for

the 18,706 residents initially booked into ICE family residential facilities from October 23, 2015,

to May 18, 2016, and subsequently released or removed as of May 16, 2016, the average length

of stay was 11.8 days. D's Opp. to Motion. Doc. # 208 at 26. (citing Gurule Decl. ¶13)

10.     As Defendants indicated above, their average only applies to those who were initially

booked into an ICE facility *and then subsequently released.* When asked to elaborate on this

issue, ICE Assistant Director of Field Operations for Enforcement and Removal Operations,

Philip Miller testified that,

> [ICE's] system of record, the way we count average length of stay, is the difference
> between when you book into a FRC and when you're released.  And released can be, you
> know, different mechanisms, whether that's released on supervised release, posting a
> bond, granted release or removed from the United States. For the people who remain on
> campus, we can't measure how long they -- since they -- you know, between book in and
> book out because they have yet to book out.  So that's why this Declaration correctly
> states that we're talking about a population that was, you know, released or removed,
> because that's the only way our system allows us to count length of stay.
> Miller Dep. 141:23-142:17

11.     ICE's method of calculating their so-called "average" creates an entirely inaccurate

impression of the status of those detained by ICE. Most importantly, Defendant's calculations

are based solely on class members' and mothers' "book in" and "book out" (i.e. release) times

and fail to take into account all class members and their mothers detained by ICE but not

"booked out" each time the agency calculates the "averages" it has shared with the Court. By

failing to acknowledge the weeks and months these class members and their mothers have been

in detention, Defendants' various reported "averages" are meaningless.

12.     Indeed, our data shows that the "average" class member detained at defendants Berks facility has been detained for more than 200 days. Of those detained in Berks, 30 families have been detained longer than the Berks detention average of 200 days, 22 families have been detained over 300 days, and 14 families detained over 400 days.

13.     In November 2016, CARA Project attorneys reported that women and children were appearing at the Dilley detention center who had never been in expedited removal proceedings under INA § 235. Instead, Customs and Border Patrol had opted to institute conventional removal proceedings under INA § 240 through the issuance of a Notice to Appear.

14.     At this same time, CARA Project attorneys reported that women and children were appearing at the Dilley detention center who had been placed into expedited removal proceedings under INA § 235. These women and children were required to undergo the credible fear screening process prior to their release.

15.     In order to understand the impact of the CBP decision to use conventional § 240 proceedings versus expedited § 235 proceedings on detention duration, I was asked to analyze data maintained in LawLab to compare the detention duration between these two classes.

16.     I selected a total of 20 records where the date of apprehension by CBP was between November 7, 2016 and November 115, 2016. Of these 20 records, ten records were for women and children against whom CBP had initiated conventional § 240 proceedings and ten were for women and children against whom CBP had initiated expedited § 235 proceedings. I have provided the A-file numbers to plaintiffs' counsel for all 20 records.

17.     I measured the dates of detention by using the dates recorded in the LawLab system. The apprehension date is reported to CARA by the client. The release date is reported to CARA by the government. In both instances, the actual date of apprehension or release may vary slightly because of inconsistencies or inaccuracies caused by the reporter.

18.     Based on this review, the average period of detention for women and children against whom CBP commenced conventional § 240 proceedings was 7.5 days. The average period of detention for women and children against whom CBP commenced expedited § 235 proceedings was 20 days.

19.     Because the duration of detention was nearly two-thirds longer for expedited § 235 proceedings, I looked at the records to determine if there were objective factors that would explain CBP's decision to use conventional § 240 proceedings versus expedited § 235 proceedings.

20.     Again, using data reported in the LawLab system, I collected nationality data, the number of children, and the reported ages of the women and children.

21.     Based on this review, there is no apparent demographic data that would explain the CBP choice to use § 240 proceedings versus § 235 proceedings. There are no meaningfully distinguishing demographic characteristics that would explain the CBP choice.

22.     When attempting to assess compliance with the *Flores* Settlement the use of "average" lengths of detention in different weeks and months is unhelpful. Nowhere in the *Flores* Settlement did the parties agree to use "averages" as a measure of the appropriate length of detention of Class Member children. Each child is supposed to be assessed individually and the Government is required to make continuous efforts from the time of "apprehension" (unless the mother opts her child out of the release provisions of the Settlement) aimed at releasing or placing the child in a licensed non-secure facility "as expeditiously as possible" and "without unnecessary delay" and generally within five days.

23.     The "average" length of detention could, for example, be 10 days (as calculated by defendants ignoring class members not released), while hundreds of class members are held for weeks or months without being included in defendants' "average" calculation offered to the

Court and with no activity taken by defendants to release or place them as required by the Settlement.

24.     This could also be true even if defendants included non-released class members in their "average" calculations. For example, if for a few days defendants decide to release large numbers of apprehended class members and their mothers and simply place them in regular removal proceedings (as they did before the summer of 2014 and continue to do sporadically now without explanation to class members or their lawyers), the "average" weekly or monthly number drops dramatically even though hundreds of class members are being held for weeks or months with no action taken by Defendants to make and record efforts aimed at the release or placement of detained Class Members as expeditiously as possible. In short, if Defendants complied with the Settlement and released about 2/3 of all apprehended class members within a few days and detained the balance (hundreds of children) for 30 days ignoring the release provisions of the Settlement for the detained group, they could easily arrive at an average of detention of about 10 days.

25.     By all reports from pro bono counsel who have represented hundreds of class members and their mothers during the past 12 months, there is virtually no compliance with the *Flores* Settlement in terms of expeditiously processing minors for release under the various terms of the Settlement because Defendants simply take the position across-the-board that they have placed detained minors in expedited removal proceedings.

26.     Clearly, if ten days or several weeks or months after being detained the mother's asylum credible fear claim is approved, the class member will almost always be released with his or her mother. That process may take 10-15 days for some Class Members and a few weeks or months for others. It has nothing to do with complying with the several steps set out in the *Flores*

Settlement dealing with how the presumption of release or placement in a licensed non-secure facility should proceed.

27.     It is well known that Defendants stopped compliance with the release provisions of *Flores* in the summer of 2014 in response to a temporary surge of unaccompanied and accompanied children. They initially defended this position by arguing for the first time that accompanied children were not class members. Since this Court's July and August 2015 Orders and the Court of Appeals' 2016 decisions were issued, ICE has taken steps to improve its "average" length of detention of Class Members but continues to ignore the actual steps required by the release provisions of the Settlement arguing that there is no presumption of release and no release actions required on ICE's part because the agency has placed class members in expedited removal proceedings, effectively wiping out class members' release rights under the Settlement.

28.     Finally, while under the Settlement ICE may consider detaining a class member in a secure facility based on several factors it must consider, including but not limited to whether the child is a substantial flight risk because he or she is under a final order of removal, it is not our experience representing hundreds of Class Members over the past year that ICE makes individualized determinations of flight risk. The agency simply holds Class Members *en masse* as flight risks because Defendants have issued these Class Members expedited removal orders. In most cases where Class Members are not promptly removed from the country and remain detained here, it is precisely because they are *not* under final and executable orders of removal. They or their mothers are seeking some form of relief that prevents execution of any order of removal. ICE in fact routinely releases on bond or conditions adult immigrants in regular removal proceedings under orders of removal that are being considered in administrative or judicial proceedings without concluding en masse that such immigrants are likely to flee and therefore not amenable to release.

8

29.     In terms of length of detention of class members in the period from October 2015 to December 2016 using the LawLab data shows that approximately 2,499 class members and their mothers (i.e. family units) were held for 0-15 days, 3180 for 15-30 days, 561 for 30-60 , 39 for 60-90 days, 47 for more than 90 days.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of September, 2016, in the City of Portland, State of Oregon.

Stephen W. Manning

# Exhibit 2

Publicly Filed

1

                UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA

    JENNY LISETTE FLORES,      )
    et al.,                    )
                               )
                               )
                Plaintiffs,    )
    VS.                        ) Case No. CV 85-4544 DMG
                               )
                               )
    LORETTA E. LYNCH,          )
    Attorney General of the    )
    United States, et al.,     )
                               )
                               )
                Defendants.    )
    --------------------------x


    ORAL DEPOSITION OF MANUEL PADILLA, JR., produced as a

witness at the instance of the Plaintiffs and duly sworn, was

taken in the above-styled and numbered cause on the 23rd day of

September, 2016 from 1:36 p.m. to 3:21 p.m. before Katherine J.

Brookbank, CSR in and for the State of Texas, reported by

method of machine shorthand, at the office of Rio Grande Valley

Sector, 4400 South Highway 281, Edinburg, Texas, 78539,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record hereto.


Job No. 46492

2

1                     A P P E A R A N C E S

2

    FOR THE PLAINTIFF, JENNY LISETTE FLORES:
3

4           CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
            256 South Occidental Boulevard
5           Los Angeles, California 90057
            BY:  Peter A. Schey, Esq. (Via telephone)
6                pschey@centerforhumanrights.org

7

8    FOR THE DEFENDANTS LORETTA E. LYNCH, Attorney General of
     the United States, et al.:
9
            DISTRICT COURT SECTION
10          OFFICE OF IMMIGRATION LITIGATION
            P.O. Box 868, Ben Franklin Station
11          Washington, D.C. 20044
            BY:  Sarah B. Fabian, Esq., Senior Litigation Counsel
12               sarah.b.fabian@usdoj.gov

13

14

15

16   ALSO PRESENT:

17          U.S. DEPARTMENT OF HOMELAND SECURITY
            4400 South Expressway 281
18          Edinburg, Texas  78542
            BY:  Eric J. Drootman
19               eric.drootman@cbp.dhs.gov

20

21

22

23

24

25

3

1                              INDEX
                                                        PAGE
2
     Appearances ------------------------------------------   2
3
     Stipulations (Attached hereto) --------------------------- N/A
4
     MANUEL PADILLA, JR.
5
          Examination by Mr. Peter Schey ----------------------   4
6

7

8
                               EXHIBITS
9    NO. DESCRIPTION                                         PAGE

10   Exhibit 1 - Declaration of Mr. Manuel Padilla, Jr.        4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          MANUEL PADILLA, JR.,

2          having been duly sworn, testified as follows:

3                    E X A M I N A T I O N

4     Q     (BY MR. SCHEY) Okay.  Good morning, Mr. Padilla.  How

5  are you?

6     A     Doing well, sir.  How are you?

7     Q     Thanks for taking the time for this deposition.

8               MS. FABIAN:  Peter, I am just going to state for

9  the record, I have given the witness his declaration and

10  attached exhibits.  And it has been marked Exhibit 1.  And it's

11  before the witness.

12               MR. SCHEY:  Thank you so much.

13     Q     (BY MR. SCHEY) If you do not understand a question,

14  please just tell me and I will try to rephrase it.

15     A     Will do, sir.

16     Q     If I wanted to tour the area Border Patrol stations

17  in your sector with a car and I just wanted to stop at each one

18  for five minutes, and I wanted to take the shortest route from

19  one to the next, what would the -- how would I do that -- or

20  not how I would -- not how would I do that, but starting with

21  one at one end and going to the other end, tell us how long

22  approximately it would take to get to each station in an

23  automobile.

24               MS. FABIAN:  Object to form.

25               THE WITNESS:  Okay.  So if you started on our

5

1  western part would be Rio Grande City station, and you started

2  driving east, it would take you approximately 40 to 45 minutes

3  to get to the next station, which would be McAllen station.

4  And these are approximate times, Peter.  And then if you would

5  leave McAllen station and continue going east, the next station

6  would be Weslaco station.  And that would be probably about 20

7  to 30 minutes.  And from Weslaco you would continue going east

8  to Harlingen; that would be another 20 to 30 minutes.  And from

9  Harlingen to Fort Brown I would say -- Harlingen to Fort Brown

10  would be another 20 to 30 minutes.  And Fort Brown to

11  Brownsville is actually pretty close; that would be, I am going

12  to say, about 15 minutes max, probably a little bit less.

13          So that would cover your six border stations.  And

14  you would turn around from Fort Brown to -- you know, from Fort

15  Brown you go to Brownsville.  You turn around to come to Sector

16  from Brownsville station, I would say that's about an hour and

17  10 minutes.  And that would be here at the Rio Grande Valley

18  Sector.  So now that you have got two northern -- what we call

19  the northern corridor stations.  One is Falfurrias, which is

20  about an hour from here at Sector.  And the other one is Sarita

21  or Kingsville station, which is about an hour from here north.

22  On two different highways.

23      Q    (BY MR. SCHEY) And it's an hour from -- from Rio

24  Grande City?

25      A    From Rio Grande Valley Sector.

8

1          MS. FABIAN:  Objection.  Peter, I am going to

2     need to check.  I think that information may be law enforcement

3     sensitive.  Can we go off the record, please?

4          MR. SCHEY:  Sure.

5          (Off record)

6          MS. FABIAN:  In response to your question, we

7     can look into a protective order.  But at this time, that

8     information is law enforcement sensitive so we are not going to

9     put it in the public record in this deposition.  We will -- we

10    can explore entering into a protective order and discuss

11    whether we will provide numbers, capacity information after

12    that's been discussed.

13         MR. SCHEY:  So you are instructing him not to

14    answer that question?

15         MS. FABIAN:  I am at this time, yes.

16    Q    (BY MR. SCHEY) Do you -- do you get capacity

17    information for your stations from headquarters?

18    A    No.

19    Q    Okay.  How do you determine what your capacity --

20    your capacity is, for example, under local fire codes?

21    A    Yes.  Peter, I don't know the formula right offhand

22    as far as how many square foot is per person.  But I can tell

23    you that we have some capacity thresholds, if you will, where

24    we do not put more than a given number of people into a certain

25    cell.

10

1   detained as Ursula?

2        A    At Ursula, itself, I would say approximately 600 to

3   700.  And that's -- yeah, that's -- that would be an

4   approximate average.  Yes.  And that fluctuates

5   drastically, Peter.  Because we have -- if I look at the entire

6   week in apprehensions, you have some very low days and some

7   higher days.  Actually, I can tell you that this fiscal year to

8   date we have only had one day where we have broken 1,000

9   apprehensions.  But we have had several other days where we

10  were at the 900 mark.

11       Q    I am sorry.  Could you just repeat that one more

12  time, please?

13       A    Yes.  I was saying that the -- that the numbers at

14  Ursula fluctuate drastically, and actually from day-to-day.  I

15  was saying that this fiscal your, I would say we have one day

16  where we have surpassed 1,000 apprehensions in a 24-hour period

17  in a day.  But we have had several other days where we have hit

18  900 or high 800 numbers.

19       Q    When you say one day where you surpassed 1,000

20  apprehended, are you referring to total apprehensions or total

21  people in family units?  What are you referring to?

22       A    Total apprehensions in one day.

23       Q    Okay.  And how about -- have you ever exceeded -- in

24  the time that you have been there have you ever exceeded the

25  1,000 capacity at Ursula?

14

1   of apprehension, is that -- according to this, is that the date

2   and time that the person was taken into custody?

3        A    Yes.

4        Q    And the date and time of processing out, is that your

5   understanding of the date and time that somebody is transferred

6   -- generally transferred to the custody of ORR if they are

7   unaccompanied or to ICE if they are accompanied?

8                  MS. FABIAN:  Object to form.

9                  THE WITNESS:  Yes.  That is my understanding.

10       Q    (BY MR. SCHEY) And with regards to the one that's in

11  the middle that seems to be date -- date and time of in-take, I

12  think.  What -- what -- is that -- if the person went first to

13  McAllen and then to Ursula, would -- would that date and time

14  be the time they were processed at McAllen or would that be the

15  date and time they were processed into Ursula?

16                 MS. FABIAN:  Object to form.  Foundation.

17                 THE WITNESS:  Yes, Peter, I cannot tell you -- I

18  cannot answer that with any certainty.

19       Q    (BY MR. SCHEY) Okay.  No problem.  You say in

20  paragraph 15 that consistent with the March 20th, 2009 TVPRA

21  guidance that during questioning of unaccompanied minors,

22  agents are required -- you use the word required to record the

23  location of any parents or guardian as well as the location and

24  contact information for any relatives in the United States.  Is

25  there any similar guidance that you can point to -- and I don't

15

1    want you to just tell me generally agents do this or do that.

2    Is there any specific guidance for -- and if so, tell us when

3    it was issued or how it was issued -- that gives the same

4    instruction to Border Patrol agents with regards to accompanied

5    minors?

6                    MS. FABIAN:  Object to form.

7                    THE WITNESS:  The guidance that I can tell you

8    right now is the training that was -- that was implemented.

9    And I am looking -- I know that I included that in my

10   deposition.  But I believe it was -- October 2015.  Yeah.  That

11   guidance was a memorandum that was issued October 16, 2015, if

12   you look at paragraph 26 on my declaration.  So that guidance

13   is just the -- it's the steps that properly log the compliance

14   with the -- you know, with the treatment and the caring and

15   feeding of the detainees.

16       Q    (BY MR. SCHEY) Yeah, but I don't see anything in that

17   that refers to my question.  I am not talking about food or

18   water.  I am very specifically looking at your paragraph 15.

19   And your paragraph 15 tells us that your agents have been

20   provided guidance that they are "required" to follow.  And that

21   guidance requires them from unaccompanied minors to obtain not

22   only parents and legal guardian contact information in the

23   United State, but also "any relatives."  My question is very

24   simple.  Has a similar guidance been issued to agents with

25   regards to accompanied minors, and if so, when was it issued

16

1    and in what manner was it issued?

2            MS. FABIAN:  Object to form.

3            THE WITNESS:  Yes, sir.  I do not -- I cannot

4    answer that question right now.  I would have to research that.

5        Q    (BY MR. SCHEY) I understand.  In paragraph 16 you say

6    that in your experience agents normally ask about other family

7    contacts, including contact information.  When you say

8    normally, what -- what percentage of time do you think that

9    happens or doesn't happen?

10       A    Yes.

11           MS. FABIAN:  Object to form.

12       Q    (BY MR. SCHEY) If you have any idea.  Please don't

13   speculate.

14       A    So I will just give you some -- some context to

15   that -- to that.  So if you look at our intent.  Our intent is

16   to process and turn people over to other agencies as soon as

17   possible.  So that is the intent.  So that information that we

18   are gathering as far as other relatives and information that

19   would be useful to other agencies we are turning people to,

20   that is what is collected.  As far as a hard percentage on how

21   many times we have asked that question on other relatives, I

22   cannot give you an answer on that.  But I think the context is

23   important, that our intent is to process and turn these people

24   over to the other respective agencies that have a role in the

25   -- in the system.

17

1    Q    And if that information was, in fact, gathered, where
2    would it be recorded?
3    A    That would be -- that would be recorded in the -- in
4    the 213 form.  And that's also electronically, of course,
5    captured in the EDM or E3.
6    Q    And are you familiar with the options for release for
7    minors in paragraph 14 of the settlement?
8    A    Paragraph 14 of the settlement?
9    Q    Of the Florida settlement.
10   A    Yes, sir.  I don't have it in front of me, so I would
11   like to refer to it.
12   Q    Okay.  What is -- are you aware that under paragraph
13   14 a minor shall be released to a suitable custodian,
14   including, let's say, an uncle and an auntie or grandmother or
15   grandfather?  Are you aware of that?
16            MS. FABIAN:  I object to the form and foundation
17   and the characterization under the requirements of the
18   agreement.
19            THE WITNESS:  Yes, sir.  I am aware that it's a
20   parent or a legal guardian, if I remember correctly.
21   Q    (BY MR. SCHEY) Okay.  But other than -- other than
22   the parents or legal guardian, without guessing, do you
23   remember what the other options are that could be explored for
24   placement under paragraph 14, if you -- if you recall?
25   A    Yes.  What I do recall is that we give as much

18

1    information to ORR and it is their responsibility to look at

2    those options to see who is suitable to take custody and care

3    of those unaccompanied children.

4        Q    Okay.  And you are saying that under the instructions

5    that were issued March 20th, 2009, your agents are required to

6    get that information from unaccompanied minors.  Correct?

7        A    Yes, sir.  To the extent possible, yes.

8        Q    Now, that memo only addresses unaccompanied minors.

9    Right?  It does not address accompanied minors.  Correct?

10       A    Correct.

11       Q    Okay.  So my question is, if you are dealing with,

12   let's say, an accompanied minor, do you know what the options

13   are for release for that minor?

14            MS. FABIAN:  Object to form.  Foundation.

15       Q    (BY MR. SCHEY) Other than that could be released to a

16   parent or guardian.

17            MS. FABIAN:  Do you mean for Border Patrol to

18   release them?

19       Q    (BY MR. SCHEY) For anybody to release them in the

20   future.  Do you know?

21       A    I do not know.

22       Q    Okay.  And do -- do you know whether -- and again,

23   don't speculate.  It is not about speculation.  Tell us what

24   you know or don't know.  Do you know whether your agents, when

25   they are processing a family unit, whether they currently

19

1   provide any information to a mother or a father or a child or

2   an older child about the availability licensed programs that

3   they may be released to, that the minors be may be released to?

4             MS. FABIAN:  Object to form.  Foundation.

5             THE WITNESS:  Peter, if you are talking about

6   the list of free legal services?

7        Q    (BY MR. SCHEY) No.  No.  No.  I am saying during the

8   processing when your agents are gathering information,

9   background information from recently apprehended parents and

10  children, are -- are your officers collecting -- or are your

11  officers informing those apprehended family -- families about

12  potential licensed programs where the minor could be placed, if

13  you know?

14            MS. FABIAN:  Object to form.  Foundation.

15            THE WITNESS:  Yes, sir.  I do not know.

16       Q    (BY MR. SCHEY) Okay.  How about when -- when your

17  agents are processing family units -- or let's say family

18  units, A, as a matter of practice, if you know, do they ask the

19  mother or the father if there is a non-relative adult living in

20  the United States to whom they may want their child released?

21            MS. FABIAN:  Object to form.  Foundation.

22       Q    (BY MR. SCHEY) If you know.

23       A    Yes.  I -- I do not know.  And I do not want to

24  speculate.

25       Q    Okay.  And with regards to -- I know you do this for

20

1    unaccompanied minors pursuant to the March 20th, 2009 guidance,

2    but -- so setting aside the unaccompanied minors, for the

3    accompanied minors, at this time as a matter of practice, do

4    you know -- and please do not guess -- are agents in your

5    sector when they are processing recently apprehended family

6    units, are they inquiring about every potential grandmother,

7    grandfather, auntie, uncle, adult brother or sister to whom

8    that minor may be released in the United States?  And again, if

9    you know, tell us; if you are not sure, just tell us you are

10   not sure.

11              MS. FABIAN:  Object to form.

12              THE WITNESS:  Yes.  I do not -- I do not know.

13        Q    (BY MR. SCHEY) Okay.  Are you currently aware of any

14   licensed program that either Border Patrol or ICE is operating,

15   or has a contract with, where minors may be placed temporarily

16   if they are not eligible for release from custody?

17              MS. FABIAN:  Object to form.  Foundation.

18              THE WITNESS:  Is this accompanied minors or

19   unaccompanied minors?

20        Q    (BY MR. SCHEY) Accompanied minors.  I know -- I know

21   unaccompanied minors go to ORR.

22              MS. FABIAN:  Same objection.

23              THE WITNESS:  Yes.  I am not -- I am not aware

24   of any program that Border Patrol works with -- in that -- in

25   that construct.

25

1        A     No, we haven't.

2        Q     Okay.  I am looking at -- and I am sure you don't

3    have this -- but I am looking at Defendant's Exhibit 60, which

4    is the declaration of David Strange.  He is an assistant chief

5    with Division E3 of Border Patrol.  And he attaches various --

6    he has a very short declaration.  Mostly what he does is just

7    attach as exhibits printouts of the activity log from E3 and

8    E3M detention module.  And I notice -- I am looking at his

9    Exhibit A.  And in Exhibit A he indicates that this alien

10   was -- was apprehended on a day -- on this day -- the date

11   doesn't matter, January 22nd, 2016 at 5:15 in the morning.  And

12   this appears to be in your sector.  And the notes -- the

13   activity log indicates the first meal occurred at 1522 hours.

14   So it seems like roughly 10 or 11 or 12 hours before -- 10

15   hours before they got their first meal.  Can you tell me why

16   would something like that happen, assuming these records are

17   accurate?

18                  MS. FABIAN:  Object to form.  Foundation.

19                  THE WITNESS:  Yes, sir.  I would -- I would need

20   the entire information on it, because there are a couple of

21   explanations that, again, I am kind of speculating to what

22   could have happened.  So one, the system being down and where

23   the feedings would take place and then logging them in

24   manually.  That's one possibility.  And then the other

25   possibility was, you know, that -- that the feeding time was

26

1    not -- was not logged in because we have the -- the -- as you

2    may know, the EDM has the audit, an internal audit, if you

3    will, starts flashing if somebody is not being fed within

4    certain time frames.  I think it's eight hours between meals

5    and then snacks for family units and juveniles, snacks --

6    actually, they have access to snacks throughout.  I think it is

7    every four hours.  Those are some possible answers to that, but

8    I would have to have all of the information to really conclude

9    what happened.

10       Q    (BY MR. SCHEY) Is it also possible that this record

11   is accurate and that for some reason, without speculating what

12   the reason, that for some reason a person -- this person

13   identified in Exhibit A may in fact have been apprehended about

14   5:15 in the morning, hadn't received their first meal at

15   (unintelligible) hours, is it possible that the record is

16   accurate?

17       A    I would say it's possible definitely, but it's so

18   unlikely.  Because what I have seen, Peter, and I have been one

19   of them, is agents -- we have bought food for people that are

20   in detention.  And if you look at the McAllen processing

21   center, I mean, you see all of the contracts.  There are so

22   many different people and so many eyes on the situation that I

23   just do not see it something that would likely happen.

24       Q    Okay.  I see another one here in Exhibit F.  And that

25   indicates an arrest date and time of 12/212015 at 1300 hours,

27

1    at 1 p.m.  And it does -- and -- and the activity log states

2    that the next meal -- that the first meal the person received

3    was on October 22nd at -- at midnight, about 11 hours later.

4    Are you able to tell us why that person didn't get food for 11

5    hours?  And don't speculate.  If you can tell us:  Well, this

6    may have happened, that may have happened, other than a problem

7    with the system, with the -- with the -- with the system.  In

8    real life can you tell us why that may have happened to a

9    person?

10                    MS. FABIAN:  Object to form.  Foundation.

11                    THE WITNESS:  Yes, sir.  So again, not having

12   all of the information, it's kind of hard to point out.  But

13   if -- I am sure that that was not the only person in custody,

14   so if all of the rest of them show that they were fed on time,

15   so why this anomaly?  Right?  That would be my starting point.

16   Why would one person out of several not have been fed?  But

17   again, without having the information I cannot make a

18   conclusion or ascertain of was that a system error or input

19   error or what caused that anomaly.

20        Q    (BY MR. SCHEY) And the same question for what he

21   submitted as Exhibit I.  And in that one he says the detainee

22   being apprehended on December the 3rd, 2015 at -- at 1400 hours

23   or 2:00 p.m., and the first meal was served and accepted at --

24   on December 4th at 2 a.m., about 12 hours later, can you

25   explain why a delay of 12 hours might -- might -- might

28

1   happen?

2            MS. FABIAN:  Object to form.  Foundation.

3   Peter, it seems unfair to be asking the witness about documents

4   you are not putting in front of him.  You could have sent these

5   to me in advance of the deposition and we would have been able

6   to put these documents in front of him.  It's kind of hard for

7   him to answer questions about documents you are not providing

8   him.  You are really just asking him to speculate about

9   documents he is not looking at.

10   Q    (BY MR. SCHEY) Let me ask you, Exhibit J, these are

11   all government exhibits --

12            MS. FABIAN:  I understand that.  But this is

13   your deposition.  And it's your obligation to bring documents

14   you want before the witness for the deposition.  I have agreed

15   to allow you to take these depositions by telephone.  It's

16   unfair for him to be trying to answer questions about documents

17   that aren't in front of him.  I will let him answer as best he

18   can, but I am just stating that that's sort of an unfair

19   practice if I am going to agree to these by phone, to ask him

20   now to be speculating about documents that he doesn't have

21   available to him.

22            MR. SCHEY:  I don't think I need to give him

23   documents.

24   Q    (BY MR. SCHEY) Let me -- let me proceed.  Chief

25   Padilla, I will tell you that Exhibit J, Government Exhibit J,

30

1    second.  I notice in paragraph 34 you say that welfare checks

2    are conducted on a regular and frequent basis.  And you specify

3    the five or six things that are recorded.  Is that correct?

4    Paragraph 34.

5         A    Yes, sir.

6         Q    Okay.  And I think you answered this question before.

7    But if one were to -- or strike that.

8              As part of these welfare checks, there is no

9    field to record sleep versus not sleeping.  Is that correct?

10        A    Correct.

11        Q    And there is no field to record whether the minor

12   received a mat to sleep on or did not.  Is that correct?

13             MS. FABIAN:  Object to form.

14             THE WITNESS:  Correct.

15        Q    (BY MR. SCHEY) And there is no field to report if the

16   minor, a particular minor claimed that it was too cold to

17   sleep.  Is that correct?

18             MS. FABIAN:  Object to form and foundation.

19             THE WITNESS:  Yes.  So that's -- that's one

20   thing.  But I think you read my deposition.  So we have to

21   ensure that the temperatures in those rooms --

22        Q    (BY MR. SCHEY) I did read that.

23        A    Yes.  So that we actually have some measures in place

24   to make sure that the temperatures are within those

25   acceptable -- that acceptable range.

31

1    Q    I understand that.  But I am just saying, there is no

2  place in the welfare check E3DM system -- there is no field to

3  say that this person or the mother complained that it was too

4  cold to sleep.  Is that fair to say?

5    A    That is fair to say.

6    Q    And there is also no place to check if a person

7  claimed that they did not get fed.  Is that correct?

8              MS. FABIAN:  Object to form.  Foundation.

9    Q    (BY MR. SCHEY) I realize that agents are supposed to

10  record when people are fed.

11    A    Correct.

12    Q    But I am saying, there is no field to enter if the

13  alien claimed that he had not been fed.

14    A    That is correct.  But the likelihood of somebody

15  going unfed when you have the -- you know, the feeding times

16  and the contractors in there, you know, that many people in

17  there, it's so unlikely, Peter, that it's -- that it is an

18  anomaly that I would have -- I would require more information

19  to find out exactly what happened.

20    Q    All right.  I understand from the -- at least the

21  visit that I had in McAllen a few months ago, I understand that

22  the Border Patrol agents go to a local outlet to purchase the

23  food for the detainees.  Is that correct?

24    A    Correct.

25    Q    And I understand that with regards to the sandwiches,

32

1   the agents actually make the sandwiches.  Is that correct?

2       A    That is not totally correct.  We had at some points

3   and primarily in 2014 where just based out of necessity that

4   was a practice.  Right now we have contract people doing that

5   duty, preparing the sandwiches.

6       Q    And where do they prepare the sandwiches?

7       A    Where physically do they prepare the sandwiches?

8       Q    In other words, do they do that at the Border Patrol

9   station or is that done some other place and they just deliver

10  the sandwiches?

11      A    Yes.  I have actually seen them be delivering

12  sandwiches.  So I would have to follow up on where the

13  sandwiches are physically made.  I have just seen them feeding

14  people.

15      Q    And when I was there and interviewed a lot of people,

16  sandwiches just consisted of two pieces of bread and one slice

17  of meat.  Is that still the case today?

18               MS. FABIAN:  Object to form.

19               THE WITNESS:  Yes, sir.  I have seen -- yeah, I

20  have seen the sandwiches be a sandwich of bread and the meat.

21      Q    (BY MR. SCHEY) Okay.  And when I was there the only

22  meat that was used was one slice of bologna.  Has that changed?

23  And if so, how has that changed?

24               MS. FABIAN:  Object to form.  Foundation.

25      Q    (BY MR. SCHEY) If you know.  Do not speculate.

47

1    that would instruct officers to make a victimization inquiry

2    with regard to accompanied minors?  Are you aware of any such

3    instruction?

4        A    Yes.  I am aware of the instruction.  I am not aware

5    of this being the same form.  So when we have -- regardless of

6    age -- regardless of age, we have a screening or we --

7    especially when we have people that are vulnerable and, say,

8    that they have been -- you know, they feel that they are

9    victims of trafficking, then we act accordingly, working with

10   our other federal and -- and state partners, if you will.  But

11   as far as a form, I am not -- I am not aware of what form is

12   used for accompanied minors.

13       Q    Okay.  Are there any -- I know that at the present

14   time mattresses are provided at UrsUla but not at the other

15   stations.  Is that primarily a budget concern or is it that

16   there is just no space for people to sleep, to lay down on a

17   mat at those stations?

18               MS. FABIAN:  Object to form.  Foundation.

19               THE WITNESS:  Yes, sir.  It's not practical to

20   have those mattresses at the -- at the station level because,

21   again, our intent is to process people and turn them over to

22   the appropriate agencies as soon as practical.

23       Q    (BY MR. SCHEY) I understand.

24       A    Yeah.  It is just not an operational -- not

25   operationally feasible.

53

1

2    STATE OF _____ )

3                                 )  :ss

4    COUNTY OF _____)

5

6

7            I, MANUEL PADILLA, JR., the

8    witness herein, having read the foregoing

9    testimony of the pages of this deposition,

10   do hereby certify it to be a true and

11   correct transcript, subject to the

12   corrections, if any, shown on the attached

13   page.

14

15                    _____

16                        MANUEL PADILLA, JR.

17

18

19

20   Sworn and subscribed to before

21   me, this           day of

22                        , 2016.

23

24   _____

25           Notary Public

54

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

JENNY LISETTTE FLORES, et al,   *
                      Plaintiffs,   *
                                *
VS.                             *  CASE NO. CV 85-4544 DMG (AGRx)
                                *
LORETTA E. LYNCH, Attorney      *
General of the United States,   *
                      Defendants.  *

----------------------------------------------------------------
                CERTIFICATION FROM THE
        ORAL DEPOSITION OF MANUEL PADILLA, JR.
                  SEPTEMBER 23, 2016
----------------------------------------------------------------

      I, KATHERINE J. BROOKBANK, a Certified Shorthand Reporter

in and for the State of Texas, do hereby certify that the

foregoing deposition is a full, true, and correct transcript;

      That the foregoing deposition of MANUEL PADILLA, JR., the

witness hereinbefore named, was at the time named taken by me

in stenograph on September 23, 2016, the said witness having

been by me first duly cautioned and sworn to tell the truth,

the whole truth, and nothing but the truth, and the same were

thereafter reduced to typewriting by me or under my direction.

      That the deposition transcript was submitted on _____

to the witness or to the attorney for witness for examination,

signature, and return to me by _____;

      That, by agreement of counsel, the deposition officer is

instructed to release the original deposition transcript, and

the deposition officer is thereafter released of any further

55

1    responsibility with regard to the original;

2        That the transcript ( ) was ( ) was not received from the

3    witness within 30 days;

4        That the cost to the Plaintiff for producing the

5    transcript and any exhibits is $_____.

6        I further certify that I am neither counsel for, related

7    to, nor employed by any of the parties in the action in which

8    this proceeding was taken, and further that I am not

9    financially or otherwise interested in the outcome of the

10   action.

11       WITNESS MY HAND, this the 30th day of September, A.D.

12   2016.

13

14

15

16                          _____
                            KATHERINE J. BROOKBANK
17
                            Certified Shorthand Reporter
18                          in and for the State of Texas
                            Cert. No. 2060, Expires 12/31/16
19

20

21

22

23

24

25

# Exhibit 3

Publicly Filed

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA


JENNY  LISETTE  FLORES,

et al.

        Plaintiffs

vs.                           CASE  NO.  CV-85-4544

LORETTA  E.  LYNCH,  et al.

        Defendants

_____/




        The  Deposition  of  CHIEF  PATROL  AGENT

RODNEY  S.  SCOTT  was  held  on  Tuesday,  September  20,

2016,  commencing  at  10:25  a.m.,  at  the  Offices  of

the  U.S.  Department  of  Homeland  Security,  1300

Pennsylvania  Avenue,  N.W.,  Washington,  D.C.  20229,

before  Steven  Poulakos,  RPR,  Notary  Public.




Job  Number  340272



REPORTED  BY:   Steven  Poulakos,  RPR

RODNEY S. SCOTT - 9/20/2016

```
 1    APPEARANCES:

 2

 3         ON BEHALF OF THE PLAINTIFFS:

 4         PETER SCHEY, ESQUIRE (Via Telephone)

 5             Center for Human Rights & Constitutional Law

 6             256 South Occidental Boulevard

 7             Los Angeles, California 90057

 8             Telephone:  213-388-8693

 9             Email:  pschey@centerforhumanrights.org

10

11         ON BEHALF OF THE DEFENDANTS:

12         SARAH FABIAN, ESQUIRE

13             Office of Immigration Litigation

14             P.O. Box 868, Ben Franklin Station

15             Washington, D.C. 20044

16             Telephone:  202-532-4824

17             Email:  sarah.b.fabian@usdoj.gov

18

19

20

21

22

23

24

25    (Appearances Continued on Next Page)
```

RODNEY S. SCOTT - 9/20/2016

```
 1    APPEARANCES CONTINUED:

 2

 3         ON BEHALF OF THE DEFENDANTS:

 4         LOUISA C. SLOCUM, ESQUIRE

 5              U.S. Department of Homeland Security

 6              1300 Pennsylvania Avenue, N.W.

 7              Washington, D.C. 20229

 8              Telephone:  202-325-1408

 9              Email:  louisa.slocum@chp.dhs.gov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    ALSO PRESENT:  Alex Conway
```

RODNEY S. SCOTT - 9/20/2016

```
 1                        INDEX

 2       Deposition of CHIEF PATROL AGENT RODNEY S. SCOTT

 3                    September 20, 2016

 4

 5    Examination By:                             Page

 6    Mr. Schey                                     5

 7

 8    Exhibit No.                               Marked

 9    Exhibit 1    A declaration                    28

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

RODNEY S. SCOTT - 9/20/2016

```
 1                       PROCEEDINGS
 2   Whereupon,
 3            CHIEF PATROL AGENT RODNEY S. SCOTT,
 4   called as a witness, having been first duly sworn to
 5   tell the truth, the whole truth, and nothing but the
 6   truth, was examined and testified as follows:
 7                 EXAMINATION BY MR. SCHEY
 8        Q     How many border patrol stations are within
 9   the sector that you have oversight on?
10        A     I'm the chief of the El Centro sector.  So
11   there are three stations.  It's Calexico, El Centro,
12   and Indio.
13        Q     And do you -- if a family unit, mainly a
14   mother or father and a minor, are apprehended in your
15   sector, might they be detained at any one of those
16   stations?
17        A     Yes.  They can be at any one of the three,
18   yes.
19        Q     And from those three stations, where is the
20   next place that they would go?
21             MS. FABIAN:  Object to form.
22             THE WITNESS:  So it really depends on the
23   station.  So when we process, that's our piece of it.
24   We make the apprehension in the process, and then we
25   release the individuals, or turn the individuals over,
```

RODNEY S. SCOTT - 9/20/2016

```
 1    the data, that's all within E3.  And it just kind of

 2    walks you through that process automatically.

 3    BY MR. SCHEY:

 4         Q      Are family units ever issued a notice to

 5    appear and released from one of your stations?

 6         A      You said "ever," so, yes, that can happen.

 7    That does happen.  Again, the normal process is for us

 8    to turn them over to ICE Enforcement Removal

 9    Operations, but in special cases -- humanitarian

10    reasons, special circumstances -- we can skip that

11    process and actually release them on our own.  We still

12    give them a notice to appear in their -- what's called

13    released on their own recognizance.

14              But in most cases, the vast majority of

15    cases, they're turned over to ICE ERO.  And then

16    anything that happens after them, to include that

17    option is up to ERO.  That's not within my purview.

18         Q      And can you just explain more about the

19    circumstances in which a family or an uncompanied minor

20    may be released within the MTA?

21              MS. FABIAN:  Object to the form.

22              THE WITNESS:  So a family unit, I will be

23    speculating on the -- on the specific circumstances.  I

24    probably -- I wouldn't probably go there.  I don't know

25    how to answer that question, actually, without
```

RODNEY S. SCOTT - 9/20/2016

Page 21

```
 1    depending on who gives us the best value for the best
 2    price.
 3        Q      Are juveniles in your sector fed three
 4    meals a day?
 5        A      Yes, they are.  They are on a six-hour
 6    mealtime schedule, and then they get snacks in between
 7    that if -- if they request.
 8        Q      And so they may receive up to -- or strike
 9    that.
10            What do those meals consist of, generally
11    speaking?
12        A      So generally, it consists of a -- of a hot
13    burrito of their choice.  It also has a juice or water
14    and then some crackers.  We also have either fruit cups
15    or, like, the squeezable apple sauce thing.  So the
16    combination, basically, is, like, the cracker, the
17    juice, the burrito, and then a -- a fruit or a fruit
18    product.
19        Q      And are any warm meals served, other than
20    burritos?
21        A      No, not as a matter of policy or routine.
22    There -- there are exceptions to that.  I've seen on
23    numerous occasions -- again, these are just temporary
24    holding facilities.  So we're not planning on keeping
25    people long-term.
```

RODNEY S. SCOTT - 9/20/2016

```
 1    I was told by my staff that -- that the most commonly
 2    refer -- requested is just the plain old bean burritos,
 3    so that's what we stock the most of, but there is a
 4    variety.
 5         Q     Can you tell us, is -- are juveniles held
 6    in your stations provided soap to wash with?
 7         A     Yes.  Every one of the holding rooms has a
 8    sink and it has a soap dispenser that's checked every
 9    day to make sure that it's -- it's restocked and
10    supplied, yes.
11         Q     And are they provided any type of towels to
12    dry themselves, dry their hands or face with after
13    washing?
14         A     In El Centro sector, no.  It's a unique
15    environment.  It's very arid.  I mean, there's no
16    humidity hardly whatsoever.  So it air dries very
17    quickly.  So we do not provide paper towels.
18    Unfortunately, throughout -- over the years, we've
19    realized that there's a lot of problems with the paper
20    towel.
21              They actually, very intentionally or
22    unintentionally, they think they can flush it down the
23    toilet.  And we've had a lot of plumbing issues, and
24    then through research we decided this was a better
25    option.  It's also more environmentally friendly that
```

RODNEY S. SCOTT - 9/20/2016

Page 24

 1    you don't have the germ issues this way either.  And
 2    we're talking hand washing and face washing on a daily
 3    basis, not -- not, like, a shower or something like
 4    that.
 5         Q     And if the juvenile is detained, is
 6    there -- is there any policy in your sector which would
 7    indicate at what point a juvenile may or may not be
 8    offered a warm shower?
 9         A     Yes.  At 48 hours, if we have access to
10    facilities, we're going -- we're going to try to make
11    sure that kid gets a shower offered to them.  Our --
12    our facilities don't normally have -- or our stations
13    don't normally have those facilities, so we've had to
14    kind of do an ad hoc in a couple of occasions.
15              But, yes.  So at 48 hours, we're trying to
16    find a place for them to take a shower.  And in that
17    case, they do get a full-on towel, normal, clean towel,
18    shampoo, soap, that kind of stuff.
19         Q     You say that's only happened a couple of
20    times, that you can recall?
21         A     It's happened more than a couple of times,
22    but on average right now, we're getting picked up at 42
23    hours, so it's not a daily occurrence.  It's -- but I
24    would -- I would say it's happened more than a couple.
25    I don't have that specific number, though, for you.

RODNEY S. SCOTT - 9/20/2016

1    significantly more people than that.  There's plenty of

2    room to lay down.

3    BY MR. SCHEY:

4        **Q       And how are juveniles in the El Centro**

5    **sector provided with water to drink?**

6        A       So there's two ways.  Every -- again, every

7    one of the holding cells has a water fountain

8    incorporated into the sink/toilet setup.  It's fresh,

9    clean water, and they're told that that's good water,

10   they can drink it.

11              But we also make sure that there's a

12   5-gallon water jug with fresh water in the cell, as

13   well, separately, because some people don't like the

14   way the water fountain looks or they don't want to

15   drink out of a water fountain.

16              And then beside that water jug, there's --

17   just like those little paper Dixie cups, so whenever

18   they want a fresh drink, they can either -- they can

19   just get a new cup or they can use their old cup or

20   whatever they want.  But there's -- there's a full

21   supply of cups and water in all of the holding cells at

22   all times.

23       **Q       And how often are those 5-gallon water jugs**

24   **cleaned, and who cleans them?**

25       A       We have a -- I -- I would have to

RODNEY S. SCOTT - 9/20/2016

1    the children.  We want to offer the most secure, safe

2    environment possible, so we don't issue items like

3    that.

4            However, at that 48-hour mark, that's kind

5    of included with part of their shower.  So they'll get

6    an opportunity to take a shower, as we discussed

7    earlier, and they'll get a toothbrush and toothpaste at

8    that time to be able to do all that.  And then the

9    toothbrush is taken back.  They can't take that back

10   with them into the holding area.

11   BY MR. SCHEY:

12       Q      **And do you get -- I mean -- strike that.**

13              **How do you know that this 48-hour-mark**

14   **shower is being provided?**

15       A      So that's documented now, kind of what we

16   talked about a minute ago, through the E3 detention

17   module.  It's a database we have.  So that's one of the

18   red flags that pops up, and then the agents actually

19   have to put data into the system so you can go back and

20   track and record -- you know, basically see was it

21   done, exactly when was it done.

22              If the system ever does fail -- and

23   occasionally, just like anything else, you know, you've

24   got updates or whatever and the system won't be

25   available.  There's a policy mandate that the agents

RODNEY S. SCOTT - 9/20/2016

1    have to write it down and then go back as soon as the

2    system is up and input it.  So all of that is in the

3    system, and the clock is in the system.

4              So the -- the ticking clock, if you will,

5    can't -- can't be manipulated.  It's in the system.  So

6    the minute that they -- they type in that they're

7    processing this person, they moved him to this cell,

8    all of that is in the system automatic.

9              And then, as we mentioned before, we now

10   have flags that even pop up, whether it be yellow, that

11   they're getting close to the timeline, or red, it's now

12   time to whatever it is.  The food, the shower, the

13   inspections of the holding facilities.  It's a very

14   streamlined automated process now, and it's all

15   documented.

16        **Q      Do you receive any kind of reports from**

17   **that system that would monitor for you some of the**

18   **issues that we have been discussing, provision of, you**

19   **know, ability to --**

20        A      Yes.

21        **Q      Can you tell us about that?**

22             MS. FABIAN:  Object to form.

23             THE WITNESS:  So the -- the underlying

24   question was do I get reports.  So yes and no.

25             I do not get a systematic report currently

RODNEY S. SCOTT - 9/20/2016

1    out of that system based on the timelines and

2    everything else; however, there's -- and I don't know

3    the specific division, I apologize, but there's a

4    division at our headquarters in Washington, D.C., that

5    monitors that system on a regular basis.  And I get

6    flags from them, if you will.

7              So, for example, if there's an issue

8    identified with water in a holding facility or if I've

9    got somebody over a timeline that's in the system, any

10   of those red flags that pop up that are not immediately

11   addressed, headquarters border patrol also sees those

12   flags, and they send me a notice.  So it's kind of like

13   a report, but it's more of a notification system.  It's

14   just via e-mail.

15             But they send me a notice, and then I have

16   to respond back to them and explain to them how I fixed

17   or addressed that situation.

18             So does that make sense?  It's not

19   specifically a report.  That's why I gave you a

20   long-winded answer.  But there is a process.

21      Q    Okay.  I think I understand it.  And when

22   you get these e-mails from headquarters, is it -- can

23   you just sort of -- since I've never seen them, can you

24   just sort of describe what that looks like, what it

25   includes, how long it is, et cetera?

RODNEY S. SCOTT - 9/20/2016

1      Q      And is that done in the PALM system or a

2   different system?

3      A      Within the PALM system, which is controlled

4   by our Office of Training and Development.  I don't

5   have assess to that, but, yes, it is tracked.  That's

6   how we know who's -- who's completed which requirements

7   and who has yet to complete them.

8      Q      And do you receive reports that would

9   compile information, for example, showing so many

10   officers have done training about Flores or children's

11   rights and so many haven't?  Do you get any such

12   reports?

13      A      Not in the context that you just put it.

14   What I get is what we call "delinquency reports."  So

15   just based on the sheer numbers of employees, I don't

16   get a report on everybody that did take the training.

17           But I do get a report on anybody that's

18   either approaching the deadline and has not completed

19   the training, because there's also, like, requirements.

20   Within 12 months, you must do whatever.  So I get

21   what's called a "delinquency report" of anybody that

22   is -- is not meeting the training requirements so I can

23   take action.  But I don't get the reverse.  I don't get

24   a report that says they did.

25      Q      And, to the best of your knowledge, then,

RODNEY S. SCOTT - 9/20/2016

1   **entity seeking custody in the discretion of the INS**

2   **when it appears that there is no other likely**

3   **alternative to long-term detention, and family**

4   **reunification does not appear to be a reasonable**

5   **possibility.**

6           **So with regards to those requirements, what**

7   **is your understanding about what, if anything, your**

8   **agents are supposed to be doing?**

9           MS. FABIAN:  Peter, I'm going to object to

10  form and foundation, and the fact that you're asking

11  him to make a legal analysis of what the agreement

12  requires.  It's not his purview, but he can answer, to

13  the best of his ability.

14          THE WITNESS:  So without giving a legal

15  review, I'll tell you the guidance that we issue

16  internally.

17          To enhance the safety of the child and to

18  ensure that he is really, truly -- he or she is really,

19  truly being released to a guardian that has the child's

20  best interest in mind, a border patrol agents -- and,

21  again, even though special cases, the only time that we

22  are going to release is if we are highly confident that

23  it's a parent.  Internal policy shifts the -- the

24  custody determination.

25          Beyond that, to all the other paragraphs or

RODNEY S. SCOTT - 9/20/2016

1   when this -- when this was rolled out, it gave us that

2   national ability to track beyond pen and paper or

3   stand-alone Excel spreadsheets or whatever was being

4   used at the time.

5          We were -- we were tracking compliance.  I

6   just want to make sure that we understand, it just

7   wasn't in a national unified system.  And that

8   memorandum I'm referring to, with the rollout and the

9   -- and -- the policy requirements are now use that

10  system, or to start using that system.

11     **Q     And was there anything else, other than**

12  **that October 16 memo, that you can recall in the past**

13  **12 months?**

14     A     After the August -- and, again, I'm going

15  to refer to my -- my declaration for the dates, because

16  I'm not that great with the dates.  But after that

17  court order in August 2015, additional guidance -- and

18  that was issued by a memorandum -- went out.

19          For example, that Flores applied to all

20  juveniles, not just unaccompanied.  That changed some

21  of our processing so that we are issuing the I77

22  juvenile rights forms to all juveniles, not just

23  unaccompanied.  So there were memorandums and guidance

24  associated with that, both from headquarters and the

25  local level.

```
 1    shelter and not then factor in air-conditioning.  And
 2    then how am I going to power that air-conditioning?  Do
 3    I need an electric generator, like a gas generator?
 4    Where am I going to get that?  What is the -- what's --
 5    what's your evacuation plan?  How am I safely going to
 6    secure these people?
 7          You have to walk through all of that, but
 8    I -- I don't know how I could explain it if you haven't
 9    sat through one of those meetings.  But when we're
10    doing these discussions when it's with the ERO,
11    everything is on the table to talk about, but not
12    everything is feasible.  Does that make sense?
13    BY MR. SCHEY:
14        Q     Yes, totally.
15             About safety and security, I'm trying to
16    understand -- and we've been discussing capacity --
17    what capacity rules apply to the holding cells where
18    Flores applied standards are detained in your sector.
19        A     So there's two separate factors.  We have
20    internal policies, if you will, and we have our own
21    internal branch called a "facility and maintenance" --
22    "Facilities Management."  They, literally, determine
23    and post -- and I'm not at liberty to give out specific
24    numbers -- like occupancy of each one of the physical
25    rooms.
```

RODNEY S. SCOTT - 9/20/2016

```
 1              And then, of course, we have state and
 2   local fire codes as well, maximum occupancy.  So
 3   those -- those are the overriding -- those are the --
 4   the main numbers we're looking at for how many people
 5   come and go out of those facilities.
 6              Does that make sense?
 7   BY MR. SCHEY:
 8        Q      Yes, although -- I think it did.  But can
 9   you just state again -- so you said something about a
10   group called Facilities Management and that they have
11   certain guidelines; is that correct?
12        A      So within CBP, the actual facilities are
13   managed by our Office of Administration, and its
14   subcomponent of that is FM&E, facilities, maintenance,
15   and something else.  I don't know what the "E" stands
16   for.  Equipment.  Facilities, Maintenance, and
17   Equipment.  I do not have the luxury of posting -- and
18   this is getting down to the tactical -- the occupancy
19   level of each one of those rooms.  I don't determine
20   that.  That's not within my purview.
21              When the facility is being either built or
22   we're moving into it, our FM&E owns those requirements,
23   if you will, and will tell me, literally, with a sign
24   on the door, how many people can be in each one of the
25   hold cells, based on how many toilets are in there, how
```

RODNEY S. SCOTT - 9/20/2016

1  someone's name, for example, we could track through the

2  E3 detention module and tell you exactly what room they

3  were in, when and where, you know, all that.

4         And then the other way is you can look at

5  it by room, and you can literally just see how many

6  people were in each room during each time block.

7         Does that make sense?

8       **Q      Yes, it does.  And so you're saying that**

9  **you could actually look at a room, and it would tell**

10  **you, like -- and I assuming that's a certain time**

11  **period, like in a one-hour block or a three-hour block,**

12  **it would tell you how many people were in that room?**

13      A      Yes.  To the best of my knowledge, yes,

14  that information could be pulled out of it, yes.

15      **Q      You have not pulled it out; is that**

16  **correct?**

17      A      No, I have not.

18      **Q      And has anybody -- has anybody from**

19  **headquarters sent you an alert that there's been a**

20  **problem -- it doesn't sound like it, but that there's**

21  **been a problem with room capacity?**

22      A      No --

23         MS. FABIAN:  Objection to form.

24         THE WITNESS:  Oh, sorry.

25         MS. FABIAN:  Go ahead.

RODNEY S. SCOTT - 9/20/2016

1    ultimate determination in most cases goes to ICE ERO.

2    So they would be inputting where the child actually

3    went and what actually happened to them.  What the --

4    what --

5    BY MR. SCHEY:

6        Q      Okay.  But would your agents enter into the

7    detention module the relative or friend that the

8    apprehended alien intended to go to?

9        A      No.  That would --

10              MS. FABIAN:  Object to form.

11              THE WITNESS:  Sorry.

12              No.  That would be in the 213.  The

13   detention module would not have that.  The detention

14   module would document when we released them to ERO, but

15   not -- not what you're referring to.

16   BY MR. SCHEY:

17       Q      Okay.  So the best of your knowledge,

18   there's no field in the detention module for border

19   patrol agents to enter in data about the name, the

20   contact information for the relative or the friend that

21   the detainee planned to go to if released from custody;

22   is that correct?

23              MS. FABIAN:  Object to the form.

24              THE WITNESS:  Correct.

25   BY MR. SCHEY:

RODNEY S. SCOTT - 9/20/2016

1    have all of those problems.  They would be accompanied.

2    They would stay together.

3    BY MR. SCHEY:

4        **Q      Oh.  Okay.  So if the juvenile was**

5    **apprehended with a parent, then your agents not seek to**

6    **acquire all of this information --**

7        A      Correct.

8        **Q      -- is that fair to say?**

9        A      That is fair to say, because the parent is

10   right there.

11       **Q      But if the juvenile was unaccompanied, then**

12   **your agents would attempt to gather this information to**

13   **pass it on to ICE and ORR?**

14       A      That is accurate.

15       **Q      Okay.  I think I understand.**

16       A      Okay.

17       **Q      And so in that way, I think it's fair to**

18   **say that unaccompanied juveniles are treated**

19   **differently from accompanied juveniles.  Is that fair**

20   **to say?**

21              MS. FABIAN:  Object to form.

22              THE WITNESS:  For -- for processing and

23   specific detention, yes, because if they're

24   accompanied, we try to keep the family together.  And

25   if they're accompanied, the adult is in the position,

RODNEY S. SCOTT - 9/20/2016

```
 1       CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2

 3               I, Steven Poulakos, registered

 4   Professional Reporter, the officer before whom the

 5   foregoing proceedings were taken, do hereby certify

 6   that the foregoing transcript is a true and correct

 7   record of the proceedings; that said proceedings were

 8   taken by me stenographically and thereafter reduced to

 9   typewriting under my supervision; and that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to this case and have no interest, financial or

12   otherwise, in its outcome.

13

14               IN WITNESS WHEREOF, I have hereunto set my

15   hand this 30th day of September, 2016.

16

17

18

19                        _____

20                        Steven Poulakos

21                        Notary Public

22

23

24   My Commission Expires:

25   May 31, 2021
```

# Exhibit 4

Publicly Filed

1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES,          )
et al.,                        )
                               )
                               )
              Plaintiffs,      )
VS.                            ) Case No. CV 85-4544 DMG
                               )
                               )
LORETTA E. LYNCH,              )
Attorney General of the        )
United States, et al.,         )
                               )
                               )
              Defendants.      )
--------------------------x

DEPOSITION OF PAUL BEESON

September 27, 2016

Tucson, Arizona

1:00 p.m.

Reported by:
Kenneth W. Schippers, RPR
Job No:  46541

PAUL BEESON

2

1    Deposition of PAUL BEESON
     Tuesday, September 27, 2016
2    Tucson, Arizona

3

4                    I N D E X

5

         EVENT                              PAGE
6
     Examination(s) by:  Mr. Schey            4
7

8    Examination(s) by:  Ms. Fabian          64

9

10
             EXHIBITS MARKED FOR IDENTIFICATION
11
         NUMBER                              PAGE
12
      Exhibit 1:  Declaration of Paul A. Beeson     4
13

14

15

16
                   * * * * *
17

18

19

20

21

22

23

24

25

PAUL BEESON

3

1

2      APPEARANCES:

3      FOR THE PLAINTIFFS:
                Center for Human Rights & Constitutional L
4                256 South Occidental Boulevard
                Los Angeles, California  90057
5                (213) 388-8693
                BY:  Peter A. Schey, Esq. (via telephone)
6                    pschey@centerforhumanrights.org

7

       FOR THE DEFENDANTS:
8                UNITED STATES DEPARTMENT OF JUSTICE
                District Court Section
9                P.O. Box 868
                Ben Franklin Station
10               Washington, D.C.  20044
                (202) 307-4693
11               BY:  Sarah B. Fabian, Esq.
                    Justin Crofts, Esq.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PAUL BEESON

4

1          (Deposition Exhibit 1 was marked

2     for identification.)

3

4                    PAUL BEESON,

5     having first been duly sworn to tell the truth, the

6     whole truth and nothing but the truth, testified as

7     follows:

8

9          MS. FABIAN:  Peter, you can go ahead.  I'll

10    just state for the record that we've marked Chief

11    Beeson's declaration as Exhibit 1 and I'm handing the

12    declaration to the witness if you want to ask questions

13    about that.

14          MR. SCHEY:  Thank you.

15

16                    EXAMINATION

17    BY MR. SCHEY:

18    Q   Hi, Chief Beeson.  Thank you for coming to your

19    deposition today.

20          If I ask you any questions that you do not

21    understand, would you let me know that you do not

22    understand the question and I will try to rephrase it for

23    you, okay?

24    A   Okay.  I will.

25    Q   And I'm entitled to your best estimation of

PAUL BEESON

12

1    A    I'm sorry, could you repeat the question?

2    Q    Do you recall at all what PALMS has to say about

3    the definition of a, quote, special needs minor, unquote,

4    with regards the Flores settlement?

5    A    I don't recall.

6    Q    And do you recall receiving any instructions or

7    guidance aside from PALMS dealing with this, what the

8    term special needs minor means in the Flores settlement?

9    A    Not that I recall.

10   Q    Do you recall what PALMS states or any guidance

11   or instructions you received outside of PALMS regarding

12   what the term, quote, medium security facility, unquote,

13   means in the Flores settlement?

14             MS. FABIAN:  Object to form.  Foundation.

15             THE WITNESS:  Not that I recall, sir.

16   Q    (By Mr. Schey:)  Is it correct that you've been

17   instructed to keep the temperature in holding cells for

18   minors and possibly including adults, between 66 and 80

19   degrees?

20             MS. FABIAN:  Objection.  Form.  Foundation.

21             THE WITNESS:  There is some discussion

22   about the temperature.  I can't remember if it's 66 or

23   68, but 80 is the top range.

24   Q    (By Mr. Schey:)  Okay.  And do you recall what

25   or are you aware of what the Flores settlement states

PAUL BEESON

13

1   with regards to the segregation of minors from unrelated

2   adults in CBP custody?

3       A   I think the intent is for us to keep them

4   completely separated unless it were like just not

5   operationally feasible.

6       Q   Do you recall whether any of the PALMS contents

7   or guidance or instructions you have received require

8   that minors in your custody should be separated from

9   delinquent offenders; if you recall?

10      A   I know it talks about separation from adults.

11  I'm just trying to think if there was a reference to the

12  length of offenders in there.

13      Q   I'm asking if you recall.

14      A   Yeah, I just don't recall.

15      Q   Do you recall from PALMS or from any

16  instructions or directions that you have received what,

17  if any, notice of rights accompanied minors should be

18  provided in CBP custody; if you recall?

19      A   Accompanied minors is what I heard you say; is

20  that correct.

21      Q   That's correct.

22      A   Okay.  My recollection is that we provide them

23  with the 770 and the 826, if I recall correctly.

24      Q   What is the 826?

25      A   I think it is the notice of disposition, I

PAUL BEESON

33

1    parent because of age?

2        Q    (By Mr. Schey:)  Because of age or sex or any

3    other reason.

4        A    I'm not aware of a circumstance where we would

5    do that.

6        Q    Okay.  So to the best of your knowledge

7    accompanied minors are held in one area with their

8    accompanying parents and unaccompanied minors are held in

9    a different area; is that correct?  Different holding

10   cell; is that correct?

11       A    That's my -- yes, I believe that's correct.

12       Q    And then all of those, all of the above have

13   access to some sort of common area where they can walk

14   into where you might have crackers and juice set up; is

15   that your understanding?

16       A    Yes, so right outside those detention areas they

17   walk out the door, right to the door there's the cart, if

18   you will, that has the crackers and the juice and the

19   hygiene products set up there.

20       Q    Okay.

21       A    And then there's an area where there's some

22   access to videos if they want to watch a video or

23   something like that.

24       Q    I see.  And at the Border Patrol station, if a

25   minor wanted to lay down to sleep, are they provided any

PAUL BEESON

35

```
 1        A    -- family?  Yes, that's my understanding.

 2        Q    Okay.  But my question was are they also

      provided to all adults, other adults, if you know?

 4        A    I'm thinking here.  Trying to remember.  I

      believe that they are.

 6        Q    And at the Border Patrol station and please

      don't guess, if you know, tell us, if you don't know,

      just say you don't know --

 9        A    Sure.

10        Q    -- are minors in your custody provided any

      blankets to sleep under, if you know?

12        A    I don't know.

13        Q    How about at the TCC?

14        A    Yes, they are.

15        Q    And what type of blankets are they provided?

16        A    They are the mylar type.

17        Q    Okay.  And have you received any instructions

      from headquarters regarding how many detainees may be

      held in each one of the holding cells in your sector?

20        A    I do not recall.

21        Q    Do you recall where that information may be or

      how that information may be communicated to your officers

      in charge or supervisors at the different stations in

      your sector?

25             MS. FABIAN:  Object to form.
```

PAUL BEESON

39

1    Q    And of the current budget for this year, which I

2    think you said -- I'm sorry, was it 20 million or 30

3    million?

4    A    I think I said in the neighborhood of 30

5    million.

6    Q    Okay.  Approximately how much of that is set

7    aside for items and services that might be provided to

8    the detainees, if you recall?

9    A    I do not recall.

10   Q    At these Border Patrol stations, am I correct

11   the lights are on 24/7; is that right?

12            MS. FABIAN:  Object to form.

13   Q    (By Mr. Schey:)  Lights in the holding cells.

14   A    I believe that they are, yes.

15   Q    Is there any reason why at night in cells that

16   hold minors, those lights could not be dimmed, somewhat

17   dimmed, to make it easier for minors to sleep but still

18   permit visual observation of the people in the holding

19   cells?

20   A    I don't know.

21            MS. FABIAN:  Object to form.

22            THE WITNESS:  Sorry.  I'll just wait until

23   you're done.  I don't know.

24            MS. FABIAN:  I'm just informing the witness

25   of his right to ask for a break.  You can ask for one at

PAUL BEESON

45

1      A    Correct.

2      Q    And all of this now is done electronically in

3  the holding 3E standard system; is that correct?

4      A    Yes, I believe that's correct.

5      Q    And all significant statements obtained from the

6  person are going to be recorded in that system; is that

7  correct?

8      A    Yes.

9      Q    And your officers or your agents also now are

10  entering into that system when they do welfare checks on

11  children in their custody and when they feed them meals;

12  is that correct?

13      A    Yes, sir.

14      Q    Okay.  And I'm just curious, I'm just trying to

15  understand, let's say you have three or four agents going

16  around at a mealtime distributing burritos to detained

17  people, who specifically is tasked with entering into

18  this E3 system that those meals were provided?

19          MS. FABIAN:  Object to form.

20      Q    (By Mr. Schey:)  If you know?

21      A    I don't know.

22      Q    And are you aware of any, of any in-person

23  training that the agents working under you receive in how

24  to input data with regards to the delivery of meals, if

25  you know?

PAUL BEESON

46

1    A    I don't know.

2    Q    Are you aware of anything in PALMS or any

3    written guidance or instruction to your agents regarding

4    how or who could enter data into that system about

5    delivered meals --

6            MS. FABIAN:  Object to form.

7    Q    (By Mr. Schey:)  -- if you know?

8    A    I do not know.

9    Q    Are you aware of any efforts to monitor the

10   accuracy of records entered with regards to meals served,

11   anything that would be brought to your attention

12   monitoring the accuracy of that data?

13   A    No, sir.

14   Q    Would your response be the same if I asked you

15   about other factors that you're supposed to put in there

16   such as temperature control, et cetera, would your

17   responses be the same about what you know or don't know

18   or are familiar with about their training, instruction

19   guidance, et cetera?

20           MS. FABIAN:  Object to form.

21           THE WITNESS:  Yes, I think it would.

22   Q    (By Mr. Schey:)  Do you know what the FIGMA

23   System is, data system?

24   A    You were kind of muffled there.  I didn't hear

25   the question.

PAUL BEESON

50

1       (Recess, 2:30 p.m.–2:34 p.m.)

2              MS. FABIAN:   Okay.   We're back on the

3       record.

4       Q    (By Mr. Schey:)   Do you have any idea when you

5       have a family detained and you're going to turn them over

6       to ICE, do you have any idea where ICE detains these

7       families that are apprehended in the Arizona area?

8       A    No.

9       Q    Do you know whether they are transferred to

10      either the Karnes or the Dilley ICE facility in Texas?

11      A    I don't know if they are not.   It's not a

12      conversation that I have had with ICE.

13      Q    Might the delay in transferring family units

14      from your custody to ICE be caused by ICE delays in

15      coming to pick up the family?

16              MS. FABIAN:   Object to form.   Foundation.

17      Q    (By Mr. Schey:)   Let me rephrase the question.

18              MS. FABIAN:   I'm not sure that he's

19      testified about any delays.

20      Q    (By Mr. Schey:)   Okay.   Let me rephrase the

21      question.

22              Is it correct that in addition to processing

23      time that the amount of time that an individual may spend

24      in Border Patrol custody may be impacted about by

25      availability of bed space at ICE detention facilities?

PAUL BEESON

51

1          MS. FABIAN:  Object to the form.

2      Q   (By Mr. Schey:)  If you know.

3      A   It is possible, yes.

4      Q   And has that happened in the previous three or

5  six months, if you know?

6      A   Not that I'm aware of.

7      Q   And other than providing with minors in your

8  custody with access to toilets and sinks, drinking water

9  and food, as appropriate, emergency medical assistance,

10  adequate temperature control and ventilation and adequate

11  supervision, is there anything else you're aware of that

12  you're required to provide minors in your custody?

13          MS. FABIAN:  Object to form, foundation.

14          THE WITNESS:  Not that I recall.  We talked

15  about -- you talked about food, sanitary supplies, things

16  like that.  I'm not recalling additional beyond what you

17  listed.

18      Q   (By Mr. Schey:)  Are you aware of any

19  instructions or guidance issued to your agents at

20  different stations, and if so, who issues those

21  instructions and when, telling them that they must keep

22  the temperature between 71 and 74 degrees in holding

23  cells?

24          MS. FABIAN:  Object to form, foundation.

25      Q   (By Mr. Schey:)  If you don't recall, just say

PAUL BEESON

56

1 Q Okay.  So, in other words, you observed clothing

2 that could basically accommodate children of almost any

3 age; would that be fair to say?

4 A Yes, sir.

5 Q Have you ever looked into the nutritional value

6 of the food that's being served, burritos?

7 A No.

8 Q Has anybody to your knowledge working under your

9 supervision?

10 A Not to my knowledge.

11 Q Can you recall receiving any direction or

12 guidance or training or instructions from headquarters

13 dealing with the nutritional value of food made available

14 to minors in your custody?

15 MS. FABIAN:  Object to form.

16 THE WITNESS:  I do not recall.

17 Q (By Mr. Schey:)  I know you have a contract with

18 a cleaning service for the Border Patrol station, is that

19 correct, other than I think the GSA may have one

20 contract; is that correct?

21 A We do have a contract with cleaning the

22 stations, yes.

23 Q And what is your understanding about what those

24 contracts require in terms of how often your stations are

25 cleaned out, if you recall?

PAUL BEESON

61

1        A    No, sir, not that I recall.

2        Q    Have you been advised by anybody in the past 12

3    months that the juvenile coordinator employed by ICE has

4    visited or reviewed any of your Border Patrol stations to

5    examine the processing of children?

6        A    I have not been advised of that, no.

7        Q    I noticed at the very end of your declaration,

8    if you just turn to I think it's the final page, Exhibit

9    3, has got pictures of different things.

10       A    I have it.

11       Q    Okay.  What is that?  Where is that from?

12       A    That's posted in the area of the juvenile and

13   it's describing things that are available to them if they

14   need any of these things.  A lot -- well, not to say a

15   lot, some of this stuff is available on the cart as I

16   mentioned.  If it weren't, then they would just have to

17   ask for it and we would provide it.

18       Q    And have you personally observed this poster

19   that appears in your Border Patrol stations or is this

20   something that you know is available at the TCC?

21       A    I believe this is up at all the stations, but I

22   have seen it specifically at the TCC.  I don't recall

23   seeing it at the stations.

24       Q    Okay.  So just to be clear, I couldn't quite

25   hear you, I believe you said that you have seen it at the

PAUL BEESON

67

1

2    STATE OF _____ )

3                             ) :ss

4    COUNTY OF _____)

5

6

7            I, PAUL BEESON, the

8    witness herein, having read the foregoing

9    testimony of the pages of this deposition,

10    do hereby certify it to be a true and

11    correct transcript, subject to the

12    corrections, if any, shown on the attached

13    page.

14

15                   _____

16                   PAUL BEESON

17

18

19

20    Sworn and subscribed to before

21    me, this           day of

22                   , 2016.

23

24    _____

25          Notary Public

PAUL BEESON

68

1    STATE OF ARIZONA     )
                           ) ss:
2    COUNTY OF PIMA        )

3

4    BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness, PAUL BEESON, before
5    testifying was duly sworn by me to testify to the whole
     truth; that the foregoing pages are a full, true and
6    accurate record of the proceedings, all done to the best
     of my skill and ability; that the proceedings were taken
7    down by me in shorthand and thereafter reduced to print
     under my direction.

8

9        I CERTIFY that I am in no way related to any of
     the parties hereto nor am I in any way interested in
     the outcome hereof.

10

11       ^ [X] ^ [ ]  Review and signature was requested.

12

13       I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(f)(3) and ACJA
14   7-206 J(1)(g)(1) and (2).  Dated at Tucson, Arizona,
     this 29th day of September, 2016.

15

16

17   _____

18   Kenneth W. Schippers, RPR
     Certified Reporter 60248

19

20

21

22

23

24

25

# Exhibit 5

Publicly Filed

1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES,       )
et al.,                     )
                            )
                            )
            Plaintiffs,     )
VS.                         ) Case No. CV 85-4544 DMG
                            )
                            )
LORETTA E. LYNCH,           )
Attorney General of the     )
United States, et al.,      )
                            )
                            )
            Defendants.     )
--------------------------x

ORAL DEPOSITION OF CHIEF MARIO MARTINEZ, produced

as a witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on the 22nd day of September, 2016, from 9:00 a.m. to

11:30 a.m., via telephone, before MARIA GALLEGOS, CSR in

and for the State of Texas, reported by machine

shorthand, at the Laredo Sector Headquarters, 207 West

Del Mar Blvd., Laredo, Texas 78041, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.


Job No. 46491

2

1                       A P P E A R A N C E S

2

    FOR THE PLAINTIFF, JENNY LISETTE FLORES:
3

4           CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
            256 South Occidental Boulevard
5           Los Angeles, California 90057
            BY:  Peter A. Schey, Esq. (Via telephone)
6                pschey@centerforhumanrights.org

7

8    FOR THE DEFENDANTS LORETTA E. LYNCH, Attorney General of
     the United States, et al.:
9
            DISTRICT COURT SECTION
10          OFFICE OF IMMIGRATION LITIGATION
            P.O. Box 868, Ben Franklin Station
11          Washington, D.C. 20044
            BY:  Sarah B. Fabian, Esq., Senior Litigation Counsel
12               sarah.b.fabian@usdoj.gov

13

     FOR THE CUSTOMS AND BORDER PROTECTION:
14
            CUSTOMS AND BORDER PROTECTION
15          Office of Chief Counsel
            109 Shiloh Drive, Ste. 300
16          Laredo, Texas 78045
            BY:  Jesus Ybarra, Esq.
17               jesus.ybarra@cbp.dhs.gov

18

19

20

21

22

23

24

25

3

1                                   INDEX

2                                                         PAGE

3       Appearances...................................     2

4       CHIEF MARIO MARTINEZ

5            Examination by Mr. Schey.................     4

6

7

8

9                                 EXHIBITS

10      NO.  DESCRIPTION                               PAGE

11      Exhibit 1    Declaration.....................     4

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    CHIEF MARIO MARTINEZ,

2      having been first duly sworn, testified as follows:

3                         EXAMINATION

4      BY MR. SCHEY:

5          Q.   Good morning, Chief Martinez.  How are you?

6          A.   I am well.  Thank you very much for asking.

7      How about yourself?

8          Q.   I'm good.  Thank you, sir.  I know we have

9      limited time so I'm just going to jump right into it.

10                     MS. FABIAN:  Peter, just to -- to

11     expedite things, do you want -- I've marked his

12     declaration as Exhibit 1.  Would you like me to hand

13     that to the witness so that he has it for your

14     questioning?

15                     (Exhibit was marked for identification as

16                     Deposition Exhibit 1.)

17                     MR. SCHEY:  Yes, please.

18                     MS. FABIAN:  I've done that.  You can go

19     ahead.

20         Q.   (By Mr. Schey)  Okay.  If you do not

21     understand any question, please let me know.  Okay?

22         A.   I will, sir.

23         Q.   And I'm entitled to get your best estimate of

24     things you're not sure about, but on the other hand I do

25     not want you to speculate.  Do you understand that?

7

1    Q.   And how far would that be?

2    A.   Carrizo Springs Station itself is physically

3    about maybe two hours from where I'm at --

4    Q.   Okay.

5    A.   -- in Laredo.

6    Q.   And I believe you indicated in your

7    declaration that if -- if one of your stations reached

8    capacity that they would then -- somebody from that

9    station would get in touch with an officer in charge or

10   a supervisor at some of the other stations to determine

11   space availability; is that -- is that correct?

12            MS. FABIAN:  Object to foundation.  Form.

13   A.   Well, the -- the actual immediate response

14   would be internal to Laredo.  So the -- just to clarify,

15   that individual would look for space within the Laredo

16   sector first.  And then --

17   Q.   (By Mr. Schey)  And how would he do that?

18   A.   Well, he will call the next station or a

19   station that is available to him in order for him to be

20   able to get that space availability.

21   Q.   And is there any way to check space

22   availability online or would it require the phone call?

23   A.   So it would require a phone call.  We do have

24   a capacity report that comes out regularly during the

25   day.  It's about approximately every three or four

8

1   hours.  And that really talks about how many people are

2   in custody in each particular station.  And so that

3   would be a document that that individual would have at

4   his disposal as well.

5       Q.   And that's issued approximately every three

6   hours you said?

7       A.   About three to four hours.

8       Q.   And that's available online?

9       A.   It's available -- no, it's generated by -- by

10  our intelligence center and it's distributed to all the

11  stations in --

12      Q.   Okay.

13      A.   -- management.

14      Q.   But is that something that you can check on a

15  computer?

16      A.   No.  It's like an e-mail that comes out with

17  the actual paper document itself.

18      Q.   I understand.  And do you just get that for

19  the Laredo sector or could you access that for let's say

20  the Rio Grande Valley sector?

21      A.   No, sir.  I would only have that information

22  available for the Laredo sector.

23      Q.   And so if you wanted to transport somebody to

24  the Rio Grande Valley sector because of capacity issues,

25  in that case you would -- you would have to make a phone

12

1          MR. SCHEY:  Declaration.

2          MS. FABIAN:  Can you just repeat the

3    question?  I think we might have misheard you.

4          MR. SCHEY:  Yeah.  Let me try to repeat

5    the whole -- the whole question.

6     Q.   (By MR. Schey)  Your declaration in many parts

7    is word for word the same as the declaration of the

8    chief of the El Centro section.  I'm trying to determine

9    who you received the first draft declaration from, if

10   you remember?

11    A.   I don't remember receiving any draft

12   declaration from anyone.  I believe that this

13   declaration was drafted based on, you know, my staff's

14   input with the assistance of our counsel.

15          MS. FABIAN:  Peter, can we go off the

16   record for one second?

17          MR. SCHEY:  Yes.

18          (Off the record.)

19          MS. FABIAN:  All right.  Peter, go ahead.

20          MR. SCHEY:  Okay.

21    Q.   (By Mr. Schey)  Do you have any idea whether

22   the stations in Laredo have any holding capacity

23   requirements other than anything you may have obtained

24   from headquarters such as capacity that's issued by

25   local fire department?

13

1          MS. FABIAN:  Object to form.

2      A.   No, sir, I would not.  I don't -- I don't have

3   that information.

4      Q.   (By Mr. Schey)  Okay.  So the only capacity

5   documentation that you have received has come from the

6   headquarters facility and maintenance and engineering?

7      A.   That's correct, sir, to my knowledge.

8      Q.   In paragraph 14 of your declaration you state

9   that border patrol agents when they are processing

10  family units asked about contacts that the family has in

11  the United States; do you see that or recall that?

12     A.   Yes, sir, I see it.

13     Q.   Where is that information recorded?  The

14  responses to that inquiry or those inquiries, where --

15  where is that recorded?

16     A.   That would be recorded within the e3 in the

17  I-213.

18     Q.   I'm sorry.  In both places?

19     A.   Well, e3 is the mechanism through which the

20  I-213 form is generated.

21     Q.   Okay.  So the I-213 is part of the e3

22  detention module?

23     A.   Not the detention module, but the actual

24  enforcement module.  So we used e3, which is a system,

25  and within that system there are different modules.  And

14

1    the processing is done within the one system so that we

2    can capture all the information that is pertinent, not

3    just from the law enforcement perspective but also for

4    the processing of the individual and the disposition.

5        Q.    And what is -- in what module is the I-213

6    included?

7        A.    It's in the actual processing site of the e3

8    intake.

9        Q.    Is it just called intake?

10       A.    I don't know what the formal name is.  I don't

11   recall that right off the top of my head, sir.

12       Q.    But that's where that information would be

13   recorded?

14       A.    Correct, sir.  That's where we're holding the

15   individual.

16       Q.    And are -- have any instructions that you are

17   aware of being issued to your agents and, if so, who

18   issued that instruction and how was it issued that when

19   processing family units agents should collect any

20   different information that would normally be collected

21   during anyone else's processing with regards to

22   contacts, family or friends, that the alien may have in

23   the United States?

24            MS. FABIAN:  Object to form.

25       A.    Okay.  I'll try to answer your question.  It's

18

1     Q.   Okay.

2     A.   -- the document --

3     Q.   My question is:   What is the most recent

4  instruction that you can remember that talks about that,

5  if you recall?

6     A.   Well, I think that the only one that comes to

7  mind right now that I can recall would be the TEDS --

8  the document that came out on how we detain and process

9  folks in our custody.

10          (Reporter asks for clarification.)

11          THE WITNESS:   TEDS, T-E-D-S.

12     Q.   (By Mr. Schey)  And what -- what does the TEDS

13  document tell your agents about asking apprehended

14  immigrants about their contacts in the United States?

15     A.   I don't have the document in front of me, so I

16  can't tell you exactly what it does or does not say.

17     Q.   Okay.  I'm not arguing exactly.  What --

18  what's your best recollection about what TEDS says?

19     A.   So TEDS does talk about moving the folks that

20  are in custody as quickly as you possibly can to either

21  repatriate into -- and/or to the custody of another

22  agency.  And -- and I do believe it does speak to us

23  gathering as much information on contacts that they may

24  or may not have in the United States in order to do

25  that.

19

1    Q.   Is it -- are you aware of any instruction that

2    your agents would know about that would tell them to

3    gather information about all the contacts listed or the

4    potential placements for release minors that are set

5    forth in paragraph 14 of the Flores settlement?

6              MS. FABIAN:   Object to form.   Foundation.

7    A.   So what the agents do is process on a regular

8    basis.   So this becomes not necessarily a matter of them

9    checking a document every time they go and process an

10   individual, but it becomes just a procedural mechanism

11   that they go through all the time.

12              So when you're talking about children or

13   especially specifically unaccompanied alien children,

14   what we look to is very specifically entering the

15   information into e3 so that health and human services

16   and the office of refugee settlement has the information

17   that they need to be able to place the individual.   We

18   do not place the individual, we just need to turn the

19   individual over or the child over to -- or as quickly as

20   we possibly can.

21   Q.   Okay.

22   A.   In terms of family units, that information is

23   entered into e3 for the purpose of ICRO being able to

24   make a determination as to whether or not the family

25   unit is going to be moved to a residential facility or

20

1    they're going to take the person into their actual

2    facility here in Saunders.  So that's just basically a

3    general rule is that we get as much information as we

4    possibly can from all of the persons that are

5    apprehended so that we can make those types of custody

6    determinations and help other agencies make their

7    custody determinations along the way.

8        Q.   Okay.  My question was:  Are you familiar with

9    paragraph 14 of the Flores settlement?

10       A.   I do not know all the paragraph numbered, but

11   if you tell me what part of that settlement you speak

12   of, I would probably be able to tell you a little bit

13   about it.

14       Q.   Okay.  Paragraph 14 is order of preference for

15   the release of apprehended minors.

16       A.   That's correct.  And so --

17       Q.   And paragraph 14 lists approximately ten

18   options for placements.

19       A.   Correct.

20       Q.   Are you aware of that?

21       A.   That -- that is correct.

22       Q.   Okay.  And are you aware that that includes

23   both relatives and -- and certain defined nonrelatives?

24       A.   That's correct.

25       Q.   And are you aware that -- and so my question

31

1    accept a child.

2        Q.   And approximately in your experience for a

3    one-month period how often does that happen?

4        A.   I don't have any idea of the exact number of

5    how often that would happen.  That -- it -- it depends

6    on the number of unaccompanied alien children we have

7    and how many of them are actually from Mexico.

8        Q.   What's your best estimate just based on your

9    experience as to how often that happens per week or per

10   month?

11       A.   Well, that probably happens once or twice a

12   week.

13       Q.   Okay.  And do you know based on your

14   communications with the sector of chiefs from Rio Grande

15   or Del Rio, do they do the same thing?

16       A.   No, sir.  I don't know what their process is.

17       Q.   I noticed the El Centro chief testified, I

18   believe, that they have facilities for attorney visits.

19   From your declaration I have the impression that you do

20   not have facility -- facilities for attorney visits; is

21   that correct?

22            MS. FABIAN:  Object to form.

23       A.   That's correct, sir.

24       Q.   (By Mr. Schey)  I believe you indicate that

25   minors or their parents are provided a list of free

32

1    attorneys or low cost attorneys; is that correct?

2        A.   That's correct.

3        Q.   And are they permitted to keep that with them

4    or are they just shown it and then it's placed in their

5    file?

6        A.   It's given to them with the rest of their

7    paperwork.

8        Q.   And -- and they can keep that while detained

9    in your stations?

10       A.   Yes, sir.

11       Q.   And what other paperwork are they issued that

12   they can keep with them at your stations?

13       A.   Well, when they get their actual packet from

14   us that once they're processed -- so that includes their

15   WA, their NTA, et cetera.

16       Q.   What if they don't have an NTA, what do they

17   get to keep with them other than the list of free legal

18   services?

19            MS. FABIAN:  Object to form.

20       A.   Well, for the family units they're probably

21   just going to receive a WA/NTA unless the individual has

22   a prior criminal history, one of the parents do -- has a

23   prior deportation.  Then they would get, you know, a

24   copy of that reinstatement form for the deportation.

25       Q.   (By Mr. Schey)  Okay.  So they need -- they

42

1    And so we see those children normally place within

2    24 hours.  So normally once they go to Cotulla, you

3    know, that's a space that's reserved mostly for UACs and

4    so that -- that is where that person would be

5    transported to.

6        Q.   (By Mr. Schey)  Well, they -- they would be

7    transported there regardless of whether they were able

8    to sleep at the border patrol station processing them;

9    is that correct?

10       A.   That's correct, sir.  As soon as we proce- --

11   as soon as we can get them processed, which is our

12   priority, and we can get them up to Cotulla.

13       Q.   And do you track how long it is on average

14   it's taking you to complete processing?  Is that tracked

15   anywhere?

16           MS. FABIAN:  Object to form.

17       A.   Yes, sir.

18       Q.   (By Mr. Schey)  And what's the most recent

19   data on that?

20       A.   For the -- for juveniles?

21       Q.   Yeah.  Let's say if you have -- let's say for

22   unaccompanied minors first?

23       A.   So -- so for minors it's normally there are

24   from arrests to placement is within 24 hours.

25       Q.   And what's the average length of time that --

43

1     or do you have data?  I'm not asking you just to give us

2     some estimate.  I'm wondering did -- are you provided

3     any data that would tell you that during the previous

4     week or day or month or six months unaccompanied minors

5     were -- were at one -- on average were at our stations

6     for x number of hours?

7                    MS. FABIAN:  Object to form.

8         A.   Okay.  So we do get a report daily and it --

9     it doesn't necessarily tell us how much there -- how

10    long they're there, but it really looks at when they

11    extend past, you know, 8 hours, 12 hours, 24 hours and

12    the like.

13        Q.   (By Mr. Schey)  Okay.  And based on -- what

14    was the most recent data, let's say, for the previous

15    two months?  What -- what does that indicate to you

16    about the average length of stay in one of your stations

17    for unaccompanied minors?

18                    MS. FABIAN:  Object to form.

19        A.   So as I mentioned before I don't have that

20    data in front of me, but I can tell you it's within

21    24 hours.  So they normally would not go over 24 hours.

22        Q.   (By Mr. Schey)  Okay.  How about family units,

23    do you have that data?  Have you seen any reports about

24    average length of stay of family units in one of your

25    stations or all of your stations?

44

1    A.   That's correct.  And so that data will tell me

2    that -- that they do not exceed over 48 hours in being

3    placed.

4    Q.   Okay.  Does the average -- is the average -- I

5    know that for -- well, for your sector it would be -- is

6    the average about 48 hours?

7              MS. FABIAN:   Object to form.

8    A.   So complete in that -- in that would include

9    adults and minors and family units all total?

10   Q.   (By Mr. Schey)  Yeah, all total --

11   A.   Yes.

12   Q.   -- from the time of apprehension to time of

13   transfer to ICE, is that about -- on average about

14   48 hours?

15   A.   That would be the average if you would take

16   all of those together.

17   Q.   Okay.  Those family units together?

18   A.   Yes, but family units are prioritized as

19   unaccompanied alien children, family units and then

20   adult males.  And so the adult males are the ones that

21   would, you know, drive that number up.

22   Q.   Okay.  And are -- if you just looked at the

23   family units what would the average number be, about

24   48 hours?

25   A.   Yeah, I don't have that -- no, sir.  I think

51

1    Q.   Okay.  So let's say if a child -- let's say

2    tomorrow a child needed a shower, had been there for two

3    days or three days, where would you take that child to

4    be showered, if anywhere?  Or if you don't have

5    showering capacity, just tell us.

6              MS. FABIAN:  Object to form.  Are you

7    talking about now an unaccompanied child, Peter?

8              MR. SCHEY:  So let's start with

9    unaccompanied minors and then we'll discuss families.

10    A.   Okay.  So if it's an unaccompanied alien

11    child, that child we would -- and the child right now

12    for us, we have very little capacity.  I mean in terms

13    of the number of children that are coming through here,

14    unaccompanied alien children, and so we're having very

15    good, you know, record of having placed in placing those

16    children within 24 hours.  If it goes to 48 hours, then

17    the Cotulla station has contracts out to a local

18    establishment, a hotel, and then they rent that room for

19    the purpose of having that child take a shower there.

20    So our agents would transport that.  The female agents

21    would transport the child depending on the gender to

22    the -- to there and they would make sure that the child

23    has an opportunity to take a shower.  And then he's

24    turned over to OR as soon as possible.

25              Those are like I said very rare.  We

52

1    don't have those.  OR has been very good about placing

2    those children within 24 hours of us calling them.

3        Q.   (By Mr. Schey)  Okay.  And how about a child

4    in a -- with a family unit, where would such a child be

5    taken -- or can you recall in the previous year any

6    child in a family unit being taken to shower some place,

7    and if so tell us where they were taken.

8        A.   So the last --

9             MS. FABIAN:  Object to form.

10       A.   Okay.  So in the last year I do not recall us

11   having to do that with any child that's in a family

12   unit.  We try to place our family units as quickly as we

13   possibly can into ICRO custody.  And so that child would

14   either have been -- you know, the disposition had been

15   determined by ICRO long before that.

16       Q.   (By Mr. Schey)  Is the -- the availability of

17   the shower or -- or if a kid was provided a shower, is

18   that one of the events that -- that that should be noted

19   in the e3DM?

20       A.   That's correct, sir.

21       Q.   And is there a field for showers in the e3DM?

22       A.   A field?

23       Q.   Well, how -- yeah, how would you note it in

24   the e3DM?

25       A.   So I don't know the specific fields within the

94

STATE OF _____ )

                         )  :ss

COUNTY OF _____)




          I, CHIEF MARIO MARTINEZ, the

witness herein, having read the foregoing

testimony of the pages of this deposition,

do hereby certify it to be a true and

correct transcript, subject to the

corrections, if any, shown on the attached

page.



                    _____

                    CHIEF MARIO MARTINEZ




Sworn and subscribed to before

me, this          day of

                    , 2016.


_____

          Notary Public

95

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JENNY LISETTE FLORES,          )
etal.,                         ) Case No. 85-4544 DMG
                               ) (AGRx)
                               )
                   Plaintiffs, ) Plaintiffs' Combined
VS.                            ) Reply in Support of
                               ) Motion to Enforce
                               ) Settlement and Appoint
LORETTA E. LYNCH,              ) a Special Monitor and
Attorney General of the        ) Opposition to
United States, etal.,          ) Defendants' Motion for
                               ) Evidentiary Hearing
                               )
                   Defendants. ) Hearing: October 6,
                               ) 2016; Time:  10:00 a.m.
                               )
                               ) Courtroom 7,312 N.
                               ) Spring Street

REPORTER'S CERTIFICATION
DEPOSITION OF CHIEF MARIO MARTINEZ
TAKEN SEPTEMBER 22, 2016

     I, MARIA GALLEGOS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

     That the witness, CHIEF MARIO MARTINEZ, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

     That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and return to DAVID FELDMAN WORLDWIDE, INC., by _____;

     That the amount of time used by each party at the deposition is as follows:

     Mr. Peter Schey - 2 Hours, 14 Minutes

     Ms. Sarah B. Fabian - 0.00 Minutes

     Mr. Jesus Ybarra - 0.00 Minutes

96

1      That pursuant to information given to the
deposition officer at the time said testimony was taken,
2 the following includes counsel for all parties of
record:

3

        Mr. Peter Schey - Attorney for Plaintiff

4

        Ms. Sarah B. Fabian - Attorney for Defendant

5

        Mr. Jesus Ybarra - Attorney for CBP

6

7      I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
8 taken, and further that I am not financially or
otherwise interested in the outcome of the action.

9

        Further certification requirements pursuant to
10 Rule 203 of TRCP will be certified to after they have
occurred.

11

        Certified to by me this the 30th day of September,
12  2016.

13

14

15

16

17

18     *Maria Gallegos*
       _____
19     MARIA GALLEGOS, CSR NO. 6285
       Expiration Date:  12-31-17

20

21

22

23

24

25

97

FURTHER CERTIFICATION UNDER RULE 203 TRCP

1

2      The original deposition was/was not returned to the
deposition officer on _____;

3

4      If returned, the attached Changes and Signature
page contains any changes and the reasons therefor;

5      If returned, the original deposition was delivered
to Mr. Peter A. Schey (Cal. Bar No. 58232), Custodial

6  Attorney;

7      That $ _____ is the deposition officer's
charges to Plaintiff for preparing the original

8  deposition transcript and any copies of exhibits;

9      That the deposition was delivered in accordance
with Rule 203.3, and that a copy of this certificate was

10  served on all parties shown herein and filed with the
Clerk.

11
       Certified to by me this 30th day of September,
12  2016.

13

14

15

16

17  *Maria Gallegos*
    _____
18  MARIA GALLEGOS, CSR NO. 6285
    Expiration Date:  12-31-17

19

20

21

22

23

24

25

DATED: December 5, 2016          Respectfully submitted,

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey
Carlos Holguín


ORRICK, HERRINGTON & SUTCLIFFE LLP
T. Wayne Harman
Elena García

LA RAZA CENTRO LEGAL, INC.
Michael Sorgen
Amanda Alvarado Ford

LAW FOUNDATION OF SILICON VALLEY -
LEGAL ADVOCATES FOR CHILDREN &
YOUTH
Jennifer Kelleher Cloyd
Katherine H. Manning
Kyra Kazantzis
Annette Kirkham

Of counsel:

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

/s/   *Peter Schey*
*Attorneys for Plaintiffs*

/ / /

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On December 6, 2016 I electronically filed the following document(s):

- **Plaintiffs EXHIBITS 1-5 [PART 1 OF 6]**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/__*Peter Schey*_____
*Attorney for Plaintiffs*