1

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org

2

3

4

5

6

7

8

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020

9

10

11

12

13

*Attorneys for plaintiffs (listing continues on following page)*

14

UNITED STATES DISTRICT COURT

15

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

16

17

JENNY LISETTE FLORES, *et al.*,

18

     Plaintiffs,

19

- vs -

20

JEH JOHNSON, SECRETARY, U.S.

21

DEPARTMENT OF HOMELAND SECURITY,

22

*et al.*,

23

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 85-4544 DMG (AGRx)

PLAINTIFFS' EXHIBITS 6-8 [PART 2 OF 6]

Hearing: January 30, 2017

24

25

*Plaintiffs' counsel, continued:*

26

27

28

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX OF EXHIBITS

1.  Declaration of Stephen Manning………………………………...…………... 1

2.  Deposition of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. – Transcript Excerpts…………………………………………………………………… 10

3.  Deposition of Chief Patrol Agent – El Centro Sector, CBP, Rodney Scott – Transcript Excerpts…………………………………………………….…………… 36

4.  Deposition of Chief Patrol Agent – Tucson Sector, CBP, Paul Beeson – Transcript Excerpts…………………………………………………...…………… 59

5.  Deposition of Chief Patrol Agent – Laredo Sector, CBP, Mario Martinez – Transcript Excerpts…………………………………………….…………… 77

6.  Deposition of Karnes Assistant Field Office Director, Enforcement and Removal Operations, ICE, Juanita Hester – Transcript Excerpts……………………………….……………... 101

7.  Deposition of Dilley Assistant Field Office Director, Enforcement and Removal Operations, ICE, Valentin de la Garza – Transcript Excerpts…………………………………….. 121

8.  Deposition of Berks Assistant Field Office Director, Enforcement and Removal Operations, ICE, Joshua Reid – Transcript Excerpts……………………………………………….... 149

9.  Deposition of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller – Transcript Excerpts…………………………………….…………… 193

10. Deposition of Class Member Mother Ritza Mxxx xxxxxxx – Transcript Excerpts…………………………………………………………… 230

11. Deposition of Class Member Mother Celina Sxxxxxx-xxxx – Transcript Excerpts…………………………………………………………… 244

12. Deposition of Class Member Franklin Rxxxx xxxxxxxxxx– Transcript Excerpts…………………………………………………………… 263

13. Deposition of Class Member Mother Karina Vxxxx xxxxxxx – Transcript Excerpts…………………………………………………………….289

14. Deposition of Class Member Mother Lindsay Gxxxx xxxxx – Transcript Excerpts…………………………………………………………… 316

15.  Deposition of Class Member Mother Mirna Mxxxxxx xxxxx – Transcript Excerpts…………………………………………………………… 341

16. Deposition of Class Counsel Peter Schey – Transcript Excerpts…………………….……… 361

17. Deposition of Class Member Mother Sara Exxxxxxxx xxxxx – Transcript Excerpts……………………………………………………………….. 381

18. Deposition of Class Member Yeslin Lxxxx xxxxxxx – Transcript Excerpts…..…………………………………………………………… 399

19. Deposition of Class Member Mother Yessenia Exxxxxxxx xxxxxxx – Transcript Excerpts………..…………………………………………418

20. Deposition of Class Member Mother Zulma Mxxxxxxx xxxxxxx – Transcript Excerpts…………………………………………………… 432

21. Deposition of Attorney Bridget Cambria  – Transcript Excerpts…………………….…… 458

22. Deposition of Attorney Amanda Doroshow – Transcript Excerpts………………….…... 467

23. Deposition of Attorney Robyn Barnard – Transcript Excerpts…………………………… 476

24. Deposition of Attorney Edward McCarthy – Transcript Excerpts…………………...…… 505

25. Deposition of Jacqueline Kline – Transcript Excerpts…………………………………… 528

26. Declaration of Attorney Robert Doggett…………………………………..……………… 537

27. Declaration of Chapman Noam………………………………………..…………… 543

# Exhibit 6

Publicly Filed

Case 2:85-cv-04544-DMG-AGR   Document 287-2   Filed 12/06/16   Page 6 of 98   Page ID #:8469

Deposition of Juanita Hester

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1                UNITED STATES DISTRICT COURT
                 CENTRAL DIVISION OF CALIFORNIA,
 2                     WESTERN DIVISION

 3   JENNY LISETTE FLORES, et    '
     al.,                        '
 4                               '
          PLAINTIFFS,            '
 5                               '
     VS.                         '  CIVIL ACTION NO.
 6                               '  CV 85-4544 DMG (AGRx)
     LORETTA E. LYNCH,           '
 7   ATTORNEY GENERAL OF THE     '
     UNITED STATES, et al.,      '
 8                               '
          DEFENDANTS.            '
 9   * * * * * * * * * * * * * * * * * * * * * * * * * *

10               ORAL AND TELEPHONIC DEPOSITION OF

11                        JUANITA HESTER

12                     SEPTEMBER 9, 2016

13

14   * * * * * * * * * * * * * * * * * * * * * * * * * *

15        ORAL AND TELEPHONIC DEPOSITION OF JUANITA HESTER,

16   produced as a witness at the instance of the Plaintiff,

17   was taken in the above-styled and numbered cause on the

18   9th day of September, 2016, from 2:14 p.m. to 5:02 p.m.,

19   before Jessica Butts, CSR, in and for the State of Texas,

20   reported by machine shorthand, at The United States

21   Attorney's Office, 601 North West 1604 Loop, Suite 600,

22   San Antonio, Texas 78216, pursuant to the Federal Rules

23   and the provisions stated on the record or attached

24   hereto.

25
```

Deposition of Juanita Hester                                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         MR. PETER SCHEY
           THE CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
 5         256 South Occidental Boulevard,
           Los Angeles, California 90057
 6         Telephone:     (213) 388-8693
           Fax:           (213) 386-9484
 7         E-mail: pschey@centerforhumanrights.org
           (Present by telephone)
 8

 9         MR. MANOJ GOVINDAIAH
           THE REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND
10         LEGAL SERVICES
           5121 Crestway Drive, Suite 105,
11         San Antonio, Texas 78239
           Telephone:     (210) 226-7722
12         Fax:           (210) 212-4856
           E-mail: manoj.govindaiah@raicestexas.org
13

14    FOR THE DEFENDANTS:

15         MS. SARAH B. FABIAN
           THE U.S. DEPARTMENT OF JUSTICE
16         CIVIL DIVISION
           TRIAL ATTORNEY
17         P.O. Box 868
           Ben Franklin Station
18         Washington, D.C. 20044
           Telephone:     (202) 532-4824
19         Fax:           (202) 616-8962
           E-mail: sarah.b.fabian@usdoj.gov
20

21         MR. GARY L. ANDERSON
           THE U.S. DEPARTMENT OF JUSTICE
22         UNITED STATES ATTORNEY'S OFFICE
           ASSISTANT UNITED STATES ATTORNEY
23         601 North West Loop 410, Suite 600
           San Antonio, Texas 78216
24         Telephone:     (210) 384-7365
           Fax:           (210) 384-7312
25         E-mail: gary.anderson@usdoj.gov
```

```
 1                    (APPEARANCES CONTINUED)

 2


 3          MR. NATHAN L. HERBERT
            THE U.S. DEPARTMENT OF HOMELAND SECURITY
 4          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
            DEPUTY CHIEF COUNSEL, OFFICE OF THE CHIEF COUNSEL
 5          300 El Ranchero Way
            Dilley, Texas 78017
 6          Telephone:    (830) 378-6626
            E-mail: nathan.l.herbert@ice.dhs.gov
 7


 8          MR. JUSTIN F. ADAMS
            THE U.S. DEPARTMENT OF HOMELAND SECURITY
 9          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
            DEPUTY CHIEF COUNSEL, OFFICE OF THE CHIEF COUNSEL,
10          OFFICE OF THE PRINCIPAL LEGAL ADVISOR
            8940 Fourwinds Drive
11          San Antonio, Texas 78239
            Telephone:    (210) 967-7237
12          Fax:          (210) 967-7118
            E-mail: justin.f.adams@ice.dhs.gov
13


14          MR. THOMAS F. ZIMMERMAN
            THE U.S. DEPARTMENT OF HOMELAND SECURITY
15          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
            DISTRICT COURT LITIGATION DIVISION
16          ASSOCIATE LEGAL ADVISOR
            500 12th Street, South West
17          Washington, D.C. 20256
            Telephone:    (202) 732-5993
18          E-mail: thomas.f.zimmerman@ice.dhs.gov

19


20

21    ALSO PRESENT:

22          MS. JESSICA BUTTS,
            TEXAS CERTIFIED SHORTHAND REPORTER
23


24


25
```

```
 1                     I N D E X

 2                                              PAGE

 3    APPEARANCES...................................     2

 4    THE WITNESS:   JUANITA HESTER

 5    Examination by Mr. Schey.....................     5

 6    Signature and Changes........................   103

 7    Reporter's Certificate.......................   105

 8    Further Certification........................   108

 9

10

11              E X H I B I T   I N D E X

12    EXHIBIT

13    NO.              DESCRIPTION           PAGE MARKED

14    Exhibit  1    Declaration of Juanita Hester.......    43

15

16

17

18

19

20

21

22

23

24

25
```

1      P R O C E E D I N G S

2          (Proceedings began at 2:14 p.m.)

3               JUANITA HESTER,

4    having been duly sworn, testified under oath as follows:

5                  EXAMINATION

6    BY MR. SCHEY:

7          MS. FABIAN:  Peter, you can ago ahead.  We're

8    getting a lot of background noise from you.

9      Q.   (By Mr. Schey)  Okay.  Is that better?

10         MS. FABIAN:  I think so.

11     Q.   (By Mr. Schey)  Okay.  Ms. Hester, in October

12   2015, ICE updated its procedures to ensure families are

13   processed as expeditiously as possible.  Can you tell us,

14   with regards to updating procedures at Karnes, how -- what

15   instructions were you given to update these procedures?

16   Was it in writing, or was its oral?

17         MS. FABIAN:  Objection; form, foundation.

18     Q.   (By Mr. Schey)  I did not hear any response.

19         MS. FABIAN:  Yeah, it's -- She's thinking.

20         THE WITNESS:  Could you repeat the question?

21     Q.   (By Mr. Schey)  Yeah.  Did you get the

22   instructions orally or in writing to update procedures

23   around October 2015, if you recall?

24     A.   I don't recall if it was in writing or a verbal.

25     Q.   But you do recall getting instructions to update

1    have no relief at that time.

2        Q.    (By Mr. Schey)  And other than that change in

3    policy that you'd mentioned, are -- were any other changes

4    made in October or November, that you know of, at Karnes

5    as a result of Judge Gee's August order?

6        A.    I don't recall.

7        Q.    Okay.  Is -- Is anything happening now at Karnes,

8    as a result of Judge Gee's August 2015 order, that you

9    know about?

10        MS. FABIAN:  Ob -- Object to form.

11        THE WITNESS:  I was not privy to Judge Gee's

12    rulings, so I've never seen it --

13        (Mr. Anderson reentered the conference room)

14        THE WITNESS:  -- so I -- I'd be unable to answer

15    your question.

16        Q.    (By Mr. Schey)  Did the -- Were any additional

17    ICE agents assigned to Karnes around September or October

18    or November 2015 in order to decrease the average length

19    of detention of detainees?

20        A.    Karnes has always had detailed staff assisting

21    us, from the -- the very beginning when they turned into a

22    Family Residential Center in August of 2014.

23        Q.    And -- And -- And how many ICE agents were first

24    assigned to Karnes when they first opened, approximately?

25        A.    I was not there when it first opened, so I would

1        MS. FABIAN:  Object to form.

2        THE WITNESS:  Yes.  It was between 10 and 100, a

3   number in --

4        Q.   (By Mr. Schey)  Okay.

5        A.   -- between there.

6        Q.   Now, you started in November of 2014.  At any

7   time from November 2014 to the present, has the number of

8   ICE agents assigned to Karnes increased?

9        A.   Could you clarify the question?  Are -- Are you

10  talking about all agents assigned?

11       Q.   ICE agents.

12       A.   Okay.  Please repeat the question one more time.

13       Q.   At any time from November 2014 to the present,

14  has the number of ICE agents assigned to Karnes increased?

15       A.   Yes.  ICE agents, the -- the number of staff

16  assigned to Karnes has increased.

17       Q.   And in 2015, in -- did the numbers increase in

18  2015?

19       MS. FABIAN:  Object to form.

20       THE WITNESS:  Do you have a specific date in 2015

21  that you're --

22       Q.   (By Mr. Schey)  No.

23       A.   -- talking --

24       Q.   No.

25       A.   -- about?

1    A.    -- as well.

2    Q.    Is any data put in there?

3    A.    I'm sorry.  I didn't hear you.

4    Q.    Is any other data put into that system?

5    A.    That's the data I know about.  That -- That's

6    what I use it for.

7    Q.    Okay.  And is any effort made to determine --

8    When processing is completed, is that recorded anywhere?

9    In other words, the time of completion of intake

10   processing?

11       (Mr. Anderson reentered the conference room)

12       MS. FABIAN:  Object to form.

13       THE WITNESS:  Not that I'm aware of.  There's no

14   time stamp anywhere.

15   Q.    (By Mr. Schey)  Okay.  And have you been able to

16   reduce detention time as a result of having additional ICE

17   agents assigned to Karnes?

18       MS. FABIAN:  Object to form, foundation.

19       THE WITNESS:  The time in custody has been

20   lowered, decreased; however, we were striving to do that

21   long before other people showed up and were assisting us.

22   Q.    (By Mr. Schey)  So that's -- But it's always a

23   goal to reduce detention time; is that fair to say?

24   A.    One more time?

25   Q.    It's always a goal to reduce detention time, if

1    somebody has a remedy available to them in the United

2    States; is that fair to say?

3            MS. FABIAN:  Object to form.

4            THE WITNESS:  At Karnes, we don't want somebody

5    in our custody if they have relief available and they're

6    able to be released.  We're going to make every effort to

7    have that happen as soon as possible.

8        Q.   (By Mr. Schey)  Now, other than increased -- an

9    increase in the number of ICE officers assigned to Karnes,

10   what else was done around October, November, December of

11   2015 to reduce detention time at Karnes?

12           MS. FABIAN:  Object to form, foundation.

13           THE WITNESS:  I believe I answered that question

14   earlier, and that was, We had the ability to release

15   residents if they were found with a positive credible fear

16   finding or a reasonable fear finding; and instead of them

17   staying for the -- their actual asylum hearing in front of

18   the immigration judge, we were able to get them released

19   so they could wait outside versus in custody.

20       Q.   (By Mr. Schey)  Are you aware of any effort that

21   has been made to track the amount of time while Flores

22   Class members are at Karnes, between the activities

23   involved with the initial intake, a fear interview, and

24   making a decision on custody if a positive determination

25   was issued as a result of the fear interview?  Are you

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

1   say?

2       A.   The report shows who's been in custody 15 days or

3   more at the Karnes facility.

4       Q.   And does it have a tabulation to say that there's

5   this many people or that many people who've been here for

6   15 days or more, or is it just -- each individual is

7   listed so you could tell if they've been there for 15 days

8   or more?

9       A.   There's no tabulation.  It's just a list.

10      Q.   It's -- It's a list of individuals; is that

11  correct?

12      A.   It is a list of heads of household.

13      Q.   Does it also list their children or just the

14  heads of the household?

15      A.   The report only lists the heads of household, the

16  mothers.

17      Q.   And it states that -- Does it state the date of

18  apprehension?

19      A.   I don't have the report in front of me to -- to

20  be able to tell you yes or no.

21      Q.   Okay.  Does it -- Does it list the date that they

22  entered Karnes?

23      A.   That would be the same question.  I don't have

24  the report in front of me to be able to tell you that.

25      Q.   Well, just from --

1    A.   Exhibit 6 of -- I -- I didn't hear you.  All I

2    heard was Exhibit 6.

3    Q.   Yeah.  It's Exhibit 6.  It's a notice of the

4    right to judicial review.  Is that being distributed to

5    class members or their mothers at Karnes at this time, if

6    you know?

7         MS. FABIAN:  Object to form.

8    Q.   (By Mr. Schey)  If you don't know, just --

9    A.   Exhibit --

10   Q.   -- say --

11   A.   -- 6 --

12   Q.   -- you don't know.

13   A.   -- of the Flores Service Agreement is being

14   issued out to juveniles, yes.

15   Q.   Okay.  And when did that start?

16   A.   Several months ago, I think, is when that

17   directive came out.

18   Q.   Okay.  Now, in your declaration, you -- you

19   described certain detainees, or former detainees, and

20   you -- you indicate when they were released -- some of

21   them were released.  Do you know when -- when they were

22   first apprehended?  For those -- for those who you

23   identified as being released, do you know when they were

24   first apprehended?

25   A.   I don't have that information in front of me.

1    Q.   When you release mothers and children because

2  they have had a positive fear determination, is it correct

3  that you're exercising your discretionary authority to

4  release them?

5          MS. FABIAN:  Object to --

6          THE WITNESS:  The --

7          MS. FABIAN:  -- form.

8          THE WITNESS:  The resident, or the family unit,

9  if they get a positive credible fear finding or a positive

10  reasonable fear finding, and a notice to appear has been

11  issued by Citizenship and Immigration Services, then we

12  release them on an order of recognizance or parole,

13  depending on what case that may be.

14    Q.   (By Mr. Schey)  Okay.  And -- And you exercise

15  your discretion to do that; is that correct?

16    A.   I don't want to say it's my discretion.  It --

17  It's discretion of the service.

18    Q.   Right.  Discretion of some agent; correct --

19          MS. FABIAN:  Object to --

20    Q.   (By Mr. Schey)  -- not yours personally?

21          MS. FABIAN:  Object to form.

22          THE WITNESS:  The service has that discretion.

23    Q.   (By Mr. Schey)  Okay.  And -- And -- And you say

24  that individuals determined not to prese -- possess a

25  credible fear remain in the expedited removal process and

1    Q.    -- they're in the expedited removal.

2    A.    Okay.

3    Q.    That's --

4          MS. FABIAN:  She --

5    Q.    (By Mr. Schey)  -- not --

6          MS. FABIAN:  She --

7    Q.    (By Mr. Schey)  -- what we're --

8          MS. FABIAN:  She was still answering.

9    Q.    (By Mr. Schey)  -- discussing.

10         MS. FABIAN:  Peter, you -- She --

11         MR. SCHEY:  Oh.

12   Q.    (By Mr. Schey)  Go -- Go ahead.

13         THE WITNESS:  If they claim credible fear, then

14   they go in front of Asylum.  But if they don't claim fear,

15   they're a final order of removal, and we will process them

16   and have them returned to their country as soon as

17   possible.

18   Q.    (By Mr. Schey)  Right.  We know all that.

19   What -- What -- What we're trying to understand is, Who

20   issues those final orders of removal, and I think you're

21   saying it is the Border Patrol that does that before they

22   come to Karnes; is that correct?

23         MS. FABIAN:  Object to form, foundation.

24         THE WITNESS:  Their process does an expedited

25   removal.  We accept --

1    Q.   Can you remember approximately what the number

2  was?  I don't want you to just guess, but if you have some

3  recollection of the approximate number, that would be

4  helpful.

5    A.   I would think less than 10.

6    Q.   Okay.  And if -- And -- And so, is it -- Are --

7  Are you saying that it is part of your goal to have that

8  population down to the lowest number possible?  Would that

9  be fair to say, that that's part of the objective of ICE

10 units?

11         MS. FABIAN:  Object to form.

12         THE WITNESS:  No.  As I stated earlier, it's --

13 it's for us to be -- to be able to look at and -- and look

14 at cases, and what I consider, you know, somebody in 15 --

15 15 days in custody or more.

16   Q.   (By Mr. Schey)  Right.  But my -- my point is

17 that -- that you -- obviously, you're looking at 15 days

18 or more because someone is concerned about those cases;

19 right?  That there's some different level of concern about

20 those cases and, therefore, you're tracking those; is that

21 correct?

22         MS. FABIAN:  Object to form, foundation.

23         THE WITNESS:  No.  That -- That case is no

24 different than any other case at the Residential Center.

25 They're all important.  Those are just cases that I -- I

1    I, JUANITA HESTER, have read the foregoing

2  deposition and hereby affix my signature that same is true

3  and correct, except as noted above.

4

5    _____

6    JUANITA HESTER

7

8

9  THE STATE OF TEXAS          )

10  COUNTY OF BEXAR             )

11

12

13    Before me, _____, on this day

14  personally appeared JUANITA HESTER, known to me (or proved

15  to me under oath of through _____) to be the person

16  whose name is subscribed to the foregoing instrument and

17  acknowledged to me that they executed the same for the

18  purposes and consideration therein expressed.

19    Given under my hand and seal of this office

20  this _____ day of _____, 2016.

21

22

23    _____

    NOTARY PUBLIC IN AND FOR

24    THE STATE OF TEXAS

    LICENSE EXPIRES ON _____

25

```
 1                 UNITED STATES DISTRICT COURT
                   CENTRAL DIVISION OF CALIFORNIA,
 2                       WESTERN DIVISION

 3   JENNY LISETTE FLORES, et  '
     al.,                      '
 4                             '
          PLAINTIFFS,          '
 5                             '
     VS.                       '  CIVIL ACTION NO.
 6                             '  CV 85-4544 DMG (AGRx)
     LORETTA E. LYNCH,         '
 7   ATTORNEY GENERAL OF THE   '
     UNITED STATES, et al.,    '
 8                             '
          DEFENDANTS.          '
 9
     * * * * * * * * * * * * * * * * * * * * * * * * * *
10

11                   REPORTER'S CERTIFICATION
        ORAL AND TELEPHONIC DEPOSITION OF JUANITA HESTER
12                     SEPTEMBER 9, 2016

13          I, JESSICA BUTTS, a Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16          That the witness, JUANITA HESTER, was duly sworn

17   by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by the

19   witness;

20          That the original deposition transcript was

21   delivered to _____;

22          That a copy of this certificate was served on all

23   parties and/or the witness shown herein on

24   _____.

25          I further certify that pursuant to FRCP Rule
```

1    30(f)(1) that the signature of the deponent was requested

2    by the deponent or a party before the completion of the

3    deposition and that the signature is to be before any

4    notary public and returned within 30 days from date of

5    receipt of the transcript.  If returned, the attached

6    Changes and Signature Page contains any changes and the

7    reasons therefor.

8            I further certify that the amount of time used by

9    each party at the deposition is as follows:

10           Mr. Schey:          2 Hours  43 Minutes

11           Ms. Fabian:         0 Hours  00 Minutes

12           That pursuant to information given to the

13   deposition officer at the time said testimony was taken,

14   the following includes counsel for all parties of record:

15           MR. PETER SCHEY, ATTORNEY FOR PLANTIFFS;

16           MR. MANOJ GOVINDAIAH, ATTORNEY FOR PLAINTIFFS;

17           MS. SARAH B. FABIAN, ATTORNEY FOR DEFENDANTS;

18           MR. GARY L. ANDERSON, ATTORNEY FOR DEFENDANTS;

19           MR. NATHAN L. HERBERT, ATTORNEY FOR DEFENDANTS;

20           MR. JUSTIN F. ADAMS, ATTORNEY FOR DEFENDANTS;

21           MR. THOMAS F. ZIMMERMAN, ATTORNEY FOR DEFENDANTS;

22           I further certify that I am neither counsel for,

23   related to, nor employed by any of the parties of

24   attorneys in the action in which this proceeding was

25   taken, and further that I am not financially or otherwise

1   interested in the outcome of the action.

2           Further certification requirements pursuant to

3   Federal Rules will be certified to after they have

4   occurred.

5           Certified to by me on this _____ day of

6   _____, 2016.

7

8           _____

9           Jessica Butts
            Texas CSR #9441
10          Expiration Date: December 31, 2018

11          HOFFMAN REPORTING AND VIDEO SERVICE
            Firm # 93
12          206 E. Locust St.
            San Antonio, Texas 78212
13          Telephone:   (210) 736-3555
            Fax:         (210) 736-6679
14          www.hoffmanreporting.com

15

16

17

18

19

20

21

22

23

24

25

Case 2:85-cv-04544-DMG-AGR   Document 287-2   Filed 12/06/16   Page 24 of 98   Page ID #:8487

Deposition of Juanita Hester                                          Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1   COUNTY OF BEXAR          )
                              )
 2   STATE OF TEXAS           )

 3

 4           I hereby certify that the witness was notified on

 5   _____ that the witness has 30 days

 6   after being notified by the officer that the transcript is

 7   available for review by the witness and if there are

 8   changes in the form or substance to be made, then the

 9   witness shall sign a statement reciting such changes and

10   the reasons given by the witness for making them:

11           That the witness' signature was/was not returned

12   as of _____.

13           Subscribed and sworn to on this _____ day

14   of _____, 2016.

15

16

17           _____

18           Jessica Butts
             Texas CSR #9441
19           Expiration Date: December 31, 2018

20           HOFFMAN REPORTING AND VIDEO SERVICE
             Firm # 93
21           206 E. Locust St.
             San Antonio, Texas 78212
22           Telephone:   (210) 736-3555
             Fax:         (210) 736-6679
23           www.hoffmanreporting.com

24

25
```

# Exhibit 7

Publicly Filed

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DIVISION OF CALIFORNIA,
 2                    WESTERN DIVISION

 3   JENNY LISETTE FLORES, et  '
     al.,                      '
 4                             '
          PLAINTIFFS,          '
 5                             '
     VS.                       ' CIVIL ACTION NO.
 6                             ' CV 85-4554 DMG (AGRx)
     LORETTA E. LYNCH,         '
 7   ATTORNEY GENERAL OF THE   '
     UNITED STATES, et al.,    '
 8                             '
          DEFENDANTS.          '
 9   * * * * * * * * * * * * * * * * * * * * * * * * *

10              ORAL AND TELEPHONIC DEPOSITION OF

11                   VALENTIN DE LA GARZA

12                     SEPTEMBER 9, 2016

13

14   * * * * * * * * * * * * * * * * * * * * * * * * *

15              ORAL AND TELEPHONIC DEPOSITION OF

16                   VALENTIN DE LA GARZA,

17   produced as a witness at the instance of the Plaintiff,

18   was taken in the above-styled and numbered cause on the

19   9th day of September, 2016, from 9:16 a.m. to 1:14 p.m.,

20   before Jessica Butts, CSR, in and for the State of Texas,

21   reported by machine shorthand, at The United States

22   Attorney's Office, 601 North West 1604 Loop, Suite 600,

23   San Antonio, Texas 78216, pursuant to the Federal Rules

24   and the provisions stated on the record or attached

25   hereto.
```

Deposition of Valentin De La Garza                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1                A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4        MR. PETER SCHEY
          THE CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
 5        256 South Occidental Boulevard,
          Los Angeles, California 90057
 6        Telephone:     (213) 388-8693
          Fax:           (213) 386-9484
 7        E-mail: pschey@centerforhumanrights.org
          (Present by telephone)
 8

 9        MR. MANOJ GOVINDAIAH
          THE REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND
10        LEGAL SERVICES
          5121 Crestway Drive, Suite 105,
11        San Antonio, Texas 78239
          Telephone:     (210) 226-7722
12        Fax:           (210) 212-4856
          E-mail: manoj.govindaiah@raicestexas.org
13

14   FOR THE DEFENDANTS:

15        MS. SARAH B. FABIAN
          THE U.S. DEPARTMENT OF JUSTICE
16        CIVIL DIVISION
          TRIAL ATTORNEY
17        P.O. Box 868
          Ben Franklin Station
18        Washington, D.C. 20044
          Telephone:     (202) 532-4824
19        Fax:           (202) 616-8962
          E-mail: sarah.b.fabian@usdoj.gov
20

21        MR. GARY L. ANDERSON
          THE U.S. DEPARTMENT OF JUSTICE
22        UNITED STATES ATTORNEY'S OFFICE
          ASSISTANT UNITED STATES ATTORNEY
23        601 North West Loop 410, Suite 600
          San Antonio, Texas 78216
24        Telephone:     (210) 384-7365
          Fax:           (210) 384-7312
25        E-mail: gary.anderson@usdoj.gov
```

```
 1                  (APPEARANCES CONTINUED)

 2


 3          MR. NATHAN L. HERBERT
            THE U.S. DEPARTMENT OF HOMELAND SECURITY
 4          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
            DEPUTY CHIEF COUNSEL, OFFICE OF THE CHIEF COUNSEL
 5          300 El Ranchero Way
            Dilley, Texas 78017
 6          Telephone:    (830) 378-6626
            E-mail: nathan.l.herbert@ice.dhs.gov
 7


 8          MR. JUSTIN F. ADAMS
            THE U.S. DEPARTMENT OF HOMELAND SECURITY
 9          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
            DEPUTY CHIEF COUNSEL, OFFICE OF THE CHIEF COUNSEL,
10          OFFICE OF THE PRINCIPAL LEGAL ADVISOR
            8940 Fourwinds Drive
11          San Antonio, Texas 78239
            Telephone:    (210) 967-7237
12          Fax:          (210) 967-7118
            E-mail: justin.f.adams@ice.dhs.gov
13


14          MR. THOMAS F. ZIMMERMAN
            THE U.S. DEPARTMENT OF HOMELAND SECURITY
15          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
            DISTRICT COURT LITIGATION DIVISION
16          ASSOCIATE LEGAL ADVISOR
            500 12th Street, South West
17          Washington, D.C. 20256
            Telephone:    (202) 732-5993
18          E-mail: thomas.f.zimmerman@ice.dhs.gov

19


20


21    ALSO PRESENT:

22          MS. JESSICA BUTTS,
            TEXAS CERTIFIED SHORTHAND REPORTER
23


24


25
```

```
 1                     I N D E X

 2                                              PAGE

 3   APPEARANCES..................................    2

 4   THE WITNESS:   VALENTIN DE LA GARZA

 5   Examination by Mr. Schey.....................    5

 6   Examination by Ms. Fabian...................  119

 7   Examination by Mr. Schey....................  120

 8   Signature and Changes.......................  137

 9   Reporter's Certificate......................  139

10   Further Certification.......................  142

11

12

13              E X H I B I T   I N D E X

14   EXHIBIT

15   NO.              DESCRIPTION          PAGE MARKED

16   Exhibit  1    Declaration of Valentin De La Garza...   66

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2               (Proceedings began at 9:16 a.m.)

 3                    VALENTIN DE LA GARZA,

 4      having been duly sworn, testified under his oath as

 5      follows:

 6               MS. FABIAN:  Peter, you can ago ahead.

 7                         EXAMINATION

 8      BY MR. SCHEY:

 9         Q.   Okay.  Mr. De La Garza, can you tell us which

10      detention center you have authority over?

11         A.   Good morning, Mr. Schey, and yes, I can.  I --

12      One fa -- I oversee the Dilley, Texas, facility.  They

13      call it the South Texas Family Residential Center.

14         Q.   And approximately how many ICE agents are

15      currently assigned to that facility?

16         A.   Approximately 125.

17         Q.   And do they work full time at that facility?

18         A.   Yes, sir.

19         Q.   And is that current number -- is that unusual,

20      or -- or for how long has that been the approximate

21      number?

22               MS. FABIAN:  Object to form.

23               THE WITNESS:  Sir, that's what -- That's the

24      number that it -- that's been assigned there right now.

25               Could you repeat the question again?
```

1    Q.    -- would you --

2    A.    -- numbers you --

3    Q.    -- say --

4    A.    -- have --

5    Q.    -- that --

6    A.    -- the -- the faster you're going to get things

7    done, yeah, of course.

8    Q.    Okay.  So the more agents you have there, the

9    faster you'd get things done; is that fair to say?

10         MS. FABIAN:  Ob -- Object to form.

11         THE WITNESS:  That's hard to say, I mean, but in

12   a real -- in the real world -- or in a perfect world, yes.

13   If each individual --

14   Q.    (By Mr. Schey)  Okay.

15   A.    Each individual is different, you know.  It --

16   It's -- It's -- But yes, sir.

17   Q.    But would -- Okay.

18         When a person expresses a -- a fear, you set up

19   an interview with the CIS agents; is that correct, an

20   Asylum agent?

21   A.    No, sir.  We don't set up the interview.  We just

22   refer the case to CIS, and they do everything --

23   Q.    Okay.

24   A.    -- else.

25   Q.    And what -- Why don't you explain to us how you

1    Q.    -- any other -- are there any --

2          THE WITNESS:  Did David --

3    Q.    (By Mr. Schey)  -- other documents that you --

4          MS. FABIAN:  No.

5    Q.    (By Mr. Schey)  -- relied --

6          THE WITNESS:  No?

7    Q.    (By Mr. Schey)  -- upon to execute your --

8    A.    No.

9    Q.    -- declaration?

10   A.    No, sir.  There's no other documents, other than

11   the database that we took everything off, and that's what

12   we -- that's what -- I've given it to my attorneys here

13   today.

14   Q.    Okay.  And can you -- can you tell us when was

15   the most recent time that you received any training about

16   the requirements of the Flores Settlement and who provided

17   you that training?

18         MS. FABIAN:  Object to form.

19         THE WITNESS:  They haven't had any training, sir.

20   Q.    (By Mr. Schey)  And can you tell us whether you

21   have read the August decision, issued by Judge Gee, in the

22   Flores case?

23   A.    I read it, sir.

24   Q.    Okay.  And can you tell us when and who provided

25   you a copy of that decision?

1    A.   No, sir.  I couldn't.  I got it on e-mail.

2    Q.   Can you tell -- can you tell us approximately

3  when you received that decision and how you received it?

4    A.   I don't remember the exact date.  It was --

5  pretty much as soon as my agency found out about it, I got

6  it.

7    Q.   And can you tell us, have you ever received any

8  training about that court decision, and if so, who

9  provided you that training?

10    A.   No, sir.  It's a "no" to both -- both questions.

11    Q.   During the time that you have been in charge of

12  matters at Dilley, can you tell us when the agent -- the

13  ICE agents working there have been provided training about

14  the requirements of the Flores Settlement, and who

15  provided that training?

16         MS. FABIAN:  Object to form, foundation.

17         THE WITNESS:  It's "no" to that one, too.

18    Q.   (By Mr. Schey)  And during the time that you have

19  been -- Or since August of 2015 and the present, can you

20  identify any time when the ICE agents working at Dilley

21  were provided training about Judge Gee's order, and who

22  provided that training to them?

23    A.   It's "no" to those questions, too, sir.

24    Q.   Can you tell us what, if any, type of license

25  Dilley currently has, a -- a state-issued or -- or a

1   county-issued license?

2          MS. FABIAN:  Ob -- Object to form.

3          THE WITNESS:  To my knowledge, sir, we don't have

4   one -- or they don't have one.

5      Q.   (By Mr. Schey)  And is it fair to say that Dilley

6   is a secure facility?

7          MS. FABIAN:  Object to form.

8      Q.   (By Mr. Schey)  You can answer the question.

9      A.   Yes.

10         If it's -- Is it a secure --

11     Q.   And --

12     A.   -- facility?  Has anybody -- Everybody's freedom

13  of movement there, sir.

14     Q.   Okay.  Are people free to leave the facility if

15  they want to?

16     A.   No, sir.  Not until we tell them it's -- it's

17  okay to leave.

18     Q.   And in that facility, are chi -- are children

19  half detained with their fathers?

20     A.   No, sir.

21         MS. FABIAN:  Object to form.

22     Q.   (By Mr. Schey)  And is that facility limited to

23  detention of children with mothers?

24         MS. FABIAN:  Object to form.

25         THE WITNESS:  Yes.  It's just adult mothers with

```
 1      Q.   And -- And what -- What do you ask them?

 2      A.   What you just asked me to answer, sir.  Just --

 3   Just ask them where were they going to be staying in the

 4   United States and with what family members or friends.

 5      Q.   Do you get a list of all family members or just

 6   the family member or friends with a wish to reside?

 7      A.   Just whatever they provide.

 8      Q.   Okay.  My question was, Do you request that they

 9   give you all their family members or friends in the United

10   States or simply with a wish to reside?

11      A.    It's just one question we ask them, you know,

12   and -- and it's pretty much a general saying, where they

13   were going to be resi -- residing here in the United

14   States and with who.  It's whatever they provide after

15   that.  We don't -- If it's more than one, then it's more

16   than one.  If it's just one, or if it's none, it -- it's

17   whatever they provide, sir, if they provide anything.

18      Q.   And prior to the credible fear interview, do your

19   agents make any effort to determine the suitability of

20   that relative or friend to provide for the care and

21   custody of the minor?

22      A.   What do you mean exactly, "suitability"?

23      Q.   Whether -- Do your agents -- Prior to the CIS

24   Asylum interview, or fear interview, do your agents in --

25   take any action to investigate the appropriateness of
```

1    placing the minor with a relative or friends that the

2    minor or the mother have identified, and if so, what is

3    the nature of that investigation?

4             MS. FABIAN:  Object to form.

5             THE WITNESS:  No, sir.

6        Q.   (By Mr. Schey)  Prior to the -- Well, let's call

7    it the Asylum interview with the Asylum officers.  Prior

8    to the Asylum interview, have your agents been instructed

9    to take any steps aimed at the release or the placement of

10   the minors under the Flores Settlement?

11            MS. FABIAN:  Object to form, foundation.

12            THE WITNESS:  No, sir.

13       Q.   (By Mr. Schey)  And prior to the Asylum

14   interview, have your agents been issued any instructions

15   to make efforts to release or place the minors, pursuant

16   to Judge Gee's -- to anything in Judge Gee's August 2015

17   order?

18            MS. FABIAN:  Object to form.

19            THE WITNESS:  And you're saying that's prior to

20   the Asylum interview?

21       Q.   (By Mr. Schey)  Correct.

22       A.   No, sir.

23       Q.   And can you identify any licensed facility where

24   ICE, anytime in the past -- anytime while you have been in

25   charge of the Dilley facility, has placed minors, pursuant

1    We'd proceed with the -- the removal order.

2        Q.   Okay.  My question was not whether they become

3    subject to mandatory detention if their -- if their fear

4    claim is denied.  My question was, Have you received any

5    instructions to comply with paragraph 14, regarding the

6    release of minors if that minor's claim, fear claim, has

7    been rejected?

8            MS. FABIAN:  Ob -- Object to form and foundation.

9            I think he's answered your question to the best

10   of his ability.

11       Q.   (By Mr. Schey)  Okay.  You may answer this

12   question.

13       A.   Yes, sir.  Our guidance is that, at that point,

14   they are a final order; they become a mandatory detention,

15   and we proceed with the removal.

16       Q.   Okay.  So in other words, you have not received

17   any instruction or guidance regarding the release of

18   minors under paragraph 14 if their fear claim has been

19   denied; is that fair to say?

20           MS. FABIAN:  Object to form, foundation.

21           THE WITNESS:  My answer's going to be the same

22   thing, sir.  My guidance is to hold them to -- until they

23   become a mandatory --

24       Q.   (By Mr. Schey)  Okay.

25       A.   -- detention and to proceed with the removal.

1    amount of bond they should set on a class member whose

2    fear claim or whose mother's fear claim has been approved,

3    and if so, when was that instruction provided to those

4    agents?

5            MS. FABIAN:  Object to form.

6            THE WITNESS:  No.

7        (Mr. Anderson reentered the conference room)

8        Q.    (By Mr. Schey)  At Dilley at this time, is the

9    notice of rights to judicial review provided to class

10   members or their mothers?

11       A.    I don't recall the notice of rights, what exactly

12   it contains, so I'm going to have to answer, "No, I don't

13   know."

14           MS. FABIAN:  Peter, I think if you clarify which

15   document you're talking about, it would be helpful.

16       Q.    (By Mr. Schey)  Yeah.  I believe it is Exhibit 6

17   to the agreements.  Does that remind you?

18       A.    If it's the form I'm thinking of, yes, sir, we --

19   we provide it to them.

20       Q.    And what do you fill in on that form?

21       A.    You're asking me to try to remember.  I'm going

22   off of just memory.

23       Q.    Yeah.  Just from your memory.

24       A.    Date, names of the individuals being it served

25   on, and the person serving it.

1    A.   -- need an interpreter.

2    Q.   And how do you get an interpreter?

3    A.   There's language lines that we call on the

4   telephone, sir.

5    Q.   And can you tell us, in Dilley, are -- are there

6   any rules regarding the separation of class members from

7   unrelated adults, and if so, what are those rules?

8         MS. FABIAN:  Object to form.

9         THE WITNESS:  I don't know if we've ever

10  separated anybody that's a class member, sir.  I don't

11  recall.

12   Q.   (By Mr. Schey)  To your knowledge, is ICE

13  currently attempting to obtain a license for Dilley, a

14  license to hold children?

15   A.   No, sir.  We're not.

16   Q.   Have the agents working at Dilley received any

17  instruction to determine whether a youth detained at

18  Dilley is, in fact, a minor, and if so, when did they

19  receive those instructions and from whom?

20        MS. FABIAN:  Objection to form.

21   Q.   (By Mr. Schey)  If you don't know, just --

22   A.   Huh.  Yeah.  I'm going to --

23   Q.   -- say you don't know.

24   A.   I don't know.

25   Q.   Okay.  Are you aware of any case during the past

1   states that a minor in deportation proceedings shall be

2   afforded a bond redetermination hearing before an

3   immigration judge unless the minor indicates, on a notice

4   of custody determination form, that he or she refuses such

5   a hearing.

6          Are you aware of any records maintained by ICE at

7   Dilley that would record compliance with that paragraph of

8   the settlement?

9          MS. FABIAN:  Object to form, foundation, and

10  characterization of paragraph 24.

11         THE WITNESS:  No.  We haven't encountered that,

12  so...

13     Q.   (By Mr. Schey)  And I believe your prior

14  testimony is that a bond redetermination hearing may only

15  be triggered if a class member's fear claim has been

16  approved by U.S. CIS and a custody determination for that

17  class member has been made by ICE and that class member

18  which is -- wishes to have that determination reviewed by

19  an immigration judge; is that correct?

20         MS. FABIAN:  Ob -- Object to form, foundation.

21         THE WITNESS:  If they are eligible for it, yes,

22  sir.

23     Q.   (By Mr. Schey)  Have ICE agents at Dilley

24  received any training, direction, or instructions, and if

25  so, by whom and when, if you know, regarding that part of

1  paragraph 27 of the settlement which states that no minor

2  who is represented by counsel shall be transferred without

3  advance notice to such counsel, except in unusual and

4  compelling circumstances, such as where the safety of the

5  minor or others is threatened or the minor has been

6  determined to be an escape risk or if counsel has waived

7  such notice?

8         MS. FABIAN:  Object to form, foundation.

9         THE WITNESS:  We received direction to notify the

10  attorney of records.

11     Q.   (By Mr. Schey)  And when did you receive that

12  direction and from whom?

13     A.   From my chain of command.  When, I don't know.

14  Can't remember.  Don't recall.

15     Q.   Was it within the past two months?

16     A.   It's been a while, sir.

17     Q.   Would it be within the past six months?

18     A.   It was right around the time the order came out

19  from Judge Gee that we had to do it, but I don't know when

20  that was, sir.  I can't rem -- I can't recall.

21     Q.   And when is notification provided to an attorney

22  of record?

23     A.   No less than 24 hours.  Could be -- Hold on.  Am

24  I trying to -- I'm trying to phrase it, sir.  If -- It's

25  at any time as soon as we find out that we were going to

1   transfer.  But no, at least 24 hours out before the date

2   of the transfer.

3       Q.   And -- And -- And you're -- you're saying notice

4   is provided 24 hours before the transfer or within 24

5   hours of the transfer?

6       A.   It's provided -- We give them at least 24 hours'

7   notice.  Sometimes, we give them more.

8       Q.   And how is that notice provided to the attorney

9   of record?

10      A.   E-mail, telephone, face-to-face.  It all depends.

11      Q.   And is the fact that that notice has been

12  provided recorded in the class member's A-file?

13      A.   Recorded?  No.

14      Q.   Have you had any communication with the ICE

15  juvenile coordinator?

16      A.   No, sir.

17      Q.   Do you know who the ICE juvenile coordinator is

18  at this time?

19      A.   I don't know exactly who you're referring to, but

20  no, sir.

21      Q.   During the -- the past 12 months, have you

22  been -- ha -- have you provided any information to anyone

23  involving data showing compliance with the Flores

24  Settlement by ICE agents working at Dilley?

25          MS. FABIAN:  Object to form, foundation.

 1          THE WITNESS:  I don't know.

 2          (Mr. Zimmerman exited the conference room)

 3      Q.   (By Mr. Schey)  At Dilley, mothers and children

 4  are assigned to different sleeping quarters; is that

 5  correct?

 6          MS. FABIAN:  Object to form.

 7          THE WITNESS:  You're talking about -- Could you

 8  clarify that, sir?  Because I'm a little confused at what

 9  you're saying.  You're saying I'm separating families, or

10  I'm keeping families together, or different families --

11      Q.   (By Mr. Schey)  Let me re -- Let me repeat the

12  question.

13          At Dilley, is it correct that mothers and their

14  children are assigned sleeping quarters?

15      A.   Yes.  They are.

16      Q.   And in a typical sleeping quarters, how many

17  mothers and children may share that space?

18      A.   It's all dependent on the configuration of the

19  family, sir.  There's different groups that we have here

20  or there that we just don't mix certain age groups and

21  certain sexes together.  It's all dependent on the

22  configuration of the family.  But there's 12 beds in --

23      Q.   Okay.

24      A.   -- each suite -- in each suite.  In essence, if

25  you must speak hypothetically, if there's one mother and

1    one child and they fall within one of the groups, in the

2    same groups, then we can house up to 12 -- I mean, six

3    mothers and six different children in one room.

4        Q.    Okay.  Most of the suites accommodate

5    approximately 12 people?

6        A.    There's -- They -- They can accommodate up to 12

7    people, correct.

8            (Mr. Zimmerman reentered the conference room)

9        Q.    (By Mr. Schey)  And how many suites are there,

10   approximately?

11       A.    I don't recall, sir.

12       Q.    And may adults enter the suites they have been

13   assigned to at any time during the day?

14       A.    If they're assigned to a suite, they can -- they

15   can walk in and out of that suite at any time of the day

16   or night, sir.

17       Q.    And if -- if there are class members in that

18   suite, may mothers assigned to that suite still go in and

19   out of the suite during the day?

20       A.    Yes.

21       Q.    And if -- if a class member was in a suite during

22   the day, and an unrelated mother wished to go into that

23   suite during that -- the day, could she do so?

24       A.    If she's assigned to that one, yes.

25       Q.    And if a class member was in a suite during the

1    day and an unrelated mother wanted to go into that suite

2    during the day, would she have to be accompanied by a

3    staff member to do so?

4        A.   It's only assigned unrelated mothers, any room,

5    can enter a suite.  If it's an unrelated mother and it's

6    not assigned to that room, we ask them not to.  We tell

7    them not to.  We're -- The contractors tell them not to.

8        Q.   And how is that monitored?

9        A.   By the CCA staff member that's assigned to that

10   neighborhood, or complex.

11       Q.   And -- And how would that staff member assigned

12   to that suite monitor whether a mother not assigned to the

13   suite had entered the suite or not?

14       A.   Outside of each suite, there's a photograph of

15   each individual that's assigned to that suite.

16       Q.   And how would -- How do they monitor that, is my

17   question.  In other words, do they sit on a chair outside

18   each suite, or how do they monitor who is going in and out

19   of the suites?

20       A.   That -- That's up to the resident supervisor how

21   they're doing it, sir.

22       Q.   So you --

23       A.   It --

24       Q.   -- do not know how they're doing it?

25       A.   No, sir.  I don't.  Not exactly.

1    Q.   And when you said that you assign mothers and

2    their children to suites depending on certain criteria,

3    why don't you explain to us how that works?

4    A.   I don't know that by heart, sir.  I can't recall

5    exactly.  There's different age groups, and the sexes have

6    to also -- have to come into -- they take that into

7    consideration.  And I don't assign them; the contractors

8    do.

9    Q.   Okay.  And who -- Do -- Does it -- Is it the

10   contractor that decides those configurations?

11   A.   No, sir.  That's at a higher level than my chain

12   of command.

13   Q.   And during the day when -- or the evening when

14   class members are not in their suites, do they commingle

15   with unrelated adults in common areas of the facility?

16        MS. FABIAN:  Object to form.

17        THE WITNESS:  The common areas are open to

18   everybody, sir.  They choose to.  There's other members,

19   and if there's other families in there, then it's

20   possible.

21   Q.   (By Mr. Schey)  Re -- Regarding the configuration

22   that you mentioned about placement into sleeping quarters,

23   is that configuration based on any state or federal rules,

24   if you know?

25   A.   No, sir.  I don't.

1    Q.   So --

2    A.   -- document that.

3    Q.   So neither the A-file nor the database is likely

4  to refer to any alleged difficulties that they've had

5  communicating with their lawyer; is that fair to say?

6    A.   That's correct.

7         MS. FABIAN:  Object to form.

8    Q.   (By Mr. Schey)  And neither the database nor

9  their A-file will probably reflect the type of food they

10  got or they didn't get; is that fair to say?

11    A.   I'm sorry.  What was the last part of the

12  question?

13    Q.   Neither the A-file nor the database, unless they,

14  of course, gave you a written re -- complaint, and maybe

15  you put it in the A-file -- but short of something like

16  that, the A-file and the database is not going to reflect

17  the type of food they got, or -- right --

18         MS. FABIAN:  Object to --

19    Q.   (By Mr. Schey)  -- their complaints about food?

20    A.   Are you -- are you --

21         MS. FABIAN:  Object to form.

22         THE WITNESS:  Are you saying "food"?

23    Q.   (By Mr. Schey)  Yeah.

24    A.   No.  It's not going to -- We're not going to keep

25  a record of that in that -- those two -- the A-file or the

Case 2:85-cv-04544-DMG-AGR   Document 287-2   Filed 12/06/16   Page 48 of 98   Page ID #:8511

Deposition of Valentin De La Garza                                Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1              I, VALENTIN DE LA GARZA, have read the

 2    foregoing deposition and hereby affix my signature that

 3    same is true and correct, except as noted above.

 4

 5                              _____

 6                              VALENTIN DE LA GARZA

 7

 8

 9    THE STATE OF TEXAS           )

10    COUNTY OF BEXAR              )

11

12

13              Before me, _____, on this day

14    personally appeared VALENTIN DE LA GARZA, known to me (or

15    proved to me under oath of through _____) to be the

16    person whose name is subscribed to the foregoing

17    instrument and acknowledged to me that they executed the

18    same for the purposes and consideration therein expressed.

19              Given under my hand and seal of this office

20    this _____ day of _____, 2016.

21

22

23                              _____

                                NOTARY PUBLIC IN AND FOR
24                              THE STATE OF TEXAS
                                LICENSE EXPIRES ON _____
25
```

```
 1              UNITED STATES DISTRICT COURT
               CENTRAL DIVISION OF CALIFORNIA,
 2                    WESTERN DIVISION

 3  JENNY LISETTE FLORES, et  '
    al.,                      '
 4                            '
          PLAINTIFFS,         '
 5                            '
    VS.                       ' CIVIL ACTION NO.
 6                            ' CV 85-4544 DMG (AGRx)
    LORETTA E. LYNCH,         '
 7  ATTORNEY GENERAL OF THE   '
    UNITED STATES, et al.,    '
 8                            '
          DEFENDANTS.         '
 9
    * * * * * * * * * * * * * * * * * * * * * * * * *
10

11                REPORTER'S CERTIFICATION
     ORAL AND TELEPHONIC DEPOSITION OF VALENTIN DE LA GARZA
12                   SEPTEMBER 9, 2016

13          I, JESSICA BUTTS, a Certified Shorthand Reporter

14  in and for the State of Texas, hereby certify to the

15  following:

16          That the witness, VALENTIN DE LA GARZA, was duly

17  sworn by the officer and that the transcript of the oral

18  deposition is a true record of the testimony given by the

19  witness;

20          That the original deposition transcript was

21  delivered to _____;

22          That a copy of this certificate was served on all

23  parties and/or the witness shown herein on

24  _____.

25          I further certify that pursuant to FRCP Rule
```

Case 2:85-cv-04544-DMG-AGR   Document 287-2   Filed 12/06/16   Page 50 of 98   Page ID #:8513

Deposition of Valentin De La Garza                                    Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

1    30(f)(1) that the signature of the deponent was requested

2    by the deponent or a party before the completion of the

3    deposition and that the signature is to be before any

4    notary public and returned within 30 days from date of

5    receipt of the transcript.  If returned, the attached

6    Changes and Signature Page contains any changes and the

7    reasons therefor.

8            I further certify that the amount of time used by

9    each party at the deposition is as follows:

10           Mr. Schey:          3 Hours  21 Minutes

11           Ms. Fabian:         0 Hours  03 Minutes

12           That pursuant to information given to the

13   deposition officer at the time said testimony was taken,

14   the following includes counsel for all parties of record:

15           MR. PETER SCHEY, ATTORNEY FOR PLANTIFFS;

16           MR. MANOJ GOVINDAIAH, ATTORNEY FOR PLAINTIFFS;

17           MS. SARAH B. FABIAN, ATTORNEY FOR DEFENDANTS;

18           MR. GARY L. ANDERSON, ATTORNEY FOR DEFENDANTS;

19           MR. NATHAN L. HERBERT, ATTORNEY FOR DEFENDANTS;

20           MR. JUSTIN F. ADAMS, ATTORNEY FOR DEFENDANTS;

21           MR. THOMAS F. ZIMMERMAN, ATTORNEY FOR DEFENDANTS;

22           I further certify that I am neither counsel for,

23   related to, nor employed by any of the parties of

24   attorneys in the action in which this proceeding was

25   taken, and further that I am not financially or otherwise

1    interested in the outcome of the action.

2          Further certification requirements pursuant to

3    Federal Rules will be certified to after they have

4    occurred.

5          Certified to by me on this _____ day of

6    _____, 2016.

7

8          _____

9          Jessica Butts
           Texas CSR #9441
10         Expiration Date: December 31, 2018

11         HOFFMAN REPORTING AND VIDEO SERVICE
           Firm # 93
12         206 E. Locust St.
           San Antonio, Texas 78212
13         Telephone:   (210) 736-3555
           Fax:         (210) 736-6679
14         www.hoffmanreporting.com

15

16

17

18

19

20

21

22

23

24

25

Deposition of Valentin De La Garza

Jenny Lisette Flores, et al vs. Loretta E. Lynch, et al

```
 1    COUNTY OF BEXAR          )
                               )
 2    STATE OF TEXAS           )

 3
                I hereby certify that the witness was notified on
 4
      _____ that the witness has 30 days
 5
      after being notified by the officer that the transcript is
 6
      available for review by the witness and if there are
 7
      changes in the form or substance to be made, then the
 8
      witness shall sign a statement reciting such changes and
 9
      the reasons given by the witness for making them:
10
                That the witness' signature was/was not returned
11
      as of _____.
12
                Subscribed and sworn to on this _____ day
13
      of _____, 2016.
14

15

16

17           _____

18           Jessica Butts
             Texas CSR #9441
19           Expiration Date: December 31, 2018

20           HOFFMAN REPORTING AND VIDEO SERVICE
             Firm # 93
21           206 E. Locust St.
             San Antonio, Texas 78212
22           Telephone:   (210) 736-3555
             Fax:         (210) 736-6679
23           www.hoffmanreporting.com

24

25
```

# Exhibit 8

Publicly Filed

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA


_____ :
                               :
JENNY LISETTE FLORES, et al.,:
          Plaintiffs           :   Case No. CV 85-4544
vs.                            :
                               :
LORETTA A. LYNCH, Attorney     :
General for the United         :
States, et al.,                :
          Defendants           :
_____:


          Taken By:   Peter Schey, Esquire

          Date:       Monday, September 12, 2016
                      1:30 p.m.

          Place:      York County Prison
                      3400 Concord Road
                      York, Pennsylvania

150

JOSHUA REID -  9/12/2016

```
1        APPEARANCES: Center for Human Rights and Constitutional Law

2
     PETER SCHEY, ESQUIRE
3           CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
            256 South Occidental Boulevard
4           Los Angeles, California  90057
            pschey@centerforhumanrights.org
5

6               For - The Plaintiffs

7           SARAH B. FABIAN, ESQUIRE
            Office of Immigration Litigation
8           P.O. Box 868, Ben Franklin Station

9           Washington, D.C.  20044

10          sarah.b.fabian@usdoj.gov

11              For - Defendants
         ALSO PRESENT:
12       Bridget Cambria, Esquire
         Jaqueline Kline, Esquire
13       Geraldine K. Richardson, Esquire

14       Ambler Napalitano, Esquire

15       Wendy L. Wallace, ICE Office Principal

16

17

18

19

20

21

22

23

24

25
```

JOSHUA REID  -  9/12/2016

1                          INDEX TO WITNESSES

2

   WITNESS

3

   Joshua Reid - By Mr. Schey - 4

4

5

6

                           INDEX TO EXHIBITS

7

   DEPOSITION

8  EXHIBIT NO.                                    MARKED

9  1 - Declaration and Handbook                      22

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOSHUA REID -  9/12/2016

```
 1                          JOSHUA REID,
         called as a witness, having been duly sworn or
 2       affirmed, was examined and testified as follows:
 3              MS. FABIAN:  Peter, before you start, I'm
 4       going to state an objection on the record.  We have
 5       Bridget Cambria and Jaqueline Kline appearing in the
 6       deposition today.  They're also witnesses in this
 7       case, as they have submitted declarations to the
 8       extent they intend to testify in the case.  We would
 9       object to their appearing as both counsel in the
10       case and as witnesses in the case.
11              MR. SCHEY:  Okay.  I understand.  I guess
12       the same would be true of me since you want to
13       depose me.
14              MS. FABIAN:  It is also true of you.
15              MR. SCHEY:  Okay.
16              MS. FABIAN:  But I'll state that objection
17       at your deposition as well.
18              We're ready, Peter.  You can go ahead.
19                          EXAMINATION
20       BY MR. SCHEY:
21              Q.    Mr. Reid, are you ready to proceed?
22              A.    Yes, sir.
23              Q.    If you do not understand any of my
24       questions please just let me know.
25              A.    Okay.
```

JOSHUA REID -  9/12/2016

1          Q.    And if you can make an estimate of

2     something and then go ahead and make an estimate,

3     but do not guess or speculate, okay?

4          A.    Okay.

5          Q.    All right.  Can you tell me when was

6     the most recent time that you received either

7     training, guidance or instruction regarding the

8     requirements of the 1997 Flores settlement and who

9     provided you with that training, guidance or

10    instruction?

11         A.    I mean --

12         Q.    If you do not recall, just so state.

13         A.    We received training in and guidance

14    for different ICE policies all the time.  As far as

15    something that's, you, know definitely tied to the

16    Flores settlement, I do not recall.

17         Q.    Okay.  When was the most recent

18    time, if you recall, that you received any training,

19    guidance or instructions regarding an order that

20    Judge Gee issued in August 2015 in the Flores case,

21    and if you received any such training guidance or

22    instructions, who did you receive it from, if you

23    recall?

24         A.    I just became involved with the

25    Berks Family Center in March.  There might have been

JOSHUA REID -  9/12/2016

```
1    policies or guidance that came out prior to my

2    involvement, but I don't recall receiving anything

3    that was particularly since I've been involved

4    related to that.

5            Q.    And are you other than yourself

6    personally are you aware of when the most recent

7    time was that other ICE officers working at Berks

8    received instruction, training or guidance regarding

9    the 1997 Flores settlement if you know?

10           MS. FABIAN:  Objection to form.  You can

11   answer.

12           THE WITNESS:  I'm not aware when they

13   received guidance, particularly related to the

14   Flores settlement.

15   BY MR. SCHEY:

16           Q.    Okay.  And same question with

17   regards to Judge Gee's August 2015 order.

18           Would it be the same response?

19           MS. FABIAN:  Object to form.

20           THE WITNESS:  Yes.  It would be the same

21   response.

22   BY MR. SCHEY:

23           Q.    And do you know who the class

24   members are in the Flores case?

25           A.    No.  I'm not particularly aware of
```

JOSHUA REID –  9/12/2016

```
 1    who are the class members.
 2              Q.    Okay.  Are you aware of what
 3    paragraph 14 of the Flores settlement requires?
 4              A.    I don't know specifically what
 5    paragraph 14 states, sir.
 6              Q.    Are you aware of what paragraph 19
 7    states?
 8              A.    I do not know specifically what
 9    paragraph 19 states.
10              Q.    Are you in charge of supervising the
11    ICE offices that work at Berks?
12              A.    Yes.  I'm the assistant field
13    director over the family cases.
14              Q.    And how many ICE officers work at
15    Berks approximately?
16              A.    We just had a few just transferred.
17    I believe we're at nine officers.
18              Q.    And before the transfer how many
19    were there?
20              A.    Eleven officers, not including the
21    supervisors or support staff.
22              Q.    When you say supervisors, do you
23    mean ICE supervisors?
24              A.    Correct.
25              Q.    And how many ICE supervisors are
```

JOSHUA REID -  9/12/2016

1    assigned to Berks?

2            A.    Two.

3            Q.    And is one of the factors relevant

4    to how rapidly ICE officers can process cases at

5    Berks the number of officers assigned to Berks?

6            MS. FABIAN:  Object to form.

7            THE WITNESS:  Can you please explain what

8    you mean by process?

9            MR. SCHEY:  Certainly.

10   BY MR. SCHEY:

11           Q.    In your declaration you talk about

12   various things that ICE officers do to assess cases

13   for release from custody or to process them for

14   removal.

15           Do you recall discussing that in general

16   in your declaration?

17           MS. FABIAN:  Object to form.

18           THE WITNESS:  General things of that

19   nature, yes.  But when you say process, what

20   specifically are you talking about?  You talked

21   about essentially three or four different things

22   there.

23   BY MR. SCHEY:

24           Q.    Why don't you briefly tell us what

25   the ICE officers do there?

JOSHUA REID  -  9/12/2016

1              MS. FABIAN:  Object to form.

2              THE WITNESS:  They are responsible for

3    managing the cases of the families that are at the

4    center.

5    BY MR. SCHEY:

6              Q.    **When you say managing the cases,**

7    **what does that mean?**

8              A.    Well, as they go through proceedings

9    making certain they are served with any forms.  If

10   they receive a final order of removal, obtaining

11   travel documents and scheduling removal.  If they

12   are going through the credible fear process,

13   assisting CIS with serving forms, things of that

14   nature.

15             Q.    **Okay.  So as to those functions, can**

16   **we call that processing for convenience?**

17             A.    Sure.

18             Q.    **Would that processing be speeded up**

19   **or slowed down if you had additional ICE officers**

20   **assigned to Berks?**

21             MS. FABIAN:  Object to form.

22             THE WITNESS:  Our officers are processing

23   things in a quick manner to begin with, so I think

24   we're at adequate staff to process things quickly

25   and efficiently.

JOSHUA REID -  9/12/2016

Page 13

```
 1     connection with the Flores settlement.
 2             Q.    I'm not sure what you mean.  What
 3     rights does it advise them of?
 4             A.    It basically states that juveniles
 5     are to be housed in an open setting and not in
 6     detention facilities.  If they believe they have
 7     been inappropriately placed, they can request for a
 8     federal judge to review that.
 9             Q.    When did you start distributing that
10     notice?
11             A.    I don't recall the specific dates,
12     but it was sometime towards the end of July of 2016.
13             Q.    I notice in your declaration that
14     you mentioned that ICE maintains limited discretion
15     to parole detainees subject to expedited removal
16     when parole is required to meet medical emergency or
17     it is necessary for legitimate law enforcement
18     objectives.
19             Do you recall making that statement in
20     your declaration?
21             A.    Yes, sir.
22             Q.    Since you have been there in --
23     starting in March 2016, are you aware of any minor
24     who was released pursuant to the 1997 Flores
25     settlement?
```

JOSHUA REID –  9/12/2016

1     release.  We release families based on applicable

2     guidelines and policies.  Some of those might have

3     been in conjunction, but honestly I'm not sure.

4     BY MR. SCHEY:

5            **Q.    When you say applicable policies,**

6     **are you referring to what you stated in your**

7     **declaration, namely, that there is a medical**

8     **emergency or a legitimate law enforcement objective.**

9     **Those are the only two things that you mentioned in**

10    **the declaration.**

11           **Is that what you were referring to?**

12           MS. FABIAN:  Object to form, foundation

13    and characterization of his declaration.  Go ahead.

14           THE WITNESS:  Those wouldn't be the only

15    things we consider, no.

16    BY MR. SCHEY:

17           **Q.    What are the other things you**

18    **consider?**

19           A.    There's a variety of policies and

20    procedures.  For example, the DHS enforcement

21    priorities, you know, the ICE directive relating to

22    the parole of aliens found to be credible fear,

23    policies such as those.

24           **Q.    So you said one was the credible**

25    **fear.  What was the other one?**

JOSHUA REID – 9/12/2016

```
 1              A.    The DHS Department Homeland Security
 2       Enforcement priorities that were set in place by DHS
 3       Secretary Johnson.
 4              Q.    And what are the criteria in those
 5       enforcement policies that could result in a release
 6       of a minor?
 7              A.    They're not really specific to
 8       minors, but they to -- they are specific to the
 9       decision whether to apprehend, detain or remove
10       aliens in general.
11              Q.    Let's say aliens in general.  What
12       are those enforcement policies specifically with
13       regard to release?
14              A.    I'm sorry.  Did you say enforcement
15       priorities relating to release?
16              Q.    Yes.  That you have been referring
17       to.
18              A.    Well, the memorandum states if an
19       alien falls within the priorities, depending on the
20       level, ICE should typically pursue apprehension,
21       detention and removal unless there's exceptional or
22       compelling circumstances against other or alien
23       demonstrates they're eligible for some form of
24       relief removal, either asylum or some other forms.
25              Q.    Okay.  And other than if they
```

JOSHUA REID -  9/12/2016

```
 1              Q.     But my question was, who falls
 2     within the priorities?  Who's eligible for release?
 3     Not for ongoing detention.
 4              MS. FABIAN:  Object to form.
 5     BY MR. SCHEY:
 6              Q.     Other than people who appear to
 7     qualify for relief from removal?
 8              MS. FABIAN:  Object to form.
 9              THE WITNESS:  Aliens that -- that would be
10     it, that appear to be eligible for some type of
11     relief or removal or can demonstrate exceptional
12     circumstances.
13     BY MR. SCHEY:
14              Q.     What does that mean, the exceptional
15     circumstances?
16              A.     There's a variety of things that
17     could be taken into play.  It could be a medical
18     condition a medical condition of their family
19     member; numerous factors.
20              Q.     Other than -- so far you mentioned
21     medical conditions and they qualify for some relief
22     from removal.
23              Other than those two, what are the other
24     priorities that could result in release?
25              A.     Well, you keep stating what are the
```

JOSHUA REID -  9/12/2016

Page 19

```
 1    priorities that result in release.  The priorities
 2    are used to determine when somebody should be taken
 3    into custody generally.
 4            Q.    I'm talking just about release, not
 5    taken into custody.  Are there any other priorities
 6    you can recall that would permit release other than
 7    a person appears to qualify for relief from removal
 8    or there is a medical emergency.  Other than those
 9    two, is there any other that you can recall that
10    would precipitate a persons release?
11            MS. FABIAN:  Object to form.
12            THE WITNESS:  Like I said, in compelling
13    and exceptional circumstances, there's different
14    factors and circumstances that we would take into
15    consideration.
16    BY MR. SCHEY:
17            Q.    And this policy, does it provide any
18    examples of these compelling or exceptional
19    circumstances?
20            A.    I would have to look at the policy
21    memorandum to answer that, sir.
22            Q.    Okay.  Can you recall any without
23    looking at it?
24            A.    Not without looking at it, no.
25            Q.    If a mother is determined to be
```

JOSHUA REID - 9/12/2016

1    pregnant at Berks, is that a basis upon which the

2    mother and her accompanying child may be released?

3              A.    That we would take that

4    consideration into factor and, yes, it could be.

5              Q.    Other than to attend a removal

6    hearing, can you recall the most recent example of

7    when a class member, a Flores class member, was

8    authorized to leave the grounds of Berks?

9              MS. FABIAN:  Object to form.  Foundation.

10   I just want to state at the beginning, you asked him

11   if he understood what constituted a class member,

12   and I think he said, no, I don't know.  If you want

13   to define class member for the purposes of your

14   question.

15             MR. SCHEY:  Okay.  That's a good point.

16   Thank you.

17   BY MR. SCHEY:

18             Q.    Can you recall the most recent time

19   that a child and mother were authorized to leave the

20   Berks facility, not be released, but just

21   temporarily leave the facility for something like

22   shopping or to go to a library or visit friends?

23   Can you recall any such incident?

24             MS. FABIAN:  Object to form.

25             THE WITNESS:  I don't recall or know of a

JOSHUA REID -  9/12/2016

1           MS. FABIAN:  I wasn't sure if you were

2     asking if he said that, in which case it would be

3     helpful to have it.  This will be marked.

4           (Deposition Exhibit Number 1 marked.)

5           MS. FABIAN:  It's been marked and handed

6     to the witness.

7     BY MR. SCHEY:

8           **Q.   At paragraph 22, the residents are**

9     **in ICE custody.**

10          **Can you explain what that means?**

11          A.   Yes.  When residents are

12    apprehended, whether it be CBP or inspections, they

13    are turned over to ICE.  And when it's families they

14    are going to be housed at a family residential

15    center, but they are advised they are in custody.

16    And like I stated in my declaration, if they would

17    like to leave the center they would need permission.

18          **Q.   Are you aware of any case between**

19    **March and the present when a detainee at Berks was**

20    **permitted to leave the facility without supervision?**

21    **If so, tell us when that happened.**

22          MS. FABIAN:  Object to form.

23          THE WITNESS:  There have been several

24    residents that have been released from the center.

25    MR. SCHEY:

JOSHUA REID  -  9/12/2016

1          Q.    I'm talking about if they are
2     allowed to leave, not released.  They are allowed
3     to.
4          Can you recall any circumstance between
5     March and the present?  If so, explain it to us.
6          A.    Well, --
7          Q.    When a detainee was allowed to
8     temporarily leave the facility without supervision?
9          MS. FABIAN:  Object to form.
10          THE WITNESS:  Can you give an example,
11     leave the facility for what?
12     BY MR. SCHEY:
13          Q.    Go shopping, go to the movies, go to
14     the library take their child to a school, anything
15     like that.
16          Can you recall any such circumstance
17     between March and the present?  If so, tell us about
18     it.
19          MS. FABIAN:  Object to form.
20          THE WITNESS:  No.  I can't recall that
21     they were allowed to leave without supervision by
22     Berks counselors.
23     BY MR. SCHEY:
24          Q.    And can you recall any situation
25     between March and the present in which a detainee

JOSHUA REID -  9/12/2016

1  **was allowed to temporarily leave the facility**

2  **without authorization?  If so, tell us about it.**

3          MS. FABIAN:  Object to form.

4          THE WITNESS:  I'm not aware of any time a

5  resident was allowed to leave the center without

6  authorization, no.

7  BY MR. SCHEY:

8          **Q.    Would it be fair to say, as I**

9  **believe you said in your declaration, paragraph 22,**

10  **that if a parent or his or her child left the**

11  **facility without authorization or supervision that**

12  **they would be considered a fugitive.**

13          **Is that fair to say?**

14          A.    The fact and circumstances of each

15  case is different.  If a resident left the center

16  along with their children without authorization a

17  decision wouldn't be made in the vacuum.  It would

18  be made by ICE management, ICE headquarters, the

19  juvenile family management residential unit as to

20  what steps would be taken next.

21          **Q.    What did you mean in your**

22  **declaration when you said that they may be**

23  **considered a fugitive?**

24          A.    What was stated, that they could be

25  considered a fugitive.

JOSHUA REID -  9/12/2016

1          Q.    Okay.  And has that ever happened to

2    your knowledge?

3          A.    Not since I've been involved in the

4    center, no.

5          Q.    How about before you were involved?

6          A.    I wouldn't know before I was

7    involved.

8          Q.    Okay.  And is it your understanding

9    that no detainees at Berks walk away from that

10   facility because they just do not want to?  Why did

11   you think they do not just walk away from the

12   facility?

13         MS. FABIAN:  Object to form.  Foundation.

14   Calls for speculation.

15         THE WITNESS:  Exactly, I'm not going to

16   speculate why the resident choose to stay or choose

17   not to walk away.

18   B MR. SCHEY:

19         Q.    Are the residents informed that if

20   they walk away without supervision and authorization

21   they may be considered a fugitive and arrested by

22   ICE officers?  Are they informed of that?

23         A.    When residents are admitted to the

24   center they are given a handbook and that book

25   details what are the potential offenses, and one of

JOSHUA REID - 9/12/2016

```
 1     them is leaving the center without authorization.
 2              Q.    Did you attach that as an exhibit to
 3     your declaration, that handbook?
 4              A.    Yes.  The resident handbook in one
 5     of the exhibits, correct.
 6              Q.    Can you point to the language that
 7     tells detainees when you told us?
 8              A.    I would have to review the handbook
 9     itself, sir, to find that.
10              MS. FABIAN:  I did not hand him the
11     exhibits because you had me not do that on Friday.
12     I can do that now, if you would like.  We can
13     include that exhibit as part of the exhibit.
14              MR. SCHEY:  That's fine.
15              MS. FABIAN:  I'm amending one to be the
16     declaration including all of the attached exhibits.
17              THE WITNESS:  On page 28 of the resident
18     handbook it states, leaving the grounds of the
19     facility or from the custody of an employee outside
20     the facility without permission is a disciplinary
21     offense.
22     BY MR. SCHEY:
23              Q.    What number is that?
24              A.    That's under number 312.
25              Q.    That's called escape?
```

JOSHUA REID -  9/12/2016

1          A.     Correct.

2          Q.     And in the earlier parts of that

3    instruction, it talks about the rights of detainees

4    and that's on page 6.  Anywhere in the rights of

5    detainees does it indicate that they are free to

6    leave the facility?

7          A.     I would need to review them, sir.

8          Q.     Take a look.

9          A.     Can you repeat the question, sir?

10          Q.     Is there anything among the list of

11    rights of detainees that tells them that they have

12    the right to leave the facility?

13          A.     No.

14          Q.     Is Berks currently a licensed

15    facility or unlicensed?

16          MS. FABIAN:  Object to form.

17          THE WITNESS:  As the license is pending

18    litigation, I don't feel I'm qualified to make that

19    determination.

20    BY MR. SCHEY:

21          Q.     When you say it's pending

22    litigation, what litigation is that?

23          A.     You would need to consult with the

24    attorneys that are involved in that litigation to

25    get the specifics.

JOSHUA REID -  9/12/2016

1    I've had fathers detained.  We don't dictate what

2    request we receive.  We review them as they come

3    from either the arresting officers or San Antonio

4    ICE.

5    BY MR. SCHEY:

6         Q.    My question was, do you have any

7    idea why all of the accompanying parents are mothers

8    and no fathers?

9              MS. FABIAN:  Object to form.  Foundation.

10             THE WITNESS:  As stated, we don't control

11   who requests families to be housed at the center.

12   So when fathers come to the center, when we receive

13   requests from fathers, we review them similar to any

14   other request and have accepted fathers in the past.

15   BY MR. SCHEY:

16        Q.    When was the most recent time that

17   you had a father detained with a child at Berks?

18        A.    I don't know the specific dates, but

19   it's couple weeks ago we had a few fathers.

20        Q.    And when you have fathers there

21   during the daytime, do they use common areas that

22   children may also use?

23        A.    Yes.  As it's an open center that

24   doesn't restrict the movement of residents, yes,

25   they use the common areas as the mothers and

JOSHUA REID -  9/12/2016

1      children.

2              Q.    And would the same be true of the

3      mothers?

4              A.    The same would be true of the

5      mothers.

6              Q.    To your knowledge, has ICE

7      considered segregating unrelated fathers from other

8      children in the common areas at Berks, if you know?

9              A.    I'm not aware of ICE considering

10     that, no.

11             Q.    And of the detainees at Berks, can

12     you tell us, are some of these detainees transferred

13     from Delhi {phonetic} or Karnes to Berks?

14             A.    Yes, sir.

15             Q.    And approximately what percentage,

16     in your experience, are transferred from Delhi

17     {phonetic} or Karnes to Berks?

18             MS. FABIAN:  Object to form.

19             THE WITNESS:  I don't know the

20     approximate.

21     BY MR. SCHEY:

22             Q.    Is it approximately 50 percent or

23     more or less?  What's your best estimate?

24             A.    If I was to estimate I would say

25     it's over 50 percent.

JOSHUA REID -  9/12/2016

Page 37

```
 1            Can you repeat the question, please?
 2      BY MR. SCHEY:
 3            Q.    Certainly.  I'm looking at the third
 4      sentence that begins with, soon after arrival, ERO
 5      will review the family's alien files --
 6            A.    Okay.
 7            Q.    -- and interview the head of
 8      household.  Are you aware of any written
 9      instructions to ICE agents at Berks explaining to
10      them how during this process they are to apply or
11      comply with paragraphs 14 or 19 of the Flores
12      settlement?  And if so, tell us about those
13      instructions, if you know about them.
14            MS. FABIAN:  Object to form.
15            THE WITNESS:  As I'm not familiar with
16      paragraph 14 and 19 of the settlements, I don't
17      know.
18      BY MR. SCHEY:
19            Q.    What currently is the length of
20      detention for the longest detained child at Berks?
21            A.    I don't know off the top of my head
22      what the longest would be exactly, sir.
23            Q.    Let's not try to be exact, because I
24      know that would be difficult or impossible.  Let's
25      just say approximately, what is the longest held
```

JOSHUA REID -  9/12/2016

1      child that you have at Berks at the present time?

2      Approximately.

3              A.    Approximately --

4              MS. FABIAN:  Object to form.

5              THE WITNESS:  Approximately, I would say

6      probably about 13 months.

7      BY MR. SCHEY:

8              Q.    And approximately how many children

9      have been held at Berks for more than 12 months?

10             A.    I don't know.

11             Q.    What would your best estimate be?

12             A.    I don't want to speculate on that,

13     to be honest.  I don't know on that one.

14             Q.    Okay.  And at the present time,

15     approximately how many children have been held at

16     Berks for more than six months?  I realize you don't

17     have the exact number, but I'm just saying your best

18     estimate based on your function at the facility?

19             A.    I would have to review the custody

20     information.  I don't want to even give you an

21     approximate on that.  There's several, but a number

22     I don't know.

23             Q.    Are there any other requirements of

24     the 1997 Flores settlement that you can tell us

25     about today?

JOSHUA REID - 9/12/2016

Page 42

1    BY MR. SCHEY:

2        Q.    Have you attempted to determine how

3    long the longest detained children have been at

4    Berks because they or their mothers received a stay

5    of deportation, either from the Board of

6    Immigration Appeals or an immigration judge or a

7    federal court?

8        MS. FABIAN:  Object to form.

9    BY MR. SCHEY:

10        Q.    Have you attempted to determine

11    that?

12        MS. FABIAN:  Objection to form.

13        THE WITNESS:  Sorry.  Can you repeat that,

14    please?

15    MR. SCHEY:

16        Q.    Have you attempted to determine how

17    long the longest held children and mothers have been

18    at Berks as a result of stays issued by an

19    immigration judge or the Board of Immigration

20    Appeals or a federal court?

21        MS. FABIAN:  Object to form.

22        THE WITNESS:  I would need to look at

23    their cases to determine that.  Have I specifically

24    attempted to determine that?  No.

25    BY MR. SCHEY:

JOSHUA REID -  9/12/2016

```
 1      agency.  I think -- let me go off the record real

 2      quick.

 3                  MR. SCHEY:  Sure.  You can put me on hold.

 4                  (Discussion held off the record.)

 5                  MS. FABIAN:  Back on the record.  Go

 6      ahead.

 7      BY MR. SCHEY:

 8                  Q.    Mr. Reid, when the detainees at

 9      Berks, or any other detainees are apprehended, based

10      on your experience as an ICE officer, where is the

11      date of apprehension recorded?

12                  A.    Date of apprehension would be in

13      EARM.

14                  Q.    Is that EARM for Enforcement Alien

15      Removement Module?

16                  A.    Yes.

17                  Q.    And generally, am I correct that the

18      time of apprehension is recorded?

19                  A.    I'm not sure, to be honest with you,

20      sir, in EARM if that is recorded.  There is a

21      processing system that I forgot to mention.  It's

22      EAGLE.  I don't know what the full acronym stands

23      for.  But I believe the apprehension time would be

24      recorded in EAGLE.

25                  Q.    And is EAGLE something used by both
```

JOSHUA REID  -  9/12/2016

```
 1              THE WITNESS:  It's usually issued by the
 2      apprehending agency.  As to the specific time they
 3      issue it, I don't know.
 4      BY MR. SCHEY:
 5              Q.    And if the apprehending agency or --
 6      strike that.
 7              When a person expresses a fear of return,
 8      is that recorded in that person's A file?
 9              MS. FABIAN:  Object to form.
10              THE WITNESS:  It would depend on when they
11      expressed the fear.
12      BY MR. SCHEY:
13              Q.    Okay.  Can you just explain that?
14              A.    If they express a fear of returning
15      to their home country at the time of apprehension,
16      yes, it would typically be documented in the A file.
17              Q.    Where would it be in the A file?  Is
18      there a particular form that's used for that?  Where
19      would it be?
20              A.    There's several different forms.  It
21      could be a sworn statement or the record of
22      deportable alien.
23              Q.    And if they expressed it
24      subsequently to the time of apprehension, where
25      would that be?
```

JOSHUA REID - 9/12/2016

```
 1      putting data into the EARM system in some ways
 2      replaced putting data into the old paper A files?
 3                MS. FABIAN:  Object to form.
 4                THE WITNESS:  No.  Not necessarily.
 5      MR. SCHEY:
 6                Q.    Is some data put into the EARM
 7      system, such as a person expressing a fear that may
 8      not be put into the person's A file somewhere?
 9                MS. FABIAN:  Object to form.
10                THE WITNESS:  I don't want to speculate on
11      that.  But if an alien expresses a fear, it could be
12      in the A file and not in the EARM at all, or it
13      could be vice versa.
14      BY MR. SCHEY:
15                Q.    But it's going to be in at least one
16      place and it could be in both.
17                Is that true?
18                A.    It could be in either, yes.
19                Q.    And would the date that the person
20      requested or made a fear statement, would the date
21      be recorded in either the EARM or in the A file?
22                A.    It should be, yes.
23                Q.    And would the time be recorded, if
24      the time was known?
25                A.    I don't know about that.
```

JOSHUA REID -  9/12/2016

 1          Q.    And then when CIS is notified that
 2     this person has expressed a fear, how are they
 3     notified?  Just tell us, how is that accomplished?
 4          A.    It's typically done via e-mail
 5     notification.
 6          Q.    Okay.  And so the ICE officer who
 7     would -- would the ICE officer get directly in touch
 8     with CIS, or does that go through a particular ICE
 9     officer so all the requests go to that ICE officer
10     and that ICE officer forwards them to CIS?
11          MS. FABIAN:  Object to form.
12          THE WITNESS:  You're talking in general,
13     or are you talking about York or somewhere specific?
14     BY MR. SCHEY:
15          Q.    I'm talking about York.  But if it's
16     different from the general, let us know.
17          A.    I don't know if there's a general
18     way.  Each office, I'm sure, does it differently.
19          Q.    And how do you do it at York?
20          A.    At York there is an enforcement
21     removal assistant that's the designated point of
22     contact with CIS.
23          Q.    So your offices would communicate
24     this to your -- what did you call that person?
25          A.    It's called ERA, enforcement removal

JOSHUA REID -  9/12/2016

1    BY MR. SCHEY:

2          Q.    Okay.  The first question was at

3    Berks, if a mother or a minor made a fear request,

4    let's say orally to an ICE agent, would that ICE

5    agent communicate that directly to CIS or would they

6    communicate it to some other ICE agent who is

7    assigned to then communicate with CIS?

8          A.    The ICE agent would likely do it

9    directly.

10         Q.    Okay.  And when that happens, does

11   it happen by e-mail or how does it happen?

12         A.    I believe it happens via e-mail.

13         Q.    Okay.  When was the most recent time

14   you determined or looked into how that's

15   accomplished?

16         A.    Honestly, I can't recall.  Most of

17   the cases that come to Berks have already been

18   referred.

19         Q.    And let's say they've not been

20   referred, and let's stick with that for a moment.

21         When you say you think it's done by

22   e-mail, what makes you believe that it's done by

23   e-mail?

24         A.    I've been copied on a few e-mails,

25   whether it's done for everyone by e-mail, I don't

JOSHUA REID - 9/12/2016

1      Q.   Okay.  And then information is
2  placed in the A file?
3      A.   That is correct.
4      Q.   And is the date that that was
5  received entered into the EARM system?
6      A.   I believe so, yes.
7      Q.   And if the decision is negative but
8  the person seeks some type of review, is that also
9  recorded somewhere in either the A file or the EARM?
10     MS. FABIAN:  Object to form.
11     THE WITNESS:  It could be in both.
12  BY MR. SCHEY:
13     Q.   Could it be in both or either one?
14     A.   It could be in either one.
15     Q.   Would it be fair to say it could be
16  in one and not the other?  Is that fair to say?
17     A.   I would say in most instances it
18  will probably be in both.  Is that possible?
19  Anything is possible.
20     Q.   I understand.  Are all -- what, in
21  general terms, in this EARM, are any significant
22  events, dates about that detainee that's supposed to
23  be entered into that system?
24     MS. FABIAN:  Object to form.
25  MR. SCHEY:

JOSHUA REID -  9/12/2016

```
 1              Q.    Such as requests for

 2   reconsideration, applications for release, and

 3   decisions on those.  Are those the types of things

 4   that would generally be recorded in the EARM?

 5              MS. FABIAN:  Object to form.

 6              THE WITNESS:  Some of those things can be

 7   recorded in the EARM.

 8   BY MR. SCHEY:

 9              Q.    Let's turn to the question of the

10   custody determination at Berks.

11              When is that custody determination made?

12              A.    What are you specifically talking

13   about?  What custody termination?

14              Q.    Let me back up and approach it

15   differently.

16              Do ICE agents at Berks make any custody

17   determinations?

18              A.    If you're asking if officers make

19   custody determinations, officers make

20   recommendations.  They do not make determinations.

21              Q.    And who does those recommendations

22   go to?

23              A.    Supervisors.

24              Q.    And how many supervisors are at

25   Berks?
```

JOSHUA REID -  9/12/2016

1     to as a RFI.  It would be a positive credible fear

2     determination.

3     BY MR. SCHEY:

4              Q.    Who then decides what the terms of

5     release might be?  Who decides that?

6              A.    Once again, several people are

7     involved in that.

8              Q.    Just tell us who would do that.

9              A.    From the officer to the supervisor

10    to myself to sometimes the deputy field office

11    director, and the field office director.

12             Q.    And after a positive RFI, or

13    positive fear determination is received, is the date

14    and time that that's received recorded somewhere?

15             A.    I don't know about time.  Dates

16    should be recorded.

17             Q.    Would that be in the EARM or the A

18    file?

19             A.    It should be in one of the two,

20    correct.

21             Q.    Okay.  And then is the date and time

22    by which the custody determination is made, is that

23    recorded somewhere?

24             A.    Usually if we make a custody

25    determination.  I don't know about time, but, yes,

JOSHUA REID -  9/12/2016

 1    dates should be recorded in the EARM.

 2            Q.    And then how about when those

 3    different levels of review of the custody

 4    determination are being made by the supervisors,

 5    possibly by yourself, possibly by somebody, one of

 6    your supervisors, is the date and time of those

 7    actions recorded or logged?

 8            A.    Once again, it could be either EARM

 9    or the A file.  The date, I'm not sure about the

10    time.

11            Q.    With regards to these different time

12    periods that we've been discussing, to your

13    knowledge, are these time periods captured in any

14    reportable way other than the fact that we know they

15    are either in the EARM or the A file?

16            MS. FABIAN:  Object to form.

17    BY MR. SCHEY:

18            Q.    Do you understand my question?

19            A.    Can you please clarify it?

20            Q.    You know how there's some matters

21    like whatever average length of detention or number

22    of people there, where data is extracted on a daily

23    or maybe a weekly or maybe even a monthly basis so

24    things can be tracked.  And I'm wondering, are these

25    time periods that I've been discussing with you, are

JOSHUA REID -  9/12/2016

```
 1      any data reports prepared for you that would give

 2      you a snapshot of how long it's taking to do the

 3      various things that I just mentioned?

 4              MS. FABIAN:  Object to form.

 5              THE WITNESS:  Prepared for me

 6      specifically, no.  Are there reports that could be

 7      prepared for that?  I don't know.

 8              MS. FABIAN:  Okay.  Can we take a quick

 9      break?

10              MR. SCHEY:  Of course.  Do you want to

11      just stay on hold?

12              Let's go off the record.

13              (A brief recess was taken.)

14              MS. FABIAN:  On the record.

15      MR. SCHEY:

16              Q.   Mr. Reid, I think what we were just

17      talking about was are you aware of any -- of any

18      such reports being prepared even if they're not

19      routed to you for review?

20              A.   Reports?

21              MS. FABIAN:  Object to form.

22      BY MR. SCHEY:

23              Q.   Reports to track the time period

24      between the different stages of cases we have been

25      discussing.
```

JOSHUA REID -  9/12/2016

1              THE WITNESS:  I don't know if that

2      information would be recorded in the EARM.

3      BY MR. SCHEY:

4              Q.    Okay.  So on -- so you're saying

5      that you're not sure the reason for the denial would

6      be recorded in the EARM; is that correct?

7              A.    That is correct.  It would probably

8      state that a request was received and when it was

9      denied.  I don't know if it would put the particular

10     reasons of the denial in there.

11             Q.    So on what basis does your

12     declaration state that although you maintain limited

13     discretion to parole aliens subject to expedited

14     removal, when it is, quote, required to meet a

15     medical emergency or is necessary for the legitimate

16     law enforcement objective, end quote, these cases,

17     meaning, obviously, the cases above, failed to meet

18     the noted exceptions and, therefore, do not warrant

19     release.

20             On what basis do you make that statement?

21             A.    Under the INA.

22             Q.    Okay.  So based on the law that

23     they're subject to mandatory detention?

24             A.    Yes.  That was one of the factors.

25     Like I said, there's other factors taken into

JOSHUA REID -  9/12/2016

```
 1    consideration, but that was one.
 2             Q.    Other than the INA, what are the
 3    other factors that you could consider other than
 4    what's authored by the INA?
 5             A.    Whether they're -- they appear to be
 6    eligible for any particular form of relief, family
 7    ties community ties, manner of entry, length of
 8    presence in the United States, are typically factors
 9    that are taken into consideration; some of them.
10    Not all.
11             Q.    So when was the most recent time
12    that you authorized the release of somebody using
13    those factors even though they were subject to
14    mandatory detention in ICE's view?  Go ahead answer
15    that question.
16             MS. FABIAN:  Object to form.
17             THE WITNESS:  I don't recall off the top
18    of my head.
19    BY MR. SCHEY:
20             Q.    Okay.  So you are saying based on
21    the INA, these people identified above, they're not
22    subject to -- their cases, you said, do not warrant
23    release.  And you say they do not warrant release,
24    and you even said in quotes, because they don't have
25    a medical emergency and their release is not
```

1    somebody who you think is subject to mandatory

2    detention, do you still consider all of these

3    factors?

4            MS. FABIAN:  Object to form.

5            THE WITNESS:  We consider lawyers' request

6    for reassess.  We try to review everything and take

7    all factors into consideration.

8    BY MR. SCHEY:

9            Q.    Then I assume that you note that

10   somewhere, correct, in the A file?

11           A.    It could be in the response letter

12   that we provide to the alien or attorney if they

13   submit it.

14           Q.    And okay.  And then that would be in

15   the A file, correct?

16           A.    Typically a copy would, correct.

17           Q.    Okay.  So if all of those factors

18   are considered, there ought to be some indication of

19   that, either in the A file or in the letter that was

20   sent to -- provided to the detainee or his or her

21   lawyer, which would most likely be in the A file; is

22   that correct?

23           MS. FABIAN:  Object to form.

24           THE WITNESS: As I stated, yes.  There's a

25   letter that's sent typically.  If we receive a

JOSHUA REID - 9/12/2016

```
 1      request for release in writing we're going to
 2      provide a written response.  And likely, that will
 3      be included in the A file.
 4      BY MR. SCHEY:
 5              Q.    And if all of these factors are
 6      considered, typically the letter or the notes in the
 7      A file would indicate that they were considered?  Is
 8      that fair to say, if they were considered?
 9              MS. FABIAN:  Object to form.
10              THE WITNESS:  Yes.  For example, for
11      several of these, it goes over the immigration
12      history, how they were encountered, the length of
13      presence.  A lot of those factors are in the
14      letters.
15      BY MR. SCHEY:
16              Q.    Okay.  And is it fair to say if
17      something is going to be considered, if a record is
18      going to be made of that, is that fair to say?
19              MS. FABIAN:  Object to form.
20      BY MR. SCHEY:
21              Q.    In most cases.  People make
22      mistakes.  But in most cases things that are
23      considered to be recorded, correct?
24              MS. FABIAN:  Object to form.
25      MR. SCHEY:
```

JOSHUA REID – 9/12/2016

Page 112

```
1                 Q.    And a decision would be recorded; is
2       that correct?
3                      MS. FABIAN:  Object to form.
4                      THE WITNESS:  As stated previously,
5       usually it's something that EARM will be added, a
6       request was received, and it was approved or denied
7       in the letter that we provide.
8       BY MR. SCHEY:
9                 Q.    You seem to be a little vague to me.
10      It's one thing to record that a request is received
11      and that it was denied and a letter was issued which
12      may or may not include something.
13                My question is as a matter of practice, to
14      the best of your knowledge, do your agents record
15      somewhere the factors that they considered and the
16      decisions made based on those factors?  Is that
17      recorded somewhere?
18                      MS. FABIAN:  Object to form.
19                      THE WITNESS:  Yes.  In the response
20      letters.
21      BY MR. SCHEY:
22                 Q.    Okay.  And would anything different
23      be recorded in the A file?  Would more detail be in
24      the A file other than the letter?
25                      MS. FABIAN:  Object to form.
```

JOSHUA REID -  9/12/2016

Page 121

```
 1      Could it have been one, 50 or 100?

 2              A.    As there is only 67 residents

 3      currently at the center, I don't think it would be

 4      100.  Could it be one?  Yes.  Could it be a handful?

 5      Yes.  I don't recall the specific number off the top

 6      of my head.

 7              Q.    Okay.  And in any of those cases, do

 8      you recall what factor or factors prompted the

 9      release of that either one person or a handful of

10      people?

11              A.    I don't recall off the top of my

12      head.  Like I said, we take into consideration

13      multiple factors.  I don't think it would be one

14      factor that would make the decision.  It's not made

15      in a vacuum.  We try to take in all the factors that

16      I mentioned before.

17              Q.    And where were you working early in

18      2014?

19              A.    2014 I was working in York.

20              Q.    That's what, adult detainees?

21              A.    Yes.

22              Q.    And were children ever detained

23      there?

24              A.    No.  Children should not be detained

25      with adults there, no.
```

JOSHUA REID -  9/12/2016

1    COUNTY OF LANCASTER              :

2    COMMONWEALTH OF PENNSYLVANIA     :

3

4            I, Diana L. Netherton, RPR, MBVIR, Notary

5    Public, Official Court Reporter and Undersigned

6    Commission, do hereby certify that personally

7    appeared before me, the witness, being by me first

8    duly sworn or affirmed to testify to the truth, the

9    whole truth and nothing but the truth, in answer to

10   the oral questions propounded to the witness by the

11   attorneys for the respective parties as set forth in

12   the foregoing deposition.

13           I further certify that before the taking of

14   said deposition, the above witnesses were duly sworn

15   or affirmed, that the questions and answers were

16   taken down stenographically by the said Diana L.

17   Netherton, RPR, MBIVR, Official Court Reporter,

18   Lancaster, PA, approved and agreed to, and

19   afterwards reduced to print by means of

20   computer-aided transcription under the direction of

21   the aforesaid reporter.

22           In testimony whereof, I have hereunto

23   subscribed my hand this 14th day of September 2016.

24

25   Diana L. Netherton, RPR, MBIVR
     Official Court Reporter

DATED: December 5, 2016                   Respectfully submitted,

                                          CENTER FOR HUMAN RIGHTS &
                                          CONSTITUTIONAL LAW
                                          Peter A. Schey
                                          Carlos Holguín


                                          ORRICK, HERRINGTON & SUTCLIFFE LLP
                                          T. Wayne Harman
                                          Elena García

                                          LA RAZA CENTRO LEGAL, INC.
                                          Michael Sorgen
                                          Amanda Alvarado Ford

                                          LAW FOUNDATION OF SILICON VALLEY -
                                          LEGAL ADVOCATES FOR CHILDREN &
                                          YOUTH
                                          Jennifer Kelleher Cloyd
                                          Katherine H. Manning
                                          Kyra Kazantzis
                                          Annette Kirkham

                                          Of counsel:

                                          YOUTH LAW CENTER
                                          Alice Bussiere
                                          Virginia Corrigan

                                          /s/__Peter Schey_____
                                          *Attorneys for Plaintiffs*

/ / /

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On December 6, 2016 I electronically filed the following document(s):

- **Plaintiffs Exhibits 6-8 [Part 2 of 6]**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/__*Peter Schey*_____
*Attorney for Plaintiffs*