1    CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
     Peter A. Schey (Cal. Bar No. 58232)
2    Carlos Holguín (Cal. Bar No. 90754)
3    256 South Occidental Boulevard
     Los Angeles, CA  90057
4    Telephone: (213) 388-8693
     Facsimile: (213) 386-9484
5    Email: pschey@centerforhumanrights.org
6            crholguin@centerforhumanrights.org

7

8    ORRICK, HERRINGTON & SUTCLIFFE LLP
     Elena Garcia (Cal. Bar No. 299680)
9    egarcia@orrick.com
10   777 South Figueroa Street, Suite 3200
     Los Angeles, CA 90017
11   Telephone:  (213) 629-2020

12

13   *Attorneys for plaintiffs (listing continues on following page)*

14                   UNITED STATES DISTRICT COURT

15          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

16

17   JENNY LISETTE FLORES, *et al.*,          )   Case No. CV 85-4544 DMG (AGRx)
                                              )
18           Plaintiffs,                      )   PLAINTIFFS' EXHIBITS 9-12 [PART 3 OF
19   - vs -                                   )   6]
                                              )
20   JEH JOHNSON, SECRETARY, U.S.             )   Hearing: January 30, 2017
21   DEPARTMENT OF HOMELAND SECURITY,         )
22   *et al.*,                                )
                                              )
23           Defendants.                      )

24   _____

25   *Plaintiffs' counsel, continued:*

26

27

28

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX OF EXHIBITS

1.  Declaration of Stephen Manning…………………………………………...…………... 1

2.  Deposition of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. –
    Transcript Excerpts……………………………………………………………………. 10

3.  Deposition of Chief Patrol Agent – El Centro Sector, CBP, Rodney Scott – Transcript
    Excerpts……………………………………………………………….……………… 36

4.  Deposition of Chief Patrol Agent – Tucson Sector, CBP, Paul Beeson – Transcript
    Excerpts……………………………………………………………………...…………59

5.  Deposition of Chief Patrol Agent – Laredo Sector, CBP, Mario Martinez – Transcript
    Excerpts……………………………………………………………….……………… 77

6.  Deposition of Karnes Assistant Field Office Director, Enforcement and Removal Operations,
    ICE, Juanita Hester – Transcript Excerpts…………………………………………..... 101

7.  Deposition of Dilley Assistant Field Office Director, Enforcement and Removal Operations,
    ICE, Valentin de la Garza – Transcript Excerpts…………………………………….. 121

8.  Deposition of Berks Assistant Field Office Director, Enforcement and Removal Operations,
    ICE, Joshua Reid – Transcript Excerpts…………………………………………….... 149

9.  Deposition of Assistant Director of Field Operations, Enforcement and Removal Operations,
    ICE, Phillip Miller – Transcript Excerpts……………………………….…………… 193

10. Deposition of Class Member Mother Ritza Mxxx xxxxxxx – Transcript
    Excerpts……………………………………………………………………………… 230

11. Deposition of Class Member Mother Celina Sxxxxxx-xxxx – Transcript
    Excerpts……………………………………………………………………………… 244

12. Deposition of Class Member Franklin Rxxxx xxxxxxxxxx– Transcript
    Excerpts……………………………………………………………………………… 263

13. Deposition of Class Member Mother Karina Vxxxx xxxxxxx – Transcript
    Excerpts……………………………………………………………….……………… 289

14. Deposition of Class Member Mother Lindsay Gxxxx xxxxx – Transcript
    Excerpts……………………………………………………………………………… 316

15.  Deposition of Class Member Mother Mirna Mxxxxxx xxxxx – Transcript
    Excerpts……………………………………………………………………………… 341

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16. Deposition of Class Counsel Peter Schey – Transcript Excerpts……………………….…….. 361

17. Deposition of Class Member Mother Sara Exxxxxxxx xxxxx – Transcript
    Excerpts……………………………………………………….………………………….. 381

18. Deposition of Class Member Yeslin Lxxxx xxxxxxx – Transcript
    Excerpts…..………………………………………………………………………………. 399

19. Deposition of Class Member Mother Yessenia Exxxxxxxx xxxxxxx –
    Transcript Excerpts…………...………………………………………………………….418

20. Deposition of Class Member Mother Zulma Mxxxxxxx xxxxxxx –
    Transcript Excerpts………………………………………………………………………. 432

21. Deposition of Attorney Bridget Cambria  – Transcript Excerpts…………………….…….458

22. Deposition of Attorney Amanda Doroshow – Transcript Excerpts………………….….... 467

23. Deposition of Attorney Robyn Barnard – Transcript Excerpts……………………………. 476

24. Deposition of Attorney Edward McCarthy – Transcript Excerpts…………………..…...505

25. Deposition of Jacqueline Kline – Transcript Excerpts……………………………………. 528

26. Declaration of Attorney Robert Doggett………………………………………..………….537

27. Declaration of Chapman Noam……………………………………………..…………. 543

# Exhibit 9

Publicly Filed

1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

```
JENNY LISETTE FLORES,      )
et al.,                    )
                           )
                           )
              Plaintiffs,  )
VS.                        ) Case No. CV 85-4544 DMG
                           )
                           )
LORETTA E. LYNCH,          )
Attorney General of the    )
United States, et al.,     )
                           )
                           )
              Defendants.  )
--------------------------x
```

DEPOSITION OF PHILIP MILLER

WASHINGTON, D.C.

SEPTEMBER 28, 2016

1:01 p.m.

Reported by:
Misty Klapper, CRR, RPR, CMR
Job No. 46539

2

1

2

3

4                        PHILIP MILLER

5                        SEPTEMBER 28, 2016

6                        1:01 p.m.

7

8             Deposition of Philip Miller,

9         held at the Department of Justice,

10        450 5th Street, N.W., Washington,

11        D.C., pursuant to Notice, before

12        Misty Klapper, RPR, CRR, CMR and

13        Notary Public within and for the

14        District of Columbia.

15

16

17

18

19

20

21

22

23

24

25

3

1

2     APPEARANCES:

3     FOR THE PLAINTIFFS:
                  Center for Human Rights & Constitutional L
4                 256 South Occidental Boulevard
                  Los Angeles, California  90057
5                 (213) 388-8693
                  BY:  Peter A. Schey, Esq. (via telephone)
6                      pschey@centerforhumanrights.org

7

      FOR THE DEFENDANTS:
8                 UNITED STATES DEPARTMENT OF JUSTICE
                  District Court Section
9                 P.O. Box 868
                  Ben Franklin Station
10                Washington, D.C.  20044
                  (202) 307-4693
11                BY:  William Silvis, Esq.
                       william.silvis@usdoj.gov
12

13    ALSO PRESENT:

14                 Tom Zimmerman

15                 Wendy Wallace

16

17

18

19

20

21

22

23

24

25

4

1

2                              C O N T E N T S

3       WITNESS:                    EXAMINATION BY:      PAGE

4       Philip Miller               Mr. Schey              5

5

6

7

8                              E X H I B I T S

9       NO.:          DESCRIPTION:                        PAGE

10      Exhibit 1    Gurule Declaration                    34

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1

2

3          MS. REPORTER:  Mr. Schey, do

4      you hereby order our services for

5      this deposition and agree to

6      payment?

7          MR. SCHEY:  Yes.

8              P R O C E E D I N G S

9   Whereupon:

10                 PHILIP MILLER,

11              was called for examination, and, after

12   being duly sworn, was examined and testified as

13   follows:

14          EXAMINATION BY COUNSEL FOR

15      PLAINTIFFS

16          BY MR. SCHEY:

17      Q.   If you don't understand any

18   of my questions, would you please let

19   me know that you do not understand my

20   question and I will rephrase it?

21      A.   I will.  Thank you.

22      Q.   And I'm entitled to your best

23   estimation of things.  So if you have

24   an estimate, please give it, but do not

25   guess or speculate.

11

1           PHILIP MILLER

2        Q.   Do you know approximately --

3    before Dilley and Karnes were set up,

4    do you know approximately what

5    percentage of apprehended minors were

6    released because there was no space

7    available, detention space available,

8    for them?

9        A.   I do not know that.

10       Q.   And when -- prior to Karnes

11   and Dilley being set up, when -- when

12   accompanied minors were released, what

13   authority was relied upon by ICE to

14   release those children?

15            MR. SILVIS:  I'll object to

16       the extent you're asking for a

17       legal conclusion.

18            THE WITNESS:  We used our

19       discretionary detention authority

20       under Section 236(a), which also

21       provides opportunity for us to set

22       conditions to include the

23       conditions under which someone

24       could be released.

25            BY MR. SCHEY:

12

PHILIP MILLER

Q.   And what does 236(a) say?
Can you tell us your best recollection?

A.   Well, I'm not an attorney, so
I don't have the law memorized; but
operationally it gives us the authority
to set conditions of either continued
detention or release for cases that are
not mandatory detention.

Q.   Okay.  Weren't -- weren't the
vast majority of those accompanied
minors apprehended close to the border?

A.   I don't have a breakdown in
front of me, nor do I recall the
location of -- of folks where they're
arrested.

Q.   Give us your best estimate.
Isn't it a fact that the great majority
of minors apprehended accompanied by
parents by ICE this year, last year,
the previous two years, five years, ten
years have always been apprehended
along the border?  Isn't that true?

MR. SILVIS:  Object to the
form and foundation.

49

PHILIP MILLER

1

2      settlement agreement requires is

3      legal advice and that he won't be

4      providing what that legal advice

5      was.  And that would be

6      attorney/client privilege.

7           BY MR. SCHEY:

8      Q.   Were -- other than through

9  your meetings with counsel, have -- has

10  anybody provided you with any

11  documentation regarding the

12  requirements of Flores?

13      A.   No, sir.

14      Q.   And when -- when -- when was

15  the most recent time that ICE officers

16  at your detention facilities received

17  any in-person training regarding the

18  options for release under the Flores

19  settlement for minors in your custody?

20           MR. SILVIS:  Object to the

21      form and to the foundation of the

22      question.

23           THE WITNESS:  Every time new

24      detailers arrive at one of the

25      residential centers, they have an

50

PHILIP MILLER

1

2          intake briefing and instruction

3          on, you know, what they will be

4          required to do while they're at

5          the facility.  And that training

6          is predicated on our operational

7          understanding of the Flores

8          agreement.

9               It's not limited to -- to

10         different sections of it.  It's an

11         overall intake briefing that

12         covers our expectations of our

13         officers while they're on campus.

14              BY MR. SCHEY:

15         Q.   Okay.  I'm going to ask you

16    to try to answer my questions or this

17    deposition will just go on for a lot

18    longer than it needs to.

19              My question was not generally

20    what kind of training you provide to

21    your officers.  My question was very

22    specific.  And most of my questions

23    will be very specific.

24              My question was -- and if you

25    don't know, just state you don't know.

52

PHILIP MILLER

1    question.

2            BY MR. SCHEY:

3    Q.   And if you don't know, just

4    say you don't know.  Don't tell us

5    about they get all kinds of memos all

6    the time.  My question is a very

7    specific question.

8            MR. SILVIS:  Object to the

9        form.

10           THE WITNESS:  I don't know.

11           BY MR. SCHEY:

12   Q.   And are you aware of any time

13   in which ICE agents working at the

14   family detention facilities have

15   received in-person training about the

16   Flores requirements with regards to the

17   options for release of minors in your

18   custody?

19   A.   No, I don't.

20   Q.   Are you aware of any time in

21   which ICE officers working at your

22   family detention facilities have

23   received written instructions or

24   guidance regarding the options for

53

PHILIP MILLER

1

2  release of minors under the Flores

3  settlement?

4       A.   No, sir.

5       Q.   Are you aware of any

6  in-person training provided to your

7  officers at family detention centers --

8  I said in-person training -- regarding

9  Judge Gee's -- and for the Court

10  Reporter, that's G-E-E -- August 2015

11  order in the Flores case?

12       A.   No.

13       Q.   Are you aware of any written

14  instructions or guidance issued to your

15  officers at the family detention

16  centers in writing, instructions or

17  guidance, regarding Judge Gee's August

18  2015 order in the Flores case?

19            MR. SILVIS:  Object to

20       foundation.

21            THE WITNESS:  No, not to the

22       officers.

23            BY MR. SCHEY:

24       Q.   Are you aware of any part of

25  the PALMS -- for the Court Reporter, I

54

PHILIP MILLER

1    believe that's capital -- all capitals

2    P-A-L-M-S -- PALMS Training Module that

3    includes an explanation of the options

4    for release of minors set forth in the

5    Flores settlement?

6        A.    No.

7        Q.    Are you aware of any part of

8    the PALMS Training Module that

9    addresses the meaning of a special

10   needs minor under the Flores

11   settlement?

12       MR. SILVIS:  Object to

13       foundation.

14       THE WITNESS:  No.

15           BY MR. SCHEY:

16       Q.    Are you aware of any training

17   provided in the PALMS Module regarding

18   the definition of a licensed program

19   under the Flores settlements?

20       MR. SILVIS:  Object to

21       foundation.

22       THE WITNESS:  No.

23           BY MR. SCHEY:

24       Q.    Are you aware whether anybody

60

PHILIP MILLER

1    approximately ten options generally

2    involving release to people, that

3    they're then entitled to be offered

4    release to a licensed program?

5              MR. SILVIS:  Object to the

6         form.

7              BY MR. SCHEY:

8    Q.   Are you aware of that or not?

9              MR. SILVIS:  Objection to the

10        form and foundation.

11             THE WITNESS:  No.

12               BY MR. SCHEY:

13   Q.   Was that a no?

14   A.   Yes, my answer was no.

15   Q.   And at the present time, does

16   ICE have any contracts with any

17   licensed programs, other than your

18   detention -- family detention centers,

19   in which you could place accompanied

20   minors?

21             MR. SILVIS:  Objection,

22        foundation.

23             THE WITNESS:  Not placement

24        locations.  We have a family case

61

1              PHILIP MILLER

2         management program where we could

3         facilitate community re-engagement

4         generally utilized for folks who

5         are not good candidates for the

6         FRCs.  We will look to place them

7         into the family case management

8         program as an alternative to

9         detention.

10              BY MR. SCHEY:

11         Q.   Okay.  Again, I'm just going

12    to request that you try to focus on my

13    questions and that way we'll just get

14    through your deposition a lot quicker

15    and you can get on with your work and I

16    can get on with my work.

17              My -- my question was a very

18    specific question.  Are you aware of --

19    of any licensed program, other than

20    your family detention centers, your

21    three family detention centers, that

22    ICE has contracted with for the

23    placement of minors in your custody who

24    for one reason or another placement

25    with an individual is not available or

62

                    PHILIP MILLER

1

2    appropriate?

3         A.   No.

4         Q.   Are you aware of whether in

5    the past couple of years ICE has had

6    any such contracts with licensed

7    programs --

8         A.   No.

9         Q.   -- for the placement of

10   minors?

11            MR. SILVIS:  Objection,

12        foundation.

13            THE WITNESS:  No.

14               BY MR. SCHEY:

15        Q.   Okay.  Are you aware of any

16   of the -- any of the requirements in

17   the Flores settlement with reference to

18   how rapidly minors may have the right

19   to be placed with an individual or

20   placed in a licensed program?

21            MR. SILVIS:  Object to the

22        form.

23            THE WITNESS:  Yes.

24               BY MR. SCHEY:

25        Q.   I'm sorry?

71

                    PHILIP MILLER

1

2    accompanying children; is that correct?

3         A.   We have the capability to do

4    it, yes.

5         Q.   And those fathers and mothers

6    at your facility are commingled with --

7    with children detained at that

8    facility; is that correct?

9         A.   Yes.

10        Q.   And does that raise any

11   concerns with you or with the agency?

12             MR. SILVIS:  Object to the

13        form.

14             THE WITNESS:  No.

15               BY MR. SCHEY:

16        Q.   How about at the other two

17   facilities, in Dilley and Karnes, their

18   children are also coming over with

19   unrelated adults; is that correct?

20        A.   Yes.

21        Q.   And does that raise any

22   concern for you or for the agency that

23   you are aware of?

24             MR. SILVIS:  Object to the

25        form.

72

                    PHILIP MILLER

1

2              THE WITNESS:  No.

3                  BY MR. SCHEY:

4       Q.    How many -- if you know,

5    approximately what is the mix of

6    fathers versus mothers detained at

7    Dilley?

8       A.    There are no fathers at

9    Dilley.

10      Q.    How about at Karnes?

11      A.    There are no fathers at

12   Karnes.

13      Q.    How about at Berks?

14      A.    There are no fathers at

15   Berks.

16      Q.    And why is it that your

17   agency does not detain fathers who are

18   accompanying their children when

19   apprehended?

20             MR. SILVIS:  Object to

21        foundation.

22             THE WITNESS:  We don't have

23        the capacity to do it at this

24        time.

25                  BY MR. SCHEY:

89

PHILIP MILLER

1
2  that same information could not be put

3  into the case comment section of the

4  EARM system?

5      A.   No.

6      Q.   And with regards to the

7  sponsorship person or the sponsor

8  person, if -- if what was involved was

9  a minor, would your officers make

10  inquiry as to the appropriateness of

11  the minor joining that sponsor or

12  living with that sponsor?

13      A.   Sorry, I don't understand

14  your question.

15      Q.   Sure.  You talked about how

16  the officers would make inquiry into

17  the sponsor; is that correct?

18      A.   Yes.

19      Q.   And you mentioned several

20  things they would look into.

21          If a minor is involved, is

22  one of the issues they look into the

23  appropriateness of the minor living in

24  that home?

25      A.   No.  We defer to the mother.

99

PHILIP MILLER

1

2     Q.   And what are those

3  circumstances -- what are those

4  instructions, excuse me?

5     A.   As I said, when they arrest

6  or encounter a juvenile offender, they

7  should confer with the field office

8  juvenile coordinator.

9     Q.   Okay.  And you previously

10  said a juvenile who has been convicted

11  of an adult crime.  I believe that's

12  what you said.  Is that correct?

13     A.   That was an example of

14  someone who could be placed in adult

15  detention, yes.

16     Q.   Okay.  And my question was,

17  are you aware of any instructions to

18  ICE officers regarding the

19  circumstances in which a minor in your

20  custody may be placed in an ICE

21  detention facility or ICE contracted

22  facility?

23        MR. SILVIS:  Object to the

24     form.

25           BY MR. SCHEY:

100

1          PHILIP MILLER

2       Q.   Are you aware of any such

3   instructions and, if so, tell us about

4   those instructions.

5          MR. SILVIS:  Object to the

6       form.

7          BY MR. SCHEY:

8       Q.   I'm not talking about whether

9   they were instructed to contact some

10  juvenile coordinator.

11      A.   Those are the instructions.

12  If you don't like the answer, there's

13  nothing I can do about it, but that's

14  my answer.

15      Q.   Okay.  So my question is, are

16  you aware of any instructions -- aside

17  from contacting a juvenile coordinator,

18  are you aware of any instructions to

19  ICE officers regarding the

20  circumstances in which a minor in ICE

21  custody may be placed in a secure ICE

22  detention facility or ICE contracted

23  facility, any such instructions?

24          MR. SILVIS:  Objection, asked

25      and answered.

101

PHILIP MILLER

1    THE WITNESS:  No.

2        BY MR. SCHEY:

3    Q.   Are you aware whether or not

4    the Flores settlement requires that

5    when a minor is placed in such a

6    detention facility, a secure detention

7    facility, that facility must have

8    separate accommodations for minors?

9    A.   No.

10    Q.   Are you aware of any

11    instructions that have been issued to

12    ICE officers in writing, and, if so,

13    what instructions, that would help them

14    understand what the term escape risk

15    means under the Flores settlement?

16        MR. SILVIS:  Objection to

17        form.

18        THE WITNESS:  Can you ask

19        your question again?

20        BY MR. SCHEY:

21    Q.   Are you aware of any written

22    instructions issued to ICE officers,

23    and, if so, please identify those

24    instructions, that explains to them

102

1              PHILIP MILLER

2     what the term escape risk means in the

3     Flores settlement?

4          A.   No.

5          Q.   Are you aware of any

6     in-person training about that?

7          A.   About defining terms from

8     Flores?

9          Q.   Explaining to the officers

10    what the term escape risk means under

11    the Flores settlement, are you aware of

12    any in-person training on that

13    question?

14         A.   No.

15         Q.   Do you recall what the -- or

16    how the term escape risk is -- is

17    defined in -- in the Flores settlement

18    in general?

19         A.   No.

20         Q.   Are you yourself aware of

21    what the term medium secure facility

22    means as set forth in the Flores

23    settlement?

24         A.   No.

25         Q.   Are you aware of what the

103

PHILIP MILLER

1   Flores settlement states with regards

2   to the placement of minors in medium

3   secure facilities as an alternative to

4   placement in a secure facility?

5       A.   No.

6       Q.   What is your understanding of

7   the current status of licensing for the

8   facility at Dilley?

9       A.   Current status is that the

10  final adjudication is being held in

11  abeyance by the State of Texas pending

12  the grassroots litigation.

13      Q.   And so at the present time

14  the Dilley facility is not licensed; is

15  that correct?

16      A.   Yes.

17      Q.   How about the same question

18  for the Karnes facility, does that have

19  a current operative license or not?

20      A.   It does have a current

21  operative license.

22      Q.   And when does that license

23  expire?

24      A.   Sometime in October.  I do

121

                    PHILIP MILLER

1   you know?

2       A.   I believe that was determined

3   by the State of Texas in coordination

4   with the juvenile family resident

5   management unit.

6       Q.   When was that change made to

7   go from 8 persons to 5 people per room?

8       A.   I don't remember the exact

9   date, but it was during the process of

10  obtaining the temporary license.

11      Q.   And the Declaration also

12  states that -- strike that.

13          Has ICE made any effort that

14  you are aware of to determine whether

15  the period of time in which you are

16  detaining these family units prior to

17  their fear interviews is sufficient

18  time to allow for adequate preparation

19  and representation by counsel?

20          MR. SILVIS:  Object to the

21      form.

22          THE WITNESS:  Although I

23      wasn't involved in the

24      conversation, I know that our

122

1          PHILIP MILLER

2      Chief Counsel Office in San

3      Antonio, along with USCIS and the

4      different pro bono providers, met

5      and came to an agreement of how

6      long the -- the resident would be

7      on campus before they would have

8      their initial interview.

9          BY MR. SCHEY:

10     Q.   And do you know what they

11  determined?

12     A.   I believe it's 72 hours.

13     Q.   And so you understand there

14  was some agreement with the pro bono

15  attorney groups that 72 hours was

16  sufficient time for them to adequately

17  prepare for legal representation at a

18  fear interview; is that correct?

19     A.   Yes, sir.

20     Q.   And who communicated that to

21  you, if you recall?

22     A.   Our attorneys.

23     Q.   When you say our attorneys,

24  do you mean ICE attorneys or attorneys

25  with the Office of Immigration?

135

PHILIP MILLER

1   remember at this time, yes, sir.

2       Q.   And when you said -- the

3   first one you gave was age and then a

4   separate one children under one.

5           Can you explain the criteria

6   of age to us?

7       A.   Sure.  Some families have

8   children that are -- you know -- that

9   are older than 17.  Some families --

10  you know, it's like -- there is no

11  standard definition, at least for us

12  and what comprises a family.  So we

13  have to look, you know, at the age of

14  the children relative to, you know,

15  what's readily available; you know,

16  whether the family unit is comprised of

17  children that are, you know, of

18  majority under the INA or deemed

19  juvenile.

20          So it's a little bit -- you

21  know, we try to keep family units

22  together.  And so we'll look at kind of

23  the totality of the circumstances of --

24  of that individual family unit and does

136

PHILIP MILLER

1   that individual family unit's profile,

2   taking into account those six -- and I

3   believe there's probably others, I

4   don't have the -- I don't have the

5   screening tool in front of me -- but

6   they -- you know -- they try to look at

7   the totality of the family composition

8   and whether or not their needs can be

9   met before we make a determination on

10   placement.

11        Q.   Okay.  I apologize, I'm sure

12   it's me, but I'm still not quite

13   understanding what you're saying about

14   the age.  I know you said if they were

15   older children.  I think you said older

16   than 17.

17        A.   Right.  If they're over 17 --

18   like some groups, especially at ports

19   of entry, present themselves as a

20   family unit.  They consider themselves

21   a family unit.  Sometimes in that

22   family unit they'll say this is my son,

23   he's 19; this is my daughter, who is

24   16, but she's a U.S. citizen; this is,

151

                    PHILIP MILLER

1

2   Declaration states in paragraph 15 that

3   ICE review every case no later than 15

4   days or after the family units'

5   apprehension and every 15 days

6   thereafter.

7           Do you see that in paragraph

8   15?

9       A.   Yes, sir.

10      Q.   When -- when I deposed the --

11  the ICE officials in charge of these

12  three detention centers, I was not able

13  to learn what -- what they would do

14  differently at the 15 day mark than at

15  any other time, because they testified

16  we're constantly reviewing every case

17  to see if anything has changed.

18          I'm wondering, can you tell

19  us what the instruction says about this

20  15 days and what it says anybody is

21  supposed to do differently after 15

22  days?

23          MR. SILVIS:  Object to the

24      form.

25          THE WITNESS:  Sure.  The

152

PHILIP MILLER

1

2    original guidance that went out, I

3    believe it was in June of '15, was

4    at the Secretary's direction to,

5    you know, provide the residents

6    with the opportunity to -- to

7    inform ICE of any changes in their

8    circumstance or sponsorship.  And

9    we would do that iteratively

10   throughout their continued

11   detention.

12        Now that families are in

13   detention for a much shorter

14   period of time, I probably would

15   imagine that AFODs, A-F-O-D,

16   assistant field office directors

17   at the facilities had that ongoing

18   dialogue with the residents.

19        The 15-day benchmarks remain

20   in effect.  They notice the

21   residents that their -- you

22   know -- that their case is being

23   reviewed and if they have any

24   additional submissions that they

25   or their counsel would like to

153

                    PHILIP MILLER

1

2       have considered.

3           But for many of them if -- if

4       they get to the 15 day point, it's

5       usually only once.  You know, most

6       of these folks that we're talking

7       about are -- you know -- are

8       generally put on supervised

9       release around the 15 day mark, if

10      not shortly thereafter.

11          BY MR. SCHEY:

12      Q.   And was any written

13  instruction issued about what to do

14  differently at the 15 day mark, if you

15  know?

16      A.   I believe there was in -- in

17  June of '15.

18      Q.   But when you say you believe

19  there was, have you seen a written

20  instruction that went out to ICE agents

21  telling them what to do any differently

22  at the 15 day mark?

23      A.   To the best of my

24  recollection, it went to the field

25  office directors, yes.

154

PHILIP MILLER

1

2      Q.   And do you know -- have you

3   seen any evidence of field office

4   directors then issued something to

5   their agents about what to do at the 15

6   day mark?

7      A.   That's what they indicated to

8   me.  Yes, they did that.

9      Q.   And my question was, have you

10   seen what they've distributed?

11      A.   No, I have not seen what they

12   distributed.

13      Q.   Okay.  And it's your

14   understanding that every 15 days that a

15   family unit is in custody, that ICE

16   gives them some sort of a written

17   notice telling them that if they have

18   anything new about their custody

19   status, to come and bring that forward

20   to an ICE agent?

21      A.   Yes, that's my understanding.

22      Q.   And have you ever seen one of

23   those documents that is allegedly given

24   to these detainees?

25      A.   I saw it during the creation

155

1                    PHILIP MILLER

2    of the -- of the document.

3         Q.   Sorry, during the creation of

4    what document?

5         A.   The document that you just

6    referenced, the notice document.

7         Q.   So during its creation you

8    observed a document that ICE agents are

9    supposed to distribute to families

10   every 15 days who have been in custody

11   for more than 15 days; is that your

12   testimony?

13        A.   Yes.

14        Q.   And is there any required

15   reporting, like in the system you

16   mentioned earlier, the data system,

17   that that would be recorded, that these

18   families have been provided this 15-day

19   notice every 15 days?

20           MR. SILVIS:  Object to form.

21           THE WITNESS:  I don't recall

22      requirements.

23             BY MR. SCHEY:

24        Q.   Okay.  Have you seen any

25   reports that would indicate to you that

156

PHILIP MILLER

1

2      this -- the fact that this is being

3      done is being recorded anywhere?

4          A.   Yes.

5          Q.   Okay.  And what reports have

6      you seen that would indicate that this

7      is being done at the three family

8      detention facilities?

9          A.   I see an aggregate report of

10     either changes in custody

11     determinations or other actions taken.

12         Q.   So you've seen an activity

13     report about custody determinations;

14     but my question was, do you see any

15     report that would indicate that these

16     notices have been distributed every 15

17     days?

18         A.   The distribution of the

19     notices, no, I don't track that.  I

20     track the actions taken based on the

21     case reviews.

22         Q.   And what is this case review?

23     What is it called in the memo, in the

24     instruction memo?

25         A.   I don't recall that.

165

PHILIP MILLER

1    behalf of minors.

2        Again, we see the decision on

3    how and where children reside to

4    be a decision of the mother.  We

5    work to ensure that the family

6    stays together, both while they're

7    detained and while they're in

8    transit.

9        And so the kind of

10   assessments that you're

11   describing, I think, are being

12   done well by ORR.  At least it's

13   my understanding that ORR does

14   them well.

15       And I think if Congress

16   wanted us to -- to do that and not

17   do a law enforcement mission, we

18   would have been directed to do so.

19           BY MR. SCHEY:

20       Q.   Okay.  But are you aware of

21   anything in the budget approved by

22   Congress -- for your -- you know --

23   your couple billion dollars for

24   detention costs, are you aware of

177

STATE OF _____ )

) :ss

COUNTY OF _____)


           I, PHILIP MILLER, the

witness herein, having read the foregoing

testimony of the pages of this deposition,

do hereby certify it to be a true and

correct transcript, subject to the

corrections, if any, shown on the attached

page.



                    _____

                         PHILIP MILLER




Sworn and subscribed to before

me, this          day of

                    , 2016.


_____

      Notary Public

178

1

2                    CERTIFICATE OF NOTARY

3        I, MISTY KLAPPER, the officer before whom the

4     foregoing deposition was taken, do hereby certify

5     that the witness whose testimony appears in the

6     foregoing deposition was duly sworn by me; that the

7     testimony of said witness was taken by me in

8     shorthand and thereafter reduced to typewriting by

9     me; that said deposition is a true record of the

10    testimony given by said witness; that I am neither

11    counsel for, related to, nor employed by any of the

12    parties to the action in which this deposition was

13    taken; and, further, that I am not a relative or

14    employee of any attorney or counsel employed by the

15    parties hereto, nor financially or otherwise

16    interested in the outcome of this action.

17

18

19                    _____

20                    Misty Klapper
                       Notary Public in and for the
21                    District of Columbia

22

23

24

25

# Exhibit 10

Conditionally Filed Under Seal

1           **IN THE UNITED STATES DISTRICT COURT**
         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
2                 **WESTERN DIVISION**

3 **JENNY LISETTE FLORES, et al,**

4       **Plaintiffs,**

5 **vs.**                **CASE NO.: CV 85-4544 DMG (AGRx)**

6 **LORETTA E. LYNCH, Attorney**
**General of the United States,**
7 **et al,**            **Hon. Dolly M. Gee**
                **United States District Judge**
8       **Defendants.**

9                **\*   \*   \***

10

11                 **CONFIDENTIAL**

12 **DEPOSITION OF:**         **Ritza M█████████████**

13 TAKEN AT INSTANCE OF:    The Defendants

14 DATE:             September 27, 2016

15 PLACE:            United States Attorney's
                  Office
16                   1001 E. Business Highway 98
                  Panama City, Florida
17
  TIME:              3:00 P.M., CST
18

19

20

21

22

23

24

25

1              **APPEARANCES:**

2            **FOR THE PLAINTIFF:**

3              Katherine Manning, Esq.
                 Ms. Annette Kirkham
4              via telephone conference
        The Law Foundation of Silicone Valley
5                152 North Third Street
                     Third Floor
6              San Jose, CA  95112

7            **FOR THE DEFENDANTS:**

8             C. Frederick Sheffield, Esq.
        United States Department of Justice
9                  Civil Division
        Office of Immigration Litigation
10             **District court Section**
        P.O. Box 868, Ben Franklin Station
11            Washington, D.C.  20044

12             **ALSO PRESENT:**

13       Ms. Alicia Madrado, Interpreter

14             - - - - - -

15              **I N D E X**

16   **WITNESS**                          **PAGE**

17   Ritza M█████████████
                   Direct Examination
18                   by Mr. Sheffield       3
                 Cross Examination
19                   by Ms. Manning        35

20   Certificate of Reporter              37

21             **EXHIBIT INDEX**

22   **NUMBER    DESCRIPTION**               **PAGE**

23     1      English version of Declaration    25

24     2      Spanish version of Declaration    26

25

1      The following pages constitutes the Deposition

2  of **RITZA M**▮▮▮▮▮▮▮▮▮▮ taken at the instance of the

3  Plaintiff upon oral examination, taken pursuant to notice at

4  3:00 P.M., C.D.T.,  on the 27th day of September, 2016, in

5  the Office of the United States Attorney, 1001 East Business

6  Highway 98, Panama City, Florida.

7      The Deposition is being taken for the purpose of

8  discovery, use at trial, or for both of the foregoing, or

9  for such other uses and purposes that may be permitted

10  under the applicable and governing rules.  Taken before

11  Floie Lynn Sexton, a Notary Public in and for the State of

12  Florida at Large.

13                          *   *   *

14      MR. SHEFFIELD:  Okay, with that, let's begin, I'll

15  start by just noting, Court Reporter, if you would please

16  designate this deposition as confidential and subject to the

17  Protective Order in this case.

18      COURT REPORTER:  Would you raise your right hand,

19  please?

20      MR. SHEFFIELD:  And we're going to swear in the

21  interpreter.

22      (INTERPRETER SWORN BY THE COURT REPORTER)

23      MR. SHEFFIELD:  And can you swear in the witness

24  at this point too?

25          (WITNESS SWORN BY THE COURT REPORTER)

```
 1              MS. MANNING:  Vague and ambiguous.

 2      Q    You can continue.  Was there a process to check

 3 you in, did anyone speak with you?

 4      A    She was talking to the officer and after thirty

 5 minutes, and he was asking where she came from, what she was

 6 doing and where, what she was supposed to do, and all those

 7 questions he was asking her.  Thirty minutes.

 8      Q    Okay.  Did they ask you for your documents?

 9      A    Yes, and they took them.

10      Q    Okay.  Were you given any type of blanket while

11 you were there?

12      A    No.

13      Q    Were you given anything, which we would call a

14 Mylar blanket, which kind of looks metallic?

15      A    No.

16      Q    Were you given anything at all to help keep you

17 warm?

18      A    She, the only thing that she had was a sweater,

19 and that's how she covered her son because he has asthma.

20      Q    Okay.  So how long after you arrived were you

21 given food to eat?

22      A    She doesn't remember very well.

23      Q    Okay, was it --

24      A    She say it was very late.

25      Q    Okay.  But there was, would you estimate that it
```

```
 1   was before midnight or after midnight or?

 2        A    She don't know.

 3        Q    Okay.  And what did that meal consist of?

 4        A    Okay.  They give her a sandwich that didn't have

 5   anything inside, they didn't give anything to the son, so

 6   she had to share with him.

 7        Q    What do you mean, there was nothing inside?

 8        A    Just a sandwich with nothing inside.  What she

 9   means that it's just bread, and it didn't have anything

10   inside, you know, no meat or something.

11        Q    It was just two pieces of bread?

12        A    Si, yes, two pieces of bread.

13        Q    And how was, can you describe how this was

14   provided to you?

15        A    She doesn't remember.

16        Q    Did someone give it to you or was there a place

17   where you could go get it?

18        A    Okay, he gave it to her.

19        Q    Who?

20        A    An officer, a policeman gave it to her.

21        Q    Okay.  Do you remember how many meals you were

22   provided with while you were in detention total?

23        A    It was only one, it was only two breads that they

24   gave me.

25        Q    So you were only provided with food on one
```

```
 1   instance?
 2        A    Okay.  In the morning, I'm sorry, they, I'm sorry,
 3   they took her to a place that it's like a doggy house,
 4   that's how it is translated and they give her an apple, a
 5   burrito, a cookie and a juice.
 6        Q    So what time about was that?
 7        A    7:00 A.M.
 8        Q    Okay.
 9        A    Okay, wait a minute, she's saying that they get
10   out at 2:00 in the morning and got there at 7:00, so, but
11   you know, that's what she's saying.
12        Q    Okay, so let me clarify.  So you, you checked into
13   the facility at, in the evening, right?
14        A    Okay, she's saying the same day that she got
15   there, since there were so many people, she got sick.
16        Q    Okay.  But let's go back a second.  What time of
17   day was it that you arrived at the first facility?
18        A    7:00 P.M. at night.
19        Q    Okay.  And you stayed at that facility until the
20   next morning?
21        A    Si, yes.
22        Q    And where did you go after that first facility?
23        A    The second, the second part was the doggy house
24   and it is the second place that she went.
25        Q    Okay.  About how long did it take to get from the
```

```
 1    first place to the second place?  Less than --
 2         A    She doesn't know.
 3         Q    -- more or less than two hours?
 4         A    She doesn't remember, she doesn't know either to
 5    tell you.
 6         Q    Okay.
 7         A    Okay.
 8         Q    So when you describe getting a burrito and the
 9    food that you described, was that at the first facility or
10    the second facility?
11         A     Okay, when they gave her the burrito and the
12    apple and cookie, it was in the doggy house.
13         Q    Okay.  How long did you stay there?
14         A    Okay.  She say, I don't know, you know, I couldn't
15    tell you, it was like a day, one day, a complete day.
16         Q    Okay.  And how many times were you provided with
17    food at that place?
18         A    One time.
19         Q    Okay, let's go back to the first place, did your
20    son eat anything at that place?
21         A    Only breast, um hm.
22              MR. SHEFFIELD:  Did you get that?
23              COURT REPORTER:  Only bread?
24              THE INTERPRETER:  Yeah, only breast, I mean, she's
25    breastfeeding.
```

```
 1              COURT REPORTER:  Oh, breast?

 2              MR. SHEFFIELD:  Yeah.

 3              THE INTERPRETER:  I'm sorry.

 4              COURT REPORTER:  Thank you for clarifying.

 5       Q    Were you offered juice or anything to drink?

 6   Again, just to clarify, I'm talking about the first place.

 7       A    No.  Oh, okay, water.  Water.

 8       Q    Okay.

 9       A    Um hm.

10       Q    About how many people were in the room with you at

11   the first place?

12       A    A lot.

13       Q    Can you estimate how many?

14       A    No, she can't.

15       Q    Okay.  You said you had access to drinking water?

16       A    Yes, the ones that, you know, that you push and

17   then you drink, but she say that it taste chlorine.

18       Q    Okay.

19       A    Chlorine, it tasted chlorine.

20              COURT REPORTER:  Chlorine?

21              THE INTERPRETER:  Yes, chlorine.

22       Q    Do you mean it was like a drinking fountain?

23       A    Si, yes, um hm.

24       Q    Okay.  Did you get access to cups or anything like

25   that?
```

```
 1        A    No.

 2        Q    So in order to drink, you would just drink from

 3   the Fountain?

 4        A    Si, yes.

 5        Q    Okay.  Can you describe, was there a bathroom in

 6   the room where you were located in the first facility?

 7        A    There was a bathroom, but it was low, there wasn't

 8   a, you know, a cover or it wasn't private.

 9        Q    Was there any type of wall or anything separating

10   the bathroom from the rest of the room?

11        A    Yes.

12        Q    We need to describe that for the...

13        A    It was a, you know, like I will say six feet.

14        Q    Well, let's, like where on, can you describe how

15   far it comes up to your body?  Say it out loud.  Say it out

16   loud.

17        A    Okay.  To the leg, the beginning of the leg, that

18   was how far it was.  And it wasn't --

19        Q    Was it, did it have, was it one wall or was it two

20   walls, how many of those walls separated the bathroom from

21   the rest of the room?

22        A    Okay, only one, only one.

23        Q    Okay.  Did you have any health problems while you

24   were at the first facility?

25        A    She say yes, I have fever and I have a rash all
```

```
 1    over my body.

 2        Q    When did this start?

 3        A    Okay.  It started the same day about 9:00, she

 4    remembers the time.

 5        Q    9:00 at night or 9:00 in the morning?

 6        A    9:00 at night, P.M.

 7        Q    Okay.

 8        A    When she got there.

 9        Q    Did you tell any of the people, who worked at the

10    facility, about these issues?

11        A    Yes, but they didn't do anything, they didn't give

12    her anything.

13        Q    Okay.

14        A    They didn't give her anything, they didn't give

15    her anything.

16        Q    Did you receive any treatment once you got to the

17    second facility?

18        A    No.

19        Q    Did anyone ever examine you in a medical capacity

20    while you were in either of the two facilities?

21        A    Okay.  When they got there, the only, at the

22    second one, the only thing that they did was to check the

23    son because he has problem breathing, and he has a problem

24    in one of the lungs, and that's, that's what happened, they

25    check him.
```

1          MR. SHEFFIELD:  Okay.  All right, that's all the

2    questions I have.  Yeah, we're done.

3          MS. MANNING:  Okay, I just wanted to ask a couple

4    of clarifications questions.

5          MR. SHEFFIELD:  All right.

6          MS. MANNING:  I know you're in a rush, but...

7          MR. SHEFFIELD:  Well, I'm going to object to

8    clarification questions for the record, but go ahead anyway.

9          MS. MANNING:  Okay.

10                        CROSS EXAMINATION

11   BY MS. MANNING:

12        Q    There were a lot of questions about, about what

13   you were wearing or holding when you crossed the river, and

14   I just wanted to clarify, is it correct that you were

15   wearing your boxer shorts, which are pajamas when you

16   crossed the river and you were holding your pants in your

17   hand?

18        A    Yes.

19        Q    Okay.  And that you were then wearing your boxer

20   shorts in the cell and you asked for dry pants, but they

21   gave you back your wet pants, is that correct?

22        A    Yes.

23        Q    And in terms of the water fountain that you, you

24   said you drank out of the water fountain with your mouth,

25   and that water fountain was attached to the toilet, is that

```
 1   correct?

 2            MR. SHEFFIELD:  I would object based on the fact

 3   that that's not reflected in your testimony or in the

 4   declaration.  I'm not sure where counsel is getting that

 5   assertion.  You can answer it.

 6      A     She say it was near the bathroom, um hm, near the,

 7   you know, where you go to the bathroom, it's nearby.

 8            MR. SHEFFIELD:  Okay.

 9            MS. MANNING:  Okay.  Okay, I don't have any

10   further questions.

11            MR. SHEFFIELD:  All right, thank you, Kate.  I'm

12   going to sign off now.

13            MS. MANNING:  Okay, thank you.

14            MR. SHEFFIELD:  All right, bye-bye.

15            MS. MANNING:  Thank you.

16            THE INTERPRETER:  Thank you.

17                    NO FURTHER EXAMINATION.

18                 (Concluded at 4:30 P.M.)

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF BAY

4        I, Floie Lynn Sexton, a Court Reporter and Notary

5    Public in and for the State of Florida at Large:

6        DO HEREBY CERTIFY that the foregoing transcript was

7    taken before me at the time and place therein

8    designated; that before testimony was taken the witness

9    was duly sworn; that the deposition was taken

10   stenographically and digitally recorded, and thereafter

11   reduced to typewriting; and the foregoing pages numbered

12   three (3) through thirty-six (36) are true and correct to

13   the best of my knowledge and belief.

14       I FURTHER CERTIFY that I am not a relative, employee,

15   attorney or counsel of any of the parties, nor a relative

16   or employee of such attorney or counsel, nor financially

17   interested in the foregoing action.

18       WITNESS my hand and official seal this 3rd day of
     October, 2016.
19

20   _____Floie Lynn Sexton_____

21        Floie Lynn Sexton
          Notary Public - State of Florida
22        My Commission No.  GG 27111
          Expires:  September 6, 2020
23

24

25
```

# Exhibit 11

Conditionally Filed Under Seal

Page 1

1              UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA

2

      ------------------------------:

3   JENNY LISETTE FLORES, et al,  :  NO. Cv 85-4544
                  Plaintiff       :

4                                 :

                  vs.             :

5                                 :

    LORETTA E. LYNCH, Attorney    :

6   General of the United States, :

    Et al.                        :

7                  Defendants     :

      ------------------------------:

8

9                                 Leesport, Pennsylvania

10

                                Tuesday, October 4, 2016

11

12   DEPOSITION OF:

13              CELINA S&#9608;&#9608;&#9608;&#9608;&#9608;

14   called as a witness, pursuant to notice, by counsel

15   for Defendants, held at the Berks County Resitential

16   Center, 1040 Berks Road, Leesport, Pennsylvania,

17   before Suzanne, L. E. Toto, RPR, of Capital

18   Reporting Company, a Notary Public in and for the

19   Commonwealth of Pennsylvania, beginning at

20   approximately 1:16 p.m., when were present on behalf

21   of the respective parties:

22

23

24

25

Page 2

```
 1              A P P E A R A N C E S
 2              ACLU
                BY:  CODY WOFSY, ESQ.
 3              39 Drumm Street
                San Francisco, CA  94111
 4              415-343-0785
                cwofsy@aclu.org
 5                    -- AND --
                CAMBRIA & KLINE
 6              BY:  BRIDGET CAMBRIA, ESQ.
                123 North Third Street
 7              Reading, PA  19601
                484-926-2014
 8               -- For C███████████████
 9              (Via Telephone)
                PETER SCHEY, ESQ.
10              256 Occidental Boulevard
                Los Angeles, CA  90057
11              323-251-3223
                pschey@centerforhumanrights.org
12               -- For Flores Class Action
13              ADRIANA C. ZAMBRANO
                Law Student Intern
14
15              US DEPARTMENT OF JUSTICE CIVIL DIVISION
                BY:  KATHLEEN A. CONNOLLY, ESQ.
16              Ben Franklin Station
                Washington, DC  20044
17              202-305-8627
                kathleen.a.connolly@usdoj.gov
18               -- For The Defendant
19
20
21
22
23
24
25
```

```
 1                    I N D E X
 2                   WITNESSES
 3     ALL WITNESSES:                          PAGE:
 4
         CELINA S_____
 5         Examination by MS. CONNOLLY         4:24
 6
 7
                        EXHIBITS
 8
       CSB NO.:             DESCRIPTION:        PAGE:
 9
10     CSB 1               Exhibit 28 -
                           Conditionally Filed
11                         Under Seal:
                           For Identification   27:15
12
13     (Exhibits attached to transcript)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              P R O C E E D I N G S
 2              MS. CONNOLLY:  All objections except
 3   for the form of a question and privilege will be
 4   reserved until time of trial.
 5              MR. WOFSY:  That's fine.  Want to make
 6   sure we're on the same page.
 7              VERONICA QUIROZ, was duly sworn to
 8   translate English into Spanish and Spanish into
 9   English in the following deposition:
10              CELINA S████████ having been
11   first duly sworn, was examined and testified through
12   the interpreter as follows:
13              MS. CONNOLLY:  Good morning, ma'am.
14              Hi, Peter.  This is Kate Connolly with
15   DOJ.  How are you?
16              MR. SCHEY:  Okay.  How are you?
17              MS. CONNOLLY:  Good.  So we have just
18   sworn in the interpreter and sworn in the witness,
19   and I'm about to begin.  Are you ready?
20              MR. SCHEY:  I am ready, I guess.  For
21   the record I am joining on behalf of the Flores
22   class.
23                        *   *   *
24                      EXAMINATION
25   BY MS. CONNOLLY:
```

Celina S

October 4, 2016

Page 11

```
 1    declaration jurada.  I mean, I'm just an interpreter.

 2    The deposition is the right interpretation or

 3    translation is declaration jurada, but you're

 4    thinking that is confusing?

 5                        MR. WOFSY:  Do you want to go off

 6    the record?

 7                        MS. CONNOLLY:  Yes.

 8                    (Discussion held off the record.)

 9    BY MS. CONNOLLY:

10    Q.          So what's going to happen today in the

11    deposition is that I'm just going to ask you a series

12    of questions.  If there's anything that I ask that

13    you don't understand, please just let me know and we

14    can phrase it a different way.

15    A.          Okay.

16    Q.          Do you speak or understand any English?

17    A.          No.

18    Q.          So the woman, as you know, to your left

19    is your interpreter today.  She is translating

20    everything I say to you and everything you say to me.

21    So just make sure she finishes translating before you

22    respond to her question.

23    A.          Okay.

24    Q.          Now, you took an oath a few minutes ago.

25    Do you recall that?
```

Celina S.                                October 4, 2016

Page 16

1    Q.          And what happened then?

2    A.          They took us.  They ask us to go out of

3    the patrol.  They asked us if we were hungry.  They

4    feed us.

5    Q.          And where was this that they fed you?

6    A.          There at La Hielera.

7    Q.          Okay.  And what did they feed you?

8    A.          Only a piece of bread with mortadella and

9    a juice.

10   Q.          And then what happened?

11   A.          Then after that, they get us in a room

12   where we're going to stay.

13   Q.          Okay.  And so was that the -- that was

14   the first location that the border patrol brought you

15   to, correct?

16   A.          It is correct.

17   Q.          And that was in Texas?

18   A.          Yes.

19   Q.          Do you know where specifically in Texas

20   that was?

21   A.          McAllen.

22   Q.          McAllen?

23   A.          Yes.

24   Q.          Now, you said when you first arrived they

25   gave you the sandwich with mortadella, is that

Celina S.                                           October 4, 2016

                                                        Page 17

1    correct?

2    A.          It is correct.

3    Q.          And did your son get one as well?

4    A.          Yes, also.

5    Q.          And then can you describe for me the room

6    that they put you in?

7    A.          It was a room bigger than this.  Very

8    cold.  There were a lot of people.  Well, there

9    weren't beds or like something to sleep on.  There

10   was an open bathroom, so if you go to the bathroom

11   everybody would see you.  They didn't give us

12   blankets to get warmer.

13   Q.          Okay.  So how many people would you

14   estimate were in the room with you?

15   A.          Well, more or less 50 people.

16   Q.          50 people.  Was it all women and

17   children?

18   A.          Women and children.

19   Q.          And while you were in that room, would

20   you see the officers come by the room pretty

21   regularly?

22   A.          Yes.

23   Q.          And what were they doing when they came

24   by?

25   A.          They look at us, and one of the person

Page 18

1    ask them if they could lower the -- not the heat, the

2    air conditioning because it was very cold.  And we

3    saw that they pointed, but we don't think that they

4    lower it because we still be cold.

5                        MR. WOFSY:  Can I just note for the

6    record, the deponent said air conditioning and the

7    translator was the one who was confused about the

8    wording, whether it was heat or air conditioning.

9                        THE INTERPRETER:  Yes, I got

10   confused with heat and air conditioning.

11   BY MS. CONNOLLY:

12   Q.          So you saw the agents with something in

13   their hand that they were pointing towards the air

14   conditioning?

15   A.          Yes.

16   Q.          Now, let's talk about the food situation

17   for a minute.  How was food distributed or given out

18   to you when you were in that cell?

19   A.          There was a patrol agent, and he comes in

20   every three hours.

21   Q.          Okay.  And what happens when he comes?

22                        THE INTERPRETER:  I couldn't hear

23   it.

24   A.          So he came.  He ask us to go out of the

25   room.  We went in like a line, and they check us.

Celina S.                                    October 4, 2016

Page 19

1    And they were checking us and giving us one

2    mortadella sandwich and one juice.

3    Q.          And you say one, do you mean one for you

4    and one for your son?

5    A.          Yes.

6    Q.          And you said that he came around every

7    three hours or so?

8    A.          Yes, they ask us to go out.

9    Q.          And other than the sandwich you've talked

10   about, did they bring any snacks or juice?

11   A.          No.  They always gave us the same.

12   Q.          So there were never any like any cookies

13   or any snacks given out?

14   A.          Sometimes they gave the kids one cookie

15   and then juice.

16   Q.          This sandwich, did you ever refuse the

17   sandwich?

18   A.          I always took it.

19   Q.          Now, were you ever given any warm food at

20   that first place?

21   A.          No, never.

22   Q.          Now, how often were you and your son

23   given juice?

24   A.          Every three to four hours.

25   Q.          What about the water situation, was there

Case 2:85-cv-04544-DMG-AGR   Document 287-3   Filed 12/06/16   Page 66 of 102   Page ID #:8627

```
 1    water in the room that you were in?

 2    A.          Yes.  There were like cubes -- something

 3    like that with water, but we all use the same glass.

 4    Q.          You had one glass for all of you?

 5    A.          There were two to three glasses, but for

 6    all of us.

 7    Q.          And they didn't have any little like

 8    plastic cups or anything?

 9    A.          No.  I never saw them.

10    Q.          And these cups, were they glass cups,

11    were they plastic, or do you remember?

12    A.          Plastic.

13    Q.          Now, and that jug of water was right in

14    the room with you there?

15    A.          Yes, it was in the room.

16    Q.          Now, can you talk -- you had mentioned a

17    few moments ago the toilet facilities.

18    A.          Yes.

19    Q.          Where in the room was the toilet?

20    A.          Well, the room, it was in the back part.

21    Q.          So it was kind of in the corner?

22    A.          Yes.

23    Q.          Okay.  And what was around the toilet?

24    A.          Well, the other people, what they did is

25    lay down around there.
```

Page 21

```
 1    Q.            Okay.  So you're saying there are people

 2    laying down by the toilet?

 3    A.            Yes.

 4    Q.            So -- but next to the toilet there was a

 5    wall there, correct?

 6    A.            Yes.  There was a wall but a short one.

 7    Q.            Okay.  So let's figure out what that

 8    means by short.

 9    A.            Well, a tall one you don't see anyone.

10    But this one gets to here so that people see us when

11    we went to the bathroom.

12                  MS. CONNOLLY:  So for the record,

13    the witness is pointing to her approximately

14    bellybutton area.

15    A.            So that was the height of the wall.

16    Q.            Okay.  So when you were sitting at the

17    toilet, was your torso covered by the wall?

18    A.            A little bit, not that much.

19    Q.            Okay.  So how much of your torso was

20    covered by the wall?

21                  MR. SCHEY:  I would object to the

22    question.  It's vague and ambiguous because it would

23    obviously depend if -- you know, whether it is for a

24    four-year-old child who is tall or somebody taller,

25    it would be visible to somebody standing up.  It
```

Celina S.                                    October 4, 2016

                                                    Page 32

1    Q.          When did you first learn about Flores?

2    A.          I learn in April.

3    Q.          And where were you -- which facility were

4    you at in April?

5    A.          Here in Berks.

6    Q.          Here at Berks?

7    A.          Berks.

8    Q.          So April 2016 is when you first heard

9    about Flores?

10   A.          Yes.

11   Q.          So now, going back to this first facility

12   when you met with the immigration officer, did they

13   give you any paperwork or information about

14   immigration places?

15                        MR. WOFSY:  Objection.  Vague.

16   Sorry, go ahead.

17   BY MS. CONNOLLY:

18   Q.          About immigration attorneys that may help

19   you?

20   A.          No.

21   Q.          Now, how long were you at that first

22   facility?

23   A.          At La Hielera?

24   Q.          Yes, the first facility.

25   A.          Two days.

Celina Soto                                      October 4, 2016

Page 34

1    Q.          And what did they feed you?

2    A.          Well, they gave us burritos, applesauce,

3    juice and some candies.

4    Q.          And that was for you and also for your

5    son?

6    A.          Yes.

7    Q.          And did you have anything to sleep on?

8    A.          They were like a mattress, like little

9    tiny mattress.

10   Q.          Little tiny mattress?

11                    THE INTERPRETER:  Yes, because

12   (Spanish word spoken) is not a mattress but is a

13   little fluffy.

14   BY MS. CONNOLLY:

15   Q.          And was there water provided to you at

16   this location?

17   A.          Yes.

18   Q.          And toilet facilities as well?

19   A.          Yes, there were -- there was a bathroom.

20   Q.          Now, was your son ever separated from you

21   at this location?

22   A.          No.

23   Q.          And do you remember how many people were

24   in your room with you?

25   A.          More or less, 15.

Page 36

1    us.

2    Q.          Now, when you were at Dilley, you spoke

3    with some immigration folks, is that correct?

4    A.          Yes, it is correct.

5    Q.          And did they give you a list of free

6    legal services?

7                   MR. WOFSY:  I'm going --

8    A.          There, no.

9    Q.          They did not at Dilley give you a list of

10   free legal services?

11   A.          That was after when I went to saw a

12   lawyer.

13   Q.          And was that while you were still at

14   Dilley?

15   A.          Yes.

16   Q.          Okay.  And so you were able to go speak

17   with a lawyer while you were at Dilley?

18   A.          Yes.

19   Q.          And now, when you were at Dilley, the

20   walls of the rooms, did you notice the posters on the

21   walls?

22   A.          Yes, there were.

23   Q.          Do you remember what they were?

24                   MR. WOFSY:  Objection.  That's not

25   the question.

Celina S.

October 4, 2016

Page 37

```
 1    BY MS. CONNOLLY:

 2    Q.          Do you remember what the posters said?

 3                     MR. WOFSY:  Objection.  That's

 4    not -- the interpretation is where the posters were.

 5    The question is what the posters were.

 6                     THE INTERPRETER:  Where or what?

 7    BY MS. CONNOLLY:

 8    Q.          There were posters on the wall.  Do you

 9    remember what they said?

10                     THE INTERPRETER:  Oh, my God.

11    Okay.  I understand where.  I'm sorry.

12    A.          Well, what I remember is the name of any

13    place there was there.

14    Q.          Any place that was there?

15    A.          Well, yes.  For example, where was the

16    visitor room located.

17    Q.          Okay.  Do you remember seeing posters for

18    free legal services posted on the wall?

19    A.          No.  That, no.

20    Q.          And you don't remember getting any sort

21    of list of legal services?

22    A.          When I went with the lawyer, he gave me a

23    list.

24    Q.          The lawyer gave you a list?

25    A.          Yes, a lawyer.
```

```
 1                  C E R T I F I C A T E
 2
 3      I do hereby certify that I am a Notary Public
        in good standing, that the aforesaid testimony
 4      was taken before me, pursuant to notice, at the
        time and place indicated; that said deponent
 5      was by me duly sworn to tell the truth, the
        whole truth, and nothing but the truth; that
 6      the testimony of said deponent was correctly
        recorded in machine shorthand by me and
 7      thereafter transcribed under my supervision
        with computer-aided transcription; that the
 8      deposition is a true and correct record of the
        testimony given by the witness; and that I am
 9      neither of counsel nor kin to any party in said
        action, nor interested in the outcome thereof.
10
11      WITNESS my hand and official seal this 7th day of
        October, 2016.
12
13
14
15      Notary Public
16
17
18
19
20
21
22
23
24
25
```

Celina S█████                                               October 4, 2016

Page 49

```
1    A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3    I, CELINA S█████████  do hereby acknowledge

4    I have read and examined the foregoing pages of

5    testimony, and the same is a true, correct and

6    complete transcription of the testimony given

7    by me, and any changes or corrections, if any,

8    appear in the attached errata sheet signed by me.

9

10

11

12

13

14

15

     _____     _____
16   Date                  CELINA S█████████

17

18

19

20

21

22

23

24

25
```

Page 50

```
 1    Cody Wofsy, Esquire

      American Civil Liberties Union

 2    39 Drumm Street

      San Francisco, CA

 3

      IN RE:  Jenny Lisette Flores v. Loretta Lynch

 4

 5

 6   Dear Mr. Wofsey,

 7          Enclosed please find your copy of the

 8    deposition of CELINA S█████       along with

 9    the original signature page.  As agreed, you

10    will be responsible for contacting the witness

11    regarding signature.

12          Within 30 days of October 10, 2016, please

13    forward errata sheet and original signed signature

14    page to counsel for Plaintiff, Kathleen Connolly.

15       If you have any questions, please do not

16    hesitate to call.  Thank you.

17

18    Yours,

19    Suzanne Toto

      Reporter/Notary

20

21    cc:  Kathleen Connolly, Esquire

22

23

24

25
```

# Exhibit 12

Conditionally Filed Under Seal

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JENNY LISETTE FLORES, et al., )
                                   )
5                     Plaintiffs,  )
                                   )
6            vs.                   )   Case No. 2:85-CV-04544
                                   )
7    JEH JOHNSON, Secretary,       )
     U.S. DEPARTMENT OF HOMELAND   )
8    SECURITY et al.,              )
                                   )
9                     Defendants.  )
     _____)

10

11

12            DEPOSITION OF FRANKLIN ███████████

13

14

15         TAKEN AT:   300 North Los Angeles Street
                       Los Angeles, CA  90012
16
           DATE/TIME:  Thursday, September 22, 2016
17                     3:53 p.m. - 5:10 p.m.

18         REPORTER:   Sharon A. Golding
                       CSR No. 5934
19
           JOB NO.:    35027
20

21

22

23

24

25

                                                            264

```
 1    APPEARANCES:

 2        For Plaintiffs:

 3            CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
              BY:  PETER A. SCHEY, ESQ.
 4            256 South Occidental Boulevard
              Los Angeles, CA  90057
 5            (213) 388-8693
              (Not Present)
 6
          For Defendants:
 7
              U.S. DEPARTMENT OF JUSTICE
 8            CIVIL DIVISION
              OFFICE OF IMMIGRATION LITIGATION
 9            BY:  LAUREN FASCETT, ESQ.
              BY:  COLIN A. KISOR, ESQ.
10            BY:  SARAH L. VUONG, ESQ.
              P.O. Box 878
11            Ben Franklin Station
              Washington, DC  20044
12            (202) 532-4281

13        For the Witness:

14            ORRICK, HERRINGTON & SUTCLIFFE LLP
              BY:  ELENA GARCIA, ESQ.
15            2050 Main Street, Suite 1100
              Irvine, CA  92614-8255
16            (949) 567-7738

17        Also Present:

18            Ivonne Marie Padro, Spanish Interpreter
              Cert No. 301749
19            Raquel Somorriba

20

21

22

23

24

25
```

FRANKLIN                          September 22, 2016

```
 1                    I N D E X

 2      Witness                        Examination

 3   Franklin

 4         By Ms. Fascett                    4, 42
           By Ms. Garcia                       39
 5

 6

 7

 8                  E X H I B I T S

 9   Identification                          Page

10     1 - Declaration                        25

11

12

13

14            INFORMATION REQUESTED

15                  (None)

16

17

18

19      QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

20                  (None)

21

22

23

24

25
```

| 15:04 | 1 | Los Angeles, California; Thursday, September 22, 2016 |
| | 2 | 3:53 p.m. |
| | 3 | * * * |
| | 4 | |
| 15:04 | 5 | (Whereupon, IVONNE MARIE PADRO was duly |
| | 6 | sworn as the English-Spanish interpreter.) |
| | 7 | |
| | 8 | FRANKLIN ███████ |
| | 9 | having been first duly sworn, was examined and testified |
| 15:04 | 10 | as follows: |
| | 11 | |
| | 12 | EXAMINATION |
| | 13 | BY MS. FASCETT: |
| | 14 | Q    Good afternoon, Franklin. |
| 15:53 | 15 | MS. GARCIA:  I'm sorry. |
| | 16 | We ask that the questioning be limited to an |
| | 17 | hour because he is a minor, and it has been a long day |
| | 18 | for him.  I don't know if you guys agree to that. |
| | 19 | MS. FASCETT:  I'm not going to agree to any |
| 15:53 | 20 | limitation, but let's see how he's doing in an hour, and |
| | 21 | we can certainly discuss it. |
| | 22 | Q    My name is Lauren Fascett.  I'm an attorney |
| | 23 | with the Department of Justice.  I'm going to ask you a |
| | 24 | series of questions that you're under oath to provide a |
| 15:54 | 25 | full and complete answer. |

| 15:56 | 1 | we did in the last case where we did the translation and |
|---|---|---|
| | 2 | we got that certified.  You have a copy to look at. |
| | 3 | MS. FASCETT:  So you're handing me a translated |
| | 4 | version of his statement. |
| 15:57 | 5 | MS. GARCIA:  Yeah. |
| | 6 | MS. FASCETT:  Did you provide this to Franklin and |
| | 7 | his mother? |
| | 8 | MS. GARCIA:  Yes. |
| | 9 | MS. FASCETT:  So this is the version he reviewed |
| 15:57 | 10 | with his mother today? |
| | 11 | MS. GARCIA:  Yes. |
| | 12 | MS. FASCETT:  Because I don't have a translated |
| | 13 | version.  That's why I was asking. |
| | 14 | Q    So I want to ask you some specific questions |
| 15:57 | 15 | about your time in the Customs and Border Patrol |
| | 16 | facilities when you first came to the United States. |
| | 17 | So you were apprehended by immigration |
| | 18 | officials on January 22nd, 2016; is that correct? |
| | 19 | A    Yes. |
| 15:57 | 20 | Q    And who was with you at that time? |
| | 21 | A    My mother. |
| | 22 | Q    Anyone else? |
| | 23 | A    No. |
| | 24 | Q    And what happened when you were apprehended? |
| 15:58 | 25 | A    They took us to a detention center.  They call |

| | | | |
|---|---|---|---|
| 15:58 | 1 | | it "the ice box." |
| | 2 | Q | And who is "they"? |
| | 3 | A | The people from immigration, from the border |
| | 4 | | patrol. |
| 15:58 | 5 | Q | They took you to the border station? |
| | 6 | A | Yes. |
| | 7 | Q | And you said they call it "the ice box." |
| | 8 | | Who is "they" in that statement? |
| | 9 | A | The people that work there at that location. |
| 15:58 | 10 | Q | So the border patrol agents called it "the ice |
| | 11 | | box"? |
| | 12 | A | No. |
| | 13 | Q | So who did you hear call it "the ice box"? |
| | 14 | A | The people that were there in that same room. |
| 15:59 | 15 | Q | The other immigrants? |
| | 16 | A | Yes. |
| | 17 | Q | Did you ever hear anyone else call it "the ice |
| | 18 | | box"? |
| | 19 | A | No. |
| 15:59 | 20 | | (Mr. Kisor entered the deposition room |
| | 21 | | at 3:59 p.m.) |
| | 22 | Q | BY MS. FASCETT:  And how long were you at the |
| | 23 | | McAllen border station? |
| | 24 | A | Like, two days. |
| 15:59 | 25 | Q | Do you remember what time you arrived there? |

FRANKLIN                              September 22, 2016

```
15:59    1      A    It was around, like, 7:00 o'clock in the

         2    morning or 6:00.

         3      Q    Around 7:00 o'clock in the morning that you

         4    arrived at the border station?

16:00    5      A    It's that we're right there very early in the

         6    morning.

         7      Q    So what time were you apprehended, if you

         8    remember?

         9      A    Twenty-two, but it was, like, 3:00 or

16:00   10    4:00 o'clock in the morning.

        11      Q    Can you please describe for me the area that

        12    you were in at the McAllen border station.

        13      A    It was a closed room.  It was very cold.  There

        14    was only one cement bench and lots of minors.  Couldn't

16:01   15    sleep.

        16      Q    You said "lots of minors."

        17           About how many minors?

        18      A    Like, 15 or 20 minors.

        19      Q    And what ages were they, if you know?

16:01   20      A    Fifteen to sixteen years old.

        21      Q    Were there any adults in the area with you?

        22      A    No.

        23      Q    Did you receive a blanket?

        24      A    No.

16:01   25      Q    Did you receive anything to keep warm?
```

| | | | |
|---|---|---|---|
| 16:01 | 1 | A | No. |
| | 2 | Q | Can you tell me about the toilet facilities? |
| | 3 | A | It was a toilet, and it didn't have a seat |
| | 4 | where you sit down.  It was not very clean, and they |
| 16:02 | 5 | only had a sink. |
| | 6 | Q | Okay.  So there was a sink in the bathroom? |
| | 7 | A | Yes.  No paper or anything to wash. |
| | 8 | Q | Was there any soap? |
| | 9 | A | No. |
| 16:02 | 10 | Q | Was there any hand sanitizer? |
| | 11 | A | No. |
| | 12 | Q | Was there a wall around the toilet area? |
| | 13 | A | Yes.  There was a wall about this high |
| | 14 | (indicating). |
| 16:02 | 15 | Q | For the record, you're holding your hand up |
| | 16 | about three feet, would you say? |
| | 17 | A | Yes. |
| | 18 | Q | Okay.  I want to ask you about the food |
| | 19 | situation. |
| 16:02 | 20 | | Were you given food? |
| | 21 | A | Yes. |
| | 22 | Q | What did you receive? |
| | 23 | A | First it was -- they gave us a cookie, and then |
| | 24 | later on bread with ham.  And for dinner, another |
| 16:03 | 25 | cookie. |

FRANKLIN                          September 22, 2016

| | | | |
|---|---|---|---|
| 16:03 | 1 | Q | Did they provide any other meals? |
| | 2 | A | No. |
| | 3 | Q | Did you eat the food that they gave you? |
| | 4 | A | Yes. |
| 16:03 | 5 | Q | And were you provided with a jug of water? |
| | 6 | A | There they had a jug of water, but they only |

had one cup.

8       Q    Can you explain that more.

9       A    They only had one cup for everyone that was

16:04   10   there, and I only drank water once from that cup.

11      Q    Okay.  What was the cup made of?

12      A    It was, like, paper.

13      Q    Did you ever ask for another cup?

14      A    No.

16:04   15   Q    Were you free to access the water at any time?

16      A    Yes.

17      Q    You said you used the cup to drink water one

18   time; correct?

19      A    Yes.

16:04   20   Q    Is it fair to say you had the opportunity to

21   drink more water if you had wanted?

22      A    Yes.

23      Q    And how was your health during this time?

24      A    The next day I was feeling, like, really bad,

16:05   25   very tired and dizzy.

FRANKLIN                                    September 22, 2016

16:06    1        A    All this part and all this area (indicating), I

         2    got spots because of the cold.

         3        Q    Did you seek medical treatment for that

         4    condition?

16:07    5        A    Not at that place.

         6        Q    Okay.  I want to clarify.

         7              You said you had spots from the cold on your

         8    cheeks?

         9        A    Yes.

16:07   10        Q    Before you were apprehended, did you have any

        11    medical problems?

        12        A    No.

        13        Q    You said you did not notify anyone at the

        14    McAllen border station about your skin.

16:07   15        A    Yes.

        16        Q    Yes, you did not tell anyone?

        17        A    Not at that place, but yes to the next place

        18    that we were detained, the following place.

        19        Q    Okay.  When you were taken to the McAllen

16:07   20    border station, was your mother with you?

        21        A    No.

        22        Q    Do you know where she was?

        23        A    No.

        24        Q    So the next day on January 23rd, you were

16:08   25    transferred to the Ursula facility; is that correct?

Case 2:85-cv-04544-DMG-AGR  Document 297-3  Filed 12/06/16  Page 86 of 102  Page ID
#:8847

| | | | |
|---|---|---|---|
| 16:08 | 1 | A | No. |
| | 2 | Q | Okay.  Tell me where you were taken next. |
| | 3 | A | To a place they call it "the dog cages." |
| | 4 | Q | Who is "they"? |
| 16:08 | 5 | A | I don't know. |
| | 6 | Q | Why do they call it "the dog cages"? |
| | 7 | A | It is a very big place, and they have a lot of |
| | 8 | | youth people there in different cells. |
| | 9 | Q | And who did you hear say "the dog cages"? |
| 16:09 | 10 | A | The minors.  The same minors that were there. |
| | 11 | Q | So what time did you arrive at that facility? |
| | 12 | A | Like, in the morning. |
| | 13 | Q | Okay.  And do you remember how long you were |
| | 14 | | there? |
| 16:09 | 15 | A | No. |
| | 16 | Q | Were you given a meal when you arrived at that |
| | 17 | | facility? |
| | 18 | A | Yes. |
| | 19 | Q | And what were you given? |
| 16:10 | 20 | A | An apple and, like, a taco.  Like, a burrito. |
| | 21 | Q | Okay.  And were you served another meal later |
| | 22 | | that day? |
| | 23 | A | Yes. |
| | 24 | Q | Can you tell me about what time that was and |
| 16:10 | 25 | | what you received? |

| | | |
|---|---|---|
| 16:14 | 1 | A    No. |
| | 2 | Q    So earlier you said that you did not tell |
| | 3 | anyone at the border station about the spots on your |
| | 4 | skin, but that you did tell someone later. |
| 16:14 | 5 | When and who did you tell? |
| | 6 | A    I told that to one of the persons that were |
| | 7 | there, but that person only just told me, "Just wash |
| | 8 | your face." |
| | 9 | Q    So you told someone -- a border patrol agent? |
| 16:14 | 10 | A    To the guards that they were taking care of us |
| | 11 | at the second location. |
| | 12 | Q    Okay.  And were you able to wash your face? |
| | 13 | A    Yes. |
| | 14 | Q    Okay.  Was there soap available? |
| 16:15 | 15 | A    No. |
| | 16 | Q    Were there paper towels? |
| | 17 | A    Yes. |
| | 18 | Q    Were you given a toothbrush? |
| | 19 | A    Yes. |
| 16:15 | 20 | Q    And can you describe the setup of the bathroom. |
| | 21 | A    They were, like, portable bathrooms, and they |
| | 22 | were very clean. |
| | 23 | Q    Was there a wall surrounding these bathrooms? |
| | 24 | A    No. |
| 16:16 | 25 | Q    Was it in a separate room? |

| 16:16 | 1 | A | Yes. |

| | 2 | Q | So there was privacy? |

| | 3 | A | Yes. |

| | 4 | Q | Did you receive a blanket at the second |

16:16    5    facility?

| | 6 | A | Yes. |

| | 7 | Q | Did you need it? |

| | 8 | A | Yes. |

| | 9 | Q | Can you describe the temperature? |

| 16:16 | 10 | A | Cold. |

| | 11 | Q | Was your mother at this facility with you? |

| | 12 | A | Yes. |

| | 13 | Q | How did you know she was there? |

| | 14 | A | Because they transported us together. |

| 16:16 | 15 | Q | And was she in the same area as you? |

| | 16 | A | No. |

| | 17 | Q | Where was she, if you know? |

| | 18 | A | I don't know. |

| | 19 | Q | Okay.  Can you describe the area that you were |

16:17    20    kept in.

| | 21 | A | It was a very spacious area, and they gave us a |

22    blanket.

| | 23 | Q | Were there mats provided? |

| | 24 | | THE INTERPRETER:  Let me inquire. |

| 16:17 | 25 | | THE WITNESS:  Okay.  Like a mat, yeah.  A mattress. |

FRANKLIN                              September 22, 2016

| | | | |
|---|---|---|---|
| 16:17 | 1 | Q | BY MS. FASCETT:  Were you able to sleep? |
| | 2 | A | Yes. |
| | 3 | Q | Were there other people in the cell with you? |
| | 4 | A | Yes. |
| 16:17 | 5 | Q | And how many? |
| | 6 | A | Ten. |
| | 7 | Q | And who were they? |
| | 8 | A | I don't know.  Minors. |
| | 9 | Q | About what age? |
| 16:18 | 10 | A | Fifteen, sixteen years old. |

11    Q    Were you ever afraid of any of the other

12  minors?

13    A    No.

14    Q    At the second facility, did you ever feel

16:18  15  unsafe?

16    A    No.

17    Q    Were you ever afraid of any of the guards?

18    A    Yes.

19    Q    Why?

16:18  20    A    Because one time when they took us so we could

21  sit down to make a line, one of them scolded me really

22  bad.

23    Q    How did he scold you?

24    A    He told me that I was an immigrant, for me to

16:19  25  be grateful and appreciate this opportunity that I was

FRANKLIN ████████, September 22, 2016

| | | | |
|---|---|---|---|
| 16:24 | 1 | Q | Who else? |
| | 2 | A | Two other families. |
| | 3 | Q | Were you ever afraid of the other families? |
| | 4 | A | No. |
| 16:25 | 5 | Q | At some point did an immigration official give |
| | 6 | you a document explaining your rights? |
| | 7 | A | No. |
| | 8 | Q | Did any of the government officials explain |
| | 9 | your rights? |
| 16:25 | 10 | A | No. |
| | 11 | Q | Did anyone ask you about any family you have in |
| | 12 | the United States? |
| | 13 | A | No. |
| | 14 | Q | Did you ever tell anyone that you had relatives |
| 16:25 | 15 | in the United States? |
| | 16 | A | No. |
| | 17 | Q | And is it correct that you do have an uncle in |
| | 18 | the United States? |
| | 19 | A | Yes. |
| 16:26 | 20 | Q | Okay.  But you didn't tell any government |
| | 21 | official about your uncle? |
| | 22 | A | No. |
| | 23 | Q | I want to ask you about your declaration |
| | 24 | specifically. |
| 16:26 | 25 | | I'm going to have the redacted declaration |

| | | | |
|---|---|---|---|
| 16:40 | 1 | A | Group. |
| | 2 | Q | What did he say? |
| | 3 | A | "Get up."  For us to get up.  Not to be sitting |
| | 4 | | down on the floor. |
| 16:40 | 5 | Q | Anything else? |
| | 6 | A | No. |
| | 7 | Q | I want to clarify. |
| | 8 | | Were you ever physically touched by the agents |
| | 9 | | in an oppressive manner? |
| 16:41 | 10 | A | No. |
| | 11 | Q | Why did you not mention any guards speaking |
| | 12 | | harshly in your declaration? |
| | 13 | A | I don't know. |
| | 14 | Q | You're not in any detention now; correct? |
| 16:41 | 15 | A | No. |
| | 16 | Q | So the last place you were at was the Karnes |
| | 17 | | facility. |
| | 18 | A | Yes. |
| | 19 | Q | And how long were you there again? |
| 16:41 | 20 | A | Like, around 15 days. |
| | 21 | Q | And then what happened on the 15th day when you |
| | 22 | | were released? |
| | 23 | A | They called us.  They took us to a room, and |
| | 24 | | they just called my uncle and told him to come and pick |
| 16:42 | 25 | | us up. |

FRANKLIN ████████████, September 22, 2016

| 16:54 | 1 | A   To be able to obtain political asylum. |
| | 2 | Q   I wanted to ask you again about the spots |
| | 3 | that -- you said you had your spots at the first border |
| | 4 | station. |
| 16:55 | 5 | Did they hurt? |
| | 6 | A   No. |
| | 7 | Q   Was it, like, dry skin? |
| | 8 | A   Yes. |
| | 9 | Q   And when did they first develop? |
| 16:55 | 10 | A   When we started being there at the ice box. |
| | 11 | Q   And why do you think they came?  From the cold; |
| | 12 | is that right? |
| | 13 | A   Yes. |
| | 14 | Q   So did they go away as soon as you weren't cold |
| 16:55 | 15 | anymore? |
| | 16 | A   Yes. |
| | 17 | Q   I have a question about your declaration. |
| | 18 | In paragraph 14, regarding the last sentence, |
| | 19 | it says: |
| 16:56 | 20 | "I think the only reason I have been |
| | 21 | treated so inhumanely is so the U.S. |
| | 22 | immigration authorities can use me and other |
| | 23 | detained minors as an example to convince |
| | 24 | other young people facing violence and even |
| 16:56 | 25 | death in El Salvador to stay home, deal with |

| 16:56 | 1 | the violence, risk death, but don't come |
| | 2 | here for protection." |
| | 3 | What made you think that? |
| | 4 | A    Because of the reason that there were some of |
| 16:57 | 5 | the minors that they were detained for over a month. |
| | 6 | Q    Okay.  And when you say they were using the |
| | 7 | experience as an example to deter others, are those your |
| | 8 | words? |
| | 9 | A    Yes. |
| 16:57 | 10 | Q    Okay.  And so you say that was based on the |
| | 11 | fact that you knew other minors who were detained for a |
| | 12 | month's time? |
| | 13 | A    Yes. |
| | 14 | Q    Was there any other reason? |
| 16:58 | 15 | A    Because also by being there for a month or such |
| | 16 | a long time will make you go back to your country and |
| | 17 | not be there for that long time. |
| | 18 | Q    And to clarify, you were at the Karnes facility |
| | 19 | for 15 days; is that correct? |
| 16:58 | 20 | A    Where? |
| | 21 | Q    The Karnes facility. |
| | 22 | A    Yes. |
| | 23 | Q    And you were at the first border station for |
| | 24 | barely a day? |
| 16:59 | 25 | A    Two. |

FRANKLIN                              September 22, 2016

17:01    1    any redirect.

         2        MS. GARCIA:  Yeah, I do.  I know it's been a long

         3    questioning, but I have a few more questions for him.

         4

17:01    5                        EXAMINATION

         6    BY MS. GARCIA:

         7        Q    You said that you were at McAllen, you think,

         8    for two days.

         9        A    Yes.

17:01   10        Q    And were you able to sleep those days?

        11        A    No.

        12        MS. GARCIA:  Okay.  Was he given any -- he testified

        13    that there was no blanket.

        14            Was there anything else that he could sleep

17:01   15    with?

        16        THE WITNESS:  No.

        17        MS. GARCIA:  Could he lay down?

        18        THE WITNESS:  No.

        19        MS. GARCIA:  Why not?

17:02   20        THE WITNESS:  There were too many people.

        21        MS. GARCIA:  Could he sit?

        22        THE WITNESS:  No.

        23        MS. GARCIA:  Was it like that the whole two days?

        24        THE WITNESS:  Yes.

17:02   25        Q    BY MS. GARCIA:  So you couldn't even rest by

| | | |
|---|---|---|
| 17:02 | 1 | sitting? |
| | 2 | A    No. |
| | 3 | Q    And were you cold the whole two days that you |
| | 4 | were there? |
| 17:02 | 5 | A    Yes. |
| | 6 | Q    And did you feel you had enough privacy using |
| | 7 | the toilet? |
| | 8 | A    No. |
| | 9 | Q    The attorney here said you have -- you |
| 17:03 | 10 | mentioned here in your declaration about some statements |
| | 11 | that your mom made to you. |
| | 12 | A    Yes. |
| | 13 | Q    You had an opportunity to talk to your mother |
| | 14 | in Karnes before you made this declaration? |
| 17:03 | 15 | A    Yes. |
| | 16 | Q    So you guys shared all your experiences. |
| | 17 | A    Yes. |
| | 18 | Q    Okay.  Now I'm going to ask a couple of |
| | 19 | questions about the declaration itself and how it was |
| 17:04 | 20 | taken. |
| | 21 | A    Okay. |
| | 22 | MS. GARCIA:  Did the attorney who took the |
| | 23 | declaration at any time tell him what had to go in the |
| | 24 | declaration? |
| 17:04 | 25 | THE WITNESS:  No. |

| | | |
|---|---|---|
| 17:04 | 1 | Q    BY MS. GARCIA:  Did she ever put words in your |
| | 2 | mouth? |
| | 3 | A    No. |
| | 4 | Q    And you had the chance to read it and agreed |
| 17:04 | 5 | with everything in the declaration before you signed it? |
| | 6 | I'm sorry.  Can I strike that. |
| | 7 | MS. GARCIA:  I meant to say that the attorney read |
| | 8 | it to him, and he agreed with everything she read to |
| | 9 | him? |
| 17:05 | 10 | MR. KISOR:  We don't mind, but you objected before |
| | 11 | as to leading. |
| | 12 | MS. GARCIA:  Okay. |
| | 13 | MR. KISOR:  We don't mind. |
| | 14 | MS. GARCIA:  Well, can he answer the question? |
| 17:05 | 15 | THE INTERPRETER:  Can you repeat the question. |
| | 16 | MS. GARCIA:  Can you repeat my question. |
| | 17 | (The record was read.) |
| | 18 | THE WITNESS:  Yes. |
| | 19 | MS. GARCIA:  Give me one minute, please. |
| 17:06 | 20 | Q    Were you at any point in your detention told |
| | 21 | about your rights as a minor under Flores? |
| | 22 | A    No. |
| | 23 | MS. GARCIA:  Those are all the questions. |
| | 24 | MS. FASCETT:  We can go off the record for a second. |
| 17:07 | 25 | (Discussion held off the record.) |

```
17:07    1         MS. FASCETT:  Okay.  We can go back on the record.

         2         Q    I want to clarify one of the questions that

         3    your attorney asked you.

         4

17:07    5                        FURTHER EXAMINATION

         6    BY MS. FASCETT:

         7         Q    You said that you were not able to lay down or

         8    sit at the McAllen border station.

         9              So are you saying that you stood for two days?

17:07   10         A    Kneeled.

        11         Q    You kneeled.

        12         A    Stoop, squat, crouch.

        13         MR. KISOR:  He can demonstrate if he wants to.

        14         MS. GARCIA:  Is that necessary?

17:08   15         THE INTERPRETER:  Crouch down.

        16         Q    BY MS. FASCETT:  So were you at all sitting?  I

        17    guess I'm a little confused.

        18         MS. GARCIA:  Objection.  Asked and answered.

        19         Q    BY MS. FASCETT:  Were you able to sit in any

17:08   20    way?

        21         A    No.

        22         Q    You said that your mother and you were trying

        23    to get apprehended by the immigration officials.

        24         A    Yes.

17:08   25         Q    When or how did you learn that you could turn
```

FRANKLIN                                    September 22, 2016

| | | |
|---|---|---|
| 17:10 | 1 | (Whereupon, the deposition was |
| | 2 | concluded at 5:10 p.m.) |
| | 3 | |
| | 4 | * * * |
| 17:10 | 5 | |
| | 6 | I declare under penalty of perjury under the |
| | 7 | laws of the State of California that the foregoing is |
| | 8 | true and correct.  Executed this _____ day of _____, |
| | 9 | 2_____, at _____, California. |
| 17:10 | 10 | |
| | 11 | _____ |
| | | WITNESS SIGNATURE |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1                 Certificate of Person Reading

 2                  Deposition To Witness

 3

 4          I, _____, a

 5     _____ interpreter, having interpreted the

 6     testimony contained in the foregoing deposition from

 7     English into Spanish and the corrections that are made

 8     thereon were made through me by the witness translating

 9     from Spanish into English.

10          I certify under penalty of perjury that I well

11     and truly translated from English into Spanish and

12     Spanish into English the foregoing deposition.

13          Executed at _____, California,

14     this _____ day of _____ 2016.

15

16               _____

17               Signature of Interpreter

18               _____

19               First and Last Name Printed

20          _____

21               Address

22               _____

23               Telephone

24

25
```

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF LOS ANGELES   )

 3

 4                    REPORTER'S CERTIFICATE

 5

 6          I, Sharon Amy Golding, Certified Shorthand

 7   Reporter No. 5934, do hereby certify:

 8          That, prior to being examined, Franklin

 9   Castillo Somorriva, the witness in the foregoing

10   deposition was by me duly sworn to testify to the truth,

11   the whole truth and nothing but the truth;

12          That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to print by means of computer-aided

15   transcription under my direction, and the same is a

16   true, correct and complete transcript of said

17   proceedings;

18          I further certify that I am neither counsel

19   for, nor related to any party to said action, nor in any

20   way interested in the outcome thereof;

21          In witness whereof, I have hereunto subscribed

22   my name this 25th of September, 2016.

23

24          _____

            Sharon Amy Golding, CSR No. 5934
25
```

1

2   DATED: December 5, 2016                   Respectfully submitted,

3                                             CENTER FOR HUMAN RIGHTS &
4                                             CONSTITUTIONAL LAW
                                              Peter A. Schey
5                                             Carlos Holguín

6

7
                                              ORRICK, HERRINGTON & SUTCLIFFE LLP
8                                             T. Wayne Harman
9                                             Elena García

10                                            LA RAZA CENTRO LEGAL, INC.
11                                            Michael Sorgen
                                              Amanda Alvarado Ford
12

13                                            LAW FOUNDATION OF SILICON VALLEY -
                                              LEGAL ADVOCATES FOR CHILDREN &
14                                            YOUTH
15                                            Jennifer Kelleher Cloyd
                                              Katherine H. Manning
16                                            Kyra Kazantzis
17                                            Annette Kirkham

18                                            Of counsel:

19                                            YOUTH LAW CENTER
20                                            Alice Bussiere
                                              Virginia Corrigan
21

22                                            /s/__Peter Schey_____
23   / / /                                    Attorneys for Plaintiffs

24

25

26

27

28

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On December 6, 2016 I electronically filed the following document(s):

- **Plaintiffs EXHIBITS 9-12 [PART 3 OF 6]**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/  *Peter Schey*
*Attorney for Plaintiffs*