CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org


ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| Plaintiffs, | ) |
| - vs - | ) PLAINTIFFS' EXHIBITS 13-18 [PART 4 OF 6] |
| | ) |
| JEH JOHNSON, SECRETARY, U.S. | ) Hearing: January 30, 2017 |
| DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) |
| Defendants. | ) |

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

INDEX OF EXHIBITS

1.  Declaration of Stephen Manning…………………………………………...…………... 1

2.  Deposition of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. – Transcript Excerpts……………………………………………………………………… 10

3.  Deposition of Chief Patrol Agent – El Centro Sector, CBP, Rodney Scott – Transcript Excerpts……………………………………………………………….……………… 36

4.  Deposition of Chief Patrol Agent – Tucson Sector, CBP, Paul Beeson – Transcript Excerpts……………………………………………………………...…………… 59

5.  Deposition of Chief Patrol Agent – Laredo Sector, CBP, Mario Martinez – Transcript Excerpts……………………………………………………….……………… 77

6.  Deposition of Karnes Assistant Field Office Director, Enforcement and Removal Operations, ICE, Juanita Hester – Transcript Excerpts…………………………………………..… 101

7.  Deposition of Dilley Assistant Field Office Director, Enforcement and Removal Operations, ICE, Valentin de la Garza – Transcript Excerpts…………………………………….. 121

8.  Deposition of Berks Assistant Field Office Director, Enforcement and Removal Operations, ICE, Joshua Reid – Transcript Excerpts………………………………………….....… 149

9.  Deposition of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller – Transcript Excerpts……………………………….…………… 193

10. Deposition of Class Member Mother Ritza Mxxx xxxxxxx – Transcript Excerpts………………………………………………………………………… 230

11. Deposition of Class Member Mother Celina Sxxxxxx-xxxx – Transcript Excerpts………………………………………………………………………… 244

12. Deposition of Class Member Franklin Rxxxx xxxxxxxxxx– Transcript Excerpts………………………………………………………………………… 263

13. Deposition of Class Member Mother Karina Vxxxx xxxxxxx – Transcript Excerpts……………………………………………………………….…………… 289

14. Deposition of Class Member Mother Lindsay Gxxxx xxxxx – Transcript Excerpts………………………………………………………………………… 316

15.  Deposition of Class Member Mother Mirna Mxxxxxx xxxxx – Transcript Excerpts………………………………………………………………………… 341

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16. Deposition of Class Counsel Peter Schey – Transcript Excerpts……………………….……. 361

17. Deposition of Class Member Mother Sara Exxxxxxxx xxxxx – Transcript
    Excerpts……………………………………………….…………………………………….. 381

18. Deposition of Class Member Yeslin Lxxxx xxxxxxx – Transcript
    Excerpts…..……………………………………………………………………………….. 399

19. Deposition of Class Member Mother Yessenia Exxxxxxxx xxxxxxx –
    Transcript Excerpts…………...…………………………………………………………….418

20. Deposition of Class Member Mother Zulma Mxxxxxxx xxxxxxx –
    Transcript Excerpts……………………………………………………………………….. 432

21. Deposition of Attorney Bridget Cambria  – Transcript Excerpts…………………….…….458

22. Deposition of Attorney Amanda Doroshow – Transcript Excerpts………………….…..... 467

23. Deposition of Attorney Robyn Barnard – Transcript Excerpts…………………………….476

24. Deposition of Attorney Edward McCarthy – Transcript Excerpts…………………..…..…505

25. Deposition of Jacqueline Kline – Transcript Excerpts…………………………………… 528

26. Declaration of Attorney Robert Doggett……………………………………..…………….537

27. Declaration of Chapman Noam……………………………………………..………… 543

# Exhibit 13

Conditionally Filed Under Seal

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2       FOR THE CENTRAL DISTRICT OF CALIFORNIA

    -----------------------------:

 3  JENNY LISETTE FLORES, et al.,:

                                 :

 4                   Plaintiffs,:

                                 :

 5       vs.                     :NO. Cv 85-4544

                                 :

 6  LORETTA E. LYNCH, Attorney   :

                                 :

 7  General of the United States,:

                                 :

 8  et al.,                      :

                                 :

 9                   Defendants.:

    -----------------------------:

10

11                         Alexandria, Virginia

12                   Wednesday, September 28, 2016

13  Deposition of:

14            KARINA V█████████

15  called as a witness, pursuant to notice, by counsel

16  for Defendants, held at the Offices of Justin W.

17  Williams U.S. Attorney's Building, 2100 Jamieson

18  Ave., Alexandria, VA, befoer Amy Sikora, RPR, CRR,

19  CLR, of Capital Reporting Company, a Notary Public

20  in and for the Commonwealth of Virginia, beginning

21  at aproximately 11:58 a.m., when were present on

22  behalf of the respective parties:
```

Kanna M.

September 28, 2016

Page 2

```
 1              A P P E A R A N C E S

 2    ON BEHALF OF THE U.S. DEPARTMENT OF JUSTICE:

 3        KATHRYNE M. GRAY, ESQUIRE

 4        U.S. Department of Justice

 5        District Court Section

 6        P.O. Box 868

 7        Ben Franklin Station

 8        Washington, DC 20044

 9        kathryne.m.gray@usdoj.gov

10

11        ELIANIS N. PÉREZ, ESQUIRE

12        U.S. Department of Justice

13        P.O. Box 868

14        Ben Franklin Station

15        Washington, DC 20044

16        elianisperez@usdoj.gov

17        202-616-9124

18

19

20

21

22
```

 1                  A P P E A R A N C E S

 2                      (Continued)

 3         SARAH L. VUONG, ESQUIRE

 4         U.S. Department of Justice

 5         P.O. Box 878

 6         Ben Franklin Station

 7         Washington, DC 20044

 8         sarah.l.vuong@usdoj.gov

 9         202-532-4281

10

11

12

13

14

15

16

17

18

19

20

21

22

Karina V█████                                                      September 28, 2016

Page 4

1                    A P P E A R A N C E S

2                      (Continued)

3    ON BEHALF OF NONPARTY WITNESS KARINA V████

4    ████████

5        SHIRA RENEE ZEMAN, ESQUIRE

6        Zeman and Petterson, PLLC

7        105 E. Annandale Road, Suite 212

8        Falls Church, Virginia 22046

9        szeman@zpimmigration.com

10       703-991-6761

11

12

13

14

15

16

17

18

19

20

21

22

Karina V█████████                                    September 28, 2016

                                                                  Page 5

 1    September 28, 2016

 2                    C O N T E N T S

 3    EXAMINATION OF KARINA V████  ████████        PAGE

 4    By MS. GRAY                                        6

 5

 6                    E X H I B I T S

 7    V████  ████████                                PAGE

 8      1    copy of V████  ████████              79

 9           declaration in English, three

10           pages

11      2    copy of V████  ████████              88

12           declaration in Spanish, four

13           pages

14

15    (Exhibits attached to transcript)

16

17

18

19

20

21

22

Page 6

```
 1              P R O C E E D I N G S

 2    Whereupon,

 3                  VERA WILKERSON,

 4    a Spanish language interpreter, having been

 5    first duly sworn by the Notary Public

 6    (Amy E. Sikora-Trapp), solemnly swore to

 7    interpret the proceedings from English to

 8    Spanish, Spanish to English.

 9                     - - -

10              P R O C E E D I N G S

11    Whereupon,

12                  KARINA V█████  ████████

13    having been first duly sworn by the Notary

14    Public (Amy E. Sikora-Trapp), was examined

15    and testified, through the interpreter, as

16    follows:

17                EXAMINATION BY COUNSEL

18        FOR THE U.S. DEPARTMENT OF JUSTICE

19    BY MS. GRAY:

20            Q.    Good morning.  My name is

21    Kathryne Gray.  I'm an attorney with the

22    United States Department of Justice.  And
```

Karina V. 1                                    September 28, 2016

Page 22

1    night?

2            A.     I think so.

3            Q.     Okay.  And was your son with

4    you the entire time?

5            A.     Yes.

6            Q.     And what happened when you

7    first arrived at the border patrol station?

8            A.     Okay.  They took all our

9    belongings and they put us in a cold room.

10           Q.     Did anyone speak to you about

11   what would happen to you when you first

12   arrived?

13           A.     No.

14           Q.     Were you given any paperwork

15   or forms to fill out?

16           A.     No.

17           Q.     Did you eventually go to sleep

18   that night?

19                  THE INTERPRETER:  Go what?

20                  MS. GRAY:  Go to sleep.

21           Q.     Did you eventually sleep?

22           A.     Yes.

Karina ███████                                    September 28, 2016

```
 1           Q.     And where were you taken to
 2    sleep?
 3           A.     On the floor.
 4           Q.     And can you describe the room
 5    where you were taken?
 6           A.     It was a large room, similar
 7    to this one.  There were a few windows with
 8    glasses, and there were kind of concrete
 9    seats.
10           Q.     There were chairs?
11           A.     No.
12           Q.     Benches?
13           A.     Only concrete seats.
14           Q.     And why do you call it the
15    icebox?
16           A.     Because it's very cold.
17           Q.     About how many people would
18    you say were in the room with you?
19           A.     Many women.  More than 50.
20           Q.     Were there more or less
21    children than women?
22           A.     Only women with children.
```

Karina V.                          September 28, 2016

Page 25

1   bigger than 20 by 10.

2                   MS. GRAY:   Can we update the

3   record with that information?   So we will

4   update the record with the information on

5   the size of this room.

6                   MS. PÉREZ:   On this exact

7   size.

8           Q.    Now, in the room was there

9   enough space for everyone to lay down to

10  sleep?

11          A.    Yes.

12          Q.    And where did you sleep in the

13  room?

14          A.    On the floor.

15          Q.    And can you explain the

16  arrangement of the bathroom?   Was it in the

17  room or was it separate?

18          A.    Inside the room.

19          Q.    Was the toilet blocked off by

20  anything?

21                  THE INTERPRETER:   You mean

22  walls?

Karina V.                                    September 28, 2016

                                                        Page 26

 1                   MS. GRAY:  No, just anything.

 2          A.     A short wall.

 3          Q.     Was there a door to the

 4    toilet?

 5          A.     No.

 6          Q.     How many toilets were in the

 7    room?

 8          A.     Three or four.

 9          Q.     Did the bathrooms have sinks?

10                 THE INTERPRETER:  Have what?

11                 MS. GRAY:  Sinks, a sink.

12                 THE WITNESS:

13          A.     (Witness in English):  No.

14                 THE INTERPRETER:  To wash

15    hands?

16                 MS. GRAY:  Yes.

17          A.     No sink to wash the hands.

18          Q.     Did you have access to a sink

19    in that first station?

20          A.     No, I didn't.

21          Q.     Okay.  Were you given anything

22    to sleep with?

Karina V. ██████████                                    September 28, 2016

```
 1              A.    They gave me an aluminum
 2    sheet.
 3              Q.    And did they give your son an
 4    aluminum sheet as well?
 5              A.    They gave him nothing.
 6              Q.    Did they give you the sheet to
 7    share?
 8              A.    Yes.  To share with my son.
 9              Q.    Can you describe the floor of
10    the room where you slept?
11              A.    Just concrete.
12              Q.    Was it clean or dirty?
13              A.    Dirty.
14              Q.    How do you mean?  How was it
15    dirty?
16              A.    Dirty.  Like a soil from
17    outside.
18              Q.    Was there trash on the floor?
19              A.    No.
20              Q.    Now, how long after your
21    arrival at the first border patrol station
22    were you and your son first offered food to
```

Karina V.                                    September 28, 2016

Page 28

1   eat?

2          A.     About two hours after we

3   arrived.

4          Q.     And what type of food was

5   offered you to in that first meal?

6          A.     A sandwich with frozen ham.

7          Q.     What do you mean by "frozen

8   ham"?

9          A.     Very cold, and there was kind

10  of ice under the bread.

11         Q.     Could you chew the ham?

12         A.     Yes, because I was very

13  hungry.

14         Q.     And was your son also given a

15  sandwich?

16         A.     Yes.

17         Q.     And when were you and your son

18  offered the next meal?

19         A.     I don't remember.  Maybe three

20  or four hours later.

21         Q.     Maybe when you woke up you

22  were offered a meal?

1           Q.    And would you say that you had

2    three meals each day that you were there?

3           A.    I don't remember.

4                 MS. PÉREZ:  Sorry, I don't

5    think that that was the -- the translation

6    was three meals each day, not three meals

7    during the time that you were there.  So it

8    was if she got three meals each day that she

9    was --

10                THE INTERPRETER:  Each day.

11                (Question reasked by the

12          interpreter.)

13          A.    I don't remember.

14          Q.    Do you remember what type of

15   food your next meal after the ham sandwich

16   was?

17          A.    The same thing.  Just the same

18   thing.

19          Q.    Were you ever provided

20   anything other than a sandwich?

21          A.    A little glass of juice, the

22   cookie.

Karine V.                                    September 28, 2016

1              Q.     Were you and your son offered

2       juice and cookies?

3              A.     Yes.

4              Q.     Did you ever request more

5       food?

6              A.     Yes.  I did.

7              Q.     When did you request more

8       food?

9              A.     When I arrived, and they gave

10      me some food, I ate and I ask for some more.

11             Q.     What did they tell you?

12             A.     That there wasn't.

13             Q.     Did you ask for another

14      sandwich?

15             A.     Yes.

16             Q.     Did you ask for more food any

17      other time while you were at the border

18      patrol station?

19             A.     Yes.

20             Q.     When was that?

21             A.     After the first time they gave

22      me food.

1            MS. ZEMAN:  "I don't remember"

2    at the end.  She was just clarifying she

3    didn't remember at the end.

4            A.    I don't remember if it was

5    after the first time they gave me food.

6            Q.    Okay.  But you only asked for

7    food one time or multiple times?

8            A.    Just once.

9            Q.    Okay.  And how many times

10   during the entire time you were at the

11   border patrol station were you offered

12   snacks?

13           A.    Never.

14           Q.    But you just told us that you

15   and your son were given cookies and juice;

16   correct?

17           A.    The glass of juice and the

18   cookie or cracker came at the same time with

19   the sandwich.

20           Q.    Ah, okay.  So you were never

21   given food in between the meals with the

22   sandwiches?

1              A.    No.

2              Q.    Did you ever request

3   additional food in between meals?

4              A.    Only the first time.

5              Q.    And can you explain your

6   access to drinking water while you were at

7   the border patrol station?

8                    THE INTERPRETER:  Okay.

9              A.    They had big gallons of water

10  and we could get water from there.

11             Q.    Did you have continuous access

12  to that water?

13                   THE INTERPRETER:  Ah, okay.

14             A.    What happened is that the

15  little glasses were over, and then people

16  had to use the little bottle that came with

17  juice to put water inside to drink.

18                   MS. PÉREZ:  So they run out.

19             Q.    So did you always~-- did you

20  throw away your cup each time you got water?

21             A.    Most of the times there

22  weren't little glasses, so I used the same

1    bottle.

2              Q.    But were you originally

3    provided or were you ever provided a little

4    glass?

5              A.    Once they did.

6              Q.    Did you throw away that one

7    glass?

8              A.    Other people used the same

9    glass.

10             Q.    So you shared~--- sorry.  Let

11   me rephrase.

12                   Was the glass a plastic clear

13   cup?

14                   THE INTERPRETER:  Beg your

15   pardon?

16             Q.    Was it a plastic clear cup?

17                   THE INTERPRETER:  Like this?

18                   MS. GRAY:  Yes.

19             A.    It was a kind of triangle

20   glass made of paper.

21             Q.    And did you share your

22   triangular glass with people that you did

Karina V[redacted]                              September 28, 2016

                                              Page 35

1   not know?

2           A.    Yes.

3           Q.    How many people did you share

4   your cup with?

5           A.    I don't remember.

6           Q.    Was it more than one other

7   person?

8           A.    Yes.

9           Q.    And when you say a big barrel

10  of water, do you mean the ones where you

11  push down to get the water?

12          A.    Yes.  They had a little~--

13                THE INTERPRETER:  How can I

14  say?

15                MS. ZEMAN:  Spout.

16          A.    Yeah.  A little thing you can

17  press and get the water.

18          Q.    Okay.  And so were there also

19  water fountains or just that barrel of

20  water?

21          A.    Only the big gallons.

22          Q.    And just to clarify, you could

Page 36

1   always go and get the water from the barrel?

2          A.    Yes.

3          Q.    Do you remember anything in

4   particular about how the water tasted?

5          A.    Yes.  I remember.  It has~--

6   it tasted chloro.

7                MS. GRAY:  Chlorine?

8                THE INTERPRETER:  I don't know

9   if it is~--

10               MS. PÉREZ:  Chloro?

11               MS. VUONG:  Bleach.

12         A.    Clorox.  It tasted like

13   Clorox.

14               MS. VUONG:  Bleach.

15         Q.    Was the barrel where you got

16   the water, could you see through it or what

17   color was it?

18         A.    It was kind of orange.

19         Q.    And did you ever request any

20   other type of water?

21         A.    I took that water only once

22   because I didn't like it.

 1              Q.    And when you say "only once,"

 2    do you mean only once in the first day that

 3    you were there at the border patrol station?

 4              A.    Yes.  I didn't like the water

 5    taste.

 6              Q.    Did you request that the

 7    officers provide you with any other type of

 8    water, though?

 9              A.    I didn't, but other women did

10    because they wanted other water for the

11    children.

12              Q.    You did not request other

13    water for your son or you~-- sorry.  Let me

14    rephrase.

15                    Did your son drink out of the

16    big barrel of water?

17              A.    Yes, and he got sick.

18              Q.    Can you explain how he got

19    sick?

20                    THE INTERPRETER:  How he got

21    sick?

22              A.    He got diarrhea.

1          Q.     And how soon after you arrived

2     did he get diarrhea?

3          A.     When we arrived and they gave

4     us food, we ate and he also drank that

5     water, and then diarrhea started.

6          Q.     So did it start the night that

7     you arrived or the next day?

8          A.     At the night we arrived.

9          Q.     So was it past midnight when

10    you arrived at the first border patrol

11    station?

12              THE INTERPRETER:  Past

13    midnight.

14         A.     Yes.

15         Q.     And did you request medical

16    care for your son?

17              THE INTERPRETER:  Okay.

18         A.     They took us to a doctor that

19    was right there, and he gave him Pedialyte.

20              THE INTERPRETER:  I don't know

21    this name.

22         Q.     Pedialyte?

Page 43

```
 1            Q.    Okay.

 2                  MS. PÉREZ:  Excuse me one

 3   second.

 4                  (Discussion off the record.)

 5            Q.    Were you taken to any other

 6   location after the first one?

 7            A.    Yes.

 8            Q.    Did your son stop having

 9   diarrhea before you were taken to that

10   second location?

11                  THE INTERPRETER:  May I use

12   another words?

13                  MS. GRAY:  Yes.

14                  THE INTERPRETER:  Okay.

15                  MS. PÉREZ:  That's her belief.

16   That's what she said.

17            A.    What happen is that we stopped

18   eating because we were afraid that food was

19   causing the diarrhea.  So we stopped eating.

20                  MS. PÉREZ:  So he stopped the

21   diarrhea.

22            Q.    Okay.
```

Karina V.                                    September 28, 2016

                                                    Page 54

1           A.     Toilet tissues.

2                  MS. PÉREZ:  Toallas or towels.

3                  THE INTERPRETER:  If you use

4     the word in English, it's rugs.

5                  MS. PÉREZ:  (Speaking to the

6     witness in Spanish).  Baby wipes.

7           A.     Baby wipes.

8                  MS. VUONG:  Can we do that

9     again.

10                 MS. GRAY:  Okay.

11          Q.     So why did you ask the

12    cleaning woman for a drink for your son?

13          A.     Because I was desperate.  In

14    my desperation, I saw her and I saw she was

15    a woman.  And she told me that she would

16    prefer that my son die with diarrhea before

17    she gave me something.

18          Q.     Did she say that in English or

19    Spanish?

20          A.     In Spanish.

21          Q.     And did you ever tell an

22    officer that she told you that?

1          A.    I also don't remember because

2    I didn't have how to check the time.

3          Q.    Okay.  At any point when you

4    were in custody with border patrol, did you

5    receive a document explaining your rights or

6    your son's rights?

7          A.    No.

8          Q.    Is it possible that the rights

9    were posted on the wall of the detention

10   center?

11         A.    No.  There was anything -- or

12   maybe.  I don't remember.

13              MS. VUONG:  She said, I didn't

14   see anything.

15         A.    I can't remember seeing

16   anything.

17              MS. GRAY:  Did she say

18   probably?

19              MS. VUONG:  Probablemente.

20         A.    Yeah, probably.

21         Q.    Okay.  So they were probably

22   posted on the wall?

1              C E R T I F I C A T E

2          I do hereby certify that I am a

3    Notary Public within and for the Commonwealth

4    of Virginia in good standing; that the

5    aforesaid testimony was taken before me,

6    pursuant to notice, at the time and place

7    indicated; that KARINA V███ ██████ was by

8    me duly sworn to tell the truth, the whole

9    truth, and nothing but the truth; that the

10   testimony of said deponent was correctly

11   recorded in machine shorthand by me and

12   thereafter transcribed under my supervision

13   with computer-aided transcription; that the

14   deposition is a true and correct record of the

15   testimony given by the witness; and that I am

16   neither of counsel nor kin to any party in said

17   action, nor interested in the outcome thereof.

18          WITNESS my hand and official seal

19   this 8th

20

             AMY E. SIKORA-TRAPP, RPR, CRR, CLR

21                 Notary Public

      within and for the Commonwealth of Virginia

22   My Commission expires:  4/30/17

Page 107

1                              Flores v. Lynch

2                         KARINA V███  ████████

3           ACKNOWLEDGMENT OF DEPONENT

4           I, _____, do

5    hereby certify that I have read the

6    foregoing pages and that the same is a

7    correct transcription of the answers given

8    by me to the questions therein propounded,

9    except for the corrections or changes in

10   form or substance, if any, noted in the

11   attached Errata Sheet.

12

13   _____        _____

14      DATE                  SIGNATURE

15

16   Subscribed and sworn to before me this

17   _____ day of _____, 2016.

18

19   My commission expires:  _____

20   _____

21   Notary Public

22   PA2447771

# Exhibit 14

Conditionally Filed Under Seal

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   JENNY LISETTE FLORES, et al., )
                                  )
5                    Plaintiffs,  )
                                  )
6             vs.                 )   Case No. 2:85-CV-04544
                                  )
7   JEH JOHNSON, Secretary,       )
    U.S. DEPARTMENT OF HOMELAND   )
8   SECURITY et al.,              )
                                  )
9                    Defendants.  )
    _____)

10

11

12            DEPOSITION OF LINDSAY ███████████

13

14

15          TAKEN AT:   300 North Los Angeles Street
                        Los Angeles, CA  90012
16
            DATE/TIME:  Thursday, September 22, 2016
17                      1:16.m. - 3:01 p.m.

18          REPORTER:   Sharon A. Golding
                        CSR No. 5934
19
            JOB NO.:    35027
20

21

22

23

24

25

```
 1    APPEARANCES:

 2        For Plaintiffs:

 3            CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
              BY:  PETER A. SCHEY, ESQ.
 4            256 South Occidental Boulevard
              Los Angeles, CA  90057
 5            (213) 388-8693
              (Not Present)

 6        For Defendants:

 7
              U.S. DEPARTMENT OF JUSTICE
 8            CIVIL DIVISION
              OFFICE OF IMMIGRATION LITIGATION
 9            BY:  LAUREN FASCETT, ESQ.
              BY:   COLIN A. KISOR, ESQ.
10            BY:  SARAH L. VUONG, ESQ.
              P.O. Box 878
11            Ben Franklin Station
              Washington, DC  20044
12            (202) 532-4281

13        For the Witness:

14            ORRICK, HERRINGTON & SUTCLIFFE LLP
              BY:  ELENA GARCIA, ESQ.
15            2050 Main Street, Suite 1100
              Irvine, CA  92614-8255
16            (949) 567-7738

17        Also Present:

18            Ivonne Marie Padro, Spanish Interpreter
              Cert No. 301749
19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2      Witness                        Examination

 3   Lindsay ████████████

 4        By Ms. Fascett                         5
          By Ms. Garcia                         39
 5

 6

 7

 8                  E X H I B I T S

 9   Identification                          Page

10     1 - Declaration                        23

11

12

13

14              INFORMATION REQUESTED

15                    (None)

16

17

18

19       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

20                  Page     Line

21                   27        1
                     28       11
22                   28       16

23

24

25
```

```
12:40   1        Los Angeles, California; Thursday, September 22, 2016

        2                         1:16 p.m.

        3                         * * *

        4

12:40   5           (Whereupon, IVONNE MARIE PADRO was duly

        6        sworn as the English-Spanish interpreter.)

        7

        8                      LINDSAY ████████████

        9   having been first duly sworn, was examined and testified

12:40  10                      as follows:

       11

       12        THE INTERPRETER:  Ivonne Padro, certification number

       13   301749.

       14        MS. FASCETT:  So this marks the beginning of the

13:16  15   deposition of Lindsay ████████████ in the case of Flores

       16   versus United States Attorney General.

       17           And you have the case number?

       18        THE REPORTER:  Yes.

       19        MS. FASCETT:  Today's date is September 22nd, and

13:17  20   we're on the record at about 1:20 p.m.

       21           Today's deposition is being taken on behalf of

       22   the defendant, the Attorney General, at the

       23   U.S. Attorney's Office, 300 North Los Angeles Street,

       24   Suite 7516, Los Angeles, California.

13:17  25           Would the court reporter please swear in the
```

| 13:20 | 1 | Q     And did you review any documents? |
| | 2 | A     Only my declaration. |
| | 3 | Q     Okay.  And did you talk to anyone else besides |
| | 4 | your attorney here? |
| 13:20 | 5 | A     No. |
| | 6 | Q     Okay.  So you said that you came to the U.S. on |
| | 7 | January 31st; correct? |
| | 8 | A     Yes. |
| | 9 | Q     And when you were first apprehended, you spent |
| 13:21 | 10 | some time at the Customs and Border Protection patrol |
| | 11 | station in the McAllen station; is that right? |
| | 12 | A     I don't remember if it was McAllen because |
| | 13 | first they took me to a place to -- to cold place and -- |
| | 14 | MS. GARCIA:  Sorry to interrupt.  That's an ice box. |
| 13:21 | 15 | THE INTERPRETER:  Ice box. |
| | 16 | THE WITNESS:  They were ice box because at a certain |
| | 17 | place they had children detained, and in a separate |
| | 18 | place they had the adults. |
| | 19 | Q     BY MS. FASCETT:  So the ICE records say that it |
| 13:22 | 20 | was the McAllen border station. |
| | 21 | A     When I arrive at a place and before the |
| | 22 | attorneys came to talk to us just to ask us what was the |
| | 23 | experience, and they called it -- |
| | 24 | MS. GARCIA:  The dog cages. |
| 13:22 | 25 | THE WITNESS:  -- "the dog cages."  And this happened |

LINDSAY                                September 22, 2016

| 13:22 | 1 | when we were already at those dog cages where it was |
| | 2 | more comfortable. |
| | 3 | Q     BY MS. FASCETT:  So starting with the very |
| | 4 | first place you went, the border station, I believe, how |
| 13:22 | 5 | long -- if you remember, how long were you at the first |
| | 6 | place? |
| | 7 | A     Twenty-four hours. |
| | 8 | Q     Okay.  And did you have any family members with |
| | 9 | you? |
| 13:23 | 10 | A     My daughter, three years old. |
| | 11 | Q     And what is her name? |
| | 12 | A     Kenia J███████ |
| | 13 | Q     And so can you describe more specifically the |
| | 14 | conditions just at that first place. |
| 13:23 | 15 | A     I'm sorry if you look at me, and my tears come |
| | 16 | out. |
| | 17 | That was the first experience -- this was the |
| | 18 | first experience ever since I left Honduras. |
| | 19 | We arrived at 11:30 to a very cold place, and |
| 13:24 | 20 | they had some cement benches.  The bathroom was divided |
| | 21 | only by a wall.  There wasn't any privacy.  You didn't |
| | 22 | have a place where you could brush your teeth, no soap. |
| | 23 | They gave us a very thin blanket, which they |
| | 24 | didn't cover that much.  We were -- there were lots of |
| 13:24 | 25 | people, lots of kids, and they were crying.  Those |

| | | |
|---|---|---|
| 13:24 | 1 | people, they treat us really bad.  Throughout the time |
| | 2 | passed by, the temperature got colder.  There was a time |
| | 3 | at 4:00 o'clock in the morning that my daughter couldn't |
| | 4 | sleep anymore, and I just had to wrap her with my shirt. |
| 13:25 | 5 | And then I had to put her feet between my legs because |
| | 6 | they were turning blue.  I had to reiterate the fact |
| | 7 | that she had a rash and I requested help, and she got |
| | 8 | worse when she was inside. |
| | 9 |     Q     So I'm sorry. |
| 13:25 | 10 |         Did she have the rash before you got into the |
| | 11 | facility? |
| | 12 |     A     Yes.  But it wasn't that bad. |
| | 13 |     Q     And so did you ask for medical help? |
| | 14 |     A     Yes. |
| 13:26 | 15 |     Q     And what happened? |
| | 16 |     A     Nothing. |
| | 17 |     Q     So no -- |
| | 18 |     A     They ignored me totally. |
| | 19 |     Q     They didn't give you any help? |
| 13:26 | 20 |     A     No. |
| | 21 |     Q     Okay. |
| | 22 |     A     They just took me out of the cell just to give |
| | 23 | a statement and take my fingerprint.  And on occasion |
| | 24 | they wanted for me to sign my deportation. |
| 13:26 | 25 |     Q     You'd said that there was a toilet facility |

| 13:26 | 1 | with a wall. |
| | 2 | How high was the wall? |
| | 3 | A    Like this.  Like this (indicating).  You will |
| | 4 | sit down, and this part was open (indicating). |
| 13:26 | 5 | Q    So you're holding your hand up about four feet. |
| | 6 | A    It was low.  It wasn't high. |
| | 7 | MS. GARCIA:  Yeah.  I would say three to four feet. |
| | 8 | THE WITNESS:  Yes. |
| | 9 | Q    BY MS. FASCETT:  And there was a sink in the |
| 13:27 | 10 | bathroom? |
| | 11 | A    You will drink water from that same sink. |
| | 12 | Q    Was it a water fountain? |
| | 13 | A    (Witness nods head.) |
| | 14 | Q    Was that your only source of water? |
| 13:27 | 15 | A    Yes. |
| | 16 | Q    Did they give you a jug or bottle of water? |
| | 17 | A    No, of course not.  Just some strawberry juice |
| | 18 | and said they will give those to you and they will give |
| | 19 | you a sandwich. |
| 13:27 | 20 | Q    Let's talk about food. |
| | 21 | What did they give you for food? |
| | 22 | A    Two slices of bread with a slice of mortadella, |
| | 23 | strawberry juice, and to my daughter, a cracker. |
| | 24 | Q    Do you remember when you first received food? |
| 13:28 | 25 | A    The first one is when I arrived, and the second |

```
13:28    1    one, it was around 6:00 o'clock.  That's my estimate

         2    because they didn't have a clock, and I didn't know what

         3    time it was.

         4        Q    And did they give you --

13:28    5        MS. GARCIA:  I'm sorry.  She also talked about the

         6    windows.  She maybe missed it.

         7        THE INTERPRETER:  She didn't say anything about a

         8    window.

         9        THE WITNESS:  Everything is enclosed.  No windows.

13:29   10        Q    BY MS. FASCETT:  Did you receive any other food

        11    later that evening?

        12        A    Another sandwich.

        13        Q    Do you know what time that was?

        14        A    I would not be able to tell you the time

13:29   15    because you didn't have a clock.  Everything was

        16    enclosed, and you don't even know if it's daylight or

        17    nighttime.

        18        Q    And did you spend the night at that location?

        19        A    Yes.

13:29   20        Q    Did you get food the next morning?

        21        A    It was not until I arrived to Ursula where they

        22    call it, like, "the dog cage."  I think it was very

        23    early in the morning, and she was telling me that she

        24    was very hungry, my daughter.

13:29   25        Q    Okay.  I'm going to ask you another question
```

LINDSAY                    September 22, 2016

```
13:31    1        A     No.

         2        Q     Do you remember how many times she got juice

         3   and cookies?

         4        A     Twice.

13:32    5        Q     And you said that there was a water fountain in

         6   the bathroom.

         7              Was there any other water source in the room?

         8        A     No, only that one.  That one and for the boys

         9   where the kids were.

13:32   10        Q     Was your daughter with you in the same area the

        11   whole time?

        12        A     Oh, yes, of course.  I would have never allowed

        13   for her to be somewhere else.

        14        Q     And you said that you did receive a blanket of

13:32   15   some sort?

        16        A     It was like aluminum.

        17        Q     If you had to guess the temperature, what do

        18   you think it was?

        19        MS. GARCIA:  Objection.  Calls for speculation.

13:33   20        THE WITNESS:  The temperature of my blanket or if it

        21   will cover me from the cold weather?  They were not very

        22   large.  It would not cover me completely.

        23        Q     BY MS. FASCETT:  Okay.

        24        A     And at the beginning, yes, it will warm me up.

13:33   25   But throughout the time, the temperature kept going
```

LINDSAY                    September 22, 2016

```
13:33    1   lower and lower and lower to the point that my daughter

         2   became bluish because of the cold weather.

         3        Q    And when you noticed your daughter was turning

         4   bluish, as you said, did you ask for medical treatment

13:34    5   at that point?

         6        A    No one.  We were just basically ignored all the

         7   time.  They would just open -- they would just open the

         8   door, call the person, give us whatever they were going

         9   to give us or call the person for us to go out and give

13:34   10   a statement.

        11        Q    So you weren't able to report her turning blue

        12   to any medical staff.

        13        A    No, I wasn't able.  The only thing that I was

        14   able to do as a mother at that time, it was just protect

13:35   15   her, cover her with my shirt and put her legs in between

        16   my legs.  And that was the only thing I was able to do.

        17        Q    And then the next morning you were moved to

        18   another facility; is that correct?

        19        A    Yes.  They made changes, like, around 9:50 to

13:35   20   that other place, Ursula.  That was the dog cages.

        21        Q    Why do you call it "the dog cages"?

        22        A    That's how they call it.  It is a better place

        23   than the ice box.  But that was the only time that my

        24   daughter was able to eat, like, a meal -- a hot meal.

13:35   25        Q    You said they call it "the dog cages."
```

| | | |
|---|---|---|
| 13:40 | 1 | has to do with any material disputed facts. |
| | 2 | THE WITNESS: Yeah, because my experience, the worst |
| | 3 | one was when I was at the ice box. That's where they |
| | 4 | will treat us really bad. |
| 13:40 | 5 | Q BY MS. FASCETT: I understand. |
| | 6 | Can you describe the condition of the cell you |
| | 7 | were kept in at Ursula. |
| | 8 | A They had mattresses there. I was able to sleep |
| | 9 | and rest for a little bit. Not that much because there |
| 13:41 | 10 | were all kinds of people. There were lots of people |
| | 11 | there. |
| | 12 | MS. GARCIA: I'm sorry. She did not say that she |
| | 13 | could sleep. |
| | 14 | THE INTERPRETER: She said she could -- |
| 13:41 | 15 | THE WITNESS: I spent almost two nights without |
| | 16 | sleeping. I was able to lean and rest. The place was |
| | 17 | really cold, and I was able to sit in a corner there. |
| | 18 | And there were a lot of benches -- concrete benches. |
| | 19 | And there were a lot of women there that were pregnant |
| 13:42 | 20 | too. Lots of kids. |
| | 21 | Q BY MS. FASCETT: Are you talking about the |
| | 22 | first location or the second location? |
| | 23 | A The ice box, the first one. My ugliest |
| | 24 | experience was there. It was -- in my entire journey, |
| 13:42 | 25 | that was my most horrible experience that I had. |

| | | |
|---|---|---|
| 13:42 | 1 | Q    I understand that. |
| | 2 | I want to talk about the second location for a |
| | 3 | minute; okay? |
| | 4 | Can you describe the conditions at the second |
| 13:42 | 5 | location. |
| | 6 | A    They're better than the first one. |
| | 7 | Q    How was it better? |
| | 8 | THE INTERPRETER:  I need to inquire. |
| | 9 | THE WITNESS:  They had mattress that you were able |
| 13:43 | 10 | to sit down, rest, and they will give you another |
| | 11 | blanket like the other kind, the aluminum other one. |
| | 12 | And I said it was better because of the food. |
| | 13 | Q    BY MS. FASCETT:  Did you sleep at all at the |
| | 14 | second location? |
| 13:43 | 15 | A    No.  My daughter was able to sleep.  Not me. |
| | 16 | Because we were all mixed up there.  And I was just |
| | 17 | protecting my daughter because you never know the type |
| | 18 | of people who's there. |
| | 19 | Q    Who else was in the cell with you? |
| 13:44 | 20 | A    Like, ten other women with children. |
| | 21 | Q    Were there any toys? |
| | 22 | A    No. |
| | 23 | Q    Was there access to water? |
| | 24 | A    Yes. |
| 13:44 | 25 | Q    And how could you drink water? |

LINDSAY                   September 22, 2016

| | | | |
|---|---|---|---|
| 13:44 | 1 | A | Bottles.  They will give us bottles. |
| | 2 | Q | So you had water available? |
| | 3 | A | We will ask for them. |
| | 4 | Q | And when you asked, they would give you water? |
| 13:44 | 5 | A | We'll wait for ten minutes, but they will bring |

them to us.

7    Q    Can you tell me about the toilet facilities.

8    A    Well, I would not be able to tell you anything

9  about the bathrooms because I wasn't able to use them

13:44  10  while I was there.  They didn't even give me the

11  opportunity to take a shower.  Only the minors that they

12  were from 14 years old to 18 years old, they were able

13  to take a shower and watch TV.

14    Q    Okay.  When you said you weren't able to use

13:45  15  the bathroom, are you saying you weren't allowed to go

16  to the bathroom or you didn't have to go to the

17  bathroom?

18    A    I didn't have the urge of going to the

19  restroom.  They were portable restrooms.

13:45  20    Q    Was there a sink?

21    A    Yes, right there.

22    Q    Do you know if there was soap?

23    A    I have no idea.  I didn't use them.

24    Q    You said that you received a burrito, an apple,

13:46  25  hot Cheetos.  When you arrived, you were fed.

LINDSAY                 September 22, 2016

| | | |
|---|---|---|
| 13:46 | 1 | Did you receive food again later that day? |
| | 2 | A    Yes. |
| | 3 | MS. GARCIA:  Objection. |
| | 4 | Where did you get the Cheetos? |
| 13:46 | 5 | MS. FASCETT:   She testified to it. |
| | 6 | THE WITNESS:  Like potato chips.  Cheetos.  Hot |
| | 7 | Cheetos.  Like we call it in our country. |
| | 8 | Q    BY MS. FASCETT:  Like a snack bag. |
| | 9 | A    It's a small snack. |
| 13:47 | 10 | Q    Were there snacks available in the room? |
| | 11 | A    Only they will give that to us when they will |
| | 12 | give us the meal. |
| | 13 | Q    Did they give you lunch that day? |
| | 14 | A    They only gave it to me twice.  It was at |
| 13:47 | 15 | 11:00, at 4:00 o'clock p.m. before we left, and they |
| | 16 | gave us in the bus too. |
| | 17 | Q    So you ate on the bus there.  You ate once you |
| | 18 | arrived at some point, and then again later that |
| | 19 | afternoon? |
| 13:47 | 20 | THE INTERPRETER:  Okay.  I have to inquire about |
| | 21 | that because I thought she said at 11:00, at 4:00 and |
| | 22 | when they left in the bus. |
| | 23 | THE WITNESS:  At 11:00, at 4:00 and at 7:00, but the |
| | 24 | meal that was given at 7:00, it was in the bus. |
| 13:48 | 25 | Q    BY MS. FASCETT:  Where was that bus going? |

| 13:48 | 1 | A | Rancho Dilley, Texas. |

13:48    1      A    Rancho Dilley, Texas.

         2      Q    Did you have any medical problems while you

         3    were there?

         4      A    Where, in Texas?

13:48    5      Q    At Ursula.

         6      A    No.  They wouldn't check us out.  They didn't

         7    treat us -- they don't pay attention to us.  I don't

         8    know how to explain it.  It's a weird thing.

         9      Q    Were you personally experiencing any medical

13:48   10    issues?

        11      A    No.  I was just tired.  My daughter, yes.

        12      Q    I want to turn your attention to when an

        13    attorney came to talk to you at the Ursula facility.

        14           Do you remember someone coming to talk to you?

13:49   15      A    Yes.  Three ladies and a guy.  The guards

        16    called us, and we were told that they wanted to talk to

        17    us regarding how we were treated there, if they gave us

        18    the opportunity -- they asked us if we had the

        19    opportunity to talk to an attorney, that we were

13:50   20    entitled to have one call to an attorney.  And,

        21    obviously, we didn't.  We didn't have the opportunity to

        22    that.

        23      Q    Did the attorney explain the Flores case to you

        24    at all?

13:50   25      A    No.

| 13:57 | 1 | Q | Do you speak a little bit of English? |

```
13:57    1        Q    Do you speak a little bit of English?

         2        A    No.

         3        Q    Or understand any English?

         4        A    No.  I've only been here for six months.  Just

13:57    5   "good morning," "good night" and "hi" with the

         6   neighbors.  No English.  I have to go to school.

         7        Q    When you made this declaration, did the

         8   attorney explain that you might be called as a witness?

         9        A    Yes, but I never thought that I would come here

13:58   10   because six months went by, and it was not until

        11   two weeks ago that they contacted me.

        12        MS. FASCETT:  Okay.  Do you want to take a

        13   ten-minute break?

        14        MS. GARCIA:  Okay.  Do you still have a lot --

13:58   15        MS. FASCETT:  Not a lot.

        16            (A recess was taken.)

        17        MS. FASCETT:  We can go back on the record.

        18        Q    Okay.  I had one clarification question.

        19            You said that you received a sandwich with

14:12   20   mortadella, and I wanted to clarify what that is in

        21   English.

        22        A    Bologna.

        23        Q    So like bologna?

        24        A    Like bologna, yeah.  No mustard, no mayonnaise.

14:12   25   It's like those Oscar Mayer things, salami.  That's what
```

| | | |
|---|---|---|
| 14:13 | 1 | it is.  It was frozen. |
| | 2 | Q    What do you mean, "it was frozen"? |
| | 3 | A    It has, like, a layer of ice.  But very thin. |
| | 4 | But it had ice. |
| 14:13 | 5 | Q    Were you able to eat it? |
| | 6 | A    We waited for a little bit so it will change |
| | 7 | temperature because we were very hungry. |
| | 8 | Q    And then you ate it? |
| | 9 | A    Yes, after a little while. |
| 14:13 | 10 | Q    Now, you have called the first station "the ice |
| | 11 | box"; is that right? |
| | 12 | A    Yes. |
| | 13 | Q    Where does that name come from? |
| | 14 | A    Because it was very cold.  According to them, |
| 14:14 | 15 | it was to disinfect us. |
| | 16 | Q    According to who? |
| | 17 | A    The people that were there, they said that the |
| | 18 | guards from there will tell them that the cold, it was |
| | 19 | to disinfect us. |
| 14:14 | 20 | Q    Did you make up the term "ice box"? |
| | 21 | A    No.  That's how it's called. |
| | 22 | Q    Who did you first hear say that? |
| | 23 | A    From my country. |
| | 24 | Q    Did your attorney ever call it "the ice box"? |
| 14:14 | 25 | A    No. |

LINDSAY                          September 22, 2016

| | | |
|---|---|---|
| 14:21 | 1 | A    They will tell us, "Stop," "Shut up," "Sleep." |
| | 2 | They will knock us at the door for us to tell the kids |
| | 3 | to -- for kids to be quiet.  There were a lot of kids |
| | 4 | crying. |
| 14:21 | 5 | Q    So were the guards saying this to a group of |
| | 6 | people or just to you? |
| | 7 | A    The group of people. |
| | 8 | Q    Did any guard verbally threaten you personally? |
| | 9 | A    No.  They only wanted me to sign deportation. |
| 14:22 | 10 | They took me out of the cell.  They will put the papers |
| | 11 | here, and they will ask me, "Sign, sign." |
| | 12 | And I said, "No."  And I told them, "I'm not |
| | 13 | going to sign because if I go to my country, I'll die." |
| | 14 | Needless to say, I came from my country because |
| 14:22 | 15 | I was assaulted in my country.  My husband -- it was |
| | 16 | six months that my husband passed away, and he left me |
| | 17 | with life insurance, and that's when the extortion |
| | 18 | became, and they threaten me that they were going to |
| | 19 | kill me. |
| 14:23 | 20 | Q    Were you ever afraid when you were in the |
| | 21 | detention facility at the border station? |
| | 22 | A    I felt humiliated, denigrated. |
| | 23 | Q    Why did you feel that way? |
| | 24 | A    Because they will take -- pick up our things |
| 14:23 | 25 | like this (indicating).  They will pick up the things |

| | | |
|---|---|---|
| 14:46 | 1 | Do you have anything? |
| | 2 | MS. GARCIA:  Yeah.  A couple. |
| | 3 | |
| | 4 | EXAMINATION |
| 14:46 | 5 | MS. GARCIA:  Going back to some of the earlier |
| | 6 | questions, in the first facility where she was held, she |
| | 7 | said that they gave her daughter a cookie and juice. |
| | 8 | Was she still hungry after she had that? |
| | 9 | THE WITNESS:  Yes, of course. |
| 14:46 | 10 | MS. GARCIA:  And how does she know that she was |
| | 11 | still hungry? |
| | 12 | THE WITNESS:  Because she told me, "Mommy, I'm still |
| | 13 | hungry.  I want an egg.  I want an egg."  That's what |
| | 14 | she told me and, like, teary. |
| 14:47 | 15 | MS. GARCIA:  Did she observe the other kids were |
| | 16 | hungry as well or did they get enough to eat? |
| | 17 | THE WITNESS:  Yes, they were crying with hunger.  As |
| | 18 | a matter of fact, there was a lady there that she was |
| | 19 | pregnant.  She was very hungry. |
| 14:47 | 20 | MS. VUONG:  When you say "she," do you mean the |
| | 21 | daughter? |
| | 22 | MS. GARCIA:  Yes, the daughter. |
| | 23 | Oh, you're asking me? |
| | 24 | MS. VUONG:  Yes. |
| 14:47 | 25 | MS. GARCIA:  So my question was her daughter getting |

LINDSAY                      September 22, 2016

| | | |
|---|---|---|
| 14:47 | 1 | the food.  I'm sorry. |
| | 2 | THE WITNESS:  Because she told me that she was still |
| | 3 | hungry and that she wanted an egg.  And I remember that |
| | 4 | very well. |
| 14:48 | 5 | MS. VUONG:  The follow-up was, did she observe other |
| | 6 | people who were hungry.  That's what I was asking. |
| | 7 | MS. GARCIA:  Did she, Ms. Lopez herself, observe |
| | 8 | other kids that were hungry as well? |
| | 9 | THE WITNESS:  Yes.  I mean, a cookie and a juice. |
| 14:48 | 10 | And imagine for us, you get a couple of bites of that |
| | 11 | sandwich, and that's not enough. |
| | 12 | MS. GARCIA:  She also mentioned that her daughter |
| | 13 | had trouble sleeping because it was so cold. |
| | 14 | Can she clarify whether her daughter was able |
| 14:49 | 15 | to sleep at all throughout the night? |
| | 16 | THE WITNESS:  Yes, of course.  Besides the |
| | 17 | temperature, there were other kids that they were crying |
| | 18 | too because of the temperature. |
| | 19 | MS. GARCIA:  Ms. Lopez -- |
| 14:49 | 20 | MS. FASCETT:  Could we go off the record a second. |
| | 21 | (Discussion held off the record.) |
| | 22 | Q    BY MS. GARCIA:  I'm going to direct the |
| | 23 | questions at you. |
| | 24 | THE INTERPRETER:  Just go ahead, and I'll interpret. |
| 14:50 | 25 | Q    BY MS. GARCIA:  You also mentioned that you got |

LINDSAY                    September 22, 2016

```
15:01    1              I declare under penalty of perjury under the

         2    laws of the State of California that the foregoing is

         3    true and correct.  Executed this _____ day of _____,

         4    2_____, at _____, California.

15:01    5

         6              _____
                             WITNESS SIGNATURE
         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25
```

```
 1                Certificate of Person Reading

 2                    Deposition To Witness

 3

 4         I, _____, a

 5    _____ interpreter, having interpreted the

 6    testimony contained in the foregoing deposition from

 7    English into Spanish and the corrections that are made

 8    thereon were made through me by the witness translating

 9    from Spanish into English.

10         I certify under penalty of perjury that I well

11    and truly translated from English into Spanish and

12    Spanish into English the foregoing deposition.

13         Executed at _____, California,

14    this _____ day of _____ 2016.

15

16            _____
                 Signature of Interpreter
17

18            _____
                 First and Last Name Printed
19

20         _____
                      Address
21            _____
22                    Telephone

23

24

25
```

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF LOS ANGELES    )

 3

 4                        Reporter's Certificate

 5

 6         I, Sharon Amy Golding, Certified Shorthand

 7   Reporter No. 5934, do hereby certify:

 8         That prior to being examined, the witness named

 9   in the foregoing deposition, to wit, Lindsay

10   ███████████  was by me duly sworn to testify to the

11   truth, the whole truth and nothing but the truth;

12         That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to print by means of computer-aided

15   transcription under my direction, and the same is a

16   true, correct and complete transcript of said

17   proceedings;

18         I further certify that I am not interested in

19   the event of the action.

20         Witness my hand this 25th day of September,

21   2016.

22

23         _____

24         Sharon Amy Golding, CSR No. 5934

25
```

# Exhibit 15

Conditionally Filed Under Seal

Mirna █████████
September 16, 2016

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES;      §
ET AL.,                     §
    Plaintiffs,        §
                            §
v.                          §   Case No. CV 85-4544
                            §
LORETTA E. LYNCH,           §
ATTORNEY GENERAL OF THE     §
UNITED STATES; ET AL.,      §
    Defendants.        §

**********************************************************

INTERPRETED DEPOSITION

MIRNA █████████

VOLUME I OF I

9/16/16

**********************************************************

    INTERPRETED DEPOSITION OF MIRNA █████████
produced as a witness at the instance of the U.S.
Department of Justice and duly sworn, was taken in
the above-styled and numbered cause on the 16th day
of September, 2016, from 9:19 a.m. to 11:38 a.m.,
before Cynthia Schmitt, Certified Shorthand Reporter
in and for the State of Texas, reported by
computerized stenotype machine at the United States
Attorney's Office, 1000 Louisiana, 23rd Floor,
Conference Room 2303, Houston, TX 77002, pursuant to
the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

Mirna ████████████
September 16, 2016

```
1                        APPEARANCES

2

3        MS. KATHLEEN CONNOLLY
         U.S. DEPARTMENT OF JUSTICE
4        OFFICE OF IMMIGRATION LITIGATION
         DISTRICT COURT SECTION
5        CIVIL DIVISION
         450 5TH STREET, N.W.
6        WASHINGTON, DC  2001
         Telephone: (202) 305-4193
7        E-mail: kconnoll@CIV.USDOJ.GOV

8

9   ALSO PRESENT:

10       MS. LINDA HERNANDEZ, INTERPRETER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Mirna ███████████
September 16, 2016

1                           INDEX

2    MIRNA ████████████                    PAGE

3    Examination by Ms. Connolly .......................4
     Signature Page  ..................................45
4

5                       EXHIBIT INDEX

6    EXHIBIT                                      PAGE

7    1              Exhibit 25 Conditionally Filed    4
                    Under Seal - Declaration
8
     2              E-mail to Connolly from           6
9                   Martinez Dated 9/16/16

10   3              Exhibit R - Subject Activity      27
                    Log
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mirna █████████████
September 16, 2016

```
  1              MIRNA ████████████
  2   having been first duly sworn, testified as follows:
  3                      EXAMINATION
  4      Q    (BY MS. CONNOLLY)  Good morning, ma'am.  My
  5   name is Kathleen Connolly.  I'm an attorney with the
  6   U.S. States Government.  I'm here to take your
  7   deposition today in a case called Flores versus
  8   Lynch, Case Number 85-CV-4544.  And this case is out
  9   of the Central District of California.
 10              Now, back in January of this year
 11   2016, you were in a facility in Texas; is that
 12   correct?
 13      A.    Yes.
 14      Q.    And while you were there, you gave a
 15   declaration that you signed your name to.  Do you
 16   recall that?
 17      A.    Yes.
 18      Q.    And today at the deposition we will be
 19   focusing solely on -- primarily on that information.
 20      A.    Okay.
 21              (Exhibit 1 marked)
 22      Q    (BY MS. CONNOLLY) And for the record, we
 23   will introduce that exhibit.  And this has been
 24   marked for today as Government's Exhibit 1.  And what
 25   this is, is this is the declaration -- your
```

Mirna ▮▮▮▮▮▮▮▮▮▮▮
September 16, 2016

1    the first facility.

2         A.    Okay.

3         Q.    Can you describe for me yourself the area

4    you were staying?

5         A.    Yes.  It's like a room and has a cement

6    sidewalk.  And it has its bathroom.  And it's very

7    cold.

8         Q.    Let's talk about the temperature for a

9    second.  You say it was very cold.

10        A.    Very cold.

11        Q.    Now, you had clothing that you -- what

12   clothing were you wearing when you were there?

13        A.    I only had on a shirt or a blouse.  Excuse

14   me.  Blouse.  And a pair of pants and only that

15   because I couldn't bring in my sweater.  They had

16   took that away from me.  I couldn't bring in anything

17   else.

18        Q.    Now, did you at any time see anyone

19   adjusting the temperature?

20        A.    No.

21        Q.    When you came to the facility, how had you

22   crossed into the United States?

23        A.    Through the river.

24        Q.    Prior to the river, where were you?

25        A.    In Monterrey.

Mirna ██████████████
September 16, 2016

```
1        Q.    Now, you said that the temperature was
2   chilly in the cell you were in.
3        A.    Yes.
4        Q.    Did the facility give you and your sons any
5   sort of cover or blanket?
6        A.    No.
7        Q.    At no point that you were there?
8        A.    No.  At no time.  No.
9        Q.    Now, do you remember when you went to
10  Karnes a few days later?
11       A.    Karnes.
12       Q.    The second facility.
13       A.    The second place that I arrived at was
14  called the doghouse.
15             THE INTERPRETER:  And I'd like to
16  write that down.  In case anyone should question, I
17  would like to write it down in Spanish, spell it in
18  Spanish.
19             MS. CONNOLLY:  You, the interpreter
20  would like to write that down or the witness would
21  like to write that down?
22             THE INTERPRETER:  No.  I would like to
23  write it down in case it's ever questioned.  Is that
24  okay?  The doghouse, it has a pretty bad connotation
25  in Spanish.  Okay.  It's called el perrera,
```

Mirna ███████████
September 16, 2016

```
 1   parts of it that we're talking about.
 2       A.    Okay.
 3       Q.    So I'm handing you Government's Exhibit
 4   Number 1.  And this is the declaration of Mirna
 5   Marisol ████████████
 6                 And the first line says:  I am a
 7   citizen and national of El Salvador.  I was born on
 8   ██████ 1991; is that correct?
 9       A.    Yes.
10       Q.    So you weren't born on ██████████ 1991?
11       A.    Yes.
12       Q.    Okay.  So this says you were born on
13   ███████████ 1991.  So my question is:  Is that
14   incorrect on the declaration?
15       A.    Yes.
16       Q.    Okay.  Now, let's go back to the
17   temperature control for a moment.  You said a moment
18   ago that it was very cold in there.
19       A.    Yes.
20       Q.    Do you know what the exact temperature was
21   in that facility, in that room?
22       A.    No.  The only thing that I know is that it
23   was much too cold.
24       Q.    Now, in your declaration, you discuss the
25   temperature.  And you said the children began crying.
```

Mirna ████████████
September 16, 2016

```
 1    And when the children cried, they would turn the
 2    temperature down even further.
 3         A.    Yes.
 4         Q.    And is it your testimony today that that is
 5    accurate?
 6         A.    Yes.
 7         Q.    Now, you never saw anyone touch a
 8    temperature gauge, correct?
 9         A.    Well, they didn't get near it.  It was
10    at -- the officer, he had something in his hand.  And
11    he would simply go like this and lower it, lower it,
12    make it colder.
13         Q.    And just for the record --
14         A.    He held something in his hand.
15         Q.    Okay.  Nevermind.
16               Now, tell me about the -- you were
17    describing your cell to me earlier.  Tell me about
18    the toilet and sink.
19         A.    The sink?
20         Q.    So there was a toilet in your cell,
21    correct?
22         A.    Yes.
23         Q.    And there was a sink with that toilet?
24         A.    Yes.
25         Q.    And they had soap with that sink?
```

Mirna ███████████
September 16, 2016

1      A.    No.

2      Q.    And they had a dryer with which to dry your

3  hands, correct?

4      A.    Yes.  There were napkins like the ones that

5  are on the wall.

6      Q.    Okay.  There were paper towels?

7      A.    Yes.

8      Q.    Now, there was a wall protecting the view

9  to the toilet, what I -- the toilet was behind a

10 wall?

11     A.    No, no.

12     Q.    So your testimony today is that the toilet

13 was wide open with the rest of the cell?

14     A.    There was a toilet, but there was a small

15 wall about this tall.  And it would only cover me

16 from here down.

17            THE INTERPRETER:  She says from here

18 down.

19     Q    (BY MS. CONNOLLY) Okay.

20     A.    And it didn't have a door.

21     Q.    Okay.  So the wall was in between the rest

22 of the cell and where the toilet was, correct?

23     A.    It was -- it was in the same cell.  And it

24 was over in the corner.  And there was just a little

25 wall that divided, separated the toilet from the rest

Mirna ████████████
September 16, 2016

```
1    of the room, short wall.

2         Q.    Right.  So the wall didn't go up to the

3    ceiling?

4         A.    No.

5         Q.    But when you were sitting on the toilet,

6    can you show us how high the wall came up?

7         A.    Here (indicating).

8         Q.    And for the record, the wall came up to her

9    eye height?

10        A.    Yes.

11        Q.    Let's talk about the food situation.

12   What -- do you remember the food that you received

13   there?

14        A.    It was a bread, a sandwich with a cold

15   bologna in the middle.

16             THE INTERPRETER:  With a cold bologna

17   in the middle.

18        Q   (BY MS. CONNOLLY)  Okay.

19             THE INTERPRETER:  Excuse me.  Off the

20   record.

21             MS. CONNOLLY:  Yes, off the record.

22             (Recess taken)

23        Q   (BY MS. CONNOLLY) Okay.  And was there any

24   other different types of food you got?

25        A.    No.
```

Mirna █████████████
September 16, 2016

```
 1      Q.     What about any snacks?

 2      A.     A cracked --

 3             THE INTERPRETER:  I need to ask again

 4   because of the -- she has said galletas,

 5   G-A-L-L-E-T-A-S.

 6      A.     It would be like a cookie or a -- or a

 7   fruitcy (phonetic), a little -- a drink, fruit drink.

 8      Q   (BY MS. CONNOLLY) Like a juice box?

 9      A.     A fruit juice in a small plastic mug.

10      Q.     Now, in your declaration at Paragraph 5 you

11   say:  There was not enough food.  All we got were two

12   slices of bread with a small slice of mortadella and

13   small juices.

14             What is mortadella?

15      A.     Well, I call it mortadella because that's

16   what I call it in my country.  But it's a -- kind of

17   a -- some kind of a meat made round like this.

18      Q.     Okay.  And --

19      A.     And here they call it bologna.  But I don't

20   know what else it is.

21      Q.     Now, then the next sentence says -- you

22   say:  We got those sandwiches twice a day and once

23   three times a day?

24      A.     Yes, yes.

25      Q.     And is that your recollection that that
```

Mirna ██████████
September 16, 2016

```
 1   just came in, when I just went in, came in.
 2        Q.    So they gave you food when you first got
 3   there?
 4        A.    Yes.
 5        Q.    And then they gave you more food you said
 6   around noon?
 7        A.    Yes.
 8        Q.    And then on that first day, you actually
 9   got another meal after that, correct?
10        A.    Around 10:00 at night.  Actually I really
11   couldn't understand there whether it was daytime or
12   nighttime.
13        Q.    And so these meals that you had that first
14   day, were any of them warm meals?
15             THE INTERPRETER:  Excuse me.  I think
16   I misphrased that.  Would you repeat your question?
17             She's going to ask her question again.
18        Q    (BY MS. CONNOLLY)  So that first day that
19   you were there, these meals that we're talking about,
20   were any of them warm meals?
21        A.    No.
22        Q.    And what about the second day you were
23   there?  How many times were you fed the second day?
24        A.    Some two times, two.
25        Q.    So you were served a meal early in the
```

Mirna ███████████
September 16, 2016

1    morning around 7:40.  Does that sound right?

2        A.    Well, actually I really couldn't tell you

3    what time it was.  All I know is that they would call

4    us up to make line so that they could give us a

5    sandwich, one in the morning and one at night.

6        Q.    So you don't recall getting fed then around

7    2:45 in the afternoon?

8        A.    No.

9        Q.    Or 7:18 in the evening?

10       A.    No.

11       Q.    But a few minutes ago, you said you didn't

12   know what time it was in there.

13       A.    Yes, but that was because I didn't know

14   when I was in there whether it was day or it was

15   night, whether it was 7:00 or whether it was 8:00.

16   The only -- all I knew is that twice we would be

17   called out to come out and stand in line and two

18   times we would be given something to eat.

19       Q.    But a few minutes ago you said there was at

20   least one day you received at least three meals.

21       A.    Yes.  That was the first day when I went

22   in.

23       Q.    Okay.  And the last day you were there, do

24   you recall being served meals then?

25       A.    Yes.

Mirna ████████████████
September 16, 2016

```
 1   question.
 2       A.   Were these all of the meals that were given
 3   me before I was sent to the home house?
 4       Q.   This is just the report from the first
 5   facility you were in, the facility we're talking
 6   about.
 7            So according to this report, you
 8   received at least 12 meals during the time you were
 9   at that first facility.
10       A.   I don't remember having eaten that many
11   times.
12       Q.   Okay.  Is it possible that what you said
13   here in the declaration about only getting fed twice
14   a day is not entirely accurate?
15       A.   It's that I remember that there were two,
16   three times.  And that's what I remember.  And that's
17   what I said.
18       Q.   Okay.  Well, you talked a few moments ago
19   about snacks that you received while you were there.
20            THE INTERPRETER:  What is it, she
21   says?
22       Q    (BY MS. CONNOLLY) Remember you talked about
23   like a cookie or a fruit drink?
24       A.   Yes.
25       Q.   And so you got those -- you also got those
```

Mirna ████████████
September 16, 2016

```
1    about your health on the 30th of January?
2         A.    The only thing I remember is that the day
3    that I went in, they checked me out.  My arms, my
4    hands, my feet, my stomach, and my back side, my
5    back.  Not back side.  My back and my head.
6         Q.    Right.  I'm asking about after that first
7    time?
8         A.    Yes.  Several times it was the same thing,
9    but it was only that.
10        Q.    Okay.  Several times it was the same thing,
11   but it was only that.  I don't know what that means.
12        A.    It was the same routine everyday.  They
13   would check our head.  They would check our hands and
14   our arms, our feet and all around here (indicating)
15   to the back.
16        Q.    And you said a few minutes ago that you
17   weren't drinking the water because you didn't like
18   the water there; is that correct?
19        A.    Yes.  I never drank any water.
20        Q.    And the entire time that you were at the
21   CBP facility, your sons were with you; is that
22   correct?
23        A.    Yes.
24        Q.    And while you were at that facility,
25   officers from the facility would walk by the cell
```

Mirna ███████████
September 16, 2016

```
 1    periodically; is that correct?
 2         A.    Yes.
 3         Q.    So now I'm showing you again this is
 4    exhibit -- what's marked as Exhibit 1 which is your
 5    declaration.  And I'm going to be reading from
 6    Paragraph 5.  And where it says, There was not enough
 7    water for us to drink.  There was some water that had
 8    a very odd taste like chemicals.
 9              Do you remember stating that in your
10    declaration?
11         A.    Yes.
12         Q.    So the jug that you talked about was
13    available to you in your cell; is that correct?
14         A.    Yes, it was there.  But since there was a
15    lot of people they would drink it up quickly.  There
16    were times when there was no water.
17         Q.    Okay.  A few moments ago you said you
18    didn't drink it because it didn't taste good.
19         A.    No.  Yes.
20         Q.    And now for the first time you're saying
21    there wasn't any water in there.
22         A.    Yes, there was water because they would
23    come in and fill it up, but the people that were
24    there would drink it up.
25         Q.    But my question to you was:  When I asked
```

Mirna ███████████
September 16, 2016

```
 1              SIGNATURE PAGE

 2        I, MIRNA ██████████████ have read the foregoing

 3   deposition and hereby affix my signature that same is

 4   true and correct, except as noted on the correction

 5   page.

 6              _____

 7              MIRNA ██████████████

 8   THE STATE OF _____)

 9   COUNTY OF _____)

10        Before me, _____, on this

11   day personally appeared MIRNA ██████████████ known

12   to me or proved to me on the oath of

13   _____ or through

14   _____ (description of identity

15   card or other document) to be the person whose name

16   is subscribed to the foregoing instrument and

17   acknowledged to me that he/she executed the same for

18   the purpose and consideration therein expressed.

19        Given under my hand and seal of office on this

20   _____ day of _____, _____.

21

22              _____

23              NOTARY PUBLIC IN AND FOR

24              THE STATE OF _____

25   My Commission Expires: _____
```

Mirna ████████████
September 16, 2016

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
2
   JENNY LISETTE FLORES;    §
3  ET AL.,                  §
            Plaintiffs,     §
4                           §
   v.                       §  Case No. CV 85-4544
5                           §
   LORETTA E. LYNCH,        §
6  ATTORNEY GENERAL OF THE  §
   UNITED STATES; ET AL.,   §
7          Defendants.      §

8

9               REPORTER'S CERTIFICATION
            DEPOSITION OF MIRNA ████████████
10               TAKEN ON 9/16/16

11     I, Cynthia Joan Schmitt, Certified Shorthand

12  Reporter in and for the State of Texas, hereby certify

13  to the following:

14     That the witness, MIRNA ████████████ was duly

15  sworn by the officer and that the transcript of the

16  oral deposition is a true record of the testimony

17  given by the witness;

18     That the original deposition was delivered to Ms. Kathleen

19  Connolly;

20     That a copy of this certificate was served on all

21  parties and/or the witness shown herein on _____.

22     I further certify that pursuant to FRCP No. 30 (e)(2)

23  that the signature of the deponent:

24     _____was requested by the deponent or a party before

25  the completion of the deposition and that the signature
```

Blue Ribbon Legal, LLC
(866) 477-9067

359

Mirna ████████████
September 16, 2016

1   is to be returned within 30 days from date of receipt of

2   the transcript.  If returned, the attached Changes and

3   Signature Page contains any changes and the reasons

4   therefor;

5        _____was not requested by the deponent or a party

6   before the completion of the deposition.

7        I further certify that I am neither counsel for,

8   related to, nor employed by any of the parties in the

9   action in which this proceeding was taken, and further

10  that I am not financially or otherwise interested in

11  the outcome of the action.

12        Certified to by me this 28th day of September, 20__.

13

14  _____

15        Cynthia Schmitt, CSR
        Texas CSR 5813
16      Expiration:  12/31/17

17      Blue Ribbon Legal, LLC
        Firm Registration #560
18      7020 Portwest Drive
        Suite 140
19      Houston, TX  77024
        Telephone:  (713) 861-8004
20      Facsimile: (713) 861-8880

21

22

23

24

25

# Exhibit 16

Publicly Filed

Peter A. Schey                                      September 1, 2016

Page 1

1            UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    JENNY LISETTE FLORES; et al.,

5                 Plaintiffs,

6                 vs.            Case No. BC 465171

7    ERIC H. HOLDER, JR., Attorney  CV 85-4544-DMG
            v
8    General of the United States;

9    et al.,

10                Defendants.
     _____/

11

12

13          DEPOSITION OF PETER A. SCHEY

14

15     DATE:        Wednesday, September 1, 2016

16     TIME:        9:55 a.m. - 1:41 p.m.

17     LOCATION:    Center for Human Rights and
                    Constitutional Law
18                  256 S. Occidental Boulevard
                    Los Angeles, California
19

       REPORTED BY:  Wendy S. Screiber
20                    CSR No. 3558

21

22

23

24

25

Peter A. Schey                                    September 21, 2016

                                                        Page 2

 1     APPEARANCES OF COUNSEL:

 2        For the Plaintiffs:

 3

 4           CENTER FOR HUMAN RIGHTS AND

 5           CONSTITUTIONAL LAW

 6           BY:   PETER A. SCHEY, ESQ.

 7           256 South Occidental Boulevard

 8           Los Angeles, California 90057

 9           (213) 388-8693

10           peter@peterschey.com

11           (In Propria Persona)

12

13

14        For the Defendant:

15

16           U. S. DEPARTMENT OF JUSTICE

17           Civil Division

18           BY:   COLIN A. KISOR, ESQ.

19                 SARAH L. VUONG, ESQ.

20                 LAUREN FASCETT, ESQ.

21           P. O. Box 868

22           Ben Franklin Station

23           Washington, D.C.  20044

24           (202) 532-4331

25           colin.kisor@usdoj.gov

Peter A. Schey                                    September 21, 2016

Page 3

```
 1                          INDEX

 2                        VOLUME I

 3

 4    WEDNESDAY, SEPTEMBER 21, 2016

 5

 6    WITNESS                              EXAMINATION

 7    PETER A. SCHEY

 8

 9         (By Mr. Kisor)                        4

10          P. M. Session)                      83

11

12

13                  DEPOSITION EXHIBITS

14                    PETER A. SCHEY

15

16    NUMBER           DESCRIPTION                  PAGE

17    Exhibit 1    Declaration of Peter A. Schey      6

18

19    (Exhibit attached to transcript)

20

21

22

23

24

25
```

Peter A. Schey                                    September 21, 2016

                                                        Page 4

1       LOS ANGELES, CALIFORNIA; MONDAY, SEPTEMBER 21, 2016

2                          9:55 A.M.

3

4                       PETER A. SCHEY,

5       having been first placed under oath, testified as

6       follows:

7

8                       EXAMINATION

9       BY MR. KISOR:

10         Q.  Well, good morning.  Thank you for meeting with

11      us today.

12             You're Class counsel in this case; is that

13      correct?

14         A.  Correct.

15         Q.  And how long have you been Class counsel for this

16      case?

17         A.  For a long time.  Many years.

18         Q.  Twenty years?  Greater than 20 years?

19         A.  I'm trying to recall when the Court issued the

20      class certification order.  I would say more than 17

21      years ago.

22         Q.  Okay.

23         A.  Approximately.

24         Q.  And you're a member of the Bar?

25         A.  Yes.

Peter A. Schey                                                September 21, 2016

Page 26

1     interviewed by other attorneys because I generally did

2     not -- several attorneys would gather declarations from

3     detainees, from Class members and their mothers.  I

4     would not personally obtain every declaration but I

5     talked to approximately 20 mothers and children

6     personally during the approximately three hours that we

7     spent at the McAllen station  and I can tell you in

8     addition that on several of these items -- and I will

9     tell you which -- they're based -- even though I don't

10    state this in my declaration, I state this is just what

11    mothers and children have reported.  But there were

12    certainly certain things that I personally could observe

13    and there are certain things that were confirmed to me

14    either by somebody at the facility or later by

15    defendants' counsel and those things are in this.

16         Being held in severely overcrowded cells, I was

17    there.  I was there for several hours.  It appeared to

18    me that the cells were severely overcrowded.  It

19    appeared to me that there was not room for people to

20    sleep.  People were forced to sit on -- on the floor.

21    There was just a narrow bench going around the edge of

22    the -- the perimeter of the cells.  They -- I'm not an

23    expert, I don't give my declaration -- I don't provide a

24    fire safety code because that's something I -- we're

25    trying to explore right now.  We've requested over and

Peter A. Schey                                            September 21, 2016

Page 27

1    over again from defendants to provide us with capacity

2    requirements for these facilities.  I'm not an expert in

3    capacity.  All I'm saying is my personal observation was

4    consistent with what the mothers and children reported

5    to me and that was that these cells -- at least the ones

6    that I went to didn't appear to be seriously

7    overcrowded.  Having to sleep on concrete floors, I

8    personally observed people -- now, it wasn't at

9    nighttime, it was the morning, but I personally observed

10   many people sleeping on a concrete floor even though it

11   was morning time.  Not being provided mats or blankets,

12   I've personally observed and I believe spoke to agents

13   and it has been confirmed over and over again by

14   defendants since then that detainees at McAllen were not

15   provided mats.  About the blankets, I did not have

16   personal observation.  I believe people told me that

17   they were getting a Mylar blanket but if they were cold

18   and needed a second blanket, they weren't getting it.

19        Q.  Who told you that?

20        A.  The approximately 20 detainees who I spoke with.

21        Q.  Do you speak Spanish?

22        A.  I do speak some Spanish and I also had one of the

23   teams also assisting me.  But I can communicate on

24   things about -- I couldn't communicate with somebody

25   about classical music in Spanish but on things that sort

Peter A. Schey                                                September 21, 2016

Page 28

1    of involve the work that we do, I can communicate.  It

2    may all be in the present tense but I can communicate.

3    There was also a member of the team available to help --

4    I don't recall who it was -- but it was always available

5    who was bilingual who was always available to assist in

6    translating.

7         The bright lights as being -- this is what people

8    told me.  I was not there at nighttime but defendants

9    have confirmed over and over again that, yeah, they're

10   bright lights.  Inadequate food, I did not personally

11   observe that.  What I observed was that the food that

12   seemed to be served was burritos.  What people said over

13   and over again is they either got burritos or a sandwich

14   but I didn't observe the sandwiches.  Again, defendants

15   haven't rebutted that -- that aspect of -- in terms of

16   what's served, it's either a burrito or it's a -- two

17   pieces of bread with a slice of bologna.  Nobody has

18   disputed that that's what was served.

19        Dirty drinking water.  I think I did observe -- I

20   think one mother came up and showed me -- and I thought

21   I put this down in my declaration -- and showed me

22   something in the water that was floating in the water.

23   Who put -- how did it get in the water, I don't know.

24        Q.  Where did that water come from?

25        A.  From a bucket in the cell.

Peter A. Schey                                                September 21, 2016

Page 30

1    conditions.  It's not that I would say to them -- I

2    didn't have a checklist and go through a checklist and

3    say did this happen, did that happen --

4        Q.  Did you make --

5        A.  -- and several of the mothers and Class members

6    complained to me that -- I don't think they were saying

7    every single time because I think this happened but

8    definitely complained of dirty drinking water and

9    more -- more frequently complained of insignificant

10   cups.  So they would have to share a cup with other

11   people if they wanted to use a cup.  Because you

12   couldn't really -- you couldn't lift the water cooler

13   and drink directly from it.  It would just be too heavy.

14   And they complained that if they wanted to drink water,

15   that they would have to share a water cup with other

16   detainees.  Again, you may call that hearsay, the judge

17   may or whatever.  It's not up to me to determine what

18   the judge will or will not consider.  I observed that

19   once and it may have been an aberration, it may not have

20   been.

21        The no soap or water, that's not really

22   contested.  I observed there was no soap and there was

23   no paper towels.  That's what all the mothers say and

24   CBP doesn't deny that in any of their declarations that

25   they have filed in this case.  They say that people are

1    either provided soap or hand sanitizer.  To be honest

2    with you, I didn't see -- in the cells I visited maybe

3    the day I visited they took out all the hand sanitizers

4    just for my visit but -- but I can tell you that in none

5    of the cells that I visited was there either hand

6    sanitizer or soap.  There was nothing.  There was

7    nothing to wash with.  Nor -- nor -- there was a small

8    sink with cold water right above the toilet.  So you

9    have a metal toilet, no toilet seat, and right above the

10   toilet is a very small sink with one water spout, cold

11   water.  And if you wanted to wash, I guess you could

12   wash there but there was no soap and there were no

13   towels of any type to dry.  If you washed your face,

14   washed your hands, there was no -- so I personally

15   observed that.  In discussions with defendants they

16   haven't denied that.  They've admitted that they don't

17   have paper towels and they've given their reasons why

18   they don't.  In terms of no soap, as I said in --

19   subsequently defendants have taken the position that

20   they do provide either soup or hand sanitizers.

21        Lack of privacy around the toilets, I have

22   personally observed that.  It's not in dispute.

23        Cleanliness in toilets.  I visited about four --

24   three or four detention cells and in two of them I

25   observed that there seemed to be plenty of problems in

1    the sense that there was what seemed to be soiled toilet

2    paper around the -- around the toilets.

3           Class members -- I did not personally observe

4    this -- but numerous Class members informed me that at

5    night the cells were crowded and people would have to

6    sleep right around the toilet which is in an area maybe

7    four feet by five feet that has a semi-privacy wall

8    around it that I forget came up maybe -- maybe four

9    feet.  So you could always see the person's head if they

10   were inside which was set up that way I'm sure for

11   security reasons.  So there's no -- there's no total

12   privacy.

13          No access to information regarding detainees'

14   rights, that's what people told me.  I didn't -- in my

15   personal observation nobody -- no detainee who I spoke

16   to -- to Class member or mother -- was able to -- or had

17   in her possession, and I could physically observe this,

18   any notice of rights.  When I asked them, "Do you have

19   any sort of notice of rights relating to Flores or

20   anything else," they said no.  They hadn't even heard of

21   Flores.  They said, no, they didn't.  I don't think that

22   that's in -- in dispute.  In my subsequent conversations

23   with defendants' counsel nobody disputes that.

24          So -- so that -- you focused me on paragraph 5.

25   That's what I have to say about paragraph 5.  I think --

Peter A. Schey                                          September 21, 2016

1    one border patrol section or to a holding area but in an

2    hour or two they're going to be brought to a border

3    patrol station -- typically, I'm not saying in every

4    case -- within on average three, 3.5 hours a processing

5    will take place and will be completed and an I-213 will

6    be completed.  Information will be put into that

7    person's A file and at least our interpretation of the

8    settlement would be that during that processing, during

9    that initial processing, efforts commence to implement

10   paragraph 14 and 16 and the other -- whatever other

11   paragraphs may be significant.

12        What does that mean?  That means gathering

13   information.  Typically we believe -- and, again, I've

14   got to say that we have requested the relevant pages of

15   A files from the declarants because we think that's by

16   far and away -- my declaration, border patrol

17   declarations, these depositions we think that's the best

18   evidence about what is actually happening, what is the

19   actual practice.

20        The information that we have is that during that

21   initial processing, an I-213 or whatever other forms

22   have to be completed -- people are certainly routinely

23   asked, "Where were you headed in the United States?  Do

24   you have a sister or mother or brother?  Where were you

25   going?"  Who is that person and possibly even their

Peter A. Schey                                    September 21, 2016

Page 55

1    address and that that would be noted in the I-213.  What

2    we don't see -- what we don't believe is happening are

3    questions beyond that one question which would begin

4    compliance with paragraphs 14 and 16.  Not necessarily

5    to -- the settlement doesn't require that you

6    immediately release the person.  The settlement

7    contemplates that that could even take a few days but

8    that that process starts immediately.  We don't see that

9    process as starting immediately even in border patrol

10   stations.  And my sense is from depositions that I have

11   now taken of three ICE officers in charge of the three

12   detention facilities and one border sector Chief in El

13   Centro is that border patrol agents don't fail to gather

14   that information out of ill will or -- or because they

15   don't like children.  I think they don't start to

16   collect that information because nobody has instructed

17   them to because they're under the impression that that

18   is something that they have no control over releasing

19   children under Flores and therefore that's something

20   that maybe ICE will do once we transfer these kids into

21   the custody of ICE.  You know, their view -- and I'm not

22   blaming the border patrol agent.  He doesn't or she

23   doesn't know any worse or any better.  Their view is

24   we've apprehended this person within 100 miles of the

25   border.  We're placing them into expedited removal.

Peter A. Schey                                September 21, 2016

Page 56

1   They're subject to mandatory detention and barring some

2   highly unusual pretty much medical situation -- that's

3   the only one anybody can think of -- we don't release

4   them.  And so we transfer them over to ICE.

5         So in that circumstance I would say it's a --

6   it's a -- it's a failure on the part of ICE -- of border

7   patrol leadership.  I'm not saying at what level of

8   leadership somebody needs to get on this but it's

9   certainly not the fault of the border patrol agents.

10  But at some level somewhere in Washington, D.C. probably

11  because they don't believe it's required under the

12  settlement, nobody has told border patrol agents you

13  need to collect this information.

14        With regards to the conditions of detention which

15  is obviously a different kettle of fish, I noticed,

16  for example, in the monitoring -- in monitoring the

17  protocol that is being set up for border patrol

18  conditions, they say monitoring of temperatures is

19  acceptable if it's from 66 to 80 degrees.  So if border

20  patrol sections keep it at 66, apparently it's okay

21  under the monitoring guidelines but yet for most Class

22  members, especially if they have to sleep on a concrete

23  floor and they've just got one mylar blanket they're

24  going to be freezing cold.  I would be freezing cold in

25  a 66-degree room where the walls all -- you don't have

1    questions whether the child's father is here or were you

2    asked questions about any brothers -- adult brothers or

3    sisters that the child could potentially be placed with

4    here in the United States or were you asked about any

5    grandparents or uncles or aunts who your child could be

6    placed with or were you asked about another responsible

7    adult who you would designate that your child could be

8    placed with or were you asked if none of the above was

9    available or if -- whether it may be appropriate to

10   place the child in a licensed program which is another

11   option certainly under paragraph 19 and there's also an

12   option similar to that in paragraph 14 -- and in all of

13   those cases the parents or it was an older kid would --

14   would respond, no, nobody has questioned me about those

15   potential options.  And -- and I know this is in the

16   declarations but, I mean, for example, there was a case

17   where the mother told me, yeah, his father lives in X

18   place and I'd be happy to have him with the father but

19   nobody has asked me about that.  Nobody has inquired

20   into that.  Also under the settlement the government, at

21   least it's the plaintiffs' view -- and I'm just looking

22   at the settlement now -- it's also required under

23   paragraph 15 -- and I think it's pretty clear under

24   paragraph 14 -- that -- that it's not just identifying

25   these options, these ten or 11 options that are

1   available under paragraph 14, maybe it's 11 under

2   paragraph 19 is not just inquiring are any of these

3   options available, it's also inquiring of the mother, of

4   the child particularly if the child is older what is the

5   suitability of that placement?  Would you want the child

6   at that placement?  Let's say the mother says, yes, I

7   would like the child to be with my sister in Chicago, no

8   Class member or mother that had been asked what would

9   the suitability be of that person, do you know?  Are

10  they employed?  Are they homeless?  Do they have a

11  criminal history to your knowledge?  So in our meetings

12  or my meetings with Class members, none of them

13  indicated that they had been questioned about those

14  types of inquiries that I think would have to be made

15  under paragraph 14.

16          It later turns out that -- it's later revealed in

17  defendants' opposition and in declarations attached to

18  defendants' opposition and then in the three depositions

19  that I have taken of ICE officials that what the

20  declarants were saying appears to be totally accurate

21  because in essence the defendants' position is, yes, we

22  are not obligated to make all those inquiries because we

23  initially hold mothers and children and we try to

24  schedule a fear interview as rapidly as possible if they

25  express a fear.  Once -- once that fear determination

Peter A. Schey                                          September 21, 2016

1    has been made by -- and it's communicated to us by CIS,

2    we attempt to process the mother and the child as

3    expeditiously for release as possible, generally within

4    a day or two or three, and then we release them.  So it

5    became -- and if they don't pass the critical interview

6    we don't release them unless there's an important

7    medical problem at play or some other urgent

8    humanitarian reason and they point to the regulation

9    that prevents parole under those circumstances.  So it

10   became clear to me later really just as a result of

11   reading defendants' opposition and -- and then taking

12   these depositions particularly of the ICE people that

13   there is no material dispute of the facts, at least

14   that's my current perception.  I could be wrong.  There

15   is no -- you know, the issue is really a legal issue.

16   The issue is really under the Florida settlement does

17   ICE in essence -- I wouldn't want to be quoted in the

18   final analysis that this is what I think the issue is

19   I'm just saying it appears to me at this time that

20   perhaps the issue before the Court is really does this

21   settlement permit ICE to take the position that since we

22   arrested these children or apprehended these children

23   within 100 miles of the border we're obligated -- and

24   they express a fear, we're obligated to give them a fear

25   interview.  We're trying to do that as rapidly as

Page 105

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were administered an oath; that a record of

7    the proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11         Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal Case,

13   before completion of the proceedings, review of the

14   transcript [X] was [ ] was not requested.

15         I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or any party to this action.

18         IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20

21   Dated:  September 26, 2016

22

23

24   _____

25         WENDY S. SCHREIBER, CSR No. 3558

Peter A. Schey                                    September 21, 2016

Page 106

1    A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3    I, Peter A. Schey, do hereby acknowledge

4    I have read and examined the foregoing pages of

5    testimony, and the same is a true, correct and

6    complete transcription of the testimony given

7    by me, and any changes or corrections, if any,

8    appear in the attached errata sheet signed by me.

9

10

11

12

13

14

15

     _____      _____

16   Date                     Peter A. Schey

17

18

19

20

21

22

23

24

25

1   Colin Kisor, Esquire

    U.S. Department of Justice

2   450 5th Street, NW

    Washington, D.C.

3

    IN RE:  Jenny Lisette Flores v. United States

4

5

6   Dear Mr. Kisor,

7        Enclosed please find your copy of the

8   deposition of Peter A. Schey, along with

9   the original signature page.  As agreed, you

10  will be responsible for contacting the witness

11  regarding signature.

12       Within 30 days of September 30, 2016, please

13  forward errata sheet and original signed signature

14  page to Capital Reporting Company.

15       If you have any questions, please do not

16  hesitate to call.  Thank you.

17

18  Yours,

19  Wendy Schreiber

    Reporter/Notary

20

21

22

23

24

25

# Exhibit 17

Conditionally Filed Under Seal

███████████████

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

JENNY LISETTE FLORES, et al.,

      Plaintiffs,

                         CASE NO.:
     v.                    CV 85-4544 DMG (AGRx)

LORETTA E. LYNCH, Attorney
General of the United States,
et al.,

      Defendants.


      Interpreted deposition of SARA ███████

████████████ taken on behalf of the Defendants,

pursuant to notice and agreement of counsel, with all

formalities waived, before Linda McGee, Certified

Court Reporter, at 75 Ted Turner Drive, SW, Sixth

Floor, Atlanta, Georgia, on the 23rd day of

September, 2016, commencing at the hour of 11:15 a.m.

```
 1    APPEARANCES OF COUNSEL:

 2    For the Defendants:
           C. FREDERICK SHEFFIELD
 3         Trial Attorney
           United States Department of Justice
 4         450 Fifth Street
           Washington, DC 20530-0001
 5         202.532.4737
           202.307.8781  Fax
 6         carlton.f.sheffield@usdoj.gov

 7    For the Deponent:
           KERRY E. McGRATH
 8         Attorney at Law
           The Law Office of Kerry E. McGrath, LLC
 9         Suite 760
           1100 Spring Street, NW
10         Atlanta, Georgia 30309
           404.377.6600
11         kerry@kerrylaw.com

12
      Also Present:  Alba Males, Interpreter
13                    Andrea Bono

14                        - - -

15

16

17

18

19

20

21

22

23

24

25
```

1          I N D E X   O F   E X A M I N A T I O N S

2     WITNESS:
      SARA ██████████████████
3
      Cross-Examination By Mr. Sheffield                    4
4
      Direct Examination By Ms. McGrath                    33
5

6                         - - -

7            I N D E X   O F   E X H I B I T S

8      Solis-Lopez
      Depo Exhibits  Description                         Page
9
      Exhibit A        Declaration of Sara E ████████     27
10                     ████████████
11     Exhibit B        Document in Foreign Language      28

12                        - - -

13          (Original exhibits were attached to the

14       original transcript.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              (A copy of the reporter's disclosure

 2         statement was made available for review to

 3         counsel or parties pro se at the taking of the

 4         deposition pursuant to O.C.G.A. 9-11-28(c).)

 5                             - - -

 6              MR. SHEFFIELD:  So I guess we'll begin by

 7         swearing the witness in.

 8                             - - -

 9              (Alba Males was duly sworn as the

10         interpreter.)

11                             - - -

12              (All answers given are through the

13         interpreter unless otherwise indicated.)

14                             - - -

15                    SARA ████████████████████

16    being first duly sworn, was deposed and testified as

17    follows:

18              MR. SHEFFIELD:  Okay.  And, I guess, if the

19         court reporter could designate this entire

20         deposition as subject to the protective order in

21         this case.

22                        CROSS-EXAMINATION

23    BY MR. SHEFFIELD:

24         Q    So good morning.  My name is Craig

25    Sheffield.  I represent the Attorney General.  I'm
```

```
 1   or water prior to arriving at that facility?

 2       A    No.

 3       Q    Okay.  So at the first facility where you

 4   were taken, how long were you -- how long did you

 5   spend there with your daughter?

 6       A    Two days.

 7       Q    Okay.  And were you with your daughter the

 8   whole time?

 9       A    Yes.

10       Q    Do you remember at about what time of day

11   you arrived at the station?

12       A    No, I don't remember.

13       Q    Was it morning, middle of the day, evening?

14       A    In the morning.

15       Q    Okay.  What time of day was it that you

16   were initially discovered by the officers?

17       A    It was around 9:00 a.m.

18       Q    So can you describe to me what happened --

19   what happened in the very first moments when you

20   arrived at the facility?

21       A    Okay.  We got there.  They gave me a

22   sandwich for my child, juice.

23       From there, they asked for the documents that we

24   had with us.  And the one -- the lady who was seated

25   there -- I don't know -- she started verifying the
```

 1    information.

 2         They took our shoe laces.  They took everything

 3    we had with us.

 4         From there, they put us into a cold room, and we

 5    spent two days in there, and two nights.

 6         Q    Okay.  Were you called into an office or

 7    anything like that?

 8         A    No.

 9         Q    Okay.  So where was the person who was

10    asking for your documents?  Were they positioned at

11    like a desk or in a separate room?

12         A    The immigration station.  They have plenty

13    of people seated, like, around.

14         Q    So did people just come and talk to you

15    then?

16         A    They would call one over.

17         Q    Okay.  And you said -- did you give them --

18    did you provide them the documents that you had?

19         A    Yes, but they were given back to me.

20         Q    Okay.  What kind of documents were those?

21         A    My birth certificate.  That's it.

22         Q    Okay.  And did they provide you with any

23    documents?

24         A    No.

25         Q    So you were not given any paperwork at any

1    time -- or at -- of any kind?

2        A    No.

3        Q    Okay.  Were you given any paperwork of any

4    kind for the two days that you stayed there?

5        A    No, nothing.

6        Q    Okay.  So you said, after you arrived, you

7    and your daughter were given sandwiches and juice

8    box; is that right?

9        A    Yes.

10       Q    Okay.  So if you can remember -- I know

11   it's a long time ago, but about how much time from

12   the moment you arrived to the time that you were

13   given the food and juice boxes?

14       A    We would each be given a sandwich only at

15   breakfast and at lunchtime.

16       Q    Okay.  But specifically on the day that you

17   arrived, how much time would you estimate passed

18   between the time that you got off the truck and the

19   time you got your first food?

20       A    As soon as we got there.

21       Q    Okay.  And that was in the morning, you

22   said?

23       A    Yes.

24       Q    Okay.  And then do you remember when the

25   next meal that you were provided was?

```
1        A    In the afternoon, around 3:00.

2        Q    Okay.  And what was that meal like?

3        A    Piece of bread and a piece of ham.

4        Q    Okay.  At any time when you stayed at this

5   first facility, were you given any other types of --

6   type of food, apart from the sandwich:  snacks?

7        A    No.

8        Q    So the only kind of food....

9        Was there a difference between the food that

10   they offered for breakfast as opposed to middle of

11   the day or in the evening?

12        A    No.  It was the same thing.

13        Q    Okay.  And what was the sandwich like

14   again?  Can you describe that?

15        A    It was a slice of bread and a piece and a

16   half of ham.

17        Q    Okay.  And was this the same type of food

18   that was provided to your daughter as well?

19        A    Yes, the same thing.

20        Q    Okay.  Did she eat anything while she was

21   at this first facility?

22        A    No, because she doesn't like bread.  She

23   only ate the ham.

24        Q    Does she still -- does she eat bread now?

25        A    No.
```

```
 1        Q     Okay.  So can you estimate how many times
 2   per day you were given food while at this first
 3   station?
 4        A     We were given twice a day.  Because it just
 5   wasn't enough because there were so many people stuck
 6   in there.
 7        Q     About how many people would you estimate
 8   were there?
 9        A     It was really full.  Lots of moms with
10   their kids.
11        Q     In the room that you stayed in -- let's
12   strike that actually.
13        Did you stay in the same room for the whole time
14   that you were there?
15        A     Yes.
16        Q     And can you estimate about how many other
17   people were in that room with you?
18        A     Around 20 moms with their kids.
19        Q     Okay.  Is that 20 people total or 20 moms?
20        A     No, 20 moms plus their children.
21        Q     Okay.  But it was all women and children?
22        A     Yes, mothers and children.
23        Q     And how was the food distributed?  How was
24   it provided?
25        A     An officer would come with a little cart
```

1    and he would give it out.

2        Q    Okay.  And was it -- so it was available to

3    everyone at the same time?

4        A    Yes, yes.

5        Q    Okay.  Were there any times where the cart

6    was made available to you and your daughter, but you

7    decided not to take food?

8        A    No.  They would come and they put it in

9    your hand.  They put the sandwich in someone's hand.

10       Q    Okay.  And it was only sandwiches?  There

11   was never any snacks or anything else offered?

12       A    No, no.

13       Q    Okay.  Was it hot food or cold food?

14       A    Cold.  It wasn't hot.

15       Q    Okay.  Did you have access to drinking

16   water at the station?

17       A    No.  Only the bathroom.

18       Q    So how did you and your daughter drink

19   while you were there?

20       A    There was a thermos, big thermos, but it

21   had too much bleach to drink it.

22       The children were thirsty, so they would drink

23   it, but my daughter wouldn't.  Neither would I.

24       Q    And was that thermos in the room with you?

25       A    Yes, yes.

```
 1        A    Yes.

 2        Q    Okay.  So you mentioned this again, but --

 3   but I'll ask it again:  So you -- do you remember

 4   anything about how the water tasted?

 5        A    Yes.  Like bleach.

 6        Q    Okay.  Were there any signs or information

 7   posted on the walls of the place -- the room that you

 8   were held?

 9        A    No.

10        Q    Nothing whatsoever?

11        A    No, nothing.

12        Q    Okay.  Okay.

13   So you said you spent two days at that facility?

14        A    Yes.

15        Q    And then where did you go?

16        A    They took me to a place called the dog

17   house.

18        Q    And how were you taken there?

19        A    In a bus.

20        Q    Okay.  With about how many other people?

21        A    Around 30 families.

22        Q    How long did it take to go there?

23        A    We left around 2:00 p.m. and we arrived

24   around 8:00 p.m.

25        Q    So it took six hours -- you were on the
```

```
 1    road for six hours?

 2         A    No.   Sorry.   That was from the dog house to

 3    the detention.

 4         From the icebox to the dog house, I don't know

 5    what time they took me out, but it was still

 6    daytime -- daylight.   But I don't know how many hours

 7    it took us to get to the dog house.

 8         Q    Okay.   Do you know if the dog house has

 9    another name?

10         A    That's what it's referred to.

11         Q    Okay.   Did anyone tell you why you were

12    going from one facility to another?

13         A    No.   No, we were not told.

14         Q    But what time of day -- I think you

15    mentioned this, but just, again, what time of day

16    were you taken from the first facility to the second?

17         A    In the afternoon.

18         Q    Okay.   And what was this second facility,

19    the dog house, what was it like as compared to the

20    first one?

21         A    Well, when we got there, we were fed.

22    Again, sandwiches.   But there they would give us

23    fruit for the children.

24         But they did not give us anything to bathe or

25    brush our teeth, nothing.
```

```
 1        Q    And how long did you stay at this place?

 2        A    The same, I think.  Two days.  Yes, two

 3   days.  Two nights.

 4        Q    And so you mentioned that you were given

 5   sandwiches and fruits for the kids.  Any other foods

 6   that was offered?

 7        A    No.  No, only sandwiches.  The same.

 8        Q    Okay.  Any hot food?

 9        A    No.

10        Q    And was the food -- the distribution system

11   for the food the same as well?

12        A    Yes.  They come to give it out.

13        Q    Okay.  Did they come more often?  Was the

14   food offered more frequently?

15        A    There, they gave it to us three times a

16   day.

17        Q    Okay.  Was there any -- were there any

18   issues with the drinking water at that facility?

19        A    There was none to brush our teeth or to

20   bathe, just what they would give us to drink.

21        Q    Okay.  Was the water, did it also -- you

22   mentioned that it tasted like chlorine at the first

23   place.  Was that the case at the second place as

24   well?

25        A    The same at the second place, but there we
```

1  we had been treated.

2      Q    Did you -- do you remember how long your

3  interview with the attorney lasted?

4      A    It didn't take long.  Around an hour.

5      Q    Okay.  And then do you remember about how

6  long after the interview you signed this English

7  version?

8      A    No.

9      Q    But do you know if it was the same day or a

10  different day?

11      Okay.

12      A    The same day because....

13      Q    Okay.  So just looking at the declaration

14  now....

15      And I only have a couple more questions.  We're

16  almost done.

17      A    Okay.

18      Q    There are a couple places where -- in the

19  declaration, where it talks about the Flores case,

20  like paragraph 7 and paragraph 9.

21      Do you know what the Flores case is?

22      A    Uh-huh.

23      Q    How did you learn about the Flores case?

24      A    Because over in detention, some attorneys

25  came.  They said they were Flores attorneys and that

```
 1    they were going to help us because the children had
 2    the right -- had the right to be with a relative
 3    while we were being held there.
 4         Q    Okay.
 5         A    But, in detention, we were not told
 6    anything about that.
 7         Q    Okay.  So when was the first time you
 8    learned about the Flores case?
 9         Which -- I'll say, "Which facility were you
10    being held at when you learned about the Flores
11    case?"
12         A    I was already in detention.  I had been
13    there for about a month and a half.
14         Q    Which place?
15         A    In Karnes.
16         Q    Okay.  So in your declaration -- I think in
17    paragraph 9 -- you mentioned that "To the best of my
18    recollection, I don't remember anyone explaining that
19    my daughter had rights as a minor under the Flores
20    case."
21         Is it possible that you forgot being advised of
22    this?
23         A    But I'd already been detained for a while,
24    but the officers never said anything to me about my
25    daughter being able to be with my brother.
```

1                      D I S C L O S U R E

2     STATE OF GEORGIA:
      COUNTY OF GWINNETT:
3

4          Deposition of Sara ████████████████████

5

6          Pursuant to Article 10.B. of the Rules and
      Regulations of the Board of Court Reporting of the
      Judicial Council of Georgia, I make the following
7     disclosure:

8          I am a Georgia Certified Court Reporter.  I
      am here as an independent contractor for Huseby, Inc.
9

10         Huseby, Inc., was contacted by the offices
      of the U.S. Department of Justice to provide court
      reporting services for this deposition.  I will not
11    be taking this deposition under any contract that is
      prohibited by O.C.G.A. 15-14-37 (a) and (b).
12

13         I have no contract to provide reporting
      services with any party to the case, any counsel in
      the case, or any reporter or reporting agency from
14    whom a referral might have been made to cover this
      deposition.  I will charge my usual and customary
15    rates to all parties in the case, and a financial
      discount will not be given to any party to this
16    litigation.

17

18    Dated:  September 23rd, 2016

19    Linda McGee, CCR-B-2040

20

21

22

23

24

25

397

```
 1                 C E R T I F I C A T E

 2    STATE OF GEORGIA:
      COUNTY OF GWINNETT:
 3

 4            I hereby certify that the foregoing
      deposition was reported, as stated in the caption,
 5    and the questions and answers thereto were reduced to
      print under my direction; that the foregoing 36 pages
 6    represent a true, correct and complete transcript of
      the evidence given on September 23rd, 2016, by the
 7    witness, Sara ███████████████ who was first
      duly sworn by me.
 8

 9            I certify that I am not disqualified for a
      relationship of interest under O.C.G.A. 9-11-28(c);
10    I am a Georgia Certified Court Reporter here as an
      independent contractor of Huseby, Inc.; I was
11    contacted by Huseby, Inc., to provide court reporting
      services for this deposition; I will not be taking
12    this deposition under any contract that is prohibited
      by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of
13    the Rules and Regulations of the Board; and by the
      attached disclosure form I confirm that I am not a
14    party to a contract prohibited by O.C.G.A. 15-14-37
      or Article 7.C. of the Rules and Regulations of the
15    Board.

16            This certification is expressly withdrawn
      and denied upon the disassembly or photocopying of
17    the foregoing transcript, or any part thereof,
      including exhibits, unless said disassembly or
18    photocopying is done by the undersigned Certified
      Court Reporter and original signature and seal is
19    attached thereto.

20            This 29th day of September, 2016.

21

22    _____
      Linda McGee
23    Certified Court Reporter
      Georgia Certificate No. CCR-B-2040
24

25
```

398

# Exhibit 18

Conditionally Filed Under Seal

Page 1

1            UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF CALIFORNIA

2

    ------------------------------:
3   JENNY LISETTE FLORES, et al,  :  NO. Cv 85-4544
                Plaintiff         :
4                                 :
                                  :
                vs.               :
5                                 :
    LORETTA E. LYNCH, Attorney    :
6   General of the United States, :
    Et al.                        :
7               Defendants        :
    ------------------------------:

8

9                                   Leesport, Pennsylvania

10
                                    Tuesday, October 4, 2016

11

12  DEPOSITION OF:

13            YESLIN ████████████

14  called as a witness, pursuant to notice, by counsel

15  for Defendants, held at the Berks County Residential

16  Center, 1040 Berks Road, Leesport, Pennsylvania,

17  before Suzanne, L. E. Toto, RPR, of Capital

18  Reporting Company, a Notary Public in and for the

19  Commonwealth of Pennsylvania, beginning at

20  approximately 1:16 p.m., when were present on behalf

21  of the respective parties:

22

23

24

25

```
 1    APPEARANCES:
 2                    ACLU
                      BY:  CODY WOFSY, ESQ.
 3                    39 Drumm Street
                      San Francisco, CA  94111
 4                    415-343-0785
                      cwofsy@aclu.org
 5                         -- AND --
                      CAROL ANNE DONOHOE, ESQ.
 6                    PO Box 12912
                      Reading, PA  19612
 7                    610-370-7956
                      Attorneycd@gmail.com
 8                     -- For Yeslin ███████
 9                    (Via Telephone)
                      PETER SCHEY, ESQ.
10                    256 Occidental Boulevard
                      Los Angeles, CA  90057
11                    323-251-3223
                      pschey@centerforhumanrights.org
12                     -- For Flores Class Action
13                    ADRIANA C. ZAMBRAVNO, ESQ.
                      Law Student Intern
14
15                    US DEPARTMENT OF JUSTICE CIVIL DIVISION
                      BY:  KATHLEEN A. CONNOLLY, ESQ.
16                    Ben Franklin Station
                      Washington, DC  20044
17                    202-305-8627
                      kathleen.a.connolly@usdoj.gov
18                     -- For The Defendant
19
20
21
22
23
24
25
```

Page 3

1                          I N D E X

2                          WITNESSES

3   ALL WITNESSES:                              PAGE:

4

        YESLIN ████████████████████

5       Examination by MS. CONNOLLY          4:9

6

7

                           EXHIBITS

8

    YLE NO.:              DESCRIPTION:           PAGE:

9

10   YLE 1               Exhibit 23 -
                         Conditionally Filed
11                       Under Seal:
                         For Identification     24:9

12

13

14   (Exhibit attached to transcript)

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                     VERONICA QUIROZ, was duly sworn to

3      translate English into Spanish and Spanish into

4      English in the following deposition:

5                     YESLIN ███████████████████ having

6      been first duly sworn, was examined and testified

7      through the interpreter as follows:

8                          *   *   *

9                          EXAMINATION

10     BY MS. CONNOLLY:

11     Q.          Hello, Yeslin.

12     A.          Hi.

13     Q.          Is it okay if I call you Yeslin?

14     A.          Yes.

15     Q.          So my name is Katie Connolly.  And I'm an

16     attorney here with the United States Department of

17     Justice.

18     A.          Okay.

19     Q.          And I'm here today to ask you some

20     questions.

21     A.          Okay.

22     Q.          And I'm asking questions in the case of

23     Flores v. Lynch, 85-CV-4544.

24     A.          Okay.

25     Q.          From the Central District of California.

Page 10

```
 1                    THE WITNESS:  I don't remember.
 2      BY MS. CONNOLLY:
 3      Q.         Do you remember the first time you came
 4      in with your mom and your sister and your brother?
 5      A.         Where?
 6      Q.         When you came into the United States.
 7      A.         Yes.
 8      Q.         And did some people take you somewhere?
 9      A.         Yes.
10      Q.         And do you remember where they took you?
11      A.         Yes.
12      Q.         So what happened when you got to that
13      location?
14      A.         They took me there, and they left me
15      there.
16      Q.         Okay.  So were you with your mom?
17      A.         Yes.
18      Q.         And your brother and your sister?
19      A.         Yes.
20      Q.         Okay.  So when you got to that first
21      place, what happened?
22      A.         We couldn't sleep.
23      Q.         Okay.  And were you in a room?
24      A.         Yes.
25      Q.         When you got there, did they give you any
```

Yesim ~~████████~~                                          October 4, 2016

                                                           Page 11

1    food?

2    A.          They gave me a cracker and a juice.

3    Q.          And did they give some to your sister?

4    A.          Yes.

5    Q.          And your mom too?

6    A.          I don't remember.

7    Q.          Okay.  Now, after they fed you, is that

8    when they put you in the room?

9    A.          Yes.

10   Q.          And do you remember how long you were in

11   that room?

12   A.          Two days and one night.

13   Q.          And what did they feed you while you were

14   there?

15   A.          They only gave me crackers and a little

16   juice.

17   Q.          Did they ever give you like a little

18   sandwich?

19   A.          No.  In the other center they gave me.

20   Q.          So you went to a second center after

21   this, right?

22   A.          Um-hum.

23   Q.          Okay.  So going back to the first place,

24   so they gave you some snacks and some juice?

25   A.          They only gave us cracker.

Page 12

```
1    Q.          What did you have to drink?

2    A.          Only one juice.

3    Q.          For the two days you were there?

4    A.          Yes.

5    Q.          And that was -- they only gave you the

6    one juice when you first arrived?

7    A.          They gave us one juice every meal time.

8    Q.          Okay.  I see.

9                     MR. WOFSY:  Objection.  I don't

10   believe that's what she said.

11                    THE INTERPRETER:  (Spanish word

12   spoken).

13                    MR. WOFSY:  (Spanish word spoken).

14                    THE INTERPRETER:  Yeah, but

15   sometimes when you say (Spanish word spoken) you mean

16   (Spanish word spoken).

17                    MR. WOFSY:  The literal translation

18   is lunch.

19                    THE INTERPRETER:  Lunch.

20   BY MS. CONNOLLY:

21   Q.          So let me try to understand.  How often

22   did they bring you food?

23   A.          I don't understand.

24   Q.          Okay.  So you were at this first place

25   for two days?
```

Page 13

1   A.         Yes.

2   Q.              Okay.  And you said they gave you some

3   snacks and juice?

4                        THE INTERPRETER:  Okay.  Snacks.

5   Different country would use different words.  Which

6   word would you want me?  Little food?  Because we say

7   (Spanish word spoken).

8                        MS. CONNOLLY:  I'll ask a different

9   question.

10  BY MS. CONNOLLY:

11  Q.         So they gave you some juice, right?

12  A.         Yes.

13  Q.         And what did you eat?

14  A.         One cracker.

15                       MR. WOFSY:  Objection.  I think she

16  said --

17                       THE INTERPRETER:  (Spanish word

18  spoken), one cracker.

19                       MR. WOFSY:  Misheard.

20  BY MS. CONNOLLY:

21  Q.              Did you get juice and one cracker more

22  than once?

23  A.         Yes, they gave us three times a day.

24  Q.              Okay.  Now, did you have any -- do you

25  remember -- did you have any water in that room?

Page 14

```
 1    A.          No.

 2    Q.          Do you remember seeing a big jug on a

 3    table of anything?

 4    A.          No.

 5    Q.          And did you -- while you were in that

 6    room, did you see the border patrol agents come by?

 7    A.          No.

 8    Q.          You didn't see them?

 9    A.          I don't remember.

10    Q.          Okay.  How did you get the food?

11    A.          I don't understand what you say.

12    Q.          Did they bring the food to your room or

13    did you leave the room to go get food?

14    A.          They brought it.

15    Q.          Okay.  And so the men came by and brought

16    you the food?

17    A.          Yes.

18    Q.          Okay.  Now, while you were in that room,

19    were you always with your mom and your brother and

20    your sister?

21    A.          Yes.

22    Q.          And do you remember there was a toilet in

23    that room?

24    A.          Toilet, I don't know what is that.

25    Q.          Where you go to the bathroom?
```

Testimony

October 4, 2016

Page 16

```
 1    Q.          Now, did you get any blankets while you
 2    were at that first place?
 3    A.          No.
 4    Q.          And --
 5    A.          We had them, but they don't allow us to
 6    take them.
 7    Q.          Okay.  So you had them when you were
 8    first stopped by the men?
 9    A.          Yes.
10    Q.          But they didn't allow them into the room
11    with you?
12    A.          Yes.
13    Q.          Okay.  Now, you were there, you said, I
14    think, for two days?
15    A.          Yes.  And one night.
16    Q.          And when -- you were in that same room
17    that whole time?
18    A.          Yes.
19    Q.          And who else was in that room with you?
20    A.          There were enough people.
21    Q.          Were there other children in that room
22    with you?
23    A.          They were a lot of kids and a lot of moms
24    also.
25    Q.          Now, after that first location, they took
```

Testimony

October 4, 2016

Page 18

1    Q.          Do you remember that place?

2    A.          Yes.

3    Q.          Okay.  Do you remember what happened when

4    you got there?

5    A.          Yes.

6    Q.          Why don't you tell me what happened when

7    you got there.

8    A.          Well, what happened is that they told us

9    to grab a blanket.

10                  THE INTERPRETER:  She say aluminum.

11   Can I ask her if she said that?

12                  THE WITNESS:  Aluminum blanket and

13   a mattress, that it was not broken, scratched.

14                  MR. WOFSY:  So the interpreter was

15   asking the deponent whether she had said the Spanish

16   word for aluminum.  I would ask that the interpreter

17   not ask her own questions to the deponent and just

18   translate what she hears.

19                  THE INTERPRETER:  Okay.

20   BY MS. CONNOLLY:

21   Q.          When you got to the second place, they

22   told you to take a blanket, an aluminum blanket?

23   A.          Yes.

24   Q.          And you said that there was a pad to

25   sleep on?

Yesim                                    October 4, 2016

Page 19

1    A.           Yes.

2    Q.           And did they feed you there?

3    A.           Yes.

4    Q.           Do you remember what they fed you?

5    A.           Frozen bread with a little meat inside

6    it.

7    Q.           Okay.  Was the bread frozen when you got

8    it?

9    A.           Yes.

10   Q.           Could you bite into the sandwich?

11   A.           Yes.

12   Q.           Okay.  And you said there was a little

13   bit of meat in the middle?

14   A.           Yeah.

15   Q.           And did you get this more than one time?

16   A.           They gave us three times.

17   Q.           Three times while you were there?

18   A.           No, three times a day.

19   Q.           Okay.  And did you get any snacks in

20   addition to that?

21   A.           No.

22   Q.           Did you get any juice?

23   A.           Milk.

24   Q.           You got milk.  Did you ever get any sort

25   of like cookies or anything like that?

Yesmi~                                                October 4, 2016

                                                      Page 20

1    A.         No.

2    Q.         Any crackers?

3    A.         No.

4    Q.         And you said you got milk?

5    A.         Yes.

6    Q.         Did you get any juice?

7    A.         No.

8    Q.         And was there water in your room at that

9    second place?

10   A.         Well, there wasn't a room -- it was a big

11   room where all the people were all there.  Only there

12   were -- (Spanish word spoken).  They were pieces of

13   fabric.

14                    MR. WOFSY:  Nets maybe?

15   A.         Nets.  There were nets over there.

16   Q.         And so --

17                    MR. WOFSY:  Sorry, I don't think

18   that was the complete translation of what she said.

19   A.         Over there and over there.

20                    MR. WOFSY:  And so, just for the

21   record, I think the deponent was indicating there

22   were nets on three sides.

23                    THE INTERPRETER:  On where?

24                    MR. WOFSY:  Three sides.

25                    MS. CONNOLLY:  That is correct.

Yesim                                                    October 4, 2016

1    The deponent did indicate with her arms that there

2    was this object, which is translated as nets, on

3    three different sides.

4    BY MS. CONNOLLY:

5    Q.          So in this room, was there water?

6    A.          No.

7    Q.          No water?

8    A.          No.

9    Q.          No jug of water on a table?

10   A.          No.

11   Q.          And was there a place to go to the

12   bathroom in the room?

13   A.          I don't remember because I didn't go to

14   the bathroom there.  Not one time.

15   Q.          And while you were there, were you with

16   your mom the whole time?

17   A.          Yes.

18   Q.          And was your sister and your brother also

19   with you and your mom the whole time?

20   A.          Yes.

21   Q.          Now, how long were you at that second

22   place?

23   A.          I don't remember.

24   Q.          And then you were taken to a third place.

25   Do you remember that?

Yesim _____   October 4, 2016

1    A.          Yes.

2    Q.          And did they feed you at that third

3    place?

4    A.          Yes.

5    Q.          Do you remember what they gave you?

6    A.          Yes.

7    Q.          What did they give you?

8    A.          They gave us cheese sandwiches and they

9    gave us a lot of things there.

10   Q.          A lot of things to eat?

11   A.          Yes.

12   Q.          And did you have -- in that third place,

13   did you have a bed there?

14   A.          Yes.  There, there were beds.

15   Q.          And blankets as well?

16   A.          Yes.

17   Q.          Okay.  And then after a while you were

18   brought to where you are now, is that right?

19   A.          Yes.

20   Q.          So when you were at the third place, were

21   you with your mom the whole time?

22   A.          No.

23   Q.          You were not.  Who were you with?

24   A.          Sometimes I was at school.

25   Q.          Okay.  So when you were at the third

Page 35

1                C E R T I F I C A T E

2

3     I do hereby certify that I am a Notary Public
      in good standing, that the aforesaid testimony
4     was taken before me, pursuant to notice, at the
      time and place indicated; that said deponent
5     was by me duly sworn to tell the truth, the
      whole truth, and nothing but the truth; that
6     the testimony of said deponent was correctly
      recorded in machine shorthand by me and
7     thereafter transcribed under my supervision
      with computer-aided transcription; that the
8     deposition is a true and correct record of the
      testimony given by the witness; and that I am
9     neither of counsel nor kin to any party in said
      action, nor interested in the outcome thereof.

10

11    WITNESS my hand and official seal this 7th day of
      October, 2016.

12

13

14    _____

15    Notary Public

16

17

18

19

20

21

22

23

24

25

Yeslin ███████████                                    October 4, 2016

Page 36

1    A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3    I, Yeslin ████████████    do hereby acknowledge

4    I have read and examined the foregoing pages of

5    testimony, and the same is a true, correct and

6    complete transcription of the testimony given

7    by me, and any changes or corrections, if any,

8    appear in the attached errata sheet signed by me.

9

10

11

12

13

14

15

     _____        _____

16   Date                    Yeslin ███████████████

17

18

19

20

21

22

23

24

25

Yeslin

October 4, 2016

Page 37

1    Cody Wofsy, Esquire

     American Civil Liberties Union

2    39 Drumm Street

     San Francisco, CA

3

     IN RE:  Jenny Lisette Flores v. Loretta Lynch

4

5

6  Dear Mr. Wofsey,

7          Enclosed please find your copy of the

8    deposition of Yeslin ███████████ along with

9    the original signature page.  As agreed, you

10   will be responsible for contacting the witness

11   regarding signature.

12       Within 30 days of October 10, 2016, please

13   forward errata sheet and original signed signature

14   page to counsel for Plaintiff, Kathleen Connolly.

15     If you have any questions, please do not

16   hesitate to call.  Thank you.

17

18   Yours,

19   Suzanne Toto

     Reporter/Notary

20

21   cc:  Kathleen Connolly, Esquire

22

23

24

25

DATED: December 5, 2016                Respectfully submitted,

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey
Carlos Holguín


ORRICK, HERRINGTON & SUTCLIFFE LLP
T. Wayne Harman
Elena García

LA RAZA CENTRO LEGAL, INC.
Michael Sorgen
Amanda Alvarado Ford

LAW FOUNDATION OF SILICON VALLEY -
LEGAL ADVOCATES FOR CHILDREN &
YOUTH
Jennifer Kelleher Cloyd
Katherine H. Manning
Kyra Kazantzis
Annette Kirkham

Of counsel:

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

/s/__*Peter Schey*_____
*Attorneys for Plaintiffs*

/ / /

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On December 6, 2016 I electronically filed the following document(s):

- **Plaintiffs EXHIBITS 13-18 [PART 4 OF 6]**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/  *Peter Schey*
*Attorney for Plaintiffs*