CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
         crholguin@centerforhumanrights.org


ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| Plaintiffs, | ) |
| - vs - | ) PLAINTIFFS' EXHIBITS 19-26 [PART 5 OF 6] |
| JEH JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) Hearing: January 30, 2017 |
| Defendants. | ) |

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

1

2

INDEX OF EXHIBITS

3

4

1.  Declaration of Stephen Manning…………………………………………...…………... 1

5

2.  Deposition of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. – Transcript Excerpts……………………………………………………………………. 10

6

7

3.  Deposition of Chief Patrol Agent – El Centro Sector, CBP, Rodney Scott – Transcript Excerpts……………………………………………………………….………………. 36

8

9

4.  Deposition of Chief Patrol Agent – Tucson Sector, CBP, Paul Beeson – Transcript Excerpts……………………………………………………………...……………59

10

5.  Deposition of Chief Patrol Agent – Laredo Sector, CBP, Mario Martinez – Transcript Excerpts…………………………………………………………….……………... 77

11

12

6.  Deposition of Karnes Assistant Field Office Director, Enforcement and Removal Operations, ICE, Juanita Hester – Transcript Excerpts………………………….………………..… 101

13

14

7.  Deposition of Dilley Assistant Field Office Director, Enforcement and Removal Operations, ICE, Valentin de la Garza – Transcript Excerpts……………………………………….. 121

15

16

8.  Deposition of Berks Assistant Field Office Director, Enforcement and Removal Operations, ICE, Joshua Reid – Transcript Excerpts…………………………………………….….. 149

17

9.  Deposition of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller – Transcript Excerpts…………………………………….……….. 193

18

19

10. Deposition of Class Member Mother Ritza Mxxx xxxxxxx – Transcript Excerpts…………………………………………………………………. 230

20

21

11. Deposition of Class Member Mother Celina Sxxxxxx-xxxx – Transcript Excerpts…………………………………………………………………. 244

22

23

12. Deposition of Class Member Franklin Rxxxx xxxxxxxxxx– Transcript Excerpts……………………………………………………………….. 263

24

13. Deposition of Class Member Mother Karina Vxxxx xxxxxxx – Transcript Excerpts…………………………………………………….………………….289

25

26

14. Deposition of Class Member Mother Lindsay Gxxxx xxxxx – Transcript Excerpts………………………………………………………………… 316

27

28

15.  Deposition of Class Member Mother Mirna Mxxxxxx xxxxx – Transcript Excerpts………………………………………………………………… 341

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16. Deposition of Class Counsel Peter Schey – Transcript Excerpts…………………….……… 361

17. Deposition of Class Member Mother Sara Exxxxxxxx xxxxx – Transcript Excerpts…………………………………………………….……………………………….. 381

18. Deposition of Class Member Yeslin Lxxxx xxxxxxx – Transcript Excerpts…..……………………………………………….………………………… 399

19. Deposition of Class Member Mother Yessenia Exxxxxxxx xxxxxxx – Transcript Excerpts………..…………………………………………………………………418

20. Deposition of Class Member Mother Zulma Mxxxxxxx xxxxxxx – Transcript Excerpts……………………………………………………………………. 432

21. Deposition of Attorney Bridget Cambria  – Transcript Excerpts…………………….………458

22. Deposition of Attorney Amanda Doroshow – Transcript Excerpts………………….…... 467

23. Deposition of Attorney Robyn Barnard – Transcript Excerpts…………………….……… 476

24. Deposition of Attorney Edward McCarthy – Transcript Excerpts………………….……... 505

25. Deposition of Jacqueline Kline – Transcript Excerpts………………………………… 528

26. Declaration of Attorney Robert Doggett……………………………………………..……… 537

27. Declaration of Chapman Noam……………………………………………..………… 543

# Exhibit 19

## Conditionally Filed Under Seal

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                      WESTERN DIVISION

4   JENNY LISETTE FLORES, et al,

5            Plaintiff,

6   VS.                      NO. CV 85-4544 DMG (AGRx)
                             Hon. Dolly M. Gee
7   LORETTA E. LYNCH,        United States District Judge
    Attorney General of the
8   United States, et al.,

9            Defendant.
    _____
10   DEPOSITION OF:  **YESSENIA** ███████████████████████
                     Taken on:  Se██
11  _____
    APPEARANCES:
12
                    **On behalf of the Witness:**
13
                      AMY BELSHER, ESQ.
14                 BENJAMIN D. BLEIBERG, ESQ.
                    Chadbourne & Parke, LLP
15                1301 Avenue of the Americas
                    New York, NY 10019
16

17                **On behalf of the Defendant:**

18             C. FREDERICK SHEFFIELD, ESQ.
             United States Department of Justice
19                    Civil Division
             Office of Immigration Litigation
20                 District Court Section
             PO Box 868, Ben Franklin Station
21               Washington, DC 20044

22
                     **Also Present:**
23
                 Heather Hayes, Interpreter
24
      Belen ████████████████████████  Mother of witness
25

                                              Page 1

1                          <u>I N D E X</u>

2

3    <u>WITNESS:</u>

4    YESSENIA ████████████████████████

5          Examination by Mr. Sheffield........Page 5

6          Examination by Ms. Belsher..........Page 34

7

8

9                          <u>EXHIBITS</u>

10   No. 1....................................Page 25

11   No. 2....................................Page 25

12

13

14

15

16

17

18

19

20

21

22

23

24

25

420

```
 1              The deposition of YESSENIA

 2  ████████████████  was taken by counsel for the

 3  Defendant, pursuant to notice, at The Inn at Opryland,

 4  2401 Music Valley Drive, Donelson "A" conference room,

 5  Nashville, Tennessee, 37214, on September 28, 2016,

 6  pursuant to Rule 30 of the Federal Rules of Civil

 7  Procedure.

 8              The formalities as to notice, caption,

 9  certificate, et cetera, are waived.

10              It is agreed that Jeanine D. Everhart,

11  being a Notary Public and court reporter for the State

12  of Tennessee, may swear the witness, and that the

13  reading and signing of the completed deposition by the

14  witness are waived.

15

16

17                            *  *  *

18

19

20

21

22

23

24

25
                                                     Page 3
```

```
 1        MR. SHEFFIELD:  This marks the

 2   beginning of the deposition of Yessenia

 3   ███████████████████

 4        Did I pronounce that right, ████████

 5   (A-ZWA-LEEP)?

 6        MS. ████████████████  ████████████████

 7   ████████

 8        MR. SHEFFIELD:  ███████████████

 9   Gracias.

10        And this is in the case of Flores vs.

11   United States Attorney General, Case

12   #2:85-cv-04544.

13        Today's date is September 28th, 2016,

14   and we are on the record at 5:45 -- I'm

15   sorry, 4:45.                                04:44F

16        I would ask the court reporter to,

17   please, swear in our interpreter.

18        (The interpreter was duly sworn by the

19   court reporter.)

20        MR. SHEFFIELD:  And now we'll have you  04:44F

21   swear in Ms. ████████

22        (The witness was duly sworn by the

23   court reporter.)

24        MR. SHEFFIELD:  Okay.  Court reporter,

25   would you, please, designate this           04:45F
```

Page 4

```
1              transcript as confidential and subject to
2         the protective order in this case.
3              And could we just go around the room
4         and everyone state your name for the
5         record.                                         04:45
6              We'll start with Yessenia.
7              THE WITNESS:  Yessenia ███████
8         ████████████
9              MR. SHEFFIELD:  Thank you.
10        And next?
11             MS. ██████████:  Belen █████████
12        █████████.
13             MR. SHEFFIELD:  Okay.
14             MS. BELSHER:  Amy Belsher.
15             MR. BLEIBERG:  Benjamin Bleiberg from
16        Chadbourne Parke on behalf of the witness.
17
18             YESSENIA ███████████████
19   Was called as a witness, and after having been first
20   duly sworn, testified as follows:
21                       EXAMINATION
22   BY MR. SHEFFIELD
23        Q.   Okay.  So good morning -- or -- good
24   morning -- I'm still using --
25             Yessenia, my name is Fred Sheffield.  I'm   04:46
```

Page 5

423

```
 1          misconstrued the question; misstated the
 2          question.
 3               MR. SHEFFIELD:  Thank you.
 4     A.    They didn't offer us anything.
 5     Q.    Perfect.                                    05:05
 6          Did they -- okay.  Did they ask you to go
 7  into a vehicle or something like that?
 8     A.    Yes.
 9     Q.    What kind of vehicle was it?
10     A.    Immigration.                               05:05
11     Q.    Was it, like, a car or a truck or --
12     A.    It was, like, a van.
13     Q.    Okay.  So then did they take you to a
14  border facility or a detention facility or something
15  like that?                                          05:05
16               MS. HAYES:  Just for the record, the
17          interpreter is asking "you" singular; did
18          they take "you," or is the interpreter
19          asking did they take "you" pleural?
20               MR. SHEFFIELD:  Single.                 05:05
21               MS. HAYES:  Thank you.
22     A.    No, I don't know.
23     Q.    So when they put you in the truck; in the
24  van you said, were you with your mother and your
25  brother?                                            05:06
```

                                                   Page 16

                                                        424

1          A.    I was with both of them.

2          Q.    Okay.  And where did you go in the van?

3          A.    To the icebox.

4          Q.    Do you know if the icebox has another name?

5          A.    No.                                                    05:06P

6          Q.    Is the icebox -- what -- how would you

7    describe the icebox?

8          A.    It's a room.  It's really cold.

9          Q.    Okay.  Is that where you were -- you were

10   detained with your mother and your brother?          05:07P

11         A.    Yes.

12         Q.    Do you know was it cold there because of,

13   like, air-conditioning or was it cold because it's cold

14   outside?

15              MS. BELSHER:  Objection; calls for           05:07P

16         speculation.

17              MR. SHEFFIELD:  You can answer it.

18         A.    Air-conditioning.

19         Q.    Okay.  So when you went to this

20   facility--and just for the record I'm going to call it   05:08P

21   the icebox, the first facility--so when you went to the

22   first facility, were there other people in the room

23   with your brother and your mother?

24         A.    Yes.

25         Q.    And you were put in a room with your mother   05:08P

                                                  Page 17

1    and your brother?

2         A.   Yes.

3         Q.   Okay.  And at this first place that you

4    were taken, were you always with your mother and your

5    brother the whole time?                                    05:09P

6         A.   Yes.

7         Q.   Okay.  And you say it was cold there,

8    right?

9         A.   Yes.

10        Q.   Was it always too cold or was it sometimes    05:09P

11   too hot and sometimes too cold or was it just always

12   too cold?

13        A.   Always too cold.

14        Q.   Were you given food at this first place?

15        A.   Yes.                                           05:09P

16        Q.   What was it like?  What kind of food?

17        A.    It was, like, two pieces of bread and a

18   piece of meat.

19        Q.   Was there anything else in between the

20   bread besides just a piece of meat?                       05:09P

21        A.   That was it.

22        Q.   Okay.  How often did you get these

23   sandwiches?

24        A.   I don't know.

25        Q.   Was it more than once a day?                   05:10P

                                              Page 18

1          A.   Yes.

2          Q.   Okay.  Do you know if it was more than two

3     times a day?

4               MS. BELSHER:  Objection; vague.

5               MR. SHEFFIELD:  You can answer.

6          A.   Yes.

7          Q.   Okay.  Were you given any type of, like,

8     snacks or anything aside from just these sandwiches?

9          A.   No.

10         Q.   Were you given anything -- was there

11    anything to drink at the first place that you went?

12         A.   Yes.

13         Q.   What was there to drink?

14         A.   Just juice.

15         Q.   Was there water?

16         A.   No.

17         Q.   What kind of -- how did the juice come?

18    Was it in cups or was it in boxes?  What was that like?

19         A.   In a bottle.

20         Q.   In a bottle.

21              Were there any pads or anything to sleep

22    on?

23         A.   No.

24         Q.   Did you sleep when you were there?

25         A.   Hardly at all.

                                             Page 19

427

```
 1          Q.   Where did you -- were you able to lie down

 2    or anything?

 3          A.   On the floor.

 4          Q.   Okay.  Was there a mat or anything to lay

 5    on?                                                        05:12P

 6               MS. BELSHER:  Objection; asked and

 7          answered.

 8               MR. SHEFFIELD:  You can answer it.

 9          A.   I didn't understand.

10          Q.   Was there anything like a blanket or any     05:12P

11    type of a mat or anything to lay on?

12          A.   No.

13          Q.   Okay.  Do you remember about how many

14    people were there in the room with you?

15          A.   Quite a few.                                  05:12P

16          Q.   Would you say more or less than 20 if you

17    had to estimate?

18               MS. BELSHER:  Objection; form.

19          A.   More.

20          Q.   Was there a toilet in the room?              05:13P

21          A.   Yes.

22          Q.   And where was the toilet?

23          A.   In the corner.

24          Q.   Was there a wall around the toilet or

25    anything?                                                05:13P
```

Page 20

1           A.   A little wall.

2           Q.   The people at the first -- the people who

3    worked there at the first facility, did they give you

4    anything apart from sandwiches or juice?

5                MS. BELSHER:  Objection to form.                    05:14

6           A.   No.

7           Q.   Did they give you any blankets or anything

8    like that?

9           A.   No.

10          Q.   So do you remember how long you spent at          05:14

11   the first place that you went?

12          A.   Three nights.

13          Q.   Three nights.

14               And then were you and your mom and your

15   brother then taken -- were you taken to, like, a second      05:14

16   place?

17          A.   Yes.

18          Q.   And do you remember what that place was

19   called?

20          A.   The dog pen.  The dog pound/the dog pen.          05:14

21          Q.   Do you know if the dog pound had another

22   name?

23          A.   No.

24          Q.   Do you know why people call it the dog

25   pound?                                                        05:15

Page 21

1          Q.    Were you apart from -- just generally, were

2     you apart from your mother and your brother at this

3     second place?

4          A.    Yes.

5          Q.    For about how long?                              05:16

6          A.    I don't remember.

7          Q.    Was it the whole time that you spent at the

8     second place that you were separated or just part of

9     the time?

10         A.    All the time.                                    05:17

11         Q.    Do you know why you were separated?

12         A.    No.

13         Q.    Okay.  You're doing great, by the way, and

14    we're almost done.  That's the good news.

15              Do you remember if there were any posters       05:17

16    or anything like that on the wall at either of the two

17    places where you were held?

18         A.    No.

19         Q.    Do you know -- you don't remember or there

20    weren't any?                                                05:18

21              MS. BELSHER:  Objection to form.

22         Q.    That's okay.

23         A.    I don't remember.

24         Q.    Okay.  And do you remember if anyone -- do

25    you remember if anybody who worked there at the           05:18

                                              Page 23

1                      C E R T I F I C A T E

2     STATE OF TENNESSEE

3     COUNTY OF RUTHERFORD

4              I, Jeanine D. Everhart, a Notary Public in

5     and for the State of Tennessee at Large, do hereby

6     certify that YESSENIA ███████████████ was

7     by me first duly sworn to testify the whole truth; that

8     the testimony of said deponent was recorded

9     stenographically by me and thereafter reduced to

10    computer-aided transcription; and that said deposition

11    constitutes a true and correct transcript of my

12    stenotype notes of the testimony given by said witness.

13             WITNESS my hand and seal in the city of

14    Christiana, Rutherford County, Tennessee, this _____

15    day of _____, 20__.

16                      _____

17                      JEANINE D. EVERHART, Notary Public,

18                      State of Tennessee at Large.

19                      My Commission expires:  5/20/2017

20                      LCR# 215   Exp: 6/30/2018

21

22

23

24

25

                                                    Page 37

# Exhibit 20

Conditionally Filed Under Seal

1

1

2      UNITED STATES DISTRICT COURT

3      FOR THE CENTRAL DISTRICT OF CALIFORNIA

4      Civil Action No. 2:85-CV-04544-DMG-AGR

5      -------------------------------------

6      JENNY L. FLORES, et al.,

7                     Plaintiffs,

8        -against-

9      LORETTA E. LYNCH, United States Attorney

10     General,

11                    Defendant.

12     -------------------------------------

13

14

15            DEPOSITION OF ZULMA ████████

██  ████████  a third-party witness herein, taken

17     by Defendant, pursuant to Subpoena, held at

18     the offices of the United States Attorney,

19     271 Cadman Plaza East, Brooklyn, New York, on

20     Wednesday, October 5, 2016, at 10:02 a.m.,

21     before Deborah Moschitto, a Shorthand

22     Reporter and notary public, within and for

23     the State of New York.

24

25

2

1

2     A P P E A R A N C E S :

3

4     PETER A. SCHEY, ESQ.,

5         President

6         CENTER FOR HUMAN RIGHTS AND

7         CONSTITUTIONAL LAW

8         (Via telephone)

9

10

11    UNITED STATES DEPARTMENT OF JUSTICE

12    Attorneys for Defendant

13        P.O. Box 878

14        Ben Franklin Station

15        Washington, DC 20044

16    BY: YAMILETH G. DAVILA, ESQ.

17

18

19    Also Present:

20        XIMENA VARGAS, Spanish Interpreter

21

22

23

24

25

3

1

2

3          IT IS HEREBY STIPULATED AND AGREED

4    that all objections, except as to the form of

5    the questions, shall be reserved to the time

6    of the trial;

7          IT IS FURTHER STIPULATED AND AGREED

8    that the within examination may be subscribed

9    and sworn to before any notary public with

10   the same force and effect as though

11   subscribed and sworn to before this court.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1

2                    XIMENA VARGAS,

3        called as the interpreter in this

4        matter, was first duly sworn to

5        faithfully and accurately translate the

6        questions propounded to the witness from

7        English to Spanish, and the answers

8        given by the witness from Spanish to

9        English;

10

11        ZULMA ██████████████████

12        after having been first duly sworn, was

13        examined and testified through the

14        Interpreter as follows:

15

16   EXAMINATION BY

17   MS. DAVILA:

18    Q.    Good morning, my name is Yamileth

19    Davila.  I know we have already been

20    introduced, but I wanted to go ahead and

21    state my name for the record.  I represent

22    the defendant, the United States Attorney

23    General in the case of Flores versus Meese,

24    currently pending in the U.S. District Court

25    for the Central District of California.

5

1              Z.  ███████

2              Are you represented by counsel?

3    A.    When I was told that I was going

4    to have some sort of presentation from my

5    attorney, through, I don't know the -- but

6    somebody told me.

7    Q.    What is your attorney's name?

8    A.    Look, I don't really remember.  I

9    only got to court yesterday asking if I had

10   somebody to represent me.  They told me that

11   I would work with Human Rights and they were

12   the people who help.

13   Q.    Who did you speak to?

14   A.    Yes, somebody called me yesterday.

15   I spoke to somebody when they called me to

     4    with the assistance of the interpreter?

     5         A.    Yes.

     6         Q.    Thank you.

     7               Mrs. ███, did you travel to the

     8    United States in November of 2015?

     9         A.    Yes.

    10         Q.    Who traveled with you?

    11         A.    My son.

    12         Q.    And how old was your son in

    13    November of 2015?

    14         A.    Eleven years old.

    15         Q.    Did you arrive in Texas in

    16    November of 2015?

    17         A.    Yes.

    18         Q.    Which part of Texas?

    19         A.    Look, I don't really remember the

    20    place where I landed.  All I know is that as

    21    soon as I filed with Immigration, they took

    22    me to a place called la hielera, or the

    23    cooler.

    24         Q.    Would you please spell la hielera?

    25         A.    I don't understand.  I don't

                                                    12

     1                    Z. ███

```
2    really know how to spell it.  I just know

3    that we all called it la hielera.

4         Q.    Who called it la hielera?

5         A.    Everyone who arrives there, we

6    call it that because it's a long, narrow room

7    and it's very, very cold.

8         Q.    Do you know la hielera by any

9    other name?

10        A.    No.  I only know it by that name.

11        Q.    Was la hielera a facility managed

12   by Customs and Border Patrol?

13        A.    Yes, from the Border Patrol.

14        Q.    Please describe the facility.

15        A.    Look, I know that we just arrived

16   at this space.  I know that -- what I

17   remember was there was a parking lot and then

18   there was a long hallway that went to the

19   room where they took us, and all I know is

20   that when they put me in there, they took my

21   child and they separated us.

22        Q.    Where was your child taken?

23        A.    Well, they are in the same place,

24   but to another room.

25             MR. SCHEY:  Could I just suggest
```

25          Q.    Do you know how many people were

                                                14

1                        Z. ███████

2    at the facility?

3          A.    Look, there were many.

4          Q.    Do you know approximately how

5    many?

6          A.    I would say maybe around 75

7    people, and there were children, very small

8    children as well.

9          Q.    Did you sleep at the facility?

10         A.    Yes.

11         Q.    Where did you sleep?

12         A.    In the floor.  We really couldn't

13   sleep because it was just too cold.

14         Q.    Have you finished your answer?

15         A.    No.  No, no, I wasn't finished.

16   No.  We really couldn't sleep because it was

17   so cold.  They gave us something, supposedly

18   they were blankets, but they were made out of

19   aluminum.  But it wouldn't help us with the

20   cold and we arrived there all wet.  There

21   were no mattresses.  There was nothing on the

22   floor.  We were just -- we couldn't sleep.

23    The children were crying and screaming:  Mom,

24    let's go, let's go.

25              It was really, really difficult

                                                    15

1                       Z. ████████

2    because I could see my child was desperate

3    and wanted to leave there.  I couldn't really

4    see him because he was in another room, but I

5    could see him through a window and we can

6    only do signals.  I kept giving him the

7    signal to pray to God.

8         Q.    Have you finished your response?

9         A.    No.  I was particularly suffering

10   because my child is asthmatic.  He has asthma

11   and the air, I knew the air wasn't really

12   good for him and it was going to be very

13   difficult.  All I could see him was through

14   this window.

15              When I left my country, I had --

16   when I was coming over here, I had medicine

17   for him, but when I arrived to that center,

18   they took it and they threw it away and they

19   said that it was forbidden.

20        Q.    The last question was where did

441

21     you sleep.  I understand that you have a lot

22     of information that you would like to tell

23     us, but I think it's important that you

24     respond to my question.

25          A.    Okay.


                                                16

1                         Z. █████████

2          Q.    Is it your testimony that you

3     slept on the floor?

4          A.    Yes.

5               MR. SCHEY:  I just want to --

6               excuse me.  I just want to object to two

7               things:  One is that I think she has been

8               responding to your questions

9               appropriately.

10              And secondly, that your most

11              recent question misstates the evidence,

12              because she has already testified that

13              she could not sleep.

14    BY MS. DAVILA:

15         Q.    I'll rephrase the last question.

16              Is it your testimony that you did

17    not sleep for three days?

18         A.    Yes.  I couldn't sleep because of

19      the cold.

20           Q.      Is it your testimony that you were

21      not provided with a bed?

22           A.      No, not even a bed or a mattress.

23           Q.      Did your son sleep at the

24      facility?

25           A.      Yes.


                                                    17

1                       Z. ▮▮▮▮▮▮

2            Q.      How do you know?

3            A.      To sleep, to sleep, not really.

4       He couldn't really sleep peacefully.  Yes, we

5       did spend the night there, but we couldn't

6       sleep, because how can you sleep on the

7       floor?

8            Q.      Did you speak --

9            A.      I'm sorry, and because of the

10      cold.

11           Q.      Did you speak with your son while

12      he was at the la hielera?

13           A.      I couldn't speak to him.  I could

14      only look at him when he came out into the

15      hallway and I could see him through a window.

16           Q.      Were you told why you were

17    separated from your son?

18        A.    They only told me that he couldn't

19    be with me because he was too old.  I told

20    him to please let him stay with me and they

21    wouldn't.  They were quite upset and angry

22    and they told us to move quickly to the room

23    and they took him to the other room.

24        Q.    Who took your son to the other

25    room?

                                                    18

1                 Z.  ███████

2        A.    An officer from there.

3        Q.    Do you know the officer's name?

4        A.    No, I don't know the name.

5        Q.    Was your son given a blanket at

6    the facility?

7        A.    No.  Supposedly, the blanket was

8    that aluminum paper that they gave you there.

9        Q.    Were those around you provided

10    with the same aluminum blanket?

11        A.    Some of them had some and some

12    others didn't.  They would give them to some

13    and not to others.  The hardest part was to

14    see the children complain because of the

15    cold.

16        Q.    Were you given food at the

17    facility?

18        A.    The only food they gave us was

19    some very cold bread with, I don't know if it

20    was ham or another cold cut, and it was for

21    breakfast, for lunch and for dinner.  It was

22    so cold and you felt it in your stomach.

23        Q.    Were you given the cold cut

24    sandwich three times a day?

25        A.    And a little box of juice.  Yes,

19

1                    Z.    ███████

2    but I didn't take it every time because the

3    first time I had it, it didn't settle very

4    well with me, so I wouldn't take it every

5    time.

6        Q.    Was your son provided with food at

7    the facility?

8        A.    The same thing that they gave me.

9    They gave us all the same thing.

10        Q.    Where did you eat your meals?

11        A.    In the same place.  They would

12    only take us out in the hallway to get on

13   line to receive the food and they we would be

14   ushered back to the room.

15        Q.    Was the same meal given to

16   everyone?

17        A.    Yes, it was the same thing for

18   everyone, and sometimes they would get upset

19   over there because they say that it wasn't a

20   Burger King because some of the children were

21   complaining.

22        Q.    Who would say it wasn't a Burger

23   King?

24        A.    One of the officers that was

25   distributing the food there stated, because

                                                    20

1                    Z. █████████

2    some people noticed that they were serving

3    the same thing over and over, so they

4    complained.  And one of the officers said

5    this was not a Burger King, you cannot place

6    an order.

7         Q.    Did you shower at the facility?

8         A.    No.

9               (Interruption.)

10              MS. DAVILA:  Let's go off the

3    the Customs and Border Patrol?

4         A.    Always by the same officers of the

5    Border Patrol.

6         Q.    Did your son go with you to la

7    perrera?

8         A.    Yes.

9         Q.    How were you transported to la

10   perrera?

11        A.    They took us in a bus.

12        Q.    Did you travel with your son?

13        A.    Yes.  It was there, after so many

14   days, that we met again.

15        Q.    How many people were at the la

16   perrera?

17        A.    Look, there were perhaps about 50

18   people, but there were also children there.

19        Q.    When you arrived at la perrera,

20   were you separated from your son?

21        A.    Yes.  They separated us again.

22        Q.    Who separated you?

23        A.    The same officers there.  He was

24   going to one place and I was going to

25   another.

25

447

1                    Z. ███████

2        Q.    Did the officers tell you why you

3    had been separated?

4        A.    Supposedly because of his age.

5        Q.    Where was your son taken?

6        A.    In the same center, but -- in the

7    same facility, but in another area.  I could

8    barely see him.

9        Q.    Did you sleep at la perrera?

10       A.    There I slept a little more

11   because they had some mattresses on the

12   floor.

13       Q.    Did your son sleep in la perrera?

14       A.    Yes.

15       Q.    Was your son also provided with a

16   mattress on the floor?

17       A.    Yes.

18       Q.    Were you provided with a blanket

19   in la perrera?

20       A.    No.  There, no.  Only the

21   mattresses.

22       Q.    Was your son provided with a

23   blanket in la perrera?

24       A.    No.

25       Q.    How do you know?

26

1                          Z. ████████

2          A.    Because when we were there, we

3     didn't have any blankets.  Only the

4     mattresses.

5          Q.    Were you given food in la perrera?

6          A.    Yes, they gave us.

7          Q.    How often were you given food?

8          A.    The only thing they gave us was a

9     burritos and an apple and some fries and

10    cookies.

11         Q.    Please answer my question.  I

12    asked how often were you given food?

13         A.    I'm sorry.  What do you mean, how

14    many times?

15         Q.    How many times a day did you

16    receive food in la perrera?

17         A.    Three times a day.

18         Q.    Were you provided with food for

19    breakfast?

20         A.    Yes.

21         Q.    Were you provided with food for

22    lunch?

23         A.    Yes.

24      Q.    Were you provided with food for

25   dinner?


                                            27

1                    Z.    ████

2       A.    Yes.

3       Q.    What food did you receive for

4    breakfast?

5       A.    Burritos.

6       Q.    Did you receive anything else?

7       A.    An apple and some fries and a

8    cookie.

9       Q.    Were you provided with anything to

10   drink?

11      A.    To drink, I don't remember.  I

12   don't remember that.

13      Q.    Were you provided with water at la

14   perrera?

15      A.    Yes.

16      Q.    What were you provided with --

17   strike that.

18            What food were you provided with

19   for lunch?

20      A.    The same thing, a burrito and an

21   apple and the cookies and the fries.

22      Q.    Is it your testimony that you were

23  provided with the same foods three times a

24  day?

25      A.    Yes.


                                        28

1               Z.  █████████

2               MR. SCHEY:  I think she said

3          potato chips, not fries.

4               THE INTERPRETER:  Thank you.

5          Thank you very much.  I was trying to

6          think of a better word.  Yes.  I'm sorry.

7               MR. SCHEY:  So she say potato

8          chips; is that correct?

9               THE WITNESS:  Yes, potato chips

10         that come in a little bag.

11              MR. SCHEY:  Thank you.

12              THE INTERPRETER:  Thank you,

13         counselor.

14  BY MS. DAVILA:

15      Q.    Is that your complete answer?

16      A.    Yes.

17      Q.    Do you know if your son received

18  food at the la perrera?

19      A.    Yes, he received food.

20    Q.    How do you know?

21    A.    Because when we got out, he told

22    me that he had gotten the same thing, the

23    burrito.  I thought that he was getting

24    something different.

25    Q.    Were those around you given the

                                                29

1                    Z. ████

2    same foods?

3    A.    Yes.

4    Q.    Did you receive any medical care

5    at this facility?

6    A.    No.

7    Q.    Did you request any medical care

8    at this facility?

9    A.    Yes.  I asked for medical care for

10   my son because when we got out, I could see

11   that he was not doing well.  He was -- he had

12   a cold and -- because of the cold and the

13   tiredness.  He was going to get an attack.

14   Q.    When you say an attack, are you

15   referring to an asthma attack?

16   A.    Yes, because he does suffer from

17   asthma.

19          Q.    Is there anything that you would

20    like to state to make your testimony

21    complete?

22          A.    No, not for the moment, no.

23                MS. DAVILA:  Mr. Schey, would you

24          like to question the witness?

25                MR. SCHEY:  I just have a couple

                                            42

1                    Z. ███████

2          of questions.

3     EXAMINATION BY

4     MR. SCHEY:

5          Q.    When you arrived at la hielera,

6     were your son's clothes wet from crossing the

7     river?

8          A.    Yes.

9                MS. DAVILA:  Objection, leading.

10         The witness answered yes.

11         Q.    And did anybody at that Border

12    Patrol Station offer your son dry clothing?

13         A.    No.

14         Q.    And to your knowledge, at that

15    first Border Patrol Station, did anyone offer

16    your son a warm shower?

17          MS. DAVILA:  Mr. Schey, the

18     witness indicated she didn't finish her

19     previous response.  Would you like her to

20     finish it?

21          MR. SCHEY:  Yes.

22     A.    Yes.  Like I told you before, a la

23 hielera, they didn't offer us anything, not

24 clothes, not blankets, not a shower, nothing.

25          THE INTERPRETER:  I'm going to do


                                                    43

1               Z. ███████

2       the question that you had previously

3       asked.

4       A.    No.

5       Q.    And at la hielera, was there any

6  soap and towels in the cell so that you could

7  wash your hands and face?

8       A.    No.

9       Q.    When you left that first location

10 after about two nights, you were transported

11 to la perrera with your son; is that correct?

12      A.    Yes.

13      Q.    And at that time, when you saw

14 your son, did he seem to you to be exhausted

15      from the lack of sleep?

16              MS. DAVILA:  Objection, leading.

17      A.    Yes.  He was tired because he

18      hadn't been able to sleep and the air was not

19      good for him.

20              MR. SCHEY:  I have no further

21              questions.  Thank you.

22              MS. DAVILA:  I'd like to provide

23              the witness with an opportunity to read

24              and sign her declaration.  Would she like

25              that opportunity?


                                              44

1                       Z.  █████████

2                I'm sorry, I meant the transcript,

3              not the declaration.

4                THE WITNESS:  To sign?

5                MS. DAVILA:  The opportunity to

6              read it and sign it.  Would you like that

7              opportunity?

8                MR. SCHEY:  Tell her I'm advising

9              her yes, that we do want that

10             opportunity.

11               THE WITNESS:  Okay.

12               MR. SCHEY:  I have another

```
 4    ZULMA ███████████████████

 5                    MS. DAVILA          4, 49

 6                    MR. SCHEY          42, 57

 7

 8

 9    DEFENDANT'S

10    EXHIBITS      DESCRIPTION              PAGE

11    Exhibit A    Notice of Deposition        7

12    Exhibit B    Subpoena                    7

13    Exhibit C    Declaration of Zulma

14                 ████████████████         35

15    Exhibit D    Signed Declaration of Zulma

16                 ████████████████         45

17    Exhibit E    Spanish language translation

18                 of the Declaration of Zulma

19                 ████████████████         49

20

21

22

23

24

25
```

62

```
 1
```

2

3                    C E R T I F I C A T I O N

4

5                    I, DEBORAH MOSCHITTO, a

6    Shorthand Reporter and notary public, within

7    and for the State of New York, do hereby

8    certify:

9                    That ZULMA ███████████

10   ███████ the witness whose examination is

11   hereinbefore set forth, was first duly sworn

12   by me, and that transcript of said testimony

13   is a true record of the testimony given by

14   said witness.

15                   I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage, and that I am in no way

18   interested in the outcome of this matter.

19

20                   IN WITNESS WHEREOF, I have

21   hereunto set my hand this _____ day of

22   _____, 2016.

23

24                         _____

25                         DEBORAH MOSCHITTO

# Exhibit 21

Publicly Filed

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 2

 3

          --------------------------:
 4   JENNY LISETTE FLORES, ET   :
     AL.,                       :
 5                              :
              Plaintiffs,       :CASE NO:
 6                              :CV-85-4544-DMG
              vs.               :
 7                              :
     ERIC H. HOLDER, JR,        :
 8   ATTORNEY GENERAL OF THE    :
     UNITED STATES, ET AL.,     :
 9                              :
              Defendants.       :
10   --------------------------:
11
                  Tuesday, October 18, 2016
12

13

14           Oral deposition of BRIDGET CAMBRIA,
15   taken at the offices of The United States
16   Attorney's Office for the Eastern District of
17   Pennsylvania, 615 Chestnut Street, Suite 1250,
18   Philadelphia, Pennsylvania, commencing at 1:10
19   p.m., before Theresa F. Franco, a Court
20   Reporter and Notary Public.
21

22

23

24

25
```

Page 2

1   A P P E A R A N C E S
2
3   CHADBOURNE & PARKE, LLP
    By:  MICHAEL BHARGAVA, ESQUIRE
4   1200 New Hampshire Avenue, NW
    Washington, DC  20036
5   202-974-5629
    mbhargava@chadbourne.com
6   Representing Bridget Cambria
7
8   UNITED STATES DEPARTMENT OF JUSTICE, CIVIL
    DIVISION
9   By:  SARAH L. VUONG, ESQUIRE
         COLIN KISOR, ESQUIRE, DEPUTY DIRECTOR
10       SOPHIE KAISER, ESQUIRE
    P.O. Box 878
11  Ben Franklin Station
    Washington, DC  20044
12  202-532-4281
    sarah.l.vuong@usdoj.gov
13  colin.kisor@usdoj.gov
    sophie.b.kaiser@usdoj.gov
14  Representing the Defendants
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            - - -
2          I N D E X
3            - - -
4   Witness: BRIDGET CAMBRIA            PAGE
5   By Ms. Vuong . . . . . . . . . . . .    4
6            - - -
7        E X H I B I T S
8            - - -
9   NUMBER        DESCRIPTION        PAGE
10
11        (None marked.)
12
13           - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            BRIDGET CAMBRIA
2              - - -
3         BRIDGET CAMBRIA, having been first
4   duly sworn, was examined and testified as
5   follows:
6              - - -
7            EXAMINATION
8              - - -
9   BY MS. VUONG:
10     Q.    Good afternoon, Ms. Cambria.
11     A.    Hello.
12     Q.    My name is Sarah Vuong.  I'm here
13  on behalf of the Department of Justice.  Do you
14  know why we are here today?
15     A.    Yes.
16     Q.    And why is that?
17     A.    I'm being deposed in the Flores
18  case.
19     Q.    And do you know why you're being
20  deposed in the Flores case?
21     A.    Because I submitted a declaration.
22     Q.    And which declaration are you
23  referring to?
24     A.    Well, I submitted two declarations,
25  but I believe I'm being deposed on my second

Page 5

1            BRIDGET CAMBRIA
2   declaration.
3      Q.    And when did you sign that
4   declaration?
5      A.    It would have been 2016, mid 2016.
6   I couldn't give you the exact date.
7      Q.    Okay.  And we just broke for lunch.
8   Did you have any communication with anyone
9   during the lunch break regarding the deposition
10  that took place earlier this morning?
11     A.    Just my attorney.
12     Q.    Okay.  And with Ms. Kline?
13     A.    We had lunch, yes.
14     Q.    But you didn't talk about her
15  deposition?
16     A.    It was more just, did it go okay?
17  Yes.
18     Q.    Okay.  And she's doing okay?
19     A.    I think so.
20     Q.    Good.  And how did you prepare for
21  the deposition today?
22     A.    I did consult with my attorney.  I
23  also read my declarations, and I read the
24  Flores settlement again.
25     Q.    Okay.  And did you review both of

Page 26

BRIDGET CAMBRIA

1  like no nonprofits were able to access the
2  lists of people.  So what happened was women
3  just passed numbers.  And that's sort of the
4  same thing that happens at Berks because, even
5  though we have a nonprofit now, they don't
6  provide lists to anyone.  It's just women
7  pass -- you know, it's all through word of
8  mouth.
9  Q.     And when you say lists, those are
10 lists handed out by the facility?
11 A.     I would assume, yes.
12 Q.     Do you know who creates the list?
13 A.     No.
14 Q.     Okay.  But lists are handed out at
15 Berks?
16 A.     No.
17 Q.     Oh, they're not handed out at
18 Berks.
19 A.     Meaning that at, for example,
20 Dilley or Karnes, which are the other two
21 facilities, there are nonprofits that are
22 there.  They're provided information about
23 who's detained there.  That does not exist
24 here.
25

Page 27

BRIDGET CAMBRIA

1  Q.     Okay.  So you're saying the
2  facility provides information to the pro
3  bono --
4  A.     Mm-hmm.
5  Q.     -- groups at Dilley and Karnes?
6  A.     (Indicating.)
7  Q.     Okay.  But at Berks there are lists
8  of pro bono attorneys handed out to the
9  detainees?
10 A.     Yes.  Well, they're giving them --
11 the people that are at Berks right now are
12 Texas transfers, so they were given pro bono
13 attorneys' names in Texas.  I'm not sure if
14 they were given pro bono attorneys' names here
15 when they were transferred here.  But even if
16 they were given that list, people on the list
17 don't actually come to the facility and provide
18 representation.
19 Q.     Okay.  Because they're from Texas?
20 A.     No.  No.  So, if you have a new --
21 a person that's new at Berks, they'll be given
22 a list of free legal service providers.  But
23 the people that are on the list don't actually
24 work at Berks, and they won't come to Berks,

Page 28

BRIDGET CAMBRIA

1  and they won't represent anyone at Berks.  So
2  they're never actually given a list of actual
3  attorneys --
4  Q.     Okay.
5  A.     -- who will come and do pro bono
6  work.
7  Q.     Okay.
8  A.     That's a problem.
9  Q.     And you don't know who creates the
10 list?
11 A.     It's created by the Executive
12 Office for Immigration Review, the Court.
13 Q.     And do you know if you could get
14 your office's name on that list?
15 A.     I don't believe so because we're a
16 private firm, but once we are established as a
17 nonprofit, we can apply and have to be approved
18 by the court just like everyone else.
19 Q.     Okay.  And are you all working to
20 become a nonprofit?
21 A.     A portion, yeah.
22 Q.     Oh, okay.  So will that cover, kind
23 of, your Berks litigation?
24 A.     Hopefully, and other nonprofit work
25

Page 29

BRIDGET CAMBRIA

1  that we want to do.  We'd like to help the
2  community of Reading because it's so
3  impoverished and so immigrant-based.  That's
4  sort of our idea.
5  Q.     Okay.  And when you say "our," do
6  you mean --
7  A.     Jacqui and myself.
8  Q.     -- Ms. Kline -- okay.  And you have
9  one more partner?
10 A.     No.
11 Q.     Is there one more attorney who
12 works there?
13 A.     There's an associate.
14 Q.     Okay.  And what is his name?
15 A.     Ken Salador.
16 Q.     Okay.  Is he also involved in the
17 pro bono work at Berks?
18 A.     He does -- he does help represent
19 some of the people who are there.
20 Q.     Okay.  Okay.  Now, we've been over
21 this, but you've submitted two declarations in
22 the Flores litigation, correct?
23 A.     Yes.
24 Q.     Okay.  I'm mostly going to ask you

Page 46

BRIDGET CAMBRIA

1  the dates.  So these people each came, I guess,
2  after this -- after the court -- after the
3  Central District of California's decision from
4  August 21st, 2015?
5      A.    That's right.  Immediately after.
6      Q.    Okay.  And again, you state that
7  these folks are representative of others who
8  are detained right now?
9      A.    That's right.
10     Q.    Is that --
11     A.    Not exhaustive, just
12  representative.
13     Q.    I guess, how are you making that
14  determination?  Are you looking at the
15  population as a whole and picking out ages or
16  what are you picking about these clients that
17  makes them representative of the class?
18     A.    They're representative because
19  they're children who were detained at Berks,
20  and they were detained immediately after Judge
21  D. ruled, and they're just clients who I know a
22  lot about and who I love.  So...
23     Q.    Okay.
24     A.    They're just the ones that came to

Page 47

BRIDGET CAMBRIA

1  mind.
2      Q.    Okay.  Did you receive a waiver
3  from the clients to provide their
4  information --
5      A.    I do have a waiver.
6      Q.    -- in your court filing?
7      A.    Yes.  Sorry.  I have a waiver.  I
8  have a release for each family to provide.
9      Q.    Okay.  And that was in writing?
10     A.    Yes.
11     Q.    Now --
12     A.    I don't discuss their individual
13  cases though.  I'm permitted to talk about
14  their detention.
15     Q.    Okay.  And that's explained in the
16  waiver?
17     A.    No.  It's a general -- it's a
18  general waiver of advocacy.
19     Q.    Okay.  And when you meet with --
20  when you meet with your clients, you're meeting
21  with the child and the mother or the mother
22  separate from the child?
23     A.    I'm not permitted to meet with the
24  children without their mother.

Page 48

BRIDGET CAMBRIA

1      Q.    And who -- is that a Berks policy
2  or an ICE policy?
3      A.    I don't know whose policy it is,
4  but I've tried to meet with children without
5  their mother, for example, if a mother is ill
6  or is hospitalized, I'd like to talk to their
7  children to make sure they're okay, but I'm not
8  permitted.
9      Q.    Is there any age limitation on
10  that?
11     A.    No.
12     Q.    So it's children up to the age of
13  18 or...
14     A.    I can't see them without their
15  mother.
16     Q.    Okay.
17     A.    Even though I represent them, I
18  can't.
19     Q.    Okay.  But if they don't have a
20  family member there, it's --
21     A.    They all have family members there,
22  so...
23     Q.    Okay.  Okay.  So when you talk
24  about Steven, which is the first child in

Page 49

BRIDGET CAMBRIA

1  paragraph 9, have you -- so you talk about
2  Steven's skin condition and, kind of, his
3  behavioral issues.  So I guess, are these
4  things that you have observed or are those
5  things that, in discussions with his mother,
6  she has told you?
7      MR. BHARGAVA:  Hold on.  That's
8  asking for privileged communications between a
9  client and the attorney, so I just caution you
10  not to disclose any privileged information.
11     THE WITNESS:  I won't disclose --
12     MR. BHARGAVA:  Do you want to
13  rephrase the question so it's not specifically
14  asking for privileged information?
15  BY MS. VUONG:
16     Q.    Well, I mean, I guess it's in your
17  declaration, so you've given the information
18  that he has a skin condition and that he's
19  experiencing behavioral issues, so I'm just
20  wondering if that's something that you observed
21  or if that's something that Steven or his
22  mother told you?
23     A.    Both.
24     MR. BHARGAVA:  I think you can ask

Page 54

BRIDGET CAMBRIA

1
2 issues?
3      A.    The behavioral issues, I do
4 understand that -- if I could recall exactly
5 the documents that list his behavioral issues,
6 I believe that the facility has several.
7      Q.    Okay.
8      A.    I don't have those with me, but I
9 believe the facility has several.
10     Q.    Okay.  And then the incident with
11 the inappropriate touching, that came from the
12 Berks facility?
13     A.    That's right.
14     Q.    Okay.  Is that a part of -- well,
15 does Berks keep a file on each of its
16 detainees?
17     A.    They do.
18     Q.    Is that file a part of the A file?
19     A.    No.
20     Q.    It's a separate file?
21     A.    Yes.
22     Q.    Okay.  And do you have access to
23 the Berks file?
24     A.    Only if I request it.
25     Q.    Okay.  But if you request it, you

Page 55

BRIDGET CAMBRIA

1
2 do have access to it?
3      A.    Yes.
4      Q.    Okay.  Okay.  So then, like, the
5 inappropriate -- so the inappropriate touching
6 was a report in that file?
7      A.    That's correct.
8      Q.    Okay.  And then with the
9 psychologist, the psychologist's reports, would
10 psychologist's reports be included in that
11 Berks file?
12     A.    Yes.
13     Q.    And is Steven seeing the
14 psychologist at Berks?
15     A.    No.
16     Q.    But the psychologist did tell you
17 that Steven used the lanyard to simulate
18 asphyxiating himself?
19     A.    No.  It was an independent
20 psychologist that we brought in because we had
21 heard a report that this had happened, so out
22 of concern we brought in a psychologist.
23     Q.    Who did you hear a report from?
24     A.    I don't want to disclose privileged
25 conversations.

Page 56

BRIDGET CAMBRIA

1
2      Q.    Okay.  Even though you wrote about
3 it in the declaration that was submitted to the
4 Court?
5      A.    Yes.  Because -- yes, it's
6 privileged.
7      Q.    But you haven't seen -- you have
8 not seen Steven simulate asphyxiating himself?
9 You haven't seen Steven engaging in that
10 behavior; is that correct?
11     A.    No.
12     Q.    Okay.  And then when you say there
13 have been no efforts to effectuate release, is
14 that based on your observation that Steven has
15 not been released?
16     A.    Yes.
17     Q.    Okay.  Is that from -- it's not
18 from conversations with DHS or ICE?
19     A.    No.
20     Q.    Okay.  Oh, and then back to the
21 skin condition, is that -- is that a condition
22 that you observed yourself?
23     A.    Yes.
24     Q.    Okay.
25     A.    Not all.  I observed it in areas

Page 57

BRIDGET CAMBRIA

1
2 that are appropriate for me to look at, with
3 that one.
4      Q.    Okay.  And so your next statement
5 is, "When Steven's mother asked ICE for help
6 for her son's chronic medical condition, she
7 was advised by ICE to withdraw her case for
8 protection and to accept removal to El
9 Salvador."  Do you see that sentence?
10     A.    Yes.
11     Q.    Okay.  Were you present when
12 Steven's mother asked ICE for help?
13     A.    No.
14     Q.    And did you hear ICE's statements
15 that she withdraw her case for protection and
16 accept the removal to El Salvador?
17     A.    They wrote it down and signed it.
18     Q.    They --
19     A.    She filed a grievance requesting
20 medical assistance for her son whose genitals
21 were bleeding, and the response from ICE was to
22 withdraw her case and accept removal.  And it
23 was signed by the deportation officer.
24     Q.    Okay.  Is that -- and that's in --
25     A.    That's not in the record, but I can

463

15 (Pages 54 - 57)

Page 66

BRIDGET CAMBRIA

1
2    Q.   Okay.  And do the reports show that
3  these behavioral issues are related to
4  detention or, you know, outstanding behavioral
5  issues?
6    A.   I think that's -- it's an opinion.
7  If you were going to ask my opinion, I believe
8  that it's exacerbated by the detention.  The
9  facility, however, in conducting reports, does
10  not typically address whether detention itself
11  actually affects that.  However, in the case of
12  Jefferson, because we brought in an outside
13  psychologist -- I'm sorry, licensed social
14  worker, who deals with child trauma, she
15  absolutely said that the detention is
16  exacerbating these issues in Jefferson.
17    Q.   Okay.  And then in paragraph 10,
18  you state, "Children right now detained at
19  Berks exhibit suicidal ideation, anxiety,
20  stress, chronic depression, constant
21  tearfulness, isolation and anger."  How are you
22  coming to that conclusion?
23    A.   That's what I see.  Kids tell me
24  that they want to kill themselves; sometimes
25  they tell me how.  They tell me how stressed

Page 67

BRIDGET CAMBRIA

1
2  they are.  They tell me how depressed they are.
3  They cry.  Sometimes they don't talk at all and
4  they're obviously very angry.
5    Q.   Okay.  And all of the folks -- all
6  of the children and mothers that you see are
7  asylum seekers?
8    A.   All of them.
9    Q.   Okay.  And they're people fleeing
10  their own country?
11    A.   Yeah.  They're fleeing their
12  countries for protection.
13    Q.   Right.  If they're seeking asylum,
14  they're fleeing persecution of some sort?
15    A.   That's right.
16    Q.   Which is also stressful, would you
17  say?
18    A.   Absolutely, yeah.
19    Q.   So it is your -- is it your opinion
20  that, kind of, the behavioral issues are coming
21  from the detention or could they possibly be
22  coming from, you know, the journey to the
23  United States?
24    A.   If I was to give my opinion, I
25  would say that we're taking already traumatized

Page 68

BRIDGET CAMBRIA

1
2  children and putting them into a different
3  traumatic situation.  And if you compound
4  trauma, you're obviously going to have even
5  more trauma.  You can't cure trauma by putting
6  them into a place where they're continuing to
7  endure trauma.
8    Q.   What trauma are they experiencing
9  at Berks?
10    A.   There's no -- there's no freedom to
11  leave.  There's no ability to reunify with
12  their whole families.  There's no control over
13  themselves or their own bodies.  They don't get
14  to decide what they eat.  They don't get to
15  decide what they wear.  Their parents can't be
16  their parents.  You know, the facility is the
17  one that provides the rules.  They don't know
18  whether they're going to leave the facility in
19  freedom.  They don't know if they're going to
20  be deported.  They watch families being pulled
21  out of bed at three in the morning, screaming
22  and crying, being sent to a place where they
23  believe they're going to die.
24        So the constant unknowing of
25  whether they're going to be okay or they're not

Page 69

BRIDGET CAMBRIA

1
2  going to be okay is what makes these kids
3  suffer all of these things.  And that's just
4  what I see.  It's my opinion.
5    Q.   So it's the situation?
6    A.   It's -- I absolutely believe, I'm
7  sure, that the trauma they suffered in their
8  countries doesn't just go away when they get
9  here.  But once they're here and they're in
10  detention, these families, for a period of a
11  year, the unknowing and the effects of
12  everything that's happening to them, make it
13  worse, not better.
14    Q.   Okay.  So I guess, then, what would
15  be -- in your opinion, what is a solution to
16  that problem?
17    A.   I don't think -- I think a solution
18  would be that family detention wouldn't exist,
19  that we would come up with alternatives to
20  detention or community-based alternatives for
21  people that have no place to go.  I think that
22  the Berks facility probably ran pretty well
23  before 2014.  The issues were -- or back when I
24  worked there -- when people were detained a
25  long time, that sort of went away.  And when

Page 74

BRIDGET CAMBRIA

1
2 they've said no?
3     A.    That's correct.  I also, you know,
4 I observe the paperwork that they receive.
5 They provide the paperwork Immigration gives
6 them.  I didn't see any of it, anything about
7 the Flores settlement.
8     Q.    Okay.  What other rights do you
9 think should be included in the notice?
10     A.    The right to seek an attorney.  The
11 right to preference of placement.  The right
12 to -- actually the requirement of a bond
13 hearing in front of an immigration judge.
14 Those are just some examples.
15     Q.    All right.  And are you saying that
16 the detainees are not told that they have a
17 right to seek an attorney?
18     A.    I think that they are, but not
19 under the requirement of the Flores settlement.
20 I think everyone's given a list of legal
21 services.
22     Q.    Okay.
23     A.    Yeah.
24     Q.    And they have the opportunity to
25 seek an attorney if they want; is that correct?

Page 75

BRIDGET CAMBRIA

1
2     A.    Absolutely.
3     Q.    Okay.
4         MS. VUONG:  Can we go for, like,
5 ten more minutes and take a break?
6         MR. BHARGAVA:  Sure.  Take a break
7 and have another round, or take a break with
8 the idea that it might not continue.
9         MS. VUONG:  Take a break and have
10 another round.  Is that...
11         THE WITNESS:  Yeah, we can go
12 straight through or whatever.
13 BY MS. VUONG:
14     Q.    Now, Berks used to have a license,
15 right, to operate as a child residential
16 facility?
17     A.    That's right.
18     Q.    And do they currently have a
19 license?
20     A.    The license is on appeal.
21     Q.    Okay.
22     A.    They're operating, so I don't know
23 legally whether they have or have not, but...
24     Q.    Okay.  And when you say the license
25 is on appeal, what issue is on appeal?

Page 76

BRIDGET CAMBRIA

1
2     A.    The issue on appeal is whether the
3 license should be non-reviewed and revoked.
4     Q.    Okay.
5     A.    Non-reviewed and revoked.
6     Q.    Okay.
7     A.    I'm sorry.
8     Q.    So it was revoked; is that correct?
9     A.    Yes.
10     Q.    And that decision has been
11 appealed?
12     A.    Yes.
13     Q.    Were you involved in the revocation
14 of that license?
15     A.    No.
16     Q.    Okay.  Did you -- and I'm using
17 involved broadly, not --
18     A.    Okay.
19     Q.    -- did you petition to have it -- I
20 guess, did you petition to have the license
21 revoked?
22     A.    No.  I was involved in advocacy,
23 but never petitioned to get it revoked.
24     Q.    Okay.  What, I guess, what steps
25 did you do to advocate to have the license

Page 77

BRIDGET CAMBRIA

1
2 revoked?
3     A.    I think I signed onto a letter, but
4 that's about it.  I mean, us -- immigration
5 attorneys, you know, we talk, and we advocate
6 for our clients.  And I believe all I did was
7 sign a letter.
8     Q.    Did you write the letter?
9     A.    No.
10     Q.    Do you remember who wrote the
11 letter?
12     A.    Matthew Archambeault.
13     Q.    Do you know how to spell
14 Archambeault?
15     A.    A-R-C-H-A-M-B-E-A-L-T (sic) -- L-T,
16 yeah.
17     Q.    And did he ask you to sign the
18 letter?
19     A.    Yes.
20     Q.    And in your view, do you think the
21 license should be revoked?
22     A.    I don't believe it's a child
23 residential center.  So, I mean, that's up to
24 the state whether they think that that meets
25 the requirements or not.

465

Page 86

**BRIDGET CAMBRIA**

1
2    Q.    Okay.
3    A.    So there's no problem with that.
4    Q.    Did they deliver the cards?
5    A.    She did.
6    Q.    But you haven't organized any of
7   these protests?
8    A.    No.
9    Q.    How do you learn about them?
10   A.    Facebook.
11   Q.    Are you just friends with the
12  organizations --
13   A.    Yeah.
14   Q.    -- on Facebook?
15   A.    Yes.
16   Q.    Okay.
17        MS. VUONG:  All right.  Let's take
18  a quick break.
19            - - -
20        (A short recess was taken.)
21            - - -
22  BY MS. VUONG:
23   Q.    I only have a couple more questions
24  to get through.  Do you have any financial
25  income -- do you have any financial interest in

Page 87

**BRIDGET CAMBRIA**

1
2   the outcome?
3    A.    Not --
4    Q.    I'm sorry.  Do you have any
5   financial interest in the outcome of the Flores
6   settlement?
7    A.    No.
8    Q.    Okay.  So there's -- is there any
9   agreement regarding EAJA, and -- is there any
10  agreement regarding EAJA?
11   A.    No.
12   Q.    Are you a paid consultant for
13  Flores?
14   A.    Nonpaid.  No.
15   Q.    Okay.  Do you have any hope that
16  you would get any possible EAJA fees?
17   A.    No.
18   Q.    And are you able to bill for the
19  time that you've spent here today?
20   A.    No.  Not that I know of actually.
21  I don't think so.
22   Q.    So then with 30 to 40 percent of
23  your work being pro bono, does the -- the other
24  60 to 70 percent can cover the operating costs
25  of your firm?

Page 88

**BRIDGET CAMBRIA**

1
2    A.    For now.
3    Q.    Okay.  Is that why you're seeking
4   nonprofit status?
5    A.    Yeah.  Not -- well, we're still
6   going to have a firm, but we're going to create
7   a nonprofit for our community that hopefully
8   can address some of the legal deficiencies, not
9   only at that center but in Reading as a whole.
10   Q.    I don't have any further questions.
11        MR. BHARGAVA:  Great.  I have none.
12        MR. KISOR:  Do you want a copy of
13  the transcript?
14        MR. BHARGAVA:  That would be great.
15        MR. KISOR:  Same for Ms. Kline's?
16        MR. BHARGAVA:  Yes.
17        MR. KISOR:  We'll send them to you
18  then.
19        MR. BHARGAVA:  Okay, great.
20            - - -
21        (Witness excused.)
22            - - -
23        (Deposition concluded at 2:42 p.m.)
24            - - -
25

Page 89

**C E R T I F I C A T E**

1
2
3        I do hereby certify that I am a
Notary Public in good standing, that the
4   aforesaid testimony was taken before me,
pursuant to notice, at the time and place
5   indicated; that said deponent was by me duly
sworn to tell the truth, the whole truth, and
6   nothing but the truth; that the testimony of
said deponent was correctly recorded in machine
7   shorthand by me and thereafter transcribed
under my supervision with computer-aided
8   transcription; that the deposition is a true
and correct record of the testimony given by
9   the witness; and that I am neither of counsel
nor kin to any party in said action, nor
10  interested in the outcome thereof.
11        WITNESS my hand and official seal
this 28th day of October, 2016.
12
13
14
15        _Theresa P. Franco_
16        Theresa P. Franco
         Notary Public
17
18
19
20
21
22
23
24
25

23 (Pages 86 - 89)

466

# Exhibit 22

Publicly Filed

1

1

2    UNITED STATES DISTRICT COURT

3    FOR THE CENTRAL DISTRICT OF CALIFORNIA

4    Civil Action No. 2:85-CV-04544-DMG-AGR

5    ------------------------------------

6    JENNY L. FLORES, et al.,

7                    Plaintiffs,

8       -against-

9    LORETTA E. LYNCH, United States Attorney

10   General,

11                   Defendant.

12   ------------------------------------

13

14

15           DEPOSITION OF AMANDA DOROSHOW,

16   ESQ., a third-party witness herein, taken by

17   Defendant, pursuant to Notice, held at the

18   offices of the United States Attorney, 271

19   Cadman Plaza East, Brooklyn, New York, on

20   Wednesday, October 5, 2016, at 1:00 p.m.,

21   before Deborah Moschitto, a Shorthand

22   Reporter and notary public, within and for

23   the State of New York.

24

25

2

1

2    A P P E A R A N C E S :

3

4    KATHERINE MANNING, ESQ.,

5        Legal Advocate for Children and Youth

6        Law Foundation of Silicon Valley

7          (Via telephone)

8

9

10   UNITED STATES DEPARTMENT OF JUSTICE

11       Attorneys for Defendant

12       P.O. Box 878

13       Ben Franklin Station

14       Washington, DC 20044

15   BY: YAMILETH G. DAVILA, ESQ.

16

17   CHADBOURNE & PARKE LLP

18       Attorneys for Witness

19       1301 Avenue of the Americas

20       New York, New York  10019

21   BY: NICHOLAS CHANDLER, ESQ.

22

23

24

25

                                                                3

1

2

3            IT IS HEREBY STIPULATED AND AGREED

4    that all objections, except as to the form of

5    the questions, shall be reserved to the time

6    of the trial;

7            IT IS FURTHER STIPULATED AND AGREED

8    that the within examination may be subscribed

9    and sworn to before any notary public with

10   the same force and effect as though

11   subscribed and sworn to before this court.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1            A. Doroshow

2            Whereupon,

3            AMANDA DOROSHOW,

4    after having been first duly sworn, was

5    examined and testified as follows:

6    EXAMINATION BY

7    MS. DAVILA:

8        Q.    Good afternoon.  I know we have

9    already been introduced, but for the benefit

10   of the record, I just wanted to state again

11   that my name is Yamileth Davila, and I

12   represent the defendant, the Attorney

13   General, in the matter of Flores versus

14   Meese, currently pending in the Central

15   District of California.

16            Are you represented by counsel

17   today?

9      part of the Flores class?

10        A.      No.

11        Q.      While you were working at Dilley,

12    did you ask any of your clients if they were

13    members of the Flores class?

14        A.      I did not directly say are you a

15    member of the Flores class, because I don't

16    think the clients would have understood that,

17    but I would ask them questions about if they

18    were aware of their rights and certain things

19    like that, that I knew were protected under

20    the Flores class.

21        Q.      From that information, did you

22    derive any information on whether they were

23    Flores class members?

24        A.      Yes, they are, the children who

25    were detained are.


                                                    22

1                  A. Doroshow

2        Q.      If you could please turn your

3    attention to paragraph number 6 of your

4    declaration, in paragraph 6, it says that it

5    appeared to you that accompanied minors at

6    Dilley were treated as if they were not

7    Flores class members.

8              What is the basis for this belief?

9      A.    Well, the basis for this belief is

10   that no one had any idea about the rights

11   that they had.  No one had any idea that --

12   about being released, about the right to a

13   bond hearing, about the right to their -- not

14   even an idea of what the process the credible

15   fear interview was, a right of review of a

16   credible fear interview.

17             If anything, I thought people were

18   misinformed of their rights because officers

19   were telling them lies of saying things about

20   lies about being entitled to bond or how much

21   bond was.  So that's where that statement

22   comes from.

23     Q.    How did you know that -- strike

24   that.

25             How do you know that officers were

23

1              A. Doroshow

2    telling them lies?

3      A.    I would ask clients.  I would ask

4    them has anyone explained to you -- for

473

5      example, has anyone explained to you about a

6      bond.

7              That was one of the things that I

8      remember happening regularly.  They would say

9      yeah, the officer told me it would be, and

10     they would say an exorbitant number.  It

11     would make me stay here much longer.

12             They would tell them facts that

13     weren't true.  The motivation, I think, at

14     that time, they wanted people to be released

15     with equal monitors, so I'm assuming that

16     that was the motivation, but I would ask

17     them, because one of the things I would do

18     when they first came in, I wanted to make

19     sure they could know as much of their rights

20     as they could and retain it for when they're

21     not talking to their lawyer.

22         Q.    Did you speak to any of the

23     officers about any of the misinformation that

24     your clients received?

25         A.    No.  That wasn't my place.  I


                                           24

1              A. Doroshow

2      would tell some of the -- like, like there


474

16

17

18

19

20

21

22

23

24

25

31

1

2

3          C E R T I F I C A T I O N

4

5          I, DEBORAH MOSCHITTO, a

6   Shorthand Reporter and notary public, within

7   and for the State of New York, do hereby

8   certify:

9          That AMANDA DOROSHOW, ESQ., the

10   witness whose examination is hereinbefore set

11   forth, was first duly sworn by me, and that

12   transcript of said testimony is a true record

13   of the testimony given by said witness.

14                    I further certify that I am not

15      related to any of the parties to this action

16      by blood or marriage, and that I am in no way

17      interested in the outcome of this matter.

18

19                    IN WITNESS WHEREOF, I have

20      hereunto set my hand this _____ day of

21      _____, 2016.

22

23                         _____

24                    DEBORAH MOSCHITTO

25


                                                    32

1

2                DEPOSITION ERRATA SHEET

3

4            DECLARATION UNDER PENALTY OF PERJURY

5                    I declare under penalty of perjury

6       that I have read the entire transcript of my

7       Deposition taken in the captioned matter or

8       the same has been read to me, and the same is

9       true and accurate, save and except for

10      changes and/or corrections, if any, as

11      indicated by me on the DEPOSITION ERRATA

```
12    SHEET hereof, with the understanding that I

13    offer these changes as if still under oath.

14

15

16    _____

17              AMANDA DOROSHOW, ESQ.

18

19    Subscribed and sworn to on the _____ day of

20    _____, 2016 before me,

21    _____

22    Notary Public,

23    in and for the State of _____

24

25
```

                                                        33

```
 1

 2              DEPOSITION ERRATA SHEET

 3    Page No. _____ Line No. _____ Change to: _____

 4    _____

 5    Reason for change: _____

 6    Page No. _____ Line No. _____ Change to: _____

 7    _____

 8    Reason for change: _____

 9    Page No. _____ Line No. _____ Change to: _____
```

# Exhibit 23

Publicly Filed

1

1

2      UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA
3      ------------------------------------------------
       JENNY L. FLORES, et al.,
4
                              Plaintiffs,
5
                                      Civil Action No.
6          -against-               2:85-CV-04544-DMG-AGR

7      LORETTA E. LYNCH, United States Attorney General,

8                         Defendant.
       ------------------------------------------------
9

10            DEPOSITION OF ROBYN BARNARD, ESQ., a witness

11      on behalf of the Plaintiffs herein, taken by

12      Defendant, pursuant to subpoena, at the offices of

13      the United States Attorney's Office, 271 Cadman

14      Plaza East, Brooklyn, New York, on Friday, September

15      16, 2016, at 2:07 p.m., before Patricia Guarino, a

16      Shorthand Reporter and notary public, within and for

17      the State of New York.

18

19

20

21

22

23

24

25

2

1

2        A P P E A R A N C E S :

3        CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
                Attorneys for Plaintiffs
4        256 South Occidental Boulevard
         Los Angeles, California 90057

5

         BY:   PETER SCHEY, ESQ.
6              (Via telephone)
               (323) 251-3223
7              pschey@centerforhumanrights.org

8

9
         HUMAN RIGHTS FIRST
10              Attorneys for Plaintiffs
         805 15th Street, N.W., #900
11       Washington, D.C. 20005

12       BY:   HARDY VIUEX
               Legal Director
13             (202) 888-7607
               vieuxh@humanrightsfirst.org
14

15

16       U.S. DEPARTMENT OF JUSTICE
                Attorneys for Defendant
17       P.O. Box 878
         Ben Franklin Station
18       Washington DC  20044

```
19       BY:    YAMILETH G. DAVILA, ESQ.
                Senior Litigation Counsel
20              Office of Immigration Litigation
                (202) 305-0137
21              yamileth.g.davila@usdoj.gov

22
                                    * * *
23

24

25
```

3

```
1

2

3                    IT IS HEREBY STIPULATED AND AGREED
that

4        all objections, except as to the form of the

5        questions, shall be reserved to the time of the

6        trial;

7                    IT IS FURTHER STIPULATED AND AGREED

8        that the within examination may be subscribed and

9        sworn to before any notary public with the same

10       force and effect as though subscribed and sworn to

11       before this court.

12

13

14
```

15

16

17

18

19

20

21

22

23

24

25

4

1

2          Whereupon,

3                    ROBYN BARNARD,

4     after having been first duly sworn, was examined and

5     testified as follows:

6     EXAMINATION BY MS. DAVILA:

7          Q.   Good afternoon, Ms. Barnard.  I know we've already been introduced, but for the record my

9     name is Yami Davila and represent the defendant, the

10    Attorney General, in the case of Flores versus

Meese

11     currently pending in the U.S. District Court for
the

12     Central District of California, Docket Number 2:85

13     CV-4544.

14           Are you represented by counsel?

15     A.   I am.

16     Q.   Who is your attorney?

17     A.   Hardy Vieux, to my right.

18     Q.   Have you ever been deposed before?

19     A.   I have not.

20     Q.   Please allow me to explain a few
things

21     before we begin today.

22           I will be asking you a series of

23     questions to which you are under oath to provide a

24     full and complete answer.  If I ask you a question

25     that is confusing or that you don't understand,
I'll

43

1                 Barnard

2     A.   When you say Berks detainee files,
what

3     do you mean?

4     Q.   In paragraph 11 you describe
difficulty

5      in representation due to delayed access to
detainees

6      Immigration and Customs Enforcement administrative

7      files.

8              What delays are you referring to?

9        A.   That is -- I'm referring to accessing

10     immigration documents such as the record of
credible

11     fear interviews or records of immigration judge

12     reviews of negative credible reasonable fear

13     interviews and other documents that amount to the

14     file that is transferred -- that follows the

15     detainee from detention center to detention
center.

16       Q.   How long are these delays?

17       A.   I can't speak to each case.

18       Q.   On average, what's the length of the

19     delay?

20              MR. VIEUX:   Objection to the form of

21     the question.  Calls for speculation.

22              You can answer.

23       A.   Speaking generally, sometimes it
would

24     take a few hours to obtain the detainees' files.
In

25     some cases it could take more than a day and

484

44

```
 1                         Barnard
 2        sometimes longer than that.
 3              Q.    What's the frequency of delays you
 4        experienced in getting the files?
 5              A.    There are many different things that
 6        add to the delay.  It could -- in some cases it
was
 7        trying to ascertain exactly who represented the
 8        family.  Sometimes it was trying to get access to
 9        files from their Immigration and Customs
Enforcement
10        deportation officer who may not be that
responsive.
11        In some cases the counsel of record in Texas
hadn't
12        been provided copies of documents themselves by
13        either the asylum office or by Immigration and
14        Customs Enforcement.  So they also had a delay on
15        their end.  So there are many different things
that
16        added to the delay, I believe.
17              Q.    Have the delays affected your ability
18        to represent clients at Berks?
19              A.    Yes.
20              Q.    Have you discussed the delays with
ICE
```

21     officials?

22             A.   Yes.

23             Q.   What was the result?

24             A.   We would ask for better notice to

25     counsel of record before someone was transferred
to

45

1                         Barnard

2      allow for the detainees to collect their documents

3      before they were transferred so that they would
have

4      them with them when they arrived at the new

5      detention center.

6              I had asked for the new –– the

7      information for new arrivals to be provided to

8      counsel that they obtained once they were at the

9      Berks County facility.  Those were the things that

10     we asked for.

11             Eventually, Immigration and Customs

12     Enforcement would notify counsel of record in
Texas

13     not before the transfer, but usually I would say

14     within about a day to two days after the person
was

15     transferred.

16          Q.    Who did you speak to about the
delays?

17          A.    Several Immigration and Customs

18     Enforcement officers, including Jennifer Ritchey,

19     Joshua Reid.

20          Q.    To your knowledge, is the delay in

21     obtaining files at Berks any different than any

22     other facility?

23          A.    In my experience it is a bit
different

24     because many of the families are transferred from

25     Texas where they have counsel to Pennsylvania to
the


46

1                        Barnard

2      Berks facility.  So that makes it much more

3      complicated.  And in my experience, the situation

4      with the families who are transferred to Berks is

5      quite different because they are transferred after

6      having these negative credible or reasonable fear

7      interviews.  So they are transferred at a moment
in

8      their case in which the legal posture is very

9      difficult because they are deportable.  So they

10     could be deported.  They have these negative and

487

11      credible or reasonable fear interviews which is

12      quite different to my other experiences of

13      individuals who are transferred to new detention

14      centers.

15              Q.    Do you represent any of the mothers

16      described in paragraph 14 of your declaration?

17              A.    No.

18              Q.    Is it correct that paragraph 14 is
not

19      based on your personal knowledge?

20              A.    It is based on my having reviewed

21      written complaints made by mothers detained at the

22      Berks facility to their ICE deportation officers
and

23      also based on my reading the responses from the
ICE

24      deportation officers to the mothers' written

25      complaints.

58

1                           Barnard

2       and if not parents, then to legal guardians, and
if

3       not legal guardians, then to relatives like

4       brothers, sisters, uncles, aunts?  If not them, to

5       unrelated adults appointed by or designated by a

6         parent?  And notes indicating that those people were

7         contacted to determine their suitability -- did any

8         such notes appear in any of the documents you've

9         received from your clients or from ICE from October

10        2015 to the present?

11                MS. DAVILA:   Objection, compound.

12                Objection, vague.

13        A.    I can speak to -- some of the families

14        have received every 90 days, I believe, custody

15        determine notices from Immigration and Customs

16        Enforcement, which I believe in my experience is a

17        standard practice for anyone who is subject to

18        immigration detention.  Those notices asked the

19        detainee that if they wanted to be released from

20        detention they should provide reasons and supporting

21        evidence for why they should be released.

22                And for several of the families,

23        documents were submitted from appropriate either

24        immediate family, relatives that lived in the United

25        States or extended family or, in some cases, friends

59

                                        Barnard

1

2          who lived in the United States who had immigration

3          status and who were willing and able to receive
the

4          class members, the Flores class members, as well
as

5          their parents, if they were released from
detention.

6                    That is the only document that I've

7          received relating to any of the Berks families

8          detained at the Berks facility that relates to

9          release, but none of the families that I am aware
of

10         who submitted that supporting documentation

11         requesting release were granted release.

12                   Q.   So other than that 90-day review that

13         permitted families to try to submit some
information

14         about their relatives and contacts here in the
U.S.,

15         other than that, we focused on the first 90 days
of

16         detention of class members, have you seen anything

17         that would indicate that ICE was making ongoing
and

18         continuous and recording efforts to determine if

19         there were appropriate placements for children
with

20      either other parents —— another parent in the
United

21      States —— I guess it would be a father or brother,

22      sister, uncle, aunts or an adult designated by a

23      parent —— other than the 90-day review you've

24      mentioned did you see anything else that would

25      indicate what I just described was happening?


61

1                       Barnard

2       four people that you've represented, four class

3       members that you were representing, has any

4       documentation been shared with you by ICE or by

5       anybody else, including your clients or any other

6       pro bono lawyer, that would indicate that anything

7       changed at Berks as a result of Judge Gee's order
in

8       terms of trying to comply with her order?

9               MS. DAVILA:   Objection, vague.

10              Objection, calls for a legal

11      conclusion.

12              A.   Since October 2015 I have not been

13      provided any documentation by Immigration and

14      Customs Enforcement that states that they are

15      changing certain things at the Berks County Family

16      Detention Center in order to comply with Judge

Gee's

17      order.

18              I can speak to the maybe -- I think

19      that's enough as far as I recall.

20              MS. DAVILA:   Have you finished your

21      answer?  Did the witness finish her answer?

22          A.   I was going to say that since October

23      2015, the only thing I can say based on my

24      experience at the Berks Detention Center that has

25      changed obviously is the length of detention of

62

1                       Barnard

2      families at the facility has risen dramatically,

3      which I believe Judge Gee's order called for the

4      opposite, that families should be released from

5      detention more expeditiously.  But I have not been

6      provided any documentation outlining Immigration

and

7      Customs Enforcement to comply with Judge Gee's

8      order.

9          Q.   When you say that families should be

10      released more promptly, do you mean children?  You

11      mean Flores members, class member?

492

12          A.    Yes.   I believe insofar as the Flores

13     settlement agreement requires that constant
efforts

14     be made for Flores class members be released from

15     detention if possible.

16          Q.    Have ICE officers indicated to you
that

17     these class members are not being released because

18     they're subject to, quote, "mandatory detention,"

19     unquote?

20          A.    In any notice that I've been given or

21     any conversations I've had with Immigration and

22     Customs Enforcement officers about why families
who

23     have been subject to prolonged detention at the

24     Berks Detention Center and why they're not being

25     released, the answers I am given generally are
that

63

1                          Barnard

2     it is because they are not eligible for release.

3          Q.    You keep using the word "families."
My

4     questions just go to class members.  Would your

5     response —— let me reask the question because
should

493

6       I ever want to share it with the court, I don't
want

7       to have to share a series of questions.

8              Just with regard to class members,
have

9       ICE officers indicated to you that your clients
are

10      not amenable to release or placement because
they're

11      subject to mandatory detention?

12              MS. DAVILA:   Objection, vague.

13              Objection, compound.

14      A.   The only time I've had any discussion

15      with Immigration and Customs Enforcement officers

16      who are giving me reasons for why either the
parent

17      or child who are detained at Berks Detention
Center

18      are not being released, they will solely say

19      generally that it's because they're not eligible
for

20      release, and by that I understand that they mean

21      that the parent and child had been entered into

22      expedited removal and were not eligible under the

23      laws that apply to expedited removal and both were

24      entered in that proceeding to be released from

25      detention because of their negative or credible or

64

```
 1                          Barnard
 2      reasonable fear interviews.
 3              Q.   Are any of the four people who you
are
 4      representing, the four class members who you are
 5      representing or their mother's included in any
writs
 6      that are being filed, such as they have a stay of
 7      deportation or not?
 8              A.   Do you mean a part of the -- a writ
of
 9      habeas?
10              Q.   Yes.
11              A.   Yes.
12              Q.   How many of the class members who you
13      are the representing have a stay of deportation
14      issued by any authority?
15              A.   All of them received stays of
16      deportation.
17              Q.   And all of them have remained in
18      custody despite the fact that they have a stay of
19      deportation; is that correct?
20              A.   Correct.
21              Q.   When the class members who you
22      represent were granted stays of deportation by
some
```

23     authority, did that make any difference that you are

24     aware of in terms of triggering or commencing

25     efforts aimed at the placement of that child outside

68

1                          Barnard

2          Q.   Have those four families now been

3     released?

4          A.   As far as I recall, only one of the

5     families has been released from detention as of

6     today.

7          Q.   Do you have any idea why that class

8     member was released?

9               MR. VIEUX:   Objection, calls for

10    speculation.

11         Q.   If you know.

12         A.   As far as I recall, the one family was

13    released because they were granted a new credible

14    fear interview and were issued a notice to appear

15    and were then released from detention.

16         Q.   With regards to the other three can you

17    tell us for each one, based on the time you've had

496

18      contact with them, how long you believe they've been

19      detained at Berks?

20              MS. DAVILA:   Objection, calls for

21      speculation.

22              Q.   Just to the best of your knowledge or

23      your best estimate.   You're allowed to give your

24      best estimate.

25              A.   As far as I recall, the other three


69

1                       Barnard

2       families have all been in immigration detention for

3       approximately four to six months at least.

4               Q.   Do you know, with your current pro bono

5       effort, how many people at Berks have representation

6       versus do not have representation or the approximate

7       percentage of class members who have representation

8       or do not have representation?

9               MS. DAVILA:   Objection, vague.

10              Objection, calls for speculation.

11              A.   I can answer that the majority of the

12          families at the Berks facility today do have

13          representation.

14                  Q.   I have no further questions.

15                  MS. DAVILA:    Thank you.

16                  I have a couple questions.

17                  (Discussion held off the record.)

18          BY MS. DAVILA:

19                  Q.   Is it correct that you have personally

20          represented four Flores class members at Berks?

21                  A.   Yes.

22                  Q.   Is it correct that one of those clients

23          was released?

24                  A.   The family was released, yes.

25                  Q.   One family?

70

1                           Barnard

2                   A.   Correct.

3                   Q.   How do you know that family was

4           released?

5                   A.   Because I was issued a release notice

6           from the detention center and was told by the family

7          once they were released.

8                    Q.    Were your other three clients released?

9                    A.    No.

10                   Q.    How do you know?

11                   A.    Because they remain in the family

12         detention center.  They remain detained and I was

13         issued a notice from the Immigration and Customs

14         Enforcement that they were not going to be released.

15                   Q.    Were you provided with any reasons why

16         they were not released?

17                   A.    No.

18                   Q.    Did the notice only state that they

19         would not be released?

20                   A.    The notice is, as far as I'm aware and

21         my experience, it's the standard notice that

22         Immigration and Customs Enforcement issues in

23         relation to a parole request.  And all that it

24         states is the person's name and that the release

25         request had been received and that upon

71

1                                        Barnard

499

2        consideration of the person's case it has been

3        determined that they are not eligible for release.

4               Q.    Is there anything you would like to
add

5        to make your testimony complete?

6               A.    No.

7               Q.    I have no further questions.

8                     MS. DAVILA:  We can close the

9        deposition.

10                    MR. VIEUX:    I have no questions.

11                    MS. DAVILA:    Thank you so much for

12       your time.

13                    (Discussion held off the record.)

14                    MS. DAVILA:    We would like to offer

15       you the opportunity to read and sign your
deposition

16       transcript.  Would you like to take that

17       opportunity?

18                    THE WITNESS:    Yes, please.

19                    (Discussion held off the record.)

20                    MR. SCHEY:    The government has
ordered

21       an expedited transcript and plaintiff would like a

22       digital copy.  We understand that that should be

23       forwarded to us by next Wednesday.  Thank you.

24                    MS. DAVILA:    Do you understand
that's

500

25        a three-day expedited transcript, right?  Not

72

1                            Barnard

2        Monday.

3                    THE WITNESS:  Yes.  He just said

4        Wednesday.

5                    (Time noted:  3:35 p.m.)

6

7

                                 Robyn Barnard
8

9        Subscribed and sworn to

10       before me this     day

11       of              , 2016.

12

13          Notary Public

14

15

16

17

18

19

20

21

22

23

24

25

73

1

2                              I N D E X

3       WITNESS        EXAMINATION BY                PAGE

4       R. Barnard     Ms. Davila                    4, 69
                       Mr. Schey                     48
5

6

7       EXHIBITS                                     PAGE

8          1        Declaration document             21

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     Copy of exhibit given to court reporter to
       include with transcript.

25


75

1

2                           C E R T I F I C A T I O N

3

4              I, PATRICIA GUARINO, a Shorthand

5       Reporter and notary public, within and for the
State

6       of New York, do hereby certify:

7                   That ROBYN BARNARD, the witness whose

8       examination is hereinbefore set forth, was first

9       duly sworn by me, and that this transcript of said

10      testimony is a true record of the testimony given
by

11      said witness.

12                  I further certify that I am not
related

13      to any of the parties to this action by blood or

14      marriage, and that I am in no way interested in
the

503

15        outcome of this matter.

16

17              IN WITNESS WHEREOF, I have hereunto set

18        my hand this 19th day of September, 2016.

19

20

21                          PATRICIA GUARINO

22

23

24

25

504

# Exhibit 24

Publicly Filed

1

1

2      UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA
3      -------------------------------------------------
       JENNY L. FLORES, et al.,
4
                              Plaintiffs,
5
                                          Civil Action No.
6          -against-                      2:85-CV-04544-DMG-AGR

7      LORETTA E. LYNCH, United States Attorney General,

8                              Defendant.
       -------------------------------------------------
9

10              DEPOSITION OF EDWARD McCARTHY, ESQ., a

11     witness on behalf of the Plaintiffs herein, taken
by

12     Defendant, pursuant to subpoena, at the offices of

13     the United States Attorney's Office, 271 Cadman

14     Plaza East, Brooklyn, New York, on Friday,
September

15     16, 2016, at 10:06 a.m., before Patricia Guarino,
a

16     Shorthand Reporter and notary public, within and
for

17     the State of New York.

18

19

20

21

22

23

24

25

2

1

2          A P P E A R A N C E S :

3      CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
              Attorney for Plaintiffs
4      256 South Occidental Boulevard
       Los Angeles, California 90057
5
       BY:   PETER SCHEY, ESQ.
6             (Via telephone)
              (323) 251-3223
7             pschey@centerforhumanrights.org

8

9      U.S. DEPARTMENT OF JUSTICE
              Attorneys for Defendant
10     P.O. Box 878
       Ben Franklin Station
11     Washington DC  20044

12     BY:   YAMILETH G. DAVILA, ESQ.
              Senior Litigation Counsel
13            Office of Immigration Litigation
              (202) 305-0137
14            yamileth.g.davila@usdoj.gov

15
                         * * *
16

17

507

18

19

20

21

22

23

24

25


3

1

2

3          IT IS HEREBY STIPULATED AND AGREED
that

4     all objections, except as to the form of the

5     questions, shall be reserved to the time of the

6     trial;

7          IT IS FURTHER STIPULATED AND AGREED

8     that the within examination may be subscribed and

9     sworn to before any notary public with the same

10    force and effect as though subscribed and sworn to

11    before this court.

12

13

14

508

15

16

17

18

19

20

21

22

23

24

25

4

1

2          Whereupon,

3                    EDWARD MCCARTHY,

4     after having been first duly sworn, was examined and

5     testified as follows:

6     EXAMINATION BY MS. DAVILA:

7          Q.   Good morning.  My name is Yamileth

8     Davila.  I represent the defendant, the attorney

9     general.  I am from the United States Department of

10    Justice Civil Division, Office of Immigration

11        Litigation, the District Court section.

12                    We are here in the matter of Flores

13        versus Meese, currently pending in the U.S. District

14        for the Central District of California, Docket

15        Number 2:85 CV-4544.

16                    Are you represented by counsel?

17        A.   No.

18        Q.   Have you ever been deposed before?

19        A.   No.

20        Q.   Please allow me to explain a few things

21        with before we begin.

22                    I will be asking you a series of

23        questions to which you are under oath to provide a

24        full and complete answer.  If I ask you any question

25        that is confusing or that you don't understand, I'll

29

1                         McCarthy

2        release of a client.

3        Q.   Did you ask a deportation officer why

4        they hadn't had the opportunity to meet with an

5        immigration judge to discuss release?

6        A.   No.

7          Q.    Paragraph 4 of your declaration states

8          that you observed no change in ICE policy in the

9          detention of Flores members while at Karnes.

10                What do you mean by "no change"?

11                A.    Their practice of holding women in

12         detention who had received a negative determination

13         following credible fear or a reasonable fear

14         interview did not change while I was there.  And at

15         no point did they receive a custody review in front

16         of an immigration judge, and so there were no

17         changes in that status.

18                Q.    Do you mean there were no changes in

19         the two weeks you were working at Karnes?

20                A.    Right, correct.

21                Q.    What observations did you make

22         regarding your clients detention at Karnes?

23                MR. SCHEY:   I would object to that

24         question.  Too broad.  We could be here for three

25         days with him describing every observation.


37

1                          McCarthy

2          before the client could continue what it was that

3       they had been saying.

4               Q.    Did you inform the asylum officer that

5       your client had not been permitted to finish her

6       answer?

7               A.    Yes.

8               Q.    What was the result?

9               A.    At that point she -- let me think.

10      At that point she was permitted to finish what it

11      was that she had been saying.

12              Q.    How many times did that occur during

13      this interview?

14              A.    I don't recall the exact number, but it

15      happened more than five times, probably between five

16      and ten times.

17              Q.    You mentioned that during this

18      interview the translator was switched; is that

19      correct?

20              A.    Yes.

21              Q.    Did the translation issues persist

22      after the translator was switched?

23              A.    Yes.

24              Q.    Did the interruption issues persist

25      after the translator was switched?

38

                    1                              McCarthy

                    2              A.    Yes.  And again, this is relevant

                    3        because most of these credible fear interviews

                    4        happen without attorneys, so there's not someone

                    5        there to notify the asylum officer that there are

                    6        mistranslations and that the client had not

finished

                    7        what they were saying.  So in the vast majority of

                    8        these cases this wouldn't come to light.

                    9              Q.    What is the basis for that belief?

                   10              A.    Having met with numerous clients who

                   11        are unrepresented at their credible fear and

                   12        reasonable fear interviews.

                   13              Q.    And those clients told you what

                   14        happened at their credible fear interviews?

                   15              A.    Yes.

                   16              Q.    But you've only attended one credible

                   17        fear interview; is that correct?

                   18              A.    Correct.

                   19              Q.    Was your client asked about social

                   20        group membership during her credible fear

interview

                   21        on October 30, 2015?

22          A.   She was asked whether her persecution

23     was based on her membership in a social group, in

24     those words.

25          Q.   And your declaration states that she


40

1                        McCarthy

2          A.   Yes.

3          Q.   What did your client say to you about

4     the social group question?

5          A.   She said she didn't understand what

we

6     meant when we asked her about social group.

7          Q.   Did you inform the asylum officer

that

8     your client did not understand the question?

9          A.   No.

10          Q.   Why not?

11          A.   I don't know.

12          Q.   While you were working at Karnes,

were

13     any of your clients relocated without your notice?

14          A.   Yes.

15          Q.   How many?

16          A.   So two clients who I was the main

17     attorney on were relocated.  One of the other

514

18     clients —— at least one of the other clients who

one

19     of my colleagues was working on and I was

assisting

20     with was also transferred without our notice.

21          Q.   When you say that you were the main

22     attorney, what do you mean?

23          A.   I was drafting the re-interview

24     request.

25          Q.   ** What were the names of the clients

48

1                    McCarthy

2          MS. DAVILA:   Objection, leading.

3          A.   They I guess —— yes.  The children ——

4     children and parents were commingled, from what I

5     understand.

6          Q.   To the best of your knowledge, were

7     children ever allowed to leave the facility unless

8     they were actually released?

9          A.   No.

10          Q.   Did it appear to you that the

children

11     were —— that the location where children were

held,

12     I guess, along with adults, were those locations

13        locked?

14              A.    Yes.

15              Q.    Now, when you were there, you had the

16        opportunity to review your clients' files to the

17        extent that they had copies of their files; is that

18        correct?

19              A.    Yes.

20              Q.    And did you also have the opportunity

21        to speak to some ICE officers and staff at the

22        facility?

23              A.    Yes.

24              Q.    And you also had the opportunity to

25        speak with your clients?


49

1                           McCarthy

2              A.    I did.

3              Q.    Based on those conversations and your

4        review of your clients' files, did you learn

5        anything that indicated to you that prior to the

6        credible or reasonable fear interviews, efforts were

7        being made by ICE officers -- continuous efforts

8        were being made by ICE officers aimed at the release

516

9      of children under paragraph 14 of the Flores

10     settlement?

11              MS. DAVILA:   Objection, leading.

12              Objection, vague.

13        A.   In speaking to my clients and the

14     employees at Karnes and the deportation officers,

at

15     no point did any of them mention any efforts being

16     made to place -- to place their children outside

of

17     Karnes.

18        Q.   Did you observe anything or read

19     anything in your clients' files that indicated to

20     you that ICE was taking steps to comply with Judge

21     Gee's August 2015 order?

22        A.   I saw nothing to that effect.

23        Q.   Based on the discussions that you had

24     at Karnes with ICE officers or with your clients

and

25     based on your review of your clients' files, did

you

50

1                    McCarthy

2      become aware of any efforts being made by ICE

3      officers to release children under paragraph 14 of

4          the Flores settlement subsequent to negative fear

5          determinations made by USCIS?

6                    MS. DAVILA:    Objection, leading.

7                    Objection, vague.

8               A.    I saw nothing that would indicate that

9          they were trying to place children outside of Karnes

10         subsequent to -- subsequent to a negative credible

11         fear or reasonable fear finding.

12              Q.    What were your observations, if any,

13         regarding fair consideration given to any credible

14         or reasonable fears that Flores class members may

15         have possessed aside from any claims that their

16         mothers may have possessed?

17              A.    I saw no consideration being given to

18         any credible or reasonable fear -- fears that --

19         sorry, any credible fears that the children might

20         have had.  At no point had I heard of children being

21         present during the parents' interview or having

22         their own interview for any of my clients.  And in

23         many of those cases the child likely had their own

24         -- not likely, but there are definitely cases where

25         the child had their own independent claim separate

518

51

1                          McCarthy

2        from their parents, and that was not taken into

3        account during the credible fear or reasonable
fear

4        process.  And in some cases the parent had been

5        previously deported, so the parent actually had to

6        meet a higher standard, the reasonable fear

7        standard, whereas their children did not.  And
there

8        was no indication that that was taken into account

9        when making that determination.

10            Q.   Based on your observation and your

11       discussions with your colleagues, those who were

12       denied a positive fear determination, were you
able

13       to determine what seemed to be the basis for most
or

14       the majority of those denials?

15            A.   Frequently the clients did not

16       articulate their fears in a way that the officer

17       found fit into one of the boxes for asylum.  So,
for

18       example, one client's husband had been murdered,
and

19       of course that was the issue that was present in
her

20    mind and that was the most relevant to her.   So

21    that's what she discussed during her interview.
But

22    she didn't discuss things that might have been
more

23    relevant to her personal claim, for instance, the

24    assistance that she gave police regarding her

25    husband's murder.   And so because this individual
--

52

1                        McCarthy

2    and most -- all of the individuals that I later

3    represented were not represented in their initial

4    interviews.   They did not articulate their claims
in

5    a way that would be recognized under immigration

6    laws.

7                        And further, many of these women had

8    experienced trauma.   They had been through
horrific

9    things in their countries.   In my experience

10    representing victims of trauma, you can take a

11    long time, many meetings, before a client is

12    comfortable enough to share the horrible things
that

13    they've been through.   For example, one client --

14      one client had been filmed by her significant
other

15      during a sexual act without her knowledge and then

16      her partner later used that film to control that

17      woman as part of his -- as part of domestic
violence

18      against that woman.  But that would not be the
type

19      of thing that she would be comfortable sharing

20      initially.  It took, with me, many meetings and
much

21      work in order to allow that particular client to

22      feel comfortable in sharing that occurrence.

23              In other instances, my clients had

24      difficulties based on language and based on the
fact

25      that they were working through an interpreter who


64

1                      McCarthy

2      desire to see as many clients as we could because

3      otherwise they would be unrepresented and they
would

4      be in a much worse situation.

5              Q.   Do you think given the very short

6      period of time between Flores class members
arriving

7      at Karnes and the scheduling of their fear

521

          8        interviews and given the remoteness and the
location

          9        of Karnes, do you think it is possible to provide

          10       adequate representation or effective
representation

          11       to class members at that facility?

          12                    MS. DAVILA:   Objection, leading.

          13                    Objecting, vague.

          14                    Objection, compound.

          15            A.    I don't think that it's possible to

          16       provide effective representation to individuals

          17       detained at Karnes.  Karnes is remote.  It's over
an

          18       hour away from the nearest city, San Antonio, and

          19       there are numerous things that need to happen in a

          20       short amount of time.  If you don't submit things
in

          21       time, your client can be removed, and that is

          22       something that did happen in one of our cases in

          23       that a client was removed before we could submit
the

          24       re-interview request.

          25                    We would see as many clients as we


          66

          1                         McCarthy

          2        mandated by law to detain these Flores class

members

```
 3        or is it your understanding that ICE exercises its

 4        discretion to place these class members into

 5        expedited removal proceedings and mandatory

 6        detention?

 7                    MS. DAVILA:   Objection, compound.

 8                    Objection, leading.

 9                    Objection, vague.

10                    Objection, calls for a legal

11        conclusion.

12              A.   From my understanding this is a

13        discretionary determination made by ICE to detain

14        these individuals.  ICE has the discretion to

15        release them, but it chooses not to do so.

16              Q.   At any time that you were
```
volunteering
```
17        at Karnes, based on your discussions with the

18        mothers you met with or your review of their files
```
ever
```
19        or your discussions with ICE officers, did you
```
by
```
20        become aware whether any efforts were being made

21        ICE to place Flores class members in licensed

22        programs under paragraph 19 of the settlement if
```
14
```
23        there was no available placement under paragraph

24        of the settlement?
```

```
25              A.   No.
```

71

```
 1

 2                        I N D E X

 3      WITNESS        EXAMINATION BY              PAGE

 4      E. McCarthy    Ms. Davila                  4, 67
                       Mr. Schey                   47
 5

 6
        EXHIBITS                                   PAGE
 7
           1        Declaration document           16
 8

 9

10
        MARKED FOR A RULING:
11
        Page  Line
12
         32    13
13       40    25

14

15

16

17

18

19

20

21
```

22

23
      Copy of exhibit given to court reporter to
24
      include with transcript.

25

72

1

2
                C E R T I F I C A T I O N
3

4
          I, PATRICIA GUARINO, a Shorthand

5
      Reporter and notary public, within and for the State

6
      of New York, do hereby certify:

7
         That EDWARD McCARTHY, the witness whose

8
      examination is hereinbefore set forth, was first

9
      duly sworn by me, and that this transcript of said

10
      testimony is a true record of the testimony given by

11
      said witness.

12
         I further certify that I am not related

13
      to any of the parties to this action by blood or

14
      marriage, and that I am in no way interested in the

15
      outcome of this matter.

16

525

17          IN WITNESS WHEREOF, I have hereunto set

18     my hand this 19th day of September, 2016.

19

20

21               PATRICIA GUARINO

22

23

24

25


73

1          DEPOSITION ERRATA SHEET

2

3     Our Assignment No.:  4771

4     Case Caption:  Flores vs. Loretta E. Lynch

5

6          DECLARATION UNDER PENALTY OF PERJURY

7

8     I declare under penalty of perjury that I have read

9     the entire transcript of my Deposition taken in the

10     captioned matter or the same has been read to me,

11     and the same is true and accurate, save and except

12        for changes and/or corrections, if any, as indicated

13        by me on the DEPOSITION ERRATA SHEET hereof, with

14        the understanding that I offer these changes as if

15        still under oath.

16                _____

17                Edward McCarthy

18        Subscribed and sworn to on the ____ day of _____,

19        20 ____ before me.

20        _____

21        Notary Public,

22        in and for the State of _____.

23

24

25

# Exhibit 25

Publicly Filed

Jacquelne Kline                                    October 18, 2016

                                                    Page 1

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA

2

3

      --------------------------:
4     JENNY LISETTE FLORES, ET    :
      AL.,                        :
5                                 :  CASE NO:
              Plaintiffs,         :
6                                 :  CV-85-4544-DMG
              vs.                 :
7                                 :
      ERIC H. HOLDER, JR,         :
8     ATTORNEY GENERAL OF THE     :
      UNITED STATES, ET AL.,      :
9                                 :
              Defendants.         :
10    --------------------------:

11

              Tuesday, October 18, 2016

12

13

14           Oral deposition of JACQUELYN KLINE,
15    taken at the offices of The United States
16    Attorney's Office for the Eastern District of
17    Pennsylvania, 615 Chestnut Street, Suite 1250,
18    Philadelphia, Pennsylvania, commencing at 10:04
19    a.m., before Theresa F. Franco, a Court
20    Reporter and Notary Public.

21

22

23

24

25

Page 2

| 1 | A P P E A R A N C E S |
|---|---|

2

3   CHADBOURNE & PARKE, LLP
    By:  MICHAEL BHARGAVA, ESQUIRE
4   1200 New Hampshire Avenue, NW
    Washington, DC  20036
5   202-974-5629
    mbhargava@chadbourne.com
6   Representing the Plaintiff, Jacquelyn Kline

7

8   UNITED STATES DEPARTMENT OF JUSTICE, CIVIL
    DIVISION
9   By:  SARAH L. VUONG, ESQUIRE
       COLIN KISOR, ESQUIRE, DEPUTY DIRECTOR
10      SOPHIE KAISER, ESQUIRE
    P.O. Box 878
11  Ben Franklin Station
    Washington, DC  20044
12  202-532-4281
    sarah.l.vuong@usdoj.gov
13  colin.kisor@usdoj.gov
    sophie.b.kaiser@usdoj.gov
14  Representing the Defendants

15

16

17

18

19

20

21

22

23

24

25

Page 3

1              - - -

2            I N D E X

3              - - -

4   Witness: JACQUELYN KLINE            PAGE

5   By Ms. Vuong . . . . . . . . . . . .    4

6              - - -

7           E X H I B I T S

8              - - -

9   NUMBER        DESCRIPTION        PAGE

10

11          (None marked.)

12

13              - - -

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1              JACQUELYN KLINE

2               - - -

3        JACQUELYN KLINE, having been first

4   duly sworn, was examined and testified as

5   follows:

6               - - -

7           EXAMINATION

8               - - -

9   BY MS. VUONG:

10      Q.    Good morning, Ms. Kline.

11      A.    Hi.

12      Q.    My name is Sarah Vuong.  I'm from

13  the Department of Justice.  Do you know why

14  we're here today?

15      A.    Yes.

16      Q.    And why is that?

17      A.    We're taking depositions for the

18  Flores case.

19      Q.    Are you counsel in the Flores case?

20      A.    We're consultants with the Flores

21  counsel.

22      Q.    Can you explain to me a little bit

23  what that means?

24      A.    So since -- my understanding, at

25  least, of it is that, since Flores counsel

Page 5

1              JACQUELYN KLINE

2   isn't present in the facilities and we are

3   there, we've been present, so when Peter would

4   come and speak with our clients, or if there's

5   specific issues being raised, we would have

6   more information about that than Flores counsel

7   may have.

8      Q.    So you work directly with Peter?

9      A.    We work with Peter, yes.

10     Q.    Okay.  And the Center for

11  Constitutional Rights?

12     A.    Yeah.  I think that's where he's

13  through.

14     Q.    Okay.  Are there any -- are there

15  any other attorneys that you work with

16  through -- with CCR?

17     A.    We've spoken with -- I don't know

18  what Chapman's last name is, but he works with

19  Peter.

20     Q.    Chapman Noam?

21     A.    Yes.

22     Q.    Okay.  But any other attorneys

23  within CCR?

24     A.    Not that I'm aware of.

25     Q.    But you have -- or have you entered

530

2 (Pages 2 - 5)

Page 38

JACQUELYN KLINE

1    JACQUELYN KLINE
2  the Motion to Appoint Special Counsel or --
3      A.   Yeah.  Specific Monitor?
4      Q.   I'm not sure what that phrasing
5  was.
6      A.   Yeah.
7      Q.   So then the 2016 is the only
8  declaration that you've submitted, correct?
9      A.   Yes.
10     Q.   Okay.  So we talked about this a
11 little bit, but in that declaration you state
12 that access to counsel is limited?
13     A.   Mm-hmm.
14     Q.   Do you have any other -- I mean, do
15 you think there's anything that the facility is
16 doing to limit that access?
17     A.   I don't -- I mean, to my knowledge,
18 the only information they give them as to
19 attorneys they can contact is that pro bono
20 list, of which the majority, if not all, of the
21 organizations on there -- I know of one,
22 specifically that I can think of, handles
23 detained cases; the others do not.
24     Q.   Okay.  But the facility doesn't
25 prevent you from meeting with clients, correct?

Page 39

1    JACQUELYN KLINE
2      A.   Prevent in what way?
3      Q.   Not allow you access.
4      A.   I mean, we're allowed to meet with
5  clients.
6      Q.   Okay.  And are there -- is there --
7  are there telephones at the facility that the
8  detainees can use?
9      A.   Yes.
10     Q.   Are there computers at the
11 facilities that the detainees can use?
12     A.   Yes.
13     Q.   All right.  So do detainees -- has
14 a detainee ever called you to seek to have you
15 represent them?
16     A.   They or their family have called
17 us, I think, yes.
18     Q.   So they were able to find you and
19 call you on the phone, versus -- and I mean
20 this versus seeing you in person while you were
21 there?
22     A.   Yes, but our clients who are there
23 also have our telephone number.
24     Q.   Okay.  Okay.  And just so I'm
25 clear, the facility itself is not limiting

Page 40

1    JACQUELYN KLINE
2  access to attorneys?  There's no -- I guess
3  what I'm asking is:  There's no policy by Berks
4  that detainees can't reach out to attorneys,
5  correct?
6      A.   No.
7      Q.   Okay.  And your -- how does it work
8  when you go to meet with clients?  Are you
9  provided a room where you can meet with the
10 clients?
11     A.   There's a couple of attorney rooms,
12 yes.  There are attorney rooms.
13     Q.   Mm-hmm.  Okay.  And I think -- I
14 think it's your declaration, where you can
15 bring in a laptop?
16     A.   Now, yes.
17     Q.   Okay.  What do you mean now?
18     A.   Previously, no, we were not allowed
19 to.
20     Q.   What is, just timing-wise, what
21 does previously mean?  2014?  2015?
22     A.   We did not bring in computers
23 in 2014.  I'm not sure exactly when we started.
24 I know it was more recently, like in the past
25 few months, we definitely have been, but prior

Page 41

1    JACQUELYN KLINE
2  to that, I don't remember when.
3      Q.   Okay.  And were the -- the
4  communications with your clients, those are
5  confidential, correct?
6      A.   Yes.
7      Q.   In that ICE is not monitoring the
8  rooms and recording that information, correct?
9      A.   Well, ICE's office is right on the
10 other side of the wall from the attorney rooms,
11 and you can hear them in their office, so
12 presumably they can hear us as well, I mean in
13 some sense.  And there is cameras in -- there
14 are, like, three -- there's like a main room
15 and then two small rooms off of it.  There is a
16 camera in the main room, not in the two small
17 rooms.
18     Q.   Okay.  Do you know why that camera
19 is in the main room?
20     A.   I have no idea.
21     Q.   But there are no cameras in the --
22 I guess the small rooms are the, kind of, like,
23 offices where you meet with your clients or do
24 you meet with your clients --
25     A.   We have had to meet with clients in

531

Page 42

JACQUELYN KLINE

1    JACQUELYN KLINE
2  that larger room as well.
3      Q.    Okay.  Do you think the camera is
4  there for security purposes?
5      A.    I don't know why it's there.
6      Q.    And then -- okay.
7          Do you know how the other pro bono
8  attorneys got, I guess -- I'm sorry.  Let me
9  try to do this better.
10         With the other private pro bono
11  attorneys, do you know, have they had any
12  trouble gaining access to Berks?
13     A.    I guess it depends on what you mean
14  by trouble or access to.
15     Q.    Well, I guess, would you say you've
16  had trouble gaining access to Berks?
17     A.    There are times that we have had
18  trouble getting into the facility, yes.
19     Q.    But you've been able to get into
20  the facility each time?
21     A.    I think almost every time, yes.
22     Q.    Okay.  Why do you say almost every
23  time?  Can you think of a specific time when
24  you weren't able to get into the facility?
25     A.    I believe there was a time or two

Page 43

JACQUELYN KLINE

1    JACQUELYN KLINE
2  when they told us that the rooms were full so
3  we couldn't come to visit clients on that day.
4      Q.    Okay.  And the rooms being the
5  attorney rooms?
6      A.    The attorney rooms, yeah.
7      Q.    Okay.  Okay.  And, I mean, I think
8  you said you were going several times a week?
9      A.    Mm-hmm.
10     Q.    For a couple of years?
11     A.    Yeah.
12     Q.    So there's only been a few times,
13  and it's only been because the attorney rooms
14  were being used; is that correct?
15     A.    Well, where they wouldn't let us
16  into the building at all, there's other times.
17  I don't know exactly what -- how specific
18  you're asking about what kind of access issues
19  we have had.
20     Q.    Well, I'm just trying to clarify
21  when you say access to counsel is extremely
22  limited.  To me, it sounds like you have been
23  able to get into Berks fairly regularly and
24  meet with your clients.
25     A.    Mm-hmm.

Page 44

JACQUELYN KLINE

1    JACQUELYN KLINE
2      Q.    And that you've been able to -- you
3  and your partners meet with people around three
4  times a week.
5      A.    Right.
6      Q.    So what I'm trying to figure out is
7  when you say access to counsel is extremely
8  limited, if you can provide me with specific
9  examples when your access to your clients has
10  been limited.
11     A.    I mean, there's a lot of times when
12  we show up and we call, and we have to wait in
13  the waiting room for extended periods of time
14  before they come and let us in.  There are days
15  where we show up where they tell us, today you
16  can bring this item.  The next day we show up
17  and they say you can't.
18         Recently, we had been bringing a
19  printer, and one day when we showed up, they
20  told us we couldn't have it.  And we had to
21  leave it in the hallway, and we had to go back
22  to our office to print documents to have
23  clients sign and come back again.
24         There are times when we've asked
25  for caseworkers to allow a client to use the

Page 45

JACQUELYN KLINE

1    JACQUELYN KLINE
2  attorney rooms to make a phone call to us where
3  that didn't occur.
4          So I mean there's a lot of
5  different, over the two years, I mean, there's
6  a lot of different issues that I would say
7  limit our access to our clients.  So that's
8  what I mean.  It's hard for me to know exactly
9  what kind of examples you're asking me for.
10     Q.    Okay.  And is the process that -- I
11  guess, explain to me the process a little bit,
12  too, about how you set up a client meeting.
13     A.    Well, now, we have to send them an
14  email 24 hours in advance to tell them exactly
15  who's coming and exactly which clients we're
16  going to see.
17     Q.    Is this to Berks?
18     A.    Yes.  Which was not previously the
19  case.
20     Q.    And when you say previously,
21  previous to what?
22     A.    When we first started going
23  in 2014, I mean, we would just show up, and
24  whoever wanted to speak with us would be
25  allowed to speak with us.  And then, I don't

12 (Pages 42 - 45)

Page 54

JACQUELYN KLINE

1
2      A.    Yes.  Well, it's usually more of
3   like, we're yelling something, I guess, to
4   them, and they're yelling something back.
5      Q.    Okay.
6      A.    We're yelling to the detainees;
7   they're yelling something back.
8      Q.    Okay.  Do you know what you were
9   yelling?  Can you remember what you were
10  yelling to the detainees?
11     A.    I mean, sometimes it's stuff like
12  "liberty," or I don't remember all of the
13  things, like, back and forth.
14     Q.    Is it in English or Spanish?
15     A.    Usually Spanish.
16     Q.    Okay.  Okay.  Okay.  So "Libertad"?
17     A.    Mm-hmm.
18     Q.    Do you remember any of the other
19  chants?
20     A.    Honestly, I don't speak Spanish, so
21  I don't always know.
22     Q.    Okay.  Do you remember if you were
23  holding a sign?
24     A.    Probably.
25     Q.    Did you draw up a sign?

Page 55

JACQUELYN KLINE

1
2      A.    I didn't make one, no.
3      Q.    Okay.  So you maybe picked one up
4   while you were there?
5      A.    Yeah.
6      Q.    And do you remember what the sign
7   said?
8      A.    I mean, I guess we've been to a
9   lot, and they've had different ones, but
10  sometimes they say, like, "End family
11  detention," or "don't separate families," or I
12  don't know, things of that nature.
13     Q.    Okay.  And when you say, "End
14  family detention," I guess what is your goal?
15         MR. BHARGAVA:  Objection; vague.
16  BY MS. VUONG:
17     Q.    You can answer the question.
18     A.    I think that we would like to see
19  the policy return to what it was before 2014
20  where families weren't being detained by -- in
21  detention facilities.
22     Q.    Okay.  And prior to 2014 -- can you
23  explain to me a little bit, what would happen
24  prior to 2014?
25     A.    In our experience, prior to 2014 --

Page 56

JACQUELYN KLINE

1
2   well, Berks was the only facility in the entire
3   country for family detention.  And the people
4   who were detained there, it was for a few
5   weeks, maybe, while they contacted their
6   family.  And -- or, I mean, I guess there are
7   cases where they didn't actually have any
8   family and a church organization would come in,
9   something like that.
10         And then what we started to see in
11  the summer of 2014 was that the families were
12  being detained and not being released, and then
13  also these facilities in Dilley and Karnes were
14  built and opened to detain families.
15         So prior to that, if they were
16  encountered by Immigration, typically they
17  were, you know, given a Notice to Appear in
18  whatever court, you know, whether it was in
19  Texas or in a court where they relocated to,
20  and they may or may not have an ankle
21  monitoring device or check-ins with
22  Immigration, something of that nature.
23     Q.    And when you say released, you mean
24  within the United States or do you mean
25  returned to their home country?

Page 57

JACQUELYN KLINE

1
2      A.    Released into the United States to
3   complete their asylum.  Usually there was an
4   asylum process.
5      Q.    Okay.  So going to your declaration
6   again back to paragraph 6.
7      A.    Yes.
8      Q.    You also state that, "Detainees
9   have informed me that they have been told by
10  ICE officials or facility staff they would be
11  charged with a federal crime if they pass the
12  cones."  Do you see that statement?
13     A.    Yes.
14     Q.    Okay.  How many -- how often have
15  you heard that?
16     A.    I mean, we've heard it several
17  times.  Now it's a fence.  There's an actual
18  fence, but at this time, it was orange cones
19  that they weren't -- that demarcated the line.
20     Q.    Okay.  And I guess -- but the
21  detainees -- you just said detainees, so I'm
22  trying to get a sense of how many people you
23  think -- how many people told you this.
24     A.    On the day that Decker came,
25  several of our clients told us that they had

Page 70

JACQUELYN KLINE

1           JACQUELYN KLINE
2  anything about it, so...
3      Q.    So then you would -- would you
4  prefer the state be more active?
5      A.    Yes.
6      Q.    I guess -- yes.  Okay.  And then in
7  paragraph 9 you have a statement that,
8  "Children remain detained with unrelated
9  adults --
10     A.    Yes.
11     Q.    -- yet another violation of state
12  law and the terms of the Flores settlement."
13     A.    Yes.
14     Q.    Can you just explain to me a little
15  bit of what you mean by that statement?
16     A.    At Berks, the families are several
17  families to a room.  I think it's, I don't
18  know, somewhere between three and six families
19  in a room.  So you have children with unrelated
20  adults and unrelated children together in a
21  room.  Particularly when they have male
22  detainees, you have mixed male and female
23  children in rooms with other unrelated adult
24  males.
25     Q.    Okay.  But is the case, though,

Page 71

JACQUELYN KLINE

1           JACQUELYN KLINE
2  that the children are also with their own
3  relative in that room within those three to six
4  families?
5      A.    If the children are under a certain
6  age, they're with their parent.  If they're
7  over a certain age, no, they're in rooms by
8  themselves -- I mean children, a bunch of
9  children in the room by themselves.
10     Q.    What age is that?
11     A.    I think it's 11 or 12 maybe.  I
12  can't remember the exact age where they start
13  to separate them.
14     Q.    So the 11- or 12-year-olds would be
15  in a room with other 11- or 12-year-olds?
16     A.    And older.
17     Q.    And older?
18     A.    Yeah.
19     Q.    Okay.  And under that age, it would
20  be with their parent or whoever -- whichever
21  relative they're with and possibly other
22  families?
23     A.    Yes, definitely.
24     Q.    And likely with other families?
25     A.    Yes.

Page 72

JACQUELYN KLINE

1           JACQUELYN KLINE
2      Q.    Okay.  And, I guess, what would --
3  how do you think that should be different?
4      A.    I think the -- you could have -- I
5  mean the rooms should be more -- like, the
6  families, only those families, in rooms
7  together.  More like -- I mean, you can have
8  residential facilities set up more as suites or
9  something where it's just your family and that
10  you're not in with other unrelated adults or
11  children.
12     Q.    Okay.
13           MR. BHARGAVA:  And can I just have
14  a clarification?  When you're asking her
15  these questions, what do you want, what do
16  you think should happen, I'm assuming
17  you're asking her in her personal
18  capacity, her individual wants other than
19  speaking for Flores counsel or her firm?
20           MS. VUONG:  Well, her, as a witness
21  in this case who has -- right, who has
22  submitted a declaration in this case, kind
23  of, you know, the intent behind the
24  statements.
25

Page 73

JACQUELYN KLINE

1           JACQUELYN KLINE
2  BY MS. VUONG:
3      Q.    Okay.  So more -- more like a hotel
4  or dorm room?
5      A.    I guess more, yeah, just private
6  areas for each family.
7      Q.    Okay.  All right.
8           MS. VUONG:  Let's take a
9  five-minute break, and then I'll talk with
10  my colleagues and then come back.
11           MR. BHARGAVA:  How much longer do
12  you think?
13           MS. VUONG:  I don't think long.
14                    - - -
15           (A short recess was taken.)
16                    - - -
17  BY MS. VUONG:
18     Q.    So I have a couple more questions
19  regarding your declaration.
20     A.    Yep.
21     Q.    In paragraph 2, the first sentence
22  says, "Despite the fact that in my experience
23  about 95 percent of detained Flores class
24  members at Berks have close family members to
25  whom they could be released..."

Page 74

JACQUELYN KLINE

1  Can you tell me how you reached
2  that 95 percent number?
4     A.    I can only think of, maybe, less
5  than ten clients out of the hundreds that we've
6  represented who did not have family in the
7  United States.
8     Q.    And when you say family in the
9  United States, I guess, what falls in -- falls
10 within this definition of "close family
11 members?"
12    A.    That had, you know, a parent, a
13 brother, a sister, an aunt, an uncle.  I mean,
14 sometimes -- the people that I'm thinking of
15 didn't really have any real, like any family
16 ties in the United States.
17    Q.    Would a cousin count as a close
18 family member?
19    A.    I think they could.
20    Q.    Okay.  In your opinion, is what I'm
21 trying to say.
22    A.    I guess in my opinion, the
23 majority, 95 percent, of our clients have
24 someone who they know that they would go to
25 live with if they were released, whether that's

Page 75

JACQUELYN KLINE

1  a close family friend, a cousin, some closer
2  family relative.  And only in a few cases that
3  I can think of did we have clients who did not
4  have friends, family, et cetera in the United
5  States.
6     Q.    Okay.  And are friends included
7  under paragraph 14 of the Flores settlement as
8  someone --
9     A.    Right.
10    Q.    -- who a minor can be released to?
11       MR. BHARGAVA:  Objection, it calls
12 for a legal conclusion.
13       MS. VUONG:  Okay.
14       THE WITNESS:  I don't remember the
15 exact -- I mean, I know generally
16 paragraph 14, and I know some of the top
17 categories.  I don't remember if it --
18 like exactly, every single category, if it
19 is spelled out of relations.
20 BY MS. VUONG:
21    Q.    I guess, so this 95 percent number
22 is --
23    A.    That's people who have family in
24 the United States.

Page 76

JACQUELYN KLINE

1     Q.    Okay.  And, sorry, and so those few
2  instances are people who, kind of, came over
3  not knowing anyone; is that --
4     A.    Or who may have family but are not
5  necessarily in contact -- have contact with.
6  Maybe it's a cousin but they don't have contact
7  with them.
8     Q.    All right.  But as far as creating
9  a number, you didn't sit down and say, I've had
10 this amount of clients and this percentage of
11 these clients, only five percent -- whatever, I
12 have a hundred clients and only five of them
13 don't have family members, so I'll say
14 95 percent?
15    A.    Well, like I said, out of -- I
16 mean, in the two years that we've been at
17 Berks, we've had hundreds of clients, and I can
18 only think of maybe ten families who didn't
19 have someone that they could be released to,
20 so...
21    Q.    So I guess it's -- so it's more of
22 a -- was it more of a guesstimate rather than a
23 statistical analysis?
24    A.    I mean I didn't count every single

Page 77

JACQUELYN KLINE

1  person we had, no.
2     Q.    Okay.  So I mean, it could be
3  lower; it could be higher?
4     A.    I guess.
5     Q.    And then continuing on in that
6  sentence, you say, "In none of my clients'
7  cases or other cases I'm aware of has DHS made
8  or recorded any ongoing effort aimed at the
9  placement of Flores members with relatives or
10 family friends."  And any is italicized.  What
11 do you mean by that -- or -- yeah, what do you
12 mean by that?
13    A.    That despite 95 percent or the
14 majority of our clients having family to be
15 released to, they have not been released to --
16 they haven't been released, so...
17    Q.    Okay.  So when you say DHS has not
18 made any efforts, you're equating those efforts
19 with release?
20    A.    Yes.  I mean, yes.
21    Q.    Okay.  So not in comparison with, I
22 don't know, DHS doing any other work in the
23 background to try to find and contact
24 relatives?

Jacquelyne Kline                                                    October 18, 2016

Page 90

1        JACQUELYN KLINE
2     it's operating now and from a wide range
3     of factors.
4  BY MS. VUONG:
5     Q.    Okay.  And how do you know
6  Ms. Cambria?
7     A.    We met at the prior office that we
8  worked at together.
9     Q.    Okay.  Did you know her before
10 then?
11    A.    No.
12    Q.    All right.  And then you guys
13 started your own law firm?
14    A.    Mm-hmm.
15    Q.    And now you work very closely with
16 her?
17    A.    Yes.
18    Q.    Okay.  I don't have any further
19 questions.  I don't know if you have any.
20        MR. BHARGAVA:  No.
21        MS. VUONG:  I think we're done.
22            - - -
23        (Witness excused.)
24 (Deposition concluded at 11:59 a.m.)
25

Page 91

1     C E R T I F I C A T E
2
3        I do hereby certify that I am a
   Notary Public in good standing, that the
4  aforesaid testimony was taken before me,
   pursuant to notice, at the time and place
5  indicated; that said deponent was by me duly
   sworn to tell the truth, the whole truth, and
6  nothing but the truth; that the testimony of
   said deponent was correctly recorded in machine
7  shorthand by me and thereafter transcribed
   under my supervision with computer-aided
8  transcription; that the deposition is a true
   and correct record of the testimony given by
9  the witness; and that I am neither of counsel
   nor kin to any party in said action, nor
10 interested in the outcome thereof.
11        WITNESS my hand and official seal
   this 28th day of October, 2016.
12
13
14
15
        _Theresa P. Franco_
        Theresa P. Franco
16        Notary Public
17
18
19
20
21
22
23
24
25

www.CapitalReportingCompany.com

# Exhibit 26

Publicly Filed

## DECLARATION OF ROBERT DOGGETT

I, Robert Doggett, hereby declare:

1. I make this declaration based on my own personal knowledge and, if called to testify, I could and would do so competently as follows:

2. I have been a licensed Texas attorney since 1990. I hold the position of General Counsel with Texas RioGrande Legal Aid, Inc. (TRLA). My office address is 4920 North IH-35, Austin, Texas, 78751.

3. I currently represent Grassroots Leadership, Inc., a non-profit organization, and recent immigrant women and children that have fled Central America that have been detained as Plaintiffs in a lawsuit for declaratory judgment against the Texas Department of Family and Protective Services ("DFPS" or the "State") that is pending in the Travis County District Court in Austin, Texas. Originally, the suit challenged the agency's "emergency" adoption of a regulation allowing for the licensing of family immigration detention facilities operating in Karnes City ("the Karnes facility") and Dilley, Texas ("the Dilley facility"). Once the court invalidated the emergency rule, DFPS adopted another licensing regulation using normal adoption procedures (40 TEX. ADMIN. CODE § 748.7).  Subsequently, our suit was amended to include claims that the new rule conflicts with Texas law, and was enacted without statutory authority. On May 4, 2016, the court issued a temporary restraining order prohibiting further implementation of the new rule and subsequently the court issued a temporary injunction that prohibited the issuance of a license to Dilley (the Karnes facility obtained a license before the court could issue the temporary restraining order).

4. On December 2, 2016, the court issued a final judgment that invalidated 748.7 because it "contravenes Texas Human Resources Code § 42.002(4) and runs counter to the general objectives of the Texas Human Resources Code." *See* Final Judgment at 3, attached.  The State filed an appeal of the Final Judgment the morning of December 5, 2016.  (In Texas, the State has a right to supersede a judgment while on appeal automatically, unless a court decides otherwise.)  In response to concerns raised by Plaintiffs and the admission that Defendants intended to license Dilley while the case is on appeal, the court conducted a hearing the afternoon of December 5, 2016.  At the conclusion of that hearing the court orally enjoined the State from issuing a license to Dilley or any other facility because of her ruling on December 2, 2016.  The Court indicated in the hearing that the parties would be receiving a written amended final judgment within the week that included this injunction language and that would address the State's ability to supersede the judgment while on appeal.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th of December, 2016 at Austin, Texas.

Robert Doggett

In the District Court
of Travis County, Texas

DEC 0 2 2016

At_____ 4:22 P.M.

Velva L. Price, District Clerk

No. D-1-GN-15-004336

| | | |
|---|---|---|
| **GRASSROOTS LEADERSHIP, INC.,** | § | **IN THE DISTRICT COURT OF** |
| ***et al.,*** | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **TEXAS DEPARTMENT OF FAMILY** | § | **TRAVIS COUNTY, TEXAS** |
| **AND PROTECTIVE SERVICES (DFPS),** | § | |
| ***et al.,*** | § | |
| ***Defendants,*** | § | |
| | § | |
| **and** | § | |
| | § | |
| **CORRECTIONS CORPORATION OF** | § | **353rd JUDICIAL DISTRICT** |
| **AMERICA, INC., and** | § | |
| **THE GEO GROUP,** | § | **(All proceedings assigned to the** |
| ***Intervenors.*** | § | **250th Judicial District Court)** |

## FINAL JUDGMENT

On this day, the Court considered Defendants Texas Department of Family and Protective Services ("DFPS"), Texas Health and Human Services Commission ("HHSC"), and their Commissioners' (collectively "Defendants") Third Amended Plea to the Jurisdiction.

The Court, having considered Defendants' Third Amended Plea to the Jurisdiction and arguments of counsel, is of the opinion that the plea should be GRANTED in part and DENIED in part as follows:

1. IT IS ORDERED that Defendants' Plea to the Jurisdiction is GRANTED on the following claims: (a) Plaintiffs' claims under the Uniform Declaratory Judgment Act; and (b) Plaintiffs' claims for the recovery of attorney's fees under the Uniform Declaratory Judgment Act and Tex. Civ. Prac. & Rem. Code § 37.009; and

Final Judgment- *Grassroots v. TDFPS, et al. and CCA and The Geo Group*

Page **1** of **3**

540

2. IT IS THEREFORE ORDERED that Plaintiffs' claims under the Uniform Declaratory Judgment Act and for the recovery of attorney's fees under the Uniform Declaratory Judgment Act and Tex. Civ. Prac. & Rem. Code § 37.009 are DISMISSED with prejudice; and

3. IT IS FURTHER ORDERED that Defendant's Plea to the Jurisdiction is DENIED on all remaining grounds.

By agreement of the parties, the Court considered the following Cross-Motions for Summary Judgment regarding the validity of the regulation adopted by the Texas Department of Family and Protective Services and published in the Texas Register at Title 40, Part 19, Chapter 748, Subchapter A, Rule § 748.7 (effective March 1, 2016), 41 Tex. Reg. 1493-1502 (Feb 26, 2016) (hereinafter referred to as the "FRC Rule") by submission:

1. Plaintiffs' Motion for Summary Judgment;

2. Defendants' Motion for Summary Judgment;

3. Intervenor Corrections Corporation of America's ("CCA") Motion for Summary Judgment; and

4. Intervenor The GEO Group's ("GEO") Motion for Summary.

After reviewing the parties' Cross-Motions for Summary Judgment and responses thereto, the evidence presented and objections thereto, the pleadings on file, and the applicable law, IT IS ORDERED, ADJUDGED, AND DECLARED that:

1. Plaintiffs' Motion for Summary Judgment on Plaintiffs' claim for declaratory relief under TEX. GOV'T CODE § 2001.038, also known as the Administrative Procedure Act (APA), is GRANTED;

2. The FRC Rule contravenes Texas Human Resources Code § 42.002(4) and runs counter to the general objectives of the Texas Human Resources Code and is, therefore, invalid;

3. Defendants' Motion for Summary Judgment is DENIED;

4. Intervenor GEO Group's Motion for Summary Judgment is DENIED;

5. Intervenor Correction Corporation of America's Motion for Summary Judgment is DENIED; and

6. All relief not expressly granted herein is DENIED.

All costs are assessed against each party incurring the same.

This Final Judgment disposes of all parties and claims and is a final and appealable judgment.

SIGNED on this the 2nd day of December 2016.

JUDGE PRESIDING
KARIN CRUMP

DATED: December 5, 2016                    Respectfully submitted,

                                           CENTER FOR HUMAN RIGHTS &
                                           CONSTITUTIONAL LAW
                                           Peter A. Schey
                                           Carlos Holguín


                                           ORRICK, HERRINGTON & SUTCLIFFE LLP
                                           T. Wayne Harman
                                           Elena García

                                           LA RAZA CENTRO LEGAL, INC.
                                           Michael Sorgen
                                           Amanda Alvarado Ford

                                           LAW FOUNDATION OF SILICON VALLEY -
                                           LEGAL ADVOCATES FOR CHILDREN &
                                           YOUTH
                                           Jennifer Kelleher Cloyd
                                           Katherine H. Manning
                                           Kyra Kazantzis
                                           Annette Kirkham

                                           Of counsel:

                                           YOUTH LAW CENTER
                                           Alice Bussiere
                                           Virginia Corrigan

                                           /s/__Peter Schey_____
                                           *Attorneys for Plaintiffs*

/ / /

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am

employed in the County of Los Angeles, State of California. My business address is

256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On December 6, 2016 I electronically filed the following document(s):

- **Plaintiffs Exhibits 19-26 [Part 5 of 6]**

with the United States District Court, Central District of California by using the

CM/ECF system. Participants in the case who are registered CM/ECF users will be

served by the CM/ECF system.

/s/__*Peter Schey*_____
*Attorney for Plaintiffs*