CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org


ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>          Plaintiffs,<br><br>- vs -<br><br>JEH JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>          Defendants. | Case No. CV 85-4544 DMG (AGRx)<br><br>PLAINTIFFS' EXHIBIT 27 [PART 6 OF 6]<br><br>Hearing: January 30, 2017 |

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
         kate.manning@lawfoundation.org
         kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

1

2 <center>INDEX OF EXHIBITS</center>

3

4

5  1.  Declaration of Stephen Manning…………………………………………...…………... 1

6  2.  Deposition of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. –
     Transcript Excerpts……………………………………………………………………… 10

7  3.  Deposition of Chief Patrol Agent – El Centro Sector, CBP, Rodney Scott – Transcript
     Excerpts……………………………………………………………………….………… 36

8  4.  Deposition of Chief Patrol Agent – Tucson Sector, CBP, Paul Beeson – Transcript
     Excerpts………………………………………………………………………..………… 59

9  5.  Deposition of Chief Patrol Agent – Laredo Sector, CBP, Mario Martinez – Transcript
     Excerpts……………………………………………………………….………………… 77

10  6.  Deposition of Karnes Assistant Field Office Director, Enforcement and Removal Operations,
      ICE, Juanita Hester – Transcript Excerpts……………………………………………..… 101

11  7.  Deposition of Dilley Assistant Field Office Director, Enforcement and Removal Operations,
      ICE, Valentin de la Garza – Transcript Excerpts……………………………………….. 121

12  8.  Deposition of Berks Assistant Field Office Director, Enforcement and Removal Operations,
      ICE, Joshua Reid – Transcript Excerpts……………………………………………….... 149

13  9.  Deposition of Assistant Director of Field Operations, Enforcement and Removal Operations,
      ICE, Phillip Miller – Transcript Excerpts……………………………………….……….193

14  10. Deposition of Class Member Mother Ritza Mxxx xxxxxxx – Transcript
      Excerpts……………………………………………………………………………… 230

15  11. Deposition of Class Member Mother Celina Sxxxxxx-xxxx – Transcript
      Excerpts……………………………………………………………………………… 244

16  12. Deposition of Class Member Franklin Rxxxx xxxxxxxxxx– Transcript
      Excerpts……………………………………………………………………………… 263

17  13. Deposition of Class Member Mother Karina Vxxxx xxxxxxx – Transcript
      Excerpts……………………………………………………………….…………………289

18  14. Deposition of Class Member Mother Lindsay Gxxxx xxxxx – Transcript
      Excerpts……………………………………………………………………………… 316

19  15.  Deposition of Class Member Mother Mirna Mxxxxxx xxxxx – Transcript
      Excerpts……………………………………………………………………………… 341

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16. Deposition of Class Counsel Peter Schey – Transcript Excerpts……………………….….….. 361

17. Deposition of Class Member Mother Sara Exxxxxxxx xxxxx – Transcript
    Excerpts……………………………………………….…………………………………….. 381

18. Deposition of Class Member Yeslin Lxxxx xxxxxxx – Transcript
    Excerpts…..……………………………………………………………………… 399

19. Deposition of Class Member Mother Yessenia Exxxxxxxx xxxxxxx –
    Transcript Excerpts………...…………………………………………………………418

20. Deposition of Class Member Mother Zulma Mxxxxxxx xxxxxxx –
    Transcript Excerpts…………………………………………………………………. 432

21. Deposition of Attorney Bridget Cambria  – Transcript Excerpts…………………….…….458

22. Deposition of Attorney Amanda Doroshow – Transcript Excerpts………………….….... 467

23. Deposition of Attorney Robyn Barnard – Transcript Excerpts…………………………… 476

24. Deposition of Attorney Edward McCarthy – Transcript Excerpts…………………....….. 505

25. Deposition of Jacqueline Kline – Transcript Excerpts………………………………… 528

26. Declaration of Attorney Robert Doggett…………………………………..……………. 537

27. Declaration of Chapman Noam……………………………………………..…………… 543

# Exhibit 27

Publicly Filed

DECLARATION OF CHAPMAN NOAM

I, Chapman Noam, depose and say:

1.  I am employed by the Center for Human Rights and Constitutional Law as a paralegal for the Flores Class Counsel.

2.  Attached is a true and correct copy of the Report of the DHS Advisory Committee on Family Residential Centers dated September 30, 2016. Retrieved from https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.


I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of December, 2016, in the City of Los Angeles, CA



_____/s/_____

Chapman Noam

# Report of the DHS Advisory Committee on Family Residential Centers

### September 30, 2016

Table of Contents

Introduction.................................................................................................................1

1. **Decisions to Detain and Release** .....................................................................1
   A. Limit or Eliminate the Use of Expedited Removal and Reinstatement of Removal for Families.............................................................................................2
   B. Avoiding Detention During Credible and Reasonable Fear Processes................7
   C. Inconsistency in Criteria for Release of Families ...........................................11
   D. Unduly Onerous Conditions of Release .........................................................15

2. **Reform of Detention and Alternatives-to-Detention (ATD)**............................21
   A. Population Management ................................................................................21
      1. Incorrect Assumptions about Civil Detainees................................................21
      2. Insufficient Information and Analysis, Planning, and Preparedness ...............25
      3. Outsourcing vs. Acquiring Internal Expertise ..............................................26
   B. Detention Management .................................................................................28
      1. Normalization .............................................................................................28
      2. Building a Culture of Safety ........................................................................31
   C. Accountability..............................................................................................34
      1. Roles and Responsibilities of Government Actors .........................................34
      2. Roles and Responsibilities of Public and Private Sector Contractors..............34
      3. Transparency: Government's Core Commitment to Good Governance.............35

3. **Access to Counsel**...........................................................................................37
   A. Overarching Recommendations......................................................................38
   B. Meeting and Communicating with Counsel ....................................................42
      1. Meeting with Counsel ..................................................................................44
      2. Care of Children During Attorney-Client Meetings .......................................45
      3. Location of Attorney-Client Meetings ..........................................................45
      4. Ensuring Attorney Teams Can Function in their Role as Counsel ...................45
   C. Counsel's Role in Decisions Critical to Detainees' Safety and Right to Due Process ......46
   D. Counsel's Role in Decisions to Separate Children from Parents........................47
   E. Meaningful Access to a Law Library...............................................................48
   F. Access to Information Specific to Crime and Trauma Victims...........................51

4. **Education Services and Programs** ...................................................................54
   A. Early Childhood Education .............................................................................56
      1. Access to Child Care....................................................................................56
      2. Child Care and Pre-Kindergarten Programming.............................................56
      3. Program Quality...........................................................................................57
      4. Pre-Kindergarten Preparation and School Readiness ......................................58
      5. Early Childhood Development ......................................................................59
   B. K-12 School Schedule....................................................................................59

i

C.  K-12 Curriculum and Instruction ......................................................................60
   1. Qualified Staff ...............................................................................................60
   2. Curriculum .....................................................................................................61
   3. Instruction .....................................................................................................62
   4. English Language Instruction ........................................................................63
D.  Assessing and Communicating K-12 Student Progress ....................................64
   1. Grade-Level Placements ................................................................................65
   2. Feedback to Students and Parents about Progress .........................................65
E.  Special Education Services ................................................................................65
   1. Eligibility ......................................................................................................66
   2. Provision of Services .....................................................................................67
F.  K-12 Student Orientation to Transition to U.S. Schools ..................................67
G.  Trauma-Informed Education Practices ..............................................................69
   1. Social-Emotional Learning ...........................................................................69
   2. Classroom Management Practices .................................................................69
   3. Trauma-Informed Practices ..........................................................................70
H.  Educator Professional Development ..................................................................71
   1. Instruction .....................................................................................................71
   2. Performance Evaluation .................................................................................72
   3. Trauma ...........................................................................................................72
   4. Prevention and Reporting ..............................................................................73
I.   K-12 School Performance .................................................................................73
J.   Education Records .............................................................................................74
K.  Parent Education ................................................................................................74
   1. Information about K-12 Schooling ................................................................75
   2. Orientation to Transition Children to U.S. Schools ......................................75
   3. Parenting Support ..........................................................................................76
   4. English Language Instruction ........................................................................76
   5. Newcomer Education .....................................................................................76
5.   **Language Access** ...............................................................................................**77**
A.  Non-Spanish Speakers: Overarching Recommendation ...................................79
B.  Disability Access ...............................................................................................80
C.  Identification .....................................................................................................82
D.  Orientation ........................................................................................................85
E.  General Provision of Language Access Services ...............................................88
F.  Access to Fair Immigration Procedures: Law Library ......................................91
G.  Access to Fair Immigration Procedures: Credible and Reasonable Fear Processes............93
   1. Conversation with Potential or Retained Immigration Lawyers.....................93
   2. Asylum Orientations ......................................................................................93
   3. Asylum Officer Interviews ............................................................................94
   4. Conversations with ICE Personnel, Including Deportation Officers and Lawyers ...........95
   5. Appearances Before an Immigration Judge. ..................................................95
H.  Grievances and Requests ...................................................................................100
   1. Grievances......................................................................................................100
   2. Non-grievance Requests .................................................................................101
I.   Medical and Mental Health Care .......................................................................102

J.   Discipline ......................................................................................104
K.   Release .........................................................................................105
L.   Training ........................................................................................106
M.   Quality Monitoring and Improvement .........................................107
**6.   Medical, Mental Health and Trauma-Informed Care ..................109**
A.   Medical Assessment and Care ......................................................111
   1. Essential Health Care Screenings ...........................................112
   2. Medical Screenings for Children .............................................114
   3. Children's Health Care ............................................................115
   4. Parents Accompanying Children Needing Hospital Care or Mental Health Residential
      Treatment ................................................................................115
   5. Communicable Screening for the Zika Virus ..........................117
   6. Sexual Assault, Domestic Violence, and Human Trafficking Screenings......................117
   7. Prison Rape Elimination Act Implementation .........................120
   8. Communication of Medical Screening and Test Results..........121
   9. Dental Health ...........................................................................122
   10.   Pharmaceutical Management .............................................123
   11.   Care of Pregnant Women ...................................................123
   12.   Emergency Medical Services and Procedures ....................124
   13.   Accreditation and Compliance with Joint Commission on the Accreditation of
         Health Care Organizations (JCAHO) Standards.................125
B.   Mental Health Assessment and Care ............................................126
   1. Mental Health Screening..........................................................126
   2. Mental Health Referrals and Response....................................128
   3. Psychiatric Management and Pharmacotherapy .......................131
   4. Credentials of Mental Health Professionals.............................132
   5. Psychotherapies........................................................................133
   6. Support/Therapeutic Groups ...................................................134
C.   Trauma-Informed Care .................................................................135
   1. Implementing a SAMHSA Trauma-Informed Approach ........137
   2. Trauma-Informed Approach: Elimination of Nighttime Bed Checks ...........139
   3. Trauma-informed Approach: Supports for Parenting ...............140
D.   Release Preparation, Case Management, Continued Care and Access to Mental Health
      Professionals ...............................................................................141
E.   Medical, Dental, and Mental Health Records ..............................143
**7.   Inspections, Complaints, and Oversight........................................145**

**Appendix A: Members of the DHS Advisory Committee on Family Residential
      Centers.........................................................................................148**
**Appendix B: Advisory Committee on Family Residential Centers (ACFRC)
      Committee Tasking .....................................................................149**
**Appendix C: A Brief History of INS/ICE Family Residential Facilities...............150**
**Appendix D: Examples of Federal Resources, Tools, and On-Line Trainings on
      Trauma-Informed Care ..............................................................152**
**Appendix E: Acronyms Used in the Report ......................................................158**

iii

## INTRODUCTION

Prompted by controversy over DHS's policies and practices relating to family detention, Secretary Jeh Johnson announced the establishment of the DHS Advisory Committee on Family Residential Centers (ACFRC or the Committee) on June 24, 2015.[1] Secretary Johnson explained that:

> ICE Director Saldaña and I understand the sensitive and unique nature of detaining families, and we are committed to continually evaluating it. We have concluded that we must make substantial changes to our detention practices when it comes to families.

Among the responses he announced was the formation of this Committee, "to advise Director Saldaña and me concerning family residential centers." The Committee's charter confirms a broad scope for our advice-giving:

> The Committee provides advice and recommendations to the Secretary of the Department of Homeland Security (DHS) through the Assistant Secretary for U.S. Immigration and Customs Enforcement (ICE) on matters concerning ICE's family residential centers as it relates to primary education, immigration law, physical and mental health, trauma-informed services, family and youth services, detention management, and detention reform.[2]

And similarly, our March 2016 tasking directed the ACFRC to:

> Develop recommendations for best practices at family residential centers that will build on ICE's existing efforts in the areas of educational services, language services, intake and out-processing procedures, medical staffing, expansion of available resources and specialized care, and access to Legal Counsel . . . Detail mechanisms to achieve recommended efficiencies in the following focus areas: 1) educational services . . . 2) language services . . . 3) detention management . . . 4) medical treatment . . . 5) access to counsel.

The Committee's members are listed at this Report's Appendix A; the Committee's tasking is attached to this Report as Appendix B.[3]

Prior to presenting this report to ICE and DHS, the Committee met twice, once in Washington, D.C. in December 2015, and once in Texas in March 2016, in order to participate in guided site visits of two of the Family Residential Centers (FRCs), the South Texas Family Residential Center (Dilley) and the Karnes County Residential Center (Karnes). A much smaller group visited the third FRC, the Berks Family Residential Center (Berks), in June 2016. In order to fulfill our tasking, the Committee submitted numerous information requests to ICE, which supplied some of the requested documents and other information. Unfortunately, ICE deemed a number of our requests beyond the Committee's scope, which it considered more limited than our charter or our

---

[1] Jeh C. Johnson, Secretary of Homeland Security, *Statement by Secretary Jeh C. Johnson On Family Residential Centers* (June 24, 2015), https://www.dhs.gov/news/2015/06/24/statement-secretary-jeh-c-johnson-family-residential-centers.

[2] U.S. Immigration and Customs Enforcement Advisory Committee on Family Residential Centers (July 24, 2015), https://www.ice.gov/sites/default/files/documents/Document/2015/acfrcCharter.pdf.

[3] *See* Advisory Committee on Family Residential Centers (ACFRC), *Committee Tasking,* https://www.ice.gov/acfrc.

1

tasking. We have therefore supplemented the information ICE provided with information from credible non-governmental organizations, federal court filings, and the ACFRC's own individual members' expertise. This report covers all the areas in our tasking, and notes the basis of our information and recommendations.

The detention of migrant children and families by the U.S. government has been controversial since its inception. Child and family detention has been the subject of a number of federal lawsuits – most notably, the *Flores* litigation (currently captioned *Flores v. Lynch*), filed in 1985 and still in active litigation.[4] Since its inception, many reports by government agencies (including the Government Accountability Office (GAO) and various subunits of DHS), the United Nations High Commissioner for Refugees (UNHCR), the American Bar Association (ABA), and advocacy organizations have made similar and negative findings. In this report, the ACFRC adds our voice to those prior critiques. We offer numerous recommendations to improve detention management and conditions. But these should be understood in light of our basic conclusion and first recommendation, which is repeated and discussed in depth in Part I, below:

**Recommendation 1-1: DHS's immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families – and that detention or the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children. DHS should discontinue the general use of family detention, reserving it for rare cases when necessary following an individualized assessment of the need to detain because of danger or flight risk that cannot be mitigated by conditions of release. If such an assessment determines that continued custody is absolutely necessary, families should be detained for the shortest amount of time and in the least restrictive setting possible; all detention facilities should be licensed, non-secure and family-friendly. If necessary to mitigate individualized flight risk or danger, every effort should be made to place families in community-based case-management programs that offer medical, mental health, legal, social, and other services and supports, so that families may live together within a community.**

Our report proceeds as follows: We complete this Introduction with some background on family detention. We then proceed in seven parts, addressing:

1. Decision to Detain and Release
2. Reform of Detention and Alternatives-to-Detention (ATD)
3. Access to Counsel
4. Education Services and Programs
5. Language Access
6. Medical, Mental Health, and Trauma-Informed Care
7. Inspections, Complaints, and Oversight

---

[4] For a summary of the litigation, see CIVIL RIGHTS LITIGATION CLEARINGHOUSE, *Case Profile Flores v. Reno*, http://www.clearinghouse.net/detail.php?id=9493. *See especially* Stipulated Settlement Agreement, Flores v. Reno, No. 85-cv-4544-RJK(Px) (C.D. Cal. Jan.17, 1997), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf.

**Background:**

In 2009, at the beginning of the Obama Administration, ICE funded two FRCs – the Berks County Family Residential Center, in Leesport, PA, and the T. Don Hutto Residential Center in Taylor, TX (Hutto). Total capacity was an estimated 384 beds. Within nine months, ICE had stopped detaining families at Hutto, reducing its family detention capacity by about 500 beds. Since then, ICE has opened and closed one temporary FRC and then opened two new FRCs, over time increasing its total capacity to detain families by over 3,200 beds. (See Appendix B: A Brief History of INS/ICE Family Residential Facilities.)

Today, midway through the Administration's eighth and final year, ICE maintains three FRCs, each operated by a different contractor, although of course ICE is responsible for all three.[5] As is ordinary practice, we refer to the facilities, which are described below,[6] by their location rather than their formal name/abbreviation. The contracting organizations have hundreds of staff, and ICE also has employees who work at the facilities, both to monitor conditions and to carry out immigration processing. Their total operating capacity is 3,326 beds:

- Karnes County Residential Center. This facility, in Karnes City, Texas, is operated by the GEO Group – a private prison company. It has been a family detention center since August 2014. As of August 2016, it held 595 women and children, which is approximately its operating capacity. As of June 2016, ICE reported 49 ICE staff at Karnes.
- South Texas Family Residential Center. This facility, in Dilley, Texas, is operated by Corrections Corporation of America; it opened in December 2014. It has a 2,400 bed capacity, but as of August 2016 held 1,374 women and children; in June 2015, ICE reported 41 ICE staff at Dilley.
- Berks Family Residential Center. This facility, in Berks County, Pennsylvania, is owned and operated by Berks County. It originally opened in March 2001. In February 2013 the facility was moved to a new building, also operated by the county, reconfigured with original capacity for 96 but potential capacity for up to 200, and designed as a non-secure residential facility for children and their parents. It currently has a maximum capacity of 96, but as of August 2016, held 75 people. Fathers have in the past been detained at Berks, but it is our understanding that ICE currently is using the facility to detain only mothers and their children. We do not know how many ICE staff work at Berks.

ICE was unwilling to share with us information on the length of detainees' stays, but according to the federal government's public filings in the *Flores* litigation, looking at families initially booked into ICE's FRCs starting October 23, 2015 (that is, excluding any families taken into custody prior to that date), the statistics as of May 16, 2016 were:

- Total detainees over the 7-month period: 18,706.
- Average length of stay: 17.7 days for those still detained as of that date; 11.8 days for those no longer in detention.
- Over the entire population (both detained as of May 2016 and previously released):

---

[5]

[6] Descriptions are largely based on Decl. of Jon Gurule at ¶ 5, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf.

  a.  58% were released in 10 days or less.
  b.  96% were released in 20 days or less.
  c.  99% were released in 30 days or less.[7]

The same filing also included snapshot-type information. Looking at the population detained on May 16, 2016:

- There were a total of 1,734 detainees.
- 44% at that point in time had so far been detained for 10 days or less.
- 88% at that point in time had been detained for 20 days or less.
- 94% at that point in time had been detained for 30 days or less.[8]

We have been told that after U.S. District Judge Dolly Gee entered an order in *Flores* in July 2015[9] requiring speedier release of most children from family detention, the Texas facilities have mostly had families pass through in less than three weeks; families housed at Berks have faced very substantially longer detention periods with some families remaining in detention for over a year.

Each FRC is covered by ICE's Family Residential Standards, which are publically available at https://www.ice.gov/detention-standards/family-residential. In addition, materials provided by ICE to the ACFRC Subcommittees confirm that when the 2011 Performance Based National Detention Standards (PBNDS 2011) provide a higher level of care for detainees, FRCs are required to adhere to that higher standard. With respect to medical and mental health care, FRCs are also required to comply with ICE Health Care Service Corps (IHSC) policies and procedures, but these were not made available to the ACFRC.

Each facility has adopted its own facility-specific policies, which are supposed to implement and expand upon the Standards. These are not publically available but we have obtained a few of them from ICE. In addition, each FRC provides its detainees with a resident handbook, which summarizes the rules, policies, and procedures that affect them; we were provided the handbooks in English, but they are also available in Spanish.[10]

---

[7] *Id.* at 12–13.

[8] *Id.* at 13.

[9] Flores v. Johnson, 2:85-cv-04544 (C.D. Cal. July 24, 2015), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0017.pdf. In her July 2015 *Flores* decision, Judge Gee found that the DHS's family detention policies were out of compliance with the stipulated settlement in the case, which regulated the treatment and conditions of children in INS custody. The settlement is available at http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf.

[10] Each of the existing FRC resident handbooks is publically available, because they were filed in the *Flores* litigation. The Karnes handbook, in English and Spanish, is available as exhibits 1 and 2 to the Decl. of Juanita Hester, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0029.pdf. The Dilley handbook, in English and Spanish, is available as exhibits 1 and 2 to the Decl. of Valentin de la Garza, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0029.pdf. The Berks handbook is available, in English only, as exhibit 2 to the Decl. of Joshua G. Reid, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf.

1.   DECISIONS TO DETAIN AND RELEASE

In the view of the ACFRC, it is well within our broad mandate and tasking, quoted above, to evaluate DHS's policies relating to decisions to detain, the length of detention, decisions to release, and conditions of release. Operating on this premise, and beginning in December 2015 and continuing to the present, members of the ACFRC and its Subcommittees requested relevant information regarding detention and release policies. DHS was unresponsive to these requests; ICE ultimately stated in a July 2016 exchange with the ACFRC that issues concerning decisions to detain, length of detention, conditions of release, and related questions are "outside the scope" of our mandate to develop best practices applicable to FRCs. This conclusion contradicts the Committee's charter and appointment documents.

In the absence of requested information from DHS, the Committee has consulted a wide range of other credible sources, including, for example, the United States Commission on International Religious Freedom, the American Bar Association, reports by well-respected non-governmental organizations, and public statements made by Secretary Johnson.

Each recommendation in this Part is preceded by a brief overview of the controlling law and policies relevant to detention and release, and a summary of current practice. The recommendations are intended to improve current practice consistent with extant U.S. law and policy.

First and most importantly, our overarching recommendation is for DHS simply avoid detaining families. We recommend that DHS *not* place asylum seeker families in expedited removal or reinstatement of removal, and instead to return to its prior practice of placing these families in regular removal proceedings via a Notice to Appear (NTA) and releasing them. with the use of appropriate follow up support or compliance requirements as alternatives to detention where needed to address public safety or flight risk concerns.

**Recommendation 1-1: DHS's immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families – and that detention or the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children. DHS should discontinue the general use of family detention, reserving it for rare cases when necessary following an individualized assessment of the need to detain because of danger or flight risk that cannot be mitigated by conditions of release. If such an assessment determines that continued custody is absolutely necessary, families should be detained for the shortest amount of time and in the least restrictive setting possible; all detention facilities should be licensed, non-secure and family-friendly. If necessary to mitigate individualized flight risk or danger, every effort should be made to place families in community-based case-management programs that offer medical, mental health, legal, social, and other services and supports, so that families may live together within a community.**

In the event that DHS declines to accept this recommendation in full, we make additional recommendations on, *inter alia*, the proper release of families in expedited removal processes and against the use of prolonged detention of families in almost any circumstance. This Part concludes with recommendations relating to conditional release, bond, and case management for released families.

1

### A. Limit or Eliminate the Use of Expedited Removal and Reinstatement of Removal for Families

In 1996, the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) created a new "expedited removal process," giving immigration officers the authority to order certain categories of immigrants removed without a hearing or review by an immigration judge.[11] The expedited removal statute, INA Section 235, states that "any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."[12] The government interprets this language to require detention in the specified circumstances. Similarly IIRIRA also established Reinstatement of Removal for individuals returning with prior orders of removal.[13]

Since the initial implementation of expedited removal, the categories of people to which it applies have been successively expanded[14] by DHS and the number of immigrants placed in expedited removal proceedings has increased dramatically.[15] Nationals from Mexico, Guatemala, Honduras,

---

[11] Immigration and Nationality Act (INA) § 235.

[12] *Id.* § 235(b)(1)(B)(iii)(IV).

[13] Like those in expedited removal, immigrants whose prior removal orders are reinstated are also subject to curtailed administrative procedures. INA § 241(a)(5); 8 C.F.R. § 1241.8. However, individuals in reinstatement of removal who are found to have a reasonable fear of persecution or torture are eligible for withholding of removal or protection under the Convention Against Torture. Although DHS takes the position that these individuals are *not* eligible for asylum, litigants have raised contrary views, which have been accepted by at least some immigration judges. As the Committee's recommendations in this section focus primarily on expedited removal, we do not here engage in a detailed discussion of reinstatement of removal procedures. The curtailed reinstatement procedures, however, raise many of the same concerns regarding lack of due process and the possibility of *refoulement* of refugees in violation of international and domestic legal obligations. In addition, some of the detainees at FRCs will be immigrant crime victims with pending VAWA, T or U visa cases. In the Violence Against Women Act of 2005, Congress urged the Department of Homeland Security to exercise its discretion not to subject immigrant victims with pending or approved VAWA self-petitions, U visas or T visas to reinstatement of removal, which prevent securing such relief. *See* Extension of Remarks by John Conyers Regarding VAWA, 151 Cong. Rec. E2605-07 (Dec. 18, 2005).

[14] Expedited removal was first implemented in 1997 when IIRIRA entered into force and at that time only applied to arriving non-citizens at ports of entry, per INA § 235(b)(1)(A)(i). INA §235(b)(1)(A)(iii) also gives the Attorney General authority to apply expedited removal to other categories of immigrants. In November 2002, expedited removal was expanded to apply to undocumented non-Cubans entering the U.S. by sea and by September 2005 had been expanded to apply to undocumented non-Cubans apprehended within 14 days after entry within 100 miles of the U.S. Southwest border. Elizabeth Cassidy & Tiffany Lynch, U.S. Comm'n on Int'l Religious Freedom (USCIRF), Barriers to Protection: the Treatment of Asylum Seekers in Expedited Removal 13 (2016), http://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf [hereinafter "USCIRF Report"]. In 2006, this provision was extended to all U.S. borders. American Immigration Council, *Removal Without Recourse: The Growth of Summary Deportations from the United States* (Apr. 28, 2014), https://www.americanimmigrationcouncil.org/research/removal-without-recourse-growth-summary-deportations-united-states. Data from USCIS Asylum Division Quarterly Stakeholder Meetings shows that in FY2014, 80% of people put into expedited removal were non-citizens crossing the border versus 20% non-citizens entering at ports of entry. In contrast, in FY2005, non-citizens crossing the border comprised 10% of expedited removal cases and ports of entry 90%. USCIRF Report at 14.

[15] In FY 1998, there were 23,487 expedited removals (representing 20% of all removals). In FY 2013, there were 193,032 expedited removals (representing 44% of all removals). USCIRF Report, *supra* note 14, at 12 (citing data from the DHS Office of Immigration Statistics, Annual Reports on Immigration Enforcement Actions and Statistical Yearbook).

and El Salvador accounted for 98% of all expedited removals in FY 2013.[16] However the use of expedited removal and reinstatement of removal is discretionary and not mandatory. DHS has the option of using or not using expedited removal or reinstatement of removal in individual cases. In fact, prior to 2014, families were typically not put into expedited removal and rarely reinstated but instead generally issued Notices to Appear and released.[17] In fact, ICE officials stated in 2011 that it was ICE policy to place families apprehended at or near the border in regular removal proceedings under Section 240 of the INA, rather than expedited removal.[18]

Following the increase in arrivals of unaccompanied children as well as families (often referred to as the "surge") in the summer of 2014, this policy changed. DHS Secretary Jeh Johnson began stating publicly that families would be detained in order to deter others from coming to the U.S.[19] To effect this policy, DHS began putting families – primarily mothers and their children – in expedited removal proceedings[20] and reinstatement proceedings, and detaining them. In 2014, there was only one family detention center in operation, the Berks County Family Residential Center, with a 96-bed capacity.[21] As it began scaling-up the use of expedited removal for families

---

[16] USCIRF REPORT, *supra* note 14, at 13. *See also* HUMAN RIGHTS FIRST, FREQUENTLY ASKED QUESTIONS: ASYLUM SEEKERS AND THE EXPEDITED REMOVAL PROCESS (Nov. 2015), http://www.humanrightsfirst.org/sites/default/files/FAQ-asylum-seekers-and-the-expedited-removal-process.pdf ("The overwhelming majority of individuals placed in expedited removal are from El Salvador, Guatemala, Honduras, and Mexico.").

[17] *See, e.g.,* COMM'N ON IMMIGRATION, AMERICAN BAR ASS'N, FAMILY IMMIGRATION DETENTION: WHY THE PAST CANNOT BE PROLOGUE 22 (July 31, 2015), https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/FINAL%20ABA%20Family%20Detention%20Report%208-19-15.authcheckdam.pdf ("In the years immediately prior to the summer of 2014, almost all families arriving at the U.S. border seeking asylum were released to live in the community while their immigration hearings moved forward") [Hereinafter ABA FAMILY DETENTION REPORT].

[18] INTER-AM. COMM'N ON HUMAN RIGHTS, REPORT ON IMMIGRATION IN THE UNITED STATES: DETENTION AND DUE PROCESS note 568 (Dec. 30, 2011), https://www.oas.org/en/iachr/migrants/docs/pdf/Migrants2011.pdf.

[19] *See, e.g.,* Statement by Secretary of Homeland Security Jeh Johnson Before the Senate Committee on Appropriations (July 10, 2014), https://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations; Jeh C. Johnson, Secretary of Homeland Security, Readout of Secretary Johnson's Visit to Texas (June 20, 2014), https://www.dhs.gov/news/2014/06/20/readout-secretary-johnsons-visit-texas; ABA FAMILY DETENTION REPORT, *supra* note 16, at 23 (describing the Administration's "no-release" policy intended to deter other families from seeking asylum in the U.S.).

[20] CATHOLIC LEGAL IMMIGRATION NETWORK, EXPEDITED REMOVAL AND FAMILY DETENTION: DENYING DUE PROCESS 1 (2015), https://cliniclegal.org/sites/default/files/cara/Expedited-Removal-Backgrounder.pdf ("[T]he number of families the government has placed into the expedited removal process and subsequently detained has increased.").

[21] *See* ABA FAMILY DETENTION REPORT, *supra* note 16, at 8–12 for a history of family detention in the United States, including a summary of the opening in 2006 and subsequent decommissioning in 2009 of the T. Don Hutto Family Residential Center as a place to detain families. The Berks County Family Residential Center was opened in 2001, converted from a former nursing home, with 84 beds. It has since been expanded to its current 96-bed capacity.

in response to the "surge," ICE opened additional family detention facilities[22] to hold the dramatically larger number of detained families.[23]

In February 2015, the U.S. District Court for the District of Columbia issued a preliminary injunction enjoining DHS from using deterrence as a factor in initial custody determinations and in arguments against release of families on bond.[24] In June 2015, Secretary Johnson announced that DHS had "discontinued invoking general deterrence as a factor in custody determinations in all cases involving families."[25]

Nevertheless, at the individual immigration officer level, it remains unclear what factors are used for custody determinations, and how they are applied. It is also unclear whether these decisions are made by ICE or Customs and Border Protection (CBP). The ACFRC repeatedly requested information on this point, but ICE did not provide the requested information. In the absence of information from ICE, we have looked to data and analysis provided by other credible sources, a number of which have found that the decision to put women and children in expedited removal has not seemed to follow any clear applicable standard, but appears largely dependent on whether there is available bed space in FRCs. We do not know if this remains true in recent months, when the *Flores* court's insistence on speedier processing of families has reduced the population in the FRCs to well below capacity. But prior to that change in circumstances, the United States Commission on International Religious Freedom (USCIRF) report found, for example, that the McAllen Border Patrol station tracks family detention bed space and, if there are no beds available, releases families with bus tickets and Notices to Appear.[26] The Inter-American Commission on Human Rights (IACHR) also concluded, "but for capacity limitations, all families would be detained under current policy . . . No substantive criteria are used, nor is an individualized

---

[22] DHS Press Office, *South Texas ICE Detention Facility to House Adults With Children* (July 31, 2014), https://www.dhs.gov/news/2014/07/31/south-texas-ice-detention-facility-house-adults-children (Karnes, formerly an adult-male facility, was repurposed and opened as a family detention center on August 1, 2014); ICE Newsroom, *ICE's New Family Detention Center in Dilley, Texas to Open in December* (Nov. 17, 2014), https://www.ice.gov/news/releases/ices-new-family-detention-center-dilley-texas-open-december (South Texas Family Residential Center – that is, Dilley – slated to open December 2014).

[23] HUMAN RIGHTS FIRST, FAMILY DETENTION: STILL HAPPENING, STILL DAMAGING 2–3 (Oct. 2015), http://www.humanrightsfirst.org/sites/default/files/HRF-family-detention-still-happening.pdf ("If the pace of detention continues as it has over the past month, DHS may hold 45,000 children and parents in family detention this year, as compared to approximately 6,000 individuals who were detained last year."). U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, ICE ENFORCEMENT AND REMOVAL OPERATIONS REPORT: FISCAL YEAR 2014, at 3 (Dec. 19, 2014), https://www.ice.gov/doclib/about/offices/ero/pdf/2014-ice-immigration-removals.pdf ("[F]amily units apprehended at the border may be placed into expedited removal proceedings and detained. However, this process requires ICE to maintain an increased level of family detention space, which historically has been limited to fewer than 100 beds nationwide…As a result, in the summer ICE sought substantial resources and authority to build additional detention capacity to detain and remove family units, and since then ICE has opened three additional facilities for this purpose.").

[24] Court Order, RILR v. Johnson, 1:15-cv-0011-JEB (D.D.C. Feb. 20, 2015), https://www.aclu.org/legal-document/rilr-v-johnson-order?redirect=immigrants-rights/rilr-v-johnson-order. Note that this preliminary injunction was dissolved by agreement of the parties after DHS announced a new policy whereby it would abide by injunction terms.

[25] Jeh C. Johnson, Secretary of Homeland Security, Statement On Family Residential Centers (June 24, 2015), https://www.dhs.gov/news/2015/06/24/statement-secretary-jeh-c-johnson-family-residential-centers.

[26] USCIRF REPORT, *supra* note 14, at 62.

4

assessment conducted."[27] Several NGOs have asserted that although the Administration has
disavowed the deterrence rationale for detention publicly, its continued over-detention of asylum
seekers – including women and children – may indicate otherwise.[28]

DHS is not required to place families in expedited or reinstatement of removal, with their attendant
policy of detention. There is clear authority holding that immigration officials have the discretion
to refer any individual who could be subject to expedited removal or reinstatement of removal to
regular Section 240 removal proceedings before an immigration judge instead.[29] In February 2016,
a coalition of organizations, including faith-based organizations, sent a letter to Secretary Johnson
and Deputy Secretary Alejandro Mayorkas calling on DHS to exercise this discretion and to "stop
using fast-track removal procedures, such as expedited removal, against Central Americans."[30]
The letter argued that "these fast-track processes deprive asylum seekers of their right to due
process and results in vulnerable children and their mothers being deported to the very dangers
they fled."[31]

---

[27] INTER-AM. COMM'N ON HUMAN RIGHTS, HUMAN RIGHTS SITUATION OF REFUGEE AND MIGRANT FAMILIES AND
UNACCOMPANIED CHILDREN IN THE UNITED STATES ¶ 135 (Oct. 2015),
http://www.oas.org/en/iachr/reports/pdfs/Refugees-Migrants-US.pdf [Hereinafter IACHR OCTOBER 2015 REPORT];
see also LUTHERAN IMMIGRANT REFUGEE SERVICES (LIRS) AND THE WOMEN'S REFUGEE COMMISSION (WRC),
LOCKING UP FAMILY VALUES, AGAIN 3 (Oct. 2014), http://lirs.org/wp-
content/uploads/2014/11/LIRSWRC_LockingUpFamilyValuesAgain_Report_141114.pdf ("DHS officials have stated
that there is no set standard or policy to determine which families are detained and which families are released except
for the availability of bed space.").
[28] HUMAN RIGHTS FIRST, LIFELINE ON LOCKDOWN: INCREASED U.S. DETENTION OF ASYLUM SEEKERS LIFELINE ON
LOCKDOWN 3(July 2015), http://www humanrightsfirst.org/sites/default/files/Lifeline-on-Lockdown_0.pdf ("Some
detention and release decisions appear to be based on a desire to deter asylum seekers from seeking U.S. protection.
Some of ICE's decisions to continue detention and/or deny parole appear to be motivated by a legally impermissible
objective of deterrence."); Guillermo Cantor, Deterrence Strategy Targeting Central American Asylum Seekers Comes
at a High Human Cost, IMMIGRATIONIMPACT.COM (May 18, 2016), http://immigrationimpact.com/2016/05/18/central-
americans-deported/.
[29] Matter of E-R-M & L-R-M, 25 I. & N. Dec. 520 (BIA 2011) (DHS argued before the BIA that it had discretion to
place an arriving alien in Section 240 removal proceedings rather than invoking expedited removal. The BIA agreed,
finding that "Congress' use of the term 'shall' in Section 235(b)(1)(A)(i) of the Act does not carry its ordinary
meaning, namely, that an act is mandatory. It is common for the term 'shall' to mean 'may' when it relates to decisions
made by the Executive Branch of Government on whether to charge an individual and on what charges to bring.") See
also HUMAN RIGHTS FIRST, FREQUENTLY ASKED QUESTIONS, supra note 16, at 2 (explaining that expedited removal is
discretionary).
[30] Letter from Advancement Project et al., to Jeh Johnson, Secretary of Homeland Security, and Alejandro Mayorkas,
Deputy Secretary of Homeland Security (Feb. 18, 2016),
http://www.lawg.org/storage/documents/JohnsonMayorkas_letter_final_signed_2232016.pdf.
[31] Id. Other NGOs have raised similar concerns about whether the widespread use of expedited removal violates due
process and results in the removal of persons with legitimate grounds for relief. See, e.g., American Immigration
Council, Removal Without Recourse, supra note 14, at 2 ("[E]xpedited removal can lead to erroneous deportations of
individuals who are not deportable or who would be eligible to apply for lawful status in the United States or to seek
prosecutorial discretion if processed through normal immigration court procedures. In addition, individuals who may
have resided in the United States for decades, and left only for a brief period of time, may be deported pursuant to
expedited removal despite having significant ties to the United States."); CATHOLIC LEGAL IMMIGRATION NETWORK,
EXPEDITED REMOVAL AND FAMILY DETENTION, supra note 20, at 2; AMERICAN CIVIL LIBERTIES UNION, AMERICAN
EXILE: RAPID DEPORTATIONS THAT BYPASS THE COURTROOM 4 (Dec. 2014), https://www.aclu.org/files/assets/120214-
expeditedremoval_0.pdf ("DHS officials use these procedures not only to rapidly deport genuine asylum seekers
arriving at our borders, but also to remove longtime residents with U.S. citizen family; children; individuals with valid

ICE's stated policy is to "prioritize[] detention bed space for: (1) aliens it is required to detain under the INA; (2) those who pose a risk to public safety if released; and (3) those at risk of absconding."[32] Prior to 2014, ICE was seemingly adhering to this practice by not putting families in expedited removal and detention. Expedited and reinstatement of removal is discretionary and, at present, appears to be applied to families arbitrarily, dependent on available bed space in family detention centers.

Of critical importance here, the vast majority of families placed into expedited removal or reinstatement of removal and subjected to family detention are fleeing the Northern Triangle countries of Guatemala, Honduras, and El Salvador. The region is undergoing a well-documented human rights crisis[33] and nearly 90% of individuals in family facilities from these countries pass their credible or reasonable fear interviews.[34] The use of expedited removal, reinstatement, and detention, against a population that has so overwhelmingly demonstrated credible claims is unnecessary and wasteful. Moreover, while the Committee believes strongly that bona fide asylum seekers in general should not be needlessly detained, this is particularly true for children, whose best interests must be paramount in all enforcement decisions pertaining to them. The harmful effects of detention on children are well established.

Given that Secretary Johnson has acknowledged that deterrence should not be a factor in custody determinations and recognizing the myriad concerns about expedited removal and reinstatement of removal[35] raised by NGOs and others, DHS should discontinue the widespread application of expedited removal and reinstatement of removal to families. Instead, DHS should release asylum seeker families with a Notice to Appear unless DHS makes a determination, based on individualized factors, that a family presents a danger to the community or a risk of flight that cannot be mitigated.[36] Moreover, any decision to detain a family should be reviewed by ICE Headquarters and reassessed at the Headquarters level at least once a month.

---

work and tourist visas; and others with significant ties or legal claims to be in the United States. Some individuals quickly deported through these processes are eligible for relief from deportation and would win the right to remain in the United States if brought before an immigration judge.").

[32] OFFICE OF INSPECTOR GENERAL, DEP'T OF HOMELAND SECURITY, OIG-15-22, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S ALTERNATIVES TO DETENTION (REVISED) 3 (Feb. 4, 2011), https://www.oig.dhs.gov/assets/Mgmt/2015/OIG_15-22_Feb15.pdf [Hereinafter OIG ISAP REPORT].

[33] See, e.g., Diego Zavala, Fleeing for Our Lives: Central American Migrant Crisis, AMNESTY USA (Apr. 1, 2016, 12:12 PM), http://blog.amnestyusa.org/americas/fleeing-for-our-lives-central-american-migrant-crisis/; Lily Folkerts, A Look at the Northern Triangle of Central America in 2016: Sustained Violence and Displacement, LATIN AMERICA WORKING GROUP (Aug. 15, 2016) http://www.lawg.org/action-center/lawg-blog/69-general/1709-a-look-at-the-northern-triangle-of-central-america-in-2016-sustained-violence-and-displacement.

[34] AMERICAN IMMIGRATION LAWYERS ASS'N, DUE PROCESS, DENIED: CENTRAL AMERICANS SEEKING ASYLUM AND LEGAL PROTECTION IN THE UNITED STATES 3 (June 15, 2016), http://www.aila.org/infonet/report-due-process-denied (citing USCIS data at note 2).

[35] INA § 241(a)(5), 8 U.S.C. § 1231(a)(5), 8 C.F.R. § 241.8. For a summary of reinstatement procedure and practice, see Trina Realmuto, American Immigration Council, Practice Advisory: Reinstatement of Removal (April 29, 2013), https://www.americanimmigrationcouncil.org/sites/default/files/practice_advisory/reinstatement_of_removal_4-29-13_fin.pdf.

[36] See 8 C.F.R. § 236.1(c)(8); cf. Zadvydas v. Davis, 533 U.S. 678 (2001) (discussing permissible uses of civil immigration detention under INA § 241).

**Recommendation 1-2: DHS should not use detention for the purpose of deterring future family migration or punishing families seeking asylum in the U.S. Any contrary policy is unlawful, and ineffective.**

**Recommendation 1-3: DHS should return to its prior practice of not putting families into expedited removal and reinstatement of removal. Instead, DHS should place families in regular proceedings via issuance of a Notice to Appear and in all but the most unusual situations release them promptly as a family.**

### B.  Avoiding Detention During Credible and Reasonable Fear Processes

Current practice indicates that DHS typically detains individuals under INA Section 235(b) and INA Section 241(a)(5) during the course of credible fear and reasonable fear interviews and following a negative credible or reasonable fear determination until removal. Although it has characterized such detention as mandatory, DHS has recognized and exercised humanitarian parole authority pursuant to INA Section 212(d)(5) to release individuals detained under INA Section 235(b) for humanitarian reasons or a significant public benefit.[37] Regulations explicitly list as a category of immigrants meriting parole those "who have serious medical conditions in which continued detention would not be appropriate" or present medical emergencies, in addition to those whose release would favor law enforcement objectives.[38] Serious medical conditions include mental health conditions that may be exacerbated by prolonged detention and isolation.

Many asylum seekers suffer from post-traumatic stress disorder, depression, anxiety disorders, and other psychological disorders[39] that qualify as serious medical conditions. For many of the women and children detained in FRCs, these medical conditions resulted from domestic violence, sexual assault, attempted sexual assault, and/or other traumatic events in their home country, during their travel, and after arriving in the U.S. UNHCR, in particular, has documented that many of the detained women and children have particularly high rates of trauma sustained both in the home country and en route to the U.S.[40] For mothers and children with these conditions, "continued

---

[37] *See* INA § 212(d)(5)(A); 8 C.F.R. § 212.5(b). *See, also, e.g.*, Decl. of Denise Gilman at ¶¶ 3-4, Flores v. Lynch, No. 2:85-cv-04544 (C.D. Cal. Aug. 14, 2015), ECF 187-7, Exh. 96 (attesting to knowledge of instances in which asylum seekers placed in expedited removal were paroled pending their credible fear interviews); Arlington Asylum Office, *Stakeholder Engagement Meeting Minutes* (Feb. 25, 2015) at 6, http://www.ga-al.com/wp-content/uploads/2015/08/2015-02-25-Stakeholder-Meeting-Minutes.pdf (reporting that the number of pending non-detained credible fear cases was 308).

[38] 8 C.F.R. §§ 212.5(b)(1), 235(b)(4)(ii).

[39] United Nations High Comm'r for Refugees, Refugee Resettlement: An International Handbook to Guide Reception and Integration 233 (Oct. 1, 2002), http://www.unhcr.org/en-us/protection/resettlement/4a2cfe336/refugee-resettlement-international-handbook-guide-reception-integration.html (citing clinical studies that found rates of PTSD in refugees ranged from 39-100%, compared to 1% in the general population, and rates of depression in refugees ranged from 47-72%). *See also* CARA Family Detention Pro Bono Project, Office for Civil Rights and Civil Liberties Complaint, *Ongoing Concerns Regarding the Detention and Fast-Track Removal of Children and Mothers Experiencing Symptoms of Trauma* 2 (Mar. 28, 2016), http://www.aila.org/advo-media/press-releases/2016/cara-crcl-complaint-concerns-regarding-detention ("[M]any detained families suffer from Post-traumatic Stress Disorder (PTSD), anxiety, depression or other emotional or cognitive disorders").

[40] United Nations High Commissioner for Refugees (UNHCR), Women on the Run (Oct. 2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html; United Nations High Commission

detention would not be appropriate."[41] Numerous studies have documented how detention exacerbates existing mental trauma and is likely to have additional deleterious physical and mental health effects on immigrants – particularly traumatized persons like asylum seekers. [42] NGOs maintain that it is especially inappropriate to detain women and children given allegations of sexual abuse in FRCs[43] that threaten to further traumatize detainees, many of whom fled their countries due to sexual violence.[44]

Many mothers and children in family detention may also have suffered crime victimization or domestic violence while in the U.S. or were trafficked to the U.S., and could qualify for a U-visa, VAWA self-petition, or T visa as a result. Children who have been abused, abandoned, or neglected by one of their parents may qualify for Special Immigrant Juvenile Status (SIJS). Detention, however, prevents women and children from learning about and pursuing these other forms of relief, especially as ICE fails to screen for or even inform them of such relief. Detention may also impede law enforcement objectives by hindering cooperation with authorities regarding crimes – necessary in particular for U-visa applicants.[45] Potential eligibility for any of these forms of relief should counsel in favor of release.

---

FOR REFUGEES (UNHCR), CHILDREN ON THE RUN (Mar. 2016), http://www.unhcr.org/en-us/about-us/background/56fc266f4/children-on-the-run-full-report.html?query=children%20on%20the%20run.
[41] 8 C.F.R. § 212.5(b)(1).
[42] Katy Robjant, Rita Hassan, & Cornelius Katona, *Mental Health Implications of Detaining Asylum Seekers: Systematic Review,* THE BRITISH J. OF PSYCHIATRY, 306-312 (Apr. 2009), http://bjp.rcpsych.org/content/bjprcpsych/194/4/306.full.pdf; IACHR OCTOBER 2015 REPORT, *supra* note 27, ¶ 145; LUTHERAN IMMIGRANT REFUGEE SERVICES (LIRS) AND THE WOMEN'S REFUGEE COMMISSION (WRC), LOCKING UP FAMILY VALUES, AGAIN, *supra* note 27; American Immigration Lawyers Ass'n,et al., Office for Civil Rights and Civil Liberties Complaint, *The Psychological Impact of Family Detention on Mothers and Children Seeking Asylum* (June 30, 2015) http://www.aila.org/advo-media/press-releases/2015/impact-family-detention-mental-health/complaint-crcl; Unitarian Universalist Service Center, *No Safe Haven Here: Mental Health Assessment of Women and Children Held in U.S. Immigration Detention* (Oct. 2015), ,https://www.researchgate.net/publication/283014905_No_Safe_Haven_Here_Mental_Health_Assessment_of_Women_and_Children_Held_in_US_Immigration_Detention; CARA Family Detention Pro Bono Project, Office for Civil Rights and Civil Liberties Complaint, *Ongoing Concerns Regarding the Detention and Fast-Track Removal of Children and Mothers Experiencing Symptoms of Trauma*, *supra* note 39.
[43] Mexican American Legal Defense and Educational Fund, et al., *[CRCL] Complaints Regarding Sexual Abuse of Women in DHS Custody at Karnes County Residential Center* (Sept. 30, 2014), http://www.maldef.org/assets/pdf/2014-09-30_Karnes_PREA_Letter_Complaint.pdf; Renée Feltz, *Immigration Facility Guard Given Jail Time for Sexual Assault of Detainee*, THE GUARDIAN (Apr. 23, 2016, 7:00 PM) https://www.theguardian.com/us-news/2016/apr/23/immigration-detention-center-guard-sexual-assault-prison (describing sexual assault at Berks County Residential Center);
[44] *U.S.: Trauma in Family Immigration Detention*, HRW.ORG (May 15, 2015, 12:22 PM) https://www.hrw.org/news/2015/05/15/us-trauma-family-immigration-detention-0; AMERICAN CIVIL LIBERTIES UNION, IMMIGRANT FAMILY DETENTION IN THE UNITED STATES 1 (Apr. 17, 2015), https://www.aclu.org/files/field_document/ACLU%20-%20Family%20Detention.pdf ("According to Physicians for Human Rights and the Bellevue/NYU Program for Survivors of Torture, detention can also exacerbate the trauma experienced by both children and adults who have fled violence in their home countries…In addition, there have been allegations of abusive conditions at the different family detention facilities, including sexual abuse, threats by guards to separate mothers from their children, retaliation against mothers for engaging in actions to protest their detention, and inadequate mental health and medical care.").
[45] Research has found both U visa victims and VAWA self-petitioners who have begun the process of filing for immigration relief under these programs call the police to report crimes at significant rates. This is true although

8

In addition to these humanitarian concerns, release of mothers and children from detention would have significant public benefit, a factor favoring release under the statute. The argument for public benefit has been made by NGOs that cite to the high cost of immigration detention and point to "the cost created for U.S. taxpayers of needless, long-term detention of individuals seeking protection."[46] These NGOs and others additionally assert that due process violations impede the ability of detained families to effectively apply for asylum while detained, creating situations contrary to the public interest in which bona fide refugees are returned to face continued persecution, including death, in their countries of origin.[47]

DHS policy guidance on discretionary factors to consider in enforcement decisions so as to free up limited law enforcement resources for more pressing cases supports the release of families during credible fear processes. Secretary Johnson's November 2014 *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* memorandum addresses issues pertinent to the release of families; it specifically states:

> Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be *suffering from serious physical or mental illness*, who are disabled, elderly, pregnant, or nursing, *who demonstrate that they are primary caretakers of children* or an infirm person, or *whose detention is otherwise not in the public interest* . . . If an alien falls within the above categories and is subject to mandatory detention, field

---

VAWA self-petitioners have no cooperation requirement related to the VAWA self-petitioning program. KRISZTINA E. SZABO, DAVID STAUFFER, BENISH ANVER & LESLYE E. ORLOFF, EARLY ACCESS TO WORK AUTHORIZATION FOR VAWA SELF-PETITIONERS AND U VISA APPLICANTS, NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT 31–32 (Feb. 12, 2014), http://niwap.org/reports/Early-Access-to-Work-Authorization.pdf (36.2% of VAWA self-petitioners and 25% of U visa victims file police reports for future abuse after filing their immigration cases and 73.1% of U visa victims actively cooperate in criminal investigations and prosecutions); LESLYE ORLOFF, LEVI WOLBERG, & BENISH ANVER, U-VISA VICTIMS AND LAWFUL PERMANENT RESIDENCY, NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT (Sept. 6, 2012), http://library.niwap.org/wp-content/uploads/2015/pdf/PB-Tkit-UVisaLawfulPermanentResidency-9.6.12.pdf (70% of U visa victims continue actively to cooperate in criminal investigations and prosecutions and another 29% want to offer cooperation but the criminal investigation or prosecution in their case is not moving forward).

[46] LIFELINE ON LOCKDOWN, *supra* note 28, at 30 (indicating that DHS requested an allocation of $2.2 billion for immigration detention in FY 2017); AMERICAN CIVIL LIBERTIES UNION, ALTERNATIVES TO IMMIGRATION DETENTION: LESS COSTLY AND MORE HUMANE THAN FEDERAL LOCK-UP (2015), ,https://www.aclu.org/sites/default/files/assets/aclu_atd_fact_sheet_final_v.2.pdf (citing Senate estimates that family detention costs $266 per person per day in 2014).

[47] GUILLERMO CANTOR & TORY JOHNSON, AMERICAN IMMIGRATION COUNCIL, DETAINED, DECEIVED, AND DEPORTED (May 2016), https://www.americanimmigrationcouncil.org/sites/default/files/research/detained_deceived_deported_experiences_of_recently_deported_central_american_families.pdf; Sibylla Brodzinsky & Ed Pilkington, *U.S. Government Deporting Central American Migrants to their Deaths*, THE GUARDIAN (Oct. 12, 2015, 8:57 AM), https://www.theguardian.com/us-news/2015/oct/12/obama-immigration-deportations-central-america (discussing a study finding that as many as 83 Central American migrants were murdered soon after being deported from the U.S. in 2015); Letter from Benjamin Johnson, American Immigration Council, et al., to Léon Rodríguez, Director, U.S. Citizenship and Immigration Services, and Sarah Saldaña, Director, Immigration and Customs Enforcement (Dec. 24, 2015), http://www.aila.org/advo-media/aila-correspondence/2015/letter-uscis-ice-due-process (enumerating a number of due process concerns implicated in family detention and warning against "the danger of wrongfully returning someone – especially a child – to the very danger that prompted his or her family's flight").

office directors are encouraged to contact their local Office of Chief Counsel for
guidance.[48] (emphasis added)

Families seeking asylum fall into a number of the categories articulated by Secretary Johnson. We
have stated above that expedited removal, reinstatement of removal, and detention is not
mandatory for these families and even if it were, the memorandum indicates that release may
nonetheless be appropriate. In the past, the government has released individuals in expedited
removal before they underwent their credible fear interviews. The Committee requested
information related to this issue but it was not produced. So it is unclear to us whether there are
clear guidelines on when immigrants in expedited removal or reinstatement of removal can be
paroled prior to a positive credible fear or reasonable fear determination. Per statute and
regulations, and given the humanitarian, public benefit, and other considerations described in this
section, if DHS chooses to place families in expedited or reinstatement of removal
(notwithstanding the earlier recommendation to cease doing so), it should broadly grant parole or
release rather than detention for families.

Disconcertingly, recent evidence suggests that some families are separated and adults detained and
placed in expedited removal or reinstatement proceedings while children are sent to the Office of
Refugee Resettlement.[49] Family separation in these circumstances raises serious concerns and
violates the best interests of the child – which requires prioritizing family integrity and the
maintenance of emotional ties and relationships among family members. The same family integrity
and unity considerations favor joint release of families with other family members in the U.S. (and
who often may be mixed-status families). The best interests of the child should be paramount in all
custody decisions regarding family members apprehended by DHS, including in the custody
decisions about adults arriving with their children, and should favor release of the whole family
together as soon as possible – even if some family members are undergoing expedited removal or
reinstatement procedures.

If DHS does detain a family, ICE should immediately work to facilitate release as soon as possible,
verifying community ties, and putting in place release provisions that mitigate flight risks.
Situations may change, as well, as a family's immigration case proceeds.

**Recommendation 1-4: Even if (notwithstanding Recommendation 1-2) DHS chooses to place
a family or any family members in expedited removal or reinstatement of removal
proceedings, DHS should generally exercise its authority to release family members, together
as a family, as soon as possible. Detention should be only long enough to process a family for
release into alternatives to detention, and any decision to detain rather than release should be
reviewed at least monthly at the ICE Headquarters level. When DHS concludes that it
should, or must, release a child from family detention it should release the child with her
parent and siblings absent extraordinary circumstances, given the traumatic and detrimental**

---

[48] Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, *Policies for the Apprehension, Detention
and Removal of Undocumented Immigrants* 5 (Nov. 20, 2014),
https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.
[49] Leigh Barrick, *Divided By Detention: Asylum Seeking Families' Experience of Separation*, AMERICAN
IMMIGRATION COUNCIL (Aug. 31, 2016), https://www.americanimmigrationcouncil.org/research/divided-by-detention-
asylum-seeking-families-experience-of-separation.

**impact of that separation, and because in most cases, there are less restrictive means to ensure the parent's continued participation in the legal process.**

### C. Inconsistency in Criteria for Release of Families

With the expansion of family detention following the "surge" in the summer of 2014, families were kept in detention for months or up to a year, even with a positive credible fear or reasonable fear determination.[50] This occurred notwithstanding DHS guidance that set the presumption that immigrants with a positive credible fear or reasonable fear determination should be released from detention. A 2009 memorandum from ICE provides guidance on *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* and requires that persons found to have a credible fear be automatically reviewed by ICE for parole eligibility with a decision no more than 7 days after the parole interview.[51] The stated purpose of the memorandum was to "explain[] how the term ["public interest"] is to be interpreted by DRO when it decides whether to parole."[52] The memorandum instructs that parole should be granted following a positive credible fear determination if the person establishes identity, poses no danger to the community and is not a flight risk because "continued detention is not in the public interest."[53] Although the 2009 parole memorandum applies explicitly only to "arriving aliens" – immigrants who arrive at an official port of entry or via interdiction at sea – the recognition that the public interest favors release of *bona fide* asylum seekers applies broadly to any asylum seeker who has established credible fear or reasonable fear, whether an "arriving alien" or not. Moreover, for those pursuing asylum in regular immigration proceedings, the Immigration and Nationality Act generally does *not* require

---

[50] ELEANOR ACER & OLGA BYRNE, HUMAN RIGHTS FIRST, U.S. DETENTION OF FAMILIES SEEKING ASYLUM: A ONE-YEAR UPDATE 1 (June 2015), http://www.humanrightsfirst.org/sites/default/files/hrf-one-yr-family-detention-report.pdf ("About five thousand children and mothers have been held in U.S. immigration detention since June 2014. Some have been held for nearly a year, and as of April 25, 2015, nearly one-third has spent more than two months in U.S. detention facilities."); IACHR OCTOBER 2015 REPORT, *supra* note 27, at ¶5 ("According to the information received, families for whom there is capacity at an immigration detention center are automatically and arbitrarily being detained for the duration of the immigration proceedings initiated against them, even in cases where the mother has passed an initial asylum screening."); *Id.* at ¶138 ("[F]or those families who were eligible for bond and a custody review, the Commission observed with concern that those families are usually being kept in detention for the duration of their immigration proceedings…ICE attorneys have been arguing since the peak of arrivals in 2014 that every family at Karnes must remain detained because they 'pose a danger to national security,' as well as for 'deterrence of mass illegal migration.'"); Complaint at ¶¶4–5, RILR v. Johnson (D.D.C. 2014), https://www.aclu.org/legal-document/rilr-v-johnson-complaint ("[B]eginning in June 2014, faced with increased numbers of Central American migrants entering or seeking to enter the United States through the southwest border, DHS decided to start detaining families in large numbers. At the same time, DHS adopted a blanket No-Release Policy for Central American families in order to deter additional migrants from coming to the United States. Under this policy, even though Plaintiffs have all demonstrated a credible fear of persecution – entitling them to pursue their asylum claims before the immigration court – and even though they are eligible under the immigration laws to be considered for release on bond, recognizance, or other conditions, Defendants [DHS] are refusing to consider them for release and instead ordering their continued detention."); ABA FAMILY DETENTION REPORT, *supra* note 17, at 24 ("Between June 2014 and February 2015, ICE denied release to nearly all detained families in its initial custody determination, even those who had passed their screening interviews.").

[51] U.S. Immigration and Customs Enforcement, Directive No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* ¶ 8.2 (Dec. 8, 2009), https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.

[52] *Id.* at ¶4.4.

[53] *Id.* ¶ 6.2.

11

detention but instead broadly favors release unless ICE demonstrates individualized danger or flight risk.[54] Absent such showing, the presumption should be to release or parole any families who establish a credible or reasonable fear.

The November 2014 memorandum from Secretary Johnson, referred to above, supports this position. The memorandum lists as a Priority 1 category for enforcement "aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States…*unless* they qualify for asylum or another form of relief under our laws, or *unless*…there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority."[55] As mentioned previously, DHS has found credible fear or reasonable fear for 90% of mothers and children held in family detention. Parents and children seeking protection and especially those who have been found to have a credible or reasonable fear of persecution or torture should not be viewed as an enforcement priority, and costly detention resources should not be expended on them.[56]

A similar presumption should apply for those parents and children in detention who might qualify for Violence Against Women Act (VAWA), T or U visa immigration relief based on having suffered crime victimization in the U.S., even if they do not establish credible fear. Credible and reasonable fear processes are not designed to uncover such eligibility and DHS does not currently screen separately for it.

Moreover, ICE should ensure that presumptions against the use of detention for families apply equally to men and women. Currently, the criteria and conditions for admissions and releases of mothers with minor children and fathers with minor children appear to be different and arbitrary, with insufficient justification. Historically, fathers and their children have been assigned to Berks only. During the ACFRC's summer 2016 site visit of Berks there were no fathers present. This is consistent with reports by advocates that fathers with children had either been released to the community or separated from their families, with the fathers assigned to detention facilities designated for housing adult males and their children transferred to the custody of Office of Refugee Resettlement (ORR). ICE has declined to answer the Committee's questions on this topic, either as to current or future practice.

Following the February 2015 *RILR v. Johnson* decision[57] and July 2015 *Flores v. Johnson* decision,[58] it appears that DHS changed some of its policies and the amount of time that

---

[54] *See* INA § 236; 8 C.F.R. § 236.3. Mandatory detention during the course of removal proceedings is required only for certain classes of individuals based on criminal history, national security risk, or ties to terrorism – generally not applicable to any of the mothers and children in family detention. INA § 236(c).

[55] *Memorandum from Jeh Charles Johnson*, *supra* note 48, at 3 (emphasis added).

[56] *Id.* at 5.

[57] *RILR v. Johnson* was a class action by mothers and children in family detention with a positive credible fear determination who alleged that the government had effectively adopted a "no-release policy," which interfered with their ability to pursue asylum and violated U.S. immigration law as well as constitutional right to due process. On February 20, 2015, the U.S. District Court for the District issued a preliminary injunction prohibiting the government from using deterrence as a factor in family custody decisions. Court Order, RILR v. Johnson, supra note 24. The preliminary injunction was dissolved – with agreement of parties– after DHS announced a new policy whereby it would abide by the injunction terms.

[58] Flores v. Johnson, 2:85-cv-04544 (C.D. Cal. July 24, 2015), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0017.pdf.

immigrants are held in family detention has shrunk substantially. ICE announced in July 2015 that
it would generally not detain a family (a mother and her child(ren)) if they had a positive credible
or reasonable fear determination.[59] ICE recently reported that 94% of people are released from
family detention within 30 days, and the majority sooner, within 10-20 days.[60] However, it is
critical to note that while it appears most people in family detention are being released more
quickly, there are others that continue to be held for long periods. A group of 22 women detained
with their children at Berks in August 2016 engaged in a hunger strike to protest their detention
"from 270 days to 365 days . . . with children ages 2 to 16 years old," according to their open letter
to Secretary Johnson.[61] Although some of these women and children may have been contesting
negative credible or reasonable fear determinations or possibly subject to reinstatement of removal
(a process separate from expedited removal), the length of time is nevertheless concerning.
Asylum seekers should not be subject to prolonged detention absent individualized danger or flight
risk that cannot be mitigated. Moreover, as mothers and children are not being informed about or

---

[59] Email from Richard Rocha, U.S. Immigration and Customs Enforcement Spokesperson, *ICE July 2015 Family Detention Announcement* (July 13, 2015), http://immigrantjustice.org/ice-july-2015-family-detention-announcement.
[60] Decl. of Jon Gurule, *supra* note 6, at, ¶13 Decl. of Jon Gurule at ¶ 13, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. , ¶13 (June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf (stating that 94% of people in family detention from 10/23/2015-5/16/2016 were detained for 30 days or less). Decl. of Joshua Reid, Assistant Field Office Director for ICE at the Berks Family Residential Center, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016) at ¶7, http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf ("Soon after arrival at the BFRC, ERO will review the family's alien files, briefly interview the Head of Household (HOH) in order to verify previously provided information, to include potential sponsors…"); Decl. of Juanita Hester, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016) ¶ 4, http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0029.pdf ("Staff will begin efforts to identify sponsors and future release options as soon as practicable after a family is booked into KCRC. ERO FRC staff will interview the head of household (i.e. the adult parent or legal guardian accompanying the child or children) to determine if the child or children has/have another parent or legal guardian in the United States to whom the child or children may be released."); Decl. of Valentin de la Garza, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016) ¶ 7, http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0029.pdf ("Since October 2015, ICE/ERO has updated its procedures to ensure families are processed as expeditiously as possible…ERO FRC staff will being efforts to identify sponsors and future release options as soon as practicable after a family is booked into STFRC. ERO FRC staff will interview the head of household to determine if the child or children has another parent or legal guardian in the United States to whom that child or children may be released."). *See also* ABA FAMILY DETENTION REPORT, *supra* note 17, at 27 (chart showing changes in family detention pre-2014, post-surge, and post-*RILR*/*Flores*); USCIRF REPORT, *supra* note 14, at 12 (indicating that USCIRF observed a similar timeline as that described by ICE with CFI usually within 14 days after USCIS receives referral and immigration judge review of negative determinations usually happens within a week); Josh Gerstein, *Johnson: Feds Looking at Family Immigration Detention Changes*, POLITICO (Aug. 4, 2016, 7:39 PM), http://www.politico.com/blogs/under-the-radar/2016/08/johnson-dhs-looking-at-family-detention-changes-in-wake-of-court-ruling-226694 (quoting Peter Schey, President and Executive Director of the Center for Human Rights and Constitutional Law, who is leading the effort to enforce the *Flores* settlement: "Detention [of families] has gone from an average of 60-plus days to an average of about 10 days.").
[61] Berks County Residential Center Detainees, *Open Letter to Jeh Johnson* (Aug. 10, 2016), http://www.humanrightsfirst.org/sites/default/files/BerksWomenLettertoJohnson.pdf. It should also be noted that although *Flores* and *RILR* have had an ameliorative effect on family detention, it does not apply across the board to immigration detention more generally. *See, e.g.,* LIFELINE ON LOCKDOWN, *supra* note 28, at 3 (91% of nonprofit attorneys consulted for the report stated that "ICE denies parole in cases where asylum seekers appear to meet all the criteria for release" and data from a FOIA request by the ACLU/CGRS showed that only 47% of parole requests were granted in the first nine months of 2015.).

13

screened for other forms of immigration relief, individuals eligible for U visas, T visas, VAWA, or Special Immigrant Juvenile Status may be among those detained longer periods of time.

We note that a year in detention, particularly in the life of a child, is an extraordinarily long time that has serious repercussions for legal access, education, medical and mental health, and civil liberties more generally. Such detention should not be prolonged *regardless* of the status of a legal claim to protection. Prolonged detention of families should be an absolute last resort, used only when no conditions can mitigate serious danger to the community or serious risk of flight.

In July 2016, the 9th Circuit upheld the District Court's *Flores* ruling as to the minors in custody but held that the District Court had erred in interpreting the settlement to require the release of accompanying adults.[62] However, this decision does not authorize family detention, does not affect ICE's ability to release parents with their children, and in no way requires separation or continued detention.

For the humanitarian, public interest, and other reasons discussed above, ICE should not resort to detaining parents separately from their children and should not seek continued justification for the detention of families.

**Recommendation 1-5: Children should not be separated from their parents in order to continue to detain the adults, or to continue to hold the children by placing them in ORR care.**

**Recommendation 1-6: To avoid inappropriate gender-based disparate treatment, and in keeping with the recommended criteria and conditions, the presumption of release together as a family should apply equally to mothers and fathers arriving with minor children, and neither fathers nor mothers should face separation from their minor children.**

**Recommendation 1-7:**

a) **As soon as practicable, DHS should check its systems for pending VAWA, T, or U applications for any families in detention. If present, families should be released and any expedited removal or reinstatement processes against them halted pursuant to DHS's prosecutorial discretion or other authority to ensure eligibility for crime-based relief. DHS should also expeditiously process families' pending applications for other relief.**

b) **Going forward, DHS should ensure timely screening, prompt release, and preservation of eligibility for individuals in family detention who may have claims for crime-based immigration relief. DHS should not detain immigrant crime victims with pending and approved VAWA confidentiality-protected cases. Children of VAWA confidentiality-protected victims should be released along with their parents without regard to whether the children are included in the victims' application.**

---

[62] Flores v. Lynch, 828 F.3d 898 (9th Cir. 2016).

### D.  Unduly Onerous Conditions of Release

When DHS releases individuals from detention, it may generally do so on recognizance, parole, bond, or conditions of supervision. At present, a condition commonly imposed includes enrollment in a program known as the Intensive Supervision Appearance Program (ISAP). ICE is also piloting a case management-based alternatives-to-detention program for families, which remains limited in scope.

For many families, release on recognizance with information about rights and responsibilities and referrals to legal services and psycho-social supports is sufficient to ensure compliance with immigration proceedings. Other families may benefit from community-based case management alternatives to detention or case management programs that provide more robust support. Only where an individualized assessment has demonstrated need does it make sense to enroll a family in a more intensive form of supervision such as the Intensive Supervision Appearance Program. The Committee requested information from ICE regarding release on bond and bond amounts, and ICE declined to provide such information. Therefore, the Committee has looked to other credible sources of information on bond practice. It has been reported that when DHS releases individuals on bond, it often imposes amounts that are too high for families to afford, and then defends those high amounts when individuals who are eligible for a bond hearing ask an immigration judge to lower bond.[63] According to the August 2016 report from the United States Commission on International Religious Freedom (USCIRF):

> [D]uring USCIRF monitoring visits at ICE detention centers and in meetings with ICE officials and legal service providers…USCIRF heard of bond amounts ranging from $1,500 minimum to $7,000. When ICE officials were asked how a bond rate was determined, one detention supervisor said they give a blanket $2,000 bond rate because 'that is a number we are comfortable with from the INS days.' An ICE official at headquarters said bond rates are determined in different areas based on bed space – rates are lower when there are fewer beds available since there is nowhere to detain the individual and vice versa."[64]

In July 2016, Human Rights First released a report in which they surveyed attorneys around the country, nearly 70% of whom reported that ICE sets bond too high for asylum seekers and immigrants to pay.[65]

---

[63] Human Rights First, *A One-Week Snapshot: Human Rights First at Dilley Family Detention Facility Post-Flores Ruling* (Aug. 2015), http://www.humanrightsfirst.org/sites/default/files/A%20One-Week%20Snapshot-%20Human%20Rights%20First%20at%20Dilley%20Family%20Detention%20Facility%20Post-Flores%20Ruling%20ob.pdf (describing 40 cases where initial bond was set between $7,000-$9,500, including one case in which "an ICE trial attorney stated that he had received instructions to 'vigorously contest' release of mothers and children on conditional parole and to 'request high bond amounts' instead. Even when mothers had close family ties in the United States and presented no safety risks, ICE argued that the family was a flight risk as justification for denying release, or demanding high bonds.").

[64] USCIRF REPORT, *supra* note 14, at 47-48.

[65] LIFELINE ON LOCKDOWN, *supra* note 28, at 25. *See also* IACHR OCTOBER 2015 REPORT, *supra* note 27, ¶ 138 ("[A]t the culmination of bond hearings, immigration judges have been setting extremely high bond amounts, up to $15,000 or more, such that those who may qualify to be released are unable to meet the required amount."); USCIRF REPORT,

In June 2015, Secretary Johnson announced that he had worked with ICE Director ICE Sarah Saldaña to ensure that the bond would be set at an amount that is "reasonable" and based on an assessment of the family's ability to pay.[66] However, sources have reported that this policy has not been implemented and it does not appear that ICE has issued any formal guidance to field offices instructing ICE officers how to assess a family's ability to pay.[67] This is concerning particularly as asylum seeker families, many of whom are impoverished in their home countries and/or forced to flee with nothing, are especially likely to have limited ability to pay even a low bond.

Whether or not immigrants are required and able to pay bond, they have been frequently enrolled in the ISAP upon release from detention.[68] ISAP widely imposes electronic surveillance – including for most mothers released from family detention – in the form of ankle monitors, which participants have described as physically painful, traumatizing, and humiliating.[69] ISAP is run by a for-profit firm, Behavioral Interventions Incorporated, which was acquired by the GEO Group in 2010.[70] The Request for Expressions of Interest published by ICE when looking to award the ISAP III contract describes the program as relying on telephonic reporting, unannounced home visits, and in-person interviews at an assigned ISAP office, in addition to the electronic monitoring devices.[71]

---

*supra* note 14, at 59 (reporting "USCIRF heard from several NGOs and legal service providers of bond rates as high as $7,500, much higher than the statutory minimum of $1,500").

[66] *Statement by Secretary Jeh Johnson, supra* note 1.

[67] LIFELINE ON LOCKDOWN, *supra* note 28, at 25 ("[I]t is not clear whether ICE has issued any formal guidance to field offices instructing ICE officers how to assess an individual's ability to pay – with respect to families in detention or individuals generally. Reports from attorneys serving asylum seekers and other immigrants do not indicate that any such policy has been implemented.") The Committee requested information about bonds and bond amounts but ICE declined to provide any information.

[68] ISAP I was originally piloted in ten cities from 2004-2009. In June 2008, Congress funded the first year of the nationwide ISAP II program. And in November 2014 Congress appropriated $90 million for the existing ISAP III program. OIG ISAP REPORT, *supra* note 32, at 3.

[69] *See, e.g.*, Oakland Centro Legal de la Raza, et al., Office for Civil Rights and Civil Liberties Complaint, *Violations of Due Process and Liberty Rights of Asylum Seekers by U.S. Immigration and Customs Enforcement through the Use of the Intensive Supervision and Appearance Program (ISAP)* (Apr. 20, 2016) at 6–14, http://centrolegal.org/wp-content/uploads/2016/05/Complaint-to-OCRCL-Cover-Letter.pdf [Hereinafter Oakland Centro Legal de la Raza, et al. Complaint]; E.C. Gogolak, *Ankle Monitors Weigh on Immigrant Mothers Released From Detention*, N.Y. TIMES (Nov. 15, 2015), http://www.nytimes.com/2015/11/16/nyregion/ankle-monitors-weigh-on-immigrant-mothers-released-from-detention.html?_r=1.

[70] Lutheran Immigration and Refugee Service, *Backgrounder: Alternatives to Detention (ATD): History and Recommendations* (July 6, 2015), http://lirs.org/wp-content/uploads/2015/07/LIRS-Backgrounder-on-Alternatives-to-Detention-7.6.15.pdf.

[71] *Intensive Supervision Appearance Program (ISAP III): Request for Expressions of Interest* (July 26, 2014), http://www.dgmarket.com/tenders/np-notice.do?noticeId=10972659. ("ISAP III is a core community-based supervision and in-person reporting program designed to provide cost-effective electronic monitoring supervision and case management for individuals who are not subject to mandatory detention but have been determined to require a higher level of monitoring than being released on recognizance or with bond conditions alone. These individuals may be at any stage in the Immigration Court system. Activities of aliens released from ICE custody and placed in the program (i.e. participants) may be monitored by case specialists (i.e. contractors) or directly by the ICE officers themselves. Aliens participating in this alternative program must comply with a variety of activities and reporting requirements designed to successfully reintegrate the alien into his or her community while navigating the immigration process from initial of proceedings through departure. Program requirements for compliance include, but are not limited to: unannounced home visits, scheduled office visits, electronic monitoring, and submission of a valid travel

When ISAP expanded to a nationwide program in 2009, ERO identified three high priority categories: "(1) aliens with final removal orders who are not removable from the United States and cannot be legally held in custody more than 6 months, but who are a danger to the community; (2) aliens in removal proceedings, not issued final removal orders, who are at high risk of absconding; and (3) aliens with final removal orders, previously released under supervision, who violate the terms of supervision by committing crimes or otherwise fail to comply with release conditions."[72] None of these categories applies as a blanket matter to individuals held in family detention. However, it appears that ICE is routinely requiring ISAP, including ankle monitors, as a general condition of release from family detention.[73]

In 2011, ERO headquarters changed the criteria for participation in ISAP and instructed field offices to "limit GPS monitoring for aliens who did not yet have a removal order, but were waiting to appear in immigration court . . . ERO headquarters recommended using another monitoring method during this period, such as having participants report telephonically."[74] However, USCIRF concluded in its August 2016 report that "it appears that electronic monitoring is being used extensively without full individualized assessments of whether an asylum seeker is a non-appearance risk."[75] In fact, Secretary Johnson told the House Judiciary Committee that ICE was "ramping up" its use of ankle monitors and intended to double the number of monitors from 23,000 in 2015 to 53,000 in 2016.[76]

Many civil society organizations have raised concerns about ISAP and the use of electronic monitors, including a group of 17 NGOs who filed a DHS Office for Civil Rights and Civil Liberties (CRCL) complaint about ISAP in April 2016;[77] the American Bar Association in a letter to Secretary Johnson in March 2016;[78] 73 organizations in a letter to Secretary Johnson and

---

document. To ensure successful outcomes, the program relies on Electronic Monitoring (EM) devices, telephonic reporting and unannounced home visits. Participants must also report to their assigned ISAP office regularly for face-to-face interviews.").

[72] OIG ISAP REPORT, *supra* note 32, at 4.

[73] *E.g.,* A group of CA-based NGOs have an internal ICE email dated May 15, 2015 stating that "Absent extraordinary circumstances, *all* persons released from a family residential center or adult detention facility by ERO *will be enrolled* in some form of ATD under the provisions of the ISAP II contract." Oakland Centro Legal de la Raza, et al, Complaint, *supra* note 69, at n.17 ("The reliance on ankle shackles, along with burdensome reporting requirements and arbitrary practices, interferes with the due process and liberty rights of the complainants – primarily mothers – fleeing severe harm in their countries of origin and seeking protection in the United States."). The complaint was submitted by the following organizations: Centro legal de la Raza, Community Legal Services of East Palo Alto, the East Bay Community Law Center, and members of the San Francisco Immigrant Legal Defense Collaborative – Asian Pacific Islander Legal Outreach, Central American Community Resource Center, Center for Gender & Refugee Studies, Dolores Street Community Services, Immigration Center for Women and Children, Immigrant Legal Resource Center, La Raza Centro Legal, La Raza Community Resource Center, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Legal Services for Children, Pangea Legal Services, the Bar Association of San Francisco, and University of San Francisco Immigration and Deportation Defense Clinic.

[74] OIG ISAP REPORT, *supra* note 32, at 7.

[75] USCIRF REPORT, *supra* note 14, at 48.

[76] Molly Hennesy-Fiske, *Immigrants Object to Growing Use of Ankle Monitors After Detention*, L.A. TIMES (Aug. 2, 2015, 3:30 AM), *available at* http://www.latimes.com/nation/immigration/la-na-immigrant-ankle-monitors-20150802-story.html.

[77] Oakland Centro Legal de la Raza, et al. Complaint, *supra* note 69, at 1.

[78] Letter from Paulette Brown, President, American Bar Association, to Jeh Johnson, Secretary, Department of Homeland Security (Mar. 18, 2016),

Deputy Secretary Mayorkas in Feb 2016;[79] and the CARA Family Detention Pro Bono Project (consisting of the American Immigration Lawyers Association, the American Immigration Council, the Catholic Legal Immigration Network, and the Refugee and Immigrant Center for Education and Legal Services) in a letter to ICE Director Saldaña in July 2015.[80] Many of the concerned organizations have indicated that there is no clarity around either the criteria for putting individuals on ISAP or for de-escalation (such as having monitors removed).[81] They raise serious concerns about ISAP and the use of electronic monitors including physical and mental harms,[82] economic harms,[83] and de facto criminalization of asylum seekers.[84]

ICE has also begun to pilot the use of a case-management-based alternative to ISAP for certain families. The ICE Family Case Management Program (FCMP) is contracted through GEO Care, another affiliate of the GEO Group, and began in January 2016. The program provides a case management-based alternative to detention in five metropolitan regions, including Baltimore/Washington D.C., New York City/Newark, Chicago, Miami, and Los Angeles. Families receive case management from GEO Care to ensure that they comply with their immigration obligations, including ensuring family members understand those obligations, have transportation arrangements for court proceedings, and are proactively connected to needed community-based services.

The program, however, remains very limited. While the program's initial pilot states a capacity for 800 participants, at the time that ICE shared data with this Committee, only 48 families had been

---

http://www.americanbar.org/content/dam/aba/administrative/immigration/ABALetter_anklemonitors2016.authcheckdam.pdf ("The ABA believes that any restrictions or conditions placed on noncitizens to ensure their appearance in immigration court or for their removal should be the least restrictive, nonpunitive means necessary to further these goals. The use of electronic monitors is an extreme measure that is often overly restrictive and intrusive in nature.").
[79] Letter from Advancement Project *et al.*, *supra* note 30 (asserting that persons released from family detention are "frequently forced to wear ankle monitors despite demonstrating no significant risk of flight.").
[80] Letter from CARA Family Detention Pro Bono Project, to Sarah Saldaña, Director, Immigration and Customs Enforcement (July 27, 2015), http://www.aila.org/File/DownloadEmbeddedFile/65278 (stating that ICE was using coercive tactics and intimidation to require that women at Dilley wear ankle monitors as a condition of release).
[81] Oakland Centro Legal de la Raza, et al. Complaint, *supra* note 69, at 14; RUTGERS SCHOOL OF LAW-NEWARK IMMIGRANT RIGHTS CLINIC & AMERICAN FRIENDS SERVICE COMMITTEE, FREED BUT NOT FREE: A REPORT EXAMINING THE CURRENT USE OF ALTERNATIVES TO IMMIGRATION DETENTION 13-14 (July 2012), http://afsc.org/sites/afsc.civicactions.net/files/documents/Freed-but-not-Free.pdf, [hereinafter FREED BUT NOT FREE]; Letter from CARA Family Detention Pro Bono Project, *supra* note 80, at 4 ("There is no transparency or consistency regarding how ICE sets bond amounts, why certain individuals are required to pay a bond in addition to an ankle monitor, and why restrictive forms of supervision like ankle monitors are necessary to mitigate a particular flight risk.").
[82] Kyle Barron & Cinthya Santos Briones, *No Alternative: Ankle Monitors Expand the Reach of Immigration Detention*, NACLA (Jan. 6, 2015), http://nacla.org/news/2015/01/06/no-alternative-ankle-monitors-expand-reach-immigration-detention ("The use of the ankle monitors requires a period of physical adjustment, causing swelling of the foot and leg, as well as severe cramps. The person must be tethered to an outlet as the device is charged for hours, twice every day…The greatest challenge that people under ISAP face with the use of the monitor is the psychological effects. The international coordinator of the Honduran solidarity group OFRANEH, Carla Garcia, explains that for her, the shackle conjures up the brutal history of her people in the Americas.*); Freed But Not Free, supra* note 81, at 17-18; Letter from Paulette Brown, American Bar Association, to Jeh Johnson, *supra* note 78.
[83] To cite two of many possible examples, frequency and duration of check-ins impede ISAP participants' ability to work; and there are expenses associated with traveling to ISAP office for check-ins. FREED BUT NOT FREE, *supra* note 81, at 16-17.
[84] Molly Hennesy-Fiske, *Immigrants Object, supra* note 76.

enrolled. Moreover, there is so far little data on the program's efficacy. Based on preliminary reports from advocates and the materials ICE shared with the Committee, FCMP appears to be a less punitive option than ISAP for providing safe release. The Committee is, however, concerned over the award of the contract to a for-profit company. In the Committee's view, neither the operation of facilities, community supervision program, nor case management services for families should be driven by profit motives, and conflicts of interest with respect to use or expansion of detention should be avoided. Instead, families should be served by culturally-sensitive, community-based organizations with expertise in social service provision.

In light of recent findings questioning the efficacy and standards of private prison contracts, the decision by the Department of Justice to discontinue private prison contracts, and Secretary Johnson's announcement that DHS will conduct a review to assess the policy for DHS facilities, we recommend that alternatives-to-detention programs be included in the review.[85]

**Recommendation 1-8: In the absence of individualized assessment of clear flight risk or danger, detained families should be released on their own recognizance. Where bonds are set, the amounts should be reasonable based on the family's ability to pay.**

**Recommendation 1-9:**
  a) **Any conditions for release, including community supervision, should be the least restrictive means consistent with the needs and risk that the family presents in a community setting, and only for as long as necessary. Factors that should be considered in determining the most appropriate and least restrictive placement include the best interest if the child, the strength or durability of each family's community ties, and whether removal is likely.**
  b) **ICE should retain personnel with clinical degrees and expertise in assessment to ascertain what needs and risks, if any; each family being considered for release presents, and then to identify the conditions or precautions to adopt in order to mitigate any concerns and achieve compliance in the community. Conditions of release to the community should be specifically tailored to reflect individuals' assessed needs and risks, yielding both the least restrictive and most effective means of achieving excellent outcomes.**
  c) **Supervision, including community programs, electronic monitoring, and other restrictive alternatives to detention, should be imposed only after an individualized determination of danger or flight risk, and with clear standards and timeframes for eliminating these controls, especially removal of ankle monitors.**
  d) **Detention should not be used due to a lack of available space in such programs; instead community support and case management alternatives should be expanded with a thorough review of contracting processes, examining efficacy, quality of services, and the appropriateness of using a for-profit prison company for case management.**

---

[85] *See* Deputy Attorney General Sally Q. Yates, Phasing Out Our Use of Private Prisons, JUSTICE.GOV (Aug. 18, 2016), https://www.justice.gov/opa/blog/phasing-out-our-use-private-prisons; Jeh C. Johnson, Secretary of Homeland Security, Statement on Establishing Review of Private Immigration Detention (Aug. 29, 2016), https://www.dhs.gov/news/2016/08/29/statement-secretary-jeh-c-johnson-establishing-review-privatized-immigration.

e)  Families that have similar community ties, risks and needs should receive the same access to ATDs and should not be over-supervised or under-supervised due to lack of appropriate options in the area to which the family is released.

f)  ICE should regularly review placements that limit freedom of movement or carry other restrictions to determine whether a family could be "stepped down" to a less restrictive option.

**Recommendation 1-10: Any ankle monitors used for electronic monitoring should be no more restrictive than necessary, and should minimize inconvenience, discomfort, and stigmatization. For example, the ankle monitors used should minimize weight, heat, and the time the wearer must spend physically next to an outlet charging the device.**

20

## 2.   REFORM OF DETENTION AND ALTERNATIVES-TO-DETENTION (ATD)

Much criticism has been leveled against criminal incarceration and yet, amongst its many questionable practices, the criminal justice system has not detained families with children for several hundred years. As already stated, the ACFRC believes that ICE should generally discontinue its use of FRCs, and should place a family in detention only when it is absolutely necessary. Even when custody is necessary, alternatives to the FRCs should be used where possible; custodial arrangements that fall short of physical detention may suffice. When detention is necessary, families should be detained only for the briefest possible period of time and in the least restrictive setting possible. Parts 3 to 7 address particular areas of concern; in this Part, the Committee recommends more general significant substantive improvements, grouped in three interdependent and complementary areas of policy and practice: population management, detention management, and accountability.

### A.  Population Management

Population management encompasses the continuum and the conditions of control that ICE exercises over those in its custody and under its supervision in the community from least to most restrictive, and includes the core assumptions and overarching strategies by which it manages families. It consists of the policies and processes that constitute ICE's system for detaining and supervising families, including the specific strategies by which families are monitored and may be admitted to, released, and returned to family detention. The Committee identified three key problems in ICE's approach to population management.

### 1.  Incorrect Assumptions about Civil Detainees

The current management of the FRCs is, improperly, premised upon criminal justice models rather than civil justice requirements or needs. Immigration detention is intended to hold individuals only as long as necessary, when absolutely necessary, pending removal or relief. Criminal incarceration, on the other hand, is fundamentally punitive in its purposes and goals. Consistent with its statutory mandate and case law, DHS's use of civil detention, including alternative forms of detention and alternatives to detention (ATD), should be premised upon civil, rather than criminal, principles. This premise is imbedded in case law that migrants must not be detained to deter,[86] detained to punish,[87] or detained indefinitely,[88] and that children in immigration custody be placed in the "least restrictive setting,"[89] in the community. Moreover, when used, detention should always be

---

[86] Deterrence is not a valid governmental purpose that could overcome the presumption of liberty to justify immigration or other civil detention. *See, e.g.*, R.I.L.R., 2015 U.S. Dist. LEXIS 20441.

[87] *Zadvydas v. Davis*, 533 U.S. 678 (2001) (noting that civil detention does not result from a criminal conviction and holding it is legitimate only where shown to be necessary in an individual case).

[88] *Id. at 690.* (liberty is the rule and that government detention of immigrants violates the Due Process Clause of the U.S. Constitution unless a specific justification, usually prevention of flight risk or danger, outweighs the "individual's constitutionally protected interest in avoiding physical restraint"). *See also Demore v. Kim*, 538 U.S. 510 (2003) (detention is permissible only 'to facilitate deportation, or to protect against risk of flight or dangerousness); *Doan v. INS*, 311 F.3d. 1160, 1162 (9th Cir. 2002) ("serious questions arise about the reasonableness of the amount of bond if it has the effect of preventing one's release").

[89] Stipulated Settlement Agreement, Flores v. Reno, No. 2:85-cv-04544 (C.D. Cal. Jan. 17, 1997), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf. For a summary of the litigation, see CIVIL RIGHTS LITIGATION CLEARINGHOUSE, *Case Profile Flores v. Reno*, http://www.clearinghouse.net/detail.php?id=9493.

21

for the briefest amount of time possible.[90] This report concludes, as have many reports preceding it, that inappropriately punitive conditions continue to exist, and that, in fact, it is not practical to detain families in a manner that is in keeping with the civil objective of immigration detention.

Top among the many factors that contribute to inappropriate conditions is that the current management of the FRCs is premised upon the incorrect assumption that migrant families present significant risks to others. In fact, the FRC population consists of families with minor children, many of them seeking asylum – not of criminal defendants and convicted inmates. For the most part, families with children are high functioning, self-sufficient, independent, autonomous and responsible individuals who are pursuing long-term gains. They have made a dangerous journey in search of safety for themselves and their children. They have job skills, were gainfully employed and provided for their children, hold religious beliefs, paid taxes, owned homes, and voted where it was permitted in their home countries. And despite ICE's assertions that it is necessary to detain so many families, to our knowledge none of those held in FRCs have criminal records. In fact, most families are fleeing pervasive violence, and are using appropriate channels to seek asylum. But once in ICE custody, they are managed by ICE and its contractors in the same manner that the criminal justice system manages criminal defendants and convicted inmates.

Further, ICE's commitments to mitigating psychological trauma and creating a safe residential environment by providing trauma-informed care (and presumably custody and control as well) are undermined by its evident key operative assumptions about civil detainees and the risk they present. The very experience of detention, as well as some of its alternatives (most notably electronic monitoring), is a continuing source of trauma for families who fled to the U.S. seeking safety. In sum, the very principles the guide and shape family detention and alternatives to detention are wrong. There are two fundamental errors that must be corrected: *criminalization* and *prisonization*. The remedy is *normalization*.

*Criminalization* of the population – managing migrants and their children as if they are pretrial defendants or convicted inmates – no matter whether intentional or accidental, diminishes their self-esteem; impedes their access to the asylum system; negates their status as parent, protector, and provider; undermines family relationships; and contributes to the erosion of their physical, psychological, and social well-being, all of which are contrary to ICE's express commitment to creating a safe place.

*Prisonization* of detention – operating FRCs like jails – is contrary to both ICE's statutory mandate and case law. Prisonized policies, practices, physical plant, and personnel all contribute to families' sense of anomie and anxiety. They are harmful, unnecessary and unnecessarily costly. Yet ICE's Family Residential Standards are based upon, and extremely similar to, standards developed by the American Correctional Association for adult criminal defendants incarcerated

---

[90] Committee members' conversations with mothers at Berks and with pro bono legal staff, as well as recent news accounts of families engaged in hunger strikes all substantiate long stays, often in excess of a year. *See* Renée Feltz, *Mothers at US Immigration Center on Hunger Strike to Protest Year in Custody*, GUARDIAN (Aug. 15, 2016), https://www.theguardian.com/us-news/2016/aug/15/immigration-women-hunger-strike-pennsylvania-berks-county, *Mothers at Berks County Residential Center Suspend Hunger Strike*, *Reading Eagle* (Aug. 26, 2016), http://www.readingeagle.com/news/article/mothers-at-berks-county-residential-center-suspend-hunger-strike, Liz Robbins, *22 Migrant Women Held in Pennsylvania Start a Hunger Strike to Protest Detention*, N.Y. TIMES (Sept. 2, 2016), http://www.nytimes.com/2016/09/03/nyregion/22-migrant-women-held-in-pennsylvania-start-a-hunger-strike-to-protest-detention.html.

573

pretrial. Both Karnes and Hutto were correctional facilities when they opened. Additionally, the FRCs are largely staffed and monitored by correctional employees.

*Normalization* – permitting persons to live their lives as normally as possible – on the other hand, is consistent with both case law and ICE's avowed policy posture. Normalization should be the goal of policies and procedures, personnel, physical plant, programs, and services. Normalization would empower families to remain intact, maintaining their equilibrium; it would maximize families' opportunity to function as pro-social and productive members of the community. Obviously, normalization can best be achieved by releasing families seeking asylum or other protection, with case management programs if needed. Community-based placements should be as normalized as possible. In addition, the FRCs too, if they remain in use, should be thoroughly normalized; this is appropriate whether families are released to the community or removed.

The number of families detained, the conditions and circumstances under which they are detained, and the lengths of time they spend in detention are not supported by either the needs and risks they present or the available case law and the field's preferred practices. Similarly, the number of families assigned to Alternatives to Detention, the conditions and circumstances under which they are supervised, and the lengths of time they spend supervised in the community are not supported by the needs and risk they present.

In 2009, ICE began to develop a risk assessment instrument to objectively identify detainees likely to succeed with community supervision and the circumstances under which success could be maximized through conditions of supervision ranging from least (none) to most restrictive (continuous monitoring, electronic and otherwise). The instrument was completed in 2010 and adopted in 2011. Assessments of its implementation found that the instrument was ineffective overall due in large part to a blanket pre-emption of the tool by mandatory detention determinations and its reliance on factors from the criminal context that are not necessarily appropriate in the immigration context.[91] In 2015, ICE introduced a revised instrument primarily to address the number of adult males who had failed to report or had absconded.[92] Families in custody most often consist of female heads of household and their children; their detention and release decisions cannot reasonably be based on assumptions or findings relating to adult males. An instrument specifically normed for families and not pre-empted mandatory detention determinations, is necessary and will improve outcomes. This instrument and its corresponding interview protocols should also be sensitive to gender roles and other cultural as well as language differences.

**Recommendation 2-1: To allow objective and accurate determination of which families must be detained due to individualized determinations of flight risk or danger, and also the use of ATD, ICE should retain one or more subject matter experts to create needs and risk assessment instruments specifically for families, to be used regardless of assumptions about mandatory detention. This instrument and its corresponding interview protocols should be specifically normed to families' demographics; sensitive to gender and to cultural and language differences; mindful of community ties and other factors that inform consideration**

---

[91] Mark Noferi & Robert Koulish, *The Immigration Detention Risk Assessment*, 29 GEORGETOWN IMM. L.J. 45 (2014).
[92] *See* OFFICE OF INSPECTOR GENERAL, DEP'T OF HOMELAND SECURITY, OIG-15-22, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S ALTERNATIVES TO DETENTION (REVISED) 3 (Feb. 4, 2011), https://www.oig.dhs.gov/assets/Mgmt/2015/OIG_15-22_Feb15.pdf. [Hereinafter OIG ISAP REPORT].

for release; and validated to accurately ascertain any risk family members may present or face. ICE's recently revised ATD Risk Assessment Instrument may not currently be appropriately normed for families and female heads of household.

**Recommendation 2-2:** ICE's bed capacity and community supervision slots should be consistent with the actual numbers of families objectively appropriate for detention or supervision in the community. Under no circumstances should families be assigned to inappropriate or unlicensed facilities due to a lack of appropriate beds; similarly, families should be neither over- nor under-supervised in the community due to lack of appropriate placement options in the areas to which families are released.

**Recommendation 2-3:** DHS contract terms should not incentivize the otherwise unwarranted use of detention or supervision capacity; for example, contracts should not reduce the per bed price when the population exceeds a certain percent of occupancy, or pay for all beds, whether or not occupied. ICE should renegotiate any contracts with such terms. Contract terms should clearly state all costs. Contracts should include penalties for failure to satisfactorily perform all terms as stipulated.

**Recommendation 2-4:** Both the FRCs and community-based placements should eliminate as many characteristics of criminalization and prisonization as practicable, and become as normalized as possible in their design and operation. Families should be afforded every opportunity to continue to function as families, to exercise autonomy regarding parenting and their daily lives, including activities of daily living (e.g., when to wake and go to bed, menu and food preparation, wardrobe, hygiene, sanitation, discipline, and worship). Families in custody should be allowed easy access to immediate family members, whether themselves in custody or the community, by contact visitation and no-cost phone, email, and skype. Families should be permitted to live as intact groups and all members of a family group should be assigned to the same sleeping and living quarters.

**Recommendation 2-5:** Consistent with the commitment to normalization, when detention is necessary, ICE should only use small, non-institutional and non-secure facilities and assign staff specifically selected to work with families, especially families exposed to the documented trauma this population has experienced. Correctional facilities and personnel should not be used under any circumstances. All facilities should be licensed to provide child welfare consistent conditions and services in accordance with the *Flores* Settlement Agreement.

**Recommendation 2-6:** The current monitoring instruments developed by ICE and used by ICE and its contractors to ascertain whether FRCs meet minimum operating expectations should be replaced with instruments and methods that will accurately assess compliance with its contracts and MOUs as well as the Family Residential Standards, both those in effect today and upon its their revision. The FRCs should be held to the highest applicable standard of care – whether that is in the Family Residential Standards or the PBNDS.

575

**Monitoring of ICE's compliance with applicable standards should be done by an entity with child welfare expertise and experience.[93]**

## 2. Insufficient Information and Analysis, Planning, and Preparedness

DHS's core mission is national emergency planning and preparedness. Emergency planning and preparedness requires viable plans and ample practice. DHS must prepare and plan for periodic increases in the migration of families seeking relief in the U.S. – and DHS plans should rely on routine secure detention or excessive close supervision.

In 2009, at the beginning of the current Administration, ICE operated the largest system of detention and community release programs in the country with 378,582 migrants from 221 countries in its custody or under its supervision.[94] Today, in the eighth and final year of the Administration, ICE continues to operate the largest system of detention and community release programs in the country with 783,454 migrants from 178 countries in its custody or under its supervision. It also continues to be one of the largest national systems of detention and community release programs with the most highly transient and diverse populations of any detention system in the world. The measures that the current, and the next, Administration take with regard to its response to families and other migrants seeking safety in the U.S. are watched closely by other governments and are frequently emulated.

In order to effectively manage a national system, both day-to-day and over a foreseeable period of time, with reliable information at the ready for mid-range and long-term planning and evaluation, ICE should identify, define, collect, scrub, and publish key indicators on a continuous basis.

**Recommendation 2-7:**

   a) **ICE should convene its stakeholders to introduce detention management key indicators, describe data collection methods and finalize definitions with the group. ICE should consider additional data proposed by stakeholders. Data collection should begin with the next quarter.**
   b) **Key indicators should be collected and published, online. They should include, at least:**
      i. **actual capacity (both beds and ATD slots by type of ATD),**
      ii. **operating capacity,**
      iii. **capacity utilization (i.e., the average daily population (ADP) detained and on ATD),**
      iv. **actual and average lengths of stay (ALOS) in ICE custody and at each facility while in ICE custody.**
      v. **frequency distributions for detainee age and gender,**
      vi. **frequency distributions of family members' risk assessment and mental health risk assessment scores,**

---

[93] Dayna International, a marketing consultant (and effective 2016 a wholly owned subsidiary of DLH Holdings Corp. Co.) "offering technology-enabled services to achieve social impact for the government," does not appear to have the requisite experience to adequately assess ICE's compliance with either the current or ideal Family Residential Standards; its performance should be assessed and addressed as warranted.

[94] Dora Schriro, U.S. Immigration and Customs Enforcement, *Immigration Detention: Overview and Recommendations* (Oct. 6, 2009), https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

    vii.   frequency distributions of family members' medical and psychiatric diagnoses,

    viii.   the number of mental health visits (primary care mental health visits, mental health professional evaluations, individual psychotherapy, group therapy, psychiatric evaluations, psychiatric follow-up visits),

    ix.   the number of scheduled and emergency hospitalizations,

    x.   the number and duration of seclusion and restraint episodes, including all uses of isolation housing, and their justifications,

    xi.   releases due to deteriorating health or mental health condition, and their justifications,

    xii.   deaths in detention (or in a hospital while still in ICE custody, after detention),

    xiii.   frequency distributions of family members' primary and secondary languages, including literacy rates,

    xiv.   the number and location of failures to appear and absconders previously in detention, or in ATD, and

    xv.   per diem cost and total operating cost (bed by facility, slot by ATD type, and total).

   c)  In general, data should be published at least monthly; some data should be published more frequently. For example, actual capacity, operating capacity, capacity utilization should be updated weekly online; and deaths in detention should be updated daily online.

**Recommendation 2-8: ICE should engage in strategic planning on an on-going basis, actively involving both field staff and stakeholders, and should develop a five-year strategic plan that is updated annually consistent with data trends, case law, and other key factors.**

**Recommendation 2-9: ICE should prepare a Continuity of Operations (COOP) plan and update it annually. A COOP is a federal government initiative, required by Presidential directive, to ensure that agencies are able to continue performance of essential functions under a broad range of circumstances including localized acts of nature, accidents and technological or attack-related emergencies. Periodic increases, or surges, in the migration of families, seeking relief in the U.S. are situations well-suited for this measure.**

**Recommendation 2-10: ICE should create the infrastructure – including data collection, planning processes, personnel with specialized skill sets suited to the work at hand, and a continuum of viable placement and program options – to receive and assess and then release or refer families in less than 24 hours and without detaining them. ICE should consider models used by social service and not-for-profit organizations with child welfare expertise that specialize in emergency response and relief.**

**Recommendation 2-11: Even in the event of ebbs and flows in population, ICE should create capacity to keep families in the community in lieu of temporary detention whenever possible and to detain families only when necessary and for the briefest period of time, in temporary, family-friendly, non-secure and licensed settings.**

    3.  **Outsourcing vs. Acquiring Internal Expertise**

Since its inception, ICE has relied primarily upon an outsourced correctional workforce and model to perform most work associated with detention and its alternatives. Contracting with public and

private sector correction providers on a large-scale basis in the immediate aftermath of its inception – and at a time that government's policy changed from one of more frequent release of apprehended migrants to one of greater use of detention – may have been necessary and certainly it was expedient, but it is no longer sufficient or appropriate. Reliance on public and private sector corrections providers has resulted in many unfortunate compromises including use of unduly punitive facilities designed and constructed for penal purposes and of personnel who are unfamiliar with non-criminal, foreign-born populations. Like ICE, its private and public sector partners lack the requisite knowledge, skills, and abilities to envision how this civil system should be organized and operated to achieve its lawful goals, without criminalization or prisonization. And outsourcing has meant that ICE has not itself acquired the critical skills to make informed, independent decisions about detention and its alternatives.

On August 18, 2016, the U.S. Department of Justice (DOJ) announced that the Federal Bureau of Prisons (BOP) would reduce and ultimately end its use of private prisons. The DOJ determined that its private prisons were neither as efficient nor as effective as its own, federally-operated correctional facilities. On August 29, 2016, Secretary Johnson directed the Homeland Security Advisory Council to evaluate whether ICE should move in the same direction regarding its operation of immigration detention facilities. Outsourcing to public corrections entities is not the antidote to privatization, however. County governments and their agencies – including, especially, sheriffs' departments – lack the expertise and to serve migrant families. In addition, they may be motivated by their desire to augment their operating budgets, avoid layoffs, and fill empty buildings. These are circumstances that can incentivize prolonged and unnecessary custody, and result in failures to meet the needs of migrant individuals or families in DHS custody.

ICE is composed primarily of law enforcement personnel with extensive expertise performing removal functions, but not in the design and delivery of residential detention and community-based alternatives. Yet the agency has been charged with both prosecuting families for unlawful entry and caring for them while they are in federal custody. Assigning two highly distinctive and conflicting functions to the same agency is the equivalent of combining corrections and the criminal courts. Outsourcing of detention operations to public and private correction providers has not been effective in alleviating this tension due to the profit motivations discussed above and a lack of non-criminal expertise.

The solution does not lie in retaining the services of and leasing facilities from either private or public sector criminal justice entities. Rather, to effectively and humanely detain families for any period of time, ICE must itself acquire requisite knowledge, skills and abilities to envision how this system should be organized and operated to achieve its lawful goals. Moreover, it should separate enforcement and custodial functions.

**Recommendation 2-12: ICE should develop sufficient internal expertise to perform and monitor key functions that are currently out-sourced, by providing extensive in-service training of qualified enforcement personnel and by hiring, as ICE staff, subject matter experts to design and implement reform, including this Committee's recommendations. Subject matter experts should have a work history and professional orientation related to child and family welfare, not criminal justice.**

**Recommendation 2-13:**

a) ICE should immediately cease the expansion of the current FRCs' capacities. ICE should provide timely notice to those vendors that their contracts for family residential housing and services will not be renewed.

b) In place of the FRCs, when detention or ATDs are necessary, ICE should pursue placements in small, licensed group homes and evidence-based community supervision programs.

c) If larger facilities must be used, they should nonetheless be small, in order to facilitate a sense of safety and well-being, and should have ample space to separate one function from another (e.g., sleeping areas from recreational areas). Facility design and construction should provide ample natural light and fresh air, ready access to the outdoors, and building materials similar to those used in residential settings (not cinder block or industrial-sized porcelain tiles on the walls). Furnishings should be family-friendly as well; for example, using fabric and wood rather than plastic or metal and including privacy-protective window treatments.

d) Available placements should be sufficient in number, operated by non-criminal-justice subject matter experts, and located nearby population centers with ample access to legal counsel, public transportation, access to emergency health care, and a diverse and qualified workforce.

**Recommendation 2-14:** Ideally, DHS should separate enforcement and custodial/supervision functions from one another within ICE, with ERO focusing exclusively on enforcement and a new division focusing exclusively on envisioning and executing a system of temporary non-secure housing and supervision strategies specifically tailored to the objectively assessed needs and risks presented by migrant individuals and families. ICE should acquire the expertise to perform custodial/supervision functions itself, or those functions should be assigned to another governmental entity that is appropriately expert in non-criminal population welfare and services.

## B. Detention Management

Detention management focuses on the core operating assumptions, rules, regulations and expectations as enumerated in case law and implemented via the Family Residential Standards, contracts and Memoranda of Understanding (MOUs), and FRC policies and procedures. The Committee identified three key issues specific to detention management: normalization, creation of a culture of safety, and commitment to regulatory requirements.

### 1. Normalization

Instead of institutionalized/prisonized conditions of detention and alternatives to detention, both should be normalized. The policies and procedures that have guided ICE's operation of the FRCs and community supervision programs have not been either efficient or effective. For the most part, migrant families with children seeking status in the U.S. are intact families, with parents capable of caring for their children, providing for themselves, and contributing to their communities. Over-supervising families who require little or no supervision, regardless of its form, is costly and counterproductive. Limiting or impeding parents' ability to make decisions about the care of their children and threatening families with separation as means of control or retaliation breaks down the families and erodes the appropriate parent/child relationship. Families cannot thrive in settings

<div align="center">28</div>

such as these. The resulting negative effects of detention and unduly harsh community supervision on children and families have been well documented.

ICE has made efforts to improve the FRCs and expand its electronic monitoring, including, for example, adopting a language access policy and trauma-informed practices and care coordinators, but these changes are insufficient. They are not yet fully or successfully implemented; they suffer from insufficient oversight; and most fundamentally, they do not address the root cause of the reoccurring problem – superimposition of a criminal justice system on a non-criminal population.

At times – whether due to medical or other considerations – it is necessary for ICE to temporarily remove a parent from an FRC or otherwise separate him or her from the general population. This may occur, for example, if a parent is too ill to care for his or her child or must be hospitalized. Separation can be acutely frightening for children, and can leave children in ad hoc care situations that compromise their safety and well-being. It can also be traumatizing and extremely stressful for the parent who is dealing with the underlying situation but also possible feelings of guilt and worry for their child. This situation poses challenges for normalization, and is addressed in its own recommendation.

**Recommendation 2-15: ICE should realign its core operating assumptions and expectations – as expressed in its rules and regulations, existing and future contracts and memoranda of understanding, and current Family Residential Standards – with the individuals actually in its custody and under its supervision, who are neither criminal defendants nor sentenced inmates within a criminal justice system.**

**Recommendation 2-16: ICE should work with NGOs and other entities and experts with experience in child welfare to significantly modify the Family Residential Standards, eliminating all of the components of the FRCs that are characteristic of prisons and jails, normalizing to the greatest extent possible families' time both in detention and under ICE supervision in the community. The approach taken should be trauma-informed, and follow principles outlined by SAMHSA. The many facets of ICE's care, custody and control warranting substantive modification include: counts and bed checks, the daily schedule, rules governing grooming and personal appearance and other activities of daily living, housing/bed assignments, access to immediate family members and to others, and the addition of a Family Bill of Rights. Additional attention must be given to other key areas discussed at length in this Report, notably access to legal counsel; language access; health, mental health and trauma informed care; and free and appropriate education services.**

**Recommendation 2-17: For situations in which families must be detained, detention rules and practices should be normalized in at least the following ways:**

   a) **Counts and Bed Checks: Both parents and children need their sleep. All bed checks should stop immediately. If there is a bed check to be made, it should be by children's parents, if they feel one is necessary. ICE should develop means to account for and ensure the safety of everyone in its care that do not involve entering rooms at night when parents and/or children are sleeping.**

   b) **Daily Schedule: The prototypical institution schedule should be eliminated. In its place, "wake-up" and "lights-out" as well as the meal service schedule should be determined by parents. A flexible sleep schedule would help to demarcate weekends and holidays from weekdays and school days, and reduce idleness. Getting up early**

with no place to go makes little sense, and adds to the feeling of helplessness that so many in the population expressed.

c) <u>Food Service</u>: The menu has been a significant source of concern for parents detained in the FRCs; many of them have worried about their children's weight loss. ICE should adopt alternative means of planning and preparing meals with the active participation of parents, affording them opportunity to prepare breakfast and lunch with staples kept at the ready and to modify dinner with seasonings, sauces, and fresh fruits and vegetables that are familiar to them. Healthy snacks, water, and juice should be made available to parents and their children 24 hours per day.

d) <u>Grooming and Personal Appearance</u>: As much as possible, ICE should afford families in detention unencumbered access to personal property, toiletries and shaving supplies, their own clothes (or new garments but not used clothes, used undergarments and used shoes) and their children's toys and books, laundry soap, mending kits, ironing boards and irons, and haircuts as often as needed. Children should be allowed to keep toys, stuffed animals and other property in their living space and to hang artwork and other decorations on the walls.

e) <u>Other Activities of Daily Living</u>: ICE should provide parents opportunities to launder/tailor the family's clothes, tend a garden that they control, and assign their children household responsibilities as appropriate. Both parents and older children should be offered opportunities to perform meaningful work for wages and hours set by the U.S. Department of Labor. Subminimum wages should be prohibited.

f) <u>Housing/Bed Assignments</u>: ICE should modify and deinstitutionalize FRC sleeping quarters by housing family members together in private rooms with attached bathrooms; and using privacy panels, or hanging curtains or doors, in the restrooms, bedrooms and changing areas.

g) <u>Family Bill of Rights</u>: Intact families' parental decisions and authority should not be subordinated by ICE rules and contractor practices. ICE should develop a Family Bill of Rights that ensures the protection of a detained or supervised parent's fundamental right to make decisions about the care of his or her child, while protecting children from abuse and neglect.

h) <u>Access to Immediate Family Members</u>: ICE should ensure families in detention have reliable, routine, and affordable access in person and by phone, email, and mail, to their family members, whether those family members reside in the U.S. and elsewhere, and whether the family members are detained in another ICE facility, supervised by ICE in the community, or in the custody of ORR or the child welfare system. ICE should afford any indigent detainees ready access to phone calls and email to facilitate meaningful contact with family members.

i) <u>Access to Others</u>: Families in detention require contact with many individuals who are not their relatives and with government agencies – for example, former and prospective employers, consulates, victim-advocacy programs, and child welfare agencies – to manage their affairs prior to their release or removal and in anticipation of the release or removal. ICE should ensure families in detention have reliable, routine, and affordable access to community resources, by phone, email, and mail, as well as by contact visits.

581

**Recommendation 2-18:**

a) **ICE should develop and implement a consistent policy for caring for children who are temporarily out of the care of their parents. All details of this policy should be developed by child and family welfare experts and with the input of counsel who have expertise in FRC detainee representation. Each FRC should employ a qualified child welfare coordinator with designated responsibility for overseeing implementation of this policy.**

b) **Any child who is out of the care of his or her parent should be supervised and cared for by a staff member with child welfare expertise. At no time should ICE or contractor personnel use the threat of family separation or actual family separation to discipline or retaliate against a parent or child. In every case where they have the mental and physical capacity to communicate a choice, parents should have a choice as to what happens with their child in their absence. In any case where circumstances indicate that the parent will be unavailable to care for their child for more than 72 hours the parent should be consulted regarding options including reunifying the child with family members or sponsors in the community, or ORR custody as an unaccompanied child.**

c) **Decisions regarding separation because of abuse or neglect should be made by a child/family welfare professional only. ICE personnel and contractors should immediately report any suspected maltreatment of a child – whether by a parent, ICE personnel or contractor staff – to the relevant jurisdiction's child welfare agency, consistent with obligations under state and federal law. In any case in which a child is separated from a parent due to accusations of abuse or neglect, the child should be provided with an advocate or legal counsel, and the parent should have the right to an attorney or advocate to assist him or her.**

2. **Building a Culture of Safety**

ICE should build a culture of safety. When the government places someone in its custody or under its supervision, the government assumes the responsibility for their safety and well-being. ICE's commitment to trauma-informed care appears to be earnest. However, both the agency and its agents' understanding of what it means for care to be trauma-informed appear quite limited, as is its awareness of the nexus between ICE's policies and practices and harm to families. The criminalization/prisonization already discussed inadvertently re-traumatizes those in its care, most of whom have already experienced considerable trauma in their past.

Small differences can and do contribute to considerable distress. The inability to communicate in one's own language, to eat familiar food, to wear one's own clothes, to care for one's own family, to seek and receive crime victim services and trauma-informed care, to name but a few of the many topics discussed in this Report, quickly add up even during a short stay. The cumulative effect over the course of longer stays can be and has been devastating for many families. We discuss trauma-informed care in depth in Part 6.C. Here, we discuss other aspects of promoting safety for detainees.

<u>Orientation</u>: Most detainee families have had no prior exposure to incarceration. Therefore, their familiarity with and their ability to anticipate ICE's expectations are significantly limited. Their introduction to detention is a process, not an event. Access to information and explanations need to

31

582

be ongoing; detainees need to feel welcome and invited to have conversations and ask questions of staff.

**Recommendation 2-19: ICE should provide both an orientation and a handbook that is easy to understand, communicated in a manner that it is accessible to detainees, highly likely to meet the informational needs of detained families, and encourages questions and conversations between detainees and FRC and ICE staff.**

Staff cultural competence: The Committee experienced considerable difficulty obtaining information about ICE and FRC staff, including their selection, training, and supervision. With regard to the medical and mental health personnel working at the FRCs, no information was provided regarding credentials or qualifications. The resulting deficit of information includes: not knowing the numbers of positions funded and positions filled by job title, job descriptions, minimum job qualifications, credentials, persons working in limited capacities or with restricted licenses, and staff's demographics, as well as employers' minimum pre-service and in-service training requirements and staffs' satisfaction of those requirements. Based largely upon Committee members' observations during the tours, firsthand knowledge drawn from their primary work duties, and credible reports published by reputable organizations, it is believed that most of the ICE and contractor staff that interfaces with detained families were hired to perform enforcement functions and for the most part, previously worked with pretrial inmates and sentenced prisoners. And, although there are a significant number of multi-lingual and culturally competent potential employees and contractors in the immediate areas of the three FRCs, it seems that many staff are not bilingual and have no particular background or training to ensure cultural competence, or professional competence to work with trauma and crime victims. Cultural competence is "a set of congruent behaviors, attitudes, and policies that come together in a system, agency, or among professionals that enables effective work in cross-cultural situations." It is vitally important if a system is going to function effectively "within the context of the cultural beliefs, behaviors, and needs presented by consumers and their communities."[95]

**Recommendation 2-20: ICE and the FRCS should employ and assign both line staff and supervisors whose skills, languages, education and training, and prior employment and work histories are compatible with the needs of detainee families, and should ensure that staff receive pre-service and ongoing in-service instruction in meeting the needs of protection-seeker children and families that is sufficiently in-depth and of adequate duration for personnel to perform their duties with proficiency. ICE should designate a child welfare coordinator with expertise in working with traumatized children and families at each FRC to oversee implementation of a child-friendly service model and provide ongoing training of staff.**

Regulatory Requirements, Licensing, and States' Certifications of FRCs to Operate. ICE's use of the FRCs and the conditions at the FRCs themselves do not appear to satisfy, in letter or in spirit, the *Flores* court's requirements that ICE assign families to facilities only when such assignments are necessary, and that facilities be non-secure (that is, have an open campus in both design and

---

[95] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OFFICE OF MINORITY HEALTH, WHAT IS CULTURAL COMPETENCY, http://www.cdc.gov/nchhstp/socialdeterminants/docs/what_is_cultural_competency.pdf.

operation) and duly licensed to care for children.[96] The FRCs are far from non-secure. Whether or not there is a lock on the door or a fence around the property perimeter, they exhibit key characteristics of secure facilities. For example, they conduct numerous invasive counts daily and dictate when families rise and go to bed; when they eat and what they eat; what they wear; and when they can go outdoors, confer with counsel and receive visitors. ICE has resisted the idea of civil licensure by urging host state and county governments to license facilities that do not meet existing core requirements or to create licenses solely for its use.

Likewise, ICE has not yet fully complied with the DHS Prison Rape Elimination Act (PREA) regulation.[97] None of the FRCs is PREA-compliant and cross-gender supervision strategies are still inappropriate. Families also report problems with bullying and intimidation, often about sexual identity and orientation. Vendors employ persons to work as guards who have criminal histories, older children are routinely reassigned to sleep in rooms with adults to whom they are not related, children of both sexes and their parents are assigned to sleeping quarters that lack privacy screens for changing and toileting, and bed checks are routinely performed by guards of the opposite sex. As a result, family members' sexual and physical safety and families' overall well-being are not yet assured.

**Recommendation 2-21: ICE should comply in both letter and spirit with the concept of operating only non-secure and fully credentialed facilities for families; FRCs should be licensed as child care facilities by the appropriate state regulatory agencies.**

**Recommendation 2-22: DHS and ICE should comply in full with federal laws and regulations that impact the conditions of families' detention. They should not expend efforts to secure exemptions; instead, DHS and its agencies should lead by example. In all residential custodial settings – including those that are community-based – ICE should ensure compliance in full with PREA and the DHS PREA regulation. ICE should ensure that individuals who are victims of sexual abuse or assault are not transferred away from legal counsel without their explicit consent and that victims are advised of and assessed for potential U visa eligibility.**

---

[96] Stipulated Settlement Agreement, Flores v. Reno, No. 2:85-cv-04544 (C.D. Cal. Jan. 17, 1997). http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf. Both Dilley and Karnes sought to obtain child care licenses following Judge Gee's July 2015 decision, discussed *supra* note 9 and accompanying text. In April 2016, the Texas Department of Family and Protective Services (DFPS) approved a child care license for Karnes. *Judge Halts Child Care License for Dilley Detention Center*, TEXAS OBSERVER (June 2, 2016), https://www.texasobserver.org/immigrant-family-detention-license-hold/. Dilley also applied for a child care license but a state district judge temporarily enjoined the grant of that license in June 2016, pending additional litigation. *See Case Profile: Grassroots Leadership v. Texas Department of Family and Protective* Services, CIVIL RIGHTS LITIGATION CLEARINGHOUSE (Aug. 4, 2016). The child care license at Berks expired in February 2016 and was not renewed by the Pennsylvania Department of Family Services. American Immigration Council, *A Visit to Berks Family Detention Center Makes Clear Why They Lost their License* (Feb. 22, 2016), http://immigrationimpact.com/2016/02/22/berks-family-detention-center/. The County has appealed the decision and the case will be heard in November. Liz Robbins, *22 Migrant Women Held in Pennsylvania Start a Hunger Strike to Protest Detention*, N.Y. TIMES (Sept. 2, 2016), http://www.nytimes.com/2016/09/03/nyregion/22-migrant-women-held-in-pennsylvania-start-a-hunger-strike-to-protest-detention.html.

[97] 28 C.F.R. § 115.

584

## C. Accountability

Accountability encompasses the operating framework by which ICE provides oversight, ensures compliance with its standards of care and other benchmarks, commits to and pursues continuous improvement, and achieves transparency in the fulfillment of its executive duties. It is the keystone to the development and implementation of an appropriate response to families seeking to remain in the U.S.

### 1. Roles and Responsibilities of Government Actors

DHS and ICE are charged with the responsibility of immigration enforcement, which includes both the detention and community supervision of foreign-born migrants, including families. ICE may delegate many of its duties to other public or to private actors but it is always responsible for their acts and outcomes.

Like many others, the Committee has concerns about the processes by which ICE selects public and private sector actors, ascertains actor compliance, decides whether to retain and sanction or remove actors, and determines the costs for goods and services received. Typically, ICE foregoes the competitive bid process instead; it enters into contracts and executes MOUs under exigent circumstances or by emergency provisions. The terms and conditions to which ICE agrees are often unfavorable to both ICE and the families in its custody. For example, ICE has sometimes agreed to pay for beds whether or not they are occupied. ICE has sometimes accepted contractor personnel without conducting independent background investigations or reviewing credentials.

**Recommendation 2-23: To realize better outcomes at less cost, ICE should become more proactive and less reactive. ICE should engage in ongoing strategic planning, eliciting feedback from within the agency and input by its stakeholders, publishing a five-year strategic plan and updating it annually. The focus of this process should be on expanding the use of release and alternatives to detention, housing those families who are detained in group home settings near urban areas, and ensuring that contractors and their personnel are appropriately suited to the families in its custody.**

### 2. Roles and Responsibilities of Public and Private Sector Contractors

The FRCs' problems are longstanding and much-noted. There is a tendency to blame privatization as the source of longstanding FRC performance issues. This is not necessarily the case. Both public and private sector providers have performed poorly; and both the profit and not-for-profit sectors should do better. Nonetheless, ICE has delegated undue authority to its contractors, leading to unjustifiable variation and a lack of accountability across the FRCs, and an imbalance of power that sometimes allows contractors to dictate or unduly influence conditions of care, population management, and other practices. For example, the contractors that run the FRCs have made major modifications to the rules governing detainee conduct. There are 28 common rules in effect at all three FRCs, but Berks has added 64 additional rules; violation of any one of 34 of these rules can result in punishment of detainees. Similarly, the FRCs vary in their decision whether detainees may wear their own clothes and if not, whether they will be provided new or donated clothing, shoes, and undergarments, and how many of each article of clothes may kept in their possession.

**Recommendation 2-24: ICE should not delegate substantive decision-making to its contractors, since it is ICE that is ultimately responsible for the safety and well-being of those in its custody. Instead, ICE should raise FRC standards and then hold FRCs**

**accountable to them. The strategic planning process is a credible process by which to begin to accomplish this work but meaningful monitoring, oversight and accountability measures are also critical.**

**Recommendation 2-25: Reforms adopted by ICE at the beginning of the Obama Administration – in particular, adding on-site oversight and deploying Office of Detention Oversight teams to its largest facilities -- have not yielded optimal outcomes; they should be revisited and revised. Other proposals were not implemented, including creation of in-house expertise relating to the care and custody of families, to oversee reform. This should be pursued immediately and in earnest.**

### 3.   Transparency: Government's Core Commitment to Good Governance

As mentioned in other parts of this Report, a significant lack of information hindered the Committee's efforts to fulfill our tasking. It is unclear whether some of the information that was requested was not routinely collected and or retained by ICE or whether decisions were made to not provide it to the Committee. But either way, the type of administrative information sought from ICE is routinely provided to public bodies by state and local governments. Even basic information about the number and characteristics of the detained population was unavailable to the Committee. Examples of basic demographic information that the Committee requested but did not receive are (1) the number of mothers and fathers and children, by gender and age, in custody; (2) primary and secondary languages spoken; (3) the number of families released to the community; (4) the number of families separated from one another; and (5) families' actual total length of stay in ICE custody.

Similarly, the Committee was unable to obtain from ICE basic information about FRC operations and outcomes, including (1) each FRC's health care staffing and formulary; (2) the number of avoidable illnesses, injuries and/or deaths in detention year to date; (3) the number of children enrolled in school; (4) students' grade gains; and (5) the number of incidents of sexual misconduct reported. Likewise, the Committee could not obtain information about special populations and requests: (1) special diet requests, (2) accommodations for holy day observances, (3) scheduling off-site medical care, providing emergency off-site medical treatment, and arranging for corresponding child care; and (4) death and serious illness notifications.

A third category of basic information ICE declined to provide related to contract monitoring and oversight of contractors, including information about contract compliance, audits and evaluations, and possible corrective actions. Examples of information that the Committee requested but did not receive are (1) copies of the audit and evaluation instruments currently in use; (2) evidence of vendors' compliance with FRC minimum standards, (3) evidence of vendor's compliance with contractual or MOU commitments to ICE; and (4) corrective actions taken and consequences imposed by ICE for negative findings, failures to remediate negative findings, frequently reoccurring negative findings, including sanctions imposed including contracts and MOUs modified or cancelled. Also difficult to obtain was a clear, consistent description or mapping of the process of submitting, investigating or responding to a grievance or allegation of a rule violation or child or sexual abuse including how detainee and staff interviews are conducted. And finally, the Committee received no requested information about the ICE's expenditures. Examples of information that the Committee requested but did not receive are (1) copies of current contracts and MOUs for beds, community supervision program services, health care, education services, and

contract monitoring; (2) cost per bed day per facility and vendor; and (3) per diem cost per community supervision slot.

**Recommendation 2-26: ICE should manifest its commitment to detention reform by making the most of every opportunity to improve transparency and accountability. ICE should publish on the internet FRC policies and performance measures, and quarterly accountability reporting results. ICE should consider improving transparency and accountability by publishing its contracts and MOUs (suitably redacted if need be) and corresponding audits and evaluations.**

36

3.   ACCESS TO COUNSEL

Parents and children detained in FRCs face the highest of stakes: the loss of liberty; the right to
freely exercise the rights and responsibilities of parenting and being a member of a family;
separation from parents, children, siblings and spouses; and the risk of removal (deportation) to a
country where they may face violence or death. These stakes necessitate a fair and just decision-
making process: not just in regard to those decisions made by officials with the authority to order
removal, but any decision that may impact liberty, family integrity, and life.

The specific families the government has targeted for family detention since 2014 – their
communities of origin, the circumstances from which they are fleeing, and the composition of their
families – heightens the government's need and obligation to take special care to ensure due
process. The government has targeted families who do not speak English and who often speak a
language other than Spanish for which interpreters are limited (for example, languages indigenous
to Central America). Family members – both adults and children – are unfamiliar with our legal
system and may hold deep fear or suspicion of authority figures as a result of experiences in their
countries of origin, or countries of transit. Many of the families may have experienced traumatic
events – including violence and threats of violence – from which they have not had an opportunity
to recover. Children arriving with parents range in age from infants to teenagers, and have varying
abilities to communicate and express their wishes. Thus the government must work even harder to
ensure these families receive due process as they navigate an entirely new system in which their
liberty and family integrity are curtailed.

For these reasons, this Committee believes that full and unhindered access to an attorney is a
necessary, but insufficient, prerequisite to fair and just decision-making for every family held in
immigration detention. There is overwhelming evidence that individuals seeking the protection of
asylum and other forms of violence – protection from persecution as provided for in the
Immigration and Nationality Act (INA) – are significantly more successful when the individuals
are represented by counsel. Not surprisingly, attorneys representing mothers at DHS's Family
Residential Centers (FRCs) report high success rates when they represent women during their
initial interviews (whether they are credible fear or reasonable fear interviews) but also when they
represent women as they seek to overturn adverse, initial findings made when the women lacked
an attorney and appeared *pro se*. Yet access to counsel is much more difficult for people who are
detained.[98]

We therefore recommend, without reservation, that the federal government should provide an
attorney to every individual held in family detention. While this responsibility may be shared by
the Department of Justice (DOJ), rather than the Department of Homeland Security (DHS) which
tasked us with making recommendations regarding detainees' access to counsel, no agency can
ignore the consequences of the failure to ensure due process; if necessary, government agencies
should coordinate to meet this obligation. At the very least, the lack of counsel should never be a
basis for expediting a proceeding involving a claim for protection from harm. The Committee
further recommends that the most effective way in which to facilitate access to counsel for families
facing deportation is to release families to communities with clear information about their right to

---

[98] *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. PENN. L.
REV. 1 (2015) (finding that only 14% of detained immigrants have representation, as compared to 37% of all
immigrants in proceedings).

counsel and how to find counsel, and their obligation to appear in court and information about the court in the jurisdiction where they will reside.

The recommendations that follow attempt to address the current situation of families in detention and the current system of decision-making about custody, immigration relief, and ultimately, deportation for families apprehended and detained by DHS. These recommendations are not intended as a justification of that system, nor do we believe they will effectuate an amelioration of the problems inherent in this system. But we do believe they fulfill the specific tasking given to us by the Secretary of Homeland Security.

### A.  Overarching Recommendations

There is no dispute regarding the critical role of counsel in advocating for and protecting the rights of detained families. Detention standards promulgated by ICE affirm the right of detainees to meet and communicate confidentially with counsel. Both the Karnes and Dilley facilities in Texas have rooms where detainees can meet privately with counsel, though these spaces appeared to Committee members, and have been reported by nongovernment entities, as entirely insufficient for the number of detained individuals and the scope of legal issues to be addressed by families in detention. Moreover, those rooms appeared to lack the tools critical for representing detained families in expedited proceedings—from small, portable printers and scanners to access to phones and internet for attorney teams building factual records and legal arguments for families in expedited proceedings. Similarly, both the Karnes and Dilley facilities include spaces designated as law libraries. However, both were empty during Committee site visits and, as described below, were ill-equipped to be of much use for the families detained at each facility.

During Committee site visits to the FRCs, committee members were struck, above all, by two observations. First was the glaring absence of an understanding – in written policies, in practice, and among facility leadership and staff selected to give guided tours – of the essential role of attorneys in ensuring a fair and just process for detainees. Second was the inconsistent, widely varying, and constantly shifting policies regarding detainee access to counsel, which individually might be merely a headache, but collectively paralyze the ability of legal organizations to provide effective representation to detainees. This is critical not just for detainees who seek a fair opportunity for their claims to be heard, but also relieves pressure on and benefits the DHS and the Department of Justice because counsel who understand both the procedure and substance of the law governing detainees' claims make the process more fair and efficient.

Time and again, when we asked about access to counsel and whether detainees had the right to attorneys during particular processes or decisions, we were told "If the women think they need an attorney, all they have to do is ask for one." This is unreasonable to the point of being unjust. Detainees who do not get to make decisions as simple as where their child sleeps[99] are nevertheless expected to intuit that a decision such as whether to accept an ankle monitor as a condition of release could benefit from the advice of counsel and then ask their jailer to wait while they make a call or schedule an appointment to seek legal counsel. Rather than putting the burden on women – many of whom have no real understanding of their rights – to affirmatively ask for an

---

[99] For example, at the Berks facility, mothers are prohibited from sharing a room with any of their children age 12 or older. *See* Berks Resident Handbook 9-10.

attorney, facility personnel should consistently communicate that families have this right and should encourage them to exercise it whenever decisions affecting their rights are being made.

Moreover, we never once heard children referred to as decision-makers within their cases even though they are subject to the immigration detention and adjudication process; and not surprisingly, none of the materials designed to inform detainees of their rights – from posters in laundry rooms to materials in law libraries – were designed for children or adolescents, further diminishing the likelihood that they would know how to ask for help from an attorney. By contrast, unaccompanied children placed in the custody of the Office of Refugee Resettlement (ORR) receive "Know Your Rights" presentations tailored to the children's ages and stages of development, so that even fairly young children can understand that there are adults who are willing to meet to talk about their needs and wishes in a private matter. The children detained at ICE family residential centers have no less of a need than children in ORR custody to understand the circumstances of their detention, their right to seek protection in the United States and to request release from detention, and their right to speak with an attorney in confidence. Just like their parents, children in family detention face removal (deportation) to circumstances that may threaten their safety and well-being. And they may be eligible to apply for asylum, T- and U- non-immigrant status, special immigrant juvenile status or other forms of protection, in addition to any claims for relief made by their parents. They have no less need for opportunities to speak with an attorney to determine whether they have claims for relief from removal that are separate or different from their parents.

One deeply troubling result of this misconception of the necessary role of counsel is that there is simply no effective mechanism in place to direct every detainee to an attorney. At one facility, detainees receive a "Know Your Rights" presentation in which newly-arrived mothers and children are presented with information about immigration procedures and at least some of the complex forms of relief from removal for which they may be eligible (subjects many law students struggle to master in an entire semester).[100] Yet this occurs in a meeting in which the presenters cannot provide legal advice and where presentations must be approved in advance by ICE.[101] Detainees are then asked if they wish to speak with an attorney, without necessarily understanding what an attorney is, the confidential nature of attorney-client conversations, and the difference between government officials responsible for detaining them and deporting them, and independent

---

[100] To the best of the Committee's understanding, their presentations address the subject of asylum; but it is not clear whether they also address other immigration benefits such as T and U non-immigrant status, VAWA relief, or special immigrant juvenile status for children abused, neglected, or abandoned by a parent.

[101] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARDS 6.3, LEGAL RIGHTS GROUP PRESENTATIONS, https://www.ice.gov/doclib/dro/family-residential/pdf/rs-legal-rights-presentations.pdf, requires attorneys or legal organizations who wish to make group presentations to provide a syllabus or outline of the presentation to ICE, which may accept or reject the presentation and which "is under no obligation to seek a replacement provider" if the presentation is not approved. By contrast, children detained as unaccompanied minors in facilities run by the Office of Refugee Resettlement also receive a "Know Your Rights" presentation. In recent years, led by organizations such as South Texas Pro Bono Asylum Representation Project (ProBAR) in Harlingen, Texas, those presentations have evolved into "charlas" in which skilled members of attorney teams help children understand the most important information at that moment in time, the beginning of their period in custody – the right to an attorney, the confidentiality that attaches to attorney-client conversations, the difference between government and non-government actors – in language and with visuals developed for children who have experienced trauma and separation and which are built on well-established pedagogical principles.

590

attorneys who may be able to assist them in securing release from detention and possibly relief
from removal. The names of those parents who affirmatively request to meet with an attorney at a
later time are eventually forwarded to the legal services organizations that have mobilized to
provide counsel to these families – but that information-sharing may not take place until *after* a
parent has had her first and most critical interview by immigration authorities, the "credible fear"
or "reasonable fear" interview, which determines whether an individual may pursue a claim for
relief or will be removed.[102] At Berks, there are a handful of private attorneys and a few NGOs
who have stepped forward to try and identify and meet with detained families and either represent
or find representation for them; however, they are under-resourced and are unable to meet the high
demand. Furthermore, evidence suggests that periods of detention at Berks are far longer than the
average on other facilities[103] (our persistent requests for data on the average length of stay for
families at Berks and how those statistics are calculated were repeatedly denied) which may result
in a larger number of issues for attorney teams to address with clients.

The remote location of current FRCs further hampers access to counsel and due process. All of the
FRCs in use at the writing of these recommendations are over an hour's drive one-way from major,
metropolitan areas. This significantly hampers access to attorney teams, interpreters, physical and
mental health providers and other experts who could help to ensure fair and just process. In order
to visit the two Texas-based facilities, Committee members traveled nearly two hours (one way)
from San Antonio by van to the Dilley detention facility before returning to San Antonio and then
embarking on another trip (this time approximately 90 minutes each way) to the Karnes detention
facility. Attorneys in San Antonio, the nearest metropolitan area, must make similar journeys in
order to meet with clients, as must *pro bono* attorneys who periodically fly in from other parts of
the country to provide representation to detained families.

Although United States Citizenship and Immigration Services (USCIS) officers have been detailed
to the two Texas facilities to provide on-site credible fear and reasonable fear interviews, there are
no on-site immigration courts, and detainees who appear before immigration judges during their
stay do so via videoconference – a procedure whose limitations and impact on due process have

---

[102] Previous reports indicate that representation by counsel during expedited immigration proceedings has a significant
impact on an individual's likelihood of success in the preliminary interview (which determines whether the individual
may proceed with her claim for protection). *See* American Immigration Council, Immigration Policy Center, *Removal
without Recourse: The Growth of Summary Deportations from the United States* (May 2014),
https://www.americanimmigrationcouncil.org/research/removal-without-recourse-growth-summary-deportations-
united-states. Attorneys working at Karnes and Dilley report similar success in reversing negative determinations
made while detainees appeared *pro se* (without counsel). that when they are able to work with detainees whose initial
claims were denied in a credible fear or reasonable fear interview in which the detainees appeared *pro se* (without
counsel). In other words, when women and children have the benefit of an attorney who understands which parts of
their stories are relevant to the decisions the government is making, they are more successful than when they need to
figure this all out on their own. Facilitating representation prior to the credible fear interview would likely alleviate the
need for a significant number of appeals and therefore conserve a significant amount of government resources
(including the staff who must review and adjudicate the appeal, as well as the additional expense of detaining families
while they successfully appeal an erroneous, initial decision.)
[103] *See, e.g.,* Human Rights First, *Long-Term Detention of Mothers and Children in Pennsylvania* (2016),
http://www.humanrightsfirst.org/sites/default/files/HRF-Long-Term-Detention-Brief.pdf (indicating periods of
detention "upwards of six months" for most families at the time of a July 2016 visit).

been detailed in prior reports.[104] Notably, at the time of our visit to Dilley and Karnes, detainees scheduled for hearings before immigration judges (which take place after on-site interviews to screen for a "credible fear" of return or a "reasonable fear" of return) appeared by video-conference before immigration judges located in other cities. For hearings, the detainee appears in a "courtroom" at the facility – but the Immigration Judge and the attorney representing the government and pursuing the case against the detainee, were located together in another immigration courtroom in another city. The Berks facility is located over an hour from Philadelphia and from its immigration court, legal services providers, and community of *pro bono* attorneys.

**Recommendation 3-1: DHS should develop, implement and train staff to operate on the principle that it is best – for detainees and for the efficiency of the system as a whole – for detainees to consult with an attorney before making any significant decisions about their case, the conditions of custody, or the conditions of release from custody. Staff should consistently inform detainees of their right to speak with counsel and provide access to counsel whenever detainees invoke that right. Rather than waiting for detainees to affirmatively request an opportunity to speak with an attorney, detainees should be offered affirmatively the opportunity to consult with an attorney (in person, over the phone or by video conferencing) before making any decisions about their case, conditions of custody, or conditions of release. ICE staff and USCIS asylum officers should be directed not simply to ask detainees whether they want an attorney or whether they think they need one, when detainees might not know how an attorney could help, and may not be aware that an attorney will maintain confidentiality, or that the attorney may provide free services. DHS and USCIS should also inform detainees of their right to representation, and what that representation entails, and that counsel (independent from the government) are on-site and available to meet with them prior to any government interviews.**

**Recommendation 3-2: Before any detainee appears for a credible fear interview, reasonable fear interview or bond hearing, DHS should confirm that the detainee has received a "Know Your Rights" or "Legal Orientation Presentation" and has had an opportunity to meet with an attorney. If the detainee has not secured counsel she should be provided an opportunity to do so unless she affirmatively states a preference to proceed without counsel. In all cases in which the desire for counsel has been expressed, DHS should take all possible steps to ensure that the individual has an attorney without undo delay, before proceeding with /any decisions that could result in removal.**

**Recommendation 3-3: Legal services organizations and other attorney groups (authorized in advance by DHS or DOJ) who provide pro bono counseling and representation to detainees should be given a daily census of all detainees with information that protects individuals' privacy but allows attorneys to prioritize cases for pro bono consultation. The census should include the age and gender of the adult family member, date of arrival, country of origin, the ages and number of children detained with the parent, primary (or preferred) language and, importantly, the date(s) of credible or reasonable fear interviews or any other scheduled**

---

[104] *See, e.g.*, Legal Assistance Foundation of Chicago and Chicago Appleseed Fund for Justice, V*ideoconferencing in Removal Proceedings: A Case Study of the Chicago Immigration Court* (Aug. 2, 2005), http://chicagoappleseed.org/wp-content/uploads/2012/08/videoconfreport_080205.pdf.

592

hearing for any member of the family—and a numerical indicator that will allow DHS to notify the detainee if the attorney or legal services organization wishes to schedule a meeting. DHS can establish procedures to limit the number of attorney groups and legal services organizations who receive this information, protect confidential information, and require the legal services organizations and attorney groups to prevent further disclosure.

**Recommendation 3-4:** Detention facilities should not be located more than 30 minutes from major metropolitan areas with immigration courts to increase access to counsel (NGO counsel, pro bono counsel, paid counsel) and should be designed to ensure in-person appearances before immigration judges, USCIS officials and other government officials, which will result in more just and efficient adjudication of cases.[105]

**Recommendation 3-5:** DHS should ensure that children who wish to speak with an attorney, or whose parents wish for them to speak with an attorney, know about their right to access counsel and have the ability to meet with counsel. This would require DHS to contract with legal services providers with experience representing and working with children to create and provide developmentally appropriate "Know Your Rights" presentations; and to provide time and child-appropriate space for attorneys to meet privately with children.

**Recommendation 3-6:** In order to ensure that families—parents and children—have a fair opportunity to present claims for relief as they transition into communities, enroll children in school, seek help for medical and mental health concerns and obtain other services, ICE's Office of Chief Counsel (responsible for representing the government in removal proceedings) should not:

a) oppose requests for continuances submitted by counsel for families previously detained in FRCs, given the challenges of preparing their legal case;

b) seek *in absentia* removal orders the first time a family previously detained in an FRC fails to appear at immigration court, but instead asks that the court reschedule/reset and send notice to the last known address; and

c) oppose motions to reopen filed by post-release families, whether represented or *pro se*, when they do appear in court after a prior *in absentia* removal order.

### B.  Meeting and Communicating with Counsel

On site visits to Karnes and Dilley, Committee members were informed by ICE and facility staff that detainees could meet with counsel whenever they wished to. Yet on those same visits, mothers identified a number of hurdles that delayed or prevented their ability to meet with counsel, including not knowing or not understanding that non-government attorneys were available to meet with them at no cost; not being able to access child care during meetings; and not knowing whether or when they could meet with counsel. Some of those concerns were echoed during the public comment period of the Committee's March meeting in San Antonio. Reports published by credible

---

[105] Committee members have been told both by immigration judges and asylum officers that they prefer to adjudicate cases in which individual is represented.

non-governmental organizations detail similar, and sometimes more wide-ranging concerns with the ability of detained families to meet with attorney organizations.[106]

The logistical obstacles to meeting with counsel are unnecessary and easily overcome. These obstacles, imposed by ICE policy or practice, include but are not limited to: requiring attorneys to identify, in advance of meetings, prospective clients with whom they wish to meet (without, as noted in the prior section, knowing which new detainees have yet to meet with counsel); requiring attorneys to identify, in advance of meetings, current clients with whom they wish to meet without knowing whether clients' circumstances have changed such that they might prioritize visits differently; insufficient space for attorneys to meet privately with clients; the inability of attorneys to complete the essential tasks of lawyering due to constantly-shifting policies regarding technology, entry/exit, and even things as simple as access to printers, phones, food and bathrooms; and insufficient efforts to provide adequate and appropriate child care so that mothers can share details about past, traumatic experiences without worrying about where their children are or what they might witness or overhear.

The spaces allotted for attorney-client meetings are far from optimal and may even be prejudicial to ensuring effective communication and collaboration between attorneys and detainees. At Dilley, parents who wish to meet privately with an attorney cannot see the area in which their children are cared for (on our site visit Committee members observed rows of children sitting in a small room and staring silently at a TV while a facility worker sat along a back wall). At Karnes, children whose parents are meeting with counsel but who wish to be in the same area appear to wait in a large, open and sterile area.

At Berks, detainees are able to meet with a law student or paralegal who forwards requests for legal assistance to the Pennsylvania Immigration Resource Center (PIRC) and the local immigration bar. PIRC attorneys and other counsel meet with clients in a small office on the first floor of the facility. The office has a window to a waiting area where children can be observed by the client, but the area is not equipped with anything to divert a child's attention from his or her mother's meeting with the attorney (*e.g.*, no toys, television, or reading materials). There is a telephone in the office, but there do not appear to be any legal materials available in this area, nor a printer for producing any legal documents.

Tasked by the Secretary of Homeland Security to advise the department on "existing resources and tools" that affect access to counsel, the recommendations that follow address these concerns. They should apply equally to attorneys considering whether to represent detainees in any type of matter; to attorneys retained by detainees (for a fee or on a pro bono basis) to represent them in immigration or other proceedings in the U.S. or abroad (including but not limited to custody cases, other family law cases involving their children, tort actions, or civil rights claims); and to any support staff authorized by such an attorney to carry out the attorney's work – including, but not limited to, BIA-accredited representatives, paralegals, law students, interpreters, subject matter,

---

[106] *See, e.g.*, American Bar Association Commission on Immigration, *Family Immigration Detention: Why the Past Cannot be Prologue* (July 31, 2015),
https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/FINAL%20ABA%20Family
%20Detention%20Report%208-19-15.authcheckdam.pdf. *See also* U.S. Commission on Civil Rights, *With Liberty and Justice for All: The State of Civil Rights at Immigration Detention Facilities* (Sept. 2015),
http://www.usccr.gov/pubs/Statutory_Enforcement_Report2015.pdf.

594

medical or mental health experts, and administrative support staff of the attorney or law firm. We refer to these individuals in the collective, as "attorney teams."

Finally, but no less importantly, when we refer to detainees and their right to meet with counsel, we are referring to all adult family members detained in the facility; any child whose parent or legal guardian wishes for the child to meet independently with an attorney; and any child of any age who expresses a wish to meet with an attorney.

1. **Meeting with Counsel**

**Recommendation 3-7: Detention facilities should allow attorney teams (attorneys and supporting professionals including law students, paralegals, interpreters and experts) maximum access and flexibility in meeting and speaking with detained persons and advising or representing them in proceedings that take place while the person is detained.**

**Recommendation 3-8: Visitation policies at each facility – including but not limited to visiting hours, technology permitted in counsel visitation rooms, and child care provided during attorney-client meetings – should remain consistent. Frequent changes undermine counseling and representation and may deny notice to attorneys and their support staff and to the detainees and their families for timely attorney-client meetings to take place. Signs and posters to this effect, in different languages, should be posted in housing units, cafeterias, recreational areas, and law libraries.**

**Recommendation 3-9: FRC handbooks, manuals and policies should be amended to clearly state that detainees – including the children of parents detained at the facility – have the right to meet with an attorney at any time the attorney is available within facility visiting hours, and to contact their attorney by telephone at any time; detainees should not be precluded from meeting with or calling an attorney because they failed to make an advance request.[107]**

**Recommendation 3-10: Legal services organizations should not be required to identify particular detainees with whom they desire to meet before arriving at the facility, in order to provide free legal consultations and/or legal representation. Specifically, they should be able to establish "drop in" hours or meet with prospective or retained clients on an as-needed basis and detainees should be able to request a same-day meeting with a member of an attorney team and should be informed and encouraged to seek legal advice as available.**

**Recommendation 3-11: ICE should use available technology (such as pagers) to allow detainees who wish to meet with an attorney to sign up and then continue with their daily activities until an attorney is available.**

This would not obligate attorney organizations to meet with everyone who makes such a request; attorney teams will exercise their discretion to prioritize appointments. But there is no need for detainees to have to wait for hours in a room and miss other activities (including meals); with a

---

[107] The Berks Resident Handbook says only "You have the right to pursue legal assistance at no cost to the U.S. government." The Resident "Rights and Responsibilities" section doesn't say anything else about counsel, and the section on visitation don't mention attorneys. Berks Resident Handbook 6–7.

pager or other similar technology they could be notified immediately when an attorney is available to meet with them.

**Recommendation 3-12: Detainees should be able to prioritize meetings with counsel over nearly all other "activities" while in custody. Detainees should never be discouraged from meeting with counsel or members of the legal team (including experts) because they might miss a planned activity, meal or (for children) even school, or because the meetings increase demands on child care providers within the facility.**

## 2. Care of Children During Attorney-Client Meetings

**Recommendation 3-13: ICE should design spaces for counsel to meet with parents from which parents can see their children in an open, shared play space (rather than closed-off or separate rooms where children have only enough space to watch TV) so that they can focus on communicating with their attorneys knowing exactly where their children are.**

**Recommendation 3-14: Child care hours should be extended to match hours when parents can meet with attorney teams, for parents who wish to use child care during this time. ICE should provide sufficient day care space and staffing to allow all parents who wish to meet with counsel outside the presence of their children to do so.**

## 3. Location of Attorney-Client Meetings

**Recommendation 3-15: ICE should immediately re-design or re-organize space within each FRC to increase and ensure sufficient private, sound-proof spaces for detainees to meet with attorney teams, both in small groups and individually. Detainees need to meet with counsel prior to and in preparation for each proceeding or interview at which the detainee is scheduled to appear related to the detainee's immigration case or any other proceeding in which the detainee is involved. Reorganization of space should be undertaken in consultation with attorney teams and considering data including the number of detainees in the facility, the average length of stay, the number of interviews or proceedings per detainee (each of which requires different consultation with counsel). Committee members requested much of this data but were denied the information.**

## 4. Ensuring Attorney Teams Can Function in their Role as Counsel

**Recommendation 3-16: Facilities should establish clear, consistent policies permitting attorney teams to bring food and drink into the facility and/or (if they choose) to leave the facility for meals and return later in the day. Attorneys and detainees should be able to eat and drink during meetings, and to use the bathrooms as needed during meetings, without having to terminate meetings.**

**Recommendation 3-17: Attorney teams should be permitted to bring and easily access cell phones, laptops, printers, scanners and wireless internet connections in designated spaces while meeting with detainees. This technology should be available in the same space in which attorneys are meeting with detainees.**

**Recommendation 3-18: ICE should develop a simple form by which detainees in any facility can request copies of any document from their file including documents the individuals had**

45

with them at the time of apprehension,[108] unless the record requires a Health Insurance Portability and Accountability Act (HIPAA)-compliant release, and which permits release of the document to both the detainee and the detainee's attorney team. This form should be consistent across facilities and be translated consistent with the recommendations in Part 5.

Recommendation 3-19: ICE should make available a HIPAA-compliant release form that detainees could sign while in the facility and should implement procedures that ensure that information covered by HIPAA is released by the FRC to the person designated by the detainee (including members of their legal team) within one business day after receipt of a the HIPAA-complaint release, unless the individual indicates a more immediate need for the information (such as a hearing). Providing counsel access to medical, dental, and mental health records is part of a trauma-informed approach. The information can both strengthen the legal cases and also provide background essential to counsel's ability to offer trauma-informed representation to the trauma victim.[109]

### C.  Counsel's Role in Decisions Critical to Detainees' Safety and Right to Due Process

Notwithstanding policies that anticipate meetings between detainees and counsel and that recognize the role of counsel in protecting detainees' rights,[110] attorneys serving detainees report systematic and fundamental breaches in access to counsel with respect to the movement of detainees from one facility to another, and with respect to their removal (deportation) during the pendency of proceedings.[111] Those same standards acknowledge the right of detainees to be represented by, or even accompanied by counsel as early as their first interview; yet it appears that many if not most of those interviews take place before detainees are advised of their rights or have the opportunity to meet with counsel. In 2015, attorneys representing detainees in Karnes and Dilley filed a complaint with the Department's Office for Civil Rights and Liberties alleging that detainees were denied access to counsel during meetings that determined the conditions of release.[112] In some cases, free legal services providers received notice of hearings within hours of the actual hearing, precluding both in-person meetings with clients and anything that might be

---

[108] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARD 2.3, FUNDS AND PERSONAL PROPERTY, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_funds_and_personal_property.pdf (requiring that funds, valuables, baggage, and personal inventory be inventoried, receipted, stored, and safeguarded).

[109] See KRISZTINA SZABO ET AL., ADVOCATE'S AND ATTORNEY'S TOOL FOR DEVELOPING A SURVIVORS STORY: TRAUMA INFORMED APPROACH (2013), http://niwaplibrary.wcl.american.edu/pubs/tool-trauma-informed-approach/http://library niwap.org/wp-content/uploads/2015/pdf/TRAUM-Qref-AdvocatesToolDevelopingSurvivorStory.pdf; MARY ANN DUTTON ET AL., TRAUMA INFORMED STRUCTURED INTERVIEW QUESTIONNAIRE (2013), http://library niwap.org/wp-content/uploads/2015/SIQI.edited.di-tb-6.15.15.pdf.

[110] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARD 6.2, LAW LIBRARIES AND LEGAL MATERIAL 1, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_law_libraries_and_legal_material.pdf.

[111] See, e.g., AILA CLINIC, AIC, Human Rights First and RAICES, Letter to Director León Rodriguez and Director Sarah Saldaña 10-14 (Dec. 24, 2015) [hereinafter AILA et al. letter] (documenting specific cases in which ICE deported families with pending requests for reconsideration of negative credible fear determinations and transferred families with counsel from a facility in Texas to a facility in Berks without representation).

[112] Complaint Regarding Coercion and Violations of Right to Counsel at the South Texas Family Residential Center in Dilley, Texas (Sept. 30, 2015), http://www.aila.org/File/DownloadEmbeddedFile/65906.

597

considered adequate preparation time.[113] This undermines due process and is inconsistent with the stated intent of ICE policy to provide access to counsel.

**Recommendation 3-20: DHS policy and facility design should allow attorneys to be present with detainees during interviews with asylum officers or any other immigration officials and any disciplinary hearing or action regarding the detainee or the detainee's child.**

**Recommendation 3-21: ICE should never move a detainee from one ICE detention facility to another without providing notice to the detainee and her counsel, and without providing an opportunity for the detainee's counsel to respond to proposed relocation.**

**Recommendation 3-22: Detainees presented with a release alternative or conditions of release should be informed that they can consult with an attorney while making decisions, and given phone access to attorneys during this process. A detainee's decision to consult with an attorney should not delay her release more than the time such consultation takes.**

**Recommendation 3-23: ICE should never deport a detainee while the detainee's case is in progress – in particular, but not limited to, if a detainee has filed a request for reconsideration of a claim, or has any pending petition for review before a federal court, or any pending VAWA, T or U visa case. If a detainee has a pending civil rights complaint, the office investigating that complaint should have a full opportunity to interview the detainee and, if it so chooses, to delay deportation.**

### D.  Counsel's Role in Decisions to Separate Children from Parents

Detainees who met Committee members expressed tremendous confusion and uncertainty about their future; fear of return to their countries; anxiety over the health and well-being of their children; and in some cases, fear of separation from their children. These concerns are not unfounded. In the professional experience of multiple Committee members, in recent years children held in detention at Berks and at least one of the Texas FRCs have been separated from mothers, designated as unaccompanied children, and transferred to ORR facilities in other states. Without transparent processes and an opportunity for counsel to advocate for families prior to separation in DHS custody, there is a risk that separation will violate the parent's constitutional right to the care and custody of her child or result in separations that are contrary to the child's best interests. The Department has previously declared its interest in protecting the constitutional rights of children and parents facing separation as a result of immigration proceedings with its Parental Interests Directive, issued by the Department in 2013, to ensure the participation of detained parents' in child welfare proceedings involving their children.[114]

**Recommendation 3-24: ICE should never separate a parent from a child without providing notice to the parent, the child, and the parent's and the child's counsel (absent extreme emergencies), and an opportunity for the parent, child, the parent's counsel and the child's**

---

[113] *See*, *e.g.*, AILA et al. letter, supra note 111, at 2 (noting that at Dilley, *pro bono* attorneys receive court dockets in the late afternoon for hearings the next morning, while at Karnes *pro bono* attorneys do not receive the immigration court docket at all).

[114] U.S. Immigration and Customs Enforcement, Facilitating Parental Interests in the Course of Civil Immigration 1, 2 (Directive 11064.1Aug. 23, 2013), https://www.ice.gov/doclib/detention-reform/pdf/parental_interest_directive_signed.pdf.

counsel to appear before and make arguments to the ICE official making the decision. If the basis for the separation is a concern about the detained parent's failure to care for, or maltreatment of, the child, the matter should be referred to local child welfare authorities for investigation before the parent and child are separated (absent an imminent threat to the child's safety or well-being, which should result in the child's separation from the parent but remaining within the facility). Referral to the local child welfare authorities and a review of the decision to separate and reunification if appropriate pending further investigation should occur within the time required under state law for reports and investigations of child abuse or neglect. This will help ensure that the right afforded all parents to the care and custody of their child, regardless of immigration status, are protected.[115]

**Recommendation 3-25:** Threats of or actual separation of a parent and child should never be used as punishment or retaliation for exercising rights, nor as a means of discouraging the exercise of rights.

**Recommendation 3-26:** If ICE intends to separate a parent and child because of concerns regarding the legal relationship between the parent and child, and renders the child an unaccompanied minor pursuant to 6 U.S.C. § 1279(g), ICE should provide meaningful notice (at least 48 hours) to the parent, child and parent's and child's counsel and an opportunity for the parent, child, the parent's counsel and the child's counsel to appear before and make arguments to the ICE official making the decision, prior to transferring the child to the Office of Refugee Resettlement (ORR) custody.[116]

**Recommendation 3-27:** In exceptional cases in which DHS separates a parent and child, renders the child unaccompanied, and transfers the child to the custody of the Office of Refugee Resettlement, the agency should submit a concurrent referral for the appointment of an independent Child Advocate pursuant to the Trafficking Victims Protection Reauthorization Act (TVPRA).

### E.  Meaningful Access to a Law Library

ICE Residential Standards and implementing policies at each facility establish detainees' right to access legal materials to "facilitate the preparation of documents."[117] Yet the Texas facilities visited by Committee members failed to reflect either the needs or (suspected) demographics of the population detained in each facility – libraries presumed a high degree of literacy, of computer literacy, experience with computerized databases, and fluency in written English. Moreover, at both Karnes and Dilley, law libraries were located in areas inaccessible to attorneys and legal teams, precluding any collaboration between attorney teams and detainees to make better use of these libraries and their equipment.

---

[115] Under the U.S. Constitution immigrant parents have the same rights to care, custody, and control over their children without regard to their documented or undocumented status or their detention or deportation. *See, e.g.*, In re Interest of Angelica L., 277 Neb. 984, 1007, 1009-1010 (2009) (there is an "[o]verriding presumption that the relationship between parent and child is constitutionally protected and that the best interests of a child are served by reuniting the child with his or her parent. This presumption is overcome only when the parent has been proven unfit").

[116] Pursuant to federal law, ICE has 72 hours to transfer unaccompanied minors to the Office of Refugee Resettlement (ORR). 8 U.S.C. § 1232(b)(3).

[117] FAMILY RESIDENTIAL STANDARD: LAW LIBRARIES AND LEGAL MATERIAL, *supra* note 110, at 1.

Two of the three facilities visited by Committee members – Karnes and Dilley – had areas designated as "law libraries." At Karnes, the law library consisted of two rooms adjacent to the main library. They contained tables, and chairs, computers, and some printed information. We were advised that detainees are able to get onto computers (in the law library and main library) to access email accounts and news sites. To the best of Committee members' recollection there were no hard copy books in the Karnes "law library" except for a binder with "Know Your Rights" information authored by the American Bar Association and reproduced in several languages. Committee members were told by facility staff that detainees could use an electronic law library (specifically LexisNexis); that service is available only in English. The law library at Dilley included printed materials in a central room, with a computer room to each side. The Dilley library also included copies of the American Bar Association's "Know Your Rights" document – notably, there was no copy available in Spanish, although copies were available in other languages.

**Recommendation 3-28: Detainees should be informed of the law library and the legal resources available for assistance in their asylum applications during the intake process and throughout their time in detention. Posters or other easily-observed notices informing residence of the law library should be posted in common areas throughout the facility, including near monitors showing the Know Your Rights video. Such notices should include the following:**

   a) **that a law library is available;**
   b) **the hours of the law library;**
   c) **that no permission is needed to access the law library;**
   d) **that the law library has the legal materials listed below;**
   e) **the procedure for requesting materials not available in the law library;**
   f) **that the law library has the equipment (e.g., computers) listed below;**
   g) **that materials reviewed or prepared by detainees will not be read by facility staff; and**
   h) **that the detainee may be accompanied by counsel in the law library.**

**Recommendation 3-29: FRC law libraries should be open 7 days per week, from 8 am to 8 pm. Detainees' use of the law library should not be restricted by time (i.e., length of usage), unless crowded conditions require restricting access. Detainees' use of the law library should not be restricted or denied due to any violation of facility rules, by adult residents or children, nor by medical condition, unless required by a compelling medical concern. Detainees facing a legal deadline should have priority in accessing the law library. Supervision of detainees using the law library should not include reading any of their materials.**

**Recommendation 3-30: All FRC law libraries should be supplied with materials necessary for effective education, research and advocacy by detainees, including:**

   a) **pamphlets or similarly portable hard-copy publications providing basic legal information about the asylum process, and other related forms of relief, such as withholding and protection under the Convention against Torture under United States law in Spanish and other languages used by facility detainees;**
   b) **all of the materials listed in Attachment A to the *Karnes City Residential Policy and Procedure Manual, Part 6: Justice*; and**

49

    c)  **contact information for pro bono asylum/immigration services in the locality or region where the detainee indicates she will reside after release.**

**Lost or damaged legal materials should be replaced as soon as practicable.**

**Recommendation 3-31: All FRC law libraries should include the following equipment:**

    a)  **access to electronic legal research products (e.g., Westlaw or LexisNexis);**
    b)  **computers**
    c)  **printers;**
    d)  **copier(s);**
    e)  **scanner(s);**
    f)  **writing utensils (pens, pencils); and**
    g)  **paper.**

**This equipment should not be restricted to legal research and work product, but should be allowed to be used to prepare or copy grievances, letters regarding facility conditions, or any matter relating to immigration, asylum and other forms of relief, release or the care and custody of children. Upon request, detainees should be provided with a means of saving legal research and/or work product in a convenient electronic format (e.g., thumb drive or flash drive).**

**Recommendation 3-32: Detainees should be allowed to email documents, including scanned and original documents. Indigent detainees should be provided with free envelopes and stamps for mail relating to legal matters, including correspondence with counsel (or in search of counsel), and any court.**

**Recommendation 3-33: ICE should designate a staff member or members to regularly to inspect each FRC law library equipment and legal materials. Legal materials should be regularly updated; staff should check to determine whether updates are available no less than annually.**

**Recommendation 3-34: FRC law libraries should be available to pro bono counsel, to facilitate provision of legal services to detainees without requiring unnecessary repeat visits. The use of an FRC law library should be sufficient justification for her a detainee to request and receive monitored, short-term care for her children.**

**Recommendation 3-35: FRC libraries should prominently display and provide, in English and Spanish, copies of the USCIS-produced brochure on VAWA, T and U visa and SIJS immigration relief.[118] Detainees who are illiterate or whose primary language is one other than a language in which the brochures are translated should be able to receive information about these forms of crime victims related immigration relief though interpretation into their primary language.**

---

[118] U.S. Citizenship and Immigration Services, *Immigrant Options for Victims of Crimes, Information for Law Enforcement, Healthcare Providers, and Others* (Feb. 2010), https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Battered%20Spouse,%20Children%20&%20Parents/Immigration%20Options%20for%20Victims%20of%20Crimes.pdf.

**Recommendation 3-36: ICE and the FRCs should accept published or unpublished legal materials from outside persons or organizations for inclusion in each FRC law library and/or distribution to detainees. Any such materials should identify on the cover: (1) the identity of the author; (2) a statement that ICE did not prepare and is not responsible for the content of the publication; and (3) the date of submission to the facility. The facility should forward the material to ICE for review and approval. If approval is declined, the author or person/entity responsible for its submission should be informed of the reason(s) for its being declined.**

### F.  Access to Information Specific to Crime and Trauma Victims

Many parents and children detained in FRCs may qualify for other forms of crime-victim based immigration relief.[119]

Specifically, VAWA relief, T non-immigrant status ("T visas"), U non-immigrant status ("U visas") and special immigrant juvenile status (SIJS) are immigration benefits for which detainees and/or their children may be eligible to apply. Despite the high rates of past violence and traumatic experiences among detainees at FRCs, it is not clear the extent to which detained families receive information about the primary forms of immigration relief available to crime victims in the U.S. To the extent any of this information is provided it might be included in Legal Orientation Program presentations and it may be explained as an option by attorneys or attorney teams who provide legal representation for detainees at the FRCs. Access to information about immigration benefits for crime victims will help detainees to determine whether to pursue these benefits after establishing their credible or reasonable fear. Existing literature produced or distributed by the

---

[119] The primary forms of crime-victim based immigration relief that FRC detainees may qualify for are:

- VAWA immigration relief (self-petitioning, VAWA cancellation of removal, VAWA suspension of deportation) for immigrant spouses and children who have suffered battering or extreme cruelty perpetrated by their U.S. citizen or lawful permanent resident spouse, parent or step-parent. It is not uncommon for immigrant spouses and children of U.S. citizen and lawful permanent resident abusers to end up outside of the U.S. often for reasons related to the abuse.
- U non-immigrant status ("U visas") for immigrant victims of certain crimes perpetrated in the United States. The vast majority of U visa cases filed in the United States are filed by victims of domestic violence, sexual assault and human trafficking. Any detained parent or child who suffered abuse, trafficking or sexual assault in the United States would qualify for a U visa upon certification from a law enforcement agency. This includes victimization occurring in and outside of DHS custody.
- T non-immigrant status ("T visas") for victims of human trafficking. Human traffickers have networks that operate inside the U.S. and abroad and prey on both adults and children. Detained mothers and children could include human trafficking victims eligible to file for T visas. Law enforcement officials may also request that the ICE Law Enforcement Parole Branch grant continued presence for victims of human trafficking who are potential witnesses in trafficking investigations or prosecutions. Continued presence provides temporary immigration status and work authorization for one year (with the possibility of one-year renewals). for T visas and/or continued presence.
- Special Immigrant Juvenile Status (SIJS) for immigrant children who have been abused, abandoned or neglected either in the U.S. or abroad by one of their parents. Children in family detention may have suffered abuse, sexual assault, neglect or abandonment perpetrated by their father. In these cases, the child would independently qualify for SIJS immigration relief in addition to qualifying to be included in their parent's petition for an immigration benefit.

federal government should help ensure that this information is readily available to detainees and their families, while in custody and upon their release.[120]

ICE must ensure that the FRCs, as well as the organizations running the legal orientation programs at each FRC, are providing information to detainees on VAWA, T and U visa, special immigrant juvenile visas, and other forms of immigration relief in addition to information about asylum, withholding, and CAT protection. The best way for detainees to learn about and understand their rights and options is through participating in information sessions and, most importantly, leaving FRCs with hard copies of brochures and/or pamphlets detailing their rights and immigration options in a language they understand well.

**Recommendation 3-37: FRCs should organize and offer informational group sessions that explicitly provide information about domestic violence, sexual assault, and human trafficking and should provide information about VAWA self-petitioning, VAWA cancellation of removal, U visa and T visa immigration relief, and SIJS immigration relief. Ensuring delivery of this service should be among the responsibilities of the Trauma Informed Care Coordinator working at each FRC.**

**Recommendation 3-38: FRCs should provide each detained family with a copy of the following USCIS brochures, which should be distributed at legal orientation programs, by Trauma Informed Care Coordinators, and again to each detainee upon release from detention:**

    a) **"Immigration Options for Victims of Crimes" at intake and upon release. The brochure should be provided in the detainee's primary language.**

    b) **Pamphlet for K-1, K-3, IR-1/CR-1, and F2A Immigrant Visa Applicants under the International Marriage Broker Regulation Act (IMBRA). This pamphlet is available in various languages on the State Department website.[121] The IMBRA pamphlet should be readily available at all FRCs and distributed to detainees.**

---

[120] ICE's Performance Based National Detention Standards 2011 require use of the ICE custody classification worksheet that screens for special vulnerabilities that include victims of sexual abuse, violent crime, human trafficking, persecution, or torture. U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, 2011 OPERATIONS MANUAL ICE PERFORMANCE-BASED NATIONAL DETENTION STANDARDS (2012), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011.pdf [hereinafter PBNDS 2011], at Appendix 2.2A, 78. Many of these factors could be a basis for immigration relief under the VAWA, U or T visa programs. Additionally, USCIS has developed a pamphlet entitled "Immigration Options for Victims of Crimes" that provides an overview of VAWA, T and U visa immigration relief for immigrant crime victims. U.S. CITIZENSHIP AND IMMIGRATION SERVICES, RESOURCES FOR VICTIMS OF HUMAN & OTHER CRIMES, https://www.uscis.gov/tools/humanitarian-benefits-based-resources/resources-victims-human-trafficking-other-crimes (for resources available in English, Spanish, Russian, Chinese). USCIS has also developed an informational fact sheet for child welfare workers that could be used to inform detainees and their children about SIJS. USCIS, Special Immigrant Juvenile Status: Information for Child Welfare Workers available at http://niwaplibrary.wcl.american.edu/pubs/uscis-sijs-info-for-childwelfareworkers/. Finally, the U.S. Department of State has developed a brochure entitled "Information on the Legal Rights Available to Immigrant Victims of Domestic Violence in the United States and Facts About Immigrating on a Marriage Based Visa" that provides information on domestic violence, hotlines, and human trafficking. U.S. DEP'T OF STATE – BUREAU OF CONSULAR AFFAIRS, RIGHTS AND PROTECTIONS FOR FOREIGN-CITIZEN FIANCÉ(E)S AND SPOUSES OF U.S. CITIZENS AND SPOUSES OF LAWFUL PERMANENT RESIDENTS, https://travel.state.gov/content/visas/en/general/IMBRA.html (available in: Arabic, Chinese, Spanish, English, Farsi/Dari, French, German, Hindi, Japanese, Korean, Polish, Portuguese, Romanian, Russian, Tagalog, Thai, Ukrainian, Uzbek, Vietnamese).

[121] *Id.*

c) **"Special Immigrant Juvenile Status: Information for Child Welfare Workers" should be translated into Spanish and should be provided at intake and upon release to all FRC detainees.**

## 4.   EDUCATION SERVICES AND PROGRAMS

The ACFRC was appointed to develop recommendations to strengthen the education services and programs provided to families detained in Family Residential Centers (FRCs). It is our opinion that, to fulfill our mandate, education services and programs should span infant and toddler child care, pre-kindergarten for children age 4, the conventional K-12 grades for all children ages 5-18, as well as parent education to support parents under tremendous stress related to their immigration journey, detention experience, and transition to new lives in U.S. communities.

The practice of detaining migrating families has presented FRCs with an unfamiliar challenge of providing an education for children apprehended with their parents. Under federal law, all children in the U.S. are entitled to a free basic public elementary and secondary education regardless of race, color, national origin, citizenship, immigration status, or the immigration status of their parents or guardians.[122]

Because FRCs detain women and children who are new arrivals to the U.S., many of whom are likely to a remain and become members of our communities, and because FRCs house children ranging from newborns to age 18 (as specified by the Homeland Security Act of 2002 and Trafficking Victims Protection Reauthorization Act of 2008),[123] the span of education services and programs is necessarily broad. While detained for an uncertain period of time, parents need child care for their young children in order for them to attend to their immigration cases, to meet with attorneys, to receive health and mental health care, to cope in the detention environment, and to prepare their children to enter kindergarten ready to learn in U.S. schools. Likewise, school age children living in FRCs have the right and responsibility to attend school daily. The *Flores* settlement also specifies that education be provided to children in immigration custody.[124]

Access to education is a basic human right. It helps to stabilize immigrants, reduce poverty, develop knowledge useful in daily life, and normalize the otherwise very unsettling circumstances of living in FRCs and adjusting to a new country. Education is key to the promise of a better life for detained families when they are released into U.S. communities.

The FRCs are required to provide "comprehensive educational services and programs to children eligible for formal education as defined by applicable state laws and regulations."[125] The Family Residential Standards for education consist of very basic guidelines for the pre-kindergarten and the K-12 programs, but omit even basic guidelines about infant and toddler child care and parent education. Similarly, there is scant information about the education services and programs in each of the three FRC resident handbooks. The handbooks simply document that each FRC operates an on-site pre-kindergarten program and K-12 school Monday through Friday throughout the year, and that attendance is mandatory for children age 5 and older. Upon enrollment, students are

---

[122] U.S. DEP'T OF JUSTICE & U.S. DEP'T OF EDUCATION, FACT SHEET: INFORMATION ON THE RIGHTS OF ALL CHILDREN TO ENROLL IN SCHOOL (May 2014), www.justice.gov/sites/default/files/crt/legacy/2014/05/08/plylerfact.pdf.

[123] Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat 5044 (2008).

[124] Stipulated Settlement Agreement, Flores v. Reno, No. 2:85-cv-04544 (C.D. Cal. Jan. 17, 1997), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf.

[125] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARD 5.2, EDUCATION POLICY 4 (Dec. 21, 2007), http://www.ice.gov/doclib/dro/family-residential/pdf/rs_educational_policy.pdf [hereinafter FAMILY RESIDENTIAL STANDARD: EDUCATION POLICY].

assessed for grade level knowledge and skill and evaluated for special needs. The academic program includes state-specific, standards-based instruction in language arts, math, science, social studies, and physical education.

Beyond that, the standards and resident handbooks offer virtually no specific information about curriculum, instruction, classroom management, social-emotional learning, addressing childhood trauma in the classroom, or preparing students to transition to new schools in their post-release communities. Without more specific standards, ICE cannot hold itself or its contractors accountable for the content, quality, and consistency of its education services and programs, including addressing the recommendations made by the ACFRC.

**Recommendation 4-1: ICE should review and revise its FRC standards for education to add needed detail about the expected content and quality of the education services and programs and to align with the Committee's education recommendations. To inform new education standards that specify best practices, ICE should also elicit input from a panel of education advisors with expertise in the following fields: child care; pre-kindergarten education; K-12 curriculum, instruction, and assessment; newcomer students and English language learners; interrupted schooling, dropout prevention, parent engagement, adult learners (including parents), and trauma-informed classroom practices.**

On-site visits to the FRCs provided some additional information about how schools and classrooms were organized and how education contractors designed and delivered the infant-toddler, pre-kindergarten, and K-12 programs. Information from ICE staff, education contractors, and parents at these site visits corroborated that, in general, young children had not participated in out-of-home child care or pre-kindergarten programs in their home countries and that many K-12 students were far behind grade level academically due to interruptions in their formal schooling, and entered FRCs speaking one or more languages but with no or limited English language skills.

Despite written and verbal requests from the ACFRC to ICE for more detailed information about its education services and programs, little additional information was provided, and it remains unclear to the ACFRC how well the existing services and programs are working. While ICE provided some additional helpful information, we also received incomplete information on a number of key education issues and, in certain instances, information that conflicted with our site visit observations and FRC standards.

In the absence of better information, including an examination of curricula, systematic observations of classroom practices and school operations, and interviews with contract monitors, educators, parents, and students, the ACFRC consulted with, in addition to sources provided by ICE, other credible sources from education research and practice to develop the recommendations. In doing so, we focused mostly on best education practices for immigrant and English learner students, students with interruptions in their formal education, and students who experienced childhood trauma.

While in ICE custody, children should have a caring school experience, an engaging curriculum, and high quality instruction, and parents should receive compassionate and practical support to help their children succeed in school while their families are detained. This part is a set of very specific recommendations to better align FRC education services and programs with key best education practices.

### A.  Early Childhood Education

While detained, parents of young children may need child care options in order to manage family life in FRCs, to attend personal appointments, and to address their immigration case. High quality care includes qualified teachers, culturally sensitive and responsive caregiving, stimulating cognitive and language development, and programming in safe and healthy spaces. Yet the Family Residential Standards for education do not specify if FRCs are expected to offer child care or include guidelines about the content or quality of infant and toddler care in the existing programs at Dilley and Karnes. In fact, the ACFRC has been informed by advocacy organizations and some detained mothers during site visits that parents are expected to supervise their children at all times. This is interpreted as not allowing a mother to ask another mother to watch her child while she, for example, takes a nap, conducts an errand, or needs a break. Children age 13 or older are allowed to walk through FRCs unaccompanied by their parent but children under age 13 must be supervised by a parent or in school.

The Family Residential Standards for education are clearer about offering a pre-kindergarten program. As stated, the pre-kindergarten program "shall provide comprehensive child development services such as educational, health, nutritional, and social services to eligible four-year-old children and their families."[126] Eligibility criteria and program characteristics are not defined. The resident handbooks suggest that pre-kindergarten is a half-day program.

### 1.  Access to Child Care

**Recommendation 4-2: Infant and toddler child care should be:**

    a) **provided at all FRCs (currently, Berks does not offer an official structured child care program); and**

    b) **available to parents for any reason, and not restricted to times when parents are engaged in legal or medical-related business.**

**Recommendation 4-3: FRC child care programs should be accessible and expanded programmatically to be age appropriate for children under the age of 13 when not in school, and available upon request from parents, regardless of whether they are attending to legal- or medical-related business. Currently, child care programs are only for infants and toddlers. FRCs do not permit children to be separated from their parents until age 13, yet there are no supervised care options for these children.**

### 2.  Child Care and Pre-Kindergarten Programming

**Recommendation 4-4: Pre-kindergarten teachers and infant and toddler caregivers should:**

    a) **create learning environments and provide age- and developmentally-appropriate art, music, play, and literature activities to engage young children who may be unfamiliar with out-of-home care or a formal education program;**

    b) **routinely incorporate parents in play and learning activities when parents want to participate; and**

---

[126] FAMILY RESIDENTIAL STANDARD: EDUCATION POLICY, *supra* note 125, at 2.

c) encourage parents to participate in programming as much as they want in order to help their child, especially at the onset, adjust to separating from them while in child care or prekindergarten.

**Recommendation 4-5:** The FRC pre-kindergarten and child care programs should follow the best practices guidelines for media use (e.g., watching television, using a tablet or computer) by young children set by the American Academy of Pediatrics and endorsed by the Mayo Clinic.[127] The guidelines discourage media use by children younger than age 2 and limiting older children's screen time to no more than two hours daily. However, this should not infringe on a parent's right to make independent choices regarding media use for their children when in their care.

**Recommendation 4-6:** Pre-kindergarten teachers and infant and toddler caregivers should update parents informally about their children's activities and skills during daily drop off and pick up times. Formal progress reports should be issued weekly, like at Dilley, and not every six weeks, which is the current practice at Karnes, resulting in the likelihood of families with shorter detention stays not receiving formal reports. Progress reports should be reviewed with parents in a language they understand well (ideally in their primary language).

**Recommendation 4-7:** Pre-kindergarten teachers and infant and toddler caregivers should understand:

a) the value of acknowledging and reinforcing cultural and family strengths;
b) the way stress, trauma, and coping affect infant and toddler adjustment to the detention environment;
c) the way stress, trauma, and coping affect parenting in the detention environment; and
d) that parents' cultural values or lack of formal education do not invalidate good parenting skills, but that they may need additional information to orient them to U.S. parenting norms.

**Recommendation 4-8:** Pre-kindergarten teachers and infant and toddler caregivers should have the training and skills to encourage learning and good behavior. Practices that grant or deny young children food or playtime as rewards or punishments should be prohibited.

3. **Program Quality**

**Recommendation 4-9:** Pre-kindergarten teachers and infant and toddler caregivers should be bilingual in Spanish or another language frequently spoken at the FRCs and should be credentialed in early childhood education.

**Recommendation 4-10:** Pre-kindergarten teachers and infant and toddler caregivers should be monitored by:

---

[127] *Media and Children*, AM. ACAD. OF PEDIATRICS, https://www.aap.org/en-us/advocacy-and-policy/aap-health-initiatives/Pages/Media-and-Children.aspx; *Screen Time and Children – How to Guide Your Child*, MAYO CLINIC (Aug. 6, 2016), http://www.mayoclinic.org/healthy-lifestyle/childrens-health/in-depth/screen-time/art-20047952.

57

   a) **a contractor representative with pre-kindergarten content expertise, using multiple monitoring techniques: unscheduled weekly walkthroughs, scheduled quarterly observations, and mid-year and end-year performance reviews with feedback and professional development support for corrective action; and**

   b) **a qualified independent, impartial oversight authority annually for contract compliance and for quality, and all monitoring reports should be submitted directly to ICE and available to the public.**

4. **Pre-Kindergarten Preparation and School Readiness**

**Recommendation 4-11: Since learning one language does not impair the ability to learn a second language in the long run, pre-kindergarten teachers should partner with parents to promote dual language learning. For example, pre-kindergarten teachers should encourage retention of children's primary language at the same time children are learning English.**

**Recommendation 4-12: Pre-kindergarten teachers should encourage young children to use trial-and-error speech in both their primary language and in English.**

**Recommendation 4-13: Pre-kindergarten teachers should continue to base their curriculum on their respective state's early childhood education standards and guidelines, and should teach:**[128]

   a) **pre-literacy skills through interactive storybook reading;**

   b) **mathematical knowledge and skills through exposure to number words, names of shapes and sizes, and comparison of quantities;**

   c) **science literacy through interaction with the natural world. (For example, water and earth; hot and cold; motion and gravity; liquids and solids; living and inanimate objects; and day and night);**

   d) **cultural and self-expression through music, art, movement, and play in activities;**

   e) **learning readiness skills: waiting, sitting, attending to others and materials, changing responses based on prompts, following individual instructions, and following group instructions; and**

   f) **young children how to draw pictures of themselves and write their names.**

**Recommendation 4-14: Pre-kindergarten teachers should allow young children to participate in activities silently or as quiet observers since apprehension is normal for those inexperienced with out-of-home care or early education programs and for those who experienced trauma or are adjusting to disorienting circumstances.**

**Recommendation 4-15: Pre-kindergarten teachers should label bulletin boards, toys, and educational materials with visual icons and in English, Spanish, and other languages frequently spoken at FRCs.**

**Recommendation 4-16: Pre-kindergarten teachers should assess young children using a validated kindergarten readiness indicators checklist that minimally assesses: expressive and**

---

[128] CAL. DEP'T OF EDUC., FAMILY PARTNERSHIPS AND CULTURE: BEST PRACTICES FOR PLANNING CURRICULUM FOR YOUNG CHILDREN (2016), http://www.cde.ca.gov/sp/cd/re/documents/familypartnerships.pdf.

receptive language, approaches to learning and cognition, phonological awareness and print knowledge, mathematics, social-emotional learning, physical development, and self-care. An example of a best practices readiness checklist is developed by the National Center for Learning Disabilities.[129]

**Recommendation 4-17: Pre-kindergarten teachers should prepare an early learning passport for each child transitioning from FRCs to kindergarten in U.S. schools. This best practice is a folder that contains information about a young child's skills and development, including assessment results and work samples to share with prospective teachers.[130]**

### 5. Early Childhood Development

**Recommendation 4-18: Pre-kindergarten and infant and toddler child-care activities should foster young children reaching normative developmental milestones at certain ages regarding how they play, learn, speak, behave, and move. The FRCs should use the best practices checklist of the Centers for Disease Control and Prevention on developmental milestones from birth through age 5 and the best practices formative assessment of developmental milestones, the *Desired Results Developmental Profile: A Developmental Continuum from Early Infancy to Kindergarten Entry*, produced by the California Department of Education.[131]**

**Recommendation 4-19: Young children with special education or special health needs should be included in all infant and toddler child-care and pre-kindergarten activities to the extent possible.**

**Recommendation 4-20: Young children should have safe, structured, and age-appropriate opportunities to play daily.**

### B. K-12 School Schedule

The general education guidelines in the Family Residential Standards specify that K-12 "educational services are provided . . . Monday through Friday, excluding holidays, and are modeled after a year-round program."[132] The standards and resident handbooks require that students receive at least one hour of instruction in each of the five core subjects. Yet, the standards also say that school attendance is recorded twice daily for morning and afternoon sessions, suggesting half-day attendance.[133] Perhaps the FRCs have split school days only when enrollment exceeds the FRC standard of one teacher to 20 students or the respective state's student-to-teacher ratio. However, during ACFRC site visits at each of the FRCs we did not observe classroom

---

[129] Nat'l Center for Learning Disabilities, Inc. & the Am. Federation of Teachers, Transitioning to Kindergarten: School Readiness (2006), http://www.aft.org/sites/default/files/t2k_schoolreadiness.pdf.
[130] *Id.*
[131] *Developmental Milestones*, Centers for Disease Control and Prevention (Mar. 15, 2016), http://www.cdc.gov/ncbddd/childdevelopment/positiveparenting/toddlers.html; California Department of Education, *Desired Results Developmental Profile: A Developmental Continuum from Early Infancy to Kindergarten Entry* (2015), http://www.cde.ca.gov/sp/cd/ci/documents/drdp2015infanttoddler.pdf.
[132] Family Residential Standards: Education Policy, *supra* note 125, at 2.
[133] *Id.* at 4.

instruction at any of them, and heard from ICE education contractors, ICE staff, and parents that the school schedule has not routinely operated on either full-day and year-round schedules.

**Recommendation 4-21: FRC schools should operate on a year-round, full-day schedule. If limitations to expansion from a half-day schedule are due to classroom capacity or the number of teachers, then the library or other buildings should be utilized and additional staff hired.**

### C.  K-12 Curriculum and Instruction

Curriculum (i.e., the content of the courses offered) and instruction (i.e., the ways the content is taught) are at the core of the FRC K-12 education program. Our understanding is that under the supervision of a contracted school administrator, a contracted teacher develops the curriculum in the form of a weekly lesson plan for a particular grade using state-specific, standards-based curriculum (Dilley and Karnes use Texas state standards and Berks uses Pennsylvania state standards). The Family Residential Standards for education states that "best practices"[134] curricula are used, but there is no corroborating information. In addition, the standards fail to provide any information about expectations for and guidance about effective instructional practices. Without evidence of the content of what students are taught, we recommend a number of best practice curricula to draw upon for developing the FRC curriculum that have engaging content for English language learners and students who are academically behind grade level. Similarly, without standards and observation of instructional practices, there is no way to know what teaching routinely looks like across grades and FRCs and, therefore, we recommend FRC schools adopt the effective instructional practices and approaches listed below.

Our recommendations also depart from ICE's existing standards in one critical way: we recommend, given the current context of relatively short stays of most students, especially at Dilley and Karnes where stays are currently short in comparison to Berks, that the education services and programs focus foremost on English language development instead of academic content. The current guidelines state: "While education services will focus primarily on the development of academic competencies, the secondary focus shall be on English Language Training."[135] This is misguided for students attending schools for several days or a few weeks. (It is much more appropriate for students with longer detention stays, which seems to be more common at Berks.) We proposed a number of recommendations for integrating academic content through curriculum and instruction while primarily focusing on developing critical language skills for students who are detained for less than one month.

### 1.  Qualified Staff

**Recommendation 4-22: FRC schools should continue to only hire credentialed teachers who are bilingual in English and Spanish or another language frequently spoken at the FRCs or who are credentialed in English as a Second Language (ESL), and staffing at each facility should include at least one credentialed special education teacher.**

---

[134] *Id.* at 1.
[135] *Id.* at 2.

2. **Curriculum**

**Recommendation 4-23: FRC schools should continue to provide a self-paced curriculum adapted to student skill and knowledge levels.**

**Recommendation 4-24: For the first month in detention, FRC schools should provide students with grade-level proficiency in the core content areas (e.g., language arts, math, science, social studies) and English language learning and literacy development curriculum that integrates content-based teaching.**

**Recommendation 4-25: After students have been in detention for one month, FRC schools should provide students with grade-level proficiency in the core content areas (i.e., language arts, math, science, social studies) a standards-based curriculum that fully integrates English language learning and preparation to transition at grade level to U.S. schools in post-release communities.**

**Recommendation 4-26: For students with below grade-level proficiency in the core content areas (e.g., language arts, math, science, social studies), or with histories of interrupted schooling in their country of origin, FRC schools should use an English language learning and literacy development curriculum that integrates content-based teaching.**

**Recommendation 4-27: Teachers should develop and use a curriculum that:**[136]

   a) **integrates the content and instructional approaches in best practice curricula such as Do the Math, Math Upgrade, Math Pathways and Pitfalls, Language Central for Math, ST Math, MasterPieces, Step Up to Writing, WriteToLearn, and WRiTE BRAiN BOOKS, Fast ForWord, and Reading Apprenticeship;**
   b) **emphasizes 21st century learning skills:**
      i. **critical thinking (e.g., analyzing, classifying, explaining);**
      ii. **creative thinking (e.g., brainstorming, designing, imagining, questioning);**
      iii. **communicating (e.g., analyzing the situation, evaluating messages, following conventions, listening actively); and**
      iv. **collaborating (e.g., goal setting, delegating, managing time, resolving conflict);**
   c) **focuses on the components of reading (i.e., phonemic awareness, phonics, fluency, vocabulary, and text comprehension) and increasingly unifies instruction in English language and the core content areas;**

---

[136] BETHANN BERLINER, IMAGINE THE POSSIBILITIES: SOURCEBOOK FOR EDUCATORS COMMITTED TO THE EDUCATIONAL SUCCESS OF STUDENTS EXPERIENCING HOMELESSNESS (2001), http://files.eric.ed.gov/fulltext/ED463335.pdf; [hereinafter IMAGINE THE POSSIBILITIES]; CENTER FOR APPLIED LINGUISTICS, PROCEEDINGS OF THE FIRST NATIONAL CONFERENCE FOR EDUCATORS OF NEWCOMER STUDENTS (Beverly A. Boyson et al., eds., 2002), http://crede.berkeley.edu/pdf/newcomer.pdf [hereinafter NEWCOMER STUDENTS PROCEEDINGS]; *These Innovative Programs Can Help Build Student Confidence in Their Writing Skills*, LANGUAGE MAGAZINE (May 2015), http://languagemagazine.com/?page_id=124450; A Selection of Products Designed to Help English Learners Master the Nuances of the New Math Standards, Language Magazine (Aug. 2016), http://languagemagazine.com/?page_id=123802; ; RUTH SCHOENBACH ET AL., READING FOR UNDERSTANDING: A GUIDE TO IMPROVING READING IN MIDDLE AND HIGH SCHOOL CLASSROOM (1999); DEBORAH J. SHORT & BEVERLY A. BOYSON, HELPING NEWCOMER STUDENTS SUCCEED IN SECONDARY SCHOOLS AND BEYOND (2012), http://www.cal.org/content/download/2222/28779/file/Helping%20Newcomer%20Students%20-%20Report.pdf [hereinafter HELPING NEWCOMER STUDENTS].

d) explores in-depth real-world issues (e.g., communities, migration, ecosystems, climate, use of energy) thematically across the core content areas;

e) integrates learning readiness skills for transitioning to U.S. schools in post-release communities. For example:

    i. developing an identity as a student (e.g., knowing strengths, interests, and learning styles);

    ii. understanding classroom routines (e.g., daily attendance, completion of homework and assignments);

    iii. engaging in learning (e.g., participating, asking questions, learning from mistakes, taking academic risks, persevering); and

    iv. basic school study skills (currently, Dilley is the only FRC that reports integrating learning readiness skills across the curriculum); and

f) Incorporates student interests, strengths, cultures, and self-expression.

**Recommendation 4-28:** FRC curriculum should be offered as "mini-lessons" so that students can experience completion and mastery of parts of lessons if their detention stay is short in duration. This can include experiential learning such as field trips outside of FRCs or project-based activities that can be completed in short time frames such as composing music in GarageBand, building small robots, conducting science experiments, and gardening.

**Recommendation 4-29:** FRC schools should include safe, structured, and age-appropriate opportunities to play daily. This includes offering inclusive team games, developing basic sports skills, teaching fitness principles, and modeling fair play.

3. **Instruction**

**Recommendation 4-30:** Teachers should consistently use instructional practices that education experts widely agree hold promise or have high-levels of effectiveness such as:[137]

a) using mastery learning instructional techniques so all students can achieve the same level of learning, including advanced organizers, guided practice, modeling, nonlinguistic representations such as symbols and physical models to convey information, teaching to learning objectives, and providing feedback and corrective strategies to students;

b) providing ample wait time for students to respond to instructions or questions to ensure adequate time to process new content and information in a new language;

c) modeling effective learning to read instructional techniques: previewing text, visualizing the story, asking questions, predicting what will happen, inferring from cues, making connections to other texts or the real world, summarizing, and discussing what was liked or disliked in the text;

d) incorporating extensive oral language development in literacy instruction;

e) encouraging students to explore the meaning of their ideas by practicing language skills. For example, instruction should use open-ended questions, asking students to

---

[137] Imagine the Possibilities, *supra* note 136; NEWCOMER STUDENTS PROCEEDINGS, *supra* note 136; MARZANO ET AL, HELPING NEWCOMER STUDENTS, *supra* note 136.

elaborate on their ideas using additional descriptors and more complex language to
summarize or explain what they understood; and

f)   directly teaching math vocabulary and using drawings, diagrams, graphs and other
visual aids to help English language learner students develop math concepts and
understanding.

**Recommendation 4-31: Teachers should focus their instruction on growth, not ability. For
example, teachers should communicate high expectations for learning and performing and a
belief in the ability of students to grow and improve, routinely providing students with
opportunities to relearn content, revise work, and re-take tests.**

**Recommendation 4-32: Teachers should explicitly teach students study skills across the
curriculum.**

4.   **English Language Instruction**

**Recommendation 4-33: Teachers should use instructional approaches that are aligned with
the Common Core State Standards and have a record of success with English language
learners with limited and/or interrupted formal education. The Sheltered Instruction
Observation Protocol (SIOP) Model is a set of best instructional practices for designing and
delivering lessons for English language learners. Currently, Dilley is the only FRC that
reports using SIOP.[138]**

**Recommendation 4-34: Teachers should use a wide variety of instructional strategies to
develop language and literacy in both a student's primary language and in English.
Examples of best practices include:[139]**

a)   **instruction that incorporates English language and literacy development (e.g.,
listening, speaking, reading, and writing) across the core content areas (e.g., language
arts, math, science, social studies);**

---

[138] JANE ECHEVARRIA, MARY ELLEN VOGT, & DEBORAH J. SHORT, MAKING CONTENT COMPREHENSIBLE FOR ENGLISH LEARNERS: THE SIOP MODEL (2016).
[139] U.S. DEP'T OF EDUC., NCEE 2014-4012, TEACHING ACADEMIC CONTENT AND LITERACY TO ENGLISH LEARNERS IN ELEMENTARY AND MIDDLE SCHOOL (Apr. 2014),
http://ies.ed.gov/ncee/wwc/Docs/practiceguide/english_learners_pg_040114.pdf; Andrea DeCapua & Heather Marshall, *Reaching ELLs at Risk: Instruction for Students with Limited or Interrupted Formal Education,* 55 PREVENTING SCHOOL FAILURE: ALTERNATIVE EDUCATION FOR CHILDREN AND YOUTH, no. 1 (2011) at 35–41; INDIANA DEPARTMENT OF EDUCATION, OFFICE OF ENGLISH LANGUAGE LEARNING & MIGRANT EDUCATION. EFFECTIVE PROGRAMS FOR ENGLISH LANGUAGE LEARNERS (ELL) WITH INTERRUPTED FORMAL EDUCATION. http://www.brycs.org/documents/upload/ELLswithInterruptedFormalEducation.pdf;
Kristina Robertson & Lydia Breiseth, *How to Support Refugee Students in the ELL Classroom,* COLORINCOLORADO (2015), http://www.colorincolorado.org/article/how-support-refugee-students-ell-classroom; Kristina Robertson & Susan Lafond, *How to Support ELL Students with Interrupted Formal Education (SIFE),* COLORINCOLORADO (2008). http://www.colorincolorado.org/article/how-support-ell-students-interrupted-formal-education-sifes; Jeff Whittingham et al., *Use of Audiobooks in a School Library and Positive Effects of Struggling Readers' Participation in a Library Sponsored Audiobook Club.* 16 School Library Research (Dec. 19, 2012),
http://www.ala.org/aasl/sites/ala.org.aasl/files/content/aaslpubsandjournals/slr/vol16/SLR_Use_of_AudiobooksV16.pdf.

b) **for students without basic literacy skills, literacy instruction that focuses on the fundamentals such as the alphabet, vowel and letter sounds, phonemic awareness, phonics, and syllables. Using wordless picture books can also promote vocabulary, speaking, and writing;**

c) **for students with basic literacy skills, literacy instruction that incorporates chanting vocabulary words, guided reading groups, choral reading, interactive read-alouds, echo reading, and silent, independent reading;**

d) **instruction that incorporates academic English such as vocabulary, word parts, grammar, punctuation, syntax, discipline-specific terminology, and rhetorical conventions;[140]**

e) **instruction that incorporates sheltered English-language instruction techniques such as the use of gestures; graphics, maps, and other visuals; collaborative learning activities, demonstrations, and other interactive instructional tools such as the SMARTBoard, videos, and manipulatives;**

f) **instruction that routinely uses online dictionary features that in addition to definitions include images, audio pronunciation, and related words. An example is the Merriam-Webster Visual Dictionary; and**

g) **instruction that integrates the use of English-language audiobooks as an assisted reading strategy for introducing new vocabulary and concepts and giving students access to content and literature above their reading fluency levels.**

**Recommendation 4-35: Since learning in one language does not impair the ability to learn a second language in the long run, teachers should partner with parents to promote dual language learning by encouraging retention of the primary language at the same time K-12 students are learning English.**

### D. Assessing and Communicating K-12 Student Progress

The Family Residential Standards for education have clear guidelines about assigning students to a specific grade based upon student age and educational assessment outcomes.

These standards are more vague about the nature of ongoing student evaluation and the reporting schedule for communicating about student progress. They state that "Student progress reports are distributed to all students on a regular and consistent schedule, and facility policy encourages the scheduling of parent-teacher conferencing to discuss student achievement."[141] The standards further specify that academic progress be measured every 90 days using the same testing instrument, regardless of a student's length of detention stay. This does not represent best practices in the field, especially for students with interruptions in their formal education. Students should receive regular feedback during the learning process to improve student outcomes. Feedback should be individualized, relevant, timely, specific, address advancement toward learning goals, and directly involve the student. Across the FRCs, school practices reportedly vary in how and how often they assess student performance.

---

[140] These language skills are needed for students at all grade levels to understand classroom lessons, books, tests, assignments, and school policies.

[141] FAMILY RESIDENTIAL STANDARDS: EDUCATION POLICY, *supra* note 125, at 4.

1. **Grade-Level Placements**

**Recommendation 4-36: FRC schools should continue to make grade-level placements based on a student's age to align with U.S. schools practices.**

**Recommendation 4-37: Given the special circumstances and often short duration of attending school in FRCs, students should be assessed for grade level readiness and shortfalls for age-based placements should be identified and addressed to prepare students to transition to U.S. schools in post-release communities.**

**Recommendation 4-38: FRC schools should continue to include documentation about grade placements in student education records that are shared with students and parents upon release, to facilitate enrollment and the transition to U.S. schools in post-release communities.**

2. **Feedback to Students and Parents about Progress**

**Recommendation 4-39: Teachers should routinely use multiple informal teacher-made assessments to measure student English language skills and content knowledge such as journal writing, oral presentations, and writing tasks in the primary language.**

**Recommendation 4-40: Teachers should supplement the currently used quarterly assessment that tracks academic progress from baseline results with a weekly report-card-in-progress that is completed with student participation and shared with parents since most students have shorter stays in detention. Currently, Dilley is the only FRC that reports providing weekly progress reports.**

**Recommendation 4-41: Teachers should routinely use a basic rubric to measure achievement of learning targets to enable students and parents to easily understand and monitor progress. A recommended rubric is: exceeding a target, meeting a target, approaching a target, and not yet approaching a target. The rubric should use icons to help supplement the text that describes the performance levels.**

**Recommendation 4-42: Formal parent-teacher conferences to discuss student adjustment to school, classroom behavior, and achievement should be scheduled at the end of the first week of enrollment with guidance about how to support student progress. Thereafter, formal conferences should be scheduled monthly and continue to be available upon request from a parent, a student, or a teacher.**

E. **Special Education Services**

The Family Residential Standards for education state that all incoming students will be assessed for special needs. Students determined to have a disability under the Individuals with Disabilities Education Act (IDEA), the federal law that requires schools to serve the educational needs of students with disabilities, and who are eligible for special education services, will receive an Individualized Education Plan (IEP), the plan for a student's special education services, and appropriate services at FRC schools or from the local education agency. The standards include additional guidelines about furnishings and equipment, on-site and off-site availability of services, and assessments and records, among other issues related to complying with the requirements of IDEA. The ACFRC has little corroborating information about how special education actually

works in FRCs, and received information that students at Karnes and Berks may not have access to a qualified IEP team. (Karnes reported to the ACFRC that it has never organized an IEP team and Berks reported that its IEP team only includes a special education teacher.) Given the limited English proficiency of most students enrolled in FRC schools, and the trauma of their immigration journey and detention experience, determining eligibility for special education is especially complex and providing appropriate education services is critical.

1. **Eligibility**

**Recommendation 4-43: In accordance with federal law (IDEA):**[142]

a) **FRC schools should not exclude children on the basis of a diagnosed long term or temporary disability or unexplained academic, behavioral, or health challenges at school.**
b) **Parents should be informed of their child's right to be referred to and assessed for special education and, if eligibility for special education is determined, to receive services.**
c) **Special education assessment results should be reviewed with parents in a language they understand well (ideally their primary language).**

**Recommendation 4-44: Students with obvious signs of cognitive or physical disabilities such as known brain damage, impaired hearing or vision, impaired mobility or dexterity, polio, cerebral palsy, cleft palate, malnutrition, or traumatic stress should be immediately assessed for special education needs and, if eligibility for special education is determined, FRC schools should provide services from a credentialed special education teacher.**

**Recommendation 4-45: Students should be assessed by FRC medical and mental health staff or, upon parental request, by medical or mental health staff outside of FRCs, for Section 504 accommodations.**[143] **These plans fall under Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against public school students with disabilities and specify accommodations to ensure that students can participate in the general education program. Additionally, FRCs should have a process for teachers and school administrators to refer students to medical and mental health staff for screenings based on behaviors observed in school.**

**Recommendation 4-46: Students should be assessed for a disability if a parent requests it or if health or education professionals suspect a need for special education services.**

**Recommendation 4-47: With respect to special education and trauma, FRC schools should ensure that qualified special education professionals who are also familiar with the cultural background and trauma experiences of the FRC student population oversee the determination if a student qualifies for special education services and is eligible for an IEP or**

---

[142] *10 Basic Steps in Special Education*, CTR. FOR PARENT INFO. AND RES. (Apr. 2014), http://www.parentcenterhub.org/repository/steps/; U.S. DEP'T OF EDUC., OFFICE OF SPECIAL EDUC. PROGRAMS, 300.366, DETERMINATION OF ELIGIBILITY. (Oct. 4, 2006), http://idea.ed.gov/explore/view/p/%2Croot%2Cregs%2C300%2CD%2C300%252E306%2C.
[143] *Protecting Students with Disabilities: Frequently Asked Questions about Section 504 and the Education of Children with Disabilities*, U.S. DEP'T OF EDUC. (Oct. 16, 2015), http://www2.ed.gov/about/offices/list/ocr/504faq.html.

66

504 accommodation. Special consideration should be given to the needs of students who present trauma symptoms that may impede learning and functioning in school, including symptoms that may mask or amplify other disabilities.

**Recommendation 4-48:** With respect to special education and limited English proficiency, assessing for special education needs is especially complex when students are English language learners and may also exhibit trauma symptoms. A best practice for determining if a student is struggling in the classroom due to language barriers or disabilities is to document if their academic progress advances at the same rate as other English language learners with similar linguistic, cultural, educational, and immigration experiences. Students who progress much more slowly should be assessed for unidentified special needs.[144]

## 2. Provision of Services

**Recommendation 4-49:** In accordance with IDEA:[145]

a) The IEP team should be composed of a parent, a student, at least one general education teacher, at least one special education teacher, a district staff member who can supervise special education services, an educator who can interpret evaluation results such as a school psychologist, a parent advocate, and a translator if needed. Currently, Dilley is the only FRC that reports having this kind of IEP structure.

b) IEP accommodations, modifications, and supports should be developed with parents and the contents explained to them in their primary language or in a language in which they are proficient as defined by federal law.

c) A skilled interpreter should be present at all IEP meetings to explain the process and to ensure parental consent to special education services.

d) Parents of children classified with a disability should be allowed to examine all education records and participate (e.g., provide input, make requests, refuse provisions, and be informed in their primary language) in all meetings regarding the identification, evaluation, and educational placement of their child.

e) Parents with children classified with a disability and provided with an IEP or a 504 accommodation should receive a thorough explanation of the plan(s) and their purpose in a language they understand well, ideally their primary language, and should receive written and electronic copies of the plans for continuity of services in schools in post-release communities.

## F. K-12 Student Orientation to Transition to U.S. Schools

The Family Residential Standards for education do not reference or provide guidelines about student orientation to transition to U.S. schools in post-release communities. The ACFRC did not receive any requested information about how students and their parents are informed about enrollment, school requirements and norms, or managing the cultural and logistical challenges that

---

[144] Kristina Robertson, *How to Address Special Education Needs in the ELL Classroom*, COLORÍN COLORADO http://www.colorincolorado.org/article/how-address-special-education-needs-ell-classroom.

[145] *Topic: Individualized Education Program (IEP), Team Meetings, and Changes to the IEP*, U.S. DEP'T OF EDUC.,. OFFICE OF SPECIAL EDUC. PROGRAMS (Oct. 4, 2006), http://idea.ed.gov/explore/view/p/%2Croot%2Cdynamic%2CTopicalBrief%2C9%2C.

many new immigrant students face. Because school attendance is compulsory under law and beneficial to families and students as they rebuild their lives in a new country, and because attending school also encourages families to appear in court for their immigration cases, the ACFRC recommends that facilitating the transition to schools in post-release communities is critical. Further, the U.S. Department of Education recognizes that immigrant families need detailed information and support to transition to the K-12 school system, and has made efforts to encourage enrollment and attendance, to prevent discrimination, and to address the learning needs of newcomers.[146]

**Recommendation 4-50: FRC schools should orient K-12 students about:**

   a) **conventional school routines and expectations such as sitting still for periods of time, riding a school bus, attendance and report cards, raising a hand to speak, co-educational classes, using a locker, changing clothes for gym classes, school discipline, following a schedule and rotating classes and teachers, working independently or in a group, participating in activities, and completing in-class and homework assignments;[147] and**
   b) **immigrant discrimination and bullying in the form of taunts and slurs, threats, aggression, cyber bullying, social exclusion, dating violence, sexual assault, stalking, and human trafficking that may occur in U.S. schools. Acculturation about peer and cultural norms related to hygiene, dress, personal space, gestures, mannerisms, expressions, and how to make friends may ease the transition, reduce victimization, and increase student safety.[148]**

**Recommendation 4-51: FRC schools should inform students ages 16+ that they may not be able to accrue the required high school credits to graduate by the time they reach the maximum age of enrollment in U.S. schools (which varies by jurisdiction from age 19-21), but that this fact does not negate their right to a free education until they age out. Related, secondary students who are over-age for their grade level should be informed about alternative education options including alternative high school completion certificates, alternative schools, community college programs, and job training programs.**

**Recommendation 4-52: FRC schools should provide each exiting student with a backpack containing school supplies, a checklist detailing the steps for enrolling in U.S. schools, and information on troubleshooting enrollment challenges; how to get additional help with school issues or abuse, threats, bullying, or other discrimination in school; and how to file a complaint.**

---

[146]*Resource Guide: Supporting Undocumented Youth*, U.S. DEP'T OF EDUC. (Oct. 20, 2015), http://www2.ed.gov/about/overview/focus/supporting-undocumented-youth.pdf; *Newcomer Toolkit*, U.S. DEP'T OF EDUC. (June 2016), http://www2.ed.gov/about/offices/list/oela/new-comer-toolkit/ncomertoolkit.pdf.
[147]*Welcoming and Orienting Newcomer Students to U.S. Schools*, BRIDGING REFUGEE YOUTH & CHILDREN'S SERVICES (2008), http://www.brycs.org/documents/upload/brycs_spotspring2008-2.pdf.
[148] *Back to School: Challenges and Strengths of Refugee Students*, BRIDGING REFUGEE YOUTH & CHILDREN'S SERVICES (2003), http://www.brycs.org/documents/upload/brycs_spotsept.pdf.

### G. Trauma-Informed Education Practices

The Family Residential Standards for education offer no explicit guidelines about the culture and climate of FRC schools. This omission is particularly concerning given the stress students experience from immigrating, living in custody, and worrying about an uncertain future. While there are guidelines about twice-annual teacher training requirements on related topics such as cultural sensitivity, child development theory, and mental health issues, they are silent about developing the knowledge and skills to routinely integrate trauma-informed practices in the classroom. It is imperative that classroom practices use a trauma-informed approach to establish a culture and climate that is welcoming and safe, and to develop curriculum, deliver instruction, and manage the classroom in ways the show caring and minimize trauma responses.

#### 1. Social-Emotional Learning

**Recommendation 4-53: FRC schools should require explicit instruction in social-emotional skills. Best practice social-emotional learning curricula focus on five general research-based competencies endorsed by the Collaborative for Academic, Social and Emotional Learning (CASEL): self-awareness, self-management, social awareness, relationship skills, and responsible decision-making.[149] Curricula recommended by CASEL are listed in the guides Effective Social and Emotional Learning Programs: Preschool and Elementary School Edition and Effective Social and Emotional Learning Programs: Middle and High School Edition.[150]**

**Recommendation 4-54: Teachers should:[151]**

    a) **develop core content curriculum, deliver instruction, and manage classrooms in ways that incorporate the development of social-emotional skills. (For example, they should model and expect from students effective listening, conflict resolution, problem solving, personal reflection and responsibility, and ethical decision-making.);**

    b) **encourage positive social skills and self-image development by both respecting the various cultural attributes and backgrounds of their students and providing exposure to U.S. cultural norms; and**

    c) **provide a space and routine for students to manage their emotions in age-appropriate ways in the classroom using, for example, a cool-down corner for younger students or writing in a journal or talking into a recorder for audio journaling for older students.**

#### 2. Classroom Management Practices

**Recommendation 4-55: Teachers and students should jointly establish and maintain classroom behavior expectations, rules, and routines that reinforce caring and safety.**

---

[149] Roger P. Weissberg &Jason Cascarino, *Academic Learning + Social-Emotional Learning = National Priority*, PHI DELTA KAPPAN, Oct. 2013, at 8-13.

[150]*2013 CASEL Guide: Effective Social and Emotional Learning Programs: Preschool and Elementary School Edition*, COLLABORATIVE FOR ACAD., SOC. AND EMOTIONAL LEARNING (2012), http://www.casel.org/preschool-and-elementary-edition-casel-guide; *2013 CASEL Guide: Effective Social and Emotional Learning Programs: Middle and High School Edition*, COLLABORATIVE FOR ACAD., SOC. AND EMOTIONAL LEARNING (2012), http://www.casel.org/middle-and-high-school-edition-casel-guide.

[151] *Newcomer Toolkit*, *supra* note 146.

**Recommendation 4-56: FRC classroom behavior management practices should never:**

    a) punish or penalize students for behaviors that are associated with experiencing trauma such as falling asleep during class, having difficulty concentrating on an assignment, or being reluctant to participate in an activity;

    b) use exclusionary sanctions that remove students from the classroom or reduce instructional time, including detention or suspension, unless under exigent circumstances;

    c) use punishment-based strategies, including reprimands, ultimatums, loss of privileges, or office referrals, absent positive behavior support strategies; or

    d) reward or punish students with food or play for learning or behavior.

**Recommendation 4-57: FRC schools should adopt best practice classroom behavior management strategies including:[152]**

    a) Positive Behavioral Interventions and Supports (PBIS). Instead of being reactive to misbehaviors, including disengagement, PBIS introduces, models, reinforces, and rewards positive social behaviors and creates a more positive school climate.

    b) Restorative justice approaches to behavior disruptions with the goals of repairing harm and restoring relationships between those impacted. This includes teachers collaborating with parents and mental health professionals to design and carry out agreed upon consequences.

    3.  **Trauma-Informed Practices**

**Recommendation 4-58: Teachers should take into account:**

    a) the impact of childhood trauma on learning, development, and behavior. For example, teachers need to understand how trauma can impair concentration and memory; cause intrusive thoughts, frustration, aggression, perfectionism, or withdrawal; and dysregulate executive functioning such as goal setting, organizing, or anticipating consequences; and

    b) student expressions of trauma and dysregulation in classrooms, and that coping behaviors should not be viewed as misconduct and addressed with punishment but rather they should elicit trauma-informed supportive responses.

**Recommendation 4-59: Teachers should maintain a classroom culture and climate that ensures students have: physical, social, and emotional safety at school; and academic safety to encourage students taking educational risks and learning from mistakes.**

**Recommendation 4-60: FRC schools should have protocols for educators and mental health practitioners to routinely collaborate and to provide integrated trauma-informed**

---

[152] Trevor Fronius, et al., *Restorative Justice in U.S. Schools: A Research Review*, WESTED, Feb. 2016, http://jprc.wested.org/wp-content/uploads/2016/02/RJ_Literature-Review_20160217.pdf; Rob H. Horner, George Sugai, & Timothy Lewis, *Is School-Wide Positive Behavior Support an Evidence-Based Practice* (April 2015), https://www.pbis.org/research; HANDBOOK OF POSITIVE BEHAVIOR SUPPORT (Wayne Sailor, Glen Dunlap, George Sugai & Rob Horner eds., Issues in Clinical Psychology 2008).

621

interventions for students exhibiting trauma symptoms in the classroom such as inattentiveness, agitation, hypervigilance, persistent anxiety or depression, preoccupation, helplessness, detachment, or suicidal thoughts.

Recommendation 4-61: FRC school schedules should be routinized and predictable, and changes should be clearly communicated to students in advance, including changes in teachers, routines, or the student composition of the class.

Recommendation 4-62: Students should have small daily jobs that directly communicate that they are valued and belong in the school community. Examples include tending to indoor plants, a garden, or pets; setting up activities; or helping younger students or peers with their school work.

## H. Educator Professional Development

U.S. teachers are not trained to work with newcomer students[153] or in schools that serve students detained with their parents while transitioning to an uncertain future in post-release communities or in their home countries. Given the unique circumstances of FRCs, FRC teachers need to be equipped with the knowledge, skills, and personal dispositions to work under significantly different circumstances than a tradition school setting.

The Family Residential Standards for education offer guidance about educator development requirements. They specify, for example, that teaching staff require a minimum of twice annual trainings on several key education topics and that they have a staff development plan, overseen by a school administrator, which aligns with the respective state requirements.[154] Documentation provided by ICE further indicates that at some of the FRCs there are other professional development opportunities, such as the weekly professional learning community meetings held at Dilley and regularly scheduled administrator-led monthly trainings at Dilley and Berks. However, the Committee has no additional information about the content and quality of professional development. Specifically, there is no indication that there is in-depth training on cultural competence, especially about indigenous cultures; on using trauma-informed curriculum, instruction, and management practices in classrooms; or on Prison Rape Elimination Act (PREA) compliance with employee training requirements.

### 1. Instruction

Recommendation 4-63: Teachers and school administrators should be trained and supported to use the curriculum, instructional strategies, and classroom management techniques recommended above.

Recommendation 4-64: Secondary teachers should receive specialized training for teaching adolescent students since these students are just developing proficiency in academic English without the foundation of academic literacy and grade-level schooling in their primary language, and students need targeted preparation to transition to U.S. schools in post-release communities.

---

[153] *Newcomer Toolkit, supra* note 146.
[154] FAMILY RESIDENTIAL STANDARDS, EDUCATION POLICY, *supra* note 125, at 5.

2. **Performance Evaluation**

**Recommendation 4-65: ICE should ensure that a qualified independent, impartial oversight authority formally monitors the performance of FRC-contracted teachers and school administrators annually, and that all monitoring reports are submitted directly to ICE and available to the public. Given the high mobility and the low grade-level proficiency of students in FRC schools, teachers should not be evaluated primarily on student achievement outcomes but through a combination of measures such as multiple classroom observations, curriculum and lesson plan reviews, student work, teacher self-reflections, and student and parent surveys that assess instructional effectiveness in context. These evaluations should identify teachers in need of improvement and provide feedback and corrective support to teachers to help them improve their practice. Ineffective teachers and administrators should be terminated.**

**Recommendation 4-66: Teachers should be monitored by the contracted school administrators using multiple techniques: weekly unscheduled walkthroughs, quarterly scheduled classroom observations, and mid-year and end-year performance reviews with feedback and professional development support for corrective action.[155] Ineffective teachers should be terminated.**

3. **Trauma**

**Recommendation 4-67: Teachers and school administrators should receive in-depth, ongoing training about the effects of childhood trauma on learning, development, and behavior, which can be provided by the National Center for Trauma-Informed Care.[156] The reported level of training on trauma that educators are offered is inconsistent across the FRCs.**

Currently, Dilley reports annual trainings plus monthly teacher-led professional development sessions; Karnes reports an initial training upon employment; and Berks reports no specific training on trauma, only training to identify and report suspected physical and sexual abuse.

**Recommendation 4-68: Teachers and school administrators should be trained and accountable to:[157]**

a) **identify behaviors that may indicate current or past traumas that impact student success and safety; and**
b) **routinely use evidence based trauma-informed school practices that are documented in The National Child Traumatic Stress Network's Child Trauma Toolkit for Educators and the Massachusetts Advocates for Children and Harvard Law School's Helping Traumatized Children Learn.**

---

[155] Currently, Dilley is the only FRC that reports this kind of teacher performance monitoring process.

[156] http://www.smahsa.gov/nctic.

[157] *Helping Traumatized Children to Learn: Supportive School Environments for Children Traumatized by Family Violence*, MASS. ADVOCATES FOR CHILDREN (2009). https://traumasensitiveschools.org/wp-content/uploads/2013/06/Helping-Traumatized-Children-Learn.pdf; *Child Trauma Toolkit for Educators*, NAT'L CHILD TRAUMATIC STRESS NETWORK SCH. COMM. (Oct. 2008), http://www.nctsn.org/sites/default/files/assets/pdfs/Child_Trauma_Toolkit_Final.pdf.

**Recommendation 4-69: Teachers and school administrators should be trained to routinely collaborate with mental health practitioners to provide complementary trauma-informed interventions for students.**

**Recommendation 4-70: Teachers and school administrators should be trained to understand the basics of the U.S. immigration system and the rights of families to request protection, a hearing, and due process. They should also be trained to never provide students and their families with legal advice or to comment about their prospects for release.**

4.  **Prevention and Reporting**

**Recommendation 4-71: Teachers and school administrators are required under the ICE PREA standards to complete training in all topics for PREA employee training. They should understand the standards and develop skills to prevent, detect, and report sexual and physical abuse, including human trafficking.**

**Recommendation 4-72: Teachers and school administrators should be trained to prevent, detect, and report bullying.**

**Recommendation 4-73: Teachers and school administrators should know about appropriate referral resources for parents and students who show signs of stress, distress, or trauma.**

**I.  K-12 School Performance**

The Committee received only limited information, and therefore has an incomplete understanding of FRC school performance (e.g., administration and operation, characteristics of the education services and programs, student achievement and growth, school environment and resources). FRCs schools should be monitored for compliance with both ICE standards and effective implementation of the recommended best education practices herein.

**Recommendation 4-74: ICE should ensure that a qualified independent, impartial oversight authority monitors the performance of school contractors twice annually for compliance with ICE education standards and contract obligations, and that all monitoring reports are submitted directly to ICE and available to the public. These performance audits should include information from classroom observations, curriculum and lesson plan reviews, administrative and financial document reviews, and interviews with students, parents, teachers, and school administrators and should hold contractors accountable to address infractions.**

**Recommendation 4-75: ICE should ensure that a qualified independent, impartial oversight authority monitors the overall quality of the FRC K-12 education program twice annually for consistency with education best practices for English learners, students behind grade level, students who experience trauma, and students with interrupted formal schooling, and that all monitoring reports are submitted directly to ICE and available to the public. These evaluations should include information from classroom observations, curriculum and lesson plan reviews, administrative and financial document reviews, and interviews with students, parents, teachers, and school administrators and should hold contractors and their teachers and school administrators accountable for corrective actions.**

### J.  Education Records

While the Family Residential Standards for education specify the documentation that should be included in each student's education record, the Committee received supplementary information from the FRCs that suggest the contents of the files vary and that the transfer of records to families upon release from detention is inconsistent. Ensuring families exit with these records may facilitate enrollment, placement, and services for students transitioning to schools in post-release communities.

**Recommendation 4-76: Education records should be standardized across FRCs. Currently there is variation. Minimally, records should include: grade placement; assessment results; progress reports and report cards; special education referrals, assessments, and IEP and 504 accommodation plans; earned credits; student work; and parent-teacher conference notes.**

**Recommendation 4-77: A hard copy and access to an electronic copy of each student's education records should be available to each family upon release from FRCs. This currently varies across FRCs.[158]**

**Recommendation 4-78: Education records should be available to families and receiving schools through an electronic record system to ensure expedited and secure access to information for enrollment, grade placement, and continuity of special education services and other education programming. If, as planned, according to ICE staff during the ACFRC site visits, ICE develops and implements a web-based portal for the transmission of FRC detainees' medical records, it should also be used to transmit education records. For example, the education and health records of migrant students enrolled in U.S. schools are managed through a web-based platform to enable the national exchange of information for highly-mobile students through the Migrant Student Information Exchange (MSIX) by the U.S. Department of Education.[159]**

**Recommendation 4-79: Education records should provide a detailed accounting of the credits each student earns while in detention, and these credits should be equivalent to those earned in U.S. schools and transferable to schools in post-release communities.**

### K.  Parent Education

The Family Residential Standards for education do not address parent education. However, additional information provided by ICE documented that detained parents have access to some formal and informal educational opportunities, including English language classes and other scheduled self-care activities. This was corroborated through interviews with parents during Committee site visits, but the content and quality of parent education appear to be inconsistent. Providing parents with information about their children's education and the transition to new

---

[158] Berks reports that hard copies are routinely provided to parents; Dilley reports that they are provided upon request; and Karnes reports that it does not provide hard copies to exiting families.

[159] *Migrant Student Records Exchange Initiative*, U.S. Dep't of Educ. (Aug. 26, 2014), http://www2.ed.gov/admins/lead/account/recordstransfer.html.

schools, and family support and self-care strategies, can ease both the stress of living in custody and the move to post-release communities.

1. **Information about K-12 Schooling**

**Recommendation 4-80: Parents should be informed in a language they understand well (ideally their primary language) about:**[160]

a) **the curriculum, instructional strategies, and classroom management techniques, expectations, and requirements of their children's education program;**

b) **their right to a free, public education notwithstanding their child's country of origin, child's best or first language, or child's disability, and their concurrent responsibility to send their school-age children to school daily and on time, to make sure they complete homework assignments, and to monitor their school performance;**

c) **their right to have a written translation or an interpreter translate school paper work and communications. Their children should not serve as translators about education issues; and**

d) **the contents of their child's education records.**

**Recommendation 4-81: Parents should be notified immediately of any student behavior issues or disciplinary measures, including exclusion from activities or assignment of extra work. Disciplinary measures should be determined with input and approval from parents.**

2. **Orientation to Transition Children to U.S. Schools**

**Recommendation 4-82: Parents should receive information in a language they understand well (ideally their primary language), about:**

a) **the U.S. school system, in particular: the preschool, kindergarten, middle school, and high school curricula and grade-level expectations; and services for English language learners and newcomer students, before- and after-school care, special education, and free-reduced price school meal programs;**

b) **the U.S. school calendar, compulsory school attendance laws, consequences of violating these laws, where to go for help when children are not attending school, and daily school attendance requirements;**

c) **U.S. school operations and procedures. For example, enrollment, transportation, absences, grades and report cards, parent-teacher conferences, interpreters for meetings, fees for events and activities, school events, and school rules and discipline;**

d) **the option of enrolling their children in a newcomer school or program if one is available in their post-release communities. Newcomer programs are specialized academic environments that serve newly arrived, immigrant English language learners for a limited period of time and focus on: acquisition of English language skills, limited instruction in the core academic areas, cultural adjustment to the U.S. school system, and development of literacy in the primary language; and**

---

[160] INT'L RESCUE COMM., EDUCATIONAL HANDBOOK FOR REFUGEE PARENTS (2006), http://www.brycs.org/documents/upload/Educational-Handbook-English.pdf.

e) the importance of completing a high school degree to increase postsecondary education and employment options and high school transitions such as dropping out, earning alternative diplomas, job training, vocational certificate programs, and college.

3. **Parenting Support**

**Recommendation 4-83: Parents should receive evidence-based, culturally sensitive information about U.S. parenting norms in a language that they understand well (ideally their primary language). An example is the Nurturing Skills for Families curriculum offered at Dilley, which is recognized by the Child Welfare League of America and the Substance Abuse and Mental Health Services Administration.[161]**

**Recommendation 4-84: Parents should be informed in a language that they understand well (ideally their primary language) about the therapeutic supports available at FRCs to alleviate trauma symptoms caused by their immigration and detention experiences such as the struggle to manage their families or protect their children from the uncertainty of their situation and FRC rules and regulations that may conflict with family or cultural traditions and preferences.**

**Recommendation 4-85: Parents should have access to self-care and stress reduction activities that focus on maintaining good nutrition, simple exercise routines (e.g., walking, stretching), and therapeutic mindfulness breathing exercises.**

4. **English Language Instruction**

**Recommendation 4-86: ICE should provide daily scheduled English language classes taught by credentialed English as a Second Language (ESL) adult education teachers to learn basic conversational English. Language instruction should focus on speaking practice, pronunciation improvement, and vocabulary expansion.**

**Recommendation 4-87: Parents should have structured opportunities to practice English language skills during hands-on activities such as playing with children, preparing food, or making crafts.**

5. **Newcomer Education**

**Recommendation 4-88: ICE should provide parents with information about key newcomer issues (e.g., learning English, receiving an education, finding housing, searching for a job, securing child care, using public transportation, banking and managing personal finances, and accessing legal and health, mental health, and dental services) to ease the transition to post-release communities.**

---

[161] NURTURING PARENTING (n.d.), http://www.nurturingparenting.com/.

## 5.   LANGUAGE ACCESS

The families detained at ICE's Family Residential Centers (FRCs) have been through tremendous stress and danger. Immigration processing and detention both add more anxiety and trauma. All the detainees need information about the situation they find themselves in and about what lies ahead; many also have significant medical and mental health needs. Effective communication is vital for fair treatment, and the stakes of their communication could hardly be higher: their ability to understand and convey information can affect their liberty and immigration status, their ability to care for and make decisions about their child or children, and their own and their children's health and safety.

But meaningful and timely access to both legal proceedings and services through effective communication is challenging. Very few of the adult detainees of ICE's three FRCs are comfortable communicating using either written or spoken English. Most of them speak Spanish – but some do not. We understand that the non-Spanish speakers usually speak one of many indigenous Central American languages, or Portuguese. There are at least a few detainees, not from Latin America, who speak other languages, including various Chinese dialects and (we have heard) Urdu; no doubt there are others as well. Thus DHS faces significant language barriers in providing safe and humane detention and immigration processing for this population. Crucially, Spanish language services can meet an important part of this need, but by no means all of it.

Executive Order 13166, *Improving Access to Services for Persons with Limited English Proficiency*, requires that people whose English proficiency is limited nonetheless receive "meaningful access" to federal programs, benefits, and services. Throughout DHS, the obligation to provide language access for LEP (limited English proficient) individuals is particularly urgent, because of the very high prevalence of limited English proficiency and the very high stakes of communication. Language access to DHS programs, benefits, and services is thus a vital matter of equality, fairness, and safety.

DHS's overarching Language Access policy statement[162] covers the key needs:

> It is the policy of DHS to provide meaningful access for individuals with limited English proficiency to operations, services, activities, and programs that support each Homeland Security mission area by providing quality language assistance services in a timely manner. DHS Components, therefore, should incorporate language access considerations into their routine strategic and business planning, identify and translate crucial documents into the most frequently encountered languages, provide interpretive services where appropriate, and educate personnel about language access responsibilities and how to utilize available language access resources.

---

[162] U.S. DEP'T OF HOMELAND SEC., MESSAGE FROM THE SECRETARY https://www.dhs.gov/sites/default/files/publications/crcl-language-access-plan-s1-message-english.pdf, (Feb. 2012).

As DHS's 2012 Language Access Plan[163] explains, under applicable guidance from the
Department of Justice,

> [A] four-factor analysis . . . assists in assessing meaningful access. These factors are
> the:
> 1) Number or proportion of LEP individuals encountered or likely to be encountered;
> 2) Frequency of contact with LEP individuals;
> 3) Nature and importance of the program, activity or service provided; and
> 4) Resources available and costs to provide the meaningful access.

In ICE family detention, the first three factors each weigh heavily in favor of comprehensive
language access services: nearly all of the detainees have limited English proficiency; the contact
is full-time during their stay in the facilities; and as already mentioned, the programs, activities,
and services provided are essential to their safety, health, and fair treatment as would-be
immigrants. In addition, relevant to the fourth factor, the fact that FRC population is large and the
need is concentrated creates substantial economies of scale, ameliorating the costs needed to
provide adequate language services.

ICE's Language Access Plan[164] confirms the agency's commitment to providing language access
services throughout the course of detention:

> [T]he [ICE] standards . . . require that language services be offered in all detention
> facilities. . . . The standards also require that language services be offered throughout
> the detention process (e.g., during admission/intake, medical, classification,
> grievance system, discipline, legal rights group presentations, telephone access,
> transfer, and visitation).

Finally, ICE's Family Residential Standard 2.8 (Staff-Resident Communication), states, generally:
"Where required, residents have regular access to translation services and/or are provided
information in a language that they understand."[165] This requirement is then repeated many times,
with respect to particular programs, including, for example, Legal Rights Group Presentations and
Sexual Abuse and Assault Prevention and Intervention, among others.[166]

Thus DHS policy on language access, including for families in detention, is quite robust. However,
that policy is neither appropriately implemented nor appropriately communicated to families
detained in ICE's FRCs. This Part offers recommendations for improvement. From the moment
LEP families arrive in DHS's custody, they are in need of language access services. Most

---

[163] U.S. DEP'T OF HOMELAND SEC., LANGUAGE ACCESS PLAN 3 (Feb. 28, 2012),
https://www.dhs.gov/sites/default/files/publications/crcl-dhs-language-access-plan.pdf [hereinafter DHS Language
Access Plan].
[164] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, LANGUAGE ACCESS PLAN 10 (June 14, 2015),
https://www.dhs.gov/sites/default/files/publications/final-ice-lep-plan.pdf [hereinafter ICE Language Access Plan].
[165] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, ICE/DRO RESIDENTIAL STANDARD 2.8 STAFF-RESIDENT
COMMUNICATION 1 (Dec. 21, 2007), www.ice.gov/doclib/dro/family-
residential/pdf/rs_staff_resident_communications.pdf.
[166] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, ICE/DRO RESIDENTIAL STANDARD 2.7 SEXUAL ABUSE AND
ASSAULT PREVENTION AND INTERVENTION 1 (Dec. 21, 2007), www.ice.gov/doclib/dro/family-
residential/pdf/rs_sexual_assault_prevention-intervention.pdf; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT,
ICE/DRO RESIDENTIAL STANDARD 6.3 LEGAL RIGHTS GROUP PRESENTATIONS 1 (Dec. 21, 2007),
www.ice.gov/doclib/dro/family-residential/pdf/rs-legal-rights-presentations.pdf.

typically, the first DHS component such families encounter is Customs and Border Protection (CBP), whose interactions with families are beyond the scope of this Committee. At some point, however, some (unknown to us) portion of families are transferred into ICE custody and the decision is made to detain them in family detention. That's where our recommendations will begin. Our recommendations are all framed by the family detention setting – but in our view they actually apply equally to *non-family* detention; implementation in all immigration detention facilities would improve ICE's language access considerably.

### A.  Non-Spanish Speakers: Overarching Recommendation

In this Part, we explore the language-related needs of ICE FRC detainees who have limited English proficiency. Most are Spanish speakers; their needs are very significant and are addressed below. However, the Spanish-language issues are dwarfed by the needs of detainees who speak various Central American indigenous languages. For the latter group, it seems clear that DHS systematically fails to provide appropriate language access. That failure threatens both their health and safety while they are in DHS custody, and their fair immigration adjudication.

DHS Secretary Jeh Johnson announced in 2014 that DHS should avoid detaining members of various groups particularly vulnerable to harm in detention:

> Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest.[167]

Individuals who speak only (or nearly only) a language that ICE is unable to accommodate are as vulnerable to harm from detention as persons who are disabled, elderly, or pregnant. Moreover, they cannot receive fair immigration processes. The changes needed to provide effective language access are identified below. But it is our view that providing indigenous language interpretation is almost certainly too challenging for ICE to manage. There are too many languages, each spoken by only a few people at any given time. Competent interpreters are few and far between, and telephonic interpretation, even when available, largely fails to provide effective communication. The time for processing detainees who are in expedited removal proceedings is too short to find necessary language services. Effective communication for detainees who speak indigenous languages is extremely difficult and in many instances impossible. Accordingly, we make one overarching recommendation on the subject of language access: that individuals who speak rare languages that pose these kinds of language access difficulties should be kept out of detention, to avoid the threats to their health and safety there and to reduce government costs related to identifying and providing interpretation for indigenous individuals, including the cost of their often prolonged detention while these services are located. And they should be placed into ordinary rather than expedited proceedings, to expand the time available to arrange language services. In the rare case where it is impossible or inappropriate to avoid expedited removal proceedings and/or

---

[167] U.S. Dep't of Homeland Sec., *Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

630

detention, DHS should continue to strive to ensure appropriate interpretation and appoint each such person a lawyer, who can in turn facilitate fair processes and language access.[168]

**Recommendation 5-1: When DHS encounters an individual who speaks a rare language that poses severe language access difficulties – such as a Central American indigenous language – such a person should not be detained, but should rather be released with a Notice to Appear, on their own recognizance or with the support of a case management support program. In the rare event that this approach is inappropriate or impossible, such persons should be provided with appointed counsel who can facilitate both effective language access and fair immigration proceedings.**

### B. Disability Access

We note that language access is a particularly acute need for detainees with communications-related disabilities – who may be sight-impaired, hearing-impaired, or speech-impaired. The Rehabilitation Act of 1973, 29 U.S.C. § 794, forbids discrimination against such individuals, and the Rehabilitation Act's DHS regulation requires all its components to "take appropriate steps to ensure effective communication with applicants, participants, personnel of other Federal entities, and members of the public" including by "furnish[ing] appropriate auxiliary aids where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the Department." The regulation notes that, "In determining what type of auxiliary aid is necessary, the Department shall give primary consideration to the requests of the individual with a disability."[169] A DHS Management Directive elaborates further that the "effective communication" obligations apply to "persons who are deaf or hard of hearing or are blind or have low vision," and also require "modifying practices and materials to ensure effective communication with persons with intellectual or developmental disabilities."[170]

The Committee requested that ICE provide us all "communication policies/SOPs [Standard Operating Procedures]/strategies to ensure effective communication for people with communications disabilities," and were told they were being provided. But the only relevant documents provided concerned telephone usage and FRC policies on "Sexual Abuse/Assault Prevention and Intervention Programs." Similarly, ICE's response to our question "What auxiliary aids and services are available (hearing aids, TTY, videophone, captel, etc.)?" was that the facilities have a TTY – a telephonic communications (TTY stands for **T**ele**TY**pewriter) device for people who are deaf and literate – and that "after medical prescription-hearing aid[s]" are available.

We conclude that there are no general policies, standard operating procedures, or strategies in place to ensure compliance with the above legal requirements and other best practices for the

---

[168] In their inability to communicate and navigate the immigration system, people who speak rare languages are similar to those with mental disabilities, for whom the government is under court order to provide counsel. *See* Franco-Gonzales v. Holder, No. 2:10-cv-02211-DMG, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013), *settlement approved sub nom.* Gonzalez v. Holder, No. 2:10-cv-02211-DMG, 2015 WL 11116905 (C.D. Cal. Sept. 25, 2015).

[169] 6 C.F.R. § 15.60 (2004).

[170] U.S. Dep't of Homeland Sec., Directive No. 065-01, Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment) § V.A.1.c (Sept. 25, 2013), https://www.dhs.gov/sites/default/files/publications/dhs-management-directive-disability-access_0.pdf.

631

confinement of persons with communications disabilities. This absence of policies and procedures are devastating if a detainee with a communication-related disability enters FRC custody. There is no system in place to ensure appropriate orientation, to facilitate effective communication during immigration processing, or to provide appropriate medical and mental health care. For each of the sections of this report that follow this one, both policy and practice would have to be altered to accommodate the communications needs of any detainee who was deaf or hard-of-hearing, blind or low-vision, speech-impaired, or whose communications abilities are undermined by an intellectual or developmental disability. The communications difficulties would be further augmented when, as is highly likely, the affected detainees have limited written English (and perhaps limited written Spanish) proficiency – particularly because there are many different sign languages used by deaf Central and South Americans. For each such detainee, the required auxiliary aids and services would have to be specially assessed and would be both urgent and extremely challenging – perhaps even impossible – to provide in a timely way.

The presence of a TTY machine is far from sufficient to provide effective communication. Even considering only the issue of telephonic communication, a TTY cannot work at all for a deaf detainee who cannot type in English or Spanish. And even for detainees who are literate, a TTY requires access to a relay service for it to be useful to reach anyone who doesn't him or herself have a TTY.[171] For someone whose written language is Spanish, that needs to be a Spanish relay service. Both Texas and Pennsylvania have both Spanish and English relay services – TTY users simply dial 711. But, unless staff are trained in how to use the TTY and how to access the relay service, they will not know it exists, and the TTY will be ineffective.

For non-telephonic communication for deaf detainees, live and/or video sign-language interpretation would often be needed, and would likely require multiple interpreters (e.g., English to Spanish to the appropriate sign language). For blind detainees, a variety of accommodations are necessary for safe detention and effective communication. For detainees with intellectual or developmental disabilities, the complex written and oral materials given to detainees are far too sophisticated for effective communication, and are compounded by their likely limited English proficiency.

ICE informed us that there has been just one FRC detainee with a communications disability, a sight-impaired detainee in June 2016. Detention of any such persons in the future is unlikely to comply with the applicable legal or humanitarian imperatives. Such persons will require substantial resources and assistance to facilitate fair immigration processing. Accordingly, and consistent with the Secretary's 2014 reference to persons with serious disabilities, we make the following overarching recommendation:

**Recommendation 5-2: Immediately upon taking custody of a potential detainee, ICE should assess each such person to determine if his or her ability to communicate is impaired by a disability – because he or she is deaf or hard-of-hearing, low-vision, speech-impaired, or has a developmental or intellectual disability. Absent extraordinary circumstances, such persons should not be detained, but should be released to the community with a Notice to Appear and if feasible, enrolled in a family case management-based program or other support program. If ICE declines to adopt this recommendation, it is urgent that policy and practice be**

---

[171] The relay service allows the deaf individual using the TTY to type her message; the relay operator then reads what is typed out loud to a person using a regular phone on the other side of the conversation; that other person responds verbally and the relay operator types what is said to be read by the deaf individual using the TTY.

632

**modified and individualized for every type of communication for any detainee with a communications disability, and that adequate monitoring and oversight policies be put into place to ensure that such individualized plans are followed.**

### C. Identification

The first step to providing language services is identification. ICE's process for identifying language needs for FRC detainees saw significant improvements after ICE promulgated its language access plan in the summer of 2015.[172] The current procedure is described in an undated ICE memo titled *New Protocol for Identifying Indigenous Language Speakers at Family Centers*,[173] apparently issued sometime after August 2015. The memo explains, correctly, that "one-word responses are insufficient to assess understanding" of a given language and therefore directs staff to "engage residents in conversation to elicit responses that convey meaningful understanding." The process begins with a script, in Spanish; ICE staff are instructed to use the script to "address all Mexican, Central and South American individuals to determine the resident's primary language." The script includes several questions that call for discursive answers;[174] staff are instructed to gauge each detainee's comfort level in Spanish based on her answers.

Even if the staff administering the script believe, based on the answers, that the detainee is proficient in Spanish, they are instructed to next "ask a control question to determine if the resident feels more comfortable speaking a language other than Spanish." This is:

> "You seem to understand Spanish. Is there another language you speak more often with your family or children when in your home country?"

If the detainee responds "no," Spanish is recorded as her primary language. If the answer is "yes," then the detainee is asked "Are you more comfortable speaking this language?"

If the detainee's answers to the script questions indicate that she is not comfortable in Spanish, or if the answer to this second control question is yes, the next step is an "Indigenous Language Slideshow." These slides include written text (using the standard English/Spanish alphabet) and audio that ask, in a series of languages: "We need to identify your native language. Please raise your right hand if this is the language you speak at home with your family." Included in the slides are nearly a dozen indigenous languages from Central America (Quechua, Mam, Q'anjob'al, K'iche, Q'eqchi, Achi, Awakateco, Chuj, Popti, Ixil, Mixteco) and two African languages (Amharic, prevalent in Ethiopia, and Tigrinya, prevalent in Eritrea).[175]

---

[172] ICE Language Access Plan, *supra* note 164, at 1. The Language Access Plan has a date of June 14, 2015 on the first page, but the Director's signature, on the second page, is dated August 7, 2015.

[173] *See* Decl. of Jon Gurule, Exh. 5, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf. We note that this document was not provided to us by ICE, though it is clearly encompassed by our request for information and it was described to us during one of the Committee meetings.

[174] In Spanish: 1. Where do you normally shop for clothing and food in your home country? 2. Describe the area where you and your family live in your home country. 3. Tell me about the school or education your children had in your home country. *Id.*, Exh. 6.

[175] *Id.* Exh. 8.

633

The policy provides that "when an indigenous speaker has been identified the language must be documented in EADM [ENFORCE Alien Detention Module] and the detainee file and communicated to FRC staff. Intake staff will seek interpretive assistance from one of several language lines available."[176] ICE staff are further directed to a non-public intranet page: "For more information on available language lines please visit https://insight.ice.dhs.gov/ero/custody/Pages/jfnnu.aspx."[177] ICE briefed us on this protocol in March 2016, and told us that "[a]ffirmation of full compliance is pending, as the program continues its 'rollout' phase."[178]

Thus ICE policymaking has been attentive to the need to identify the language needs of detainees. However, it is not clear to us that ICE has in place the tools or procedures needed to succeed in these efforts:

First, the language identification slideshow does not cover all the languages used by FRC detainees. When we requested a list of languages spoken by detainees, the answer ICE provided was "Languages vary, but currently residents throughout the FRCs speak Spanish, English, Portuguese, Mam, Kiche, and Q'anjab'ol, Akateko, and different Chinese dialects." The slideshow does not include Akateko (which is a different language from Awakateco[179]), Portuguese, or Chinese. It also omits other languages that may also be appropriate to include; a recent NGO complaint to DHS about indigenous language services at the FRCs listed four other languages not covered by the slideshow – Maya, Garifuna, Kaqchikel, and Lenca – as notable needs.[180] Without fuller information about what languages are spoken by detainees, we cannot advise ICE – and ICE cannot itself determine – what is needed.

Second, we are unable to evaluate how well the processes that exist are working, even for the languages that are covered. We note that in a recent court filing by the *Flores* plaintiffs, the Policy Director for the NGO RAICES (Refugee and Immigrant Center for Education and Legal Services) explained that her colleagues were able to review the situations of 250 families, "primarily from Guatemala, who speak variations of Akateco, Kanjobal [Q'anjab'ol], Quiche, Kekchi, Mam,

---

[176] *Id.* Exh. 5.
[177] We were also shown a DHS resource, the *I-Speak* booklet, which is designed to facilitate LEP persons' identification of their language, if they are literate, by listing languages in the applicable characters, and allowing them to point to those they can understand. But this resource cannot help someone who is illiterate, and it was not explained to us how the I-Speak booklet is used. Because the I-Speak booklet is not referenced in the memo just described or in the process flowchart that accompanies that memo, we infer that it is not used, in practice.
[178] U.S. Immigration & Customs Enforcement, *Advisory Comm. on Family Residential Centers Read Aheads* 7 (Mar. 16, 2016), https://www.ice.gov/sites/default/files/documents/Document/2016/acfrcBriefingMaterialsMar2016.pdf; *see also* U.S. Immigration & Customs Enforcement, *Advisory Comm. on Family Residential Centers Summary of Meeting* (Mar. 16, 2016), https://www.ice.gov/sites/default/files/documents/Document/2016/ACFRC-201603.pdf.
[179] Compare *Akatek Language*, Wikipedia (last modified Sept. 18, 2015), https://en.wikipedia.org/wiki/Akatek_language, with *Awakatek Language*, Wikipedia (last modified Jan. 13, 2016), https://en.wikipedia.org/wiki/Awakatek_language.
[180] Compl. submitted by Karen S. Lucas, et al., CARA Family Detention Pro Bono Project, to Megan Mack, Office for Civil Rights & Civil Liberties, U.S. Dep't of Homeland Sec., and John Roth, Office of Inspector Gen., U.S. Dep't of Homeland Sec., AILA Doc. No. 15121011 (Dec. 10, 2015), http://www.aila.org/File/DownloadEmbeddedFile/66618 [hereinafter CARA Complaint].

Maya, Popti, Achi, Garifuna, Kaqchikel, Chuj, Ixil, Lenca, and other Mayan languages." She explained:

> Based on our review, several trends emerged, including: (1) inadequate screening of language ability by CBP and ICE both at the border and in the family detention facilities; (2) DHS's failure to provide written materials concerning *Flores* rights or asylum in indigenous languages; and (3) DHS's failure to provide indigenous language interpreters to enable government officials, detention center staff and service providers to convey critical information.[181]

This leads to a third point: ICE does not adequately track either non-Spanish languages needed for interpretation/translation, or how well its language access processes are working. We were unable to obtain from ICE any of the following:

- a comprehensive list of languages detainees speak or read;
- the number of language-line interpretation requests;
- the number of hours of language-line usage; or
- languages for which interpretation services were used for medical care.

ICE also informed us that it does not track either the proportion of adult detainees not fluent in Spanish or the proportion of adult detainees not literate in Spanish. Without keeping better records than we have evidence of, ICE simply cannot provide adequate language access to non-Spanish speakers.

**Recommendation 5-3: ICE should ensure that each adult detainee can effectively communicate to DHS, ICE, and FRC staff what language she and her children speak (these may differ). This information should be tracked individually for both the adult and children, by ICE and by FRC staff, and the appropriate language used whenever necessary for meaningful access to ICE programs, activities, and services. The current audio slideshow is a good step towards the goal of language identification. But it should be augmented with other languages that detainees have used since the FRCs opened, including, e.g., Akateko and other indigenous languages, Portuguese, various Chinese dialects, and Urdu. ICE policy and procedure should cover the possibility that a detainee may not confirm any language covered by the slideshow. In that event, ICE should undertake additional individualized steps to identify the language need. All detainees without exception – children – and adults – should have a primary language noted in their file, and on their ID.**

**Recommendation 5-4: ICE should track the languages spoken by FRC detainees, and their needs for interpretation and translation services, so that statistical information on the frequency of language needs is readily available to ICE and throughout DHS. This will facilitate planning and service provision.**

In addition, the language access needs of detainees vary with their literacy level. A 50-page handbook or even a single page form constitutes ineffective communication if she is illiterate. We

---

[181] Plaintiff's Exhibits in Support of Motion to Enforce Settlement and for Appointment of Special Master [Part 6: Exhibits 48-69] Exh. 67 (Decl. of Amy Fischer), ¶ 6, Flores v. Johnson, No. 2:85-cv-04544 (C.D. Cal. May 19, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0024.pdf.

have no precise information on the literacy level of the FRC's adult detainees, regardless of their language, because ICE does not track that information. But we do know from many sources that the rate of illiteracy is high, which affects the steps ICE should take to provide effective communication: translations of complex English documents are not sufficient.

**Recommendation 5-5: For each document provided with FRC detainees, ICE should create versions that are as accessible as possible, using simple language, flowcharts, graphics, and similar non-text strategies that assist in comprehension and understanding for a variety of potential obstacles including literacy level, education level, intellectual capacity and disabilities of any kind.**

**Recommendation 5-6: ICE should assess and track the literacy of each adult FRC detainee, in each language she speaks, noting low literacy in detainees' files. Whenever ICE communicates in writing with a detainee whose literacy is low, it should use documents that are both (a) in a language the detainee understands and (b) adapted to be more accessible, in light of her literacy level. In addition, oral communication of rules, procedures, and expectations is particularly important for detainees with low literacy and should be conducted, using simple and direct phrasing, in a language detainees understand or using a qualified interpreter.**

### D.  Orientation

Once a detainee's language needs are ascertained, those needs should be met. The first situation in which good language access is needed is orientation; that's when detainees are given an explanation of rules, services, and what is going to happen to them. FRC orientation includes both a spoken presentation in Spanish and the provision of the resident handbook already mentioned. The handbooks are very lengthy, facility-specific documents (Berks: 38 pages; Karnes: 45 pages; Dilley: 79 pages). ICE rules dictate that they must be available in English and Spanish, but do not require availability in any other language, unless that language is more prevalent than Spanish.[182] Facility policies are a bit more ambiguous,[183] but in fact, the handbooks have not been translated into any other languages.

Yet if more than a few detainees who are literate in other languages are housed in an FRC – the absence of statistical information mentioned above means we cannot know if this is the case – ICE should translate the resident handbooks into additional languages. An NGO that has had substantial interaction with detainees suggests that written translations are appropriate in Akateco, Kanjobal, Kiche, Kekchi, Mam, Maya, Popti, Achi, Garifuna, Kaqchikel, Chuj, Ixil, and Lenca.[184] In our view, translated written materials should be prepared for any language that is the primary language for 0.5% of detainees, or for 50 detainees per year, whichever is lower. (ICE reported in May 2016 to the *Flores* district court that nearly 19,000 persons had been detained over the prior

---

[182] *See* U.S. Immigration & Customs Enforcement, Detention and Removal Operations Performance Monitoring Tool, Monthly Compliance Review Report (requiring availability of "[o]rientation material in English, Spanish or most prevalent second language. All orientations are conducted in person" and "[r]esident handbook . . . [a]vailable in both English and Spanish and/or second most prevalent language.").

[183] *See, e.g.*, Dilley Policy 14-101, Resident Grievance Procedures 2 (Aug. 17, 2015) ("Each resident shall be provided, upon admittance, a copy of the resident handbook which provides notice of the following in English, Spanish, and other languages most widely spoken among the residents.").

[184] CARA Complaint, *supra* note 180, at 9.

seven months; an average of about 2,700/month. On that admissions rate, 0.5% is 13 in an average month.)

Again, given what are likely low adult literacy rates among all detainees, regardless of their language, it is vital to make available simplified summaries of the voluminous orientation materials. In addition, oral communication, in a language each detainee understands, of all rights, rules, and requirements during orientation is particularly important. All three facility policies provide for such oral communication. At Dilley, for example, the policy requiring that detainees receive a copy of the resident handbook also explains about it that "Interpretation or translation services will be provided to residents who are not proficient in English."[185] All three handbooks state that residents "have the right to be informed of the rules, procedures and schedules concerning the operation of the facility where you are detained" and "have the responsibility to know them and abide by them."[186] However, only the Karnes handbook tells detainees themselves that they are entitled to language assistance in order to understand orientation. It states (in the section on grievances):

> If a resident cannot read or does not understand the language of the handbook, the Facility Administrator arranges for the orientation materials to be read to the resident, provide the material using audio or video tapes in a language the resident does understand, or provide a translator or interpreter within a reasonable amount of time.[187]

We are not, however, aware that any such video or audio tapes have ever been used. And it seems highly likely that the necessary interpretive services – though they may be available, via telephonic language lines – are not consistently used at the FRCs.

We cannot be absolutely certain of this last conclusion because, as already explained, ICE declined to tell us the number of language-line interpretation requests or the number of hours of language-line usage. And (as we discuss in Section M, below), ICE does not currently conduct any systematic self-monitoring or language access assessment. But we do have some important evidence: the NGO report cited above, which was based on review of 250 files, and an ICE compliance review.

The NGO report alleges that FRC staff systematically fail to communicate with non-Spanish speakers in their languages. It claims that the following is typical:

> When Elana and her two-year-old son first arrived at the Dilley detention center after being detained on August 26, 2015, she informed officials that she spoke Mam, an indigenous Mayan language spoken by half a million Guatemalans, and that her religion was Mam. But during the three weeks that she and her two-year-old son spent in detention, neither ICE nor Corrections Corporations of America (CCA) (the private prison contractor operating the Dilley detention center) staff

---

[185] Dilley Policy 14-101, *supra* note 183, at 2.
[186] Berks Resident Handbook 6 (undated); Dilley Resident Handbook 11 (2016); Karnes Resident Handbook 2 (2015).
[187] Karnes Resident Handbook, *supra* note 186, at 24.

637

communicated with her in Mam. ICE never found a Mam interpreter for Elana or gave her any documents written in Mam."[188]

Since August 2015, a company called Danya International has conducted monthly compliance reviews of all three facilities, to evaluate their compliance with ICE's Family Residential Standards. The reviews include evaluation of facility compliance with Family Residential Standard 2.8, which requires language access services. (It states, in part: "Where required, detainees have regular access to translation services and/or are provided information in a language that they understand.") Notwithstanding their relevance to our task, ICE unfortunately declined to make these documents available to us. However, out of the dozen-plus reviews conducted for each facility, ICE chose one review per facility to provide to the *Flores* District Court.[189] The one review of Dilley ICE chose to include in its court filing describes both a documentation problem and an underuse of interpretation. It noted, earlier this year, that "Review of both the log and the list of the detainee's primary and second language (dated 1/04/16) does not show consistent use or consistent documentation of use of the language line." And it recommended that officials "Ensure that staff assigned to intake are aware of when to use and document the use of the language line. For those detainees where the primary and secondary language is not English or Spanish and the language line is not used, develop and implement a process [to] document why."[190]

In short, we are unable to assess how prevalent language line use is, and, correspondingly, the extent of underuse, because ICE declined to provide the necessary information. But we think it likely that FRC detainees who do not speak English or Spanish are not receiving interpretive services during orientation.

Even if telephonic interpretation were provided consistently when appropriate, the extensive discussion that is necessary to substitute for such lengthy documents as the resident handbooks undermine the efficacy of such interpretation. During one of our facility visits, staff explained to us that an Urdu-speaking ICE staff member temporarily assigned to one of the Texas facilities was able to greatly ease the detention experience of one detainee family who were otherwise dependent on language line interpretation. As this explanation suggests, language lines are helpful, but live interpretation – or, even better, bilingual staff – are far more effective. Presumably it is for this reason that Dilley has contracted with a Mam speaker. Video or audio tapes – if ICE were sure that they were in the right language – would likewise be better than an extensive interpreted session.

**Recommendation 5-7: After tracking the languages spoken and the language access needs for several months, ICE should ensure that the FRC resident handbooks are translated into any additional languages that are used by the lower of 0.5% or more detainees, or 50 detainees in the course of a year. ICE should ensure that video or audio taped summaries of the handbooks are available for any detainees who are not highly literate in any language for which a translation is available, and should offer an opportunity to listen to or watch such a recording to all detainees.**

---

[188] CARA Complaint, *supra* note 180, at 5.
[189] *See* Decl. of Jon Gurule, *supra* note 6, Exh. 1-3 (Danya International Reports of Compliance Inspections of BFRC (Berks) (Nov. 10, 2015), KCRC (Karnes), (Sept. 10, 2015), and STFRC (Dilley), (Jan. 27, 2016)).
[190] Decl. of Jon Gurule, *supra* note 6, Exh. 3, at 4.

### E.  General Provision of Language Access Services

For all three facilities, once orientation is complete, neither facility policy documents nor the resident handbooks include any general statement describing language access policy/rights. There is no policy that repeats the general command of ICE Family Residential Standard 2.8 ("Where required, residents have regular access to translation services and/or are provided information in a language that they understand."). And the availability of language services is not communicated – at least not in writing – to detainees. Each of the resident handbooks includes a section "Resident Rights and Responsibilities," for example, but those sections do not inform detainees of their right to language assistance that provides meaningful access to programs, benefits, and services. Policies and the handbook occasionally mention language services – but for only a very few of the many situations where such services are needed for LEP detainees' equal access. Indeed, the explicit reference in a few circumstances to interpretation services might easily be read by detainees to suggest that such services are not more broadly available, even when needed in order to communicate effectively with FRC staff, ICE, USCIS, FRC health care, child care, food service, mental health, teachers and others at the FRC.

This failure to communicate the language access services is in violation of the direction of the Attorney General to all federal agencies to "Notify the public, through mechanisms that will reach the LEP communities you serve, of your LEP policies, plans, and procedures, and LEP access-related developments."[191] In addition, orderly management of the facilities and fair and equal treatment of the detainees depends on their understanding of what is going on. All three of the handbooks explain that it constitutes misconduct for a resident to fail to "follow[] specific rules and/or orders which have been designated for the clean, safe, orderly operation of the facility which residents have been told in advance through posting or have been given verbally by an employee of the facility or person who has charge of the resident at the time."[192] Yet, the handbooks — which, remember, constitute the material that is supposed to be presented during orientation to each non-Spanish speaking detainee via interpretation – do not inform detainees how they are supposed to respond to a command or an instruction in a language they do not speak, if they do not understand it.

ICE has not shared with the ACFRC the information we would need to thoroughly understand general language assistance practices and when current efforts are falling short. We do know, however, that problems exist. The NGO report already cited alleges a systemic failure to provide interpretive services and documents in indigenous languages. And ICE itself has disclosed some problems to the *Flores* court: in the one standards compliance report the government recently chose to file in the *Flores* court about Berks, the evaluation noted problems with compliance with Family Residential Standard 2.8:

> "Observation: The following forms signed by residents were not provided in
> Spanish or other native languages: Food Service Agreement to Work; Maintenance

---

[191] *Memorandum from the Attorney General to Heads of Federal Agencies, General Counsels, and Civil Rights Heads, re. Federal Government's Renewed Commitment to Language Access Obligations under Executive Order 13166*, at 2 (Feb. 17, 2011), https://www.lep.gov/13166/AG_021711_EO_13166_Memo_to_Agencies_with_Supplement.pdf.
[192] Berks Resident Handbook, *supra* note 186, at 26; Dilley Resident Handbook, *supra* note 186, at 58; Karnes Resident Handbook, *supra* note186, at 13.

639

Agreement to Work; Housekeeping Agreement to Work; Consent for Treatment; Right to Know; and Grievance Procedure. *(Observed 9/15/15)*

"Recommendation: Translate forms into Spanish or any other native languages or document that language line was used to translate form prior to resident signing.

"Follow-up: Resolved-The facility has translated into Spanish forms to be signed by residents for the following: Food Service Agreement to Work; Maintenance Agreement to Work; Housekeeping Agreement to Work; Consent for Treatment; Right to Know; Parental Notification Form and Grievance Procedures; New Admission Orientation Acknowledgement Form; and Voluntary Work Program Agreement Form. There is a box on each form for the signature of the interpreter used attesting to the information translated. *(Observed 10/26/15)*"[193]

It seems likely that the system in place to ensure effective communication with non-Spanish FRC detainees in their general lives is not succeeding.

For both Spanish speakers and non-Spanish speakers, we have also heard reports of children being asked to interpret for their mothers or for other adults. ICE policy forbids this practice absent exigent circumstances.[194] It is bad practice for many reasons:[195]

- Omissions: Particularly when information is sensitive – which in this setting is frequent – parents may omit important information, or soften the details, because they do not want the child to know sensitive aspects of their lives or because they do not want to traumatize or re-traumatize the child.
- Trauma: If a parent does not omit sensitive information, that information can be traumatizing to the child.
- Editing: Children may alter language to fit their own view of what is appropriate, convenient, or proper to say, or to spare parents from suffering embarrassment or because they are just not able intellectually or emotionally to convey the accurate information.
- Role reversal: It can interfere with parental discipline for the child to be called upon to provide help and support to the parent.
- Mistakes: Children are likely to make mistakes, even if they say (and believe) they understand and are interpreting correctly.
- Guilt: It is easy for children to feel they are the cause of suffering because they conveyed something painful or to fear that a bad outcome results from their inadequacy as an interpreter.
- Confidentiality: Even when cautioned, children do not understand issues of confidentiality and may inadvertently reveal sensitive material learned during interpreting.

---

[193] Decl. of Jon Gurule, *supra* note 66, Exh. 1, at 4.
[194] ICE Language Access Plan, *supra* note 164, at 9.
[195] The list in text is largely adapted from M.J. Gilbert, *The Case Against Using Family, Friends, and Minors as Interpreters in Health and Mental Health Care Settings*, in PROCESS OF INQUIRY – COMMUNICATING IN A MULTICULTURAL ENVIRONMENT (Nat'l Ctr. for Cultural Competence, Geo. Univ. Ctr. for Child and Human Dev. 2005), http://www.ncccurricula.info/communication/D15 html.

640

**Recommendation 5-8: For all detainees, ICE should facilitate effective communication and meaningful access to programs, benefits, and services by using clear, simple language whenever possible.**

**Recommendation 5-9: ICE should ensure that facility policy, resident handbooks, and oral orientation (whether live or recorded) clearly communicate the overarching policy that detainees have a right to language assistance that provides meaningful access to programs, benefits, and services, and that this right includes interpretive services, if necessary, for all important conversations with ICE and contractor staff.**

**Recommendation 5-10: ICE should ensure that all routinely used documents are translated into all languages read by the lower of 0.5% or more detainees, or 50 detainees in the course of a year. Documents should also be adapted into a summary bullet point or into graphics when possible, to facilitate understanding by detainees with low literacy. Every document should be tested with detainees to ensure understanding and effective communication before being finally adopted.**

**Recommendation 5-11: ICE should provide qualified interpretation whenever necessary to provide meaningful access to programs, benefits, and services. This right includes interpretive services, if necessary, for conversations involving DHS or contractor staff. Interpretation can be provided using telephonic or video interpretation,[196] but in addition, ICE should investigate the option of local interpretive service providers who specialize in regional dialects and indigenous languages.**

**Recommendation 5-12: Having identified what non-Spanish languages are frequently needed, ICE should explore various ways to provide live interpretation or bilingual staff, by, e.g., hiring contractors and bringing in detailees.**

**Recommendation 5-13: ICE should record each time a detainee receives qualified interpretation services, whether by language line or in-person interpreter, and should conduct frequent checks of detainees' language needs against language line and interpreter usage, systematically auditing when detainees who do not speak Spanish are receiving communication in a language they understand and when they are not, and then implementing resources, training, and other supervision to improve language access as the audit reveals various needs. The audits should pay particular attention to orientation, medical and mental health care, case processing, and release conditions.**

**Recommendation 5-14: ICE should track and report monthly statistics relating to interpretive services, including how many times interpreters – telephonic or in-person – are used, for how many detainees, and the languages and situations involved. The statistics**

---

[196] For discussion of video interpretation, see 45 C.F.R. § 92.201(f) (2016), https://www.federalregister.gov/documents/2016/05/18/2016-11458/nondiscrimination-in-health-programs-and-activities.

641

**should include how often per week in detention interpretive services are provided to non-Spanish speakers.**[197]

**Recommendation 5-15: Children should not be used as interpreters. With proper planning and staffing, the exigent circumstances that are the prerequisite to such use under ICE policy can be entirely avoided.**

### F.  Access to Fair Immigration Procedures: Law Library

ICE does not provide counsel to FRC detainees, but rather supports their access to legal services less directly – via provision of a law library and facilitation of communication with potential and actual counsel. Part 3.E of this Report covers the law library more generally, including its appropriate content. It is vital for the libraries to include legal materials in Spanish and other languages detainees read, when those are available. Even if this is done, however, many books and other materials in the law library are, necessarily, in English, so this particular language access issue is applicable to all the Spanish-speaking detainees, as well as those who speak neither Spanish nor English.

The Supreme Court case law from the analogous situation in prison demonstrates that it is constitutionally insufficient for a detaining authority to provide non-English-speaking detainees with law books unusable by them. In *Lewis v. Casey*, the Court wrote: "Of course, we leave it to prison officials to determine how best to ensure that inmates with language problems have a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement. But it is that capability, rather than the capability of turning pages in a law library, that is the touchstone."[198] Facility policies recognize this point. Karnes's policy, for example, states:

> Unrepresented illiterate, non-English speaking or disabled detainees who wish to pursue a legal claim related to their immigration proceedings or detention, and who indicate difficulty with the legal materials must be provided assistance beyond access to a set of English-language law books. To the extent practicable and consistent with the good order and security of the facility, all efforts will be made to assist all illiterate, limited-English proficient and disabled persons in using the law library."[199]

The Karnes policy then sets out "[p]rocedures to meet this obligation:"

> "1. Helping the resident obtain assistance in using the law library and drafting legal documents from residents with appropriate language and reading-writing abilities; and
>
> "2. Assisting in contacting pro legal-assistance organizations from the ICE approval

---

[197] The kind of report the Committee has in mind in the last sentence of the recommendation might read, e.g.:
   Number of non-Spanish speakers in detention, January 2017: 72.
   Interpretive services provided:       1 per week: 10
                                         2 per week: 22
                                         3 per week: 40.
[198] Lewis v. Casey, 518 U.S. 343, 356–57 (1996).
[199] Karnes Policy 6.1.1, Law Library and Legal Materials 6.

list.

"3. Where required, residents have regular access to translation services and/or are provided information in a language they understand.

"If such methods prove unsuccessful in providing a particular non-English-speaking or illiterate resident with sufficient assistance, the facility shall notify JFRMU, ICE Field Office, and ICE Chief Counsel. The standard complies with federal laws and with DHS regulations regarding residents with special needs."[200]

Both Dilley and Berks policies similarly cover what the Karnes' policy labels items 1 and 2 – but both omit the Karnes' policy's item 3. That is, at Dilley and Berks, the policy completely omits translation or interpretation.[201]

Moreover, neither the Dilley nor the Berks resident handbook mentions anything about even this limited language assistance policy in connection to the law library – so detainees are given no information about what help is available to them. And even at Karnes, where the policy mentions translation, the resident handbook does not. It simply states:

By submitting a Resident Request Form, you may be permitted to obtain assistance from other residents in researching and preparing legal documents, except when such assistance may pose a security risk. Such assistance is voluntary; no resident will be allowed to charge a fee or accept anything of value for assistance. Illiterate, unrepresented and non-English speaking residents will be provided with access to more than English-language law books, assistance in using the Law Library, and contacting Pro Bono legal assistance organizations, upon request. ICE will not pay compensation to a resident for researching or preparing legal documents on behalf of another resident.

Moreover, the Karnes Resident Handbook actually states – inappropriately – "Printing of documents can only be done in the English language; therefore you will have your printed documents checked by the Library staff before you depart the law library." This renders detainees unable to print any certain legitimate legal documents, including, for example, the *Flores* pro-se handbooks, explanations of parental rights, and many other important and helpful tools and resources, as well as witness declarations and USCIS explanatory material. (See the USCIS Language Access Plan[202] for a description of ongoing USCIS efforts to provide many different documents in high-use languages, including Spanish.)

More generally, it is apparent from descriptions in all three handbooks, and from the Dilley and Berks policies, that interpretation and translation services for law library access are not routinely – and perhaps not ever – offered. This is not only a language access failure under Executive Order 13166; it may also constitute an inappropriate denial of access to the courts. As the Supreme Court explained in the passage from *Lewis v. Casey* cited above, what is important is that the detainees have an adequate opportunity to make their claims (here immigration rather than prison-related

---

[200] *Id.*

[201] Berks Policy 15.010, Law Library and Legal Material 2 (Dec. 1, 2013); Dilley Policy 14-105, Law Libraries and Legal Materials 5 (Jan. 15, 2016).

[202] U.S. DEP'T OF HOMELAND SEC., U.S. CITIZENSHIP & IMMIGRATION SERVS., LANGUAGE ACCESS PLAN (June 3, 2016), https://www.uscis.gov/sites/default/files/USCIS/Outreach/LanguageAccessPlan06042016.pdf.

643

claims), both with the agency and with the courts. The help of other detainees is unlikely to meet the need – FRC detainees, who are responsible for caring for their children, do not have the time available to develop the expertise to become "jailhouse lawyers." And access to legal assistance organizations may or may not be sufficient to provide the constitutionally required opportunity. Where it is not, translation and/or interpretation may be needed.

**Recommendation 5-16: As much as possible of the FRC law library material should be in Spanish and other languages detainees read, in addition to English.**

**Recommendation 5-17: ICE should provide language access services for detainees who use the law library, including translation and interpretive services. Bilingual paralegal services may prove necessary to meet language access needs. Facility policy and the resident handbooks should state clearly that language access services are available if needed for access to the law library, and that these include necessary translation and interpretive services. Signs conveying this information should also be placed in FRC law libraries and housing units.**

**Recommendation 5-18: Printing in the law library may be limited to appropriate legal documents and supporting materials, but non-English documents should not be categorically excluded. ICE should ensure that the Karnes Resident Handbook so reflects, and if the same rule is imposed at another FRC, it should be changed.**

### G. Access to Fair Immigration Procedures: Asylum Processes

FRC detainees participate in five different kinds of immigration proceedings/interviews. (1) They may meet with lawyers to discuss their cases. (2) They receive orientation about the immigration process. (3) They meet with USCIS asylum officers for "credible fear" or "reasonable fear" interviews.[203] (4) They have conversations about their cases with ICE personnel, including deportation officers and ICE lawyers. (5) They appear before immigration judges in immigration court, an adjudicatory body organizationally located within the Department of Justice's Executive Office for Immigration Review (EOIR). The detainees' language access needs in each of these settings are similar – but the practical, statutory, and regulatory settings are different.

#### 1. Conversation with Potential or Retained Immigration Lawyers

Because the government is not on either side of detainees' conversations with lawyers about their cases, DHS incurs no language access obligations.

#### 2. Asylum Orientations

According to government filings in the *Flores* litigation, within the first few days of an individual's stay at an FRC, "DHS conducts an orientation for the individual during which DHS explains the credible fear or reasonable fear process, and provides the individual with the Executive Office for Immigration Review's list of free legal service providers who may be

---

[203] Most people claiming a fear for their safety if they are returned to their home country are screened to determine if they have a credible fear of torture or persecution. But individuals facing reinstatement of a prior removal order receive, instead, what is called a "reasonable fear" interview and determination. For our purposes, this difference is unimportant.

93

available to provide legal assistance if the individuals wish to utilize them."[204] We do not precisely understand what this declaration is referring to – perhaps it is a video orientation that we observed in part. In addition, several non-profit advocacy organizations contract with the Department of Justice to do "Legal Orientation Presentations." It is unclear whether ALL individuals receive such a presentation before a credible fear or reasonable fear interview. However, where they do and where the presentation is part of a federal program – certainly if these programs are what the government is referring to in the quotation above – we believe that they are covered by DHS's language access obligations, and that DHS accordingly has the obligation to provide translation and interpretive services.

We have already addressed the lack of adequate language accommodations made at orientation and in the Handbook generally. We understand that the orientations just described are offered in Spanish. We have not been told of any special efforts made to provide additional language access. Obviously interpretive services are needed for all non-Spanish speakers. But we have no reason to think such services are being provided by the government.

### 3. Asylum Officer Interviews

USCIS conducts thousands of screenings of FRC detainees, generally 3-5 days after asylum orientation. These are extensive interviews: asylum officers conduct only two to three each day.[205] They are a crucial part of immigration processing. Applicable credible fear interview regulations require provision of interpretive services, stating "If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview."[206] The regulation also states that "The interpreter must be at least 18 years of age. . . ."[207] It is our understanding that the interviews are sometimes conducted in Spanish, by USCIS asylum officers who are competent in that language. Often, however, telephonic interpretation is used. When this occurs, many have observed problematic results.[208] We discuss, below, the ways in which telephonic interpretation can fail to achieve effective communication.

For FRC detainees who speak indigenous languages, we understand that sometimes telephonic interpretation is used, and other times, USCIS decides to forego the credible/reasonable fear interview,[209] proceeding directly to immigration court. This may actually prolong detention, if an

---

[204] Decl. of John L. Lafferty at 2, Flores v. Lynch, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf.

[205] *See id.*

[206] 8 C.F.R. § 208.30(d)(5) (2016); *see also* 8 C.F.R. § 235.3(b)(2)(i) (on initial inspection by examining officer for individuals placed in expedited removal, "[i]nterpretative assistance shall be used if necessary to communicate with the alien").

[207] 8 C.F.R. § 208.30(d)(5).

[208] *See, e.g.*, John Washington, *The U.S. is Locking Up Immigrant Children in Private Prisons Under Inhumane Conditions*, IN THESE TIMES (July 6, 2015), http://inthesetimes.com/article/18140/lockingup-immigrant-kids (describing a telephonically interpreted credible fear interview in which the interpreter and interviewee had difficulty hearing each other and the interpreter several times misinterpreted the testimony).

[209] *See* AM. BAR ASS'N, COMM'N ON IMMIGRATION, FAMILY IMMIGRATION DETENTION: WHY THE PAST CANNOT BE PROLOGUE 38 (2015), http://www.americanbar.org/content/dam/aba/administrative/immigration/FamilyDetentionReport2015.authcheckdam.

94

immigration judge is reluctant to release the detainee during the pendency of her proceedings without the reassurance of a credible fear finding.[210]

### 4. Conversations with ICE Personnel, Including Deportation Officers and Lawyers

If the Asylum Officer finds credible (or reasonable) fear, the matter is next referred to an immigration judge. For persons not facing reinstatement of removal, typically, the family is released from detention at this point. If the Asylum Officer does *not* find credible (or reasonable) fear, the individual may request review by an immigration judge. Either way, individuals are likely to have conversations with ICE personnel, conceivably including lawyers. Some of these conversations deal with release conditions (see Part 5.K, below). Other conversations may involve other aspects of the person's life or immigration case. All such encounters require effective communication. Unless ICE personnel are competent in the detainee's language or a qualified interpreter is provided, the result is LEP persons' discriminatory exclusion from full access to the arrangements that could be discussed.

### 5. Appearances Before an Immigration Judge.

Some immigration court hearings occur via video at the FRCs; others take place after FRC detainees are released from detention. Either way, Executive Office for Immigration Review (EOIR) policy is to provide interpreters at government expense in immigration court.[211] EOIR is part of the Department of Justice, not DHS, and therefore its activities are beyond our scope. We note, however, that many observers have criticized the resulting interpretative services as inadequate. The problem is amplified for FRC detainees because they appear in court by video. As the American Bar Association recently summarized:

> This [language-related] procedural unfairness continues throughout the proceedings in the immigration courts, even after the women pass their credible or reasonable

---

pdf ("For those women who speak indigenous languages, immigration authorities frequently skip the credible fear interview altogether, moving directly to the merits determination.") [hereinafter ABA Report].

[210] *See id.* ("But without a positive credible fear determination, judges are hesitant to grant release pending conclusion of the proceedings, thereby further prolonging detention."); *see also* LUTHERAN IMMIGRATION AND REFUGEE SERV. & THE WOMEN'S REFUGEE COMM'N, LOCKING UP FAMILY VALUES, AGAIN: A REPORT ON THE RENEWED PRACTICE 10–11, 15, 19 (2014), http://lirs.org/wp-content/uploads/2014/11/LIRSWRC_LockingUpFamilyValuesAgain_Report_141114.pdf (noting that, while Immigration Judges may release individuals who pass a credible fear interview, there are "deep flaws" in the initial screening of individuals for eligibility for a credible fear interview).

[211] *See* EXEC. OFFICE FOR IMMIGRATION REVIEW, U.S. DEP'T OF JUSTICE, IMMIGRATION COURT PRACTICE MANUAL § 4.11 66 (2016) ("Interpreters are provided at government expense to individuals whose command of the English language is inadequate to fully understand and participate in removal. In general, the Immigration Court endeavors to accommodate the language needs of all respondents and witnesses. The Immigration Court will arrange for an interpreter both during the individual calendar hearing and, if necessary, the master calendar hearing."), https://www.justice.gov/sites/default/files/pages/attachments/2016/02/04/practice_manual_-_02-08-2016_update.pdf; ("Interpreters are provided at government expense to individuals whose command of the English language is inadequate to fully understand and participate in removal. In general, the Immigration Court endeavors to accommodate the language needs of all respondents and witnesses. The Immigration Court will arrange for an interpreter both during the individual calendar hearing and, if necessary, the master calendar hearing."). *See also* 8 C.F.R. § 1003.22 ("Any person acting as an interpreter in a hearing shall swear or affirm to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath or affirmation shall be required.").

fear interviews, because the families must attend their hearings virtually through video-conferencing. As a result, the interpreter is often not in the same location as either the asylum-seeker or the judge, significantly impeding the ability of the interpreter to understand the detainee and increasing the probability of inaccurate communication that affects procedural due process rights.[212]

At each of these five stages, both Spanish and non-Spanish speakers face endemic problems, which overlap but are not the same:

For Spanish speakers, there seem to be occasional deprivations of needed interpretive services altogether – but more often, the problem is that telephonic and video interpretation is not very effective. Consider two accounts of communications problems. The first account was filed by the *Flores* plaintiffs; it is a declaration by one Spanish-speaking resident who explained that when it was time for her release:

> I did not want to leave with grillete [an ankle monitor]. I had asked my daughter in Minnesota to help pay my bond.
> The officer spoke very fast and I could not understand what he was saying.
> I understood that those who passed through the bridge would not have grillete. . . . I signed the docs because the officer said it was "only to prove that you were here detained in this center."
> They told me that they didn't know much about the grillete after we leave because they said it depends on the state. . . .
> I did not understand that I was signing a document agreeing to leave with grillete.[213]

A second published account last year described a similarly ineffective credible fear interview of a Spanish speaker, this one marred by the problems inherent in telephonic interpretation:

> For Carolina's CFI, the AO used a phone-in interpretation service. . . . At first, Carolina had trouble hearing the interpreter. Then the interpreter has trouble hearing Carolina. In the playroom, heard through the thin trailer wall, a child started crying. Throughout the interview, the interpreter repeatedly misunderstood Carolina. I tried to correct the translation, but the AO officer wouldn't let me speak. The AO missed the most important thread of Carolina's story – that of being intimidated by the rival gangs, the fear she most often described to me.[214]

Generally, telephonic and video interpretation suffers from numerous flaws that tend to make important legal processes less fair and accurate:

---

[212] *See* ABA Report, *supra* note 209, at 38; *see also* LAURA ABEL, BRENNAN CENTER FOR JUSTICE, LANGUAGE ACCESS IN IMMIGRATION COURTS 8-9 (2011), http://www.brennancenter.org/sites/default/files/legacy/Justice/LangAccess/Language_Access_in_Immigration_Courts.pdf (describing problems with remote interpreting technologies).

[213] Plaintiff's Exhibits in Support of Motion to Enforce Settlement and for Appointment of Special Master Part 1: Exhibits 1-13 [hereinafter Flores Plaintiff's Exhibits Part 1], Exh. O, Attach. to Exh. 13 (Ankle Monitor Coercion Affidavit), Flores v. Johnson, No. 2:85-cv-04544 (C.D. Cal. May 19, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0020.pdf.

[214] Washington, *supra* note 208.

- Technological limitations mar telephonic interpretation and lead to the loss of important information.
  - Telephonic interpreters can have trouble hearing the speaker, and being heard. The result is frequent miscommunication. In fact, many telephonic interpretation services allow interpreters to use cell phones; the result is often lots of background noise or added difficulty hearing.
  - Telephonic interpretation often uses a speaker phone that allows only one person to talk at a time. That means interpreters can't interrupt to clarify or seek clarification.
  - Telephonic interpreters are frequently cut off. When the parties reconnect, they may or may not get the same interpreter. The result is at best delay and at worst starting all over.
  - Decision makers often express frustration and/or impatience with the long wait times, difficulty hearing, and other challenges of telephonic interpretation. This can affect their temperament, or lead the speaker to believe the decision maker is hostile to her.

- Compared to in-person interpreters, telephonic interpreters are less likely to facilitate trust and solve communication problems.
  - Telephonic interpreters lack the opportunity to introduce themselves to the client, test for language "match," and establish rapport.
  - Speakers who believe that the interpreter can't hear them for technological reasons are likely to abbreviate their story, cut to the chase, and omit details that are extremely important to the accurate adjudication.
  - Detainees – adults and children – are less likely to disclose traumatic information over the phone. Families in detention may have many reasons to distrust government officials or anyone associated with the government. In general, people are less likely to trust someone they cannot see. And detainees may believe that the interpreter is not the only person on the telephone line. When there is lack of trust, the speaker is particularly likely to be nervous about disclosing traumatic information, and may abbreviate or omit details. This may undermine the factual accuracy of the proceeding.
  - Live interpreters can read body language and visual clues, especially those specific to a given culture or dialect; this can both help with interpretation and allow an interpreter to understand when the speaker does not understand something. A live interpreter but not a telephonic one can see if a speaker looks confused, even if the speaker is too scared to ask for clarification.
  - It is difficult if not impossible for detainees to be confident that telephonic interpreters will not compromise the safety of a detained individual. Without face-to-face contact it is equally difficult for the detainee to develop a sense of trust or assess the reliability and trustworthiness of an interpreter. Conflict situations like the ones many families have fled mean that individuals on different sides of a conflict may arrive in the U.S. Detained individuals may therefore fear that their interpreter will share information about them with a person or state actor from whom they have fled.

- Visual cues can be vital to effective communication.

97

- Live interpreters are easily able to signal, without interrupting, that they need a break in the communication to catch up the interpretation. Telephonic interpreters cannot do this. When there's a telephonic interpreter, the speaker's narrative is apt to get too long and the interpreter may therefore lose details or summarize or paraphrase.
- An interpreter who is not in the room, observing the speaker's gestures, has difficulty conveying the gravity of a violent act or the seriousness of an injury. The speaker may point to a part of the body, for example, but if the interpreter cannot see, the interpretation is inadequate.

These problems are difficult or even impossible to avoid when using telephonic interpretation. But the size and high concentration of Spanish speakers mean that the FRCs can avoid telephonic interpreters; economies of scale minimize the cost of using staff who speak Spanish and in-person interpreters.

**Recommendation 5-19: DHS should avoid use of telephonic Spanish interpreters, developing and implementing policies and practices to instead provide in-person Spanish interpretive services, except in unusual or exigent circumstances, at each and every stage of the immigration proceedings, including, e.g., legal orientation; asylum officer interviews; and conversations with ICE personnel about matters such as procedures and release conditions. EOIR should do the same for appearances in immigration court.**

**Recommendation 5-20: DHS should undertake systematic efforts to improve the quality of language line interpretation.**

   a) **For each use of telephonic interpretation, DHS should ask DHS staff, facility staff, court staff, interpreters (when appropriate) and the assisted detainee to rate the effectiveness of interpretation and describe any problems; when a rating is low, DHS staff should review the circumstances and take corrective steps.**
   b) **DHS should track the ratings/problems and address them. For example, if cell phone usage by interpreters emerges as an issue, the contract terms should be quickly modified to bar cell phone usage.**

Language access problems affecting immigration proceedings are yet more severe for non-Spanish speakers. Interpretive services seem to be offered only a fraction of the time that they are needed, and are often ineffective when offered. Indigenous language interpretation can fail for a number of reasons: technical, dialect related, and because sometimes (when the DHS speaker does not speak Spanish, and the interpreter does not speak English) because it's a cumbersome two-step process that may resemble a game of telephone – English to Spanish, Spanish to dialect. All of these combined in an example described in one NGO letter to the Directors of ICE and USCIS:

> "Eliana," a Guatemalan Mam-speaking mother, and her four children, ages four, five, nine, and thirteen, were detained at Dilley for more than a month. An asylum officer interviewed Eliana on November 18, 2015. But the transcript of the interview revealed clear communication difficulties because Eliana could not understand the particular dialect spoken by the Mam interpreter, who in turn spoke to a telephonic Spanish interpreter, who then communicated with the asylum officer. On multiple occasions, Eliana asked for a different interpreter and stated she did not understand the language being used, but the asylum officer responded

98

that this was "proably [sic] as good as it gets" and forged ahead with the interview.
At two points of the interview, the interpreter service was disconnected, first for
twenty minutes and then for five minutes. . . .[215]

Another account described a similar situation before an immigration judge:

> I also sat in on a tele-hearing in which an indigenous Mam speaker from Guatemala
> appeared before a flat screen television to appeal an AO's decision that she did not
> have credible fear of persecution. In Miami, the judge held court in front of a
> camera and a screen of her own. She had a Spanish interpreter in the courtroom and
> a Mam interpreter on a telephone loudspeaker. The questions to the client went
> from Judge (in Miami) to Spanish Interpreter (Miami) to Mam interpreter
> (undisclosed location) to client (Dilley) back to Mam Interpreter (undisclosed
> location) to Spanish interpreter (Miami) back to judge (Miami). That is: English to
> Spanish to Mam to Mam to Spanish to English, in three locations. Not surprisingly,
> it was a total bungle . . . .[216]

It also seems likely that often, non-Spanish speakers are simply processed without being able to
understand or communicate effectively. For example, in a declaration filed in the *Flores* court by
the plaintiffs, one former Dilley resident explained that she was released without an interview with
an asylum officer because she speaks Kiche rather than Spanish. But notwithstanding the difficulty
she had understanding Spanish – which was known to DHS and was significant enough to preempt
her interview with an asylum officer – she describes signing papers she didn't entirely understand,
in Spanish, related to her ankle monitor.[217]

All in all, it seems clear that indigenous language speakers are not receiving equal access to
immigration benefits – and that their cases are probably not receiving fair processing.

**Recommendation 5-21: DHS should provide interpretive services to indigenous-language
speakers at each and every stage of the immigration proceedings, including, e.g., legal
orientation; asylum interviews; and conversations with ICE personnel about matters such as
procedures and release conditions. EOIR should do the same for appearances in immigration
court. For non-Spanish speakers, each and every encounter that can impact the detainee's
liberty or safety should be interpreted.**

**Recommendation 5-22: DHS should systematically monitor and improve the quality and
availability of language access for indigenous-language speakers, ensuring that interpretive
services are offered and that they are effective. For each use of interpretation services:**

   a)  **DHS should ask DHS staff, facility staff, court staff, interpreters (when appropriate)
and the assisted detainee to rate the effectiveness of interpretation and describe any
problems and when a rating is low, DHS staff should review the circumstances and
take corrective steps;**

   b)  **DHS should track the ratings/problems and address them; and**

---

[215] *Flores* Plaintiff's Exhibits Part 1, supra note 213, Exh. Q, Attach. to Exh. 13, at 9 (Dec. 24, 2015 Letter to León
Rodríguez & Sarah Saldaña).

[216] Washington, *supra* note 208.

[217] *Flores* Plaintiff's Exhibits Part 1, *supra* note 213, Exh. K, Attach. to Exh. 13 (Decl. of former Dilley resident).

c) **DHS should make every effort to avoid "two step" telephonic interpretation, e.g., from English to Spanish to a third language.**

### H. Grievances and Requests

All detainees, regardless of their language proficiency, need to be able to make requests and report misconduct or other problems. Presenting requests or grievances presents serious difficulties for any FRC resident who is either illiterate or does not speak Spanish.

1. **Grievances**

We received blank grievance forms for all three FRCs. A requirement that officials accept the forms when filled out in a non-English language is neither part of the relevant policies nor mentioned in the resident handbooks, and we have been unable to verify if that this occurs in practice. Still, forms for all three FRCs use both English and Spanish, so we infer that written responses to the form's questions in Spanish are accepted and processed at all three facilities.

We are less optimistic about access to the grievance system for non-Spanish speakers. In this area, existing policy is not the problem. Grievance policy documents for all three facilities provide for language assistance:

- Karnes: "Mothers and children are informed about the facility's informal and formal grievance system in a language or manner they understand."[218] "For mothers and children with limited proficiency with English, every effort will be made to find a staff member who speaks the primary language as the mother and child, to help them complete the written grievance form."[219]
- Dilley: "Written policy and procedures as established herein provide for a resident grievance system that: . . . Ensures information, advice, and directions are provided to residents in a language they can understand, or that interpretation/translation services are utilized."[220]
- Berks: "The Program Director shall ensure that procedures accommodate the need for special assistance to residents who are disabled, illiterate, or limited in English in preparing and pursuing a grievance."[221]

However, detainees are not provided adequate notice of the availability of these language services; rather they are simply told to ask for help. At Karnes, detainees are notified by the resident handbook that they can request help from "staff members, other residents or outside sources such as members or legal representatives";[222] at both Berks and Dilley, the resident handbooks list the possibility of requesting help from "other residents, family members, legal representatives or staff."[223] Thus there is no particularized notice to detainees that they can get language assistance for grievances.

---

[218] Karnes Policy 6.1.3, Grievance Procedure 1.
[219] *Id.* at 3.
[220] Dilley Policy 14-101, Resident Grievance Procedures 2 (Aug. 17, 2015).
[221] Berks Policy 11.010, Resident Grievance Process 3 (Jan. 26, 2015).
[222] Karnes Resident Handbook, *supra* note 186, at 35.
[223] Berks Resident Handbook, *supra* note 186, at 21; Dilley Resident Handbook, *supra* note 186, at 51.

100

2.  **Non-grievance Requests**

We have no information on the rate of grievance-filing at the FRCs, but our experience suggests
that it is likely extremely low. Detainees' relatively short stays at Karnes and Dilley, and the
grievance process's formality at all three facilities, make the process described in the policies quite
cumbersome for them. Therefore, non-grievance requests and other written and verbal methods of
bringing needs or problems to the attention of authorities are more practically important for
resident welfare and safety than grievances are.

As with the grievance forms, we have been provided non-grievance request forms in both Spanish
and English, and we infer (though there is no policy so stating) that they are accepted when filled
out in Spanish.[224] However, we did not receive such a form for Dilley, so have not confirmed that
that facility's form includes Spanish. In addition, the various Resident Handbooks reference
several additional documents which we were not provided, so we do not know if they are available
or accepted in Spanish. These include a "Program Request" form (Berks); "Talton telephone
resolution form" (Karnes); and "14-100G Lost / Damaged / Stolen Personal Property Claim"
(Dilley).

Unlike with respect to grievances, where the language assistance policy is clear – though, as
described above, not communicated clearly to detainees – for non-grievance requests, there are no
applicable facility policy discussions. In addition, only in the Karnes Resident Handbook is
language access mentioned, stating:

> A resident may obtain assistance from another resident, counselor, or other facility
> staff in preparing a request form. The Facility Administrator will ensure that the
> standard operating procedures cover residents with special requirements, including
> those who are disabled, illiterate, or know little or no English. KCRC staff is
> encouraged to use the Language Line available to them for translation services.[225]

For both Dilley and Berks, the resident handbooks do not mention language assistance, but do
inform residence that they "may obtain assistance from another resident or staff member in
preparing" the form.[226]

Given the high importance of these request forms, language access assistance should be readily
available – and detainees should be explicitly informed about that availability.

**Recommendation 5-23: ICE should ensure that all grievance and request forms, including
specialized request forms (e.g., Program Request, Talton telephone resolution form, 14-100G
Lost/Damaged/Stolen Personal Property Claim) are provided to detainees routinely in both
Spanish and English. In addition, written translations for other languages that tracking
reveals are prevalent in any significant numbers should be conducted and made readily
available, using the same cutoff for translation as described in Recommendation 5-7.**

**Recommendation 5-24: ICE should ensure that facility policy and the resident handbooks
state expressly that both grievances and request forms filed in Spanish or any other written**

---

[224] We have reviewed forms from both Berks and Karnes headed "General Request." The Resident Handbooks in all
three facilities refer to a "Resident Request Form" which we assume is this same document.
[225] Karnes Resident Handbook, *supra* note 186, at 24.
[226] Berks Resident Handbook, *supra* note 186, at 8–9; Dilley Resident Handbook, *supra* note 186, at 10, 15, 18.

language will be accepted and processed. ICE should ensure there is a process in place for response to such non-English written requests/grievances, including for any needed language assistance in communicating that response with the resident who submitted the request.

**Recommendation 5-25:** ICE should ensure that resident handbooks expressly state that interpretation services are available if needed for grievances and requests and that there is a zero tolerance policy for retaliation by ICE or facility staff; this also should be part of the oral orientation provided non-Spanish speakers, and should be printed on the grievance and request forms. For any oral communication conducted with a detainee in connection with the grievance or request, interpretation services should be offered without waiting for a request by a detainee.

**Recommendation 5-26:** ICE should conduct audits of requests and grievances made by non-Spanish speakers, to ensure that (a) such requests are actually being made at approximately the same rate as Spanish speakers (because under-use of the system likely indicates a failure of language access); (b) language assistance is being used when useful for such requests.

## I.   Medical and Mental Health Care

Particularly in light of the traumatic experiences many of the FRC's detainees have lived through, their medical and mental health care may be far from routine – so effective communication is an urgent need.

ICE's Family Residential Standard 4.3 (Medical Care),[227] covers language issues, requiring that:

- "Newly admitted residents will be informed how to access health services, in a language they can understand."
- "Where required, residents have regular access to translation services and/or are provided information in a language that they understand."
- "If language difficulties prevent the health care staff from sufficiently communicating with the resident to complete the intake screening, the staff shall obtain interpreter assistance."
- "Such assistance may be provided by another staff or by a professional service, such as a telephone interpreter service."
- "Only in emergency situations may a resident be used for interpreter assistance, and then only if the interpreter is proficient and reliable, and only with the consent of the resident being screened."
- "If the procedure [for requesting health care services] is a written request slip, they shall be provided in English and the most common languages spoken by the resident population of that facility. If necessary, residents, especially those illiterate or non-English speaking, shall be provided assistance to complete a request slip."
- "Informed consent standards of the jurisdiction shall be observed, and consent forms shall either be in a language understood by the resident, or interpreter assistance shall be provided and documented on the form."

---

[227] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, ICE/DRO RESIDENTIAL STANDARD 4.3 MEDICAL CARE (Dec. 21, 2007), www.ice.gov/doclib/dro/family-residential/pdf/rs_medical_care.pdf.

653

The resident handbooks do not include any reference to detainees' right to language access services relating to medical or mental health care. However, we received intake medical screening forms for both adults and children, each of which included a question to elicit the patient's language.[228] The ACFRC has not received any documentation of any particular process used to ascertain the language spoken by any resident, when there is any difficulty. Presumably, medical and mental health staff rely on the process already described, in Section C (Orientation).

In addition, the intake screening forms include several relevant checkboxes, presumably indicating goals, if not universal achievement of those goals. For the adults, these are:

☐ Resident given medical orientation and health information handouts in Residents language.
☐ Resident was given written orientation materials and/or translations in Residents own language.
☐ If a literacy problem exists, screener assisted the Resident with understanding education handouts.
☐ Resident verbalized understanding of any teaching or instruction and was asked if he or she had any additional questions.

As these check boxes indicate, there seem to be various handouts used for medical and mental health care. Karnes, at least, distributes a health information handout as part of its resident handbook, including (we assume) a translated version in the Spanish version of the handbook. We do not understand that any of the materials, or sick call slips (where they are used) have been translated into any non-Spanish languages.

For most of the detainees, providing effective medical and mental health care requires Spanish language services – by translation of documents (which may be occurring already) and by Spanish-language conversation or interpretation of oral communications.

However, it is worth noting that interpretation can obstruct development of an appropriate therapeutic relationship for providers – particularly for mental health providers. So ideally, both medical and mental health treatment professionals would speak good Spanish, and therefore have no need for interpretation. We do not know the language skills of ICE Health Service Corps (IHSC) and contracted medical and mental health staff at the FRCs, but in a recent court filing, the *Flores* plaintiffs filed evidence that, at least at Berks in August 2015, there were no Spanish-speaking mental health staff. The plaintiffs' witness, a social worker who toured the facility and spoke with its mental health staff, observed:

> During the tour, I was most struck by our discussion with the mental health staff. They explained to us that there were no Spanish-speaking mental health staff at Berks, that all services were provided through a phone interpreter, and that they had no problem with this arrangement. As a long time practitioner in the field of mental health, I found this arrangement concerning as the inability to communicate with

---

[228] The adult form is labeled "GEO," which is odd, since the Geo Group does not provide the medical care even at Karnes, where it operates the facility more generally. *See* HS-168 Intake Screening (rev. Jan. 2014).

clients effectively has a deleterious impact on a clinician's ability to build rapport and trust with a client. These are the bedrocks of the therapeutic relationship.[229]

We have no more up-to-date information, or any information on this issue for Dilley and Karnes.

If providers are not adequately fluent in Spanish – and for patients who speak neither English nor Spanish – telephonic, video, or live interpretation is needed.[230] As with non-medical interpretation, we are, unfortunately, unable to evaluate whether interpreter services are being used appropriately. ICE's Language Access Plan states: "Using the electronic Health Record (eHR), IHSC has the capability to track interpretation services provided to LEP individuals by searching the Registry for the languages utilized." We requested this information for each of the FRCs, including: a. languages utilized; b. situations covered; and c. whether the interpretation was live or via telephone. But ICE declined to answer those questions, deeming them – incorrectly, we think – outside the committee's scope.

**Recommendation 5-27: ICE should notify all detainees – using resident handbooks and signs posted in medical clinics for those who read Spanish or English, and orally in a language that others understand – that they have a right to language-related services needed to meaningfully access medical and mental health care.**

**Recommendation 5-28: ICE should attempt to meet most FRC detainees' need for Spanish-language medical and mental health services by adjusting its staffing decisions to prioritize Spanish-language skills among medical and mental health staff.**

**Recommendation 5-29: ICE should audit the medical and mental health encounters of detainees who speak indigenous languages, to see how their language access needs are being met. Whenever the audits reveal a problem, ICE should promptly develop particular policy, resource, or training solutions.**

## J. Discipline

The FRC disciplinary process is to be used only "as a last resort."[231] But if a detainee's alleged misconduct is made the subject of formal discipline, a multi-step process ensues. First, there is an investigation. Next comes a hearing either before a Management Review Committee or – for more serious offenses or on referral by the Management Review committee – before an Executive Review Panel. Then the facility administrator reviews the findings of the Executive Review Panel. Finally, there are avenues of appeal.

---

[229] Plaintiff's Exhibits in Support of Motion to Enforce Settlement and for Appointment of Special Master Part 6: Exhibits 48-69, Exh. 62 (Decl. of Jessica Gorelick), ¶ 7, Flores v. Johnson, No. 2:85-cv-04544 (C.D. Cal. May 19, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0024.pdf.

[230] Cf. 45 C.F.R. § 92.201, https://www.federalregister.gov/documents/2016/05/18/2016-11458/nondiscrimination-in-health-programs-and-activities.

[231] Karnes Resident Handbook, *supra* note 186, at 10.

ICE's Family Residential Standard 3.1 (Discipline and Behavior Management)[232] provides that
"The Facility Administrator (FA) or designee shall, upon the resident's request, assign a staff
representative to help prepare a defense. This help will be automatically provided for illiterate
residents, residents with limited English-language skills, and residents without means of collecting
and presenting essential evidence." It also states more generally that "Where required, residents
have regular access to translation services and/or are provided information in a language that they
understand."

However, the FRCs' practice is apparently inconsistent with these requirements. All three resident
handbooks tell detainees that they have a right to have an interpreter present during hearings before
the Management Review Committee and the Executive Review Panel.[233] This is useful, but
insufficient and non-compliant with the ICE standard. First, no mention is made of the right to
interpretive and translation services prior to the hearing, although that is clearly required by
Standard 3.1. Second, there is no notice given of the right to a staff representative, to assist
detainees to prepare a defense, again, clearly required by Standard 3.1.

**Recommendation 5-30: ICE should ensure that FRC policy and practice is to provide limited
English proficient detainees needed translation and interpretation services not only during
disciplinary hearings but during investigations as well. Detainees should be notified of their
entitlement to such services in the resident handbook and by other orientation methods.**

**Recommendation 5-31: ICE should ensure that FRC policy and practice is to automatically
assign LEP detainees facing disciplinary charges a staff representative to help prepare a
defense. If the staff representative needs interpretation services to talk to the resident, these
should be provided.**

**Recommendation 5-32: ICE should conduct audits of disciplinary proceedings and
investigations involving non-Spanish speakers, to ensure that language assistance is being
used.**

### K. Release

ICE declined to share with us any information about resident release conditions or processes,
including language access services. Many NGOs have complained that detainees who are released
do not receive effective communication of their release conditions or options, including, for non-
Spanish speakers, instructions in a language they understand about when and where to appear in
court.[234] Released individuals are often confused about their simultaneous obligations to report to
both ICE *and* the court. This is a problem that can be solved going forward by better language
access practices. But some detainees who were already released without effective communication
about their court appearance requirements were then ordered removed *in absentia*. They need a
backward-looking remedy.

---

[232] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, ICE/DRO RESIDENTIAL STANDARD 3.1 DISCIPLINE AND BEHAVIOR
MANAGEMENT (Dec. 21, 2007), www.ice.gov/doclib/dro/family-
residential/pdf/rs_discipline_and_behavior_management.pdf.
[233] Berks Resident Handbook, *supra* note 186, at 24; Dilley Resident Handbook, *supra* note 186, at 55–56; Karnes
Resident Handbook, *supra* note 186, at 12.
[234] *See, e.g.*, CARA Complaint, *supra* note 180, at 7.

**Recommendation 5-33: DHS should ensure that all detainees are given clear instructions in a language they understand well (ideally their primary language) – written as well as oral – about their release obligations and options. To facilitate understanding, the materials should include easy-to-follow visual indications that explain the simultaneous obligations to report to both ICE and the court. Release materials should also include information (telephone numbers, websites, and the like) in a language a detained individual understands well to assist with language access for immigration encounters and proceedings after the resident arrives to her post-release community, as well as information about services to assist victims of sexual abuse, assault and human trafficking.**

**Recommendation 5-34: DHS should audit the language services used for limited English proficient individuals – including, particularly, non-Spanish speakers – in communicating with them about their release to ensure that detainees are receiving communication in a language they understand well, and should implement resources, training, and other supervision to improve language access as the audit reveals various needs.**

**Recommendation 5-35: DHS should review the files of indigenous language and other non-Spanish speakers who have been issued *in absentia* removal orders. If no language access services were provided to ensure that the conditions of release were communicated to the former detainee in a language she could understand, DHS should reopen the immigration proceeding, without waiting for a request.**

### L. Training

The DHS Language Access Plan explains that there are three components to language access:

> (1) providing the necessary language assistance services; (2) training staff on policies and procedures; and (3) providing notice of language assistance services.[235]

Our recommendations above cover the first and third of these components. We are, unfortunately, less able to offer feedback with respect to training, because ICE has declined to share with us the necessary information. In particular, ICE was unwilling to share its training documentation and materials with us. We were informed, merely: "ICE Staff are provided with language access training during orientation and refresher training annually," and "Headquarters IHSC is formalizing training, specific to healthcare services and is on track to be released by the end of FY16." ICE further took the unfortunate – and in our view incorrect – position that the language access training provided to volunteers and contractors – the latter of whom have nearly constant contact with FRC detainees – was outside the scope of the Committee's work.

Accordingly, we do not know if contractors, in particular, receive any training at all on language access obligations, and we are unable to assess the quality of any ICE or IHSC training that is provided. We are therefore unable to offer little more than general recommendations:

**Recommendation 5-36: DHS should ensure that ICE staff, IHSC staff, contractors and volunteers receive high quality training on language access requirements and procedures, with an emphasis on application of the policies to particular situations where they are likely**

---

[235] DHS Language Access Plan, *supra* note 163, at 3.

to arise, and on how to communicate effectively with detainees who do not speak English, and with detainees who speak neither English nor Spanish.

**Recommendation 5-37: DHS should share with this Committee or (if the Committee is no longer in operation) with stakeholder groups the orientation and refresher language training provided ICE staff, the IHSC training currently in development, and any training provided FRC contractors, in order to obtain feedback.**

### M. Quality Monitoring and Improvement

ICE has already undertaken to develop systematic assessment and quality improvement tools. The ICE Language Access Plan, which was finalized a year ago, includes three relevant provisions:

- "During initial processing, ICE, through ERO, identifies the LEP individuals in custody for whom language services are not readily available, as well as the points of interaction requiring language services. As of March 2015, the following Mayan dialects are represented within the ICE family residential facilities: Quiche (K'iche), Mam, Achi, Ixil, Awakatek, Jakaltek (Popti), and Qanjobal (K'anjob'al). Efforts are currently underway to improve the language services provided in ICE residential facilities including identifying vendors through ICE's existing Language Services Blanket Purchase Agreement that can provide interpretation services to indigenous speakers."[236]
- "ERO [Enforcement and Removal Operations] will develop an LEP assessment tool to assess language access procedures as well as the effectiveness of LEP interventions for the detainee."[237]
- "ODCR [Office of Diversity and Civil Rights] will facilitate the establishment of a plan for monitoring the quality and effectiveness of current language service programs and activities within ICE. The plan will include assessing the effectiveness of the use of tools such as "Tips on Working with Interpreters" and training as needed based on the results of the monitoring."[238]

Unfortunately, in the year since ICE's Language Access plan was finalized, it seems little progress has been made. We asked questions about each of these items and received no information about any improvements. Rather, ICE informed us that the assessment tool "is not yet developed," that the quality monitoring plan is "not yet finalized." In response to the question "what is the status of the efforts to improve the [telephonic] language services?" ICE stated only that "ICE has access to language lines with a wide range of languages available."

As we have emphasized throughout this Part, ICE is unlikely to be able to improve language access services if it does not systematically self-monitor its needs, successes, and challenges.

**Recommendation 5-38: ICE should complete and solicit public comment on its LEP assessment tool and language access quality monitoring plan. These should include criteria for prevalence of a language in a given population that justifies translation of orientation and**

---

[236] ICE Language Access Plan, *supra* note 164, at 10.
[237] *Id.* at 15.
[238] *Id.* at 16.

658

**other documents. The quality monitoring plan should include systematic solicitation of anonymous feedback from detainees.**

108

659

## 6.   MEDICAL, MENTAL HEALTH AND TRAUMA-INFORMED CARE

In the past three years, thousands of women and children apprehended on the southwestern border fled from violence in their native countries of Honduras, Guatemala, and El Salvador, seeking humanitarian protection in the U.S. Despite efforts to deter immigration from these countries, unaccompanied children and families (mainly mothers and children) continue to brave the treacherous journey to a safer location. Many have endured domestic violence, sexual assault, rape, and threats to their lives.[239] Women interviewed by the United Nations High Commissioner on Refugees reported being victims of extortion and further sexual and physical assaults on the journey.[240] It is within this context that families arrive at the Family Residential Centers (FRCs), traumatized and coping with the separation from family members and friends. Newly arrived families at the FRCs are in need of health, mental health, and victim services provided by professional staff trained in trauma-informed care.

The families residing in the FRCs are in civil immigration detention. They are not being held as a result of criminal arrests or convictions and in fact the current policy is that anyone with a criminal background may not be detained in an FRC. They should not be treated as criminals, particularly when it comes to access to critical health, mental health, and victim services. The U.S. government has an obligation to provide them trauma-informed medical, mental health, and victim services. These services should never be withheld to correct behavior or as punishment to any person detained by the U.S. government.

Detention in and of itself has been found to be traumatizing and have significant mental and physical health consequences.[241] The indefinite nature of immigration detention may trigger a profound sense of powerlessness and loss of control, contributing to additional severe and chronic emotional distress for asylum seekers.[242] Detaining families undermines family relationships in very damaging ways – for example, adult detainees' ability to parent is compromised because they lose authority in the eyes of their children (and in reality); parents are unable to protect their children from guards or outside authorities; children blame their parents for being locked up; the stress, fear and powerlessness has a direct effect on children's behavior and simultaneously undermines parents' ability to address that behavior.[243] Children are especially impacted;

---

[239] UNITED NATIONS HIGH COMM'R FOR REFUGEES, WOMEN ON THE RUN: FIRST-HAND ACCOUNTS OF REFUGEES FLEEING EL SALVADOR, GUATEMALA, HONDURAS, AND MEXICO (October 2015), http://www.unhcr.org/5630f24c6.html [hereinafter UNHCR, WOMEN ON THE RUN]; Krista M. Perreira & India Ornelas, *Painful Passages: Traumatic Experiences and Post-Traumatic Stress Among Iimmigrant Latino Adolescents and their Primary Caregivers*, 47 INT'L MIGRATION REV. 28, 43 (Dec. 2013).

[240] UNHCR, WOMEN ON THE RUN, *supra* note 239.

[241] *See, e.g.*, Guy J. Coffey, et al., *The Meaning and Mental Health Consequences of Long-Term Immigration Detention for People Seeking Asylum*, 70 SOC. SCI. & MED. 2070 (2010); *see also* U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL (2005).

[242] CTR. FOR VICTIMS OF TORTURE, TORTURED & DETAINED: SURVIVOR STORIES OF IMMIGRATION DETENTION (2015), http://www.cvt.org/sites/cvt.org/files/Report_TorturedAndDetained_Nov2013.pdf.

[243] LUTHERAN IMMIGRATION & REFUGEE SERV. (LIRS) & WOMEN'S REFUGEE COMM'N (WRC), LOCKING UP FAMILY VALUES: THE DETENTION OF IMMIGRANT FAMILIES (2007), http://lirs.org/wp-content/uploads/2012/05/RPTLOCKINGUPFAMILYVALUES2007.pdf; LUTHERAN IMMIGRATION & REFUGEE SERV. & WOMEN'S REFUGEE COMM'N, LOCKING UP FAMILY VALUES AGAIN (2014), https://www.womensrefugeecommission.org/resources/document/1085-locking-up-family-values-again.

660

international research has found that the unique vulnerabilities of children place them especially at risk of health and development issues even if the detention is for short periods.[244] It is crucial that the environment of the FRCs be normalized in order to continue to maintain the normal parent-child relationship and to avoid destabilization of the family.

The fact that mothers and their children have suffered trauma in their home countries and often have suffered additional abuse, sexual assault, and victimization on their journey amplifies and exacerbates the negative impact of FRC detention. For the overwhelming majority, the persecution suffered by the child or adolescent has taken the form of violence – either through physical violence the child or adolescent suffered themselves or through exposure to violence against close family members and friends.[245] Even more significantly, a substantial body of psychological and physiological research shows that childhood or adolescent exposure to trauma and/or violence negatively impacts cognitive, social, and biological development.[246] Moreover, neurobiological studies show that the impact of trauma on children's brain development is not just measured by diagnoses of post-traumatic stress disorder (PTSD) or other psychiatric diagnoses; in fact, research indicates that the physical development of the human brain is negatively impacted when a child or adolescent faces maltreatment or violence, particularly when such trauma is long-term or continuing.[247] The endogenous chemicals that stimulate the emotional centers of the brain and the "fight or flight" response have a counter effect on the frontal lobes, reducing activity in those lobes, which are the most important brain areas regarding executive functions.[248] In essence, child trauma victims' brain development and abilities will be developmentally behind children or adolescents of the same age without such a history of trauma, and these difficulties will have long-lasting impacts. All of these difficulties are amplified for children in FRCs by the continuing traumatic impact of detention.

Thus, since the majority of the detainees are children, special consideration of the best interests of children should be taken in all aspects of care for this vulnerable group.[249] Studies have shown negative physical and emotional symptoms among detained children[250] and experts have

---

[244] INT'L DETENTION COAL., CAPTURED CHILDHOOD 1, 50 (2012), http://idcoalition.org/wp-content/uploads/2012/03/Captured-Childhood-FINAL-June-2012.pdf.

[245] See Krista M. Perreira, Painful Passage: Traumatic Experiences and Post-Traumatic Stress Among Immigrant Latino Adolescents and Their Primary Caregivers, 47 INT'L MIGRATION REV. 976 (2013); see also UNHCR, WOMEN ON THE RUN, supra note 239; NAT'L CHILD TRAUMATIC STRESS NETWORK, UNACCOMPANIED MIGRANT CHILDREN (2014), http://www.nctsn.org/sites/default/files/assets/pdfs/um_children.pdf.

[246] See, e.g., J. Cobb. Scott, et al., A Quantitative Meta-Analysis of Neurocognitive Functioning in Posttraumatic Stress Disorder, 141 PSYCH. BULL. 105, 113 (2015).

[247] See, e.g., Vidanka Vasilevski & Alan Tucker, Wide-Ranging Cognitive Deficits in Adolescents Following Early Life Maltreatment, 30 NEUROPSYCHOLOGY 239, 241(2016).

[248] See, e.g., John Best et al., Executive Functions After Age 5: Changes and Correlates, 29 DEVELOPMENTAL REV. 180, 187-8 (2009).

[249] SUBCOMM. ON BEST INTERESTS OF THE INTERAGENCY WORKING GRP. ON UNACCOMPANIED & SEPARATED CHILDREN, FRAMEWORK FOR CONSIDERING THE BEST INTERESTS OF UNACCOMPANIED CHILDREN 1, 5-6 (2016) ("The Framework developed by the Interagency Working Group seeks to ensure consideration of the best interests of unaccompanied immigrant children . . . This Framework envisions consideration of the best interests of the child from the moment the child is identified by federal officials as unaccompanied until there is a durable solution."

[250] Ann Lorek et al., The Mental and Physical Health Difficulties of Children Held Within a British Immigration Detention Center: A Pilot Study, 33 CHILD ABUSE & NEGLECT 573, (2009); Rachel Kronick, Cécile Rousseau, & Janet Cleveland, Asylum-seeking Children's Experiences of Detention in Canada: A Qualitative Study, 85 AM. J.

concluded that even brief detention can cause psychological trauma and induce long-term mental health risks for children.[251] Given the potential to re-traumatize children under the custody of the FRCs, specialized precautions should be taken.

Medical and mental health care delivered at the FRCs must comply with applicable state and federal regulations and with ICE Family Residential Standards. In addition, the FRCs must adhere to applicable sections of ICE's most recent version of Performance Based National Detention Standards (PBNDS 2011) where these standards provide a higher level of care for the detainees. All contractors that the ICE Health Service Corps enlists must adhere to the above standards. For the recommendations outlined in this Part, the Committee reviewed both sets of standards, as well as the best practices in the fields of medicine, mental health, victim services, and trauma-informed care. Where data and reports on the actual provision and staffing of the services were not provided for ACFRC review, recommendations are based on best practices in the field. Each recommendation reflects the most appropriate standard, and when the Family Residential Standards and/or the PBNDS 2011standards are not aligned with best practices or nationally recognized professional standards, they should be rewritten. (In addition, as ICE revises its standards over time, it should always be the case that the FRCs follow whatever standard imposes the highest level of care for detainees.)

**Recommendation 6-1: ICE should update the Family Residential Standards to include all of the additional protections, medical treatment, and opportunities for assistance included in the PBNDS 2011, without shrinking any existing Family Residential Standard requirements. In the many areas in which both the PBNDS 2011 and the Family Residential Standards are inadequate and not aligned with current best practices in the medical, mental health, and trauma fields, ICE should update both sets of standards to include these best practices.**

### A. Medical Assessment and Care

Medical screenings for certain medical conditions are fundamental in any basic medical service system. The selection of medical screenings/tests should be directly related to age group, country of origin and infectious disease exposure. All detainees transferred to ICE custody who were previously in held by Customs and Border Protection (CBP) will have arrived at the FRC with medical records transferred to ICE from CBP. Both adults and children may have received some medical screening while in CBP custody. FRCs will need to include the medical or mental health information received from CBP in the medical and mental health records created for the detainee at the FRC. FRC medical and mental health staff will also need to review those medical records as part of their assessment and screening of detainees' health care needs in the same manner as they should review any medical records the detainee brought from their home country. All medical records sent from CBP and copies of the medical records the detainee brought from their home country should be included as part of the detainees' full FRC medical/mental health record. Detainees should be provided full and complete copies of their records upon release and medical records should also be accessible to detainees and any medical providers or legal representatives

---

ORTHOPSYCHIATRY 287, 291 (2015); Sarah Mares & Jon Jureidini, *Psychiatric Assessment of Children and Families in Immigration Detention--Clinical, Administrative and Ethical Issues,* 28 AUSTL. & N.Z. J. OF PUB. HEALTH 520 (2004).
[251] SOC'Y FOR CMTY. RESEARCH AND ACTION, *Policy Statement on the Incarceration of Undocumented Migrant Families*, 57 AM. J. COMMUNITY PSYCHOL. 255 (2016).

with proper HIPAA release forms that detainees are to be provided full access to post-during their stay in detention and post release.

1. **Essential Health Care Screenings**

There are several important sources that list what health care screenings should be offered to detainees. The U.S. Department of Health and Human Services (HHS) has published a chart of the health screenings that are recommended for women.[252] The Centers for Disease Control and Prevention (CDC) has published sexually transmitted disease (STD) and HIV screening recommendations. [253] The general detention standards PBNDS 2011 require that "preventative services specific to women shall be offered for routine age appropriate screenings, to include breast examinations, pap smear, STD testing and mammograms."[254]

The current Family Residential Standard on Sexual Abuse and Assault Prevention and Intervention states, "Provision is made for testing for sexually transmitted diseases (e.g., HIV, gonorrhea, hepatitis, and other diseases and counseling, as appropriate)."[255] This could, unfortunately, be interpreted to allow rather than require medical staff to offer STD and HIV testing to sexual assault victims; perhaps that is part of the reasons FRC medical staff appear to be authorizing STD testing only for detainees who exhibit symptoms.

**Recommendation 6-2: All appropriate health screenings and tests should be offered to detainees, free of charge. This includes health screenings and tests recommended by the CDC and HHS, as well as the preventative health services required by PBNDS 2011; more detail is included in subsequent recommendations. To facilitate access to all of the health screenings listed below, ICE and the FRCs should either provide the screenings and tests or contract with nearby federally qualified health centers and/or organizations that provide mobile health screenings. Consent laws of the state in which the FRC is located should govern patient consent, including parental consent for testing children and adolescents.**

**Recommendation 6-3: All FRC detainees should receive medically indicated health screenings and tests including any tests or screenings indicated by a thorough medical history or other information provided by the detainee verbally or through documentation:**

    a) **All women should be offered: breast examinations, mammograms, pelvic examinations, pap smears, blood pressure tests, cholesterol tests, and diabetes screenings.**

    b) **Women age fifty or older, should receive bone mineral density tests and colorectal cancer screening.**

---

[252] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OFFICE OF WOMEN'S HEALTH, *Screening Tests for Women* (2013), http://www.womenshealth.gov/publications/our-publications/screening-tests-for-women.pdf.

[253] CENTERS FOR DISEASE CONTROL AND PREVENTION, *STD & HIV Screening Recommendations* (2016), http://www.cdc.gov/std/prevention/screeningreccs.htm.

[254] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, 2011 ICE PERFORMANCE-BASED NATIONAL DETENTION STANDARDS (2012), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011.pdf [hereinafter PBNDS 2011], at 306.

[255] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARD 2.7, SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION 7, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_sexual_assault_prevention-intervention.pdf.

112

663

c) **Adults and adolescents over age 13 should be offered STD testing, including for Chlamydia, Gonorrhea, Syphilis, Hepatitis B, Hepatitis C, Human Papillomavirus (HPV), Trichomonas,[256] and HIV.**

d) **Medical screening tests should be administered to each adult and child detainee based on the infectious diseases endemic in their country of origin or in countries through which they may have travelled en route to the U.S. The World Health Organization (WHO)[257] provides up-to-date information on relevant infectious diseases that are endemic internationally.**

**Recommendation 6-4: FRC medical providers should continue to offer pregnancy tests to every female of child-bearing age who is newly detained at an FRC. In addition, all requests for a pregnancy test during the period of detention should be promptly granted. Vaccines related to pregnancy should be offered pursuant to CDC guidelines and all states recognize adolescents right to consent for sexuality care including laws governing age of consent of adolescents for pregnancy and STD testing. Additional screening for pregnant women, including for anemia, gestational diabetes, Rh incompatibility, urinary tract infection, and cystic fibrosis should be provided.[258] Pregnant women should always be offered lead protection or alternatives to x-ray screenings. ICE should comply with its recent *Memo on the Identification of Pregnant Detainees*,[259] and with guidelines laid out in the PBNDS 20011 for women's health, including with respect to access to abortion, and should consider release. If detention continues ICE should ensure timely referral for appropriate pre-natal and medical care, reporting of detention to ICE Headquarters and continued review of the need to detain.**

**Recommendation 6-5: Every potentially sexually active detainee (male or female), including any detainee who requests testing, and any detainee who may have been sexually assaulted either during detention or prior to detention – whether or not the assault took place in the U.S. – should be offered tests for sexually transmitted diseases (STDs), including HIV. Testing should be offered whether or not the detainee has a history of symptoms, pursuant to guidelines of the CDC for sexually assaulted women in order to identify, prevent, and treat STDs.[260]**

---

[256] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Screening Recommendations and Considerations Referenced in the Treatment Guidelines and Original Sources*, http://www.cdc.gov/std/tg2015/screening-recommendations.htm. (testing for Trichomonas is needed for detainees because of the nature of the detention setting and because of the high numbers of detainees who have experience and fled sexual assault in their home countries or have suffered sexual assault in route to the U.S.).

[257] *Common Infectious Diseases Worldwide*, INFOPLEASE, http://www.infoplease.com/ipa/A0903696.html.

[258] *See How is Cystic Fibrosis Diagnosed?,* NAT'L INSTITUTES OF HEALTH, NAT'L HEART, LUNG, AND BLOOD INSTITUTE, https://www.nhlbi.nih.gov/health/health-topics/topics/cf/diagnosis.

[259] Thomas Homan, U.S. Immigration & Customs Enforcement, *Memo: Identification and Monitoring of Pregnant Detainees* (Aug. 15, 2016), https://www.ice.gov/sites/default/files/documents/Document/2016/11032.2_IdentificationMonitoringPregnantDetainees.pdf.

[260] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Sexual Assault and Abuse and STDs*, http://www.cdc.gov/std/tg2015/sexual-assault.htm.

**Recommendation 6-6: ICE should amend the Family Residential Standards to conform with Recommendations 6-1 through 6-4 and to meet the CDC's guidelines for testing of sexual assault victims.**

**Recommendation 6-7: All FRCs should offer all medical screenings and tests using a trauma-informed approach that recognizes that some exams, like pap smears, can re-traumatize victims of sexual assault. Medical screenings/tests should be conducted as a multi-part process. An educational video should be developed in English, Spanish, and other primary languages spoken by detainees that describes the testing and screening offered, and explains that there is no cost, how the testing is useful to adult detainees and their children, and the screening and testing process. The video should additionally explain that detainees will be informed of test results in a timely manner and provided with copies of the test results to take with them when they are released from detention. Finally, the video should inform detainees that they may choose not to have certain tests (e.g., pap smears) or can ask medical personnel to stop at any point during the screening/testing if they wish. For detainees who do not understand a language used in the video, qualified interpretive services should be provided.**

**Recommendation 6-8: ICE should update the Family Residential Standards to include the following PBNDS 2011's requirements relating to followup to sexual assault:[261]**

    a) **"Prophylactic treatment, emergency contraception and follow-up examinations for sexually transmitted diseases shall be offered to all victims, as appropriate."**
    b) **"Following a physical examination, a mental-health professional shall evaluate the need for crisis intervention counseling and long-term follow-up."**
**The detainee has the right to refuse treatment, counseling, and follow-up if she is competent, unless failure to receive such services poses an imminent danger to the detainee or others.**

2. **Medical Screenings for Children**

The Family Residential Standards require every child in the FRCs to have a health assessment and physical exam done in the first 24 hours at the FRC.[262] Staff at both Dilley and Karnes indicated during the ACFRC visits that children are given a physical exam by a nurse, tested for tuberculosis (using a PPD test) and screened by measuring blood pressure, weight, and vital signs. For children without existing immunization records, and for children behind on their immunizations according to the records they brought from their home country, immunizations should be provided to protect the child and the general population according to the age-appropriate recommendations of the Centers for Disease Control and Prevention.[263]

**Recommendation 6-9: In order to provide appropriate health care to each child detainee, a standardized screening and physical examination should be conducted to assess the child's physical health based on medical standards. This examination should include a history taken from the child's parent, including any chronic illnesses or medications taken by the child; a review of any medical records or medicine the detainee has brought from his or her home**

---

[261] PBNDS 2011, *supra* note 254, at 160.
[262] FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 2.
[263] http://www.cdc.gov/vaccines/schedules/hcp/imz/child-adolescent html

country, and a review of any medical records created for the detainee by Customs and Border Protection (CBP). The FRC pediatrician should review the child's immunization records if the family brought copies with them from their home country; children without existing immunization records, and children behind on their immunizations according to their records, should receive age-appropriate immunizations recommended by the Centers for Disease Control and Prevention.

**Recommendation 6-10: All child detainees should be tested for tuberculosis. PPD should generally be used for children younger than 5 years old and IGRA (Interferon-Gamma Release Assays) for children 5 years and older. However, IGRA is preferred for children under 5 years old who have a history of BCG vaccine (as well as those with inconsistent follow-up), which covers the majority of children in family detention.[264]**

### 3. Children's Health Care

Preventative care and health promotion are hallmarks of health care for children. The American Academy of Pediatrics' Bright Futures Guidelines[265] provide the recognized standard for preventive care for children. The Family Residential Standard on Medical Care[266] closely follows the Bright Futures Guidelines. However, on the issue of the immediate needs of sick children, the only references in the standard is in the section about sick call.[267] This section provides no specific direction with respect to sick children, and the general procedure it outlines is problematic, because it offers no time frame for either triage or treatment. The PBNDS 2011 text is slightly better, stating that detainees can "freely request health care services," and requiring triage within 24 hours, and that medical personnel be contacted immediately for urgent situations.

Parents and children should not have to wait 24 hours for treatment and should not have to wait for their health care needs to become urgent to receive quicker attention and treatment.

**Recommendation 6-11: Medical services by a licensed professional should be available 24 hours per day, 7 days per week.**

**Recommendation 6-12: The Family Residential Standards should be updated to include the provisions for Sick Call and Emergency Medical Services and First Aid from the PBNDS 2011, modified to require response within two hours by a licensed medical professional to requests by parents for treatment of sick children. This two-hour triage response is in addition to the requirements in the PBNDS 2011 to needs for emergency medical services and first aid.**

### 4. Parents Accompanying Children Needing Hospital Care or Mental Health Residential Treatment

---

[264] BCG vaccine rates are 88-96% for Guatemala, El Salvador, Honduras, and Mexico. *See* WORLD HEALTH ORGANIZATION, VACCINE-PREVENTABLE DISEASES: MONITORING SYSTEM 2016 GLOBAL SUMMARY, http://apps.who.int/immunization_monitoring/globalsummary.
[265] AM. ACAD. OF PEDIATRICS, BRIGHT FUTURES, *Recommendations for Preventive Pediatric Health Care* (Jan. 2016), https://www.aap.org/en-us/Documents/periodicity_schedule.pdf.
[266] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 2.
[267] FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 17-18.

Current Family Residential Standards do not address the ability of a parent to accompany a child when offsite health care or mental health care in a hospital or other facility is needed. The American Academy of Pediatrics recommends that parents not only accompany children to the hospital but remain with them during their hospital stay as a best practice to improve health outcomes and involve families in medical decision making.[268] Family presence during health care procedures decreases anxiety for the child and the parents.

ICE does recognize the fundamental rights of parents to make decisions concerning the care, custody, and control of their minor children without regard to the child's citizenship as provided for and limited by applicable law.[269] But the Family Residential Standards do not specify if the FRC Non-Medical Emergency Trip Request and Approvals process can be used to allow parents to accompany their children for medical treatment that takes place outside the FRC. This process could be used for parents to accompany their children to offsite medical or mental health care.

Whether children are alone or with a parent, the use of shackles or restraints should be avoided for both parent and child during medical visits, hospitalizations, and associated transport. Shackles and other similar restraints cause additional stress, and interfere with medical treatment and recovery.

**Recommendation 6-13: Parents should be allowed to accompany their child to a hospital or to another health facility and remain with the child for medical services that are provided outside the FRC.**

**Recommendation 6-14: If a child is placed in a mental health treatment facility, parents should be given ready access to visit the facility to see their child and meet with the mental health providers as needed.**

**Recommendation 6-15: Children and their accompanying parents should not be shackled during transport to hospitals and other health facilities or during treatment or resulting stays.**

**Recommendation 6-16: When a detainee's family member is provided medical or mental health care, ICE and the FRCs should provide information and support to the detainee in order to communicate what is happening and to avoid further traumatization. The family should be immediately reunited upon the patient's release from medical care.**

**Recommendation 6-17: When medical or mental health needs require separation of a detainee parent from a child for over 72 hours, ICE should consider the best interests of the child and should proceed under the policy developed pursuant to Recommendation 2-18.**

---

[268] COMM. ON HOSPITAL CARE AND INST. FOR PATIENT AND FAMILY-CENTERED CARE., *Patient and Family Centered Care and the Pediatrician's Role*, 129 PEDIATRICS 394 (2012), http://pediatrics.aappublications.org/content/pediatrics/129/2/394.full.pdf.

[269] U.S. Immigration and Customs Enforcement, Facilitating Parental Interests in the Course of Civil Immigration 1, 2 (Directive 11064.1Aug. 23, 2013), https://www.ice.gov/doclib/detention-reform/pdf/parental_interest_directive_signed.pdf.

5. **Communicable Screening for the Zika Virus**

The CDC issues guidelines for screening for communicable diseases that are continually updated to reflect new and emerging diseases globally. The FRCs seem to be screening for Zika according to best practices set out by the CDC guidelines.[270]

**Recommendation 6-18: All FRCs should continue to screen for Zika in accordance with best practices set out by current CDC guidelines. The FRCs should keep abreast of CDC guidelines in terms of screening for communicable diseases applicable to detainees. Any pregnant female who tests positive for Zika should be provided with appropriate counseling and any related follow-up services.**

6. **Sexual Assault, Domestic Violence, and Human Trafficking Screenings**

ICE and the FRCs routinely screen women and children for sexual assault and child abuse that occurred in detention, but do not routinely screen for victimization that occurred outside of detention. Specifically, none of the FRCs are screening for domestic violence, sexual assault, and child abuse that occurred prior to detention. Such screening should be part of any medical and mental health examinations conducted by FRC staff. HHS and the CDC include screening for domestic and sexual violence among the standard recommended best practices and services offered to all women in health care settings.[271] HHS has developed a recommended screening tool for healthcare providers to use to screen patients for human trafficking.[272] The most commonly used questionnaire to screen for sexual assault in health care settings was developed by the CDC and can be used for both adults and minors above the age of 13. (Below the age of 13, a minor is considered a child and children's screening processes should be used.[273]) The Substance Abuse and Mental Health Services Administration (SAMHSA) recommends an approach to screening that uses universal precautions that take into account the fact that someone who may have experienced violence will need help, support, and a screening process that accounts for and allows the trauma victim to understand the purpose of the screening and consent to the screening. When conducting screening for trauma the SAMHSA recommended approach uses a two-step process,

---

[270] Centers for Disease Control and Prevention, Clinical Guidance for Healthcare Providers Caring for Pregnant Women 1 (Aug. 16, 2016), http://www.cdc.gov/zika/hc-providers/pregnant-woman.html.

[271] CENTERS FOR DISEASE CONTROL AND PREVENTION, NAT'L CTR. FOR INJURY PREVENTION AND CONTROL, INTIMATE PARTNER VIOLENCE AND SEXUAL VIOLENCE VICTIMIZATION ASSESSMENT INSTRUMENTS FOR USE IN HEALTHCARE SETTINGS (Kathleen C. Basile, Marci F. Hertz, & Sudie E. Back, eds., 2007), http://www.cdc.gov/violenceprevention/pdf/ipv/ipvandsvscreening.pdf [hereinafter INTIMATE PARTNER VIOLENCE]; *see also Preventative Care Benefits for Women,* HEALTHCARE.GOV, https://www.healthcare.gov/preventive-care-women.

[272] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, RESOURCES: SCREENING TOOL FOR VICTIMS OF HUMAN TRAFFICKING, http://www.acf.hhs.gov/sites/default/files/orr/screening_questions_to_assess_whether_a_person_is_a_trafficking_victim_0.pdf [hereinafter SCREENING TOOL].

[273] Jane Leserman, et al., Sexual and Physical Abuse History Questionnaire, http://www.karger.com/ProdukteDB/katalogteile/isbn3_8055/_98/_53/suppmat/p41-SPAHQ.pdf.

117

which first identifies patients who have experienced trauma in the past and second focuses on the symptoms the patient is experiencing related to the trauma.[274]

The American Academy of Pediatrics suggests to begin screening children over the age of three.[275] ICE detention facilities should utilize distinct sexual assault screening processes for adults and for minors. Even though "[a]dolescents and young adults have the highest rates of sexual assault of any age group,"[276] children are much less likely to come forward about incidents of violence. The American Academy of Child and Adolescent Psychiatry and American Professional Society on the Abuse of Children have published a questionnaire and guidelines that can be used for screening practices.[277] The Department of Justice's Office on Violence Against Women funded Teen Dating Violence Technical Assistance Center has issued recommendations for conducting sexual and domestic violence screenings for teen victims.[278]

The PBNDS 2011 requires that that "All detainees shall receive medical and mental health screenings, interventions and treatments for gender-based abuse and/or violence, including sexual assault and domestic violence."[279] PBNDS 2011 requires that if the initial medical intake screening indicates recent sexual assault or violence, then an initial health appraisal shall be completed within 24 hours.[280] Additionally, the PBNDS 2011 recognizes that victims have both medical and mental health consequences of gender-based violence.[281]

**Recommendation 6-19: FRCs should conduct an initial medical intake screening for sexual assault, domestic violence, child abuse, human trafficking, and gender-based abuse as part of the initial required medical and mental health screenings of all detainees over the age of three using a separate form for each detainee, adult and child.[282]**

**Recommendation 6-20: The tools to be used by FRCs for screening should be selected from the following list:**

    a) **For domestic violence and/or sexual assault, ICE should use:**

---

[274] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, CTR. FOR SUBSTANCE ABUSE TREATMENT, SMA 14-4816, TRAUMA INFORMED CARE IN BEHAVIORAL HEALTH SERVICES 92 (2014), http://store.samhsa.gov/shin/content//SMA14-4816/SMA14-4816.pdf.

[275] Nancy Kellogg, et al., *The Evaluation of Sexual Abuse in Children,* 116 PEDIATRICS 506 (2005), http://pediatrics.aappublications.org/content/116/2/506.

[276] Miriam Kaufman, Care of Adolescent Sexual Assault Victim American Academy of Pediatrics Committee on Adolescence, 122 PEDIATRICS 462-470 (2008), http://pediatrics.aappublications.org/content/pediatrics/122/2/462.full.pdf.

[277] Kellogg, et al., *supra* note 275.

[278] Mitru Ciarlante, *A Development Approach to Working With Teens,* (June 2008), http://www.breakthecycle.org/sites/default/files/A Development Approach to Working with Teen Victims.pdf.

[279] PBNDS 2011, *supra* note 254, at 280.

[280] *Id.* at 305.

[281] *Id.* at 117. In the context of sexual assault, the PBNDS 2011 states "It is common for victims of sexual assault to have feelings of embarrassment, anger, guilt, panic, depression and fear several months or even years after the attack. Other common reactions include loss of appetite, nausea or stomach aches, headaches, loss of memory and/or trouble concentrating, and changes in sleep patterns."

[282] Kellogg, et al., *supra* note 275.

118

i. one of the assessment instruments listed by the CDC in *Intimate Partner Violence and Sexual Violence Victimization Assessment Instruments for Use in Healthcare Settings*;

ii. screening tools developed by the National Health Resource Center on Domestic Violence;[283] or

iii. tools developed by Kaiser Permanente's Family Violence Prevention Program.[284] http://www.cdc.gov/violenceprevention/pdf/ipv/ipvandsvscreening.pdf

b) For human trafficking, ICE should use the *HHS Screening Tool for Victims of Human Trafficking*.[285]

c) For trauma victims, ICE should use tools developed by the National Technical Assistance Center on Trauma Informed Care (NCTIC); these include but are not limited to training videos on medical interviews of trauma victims.

**Recommendation 6-21: If the initial medical/mental health intake indicates that a detainee has suffered sexual assault, domestic violence, child abuse, human trafficking, or gender-based abuse, an initial health/mental health appraisal should be completed within 24 hours regardless of when the victimization occurred. That appraisal should comply with the following:**

a) All screening and appraisal for sexual assault, domestic violence child abuse, human trafficking, and/or gender-based abuse should be conducted in a private, safe environment.

b) Mothers should be screened/appraised separately and without their children present. Mother should be offered the opportunity to have their children within their line of sight, in a nearby room, or to place the child in childcare – whichever the mother prefers.

c) Information on gender-based violence and abuse obtained during screenings should be both noted in a detainee's medical records and provided to the victim's current and future attorneys in a manner that is HIPAA compliant and provides swift access to the screening results.

d) ICE/FRC staff should not infer, assume, conclude, or note in medical or immigration records, that, because a detainee failed to self-identify during screening as a victim of violence, abuse, or trauma, the detainee is not a trauma victim.

e) To ensure that detainee victims are connected with proper continued treatment and services, ICE/FRC staff should provide identified victims with information about their rights as crime victims, existing services statewide and nationwide, and safety planning for post-release.

---

[283] https://www.futureswithoutviolence.org/health/national-health-resource-center-on-domestic-violence/*National Health Resource Center on Domestic Violence,* FUTURES WITHOUT VIOLENCE (2016), https://www.futureswithoutviolence.org/health/national-health-resource-center-on-domestic-violence.

[284] *Family Violence Prevention,* KAISER PERMANENTE, https://share.kaiserpermanente.org/category/fvpp/?kp_shortcut_referrer=kp.org/domesticviolence.

[285] SCREENING TOOL, *supra* note 272.

119

7.  **Prison Rape Elimination Act Implementation**

When sexual assault occurs in detention, the response required by the Family Residential Standards[286] is substantially inferior to the response required by the PBNDS 2011.[287] The latter aligns more closely with the requirements of the DHS Prison Rape Elimination Act (PREA) regulation. In the PBNDS 2011, most sections of the existing Family Residential Standards language were updated and strengthened and many new requirements were added. Examples include:

- Adopting a "zero tolerance policy"
- Mandating that sexual assault forensic examination and evidence gathering be conducted by external independent and qualified health care personnel
- Providing a detailed description of sexual assault, which covers threats, intimidation to coerce sexual acts, and sexual harassment
- Mandating staff training on vulnerable populations, sexual assault definitions, sexual harassment, prohibitions on retaliation, requirements for maintaining privacy of reports and victims, and "how to ensure that evidence is not destroyed"
- Privacy and disclosure limitations protections
- Removing staff suspects from duties that require detainee contact
- Requiring disciplinary sanctions for staff, including termination
- Encouraging detainees to report sexual assault and abuse observed with guarantee of no punishment for reporting, no retaliation, no impact on detainees' immigration case
- Notifying ICE/ERO immediately of any sexual assault/abuse reports
- Mandating posting of DHS produced posters on sexual assault awareness and hotline
- Maintaining/attempting to maintain a Memorandum of Understanding with community-based organizations with expertise serving victims of sexual assault
- Mandating that the FRC arrange forensic medical exams
- Requiring that victims' future safety, medical, mental health, and legal needs are addressed

DHS's Prison Rape Elimination Act (PREA) rule confirms and strengthens these requirements.[288]

**Recommendation 6-22: ICE and the FRCs should come into full compliance with the DHS PREA regulation and the PBNDS 2011's Sexual Abuse and Assault Prevention and Intervention Section requirements; the Family Residential Standard is insufficient.**

**Recommendation 6-23: FRCs should contract with an entity in the community that provides a coordinated community response to sexual violence, such as Sexual Assault Response**

---

[286] FAMILY RESIDENTIAL STANDARDS: SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION, *supra* note 255.

[287] PBNDS 2011, *supra* note 254, at 150-77, 306.

[288] *See* 6 C.F.R. Part 115.

120

Teams (SARTs) or Sexual Assault Response and Resource Teams (SARRTs) for forensic evidence collection, treatment and support.[289]

**Recommendation 6-24: FRCs should transport recent victims of sexual assault to the contracted community-based program whether or not the recent sexual assault occurred in the FRC. Victims should not be required to have their children accompany them but should have that option if they are anxious about separation. If a child remains at the FRC while the mother is takes to the program, the child should be left with qualified childcare staff or with another parent of the mother's choice. The contracted programs should include victim advocate involvement and informed choice and should have standards for victim-centered sexual assault evidence collection that meet or exceed the following standards:**

   a) **U.S. Department of Justice, Office on Violence Against Women, National Protocol for Sexual Assault Medical Forensic Examinations: Adults/Adolescents,[290] and all updates.**
   b) **U.S. Department of Justice, Office on Violence Against Women, National Protocol for Sexual Assault Medical Forensic Examinations: Pediatric,[291] and all updates.**

### 8. Communication of Medical Screening and Test Results

How medical screening and test results are communicated to a detainee has important health and safety consequences. Some detainees fled their home country due to their own or their child's rape, and others were raped during travel (either abroad or in the U.S.). A detainee may first learn through tests administered at the FRC that:

- She is pregnant due to the rape;
- She has contracted an STD or is HIV positive;
- Her daughter is pregnant or has contracted an STD or is HIV positive; or
- Her son has contracted an STD or is HIV positive.

Mechanisms need to be implemented to ensure that information about test results are communicated to detainees, both while in detention and post release, in a manner that is confidential, safe, and secure, taking account of safety issues that may arise if husbands, mothers, fathers, or other family members learn about the pregnancy or STD test results. Delivery of test results should occur in a culturally competent way.[292]

---

[289] *See* National Sexual Violence Resource Center, *Sexual Assault Response Team Development: A Guide for Victim Service Providers* (2011), http://www.nsvrc.org/sites/default/files/Publications_NSVRC_Guide_SART-Development.pdf; End Violence Against Women International, *Best Practices: SARRTs*, http://www.evawintl.org/PAGEID7/Best-Practices/Resources/SARRTs.

[290] U.S. Dep't of Justice, Office on Violence Against Women, A National Protocol for Sexual Abuse Medical Forensic Examinations: Adults/Adolescents (2d ed 2013), https://www.ncjrs.gov/pdffiles1/ovw/241903.pdf.

[291] U.S. Dep't of Justice, Office on Violence Against Women, A National Protocol for Sexual Abuse Medical Forensic Examinations: Pediatric (2016) https://www.justice.gov/ovw/file/846856/download.

[292] *See* U.S. Dep't of Health and Human Services, Office of Minority Health, What is Cultural Competency, http://www.cdc.gov/nchhstp/socialdeterminants/docs/what_is_cultural_competency.pdf.

FRC detainees should receive the same care and concern with respect to the delivery of information about results of medical/mental health testing as they would experience if they were receiving care from private or public providers in the community. That includes appropriate language access practices: for patients who have limited English proficiency, information about test result findings is provided in a language the patient understands well (ideally her primary language).

In addition, privacy for adolescents (under 18) is important, particularly with respect to sex-related health care in all states adolescents must themselves consent to health care related to sexual activity, including the treatment of sexually transmitted infections, prenatal care, and contraceptive services.[293]

**Recommendation 6-25: The results of medical and mental health screenings and tests should be delivered to detainees in a sensitive and HIPAA compliant manner. Specifically:**

a) **Results should be delivered to detainees in a confidential location, outside of the presence of the detainees' children, in a language the detainee understands well (ideally her primary language), and with the appropriate involvement of mental health professionals at the FRC.**

b) **Information about pregnancy or test results that are positive for an STD or other disease or mental health condition should be delivered in a culturally competent manner as defined by the CDC[294] and should involve staff with expertise in trauma-informed care. Adolescents under 18 should receive information independent of their parent.**

c) **Mechanisms should be implemented to ensure that information about test results are communicated to former detainees in a manner that is confidential, safe, and secure, and in compliance with HIPAA.**

d) **In the case of victims of sexual assault and/or abuse perpetrated at the FRCs, victims should receive information about test results from the same external independent and qualified health care personnel who performed the testing or screening.**

9. **Dental Health**

Oral health is essential to general health and well-being. The link between general health and socio-economic status is well established. Poor oral health is not only associated with poor socio-economic status but also with deprivation. In both high and lower income countries, low socio-economic status is significantly associated with increased oral cancer risk. The CDC reports that more than 40% of children have teeth decay by the time they reach kindergarten. Parents should accordingly be taught strategies to prevent teeth decay in young children.

---

[293] Aviva L. Katz, Sally A. Webb (Committee on Bioethics), *Informed Consent in Decision-Making in Pediatric Practice*, 138 PEDIATRICS (2016), http://pediatrics.aappublications.org/content/pediatrics/early/2016/07/21/peds.2016-1485.full.pdf.

[294] CENTERS FOR DISEASE CONTROL AND PREVENTION, *NCHHSTP Social Determinants of Health* (Mar. 21, 2014), http://www.cdc.gov/nchhstp/socialdeterminants/definitions.html.

122

**Recommendation 6-26: Adult and child FRC detainees should receive appropriate dental screening and care:**

    a) **A dental examination should be conducted of each adult and child as part of the FRCs' general health examination at intake.**

    b) **For adults, dental care should adhere to the standards promulgated by the CDC[295] and the American Dental Association.[296]**

    c) **For children, dental care for children should adhere to standards promulgated by the American Academy of Pediatric Dentistry.[297]**

### 10. Pharmaceutical Management

Health care organizations have policies and procedures that determine how pharmaceuticals are managed. This includes a formulary, prescription practices, storage, and controlled substances. FRC pharmaceutical management is currently subject to the applicable Family Residential Standards,[298] which are much less specific and much less well-crafted than the PBNDS 2011.[299] The PBNDS 2011 contains requirements regarding medications to be used for treatment of specific diseases and various national guidelines. For example, the PBNDS 2011 requires that TB must be treated medically following the guidelines set by the American Thoracic Society and the CDC and all medications currently approved for treatment of HIV/AIDS by the Food and Drug Administration must be available to detainees.[300]

**Recommendation 6-27: Policies and procedures for pharmaceutical management should comply with national accreditation, such as JCHAO or NCQA, state laws, and licensure standards. The Family Residential Standards should be updated to include each of the requirements in the PBNDS 2011; to cover pharmaceutical management and medication requirements imposed by national accreditation surveyors such as JCHAO or NCQA; and to ensure continuing compliance with relevant State standards.**

### 11. Care of Pregnant Women

In a memorandum to ICE Field Officers issued in August 2016, ICE explicitly states that if a pregnant detainee is not subject to mandatory detention or is eligible for parole following a positive credible fear interview, she will be released unless the Field Office Director determines that there are extraordinary circumstances.[301] The ACFRC agrees that pregnant women should not be detained in the FRCs. This policy is consistent with the information provided by ICE.

---

[295] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Oral Health* (Oct. 8, 2015) http://www.cdc.gov/oralhealth/basics/index.html.

[296] AM. DENTAL ASS'N (ADA), *Dental Standards*, http://www.ada.org/en/science-research/dental-standards/.

[297] AM. ACAD. OF PEDIATRIC DENTISTRY, *2015-2016 Definitions, Oral Health Policies, and Clinical Practice Guidelines*, http://www.aapd.org/policies/.

[298] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 10-11.

[299] *See* PBNDS 2011, *supra* note 254, at 279, 281, 283, 284, 287-88, 295-96.

[300] *Id.* at 283-85.

[301] U.S. Immigration and Customs Enforcement Memorandum from Thomas Homan, *Identification and Monitoring of Pregnant Detainees* (Aug. 15, 2016),

674

Of course while a woman is in detention, she may become pregnant or find out that she is pregnant. In that case, she needs immediate counseling and access to the full range of reproductive health care options.

**Recommendation 6-28: Barring extraordinary circumstances, no pregnant woman or her children should be detained in an FRC.**

**Recommendation 6-29: A detainee who is pregnant should be informed in a balanced manner by medical staff of all options – including raising the child herself, placing the child up for adoption, and terminating the pregnancy -- and the relevant risks of each option.[302] Discussion of options should proceed with cultural awareness and sensitivity. An unwanted pregnancy always requires responsive and expeditious care. Pregnancy termination is generally to be performed as safely and as early in pregnancy as possible. ICE and FRC staff should be required to swiftly facilitate access to whatever option each woman chooses, including emergency contraception if medically appropriate and other pregnancy termination methods. Termination of pregnancy should not depend on whether or not the specific procedure is available on site. Each woman will decide what option to choose depending on her unique circumstances and preferences; this decision is to be made without undue interference by outside bodies, including governmental bodies.**

## 12. Emergency Medical Services and Procedures

Every health care organization should have and comply with standards for providing emergency medical services. According to the Family Residential Standards, FRC staff should be "trained at least annually to respond to medical emergencies."[303] The ACFRC was unable to verify during the FRC site visits that this standard was met. In other respects, the Family Residential Standards are significantly less detailed than the PBNDS 2011.[304]

**Recommendation 6-30: ICE should amend the Family Residential Standards to include the PBNDS 2011 provisions relating to emergency medical services, and additional provisions required for national accreditation surveys. FRC medical emergency policies, procedures, services, and training should comply with national accreditation organization requirements, state laws, and licensure standards.**

**Recommendation 6-31: In the case of the deteriorating physical or mental health of a detainee, FRCs should consider the possibility of release into the care of a hospital to stabilize the patient, followed by release to the community. Other possible options could be intensive out-patient care and utilization of stable housing services, depending on the needs of the detainee. In the event of hospitalization, when discharged the resident should be**

---

https://www.ice.gov/sites/default/files/documents/Document/2016/11032.2_IdentificationMonitoringPregnantDetainees.pdf.
[302] Am. College of Obstetricians and Gynecologists, College Statement of Policy: Abortion Policy (No. 2014), https://www.acog.org/-/media/Statements-of-Policy/Public/sop069.pdf?dmc=1&ts=20160921T1319339411.
[303] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 15-19.
[304] PBNDS 2011, *supra* note 254, at 278, 282, 286, 294-295, 306.

**discharged to the community and provided with the same services, referrals, and legal rights information received had the individual been discharged directly from the FRC.**

See Part 6.B.2 for additional recommendations regarding deteriorating mental health conditions.

### 13. Accreditation and Compliance with Joint Commission on the Accreditation of Health Care Organizations (JCAHO) Standards

In order to provide the "safest, highest quality, best value health care across all settings,"[305] health organizations adopt certain health care standards; in most instances a health care organization will request that a national health care accreditation organization conduct an accreditation review as a strategy to assure the general public of its health care standards. There are multiple facets to a review or survey conducted by such an organization. These include but are not limited to patient rights and education, infection control strategies, medication management, prevention of medical errors, emergency preparedness, quality improvement and assurance strategies, and verification of the qualifications and competence of professional staff.

Among the Joint Commission on the Accreditation of Health Care Organizations (JCAHO) Standards are the Ambulatory Care Standards and Behavioral Health Standards. The Family Residential Standards require compliance with JCAHO standards, including standards of hygiene, for environmental health conditions.[306] The Family Residential Standards also state that at FRCs "The health care program and the medical facilities shall be under the direction of a health services administrator (HSA) and shall be accredited and maintain compliance with the standards of the Joint Commission on the Accreditation of Health Care Organizations (JCAHO)."[307] Finally the Family Residential Standards state that, "All health care staff shall have valid professional licenses and/or certifications. DIHS shall be consulted to determine the appropriate credentials requirements for health care providers. Medical personnel credentialing and verification shall comply with the standards established by JCAHO."[308]

Another national health care accreditation standard is the National Committee for Quality Assurance (NCQA), which could be an option for the FRC's. Although best practices in the medical field and compliance with JCAHO require conducting accreditation surveys and require that such surveys be conducted on a regular basis, the Committee was unable to obtain information from ICE about the extent to which such surveys are being conducted at FRCs.

As explained above, FRCs are required to follow PBNDS 2011 where the PBNDS 2011 provides more detailed guidance than the Family Residential Standards. The PBNDS 2011 requires that "All health care staff must be verifiably licensed, certified, credentialed, and/or registered in compliance with application state and federal requirements. Copies of documents must be

---

[305] Joint Commission, *Vision Statement*, http://www.jointcommission.org/mobile/about_us.aspx.
[306] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARDS 1.2, ENVIRONMENTAL HEALTH AND SAFETY 18, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_environmental_health_and_safety.pdf.
[307] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 5.
[308] *Id.* at 11.

676

maintained on site and readily available for review."[309] With regard to administration of the FRCs'
medical departments, PBNDS 2011 requires that the Health Services Administrator for every FRC
do the following: convene quarterly meetings with medical staff to account for the effectiveness of
the health care program and recommend corrective actions, as necessary. The minutes of each
meeting are to be recorded and kept on file.[310] The HSA is also required to implement a system of
internal review and quality assurance and to implement an intra-organizational, external peer
review program for all independently licensed medical professionals at least annually.[311] Thus, all
FRCs are required to maintain information on medical and mental health staff credentials and
licensing and keep records from its effectiveness and peer quality reviews. The ACFRC requested
that ICE provide information about credentialing of medical/mental health professionals at
facilities and compliance with JCAHO standards, but ICE declined to do so.

**Recommendation 6-32: Each FRCs should comply with health care accreditation standards
issued either by JCHAO or NCQA. All professional staff should comply with credentialing
standards of national and state accreditation and professional licensure bodies. This includes
the requirement that accreditation surveys be conducted on a regular basis.[312] Maintenance
of national accreditation standards should be part of any ICE contract or sub-contract
relating to medical or mental health care.**

**Recommendation 6-33: The Family Residential Standards should be amended to include the
PBNDS 2011 requirement[313] that copies of documents verifying the licenses, certifications,
credentials and/or registrations of medical and mental health personnel be maintained on
site and readily available for review, and that personnel with restricted licenses may not
provide health care at FRCs.**

### B.   Mental Health Assessment and Care

#### 1.   Mental Health Screening

The ICE medical evaluation forms include historical questions about past mental health conditions,
history of trauma, and limited behaviors such as suicidal ideation.[314] But the FRC population has
very limited health and mental health literacy, with little understanding or awareness of prior
mental health conditions. Coupled with the lack of access to mental health services in their home
countries and significant mental health stigma that interferes with self-identification or diagnosis,
the result can be under-identification. Given similar stigmas in the U.S., accurate mental health
screenings can be conducted using systematic, valid, and reliable screening tools that ask
respondents about key symptoms that can then be scored to evaluate risk for possible psychiatric
disorders. This approach has been used in emerging integrated behavioral health programs within
primary care, where patients are asked to rate key symptoms described in these tools. Scoring these
algorithms lead to assessment of risk for various diagnoses, and then further evaluation and

---

[309] PBNDS 2011, *supra* note 254, at 288.
[310] PBNDS 2011 *supra* note 254, at 301.
[311] *Id.* at 301-302.
[312] *See generally* JOINT COMMISSION, 2017 COMPREHENSIVE ACCREDITATION MANUALS. A JCHAO accreditation is in
effect for up to three years.
[313] PBNDS 2011, *supra* note 254, at 288.
[314] Form IHSC-794, *in* PBNDS 2011, *supra* note 254, at 290.

treatment can be targeted efficiently and effectively. This screening approach integrated within primary care has also been used for children and has strong evidence of efficiency and beneficial outcomes for both populations, including improving access and reducing stigma for Latinos.[315]

In addition, Family Residential Standards require the FRCs to use the ICE Health Service Core Pediatric Intake Form (IHSC–795 J).[316] While this form provides some basic information on an immigrant child's health and development, it does not include sufficient information, particularly with regard to the child's development and mental health status. The American Academy of Pediatrics recommends conducting a mental health evaluation using a validated screening instrument, specific screening for trauma, and a developmental screen with an age-appropriate screening instrument for all immigrant children.[317]

**Recommendation 6-34: All adult detainees should undergo systematic mental health screening using evidence-based tools immediately upon intake during their health screening and evaluation. The following tools should be used:**

    a)  **Patient Health Questionnaire-9 item (PHQ-9, which screens for depression and suicidality)[318];**

    b)  **General Anxiety Disorder 7-item (GAD-7, which screens for clinical anxiety);**

    c)  **Mood Disorders Questionnaire (MDQ), which screens for bipolar disorder);[319]**

    d)  **CAGE-AID, which screens for both alcohol and substance abuse);[320] and**

    e)  **Abbreviated Post-Traumatic Stress Check List (PCL), which screens for post-traumatic stress disorders.[321]**

**Recommendation 6-35: All child detainees should undergo systematic mental health screening using evidence-based tools immediately upon admission during their health screening and evaluation. Tools to be used should include:**

    a)  **Pediatric Symptoms Checklist (PSC-35), for children ages 6 to 17;**

    b)  **Survey of Wellbeing of Young Children (SWYC) for children 5 years old or younger; and**

---

[315] Jürgen Unutzer, et al., *Collaborative Care Management of Late-Life Depression in the Primary Care Setting: A Randomized Controlled Trial*, 288 J. AM. MED. ASS'N. 2863 (2002); Barry Sarvet, et al., *Improving Access to Mental Health Care for Children: The Massachusetts Child Psychiatry Access Project*, 126 PEDIATRICS 1191 (2010); Jeanne Miranda, et al., *State of the Science on Psychosocial Interventions for Ethnic Minorities*, 1 ANNUAL. REV. CLINICAL PSYCHOL. 113 (2005).

[316] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 22.

[317] AMERICAN ACADEMY OF PEDIATRICS, IMMIGRANT HEALTH TOOLKIT 4-5, https://www.aap.org/en-us/Documents/cocp_toolkit_full.pdf.

[318] Kurt Kroenke, Robert Spitzer, & Janet Williams, *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16(9) J. GEN. INTERNAL MED. 606 (2001)

[319] Christopher Miller, et al., *Sensitivity and Specificity of the Mood Disorders Questionnaire for Detecting Bipolar Disorder*, 81 J. AFFECTIVE DISORDER 167 (2004).

[320] Richard Brown & L.A. Ronds, *Conjoint Screening Questionnaires for Alcohol and Other Drug Abuse Criterion Validity in a Primary Care Practice*, 94(3) WIS. MED. J. 135 (1995).

[321] Kroenke, *supra* note 318; A.J. Lang & M.B. Stein, *An Abbreviated PTSD Checklist for Use as a Screening Instrument in Primary Care*, 43 BEHAVIOUR RES.& THERAPY 585 (2005).

127

c)   **CAGE-AID as a substance abuse screen for all youth 12 to 17 years of age.**

**Recommendation 6-36: The FRCs should fully implement the guidelines for mental health screening embedded within the health screenings section in PBNDS 2011, as well as those listed above.[322] Validated Spanish versions should be used for Spanish speakers, and the tools should be administered orally for detainees who lack reading literacy. For those detainees whose primary language is neither English nor Spanish, all the screening tools should be translated into languages regularly used by FRC detainees (using the cutoff described in Recommendation 5-7), or communicated by oral interpretation by a qualified interpreter. The record should reflect in what language and how the tool was administered. The administration of mental health screening tools should be conducted by credentialed health care providers who are trained in culturally and developmentally appropriate interaction around their administration with detainees.**

2.   **Mental Health Referrals and Response**

In the above-cited integrated and collaborative mental health care screening models, cut-off scores from screening tools are used to identify individuals in need of more in-depth mental health assessment. These assessments are typically conducted by a master's level mental health professional, in consultation with a psychiatrist.[323] However, there should be capability for rapid response to individuals who demonstrate agitation or signs of psychosis, or who screen for suicidality. In the mental health clinical context, such evaluations lead to a comprehensive treatment and care plan that outlines needed interventions and professional responsibilities. Mechanisms for urgent and emergent mental health responses that are accessible at any time are critical when working with a population that is especially vulnerable to mental health related emergencies. Additionally, cultural competence in the delivery of all mental health services is key given the special origins and contextual circumstances of FRC families.[324]

This is an area in which the requirements currently contained in the Family Residential Standards and the PBNDS 2011 are inadequate; both are missing requirements that conform with best practices in the field.

**Recommendation 6-37: When a detainee's mental health screening results indicate positive total scores or sub-scores or positive items on the historical screen within health forms, or a history of psychiatric symptoms or conditions, the detainee should be referred by the primary care provider conducting the screening for a comprehensive evaluation by qualified mental health professionals. These qualified health professionals may work either at the FRCs or at a community-based programs.**

**Recommendation 6-38: Psychiatric evaluation of FRC detainees should at least conform to the outline in PBNDS 2011,[325] plus include a full psychiatric review of systems, developmental history, and collateral history (from the parent present for children), any prior treatment history, a full mental status examination, and a DSM-5 diagnostic**

---

[322] PBNDS 2011, *supra* note 254, at 292.
[323] Unutzer, et al. *supra* note 315.
[324] Andrés J. Pumariega, et al., *Practice Parameter for Cultural Competence in Child and Adolescent Psychiatric Practice*, 52(10) J. AM. ACAD. CHILD ADOLESCENT PSYCHIATRY 1101 (2013).
[325] PBNDS 2011, *supra* note 254, at 292.

assessment. If the FRC does not have on staff a qualified mental health professional with
expertise in using these instruments, the FRC should have a contract with a qualified mental
health professional in the community who can conduct the evaluations described here. In
particular:

a) A detainee identified through the screening process should be seen by a qualified
mental health professional within 24 hours of screening and within 72 hours of
admission into the FRC.

b) Referrals for mental health evaluation involving suicidality or psychotic symptoms
should occur within 4 hours of identification.

c) Detainees identified with mental health needs should all have a comprehensive
treatment plan developed to meet their unique needs, with collaboration between the
mental health professional, primary care physician, and psychiatrist outlining
treatment modalities during detention and recommended treatment modalities and
services upon release. The treatment plan should be a permanent part of the
detainee's health record and updated every 4 weeks if the detainee has a longer stay
(for outpatient level care) and every week if the detainee is referred to more intensive
services (such as inpatient care).

**Recommendation 6-39:** Given the special origins and contextual circumstances of detained
families, the comprehensive mental health evaluation and treatment plan needs to
incorporate and address multiple cultural elements of cultural competence as outlined in the
American Academy of Child and Adolescent Psychiatry, *Practice Parameter for Cultural
Competence in Child and Adolescent Psychiatric Care*, for both adults and children. This
should include linguistic support, cultural context of symptoms, impact of immigration
trauma history, treatment selection, and parental involvement for children.[326]

**Recommendation 6-40:** FRCs should have on-site crisis response capabilities by masters (or
higher) level therapists, including on-call response 24/7, possibly including after-hours tele-
video accessibility. Detainees or detention staff should be able to access this resource 24/7
without need for a prior mental health diagnosis or mental health treatment plan. This will
facilitate the decision to call outside mental health crisis services.

**Recommendation 6-41:** If the FRC cannot provide the appropriate level of mental health
care, detainees should be transferred to receive that care in community.

a) The Level of Care Utilization System (LOCUS, for adults) or Child and Adolescent
Level of Care Intensity Instrument (CASII, for children 6 years of age and over)
should be used to determine the appropriate level of care.

b) If a detainee is determined to need an inpatient or residential level of care, he or she
should be sent to inpatient services first for comprehensive evaluation and
stabilization, then transferred to a residential mental health facility.

c) If clinicians at the mental health facility believe that remaining in the FRC or
returning to the FRC post-discharge would be deleterious to the detainee's health,
then ICE should release the detainee to a post-release community with the following:

---

[326] Pumariega, *supra* note 324.

    i.    safe and reliable transport to the post-release community;

    ii.    stable housing once the detainee arrives; and

    iii.    clear arrangements and appointments to receive the recommended level of care in the post-release community (using the LOCUS or CASII to determine level of care), arranged by ICE case management. ICE should collaborate with any outside clinical facility in making these arrangements.

Any minor released for mental health reasons should be accompanied by his/ her parent to a post-release community.

**Recommendation 6-42: ICE and FRC staff should receive crisis intervention training about on-site prevention and management of mental health crisis and agitation, and about formation of a behavioral rapid response team, including training on mental health restraints and medications for acute management.[327]**

**Recommendation 6-43: ICE should amend the Family Residential Standards on use of restraints to incorporate the provisions of the PBNDS 2011.[328] The FRCs should immediately follow the PBNDS 2011 both as to procedures and the substantive decision with respect to restraints.**

**Recommendation 6-44: ICE should amend the Family Residential Standards to specify policies governing external mental health crisis services for detainees. Provisions should cover: communication with crisis mental health services and first responders (including, particularly local/state police); safe method for transport; appropriate interpretation services; procedures for communication of results and recommendations from crisis evaluations back to on-site mental health providers, and communication with an inpatient facility if a detainee is hospitalized. The standard should also require formal review of sentinel events (e.g., suicide attempts, episodes of agitation/ aggression, and psychotic episodes), including debriefing with all involved staff, root causes analysis, and practices improvement based on the review. FRCs should be required to develop specific procedures and training to implement the policy, including developing contacts in advance with external providers.**

**Recommendation 6-45: ICE should treat detainees with mental health needs, including suicidality, in a non-punitive, therapeutic manner. Use of isolation cells or other isolated housing should be avoided for anyone exhibiting suicidality or symptoms of mental illness; any such use should be only in response to a threat to the physical safety of the detainee or others, if no other less restrictive option is appropriate, and for the shortest time practicable; and only if authorized by a mental health professional.[329] Use of isolation cells and segregation should particularly be avoided if such use would separate parents from their**

---

[327] COLLABORATIVE INSTITUTIONAL TRAINING INITIATIVE (CITI), https://www.citiprogram.org/.

[328] *See* PBNDS 2011, *supra* note 254, at 297, 208-224. FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 4, and FAMILY RESIDENTIAL STANDARDS 2.10: USE OF PHYSICAL FORCE AND RESTRAINTS 1-14, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_use_of_force.pdf, are less robust.

[329] *See, e.g.*, CRISIS PREVENTION INST., JOINT COMMISSION STANDARDS ON RESTRAINT AND SECLUSION/ NONVIOLENT CRISIS INTERVENTION TRAINING PROGRAM (2010), https://www.crisisprevention.com/CPI/media/Media/Resources/alignments/Joint-Commission-Restraint-Seclusion-Alignment-2011.pdf.

681

children. **In lieu of isolation cells, FRCs should practice a policy of heightened observance of at-risk detainees. In cases of suicidality or aggressive behavior, FRCs should institute special observations and therapeutic interventions, or, if the circumstances require, admit the detainee to a mental health facility.**

### 3. Psychiatric Management and Pharmacotherapy

In the above-cited integrated and collaborative care mental health care models, pharmacological treatment responsibilities are shared between the primary care physician (PCP) and psychiatrist using a stepped care model. Most patients with uncomplicated mental health problems managed by the PCP and the master's level mental health professional (MHP) with available indirect psychiatric consultation; middle complexity patients are managed with some intermittent involvement of a psychiatrist with primary management by the PCP and MHP; and patients with more complex conditions are managed primarily by the psychiatrist and MHP with PCP input and involvement. Psychiatric formularies are often complex and can include a significant number of pharmacological agents, many at significant costs. However, there are well established pharmacotherapy treatment algorithms that take into account both clinical needs and cost-effectiveness. One of the most established national standards is the Texas Medication Algorithm Project (TMAP), sponsored by the Texas Department of Mental Health in conjunction with academic institutions in the state,[330] which provides both an evidence-based guide as well as readily available consultation for the FRCs. The TMAP standards are applicable nationally and the Texas Department of Mental Health routinely provides consultations to programs in any state on the TMAP and could provide such consultations to FRCs, without regard to the state in which the FRC is located. Given the ethnicity of the families detained in FRCs (with strong indigenous origin), ethno-pharmacotherapy considerations around dosing also requires special attention.[331]

**Recommendation 6-46: All available formularies of psychiatric medications should follow the Texas Medication Algorithm Project (TMAP).[332] This nationally accepted professional standard should set the minimum requirements for the FRCs. Should state licensing laws or best practices of professional affiliations require compliance with standards of care that are higher than those contained in the TMAP, then FRC staff operating in the state should meet the higher standard. FRC medical providers, in collaboration with the psychiatric/behavioral health providers and the ICE Medical Director, should develop and reliably implement a collaborative care algorithm using a stepped care model. Such algorithm should at minimum include the following levels of care:**

   a) **Entry-level pharmacological treatment for depression or anxiety should be performed by primary care providers (PCPs), in collaboration with the on-site mental health professional serving the detainee.**
   b) **Management of detainees with moderate complexity mental health problems (including PTSD) should be managed jointly by the PCP and the consulting psychiatrist, in collaboration with the on-site mental health professional serving the detainee.**

---

[330] A. John Rush, William V. Rago, M. Lynn Crismon, et al., *Medication Treatment for the Severely and Persistently Mentally Ill: the Texas Medication Algorithm Project*, 60 J. CLINICAL PSYCHIATRY 284 (1999).
[331] ETHNICITY AND PSYCHOPHARMACOLOGY (Pedro Ruiz, ed. 2000).
[332] Rush et al., *supra* note 330.

131

c) **Management of highly complex patients, including those with severe depression or anxiety, bipolar disorder, psychosis, and autism spectrum, should be overseen by a consulting psychiatrist, with PCP input, in collaboration with the on-site mental health professional serving the detainee.**

**Recommendation 6-47: Criteria for psychiatric evaluation should include psychiatric evaluation under integrated behavioral health models,[333] guided by the above -mentioned stepped care algorithm and using offsite resources when the patient's needs for stepped care cannot be managed by on-site primary care providers, mental health professionals, or psychiatrists at the FRC. Psychiatric evaluation and management can be conducted either live or via televideo; the latter should follow the applicable provisions of the Family Residential Standard,[334] PBNDS 2011,[335] and practice parameters for telepsychiatry from the American Psychiatric Association and the American Academy of Child and Adolescent Psychiatry.[336]**

**Recommendation 6-48: As recommended by the Texas Medication Algorithm Project, the FRCs should have "as clinically necessary," psychiatric medication on formulary in the dispensary (including injectables as last resort to manage severe agitation). These should be used only for clinically necessary, not detention related, reasons.**

**Recommendation 6-49: FRCs should be cautious about ethopsychopharmacology issues given the high percent of detained families from indigenous ethnic groups (who are often slow metabolizers of psychotropics). The Addendum to the Texas Medication Algorithm Project provides specific guidance on this issue.[337]**

4. **Credentials of Mental Health Professionals**

During the Committee's visit to the FRCs, we were introduced to individuals who were the behavioral health staff for each facility. However, when we asked to see their credentials these were not made available. Similarly, the Committee requested specific information about credentials, but ICE chose to provide only a general statement about the competency and skills of the on-site mental health professionals. Thus, we are unable to comment on the credentials of the available mental health professionals at the FRCs, which should be considerable given the complex needs of the detained families. The Family Residential Standard on Medical Care is fairly specific as to basic credentialing rules and documentation and availability of such credentials, but the credentialing process is not addressed, nor are added credentials needed for mental health professionals tied to their specific areas of therapeutic skill and competency.

---

[333] Unutzer et al., *supra* note 315.

[334] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 16.

[335] PBNDS 2011, *supra* note 254, at 288-289, 292.

[336] American Academy of Child and Adolescent Psychiatry, Telepsychiatry and Your Child (Apr. 2013), http://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/Telepsychiatry-and-Your-Child-108.aspx.

[337] ETHNICITY AND PSYCHOPHARMACOLOGY, *supra* note 331.

683

**Recommendation 6-50: FRC should develop full credentialing procedures and standards as per the Joint Commission for Accreditation of Healthcare Organizations (JCAHO)[338] or the National Council for Quality Assurance (NCQA) standards,[339] state licensure requirements[340] and best practices. Facilities should comply with both national and state standards. If the state in which the FRC is located has higher standards in a given area, then the state standards should be followed. Further standards that should be applied include:**

a) **Credentialing procedures should include original source verification of credentials (i.e., education, licensure for the state in which the FRC is located, added training and certificates).[341]**

b) **A Credentialing Committee for the FRC should review credentials and grant clinical privileges.**

c) **Credentials should be specific to the scope of practice and procedures/practice for each level and type of professional.[342]**

d) **Credentials should address the professional's language competency for clinical services, taking account that few detainees are proficient in English.**

e) **Credentials should address the professional's continuing education in cultural competence and cultural literacy and training around the populations at the FRCs.[343]**

f) **FRC therapists should have documented training in basic brief Cognitive Behavioral Therapy for depression and anxiety.[344]**

g) **Credentials of medical and mental health professionals should be on file and posted on the ICE website (with appropriate privacy protections for staff) and made available for inspection at each FRC by CRCL, Danya, and others.[345]**

**Recommendation 6-51: ICE should enter contracts for FRC mental health services with clinical entities that have established credentialing and quality assurance processes and can establish satellite offices within the FRCs. (In Texas, two possible options are the University of Texas Health Sciences Center in San Antonio and the Center for Health Care Services under Bexar County MHMR in San Antonio; in Pennsylvania, Reading Hospital and Medical Center, Lehigh Valley Health System, and Lancaster General Medical Center are potential partners.)**

5. **Psychotherapies**

The mental health needs of the families detained in the FRCs are complex, and can include both general psychiatric problems and problems resulting from traumatization by pre-immigration and immigration stresses, as well as detention itself. Effective mental health care should include evidence-based standard psychotherapy modalities, not only to treat depression and anxiety but

---

[338] JOINT COMMISSION, 2017 COMPREHENSIVE ACCREDITATION MANUALS.

[339] NAT'L COMM. FOR QUALITY ASSURANCE, *Accreditation Programs*, http://www.ncqa.org/Programs/Accreditation.aspx.

[340] For more detail on state licensure, see Federation of State Medical Boards, https://www.fsmb.org/.

[341] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 3.

[342] *Id.*

[343] Miranda et al. *supra* note 315.

[344] *Id.*

[345] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 5.

684

also to treat acute stress disorder and PTSD. Due to the uncertain length of custody, and often short stays in detention , interventions need to be short-term and time limited, but also build a foundation for future longer term psychological interventions.

**Recommendation 6-52: ICE should consider a detainee's fragile health or mental health, and trauma experiences and potential re-traumatization caused by detention, as factors favoring non-admission to or release from detention. For detainees – adults or children –found to have significant mental and physical health conditions, release of the whole family from detention is probably the most appropriate outcome.**

**Recommendation 6-53: FRCs should provide detainees with care by master's or doctoral level therapists who:**

    a) **have documented training in Psychological First Aid, Trauma-focused Cognitive Behavioral Therapy and other evidence-based modalities for PTSD, Acute Stress Disorder (both for adults and children); and treatment of domestic violence, sexual violence and child abuse;**

    b) **are certified through post-professional training; and**

    c) **are certifiably bilingual with significant experience with Latino patients.[346]**

**Recommendation 6-54: FRCs should establish a formal connection between the ICE Medical Office and the National Child Traumatic Stress Network[347] technical assistance centers to provide training resources for local therapists in evidence-based therapies for psychological first aid, trauma-focused cognitive behavioral therapy and other evidence-based modalities for PTSD (many of these online). A similar relationship should be established with the National Center for Trauma Informed Care funded by SAMHSA and SAMHSA experts at HHS.**

**Recommendation 6-55: FRCs should provide, or contract with outside service providers, the above-mentioned psychotherapy to detainees as indicated by their mental health assessments and also incorporated into their individualized treatment plans.**

    6. **Support/Therapeutic Groups**

The limited mental health literacy among FRC detainees requires a psychoeducational approach to prepare them to recognize possible mental health conditions and to provide information about available treatment modalities and resources. There is evidence that psychoeducational groups can provide this level of mental health literacy as well as reduce stigma of mental illness, mental health problems, and address sensitive topics such as domestic violence, particularly in the Latino population.[348] Additionally, groups can provide parents with information on parenting and

---

[346] *Id.*; Josef I. Ruzek, et al., *Psychological First Aid,* 29 J. MENTAL HEALTH COUNSELING 17 (2007); Esther Deblinger, et al., *Trauma-Focused Cognitive Behavioral Therapy for Children: Impact of the Trauma Narrative and Treatment Length*, 28 DEPRESSION AND ANXIETY 67 (2011).

[347] NAT'L CHILD TRAUMATIC STRESS NETWORK, http://www.nctsn.org/.

[348] Edil Torres Rivera, Ivelisse Torres Fernandez & Whitney Alexander Hendricks, *Psychoeducational and Counseling Groups with Latinos/as, in* HANDBOOK OF GROUP COUNSELING AND PSYCHOTHERAPY 242-52 (Janice DeLucia-Waack, Cynthia Kalodner & Maria Riva eds., 2nd ed. 2014).

685

preventive mental health for their children.[349] Facilities should develop a psychoeducational group program to educate detainees about basic mental health concepts, diagnoses, and treatments, especially around PTSD.

**Recommendation 6-56: FRCs should create individual and group support opportunities, which may include individual counseling as well as support group sessions. FRCs should also recognize that trauma victims need access to these programs, but their autonomy to decide whether they are ready, able, or interested in participating in such programs needs to be respected.**

**Recommendation 6-57: FRCs should develop a psychoeducational group program to educate detainees about basic mental health concepts, diagnoses, and treatments, especially around PTSD and domestic and sexual violence. This can be done in collaboration with the state and local chapters of the National Alliance for the Mentally Ill (NAMI), which has considerable experience in outreach to and engagement with Latino populations and could provide group facilitators from the Latino communities and with organizations with expertise in running group sessions for victims of domestic violence and/or sexual assault These should be made available to all detained mothers and to interested teenagers who opt to participate in a psychoeducational group program. Groups may also be staffed with FRC Trauma Informed Care Coordinators with the credentials and experience to run these groups.**

**Recommendation 6-58: FRCs should develop longer term cognitive behavioral psychotherapeutic groups for trauma, depression, anxiety, and parenting issues for children with behavioral difficulties and for families who have longer term stays.**

**Recommendation 6-59: FRCs should offer brief cognitive behavioral therapy for individual detainees experiencing symptoms related to, e.g., trauma, PTSD, flashbacks, and suicide risk. This cognitive behavioral therapy needs to be available at each FRC; it should be provided in Spanish (and interpreted into other needed languages) by someone with training, qualifications, and experience to provide cognitive behavioral therapy to trauma victims.**

**Recommendation 6-60: FRCs should develop a list of practical topics that can be covered pre-release to facilitate resilience, follow-up treatment, and services for the short- stay detainees. Topics should include stress management, including breathing exercises.**

### C.  Trauma-Informed Care

Many of the mothers and children living in FRCs have been victims of or witnesses to domestic violence, sexual assault, human trafficking, child abuse, or other violence. Working with detained families who have suffered trauma requires that facilities adopt a trauma-informed care approach to identify and assist women and children in ICE custody.

Understanding the context of trauma is critical to developing an environment that reduces re-traumatization. The following background on trauma and trauma-informed principles provide

---

[349] Kimberly Ehntholt & William Yule, *Practitioner Review: Assessment and Treatment of Refugee Children and Adolescents Who Have Experienced War-Related Trauma* 47 J. CHILD PSYCHOL. & PSYCHIATRY 1197, 1197-210 (2006).

686

context for our recommendations set forth below; the discussion is primarily based on SAMHSA's Concept of Trauma and Guidance for a Trauma-Informed Approach[350] and from SAMHSA's TIP 57.[351]

Trauma is a widespread, harmful, and costly public health problem. It occurs as a result of violence, abuse, neglect, loss, disaster, forced displacement, war, and other emotionally harmful experiences. Trauma has no boundaries with regard to age, gender, socioeconomic status, race, ethnicity, geography or sexual orientation.

Emerging research has documented the relationships among exposure to traumatic events, impaired neurodevelopmental and immune systems responses and subsequent health risk behaviors resulting in chronic physical or behavioral health disorders. Furthermore, previous research indicates that victimization as a child or adolescent increases the likelihood that victimization will reoccur in adulthood. Research has also shown that traumatic experiences – especially those traumatic events that occur during childhood – are associated with both behavioral health and chronic physical health conditions. Substance use (e.g., smoking, excessive alcohol use, and taking drugs), mental health problems (e.g., depression, anxiety, or post-traumatic stress disorder), and other risky behaviors (e.g., self-injury and risky sexual encounters) have been linked with traumatic experiences. In addition, traumatic experiences can contribute to chronic physical health conditions, such as diabetes and cardiovascular diseases.

We now understand that a framework for addressing trauma – "trauma-informed care" or "trauma-informed approach" – is essential. A trauma-informed approach includes an understanding of trauma and an awareness of the impact it can have across settings, services, and populations. It involves viewing trauma through ecological and cultural lenses and recognizing that context plays a significant role in how individuals perceive and process traumatic events, whether acute or chronic.

SAMHSA's concept of a trauma-informed approach is grounded in a set of four assumptions and six key principles.

The four key assumptions for a trauma-informed approach (sometimes referred to as the four Rs) are: (1) *realizing* the prevalence of trauma; (2) *recognizing* how trauma affects all individuals involved with the program, organization, or system, including its own workforce; (3) *responding* by putting this knowledge into practice; and (4) *resisting* re-traumatization.

A trauma-informed approach reflects adherence to six key principles rather than a prescribed set of practices or procedures. SAMHSA's six key principles are: safety; trustworthiness and transparency; peer support; collaboration and mutuality; empowerment, voice and choice; and cultural, historical and gender issues.

---

[350] *See generally* SAMHSA, SAMHSA CONCEPT OF TRAUMA AND GUIDANCE FOR A TRAUMA-INFORMED APPROACH (Oct. 7, 2014), http://store.samhsa.gov/product/SAMHSA-s-Concept-of-Trauma-and-Guidance-for-a-Trauma-Informed-Approach/SMA14-4884?WT_mc_id=EB_20141022_SMA14-4884.

[351] *See generally* SAMHSA, *TIP 57: Trauma-Informed Care in Behavioral Health Sciences* (Mar. 2014), http://store.samhsa.gov/product/TIP-57-Trauma-Informed-Care-in-Behavioral-Health-Services/SMA14-4816. For information, training tools, and examples of best practices in providing trauma informed care, see this Report's Appendix D, Examples of Federal Resources, Tools, and On-Line Trainings on Trauma-Informed Care.

A trauma-informed approach is distinct from trauma-specific services or trauma systems. A trauma-informed approach is inclusive of trauma-specific interventions, whether assessment, treatment or recovery supports, yet it also incorporates key trauma principles into the organizational culture. In particular, a trauma-informed approach seeks to resist re-traumatization of clients as well as staff. Organizations often inadvertently create stressful or toxic environments that interfere with the recovery of clients, the well-being of staff and the fulfillment of the organizational mission. Staff who work within a trauma-informed environment are taught to recognize how organizational practices may trigger painful memories and re-traumatize clients with trauma histories.

Developing a trauma-informed approach requires change at multiple levels in the FRCs and systematic alignment with these principles.

1. **Implementing a SAMHSA Trauma-Informed Approach**

Internment within an institution with restricted freedom of movement and a regimented schedule in itself has been found to be highly stressful for any detainee, and particularly for young children. A trauma-informed approach thus requires that FRCs establish, to the maximum extent possible, a non-institutionalized environment. This includes predictability and establishment of natural contact points between children and parents similar to those existing in communities outside of detention. Children can suffer distress when separated from parents even for routine activities such as school, and therefore need ready physical access on demand to their parent. A goal of a trauma-informed approach at FRCs is to make the environment less penal and institutionalized, with greater internal freedom of movement, and normalization of daily activities with flexibility and natural flows in their scheduling. Practices with historical roots in prison settings should be eliminated. (See Part 2.B.1, on normalization more generally.)

Notwithstanding the critical need for a trauma-informed approach in the FRCs, there are virtually no existing trauma-informed policies in the FRC policies. An initial limited trauma-informed training is reportedly offered for some FRC staff at some, but not all, of the FRC facilities. This training is a start, but more in-depth training and ongoing implementation support is required for all staff, coupled with revision of policies and practices at all the FRCs.

A successful trauma-informed approach recognizes the widespread impact of trauma and creates a safe and compassionate environment. Success requires that trauma-informed trainings be mandatory, and policies implemented by, all staff in FRCs, not just medical staff and operations. To adopt a more trauma-informed approach, each FRC will need to start with an environmental scan of their policies, procedures, and practices relative to each of ten SAMHSA-identified domains, with the goal of incorporating SAMHSA's key principles. The ten implementation domains are: governance and leadership; policy; physical environment; engagement and involvement; cross sector collaboration; screening, assessment, treatment and services; training and workforce development; progress monitoring and quality assurance; financing; and evaluation. For each, the six key principles apply (to repeat, safety; trustworthiness and transparency; peer

support; collaboration and mutuality; empowerment, voice and choice; and cultural, historical and gender issues).[352]

Best practices for trauma-informed care include securing contracts with agencies that have expertise providing training and technical assistance on trauma-informed care. ICE can collaborate with other federal government agencies including SAMHSA, the HHS Family Violence Prevention and Services Act (FVPSA) office, and the DOJ Office on Violence Against Women (OVW) to identify potential contractors with the appropriate expertise and training capacity to assist ICE and the FRCs with trauma-informed environmental scans, implementation of work plans, staff training, and technical assistance. SAMHSA has an established contracting process with its grantees that SAMHSA may use to facilitate other government agencies contracting with SAMHSA grantees. Should ICE and any of its FRCs choose to contract with SAMHSA's grantees, SAMHSA could expedite the process of contracting with its grantees making them available to assist ICE and FRCs more rapidly.

**Recommendation 6-61: ICE and the FRCs should holistically implement a trauma-informed approach, in coordination with relevant federal agencies and their recommended subject matter experts:**

   a) **ICE and the FRCs should coordinate with the Substance Abuse and Mental Health Services Administration (SAMHSA), Department of Justice Office on Violence Against Women (OVW), and/or the Department of Health and Human Services Family Violence Prevention and Services Program (FVPSP) in as many arenas as possible, to take advantage of their deep expertise.**
   b) **ICE and the FRCs should consult with SAMHSA-recommended experts about general policies and procedures, and in particular about sensitive approaches to management of agitation, distress, or other adverse behaviors.**
   c) **All trauma-informed care polices developed by FRCs and ICE should be reviewed and approved by experts at SAMHSA and OVW; ICE should secure consensus from SAMHSA and OVW that the policies meet trauma-informed standards.**
   d) **ICE and FRC staff should contract to receive technical assistance on trauma-informed care and work with immigrant-crime-victims subject matter experts on trauma-informed care recommended and/or funded by SAMHSA, OVW, and/or FVPSA.**
   e) **ICE and FRC staff should contract with FVPSA-recommended subject matter experts to receive training and technical assistance on trauma-informed care and care for victims of domestic violence, sexual assault, child abuse, and human trafficking.**
   f) **ICE and FRC staff should contract with SAMHSA-recommended subject matter experts, with particular expertise and experience in trauma-informed training, to provide ongoing staff training and education on trauma-informed care for all ICE and FRC staff who have contact with actual or potential FRC detainees or supervise staff who have such contact.**

---

[352] SAMHSA'S TRAUMA AND JUSTICE STRATEGIC INITIATIVE, SAMHSA'S CONCEPT OF TRAUMA AND GUIDANCE FOR A TRAUMA-INFORMED APPROACH (JULY 2014), http://store.samhsa.gov/shin/content/SMA14-4884/SMA14-4884.pdf (providing a road map for a trauma-informed environmental scan). Additional resources are available at this Report's Appendix D.

689

**Recommendation 6-62: ICE and FRC trauma-informed training should have the objectives of increasing staff understanding of trauma, awareness of the impact of trauma on behavior, and how to implement trauma-informed responses.**

**Recommendation 6-63: ICE should designate Trauma Informed Care Coordinators for each FRC. The Coordinators should conduct environmental scans based on SAMHSA guidelines, identifying gaps and needs for trauma-informed care, and should develop a plan for the facilities to operate in a trauma-informed manner, taking corrective steps that prioritize the most readily-accomplished reforms and then moving on to more difficult areas. Coordinators should report to and coordinate with a staff member at the national leadership level at the ICE Enforcement and Removal Operations. Technical assistance on trauma-informed care and trauma-informed environmental scans can be provided by the National Center for Trauma Informed Care.**[353]

**Recommendation 6-64: ICE and the FRCs should use SAMHSA guidelines for recognizing the signs and symptoms of trauma in detainees and families. The FRCs should implement programs that provide support for women and children who have experienced trauma, while avoiding "caretaking" or "rescuing" responses, and should foster an environment that encourages self-care by maximizing opportunities for choice and control in their daily lives.**

**Recommendation 6-65: The FRCs should provide a culturally appropriate environment that is as non-institutional as possible, with special attention to language access, diet, customs and traditions,**[354] **daily routines, ambiance and decor (of housing units and of common areas), and adult parenting tasks, so as to minimize culture shock and to create as normal a daily structure as possible.**

2.   **Trauma-Informed Approach: Elimination of Nighttime Bed Checks**

Hourly bed checks during sleep hours that include turning on lights, using flashlights or making any physical contact to confirm that all members of a detained family are present are routine in FRCs; these practices are clearly disruptive and intrusive. They are inconsistent with trauma-informed care of detainees. It is common for individuals who have been psychologically traumatized to have extreme startle reactions, terror, and insomnia as a result of such actions or practices. Sleep disruption and deprivation has adverse implications for both general health and child development. The rationale for searches in detention is to ensure a "safe living environment" and "to prevent escapes."[355] The actual needs of these non-criminal families could be met with far less intrusive measures. As with so many other aspects of FRC operations, the current prison-based approach is inappropriate.

---

[353] National Center for Trauma-Informed Care and Alternatives to Seclusion and Restraint (NCTIC), http://www.samhsa.gov/nctic.

[354] Andres J. Pumariega et al., *Practice Parameter for Cultural Competence in Child and Adolescent Psychiatric Practice*, 52 J. AM. ACAD. CHILD ADOLESC. PSYCHIATRY 1101 (2013).

[355] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARDS 2.6, SEARCHES OF RESIDENTS, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_searches_of_residents.pdf.

**Recommendation 6-66: All FRCs should immediately discontinue the practice of nightly bed checks, which are intrusive, harmful to parents and children, and undermine the provision of trauma-informed-care at FRCs.**

### 3. Trauma-informed Approach: Supports for Parenting

Despite being in a detention facility, adults detained in the FRCs must continue parenting their children. This serves, in part, to reassure the children that they are in a predictable, nurturing, and safe environment, which is essential for every child's well-being. The FRC environment is an unfamiliar and a potentially stressful one for both parents and children. Such an environment may further compound the prior stress and trauma experienced by the parents and children before entering the United States. The general well-being of families while they are in the FRCs is highly dependent on the FRC environment, which should therefore support their parenting using a trauma-informed approach.

The Office of Refugee Resettlement (ORR) within HHS takes custody of unaccompanied children who cross the border without legal status. ORR takes responsibility to "[e]nsure that the interests of the child are considered in decisions related to the care and custody of unaccompanied children."[356] Children in the FRCs, although not unaccompanied, are still children and are the majority of FRC detainees. And the U.S. Court of Appeals for the Ninth Circuit recently ruled that they are entitled to the same protections as unaccompanied children.[357] The same underlying philosophy of safeguarding children's interests should pervade all aspects of the care of children in the FRCs.

**Recommendation 6-67: FRC Trauma Informed Care Coordinators should coordinate trauma-informed care for parents and children detained at the FRCs. The FRCs should provide and/or facilitate access to services and programming that support parents' and children's resilience and prevent re-traumatization, such as educational and information sessions, support groups, self-esteem building, and other activities that help parents and children heal from trauma and build upon their own strengths and resiliency. The Coordinators should track the numbers of detained mothers who participate in such programs.**

**Recommendation 6-68: FRC Trauma Informed Care Coordinators should regularly offer – and should reach out to detainees to invite them to participate in – informational sessions for detainees on domestic violence, sexual assault, human trafficking, and child abuse and providing an overview of help available to victims in the United States. This should include handing out the USCIS brochures discussed in Recommendation 3-35 and 3-38, above. Alternatively or additionally, these information sessions could be provided through contract with a community-based organization with expertise serving victims of domestic violence and sexual assault.**

---

[356] *About Unaccompanied Children's Services*, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT (2015), http://www.acf.hhs.gov/orr/programs/ucs/about.
[357] Flores v. Lynch, 828 F.3d 898 (9th Cir. 2016).

691

**Recommendation 6-69: Each FRC should conduct systemic surveys of detainees to document and assess family experiences in FRCs and to identify services that could help minimize re-traumatizing parents and children.**

**Recommendation 6-70: ICE and the FRCs should transparently communicate to detainees their rights and responsibilities with respect to parenting their children while in detention. The policies and communications materials should be developed with a trauma-informed approach to normalize the parent-child relationship and create the greatest possible opportunities for parental responsibility, choice, and control over their children's lives, within the confines of detention.**

**Recommendation 6-71: ICE should ensure that the best interests of child detainees are considered in all decisions related to their care and custody, and that children are not subjected to further trauma by the decisions related to the care and custody of children in the FRCs. Children should not be present for their mother's credible or reasonable fear interview, mental health screening, or delivery of the results of mental health screenings or tests.**

### D.  Release Preparation, Case Management, Continued Care and Access to Mental Health Professionals

Immigrant mothers and children who are seeking asylum or who have suffered from domestic violence, sexual assault, human trafficking, and violence, and who have trauma histories related to these and other events, need support to help them heal both while in detention and in their post-release communities. Detention itself is traumatizing and can exacerbate pre-existing trauma. Non-punitive and non-restrictive community support and case management programs can offer much-need services. So time in custody, if it is absolutely necessary, can be used to screen and identify trauma, to inform detainees of services available to them, and to connect them to relevant assistance programs in the communities to which they will be released.

Appropriate community services and support can strengthen the ability of mothers to heal, to care for their children and to fully participate in their immigration cases. Immigration case participation involves retelling the story of abuse in writing and orally, often to several persons. Retelling their stories of persecution, crime victimization, and abuse often leads victims to relive the trauma. Programs with experience working with immigrant victims of violence or persecution have needed expertise on the full range of legal protections such victims are eligible to receive, and they know how to provide assistance to victims in a trauma-informed manner.[358] This type of support will

---

[358] *See* Advocates Tool for Developing a Survivors Story; Trauma Informed Approach, http://library.niwap.org/wp-content/uploads/2015/pdf/TRAUM-Qref-AdvocatesToolDevelopingSurvivorStory.pdf; Mary Ann Dutton et al., Trauma Informed Structured Interview Questionnaire (2013), http://library.niwap.org/wp-content/uploads/2015/SIQI.edited.di-tb-6.15.15.pdf; National Immigrant Women's Advocacy Project, *Training for Advocates and Attorneys on Trauma-Informed Work With Immigrant Women*, https://www.youtube.com/watch?v=05Z95q1bkG4 (Apr. 23, 2014); Krisztina Szabo et al., *Advocate's and Attorney's Tool For Developing A Survivors Story: Trauma Informed Approach* (2013), http://library niwap.org/wp-content/uploads/2015/pdf/TRAUM-Qref-AdvocatesToolDevelopingSurvivorStory.pdf.

enhance appearance at and participation in immigration case proceedings and will simultaneously help victims and their children heal from the effects of trauma.

A systematic approach to case management has been found to be most effective in improving outcomes for other populations with complex needs – particularly an approach that directly connects persons to needed services in their communities.[359] The case management program currently piloted by ICE is promising, but requires more focus and capacity around mental health case management. In addition, a referral system and a directory of service providers in communities across the U.S. is necessary to ensure that women and children being released from detention have the access to services they need to facilitate their own healing and care for their families. Because detained mothers are new arrivals in the U.S. and are unfamiliar with the communities to which they are released, it is particularly important to not only provide referrals, but also to work to set up appointments with service providers in the communities to which detainees will be released.

**Recommendation 6-72: ICE should enroll all released detainees who need support in a community-based support program, such as ICE's Family Case Management Program, and should expand the scope of such programs to include health and mental health case referrals. Communication between detainees and counselors and mental health providers should be privileged, and their participation in counseling and mental health treatment should be entirely voluntary.**

**Recommendation 6-73: Case management for detainees as they approach release should include the services described below – but inability to secure a post-release appointment for a detainee should never delay a detainee's release.**

a) **Referral to community-based mental health programs, social services, victim services, and community support organizations in their post-release communities. FRC staff should consult the SAMHSA mental health locator[360] and National Council for Behavioral Health[361] to locate mental health providers in post-release communities. FRC staff should also provide detainees with the information about the Federally Qualified Health Center (FQHC) in post-release communities, because FQHC staff can either provide care or provide information about low-cost mental health services available in their communities.**

b) **Provision of information and education shortly before release about community mental health resources, Federally Qualified Health Centers, victim services programs, and social services programs in their post-release community, including the rationale for the mental health, victim or social services referral; a description of the help and support offered by the programs; program income eligibility; and an explanation of the programs' intake and enrollment procedures.**

c) **Referral calls to community mental health and social service agencies, with a goal of securing an intake appointment for each detainee within 7 to 14 days after release.**

---

[359] Steven J. Ziguras et al., *A Meta-Analysis of the Effectiveness of Mental Health Case Management Over 20 Years*, 51 PSYCHIATRIC SERVICES 1410 (2000).
[360] Substance Abuse and Mental Health Services Admin., *Behavioral Health Treatment Services Locator*, https://findtreatment.samhsa.gov/.
[361] Nat'l Council for Behavioral Health, http://www.thenationalcouncil.org.

693

d) **For detainees who have been identified (including who have self-identified) as victims of domestic violence, sexual assault, child abuse, human trafficking or other gender-based abuse, provision of the names of and appointments with programs in post-release communities that have expertise in working with immigrant victims of gender-based violence. Staff preparing detainees for release can identify programs with the requisite expertise using the directory of program and services available developed with funding from the Office on Violence Against Women, U.S. Department of Justice.**[362]

e) **For detainees with medical care needs, the names and contact information and appointments made with the Federally Qualified Health Center in post-release communities.**

**Recommendation 6-74: All referral information should be provided to each detainee in a language that detainee understands well (ideally her primary language).**

### E. Medical, Dental, and Mental Health Records

Under HIPAA, individuals have a right to confidentiality of protected health information (PHI) and access to inspect and obtain a copy of their medical records. Under the Family Residential Standards, detainees are to be provided a request form to receive copies of their medical records.[363] The PBNDS 2011 requires that facilities are to provide detainees with limited English proficiency and detainees who are hearing impaired with interpretation and translation services to complete the written request and that "Detainees released or removed from detention shall receive a discharge treatment plan to ensure continuity of care, full copy of their medical record, medication, and referrals to community-based providers as medically appropriate."[364]

It is essential that there be clear and easily accessible procedures in place for detainees and former detainees to be able to obtain their medical, dental and mental health records. This is useful for continuity of care and other purposes. The Family Residential Standards indicate that form I-813 can be used to request medical records.[365] But this form inappropriately requires the requester to specify why health records are being requested.[366] Whatever the reason – health, immigration case related, victim or social services, or anything else, detainees are entitled to their medical, dental, and mental health records. The PBNDS 2011 standards on provision of medical records to detainees have much stronger requirements for records provision than those required by the Family Residential Standards. The PBNDS 2011's approach eliminates the questions that the FRC requires asking about why the detainee is requesting medical records.[367]

**Recommendation 6-75: Medical, dental, and mental health records should be kept in secured and locked locations that ensure confidentiality and privacy protection, consistent with**

---

[362] Nat'l Immigrant Women's Advocacy Project, Directory of Services Providers, http://www.niwap.org/directory/.
[363] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 25.
[364] PBNDS 2011 at, *supra* note 254, at 301.
[365] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 24.
[366] U.S. Dep't of Justice, Immigration and Naturalization Serv., INS Health Care Program Authorization for Disclosure of Information (Jan. 17, 1990),
https://www.prisonlegalnews.org/media/publications/usdoj_ins_health_care_program_authorization_for_disclosure_of_info_form_i_813.pdf.
[367] PBNDS 2011 at, *supra* note 254, at 278, 299–300.

694

HIPAA as well as all local or state confidentiality regulations. The latter may require added privacy protections for psychotherapy notes and for addiction history and treatment records.

**Recommendation 6-76:** Policies and procedures should be developed and established specifying the clearance for accessing medical, dental, and mental health records by appropriate health and mental health professionals who are directly involved in a detainee's care. As per HIPAA, any access to records by any professional should be tracked either on paper or electronically. Specifically:

a) Policies and procedures should be established specifying which non-health care staff have access to any medical, dental or mental health information, specific reasons for such access, and the level of detail for such sharing or access. The policies should balance maintaining confidentiality versus clinical or emergent need to know for effective care.

b) Any non-health care staff accessing records, including interpreters and other support staff, should sign an appropriate confidentiality protection oath per HIPAA.

c) Policies and procedures should be established that prevent any individual who has any personal or outside relationship with a detainee from access to their health records unless the detainee gives signed informed consent.

**Recommendation 6-77:** On request when in detention and automatically upon release from detention, detainees should be provided with a full copy, not a summary, of medical, dental and mental health records for themselves and their children, both in an accessible electronic format such as a CD or flash drive, and in hard copy. This includes documents relating to both initial screening, immunization, and health care they received while in detention (including lab tests and any radiograph readings). To facilitate requests for records:

a) ICE should develop, translate into the languages spoken in the FRCs (using the cutoff described in Recommendation 5-7), and make easily accessible in hardcopy at all FRCs and on its website a uniform form to be used by former detainees seeking copies of their medical, dental and mental health records. This request form should be HIPAA-compliant and should not include questions about the purpose, need or reason for the request for medical, dental and mental health records. If the form is unavailable in a needed language, interpreter services should be offered to provide language access.

b) Within one business day of receiving a HIPAA-compliant request to release detainee medical, dental, and mental health records, ICE should provide a copy of such records – whether to a detainee still in custody, a former detainee, or any individual or agency the detainee or former detainee designates in the request, including health care and mental health care professionals, schools, attorneys and others.

144

695

## 7.   INSPECTIONS, COMPLAINTS, AND OVERSIGHT

DHS compliance with this Report's recommendations will require very substantial changes in policy and practice, which will need to be managed and monitored. DHS already has in place two mechanisms that can help: contracted inspections (currently performed by Danya International), and inspections by the DHS Office for Civil Rights and Civil Liberties (CRCL), which already plays an important role in monitoring ICE detention centers including the FRCs. Danya's inspections largely address processes rather than outcomes, and are tied tightly to the Family Residential Standards. CRCL's approach is more outcome-focused and utilizes the professional knowledge and skill of a range of contracted experts – physicians, psychologists, penologists, and other professionals. CRCL's inspections are not done at routine intervals and are not required; they are currently conducted in response to formal complaints, or on CRCL's initiative. Both are useful methodologies, which we recommend be continued and used to monitor FRC conditions generally and compliance with the ACFRC's recommendations in particular. However the methodological limitations of the Danya inspections, and the intermittent and discretionary nature of the CRCL inspections render them insufficient without further attention.

More generally, problems that arise at the FRCs may require sustained attention at the leadership level to solve. Whether related to the Committee's recommendation or not, detainees and their attorneys need to be able to easily bring problems to the attention of ICE and, through ICE, to DHS. Detainees need to be able raise concerns about their treatment – for example to inform ICE and DHS officials if adults or children are not receiving timely needed health care or mental health care, or are not receiving food that meets their dietary needs and restrictions. One goal is to have a mechanism that fosters quick responses and provides solutions to problems as they arise. More generally, the same mechanism can improve the information that ICE and DHS have about the internal workings of each FRC and can be harnessed to facilitate not only individual but systemic interventions. The idea is to build a system by which on-the-ground knowledge is communicated to leadership, analyzed, and routinely and transparently used for continuous quality improvement.

**Recommendation 7-1: DHS should immediately identify each ACFRC recommendation it intends to adopt and then monitor the extent to which the FRCs and ICE implement those recommendations.**

**Recommendation 7-2: DHS should require that ICE's contracted inspections (currently performed by Danya International) incorporate the recommendations contained in this Report, along with the PBNDS 2011 and the Family Residential Standards, and are routinely provided to ICE and DHS leadership, to CRCL, and to the public.**

**Recommendation 7-3:**

a) **CRCL should conduct investigations two times a year at each FRC for the first two years following the issuance of this Report. In these investigations CRCL should investigate and report on the extent to which the FRCs and ICE are implementing the ACFRC recommendations DHS has adopted.**
b) **Each year thereafter CRCL should conduct an annual inspection of each FRC.**
c) **CRCL inspection teams should minimally be composed of physicians with expertise on Joint Commission on the Accreditation of Health Care Organizations (JCAHO) inspections and compliance, and expertise on medical care for women, children and**

145

adolescents; psychiatrists with specialized expertise on immigrant and detained populations; trauma-informed-care experts; educators with expertise on students with interrupted educations and immigrants; and experts in non-correctional congregate care.

d) CRCL inspections should pay particular attention to areas in which the Family Residential Standards and PBNDS 2011 differ, to ensure that FRCs are aware of and complying with the higher standard.

e) Inspections should include not only detention conditions but the processes and outcomes relating to decisions to detain and release, and the conditions and service referrals related to release.

f) DHS should ensure that CRCL has full access to the FRCs and to ICE and FRC files, including complaint records, and is able to speak confidentially with FRC staff, ICE officers, and detainees.

g) CRCL should provide ICE leadership investigation memos (by its experts) following its inspections at FRCs within 60 days of its inspections, and with a final CRCL recommendation memo within 90 days of its inspections.

**Recommendation 7-4: Upon receipt of a CRCL recommendation memo:**

a) Within 30 days, ICE should inform CRCL and the DHS Secretary whether it concurs with each CRCL recommendation. In that response ICE should provide an explanation for any non-concurrence.

b) Any ICE non-concurrence should be reported to the DHS Secretary; the Secretary should promptly determine whether to direct ICE to reconsider or reverse its non-concurrence.

c) Any non-concurrences that remain should be reported to the chair and ranking minority member of all congressional committees with relevant oversight responsibilities (including budgetary jurisdiction), and included in CRCL's public (and web-posted) quarterly reports to Congress.

d) For each CRCL recommendation with which it concurs, ICE should provide CRCL within 60 days with an implementation plan, and then should report every 60 days until completion on implementation progress.

e) Every quarter, CRCL should inform the DHS Secretary of any outstanding implementation issues.

**Recommendation 7-5: ICE should create an ombudsperson office to receive complaints and reports from detainees and their attorneys, or other knowledgeable entities, about problems arising for detainees at FRCs and to ensure that complaints and reports are appropriately investigated and responded to. The ombudsperson office should be located within the ICE Director's Office, and should address all the subjects covered in this report, including but not limited to decisions to detain and release, alternatives to detention, detention conditions, VAWA compliance, conditions of release, community supervision, and prosecutorial discretion. All complaints and reports and resulting actions or declinations to act should be reported weekly to a senior official within the DHS Secretary's Office. At least annually, ICE should analyze complaints and reports more systematically, considering any need for systemic responses, and should report the results of that analysis to DHS.**

146

**Recommendation 7-6: DHS and ICE leadership should routinely review and analyze information – from contracted inspections, CRCL inspections, ombudsperson office complaints, NGO reports, and any other credible sources – about problems and areas of needed improvement relating to policies on family detention in general (e.g., decisions to detain and decisions to release) as well as detainee treatment at FRCs, and should direct immediate corrective action when appropriate.**

698

## APPENDIX A: MEMBERS OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS

Dr. William Arroyo, Regional Medical Director/Medical Director, Children's System of Care, Los Angeles County Department of Mental Health (LACDMH)

Howard Berman, Senior Advisor/Attorney, Covington & Burling LLP

BethAnn Berliner, Senior Researcher and Project Director, WestEd

Michelle Brané, Director, Migrant Rights and Justice, Women's Refugee Commission (WRC)

Judith Dolins, Chief Implementation Officer, American Academy of Pediatrics

Anadora Moss, President, The Moss Group, Inc.

Karen Musalo, Professor, U.C. Hastings College of the Law, and Director, Center for Gender & Refugee Studies

Jennifer Nagda, Policy Director, Young Center for Immigrant Children's Rights at the University of Chicago

Leslye Orloff, Adjunct Professor and Director, National Immigrant Women's Advocacy Project (NIWAP), American University, Washington College of Law

Sonia Parras-Konrad, Co-Director, ASISTA

Dr. Andres Pumariega, Professor and Chair, Department of Psychiatry, Cooper University Hospital and Health System, Cooper Medical School of Rowan University

Margo Schlanger, Henry M. Butzel Professor of Law, University of Michigan Law School

Dr. Dora Schriro, Commissioner, Connecticut Department of Emergency Services and Public Protection

Kurt Schwarz, Partner, Jackson Walker LLP

699

**APPENDIX B: ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS
(ACFRC) COMMITTEE TASKING**

Posted at https://www.ice.gov/acfrc (click on "Committee Tasking")

Develop recommendations for best practices at family residential centers that will build on ICE's
existing efforts in the areas of educational services, language services, intake and out-processing
procedures, medical staffing, expansion of available resources and specialized care, and access to
legal counsel.

Detail mechanisms to achieve recommended efficiencies in the following focus areas:

1. Educational Services

    1. Providing educational services to a juvenile population that will be in custody
    for a short period of time.

    2. Providing individualized educational services to a transient juvenile population
    with little to no English language capabilities and from a variety of socio-
    economic and educational levels.

    3. Phasing full delivery of services over a 15 – 20 day period with an expectation
    that the juvenile will be released and enrolled in a public school located in the
    United States pending resolution of their immigration proceedings.

2. Language Services

    1. Providing accurate and timely language services.

3. Detention Management

    1. Evaluating intake and out-processing procedures to improve overall
    management, to include screening, communication of resources available, and
    alternatives to detention.

4. Medical Treatment

    1. Expanding existing resources and specialized care to enhance medical
    treatment of family units.

    2. Providing mental health services/trauma-informed services to a multi-lingual
    population whose average length of stay may not lend itself to full delivery of
    treatment.

    3. Recruiting, placing, and retaining qualified health care providers.

        1. Recruitment through a contract for services, the U.S. Public
        Health Service Corps, and Title V/Title 38 general schedule
        personnel.

5. Access to Counsel

    1. Evaluating existing resources and tools.

## APPENDIX C: A BRIEF HISTORY OF INS/ICE FAMILY RESIDENTIAL FACILITIES

|  |  | Net change in beds | Total bed capacity |
|---|---|---|---|
|  | **INS** |  |  |
| March 2001 | INS contracts with Berks County (Co.) Pennsylvania for 84 beds, government's first FRC. Berks Co. operates the Berks Co. FRC (Berks), using it to detain both mothers and fathers with minor children. |  | 84 |
|  | **ICE** |  |  |
| Nov. 2002 | Congress passes the Homeland Security Act creating DHS. ICE assumes INS's contract for the Berks FRC. |  |  |
| May 2006 | ICE contracts with Williamson Co., Texas for 512 beds, and opens the T. Don Hutto Residential Center (Hutto), previously a medium security, adult male prison; the county subcontracts management of Hutto, named after a CCA co-founder, to CCA. ICE co-locates adult women and moms with children at Hutto. About 300 beds are for the FRC. | + ~300 | 384 |
| March 2007 | ICE establishes the Juvenile and Family Residential Management Unit (JFRMU) wi/the Office of Detention and Removal Operations (DRO); now, Enforcement and Removal Operations (ERO). |  |  |
| Dec. 2007 | ICE promulgates Family Residential Standards |  |  |
| Sept. 2007 | ICE contracts with the Nakamoto Group (Nakamoto) to provide on-site monitoring of the FRCs. |  |  |
| Sept. 2009 | ICE removes all families from Hutto; as many as possible are released and the rest are transferred to Berks. | - ~300 | 84 |
| Feb. 2013 | Berks is relocated to a larger building on the county campus; ICE increases its capacity to 96 beds. | + 12 | 96 |
| June 2014 | ICE opens and operates Artesia FRC (Artesia), capacity 672 beds. Artesia, previously a federal law enforcement training barrack, is located on government property in the southeast corner of NM. ICE uses Artesia to detain only mothers with children. | + 672 | 768 |
| August 2014 | ICE repurposes its detention facility for adult males, capacity 532 beds, in Karnes, Texas (Karnes) to detain families. ICE contracts with GEO for its operation, and uses it to detain only mothers with children. | + 532 | 1300 |

| Dec. 2014 | Karnes Co. approves a 626-bed expansion of Karnes. Construction is completed in 2015. Karnes's current operating capacity is 830 beds. | (+626) +298 | 1598 |
| Dec. 2014 | ICE closes Artesia. | - 672 | 926 |
| Dec. 2014 | ICE opens the South Texas FRC (Dilley), capacity 2400 beds, in Dilley Texas. ICE assigns moms and their children only. | +2400 | 3326 |
| Sept. 2015 | Berks's 3rd floor is finished, creating capacity for an additional 92 beds; ICE has not yet activated the additional beds. | (+92) | 3326 |
| May 2015 | ICE contracts with Danya International (Danya) to provide on-site monitoring at the FRCs. | | |

151

702

## APPENDIX D: EXAMPLES OF FEDERAL RESOURCES, TOOLS, AND ON-LINE TRAININGS ON TRAUMA-INFORMED CARE

### TRAINING RESOURCES

***TIP 57: Trauma-Informed Care in Behavioral Health Services***
**DHHS, Substance Abuse and Mental Health Services Administration**
**http://store.samhsa.gov/product/TIP-57-Trauma-Informed-Care-in-Behavioral-Health-Services/SMA14-4816**

TIP 57 is a guide to assist behavioral health professionals in understanding the impact and consequences for those who experience trauma. It discusses patient assessment, treatment planning strategies that support recovery, and building a trauma-informed care workforce. The guide can be useful to any system that is looking to be more responsive to the trauma-related needs of the population served and to implement a trauma-informed workforce and organizational change strategy. This Treatment Improvement Protocol (TIP) is divided into three parts:

> Part 1: *A Practical Guide for the Provision of Behavioral Health Services*
> Part 2: *An Implementation Guide for Behavioral Health Program Administrators*
> Part 3: *A Review of the Literature*

***Trauma-Informed Care for Women Veterans Experiencing Homelessness***
**DOL, Women's Bureau**
**https://www.dol.gov/wb/trauma/**

Trauma-Informed Care for Women Veterans Experiencing Homelessness: A Guide for Service Providers, also known as the "Trauma Guide," was created to address the psychological and mental health needs of women veterans. The guide is also a compilation of best practices aimed at improving effectiveness in engaging female veterans. Written for service providers, the guide offers observational knowledge and concrete guidelines for modifying practices with the goal of increasing re-entry outcomes. The Guide Includes:

- *User's Guide*
  A handbook offering information on the experiences and needs of female veterans, what it means to provide trauma-informed care, and resources for staff training and education.
- *Organizational Self-Assessment for Providers Serving Female Veterans*
  A manual of best practices that can be integrated into daily programming for homeless female veterans.
- *Resource Lists*
  Compilations of provider-targeted materials, videos, and websites on a variety of topics, including: female veterans, homelessness and trauma, cultural competence, trauma-informed services, participant involvement, and self-care.

***A Checklist for Integrating a Trauma-Informed Approach into Teen Pregnancy Prevention Programs***
**DHHS, Office of Adolescent Health**
[http://www.hhs.gov/ash/oah/oah-initiatives/teen_pregnancy/training/Assests/traumainformed-checklist.pdf](http://www.hhs.gov/ash/oah/oah-initiatives/teen_pregnancy/training/Assests/traumainformed-checklist.pdf)

While a teen pregnancy prevention (TPP) program generally focuses on providing sexual health education, ensuring access to youth friendly health care services, and engaging youth, families, and communities, a trauma-informed approach (TIA) is a way of addressing vital information about sexuality and well-being that takes into consideration adverse life experiences and their potential influence on sexual decision-making. A trauma-informed approach to sexual health is critical to promoting lifelong sexual health and well-being for anyone who has had adverse childhood and/or adult experiences. Principles of a trauma-informed approach can be integrated into any TPP program.

***Trauma-Informed Victim Interviewing***
**DOJ, Office for Victims of Crime**
[https://www.ovcttac.gov/taskforceguide/eguide/5-building-strong-cases/53-victim-interview-preparation/trauma-informed-victim-interviewing/](https://www.ovcttac.gov/taskforceguide/eguide/5-building-strong-cases/53-victim-interview-preparation/trauma-informed-victim-interviewing/)

Part of the Human Trafficking Task Force eGuide, developed in partnership by the U.S. Department of Justice's Office for Victims of Crime (OVC) and Bureau of Justice Assistance (BJA), this chapter provides helpful tips to building rapport in with victims in a culturally responsive and trauma-informed manner to engage more effectively.

***Think Trauma: A Training for Staff in Juvenile Justice Residential Settings***
**DOJ, National Institute for Corrections**
[http://nicic.gov/library/027731](http://nicic.gov/library/027731)

This training provides an overview for juvenile justice staff of how to work towards creating a trauma-informed juvenile justice residential setting. Creating a trauma-informed setting is a process that requires not only knowledge acquisition and behavioral modification, but also cultural and organizational paradigm shifts, and ultimately policy and procedural change at every level of the facility. "Think Trauma" is a PowerPoint-based training curriculum including four modules that can be implemented back-to-back in a single all-day training or in four consecutive training sessions over the course of several weeks or even months. Each module takes approximately one to two hours, depending on the size of the trainee group, and whether you elect to implement all of training materials and activities. It contains six case studies of representative youth who've been involved with the juvenile justice system." The complete curriculum is available (but you must create an account on the Learning Center in order to join the community.) The following resources are provided: the workshop package--Facilitator's Guide, Participant Handbook, Supplemental Materials, and multi-part Slide Deck; supplemental resources--Implementer's Guide, case vignettes and puzzles, and activity materials; and a discussion forum on which implementation questions will be answered.

*Treating the Hidden Wounds: Trauma Treatment and Mental Health Recovery for Victims of Human Trafficking*
**DHHS, Office of the Assistant Secretary for Planning and Evaluation**
**https://aspe.hhs.gov/basic-report/treating-hidden-wounds-trauma-treatment-and-mental-health-recovery-victims-human-trafficking**

This issue brief addresses the trauma experienced by most trafficking victims, its impact on health and well-being, some of the challenges to meeting trauma-related needs of trafficking victims, and promising approaches to treatment and recovery. While this issue brief touches on trauma across human trafficking populations, it has a special emphasis on trauma resulting from sex trafficking of women and girls. It includes core issues related to trauma and culture, as well as strategies for engagement and core components for trauma-specific and trauma-informed services.


*Developing a Trauma-Informed Child Welfare System*
**DHHS, Administration on Children, Children's Bureau**
**https://www.childwelfare.gov/pubs/issue-briefs/trauma-informed/**

This issue brief discusses the steps that may be necessary to create a child welfare system that is more sensitive and responsive to trauma. Every child welfare system is different, and each State or county child welfare system will need to conduct its own systematic process of assessment and planning, in collaboration with key partners, to determine the best approach. After providing a brief overview of trauma and its effects, this issue brief discusses some of the primary areas of consideration in that process, including workforce development, screening and assessment, data systems, evidence-based and evidence-informed treatments, and funding.


*Immigration and Child Welfare*
**DHHS, Administration on Children, Children's Bureau**
**https://www.childwelfare.gov/pubPDFs/immigration.pdf**

This issue brief provides information, practical tools, resources and tips for working with immigrant children and families using culturally competent and trauma-informed practices.


*Trauma-Informed Practice*
**DHHS, Administration on Children, Children's Bureau**
**https://www.childwelfare.gov/topics/responding/trauma/**

To provide trauma-informed care to children, youth, and families involved with child welfare, professionals must understand the impact of trauma on child development and learn how to effectively minimize its effects without causing additional trauma. This section provides information on building trauma-informed systems, assessing and treating trauma, addressing secondary trauma in caseworkers, and trauma training. It also offers trauma resources for caseworkers, caregivers, and families.

154

**FEDERALLY-FUNDED TRAINING, TECHNICAL ASSISTANCE, AND RESOURCE CENTERS**

**SAMHSA's National Center for Trauma-Informed Care**
http://www.samhsa.gov/nctic
**Targeted Technical Assistance, Coaching, and Training**

NCTIC provides technical assistance to advance the implementation science for trauma-informed approaches through in-person organizational technical assistance, virtual learning networks, technical assistance materials, and links to other resources supported by the federal government. NCTIC provides technical assistance and training to a range of service systems:

- Community-based behavioral health agencies
- Institutions
- Criminal and juvenile justice settings
- Homeless and HIV service providers
- Domestic violence organizations
- State and federal agencies

**SAMHSA's GAINS Center**
http://www.samhsa.gov/gains-center
**Training**

The GAINS Center focuses on expanding access to services for people with mental and/or substance use disorders who come into contact with the justice system. As part of its training program, the GAINS Center provides trauma-informed response training for professionals.

**ASISTA Immigration Assistance**
http://www.asistahelp.org
**Advanced Technical Assistance and Training**

Provides national leadership, advocacy, training, and technical support to enhance access to safety and justice for crime survivors seeking secure immigration status.

**American University - National Immigrant Women's Advocacy Project (NIWAP)**
http://www.wcl.american.edu/niwap/
**Improving Access to Services and Legal Options for Immigrant Survivors**

Through this project, the National Immigrant Women's Advocacy Project (NIWAP) at the American University Washington College of Law will provide in-person trainings, webinars, online learning modules, a family law community of practice, and technical assistance and training to OVW grantees, subgrantees, grant partners and potential grantees on legal options for immigrant victims of domestic violence, sexual assault, stalking and dating violence. Topics to be covered include: immigration, family and public benefits laws, language access and access to victim services.

155

**Domestic Violence Resource Network** (DVRN)
http://www.acf.hhs.gov/fysb/programs/family-violence-prevention-services/programs/centers
**Network of Resource Centers**

The Domestic Violence Resource Network (DVRN) is funded by the U.S. Department of Health and Human Services to inform and strengthen domestic violence intervention and prevention efforts at the individual, community, and societal levels. The DVRN works collaboratively to promote practices and strategies to improve our nation's response to domestic violence and make safety and justice not just a priority, but also a reality. DVRN member organizations ensure that victims of domestic violence, advocates, community-based programs, educators, legal assistance providers, law enforcement and court personnel, health care providers, policy makers, and government leaders at the local, state, tribal and federal levels have access to up-to-date information on best practices, policies, research and victim resources.

The DVRN includes two national resource centers, four special issue resource centers, three culturally-specific resource centers, the National Domestic Violence Hotline, and the National LGBTQ DV Capacity Building Learning Center. A few of these are listed:

- *National Latin@ Network for Healthy Families and Communities*
  www.nationallatinonetwork.org
  **Training and Resource Development**
  The National Latin Network for Healthy Families and Communities, a project of Casa de Esperanza, is the national institute on domestic violence focusing on Latin@ communities. Working both domestically and internationally, we address four primary issues: increasing access to resources for Latin@s experiencing domestic violence; providing training and tools for professionals and community advocates; conducting culturally relevant research; and advocating for public policy based on the lived realities of Latin@s.

- *National Center on Domestic Violence, Trauma & Mental Health*
  http://www.nationalcenterdvtraumamh.org/
  Training and Consultation
  The Center provides training, support, and consultation to advocates, mental health and substance abuse providers, legal professionals, and policymakers as they work to improve agency and systems-level responses to survivors and their children. Our work is survivor defined and rooted in principles of social justice.

- *National Health Resource Center on Domestic Violence*
  http://www.futureswithoutviolence.org/health
  **Training and Resource Development**
  The HRC offers personalized, expert technical assistance, an online toolkit for health care providers and DV advocates to prepare a clinical practice to address domestic and sexual violence, a free E-Bulletin and webinar series. The HRC also holds the biennial National Conference on Health and Domestic Violence—a scientific meeting at which health, medical and domestic violence experts and leaders explore the latest health research and programmatic responses to domestic violence.

156

**Training and Technical Assistance Centers funded by DHHS, Administration on Children and Families, Office of Refugee Resettlement**
**http://www.acf.hhs.gov/orr/resource/technical-assistance-providers-1**
**Training and Technical Assistance**

In order to assist ORR-funded agencies in providing the highest quality in services, ORR has funded a number of grants to organizations with technical assistance expertise in a particular area related to community integration, linguistic and cultural competence, addressing the needs of survivors of torture, etc.

157

## APPENDIX E: ACRONYMS USED IN THE REPORT

| | |
|---|---|
| ACFRC | Advisory Committee on Family Residential Centers |
| ACLU | American Civil Liberties Union |
| AO | Asylum Officer |
| ATD | Alternatives to Detention |
| BCG | Bacillus Calmette–Guérin |
| BFRC | Berks Family Residential Center |
| BOP | Federal Bureau of Prisons |
| CARA | **C**atholic Legal Immigration Network; **A**merican Immigration Council; **R**efugee and Immigrant Center for Education and Legal Services; **A**merican Immigration Lawyers Association |
| CASEL | Collaborative for Academic, Social and Emotional Learning |
| CBP | Customs and Border Protection |
| CCA | Corrections Corporations of America |
| CDC | Centers for Disease Control |
| CFI | Credible Fear Interview |
| CGRS | Center for Gender & Refugee Studies |
| CRCL | DHS Office for Civil Rights and Civil Liberties |
| COOP | Continuity of Operations |
| DHS | U.S. Department of Homeland Security |
| DHHS | U.S. Department of Health and Human Services y |
| DOL | Department of Labor |
| DRO | Detention and Removal Operations |
| EADM | ENFORCE Alien Detention Module |
| EOIR | Executive Office for Immigration Review |
| ERO | Enforcement and Removal Operations |
| ERP | Executive Review Panel |
| ESL | English as a Second Language |
| FCMP | Family Case Management Program |
| FRC | Family Residential Center |
| FRS | Family Residential Standards |
| FQHC | Federally Qualified Health Center |
| FVPSA | Family Violence Prevention and Services Act |
| GAO | Government Accountability Office |
| HHS | U.S. Department of Health and Human Services |
| HIPAA | Health Insurance Portability and Accountability Act |
| HOH | Head of Household |
| HPV | Human Papillomavirus |
| HSA | Health Services Administrator |
| IACHR | Inter-American Commission on Human Rights |
| ICE | U.S. Immigration and Customs Enforcement |
| IDEA | Individuals with Disabilities Education Act |
| IEP | Individualized Education Plan |
| IGRA | Interferon-Gamma Release Assays |

158

| | |
|---|---|
| IHSC | ICE Health Service Corps |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act |
| INA | Immigration and Nationality Act |
| INS | Immigration and Naturalization Service |
| ISAP | Intensive Supervision Appearance Program |
| JCAHO | Joint Commission on the Accreditation of Health Care Organizations |
| JFRMU | Juvenile and Family Residential Management Unit |
| LEP | Limited English Proficient |
| MDQ | Mood Disorders Questionnaire |
| MHP | Mental Health Professional |
| MISX | Migrant Student Information Exchange |
| MOU | Memorandums of Understanding |
| MRC | Management Review Committee |
| NAMI | National Alliance for the Mentally Ill |
| NCTIC | National Technical Assistance Center on Trauma Informed Care |
| NGO | Non-Governmental Organization |
| NIWAP | National Immigrant Women's Advocacy Project |
| NTA | Notice to Appear |
| NCQA | National Committee for Quality Assurance |
| OIG | Office of the Inspector General |
| ORR | Office of Refugee Resettlement |
| OVW | Office on Violence Against Women |
| PIRC | Pennsylvania Immigration Resource Center |
| PBIS | Positive Behavioral Interventions and Supports |
| PBNDS | Performance Based National Detention Standards |
| PCL | Abbreviated Post-Traumatic Stress Check List |
| PCP | Primary Care Physician |
| PHI | Protected Health Information |
| PHQ-9 | Patient Health Questionnaire-9 |
| PREA | Prison Rape Elimination Act |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SARTs | Sexual Assault Response Teams |
| SARRTs | Sexual Assault Response and Resource Teams |
| SIJS | Special Immigrant Juvenile Status |
| SIOP | Sheltered Instruction Observation Protocol |
| SME | Subject Matter Expert |
| SOP | Standard Operating Procedure |
| STD | Sexually Transmitted Disease |
| TMAP | Texas Medication Algorithm Project |
| TICC | Trauma Informed Care Coordinator |
| UNHCR | United Nations High Commission for Refugees |
| USCIRF | United States Commission on International Religious Freedom |
| USCIS | U.S. Citizenship and Immigration Services |
| VAWA | Violence Against Women Act |
| WHO | World Health Organization |
| WRC | Women's Refugee Commission |

710

DATED: December 5, 2016

Respectfully submitted,

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey
Carlos Holguín


ORRICK, HERRINGTON & SUTCLIFFE LLP
T. Wayne Harman
Elena García

LA RAZA CENTRO LEGAL, INC.
Michael Sorgen
Amanda Alvarado Ford

LAW FOUNDATION OF SILICON VALLEY -
LEGAL ADVOCATES FOR CHILDREN &
YOUTH
Jennifer Kelleher Cloyd
Katherine H. Manning
Kyra Kazantzis
Annette Kirkham

Of counsel:

YOUTH LAW CENTER
Alice Bussiere
Virginia Corrigan

/s/__*Peter Schey*_____
*Attorneys for Plaintiffs*

/ / /

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On December 6, 2016 I electronically filed the following document(s):

- **Plaintiffs Exhibit 27 [Part 6 of 6]**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/__*Peter Schey*_____
*Attorney for Plaintiffs*