CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
         crholguin@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>        Plaintiffs,<br>- vs -<br><br>JEH JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>        Defendants. | Case No. CV 85-4544 DMG (AGRx)<br><br>**[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]** PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR<br><br>Hearing: January 30, 2017 9:30 AM |

*Plaintiffs' counsel, continued next page:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:   (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
         kate.manning@lawfoundation.org
         kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

# TABLE OF CONTENTS

I.   STATEMENT OF FACTS ........................................................................1

1.   1. CONDITIONS AT THE U.S. CUSTOMS AND BORDER PROTECTION FACILITIES VIOLATE THE FLORES SETTLEMENT. ...................................................1

   A.   *Flores Class Member children in CBP facilities suffer from inadequate access to food.* .................................................................................*1*

   B.   *Flores Class Member children in CBP facilities continue to suffer from inadequate access to clean drinking water.* ........................................*4*

   C.   *Flores Class Member children are held in CBP facilities that are unsanitary and unfit for human habitation.* .................................................*5*

   D.   *Flores Class Member children are not provided with soap and towels to wash when detained or warm showers, towels or toothbrushes after being detained for longer periods of time.* ............................................*7*

   E.   *Flores Class Member children continue to suffer from extremely cold temperatures in CBP detention facilities.* ..............................................*9*

   F.   *Flores Class Member children are held in inhumanely overcrowded CBP detention facilities and are forced to endure sleep deprivation in at several CBP facilities due to their having to sleep on concrete floors with no mats or mattresses.* ...........................................................................*10*

2.   COMMENCING WITH APPREHENSION, DEFENDANTS DO *NOT* MAKE AND RECORD CONTINUOUS EFFORTS AIMED AT THE POSSIBLE RELEASE OR PLACEMENT OF CLASS MEMBERS AND CONTINUE TO COMINGLE CLASS MEMBERS WITH UNRELATED ADULTS IN FACILITIES WITHOUT LICENSES REQUIRED BY THE SETTLEMENT. ............................12

   A.   *Class Member children are commingled with unrelated adults, including adult males, rather than in licensed ICE contracted facilities having separate accommodations for minors.* ..........................................................*12*

Plaintiffs' Supplemental Brief

*B.    Accompanied Class Members are simply detained without bond unless their mothers pass credible fear interviews, are pregnant or someone in the family unit is ill*.................................................................................................13

*C.    Defendants have no contracts with licensed programs to place accompanied minors pursuant to the Flores Agreement, Paragraph 14E, nor do Defendants promptly place minors in licensed programs under Paragraphs 19 and 12A.*........16

*D.    Defendants have not prepared or provided Class Counsel with copies of "a written plan that describes the reasonable efforts that [Defendants] will take to place all minors as expeditiously as possible" during periods of influx as required by Paragraph 12C*.................................................................................17

*E.    Defendants do not have procedures in place to obtain Affidavits of Support for those willing to accept custody of a minor as required by Paragraph 15 or to conduct suitability assessments of those willing to accept custody of a minor as required by Paragraph 17 of the Flores Settlement.* ..............................................18

*F.    Defendants do not assess whether individual Class Members pose a substantial flight risk merely because their mothers did not pass a credible fear interview*.................................................................................................18

*G.    Flores Class Member children are held in unlicensed facilities in violation of Paragraphs 6, 12A, and 19* .................................................................19

*H.    Defendants have transferred minors who are represented by counsel without advance notice to their counsel.*.................................................................20

**II.   ARGUMENT** ...........................................................................................20

1.    CBP CONDITIONS ARE NOT SAFE AND SANITARY AND DO NOT TAKE INTO ACCOUNT THE PARTICULAR VULNERABILITY OF CHILDREN; CBP AGENTS DO NOT COMMENCE AND RECORD EFFORTS AIMED AT RELEASE UNDER THE SETTLEMENT. ................................20

2.    THERE IS NO "20 DAY AVERAGE DETENTION" RULE; ICE AGENTS DO NOT UNDERTAKE AND RECORD EFFORTS AIMED AT RELEASE UNDER THE SETTLEMENT......22

Plaintiffs' Supplemental Brief

3.   DEFENDANTS HAVE NOT DEMONSTRATED "SUBSTANTIAL COMPLIANCE" AS
REQUIRED BY PARAGRAPH 30 OF THE FLORES AGREEMENT; A CLEAR AND CONVINCING
STANDARD WOULD BE INAPPROPRIATE BECAUSE PLAINTIFFS DO NOT SEEK A CONTEMPT
RULING AGAINST DEFENDANTS......................................................................24

4.   Declarations are an admissible form of evidence and reflect declarants' factual
observations .............................................................................................*24*

**III.   CONCLUSION ........................................................................25**

# TABLE OF AUTHORITIES

**Cases**

*Buss v. Superior Court,* 16 Cal. 4th 35*, 939 P.2d (Cal. 1997).....................................23

*Connell v. Higgins*, 170 Cal. 541, 150 P. 769 (1915).....................................................23

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) .....................21

*Nigro v. Sears, Roebuck and Co.* (9th Cir. 2015)...........................................................24

*Thompson v. Enomoto*, 915 F.2d 1383 (9th Cir. 1990)...................................................23

*United Commer. Ins. Serv. v. Paymaster Corp.*, 962 F.2d 853*, 1992 U.S. App. LEXIS 6611, 92 Cal. Daily Op. Service 3173, 92 Daily Journal DAR 5061 (9th Cir. Cal. 1992)...........................................................................................................................24

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002) .............................24

*Wells Benz, Inc. v. United States*, 333 F.2d 89 (9th Cir. 1964) .....................................23

**Other Authorities**

8 James Wm. Moore, Moore's Federal Practice—Civil § 43.05[2] (3d ed. 2012.).......24

MEMORANDUM OF POINTS AND AUTHORITIES

# I.    STATEMENT OF FACTS

### 1.    Conditions at the U.S. Customs and Border Protection facilities violate the Flores Settlement.

This Court's July 24, 2015 Order held that Defendants "wholly failed" to meet even the "minimal standard[s]" of the Settlement with regards CBP's conditions of detention of Class Members.[1] Plaintiffs' Statement of Uncontroverted Facts cites declarations and testimony showing that conditions within CBP facilities remain deplorable despite some improved internal monitoring resulting from this Court's Orders.[2] Paragraph 12 of the Settlement requires that "[f]ollowing arrest, [Defendants] shall hold minors in facilities that are safe and sanitary and that are consistent with the [Defendants'] concern for the particular vulnerability of minors."[3] *Id*.

### A.    *Flores Class Member children in CBP facilities suffer from inadequate access to food.*

Food provided to CBP detainees remains wholly inadequate for *Flores* Class Members, both in quantity and quality. The only food Defendants provide Class Members in CBP facilities for up to three days are burritos, sandwiches with a single slice of meat. Despite the fact that CBP standards require juveniles be given meals

---

[1] July 24, 2015 Order [Doc. # 177] at 18.
[2] *See, e.g.,* Plaintiffs' Statement of Uncontroverted Facts ("SUF"), pages 1-62.
3 The Agreement also provides that any "sanctions" shall not: "(1) adversely affect either a minor's health, or physical or psychological well-being; or (2) deny minors regular meals, sufficient sleep …" *Flores* Settlement Agreement, Ex. 1C.

Plaintiffs' Supplemental Brief

"every six hours," including at least two hot meals per day, these "meals" are sometimes frozen, even though CBP standards also mandate these meals "not [be] frozen, expired or spoiled."[4]

Rodney Scott, El Centro sector Border Patrol Chief, testified that meals consist of "the cracker, the juice, the burrito, and then a -- a fruit or a fruit product" and that no other warm meals are served other than burritos "as a matter of policy or routine."[5] Manuel Padilla, Jr. ("Padilla"), Chief Patrol Agent for the Rio Grande Valley Sector, confirms that sandwiches consist of two pieces of dry bread and one slice of meat.[6]

Overwheling evidence indicates that Class Member children often receive inadequate or frozen food. *See*, *e.g.* Motion to Enforce Settlement and Appoint Special Monitor ("Motion") [Dkt. # 201] at 5-6; Exhibit 2 [Dkt. # 201-1] at pp. 1-3 (excerpts of declarations regarding children's hunger at CBP facilities); SUF at pp. 1-14.[7]

---

[4] CBP National Standards on Transport, Escort, Detention, and Search, October 2015, Ex. 20 ¶ 5.6 [Dkt # 201-5 at 810] ("Juveniles…will be offered a snack upon arrival and a meal at least every six hours thereafter, at regularly schedule meal times. At least two of those meals will be hot. Juvenile…detainees must have regular access to snacks, milk, and juice."); ¶ 4.13 Food and Beverage: "Food and water should never be used as a reward, or withheld as punishment. Food provided must be in edible condition (not frozen, expired or spoiled)."

[5] Ex. 3, Deposition of Rodney Scott, 21:3-25.

[6] Ex. 2, Deposition of Manuel Padilla, Jr., 32:15-32:19. Asked whether he had "ever looked into the nutritional value of the food" served to Class Members in the Tucson Sector, Chief Patrol Agent Paul Beeson ("Beeson"), responded "no." Ex. 4, Deposition of Paul Beeson, 56:5-56:16.

[7] *See*, *e.g.* Ritza Mxxx xxxxxxx received a sandwich "that didn't have anything inside" and CBP staff did not give anything to her son. Ex. 10, Deposition of Ritza Mxxx xxxxxxx, 18:3-18:12. Karina Vxxxx xxxxxxx was offered a "sandwich with frozen ham," which was "very cold...*[with] ice under the bread*." Ex. 13, Deposition of Karina Vxxxx xxxxxxx, 28:4-28:16 (emph. added). Franklin xxxxxxxxxx testified "they

Plaintiffs' Supplemental Brief

Defendants' activity logs themselves often reflect inadequate provision of food. Despite the fact that CBP policy is to provide a meal to individuals when they are taken into custody,[8] many Class Members were not fed for 10 to 12 hours after being brought into custody.[9] Defendants have no system in place for ensuring the accuracy of the meal delivery data input; Beeson testified "no" when asked if he was "aware of any

_____

[CBP] gave us a cookie, and then later on bread with ham. And for dinner, another cookie." Ex. 12, Deposition of Franklin xxxxxxxxx, 10:20-10:25. *See also,* Ex. 14 Deposition of Lindsay Gxxxx xxxxx, 39:10-39:19 (Children were "crying with hunger."); "For the three days we were there we were only given sandwiches to eat—3 a day. This was two slices of stale bread with one slice of bologna in the middle … I also got some sugary juice." Dec. of Yessenia Exxxxxxxx xxxxxxx, Ex. 27 ¶ 7 [Dkt. # 201-5 at 846]. Celina Sxxxxxx-xxxx testified she was detained in a CBP facility for two days and that during this time her meals consisted of "a piece of bread with mortadella and a juice." She was "never" given any warm food. *Id.*, 19:19-19:21. Sixteen-year-old Class Member Franklin xxxxxxxxx, detained for about four days, declared: "The first day that I was there they gave me a cookie for breakfast, a sandwich (2 pieces of bread with one thin slice of meat) for lunch, and another cookie for dinner. I was very hungry all day because this was not enough food." Dec. of Franklin xxxxxxxxx Ex. 45. ¶ 8 [Dkt. # 201-5]. Sara Exxxxxxxx xxxxx spent two days and two nights with her four-year-old Class Member son in CBP facilities and testified meals consisted of "a piece of bread and a piece of ham" that were given "twice a day." Ex. 17, Deposition of Sara Exxxxxxxx xxxxx, 18:6-19:12; 20:1-20:6. CBP activity logs indicate Sara and her son were given six meals on December 15, 2015, three of which were strangely delivered at 5:02 PM, 5:04 PM, and 5:15 PM. The reliability of this data is obviously questionable. Doc. No. 214-2, D's Exhibit 16 Strange Dec. Exhibit L at 25.

[8] "Additionally, individuals are served a meal once they arrive at each facility to prevent detainees from missing meals which may have occurred during the transportation process." Dec. of Beeson, Ex. 6, ¶ 27 [Dkt. # 214-2].

[9] Manuel Padilla, Jr. was unable to explain why individuals in his sector were not fed for more than 10 hours after being arrested, as reflected in activity logs. He testified that "the system being down" was one possible explanation, or that "the feeding time was not -- was not logged in." He testified it was "definitely" possible that the log was correct and that individuals were not fed during this timeframe. *Id.*, 25:2-26. He was unable to explain gaps in meal logs, including 10-12 hour periods. *Id.*, 26: 24-28: 2.

efforts to monitor the accuracy of records entered with regards to meals served," and "I don't know" when asked "[w]ho specifically is tasked with entering into this E3 system that…meals were provided?"[10]

> **B.    *Flores Class Member children in CBP facilities continue to suffer from inadequate access to clean drinking water.***

Overwhelming evidence indicates that Class Member children often receive inadequate and/or dirty water and must share cups with other unrelated detainees. *See, e.g.* Motion [Dkt. # 201] at pp. 6-7; Exhibit 2 [Dkt. # 201-1] at pp. 3 (excerpts of declarations regarding inadequate water at CBP facilities since October 2015); SUF at pp. 15-20. *Flores* Class Members and their mothers testifed in depositions that drinking water provided in CBP facilities is not readily accessible or unclean, and Class Members are routinely forced to share drinking cups with other detainees.[11]

---

[10] Ex. 4, Deposition of Paul Beeson, 45:14-45:21. *See also* "Q: And are you aware of any, of any in-person training that the agents working under you receive in how to input data with regards to the delivery of meals, if you know? A: I don't know."

[11] *See, e.g.*, Ex. 12, Deposition of Franklin xxxxxxxxx 11:5-:12 ("They only had one cup for everyone that was there, and I only drank water once from that cup."); Mother Karina Vxxxx xxxxxxx, approximately 50 hours in CBP custody with three-year-old Class Member son, testified the water "tasted like Clorox." Ex. 13, Deposition of Karina Vxxxx xxxxxxx, 36:3-36:13. Her son drank the water and quickly "got diarrhea …" *Id.*, 38:15-38:22. Ritza xxxxxxx testified that the water "tasted [like] chlorine." Ex. 10, Deposition of Ritza Mxxx xxxxxxx, 21:15-21:4. Mirna Mxxxxxx xxxxx testified the water "tasted like a chemical." Ex. 15, Deposition of Mirna Mxxxxxx xxxxx, 31:8-31:15. When asked if there was water in the room in which she was first detained for two days, Class Member Yeslin xxxxxxx, testified "no." Ex. 18, Deposition of Yeslin xxxxxxx, 12:24-13:1 ("Q: Okay. So you were at this first place for two days? A: Yes." *Id.*, 13:24-14:1: Q: "…did you have any water in that room? A: No.") "Mothers and children interviewed during the site inspections uniformly reported … dirty drinking water [and] one cup for 30-40 people to share…" Ex. 1, ¶ 5 [Doc. No. 201-1].

Defendants' TEDS policy requires that "[f]unctioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees." *See* U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search ("TEDS") §4.14 [Dkt. # 201-5]. However, Defendants have not offered admissible evidence that place into dispute the particular statements of a large number of Class Members and their mothers that their drinking water tasted like chemicals, was dirty or that they had to share drinking cups with other detainees.

### C. *Flores Class Member children are held in CBP facilities that are unsanitary and unfit for human habitation.*

Overwhelming evidence indicates that Class Member children are often detained in unsanitary conditions. *See*, *e.g.* Motion [Dkt. # 201] at pp. 7-9; Exhibit 2 [Dkt. # 201-1] at pp. 4-6 (excerpts of declarations regarding unsanitary conditions in CBP facilities since October 2015); SUF at pp. 21-25. *Flores* Class Members and their mothers report often bring forced to sleep on the ground near dirty toilets due to overcrowding.[12]

Class Member Franklin xxxxxxxxx testified: "It was a toilet, and it didn't have a seat where you sit down. It was not very clean."[13] Mirna Mxxxxxx xxxxx, a mother of

---

[12] "Since we slept on the floor and some -- and so -- and because sometimes we had to sleep there on the side of the toilet. It was ugly and dirty and smelly … I had to sleep there because there was no more room." Ex. 15, Mirna xxxxx Dep. 33:15-34:11.

[13] Ex. 12, Deposition of Class Member Franklin xxxxxxxxx, 10:2-10:17. Franklin also testified: "Q. So was there a sink in the bathroom? A. Yes. No paper or anything to wash. Q. Was there soap? A. No. Q. Was there any hand sanitizer? A. No."

Plaintiffs' Supplemental Brief

a Class Member, testified "[t]hat's where I picked up – well, head lice." Ex. 15 Mirna Mxxxxxx xxxxx Dep. 35:8-35:11.[14]

Defendants offer no admissible evidence that directly refutes the numerous sworn statements and testimony of Class Members that they had to sleep on the floor by toilets because of overcrowding.[15]

"When available, juveniles will be provided clean and dry clothing." TEDS § 5.6 at 22 [Dkt. # 201-5]. Defendants often do not provide dry clothes to children with torn, soiled or wet clothes. Defendants' policy states that "Detainees must be provided with basic personal hygiene items…. Families with small children will also have access to diapers ..." TEDS § 4.11 at 17 [Dkt. # 201-5]. Evelin Jasmin Martinez, a national of El Salvador came to the United States with her Class Member son, Jeferson Alexis Lopez Avalos (DOB 10/27/2013): "There were no diapers there. On Saturday Jeferson used the bathroom and his pants were wet. He still does not have pants to put on."

_____

14 Mirna xxxxx describes the unsanitary conditions as follows: "The bathroom situation was very unsanitary. My youngest son and I got diarrhea and we didn't receive any medical attention. We weren't provided with any toiletries, and I wasn't able to bathe. The conditions were so bad that when I later arrived at Karnes, they found that I had fleas, which I hadn't before being detained." Ex. 25 ¶ 6 [Dkt. # 201-5] ¶ 6. When asked about the state of the floors she and her three year old Class Member son were supposed to sleep on in CBP custody, Karina xxxxxxx testified that the Border Patrol Station floors were "[d]irty. Like a soil from outside." Ex. 13, Karina Vxxxx xxxxxxx Dep. 27:9-27:17

15 Defendants' policy provides that "[a]ll facilities or hold rooms used to hold detainees must be regularly and professionally cleaned and sanitized.  Officers/Agents … will not be expected nor required to perform such tasks." TEDS § 4.7 at 16 [Dkt. # 201-5].

Plaintiffs' Supplemental Brief

Declaration of Evelin Jasmin Martinez, Doc. # 201-5 Ex. 42 ¶ 7. Zulma xxxxxxx testifed: "Q. When you arrived at la hielera, were your son's clothes wet from crossing the river? A. Yes […] Q. And did anybody at that Border Patrol Station offer your son dry clothing? A. No."[16] "[T]hey didn't offer us anything, not clothes, not blankets, not a shower, nothing."[17]

### D.   Flores Class Member children are not provided with soap and towels to wash when detained or warm showers, towels or toothbrushes after being detained for longer periods of time.

Overwhelming evidence indicates that Class Members are not provided with soap and towels to wash when detained or warm showers, towels or toothbrushes after being detained for longer periods of time. *See*, *e.g.* Motion [Dkt. # 201] at p. 8; Exhibit 2 [Dkt. # 201-1] at pp. 29-30; SUF at pp. 29-34. Class member testimony and sworn statements confirm that CBP holding cells do not have soap or towels and that even children held for several days are frequently not provided with toothbrushes, showers and towels.[18]

_____

16 Deposition of Zulma Mxxxxxxx xxxxxxx, 42:5-42:24.

17 *Id*. *See also* Declaration of Yessenia xxxxxxx: "For three days we were given…no change of underwear or clothes." Dec. of Yessenia xxxxxxx, Ex. 27, ¶6 [Dkt # 201-5 at 846].

18 *See, e.g.*, Mirna xxxxx, mother of a Class Member, testified about the conditions of her cell: "Q. And they had soap with that sink? A. No." Ex. 15, Deposition of Mirna xxxxx, 18:20-19:1. Zulma xxxxxxx, mother of a Class Member, testified: "Q. … was there any soap and towels in the cell so that you could wash your hands and face? A. No." Ex. 20, Zulma xxxxxxx Dep. 43:5-43:8. Class Member Franklin S. testified: "Q: Okay. Was there soap available? A: No." Ex. 12, Franklin xxxxxxxxx Dep. 17:2-17:12. Sara Exxxxxxxx xxxxx declared: "During the three days at the border patrol facilities, my daughter was not able to shower, wash or change underwear or clothes. We were not given the opportunity to brush our teeth for three days." Doc. No., Dec. of

Plaintiffs' Supplemental Brief

Defendants do not deny that their policy and practice does not require children to be offered soap and towels to wash when detained,[19] nor have Defendants offered admissible evidence to contest Plaintiffs' sworn statements and deposition testimony that they were not provided showers, soap or toothbrushes when detained for longer periods of time.[20]

Defendants' policy only states that "Reasonable efforts will be made to provide showers…to juveniles who are approaching 48 hours in detention" or "72 hours" for adult detainees TEDS § 5.6 at 22 [Dkt. # 201-5].[21] (emphasis added).

---

Sara Exxxxxxxx xxxxx, Ex. 24, ¶ 8 [Dkt # 201-5 at 837]. " … [T]hey did not give us anything to bathe or brush our teeth, nothing." Ex. 17, Sara Exxxxxxxx xxxxx Dep. 24:24-24:25. Class Member Yessenia E. declared: "For three days we were given no soap to wash, no toothbrushes to brush our teeth, no paper towels to dry our hands when we washed our hands, nothing to brush our hair." Dec. of Yessenia Exxxxxxxx xxxxxxx, Ex. 27, ¶ 6 [Dkt # 201-5 at 846].

19 Defendants' policy states that "*Whenever operationally feasible*, soap may be made available." TEDS § 4.11 at 17 [Dkt # 201-5] (emph. added).

20 Ex. 3, Rodney Scott, Border Patrol Chief of El Centro Sector testified: "So we do not provide paper towels." *Id*. 23:5-24:4). "[O]ur facilities don't normally have -- or our stations don't normally have those [shower] facilities, so we've had to kind of do an ad hoc in a couple of occasions….So at 48 hours, we're trying to find a place for them to take a shower." *Id*., 24:5-24:18. Mario Martinez, Chief Patrol Agent of the Laredo Sector, claimed that "[i]f it goes to 48 hours, then the Cotulla station has contracts out to a local establishment, a hotel, and then they rent that room for the purpose of having that child take a shower there." Ex. 5, Martinez Dep. 51:10-52:2. Chief Patrol Agent of Tucson Sector, Paul Beeson, testified: "… I think when you're getting closer to like 48 hours is my recollection you want to get them a shower." Ex. 4, Beeson Dep. 24:17-24:23. Defendants have produced no records showing any of the Class Members' or mothers' declarations or testimony are inaccurate.

21 "Officers/Agents will enable detainees to shower (*where showers are available*) …" TEDS §4.6 at 16 [Dkt # 201-5] (emphasis added).

Plaintiffs' Supplemental Brief

Defendants have provided no evidence to dispute Class Members' claims of lack of access to soap, water and towels after being detained for a day or often longer.

**E.   *Flores Class Member children continue to suffer from extremely cold temperatures in CBP detention facilities.***

Overwhelming evidence indicates that Class Member children are held in cells for one to three days that are often described as "freezing" by Class Members and their mothers, leaving children shivering and cold while being forced to sleep on concrete floors. *See*, e.g. Motion [Dkt. # 201] at pp. 9-10; Exhibit 2 [Dkt. # 201-1] Ex. 2, pp. 6-8 (numerous excerpts of declarations regarding freezing cold temperatures in CBP detention cells); SUF at pp. 35-48.

"Clean bedding must be provided to juveniles." TEDS § 4.12 at 17 [Dkt. # 201-5]. While children are sometimes provided a thin mylar sheet, this does little to mitigate the cold since CBP cells may be kept as low as 66 degrees and still be in compliance with CBP policy guidelines and children routinely must sleep on concrete floors with no mats or mattresses.[22]

---

[22] Zulma xxxxxxx testified that her son was not given a blanket and that "some…had some [blankets] and some others didn't … The hardest part was to see the children complain because of the cold." Ex.20, Deposition of Zulma xxxxxxx, 18:5-18:15. "[Children] were crying too because of the [cold] temperature." Ex. 14, Deposition of Lindsay Gisel Lopez, 40:16-40:18. "The children began crying … We were completely unable to sleep because it was so cold ...." Dec. of Mirna Mxxxxxx xxxxx Ex. 25, ¶ 4 [Dkt. # 201-5 at 840]. A parent of a Class Member declared: "One officer told me when I showed him my freezing cold son sleeping on the floor with no blanket, 'This is what happens when you come to my country....'"Dec. of Karina Vxxxx xxxxxxx, Ex. 19-H, ¶ 11 [Dkt. # 201-3 at 631]. Class Member Yeslin Lxxxx xxxxxxx declared: "The Border Patrol agents took us to a border station … The first night we were there … we slept on the floor … [W]e were all wet and they didn't give us any

Plaintiffs' Supplemental Brief

Defendants have not disputed the individual claims by Class Members and their mothers that temperatures were extremely cold in their CBP holding cells and that with insufficient blankets, being forced to sleep on concrete floors, not being provided jackets or sweaters and no change from wet clothing, Class Member children held in CBP's holding cells for one to three days were shivering and found the temperature to be "freezing."[23]

**F.   Flores Class Member children are held in inhumanely overcrowded CBP detention facilities and are forced to endure sleep deprivation in at several CBP facilities due to their having to sleep on concrete floors with no mats or mattresses**

Overwhelming evidence indicates that Class Member children are held in overcrowded cells for one to three nights, often making sleep difficult or impossible.

_____

dry clothes… It was very cold …" Dec. of Yeslin Lxxxx xxxxxxx, Ex. 23 ¶¶ 4, 8 [Dkt. # 201-5 at 834]. Celina S., mother of a Class Member, declared that the Border Patrol facility was "extremely cold," and stated that, "as more people came into the room, the air conditioners were turned up." Dec. of Celina Sxxxxx-xxxx  Ex. 28, ¶ 5 [Dkt. # 201-5 at 849]. Franklin xxxxxxxxx testified that the cell he was in felt like an "ice box." Ex. 12, Deposition of Franklin xxxxxxxxx, 7:24-8:1. Franklin testified that he suffered from spots on his skin due to the cold. *Id.*, 13:1-13:18. Other witnesses described the facilities as the "ice box." *See, e.g.*, Ex. 13, Deposition of Karina Vxxxx xxxxxxx, 23:14-23:16. Class Member Yessenia E. testified: "Q: Was it always too cold or was it sometimes too hot and sometimes too cold or was it just always too cold? A: Always too cold." Ex. 19, Yessenia Exxxxxxxx xxxxxxx Dep. 18:10-18:13. Another mother of a Class Member declared that she slept with her son "under one of the toilets because it was too cold to sleep in the main are of the room and it was warmer under the toilet." Dec. of Karina Vxxxx xxxxxxx, Ex. 19-H, ¶ 5 [Dkt. # 201-3 at 631].
23 Defendants concede that CBP systems "used to monitor compliance with the Agreement" assess whether the temperature of cells is "between 66 and 80 degrees." D's Opposition at 9. [Doc. #208] Defendants'policy states that "[w]hen it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents." TEDS §4.7 p. 16 [Dkt. # 201-5].

Plaintiffs' Supplemental Brief

*See*, e.g. Motion [Dkt. # 201] at pp. 10-11; Exhibit 2 [Dkt. # 201-1] Ex. 2, pp. 8-11

(excerpts of numerous declarations regarding overcrowding and sleep deprivation in

CBP cells); SUF at pp. 49-56.

Sleep deprivation occurs because Class Members are forced to attempt to sleep

on concrete floors, in cold environments, without bedding or proper blankets, in

severely overcrowded cells.[24]

---

24 Class Members and their mothers repeatedly report overcrowding in CBP facilities:
"At the border patrol station there were about 50 other people in our cell. It was so
crowded there was barely room for everyone. My son and I were freezing. There were
no beds, it was just a room with cement floors and benches…." Dec. of Celina
Sxxxxxx-xxxx  Ex. 28, ¶ 8 [Dkt. # 201-5 at 849]. Franklin xxxxxxxxx testified: "Q:
You said that you were not able to lay down or sit at the McAllen border station. So are
you saying that you stood for two days? A: Kneeled. Q: You kneeled. A: Stood, squat,
..." Ex. 12, Franklin xxxxxxxxx Dep. 42:7-42:12. He was not given a blanket or any
sort of bedding to keep warm. *Id.*, 39:6-39:24; 9:23-10:1. Dec. of Yessenia Exxxxxxxx
xxxxxxx, Ex. 27, ¶ 6 [Dkt. # Doc. No. 201-5 at 846] ("No pillows or blankets and no
beds to sleep in. We had to try to sleep in the freezing cold cell on the concrete floor.
We were exhausted physically and emotionally."); Ex.19, Yessenia Exxxxxxxx
xxxxxxx Dep. 21:7-21:9. "Q: Did they give you blankets or anything like that? A: No";
Ex. 10, Ritza xxxxxxx Dep. 17:10-17:19 ("Q. Were you given any type of blanket …?
A:. No. Q: Were you given anything, which … kind of looks metallic? A. No";  Ex. 12,
Franklin xxxxxxxxx Dep. 9:23-10:1 ("Q. Did you receive a blanket? A. No. Q. Did
you receive anything to keep warm? A. No."); Ex. 13, Karina xxxxxxx Dep. 26:22-
27:1  ("Q: Were you given anything to sleep with? A: They gave me an aluminum
sheet. Q: And did they give your son an aluminum sheet as well? A: They gave him
nothing. Q: Did you give you the sheet to share? A: yes. To share with my son.");
Ex.20, Deposition of Zulma xxxxxxx, 14:9-14:24 ("We really couldn't sleep because it
was so cold. … and we arrived there all wet. There were no mattresses. There was
nothing on the floor. We were just -- we couldn't sleep. The children were crying and
screaming: Mom, let's go, let's go.") .

Defendants do not appear to have uniform guidelines across CBP stations regarding capacity.[25] Defendants have refused to provide any data to Plaintiffs regarding overcrowding or capacity limits in their CBP holding cells, citing "security" concerns with sharing such data. Defendants have offered no admissible evidence that contests Plaintiffs' particular claims of severe overcrowding in CBP holding cells.

### 2. Commencing with apprehension, Defendants do *not* make and record continuous efforts aimed at the possible release or placement of Class Members and continue to comingle Class Members with unrelated adults in facilities without licenses required by the Settlement.

### A. *Class Member children are commingled with unrelated adults, including adult males, rather than in licensed ICE contracted facilities having separate accommodations for minors.*

It is undisputed that Defendants routinely commingle Class Member children with unrelated adults.[26] Defendants are wholly unaware that the Settlement requires

---

[25] Ex. 2, Deposition of Manuel Padilla, Jr., 8:19-8:25 ("I don't know the formula right offhand as far as how many square foot is per person.  But I can tell you that we have some capacity thresholds … where we do not put more than a given number of people into a certain cell.") Defendants' policy states: "Every effort must be made to ensure that hold rooms house no more detainees than prescribed by the operational office's policies and procedures. *Capacity may ... be exceeded with supervisory approval.* … [U]nder no circumstances should the maximum occupancy rate, as set by the fire marshal, be exceeded."   TEDS § 4.7, p. 16 [Dkt. # 201-5] (emphasis added). Defendants steadfastly refuse to disclose anything further about their "operational policies" or practices with regards overcrowding in cells occupied by Class Member children. Defendants assert that CBP facilities "are not designed for sleeping." Defendants' Response In Opposition to Plaintiffs' Motion to Enforce Settlement and Appoint a Special Monitor, 208 06-03-2016, p. 20. Defendants admit that "unaccompanied minors spend an average of 42 hours in custody, while family groups spend an average of 46 hours in custody." Ex. 9 Scott Decl. ¶6 [Dkt. #210-3]

[26] *See* Ex. 2, p. 17-18 [Dkt. 201-1] and SUF at pp. 110-117 (excerpts of numerous declarations and testimony showing Class Member children are routinely commingled

Plaintiffs' Supplemental Brief

that when a minor is placed in a secure detention facility, that facility must have separate accomodations for minors.[27]

Philip Miller, Deputy Executive Associate Director for Enforcement, testified that men and women are commingled with children detained in all three ICE facilities holding Class Members. Asked if this raised any concerns with him or the agency, Miller testified, "No."[28]   When asked if he was aware that *Flores* required separate accomodations for minors in a secure detention facility, Miller testified: "No."[29]

### B.   *Accompanied Class Members are simply detained without bond unless their mothers pass credible fear interviews, are pregnant or someone in the family unit is ill*

The evidence overwhelmingly shows and it is undisputed that Defendants take no action to make and record efforts aimed at the release or placement of detained Class Members as expeditiously as possible.[30]   Children are not released to relatives or friends under Paragraph 14 without unnecessary delay, nor placed in non-secure licensed facilities under ¶ 19 within five days or as expeditiously as possible.[31]

---

for extended periods with unrelated adults at Dilley, Karnes and Berks detention facilities).

[27] Ex. 9, Deposition of Phillip Miller, 101:4-101:10. See also Settlement Paragraph 12A (requiring Defendants to hold minors in facilities consistent with their vulnerability as children), and Paragraph 21 (states that minors not placed pursuant to Paragraphs 14 and 19 should be placed in facilities "having separate accommodations for minors.")

[28] Ex. 9, Deposition of Philip Miller, 71:16-71:20.

[29] *Id*. 101:4-101:10.

[30] *See* Ex. 1 Declaration of Stephen Manning, para. 32.

[31] *See e.g.* Motion [Dkt. # 201] at pp. 12-13; Exhibit 2 [Dkt. # 201-1] pp. 13-15 (excerpts of numerous declarations showing no ongoing efforts to release Class

At least one declaration filed by Defendants indicates that, at intake processing, agents are supposed to "make efforts to identify sponsors and future release options as soon as practicable after a family unit is admitted to an FRC." Dec. of John Gurule, Ex. 22, ¶ 15 [Dkt. # 217-1]. However, when asked whether he was "aware of any time in which ICE agents working at the family detention facilities have received in-person training about the Flores requirements with regards to the options for release of minors in your custody," ICE Assistant Director Miller answered "No, I don't." Ex. 9, Miller Dep. 52:13-52:20.[32]

---

Members to relatives or place them in non-secure licensed programs); *See* Declaration of Stephen Manning; SUF at pp. 74-93 (excerpts of numerous declarations and deposition testimony showing no ongoing efforts to release Class Members to relatives or place them in non-secure licensed programs under the terms of the Settlement).

[32] Dilley Assistant Field Office Director Valentin de la Garza was asked: "Q. Okay. So in other words, you have not received any instruction or guidance regarding the release of minors under paragraph 14 if their fear claim has been denied; is that fair to say? … A: My answer's going to be the same thing, sir. My guidance is to hold them to -- until they become a mandatory … detention and to proceed with the removal." Ex. __, De La Garza Dep. 32:2-32:25. *See also* Berks Assistant Field Office Director Reid Dep. 6:17-7:4 ("Q: When was the most recent time … that you received any training, guidance or instructions regarding an order that Judge Gee issued in August 2015 in the Flores case … ? A: … I don't recall receiving anything that was particularly since I've been involved related to that"); Dilley Assistant Field Office Director De La Garza Dep. 21:7-21:17 ("Q. And can you tell us, have you ever received training about [Judge Gee's] court decision… ? A. No, sir … Q. During the time that you have been in charge of matters at Dilley, can you tell us when the agent -- ICE agents working there have been provided training about the requirements of the Flores Settlement …? THE WITNESS: It's 'no' to that one, too"). "Q: Okay. How about when -- when your agents are processing family units -- or let's say family units, A, as a matter of practice, if you know, do they ask the mother or the father if there is a non-relative adult living in the United States to whom they may want their child released? …. A: Yes. I -- I do not know.  And I do not want to speculate." (Padilla Dep. 19:16-19:24). "Consistent with Border Patrol's longstanding practice, I ensured that all agents in my Sector were reminded that they are required to ask every *unaccompanied* juvenile who must be

Defendants cite to instances where they have improved as far as releasing minors in a more timely fashion, noting: "release of individuals in ICE family facilities are now occurring more quickly than previously.  During the last half of 2014, only 21% of families booked in to family residential centers were released or removed during their first 30 days in custody. During the first six months of 2015, more than 43% of such families were released or removed within 30 days." Ex. 1, Decl. of Thomas Homan ¶ 22. [Dkt. #184-1]. While these numbers suggest Defendants have improved their efforts at releasing Class Members, "there are others that continue to be held for long periods," which indicates that most Class Members are not being released or removed within 30 days.[33]

In his deposition, Joshua Reid testified: "Q: …Let's just say approximately, what is the longest held child that you have at Berks at the present time? Approximately….A: Approximately, I would say…about 13 months."[34]

_____

separated from his or her legal guardian about other family members in the United States." Dec. of Paul Beeson, Ex. 6, ¶ 77 (emphasis added) [Dkt. 209-3]. Q: You talked about how the officers would make inquiry into the sponsor; is that correct? A: Yes. Q: And you mentioned several things they would look into. If a minor is involved, is one of the issues they look into the appropriateness of the minor living in that home? A: No." Ex. 9, Miller Dep. 89:15-89:25.

33 Ex. 27 *Report of the DHS Advisor Committee on Family Residential Centers*, Sept. 20, 2016, page 13, hereinafter ("DHS Advisor Committee Report") found at https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

34 Deposition of Joshua Reid, 37:24-38:16. "... [T]he average length of stay at Berks has been 66 days, with the lowest average length of stay for any one year at 36 days ..." Ex. 1, Decl. of Thomas Homan fn. 10. [Dkt. # 184-1]. *See also* Declaration of Carol Anne Donohoe, Doc. # 201-1 at 114, Ex. 4 ¶14, "There are several class members and mothers who have now been detained for over eight (8) months. Most of the other class members have been detained for several months and cannot be deported because of

Although Defendants slightly improved their release efforts from 2014 to 2015, the undisputed evidence shows that Defendants are not making and recording continuous efforts from the time of apprehension aimed at exploring the release or placement of accompanied Class Members under ¶¶ 14 or 19 of the Settlement. Instead, accompanied Class Members are simply now placed in expedited removal procedeings and detained unless and until their mothers pass a credible fear interview.[35]

> **C.    Defendants have no contracts with licensed programs to place accompanied minors pursuant to the Flores Agreement, Paragraph 14E, nor do Defendants promptly place minors in licensed programs under Paragraphs 19 and 12A.**

When asked in his deposition if ICE has *any* contracts with any unsecure licensed programs to place accompanied minors (other than the secure family detention centers), Deputy Executive Associate Director for Enforcement and Removal Operations, Phillip Miller, responded: "Not placement locations."[36] Asked "[a]re you aware of -- of any licensed program, other than your family detention centers,

_____

stays issued by the courts, Immigration Judges, or the Board of Immigration Appeals." "It should also be noted that many class members are still detained in secure lock-down facilities with unrelated adults for weeks or months on end even if the claimed 'average' detention is about twenty days." Dec. of Robyn Barnard, Ex. 12, ¶ 18 [Dkt. # 201-1 at 176].

35 Ex. 27 DHS Advisor Committee Report at 5, "DHS is not required to place families in expedited or reinstatement of removal, with their attendant policy of detention. There is clear authority holding that immigration officials have the discretion to refer any individual who could be subject to expedited removal or reinstatement of removal to regular Section 240 removal proceedings before an immigration judge instead."

36 Ex. 9, Miller Dep. 60-1:16-25,1-9.

your three family detention centers, that ICE has contracted with for the placement of

minors [under Paragraph 19 of the Settlement] who for one reason or another

placement with an individual [under Paragraph 14] is not available or appropriate,"

Deputy Executive Associate Director Miller simply answered "No." Ex. 9, Deposition

of Phillip Miller 61-2:18-25, 1-2.[37]

> **D.   Defendants have not prepared or provided Class Counsel with copies of "a written plan that describes the reasonable efforts that [Defendants] will take to place all minors as expeditiously as possible" during periods of influx as required by Paragraph 12C.**

Defendants regularly cite a surge of accompanied and uaccompanied minors as

the reason for which they refuse to abide by the *Flores* Settlement Agreement.[38]

While the United States has seen several temporary influxes of accompanied and

unaccompanied minors over the past few years, the Settlement nevertheless requires a

written plan shared with Class Counsel setting forth how the agency will respond to an

influx.[39] No such plan has ever been shared with Class Counsel.

---

37 Manuel Padilla, Jr., Chief Patrol Agent for the Rio Grande Valley Sector, testified that he was "not aware of any program that Border Patrol works with" when asked if he knew of any licensed program for accompanied minors to be placed temporarily if they were not eligible for release from custody under Paragraph 14 of the Settlement. Ex. 2, Deposition of Manuel Padilla, Jr., 20:13-20:25.

38 *See, e.g.*, Ex. 1, Decl. of Thomas Homan, ¶ 10 [Dkt. # 184-1]. "Q: And do you understand why in 2014 the decision was made to start detaining mothers and children? THE WITNESS:  In response to the surge on the southern border, we were asked to increase our capacity so as to, you know, re-establish a secure border." Ex. 9, Miller Dep. 19:15-19:24.

39 "In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible." *Flores* Settlement Agreement, ¶12c.

Plaintiffs' Supplemental Brief

**E.     Defendants do not have procedures in place to obtain Affidavits of Support for those willing to accept custody of a minor as required by Paragraph 15 or to conduct suitability assessments of those willing to accept custody of a minor as required by Paragraph 17 of the Flores Settlement.**

Evidence submitted with the Motion and in the SUF make clear that Defendants do not have procedures in place to obtain Afidavits of Support for those willing to accept custody of a minor as required by Paragraph 15 or to conduct suitability assessments of those willing to accept custody of a minor as required by Paragraph 17 of the *Flores* Settlement. Defendants have offered no evidence (such as Class Members' agency "A"files) to show that they ever take steps set out in ¶¶ 15 or 17 of the Settlement to assess the suitability of placements of Class Members.

**F.     Defendants do not assess whether individual Class Members pose a substantial flight risk merely because their mothers did not pass a credible fear interview**

Defendants do not deny that their practice is not to evaluate on an individual basis whether Class Members pose a "substantial flight risk" ("a serious risk that the minor will attempt to escape") before deciding to detain accompanied minors *before or after* denials of credible fear claims. Defendants' policy and practice is to merely detain accompanied minors before and after denials of their mothers' credible fear

claims.[40]  There is no training regarding the meaning of escape-risks pursuant to the

*Flores* Ageement, and it is generally disregarded.[41]

Class Members remain in detention facilities "because Defendants simply take

the position across the board that they have placed detained minors in expedited

removal proceedings."[42] "For individuals in the expedited removal process, detention

is mandatory unless the individual is determined to possess a credible fear remain in

the expedited removal process and are generally detained until removal."[43]

### G.  *Flores Class Member children are held in unlicensed facilities in violation of Paragraphs 6, 12A, and 19*

---

40 "THE WITNESS: The resident, or the family unit, if they get a positive credible fear finding or a positive reasonable fear finding, and a notice to appear has been issued by Citizenship and Immigration Services, then we release them on an order of recognizance or parole, depending on what case that may be." Ex. 6, Hester Dep. 66:8-66:13.  "For individuals in the expedited removal process, detention is mandatory unless the individual is determined to possess a credible fear remain in the expedited removal process and are generally detained until removal." Dec. of de la Garza, Ex. 21, ¶ 13 [Dkt. # 216-1].

41 "Q. Are you aware of any written instructions issued to ICE officers, and, if so, please identify those instructions, that explains to them what the term escape risk means in the Flores settlement? A. No. Q. Are you aware of any in-person training about that? A. About defining terms from Flores? Q. Explaining to the officers what the term escape risk means under the *Flores* settlement, are you aware of any in-person training on that question? A. No. Q. Do you recall what the -- or how the term escape risk is -- is defined in -- in the *Flores* settlement in general? A. No." Ex. 9, Miller Dep. 101:22-102:19.

42 Ex. 1 Declaration of Stephen Manning, ¶ 33.

43 Dec. of Valentin de la Garza, Ex. 21, ¶ 13 [Dkt. # 216-1].

Plaintiffs' Supplemental Brief

The Family Residential Center at Dilley has been and remains an unlicensed facility in violation of the *Flores* Agreement, as confirmed in the deposition of Phillip Miller.[44] The Karnes license has also been blocked by a Texas State Court.[45]

### H.   Defendants have transferred minors who are represented by counsel without advance notice to their counsel.

Paragraph 27 of the Agreement states that "no minor who is represented by counsel shall be transferred without advance notice to such counsel." Defendants do not dispute that "attorneys serving detainees report systematic and fundamental breaches in access to counsel with respect to the movement of detainees from one facility to another, and with respect to their removal (deportation) during the pendency of proceedings."[46]

## II.   ARGUMENT

**1.   CBP conditions are not safe and sanitary and do not take into account the particular vulnerability of children; CBP agents do not commence and record efforts aimed at release under the Settlement.**

---

[44] Ex. 9, Miller Dep. 103:15-17 ("Q. And so at the present time the Dilley facility is not licensed; is that correct?  A. Yes."). *See also* Valentin de la Garza, supervisor at Dilley, further demonstrates this point in his deposition: "Q. To your knowledge, is ICE currently attempting to obtain a license for Dilley, a license to hold children? A. No, sir.  We're not." Ex. 7, De la Garza Dep. 47: 12-15.

[45] Dec. of Robert Doggett, Ex. 26, ¶ 4 (referencing *Grassroots Leadership, Inc. v. Texas DFPS*, No. D-1-GN-15-004336).

46 Ex. 27 DHS Advisory Committee Report, p. 46. *See also* Ex. 2 at 26-27 [Dkt. # 201-1]; SUF at 135-155. *See also* Ex. 24, McCarthy Dep. 40:12-40:14 ("While you were working at Karnes, were any of your clients relocated without your notice? … Yes.")

Plaintiffs' Supplemental Brief

Most Class Members are initially picked up along the border, processed, and detained at CBP facilities.[47] It is undisputed that CBP agents are unfamiliar with and do not commence the steps required by the Settlement to explore possible release or placement of accompanied minors under Paragraphs 14 and 19 of the Settlement.

Defendants have not contested the specific allegations of Class Members that they have not received mattresses or mats to sleep on, are held in freezing cold cells, have been forced to share water cups with unrelated detainees, are held in severely overcrowded cells, have been forced to sleep next to dirty toilets, etc. Paragraph 12 of the Settlement requires that "[f]ollowing arrest, [Defendants] shall hold minors in facilities that are safe and sanitary and that are consistent with the [Defendants'] concern for the particular vulnerability of minors." *Id*.[48] The evidence overwhelmingly shows Defendants' CBP facilities are neither safe nor sanitary. Conditions in CBP detention cells are overcrowded and deplorable.[49]

---

[47] "At the outset of processing, biographical information is obtained and biometrics are taken and entered into CBP's system of records.  After a detainee is identified, he or she is then fully processed, including the preparation of any arrest report, immigration processing, … and communication with family members as appropriate." [Doc. No. 210-1, Dec. of Mario Martinez, Ex. 7, ¶ 11 [Dkt. 210-1]].

[48] As noted above, the Agreement also provides that any "sanctions" shall not "(1) adversely affect either a minor's health, or physical or psychological well-being; or (2) deny minors regular meals, *sufficient sleep*, exercise, …" (emphasis added.) *Flores* Settlement Agreement, Ex. 1C.

[49] In *Doe v. Johnson*, the Court recently addressed the need for basic human needs to be provided at CBP detention facilities in Arizona for all detainees, not just minors. The Court in *Doe* ordered that "clean bedding … *must include a mat* and a Mylar blanket for all detainees being held longer than 12 hours." Order 16, *Doe v. Johnson*, No. 15-00250 (emphasis added) [Doc. No. 244.].  The Court found that the conditions at the CBP facilities unconstitutionally deprived detainees of sleep. *Id.* Defendants'

Plaintiffs' Supplemental Brief

In its August 21, 2015 Order, this Court made clear that "to the extent any Border Patrol station is out of compliance with the Agreement, those stations must comply with the Agreement and Defendants' own acknowledged standards and procedures."[50] Declarants' reports of conditions in CBP facilities are not anecdotal but rather reflect widespread violations of the *Flores* Agreement.[51]

> **2.    There is no "20 day average detention" rule; ICE agents do not undertake and record efforts aimed at release under the Settlement.**

*Nothing* in the Flores Settlement states, explicitly or implicitly, that there is a "20 day average" detention rule regarding compliance with the release provisions of the Agreement.[52] Paragraph 18 provides in simple English: "*Upon taking a minor into custody*, the [Defendants] … shall make and record the prompt and continuous efforts … toward family reunification and the release of the minor pursuant to Paragraph 14

---

refusal to provide all Class Members their "basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety," is not only in violation of the Agreement, but is also likely unconstitutional. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).

50 August 21, 2015 Order at 13 [Doc. # 189.]

51 Many if not most Class Members have no idea what CBP facilities they were initially detained in. Some refer to facilities with nicknames and slang references popularly used such as the "ice box" or "dog cages," but few are able to be much more specific.

52 Defendants claim that they have been able to process and release most residents within 20 days or less since October 2015. Dec. of John Gurule, Ex. 22, ¶ 13 [Dkt. #. No. 217-1].  Even if Mr. Gurule's numbers are accurate, Defendants still are not releasing 12% of Class Members in less than 20 days. That leaves at least 2,245 Class Members in custody for more than 20 days.

Plaintiffs' Supplemental Brief

above. Such efforts at family reunification *shall continue so long as the minor is in [Defendants'] custody*." *Id.* (emphasis added).[53]

Defendants "average" argument is entirely meaningless because Defendants only take into account residents booked in and then released. They do not take into account Class Members detained for weeks and months and not released![54]

As discussed in the Statement of Facts, there are several simple steps Defendants are required to take under the Settlement in order to implement the Settlement's stated "presumption" of release. The evidence, including the testimony of Defendants' agents, clearly shows *none* of these steps are taking place because Defendants simply place Class Members in expedited removal and then assume they are subject to "mandatory detention" regardless of the Settlement's presumption of release unless and until the Class Member's mother is found to have a credible fear of return. That paradigm of course has nothing to do with the text of the Agreement.[55]

---

53 The Settlement further requires that children *not* released pursuant to Paragraph 14 be placed in a licensed program provided for by ICE. Settlement ¶ 19. ICE does not have a single contract to place children pursuant to Paragraph 19 of the Settlement.

54 "A. Our system of record, the way we count average length of stay, is the difference between when you book into FRC and when you're released … For the people who remain [detained], we can't measure how long they --since they -- you know, between book in and book out because they have yet to book out. … Q. Okay. And would it be fair to say that if we counted people who … were not released … then the numbers would change by some unknown margin? … A. I think it would be fair to say that we can't count that which is unknown. Q. Okay. A. I can't tell you how long someone has stayed until they're no longer [detained]." Ex. 9, Miller Dep. 141:22 – 143:9.

55 This Court and the Court of Appeals have already thoroughly rejected Defendants' arguments that 1997 amendments to INA creating "expedited removal" proceedings that *predated* the Settlement in any way changes Defendants' obligations under the Agreement. There is no reason for the Court to change course on this question.

**3.      Defendants have not demonstrated "substantial compliance" as required by Paragraph 30 of the Flores Agreement; a clear and convincing standard would be inappropriate because Plaintiffs do not seek a contempt ruling against Defendants.**

Plaintiffs do not seek a contempt ruling against Defendants. They seek appointment of a monitor to sort out factual and legal disputes and monitor compliance, and of course they seek compliance with the existing Agreement, a consent decree governed by contract principles.[56] *The appropriate governing standard is substantial compliance by a preponderance of the evidence*.[57] There is no mathematical definition for "substantial compliance." The Ninth Circuit has held it implies "something less than a strict and literal compliance with the contract provisions but fundamentally…means that…*deviation is unintentional and so minor or trivial as not 'substantially to defeat the object which the parties intend to accomplish*.'" *Wells Benz, Inc. v. United States*, 333 F.2d 89, 92 (9th Cir. 1964) (emphasis supplied) (quoting *Connell v. Higgins*, 170 Cal. 541, 150 P. 769, 775 (1915)). In this case Defendants' deviations are very intentional and entirely defeat the objects which the parties intended to accomplish.

**4.      Declarations are an admissible form of evidence and reflect declarants' factual observations**

---

56 "Consent decrees have the attributes of both contracts and judicial acts," and in interpreting consent decrees, courts use contract principles, specifically the contract law of the situs state. *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990).

57  *Buss v. Superior Court,* 16 Cal. 4th 35*, 939 P.2d, 766, 65 (Cal. 1997) (noting that the preponderance of evidence standard is "applicable to contractual causes of action").

Declarations are generally admissible forms of evidence in pretrial motions. "A district court has considerable discretion to decide Rule 43(c) motions solely on the basis of affidavits or to take oral testimony at a hearing.…"[58] The Ninth Circuit has recognized that oral testimony may not be necessary where "the testimony … present[ed] was contained in…declarations submitted to the district court." *United Commer. Ins. Serv. v. Paymaster Corp.*, 962 F.2d 853*, 1992 U.S. App. LEXIS 6611, 92 Cal. Daily Op. Service 3173, 92 Daily Journal DAR 5061 (9th Cir. Cal. 1992). A district court can disregard a self-serving declaration that states only conclusions and not facts; declarations are properly disregarded where they "included facts beyond the declarant's personal knowledge and did not indicate how…[the declarant] knew the facts to be true." *Nigro v. Sears, Roebuck and Co.* (9th Cir. 2015).[59] Plaintiffs' declarants have reported facts based on their personal experiences.

## III.   CONCLUSION

For all the reasons stated above, Plaintiffs' Motion should be granted.

Dated: December 5, 2016                    Respectfully submitted,

PETER A. SCHEY
CARLOS R. HOLGUIN                    ELENA GARCIA
CENTER FOR HUMAN RIGHTS AND          ORRICK, HERRINGTON &

---

58 8 James Wm. Moore, Moore's Federal Practice—Civil § 43.05[2] (3d ed. 2012.)
59 *See also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002) ("holding that the district court properly disregarded the declaration that included facts beyond the declarant's personal knowledge and did not indicate how she knew the facts to be true.")

Plaintiffs' Supplemental Brief

CONSTITUTIONAL LAW                    SUTCLIFFE LLP

AMANDA ALVARADO FORD                  JENNIFER KELLEHER CLOYD
MICHAEL S. SORGEN                     KATHERINE H. MANNING
LA RAZA CENTRO LEGAL, INC.            KYRA KAZANTZIS
                                      ANNETTE KIRKHAM
                                      THE LAW FOUNDATION OF SILICON VALLEY
                                      LEGAL ADVOCATES FOR CHILDREN AND YOUTH
                                      PUBLIC INTEREST LAW FIRM

ALICE BUSSIERE
VIRGINIA CORRIGAN
YOUTH LAW CENTER                      /s/ PETER SCHEY
OF COUNSEL FOR PLAINTIFFS             ATTORNEYS FOR PLAINTIFF

Plaintiffs' Supplemental Brief

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On December 6, 2016, I electronically filed the following document(s): STIPULATED APPLICATION FOR LEAVE TO FILE DEPOSITION EXCERPTS OF ASYLUM APPLICANTS AND MEMORANDA IDENTIFYING ASYLUM APPLICANTS UNDER SEAL, PROPOSED ORDER GRANTING LEAVE, REDACTED DECLARATIONS OF ASYLUM APPLICANTS, REDACTED STATEMENT OF UNCONTROVERTED FACTS, AND REDACTED MEMORANDA IDENTIFYING ASYLUM APPLICANTS with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*

*Attorney for Plaintiffs*