CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br>        Plaintiffs,<br>- vs -<br><br>JEH JOHNSON, SECRETARY, U.S.<br>DEPARTMENT OF HOMELAND SECURITY,<br>*et al.*,<br><br>        Defendants.<br>_____ | Case No. CV 85-4544 DMG (AGRx)<br><br>PLAINTIFFS' CORRECTED STATEMENT OF UNCONTROVERTED FACTS[1]<br>Hearing: January 30, 2017 |

*Plaintiffs' counsel, continue next page:*

_____

[1] Defendants' have filed an *ex parte* application in part seeking to strike Plaintiffs' Statement of Uncontroverted Facts [Dkt. #288] because the statement of facts in the left column purportedly includes legal conclusions. Without agreeing to Defendants' position, Plaintiffs hereby file a corrected Statement of Uncontroverted Facts eliminating text in the left hand column that may be considered legal conclusions.

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
          kate.manning@lawfoundation.org
          kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere (Cal. Bar No. 114680)
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-33

Table of Contents

**1. WHETHER CONDITIONS AT THE U.S. CUSTOMS AND BORDER PROTECTION FACILITIES VIOLATE THE FLORES AGREEMENT. DEFENDANTS CONTINUE TO DETAIN CHILDREN IN DEPLORABLE AND UNSANITARY CONDITIONS IN CBP FACILITIES IN VIOLATION OF THE SETTLEMENT AND THIS COURT'S ORDERS.** ................................................................................................ 1

   *A.* FLORES CLASS MEMBER CHILDREN IN CBP FACILITIES SUFFER FROM INADEQUATE ACCESS TO FOOD. .................. 1

   B. FLORES CLASS MEMBER CHILDREN IN CBP FACILITIES CONTINUE TO SUFFER FROM INADEQUATE ACCESS TO CLEAN DRINKING WATER ................................................................................................................................ 15

   C. FLORES CLASS MEMBER CHILDREN ARE HELD IN CBP FACILITIES THAT ARE UNSANITARY AND UNFIT FOR HUMAN HABITATION. ................................................................................................................................. 21

   D. CLASS MEMBERS WITH TORN, SOILED OR WET CLOTHES ARE NOT PROVIDED WITH DRY CLOTHES BY CBP OFFICIALS. ............................................................................................................................................... 26

   E. CLASS MEMBERS IN CBP FACILITIES FOR 12-72 HOURS ARE NOT PROVIDED SHOWERS, SOAP, TOOTHBRUSHES OR TOWELS. ................................................................................................................................................ 29

   F. CLASS MEMBERS IN CBP FACILITIES ARE NOT PROVIDED WITH SOAP AND TOWELS TO WASH FROM THE TIME THEY ARE FIRST DETAINED. .................................................................................................................... 31

   G. CLASS MEMBER CHILDREN SUFFER FROM EXTREMELY COLD TEMPERATURES IN CBP DETENTION FACILITIES. DEFENDANTS DO NOT PROVIDE CHILDREN WITH JACKETS OR SWEATERS TO DEAL WITH THE COLD TEMPERATURES. 35

   H. CLASS MEMBERS ARE HELD IN INHUMANELY OVERCROWDED CBP DETENTION FACILITIES AND ARE FORCED TO ENDURE SLEEP DEPRIVATION. ......................................................................................................... 49

   I. CLASS MEMBERS PROCESSED IN SOME CBP FACILITIES, INCLUDING IN MCALLEN AND OTHER TEXAS FACILITIES, WHERE THE LARGEST NUMBER OF CLASS MEMBERS ARE PROCESSED, MUST SLEEP ON CONCRETE FLOORS WITH NO MATS OR MATTRESSES AND ONLY A MYLAR BLANKET. ...................................................................... 56

**2. *FLORES* CLASS MEMBER CHILDREN ARE ROUTINELY NOT ADVISED OF *FLORES* RIGHTS BY CBP OR ICE OFFICERS.** ............................................................................................................................................ 63

   A. DEFENDANTS DO NOT ADVISE CLASS MEMBERS ABOUT THEIR RIGHT TO A CUSTODY HEARING BEFORE AN IMMIGRATION JUDGE AND DO NOT AFFORD ACCOMPANIED CHILDREN BOND OR CUSTODY HEARINGS BEFORE IMMIGRATION JUDGES. .......................................................................................................................... 71

   B. DEFENDANTS HAVE NOT PROVIDED ACCOMPANIED MINORS NOT RELEASED WITH "A NOTICE OF THE REASONS FOR HOUSING THE MINOR IN A DETENTION OR MEDIUM SECURITY FACILITY." .............................................. 74

**3. DHS FAILS TO MAKE AND RECORD ONGOING EFFORTS AIMED AT RELEASE OR PLACEMENT OF *FLORES* CLASS MEMBERS** ................................................................................................................... 75

   A. DEFENDANTS DO NOT MAKE AND RECORD "CONTINUOUS" EFFORTS FROM THE TIME ACCOMPANIED MINORS "ARE TAKEN INTO CUSTODY" AIMED AT THE RELEASE OF MINORS UNDER ¶¶ 14 AND 19 OF THE AGREEMENT. DEFENDANTS PLACE THESE CLASS MEMBERS IN EXPEDITED REMOVAL, SUBJECT THEM TO MANDATORY DETENTION, AND RELEASE THEM IF THEIR MOTHERS PASS A CREDIBLE OR REASONABLE FEAR INTERVIEW ...................................... 75

   B. DEFENDANTS HAVE NO CONTRACTS WITH LICENSED PROGRAMS TO PLACE ACCOMPANIED MINORS UNDER ¶¶ 14E OR 19 OF THE AGREEMENT AND THEREFORE NEVER PLACE CLASS MEMBERS IN SUCH FACILITIES ...................... 94

   C. DEFENDANTS HAVE NO PROCEDURES IN PLACE TO OBTAIN AFFIDAVITS OF SUPPORT FOR THOSE WILLING TO ACCEPT CUSTODY OF A MINOR AS REQUIRED BY ¶ 15 AND ICE OFFICERS DO NOT CONFER WITH CLASS MEMBERS OR THEIR MOTHERS ABOUT PLACEMENT PURSUANT TO ANY PART OF THE SETTLEMENT. ......................................... 96

   D. DEFENDANTS HAVE NO PROCEDURES IN PLACE TO CONDUCT SUITABILITY ASSESSMENTS OF THOSE WILLING TO ACCEPT CUSTODY OF A MINOR AS SET FORTH IN ¶ 17 OF THE AGREEMENT AND DO NOT CONFER WITH CLASS MEMBERS OR THEIR MOTHERS ABOUT SUITABILITY ASSESSMENTS. ................................................................. 101

   E. DEFENDANTS DO NOT PLACE ACCOMPANIED MINORS OR OFFER ACCOMPANIED MINORS PLACEMENT IN "LESS RESTRICTIVE ALTERNATIVES [THAN SECURE FACILITIES] THAT ARE AVAILABLE AND APPROPRIATE" UNDER ¶ 23 OF THE AGREEMENT. ................................................................................................................................ 106

iii

**4.    *FLORES* CLASS MEMBER CHILDREN ARE ROUTINELY COMMINGLED WITH UNRELATED ADULTS FOR EXTENDED PERIODS OF TIME** ................................................................ 110

**5.    DEFENDANTS DETAIN CLASS MEMBERS IN SECURE ICE FACILITIES FOR LONG PERIODS OF TIME AND DO NOT MAKE RELEASE AVAILABLE AS EXEDITIOUSLY AS POSSIBLE OR WITHOUT UNECCESARAY DELAY.** ................................................................................................ 118

    A.    DEFENDANTS DO NOT EVALUATE ON AN INDIVIDUAL BASIS WHETHER CLASS MEMBERS POSE A "SUBSTANTIAL FLIGHT RISK" ("A SERIOUS RISK THAT THE MINOR WILL ATTEMPT TO ESCAPE") BEFORE DECIDING TO DETAIN ACCOMPANIED MINORS. ................................................................................................ 125

    B.    DEFENDANTS DETAIN CLASS MEMBERS SOLELY BECAUSE DEFENDANTS HAVE PLACED THE CHILDREN IN EXPEDITED REMOVAL PROCEEDINGS EVEN THOUGH ORDERS OF EXPEDITED REMOVAL ARE STATUTORILY NOT FINAL AND EXECUTABLE UNTIL CLASS MEMBERS HAVE BEEN PROVIDED A CREDIBLE OR REASONABLE FEAR INTERVIEW, HAVE RECEIVED A DECISION, AND HAVE RECEIVED A DECISION ON ANY APPEALS TAKEN TO AN IMMIGRATION JUDGE, ALL MATTERS THAT MAY TAKE SEVERAL WEEKS OR MONTHS. ................................................ 128

**6.    *FLORES* CLASS MEMBER CHILDREN ARE ROUTINELY DETAINED FOR WEEKS OR  MONTHS IN SECURE FACILITIES** ........................................................................................................ 129

    A.    DEFENDANTS FACILITIES ARE NOT "NON-SECURE" NOR ARE THEIR FACILITIES THE "LEAST RESTRICTIVE SETTING APPROPRIATE FOR THE MINORS AGE" ....................................................................... 130

    B.    THE DILLEY AND KARNES FACILITIES HAVE NO LICENSES BOTH HAVING BEEN BLOCKED BY A COURT IN TEXAS. BERKS'S LICENSE IS ALSO BEING CHALLENGED BY THE STATE AND IN ANY EVENT DOES NOT  COMPLY WITH THE REQUIREMENTS OF EXHIBIT 1 TO THE AGREEMENT. ....................................................... 134

**7.    DEFENDANTS INTERFERE WITH CLASS MEMBERS' RIGHT TO COUNSEL** .................................. 137

iv

| | |
|---|---|
| 1. WHETHER CONDITIONS AT THE U.S. CUSTOMS AND BORDER PROTECTION FACILITIES VIOLATE THE FLORES AGREEMENT. DEFENDANTS CONTINUE TO DETAIN CHILDREN IN DEPLORABLE AND UNSANITARY CONDITIONS IN CBP FACILITIES IN VIOLATION OF THE SETTLEMENT AND THIS COURT'S ORDERS. | |
| A. **Flores Class Member children in CBP facilities suffer from inadequate access to food.** | TEDS Manual, § 4.13 Food and Beverage, p. 18: "*General:* Food and water should never be used as a reward, or withheld as punishment. Food provided must be in edible condition (not frozen, expired or spoiled)." …. "*Dietary Restrictions:* Officers/Agents should remain cognizant of a detainee's religious or other dietary restrictions." TEDS Manual, § 5.6 Detention, p. 22: "*Meals and Snacks – Juveniles, Pregnant, and Nursing Detainees:* Juveniles and pregnant detainees will be offered a snack upon arrival and a meal at least every six hours thereafter, at regularly scheduled meal times. At least two of those meals will be hot. Juveniles and pregnant or nursing detainees must have regular access to snacks, milk, and juice. *Age and Capabilities Appropriate Food:* Food must be appropriate for at-risk detainees' age and capabilities (such as formula and baby food)." Deposition Excerpts of Manuel Padilla Jr., CBP, Chief Patrol Agent – Rio Grande Valley Sector (Ex. 2): Q: …let's say you have three or four : Q: … I am looking at Defendant's Exhibit 60 [Doc. #214-1] , which is the declaration of David Strange.  He is an assistant chief with Division E3 of Border Patrol …  Mostly what he does is just attach as exhibits printouts of the activity log from E3 and E3M detention |

module … [I]n Exhibit A he indicates that this alien [Franklin Rxxxx xxxxxxxxx, Class Member. *See* Ex. 45, Doc. #201-5] was -- was apprehended on … January 22nd, 2016 at 5:15 in the morning.  And this appears to be in your sector. And  … the activity log indicates the first meal occurred at 1522 hours. So it seems like roughly … 10 hours before [the class members] got their first meal.  Can you tell me why would something like that happen, assuming these records are accurate? …

THE WITNESS: Yes, sir. I would -- … So one, the system being down and where the feedings would take place and then logging them in manually. That's one possibility.  And then the other possibility was, you know, that -- that the feeding time was not -- was not logged in because  … the EDM has … an internal audit, if you will, starts flashing if somebody is not being fed within certain time frames.  I think it's eight hours between meals and then snacks for family units and juveniles... Those are some possible answers to that, but I would have to have all of the information to really conclude what happened.

Q: Is it also possible that this record is accurate and that for some reason … this person identified in Exhibit A may in fact have been apprehended about 5:15 in the morning, hadn't received their first meal at (unintelligible) hours, is it possible that the record is accurate?

A: I would say it's possible definitely, but it's … unlikely ....

(Padilla Dep. 25:2-26:23).

Q: Okay. I see another one here in [Dina Raquel Rodriguez, Mother. *See* Ex. 19-M, Doc. #201-3] Exhibit F. And that indicates an arrest date and time of 12/212015 at 1300 hours, at 1 p.m. And it does -- … and the activity log states that the next meal -- that the first meal the person received was on October 22nd at -- at midnight, about 11 hours later. Are you able to tell us why that person didn't get food for 11 hours? …

THE WITNESS: Yes, sir. So again, not

having all of the information, it's kind of hard to point out … But again, without having the information I cannot make a conclusion or ascertain of was that a system error or input error or what caused that anomaly.
(Padilla Dep. 26:24-27:19).
Q: And when I was there and interviewed a lot of people, sandwiches just consisted of two pieces of bread and one slice of meat. Is that still the case today?
THE WITNESS: Yes, sir….
(Padilla Dep. 32:15-32:19).
_____
Deposition Excerpts of Paul Beeson, CBP, Chief Patrol Agent – Tucson Sector (Ex. 4):
Q: …let's say you have three or four agents going around at a mealtime distributing burritos to detained people, who specifically is tasked with entering into this E3 system that those meals were provided?
… A: I don't know.
Q: And are you aware of any, of any in-person training that the agents working under you receive in how to input data with regards to the delivery of meals, if you know?
A: I don't know …
Q: *Are you aware of any efforts to monitor the accuracy of records entered with regards to meals served, anything that would be brought to your attention monitoring the accuracy of that data?*
*A: No, sir.*
Beeson Dep. 45:14-46:13. (Emphasis added).

Q: Have you ever looked into the nutritional value of the food that's being served, burritos?
A: No.
Q: Has anybody to your knowledge working under your supervision?
A: Not to my knowledge.
Q: Can you recall receiving any direction or guidance or training or instructions from headquarters dealing with the nutritional value of food made available to minors in your custody?
MS. FABIAN: Object to form.
THE WITNESS: I do not recall.
(Beeson Dep. 56:5-56:16).

_____

Deposition Excerpts of Class Member Mother Ritza Mxxx xxxxxxx (Ex. 10):

Q: Okay.  And what did that meal consist of?

A: Okay.  They give her a sandwich that didn't have anything inside, they didn't give anything to the son, so she had to share with him.

Q: What do you mean, there was nothing inside?

A: Just a sandwich with nothing inside.  … it's just bread, and it didn't have anything inside, you know, no meat or something.

Q: It was just two pieces of bread?

A: Si, yes, two pieces of bread.

(Ritza Mxxx xxxxxxx Dep. 18:3-18:12).

Q: Okay.  Do you remember how many meals you were provided with while you were in detention total?

A: It was only one, it was only two breads that they gave me.

(Ritza Mxxx xxxxxxx Dep. 18:21-18:24).

Q: Okay.  How long did you stay there?

A: … I couldn't tell you, it was like a day, one day, a complete day.

Q: Okay. And how many times were you provided with food at that place?

A: One time.

(Ritza Mxxx xxxxxxx Dep. 20:13-20:25).

_____

Deposition Excerpts of Class Member Mother Celina Sxxxxxx-xxxx (Ex. 11):

Celina Sxxxxxx-xxxx was detained by CBP for approximately 66 hours. *See* Ex. 16, Strange Dec. Ex. O, Doc. #214-2.

Q: And where was this that they fed you?

A: There at La Hielera.

Q: Okay. And what did they feed you?

A: Only a piece of bread with mortadella and a juice.

(Celina Sxxxxxx-xxxx Dep. 16:5-16:9).

Q: Now, were you ever given any warm food at that first place?

A: No, never.

(Celina Sxxxxxx-xxxx Dep. 19:19-19:21).

Q. Now, how long were you at this first facility?
A: Two days.
(Celina Sxxxxxx-xxxx Dep. 25:22-25:24).

My son and I were fed only a bologna sandwich and juice.
[Doc. # 201-5 at 849, Declaration of Celina Sxxxxxx-xxxx Ex. 28, ¶ 8].

_____

Deposition Excerpts of Class Member Franklin Rxxxx xxxxxxxxx (Ex. 12):
Q: Were you given food?
A: Yes.
Q: What did you receive?
A: First it was – they gave us a cookie, and then later on bread with ham. And for dinner, another cookie.
(Franklin Rxxxx xxxxxxxxx Dep. 10:20-10:25).

"The first day that I was there they gave me a cookie for breakfast, a sandwich (2 pieces of bread with one thin slice of meat) for lunch, and another cookie for dinner. I was very hungry all day because this was not enough food."
[Doc. # 201-5 at 918, Declaration of Franklin Rxxxx xxxxxxxxx Ex. 45. ¶ 8].

_____

Deposition Excerpts of Class Member Mother Karina Vxxxx-xxxxxxx (Ex. 13):
Q: And what type of food was offered to you in that first meal?
A: A sandwich with frozen ham.
Q: What do you mean by "frozen ham"?
A: Very cold, and there was kind of ice under the bread.
Q: Could you chew the ham?
A: Yes, because I was very hungry.
Q: And was your son also given a sandwich?
A: Yes.
(Karina Vxxxx-xxxxxxx Dep. 28:4-28:16).

Q: Do you remember what type of food your

next meal after the ham sandwich was?
A: The same thing. Just the same thing.
Q: Were you ever provided anything other than a sandwich?
A: A little glass of juice, the cookie.
(Karina Vxxxx-xxxxxxx Dep. 30:14-30:22).
_____

Deposition Excerpts of Rodney Scott, CBP, Chief Patrol Agent – El Centro Sector (Ex. 3):
Q: And are any warm meals served, other than burritos?
A: No, not as a matter of policy or routine. There -- there are exceptions to that. I've seen on numerous occasions -- again, these are just temporary holding facilities.  So we're not planning on keeping people long-term.
(Scott Dep. 21:20-21:25).
_____

Deposition Excerpts of Class Member mother Lindsay Gxxxx xxxxx (Ex. 14):
Q: What did they give you for food?
A: Two slices of bread with a slice of mortadella, strawberry juice, and to my daughter, a cracker.
Q: Do you remember when you first received food?
A: The first one is when I arrived, and the second one, it was around 6:00 o'clock. That's my estimate because they didn't have a clock, and I didn't know what it was.
(Lindsay Gxxxx xxxxx Dep 10:21-11:3).

Q: …You said that you received a sandwich with mortadella, and I wanted to clarify what that is in English.
A: Bologna.
Q: So like bologna?
A: Like bologna, yeah. No mustard, no mayonnaise. It's like those Oscar Mayer things, salami. That's what it is. It was frozen.
Q: What do you mean, "it was frozen"?
A: It have, like, a layer of ice. But very thin. But it had ice.
Q: Were you able to eat it?
A: We waited for a little bit so it will change temperature because we were very hungry.
(Lindsay Gxxxx xxxxx Dep. 25:19-26:7).

MS. GARCIA: Did she observe the other kids were hungry as well or did they get enough to eat?

THE WITNESS: Yes, they were crying with hunger. As a matter of fact, there was a lady there that she was pregnant. She was very hungry. (Lindsay Gxxxx xxxxx Dep. 39:10-39:19).

_____

Deposition Excerpts of Class Member Mother Mirna Mxxxxxx xxxxx  (Ex. 15):

Mirna Mxxxxxx xxxxx was detained by CBP for approximately 62 hours. *See* Ex. 16, Strange Dec. Ex. R, Doc. #214-2.

Q. Let's talk about the food situation. What -- do you remember the food that you received there?

A. It was a bread, a sandwich with a cold bologna in the middle.

(Mirna Mxxxxxx xxxxx Dep. 20:11-20:15).

Q So that first day that you were there, these meals that we're talking about, were any of them warm meals?

A. No.

(Mirna Mxxxxxx xxxxx Dep. 25:18-25:21).

Q. And what about the second day you were there? How many times were you fed the second day?

A. Some two times, two.

(Mirna Mxxxxxx xxxxx Dep. 25:22-25:24).

Q. Okay. Now, did you ever receive a warm meal like a burrito while you were there?

A. No.

(Mirna Mxxxxxx xxxxx Dep. 31:5-31:7).

There was not enough food. All we got were two slices of bread with a small slice of mortadella and small juices. We got those sandwiches twice a day and once three times a day.

[Doc. # 201-5 at 840, Declaration of Mirna Mxxxxxx xxxxx Ex. 25, ¶ 5].

_____

Deposition Excerpts Class Member's mother Sara Exxxxxxxx xxxxx (Ex. 17):

Sara Exxxxxxxx xxxxx was detained by CBP for approximately 76 hours. *See* Ex. 16, Strange Dec. Ex. L, Doc. #214-2.

Q: Okay. And what was that meal like?
A: A piece of bread and a piece of ham.
Q: Okay. At any time when you stayed at this first facility, were you given any other types of – type of food, apart from the sandwich: snacks?
A: No.
Q: So the only kind of food… Was there a difference between the food that they offered for breakfast as opposed to middle of the day or in the evening?
A: No. It was the same thing.
(Sara Exxxxxxxx xxxxx Dep. 18:6-19:12).

Q: Okay. So can you estimate how many times per day you were given food while at this first station?
A: We were given twice a day. Because it just wasn't enough because there were so many people stuck in there.
(Sara Exxxxxxxx xxxxx Dep. 20:1-20:6).

Q: Okay. And it was only sandwiches? There was never any snacks or anything else offered?
A: No, no.
Q: Okay. Was it hot food or cold food?
A: Cold. It wasn't hot.
(Sara Exxxxxxxx xxxxx Dep. 21:10-21:14).

Declaration of Sara Exxxxxxxx xxxxx Doc. # 201-5 Ex. 24 ¶ 6. "We were fed a sandwich two times a day with some juice. My daughter refused to eat anything but the one slice of cold meat inside the sandwich. She was very hungry but we were not served any food other than the cold sandwiches."

_____

Deposition Excerpts Class Member Yeslin Lxxxx xxxxxxx (Ex. 18):

Yeslin Lxxxx xxxxxxx was detained by CBP for approximately 74 hours. *See* Ex. 16, Strange Dec. Ex. K, Doc. #214-2.

Q: When you got [to the Border Patrol station], did they give you any food?

A: They gave me a cracker and juice?
Q: And did they give some to your sister?
A: Yes.
 (Yeslin Lxxxx xxxxxxx Dep. 10:25-11:6).

Q: And do you remember how long you were in that room?
A: Two days and one night.
Q: And what did they feed you while you were there?
A: They only gave me crackers and a little juice.
Q: Did they ever give you like a little sandwich?
A: No. In the other center [Ursula] they gave me.
(Yeslin Lxxxx xxxxxxx Dep. 11:10-11:19).

Q: So going back to the first place, so they gave you some snacks and some juice?
A: They only gave us cracker.
Q: What did you have to drink?
A: Only one juice.
Q: For the two days you were there?
A: Yes.
 (Yeslin Lxxxx xxxxxxx Dep. 11:23-12:7).

Q: Did you get juice and one cracker more than once?
A: Yes, they gave us three times a day.
(Yeslin Lxxxx xxxxxxx Dep. 13:21-13:23).

Q: When you got to the second place …. Do you remember what they fed you?
A: Frozen bread with a little meat inside it.
….
Q: Okay. And did you get any snacks in addition to that?
A: No.
….

Q: Any crackers?
A: No.
Q: And you said you got milk?
A: Yes.
Q: Did you get any juice.
A: No.
(Yeslin Lxxxx xxxxxxx Dep. 18:21-20:7).

They gave us bread with a little bit of ham, but it was all frozen, so I didn't eat much. [Doc. # 201-5 at 834, Dec. of Yeslin Lxxxx xxxxxxx Ex. 23, ¶ 8].

Deposition Excerpts Class Member's Mother Yessenia Exxxxxxxx xxxxxxx  (Ex. 19):

Yessenia Exxxxxxxx xxxxxxx was detained by CBP for approximately 63 hours. *See* Ex. 16, Strange Dec. Ex. N, Doc. No. 214-2.

Q: Were you given food at this first place?
A: Yes.
Q: What was it like? What kind of food?
A: It was, like, two pieces of bread and a piece of meat.
…
Q: Okay. Were you given any type of, like, snacks or anything aside from just these sandwiches?
A: No.
Yessenia Exxxxxxxx xxxxxxx Dep. 18:14-19:9.

"For the three days we were there we were only given sandwiches to eat—3 a day. This was two slices of stale bread with one slice of bologna in the middle. Nothing else was in the sandwiches. I also got some sugary juice. In the three days I was there, the children were given cookies twice." [Doc. No. 201-5 at 846, Dec. of Yessenia Exxxxxxxx xxxxxxx Ex. 27, ¶ 7].
_____
Deposition Excerpts Class Member's mother Zulma Mxxxxxxx xxxxxxx (Ex. 20):
Q. Were you given food at the facility?
A. The only food they gave us was some very cold bread with, I don't know if it was ham or

1

2   another cold cut, and it was for breakfast, for lunch and for dinner. It was so cold and you

3   felt it in your stomach.

4   Q. Were you given the cold cut sandwich three times a day?

5   A. And a little box of juice. Yes, but I didn't take it every time because the first time I had

6   it, it didn't settle very well with me, so I wouldn't take it every time.

7   Q. Was your son provided with food at the facility?

8   A. The same thing that they gave me. They gave us all the same thing.

9   (Zulma Mxxxxxxx xxxxxxx Dep. 18:16-

10   19:9).

11   "I was held at la perrera for two days.  During this time, we were only given burritos, an

12   apple, and a bag of chips to eat for breakfast, lunch, and dinner. We were not given the

13   chance to shower or toothbrushes and toothpaste to brush our teeth."

14   [Declaration of  Zulma Mxxxxxxx xxxxxxx,

15   Doc. No. 201-3 at 610, Ex. 19-E, ¶ 8].

16   Declaration of attorney Natalia Ospina, Doc. No. 201-1 Ex. 7 ¶5 (3/10/16)

17   "A Guatemalan mother and child spent two

18   days in the 'hielera,'…They were ... unable to eat the two pieces of bread and a slice of ham

19   that they were provided twice daily during their time in the hielera."

20   _____

21   Declaration of attorney Lindsay Harris, Doc. No. 201-2 Ex. 14 ¶4(c)

22   "*Flores* class members and their mothers report being provided entirely inadequate

23   food while at CBP facilities. The food consists of two to three sandwiches a day,

24   each sandwich consisting of two pieces of dry bread and one thin slice of ham or bologna.".

25   _____

26   Declaration Class Member Herson Lxxxxxx xxxxx, Doc. No. 201-5 Ex. 46 ¶ 8

27   (01/30/2016) "Immigration gave us soup and a burrito only once a day. I was very hungry. I

28   was sad, afraid, hungry, and desperate.".

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____

Declaration of Class Member mother Raquel Axxxxx xxxxxx, Doc. No. 201-5 Ex. 26 ¶7 "They only gave us small amounts of food two times a day."

_____

Declaration of Class Member Faustino Cxxx, Doc. No. 201-6 Ex. 53 ¶5 (01/29/2016) "When being transported here my son told me that while he was detained at the Border Patrol Station, like me... he was only given three thin sandwiches a day with one slice of cold meat, one for breakfast, one for lunch, and one for dinner."

_____

Declaration of Class Member Josselyn Mxxxxx xxxxxx, Doc. No. 201-6 Ex. 55 ¶12 (01/30/2016) "The food here is not good. It is always the same—a bad sandwich. The sandwich is given three times a day. It is two pieces of bread and one slice of ham."

_____

Declaration of Class Member's mother Silvia Vxxxxxx xxxx, Doc. No. 201-6 Ex. 56 ¶6 (02/01/2016) "Our only food has been two pieces of bread with one think slice of bologna or something that looks like meat these sandwiches are distributed for breakfast, lunch and dinner. Everyone also gets a small plastic container (250 ml) of "frutoso" twice a day. This taste like colored water with sugar. We are very hungry because of the lack of food ..."

_____

Declaration of thirteen-year-old Class Member Cesia Vxxxxxxxxx-xxxx, Doc. No. 201-5 Ex. 29 ¶5 "The food was disgusting; it was just cold ham sandwiches".

_____

Declaration of Class Members' mother Isamar Sxxxxxx xxxxxx, Doc. No. 201-5 Ex. 30 ¶7 "We received food three times a day. It was the same, cookies, bread with mozzarella, and a really cold bottle of water".

_____

Declaration of Class Members' mother Kelly

Gxxxxxxx-xxxxx, Doc. No. 201-5 Ex. 31 ¶7
"The food was terrible: Just bread with one slice of cold ham."

Declaration of Class Members' mother Maria Dxxxx xxxxxxx, Doc. No. 201-5 Ex. 32 ¶6
"We were just given cold sandwiches with frozen ham inside, just one during the day and one at night."

_____

Declaration of Class Members' mother Lindsay Gxxxx xxxxx, Doc. No. 201-5 Ex. 33 ¶ 8
"I was given food but it was not good. Only a sandwich that was frozen."

_____

Declaration of Class Member Katerin Yxxxxxxx xxxxxxx (12 yrs), Doc. No. 201-5 Ex. 34 ¶ 9
"The sandwiches were just two pieces of bread and one thin slice of meat. No butter or spread, no lettuce, no cheese, nothing."

_____

Declaration of Class Members' mother Sonia Axxxxx-xxxxxx, Doc. No. 201-5 Ex. 35 ¶ 6
"To eat we only got a sandwich with one piece of ham, which was very cold as well. For the whole day and night that I was there, we only got two sandwiches and two little bottles of juice."

_____

Declaration of Class Members' mother Kenia Yxxxxx xxxxxxx, Doc. No. 201-5 Ex. 36 ¶8
"[T]hey gave me a sandwich of 2 slices of bread with a slice of cold meat, and juice. I didn't eat anything. I gave the bread to my daughter."

_____

Declaration of Class Members' mother Maria Dxxxx xxxxxxx, Doc. No. 201-5 Ex. 32 ¶ 7
"After this, we were taken to another place, like a warehouse, that they called the perrera (dog house). ... The food was still bad. My son tried to eat the burritos twice, but both times he threw up afterwards."

_____

| | Declaration of Class Member Walter Axxxxxxx xxxxxxxxx (13 yrs old), Doc. No. 201-5 Ex. 22 ¶ 8 |
|---|---|
| | "It was the same bread and ham but this time no juice, only a little water."). |
| | "The only food we got was sandwiches of 2 pieces of dry bread and one thin slice of ham and a small box of juice. We were fed three times over the two days we were there … We were hungry, very cold, scared, and unable to sleep." *Id.* ¶ 6. |
| | —————— |
| | Declaration of Class Member Bianca Cxxxxxxxx xxxxx (17yrs old), Doc. No. 201-5 Ex. 37 ¶ 13 |
| | "I have not been able to leave the cell except to get juice and bread and when they clean the cell. The food is always the same. It is 2 pieces of bread with one slice of bologna 3 times a day. I have eaten some bread since arriving." |
| | —————— |
| | Declaration of ACLU of Texas Policy Strategist Astrid Dominguez, Doc. No. 201-5 Ex. 38 ¶ 6 |
| | "They were given sandwiches three times a day, only a slice of bologna and two slices of bread." |
| | —————— |
| | Declaration of Class Member Victor Rxxxxx xxxxxxx, Doc. No. 201-5 Ex. 21 ¶ 4. |
| | "We had arrived at this station around 9 AM and were transferred out around 1 AM the next morning. While at this location we were fed twice, both times we were given a sandwich consisting of two frozen pieces of bread and one thin cold slice of ham." |

| | |
|---|---|
| **B. Flores Class Member children in CBP facilities continue to suffer from inadequate access to clean drinking water** | TEDS Manual, § 4.14 Drinking Water, p. 18: "Functioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees."<br><br>Deposition Excerpts of Class Member Mother Celina Sxxxxxx-xxxx (Ex. 11):<br>Celina Sxxxxxx-xxxx was detained by CBP for approximately 66 hours. *See* Ex. 16, Strange Dec. Ex. O, Doc. #214-2.<br><br>Q: What about the water situation, was there water in the room that you were in?<br>A: Yes. There were like cubes – something like that with water, but we all use the same glass.<br>Q: You had one glass for all of you?<br>A: There were two to three glasses, but for all of us.<br>Q: And they didn't have any little like plastic cups or anything?<br>A: No. I never saw them.<br>(Celina Sxxxxxx-xxxx 19:25-20:9).<br><br>_____<br>Deposition Excerpts of Class Member Franklin Rxxxx xxxxxxxxx (Ex. 12):<br><br>Q: And were you provided with a jug of water?<br>A: There they had a jug of water, but they only had one cup.<br>Q: Can you explain that more.<br>A: They only had one cup for everyone that was there, and I only drank water once from that cup.<br>Q: Okay. What was the cup made of?<br>A: It was, like, paper.<br>(Franklin Rxxxx xxxxxxxxx Dep. 11:5-11:12).<br><br>"The officials put a container with water in our room and gave us one cup to share amongst the 20 people in my cell. The water tasted very bad and the container was not clean. Very few minors held in my cell were willing to drink the water."<br>[Doc. No. 201-5 at 918, Dec. of Franklin |

Rxxxx xxxxxxxxxx Ex. 45. ¶8].

_____

Deposition Excerpts of Class Member Mother
Karina Vxxxx-xxxxxxx (Ex. 13):
Q: And did you share your triangular glass
with people that you did not know?
A: Yes.
Q: How many people did you share your cup
with?
A: I don't remember.
Q: Was it more than one other person?
A: Yes.
(Karina Vxxxx-xxxxxxx Dep. 34:21-35:8).

Q: Do you remember anything in particular
about how the water tasted?
A: Yes. I remember …It tasted like Clorox.
(Karina Vxxxx-xxxxxxx Dep. 36:3-36:13).

Q: Did your son drink out of the big barrel of
water?
A: Yes, and he got sick.
Q: Can you explain how he get sick?
A: He got diarrhea.
(Karina Vxxxx-xxxxxxx Dep. 38:15-38:22).

I asked for more Pedialyte for my son and an
officer gave me a little more. When my son
drank it, he seemed better, but when I gave
him water, he had immediate diarrhea again.
[Doc. # 201-3 at 631, Dec. of Karina Vxxxx-
xxxxxxx Ex. 19-H, ¶ 8].

_____

Deposition Excerpts of Class Member Mother
Mirna Mxxxxxx xxxxx  (Ex. 15):

Mirna Mxxxxxx xxxxx was detained by CBP
for approximately 62 hours. *See* Ex. 16,
Strange Dec. Ex. R, Doc. No. 214-2.

Q. And you talked also about the water. Why
don't you tell me about the water situation for
drinking?
A. Ugly.
Q. Ugly, what does that mean? A. It didn't
have a normal flavor. It takes -- it tasted like a
chemical, but I never found out what it was.
(Mirna Mxxxxxx xxxxx Dep. 31:8-31:15).

There was not enough water to drink. [Doc. #
201-5 at 840, Dec. of Mirna Mxxxxxx xxxxx
Ex. 25, ¶ 5].

_____

Deposition Excerpts of Class Counsel Peter
Schey  (Ex. 16):
… [S]everal of the mothers and Class
"Members complained to me that -- I don't
think they were saying every single time
because I think this happened but definitely
complained of dirty drinking water and more -
- more frequently complained of insignificant
cups. So they would have to share a cup with
other people if they wanted to use a cup."
(Schey Dep. 30:5-30:11).

"Mothers and children interviewed during the
site inspections uniformly reported … dirty
drinking water [and] one cup for 30-40 people
to share…" [Doc. No. 201-1 at 1, Declaration
of Peter Schey Ex. 1, ¶ 5].

_____

Deposition Excerpts Class Member's mother
Sara Exxxxxxxx xxxxx (Ex. 17):

Sara Exxxxxxxx xxxxx was detained by CBP
for approximately 76 hours. *See* Ex. 16,
Strange Dec. Ex. L, Doc. No. 214-2.

Q: So how did you and your daughter drink
while you were there?
A: There was a thermos, big thermos, but it
had too much bleach to drink it.
(Sara Exxxxxxxx xxxxx Dep. 21:20-21:21).

Q: Okay. So you mentioned this again, but  --
I'll ask it again: So you – do you remember
anything about how the water tasted?
A: Yes. Like bleach.
(Sara Exxxxxxxx xxxxx 23:2-23:5).

"The water tasted like bleach so we were
scared to drink it." Declaration of Sara
Exxxxxxxx xxxxx, Doc. No. 201-5 Ex. 24  ¶
6.

_____

Deposition Excerpts Class Member Yeslin

Lxxxx xxxxxxx (Plaintiffs Ex. 18):

Yeslin Lxxxx xxxxxxx was detained by CBP for approximately 74 hours. *See* Ex. 16, Strange Dec. Ex. K, Doc. #214-2.

Q: Now, did you have any – do you remember – did you have any water in that room?
A: No.
Q: Do you remember seeing a big jug on a table of anything?
A: No.
(Yeslin Lxxxx xxxxxxx Dep. 13:24-14:4).

Q: So in this room, was there water?
A: No.
Q: No water?
A: No.
Q: No jug of water on a table?
A: No.
(Yeslin Lxxxx xxxxxxx Dep 21:5-21:10).
_____

Deposition Excerpts Class Member's Mother Yessenia Exxxxxxxx xxxxxxx  (Ex. 19):

Yessenia Exxxxxxxx xxxxxxx was detained by CBP for approximately 63 hours. *See* Ex. 16, Strange Dec. Ex. N, Doc. #214-2.

Q: Were you given anything—was there anything to drink at the first place that you went?
A: Yes.
Q: What was there to drink?
A: Just juice.
Q: Was there water?
A: No. (Yessenia Exxxxxxxx xxxxxxx Dep. 19:10-19:16)
_____

Declaration of Raquel Axxxxx xxxxxx, Doc. No. 201-5 Ex. 26 ¶ 7
"The border patrol officials would not give us water. The only way we could get water was when we would be let into the room to get water from the sink in the bathroom. I was very thirsty and so was my daughter. I asked BP officials for water and they responded that

they 'did not have that."

_____

Declaration of Alex Mensing, Doc. No. 201-3
Ex. 19 ¶10
"Mothers also routinely reported that there is
either not enough water, no access to potable
water, or no cups with which to drink any
water that may be provided."

_____

Declaration of attorney Lindsay Harris, Doc.
No. 201-2 Ex. 14 ¶4(c)
"Drinking water is usually in a dirty container
and 30-40 detainees in the cell are often
required to share one cup."

_____

Declaration of Bianca Cxxxxxxxx xxxxx,
Doc. No. 201-5 Ex. 37 ¶ 11 (17 yrs old)
"The water they given me tasted dirty. So I
have not drunk water since arriving."

_____

Declaration of Josselyn Mxxxxx xxxxxx,
Doc. No. 201-6 Ex. 55 ¶ 13 (01/30/2016)
"The water tastes like chlorine."

_____

Declaration of Alex Mensing attachment
Exhibit P, Doc. No. 201-4 Ex. 19 ¶18
(11/15/2015)
"We had to share a cup among all the women
and children about 20 people and the water
hurt my stomach."

Declaration of Alex Mensing attachment
Exhibit TT, Doc. No. 201-4 Ex. 19 ¶ 8
"I was really dehydrated and needed water but
I couldn't drink the water because it made me
want to vomit."

Declaration of Alex Mensing, Doc. No. 201-3
Ex. 19 at ¶ 13
"...[A] mother reported that she and her eldest
experienced pain urinating from a lack of
water in the [CBP's] hielera."

Declaration of Alex Mensing attachment
Exhibit O, Doc. No. 201-3 Ex. 19 ¶6
"They gave us water but it tasted like it had a
lot of chlorine in it and tasted horrible."

| | |
|---|---|
| | Declaration of Alex Mensing attachment Exhibit W, Doc. No. 201-4 Ex. 19 ¶9 "The water wars terrible and tasted like chlorine. I couldn't drink it."<br><br>Declaration of Alex Mensing attachment Exhibit HH, Doc. No. 201-3 Ex. 19 "[T]hey gave them a dirty water that had a bad smell."<br><br>Declaration of Alex Mensing attachment Exhibit KK, Doc. No. 201-3 Ex. 19 ("In the hielera they only gave water that had a lot of chlorine and this caused my baby to get sick to his stomach.").<br>_____<br>Declaration of Karen Zxxxxx xxxxxx, Doc. No. 201-5 Ex. 39 ¶ 5 "We did not drink any water because it was right near the bathroom and the container was disgusting. Instead, I would ration the small bags of juice for my son." |

| | |
|---|---|
| **C. Flores Class Member children are held in CBP facilities that are unsanitary and unfit for human habitation** | TEDS Manual, § 4.6 Hold Room Monitoring, p. 16: "*Cleanliness:* All facilities or hold rooms used to hold detainees must be regularly and professionally cleaned and sanitized. Officers/Agents or detainees will not be expected nor required to perform such tasks." "*Hold Room Checks:* Regular hold room checks should be conducted and recorded to ensure proper occupancy levels, safety, hygiene, and the availability of drinking water. Such checks should be recorded in the appropriate electronic systems of record as soon as practicable." "*Privacy:* Officers/Agents will enable detainees to shower (where showers are available), perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances or when such viewing is incidental to routine cell checks or is otherwise appropriate in connection with a medical examination or MBM under medical supervision." "*Use of Restrooms:* If restrooms are not available in the secure area, supervisors must ensure that an officer/agent is within visible or audible range of the secure area to allow detainees to access restrooms upon request." TEDS Manual, § 4.11 Hygiene, p. 17: "*Basic Hygiene Items:* Detainees **must** be provided with basic personal hygiene items, consistent with short term detention and safety and security needs. Families with small children will also have access to diapers and baby wipes…. *Restrooms:* Detainees using the restroom will have access to toiletry items, such as toilet paper and sanitary napkins. Whenever operationally feasible, soap may be made available." TEDS Manual, § 4.12 Bedding, p. 17: |

"Clean bedding must be provided to juveniles. When available, clean blankets must be provided to adult detainees upon request."

TEDS Manual, § 4.15 Restroom Facilities, p. 18:
"*Restroom Facilities*: Restroom accommodations will be available to all detainees and a reasonable amount of privacy will be ensured. If the detainee is suspected of being an internal carrier, restroom use may be monitored.
*Privacy*: Officers/Agents must make a reasonable effort to afford privacy to all detainees of the opposite gender consistent with the prohibition on voyeurism."

TEDS Manual, § 5.6 Detention, p. 23:
"*Hold Rooms – UAC:* Hold rooms for UAC must provide the following:Toilets and sinks; Professional cleaning and sanitizing at least once per day; Drinking fountains or clean drinking water along with clean drinking cups; Adequate temperature control and ventilation; and Clean bedding."

Deposition Excerpts of Class Member Mother Celina Sxxxxxx-xxxx (Ex. 11):
Celina Sxxxxxx-xxxx was detained by CBP for approximately 66 hours. *See* Ex. 16, Strange Dec. Ex. O, Doc. No. 214-2.

Q: And what was around the toilet?
A: Well, the other people, what they did is lay down around there.
Q: Okay. So you're saying there are people laying down by the toilet.
A: Yes.
(Celina Sxxxxxx-xxxx 20:23-21:3).

There was an open toilet in the room with no toilet seat for everyone to use. Everyone could see if we were using the toilet.
[Doc. # 201-5 at 849, Dec. of Celina Sxxxxxx-xxxx Ex. 28, ¶ 8].
_____

Deposition Excerpts of Class Member Mother Karina Vxxxx-xxxxxxx (Ex. 13)

Q: Was there a door to the toilet?
A: No.
Q: How many toilets were in the room?
A: Three or four.
Q: Did the bathrooms have sinks?
[…]
A: No.  […] No sink to wash the hands.
Q: Did you have access to a sink in that first station?
A: No, I didn't.
(Karina Vxxxx-xxxxxxx Dep. 25:15-26:20).

Q: Can you describe the floor of the room where you slept?
A: Just concrete.
Q: Was it clean or dirty?
A: Dirty.
Q: What do you mean? How was it dirty?
A: Dirty. Like a soil from outside.
(Karina Vxxxx-xxxxxxx Dep. 27:9-27:17).
_____

Declaration Excerpts of Mario Martinez, Chief Patrol Agent of Laredo Sector.
Trash cans are not kept in holding rooms due to safety concerns. However, they are available in the processing area and made available to detainees after meals are served for disposal of refuse.
[Doc. No. 210-1, Dec. of Mario Martinez Ex. 7, ¶ 32].
_____

Deposition Excerpts of Class Member mother Mirna Mxxxxxx xxxxx (Ex. 15):
Mirna Mxxxxxx xxxxx was detained by CBP for approximately 62 hours. *See* Ex. 16, Strange Dec. Ex. R, Doc. #214-2.

Q. Did you have any other medical issues while you were there at the CBP facility the first facility?
A. Yes. Since we slept on the floor and some -- and so -- and because sometimes we had to sleep there on the side of the toilet. It was ugly and dirty and smelly.
Q. I'm sorry. Are you saying that you literally slept up against the toilet itself or just that you were in the cell nearby the toilet?
A. No. It was -- as it turned out, I had to sleep

there because there was no more room. It was very full.

Q. Okay. And when you say you had to sleep there, you mean your head was pressed up against the toilet?

A. The toilet was over here. It was over here on the floor. I was sleeping right there because, first of all, the force of the air didn't get as strongly there. And the other one was because there wasn't enough space. It was full. There were many people.

(Mirna Mxxxxxx xxxxx Dep. 33:15-34:11).

A. Okay. The toilet was over here. And over here was the wall from where we were at, like that. And I would lie down over here. There was a toilet. I was over here by the wall. And then I would place my little boy in between me and over there and cover him so that the strength of the cold air would not hit him.

(Mirna Mxxxxxx xxxxx Dep. 35:1-35:7).

Q (BY MS. CONNOLLY) So going back to your medical issues. So –

A. That's where I picked up -- well, head lice. That's where I picked up head lice.

(Mirna Mxxxxxx xxxxx Dep. 35:8-35:11).

The bathroom situation was very unsanitary. My youngest son and I got diarrhea and we didn't receive any medical attention. We weren't provided with any toiletries and I wasn't able to bathe. [Doc. No. 201-5 at 840, Dec. of Mirna Mxxxxxx xxxxx Ex. 25, ¶ 6].

_____

Deposition Excerpts of Class Counsel Peter Schey (Ex. 16):

Cleanliness in toilets. I visited about four -- three or four detention cells and in two of them I observed that there seemed to be plenty of problems in the sense that there was what seemed to be soiled toilet paper around the -- around the toilets. (Schey Dep. 31:23-32:2).

At night the cells were crowded and people would have to sleep right around the toilet which is in an area maybe four feet by five

1

2

3

| | feet that has a semi-privacy wall around it that I forget came up maybe -- maybe four feet. (Schey Dep. 32:4-32:9). |
|---|---|

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| **D. Class members with torn, soiled or wet clothes are not provided with dry clothes by CBP officials.** | TEDS Manual, § 5.6 Detention, p. 22: "*Hygiene Articles, Bedding and Clean Clothing - Juveniles:* Juveniles will be given access to basic hygiene articles, and clean bedding. When available, juveniles will be provided clean and dry clothing. Officers/Agents may give access to these provisions to any juvenile at any time…." |
| | Deposition Excerpt of Paul Beeson, CBP, Chief Patrol Agent – Tucson Sector (Ex. 4): Q. Okay. I'm not talking about at the TCC. I'm talking about at the station. Do you know if those stations maintain some inventory of change of clothing for children? If you know. If you don't know, just say you don't know... THE WITNESS: So I don't know for certain if they do. I believe that they do, though. (Beeson Dep. 52:24-53:8) |
| | Q. Is a there budget line item for you to acquire clothing for children? A. I'm not aware of one for that. Q. Okay. And where is that clothing obtained from? A. The stuff that I am aware of is, I believe, was donation and then I think we do get some from DUMO (phonetically), the Defense and Utilization Management Office, I think that's what it stands for if I recall correctly. Q. You believe that you get some change of clothing for children from that group or agency? A. I know we get clothing from them. I don't know that they have children specifically but I do know we have children for clothing -- clothing for children. I've seen it. Q Okay. And you have seen, and you understand that somebody donated that? A I believe some of it was donated, either brought in by agents who were donating it or we got it from other locations. Q And what was the size of the inventory at the most recent time that you looked at it? |

Approximately how many articles of clothing would you say were available and covering what age range? …

THE WITNESS: I did not go through the clothing. I don't know that I can answer that. (Beeson Dep. 53:13-54:14).

_____

Deposition Excerpts of Class Member's Mother Mirna Mxxxxxx xxxxx  (Ex. Xx):

Q. How was your health at that facility?

A. Well, what happened to me there was that there was no access to where I could change my underwear. I contacted an infection. I picked up an infection. And when I would urinate, I would like throw out blood from my parts.

 (Mirna Mxxxxxx xxxxx Dep. 32:10-32:14).

_____

Deposition Excerpts of Class Member Mother Ritza Mxxx xxxxxxx (Ex. 10):

Q. Okay. And that you were then wearing your boxer shorts in the cell and you asked for dry pants, but they gave you back your wet pants, is that correct?

A: Yes. (Ritza Mxxx xxxxxxx Dep. 35:19-35:22).

_____

Deposition Excerpts Class Member's mother Zulma Mxxxxxxx xxxxxxx (Ex. 20):

Q. When you arrived at la hielera, were your son's clothes wet from crossing the river?

A. Yes …

Q. And did anybody at that Border Patrol Station offer your son dry clothing?

A. No.

Q. And to your knowledge, at that first Border Patrol Station, did anyone offer your son a warm shower? …

A. Yes. Like I told you before, a la hielera, they didn't offer us anything, not clothes, not blankets, not a shower, nothing.

(Zulma Mxxxxxxx xxxxxxx Dep. 42:5-42:24).

_____

Declaration of Sara Exxxxxxxx xxxxx, mother of Class Member:

| | |
|---|---|
| | During the three days at the border patrol facilities, my daughter was not able to ... change underwear or clothes. [Doc. No. 201-5 at 837, Ex. 24,¶ 8].<br><br>_____<br>Declaration of Class Member Yeslin Lxxxx xxxxxxx (age 9):<br>They did not give us any blankets and we were all wet and they didn't give us any dry clothes. Ex. 23 ¶ 6<br><br>_____<br>Declaration of Eloisa Rxxxxx xxxxxx, Doc. No. 201-6 Ex. 58 ¶8<br>"My clothes and my daughter's clothes were wet and we were not given dry clothes."<br><br>Declaration of attorney Jocelyn Dyer:<br> The mother also reported that she and her son were freezing and shivering while they were in CBP custody because of the cold temperatures and the fact that they were forced to wear wet clothing for four days straight. Ex. 6 ¶11A (12/21/15).<br><br>Declaration of Class Member Mother Isamar Sxxxxxx xxxxxx:<br>We were wet from crossing the river and forced to stay in our wet clothes the entire time. (Doc. No. 201-5 Ex. 30 ¶6.)<br><br>Declaration of Class Member Mother Karen Zxxxxx xxxxxx:<br>My son was cold and wearing wet clothes, so he was so cold that his lips turned purple. (Doc. No. 201-5 Ex. 39, Ex. 39 ¶7). |

| **E. Class members in CBP facilities for 12-72 hours are not provided showers, soap, toothbrushes or towels.** | U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search ("TEDS"), October 2015, available at: https://www.cbp.gov/sites/default/files/documents/cbp-teds-policy-20151005_1.pdf.<br><br>TEDS §4.11 Hygiene<br>Showers: Reasonable efforts will be made to provide showers, soap, and a clean towel to detainees who are approaching 72 hours in detention.<br><br>TEDS §5.6 Detention<br>Showers – Juveniles: Reasonable efforts will be made to provide showers, soap, and a clean towel to juveniles who are approaching 48 hours in detention.<br>_____<br>Deposition Excerpts of Rodney Scott, CBP, Chief Patrol Agent – El Centro Sector (Ex. 3):<br>Q: And if the juvenile is detained, is there -- is there any policy in your sector which would indicate at what point a juvenile may or may not be offered a warm shower?<br>A: Yes. At 48 hours, *if we have access to facilities*, we're going -- we're going to try to make sure that kid gets a shower offered to them.  Our -- our facilities don't normally have -- or our stations don't normally have those facilities, so we've had to kind of do an ad hoc in a couple of occasions. But, yes.  So at 48 hours, we're trying to find a place for them to take a shower.  And in that case, they do get a full-on towel, normal, clean towel, shampoo, soap, that kind of stuff. (Scott Dep. 24:5-24:18) (emphasis added).<br><br>Q: How do you know that this 48-hour-mark shower is being provided? ....<br>A: So that's documented now, kind of what we talked about a minute ago, through the E3 detention module. It's a database we have. So that's one of the red flags that pops up, and then the agents actually have to put data into the system so you can go back and track and record -- you know, basically see was it done, |

29

exactly when was it done…. (Scott Dep. 49:12-49:21).

A:  … there's a division at our headquarters in Washington, D.C., that monitors that system on a regular basis. And I get flags from them, if you will. (Scott Dep. 51:3-51:6).

_____

Deposition Excerpts of Class Member mother Sara Exxxxxxxx xxxxx (Ex. 17):
A: But they did not give us anything to bathe or brush our teeth, nothing.
(Sara Exxxxxxxx xxxxx Dep. 24:24-24:25).

Q: Was there any – were there any issues with the drinking water at the facility?
A: There was none to brush our teeth or to bathe, just what they would give us to drink.
(Sara Exxxxxxxx xxxxx Dep. 25:17-25:20).

During the three days at the border patrol facilities, my daughter was not able to shower, wash ... We were not given the opportunity to brush our teeth for three days. [Doc. No. 201-5 at 837, Dec. of Sara Exxxxxxxx xxxxx Ex. 24, ¶ 8].

_____

Declaration of Yessenia Exxxxxxxx xxxxxxx (Doc. No. 201-5, Ex. 27):
 "For three days we were given no soap to wash, no toothbrushes to brush our teeth, no paper towels to dry our hands when we washed our hands, nothing to brush our hair, no change of underwear or clothes, no pillows or blankets and no beds to sleep in. We had to try to sleep in the freezing cold cell on the concrete floor. We were exhausted physically and emotionally." Doc. No. 201-5 at 846, Dec. of Yessenia Exxxxxxxx xxxxxxx Ex. 27, ¶ 6.

"[At La Perrera,] I was able to take a shower for the first time since before I came into custody, but I have spoken to my mother and she says that neither she nor my brother was able to take a shower." *Id.* ¶ 9.

| | |
|---|---|
| **F. Class members in CBP facilities are not provided with soap and towels to wash from the time they are first detained.** | TEDS Manual, § 4.11 Hygiene, *Basic Hygiene Items:* Detainees must be provided with basic personal hygiene items, consistent with short term detention and safety and security needs. Families with small children will also have access to diapers and baby wipes. *Restrooms*: Detainees using the restroom will have access to toiletry items, such as toilet paper and sanitary napkins. Whenever operationally feasible, soap may be made available.

TEDS Manual, § 5.6 Detention, *Hygiene Articles*, Bedding and Clean Clothing - Juveniles: Juveniles will be given access to basic hygiene articles, and clean bedding.

Deposition Excerpts of Rodney Scott, CBP, Chief Patrol Agent – El Centro Sector (Ex. 3):
Q: Can you tell us, is -- are juveniles held in your stations provided soap to wash with?
A: Yes. Every one of the holding rooms has a sink and it has a soap dispenser that's checked every day to make sure that it's -- it's restocked and supplied, yes.
Q: And are they provided any type of towels to dry themselves, dry their hands or face with after washing?
A: In El Centro sector, no.  It's a unique environment.  It's very arid.  I mean, there's no humidity hardly whatsoever. So it air dries very quickly.  So we do not provide paper towels. Unfortunately, throughout -- over the years, we've realized that there's a lot of problems with the paper towel. They actually, very intentionally or unintentionally, they think they can flush it down the toilet. And we've had a lot of plumbing issues, and then through research we decided this was a better option.  It's also more environmentally friendly that you don't have the germ issues this way either.  And we're talking hand washing and face washing on a daily basis, not -- not, like, a shower or something like that. (Scott Dep. 23:5-24:4). |

1

2          _____
           Deposition Excerpts of Class Member
3          Mother Mirna Mxxxxxx xxxxx  (Ex. 15):
           Q. So there was a toilet in your cell, correct?
4          A. Yes.
           Q. And there was a sink with that toilet?
5          A. Yes.
           Q. And they had soap with that sink?
6          A. No.
           (Mirna Mxxxxxx xxxxx Dep. 18:20-19:1).
7

8          Q. Now, you said earlier that there was no
           soap for you to wash your hands.
9          A. No.
           Q. Did you ever ask any of the people at the
10         facility to provide soap?
           A. No.
11         Q. And was there any sort of hand sanitizer in
           the facility?
12         A. Yes.
           Q. Okay. So there was the hand sanitizer in
13         the sink area?
           A. It was only the apparatus by itself.
14         Q. You're saying the apparatus was there, but
           there was no sanitizer in it?
15         A. Soap, no.
           (Mirna Mxxxxxx xxxxx Dep. 42:1-42:15).
16
           _____
17         Deposition Excerpts of Class Counsel Peter
           Schey (Ex. 16):
18         The no soap or water, that's not really
           contested. I observed there was no soap and
19         there was no paper towels. That's what all the
           mothers say and CBP doesn't deny that in any
20         of their declarations that they have filed in
           this case. They say that people are either
21         provided soap or hand sanitizer. To be honest
           with you, I didn't see -- in the cells I visited
22         maybe the day I visited they took out all the
           hand sanitizers just for my visit but -- but I
23         can tell you that in none of the cells that I
           visited was there either hand sanitizer or soap.
24         There was nothing. There was nothing to
           wash with. Nor -- nor -- there was a small
25         sink with cold water right above the toilet. So
           you have a metal toilet, no toilet seat, and
26         right above the toilet is a very small sink with
           one water spout, cold water. And if you
27

28

32

wanted to wash, I guess you could wash there but there was no soap and there were no towels of any type to dry. If you washed your face, washed your hands, there was no -- so I personally observed that.
(Schey Dep. 30:21-31:15).
_____

Deposition Excerpts Class Member's mother Zulma Mxxxxxxx xxxxxxx
(Plaintiffs' Ex. 20):
Q. And at la hielera, was there any soap and towels in the cell so that you could wash your hands and face?
A. No.
(Zulma Mxxxxxxx xxxxxxx Dep. 43:5-43:8).
_____

Deposition Excerpts of Class Member Franklin Rxxxx xxxxxxxxx (Ex. 12):
Q: Can you tell me about the toilet facilities?
A: It was a toilet, and it didn't have a seat where you sit down. It was not very clean, and they only had a sink.
Q: Okay. So there was a sink in the bathroom?
A: Yes. No paper or anything to wash.
Q: Was there soap?
A: No.
Q: Was there any hand sanitizer?
A: No.
Q: Was there a wall around the toilet area?
A: Yes. There was a wall about this high (indicating).
Q: For the record, you're holding your hand up about three feet would you say?
A: Yes.
(Franklin Rxxxx xxxxxxxxx Dep. 10:2-10:17).

Q: Okay. And were you able to wash your face?
A: Yes.
Q: Okay. Was there soap available?
A: No.
(Franklin Rxxxx xxxxxxxxx Dep. 17:2-17:12).

"At the border patrol station in McAllen …
[t]here was no soap and no hand dryer or

| | paper towels."<br>[Doc. No. 201-5 at 918, Dec. of Franklin Rxxxx xxxxxxxxx Ex. 45. ¶ 7].<br><br>_____<br><br>Deposition Excerpt of Class Member's Mother Lindsay Gxxxx xxxxx (Ex. 14):<br>A: The bathroom ...didn't have ... soap.<br>(Lindsay Gxxxx xxxxx Dep. 8:20-8:22). |
|---|---|

| | |
|---|---|
| **G. Class Member children suffer from extremely cold temperatures in CBP detention facilities. Defendants do not provide children with jackets or sweaters to deal with the cold temperatures.** | TEDS Manual 4.6 Hold Room Monitoring, p. 16:<br>"*Temperature Controls:* When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents. Under no circumstances will officers/agents use temperature controls in a punitive manner."<br><br>Declaration Excerpts of Class Member Mother Celina Sxxxxxx-xxxx (Ex. 11):<br>Celina Sxxxxxx-xxxx was detained by CBP for approximately 66 hours. *See* Ex. 16, Strange Dec. Ex. O, Doc. #214-2.<br>"We were taken to a Border Patrol station. My son and I were detained in a cell for a period of what I believe was two days. The cell was extremely cold very crowded. I believe that as more people came into the room, the air conditioners were turned up." [Doc. No. 201-5 at 849, Dec. of Celina Sxxxxxx-xxxx Ex. 28, ¶ 5].<br><br>Deposition Excerpts of Class Member Franklin Rxxxx xxxxxxxxx (Ex. 12):<br>Q:  And what happened when you were apprehended?<br>A: They took us to a detention center. They call it the "ice box."<br>(Franklin Rxxxx xxxxxxxxx Dep. 7:24-8:1).<br><br>Q: So who did you hear call it "the ice box"?<br>A: The people that were there in that same room.<br>Q: The other immigrants?<br>A: Yes.<br>(Franklin Rxxxx xxxxxxxxx Dep. 8:13-8:16).<br><br>A: All this part and all this area (indicating), I got spots because of the cold.<br>Q: Did you seek medical treatment for that condition?<br>A: Not at that place.<br>Q: Okay. I want to clarify. You said you had spots from the cold on your cheeks?<br>A: Yes.<br>Q: Before you were apprehended, did you |

35

have any medical problems?
A: No.
Q: You said you did not notify anyone at the McAllen border station about your skin.
A: Yes.
Q: Yes, you did not tell anyone?
A: Not at that place, but yes to the next place that we were detained, the following place. (Franklin Rxxxx xxxxxxxxx Dep. 13:1-13:18).

Q: So earlier you said that you did not tell anyone at the border station about the spots on your skin, but that you did tell someone later. When and who did you tell?
A: I told that to one of the persons that were there, but that person only just told me, "Just wash your face."
Q: So you told someone -- a border patrol agent?
A: To the guards that they were taking care of us at the second location. (Franklin Rxxxx xxxxxxxxx Dep. 17:2-17:11).

Q: Did you receive a blanket at the second facility?
A: Yes.
Q: Did you need it?
A: Yes.
Q: Can you describe the temperature?
A: Cold. (Franklin Rxxxx xxxxxxxxx Dep. 18:4-18:10).

Q: And were you cold the whole two days that you were there?
A: Yes. (Franklin Rxxxx xxxxxxxxx Dep. 40:3-40:5).

Deposition Excerpts of Class Member Mother Karina Vxxxx-xxxxxxx (Ex. 13)
Q: And why do you call it the icebox?
A: Because it's very cold. (Karina Vxxxx-xxxxxxx Dep. 23:14-23:16).

The door to the room was thick metal, like the door to a walk-in freezer.  [Doc. No. 201-3 at

631, Dec. of Karina Vxxxx-xxxxxxx Ex. 19-H, ¶ 2].

The room was horrible. It was freezing cold. The floor was concrete. Many people slept on the floor with no blankets.
[Doc. No. 201-3 at 631, Dec. of Karina Vxxxx-xxxxxxx Ex. 19-H, ¶ 3].

My son and I slept under one of the toilets because it was too cold to sleep in the main area of the room and it was warmer under the toilet. The smell was horrible and other people used the toilet during the night while we were lying under it.
[Doc. No. 201-3 at 631, Dec. of Karina Vxxxx-xxxxxxx Ex. 19-H, ¶ 5].

Many people slept in the toilet areas. As many people as could fit tried to sleep there and people were fighting over those spaces. [Doc. No. 201-3 at 631, Dec. of Karina Vxxxx-xxxxxxx Ex. 19-H, ¶ 6].

Many time, such as when I asked for a blanket because it was so cold, officers told me that being in the hielera was our punishment for coming to the United States. One officer told me when I showed him my freezing cold son sleeping on the floor with no blanket, "This is what happens when you come to my country – you know that we don't like immigrants."
[Doc. No. 201-3 at 631, Dec. of Karina Vxxxx-xxxxxxx Ex. 19-H, ¶ 11].

Declaration Excerpt of Mario Martinez, Chief Patrol Agent of Laredo Sector (Exhibit 5): Laredo Sector Stations maintain a temperature conducive to the health of detainees, with particular caution given to overheating. I have never heard of temperature being used by Border Patrol Agents in a punitive manner. In holding rooms designed for juveniles, the temperature is maintained between 66-80 degrees Fahrenheit.
[Doc. No. 210-1, Dec. of Mario Martinez Ex. 7, ¶ 33].

Although Border Patrol has long maintained appropriate temperatures in its stations, in response to the Court's order, the Laredo Sector also obtained infared temperature meters in order to take the temperature in any holding room prior to placing a juvenile in that room and every twenty-four hours thereafter. […] Consistent with the October 16, 2015 guidance, Border Patrol Agents record in e3DM if the temperature is within range (66-80 degrees Fahrenheit) or must specifically note when the temperature is out of range. If the temperature is out of range, Border Patrol Agents must immediately inform their supervisors who will contact FM&E for immediate corrective action. [Doc. No. 210-1, Dec. of Mario Martinez Ex. 7, ¶ 63].

Deposition Excerpts of Manuel Padilla Jr., CBP, Chief Patrol Agent – Rio Grande Valley Sector (Ex. 2):
Q: …But I am just saying, there is no place in the welfare check E3DM system – there is no field to say that this person or the mother complained that it was too cold to sleep. Is that fair to say?
A: That is fair to say. (Padilla Dep. 31:1-31:5).

Deposition Excerpts of Paul Beeson, CBP, Chief Patrol Agent – Tucson Sector (Ex. 4):
Q Is it correct that you've been instructed to keep the temperature in holding cells for minors and possibly including adults, between 66 and 80 degrees? ...
THE WITNESS: There is some discussion about the temperature. I can't remember if it's 66 or 68, but 80 is the top range.
(Beeson Dep. 12:16-12:23).

Q: Would your response be the same if I asked you about other factors that you're supposed to put in there such as temperature control, et cetera, would your responses be the same about what you know or don't know or are familiar with about their training,

instruction guidance, et cetera?
....
THE WITNESS: Yes, I think it would.
(Beeson Dep. 46:14-46:21).

The temperature at Tucson Sector Border
Patrol stations is set between 71 and 74
degrees, and generally ranges between 68 and
80 degrees in practice. In my experience,
many detainees are not accustomed to air
conditioning, and sometimes find the holding
rooms cooler than they are accustomed to.
[Doc. No. 209-3, Dec. of Paul Beeson, Ex. 6,
¶ 37].

Deposition Excerpts of Class Member mother
Lindsay Gxxxx xxxxx (Ex.14):
Q: And when you were first apprehended, you
spent some time at the Customs and Border
Protection patrol station in the McAllen
station; is that right?
A: I don't remember if it was McAllen
because first they took me to a place – to cold
place and –
MS. GARCIA: Sorry to interrupt. That's an
ice box.
THE INTERPRETER: Ice box.
THE WITNESS: They were ice box because
at a certain place they had children detained,
and in a separate place they had the adults.
Q: So the ICE records say that it was the
McAllen border station. (Lindsay Gxxxx
xxxxx Dep. 7:9-7:20).

A: We arrived at 11:30 to a very cold place,
and they had some cement benches.
(Lindsay Gxxxx xxxxx Dep. 8:19-8:20).

A: …Throughout the time passed by, the
temperature got colder. There was a time at
4:00 o'clock in the morning that my daughter
couldn't sleep anymore, and I just had to wrap
her with my shirt. And then I had to put her
feet between my legs because they were
turning blue. I had to reiterate the fact that she
had a rash and I requested help, and she got
worse when she was inside.
(Lindsay Gxxxx xxxxx Dep. 9:1-9:8)

A: The temperature of my blanket or if it will cover me from the cold weather? They were not very large. It would not cover me completely.

Q: Okay.

A: And at the beginning, yes, it will warm me up. But throughout the time, the temperature kept going lower and lower and lower to the point that my daughter became bluish because of the cold weather. (Lindsay Gxxxx xxxxx Dep. 13:20-14:2).

Q: Now, you have called the first station "the ice box"; is that right?

A: Yes.

Q: Where does that name come from?

A: Because it was very cold. According to them, it was to disinfect us.

Q: According to who?

A: The people that were there, they said that the guards from there will tell them that the cold, it was to disinfect us. (Lindsay Gxxxx xxxxx Dep. 26:10-26:19).

A: Besides the temperature, temperature, there were other kids that they were crying too because of the temperature. (Lindsay Gxxxx xxxxx Dep. 40:16-40:18).

"Kenia was so cold she could not go to sleep. There were no beds, pillows or blankets. I held Kenia tight, wrapping my arms around her to keep her warm. I did that for over three hours to help her sleep. She has a rash, and I was worried about her. She did not get to see a doctor or nurse while we were at the CBP station. Her hands started to turn colors, she was so cold." [Doc. No. 201-5 at 872, Dec. of Lindsay Gxxxx xxxxx Ex. 33, ¶7].

Deposition Excerpts of Class Member Mother Mirna Mxxxxxx xxxxx  (Ex. 15):

Mirna Mxxxxxx xxxxx was detained by CBP for approximately 62 hours. *See* Ex. 16, Strange Dec. Ex. R, Doc. #214-2.

Q. Can you describe for me yourself the area you were staying?

A. Yes. It's like a room and has a cement sidewalk. And it has its bathroom. And it's very cold.

Q. Let's talk about the temperature for a second. You say it was very cold.

A. Very cold.

Q. Now, you had clothing that you -- what clothing were you wearing when you were there?

A. I only had on a shirt or a blouse. Excuse me. Blouse. And a pair of pants and only that because I couldn't bring in my sweater. They had took that away from me. I couldn't bring in anything else.

Q. Now, did you at any time see anyone adjusting the temperature?

A. No.

(Mirna Mxxxxxx xxxxx Dep. 12:3-12:20).

Q. Now, you said that the temperature was chilly in the cell you were in.

A. Yes.

Q. Did the facility give you and your sons any sort of cover or blanket?

A. No.

Q. At no point that you were there?

A. No. At no time. No.

(Mirna Mxxxxxx xxxxx Dep. 13:1-13:8).

Q. Now, in your declaration, you discuss the temperature. And you said the children began crying. And when the children cried, they would turn the temperature down even further.

A. Yes.

Q. And is it your testimony today that that is accurate?

A. Yes.

Q. Now, you never saw anyone touch a temperature gauge, correct?

A. Well, they didn't get near it. It was at -- the officer, he had something in his hand. And he would simply go like this and lower it, lower it, make it colder.

Q. And just for the record –

A. He held something in his hand.

(Mirna Mxxxxxx xxxxx Dep. 17:24-18:14).

We never got a mattress or a blanket, and it was very cold.  The children began crying, and when the children cried they would turn the temperature down even further.  We were completely unable to sleep because it was so cold. [Doc. No. 201-5 at 840, Dec. of Mirna Mxxxxxx xxxxx Ex. 25, ¶ 4].

Deposition Excerpt of Attorney Peter Schey (Ex. 16):
…[I]n monitoring the protocol that is being set up for border patrol conditions, they say monitoring of temperatures is acceptable if it's from 66 to 80 degrees. So if border patrol sections keep it at 66, apparently it's okay under the monitoring guidelines but yet for most Class members, especially if they have to sleep on a concrete floor and they've just got one mylar blanket they're going to be freezing cold. (Schey Dep. 56:16-56:24).

Deposition Excerpts Class Member's mother Sara Exxxxxxxx xxxxx (Ex.17):
Sara Exxxxxxxx xxxxx was detained by CBP for approximately 76 hours. *See* Ex. 16, Strange Dec. Ex. L, Doc. No. 214-2.
A: From there, they put us into a cold room, and we spent two days in there and two nights. (Sara Exxxxxxxx xxxxx 17:4-17:5).

The place was very cold. [Doc. No. 201-5 at 837, Dec. of Sara Exxxxxxxx xxxxx Ex. 24,, ¶ 6].

Deposition Excerpts Class Member Yeslin Lxxxx xxxxxxx (Ex. 18):
Yeslin Lxxxx xxxxxxx was detained by CBP for approximately 74 hours. *See* Ex. 16, Strange Dec. Ex. K, Doc. #214-2.
Q: Now, did you get any blankets while you were at that first place?
A: No.
Q: And –
A: We had them, but they don't allow us to take them.
Q: Okay. So you had them when you were first stopped by the men?
A: Yes.

Q: But they didn't allow them into the room with you?
A: Yes.
(Yeslin Lxxxx xxxxxxx Dep. 16:1-16:12).

Deposition Excerpts Class Member Yessenia Exxxxxxxx xxxxxxx  (Ex. 19):
Yessenia Exxxxxxxx xxxxxxx was detained by CBP for approximately 63 hours. *See* Ex. 16, Strange Dec. Ex. N, Doc. No. 214-2.

Q: So when they put you in the truck; in the van you said, were you with your mother and your brother?
A: I was with both of them.
Q: Okay. And where did you go in the van?
A: To the icebox.
Q: Do you know if the icebox has another name?
A: No.
Q: Is the icebox—what—how would you describe the icebox?
A: It's a room. It's really cold.
Q: Okay. Is that where you were—you were detained with your mother and your brother?
A: Yes. (Yessenia Exxxxxxxx xxxxxxx Dep. 16:23-17:11).

Q: Was it always too cold or was it sometimes too hot and sometimes too cold or was it just always too cold?
A: Always too cold. (Yessenia Exxxxxxxx xxxxxxx Dep. 18:10-18:13).

Deposition Excerpts Class Member's mother Zulma Mxxxxxxx xxxxxxx (Ex. 20):
Q. Who called it la hielera?
A. Everyone who arrives there, we call it that because it's a long, narrow room and it's very, very cold.
(Zulma Mxxxxxxx xxxxxxx Dep. 12:4-12:7).

Q. Is it your testimony that you did not sleep for three days?
A. Yes. I couldn't sleep because of the cold.
(Zulma Mxxxxxxx xxxxxxx Dep. 16:16-19).

43

Q. Was your son given a blanket at the facility?
A. No. Supposedly, the blanket was that aluminum paper that they gave you there.
Q. Were those around you provided with the same aluminum blanket?
A. Some of them had some and some others didn't. They would give them to some and not to others. The hardest part was to see the children complain because of the cold. (Zulma Mxxxxxxx xxxxxxx Dep. 18:5-18:15).

Declaration of Alex Mensing:
"He [Fredis] was in bad shape. The three days of freezing in la hielera had made him very sick and he had difficulty breathing."  [Doc. # 201-3 at 610, Dec. of Alex Mensing Ex. 19-E, ¶ 7].

Declaration of Alex Mensing, ¶12(3) The hieleras are very cold, and mothers reported that the air conditioning runs constantly. Some families reported being so cold that their 'bones began to ache,' that they 'lost feeling in hands and feet,' or that their hands and feet became 'numb.' One mother described the cold as 'unbearable' and recalled that while she herself was shaking with cold, children were crying from cold and hunger. Another mother reported that she woke up with a headache from the cold. One fifteen-year-old *Flores* class member reported that she could not feel her feet because she was so cold. One mother reported feeling like her hair was frozen and wrapping her sweater around her son's head to keep him warm. Another recounted that the 'cold penetrated me to the bones' and she wrapped her small children in her jacket in an effort to keep them warm. One mother reported that her ten-year-old *Flores* class member son's lips became so badly chapped from the cold that they burst, were bleeding, and he could not open his mouth to eat.

Declaration of Alex Mensing, Ex. 19 ¶12(4)
"While some mothers and children received

"aluminum" sheets to sleep under, others did not. Many mothers who received the sheets reported that they did not provide sufficient warmth. Other mothers were deterred from requesting the sheets after seeing how angrily officials reacted when other detained mothers asked for them. One mother reported that CBP officials made the families throw away the thin pieces of aluminum foil each day and then withheld "new ones as punishment if we asked too many times for help. " Other mothers reported that officers ordered the families held clean the cells. When the families did not comply to the officers' satisfaction, the officers reportedly punished them by taking away the remaining mylar sheets or ordering them to throw their sheets in the trash."

_____

Declaration of Sonia Axxxxx-xxxxxx, Class Member Mother:
We were transported to a border patrol station where we were held for one day and one night…It was very cold there…There were about 20 or 25 children in the cell and they were all crying because it was so cold. Doc. # 201-5 Ex. 35 ¶6.

_____

Declaration of Class Member Allison Mxxxx xxxxx:
Every time more people came it seems to get colder in the room. Doc. # 201-5 Ex. 40 ¶6 (05/01/2016).

_____

Declaration of volunteer attorney Natalia Ospina, Doc. # 201-1 Ex. 7 ¶5 (3/10/16)
"A Guatemalan mother and child…informed me that they were unable to sleep due to the cold, lack of space, and wet floors."

_____

Declaration of CARA Pro Bono Project volunteer Leanne Purdum, Doc. # 201-1 Ex. 8 ¶ 5 (3/1/16)
"Mothers   consistently told me that the hielera was very cold..."

_____

Declaration of attorney Jocelyn Dyer, Doc. # 201-1 Ex. 6 ¶11A (12/21/15)

"The mother also reported that she and her son were freezing and shivering while they were in CBP custody because of the cold temperatures and the fact that they were forced to wear wet clothing for four days straight."

*Id.* ¶11B (12/21/15)
"The mother reported that she and her daughter were extremely cold at the hielera where they were initially detained at the border for three days. She observed that the more crowded their cell became, the lower the CBP officials dropped the temperature."

_____

Declaration of volunteer attorney Theresa Wilkes, Doc. # 201-1 Ex. 9 ¶8 (11/2015)
"They reported that temperatures in the *hielera* were so low that their children got sick. They were given thin foil blankets, often only one per family, that would easily tear and rattle in the cold air blowing into their holding cells..."

_____

Declaration of Class Member Melvin Mxxxxxxx xxxxx, Doc. # 201-6 Ex. 59 ¶6 (01/20/2016):
"We would sleep on the floor with no blankets or pillows, The place was very cold – we could not stand how cold it was."

_____

Declaration of Class Member Mother Isamar Sxxxxxx xxxxxx, Doc. # 201-5 Ex. 30 ¶6
"The temperature in the room was extremely cold. We were wet from crossing the river and forced to stay in our wet clothes the entire time. We were only given aluminum blankets to keep warm."

_____

Declaration of Class Member Mother Karen Zxxxxx xxxxxx, Doc. # 201-5 Ex. 39 ¶7
"We could not sleep because the air conditioning was turned up high and we were very cold. We only had cement planks to lie on and they did not give us blankets. They gave us plastic sheets. My son was cold and wearing wet clothes, so he was so cold that his lips turned purple. I had to wrap him in a

plastic sheet and hold him on my lap so that he would not have to sleep on the cold cement."

_____

Declaration of Class Member Mother Kelly Gxxxxxxxx-xxxxx, Doc. # 201-5 Ex. 31 ¶5
"My son and I were taken, I believe to the McAllen Border Patrol station, which all detainees there called the hielera (ice box) because it was so cold."

_____

Declaration of Class Member Mother Alex Mensing attachment Exhibit Y, Doc. # 201-4 Ex. 19 ¶2
"They took us to the ICE holding facility. It was ice cold, and we were soaking wet from the river. Super cold. Woke up with a headache from the cold... Everyone was shivering. I hugged my child to keep him warm...We slept on the floor, and they gave us aluminum space blankets."

_____

Declaration of Class Member Mother Amarilis Lxxxxxx xxxxx, Doc. # 201-5 Ex. 44 ¶7 (2/3/16)
"The border patrol station was very cold... [W]e had to sleep on a concrete bench, which was also a very cold temperature."

_____

Declaration of Class Member Mother Kelly Gxxxxxxxx-xxxxx, Doc. # 201-5 Ex. 31 ¶7
"It was very cold in the hielera and my son and I did not have blankets"

_____

Declaration of Kelly Gxxxxxxxx-xxxxx, Doc. # 201-5 Ex. 31 ¶8
"It was also very cold in the perrera."

_____

Declaration of Class Member Edgardo Dxxxxx xxxxxxxx, Doc. # 201-6 Ex. 49 ¶ 6
"The cell was very cold. I did not have a jacket and was not provided a jacket to wear in the cold cell. I felt very, very cold in that cell."

_____

Declaration of Class Member Mother Raquel Axxxxx xxxxxx, Doc. # 201-5 Ex. 26 ¶ 9
"The temperature in the border patrol center

| | |
|---|---|
| | was extremely cold. All I had was what I was wearing and it was very cold. There was a leftover space blanket in my room and I would use this, but they did not give us anything for the terrible cold."<br><br>_____<br>Declaration of Alex Mensing attachment Exhibit U, Doc. # 201-4 Ex. 19 ¶7<br>"[T]he most difficult part about being in this station, also known as the 'Icebox,' was the cold, which was made worse by the fact that we slept directly on the floor and had no blankets.")<br><br>_____<br>Declaration of Alex Mensing attachment Exhibit CC, Doc. # 201-3 Ex. 19 ¶2<br>"I had to sleep on the floor with my daughter in a freezing cold room without any blankets."<br><br>_____<br>Declaration of Alex Mensing attachment Exhibit SS, Doc. # 201-4 Ex. 19 ¶5<br>"We had to sleep on the cold concrete floor. I asked the officers for blankets and they told me to wait but never gave us blankets." |

| **H. Class Members are held in inhumanely overcrowded CBP detention facilities and are forced to endure sleep deprivation.** | TEDS Manual § 4.7 Hold Room Standards, p. 16: <br><br> *"Capacity:* Every effort must be made to ensure that hold rooms house no more detainees than prescribed by the operational office's policies and procedures. Capacity may only be exceeded with supervisory approval. However, under no circumstances should the maximum occupancy rate, as set by the fire marshal, be exceeded." <br><br> Deposition Excerpts of Class Member Mother Celina Sxxxxxx-xxxx (Ex. 11): <br> Q: And then can you describe for me the room that they put you in? <br> A: It was a room bigger than this. Very cold. There were a lot of people. Well, there weren't beds or like something to sleep on. There was an open bathroom, so if you go to the bathroom everybody would see you. They didn't give us blankets to get warmer. <br> Q: Okay. So how many people would you estimate were in the room with you? <br> A: Well, more or less 50 people. <br> Q: 50 people. Was it all women and children? <br> A: Women and children. (Celina Sxxxxxx-xxxx Dep. 17:5-17:18). <br><br> "At the border patrol station there were about 50 other people in our cell. It was so crowded there was barely room for everyone. My son and I were freezing. There were no beds, it was just a room with cement floors and benches…." [Doc. # 201-5 at 849, Dec. of Celina Sxxxxxx-xxxx Ex. 28, ¶ 8]. <br> _____ <br> Deposition Excerpts of Class Member Franklin Rxxxx xxxxxxxxx (Ex. 12): <br> Q: Can you please describe for me the area that you were in at the McAllen border station. <br> A: It was a closed room. It was very cold. There was only one cement bench and lots of minors. Couldn't sleep. <br> Q: You said "lots of minors." About how many minors? <br> A: Like, 15 or 20 minors. <br> (Franklin Rxxxx xxxxxxxxx Dep. 9:11-9:18). |

BY MS. GARCIA:
Q: You said that you were at McAllen, you think, for two days.
A: Yes.
Q: And were you able to sleep those days?
A: No.
...
MS. GARCIA: Could he lay down?
THE WITNESS: No.
MS. GARCIA: Why not?
THE WITNESS: There were too many people.
MS. GARCIA: Could he sit?
THE WITNESS: No.
MS. GARCIA: Was it like that the whole two days?
THE WITNESS: Yes.
(Franklin Rxxxx xxxxxxxxx Dep. 39:6-39:24).

Q: You said that you were not able to lay down or sit at the McAllen border station. So are you saying that you stood for two days?
A: Kneeled.
Q: You kneeled.
A: Stood, squat, couch.
(Franklin Rxxxx xxxxxxxxx Dep. 42:7-42:12).

"At the border patrol station in McAllen I was held in an over-crowded cell with about 20 other minors. The cell was only concrete and had a concrete bench around the edge of the cell except where there was a metal toilet with a short wall around two sides. ... Bright lights were left on all night long making it difficult to sleep and border patrol officials were constantly coming in and out of the cell... We were required to sleep on the concrete floor, which was also very cold. ... Sleeping there was almost impossible. In the morning I felt completely weak and wasted." [Doc. # 201-5 at 918, Dec. of Franklin Rxxxx xxxxxxxxx Ex. 45. ¶ 7].

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Deposition Excerpts of Class Member mother Karina Vxxxx-xxxxxxx  (Ex. 13):
Q: About how many people would you say were in the room with you?
A: Many women. More than 50.
Q: Were there more or less children than women?
A: Only women with children.
(Karina Vxxxx-xxxxxxx Dep. 23:17-23:22).

_____

Declaration of Chief Patrol Agent – Laredo Sector, CBP, Mario Martinez. (Doc. # 210-1, Ex. 7, ¶ 40):
"The lights typically remain on at all times while detainees remain in Border Patrol custody for security reasons and due to operational necessity. Border Patrol Stations are 24/7 facilities, and Border Patrol Agents may arrive with newly apprehended aliens at all hours of the night. Border Patrol Agents must be able to maintain visual control over the holding rooms to ensure the safety and security of the detainees."

_____

Declaration of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. [Doc. # 211-1, Ex. 10, ¶ 22]:
Due the fact that the number of apprehensions varies widely on a daily basis, the number of detainees per station and, in turn, per holding cell fluctuates greatly. For this reason, there are times when a large number of detainees may be held in a certain hold room. As the RGV Sector has nine stations as well as the CPC-Ursula, our agents are able to take various steps to reduce overcrowding. This includes activating CPC-Weslaco, detailing agents from other sectors, and moving aliens to stations that have a lower detainee population.

_____

Deposition Excerpts of Chief Patrol Agent – El Centro Sector, CBP, Rodney Scott (Ex. 3):
Q: Yes, it does. And so you're saying that you could actually look at a room, and it would tell you, like -- and I assuming that's a certain time period, like in a one-hour block or a three-hour block, it would tell you how many

people were in that room?
A: Yes. To the best of my knowledge, yes,
that information could be pulled out of it, yes.
Q: You have not pulled it out; is that correct?
A: No, I have not.
Q: And has anybody -- Q: And anybody from
headquarters sent you an alert that there's
been a problem -- it doesn't sound like it, but
that there's been a problem with room
capacity?
A: No – (Scott Dep. 87:8-87:22).

_____

Deposition Excerpts of Chief Patrol Agent –
Tucson Sector, CBP, Paul Beeson (Ex. 4):
Q: At these Border Patrol stations, am I
correct the lights are on 24/7; is that right?
MS. FABIAN: Object to form.  Q: (By Mr.
Schey:) Lights in the holding cells.
A: I believe that they are, yes.
(Beeson Dep. 39:10-39:14).

Because individuals are coming and going at
all hours of the day and evening, it is
necessary for the lights to remain on for
round-the-clock processing. [Doc. # 209-3,
Dec. of Paul Beeson, Ex. 6, ¶ 9].

_____

Deposition Excerpts of Class Member mother
Lindsay Gxxxx xxxxx (Ex. 14):
Q: Can you describe the condition of the cell
you were kept in at Ursula.
A: ... I was able to sleep and rest for a little
bit. Not that much because there were all
kinds of people. There were lots of people
there. (Lindsay Gxxxx xxxxx Dep. 17:6-
17:11).

THE WITNESS: I spent almost two nights
without sleeping. I was able to lean and rest.
The place was really cold, and I was able to
sit in a corner there. And there were a lot of
benches—concrete benches. And there were a
lot of women there that were pregnant too.
Lots of kids.
Q: Are you talking about the first location or
the second location?
A: The ice box, the first one. My ugliest
experience was there. (Lindsay Gxxxx xxxxx

Dep. 17:15-17:24).

_____

Deposition Excerpts of Class counsel Peter
Schey (Ex. 16):
It appeared to me that the cells were severely
overcrowded. It appeared to me that there was
not room for people to sleep.
(Schey Dep. 26:17-26:20).

I was not there at nighttime but defendants
have confirmed over and over again that,
yeah, they're bright lights. (Schey Dep. 28:8-
28:10).

_____

Declaration of Class Member mother Ritza
Mxxx xxxxxxx (Doc. # 201-3, Ex. 19-O, ¶ 7):
"The lights were left on all night when we
were in the hielara. My son and I were not
able to sleep all night because of the lights
and because we were so cold. Even if we
were able to sleep, there was no place to
sleep. The only option was to sleep on the
floor."

_____

Deposition Excerpts of Class Member mother
Sara Exxxxxxxx xxxxx (Ex. 17):
Q: About how many people would you
estimate were there?
A: It was really full. Lots of moms with their
kids.
(Sara Exxxxxxxx xxxxx Dep. 20:7-20:10).

Q: And can you estimate about how many
other people were in that room with you?
A: Around 20 moms with their kids.
Q: Okay. Is that 20 people total or 20 moms?
A: No, 20 moms plus their children.
(Sara Exxxxxxxx xxxxx Dep. 20:16-20:20).

We would sleep on the floor. [Doc. # 201-5 at
837, Dec. of Sara Exxxxxxxx xxxxx Ex. 24,,
¶ 6].

_____

Declaration of Class Member Yeslin Lxxxx
xxxxxxx Doc. # 201-5 at 834, Ex. 23, ¶ 6:
"The first night we were there, we had to
sleep sitting up on a bench because there were
so many people there that there was no room

1

2    to lay down.  They next night, we slept on the
floor.  ...  I could only sleep a tiny bit because

3    the lights were always on the whole time and
the floor was cold and hard."

4
_____

5    Deposition Excerpt of Class Member mother
Yessenia Exxxxxxxx xxxxxxx (Ex. 19):

6    Q: Okay. Do you remember about how many
people were there in the room with you?

7    A: Quite a few.
Q: Would you say more or less than 20 if you

8    had to estimate? …
A: More.

9    (Yessenia Exxxxxxxx xxxxxxx Dep. 20:13-

10    20:19).

_____

11    Declaration of Kenia Yxxxxx xxxxxxx, Doc.
# 201-5 Ex. 36 ¶ 8.

12    "This facility was very crowded the whole
time we were there. There [were] about 40

13    people in one room the size of a bedroom.
There was no space to do anything. Every

14    time we tried to stand up, they just kept
yelling that we should sit or lay down, but

15    there was barely any space."

16
_____

17    Declaration of Silvia Vxxxxxx xxxx, Doc. #
201-6 Ex. 56 ¶4 (02/01/2016)

18    "Here at the Border Patrol facility we are held
in a cell with about thirty to forty other

19    mothers, and children. ... The bright lights on
the ceiling stay on all nights. ... It is very hard

20    to get any sleep because the floor is hard and
cold, the cell is very crowded, the lights are

21    on and very bright, and children are crying

22    and coughing all night long."

_____

23    Declaration of attorney Lindsay Harris, Doc.
#201-2 Ex. 14 ¶4(b)

24    " Holding cells are often so overcrowded that
Flores class members cannot lie down on the

25    concrete to try to sleep. Lights are kept on all
night adding to the extreme difficult children

26    have sleeping in these cells."

27
_____

28    Declaration of CARA Pro Bono Project
volunteer Leanne Purdum, Doc. # 201-1 Ex. 8
¶ 5 (3/1/16)

"Mothers consistently told me that ... the lights were kept on all night, and the rooms are sometimes so full that no one can lie down."
_____

Declaration of Alex Mensing attachment Exhibit PP, Doc. # 201-4 Ex. 19 ¶5
"There was nowhere to lay down. There were only cement benches. The lights were always on... There were a lot of people in this hielera. I would guess more than thirty women and children."
_____

Declaration of Allison Mxxxx xxxxx Leiva (2/19/16), Doc. # 201-5 Ex. 40 ¶6
"*There were so many people squeezed into the room. There were no beds, just a few cement slabs to lay on.*" [Emphasis added]
_____

Declaration of Cesia Vxxxxxxxxx-xxxx (13 yrs) (4/23/16), Doc. # 201-5 Ex. 29 ¶5
"There were many people in our cell...The lights were on all night and there was just one small window."
_____

Declaration of Isamar Sxxxxxx xxxxxx (4/23/16), Doc. # 201-5 Ex. 30 ¶5
"We were kept in a very small room with no beds. The only place to sleep was on the floor. But there were so many people in the room that there was not enough room for us all to lay down ... It was also hard because we could not tell what time of day or night it was. It was hard to get any sleep there."
_____

Declaration of Maria Dxxxx xxxxxxx (4/23/16), Doc. # 201-5 Ex. 32 ¶6
"We slept on the floor, but there was barely any room to sleep because there were too many people in the cell."
_____

Declaration of Maria Dxxxx xxxxxxx (4/23/16), Doc. # 201-5 Ex. 32 ¶7
"After this, we were taken to another place, like a warehouse, that they called the perrera (dog house)... There were even more people there than in the hielera…The lights were kept on all night and there were no windows."

| | |
|---|---|
| | _____<br>Declaration of Sonia Axxxxx-xxxxxx (2/3/16), Doc. # 201-5 Ex. 35 ¶6<br>"…[T]here wasn't enough space to lie down. There were about 35 or 40 people in the cell. We had to try to sleep sitting up, which was very difficult… There were about 20 or 25 children in the cell and they were all crying..."<br><br>_____<br>Declaration of Alex Mensing attachment Exhibit R, Doc. # 201-4 Ex. 19 ¶1 (11/9/15)<br>"There were a lot of people. There were people who slept standing up. Even a woman who was 8 months pregnant with swollen legs slept standing up. …The lights were on all night."<br><br>_____<br>Declaration of Fanny Exxxxxxxx xxxxxxxxx, Doc. # 201-6 Ex. 54 ¶ 4 (2/3/16)<br>"My son and I had to sleep on the floor. The room where we were held was … very crowded. ... Bright lights were kept on all day and all night long. With these conditions it was almost impossible to sleep for several days."<br><br>_____<br>Declaration of Eloisa Rxxxxx xxxxxx, Doc. # 201-6 Ex. 58 ¶8 (01/29/2016)<br>"My daughter and I were taken to another facility, where we spent a day and a night. We were in a cell with about 60 people. We could not lie down to sleep."<br><br>_____<br>Declaration of Josselyn Mxxxxx xxxxxx, Doc. # 201-6 Ex. 55 ¶ 7 (01/30/2016)<br>"This cell is very crowed. I think there are 40 or 50 people here. Yesterday I think there were more than 70 people in this cell." |
| **I.  Class members processed in some CBP facilities, including in McAllen and other Texas facilities, where the largest number of class members are processed, must sleep on concrete floors with no mats or** | TEDS Manual § 4.12 Bedding, p. 17:<br>"Clean bedding must be provided to juveniles. When available, clean blankets must be provided to adult detainees upon request."<br><br>Deposition Excerpts of Class Member Franklin Rxxxx xxxxxxxxx (Ex. 12):<br>Q: Did you receive a blanket?<br>A: No. |

| | |
|---|---|
| **mattresses and only a mylar blanket.** | Q: Did you receive anything to keep warm? A: No. (Franklin Rxxxx xxxxxxxxx Dep. 9:23-10:1). |
| | BY MS. GARCIA: Q: You said that you were at McAllen, you think, for two days. A: Yes. Q: And were you able to sleep those days? A: No. MS. GARCIA: Okay. Was he given any -- he testified that there was no blanket. Was there anything else that he could sleep with? THE WITNESS: No. (Franklin Rxxxx xxxxxxxxx Dep. 39:6-39:16). |
| | "Making it even harder to sleep, we were not given mats or mattresses to sleep on. We were required to sleep on the concrete floor, which was also very cold. We had no pillows or blankets. Sleeping there was almost impossible. In the morning I felt completely weak and wasted." [Doc. # 201-5 at 918, Dec. of Franklin Rxxxx xxxxxxxxx Ex. 45. ¶ 7]. |
| | _____ Deposition Excerpts of Class Member mother Ritza Mxxx xxxxxxx (Ex. 10): Q: Were you given any type of blanket while you were there? A: No. Q: Were you given anything, which we would call a Mylar blanket, which kind of looks metallic? A: No. Q: Were you given anything at all to help you keep warm? A: She, the only thing that she had was a sweater, and that's how she covered her son because he has asthma. (Ritza Mxxx xxxxxxx Dep. 17:10-17:19). |
| | _____ Deposition Excerpts of Class Member mother Yessenia Exxxxxxxx xxxxxxx (Ex. 19): Q: Were there any pads or anything to sleep on? A: No. Q: Did you sleep when you were there? |

A: Hardly at all.
Q: Where did you—were you able to lie down or anything?
A: On the floor.
Q: Okay. Was there a mat or anything to lay on? …
A: No.
(Yessenia Exxxxxxxx xxxxxxx Dep. 19:21-20:12).

Q: Did they give you blankets or anything like that?
A: No. (Yessenia Exxxxxxxx xxxxxxx Dep. 21:7-21:9).

"On the third day I was finally given a silver foil to cover myself at night. At times the cell was so crowded that it wasn't possible to lay down to try to sleep because there wasn't enough room." [Doc. # 201-5 at 846, Dec. of Yessenia Exxxxxxxx xxxxxxx Ex. 27, ¶ 6].
_____

Deposition Excerpts of Class Member mother Karina Vxxxx-xxxxxxx (Ex. 13):
Q: And where were you taken to sleep?
A: On the floor.
(Karina Vxxxx-xxxxxxx Dep. 23:1-23:3).

Q: Were you given anything to sleep with?
A: They gave me an aluminum sheet.
Q: And did they give your son an aluminum sheet as well?
A: They gave him nothing.
Q: Did they give you the sheet to share?
A: yes. To share with my son.
Q: Can you describe the floor of the room where you slept?
A: Just concrete.
Q: Was it clean or dirty?
A: Dirty.
Q: What do you mean? How was it dirty?
A: Dirty. Like a soil from outside.
(Karina Vxxxx-xxxxxxx Dep. 26:22-27:17).
_____

Deposition Excerpts of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. (Ex. 2):
Q: And there is no field to record whether the

minor received a mat to sleep on or did not. Is that correct?
MS. FABIAN:  Object to form.
THE WITNESS:  Correct. (Padilla Dep. 30:11-30:14).

Q: Okay.  Are there any -- I know that at the present time mattresses are provided at Ursula but not at the other stations. Is that primarily a budget concern or is it that there is just no space for people to sleep, to lay down on a mat at those stations?
THE WITNESS: Yes, sir.  It's not practical to have those mattresses at the -- at the station level because, again, our intent is to process people and turn them over to the appropriate agencies as soon as practical.
Q: I understand.
A: Yeah.  It is just not an operational – not operationally feasible. (Padilla Dep. 47:13-47:25).
_____
Deposition Excerpts of Chief Patrol Agent – Tucson Sector, CBP, Paul Beeson (Ex. 4):
Q: -- are minors in your custody provided any blankets to sleep under, if you know?
A: I don't know.
Q:How about at the TCC?
A: Yes, they are.
Q: And what type of blankets are they provided?
A: They are the mylar type.
(Beeson Dep. 35:10-35:16).
_____
Deposition Excerpts of Class Counsel Peter Schey (Ex. 16):
I personally observed people – now, it wasn't at nighttime, it was in the morning, but I personally observed many people sleeping on a concrete floor even though it was morning time. Not being provided mats or blankets, I've personally observed and I believe spoke to agents and it has been confirmed over and over again by defendants since then that detainees at McAllen were not provided mats. (Schey Dep. 27:7-27:15).

I believe people told me that they were

getting a Mylar blanket but if they were cold
and needed a second blanket, they weren't
getting it. (Schey Dep. 27:16-27:18).

_____

Deposition Excerpts of Class Member mother
Zulma Mxxxxxxx xxxxxxx (Ex. 20):
A.... They gave us something, supposedly
they were blankets, but they were made out of
aluminum. But it wouldn't help us with the
cold and we arrived there all wet. There were
no mattresses. There was nothing on the floor.
We were just -- we couldn't sleep. The
children were crying and screaming: Mom,
let's go, let's go.
(Zulma Mxxxxxxx xxxxxxx Dep. 14:17-
14:24).

_____

Declaration of Silvia Vxxxxxx xxxx, Doc. #
201-6 Ex. 56 ¶4 (02/01/2016)
"Here at the Border Patrol facility …[t]he cell
has no furniture. There is a concrete floor and
concrete bench around the walls of the cell.
People fill the floor and benches. Everyone
sleeps on the concrete floors and benches side
by side. ... We have no mattresses or pillows
or blankets. We only have a thin silver paper
to cover ourselves when trying to sleep. "

_____

Declaration of attorney Lindsay Harris, Ex.
14 ¶4(b)
"*Flores* class members may be held in CBP
facilities from one to three nights and are
provided no mattresses, mats, blankets or
pillows. They sleep on concrete floors or
benches and are usually only provided a foil
sheet to cover themselves with."

_____

Declaration of volunteer attorney Theresa
Wilkes, Doc. # 201-1 Ex. 9 ¶8 (3/16)
"They were given thin foil blankets, often
only one per family, that would easily tear
and rattle in the cold air blowing into their
holding cells."

_____

Declaration of Amarilis Lxxxxxx xxxxx, Doc.
# 201-5 Ex. 44 ¶7 (2/3/16)
"It was only concrete in my cell and we had
to sleep on a concrete bench, which was also

a very cold temperature. We were not given mattresses or pillows for the concrete bench on which we had to sleep. It was very difficult to sleep."

_____

Declaration of Fanny Exxxxxxxx xxxxxxxxx, Doc. # 201-6 Ex. 54 ¶ 4 (2/3/16) "We were not given mattresses or blankets. We were each given a foil sheet to use as a blanket. The floor we had to sleep on was very hard and very cold. Bright lights were kept on all day and all night long. With these conditions it was almost impossible to sleep for several days."

_____

Declaration of Sonia Axxxxx-xxxxxx (2/3/16), Doc. # 201-5 Ex. 35 ¶6 "No blankets or mattresses were provided."

_____

Declaration of Alex Mensing, Doc. # 201-3 Ex. 19 ¶12(5) "At the hieleras, most mothers and children were forced to sleep on cold concrete floors."

_____

Declaration of Alex Mensing attachment Exhibit C, Doc. # 201-3 Ex. 19 ¶4 "There were some aluminum sheets in the corner for us to cover ourselves with, but they were used, and there were not enough for everyone. There were no mattresses in our room."

_____

Declaration of Josselyn Mxxxxx xxxxxx, Doc. # 201-6 Ex. 55 ¶ 10 (01/30/2016) "There are no beds or blankets here, just a piece of foil. I have slept on the concrete floor and a concrete bench that lines the wall... I wish there was a mattress or pillows here."

_____

Declaration of Edgardo Dxxxxx xxxxxxxx, Doc. # 201-6 Ex. 49 ¶ 6 "We were required to sleep on the concrete floor… We had no pillows or blankets. Each minor was given a thin silver foil paper to cover ourselves with… But it didn't make much difference. Sleeping there was almost impossible. In the morning I was exhausted and the other

61

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | minors also seemed exhausted." |
| --- | --- |
| | _____ |
| | Declaration of Alex Mensing attachment Exhibit H, Doc. # 201-3 Ex. 19 ¶4 "Every time an officer came to the door of the room to bring someone in or take someone out, I would ask the officer for a blanket for both of us or at least for my three year old son. I asked about ten different officers. They said they would bring me one but they never did." |

| | |
|---|---|
| 2. *FLORES* CLASS MEMBER CHILDREN ARE ROUTINELY NOT ADVISED OF *FLORES* RIGHTS BY CBP OR ICE OFFICERS. | Deposition Excerpts of Class Member mother Celina Sxxxxxx-xxxx (Ex. 11): Q: So now, going back to this first facility when you met with the immigration officer, did they give you any paperwork or information about immigration places? …. A: No. (Celina Sxxxxxx-xxxx Dep. 32:11-32:20). |

Q: Now, when you were at Dilley, you spoke with some immigration folks, is that correct?
A: Yes, it is correct.
Q: And did they give you a list of free legal services?
A: There, no.
Q: They did not at Dilley give you a list of free legal services?
A: That was after when I went to saw a lawyer.
Q: And was that while you were still at Dilley?
A: Yes.
Q: Okay. And so you were able to go speak with a lawyer while you were at Dilley?
A: Yes.
Q: And now, when you were at Dilley, the walls of the rooms, did you notice the posters on the walls?
A: Yes, there were….
Q: Okay. Do you remember seeing posters for free legal services posted on the wall?
A: No. That, no. (Celina Sxxxxxx-xxxx Dep. 36:2-37:19).

"My son and I were held in the immigration detention center in Dilley, Texas for about 18 days. During my time in Dilley, neither me nor my son were told by immigration officials about the Flores case. I have no knowledge of the Flores case. I have no knowledge of the Flores case." [Doc. # 201-5 at 849, Dec. of Celina Sxxxxxx-xxxx Ex. 28, ¶ 11].

_____

Deposition Excerpts of Class Member Franklin Rxxxx xxxxxxxxx (Ex. 12):
Q: At some point did an immigration official give you a document explaining your rights?
A: No.

(Franklin Rxxxx xxxxxxxxx Dep. 24:5-24:7).
Q: Were you at any point in your detention
told about your rights as a minor under
Flores?
A: No.
(Franklin Rxxxx xxxxxxxxx Dep. 41:20-
41:22).

"No one at the border patrol facility notified
me about any rights I had under the Flores
case. I never heard of the Flores case until I
was interviewed to provide this declaration."
[Doc. # 201-5 at 918, Dec. of Franklin Rxxxx
xxxxxxxxx Ex. 45. ¶ 10].
"I have not been told about anything about
any rights I may have under the Flores case at
this detention facility." [Doc. # 201-5 at 918,
Dec. of Franklin Rxxxx xxxxxxxxx Ex. 45. ¶
12].
_____
Deposition Excerpts of Class Member mother
Karina Vxxxx-xxxxxxx (Ex. 13):
Q: At any point when you were in custody
with border patrol, did you receive a
document explaining your rights or your son's
rights?
A: No.
Q: Is it possible that the rights were posted on
the wall of the detention center?
A: No. There was anything – or maybe. I
don't remember. […] I can't remember seeing
anything.
(Karina Vxxxx-xxxxxxx Dep. 68:3-68:16).
_____
Declaration of Chief Patrol Agent – Laredo
Sector, CBP, Mario Martinez Doc. # 210-1,
Ex. 7 ¶ 39
In March 2016, the CBP Office of
Administration, Chief Accountability Officer
(CAO) Management Inspections Division
(MID) conducted the audits at several Laredo
Sector stations and examined that (1) no
reports had been maintained to document
UACs viewing the video *Know What to
Expect* (video intended to provide a clear and
consistent message in simple Spanish
explaining to the UACs what they can expect
while in CBP custody)

_____

Deposition of attorney Bridget Cambria (Ex. 21):

A. ... I observe the paperwork that they receive. They provide the paperwork Immigration gives them. I didn't see any of it, anything about the Flores settlement. (Cambria Dep. 74:3-74:6).

At no point since my representation of families at the Berks County Residential Center began in June of 2014 has any child or mother in the facility been advised of their rights under the *Flores* Settlement.   [Doc. # 201-1 at 103, Dec. of Bridget Cambria Ex. 3, ¶ 12].

_____

Declaration of Ed McCarthy, Doc. # 201-1  at 173,  Ex. 11 ¶ 11

"None of the mothers and *Flores* class members who I interviewed or represented at Karnes from October 17, 2015 to October 30, 2015 told me that any CBP or ICE official, or staff member at Karnes, had informed them about any aspect of the *Flores* settlement including any rights that *Flores* class members may possess."

_____

Deposition Excerpts of Class Counsel Peter Schey (Ex. 16):

No access to information regarding detainees' rights, that's what people told me. I didn't -- in my personal observation nobody -- no detainee who I spoke to -- to Class member or mother -- was able to -- or had in her possession, and I could physically observe this, any notice of rights. When I asked them, "Do you have any sort of notice of rights relating to Flores or anything else," they said no. They hadn't even heard of Flores. (Schey Dep. 32:13-32:21).

Despite many class members being held at CBP facilities for a day or several days, no efforts that Class Counsel is aware of are made by CBP staff to comply with Paragraphs 12A, 18 and 24D. Indeed, Border Patrol agents do not even appear to be aware of

these obligations of the Settlement rather than intentionally violating them… Not one of the Class Members and mothers interviewed during Class Counsel's inspections had any idea how to contact an attorney.
[Doc. # 201-1 at 1, Dec. of Peter Schey Ex. 1, ¶ 8].
_____

Deposition Excerpts of Class Member mother Sara Exxxxxxxx xxxxx (Ex. 17):
Q: And did they provide you with any documents?
A: No.
Q: So you were not given any paperwork at any time – or at – of any kind?
A: No.
Q: Okay. Were you given any paperwork of any kind for the two days that you stayed there?
A: No, nothing.
(Sara Exxxxxxxx xxxxx Dep. 17:25-18:5).

Q: Okay. So when was the first time you learned about the Flores case? Which – I'll say, "Which facility were you being held at when you learned about the Flores case?
A: I was already in detention. I had been there for about a month and a half.
Q: Which place?
A: In Karnes.
(Sara Exxxxxxxx xxxxx Dep. 32:7-32:15).

Q: Is it possible that you forgot being advised of this?
A: But I'd already been detained for a while, but the officers never said anything to me about my daughter being able to be with my brother. (Sara Exxxxxxxx xxxxx Dep. 32:21-32:25).

Q. Were there any signs or information posted on the walls of the place – the room that you were held?
A: No.
Q: Nothing whatsoever?
A: No, nothing.
(Sara Exxxxxxxx xxxxx Dep. 23:6-23:11).

No one at the border patrol facilities notified me about rights my daughter had as a minor or any rights she had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There was no list of lawyers or free legal aid programs to call posted anywhere that I saw. [Doc. # 201-5 at 837, Declaration of Sara Exxxxxxxx xxxxx Ex. 24,, ¶ 6].

"I don't remember anyone explaining that my daughter had rights as a minor under the Flores case." [Doc. # 201-5 at 837, Declaration of Sara Exxxxxxxx xxxxx Ex. 24,, ¶ 9].

_____
Declaration of Yessenia Exxxxxxxx xxxxxxx, Doc. # 201-5 at 846,  Ex. 27, ¶ 8
"No one at the border patrol facilities told me about rights I had as a minor or any rights I had under the Flores case. No one told me that I could use a phone to call a lawyer nor did I see any phones to use to call a lawyer. No one gave me a list of lawyers I could call. There were no list of lawyers or free legal aid programs to call posted anywhere that I could see. No one asked me if I had relatives in the United States other than my mother who could care for me. No one told me that I had a right to see an Immigration Judge about my detention. No one asked me if I feared return to my home country."

_____
Declaration of CARA Pro Bono Project volunteer Leanne Purdum, Doc. # 201-1 Ex. 8 ¶11 (3/1/16)
"None of the Flores class members or their mothers that I interviewed indicated that they were told by any CBP, ICE or detention facility staff about the Flores case, or any rights that minors have under the Flores settlement or the District Court's August remedial Order."

_____
Declaration of volunteer attorney Theresa Wilkes, Doc. # 201-1 Ex. 9 ¶12 (11/2015)

"Indeed, none of the family units I interviewed had been told anything about the Flores Settlement by CBP or ICE officers or by other staff employed at Dilley."

_____

Declaration of Allison Mxxxx xxxxx, Doc. # 201-5 Ex. 40 ¶10 (5/1/16)
"At no point did any officer or official ever talk to me, my sister, or my mom about our legal rights or the Flores case."

*Id.* ¶11
"The entire eight months we have been detained neither me, nor my sister, nor my mother have ever been spoken to by officials about a case called Flores."

_____

Declaration of Diana Cxxxxx xxxxx, Doc. # 201-5 Ex. 43 ¶6 (2/2/16)
"While I was in detention before my release the authorities never gave me any notice of my rights as a juvenile or under the Flores case."

*Id.* ¶9
"During our time here at Dilley no one has given me or my mother any notice about my rights as a minor or my rights under the Flores case."

_____

Declaration of Cesia Vxxxxxxxxx-xxxx, Doc. # 201-5 Ex. 29 ¶19 (4/23/16)
"No officials have told me anything about Flores throughout all the months that I have been detained."

_____

Declaration of Isamar Sxxxxx xxxxx, Doc. # 201-5 Ex. 30 ¶33 Berks, (4/23/16)
"Immigration at Dilley never told us we had any rights under Flores for my daughter."

_____

Declaration of Kelly Gxxxxxxxx-xxxxx, Doc. # 201-5 Ex. 31 ¶8 (5/1/16)
"At no time while detained at this facility did any ICE agent or any other official tell me anything about my son's rights under the Flores case. To

the best of my knowledge, no one
explained anything about the Flores
case to my son."
_____
Declaration of Maria Dxxxx xxxxxxx,
Doc. # 201-5 Ex. 32 ¶9 (4/23/16)
"No official at Dilley told me anything
about the Flores case or any rights my
son had under the Flores case."
_____
Declaration of Amarilis Lxxxxxx xxxxx,
Doc. # 201-5 Ex. 44 ¶7 (2/3/16)
"No one at the border patrol facilities
notified my son or I about the rights that
my son had under the Flores case."
_____
Declaration of Herson Lxxxxxx xxxxx,
(13yrs), Doc. # 201-5 Ex 46 ¶9 (2/3/16)
"To date, I have not been advised of my
rights under the Flores case. My mother
was not provided any information about
my rights under the Flores case."
_____
Declaration of Raquel Axxxxx xxxxxx, Doc.
# 201-5 Ex. 26 ¶11 (2/3/16)
"Since our arrest no official has told us
anything about the Flores case."
_____
Declaration of Katerin Yxxxxxxx xxxxxxx
(12 yrs), Doc. # 201-5 Ex. 34 ¶13 (2/3/16)
"As best I remember I have not been told
about my rights under the Flores case at this
detention facility."
_____
Declaration of Sonia Axxxxx-xxxxxx, Doc.
# 201-5 Ex. 35 ¶8 (2/3/16) "I have not been
told that my son has about my rights under
the Flores case ..."
_____
Declaration of Vilma Sxxxx xx xxxx,
Doc. # 201-5 Ex. 47 ¶9 (2/3/16)
"No one here has told me anything about
any rights my daughter has under the
Flores case. No forms relating to the
Flores case have been given to me."
_____
Declaration of volunteer attorney Natalia
Ospina, Doc. # 201-1 Ex. 7 ¶9 (3/10/16)

"During the numerous interviews I conducted at the Dilley detention center I did not encounter a single Flores class member or Flores class member mother who indicated that they … had been provided any documents or advisals required by the Flores Settlement..

_____

Karen Zxxxxx xxxxxx and her son, nationals of El Salvador, were apprehended in Texas on or about August 29, 2015 and then detained at Dilley, TX. On or about October 28, 2015 they were transferred to the detention center at Berks, PA. Ms. Zxxxxx xxxxxx declares: "The officials and staff at the detention center in Dilley never advised me of my son's rights under the *Flores* case." Dec. of Karen Zxxxxx xxxxxx, Doc. # 201-5 Ex. 39 ¶ 11.

_____

Walter Axxxxxxx xxxxxxxxx, a thirteen-year-old national of El Salvador, was detained on or about November 9, 2015 at the Texas border. He declares that during several weeks of detention at Dilley "no officer told   me anything about the Flores case or my rights under the Flores case." Declaration of Walter Axxxxxxx xxxxxxxxx, Doc. # 201-5 Ex. 22 ¶ 9. After three weeks of further detention at Berks "no official has explained any rights I may have under the Flores case." *Id.* ¶12.

70

| A. Defendants do not advise Class Members about their right to a custody hearing before an Immigration Judge and do not afford accompanied children bond or custody hearings before Immigration Judges. | Dec. of Celina Sxxxxxx-xxxx, Doc. # 201-5 at 849, Ex. 28, ¶ 7<br>"I was never told that my son a had a right under the Flores case to have an immigration judge review his bond situation or consider his release. I was not told that my son could speak with an attorney or given a list of free legal services until I was later taken to Dilley, TX, a detention center.<br>_____<br>Dec. of Franklin Rxxxx xxxxxxxxx, Doc. # 201-5 at 918, Ex. 45 ¶ 11<br>"No one told me that I had a right to see an Immigration Judge about my detention. I have talked to my mother and my mother has said that no one told her about any rights that I have as a minor, or any rights I may have to see an immigration judge, or any rights I may have under the Flores case."<br><br>"I have not been told that I can see a judge about my detention or release." [Doc. # 201-5 at 918, Dec. of Franklin Rxxxx xxxxxxxxx Ex. 45. ¶ 11].<br>_____<br>Deposition Excerpts of Dilley Assistant Field Office Director, Enforcement and Removal Operations, ICE, Valentin de la Garza (Ex. 7):<br>Q. (By Mr. Schey) At Dilley at this time, is the notice of rights to judicial review provided to class members or their mothers?<br>A. I don't recall the notice of rights, what exactly it contains, so I'm going to have to answer, "No, I don't know."<br>MS. FABIAN: Peter, I think if you clarify which document you're talking about, it would be helpful.<br>Q. (By Mr. Schey) Yeah. I believe it is Exhibit 6 to the agreements. Does that remind you?<br>A. If it's the form I'm thinking of, yes, sir, we -- we provide it to them.<br>Q. And what do you fill in on that form?<br>A. You're asking me to try to remember. I'm going off of just memory.<br>Q. Yeah. Just from your memory.<br>A. Date, names of individuals being it served on, and the person serving it. |

(De La Garza Dep. 43:8-43:25).

_____

Dec. of Yessenia Exxxxxxxx xxxxxxx, Doc. #
201-5 at 846, Ex. 27 ¶ 10
 "I have not been told that I can see a judge
about my release."

_____

Deposition Excerpts of CARA project
volunteer attorney Admanda Doroshow (Ex.
22):
A: Well, the basis for this belief is that no one
had any idea about the rights that they had.
No one had any idea that -- about being
released, about the right to a bond hearing,
about the right to their – not even an idea of
what the process the credible fear interview
was, a right of review of a credible fear
interview. If anything, I thought people were
misinformed of their rights because officers
were telling them lies of saying things about
lies about being entitled to bond or how much
bond was. So that's where that statement
comes from. (Doroshow Dep. 22:9-22:22).

Q: How did you know the officers were
telling them lies?
A: I would ask clients. I would ask them has
anyone explained to to you – for example, has
anyone explained to you about a bond. That
was one of the things that I remember
happening regularly. They would say yeah,
the officer told me it would be, and they
would say an exorbitant number. It would
make me stay here much longer. They would
tell them facts that weren't true. The
motivation, I think, at that time, they wanted
people to be released with equal monitors, so
I'm assuming that that was the motivation,
but I would ask them, because one of the
things I would do when they first came in, I
wanted to make sure they could know as
much of their rights as they could and retain it
for when they're not talking to their lawyer.
(Doroshow Dep. 22:25-23:21).

_____

Dec. of Juanita Hester, Doc. # 215-1, Ex. 20 ¶
10
To my knowledge, ICE (or legally INS) has

|  | not provided the notice in Exhibit 6 of the FSA to accompanied children. However, ICE is committed to providing the Exhibit 6 notice and will be working to implement a procedure to provide the notice to accompanied minors at KCRC.<br><br>_____<br><br>Dec. of Bridget Cambria, Doc. # 201-1 at 103, Ex. 3 ¶ 12<br>No child has ever been afforded a bond hearing before an immigration judge as is required under *Flores*. I have never seen any efforts towards compliance on the part of ICE, except the period immediately prior to the Order of Judge Gee.<br><br>_____<br><br>Declaration of Peter Schey, Doc. # 201-1 at 1, Ex. 1, ¶ 10<br>"Class Members and those representing them consistently report and declare in their declarations filed herewith that ICE agents in violation of the Settlement –...<ul><li>Do not provide accompanied Class Members with "a notice of rights," (Paragraph 12A), they do not "promptly provide each minor not released with... (b) an explanation of the right of judicial review as set out in Exhibit 6…"</li></ul> |

| | |
|---|---|
| **B. Defendants have not provided accompanied minors not released with "a notice of the reasons for housing the minor in a detention or medium security facility."** | Deposition Excerpts of attorney Robyn Barnard (Ex. 23):<br>Q. Were you provided with any reasons why they were not released?<br>A. No.<br>Q. Did the notice only state that they would not be released?<br>A. The notice is, as far as I'm aware and my experience, it's the standard notice that Immigration and Customs Enforcement issues in relation to a parole request. And all that it states is the person's name and that the release request had been received and that upon consideration of the person's case it has been determined that they are not eligible for release.<br>(Barnard Dep. 70:15-71:3).<br><br>Deposition Excerpts of Berks Assistant Field Office Director, Enforcement and Removal Operations, ICE, Joshua Reid (Ex. 8):<br>Q. Is there anything among the list of rights of detainees that tells them that they have the right to leave the facility?<br>A. No.<br>(Reid Dep. 28:10 – 28:13)<br><br>Deposition Excerpts of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller (Ex. 9):<br>Q. Are you yourself aware of what the term medium secure facility means as set forth in the Flores settlement?<br>A: No.<br>(Miller Dep. 102:20-102:23)<br><br>Q. So you've seen an activity report about custody determinations; but my question was, do you see any report that would indicate that these notices have been distributed every 15 days?<br>A. The distribution of the notices, no, I don't track that. I track the actions taken based on the case reviews.<br>(Miller Dep. 156:12-156:21) |

| 3. DHS FAILS TO MAKE AND RECORD ONGOING EFFORTS AIMED AT RELEASE OR PLACEMENT OF *FLORES* CLASS MEMBERS | |
|---|---|
| **A. Defendants do not make and record "continuous" efforts from the time accompanied minors "are taken into custody" aimed at the release of minors under ¶¶ 14 and 19 of the Agreement. Defendants place these Class Members in expedited removal, subject them to mandatory detention, and release them if their mothers pass a credible or reasonable fear interview.** | TEDS Manual, § 5.6 Detention, *Expeditious Processing*: Whenever operationally feasible, at-risk individuals will be expeditiously processed to minimize the length of time in CBP custody.<br><br>Declaration of Assistant Field Office Director of Enforcement and Removal Operations, San Antonio Field Office, ICE, Juanita Hester, Ex. 21, ¶ 13 "At the time of their detention at STFRC, the declarants above were in expedited removal proceedings and subject to mandatory detention. Many individuals detained at a FRC are not eligible for bond. For example, individuals who are processed as reinstatements of previously-issued final orders of removal or as arriving aliens are not eligible for a bond hearing before an immigration judge. For individuals in the expedited removal process, detention is mandatory unless the individual is determined to possess a credible fear remain in the expedited removal process and are generally detained until removal." [Doc. # 216-1, Declaration of Juanita Hester, Ex. 21, ¶ 13].<br><br>Deposition Excerpts of Berks Assistant Field Office Director, Enforcement and Removal Operations, ICE, Joshua Reid (Ex. 8):<br>Q. What are other things you consider?<br>A. There's a variety of policies and procedures. For example, the DHS enforcement priorities, you know, the ICE directive relating to parole of aliens found to be credible fear, policies such as those.<br>Q. So you said one was the credible fear.  What was the other one?<br>A. The DHS Department Homeland Security Enforcement priorities that were set in place by DHS Secretary Johnson. |

Q. And what are the criteria in those enforcement policies that could result in a release of a minor?

A. They're not really specific to minors, but they to—they are specific to the decision whether to apprehend, detain or remove aliens in general. (Reid Dep. 15:17-16:10)…

A. Well, the memorandum states if an alien falls within the priorities, depending on the level, ICE should typically pursue apprehension, detention and removal unless there's exceptional or compelling circumstances against other or alien demonstrates they're eligible for some form of relief removal, either asylum or some other forms. (Reid Dep. 16:18-16:24)

Q. But my question was, who falls within the priorities?  Who's eligible for release? Not for ongoing detention…

Q. Other than people who appear to qualify for relief from removal?

THE WITNESS: Aliens that—that would be it, that appear to be eligible for some type of relief or removal or can demonstrate exceptional circumstances.

Q. What does that mean, exceptional circumstances?

A. There's a variety of things that could be taken into play.  It could be a medical condition a medical condition of their family member; numerous factors. (Reid Dep. 18:1-18:19)

Q. And this policy, does it provide any examples of these compelling or exceptional circumstances?

A. I would have to look at the policy memorandum to answer that, sir. (Reid Dep. 19:17-19:21)

Q. If a mother is determined to be pregnant at Berks, is that a basis upon which the mother and her accompanying child may be released?

A. That we would take that consideration into factor and, yes, it could be.

Q. Other than to attend a removal hearing, can

you recall the most recent example of when a class member, a Flores class member, was authorized to leave the grounds of Berks? ….
THE WITNESS: I don't recall…. (Reid Dep. 19:25-20:25)

Q. …When a person expresses a fear of return, is that recorded in that person's A file? ….
THE WITNESS: It would depend on when they expressed the fear.
Q. Okay. Can you just explain that?
A. If they express fear of returning to their home country at the time of apprehension, yes, it would typically be documented in the A file….
A. There's several different forms. It could be a sworn statement or the record of deportable alien. (Reid Dep. 69:7-69:22)
….
THE WITNESS: …But if an alien expresses a fear, it could be in the A file and not in the EARM at all, or it could be vice versa. (Reid Dep. 71:11-71:13)

Q. And then when CIS is notified that this person has expressed a fear, how are they notified? Just tell us, how is that accomplished?
A. It's typically done via e-mail notification. (Reid Dep. 72:1-72:5). ….

Q. Okay. The first question was at Berks, if a mother or a minor made a fear request, let's say orally to an ICE agent, would that ICE agent communicate that directly to CIS or would they communicate it to some other ICE agent who is assigned to then communicate with CIS?
A. The ICE agent would likely do it directly.
Q. Okay.  And when that happens, does it happen by e-mail or how does it happen?
A: I believe it happens via e-mail. (Reid Dep. 74:2-74:12)

Q. I understand.  Are all -- what, in general terms, in this EARM, are any significant events, dates about that detainee that's

supposed to be entered into that system? ….
Q. Such as requests for reconsideration,
applications for release, and decisions on
those. Are those the types of things that would
generally be recorded in the EARM? ….
THE WITNESS: Some of those things can be
recorded in the EARM. (Reid Dep. 78:20-
79:4)

Q. Who then decides what the terms of
release might be?  Who decides that?
A. Once again, several people are involved in
that.
Q. Just tell us who would do that.
A. From the officer to the supervisor to
myself to sometimes the deputy field office
director, and the field office director. (Reid
Dep. 83:4-83:11)

Q. You know how there's some matters like
whatever average length of detention or
number of people there, where data is
extracted on a daily or maybe a weekly or
maybe even a monthly basis so things can be
tracked.  And I'm wondering, are these time
periods that I've been discussing with you, are
any data reports prepared for you that would
give you a snapshot of how long it's taking to
do the various things that I just mentioned?
MS. FABIAN: Object to form.
THE WITNESS: Prepare for me specifically,
no. Are there reports that could be prepared
for that? I don't know. (Reid Dep. 84:20-
85:7)

Q. So on what basis does your declaration
state that although you maintain limited
discretion to parole aliens subject to expedited
removal, when it is, quote, required to meet a
medical emergency or is necessary for the
legitimate law enforcement objective, end
quote, these cases, meaning, obviously, the
cases above, failed to meet the noted
exceptions and, therefore, do not warrant
release. On what basis do you make that
statement?
A. Under the INA.
Q. Okay.  So based on the law that they're

1

2   subject to mandatory detention?
A. Yes. That was one of the factors. Like I
3   said, there's other factors taken into
consideration, but that was one.
4   Q. Other than the INA, what are the other
factors that you could consider other than
5   what's authored by the INA?
A. Whether they're -- they appear to be
6   eligible for any particular form of relief,
family ties community ties, manner of entry,
7   length of presence in the United States, are
typically factors that are taken into
8   consideration; some of them. Not all. (Reid
Dep. 106:11-107:10)
9

10   Q. Okay. So if all of those factors are
considered, there ought to be some indication
11   of that, either in the A file or in the letter that
was sent to -- provided to the detainee or his
12   or her lawyer, which would most likely be in
the A file; is that correct?
13   MS. FABIAN: Object to form.
THE WITNESS: As I stated, yes. There's a
14   letter that's sent typically. If we receive a
request for release in writing we're going to
15   provide a written response. And likely, that
will be included in the A file.
16   Q. And if all of these factors are considered,
typically the letter or the notes in the A file
17   would indicate that they were considered?  Is
that fair to say, if they were considered?
18   THE WITNESS: Yes.  For example, for
several of these, it goes over the immigration
19   history, how they were encountered, the
length of presence. A lot of those factors are
20   in the letters.
Q. Okay. And is it fair to say if something is
21   going to be considered, if a record is going to
be made of that, is that fair to say? ….
22   THE WITNESS:  As stated previously,
usually it's something that EARM will be
23   added, a request was received, and it was
approved or denied in the letter that we
24   provide. (Reid Dep. 110:17-112:7)
25

26

27

28   Q. Okay. And in any of those cases, do you
recall what factor or factors prompted the
release of that either one person or a handful

of people?

A. I don't recall off the top of my head. Like I said, we take into consideration multiple factors.  I don't think it would be one factor that would make the decision. It's not made in a vacuum. We try to take in all the factors that I mentioned before. (Reid Dep. 121:7-121:16)

Deposition Excerpts of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller (Ex. 9):

Q. And when -- prior to Karnes and Dilley being set up, when – when accompanied minors were released, what authority was relied upon by ICE to release those children? THE WITNESS: We used our discretionary detention authority under Section 236(a), which also provides opportunity for us to set conditions to include the conditions under which someone could be released. (Miller Dep. 11:10-11:24)

Q.  And what does 236(a) say? Can you tell us your best recollection? A. Well, I'm not an attorney, so I don't have the law memorized; but operationally it gives us the authority to set conditions of either continued detention or release for cases that are not mandatory detention. (Miller Dep. 12:2-12:9)

Q. And when -- when -- when was the most recent time that ICE officers at your detention facilities received any in-person training regarding the options for release under the Flores settlement for minors in your custody? THE WITNESS:  Every time new detailers arrive at one of the residential centers, they have an intake briefing and instruction on, you know, what they will be required to do while they're at the facility.  And that training is predicated on our operational understanding of the Flores agreement. (Miller Dep. 49:14-50:8).

Q. And are you aware of any time in which ICE agents working at the family detention facilities have received in-person training

about the Flores requirements with regards to the options for release of minors in your custody?
A. No, I don't. (Miller Dep. 52:13-52:20).

Q. Are you aware of any in-person training provided to your officers at family detention centers -- I said in-person training -- regarding Judge Gee's -- and for the Court Reporter, that's G-E-E -- August 2015 order in the Flores case?
A. No.
Q. Are you aware of any written instructions or guidance issued to your officers at the family detention centers in writing, instructions or guidance, regarding Judge Gee's August 2015 order in the Flores case?
THE WITNESS:  No, not to the officers. (Miller Dep. 53:5-53:22).

Q. Are you aware of any written instructions issued to ICE officers, and, if so, please identify those instructions, that explains to them what the term escape risk means in the Flores settlement?
A. No.
Q. Are you aware of any in-person training about that?
A. About defining terms from Flores?
Q. Explaining to the officers what the term escape risk means under the Flores settlement, are you aware of any in-person training on that question?
A. No.
Q. Do you recall what the -- or how the term escape risk is -- is defined in -- in the Flores settlement in general?
A. No.
(Miller Dep. 101:22-102:19).

Declaration of Assistant Director for Field Operations, Enforcement and Removal Operations (ERO), in Washington, D.C., ICE, John Gurule, Doc. # 217-1, Ex. 22, ¶ 14:
A small percentage of individuals do remain in ICE family residential centers for longer periods of time.  This is because these individuals generally fall into one of three

categories: (1) individuals who are in
mandatory detention because they have not
yet been found to have a credible fear, are still
seeking to establish a claim to credible fear
through requests for re-interview or
reconsideration, and have sought and received
stays of removal; (2) individuals who have
been denied a finding of credible fear and are
awaiting removal and subject to mandatory
detention; or (3) individuals in family units
with final orders where the parent has been
determined to constitute a flight risk.
[Doc. # 217-1, Declaration of John Gurule,
Ex. 22, ¶ 14].

Deposition Excerpts of attorney, Ed
McCarthy, Ex. 24:
Q. Paragraph 4 of your deposition states that
you observed no change in ICE policy in the
detention of Flores members while at Karnes.
What do you mean by "no change"?
A. Their practice of holding women in
detention who had received a negative
determination following credible fear or a
reasonable fear interview did not change
while I was there. And at no point did they
receive a custody review in front of an
immigration judge, and so there were no
changes in that status. (McCarthy Dep. 29:7-
29:17).

A. In speaking to my clients and the
employees at Karnes and the deportation
officers, at no point did any of them mention
any efforts being made to place – to place
their children outside of Karnes. (McCarthy
Dep. 49:13-49:17).

A. I saw no consideration being given to any
credible or reasonable fear – fears that –
sorry, any credible fears that the children
might have had. At no point had I heard of
children being present during the parents'
interview or having their own interview for
any of my clients. (McCarthy Dep. 50:17-
50:22).

Declaration Excerpts of Ed McCarthy, Doc. #

201-1 at 173, Ex. 11:
"I observed no change in ICE policy in the detention of accompanied *Flores* class members during my pro bono work at Karnes." [Doc. # 201-1 at 173, Declaration of Ed McCarthy Ex. 11, ¶ 4].

"None of the mothers or *Flores* class members who I interviewed or represented at Karnes…informed me that any efforts had been taken or were being taken that they were aware of to release or place *Flores* class members as expeditiously as possible under the terms of the *Flores* settlement. [Doc. # 201-1 at 173, Dec. of Ed McCarthy Ex. 11, ¶ 12].

Deposition Excerpts of attorney Robyn Barnard (Ex. 23):
A. The only time I've had any discussion with Immigration and Customs Enforcement officers who are giving me reasons for why either the parent or child who are detained at Berks Detention Center are not being released, they will solely say generally that it's because they're not eligible for release, and by that I understand that they mean that the parent and child had been entered into expedited removal and were not eligible under the laws that apply to expedited removal and both were entered in that proceeding to be released from detention because of their negative or credible or reasonable fear interviews.
(Barnard Dep. 63:14-64:2).

Q. How many of the class members who you are the representing have a stay of deportation issued by any authority?
A. All of them received stays of deportation.
Q. And all of them have remained in custody despite the fact that they have a stay of deportation; is that correct?
A. Correct.
(Barnard Dep. 64:12-64:20).

Deposition Excerpts of Dilley Assistant Field Office Director, Enforcement and Removal

Operations, ICE, Valentin de la Garza (Ex. 7):
Q. Okay. My question was not whether they become subject to mandatory detention if their -- if their fear claim is denied. My question was, have you received any instructions to comply with paragraph 14, regarding the release of minors if that minor's claim, fear claim, has been rejected?
MS. FABIAN: Ob -- Object to form and foundation. I think he's answered your question to the best of his ability.
Q. (By Mr. Schey) Okay. You may answer this question.
A. Yes, sir. Our guidance is that, at that point, they are a final order; they become a mandatory detention, and we proceed with the removal.
Q. Okay. So in other words, you have not received any instruction or guidance regarding the release of minors under paragraph 14 if their fear claim has been denied; is that fair to say?
MS. FABIAN: Object to form, foundation.
THE WITNESS: My answer's going to be the same thing, sir. My guidance is to hold them to -- until they become a mandatory --
Q. (By Mr. Schey) Okay.
A.-- detention and to proceed with the removal.
(De La Garza Dep. 32:2-32:25).

Declaration of Sara Eizabeth Lopez, Doc. # 201-5, Ex. 24, ¶ 9
"No one has talked to me about whether my daughter can be released to a friend or relative in the United States."
[Doc. # 201-5, Dec. of Sara Exxxxxxxx xxxxx, Ex. 24, ¶ 9].

Declaration of Karen Zxxxxx xxxxxx, detained with her Class Member son since on or about August 29, 2015, and still detained with her son eight months later, Doc. # 201-5 Ex. 39 ¶ 11
"No official questioned me about relatives or friends in the U.S. able to care for my son. No one asked me if I wanted my son transferred to a licensed facility for children."

Declaration of Karen Zxxxxx xxxxxx, Doc. # 201-5 Ex. 39 ¶ 11.

Declaration of Class Member, Walter Axxxxxxx xxxxxxxxx, Doc. # 201-5 Ex. 22 ¶ 9
"No one asked me about relatives or family friends who may be willing to take care of me here in the U.S. No official told me that any decision had been made about releasing or detaining me …"
Declaration of Walter Axxxxxxx xxxxxxxxx, Doc. # 201-5 Ex. 22 ¶ 9.

Declaration of volunteer attorney Natalia Ospina, Doc. # 201-1, Ex. 7, ¶9 (3/10/16)
"During the numerous interviews I conducted at the Dilley detention center I did not encounter a single Flores class member or Flores class member mother who indicated that they had been interviewed or questioned by CBP or ICE officials to obtain information needed to expeditiously process class members for release to family or friends or placement in a facility licensed for the care of dependent children.".
Declaration of Natalia Ospina, Doc. # 201-1, Ex. 7, ¶9.

Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, Doc. # 201-2 Ex. 17, ¶16 "When they arrived at the border, she and her daughters entered the United States and were detained at the Karnes detention center around January 26, 2016. Her son entered with an unrelated Brazilian man who traveled with them. Her son was classified as an unaccompanied minor and placed in the custody of the Office of Refugee Resettlement ("ORR"). Although Rina had relatives in Boston that were willing to sponsor her son for release from ORR custody, on February 10, 2016 ORR "reunified" Rina's son with her and ICE admitted him at the Karnes detention center." Declaration of Manoj Govindaiah, Director of Family Detention Services with

RAICES, Doc. # 201-2, Ex. 17, ¶16.

Declaration of volunteer attorney Theresa Wilkes, Doc. # 201-1, Ex. 9, ¶ 11 (11/2015) "I interviewed no *Flores* class members or their mothers who had been questioned during their several weeks of detention by CBP or USICE officers about relatives or friends who could care for the children upon release, nor had any class member or mother been questioned about the possibility of the class member being placed in a licensed facility for the care of dependent children.  I saw absolutely no evidence either in my discussions with class members or their mothers, or when reviewing their administrative files, that DHS was in any way taking and recording steps to release Flores class members without unnecessary delay or as expeditiously as possible. In fact, I became aware of no efforts at all to release class members under Paragraph 14 or to place them under Paragraph 19 of the *Flores* Settlement. Based on my discussions with Flores class members and their mothers, and review of their files, it was clear that DHS continues to ignore Paragraph 18 of the Settlement which provides upon taking a minor into custody, DHS must make and record prompt and continuous efforts toward family reunification and the release of the minor pursuant to Paragraph 14."
Declaration of Theresa Wilkes, Doc. # 201-1, Ex. 9, ¶ 11.

Declaration of Raquel Axxxxx xxxxxx, Doc. # 201-5, Ex. 26, ¶11 (2/3/16)
"No officials have talked to me about whether we have relatives or close friends in the U.S. who could temporarily care for my daughter."
Declaration of Raquel Axxxxx xxxxxx, Doc. # 201-5, Ex. 26, ¶11.

Declaration of Class Member, Katerin Yxxxxxxx xxxxxxx (12 years old) Doc. # 201-5, Ex. 34, ¶13 (2/3/2016)
"No one asked where I was hoping to live in the United States, even though my dad lives

in Virginia and my mom and I want to live
with him."
Declaration of Katerin Yxxxxxxx xxxxxxx,
Doc. # 201-5, Ex. 34, ¶13.

Declaration of Sonia Axxxxx-xxxxxx, Doc. #
201-5, Ex. 35, ¶8 (2/3/16)
"No one at the border patrol station or here at
Karnes has ever questioned me or discussed
with me the possibility of my sons being
released to relatives or friends here in the
United States."
Declaration of Sonia Axxxxx-xxxxxx, Doc. #
201-5, Ex. 35, ¶8.

Declaration of Leny Adonay Guzman (15
yrs old) Doc. # 201-6, Ex. 48, ¶ 8 (2/3/16)
"To this day no officer or employee at
Karnes has discussed with me or my mom
the possibility that I could be released to
my aunt in Houston. To the best of my
knowledge no one has contacted my aunt
to learn more about whether she can take
care and custody of me." Declaration of
Leny Adonay Guzman (15 yrs old) Doc. #
201-6, Ex. 48, ¶ 8.

Declaration of Bridget Cambria, Doc. # 201-1
at 103, Ex. 3, ¶ 12
"I have never been informed or seen any
efforts by the Defendants to provide
continuous efforts toward release except the
period immediately prior to the Order of
Judge Gee. Following the decision and order
of Judge Gee and the release of many families
who were detained for long periods of time,
ICE nearly immediately began to detain class
members for periods in violation of the
settlement."
Declaration of Bridget Cambria, Doc. # 201-1
at 103, Ex. 3, ¶ 12.

Declaration of Raquel Axxxxx xxxxxx, Doc.
# 201-5, Ex. 26, ¶¶ 11-12 (2/3/16)
"My daughter is not a flight risk, a danger to
herself or others, or are juvenile delinquent,
yet not one official has talked to me in the
past month and a half to explore whether my

daughter can or should be released to a family
member or family friend."
Declaration of Raquel Axxxxx xxxxxx, Doc.
# 201-5, Ex. 26, ¶¶ 11-12.

Declaration of Kelly Gxxxxxxxx-xxxxx,
Doc. # 201-5, Ex. 31, ¶14 (5/1/16)
"I have family here in the U.S., my
brother lives here and he has TPS
[Temporary Protected Status], he has
been here for more than 20 years and
lives in Houston. He would be willing to
have my son live with him. No
immigration officers at the border, at
Karnes, or [at] Berks have ever asked me
about my son going to live with my
brother."
Declaration of Kelly Gxxxxxxxx-xxxxx,
Doc. # 201-5, Ex. 31, ¶14.

Declaration of attorney Lindsay Harris, Doc.
# 201-2, Ex. 14, ¶4(d)
"*Flores* class members in CPB facilities are
not told by officials about any rights they may
possess under the Flores settlement."
Declaration of Lindsay Harris, Doc. # 201-2,
Ex. 14, ¶4(d)
Declaration of volunteer attorney Natalia
Ospina, Doc. # 201-1, Ex. 7, ¶9 (3/10/16)
"According to the detainees I interviewed
not one had been told that Flores class
members have the right to a custody
hearing before an immigration judge and
none of the Flores class members had
been taken before an immigration judge
for a bond redetermination hearing."
Declaration of Natalia Ospina, Doc. #
201-1, Ex. 7, ¶9.

Declaration of Allison Mxxxx xxxxx,
Doc. # 201-5, Ex. 40, ¶10 (5/1/16)
"At no point [during our detention]
did anyone ever talk to me or my
sister about our rights as children. I
was never talked to about any ability
to be released to my dad or to receive
a bond in front of an immigration
judge."

1

2

| | Declaration of Allison Mxxxx xxxxx, Doc. # 201-5, Ex. 40, ¶10. |
|---|---|
| | Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, San Antonio, Texas, Doc. # 201-2, Ex. 17, ¶20<br>"Children at the Karnes detention center have routinely told us that they were not informed of their rights to custody redetermination hearings, as required by the *Flores* settlement agreement, and the same is true of the class members I met with on February 3, 2016."<br>Declaration of Manoj Govindaiah Doc. # 201-2, Ex. 17, ¶20. |
| | Declaration of thirteen-year-old class member Cesia Vxxxxxxxxx-xxxx, Doc. # 201-5, Ex. 29, ¶19<br>"...[n]o official … has informed me that I have a right to see an immigration judge about my custody status."<br>Declaration of Cesia Vxxxxxxxxx-xxxx, Doc. # 201-5, Ex. 29, ¶19. |
| | Declaration of Kelly Gxxxxxxxx-xxxxx, Doc. # 201-5, Ex. 31, ¶ 6 (5/1/16)<br>"I was never told that my son had a rights under the Flores case to have an immigration judge review his bond situation or consider his release."<br>Declaration of Kelly Gxxxxxxxx-xxxxx, Doc. # 201-5, Ex. 31, ¶ 6. |
| | Declaration of Victor Rxxxxx xxxxxxx (age 15), Doc. # 201-5, Ex. 21, ¶¶ 7, 11 (4/23/16)<br>"No one told me that I maybe had the right to ask an immigration judge to review my detention status or whether I should be released on bond or other conditions…."<br>Declaration of Victor Rxxxxx xxxxxxx, Doc. # 201-5, Ex. 21, ¶¶ 7, 11. |
| | Declaration of Walter Axxxxxxx xxxxxxxxx (age 13), Doc. # 201-5, Ex. 22, ¶ 8 (2/18/16)<br>"No one told me about … seeking a judge about being held in detention." |

Declaration of Walter Axxxxxx xxxxxxxxx, Doc. # 201-5, Ex. 22, ¶ 8.

Declaration of Diana Cxxxxx xxxxx, Doc. # 201-5, Ex. 43, ¶10 (2/2/16)

"While here at Dilley for the past month no one working with the immigration has talked to me about … my right to see a judge to decide if I should be released. My mother has told me that while we have been detained here no one has spoken to her about … my right to see a judge about my release."

Declaration of Diana Cxxxxx xxxxx, Doc. # 201-5, Ex. 43, ¶10.

Declaration of Edgardo Dxxxxx xxxxxxxx, Doc. # 201-6, Ex. 49, ¶11 (2/2/16)

"...no officer here at Dilley has said anything to me or my mother about … seeing an immigration judge to decide if I or I and my mother should be released from detention."

Declaration of Edgardo Dxxxxx xxxxxxxx, Doc. # 201-6, Ex. 49, ¶11.

Declaration of twelve-year-old Class Member, Flember Jose Contreras, Doc. # 201-6, Ex. 50, ¶8 (2/2/16)

"I have not been told that I can see a judge about my detention or release."

Declaration of Flember Jose Contreras, Doc. # 201-6, Ex. 50, ¶8.

Declaration of Karen Lxxxxxx xxxxxxxx (12 years old), Doc. # 201-6, Ex. 51, ¶11 (2/2/16)

"I came to Dilley with my mother on Sunday, January 23, 2016. I have not been told that I can see a judge about my release."

Declaration of Karen Lxxxxxx xxxxxxxx, Doc. # 201-6, Ex. 51, ¶11.

Declaration of Madelyn Mxxxxxxx-xxxxx, Doc. # 201-6, Ex. 52, ¶10 (13 years old w/ mother, Elsy Noemi Lopez, (2/2/16)

"While here at Dilley for the past month no one working with the immigration has

talked to me about … my right to see a judge to decide if I should be released. My mother has told me that while we have been detained here no one has spoken to her about …my right to see a judge about my release."
Declaration of Madelyn Mxxxxxxx-xxxxx, Doc. # 201-6, Ex. 52, ¶10.

Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES in San Antonio, Texas, Doc. # 201-2, Ex. 17, ¶21
"Class members also reported being placed with unrelated adults, which is also very common at the Karnes detention center too."
Declaration of Manoj Govindaiah, Doc. # 201-2, Ex. 17, ¶21.

Declaration of Amarilis Lxxxxxx xxxxx, Doc. # 201-5, Ex. 44, ¶8 (2/3/16)
"I have not been told that I can see a judge about my detention or release."
Declaration of Amarilis Lxxxxxx xxxxx, Doc. # 201-5, Ex. 44, ¶8.

Declaration of Sonia Axxxxx-xxxxxx, Doc. # 201-5, Ex. 35, ¶8 (2/3/16)
"I have not been told that my son …could see a judge about his detention or release."
Declaration of Sonia Axxxxx-xxxxxx, Doc. # 201-5, Ex. 35, ¶8.

Declaration of Katerin Yxxxxxxx xxxxxxx, Doc. # 201-5, Ex. 34, ¶7 (2/3/16)
"No one told me that I had a right to see an Immigration Judge about my detention. …  I have talked to my mother and my mother has said that no one has told her about… any rights I may have to see an immigration judge."
Declaration of Katerin Yxxxxxxx xxxxxxx, Doc. # 201-5, Ex. 34, ¶7.

Declaration of Allison Mxxxx xxxxx, Doc. # 201-6, Ex. 40, ¶12 (2/19/16)

91

"There was no need for me [or] my sister … to be placed in detention. Our father, Elias Mxxxxx xxxxx, lives in Dallas, Texas. He has been here for about 12 years. My mother also has a sister … who lives in Maryland and is a Legal Permanent Resident … My mom also has an aunt in Maryland who is a U.S. citizen … Immigration knows that we have family willing to care for us, and they have denied our release for the last 8 months." Dec. of Allison Mxxxx xxxxx, Doc. # 201-6, Ex. 40, ¶12.

Declaration of 13-year-old Class Member, Cesia Vxxxxxxxxx-xxxx, who was detained for about six months when she declared: "No official here has questioned me to determine if I have a close family member to whom I could be released or whether I am willing to be placed in a licensed home if  no relative is found to be capable of caring for me."
Dec. of Cesia Vxxxxxxxxx-xxxx, Doc. # 201-5, Ex. 29, ¶19.

No one at the border patrol station asked me any questions about whether I had any relatives or family friends to whom I could be released in the United States. My mother was with me when I was interviewed and provided this declaration and she also says that no one ever asked her about any relatives or close friends we have in the U.S. that could take care of me if I was released from detention. I do have an uncle named Leandro Ortiz Garcia, and he has permission to be in the United States and travels in and out of the country frequently. He lives in San Antonio, Texas and he could care for me if I am released from custody. My uncle owns his house. He works in construction. My uncle's address is 12809 Old Spanish Trl. Live Oak, San Antonio, TX 78233. My uncle could pick me up from Karnes City if I were released. My mother and I were planning to travel to San Antonio, TX to live with my uncle. But no one has made any effort to reunite me with my uncle. Since being detained and being in

| | |
|---|---|
| | close contact with many other detained minors and talking to them every day, to the best of my knowledge not one minor in custody has been questioned about relatives in the U.S. or close family friends to whom they could be released. Release is not an option if you are arrested with your mother." Declaration of Franklin Rxxxx xxxxxxxxx, Doc. # 201-5 at 918, Ex. 45, ¶ 10. Declaration of Sara Exxxxxxxx xxxxx, Doc. # 201-5 at 837, Ex. 24, ¶ 9 "No one has talked to me about whether my daughter can be released to a friend or relative in the United States." Declaration of Sara Exxxxxxxx xxxxx, Doc. # 201-5 at 837, Ex. 24, ¶ 9. |

| | |
|---|---|
| **B. Defendants have no contracts with licensed programs to place accompanied minors under ¶¶ 14E or 19 of the Agreement and therefore never place Class Members in such facilities** | Deposition Excerpts of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. (Ex. 2):<br>Q. Okay. Are you currently aware of any licensed program that either Border Patrol or ICE is operating, or has a contract with, where minors may be placed temporarily if they are not eligible for release from custody?...<br>THE WITNESS:  Is this accompanied minors or unaccompanied minors?<br>Q. Accompanied minors.  I know -- I know unaccompanied minors go to ORR.<br>THE WITNESS: Yes. I am not -- I am not aware of any program that Border Patrol works with -- in that – in that construct. (Padilla Dep. 20:13-20:25).<br><br>Deposition Excerpts of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller (Ex. 9):<br>Q. Are you aware of any training provided in the PALMS Module regarding the definition of a licensed program under the Flores settlements?<br>MR. SILVIS:  Object to foundation.<br>THE WITNESS:  No.<br>(Miller Dep. 54:17-54:23).<br><br>Q. And at the present time, does ICE have any contracts with any licensed programs, other than your detention -- family detention centers, in which you could place accompanied minors?<br>MR. SILVIS: Objection, foundation.<br>THE WITNESS:  Not placement locations. We have a family case management program where we could facilitate community re-engagement generally utilized for folks who are not good candidates for the FRCs.  We will look to place them into the family case management program as an alternative to detention. (Miller Dep. 60:16-61:9).<br><br>Q. Are you aware of -- of any licensed program, other than your family detention centers, your three family detention centers, |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | that ICE has contracted with for the placement of minors in your custody who for one reason or another placement with an individual is not available or appropriate? A. No. (Miller Dep. 61:18-62:2).

Deposition of Berks Assistant Field Office Director, Enforcement and Removal Operations, ICE, Joshua Reid (Ex. 8): Q. Is Berks currently a licensed facility or unlicensed? MS. FABIAN: Object to form. THE WITNESS: As the license is pending litigation, I don't feel I'm qualified to make that determination. (Reid Dep. 28:14-28:19). |
|---|---|

| | |
|---|---|
| **C. Defendants have no procedures in place to obtain Affidavits of Support for those willing to accept custody of a minor as required by ¶ 15 and ICE officers do not confer with Class Members or their mothers about placement pursuant to any part of the Settlement.** | Deposition of Assistant Field Office Director of Enforcement and Removal Operations, San Antonio Field Office, ICE, Juanita Hester, Ex. 6: <br><br> THE WITNESS: As I stated earlier, the information in reference to family, friends, relative, that information would be in the database, not necessarily in their A-file. (Hester Dep. 100:22-100:25) <br><br> Deposition of Karina Vxxxx-xxxxxxx, Ex. 13: <br> Q. Did anyone speak to you about what would happen to you when you first arrived? <br> A. No. <br> Q. Were you given any paperwork or forms to fill out? <br> A. No. <br> (Karina Vxxxx-xxxxxxx Dep. 22:10-22:16). <br><br> Deposition of Chief Patrol Agent – Laredo Sector, CBP, Mario Martinez, Ex. 5: <br> Q. In paragraph 14 of your declaration you state that border patrol agents when they are processing family units asked about contacts that the family has in the United States; do you see that or recall that? <br> A: Yes, sir, I see it. <br> Q: Where is that information recorded? The responses to that inquiry or those inquiries, where – where is that recorded? <br> A: That would be recorded within the e3 in the I-213. <br> Q. I'm sorry. In both places? 19 A. Well, e3 is the mechanism through which the 20 I-213 form is generated. <br> Q. Okay. So the I-213 is part of the e3 detention module? <br> A. Not the detention module, but the actual enforcement module. So we used e3, which is a system, and within that system there are different modules. And the processing is done within the one system so that we can capture all the information that is pertinent, not just from the law enforcement perspective but also for the processing of the individual and the disposition. <br> Q. And what is -- in what module is the I-213 |

included?
A. It's in the actual processing site of the e3 intake.
(Martinez Dep. 12:8-14:8).

Deposition Excerpts of Chief Patrol Agent – Rio Grande Valley Sector, CBP, Manuel Padilla Jr. (Ex. 2):
Q. Yeah, but I don't see anything in that that refers to my question. I am not talking about food or water. I am very specifically looking at your paragraph 15. And your paragraph 15 tells us that your agents have been provided guidance that they are "required" to follow. And that guidance requires them from unaccompanied minors to obtain not only parents and legal guardian contact information in the United State, but also "any relatives."  My question is very simple. Has a similar guidance been issued to agents with regards to accompanied minors, and if so, when was it issued and in what manner was it issued?
THE WITNESS:  Yes, sir. I do not -- I cannot answer that question right now. I would have to research that. (Padilla Dep. 15:16-16:4).

Q. Okay. What is -- are you aware that under paragraph 14 a minor shall be released to a suitable custodian, including, let's say, an uncle and an auntie or grandmother or grandfather?  Are you aware of that?
THE WITNESS: Yes, sir. I am aware that it's a parent or a legal guardian, if I remember correctly.
Q. Okay.  But other than -- other than the parents or legal guardian, without guessing, do you remember what the other options are that could be explored for placement under paragraph 14, if you -- if you recall?
A. Yes. What I do recall is that we give as much information to ORR and it is their responsibility to look at those options to see who is suitable to take custody and care of those unaccompanied children.
(Padilla Dep. 17:12-18:7).

Q. Okay. How about when -- when your

agents are processing family units -- or let's say family units, A, as a matter of practice, if you know, do they ask the mother or the father if there is a non-relative adult living in the United States to whom they may want their child released? ….

A. Yes. I -- I do not know.  And I do not want to speculate. (Padilla Dep. 19:16-19:24).

Declaration of Chief Patrol Agent, Tucson Sector, CBP, Paul Beeson

"The TCC maintains a team of processors specifically for juveniles, who are given training by the Tucson Sector Juvenile Coordinator to ensure their actions comply with the Agreement and the TVPRA.  Each agent receives a two hour training block covering appropriate processing procedures, credible fear claims, trafficking questions and other concerns which are unique to the juvenile population."

Declaration of Paul Beeson, Doc. # 209-3, Ex. 6, ¶ 85.

Deposition Excerpts of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller (Ex. 9):

Q. Sure. You talked about how the officers would make inquiry into the sponsor; is that correct?

A. Yes.

Q. And you mentioned several things they would look into. If a minor is involved, is one of the issues they look into the appropriateness of the minor living in that home?

A. No. We defer to the mother.

(Miller Dep. 89:15-89:25).

Q. When -- when I deposed the -- the ICE officials in charge of these three detention centers, I was not able to learn what -- what they would do differently at the 15 day mark than at any other time, because they testified we're constantly reviewing every case to see if anything has changed. I'm wondering, can you tell us what the instruction says about this 15 days and what it says anybody is supposed

to do differently after 15 days?

MR. SILVIS: Object to the form.

THE WITNESS: Sure. The original guidance that went out, I believe it was in June of '15, was at the Secretary's direction to, you know, provide the residents with the opportunity to -- to inform ICE of any changes in their circumstance or sponsorship. And we would do that iteratively throughout their continued detention. Now that families are in detention for a much shorter period of time, I probably would imagine that AFODs, A-F-O-D, assistant field office directors at the facilities had that ongoing dialogue with the residents. The 15-day benchmarks remain in effect. They notice the residents that their -- you know -- that their case is being reviewed and if they have any additional submissions that they or their counsel would like to have considered.  But for many of them if -- if they get to the 15 day point, it's usually only once. You know, most of these folks that we're talking about are -- you know -- are generally put on supervised release around the 15 day mark, if not shortly thereafter.

(Miller Dep. 151:10-153:10).

Q. Okay. And it's your understanding that every 15 days that a family unit is in custody, that ICE gives them some sort of a written notice telling them that if they have anything new about their custody status, to come and bring that forward to an ICE agent?

A. Yes, that's my understanding.

(Miller Dep. 154:13-154:21).

Q. So you've seen an activity report about custody determinations; but my question was, do you see any report that would indicate that these notices have been distributed every 15 days?

A. The distribution of the notices, no, I don't track that. I track the actions taken based on the case reviews.

(Miller Dep. 156:12-156:21).

A. Again, we see the decision on how and where children reside to be a decision of the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

mother. We work to ensure that the family stays together, both while they're detained and while they're in transit. And so the kind of assessments that you're describing, I think, are being done well by ORR. At least it's my understanding that ORR does them well. And I think if Congress wanted us to -- to do that and not do a law enforcement mission, we would have been directed to do so.
(Miller Dep. 165:3-165:19).

Declaration of Yeslin Lxxxx xxxxxxx, Doc. # 201-5 at 834, Ex. 23, ¶ 7
"No one there asked me or my mom if there was someone who could take care of me in the U.S. If they had, I would have told them that we could go stay with my dad in Billings, Montana.  But they never told us that we go leave or that we could ask a judge to be released."
Declaration of Yeslin Lxxxx xxxxxxx, Doc. # 201-5 at 834,  Ex. 23, ¶ 7.

Declaration of attorney, Amanda Doroshow, Doc. # 201-1 at 170, Ex. 10, ¶6
"During the six days I spent at Dilley, I did not meet any *Flores* class member or mother who told me that the class member had been informed by CBP or ICE about … any way that continuous efforts were being made to explore release or placement under the *Flores* settlement. It appeared to me that accompanied minors in Dilley were being treated as if they are not *Flores* class members at all."
Declaration of Amanda Doroshow, Doc. # 201-1 at 170, Ex. 10, ¶6.

| | |
|---|---|
| **D. Defendants have no procedures in place to conduct suitability assessments of those willing to accept custody of a minor as set forth in ¶ 17 of the Agreement and do not confer with Class Members or their mothers about suitability assessments.** | Declaration Excerpts of Class Member Mother Celina Sxxxxxx-xxxx (Ex. 11): Celina Sxxxxxx-xxxx was detained by CBP for approximately 66 hours. *See* Ex. 16, Strange Dec. Ex. O, Doc. #214-2. "I have family here in the U.S. The father of my son Jefferson is here in the U.S. He is living in Manassas, Virginia and is willing to provide car for my son and me….No officer has asked me about me or my son's preference to be released to his father." (Doc. # 201-5 at 849, Dec. of Celina Sxxxxxx-xxxx Ex. 28, ¶ 23). |
| | |
| | Deposition Excerpts of Class Member Franklin Rxxxx xxxxxxxxx (Ex. 12): Q: Did anyone ask you about any family you have in the United States? A: No. (Franklin Rxxxx xxxxxxxxx Dep. 24:11-24:13). |
| | |
| | Deposition Excerpts of Rodney Scott, CBP, Chief Patrol Agent – El Centro Sector (Ex. 3): Q: Okay. So the best of your knowledge, there's no field in the detention module for border patrol agents to enter in data about the name, the contact information for the relative or the friend that the detainee planned to go to if released from custody; is that correct? THE WITNESS: Correct. (Scott Dep. 91:17-91:24)…. |
| | |
| | Deposition Excerpt of Valentin de la Garza, Dilley Supervisor (Exhibit 7): Q. Okay. My question was, Do you request that they give you all their family members or friends in the States or simply with a wish to reside? A. It's just one question we ask them, you know, and -- and it's pretty much a general saying, where they were going to be resi -- residing here in the United States and with who. It's whatever they provide after that. We don't -- If it's more than one, then it's more than one. If it's just one, or if it's none, it—it's whatever they provide, sir, if they provide anything. |

(De La Garza Dep. 25:8-25:17).

Q. Prior to the -- Well, let's call it the Asylum interview with the Asylum officers. Prior to the Asylum interview, have your agents been instructed to take any steps aimed at the release or the placement of the minors under the Flores Settlement?

...

THE WITNESS: No, sir.
Q. And prior to the Asylum interview, have your agents been issued any instructions to make efforts to release or place the minors, pursuant to Judge Gee's -- to anything in Judge Gee's August 2015 order?
MS. FABIAN: Object to form.
THE WITNESS: And you're saying that's prior to the Asylum interview?
Q. Correct.
A. No, sir.
(De La Garza Dep. 26:6-26:22).

Deposition Excerpt of attorney Jacqueline Kline (Plaintiff's Ex. xx):
A: I guess in my opinion, the majority, 95 percent of our clients have someone who they know that they would go to live with if they were released, whether that's a close family friend, a cousin, some closer family relative. And only in a few cases that I can think of did we have clients who did not have friends, family, et cetera in the United States.
Q: Okay. And are friends included under paragraph 14 of the lore settlement as someone --
A: Right. (Kline Dep. 74:22-75:10).

Declaration of Attorney Bridget Cambria: "Despite the fact that in my experience about 95% of detained *Flores* class members at Berks have close family members to whom they could be released under Paragraph 14 of the *Flores* Settlement, to this date, despite the District Court's August Order, in none of my clients' cases, has DHS made and recorded any ongoing efforts aimed at placement of *Flores* class members with relatives or family friends as required by Paragraph 14 and 18 of

the Settlement. Based on my observations, discussions with my clients, and review of their files, I am aware of no effort to comply with the District Court's August Order requiring DHS to make continuous efforts to expeditiously release or place minors. Minors have been and are being detained at Berks for up to four months with no effort being made to release or place them as required by Paragraphs 14, 18, and 19 of the Flores Settlement. [Doc. # 201-1 at 103, Dec. of Bridget Cambria Ex. 3, ¶ 2].

"All these Flores members and their mothers have family or friends ready to provide housing and care, no criminal history, and pose no threat or security or flight. Yet none have been released despite the terms of the Flores Settlement and the District Court's August remedial Order." [Doc. # 201-1 at 103, Dec. of Bridget Cambria Ex. 3, ¶ 10].

Deposition Excerpts of Class Member Mother Mirna Mxxxxxx xxxxx  (Ex. 15):
Mirna Mxxxxxx xxxxx was detained by CBP for approximately 62 hours. *See* Ex. 16, Strange Dec. Ex. R, Doc. #214-2.
The father of my younger child, Josue, lives in the United States and is pursuing asylum. No one has asked me whether my sons have family in the United States that they could be released to or made any efforts for my sons to be released to family members. In particular, no one has made any effort to release my son Josue to his father. [Doc. # 201-5 at 840, Dec. of Mirna Mxxxxxx xxxxx Ex. 25, ¶ 8].

Deposition of Attorney Peter Schey (Plaintiff's Ex. 16):
The information that we have is that during that initial processing, an I-213 or whatever other forms have to be completed -- people are certainly routinely asked, "Where were you headed in the United States? Do you have a sister or mother or brother? Where were you going?" Who is that person and possibly even their address and that that would be noted in the I-213. What we don't see -- what we don't

believe is happening are questions beyond that one question which would begin compliance with paragraphs 14 and 16. Not necessarily to -- the settlement doesn't require that you immediately release the person. The settlement contemplates that that could even take a few days but that that process starts immediately. We don't see that process as starting immediately even in border patrol stations.
(Schey Dep. 54:20-55:10).

[Regarding being asked about other family members to be released to]... [A]nd in all of those cases the parents or it was an older kid would -- would respond, no, nobody has questioned me about those potential options.
(Schey Dep. 88:12-88:15).

So in our meetings or my meetings with Class members, none of them indicated that they had been questioned about those types of inquiries that I think would have to be made under paragraph 14.
(Schey Dep. 89:11-89:15).

The inspections also clearly disclosed that whether Class Members were detained for days, weeks or months, continuous efforts are not made and recorded to release children under Paragraph 14 or place them under Paragraph 19, and all children end up detained in Defendants unlicensed or secure facilities commingled with unrelated adults.
[Doc. # 201-1 at 1, Dec. of Peter Schey Ex. 1, ¶ 9].

Deposition of Attorney Robyn Barnard (Ex. 23):
A. I can speak to -- some of the families have received every 90 days, I believe, custody determine notices from Immigration and Customs Enforcement, which I believe in my experience is a standard practice for anyone who is subject to immigration detention. Those notices asked the detainee that if they wanted to be released from detention they should provide reasons and supporting

|  | evidence for why they should be released. And for several of the families, documents were submitted from appropriate either immediate family, relatives that lived in the United States or extended family or, in some cases, friends who lived in the United States who had immigration status and who were willing and able to receive the class members, the Flores class members, as well as their parents, if they were released from detention. That is the only document that I've received relating to any of the Berks families detained at the Berks facility that relates to release, but none of the families that I am aware of who submitted that supporting documentation requesting release were granted release. (Barnard Dep. 58:13-59:11). |
|---|---|

| | |
|---|---|
| **E. Defendants do not place accompanied minors or offer accompanied minors placement in "less restrictive alternatives [than secure facilities] that are available and appropriate" under ¶ 23 of the Agreement.** | TEDS 4.16 Open Area Security: Additional caution must be exercised to ensure the safety of the public and staff in open areas.  Officers/Agents working in or transiting this area must exercise due diligence to safeguard their firearms and other weapons.  Staff must also ensure that all potential egress points are utilized in a manner that reduces escape risk.<br><br>Deposition Excerpts of Phillip Miller, Deputy Executive Associate Director for Enforcement and Removal Operations, ICE (Ex. 9):<br>Q: Are you aware of what the Flores settlement states with regards to the placement of minors in medium secure facilities as an alternative to placement in a secure facility?<br>A. No.  (Miller Dep. 102:25-103:6).<br><br>Deposition Excerpts of Rodney Scott, CBP, Chief Patrol Agent – El Centro Sector (Ex. 3):<br>Q: Are family units ever issued a notice to appear and released from one of your stations?<br>A: You said "ever," so, yes, that can happen.  That does happen.  Again, the normal process is for us to turn them over to ICE Enforcement Removal Operations, but in special cases – humanitarian reasons, special circumstances -- we can skip that process and actually release them on our own.  We still give them a notice to appear in their -- what's called released on their own recognizance.  But in most cases, the vast majority of cases, they're turned over to ICE ERO. And then anything that happens after them, to include that option is up to ERO. That's not within my purview. (Scott Dep. 15:4-15:17).<br><br>Deposition Excerpts of Mario Martinez, Chief Patrol Agent of Border Patrol, Laredo Sector (Ex. 5):<br>A. Well, I think that the only one that comes to mind right now that I can recall would be the TEDS -- the document that came out on how we detain and process folks in our |

custody.

THE WITNESS: TEDS, T-E-D-S.

Q. And what -- what does the TEDS document tell your agents about asking apprehended immigrants about their contacts in the United States?

A. I don't have the document in front of me, so I can't tell you exactly what it does or does not say.

Q. Okay. I'm not arguing exactly. What -- what's your best recollection about what TEDS says?

A. So TEDS does talk about moving the folks that are in custody as quickly as you possibly can to either repatriate into -- and/or to the custody of another agency. And -- and I do believe it does speak to us gathering as much information on contacts that they may or may not have in the United States in order to do that.

(Martinez Dep. 18:6-18:25).

A: So when you're talking about children or especially specifically unaccompanied alien children, what we look to is very specifically entering the information into e3 so that health and human services and the office of refugee settlement has the information that they need to be able to place the individual. We do not place the individual, we just need to turn the individual over or the child over to -- or as quickly as we possibly can.

(Martinez Dep. 19:12-19:20).

A. In terms of family units, that information is entered into e3 for the purpose of ICRO being able to make a determination as to whether or not the family unit is going to be moved to a residential facility or they're going to take the person into their actual facility here in Saunders. So that's just basically a general rule is that we get as much information as we possibly can from all of the persons that are apprehended so that we can make those types of custody determinations and help other agencies make their custody determinations along the way.

(Martinez Dep. 19:22-20:7).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Deposition Excerpts of Rodney Scott, CBP, Chief Patrol Agent – El Centro Sector (Ex. 3):
THE WITNESS: So without giving a legal review, I'll tell you the guidance that we issue Internally. To enhance the safety of the child and to ensure that he is really, truly -- he or she is really, truly being released to a guardian that has the child's best interest in mind, a border patrol agents -- and, again, even though special cases, the only time that we are going to release is if we are highly confident that it's a parent.  Internal policy shifts the – the custody determination. (Scott Dep. 68:14-68:24).

Q: And was there anything else, other than that October 16 memo, that you can recall in the past 12 months?
A: After the August -- and, again, I'm going to refer to my -- my declaration for the dates, because I'm not that great with the dates. But after that court order in August 2015, additional guidance – and that was issued by a memorandum -- went out. For example, that Flores applied to all juveniles, not just unaccompanied.  That changed some of our processing so that we are issuing the I77 juvenile rights forms to all juveniles, not just unaccompanied. So there were memorandums and guidance associated with that, both from headquarters and the local level. (Scott Dep. 76:11-76:25).

Q: Okay. So the best of your knowledge, there's no field in the detention module for border patrol agents to enter in data about the name, the contact information for the relative or the friend that the detainee planned to go to if released from custody; is that correct?
THE WITNESS: Correct. (Scott Dep. 91:17-91:24)….

Q: And so in that way, I think it's fair to say that unaccompanied juveniles are treated differently from accompanied juveniles.  Is that fair to say?
THE WITNESS: For -- for processing and

| | specific detention, yes, because if they're accompanied, we try to keep the family together... (Scott Dep. 94:17-94:24). |
|---|---|

| 4. *FLORES* CLASS MEMBER CHILDREN ARE ROUTINELY COMMINGLED WITH UNRELATED ADULTS FOR EXTENDED PERIODS OF TIME | TEDS 5.6 Detention<br>Detention – UAC and Juveniles: UAC must be held separately from adult detainees.  A juvenile may temporarily remain with a non-parental adult family member where: 1) the family relationship has been vetted to the extent feasible, and 2) the CBP supervisor determines that remaining with the non-parental adult family member is appropriate, under the totality of the circumstances.<br><br>Deposition Excerpts of Class Member Mother Karina Vxxxx-xxxxxxx (Ex. 13):<br>Q: How many were in the room with you?<br>A: Many women. More than 50.<br>Q: Were there more or less children than women?<br>A: Only women with children.<br>(Karina Vxxxx-xxxxxxx Dep. 23:17-23:22).<br><br>Deposition Excerpts of Assistant Field Office Director, Enforcement Removal Operations, ICE, Valentin de la Garza, (Ex. 7):<br>Q. And can you tell us, in Dilley, are – are there any rules regarding the separation of class members from unrelated adults, and if so, what are those rules?...<br>THE WITNESS: I don't know if we've ever separated anybody that's a class member, sir. I don't recall.<br>(De La Garza Dep. 47:5-47:11).<br><br>Q: Let me re—Let me repeat the question. At Dilley, is it correct that mothers and their children are assigned sleeping quarters?<br>A. Yes. They are.<br>Q. And in a typical sleeping quarters, how many mothers and children may share that space.<br>A. It's all dependent on the configuration of the family, sir. There's different groups that we have here or there that we just don't mix certain age groups and sexes together. It's all dependent on the configuration of the family. But there's 12 beds in –<br>Q. Okay.<br>A. – each suite – in each suite. In essence, if you must speak hypothetically, if there's one |
|---|---|

mother and one child and they fall within one
of the groups, in the same groups, then we can
house up to 12 – I mean six mothers and six
different children in one room.

Q. Okay. Most of the suites accommodate
approximately 12 people?

A. There's – They  -- They can accommodate
up to 12 people, correct.

...

Q. And may adults enter the suites they have
been assigned to at any time during the day?

A. If they're assigned to a suite, they can –
they can walk in and out of that suite at any
time of the day or night, sir.

Q. And if – if there are class members in that
suite, may mothers assigned to that suite still
go in and out of the suite during the day.

A. Yes.

Q. And if a class member was in a suite
during the day, and an unrelated mother
wishes to go into that suite during that – the
day, could she do so?

A. If she's assigned to that one, yes.

Q. And if a class member was in a suite
during the day and an unrelated mother
wanted to go into that suite during the day,
would she have to be accompanied by a staff
member to do so?

A. It's only assigned unrelated mothers, any
room, can enter a suite. If its an unrelated
mother and its not assigned to that room, we
ask them not to. We tell them not to. We're –
the contractors tell them not to.

Q. And how is that monitored?

A. By the CCA staff member that's assigned
to that neighborhood, or complex. ...

Q. And how would – How do they monitor
that, is my question. In other words, do they
sit on a chair outside each suite, or how to
they monitor who is going in and out of the
suites?

A. That – That's up to the resident supervisor
how they're doing it, sir.

Q. So you –

A. It –

Q. – do not know how they're doing it?

A. No, sir. I don't. Not exactly.

(De La Garza Dep. 53:11-55:25).

Q. And during the day when -- or in the evening when class members are not in their suites, do they comingle with unrelated adults in common areas of the facility? ...
THE WITNESS: The common areas are open to everybody, sir. They choose to. There's other members, and if there's other families in there, then it's possible.
(De La Garza Dep. 56:13-56:20).

Deposition Excerpt of Joshua Reid, Assistant Field Office Director, Enforcement and Removal Operations, ICE, (Ex. 8):
Q: And when you have fathers there during the daytime, do they use common areas that children may also use?
A: Yes.  As it's an open center that doesn't restrict the movement of residents, yes, they use the common areas as the mothers and children. (Reid Dep. 32:20-33:1).

Q: To your knowledge, has ICE considered segregating unrelated fathers from other children in the common areas at Berks, if you know?
A: I'm not aware of ICE considering that, no. (Reid Dep. 33:6-33:10).

"Two declarants (Celina and Karen) indicated that detained men are commingled with detained mothers and children at BFRC. The BFRC accommodates both male and female heads of households and their children….male residents are permitted to commingle with female residents within program areas…." [Doc. # 217-4, Dec. of Joshua Reid Ex. 28, ¶ 17].

Deposition Excerpts of Paul Beeson, CBP, Chief Patrol Agent – Tucson Sector (Ex. 4):
Q: And do you recall what or are you aware of what the Flores settlement states with regards to the segregation of minors from unrelated adults in CBP custody?
A: I think the intent is for us to keep them completely separated unless it were like just not operationally feasible. (Beeson Dep.

1

2            12:24-13:5).

3            Q: Okay. So to the best of your knowledge
             accompanied minors are held in one area with

4            their accompanying parents and
             unaccompanied minors are held in a different

5            area; is that correct? Different holding cell; is
             that correct?

6            A: That's my -- yes, I believe that's correct.

7            (Beeson Dep. 33:6-33:11).

8            UACs are separated from adults as quickly as
             operationally possible.  For hold rooms

9            containing juveniles, the hold room doors are
             generally left open to allow free movement.

10           To maintain family unity, Border Patrol

11           normally tries to segregate families from the
            rest of the detained population. [Doc. # 209-3,

12           Dec. of Paul Beeson, Ex. 6, ¶ 21].

13           Deposition Excerpts of Phillip Miller, Deputy

14           Executive Associate Director of Field
            Operations, Enforcement and Removal

15           Operations, (Ex. 9):
            Q: And those fathers and mothers at your

16           facility are commingled with -- with children
            detained at that facility; is that correct?

17           A: Yes.
            Q: And does that raise any concerns with you

18           or with the agency?

19           THE WITNESS:  No. (Miller Dep. 71:5-
            71:14).

20

21           Q: How about at the other two facilities, in
            Dilley and Karnes, their children are also

22           coming over with unrelated adults; is that
            correct?

23           A: Yes. (Miller Dep. 71:16-71:20).

24           Q: And why is it that your agency does not

25           detain fathers who are accompanying their
            children when apprehended?

26           THE WITNESS:  We don't have the capacity
            to do it at this time. (Miller Dep. 72:16-

27           72:24).

28           Q. Are you aware whether or not the Flores
            settlement requires that when a minor is

placed in such a detention facility, a secure
detention facility, that facility must have
separate accommodations for minors?
A. No.
(Miller Dep. 101:4-101:10).

Q: Can you explain the criteria of age to us?
A. Sure. Some families have children that are
-- you know -- that are older than 17. Some
families -- you know, it's like -- there is no
standard definition, at least for us and what
comprises a family. So we have to look, you
know, at the age of the children relative to,
you know, what's readily available; you
know, whether the family unit is comprised of
children that are, you know, of majority under
the INA or deemed juvenile. So it's a little bit
-- you know, we try to keep family units
together. And so we'll look at kind of the
totality of the circumstances of -- of that
individual family unit and does that individual
family unit's profile, taking into account those
six -- and I believe there's probably others, I
don't have the -- I don't have the screening
tool in front of me -- but they -- you know --
they try to look at the totality of the family
composition and whether or not their needs
can be met before we make a determination
on placement. (Miller Dep. 135:6-136:11).

Deposition Excerpts of Attorney Jacqueline
Kline (Ex. 25):
A: At Berks, the families are several families
to a room. I think it's, I don't know,
somewhere between three and six families in
a room. So you have children with unrelated
adults and unrelated children together in a
room. Particularly when they have male
detainees, you have mixed male and female
children in rooms with other unrelated adult
males. (Kline Dep. 70:16-70:24).

A: I think the – you could have – I mean the
rooms should be more – like, the families,
only those families, in rooms together. More
like – I mean, you can have residential
facilities set up more as suites or something
where it's just your family and that you're not

in with other unrelated adults or children.
(Kline Dep. 72:4-72:11).

Declaration Excerpt of attorney Bridget
Cambria:
Children remain detained at the BCRC with
their adult parents.  Children remain detained
with unrelated adults, yet another violation of
State law and the terms of the Flores
Settlement. [Doc. # 201-1 at 103, Dec. of
Bridget Cambria Ex. 3, ¶ 9].

Declaration of Attorney Peter Schey:
And all children end up detained in
Defendants unlicensed or secure facilities
commingled with unrelated adults.
[Doc. # 201-1 at 1, Dec. of Peter Schey Ex. 1,
¶ 9].

Deposition Excerpt of Attorney Robyn
Barnard (Plaintiff's Ex. xx)
Q. Do the class members during the day
commingle -- are they commingled with both
adult males and females?
A. Yes, they are, to my knowledge.
(Barnard Dep. 65:13-65:16).

"It should also be noted that many class
members are still detained in secure lock-
down facilities with unrelated adults for
weeks or months on end even if the claimed
"average" detention is about twenty days."
[Doc. # 201-1 at 176, Dec. of Robyn Barnard
Ex. 12, ¶ 18].

Deposition Excerpts Class Member's mother
Sara Exxxxxxxx xxxxx (Ex. 17):
Sara Exxxxxxxx xxxxx was detained by CBP
for approximately 76 hours. *See* Ex. 16,
Strange Dec. Ex. L, Doc. #214-2.
Q: And can you estimate about how many
other people were in that room with you?
A: Around 20 moms with their kids.
Q: Okay. Is that 20 people total or 20 moms?
A: No, 20 moms plus their children.
(Sara Exxxxxxxx xxxxx Dep. 20:16-20:20).

Deposition Excerpts Class Member Yeslin

Lxxxx xxxxxxx (Ex. 18):
Yeslin Lxxxx xxxxxxx was detained by CBP for approximately 74 hours. *See* Ex. 16, Strange Dec. Ex. K, Doc. #214-2.
Q: And who else was in that room with you?
A: There were enough people/
Q: Were there other children in that room with you?
A: They were a lot of kids and a lot of moms also.
(Yeslin Lxxxx xxxxxxx Dep. 16:19-16:25).

Declaration of Karen Zxxxxx xxxxxx, Class Member Mother:
"Detained men here are comingled with detained mothers and children and this makes the children and woman very uncomfortable." Declaration of Karen Zxxxxx xxxxxx, Doc. # 201-5 Ex. 39 ¶23.

Declaration of Amarilis Lxxxxxx xxxxx, Class Member Mother:
It is very disturbing for my child to be detained here with several hundred unrelated adults. He is becoming more and more depressed and anxious the longer we are in this detention center unsure of our future and detained with hundreds of unrelated adults. Doc. # 201-5 Ex. 44 ¶10. (2/3/16).
Declaration of Raquel Axxxxx xxxxxx, Class Member Mother: We are detained with hundreds of other unrelated women and their children. Many people must share rooms and many of the children are sick because of the close quarters we share. Declaration of Raquel Axxxxx xxxxxx, Doc. # 201-5 Ex. 26 ¶ 11.

Declaration of Volunteer Advocate (non-attorney) with the CARA project, Alex Mensing: The room was about 3 meters wide by 4 or 5 meters long. There were about 18 people inside. There were babies as young as 1 and a half years old. The babies cried continuously. They kept loading in more and more women with children. There wasn't enough space to sleep because we didn't fit. Exhibit Y ¶4, Doc. # 201-4 Ex. 19 (11/13/15)

116

Declaration of Alex Mensing: I was with my two kids and some other people… There were a lot of people. There were people who slept standing up. Even a woman who was 8 months pregnant with swollen legs slept standing up. Exhibit R, Doc. # 201-4 Ex. 19 (11/9/15)

Declaration of Maria Dxxxx xxxxxxx, Class Member Mother:There were many people, maybe forty people in the cell, all mothers with children. Doc. # 201-5 Ex. 32 ¶ 6 (4/23/16)

Declaration of Karen Zxxxxx xxxxxx, Class Member Mother: Detained men here are comingled with detained mothers and children and this makes the children and woman very uncomfortable. (5/1/16), Doc. # 201-5 Ex. 39 ¶23.

Declaration of Class Member, Victor Rxxxxx xxxxxxx (15 yrs old): I felt very depressed at Karnes. It was very distressing and embarrassing being detained with a large number of unrelated adults…Like at Karnes, it is very disturbing to be detained with other unrelated adults. Here both adult men and women are detained with unrelated minors. This does not feel like a safe situation. Doc. # 201-5 Ex. 21 ¶¶ 8, 16 (4/23/16)

Declaration of Alex Mensing:
On the plane, we were mixed in with men… There were men who were handcuffed at the feet and at the wrist. We were really uncomfortable. We didn't know what class of person they were. We worried about what these men could do. Instead of having a relaxing trip, we wondered what would happen. We were worried the whole time. Exhibit GG, Doc. # 201-3 Ex. 19 ¶ 14 (11/13/15)

| 5. DEFENDANTS DETAIN CLASS MEMBERS IN SECURE ICE FACILITIES FOR LONG PERIODS OF TIME AND DO NOT MAKE RELEASE AVAILABLE AS EXEDITIOUSLY AS POSSIBLE OR WITHOUT UNECCESARAY DELAY. | Deposition Excerpts of Class Member Mother Celina Sxxxxxx-xxxx (Ex. 11): "The prolonged detention is having a terrible effect on my son. He cries, kicks things, throws things or himself on the floor….He has always been a good child, but now he is becoming aggressive with me. He has begun to bite me. He throws himself on the ground….When my son acts out the staff get angry and they make faces and negative comments." [Doc. # 201-5 at 849, Dec. of Celina Sxxxxxx-xxxx Ex. 28, ¶ 17]. |
|---|---|
| | Deposition of Joshua Reid, Assistant Field Office Director at Berks Family Residential Center (Ex. 8): Q: Would processing be speeded up or slowed down if you had additional ICE officers assigned to Berks? THE WITNESS: Our officers are processing things in a quick manner to begin with, so I think were at adequate staff to process things quickly and efficiently. (Reid Dep. 10:18-10:25). |
| | Q: …Let's just say approximately, what is the longest held child that you have at Berks at the present time? Approximately…. A: Approximately, I would say probably about 13 months. (Reid Dep. 37:24-38:16). |
| | Q: Okay. And at the present time, approximately how many children have been held at Berks for more than six months?  I realize you don't have the exact number, but I'm just saying your best estimate based on your function at the facility? A: I would have to review the custody information.  I don't want to even give you an approximate on that.  There's several, but a number I don't know. (Reid Dep. 38:14-38:22). |
| | Q: Have you attempted to determine how long the longest held children and mothers have been at Berks as a result of stays |

issued by an immigration judge or the Board of Immigration Appeals or a federal court? …

THE WITNESS: I would need to look at their cases to determine that. Have I specifically attempted to determine that? No. (Reid Dep. 42:16-42:24).

Q: Mr. Reid, when the detainees at Berks, or any other detainees are apprehended, based on your experience as an ICE officer, where is the date of apprehension recorded?
A: Date of apprehension would be in EARM.
….
Q: And generally, am I correct that the time of apprehension is recorded?
A: I'm not sure, to be honest with you, sir, in EARM if that is recorded.  There is a processing system that I forgot to mention.  It's EAGLE.  I don't know what the full acronym stands for.  But I believe the apprehension time would be recorded in EAGLE. (Reid Dep. 62:8-62:24).

Deposition Excerpts of Juanita Hester, Assistant Field Office Director at Karnes Residential Facility (Ex. 6):
Q. It's always a goal to reduce detention time, if somebody has a remedy available to them in the United States; is that fair to say?
THE WITNESS: At Karnes, we don't want somebody in our custody if they have relief available and they're able to be released.  We're going to make every effort to have that happen as soon as possible.
(Hester Dec. 21:25-22:7).

A. The report shows who's been in custody 15 days or more at the Karnes facility.
Q. And does it have a tabulation to say that there's this many people or that many people who've been here for 15 days or more, or is it just -- each individual is listed so you could tell if they've been there for 15 days or more?
A. There's no tabulation. It's just a list.
Q. It's -- It's a list of individuals; is that

119

correct?

A. It is a list of heads of household.

Q. Does it also list their children or just the heads of the household?

A. The report only lists the heads of household, the mothers.

(Hester Dec. 28:2-28:16).

THE WITNESS: If they claim credible fear, then they go in front of Asylum. But if they don't claim fear, they're a final order of removal, and we will process them and have them returned to their country as soon as possible. (Hester Dec. 71:13-71:17).

Q. Okay. And if -- And -- And so, is it -- Are -- Are you saying that it is part of your goal to have that population down to the lowest number possible? Would that be fair to say, that that's part of the objective of ICE units? ...

THE WITNESS: No. As I stated earlier, it's -- it's for us to be -- to be able to look at and -- and look at cases, and what I consider, you know, somebody in 15 -- 15 days in custody or more.

(Hester Dec. 86:6-86:15).

Deposition Excerpts of Class Member Franklin Rxxxx xxxxxxxxx (Ex. 12):

Q: So the last place you were at was the Karnes facility.

A: Yes.

Q: And how long were you there again?

A: Like, around 15 days.

(Franklin Rxxxx xxxxxxxxx Dep. 33:16-33:20).

Q: I have a question about your declaration. In paragraph 14, regarding the last sentence, it says: "I think the only reason I have been treated so inhumanely is so the U.S. immigration authorities can use me and other detained minors as an example to convince other young people facing violence and even death in El Salvador to stay home, deal with the violence, risk death, but don't come here for protection." What made you think that?

A: Because of the reason that there were some of the minors that they were detained for over a month.
(Franklin Rxxxx xxxxxxxxx Dep. 36:17-37:5).

Q: Was there any other reason?
A: Because also by being there for a month or such a long time will make you go back to your country and not be there for that long time.
(Franklin Rxxxx xxxxxxxxx Dep. 37:14-37:17).

Deposition Excerpt of Mario Martinez, Chief Patrol Agent of Border Patrol in Laredo sector (Ex. 5):
Q: Yeah. Let's say if you have -- let's say for unaccompanied minors first?
A. So -- so for minors it's normally there are from arrests to placement is within 24 hours.
(Martinez Dep. 42:21-42:24).

Q. How about family units, do you have that data? Have you seen any reports about average length of stay of family units in one of your stations or all of your stations?
A. That's correct. And so that data will tell me that -- that they do not exceed over 48 hours in being placed.
(Martinez Dep. 43:22-44:3).

Deposition Excerpts of Juanita Hester, Assistant Field Office Director at Karnes Residential Facility (Ex. 6):
Q. Did the -- Were any additional ICE agents assigned to Karnes around September or October or November 2015 in order to decrease the average length of detention of detainees?
A. Karnes has always had detailed staff assisting us, from the -- the very beginning when they turned into a Family Residential Center in August of 2014.
(Hester Dep. 12:16-12:22).

Q. At any time from November 2014 to the present, has the number of ICE agents

1

2    assigned to Karnes increased?
     A. Yes. ICE agents, the -- the number of staff
3    assigned to Karnes has increased.
     (Hester Dep. 15:13-15:16).
4

5    THE WITNESS: The resident, or the family
     unit, if they get a positive credible fear
6    finding or a positive reasonable fear finding,
     and a notice to appear has been issued by
7    Citizenship and Immigration Services, then
     we release them on an order of recognizance
8    or parole, depending on what case that may
     be.
9    (Hester Dep. 66:8-66:13).

10

11   Deposition Excerpt Dilley Assistant Field
     Office Director, Enforcement and Removal
12   Operations, ICE, Valentin de la Garza, (Ex.
     7):
13   Q. Okay. So the more agents you have there,
     the faster you'd get things done; is that fair to
14   say? …
     THE WITNESS: That's hard to say, I mean,
15   but in a real -- in the real world -- or in a
     perfect world, yes. If each individual --
16   (De La Garza Dep. 9:8-9:13).

17   Deposition Excerpt of Attorney Robyn
     Barnard (Ex. 23):
18   A. I was going to say that since October 23
     2015, the only thing I can say based on my
19   experience at the Berks Detention Center that
     has changed obviously is the length of
20   detention of families at the facility has risen
     dramatically, which I believe Judge Gee's
21   order called for the opposite, that families
     should be released from detention more
22   expeditiously. But I have not been provided
     any documentation outlining Immigration and
23   Customs Enforcement to comply with Judge
     Gee's order.
24   (Barnard Dep. 61:22-62:8).

25

26   A. As far as I recall, the other three families
     have all been in immigration detention for
27   approximately four to six months at least. [*in
     reference to families she previously*
28   *represented at Berks*]

(Barnard Dep. 68:25-69:3).

Declaration of CARA Project attorney Ana Camila Colon, (explaining that delays in the conducting of reasonable fear interviews result in prolonged detention for class members: "One case I worked [on] in November 2015 for the Flores class members from El Salvador waited 16 days for the reasonable fear interview. Another case I worked on in February 2016 for the Flores class members from Guatemala waited 19 days for the reasonable fear interview. A more recent case I worked on March 2016 for the Flores class members from El Salvador waited 20 days for the reasonable fear interview." (Doc. # 201-6 Ex. 64 ¶7).

Declaration of Lindsay Harris:
As a result of my work with the CARA Pro Bono Project, I am aware of many more cases of families held in immigration detention centers who were not released "without unnecessary delay." Indeed, during my February 2016 visit to the Berks County Family Residential Center, all of the families with whom I met had been detained for more than four months. (Doc. # 201-2 Ex. 14, ¶5).

Declaration of Carol Anne Donohoe:
There are several class members and mothers who have now been detained for over eight (8) months. Most of the other class members have been detained for several months and cannot be deported because of stays issued by the courts, Immigration Judges, or the Board of Immigration Appeals. (Doc. # 201-1 Ex. 4 ¶14).

Declaration of Attorney Kathryn Shepherd:
In the hundreds of families I have represented detained at Dilley since October 2015, when I started volunteering in the detention center, I have never seen a family

released in less than five days. Indeed, since the October 23, 2015 date for the government to comply with the Judge's August orders in Flores, according to CARA Project records, we have represented over 6,500 Class member children who have been held in detention for at least five days or longer. … I have routinely seen cases in which class members/parents are detained for longer than 20 days from apprehension to release. In those cases, we have Class member children and their mothers who have been held in detention in Dilley for months. More often, however, families in this position are transferred at some point to the detention center in Berks County, Pennsylvania, and their detention continues there instead of at Dilley. At any one time, we are usually working with around 150 families who have been detained for longer than 20 days. (Doc. # 201-6 Ex. 69 ¶26).

Deposition Excerpts Class Member's mother Sara Exxxxxxxx xxxxx (Ex. 17):
 A: I was already in detention. I had been there for about a month and a half.
Q: Which place?
A: In Karnes.
(Sara Exxxxxxxx xxxxx 32:12-32:15).

I was brought to Karnes with my daughter on or about Thursday, December 17, 2015. We have now been detained here for a month and a half.  [Doc. # 201-5 at 837, Dec. of Sara Exxxxxxxx xxxxx Ex. 24,, ¶ 9].

Deposition Excerpts Class Member Yeslin Lxxxx xxxxxxx (Ex. 18):
I was in Dilley about 20 days. Again, no official asked me about being released to my dad. No one told me I could see a judge about being released to my dad. [Doc. # 201-5 at 834, Dec. of Yeslin Lxxxx xxxxxxx Ex. 23, ¶ 11].

| | |
|---|---|
| **A. Defendants do not evaluate on an individual basis whether class members pose a "substantial flight risk" ("a serious risk that the minor will attempt to escape") before deciding to detain accompanied minors.** | TEDS Manual, 4.3 General Detention Procedures, *Safety and Security Reporting*: During shift change officers/agents must convey all known information of vulnerabilities, escape risks, criminal background or involvement, and/or violence to oncoming officers/agents.<br><br>Deposition Excerpts of Phillip Miller, Deputy Executive Associate Director for Enforcement and Removal Operations, ICE, (Ex. 9):<br>"Q. Are you aware of any written instructions issued to ICE officers, and, if so, please identify those instructions, that explains to them what the term escape risk means in the Flores settlement?<br>A. No. Q. Are you aware of any in-person training about that?<br>A. About defining terms from Flores?<br>Q. Explaining to the officers what the term escape risk means under the Flores settlement, are you aware of any in-person training on that question?<br>A. No. Q. Do you recall what the -- or how the term escape risk is -- is defined in -- in the Flores settlement in general? A. No." (Miller Dep. 101:22-102:19).<br><br>Deposition Excerpts of Juanita Hester, Assistant Field Office Director at Karnes Residential Facility (Ex. 6):<br>Q. Okay. And are you aware of whether agents working at Karnes have received any training on the definition of an escape risk under the Flores Settlement, the 1997 Settlement? …<br>THE WITNESS: I'm not aware.<br>Q. And have you yourself -- Do -- Do you recall receiving any training about what it means to be an escape risk under the terms of the Flores Settlement? And if so, when did you get that training, and who gave it to you?<br>…<br>THE WITNESS: I'm unaware. I -- I'm not able to answer that question.<br>(Hester Dep. 76:1-14).<br><br>Deposition Excerpt Dilley Assistant Field |

Office Director, Enforcement and Removal Operations, ICE, Valentin de la Garzaof Valentin de la Garza, (Ex. 7):

Q. And it is your testimony that -- Or is it your testimony that, during the previous 12 months, no mother has ever been determined to be a flight risk or a danger to herself or others once they were approved on their fear claim? …

THE WITNESS: To my recollection yes, sir. Everybody that's pretty much gotten a positive credible fear findings have been -- have been redetermined, and they -- they've been released and gotten a redetermination in front of an immigration judge that would release them on a -- on a order of recognizance with an alternative detention, monitor --

(De La Garza Dep. 61:17-62:4).

Q. Have ICE agents working at Dilley during the past 12 months been provided with any training or direction or instructions regarding the assessment of escape risks under paragraph 22 of the settlement, and if so, when was such training, guidance, or instructions provided to those agents? …

THE WITNESS: No. I don't know.

(De La Garza Dep. 49:7-14).

Deposition Excerpts of Mario Martinez, Chief Patrol Agent of Border Patrol in Laredo sector (Ex. 5):

Q. Are you aware of how the Flores settlement describes a flight risk for a minor?

A. Vaguely.

(Martinez Dep. 71:16-18).

Declaration of Carol Anne Donohoe:

Class member children at Berks are detained for weeks or months on end and denied parole requests, even with stays of deportation and diagnosed illnesses, and *not* because they are a flight risk or a danger to themselves or others. (Declaration of Carol Anne Donohoe, Doc. # 201-1 Ex. 4 ¶12).

Declaration of Class Member Mother,

| | Raquel Axxxxx xxxxxx:<br>My daughter is not a flight risk, a danger to herself or others, or are juvenile delinquent, yet not one official has talked to me in the past month and a half to explore whether my daughter can or should be released to a family member or family friend.<br>(Declaration of Raquel Axxxxx xxxxxx, Doc. # 201-5, Ex. 26, ¶¶ 11-12). |
|---|---|

| | |
|---|---|
| **B. Defendants detain class members solely because defendants have placed the children in expedited removal proceedings even though orders of expedited removal are statutorily not final and executable until class members have been provided a credible or reasonable fear interview, have received a decision, and have received a decision on any appeals taken to an Immigration Judge, all matters that may take several weeks or months.** | Deposition Excerpts of Class Member mother Lindsay Gxxxx xxxxx (Ex. 14): Q: Did any guard verbally threaten you personally? A: No. They only wanted me to sign deportation. They took me out of the cell. They will put the papers here, and they will ask me, "Sign, sign." And I said, "No." And I told them, "I'm not going to sign because if I go to my country, I'll die." (Lindsay Gxxxx xxxxx Dep. 30:8-30:13). |
| | Declaration of Assistant Field Office Director of Enforcement and Removal Operations, San Antonio Field Office, ICE, Juanita Hester, Ex. 21, ¶ 13 "At the time of their detention at STFRC, the declarants above were in expedited removal proceedings and subject to mandatory detention. Many individuals detained at a FRC are not eligible for bond. For example, individuals who are processed as reinstatements of previously-issued final orders of removal or as arriving aliens are not eligible for a bond hearing before an immigration judge. For individuals in the expedited removal process, detention is mandatory unless the individual is determined to possess a credible fear remain in the expedited removal process and are generally detained until removal." [Doc. # 216-1, Declaration of Juanita Hester, Ex. 21, ¶ 13]. |
| | Deposition Excerpts of Attorney Edward McCarthy (Plaintiff's Ex. 24): A: From my understanding this is a discretionary determination made by ICE to detain these individuals. ICE has the discretion to release them, but it chooses not to do so. (McCarthy Dep. 66:12-66:15). |
| | Deposition Excerpts of Joshua Reid, Assistant Field Office Director for Berks Residential Facility (Plaintiff's Ex. xx): A: Well, the memorandum states if an alien falls within the priorities, depending on the |

| | |
|---|---|
| | level, ICE should typically pursue apprehension, detention and removal unless there's exceptional or compelling circumstances against other or alien demonstrates they're eligible for some form of relief removal, either asylum or some other forms. (Reid Dep. 16:18-16:24). |
| | Declaration Excerpt of Valentin de la Garza, Dilley Supervisor: For individuals in the expedited removal process, detention is mandatory unless the individual is determined to possess a credible fear remain in the expedited removal process and are generally detained until removal. Doc. # 216-1, Dec. of Valentin de la Garza, Ex. 21, ¶ 13. |
| | Deposition Excerpts of attorney Robyn Barnard (Ex. 23): A. The only time I've had any discussion with Immigration and Customs Enforcement officers who are giving me reasons for why either the parent or child who are detained at Berks Detention Center are not being released, they will solely say generally that it's because they're not eligible for release, and by that I understand that they mean that the parent and child had been entered into expedited removal and were not eligible under the laws that apply to expedited removal and both were entered in that proceeding to be released from detention because of their negative or credible or reasonable fear interviews. (Barnard Dep. 63:14-64:2). |
| 6. *FLORES* CLASS MEMBER CHILDREN ARE ROUTINELY DETAINED FOR WEEKS OR MONTHS IN SECURE FACILITIES | |

| **A. Defendants facilities are not "non-secure" nor are their facilities the "least restrictive setting appropriate for the minors age"** | TEDS Manual, 5.6 Detention *Least Restrictive Setting*: Officers/Agents will place each at-risk detainee in the least restrictive setting appropriate to their age and special needs, provided that such setting is consistent with the need to ensure the safety and security of the detainee and that of others.<br><br>Deposition Excerpts of Joshua Reid, Assistant Field Office Director for Berks Residential Facility (Plaintiff's 8.):<br>Q: Are the residents informed that if they walk away without supervision and authorization they may be considered a fugitive and arrested by ICE officers?  Are they informed of that?<br>A: When residents are admitted to the center they are given a handbook and that book details what are the potential offenses, and one of them is leaving the center without authorization. (Reid Dep. 26:19-27:1).<br><br>Q: Is there anything among the list of rights of detainees that tells them that they have the right to leave the facility?<br>A: No. (Reid Dep. 28:10-28:13).<br><br>A: When residents are apprehended, whether it be CBP or inspections, they are turned over to ICE.  And when it's families they are going to be housed at a family residential center, but they are advised they are in custody. And like I stated in my declaration, if they would like to leave the center they would need permission. (Reid Dep. 23:11-23:17).<br><br>THE WITNESS: No. I can't recall that they were allowed to leave without supervision by Berks counselors. (Reid Dep. 24:20-24:22).<br><br>THE WITNESS: I'm not aware of any time a resident was allowed to leave the center without authorization, no.<br>(Reid Dep. 25:4-25:6).<br><br>Deposition Excerpt of Attorney Bridget Cambria (Plaintiff's Ex. xx):<br>Q. What trauma are they experiencing at |

Berks?

A. There's no -- there's no freedom to leave. There's no ability to reunify with their whole families. There's no control over themselves or their own bodies. They don't get to decide what they eat. They don't get to decide what they wear. Their parents can't be their parents. You know, the facility is the one that provides the rules. They don't know whether they're going to leave the facility in freedom. They don't know if they're going to be deported. They watch families being pulled out of bed at three in the morning, screaming and crying, being sent to a place where they believe they're going to die. So the constant unknowing of whether they're going to be okay or they're not going to be okay is what makes these kids suffer all of these things. And that's just what I see. It's my opinion. (Cambria Dep. 68:8-69:4).

Deposition Excerpts of Attorney Edward McCarthy (Plaintiff's Ex.24):

Q: Did it appear to you that the children were – that the location where children were held, I guess, along with adults, were those locations locked?

A: Yes. (McCarthy Dep. 48:10-48:14).

Deposition Excerpts of Attorney Jacqueline Kline (Plaintiff's Ex. 25):

Q: Okay. And prior to 2014 -- can you explain to me a little bit, what would happen prior to 2014?

A: In our experience, prior to 2014 – well, Berks was the only facility in the entire country for family detention. And the people who were detained there, it was for a few weeks, maybe, while they contacted their family. And – or, I mean, I guess there are cases where they didn't actually have any family and a church organization would come in, something like that. And then what we started to see in the summer of 2014 was that the families were being detained and not being released, and then also these facilities in Dilley and Karnes were built and open to detain families…. (Kline Dep. 55:25-56:14).

Declaration of Attorney Jodilyn Goodwin, Doc. # 201-6 Ex. 65 ¶12 (explaining that based on her extensive experience representing immigrants in South Texas, "I do not perceive any difference between the families of mothers and children released after processing at the border, who have interacted with our volunteer attorneys, and the families sent to the family immigration detention centers.  Based on information that I have received from the press, DHS statements and statistics and my conversations with immigration attorneys around the country, including AILA attorneys who volunteer at the family immigration detention centers, the families of mothers and children sent to immigration detention centers are almost all Central American families seeking asylum. The vast majority are apprehended shortly after crossing into the United States, although some families presented themselves to immigration officials before crossing into the United States. The families released at the border and those held in family detention appear to be very similar in national origin, size of family, reasons for arriving in the United States and manner of apprehension.").

Declaration of Carol Anne Donohoe, Doc. # 201-1 Ex. 4 ¶12:
There appears to be no rational reason why some families are detained and others released other than the availability of ICE bed space and the sex of the parent apprehended with the class member child… Class members are not detained or released because of the Settlement or the Court's Orders. Class members are released because bed space is limited or because the mother eventually receives a positive credible fear or reasonable fear determination. Class member children at Berks are detained for weeks or months on

end and denied parole requests, even with stays of deportation and diagnosed illnesses, and *not* because they are a flight risk or a danger to themselves or others.

Declaration of Karen Lucas Re Flores detention facility Inspection, Doc. # 201-6 Ex. 68 ¶¶6-9 ("During the Ursula inspection, Class Counsel asked an ICE Enforcement and Removal Operations (ERO) official how ICE decides which class members and parents to release, and which to continue to detain…This is the decision-making process the ICE ERO officer described: If the family detention centers tell Ursula they have bed space, ICE then looks at the family's "composition," including the gender of the parent and the gender and age of the children (ages 2-14 at Dilley, ages 2-17 at Karnes, he said), to see if the family is suitable for any available family detention spaces, given the makeup of the currently detained population (e.g., because more than one family sleeps in the same room, the gender of the children is considered). They also look to see if the detention center in question can provide medical care needed by any or all of the family members…If the family does not "qualify" for detention, then they "qualify" for release, he said…With respect to male head-of-household families in particular, the official explained that the Dilley and Karnes detention centers do not accept male heads of household. So if Berks has bed space, the family could go to Berks – if not, they would be issued an NTA and released.").

Declaration of Karen Lucas Re Flores detention facility Inspection:
It …appeared to me that the decision to transfer a particular family from Ursula to a family detention center, rather than to release with an NTA, is completely arbitrary. It appears to be based on a combination of available bed space and characteristics like the age, gender, and medical conditions of parents and child(ren). (Doc. # 201-6 Ex. 68 ¶13).

| | |
|---|---|
| **B. The Dilley and Karnes facilities have no licenses both having been blocked by a court in Texas. Berks's license is also being challenged by the State and does not comply with the requirements of Exhibit 1 to the Agreement.** | Deposition Excerpts of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller (Ex. 9):<br>Q.   And so at the present time the Dilley facility is not licensed; is that correct?<br>A.   Yes.<br>(Miller Dep. p. 103:15-103:17).<br><br>Deposition Excerpts of Valentin de la Garza, Dilley Supervisor (Plaintiff's Ex. 7):<br>Q.  Can you tell us what, if any, type of license Dilley currently has, a -- a state-issued or -- or a county-issued license?<br>MS. FABIAN:  Ob -- Object to form.<br>THE WITNESS:  To my knowledge, sir, we don't have one -- or they don't have one.<br>(De la Garza Dep. 21:24-22:4).<br><br>Q: And is it fair to say that Dilley is a secure facility?<br>MS. FABIAN:  Object to form.<br>Q.   You can answer the question.<br>A.   Yes.  If it's -- Is it a secure –<br>Q.   And --<br>A.   -- facility?  Has anybody -- Everybody's freedom of movement there, sir.<br>Q.   Okay.  Are people free to leave the facility if they want to?<br> A.   No, sir.  Not until we tell them it's - - it's okay to leave.<br>(De la Garza Dep. 22:5-22:17).<br><br>Q. To your knowledge, is ICE currently attempting to obtain a license for Dilley, a license to hold children?<br>A. No, sir. We're not.<br>(De la Garza Dep. p. 47:12-47:15).<br><br>Temporary Restraining Order dated May 4, 2016, *Grassroots Leadership v. Texas Department of Family and Protective Services,* Attachment 7 to Declaration of Robert Doggett, Doc. # 201-2, Ex. 18:<br>THE TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, and its agents, servants, employees, and attorneys are hereby ORDERED to desist and refrain from implementing 40 Tex. Admin Code § 748.7 to |

issue any license to the owner or operator of the South Texas Family Residential Center in Dilley, Texas, until further order of the Court. [Attachment 7 at 2, Decl. of Robert Doggett, Doc. # 201-2, Ex. 18]

Declaration Excerpts of Robert Doggett, Doc. # 287-5, Ex. 26:
I currently represent Grassroots Leadership, Inc., a non-profit organization… in a lawsuit for declaratory judgment against the Texas Department of Family and Protective Services ("DFPS") that is pending in the Travis County District Court in Austin, Texas … On May 4, 2016, the court issued a temporary restraining order prohibiting further implementation of the new rule and subsequently issued a temporary injunction that prohibited the issuance of a license to Dilley (the Karnes facility obtained a license before the Court could issue the temporary restraining order).

On December 2, 2016, the Court issued a final judgment that invalidated 748.7 because it "contravenes Texas Human Resources Code § 42.002(4) and runs counter to the general objectives of the Texas Human Resources Code." *See* Final Judgment at 3, attached. The State filed an appeal of the Final Judgment the morning of December 5, 2016. (In Texas, the State has a right to supersede a judgment while on appeal automatically, unless a Court decide otherwise.) In response to concerns raised by Plaintiffs and the admission that Defendants intended to license Dilley anyway while the case is on appeal, the Court conducted a hearing the afternoon of December 5, 2016.  At the conclusion of that hearing the Court orally enjoined the State from issuing a license to Dilley or any other facility because of her ruling on December 2, 2016.  The Court indicated in the hearing that we would be receiving a written Amended Final Judgment within the week that included this injunction language and that would address the State's ability to supersede the judgment while on appeal. [Doc. # 287-5, Dec. of Robert Doggett, Ex. 26, ¶¶ 3-4].

135

| | |
|---|---|
| | Letter from Pennsylvania Department of Human Services to Berks County Residential Center dated January 27, 2016, Doc. # 201-6, Ex. 60:<br>The Department of Human Services (Department) is not renewing the certificate of compliance issued to the Berks County Commissioners to operate the Berks County Residential Center as a child residential facility … when your current certificate of compliance expires on February 21, 2016. The Department is also revoking the certificate of compliance effective from February 21, 2016 to February 21, 2017, issued on November 9, 2015. As the Department notified you by letter of November 17, 2015, that certificate was issued as a result of a systems error.<br><br>This decision to NON-RENEW and REVOKE the certificates of compliance is based on the Department's determination that the Berks County Residential Center is not operating as a child residential facility under the Human Services Code or the Department's regulations. Instead, Berks County Residential Center is operating as a residential center for the detention of immigrant families, including adults. [Letter from Pennsylvania Department of Human Services to Berks County Residential Center dated January 27, 2016, Doc. # 201-6, Ex. 60] |

| | |
|---|---|
| 7. **DEFENDANTS INTERFERE WITH CLASS MEMBERS' RIGHT TO COUNSEL** | Declaration Excerpts of Celina Sxxxxxx-xxxx, Doc. # 201-5 at 849, Ex. 28:<br>"When I was at Dilley it was the first time either me or my son was given a list of free legal services. I was not able to use a phone unless I had money….There are so many families in Dilley that even though there are a few volunteers, there are far to few volunteers to help most of the families."<br>[Doc. # 201-5 at 849, Dec. of Celina Sxxxxxx-xxxx, Ex. 28, ¶ 12].<br><br>"My interview lasted about an hour and a half. I was not able to have an attorney to be present with me at the credible fear interview. I was interview by a man and I was very nervous….There were times he would laugh at me."<br>[Doc. # 201-5 at 849, Dec. of Celina Sxxxxxx-xxxx Ex. 28, ¶ 13].<br><br>"…When she explained the papers in my negative decision, it was the first time that I realized that the border officer put false information on my interview from the border station where we were first detained. The officer wrote down that I did not have a fear, when I specifically said I was afraid for our safety and the life of my son…."<br>[Doc. # 201-5 at 849, Dec. of Celina Sxxxxxx-xxxx Ex. 28, ¶ 14].<br><br>Deposition Excerpt of Mario Martinez, Chief Patrol Agent of Border Patrol in Laredo sector (Ex. 5):<br>Q. I noticed the El Centro chief testified, I believe, that they have facilities for attorney visits.  From your declaration I have the impression that you do not have facility -- facilities for attorney visits; is that correct?<br>MS. FABIAN: Object to form. A. That's correct, sir.<br>Q. (By Mr. Schey) I believe you indicate that minors or their parents are provided a list of free attorneys or low cost attorneys; is that correct?<br>A. That's correct.<br>Q. And are they permitted to keep that with |

them or are they just shown it and then it's placed in their file?

A. It's given to them with the rest of their paperwork.

Q. And -- and they can keep that while detained in your stations?

A. Yes, sir.

Q. And what other paperwork are they issued that they can keep with them at your stations?

A. Well, when they get their actual packet from us that once they're processed -- so that includes their WA, their NTA, et cetera.

(Martinez Dep. 31:17-32:15).

Declaration of Mario Martinez, Doc. # 210-1, Ex. 7, ¶ 49

"Consistent with Border Patrol's March 20, 2009 policy in the TVPRA, all children are provided with a list of free legal services at the time of processing."

[Doc. # 210-1, Declaration of Mario Martinez, Ex. 7, ¶ 49].

Declaration Excerpts of Juanita Hester, Doc. # 215-1, Ex. 20

"Families are offered the opportunity to participate in a legal orientation program (LOP) from certified pro bono organizations, which, for many, will be their first opportunity to learn of their rights and responsibilities under the immigration laws of the United States."

[Doc. # 215-1, Dec. of Juanita Hester Ex. 20, ¶ 6].

"Also, to the extent that residents have any questions about their case or the immigration process, pro bono attorneys are present at the facility from Monday through Friday each week, and volunteers and law students assist on weekends in the legal assistance area."

[Doc. # 215-1, Dec. of Juanita Hester Ex. 20, ¶ 14].

"Upon intake, each resident is provided a "List of Legal Services," which provides contact information for attorneys who will provide legal services for little or" no cost."

[Doc. # 215-1, Dec. of Juanita Hester Ex. 20, ¶ 15].

Deposition Excerpts Dilley Assistant Field Office Director, Enforcement and Removal Operations, ICE, Valentin de la Garza (Ex. 7):
Q. (By Mr. Schey) Have ICE agents at Dilley received any training, direction, or instructions, and if so, by whom and when, if you know, regarding that part of paragraph 27 of the settlement which states that no minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances, such as where the safety of the minor or others is threatened or the minor has been determined to be an escape risk or if counsel has waived such notice?
MS. FABIAN: Object to form, foundation.
THE WITNESS: We received direction to notify the attorney of records.
Q. (By Mr. Schey) And when did you receive that direction and from whom?
A. From my chain of command. When, I don't know. Can't remember. Don't recall.
Q. Was it within the past two months?
A. It's been a while, sir.
Q. Would it be within the past six months?
A. It was right around the time the order came out from Judge Gee that we had to do it, but I don't know when that was, sir. I can't rem -- I can't recall.
Q. And when is notification provided to an attorney of record?
A. No less than 24 hours. Could be – Hold on. Am I trying to – I'm trying to phrase it, sir. If – it's at any time as soon as we find out that we were going to transfer. But no, at least 24 hours out before the date of the transfer.
Q. And – And – And you're – you're saying notice is provided 24 hours before the transfer or within 24 hours of the transfer?
A. It's provided – We give them at least 24 hours' notice. Sometimes, we give them more.
Q. And how is that notice provided to the attorney of record?
A. E-mail, telephone, face to face. It all

depends.
(De La Garza Dep. 50:23-52:10).

Q. So neither the A-file nor the database is
likely to refer to any alleged difficulties they
they've had communicating with their
lawyer? Is that fair to say?
A. That's correct.
(De La Garza Dep. 115:3-115:6).

Deposition Excerpt of Assistant Director of
Field Operations, Enforcement and Removal
Operations, ICE, Phillip Miller (Ex. 9):
Q. Has ICE made any effort that you are
aware of to determine whether the period of
time in which you are detaining these family
units prior to their fear interviews is sufficient
time to allow for adequate preparation and
representation by counsel?
MR. SILVIS: Object to the form.
THE WITNESS: Although I wasn't involved
in the conversation, I know that our Chief
Counsel Office in San Antonio, along with
USCIS and the different pro bono providers,
met and came to an agreement of how long
the -- the resident would be on campus before
they would have their initial interview.
BY MR. SCHEY: Q. And do you know what
they determined?
A. I believe it's 72 hours.
(Miller Dep. 121:14-122:12).

Deposition Excerpts of attorney Bridget
Cambria, (Ex. 21):
[*Regarding lack of information for detainees
for non-profit attorneys*]
Q. And when you say lists, those are lists
handed out by the facility?
A. I would assume, yes.
Q. Do you know who creates the list?
A. No.
Q. Okay. But lists are handed out at Berks?
A. No.
(Cambria Dep. 26:10-26:18).

A. ...So, if you have a new -- a person that's
new at Berks, they'll be given a list of free
legal service providers. But the people that

are on the list don't actually work at Berks,
and they won't come to Berks, and they won't
represent anyone at Berks. So they're never
actually given a list of actual attorneys –
Q. Okay.
A. -- who will come and do pro bono work.
Q. Okay.
A. That's a problem.
(Cambria Dep. 27:21-28:9).

A. I don't know whose policy it is, but I've
tried to meet with children without their
mother, for example, if a mother is ill or is
hospitalized, I'd like to talk to their children to
make sure they're okay, but I'm not permitted.
Q. Is there any age limitation on that?
A. No.
Q. So it's children up to the age of 18 or...
A. I can't see them without their mother.
Q. Okay.
A. Even though I represent them, I can't.
(Cambria Dep. 48:4-48:19).

Q. Okay. And so your next statement is,
"When Steven's mother asked ICE for help
for her son's chronic medical condition, she
was advised by ICE to withdraw her case for
protection and to accept removal to El
Salvador." Do you see that sentence?
A. Yes.
Q. Okay. Were you present when Steven's
mother asked ICE for help?
A. No.
Q. And did you hear ICE's statements that she
withdraw her case for protection and accept
the removal to El Salvador?
A. They wrote it down and signed it.
Q. They –
A. She filed a grievance requesting medical
assistance for her son whose genitals were
bleeding, and the response from ICE was to
withdraw her case and accept removal. And it
was signed by the deportation officer.
(Cambria Dep. 57:4-57:23).

Declaration Excerpts of attorney Bridget
Cambria, Doc. # 201-1 at 103, Ex. 3, ¶ 5
"Access to counsel at Berks is extremely

limited. A handful of pro bono and very low cost attorneys are available to represent detainees, however there are approximately hundreds of detainees at a given time."
[Doc. # 201-1 at 103, Dec. of Bridget Cambria Ex. 3, ¶ 5].

"Still today, counsel is subject to search upon entry into the BCRC. We are not permitted to bring in certain items, like a purse/bag.  We are not permitted to bring in cell phones.  We are not permitted to bring in computers unless we have prior approval.  We are not permitted to visit clients without notice. We were notified via email on November 23, 2015 of more restrictive rules regarding legal visitation requiring 24 hours' notice in order to see our clients. *See* Ex. A attached (Legal Access and Visitation Standard Operating Procedures).  These more restrictive requirements have further impeded attorneys' access to the families in the detention facility."
[Doc. # 201-1 at 103, Dec. of Bridget Cambria Ex. 3, ¶ 7].

Deposition Excerpts of attorney, Ed McCarthy, (Ex. 24):
Q. Did the interruption issues persist after the translator was switched?
A. Yes. And again, this is relevant because most of these credible fear interviews happen without attorneys, so there's not someone there to notify the asylum officer that there are mistranslations and that the client had not finished what they were saying. So in the vast majority of these cases this wouldn't come to light.
Q. What is the basis for that belief?
A. Having met with numerous clients who are unrepresented at their credible fear and reasonable fear interviews.
(McCarthy Dep. 37:24-38:12).

Q. While you were working at Karnes, were any of your clients relocated without your notice?
A. Yes. (McCarthy Dep. 40:12-40:14).

A. ...And so because this individual and most – all of the individuals that I later represented were not represented in their initial interviews. They did not articulate their claims in a way that would be recognized under immigration laws.

A. And further, many of these women had experienced trauma. They had been through horrific things in their countries. In my experience representing victims of trauma, you can take a long time, many meetings, before a client is comfortable enough to share the horrible things that they've been through…. (McCarthy Dep. 51:25-52:13)

Q. Do you think given the very short period of time between Flores class members arriving at Karnes and the scheduling of their fear interview and given the remoteness and the location of Karnes, do you think it is possible to provide adequate representation of effective representation to class members at that facility? …

A. I don't think that it's possible to provide effective representation to individuals detained at Karnes. Karnes is remote. It's over an hour away from the nearest city, San Antonio, and there are numerous things that need to happen in a short amount of time. If you don't submit things in time, your client can be removed, and that is something that did happen in one of our cases in that a client was removed before we could submit re-interview request.

(McCarthy Dep. 64:5-64:24).

Declaration Excerpts of attorney Ed McCarthy, Doc. Np. 201-1 at 173, Ex. 11: "Each of the mothers with whom I met expressed frustration with their initial credible fear and reasonable fear interviews. They told me that their interviews took place with asylum officers who did not speak Spanish. Spanish language interpretation occurred over speakerphone."

[Doc. # 201-1 at 173, Dec. of Ed McCarthy Ex. 11, ¶ 5].

"…During the interview, on numerous occasions, the interpreter mistranslated things that my client said…."
[Doc. # 201-1 at 173, Dec. of Ed McCarthy Ex. 11, ¶ 7].

"…it became clear to me that most credible fear and reasonable fear interviews do not take place with counsel present."
[Doc. # 201-1 at 173, Dec. of Ed McCarthy Ex. 11, ¶ 8].

"Aside from the problems in translation, I faced problems in accessing my clients due to Immigration and Customs Enforcement's ("ICE'S") decisions."
[Doc. # 201-1 at 173, Dec. of Ed McCarthy Ex. 11, ¶ 9].

"…When I arrived, I was informed that my clients had been transferred to an ICE family detention facility in Berks Pennsylvania, without any notice to me, their attorney…."
[Doc. # 201-1 at 173, Dec. of Ed McCarthy Ex. 11, ¶ 10].

Deposition Excerpts of attorney Jacqueline Kline, (Ex. 25):
A: Well, ICE's office is right no the other side of the wall from the attorney rooms, and you can hear them in their office, so presumably they can hear us as well, I mean in some sense.
(Kline Dep. 41:9-41:13).

A: I mean, there's a lot of times when we show up and we call, and we have to wait in the waiting room for extended periods of time before they come and let us in. There are days where we show up where they tell us, today you can bring this item. The next day we show up and they say you can't. Recently, we had been bringing a printer, and one day when we showed up, they told us we couldn't have it. And we had to leave it in the hallway, and we had to go back to our office to print documents to have clients sign and come back

again.
(Kline Dep. 44:11-44:23).

Declaration of Lindsay Gxxxx xxxxx, Doc. # 201-5 at 182, Ex. 33, ¶¶ 14-15
"I have not seen a Judge or been told that I, or my daughter, have the right to see a Judge or ask for bond. I do not know what will happen to me next."
[Doc. # 201-5 at 872, Dec. of Lindsay Gxxxx xxxxx Ex. 33, ¶¶ 14-15].

Deposition of Excerpts of attorney Robyn Barnard, (Ex. 23):
Q: In paragraph 11 you describe difficulty in representation due to delayed access to detainees Immigration and Customs Enforcement administrative files. What delays are you referring to?
A: That is – I'm referring to accessing immigration documents such as the record of credible fear interviews or records of immigration judge reviews of negative credible reasonable fear interviews and other documents that amount to the file that is transferred – that follows the detainee from detention center to detention center.
(Barnard Dep. 43:4-43:15).

Q: Have the delays affected your ability to represent clients at Berks?
A: Yes.
Q: Have you discussed the delays with officials?
A: Yes.
Q: What was the result?
A: We would ask for better notice to counsel of record before someone was transferred to allow for the detainees to collect their documents before they were transferred so that they would have them with them when they arrived at the new detention center.
(Barnard Dep. 44:17-45:5).

Q: To your knowledge, is the delay in obtaining files at Berks any different than any other facility?
A: In my experience it is a bit different

because many of the families are transferred from Texas where they have counsel to Pennsylvania to the Berks facility. So that makes it much more complicated. And in my experience, the situation with the families who are transferred to Berks is quite different because they are transferred after having these negative credible or reasonable fear interviews. So they are transferred at a moment in their case in which the legal posture is very difficult because they are deportable. So they could be deported. (Barnard Dep. 45:20-46:10).

In reviewing approximately 44 "negative" fear interview records for *Flores* class members and their mothers transferred from the two Texas family detention facilities to the Berks facility, I observed evidence of conditions that may prevent accurate assessments of credible fear:

(a) inadequate interpretation services;
(b) lack of an adequate explanation to the class members and mothers regarding the purpose of the interview or review hearing;
(c) failure to explain to class members and mothers what it means to be a member of a "social group" (the basis for most denials"
(d) use of form-letter denials that do not explain the individualized basis for the denial, thus precluding effective review by immigration judges or federal courts; and families represented by counsel in Texas, who had requested review of denial of their credible or reasonable fear interviews before immigration judges, were transferred to Berks before their immigration judge hearings had taken place.

[Doc. # 201-1 at 176, Dec. of Robyn Barnard Ex. 12, ¶ 11].

"Given the large number of families involved, the remoteness of the Berks facility, and lack of rapid access to detainees ICE

administrative files, effective representation for the great majority of detainees is impossible."
[Doc. # 201-1 at 176, Dec. of Robyn Barnard Ex. 12, ¶ 12].

"In response to the extremely low rates of *pro bono* legal representation of families detained at the Berks facility, Human Rights First partnered with a local Berks County legal service provider, the Pennsylvania Immigrant Resource Center ("PIRC"), local private attorneys, Philadelphia-based law firms, and Pennsylvania law schools to attempt to provide *pro bono* legal representation for families detained at Berks. Nevertheless, because of the remote location of this detention center, effective and thorough legal representation for the majority of *Flores* class members and their mothers is virtually impossible."
[Doc. # 201-1 at 176, Dec. of Robyn Barnard Ex. 12, ¶ 8].

"Since October 28, the *pro bono* representation project at the Berks facility has screened at least 46 families, of which 31 were transferred from either the Dilley or the Karnes facilities. All of the 31 families had been held in one of the family detention facilities in Texas for more than 30 days by the time they arrived at the Berks facility; at least four of those families had been detained in Texas for two months before their transfer to Pennsylvania. All of the families who have been transferred to the Berks facility since October 22 received an initial "negative" fear determination from the Asylum Office that adjudicated their credible or reasonable fear interviews in Texas. *The vast majority of these families, if not all of them, were transferred to the Berks facility without any prior notice to their families or their attorneys of record in Texas.*"
[Doc. # 201-1 at 176, Dec. of Robyn Barnard Ex. 12, ¶ 10].

"I have been informed by CARA attorneys

that they have discussed the unannounced transfer of families from the Dilley and Karnes facilities to Berks with Immigration and Customs Enforcement (ICE) officials in Washington, D.C. and if they are counsel of record requested notice prior to any future transfers of their clients from the Texas facilities.  As of this date, they report to me that they still do not receive prior notice for all of their clients who are scheduled to be transferred."
[Doc. # 201-1 at 176, Dec. of Robyn Barnard Ex. 12, ¶ 11].

"...I am also aware that since the District Court hearing in April 2015 at which time the Court tentatively indicated it intended to find the defendants in breach of the *Flores* settlement, defendants have attempted to speed up the credible fear interview process so that they could claim that the 'average' length of detention was reduced to about twenty days. Speeding up the process inevitably curtails class members' right to counsel and due process of law *because* of defendants' failure to cooperate with the small number of *pro bono* counsel attempting to represent as many class members and their mothers as possible, failure to notify counsel of record before transferring class members and their mothers from one facility to another, failure to promptly make administrative files available to pro bono counsel, and limiting pro bono counsel's access to detention facilities. It should also be noted that many class members are still detained in secure lock-down facilities with unrelated adults for weeks or months on end even if the claimed 'average' detention is about twenty days."
[Doc. # 201-1 at 176, Dec. of Robyn Barnard Ex. 12, ¶ 18].

Declaration of attorney Amanda Doroshow, Doc. # 201-1 at 170, Ex. 10, ¶6
"During the six days I spent at Dilley, I did not meet any *Flores* class member or mother who told me that the class member had been informed by CBP or ICE …[that] they could

have their status reviewed by an Immigration Judge, or had been brought before an Immigration Judge to review their custody status."
[Doc. # 201-1 at 170, Dec. of Amanda Doroshow Ex. 10, ¶6].

Declaration of attorney Karen Lucas, Doc. # 201-1, Ex. 13, ¶4 (3/25/16)
"ICE has consistently frustrated the ability of dedicated lawyers and legal assistants to access their clients and has systematically disregarded the attorney-client relationship."
[Doc. # 201-1, Dec. of Karen Lucas, Ex. 13, ¶4]
Attachment A to Declaration of Manoj Govindaiah, Director of Family Detention Services with RAICES, San Antonio, Texas, Doc. # 201-2 Ex. 17, Exhibit A, Letter to San Antonio Field Office Director and ICE Headquarters regarding issues with access to counsel at the Karnes detention Center. The access to counsel issues raised include:
- Restrictions on the ability of law students working under supervision to meet with detained *Flores* class members and their parents. (Page 2)
- Delayed entry into the Karnes detention center for law students working under attorney supervision. (Page 2)
- The requirement that young children remain with their mothers during attorney/client meetings during which sensitive and traumatic information must often be disclosed and discussed. (Page 3).
- Restrictions on the ability of pro bono attorneys to enter the legal visitation area upon arrival at the Karnes detention center. (Page 4).
- Ongoing restrictions on the conducting of independent medical evaluations, a critical

component of the legal case for *Flores* class members and their mothers. (Page 5).

- Requirement that visitation lists be submitted 24 hours in advance, despite the rapidly changing population at the detention center and remote location in Karnes City, Texas.
- Increasing restrictions on attorney phone calls with detained families.

Declaration of Alex Mensing, attached Exhibit PP, Doc. # 201-4 Ex. 19 ¶ 11 (11/30/2015)
"I was transferred to another detention facility away from my lawyers with no warning… It did not matter to immigration officials that I had a lawyer or that I was fighting my case.  They still moved me."
Declaration Excerpt of Alex Mensing, attached Exhibit GG, Doc. # 201-3 Ex. 19 ¶18 (11/13/15)
"I didn't know what was going to happen to my case because my lawyers were in Texas and I did not get to speak to them before I was transferred. My cousin here said he would look into getting me an attorney but there were already attorneys coming here."
Declaration of Alex Mensing, attached Exhibit NN, Doc. # 201-4 Ex. 19 ¶ 13 (11/15/2015)
"No one asked me if I had a lawyer before I was transferred to Berks and I didn't get to speak with anyone from the CARA. Project before I left."
Declaration Excerpt of Alex Mensing, attached Exhibit PP, Doc. # 201-4 Ex. 19 ¶ 13 (11/30/2015)
"When we were transferred here I was afraid I had lost my lawyers.  I felt like my case was over and that I would have no help. Here in Pennsylvania I heard that there were no lawyers here like in Texas. I was lucky enough to receive information about a lawyer from another detainee. We do not get legal access here in Berks like we did in

Texas. The staff will not help us access legal help."

Declaration Excerpts of Kathryn Shepherd, Doc. # 201-6, Ex. 69
"In the last month, the extremely limited child care capacity at Dilley has substantially increased the challenges we face in providing legal services. Mothers now must come to legal appointments with their young children in tow and tell us that while they attempted to drop off their children at the nursery, they were told that it was at capacity….Many of these mothers, and sometimes the children too, are disclosing, for the very first time, traumatic events, including rape, sexual assault, incest, domestic violence, threats, and extortion. In my experience, mothers and older children are often reluctant and sometimes totally unable to articulate the fears that they have and the horrors they have endured with younger children or siblings present in the room."
[¶¶ 9, 10]

"Another troubling recent development at Dilley regarding access to counsel is the sudden prohibition on telephonic psychological evaluations. Such evaluations by independent mental health experts are critical evidence that attorneys obtain in support of their client's legal claims, especially as it pertains to credible and reasonable fear determinations and the terms and timing of release from detention. The overwhelming majority of families detained at Dilley are fleeing violence in their home countries and seeking protection in the United States. As such, many of the children and mothers exhibit symptoms of trauma, and, when evaluated, many are diagnosed with Post-traumatic Stress Disorder, Major Depressive Disorder, Anxiety disorders, or other cognitive disabilities."
[Dec. of Kathryn Shepherd, Doc. # 201-6 Ex. 69 ¶ 13]

Declaration of Kathryn Shepherd, Doc. # 201-6, Ex. 69, ¶ 22
"On May 10, 2016… we had 163 families who wanted to attend the pre-release orientation. These are typically families who know they are about to be released within a day or two and have received a positive credible fear determination. A total of 84 families, more than half of whom wanted to attend to access this important information, were unable to attend because Building 100 was at capacity."
[Dec. of Kathryn Shepherd, Doc. # 201-6, Ex. 69, ¶ 22.]

Declaration Excerpts of attorney Lindsay Harris (Due Process), Doc. # 201-2, Ex. 16 (3/2016)
"Available pro bono counsel resources are tremendously strained, the number of volunteers fluctuates week to week, and CARA Project staff and volunteers cannot possibly serve all detained families. Recently, for example, the CARA Project had one week in March when only two volunteers were able to travel to Dilley to provide services and representation to detained children and their mothers. In that same week, new intakes increased at the detention center and the on-the-ground volunteer and staff team of 8 had to handle 60 intakes of the mother's of newly arrived *Flores* class members and conduct approximately the same number of preparation sessions for credible and reasonable fear interviews each day that week. Volunteer fatigue has been increasing steadily, and we will face difficulty maintaining consistent levels of attorney volunteers at Dilley in the coming months."
[Dec. of Lindsay Harris, Doc. # 201-2, Ex. 16, ¶13.]
"To give the court a sense of the volume of families that the CARA Project represents at this detention center where

children and their mothers are detained en masse, here are some statistics from a week in April 2016, CARA staff and volunteers conducted:

- 298 intakes for newly arrived families
- 239 credible fear interview preparation sessions
- 75 follow-up client meetings
- 12 bond hearings before an immigration judge
- 8 reviews of negative credible fear determinations before an immigration judge
- information sessions regarding sessions regarding post-release rights and obligations with 222 families"

[Dec. of Lindsay Harris, Doc. # 201-2, Ex. 16 at ¶13.]

"*Flores* class member children and their mothers are not afforded any access to counsel at Border Patrol processing stations– even though they often spend at least 72 hours and sometimes longer in these facilities before being transferred to ICE detention. CARA staff and volunteers at Dilley have served over 8000 families since March 2015, but we have yet to encounter any child or family who met with an attorney or secured representation prior to their arrival at Dilley, despite having already been in the United States for several days, and sometimes considerably longer."

[Dec. of Lindsay Harris, Doc. # 201-2 Ex.16 ¶14.]

"The CARA Project faces difficulties in providing full representation to detained families, even as we work daily within the legal visitation trailer at the Dilley detention center. *Flores* class member children and their mothers are frequently called into meetings with ICE agents to discuss the terms and conditions of their release. Counsel are prohibited from attending those meetings, even with the customary Form G-

28, Notice of Appearance as Attorney or Representative, on file with ICE. During those meetings, class members and their mothers are routinely coerced and misinformed about their right to request a bond hearing before an immigration judge, a right provided to class members under the original *Flores* settlement."
[Dec. of Lindsay Harris, Doc. # 201-2 Ex. 16 ¶15.]
"A further challenge to representation of detained *Flores* class member children and their mothers is that ICE often does not give families copies of their charging documents, removal orders, or other paperwork at intake. This makes it difficult for CARA staff and volunteers to understand the procedural posture of the case – including key issues such as whether an individual is eligible for bond or can pursue a claim for asylum."
[Dec. of Lindsay Harris, Doc. # 201-2 Ex. 16 ¶16.]

Declaration of volunteer attorney Theresa Wilkes, Doc. # 201-1, Ex. 9, ¶ 3 (11/7/14)
"The loss of income from a whole week of unpaid work makes it impossible for me to repeat this experience, despite the desperate need of families detained at the STFRC for representation."
[Dec. of Theresa Wilkes, Doc. # 201-1, Ex. 9, ¶ 3.]

Declaration of CARA Project attorney Ana Camila Colon, Doc. # 201-6, Ex. 64, ¶¶4, 6, explaining the difficulties of providing representation where CBP routinely fails to provide charging documents to families sent to Dilley for detention –
"In other words, over seventy-five percent of the families had not been issued charging/removal documents following their interviews with CBP officers prior to their arrival in Dilley, Texas. . . The government's failure to issue charging/removal documents to our clients is problematic because we cannot adequately represent them if we do not know the charges against them or

whether they are subject to a reinstated order of removal. This means that we must file an individual request for each client's full immigration file. While we wait for this file, the preparation for the family's case is delayed and they must remain in detention." [Dec. of Ana Camila Colon, Doc. # 201-6, Ex. 64, ¶¶4, 6.]

Declaration of attorney Michelle Garza Pareja, Associate Executive Director of RAICES in San Antonio, Texas, Doc. # 201-6, Ex. 66, ¶ 8(comparing ORR custody and treatment of unaccompanied children versus the accompanied children placed in family detention centers with their mothers – "At Karnes mothers complain they do not feel comfortable during their fear interviews because officers are not friendly or sensitive to their stories of persecution. Officers are often hard to understand because they use a telephonic interpreter. Because child care is not easily available, mothers who want to be interviewed outside of the presence of their children to avoid the children being further traumatized by the mothers' testimony are unable to do so. Because of the remoteness of the detention site few attorneys are available to assist class members and when attorneys do agree to do so they must often wait for hours to see their clients. Most class members and their mothers go through fear interviews without the assistance of counsel. Children rarely are provided a separate interview even though they may possess independent fear claims. In most cases the asylum officers find that the minors or mothers are credible, and have been persecuted, but then deny the fear claim because when asked what "social group" the class member or mother belonged to that caused their persecution, they have no idea what the question even means. Even the immigration judges and the courts have difficulty defining what "social groups" are." [Dec. of Michelle Garza Pareja, Doc. #

| | |
|---|---|
| | 201-6, Ex. 66, ¶ 8]<br><br>Attachment to Declaration of Amy Fischer, Policy Director, RAICES, Doc. # 201-6 Ex. 67, CARA Project Complaint submitted on December 10, 2015, to DHS Office of Civil Rights and Civil Liberties and the Office of Inspector General Re: Family Detention – Challenges Faced by Indigenous Language Speakers.  (The complaint describes various challenges for indigenous language speaking children and mothers held in family detention centers, which implicate access to counsel. These issues include a lack of interpreting assistance for interactions with government officials, subcontractors (including medical staff), and service providers, and a lack of translated written materials, denial of educational opportunities, and a failure to explain conditions of release). |

1

2

3   DATED: December 12, 2016          Respectfully submitted,
                                      CENTER FOR HUMAN RIGHTS &
4                                     CONSTITUTIONAL LAW
                                      Peter A. Schey
5                                     Carlos Holguín

6

7                                     ORRICK, HERRINGTON & SUTCLIFFE LLP
                                      T. Wayne Harman
8                                     Elena García
                                      LA RAZA CENTRO LEGAL, INC.
9                                     Michael Sorgen
10                                    Amanda Alvarado Ford

11

12                                    LAW FOUNDATION OF SILICON VALLEY -
                                      LEGAL ADVOCATES FOR CHILDREN &
13                                    YOUTH
                                      Jennifer Kelleher Cloyd
14                                    Katherine H. Manning
15                                    Kyra Kazantzis
                                      Annette Kirkham
16                                    Of counsel:
17                                    YOUTH LAW CENTER
                                      Alice Bussiere
18                                    Virginia Corrigan
19                                    /s/__Peter Schey_____
20                                    *Attorneys for Plaintiffs*

21   / / /

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On December 12, 2016 I electronically filed the following document(s):

- **Plaintiffs' Corrected Statement of Uncontroverted Facts**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/___*Peter Schey*_____
*Attorney for Plaintiffs*