CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
          pschey@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| Plaintiffs, | ) |
| - vs - | ) PLAINTIFFS' SUPPLEMENTAL RESPONSE IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR |
| JEH JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) Hearing: January 30, 2017 9:30 AM [Hon. Dolly M. Gee] |
| Defendants. | ) |

*Plaintiffs' counsel, continued next page:*

1

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)

2

474 Valencia Street, #295
San Francisco, CA 94103

3

Telephone: (415) 575-3500

4

5

THE LAW FOUNDATION OF SILICON VALLEY

6

LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM

7

Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)

8

Kyra Kazantzis (Cal. Bar No. 154612)

9

152 North Third Street, 3rd floor
San Jose, CA 95112

10

Telephone:   (408) 280-2437

11

Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org

12

        kate.manning@lawfoundation.org

13

        kyrak@lawfoundation.org

14

*Of counsel:*

15

16

YOUTH LAW CENTER
Virginia Corrigan (Cal. Bar No. 292035)

17

200 Pine Street, Suite 300
San Francisco, CA 94104

18

Telephone: (415) 543-3379

19

20

*/ / /*

21

22

23

24

25

26

27

28

1
2
3

# TABLE OF CONTENTS

1.   WHEN A CONTEMPT SANCTION IS NOT SOUGHT, NO FEDERAL COURT HAS EVER REQUIRED A PARTY TO SHOW NON-COMPLIANCE BY "CLEAR AND CONVINCING" EVIDENCE; IN THIS CASE NON-COMPLIANCE MUST BE SHOWN BY A "PREPONDERANCE" OF THE EVIDENCE ........................................................................................... 1

2.   SUBSTANTIAL COMPLIANCE IS ONLY FOUND WHEN DEVIATION IS UNINTENTIONAL AND SO MINOR AS NOT TO SUBSTANTIALLY DEFEAT THE OBJECT THAT THE PARTIES INTENDED TO ACCOMPLISH. ............ 4

3.   PROVISIONS OF THE FLORES AGREEMENT REQUIRE DEFENDANTS TO MAKE AND RECORD CONTINUOUS EFFORTS TO RELEASE MINORS FROM CUSTODY EVEN IF ACCOMPANIED BY A PARENT AND PLACED IN EXPEDITED REMOVAL PROCEEDINGS ........................................................ 5

4.   KEEPING MINORS IN UNLICENSED AND SECURE ICE FAMILY RESIDENTIAL CENTERS VIOLATES THE AGREEMENT............................ 11

5.   RULES OF EVIDENCE APPLICABLE TO CBP CONDITIONS ................ 14

6.   THE COURT MAY ORDER CLASS-WIDE RELIEF BASED ON THE DECLARATION AND DEPOSITION TESTIMONY OF DEFENDANTS' AND PLAINTIFFS' WITNESSES THAT SHOW A PATTERN OF FAILURE TO COMPLY WITH THE TERMS OF THE AGREEMENT ..................................... 15

7.   THE COURT MAY ORDER COMPLIANCE WITH AGREEMENT REGARDING CBP CONDITIONS THAT ARE UNSAFE, UNSANITARY OR INCONSISTENT WITH DEFENDANTS' PURPORTED CONCERN FOR THE PARTICULAR VULNERABILITY OF MINORS ................................................. 18

8.   PLAINTIFFS' SPECIFIC MATERIAL ALLEGATIONS OF CONDITIONS THEY EXPERIENCED IN CBP STATIONS ARE LARGELY NOT PLACED IN DISPUTE BY DEFENDANTS' EVIDENCE REGARDING THEIR POLICIES 20

9.   CONCLUSION.................................................................................. 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Aerojet-Gen. Corp. v. Transp. Indem. Co.*, 948 P.2d 909 (1997) ...........................................................3

*B* 3

*Bailey v. Roob*, 567 F.3d 930 (7th Cir. 2009) ...................................................3

*Bunikyte ex rel. Bunikiene v. Chertoff*, No. 1:07-cv-00164-SS, 2007 WL 1074070 (W.D. Tex. Apr. 9, 2007) .........................................................................................7

*Buss v. Superior Court*, 16 Cal. 4th 35*, 939 P.2d, 766 (Cal. 1997) ......................3

*City of Las Vegas v. Clark County*, 755 F.2d 697 (9th Cir. 1985)........................3

*Connell v. Higgins*, 170 Cal. 541, 150 P. 769 (Cal. 1915) ................................5

*Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ..............................................7

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)...........................2

*Go-Video v. Motion Picture Ass'n of Am. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*, 10 F.3d 693 (9th Cir. 1993) ...............................................................4

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016)...........................................1

*Matter of E-R- M- & L-R-M-*, 25 I&N Dec. 520  (BIA 2011)...............................6

*Rouser v. White*, 825 F.3d 1076 (9th Cir. 2016) ............................................4

*Spallone v. United States*, 493 U.S. 265 (1990)............................................1

*United States v. Asarco Inc.*, 430 F.3d 972  (9th Cir. 2005)..............................11

*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc., 689 F.2d 885 (9th Cir. 1982)* ...............4

*Wells Benz, Inc. v. United States*, 333 F.2d 89 (9th Cir. 1964) ..............................5

*Walnut Creek Pipe Distrib., Inc. v. Gates Rubber Co. Sales Div.*, 228 Cal. App. 2d 810, 39 Cal. Rptr. 767 (1964)..................................................................................12

**Statutes**

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ...............................................................11

**Other Authorities**

TEDS § 4.12 ................................................................................................................23

**Regulations**

8 C.F.R. § 1208.30(g)(ii) ...........................................................................................11

8 C.F.R. § 1208.30(g)(iv)(A) .....................................................................................11

8 C.F.R. § 235.3(b)(4) ...............................................................................................10

PLAINTIFFS' SUPPLEMENTAL RESPONSE IN SUPPORT OF MOTION TO ENFORCE
SETTLEMENT AND APPOINT A SPECIAL MONITOR

1.    WHEN A CONTEMPT SANCTION IS NOT SOUGHT, NO FEDERAL COURT HAS EVER
      REQUIRED A PARTY TO SHOW NON-COMPLIANCE BY "CLEAR AND CONVINCING"
      EVIDENCE; IN THIS CASE NON-COMPLIANCE MUST BE SHOWN BY A
      "PREPONDERANCE" OF THE EVIDENCE

Defendants' position that Plaintiffs must prove their claims "by clear and

convincing evidence" is frivolous. Defendants' Second Supplemental Response ("Def.

Resp.") at 5. To build their "clear and convincing evidence" edifice, Defendants rely

exclusively on cases in which a party was seeking contempt sanctions against another

party.

Defendants quote from and cite *Spallone v. United States*, 493 U.S. 265 (1990)

for the proposition that a Court's authority "to enforce the Agreement ... arises from its

civil contempt powers." Def. Resp. at 4.[1] Nothing in *Spallone* states or suggests that

all court orders to comply with consent decrees or settlements are somehow akin to

contempt sanctions and therefore violations must be shown by "clear and convincing"

evidence.

Defendants also rely on *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016)

for the position that "court-ordered remedies designed to ensure compliance with a

settlement agreement … are properly considered under civil contempt standards." Def.

---

[1] Reviewing a District Court's contempt and sanctions order, in *Spallone* the Supreme
Court simply noted that at the District Court level, "the court contemplated various
methods by which to ensure compliance with its remedial orders …" *Id.* at 275-276.
"In selecting a means to enforce the consent judgment, the District Court was entitled
to rely on the axiom that courts have inherent power to enforce compliance with their
lawful orders through civil contempt." *Id.* at 276 (internal quotation and citation
omitted).

1

Resp. at 4-5. Nothing in *Kelly* requires a court to adopt a clear and convincing evidence standard when not ordering contempt sanctions. *Kelly* involved a class action settlement with Defendants' contractor Corrections Corporation of America, Inc. ("CCA"), which also operates the Dilley facility holding hundreds of class members. *Kelly* at 1091. Upon motion by plaintiffs, the district court held CCA in contempt after other efforts at settlement compliance failed. *Kelly* at 1091. The Ninth Circuit affirmed the District Court's contempt order because CCA had not taken "all reasonable steps to comply with the settlement agreement …" *Id*. at 1091-1093.[2] Defendants here, like CCA in *Kelly*, have acted in a manner that is lawless and contemptuous. Nevertheless, as stated in the Motion to Enforce, Plaintiffs do not at this time seek a contempt ruling against Defendants believing that it would be more constructive to obtain a further remedial Order and seek appointment of a Special Monitor to help guide Defendants into compliance with the Settlement and this Court's Orders. Motion to Enforce Settlement and Appoint a Special Monitor ("Motion") (Dkt. # 201) at 35 n. 18. Nothing in the Ninth Circuit 's decision in *Kelly* gives support to Defendants' novel position that enforcement motions not seeking contempt sanctions must be treated as the functional equivalent of motions for contempt sanctions.

The Court of Appeals decision in *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999), also relied upon by Defendants, is equally inapposite to the

---

[2] Earlier, the District Court "ordered several remedial measures," including the appointment of "an independent monitor ..." *Kelly* at 1093.

present motion. Def. Resp. at 5. In *FTC*, a husband and wife were involved in Ponzi scheme, which "eventually unraveled and left thousands of investors with tremendous losses." *FTC* at 1231. After the husband and wife "refused to comply with the preliminary injunction by refusing to return their illicit proceeds, the district court found the Andersons in civil contempt of court." *FTC* at 1231. Nothing explicitly or implicitly in the decision suggests that this Court must apply a "clear and convincing" evidence standard when adjudicating a settlement compliance motion that does not seek contempt sanctions.[3] Defendants have not cited a single decision showing that to order compliance with a consent decree or appoint a special monitor the Court must treat Plaintiffs' motion as one for contempt. There are *no* reported cases that support Defendants somewhat bizarre argument.

Defendants themselves have argued that "[a] consent decree is interpreted using general contract principles." Defendants' Response In Opposition of Plaintiff's Motion to Enforce at 8, *quoting City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985). The appropriate governing standard is a preponderance of the evidence.[4]

---

[3] Defendants also cite *Bailey v. Roob*, 567 F.3d 930, 934-35 (7th Cir. 2009) in support of their "clear and convincing" evidence standard argument. Def. Resp. at 5. The Seventh Circuit "require[d] part[ies] seeking sanctions to demonstrate…violation of a court order by clear and convincing evidence." *Bailey* at 935.

[4] *Buss v. Superior Court,* 16 Cal. 4th 35*, 939 P.2d, 766, 65 (1997) (noting that the preponderance of evidence standard is "applicable to contractual causes of action"). *See also Aerojet-Gen. Corp. v. Transp. Indem. Co.*, 948 P.2d 909, 924 (1997) ("Further, 'Evidence Code section 115 . . . provides that the burden of proof that is generally applicable is proof by a preponderance of the evidence. Of course, this

2.   SUBSTANTIAL COMPLIANCE IS ONLY FOUND WHEN DEVIATION IS UNINTENTIONAL AND SO MINOR AS NOT TO SUBSTANTIALLY DEFEAT THE OBJECT THAT THE PARTIES INTENDED TO ACCOMPLISH.

Defendants argue that if Plaintiffs meet their burden of showing a breach of the Agreement, "the burden would then shift to the Government to demonstrate that it substantially complied with the Agreement, or complied with a good faith and reasonable interpretation of the Agreement." Def. Resp. at 5, *citing Go-Video v. Motion Picture Ass'n of Am. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*, 10 F.3d 693, 695 (9th Cir. 1993). In *In re Dual-Deck* the court found that a party committed only "harmless technical violations" in relation to the discovery process and was in substantial compliance with a protective order. *Id*. at 695. Stated otherwise, substantial compliance is shown when there are only "'a few technical violations' [and] where every reasonable effort has been made to comply." *Id*. at 695, *quoting Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc., 689 F.2d 885, 889 (9th Cir. 1982)*.

However, the Circuit has made clear that even "taking significant steps toward compliance comes nowhere near satisfying this exacting standard." *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016).  Rather, substantial compliance is found when deviation is "unintentional and so minor or trivial as not 'substantially to defeat the object which the parties intend to accomplish.'" *Wells Benz, Inc. v. United States*, 333

---

burden is the 'ordinary' one for civil actions.  It is applicable to contractual causes of action'").

F.2d 89, 92 (9th Cir. 1964), *quoting Connell v. Higgins*, 170 Cal. 541, 150 P. 769, 775 (Cal. 1915).

　　　In this case Defendants' deviations are intentional and wholly defeat several of the objects the parties intended to accomplish.

3.　PROVISIONS OF THE FLORES AGREEMENT REQUIRE DEFENDANTS TO MAKE AND RECORD CONTINUOUS EFFORTS TO RELEASE MINORS FROM CUSTODY EVEN IF ACCOMPANIED BY A PARENT AND PLACED IN EXPEDITED REMOVAL PROCEEDINGS

　　　Now that Defendants' novel position that accompanied children are not class members has been rejected by this Court and the Court of Appeals, Defendants move to center stage an argument they mentioned before but held in abeyance for full briefing: Namely, that Defendants can detain them even if they are class members because, simply stated, "Paragraph 14 should not be read to require the release of a minor who is in mandatory detention under the expedited removal provision of the INA." Def. Resp. at 17.[5] Defendants' witnesses now fully acknowledge that Defendants generally "do not seek to release minors who are accompanied by a parent or guardian to another adult." *Id*. at 16 n. 4. *See also* Declaration of Hectero D. Salina ("Salina Decl."), Defs' Ex. 44, at ¶ 3; Declaration of Juanita Hester ("Hester Decl."), Defs Ex. 42, at ¶ 3; Declaration of Joshua Reid ("Reid Decl."), Defs Ex. 43, at ¶ 3.

---

5 Defendants restate this position in several similar ways: "[M]inors in custody … were subject to mandatory detention because they were in expedited removal proceedings pending assessment of their credible fear claims." *Id*. at 19; "The continued detention of [class members] who are *in mandatory detention* is also permissible under the Agreement – and *is required by law*." *Id*. at 20 (emphasis added); "aliens in expedited removal proceedings are subject to mandatory custody at all stages of the proceedings." *Id*. at 20, n. 6.

Defendants' new position was long ago rejected by Defendants' Board of

Immigration Appeals ("BIA"), *ironically at Defendants' insistence. See Matter of E-R-*

*M- & L-R-M-*, 25 I&N Dec. 520, 521 (BIA 2011) (agreeing with the "DHS argu[ment]

that it is not required to process aliens described in section 235(b)(1)(A)(i) of the Act

in section 235(b) expedited removal proceedings and that it has the discretion to place

these aliens directly into section 240 removal proceedings.")[6]

Defendants' position that they are required by law to place accompanied minors

in expedited removal and mandatory detention is a fiction Defendants cannot seriously

hope any court will believe. As this Court has already held: "It is uncontroverted that,

prior to June 2014, ICE generally released children and parents upon determining that

they were neither a significant flight risk nor a danger to safety." Order re Plaintiffs'

Motion to Enforce Settlement of Class Action at 9 ("July 2015 Order") [Dkt. # 177].[7]

---

[6] Defendants' new litigation position also contradicts the agency's written policy.
*See* David J. Venturella, *Memorandum re: Family Detention and Intake Guidance*
(Aug. 14, 2009) at 2 ("Venturella Memo"). [Dkt. #261-1 at 33] ("DHS has broad
authority to decide whether to remove aliens through expedited removal . . . Effective
immediately, discretion is to be exercised broadly in charging family unit cases so that
they are placed in removal proceedings pursuant to Section 240 of the INA.")

[7] *See also* Declaration of Kevin W. Oaks ("Oaks Decl.") ¶¶ 25-29 [Dkt. #121-1]
(Defendants' Officer claims that "[F]amily units apprehended by Border Patrol . . .
claimed that a principal motive for entering the United States was to take advantage of
the 'permisos' that the United States was granting to family units. *The term 'permiso'
in this context is used to refer to a Notice to Appear which permits aliens to depart the
Border Patrol station without detention*. . . " (Emphasis added)). *See also* DHS
Advisory Committee Report at 5, Ex. 27 [Dkt. #287-6] ("DHS is not required to place
families in expedited or reinstatement of removal, with their attendant policy of
detention. There is clear authority holding that immigration officials have the

The Ninth Circuit agrees that accompanied minors may not be excised from detention and release rules the Agreement sets for all minors: "'Paragraph 19 sets out the foundation of the detention standards applicable to *any minor in United States immigration custody*, and there is no reason why its requirements should be any less applicable in a family detention context than in the context of unaccompanied minors.'" *Flores v. Lynch*, 828 F.3d 898, 906-07 (9th Cir. 2016) (emphasis added), *quoting Bunikyte ex rel. Bunikiene v. Chertoff,* No. 1:07-cv-00164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007).

The Agreement's provisions require CBP and ICE (1) "[u]pon taking a minor into custody, . . . [to] make and record prompt and continuous efforts on [their] part toward family reunification and the release of the minor,"  and to "release a minor from [their] custody without unnecessary delay" to a parent, a legal guardian, or other qualified adult custodian, except where the detention of the minor is required "either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others..." (Agreement ¶¶ 18, 14.)

---

discretion to refer any individual who could be subject to expedited removal or reinstatement of removal to regular Section 240 removal proceedings before an immigration judge instead."). To this day Defendants, for no reason they have explained other than available bed space, release some accompanied class members with Notices to Appear in removal proceedings while detaining others with their mothers. See Ex. 1, Second Excerpt of the Deposition of Phillip Miller: "A. And when – when border patrol calls you or calls somebody and says they want to transfer a family to either Dilley or Karnes, if somebody believes that that facility has reached operational capacity, do you so advise CBP? A. Yes. Q. And then is it your understanding that CBP would issue an NTA to those families and release them? […] [A.] Yeah, if all three were full…" Second Excerpt of the Deposition of Phillip Miller, Ex. 1.

The Agreement defines in detail the two circumstances in which Paragraph 14's "presumption of release" does *not* apply. Paragraphs 21 and 22 of the Agreement address *in detail* the circumstances in which release may be denied (1) to ensure the minor's safety or that of others, or (2) to secure the minor's presence before the agency or the Immigration Court.

Nowhere in Paragraphs 21 or 22 does the Agreement state or imply that Defendants can circumvent the release terms of the Agreement by exercising discretion to place apprehended class members in expedited proceedings and then rely on that decision to claim the children are now subject to mandatory detention.[8]

Nothing in the expedited removal and "mandatory" detention law, enacted in 1996 *before* the Agreement was signed by all parties and filed with the Court for its approval, requires Defendants to place class members in expedited removal proceedings or subject them to what Defendants call "mandatory" --but should call "discretionary" --detention. The text of the Agreement ¶¶ 14, 18-19 and 21-22, makes clear that the Agreement encompasses *all* minors who are in custody, without

---

[8] Since a very large majority of class members are apprehended within close proximity to the US-Mexico border, in essence Defendants' position would mean that the parties agreed to highly detailed provisions for the detention and release of children which Defendants at their whim could circumvent by simply placing all accompanied minors apprehended within 100 miles of a border into expedited removal and then claiming (falsely) those children are subject to "mandatory detention." The Agreement obviously did no such thing.

qualification as to whether they are accompanied or unaccompanied, *or placed in routine or expedited removal proceedings*.[9]

Defendants also argue that they may detain a class member "for longer than twenty days" if she or he is the subject of "a final order of removal …" Def. Resp. at 20. This position finds no support in the terms of the Agreement. Under ¶ 21, a class member may be detained if Defendants have made an individualized determination that she or he is "an escape risk." Under Paragraph 22 the term escape-risk "means that there is a serious risk that the minor will attempt to escape" from custody. "Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether: (A) the minor is currently under a final order of deportation or exclusion …" *Id*.

First, Defendants have offered no evidence nor have they testified in several depositions that they make individualized determinations of flight risk based on some class members being under final orders of deportation. Instead, Defendants' deposition testimony and briefing make clear their rule of "mandatory" detention applies across

---

[9] In Paragraph 9, the parties describe the scope of the Agreement in the following simple terms: "This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." No exemption is made for minors Defendants decide to place in expedited proceedings.

As already mentioned, ICE's conduct subsequent to the formation of the Agreement also bolsters Plaintiffs' argument that the plain terms of the Agreement do not permit Defendants to circumvent the Agreement by selecting certain children to be placed in expedited removal proceedings.

the board to all class members who they decide to place in expedited removal proceedings. *See* footnote 7, *supra*.

Second, the Agreement makes clear that class members under final orders of removal *may* be released: "Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of support (Form I-134) and an agreement to . . . notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to … [an] order of deportation …" *Id*.

Third, Defendants have failed to show that the vast majority of class members Defendants detain for weeks or months are under "final" orders of deportation. A final order of deportation is an order Defendants can execute.[10] However, Defendants concede that hundreds of "minors in custody for longer than twenty days [as of November 19, 2016] were [detained] *pending assessment of their credible fear claims, including review by an immigration judge* …" Def. Sec. Supp. Resp. at 19 (emphasis added).[11] As this Court recently stated, "[b]ut some of these [class members] who are

---

[10] Plaintiffs agree that if a class member is under a final order of deportation and Defendants are ready to execute that order, they may detain the class member if necessary for removal.

[11] In the event fear is expressed, Defendants "shall not proceed further" to remove an adult or class member child until a credible fear interview is conducted by an asylum officer. 8 C.F.R. § 235.3(b)(4). If the asylum officer does not find credible fear established, there is still no "final order of deportation" because the class member can request that an immigration judge review the negative credible fear determination. 8

by [Defendants'] discretion being subject to mandatory removal have not been subject to a final order of removal yet. And who knows how long it will be before they get a final order of removal …" October 6, 2016 Transcript at 48:8-22.

"The Settlement is a consent decree, which, 'like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree.'" *Flores v. Lynch, supra*, 828 F.3d at 808, 905 (9th Cir. 2016), *quoting United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005). The Agreement carefully identifies the reasons why some class members are not subject to release, and placement in expedited removal proceedings is not one of them.[12]

4.    KEEPING MINORS IN UNLICENSED AND SECURE ICE FAMILY RESIDENTIAL CENTERS VIOLATES THE AGREEMENT.

Nothing in the Agreement states or remotely implies that there is anything like a "20 day average" detention rule regarding compliance with the release provisions of the Agreement. The Agreement does *not* state "twenty days after taking a minor into custody ... [Defendants shall commence] and record prompt and continuous efforts … [to] release of the minor …" Instead, the Agreement CLEARLY states "continuous

---

U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1208.30(g)(ii).  If the immigration judge concurs with the asylum officer's negative credible fear finding, the "case shall be returned to the Service for removal of the alien." 8 C.F.R. § 1208.30(g)(iv)(A).

[12] Plaintiffs have not in this motion sought to preclude Defendants from placing class members in expedited removal, but Defendants may not wipe out class members' right to release to available custodians under ¶ 14 or placement in a licensed program under ¶ 19 simply because Defendants opt to place class members in expedited proceedings.

efforts" aimed at release under the terms of Agreement must commence *"[u]pon taking a minor into custody …"* (emphasis added) (Agreement ¶ 18).[13]

Such efforts "*shall continue so long as the minor is in [Defendants'] custody*." *Id.* (emphasis added). The Agreement ¶ 14 states that DHS "shall release a minor from its custody *without unnecessary delay*, in the following order of preference to … [naming various options for release]." *Id.* (emphasis added).

The Agreement provides that "[i]n any case in which the INS does not release a minor pursuant to Paragraph 14, ... [e]xcept as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program . . . ."  (Agreement ¶ 19.) This Court has held, "according to the language of the Agreement, Defendants *must* house children who are not released in a *non-secure* facility that is *licensed* by an appropriate state agency to care for dependent children." July 2015 Order at 12 (emphasis added).[14] Paragraph 19 requires that such placement happen "as expeditiously as possible." *Id.*[15]

_____

[13] By making no effort to locate custodians for accompanied minors placed in expedited removal and by refusing to release these minors even when a qualified custodian is available, Defendants have not only breached the Agreement but also have unilaterally revised it to create an additional exception to release—for minors who have been placed in expedited removal by Defendants.  *See Walnut Creek Pipe Distrib., Inc. v. Gates Rubber Co. Sales Div.*, 228 Cal. App. 2d 810, 816, 39 Cal. Rptr. 767 (1964) (courts should not imply additional terms, except in cases of "obvious necessity").

[14] A "licensed program" is defined as a "program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children . . . " (*Id.* ¶ 6.)  The Agreement requires that '[a]ll homes and facilities operated by licensed programs . . . *shall be non-secure* as required

There is no dispute that a Texas court has enjoined the licenses previously issued to Dilley and Karnes, and the State of Pennsylvania has withdrawn the license Defendants previously held for their Berks detention facility.[16] As this Court previously observed, "Defendants concede that the logical outcome of applying the licensing provision to family residential centers would be to make it impossible for ICE to house families at the family residential centers." July 2015 Order at 13, n. 8.[17]

In summary, even if Defendants' new policy of not releasing class members for weeks, months, or in some cases over a year, because Defendants have initiated expedited removal proceedings was consistent with the Agreement, which it obviously is not, Defendants are still in material breach because they admittedly do not detain

---

under state law . . . ." *Id.* ¶ 23 (emphasis added.) the evidence clearly shows that Defendants' detention sites for families are secure and any class member leaving is subject to immediate arrest.

[15] As this Court correctly stated in its August remedial Order, "A *de minimis* extension of the five-day requirement *under individualized circumstances* will not necessarily result in a breach of the Agreement or contravene the INA in all cases." (August 21, 2015 Order [Doc. # 189] at 10-11 (emphasis added).

[16] *See* Plaintiffs' Supplemental Brief at 19-20 [Dkt. # 287] ("Flores Class Member children are held in unlicensed facilities in violation of Paragraphs 6, 12A, and 19"). It is also undisputed that in violation of Paragraph 21, minors not placed pursuant to Paragraphs 14 and 19 are not housed in facilities "having separate accommodations for minors."

[17] It is undisputed and depositions of Defendants' agents confirmed that *ICE does not have a single contract to place children pursuant to Paragraph 19* of the Settlement. *See* Plaintiffs' Supplemental Brief in Support of Motion to Enforce at 16-17 [Dkt. # 287.]

minors not released in licensed non-secure facilities.[18] The Agreement makes no exception to these requirements for accompanied class members whether or not placed in expedited removal proceedings.[19]

5.    RULES OF EVIDENCE APPLICABLE TO CBP CONDITIONS

The parties agree, that "the Court should decline to consider inadmissible evidence at the January 30, 2017 hearing …" Def. Sec. Supp. Resp. at 5. Plaintiffs have never argued that the Court should consider "inadmissible evidence." Plaintiffs will file a separate response to Defendants' Statement of Evidentiary Objections to Plaintiffs' Statement of Uncontroverted Facts.

Plaintiffs have submitted numerous sworn declarations and deposition testimony taken under oath as evidence of Defendants' pervasive violations of the Agreement. Defendants' reliance (Def. Sec. Supp. Resp. at 6) on *Hubbard v. Houghland*, 471 Fed. Appx. 625, 626-27 (9th Cir. 2012) and *Earp v. Ornoski*, 431 F.3d 1158, 1169-70 (9th Cir. 2005) is misplaced because in both those cases the district courts explained why

---

[18] Plaintiffs assume that a class member's parent retains the right to effectively opt a class member out of the benefits of the Agreement and decide to keep her child with her in an unlicensed and secure facility. Nothing in the text of the Agreement precludes class members from making informed decisions to waive their rights under the Agreement.

[19] Finally, Defendants arguments about the "average" number of days class members spend in custody in facilities that violate the Agreement are entirely meaningless because depositions disclosed that *Defendants do not take into account Class Members detained for weeks or months and not released*. So class members detained for months on end are simply not included in Defendants' "average" calculations! *See* Plaintiffs Supp. Brief at 23 and n. 54 [Dkt. # 287.]

they had good reasons to question the truthfulness of inmate plaintiffs' declarations. *Hubbard, supra*, at 627; *Earp, supra*, at 1168.

In this case, the Court may consider the sworn testimony of Plaintiffs' witnesses, "as they involve the declarant's own actions," and not "facts beyond the declarant's personal knowledge." *SEC v. Phan,* 500 F.3d 895 (9th Cir. 2007).

In *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 858 (9th Cir. 1992), the Court recognized that oral testimony may not be necessary where the testimony presented was contained in declarations submitted to the district court. The Court of Appeals stated that "the trial court has wide discretion in deciding whether to admit or deny oral testimony," and that "little purpose would be served by a blanket rule requiring oral testimony." *Id*. at 858 (9th Cir. 1992).

Rule 32 of the Federal Rules of Civil Procedure provides in relevant part that at a hearing or trial, all or part of a deposition may be used against a party if the party was present or represented at the taking of the deposition, the testimony is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying, and the deponent was a party or anyone who, when deposed, was a party's officer or designee under Rule 30(b)(6) or 31(a)(4).

6.    THE COURT MAY ORDER CLASS-WIDE RELIEF BASED ON THE DECLARATION AND
      DEPOSITION TESTIMONY OF DEFENDANTS' AND PLAINTIFFS' WITNESSES THAT
      SHOW A PATTERN OF FAILURE TO COMPLY WITH THE TERMS OF THE AGREEMENT

Defendants argue that "the Court should limit the scope of the hearing" because the "only evidence Plaintiffs have supplied ... is declaration or deposition

testimony of individuals who experienced conditions at only eleven CBP facilities […] all of which are within the state of Texas." Def. Sec. Supp. Resp. at 7. However, this Court has previously held:

> Defendants suggest that the July 24, 2015 Order will *enjoin* their *current* policies and practices that "were not challenged by Plaintiffs in their enforcement motion, are authorized by the INA, and do not violate the Agreement." Defendants' Resp. at 9. *The July 24, 2015 Order will do no such thing. The Court is not enjoining current policies and practices that comply with the Agreement—only those that do not*.

August 21, 2015 Order, p. 11 (emphasis added).[20]

Defendants' minimization of Plaintiffs' evidence relating to conditions in CBP facilities is baseless. Def. Sec. Supp. Resp. at 7. As the undersigned counsel has declared, Plaintiffs' declarants are only limited in quantity to the extent that Plaintiffs' counsel has limited ability to monitor CBP facilities. Declaration of Peter Schey, Ex. 1, ¶13 [Dkt # 201-1.]

---

[20] This Court also previously held that its "remedial order does not enjoin policies and practices that comply with the Agreement." *Id*. at 12. In its August 2015 Order, this Court found that:

> The parties simply did not present evidence as to the conditions at every Border Patrol station one way or the other. Nonetheless, the Court need not find that all Border Patrol stations are in breach of the Agreement before it can enforce standards set out in that Agreement. Thus, *to the extent any Border Patrol station is out of compliance with the Agreement, those stations must comply with the Agreement and Defendants' own acknowledged standards and procedures*.

*Id*. at 13 (emphasis added).

There is no reason for this Court to change course. If some CBP facilities are in compliance with the Agreement, then they may continue to comply; this Court's Order would only apply to noncompliant facilities.[21]

Defendants argue that "each CBP facility applies CBP policies on holding and detention in a manner appropriate … to address the unique factual circumstances in any given facility." Def. Resp. at 8. However, the Agreement does not contemplate substantial varying conditions relating to compliance from facility to facility. If the parties had intended to accept varying conditions, they could have negotiated for that result. Instead, the "Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of [Defendants] ..." Agreement ¶ 9.[22]

In *Unknown Parties v. Jeh Johnson*, No. CV-15-00250-TUC-DCB (U.S. District Court for the District of Arizona) (Nov. 18, 2016) ("Unknown Parties") [Az Dkt. # 244], the district court recently issued a preliminary injunction in response to plaintiffs' constitutional claims remarkably similar to the claims raised in the instant motion to enforce dealing with inhumane conditions in CBP stations. The *Unknown Parties* Preliminary Injunction Order covers both adults and children detained in Defendants' CBP stations in Arizona. Plaintiffs will separately file a motion with this Court requesting that it take judicial notice of the preliminary injunction issued in the *Unknown Parties* case and undisputed evidence regarding several of the same overall claims raised in Plaintiffs'

pending motion to enforce in this case including lack of mats or mattresses for

detainees to sleep on, lack of access to showers and bathing facilities,

deprivation  of  sleep, inadequate food and water, and cold temperatures. This

Court may take judicial notice of uncontradicted evidence on file in the

*Unknown Parties* case that shows that the claims made in the instant motion to

enforce are systemic and not limited to CBP stations based in Texas.[23]

7.     THE COURT MAY ORDER COMPLIANCE WITH AGREEMENT REGARDING CBP
       CONDITIONS THAT ARE UNSAFE, UNSANITARY OR INCONSISTENT WITH
       DEFENDANTS' PURPORTED CONCERN FOR THE PARTICULAR VULNERABILITY OF
       MINORS

Defendants complain because certain conditions of detention in CBP facilities

that Plaintiffs address in their motion are allegedly "found nowhere in the

Agreement." Def. Sec. Supp. Resp. at 14 (re sleep); *see also id*. at 15 (with regards

not providing minors with "soap and towels to wash" when detained, "warm

showers, towels or toothbrushes after being detained for longer periods of time," or

"dry clothing when [a child's clothing] is soiled or wet.") Defendants respond that

"these requirements [and avoiding extreme overcrowding] are not contained in the

---

[23] *See* Declaration of Border Patrol Chief Assistant Chief Allen, Ex. 3 (Border Patrol processing begins in the field; Processing consists of obtaining biographical information and biometrics); Joseph Gaston Decl., Ex. 5 ("out of 16,992 detainees between June 10 and September 28, 2015, only 122 were recorded to have received a mat"); Eldon Vail, Ex. 4 (of 16,992 detainees between June 10 and September 28, 2015, only 122 were recorded to have received a mat for sleeping).

Agreement, and should not be read into it in the absence of any explicit indication within the four corners of the Agreement that the parties intended to require CBP to take such steps." *Id.*

Defendants' failure to provide these basic human necessities obviously frustrates the purpose and meaning of the Agreement. Paragraph 11 of the Agreement requires that Defendants "treat [ ], and shall continue to treat, all minors in [their] custody with *dignity, respect and special concern for their particular vulnerability as minors.*" *Id.* (emphasis added).

The Agreement also provides that "[f]ollowing arrest, the [Defendants] shall hold minors in facilities that are *safe and sanitary* and that are consistent with the [Defendants'] concern for the particular vulnerability of minors," and that "[e]very effort must be taken to ensure that the *safety and well-being* of the minors detained in these facilities are satisfactorily provided for ..." *Id.* (emphasis supplied).[24]

It does not require an advanced degree in child welfare to understand that not providing children with soap and a towel when detained, not providing tooth brushes, showers and towels to children detained overnight or for a day or longer, not providing space for children to sleep because of overcrowding, or forcing children to sleep on cold concrete floors without mats or mattresses or blankets to stay warm, or not providing a change of clothing when a child's clothing is soiled or wet, all fail to

---

[24] Taken together, Defendants are obligated to provide conditions of detention that are consistent with children's "dignity," show "respect" and "concern" for the "particular vulnerability" of detained children, are "safe and sanitary," and address the "well-being" of detained children.

Plaintiffs' Supplemental Memorandum

19

address children's "dignity," or show "respect" and "concern" for children's "particular vulnerability" and "well-being," and are not conditions that are "safe" and "sanitary" for children.

Requiring Defendants to address these concerns hardly involves "redraft[ing] the Agreement," nor should providing class members with these basic necessities require "a new lawsuit." Def. Resp. at 13-14. Each of the concerns raised by class members patently involve their vulnerability as children, and their dignity, well-being, safety and right to be detained in sanitary conditions. These terms have common meanings in the English language and the parties are assumed to have meant what they said when they included these terms in the Agreement.

Requiring that Defendants provide these essential items for children in their custody often for 48 hours or longer does not "ignore the plain terms of the Agreement …" *Id.* at 14. In fact, ignoring these essential needs of detained class members would require the parties and this Court to simply ignore language in the Agreement that Defendants will treat children in their custody with dignity and respect for their particular vulnerability and will provide for children's well-being and safety. Unless these words mean something, they are simply surplusage added to the Agreement for no discernable reason.

8.    PLAINTIFFS' SPECIFIC MATERIAL ALLEGATIONS OF CONDITIONS THEY EXPERIENCED IN CBP STATIONS ARE LARGELY NOT PLACED IN DISPUTE BY DEFENDANTS' EVIDENCE REGARDING THEIR POLICIES

Plaintiffs have provided a large volume of declarations and sworn deposition testimony in which class members and their mothers consistently and routinely affirm

under oath that conditions in CBP stations where they were held often for as long as 72 hours with no mats for children to sleep on forcing them to try to sleep on cold concrete floors, mothers and children forced to sleep on the floors next to toilets because of pervasive over-crowding, no access to soap, showers, toothbrushes, or towels while detained for up to three days, cell temperatures that leave class feeling like they are detained in an "ice-box," food that is inadequate and sometimes frozen, water that is dirty and shared cups for several detainees, and no change of clothes provided to children with soiled or set clothing. *See, e.g.*, Plaintiffs Statement at 1-56 [Dkt. # 293]; *see also* Plaintiffs' Exhibits in Support of Motion to Enforce Settlement, Ex. 2 (excerpts of numerous class member and their mother's sworn statements) [Dkt. 201-1.]

Defendants respond with declarations from various officials who almost exclusively address what Defendants' purported policies are, *not what class member children declare they experienced.* Defendants have offered no records or written policy showing that any of the over 100 declarants was ever provided a mat or mattress to sleep on and admit no such mats are available at least in Texas and Arizona sectors; Defendants have no records showing that any declarant was provided soap or towels to wash with during the first few hours in custody nor do any of their declarations claim soap or towels were available for washing in declarants' holding cells; they have provided no records showing that the declarants (or any class members) were actually provided access to showers, soap and towels after a day or longer in custody; they have

no records refuting class members routine claims of severe overcrowding in cells with large numbers of unrelated adults; they have no records and have offered no records showing class members were not required to try to sleep on concrete floors next to toilets; they have no records and offered no evidence showing that numerous class members who had wet or soiled clothing and needed dry clothes actually got them.

Regarding inadequate and frozen food, Defendants at best contest a handful of the allegations of about six declarants and then do so based on a declaration of David Strange, an assistant chief with the Border Patrol in Washington, DC, who was never made available for deposition. Mr. Strange didn't enter the data he relied upon to contest certain class members' allegations, he does not state in his declaration who entered the data, he does not indicate what training data entry people had, and he does not vouch for the accuracy of the data. In fact, the data often showed children were not fed for up to ten hours. *See* Plaintiffs' Supplemental Brief in Support of Motion to Enforce ("Plaintiffs' Supp. Bf.") [Dkt. # 287] at 3.

Overwhelming evidence indicates that Class Member children often receive inadequate or frozen food. *See, e.g.* Motion to Enforce [Dkt. # 201] at 5-6; Exhibit 2 [Dkt. # 201-1] at pp. 1-3 (excerpts of declarations regarding children's hunger at CBP facilities); Plaintiffs' Statement [Dkt. # 293] at pp. 1-14 (citations to evidence of inadequate and frozen foods); Plaintiffs' Supp. Bf. [Dkt. # 287] at p. 2 n. 7. Defendants' activity logs themselves often reflect inadequate provision of food. Despite the fact that CBP policy is to provide a meal to individuals when they are

taken into custody, many Class Members were not fed for 10 to 12 hours after being brought into custody. Plaintiffs' Supp. Bf. at 3. Defendants have no system in place for ensuring the accuracy of the meal delivery data input; Beeson testified "no" when asked if he was "aware of any efforts to monitor the accuracy of records entered with regards to meals served," and "I don't know" when asked "[w]ho specifically is tasked with entering into this E3 system that…meals were provided?"[25]

Overwhelming evidence indicates that Class Member children are often detained in unsanitary conditions. See, e.g. Motion [Dkt. # 201] at pp. 7-9; Exhibit 2 [Dkt. # 201-1] at pp. 4-6 (excerpts of declarations regarding unsanitary conditions in CBP facilities since October 2015); Plaintiffs' Statement [Dkt. # 293] at pp. 21-25.  Flores Class Members and their mothers report often bring forced to sleep on the ground near dirty toilets due to overcrowding. Id. Defendants have refused to provide documents or testify regarding cell capacity and overcrowding for "security" reasons.

Defendants' own TEDS policy requires that "Clean bedding must be provided to juveniles." TEDS § 4.12 at 17 [Dkt. # 201-5]. Yet it is undisputed that class members at minimum in Texas and Arizona are required to sleep on concrete floors for one to

---

[25] Ex. 4, Deposition of Paul Beeson, 45:14-45:21. See also "Q: And are you aware of any, of any in-person training that the agents working under you receive in how to input data with regards to the delivery of meals, if you know? A: I don't know." Manuel Padilla, Jr. was unable to explain why individuals in his sector were not fed for more than 10 hours after being arrested, as reflected in activity logs. He testified that "the system being down" was one possible explanation, or that "the feeding time was not -- was not logged in." He testified it was "definitely" possible that the log was correct and that individuals were not fed during this timeframe. Ex. 2, Deposition of Manuel Padilla, Jr.25:2-26 [DKT. #201].

three nights.

9.    CONCLUSION

For all the reasons stated above, Plaintiffs' Motion should be granted.

Dated: January 3, 2017                    Respectfully submitted,

PETER A. SCHEY
CARLOS R. HOLGUIN                          ELENA GARCIA
CENTER FOR HUMAN RIGHTS AND                ORRICK, HERRINGTON &
CONSTITUTIONAL LAW                         SUTCLIFFE LLP

AMANDA ALVARADO FORD                       JENNIFER KELLEHER CLOYD
MICHAEL S. SORGEN                          KATHERINE H. MANNING
LA RAZA CENTRO LEGAL, INC.                 KYRA KAZANTZIS
                                           ANNETTE KIRKHAM
                                           THE LAW FOUNDATION OF SILICON VALLEY
                                           LEGAL ADVOCATES FOR CHILDREN AND YOUTH
                                           PUBLIC INTEREST LAW FIRM
ALICE BUSSIERE
VIRGINIA CORRIGAN
YOUTH LAW CENTER                           /s/ PETER SCHEY
OF COUNSEL FOR PLAINTIFFS                   ATTORNEYS FOR PLAINTIFF

1

# CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On January 3, 2017, I electronically filed the following document(s):

PLAINTIFFS' SUPPLEMENTAL RESPONSE IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/___Peter Schey
*Attorney for Plaintiffs*