CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org


ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>    Plaintiffs,<br><br>- vs -<br><br>JEH JOHNSON, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et al*.,<br><br>    Defendants. | Case No. CV 85-4544 DMG (AGRx)<br><br>PLAINTIFFS' EXHIBITS 1 – 5 TO PLAINTIFFS' SUPPLEMENTAL RESPONSE IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL MONITOR<br><br>Hearing: January 30, 2017 |

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:   (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

INDEX OF EXHIBITS

1.  Deposition of Assistant Director of Field Operations, Enforcement and Removal Operations, ICE, Phillip Miller – Transcript Excerpts……………………………………….………1

2.  Order Granting Preliminary Injunction, *Unknown Parties v. Jeh Johnson*, No. CV-15-00250-TUC-DCB (U.S. District Court for the District of Arizona) (Nov. 18, 2016) ("Unknown Parties") [Az Dkt. # 244……………………………………………………………… 7

3.  Declaration of Border Patrol Assistant Chief George Allen, from Doe, et al. v. Johnson, et al. Case No. CV-15-0250 (D. Ariz.)……… …………………….....…… 36

4.  Declaration of Eldon Vail, from Doe, et al. v. Johnson, et al. Case No. CV-15-0250 (D. Ariz.)……………………….……………………………………………………38

5.  Declaration of Joeseph Gaston, from Doe, et al. v. Johnson, et al. Case No. CV-15-0250 (D. Ariz.)……………………………………………………………………97

# Exhibit 1

1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES,      )
et al.,                    )
                           )
                           )
            Plaintiffs,    )
VS.                        ) Case No. CV 85-4544 DMG
                           )
                           )
LORETTA E. LYNCH,          )
Attorney General of the    )
United States, et al.,     )
                           )
                           )
            Defendants.    )
--------------------------x

DEPOSITION OF PHILIP MILLER

WASHINGTON, D.C.

SEPTEMBER 28, 2016

1:01 p.m.

Reported by:
Misty Klapper, CRR, RPR, CMR
Job No. 46539

2

1

2

3

4                         PHILIP MILLER

5                         SEPTEMBER 28, 2016

6                         1:01 p.m.

7

8              Deposition of Philip Miller,

9         held at the Department of Justice,

10        450 5th Street, N.W., Washington,

11        D.C., pursuant to Notice, before

12        Misty Klapper, RPR, CRR, CMR and

13        Notary Public within and for the

14        District of Columbia.

15

16

17

18

19

20

21

22

23

24

25

3

APPEARANCES:

FOR THE PLAINTIFFS:
            Center for Human Rights & Constitutional L
            256 South Occidental Boulevard
            Los Angeles, California  90057
            (213) 388-8693
            BY:  Peter A. Schey, Esq. (via telephone)
                 pschey@centerforhumanrights.org


FOR THE DEFENDANTS:
            UNITED STATES DEPARTMENT OF JUSTICE
            District Court Section
            P.O. Box 868
            Ben Franklin Station
            Washington, D.C.  20044
            (202) 307-4693
            BY:  William Silvis, Esq.
                 william.silvis@usdoj.gov


ALSO PRESENT:

            Tom Zimmerman

            Wendy Wallace

130

PHILIP MILLER

1    questioning.  I'm sorry if I

2    misunderstood you.

3    Q.   Let's go back.  No problem.

4    It's probably my fault.

5    Have you ever -- in -- in

6    this fiscal year did you ever reach

7    maximum bed capacity at the Dilley

8    detention center?

9    A.   No.

10   Q.   How about -- and what has

11   been the average bed usage over the

12   year?

13   A.   As I said previously, I don't

14   know what the average utilization was

15   at Dilley, but the -- the physical

16   plant capacity is much greater than the

17   operational capacity because, although

18   not licensed, Dilley is operating under

19   the Texas space allotment criteria and

20   JFRMU's guidance on family separation.

21   So that has reduced our

22   operational capacity, as I said, to a

23   little bit over 1500; whereas, the

24   physical plant capacity is 2400.  So

131

PHILIP MILLER

1

2     we're focusing on operational

3     capacities at the three facilities,

4     whether under licensure or under

5     anticipated licensure, and not the

6     physical plant capacities.

7          Q.   And would the same be true of

8     Karnes?

9          A.   Yes, sir.

10         Q.   And when -- when border

11    patrol calls you or calls somebody and

12    says they want to transfer a family to

13    either Dilley or Karnes, if somebody

14    believes that that facility has reached

15    operational capacity, do you so advise

16    CBP?

17         A.   Yes.

18         Q.   And then is it your

19    understanding that CBP would issue an

20    NTA to those families and release them?

21              MR. SILVIS:  Objection to the

22         foundation.

23              THE WITNESS:  Yeah, if all

24         three were full, I believe that

25         would be the case.  I don't think

132

                    PHILIP MILLER

1

2       we've ever hit a point this fiscal

3       year where all three have been

4       full on the same day.

5              BY MR. SCHEY:

6       Q.   Okay.  And -- and might you

7  transport somebody -- from the

8  U.S./Mexico border in Texas, might you

9  transfer somebody all the way to Berks

10  if there's bed space available there?

11       A.   Yes.

12       Q.   You would?

13       A.   Yes, sir.

14       Q.   And -- and approximately what

15  is your transportation budget for

16  fiscal year 2016 for family units?

17       A.   We don't -- we don't

18  differentiate in terms of, you know,

19  our -- our budget for different

20  criteria.  We track somewhat

21  differently as it relates to ORR

22  placements; but in terms of family unit

23  placements, I don't believe that we

24  track that separately.

25       Q.   Okay.  So the answer is you

# Exhibit 2

1

2

3

4

5

6                        **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    Unknown Parties, et al.,                    No. CV-15-00250-TUC-DCB

10                    Plaintiffs,                 **ORDER**

11   v.

12   Jeh Johnson, et al.,

13                    Defendants.

14

15           Plaintiffs filed this action on June 8, 2015, asserting six claims for relief related to

16   alleged inhumane and punitive treatment of Tucson Sector[1] civil immigration detainees.

17   Plaintiffs allege five claims of violations of the Due Process Clause of the Fifth

18   Amendment based on deprivation of sleep, of hygienic and sanitary conditions, of

19   adequate medical screening and care, of adequate food and water, and of warmth. (Doc. 1

20   ¶¶ 184-218.) Plaintiffs also alleged the Defendants violated the Administrative

21   Procedures Act (APA) by failing to enforce their own procedures related to the operation

22   of holding cells in Tucson Sector facilities, *id.* ¶¶ 219-24, but this claim was dismissed,

23   (Order (Doc. 118)).   Previously in addition to granting in part and denying in part

24   Defendants' Motion to Dismiss, the Court certified the case as a class action.  (Order

25   (Doc. 117)).   The Court now considers Plaintiffs' Motion for a Preliminary Injunction.

26   _____

27          [1] The Tucson Sector includes Border Patrol facilities at Bisbee (Brian A. Terry
     Station/ Naco Station), Casa Grande, Douglas, Nogales, Sonoita, Tucson, Why (Ajo
28   Station), Willcox, and Three Points.  The Motion for Preliminary Injunction relied on
     early discovery conducted at Tucson, Douglas, Nogales, and Casa Grande.

Following an evidentiary hearing, the Court finds the evidence supports the Plaintiffs' experts' declarations attached to the Motion for a Preliminary Injunction,[2] and grants the motion for the reasons that follow.

<u>A.   Preliminary Injunction: Standard of Review</u>

Preliminary injunctions are an "extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  In *Winter,* the Supreme Court explained the four-factor test. "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter*, 555 U.S. at 20).  "The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C.Cir. 2014) ("We begin with the first and most important factor: whether petitioners have established a likelihood of success on the merits.")). "Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, we 'need not consider the remaining three [Winter elements].'" *Id.* (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (quoting *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776–77 (9th Cir. 2011)).

When a plaintiff is requesting a mandatory injunction, the burden is doubly demanding because then the plaintiff must establish that the law and facts clearly favor

---

[2] Motion for Preliminary Injunction (MPI) (Doc. 206); Opposition (Response) (Doc. 141); Reply (Doc. 145).  The Plaintiffs' experts are: Eldon Vail, a corrections administrator; Robert Powitz, a forensic Sanitarian, with expertise in correctional public health; Joe Goldenson, M.D., Medical Director for Jail Health Services for the San Francisco Department of Public Health; Joseph Gaston, Plaintiffs' attorney responsible for data analysis, and Kevin Coles, Plaintiffs attorney responsible for reviewing video surveillance tapes.  Defendants experts are: George Allen, the Assistant Chief Patrol Agent for the Tucson Sector; Diane Skipworth, Sanitarian; Richard Bryce, retired Undersheriff of Ventura County Sheriff's Department in California; Philip Harber, M.D., Professor of Medicine with expertise in occupational-environmental (preventative) medicine, and Justin Bristow, Border Patrol's Acting Chief, Strategic Planning and Analysis, overseeing various programs including the e3 Processing Module/e3 Detention Module (e3DM data system).

her position, not simply that she is likely to succeed on the merits. *Id.* This was the standard applied when an actress requested an injunction requiring Google to take affirmative action—to remove (and to keep removing) *Innocence of Muslims* from YouTube and other sites under its auspices. This relief was treated as a mandatory injunction because it "orders a responsible party to 'take action.'" *Id.* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). This heightened standard is necessary because a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored," *id.* (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)). Therefore, "mandatory injunctions should not issue in 'doubtful cases.'" *Id.* (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

Following *Winter*,[3] the Ninth Circuit applies a sliding scale test where serious questions going to the merits and a balance of hardships that tips sharply in favor of the plaintiff can support issuance of a preliminary injunction if plaintiff also shows that there is a likelihood of irreparable injury and the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Harm that is merely monetary "will not usually support injunctive relief." *American Trucking Associations v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009). Harm that is "merely speculative" will not support injunctive relief. *Id.* This is because "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 55. In balancing the competing claims of injury and consequences resulting from the granting or withholding of the requested relief, a court

---

[3] Before *Winter*, a plaintiff could demonstrate either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represented extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success the party had to show. In *Winter*, the Supreme Court definitively refuted the "possibility of irreparable injury" standard as too lenient. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126–27 (9th Cir. 2009)

exercises its sound discretion, and, in equity, a court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). The government cannot be harmed, however, from an injunction that merely ends an unconstitutional practice. *Rodriguez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013).

The Court "'need not consider public consequences that are highly speculative.'" *Stormans*, 586 F.3d at 1139. (quoting *Golden Gate Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008)). "In other words, the court should weigh the public interest in light of the likely consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." *Id.*

In the Ninth Circuit "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012). This is because "constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Am. Trucking Ass'ns, Inc.,* 559 F.3d at 1059. In the Ninth Circuit, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres,* 695 F.3d at 1002 (quoting *Sammarano v. First Jud. Dist. Ct.,* 303 F.3d 949, 974 (9th Cir. 2002)). If plaintiffs "show that a constitutional rights claim is likely to succeed, the remaining preliminary injunction factors weigh in favor of granting an injunction." *Vivid Entm't, LLC v. Fielding,* 956 F. Supp. 2d 1113, 1136 (C.D. Calif. 2013) (citing *Melendres,* 695 F.3d at 1002; *Klein v City of San Clemente,* 584 F.3d 1196, 1208 (9th Cir. 2009)).

In summary, as a threshold matter under *Winter*, the Plaintiffs must establish a likelihood of success on the merits of their claims before the Court can grant a preliminary injunction. If the Plaintiffs are unable to establish the threshold element of likely success on the merits, the request for a preliminary injunction must be denied and the Court need not review whether the remaining requirements for issuance of a preliminary injunction are satisfied. If the threshold is met, the Plaintiffs must establish

- 4 -

the other three elements: they are likely to suffer irreparable harm without the injunction, the balance of equity tips in favor of the injunction, and the public interest favors the injunction. Alternatively, under the "sliding scale" approach, a preliminary injunction may be granted if there are "serious questions going to the merits and a hardship balance that tips sharply toward the [Plaintiffs]," so long as "the other two elements of the *Winter* test, [irreparable harm and public interest], are also met."

If a mandatory injunction is sought, the Plaintiffs must make a doubly burdensome threshold showing: that the law and facts clearly favor their position, not simply that there is a likelihood of success on the merits. This is because mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases.

## B. Mandatory Injunction or Injunction to Maintain the Status Quo?

A mandatory injunction orders a party to take action, while a prohibitory injunction prohibits action and preserves the status quo pending a determination of the action on the merits. *Marlyn Nutraceuticals,* 571 F.3d at 878–79. "The relevant status quo is that 'between the parties pending a resolution of a case on the merits.'" *Arizona Dream Act Coalition (DACA) v. Brewer,* 757 F.3d 1053, 1061 (9th Cir. 2014) (quoting *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)). In the context of a preliminary injunction, the "status quo" refers to the legally relevant relationship between the parties before the controversy arose. *McCormack,* 694 F.3d 1020. It is not enough that the result of an injunction may be an action taken in response to it; as long as the injunction does not mandate a change in the status quo it is prohibitory. *Id.* (citing *see Marlyn Nutraceuticals*, 571 F.3d at 879).

It is not a defense that "Border Patrol has done everything possible with the resources provided by Congress to ensure that conditions at its stations protect the health and safety of the individuals in its custody." (Response at 3.) The Court is not unsympathetic, but a deprivation of constitutional rights cannot be justified by fiscal necessity, *Golden Gate Rest. Ass'n.,* 512 F.3d at 1126, and the government may be

- 5 -

compelled to expand the pool of resources to remedy a constitutional violation, *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir.2014) (en banc).  The role of the judiciary is a limited one—restricted to assessing the constitutionality of government conduct.  It is for the elected officials, both legislative and executive, and their administrators to determine this Country's immigration policies and how to finance and implement them.

Accordingly, the Court turns to the question of whether or not the government's actions are constitutional.  Defendants submit that they provide medical care, warmth, sanitation, food, and water, and allow detainees to sleep.  Defendants assert they provide for detainees basic human needs pursuant to Border Patrol's 2008 Hold Rooms and Short Term Custody Policy (2008 Policy) and the National Standards on Transport, Escort, Detention, and Search (TEDS standards).

The Court accepts for purposes of this preliminary injunction that these guidelines, the 2008 Policy and TEDS, provide for constitutional conditions of confinement, which Defendants assert is the status quo.  Plaintiffs have presented persuasive evidence that the basic human needs of detainees are not being met pursuant to the current practices being implemented by Defendants pursuant to these guidelines.  The Court preliminarily orders full and immediate compliance with these guidelines, with the clarification that the guideline requiring Defendants to give clean bedding to detainees includes mats for detentions exceeding 12 hours.

### C.  Unconstitutional Conditions of Confinement

"When the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being: Under this rationale, the State must provide for a detainee's "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—."*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989).

It is undisputed that Border Patrol holds the Plaintiffs as civil detainees, pursuant to civil immigration laws, *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001), therefore, they

- 6 -

are protected under the Fifth Amendment from being held without due process of law under conditions that amount to punishment. *Wong Wing v. United States,* 163 U.S. 228, 237 (1896). Similarly, the Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, and medical care, and take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). But to be liable under the Eighth Amendment, a prison official must act with deliberate indifference to an inmate's health or safety. *Id.* at 834. Conditions of confinement that violate the Eighth Amendment necessarily violate the Fifth Amendment, but the reverse is not necessarily true. In other words, Plaintiffs are protected by both the Fifth and Eighth Amendments.

Because Plaintiffs are civil detainees and <u>not</u> prisoners, the Court applies the Fifth Amendment, mirrored by the Fourteenth Amendment,[4] Due Process Clause. Both the Fifth and Fourteenth Amendments protect a non-convicted detainee from punishment prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 534–35 (1979). "This standard differs significantly from the standard relevant to convicted prisoners, who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment." *Pierce v. County of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008). The "more protective" Fourteenth Amendment standard requires the government to do more than provide minimal necessities, *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004),[5] but, a detainee does not have a fundamental liberty interest under the

---

[4] The Due Process Clause of the Fourteenth Amendment bars any State from depriving any person of rights secured under the Bill of Rights (the first eight amendments). Therefore, the Court relies equally on cases applying the Fourteenth and Fifth Amendment Due Process Clauses.

[5] Overruled in part by *Peralta*, 744 F.3d at 1083 (holding monetary damages as a retroactive remedy is unavailable against an official capacity defendant who lacks authority over budgeting decisions; applying subjective intent standard allowing fiscal considerations to factor into deliberate indifference analysis in Eighth Amendment case). The government cannot assert a lack of resources defense against an injunction because it is prospective relief, and the government may be compelled to expand the pool of resources to remedy a constitutional violation. *Id.*.

Fourteenth Amendment to be free from discomfort, *Bell*, 441 U.S. at 537. Under the Fourteenth Amendment, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738, (1972).

To evaluate the constitutionality of a pretrial detention condition, a district court must determine whether those conditions amount to punishment of the detainee. *Bell*, 441 U.S. at 535; *Pierce*, 526 F.3d at 1205; *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004). For a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or disability, and (2) amount to punishment. *Pierce*, 526 F.3d at 1205 (quoting *Bell*, 441 U.S. at 538). To constitute punishment, the governmental action must cause harm or disability that either significantly exceeds or is independent of the inherent discomforts of confinement. *Demery*, 378 F.3d at 1030. In the absence of evidence of express intent, a court may infer that the purpose of a particular restriction or condition is punishment if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 539); *Demery*, 378 F.3d at 1028 (citing *Bell*, 441 at 538).

"Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546; *Pierce*, 526 F.3d at 1205. In the absence of substantial evidence that indicates officials have exaggerated their responses, courts should ordinarily defer to the expert judgment of correction officials to determine whether detention restrictions or conditions are reasonably related to maintaining security and order and operating the institution in a manageable fashion. *Bell*, 441 U.S. at 540 n. 23.

A reasonable relationship between the governmental objective and the challenged condition does not require an "exact fit," proof that the policy in fact advances the legitimate governmental objective, or even that it is the "least restrictive alternative."

*Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002). However, the correction official must have reasonably thought that the policy would advance a legitimate governmental objective. *Id.* The relevant question is whether the official's judgment was rational, that is whether the Defendants might reasonably have thought that their policies and practices would advance legitimate interests. *Id.* at 1046 (citing *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999)).

In summary, a condition of confinement for an inmate who has not been convicted violates the Fifth and Fourteenth Amendments if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2473-74 (2015). Under the Fourteenth Amendment, the Court makes an objective assessment whether there is a reasonable relationship between the government's conduct and a legitimate purpose. *Id.* at 2469. This is the measurement for harm relevant for assessing the merits of Plaintiffs' constitutional claims that the conditions of confinement are punitive.

Importantly, the Court notes that Plaintiffs are not pretrial detainees and that the civil nature of their confinement provides an important gloss on the meaning of "punitive" in the context of their confinement. Because they are detained under civil, rather than criminal, process, they are most decidedly entitled to "more considerate treatment" than those who are criminally detained. *Cf. Estelle v. Gamble*, 429 U.S. 97, 104, (1976); *Youngberg v. Romeo*, 457 U.S. 307, 321–22, (1982). In this way, decisions defining the constitutional rights of prisoners establish a floor for the constitutional rights of the Plaintiffs. *Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir. 2012) (citations omitted). Therefore, the Court should presume the Plaintiffs are being subjected to punishment if they are confined in conditions identical to, similar to, or more restrictive than those under which the criminally convicted are held. *See Sharp v. Weston*, 233 F.3d 1166, 1172–73(9th Cir. 2000) (finding that *Youngberg* required that individuals civilly confined

- 9 -

at a commitment center receive "more considerate" treatment than inmates at the correctional center in which the commitment center was located). Similarly, "[i]f pretrial detainees cannot be punished because they have not yet been convicted, [citing *Bell* ], then [civil] detainees cannot be subjected to conditions of confinement substantially worse than they would face upon commitment." *Lynch v. Baxley*, 744 F.2d 1452, 1461 (9th Cir. 1984). "Or, to put it more colorfully, purgatory cannot be worse than hell." *Jones,* 393 F.3d at 933.

This is precisely the case here. Assistant Chief Patrol Agent for the Tucson Sector, George Allen, admitted, when this Court asked him to compare the conditions of confinement at Tucson Sector Border Patrol stations with those afforded criminal detainees at the Santa Cruz County jail, that in jail, detainees have a bed, with blankets, clean clothing, showers, toothbrushes and toothpaste, warm meals, and an opportunity for uninterrupted sleep. Likewise, the conditions of confinement for civil immigration detainees improve once they are transferred from Border Patrol holding cells to detention centers operated by the United States Marshals.

### D. Discussion

The Tucson Sector stations are designed for short-term civil detention for processing of immigrant detainees for transfer to Immigration and Customs Enforcement (ICE) for civil immigration removal proceedings or Enforcement and Removal Office (ERO) for juvenile custody determinations, to the United States Marshal for prosecution, or for repatriation. (Allen Decl. ¶ 7.) There is no dispute that upon transfer to detention by ICE, ERO or the United States Marshal affords conditions of confinement like those found in the county jails where detainees have beds, blankets, clean clothing, showers, personal hygiene items like toothbrushes, etc., hot meals, and the opportunity to sleep uninterrupted.

Defendants argue the constitutionality of the conditions of confinement in the Border Patrol stations must be assessed with due consideration given to the nature, purpose, and duration, of an individual's time in a Border Patrol station." (Response at

- 10 -

24.)  "[B]order Patrol stations are twenty-four hour operations, and in fact a significant number of individuals who are detained in Border Patrol stations are apprehended during the evening and night time hours."  *Id.*  Defendants assert that providing sleeping facilities and turning off lights would require structural changes at the facilities, create safety risks, and impede its purpose to provide 24-7 immigration processing.  *Id.* at 24-25, *see also*: (Allen Decl. ¶¶ 46-47; Bryce Decl.  ¶¶ 100-02; Skipworth Decl. ¶¶ 153; Harber Decl. ¶ 65.)  Accordingly, the hold rooms are not designed for sleeping and, therefore, have no beds.  (MPI, Ex. 81:Hold Room Policy (sealed) (Doc. 193)).

Assistant Chief Allen explains that Border Patrol processing begins in the field, but on arrival at the detention facility intake begins in the "sally port" where detainees' outer-clothing is removed for security reasons, (Allen Decl. ¶ 1-4), leaving detainees without sweatshirts, jackets, or second layers of clothing for warmth.  Detainees are placed into group-holding rooms based on age, gender, family units, or criminal suspects. *Id.* ¶ 4.  Processing consists of obtaining biographical information and biometrics and submitting this information through the e3Nex Generation Identification system to determine prior criminal and immigration arrests.  *Id.* ¶ 5.  Fully processing a detainee includes preparing an arrest report, immigration processing, service of immigration forms, consular notifications, and communication with family members and attorneys as appropriate.  *Id.*  If uninterrupted and if there is no remarkable criminal or immigration history, processing would take between two and two and one-half hours.  *Id.*

But there are interruptions, which can be caused by a large number of prior apprehensions and the criminal background of the detainees awaiting processing, the need to dispense meals, medical or health care, to arrange consular communications, phone calls to family members or attorneys, to conduct investigations, and computer system outages.  *Id.*  Evidence at the hearing revealed that detention in Border Patrol holding rooms is also extended because of delays by the receiving agencies ICE, ERO, and the United States Marshal in accepting the Border Patrol transfers.  *See also* (Allen Decl. ¶ 9.)

- 11 -

Discovery in this case reflects that between June 10, 2015 and September 28, 2015, only about 3,000 of approximately 17,000 detainees were processed out of Border Patrol station detention within 12 hours. (Gaston Decl. ¶ 20.) Of these 17,000 detainees, 8,644 people were held at Border Patrol stations up to 23 hours, 6,807 were held up to 47 hours, 1,207 were held up to 71 hours, and 476 were held for 72 hours or more. (Response at 6.) Defendants' expert, Diane Skipworth, indicated that based on her review "BP tries diligently to process detainees promptly, and generally does so within 24 hours." (Skipworth Decl. ¶ 154.) Defendants' other expert, Richard Bryce, believes that nearly all detainees were processed within 48 hours. (Bryce Decl. ¶ 38.)

The conditions of confinement challenged by the Plaintiffs include: 1) deprivation of sleep; 2) failure to provide a safe and sanitary environment, including potable water; 3) inadequate and insufficient food, and 6) inadequate medical screening and care.

<u>1. Success on the Merits</u>

<u>Sleeping:</u>

"Detention facilities (and prisons) must provide detainees held overnight with beds *and* mattresses. The absence of *either* violates detainees' due process rights." (MPI at 10 (citing *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1448 (9th Cir. 1989); *accord Anela v. City of Wildwood,* 790 F.2d 1063, 1069 (3rd Cir. 1986)). "Indeed, the use of floor mattresses—i.e., mattresses without bed frames—is unconstitutional 'without regard to the number of days a prisoner is so confined.'" *Id.* (quoting *Lareau v. Manson,* 651 F.2d 96, 105 (2nd Cir. 1981)).

According to Plaintiffs' analysis of the Defendants' e3DM data system,[6] "out of 16,992 detainees between June 10 and September 28, 2015, only 122 were recorded to have received a mat." (Vail Decl. ¶ 62 (citing Gaston Decl. ¶ 25.) The remainder of detainees' bedding needs was met with a Mylar sheet/blanket. The 2008 Policy provides

---

[6] This is an electronic data system designed by Defendants to track each action taken by Border Patrol for each detainee, including the time of arrest; check-in and out at the station; when meals are served, mats are provided, personal hygiene items are delivered, health care is administered, and when a transfer is made to a hospital facility, etc.

that "detainees requiring bedding will be given clean bedding." (Ex. 87 at 000330.) Under TEDS, only juveniles receive mats. (Ex. 95: TEDS at 000634). Adults get clean blankets, which are Mylar sheets, upon request when available. *Id.* Video releases by Defendants reflect overcrowded hold rooms with wall to wall detainees lying cocooned in Mylar blankets and adjacent empty cells with some of the empty cells having mattresses piled high. (Coles Decl. ¶ 37.) Plaintiffs found no mats in videos from the Casa Grande, Willcox, Sonoita, and the Brian A. Terry stations. (Coles Decl. ¶ 37.)

Plaintiffs add that the harshness caused by the lack of mats and the inadequacy of the Mylar blankets is compounded by the Defendants' practices of keeping holding-cell lights turned on 24-7, feeding one of the three regular hot meals to detainees at 4:00 a.m., moving detainees in and out of holding cells throughout the night for processing, overcrowding cells which causes people to lie cramped together and next to toilet facilities or to sit or stand up, and because the hard concrete floors and benches retain the cold caused by low thermostat temperatures and make it too hard and cold to sleep.[7]

Plaintiffs attest that there are prison standards for short-term detentions, defined as being less than 10 hours, which require at least 25 square feet of unencumbered space per occupant. (Vail Decl. ¶ 42). Prison standards for detaining two to 64 occupants requires 25 square feet of unencumbered space per occupant, *id.* ¶ 44, and 35 square feet when confinement exceeds ten hours per day, *id.* (relying on American Correctional Association (ACA) CORE Jail Standards, United States Department of Justice National

---

[7] *Toussaint v. McCarthy,* 597 F. Supp. 1388, 1409-10 (N.D. Calif. 1984) (noise occurring every night, often all night interrupting or preventing sleep gives rise to due process claim), *reversed on other grounds*; *Keenan v. Hall,* 83 F.3d 1083, 1090 (9th Cir. 1996) (no penological justification for psychological harm caused by living in constant illumination), *amended on other grounds*; *King v. Frank,* 328 F. Supp.2d 940, 946-47 (W.D. Wis. 2004) (constant illumination leading to sleep deprivation may violate Eighth Amendment); *Bowers v. City of Philadelphia,* 2007 WL 219651 (E.D. Pa. Jan. 25 2007) (unconstitutional where overcrowding caused detainees to sleep overlapping one another and on every inch of concrete floors with heads next to toilets and on metal benches); *United States v. Wilson,* 344 F. App'x 134, 137, 143 (6th Cir. 2009) (cells with only concrete bench and floors stated Eighth Amendment claim for subjection to cold); *Knop v. Johnson,* 667 F. Supp. 467, 475-77 (W.D. Mich. 1987) (clothing must be minimally adequate for conditions of confinement); *Henderson v. DeRobertis,* 940 F.2d 1055, 1059 (7th Cir. 1991) (same).

Institute of Corrections (NIC), and United Nations Body of Principles for the Protection of all Persons Under any form of Detention or Prison).

In comparison, the capacity numbers for the border patrol holding cells is calculated as 35 square feet for the first detainee, plus an additional seven square feet for each additional detainee. *Id.* ¶ 41, ¶ 29 (citing 2009 Border Patrol Handbook). At the evidentiary hearing, the evidence reflected that holding-cell occupancy limits are established for detainees sitting up, and the problem of overcrowding is compounded by the need to lie down and would be further compounded if detainees were given mats to lie down in the holding cells. Detainees need to lie down to sleep because they are detained at the Border Patrol stations in excess of 12 hours. The Court finds the holding-cell capacity numbers cannot accommodate the number of detainees being detained longer than twelve hours because detention of this duration requires them to lie down to sleep rather than sit up.

Defendants' expert, Richard Bryce, objects to Plaintiffs' comparison between Border Patrol short-term immigration processing facilities and detention facilities like prisons and jails. (Bryce Decl. ¶ 32.) He opines the Border Patrol facilities are on par with short-term [prison] holding cells, *id.* ¶ 35, of the type which is used during the booking process in jail facilities. He explains that "[n]o other law enforcement agency in the United States faces the unique issue of populations subject to fluctuation based on the entry patterns of aliens." *Id.* The processing time depends on immigration patterns and the characteristics of those apprehended, but generally he believes that nearly all detainees are processed within 48 hours. *Id.* ¶ 38.

The Court rejects Bryce's suggestion to allow conditions of confinement appropriate for holding cells used at a jail facility for its booking process, which does take hours instead of days. The processing being conducted at the Border Patrol stations, whether or not it is being done for booking purposes, takes days (48 hours).

It is undisputed that the holding-cells are illuminated 24-7 for security reasons and there is constant coming and going during the night, which Defendants assert is

- 14 -

1   necessary, given the very essence of the facility is to provide 24-7 immigration

2   processing.  The Court accepts Defendants' assertion that the holding cells need to be

3   illuminated for security where security cameras are not technologically capable of

4   recording in dimmed light.  In terms of interruptions of sleep, the Court finds no security

5   reason nor any reason related to the processing activities being conducted at these

6   facilities to wake up detainees by scheduling one of the three burrito meals at 4:00 a.m.

7        As to warmth, without mats, the Mylar sheets are the only barriers between the

8   detainee and the cold, including the cold concrete floors and benches in the holding cells

9   upon which they are forced to lie.  Defendants admit that the Mylar sheets do not provide

10  insulation but merely prevent evaporation so that when wrapped around the body the

11  Mylar blankets reflect approximately 80% of body heat back to the body and provide a

12  barrier between the body and air currents or drafts.  (Skipworth Decl. ¶ 150.) The efficacy

13  of the Mylar blanket depends on comfortable room temperatures being maintained at

14  Border Patrol stations.  *Id.*

15       Defendants report holding cell temperatures are set between 71 and 74 degrees,

16  (Response at 10 (citing Allen Decl ¶¶ 13-14; Skipworth Decl. ¶¶ 35, 133-134, 137-141,

17  147-48 (citing Ex. 2) Bryce Decl. ¶¶ 82, 83 (citing Ex. 3); Harber Decl. ¶ 66 (citing Ex.

18  4), and at the hearing the evidence reflected a variability of 2 degrees up or down.

19  Defendants assert the acceptable institutional standard is 68 to 80 degrees.  (Skipworth

20  Decl. ¶ 133 (citing ANSI and ASHRAE standards).   In addition to room temperature,

21  body heat is affected by the sedentary nature of the detention and whether or not

22  detainees have the ability to move around can be a factor in warmth.   The Court

23  recognizes that Plaintiffs have a constitutional right to clothing that is at least minimally

24  adequate for the conditions of confinement, *Knop v. Johnson*, 66 F. Supp. 467, 475-77

25  (Mich. 1987), but when mats are provided for detentions exceeding 12 hours the analysis

26  regarding adequate clothing and comfortable room temperature may change.  As of now,

27  the Court will require Defendants to continue monitoring cell temperatures.

28       The Court finds that the law and the facts clearly favor Plaintiffs' position that

- 15 -

Defendants are violating Plaintiffs' constitutional right to sleep. Preliminary, the Court orders that clean bedding, which Defendants assert they are providing to all detainees, must include a mat and a Mylar blanket for all detainees being held longer than 12 hours.

<u>Sanitation:</u>

"A sanitary environment is a basic human need that a penal institution must provide for all inmates," *Toussaint,* 597 F.Supp. at 1411, which includes a "right to personal hygiene supplies such as toothbrushes and soap," *Keenan v. Hall,* 83 F.3d 1083, 1091 (9th Cir. 1996), and "sanitary napkins for female prisoners," *Atkins v. County of Orange,* 372 F. Supp.2d 377, 406 (S.D.N.Y 2005). *See also Dawson v Kendrick,* 527 F. Supp. 1252, 1288-89 (S.D.W.Va. 1981) (failing to provide clean bedding, towels, clothing and sanitary mattresses, as well as toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror and sanitary napkins for women constitutes denial of sanitary living conditions). Sanitation includes "the control of vermin and insects, food preparation, medical facilities, lavatories and showers, clean places for eating, sleeping, and working." *Rhodes v. Chapman*, 452 U.S. 337, 364 (1981).

Plaintiffs offer the opinion of Robert Powitz, a practicing forensic sanitarian, who has expertise in correctional public health. He opines that Defendants do not comply with their own Border Patrol standards, which do not comply with national standards for correctional facilities with respect to hygiene. *Id.* ¶ 18-22 (relying on Performance-Based Standards for Adult Local Detention Facilities (ALDF), American Public Health Association Standards for health Services in Correctional Institutions, and U.S. Depart. of Justice ICE Detention Standards).

He personally observed holding rooms with floors, walls, benches, drains, toilets, sinks, stalls, and other fixtures—all of which were badly soiled. *Id.* ¶ 23. ICE detention standards require garbage and refuse be collected and removed from common areas daily. *Id.* ¶ 25. The hold rooms lacked trash receptacles, *id.* ¶ 27, and toilet stalls lacked waste receptacles for sanitary napkins, diapers, and other bathroom waste. *Id.* ¶ 28. Cleaning supplies did not appear to be segregated so as to prevent interchangeable use in toilet

areas and food storage or sleeping areas. *Id.* ¶ 88. Cleaning crews did not appear to clean and sanitize common-touch points in detainee areas. *Id.* ¶ 89. He concluded that cleaning was not sufficient to sanitize the holding cells. *Id.* ¶¶ 88,89. He explains that exposure to garbage increases the risk of disease and presence of vermin, and is psychologically stressful. Blood-born transmission can occur from exposure to diapers and sanitary napkins. *Id.* ¶ 31.

According to Powitz, the CORE prison standard 4-4137 requires one toilet for every twelve male prisoners and one toilet for every eight female detainees. *See also* TEDS § I.A.7. He reports that "in most cases, the number of toilets in a hold room was inadequate for the contemplated occupancy numbers posted or produced by Defendants." *Id.* ¶ 51. One large hold room at Nogales station, with capacity up to 88, had one working toilet and one non-flushing toilet. *Id.* ¶ 52, *see also* ¶¶ 83-86 (relying on Border Patrol logs[8] reflecting long-term out of order sinks and toilets supporting his conclusion that there is no regular maintenance program and policy), *see also* (Vail Decl. 51; Powitz Decl. ¶ 52) (some rooms where over 40 detainees were forced to share one toilet).

Powitz explains that the toilet is a sink/toilet combination fixture, with the sink fixture on top of the toilet and the water spigot is designed for use as a water fountain. *Id.* ¶ 38. This explains the lack of hot water and why the fixtures were not capable of providing an uninterrupted water flow of at least ten seconds, which is the minimal flow required for adequate hand washing. *Id.* ¶ 64. This also creates a potential for contamination from fecal matter and saliva. *Id.* ¶ 39. Plaintiffs complain that the toilet/sink combination system for dispensing drinking water creates a potable water problem. At the Tucson and Nogales stations, 5-gallon Igloo water coolers are placed in many hold cells, without cups and there are no sinks, kitchens, or any other means at these facilities to properly clean the Igloo containers. *Id.* ¶ 73. One video recorded

---

[8] The Court is not clear on whether these logs are part of the e3DM data system or were designed for purposes of conducting discovery in this case. Regardless, the Court will rely on them for the purposes of monitoring compliance with TEDS standards for the working sinks and toilets per detainee.

detainees all drinking from the same one-gallon water jug because cups were not provided. *Id.* ¶ 75.

A person who has been trudging across the Arizona desert will likely arrive at a detention station dirty and in need of a shower, but Plaintiffs report that only two stations, Nogales and Tucson, have shower facilities, and these were sparsely used, generally for detainees who have scabies. (Vail Decl. ¶ 116.) The Defendants e3DM data system showed that only 115 detainees were given showers out of the 16,992 held between June 10 and September 28, 2015. Of those 115 showers, 20 reportedly occurred at Casa Grande station where Border Patrol agents said no shower facilities existed. *Id.*

Plaintiffs tender first-hand accounts from detainees that there were no sanitary napkins, or available diapers. (Vail Decl. ¶ 125.) The Defendants e3DM data confirms that personal hygiene items, including those necessary for feminine hygiene and dental care, were routinely denied. (Powitz Decl. ¶ 60.)

Defendants offer explanations to present a different picture. They report the holding cells are cleaned twice a day, except for the Casa Grande station which is cleaned only once a day, (Allen Decl. ¶¶ 29-30), and admit there were problems with the Casa Grande custodial services, but assert that things are being rectified, (Allen Decl. ¶¶ 29-30).

Defendants also report that in 2015, they began placing trash receptacles in the holding cells, *id.* ¶ 31, whereas previously "there were no trashcans in the hold rooms for safety reasons," (Response to Motion for Expedited Discovery, Padilla Decl. ¶ 14 (Doc. 39-1)). Defendants admit that dirty toilet paper is on the floor next to the toilets rather than flushed because detainees are from countries where plumbing cannot tolerate flushing toilet paper and instead it is common practice to dispose of it in trash receptacles. *Id.* ¶ 32. This is no excuse. Instead, it suggests that toilet receptacles are especially important.

Cleanliness is monitored by walk-throughs of the holding cells during each shift turnover, and the review is logged in e3DM. *Id.* ¶36. Defendants' sanitarian, Skipworth,

- 18 -

inspected the Tucson station, reviewed Defendants' contracts with cleaning companies, and it was her opinion that the facility is kept clean and sanitary. (Skipworth Decl. ¶¶ 36-67 (citing TEDS)). According to her, the ACA Plumbing Fixture Standard (one toilet per 12 male detainees; one toilet per 8 female detainees) is met. *Id.* ¶ 69. Personal hygiene items are regularly dispensed, *id.* ¶¶ 78-91, and children had toys and games and were watching television in the Tucson station, *id.* ¶ 87

Defendants assert soap has been available to detainees upon request and in 2014, it was decided to fit the hold rooms with soap dispensers. Due to "security, functionality and durability" concerns, these dispensers had to be specially fabricated. The process of installing them in hold rooms was completed in 2015. *Id.* ¶ 34. The cleaning services are now responsible for filling the dispensers.

Defendants assert that if the water fountain in the cell is inoperable, the five gallon water coolers provide a sufficient source of drinking water, and disposable cups are provided. (Allen Decl. ¶ 44 (citing TEDS)). They do not explain how the Igloo water coolers are kept clean and sanitary. Skipworth's inspection found compliance with TEDS: "functioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees." (Skipworth Decl. ¶¶ 126-131.) Defendants explain the one-gallon jug seen in the video is the container of water, which was distributed in the field at the time of apprehension—some stations allow detainees to retain these jugs of water, and detainees choose to share them even though other sources of water are available. (Allen Decl. ¶ 44.) The video did not, however, reflect another water source.

The evidence reflects that Defendants are making ongoing efforts to rectify personal hygiene and sanitation problems, which in large part appear to be noncompliance issues. Preliminarily, the Court will order compliance monitoring to ensure detainees have access to working toilets and sinks, soap, toilet paper, garbage receptacles, tooth brushes and toothpaste, feminine hygiene items, baby food, diapers, and clean drinking water.

The Court turns to the admitted lack of shower facilities and lack of access to hot running water.  Jail standards require access to showers and washbasins with temperature controlled hot and cold running water 24 hours per day, (Vail Decl. ¶ 121), with daily shows being available to general population jail-inmates, *id.* ¶ 123.

Defendants assert that the lack of shower accommodations is not a problem because detainees are transferred when approaching 72 hours, and TEDS only requires that reasonable efforts be made to provide showers to those approaching 72 hour detentions.  *Id.* ¶ 33.  Like Defendants' failure to provide for the necessity of sleeping when detention exceeds 12 hours, Defendants fail to recognize the basic human need to wash during these detentions.  "The more basic the particular need, the shorter the time it can be withheld."  *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982).  So for example, it is doubtful that any circumstance would permit a denial of access to emergency medical care, but less critical needs may be denied for reasonable periods of time when warranted by exceptional circumstances such as an emergency or disciplinary need. *Id.* (citing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)).  The Court's task is to "determine whether a challenged punishment comports with human dignity," *Furman v. Georgia*, 408 U.S. 238, 282 (1972) (BRENNAN, J., concurring), and requires careful scrutiny of challenged conditions and application of realistic yet humane standards, *Rhodes*, 452 U.S. at 361.

It has been held to be self-evident that adequate and functional plumbing providing neither too hot nor too cold water is necessary so as to not discourage prisoners from taking showers, which would result in an increased risk of skin problems and transmission of disease from person to person and a foul and malodorous environment, *Benjamin v. Fraser*, 161 F. Supp.2d 151, 171 (S.D. N.Y. 2001).  Nevertheless, courts are extremely reluctant to find constitutional violations based on temporary deprivations of personal hygiene and grooming items.  *Id.* at 175 (citations omitted).  Additionally, courts have found that when other materials are made available for a prisoner to clean himself, a constitutional violation has been averted.  *Shakka v. Smith,* 71 F.3d 162, 168 (4th Cir.

- 20 -

1995).

This Court does not mean to suggest that a lack of daily showers for a few days would necessarily rise to the level of a constitutional violation in a prison setting, *see e.g. Griffin v. Southern Health Partners, Inc.,* 2013 WL 530841, *9 (W.D. Kentucky, February 11, 2013) (finding six day, eight day, and 72 hour deprivation of showers and being subjected to unsanitary conditions insufficient to violate the constitution), but Border Patrol detainees are not pretrial detainees or prisoners. They are civil detainees who are being denied the ability to wash or clean themselves for several days. Transferring them when detention approaches 72 hours does not solve this problem. Given the admitted lack of showers, the Court preliminarily finds that Defendants need only provide some means or materials for washing and/or maintaining personal hygiene when detainees are held longer than 12 hours.

Given the evidence of noncompliance related to conditions of sanitation, compliance monitoring is warranted. Plaintiffs are likely to prevail on this claim unless there is full compliance by Defendants with the guidelines for sanitation and there are materials available for detainees held longer than 12 hours to clean themselves.

## Food

It is undisputed that "[p]rison officials are 'obligt[ed] to provide inmates with nutritionally adequate meals on a regular basis.'" (MPI at 16 (quoting *Foster v. Runnels,* 554 F.3d 807, 816 (9th Cir. 2009)). Prison food does not need to be tasty or aesthetically pleasing, it must simply be adequate to maintain health. (Response at 22 (citing *Keenan v. Hall,* 83 F.3d 1083, 1091 (9th Cir. 1996)).

Detainees receive a diet of burritos (bean, beef, or beef and bean (330 to 360 calories), cheese or peanut-butter filled crackers (200 calories), and boxes of fruit juice (60 calories). (Vail Decl. ¶ 90); (Allen Decl. ¶ 37). Snacks include cookies, cereal bars, graham crackers, and goldfish crackers. (Allen Decl. 38.) There is baby food and formula. (Vail Decl. ¶ 91.) There is no evidence in the Defendants' data base of any fluctuation in this regimen except for pregnant and nursing women. *Id.* ¶ 92.

- 21 -

There are no food preparation areas in the detention stations. The burritos are heated up in microwaves or warming trays. *Id.* ¶ 93. The Defendants' e3DM data system reflects that the average time between meals/burritos is 7.336 hours, and at the Tucson station the average time between meals/burritos is 8.239 hours. *Id.* ¶ 94.

According to Defendants, this diet adequately satisfies the basic nutritional needs of detainees. (Skipworth Decl. ¶ 122.) Skipworth believes that food preparation is performed under safe and sanitary conditions, with food being commercially prepared and packaged, and agents heating it to adequate temperatures. (Skipworth Decl. ¶¶ 109-112.)

The CORE jail standards require: three meals, including at least two hot meals to be served at regular times during each 24 hour period, with no more than 14 hours between the evening meal and breakfast. *Id.* ¶¶ 96-97. TEDS mirrors this, with regularly scheduled meal times and snacks to be provided between regularly scheduled meal times. Two meals must be hot. Juveniles and pregnant detainees are to be offered a snack upon arrival and meals at least every six hours thereafter. Juveniles, pregnant and nursing detainees must have access to snacks, milk and juice. *Id.* ¶¶ 98-100.

According to Defendants, meals are served 3 times per day at 4:00 a.m., 12:00 p.m., and 8:00 p.m.; snacks are served three times per day at 8:00 a.m., 4:00 p.m., and 12:00 a.m. (Allen Decl. ¶ 38.) This creates approximately an eight-hour interval between the evening burrito meal and the burrito breakfast, and eight-hour intervals between the three regularly served burrito meals. To ensure that no more than four hours elapses between eating times, an internal auditing function exists within the e3DM system that warns agents when a detainee is approaching the timelines. *Id.* ¶ 38. When an individual is scheduled for transfer, "it is incumbent on each individual station to identify whether the transfer will cause a detainee to exceed the four hour limit to provide a snack and juice or burrito, accordingly. *Id.* ¶ 39.

With the exception of changing the 4:00 a.m. meal schedule to accommodate sleeping, the question is one of compliance with TEDS. Preliminarily, compliance

monitoring is warranted.

<u>Medical Care:</u>

"Denying, delaying, or mismanaging intake screening violates the Constitution. (MPI at 18 (citing *Gibson v. Cty. of Washoe, Nev.,* 290 F.3d 1175, 1188-90 (9th Cir. 2002); *Lareau v. Manson,* 651 F.2d 96, 109 (2nd Cir. 1981)). Defendants agree that the Constitution does require them to "'provide a system of ready access to adequate medical care.'" (Response at 13 (quoting *Madrid v. Gomez,* 889 F. Supp. 1146, 1554 (N.D. Calif. 1995) (citing *Hoptowit,* 682 F.2d at 1253; *Casey v. Lewis,* 834 F. Supp. 1477, 1545 (Ariz. 1993)). The parties are, however, at odds regarding the boundaries of this constitutional right.

Plaintiffs challenge the adequacy of Defendants' intake screening. (MPI at 18 (relying on *Graves v. Arpaio,* 48 F. Supp. 3d 1318, 1340-1344 (Ariz. 2014) and *Madrid,* 889 F. Supp. at 1257)). They bring the following challenges: 1) screening is performed by border patrol agents, not doctors, nurses, or other qualified or specially trained personnel; 2) Defendants do not maintain a medical treatment program capable of responding to emergencies that arise after detainees are placed in holding cells because they do not have medical staff on site, and 3) the practice of confiscating incoming detainees' medication creates impermissible and heightened risk that detainees will experience a medical emergency. (MPI at 18-20.)

Defendants assert that TEDS provides a system of ready access to adequate medical care. Before detainees are placed into a Border Patrol hold room, a Border Patrol agent "must ask detainees about and visually inspect for any sign of injury, illness, or physical or mental health concerns and question . . . about any prescription medications." (Harber Decl. ¶ 26-32 (citing TEDS § 4.3, 4.10)) *but see also* (Harber Decl. ¶ 30, Attachment B: Medical Screening Form used by agents) (missing questions required about physical and mental health concerns, and prescription medications)). Observed or reported injuries or illnesses should be communicated to a supervisor, documented in the appropriate electronic system, and appropriate medical care should be

provided or sought in a timely manner.  *Id.*  Treatment plans and medication accompany detainees when they are transferred or discharged.  TEDS § 4.10.

Defendants assert that they either have EMTs who can treat emergencies at the detention centers, (Harber Decl. ¶ 33), or they routinely transfer detainees to hospitals for emergency care, *id.* ¶¶ 29, 34.)

Under TEDS prescription medication may be used by incoming detainees, if it is in a properly identified container with the specific dosage indicated, but non-U.S. prescribed medication must be validated by a medical professional, or the detainee should be taken in a timely manner to a medical practitioner to obtain an equivalent United States prescription.  TEDS §  4.10.  It is standard practice to send detainees to the hospital for appropriate care and prescriptions for medication by U.S. doctors. (Allen Decl. ¶ 22; Harber Decl. ¶ 34.)

Plaintiffs' expert, Joe Goldenson, M.D., has extensive experience in jail and state correctional facilities.  (Goldenson Decl. ¶¶ 1-3.)  He based his opinion on declarations of individual Plaintiffs, review of the e3DM data system, and depositions by Vail and Powitz.  *Id.* ¶¶ 8-9. He found there was no evidence of any formalized screening process being carried out by agents at the detention centers.  *Id.* ¶¶ 19-23.  The e3DM data system reflects approximately 527 incidents of medical treatment being provided to detainees out of the approximately 17,000 detained individuals for the period of time from June 10 to September 28, 2015.  *Id.* ¶ 42.

He explains there are two components of screening: 1) immediate medical triage to determine if there are any issues that would preclude acceptance into the facility and 2) a more thorough medical and mental health screening.  *Id.* ¶ 13.  He explains that in some facilities, the first triage-step is performed upon entry into the facility, with the more thorough screening done soon after the person is accepted into the facility.  *Id.* ¶ 14.  The screening includes both a face-to-face interview using a structured questionnaire and, whenever possible, a review of the individual's prior medical record.  The questionnaire covers the detainee's current problems and medications; past history, including

- 24 -

hospitalizations; mental health history, including current or past suicidal ideation; symptoms of chronic illness; medication and/or food allergies, and dental problems. Female detainees are asked about current and past history related to pregnancy and date of last menstrual period. *Id.*

Whenever possible, intake screening is performed by qualified health professionals, but in smaller detention settings, where health staff is not present at times, specially trained custodial staff conduct the screening. *Id.* ¶ 15. This staff should be trained, including on-going training, on conducting medical screening, and there should be procedures for officers to obtain guidance and direction from a health care professional for problems beyond the scope of their training and experience. *Id.* ¶ 16. It is important to record the information obtained during screening and have the records accessible during detention so it can be provided to health care professionals as needed. *Id.* ¶ 17.

Dr. Goldenson believes that field screening is not an adequate replacement for intake screening because field screening is not done pursuant to a type of standardized protocol or procedure that would suffice as "intake screening." *Id.* ¶ 25, *see also* (Harber Decl. ¶ 30, Attachment B: Medical Screening Form used by agents) (missing questions required under TEDS about physical and mental health concerns, and prescription medications).

Proper intake screening is critical to identifying newly arriving detainees with urgent or emergent health care needs, who are suffering from potentially communicable diseases which require isolation and enhanced disinfection processes, or to identify continuity of care issues like medication or prescription needs, or to identify medical or mental health conditions that require referrals. (Goldenson Decl. ¶28.) Dr. Goldenson suggests detainees are high risk for medical problems because they have just crossed the desert under extreme physical hardship, lacking in water and food, without access to medication and medical supplies. *Id.* ¶¶ 31-39.)

The number of medical/hospital referrals, 527 out of approximately 17,000

- 25 -

detainees from June 10 to September 28, 2015, support Dr. Goldenson's opinion, especially when considered in the context of the TEDS requirement that all foreign prescriptions be rewritten by U. S. doctors. The cursory medical screening performed at the detention stations is problematic as the duration of detention lengthens because intake screening becomes more important if it must be relied on for detention extending over several days rather than for a few hours. Defendants are already using an intake screening questionnaire, but it does not meet the TEDS standards because it fails to ask about physical and mental health concerns and prescription medications. It also fails to ask about pregnancy and whether a detainee is nursing. TEDS § 4.2. And, Defendants do not know whether the screening form is being used at all the stations.

Preliminarily, the Court requires compliance with TEDS, including measures to ensure the Medical Screening Form currently being used by Defendants at some stations is used at all stations, and that the form asks questions to ensure compliance with TEDS standards for screening and delivering medical care. Without this compliance, the Court finds that Plaintiffs are likely to prevail on this constitutional claim.

### 2. Irreparable Harm

Plaintiffs have presented evidence of harm related to the conditions of confinement, such as the physiological effects of sleep deprivation or constant discomfort that comes from an inadequate food supply, or health risks related to exposure due to contaminated water or unsanitary cells, or medical risks associated with being unable to continue taking prescription medications or being exposed to communicable diseases. These are the types of harm relevant to the 14th Amendment assessment of whether the challenged conditions of confinement exceed or are independent of the inherent discomforts of confinement and are not reasonably related to a legitimate government objective, or are excessive in relation to legitimate government objectives.

For the purpose of assessing whether Plaintiffs are likely to suffer irreparable harm in the absence of an injunction, this Court looks at the deprivation of constitutional rights. If, like here, a court finds that plaintiffs are likely to succeed on the merits of their

- 26 -

constitutional claims, then "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres,* 695 F.3d at 1002. This is because "constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Am. Trucking Ass'ns, Inc.,* 559 F.3d at 1059.

### 3. Balance of equities and Public Interest

Likewise, because the Court finds the Plaintiffs have established a likelihood of success on the merits of their constitutional claims and that they are likely to suffer irreparable harm without an injunction, all that remains is for Plaintiffs to persuade the Court that the balance of equity and the public interest tips in favor of the injunction. "Once a plaintiff shows that a constitutional claim is likely to succeed, the remaining preliminary injunction factors weigh in favor of granting an injunction." *Vivid Entm't LLC,* 65 F. Supp.2d at 1136 (citing *Melendres,* 695 F.3d at 1002; *Klein,* 584 F.3d at 1208. "'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres,* 695 F.3d at 1002 (quoting *Sammarano,* 303 F.3d at 974. The government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented. *Rodriguez,* 715 F.3d at 1145 (citing *cf. Zepeda v. I.N.S.,* 753 F.2d 719, 727 (9th Cir. 1983) (INS cannot assert harm in any legal sense by being enjoined from constitutional violations).

### D. Conclusion

Defendants cannot sidestep reality by relying on the structural limitations of the Border Patrol detention facilities, i.e., that they are not designed for sleeping. If anything, this cuts against the 72-hour definition of short-term. If detainees are held long enough to require them to sleep in these facilities, take regular meals, need showers, etc., then the Defendants must provide conditions of confinement to meet these human needs. Where there is no evidence of an express intent to punish, the Court may infer that the purpose of the condition is punishment if it is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. The Court finds that there is no objectively reasonable relationship between 24-7 immigration

processing or security and the conditions of confinement which Plaintiffs have preliminary shown exist in the Tucson Sector Border Patrol stations related to sleeping, sanitation, food, and medical care. Therefore, there is a likelihood of success on the merits of Plaintiffs' constitutional claims. The deprivation of a constitutional right unquestionably constitutes irreparable injury. It is always in the public interest to prevent the violation of a party's constitutional rights, and the government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented.

**Accordingly,**

**IT IS ORDERED** that the Motion for a Preliminary Injunction (Doc. 206) is GRANTED as follows:

1.      Clean bedding, which Defendants assert they are providing to all detainees, must include a mat and a Mylar blanket for all detainees being held longer than 12 hours.

2.      Personal hygiene needs of detainees held longer than 12 hours include the need to wash or clean themselves.

3.      Defendants shall implement the universal use of their Medical Screening Form at all stations and ensure that the form questions reflect the TEDS requirements for delivery of medical care to detainees.

4.      Defendants shall monitor for compliance the following: availability of working sinks and toilets and/or other materials sufficient to meet the personal hygiene needs of detainees on a per cell per station basis; cell temperatures; cell sanitation and cleanliness; delivery to detainees of bedding, including mats, personal hygiene items such as toilet paper, toothbrushes and toothpaste, feminine hygiene items, baby food, diapers, and meals.

/ / /

/ / /

/ / /

34

**IT IS FURTHER ORDERED** that Defendants monitoring responsibilities shall be met by using the e3DM data system and Border Patrol logs, shall be released to Plaintiffs on a quarterly basis.

Dated this 18th day of November, 2016.

Honorable David C. Bury
United States District Judge

Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Jane Doe, *et al.*,

Plaintiffs,

vs.

Jeh Johnson, Secretary, Department of Homeland Security, *et al.*,

Defendants

No. 4:15-cv-00250-DCB

---

### DECLARATION OF GEORGE ALLEN

I, George Allen, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby declare as follows relating to the above-titled matter.

1. I am an Assistant Chief Patrol Agent for the United States Border Patrol, Tucson Sector, located in Tucson, Arizona. I have been employed in this capacity since August 2, 2009. I began working for USBP in July 1986, and I have worked in Yuma, Arizona, Nogales, Arizona and the Tucson Sector Border Patrol Headquarters. While assigned to the Tucson Sector Border Patrol Headquarters I have been assigned to the Prosecution Unit, the Asset Forfeiture Unit and the Tactical Infrastructure Program. During my tenure as an Assistant Chief Patrol Agent I have had oversight of the K-9 Program, the Horse Patrol Program, the Intelligence Program, BORTAC and BORSTAR. I currently have oversight of the Prosecution Program, the Asset Forfeiture Program, Seized Property, Processing and Transportation.

1

USA 000678

2. I am familiar with the Court's order of August 14, 2015, and was present during several of the site visits Plaintiffs' experts and legal counsel conducted on September 8-11, 2015 to four different Border Patrol stations. Specifically, Plaintiffs' representatives visited Border Patrol detention facilities at Tucson Sector, Nogales, Douglas, and Casa Grande.

3. It is my understanding that Plaintiffs' representatives were permitted to take temperature readings in various locations at all four stations.

4. As explained to Plaintiffs' representatives during the site inspections, Border Patrol has access to the thermostat in the Nogales facility. In all three other locations mentioned (i.e., Tucson Sector, Casa Grande, and Douglas), however, the temperature is controlled off site and the Border Patrol agents on station do not have access to the thermostat. Accordingly, they must request assistance to have the temperature changed at Tucson Sector, Casa Grande, and Douglas.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 19th day of October 2015, in Tucson, Arizona.

George Allen
Assistant Chief Patrol Agent
Tucson Sector Border Patrol
Tucson, Arizona

2

USA 000676

Exhibit 4

Harold J. McElhinny*
Kevin M. Coles*
Elizabeth G. Balassone*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
Email: HMcElhinny@mofo.com
Email: KColes@mofo.com
Email: EBalassone@mofo.com

Attorneys for Plaintiffs

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)*

Additional counsel listed on next page

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe #1; Jane Doe #2; Norlan Flores, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>   v.<br><br>Jeh Johnson, Secretary, United States Department of Homeland Security, in his official capacity; R. Gil Kerlikowske, Commissioner, United States Customs & Border Protection, in his official capacity; Michael J. Fisher, Chief of the United States Border Patrol, in his official capacity; Jeffrey Self, Commander, Arizona Joint Field Command, in his official capacity; Manuel Padilla, Jr., Chief Patrol Agent-Tucson Sector, in his official capacity,<br><br>            Defendants. | Case No. 4:15-cv-00250-TUC-DCB<br><br><br>**DECLARATION OF ELDON VAIL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Colette Reiner Mayer*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304-1018
Telephone: (650) 813-5600
Facsimile:  (650) 494-0792
Email:  CRMayer@mofo.com

Louise C. Stoupe*
Pieter S. de Ganon*
MORRISON & FOERSTER LLP
Shin-Marunouchi Building, 29th Floor
5-1, Marunouchi 1-Chome
Tokyo, Chiyoda-ku  100-6529, Japan
Telephone: +81-3-3214-6522
Facsimile: +81-3-3214-6512
Email: LStoupe@mofo.com
Email: PdeGanon@mofo.com

Linton Joaquin*
Karen C. Tumlin*
Nora A. Preciado*
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, CA  90010
Telephone: (213) 639-3900
Facsimile:  (213) 639-3911
Email:  joaquin@nilc.org
Email:  tumlin@nilc.org
Email:  preciado@nilc.org

Mary Kenney*
Emily Creighton*
Melissa Crow*
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, D.C. 20005
Telephone: (202) 507-7512
Facsimile:  (202) 742-5619
Email:  mkenney@immcouncil.org
Email:  ecreighton@immcouncil.org
Email:  mcrow@immcouncil.org

Travis Silva*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO
BAY AREA
131 Steuart Street, Suite 400
San Francisco, CA  94105
Telephone: (415) 543-9444
Facsimile:  (415) 543-0296
Email:  tsilva@lccr.com

Victoria Lopez (Bar No. 330042)**
Daniel J. Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)**
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ  85014
Telephone: (602) 650-1854
Facsimile:  (602) 650-1376
Email:  vlopez@acluaz.org
Email:  dpochoda@acluaz.org
Email:  jlyall@acluaz.org

Attorneys for Plaintiffs

*Admitted pursuant to Ariz. Sup. Ct. R. 38(a)*
**Admitted pursuant to Ariz. Sup. Ct. R. 38(f)*

I, ELDON VAIL, hereby declare:

## I.    INTRODUCTION

1.    I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify thereto.

2.    I am a former corrections administrator with nearly thirty-five years of experience working in and administering adult and juvenile institutions.  Before becoming a corrections administrator, I held various line and supervisory level positions in a number of prisons and juvenile facilities in Washington State.  I have served as the Superintendent (Warden) of 3 adult institutions, including facilities that housed maximum, medium and minimum-security inmates.

3.    I served for seven years as the Deputy Secretary for the Washington State Department of Corrections (WDOC), responsible for the operation of prisons and community corrections.  I briefly retired, but was asked by the former Governor of Washington, Chris Gregoire, to come out of retirement to serve as the Secretary of the Department of Corrections in the fall of 2007.  I served as the Secretary for four years, until I retired in 2011.

4.    Since my retirement I have served as an expert witness and correctional consultant for cases and disputes twenty-eight times in fourteen different states.  A true and correct copy of my current resume is attached as Attachment A to this report, which lists my work experience, publications, and service as an expert witness and correctional consultant.

5.    As a Superintendent, Assistant Director of Prisons, Assistant Deputy Secretary, Deputy Secretary and Secretary, I have been responsible for the safe and secure operations of adult prisons in the State of Washington, a jurisdiction that saw and continues to see a significant downward trend in prison violence with very little class action litigation.  As an expert witness and consultant I have been called upon to address security issues and conditions of confinement in adult prisons and jails in other states.  I am experienced in sound correctional practice.

## II.    ASSIGNMENT

6.    I have been asked by Plaintiffs' counsel to offer my opinions regarding the conditions of confinement in Tucson Sector Border Patrol Station Hold Rooms ("Hold Rooms").

## III.    MATERIALS RELIED UPON

7.    I personally inspected all four of the Border Patrol Stations made available to Plaintiffs for inspection—Tucson, Casa Grande, Douglas and Nogales—on September 8 through September 11, 2015.  At each station, I was accompanied by sanitarian expert Robert W. Powitz and a photographer.  I was also accompanied at each station by two of Plaintiffs' attorneys, including Colette Mayer and Nora Preciado at Tucson, Louise Stoupe and Nora Preciado at Casa Grande, Kevin Coles and James Lyall at Douglas, Nogales and an abbreviated second visit to Tucson.

8.    I reviewed surveillance video screenshots from an additional 3 stations—Sonoita, Brian A. Terry, and Willcox—which I did not personally inspect.  The conditions at these stations appear to be very similar to those at the four stations that I visited. (Exs. 168-169, 154-157, 190-191.)[1]

9.    I have read the declaration of Robert W. Powitz and believe his account of our inspections and descriptions of the various facilities to be accurate.

10.    I have read the declaration of Joseph Gaston and have based my opinion on the reports prepared at the request of Plaintiffs' counsel, which analyze "e3DM" data produced by Defendants.  I understand the e3DM data purports to reflect certain records logged by Defendants with respect to the detention of individuals at each of the eight Border Patrol Stations within the Tucson Sector.

11.    I have been provided with all documents produced by Defendants in this case to date, Bates numbers USA000001 through USA0002186.

---

[1] All exhibits referenced in this declaration are to the Appendix of Exhibits In Support of Plaintiffs' Motion for Preliminary Injunction.

12.     I have also been provided with copies of photographs taken during our Border Patrol station inspections.

13.     I have reviewed approximately 50 of the declarations of former detainees who were detained in U.S. Customs and Border Protection facilities within the Tucson Sector of the U.S. Border Patrol submitted in support of Plaintiffs' Motion for Class Certification.

14.     I have also reviewed screenshots of surveillance video from Tucson, Casa Grande, Douglas and Nogales Stations that was produced by Defendants.

15.     I have been provided with certain declarations and other documents filed in this case and *Flores v. Lynch*, No. CV 85–4544–RJK–Px (C.D. Cal. filed July 11, 1985) that relate to CBP hold rooms.

## IV.   OPINIONS

16.     It is my opinion that the operation of the CBP detention facilities in the Tucson sector does not comply with the national standards for correctional facilities in several respects outlined in more detail below.

17.     The American Correctional Association (ACA) is the primary body that promulgates standards for the operation of jails.  These standards were developed by ACA with the involvement of the National Sheriffs' Association, the American Jail Association, the National Institute of Corrections and the Federal Bureau of Prisons and they describe the mandatory standards for the safe operation of detention facilities.  A true and correct copy of these standards is attached to the Appendix of Exhibits as Exhibit 195.  The CBP makes no reference to these standards and fails to meet them in many respects.

18.     Other bodies also establish standards for the operation of jails and detention facilities. The United States Department of Justice National Institute of Corrections (NIC) has developed standards for the safe, secure and humane operation of jails.  A true and correct copy of these standards is attached to the Appendix of Exhibits as Exhibit 196.

19.     The United Nations has established a Body of Principles for the Protection of all Persons Under Any Form of Detention or Imprisonment as well as Standard

Minimum Rules for the Treatment of Prisoners. CBP makes no reference to these principles and standards to guide the operation of its detention facilities. True and correct copies of these standards are attached to the Appendix of Exhibits as Exhibits 197 and 198.

20. CBP has promulgated standards that serve as "mandatory minimum requirements for CBP managers to implement and improve the security posture for their designated CBP area of responsibilities." (*See* CBP Security Policy and Procedures Handbook, HB 140-02B, August 13, 2009 ("2009 CBP Handbook"), Appendix 8.10, attached to the Appendix of Exhibits as Exhibits 81 and 102 (produced by Defendants at USA00088-105 and USA00681-698).) The guidelines set out in the 2009 CBP Handbook remain in place today.

21. The CBP also has internal standards and guidelines that govern their interactions with detainees that were recently modified. Formerly, issues such as bedding, medical screening and hygiene were governed by CBP's 2008 Hold Rooms and Short Term Custody Policy ("2008 Policy"), attached to the Appendix of Exhibits as Exhibit 85.

22. Similarly, attached to the Appendix of Exhibits as Exhibit 86 is a true and correct copy of a document produced by Defendants on or about September 4, 2015 and Bates labeled USA000322-345, which appears to be a CBP memorandum dated October 18, 2012, with subject heading "Hold Rooms and Short Term Custody Policy," which "serves as a reminder of the [June 2, 2008] Hold Rooms and Short Term Custody Policy, which in turn "covers all persons . . . who are arrested by Border Patrol Agents and are detained in hold rooms at Border Patrol stations, checkpoints, and processing facilities."

23. The new standards recently issued by CBP "replace separate policies that have evolved over the years since CBP's formation in 2003" are lauded as "agency-wide policy that sets forth the first nationwide standards which govern CBP's interaction with detained individuals". (*See* National Standards on Transport, Escort, Detention, and Search ("TEDS standards") published on October 5, 2015, excerpts attached to the Appendix of Exhibits as Exhibit 95.)

24.     Neither the TEDS standards (which lower CBP's standards from the
preexisting level), their historical antecedents or the 2009 CBP Handbook make reference
to ACA or NIC standards or the United Nations principles and in fact in several areas
violate those standards and principles.  As described in more detail below, the result is
that many of the actual practices of the CBP facilities are unsafe and inhumane and put
detainees at risk of significant harm.  Further, these conditions serve no legitimate
penological or custodial purpose.

### A.     Hold Rooms Designed For Short Term Confinement Only

25.     It is my professional opinion that the Hold Rooms were designed and
intended for short-term confinement, meaning detentions of less than 10 hours.

26.     Defendants admit that Tucson Sector stations are "not designed for long-
term care and detention."  (ECF No. 39-1, Ex. 1 ¶ 11.)

27.     Defendants also describe these stations as "short-term facilities" that "serve
the limited purpose of overnight processing" or "brief initial processing."  (ECF No. 52 at
2, 8–9.)

28.     According to CBP officials, including Defendants here, "Border Patrol
seeks to process and transfer all aliens out of their custody within 12 hours from
apprehension."  (ECF No. 39-1, Ex. 1 ¶ 11; *see also* Request for Judicial Notice ("RJN"),
Ex. A (Declaration of Chief Border Patrol Agent Kevin W. Oaks ¶ 14, ECF. No. 121-1,
*Flores v. Lynch*, No. CV 85–4544–RJK–Px (C.D. Cal. filed July 11, 1985)).)

29.     Similarly, the design and construction of the facilities suggest that they were
intended for very short detentions only.  The 2009 CBP Handbook, describes the physical
requirements of the Hold Rooms and states, among other requirements, the amount of
unencumbered floor space that each detainee is intended to have in the Hold Rooms.
(Exs. 81.)  The 2009 Handbook mandates that each detainee should be provided with 37
square feet of unencumbered space for a single occupant hold room, and 7 additional
square feet for each additional detainee.  It also states that hold rooms have "[n]o beds; a
hold room is not designed for sleeping."  (*Id.* at USA000091.)  Facilities of the type

44

described in the Handbook, however, are inadequate for long-term detention and further support my conclusion that the facilities were not intended to hold detainees over 10 hours.

30. Detainees are held in the facilities for much longer than the time period for which they were designed. For example, according to Plaintiffs' analysis of "e3DM" data produced by Defendants, of the 17,006 individuals detained in Tucson Sector facilities between June 10, 2015 to September 28, 2015, at least 14,021 were detained for over 12 hours; 6,541 over 24 hours; 2,841 over 36 hours; 1,064 over 48 hours; and 157 over 72 hours. (Decl. of Joseph Gaston in Support of Mot. for Preliminary Injunction (Gaston Decl.") ¶ 20.)

### B. Lack of Space

31. It is my opinion that the hold rooms at the CBP facilities have maximum occupancy numbers that are overstated for housing detainees any length of time, but are particularly problematic when individuals are detained for over 10 hours. As a result, there is evidence that the hold rooms are regularly overcrowded.

32. Surveillance video from Tucson Station reveals that Defendants routinely pack so many individuals into holding cells that detainees are commonly forced to lie down on the concrete floors beneath the toilet stalls. Others are crammed so tightly, they look like sardines in a can, with no room to move in any direction without rolling over someone else:

(Ex. 188).

33.     Surveillance video from other hold rooms similarly shows detainees crowded into cells and forced to lie on concrete floors to sleep or rest.  (Exs. 151, 152, 158; *see also* Exs. 130, 170, 172-73, 176-88); Declaration of Kevin Coles In Support of Plaintiffs'  ("Coles Decl.") ¶ 36, 37.)

34.     The surveillance video also shows that people are often kept in these crowded conditions overnight.  (Coles Decl. ¶ 36.)

35.     Consistent with this, former detainees describe having to sit or stand for all or part of the nights because there was insufficient room for everyone in the cell to lie down.  (*See*, *e.g.*, ECF No. 2-1, Ex. 6 ¶ 8 (he and 15 others stood all night because there was not enough room to lie down); ECF No. 2-2, Ex. 33 ¶ 6 (sandwiched between others and unable to lie down); ECF No. 2-3, Ex. 50 ¶ 17 (forced to sleep on his side on the floor to make room for others to lie down).)

36.     This overcrowding problem is compounded by the fact that many of the holding cells I encountered in my inspections were irregularly designed in shape, often with multiple narrow concrete benches and toilet stalls.  (Exs. 52, 54, 56, 60, 62, 68, 75; *see also* Exs. 7, 19,-20.)  Despite the dimensions of the cell perimeter walls, the actual useable space available to detainees is restricted, in some cases severely.  Cells with stated

46

occupancy numbers as high as 48, such as Cell 18 in Tucson, did not even have enough floor space to fit more than a couple beds.  (Exs. 60-62.)

37.     During my inspection of Tucson, Casa Grande and Douglas Stations, I found room occupancy numbers posted above or near each holding cell door.

38.     There were no occupancy numbers posted at the Nogales Station.  We were informed that occupancy numbers had been painted over.

39.     Defendants produced their own capacity numbers for hold rooms at each of the four stations we inspected.

40.     Defendants produced various floor plans and sketches with measurements for some of the walls and fixtures in holding cells at each of those four stations.

41.     From my review of these floor plans and sketches, I believe that Defendants' hold room occupancy numbers were likely calculated by applying the 2009 CBP Handbook standard of 35 square feet for the first detainee plus 7 additional square feet for each additional detainee.

42.     CBP's unencumbered space requirements are significantly below the American Correctional Association's National Core Jail Standards ("Core Jail Standards") requirements.  A true and correct copy of excerpts of these standards is attached to the Appendix of Exhibits as Exhibit 199.  Even for confinement in multiple-occupancy cells for less than ten hours per day, the Core Jail Standard 1-CORE-1A-07 requires at least 25 square feet of unencumbered space per occupant.

43.     It is my professional judgment that the CBP Handbook standard is completely inadequate for longer-term detentions (lasting more than 10 hours), where detainees reasonably require room to lie down, sleep, and walk around.

44.     Longer-term facilities (over ten hours) have larger minimum space requirements.  For example, the Core Jail Standards state that "between two and sixty-four occupants and provide 25 square feet of unencumbered space per occupant.  *When confinement exceeds ten hours per day, at least 35 square feet of unencumbered space is provided for each occupant*."  (Ex. 199, 4-ALDF-1A-10, at 3 (emphasis added).)

45.    There is widespread consensus among corrections officials, based on their experience and supported by considerable research that goes back at least 30 years, that overcrowded facilities create conditions of confinement that increase the risk to safety and security for prisoners.  That consensus is consistent with my own correctional experience. Dr. Craig Haney, a University of California professor who has researched and testified as an expert in prison overcrowding cases, wrote in an article in the Washington University Journal of Law and Policy.

> There is widespread agreement among correctional experts that chronic idleness in prison produces negative psychological and behavioral effects…Thus, overcrowding means that there is less for prisoners to do, fewer outlets to release the resulting tension, a decreased staff capacity to identify prisoner problems, and fewer ways to solve them when they do occur. The increased risk of victimization is a likely result. [2]

46.    The conditions here serve no legitimate penological or custodial interest and in fact are likely to make the facilities unsafe as such conditions will increase tension among the detainees as they contend for space to simply lie down, sleep or use the bathroom with having someone in the immediate proximity. Based on my experience and review of literature, I believe the lack of space in these holding cells creates an unjustifiable risk of harm to detainees.

47.    The effects of overcrowding and lack of space in CBP facilities are extensive. There is simply not enough space to move around in the holding cell when they approach or exceed their stated capacity. There is not enough space to sometimes sit or find a place to sleep. Unless they stand for 24 hours of more— a difficult, if not impossible undertaking —detainees must sit or lie on heat-draining concrete floors and benches. It is very likely, and consistent with detainee declarations, that adequate sleep is impossible to achieve in these conditions.

---

[2] (Dr. Craig Haney, *The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correction Reactions*, Washington University Journal of Law & Policy, Volume 22, January 2006, pages 275-276, Exhibit 201.)

48.     There are also no activities or diversions for the detainees while they await

decisions on their next destination to distract them from the conditions.

49.     The effects of overcrowding are made worse the longer they must be

endured. However, the CBP facilities have some unique and troubling designs that can

quickly result in conditions that place great stress on detainees.

50.     The location of and access to toilets is one exacerbating factor and seems

unnecessarily humiliating for detainees. While the designs of every CBP facility I

inspected were different, access to even a modicum of privacy while using the toilet was

absent in all of them.  Every detainee in the room can view the toilet activities of others.

Moreover, the surveillance cameras mounted in each cell make clear to the detainees that

they are being watched not only by every other detainee in the room but also by the CBP

agents.  Some of the surveillance cameras even have a direct view into the toilet stall.

(Exs. 143, 144 (for surveillance video); Exs.7, 8 (for photos of the toilet stall shown in the

video).)  This lack of privacy makes overcrowding even more of an issue. (*See* ECF No.

2-3, Ex. 50 ¶ 9 (closed his eyes when using bathroom because he was so embarrassed).)

51.     Similarly, overcrowding has a direct effect on hygiene.  Many of the toilets

we inspected were leaking and stained with built up grime from over use as there are

simply not enough of them for the capacity of the detainees in some of the holding cells.[3]

(Ex. 11; Ex. 43; Ex.77.)  One detainee reported that there was only one toilet for

approximately 40 people.  (ECF No. 2-1, Ex. 6 ¶¶ 7, 10; *id.*, Ex. 7 ¶¶ 9, 14 (2 toilets for 60

people); *id.*, Ex. 16 ¶¶ 3, 12 (the sole toilet was backed up and did not flush while a

mother and two children were detained); ECF No. 2-3, Ex. 38 ¶¶ 17, 20 (approximately 90

people detained with only three of four toilets that functioned); ECF No. 2-1, Ex. 2 ¶¶ 5, 9

(52 people in a cell with only 2 of 3 toilets working); *id.*, Ex. 1 ¶¶ 4, 6 (2 of 3 toilets

working in cell with 45 people); *id.*, Ex. 17 ¶¶ 6, 13 (60 to 70 people in cell with only 2 of

---

[3] The ACA prison standard 4-4137 requires one toilet for every twelve male
prisoners and one toilet for every eight female prisoners, standards which, in my
observation, are frequently exceeded in CBP holding cells.  (*See* Ex. 195,  4-ALDF-4C-
12, at 54.)

4 toilets working).) Additionally, detainees frequently run out of toilet paper and CBP delays in resupplying them. (*Id.* Ex. 6 ¶ 10; ECF No. 2-3, Ex. 44 ¶ 25.)

52. Although CBP apparently has no policies with respect to how often the Hold Rooms must be cleaned, surveillance footage from Casa Grande station shows hold rooms being cleaned once per 48 hours, if that. (Coles Decl. ¶ 41.) There are no cleaning supplies in the hold rooms and, according to detainees, the rooms often lacked a trash can. (ECF No. 2-1, Ex. 8 ¶ 11; *id.*, Ex. 16 ¶ 25; *id.*, Ex. 43 ¶ 15.) This means, effectively, that the Hold Rooms are hardly ever clean and that the areas around the toilets are generally dirty. (ECF No. 2-1, Ex. 8¶ 11 (diapers, toilet paper and other trash was strewn around the bathroom area); ECF No. 2-3, Ex. 35 ¶ 24 (1 toilet backed up and smelled terrible).) Unfortunately, this fact does not stop the overcrowding of the cells which makes it necessary for some detainees to lie down very close to those toilets in order to find a place to sleep:

 

(Ex. 173, 174; Ex. 152; *see also* ECF No. 2-2, Ex. 32 ¶ 10 (people were so tightly packed into the cell some had to sleep in the bathroom area); *id.*, Ex. 17 ¶ 7 (same); ECF No. 2-1, Ex. 7 ¶ 13 (one detainee sat upright on the concrete floor for two nights, finding it impossible to sleep more than a couple of hours during the time he was detained); *id.*, Ex. 11 ¶ 12 (several detainees explained that in order to find space to sleep on the floor, some detainees resorted to sleeping next to toilets.).) In essence, the design of the Hold Rooms mean that the person using the toilet and the person trying to sleep both experience

difficulties, creating unnecessary tension in the holding cell, especially when it is overcrowded.

53.    All of these factors lead me to conclude that detainees suffer unnecessarily and that these conditions are likely to create tension among the detainees as they are forced to compete for access to these most basic functions of everyday life. (*See*, *e.g.*, ECF No. 2-2, Ex. 20 ¶ 18 ("Sometimes if you went to use the bathroom you would lose your seat [on the bench].").)

### C.    Deprivation of Sleep

54.    During my inspections of the four stations, I did not see a single bed, cot or mattress, and no bedding apart from two or three pillows.

55.    The only coverings I found were thin sheets made of Mylar, a material similar in appearance to, but more durable than, aluminum. These sheets are almost paper thin, but are referred to by CBP agents as "Mylar blankets":



(Ex. 4.)

56.    I understand that Plaintiffs' review of video surveillance from these stations further supports the fact that detainees are not provided beds or mattresses at these stations, regardless the duration of their detention. (Coles Decl. ¶ 45.)

57.    During my inspection of Casa Grande station, there were only three mats in the entire facility:



(Ex. 3.)

      58.    We were informed at each station that mats were intended only for families and children. According to documents filed by CBP with the court, the policy in the Tucson Sector is that "[m]attress pads are available for juvenile and family units," ECF No. 39-1, Ex. 1 ¶ 15, while in the Rio Grande Valley, "[i]n certain circumstances, aliens who are in Border Patrol's custody may require some form of bedding." (RJN, Ex. A ¶ 21.)

      59.    Surveillance video from some of these stations often shows detainees lying on the concrete floors while, at the exact same moment in time in the same station, mats go unused in other unoccupied or less occupied cells:



(Ex. 170; *see also* Ex. 147.)

      60.    Surveillance video also shows families and children confined in cells with too few or no mats:

 

(Ex. 146, 147; *see also* Ex. 155.)

61.    This is consistent with the declarations of former detainees held with their

children but not provided mats.  (ECF No. 2-1, Ex. 5, ¶ 5; *id.*, Ex. 8 ¶ 9 (mother and 6

month old daughter); *id.*, Ex. 13 ¶ 7 (pregnant mother and 5 year old daughter); *id.*, Ex. 16

¶ 7 (pregnant mother and 2 children); ECF No. 2-2, Ex. 29 ¶ 3, 7 (mother and 18 month

old child).)

62.    According to Plaintiffs' analysis of the e3DM data, out of the 16,992

individuals held in U.S. Border Patrol custody between June 10 and September 28, 2015,

only 122 were recorded to have received a mat.  (Gaston Decl. ¶ 25.)

63.    Additionally, detainees are frequently forced to endure constant illumination

in the holding cells through the night.  Video surveillance shows holding cell lights on in

the middle of the night.  (Ex. 186, 187; Ex. 142; Exs. 150, 151.)  Even when the holding

cell lights are dimmed or turned off, light from the processing areas still floods in through

the windows from the processing areas.  (Exs. 171, 182.)

64.    Detainees are commonly seen shielding the light by hiding their faces under

their Mylar blankets.  (Ex. 152; Ex. 188.)  One juvenile even appears to be shielding

himself from the light by hiding underneath one of the mats.  (Exs. 162, 163.)

65.    Declarations of former detainees also show that there is constant noise

throughout the night.  (ECF No. 2-1, Ex. 9 ¶ 9 (guards would talk to detainees throughout

the night or hit the cell window); *id.*, Ex. 11 ¶ 15 (Mylar sheets were very noisy making it hard to sleep).

66.     Video surveillance also shows CBP agents interrupting detainees' sleep in the middle of the night to conduct cell counts or call individuals in or out of the cells. (Coles Decl. ¶ 40; *see also* ECF No. 2-1, Ex.16 ¶ 11 (called out twice for interviews during the night).)

67.     The Core Jail Standards require bedding and appropriate illumination:

> Bedding Issue
> 1-CORE-4B-01 (Ref. 4-ALDF-4B-02)
> Inmates are issued suitable, clean bedding and linens.
> There is provision for linen exchange, including towels, at least weekly.

(Ex. 199, 1-CORE-4B-01, at 25.)

> Environmental Conditions/Lighting
> 1-CORE-1A-09 (Ref. 4-ALDF-1A-14, 1A-15)
> All inmate rooms/cells provide the occupants with access to natural light.  Lighting throughout the facility is sufficient for the tasks performed.

(*Id.*, 1-CORE-1A-09, at 4.)

68.     The Department of Justice NIC Standards also state:

> Inmates must be provided with clean clothes and bedding. Clothing, towels, and bedding must be exchanged, laundered, and inspected on a regular basis. Failing to do so will result in an unhygienic facility for both the inmates and the staff."

(Ex. 196 at 4.)

69.     The United Nations Standard Minimum Rules for the Treatment of Prisoners state:

> Every prisoner shall, in accordance with local or national standards, be provided with a separate bed, and with separate and sufficient bedding which shall be clean when issued, kept in good order and changed often enough to ensure its cleanliness.

(Ex. 198, R. 19 at 3.)

70.     Prior to the start of this litigation, even the CBP's own standards required all detainees to be given bedding.  According to CBP's June 2, 2008 Memorandum regarding

"Hold Rooms and Short Term Custody" (the "2008 Memorandum"), "[d]etainees
requiring bedding will be given clean bedding. Only one detainee will use this bedding
between cleanings. This bedding will be changed every three days and cleaned before it is
issued to another detainee. Vinyl or rubber-coated mattresses will be disinfected before
being reissued." (2008 Memorandum, ¶ 6.11 (Ex. 86 at 330)).

71.     Unfortunately, CBP's recently issued standards drop below even this basic
level.  Section 8.0 of the new TEDS standards defines bedding as "A (or any combination
of) blanket, mat, or cot."  Section 4.12 of the new TEDS standards states that "bedding"
must be provided to juveniles but only a "blanket" needs to be provided to adults and only
on request.

72.     CBP's recent reductions in bottom line requirements from the 2008 Memo
to the new TEDS standards serve as an admission that bedding has not been adequately
provided to detainees in these facilities.  Standards from top officials at CBP are meant to
inform as to what practices are recommended and acceptable.  It is clear that, in practice,
these minimums have been treated as maximums, if followed at all.

73.     The current practice at the CBP facilities is to force detainees to sleep on the
concrete floor or on very narrow concrete benches in overcrowded conditions. While
inspecting those facilities I made a point of sitting and lying down on those concrete
benches. Even though the air temperature of the holding cells seemed more or less
"normal" it only took a few minutes on a concrete bench to begin to feel the heat leave my
body and for me to begin to feel cold. I cannot imagine that any restful sleep is possible
without a bed that is off the floor and adequate bedding to keep myself warm.  The
declarations of former detainees confirm this.  (ECF No. 2-1, Ex. 4 ¶ 6: *id.*, Ex. 8 ¶¶ 8-9;
ECF No. 2-2, Ex. 24 ¶ 8; ECF No. 2-3, Ex. 48 ¶ 8; ECF No. 2-1, Ex. 11 ¶ 13; *id.*, Ex. 16
¶¶ 9-10; *id.*, Ex. 15 ¶¶ 9-10, 21-22.)

74.     According to one detainee, he and fifteen others had to remain standing
throughout the night and he was therefore not able to sleep at all.  (ECF No. 2-1, Ex. 6¶ 8
(gave up his place on the floor to an injured detainee).)  In its report on International

Prison Conditions, the U.S. Department of State identified overcrowding as a "central problem" in prison management and cited specific instances in Ukraine and Haiti where inmates were forced to sleep in shifts as evidence of overcrowding.[4]  The State Department stated that it "encourages the use of the general standard in section 7085(b)(1) of Public Law 111-117 for guiding our assessment of whether prison conditions are overcrowded (i.e., 'the number of prisoners or detainees does not so exceed prison capacity such that per capita floor space is sufficient to allow for humane sleeping conditions and reasonable physical movement'),"[5]

75.    Add to this mix the undisputed acknowledgement by CBP officials that the lights in the holding cell are left on 24 hours a day. Furthermore, it is likely that the lack of sleep will exacerbate tensions in an overcrowded environment. It is my opinion that the practices at the CBP facilities are well beyond what would be tolerated in jails or prisons for convicted felons in our country. It is my professional opinion that conditions of confinement at the Tucson Sector Stations unnecessarily deprive detainees of sleep, serve no legitimate penological or custodial purpose, and create an unjustifiable risk of harm to detainees.

### D.    Potable Water

76.    It is a basic requirement that detainees be provided with access to potable water.

77.    The CBP facilities deal with this issue differently.  Surveillance video of holding cells at Tucson Station (which was limited to two dates in August, 2015 and most of September, 2015, *see* Coles Decl. ¶¶ 91-111) shows a 5-gallon water cooler in cells, often placed on toilet stalls or the ground, but with few or no paper cups.  (Exs. 180, 184, 185.)  Cells with 15 or more detainees might have only four or five paper cups shared

---

[4] *Report on Int'l Prison Conditions*, U.S. Dep't of State, May 22, 2013, *available at* http://goo.gl/OaquKm.
[5] *Id.*

among the various detainees.  Individuals can also be seen drinking directly from the water cooler itself.  (Coles Decl. ¶ 39.)

78.     In Casa Grande, there were no water coolers in any of the holding cells during our inspections.

79.     There were no cups in any of the rooms at Casa Grande.  During my inspection of the Casa Grande facility I saw paper cups in the storage room.  (Ex. 1.) Papers cups were never given to the detainees in Hold Room 5 during the 5 days where they were drinking out of the plastic jug depicted below.  (Coles Decl. ¶ 46.)  Depriving detainees of paper cups appears to be common practice.  In general, during my inspections of Tucson, Casa Grande and Douglas stations, I found paper cups being stored at each of the stations, yet found few or none in the holding cells or waste receptacles.  (Ex. 1 (box of Solo brand cups); Exs. 50, 51.)

80.     Numerous detainees complained of not getting adequate access to drinking water.  (ECF No. 2-1, Ex. 5 ¶ 13 (no drinking water); ECF No. 2-3, Ex. 43 ¶ 18 (same); ECF No. 2-2, Ex. 26 ¶ 27 (no drinking water for entire first day).)  Many complain of being forced to recycle used juice boxes to hold drinking water.  (ECF No. 2-1, Ex. 2 ¶ 11; *id.*, Ex. 10 ¶ 16; *id.,* Ex. 12 ¶ 10.)

81.     This testimony is confirmed by surveillance video of the Casa Grande which shows at least a dozen different detainees drinking from the same 1-gallon water jug over the course of 5 days:



(Ex. 130; *see also* Exs. 125, 129, 130, 133, 141.)

82.     The jug was never replaced or cleaned, despite the cell being swept by maintenances crews on several occasions over the course of the 5 days it was used. (Coles Decl. ¶ 46.)

83.     In hold rooms with "bubblers" to dispense drinking water, these were usually located just above or adjacent to the toilets, often as part of the same metal toilet/sink unit.  During each of my inspections of the four stations, I observed numerous bubblers that did not work or had extremely low water pressure.  One example of a malfunctioning bubbler is shown in the picture below:



(Ex. 31.)

84.     In general, I believe that the problem with the bubblers is the same as with the toilets—they are subject to overuse as there are not enough of them for the numbers of detainees placed in the holding cells[6] and they are not regularly inspected and repaired.

85.     CBP's own inspection checklists produced in this litigation support this conclusion.  One of the earliest produced "Processing Inspection Form" for Casa Grande states that "Water fountain 10-7 in cell#6" is not working starting June 7, 2015. (Ex. 103)

---

[6] ACA prison standard 4-4138 requires one washbasin for every 12 prisoners.  (*See* Ex. 195, 4-ALDF-4C-10, at 54.)

That entry continues for months. One of the latest produced Processing Inspection Forms in October 20, 2015 shows the same water fountain has not been repaired. "One Fountain needs repairs Cell #6" (Ex. 107). Although CBP's records are incomplete, I understand that at least 34 detainees were held in Cell #6 between June 10, 2015 and September 28, 2015. (Gaston Decl. ¶ 72.)

86.     Similarly, inspection checklists for the Tucson Station report one or more malfunctioning sinks from July 16 through August 27 (Ex. 114 at USA1758-1776; Ex. 115 at USA1872-1898), and then again on September 10, 21 and 22 (Ex. 114 at USA1758-1776), and again between October 16-19 (Ex. 116 at USA2035-037; Ex. 116 at USA2055-056). Inspection checklists logs from Nogales Station report malfunctioning sinks on August 23-26 (Ex. 112 at USA1589-1592); August 28-September 9 (Ex. 112 at USA1595-1597; Ex. 112 at USA1608; Ex. 112 at USA1610; Ex. 112 at USA1610-1619); September 11-18 (Ex. 112 at USA1650-1657), September 20-21 (Ex. 112 at USA1659-1660), September 27 (Ex. 113 at USA1694); October 3 (Ex. 113 at USA1750), October 14-16 (Ex. 113 at USA1731-1732), and October 18 (Ex. 113 at USA1735).

87.     The Core Jail Standards make clear that potable water is required:

> 1-CORE-1A-05 (Mandatory) (Ref. 4-ALDF-1A-07)
> The facility's potable water source and supply, whether owned and operated by a public water department or the facility, is certified at least annually by an independent, outside source to be in compliance with jurisdictional laws and regulations.

(Ex. 199, 1-CORE-1A-05, at 2.)

88.     Even CBP's new TEDS standards make clear that detainees must be provided with potable water. Section 4.14 of the new TEDS standards also require that clean paper cups be provided to detainees. In my professional judgment, the failure to provide clean cups and potable water serves no legitimate penological or custodial interest and unjustifiably increases the risk of harm to detainees. (Ex. 95 at USA000631.)

89.     The CBP facilities need to have clear standards for providing access to potable water and make sure that each facility complies with those standards. This is the simple and basic work of a detention facility. Further, water fixtures must be checked

regularly and repaired quickly when they are broken.  If they wish to continue using water jugs as part of their water delivery system, the regular cleaning and refilling of those jugs should be scheduled and logged. In no case should detainees be expected to share the same cups or drink from the same gallon jug as they present an obvious risk of the spread of contagious disease.

### E.    Food

90.    During my inspections, I found that each of the four stations stored microwaveable burritos, crackers and boxes of fruit juice.  The nutritional information indicated that the burritos generally had between 330 and 360 calories each, crackers 200 calories and boxes of fruit juice around 60 calories.  (*See* Ex. 2.)

91.    Other than some baby foods and formulas, there was no other food for detainees at these facilities.

92.    There were no rotating menus and no evidence of differentiation between the food provided to children (other than infants), adults, and pregnant or nursing mothers.

93.    There were no facilities for preparing hot meals other than microwaves or warming trays.  (Ex. 5; Ex. 42.)

94.    Plaintiffs' analysis of the e3DM data indicates that, between June 10, 2015 and September 28, 2015, the *average* gap time between burritos reportedly offered to detainees at all Tucson sector stations was 7.336 hours.  (Gaston Decl. ¶ 49.)  At Tucson station, the average gap time between meals was 8.239 hours.  (Gaston Decl. ¶ 68.) Consistent with this, many detainees stated that they did not receive any food for 12 or more hours (ECF No. 2-3, Ex. 43 ¶¶ 9, 19, 21, 32; ECF No. 2-1, Ex. 5 ¶¶ 13, 17) and that they were constantly hungry.  (ECF No. 2-3, Ex. 43 ¶¶ 18, 32, 38; ECF No. 2-3, Ex. 45 ¶ 28; *id.*, Ex. 46 ¶¶ 12, 15; *id.*, Ex. 47 ¶ 13; ECF No. 2-2, Ex. 26 ¶ 18; ECF No. 2-3, Ex. 48 ¶ 11; ECF No. 2-1, Ex. 5 ¶¶ 13, 17; ECF No. 2-2, Ex. 30 ¶¶ 17, 18; ECF No. 2-3, Ex. 42 ¶¶ 12, 21; ECF No. 2-1, Ex. 11 ¶ 18; ECF No. 2-2, Ex. 21 ¶¶ 15, 25; ECF No. 2-3, Ex.44 ¶ 15, 21, 24; *id.*, Ex. 49 ¶¶ 20, 28; *id.*, Ex. 36 ¶ 23.)

95.     Former detainee declarants frequently complained about the quality of food as well.  (ECF No. 2-1, Ex. 9 ¶ 32; *id.*, Ex. 16, ¶ 15; *id.*, Ex. 14 ¶ 8.)

96.     The DOJ NIC Jail Standards state:

> Inmates must be provided with adequate, nutritional meals. Dieticians should ensure that each meal provides inmates with a balanced diet appropriate to their age and medical conditions. Teenagers may need a different caloric intake than older inmates. Diabetics, inmates on dialysis, and those with food allergies all need to have medically approved and appropriate diets. Inmates with legitimate religious dietary restrictions also must be accommodated.

(Ex.  196 at 4.)

97.     The Core Jail Standards make clear that nutritionally balanced diet is required and that meals must be served regularly:

> 1-CORE-4A-01 (Mandatory) (Ref. 4-ALDF-4A-07)
> The facility's dietary allowances are reviewed at least annually by a qualified nutritionist or dietician to ensure that they meet the nationally recommended dietary allowances for basic nutrition for appropriate age groups. Menu evaluations are conducted at least quarterly by food service supervisory staff to verify adherence to the established basic daily servings.

(Ex. 199, 1-CORE-4A-01, at 23.)

> 1-CORE-4A-06 (Ref. 4-ALDF-4A-17, 4A-18)
> Three meals, including at least two hot meals, are prepared, delivered, and served under staff supervision at regular times during each twenty-four hour period, with no more than fourteen hours between the evening meal and breakfast. Variations may be allowed based on weekend and holiday food service demands, provided basic nutritional goals are met.

(*Id.*, 1-CORE-4A-06, at 25.)

98.     Section 4.13 of the new TEDS Standards also requires food to be provided at "regularly scheduled meal times" and accurately "documented in the appropriate electronic system(s) of record" and snacks are to be provided "between regularly scheduled meal times."

99.     Section 5.6 of the new TEDS requires that juveniles and pregnant detainees "will be offered a snack upon arrival and a meal at least every six hours thereafter, at

regularly scheduled meal times.  At least two of those meals will be hot.  Juveniles and pregnant or nursing detainees must have regular access to snacks, milk and juice."

100.    Former detainees' declarations show that, despite providing irregular and insufficient meals, Border Patrol agents threaten to confiscate food to keep detainees quiet.  (ECF No. 2-1, Ex. 11 ¶ 21; ECF No. 2-2, Ex. 43 ¶ 21; ECF No. 2-1, Ex. 11 ¶ 21 ("Border patrol agents said that if we were not quiet they were going to take away our food.  So we stayed very quiet because we were afraid of losing the food.").)

101.    I understand that Defendants were ordered to make available to Plaintiffs documents sufficient to show current detainee detention practices and procedures at the four stations I inspected.  I have not seen any documents indicating that any of the four stations' dietary allowances have been reviewed by a qualified dietician or nutritionist, and therefore assume none exists.  I *have* seen Holding Cell Inspection forms from Douglas Station in which CBP employees include in the remarks section that the burritos are "delicious" or "yummy" or "super yummy" or "scrumptious."  (Ex. 108 at USA1185; Ex. 109 at USA1197; Ex. 111 at USA1494; Ex. 111 at USA1467.)  I understand that CBP employees do not eat the food given to detainees so I must assume that these comments are made sarcastically and with the recognition that the burritos are not particularly appetizing and are in fact considered punitive.  (ECF No. 2-1, Ex. 11 ¶ 21.)

102.    The failure to provide a nutritionally balanced diet to individuals detained more than 12 hours serves no legitimate penological or custodial interest and creates a risk of harm for some detainees.

103.    Detainees should be given food immediately upon arrival and then upon a set schedule.  The current diet also does not address food allergies and should be required to do so.

## F.    Temperature and Ventilation

104.    During our inspection, CBP agents informed us that all detainees' outer layers of clothing were confiscated before being placed in hold rooms, and in all but a few instances, detainees were not given replacement clothing.  (ECF No. 2-1, Ex. 3 ¶ 8 (agents

confiscated shirts and coat, so detainee had only a short sleeve shirt); ECF No. 2-2,

Ex. 20, ¶ 9 (clothes were confiscated, leaving detainee with only a short sleeve shirt.)

    105.    Surveillance video regularly shows detainees in Hold Rooms with no outer

layers of clothing.  (Exs. 126, 129; Ex. 165.)

    106.    Surveillance video also shows detainees huddled together under Mylar

blankets, even in the late Arizona summer months, wrapped head to toe in these flimsy

plastic sheets.  (Exs. 187, 188; Ex. 191.)  According to detainees' declarations sometimes

they would not even have these sheets.  (ECF NO. 2-3. Ex. 43 ¶ 10 ("[t]hree of the sixteen

[detainees] got small aluminum blankets but the rest of us did not. . . [w]e asked for

blankets but they ignored us"); ECF No. 2-1, Ex. 9 ¶¶ 24, 25 (guard refused detainee's

request for new aluminum sheet when it ripped, so she asked permission to take an

aluminum blanket from the trash.)

    107.    These Mylar sheets are demonstrably inadequate to keep people warm in

hold rooms that, even in the warmer months, drop to 58.8° Fahrenheit. (Ex. 111 at

USA001461.)  (ECF No. 2-2, Ex. 25, ¶ 9 (detainee stated that she tried to "curl up on the

floor and huddle with some of the other women in order to stay warm," but ultimately

needed to pace around the holding cell to try to warm herself); ECF No. 2-2, Ex. 20 ¶ 8.

(detainee stated that he understood why "dogs sleep in a little ball, to keep warm, but

couldn't even keep warm doing that."); *id.*, Ex. 26 ¶ 24 ("[m]any children were crying

because it was so cold"); ECF No. 2-3, Ex. 44 ¶¶ 8, 21 (detainee's two year old daughter

and other children in the holding cell often cried due to hunger and cold).)

    108.    Former detainee declarations commonly complain of being subjected to cold

temperatures.  (ECF No. 2-1, Ex. 6 ¶ 9 ("The temperature in the cell was very cold, we

call it the 'hielera' (freezer) because they turn on the air high and it's so cold.").)  There

are even accounts of Border Patrol agents using cold temperatures to punish inmates.

(ECF No. 2-2,  Ex. 24 ¶ 6; *id.*, Ex. 23 ¶ 17 ("One Mexican woman asked an agent to turn

off the air conditioner.  The agent said, 'Don't ask or we'll turn it up.'"); ECF No. 2-2,

Ex. 18 ¶ 8; ECF No. 2-1, Ex. 4 ¶ 6 ("When people asked the guards to make it warmer,

they made it colder. Sometimes they laughed at us when we complained about the temperature."); ECF No. 2-2, Ex. 18 ¶ 8; ECF No. 2-1, Ex. 6 ¶ 9 ("the other detainees who spoke English would translate for us and tell us that the guards said that if we talked too much or complained that they would turn on the air even colder"); ECF No. 2-3, Ex. 34 ¶ 9 ("Someone asked the officials to make the cell warmer, but they were ignored; in fact, after the request was made we could feel the cell get even colder.").)

109.    Given the lack of clothing and mattresses and nothing to do all day, detainees are left to sit or lay down on concrete, which is a very cold experience. During the inspection, I alternately sat on the concrete and wooden benches at Nogales and the difference was striking. Concrete benches are very cold and seep heat from your body.

110.    During our inspection of Douglas we were told their air-conditioning system was out of order, yet the temperatures were about the same as at the other facilities we inspected. As a result the CBP had provided sweatshirts/jackets for the detainees to wear. Every detainee was wearing them. In that the temperatures where similar to the other facilities, this is clear evidence of the need for additional insulation.  In September 2015, the Douglas station changed its Holding Cell Inspection form to include a "Cell Temperature Check" section in which CBP employees include temperature readings for each of the cells.  (Ex. 111 at USA001512.)  The temperature of the cells appears to depend on the location of that cell, with some consistently colder than others.

111.    The Core Jail Standards Require CBP to provide suitable clothing:

> 1-CORE-4B-02 (Ref. 4-ALDF-4B-03)
> Inmates are issued clothing that is properly fitted and suitable for the climate.  There are provisions for inmates to exchange clothing at least twice weekly."

(Ex. 199, 1-CORE-4B-02, at 25.)

112.    The Core Jail Standards also require:

> 1-CORE-1A-10 (Ref. 4-ALDF-1A-19, 1A-20)
> A ventilation system supplies at least 15 cubic feet per minute of circulated air per occupant, with a minimum of five cubic feet per minute of outside air. Toilet rooms and cells with toilets have no less than four air changes per hour unless state or local codes require a different number of air changes. Air

> quantities are documented by a qualified independent source and are checked not less than once per accreditation cycle. *Temperatures are mechanically raised or lowered to acceptable comfort levels."*]

(*Id.*, 1-CORE-1A-10, at 4.)

113.   Additionally, the DOJ NIC Jail Standards state (emphasis added):

> Inmates must be *provided with* clean clothes and bedding. Clothing, towels, and bedding must be exchanged, laundered, and inspected on a regular basis. Failing to do so will result in an unhygienic facility for both the inmates and the staff.

(Ex. 196 at 4.)

114.   It is my opinion that the current practice of lack of suitable clothes, lack of bedding and mattresses, and the composition of the benches and floors that detainees must sit and sleep on serves no penological interest and serves only as punishment for the detainees.

### G.   Ability to Maintain Personal Hygiene

115.   I understand that detainees often arrive dirty to the facilities and are in need of the opportunity to clean themselves and change clothing upon arrival. (ECF No. 2-1, Ex. 33 ¶ 8; ECF No. 2-3, Ex. 39 ¶ 7; ECF No. 2-2, Ex. 26 ¶ 29. Detainees also need to be able to clean their bodies prior to eating or after using the bathroom. Detainees however are unable to maintain basic personal hygiene in these facilities and typically not permitted to wash or change upon arrival or at any other time during their detention.

116.   Out of the four facilities that we inspected, only Nogales and Tucson had any facilities for detainees to shower themselves. CBP officials at Nogales told us that these showers were rarely used and then only when a detainee showed evidence of scabies. According to e3DM data produced by Defendants, only 115 detainees were given showers out of 16,992 held in Tucson Sector Border Patrol stations between June 10 and September 28, 2015. (Gaston Decl. ¶ 27.) Of those 115 showers, 20 were purportedly provided at Casa Grande station, where we were told by CBP agents that no shower facilities existed. (Gaston Decl. ¶ 60.)

117.    I observed soap dispenser located on the walls of many hold rooms. However, they were sometimes broken or empty.  During our inspection of Casa Grande station, there were no soap dispensers and no evidence of soap at all for detainees to clean themselves.  In the Douglas station, the Holding Cell Inspection forms record there being no soap during several days in October.  (Ex. 111 at USA1526; Ex. 111 at USA1528; Ex. 111 at USA1537-38; Ex. 111 at USA1546-47; Ex. 111 at USA1549; Ex. 111 at USA1557.)

118.    I also inspected the toilets and sinks.  Most cells had between one and four metal sink/toilet units behind a low brick privacy wall or stall.  (Ex. 55; Exs. 10, 23.) Occasionally the sink and toilet were separate units (Ex. 44)  A few toilets were not operational.  (Ex. 70.)

119.    In only one case did I find a sink providing hot water.

120.    We did not observe any towels that were made available to detainees.

121.    The Core Jail Standards require:

> 1-CORE-4B-04     (Ref. 4-ALDF-4B-08, 4B-09, 4C-10)
> Inmates, including those in medical housing units or infirmaries, have access to showers toilets, and washbasins with temperature controlled hot and cold running water twenty-four hours per day. Inmates are able to use toilet facilities without staff assistance when they are confined in their cell/sleeping areas. Water for showers is thermostatically controlled to temperatures ranging from 100 degrees to 120 degrees Fahrenheit.

(Ex. 199, 1-CORE-4B-04, at 26.)

122.    The result is that detainees have no opportunity to adequately clean themselves.  Hot water is virtually nonexistent, soap is sometimes available but sometimes it is not, there are no towels and there is only very rare access to a shower.  Many detainees come to the facilities after walking through the desert sometimes for days or weeks.  (ECF No. 2-1, Ex. 11 ¶ 3 (apprehended after walking in desert for 10 days); ECF No. 2-2, Ex. 23 ¶¶ 5, 10 (lost in desert for a week).)  It is likely their personal hygiene has suffered prior to the time of their apprehension.  (ECF No. 2-3, Ex. 39 ¶ 7.)  When they get to a CBP facility they do not have the opportunity to clean themselves.  Especially

given the lack of hot water, they are not able to properly clean themselves before eating or after going to the bathroom. In a detention facility where detainees are held in overcrowded conditions it is my opinion this creates an unreasonable risk for the spread of disease or infection among the detainees and the staff who work there. I would think that CBP administrators would want to do more to protect their own staff if for no other reason.

123.    Again, this is simple and basic protocol for the operation of a detention facility. Typically, general population jail inmates can shower daily. Since the detainees are constantly locked in their cells, they do not have an opportunity to shower during out of cell time like a jail population inmate. It is my opinion that detainees should be provided the opportunity to shower, after being searched, upon arrival at the facility. They should have the opportunity to shower once every 3 days they are confined at the facility.

124.    Once again, this practice of the CBP serves no legitimate penological or custodial purpose, creates an unjustifiable risk of harm to detainees, and amounts to nothing more than punishment.

125.    Additionally, I understand from detainees' declarations that they are not provided with an adequate supply of sanitary napkins (ECF No. 2-2, Ex. 25 ¶ 11) or diapers (*id.*, Ex. 29 ¶ 15 (One and a half year old child without a clean diaper for nineteen hours); *id.*, Ex. 28 ¶ 11 (agents refused mother's request that they get a diaper out of her bag, so child was left in a diaper diaper); *id.*, Ex. 30, ¶ 14.)

**H.    Unsafe Isolation Cells**

126.    At the Douglas facility there are 6 isolation cells that are completely inadequate. These cells were very alarming to me and very dangerous for any detainee who might be housed there and for the staff who must supervise them. There are no windows to see into the cells in order to view inside nor are there food ports in the doors to safely deliver meals. The in-cell cameras have at least one blind spot that does that allow viewing into all parts of the cell.

127.    Since these cells are without windows in the doors and there is no food port in the cell door, the CBP agents must open the cell door "blind" since they cannot see in before opening the door. This increases the possibility of a serious assault that could occur immediately upon opening the cell door.

128.    In all the documents I have reviewed about the operations of CBP facilities I have seen nothing that describes how these isolation cells are to be operated. As a result there is no evidence that these cells are operated according to industry standards. It is well know that the risk of suicide and self-harm is increased for persons housed in isolation. For that reason alone, consistent with ACA standards and industry practice, half hour checks are required of individuals held in isolation. Moreover, the surveillance cameras in the cells at Douglas are mounted in such a way as to create a hazard for hanging.

129.    It is my opinion that the isolation cells at Douglas should be shut down and not utilized until the problems with the cell doors are  fixed and the agency develops policy for their use that are consistent with industry standards. Continuing their operation creates the risk of serious harm for any detainee who may be housed there.

## I.    Medical Screening Standards in Detention Settings

130.    Core Jail Standards provide that the admission processes for a newly-admitted inmate include, but are not limited to, health screening, suicide screening, and alcohol and drug screening.  (Ex. 199, 1-CORE-2A-14, at 13.)

131.    Specifically, the Core Jail Standards articulate mandatory guidelines for "Intake physical and mental health screening."  (Ex. 199, 1-CORE-4C-09, at 30.)

132.    The screening should commence upon the inmate's arrival at the facility, unless there is documentation of a medical screening within the previous 90 days or the inmate is an intra-system transfer.  (*Id.*)

133.    The screening should be "conducted by health-trained staff or by qualified health care personnel in accordance with protocols established by the health authority." (*Id.*)

134.    Screening must include at least:

- current or past medical conditions, including mental health problems and communicable diseases;

- current medications, including psychotropic medications;

- history of hospitalization, including inpatient psychiatric care;

- suicidal risk assessment, including suicidal ideation or history of suicidal behavior;

- use of alcohol and other drugs including potential need for detoxification;

- dental pain, swelling, or functional impairment;

- possibility of pregnancy; and

- cognitive or physical impairment.

135.    Screening should also include observation of the following:

- behavior, including state of consciousness, mental status, appearance, conduct, tremor, or sweating;

- body deformities and other physical abnormalities;

- ease of movement;

- condition of the skin, including trauma markings, bruises, lesions, jaundice, rashes, infestations, recent tattoos, and needle marks or other indications of injection drug use; and

- symptoms of psychosis, depression, anxiety and/or aggression.

136.    At the conclusion of the screening, the medical disposition of the inmate should be determined as:

- refusal of admission until inmate is medically cleared;

- cleared for general population;

- cleared for general population with prompt referral to appropriate medical or mental health care services;

- referral to appropriate medical or mental health care service for emergency treatment; or

- process for observation for high risk events, such as seizures, detoxification head wounds, and so forth.

137.    As explained by the Core Jail Standards, the purpose of this medical screening is two-fold: "to prevent newly arrived inmates who pose a health or safety threat to themselves or others from being admitted to the general population" and "to identify inmates who require immediate medical attention." (Ex. 199, 1-CORE-4C-09, at 31.)

**J.    Failure to Screen at Tucson Sector CBP Facilities**

138.    During our inspection of the Tucson Sector CBP facilities, as described above, we were told by Defendants' personnel that medical screening is not performed upon detainees' arrival at each station. We were also told that some agents are EMT-trained and can be assigned these duties if they are available. I am not aware, however, of any records received by Plaintiffs from Defendants that ensure sufficient EMT-trained agents are on the staff rosters in each Tucson Sector CBP facility to consistently perform medical screening of arriving detainees.

139.    The declarations of numerous former detainees show the failure of CBP to provide adequate medical screening, and even medical assistance upon request. (ECF No. 2-2, Ex. 23 ¶ 7 (no medical evaluation and denied assistance when she complained of heavy vaginal bleeding); ECF No. 2-3, Ex. 38 ¶ 14 (refused medical assistance despite swollen arm); *id.*, Ex. 37 ¶¶ 22, 29, 31 (refused prescribed medication for pain leg fracture); ECF No. 2-1, Ex. 9 ¶ 12-1; ECF No. 2-2, Ex. 19 ¶ 19.) Moreover, medications that detainees have with them are confiscated. (ECF No. 201, Ex. 9 ¶ 14.)

140.    The declarations also show that detainees arriving at CBP facilities in the Tucson Sector are a particularly vulnerable population—exhausted, hungry, thirsty, many who are sick or injured and in need of immediate medical care. (ECF No. 2-2, Ex. 23, ¶ 5; ECF No. 2-2, Ex. 26, ¶¶ 15-16; *id.*, Ex. 21¶ 14; ECF No. 2-3, Ex. 36 ¶ 8; ECF No. 2-1, Ex.15 ¶ 18 (diarrhea and vomiting); *id.*, Ex. 6 ¶ 15 (heart condition); ECF No. 2-1, Ex. 20 ¶ 15 (colitis); ECF No. 2-2, Ex. 23 ¶ 23 (heavy sustained vaginal bleeding); ECF No. 2-3,

70

Ex. 37 ¶¶ 4, 21, 34 (pain from broken leg).)  This makes medical screening and care all
the more crucial in the Tucson Sector setting.

### K.   Practices and Policies are Inadequate For A Facility That Holds Detainees Over 10 Hours

141.   I understand that Defendants have been ordered to make available to
Plaintiffs documents sufficient to show current detainee detention practices and
procedures for the four stations I inspected.

142.   I have reviewed all of the policies produced.  I find them to be either
inadequate or insufficient and out of line with accepted standards for detention facilities,
and woefully inadequate for facilities that detains people over 10 hours.

143.   I understand that after the start of this litigation, in October 2015, the
government released new TEDS standards.  The new TEDS standards significantly
extended the time period that Border Patrol agents may hold detainees to 72 hours or
more.  (Ex. 95 at USA631.)  The hold rooms are completely inadequate facilities for
housing detainees that long.

144.   Apart from the deficiencies outlined above, CBP does not have policies on
basic items that are standards in all jails and other correctional facilities such as what I
have reference above for the use of isolation cells. Just a few examples of other standards
taken from the Core Jail Standards that are not addressed by current CBP policies include:

    a.    Required weekly, monthly and annual sanitation inspections.  (Ex. 199, 1-CORE-1A-01, at 1.)

    b.    All inmate rooms/cells provide the occupants with access to natural light. Lighting throughout the facility is sufficient for the tasks performed.  (*Id.*, 1-CORE-1A-09, at 4.)

    c.    When a female inmate is housed in a facility, at least one female staff member is on duty at all times. (*Id.*, 1-CORE-2A-05, at 10.)

    d.    If food services are provided by the facility, there are weekly inspections of all food service areas, including dining and food preparation areas and equipment. Water temperature is checked and recorded daily. (*Id.*, 1-CORE-4A-05, at 24.)

71

     e.      Inmates have access to exercise and recreation opportunities. When available, at least one hour daily is outside the cell or outdoors. (*Id.*, 1-CORE-5C-01, at 27.)

     f.      Annual and pre-service training requirements (*Id.*, 1-CORE-7B-03, at 52-53.)

145.    Ultimately the CBP facilities lack the focus on the detail of the operation of detention facilities necessary to make certain they operate in a safe and humane manner.

146.    CBP does not appear to have many of the accountability measures that are typically found in corrections facilities including routine inspection systems in all of its stations (daily, weekly, monthly) and outside audits. The purpose of these types of procedures is to establish accountability for local managers and to see if their practices are consistent with their policies. Corrections facilities require oversight and that appears to be woefully lacking from the operation of CBP facilities. Additionally, CBP's policies do not cover all of the apparent practices within CBP facilities, leaving room for abuse. For example, on July 21, 2015, the Tucson station appears to have ordered 30 spit hoods. (Ex. 118.) Spit hoods are typically transparent light hoods that are "designed to prevent the wearer from biting and/or transferring or transmitting fluids (saliva and mucous) to others."[7] As with any restraint and particularly since the spit hoods cover the eyes, nose, and mouth of the wearer, spit hoods may pose dangers to the wearer if not fastened properly.[8] However none of the produced policies contained any guidelines regarding the proper use of spit hoods (or any reference to spit hoods or similar devices at all).

147.    CBP's own records demonstrate failings in documenting and addressing issues in its facilities. CBP appears to complete daily Processing Inspection Forms for each of its stations. The same form is filled out for different shifts during the day.

148.    These forms suggest that inspections, which have implications for the health and safety of both detainees and CBP personnel, were not performed consistently or with

---

[7] *Policy 306*: *Handcuffing and Restraints*, University of Merced Police Department, *available at* http://police.ucmerced.edu/about/department-policies/policy-306
[8] *Id.*

appropriate care.  For example, forms from Casa Grande station indicate that the video
recording system was not working, was working intermittently, or was possibly not
checked.  (Ex. 104 at USA706-708, USA718-719, USA722-724, USA729-749) (for the
question of whether the video monitors and video loop is operational or in use, the "no"
box is checked).)  Similarly, in the Casa Grande station, a lock on a cell was reported
broken during some shifts but not during others.  (*Id.* at USA790-791 (No report of
broken lock during first shift on July 5 or July 6); Ex. 105 at USA814-816 (Lock on cell 9
reported broken during the second shift on July 5 but not on July 7); *id.* at USA836,
USA838 (Lock on cell 9 reported broken during third shift on July 5 and July 7); *id.* at
USA866, USA 868 (Lock on cell 9 reported broken during fourth shift on July 5 and July
7); Ex. 107 at USA1043, USA1047 (Lock broken again or still broken in September .)
For the Nogales station, several items are reported as needing repair on August 18,
including lighting ("At least one light out in every cell"), benches ("Some benches are
missing bolts"), and doors/locks.  (Ex. 112 at USA1570.)  No issues are reported the
following day.  (Ex. 112 at USA1571.)  However the same items are indicated as needing
repair on August 22.  (*Id.* at USA1574.)  Some forms for the Casa Grande station were not
filled out at all.  (Ex. 104, USA728; Ex. 107 at USA1021, USA1029.)  Additionally there
very few or no comments in the "Remarks" sections of forms for all stations which
suggested to me that the completion of the forms is largely a perfunctory exercise and not
an actual inspection.

149.   CBP's inconsistent practices illustrate their own misunderstanding that part
of their mission and responsibility is to attend to the basic and human needs of the
detainees.

150.   The CBP is engaged in at least two primary functions—the apprehension of
detainees and their subsequent detention. It does not appear that they fully embrace,
accept or understand the detention function. Agents for the Border Patrol are expected to
be proficient at both functions. Structurally it would be best if those functions were
separated. Absent that approach, training for agents expected to perform both functions

should be separated into separate tracks so that it is clear to agents that the skill sets are different. Managing a detained population is complex work and deserves its own focus and emphasis for the staff expected to perform those functions in order to provide for the safe and humane housing of the detainees.

151.    It is clear that the CBP facilities are designed and operated to hold detainees for a short period of time. Whether or not it is 24, 48, 72 hours, or longer, CBP still needs to learn, implement and then monitor all the basic functions of a detention operation. But in order to minimize the amount of time people spend in these facilities, I strongly recommend that CBP do a business process flow analysis of detainees from arrest to transfer out of BP custody to identify roadblocks to moving them quickly. Performance measures should then be established for agency managers to make sure they are constantly focused on the important issue of moving detainees to their next location where full services can be provided.

152.    The impact of overcrowded facilities, lack of regular sleep, lack of access to adequate food and water, inadequate sanitation, poor temperature control and ventilation, and other factors described above is likely to create conditions of confinement that place stress on detainees that is completely unnecessary for the safe and secure operation of a detention facility. Such conditions can and do lead to increased risk for detainees and staff alike as they introduce conflict for basic human necessities into an already stressful environment.  Upon arrival at the these facilities detainees are likely to be exhausted, possibly in need of medical care, and some have fled their home country out of fear for their safety or the safety of their loved ones.  (ECF No. 2-3, Ex. 41 ¶ 24 (afraid of returning to home country as relatives had been killed there); *id.*, Ex. 38 ¶ 24 (same); ECF No. 2-1, Ex. 8 ¶ 26 (afraid of returning to home country); *id.*, Ex. 15 ¶ 34 (same); ECF No. 2-2, Ex. 21 ¶ 28 (same).)  Others are seeking be reunited with U.S. citizen children and spouses – often after several years of separation.  (ECF No. 2-1, Ex. 9 ¶ 36; *id.*, Ex. 11 ¶ 23; ECF No. 2-2, Ex. 19 ¶ 27.)  Good security is a combination of humane treatment and adherence to accepted custody practices—not a focus on conditions that

simply punish which appears to be the misguided approach taken in the operation of CBP facilities.

## V.    CONCLUSION

153.    Based on my experience, review of the materials in this case, and the literature, the conditions of confinement in these holding cells for periods longer than ten hours are worse than national jails and prisons and, combined, clearly and unjustifiably create risk of harm to detainees, and, in my professional judgment, serve no penological or custodial interest.

154.    I have worked in correctional organizations for 35 years. During my career and since I commenced my work as a corrections consultant and expert witness nearly four years ago I have been in countless prisons and jails. Those facilities house individuals who have been charged with or convicted of felonies and misdemeanors. I have never been in one that treats those confined in a manner that the CBP treats detainees. The absence of medical screening upon arrival is unthinkable. Sufficient food, water and clothing are fundamental to safe, secure and humane operation but I have never seen the challenges the CBP creates for detainees for access to these basic necessities. I have seen and experienced the effects of overcrowding but no jurisdiction would cram so many people into so little space, without beds and bedding, that routinely occurs in CBP facilities. The conditions of confinement I witnessed through my inspections and through studying the records in this case are unthinkable in any other jurisdiction that I have seen or heard about. The CBP are housing people in conditions that are unnecessarily harsh, dangerous and contrary to accepted industry practices and standards. These conditions seem to me to be designed to punish and that is not the role of the Border Patrol.

155.    CBP must either take the necessary steps to ensure that detainees pass through these short-term facilities in a matter of hours, or take the significant steps required to make the conditions of confinement adequate for overnight stays.

## VI.  CELL CAPACITIES, FLOOR PLANS, AND INSPECTION FORMS

156.   Attached to the Appendix of Exhibits as Exhibit 83 is a true and correct copy of a document produced by Defendants on or about September 4, 2015 and Bates labeled USA000157, which purports to list the maximum cell capacities for each hold room at Tucson station.

157.   Attached to the Appendix of Exhibits as Exhibit 94 is a true and correct copy of a document produced by Defendants on or about September 30, 2015 and Bates labeled USA000617, which purports to list the maximum cell capacities for each hold room at Nogales station.

158.   Attached to the Appendix of Exhibits as Exhibit 99 is a true and correct copy of a document produced by Defendants on October 19, 2015 and Bates labeled USA000673-674, which purports to list the maximum cell capacities for each hold room at Douglas and Casa Grande stations.

159.   Attached to the Appendix of Exhibits as Exhibit 89 is a true and correct copy of a document produced by Defendants on September 4, 2015 and Bates labeled USA000359, which purports to be hand drawn sketches with measurements for cell dimensions at Casa Grande station.

160.   Attached to the Appendix of Exhibits as Exhibit 90 is a true and correct copy of a document produced by Defendants on September 4, 2015 and Bates labeled USA000360-363, which purports to be hand drawn sketches with measurements for cell dimensions at Douglas station.

161.   Attached to the Appendix of Exhibits as Exhibit 91 is a true and correct copy of a document produced by Defendants on September 4, 2015 and Bates labeled USA000364, which purports to be sketches with measurements for cell dimensions at Nogales station.

162.   Attached to the Appendix of Exhibits as Exhibit 92 is a true and correct copy of a document produced by Defendants on September 4, 2015 and Bates labeled

USA000365-371, which purports to be hand drawn sketches with measurements for cells at Tucson station.

163.    Attached to the Appendix of Exhibits as Exhibit 93 is a true and correct copy of a document produced by Defendants on September 28, 2015 and Bates labeled USA000573-586, which purports to be hand drawn sketches with additional measurements for cells and fixtures at Tucson station.

164.    Attached to the Appendix of Exhibits as Exhibit 93 is a true and correct copy of a document produced by Defendants on September 28, 2015and Bates labeled USA000587-591, which purports to be hand drawn sketches with additional measurements for cells and fixtures at Casa Grande station.

165.    Attached to the Appendix of Exhibits as Exhibit 93 is a true and correct copy of a document produced by Defendants on September 28, 2015 and Bates labeled USA000592-599, which purports to be hand drawn sketches with additional measurements for cells and fixtures at Douglas station.

166.    Attached to the Appendix of Exhibits as Exhibit 93 is a true and correct copy of a document produced by Defendants on September 28, 2015 and Bates labeled USA000600, which purports to be sketches with additional measurements for cells and fixtures at Nogales station.

167.    Attached to the Appendix of Exhibits as Exhibit 117 is a true and correct copy of a document produced by Defendants on October 29, 2015 and Bates labeled USA002065, which purports to be the processing area blueprint for Casa Grande station.

168.    Attached to the Appendix of Exhibits as Exhibit 117 is a true and correct copy of a document produced by Defendants on October 29, 2015 and Bates labeled USA002066, which purports to be the processing area blueprint for Nogales Grande station.

169.    Attached to the Appendix of Exhibits as Exhibit 117 is a true and correct copy of a document produced by Defendants on October 29,, 2015 and Bates labeled USA002067, which purports to be the processing area blueprint for Douglas station.

170.    Attached to the Appendix of Exhibits as Exhibit 117 is a true and correct copy of a document produced by Defendants on October 29, 2015 and Bates labeled USA002068, which purports to be the processing area blueprint for Tucson station.

171.    Attached to the Appendix of Exhibits as Exhibits 105, 106, and 107 are true and correct copies of documents produced by Defendants on November 9, 2015, which purport to be processing inspection forms for Casa Grande station between June and October, 2015.

172.    Attached to the Appendix of Exhibits as Exhibits 109, 110, and 111 are true and correct copies of documents produced by Defendants on November 9, 2015, which purport to be Holding Cell Inspection Forms for Douglas station between June and October, 2015.

173.    Attached to the Appendix of Exhibits as Exhibits 112 and 113 are true and correct copies of documents produced by Defendants on November 9, 2015, which purport to be Holding Cell Checklists for Nogales station between August and October, 2015.

174.    Attached to the Appendix of Exhibits as Exhibits 114, 115, and 116 are true and correct copies of documents produced by Defendants on November 9, 2015, which purport to be Holding Cell Checklists for Tucson station between July and October, 2015.

## VII.    AUTHENTICATION OF INSPECTION PHOTOGRAPHS

175.    Exhibit 50 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 8, 2015, which accurately depicts a rolling cart at Tucson station containing paper cups and folded Mylar blankets in a cardboard box.

176.    Exhibit 51 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 8, 2015, which accurately depicts a storage area  at Tucson station  with metal shelving and pallets containing office supplies, drinking cups, diapers, and other items.

177. Exhibit 52 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a view across the room towards the toilets.

178. Exhibit 53 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a close-up view of the toilet/sink unit inside a stall.

179. Exhibit 54 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a view from the toilet stall towards the door and windows.

180. Exhibit 55 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a close-up view of the toilet/sink unit inside a stall.

181. Exhibit 56 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a view across the room towards the toilet stalls.

182. Exhibit 57 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a close-up view of underneath a toilet bowl.

183. Exhibit 58 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a view across the room towards the toilet stalls.

184. Exhibit 60 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in Tucson station with a view of benches and toilet stalls.

185. Exhibit 61 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in Tucson station with a view of cement benches.

186.   Exhibit 62 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in Tucson station with a view from the door to the back of the cell.

187.   Exhibit 63 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in Tucson station with a close-up view of a toilet stall.

188.   Exhibit 64 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in Tucson station  with a close-up view of a handicapped toilet/sink unit in stall

189.   Exhibit 65 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in Tucson station with a close-up view of windows and a door frame.

190.   Exhibit 66 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in Tucson station with a close-up view of underneath the toilet/sink unit in a stall.

191.   Exhibit 67 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 1 in Tucson station with a close-up view of a soap dispenser and sink/backsplash.

192.   Exhibit 68 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in Tucson station with a view across the cell towards the back of the room.

193.   Exhibit 69 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in Tucson station with a close-up view of a privacy wall.

194.   Exhibit 70 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in Tucson station with a close-up view of a toilet/sink unit in a stall.

195.    Exhibit 71 is a true and correct copy of a photograph taken during Plaintiffs'
inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in
Tucson station with a close-up view of cement benches.

196.    Exhibit72 is a true and correct copy of a photograph taken during Plaintiffs'
inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in
Tucson station with a close-up view of cement benches.

197.    Exhibit 73 is a true and correct copy of a photograph taken during Plaintiffs'
inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in
Tucson station with a close-up view of cement benches.

198.    Exhibit 74 is a true and correct copy of a photograph taken during Plaintiffs'
inspection of Tucson station on September 11, 2015 which accurately depicts Room 4 in
Tucson station with a view across cell in front of toilet stalls.

199.    Exhibit 75 is a true and correct copy of a photograph taken during Plaintiffs'
inspection of Tucson station on September 11, 2015, which accurately depicts Room 6 in
Tucson station with a view of cement benches.

200.    Exhibit 76 is a true and correct copy of a photograph taken during Plaintiffs'
inspection of Tucson station on September 11, 2015, which accurately depicts Room 6 in
Tucson station with a view of underneath a toilet/sink unit.

201.    Exhibit 77 is a true and correct copy of a photograph taken during Plaintiffs'
inspection of Tucson station on September 11, 2015, which accurately depicts Room 6 in
Tucson station with a close-up view of underneath a toilet/sink unit.

202.    Exhibit 1 is a true and correct copy of a photograph taken during Plaintiffs'
inspection of Casa Grande station on September 9, 2015, which accurately depicts a
storage area in Casa Grande station with metal shelving containing items including
drinking cups, plastic liners, baby diapers, and sanitary napkins.

203.    Exhibit 2 is a true and correct copy of a photograph taken during Plaintiffs'
inspection of Casa Grande station on September 9, 2015, which accurately depicts the
back of a package of microwavable burritos at Casa Grande station.

204.    Exhibit 3 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts a storage room in Casa Grande station with metal shelving containing three sleeping mats.

205.    Exhibit 4 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts a box of Mylar blankets in Casa Grande station.

206.    Exhibit 5 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts a food heating unit and/or microwave in Casa Grande station.

207.    Exhibit 6 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts a janitor's closet in Casa Grande station.

208.    Exhibit 7 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts holding cell no. 9 in Casa Grande station from the door.

209.    Exhibit 8 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts holding cell no. 9 in Casa Grande station with a view of two toilet/sink units.

210.    Exhibit 9 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell S South Black in Douglas station with a close-up view of the floor behind the toilet/sink unit.

211.    Exhibit 10 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell S South Yellow and/or S South Blue in Douglas station with a close-up view of the toilet/sink area.

212.    Exhibit 11 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding

cell S South Yellow and/or S South Blue in Douglas station with a close-up view of the toilet/sink unit.

213.   Exhibit 12 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell S South Yellow and/or S South Blue in Douglas station with a close-up view of side of the sink and wall.

214.   Exhibit 13 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Blue in Douglas station with a close-up view of the toilet bowl.

215.   Exhibit 14 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Blue in Douglas station with a close-up view of human excrement on the privacy wall of the toilet.

216.   Exhibit 15 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Green in Douglas station with a view from opened door.

217.   Exhibit 17 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Black in Douglas station with a close-up view of the toilet bowl.

218.   Exhibit 18 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a view from the door.

219.   Exhibit 19 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a view from the side wall towards the privacy wall.

220.　Exhibit 20 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a view of the toilet/sink unit.

221.　Exhibit 21 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a close-up view of the floor next to the toilet.

222.　Exhibit 22 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a close-up view of spotted stainless steel

223.　Exhibit 23 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a view of the toilet/sink unit.

224.　Exhibit 24 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a close-up view of the floor drain.

225.　Exhibit 25 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts isolation cell No. 1 in Douglas station with a close-up view of the floor and sleeping mat.

226.　Exhibit 26 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a view into the cell from the door.

227.　Exhibit 27 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a view into the cell from the door.

228.　Exhibit 28 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a close-up of sleeping mats on benches.

229. Exhibit 29 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a close-up of sleeping mats on benches.

230. Exhibit 30 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a close-up view of a stain on the floor.

231. Exhibit 31 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 5 in Nogales station with a close-up view of an air vent.

232. Exhibit 32 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding Cell no. 1in Nogales station with a close-up view of a sink and backsplash.

233. Exhibit 33 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 1 in Nogales station with a close-up view of a ceiling vent.

234. Exhibit 34 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 1 in Nogales station with a view of a corner of the floor near a cement bench.

235. Exhibit 35 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 4 in Nogales station with a close-up view of an orange Igloo water container.

236. Exhibit 36 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts a view of the floor at Nogales station underneath a toilet/sink unit.

237. Exhibit 37 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 2 in Nogales station with a close-up view of the cinder block walls.

238. Exhibit 38 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts a cleaning supply room in Nogales station viewed from the door.

239. Exhibit 42 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room C in Nogales station with a close-up view of two microwave ovens.

240. Exhibit 43 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room 8 in Nogales station with a close-up view of underneath the toilet bowl.

241. Exhibit 44 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room 7 in Nogales station with a close-up view of underneath the sink.

242. Exhibit 45 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room 7 in Nogales station showing a corner of the floor.

243. Exhibit 46 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room 7 in Nogales station with a close-up view of a corner wall next to the door.

244. Exhibit 47 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Shower Room 2 in Nogales station viewed from the door.

245. Exhibit 48 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Station ASID at Nogales station with a view of air-conditioning controls and computers.

///

///

///

///

246.   Exhibit 49 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Station ASID at Nogales station with a view of air-conditioning controls.

Executed this 4th day of December, 2015.

_____

ELDON VAIL

# Attachment A

# ELDON VAIL

1516 8th Ave SE
Olympia, WA. 98501
360-349-3033
Nodleliav@comcast.net

## WORK HISTORY

Nearly 35 years working in and administering adult and juvenile institutions, and probation and parole programs, starting at the entry level and rising to Department Secretary. Served as Superintendent of 3 adult institutions, maximum to minimum security, male and female. Served as Secretary for the Washington State Department of Corrections (WADOC) from 2007 until 201l.

- Secretary      WADOC      2007-2011
- Deputy Secretary      WADOC      1999-2006
- Assistant Deputy Secretary      WADOC      1997-1999
- Assistant Director for Prisons      WADOC      1994-1997
- Superintendent      McNeil Island Corrections Center      1992-1994
- Superintendent      WA. Corrections Center for Women      1989-1992
- Correctional Program Manager      WA. Corrections Center      1988
- Superintendent      Cedar Creek Corrections Center      1987
- Correctional Program Manager      Cedar Creek Corrections Center      1984-1987
- Juvenile Parole Officer      Division of Juvenile Rehabilitation      1984
- Correctional Unit Supervisor      Cedar Creek Corrections Center      1979-1983
- Juvenile Institution Counselor      Division of Juvenile Rehabilitation      1974-1979

## SKILLS AND ABILITIES

- Ability to analyze complex situations, synthesize the information and find practical solutions that are acceptable to all parties.

- A history of work experience that demonstrates how a balance of strong security and robust inmate programs best improves institution and community safety.

- Leadership of a prison system with very little class action litigation based on practical knowledge that constitutional conditions are best achieved through negotiation with all parties and not through litigation.

- Extensive experience as a witness, both in deposition and at trial.

- Experience working with multiple Governors, legislators of both parties, criminal justice partners and constituent groups in the legislative and policymaking process.

1

- Skilled labor negotiator for over a decade. Served as chief negotiator with the Teamsters and the Washington Public Employees Association for Collective Bargaining Agreements. Chaired Labor Management meetings with Washington Federation of State Employees.

## HIGHLIGHTS OF CAREER ACCOMPLISHMENTS

- Reduced violence in adult prisons in Washington by over 30% during my tenure as Secretary and Deputy Secretary even though the prison population became much more violent and high risk during this same time period.

- Long term collaboration with the University of Washington focusing on improving treatment for the mentally ill in prison and the management of prisoners in and through solitary confinement.

- Implemented and administered an extensive array of evidence based and promising programs:

  o Education, drug and alcohol, sex offender and cognitive treatment programs.
  o Implemented sentencing alternatives via legislation and policy, reducing the prison populations of non-violent, low risk offenders, including the Drug Offender Sentencing Alternative and, as the Secretary, the Family and Offender Sentencing Alternative. http://www.doc.wa.gov/community/fosa/default.asp
  o Pioneered extensive family based programs resulting in reductions in use of force incidents and infractions, as well as improved reentry outcomes for program participants.
  o Established Intensive Treatment Program for mentally ill inmates with behavioral problems.
  o Established step down programs for long-term segregation inmates resulting in significant reduction in program graduate returns to segregation. http://www.thenewstribune.com/2012/07/10/2210762/isolating-prisoners-less-common.html

- Initiated the Sustainable Prisons Project http://blogs.evergreen.edu/sustainableprisons/

- Improved efficiency in the agency by administrative consolidation, closing 3 high cost institutions and eliminating over 1,200 positions. Housed inmates safely at lowest possible custody levels, also resulting in reduced operating costs.

- Increased partnerships with non-profits, law enforcement and community members in support of agency goals and improved community safety.

- Resolved potential class action lawsuit regarding religious rights of Native Americans. http://seattletimes.nwsource.com/html/opinion/2015464624_guest30galanda.html

- Successful settlement of the Jane Doe class action law suit, a PREA case regarding female offenders in the state's prisons for women.

- Led the nation's corrections directors to support fundamental change in the Interstate Compact as a result of the shooting of 4 police officers in Lakewood, WA.

- Dramatically improved media relations for the department by being aggressively open with journalists, challenging them to learn the difficult work performed by corrections professionals on a daily basis.

## EDUCATION AND OTHER BACKGROUND INFORMATION

- Bachelor of Arts - The Evergreen State College, Washington – 1973

- Post graduate work in Public Administration - The Evergreen State College, Washington - 1980 and 1981

- National Institute of Corrections and Washington State Criminal Justice Training Commission - various corrections and leadership training courses

- Member of the American Correctional Association

- Associate member, Association of State Correctional Administrators (ASCA)

- Guest Speaker, Trainer and Author for the National Institute of Corrections (NIC)

- Commissioner, Washington State Criminal Justice Training Commission 2002-2006, 2008-2011

- Member, Washington State Sentencing Guidelines Commission 2007-2011

- Instructor for Correctional Leadership Development for the National Institute of Corrections

- Author of *Going Beyond Administrative Efficiency—The Budget Crisis in the State of Washington*, published in Topics of Community Corrections by NIC, 2003

- Advisory Panel Member, *Correctional Technology—A User's Guide*

- Consultant for *Correctional Leadership Competencies for the 21st Century*, an NIC publication

3

- Co-chair with King County Prosecutor Dan Satterberg, *Examining the Tool Box: A Review of Supervision of Dangerous Mentally Ill Offenders* http://your.kingcounty.gov/prosecutor/DMIO%20-WorkgroupFinalReport.pdf

- Consultant for Correctional Health Care Executive Curriculum Development, an NIC training program, 2012

- Guest lecturer on solitary confinement, University of Montana Law School in 2012

- On retainer for Pioneer Human Services from July 2012 - July 2013

- On retainer for BRK Management Services from September 2012 – April 2013

- Guest Editorial, Seattle Times, February 22, 2014 http://www.seattletimes.com/opinion/guest-opinions-should-washington-state-abolish-the-death-penalty/

## CURRENT ACTIVITIES

- Serve on the Board of Advisors for Huy, a non-profit supporting Native American Prisoners

- Registered Agent for the Association of State Correctional Administrators (ASCA) in Washington

- Retained as an expert witness or correctional consultant in the following cases:

  o *Mitchell v. Cate*,
    No. 08-CV-1196 JAM EFB
    United States District Court, Eastern District of California,
    Declarations, March 4, 2013, May 15, 2013 and June 7, 2013
    Deposed, July 9, 2013
    Case settled, October 2014

  o *Parsons, et al v. Ryan*,
    No. CV 12-06010 PHX-NVW
    United States District Court of Arizona
    Declarations and reports, November 8, 2013, January 31, 2014,
    February 24, 2014, September 4, 2014
    Deposed, February 28, 2014 and September 17, 2014
    Case settled, October 2014

- *Gifford v. State of Oregon*,
  No. 6:11-CV-06417-TC
  United States District Court, For the District of Oregon,
  Eugene Division,
  Expert report, March 29, 2013
  Case settled, May 2013

- *Ananachescu v. County of Clark*,
  No. 3:13-cv-05222-BHS
  United States District Court, Western District of Tacoma
  Case settled, February 2014

- *Coleman et al v. Brown, et al*,
  No. 2:90-cv-0520 LKK JMP P
  United State District Court, Eastern District of California,
  Declarations, March 14, 2013, May 29, 2013, August 23, 2013 and
  February 11, 2014
  Deposed, March 19, 2013 and June 27, 2013
  Testified, October 1, 2, 17 and 18, 2013

- *Peoples v. Fischer*,
  No. 1:11-cv-02694-SAS
  United States District Court, Southern District of New York
  Interim settlement agreement reached February 19, 2014,
  Negotiations ongoing

- *Dockery v. McCarty*,
  No. 3:13-cv-326 TSL JMR
  United States District Court for the Southern District of
  Mississippi, Jackson Division
  Report, June 16, 2014

- *C.B., et al v. Walnut Grove Correctional Authority et al*,
  No. 3:10-cv-663 DPS-FKB,
  United States District Court for the Southern District of
  Mississippi, Jackson Division
  Memo to ACLU and Southern Poverty Law Center,
  March 14, 2014, filed with the court
  Reports to the court August 4, 2014 and February 10, 2015
  Testified April 1, 2 and 27, 2015

- *Graves v. Arpaio*,
  No. CV-77-00479-PHX-NVW,
  United States District Court of Arizona
  Declaration, November 15, 2013
  Testified on March 5, 2014

o  *Wright v. Annucci, et al,*
   No. 13-CV-0564 (MAD)(ATB)
   United States District Court, Northern District of New York
   Reports, April 19, 2014 and December 12, 2014

o  *Corbett v. Branker,*
   No. 5:13 CT-3201-BO
   United States District Court, Eastern District of North Carolina,
   Western District
   Special Master appointment November 18, 2013
   Expert Report, January 14, 2014
   Testified, March 21, 2014

o  *Fontano v. Godinez,*
   No. 3:12-cv-3042
   United States District Court, Central District of Illinois,
   Springfield Division
   Report, August 16, 2014

o  *Atencio v. Arpaio*,
   No. CV12-02376-PHX-PGR
   United States District Court of Arizona
   Reports, February 14, 2014 and May 12, 2014
   Deposed on July 30, 2014

o  *State of Oregon v. James DeFrank,*
   Case # 11094090C
   Malheur County, Oregon

o  *Disability Rights, Montana, Inc. v. Richard Opper,*
   No. CV-14-25-BU-SHE
   United State District Court for the District of Montana,
   Butte Division

o  *Larry Heggem v. Snohomish County,*
   No. CV-01333-RSM
   United States District Court,
   Western District of Washington at Seattle
   Report, May 29, 2014
   Deposed, June 27, 2014

o  *Padilla v. Beard, et al,*
   Case 2:14-at-00575
   United States District Court, Eastern District of California,
   Sacramento Division
   Declaration November 19, 2015

- o *Dunn et al v. Dunn et al,*
  No. 2:14-cv-00601-WKW-TFM
  United States District Court, Middle District of Alabama
  Declarations, September 3, 2014, April 29, 2015 and
  June 3, 2015

- o *Sassman v. Brown,*
  No. 2:14-cv-01679-MCE-KJN,
  United States District Court, Eastern District of California,
  Sacramento Division
  Declaration, August 27, 2014, Report, December 5, 2014
  Deposed, December 15, 2014

- o *Manning v. Hagel,*
  No. 1:14-cv-01609
  United States District Court for the District of Columbia

- o *Doe v. Michigan Department of Corrections*
  No. 5:13-cv-14356-RHC-RSW
  United States District Court, Eastern District of Michigan,
  Southern Division

- o *Robertson v. Struffert, et al*
  Case 4:12-cv-04698-JSW
  United States District Court, Northern District of California
  Declaration March 16, 2015
  Deposed May 4, 2015
  Case settled, October 2015

- o *Commonwealth of Virginia v. Reginald Cornelius Latson*
  Case No: GC14008381—00
  General District Court of the County of Stafford
  Report January 12, 2015
  Pardon granted

- o *Star v. Livingston*
  Case No: 4:14-cv-03037
  United States District Court, Southern District of Texas,
  Houston Division
  Report March 3, 2015

7

o   *Redmond v. Crowther*
        Civil No. 2:13-cv-00393-PMW
        United States District Court, Central Division,
        State of Utah
        Report April 28, 2015
        Deposed July 28, 2015

o   *Doe v. Johnson*
        Case 4:15-cv-00250-DCB
        United States District Court for the District of Arizona

o   *Flores v. United States of America*
        Civil Action No 14-3166
        United States District Court, Eastern District of New York
        Report August 14, 2015

o   *Bailey v. Livingston*
        Civil Action No. 4:14-cv-1698
        United States District Court, Southern District of Texas,
        Houston Division
        Report August 5, 2015
        Deposed December 2, 2015

o   *Rasho v. Godinez*
        Civil Action No. 07-CV-1298
        United States District Court, Central Division of Illinois,
        Peoria Division

o   *Morgal v. Williams*
        No. CV 12-280-TUC-CKJ
        United States District Court for the District of Arizona

o   *Williams v. Snohomish County*
        Case No. 15-2-22078-1 SEA
        Superior Court for the State of Washington, King County

o   *Sacramento County*
        Retained to evaluate conditions for mentally ill inmates
        in Sacramento County jail

Exhibit 5

Harold J. McElhinny*
Kevin M. Coles*
Elizabeth G. Balassone*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
Email: HMcElhinny@mofo.com
Email: KColes@mofo.com
Email: EBalassone@mofo.com

Attorneys for Plaintiffs

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)*

Additional counsel listed on next page

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe #1; Jane Doe #2; Norlan Flores, on behalf of themselves and all others similarly situated, | Case No. 4:15-cv-00250-TUC-DCB |
| Plaintiffs, | **DECLARATION OF JOSEPH GASTON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| Jeh Johnson, Secretary, United States Department of Homeland Security, in his official capacity; R. Gil Kerlikowske, Commissioner, United States Customs & Border Protection, in his official capacity; Michael J. Fisher, Chief of the United States Border Patrol, in his official capacity; Jeffrey Self, Commander, Arizona Joint Field Command, in his official capacity; Manuel Padilla, Jr., Chief Patrol Agent-Tucson Sector, in his official capacity, | |
| Defendants. | |

97

Colette Reiner Mayer*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304-1018
Telephone: (650) 813-5600
Facsimile:  (650) 494-0792
Email:  CRMayer@mofo.com

Louise C. Stoupe*
Pieter S. de Ganon*
MORRISON & FOERSTER LLP
Shin-Marunouchi Building, 29th Floor
5-1, Marunouchi 1-Chome
Tokyo, Chiyoda-ku  100-6529, Japan
Telephone: +81-3-3214-6522
Facsimile: +81-3-3214-6512
Email:  LStoupe@mofo.com
Email:  PdeGanon@mofo.com

Linton Joaquin*
Karen C. Tumlin*
Nora A. Preciado*
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, CA  90010
Telephone: (213) 639-3900
Facsimile:  (213) 639-3911
Email:  joaquin@nilc.org
Email:  tumlin@nilc.org
Email:  preciado@nilc.org

Mary Kenney*
Emily Creighton*
Melissa Crow*
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, D.C. 20005
Telephone: (202) 507-7512
Facsimile:  (202) 742-5619
Email:  mkenney@immcouncil.org
Email:  ecreighton@immcouncil.org
Email:  mcrow@immcouncil.org

Travis Silva*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO
BAY AREA
131 Steuart Street, Suite 400
San Francisco, CA  94105
Telephone: (415) 543-9444
Facsimile:  (415) 543-0296
Email:  tsilva@lccr.com

Victoria Lopez (Bar No. 330042)**
Daniel J. Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)**
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ  85014
Telephone: (602) 650-1854
Facsimile:  (602) 650-1376
Email:  vlopez@acluaz.org
Email:  dpochoda@acluaz.org
Email:  jlyall@acluaz.org

Attorneys for Plaintiffs

*Admitted pursuant to Ariz. Sup. Ct. R. 38(a)*
*\*\* Admitted pursuant to Ariz. Sup. Ct. R. 38(f)*

I, JOSEPH GASTON, hereby declare:

1.   I am an eDiscovery Analyst at the law firm of Morrison & Foerster LLP and counsel of record for Plaintiffs in this litigation.  I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify thereto.

2.   I have been employed at Morrison & Foerster LLP since October 2012.  In my role, I regularly perform data analysis on projects within the Litigation Department. Prior to my position at Morrison & Foerster LLP, I was a data analyst at SFL Data (now Discovia) and the law firm of Coblentz, Patch, Duffy, & Bass LLP.

## I.   INTRODUCTION

3.   I was asked by Plaintiffs' counsel to analyze data produced by Defendants in a native Excel spreadsheet, Bates stamped as USA000653, titled "USBP e3 Detention Module Fields for Apprehensions Booked Into TCA Facilities, Booked in 6/10/15 - 9/28/15, *Data includes Deportable Aliens Only*, Data Source: EID (Unofficial) as of 10/7/15" (the "e3DM Spreadsheet").  I understand that the spreadsheet purports to be a production of data from Defendants' logging system "e3DM," that includes various data points for civil detainees held in a U.S. Customs and Border Protection facility within the Tucson Sector of the U.S. Border Patrol booked from June 10, 2015 to September 28, 2015 (the "Relevant Time Period").  This spreadsheet contains nearly half a million rows of records.

4.   The e3DM spreadsheet title indicates that it pertains to "Deportable Aliens Only."  I understand that Defendants did not provide any explanation why records associated with all other detainees, including U.S. citizens, were omitted.

5.   I also reviewed the document produced by Defendants, Bates stamped as USA000654-665 with the heading "Statistical Information – Information Redacted From USA000653 Pursuant to 8 U.S.C. 1367" (the "e3DM Supplement").[1]  I understand this

---

[1] All exhibit references in this declaration are to an Appendix of Exhibits In Support of Plaintiffs' Motion for Preliminary Injunction.

spreadsheet purports to be a supplemental production of data from Defendants' e3DM logging system, which omits certain information Defendants allege to be protected from disclosure under federal law.

6.      I reviewed the document produced by Defendants, in conjunction with the production of this spreadsheet, titled "e3 Detention Module Custodial Action Codes," Exhibit 96, that provides "Action Descriptions" for the "Action Codes" in the e3DM Spreadsheet.

7.      I reviewed the document produced by Defendants, Exhibit 119, that defines the column headings in the e3DM Spreadsheet.

8.      I also reviewed another document produced by Defendants, Exhibit 192 at USA002184, titled "Station Abbreviations," that explains the abbreviations for each facility listed in the "Station" column of the e3DM Spreadsheet.

9.      I am informed that, although there are more than two dozen different facilities indicated in the "Station Abbreviations" column, this lawsuit specifically challenges conditions at facilities within the Tucson Sector of the U.S. Border Patrol: Ajo, Brian A. Terry, Casa Grande, Douglas, Nogales, Sonoita, Tucson/TCC, and Willcox stations (collectively, the "Tucson Sector Stations").

10.      I understand that Defendants also produced a native Excel spreadsheet, Bates stamped USA000699 with the heading "USBP e3 Detention Module Detention Cell, Booked in 6/10/15 – 9/28/15" (the "EID Spreadsheet").  I understand this information purports to be a production of data from Defendants' "Enforcement Integrated Database" ("EID"), a Department of Homeland Security shared common database repository in which information related to the investigation, arrest, booking, detention, and removal of individuals encountered by U.S. Customs and Border Protection is maintained.  I understand that the spreadsheet produced contains information regarding the last known holding cell in which individuals are detained while in Border Patrol custody.

11.     I also understand that Defendants did not preserve comprehensive records regarding other Hold Rooms in which each detainee was held.  It was therefore impossible to calculate from the data how many detainees were in any given Hold Room at one time.

12.     The e3DM Spreadsheet, e3DM Supplement and EID Spreadsheet are voluminous and would likely span hundreds of thousands of pages if printed.  I understand the spreadsheets were produced by Defendants and thus my analysis of the data contained in those spreadsheets can easily be verified by Defendants by reviewing the documents already in their possession.

## II.     e3DM SPREADSHEET ANALYSIS

13.     As explained below, my initial quality control work for the e3DM Spreadsheet  and e3DM Supplement resulted in 277,009 unique log entries and 17,006 unique Alien file Numbers, for individuals held in a U.S. Customs and Border Protection facility within the Tucson Sector of the U.S. Border Patrol during the Relevant Time Period (June 10, 2015 to September 28, 2015).  Each of these 17,006 unique individuals were booked into at least one of the 8 "Tucson Sector Stations" (defined as Tucson/TCC, Casa Grande, Douglas, Nogales, Willcox, Sonoita, Ajo and Brian A. Terry (Naco) stations).  Defendants withheld most of the data associated with 14 of these 17,006 detainees on the basis that federal law protects these records from disclosure.  For instance, the data produced does not indicate one way or the other whether these 14 individuals were provided meals, mats, personal hygiene items or other supplies.  Therefore, much of my analysis below reflects only the 16,992 individuals for whom full records were produced.

14.     The analysis below reflects only records from the Relevant Time Period.

### A.     Sector-Wide Analysis

15.     I performed the following analysis of the e3DM Spreadsheet data across the Tucson Sector of the U.S. Border Patrol.

16.     I observed, however, that the e3DM Spreadsheet included some rows of data related to facilities outside of the Tucson Sector of the U.S. Border Patrol.

17.     Based on my review of the e3DM Spreadsheet, the rows of data relating to facilities outside of the Tucson Sector appeared to be associated with individuals who were held at facilities both inside and outside of the Tucson Sector of the U.S. Border Patrol during the course of their detention(s).

18.     I used the "Station Abbreviations" provided in the "Station" column of each row of data to determine there were 24,046 rows related to facilities outside of the Tucson Sector of the U.S. Border Patrol.  That is 8.681% of the 277,009 unique log entries.  In addition to the 8 relevant Border Patrol stations, the e3DM spreadsheet also included records from Border Patrol stations from other Border Patrol Sectors as far away as Louisiana.  These stations included Baton Rouge, Calexico, Del Rio, Eagle Pass, El Centro, Falfurrias, Kingsville, Lordsburg, McAllen, Three Points, Yuma, and Welton Stations.  Records were also included from various Border Patrol checkpoints and points of entry, both in and out of the Tucson Sector geographical area.  Upon analysis of the e3DM data, it was determined that records from these facilities outside of Border Patrol's Tucson Sector were invariably related to detainees who at some point during their time in CBP custody, were brought to one of the 8 relevant Border Patrol stations.

19.     The sector-wide analysis of various time periods detailed below incorporates these out-of-sector records.  For example, according to the e3DM data produced by Defendants, starting on September 1, 2015, one detainee was held for 7.783 hours in the El Centro Station (which I am informed and believe to be located in California), then moved to the Del Rio Station (which I am informed and believe to be located in Texas) for 10.25 more hours of holding, then moved to the Tucson Sector Tucson Coordination Center for 20.8 more hours of holding.  My Sector-wide analysis would reflect that this detainee was held in CBP custody for a total of 38.833 hours.

### i.     Hours in Detention

20.     The following table represents the number of detainees held in CBP custody during the Relevant Time Period for more than the various numbers of hours listed in the

first column, as well as the corresponding percentages relating to the total number of unique individuals held in CBP Custody during the same Relevant Time Period:

| Table 1 | | |
| --- | --- | --- |
| **Time in Detention** | **Number of Detainees** | **Percentage of 17,006 Total Detainees** |
| 12 hours or more | 14,021 | 82.447% |
| 24 hours or more | 6,541 | 38.463% |
| 36 hours or more | 2,841 | 16.706% |
| 48 hours or more | 1,064 | 6.257% |
| 72 hours or more | 157 | 0.9% |

21.    The figures in Table 1 were calculated from the difference between the timestamp of the initial "In_BP_Station" action code and the final "Book_Out_DT" timestamp for a specific detainee, and the corresponding "EVENT_NUMBER" value reported.  These detainee-specific timestamps and the associated "EVENT_NUMBER" are analyzed to calculate length of detainment time, and the resulting value is defined as a single "Detainment Event."  Individuals held in CBP custody more than once for each of the various numbers of hours listed in the first column are only counted once when calculating the respective percentages in the third column.

22.    I observed that a significant number of individuals were recorded to have been in CBP custody on more than one occasion during the Relevant Time Period.  While only 17,006 individuals were detained during this period, there were 20,145 "Detainment Events," associated with those individuals.  The reason for the higher number of Detainment Events is not clear from the e3DM spreadsheet.  These individuals could have been apprehended more than once, or transferred to and from different U.S. government agencies before returning to CBP custody.  Table 1 does not reflect the fact that some individuals are associated with multiple Detainment Events.  Table 1.1, however, does

reflect the number of "Detainment Events" where any individual was detained for the various number of hours listed in the first column:

| Table 1.1 | | |
|---|---|---|
| **Time in Detention** | **Number of Detainment Events** | **Percentage of 20,145 Total Detainment Events** |
| 12 hours or more | 15,782 | 78.342% |
| 24 hours or more | 6,881 | 34.157% |
| 36 hours or more | 2,891 | 14.351% |
| 48 hours or more | 1,069 | 5.307% |
| 72 hours or more | 157 | 0.779% |

23.　　Table 1.1 reflects the number of hours each detainee was held on every occasion of detainment.  For example, if a detainee were confined for 12 hours, released, then subsequently apprehended and detained for another 12 hours, Table 1 would only count that detainee once, in the "12 hours or more" category.  Table 1.1 would instead count two Detainment Events, each under the category of "12 hours or more."  Thus, Table 1.1 more accurately reflects the hours of confinement a detainee is held on each occasion under CBP custody.

24.　　The difference between Table 1 and Table 1.1 also indicates that within the Relevant Time Period detainees were held more than once on over 3000 occasions.  This indicates that a significant number of detainees experience the hold rooms more than once.

### ii.　　Provision of Sleeping Mats

25.　　For all detainees held in U.S. Border Patrol custody over this time period, there are only 122 detainees who reportedly received a sleeping mat.  That is 0.7% out of the 16,992 unique Alien file Numbers identified in the e3DM Spreadsheet.

26.　　To calculate this figure, I searched for any occurrence in the "DA_COMMENT_TEXT" column of terms related to sleeping mats: "bed," "foam" or

"mat" (with an exclusion for "mat wit," which I observed meant "material witness"). I isolated those results and expunged the irrelevant hits to form a preliminary list of records indicating that a mat had been provided. I then did a visual check of the rows not isolated in my initial search with "DA_COMMENT_TEXT" entries for any other notes or remarks which might indicate that a mat had been provided and added any relevant records to the preliminary list.

### iii. Provision of Showers

27.     For all detainees held in U.S. Border Patrol custody over this time period, there are only 115 detainees who reportedly received a shower. That is 0. 677% of the 16,992 total number of individuals identified from the e3DM Spreadsheet.

28.     To calculate this figure, I searched for any occurrence in the "DA_COMMENT_TEXT" column for the term "shower." Following that text search, I also did a visual search for any other text related to showers on the remaining rows.

29.     I also searched for any occurrence of the "SHWRP" action code (defined as "Shower Provided").

### iv. Provision of Dental Care Supplies

30.     For all detainees held in U.S. Border Patrol custody over this time period, there are only 1,642 detainees who reportedly received provision of some dental care supplies, including toothbrush or toothpaste. That is 9.663% out of the 16,992 unique Alien file Numbers identified from the e3DM Spreadsheet.

31.     To calculate this figure, I searched for any occurrence in the "DA_COMMENT_TEXT" column of terms related to dental care: "tooth," "teeth," or "brush." Following that text search, I also did a visual search for any other text related to dental care on the remaining rows.

### v. Provision of Feminine Hygiene Supplies

32.     For all detainees held in U.S. Border Patrol custody over this time period, there are only 93 detainees who reportedly received toilet paper or feminine hygiene

supplies. That is 0.5473% of the 16,992 unique Alien file Numbers identified from the e3DM Spreadsheet.

33. To calculate this figure, I searched for any occurrence in the "DA_COMMENT_TEXT" column of terms related to toilet paper or feminine hygiene supplies: "toilet paper," "feminine hygiene products," "feminine products," "maxi pad," "pad," and "pads." Following that text search, I also did a visual search for any other text related to toilet paper or feminine hygiene supplies on the remaining rows.

34. Regarding the provision of feminine hygiene supplies, I was not able to run analysis of the data limited by gender because the e3DM Spreadsheet does not have adequate data to determine the gender of any detainee.

### vi. Provision of Baby Supplies

35. For all detainees held in U.S. Border Patrol custody over this time period, there are only 208 detainees who reportedly received baby supplies. I calculated that there were 372 infants under the age of three held in U.S. Border Patrol custody over this time period.

36. To calculate the number of detainees who reportedly received baby supplies, I searched for any occurrence in the "DA_COMMENT_TEXT" column of terms related to baby supplies: "bottle," "diaper," "diapers," "formula," and "gerber," and "nido." Following that text search, I also did a visual search for any other text related to baby supplies on the remaining rows.

37. To calculate the number of infants held in U.S. Border Patrol custody over this time period, I searched for individual detainees where the difference in their "BIRTH_DT" (birth date) was three years or less from the timestamp of the initial "In_BP_Station" action code.

### vii. Provision of Food

#### a. Gap Time Between Food Offerings

38. For all detainees held in U.S. Border Patrol custody over this time period, the average gap time between reported food offerings to detainees was 5.056 hours.

39.     In calculating these figures, I considered both the "MLACC" action code (described as "Served meal(Accepted)") and "MLREF" action code (described as "Served meal(Refused)") as an incident of a detainee being offered food.

40.     I also observed that there were occurrences in the "DA_COMMENT_TEXT" where a detainee may have been offered food but those occurrences were not logged with an "MLACC" or "MLREF" action code.

41.     I searched for any occurrence in the "DA_COMMENT_TEXT" column of terms related to food: "food," "meal," "breakfast," "lunch," "dinner," "eat," "eating," "bean," "cheese," "milk," "drink," "drinking," "ate," "water," "juice," "formula," "gerber," "nido," "pedialyte," "electrolyte," "snack," "soup," "burrito," "burro," "animal crackers," and "crackers."

42.     My search resulted in 2,168 occurrences.  For example, "subject has blanket and snack requires nothing further at this time."  For the purposes of this analysis, I counted these log entries as an incident of a detainee being offered food.

43.     Accordingly, the average gap time between food was calculated either from 1) the difference between the timestamps of an "MLACC" action code (described as "Served meal(Accepted)"), an "MLREF" action code (described as "Served meal(Refused)"), or occurrences in the "DA_COMMENT_TEXT" field as described above; 2) the difference between the timestamps of an "MLACC" or "MLREF" action code or food-related occurrence appearing in the "DA_COMMENT_TEXT" and a final book out timestamp where no subsequent "MLACC" or "MLREF" action code or food-related "DA_COMMENT_TEXT" appeared; or 3) the difference between the initial book in timestamp and an initial "MLACC" or "MLREF" action code or food-related occurrence appearing in the "DA_COMMENT_TEXT" field.

44.     My analysis indicated that there were 6,719 instances of a gap extending 12 or more hours without an individual being offered food of any kind.

45.     There were 4,474 instances of such a gap extending 15 or more hours; 2,425 instances of such a gap extending 20 or more hours; and 1,400 instances of such a gap extending 24 or more hours.

### b.     Gap Time Between Meals (Burrito)

46.     For the Tucson Sector Stations, the vast majority of the 87,712 results from the food-related term search of the "DA_COMMENT_TEXT" column hit on terms related to three types of food: burritos, juice, and crackers.

47.     In order to isolate the incidents where a detainee was offered a burrito, I searched for any occurrence in the "DA_COMMENT_TEXT" column of terms related to burrito: "burrito," "burritos," and "burro."

48.     For all detainees held in U.S. Border Patrol custody during the Relevant Time Period, there were 52,382 instances logged, where a meal (burrito) was offered.

49.     For all detainees held in U.S. Border Patrol custody during the Relevant Time Period, the average gap time between burritos reportedly offered to detainees was 7.336 hours.

50.     The e3DM data produced by Defendants does not appear to reflect whether meals were offered upon arrest or during times of transport between different facilities. To my knowledge, Defendants have not produced any policies or procedures regarding the provision of meals during transit or between time of arrest and initial book in at a Border Patrol station.

### viii.     Provision of Medical Screening

51.     For all detainees held in U.S. Border Patrol custody over this time period, I did not identify any medical screening reportedly performed on a detainee.

52.     I did not observe any columns or action codes with definitions related to medical screening, either in the e3DM Spreadsheet itself or in the list of explanations, Exhibit 119.  I searched for any occurrence in the "DA_COMMENT_TEXT" column of terms related to medical screening:  "doctor", "emergency", "medical eval", "medical screen", "medical test", "medic", "hospital", "observation" and "ER".  Following that text

search, I also did a visual search for any other text related to baby supplies on the remaining rows.

53.     That search did not result in any hits for medical screening.

### ix.     Provision of Medical Treatment

54.     For all detainees held in U.S. Border Patrol custody over this time period, in one of the eight facilities in the Tucson sector described above, I identified 527 incidents of medical treatment reportedly provided to a detainee.

55.     I did not observe any columns or action codes with definitions related to medical treatment.  Next, I searched for any occurrence in the "DA_COMMENT_TEXT" column of terms related to medical treatment:  "complained", "complaining", "EMT", "headache", "health", "injured", "medication", "medicine", "meds", "pain", "pills", "prescribed", "treated", "treatment". Following that text search, I also did a visual search for any other text related to medical treatment on the remaining rows.

### B.     Station-by-Station Analysis

56.     I performed the following analysis of the e3DM Spreadsheet data for each of the Tucson Sector Stations.

### i.     Provision of Sleeping Mats

57.     The following table represents the number of detainees held in one of the Tucson Sector facilities who reportedly received a sleeping mat, compared to the total number of individuals identified from the e3DM Spreadsheet detained in each of these facilities over this time period:

| Table 2 | | | |
|---|---|---|---|
| Facility | Number of Detainees Provided Mats | Number of Total Detainees | Percentage |
| Casa Grande | 3 | 1,700 | 0.176% |
| Douglas | 84 | 3,909 | 2.149% |
| Tucson Sector Tucson Coordinating Center | 35 | 18,087 | 0.194% |

58.     To calculate this figure, I searched for any occurrence in the "DA_COMMENT_TEXT" column of terms related to sleeping mats: "bed," "foam," or "mat" (with an exclusion for "mat wit"). Following that text search, I also did a visual search for any other text related to sleeping mats on the remaining rows.

59.     Three facilities—Douglas, Nogales and Tucson Sector Tucson Coordinating Center —yielded results from these searches.

### ii.     Provision of Showers

60.     The following table represents the number of detainees held in one of the Tucson Sector Stations who reportedly received a shower, compared to the total number of individuals identified from the e3DM Spreadsheet detained in each of these facilities over this time period:

| Table 3 | | | |
|---|---|---|---|
| Facility | Number of Detainees Provided Shower | Number of Total Detainees | Percentage |
| Casa Grande | 20 | 1,700 | 1.176% |
| Douglas | 1 | 3,909 | 0.026% |
| Nogales | 2 | 4,457 | 0.045% |
| Tucson Sector Tucson Coordinating Center | 92 | 18,087 | 0.509% |

61.     To calculate this figure, I searched for any occurrence in the "DA_COMMENT_TEXT" column for the term "shower." Following that text search, I also did a visual search for any other text related to showers on the remaining rows.

62.     I also searched for any occurrence of the "SHWRP" action code (described as "Shower Provided").

63.     Four facilities—Casa Grande, Douglas, Nogales and Tucson Sector Tucson Coordinating Center —yielded results from these searches.

64.     Of the 115 instances where subjects were provided a shower, 74 were in CBP custody for at least 24 hours, 41 were in CBP custody for at least 48 hours, and 4 were in CBP custody for at least 72 hours.  Based on a comparison with a table of common Hispanic women's names, 15 were possibly females.  Seven were juveniles.

65.     To calculate the number of juveniles held in one of the Tucson Sector Stations this time period, I searched for individual detainees where the difference in their "BIRTH_DT" (birth date) was thirteen years or less from the timestamp of the corresponding "SHWRP" action code, or timestamp of a shower-related occurrence appearing in the "DA_COMMENT_TEXT" field.

66.     My analysis of the provision of showers suggested that at least some of the e3DM data produced by Defendants is unreliable.  For example, I understand that, during Plaintiffs' inspection of the Casa Grande station on September 9, 2015, CBP informed Plaintiffs' counsel that there were no shower facilities at Casa Grande.  However, the e3DM spreadsheet shows that, between June 10 and September 28, 2015, 20 showers were provided at that facility.  Upon closer examination, it appears that 19 of those 20 showers were provided at midnight on August 4, 2015.  The 20th shower was provided at 4:15 a.m. that same day. These factors indicate that the 20 records may be incorrect.

67.     Regarding the provision of showers, specifically to female subjects, I was not able to run analysis of the data limited by gender because the e3DM Spreadsheet does not have adequate data to determine the gender of any detainee.

### iii.     Provision of Food

68.     The following table represents the average gap time between meals reportedly offered to detainees in one of the Tucson Sector Stations over this time period:

| Table 4 | | | | |
|---|---|---|---|---|
| Facility | Meals Offered | Meals Accepted | Meals Declined | Average Meal Gap Time |
| Ajo | 676 | 670 | 6 | 3.355 |
| Brian A. Terry | 1,245 | 1,206 | 39 | 5.127 |
| Casa Grande | 2,715 | 2,690 | 25 | 3.855 |
| Douglas | 5,519 | 5,468 | 51 | 5.886 |
| Nogales | 2,193 | 2,165 | 28 | 2.959 |
| Sonoita | 456 | 456 | 0 | 2.211 |
| Tucson Sector Tucson Coordinating Center | 39,352 | 39,231 | 121 | 8.239 |
| Willcox | 226 | 216 | 10 | 4.130 |

69.    These figures were calculated in the same manner as described in Section viii above, but at the station-by-station level.

## III.    EID SPREADSHEET ANALYSIS

70.    I understand that the EID Spreadsheet (USA000699) includes records of the last known holding cell at each facility in which detainees were housed during the Relevant Time Period.  I also understand that records regarding any prior cells in which detainees were held has not been preserved.

71.    The EID Spreadsheet produced by Defendants does not include any data regarding the specific dates during which individuals were held in the holding cells listed.

72.    I was asked to calculate the number of detainees at Casa Grande Station during the Relevant Time Period who were last held in Cell 6.  By filtering the "DC_Station column" for "CAG_S" and the "DCL_CELL_NM" column for any field containing the text "Cell 6," I calculated that no fewer than 34 individuals were last held in Cell 6 during the Relevant Time Period:

| Table 5 | | |
|---|---|---|
| **DC_STATION** | **DCL_CELL_NM** | **Detainee Count** |
| CAG_S | Cell 6 | 22 |
| CAG_S | Cell 6_1507 | 3 |
| CAG_S | Cell 6_4778 | 9 |

## IV.    METHODOLOGY

### A.    e3DM Spreadsheet

73.    Upon my initial review of the e3DM Spreadsheet, I observed that the document contained 498,387 rows of data, with an associated date range of October 6, 2014 to October 7, 2015.  As explained below and based on my review, it is my understanding that each row purports to represent a discrete event logged for a detainee held in BP custody.

74.    I implemented a variety of quality control measures before performing analysis on the data.  I discovered that a significant number of rows in the e3DM Spreadsheet were duplicates of other rows.  To remove the duplicate rows, I engaged in the following process:  First, I sorted the rows into chronological order.  Then, I used a text editing program to locate rows that contained identical information in the first twenty-five columns of the e3DM Spreadsheet.  Once identified, I removed those duplicate rows.

75.    I also observed that the e3DM Spreadsheet included rows that were outside of the Relevant Time Period.  I observed that records outside the Relevant Time Period invariably pertained to individuals who were also detained at some point during the Relevant Time Period.  When I searched the number of records on each day outside the Relevant Time Period, I found that these records were dramatically fewer than the records for each day inside the Relevant Time Period.  I understand that Defendants were only ordered to produce e3DM data for detainees held during the Relevant Time Period.  Considering all these factors, I concluded that the data from outside the Relevant Time period was not comprehensive (i.e., the majority of records from those dates had been omitted from the e3DM Spreadsheet produced by Defendants).  Because the records

113

outside the Relevant Time Period appeared largely incomplete and unreliable for
statistical analysis, I applied a date filter to include only rows with an associated date
range of June 10, 2015 to September 28, 2015 (the Relevant Time Period).  I created this
filter based on the data in the "Action_DT" (action date) and "Book_Out_DT" (book out
date) columns.

76.  After deduplication and date filtering, there were 277,009 rows of data in
the e3DM Spreadsheet.

77.  Because each row purports to represent a discrete event logged for a
detainee, I then searched for all unique "ALIEN_FILD-NBRs" (defined as Alien file
Numbers) to attempt to determine the number of individuals captured in the e3DM and
e3DM Supplemental Spreadsheets.  That search resulted in 17,006 unique Alien file
Numbers.  This number includes the 14 anonymous individuals who were listed in the
Supplemental e3DM Spreadsheet (Ex. 97) and whose records were largely withheld.

78.  In performing my analysis on this data, I observed a common workflow for
processing detainees that included rows logging the following events listed in the
"Actions" column of the e3DM Spreadsheet:

- "Arrest"
- "In_BP_Station" – when detainee arrived at Border Patrol station
- "In_Transit" – if detainee was transported from one station to another
- "In_BP_Station" – following any "In_Transit" action code
- Custodial action codes while a detainee was in a facility, including:
  - "MLACC" – served meal, accepted
  - "MLREF" – served meal, accepted
  - "SHWRP" – shower provided

79.  In my review of the e3DM Spreadsheet, I did not observe unique rows that
contained data logging the date and time a detainee was booked out of Border Patrol
custody ("Book_Out_DT").  Instead, the "Book_Out_DT" information was somehow

entered into a field in a subsequent column of the row logging the "In_BP_Station" action code.

### B. Supplemental e3DM Spreadsheet

80.     I implemented the same quality control measures for the Statistical Information – Information Redacted from USA000653 Pursuant to 8 U.S.C. 1367 spreadsheet ("supplemental e3DM Spreadsheet").

81.     Upon my initial review of the supplemental spreadsheet, I observed that the document contained 402 rows of data.

82.     I deduplicated the rows by sorting them into chronological order and used a text editing program to locate rows that contained identical information in the first twenty-five columns of the supplemental spreadsheet.

83.     I also applied a date filter to include only rows with an associated date range of June 10, 2015 to September 28, 2015.

84.     After deduplication and date filtering, there were 216 rows of data in the supplemental spreadsheet.

85.     I also identified 14 unique Alien file numbers, suggesting that the 216 records pertained to 14 different individuals.

## V.    ADDITIONAL DOCUMENTS RELIED UPON

86.     Exhibit 78 is a true and correct copy of a document produced by Defendants on or about August 24, 2015, Bates labeled USA000001-004, which purports to be a list of all logs required to be produced under the Court's August 14, 2004 Order.  The document provides a description of Defendants' Enforcement Integrated Database (EID), the e3 application through which Border Patrol records information specific to individual detainees, and the e3DM Detention Module, which "maintains information related to individuals who are detained in BP custody."  (Ex. 78 at USA000003.)

87.     Exhibit 82 is a true and correct copy of a document produced by Defendants on or about September 4, 2015, Bates labeled USA000119-122, which purports to be a CBP Memorandum dated September 24, 2012 with the subject heading:  "Use of the e3

Detention Module," which requires as of October 1, 2012 that "usage of the e3 Detention Module (e3DM) by all field elements will be mandatory for all transfers out of U.S. Border Patrol custody and inter-sector/station transfers." (Ex. 82 at USA000121.) The memorandum also states that "Due to the importance that Congress, DHS and CBP place on the integrity of data returned from all information technology systems, it is imperative that all data be as complete and accurate as possible" and requires "each sector will establish local protocols for using the module[.]" (*Id.*)

88.    Exhibit 86 is a true and correct copy of a document produced by Defendants on or about September 4, 2015, Bates labeled USA000321, which purports to be a CBP Memorandum dated October 8, 2013 with subject heading "Use of the Updated e3 Detention Module," which states that "all Chief Patrol Agents will ensure that the updated e3DM is used to the fullest extent to capture the custodial actions and transportation for all detainees." (Ex. 86 at USA000321.)

89.    Exhibit 193 is a true and correct copy of a letter dated October 16, 2015 from Plaintiffs' counsel requesting that Defendants "produce the manual or instructions for inputting and storing [e3DM] data through the e3 application and e3DM module so that [Plaintiffs] can understand how Border Patrol creates and maintains these records, and the nature of the data reflected in those records." (Ex. 193 at 1.)

90.    Exhibit 194 is a true and correct copy of a letter dated October 23, 2015, received by Plaintiffs' counsel, wherein Defendants "decline to produce those additional materials, if any exist" in reference to the e3DM manual or instructions requested in Exhibit 193. (Ex. 194 at 1.)

91.    Exhibit 96 is a true and correct copy of a document produced by Defendants on or about October 9, 2015, Bates labeled USA00652, entitled "e3 Detention Module Custodial Action Codes," which purports to explain "Action Codes" appearing in Defendant's e3DM data. (Ex. 96.)

92.    Exhibit 97 is a true and correct copy of a document produced by Defendants on or about October 12, 2015, Bates labeled USA000654-665 and entitled "Statistical

1   Information – Information Redacted From USA000653 Pursuant to 8 U.S.C. 1367,"

2   which purports to include partial detainee records that were omitted from Defendants'

3   original production of e3DM data.  (Ex 97 at USA000654.)

4       93.    Exhibit 119 is a true and correct copy of Bates labeled USA002184-2186

5   produced by Defendants on or about November 6, 2015 and purports to provide

6   descriptions of column headings in the e3DM data spreadsheet, USA00653.  This

7   document was previously produced, Bates labeled USA00700-020.

8       94.    Exhibit192 at USA002184, on November 13, 2015, Defendants produced a

9   second document Bates labeled USA002184, which purports to explain station

10   abbreviations in the e3DM data spreadsheet (USA000653).

11       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

12   is true and correct.

13       Executed this 4th day of December, 2015.

14

15                     JOSEPH GASTON

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am

employed in the County of Los Angeles, State of California. My business address is

256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On January 3, 2017 I electronically filed the following document(s):

- **PLAINTIFFS' EXHIBITS 1 - 5 TO PLAINTIFFS' SUPPLEMENTAL RESPONSE IN
  SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND APPOINT A SPECIAL
  MONITOR**

with the United States District Court, Central District of California by using the

CM/ECF system. Participants in the case who are registered CM/ECF users will be

served by the CM/ECF system.

/s/___*Peter Schey*_____
*Attorney for Plaintiffs*

iv