1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4        HONORABLE DOLLY M. GEE, JUDGE PRESIDING

5                        ---

6

7

8    **JENNY L. FLORES,**                      )
                                               )
9                                              )
                                               )
10                   Plaintiff,                )
                                               )No. 85-4544DMG
11            VS                               )
                                               )
12   **LORETTA E. LYNCH**, et al.,             )
                                               )
13                                             )
                     Defendants.               )
14   _____)

15

16          Reporter's Transcript of Proceedings
                     Motion Hearing
17               Los Angeles, California
              FRIDAY, SEPTEMBER 16, 2016
18

19

20

21

22
             ANNE KIELWASSER, CRR, RPR, CSR
23            Federal Official Court Reporter
             312 North Spring Street, Room 432
24            Los Angeles, California 90012
               Telephone: (213) 894-2969
25             anne.kielwasser@gmail.com
                    AKtranscripts.com

```
1                    A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4    Carlos Holguin
     Center For Human Rights & Constitutional Law
5    256 South Occidental Boulevard
     Los Angeles, CA 90057
6    Tel:  213-388-8693
     Fax:  213-386-9484
7    E-mail:  Crholguin@centerforhumanrights.org

8

9

10   ON BEHALF OF THE DEFENDANT:

11

     Sarah B Fabian
12   US Department of Justice
     Office of Immigration Litigation
13   PO Box 868 Ben Franklin Station
     Washington, document 20044
14   Tel:  202-532-4824
     Fax:  202-305-7000
15   E-mail:  Sarah.b.fabian@usdoj.gov

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1   FRIDAY, SEPTEMBER 16, 2016                    11:00 A.M.

 2                          ~ ~ ~

 3                 P R O C E E D I N G S

 4                          ~ ~ ~

 5        COURT CLERK:  Calling Item No. 2.  CV 85-4544DMG.

 6   Jennie L. Flores versus Loretta E. Lynch, et al.

 7             Counsel, your appearances please.

 8        MR. HOLGUIN:  Good morning, Your Honor.  Carlos

 9   Holguin on behalf of plaintiffs, Jenny Flores, et al.

10        THE COURT:  Good morning.

11        MS. FABIAN:  Good morning, Your Honor.  Sarah

12   Fabian on behalf of the government defendants.

13        THE COURT:  Good morning.

14             Counsel, I apologize for the delay.  The

15   previous hearing lasted longer than I expected.

16             And as you can see, I don't have a tentative

17   ruling for you today.  I have more questions than answers at

18   the moment.  So, perhaps I can get some clarification from

19   counsel on some of the questions that I have.

20             Mr. Holguin, will you be speaking on behalf

21   of plaintiffs?

22        MR. HOLGUIN:  Yes, Your Honor.

23        THE COURT:  All right.  Would you take your place

24   at the lectern?

25             I'm trying to understand the scope of your
```

UNITED STATES DISTRICT COURT

4

1    motion.  Is this going to affect all children who are

2    unaccompanied?  In other words, are all unaccompanied minors

3    subject to paragraph 24(a) even if they're, for example, held

4    in nonsecure facilities?

5           **MR. HOLGUIN:**  Yes, they are, Your Honor.

6           **THE COURT:**  Because the declarations all have

7    been -- sound like they're -- all the people who are

8    mentioned in the declarations are held in secure facilities.

9           **MR. HOLGUIN:**  That's correct, Your Honor.  The

10   paragraph applies regardless of the level of security in

11   which the class member is being held.  But as a practical

12   matter, the majority of the cases that have come to the class

13   counsel's attention has been problematic, have involved those

14   minors who are placed in a secure facilities.

15          **THE COURT:**  All right, but in the practical

16   sphere, as people are out there dealing with these issues,

17   your contention is that either a child who is unaccompanied

18   in a secure facility or a nonsecure facility would still be

19   detained in the sense that, such that they would be able to

20   seek a bond hearing; is that correct?

21          **MR. HOLGUIN:**  That's correct, Your Honor.

22              I think that there is a correspondence

23   between the facts and the need for relief.  It seems that in

24   most of the cases where class members have been held in

25   secure facilities and been denied release, it's been done on

```
1    the grounds that they appear to be dangerous or perhaps a
2    flight risk.  When minors are placed in nonsecure facilities
3    or licensed facilities, there tend to be fewer issues around
4    flight risk or dangerousness to impede their release.
5              So, we're -- as a practical matter, I think
6    we're talking mostly about minors who are being held in
7    secure facilities, although the paragraph applies without
8    restriction to all minors.
9              THE COURT:  Okay.  And the paragraph that is 24(a)
10   does refer to children who are in removal proceedings.  Am I
11   to understand that children are in removal proceedings as
12   soon as they're arrested?  Or when does the removal
13   proceedings get triggered?
14             MR. HOLGUIN:  According to the regulations,
15   they're supposed to be issued an NTA, a notice to appear,
16   within 48 hours of arrest.  I think in most cases that
17   probably happens once they are NTA, as it's commonly termed,
18   that is the initiation of the removal process.
19             THE COURT:  The NTA is?
20             MR. HOLGUIN:  Notice to appear.
21             THE COURT:  Okay.  All right.
22             MR. HOLGUIN:  Back in the day we used to call it
23   order or OSC, but now it's an NTA.
24             THE COURT:  Okay.  And that is -- but for
25   practical purposes, when removal proceedings are triggered.
```

1          **MR. HOLGUIN:**  Yes.

2          **THE COURT:**  And even if someone has an asylum

3    petition, for example, or some other reason why they think

4    their status should be adjusted, they would still be in

5    removal proceedings; it's just that they would respond to the

6    removal proceedings by asserting a request for asylum or some

7    other argument?

8          **MR. HOLGUIN:**  That is generally the case with

9    respect to defense as to removal; however, in the case of

10   minors, and if there is an asylum application that is

11   tendered, then the law provides that there to be -- given an

12   asylum interview before an asylum officer outside of an

13   adversarial process.

14              And if you look at the factual materials that

15   we've filed, Hector Boteo is one of the minors who was

16   affirmatively applied for asylum, even though he's in a

17   removal proceeding, and was taken in shackles from Yolo

18   County to the San Francisco asylum office for his asylum

19   interview.

20         **THE COURT:**  All right.  But when that happens,

21   they're still within the jurisdiction of the Office of Refuge

22   Resettlement; is that correct?

23         **MR. HOLGUIN:**  Yes, they are, Your Honor.

24         **THE COURT:**  So, how many unaccompanied minors

25   would you estimate are held in secure facilities?

```
 1              MR. HOLGUIN:  We get reports from that, and there
 2     appears to be about, oh, 2- to 300 at any given time.  I'd
 3     have to check that, but that would be an estimate.
 4              THE COURT:  Are you talking about in the Ninth
 5     Circuit or in the country?
 6              MR. HOLGUIN:  In the country.
 7              THE COURT:  And after the TVPRA was enacted, was
 8     there still a period of time when there were bond hearings
 9     pursuant to the Flores agreement?  Or did it stop
10     immediately?
11              MR. HOLGUIN:  It did not stop immediately.
12              There has been a gradual progression of
13     tightening up on the access to bond hearings.  Immigration
14     judges in different parts of the countries have been -- have
15     struggled with -- with determining whether they have
16     jurisdiction or not.
17              We always believed that the BIA was a viable
18     option since it had ruled on two -- two occasions that their
19     immigration judges did have jurisdiction, and it wasn't until
20     Ms. Cooper's case, who's here with me today, when the BIA
21     definitely ruled that it was not going to provide an
22     administrative remedy for class members who were denied
23     release.
24              THE COURT:  That was the 2016 decision.
25              MR. HOLGUIN:  Correct.
```

```
 1              THE COURT:  But you're saying that prior to that
 2    there were some other BIA decisions that suggested otherwise?
 3              MR. HOLGUIN:  Yes.  Prior to --
 4                    There's two of them that are cited in our
 5    brief.  They are unpublished opinions, but they do affirm
 6    that IJs did have jurisdiction to review -- or are custody
 7    decisions, which was the state of the law as far as we knew
 8    it until Ms. Cooper's case, 2016.
 9              THE COURT:  I see.  So, it sounds like it was --
10    has been kind of broiling around in the immigration court's
11    world as to what the actual rule has been.
12              MR. HOLGUIN:  Yes, Your Honor.
13              THE COURT:  And different jurisdictions have been
14    coming down differently, depending on who the immigration
15    judge was.
16              MR. HOLGUIN:  That's correct.
17              THE COURT:  All right, thank you.
18                    Ms. Fabian?  I have some questions for you as
19    well.
20                    I know that the government's argument is that
21    the TVPRA supersedes the Flores agreement; but when I read
22    the TVPRA, I don't see anything in the statute that
23    specifically addresses the issue of bond hearing.  It talks
24    about placement, which sounds different to me than the
25    question of detention which is sort of the threshold issue of
```

1    whether they should be detained in the first place.

2            **MS. FABIAN:**  Your Honor, I think the way -- the

3    way to look at it is the framework that's been created by the

4    TVPRA.  So, what 24(a) says in the agreement is that it would

5    provide a bond redetermination hearing.

6            And that's a very specific type of hearing,

7    and it is when -- at the time the INS and now DHS makes a

8    bond determination, which is what is done for individuals who

9    are in discretionary DHS and then INS custody, that -- that

10   then immigration judges have the authority to do a bond

11   redetermination hearing of those custody decisions.

12           That's -- that's the framework that existed

13   in 1997, and that's the framework in which bond

14   redetermination hearings can be provided.

15           So, we have -- once we have the TVPRA, it

16   sets up an entire framework that governs the custody of UACs,

17   and so -- and UACs is Unaccompanied Alien Children, which is

18   the -- the term that --

19           **THE COURT:**  Yes, I understand.

20           **MS. FABIAN:**  -- used for simplicity's sake.

21   The -- those --

22           Those UACs are required to go into the

23   custody of HHS, and HHS is required to do a number of things

24   under 1232, I believe it's (c)(3), suitability assessments

25   and such that -- that must be made and must be conducted

```
 1   before those minors can be released to a custodian.  There is

 2   no -- and -- and --

 3              You know, we'd look at -- even the Flores

 4   Supreme Court decision recognized minors can't just be

 5   released on their own without a custodian.

 6         THE COURT:  That's very true, and I don't think

 7   there is any suggestion on my part that they can be.

 8              My question has to do with:  What in the

 9   actual language of the TVPRA tells us that it supersedes the

10   existing law with regard to bond hearings?

11              The existing law, for example, in 1226 is

12   very specific about bond hearings, and it uses language

13   pertinent to bonds and what the minimum amount of bond is, et

14   cetera.

15              The TVPRA talks in terms of placement.  That

16   tells me that it's talking about where the child should be

17   placed, which facility.  That doesn't seem to address the

18   issue of detention and whether or not they should receive a

19   bond hearing or, for that matter, any kind of -- some

20   semblance of due process review of whether they should be in

21   detention or not.

22              I don't see that in the TVPRA, but perhaps

23   you can tell me I've missed some language that suggests that

24   there is some kind of due process proceeding.

25         MS. FABIAN:  Well, Your Honor, what I would say is
```

```
1    that the TVPRA, when you look at the legislative history of

2    the TVPRA that we noted in our brief, there is a suggestion

3    that it was developed to create -- to create a system to

4    govern the custody and release of UACs.

5              And so, I would say that that states an

6    intention to create the entirety of the system and the

7    TVPRA --

8              The TVPRA is not part of the INA.  And so

9    when you're talking about the 1226 --

10             What the TVPRA did was take this custody and

11   release procedures entirely outside of the INA.

12             So, while I agree, I can't point to a

13   language that would specifically say:  This is intended to --

14   to replace those procedures or to overrule Flores

15   specifically, I don't have that language.  But I would say by

16   creating a new system, a new framework --

17             THE COURT:  Scheme.

18             MS. FABIAN:  Exactly, that would govern this

19   custody and release determination, placing that entirely in

20   the hands of HHS, it -- it -- I mean, practically, just to

21   point to a few difficulties -- so, HHS doesn't appear in

22   immigration courts.  DHS doesn't represent HHS, and I'm going

23   to use too many acronyms here.

24             THE COURT:  Well, the Health and Human Services,

25   which is what we're referring to as HHS, it does say in the
```

1    TVPRA that it must coordinate with the other agencies.  That

2    would seem to imply that there is some coordination that is

3    available such that the provisions of the TVPRA can coexist

4    comfortably with the concept of a bond hearing, in that the

5    IJ, the immigration judge would determine whether or not

6    there should be a bond, and then the HHS would still have the

7    ability to determine what is a suitable placement for the

8    child.

9           **MS. FABIAN:**  And, Your Honor, I think that the --

10   the problem with that is, there's a number of practicalities

11   and sort of jurisdictional issues that arise with creating a

12   framework like that.

13              As I noted before, so, immigration judges

14   do -- and I think -- and maybe Your Honor has already

15   anticipated this -- immigration judges can only determine

16   flight risk and dangerousness.

17              And so, certainly, the immigration judge

18   can't actually assess or -- or -- or HHS's decision to

19   release or their placement decisions.  They would be limited

20   to a very small area.  There would be no representation then

21   of HHS's custody and release decisions in the immigration

22   court.  Though, if we have --

23              I think what you're suggesting --

24              And this is -- this was actually the BIA

25   decision of 2006 that Mr. Holguin referred to, I believe it's

1    the 2006 decision, it was --

2                    So, it seems to me that the BIA at that time

3    was -- was a little split, but they -- they did sort of

4    propose a system, as Your Honor is suggesting, where the

5    immigration judge might assess flight risk and dangerousness,

6    and HHS would still assess the actual custody decision.

7                    The thing is that the custody decision is --

8    is sort of intricately tied to the release decision.  So that

9    HHS is required to do certain things under the TVPRA to make

10   certain assessments in determining whether a minor can be

11   released to the -- to the proposed custodian.  And so we're

12   talking --

13                   And, unfortunately, I don't have the numbers

14   that Your Honor asked for either.  My client, HHS, tells me

15   that it's a very small number of individuals who ultimately

16   are not released to a custodian and may stay in the secure,

17   staff secure facilities which are the -- sort of the two

18   levels.

19                   But -- but that -- the reason for those are

20   going to be always sort of intricately tied to a number of

21   different factors.  And so, I mean, if you -- if you posit

22   the example of an immigration judge finding that an

23   individual is not a danger based on the factors that HHS

24   considered, HHS still has to look at that and say -- for

25   example, if a child has -- has a drug problem that, you know,

```
 1   HHS might assess that that child has a criminal history

 2   that's related -- or, you know, criminal propensities related

 3   to this drug problem, that might be able to be dealt with by

 4   the proper custodian.

 5            And there might be a custodian out there that

 6   could say:  I can get this child into the proper treatment

 7   program, and then HHS would be able to make the suitability

 8   determination to release the minor.

 9            In a different case where there is no

10   custodian, that could be found that might be able to

11   adequately deal with that sort of drug problem, the

12   dangerousness -- now, it would be maybe a dangerous analysis,

13   but it's always going to be tied into the suitability of the

14   custodian.

15            THE COURT:  What would be the problem if you had a

16   situation like the one with the declarant, Sandra Igihozo

17   from Rwanda?  She had an IJ determination, bond determination

18   hearing in 2013.  The immigration judge found that she did in

19   fact have authority to review the bond redetermination but

20   not the placement and care of the minor.

21            MS. FABIAN:  Well, I think that's sort of exactly

22   the situation that -- that -- if --

23            If we set up that framework, I think -- or

24   still has to make all of the same assessments --

25            THE COURT:  Yes, I'm not saying it can't.  I'm
```

1    just saying what would be the problem with being able to have

2    at least some due process review of a detention relating to

3    the specific issues that judges would have the authority to

4    review, and yet the HHS would still retain its authority and

5    responsibility to determine placement.

6              **MS. FABIAN:**  Your Honor, with all due respect, I

7    think it would just be a -- to waste the resources of all of

8    the agencies evolved.

9              If the immigration judges are making an

10   assessment, they're not going to be able to consider any of

11   the factors that OR has to consider.  So, any rulings by an

12   immigration judge as to flight risk and dangerousness, is, A,

13   it has no -- it has -- there's no jurisdiction for them to

14   then tell HHS to release.  It has -- it has no authority over

15   HHS's decision.

16             So, if the immigration judges make a bond

17   redetermination, it -- even if we were to say HHS could

18   consider that, it is made in a framework that's entirely

19   outside of all the considerations that HHS is making.

20             **THE COURT:**  Well, some people have described due

21   process as a waste of time, but I don't think it is.

22             We have some declarants here who have been

23   held in detention for well over six months.  You're asking me

24   to construe the statute in the way that potentially could

25   result in indefinite detention without any due process

```
 1   review.
 2              MS. FABIAN:  Well, Your Honor, I would say that,
 3   I'm not -- I don't --
 4                   An immigration judge is not going to be
 5   providing due process with regard to ORR's custody decisions.
 6   Immigration judge is not going to be reviewing that decision.
 7   An immigration judge would make an entirely independent
 8   decision.  HHS would not appear.  HHS's position on custody
 9   would not be presented in the immigration judge hearing.
10              THE COURT:  Given that the TVPRA says that the HHS
11   can coordinate with other branches of -- or the other -- the
12   other agencies, what would prevent it from actually appearing
13   at a bond hearing and giving its views of what it thinks are
14   appropriate?
15              MS. FABIAN:  I think there is no -- there is no
16   regulation or statute that --
17                   HHS simply does not appear in immigration
18   court.  I would question whether plaintiffs would want to
19   start setting up a framework.
20                   Part of the idea of the TVPRA is that HHS
21   custody is entirely separate from the immigration
22   proceedings.  But HHS is not -- is interested -- their focus
23   is in the best interest of the child, and they're not
24   involving themselves in the immigration proceeding.
25                   The only part of the process that I
```

```
 1    understand is that, to -- a custodian is given a notice of

 2    their requirement to ensure that the child appears in

 3    immigration court.  But that's not -- HHS doesn't follow up

 4    to ensure that, you know, for purposes that the child is then

 5    taken by the custodian to immigration court.

 6                 So, I don't think that it's in the best

 7    interest of anyone to create a system where HHS and VHS are

 8    working more in concert --

 9         THE COURT:  Well, I'm not trying to create

10    anything; I'm just trying to understand what the statute is

11    telling us.  And what I'm grappling with is a statute that is

12    completely silent about bond hearings.

13                 There is a provision called the Savings

14    Clause that says that all agreements remain in effect unless

15    it's superseded by operation of law.

16                 And the law in that area as to whether a

17    contract is superseded by operation of law usually talks

18    about wether the law addresses the specific issue that is in

19    question.

20                 And while the TVPRA does create a new scheme

21    that is sort of all-encompassing in a way, it's very

22    conspicuously silent about bond hearings; and given the law

23    in the circuit that you're probably familiar with, such as

24    Rodriguez versus Hayes, Robbins, Casas-Castrillon, Diouf,

25    those all imply that there are potentially constitutional
```

1    issues if I construe the statute in a way that does not allow

2    for any due process hearing.

3              **MS. FABIAN:**  Well, Your Honor, I would -- I would

4    say that in fact the TVPRA did create some level of due

5    process in review within HHS for secure placements.  The

6    statute specifically says that the assistant secretary -- or

7    that the secretary of HHS will create review determinations

8    for minors who are placed in secure --

9              **THE COURT:**  And how does that work in practical

10   terms?

11             **MS. FABIAN:**  The -- A -- once -- once a decision

12   is made, the proposed custodian can challenge --

13                  Well, for individuals who are placed in

14   secure facilities, there is just the regular review by the

15   assistant secretary that's made to ensure that the secure

16   placement remains the best placement for the child.

17             **THE COURT:**  What does that mean exactly?  Is

18   that -- does that just mean that a representative of health

19   and human services department checks in and looks around and

20   sees whether or not the facilities look suitable, or is there

21   actually like a, some kind of give-and-take with the child or

22   the child's attorney?

23             **MS. FABIAN:**  There is ongoing review.  So, the

24   child is receiving ongoing services.  They're going to be

25   having sort of ongoing services within the facility.

```
 1   Those -- if there are changes in the child's behavior,
 2   changes in the child's -- even their relationship to --
 3               I think it's all going to remain sort of in
 4   concert with the custody determination.
 5               So, for example, there are situations where a
 6   child in secure placement might be able to be stepped down
 7   rather than initially released to their parent, they might be
 8   stepped down to a less secure facility that's close to their
 9   parent so that the -- the agency can -- the -- the child can
10   spend some time with the parents, the agency can sort of
11   assess that relationship and give further review of whether
12   that's going to be a suitable custodian situation.
13           THE COURT:  What if the child or his or her
14   representative disagrees with the HHS's determination, what
15   then?
16           MS. FABIAN:  A parent or a guardian can file --
17   send a letter -- I believe it's by sending a letter to the
18   assistant secretary, and they will -- there will be a further
19   review of that custody decision -- the custody determination.
20           THE COURT:  Is that pursuant to CFR, or is that in
21   the TVPRA itself?
22           MS. FABIAN:  That is the -- there's -- it's a --
23               I don't believe it's actually published
24   regulations, but it is in the published procedures by the
25   agency.
```

1             I believe they were put on line in 2015, but

2    these are the -- this is -- but they -- but they are older

3    than that.  This is the --

4             So, where the TVPRA told the agency to -- to

5    set up these procedures, the agency has done so.

6        **THE COURT:**  Can you provide the Court with a copy

7    of that?

8        **MS. FABIAN:**  I believe that Mr. Holguin actually

9    attached it as one of the exhibits.

10       **THE COURT:**  Where is it?

11            It's not a CFR, though.

12       **MS. FABIAN:**  It's not.  It is Exhibit 5 to

13   Mr. Holguin's --

14            I haven't looked all the way to ensure that's

15   the complete set, but if it's not, I can file something

16   supplemental with the -- with the link or the --

17       **THE COURT:**  Okay.  And are you contending that

18   that sort of satisfies the due process procedure?

19       **MS. FABIAN:**  Well, Your Honor, what I would say is

20   that, if -- if the question is, are HHS's procedures applying

21   proper due process, I would -- the government would dispute

22   that the Flores settlement agreement is -- is in a motion to

23   enforce the Flores settlement agreement is the proper venue

24   to raise that challenge.

25       **THE COURT:**  I understand, and I'm not suggesting

```
 1   that they're raising an affirmed due process claim.  I'm

 2   talking about the canon of constitutional avoidance; that is,

 3   you're asking me to construe the statute in a certain way to

 4   supersede the Flores contract.  I'm trying to figure out

 5   whether I can construe it in the way that you wish me to

 6   without running afoul of the Constitution.

 7                    That's different than saying that I'm going

 8   to adjudicate a claim on the constitutionality of the

 9   statute.

10           MS. FABIAN:  Well, we would contend that HHS's

11   procedures are -- are --

12           THE COURT:  I'm trying to avoid the Constitutional

13   issue.

14           MS. FABIAN:  I understand, Your Honor.  And --

15   and --

16                    What I would say is, we do contend, although

17   we haven't argued in our briefs, because we don't -- we don't

18   believe that that's the analysis that needs to be made.

19                    I think if -- if the case were to be raised,

20   do we believe HHS has provided sufficient due process, we do;

21   but I think more, we would say, when the statute was enacted,

22   there is no doubt that the TV -- that the individuals who

23   drafted the TVPRA, had -- had seen Flores.

24                    There are many aspects of Flores that were

25   implemented within the TVPRA.  They stated that they were
```

```
1   creating a structure that would provide oversight into the
2   care and custody of these minors.  They did not carry over
3   bond redetermination hearings which were an aspect of
4   immigration custody with the service.
5                  Instead, they took all care and custody
6   decisions, placed them with HHS, and stated different
7   procedures that -- according to Congress at the time then
8   provided the due process that would be provided to
9   unaccompanied minors.
10                 So, I think --
11      THE COURT:  Well, that's not exactly what the
12  statute says though.  The statute doesn't explicitly say it
13  supersedes bond hearings.
14          MS. FABIAN:  I think that bond redetermination
15  hearings are a very specific thing.  They're not -- the
16  statement --
17                 I mean, this Court, plaintiffs, the Ninth
18  Circuit, all have said we have to look very carefully at the
19  four corners of the agreement and what is required.
20                 What is required in the agreement is bond
21  redetermination hearings which are a very specific thing that
22  are only provided pursuant to very specific regulations, and
23  that is when the immigration authorities, the INS then now
24  DHS, make a bond decision, it can be redetermined by an
25  immigration judge.  And that authority is only given to the
```

1    immigration judge under very specific relations.

2            THE COURT:  Are there no bond determinations ever

3    made now with regard to unaccompanied children?

4            MS. FABIAN:  There are not.  That is not -- there

5    is -- there's simply no authority for an immigration judge to

6    conduct a bond hearing or a bond redetermination hearing of a

7    decision that was not made by the immigration authority

8    related to bond.

9            HHS does not issue bonds.  It has never

10   issued bonds to my knowledge.  There is simply no bond

11   determination made by HHS for there to be a bond

12   redetermination hearing.

13           THE COURT:  How did -- how did it arise, then,

14   that Sandra, the one that I mentioned earlier, received a

15   bond redetermination hearing?

16           MS. FABIAN:  I'm not sure which case --

17           THE COURT:  The child from Rowanda.  Sandra

18   Igihozo, I-G-I-H-O-Z-O.  She requested a review -- I believe

19   she requested a review of the ORR's *no release* decision and

20   $20,000 bond.

21           MS. FABIAN:  There -- actually -- I correct

22   myself.  I am aware of -- of a recent decision, and maybe

23   that's the one.  I thought it was the one that was then

24   recently overturned by the BIA's 2016 decision.

25           There were individuals recently who have been

```
 1    requesting bond hearings from immigration judges.  And as

 2    Mr. Holguin acknowledged, there was not case law from the BIA

 3    that specifically addressed it.

 4                   So, there may have been instances prior to

 5    2016, prior to the most recent decisions where immigration

 6    judges issued orders requiring release on bond.

 7            THE COURT:  All right, but I'm asking about the

 8    step before that.  How did Ms. Igihozo receive a *no release*

 9    decision and a $20,000 bond?

10            MS. FABIAN:  I can only surmise that that was two

11    separate --

12                   If -- if she received a *no release* decision

13    from ORR, there wouldn't have been a bond determination

14    attached to that.  I am aware of a situation.  I -- I just

15    can't say if it's this one where a minor did also at the same

16    time -- because most of these minors are in immigration

17    proceedings; and so if they appear before the immigration

18    judge and request a bond hearing, certainly without -- prior

19    to the guidance recently issued by the BIA, a child might

20    have been given -- an immigration judge might have decided

21    that he or she did have authority to issue a bond decision.

22                   However, that bond decision -- and I -- I

23    assume that would be the case from this individual, she's

24    plaintiff in this case, that that would have no impact on

25    HHS's custody redetermination.  It's simply in that other
```

1    framework that doesn't apply to what HHS does here.  And that

2    is what has been cleared up by the BIA in their most recent

3    2016 decision.

4         **THE COURT:**  Well, under your -- your

5    interpretation of the TVPRA and the BIA's latest

6    determination of what is appropriate under the TVPRA,

7    wouldn't children have less due process protection than

8    adults do?

9         **MS. FABIAN:**  No, Your Honor.  I think, first of

10   all, the children benefit from all of the -- the sort of

11   entirety of the TVPRAs.  As Mr. Holguin acknowledged, the

12   majority of children are -- they come into HHS custody --

13        **THE COURT:**  Well, I'm not talking about the

14   majority of children.  A lot of times here, as Mr. Holguin

15   pointed out, there is going to be a small number of people

16   who are probably going to be affected by this, since there

17   are only 200 to 300 nationwide who are detained in secure

18   facilities.

19              But we have examples of people who have been

20   detained for long periods of time, more than six months.

21   That seems to be somewhat problematic.

22        **MS. FABIAN:**  Well, I mean -- I would --

23        **THE COURT:**  Without a hearing.

24        **MS. FABIAN:**  All of those individuals are

25   receiving regular review by an agency unrelated to

1    immigration, not concerned with their immigration status

2    or -- well, their status governs their UAC status.  But --

3    so, they are receiving regular review.  And I -- I -- I would

4    say, and -- and -- and I -- I know Your Honor has

5    acknowledged this, but if -- if those procedures are not

6    providing sufficient due process, then that is a separate

7    claim that needs to be raised as a separate -- a separate

8    lawsuit.

9              But HHS, they are receiving regular review,

10   and -- and the -- they -- sort of the fact that -- the reason

11   they cannot be treated by -- like adults, is that they have

12   to be released to someone.  So, the part of that -- it --

13   it --

14             Part of that analysis has to be:  Do we have

15   a custodian who can take care of this child?

16        **THE COURT:**  Right, and I acknowledge that HHS

17   still has the responsibility to make that determination.

18   Not surprising --

19             I'm not suggesting that they should be

20   deprived of that ability to make the determination of

21   placement.  The question is whether there should be a due

22   process hearing in which an IJ can determine the detention

23   decision as a threshold.  Does this person seem to be a

24   flight risk or a danger to himself or others?

25        **MS. FABIAN:**  The immigration judge making that

1    decision would -- would simply have no impact on the due

2    process that is still -- needs to be under the TVPRA,

3    conducted by HHS.

4                   And so to the extent the question is:  Would

5    an immigration judge hearing provide additional due process

6    to these individuals, I think the answer is no because

7    it's -- it's simply a separate -- it's a decision being made

8    in an entirely separately framework that can't -- it -- it

9    may be then considered by HHS.  It may provide one more piece

10   of evidence or piece of the puzzle for HHS to consider.

11                  But if -- even if -- if the immigration

12   judge -- judge says this child is not a flight risk, but HHS

13   says there is simply no custodian, the custodian who's

14   applied simply is not competent to care for this minor for a

15   number of reasons.  We've conducted various health -- mental

16   health screenings, and we don't believe that this custodian

17   can care for this minor, then that -- there's -- that

18   immigration judge's decision will not have -- will not be

19   able to impact that decision that still has to be made under

20   the TVPRA by HHS.

21             **THE COURT:**  All right, let me hear from

22   Mr. Holguin in response to that.  That is sort of a practical

23   concern.

24                  Perhaps you can address two issues that have

25   been raised by Mr. -- by Ms. Fabian.  No. 1, that there is

1    not a determination of a bond to begin with; so, therefore,

2    there can't be a bond redetermination hearing.

3          And, second, that is it sort of a -- is it a

4    wasted procedure to have an immigration judge look at the

5    detention issue if the DHHS still has final word on where

6    that child has to be placed?

7         **MR. HOLGUIN:**  Okay, Your Honor, with respect to

8    the first, if you look at the regulation that talks about

9    what goes on in a bond redetermination hearing, it is called

10    a bond redetermination hearing; but a big part of the bond

11    redetermining hearing is determining whether the custody,

12    whether the individual should remain in custody, this is

13    custody or release.

14         So, an immigration judge does not merely

15    review the amount of bond that ICE has set for an individual,

16    but it also reviews whether there ought to be any bond

17    required at all.

18         If ICE says we just think this person is too

19    dangerous to release, an immigration judge refuses that

20    custody decision as well.

21         **THE COURT:**  Is that -- are those children given

22    that determination in all situation?

23         **MR. HOLGUIN:**  Well, no, Your Honor.  That's the

24    problem, is that in -- in the case of --

25         If you look at the case of Hector Boteo we

1   have here, he's -- he's been a year in -- in government

2   custody.  He has yet to receive a decision either that he

3   cannot be released to his mother or that he should be

4   released to his mother.

5               He's left essentially twisting in the wind

6   for a year now, wondering what's going to happen.  He's told

7   at the beginning, you know, maybe in about a month we'll let

8   you out.  We're doing some psychological evaluations and so

9   forth.  He's told that's fine, psychological evaluations

10  should come out fine.  We've evaluated your mother, she seems

11  fine --

12             **THE COURT:**  But hasn't there been a decision for

13  him that he is to be in detention?

14             **MR. HOLGUIN:**  No, Your Honor.  There has been no

15  decision.

16             **THE COURT:**  So, he's just been in fact in

17  detention but not formally told.

18             **MR. HOLGUIN:**  Correct, correct.  He has never been

19  given any reason, formally told:  This is the reason why

20  we're not releasing you, presented with the evidence that's

21  justified his continued detention for a year now.  No

22  evidence that has been shown to him about the unsuitability

23  of his mother, that he's dangerous, that he's a flight risk

24  or anything else.  He's simply left there to twist in the

25  wind.

1          And this is not due process.  This is clearly

2  something that was contrary to what the intent of the TVPRA

3  was, which was to improve procedures, improve the treatment

4  for these minors.

5          Now, turning to your -- to Your Honor's

6  second question.  This -- this distinction between what

7  immigration judges typically review, dangerousness and flight

8  risk, versus the suitability of the custodian has been in

9  existence since this agreement was -- was -- was signed.

10  The --

11          If you look at the agreement itself, it says:

12  The INS need not release a minor to any adult or a custodian

13  to -- that it believes might harm or neglect the minor.  But

14  the two end issues of *dangerousness* and *flight risk* need to

15  be reviewed by an immigration judge.

16          Now, when -- when -- when the government

17  submits that, you know, that HHS doesn't have any interest in

18  looking at what's going on with *flight risk* or dangerousness,

19  that's just not true.

20          The TVPRA requires them to look at those --

21  at those issues.  And in the cases that we brought to the

22  Court's attention, the children are being detained but it's

23  not because their custodians are not suitable but because the

24  agency apparently -- and although in only one case do we have

25  an actual written decision on this; in Hector Boteo's case we

1    don't even have that much -- the government seems to believe

2    that the children are too dangerous to be released.

3                  And yet there is never -- they're never shown

4    any evidence as to what supports that determination.  They're

5    not allowed any kind of a hearing where they can present

6    rebuttal evidence, they're not -- they're not entitled to --

7                  In fact, they're not even entitled to the --

8    the ORR's own procedure which is senate subcommittee, it's

9    called Making Policy on the Fly, doesn't even recognize that

10   the juveniles who are being detained have any interest, any

11   interest at all in their -- in their release or detention.

12   It's only the parents.

13                  And other custodians don't have any ability

14   even to each write a letter to the person that -- that is

15   supposedly at ACH that's going to review this thing.  There

16   is no allocations of burdens to proof.

17                  If you go to an immigration judge, it'd have

18   to be *clear and convincing evidence* of *dangerousness* or

19   *flight risk*.  ORR doesn't have any of that.

20                  It -- it does not want to adhere to the

21   immigration paradigm, which is an immigration judge decision,

22   where there's rules, there's transparency, they barely look

23   at evidence.  It does not want to look -- it does not want to

24   adhere to the child welfare paradigm.

25                  Where in every situation, at every

1    jurisdiction in this country, if a child is going to be

2    detained, you better believe there is going to be a hearing

3    and there is going to be due process.

4                     So, what we have here is the worst of both

5    worlds.  If you happen to be an accompanied child who has

6    someone to speak for you, you get a bond hearing.  But if

7    you're an unaccompanied child and you go to an ORR, then

8    you're allowed to twist in the wind without ever knowing.

9                     And we've had child after child tell us, you

10   know, the staff has been telling us, we're -- *I'm going to be*

11   *released soon, I'm going to be released soon*.  Only at the

12   last minute to be told:  We changed our mind.  Well, who's

13   changed -- who's changed their mind?  And why?  No

14   explanation.

15                    So, this is -- this is working irreparable

16   harm on children who have already been very, very

17   traumatized.  If you look at the declaration of Hector Boteo,

18   he spent three years, three years, kidnapped in the

19   custody of -- kidnapped in Mexico, witnessed the rape of his

20   sister, was returned to Guatemala, who was again abused,

21   finally makes to the United States, and now for a year he

22   spends in ORR in Yolo County, where he describes it as

23   "prison like conditions," and never knowing, never having an

24   opportunity to contest why he's being held in that situation.

25              **THE COURT:**  Now, let's address the practicalities

```
 1    of how this works in this current scheme for a moment.  Let's

 2    say that you do have a bond hearing, and the immigration

 3    judge says:  I think that there should be a bond; it will be

 4    set at $5,000.  You can stay with your mother.  Then what if

 5    the HSS says:  No, your mother is not a suitable place for

 6    you to be?

 7              MR. HOLGUIN:  Well, Your Honor, then the issues

 8    have been narrowed, correct?  We're not holding children

 9    because they're too dangerous or because they're too flight

10    risk, we're holding them because the custodian is not a fit

11    custodian.

12              THE COURT:  So, then they would be placed in

13    nonsecure facility?

14              MR. HOLGUIN:  Well, I --

15              THE COURT:  Potentially?

16              MR. HOLGUIN:  -- I would certainly think that that

17    would -- I would argue for placement in a -- in a less secure

18    setting.  Those issues are clearly rated.  And -- but the --

19    the advantage of having this happen, which is what the

20    parties bargained for, and this was the same thing that

21    existed in the time that this agreement was signed, is that

22    you -- what you end up doing then, is say, okay, the

23    custodian is not suitable.  Let's find another custodian.

24              THE COURT:  So, then you go through the list of --

25              MR. HOLGUIN:  Exactly, exactly.
```

34

1          **THE COURT:** -- priorities --

2          **MR. HOLGUIN:** Exactly.

3          **THE COURT:** Paragraph 14?

4          **MR. HOLGUIN:** Yes, Your Honor.  That's exactly

5 right, yes, Your Honor.

6               But you're not stopping your search, you're

7 not stopping your efforts to find suitable placement because

8 you think this child is too much of a *flight risk* or too

9 dangerous.

10              And that's what the parties bargained for,

11 and that's a substantial advantage to any of these children

12 including the advantage that you pointed out, which is, you

13 know:  If an immigration judge doesn't think I'm dangerous,

14 why am I in this secure facility?

15              Now, if you look at the other case that we've

16 cited, a Bryan Ortiz, I mean, he languishes in ORR custody,

17 he turns 18, he goes to ICE, he gets a bond redetermination.

18 Immigration judge says:  *I don't think you're dangerous; I*

19 *don't think you're a flight risk.*  And he's out.

20              Whatever the ORR thought about him before he

21 turns 18, all of a sudden -- as a juvenile, he's too

22 dangerous to release -- and all of a sudden when he turns 18,

23 he's no longer that dangerous.

24              So, it's this kind of arbitrary freakishness

25 that's -- that's really at the heart of this, Your Honor.

1               And the truth of the matter is that if the

2    government feels that there is some kind of real impediment,

3    practical or otherwise in providing these children bond

4    redetermination hearings, it's free to ask the Court to

5    modify the settlement to address any particular conflicts.

6    But throwing out the baby with the bath water is not really

7    an option.

8               **THE COURT:**  Perhaps you or Ms. Cooper could

9    eliminate the situation involving Ms. -- I keep forgetting

10   her last name -- Igihozo.

11              **MR. HOLGUIN:**  My -- my --

12              **THE COURT:**  How did she end up with a 200 -- or a

13   $20,000 bond?

14              **MR. HOLGUIN:**  My understanding, Your Honor, was

15   that the immigration judge declined to exercise jurisdiction.

16   The immigration judge said:  *I wish I could review this, I*

17   *wish I had jurisdiction over this, but I don't believe I do;*

18   *therefore, I'm not going to review that -- I'm not going to*

19   *redetermine the bond.*

20              So, we've had these kind of conflicting

21   signals from immigration judges, as I said --

22              **THE COURT:**  No, I thought she said she should be

23   released but that she can't make a determination on the

24   placement and care of the minor.

25              **MR. HOLGUIN:**  Correct, correct, yes.

1         **THE COURT:**  So -- but the review that was

2 requested was -- the immigration judge was asked to review

3 the ORR's no release decision and a $20,000 bond.

4         **MS. FABIAN:**  Correct.

5         **THE COURT:**  That's what I don't understand.  How

6 did the $20,000 bond arise?

7         **MR. HOLGUIN:**  My understanding is that ICE placed

8 that upon her when it -- before it transferred custody to

9 ORR.

10         **THE COURT:**  Okay.  But Ms. Fabian says that they

11 no longer do that for children.  Is that correct?

12         **MR. HOLGUIN:**  Well, I think for the most part that

13 is correct.  Now, in this case where ICE imposes a bond to

14 begin with, and then the minor is transferred to ORR, I

15 believe under the TVPRA, ORR would have the authority to say:

16 No, we -- we're going to release without requiring that kind

17 of a bond.  But I think that there is this -- the

18 confusion --

19         I mean, the -- the --

20         When the Ninth Circuit reviewed this -- this

21 Court's decision on -- on the family detention policy, it

22 said, you know: *We don't really think that changing the*

23 *bureaucracy ought to have a substantial impact on compliance*

24 *with this settlement.*

25         And this is really the same sort of thing

```
1    that we're dealing with here.  They can work together.  They

2    can figure it out, and -- but -- but they should not be

3    permitted to simply detain minors at infinitum, indefinitely,

4    without providing them a meaningful opportunity to be heard.

5              THE COURT:  All right.  Thank you.

6                   This matter will stand submitted.  But before

7    I let you leave, I would like to ask you what the status of

8    your settlement conference has been, with -- because there is

9    a hearing coming up in October, I believe.

10             MS. FABIAN:  Yes, Your Honor.

11                  I'll just go to the lectern, make it easier.

12                  Yes, Your Honor.  Settlement talks terminated

13   yesterday.  I don't believe there will be a settlement.  I

14   don't believe there will be a partial settlement with --

15                  Having heard Your Honor, I understand that

16   that was -- Your Honor is urging to the parties, but at

17   this -- at this time we may have one further discussion here,

18   if that's a possibility, but I don't --

19             THE COURT:  The last time I had you folks here, I

20   was told that you had a reached substantial agreement on a

21   large number of issues and that there only remained a couple

22   of issues that were a problem, and I had said:  Well, even if

23   that's the case, why can't you narrow down the issues and

24   agree on what you can agree on.  What happened to that?

25             MS. FABIAN:  I understand, Your Honor.  And there
```

```
 1    was a lot of progress made.  I think -- I think the parties
 2    reached an agreement on a lot of -- of issues.  There were
 3    some sticking points, and I think those sticking points
 4    made -- at least for my client, I can't speak for
 5    plaintiffs -- unwilling to settle partial -- partially settle
 6    the issues, but -- that remained.
 7               THE COURT:  Given the nature of this dispute which
 8    relates to how much light is in the room, whether people can
 9    lay down, whether there is toothpaste, whether there's this,
10    that.
11               I mean, are you serious that you're going to
12    ask me to decide those issues?  I can't -- I mean, it's
13    outrageous that you folks have been at this for two months,
14    and you've reached agreement on a substantial number of the
15    issues, and now you're going to throw the entire agreement
16    out the window because you can't agree on two of the items?
17               MS. FABIAN:  I understand, Your Honor.  And you
18    sound exactly like Judge King.  That's where --
19               THE COURT:  Well, probably because it doesn't make
20    any sense.
21               MS. FABIAN:  I understand.  That's -- that's where
22    the parties are at this time.  There is --
23               I think it highlights the complications of --
24    of interpreting what is sort of a vague settlement agreement
25    and trying to institute more specific terms.  But at this
```

```
 1    time, the parties haven't been able to agree on specific
 2    terms that would be able to be added to the agreement or made
 3    into a new settlement agreement.
 4            THE COURT:  So, it's another thing to be thrown
 5    into my lap, then.
 6            MS. FABIAN:  And I apologize, Your Honor, and I'm
 7    sorry that it's that way but --
 8            THE COURT:  Well, I'm not -- I'm not concerned
 9    because I have to do more work.  What I'm concerned about is
10    that instead of resolving something that should be resolved,
11    involving issues that relate to people's daily maintenance
12    and -- and care, we're going to have a full-blown hearing and
13    briefing on these subjects and then an appeal and God knows
14    how many years later are we going to have a resolution of
15    this matter about some very basic issues.
16                 I can't believe that the parties don't think
17    that it makes sense to resolve these issues rather than have
18    a litigation over these kinds of picayune issues.
19            MS. FABIAN:  I understand, Your Honor.  I think
20    from my client's perspective, we believe that we are
21    providing all of these things, that we had made great strides
22    in providing those things.  So, since Your Honor's order,
23    that we are monitoring them as Your Honor has ordered us to
24    do, and that there is really no cause for there to be a
25    second motion here on these issues.
```

```
1                        So, I understand Your Honor's frustration,
2       but I think at this stage that -- that we were -- that's
3       where we are on this settlement issue.
4                   THE COURT:  All right.  Well, I -- I guess then
5       the hearing in October will go forward.
6                   MS. FABIAN:  Your Honor, can I ask for
7       clarification?  And I -- I had hoped to speak to plaintiff's
8       counsel last night, but we missed each other.  Mr. Schey.
9                        Is -- is that to be an issue -- a hearing on
10      the legal issues, and then with -- with --
11                       I know we have a pending motion for an
12      evidentiary hearing.  I imagine we can conduct that in one
13      day.
14                  THE COURT:  Well, I had sort of put that on hold
15      in the hopes that you folks will have resolved some, if not
16      all of the issues.  So, I guess I'm going to need you to get
17      together and file a status report as to what remains to be
18      decided.
19                  MS. FABIAN:  Okay, Your Honor.  We'll do that.  Do
20      you have a date by which you'd like that, or should we just
21      do it as soon as possible?
22                  THE COURT:  Well, since you're here, perhaps you
23      can meet and confer with opposing counsel and file a joint
24      status report within one week.
25                  MS. FABIAN:  We'll do that, Your Honor.
```

```
 1              THE COURT:  Is the hearing -- the next hearing on
 2   October 7th?
 3              MS. FABIAN:  It's October 6.  So, it's a Thursday.
 4              THE COURT:  October 6th.
 5              All right, well, if there is to be an
 6   evidentiary hearing, it's probably likely that we may have to
 7   have the evidentiary hearing first before we have a hearing
 8   on the ultimate issues.
 9              MS. FABIAN:  Your Honor -- and I would say that
10   plaintiff's counsel had left me a message last night.  I
11   think we have had some talks about deciding this.  I think
12   what we could try to sort of parse out what are the legal
13   issues and what are the factual issues, and maybe if there is
14   a preference or an easier way, we would suggest that those be
15   decided.  Our position would, I think, be that there are some
16   legal issues that could be decided first, but I'll confer
17   with him and --
18              THE COURT:  Well, I think I pointed that out last
19   time, which is maybe you can avoid having a whole bunch of
20   evidentiary issues if you can just assume for the sake of
21   argument that certain facts are true, and then I'll decide
22   the legal issue.
23              MS. FABIAN:  I think we both agree that's true,
24   and we just haven't had time to finalize what exactly those
25   are.  So, I'll do my best to talk to him as much as I can
```

1    this week and get something to you.

2              **THE COURT:**  All right, thank you.

3                   All right, thank you.  The matter will stand

4    submitted.

5              COURT CLERK:  This Court is adjourned.

6              (Court adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2     I hereby certify that the foregoing is a true and correct

 3     transcript of the stenographically recorded proceedings in

 4     the above matter.

 5     Fees charged for this transcript, less any circuit fee

 6     reduction and/or deposit, are in conformance with the

 7     regulations of the judicial conference of the United States.

 8

 9

10     /S/Anne Kielwasser                  01/26/2017

11     _____        _____
       Anne Kielwasser, CRR, RPR, CSR      Date
       Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$20,000** [5] - 23:20, 24:9, 35:13, 36:3, 36:6
**$5,000** [1] - 33:4

## /

**/S/Anne** [1] - 43:10

## 0

**01/26/2017** [1] - 43:10

## 1

**1** [1] - 27:25
**11:00** [1] - 3:1
**1226** [2] - 10:11, 11:9
**1232** [1] - 9:24
**14** [1] - 34:3
**16** [2] - 1:17, 3:1
**18** [3] - 34:17, 34:21, 34:22
**1997** [1] - 9:13

## 2

**2** [2] - 3:5, 7:2
**200** [2] - 25:17, 35:12
**20044** [1] - 2:13
**2006** [2] - 12:25, 13:1
**2013** [1] - 14:18
**2015** [1] - 20:1
**2016** [7] - 1:17, 3:1, 7:24, 8:8, 23:24, 24:5, 25:3
**202-305-7000** [1] - 2:14
**202-532-4824** [1] - 2:14
**213** [1] - 1:24
**213-386-9484** [1] - 2:6
**213-388-8693** [1] - 2:6
**24(a** [3] - 4:3, 5:9, 9:4
**256** [1] - 2:5

## 3

**300** [2] - 7:2, 25:17
**312** [1] - 1:23

## 4

**432** [1] - 1:23
**48** [1] - 5:16

## 5

**5** [1] - 20:12

## 6

**6** [1] - 41:3
**6th** [1] - 41:4

## 7

**7th** [1] - 41:2

## 8

**85-4544DMG** [2] - 1:10, 3:5
**868** [1] - 2:13
**894-2969** [1] - 1:24

## 9

**90012** [1] - 1:24
**90057** [1] - 2:5

## A

**A.M** [1] - 3:1
**ability** [3] - 12:7, 26:20, 31:13
**able** [10] - 4:19, 14:3, 14:7, 14:10, 15:1, 15:10, 19:6, 27:19, 39:1, 39:2
**abused** [1] - 32:20
**access** [1] - 7:13
**accompanied** [1] - 32:5
**according** [2] - 5:14, 22:7
**ACH** [1] - 31:15
**acknowledge** [1] - 26:16
**acknowledged** [3] - 24:2, 25:11, 26:5
**acronyms** [1] - 11:23
**actual** [4] - 8:11, 10:9, 13:6, 30:25
**added** [1] - 39:2
**additional** [1] - 27:5
**address** [4] - 10:17, 27:24, 32:25, 35:5
**addressed** [1] - 24:3
**addresses** [2] - 8:23, 17:18
**adequately** [1] - 14:11
**adhere** [2] - 31:20, 31:24
**adjourned** [2] - 42:5, 42:6
**adjudicate** [1] - 21:8
**adjusted** [1] - 6:4
**administrative** [1] - 7:22
**adult** [1] - 30:12
**adults** [2] - 25:8, 26:11
**advantage** [3] - 33:19, 34:11, 34:12
**adversarial** [1] - 6:13
**affect** [1] - 4:1
**affected** [1] - 25:16
**affirm** [1] - 8:5
**affirmatively** [1] - 6:16
**affirmed** [1] - 21:1
**afoul** [1] - 21:6
**agencies** [3] - 12:1, 15:8, 16:12
**agency** [7] - 19:9, 19:10, 19:25, 20:4, 20:5, 25:25, 30:24
**agree** [6] - 11:12, 37:24, 38:16, 39:1, 41:23
**agreement** [17] - 7:9, 8:21, 9:4, 20:22, 20:23, 22:19, 22:20, 30:9, 30:11, 33:21, 37:20, 38:2, 38:14, 38:15, 38:24, 39:2, 39:3
**agreements** [1] - 17:14
**aKtranscripts.com** [1] - 1:25
**al** [3] - 1:12, 3:6, 3:9
**Alien** [1] - 9:17
**all-encompassing** [1] - 17:21
**allocations** [1] - 31:16
**allow** [1] - 18:1
**allowed** [2] - 31:5, 32:8
**amount** [2] - 10:13, 28:15
**analysis** [3] - 14:12, 21:18, 26:14
**Angeles** [3] - 1:17, 1:24, 2:5
**Anne** [1] - 43:11

**ANNE** [1] - 1:22
**anne.kielwasser@gmail.com** [1] - 1:25
**answer** [1] - 27:6
**answers** [1] - 3:17
**anticipated** [1] - 12:15
**apologize** [2] - 3:14, 39:6
**appeal** [1] - 39:13
**appear** [7] - 5:1, 5:15, 5:20, 11:21, 16:8, 16:17, 24:17
**appearances** [1] - 3:7
**appearing** [1] - 16:12
**application** [1] - 6:10
**applied** [2] - 6:16, 27:14
**applies** [2] - 4:10, 5:7
**apply** [1] - 25:1
**applying** [1] - 20:20
**appropriate** [2] - 16:14, 25:6
**arbitrary** [1] - 34:24
**area** [2] - 12:20, 17:16
**argue** [1] - 33:17
**argued** [1] - 21:17
**argument** [3] - 6:7, 8:20, 41:21
**arise** [3] - 12:11, 23:13, 36:6
**arrest** [1] - 5:16
**arrested** [1] - 5:12
**aspect** [1] - 22:3
**aspects** [1] - 21:24
**asserting** [1] - 6:6
**assess** [5] - 12:18, 13:5, 13:6, 14:1, 19:11
**assessment** [1] - 15:10
**assessments** [3] - 9:24, 13:10, 14:24
**assistant** [3] - 18:6, 18:15, 19:18
**assume** [2] - 24:23, 41:20
**asylum** [8] - 6:2, 6:6, 6:10, 6:12, 6:16, 6:18
**attached** [2] - 20:9, 24:14
**attention** [2] - 4:13, 30:22
**attorney** [1] - 18:22
**authorities** [1] - 22:23
**authority** [10] - 9:10, 14:19, 15:3, 15:4, 15:14, 22:25, 23:5, 23:7, 24:21, 36:15
**available** [1] - 12:3

**avoid** [2] - 21:12, 41:19
**avoidance** [1] - 21:2
**aware** [2] - 23:22, 24:14

## B

**baby** [1] - 35:6
**barely** [1] - 31:22
**bargained** [2] - 33:20, 34:10
**based** [1] - 13:23
**basic** [1] - 39:15
**bath** [1] - 35:6
**begin** [2] - 28:1, 36:14
**beginning** [1] - 29:7
**behalf** [3] - 3:9, 3:12, 3:20
**BEHALF** [2] - 2:3, 2:10
**behavior** [1] - 19:1
**believes** [1] - 30:13
**Ben** [1] - 2:13
**benefit** [1] - 25:10
**best** [4] - 16:23, 17:6, 18:16, 41:25
**better** [1] - 32:2
**between** [2] - 4:23, 30:6
**BIA** [8] - 7:17, 7:20, 8:2, 12:24, 13:2, 24:2, 24:19, 25:2
**BIA's** [2] - 23:24, 25:5
**big** [1] - 28:10
**blown** [1] - 39:12
**bond** [58] - 4:20, 7:8, 7:13, 8:23, 9:5, 9:8, 9:10, 9:13, 10:10, 10:12, 10:13, 10:19, 12:4, 12:6, 14:17, 14:19, 15:16, 16:13, 17:12, 17:22, 22:3, 22:13, 22:14, 22:20, 22:24, 23:2, 23:6, 23:8, 23:10, 23:11, 23:15, 23:20, 24:1, 24:6, 24:9, 24:13, 24:18, 24:21, 24:22, 28:1, 28:2, 28:9, 28:10, 28:15, 28:16, 32:6, 33:2, 33:3, 34:17, 35:3, 35:13, 35:19, 36:3, 36:6, 36:13, 36:17
**bonds** [3] - 10:13, 23:9, 23:10
**Boteo** [3] - 6:15, 28:25, 32:17
**Boteo's** [1] - 30:25

Boulevard [1] - 2:5
Box [1] - 2:13
branches [1] - 16:11
brief [2] - 8:5, 11:2
briefing [1] - 39:13
briefs [1] - 21:17
broiling [1] - 8:10
brought [1] - 30:21
Bryan [1] - 34:16
bunch [1] - 41:19
burdens [1] - 31:16
bureaucracy [1] - 36:23

C

c)(3 [1] - 9:24
CA [1] - 2:5
CALIFORNIA [1] - 1:2
California [2] - 1:17, 1:24
cannot [2] - 26:11, 29:3
canon [1] - 21:2
care [8] - 14:20, 22:2, 22:5, 26:15, 27:14, 27:17, 35:24, 39:12
carefully [1] - 22:18
Carlos [2] - 2:4, 3:8
carry [1] - 22:2
Casas [1] - 17:24
Casas-Castrillon [1] - 17:24
case [17] - 6:8, 6:9, 7:20, 8:8, 14:9, 21:19, 23:16, 24:2, 24:23, 24:24, 28:24, 28:25, 30:24, 30:25, 34:15, 36:13, 37:23
cases [4] - 4:12, 4:24, 5:16, 30:21
Castrillon [1] - 17:24
Center [1] - 2:4
CENTRAL [1] - 1:2
certain [4] - 13:9, 13:10, 21:3, 41:21
certainly [2] - 12:17, 24:18, 33:16
certify [1] - 43:2
cetera [1] - 10:14
CFR [2] - 19:20, 20:11
challenge [2] - 18:12, 20:24
changed [3] - 32:12, 32:13
changes [2] - 19:1, 19:2
changing [1] - 36:22
charged [1] - 43:5

check [1] - 7:3
checks [1] - 18:19
child [27] - 4:17, 10:16, 12:8, 13:25, 14:1, 14:6, 16:23, 17:2, 17:4, 18:16, 18:21, 18:24, 19:6, 19:9, 19:13, 23:17, 24:19, 26:15, 27:12, 28:6, 31:24, 32:1, 32:5, 32:7, 32:9, 34:8
child's [3] - 18:22, 19:1, 19:2
Children [1] - 9:17
children [16] - 4:1, 5:10, 5:11, 23:3, 25:7, 25:10, 25:12, 25:14, 28:21, 30:22, 31:2, 32:16, 33:8, 34:11, 35:3, 36:11
circuit [2] - 17:23, 43:5
Circuit [3] - 7:5, 22:18, 36:20
cited [2] - 8:4, 34:16
claim [3] - 21:1, 21:8, 26:7
clarification [2] - 3:18, 40:7
class [4] - 4:11, 4:12, 4:24, 7:22
Clause [1] - 17:14
clear [1] - 31:18
cleared [1] - 25:2
clearly [2] - 30:1, 33:18
CLERK [2] - 3:5, 42:5
client [2] - 13:14, 38:4
client's [1] - 39:20
close [1] - 19:8
coexist [1] - 12:3
comfortably [1] - 12:4
coming [2] - 8:14, 37:9
commonly [1] - 5:17
competent [1] - 27:14
complete [1] - 20:15
completely [1] - 17:12
compliance [1] - 36:23
complications [1] - 38:23
concept [1] - 12:4
concern [1] - 27:23
concerned [2] - 26:1, 39:8, 39:9
concert [2] - 17:8, 19:4
conditions [1] - 32:23

conduct [2] - 23:6, 40:12
conducted [3] - 9:25, 27:3, 27:15
confer [2] - 40:23, 41:16
conference [2] - 37:8, 43:7
conflicting [1] - 35:20
conflicts [1] - 35:5
conformance [1] - 43:6
confusion [1] - 36:18
Congress [1] - 22:7
consider [4] - 15:10, 15:11, 15:18, 27:10
considerations [1] - 15:19
considered [2] - 13:24, 27:9
conspicuously [1] - 17:22
Constitution [1] - 21:6
Constitutional [2] - 2:4, 21:12
constitutional [1] - 17:25, 21:2
constitutionality [1] - 21:8
construe [4] - 15:24, 18:1, 21:3, 21:5
contend [2] - 21:10, 21:16
contending [1] - 20:17
contention [1] - 4:17
contest [1] - 32:24
continued [1] - 29:21
contract [2] - 17:17, 21:4
contrary [1] - 30:2
convincing [1] - 31:18
Cooper [1] - 35:8
Cooper's [2] - 7:20, 8:8
coordinate [2] - 12:1, 16:11
coordination [1] - 12:2
copy [1] - 20:6
corners [1] - 22:19
correct [16] - 4:9, 4:20, 4:21, 6:22, 7:25, 8:16, 23:21, 29:18, 33:8, 35:25, 36:4, 36:11, 36:13, 43:2
correspondence [1] - 4:22
Counsel [1] - 3:7
counsel [5] - 3:14,

3:19, 40:8, 40:23, 41:10
counsel's [1] - 4:13
countries [1] - 7:14
country [3] - 7:5, 7:6, 32:1
County [2] - 6:18, 32:22
couple [1] - 37:21
COURT [78] - 1:1, 3:5, 3:10, 3:13, 3:23, 4:6, 4:15, 5:9, 5:19, 5:21, 5:24, 6:2, 6:20, 6:24, 7:4, 7:7, 7:24, 8:1, 8:9, 8:13, 8:17, 9:19, 10:6, 11:17, 11:24, 14:15, 14:25, 15:20, 16:10, 17:9, 18:9, 18:17, 19:13, 19:20, 20:6, 20:10, 20:17, 20:25, 21:12, 22:11, 23:2, 23:13, 23:17, 24:7, 25:4, 25:13, 25:23, 26:16, 27:21, 28:21, 29:12, 29:16, 32:25, 33:12, 33:15, 33:24, 34:1, 34:3, 35:8, 35:12, 35:22, 36:1, 36:5, 36:10, 37:5, 37:19, 38:7, 38:19, 39:4, 39:8, 40:4, 40:14, 40:22, 41:1, 41:4, 41:18, 42:2, 42:5
court [4] - 12:22, 16:18, 17:3, 17:5
Court [8] - 1:23, 10:4, 20:6, 22:17, 35:4, 42:5, 42:6, 43:11
court's [1] - 8:10
Court's [2] - 30:22, 36:21
courts [1] - 11:22
create [8] - 11:3, 11:6, 17:7, 17:9, 17:20, 18:4, 18:7
created [1] - 9:3
creating [1] - 11:16, 12:11, 22:1
crholguin@ centerforhumanrights .org [1] - 2:7
criminal [2] - 14:1, 14:2
CRR [2] - 1:22, 43:11
CSR [2] - 1:22, 43:11
current [1] - 33:1
custodian [22] - 10:1, 10:5, 13:11, 13:16, 14:4, 14:5, 14:10,

14:14, 17:1, 17:5, 18:12, 19:12, 26:15, 27:13, 27:16, 30:8, 30:12, 33:10, 33:11, 33:23
custodians [2] - 30:23, 31:13
custody [30] - 8:6, 9:9, 9:11, 9:16, 9:23, 11:4, 11:10, 11:19, 12:21, 13:6, 13:7, 16:5, 16:8, 16:21, 19:4, 19:19, 22:2, 22:4, 22:5, 24:25, 25:12, 28:11, 28:12, 28:13, 28:20, 29:2, 32:19, 34:16, 36:8
CV [1] - 3:5

D

daily [1] - 39:11
danger [2] - 13:23, 26:24
dangerous [11] - 5:1, 14:12, 28:19, 29:23, 31:2, 33:9, 34:9, 34:13, 34:18, 34:22, 34:23
dangerousness [9] - 5:4, 12:16, 13:5, 14:12, 15:12, 30:7, 30:14, 30:18, 31:18
date [1] - 40:20
Date [1] - 43:11
deal [1] - 14:11
dealing [2] - 4:16, 37:1
dealt [1] - 14:3
decide [2] - 38:12, 41:21
decided [4] - 24:20, 40:18, 41:15, 41:16
deciding [1] - 41:11
decision [36] - 7:24, 10:4, 12:18, 12:25, 13:1, 13:6, 13:7, 13:8, 15:15, 16:6, 16:8, 18:11, 19:19, 22:24, 23:7, 23:19, 23:22, 23:24, 24:9, 24:12, 24:21, 24:22, 25:3, 26:23, 27:1, 27:7, 27:18, 27:19, 28:20, 29:2, 29:12, 29:15, 30:25, 31:21, 36:3, 36:21
decisions [8] - 8:2, 8:7, 9:11, 12:19,

12:21, 16:5, 22:6, 24:5
**declarant** [1] - 14:16
**declarants** [1] - 15:22
**declaration** [1] - 32:17
**declarations** [2] - 4:6, 4:8
**declined** [1] - 35:15
**DEFENDANT** [1] - 2:10
**defendants** [2] - 1:13, 3:12
**defense** [1] - 6:9
**definitely** [1] - 7:21
**delay** [1] - 3:14
**denied** [2] - 4:25, 7:22
**department** [1] - 18:19
**Department** [1] - 2:12
**deposit** [1] - 43:6
**deprived** [1] - 26:20
**described** [1] - 15:20
**describes** [1] - 32:22
**detain** [1] - 37:3
**detained** [7] - 4:19, 9:1, 25:17, 25:20, 30:22, 31:10, 32:16
**detention** [13] - 8:25, 10:18, 10:21, 15:2, 15:23, 15:25, 26:22, 28:5, 29:13, 29:17, 29:21, 31:11, 36:21
**determination** [17] - 9:8, 11:19, 14:8, 14:17, 19:4, 19:14, 19:19, 23:11, 24:13, 25:6, 26:17, 26:20, 28:1, 28:22, 31:4, 35:23
**determinations** [2] - 18:7, 23:2
**determine** [5] - 12:5, 12:7, 12:15, 15:5, 26:22
**determining** [3] - 7:15, 13:10, 28:11
**developed** [1] - 11:3
**DHHS** [1] - 28:5
**DHS** [4] - 9:7, 9:9, 11:22, 22:24
**different** [7] - 7:14, 8:13, 8:24, 13:21, 14:9, 21:7, 22:6
**differently** [1] - 8:14
**difficulties** [1] - 11:21
**Diouf** [1] - 17:24
**disagrees** [1] - 19:14
**discretionary** [1] - 9:9
**discussion** [1] - 37:17
**dispute** [2] - 20:21, 38:7

**distinction** [1] - 30:6
**DISTRICT** [2] - 1:1, 1:2
**document** [1] - 2:13
**DOLLY** [1] - 1:4
**done** [3] - 4:25, 9:8, 20:5
**doubt** [1] - 21:22
**down** [5] - 8:14, 19:6, 19:8, 37:23, 38:9
**drafted** [1] - 21:23
**drug** [3] - 13:25, 14:3, 14:11
**due** [21] - 10:20, 10:24, 15:2, 15:6, 15:20, 15:25, 16:5, 18:2, 18:4, 20:18, 20:21, 21:1, 21:20, 22:8, 25:7, 26:6, 26:21, 27:1, 27:5, 30:1, 32:3

**E**

**e-mail** [2] - 2:7, 2:15
**easier** [2] - 37:11, 41:14
**effect** [1] - 17:14
**efforts** [1] - 34:7
**either** [3] - 4:17, 13:14, 29:2
**eliminate** [1] - 35:9
**enacted** [2] - 7:7, 21:21
**encompassing** [1] - 17:21
**end** [3] - 30:14, 33:22, 35:12
**enforce** [1] - 20:23
**ensure** [4] - 17:2, 17:4, 18:15, 20:14
**entire** [2] - 9:16, 38:15
**entirely** [6] - 11:11, 11:19, 15:18, 16:7, 16:21, 27:8
**entirety** [2] - 11:6, 25:11
**entitled** [2] - 31:6, 31:7
**essentially** [1] - 29:5
**estimate** [2] - 6:25, 7:3
**et** [4] - 1:12, 3:6, 3:9, 10:13
**evaluated** [1] - 29:10
**evaluations** [2] - 29:8, 29:9
**evidence** [7] - 27:10, 29:20, 29:22, 31:4, 31:6, 31:18, 31:23

**evidentiary** [4] - 40:12, 41:6, 41:7, 41:20
**evolved** [1] - 15:8
**exactly** [10] - 11:18, 14:21, 18:17, 22:11, 33:25, 34:2, 34:4, 38:18, 41:24
**example** [6] - 4:3, 6:3, 10:11, 13:22, 13:25, 19:5
**examples** [1] - 25:19
**exercise** [1] - 35:15
**Exhibit** [1] - 20:12
**exhibits** [1] - 20:9
**existed** [2] - 9:12, 33:21
**existence** [1] - 30:9
**existing** [2] - 10:10, 10:11
**expected** [1] - 3:15
**explanation** [1] - 32:14
**explicitly** [1] - 22:12
**extent** [1] - 27:4

**F**

**Fabian** [5] - 2:11, 3:12, 8:18, 27:25, 36:10
**FABIAN** [42] - 3:11, 9:2, 9:20, 10:25, 11:18, 12:9, 14:21, 15:6, 16:2, 16:15, 18:3, 18:11, 18:23, 19:16, 19:22, 20:8, 20:12, 20:19, 21:10, 21:14, 22:14, 23:4, 23:16, 23:21, 24:10, 25:9, 25:22, 25:24, 26:25, 36:4, 37:10, 37:25, 38:17, 38:21, 39:6, 39:19, 40:6, 40:19, 40:25, 41:3, 41:9, 41:23
**FLORES** [1] - 1:8
**Fly** [1] - 31:9
**focus** [1] - 16:22
**folks** [3] - 37:19, 38:13, 40:15
**follow** [1] - 17:3
**foregoing** [1] - 43:2
**forgetting** [1] - 35:9
**formally** [2] - 29:17, 29:19
**forth** [1] - 29:9
**forward** [1] - 40:5
**four** [1] - 22:19
**framework** [11] - 9:3, 9:12, 9:13, 9:16, 11:16, 12:12, 14:23, 15:18, 16:19, 25:1, 27:8
**Francisco** [1] - 6:18
**Franklin** [1] - 2:13
**freakishness** [1] - 34:24
**free** [1] - 35:4
**FRIDAY** [2] - 1:17, 3:1
**frustration** [1] - 40:1
**full** [1] - 39:12
**full-blown** [1] - 39:12

41:13
**familiar** [1] - 17:23
**family** [1] - 36:21
**far** [1] - 8:7
**Fax** [2] - 2:6, 2:14
**Federal** [1] - 1:23
**fee** [1] - 43:5
**fees** [1] - 43:5
**few** [1] - 11:21
**fewer** [1] - 5:3
**figure** [2] - 21:4, 37:2
**file** [4] - 19:16, 20:15, 40:17, 40:23
**filed** [1] - 6:15
**final** [1] - 28:5
**finalize** [1] - 41:24
**finally** [1] - 32:21
**fine** [3] - 29:9, 29:10, 29:11
**first** [5] - 9:1, 25:9, 28:8, 41:7, 41:16
**fit** [1] - 33:10
**flight** [15] - 5:2, 5:4, 12:16, 13:5, 15:12, 16:24, 27:12, 29:23, 30:7, 30:14, 30:18, 31:19, 33:9, 34:8, 34:19
**Flores** [11] - 3:6, 3:9, 7:9, 8:21, 10:3, 11:14, 20:22, 20:23, 21:4, 21:23, 21:24

**G**

**GEE** [1] - 1:4
**generally** [1] - 6:8
**give-and-take** [1] - 18:21
**given** [10] - 6:11, 7:2, 16:10, 17:1, 17:22, 22:25, 24:20, 28:21, 29:19, 38:7
**God** [1] - 39:13
**govern** [2] - 11:4, 11:18
**government** [6] - 3:12, 20:21, 29:1, 30:16, 31:1, 35:2
**government's** [1] - 8:20
**governs** [2] - 9:16, 26:2
**gradual** [1] - 7:12
**grappling** [1] - 17:11
**great** [1] - 39:21
**grounds** [1] - 5:1
**guardian** [1] - 19:16
**Guatemala** [1] - 32:20
**guess** [2] - 40:4, 40:16
**guidance** [1] - 24:19

**H**

**hands** [1] - 11:20
**harm** [2] - 30:13, 32:16
**Hayes** [1] - 17:24
**Health** [1] - 11:24
**health** [3] - 18:18, 27:15, 27:16
**hear** [1] - 27:21
**heard** [2] - 37:4, 37:15
**hearing** [38] - 3:15, 4:20, 8:23, 9:5, 9:6, 9:11, 10:19, 12:4, 14:18, 16:9, 16:13, 18:2, 23:6, 23:12, 23:15, 24:18, 25:23, 26:22, 27:5, 28:2, 28:9, 28:10, 28:11, 31:5, 32:2, 32:6, 33:2, 37:9, 39:12, 40:5, 40:9, 40:12, 41:1, 41:6, 41:7
**Hearing** [1] - 1:16
**hearings** [1] - 7:8, 7:13, 9:14, 10:10, 10:12, 17:12, 17:22, 22:3, 22:13, 22:15, 22:21, 24:1, 35:4

heart [1] - 34:25
Hector [4] - 6:15, 28:25, 30:25, 32:17
held [8] - 4:3, 4:8, 4:11, 4:24, 5:6, 6:25, 15:23, 32:24
hereby [1] - 43:2
HHS [41] - 9:23, 11:20, 11:21, 11:22, 11:25, 12:6, 13:6, 13:9, 13:14, 13:23, 13:24, 14:1, 14:7, 15:4, 15:14, 15:17, 15:19, 16:8, 16:10, 16:17, 16:20, 16:22, 17:3, 17:7, 18:5, 18:7, 21:20, 22:6, 23:9, 23:11, 25:1, 25:12, 26:9, 26:16, 27:3, 27:9, 27:10, 27:12, 27:20, 30:17
HHS's [8] - 12:18, 12:21, 15:15, 16:8, 19:14, 20:20, 21:10, 24:25
highlights [1] - 38:23
himself [1] - 26:24
history [2] - 11:1, 14:1
hold [1] - 40:14
holding [2] - 33:8, 33:10
HOLGUIN [33] - 3:8, 3:22, 4:5, 4:9, 4:21, 5:14, 5:20, 5:22, 6:1, 6:8, 6:23, 7:1, 7:6, 7:11, 7:25, 8:3, 8:12, 8:16, 28:7, 28:23, 29:14, 29:18, 33:7, 33:14, 33:16, 33:25, 34:2, 34:4, 35:11, 35:14, 35:25, 36:7, 36:12
Holguin [9] - 2:4, 3:9, 3:20, 12:25, 20:8, 24:2, 25:11, 25:14, 27:22
Holguin's [1] - 20:13
Honor [42] - 3:8, 3:11, 3:22, 4:5, 4:9, 4:21, 6:23, 8:12, 9:2, 10:25, 12:9, 12:14, 13:4, 13:14, 15:6, 16:2, 18:3, 20:19, 21:14, 25:9, 26:4, 28:7, 28:23, 29:14, 33:7, 34:4, 34:5, 34:25, 35:14, 37:10, 37:12, 37:15, 37:16, 37:25, 38:17, 39:6, 39:19, 39:23, 40:6,

40:19, 40:25, 41:9
Honor's [3] - 30:5, 39:22, 40:1
HONORABLE [1] - 1:4
hoped [1] - 40:7
hopes [1] - 40:15
hours [1] - 5:16
HSS [1] - 33:5
Human [2] - 2:4, 11:24
human [1] - 18:19

I

I-G-I-H-O-Z-O [1] - 23:18
ICE [5] - 28:15, 28:18, 34:17, 36:7, 36:13
idea [1] - 16:20
Igihozo [4] - 14:16, 23:18, 24:8, 35:10
IJ [3] - 12:5, 14:17, 26:22
IJs [1] - 8:6
imagine [1] - 40:12
immediately [2] - 7:10, 7:11
Immigration [1] - 2:12
immigration [58] - 7:13, 7:19, 8:10, 8:14, 9:10, 11:22, 12:5, 12:13, 12:15, 12:17, 12:21, 13:5, 13:22, 14:18, 15:9, 15:12, 15:16, 16:4, 16:6, 16:7, 16:9, 16:17, 16:21, 16:24, 17:3, 17:5, 22:4, 22:23, 22:25, 23:1, 23:5, 23:7, 24:1, 24:5, 24:16, 24:17, 24:20, 26:1, 26:25, 27:5, 27:11, 27:18, 28:4, 28:14, 28:19, 30:7, 30:15, 31:17, 31:21, 33:2, 34:13, 34:18, 35:15, 35:16, 35:21, 36:2
impact [4] - 24:24, 27:1, 27:19, 36:23
impede [1] - 5:4
impediment [1] - 35:2
implemented [1] - 21:25
imply [2] - 12:2, 17:25
imposes [1] - 36:13
improve [2] - 30:3
INA [2] - 11:8, 11:11
including [1] - 34:12
indefinite [1] - 15:25

indefinitely [1] - 37:3
independent [1] - 16:7
individual [4] - 13:23, 24:23, 28:12, 28:15
individuals [7] - 9:8, 13:15, 18:13, 21:22, 23:25, 25:24, 27:6
infinitum [1] - 37:3
initiation [1] - 5:18
INS [4] - 9:7, 9:9, 22:23, 30:12
instances [1] - 24:4
instead [2] - 22:5, 39:10
institute [1] - 38:25
intended [1] - 11:13
intent [1] - 30:2
intention [1] - 11:6
interest [5] - 16:23, 17:7, 30:17, 31:10, 31:11
interested [1] - 16:22
interpretation [1] - 25:5
interpreting [1] - 38:24
interview [2] - 6:12, 6:19
intricately [2] - 13:8, 13:20
involved [1] - 4:13
involving [3] - 16:24, 35:9, 39:11
irreparable [1] - 32:15
issue [11] - 8:23, 8:25, 10:18, 17:18, 21:13, 23:9, 24:21, 28:5, 40:3, 40:9, 41:22
issued [4] - 5:15, 23:10, 24:6, 24:19
issues [29] - 4:16, 5:3, 12:11, 15:3, 18:1, 27:24, 30:14, 30:21, 33:7, 33:18, 37:21, 37:22, 37:23, 38:2, 38:6, 38:12, 38:15, 39:11, 39:15, 39:17, 39:18, 39:25, 40:10, 40:16, 41:8, 41:13, 41:16, 41:20
it'd [1] - 31:17
Item [1] - 3:5
items [1] - 38:16
itself [2] - 19:21, 30:11

J

Jennie [1] - 3:6
JENNY [1] - 1:8

Jenny [1] - 3:9
joint [1] - 40:23
Judge [1] - 38:18
JUDGE [1] - 1:4
judge [32] - 8:15, 12:5, 12:17, 13:5, 13:22, 14:18, 15:12, 16:4, 16:6, 16:7, 16:9, 22:25, 23:1, 23:5, 24:18, 24:20, 26:25, 27:5, 27:12, 28:4, 28:14, 28:19, 30:15, 31:17, 31:21, 33:3, 34:13, 34:18, 35:15, 35:16, 36:2
judge's [1] - 27:18
judges [12] - 7:14, 7:19, 9:10, 12:13, 12:15, 15:3, 15:9, 15:16, 24:1, 24:6, 30:7, 35:21
judicial [1] - 43:7
jurisdiction [8] - 6:21, 7:16, 7:19, 8:6, 15:13, 32:1, 35:15, 35:17
jurisdictional [1] - 12:11
jurisdictions [1] - 8:13
Justice [1] - 2:12
justified [1] - 29:21
juvenile [1] - 34:21
juveniles [1] - 31:10

K

keep [1] - 35:9
kidnapped [2] - 32:18, 32:19
KIELWASSER [1] - 1:22
Kielwasser [2] - 43:10, 43:11
kind [9] - 8:10, 10:19, 10:24, 18:21, 31:5, 34:24, 35:2, 35:20, 36:16
kinds [1] - 39:18
King [1] - 38:18
knowing [2] - 32:8, 32:23
knowledge [1] - 23:10
knows [1] - 39:13

L

language [5] - 10:9, 10:12, 10:23, 11:13, 11:15

languishes [1] - 34:16
lap [1] - 39:5
large [1] - 37:21
last [6] - 32:12, 35:10, 37:19, 40:8, 41:10, 41:18
lasted [1] - 3:15
latest [1] - 25:5
law [10] - 6:11, 8:7, 10:10, 10:11, 17:15, 17:16, 17:17, 17:18, 17:22, 24:2
Law [1] - 2:4
lawsuit [1] - 26:8
lay [1] - 38:9
least [2] - 15:2, 38:4
leave [1] - 37:7
lectern [2] - 3:24, 37:11
left [3] - 29:5, 29:24, 41:10
legal [4] - 40:10, 41:12, 41:16, 41:22
legislative [1] - 11:1
less [4] - 19:8, 25:7, 33:17, 43:5
letter [3] - 19:17, 31:14
level [2] - 4:10, 18:4
levels [1] - 13:18
licensed [1] - 5:3
light [1] - 38:8
likely [1] - 41:6
limited [1] - 12:19
line [1] - 20:1
link [1] - 20:16
list [1] - 33:24
Litigation [1] - 2:12
litigation [1] - 39:18
look [16] - 6:14, 9:3, 10:3, 11:1, 13:24, 18:20, 22:18, 28:4, 28:8, 28:25, 30:11, 30:20, 31:22, 31:23, 32:17, 34:15
looked [1] - 20:14
looking [1] - 30:18
looks [1] - 18:19
Loretta [1] - 3:6
LORETTA [1] - 1:12
Los [3] - 1:17, 1:24, 2:5
Lynch [1] - 3:6
LYNCH [1] - 1:12

M

mail [2] - 2:7, 2:15
maintenance [1] -

5

39:11
**majority** [3] - 4:12, 25:12, 25:14
**materials** [1] - 6:14
**matter** [8] - 4:12, 5:5, 10:19, 35:1, 37:6, 39:15, 42:3, 43:4
**mean** [10] - 11:20, 13:21, 18:17, 18:18, 22:17, 25:22, 34:16, 36:19, 38:11, 38:12
**meaningful** [1] - 37:4
**meet** [1] - 40:23
**member** [1] - 4:11
**members** [2] - 4:24, 7:22
**mental** [1] - 27:15
**mentioned** [2] - 4:8, 23:14
**merely** [1] - 28:14
**message** [1] - 41:10
**Mexico** [1] - 32:19
**might** [10] - 13:5, 14:1, 14:3, 14:5, 14:10, 19:6, 19:7, 24:19, 24:20, 30:13
**mind** [2] - 32:12, 32:13
**minimum** [1] - 10:13
**minor** [10] - 13:10, 14:8, 14:20, 24:15, 27:14, 27:17, 30:12, 30:13, 35:24, 36:14
**minors** [16] - 4:2, 4:14, 5:2, 5:6, 5:8, 6:10, 6:15, 6:24, 10:1, 10:4, 18:8, 22:2, 22:9, 24:16, 30:4, 37:3
**minute** [1] - 32:12
**missed** [2] - 10:23, 40:8
**modify** [1] - 35:5
**moment** [2] - 3:18, 33:1
**monitoring** [1] - 39:23
**month** [1] - 29:7
**months** [3] - 15:23, 25:20, 38:13
**morning** [4] - 3:8, 3:10, 3:11, 3:13
**most** [6] - 4:24, 5:16, 24:5, 24:16, 25:2, 36:12
**mostly** [1] - 5:6
**mother** [6] - 29:3, 29:4, 29:10, 29:23, 33:4, 33:5
**motion** [4] - 4:1, 20:22, 39:25, 40:11

**Motion** [1] - 1:16
**MR** [33] - 3:8, 3:22, 4:5, 4:9, 4:21, 5:14, 5:20, 5:22, 6:1, 6:8, 6:23, 7:1, 7:6, 7:11, 7:25, 8:3, 8:12, 8:16, 28:7, 28:23, 29:14, 29:18, 33:7, 33:14, 33:16, 33:25, 34:2, 34:4, 35:11, 35:14, 35:25, 36:7, 36:12
**MS** [42] - 3:11, 9:2, 9:20, 10:25, 11:18, 12:9, 14:21, 15:6, 16:2, 16:15, 18:3, 18:11, 18:23, 19:16, 19:22, 20:8, 20:12, 20:19, 21:10, 21:14, 22:14, 23:4, 23:16, 23:21, 24:10, 25:9, 25:22, 25:24, 26:25, 36:4, 37:10, 37:25, 38:17, 38:21, 39:6, 39:19, 40:6, 40:19, 40:25, 41:3, 41:9, 41:23
**must** [2] - 9:25, 12:1

## N

**name** [1] - 35:10
**narrow** [1] - 37:23
**narrowed** [1] - 33:8
**nationwide** [1] - 25:17
**nature** [1] - 38:7
**need** [4] - 4:23, 30:12, 30:14, 40:16
**needs** [3] - 21:18, 26:7, 27:2
**neglect** [1] - 30:13
**never** [6] - 23:9, 29:18, 31:3, 32:23
**new** [4] - 11:16, 17:20, 39:3
**next** [1] - 41:1
**night** [2] - 40:8, 41:10
**Ninth** [3] - 7:4, 22:17, 36:20
**nonsecure** [4] - 4:4, 4:18, 5:2, 33:13
**North** [1] - 1:23
**noted** [2] - 11:2, 12:13
**notice** [3] - 5:15, 5:20, 17:1
**NTA** [4] - 5:15, 5:17, 5:19, 5:23
**number** [9] - 9:23, 12:10, 13:15, 13:20, 25:15, 27:15, 37:21,

38:14
**numbers** [1] - 13:13

## O

**occasions** [1] - 7:18
**Occidental** [1] - 2:5
**October** [5] - 37:9, 40:5, 41:2, 41:3, 41:4
**OF** [3] - 1:2, 2:3, 2:10
**Office** [2] - 2:12, 6:21
**office** [1] - 6:18
**officer** [1] - 6:12
**official** [1] - 43:11
**Official** [1] - 1:23
**older** [1] - 20:2
**ON** [2] - 2:3, 2:10
**once** [4] - 5:17, 9:15, 18:11
**one** [12] - 6:15, 14:16, 20:9, 23:14, 23:23, 24:15, 27:9, 30:24, 37:17, 40:12, 40:24
**ongoing** [3] - 18:23, 18:24, 18:25
**operation** [2] - 17:15, 17:17
**opinions** [1] - 8:5
**opportunity** [2] - 32:24, 37:4
**opposing** [1] - 40:23
**option** [2] - 7:18, 35:7
**OR** [1] - 15:11
**order** [4] - 5:23, 39:22
**ordered** [1] - 39:23
**orders** [1] - 24:6
**ORR** [9] - 24:13, 31:19, 32:7, 32:22, 34:16, 34:20, 36:9, 36:14, 36:15
**ORR's** [4] - 16:5, 23:19, 31:8, 36:3
**Ortiz** [1] - 34:16
**OSC** [1] - 5:23
**otherwise** [2] - 8:2, 35:3
**ought** [2] - 28:16, 36:23
**outrageous** [1] - 38:13
**outside** [3] - 6:12, 11:11, 15:19
**overrule** [1] - 11:14
**oversight** [1] - 22:1
**overturned** [1] - 23:24
**own** [2] - 10:5, 31:8

## P

**paradigm** [2] - 31:21, 31:24
**paragraph** [5] - 4:3, 4:10, 5:7, 5:9, 34:3
**parent** [3] - 19:7, 19:9, 19:16
**parents** [2] - 19:10, 31:12
**parse** [1] - 41:12
**part** [8] - 10:7, 11:8, 16:20, 16:25, 26:12, 26:14, 28:10, 36:12
**partial** [2] - 37:14, 38:5
**partially** [1] - 38:5
**particular** [1] - 35:5
**parties** [7] - 33:20, 34:10, 37:16, 38:1, 38:22, 39:1, 39:16
**parts** [1] - 7:14
**pending** [1] - 40:11
**people** [6] - 4:7, 4:16, 15:20, 25:15, 25:19, 38:8
**people's** [1] - 39:11
**perhaps** [6] - 3:18, 5:1, 10:22, 27:24, 35:8, 40:22
**period** [2] - 7:8
**periods** [1] - 25:20
**permitted** [1] - 37:3
**person** [3] - 26:23, 28:18, 31:14
**perspective** [1] - 39:20
**pertinent** [1] - 10:13
**petition** [1] - 6:3
**picayune** [1] - 39:18
**piece** [2] - 27:9, 27:10
**place** [3] - 3:23, 9:1, 33:5
**placed** [9] - 4:14, 5:2, 10:17, 18:8, 18:13, 22:6, 28:6, 33:12, 36:7
**placement** [13] - 8:24, 10:15, 12:7, 12:19, 14:20, 15:5, 18:16, 19:6, 26:21, 33:17, 34:7, 35:24
**placements** [1] - 18:5
**placing** [1] - 11:19
**plaintiff** [2] - 1:10, 24:24
**PLAINTIFF** [1] - 2:3
**plaintiff's** [2] - 40:7, 41:10

**plaintiffs** [5] - 3:9, 3:21, 16:18, 22:17, 38:5
**PO** [1] - 2:13
**point** [2] - 11:12, 11:21
**pointed** [2] - 25:15, 34:12, 41:18
**points** [2] - 38:3
**policy** [1] - 36:21
**Policy** [1] - 31:9
**posit** [1] - 13:21
**position** [2] - 16:8, 41:15
**possibility** [1] - 37:18
**possible** [1] - 40:21
**potentially** [3] - 15:24, 17:25, 33:15
**practical** [7] - 4:11, 4:15, 5:5, 5:25, 18:9, 27:22, 35:3
**practicalities** [2] - 12:10, 32:25
**practically** [1] - 11:20
**preference** [1] - 41:14
**present** [1] - 31:5
**presented** [2] - 16:9, 29:20
**PRESIDING** [1] - 1:4
**prevent** [1] - 16:12
**previous** [1] - 3:15
**priorities** [1] - 34:1
**prison** [1] - 32:23
**problem** [8] - 12:10, 13:25, 14:3, 14:11, 14:15, 15:1, 28:24, 37:22
**problematic** [2] - 4:13, 25:21
**procedure** [3] - 20:18, 28:4, 31:8
**procedures** [9] - 11:11, 11:14, 19:24, 20:5, 20:20, 21:11, 22:7, 26:5, 30:3
**proceeding** [3] - 6:17, 10:24, 16:24
**proceedings** [9] - 5:10, 5:11, 5:13, 5:25, 6:5, 6:6, 16:22, 24:17, 43:3
**Proceedings** [1] - 1:16
**process** [23] - 5:18, 6:13, 10:20, 10:24, 15:2, 15:21, 15:25, 16:5, 16:25, 18:2, 18:5, 20:18, 20:21, 21:1, 21:20, 22:8, 25:7, 26:6, 26:22,

27:2, 27:5, 30:1, 32:3
**program** [1] - 14:7
**progress** [1] - 38:1
**progression** [1] - 7:12
**proof** [1] - 31:16
**propensities** [1] - 14:2
**proper** [4] - 14:4, 14:6, 20:21, 20:23
**propose** [1] - 13:4
**proposed** [2] - 13:11, 18:12
**protection** [1] - 25:7
**provide** [6] - 7:21, 9:5, 20:6, 22:1, 27:5, 27:9
**provided** [5] - 9:14, 21:20, 22:8, 22:22
**provides** [1] - 6:11
**providing** [6] - 16:5, 26:6, 35:3, 37:4, 39:21, 39:22
**provision** [1] - 17:13
**provisions** [1] - 12:3
**psychological** [2] - 29:8, 29:9
**published** [2] - 19:23, 19:24
**purposes** [2] - 5:25, 17:4
**pursuant** [3] - 7:9, 19:20, 22:22
**put** [2] - 20:1, 40:14
**puzzle** [1] - 27:10

**Q**

**questions** [3] - 3:17, 3:19, 8:18

**R**

**raise** [1] - 20:24
**raised** [3] - 21:19, 26:7, 27:25
**raising** [1] - 21:1
**rape** [1] - 32:19
**rated** [1] - 33:18
**rather** [2] - 19:7, 39:17
**reached** [3] - 37:20, 38:2, 38:14
**read** [1] - 8:21
**real** [1] - 35:2
**really** [5] - 34:25, 35:6, 36:22, 36:25, 39:24
**reason** [5] - 6:3, 13:19, 26:10, 29:19
**reasons** [1] - 27:15

**rebuttal** [1] - 31:6
**receive** [3] - 10:18, 24:8, 29:2
**received** [2] - 23:14, 24:12
**receiving** [4] - 18:24, 25:25, 26:3, 26:9
**recent** [1] - 23:22, 24:5, 25:2
**recently** [3] - 23:24, 23:25, 24:19
**recognize** [1] - 31:9
**recognized** [1] - 10:4
**recorded** [1] - 43:3
**redetermination** [17] - 9:5, 9:11, 9:14, 14:19, 15:17, 22:3, 22:14, 22:21, 23:6, 23:12, 23:15, 24:25, 28:2, 28:9, 28:10, 34:17, 35:4
**redetermine** [1] - 35:19
**redetermined** [1] - 22:24
**redetermining** [1] - 28:11
**reduction** [1] - 43:6
**refer** [1] - 5:10
**referred** [1] - 12:25
**referring** [1] - 11:25
**Refuge** [1] - 6:21
**refuses** [1] - 28:19
**regard** [3] - 10:10, 16:5, 23:3
**regardless** [1] - 4:10
**regular** [4] - 18:14, 25:25, 26:3, 26:9
**regulation** [1] - 16:16, 28:8
**regulations** [4] - 5:14, 19:24, 22:22, 43:7
**relate** [1] - 39:11
**related** [2] - 14:2, 23:8
**relates** [1] - 38:8
**relating** [1] - 15:2
**relations** [1] - 23:1
**relationship** [2] - 19:2, 19:11
**release** [22] - 4:25, 5:4, 7:23, 11:4, 11:11, 11:19, 12:19, 12:21, 13:8, 14:8, 15:14, 23:19, 24:6, 24:8, 24:12, 28:13, 28:19, 30:12, 31:11, 34:22, 36:3, 36:16
**released** [12] - 10:1, 10:5, 13:11, 13:16, 19:7, 26:12, 29:3,

29:4, 31:2, 32:11, 35:23
**releasing** [1] - 19:20
**relief** [1] - 4:23
**remain** [3] - 17:14, 19:3, 28:12
**remained** [2] - 37:21, 38:6
**remains** [2] - 18:16, 40:17
**remedy** [1] - 7:22
**removal** [9] - 5:10, 5:11, 5:12, 5:18, 5:25, 6:5, 6:6, 6:9, 6:17
**replace** [1] - 11:14
**report** [2] - 40:17, 40:24
**Reporter** [2] - 1:23, 43:11
**Reporter's** [1] - 1:16
**reports** [1] - 7:1
**represent** [1] - 11:22
**representation** [1] - 12:20
**representative** [2] - 18:18, 19:14
**request** [2] - 6:6, 24:18
**requested** [3] - 23:18, 23:19, 36:2
**requesting** [1] - 24:1
**required** [6] - 9:22, 9:23, 13:9, 22:19, 22:20, 28:17
**requirement** [1] - 17:2
**requires** [1] - 30:20
**requiring** [2] - 24:6, 36:16
**Resettlement** [1] - 6:22
**resolution** [1] - 39:14
**resolve** [1] - 39:17
**resolved** [2] - 39:10, 40:15
**resolving** [1] - 39:10
**resources** [1] - 15:7
**respect** [3] - 6:9, 15:6, 28:7
**respond** [1] - 6:5
**response** [1] - 27:22
**responsibility** [2] - 15:5, 26:17
**restriction** [1] - 5:8
**result** [1] - 15:25
**retain** [1] - 15:4
**returned** [1] - 32:20
**review** [24] - 8:6, 10:20, 14:19, 15:2, 15:4, 16:1, 18:5,

18:7, 18:14, 18:23, 19:11, 19:19, 23:18, 23:19, 25:25, 26:3, 26:9, 28:15, 30:7, 31:15, 35:16, 35:18, 36:1, 36:2
**reviewed** [2] - 30:15, 36:20
**reviewing** [1] - 16:6
**reviews** [1] - 28:16
**Rights** [1] - 2:4
**risk** [15] - 5:2, 5:4, 12:16, 13:5, 15:12, 26:24, 27:12, 29:23, 30:8, 30:14, 30:18, 31:19, 33:10, 34:8, 34:19
**Robbins** [1] - 17:24
**Rodriguez** [1] - 17:24
**Room** [1] - 1:23
**room** [1] - 38:8
**Rowanda** [1] - 23:17
**RPR** [2] - 1:22, 43:11
**rule** [1] - 8:11
**ruled** [2] - 7:18, 7:21
**rules** [1] - 31:22
**ruling** [1] - 3:17
**rulings** [1] - 15:11
**running** [1] - 21:6
**Rwanda** [1] - 14:17

**S**

**sake** [2] - 9:20, 41:20
**San** [1] - 6:18
**Sandra** [3] - 14:16, 23:14, 23:17
**Sarah** [2] - 2:11, 3:11
**sarah.b.fabian@ usdoj.gov** [1] - 2:15
**satisfies** [1] - 20:18
**Savings** [1] - 17:13
**scheme** [3] - 11:17, 17:20, 33:1
**Schey** [1] - 40:8
**scope** [1] - 3:25
**screenings** [1] - 27:16
**search** [1] - 34:6
**second** [3] - 28:3, 30:6, 39:25
**secretary** [4] - 18:6, 18:7, 18:15, 19:18
**secure** [17] - 4:8, 4:14, 4:18, 4:25, 5:7, 6:25, 13:16, 13:17, 18:5, 18:8, 18:14, 18:15, 19:6, 19:8, 25:17, 33:17, 34:14
**security** [1] - 4:10

**see** [4] - 3:16, 8:9, 8:22, 10:22
**seek** [1] - 4:20
**seem** [3] - 10:17, 12:2, 26:23
**sees** [1] - 18:20
**semblance** [1] - 10:20
**senate** [1] - 31:8
**send** [1] - 19:17
**sending** [1] - 19:17
**sense** [3] - 4:19, 38:20, 39:17
**separate** [6] - 16:21, 24:11, 26:6, 26:7, 27:7
**separately** [1] - 27:8
**SEPTEMBER** [2] - 1:17, 3:1
**serious** [1] - 38:11
**service** [1] - 22:4
**Services** [1] - 11:24
**services** [3] - 18:19, 18:24, 18:25
**set** [5] - 14:23, 20:5, 20:15, 28:15, 33:4
**sets** [1] - 9:16
**setting** [2] - 16:19, 33:18
**settle** [2] - 38:5
**settlement** [11] - 20:22, 20:23, 35:5, 36:24, 37:8, 37:12, 37:13, 37:14, 38:24, 39:3, 40:3
**shackles** [1] - 6:17
**shown** [2] - 29:22, 31:3
**signals** [1] - 35:21
**signed** [2] - 30:9, 33:21
**silent** [2] - 17:12, 17:22
**simplicity's** [1] - 9:20
**simply** [10] - 16:17, 23:5, 23:10, 24:25, 27:1, 27:7, 27:13, 27:14, 29:24, 37:3
**sister** [1] - 32:20
**situation** [8] - 14:16, 14:22, 19:12, 24:14, 28:22, 31:25, 32:24, 35:9
**situations** [1] - 19:2
**six** [2] - 15:23, 25:20
**small** [3] - 12:20, 13:15, 25:15
**someone** [3] - 6:2, 26:12, 32:6
**somewhat** [1] - 25:21
**soon** [4] - 5:12, 32:11,

40:21
**sorry** [1] - 39:7
**sort** [21] - 8:25, 12:11, 13:3, 13:8, 13:17, 13:20, 14:11, 14:21, 17:21, 18:25, 19:3, 19:10, 20:18, 25:10, 26:10, 27:22, 28:3, 36:25, 38:24, 40:14, 41:12
**sound** [2] - 4:7, 38:18
**sounds** [2] - 8:9, 8:24
**South** [1] - 1:7
**speaking** [1] - 3:20
**specific** [10] - 9:6, 10:12, 15:3, 17:18, 22:15, 22:21, 22:22, 23:1, 38:25, 39:1
**specifically** [5] - 8:23, 11:13, 11:15, 18:6, 24:3
**spend** [1] - 19:10
**spends** [1] - 32:22
**spent** [1] - 32:18
**sphere** [1] - 4:16
**split** [1] - 13:3
**Spring** [1] - 1:23
**staff** [2] - 13:17, 32:10
**stage** [1] - 40:2
**stand** [2] - 37:6, 42:3
**start** [1] - 16:19
**state** [1] - 8:7
**statement** [1] - 22:16
**STATES** [1] - 1:1
**states** [1] - 11:5
**States** [2] - 32:21, 43:7
**Station** [1] - 2:13
**status** [7] - 6:4, 26:1, 26:2, 37:7, 40:17, 40:24
**statute** [12] - 8:22, 15:24, 16:16, 17:10, 17:11, 18:1, 18:6, 21:3, 21:9, 21:21, 22:12
**stay** [2] - 13:16, 33:4
**stenographically** [1] - 43:3
**step** [1] - 24:8
**stepped** [2] - 19:6, 19:8
**sticking** [2] - 38:3
**still** [13] - 4:18, 6:4, 6:21, 7:8, 12:6, 13:6, 13:24, 14:24, 15:4, 26:17, 27:2, 27:19, 28:5
**stop** [2] - 7:9, 7:11
**stopping** [2] - 34:6,

34:7
**Street** [1] - 1:23
**strides** [1] - 39:21
**structure** [1] - 22:1
**struggled** [1] - 7:15
**subcommittee** [1] - 31:8
**subject** [1] - 4:3
**subjects** [1] - 39:13
**submits** [1] - 30:17
**submitted** [2] - 37:6, 42:4
**substantial** [4] - 34:11, 36:23, 37:20, 38:14
**sudden** [2] - 34:21, 34:22
**sufficient** [2] - 21:20, 26:6
**suggest** [1] - 41:14
**suggested** [1] - 8:2
**suggesting** [4] - 12:23, 13:4, 20:25, 26:19
**suggestion** [2] - 10:7, 11:2
**suggests** [1] - 10:23
**suitability** [4] - 9:24, 14:7, 14:13, 30:8
**suitable** [7] - 12:7, 18:20, 19:12, 30:23, 33:5, 33:23, 34:7
**supersede** [1] - 21:4
**superseded** [2] - 17:15, 17:17
**supersedes** [3] - 8:21, 10:9, 22:13
**supplemental** [1] - 20:16
**supports** [1] - 31:4
**supposed** [1] - 5:15
**supposedly** [1] - 31:15
**Supreme** [1] - 10:4
**surmise** [1] - 24:10
**surprising** [1] - 26:18
**system** [5] - 11:3, 11:6, 11:16, 13:4, 17:7

### T

**talks** [6] - 8:23, 10:15, 17:17, 28:8, 37:12, 41:11
**tel** [2] - 2:6, 2:14
**telephone** [1] - 1:24
**tend** [1] - 5:3
**tendered** [1] - 6:11

**tentative** [1] - 3:16
**term** [1] - 9:18
**termed** [1] - 5:17
**terminated** [1] - 37:12
**terms** [4] - 10:15, 18:10, 38:25, 39:2
**THE** [77] - 2:3, 2:10, 3:10, 3:13, 3:23, 4:6, 4:15, 5:9, 5:19, 5:21, 5:24, 6:2, 6:20, 6:24, 7:4, 7:7, 7:24, 8:1, 8:9, 8:13, 8:17, 9:19, 10:6, 11:17, 11:24, 14:15, 14:25, 15:20, 16:10, 17:9, 18:9, 18:17, 19:13, 19:20, 20:6, 20:10, 20:17, 20:25, 21:12, 22:11, 23:2, 23:13, 23:17, 24:7, 25:4, 25:13, 25:23, 26:16, 27:21, 28:21, 29:12, 29:16, 32:25, 33:12, 33:15, 33:24, 34:1, 34:3, 35:8, 35:12, 35:22, 36:1, 36:5, 36:10, 37:5, 37:19, 38:7, 38:19, 39:4, 39:8, 40:4, 40:14, 40:22, 41:1, 41:4, 41:18, 42:2
**themselves** [1] - 16:24
**therefore** [2] - 28:1, 35:18
**thinks** [1] - 16:13
**three** [2] - 32:18
**threshold** [2] - 8:25, 26:23
**throw** [1] - 38:15
**throwing** [1] - 35:6
**thrown** [1] - 39:4
**Thursday** [1] - 41:3
**tied** [3] - 13:8, 13:20, 14:13
**tightening** [1] - 7:13
**today** [2] - 3:17, 7:20
**together** [2] - 37:1, 40:17
**took** [1] - 22:5
**toothpaste** [1] - 38:9
**Transcript** [1] - 1:16
**transcript** [2] - 43:3, 43:5
**transferred** [2] - 36:8, 36:14
**transparency** [1] - 31:22
**traumatized** [1] - 32:17
**treated** [1] - 26:11

**treatment** [2] - 14:6, 30:3
**triggered** [2] - 5:13, 5:25
**true** [5] - 10:6, 30:19, 41:21, 41:23, 43:2
**truth** [1] - 35:1
**try** [1] - 41:12
**trying** [6] - 3:25, 17:9, 17:10, 21:4, 21:12, 38:25
**turning** [1] - 30:5
**turns** [3] - 34:17, 34:21, 34:22
**TV** [1] - 21:22
**TVPRA** [31] - 7:7, 8:21, 8:22, 9:4, 9:15, 10:9, 10:15, 10:22, 11:1, 11:2, 11:7, 11:8, 11:10, 12:1, 12:3, 13:9, 16:10, 16:20, 17:20, 18:4, 19:21, 20:4, 21:23, 21:25, 25:5, 25:6, 27:2, 27:20, 30:2, 30:20, 36:15
**TVPRAs** [1] - 25:11
**twist** [2] - 29:24, 32:8
**twisting** [1] - 29:5
**two** [9] - 7:18, 8:4, 13:17, 24:10, 27:24, 30:14, 38:13, 38:16
**type** [1] - 9:6
**typically** [1] - 30:7

### U

**UAC** [1] - 26:2
**UACs** [4] - 9:16, 9:17, 9:22, 11:4
**ultimate** [1] - 41:8
**ultimately** [1] - 13:15
**unaccompanied** [7] - 4:2, 4:17, 6:24, 22:9, 23:3, 32:7
**Unaccompanied** [1] - 9:17
**under** [8] - 9:24, 13:9, 23:1, 25:4, 25:6, 27:2, 27:19, 36:15
**unfortunately** [1] - 13:13
**UNITED** [1] - 1:1
**United** [2] - 32:21, 43:7
**unless** [1] - 17:14
**unpublished** [1] - 10:25
**unrelated** [1] - 25:25
**unsuitability** [1] -

29:22
**unwilling** [1] - 38:5
**up** [10] - 7:13, 9:16, 14:23, 16:19, 17:3, 20:5, 25:2, 33:22, 35:12, 37:9
**urging** [1] - 37:16
**US** [1] - 2:12
**uses** [1] - 10:12

### V

**vague** [1] - 38:24
**various** [1] - 27:15
**venue** [1] - 20:23
**versus** [3] - 3:6, 17:24, 30:8
**VHS** [1] - 17:7
**viable** [1] - 7:17
**views** [1] - 16:13
**vS** [1] - 1:11

### W

**Washington** [1] - 2:13
**waste** [2] - 15:7, 15:21
**wasted** [1] - 28:4
**water** [1] - 35:6
**week** [2] - 40:24, 42:1
**welfare** [1] - 31:24
**wether** [1] - 17:18
**whole** [1] - 41:19
**wind** [3] - 29:5, 29:25, 32:8
**window** [1] - 38:16
**wish** [3] - 21:5, 35:16, 35:17
**witnessed** [1] - 32:19
**wondering** [1] - 29:6
**word** [1] - 28:5
**words** [1] - 4:2
**works** [1] - 33:1
**world** [1] - 8:11
**worlds** [1] - 32:5
**worst** [1] - 32:4
**write** [1] - 31:14
**written** [1] - 30:25

### Y

**year** [4] - 29:1, 29:6, 29:21, 32:21
**years** [3] - 32:18, 39:14
**yesterday** [1] - 37:13
**Yolo** [2] - 6:17, 32:22